1    UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION

3              - - - - -

4

5   IN RE:                    )
                              )
6      NATIONAL PRESCRIPTION   )   CASE NO. 1:17CV2804
                              )
7      OPIATE LITIGATION       )

8

9              - - - - -

10   TRANSCRIPT OF TELECONFERENCE PROCEEDINGS HAD BEFORE

11   THE HONORABLE JUDGE DAN A. POLSTER, JUDGE OF SAID

12      COURT, ON WEDNESDAY, DECEMBER 13TH, 2017,

13         COMMENCING AT 1:00 O'CLOCK P.M.

14              - - - - -

15

16

17

18   Court Reporter:         GEORGE J. STAIDUHAR
                             801 W. SUPERIOR AVE.,
19                           SUITE 7-184
                             CLEVELAND, OHIO 44113
20                           (216) 357-7128

21

22

23

24

25

1    <u>Plaintiffs' Counsel Speakers:</u>

2    James C. Peterson, Esq.

3    Peter Weinberger, Esq.

4    Joe Rice, Esq.

5    Paul Hanly, Jr., Esq.

6    Paul Farrell, Jr., Esq.

7

8

9    <u>Defense Counsel Speakers:</u>

10   Mark Cheffo, Esq.

11   Enu Mainigi, Esq.

12   Tyler Tarney, Esq.

13

14

15   <u>Requests from Prospective Speakers:</u>

16   Lee Javins, Esq.

17   Steve Berman, Esq.

18   Frank Dudenhefer, Esq.

19   Dave Cates, Esq.

20   James Young, Esq.

21   Mark Troutman, Esq.

22   James R. Dugan, Esq.

23   Don Barrett, Esq.

24   Hunter Shkolnik, Esq.

25                - - - - -

3

P R O C E E D I N G S

THE COURT:  All right.  Good afternoon,
everyone.  And thanks for getting available on short
notice.  This is the initial telephone conference in
Opiate Litigation MDL No. 2804, and I do have a court
reporter who is going to transcribe this.

I want to do a couple housekeeping things at
the outset.  The master MDL docket is up and running, and
all or virtually all of the cases that have been
transferred into the MDL, approximately 146, have been
electronically transferred.

So if you have a filing in an individual
case, you should file it in the individual case.  If it
is a filing that pertains to more than one case, you
should file it in the master docket.

If any lawyer has an ECF account in any
federal court around the country, you don't need pro hac
vice status in our Court.  We could make a whole lot of
money, but we are not going to make it unnecessarily.  So
if you have an ECF account, you are in.  If any attorney
has already filed a notice of appearance in the
transferor Court, you need not file a new notice of
appearance in the MDL.  With your being added to a roster
of attorneys, a new attorney, you have got to file your
notice of appearance, and any new case that comes into

1    the MDL, obviously, you have to file a notice of

2    appearance.

3            So also, at the outset, I want to give a big

4    thanks to Jim Peterson of West Virginia and his staff,

5    including Pam Perkins and Aaron Herra, without their

6    help, we never would have been able to pull this

7    together.

8            MR. PETERSON:  Thank you, Judge.

9            THE COURT:  Oh, all right.  I want to

10   correct that.  We just received the first 65 cases that

11   were on the transferor order.  We haven't — there are a

12   lot of conditional transfers that haven't gone through

13   yet.  So we don't have those individual dockets in

14   Northern District of Ohio.  We do have individual case

15   dockets for the 65 government cases that were initially

16   transferred from the MDL.  All right.

17           There are a number of agenda items.  I guess

18   we can — the first thing, obviously, we are going to

19   have to organize this MDL.  We have, I think, three

20   categories of cases.  We have got the government — I

21   will call government plaintiff cases.  That would be

22   cities, counties.

23           States.  We have a category of cases filed

24   by other institutions, you know, ERISA pension, and

25   health and pension, welfare funds, et cetera, and then we

1    have some cases filed by individuals or groups of

2    individuals, and one of the things I am going to have to

3    decide is whether I am going to keep the non government

4    cases in this MDL or whether it is just not possible to

5    manage them and they need to go back.  But I am going to

6    obviously hear from everyone, and at the outset, they are

7    all going to be in the MDL.

8             So we have got to figure out how we are

9    going to organize this effectively.  So I assume that

10   some lawyers on the plaintiffs' side have given this some

11   thought as for the defendants, and we have a group of

12   manufacturer defendants.

13            We have, at least, three main distributor

14   defendants, and I know at least in the Ohio cases we had,

15   I believe, four doctors.  I haven't really analyzed the

16   other cases to see if we have other defendants.  So I

17   guess, Jim Peterson, you want to speak from the

18   plaintiffs on organization, and then I will hear from the

19   defendants.

20            MR. PETERSON:  Jim Peterson here.  Thank

21   you, your Honor.

22            And I would like to thank you and your

23   staff.  Without them, we wouldn't be here today either,

24   so I would like to thank you again.

25            THE COURT:  I have a very good staff.  Thank

1    you.

2              MR. PETERSON:  Thank you.  As far as the

3    first issue, the agenda item, with the Court's blessing,

4    I would like to host an organizational meeting on Monday,

5    December 18, 2017, in Cleveland, Ohio, so that we can

6    first address the issue of liaison counsel and steering

7    committees, and that would be with the Court's blessing.

8              And if so, I have asked Peter Weinberger who

9    is listed here to address agenda items 3, 4, and 5, I

10   have asked him because he is in Cleveland with the

11   Spangenberg firm, to see if we can't round up a meeting

12   facility, a hotel, et cetera, so that we can start moving

13   this case forward.

14             MR. WEINBERGER:  Your Honor, this is

15   Peter Weinberger.  We have tentatively made arrangements

16   for a large meeting room at the downtown Hilton for

17   December 18th.  We also have a block of rooms and are

18   prepared once we have the Court's agreement to this, to

19   send out information on venue hotel rooms, et cetera, for

20   a meeting presumably to start at about 1:00 o'clock on

21   Monday, December 18th in Cleveland.

22             THE COURT:  All right.  That's fine with me,

23   and of course, ultimately, it is my appointment, but I

24   will certainly rely heavily on suggestions from the

25   parties, and you want — you are going to have to file a

1     motion with me, with your recommendations, and again, I

2     will rely heavily on that.  I have done so in my prior

3     MDLs.  I want to make sure that the group is not too

4     large, that it is unwieldy, but you need to include the

5     right people, and of course, anyone who has a leadership

6     role, any lawyer on both sides, I am going to require his

7     or her personal involvement.

8              I've heard that in some MDLs people got

9     leadership roles, and then they sent other people in

10    their firms to court.  We don't do that.  If you have got

11    a leadership role, that's great, but it is because your

12    colleagues believed you personally are the one to

13    exercise that responsibility, and I will be relying on

14    that.

15             All right.  Well, that takes ——

16             MR. SHKOLNIK:  Judge ——

17             THE COURT:  Yes.

18             MR. SHKOLNIK:  —— Judge Polster, this is

19    Hunter, Schkolnik.  I am speaking for this purpose on

20    behalf of John Climaco, who I think advised the Court

21    that he could not be there due to a medical issue for his

22    wife, and he wanted me to offer to the Court that he

23    would jointly host this organizational meeting along with

24    Mr. Weinberger.  He was going to suggest that himself,

25    but he couldn't be on the call.

8

1          THE COURT:  Well, I know John; I know Pete.

2     You can — doesn't matter who is hosting it.  You just

3     can do it, and I think that's fine.

4          All right.  From the defendants' standpoint,

5     how are you suggesting organization?

6          MR. CHEFFO:  Your Honor, and again, I echo

7     counsel's thank you, this is Mark Cheffo for the

8     manufacturing defendants today.

9          I think we understood that that meeting

10    would be largely plaintiffs, and we don't necessarily

11    have a dog in that fight as you might imagine.  I think

12    from our prospective it is probably a little more

13    manageable just in terms of the number of defendants.

14         I think we probably would like some

15    opportunity to caucus amongst ourselves, but our view

16    generally is that we could also propose kind of a slate

17    of folks who would represent the key defendants.  I think

18    one question that we would probably like to work through

19    amongst ourselves unless, of course, the Court has

20    specific issues or suggestions or concerns, we do think

21    that the issue — and your Honor addressed this

22    upfront — kind of how do we get our hands around this

23    and kind of how your Honor gets your hands around this

24    litigation in terms of tracks and how we are going to

25    step move that will be important.

1            So in other words, we could contemplate

2    certainly one steering committee that would involve

3    distributors and manufacturers.  We could also

4    contemplate two separate defense steering committees

5    depending on how the Court thinks it is appropriate to

6    track that.  So to directly answer your question, we

7    would be happy to caucus amongst ourselves.

8            Enu will speak certainly for herself and

9    then perhaps in the next coming weeks give the Court a

10   proposal for the defense side.

11           THE COURT:  All right.  That's fine, Mark.

12   I am open — I mean, good lawyers and smart clients know

13   how to organization themselves the best, and so if you

14   think one steering — one joint steering committee with

15   the manufacturers and distributors makes sense, that's

16   fine.  If you think there should be separate ones, you

17   know, you make your proposal.  That's okay, too, I

18   guess.

19           Enu, did you want to say anything on that?

20   Enu Mainigi, did you want to say anything on that?

21           MS. MAINIGI:  Yes, your Honor.

22           Your Honor, I agree with Mr. Cheffo.  I

23   think that we are planning on getting together with the

24   other defendants, including the manufacturers, obviously,

25   and we are open to whatever organizational structure

1    would seem to make sense.  If your Honor has a certain

2    way that he has done it before, we are happy to hear more

3    about that.  Otherwise, we will come prepared on January

4    9th with a proposal.

5                    THE COURT:  All right.  Thank you.

6                    Well, each MDL is different.  This one is

7    different than my previous ones.  So I am not set on

8    whether there should be one committee with both the

9    manufacturers and distributors or two.  All right.

10                   Then we have got, at least in my cases, in

11   the Ohio cases, there were, I believe, four doctors —

12                   MR. TARNEY:  Yes, your Honor.

13                   THE COURT:  — as defendants.  So is this

14   Tyler?

15                   MR. TARNEY:  Yes, your Honor.  This is

16   Tyler Tarney speaking on behalf of the physician

17   defendants.  As far as the organization, we share in

18   the approach to justify the manufacturers and

19   distributors.

20                   THE COURT:  Well, do you think — do you

21   think there should be a separate steering committee for

22   the doctors?  I haven't looked at the other hundred

23   cases.  Are these four doctors named in a number of the

24   other cases around the country?

25                   MR. TARNEY:  They are named in 34 cases by

1    our last count in cases that are either in the MDL or

2    subject to the conditional transferor order.

3                THE COURT:  All right.  Are there other

4    individual doctors that have been sued in other cases to

5    anyone's knowledge?

6                MR. MANDEL:  Yes, your Honor.  Actually —

7    this is Aaron Mandel.  I am in St. Louis, and we

8    represent an individual physician in a case pending

9    here.

10               THE COURT:  All right.

11               MR. HANLY:  Your Honor, this is Paul Hanly

12   from Simmons Hanly Conroy.  I am one of the lawyers who

13   is listed on the list provided to the Court.  We have a

14   doctor named in cases that were brought in Louisiana and

15   are in the process of being removed and tagged into the

16   MDL.

17               THE COURT:  All right.  Well, what I am

18   going to want is those lawyers who are representing

19   physicians to caucus and decide what is best

20   organizationally, and if you want to have a separate

21   steering committee for doctors, that's okay.  If you want

22   to be part of the — if the manufacturers and the

23   distributors are proposing one Joint one and you just

24   want to have a representative on that, that's fine.

25               And that may be — I mean, candidly, it may

1    be best to have one defense steering committee, and just

2    make sure you've got at least one representative of the

3    manufacturers, one representative of the distributors,

4    and one representative of the physicians because I am

5    trying to deal with this as an organic hole.

6              I mean, there are pieces, but since many of

7    the defendants are in large numbers of cases, if I meet

8    with a steering committee, I am going to meet with the

9    steering committee.  So it is probably best to have one

10   defense steering committee with individual members.

11             Okay.  And then, I guess when — I will say

12   the same thing.  When the defendants have caucused and

13   you have a proposal, just send me a motion or a motion,

14   recommendation, whatever.  And again, I can't imagine I

15   am not going to approve it unless I see someone objects

16   to it.  You are going to have to serve it, and if someone

17   objects, I will certainly look at the objection.  I think

18   that's the way I will do it.

19             If someone objects to either what I get from

20   the plaintiffs or I get from the defendants, I will

21   certainly look at that lawyers' objection and try and

22   deal with it.  If I get no objections, I am going to

23   adopt those proposals.

24             Okay.  All right.  The second item, I know

25   — oh, right.  My law clerk, Mary Hughes, has reminded me

1    I will want to have liaison counsel that I can get hold

2    of very quickly sort of for organization purposes, to

3    distribute information, whatever, things come up.  Those

4    of you who have been in MDL know that they come up.

5               So I will want a very small number from the

6    plaintiffs' side.  You know, we are not talking like

7    probably no more than two or three from the plaintiffs'

8    side and two or three from the defendants' side.  The

9    reason I am suggesting more than one, I mean, someone

10   could be tied up in court or out of the country or

11   whatever.  So it is good to have two or three.  But

12   that's what I am talking about.

13               LAW CLERK HUGHES:  And if there are two and

14   one of them can't get on the phone, the other one will be

15   able to take the call.

16               THE COURT:  Yeah.  Right.  If I can't reach

17   one, I can reach the other.  That's the idea.  I

18   understand and am not expecting everyone to be tethered

19   to their phone.  Everyone is busy, and people have

20   personal lives.  So why don't you aim for three liaison

21   counsel for the plaintiffs and three for the defendants

22   unless someone has a strong — strongly feels there

23   should be more than that.  Okay.

24               MR. CHEFFO:  For the defense, from the

25   manufacturers, that sounds like a good idea, your Honor,

14

1     and we will do that.

2                    THE COURT:  Okay.  Thanks, Mark.

3                    MR. WEINBERGER:  Your Honor, from the

4     plaintiffs, Peter Weinberger —

5                    THE COURT:  Yes, Pete.

6                    MR. WEINBERGER:  — I think your suggestion

7     of three liaison counsel is a good one, and we will

8     certainly work with that number.

9                    THE COURT:  Okay.

10                   MR. WEINBERGER:  Thank you.

11                   THE COURT:  Okay.  All right.

12                   The second item — and again, I don't think

13    we are going to resolve this today, but it certainly is

14    out there — I know in my four or five cases, there are

15    motions to remand based on the same argument defendants

16    argued, that the distributor defendants were improperly

17    or unnecessarily joined to defeat diversity, and that

18    they don't need to be in the case.

19                   And if they are not, well, they were removed

20    on that basis, they were removed on the basis that the

21    distributors didn't need to be in the case, and if they

22    were out of the case, there is complete diversity, and

23    they can be in federal court.

24                   The plaintiffs said, look, we brought the

25    case.  We have alleged a conspiracy between the

15

1    manufacturers and distributors, and it is our case, and

2    we have a right to try and prove it.  I am sure there are

3    similar motions around the country.

4              My thought is to just leave them hanging for

5    a while.  The cases are in the MDL, and my objective is

6    to get my hands around this and see if there is some —

7    maybe some framework for some resolution, and if so, it

8    is much more preferable to have more cases in the MDL,

9    the more the better, rather than having them out there in

10   individual state courts where there can't be any

11   coordination.

12             So it was my thought just to not do anything

13   with those motions to remand at the present time, but

14   again, we have got smart lawyers, a lot of them.  So I

15   will hear from anyone who wants to talk about that.

16             MR. PETERSON:  Your Honor, Jim Peterson

17   speaking in regards briefly to this second agenda item.

18   Thanks to Lee Javins and Jennifer Connolly, who I believe

19   are on the phone, they have endeavored to put forward an

20   exhaustive list of remand motions together with the

21   procedural posture.

22             And it appears we have, at least on these

23   lists, we have 17 that are in remand, and of the 17, one

24   involves federal question, and the other 16 involve

25   fraudulently misjoinders.  So those are the issues, and

1    of course, your Honor, we do have requests from I think

2    approximately one, two, three, four, five individuals to

3    address any remand issue the Court would care to discuss

4    today.

5              We have Attorney Generals, we have cities,

6    we have counties and states involved in these remands so

7    there is some different types of dynamics going on here.

8    So I leave it up to the Court.

9              THE COURT:  Well, I understand.  Thank you,

10   Jim.

11             The point is this:  I understand that most

12   of the plaintiffs sought an MDL.  If you want an MDL,

13   that means you want your cases in here.  The purpose of

14   the MDL is to coordinate discovery, avoid a lot of

15   duplication and expense, and explore all possibilities

16   for some global resolution with cases, you know, parceled

17   out all over the country in individual state courts,

18   that's not possible.

19             So I am assuming that plaintiffs want to be

20   in the MDL, and candidly, I don't think too many

21   distributors defendants want to be cut loose and have a

22   separate case proceeding against them in 17 different

23   states, which would be the result.  I mean, if I were to

24   say that someone is fraudulently joined, the case isn't

25   dismissed.

1           Somehow, you know, that part of the case

2    gets sent to state court, so you got half the case in

3    federal court, half in state court.  So it is my thought

4    just to keep those pending.  Everyone is here, and we

5    will see what we can do, and if, you know, if I have got

6    to deal with them in the future, I will figure out some

7    way to deal with them but not to worry about that now.

8           MR. CHEFFO:  Your Honor, this is Mark Cheffo

9    again.  Just briefly, we agree with that analysis

10   completely for a few different reasons.  One is, there is

11   some overlapping claims.  There are some that are

12   different.  There are still cases that are being

13   transferred.  Some of them have been stayed.

14          There is — some of these motions haven't

15   been fully briefed, and for the reasons you were

16   articulating, frankly, seeing, number one, in terms of

17   counsel, you know, we do believe to the extent that in

18   our experience in these MDLs there is very good lawyers

19   on this phone, hopefully from both sides, we know many of

20   them, but having people who are fully committed to the

21   MDL — we are — we think this should be the center where

22   discovery and discussions about how the cases proceed or

23   potential resolution, all of those issues are kind of

24   best centered here.

25          And we think both for the remand issues that

18

1    your Honor articulated and, frankly, for even as factors

2    of consideration of who should be leading it, it should

3    be folks, again, who are fully committed to this Court

4    and your Honor as opposed to some other places where it

5    may be less easy to reach some of these interviews and

6    efficiencies that your Honor has talked about.

7            MS. MAINIGI:  Your Honor, this is Enu

8    Mainigi on behalf of the Big Three distributors, and we

9    again agree with Mr. Cheffo.  I think certainly what your

10   Honor said makes good sense for the time being, at least,

11   until we kind of get a lay of the land and leadership

12   teams are performed, just look with good intent leaving

13   the cases that are subject to remand decision here in the

14   MDL.

15           MR. TARNEY:  This is Tyler Tarney on behalf

16   of the physician defendants.  We completely agree with

17   the reasons articulated by the Court as the manufacturers

18   and the distributors.

19           THE COURT:  All right.  Anyone want to speak

20   for the plaintiffs on that?

21           MR. JAVINS:  Lee Javins on behalf of the

22   State of West Virginia, and I heard your — you

23   characterized your discussion of the cases, and it is

24   true, there are 17 remands.  Sixteen remands — there

25   will be more, I am sure — based on diversity arising out

1    of fraudulent joinder.  I am simply here to say that the

2    state of West Virginia is an outlier, and I don't know

3    that it is appropriate for the West Virginia case to be

4    in the mix because of the federal question that has been

5    remanded once.

6          So I don't need to discuss the merits.

7    Judge Copenhaver did, improper remand, and it is not even

8    timely.  And the truth of the matter is, Judge Favor

9    simply didn't get to rule on it, then briefed, and has

10   been argued.  So respectfully, on behalf of the state, I

11   would ask that the federal question remand be put maybe

12   on a separate track or be subject to a separate analysis

13   because ——

14          THE COURT:  All right.  Well, I agree,

15   that's different.  And if there is no —— I gather there

16   is no diversity, so it is in federal court on federal

17   question, or it is not.  It seems to me that if the judge

18   has already ruled on it he should rule on it again if it

19   is the same thing.

20          MR. JAVINS:  Well, the problem is, Judge

21   Copenhaver ruled on it the first time and said there is

22   no federal question, and then there came a number of

23   these cases filed in the Southern District of West

24   Virginia.  And so McKesson filed a second remand of the

25   same federal question, and it was lumped as related, and

1    so Judge Favor —

2                THE COURT:  You mean a removal?

3                MR. JAVINS:  I'm sorry.  A removal, yes.  It

4    was removed a second time in front of a different judge,

5    and he simply hasn't — we even had an expedited

6    argument, and he simply didn't rule.  But whether — you

7    know, currently, the ball is in your Court.  That's the

8    reason I am bringing it up.  And —

9                THE COURT:  I will tell you what.  I think I

10   am going to send that case back to West Virginia just for

11   ruling on that.

12               MR. JAVINS:  Okay.

13               THE COURT:  Because a judge in that Court

14   has already made a ruling.

15               MR. JAVINS:  Correct.

16               THE COURT:  So I am going to exercise my

17   discretion and send that case back — if you can give me

18   the name or the caption.

19               MR. JAVINS:  I would be prepared to chart

20   for you, your Honor, it is state of West Virginia versus

21   McKesson.

22               LAW CLERK HUGHES:  We have got it.

23               THE COURT:  We have it.  All right.  I am

24   going to send that one alone back to the district of

25   West Virginia for ruling on this simple question on the

1       federal question and the removal and remand.

2                       MR. JAVINS:  Okay.

3                       THE COURT:  And if the Judge decides that it

4       is properly in federal court, then it is going to be

5       transferred into the MDL.

6                       MR. JAVINS:  I understand.

7                       THE COURT:  If the Judge decides it is not

8       in federal court at all, it has got to go back to the

9       state court in West Virginia, and it is not in the MDL.

10      And there are cases — I know there is an Ohio case that

11      Attorney General DeWine brought that I believe is in Ross

12      County.  So there are cases in state court, and

13      presumably they will state there.  All right.  Thank you.

14                      MR. JAVINS:  Thank you, your Honor.

15                      THE COURT:  So that's what I will do.

16                      Item 3 —

17                      MR. YOUNG:  Your Honor, this is James Young

18      on behalf of some West Virginia cases.  I apologize, I

19      was waiting to see if perspective speakers 2 through 4

20      jumped in there on the remand motions.

21                      I get a sense that the train is leaving the

22      station, so I won't belabor the point, but I do just want

23      to mention we specifically availed ourselves of state

24      court in West Virginia, and we amended our complaint to

25      include a West Virginia entity that is a bit of a unique

1       statutory structure and factual background in West

2       Virginia, that is, the State Board of Pharmacy.  And

3       those remand motions were argued before Judge Favor, and

4       a ruling on them was pending.  I think it was back in

5       October, and of course, the MDL was created.

6              So I would distinguish our cases a bit from

7       the other cases that your Honor referenced in that we did

8       not petition to create the MDL.  We actually filed a

9       petition in opposition to it, and we would like to get

10      back to West Virginia.  And West Virginia has an ability

11      to conduct coordinated discovery between and among state

12      court plaintiffs through the MDL process, and we would be

13      willing to submit to coordination with the MDL once back

14      in state court.  I just want to get that on the record.

15             THE COURT:  All right.  Well, I understand

16      it.  I am going to keep that case here for the time

17      being.  I have limited time and limited staff, and I just

18      don't want to be tied up on individual remand motions at

19      the moment.  If I have to deal with them in the future, I

20      will.  So I want to see what we are going to do with this

21      constellation of cases.

22             All right.  A big issue is whether it is

23      going to be possible to keep in this MDL the three large

24      categories that we have.  We have got the government

25      entity cases.  Those are here.  They are staying.  The

1    issue in my mind, it is an open question on the other

2    institutions and the individual plaintiffs.  So I wasn't

3    going to come to a resolution today, but I want everyone

4    thinking about that.  And, you know, if people have some

5    preliminary thoughts, we can talk about it for a few

6    minutes.

7              MR. WEINBERGER:  Your Honor, this is Peter

8    Weinberger, the plaintiffs.  It is our suggestion — it

9    is my suggestion, and I think others would join in —

10   that we deal with this issue as part of our group meeting

11   that hopefully will take place this coming Monday from

12   the perspective of understanding what the Court has said,

13   and we agree that there are some unique issues associated

14   with the non governmental entities and the individuals'

15   cases.

16             And do one of two things:  Either, one,

17   arrive at a consensus to provide the Court with a

18   position on this or — and more likely — select some

19   leaders from the plaintiffs' group, who will then address

20   this perhaps starting with a meet and confer with defense

21   counsel but then have an opportunity to report back to

22   the Court so that we are in a position by the January 9th

23   hearing to address this with the Court.

24             THE COURT:  All right.  I think that's an

25   excellent suggestion, Pete, because again, the MDL panel

1    left this open, and I am not looking to just, you know,

2    throw out cases or throw them back around the country

3    because of the logistics problem.  But I want to make

4    sure that I can manage what I have got effectively, and

5    that if I keep them all, there are enough commonalities

6    that it makes sense.  So why don't you confer, and

7    defense counsel should confer, and then you can confer

8    together, and we will certainly discuss that in January.

9              Anyone else have anything sort of different

10   to say on that?

11             MR. DUGAN:  Judge Polster, this is

12   James Dugan with the Dugan law firm in New Orleans.

13             THE COURT:  Yes, James.

14             MR. DUGAN:  Thanks for putting this call

15   together and giving everyone an opportunity to speak.  I

16   have filed class actions on behalf of what we call

17   private third-party payers.  They are health and welfare

18   funds —

19             THE COURT:  Right.

20             MR. DUGAN:  — that they pay for

21   prescription costs for their members.  We filed one in

22   Boston, a nationwide class, two in the Eastern District

23   of Pennsylvania, also class actions.  To my knowledge,

24   there is a fourth case filed in the Eastern District of

25   Pennsylvania in front of Judge Savage, and then there is

1    one filed in Ohio ——

2              THE COURT:  I have got one.

3              MR. DUGAN:  It is an Ohio only class.  We

4    had filed an interested party response in support of

5    Judge Savage in the Eastern District of Pennsylvania.  We

6    are also open to discussing whatever your Honor as the

7    MDL Court uses as his discretion about how to organize

8    these cases.  There is precedent for having different

9    MDLs.

10             For example, in the Neurontin litigation,

11   which Mr. Cheffo was also involved and Mr. Barrett and

12   also Mr. Berman on this phone were involved, there was a

13   marketing MDL in front of Judge Saris in Boston, and then

14   there was also an antitrust MDL in New Jersey, both on

15   behalf of the drug Neurontin, but the claims were

16   different.  So there is certain precedent for having

17   separate MDLs.

18             At this point, obviously, it is a short time

19   frame, and we are trying to organize, but I think my

20   particular group is six firms.  There is probably another

21   four or five firms out there doing these types of cases,

22   and we would like an opportunity, we will participate in

23   the organizational process, but I would assume we will

24   also have some type of decision and recommendation with

25   options for your Honor.

1          THE COURT:  All right.  Thank you, James.  I

2    mean, you know, we can have two or three tracks in the

3    same MDL.  If there are a lot of similar issues in

4    discovery and liability, it may make sense for me to keep

5    them all.  If they are really radically different, then

6    there certainly is an option for a second or even a third

7    MDL.  But that's something I will listen carefully to,

8    what all of you propose.

9          MR. DUGAN:  Thank you, your Honor.

10          MR. CHEFFO:  This is Mark Cheffo.  Briefly,

11    we agree with counsel that we should meet and confer on

12    this.  To the extent your Honor wants our kind of

13    preliminary view from a manufacturers' perspective, we

14    think this can be handled by your Honor using separate

15    tracks.  We have worked cooperatively with all of these

16    folks.

17          We think that, particularly as to these

18    third-party payer type claims, they are very similar in

19    terms of discovery, and they can be managed most

20    effectively.  Admittedly, some of the personal injury

21    type cases are a little different than the others.  We

22    recognize that, but we still think that we will be able

23    to have a plan that will make it most efficient, but I

24    don't want to be presumptuous.  I haven't given a chance

25    for the plaintiffs to weigh in on it, but that's our

1        initial thinking, but we are certainly open to hearing

2        what they have to say in making this most efficient.

3                    THE COURT:  Okay.  Well, again, that's why I

4        — quite frankly, that's why I wanted to set up this

5        phone call early.  I don't have the answers.  I think I

6        have got most of the questions, but again, there is an

7        incredible amount of experience on the other end of the

8        line.  I have some experience, but it is dwarfed by all

9        of your collective experience, so I am looking to you.

10                   I am definitely contemplating appointing a

11       special master in this case.  I am going to need some

12       help.  I may or may not request that the Sixth Circuit

13       consider giving me an emergency law clerk, but one, I

14       have no idea what funds are available, and I think the

15       help I need is not so much from a law clerk at this

16       point; it is from a special master.

17                   So I wanted to pick someone I am experienced

18       with and comfortable with who is experienced.  So unless

19       there is a strong objection from anyone, I am going to

20       appoint someone, and the cost would be split between the

21       plaintiffs and the defendants, which is how it has worked

22       in the other MDL when I had one.  So does anyone have a

23       problem with that?

24                   MR. WEINBERGER:  Your Honor, this is

25       Peter Weinberger on behalf of the plaintiffs' side.  You

1    know, it is clear from the way that your Honor is

2    expressing himself and communicating with us that the

3    Court understands, as we all do from the plaintiffs'

4    perspective, the importance of this case and the opioid

5    epidemic that is affecting our nation.

6            So anything that the Court wants to do to

7    expedite this matter, including the appointment of a

8    special master, is certainly something that we are very

9    interested in, and I want the Court to know also that, as

10   indicated, you know, we have three lawyers who are

11   designated speakers:  Joe Rice, Paul Hanly, and

12   Paul Farrell who have a wealth of experience not only in

13   MDLs but in this particular case.

14           Some of these gentlemen have already been

15   litigating this case for a long time.  So while there is

16   an interest in expediting this, there is also a

17   realization that the breadth, the scope of these claims

18   as well as the potential damages is astounding, and to

19   the extent that a special master can help us sort out

20   some of those issues with the Court, we are all in favor.

21           Obviously, the Court, if the Court has a

22   special master in mind, we are all ears to hear it.  We

23   also would be prepared to discuss this issue on the 18th,

24   and perhaps have one or two people designated to confer

25   with the other side as well as with the Court on

1      potential special masters who we believe have the

2      expertise necessary to assist on this very important

3      case.

4                    MR. CHEFFO:  Your Honor, this is Mark

5      Cheffo.  Just briefly, we agree with your Honor's

6      suggestion.  We think it makes sense in a case like this,

7      and frankly, from the manufacturers' perspective, we

8      would be governed by the person that you think would be

9      best situated to assist the Court.

10                   MS. MAINIGI:  Your Honor, Enu Mainigi on

11     behalf of the Big Three distributors.  We have no

12     objection if your Honor would like to appoint a special

13     master.

14                   THE COURT:  All right.

15                   MR. TARNEY:  Tyler Tarney on behalf of the

16     physician defendants, we have no objection to a special

17     master.

18                   THE COURT:  All right.  Well —

19                   MR. SHKOLNIK:  Your Honor, this is

20     Hunter Schkolnik, if I can just add something on that —

21                   THE COURT:  Yes.

22                   MR. SHKOLNIK:  — we worked very closely

23     with a special master in the Minnesota MDL, and the point

24     I just want to bring up, I think it is important to have

25     someone local, much like you want to have local liaison

1     counsel, a special master, who is local to Cleveland, not

2     just Ohio; that the Court could entrust such important

3     matters as this in a major case like this.

4                 THE COURT:  Well, Hunter, that's a factor,

5     but if I think that the best person is not in Cleveland,

6     I would go with the best person.  But that certainly —

7     there is a big plus to have someone who I can sit down

8     with any day I want to at the drop of a hat.  That

9     certainly is a big plus.  All right.

10                This is what I would like to do, is I would

11    say by next Monday, that's the 18th, if anyone wants to

12    make any suggestions, they can do so.

13                LAW CLERK HUGHES:  How about after the

14    Monday meeting like Wednesday?

15                THE COURT:  Well, right.  Why don't we say

16    this:  Pete, how long do you think your meetings are

17    going to go, two days?  You know, what are you figuring?

18                MR. WEINBERGER:  Your Honor, it is our hope

19    that we will be able to meet the afternoon of Monday, the

20    18th, and conclude at that time.

21                THE COURT:  All right.  Well, why don't we

22    just say that by —

23                LAW CLERK HUGHES:  Wednesday at noon.

24                THE COURT:  — by Wednesday, the 20th, at

25    noon.  So that's a week from today, Wednesday, 12-20 at

1    noon.  If there are any — and I guess I would suggest it

2    makes sense for the plaintiffs and defendants to concur.

3    If you jointly have any individuals to recommend, that's

4    fine.  If you can't come — you know, if you — so

5    whatever way you want to get them to me, that's fine.

6    And I will consider anyone you suggest, and ultimately, I

7    will make a decision.  So it may be someone you have

8    recommended; it may not be, but I will certainly consider

9    it.

10                  MR. WEINBERGER:  Your Honor, Peter

11   Weinberger again.  That timetable will work out great and

12   give us the 19th to meet and confer with defense counsel

13   and then submit either agreed upon names or not to the

14   Court by Wednesday.

15                  THE COURT:  Okay.  Thank you.

16                  LAW CLERK HUGHES:  And also, can they file a

17   motion to approve the liaison counsel and the committees

18   by Wednesday at noon, one of the reasons they are

19   meeting?

20                  THE COURT:  Well, yeah.  I assume, Pete,

21   that by Wednesday at noon you'd — you will have your

22   recommendations for liaison and steering committee.  Is

23   that right?

24                  MR. WEINBERGER:  Your Honor, Peter

25   Weinberger.  Your Honor, I am hopeful that that will be

1    the case, but as you can hear, as you know from the

2    number of people involved from the plaintiffs' side, we

3    have a lot of people that we need to meet with, and from

4    everything that I've heard so far, we are a collegial

5    group.

6              We all are of one mind in terms of

7    importance of this case and the importance of

8    cooperation.  So with all of that in mind, it is my hope

9    that we will be in a position to provide you with a

10   motion after our meeting on the 18th.

11             THE COURT:  Well, that would be my hope.  I

12   don't want to mess up anyone's holidays, and I realize

13   two weeks after that no one is going to be — everyone is

14   going to be out and about and celebrating their holidays

15   and that's fine.  So I would like to get that by noon on

16   the 20th, and the same thing from the defendants' side

17   also, I mean, if at all possible.  If it takes longer, it

18   takes longer.  Again, I want you to be thoughtful about

19   it and make sure you include the people who need to.

20             Liaison and steering.  Okay.  All right.  It

21   is my hope to have an in-person meeting on Tuesday,

22   January 9th if everyone thinks that they will be ready,

23   and if you have think that's too early, I will hear from

24   you on that because there is a lot of people coming and a

25   lot of expense and a lot of inconvenience, and it would

1    be my intention to have client representatives there,

2    too, because I want them to be involved, and I want to

3    speak to them, and I want to hear from them.

4              I mean, this is an unusual case because

5    sometimes in an MDL from the plaintiffs' side, it is

6    really attorney driven because you have a large number of

7    wholly unrelated plaintiffs.  The only common thing they

8    have is, they feel they have suffered an injury from the

9    defendants' product.  But here we have government

10   entities who are headed my mayors and commissioners,

11   county executives, governors.  We have got large pension

12   funds with executives and boards.  It is different.  So I

13   would want those people.  So do you think that Tuesday,

14   January 9th, is — is it too early?

15             I mean, this is a case — look, we all know

16   and I should have said at the outset — everyone knows

17   about this case.  I have heard, people have called me,

18   non lawyers around the country, congratulations or

19   condolences, and so everyone is looking at this.  And so

20   I want to move this as efficiently as I can, but I also

21   know that if you try to move too fast, you don't do it

22   thoroughly and effectively.  So what do you think on

23   that.

24             MR. WEINBERGER:  Your Honor, this is

25   Peter Weinberger again.  Let me, off the top of my head,

1    react to what you said.

2              The date of January 9th, of course, has been

3    out there for counsel for, at least, three or four days

4    now, and I am assuming, at least as far as counsel is

5    concerned, those that want to be in Cleveland on the

6    9th have already set aside the time and have arranged for

7    travel, et cetera.  It is a whole different situation if

8    you want representatives of the various political

9    subdivisions and other plaintiffs actually in Court.

10             I am also trying to think of the logistics

11   of all that as far as the Court is concerned.  So I don't

12   think people, having knowledge of your January 9th date,

13   contemplated that this would include clients.  And so I

14   am wondering, your Honor, if perhaps that couldn't be a

15   matter for us to discuss from the plaintiffs' side on

16   Monday, the 18th, and then report back to you with the

17   thought of, well, the 9th logically is a little too soon,

18   let's try for a date maybe two or three weeks beyond that

19   or the 9th will work.  I don't think people are in a

20   position at this point to address this specifically now

21   because I don't think people contemplated that this was

22   how you wanted to run the first meeting.

23             THE COURT:  Well, you know, Pete, what you

24   just said, I have an additional thought to throw out, and

25   again, you don't have to decide this today, this may be a

1    case where, in addition to having attorney steering

2    committees, that maybe there would be client steering

3    committees, that there be among the plaintiffs all this

4    disparate cities, counties, states, there be a small

5    group of officials who would be the clients' steering

6    committee and could address important things on behalf of

7    the group, and that there be some number of — you know,

8    whether it is mayors, county executives, commissioners,

9    governors, attorneys general, I don't know who would do

10   that, and maybe there would be a small group of what I

11   will call third-party institutions.

12            MR. CHEFFO:  Your Honor, this is Mark

13   Cheffo.  I know that your Honor —

14            THE COURT:  And maybe the manufacturers — I

15   mean, how many — there are what, 10 or 15 manufacturers?

16   I didn't add them up but —

17            MR. CHEFFO:  About, your Honor.  This is

18   Mark Cheffo, and I am brainstorming as I hear your Honor

19   and welcoming this.  One option might be — and point

20   well taken — obviously, your Honor wants participation

21   on both sides, but there is also logistics issues.  So

22   maybe one kind of midway solution, if it would be

23   agreeable to the Court, is to keep the date of the 9th

24   and have kind of a lawyer meeting so we can work through

25   some of these procedural aspects and some of the initial

1     issues that we've discussed, and then keep in mind that

2     your Honor wants a subsequent meeting with a little more

3     lead time to decide how it is staffed with various

4     participants or whether it is necessary to have a

5     committee as you have suggested.

6                   MR. WEINBERGER:  Your Honor, this is

7     Pete Weinberger again.  Mark, I think that's an excellent

8     suggestion, and it makes a lot of sense.

9                   THE COURT:  All right.

10                  MS. MAINIGI:  Your Honor, Enu Mainigi on

11    behalf of the distributors, the Big Three distributors, I

12    think that does make a lot of sense.  We have had the

13    date set aside for several days, and because there are

14    some procedural issues to work through, I think a working

15    meeting with your Honor on the 9th in person would be

16    very productive for all of us and then, certainly, your

17    Honor could either at that time or prior set a date for a

18    meeting that could involve clients.  It gives all of them

19    a bit more notice and ability to arrange for schedules to

20    attend.

21                  MR. TARNEY:  Tyler Tarney on behalf of the

22    physician defendants, we agree with that as well.

23                  THE COURT:  All right.  That may be what we

24    do.  I want you to explore the idea I threw out of client

25    — for want of a better term — client steering groups or

1      committees because I think it may be beneficial, and I am

2      mindful of everyone's time.  And why don't you discuss

3      that?  And you can report back as to whether that makes

4      sense.

5                  LAW CLERK HUGHES:  The January 9th date for

6      lawyers only and then a subsequent date?

7                  THE COURT:  Well, when we start involving

8      clients, whether there should be a committee, that there

9      would be the client reps that would come regularly as

10     opposed to requiring every governor or mayor or whatever

11     to come every time and every pension fund, to send their

12     key person and every manufacturer to send their person.

13     So you can explore that.  And that sort of leads into the

14     last.

15                  LAW CLERK HUGHES:  Look at my note.

16                  (Pause.)

17                  THE COURT:  The last subject was the

18     possibility of exploring early resolution.  I mean, I

19     have had two substantial MDLs, and I know that you can't

20     try your way out of them, even though we have excellent

21     lawyers.  You know, I have used bellwethers, and it

22     sounds good in concept, but they don't always work for

23     various reasons.

24                  And this is a case where I think from both

25     sides there is some good reasons to seriously explore

1      some early resolution.  And so I am throwing it out, and

2      I was certainly going to discuss this in greater detail

3      on January the 9th.  So what I would like everyone, you

4      know, people have some great ideas now they want to raise

5      or just keep them privately, my plan on the 9th is to

6      have some separate discussions with the plaintiffs and

7      the defendants on this area.  But if there is something

8      that someone thinks we should do between now and January

9      9th I would like to hear from you.

10               MR. WEINBERGER:  Your Honor, this is

11     Peter Weinberger again.  I know that this, having seen

12     this as an agenda item, that this is a matter that we are

13     going to, again, as part of our organizational meeting,

14     try to select some leaders who will talk about this

15     concept and report back to the Court on that and with

16     your clear indication to us that that is all right with

17     you and rightly so, what my preference would be, I think

18     those from the plaintiffs' side, because there are so

19     many different claims and potential damage models, some

20     of which are in the process of being explored, but you

21     know, I know that we have probably — I could tell you

22     that we have a difference of opinion from the defendants

23     as to how pervasive a problem and the damages are, and we

24     may even have differences of opinion among us.

25               But that having been said, we are cognizant

1    of this being a priority item, and I would suggest that

2    you let us talk about this on the 18th and select a

3    couple of people to work on this issue and then report

4    back.

5              THE COURT:  That's fine.

6              MR. RICE:  Your Honor, this is Joe Rice from

7    Motley Rice.  A couple things I would ask the Court to be

8    thinking about in this regard as well as the overall

9    management.  I know your Honor spoke of the coordination

10   between the states and the MDL, and we all in the MDL

11   understand the importance of that, but your Honor needs

12   to be aware that there are cases, for instance,

13   Santa Clara, California, representing all the California

14   cities and counties, has been in litigation since 2014 in

15   California state court, and it is proceeding now through

16   discovery.  There is a consolidation of state court cases

17   in New York that has been going on now for several months

18   that is already into discovery.

19              And of course, there is, at least I think,

20   ten state attorney generals that have filed actions in

21   ten separate states that will remain in state courts.  So

22   there is going to be some parallel state court litigation

23   that we will be having to coordinate with.

24              In addition, and you approached the concept

25   of the special master, I would ask you to think about the

1    talent pool and the selection as it relates to managing

2    what is apparently going to be a very extensive documents

3    production litigation.

4              In our Chicago cases pending since 2014 we

5    have already had 12 million documents produced, and we

6    aren't heavily into it.  So we are going to have a lot of

7    document issues that you might want a special master or

8    someone of that nature, maybe a Magistrate Judge, working

9    with this, but that might be a different skill set than a

10   special master, that would be focused on helping the

11   parties in discussing particular resolution.

12             I just bring that to your Honor's table to

13   ask you to think about it as you are approaching some of

14   the decisions you are having to make while we will be

15   approaching the decisions in our meeting in Cleveland.  I

16   have often had people ask me if this is like a tobacco

17   case, and we have said there is a bunch of similarities

18   and a bunch of differences, but I think this group is

19   going to be cooperatively working together to try to

20   address this as quickly as possible.

21             THE COURT:  All right.  Thanks for those

22   points, Joe.  I will certainly, as I did in my gadolinium

23   MDL, because I had a lot of parallel state cases, do my

24   best to coordinate with those judges who are managing

25   those cases, to keep them advised if we can agree on

1    coordinating discovery, certainly not set dates that

2    interfere with each other.  So when I get into this, I

3    will find out who those judges are, reach out to them,

4    make sure they know who I am, and they can always call

5    me.  I may utilize one or more magistrate judges on our

6    Court.  We have very good ones if I need help on certain

7    issues.

8              MR. DUGAN:  Judge Polster, this is

9    James Dugan again from New Orleans.  I wanted to bring to

10   the Court's attention I was co-lead counsel for a class

11   of third-party payers where we settled a nationwide class

12   in front of Judge Cottle in the Southern District of New

13   York in 2008 with Perdue Pharma over the drug Oxycontin.

14   So there is also some precedent for settling at least

15   this class of entities in a class settlement.  When we

16   report to the Court, I will be more than happy to give

17   more detail about that resolution that occurred.

18             THE COURT:  Okay.  Thank you, Jim.

19             MR. CHEFFO:  Your Honor, this is

20   Mark Cheffo.  I didn't mean to talk over your Honor.

21   Just briefly, we agree with what you outlined earlier,

22   which is that we will be certainly prepared and very

23   interested in your Honor — obviously, your Honor has

24   given some thoughts in the case and others, so we will

25   welcome an opportunity to hear the Court's thoughts on

1    that.  We will come prepared to have some thoughts on our

2    own about how we might approach the early resolution

3    process and maybe some idea about what needs to be done

4    in connection with pursuing that but also some of the

5    steps we think the Court needs to address early on.

6            No surprise, we think we have some legal

7    defenses here.  Today is not the time to argue motions

8    and things like that, but we will be prepared to provide

9    some suggestions but also welcome the Court's thoughts on

10   what you think would be most efficient.

11           THE COURT:  All right.  I mean, obviously

12   these are — there are some novel theories of recovery.

13   There may be defenses to some or all of them, but again,

14   I don't think it is in anyone's interests to have this

15   dragging on for five or ten years, which it will if we

16   don't come to some resolution.

17           It will easily go that long, and there are a

18   whole lot of reasons from both sides why that doesn't

19   make sense, and quite frankly, I think the best use of my

20   time and my abilities will be to help see if there is

21   some sort of resolution we can reach.

22           I think that's why the MDL panel picked me.

23   I am sure there are better trial judges in the country,

24   maybe better trial judges right here in my Court, but I

25   think I was picked for that reason, and that's where I am

1  going to spend my time, and I will ask other people to

2  help me on the other aspects of the case.  But that part

3  I don't plan to delegate.  I will be doing that myself.

4  Okay.  I think I covered all six points on the agenda.

5  Let me see if I had — oh, I had a couple factual

6  questions.

7             Do the manufacturer or distributor

8  defendants have insurers in this case?

9             MR. CHEFFO:  This is Mark Cheffo for the

10  manufacturers.

11             THE COURT:  It may be a complicated

12  question.

13             MR. CHEFFO:  Your Honor, I think it may

14  depend on each of the different defendants.  I don't know

15  the answer to that question.

16             THE COURT:  All right.

17             MR. CHEFFO:  But certainly, we can caucus

18  amongst the group and have an answer to that.

19             THE COURT:  Okay.  Well —

20             MS. MAINIGI:  I concur —

21             THE COURT:  Okay.

22             MS. MAINIGI:  — Judge Polster.  I think it

23  is a defendant-by-defendant issue.

24             THE COURT:  Okay.

25             MS. MAINIGI:  But we can be prepared to

1    address it on January 9th.

2              THE COURT:  All right.

3              MR. CHEFFO:  And your Honor, again, this is

4    Mark Cheffo.  Just a housekeeping note if your Honor

5    could help us along with this, it will save a lot of

6    people maybe some weekends between now and the 9th.  In

7    many of these MDLs, the Court is aware, the MDL judges

8    can put an order in place that suspends deadlines for

9    transfer cases so that no one is worried about filing an

10   answer or something.

11             THE COURT:  Yeah.  I was going to say that.

12   I don't want anyone filing anything.  Okay?  I mean,

13   seriously, other than the things we've talked about, I

14   don't want any more motions to remand.  I don't think we

15   need — it is a good point.  I suspended a bunch of

16   answers in my case until the MDL was created, which has

17   been — which obviously has been created.

18             LAW CLERK HUGHES:  60 days.

19             THE COURT:  Unless there is a strong

20   objection, I am just going to put a moratorium on filings

21   for 60 days.  Does anyone have a problem with that?

22             MR. WEINBERGER:  Your Honor, this is

23   Peter Weinberger.  Thank you for raising that because —

24             THE COURT:  Well, I didn't.  I had

25   forgotten, and Mark reminded me.

1           MR. WEINBERGER:  So the other issue — and

2    Paul Farrell can address this directly — but it has to

3    do with the Rule 4 requirement of service within 90 days.

4    We know that there are a number of cases where we have

5    not been able to obtain an agreement of waiver of

6    service, and in fact, there are some international

7    defendants where we have had no ability to communicate.

8           We know there are a number of cases where we

9    have the 90 days coming up on, I think, January 8th, 9th,

10   or 10th.  And so to the extent that the Court is willing

11   to do that, do this, if we could get an extension on

12   that, I think that's in line with what the Court is

13   saying in terms of not filing any answers.  I think that

14   will help us a lot, and obviously, we would be interested

15   in what the defense has to say about that.  So what does

16   the Court please in terms of that issue?

17          THE COURT:  Well, I hadn't even thought

18   about that, Pete.  I mean, I would strongly encourage

19   counsel to just work out the service issues.  I don't

20   want to spend a lot of time and money for anyone on this.

21   You should waive — a number of defendants have been

22   served.  No one is hiding.  These manufacturers aren't

23   hiding.  The distributors aren't hiding.

24          So if you want me to put — grant an

25   extension, Pete, is that what you are suggesting, I

1    extend the service deadline for 60 days?

2           MR. WEINBERGER:  Yes, your Honor.

3    Paul Farrell, do you want to address this in any more

4    detail?

5           MR. FARRELL:  Yes.  This is Paul Farrell.

6    Judge, Rule 4(m) is the rule that includes the 90-day

7    deadline, and it also includes the ability for the Court

8    to issue an extension for good cause shown.  So there are

9    just a number of deadlines between the CTOs and where it

10    is coming from the other transferor courts, we would just

11    ask for you to be open minded in giving us some leeway to

12    effectuate waiver of service for the most part with the

13    inventory that my group has.

14           The manufacturers and distributors have been

15    extremely cooperative.  We just have a number of cases

16    that have been filed and are getting filed.  So we have

17    been waiting for this call and for this MDL, and we would

18    ask for a little bit of leeway in effectuating service?

19           THE COURT:  Well, what if I just extend the

20    service deadline for 60 days?  Whatever it is, you got 60

21    days more.  So Pete, if it was January 8th, that makes it

22    March 8th or March 7th, something like that.

23           MR. WEINBERGER:  Your Honor, this is

24    Pete Weinberger.  Yes, I think that would be great from

25    our perspective.

1          THE COURT:  And I am going to put a

2     moratorium on all filings, case filings for 60 days.

3          LAW CLERK HUGHES:  Except for the motions

4     that they are going to be filing, the motions for the

5     liaison counsel.

6          THE COURT:  I mean, substantive motions, to

7     put a moratorium.  Okay.  All right.  Was there anything

8     else that I left out or that someone wants to raise, that

9     they think would be productive?

10          MS. FREEMAN CAPPIO:  Your Honor, this is

11     Gretchen Freeman Cappio from Keller Rohrback for the city

12     of Tacoma.  And I just want to mention that we just

13     learned about this hearing yesterday and got the agenda

14     today, so we have not yet had a chance to meet and confer

15     prior to today's hearing, and we definitely understand

16     there were instructions to contact all the attorneys.

17          THE COURT:  All right.  I am sorry you are

18     breaking up, and I can't hear you.

19          MS. FREEMAN CAPPIO:  Can you hear me now?

20          THE COURT:  Yes.

21          MS. FREEMAN CAPPIO:  We wanted to advise the

22     Court that based on what we have heard some parties have

23     still not been notified of this hearing today.

24          THE COURT:  Well, I apologize.  Cases were

25     being filed very quickly, and we did the best we could.

1    There will be a transcript of this, and one of the

2    reasons I wanted a court reporter is obviously so I could

3    refer to it, but if any counsel wasn't able to be on,

4    they could get a full transcript.

5                    MS. FREEMAN CAPPIO:  Thank you very much,

6    your Honor.

7                    LAW CLERK HUGHES:  Tell them the court

8    reporter's name.

9                    THE COURT:  All right.  The court reporter

10   is George Staiduhar, S-t-a-i-d-u-h-a-r.  Okay.  Anyone

11   else want to raise anything?

12                   MR. DANIEL:  Your Honor, this is

13   Nixon Daniel.  I represent a hospital plaintiff that

14   filed in the Northern District of Florida and also an

15   Indian Tribe, the St. Croix Indians in Wisconsin.  Your

16   Honor's request, as far as the January 9 hearing is

17   concerned, do you want us to talk to hospital clients and

18   Indian Tribe clients and have them represented at that

19   hearing for January 9th?

20                   THE COURT:  No.  Nixon, we are just going to

21   have lawyers.  The hospital, obviously, you are

22   institutional.  The Indian Tribes — that may be a fourth

23   category.  Is that on behalf of a group of individuals in

24   the Tribe?

25                   MR. DANIEL:  No, sir.  We represent an

1     Indian Tribe, the St. Croix Indians, and that case was

2     filed in the Western District of Wisconsin.  We

3     anticipate filing a number of lawsuits on behalf of

4     Indian Tribes themselves.

5              And we do think that that's a separate track

6     just like the hospital track is going to be a separate

7     track.  We don't think it is going to be subject to class

8     determination at the hospital level, so we think that's

9     going to be a separate track, too, and we represent a

10    number of hospitals that have already filed, and some

11    that we have not filed yet.

12             THE COURT:  Well, the hospitals are a lot

13    like the pension funds.  What are the Indian Tribes

14    claiming?

15             MR. DANIEL:  The Indian Tribe claims are

16    very similar to a combination of all the other claims.

17    The local government entity claims that deal with law

18    enforcement and that kind of thing, the Indian Tribes

19    have those kinds of claims.  They also have healthcare

20    kind of claims.

21             Actually, the hospital claims are a little

22    different from the insurer type claims because they

23    provide not — they provide the care, which has been

24    unreimbursed.  The Indian Tribe has that kind of claim.

25    In addition, they have claims where they act as a

1    self-insurer for Tribe members.  So they are actually a

2    microcosm of all of the claims.

3              THE COURT:  Okay.  Well, we didn't have any

4    of those in Ohio, Nixon, so I was not familiar with that.

5    Well, that's something for — all right.  The hospital,

6    that may be a separate group.  I don't know how many

7    hospitals we have got and how many Native American

8    Tribes.  That's a new one, and that has elements of all

9    the other groups.  I think you are right.  So we will

10   have to figure out what to do with those.  So I am open

11   to suggestions.  All right.

12             MR. DANIEL:  Yes, sir.

13             THE COURT:  So just to summarize, and

14   obviously, I will get an order out by Wednesday, next

15   Wednesday, December 20th at noon, I will get any

16   recommendations on candidates for special master and

17   hopefully the motions, recommendations from each side for

18   liaison counsel and steering committee, and then we will

19   have an attorneys only conference on Tuesday, January the

20   9th.

21             LAW CLERK HUGHES:  What time?

22             THE COURT:  9:00 o'clock a.m., and I would

23   say by noon on Friday, the 5th, January 5th, I would like

24   — I would like written filings from each side as to your

25   thoughts on some of the things we've talked about, and I

1    think it makes sense to — anything on organization you

2    should exchange so you each see it.  So from one set —

3    one filing from the plaintiffs and one filing from the

4    defendants, and you should exchange them to the extent

5    you are talking about anything organization wise.  If you

6    have anything you want me to — anything on the

7    settlement or resolution area that you just want me to

8    see, you don't have to share that with the other side.

9    Does that make sense?

10                MR. WEINBERGER:  Pete Weinberger on behalf

11   of the plaintiffs, yes, your Honor, it does.

12                MS. MAINIGI:  Yes, your Honor.

13                THE COURT:  So again, these aren't to be

14   filed on the docket; just, I guess, e-mail them to the

15   Court.  E-mail them to me.  That's fine.  And I will get

16   this —

17                MR. TROUTMAN:  Your Honor, I am one of the

18   prospective speakers.

19                THE COURT:  I'm sorry, what?  Who is

20   speaking, please?

21                MR. TROUTMAN:  I'm sorry.  This is

22   Mark Troutman from Columbus, Ohio.  Are you planning to

23   turn to the list of prospective speakers still, or may I

24   have leave to address the point that I was going to make

25   there now?

52

1          THE COURT:  I am confused, Mark, but was

2    there something you wanted to raise?  But go ahead.

3          MR. TROUTMAN:  Yes, there is, your Honor.

4    Thank you.  Again, I am Mark Troutman with the Isaac

5    Wiles law firm in Columbus, Ohio.  We are in front of you

6    with Dan Karon and Ron Jackson and in some county cases.

7    Our law firm, along with some others, also represents the

8    Ohio Attorney General in a state case filed in Ross

9    County.

10          Mr. Rice pointed out some very important

11   things about the various status of cases filed in state

12   court, how this Santa Clara case is well into discovery.

13   And there is obviously a lot of cases that have just been

14   filed.  Our case was filed seven months ago, again in

15   Ross County, and we are through 12(b)(6) briefing and

16   starting some third-party discovery in that case.

17          We think it is important early on to

18   identify where these cases are, who the judges are.  For

19   the large participant, we might be talking about a lot of

20   the same counsel on this call and ultimately the status

21   of those cases.  And we wanted to offer to help you make

22   a more informed decision on January 9th, to volunteer to

23   gather up a list of those cases and be able to present

24   you with that on January 9th, to help facilitate any

25   coordination with those cases that could be had.

1          THE COURT:  All right.  Thank you, Mark.

2     That will be helpful.  So then, I will be able to

3     communicate with the state judges.  I found if the

4     federal judge makes the initial communication, then it is

5     easier.  Then, none of the state judges have any problem

6     in contacting me.  That's how I did it the last time and

7     worked pretty well.

8          MR. TROUTMAN:  We will be sure to have that

9     ready as soon as possible, your Honor.

10          THE COURT:  Okay.  Thank you.  Okay.

11     Anything else anyone wants to say?  So again, we will

12     have these submissions by noon on Friday, the 6th, for

13     your suggestions for the 9th —

14          LAW CLERK HUGHES:  The 5th.

15          THE COURT:  — to see what you come up with.

16          LAW CLERK HUGHES:  Friday the 5th.

17          THE COURT:  Oh, it is the 5th.  Friday the

18     5th.  I'm sorry.  I looked at the wrong date, January 5th

19     at noon, and exchange those, but I am interested in

20     getting what I will call ex parte submissions from both

21     the plaintiffs and the defendants on ideas moving toward

22     resolution or some structure or ideas on that front.

23          Okay.  Well, I want to thank everyone for

24     getting available on short notice.  I apologize if some

25     people got late notice, and I particularly apologize if

1   there are people who should have been on but weren't, but

2   this was done pretty quickly, and we didn't have the

3   benefit of electronic notification.  We now do, so that

4   shouldn't be a problem in the future, and I want to wish

5   everyone and their families a very happy holiday season

6   and Happy New Year, and I look forward to seeing you in

7   January.

8              (Counsel expressed thanks, and hearing was

9   concluded 2:50 p.m.)

10                         – – – –

11

12

13              C E R T I F I C A T E

14              I, George J. Staiduhar, Official Court

15   Reporter in and for the United States District Court,

16   for the Northern District of Ohio, Eastern Division,

17   do hereby certify that the foregoing is a true

18   and correct transcript of the proceedings herein.

19

20                    s/George J. Staiduhar
                       George J. Staiduhar,
21                    Official Court Reporter

22                    U.S. District Court
                       801 W. Superior Ave., Suite 7-184
23                    Cleveland, Ohio 44113
                       (216) 357-7128

24

25