IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No.: 1:17-md-02804-DAP |
| THIS DOCUMENT RELATES TO: | Judge Dan Aaron Polster |
| ALL CASES | |

### OBJECTION AND OPPOSITION TO PLAINTIFFS' MOTION TO APPROVE CO-LEADS, CO-LIAISONS, AND PLAINTIFFS' EXECUTIVE COMMITTEE

Tasked with representing government entities, each with their own fiduciary responsibilities to the citizens they govern, all Plaintiffs' counsel in this unprecedented multidistrict litigation should be held to a standard of conduct conforming to "the punctilio of an honor the most sensitive."[1]  Regrettably, the process leading to the "consensus" Proposed Slate set forth in the Plaintiffs' Motion to Approve Co-Leads, Co-Liaisons, and Plaintiffs' Executive Committee [Doc. # 16] and Amended Motion [Doc. # 17] (hereinafter, collectively, the "Motion"), fell far short.  What is being represented in the Motion as an open, transparent and fair process leading to broadly supported self-organization, was, in reality, anything but that.  Rather, as further described below, the December 18th meeting was little more than a mere formality:  it was simply a venue for the Proposed Slate to reveal that they had chosen themselves, and done so without input from the others in attendance and without disclosing the criteria applied.  The implications of this case—which will impact hundreds, if not thousands of municipalities, and millions of individuals—demand more, much more, from a leadership selection process.  Accordingly, following significant consideration and with reflective reticence

---

[1] *Meinhard v. Salmon*, 249 N.Y. 458, 463–64, 164 N.E. 545, 546 (1928).

1

given the gravity of this matter, respondents view it as their duty to object to the process that preceded the Motion and thus the Proposed Slate resulting therefrom.

## INTRODUCTION

This multidistrict litigation proceeding was established two weeks ago to address a national epidemic arising from the manufacturing, distribution, marketing and sale of prescription Opioids. The litigation will have national and potentially historic significance. Justice requires that the leadership team of Plaintiffs' lawyers appointed by the Court to steer this litigation be selected through an open, transparent and fair process. Nothing less is appropriate in any multidistrict litigation, but even more so here, where most of the clients—states, counties, cities and towns from across this country—are public bodies that have fiduciary duties to their respective citizens.

Regrettably—despite the Court's recently expressed wishes during the informal conference call that Plaintiffs' counsel meet separately in an effort to submit recommendations to the Court for their internal organization and leadership—the process that led to yesterday's submission of a purported "consensus slate" of leadership was not that at all. For the reasons discussed herein, the Town of Kermit, the City of Welch, the Town of Gilbert, Lincoln County, the Town of Chapmanville, Mercer County, the City of Williamson, and McDowell County, all in West Virginia (collectively, the "West Virginia Group"), object to and oppose Plaintiffs' Motion to Approve Co-Leads, Co-Liaisons, and Plaintiffs' Executive Committee (the "Motion") [Docs. # 16 & 17], and respectfully request that the Court establish an open, transparent and fair application process for the selection of the Plaintiffs' leadership, as is customary by courts across this country in multidistrict litigation proceedings. The cause at issue in this litigation is too critical to the integrity of the federal judicial system and the millions of affected people in this

2

country to permit anything less than an open, transparent and impartial process for the selection of Plaintiffs' leadership in this multidistrict litigation.

The intent of this objection and opposition is not to call into question the qualifications of any specific member of the Proposed Slate.[2] Nor is it to propose, at this time, the addition of the undersigned to the Proposed Slate to the exclusion of other potential candidates who were also excluded. Rather, light must be shed on the lack of transparency and objective criteria used to self-select the Proposed Slate, including (1) the complete failure to comply with the Court's wishes expressed during the December 12, 2017 informal conference call, (2) the disregard for the criteria provided in the *Manual on Complex Litigation*, and (3) the inclusion of multiple attorneys from several of the same firms on the Proposed Slate to the exclusion of other extremely well qualified lawyers from outside the group that created the Proposed Slate. Therefore, the undersigned respectfully request that the Court establish a deadline for all interested parties and their respective counsel—including the undersigned—to apply for positions as Co-Lead Counsel, Co-Liaison Counsel, and/or as members of the Plaintiffs' Executive Committee ("PEC") and/or Plaintiffs' Steering Committee ("PSC").

**THE WEST VIRGINIA GROUP AND THEIR CHOSEN COUNSEL**

The West Virginia Group includes the first filed case in the country against the major distributors (McDowell County) and consists of some of the most devastated cities and towns involved in this multidistrict litigation. The Town of Kermit, with a population of only 390, faced an influx of 12,068,120 hydrocodone pills and 242,300 oxycodone pills from 2007 through 2012. The City of Welch, with a population of 2,196, faced distribution numbers of 4,209,740

---

[2] Counsel for the West Virginia Group are currently working, or have in the past, with several members of the Proposed Slate in other multidistrict litigation proceedings and have high regard for their qualifications and experience. Nonetheless, the process leading to their selection was deeply flawed.

3

hydrocodone doses and 1,932,400 oxycodone doses during the same period. The Town of Gilbert, population 433, saw 4,134,550 hydrocodone doses and 1,197,420 oxycodone doses during that time. Lincoln County, population 21,559, saw 6,836,990 hydrocodone doses and 1,870,300 oxycodone doses. The Town of Chapmanville, population 1,250, saw 9,278,790 hydrocodone doses and 1,486,860 oxycodone doses. Mercer County, with a population of 61,900, was hit with 22,086,220 hydrocodone doses and 5,850,320 oxycodone doses during the same years. McDowell County, population 20,874, saw 9,902,570 hydrocodone doses and 3,235,669 oxycodone doses. Finally, the City of Williamson, population 3,050, saw 1,612,290 hydrocodone doses and 568,700 oxycodone doses.[3]

Beyond the raw numbers, these counties, cities and towns have been devastated. For example, as a result of Opioid-related costs to McDowell County and the ensuing strain on the county budget, the number of sheriff's deputies had to be cut in half. The City of Welch held the highest drug overdose death rate in the United States in 2015. On December 23, 2016, when the Undersigned filed their first case, a mother had that same week had lost her third child as a result of opioid overdoses. A pill mill in the Town of Kermit distributed 3.2 million dosage units of hydrocodone in 2006 compared with the national average of 97,000. Yet, none of the chosen counsel representing this group was even afforded an avenue to apply and be considered for a leadership position. That is not in keeping with the prospering functioning of our justice system.

As the Judicial Panel on Multidistrict Litigation ("Panel") recognized when it established this multidistrict litigation proceeding, the Opioid epidemic has resulted in a wave of litigation in federal courts across the country. The undersigned have represented the West Virginia Group in a series of cases – pending since <u>2016</u> – that were transferred to this Court pursuant to the

---

[3] The population statistics referenced in this paragraph are for the year 2013.

Panel's Transfer Order.  The West Virginia Group's chosen counsel consists of a team of law firms, including Morgan & Morgan, the largest plaintiffs' firm in the United States with more than 360 lawyers and 2,300 support staff throughout offices in nine states.  Morgan & Morgan's Complex Litigation Group routinely handles multi-party complex civil litigation, including mass torts, class actions, qui tams, environmental and governmental actions.  Members of this group have diverse backgrounds, including experience with top-50 defense firms, senior government counselors, former elected officials, and partners from other plaintiffs' firms.  Its members have repeatedly been entrusted with leadership appointments in federal and state court mass torts and class action litigation including, by way of example, *In re: Black Farmers Discrimination Litigation*, where Morgan & Morgan served as Co-Lead Counsel and negotiated a $1.2 billion settlement, and the currently pending *In re Yahoo! Inc. Customer Data Security Breach Litigation*, 16-MD-02752-LHK (N.D. Cal.), the largest data breach disclosed to date in history.  The firm's Government Action Group, led by James Young, former Special Counsel to the Florida Attorney General, consists of lawyers with substantial backgrounds and experience representing governmental entities, including former Kentucky Attorney General Greg D. Stumbo (who filed the first Attorney General case against opioid manufacturer, and defendant herein, Purdue Pharma), Robert Kennedy Jr. and Jan Schlichtman.

      The team led by Morgan & Morgan has represented the West Virginia Group in the Opioids litigation for well over a year, including having briefed and argued Motions to Remand.  In addition, Morgan & Morgan is one of three firms retained to represent the Commonwealth of Kentucky in the Opioids litigation.  This team has been at the vanguard of the Opioids litigation, asserting claims against distributor defendants before, to undersigned counsels' knowledge, all firms involved in this multidistrict litigation ever asserted them in their pleadings.  In light of

these facts, and the lack of consideration of counsel for the West Virginia Group in the process that led to the Motion, a need for a renewed sense of transparency and due process with regard to establishing a leadership structure and slate is evident.

### THE PROPOSED SLATE WAS NOT CHOSEN BASED ON AN OPEN, TRANSPARENT AND FAIR PROCESS

Undoubtedly, with over 165 cases already filed, and more being filed daily, there is an unprecedented need for strong leadership to corral a large and diverse population of Plaintiffs' counsel in this multidistrict litigation proceeding.  On December 12, 2017, recognizing the need to get the process moving before the forthcoming holiday break, this Court held an informal conference call with counsel for all parties to discuss how to move this litigation forward expeditiously.  During that conference call, the Court directed Plaintiffs' counsel (as well as Defendants' counsel) to informally meet and confer regarding the recommended organizational and leadership structure for this MDL.  Acknowledging the many lawyers with MDL experience already present, and with more appearing every day, the Court indicated that a unique leadership structure might be necessary in this historic litigation.  It was during the December 12th teleconference that the undersigned, along with a large number of counsel representing other Plaintiffs in this multidistrict litigation, were first informed that a meeting of Plaintiffs' counsel had been scheduled for December 18th in Cleveland, Ohio.  During the teleconference, the purpose of the December 18th meeting was described as affording counsel for the many Plaintiffs an opportunity to discuss the organization and proposed leadership structure for this MDL, and it was understood that any and all Plaintiffs' counsel interested in seeking leadership positions would be given due consideration.

Between the December 12th conference call and the December 18th meeting, counsel for the West Virginia Group, including Mr. Young of Morgan & Morgan attempted to reach out to

many of the other firms involved in the litigation in an effort to discuss how to organize and structure leadership to best serve the interests of every Plaintiff and their respective public constituencies.  During the course of those communications, counsel for the West Virginia Group were never provided with any meaningful information by those who organized the December 18th meeting regarding their contemplated leadership structure or the Proposed Slate. Although a December 14th email formally notifying all Plaintiffs' counsel of the December 18th meeting in Cleveland stated that the organizers would be "creating an agenda of items to be discussed and will forward that agenda by email this weekend," no such agenda was disseminated to all Plaintiffs' counsel in advance of the December 18th meeting.  Ultimately, more than 150 lawyers from all parts of the country traveled to Cleveland for the December 18th meeting, including an eight-person team representing the West Virginia Group identified above.

Instead of what was understood to be the purpose of the December 18th meeting—an open, transparent and fair process for self-organization—a small self-appointed group of Plaintiffs' attorneys carried out a scripted performance in which select members of an exclusive group of firms "educated" the large group assembled, and then unilaterally announced and unveiled the pre-ordained Proposed Slate they had internally chosen in some undisclosed manner and without any open discussion.[4]  The "process" used by this small group of counsel to self-select themselves and a group of others for various leadership positions in this multidistrict litigation was anything but open, transparent or fair.  Indeed, the presentation was so scripted that a PowerPoint presentation flashed on screens including the pre-ordained names of the members

---

[4] All persons entering the December 18th meeting were required to sign a declaration in which they agreed, *inter alia*, to "keep the contents of the meeting confidential" to protect and preserve applicable privileges from disclosure to Defendants.  In keeping with that declaration, the undersigned do not provide further details of the contents of the meeting here, but are prepared to do so by way of a sealed declaration or *in camera* presentation.

of the Proposed Slate. Immediately following the announcement of the Proposed Slate, with virtually no discussion, an individual rose with a pre-printed cue card to move for adoption of the Proposed Slate in its entirety. A "voice vote" adopting the Proposed Slate quickly ensued and the meeting ended shortly thereafter.

The process and criteria for how members of the Proposed Slate were selected was not disclosed before, during or after the meeting. There was no vote about whether specific proposed candidates should or should not be on the leadership team or opportunity for alternatives to arise. In essence there was only one name on the ballot. This process did not offer any opportunity, let alone a meaningful one, for the many other Plaintiffs' lawyers who were not pre-selected to apply for, or be considered for, leadership positions as part of an open, transparent and fair process.

As indicated in the Motion, the Proposed Slate unveiled at the December 18th meeting consists of (i) three Co-Lead Counsel, (ii) three Co-Liaison Counsel, (iii) a 15-member Plaintiffs' Executive Committee, and (iv) an undisclosed and as-yet undetermined number of members of a Plaintiffs' Steering Committee.[5] What is not readily apparent from the Motion, however, is that two of the 15 seats on the PEC include lawyers from the same firm (Baron & Budd), two other members of the PEC are from the same firms as two of the Co-Lead Counsel (Simmons Hanly Conroy and Motley Rice), and one other member of the PEC is from the same firm as one of the proposed Co-Liaison Counsel (Levin Papantonio). In addition, two other members of the proposed PEC are co-counsel to two of the Co-Lead Counsel firms (Simmons Hanly Conroy and Greene Ketchum Farrell) or one of the Co-Liaison Counsel (Levin

---

[5] The PowerPoint slide shown at the December 18th meeting identified 15 PEC members, but only 14 seats. It appeared that the 15th name had been added at the last minute because it was incorrectly inserted into a seat that identified a lawyer from a different law firm.

Papantonio) in cases filed in Wisconsin and Ohio. Likewise, three firms—Levin Papantonio, Baron & Bud, and Green Ketchum Farrell—serve as co-counsel on most if not all of their relevant cases, and are slated to fill five leadership positions. Thus, the number of "independent" members of the Proposed Slate are far fewer than the total number of actual members set forth in the Motion.

As this Court is aware, the process for the selection of Plaintiffs' leadership in MDLs typically involves the submission of individual applications by interested lawyers and law firms that include, among other things, a description of the applicant's relevant qualifications and experience, a certification of ability to personally commit the time and resources necessary to pursue the litigation, a certification of financial independence and ability to advance the costs necessary to pursue the litigation, and a list of judicial references the Court can contact as part of its due diligence process. Oftentimes, the formal written applications are followed by an opportunity for applicants to make a brief in-person presentation before the Court. That critical process was circumvented here, and the result smacks of unfairness.

Based on the foregoing, the West Virginia Group and their chosen counsel respectfully request that the Court deny the Motion in its entirety, and establish a transparent, open and fair process for the selection of the Plaintiffs' leadership team and structure in this monumental multidistrict litigation.

Dated: December 21, 2017

Respectfully submitted,

/s/ *John A. Yanchunis*
John Yanchunis
Florida Bar No. 324681
jyanchunis@forthepeople.com
Patrick A. Barthle II
Florida Bar No. 99286

pbarthle@forthepeople.com
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin St., 7th Floor
Tampa, FL 33602
(813) 223-5505

James Young
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904) 398-2722

H. Truman Chafin (WV BAR NO. 684)
Letitia N. Chafin (WV BAR NO. 7207)
**THE CHAFIN LAW FIRM, PLLC**
P.O. Box 1799
Williamson, WV 25661
Phone: 304-235-2221
Fax: 304-235-2777
Email: truman@thechafinlawfirm.com
Email: tish@thechafinlawfirm.com

Harry F. Bell, Jr., Esq. (WV BAR NO. 297)
**THE BELL LAW FIRM PLLC**
P.O. Box 1723
30 Capitol St.
Charleston, WV 25326-1723
Email: hfbel@belllaw.com
Phone: 304-345-1700

Mark E. Troy, Esq. (WV BAR NO. 6678)
**Troy Law Firm, PLLC**
222 Capitol Street, Suite 200A
Charleston, WV 25301
Email: mark@troylawwv.com
Phone 304-345-1122

*Counsel for Plaintiffs McDowell County, Mayor Raaimie Barker, on behalf of the Town of Chapmanville, Mayor Vivian Livinggood on behalf of the Town of Gilbert, Mayor Charles Sparks on behalf of the*

*Town of Kermit, The County Commission of Lincoln County, The County Commission of Mercer County, Mayor Reba Honaker on behalf of the City of Welch, Mayor Robert Carlton on behalf of the City of Williamson*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 21, 2017, I electronically filed a true and correct copy of the foregoing unopposed motion with the Clerk of the Court using the CM/ECF system, which will send notification to all attorneys of record in this matter.

/s/ *John A. Yanchunis*
John A. Yanchunis, Esq.