1    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3    -------------------------------X
                                    :
4    IN RE: NATIONAL PRESCRIPTION    :   MDL No. 2804
     OPIATE LITIGATION               :
5                                    :   Case No. 1:17-CV-2804
                                     :   Cleveland, Ohio
6                                    :
     *APPLIES TO ALL CASES*          :   Tuesday, January 9, 2018
7                                    :   9:12 a.m.
     -------------------------------X
8

9

              TRANSCRIPT OF PROCEEDINGS
10
         BEFORE THE HONORABLE DAN A. POLSTER
11            UNITED STATES DISTRICT JUDGE

12                      AND

13       BEFORE THE HONORABLE DAVID A. RUIZ
              UNITED STATES MAGISTRATE JUDGE
14

15

16   Court Reporter:      Donnalee Cotone, RMR, CRR, CRC
                          Realtime Systems Administrator
17                        United States District Court
                          801 West Superior Avenue
18                        Court Reporters 7-189
                          Cleveland, Ohio 44113
19                        216-357-7078
                          donnalee_cotone@ohnd.uscourts.gov
20

21

22

23

24

25

1    APPEARANCES (Continued):

2

3    For the Plaintiffs:       Paul T. Farrell, Jr., Esq.
                               Greene Ketchum Farrell, Bailey & Tweel
4                              419 Eleventh Street
                               Huntington, West Virginia 25724
5                              304-525-9115
                               paul@greeneketchum.com
6
     For the Plaintiffs:       Paul J. Hanly, Jr., Esq.
7                              Simmons Hanly Conroy LLC
                               112 Madison Avenue
8                              New York, New York 10016
                               212-784-6400
9                              phanly@simmonsfirm.com

10   For the Plaintiffs:       Joseph F. Rice, Esq.
                               Motley Rice LLC
11                             28 Bridgeside Boulevard
                               Mount Pleasant, South Carolina 29465
12                             843-216-9000
                               jrice@motleyrice.com
13
     For Defendants            Mark S. Cheffo, Esq.
14   Purdue Pharma L.P.,       Quinn Emanuel Urquhart & Sullivan, LLP
     Purdue Pharma Inc.,       51 Madison Avenue, 22nd Floor
15   and The Purdue            New York, New York 10010 212-849-7000
     Frederick Company         markcheffo@quinnemanuel.com
16   Inc.:

17   For Defendants            Enu Mainigi, Esq.
     Cardinal Health,          Williams & Connolly LLP
18   Inc.; Cardinal            725 Twelfth Street, NW
     Health 110, LLC:          Washington, DC 20005
19                             202-434-5000
                               emainigi@wc.com
20

21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer-aided transcription.

MORNING SESSION, TUESDAY, JANUARY 9, 2018

(Proceedings commenced at 9:11 a.m.)

- - -

THE COURT:  Everyone can be seated.  Except I apologize.  We brought in extra chairs, but I guess they ran out of extra chairs.

All right.  Well, good morning, Everyone.

This is the first meeting of counsel in the opioid MDL.  Judge Ruiz and I are here, and, again, I apologize.  The courtroom isn't big enough.  I've reserved the 16th floor, those two courtrooms, for some private conferences with counsel that we will probably go into.

I appreciate all of the submissions that I've received.  Some have been exchanged.  Some were *ex parte*, as I permitted.  I've given a lot of thought to what to do.  All of the submissions focused on how a judge should manage this MDL and the 200 or more cases in sort of a traditional manner.  I appreciate that.

I've handled and managed two other MDLs, and I'm familiar with many of the others that my colleagues have handled around the country.  But this is not a traditional MDL.  It generally focuses on something unfortunate that's happened in the past, and figuring out how it happened, why it happened, who might be responsible, and what to do about it.

1        What's happening in our country with the opioid crisis

2   is present and ongoing.  I did a little math.  Since we're

3   losing more than 50,000 of our citizens every year, about

4   150 Americans are going to die today, just today, while

09:14:08  5   we're meeting.

6        And in my humble opinion, everyone shares some of the

7   responsibility, and no one has done enough to abate it.

8   That includes the manufacturers, the distributors, the

9   pharmacies, the doctors, the federal government and state

09:14:33 10   government, local governments, hospitals, third-party

11   payors, and individuals.  Just about everyone we've got on

12   both sides of the equation in this case.

13        The federal court is probably the least likely branch

14   of government to try and tackle this, but candidly, the

09:14:58 15   other branches of government, federal and state, have

16   punted.  So it's here.

17        So I don't think anyone in the country is interested

18   in a whole lot of finger-pointing at this point, and I'm not

19   either.  People aren't interested in depositions, and

09:15:21 20   discovery, and trials.  People aren't interested in figuring

21   out the answer to interesting legal questions like

22   preemption and learned intermediary, or unravelling

23   complicated conspiracy theories.

24        So my objective is to do something meaningful to abate

09:15:51 25   this crisis and to do it in 2018.  And we have here -- we've

1   got all the lawyers.  I can get the parties, and I can

2   involve the states.  So we'll have everyone who is in a

3   position to do it.  And with all of these smart people here

4   and their clients, I'm confident we can do something to

09:16:17  5   dramatically reduce the number of opioids that are being

6   disseminated, manufactured, and distributed.  Just

7   dramatically reduce the quantity, and make sure that the

8   pills that are manufactured and distributed go to the right

9   people and no one else, and that there be an effective

09:16:40  10  system in place to monitor the delivery and distribution,

11  and if there's a problem, to immediately address it and to

12  make sure that those pills are prescribed only when there's

13  an appropriate diagnosis, and that we get some amount of

14  money to the government agencies for treatment.  Because

09:17:10  15  sadly, every day more and more people are being addicted,

16  and they need treatment.

17      So that's what I am interested in doing.  I mean, I'm

18  really -- you know, if I've got to do it in a traditional

19  way, and -- I guess I'll have no choice.  I'll admit failure

09:17:32  20  and I'll say, All right.  We've just got to plow through

21  this, and, you know, if we can't accomplish something like

22  what I've talked about then, you know, I'll talk to

23  everyone.  But my present intention is to turn everyone

24  loose.  I'll turn the plaintiffs loose on the defendants;

09:17:56  25  I'll turn the defendants lose on the plaintiffs.  You'll,

1   you know, tear each other up way down in 2017 [sic] for

2   discovery. You can go after the federal government, full

3   discovery there, too. You know, FDA, DEA, have at it, and

4   in 2019, I'll try the Ohio case myself and see what happens,

09:18:21  5   after dealing with whatever motions, and I'm sure some of

6   the claims and theories are going to be knocked out and some

7   will survive. And I'll try the case that I have

8   jurisdiction over, which is the Northern District of Ohio

9   group. What that will accomplish, I don't know. But I'd

09:18:42 10   rather not do that.

11        So that's really what I want to talk to everyone

12   today, and if we can get some agreement on both sides that

13   that's what we ought to do and that's how we should spend --

14   I mean, look around this room; an incredible amount of

09:18:59 15   talent. I doubt if any judge has ever assembled this kind

16   of talent ever. And I'm talking about you, certainly not --

17   and Judge Ruiz, not me. Okay?

18        But that's what -- I think we have an opportunity to

19   do it, and it would be an abject abdication of our

09:19:19 20   responsibility not to try it. And if we can't, then we've

21   got to do the other way. And if we can get some general

22   agreement that we should try it, then we'll figure out

23   today, how do we organize that effort, who is not here that

24   we need to get involved, and we'll get about doing it and

09:19:46 25   what help I'll need.

As I indicated in my prior order, I haven't made a
final decision on what to do regarding Special Master or
Special Masters. I looked carefully at the recommendations,
suggestions of the parties. I had some preliminary
discussions with three people suggested, who I happen to
know because I've worked with them: David Cohen,
Cathy Yanni, and Francis McGovern.

I asked David Cohen and Francis McGovern to listen in
by telephone today, and then I'll decide, after we have
probably some private discussions, what I'll do in that
regard.

So I know none of you were expecting what I just said,
but I certainly want to hear from you. I mean, I knew what
I was going to say. I have no idea what any of you are
going to say.

And so the one thing I would request, because,
obviously, we have a court reporter, is that anyone who
speaks, I think it will actually be better if you stay
seated by a microphone.

Is that right, Katie?

Or the podium, all right? If you're not seated -- if
you're seated at a table by a microphone, the sound will
work better if you stay seated. I know it's sort of
counterintuitive, you always stand in the court, but it
works better if you're seated. If you're not seated by a

1   microphone, then if you can use the lectern, because there's

2   a microphone there, and then just please identify yourself

3   and who you're representing.

4       I hope someone speaks.  I don't -- I'd hate to listen

09:22:00  5   to myself again.

6       MR. RICE:  Good morning, Your Honor.

7       Joe Rice with Motley Rice here on behalf of the

8   plaintiffs.  Thank you for your comments.

9       I think I can say on behalf of all the plaintiffs that

09:22:13  10   we share your feeling of urgency.  And I can tell you that

11   all of our clients are dealing with this every day at the

12   city, county level, everybody.

13       So we are here to give you the time and the talents

14   that we can have to try to bring something together as

09:22:29  15   quickly as possible.

16       THE COURT:  Thank you, Joe.

17       MR. HANLY:  Your Honor, if I may.

18       Yes, Judge.  My name is Paul Hanly.  I'm co-lead with

19   Mr. Rice and Mr. Farrell.

09:22:42  20       If I might just address the Court's comment about the

21   submissions.  The plaintiffs' submission does discuss

22   litigation options.  And I want to explain to the Court that

23   that's based upon good-faith discussions that we all had

24   with certain of the defendant representatives.

09:23:01  25       So we did not feel it was sufficient simply to agree

1   with the Court concerning the resolution track -- which we

2   are very, very much in favor of -- but we felt it important

3   also to present, from the plaintiffs' point of view,

4   possible litigation strategies, given that certain of the

09:23:20   5   defendants were talking in terms of litigation before they

6   wanted to discuss resolution.

7            THE COURT:  All right.  I understood that,

8   Paul.

9            But the resolution I'm talking about is really -- what

09:23:37 10   I'm interested in doing is not just moving money around,

11   because this is an ongoing crisis.  What we've got to do is

12   dramatically reduce the number of the pills that are out

13   there and make sure that the pills that are out there are

14   being used properly.  Because we all know that a whole lot

09:24:02 15   of them have gone walking and with devastating results.  And

16   that's happening right now.

17            So that's what I want to accomplish.  And then we'll

18   deal with the money.  We can deal with the money also and

19   the treatment.  I mean, that's what -- you know, we need a

09:24:26 20   whole lot -- some new systems in place, and we need some

21   treatment.  Okay?  We don't need -- we don't need a lot of

22   briefs and we don't need trials.  They're not going

23   to -- none of them are -- none of those are going to solve

24   what we've got.

09:24:41 25            So, again, you know, ideally, this should be handled

1    by the legislative and executive branches, our federal

2    government, and our state governments.  They haven't seemed

3    to have done a whole lot.  So it's here.  So . . .

4                    MR. CHEFFO:  Good morning, Your Honor.  This

09:25:14  5    is Mark Cheffo for --

6                    THE COURT:  Yes, Mark.

7                    MR. CHEFFO:  One of the liaison counsel for

8    the manufacturers.  I would, I think, just echo really what

9    Your Honor said and what counsel said.

09:25:24 10         I think from our perspective, we certainly welcome the

11    opportunity to talk in more detail with the Court.  It

12    sounds like that's what you have in mind.  I think all of us

13    recognize that there is issues in this country.  I think we

14    all, to the extent that we can, want to be part of the

09:25:39 15    solution and work with Your Honor in trying to hear about

16    some of the ways that we might move forward.

17         I think that Your Honor kind of articulated at a high

18    level some of the impediments that might be in our way to

19    try and get from here to where Your Honor's vision is.  So I

09:25:57 20    think we'd be interested in exploring that a little more.

21    You know, as you said, some of the issues include kind of

22    working through expectations, and also, you know, frankly,

23    making sure that the right folks are at the table, and many

24    of them are maybe not in this room as well.

09:26:12 25         So I think that, you know, we welcome the opportunity

1   to kind of sit down with the Court, hear your ideas, and try

2   to be as productive as we can.  And, you know, I'm sure, as

3   you know, there's a lot of defendants in this room, too, and

4   they'll all have their own specific issues and concerns.

09:26:29  5   But I think I'm very comfortable telling the Court that we

6   want to participate with Your Honor and at least try and

7   explore some of these ideas.

8           THE COURT:  Okay.  Thank you, Mark.

9           MS. MAINIGI:  Your Honor, Enu Mainigi from

09:26:44 10   Williams & Connolly on behalf of Cardinal Health.  And I'm

11   also liaison counsel for the distributors.

12       We echo Mr. Cheffo's comments.  We recognize that

13   there's a problem out there.  We're happy to have

14   discussions with Your Honor.  And we're pleased that

09:27:00 15   Your Honor has referenced the fact that there are state and

16   federal governments that are also involved here that may

17   need to be involved in the process.

18       I think as we've been having good-faith discussions

19   with plaintiffs' counsel in anticipation of today, and,

09:27:19 20   indeed, after the MDL was filed, I think that it's certainly

21   become clear to us that, as Your Honor has seen from various

22   papers that have been filed, that there are, in fact, the

23   impediments that Mr. Cheffo pointed out, certain threshold

24   issues that -- and they're not necessarily the same for

09:27:43 25   distributors, manufacturers, and other defendants, but there

1    are certain threshold issues that we think the resolution of

2    those, in some manner, and we're happy to work with the

3    Court and with plaintiffs' counsel to figure out how best to

4    get those issues decided.

09:28:00   5    But we actually think that the resolution of some of

6    those issues would be extremely helpful in then moving

7    forward with discussions about what can be done in a variety

8    of ways about this problem.

9    But we welcome the opportunity to speak to Your Honor,

09:28:20  10    either here in this group setting, or I think you alluded to

11    separate meetings at some point, but we're happy to

12    elaborate on that.

13    THE COURT:  All right.  Well, I appreciate

14    those comments.

09:28:41  15    As I presently thought through this, I'm not inclined

16    to tackle legal issues without a full factual record, and I

17    know what it will take to get a full factual record, how

18    much time and how much money.  And if I've got to do that,

19    we'll do that.  But I'm really not interested in deciding

09:29:09  20    legal issues in a vacuum just on motions.  I want to know

21    what the facts are, because the facts often drive the law.

22    So if we have to go down that route, my present

23    inclination is to just let each of you have at it, and go at

24    each other, all -- I don't know how many we've got -- 150,

09:29:37  25    200 of you, plus legions who aren't here, and, you know, the

plaintiffs will turn the manufacturers, distributors, and a

few doctors, upside down, inside out.  The defendants will

turn federal government, state government, counties, cities,

inside out, upside down over 2018, and then I'll probably

try the Ohio ones in 2019 after I decide the motion.

I really don't want to do that.  It isn't going to

resolve anything.  But my -- maybe you can convince me

otherwise, but I've given a lot of thought, and my present

feeling is I'm not going to decide these very interesting

and important legal issues in a vacuum without having a full

record.  So if we've got to go down that way, you know, we

all know how to do that.  I know how to do it and you all

know how to do it.

But while we do that, another 50- or 60,000 people are

going to die, and we'll be absolutely no closer to abating

that.

I mean, I read recently that we've managed in the last

two years, because of the opioid problem, to do what our

country has not done in 50 years, which is to -- for two

consecutive years, reduce, lower the average life expectancy

of Americans.  And if we don't do something in 2018, we'll

have accomplished it for three years in a row, which we

haven't done since the flu epidemic 100 years ago wiped out

10 percent of our population.  And this is 100 percent

manmade.  Now, I'm pretty ashamed that this has occurred

1    while I've been around.  So I think we all should be.

2        All right.  Does anyone want to say anything more

3    before we maybe have some separate caucuses?  And my plan is

4    to -- I'm going to use the 16th floor.  I've got two

09:31:52  5    courtrooms, and I think I'm going to put the plaintiffs'

6    leadership team in one room and the defendants' leadership

7    team in the other room.  And I guess -- I don't know how

8    much -- you know, if there's room for others, that's okay,

9    too.  But I want to have some candid discussions.

09:32:19 10                    MR. CHEFFO:  Your Honor.

11                    THE COURT:  Yes.

12                    MR. CHEFFO:  If I might, just one thing.

13        I think that's on.  Sorry about that.

14        I think, again, in the spirit of trying to work with

09:32:23 15    the Court on identifying -- so I think what we all need to

16    do -- and I think Your Honor, I'm sure, appreciates this --

17    is to just try and identify what we all may think are

18    impediments to get to where Your Honor wants.  One of the

19    issues is that -- probably unfortunately from our

09:32:38 20    perspective where we sit, the only -- this is not the only

21    place where activity is occurring, so --

22                    THE COURT:  Yeah, well, I can -- I can -- the

23    advantage of a federal judge is, I can order anyone in that

24    I want.  I, obviously, can pick up the phone and talk to

09:32:53 25    anyone I want.  I can pick up the phone and call any state

1    attorney general I want and invite him or them to be

2    involved, and I'm sure they will.  They've got the same

3    interests.

4         I do not control the DEA or the FDA.  I can

09:33:14  5    certainly -- if their involvement is necessary, I can invite

6    it.  I can invite it.

7              MR. CHEFFO:  Yeah, and that's -- that would

8    be -- I think, as we move forward, that would be extremely

9    helpful.  There's also the situation that many of the

09:33:28  10   extremely, as you said, talented lawyers on the plaintiffs'

11   side here also do have some state court cases.

12              THE COURT:  I understand that.

13              MR. CHEFFO:  So to the extent that we're doing

14   a stand down here, if it -- you know, if things kind of

09:33:38  15   progress in other places, that that might interfere with the

16   Court's ability to kind of get us to focus on these issues.

17         So I just throw that out as one of the issues the

18   Court might want to consider.

19              THE COURT:  I can understand that.  I can't --

09:33:52  20   I can make requests.  There's some things a federal judge

21   can order, but I can't order a state judge to do anything,

22   and -- I can make requests, and I think most -- I mean,

23   everyone should want to work together to abate the crisis

24   first and then figure out what to do.  But, again, I can

09:34:12  25   make requests.

1          MR. RICE:  Your Honor.

2          THE COURT:  Yes.

3          MR. RICE:  Joe Rice.

4          THE COURT:  Yes, Mr. Rice.

09:34:23  5          MR. RICE:  There's one item of information

6    that's available, but not available, is where the pills

7    went, where they were sold and sort of the market share

8    situation is in a database that the DEA has.  That there is

9    a federal requirement that every time one of these pills is

09:34:40 10    sold, that it's reported where it was sold to.  Having that

11    database would give us a format, both sides, to know the

12    extent of involvement by any particular distributor and

13    where maybe we need to focus more of our efforts on, where

14    the pills went.

09:34:57 15          And that was discovery that was underway in the

16    Southern District of Ohio.  There had been a subpoena

17    issued.  There had been an objection filed.  There had been

18    a motion to compel filed, and the DEA -- or DOJ on behalf of

19    the DEA was to file a brief in support of their objection

09:35:19 20    with Judge Sargus.  And that was to be filed shortly after

21    the MDL panel ruled, and that got stayed.

22          But that matter is not a legal matter as far as, you

23    know, the overall party, but it is a piece of information

24    that would be extremely valuable to the Court and to all the

09:35:35 25    parties if we could proceed with the production of that

1    ARCOS database.

2                    THE COURT:  Well, that's one possibility.  If

3    I think that we need that data, I can pick that up, and

4    I'll -- if the Department of Justice has objections, I'll

09:35:56   5    certainly consider them.  But that is a possibility.

6         So I -- who provides -- the manufacturers and

7    distributors both provide that input, or just the

8    distributors?  Where does the input come from?

9                    MR. RICE:  It comes just from the

09:36:14  10    distributors.

11                    MS. MAINIGI:  Your Honor, if I may.

12                    THE COURT:  Yes.

13                    MS. MAINIGI:  At least on behalf of the

14    distributors, the ARCOS data is composed, in significant

09:36:29  15    part, of data from distributors.  I think that there may be

16    some coming from the manufacturers, but I'll let them speak

17    to that.

18         In terms of what Mr. Rice indicated, I know -- I think

19    we are putting the cart before the horse.  I would suggest

09:36:45  20    that to the extent --

21                    THE COURT:  Well, I'm not -- I just want to

22    know where the -- so obviously each distributor knows its

23    data, but --

24                    MS. MAINIGI:  Correct.

09:36:55  25                    THE COURT:  -- you wouldn't know --

1          MS. MAINIGI:  We do not have the ability.

2          THE COURT:  -- the data that anyone else is

3     inputting.  So you've got -- obviously, you know your data,

4     and you know what you're transmitting.  Okay.  And then the

09:37:03  5     DEA compiles it.  So at the moment, they would be the only

6     entity that has everyone's data --

7          MS. MAINIGI:  Correct, Your Honor.

8          THE COURT:  -- correct?

9          MS. MAINIGI:  That's correct.

09:37:13 10          THE COURT:  Okay.

11          MS. MAINIGI:  And I know just procedurally,

12     the DEA had lodged an objection.  I don't know if that's

13     something they intend to renew if this request is renewed.

14          THE COURT:  Look, you know, I'm a former

09:37:29 15     prosecutor, and I can imagine that the DEA and the

16     Department of Justice may very well have ongoing

17     investigations as the result of the data.  They're not just

18     compiling that data for the heck of it.  Everyone knows why

19     the DEA would want to have that data.  And the last thing I

09:37:50 20     want to do is mess up an ongoing criminal investigation

21     and/or prosecution.  And that's the problem with just

22     willy-nilly making all of that data public.

23          MR. FARRELL:  Judge, this is Paul Farrell --

24          THE COURT:  Yes.

09:38:05 25          MR. FARRELL:  -- from West Virginia, and I was

1    counsel in the City of Cincinnati.  The Touhy letter that we

2    issued to the Department of Justice addresses some of those

3    concerns.  There's been -- the ARCOS data has been briefed

4    in the Madel case out of the Eighth Circuit that was pending

09:38:20  5    in Minnesota.  So it's a pretty well-defined argument on the

6    objections.

7        We believe that limiting the scope of the request to

8    the time frame in which the opioid epidemic arose and

9    eliminating, say, the last 12, 16, 24-months worth of data

09:38:38  10   preserves the ability of the Department of Justice --

11              THE COURT:  Well, you know, this is a

12   complicated issue.  Judge Sargus probably was considering

13   it.  I'm certainly not going to do anything on the fly.  I'm

14   not sure if it's necessary to have all that data to do the

09:38:56  15   kind of -- have the kind of discussions we're having.

16       I'd like to -- I think at this point, I'm going to

17   talk privately to each side and see where we go.  If we get

18   some traction, then we'll figure out what the next steps

19   are.

09:39:10  20       So let's just say this:  We'll have the plaintiffs'

21   leadership in Courtroom 16A and the defendants' leadership,

22   and that's -- I know we've got three tracks or groups of

23   defense counsel.  We've got a manufacturers' track, we have

24   a distributor track or group, and we have an individual

09:39:37  25   defendants' track or group, and my order may not have

1    been -- I added a couple of people, and they were being

2    added to the -- what I'll call the individual defendants'

3    steering committee or track.  And I think the individual

4    defendants are only doctors.

09:39:55  5    Are there any other individual defendants in the case?

6    I wasn't aware of any.

7    All right.  So the individual defendants are -- they

8    are four or five doctors.  Okay.  So I want all of the

9    defendants' leadership in 16B.  And I don't have a problem

09:40:16 10   with other lawyers coming in, but the primary spokespeople,

11   I think, will be the leadership team, which is why they were

12   created, just because it's unwieldy to have so many people,

13   and it's incredibly expensive, and, obviously, we

14   can't -- even if there are 200 people, it's not realistic

09:40:45 15   for 200 people to be addressing the Court and for me to be

16   talking to each of you, so -- but I do appreciate everyone

17   being here for the first meeting.

18   Okay.  And for those people on the phone, the

19   conference call will not continue for these private

09:41:09 20   discussions because these are not public proceedings.

21   If we come back together, I don't know if there'll be

22   a capability to get you back on the phone.  I don't know --

23   Do we know everyone who is on the phone?

24   All right.  So this may be -- probably be the last

09:41:37 25   time -- the last opportunity for those of you on the phone.

1  But I don't know if there are -- I'm not sure there's going

2  to be really a capability to call back in.

3       Although, maybe if and when we come back in, I'll put

4  a quick order out, and you can note -- access the ECF and

09:42:14  5  see when we're going back on the record and call back in.

6  That's about the best I can do.  So I'll try to do that.

7       Okay.  Then we will adjourn for private caucuses, and

8  I'll see you respectfully down on 16 in a few minutes.

9       Thank you.

09:42:34  10            DEPUTY CLERK:  All rise.

11                           - - -

12            (Proceedings adjourned at 9:42 a.m.)

13

14

15                  **C E R T I F I C A T E**

16

17       I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19

20  */s/ Donnalee Cotone _____11th of January, 2018*
    DONNALEE COTONE, RMR, CRR, CRC                    DATE
21  Realtime Systems Administrator

22

23

24

25