1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3

4     IN RE:                          Case No. 1:17-md-2804
      NATIONAL PRESCRIPTION           Cleveland, Ohio
5     OPIATE LITIGATION
                                      Monday, February 26, 2018
6                                     3:00 p.m.

7

8

9                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE DAN AARON POLSTER,
10        UNITED STATES DISTRICT JUDGE, AND THE HONORABLE
           DAVID A. RUIZ, UNITED STATES MAGISTRATE JUDGE

11

12

13    APPEARANCES:              David Rosenblum Cohen,
                                Special Master
14                              Law Office of Dave R. Cohen
                                24400 Chagrin Blvd., Ste.300
15                              Cleveland, Ohio   44122
                                216-8331-0001
16

17

18    (Appearances continued to Page 2.)

19

20

21    Official Court Reporter:  Heidi Blueskye Geizer
                                Certified Realtime Reporter
22                              United States District Court
                                801 West Superior Avenue
23                              7-178 U.S. Court House
                                Cleveland, Ohio   44113
24                              216-357-7092

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.

```
1     APPEARANCES:   (Continued)

2     For the Plaintiffs:        Paul T. Farrell, Jr.
                                 Greene, Ketchum, Farrell,
3                                 Bailey & Tweel
                                 419 Eleventh Street
4                                P.O. Box 2389
                                 Huntington, WV 25724-2389
5                                304-525-9115

6                                Peter James Mougey
                                 Levin Papantonio Thomas
7                                 Mitchell Rafferty & Proctor
                                 316 South Baylen Street, Ste. 600
8                                Pensacola, FL 32502
                                 850-435-7068
9
                                 Peter H. Weinberger
10                               Spangenberg, Shibley & Liber
                                 1001 Lakeside Avenue, E, Ste. 1700
11                               Cleveland, OH 44114
                                 216-696-3232
12
      For the Defendants         Carole S. Rendon
13    Endo Health Solutions,     Baker & Hostetler - Cleveland
      Inc., Endo                 219 Public Square, Ste. 2000
14    Pharmaceuticals:           Cleveland, OH 44114
                                 216-861-7420
15
      For the Defendants         Mitchell G. Blair
16    Actavis Pharma, Inc.,      Calfee, Halter & Griswold
      Cephalon Inc., Teva        1405, East Sixth Street
17    Pharmaceuticals USA,       Cleveland, OH 44114
      Inc., Watson Laboratories  216-622-8361
18    Inc., Teva Pharmaceutical
      Industries, Inc.:
19
      For the Defendants         Enu Mainigi
20    Cardinal Health 105,       Steven M. Pyser
      Inc.; Cardinal Health      Williams & Connolly
21    110, LLC; Cardinal         725 Twelfth Street, NW
      Health 414, LLC;           Washington, DC 20005
22    Cardinal Health 112,       202-434-5000
      LLC; Harvard Drug Group;
23    Cardinal Health 108, LLC:

24

25
```

1    APEARANCES:   (Continued)

2    For the Defendant          Geoffrey E. Hobart
     McKesson Corporation:       Covington & Burling
3                                One CityCenter
                                 850 Tenth Street, NW
4                                Washington, DC 20001
                                 202-662-6000
5
     For the Defendants          Alvin L. Emch
6    AmerisourceBergen          Jackson Kelly
     Corporation,                500 Lee Street, Ste. 1600
7    Bellco Drug Corp.:          P.O. Box 553
                                 Charleston, WV 25322
8                                304-340-1000

9    For Interested Party        James R. Bennett, II
     U.S. Department of          Karen E. Swanson-Haan
10   Justice,                    Office of the U.S. Attorney
     Drug Enforcement            Northern District of Ohio
11   Administration:             801 Superior Avenue, W, Ste. 400
                                 Cleveland, OH 44113
12                               216-622-3988

13                          -   -   -   -   -

14

15

16

17

18

19

20

21

22

23

24

25

1      AFTERNOON SESSION, MONDAY, FEBRUARY 26, 2018  3:00 P.M.

2                  THE COURT:  This is a hearing in the Opiate

3      MDL, 1:17-md-2804, regarding the production of ARCOS data.

4      I want to make sure I have everyone; I think I do.

5          For the plaintiffs we have Mr. Farrell, Mr. Mougey,

6      and Mr. Weinberger over to my right.

7          For the defendants we've got Ms. Mainigi, Mr. Pyser,

8      Mr. Hobart, Mr. Emch, Ms. Rendon, and Mr. Blair.

9          For the DEA and the U.S. Attorney's Office we've got

10     Mr. Forrest, Mr. Bennett, and Ms. Swanson Haan, who are in

11     the back.

12                 MR. BENNETT:  That's correct, Your Honor.

13                 THE COURT:  And I'm sorry, you got sort

14     of -- you should come up to the closer table.

15                 MR. BENNETT:  Yes, Your Honor.

16                 THE COURT:  I don't need to say a great deal

17     for introduction other than I essentially picked up this

18     aspect of the litigation from Judge Sargus, who was actively

19     litigating a subpoena that the plaintiffs had issued to DEA

20     for the ARCOS data in the case he had, and that case, that

21     litigation was suspended when his case was transferred into

22     my MDL.  So I picked it up at the point where DEA had

23     interposed a number of objections.

24         I issued an order at the end of January, picking up on

25     what DEA said in their last filing after they detailed the

1    objections, that they were willing to sit down with the

2    plaintiffs and discuss with them specifically what the

3    plaintiffs wanted and needed, and what could be provided,

4    and directed the parties to have those discussions; to

5    report the status of the discussions to me by last Friday,

6    and then if there were still issues, to have a hearing

7    today.

8         So I appreciate the hard work of the parties.  I did

9    read the status reports, and I see there is agreement on a

10   number of points, but still some issues of disagreement, so

11   I'm going to hear from the parties and then make a decision.

12        While I don't think there's any question about the

13   plaintiffs' need for some of this data, I think it probably

14   makes sense just so the hearing record is complete for

15   someone from the plaintiffs to just articulate what it is

16   that you want, and why it's essential to have it.

17        So Mr. Farrell.

18             MR. FARRELL:  Yes, Your Honor.  Thank you.

19   Paul Farrell, Jr., on behalf of the plaintiffs.

20        As you're aware, we have filed a number of cases on

21   behalf of governmental entities, geographical districts; for

22   instance, Campbell County, West Virginia.  And in the

23   process of the case that we filed we've asked for production

24   of the ARCOS database.

25        The ARCOS database is a mandatory reporting

1   requirement by the manufacturers and distributors of

2   prescription opioids, and each transaction that is made from

3   the manufacturer to the distributor, and then from the

4   distributor to the pharmacy, is reported through a portal

5   into a database maintained by the DEA pursuant to federal

6   law.

7        What we have asked for is we have asked for the

8   production of the database so that we can identify within

9   each jurisdiction, within each government entity that is

10  here pending before you, can identify the market share and

11  the market conduct of the manufacturers, as well as the

12  distributors.

13       Eric Eyre, the Charleston newspaper reporter that won

14  the Pulitzer prize, got access to a limited portion of the

15  ARCOS database from West Virginia, and it is that which we

16  are trying to replicate across the country for each of the

17  cases pending before you, as well as more granular data that

18  will allow us to identify with specificity the volume that

19  was distributed into each community.

20       We believe this information is necessary for a number

21  of reasons.  One of them is to identify the market share of

22  the manufacturers.  As this Court is well aware, there are

23  allegations and claims made against the manufacturers for

24  misbranding and marketing.  By identifying the market share

25  within each of the geographical boundaries of each

1    governmental entity we can then begin identifying which

2    manufacturers should be at the table for each jurisdiction.

3          In addition to the market --

4                THE COURT:  That may be manufacturers who have

5    been named and it may be others.  Is that correct?

6                MR. FARRELL:  Absolutely.

7                THE COURT:  Okay.

8                MR. FARRELL:  Part of the purpose of the ARCOS

9    database would be for us to identify those manufacturers

10   that were producing prescription opiates that wound up in

11   these jurisdictions who have yet to be identified and

12   brought into the lawsuit, let alone brought into settlement

13   discussions.

14         Secondarily, once they do come to the table, a

15   discussion needs to be had about market share; which of the

16   companies produced the most pills that wound up in each

17   community.  So when we say market share, it's not merely

18   identifying those that should sit at the table, but to have

19   meaningful settlement discussions, also for an allocation of

20   responsibility for the settlement proceeds based upon the

21   conduct.

22         Secondarily, with the distributors, what we are also

23   interested in is looking to see which distributors delivered

24   which volume of pills to which jurisdiction.  And again, for

25   purposes of settlement, it allows us to understand for

1    market conduct purposes which of the defendants are likely

2    to be most culpable for purposes of discussing settlement.

3         Importantly, only the data in West Virginia on the

4    distributors has been revealed, and it's been in annual

5    aggregates, which as you can see from the style of the

6    pleadings resulted in more than just the big three being

7    named in West Virginia.  That same analysis needs to be

8    repeated for all 49 states.  In the absence of the ARCOS

9    data, we're unable to do that.

10        THE COURT:  So in other words, there may be

11   distributors who haven't been named.

12        MR. FARRELL:  Absolutely; that's likely the

13   case.  The way that we argued and alleged in our complaints

14   in Ohio is that we understand the big three have a presence

15   in Ohio, but in the absence of this data we don't know, say,

16   Miami-Luken, CVS, Walgreens, the distributors across the

17   state that are actually involved.

18        We know anecdotally they have been delivered to some

19   of the pill mills, say in Portsmouth, Ohio, that resulted in

20   indictments, but without the ARCOS data we just don't know

21   which defendants delivered which pills into which home

22   county.

23        So what we have asked for, we have attempted to jump

24   through and overcome all of the procedural hoops to be here

25   today.  We've been asking for the data for over a year, and

1       today is the culmination of that effort.

2             We have a system in place to be able to receive the

3       data, to collate the data, sort the data, and perform an

4       analysis so we can advise our clients, as well as the Court,

5       regarding market share and market conduct that will not only

6       enable settlement discussions, but also lay the framework of

7       the infrastructure if this case proceeds to litigation, it

8       will absolutely be necessary.

9                         THE COURT:  Okay.  Thank you.

10            All right.  Does anyone wish to respond to that,

11      anyone, you know, wants to argue that the plaintiffs don't

12      need it, or contend that they could get the same information

13      from some other source?

14                        MR. BENNETT:  Your Honor, James Bennett on

15      behalf of the Drug Enforcement Administration.

16            I would like to first say regarding the Court's point,

17      and I don't know if the Court wants our whole position at

18      this point, but regarding the question the Court just asked,

19      it would definitely be the government's position that this

20      information is available from the defendant manufacturers

21      and distributors themselves; that they are the better source

22      of information, and in fact some of the cases specifically

23      say that it's more appropriate to get that from the

24      individual defendants themselves than from the government.

25                        THE COURT:  But Mr. Bennett, to be fair, what

1    I've learned is that the defendants in this case, the

2    manufacturers and the distributors have -- the estimate is

3    50 to 60 percent of the market.  So yes, while it is

4    possible to get that data from these parties, it's not

5    possible to get it from parties who aren't in the case, so

6    that's the weakness to your argument.

7              MR. BENNETT:  Your Honor, just so the Court is

8    aware, and there's been some very recent developments, and

9    I'm happy to go through the whole presentation I have for

10   the Court and the position of the government, but the

11   government offered at the meeting and today authorized the

12   DEA to disclose to the parties a list of all manufacturers

13   per state that comprise 95-plus percent of the market share

14   for that individual state.

15        So for example, in Ohio, the DEA would release to the

16   Court and to the parties a list of all of the manufacturers

17   whose opioids were sold in Ohio that had up to 95 percent of

18   the market share.  So if you had one manufacturer that had

19   25, another that had 25, another had 25, and another that

20   had 20, they would list those.  That would give you the 95

21   percent.  If it's 5 percent but we're still below the market

22   share of 95 percent, they will add that.  So basically

23   calculate the market share, add defendants -- or add

24   manufacturers until you get to the 95 percent.

25        So the need for the ARCOS data, DEA is actually

1    willing to provide that to the Court without the parties

2    needing to calculate that.  And so that was authorized

3    today, there was an authorization letter that was issued.

4                THE COURT:  Well, I mean, that's something,

5    but again, the important thing is to track whose pills went

6    where specifically, as apparently was obtained in West

7    Virginia, because that's the 24,000-dollar question.  There

8    are certain areas of the country where there are hundreds

9    and thousands of pills per person, per year, for every man,

10   woman, and child.  Everyone knows that was wrong, it

11   shouldn't have happened.  The question is, whose pills.  So

12   the ARCOS data will -- the only way to know that is the

13   ARCOS data, that I know of.

14               MR. BENNETT:  Your Honor, I think we all agree

15   that our country is facing an opioid epidemic right now, and

16   there are people dying every single day.  The Department of

17   Justice has made this a high priority, and we have engaged

18   in efforts to combat this opioid crisis.  This includes,

19   among other things, prosecuting those who overprescribe

20   opioid painkillers, and those who flood our streets with

21   drugs.

22       The DOJ has launched a pilot program to utilize data

23   and focus prosecutions on opioid-related healthcare fraud,

24   including pill mill schemes and pharmacies that unlawfully

25   divert or dispense prescription opioids for illegitimate

1    purposes.

2         To combat the opioid crisis DOJ also had provided

3    millions of dollars in grants to state and local law

4    enforcement agencies to take heroin, methamphetamines,

5    cocaine, and other illicit and diverted drugs off of our

6    streets.  We welcome the efforts of the Court and the

7    parties in this case to combat this epidemic, and we want to

8    assist in any way that we can.

9         I want to make this clear for the Court, that the

10   Department of Justice and the DEA is willing to provide

11   ARCOS data.  We are willing to provide this to assist the

12   Court in obtaining a settlement in this case, and we're

13   willing to continue to provide information that is needed

14   throughout the case.

15        However, the Department of Justice and the DEA must

16   also protect its ongoing and its future prosecutions and

17   investigations, and it must also protect the privacy and the

18   commercial interests of innocent businesses.  And so the DEA

19   came to the meeting that the Court proposed last week and

20   made an offer that was outlined in our status report.  That

21   was rejected by the plaintiffs, and so today we have

22   authorized disclosure of the ARCOS data.  And I'd like to

23   take a minute to explain to the Court what that

24   authorization entails.

25        First, the authorization, it would be subject to a

1    protective order.  We have a draft protective order that is

2    still being internally reviewed but that we can share with

3    the Court --

4                THE COURT:  I've already -- I mean, I was

5    already contemplating if I ordered the production of the

6    data to put it under a protective order.  Essentially it

7    would be short and simple, it can be used for one of two

8    purposes only, this litigation or state and/or local law

9    enforcement.  For example, if an Attorney General or county

10   sheriff or county prosecutor looks at this data and believes

11   that there's a pill mill in their jurisdiction, they can use

12   it.  Lawyers can use it for this litigation.

13       It's not going to be public, so there will be a

14   protective order.

15               MR. BENNETT:  Thank you, Your Honor.

16       The second part of the authorization is what we just

17   discussed about the manufacturers that have 95 percent or

18   more of the market share in each individual state.  So this

19   would be 51 reports, all 50 states plus Puerto Rico, that

20   would show the manufacturers; not the market share, but it

21   would show the manufacturers that have up to 95-plus percent

22   of the market share in each one of those jurisdictions.

23       We also are providing transactional data.  This

24   transactional data will include the date of the transaction,

25   it will include the buyer and the seller to the transaction.

1    That information will be de-identified using a unique number

2    for the totality of the database.  So in other words, the

3    manufacturers, rather than saying a particular name, they

4    would each have a unique identifier in that state.  This

5    would allow the parties to track from manufacturer to

6    distributor to retail transactions within the state and

7    where the drugs are going, from which number.

8         Once they are able to identify a potential bad actor

9    or a potential soft spot, they could then come back to the

10   DEA with that information, and the DEA could review to

11   determine whether or not there are legitimate law

12   enforcement sensitive concerns because they have an

13   investigation, they're able to deconflict the information to

14   determine whether there's other law enforcement --

15                   THE COURT:  I'm going to short circuit that,

16   because I'm not going to order the production of any data

17   for the last two or three years because I don't want to

18   interfere with any investigation that you've got.  I was a

19   former prosecutor, I understand that, and quite frankly, the

20   patterns and the problems were apparent with earlier years.

21        And so I don't think it's going to -- whatever was

22   going on in 2010, '11, '12, '13, you know, there's no law

23   enforcement objective there now; that's historic, but it's

24   important for this litigation.  So I think that's how I'm

25   going to deal with that.

1        MR. BENNETT:  Respectfully, Your Honor, it's

2    the position of the DEA, and it's explained in the

3    authorization letter, that you can't put a time frame on the

4    investigations.  There's a five-year statute of limitations,

5    and investigations often involve data outside of that range,

6    and so --

7        THE COURT:  Mr. Bennett, I'm balancing that.

8    Okay?  So I think it's essential, and I think it's been

9    identified that the parties need the actual transaction data

10   and to track whose pills went where.

11       MR. BENNETT:  Your Honor, the unique

12   identifier would allow them to do that without -- in

13   addition to the law enforcement interests, there are also

14   trade secret interests for the individual manufacturers and

15   distributors, some of whom are not parties here and can't

16   represent their interests, and some of whom presumably are

17   innocent, who have provided a service to the communities

18   lawfully.  And to have all of their Privacy Act-protected

19   information and all of their trade secrets disclosed in this

20   database --

21       THE COURT:  First of all, there are no trade

22   secrets here.  This is a controlled substance, they're

23   pills.  We're not going to ask the formulation of any pills,

24   that shouldn't be in the data.  Where the pills went is not

25   a trade secret.  It can be found at -- it's a balancing, I

1    understand that.

2                     MR. BENNETT:  Your Honor, I'm sure that the

3    defendants can better articulate this than I can.

4                     THE COURT:  I'll hear from them, but I

5    understand the government's position.

6                     MR. BENNETT:  Regarding the trade secrets, the

7    customers, this ARCOS data would allow someone to look at

8    the data and determine the customers of the manufacturers

9    and the distributors for an extended period of time.

10   Obviously the customer lists aren't going to change over

11   year to year, most successful businesses would build a

12   customer base.

13       It also would allow individuals to look and see the

14   marketing and the strategic plans the businesses have by

15   showing how they have had growth in certain areas, where

16   they are putting certain businesses, certain distribution

17   sites.  And so respectfully, Your Honor, and again, I will

18   let the defense explain this better --

19                     THE COURT:  My view is I think the

20   distributors, they obviously know which pharmacies they're

21   selling to and which they aren't, and I think they probably

22   have a darned good idea which of their competitors are

23   supplying the pharmacies they're not.  You just go in and

24   find out.  And look, probably it's easy to inquire.  I don't

25   think there are a lot of secrets.

1          MR. BENNETT:  Your Honor, I also believe that

2    the subpoena that was issued by the defense is unduly

3    burdensome to the DEA.  The discussion that I understand has

4    been that any ongoing investigations the information related

5    to, those would be protected, and any information that would

6    disclose the location of facilities where large quantities

7    of drugs are stored --

8          THE COURT:  That's something that was agreed,

9    I made that clear from the outset.  No one is going to

10   disclose to anyone the physical location of any warehouse.

11         MR. BENNETT:  And understandably, Your Honor.

12   The practical problem comes from the fact that there's over

13   300 million entries just of opioids, and DEA would have to

14   go through those entries to determine whether or not they're

15   going to disclose the location of large quantities of drugs

16   or whether that particular transaction is involved in an

17   investigation.

18       Obviously investigations are conducted out of field

19   offices around the country.  It's involved law enforcement

20   partners who are working with the DEA.  And so to go through

21   those 300 million, I did a little bit of math last night, if

22   you pulled all the 4,600 agents that the DEA has and you

23   gave them one minute to look at every one of the

24   transactions, it would take them over six months to go

25   through those transactions.

1          So it's the position of the DEA that that would be

2     unduly burdensome for them to go through, and that the

3     compromise offer that the DEA has offered, where the

4     information initially is de-identified, allows the parties

5     to get the information they need to determine where the

6     drugs are going by this code.  The only thing that changes

7     is instead of having the name, they have a unique code.

8          Then when they have found the actors --

9               THE COURT:  Are you saying there's no fairly

10    simple way to delete, white out, mask out the street

11    address, the physical location of a warehouse?  In fact,

12    everyone knows that the pills go from a manufacturer to a

13    warehouse, to a warehouse, to a distributor, to a

14    distributor, maybe to a warehouse, then to a pharmacy.

15    Okay?  Big deal, that's not confidential.  What is is the

16    address of those warehouses, which clearly is, and no one

17    wants to reveal those to anyone.

18               MR. BENNETT:  Your Honor, knowing the city,

19    county, and state of where those warehouses are in many

20    situations would allow identification of that warehouse.  It

21    certainly would narrow the target area that you have to look

22    for it by knowing the number coming into it.

23          So you're certainly correct that one of the fields is

24    a street address, and that street address could certainly

25    not be provided as a field to the parties, and that would

1      take care of the actual street address, but I don't believe

2      it solves the DEA's problem with being able to identify to

3      that specific of an area, especially when you're dealing

4      with what potentially could be small towns, rural areas.  It

5      might be very easy for criminals to figure out where these

6      warehouses are located.

7           It also doesn't do anything for the fact that they

8      still would have to go through the information to determine

9      whether or not it's related to a pending investigation or

10     prosecution, which would be a lot easier to do if the

11     parties would look at the data first and then point out

12     those transactions or those actors who they believe are

13     committing the torts that they allege in their complaints.

14               THE COURT:  In and of itself that data isn't

15     -- the data is simply going to point out where the drugs

16     have come from, okay?  I mean which company.  The plaintiffs

17     are going to have to do a lot more.  So I mean, I'm trying

18     to avoid a lot of back and forth.  All right?  So let's

19     focus on dealing with the location of warehouses.

20               MR. FARRELL:  Judge, Paul Farrell.  I don't

21     mean to interrupt, but I think I have something critical to

22     say on this very matter.

23               THE COURT:  All right.

24               MR. FARRELL:  The address for these warehouses

25     is publicly available.

1          THE COURT:  It is?

2          MR. FARRELL:  Yes, sir.  I have with me here

3     today documents, this is from Cardinal Health itself.

4          May I approach?

5          THE COURT:  Yes.

6          MR. FARRELL:  And I've tabbed for you, and

7     I've brought copies for everyone else, Cardinal Health in

8     its manufacturer reference manual actually has a table that

9     identifies each of its distribution facilities as well as

10    the address, the street address.

11         In addition to that, I brought with me the MOU --

12         MR. BENNETT:  Mr. Farrell, may I also have a

13    copy?

14         MR. FARRELL:  Yes.  I also brought the

15    administrative memorandum and agreement that the DEA DOJ had

16    with McKesson, and in it it identifies -- I lost

17    count -- maybe 15 or 20 of the warehouses that were subject

18    to the McKesson fine, and in it this public document

19    identifies the exact street address for each of the

20    warehouses.

21         In addition to that, if you get on all three of the

22    companies' websites, they have job application sections

23    where they post the warehouse that has job opportunities by

24    city and state.  Many of their public statements, for

25    instance, AmerisourceBergen recently announced in June of

1        2007, they put out a press release talking about the opening

2        of a new distribution center in Orlando, Florida.

3               And in addition to that, Your Honor, what I found is

4        that the Office of Diversion Control, the DEA through the

5        National Technical Information Service, which I'm presenting

6        to the Court as well, the DEA registrant database is online

7        and publicly available for a substantial fee.

8               So what you can do is you can pay -- and the fee

9        schedule is listed in there -- you can identify -- for

10       $3,000 you can get access to this data.  And as an example

11       of that, I have with me a proprietary group called DEA

12       Lookup, and what it has is it lists every DEA wholesaler in

13       the country, and it identifies for them not the street

14       address, but the city that each of these warehouses are in.

15              So what I'm proposing to the Court is that if the

16       information about where these locations are -- we don't need

17       their street address.  To be honest with Your Honor, we

18       don't even need to know the city and state.  If they want to

19       delete where these warehouses are and just tell us it's

20       Cardinal Health facility number 17, that's all we really

21       need to know.

22                     THE COURT:  Well, that's what I thought in the

23       first place, but it looks like, Mr. Bennett, a lot of these

24       companies don't seem to care about disclosing the exact

25       street address of their warehouse.

1          MR. BENNETT:  Which I think, Your Honor, is

2     more reason why we need to not disclose the actual

3     transactions, because now that the information of where

4     these warehouses is located, knowing when they're receiving

5     shipments and how much, and which are getting big

6     shipments --

7          THE COURT:  No, we are not going to do that.

8     The companies are so lax they're letting everyone know, it's

9     too bad for them.

10        We can delete -- you can just call it Cardinal

11    warehouse 1, Cardinal warehouse 2, whatever; but I'm not so

12    worried about the warehouses anymore, because sadly it looks

13    like the companies themselves haven't bothered to keep them

14    confidential.

15         MR. BENNETT:  Your Honor, in addition to the

16    distributors, which I also still think that the DEA's

17    information shouldn't be used to facilitate the crime, but

18    in addition to the distributors you also have all of the

19    individual doctors and small retail pharmacies whose

20    information would be disclosed as well if it's not

21    de-identified.

22        So while the distributors may have put their --

23         THE COURT:  This is a controlled substance,

24    all right?  This is not, you know, tires or widgets, or

25    whatever, so everyone understands that this information can

1    be accessible for certain purposes.

2              MR. BENNETT:  Your Honor, and government,

3    again, wants to reiterate that we do want to make this

4    information available to the Court and the parties to assist

5    in settling this case, but with the Privacy Act concerns,

6    with the trade secret concerns, with the law enforcement

7    concerns, with the burden on the agency, with the ability to

8    use this information --

9              THE COURT:  I'm not trying to burden the

10   agency; they just turn it over.  If there's not a way to

11   simply delete the -- I mean, just call it warehouse.  There

12   should be a way to do it, but if not, quite frankly, since

13   the companies haven't made any effort to keep these

14   locations secret, it doesn't really matter when particular

15   shipments come.  Anyone knows there's always going to be a

16   lot of pills in those warehouses, that's what they're there

17   for.

18             MR. BENNETT:  And I guess the burden I was

19   talking about, Your Honor, was also related to the ongoing

20   investigations and prosecutions, in reviewing the ARCOS data

21   to determine which transactions would relate to those

22   ongoing investigations and prosecutions, which I don't think

23   are limited to just the past three years.  Certainly there's

24   data relevant to that --

25             THE COURT:  Well, I've got to balance it,

1    Mr. Bennett, and my balance I think is going to be not

2    requiring the production of anything for the last three

3    years.  I mean, I've got to strike a balance between the

4    plaintiffs' need, and the plaintiffs include the cities and

5    counties, but also this will go to Attorneys General, and

6    they have a legitimate law enforcement interest and need in

7    shutting down pill mills.

8         And I'll just say I appreciate all the steps that you

9    outlined that the Department of Justice and DEA is now

10   taking, but it's a matter of record that those steps haven't

11   significantly stemmed the crisis, so a lot more is needed.

12   And I think that's why we have all these lawsuits; so I'm

13   trying to balance everything.

14                MR. BENNETT:  Your Honor, two final points.

15   One, I want to reiterate that all this information is

16   available to the Court and to the parties from the

17   defendants.  And the defendants who aren't present, the

18   manufacturers, DEA is willing to identify so the Court can

19   get that information from them.

20        The second thing is that the authorization has been

21   issued by the Department of Justice authorizing the

22   disclosure.  I know neither the plaintiff nor the defense

23   have had an opportunity to review that authorization and to

24   oppose it, to present arguments to the Court, and it would

25   be our position that in order for them to proceed to get the

1    information they would need to first show that the decision

2    by the U.S. Attorney was arbitrary and capricious.

3                    THE COURT:  I understand that position, but I

4    think this is covered by the Rules of Civil Procedure.  I'm

5    managing this litigation.  If I decide that the data needs

6    to be produced I'll so order, and that's how it is.  So I've

7    looked at the case law, and I believe I have the authority

8    to do that.

9         Number one, I'm not compelling any government agent or

10   officer or employee to give testimony at all, and number

11   two, all this is is data which is received by DEA from

12   private sources.  I'm not asking for any government

13   analysis.  So this is simply DEA's data because it's been

14   received by the government, but there's absolutely nothing

15   whatsoever that's been generated by any government office or

16   agent or employee.  So if I decide it is relevant and

17   important for the litigation, I have the authority to order

18   it.  It is as simple as that.

19                   MR. BENNETT:  Your Honor, I appreciate the

20   Court's position.  And just for the record, I want to say we

21   would object to providing that for the reasons set forth

22   today in our arguments, as well as set forth in the

23   authorization letter and status report to the Court.

24                   THE COURT:  Thank you, and I appreciate that,

25   everyone.

1          MR. BENNETT:  Thank you for your time.

2          THE COURT:  I appreciate everyone's hard work,

3    and I appreciate your position.  I guess does anyone from

4    either the manufacturers or the distributors want to make

5    any comments or arguments?

6          MR. EMCH:  I guess, Your Honor, by some

7    process which we can't tell, I'm elected to begin.  My name

8    is Al Emch.  I'm with the firm Jackson Kelly located in

9    Charleston, West Virginia.  Bob Nicholas is on the Steering

10   Committee on behalf of AmerisourceBergen Drug Corporation.

11   Bob is in trial this week.  Shannon McClure is one of the

12   liaison counsel, and she is also representing

13   AmerisourceBergen, but she also is in trial this week.  So

14   it falls --

15          THE COURT:  So you're not in trial, so you're

16   here.

17          MR. EMCH:  I'm here, Your Honor.  That's

18   exactly correct.

19       I represented AmerisourceBergen Drug Corporation in

20   the West Virginia litigation that's been referred to several

21   times I think before the Court.  Mr. Farrell has probably

22   mentioned it a couple times.  He and I have known each other

23   for a long time.

24       I would like to state the position of

25   AmerisourceBergen Drug Corporation with respect to the issue

1    that is before the Court today, and I appreciate the

2    opportunity to do that, Your Honor.

3          I would begin by simply stating that we have not had

4    the opportunity to state our position on this issue yet, as

5    Your Honor is aware.  We did attend -- a representative from

6    one of the other distributors and I did attend the meeting,

7    we appreciated the cooperation of the DEA as well as the

8    cooperation of plaintiffs' counsel in permitting us to be

9    there so that we could participate in and listen to the

10   discussions that were had about the ARCOS data.

11         I will say that I'm speaking now, Your Honor, only on

12   behalf of AmerisourceBergen Drug Corporation, not any of the

13   other defendants that are in the case.  They can either

14   agree or not with what I'm about to say to the Court, but I

15   do appreciate the opportunity to say it.

16         Many positions are attributed to us and have been

17   attributed to us.  Among other things, allegations are made

18   all the time about us.  We like to have the chance on

19   occasion to state our position ourselves.

20         AmerisourceBergen Drug Corporation understood that the

21   Court's interest in the ARCOS data was primarily in

22   connection with the Court's effort at this time, which is

23   directed toward a prospective list, if you will, or a

24   discussion among stakeholders of what might prospectively be

25   done, what actions could be taken, what things cooperatively

1    might be done, what initiatives might be thought of that

2    haven't been thought of before, that could be attempted with

3    the Court's imprimatur and with the Court's support, that

4    might help to alleviate the opioid epidemic and problem in

5    this country.  That is our understanding of what process we

6    are in at this moment.

7            Particularly regarding the ARCOS data, the ARCOS

8    database, AmerisourceBergen Drug Corporation supports

9    sharing of ARCOS data on a prospective going-forward basis.

10   AmerisourceBergen Drug Corporation does not support the

11   effort to discover the entire ARCOS database that has been

12   undertaken by the plaintiffs.  We don't support that for a

13   number of reasons.

14           The DEA's objections -- and let me say, Your Honor,

15   the DEA is our regulator.  We don't always see eye to eye

16   with the DEA, there are occasions when we disagree about

17   things, but we respect the DEA's obligations under our

18   system and with respect to the closed system, and we respect

19   the immense responsibility that the DEA has.  And yes, we

20   respect the efforts that the DEA has made and continues to

21   make in order to do their duty.

22           And their duty is two things, Your Honor, two things.

23   You heard this at the information day.  Their two prime

24   directives are, number one, to take all the steps they can

25   in the regulatory arena, as well as law enforcement, to try

1    to impede, interdict, stop, prevent, diversion of legal

2    controlled substances from those who have the legal right to

3    touch them to those who do not have the legal right to touch

4    them.

5        And equally important, and Your Honor hasn't heard any

6    discussion about this yet, equally important is the DEA's

7    task of assuring that adequate supplies of these controlled

8    substances are available in this country for legitimate

9    medical, scientific, and industrial purposes.

10       The ARCOS database is probably the primary tool, one

11   of the primary tools that the DEA has at its disposal and

12   that it makes available, as it has stated to the Court in

13   its filings, to law enforcement agencies around the country

14   that need that data or need access to that data because of

15   investigations or suspicions or complaints that they may

16   have, and of course they all the time use it with the U.S.

17   Attorneys around the country for their prosecutions.  They

18   don't tell us how they use it.  They don't publish how it is

19   that they look at the data, scan the data, organize the

20   data, what conclusions they draw from the data, because

21   obviously if they tell us and if they tell the public, and

22   if they tell anybody else, that compromises in some ways

23   their ability to use that data for those purposes.

24       So we understand the DEA and we support the DEA's

25   position; however, we would respectfully say that we think

1    the effort right now, and even the DEA's proposal, starts

2    down a slippery slope that we do not need to be on at this

3    point for the Court's purposes.  And that, we would

4    respectfully say, is an unfair slippery slope, and let me

5    tell you the two reasons why we so say that is the case.

6        Your Honor indicated that you saw the need for this

7    data for this litigation, in your protective order that it

8    would be for this litigation and for law enforcement, and I

9    assume regulatory purposes.  I would submit to the Court

10   that the data has always been available for law enforcement

11   and regulatory purposes, and I would also submit to the

12   Court --

13                THE COURT:  I don't think most of the state

14   Attorney Generals have this.  There may be one, Mr. Emch,

15   but to my knowledge, most of the states don't have it.

16                MR. EMCH:  They can get it, Your Honor, in

17   connection with any investigation they're involved.  Now, I

18   know --

19                THE COURT:  I'm not sure of that.

20                MR. EMCH:  Your second purpose was -- or

21   statement was for this litigation, which again we

22   understood, Your Honor, was at this point about prospective

23   things to be --

24                THE COURT:  Exactly, but the point is,

25   Mr. Emch, at one of our earlier conferences, I'm not sure

1    you were here, it was explained to me that the distributors

2    in this case distribute 50 to 60 percent of the prescription

3    opioids in the country.  Well, that means that there's a

4    very large percentage that they don't.  So if we're talking

5    about prospective relief, it doesn't do much good if say all

6    of the distributors and manufacturers who were now named who

7    are working very hard -- and I compliment the lawyers and

8    the clients, there have been some very good discussions

9    going on.  You know, they've come up with some very good

10   proposals, but if half of the industry ignores them, they're

11   not going to be very effective.

12              MR. EMCH:  Your Honor, we don't object, and I

13   don't think the DEA objects, to providing to the Court the

14   names of the others who are either distributors or

15   manufacturers who work within the system.  And our

16   presumption had been that had the Court gotten that

17   information, the names, the names and addresses of the other

18   manufacturers and maybe distributors, that the Court would

19   take it upon itself to invite those to the table.

20              THE COURT:  But I need to know, and the

21   plaintiffs -- first of all, it's up to the plaintiffs.  They

22   brought the cases, they named the individuals, the

23   defendants that they reasonably thought were liable.  They

24   didn't just put everyone in.  They've got a responsibility,

25   the lawyers have responsibility under Rule 11, to name

1      someone as a defendant you've got a good-faith basis they've

2      done something wrong, not just that they're in the field.

3           So if they get the data, it's not just the names.

4      They need to know, all right, how many pills did those

5      manufacturers end up selling into specific geographic areas.

6      So the data has to be at least as thorough as that and as

7      comprehensive as that to accomplish that purpose.

8                     MR. EMCH:  Well, respectfully, Your Honor,

9      that's a litigation goal that the plaintiffs have.  That's a

10     discovery goal.

11                    THE COURT:  It's a resolution goal, because if

12     there's significant parties who are in the market and they

13     haven't been named, any relief that the parties in the case

14     now come up with will be limited impact, because others will

15     just get around them.

16                    MR. EMCH:  Your Honor, I'm not --

17                    THE COURT:  And quite frankly, it will put the

18     defendants in this case at a competitive disadvantage, and

19     that wouldn't be fair.  They might agree to do certain

20     things or not do certain things, and then they'll see their

21     competitors just hop around them.  I wouldn't want that.

22                    MR. EMCH:  Well, Your Honor, unless I've

23     missed something, I have not seen any of the possibilities

24     or proposals for things that might be done prospectively in

25     a cooperative way to help to stem or to alleviate the opioid

1    epidemic that require an understanding of market share.  All

2    that is being discussed is ways that those who participate

3    in the system -- and Your Honor, you've got two areas of

4    stakeholders here, you have manufacturers and distributors.

5    You don't have doctors who prescribe, you don't have

6    organizations right now that represent doctors who

7    prescribe, and you don't have pharmacies at the pharmacy

8    level at the table.

9              THE COURT:  Well, but there are ways to bring

10   them in, and directly or indirectly through the states that

11   regulate them or people who sell them the drugs can just

12   say, you want our drugs?  This is what you've got to do.

13   You don't want them, you don't get them.

14             MR. EMCH:  Well, a big part of what I'm saying

15   to Your Honor is we don't want to invite all of these other

16   parties into the litigation.  Litigation is about blame and

17   fault and liability and pointing fingers.  Your Honor saw

18   that from the very beginning.

19        Resolution, trying to do things that are helpful, is

20   about entities that accept some level of responsibility for

21   the role that they play, but are talking cooperatively about

22   what may be done.

23        So I don't want to invite and ABDC doesn't want to

24   invite other parties to the litigation, but that's precisely

25   the reason that plaintiffs have said in all of their filings

1       that they're seeking this data.  They want to identify

2       additional parties that they can bring in on whatever

3       criteria they want to determine or try to use into the

4       litigation.  And I would respectfully submit that that's

5       down the road, that's not now.

6            If we want to just have people to come to the table

7       who can talk about their responsibilities and how better to

8       meet those responsibilities, what the Court needs is the

9       names of those parties that might be invited to come to the

10      table.

11                 THE COURT:  Well, they have to be identified,

12      and there has to be a reason to -- they're not likely to

13      come, Mr. Emch, if they're not named as defendants.  Okay?

14      I don't think your client, in all fairness, would have just

15      accepted someone's voluntary invitation to come and be part

16      of this.

17           You're a defendant, your client is a defendant, so

18      they're in the case.  So they can decide how they want to

19      proceed, but they're here because they're named.  So I think

20      that in terms of manufacturers or distributors, I can't

21      imagine anyone just saying, hey, I'd just like to sort of

22      join this and see what happens to me.

23           So I think they have to be named as a defendant, and

24      then the first step is these cooperative efforts.  If things

25      break down, well, they're a defendant in the case, and

1    they'll have to defend themselves.

2                    MR. EMCH:  Your Honor, again, respectfully,

3    how can we talk about parties who are not in the litigation

4    and seeking discovery from a government agency regarding a

5    database that's always been confidential, always been

6    protected, because it is indeed confidential business

7    information that is submitted to them with the understanding

8    that it will be protected.  How can we say that we'll permit

9    the plaintiffs to get that information and mine it to

10   discover -- I'll use the word discover -- to determine based

11   on whatever kind of criteria they want to know who to

12   sue --

13                   THE COURT:  They've already said they'll

14   provide it.  There are certain restrictions, and they want a

15   two-step approach.  If you're saying you're opposing what

16   DEA has already agreed to, okay, I'll hear your argument,

17   but it's not likely to be too persuasive.

18                   MR. EMCH:  I understand, Your Honor.

19                   THE COURT:  If your position is saying DEA is

20   wrong for agreeing to produce what they've said they'll

21   produce, okay, then that's your position.

22                   MR. EMCH:  Mainly at this point, Your Honor,

23   I'm simply saying that there are many -- the DEA's press

24   release that was recently put out, which does talk about a

25   step in the direction of sharing ARCOS data prospectively,

1    says, "1,500 DEA-registered manufacturers and distributors

2    will be permitted to view the number of competitors who have

3    sold a particular controlled substance to a prospective

4    customer in the last six months."

5         Very helpful information.  That's a step down the road

6    of sharing ARCOS data in a way that can help.

7         My concern, and it's only expressed because we've been

8    there, is that we are dealing with the rights of parties who

9    are not in front of the Court, that's all.

10                  THE COURT:  All right.  Well, I understand

11   that.

12                  MR. EMCH:  Let me say to Your Honor -- and I

13   appreciate your patience with me, I know I've not been here

14   before, but I appreciate the opportunity -- the other goal

15   of the plaintiffs is to get transactional data so that they

16   can mine that data and use that data against the distributor

17   defendants in this case.

18        And Your Honor, we would respectfully submit we have

19   never had access to the ARCOS data.  No distributor has ever

20   had access to the ARCOS data.  All we know about the ARCOS

21   data is the information that we submit to the DEA.

22        Plaintiffs want this information so that they can take

23   that data and use it against us, data we never had.  And

24   they want to try to shift to us or accuse us or levy against

25   us knowledge that we never had the ability to get.  We have

1       never been able to get and use the ARCOS data.

2                       THE COURT:  Obviously, if they get it you get

3       it, and the point is you know where every one of your pills

4       went because you supplied the data for your company.  I'm

5       saying your client supplied the data for its company.  So

6       you know something they don't know, which is you know where

7       all of your pills went.

8                       MR. EMCH:  We do.

9                       THE COURT:  They don't know where any of your

10      pills went at the moment.  So they could subpoena that from

11      you, and I'd probably order it produced, okay?  But the

12      advantage of getting it holistically, to get it from the

13      DEA, it's everyone.  It includes the parties in this case

14      and others.

15          So yes, I mean Mr. Bennett is correct, they could

16      subpoena the exact same data from you and from all of your

17      competitors and then put it together, and I would, you

18      know -- so they could do that.

19                      MR. EMCH:  All I'll say, Your Honor, is to the

20      extent that full knowledge of the ARCOS database and full

21      information about all of the transactions of all of the

22      distributors that have occurred in the ARCOS database, to

23      the extent that that information might ever have been useful

24      to any distributor in trying to determine how to run its

25      order monitoring program or how to fulfill its duties and

1    obligations, we never had the benefit of that.

2              THE COURT:  Understood.  Well, you'll have it

3    now, and it might actually help you.

4              MR. EMCH:  Well, that's what we're talking

5    about with prospective, Your Honor.

6              THE COURT:  Fine.

7              MR. EMCH:  The goals of this Court are our

8    goals, too.  If there are ways to improve what we do and if

9    sharing of ARCOS data under a system that I'm sure the DEA

10   is thinking about that they're going to invite our comment

11   on, and that would be put in the regulations, and that would

12   be circumscribed by all of the protections that are afforded

13   when things are done that way, we think that may be useful.

14   But my point is only that the retrospective information that

15   the plaintiffs want to discover is information we never had

16   the benefit of, and we don't think that it is fair for that

17   information to be provided for the plaintiffs to use in

18   those ways at this time.

19        We have no objection --

20             THE COURT:  I hear your argument, and so I

21   understand it.

22             MR. EMCH:  Are you able to indulge one other

23   point, Your Honor?

24             THE COURT:  Very briefly.  It's already 4:00,

25   there may be others who want to speak.

1      MR. EMCH:  All right.  I know I've taken a lot

2    of time, and I appreciate that.

3        Your Honor has heard a little bit I think about the

4    prescription drug monitoring databases.

5                    THE COURT:  Yes.

6                    MR. EMCH:  I would simply submit to the Court

7    that another thing that's been proposed, and certainly

8    AmerisourceBergen Drug Corporation has supported to the

9    extent we had any input in it, is the ability of the ARCOS,

10   the DEA, and ARCOS database information to be shared with

11   the states and the Prescription Drug Monitoring Program

12   information.  And we were a little surprised, frankly, when

13   we saw in the DEA's letter submitted on the 30th of

14   January -- not a criticism of the DEA -- when they said that

15   they make efforts to have the states share the PDMP

16   information with them, but many states do not do that.

17        Those two databases, Your Honor, from the standpoint

18   of law enforcement, from the standpoint of information that

19   can assist regulatory agencies in determining where

20   lawbreakers and diversion may be occurring, which is almost

21   always at the dispensing level, at the doctor prescribing

22   level, after that level -- I'm not accusing doctors and I'm

23   not accusing pharmacies, it is much more complicated than

24   that.  I'm just saying that is where that occurs.  But the

25   sharing of that data, the PDMP has everything about every

1    prescription that's dispensed in each of these states at any

2    time.  They've got all of that data.  They know everything

3    about every prescription, who wrote it, who filled it, what

4    drug it was, what date it was filled, how it was paid for.

5    They've got all of that information right now.

6         And when you talk about progress being made, Your

7    Honor, remember that there's so much legislation that has

8    been talked about and is being put in place today, beginning

9    really around 2012, that is making a difference, legislation

10   that permits these PDMP programs to be used in the ways that

11   they could and should be used.

12        No legislation yet, nothing that I know of at the

13   federal level certainly, that requires the coordination, if

14   you will, between these two big sources of data so that it

15   can be used to try to help in this epidemic.

16        Your Honor, we want the system to work, and we are

17   committed to doing what we can to try to help the system

18   work.  We respectfully state that in this resolution stage

19   that Your Honor is engaged in now, having the names and the

20   addresses of those who maybe ought to be here to talk about

21   that is not a bad idea, and it's easy to do; but we would

22   respectfully submit that starting down the ARCOS data

23   database revealed to -- I mean, there's nothing anywhere in

24   the statutes or anywhere else that says that the ARCOS

25   database can ever be revealed to private plaintiffs'

1      counsel, law firms, for the purpose of civil litigation.

2      That's what we have here.

3              You'll get to that, Your Honor, you'll get to that,

4      but we would respectfully say that we're not there yet, and

5      we think you're starting down a slippery slope if we begin

6      to try to let this ARCOS data be produced in these ways to

7      plaintiffs' counsel.

8              Thank you, Your Honor.

9                      THE COURT:  All right.  Anyone else from the

10     defendants?

11                     MR. PYSER:  Your Honor, briefly, Steven Pyser,

12     Williams & Connolly, for Cardinal Health, one of the

13     distributors, just to supplement a little bit of the points

14     that Mr. Emch has already touched on.

15             The problem that was trying to be solved here, Your

16     Honor, was the identification of other players in the market

17     who should be at the table who are stakeholders.  The DEA

18     has proposed a way to do that.  The DEA has offered to write

19     a list of the other manufacturers.  I'm sure a similar list

20     can be done for the distributors in broad geographic areas,

21     but what plaintiffs have presented the Court with is an

22     all-or-nothing binary choice:  Either we need everything

23     that's in the ARCOS database, or we won't be able to move

24     forward on the Court's prospective resolution path.

25             And we respectfully, Your Honor, don't believe that

1     that all-or-nothing choice is an accurate choice.  We think

2     what DEA has presented, where all of the necessary parties

3     can be brought to the table, but information that is trade

4     secrets that does impact competitive harm -- and I'm happy

5     to explain to the Court for the Court a little bit more on

6     why that's the case -- wouldn't be revealed, especially as

7     the plaintiffs have suggested to the media or to so many

8     various --

9                    THE COURT:  Nothing is going to be revealed to

10    the media unless there's a trial.  If there's a trial,

11    obviously trials in our country are public.  Hopefully there

12    will be no trials.

13                   MR. PYSER:  We appreciate that and appreciate

14    the opportunity to work on a protective order, as DEA has

15    suggested.

16                   THE COURT:  A protective order is simple, two

17    purposes; litigation, law enforcement.  That's it.

18                   MR. PYSER:  On the litigation front, I

19    respectfully suggest, Your Honor, that what's being asked

20    for in ARCOS goes deep into discovery.  It is, in fact, part

21    of the litigation, it's not part of the resolution

22    information that's necessary now.

23         And on a law enforcement front, that information is

24    available to law enforcement when they contact DEA and say

25    we have a law enforcement concern, can we work with you --

1           THE COURT:  They may not know the concern,

2    this might identify it for them.  So that's one of the

3    purposes.

4           MR. PYSER:  And DEA has the ability to work

5    with law enforcement --

6           THE COURT:  Mr. Bennett, are you also

7    proposing producing the data for 95 percent of the

8    distribution, as well?

9           MR. BENNETT:  Your Honor, when we were at the

10   meeting with plaintiffs' counsel they said they needed the

11   manufacturers data, not the distributors data, and so that's

12   why it was to the manufacturers.  At least that was my

13   understanding.  I don't want to speak for them, but that was

14   my understanding, is they only needed the manufacturers

15   list, not the distributors list, and so that's why the

16   authorization --

17          THE COURT:  I guess if it's 95 percent of the

18   pills, but except I think they also need, and I need to see,

19   which distributors are distributing those pills, where.

20          MR. BENNETT:  Your Honor, again, we don't have

21   the authority to authorize it today, but I would certainly

22   go back and recommend the same type of list for distributors

23   as we did for manufacturers.  And I don't know why that

24   would be substantially different, I assume ARCOS can show

25   you distributors versus retail versus manufacturers.

1          And I did want to answer the Court's other question

2     about the Attorney Generals, what was going on with the

3     Attorney Generals.

4          So DEA has been over the last couple of months working

5     with the state Attorney Generals to get them access and

6     information out of the ARCOS database.  It's very similar to

7     what's being proposed to the Court here, where they're able

8     to look at the data in the de-identified form, determine

9     where there are cases that they want to further investigate

10    and go forward with, and get the information that way.

11         So I think one of the things the Court put in its

12    order was, and one of the things the DEA put in its

13    objections, was to work similarly with plaintiffs as we have

14    with other governmental actors.  And I just want the Court

15    to be aware that that's what's taking place behind the

16    scenes and also what's trying to be balanced here in this

17    case.

18              THE COURT:  Well, but it hasn't happened here

19    yet.  I'm putting some sense of urgency on everyone to get

20    this data out.

21              MR. BENNETT:  Your Honor, I'm not sure I would

22    agree it hasn't happened.

23              THE COURT:  I think there is one state that

24    has it maybe, Mr. Bennett, but I don't think it's -- I'm

25    certain that it has not been provided to most of the

1       Attorneys General.  That's what they've advised me.

2                       MR. EMCH:  May I make a relevant comment, Your

3       Honor?

4                       THE COURT:  Yes.

5                       MR. EMCH:  The Ohio Automated Rx Reporting

6       System has since 2006 itself received the essential elements

7       of the ARCOS data that's reported to the DEA.  The statute,

8       and I don't have the cite here, but since 2006 Ohio has

9       received -- and I assume the Attorney General would have

10      access to, as an example -- the wholesale drug distributor

11      registration number, the purchaser registration number, the

12      NDC or National Drug Code number, the quantity, the state of

13      sale -- or the date of sale, I'm sorry, and the invoice

14      number.

15           So again, on the subject of availability of

16      information, Ohio, among some other states, has been getting

17      essentially the ARCOS data since 2006, so they have access

18      to a large portion of what's in the database.

19                      THE COURT:  All right.

20                      MR. PYSER:  Your Honor, in addition to the

21      fact that the law enforcement functions of the Attorneys

22      General either have this information through their boards of

23      pharmacy, as Mr. Emch suggested, or can query DEA

24      separately, the Court raised the issue of the warehouses and

25      plaintiffs raised the issue.

1           The issue with the warehouses is not just their

2     physical addresses; the knowledge of exactly how much is in

3     a particular warehouse.  And beyond the warehouses --

4                THE COURT:  Can you answer me why Cardinal

5     Health, why they're publicly releasing the street addresses

6     of their warehouses?

7                MR. PYSER:  Well, Your Honor, those

8     warehouses, having visited those warehouses myself, those

9     warehouses are heavily guarded.  Those warehouses are very

10    secure, and they actually have DEA regulations about cages

11    and vaults in which material is stored.

12                THE COURT:  Fine, then there's no problem with

13    revealing the locations.  You've already done it.  I thought

14    it was sort of a -- it was kept secret for good reason.

15                MR. PYSER:  The issue with revealing locations

16    also goes to the pharmacies and exactly how much of a

17    particular opioid at a particular time or how much in

18    general a pharmacy has of opioids onsite.  And that

19    information, to know which pharmacies have heavy amounts of

20    opioids, because often for legitimate purposes, there's a

21    hospice nearby or legitimate reason, a particular pharmacy

22    might have more onsite than another.  And that information

23    being disclosed to the public, they do not have --

24                THE COURT:  None of this is going to be

25    disclosed to the public, Mr. Pyser, I've already made that

1    clear, unless there's a trial.  If there's a trial, there's

2    a trial.

3                   MR. PYSER:  Your Honor --

4                   THE COURT:  No one is proposing making all

5    this publicly available.

6                   MR. PYSER:  The information that the

7    plaintiffs are seeking in this choice, where they seek the

8    ARCOS data, is discovery information.  It's not the

9    information necessary for the settlement, especially the

10   discussions for prospective relief going forward.

11                  THE COURT:  I've got to have the right people

12   at the table.

13                  MR. PYSER:  And Your Honor, respectfully, I

14   believe we can get the right people at the table without the

15   data that the plaintiffs are asking for.

16       DEA just told the Court that they would get the 95

17   percent of all manufacturers, and believe they can get a

18   very similar list of distributors.  That puts the right

19   people at the table without opening up discovery.

20                  THE COURT:  Without the names, what good is

21   it?

22                  MR. PYSER:  I believe the point, Your Honor,

23   is they provide the names.  They would provide the names of

24   the manufacturers, the names of the distributors.  The

25   information that DEA is not providing is the detailed

1    discovery that plaintiffs are seeking --

2                    THE COURT:  But the point -- Mr. Bennett, are

3    you going to provide the names, the names of all the

4    manufacturers that supply 95 percent of the prescription

5    opioids?

6                    MR. BENNETT:  In each state?

7                    THE COURT:  In each state.  The names of the

8    distributors in each state that distribute 95 percent of the

9    opioids in that state, and how much, you know, what share

10   each of them have, so that we'll know who needs to be in

11   these discussions.

12                   MR. BENNETT:  Yes, Your Honor --

13                   THE COURT:  If you have one percent, we don't

14   really care.  If they have ten percent, they should be here.

15   If they're not, they'll be brought in.

16                   MR. BENNETT:  Your Honor, I want to break

17   those into pieces, because the answer to some of it is yes,

18   some of it is no.

19        The manufacturers, yes, we would provide the names.

20        No, the DEA would not provide the percentage or market

21   share for each of those, although they certainly would know

22   how many drugs they send into a state, and the Court could

23   ask them.  The DEA wouldn't provide market share.

24        The distributors hasn't been authorized; however, I

25   would recommend to the Department of Justice and the DEA

1    that they authorize that, but it was something that

2    plaintiffs' counsel said wasn't necessary at our meeting, my

3    understanding of our discussions, but it's certainly

4    something that I think fits with what we've done already.

5           We would not again --

6                  THE COURT:  Then what?  All right, so they've

7    got this, and then it shows, just say -- what good -- it's

8    not going to do much good to say, all right, in Ohio we've

9    got 50 different distributors, A through Z and double A

10   through double Z, 52 of them, and that accounts for 95

11   percent of the pills distributed in Ohio.  What good is

12   that?

13                 MR. BENNETT:  Your Honor, my understanding of

14   what the Court needed and what the parties needed was to

15   find who needs to be in those empty chairs --

16                 THE COURT:  Right.

17                 MR. BENNETT:  -- the parties who manufacture

18   drugs that are in these states that aren't at the table.

19   This will give the Court and the parties a list of all the

20   manufacturers who manufacture drugs for every state.  It may

21   be the --

22                 THE COURT:  But wait a minute, the point is

23   not to just sue 50 companies that have a fraction of the

24   market.  All right?  The idea is to focus on those that have

25   some significant responsibility for the pills that went into

1    certain states, and those people should be at the table.

2                    MR. BENNETT:  We can certainly do it for 75

3    percent to make sure --

4                    THE COURT:  No.  What needs to be identified

5    is how many, and without getting the specific data, I don't

6    see how we're going to get that.  So if that's the position,

7    then so be it, I'll make my decision.  All right?

8        If you're saying that all you're going to provide is

9    just labels 1 through 52 with letters, I mean, I understand

10   that, I don't think that's going to be particularly helpful.

11                   MR. BENNETT:  First of all, I don't believe it

12   will be that many different manufacturers.  I could be

13   wrong, but I don't think it will be that long a list.  I

14   think it could be a shorter list than that for each

15   particular state.

16                   THE COURT:  Again, without knowing whose pills

17   went where, I don't see that it's productive at all.

18                   MR. BENNETT:  Your Honor, it would give the

19   Court the opportunity to have the parties in front of it.

20   If the Court needed more information it would have the

21   people who have the access to that information, who have

22   that information --

23                   THE COURT:  Mr. Farrell, is there anything you

24   want to respond to that?  Am I missing something?

25                   MR. FARRELL:  No, Your Honor.  The only other

1    issue that is open is a time frame.  We understand from the

2    city of Cincinnati case that the document retention policy

3    for the DEA has been held in abeyance and that they have

4    documents, the data from 2006.  And so our request would be

5    from 2006 until January 1 of 2015, giving the government a

6    three-year buffer of time frame for ongoing law enforcement

7    privileges.

8                 THE COURT:  Okay.  I understand from the

9    documents that's your request.

10                MR. PYSER:  Your Honor, just to complete our

11   point, we believe and continue to believe there's a middle

12   ground here along the lines of what DEA has suggested.  What

13   the plaintiffs are asking for is full discovery.  What the

14   Court is aiming at, what the Court has expressed multiple

15   times, I think fairly, is we need to know who the parties

16   are, and we need to know on a state-by-state basis, for

17   example, perhaps what their market share is.  That's

18   information that could be derived without going anywhere

19   near the level of detail and full discovery that plaintiffs

20   are seeking in their request.

21       I would also be remiss, Your Honor, if I didn't just

22   finish the point on competitive harm and the pharmacies in

23   particular who aren't here, in that those pharmacies have

24   what the Court will see, what anyone who looks at the data

25   can see, is that when a pharmacy has a higher level of

1    distribution it's not necessarily that they're diverting

2    opioids, it's that it's a busy pharmacy.  And if that

3    information is shared among the parties and shared out to

4    the many plaintiffs that are being discussed here, the risk

5    to the customers of Cardinal and the customers of the other

6    distributors is that that information will be used to their

7    competitive harm.

8        Those customer lists and the volume that a particular

9    pharmacy -- the volume of business that they're doing, that

10   will encourage competition, might encourage other pharmacies

11   to move into that area, and will certainly not be consistent

12   with the Court's desire to --

13              THE COURT:  Quite frankly, there shouldn't be

14   a lot of competition for distributing opioids.  If they want

15   to compete on something else, fine.  I think everyone should

16   see there's problem if pharmacies are trying to aggressively

17   compete by how many opioids they can distribute.

18              MR. PYSER:  Your Honor, in no way was I

19   implying the pharmacies are trying to distribute extra

20   opioids.

21              THE COURT:  That is what it sounds like.

22              MR. PYSER:  But it is a standard for how busy

23   a pharmacy is in general.

24              THE COURT:  Yeah, but if it's real busy for

25   opioids, that could be a signal that there's something

1    wrong.  All right?  That's my point, and that's the

2    plaintiffs' point.  And if a distributor knows that, then

3    maybe the distributor should have done something.

4        So the point is, this data is important to pinpoint

5    where there's a problem and where the pills have come from

6    in those problem areas.

7                    MR. PYSER:  And we will be able to work

8    towards those solutions with the more limited set of

9    information that DEA has proposed.

10                    THE COURT:  No one has made that clear to me,

11    what limited data will readily provide the information

12    that's needed now to make sure that everyone is at the table

13    who needs to be at the table.

14                    MR. PYSER:  I think that, Your Honor, would be

15    a list of I believe the DEA proposed 95 percent of all

16    manufacturers in a particular state, and hopefully 95

17    percent --

18                    THE COURT:  But they need to know how many --

19                    MR. PYSER:  -- of all distributors.

20                    THE COURT:  They need to know roughly how many

21    pills.  All right?

22                    MR. BENNETT:  Your Honor, in lieu of providing

23    wholesale access to the ARCOS database, would the Court

24    permit the parties to discuss the possibility of providing

25    the market share?  I obviously don't have the authorization

1    for that, but providing, in addition to the list, and I

2    don't know what the defense position would be on this, but

3    in addition to the list of manufacturers and the potential

4    list of distributors, their market share per state.

5              THE COURT:  Well, that certainly would start

6    going a long way to identifying if there are manufacturers

7    and distributors with a significant market share in a state

8    who aren't here; they should be.

9              MR. BENNETT:  And then there wouldn't be a

10   need at least at this point for the wholesale disclosure of

11   ARCOS data, which I think causes a lot of concern for the

12   DEA, as well as -- again, I don't want to speak for the

13   defendants, but the defendants as well, I presume.

14        So it's not something I can offer the Court today, but

15   something we can certainly go back and discuss internally,

16   if it would help to resolve the issue for the Court.

17             MR. PYSER:  And Your Honor, that offer sounds

18   promising and potentially a good way to resolve this issue

19   without the full-blown discovery plaintiffs are seeking.

20             THE COURT:  Mr. Weinberger.

21             MR. WEINBERGER:  Your Honor, we've heard about

22   this being described as full-blown discovery.  To be clear,

23   from the beginning, back in October when the *Touhy* letter

24   was issued, we have been requesting this information with

25   respect to the distributors and the manufacturers, so I want

1     to correct that.  That has been the case since the beginning

2     of time in terms of this issue.

3         And specifically in anticipation of the meeting in

4     Washington, DC, Your Honor, we sent a letter, Paul Farrell

5     sent a letter on February 21st, indicating eight or nine

6     items that we were looking for.  Not full-blown discovery,

7     just native files that contain the information that we

8     believe the Court needs and that we need to evaluate this

9     case.

10        Mr. Cohen got a copy of that e-mail dated February 21,

11    2018.  I think it contains the scope, the appropriate scope

12    of the information that we desire and that I think the Court

13    needs in order to move forward in accordance with potential

14    resolution of this case.

15        I'm happy to provide the Court with another copy of

16    that, unless Mr. Cohen has already done so.

17             THE COURT:  What I'm trying to do is avoid a

18    whole 'nother endless round of litigation over this.

19             MR. WEINBERGER:  We are too, Your Honor.

20             THE COURT:  And so I understand if I issue a

21    ruling and the DEA objects, they can appeal it.  They can

22    ask for me to stay my ruling.  If I don't, then they can go

23    to the Court of Appeals and ask for a stay.  And if the

24    Court of Appeals gives them the stay then no one has

25    anything, and it's tied up for another year, and that

1    doesn't help anybody, which is why I had wanted the parties

2    to try and work this out.  It wasn't out of laziness.  I can

3    issue an order, but it's to actually accomplish something.

4         I'm turning to the plaintiffs.  If you were given data

5    which identifies by each state market share, identifies by

6    manufacturer and distributor 95 percent of the pills that

7    went into a given state; we'll just talk about Ohio because

8    we're here, all right.  So for -- we'll figure out the

9    years.

10        For each year, we'll just say starting in 2006, for

11   2006, we'll track 95 percent of the opioids that went into

12   Ohio, all right, which manufacturer and the distributor, and

13   it covers 95 percent of the market share.  I think that

14   would identify -- obviously you look at it year by year, you

15   look at the totals.  That should determine if there's anyone

16   who needs to be at the table who's not, which is what we

17   need to know right now.

18        I am not saying if we've got to have a trial.  Just

19   saying hypothetically I try the Ohio case, you're not going

20   to need more.  Well, there's a whole lot of things you're

21   going to need which you don't have, but we're not talking

22   about that now.

23             MR. MOUGEY:  Your Honor, if I may, Peter

24   Mougey.  I think that's half the equation.  We're missing

25   the bridge.

1          THE COURT:  What else do you need?

2          MR. MOUGEY:  The problem is you don't know how

3    many pills and you don't know where in the specific state,

4    which communities, which counties, which cities.  So as you

5    know, all the cities and counties that have filed you have a

6    market share for the state as a total, you still don't know

7    the market share in the cities and counties, you don't know

8    the number of the pills.  At the end of the day, it is a

9    piece of information.  It still doesn't give a complete and

10   accurate picture.

11        In order to fulfill the goal and objective you set us

12   down, which is let's get this thing resolved, analyze the

13   problem, you need to be able to see the number of pills

14   going into each community --

15          THE COURT:  You only need that if you're going

16   to try that case for the particular community.  For right

17   now, for these discussions, if you see that there's a

18   distributor that has distributed 20 percent of the pills

19   into Ohio and they're not named, you get them in the case.

20   That's easy.

21          MR. MOUGEY:  The problem is --

22          THE COURT:  In which case it is, you know,

23   that's the problem, too.  You don't know which case.

24          MR. MOUGEY:  Yes, sir, that's exactly right.

25   You don't know which city, which county.  So at the end of

1     the day, city by city, county by county, jurisdiction by

2     jurisdiction, across the state of Ohio or any state, that's

3     why you need the other piece of the pie, the other piece of

4     the puzzle.  And if you don't have that puzzle you don't

5     have the bridge, you can't connect the dots, you can't

6     fulfill the objective.  And if the objective is city by

7     city, county by county --

8                  THE COURT:  We're not having discussions city

9     by city, county by county, we're having them globally.  So

10    it seems to me if you see -- it doesn't really matter.  If

11    you see company X that's not in this case and they've

12    distributed 20 percent of the pills into Ohio, you just name

13    them and bring them in.  Okay?  You've got a basis to do it,

14    and it doesn't matter which particular city those pills went

15    into.

16                 MR. MOUGEY:  At the end of the day we're going

17    to need -- our clients in cities and counties that have the

18    responsibility back to their own constituents, we're going

19    to need to be able to explain to them which defendant, how

20    many pills, broken out by city and county.  So in order to

21    have not only the defendants agree to any resolution, we are

22    going to need our clients to agree to that as well.  And in

23    order to do that we're going to need the full bridge to be

24    able to say where those pills came in and into what cities

25    and counties.

1        And at the end of the day, to have a piece of market

2   share without knowing the number of pills into the specific

3   cities and counties, and I think they do vary significantly

4   between city and counties across the state, you've got to

5   have that data when analyzing and going back to our clients

6   to address any resolution.

7        So it would be to get some numbers, some relief on the

8   table, and to address the abatement model, we've got to have

9   those pieces to the puzzle.  Otherwise, just having half of

10  the market share, without knowing the number of pills and

11  where, is only a piece of the equation.

12       So respectfully, this information is already organized

13  and sitting in a database.  You've already indicated your

14  willingness, your desire to put a protective order over

15  this.  To give us all of the tools we need to address this

16  in the context of settlement only makes sense.  It's sitting

17  in an off-the-shelf database, Your Honor.  It's looking at

18  approximately four terabytes in total in an off-the-shelf

19  database that can easily be produced in its native format to

20  us.  To go in and start dicing this in and cutting it up

21  without giving us all the tools we need doesn't make any

22  sense.

23                 THE COURT:  I know, but I don't think you need

24  to do all that to try to resolve this case.  If we have to

25  try a case, fine.

1          MR. FARRELL:  Judge, if I may, one quick

2     example.

3          Let's take Idaho, and for Idaho to be at the table to

4     be discussing settlement.  And let's say that we identified

5     that Cardinal Health has 20 percent of the market share in

6     Idaho, and that's 20 percent.  And let's say there's a

7     million people and a million pills, a pill a person.  So

8     that's 20 percent of the market share in Idaho.

9          Now let's come over to my hometown in Huntington, West

10    Virginia, and it's a hundred thousand people, and Cardinal

11    Health has 20 percent of my market share, but in my market

12    there's six and a half million pills per hundred thousand

13    persons.  For purposes of discussing --

14          THE COURT:  Mr. Bennett, we're going to need

15    to know the aggregate number of pills, the total number of

16    pills per state, to have it mean anything, because again 20

17    percent of a small number is a small number, 20 percent of a

18    large number is a very big number.

19          MR. BENNETT:  Your Honor, the de-identified

20    information that the government would provide would show the

21    total number of pills going into each community, each

22    three-digit ZIP code community.

23          MR. FARRELL:  Now, in addition to that, Judge,

24    let me make another example.  When H.D. Smith Wholesalers

25    comes in and sits at the table and they're going to say,

1    hey, we've got five percent of the market share, but we

2    shouldn't -- we're a little player in this, having this data

3    we'll be able to respond to H.D. Smith Wholesalers in

4    settlement and say, well, actually H.D. Smith, in West

5    Virginia you went from 400 pills a year to 498,000 pills a

6    year.  That's a 98,000 percent increase.  You have a bigger

7    seat at this table than Cardinal Health does.

8                    THE COURT:  Again, the point is that the data

9    for years will show that.  Okay?  It will show the aggregate

10   number in say West Virginia may have shot way up from one

11   year to the next, and it will show percentages.

12                   MR. FARRELL:  And then finally, Judge, in

13   bringing more parties to the table, it may show that H.D.

14   Smith Wholesalers sold those 498,000 pills to a particular

15   pharmacy, and now that pharmacy should share a seat at the

16   table, as well.

17        So what we're asking the Judge to do is give us a --

18                   THE COURT:  We won't bring individual

19   pharmacies into this settlement discussion.

20                   MR. FARRELL:  Judge, respectfully, if it's

21   CVS, I think it's a different story.  But all that being

22   said is instead of piecemealing this --

23                   THE COURT:  You'll have the data for CVS

24   because you know that every pill that CVS distributed went

25   to its own pharmacies.

1           MR. FARRELL:  Well, it depends, Judge.

2           THE COURT:  They've already said that, they

3   don't sell to anyone else.

4           MR. FARRELL:  CVS also at times purchased from

5   Cardinal Health.  So the Florida litigation is a matrix.

6   You know, I've got the affidavit from the DEA which

7   describes the fact that the data analyst from Cardinal

8   Health to CVS Florida --

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Maybe the thing to do is step

2     by -- again, I'm trying to move this forward, and it doesn't

3     do anyone's purpose to have this thing sidetracked in

4     litigation in the Sixth Circuit for a year or two.

5           MR. FARRELL:  Judge, respectfully, your order

6     will be on interlocutory appeal, they'll have to file a

7     writ.

8           THE COURT:  All right.

9           MR. FARRELL:  And we think you're right.  So

10    this for us --

11          THE COURT:  You don't know what I'm ordering

12    yet, and you may think I'm right if I rule in your favor;

13    they'll think I'm wrong and the DEA will think I'm wrong,

14    and I have no idea what my colleagues on the Sixth Circuit

15    will think, and who might grant a stay.  And if they grant a

16    stay, that's the end, and no one gets anything.

17          MR. FARRELL:  So can I perhaps --

18          THE COURT:  That's the reality.  I understand

19    it, you understand it.

20          MR. FARRELL:  Perhaps your order could then be

21    separated and severable, and part one says turn over your

22    list, and part two says what you've discussed, as well.  And

23    that way if they want to appeal part two they can appeal

24    part two, and if it's turned down then what we get is we get

25    the data, and we can move forward.

1          Judge, we're trying to find the truth.  We're trying

2     to get to the truth here.  We're trying to get facts that

3     help us understand how this turned into the largest epidemic

4     in our country, and so it's easy.  Let us plug in, download

5     the data, and then let us address the facts.

6                THE COURT:  All right.  I've heard the

7     arguments.  Anyone else want to weigh in?

8                MS. RENDON:  Your Honor, if I might very

9     briefly, Carole Rendon, liaison counsel for the

10    manufacturers, and specifically counsel for Endo

11    Pharmaceuticals.

12         We submitted to the Court earlier today a letter in

13    which we described as a group our belief, which you've heard

14    today here now from three different parties, that the

15    proposal that the DEA put forward is one that makes sense,

16    that works; that will allow the Court to move the litigation

17    forward in the way the Court has directed us to do so, which

18    is to try to get to a resolution; that it addresses and

19    properly balances the issues that the DEA has raised and the

20    concerns that the distributors and manufacturers

21    legitimately have.

22         And I think Your Honor has really nailed it when you

23    were just talking about the fact that perhaps if we start

24    with this, plus have the parties discuss if there's an

25    ability to get to market share, that we have what we need

1    for resolution.

2         What we need for litigation I hope we never need.

3    That's the whole goal here, trying to get to resolution.  If

4    we are going to get to resolution we have to focus all of

5    our attention and energy on that process.  And if instead

6    what we're going to be doing is litigating, then we need to

7    focus all our attention on that process, in which case the

8    discovery is going to be bilateral.  And that's not the path

9    that Your Honor wants to be on, and I don't think its the

10   path the parties want to be on.

11        So I think your proposal that we try to get what we

12   can that allows us to answer the questions that are out

13   there that Your Honor has identified without increasing the

14   risk of interlocutory litigation, and gets all of us moving

15   forward as we have been, is where the Court, respectfully,

16   should be.

17        And I think that if that ends up not being sufficient,

18   Your Honor, we'll be back here again in a couple of months,

19   and we'll tell you, you know what, we were all wrong, that

20   wasn't what we needed we to do; we need to do more, and here

21   is why.  But we have such momentum going, Your Honor, that

22   let's try to keep that momentum going forward.

23             THE COURT:  Well, I appreciate that.

24        Well, already DEA has acknowledged that what they have

25   offered isn't sufficient; maybe they will offer more.  It's

1    become very fluid.

2                MR. HOBART:  Your Honor, Jeffrey Hobart from

3    McKesson Corporation.  I would like to put on the record

4    McKesson supported the DEA's original position that they

5    mapped out at the meet and confer.  We join Ms. Rendon's

6    comments.  We think the compromise solution that Mr. Bennett

7    just proposed to the Court is a sensible one.

8         One practical approach, Your Honor, that might be

9    beneficial to all, if the DEA can get authorization for that

10   approach, would be to perhaps provide some sample reports to

11   all the parties.

12               THE COURT:  First of all, I don't want

13   to -- DEA -- Mr. Bennett, you proposed 2000-what, '13 and

14   '14 or '12 and '13?  I think it's important to go back a

15   number of years, and there's no worry about interfering with

16   law enforcement in 2006 to 2010, the statute has long since

17   gone.

18        So I think it's important, because one of the things

19   it's going to show is there might be, you know, huge bumps

20   in certain states, like you go from a very small amount to

21   some huge amount.  All right?  That's strange, that's

22   suspicious.  Why is that?  The state's population is the

23   same, roughly.  All right?  Well, all of a sudden you have

24   two, three, four, ten times the number of pills going in

25   from 2006 to 2010.  That doesn't make a lot of sense.

1              MR. BENNETT:  Your Honor, just so I can report

2      back to the decision makers, what time frame is the Court

3      proposing?  Is it 2006 through 2015?

4              THE COURT:  The plaintiffs have proposed

5      January 1, 2006 to December 31, 2014.  That's nine years.

6      All right?  I think that makes sense to me.  That's going

7      back more than three years, so I think it's very unlikely

8      that it would interfere with an investigation.  And if it

9      turns out that it is, what you can do is come to me *ex*

10     *parte*, and if I really think that -- I don't want to

11     interfere with a critical investigation; if there is

12     something, we'll figure out how to deal with it.  Okay?  I

13     can tailor it.

14              MR. BENNETT:  Yes, Your Honor.

15              THE COURT:  I think January 1, 2006 to

16     December 31, 2014.

17              MR. BENNETT:  2014, Your Honor?

18              THE COURT:  Yes.  December 31, 2014.  That's

19     nine years.  So we're now in '18, so we don't get anything

20     for '15, anything for 2016, anything for 2017, and obviously

21     nothing for 2018.  So I think that's reasonable.

22              MS. RENDON:  Your Honor --

23              THE COURT:  Yes.

24              MS. RENDON:  If I might suggest perhaps a way

25     to move forward would be to have DEA go back and see what

1      they're willing to authorize, share that with the parties,

2      and allow us an opportunity to review and respond in a short

3      time frame.

4                        THE COURT:  Well --

5                        MR. WEINBERGER:  Your Honor, we've been at

6      this for all this time.

7                        THE COURT:  Well, there was a break, but --

8                        MR. WEINBERGER:  There was, but --

9                        THE COURT:  -- I'm accelerating this.  So I'm

10     going to issue an order soon, but if the parties can agree

11     on something, I think that's preferable; but it has to be

12     enough data with enough specificity to identify whose pills

13     went where, and an aggregate.  I'll just use round numbers,

14     say we've got Ohio, 2008.  There will be the total, total

15     number of prescription opioids, and the manufacturers,

16     totaling 95 percent.

17          So just say, I'm going to use round numbers, just say

18     there were one million pills.  We'll just make simple

19     numbers.  One million pills, so we'll have manufacturing

20     totaling 950,000 pills, and the market share; and the

21     distributors totaling 950,000, and their market share -- all

22     right, that's what we're talking about -- for each year,

23     each state.

24                        MR. FARRELL:  Judge, one of the issues that

25     we're going to be addressing that we think is important is

1    whether or not manufacturer A was selling 5 milligram pills

2    or manufacturer B was selling 80 milligram pills.  So that's

3    why we need the ARCOS database --

4                    THE COURT:  I understand the ARCOS database

5    will give everything.  All right?  And if I decide to do it,

6    that's fine, but --

7                    MR. WEINBERGER:  And Your Honor, we are not

8    asking the DEA to do any work other than to transfer the

9    information to us, and we have experts prepared to create

10   reports for us that will identify the very information that

11   I think this Court needs ultimately for resolution purposes.

12                   THE COURT:  The easiest thing is just transfer

13   the data, DEA doesn't have to do anything.

14                   MR. WEINBERGER:  Right.

15                   THE COURT:  We already determined inexplicably

16   the addresses of the warehouses have been revealed, although

17   I would still prefer not to further divulge those.

18                   MR. FARRELL:  The protective order, Judge, I

19   believe is clear.

20                   THE COURT:  No, I don't even think we

21   need -- I mean anyone needs -- to have those floating

22   around, so you probably just excise the location or the

23   street addresses of the warehouses.  The cities, fine, if

24   there's some warehouse in Cleveland generically, that's all

25   right.

1              MR. BENNETT:  Your Honor, understanding the

2      Court wants to move this case forward, understanding the

3      Court wants the parties to agree rather than issuing an

4      order and litigating it, and listening to Ms. Rendon's

5      suggestion about getting some of the information and working

6      towards making a decision on the rest of it, I'm wondering

7      if the Court would entertain, we have a draft protective

8      order that we could circulate to the parties.

9          Once that protective order is in place we would be

10     able to share the information that's already been approved,

11     and while we're doing that process we can simultaneously go

12     back with the Court's comments about asking --

13              THE COURT:  Is it like a 20-page protective

14     order?

15              MR. BENNETT:  Your Honor, we can give you a

16     copy of the draft.  Again, this is still just in the draft

17     stage, but I think it's four pages.  But again, none of the

18     parties have seen this yet, but we do have copies for them.

19              THE COURT:  Well, you can start with that.  I

20     mean, I've already said I want -- there's two purposes,

21     there's this litigation and there's law enforcement, and

22     beyond that, that's it, so no public dissemination of any of

23     this.

24              MR. BENNETT:  Your Honor, may I approach the

25     bench?

1          THE COURT:  All right.  You can provide it to

2    the parties.

3          MR. BENNETT:  You want it just to the parties

4    now, or to you?

5          THE COURT:  I might as well look at it, too.

6       All right, this is what I'm going to do.  I can issue

7    an order any time, and that will be it.  If someone wants to

8    appeal, they can appeal, seek permission, and they can

9    interlocutory appeal, but I'd rather not have a lot of

10   litigation.

11      So I want the parties very quickly to agree on a

12   protective order.  Okay?  This is at least only four pages,

13   and the first page is a bunch of whereases, so who cares

14   about the whereases.  It is really only about two pages

15   actually.

16      I commend Mr. Bennett, it's actually shorter than our

17   standard one in our local rules.  Maybe we should go with

18   this.

19          MR. BENNETT:  As I said, Your Honor, there are

20   some people still reviewing it.

21          THE COURT:  We don't need the Court's

22   whereases, it could be two pages; but anyway, agree on this,

23   and then I want you to produce what you said you would

24   produce.

25          MR. BENNETT:  Yes, Your Honor.

1           THE COURT:  Which is state by state, with the

2    totals, from January 1, 2006 to 12-31-2014, the aggregate;

3    and then the market, the breakdown of the market shares for

4    95 percent of the pills, and see what that looks like to the

5    plaintiffs, and I'd like to see it, too.

6           MR. BENNETT:  Yes, Your Honor.  We'll

7    certainly provide the Court with a copy.  We do have

8    authorization for I think 2012-2013.  We'll go back and look

9    at 2006 to 2012.

10          THE COURT:  Well, get it fast.

11          MR. BENNETT:  Yes, Your Honor.

12          THE COURT:  If there's foot dragging, I'll

13   just do what I have to do.

14          MR. EMCH:  Your Honor, do we understand that

15   the transactional data that you're suggesting would be

16   de-identified and that the listing would be separate?  The

17   market share listing is separate, but the actual individual

18   transactions are not identified as to buyer, seller, et

19   cetera?

20          THE COURT:  I'm not sure what format they're

21   producing at this point.  I'll see what it is, and then

22   you're going to see it, and the plaintiffs are going to see

23   it, and the Court will see it.  All right.  Today is Monday

24   the 26th.  I want the protective order to be agreed on by

25   Friday at noon, and then DEA is to start producing.

1          When will this be produced, Mr. Bennett, so I can see

2     it and the parties can see it, and we can determine if

3     that's enough for now?

4               MR. BENNETT:  Your Honor, my understanding is

5     once the protective order is issued DEA will start producing

6     it on a rolling basis.  We're not going to wait until

7     everything is done to get it to the parties.

8          I think we were talking approximately two to three

9     weeks for that to start rolling out, for them to go through

10    the process and get all of that; but I think they were

11    talking about doing five states at a time, and I don't think

12    it would take longer than a month for everything total once

13    it starts coming.

14         The problem is the actual person who is going to do

15    this --

16               THE COURT:  I want them to tell you which

17    states for the start.

18               MR. BENNETT:  That's fine.

19               THE COURT:  All right.  Mr. Farrell, what five

20    states should be the first five?  I can guess some of them.

21               MR. FARRELL:  Ohio, Kentucky, West Virginia,

22    Florida, Alabama.

23               THE COURT:  Okay.  Those will be the first

24    five.

25               MR. BENNETT:  Yes, Your Honor.

1          THE COURT:  And I suggest, Mr. Farrell,

2     Mr. Weinberg, if you have the second five, just provide them

3     to Mr. Bennett since it's going to be on a rolling basis.

4     We've got the first five, and the plaintiffs can provide the

5     second five.

6          MR. BENNETT:  Your Honor, I assume the Court

7     and the parties would prefer us to get the manufacturer list

8     first before we start on the states so you have the actual

9     parties, or do you want the individual states' data first?

10        I'm sorry, Your Honor, it will come together.

11         THE COURT:  Yes.  It's got to be state by

12    state, or it's not really going to be intelligible.

13         MR. BENNETT:  No, it will be, Your Honor.

14         THE COURT:  All right.  And you are going to

15    get authorization for 1-1-06 to 12-31-14.  All right.  Quite

16    frankly, we'll see with the first five states, we'll see

17    exactly what it is we're getting and whether that's going to

18    be satisfactory for this for the present.  And if it's not,

19    I'll have to order something more, and if you appeal, you

20    appeal.

21        So I want to make sure, look, and I need to know very

22    quickly if the DEA is agreeing to these nine years, and the

23    market share, and the names, the names of the manufacturer

24    and distributor, so the market share of each.

25         MR. FARRELL:  The aggregate as well, Judge?

1           THE COURT:  Yes, the aggregate and the

2   individual.

3           MR. FARRELL:  So when you say aggregate and

4   individual, we're talking about the individual transactions?

5           THE COURT:  We're not going to have individual

6   transactions.  We're going to say, all right, for Ohio,

7   let's say there are a million pills in the year 2006.  We're

8   going to have total pills in 2006, one million.  You're

9   going to have the names of all the manufacturers that total

10  950,000 pills, and you're going to have their market shares.

11  You're going to have the names of the distributors totaling

12  950,000 pills and their market shares.  All right?

13      That's what we'll have, and that may be enough for now

14  or it may not be.  If you tell me there's still something

15  more I have to have for right now, then I'll consider it.

16  And obviously anything, the defendants will have it, too.

17          MR. FARRELL:  And so time frame, you are

18  expecting this within the next --

19          THE COURT:  Well, Mr. Bennett said he's going

20  to start producing it as soon as the protective order is

21  going to be signed by this week, by Friday at noon.  And

22  then they'll start coming on a rolling basis, and the first

23  five states are going to be Ohio, Kentucky, West Virginia,

24  Florida, and Alabama.

25      Mr. Bennett, how soon do you think we'll get the first

1      five states?

2                      MR. BENNETT:  Your Honor, I think that's going

3      to depend on whether we're doing the two years, which is

4      what I asked for the time frame, or whether we are doing

5      nine years, which I assume will take longer.

6          The two years, I was given a two or three-week basis

7      for that to start coming in.  I don't know if that is the

8      same for the nine-year period or if it will be longer if

9      we're doing nine years for Ohio.  So I'd like to maybe --

10                      THE COURT:  The problem is I could probably

11     get all the data faster because there it is, you don't have

12     to sort it out, you don't have to do anything, just here is

13     the data.  I'm concerned this is going to take months and

14     months and months, and we don't have months and months.

15                      MR. BENNETT:  I don't think the anticipation

16     is that it's going to be months and months and months, and I

17     will certainly explain to my client the Court's desire for

18     them to do this as expeditiously as possible.

19          So I'd be happy to kind of provide the Court with an

20     update once I have had a chance to talk to the technical

21     person and group that's doing this.

22                      THE COURT:  Well, I need that in a week, too.

23     I need that in a week, how long this is going to take.

24                      MR. BENNETT:  Yes, Your Honor.

25                      THE COURT:  Because if it's too slow then I

1       just will order the data to be produced electronically.  You

2       don't have to do any sorting, and you've got it, and it is

3       up to the plaintiffs.

4                    MR. MOUGEY:  Your Honor, we have Ph.D.s ready

5       to go with the data crunchers that can have this data turned

6       around within 30 days.

7                    THE COURT:  That's the easier thing,

8       Mr. Bennett, you just produce it, and they do what they want

9       with it.  The speed is important because we --

10                   MR. BENNETT:  I understand, Your Honor.  We

11      will do it as expeditiously as possible.

12                   THE COURT:  That's what I want.  We will have

13      a protective order by noon on Friday, and I'm going to just

14      say noon on Monday I need you to file a report as to how

15      long it's going to take.

16                   MR. BENNETT:  Yes, Your Honor.

17                   THE COURT:  All right?  As to how long

18      production will take.

19           Well, I guess that's part of your response,

20      Mr. Bennett.  It's whether DEA will voluntarily provide the

21      nine years and the distributor data and the market share

22      that we discussed, and if so, how long it's going to take.

23      All right?

24                   MR. BENNETT:  Yes, Your Honor.

25                   THE COURT:  And based on that, I'll decide

1    what to do.

2                    MR. BENNETT:  Yes, Your Honor.

3                    THE COURT:  And hopefully the answer will be

4    yes, and it won't take a real long time.

5                    MR. BENNETT:  Yes, Your Honor.

6                    THE COURT:  But if it's no and/or it takes a

7    long time, you are not giving the Court much choice.  I'll

8    just have to do what I need to do, and let the chips fall

9    where they may.

10                    MR. BENNETT:  Understood, Your Honor.

11                    THE COURT:  Okay.  All right.

12          Anything further that anyone wants to say for the

13    record?  I appreciate everyone's appearance.  And I think I

14    said it at the outset, if I didn't I apologize, I appreciate

15    everyone's very detailed and thoughtful submissions leading

16    up to today, which I and all the special masters and Judge

17    Ruiz have reviewed very carefully.

18          Okay.  Thank you.  We're adjourned then.

19                    DEPUTY CLERK:  All rise.

20                        -   -   -   -   -

21          (Proceedings adjourned at 4:56 p.m.)

22

23

24

25

1

2

3                          C E R T I F I C A T E

4

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7

8               s/Heidi Blueskye Geizer        March 1, 2018

9               Heidi Blueskye Geizer                   Date
                Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25