1                      UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF OHIO
2                           EASTERN DIVISION

3
    -------------------------------X
4                                   :
    IN RE: NATIONAL PRESCRIPTION    :   MDL No. 2804
5   OPIATE LITIGATION               :
                                    :   Case No. 1:17-md-2804
6                                   :   Cleveland, Ohio
    APPLIES TO ALL CASES            :
7                                   :
                                    :   Thursday, May 10, 2018
8   -------------------------------X

9

10

11

12              TRANSCRIPT OF DISCOVERY CONFERENCE

13          HELD BEFORE THE HONORABLE DAVID A. RUIZ

14              UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20   Court Reporter:          Lance A. Boardman, RDR, CRR
                              United States District Court
21                            801 West Superior Avenue
                              Court Reporters 7-189
22                            Cleveland, Ohio 44113
                              216.357.7186
23

24
     Proceedings recorded by mechanical stenography; transcript
25   produced by computer-aided transcription.

1    APPEARANCES:

2

     For the Plaintiffs:

3
     David R. Buchanan, Seeger Weiss
4    Peter H. Weinberger, Spangenberg, Shibley & Liber
     Troy Rafferty, Levin Papantonio
5    R. Eric Kennedy, Weisman, Kennedy & Berris
     David I. Ackerman, Motley Rice
6    J. Parker Miller, Beasley Allen
     Jennifer Scully

7

8    For the Defendants:

9    Neelum J. Wadhwani, Williams & Connolly
     Steven M. Pyser, Williams & Connolly
10   Paul E. Boehm, Williams & Connolly
     Mark S. Cheffo, Quinn Emanuel
11   Carole S. Rendon, BakerHostelter
     Sabrina H. Strong, O'Melveny & Myers

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 04:18:45 | 1 | (In Chambers.) |
| 04:18:45 | 2 | THE COURT:  This is Magistrate Judge David |
| 04:18:47 | 3 | Ruiz.  I'm here for a conference with respect to discovery |
| 04:18:50 | 4 | issues in the pending MDL action.  I'm going to have counsel |
| 04:18:54 | 5 | introduce themselves on the record and then we'll proceed. |
| 04:18:57 | 6 | Please to my left. |
| 04:18:58 | 7 | MS. WADHWANI:  Hi.  I'm Neelum Wadhwani from |
| 04:19:01 | 8 | Williams & Connolly. |
| 04:19:02 | 9 | MR. PYSER:  Steven Pyser, P-Y-S-E-R, also with |
| 04:19:05 | 10 | Williams & Connolly, for Cardinal Health. |
| 04:19:07 | 11 | MR. CHEFFO:  Mark Cheffo from Quinn Emanuel |
| 04:19:09 | 12 | for Purdue. |
| 04:19:10 | 13 | MS. STRONG:  Sabrina Strong of O'Melveny & |
| 04:19:13 | 14 | Myers for Johnson & Johnson and Janssen. |
| 04:19:16 | 15 | MS. RENDON:  Good afternoon.  Carole Rendon, |
| 04:19:18 | 16 | BakerHostetler, for Endo. |
| 04:19:20 | 17 | MR. BOEHM:  Good afternoon.  Paul Boehm at |
| 04:19:22 | 18 | Williams & Connolly for Cardinal Health. |
| 04:19:24 | 19 | MR. RAFFERTY:  Troy Rafferty for the |
| 04:19:25 | 20 | plaintiffs. |
| 04:19:25 | 21 | MR. KENNEDY:  Eric Kennedy, plaintiffs. |
| 04:19:27 | 22 | MR. BUCHANAN:  Dave Buchanan for plaintiffs. |
| 04:19:30 | 23 | MR. WEINBERGER:  Peter Weinberger for |
| 04:19:32 | 24 | plaintiffs. |
| 04:19:32 | 25 | MR. ACKERMAN:  David Ackerman for the |

| | | |
|---|---|---|
| 04:19:34 | 1 | plaintiffs. |
| 04:19:34 | 2 | MR. MILLER:  Parker Miller, Alabama. |
| 04:19:35 | 3 | MS. SCULLY:  Jennifer Scully [ph] in for the |
| 04:19:38 | 4 | plaintiffs. |
| 04:19:39 | 5 | THE COURT:  Thank you. |
| 04:19:40 | 6 | I'd like to first commend the counsel for working |
| 04:19:45 | 7 | cooperatively with Special Master Cohen to address a number |
| 04:19:50 | 8 | of these discovery issues that you face in this MDL action |
| 04:19:53 | 9 | and to prepare initial drafts of proposed protective order |
| 04:19:59 | 10 | and document production protocol. |
| 04:20:00 | 11 | Now, I understand that there are some issues that the |
| 04:20:03 | 12 | parties were not able to resolve, so I'll open up the floor |
| 04:20:07 | 13 | to hear what current disputes there are.  I know that you |
| 04:20:12 | 14 | had met a number of times previously, you met and conferred, |
| 04:20:15 | 15 | and then you -- prior to going on the record here, you met |
| 04:20:18 | 16 | with Special Master Cohen.  And it's my understanding you |
| 04:20:21 | 17 | have been able to resolve at least one pending issue.  But |
| 04:20:23 | 18 | if that's not the case, I'd like to please understand that. |
| 04:20:26 | 19 | MS. WADHWANI:  Your Honor, Neelum Wadhwani on |
| 04:20:29 | 20 | behalf of Cardinal Health. |
| 04:20:29 | 21 | THE COURT:  Yes. |
| 04:20:30 | 22 | MS. WADHWANI:  The issues that I understand to |
| 04:20:32 | 23 | be live in front of you right now, one of them relates to |
| 04:20:36 | 24 | the proposed protective order.  And the issue is whether a |
| 04:20:42 | 25 | fact witness for one defendant may be shown confidential |

04:20:46  1   information at a deposition where the witness is not an

04:20:50  2   employee of the party whose information it is.

04:20:52  3       And then with regard to the ESI protocol, we have a

04:20:57  4   few issues.  The first is the format of current and future

04:21:03  5   productions.

04:21:05  6       The plaintiff had requested native format.  The

04:21:10  7   defendants believe TIFF is the appropriate format.

04:21:12  8   Relatedly, the question as to whether documents are produced

04:21:16  9   in TIFF should be produced in color or not.

04:21:18  10      We also have an issue related to a format of the prior

04:21:22  11  productions, and those are the productions that are due June

04:21:25  12  11th under CMO number 1.

04:21:28  13      And then your comment makes me think that based on our

04:21:32  14  conversations with Special Master Cohen just a few minutes

04:21:36  15  ago, the issue as to the application of the ESI protocol to

04:21:40  16  the plaintiffs, whether it's track 1 or all plaintiffs,

04:21:44  17  might have been resolved, and that is going to apply to all

04:21:49  18  plaintiffs.

04:21:49  19      However, in the ESI protocol there is a provision that

04:21:52  20  allows any plaintiff who feels that the provisions of that

04:21:56  21  protocol may be unduly burdensome or expensive to them to

04:22:01  22  request a meet-and-confer with the defendants to see if

04:22:04  23  there can be other agreements reached.  So with that, I

04:22:07  24  think that issue is off the table, but I'll --

04:22:08  25              THE COURT:  Okay.  Mr. Buchanan is going to be

04:22:11  1    taking the lead?

04:22:12  2                MR. BUCHANAN:  Yes, I'll be addressing these

04:22:14  3    points.

04:22:14  4                THE COURT:  Okay.  Go ahead, sir.

04:22:14  5                MR. BUCHANAN:  With Special Master Cohen, he

04:22:16  6    was reframing or restating, you know, where we are in these

04:22:19  7    issues.

04:22:19  8         To be clear with regard to productions of other

04:22:22  9    plaintiffs, the proposed order that was submitted was

04:22:24  10   submitted for the track 1 plaintiffs and defendants.  The

04:22:27  11   concern expressed by the defense was, well, did we want

04:22:32  12   something that's going to apply more broadly.

04:22:35  13        As to that issue with regard to more broadly, we agree

04:22:38  14   as a PSC that any production any of these defendants make,

04:22:41  15   so long as it conforms with this production protocol, is

04:22:44  16   good as to any plaintiff in the MDL.  In other words, if any

04:22:48  17   plaintiff later litigates their claim before this Court,

04:22:51  18   they will accept the format of production that's been

04:22:53  19   negotiated by the PEC.

04:22:54  20        The concern that arose was the format of the

04:22:58  21   plaintiffs' production as it relates to non-track 1

04:23:01  22   plaintiffs, non-bellwether plaintiffs in particular, whether

04:23:04  23   that was a format they could feasibly comply with, whether

04:23:08  24   the proportionality considerations might be different.

04:23:11  25        We wouldn't want, for example, for the litigating

04:23:14   1   their claim effectively to be uneconomic because of a

04:23:17   2   probation protocol.  We'd want them to have an opportunity

04:23:20   3   to be heard to present the circumstance why they may need to

04:23:23   4   deviate.

04:23:24   5       So we're okay with it being good for the track 1

04:23:27   6   plaintiffs and the defense production being good for any

04:23:31   7   plaintiff from a production format.

04:23:34   8       And as long as -- and a subsequent bellwether

04:23:38   9   plaintiff when they're designated could be heard to the

04:23:41   10  extent their circumstances present a need to deviate.

04:23:43   11          MS. WADHWANI:  And I think the ESI protocol

04:23:46   12  already provides for that.

04:23:47   13          THE COURT:  That's my understanding in the

04:23:48   14  protocol that was filed, that it does have that provision

04:23:50   15  enabling any plaintiff that wishes to have a reconsideration

04:23:54   16  of that to raise the issue with the Court -- or meet and

04:23:57   17  confer first and then, if necessary, raise the issue with

04:23:59   18  the Court.

04:23:59   19      So based upon that, are you comfortable with that

04:24:01   20  procedure?

04:24:02   21          MR. BUCHANAN:  I am, Your Honor, yes.  And

04:24:03   22  understanding that we don't anticipate this production

04:24:05   23  format even presumptively applying outside of a bellwether

04:24:09   24  setting, you know, when a plaintiff is designated.  Because

04:24:11   25  they're not in discovery right now, the broader plaintiffs.

04:24:15    1              THE COURT:  Okay.  All right.  Now, with

04:24:16    2    respect to the other issues that Attorney Wadhwani

04:24:22    3    indicated, to use your phrasing, are live issues,

04:24:25    4    Mr. Buchanan, anything you'd like to specifically address

04:24:28    5    with respect to those issues?

04:24:28    6              MR. BUCHANAN:  Sure.  I guess we can start

04:24:29    7    with native if that's fine with the Court.

04:24:31    8              THE COURT:  Sure.  Let's first look at the

04:24:33    9    initial issue of prior production, kind of take it

04:24:39   10    historically.

04:24:40   11              MR. BUCHANAN:  Sure.  What the plaintiffs had

04:24:41   12    asked for initially was that the prior productions be made

04:24:43   13    in a format that would match the production format that we

04:24:45   14    negotiated.  We said, look, if you have the productions on a

04:24:50   15    platform, you know, one of these document management

04:24:53   16    platforms, and it's just a matter of selecting, you know,

04:24:55   17    different fields or different options when you export the

04:24:57   18    prior productions, export the prior productions in a format

04:25:00   19    that matches this format so essentially the prior

04:25:03   20    productions are as usable as they can possibly be.

04:25:05   21         We understood, frankly, from our -- the defense

04:25:09   22    presentation to Special Master Cohen last week that as a

04:25:13   23    general matter, the defendants just intended to copy the CDs

04:25:16   24    they previously delivered to regulators and other people and

04:25:20   25    turn those over to us.

04:25:22    1        We asked for an opportunity to at least know if they

04:25:26    2   had that information in a production platform so that it

04:25:29    3   could be generated in this format.  And I think -- I thought

04:25:32    4   the parties had stipulated that the defendants would provide

04:25:35    5   that information to the plaintiffs so that if it was

04:25:37    6   available in that other production format, it could be

04:25:40    7   obtained by the plaintiffs.  If there was an additional

04:25:43    8   cost, we might have to bear that cost or would presumptively

04:25:46    9   have to bear that cost.  But otherwise, the defendants were

04:25:49   10   just going to send the disks across the transom.

04:25:52   11        So that was a stipulated provision as of last Friday

04:25:55   12   in the order that went to the board.

04:25:56   13                THE COURT:  Okay.  Ms. Wadhwani?

04:25:59   14                MS. WADHWANI:  We disagree with that for the

04:26:01   15   following reasons:  Those provisions appear in the ESI

04:26:06   16   protocol, Judge Ruiz, because Special Master Cohen had given

04:26:09   17   us his ruling on last week when we met with him in

04:26:13   18   Washington, DC, and we did not want to be disrespectful to

04:26:17   19   those rulings and to the role that he had played in trying

04:26:20   20   to assist us to come to agreement.  So when we met with

04:26:26   21   Special Master Cohen, we told him that we had some

04:26:28   22   exceptions to his rulings and we would be raising objections

04:26:31   23   with you about them.

04:26:33   24        When we submitted the orders last Friday night, right

04:26:39   25   after those were submitted and those reflected Special

04:26:44  1    Master Cohen's rulings, the defendants submitted their

04:26:45  2    objections and sought the hearing that we're all having

04:26:48  3    today.

04:26:49  4        So while the language that Mr. Buchanan cites did go

04:26:55  5    into the orders, that was out of deference to Special Master

04:26:59  6    Cohen's rulings in respect to Special Master's rulings, but

04:27:02  7    also we had raised with him and he has acknowledged we

04:27:05  8    raised with him and has in fact referred all these issues to

04:27:08  9    you based on our objections and request for a hearing.

04:27:11  10               THE COURT:  So what is your specific objection

04:27:12  11   then to the request from plaintiffs' counsel?

04:27:17  12               MS. WADHWANI:  Our objection is that, as

04:27:19  13   Mr. Buchanan has said, they want our prior productions to be

04:27:22  14   reformatted and rerun to conform to the formatted

04:27:26  15   production.

04:27:26  16               THE COURT:  It sounds to me like the original

04:27:29  17   request is, one, are those maintained in a platform and

04:27:33  18   then --

04:27:33  19               MS. WADHWANI:  So there is a stipulation that

04:27:34  20   we will tell him what we know about our prior productions

04:27:37  21   within 14 days after the entry of the order.  We have

04:27:44  22   concerns, however, even with that information, about

04:27:48  23   producing any documents in a new format other than the

04:27:52  24   format in which they were previously produced unless that

04:27:55  25   format is not reasonably usable.

04:27:58  1        Rule 34 of the Federal Rules of Civil Procedure do not

04:28:01  2    require a party to produce an electronic format in more than

04:28:06  3    one format unless that format is not reasonably usable.

04:28:10  4        And in addition, there are going to be some

04:28:13  5    productions that might just be all PDF.  And matching up the

04:28:18  6    natives, finding the natives for a production that might

04:28:21  7    have been converted into an image file before it was even

04:28:24  8    reviewed and determined to be produced could create a lot of

04:28:28  9    burden.

04:28:28  10       I think, as you have aptly pointed out today and

04:28:33  11   Special Master Cohen has pointed out today, we're on a very

04:28:35  12   fast schedule.  For the defendants to go and not only

04:28:38  13   identify these prior productions, collect them, identify

04:28:43  14   where they may be housed, turn that information over to the

04:28:45  15   other side, and then have to rerun, reformat, potentially

04:28:50  16   match up PDFs with natives all by June 11th when they are

04:28:56  17   going to receive reasonably usable formats for the platforms

04:29:00  18   that we understand they're using seems to be an unnecessary

04:29:04  19   waste of the parties' resources, time, and expenses when

04:29:08  20   we're also trying to double track discovery right now and

04:29:11  21   work on producing documents in response to each other's

04:29:15  22   discovery requests.

04:29:16  23            MR. CHEFFO:  Can I say one just historical

04:29:18  24   thing?

04:29:18  25            THE COURT:  Go ahead, Mr. Cheffo.

04:29:20   1        MR. CHEFFO:  Thank you.  And I'm sorry to

04:29:21   2   interrupt.  I hope I didn't.

04:29:23   3        You know, you've been with this from the beginning,

04:29:25   4   right?  And when we had the CMO that we worked out on this,

04:29:28   5   there was a lot of give and take, I think.  And one of the

04:29:31   6   things at least I heard was Mr. Rice and others essentially

04:29:35   7   saying, we just want the ability to give everybody else and

04:29:39   8   share the information that we already have with the rest of

04:29:43   9   the PSC.  You don't have to produce anything; you don't have

04:29:46   10  to do anything.  There's no burden arguments.  We have

04:29:48   11  Chicago.  We just want the ability to deem it produced.

04:29:51   12  That was what you heard several times.  It's what we heard.

04:29:55   13  And ultimately, through a lot of give and take, that's what

04:29:58   14  we agreed to do.

04:29:59   15       Now what we're hearing is we don't just want what we

04:30:02   16  had, we actually want you to do more on top of what was

04:30:05   17  given us in the format at the same time that we also have to

04:30:09   18  do new production.

04:30:09   19       So this seems to be taking a few steps back on what

04:30:13   20  the original intent and why we agreed to do this on such an

04:30:19   21  expedited time frame.  So I just wanted to remind the Court

04:30:23   22  of that context.

04:30:25   23       MR. WEINBERGER:  Before Dave responds to

04:30:25   24  that...

04:30:25   25       THE COURT:  Mr. Weinberger, go ahead.

04:30:27   1              MR. WEINBERGER:  Yes, we had some

04:30:29   2   negotiations, but it's really important that we distinguish

04:30:32   3   what we're talking about here.

04:30:33   4        So we've got the Chicago documents, and then we've got

04:30:37   5   prior productions, too, that the defendants have made.

04:30:44   6        And with respect to the latter group of documents,

04:30:46   7   there was a negotiated agreement that ended up on page 15,

04:30:51   8   Section K number 2, of the CMO that the defendants shall

04:30:56   9   engage in rolling production of previously produced

04:30:59  10   documents during the 61-day period.  And that's what we

04:31:04  11   raised with the Court this morning, the fact that we have

04:31:07  12   not received one single document under this provision.

04:31:12  13        So setting aside the Chicago documents, which

04:31:15  14   obviously Chicago plaintiffs' counsel have, there has not

04:31:20  15   been a single document produced on a rolling basis, which

04:31:23  16   was, as I understand it, part of the agreed negotiated

04:31:28  17   portion of this CMO.

04:31:30  18              MR. CHEFFO:  Well, that's a new issue.  I'm

04:31:33  19   happy to respond to that.  I thought we weren't going to

04:31:34  20   raise new issues, but go ahead.

04:31:36  21        But the point is -- I think to that is what we're all

04:31:39  22   trying to do.  I know I can speak for my client.  We're

04:31:42  23   trying to figure out, right, as we said, if that we thought

04:31:45  24   there would be overlapping productions of what was there.

04:31:48  25   You will receive, very soon, notice that a lot of what were

04:31:51  1    in some of these other productions were also in the Chicago

04:31:53  2    production and getting people to figure that out.  So that's

04:31:56  3    what we've --

04:31:57  4                    MR. WEINBERGER:  Well, with respect to the

04:31:58  5    manufacturer.  Because the Chicago documents are with the

04:32:01  6    manufacturer.

04:32:01  7                    MR. CHEFFO:  Yeah, well, I can speak to -- I

04:32:01  8    mean, again --

04:32:01  9                    MR. WEINBERGER:  I understand.  I'm sorry.

04:32:01  10   I'm sorry to interrupt you.

04:32:04  11                   MR. CHEFFO:  No, no, no, I just wanted to

04:32:05  12   clarify.  I mean, we can -- I'd be happy to discuss if you

04:32:09  13   have -- this is the first time I'm hearing that you had some

04:32:11  14   concerns about it.  You could let me know if we do and we'll

04:32:14  15   try and raise these.

04:32:15  16                   THE COURT:  Mr. Buchanan, go ahead.

04:32:21  17                   MR. BUCHANAN:  Just to respond to

04:32:22  18   Ms. Wadhwani's argument.

04:32:22  19                   THE COURT:  Please do.

04:32:23  20                   MR. BUCHANAN:  The representation was that the

04:32:24  21   defendants were just going to turn over disks to us.  When

04:32:27  22   that became -- and not go through and do a further review

04:32:31  23   and try and match things up to what's been produced as it

04:32:35  24   relates to prior productions.

04:32:36  25                   THE COURT:  Right.

04:32:36    1          MR. BUCHANAN:  We wanted to get with the

04:32:37    2    defense and meet and confer and say, look, if you have these

04:32:40    3    in a production platform, before you give them to us in a

04:32:43    4    format that essentially elects the old production format, if

04:32:50    5    you're going to go -- the way these platforms work, as Your

04:32:53    6    Honor may know, you can store the production on the

04:32:54    7    platform.  And the platform -- this was the Chicago wave 1,

04:32:59    8    this was the Chicago wave 2, this was the Chicago wave 3.

04:33:02    9          And if all the defense was going to do was go back to

04:33:05   10    the platform and press Chicago wave 1, Chicago wave 2,

04:33:08   11    Chicago wave 3, our ask was, well, can you comply with this

04:33:13   12    protocol as it relates to those prior productions?

04:33:15   13          That was in -- they strenuously objected.  We

04:33:18   14    presented it to Special Master Cohen last week.  And the

04:33:22   15    plaintiffs lost; the defense won.  And the resolution of

04:33:27   16    that was what I thought was reflected in the submitted CMO,

04:33:32   17    which was you'll at least tell us what prior productions

04:33:34   18    you're going to produce, you'll at least tell us if they're

04:33:36   19    in a different format, and you'll at least let us, you know,

04:33:39   20    pay the excess, if we wish to, so we can get them in an

04:33:43   21    optimal format so we could use them.

04:33:44   22          But in no way did we anticipate that having a

04:33:47   23    discussion to make sure we'd get them in a usable format

04:33:49   24    would somehow bar production of anything or delay the

04:33:52   25    production of anything.  I mean, our goal is still to get

04:33:55   1    those over the transom as quickly as possible.  We

04:33:57   2    understood what the defense was going to do was ship what

04:34:00   3    they've already shipped, and we could pay an excess charge

04:34:02   4    if we had to pay an excess charge for a different format.

04:34:07   5           MS. STRONG:  And, Your Honor, it's not as

04:34:08   6    simple as just flipping a switch or pushing a button and

04:34:11   7    producing it in a different format.  There are additional

04:34:15   8    burdens associated with a reformatting of a production.  And

04:34:19   9    one of those -- I don't purport to know, you know, all of

04:34:24   10    them, but one of them is, for example, examining all of the

04:34:26   11    metadata that's involved in the native document.  And, for

04:34:28   12    example, if there's privileged material in there, that would

04:34:31   13    need to be reviewed and redacted and addressed

04:34:34   14    appropriately.

04:34:34   15    So it's a very different process to reformat a

04:34:37   16    production that was done in one way and convert that to a

04:34:40   17    native production.  It's not as simple as just pushing a

04:34:46   18    button and letting it proceed out in a different format,

04:34:48   19    Your Honor.

04:34:48   20           THE COURT:  Okay.  Now, you're talking about

04:34:52   21    prior productions.  I'm familiar with the Chicago

04:34:54   22    production.  To the extent there have been other

04:34:56   23    productions, it's unclear to me the extent, the volume, the

04:35:00   24    nature of those productions.

04:35:02   25    So, Attorney Wadhwani, can you illuminate for me the

04:35:06  1    extent to which there have been prior productions, formats

04:35:08  2    for those prior productions.  If you can speak on the -- I

04:35:11  3    know you probably won't be able to speak to specific detail

04:35:14  4    for each of the prior productions, but to the extent that

04:35:16  5    you know right now.

04:35:17  6            MS. WADHWANI:  Well, I can speak to some of

04:35:20  7    Cardinal Health because that's my client.

04:35:23  8        We are still in the process of gathering and working

04:35:27  9    through those productions.  I know that some of the prior

04:35:29  10   productions that we have made are in TIFF format and some of

04:35:34  11   them are in PDF format.

04:35:36  12       I have an understanding that some of those productions

04:35:39  13   may not still be in this live database that Mr. Buchanan

04:35:45  14   keeps referring to that he thinks that we can go quickly

04:35:49  15   look at.  You know, to Ms. Strong's point, there's more

04:35:55  16   involved than just simply pushing a button.

04:35:58  17       And in addition, Judge Ruiz, understanding that

04:36:03  18   Special Master Cohen I believe thought he was trying to

04:36:06  19   reach some kind of good middle ground with this cost

04:36:09  20   shifting argument, I think that that in itself will cause us

04:36:14  21   to incur unnecessary delays and get into what essentially is

04:36:19  22   discovery -- disputes about discovery.  Because the costs

04:36:24  23   involved here are not just the simple costs of rerunning a

04:36:28  24   production.  There is attorney time in finding out what

04:36:30  25   platforms exist, attorney time if we're converting to native

04:36:35  1   in reviewing for privileged and confidential information,

04:36:39  2   attorney time if something is in a PDF yet exists somewhere

04:36:43  3   else in native in matching up the productions.

04:36:46  4        When we submit those fees and expenses to the other

04:36:51  5   side, they may push back and resist and want to have

04:36:55  6   affidavits and billable entries and the like.  And then

04:36:59  7   we're arguing in the middle of producing current discovery

04:37:04  8   in response to current requests discovery -- having to fight

04:37:11  9   that discovery.

04:37:11  10                 THE COURT:  Thank you.

04:37:12  11        Attorney Buchanan, anything that you'd like to add to

04:37:14  12   the last point with respect to this duplicate issue?

04:37:16  13                 MR. BUCHANAN:  Yes, Your Honor.  There were a

04:37:17  14   number of arguments that were just raised, really the first

04:37:20  15   time I heard them.

04:37:20  16        To be clear, what the plaintiffs wanted to do is just

04:37:22  17   make this as usable as possible.  I did not appreciate,

04:37:25  18   frankly, after -- in all our discussions, that the

04:37:27  19   defendants objected to making information available about

04:37:30  20   the prior productions or providing information about the

04:37:34  21   platforms they were in or about offering to us the

04:37:36  22   opportunity to pay for an excess if we wanted them.

04:37:39  23        We want the information as quickly as possible.

04:37:42  24   That's our goal.  I feel like we've gone down a rabbit hole

04:37:45  25   that none of us thought we were going down.

04:37:47   1              THE COURT:  I agree with that sentiment,

04:37:50   2   Attorney Buchanan, that when you look at the case management

04:37:52   3   plan, it had contemplated immediately making the Chicago

04:37:55   4   production available and then starting a rolling production

04:37:58   5   of any prior productions, to have that completed by June

04:38:02   6   11th.  Now we're --

04:38:04   7              MR. WEINBERGER:  30 days.

04:38:06   8              THE COURT:  30 days from now, right?  So we

04:38:08   9   have a very short time frame to comply with the terms of the

04:38:10  10   case management order.

04:38:13  11         And with respect to the prior productions, the prior

04:38:18  12   productions should be produced in the format in which they

04:38:20  13   were produced previously on a rolling basis, as soon as

04:38:25  14   possible.  Based upon the issues that have been put before

04:38:30  15   me, I don't see an overwhelming argument to have the

04:38:35  16   documents reformatted in a different format to make them

04:38:39  17   more usable.  What I've heard is that the documents as

04:38:41  18   produced previously would be reasonably usable, which I

04:38:44  19   think is the appropriate standard under the Federal rules.

04:38:47  20         So to the extent prior productions are provided under

04:38:52  21   the case management plan that's currently in place, those

04:38:56  22   will be produced in the format in which they were previously

04:38:58  23   produced as soon as possible.  Okay?

04:39:00  24         Now, the second issue with respect to the format of

04:39:08  25   the documents to be produced going forward in this MDL.

04:39:10    1    Mr. Buchanan?

04:39:11    2                    MR. BUCHANAN:  Yes, Your Honor.

04:39:12    3          So we obviously have a lot of work to do.  We have to

04:39:15    4    move very quickly.  I think we're down to about 110 or 120

04:39:19    5    days left.

04:39:21    6          So what the plaintiffs asked for was a native

04:39:23    7    production.  What the defendants proposed was a native

04:39:27    8    production as it related to certain documents and not to

04:39:29    9    others.  The defendants proposed in their initial order -- I

04:39:33   10    think they've since recanted that, but they proposed native

04:39:36   11    production of Excel files, native production of audio/video

04:39:41   12    files, and native production of other files that were not

04:39:43   13    renderable I guess essentially in TIFF.

04:39:46   14                    THE COURT:  In the TIFF format.

04:39:48   15                    MR. BUCHANAN:  That's not reflected in the --

04:39:50   16    that's the initial proposal from the defense from April 27.

04:39:52   17                    THE COURT:  But that's not what reflected in

04:39:54   18    the proposed --

04:39:54   19                    MR. BUCHANAN:  What's reflected in the

04:39:56   20    proposal is -- what's reflected in what was submitted is

04:39:59   21    agreeable to the plaintiffs.  We thought what was reflected

04:40:01   22    in the proposal was agreeable to the defense.  We learned

04:40:04   23    through the e-mail exchange that you were a part of that it

04:40:07   24    was nonetheless not.

04:40:08   25          I'll note that the City of Chicago production mirrored

04:40:13  1    this process.  It was a native production with Excel

04:40:19  2    files --

04:40:19  3              THE COURT:  With respect to Excel

04:40:20  4    spreadsheets, audio files, PowerPoint presentations, things

04:40:23  5    that weren't renderable in TIFF.  But to the extent there

04:40:26  6    was a production, it was default TIFF with text file, global

04:40:30  7    files?

04:40:31  8              MR. BUCHANAN:  Yeah, so the production was

04:40:32  9    native as it related to -- for nonredacted documents, native

04:40:35  10   for Excel and PowerPoint, two of the core document formats.

04:40:38  11       The one exception that we've been fussing about here I

04:40:41  12   guess is Word files.  And our problem with, you know,

04:40:44  13   getting Word files in nonnative really comes down to when

04:40:48  14   you have multiple editors on the file.  So when you have

04:40:50  15   track changes and you can't discern who's made the change

04:40:53  16   without hovering over the track changes or you can't read

04:40:56  17   the comments because the comments, you know, will default to

04:40:59  18   a certain size when it's a heavily commented document.

04:41:01  19   You'll see the first three lines and ellipses after that.

04:41:05  20       The way parties try to solve for this sometimes is

04:41:09  21   through color production because color can identify some of

04:41:12  22   the differences, the renderable differences between them, or

04:41:15  23   by having a meet-and-confer process on a

04:41:17  24   document-by-document basis as a problematic document is

04:41:21  25   identified.

04:41:22  1    In my experience what happens with that is, yes, that

04:41:25  2    can happen, you can request the file.  Defendants will go

04:41:28  3    and look at it.  They'll then evaluate that.  Then it's got

04:41:31  4    to be reproduced to you and re-Bates-numbered.  Then it has

04:41:34  5    to be loaded back into the document platform.  And then it

04:41:37  6    takes everything out of the workflow when you're trying to

04:41:40  7    get ready for witnesses.

04:41:41  8    So we believe native is -- well, it is the way these

04:41:44  9    are maintained internally.  It is a common production

04:41:47  10    format.  I've got a stack of I think six CMOs from major

04:41:51  11    MDLs that default to native for PowerPoints, Word files, and

04:41:55  12    Excel files, all three, as well as the AV and also PDFs.

04:41:59  13    And one of the problems with not getting PDFs in

04:42:01  14    natives is that the links get broken.  So internal links and

04:42:05  15    external links don't work once they get TIFFed, which is,

04:42:09  16    again, you know, a review delay.

04:42:11  17    So when it comes to expediency, we think that native

04:42:15  18    is the way to go.  It's the way that several MDLs, frankly

04:42:19  19    MDLs involving counsel at this table, have produced their

04:42:22  20    documents.  Johnson & Johnson in I believe it's the PPI, the

04:42:27  21    Xarelto case, that's the way they're doing them.

04:42:29  22    So the platforms are built for this.  The platforms

04:42:32  23    are produced.  The native gets loaded in.  The native gets

04:42:35  24    reviewed or can be reviewed.  And then at the time of

04:42:37  25    production a choice can be made.  And a production default,

04:42:42  1   you know, format can be generated for a given case.  And

04:42:45  2   that default format can be just produce them in TIFF,

04:42:49  3   certain document types in TIFF, certain document types in

04:42:53  4   TIFF plus native, or certain document types in native only,

04:42:57  5   or you could have PDF, or you can combine this, if you will,

04:43:00  6   menu of choices any way you wish.  And that's the production

04:43:03  7   output.

04:43:04  8        So we think that the production output that the

04:43:07  9   defendants defaulted to in Chicago with regard to

04:43:10  10  PowerPoint, Excel, and everything else just should be

04:43:12  11  extended to the Word files for this extremely massive

04:43:16  12  litigation that's only -- well, it's far bigger than it was

04:43:19  13  in Chicago.  It will allow us to move faster, the platforms

04:43:23  14  can handle it, and our review will go much more smoothly.

04:43:26  15            THE COURT:  Thank you, Attorney Buchanan.

04:43:27  16       Attorney Wadhwani?

04:43:28  17            MS. WADHWANI:  Our original ESI proposal to

04:43:32  18  the plaintiffs was that there would be certain file types

04:43:36  19  that would be produced in native, such as Excel

04:43:39  20  spreadsheets, audio/video files, and of course a provision

04:43:43  21  that speaks to the concerns that Mr. Buchanan has mentioned,

04:43:47  22  which is that if there is a document in TIFF format which is

04:43:51  23  not rendered usable, we will of course entertain their

04:43:58  24  reasonable requests for a native production and move from

04:44:02  25  there.

04:44:04  1      To our minds, there should be no dispute at all, that

04:44:09  2  the right result here is TIFF, and there are two reasons

04:44:11  3  why.

04:44:12  4           THE COURT:  Are you proposing pure TIFF or

04:44:14  5  TIFF plus text file loadable metadata?

04:44:17  6           MS. WADHWANI:  TIFF plus text files loadable

04:44:19  7  metadata.

04:44:20  8      And the parties have agreed, Your Honor, as you can

04:44:22  9  see from the ESI protocol, on the metadata fields, which are

04:44:27  10  quite expansive.  Effectively, the amount of information

04:44:29  11  they are getting from the load files, the metadata, plus the

04:44:32  12  image is almost a near native.

04:44:36  13      But what TIFF removes from the calculus that native

04:44:42  14  doesn't is a whole host of concerns that are defendants'

04:44:46  15  concerns in this case.  One of them is that native format is

04:44:50  16  alterable and can be manipulated.

04:44:52  17      When you open up a document in Word that is someone

04:44:56  18  else's document, you know, even inadvertently, the document

04:45:02  19  can be altered.  And then if the alteration is the document

04:45:06  20  that walks into a deposition setting, that can have enormous

04:45:10  21  consequences.

04:45:11  22      Courts have long recognized that TIFF format is the

04:45:14  23  most secure format of production.

04:45:17  24      Another concern is the proliferation of sensitive

04:45:21  25  materials without the ability to track where they're going

04:45:24   1    and whether they've been designated as confidential under

04:45:27   2    the protective order from the face of the document.

04:45:31   3        The protective order, as typically happens, requires

04:45:36   4    the parties to stamp on the face of each document the

04:45:39   5    confidentiality protections that document is receiving, if

04:45:43   6    any.  By definition, a native format does not have a Bates

04:45:46   7    number or a confidentiality designation branded on it, so

04:45:50   8    there's no way from the face of that document for anyone to

04:45:53   9    know when they disseminate, use, or receive that native

04:45:57   10   document whether it's subject to the protections of the

04:46:01   11   protective order.

04:46:02   12       In this case, where all the defendants are competitors

04:46:07   13   of many of the other defendants, that presents a serious and

04:46:11   14   legitimate concern about the potential damage and harm to

04:46:13   15   the business interests of each defendant.

04:46:16   16       In addition, metadata in native can be hidden, and

04:46:21   17   thus privileged or highly sensitive information may be used

04:46:24   18   during the review of documents and produced by mistake,

04:46:27   19   necessitating claw-backs.

04:46:29   20       And fourth, the overall costs of dealing with native

04:46:32   21   documents given all these concerns leads to native being

04:46:36   22   more expensive.

04:46:37   23       It's for these reasons that we think both the Sedona

04:46:43   24   Conference and its principles says that TIFF is a reasonably

04:46:49   25   usable format and that it provides greater protections as

04:46:55   1    the most commonly used format in the last decade.

04:46:58   2        We also think these concerns are partly the reasons

04:47:01   3    motivating appendix K to the local rules of the Northern

04:47:05   4    District of Ohio, which state that in -- when agreement is

04:47:08   5    not reached between the parties as to the format of -- do

04:47:14   6    you know what I'm about to say?

04:47:14   7                    THE COURT:  I do.  The default standard, PDF.

04:47:17   8                    MS. WADHWANI:  The default standard when

04:47:18   9    there's no agreement is TIFF or PDF.

04:47:20   10                    THE COURT:  Yes.

04:47:20   11                    MS. WADHWANI:  We are proposing TIFF because

04:47:22   12    there is not agreement between the parties.

04:47:24   13                    THE COURT:  Mr. Buchanan?

04:47:26   14                    MR. BUCHANAN:  Yes, Your Honor.

04:47:28   15        The very frustrating part of this is the defendants

04:47:31   16    are using platforms through which they have access to the

04:47:34   17    native files.  As a matter of review, as a matter of their

04:47:38   18    use and kind of searching and doing analytics, they have the

04:47:41   19    native files.  What they are saying is they'd elect to

04:47:44   20    choose not to give us the same thing that they use to

04:47:47   21    review.

04:47:47   22        They have agreed to produce spreadsheets and

04:47:50   23    PowerPoints in native format in Chicago, as well as AV

04:47:54   24    files.  Any concern about alteration, any concern about

04:47:57   25    confidentiality, it's hard for me to discern how that

04:48:00   1   argument would not apply with the same force to the

04:48:03   2   spreadsheets and PowerPoints, yet there's agreement to do it

04:48:05   3   there.

04:48:05   4                THE COURT:  Attorney Wadhwani, what's your

04:48:07   5   response to that?

04:48:08   6                MS. WADHWANI:  Our response --

04:48:09   7                THE COURT:  And I know -- go ahead.

04:48:11   8                MS. WADHWANI:  Our response is that it's

04:48:14   9   highly unlikely in most instances that spreadsheets carry

04:48:18  10   the same concerns that we have here with Word documents

04:48:22  11   about confidentiality and privilege embedded into them in

04:48:26  12   the metadata.

04:48:28  13                MR. BUCHANAN:  I think we can search the

04:48:30  14   Chicago production, we'll see "confidential" and "highly

04:48:32  15   confidential" stamped all over PowerPoints and spreadsheets.

04:48:37  16   Formulas -- excuse me, financial data, sales data, all kinds

04:48:40  17   of information has been widely designated as confidential in

04:48:43  18   the Chicago production.  I don't see how the concern applies

04:48:48  19   with any less force as relates to those categories.

04:48:50  20        More generally though, I mean, this is the way it is

04:48:53  21   being done in big pieces of litigation.  This is how it's

04:48:57  22   being done with these defendants in many other cases.

04:49:01  23                MS. WADHWANI:  It's also the standard for the

04:49:03  24   last ten years --

04:49:04  25                MR. BUCHANAN:  Excuse me.

| 04:49:05 | 1 | THE COURT: Attorney Wadhwani, let Attorney |
| 04:49:07 | 2 | Buchanan finish. |
| 04:49:08 | 3 | Go ahead. |
| 04:49:08 | 4 | MR. BUCHANAN: I think what -- the platforms |
| 04:49:09 | 5 | became much more I'll say usable from a processing |
| 04:49:12 | 6 | perspective for output in recent years. It's very easy to |
| 04:49:17 | 7 | load natives, it's more easy to search natives, it's easy to |
| 04:49:19 | 8 | do analytics with natives. |
| 04:49:21 | 9 | And as a production matter, the menu of choices that |
| 04:49:23 | 10 | you're given on output, what would you like, A, B, or C or A |
| 04:49:27 | 11 | and C or A and B, that exists by file format. So I can't |
| 04:49:30 | 12 | discern why a Word document would be any different than a |
| 04:49:35 | 13 | PowerPoint, each of which could contain confidential |
| 04:49:38 | 14 | information, where the defense would have access to |
| 04:49:42 | 15 | comments, the full comment bubbles, the full discussions, |
| 04:49:45 | 16 | knowing who changed what in what sequence when, and we would |
| 04:49:49 | 17 | not. |
| 04:49:49 | 18 | And we have a process where, yes, we could take this |
| 04:49:52 | 19 | out of the workflow, out of the review queue, and come back |
| 04:49:56 | 20 | to the defense and say could you provide this back to us. |
| 04:49:58 | 21 | We'll get production media or an FTP site, we'll download |
| 04:50:02 | 22 | it, we'll load it back in. That takes everything out of the |
| 04:50:04 | 23 | flow as we're trying to get ready for depositions on a |
| 04:50:07 | 24 | schedule really unlike any I've ever experienced. So it |
| 04:50:12 | 25 | seems really unreasonable to draw a distinction on Word |

04:50:14 1    files.

04:50:15 2        Now, I would say I have a stack of order after order

04:50:17 3    in the last two or three years in major pieces of litigation

04:50:20 4    with many thousands of cases, BPI involving Johnson &

04:50:25 5    Johnson, Volkswagen, Judge Breyer, I think it resolved for

04:50:29 6    $15 billion.  No small piece of litigation.  Native files

04:50:32 7    produced for every file format we've talked about here with

04:50:35 8    TIFF sidecars.

04:50:36 9        The defendants were concerned that they wanted to also

04:50:39 10   produce TIFFs, so they chose to produce TIFFs as well as

04:50:42 11   natives.  They checked both box A and box B when they

04:50:46 12   produced them.

04:50:46 13       The U.S. Government produces things in native.  The

04:50:49 14   Department of Justice when they're involved as a civil party

04:50:52 15   in disputes does so.  Chrysler Jeep, Xarelto, also involving

04:50:57 16   Janssen or Johnson & Johnson, produced native I think also

04:51:00 17   with TIFF for all these file formats.

04:51:02 18       So, yes, there is a deep experience with TIFF.  It

04:51:05 19   goes back many years for ordinary cases.  For cases that are

04:51:08 20   getting loaded up where you're not just going to run it

04:51:11 21   through the scanner or do it, you know, through some other

04:51:13 22   tool, cases that merit putting it into relativity, bringing

04:51:17 23   in a document vendor and using a processing tool, native and

04:51:21 24   TIFF, native for these types of files is the way things go.

04:51:25 25            MR. CHEFFO:  Can I just respond?  Just two

things.

I don't doubt that there's five or six orders, but
I've been involved in a lot of litigation, including MDLs
recently involving thousands of cases with many of the firms
here.  I think it's an unusual practice, it's not the rule,
from my perspective again, sample size of one.  But the fact
that you find a few of these is not the way it's typically
done.  Lipitor, Zoloft, many, many litigations that's not
been done.

Two, you know, I think what you've heard is kind of a
reasonable compromise on certain documents that don't have
some of the same.  I mean, obviously you can have an on and
off thing.  I think what the defendants have kind of
proposed is somewhat of a compromise that's kind of the --
works for both sides.

The thing I haven't really heard answered is really
the issue of Bates stamping.  I mean, could you imagine,
there's going to be documents going on at the same time in
depositions, did you see this document, is this the one that
you showed.  We're going to have authentication issues and
come back, I don't know, that looks a little bit different.
Somebody -- that's formatted differently, it doesn't have
the same page.

I mean, it's a host of kind of unnecessary -- to me
it's far more complicating than the idea -- all I've really

04:52:38    1    heard is, well, we're in a fast schedule.  And I agree with

04:52:41    2    that completely.  And we may have to talk to each other.

04:52:43    3    But you know what, it's not realistic, right, that we are

04:52:46    4    not going to have to talk to each other in good faith

04:52:49    5    probably 10 times a day about discovery issues and

04:52:52    6    dispositive issues and problem, they send me a document I

04:52:56    7    can't read or question.

04:52:57    8        So that's going to happen.  Good faith takes care of

04:52:59    9    this.  Rather than have the exception kind of create the

04:53:01   10    rule here, I think what we've proposed is very reasonable.

04:53:06   11              MS. STRONG:  Yes.  And Your Honor, I would --

04:53:07   12    you know, in terms of the balancing issues of

04:53:10   13    confidentiality, just because defendants have agreed to

04:53:14   14    produce Excel in native doesn't warrant opening that up

04:53:18   15    where it's otherwise not necessary given all of the other

04:53:21   16    factors that are in play.

04:53:23   17        I would note that under Sedona Principles they

04:53:26   18    observed that native file production that includes a

04:53:28   19    substantial volume and variety of file types could become

04:53:32   20    very expensive and burdensome and substantially impact the

04:53:35   21    speed of production.  So it recognizes just the opposite of

04:53:39   22    what's being said by plaintiffs' counsel here, Your Honor,

04:53:42   23    that actually producing in native is more burdensome, more

04:53:44   24    costly, and slower.

04:53:45   25        I would also say from J & J's perspective, I don't

04:53:49  1    know the specific orders that he's addressing, but I know

04:53:50  2    that their standard protocol when it comes to PDF and Word

04:53:54  3    is to not produce in native.  That is not J & J's standard

04:53:59  4    protocol.  To the extent that he's suggesting that they may

04:54:02  5    have agreed to it in a case here or there which I'm not

04:54:04  6    familiar with, that is not their standard protocol.

04:54:07  7                 THE COURT:  Attorney Buchanan, can you talk to

04:54:09  8    some of the practical complications that Attorney Cheffo has

04:54:13  9    highlighted and Attorney Wadhwani has highlighted with

04:54:16  10   respect to the use of native production in depositions, in

04:54:18  11   motion practice, and future proceedings in this litigation

04:54:22  12   versus a TIFF that would have a Bates number on it,

04:54:28  13   confidentiality designation on it, to the extent there is

04:54:30  14   one, and can be more readily tracked that way rather than I

04:54:34  15   think what you may allude to as in fact keeping attached

04:54:37  16   values and other ways to track electronically a native

04:54:40  17   production?

04:54:42  18                 MR. BUCHANAN:  Yes.  So the proposal from the

04:54:44  19   defense, what they had proposed on April 27 is what is

04:54:47  20   commonly done with native productions.  It's for their

04:54:51  21   native -- for their native spreadsheets or in the Chicago

04:54:55  22   protocol native spreadsheets and also native PowerPoints.

04:55:00  23   You produce a slip sheet into the main production that

04:55:02  24   identifies the document produced in native.  It identifies

04:55:05  25   the Bates number that gets uniquely tagged to it, and it

04:55:09    1    requires for use at deposition that the document be appended

04:55:12    2    with the Bates number so that any party who wants to check

04:55:14    3    it can always check it.  That is the practice that's being

04:55:18    4    used commonly for native productions in litigation upon

04:55:20    5    litigation that I've been involved in.

04:55:24    6         And no one's risking their ticket altering documents.

04:55:27    7    I mean, that concern is, to me, a makeweight argument.  No

04:55:32    8    one's editing or changing the content of documents.  And

04:55:35    9    even if somebody were so inclined, I'd submit changing a

04:55:38   10    number intentionally or accidentally with a spreadsheet is a

04:55:41   11    lot easier than changing a Word file.  But it just doesn't

04:55:45   12    happen.  I'm not aware of any cases where it's been raised.

04:55:48   13    It's not a practical consideration.

04:55:49   14         The one that is a practical consideration is

04:55:52   15    suggesting that we're going to be meeting and conferring all

04:55:54   16    the time.  This should be added to the list of

04:55:57   17    meet-and-confer -- you know, request topics that we're just

04:56:00   18    going back and forth with on a regular basis.

04:56:04   19         For me to highlight to a defendant a particular

04:56:07   20    document that I'm interested in, you know, this is one that

04:56:09   21    rises to the level that I'm willing to say I want it in

04:56:13   22    native, there's something about this document that's

04:56:15   23    uniquely important, I'm now going to reveal to somebody

04:56:19   24    what's essentially work product of someone in selecting

04:56:22   25    documents just so I can see the full document.  That would

04:56:27  1   happen.  We wouldn't do it with every Word file because

04:56:30  2   doing it with every Word file would be needlessly going back

04:56:33  3   and forth to the defense anytime we saw one with comments.

04:56:36  4   We would only do it in ones that were candidates or

04:56:38  5   important candidates for us.  And now they've got a nice set

04:56:41  6   of our work product.

04:56:45  7              MS. WADHWANI:  With the metadata that the

04:56:47  8   parties have agreed to produce, plaintiffs are going to have

04:56:52  9   a trove of information that is going to give them all the

04:56:54  10  information I've heard today that they want in terms of the

04:56:58  11  ability to run analytics, conduct searches, find out who --

04:57:02  12  you know, what hidden text is in there in terms of track

04:57:07  13  changes.

04:57:07  14      What I haven't heard from them is a response to our

04:57:11  15  very legitimate concerns about proliferation of confidential

04:57:15  16  and sensitive materials, particularly in a case with

04:57:19  17  multiple defendants who are competitors.  The VW case

04:57:23  18  involved VW, not VW and all its competitors.

04:57:27  19             MR. BUCHANAN:  PPI involves a dozen PPI

04:57:29  20  manufacturers.  It's a native production.  And, yes, the way

04:57:34  21  it's handled for confidential materials is it's designated

04:57:37  22  on the slip sheet together with a Bates number, it gets

04:57:40  23  marked together with the printout of the document at the

04:57:42  24  deposition.  That's how parties in big litigation work with

04:57:46  25  these productions.  And it's not too difficult.

04:57:49  1       As to comments being in metadata, I'm not aware of a

04:57:53  2  metadata field that tracks comments.  That's the problem.

04:57:56  3  That is the issue.  The comments are not revealed on the

04:57:58  4  face of the document or a portion of the comments are

04:58:01  5  revealed on the face of the document.  The only way to truly

04:58:03  6  see the full thing and full comment and the only way to see

04:58:07  7  the back and forth and the way things evolved is by hovering

04:58:09  8  over various portions of the Word document.  I'm sure we all

04:58:12  9  have the experience of pulling up a track change document

04:58:15  10  and seeing three lines of the comment and having to hit the

04:58:18  11  ellipses to see the rest.  That -- the rest does not appear

04:58:21  12  in the metadata.

04:58:23  13       MS. WADHWANI:  Well, it sounds like they're

04:58:25  14  using a cast to cover what should be used with a Band-Aid.

04:58:30  15  If they see one of those documents where they are concerned,

04:58:33  16  they can come to us.  We're not going to form a group trying

04:58:36  17  to get into the inner workings of their legal strategy.

04:58:39  18  This process of opposing parties coming to us saying, I

04:58:44  19  think I need to see the native of this document, here's the

04:58:46  20  reason, we say we agree or we don't agree.  We're too busy

04:58:50  21  to sit there and think about all the reasons why they may be

04:58:53  22  wanting that document.  We move on to the next thing on our

04:58:55  23  list.

04:58:56  24       THE COURT:  You have something you want to

04:58:58  25  add?

04:58:58    1              MR. WEINBERGER:  Yes.  As to this issue of,

04:58:59    2    you know, there are multiple defendants here that are

04:59:01    3    competitors, I would refer the Court to the transcript of

04:59:04    4    the ARCOS hearing from February 26, 2018, page 52, where the

04:59:09    5    Court was addressing this argument that there's a concern

04:59:12    6    about sharing information because of the competition.  And

04:59:16    7    the Court said:  Quite frankly, there shouldn't be a lot of

04:59:19    8    competition for distributing opioids.  If they want to

04:59:22    9    compete on something else, fine.

04:59:25   10         So, you know, this notion that since everything here

04:59:28   11    revolves around the production of documents associated with

04:59:34   12    the manufacture and distribution of opioids, this concern

04:59:36   13    about competitive disadvantages associated with this

04:59:41   14    production really should not come into play.

04:59:45   15              THE COURT:  Now I'll give you an opportunity

04:59:51   16    to address the issue between color and black and white.

04:59:53   17              MS. WADHWANI:  Color is a much bigger file.

04:59:58   18    It is -- which therefore adds to a lot of cost.  It is

05:00:01   19    bigger to host, it is bigger to produce, it is bigger to

05:00:04   20    receive and then store on your own system, if you're

05:00:07   21    receiving color from multiple other parties.  Again, the

05:00:10   22    number of times when color is necessary to understand the

05:00:16   23    meaning and context of a document is going to be a very

05:00:19   24    small fraction of an overall production.  And our proposal

05:00:23   25    originally in the ESI protocol was come to us if you have a

05:00:29   1    color document that -- or document that you think you need

05:00:31   2    in color to more fully understand it.  Happens all the time.

05:00:35   3        I have two cases right now where we've produced color

05:00:37   4    documents to them in response to such requests saying, yes,

05:00:40   5    you're right, here you go.  But, again, we're looking for

05:00:44   6    the exception to swallow the rule.

05:00:48   7                 THE COURT:  Mr. Buchanan?

05:00:49   8                 MR. BUCHANAN:  Yes.  I think we've all seen

05:00:52   9    how color can be relevant, so our default obviously for

05:00:56   10   PowerPoints, as the default was in Chicago, was color.

05:01:00   11   Color is often material.  When you turn something into

05:01:04   12   grayscale, you can't see text versus the backdrop.  It

05:01:08   13   becomes more challenging, I'd say.  It becomes debatable.

05:01:11   14   And we can have witnesses debating things in depositions

05:01:15   15   when, no, I don't think it says that, this is the best copy

05:01:18   16   I have, this is the copy your counsel produced to me, I'm

05:01:20   17   using the one, you know, you designated as the official one,

05:01:24   18   so -- and then you have debates with witnesses about that.

05:01:27   19       It becomes really problematic though when you start

05:01:29   20   looking at graphs and charts and where you just have line

05:01:32   21   graphs, when you have bar graphs, and you can't discern the

05:01:35   22   difference between one versus the other.

05:01:37   23       I think this is -- if Your Honor were to rule that the

05:01:41   24   default is native, then I think we're talking about color in

05:01:44   25   a very small fraction of the production.  It should only be

05:01:48  1   for those documents that are redacted.

05:01:51  2        On documents that they redact for, you know, privilege

05:01:54  3   or work product, then under the protocol that we submitted

05:01:58  4   together last week, the defendants would have the right to

05:02:02  5   redact those portions, and then we would ask for those

05:02:05  6   documents to be produced in color if they're in color.

05:02:08  7        There's multiple different file formats.  They have

05:02:11  8   varying ranges of file sizes.  You can elect different ways

05:02:14  9   to show how big or small an individual page could get,

05:02:18 10   whether it's a JPEG, which might be larger, or you pick a

05:02:21 11   PDF in color, which might be the most compressed format.

05:02:25 12        So we're happy to talk with them about it.  The

05:02:28 13   plaintiffs are willing to do the same thing in reverse.  I

05:02:30 14   mean, that's the thing about this protocol is we have

05:02:32 15   entities that have documents, that have -- this is not an

05:02:36 16   individual injury case where a plaintiff is asking for the

05:02:40 17   moon, sun, and the stars.  We will have documents; we will

05:02:42 18   have to do this in reverse.  We are willing to do this

05:02:45 19   because we know that we need it this way too to hit the

05:02:49 20   dates we have to hit.

05:02:50 21        The friction that gets created by having to ask for

05:02:53 22   replacement files as a reviewer says, "I'm not sure what

05:02:56 23   this means," it adds a week, it doesn't add a day.  And

05:03:01 24   because it has to go to them, then it has to be loaded back

05:03:05 25   into the system, has to get back to the reviewer.  And we

05:03:09   1   just don't have that luxury in this case.

05:03:11   2          MS. WADHWANI:  And again, we expect any

05:03:14   3   documents that they would want in color for which there

05:03:17   4   would be a legitimate reason because the meaning and context

05:03:19   5   is not clear to be a very small percentage of the overall

05:03:22   6   production.  So they are asking for the exception to cover

05:03:27   7   everything instead of it being the exception for which there

05:03:31   8   will be a provision written into the protocol for it.

05:03:34   9          MR. BUCHANAN:  I would add one other point,

05:03:36  10   Your Honor.

05:03:36  11          THE COURT:  Attorney Buchanan, if the standard

05:03:38  12   default becomes TIFF with loadable files unless it's

05:03:44  13   something that's not renderable in a TIFF format, such as an

05:03:51  14   Excel spreadsheet or PowerPoint where you would lose some

05:03:54  15   functionality of the underlying document, what would you

05:03:57  16   propose then with respect to color pictures?

05:04:01  17          MR. BUCHANAN:  If I understand, you know, kind

05:04:02  18   of the default format being essentially TIFF for e-mail and

05:04:05  19   Word files and it would be native I guess for Excel and

05:04:09  20   PowerPoint.  Did I understand you correctly?

05:04:11  21          THE COURT:  That's my question.

05:04:12  22          MR. BUCHANAN:  Okay.  So I don't think we're

05:04:14  23   talking about anything material with regard to color on

05:04:18  24   e-mails.  It's really coming down to the Word files.  And

05:04:23  25   the only significance I see is that when you have multiple

05:04:26　1　parties doing track changes, the track changes are often

05:04:29　2　different colors depending on who's making the changes.  And

05:04:32　3　if you're not getting the native file, you would want the

05:04:35　4　colors so that you could see and track who actually did what

05:04:37　5　change.

05:04:38　6　　　　　　　　THE COURT:  It's my understanding then if that

05:04:40　7　document's not -- if a Word document has track changes in it

05:04:43　8　and it's not produced in native format but produced in a

05:04:45　9　TIFF format with color, with the underlying metadata you

05:04:49　10　would be able to see at least reference to track change.

05:04:53　11　It's my understanding the software capability you can

05:04:55　12　capture that.

05:04:55　13　　　　　　　　MR. BUCHANAN:  So you can turn a lot of things

05:04:57　14　on in the processing engines for the software.  I have not

05:05:01　15　seen any processing engine that will reveal the full comment

05:05:07　16　bubbles on the side.  So if you have -- just say one page is

05:05:10　17　heavily commented and you've got a series of comment bubbles

05:05:13　18　stacked up, you'll get three or four lines for each of the

05:05:16　19　comment bubbles even on the TIFF.  It doesn't -- because

05:05:19　20　then it would paginate onto the next page.  It doesn't

05:05:22　21　process it that way.  You get ellipses and you don't know

05:05:27　22　what the rest of the comments are.  So that's the -- in the

05:05:30　23　scenario you're proposing, I think that would still be a

05:05:35　24　hole.

05:05:36　25　　　　　　　　MS. WADHWANI:  And so in that rare instance

| | |
|---|---|
| 05:05:38 | 1 |

where they see an ellipsis, they could say could I please

have this information for the document.  But to hear

Mr. Buchanan speak, you would think it would be every single

document that we're going to encounter this problem,

therefore the need for native outweighs the default

standard, the most commonly used format, reasonably usable

format of TIFF across courts through this country in the

last decade.  It's overblowing the concerns.

TIFF has been used widely.  And as the Sedona

conference said, it is the most commonly used format for the

last decade.

MR. BUCHANAN:  The only -- where this leaves

us is where the defendants have access at any point in time

to the full comment.  They have that as part of their

review, they have that as part of their processing, and

there's an election not to produce that for reasons that I'd

say I don't see how those reasons would warrant withholding

that format.

The cost, our vendor tells us, is not going to be any

greater to produce native than TIFF.  Actually, I'm told

it's less.  The hosting charges for hosting native files are

less.  Certainly as it relates to, you know, Word files and

e-mails and Excel sheets, much more cost effective.  So I

don't understand the cost issue.

I -- it seems as though there is a content-related

05:07:03  1    reason for not sharing Word documents in a native file that

05:07:08  2    is concerning.  And, yes, if we could iterate this process

05:07:12  3    over six months to nine months or a year, like many cases

05:07:16  4    allow, yeah, you could go back and forth, you could go back

05:07:19  5    and forth and iterate for requests.

05:07:20  6        I am still troubled that they then know which

05:07:22  7    documents I'm concerned about enough to ask for in terms of

05:07:26  8    a particular file format.  You know, maybe they don't have

05:07:29  9    the team watching that, but I can't imagine somebody doesn't

05:07:32  10   shoot an e-mail around if it's an interesting document

05:07:34  11   that's called to their attention.

05:07:35  12       So if they've got them in this format, we'd ask that

05:07:38  13   they share them with us in that format.

05:07:41  14            MR. CHEFFO:  Your Honor, just, you know, the

05:07:43  15   plaintiffs keep talking about the time frame.  We agree, but

05:07:45  16   let's remember the plaintiffs are the one who asked for

05:07:48  17   these trial dates even sooner.  So to hear them, you know,

05:07:51  18   talk about all this, I mean, I think we all knew what this

05:07:54  19   was going to take, and we're all under a lot of pressure to

05:07:57  20   get it done, first thing.

05:07:58  21       The second is I think, you know, really what you've

05:08:00  22   heard is, at least one argument as I understood

05:08:04  23   Mr. Buchanan, is there's somehow information that we don't

05:08:06  24   have.  You also heard that if they get a document and it

05:08:09  25   shows a few ellipses, that they could then ask for that

05:08:13  1  document, right?  The only kind of response there was, well,

05:08:16  2  maybe it will take a little more time, which again I think

05:08:18  3  we've talked about.

05:08:19  4      So the idea that there's nothing that they won't have

05:08:21  5  or is hidden or is, you know, usable only by the defendants

05:08:25  6  because just by the nature of the document, it's going to

05:08:28  7  have those ellipses, to which they can just ask and then we

05:08:32  8  will expeditiously respond.  And if we don't, that's what

05:08:36  9  you're here for if they think that we're dragging our feet.

05:08:39  10     So I do think that we're trying to kind of create this

05:08:41  11  very broad rule based on what we're hearing is a really,

05:08:45  12  really narrow exception.

05:08:49  13             MR. ACKERMAN:  Your Honor, I'd want to address

05:08:50  14  that point real quick about whether this is a narrow

05:08:53  15  exception.  I think a significant portion of document

05:08:55  16  production, especially from the manufacturers, are going to

05:08:57  17  be -- have to do with label changes.  They're going to have

05:09:00  18  to do with communications back and forth with the FDA as

05:09:04  19  well as internal communications regarding changes to the

05:09:06  20  labels.

05:09:09  21     Those documents that we've seen in Chicago are Word

05:09:11  22  documents with track changes turned on.  And you cannot tell

05:09:15  23  in those documents when they're produced in a black and

05:09:18  24  white TIFF format who made the changes, and you cannot read

05:09:21  25  the comments because the changes tend to be extensive.

| | | |
|---|---|---|
| 05:09:29 | 1 | THE COURT:  Anyone else like to -- |
| 05:09:29 | 2 | MR. BOEHM:  Your Honor, I just have two quick |
| 05:09:29 | 3 | points. |
| 05:09:29 | 4 | THE COURT:  Go ahead, sir. |
| 05:09:31 | 5 | MR. BOEHM:  Paul Boehm from Williams & |
| 05:09:36 | 6 | Connolly for Cardinal Health.  I'll try not to overlap with |
| 05:09:38 | 7 | all the many points that have already been made. |
| 05:09:41 | 8 | But I did hear Mr. Buchanan, who I respect very much |
| 05:09:44 | 9 | and have worked with in other cases, I respect him as a |
| 05:09:46 | 10 | plaintiffs' lawyer, talk about the possibility of alteration |
| 05:09:48 | 11 | and indicate that he and other people who he worked with |
| 05:09:51 | 12 | wouldn't intentionally alter a document.  And I think that |
| 05:09:55 | 13 | is the case.  I think that -- I think that Mr. Buchanan |
| 05:09:58 | 14 | would not intentionally alter a document. |
| 05:09:59 | 15 | But I can just speak to that a little bit because I've |
| 05:10:02 | 16 | had two occasions where I've had a document altered.  One |
| 05:10:06 | 17 | very much -- I trust the lawyer -- very much |
| 05:10:09 | 18 | unintentionally, but he was bringing it in to use at a |
| 05:10:12 | 19 | deposition without knowing, without understanding.  And it |
| 05:10:14 | 20 | was only through some investigative process that we realized |
| 05:10:17 | 21 | that.  And he was very apologetic. |
| 05:10:18 | 22 | But I raised that, because I didn't want it to go |
| 05:10:21 | 23 | unanswered, that that is a real possibility and something |
| 05:10:24 | 24 | that can and in fact does sometimes happen. |
| 05:10:26 | 25 | The second point is with respect to Excel.  And you'd |

05:10:29  1   asked a question about how much of their -- how much is that

05:10:33  2   distinction between a Word document and an Excel file, how

05:10:37  3   much does that really matter, is there really a distinction.

05:10:40  4   There's a reason why, commonly, Excel files are accepted.

05:10:42  5   It is now rather common to have Excel --

05:10:45  6            THE COURT:  Produced in native format because

05:10:48  7   you have the underlying formula, and that's the information

05:10:50  8   that makes the Excel spreadsheet usable and reasonably

05:10:53  9   useful, yes, sir.

05:10:54  10            MR. BOEHM:  Correct.  That's all I was going

05:10:56  11   to say, that there's a reason why it doesn't translate as

05:10:58  12   well as these other files that are really in question today

05:11:01  13   in terms of TIFF vs. native.

05:11:04  14            THE COURT:  Okay.  Anyone else?

05:11:07  15            MR. BUCHANAN:  We'd just be rehashing

05:11:08  16   territory.

05:11:08  17            THE COURT:  I agree.

05:11:11  18       All right.  Now, with respect to the format of

05:11:26  19   production going forward, what was unclear to me in what was

05:11:32  20   filed as the proposed ESI protocol is what was actually

05:11:41  21   agreed by the parties.  Now, I've heard some differing

05:11:43  22   positions here:  I've heard what was originally agreed to by

05:11:46  23   the defendants; I've heard the plaintiffs' position.  And I

05:11:50  24   applaud counsel for thoroughly presenting your views and

05:11:57  25   representing your interests.

| | | |
|---|---|---|
| 05:11:58 | 1 | With respect to the format going forward though, the |
| 05:12:07 | 2 | standard that will govern in this case with respect to the |
| 05:12:13 | 3 | production will be a default standard of TIFF with the text |
| 05:12:19 | 4 | file loadable metadata file.  To the extent all the |
| 05:12:23 | 5 | metadata's been identified in the proposed order, that |
| 05:12:26 | 6 | metadata should be captured, including loadable files that |
| 05:12:30 | 7 | would be able to be cross-referenced with the static TIFF |
| 05:12:36 | 8 | image. |
| 05:12:36 | 9 | With respect to certain document -- type of document |
| 05:12:41 | 10 | formats that are not readily renderable into TIFF format |
| 05:12:45 | 11 | such that they do not meet a reasonably usable format, such |
| 05:12:50 | 12 | as Excel spreadsheet, PowerPoints, audio/video files, those |
| 05:12:54 | 13 | should be produced in native format.  That should be the |
| 05:12:56 | 14 | default standard for those productions. |
| 05:13:02 | 15 | And I make this determination based upon a balancing |
| 05:13:05 | 16 | of the various issues that the parties have raised here with |
| 05:13:10 | 17 | respect to the burden of a native production versus the |
| 05:13:14 | 18 | benefit of a native production versus the usability or lack |
| 05:13:20 | 19 | of usability or reduced usability of a nonnative production. |
| 05:13:27 | 20 | It's this Court's determination based upon existing |
| 05:13:32 | 21 | case law, the Federal Rules of Civil Procedure, as well as |
| 05:13:34 | 22 | the principles set forth in the Sedona Conference, that a |
| 05:13:39 | 23 | TIFF format with text and loadable file is a reasonably |
| 05:13:42 | 24 | usable format.  Based upon the fact that the parties have |
| 05:13:45 | 25 | not reached an agreement with respect to the standard |

05:13:48  1    format, that's what will be the standard format governing

05:13:51  2    production in this case going forward, with the specific

05:13:54  3    exception that to the extent there's Excel spreadsheets,

05:13:59  4    PowerPoints, volume files, WAV files, as I've indicated,

05:14:01  5    those should be produced in native format.

05:14:05  6        Now, with respect to the issue of color or black and

05:14:08  7    white, I'd like to get a better understanding here.  Is

05:14:14  8    it -- when documents are reviewed electronically to be

05:14:20  9    gathered to convert into TIFF, it's my understanding that

05:14:26  10   you can create a TIFF file that has color in it.  It doesn't

05:14:33  11   have to be black and white.

05:14:34  12                  MR. BUCHANAN:  Mm-hmm.

05:14:35  13                  THE COURT:  Is that right --

05:14:36  14                  MS. WADHWANI:  I believe that's right.

05:14:37  15                  THE COURT:  -- Attorney Wadhwani?

05:14:38  16        Attorney Buchanan?

05:14:40  17                  MR. BUCHANAN:  Yes, it could be TIFF, it could

05:14:42  18   be a PDF, it could be a JPEG.  There's a number of different

05:14:45  19   file formats that can be used in a color --

05:14:46  20                  THE COURT:  Right, I understand, if you're

05:14:48  21   going to convert something into color.  But my specific

05:14:48  22   question was with respect to TIFF.  But I understand if you

05:14:51  23   have a -- for example, a Word document that has some sort of

05:14:53  24   color image in it, you can convert it to PDF, you can

05:14:56  25   convert it to a photo technology.

05:14:59   1          MR. BUCHANAN:  There is a TIFF file format for

05:15:02   2   color, Your Honor.

05:15:03   3          THE COURT:  And, Attorney Wadhwani, I heard

05:15:05   4   the fundamental objection to not using color in creating

05:15:14   5   TIFF files was a concern over the size and cost.  Any

05:15:19   6   additional issues there?

05:15:20   7          MS. WADHWANI:  No.  It's burdensome and

05:15:22   8   expensive, and most documents, as you know, come in black

05:15:25   9   and white in native.  And so we think that this is a -- to

05:15:29  10   order color for all TIFFs would be a large sweep of a small

05:15:35  11   problem.

05:15:38  12          THE COURT:  Attorney Buchanan?  Is there a --

05:15:41  13   I'll give you an opportunity.  Is there an extent to readily

05:15:44  14   identify underlying documents that are in a color format

05:15:47  15   such that there can be a selective TIFFing, if you will, of

05:15:53  16   documents in color format, or does it need to be one or the

05:15:55  17   other, black and white or in color?  Is there a balance that

05:15:57  18   we can reach here?

05:15:59  19          MR. BUCHANAN:  I would say, Your Honor, if

05:16:01  20   you're drawing a distinction between redacted and non, with

05:16:04  21   redacted --

05:16:04  22          THE COURT:  So with redacted it's going to

05:16:05  23   have to be redacted --

05:16:06  24          MR. BUCHANAN:  If it's redacted --

05:16:07  25          THE COURT:  -- created in a TIFF file.

05:16:09  1          MR. BUCHANAN:  Right.  If it was redacted into

05:16:11  2    a TIFF file, you know, and it was a PowerPoint or an Excel

05:16:13  3    sheet, I would say color is material and that should be the

05:16:16  4    default.  It's hard for me to say with regard to Word if

05:16:20  5    there's not track changes.  There may be a metadata field

05:16:23  6    that can -- the parties -- we'd have to talk to a vendor

05:16:25  7    about that.  You know, if there's track changes in the

05:16:27  8    document, I think that may be a Word metadata file that if

05:16:32  9    that's flagged yes, we'd process them in color because I

05:16:35  10   think that is the circumstance where it would matter for

05:16:37  11   Word most generally.

05:16:38  12          MS. WADHWANI:  And my colleague brings up a

05:16:41  13   good point, which is that in today's day and age, often in

05:16:45  14   e-mails, the signature line will be in color.  So that will

05:16:48  15   add an enormous size and burden and expense just to produce,

05:16:54  16   say, the Cardinal Health logo in color on the bottom of

05:16:56  17   every single e-mail.

05:16:59  18          MR. BUCHANAN:  Plaintiffs were not asking for

05:17:01  19   e-mail --

05:17:01  20          THE COURT:  You're not asking for e-mail --

05:17:02  21          MR. BUCHANAN:  -- in color.

05:17:03  22          THE COURT:  -- being TIFF in color.  I

05:17:04  23   understand that.  But to the extent a document, a Word

05:17:06  24   document, for example, has track changes in it, is it

05:17:11  25   your -- Attorney Buchanan, you're indicating that you're

05:17:13   1   able to use the document production software to identify

05:17:19   2   whether or not there's track changes and, if that's the

05:17:22   3   case, default should be color for that?

05:17:23   4              MR. BUCHANAN:  I'd have to discern that with

05:17:25   5   our vendor.  I just don't know.  I believe there's a field

05:17:27   6   that indicates whether or not there is, quote, hidden data,

05:17:30   7   a metadata field.  I don't know if we specified it in our --

05:17:33   8              MS. WADHWANI:  That's specified in the

05:17:34   9   metadata.

05:17:35   10              MR. BUCHANAN:  So if that flag can be turned

05:17:37   11   on for yes and so the documents that hit that were the ones

05:17:40   12   that were processed, that would go most of the way to

05:17:43   13   addressing plaintiffs' concern.

05:17:44   14              THE COURT:  So if that hidden text flag is

05:17:47   15   identified, it's your request that document be rendered in

05:17:51   16   color TIFF?

05:17:51   17              MR. BUCHANAN:  Color TIFF.

05:17:52   18              THE COURT:  Attorney Wadhwani.

05:17:54   19              MS. WADHWANI:  My concern is that that is

05:17:57   20   going to slow down the review and production processes

05:17:59   21   because now you have some Word documents that are going to

05:18:04   22   be produced in color, some Word documents that aren't going

05:18:06   23   to be produced in color.  And there's going to have to be

05:18:08   24   indications for both of those, and there's a lot of room --

05:18:12   25              THE COURT:  What do you mean indications for

05:18:14  1    both of those?

05:18:14  2              MS. WADHWANI:  So if you're going to produce

05:18:16  3    some -- there has to be a way to tell the person to prepare

05:18:18  4    the production and a way during the review to indicate that

05:18:21  5    to the person who's going to be preparing and ultimately

05:18:23  6    shipping out the production, these Word documents go in

05:18:25  7    color and these Word documents go in black and white.  When

05:18:28  8    we have, according to your order, Excel spreadsheets and

05:18:32  9    PowerPoints in native, that's simple, that's all or nothing.

05:18:36  10   Now we're trying to slice and dice, which I'm worried is

05:18:40  11   going to really slow down the review and production

05:18:42  12   processes.

05:18:45  13             THE COURT:  I understand the issues presented

05:18:49  14   from each side.  But to the extent that a metadata field

05:18:53  15   identifies hidden text in a document that is to be converted

05:18:59  16   to TIFF, that document, the default should be that that's

05:19:03  17   rendered in color rather than a black and white image.

05:19:14  18             MS. STRONG:  For clarity on that, so that's

05:19:16  19   just track changes documents, Your Honor?

05:19:18  20             THE COURT:  Hidden data.  Well, okay, here's

05:19:22  21   what I'm -- what I'd like to have happen here.  It's based

05:19:27  22   upon the determination I make here.  I'd like counsel to

05:19:32  23   continue to work together and provide a stipulated ESI

05:19:36  24   protocol.  I trust that you'll be able to work through that

05:19:38  25   minor issue in presenting it.

05:19:41  1    What I'd like to have happen is have that filed

05:19:43  2    ideally by Friday, but I understand under the press of

05:19:46  3    business, we're running a little late today, so Monday, if

05:19:48  4    that's doable, for the parties to come together, set a new

05:19:52  5    protocol based upon what we discussed here, and file it as a

05:19:55  6    proposed ESI document production protocol for the Court to

05:19:59  7    consider.

05:19:59  8         MR. BUCHANAN:  We have thoroughly narrow

05:20:01  9    issues, Your Honor, so I don't think that will be a problem.

05:20:03  10   There are about a dozen hidden data fields specified as

05:20:06  11   metadata, so we'll work in identifying those fields.  If the

05:20:10  12   flag is set for yes, if I'm understanding the Court's

05:20:12  13   ruling --

05:20:12  14        THE COURT:  If the flag is set for yes, then

05:20:14  15   that should be produced in a color TIFF.

05:20:16  16        MR. BUCHANAN:  Understood.

05:20:16  17        THE COURT:  And what to him trying to do is

05:20:18  18   balance the issues for both sides.

05:20:21  19   Now, with respect to the final issue that I think we

05:20:23  20   need to address here is the use of confidential documents --

05:20:26  21   documents that have been designated confidential by one

05:20:28  22   defendant and using those documents in a deposition of

05:20:32  23   another defendant's employee.

05:20:34  24        MR. BUCHANAN:  I'm sorry, Your Honor, I know

05:20:35  25   it's late, but there was an issue, and I'm not sure if maybe

05:20:37   1    you addressed it, maybe you didn't, and I just missed it.

05:20:39   2                    THE COURT:  Go ahead.

05:20:40   3                    MR. BUCHANAN:  It's the treatment of

05:20:43   4    PowerPoint files and Excel files to the extent they're

05:20:45   5    redacted.  So if there's a legitimate basis to redact those,

05:20:50   6    what is the default production format for those?  And I

05:20:53   7    believe they would largely contain color, but that's --

05:20:58   8                    THE COURT:  I think the default standard for

05:21:00   9    that should be color as well.  And if it's a color image, if

05:21:04   10   it's a color document that's maintained in the ordinary

05:21:07   11   course of business but color images within it, then in my

05:21:11   12   view, in order to make it reasonably usable, it should be

05:21:14   13   produced in a color format as well.

05:21:15   14                   MR. BUCHANAN:  Thank you.

05:21:15   15                   THE COURT:  Now, use of confidential documents

05:21:19   16   in a deposition.

05:21:21   17                   MR. BUCHANAN:  The concern, Your Honor, is how

05:21:23   18   do we in the context of taking our testimony from various

05:21:28   19   witnesses, certainly with multi-defendants, cross-examine or

05:21:33   20   examine a witness as if they were in trial, as the rules

05:21:37   21   direct such a deposition is to be conducted, with another

05:21:42   22   party's information.  Our proposal had been, as long as we

05:21:48   23   had a reasonable basis to examine that witness and it's a

05:21:53   24   document produced by a different party, for example --

05:21:57   25                   THE COURT:  So company A produces a document

05:21:59    1    designated -- now, is the issue with respect to documents

05:22:03    2    designated confidential and highly confidential or is the

05:22:07    3    main issue with respect to highly confidential documents?

05:22:09    4         Attorney Wadhwani?

05:22:10    5              MS. WADHWANI:  I think a particular concern

05:22:12    6    with highly confidential documents, but right now the

05:22:15    7    concern exists for both.

05:22:17    8              THE COURT:  Okay.  Attorney Buchanan?

05:22:18    9              MR. BUCHANAN:  Yes, I mean, that's how it's

05:22:20   10    been framed by the defense.  They have requested, if you

05:22:22   11    will, a bar on the use of confidential and highly

05:22:25   12    confidential information with a witness for a codefendant.

05:22:29   13              THE COURT:  Right.  So in what circumstance do

05:22:33   14    you envision using a document that's been designated either

05:22:37   15    confidential or highly confidential from company A in a fact

05:22:40   16    witness deposition of an employee from company B?

05:22:44   17              MR. BUCHANAN:  A meeting, a joint meeting

05:22:47   18    that -- a file purporting to record that meeting exists in

05:22:50   19    one party's file but not in another party's file.

05:22:53   20              THE COURT:  Where the witness, for example,

05:22:55   21    was attending that meeting?

05:22:56   22              MR. BUCHANAN:  The witness may have been

05:22:57   23    attending or the witness may not have been attending but the

05:23:00   24    company had a representative there where an issue was being

05:23:03   25    discussed pertinent to that defendant.  And so we present

05:23:05   1    the witness.  And unfortunately, that may not seem like a

05:23:10   2    memo of a meeting that would be designated as confidential

05:23:12   3    or highly confidential.

05:23:13   4        Our experience with the Chicago production, from the

05:23:16   5    manufacturers at least, is medical literature that's public

05:23:20   6    is stamped "confidential" and "highly confidential," news

05:23:23   7    articles are stamped "confidential" and "highly

05:23:26   8    confidential," e-mails forwarding, you know, news articles

05:23:29   9    internally are stamped "confidential" and "highly

05:23:31  10    confidential."  We haven't yet seen the productions from the

05:23:34  11    distributors, but fearing that we land ourselves in the same

05:23:37  12    place with distributors, what the defendants have proposed

05:23:41  13    is that before we confront another defendant -- another

05:23:46  14    defendant's employee with a document produced by, say,

05:23:49  15    defendant B, we have to notify defendant B that we intend to

05:23:53  16    do so at least 48 hours before.  They have an opportunity to

05:23:58  17    either agree or not agree to our use of that document with

05:24:01  18    the witness.

05:24:02  19        With the liberality with which the defendants seem to

05:24:07  20    be designating documents as confidential and highly

05:24:09  21    confidential, that evolves into us providing an outline for

05:24:13  22    the examination 48 hours before what's supposed to be like a

05:24:17  23    trial examination.  With rare exception, the defendants are

05:24:22  24    not in this jurisdiction.  We're getting one crack at

05:24:25  25    people, and we're taking them as if they're to be played or

05:24:28  1    used at trial.

05:24:29  2              MR. CHEFFO:  Can I just answer?

05:24:31  3              MS. WADHWANI:  Please.

05:24:32  4              MR. CHEFFO:  I'm sorry, Dave.  I didn't mean

05:24:33  5    to interrupt you.  Just briefly.

05:24:35  6         I understand, you know, counsel, they're zealous

05:24:38  7    advocates, great lawyers.  I've said that many times before;

05:24:40  8    I'll say it again.  The idea, though, that kind of what --

05:24:43  9    you know, beauty is in the eye of the beholder, they get to

05:24:47  10   determine what I've seen many, many, many, many times is

05:24:50  11   what a witness becomes is a document delivery device.  So

05:24:54  12   have you seen this document?  No.  Do you think this e-mail

05:24:57  13   from somebody, is that the way a company behaves ethically?

05:25:02  14   Why do you think they would have written that?  You know.

05:25:05  15        And then they have some -- they're good lawyers,

05:25:06  16   they're creative.  Well, I think it would be helpful to

05:25:09  17   understand X, Y, and Z, and there's some rationale.

05:25:12  18        What we're asking for is not a complete bar.  And the

05:25:15  19   idea that we would have advanced notice to be able to go to

05:25:19  20   you and say this is really an unfair way of kind of

05:25:22  21   conducting a deposition if it happens -- and I think,

05:25:25  22   frankly, what happens more often than not is on both sides

05:25:28  23   it becomes an ability for the plaintiffs, not necessarily

05:25:31  24   the folks around this table, but there's probably going to

05:25:34  25   be a lot of other folks around the country who are going to

05:25:36    1    be involved in these, to make a good-faith determination, is

05:25:40    2    this really a document that I have a good-faith basis to

05:25:43    3    show somebody else's witness that's, you know, from one

05:25:46    4    company versus the other.  And many times the answer to that

05:25:49    5    will be no, and then it doesn't get shown.

05:25:51    6         And if it is a document, then we at least can have an

05:25:55    7    opportunity to say is this something that is appropriate, is

05:25:57    8    it fair.  Because at the end of the day, for the same -- we

05:26:00    9    want people deposed once based on the factual knowledge,

05:26:05   10    based on information, not based on kind of showmanship of

05:26:09   11    here's a bunch of different documents, and I want to use

05:26:12   12    three hours of the deposition to kind of run those through a

05:26:15   13    witness.

05:26:15   14         And I -- unfortunately, that happens with all too much

05:26:20   15    frequency, and I think that's driving our concern, Your

05:26:20   16    Honor.

05:26:23   17              MS. WADHWANI:  Well, that's one concern

05:26:24   18    certainly.  And the other concern is, Your Honor, the

05:26:27   19    agreed-upon definition in the protective order that we

05:26:30   20    submitted to you of highly confidential information, if we

05:26:32   21    just limit it to that for the moment, is information which

05:26:36   22    if disclosed, disseminated, or used by or to a competitor or

05:26:41   23    other individuals can result in possible antitrust

05:26:43   24    violations or commercial, financial, or business harm.

05:26:46   25         We don't know what Mr. Buchanan means by "reasonable

05:26:51   1   basis."  The examples he's given strike me as being

05:26:54   2   documents that would not be determined as highly

05:26:57   3   confidential because it doesn't sound to me like there's

05:27:00   4   going to be a concern about competitive financial business

05:27:03   5   harm if there's a memo about a meeting that took place

05:27:07   6   between the CEO of Teva and the CEO of Mallinckrodt.  This

05:27:13   7   is just a hypothetical.

05:27:13   8          THE COURT:  Hypothetical, sure.

05:27:15   9          MS. WADHWANI:  But there are going to be very

05:27:17  10   real concerns because there are going to be documents

05:27:20  11   produced we expect in this litigation that get to

05:27:23  12   information that goes to companies' sensitive competitive

05:27:28  13   proprietary interest.  And so what we are saying here is

05:27:32  14   that it should be something that is worked out on the back

05:27:35  15   end where if they want to show a confidential document to

05:27:40  16   another party, they need to raise that with the Court, that

05:27:46  17   being the presumption.  The presumption should be they don't

05:27:48  18   get to do -- show a document that is likely to lead to

05:27:54  19   antitrust concerns or competitive or business harm to

05:27:59  20   another defendant's witness.

05:28:01  21      If -- I can't speak to the City of Chicago.  That's --

05:28:06  22   my client was not involved in that case.  But if it is the

05:28:09  23   case that there are overdesignations in this case, there are

05:28:13  24   provisions in the confidentiality order for them to mount

05:28:15  25   challenge.  There are also provisions that all the

05:28:18   1    defendants have hung onto which is that we will not assign

05:28:21   2    blanket designations of confidentiality and highly

05:28:24   3    confidential designations.  So the onus is on us to make

05:28:28   4    sure that in good faith we apply those designations.  And we

05:28:33   5    apply those designations in good faith precisely to give us

05:28:35   6    the protections that we need, protections that will

05:28:39   7    effectively be eviscerated if plaintiffs can just go up to

05:28:42   8    any employee of any defendant and show any other defendant's

05:28:47   9    documents.

05:28:47  10              THE COURT:  Mr. Buchanan, in the proposed

05:28:50  11    order there is provision under the highly confidential

05:28:55  12    documents that they would not be shown to employees of

05:28:59  13    another company, right?

05:29:00  14              MR. BUCHANAN:  Yes.

05:29:02  15              THE COURT:  And that indicates unless

05:29:08  16    there's -- for categories of people I could see highly

05:29:11  17    confidential documents if there's an agreement by counsel or

05:29:15  18    separate court order, correct?  So it seems to me what the

05:29:18  19    parties have contemplated already was that documents that

05:29:21  20    are designated at least highly confidential would not be

05:29:24  21    shown -- company A, for example, highly confidential

05:29:27  22    documents would not be shown to a witness from company B.

05:29:29  23    That seems to be what the parties had contemplated from the

05:29:32  24    beginning.

05:29:32  25              MR. BUCHANAN:  Well --

05:29:33  1          THE COURT:  In what was proposed.  At least I

05:29:35  2   shouldn't say from the beginning but what was proposed for

05:29:38  3   the Court's consideration.

05:29:39  4          MR. BUCHANAN:  So it's paragraph M and

05:29:41  5   paragraph K.  I think it's 33M and paragraph 33K.  The

05:29:45  6   exception is largely the examination at deposition.

05:29:50  7      If I could pass Your Honor, this is the provision that

05:29:52  8   was in our draft protective order that following our

05:29:58  9   meet-and-confers and discussions with Special Master Cohen

05:30:01  10  was withdrawn in favor of language, paragraph M and K.  The

05:30:10  11  brackets are to make it legible.

05:30:14  12     And for the record, it's:  During the course of

05:30:16  13  examination at deposition, a party may show confidential or

05:30:19  14  highly confidential information to any witness in this

05:30:21  15  litigation to whom disclosure is reasonably necessary,

05:30:24  16  including witnesses whose statements or conduct are

05:30:26  17  discussed in a designated information and to whom disclosure

05:30:30  18  is not otherwise authorized under this order, provided that

05:30:33  19  no copies of the information designated confidential or

05:30:36  20  highly confidential shall be left with or taken from the

05:30:39  21  deposition by the witness.

05:30:40  22     That's the fundamental kind of point is that the

05:30:44  23  witness doesn't leave with anything from the examination.

05:30:47  24  The witness can be crossed, can be shown, can be examined

05:30:52  25  concerning confidential information.  And they don't get the

05:30:55  1    exhibits and they don't take them home with them, but they

05:30:58  2    can nonetheless be questioned about the events and

05:31:00  3    circumstances that are reflected in the documents.

05:31:03  4         We also provide in this -- in our draft provision that

05:31:08  5    counsel for the designating party is provided with a copy of

05:31:12  6    that particular document.  And if there's a particular issue

05:31:14  7    that would, frankly, require intervention from the Court or

05:31:21  8    special master or whatever the appropriate reviewing

05:31:25  9    tribunal would be, that the party can seek that at that

05:31:27  10   time.

05:31:27  11        So as a practical matter, we don't want to conduct an

05:31:30  12   examination in a way that's going to yield to these kind of

05:31:36  13   summary requests of the Court on a ruling.  So I think the

05:31:42  14   trying to design an order for the hundred-year flood of

05:31:46  15   antitrust violations and other circumstances unfortunately

05:31:50  16   will prevent us from doing this with most documents for

05:31:53  17   which defense counsel would not really have an objection.

05:31:56  18             THE COURT:  Well, why shouldn't the default

05:31:58  19   standard be if something's designated confidential/highly

05:32:01  20   confidential from company A, it should not be shown to an

05:32:04  21   employee of company B unless that employee of company B

05:32:06  22   somehow was included in it, received it, altered it, amended

05:32:09  23   it, somehow has factual knowledge of the underlying document

05:32:13  24   itself?  I mean, why shouldn't that be the standard?

05:32:16  25             MR. BUCHANAN:  Well, if they hadn't seen it,

05:32:17   1   but if they were nonetheless involved in the -- you know, if

05:32:20   2   it was within their scope of business responsibilities or

05:32:22   3   they were engaged in the activity that's referenced in it,

05:32:25   4   if that would be --

05:32:26   5                THE COURT:  But then you can ask them

05:32:28   6   questions about it.  Rather than showing them the document

05:32:30   7   and putting the highly confidential or confidential document

05:32:32   8   in front of the witness, you can ask them questions.

05:32:34   9                MR. BUCHANAN:  Well, then I would certainly

05:32:35  10   want to confront that witness at trial with -- have the

05:32:37  11   opportunity to confront that witness at trial with that

05:32:39  12   document.  And I don't know how we can do that with the

05:32:41  13   witnesses we have one crack at.

05:32:44  14      Most of the defendants are outside this Court's

05:32:46  15   jurisdiction.  I don't think the defendants are going to

05:32:49  16   consent to bring these employee witnesses, to the extent

05:32:51  17   they have control of them, back to court for trial.  So, you

05:32:56  18   know, we'd certainly want to make a record, a video record

05:32:59  19   that could be used before a jury with this witness

05:33:02  20   testimony.  And if -- I don't think I would be prevented

05:33:05  21   from using that document in open court in a trial

05:33:08  22   proceeding.

05:33:10  23                MR. CHEFFO:  To that point, that is one of the

05:33:13  24   reasons why -- and forgive me if I'm off on the different

05:33:18  25   variations, but I think one of the proposals was to get it

| | |
|---|---|
| 05:33:20 | 1 |
| 05:33:23 | 2 |
| 05:33:26 | 3 |
| 05:33:29 | 4 |
| 05:33:31 | 5 |
| 05:33:34 | 6 |
| 05:33:37 | 7 |
| 05:33:42 | 8 |
| 05:33:44 | 9 |
| 05:33:47 | 10 |
| 05:33:48 | 11 |
| 05:33:50 | 12 |
| 05:33:54 | 13 |
| 05:33:57 | 14 |
| 05:33:59 | 15 |
| 05:34:03 | 16 |
| 05:34:05 | 17 |
| 05:34:07 | 18 |
| 05:34:11 | 19 |
| 05:34:14 | 20 |
| 05:34:16 | 21 |
| 05:34:17 | 22 |
| 05:34:20 | 23 |
| 05:34:26 | 24 |
| 05:34:30 | 25 |

in advance just for that purpose.  Because I would agree
with you in the sense that we don't want a ruling that after
the deposition, oh, yeah, that was a document that, you
know, you could have used or should have used.  I mean, if
there's a provision where it's provided to us, we can raise
our objections if we have any, they can get resolved quickly
by the magistrate judge or the special master.  And then
obviously if we're overruled, then you have an opportunity
to use it.  If not, then we've saved ourselves a lot of
headache at deposition.

            MR. BUCHANAN:  I'd submit, Your Honor, that we
could very well start with this framework here where the
witness doesn't get shown something at a deposition until
it's been provided to the designating party.  If the
designating party thinks that implicates antitrust
considerations or some other extremely sensitive
considerations, then we could raise that issue with the
Court.  And if it becomes something that is common in this
litigation that requires an alternative, then we can
certainly look at an alternative.

    I don't think it's going to be something where the
parties are going to really feel that it implicates
antitrust considerations or, you know, the trade secret for
Coke that should prevent a witness from being examined in an
examination that's supposed to be like trial where they

05:34:31  1    don't even get to take it home it with them, from actually

05:34:34  2    occurring in that setting.

05:34:34  3                MS. WADHWANI:  It sounds like we're just

05:34:36  4    having a -- to your point, an agreement about what the

05:34:39  5    default -- disagreement about what the default standard is.

05:34:42  6    We're suggesting the default standard should be that you

05:34:44  7    can't show it to them, but if you want to, show us the

05:34:49  8    document in advance and we will take that under

05:34:51  9    consideration and do it in enough advance so that we don't

05:34:56  10   interrupt the deposition process.

05:34:57  11       What I see in this language is three points.  One, to

05:35:04  12   Mr. Buchanan's statement that the witness would not get to

05:35:07  13   take home the document, the information is in the witness's

05:35:10  14   head.  He or she has heard it.  And you can't unring that

05:35:13  15   bell, regardless of whether or not the witness gets to take

05:35:16  16   home the document.

05:35:18  17       The second point is that if we're doing this

05:35:23  18   throughout a deposition, that's going to slow the deposition

05:35:25  19   process.  We have an aggressive schedule here with multiple

05:35:30  20   defendants and multiple plaintiffs, all of whom will be

05:35:34  21   subject to multiple depositions during the next few months.

05:35:40  22   To constantly be -- even if it only happens two or three

05:35:44  23   times in each deposition, we're going to be double tracking,

05:35:47  24   triple tracking depositions.

05:35:49  25       I understand that Special Master Cohen has represented

05:35:52  1   that you will be available, but even if you are very

05:35:55  2   gracious with your time, Judge Ruiz, I don't think you will

05:35:58  3   have the time to sit on the phone all day resolving these

05:36:02  4   disputes because the presumption is that they can show them.

05:36:05  5   These disputes can be better handled if the presumption is

05:36:08  6   they cannot show these documents unless the parties can

05:36:10  7   agree or unless they get a court order in advance.

05:36:13  8               MR. BUCHANAN:  Your Honor, the ultimate

05:36:14  9   concern is that by designating information confidential and

05:36:17  10  highly confidential -- and the defendants didn't have to

05:36:22  11  come to court and make the showing to get that designation

05:36:25  12  on their documents; they're self-designating.  We agree that

05:36:29  13  they can self-designate.  There are rules around it, but

05:36:32  14  when I do see medical articles designated as highly

05:36:35  15  confidential, news articles designated highly confidential,

05:36:37  16  or, you know, submissions to an advisory committee, a

05:36:42  17  briefing document, available for public release, stamped

05:36:45  18  "confidential," then what I think is going to happen is that

05:36:48  19  for me to examine a witness, I have to give my deposition

05:36:51  20  outline to the defense 48 hours before.

05:36:53  21       So what was supposed to be essentially a protective

05:36:59  22  order and a discretionary authority by the defense to call

05:37:01  23  the balls and strikes on a protective order to protect their

05:37:03  24  documents now becomes a vehicle through which they can get

05:37:07  25  our deposition notes.

05:37:09   1        And I don't think we lose a lot by seeing if what we

05:37:14   2   believe will not be problematic truly is the case.  If Your

05:37:17   3   Honor is getting needlessly troubled by plaintiffs' counsel

05:37:22   4   or defense counsel in connection with these calls, then,

05:37:26   5   okay, maybe we need to figure out an alternative.  But the

05:37:28   6   alternative to giving being we have to give essentially a

05:37:33   7   trial examination to the defense for 48 hours to work with a

05:37:36   8   witness before, that's quite concerning to the plaintiffs.

05:37:38   9        MR. CHEFFO:  Here's what I really just

05:37:40  10   fundamentally disagree.  I mean, the idea of if their trial

05:37:42  11   outline is going to be they're going to spend most of their

05:37:45  12   time deposing company A's witness by company's B, then that

05:37:50  13   probably is a trial outline that's problematic, right?

05:37:53  14        So again, we're taking this specific issue which you

05:37:57  15   would think, right, most exceptions would be you want to

05:38:00  16   talk to the fact witness about things he or she knew, did,

05:38:04  17   heard, participated, not what, you know, Purdue wants to

05:38:09  18   talk about Cardinal's documents.  That, you would think, in

05:38:13  19   this litigation is going to be an exception.

05:38:15  20        So the idea that this is going to be this incredible

05:38:20  21   burden to see their outline I think is widely overstated.  I

05:38:22  22   think it's going to be a narrow collection of documents, if

05:38:25  23   any, and this is a very workable solution.

05:38:27  24        I will tell you, I know it's a local rule, but I was

05:38:30  25   just involved in the Lipitor litigation before Judge Gergel,

05:38:34   1   and the rule there was that the parties actually

05:38:38   2   exchanged -- they had to give exhibits 48 hours before, both

05:38:41   3   sides did.  And it actually was incredibly efficient because

05:38:45   4   to the extent that there were any concerns about documents.

05:38:48   5   So again, that's not the local rule here.  I'm not proposing

05:38:51   6   it.  But it was something that I was apprehensive about as

05:38:54   7   kind of a litigator before, but those kinds of exchanges

05:38:58   8   actually really moves things along.

05:38:59   9           MS. WADHWANI:  And to add to Mr. Cheffo's

05:39:02  10   point, it's not going to be the case that any counsel in

05:39:06  11   this litigation is going to see a document for the first

05:39:10  12   time 48 hours before because they are putting together

05:39:12  13   outlines.  They've already selected documents, which means

05:39:15  14   they've seen them before and maybe noted the fact it was a

05:39:19  15   document of interest.  If the plaintiffs think they are

05:39:22  16   seeing overdesignated documents, when they start reviewing

05:39:25  17   them and conducting searches to identify those documents of

05:39:29  18   interest, they can come to us or they can come to the Court

05:39:33  19   if our meet-and-confers are not fruitful and say, Judge, I

05:39:37  20   think we have a problem here, they're overdesignating and we

05:39:39  21   can't even put together our deposition outlines because we

05:39:42  22   think they've overdesignated and we need assistance on this.

05:39:45  23           THE COURT:  Attorney Buchanan, go ahead.

05:39:46  24           MR. BUCHANAN:  Just one final observation.

05:39:48  25   We -- the presumption by Mr. Cheffo that there really is not

05:39:52  1    going to be a good-faith basis to use one of the defendant's

05:39:55  2    documents against another really is contrary to one of our

05:39:57  3    central allegations in our RICO claims here.  There will be

05:40:00  4    showing of documents from one defendant to other defendants

05:40:04  5    I think by necessity.  Depending on the type of employee,

05:40:08  6    depending on the meetings they were engaged in, depending on

05:40:11  7    the front groups that they simultaneous engaged or that

05:40:13  8    they're referenced in, et cetera, I would anticipate that

05:40:16  9    one defendant's documents will be relevant to another

05:40:19  10   defendant's employees throughout the discovery process.

05:40:23  11         I'd submit that the likelihood that those documents

05:40:27  12   are going to trigger antitrust concerns, revealing the trade

05:40:32  13   secret for Coke, the types of concerns that would be the

05:40:35  14   basis of a 48-hour disclosure rule I think are not the

05:40:39  15   circumstances, the types of documents that we're talking

05:40:42  16   about here.  And I'd submit that maybe we could kick this

05:40:44  17   can down the road a little bit until we're in a place where

05:40:50  18   the solution of counsel intervening with a document that

05:40:53  19   raises those concerns becomes unworkable.

05:40:58  20              THE COURT:  Now, the default standard in the

05:41:01  21   Chicago litigation -- I presume counsel are familiar with

05:41:08  22   the default standard that was used in the Chicago

05:41:09  23   litigation.  The default standard was that confidential and

05:41:11  24   highly confidential documents from company A were not shown

05:41:13  25   to company B employees unless there was agreement or a

05:41:19  1    separate court order.

05:41:20  2              MR. BUCHANAN:  I can neither agree nor

05:41:21  3    disagree, but if you read that there, Your Honor, I did not

05:41:24  4    go and look at that order for that provision.

05:41:27  5              MR. ACKERMAN:  There was not a RICO claim in

05:41:28  6    the Chicago litigation.

05:41:29  7              THE COURT:  I understand that as well.

05:41:30  8         And, Mr. Buchanan, you had just I guess invited the

05:41:33  9    Court, I'll use your words, to kick the issue down -- kick

05:41:36  10   the can down the road a little bit.  Explain that to me.

05:41:39  11        How were you thinking that this issue could be tabled

05:41:42  12   for further consideration?

05:41:43  13             MR. BUCHANAN:  I think the likelihood that we

05:41:45  14   will use documents that will trigger a concern by the

05:41:48  15   designating party at a deposition to intervene with the

05:41:52  16   Court to say this is the trade secret for Coke or it

05:41:56  17   triggers antitrust concerns, this nonparty witness, I think

05:41:59  18   those are extremely rare.  I think the nature of the

05:42:01  19   documents that we would want to do them with will probably

05:42:04  20   be documents that were more in terms of summarizing meeting

05:42:07  21   occurrences, summarizing interactions with third parties,

05:42:11  22   documents that are just of a different ilk but that have

05:42:15  23   nonetheless been designated as confidential or highly

05:42:18  24   confidential.

05:42:19  25             MS. WADHWANI:  I just see us back here in

05:42:21   1   front of you then a month from now or whenever it is that we

05:42:25   2   have kicked the can down the road and how far it goes.  I

05:42:29   3   think this issue needs to be determined now, Your Honor.

05:42:34   4              MR. BOEHM:  Your Honor, may I just say one

05:42:36   5   last thing?

05:42:36   6              THE COURT:  You may.  Go for it.

05:42:39   7              MR. BOEHM:  Mr. Boehm from Williams &

05:42:43   8   Connolly.

05:42:43   9       I think respectfully, Your Honor, you may have had the

05:42:45  10   answer on this issue when you first asked Mr. Buchanan for

05:42:48  11   an example, and the example of an instance where he thought

05:42:51  12   he might need to do this was the case of a joint meeting

05:42:55  13   between the parties.  Now, one could question the likelihood

05:42:58  14   of that type of document being marked "highly confidential,"

05:43:01  15   but I would also raise how likely that is, how common that

05:43:06  16   likely would be.

05:43:07  17       To the extent that type of document exists and one is

05:43:09  18   calling into question the good-faith basis of the highly

05:43:13  19   confidential designation for that document, that answers the

05:43:15  20   question of where the presumption should be.  That may be an

05:43:17  21   issue where we need to look at that.  We can come to an

05:43:20  22   agreement.  If there's not one, we can bring it to the

05:43:22  23   Court.

05:43:22  24       But to flip the entire presumption such that any

05:43:26  25   document marked "highly confidential" is presumptively going

```
05:43:29   1    to be allowed to be used is truly extraordinary.  And that's

05:43:33   2    why I think Mr. Buchanan started with that example.

05:43:35   3         I think there was some little bit of shift of emphasis

05:43:38   4    toward the end where it sounded like maybe it might make up

05:43:41   5    more of the examination outline than he originally

05:43:44   6    indicated.  But I think that answers the question of where

05:43:47   7    the presumption ought to be here.

05:43:48   8              THE COURT:  Okay.  So I'm clear then,

05:43:51   9    defendants' position -- is your position still that

05:43:54  10    documents labeled "confidential," separating highly

05:43:59  11    confidential, but documents that are labeled "confidential"

05:44:01  12    from company A should not be shown to an employee from

05:44:04  13    company B unless there's some advance notice?  Is that still

05:44:12  14    the current position that defendants are having here?

05:44:15  15              MS. WADHWANI:  That is correct.

05:44:15  16              THE COURT:  In addition to highly

05:44:17  17    confidential?

05:44:17  18              MR. CHEFFO:  That's correct.

05:44:18  19              MS. WADHWANI:  Yes.

05:44:18  20              THE COURT:  Mr. Buchanan, you had something

05:44:19  21    you wanted to add?

05:44:19  22              MR. BUCHANAN:  Yes, Your Honor.  The proposal

05:44:20  23    for the plaintiffs is the one that's reflected in the one

05:44:21  24    page that I provided to the Court.

05:44:22  25              THE COURT:  And that's the one you read on the
```

05:44:24  1   record?

05:44:24  2           MR. BUCHANAN:  A portion of, yes, Your Honor.

05:44:26  3   There is one I guess nuance that I'd add to the defense

05:44:29  4   proposal.

05:44:29  5           THE COURT:  Plaintiffs' proposal or the

05:44:31  6   defense proposal?

05:44:32  7           MR. BUCHANAN:  To the defense proposal of the

05:44:33  8   48 hours' notice.

05:44:34  9       If that were the case, we are sufficiently concerned

05:44:37 10   about having to reveal our outlines that the mechanism for

05:44:44 11   correcting confidential and highly confidential designations

05:44:46 12   I think would have to be significantly altered.

05:44:50 13       Counsel alluded to a mechanism in the order through

05:44:54 14   which we can say these documents are inappropriately

05:44:58 15   designated as confidential or highly confidential.  And then

05:45:01 16   the way it's currently written, the plaintiffs bear the

05:45:05 17   burden of making the motion.  If the defendants want to

05:45:09 18   maintain that, they bear the burden of persuasion on the

05:45:12 19   motion as they would under 26C for a protective order.

05:45:16 20       My concern, Your Honor, would be that if this were

05:45:20 21   going to be the default, the plaintiffs would necessarily be

05:45:23 22   challenging in large numbers confidential and highly

05:45:27 23   confidential designations to strip them.  I would want the

05:45:31 24   defendants to have to make that motion to the Court and

05:45:34 25   defend those designations rather than us move and then they

05:45:40   1   bear the burden on it.  We do not want to be in a position

05:45:43   2   of revealing our outline, so we will have to create a

05:45:46   3   separate track essentially to have them prove up their

05:45:49   4   confidential and highly confidential designations.

05:45:52   5            MS. WADHWANI:  I was about to say, Your Honor,

05:45:54   6   I think CMO 1 in Section 9-O sets forth the process for

05:46:00   7   raising discovery disputes with you, and we understand that

05:46:04   8   to be the process we're all bound by, which is the parties

05:46:07   9   meet and confer.  If they cannot reach agreement through

05:46:10  10   that process, then they reach out to the clerk to seek a

05:46:14  11   meeting with either you and/or Judge Polster.  And at that

05:46:18  12   time, if you and Judge Polster upon hearing the issues think

05:46:21  13   that either a letter or a motion needs to flow, you will

05:46:26  14   make your ruling at that time.

05:46:29  15            MR. CHEFFO:  I would just say, I mean, again,

05:46:31  16   I think they are now essentially creating a straw man:  If

05:46:34  17   you rule this way, you have to change everything about the

05:46:37  18   CMO.

05:46:37  19       I think there's good reasons why that CMO said what it

05:46:40  20   does, because, again, from experience -- and this is not

05:46:42  21   nefarious -- but what you will get is we have this laundry

05:46:46  22   list, there's 10,000, a million documents that we think we

05:46:48  23   challenge, because all they had to do was put that on a word

05:46:51  24   processor, put the burden on us, whether they really need

05:46:54  25   those documents or not.  And then we're kind of back to

05:46:56    1    square one.  So I think those are apples and oranges.

05:46:58    2        I think what we've been talking about is kind of a

05:47:00    3    workable approach.  I mean, I think in a perfect world we'd

05:47:03    4    say no documents unless there's a showing, but I think we're

05:47:06    5    trying to offer what's we think, you know, a reasonable

05:47:09    6    workable solution here.

05:47:10    7        And like anything in this case, if it turns out that

05:47:14    8    it -- the system is breaking down or there's some problems,

05:47:17    9    I mean, you're one phone call and one trip on an airplane

05:47:20   10    away.  But this seems to be a very workable, sensible -- you

05:47:24   11    know, because these provisions are going to apply to both

05:47:26   12    sides.

05:47:29   13            THE COURT:  So, Mr. Buchanan, the defendants'

05:47:32   14    request to have 48-hour notice, I presume, based upon what

05:47:37   15    you and plaintiffs' counsel have indicated, you do not agree

05:47:40   16    to that?

05:47:41   17            MR. BUCHANAN:  We do not.

05:47:42   18            THE COURT:  Okay.  Based upon the fact that

05:47:45   19    the parties have not been able to reach an agreement with

05:47:49   20    respect to how to handle documents used in deposition that

05:47:55   21    are designated confidential and highly confidential, then

05:47:57   22    the default standard will be documents designated

05:48:00   23    confidential and highly confidential will not be -- cannot

05:48:06   24    be used in deposition of another company's employees unless

05:48:10   25    that company employee has in any way authored it, received

05:48:18  1    it, edited it, commented on it, had some underlying factual

05:48:23  2    basis to testify about that document.

05:48:26  3         To the extent that a document's designated as

05:48:29  4    confidential or highly confidential and plaintiffs' counsel

05:48:34  5    or in fact defendants' counsel, if that will be the case,

05:48:37  6    would like to use such a document in deposition, then by all

05:48:39  7    means they can try to reach agreement with respect to that.

05:48:41  8         If there's an issue that counsel believes documents

05:48:44  9    have been overdesignated, then they can raise that issue

05:48:46  10   with the Court.

05:48:48  11        To the extent that the Court makes a determination

05:48:50  12   documents have been overly designated as confidential or

05:48:53  13   highly confidential, then either I or Judge Polster will

05:48:58  14   reconsider the approach that parties use with respect to

05:49:01  15   highly confidential and confidential document use in

05:49:03  16   deposition.  But the standard will be that to the extent

05:49:07  17   documents are labeled "confidential" or "highly

05:49:10  18   confidential," they're not to be used in deposition with a

05:49:13  19   witness from another company unless of course that -- as I

05:49:21  20   indicated, that witness has either received it, drafted it,

05:49:25  21   commented on it, in some way have an underlying factual

05:49:29  22   basis to testify about that document.

05:49:32  23        And I will trust that counsel will have an opportunity

05:49:36  24   to meet and confer with respect to the appropriate text to

05:49:41  25   propose to the Court based upon that framework to govern the

05:49:45  1    use of such documents in depositions going forward.

05:49:49  2         Mr. Buchanan, anything further for the Court to

05:49:52  3    consider?

05:49:53  4                   MR. BUCHANAN:  No, Your Honor.

05:49:55  5                   MR. KENNEDY:  Your Honor, Eric Kennedy.

05:49:57  6                   THE COURT:  Yes, Mr. Kennedy.

05:49:59  7                   MR. KENNEDY:  If something is marked as

05:50:01  8    confidential and that document is available in the public

05:50:03  9    realm, let's say a medical article, a newspaper article, is

05:50:07  10   that to be treated as confidential and not utilized in the

05:50:11  11   context of what we've been discussing?

05:50:14  12                   THE COURT:  I think that will be an

05:50:15  13   opportunity for counsel to meet and confer with respect to

05:50:19  14   the designation of a document as confidential and whether or

05:50:21  15   not it should be designated as confidential or in fact it's

05:50:24  16   really available in the public realm.

05:50:27  17                   MR. KENNEDY:  But again, that's showing

05:50:28  18   defense counsel what we're going to utilize in a deposition.

05:50:31  19   So we could approach that en masse, then, prior to the

05:50:34  20   beginning of depositions?

05:50:35  21                   THE COURT:  I'm not going to micromanage how

05:50:38  22   counsel at this point address those issues.  I'll leave it

05:50:41  23   up to counsel based upon your experience to address the

05:50:45  24   issues as they come forward.

05:50:47  25         But I will indicate to the extent that things are

05:50:50   1    available in the public realm and are designated

05:50:52   2    confidential or highly confidential, then that raises a

05:50:55   3    serious question in this Court's mind as to proper

05:50:59   4    designation of a document to begin with.  Then the Court

05:51:01   5    would entertain revised protocol going forward in context.

05:51:06   6                    MR. BUCHANAN:  Thank you, Your Honor.

05:51:06   7                    MR. KENNEDY:  Thank you.

05:51:06   8                    THE COURT:  Anything else, Attorney Wadhwani?

05:51:08   9                    MS. WADHWANI:  No, thank you.

05:51:09  10                    THE COURT:  Counsel for the defendants?

05:51:10  11                    MR. CHEFFO:  No.

05:51:11  12                    THE COURT:  Counsel for plaintiffs?

05:51:12  13          Yes, Mr. Weinberger.

05:51:14  14                    MR. WEINBERGER:  We're interested in, aside

05:51:16  15    from these issues, what the Court's intent is in terms of

05:51:24  16    holding further conferences or hearings.  Are you going to

05:51:28  17    put something -- do you want something on the calendar once

05:51:31  18    a week?  More or less frequently?  Do you want to wait until

05:51:36  19    we have issues that we need to present to you?  Do you have

05:51:40  20    some thoughts as to how you want to manage this,

05:51:43  21    particularly in light of the fact that, you know, we are in

05:51:45  22    such a tight time frame?

05:51:47  23                    THE COURT:  What I would ask, then, is for

05:51:50  24    counsel, when you're meeting with respect to the orders that

05:51:52  25    you're going to file with the protective order as well as

05:51:56    1    the ESI document production protocol, that you meet and

05:52:01    2    confer to decide how you would like the Court's assistance

05:52:05    3    going forward.  And if you think that regular periodic

05:52:09    4    meetings with respect to underlying discovery issues is

05:52:11    5    something you think would be beneficial to assist the

05:52:14    6    counsel and the parties in moving the matter forward, then

05:52:16    7    by all means bring that proposal to the Court's attention

05:52:19    8    and we'll address that issue, whether it's me getting

05:52:22    9    involved or Judge Polster getting involved.

05:52:24   10        But to the extent counsel would like additional

05:52:26   11    judicial involvement, then that's something that we will

05:52:29   12    definitely take under advisement and, to the extent

05:52:32   13    appropriate, be hands-on.

05:52:34   14                    MR. WEINBERGER:  Good.  Thank you.

05:52:35   15                    THE COURT:  Thank you, sir.

05:52:36   16                    MR. KENNEDY:  One -- I apologize.  And again,

05:52:38   17    I think we're more looking for guidance.

05:52:40   18        With respect to the new party defendants named in the

05:52:44   19    amended complaint, from our discussions in court this

05:52:47   20    morning, the Court indicated that with respect to the

05:52:50   21    service being complete defined by complaint, that may not

05:52:53   22    happen until May 23 potentially.  Which means that we cannot

05:52:58   23    serve discovery on them until May 24, May 25.  They don't

05:53:04   24    become subject to CMO number 1 with respect to the

05:53:07   25    production of documents that they have previously produced.

05:53:12  1   I guess we're looking for guidance what we do.

05:53:14  2       In the perfect world we could have six months to do

05:53:17  3   discovery.  In something less than the perfect world we

05:53:20  4   would contact those new party defendants and say you will be

05:53:23  5   served in several weeks, but we want to serve our discovery

05:53:26  6   now, or we address either case management order number 1 and

05:53:32  7   so you best begin looking at documents from prior

05:53:34  8   productions.

05:53:37  9       What is your thought on that predicament?  Because

05:53:40  10  it's two weeks from now, I guess.

05:53:41  11              THE COURT:  Sure.  With respect to issues like

05:53:43  12  that and issues that may come up as the litigation unfolds,

05:53:47  13  the practice that we've followed thus far for counsel to

05:53:50  14  work with the special masters to determine the appropriate

05:53:53  15  way to address that I think is the approach that should be

05:53:55  16  followed.  To the extent there's a need to involve either

05:53:58  17  Judge Polster or myself in those discussions, then we can

05:54:01  18  make ourselves available.  But I think the initial procedure

05:54:04  19  should be to address those issues with the special masters.

05:54:06  20              MR. KENNEDY:  Thank you.

05:54:07  21              THE COURT:  Thank you, Counsel.

05:54:13  22              (Proceedings adjourned at 5:54 p.m.)
                                    * * * * *
          23                    C E R T I F I C A T E
                  I certify that the foregoing is a correct transcript
          24   of the record of proceedings in the above-entitled matter
               prepared from my stenotype notes.
          25        /s/ Lance A. Boardman              05/11/2018
                    Lance A. Boardman, RDR, CRR              DATE