# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

IN RE NATIONAL PRESCRIPTION OPI-
ATE LITIGATION

This document relates to:
*City of Chicago v. Purdue Pharma L.P. et al.,*
*Case No. 1:17-op-45169*

MDL No. 2804

Case No. 17-md-2804

Hon. Dan Aaron Polster

## <u>MEMORANDUM OF LAW IN SUPPORT OF THE MANUFACTURER DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' FOURTH AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ISSUES AND ARGUMENT ................................... 1

PROCEDURAL BACKGROUND .................................................................................... 3

ARGUMENT ................................................................................................................ 5

I.     The Municipal False Statement, Municipal False Claims Act, and Insurance Fraud Claims Fail (Counts 4-6 and 8) .................................... 6

     A.     The City Fails to Allege a False Claim .................................... 6

          1.     The 4AC Does Not Adequately Plead Materiality ....................... 8

          2.     The 4AC Does Not Identify Claims for Payment That Made "Specific Representations" About Opioids........................ 11

          3.     The 4AC Does Not Identify Claims That Failed to Comply with Contractual or Other Requirements .................................... 12

     B.     The City Fails to Plead Causation ........................................... 14

          1.     The 4AC Fails to Plead Causation-in-Fact .................................. 14

          2.     The 4AC Also Fails to Plead Proximate Causation .................... 17

     C.     The City Fails to Allege Any Cognizable Injury .................................... 20

          1.     The 4AC Does Not Allege Reimbursement of Any Ineffective or Harmful Prescriptions ........................................... 21

          2.     The 4AC Establishes That the City Suffered No Cognizable Economic Harm ....................................................... 22

II.     The Public Nuisance Claim Fails (Count 11) .................................... 23

     A.     The City Does Not Adequately Plead the Elements of Public Nuisance ........................................................................... 23

     B.     This Claim Is Barred by the Municipal Cost Recovery Rule ................. 25

     C.     This Claim Is Barred by the Economic Loss Doctrine ........................... 25

III.     The Municipal Services Claim Fails (Count 7) .................................... 26

IV.     The Conspiracy Claims Fail (Counts 6 and 9) .................................... 27

     A.     The 4AC Fails to Allege an Agreement to Commit an Illegal Act.......... 27

## TABLE OF CONTENTS
(continued)

**Page**

B. The City Fails to Plead a Conspiracy with Particularity ......................... 29

V. The Unjust Enrichment Claim Fails (Count 10) ................................................... 30

VI. The Unfair Practices Claim (Count 2) Should Be Dismissed and Stricken ......... 31

CONCLUSION ............................................................................................................... 31

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Bank of Am. Corp. v. City of Miami*,
　137 S. Ct. 1296 (2017) ................................................................... 17

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
　528 F.3d 426 (6th Cir. 2008) ......................................................... 11

*Bastian v. Petren Res. Corp.*,
　892 F.2d 680 (7th Cir. 1990) ......................................................... 31

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007) ................................................................. 5, 28

*Borsellino v. Goldman Sachs Grp.*,
　477 F.3d 502 (7th Cir. 2007) ......................................................... 27

*Buckman Co. v. Plaintiffs' Legal Comm.*,
　531 U.S. 341 (2001) ....................................................................... 13

*City of Chicago v. Beretta U.S.A. Corp.*,
　821 N.E.2d 1099 (2004) ......................................................... passim

*City of Chicago v. Purdue Pharma L.P.*,
　2015 WL 2208423 (N.D. Ill. 2015) .............................................. 2, 4

*City of Chicago v. Purdue Pharma L.P.*,
　211 F. Supp. 3d 1058 (N.D. Ill. 2016) .................................... passim

*City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.*,
　2016 WL 4203835 (N.D. Ill. Aug. 8, 2016), *aff'd*, 884 F.3d 798 (7th Cir. 2018) ..................... 6

*City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*,
　863 F.3d 474 (6th Cir. 2017) ......................................................... 17

*Cleary v. Philip Morris Inc.*,
　656 F.3d 511 (7th Cir. 2011) ......................................................... 30

*Cty. of Cook v. Philip Morris*,
　817 N.E.2d 1039 (Ill. App. 2004) .................................................. 17

*Coley v. Lucas Cty., Ohio*,
　2014 WL 272667 (N.D. Ohio Jan. 23, 2014) ............................... 26

*Connick v. Suzuki Motor Co.*,
　675 N.E.2d 584 (Ill. 1986) ............................................................ 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ctr. Reg'l Emps. Benefit Fund v. Cephalon, Inc.*,
  2010 WL 1257790 (D.N.J. Mar. 29, 2010) ............................................................... 21

*Cty. of Cook v. Bank of Am. Corp.*,
  2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ....................................................... 17, 18

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
  2008 WL 5413105 (D.N.J. Dec. 23, 2008) ............................................................... 22

*Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers
    Squibb Co.*,
  969 F. Supp. 2d 463 (S.D. W. Va. 2013) ................................................................. 18

*Gaudie v. Countrywide Home Loans, Inc.*,
  683 F. Supp. 2d 750 (N.D. Ill. 2010) ....................................................................... 26

*Gombita v. Nationstar Mortg., LLC*,
  2017 WL 374731 (N.D. Ohio Jan. 25, 2017) ........................................................... 30

*Hard Drive Prods., Inc. v. Does 1-55*,
  2011 WL 4889094 (N.D. Ill. Oct. 12, 2011) ........................................................... 27

*Hayward v. Cleveland Clinic Found.*,
  759 F.3d 601 (6th Cir. 2014) ................................................................................... 31

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
  545 N.E.2d 672 (Ill. 1989) ....................................................................................... 30

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
  2012 WL 3154957 (N.D. Cal. Aug. 2, 2012) ..................................................... 14, 23

*In re Plavix Mktg., Sales Practices and Prods. Liab. Litig.*,
  123 F. Supp. 3d 584 (D.N.J. 2015) .......................................................................... 12

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
  2010 WL 2346624 (D.N.J. June 9, 2010) ................................................................. 21

*In re Syngenta Mass Tort Actions*,
  272 F. Supp. 3d 1074 (S.D. Ill. 2017) ...................................................................... 25

*In re Towers*,
  162 F.3d 952 (7th Cir. 1998) ................................................................................... 20

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
  2010 WL 3119499 (S.D. Ill. Aug. 5, 2010) ......................................................... 18, 19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,
  665 F.3d 930 (7th Cir. 2012) ................................................................ 28

*Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
  34 F. Supp. 2d 656 (N.D. Ill. 1998) ...................................................... 19

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
  585 F. Supp. 2d 1339 (M.D. Fla. 2008) ................................................ 18

*Kirk v. Michael Reese Hosp. & Med. Ctr.*,
  513 N.E.2d 387 (Ill. 1987) .............................................................. 16, 19

*Lantz v. Am. Honda Motor Co.*,
  2008 WL 162759 (N.D. Ill. Jan. 17, 2008) ........................................... 31

*Lisitza v. Par Pharm. Cos.*,
  2013 WL 870623 (N.D. Ill. Mar. 7, 2013) ............................................. 28

*Lyttle v. Killackey*,
  528 F. Supp. 2d 818 (N.D. Ill. 2007) .................................................... 28

*McClure v. Owens Corning Fiberglas Corp.*,
  720 N.E.2d 242 (Ill. 1999) ................................................................... 28

*Metro. Water Reclam. Dist. of Greater Chi. v. Terra Found. for Am. Art*,
  13 N.E.3d 44 (Ill. App. 2014) .............................................................. 25

*Michigan v. U.S. Army Corps of Eng'rs*,
  911 F. Supp. 2d 739 (N.D. Ill. 2012) .................................................... 24

*Redelmann v. Claire Sprayway, Inc.*,
  874 N.E.2d 230 (Ill. App. 2007) .......................................................... 29

*Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
  2014 WL 2115498 (E.D. Pa. May 21, 2014) ......................................... 16

*Rivera v. Wyeth-Ayerst Labs.*,
  283 F.3d 315 (5th Cir. 2002) ............................................................... 21

*Roehl v. Merrilees*,
  2012 WL 1192093 (N.D. Ill. Apr. 10, 2012) ......................................... 28

*Segreti v. Lome*,
  747 F. Supp. 484 (N.D. Ill. 1990) ........................................................ 27

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*,
  20 F. Supp. 3d 305 (E.D.N.Y. 2014) .................................................... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Smith v. Eli Lilly & Co.*,
 560 N.E.2d 324 (Ill. 1990)..........................................................................18

*Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*,
 1997 WL 1106276 (N.D. Ill. Aug. 12, 1992) ............................................20

*Sweeney v. Bausman*,
 1987 WL 45713 (N.D. Ill. Nov. 5, 1987......................................................27

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*,
 136 A.3d 688 (Del. 2016) ...........................................................................22

*Travelers Indem. Co. v. Cephalon, Inc.*,
 32 F. Supp. 3d 538 (E.D. Pa. 2014), *aff'd*, 620 F. App'x 82 (3rd Cir. 2015)..........................21

*Travelers Indem. Co. v. Cephalon, Inc.*,
 620 F. App'x 82 (3d Cir. 2015) .............................................................14, 16

*Tucker v. Soy Capital Bank and Trust* Co.,
 974 N.E.2d 820 (Ill. App. 2012).............................................................26, 29

*United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*,
 400 F. App'x 255 (9th Cir. 2010) ..............................................................18

*United States ex rel. Garst v. Lockheed Integrated Solutions Co.*,
 158 F. Supp. 2d 816 (N.D. Ill. 2001) ..........................................................26

*United States ex rel. Harman v. Trinity Indus., Inc.*,
 872 F.3d 645 (5th Cir. 2017) ........................................................................9

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
 874 F.3d 905 (6th Cir. 2017) ....................................................................6, 26

*United States ex rel. Kelly v. Serco, Inc.*,
 846 F.3d 325 (9th Cir. 2017) ........................................................................9

*United States ex rel. Kennedy v. Aventis Pharm. Inc.*,
 2008 WL 5211021 (N.D. Ill. Dec. 10, 2008)...............................................22

*United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Ind., Inc.*,
 2018 WL 1566814 (S.D. Ind. Mar. 30, 2018) ............................................11

*United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*,
 2017 WL 5186344 (D.D.C. Nov. 8, 2017) .................................................11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States ex rel. McBride v. Halliburton Co.*,
   848 F.3d 1027 (D.C. Cir. 2017) ................................................................... 9

*United States ex rel. McGee v. IBM Corp.*,
   81 F. Supp. 3d 643 (N.D. Ill. 2015) ........................................................... 29

*United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*,
   865 F.3d 29 (1st Cir. 2017) .................................................................. 9, 10

*United States ex rel. Petratros v. Genentech Inc.*,
   855 F.3d 481 (3d Cir. 2017) ....................................................................... 9

*United States ex rel. Polansky v. Pfizer, Inc.*,
   822 F.3d 613 (2d Cir. 2016) ................................................................ 12, 13

*United States ex rel. Schimelpfenig v. Dr. Reddy's Labs., Ltd.*,
   2017 WL 1133956 (E.D. Pa. Mar. 27, 2017) ............................................ 11

*United States ex rel. Spay v. CVS Caremark Corp.*,
   875 F.3d 746 (3d Cir. 2017) ....................................................................... 9

*United States ex rel. Wall v. Circle C Const., L.L.C.*,
   697 F.3d 345 (6th Cir. 2012) ...................................................................... 7

*United States ex rel. Zemplenyi v. Grp. Health Coop.*,
   2011 WL 814261 (W.D. Wash. Mar. 3, 2011) .......................................... 22

*United States v. Caronia*,
   703 F.3d 149 (2d Cir. 2012) ..................................................................... 13

*United States v. Sanford-Brown Ltd.*,
   840 F.3d 445 (7th Cir. 2016) ............................................................ 9, 10, 11

*United States. ex rel. Wildhirt v. AARS Forever, Inc.*,
   2011 WL 1303390 (N.D. Ill. Apr. 6, 2011) .............................................. 26

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
   136 S. Ct. 1989 (2016) ..................................................................... 7, 8, 9, 11

*Vodak v. City of Chicago*,
   2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) ........................................... 26

*Wall v. Mich. Rental*,
   852 F.3d 492 (6th Cir. 2017) ...................................................................... 5

*Webb v. Local 73, Serv. Emps. Int'l Union*,
   2002 WL 31049841 (N.D. Ill. Sept. 13, 2002) ......................................... 27

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Williams v. Purdue Pharma Co.*,
  297 F. Supp. 2d 171 (D.D.C. 2003) ........................................................................................ 22

**Statutes**

720 ILCS 570/312 .......................................................................................................................... 24

**Other Authorities**

Dowell *et al.*, CDC Guideline for Prescribing Opioids for Chronic Pain (Mar. 18, 2016),
  www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (visited May 23, 2018) ............................ 11

**Treatises**

Restatement (Second) of Torts § 821(C)(1) ................................................................................. 23

**Regulations**

*Dissemination of Information on Unapproved/New Uses for Marketed Drugs, Biologics,
  and Devices*,
  63 Fed. Reg. 31143 (June 8, 1998) ........................................................................................ 13

## INTRODUCTION AND SUMMARY OF ISSUES AND ARGUMENT

The opioid abuse crisis is deep-seated and complex, and efforts to combat it are, for good reasons, a national priority. The City of Chicago acknowledges that this crisis involves the abuse of highly regulated, FDA-approved prescription opioid pain medicines *and* illicit opioids like heroin. The latter serve no public health purpose and are illegal to sell or use. In contrast, as the Manufacturer Defendants set forth in their brief in support of their concurrently-filed motion to dismiss in *The County of Summit, Ohio, et al. v. Purdue Pharma L.P.*, properly prescribed opioid pain medicines serve a critical public health objective by helping to provide relief to innumerable patients suffering from debilitating pain.[1]

Despite FDA's determination that opioid medications should continue to be available for the treatment of chronic pain, the crux of the City's complaint is that the Manufacturer Defendants engaged in a marketing scheme that caused doctors to write "medically unnecessary" prescriptions for opioid medicines. Through this lawsuit, the City seeks to recover its costs of reimbursing those allegedly unnecessary prescriptions. 4AC ¶¶ 813-65. The City also blames the Manufacturer Defendants for various harms—including from illegal street drugs—and seeks "costs of providing emergency services in response to opioid-related deaths, overdoses, addiction, and other injury" and "costs of funding addiction treatment." *Id.* ¶ 855.

Before the Court is the City's Fourth Amended Complaint, which asserts 11 Counts. The City's most recent complaint fares no better than its prior versions. This is the City's ***fifth*** attempt

---

[1] Under CMO One, § 2.g., Defendants incorporate herein the cross-referenced portions of the Manufacturer Defendants' Joint Motion to Dismiss in *County of Summit, Ohio v. Purdue Pharma L.P.*, Case No. 18-op-45090 ("*Summit* MTD"). Unless otherwise noted, this Memorandum adds all emphasis in quotations and omits citations and internal quotation marks.

to plead Counts 2 and 4-10.[2] The City does not cure any of the legal infirmities that led the Transferor Court to dismiss those Counts on **two** prior occasions. *See City of Chicago v. Purdue Pharma L.P.*, 2015 WL 2208423 (N.D. Ill. 2015) ("*Chicago I*"); *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016) ("*Chicago II*"). For example, the City still fails to plead an actionable false claim because it does not, and cannot, allege that any supposed misrepresentation by the Manufacturer Defendants was material to its decision to reimburse any so-called medically unnecessary prescription, including those for chronic pain. In fact, the City admits that it continues to reimburse opioid prescriptions for chronic pain, even after filing this lawsuit and with full knowledge of any supposed misstatements. That admission nullifies the City's claims as a matter of law. *See Chicago II*, 211 F. Supp. 3d at 1079-80. As another example, though the City "must adequately allege that [] prescribers relied on defendants' misrepresentations when they prescribed defendants' drugs," *id.* at 1080, it has failed to do so. As in its prior complaints, the City still has not alleged facts to show that any Chicago prescriber relied on any alleged misrepresentation or omission by any Manufacturer Defendant when writing a prescription that was purportedly medically unnecessary. Under well-settled law, allegations that sales representatives detailed and interacted with Chicago prescribers—who are obligated by law to know the labels and risks of the opioid medicines they prescribe—"do not sufficiently demonstrate that these interactions *caused* the physicians to write the prescriptions at issue." *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 87 (3d Cir. 2015).

---

[2] These Counts include causes of action for: consumer fraud in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2 ("ICFA"), and Chicago Municipal Code ("MCC") § 2-25-090 (Count 2); false statements in violation of MCC § 1-21-010 *et seq.* (Count 4); false claims in violation of MCC § 1-22-020 (Count 5); conspiracy to defraud in violation of MCC § 1-22-020 (Count 6); recovery of city costs under MCC § 1-20-020 (Count 7); insurance fraud in violation of 720 ILCS 5/17-10.5 (Count 8); civil conspiracy (Count 9); and unjust enrichment (Count 10).

The 4AC also does not cure the many other defects that the Transferor Court did not reach. For instance, the City fails to allege a legally cognizable injury. The City does not identify any City-reimbursed opioid prescription that purportedly harmed a patient or was ineffective. Instead, the City's theory is that opioid prescriptions for chronic pain *are never medically necessary*. That theory is in direct conflict with the FDA's approval of many opioid medications for that very use.

Further, the City adds for the first time a public nuisance claim (Count 11). But the City's claim is foreclosed by controlling Illinois law, including the municipal cost recovery rule and the safe harbor from nuisance liability for "conduct that is fully authorized by statute, ordinance or administrative regulation." *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1123 (2004). There can be no dispute that doctors can lawfully prescribe opioid medications, including for chronic pain.

For these and other reasons explained below, it is clear that after five attempts the City cannot plead a viable claim on Counts 2 and 4-11. The Court should now dismiss those counts with prejudice.

## PROCEDURAL BACKGROUND

The City filed its original complaint in June 2014. Dkt. No. 4-1.[3] The Manufacturer Defendants moved to dismiss that complaint, and, in response, the City filed its First Amended Complaint ("1AC") in September 2014. Dkt. No. 186.[4]

---

[3] Unless otherwise noted, all "Dkt." references are to docket entries in the transferor court, No. 14-cv-4361 (N.D. Ill.).

[4] The 1AC asserted 11 counts: (1) consumer fraud under MCC § 2-25-090; (2) false advertising under MCC § 4-276-470; (3) false statements to the City under MCC § 1-21-010 *et seq*.; (4) false claims under the Chicago Municipal False Claims Act ("MFCA") § 1-22-020; (5) conspiracy to defraud by false certification under MFCA § 1-22-020; (6) reimbursement of costs for provision of municipal services under MCC § 1-20-020; (7) statutory insurance fraud; (8) common law fraud; (9) civil conspiracy; (10) unjust enrichment; and (11) subrogation. Dkt. No. 186.

3

In December 2014, the Manufacturer Defendants moved to dismiss the 1AC. Dkt. Nos. 218-35. The Transferor Court (Judge Alonso) dismissed all claims (except for two asserted against Purdue),[5] holding that the City failed adequately to allege that the Manufacturer Defendants (a) made specific misrepresentations to Chicago prescribers; (b) were responsible for allegedly false statements made by third parties; or (c) caused the City's alleged losses—specifically, the City failed to allege the "identities of doctors who, as a result of one or more of defendants' alleged misrepresentations, prescribed opioids for chronic pain to a City-insured patient or worker's compensation recipient whose claim for that prescription the City paid, or any other details about such claims." *Chicago I*, 2015 WL 2208423, at *14.

In August 2015, the City filed a Second Amended Complaint ("2AC"), which added an unfair practices claim under the ICFA, dropped the City's subrogation and common law fraud claims, and reasserted all other claims from the 1AC. Dkt. No. 328. The Manufacturer Defendants again moved to dismiss, Dkt. Nos. 401-25, and Judge Alonso again granted the motion in substantial part. *Chicago II*, 211 F. Supp. 3d at 1084. Ruling that the City had adequately pleaded only the general deceptive practice claims asserted in Counts 1 (consumer fraud) and 3 (misrepresentations in connection with sale), Judge Alonso again dismissed all other claims because the City had failed to plead a causal link between any alleged misrepresentations and specific City-reimbursed prescriptions.[6] It was not enough, Judge Alonso held, for the City to plead that the Manufacturer Defendants made "alleged misstatements" to certain Chicago-area prescribers—the City also had

---

[5] After the City amended its complaint, the Court permitted those claims to proceed against the other Manufacturer Defendants; those claims (Counts 1 and 3 in the 4AC) are not the subject of this motion.

[6] Judge Alonso also dismissed Count 2 (ICFA unfair practices) for failure to plead any of the requisite elements. *Chicago II*, 211 F. Supp. 3d at 1075-76.

to plead that the prescribers relied on the alleged misstatements in writing City-reimbursed pre-scriptions. *Id.* at 1058, 1064, 1071, 1074-79, 1082. Judge Alonso also observed that, despite its knowledge of the alleged fraud, the City continued to pay claims for allegedly inappropriate opioid prescriptions—which further negates causation. *Id.*

In October 2016, the City filed a Third Amended Complaint ("3AC") asserting the same claims as the 2AC. Dkt. No. 478. The Manufacturer Defendants again moved to dismiss and/or strike all claims other than Counts 1 and 3. Dkt. Nos. 491-518.[7] Judge Alonso took the motion under submission but did not rule on the merits before the action's transfer to the MDL.

On April 25, 2018, the City filed its 4AC. The 4AC is nearly identical to the 3AC and the 2AC. *See In re Nat'l Prescription Opiate Litig.*, Dkt. No. 669-C (redline comparing 4AC to 2AC). It repleads all claims from the 3AC. *See* 4AC ¶¶ 768-880. And it adds only one new defendant (Mallinckrodt), *id.* ¶¶ 52, 71, 227, 235, 247, 564-73, 678; one new cause of action (common law public nuisance, in Count 11), *id.* ¶¶ 881-908; and a few new paragraphs about the claims pro-cessing for the City's health plan and workers' compensation program, *id.* ¶¶ 703-06; *see also id.* at 1, n.1. As explained below, these additions fail to cure the fundamental defects in the City's claims.

## ARGUMENT

All of the City's claims sound in fraud, *see Chicago II*, 211 F. Supp. 3d at 1058, 1064, 1071, 1074-79, 1082,[8] and must therefore meet both the particularity standard of Rule 9(b), *see*

---

[7] The Manufacturer Defendants named in the 3AC filed individual motions to dismiss that ad-dressed the deficiencies in the 3AC to each one of them. Pursuant to § 2.g. of CMO One, the Manufacturer Defendants now raise only certain key "issues common to all manufacturers" that warrant dismissal of the City's claims in the 4AC. The Manufacturer Defendants expressly reserve the right to raise additional grounds for dismissal at the appropriate time.

[8] The newly pleaded public nuisance claim, which Judge Alonso did not address, is also fraud-based.

*Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017), and the plausibility standard of *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The 4AC satisfies neither.

## I. THE MUNICIPAL FALSE STATEMENT, MUNICIPAL FALSE CLAIMS ACT, AND INSURANCE FRAUD CLAIMS FAIL (COUNTS 4-6 AND 8)

The City alleges that the Manufacturer Defendants knowingly caused prescribers to make false statements to the City to obtain its approval and payment of fraudulent claims. Counts 5 (false claims) and 6 (conspiracy to defraud by getting false or fraudulent claims paid or approved by the City) allege violations of MCC §1-22-020, the City's municipal false-claims ordinance, which is "substantially similar to the federal False Claims Act." *City of Chicago ex rel. Rosenberg v. Red-flex Traffic Sys., Inc.*, 2016 WL 4203835, at *6 n.3 (N.D. Ill. Aug. 8, 2016), *aff'd*, 884 F.3d 798 (7th Cir. 2018). Count 4 alleges violations of the City's false-statements ordinance, MCC §§1-21-010 *et seq.*, which covers the same ground. *See Chicago II*, 211 F. Supp. 3d at 1076; 4AC ¶¶ 806-27. Count 8, alleging violations of Illinois's insurance-fraud statute, 720 ILCS 5/17-10.5, is based upon the same alleged conduct underlying Counts 4-6. *See* 4AC ¶¶ 856-65. This Court should, as the Transferor Court did before, dismiss all these claims because the City fails to plead the essential elements for each: (a) a false claim for payment; (b) actual or proximate causation; and (c) a legally cognizable injury.

### A. The City Fails to Allege a False Claim

This Court should dismiss Counts 4-6 and 8 because, despite repeated opportunities, the City still does not plead a requisite false claim for payment. *See Chicago II*, 211 F. Supp. 3d at 1076-79.[9] To plead a false claim, the City "must provide the court with a specific representative

---

[9] MCC § 1-21-010(a) imposes liability on "[a]ny person who knowingly makes a *false statement* of material fact to the city . . . ." MCC § 1-22-020(2) imposes liability for "*false or fraudulent claim[s]* paid or approved by the city." 720 ILCS § 5/17-10.5(a)(1) prohibits "the making of a false claim or [] causing a *false claim* to be made on any policy of insurance . . . ."

claim submitted to the government pursuant to the alleged scheme." *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 920 (6th Cir. 2017). This includes identifying a representative claim "with *specificity* as to each necessary component of the alleged scheme; identifying a claim that merely infers one or more of these elements is inadequate." *Id.* (emphasis in original).[10]

A representative false claim can be established in one of two ways. The first way is through an express certification theory, where a defendant submits a claim with an express falsehood that renders the claim false or fraudulent. The City, however, has abandoned its prior express certification theory, *see* 4AC at 1 n.1, after Judge Alonso held that the City "failed to adequately allege a municipal false claims act claim under a theory of express false certification." *Chicago II*, 211 F. Supp. 3d at 1078.

The second way to establish a false claim is through the so-called implied certification theory. "According to this theory, when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment. But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent.'" *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016); *see also United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 356 (6th Cir. 2012). Judge Alonso also rejected the City's prior attempt to plead implied certification because the City did "not sufficiently allege[] that defendants caused misrepresentations that were material as defined in [*Escobar*] and therefore has not stated a claim for false statements or false claims." *Chicago II*, 211 F. Supp. 3d at 1079. The 4AC's attempt to bolster this theory falls short.

---

[10] "Courts have held that [federal] False Claims Act ('FCA') case law is applicable to state false claims cases." *Chicago II*, 211 F. Supp. 3d at 1077, n.19. Accordingly, this Court should "appl[y] FCA case law to the [City's] municipal false claims counts." *Id.*

Indeed, the crux of the City's implied certification theory is unchanged from previous complaints: (a) the City "only covers the cost of prescription drugs that are medically necessary or reasonably required," 4AC ¶ 808; (b) the Manufacturer Defendants' alleged misrepresentations caused prescribers to "impliedly" certify that "opioids to treat chronic pain were medically necessary and reasonably required," *id*. ¶ 806; and (c) the City "would have refused to authorize payment" had it known that opioid therapy was (allegedly) not medically necessary or appropriate to treat chronic non-cancer pain, *id*. ¶ 810.

Under *Escobar*, courts may allow the implied false certification theory only "where two conditions are satisfied: first, the claim does not merely request payment, but also makes ***specific representations*** about the goods or services provided; and second, the defendant's failure to disclose ***noncompliance*** with ***material*** statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S. Ct. at 2001. The 4AC pleads neither of these conditions.

### 1. The 4AC Does Not Adequately Plead Materiality

The City's allegations make clear that any alleged omissions were ***not*** material to its decision to pay claims. While the City alleges that it "would have refused to authorize payment for opioid prescriptions" had it known that chronic opioid therapy (allegedly) was medically unnecessary, 4AC ¶¶ 808-10, the City cannot overcome its admission in the 4AC that it continues to pay for opioids prescribed precisely for this purpose even today, *id*. ¶¶ 703-06, 824, 843. As Judge Alonso held, that admission shows as a matter of law that the alleged omissions were not material to the City's payment decisions. *See Chicago II*, 211 F. Supp. 3d at 1079-80 ("Based on the allegations therein, the City represents that is still paying for claims based on defendants' alleged misrepresentations. The City argues that it was unaware that claims were false when it paid them, but the Court has difficulty understanding how the City remained unaware that the claims were

false after the lawsuit was filed.").

So, too, in *Escobar*. The Supreme Court noted that "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.'" 136 S. Ct. at 2003-04.

Since *Escobar*, courts have repeatedly dismissed FCA claims for failure to allege materiality where, as here, the government continues to pay claims that allegedly violated certain requirements.[11] This case is no different. Any contrary holding would run afoul of *Escobar*'s "rigorous" and "demanding" materiality requirement, eliminating "fair notice" and promoting "openended liability" for alleged implied false certification, in violation of the Supreme Court's opinion. 136 S. Ct. at 1996, 2002-03. Despite this controlling law, the City tries to escape this result in various ways, each of which lacks merit.

*First*, the City asserts it has "supplement[ed] [its] allegations relating to the materiality" of the alleged fraud "based on case law subsequent to the [3AC]." 4AC at 1, n.1. The newly-added allegations, however, *defeat* any claimed showing of materiality. For example, the City alleges that it continues to make payments because it lacks "the resources to individually question the hundreds of thousands of claims for opioid prescriptions submitted to and/or paid by the [City]" and to "contest the administrative appeals when coverage of treatment is denied." *Id.* ¶ 704; *see also id.* ¶¶ 703, 705. The City's apparent practice of paying claims for opioid prescriptions without

---

[11] *See, e.g.*, *United States ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 36 (1st Cir. 2017); *United States ex rel. Petratros v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017); *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 764-65 (3d Cir. 2017); *cf. United States ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 663 (5th Cir. 2017); *United States v. Sanford-Brown Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 329 (9th Cir. 2017); *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017).

"question[ing]" them shows, as a matter of law, that the alleged omissions had no impact (let alone a material impact) on the City's payment decisions. *See Sanford-Brown*, 840 F.3d at 447; *Nargol*, 865 F.3d at 36; *Petratros*, 855 F.3d at 490. That it allegedly "would be more expensive to review each claim than to pay it" is beside the point. 4AC ¶ 704. "Simply put, a misrepresentation is not 'material to the Government's payment decision' when the relator concedes that the Government **would have paid** the claims **with full knowledge of the alleged noncompliance**." *Petratos*, 855 F.3d at 490 (quoting *Escobar*, 136 S. Ct. at 1996). That is precisely what happened—and continues to happen—with the City.

Nor can the City save its implied false certification theory by now alleging that it "may no longer be medically prudent to deny an employee's opioid claim where . . . the individual has become physically or physiologically dependent on the drug." 4AC ¶ 706. Even if that highly generalized allegation were true, it would apply only to an unspecified subset of claims for prescriptions aimed at treating a patient's alleged drug "dependen[ce]." *Id.* And in any event, the City has not identified a single prescription it reimbursed under such circumstances—let alone tied any such prescription to any allegedly false statement or other misconduct by any Manufacturer Defendant. *See Sanford-Brown*, 840 F.3d at 447; *Nargol*, 865 F.3d at 36; *Petratros*, 855 F.3d at 490.

*Second*, the City alleges that it has begun educating prescribers about the risks, benefits, and appropriate use of opioids to reduce allegedly improper prescriptions. 4AC ¶¶ 698, 707. This only underscores that the City knows—and has long known—of the allegedly undisclosed information about risks of opioid medications and that it has reimbursed opioid prescriptions with knowledge of those risks.

*Third*, the City alleges that it continues to make payments only because it "cannot unilaterally change its formulary, and must request that its benefits administrators implement requested

changes." *Id.* ¶ 699. The City alleges that it has submitted a request to the "vendors to adopt" the CDC Guideline for Prescribing Opioids for Chronic Pain ("CDC Guideline") "to govern the City's benefits." *Id.* ¶ 702. But although the City concedes that it has the power to have its vendors "adopt" its requested changes, it never specifies ***when*** it first took such action. *Id.* ¶¶ 699-702. Moreover, the 4AC's reference to the CDC Guideline makes clear that, at minimum, the City waited nearly two years after filing its initial complaint to make its request—and then did so only after the Manufacturer Defendants exposed this defect in its claim. That in itself suffices to show that the alleged omissions were non-material. *See Sanford-Brown*, 840 F.3d at 447 (alleged omissions were not material where plaintiff's "decision to pay [defendant] would" not "have been different had it known of [defendant's] alleged noncompliance").

In addition, the City nowhere alleges that the opioid prescriptions it reimbursed would have violated the CDC Guideline recommendations. And there is no basis to assume that any (let alone all) City-reimbursed opioid prescriptions did so, given that the CDC Guideline provides recommendations on "*when to initiate or continue opioids* for chronic pain," does not declare that the use of opioids to treat chronic pain is medically inappropriate, and is directed only to primary care physicians and not the entire spectrum of prescribers of opioid therapy. Dowell *et al.*, CDC Guideline for Prescribing Opioids for Chronic Pain (Mar. 18, 2016), www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (visited May 25, 2018).[12] This too defeats the City's claims. *See Sanford-Brown*, 840 F.3d at 447.

### 2. The 4AC Does Not Identify Claims for Payment That Made "Specific Representations" About Opioids

---

[12] Because the CDC Guideline is "referred to in the Complaint and [is] central to the claims contained therein," the Court may consider it in resolving this motion. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

The 4AC alleges only that prescribers, pharmacies, and patients requested payment from the City for certain opioid prescriptions. It does not allege that prescribers or pharmacies made any "specific representations" to the City in connection with those requests for payment. Absent such representations, the City's implied certification theory cannot stand. *See Escobar*, 136 S. Ct. at 1997.[13]

### 3. The 4AC Does Not Identify Claims That Failed to Comply with Contractual or Other Requirements

To the extent the 4AC purports to advance a theory that claimants (prescribers, pharmacies, or patients) failed to disclose to the City that opioid prescriptions did not comply with statutory, regulatory, or contractual requirements because the prescriptions were allegedly not medically necessary or reasonably required, *see* 4AC ¶¶ 806, 808, these allegations remain inadequate. The City does not plead any facts that would establish that any specific prescription submitted to it for reimbursement was not medically necessary or reasonably required—a threshold requirement. Nor does it plead any basis for inferring any statutory, regulatory, or contractual non-compliance. This omission alone is fatal to Counts 4-6 and 8.

Moreover, the City ignores that "a[n] FDA approved drug that is prescribed for its on-label use is 'reasonable and necessary'" and "is medically reasonable for its intended purpose by virtue of the FDA approval process." *In re Plavix Mktg., Sales Practices and Prods. Liab. Litig.*, 123 F. Supp. 3d 584, 604 (D.N.J. 2015). The 4AC concedes that, "[c]onsistent with industry practice," the City's "plan administrators presume that prescription drugs that are prescribed by the treating

---

[13] *See United States ex rel. Kietzman v. Bethany Circle of King's Daughters of Madison, Ind., Inc.*, 2018 WL 1566814, at *6-7 (S.D. Ind. Mar. 30, 2018) (FCA claim dismissed for failure to identify specific misleading representations); *United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 2017 WL 5186344, at *6 (D.D.C. Nov. 8, 2017) (same); *United States ex rel. Schimelpfenig v. Dr. Reddy's Labs., Ltd.*, 2017 WL 1133956, at *5 (E.D. Pa. Mar. 27, 2017) (same).

physician and consistent with the standard of care *are medically necessary*." 4AC ¶ 704.[14] Stated differently, it is impossible to say that a doctor writing a prescription impliedly certifies anything more than a drug's necessity for a use approved by the FDA—and a prescription may not even certify that because doctors may lawfully prescribe medications for uses not approved by the FDA. *See United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 619-620 (2d Cir. 2016). The Manufacturer Defendants are unaware of any case extending false-claims liability to doctors' on-label prescriptions of FDA-approved drugs—nor, in three rounds of prior briefing, has the City identified one. Such an expansion of false-claims liability would be extraordinary. As the Second Circuit has recognized, the federal "False Claims Act, even in its broadest application, was never intended to be used as a back-door regulatory regime to restrict practices that the relevant federal and state agencies have chosen not to prohibit through their regulatory authority." *Id.* at 629.

Likewise, the City fails to plead a basis to impose liability for any failure to disclose any alleged off-label opioid prescribing. Doctors are free to write prescriptions to treat any condition they believe to be medically appropriate, and "courts and the FDA have recognized the propriety and potential public value of unapproved or off-label drug use." *United States v. Caronia*, 703 F.3d 149, 153 (2d Cir. 2012); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n.5 (2001) (off-label use "often is essential to giving patients optimal medical care"); *Dissemination of Information on Unapproved/New Uses for Marketed Drugs, Biologics, and Devices*, 63 Fed. Reg. 31143, at 31153 (June 8, 1998). The City alleges no facts showing that it reimbursed any patient or pharmacy for any off-label opioid prescription for chronic pain (the very core of its off-label theory)—much less that any such prescription was medically unnecessary for, or did not

---

[14] Moreover, the City's own health plan allegedly defines medical necessity in terms of common practice: medically necessary drugs are those "customary for the treatment or diagnosis of an Illness or Injury, and . . . consistent with generally accepted medical standards." 4AC ¶ 667.

benefit, a particular patient. And, clearly, the City would have been aware of any such off-label condition for the prescription at the time it chose to reimburse for it. Thus, the City's theory fails as a matter of law.

**B.     The City Fails to Plead Causation**

**1.     The 4AC Fails to Plead Causation-in-Fact**

In twice dismissing Counts 2 and 4-10, Judge Alonso held that the City failed to provide the "missing link" in causation between alleged false statements and the City's alleged injuries. *Chicago II*, 211 F. Supp. 3d at 1084. To provide the "missing link," the City had to "clearly iden-tif[y]" the "prescribers who heard the misrepresentations" and allege facts showing both that "the same prescribers [] ***subsequently*** prescribed defendants' drugs," *id.* at 1080, and "***relied*** on de-fendants' misrepresentations ***when*** they prescribed defendants' drugs," *id*; *accord id.* at 1079-84.[15] Yet, despite having five opportunities to try to plead causation and allegedly interviewing multiple doctors, the City still has not provided this link, either in the 4AC or in the City's accompanying Exhibits that purportedly identify the anonymous prescribers who received alleged misrepresenta-tions from each Defendant.

In fact, the City did not even attempt to include any exhibit—or any verified allegations—specifying any prescribers who purportedly prescribed Mallinckrodt medications in reliance on alleged misrepresentations by Mallinckrodt. And as to the remaining Manufacturer Defendants, the 4AC fails to allege that most of the prescribers even heard a misrepresentation before writing a listed prescription. If an alleged misrepresentation did not precede a prescription, it cannot have

---

[15] Indeed, even if the City got the sequence correct in some instances, the fact that one event fol-lowed the other is not enough to establish causation (the well-established logical fallacy "post hoc ergo propter hoc"). *See Travelers*, 620 F. App'x at 87.

caused it. *See Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1986).[16] Further, for prescribers identified on the City's exhibits as having received an alleged misrepresentation, the 4AC does not allege facts linking each prescriber to specific misrepresentations or omissions or otherwise support an inference that the prescriber relied on those misrepresentations or omissions when prescribing that Defendant's opioid medications. For example:

- ***Cephalon***. Exhibit A.2 lists only ***three*** prescribers (R, M, and V) that supposedly "Receiv[ed] Cephalon Misrepresentations." Those three prescribers prescribed a Cephalon medicine to only one patient each, and prescribers M and V each wrote only a single prescription of a Cephalon medicine ***more than a decade ago*** (before any supposed detailing). The 4AC alleges no facts to show that Cephalon had any specific interactions with ***any of those three prescribers***, or that Cephalon made a false statement or omission to any of them. The City does not even list the prescribers in Exhibit A.2 as having been interviewed by the City about Cephalon. 4AC ¶ 392.

- ***Allergan***. Exhibit A.1 identifies only four prescribers (B, E, F, and H) who prescribed Kadian to five patients between 2009 and 2012. None of those prescribers could identify who from Allergan made a false statement, when or where such statements were made, or that they would not have prescribed Kadian but for those statements. *See id.* ¶¶ 302(a), (c), (d), (f). And Exhibits B.1 and B.2 identify only two Kadian patients (H and G) whose prescriptions the City's health and workers compensation plans reimbursed—both in 2010, both by prescribers who are not alleged to have heard or relied on any misrepresentations about Kadian at all.

- ***Endo***. For the prescribers whom the City identifies as having prescribed Endo opioids, the City either identifies no specific Endo misrepresentation that the prescriber allegedly heard, or fails to allege when and by whom the statement was made or whether the prescriber relied on the statement when writing a specific prescription. By way of example only, while the City alleges that Prescriber V was misled by Endo, *id.* ¶ 492, the City does not allege the time, place or substance of any statement by Endo to Prescriber V. Rather, the City merely speculates, because he allegedly spoke three times for Endo in 2010, that he "would have attended speakers training" at which misleading training materials may have been provided. *Id.* ¶¶ 492-93. Such speculation is insufficient to state a claim. Moreover, as a matter of logic, any misleading materials provided in 2010 could not have caused Prescriber V's alleged Opana ER prescriptions in 2007 and 2008.

---

[16] *See also In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 2012 WL 3154957, at *8-9 (N.D. Cal. Aug. 2, 2012) (dismissing third-party payor fraud and unjust enrichment claims for failure to allege facts showing that "particular doctors with a 'demonstrated connection' to the plaintiff were actually deceived by the defendant's statements"); *Summit* MTD at 11-12.

- ***Janssen***. The City alleges that 14 prescribers may have been exposed to Janssen misrepresentations. *Id.* ¶¶ 553, 558(a)-(k), 560-62. ***None***, however, is alleged to have relied on any such misrepresentation in prescribing a City-reimbursed Janssen opioid. For example, three prescribers (C, T, AA) are not alleged to have prescribed any Janssen opioid. For the remaining prescribers (B, D, G, H, J, R, S, Z, BB, CC, PP), the 4AC fails to allege ***when*** they were exposed to the alleged Janssen misrepresentation, ***what*** the content was of any such misrepresentation, or ***why*** any such misrepresentation (e.g., a sales representative's purported failure to "warn about the risk of addiction") would mislead reasonable prescribers when viewed in context.[17]

- ***Purdue***. The City does not allege that any of the 18 physicians it alleges may have heard or seen some alleged misrepresentation by Purdue relied on any misrepresentation in prescribing a Purdue medication for any patient. *Id.* ¶¶ 640-42, 646, 648. 558(a)-(k), 560-62. Seven of those physicians (C, G, Q, S, Z, EE, and GG) are not even alleged to have prescribed any Purdue medication for which the City paid. *See id.* Ex. A.5.

To make matters worse, the City does not specifically allege that ***any*** of these prescribers' prescriptions were medically unnecessary, harmful, or even ineffective.

In short, despite interviews with numerous prescribers and even after an extensive pre-suit investigation, four years of litigation, and five pleadings, the City still cannot allege that any Chicago doctor wrote a medically inappropriate opioid prescription ***because of*** any Manufacturer Defendant's alleged false or misleading statement or omission, rather than the doctor's own independent medical judgment. Under Illinois law, doctors are obliged to know the risks of medicines they prescribe—which, as the City concedes, were all clearly disclosed here through "black box warnings," *id.* ¶¶ 63, 70—and then to decide what medicine "best fits the patient's needs." *Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392-93 (Ill. 1987). The City also concedes that physicians have available many other sources of information about the risks and benefits of opioid medications, including FDA-mandated Risk Evaluation Mitigation Strategies ("REMS") programs and a large body of medical literature. *See, e.g.*, 4AC ¶¶ 60, 63, 70, 72 & n.22, 76-77,

---

[17] Moreover, some of these prescribers (e.g., D, G, H, J, Z, PP) wrote prescriptions only for Nucynta IR—an opioid approved for the treatment of "*acute* pain" that is not subject to the City's claims about the use of opioids for *chronic* pain. *See* 4AC ¶ 44(b).

86, 162-80, 210 & n.69-70. Yet, apart from allegations that doctors were detailed, *id.* ¶¶ 302, 392, 488, 558, 572, 646, there are no factual allegations that any specific doctor who wrote a City-reimbursed opioid prescription somehow abandoned his or her duty to know the label of that medicine and wrote the prescription because of some allegedly false statement by the Manufacturer Defendants. The continued absence of any details showing but-for causation is fatal to the City's claims. *See Travelers*, 620 F. App'x at 87 ("[a]llegations that physicians attended presentations and interacted with Cephalon sales representatives do not sufficiently demonstrate that these interactions caused the physicians to write the prescriptions at issue"); *Reg'l Council of Carpenters Welfare Fund* v. *Cephalon, Inc.*, 2014 WL 2115498, at *7 (E.D. Pa. May 21, 2014) (dismissing false marketing claims regarding opioid medicine because prescribers are presumed to have knowledge of a drug label's contents).

### 2.    The 4AC Also Fails to Plead Proximate Causation

In ruling that the City had sufficiently alleged proximate causation for its prior complaints, Judge Alonso applied a foreseeability test and declined to apply the "direct relation" test articulated throughout RICO and other case law. *See Chicago II*, 211 F. Supp. 3d at 1080. Subsequent United States Supreme Court authority, however, clarifies that foreseeability alone is not sufficient to satisfy common-law or statutory proximate causation requirements; instead, relying upon the very RICO case law that Judge Alonso declined to apply, the Supreme Court held that in the tort context, in addition to foreseeability, "proximate cause [] requires 'some direct relation between the injury and the injurious conduct alleged.'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1305-06 (2017).

The Sixth Circuit and other federal courts applying the *City of Miami*'s "direct relation" proximate cause standard have dismissed claims where, as here, a complaint alleges an "attenuated theor[y] of damage." *City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474, 480 (6th

17

Cir. 2017) (affirming dismissal of common-law nuisance claim); *see also Cty. of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *6 (N.D. Ill. Mar. 30, 2018) ("increased costs arising out of the provision of downstream social services such as policing and home-loss counseling, are too remote in time and too contingent on later events, to satisfy the 'first step' directness requirement that the Court now applies").[18] Courts across the country have likewise dismissed actions by payors of prescription medicines alleging deceptive marketing against pharmaceutical manufacturers because there were too many "significant independent intervening events" between the alleged misconduct (false marketing) and the alleged harm (payment of inappropriate prescriptions). *Emp'r Teamsters-Local Nos. 175/505 Health & Welfare Trust Fund v. Bristol Myers Squibb Co.*, 969 F. Supp. 2d 463, 467 (S.D. W. Va. 2013).[19]

This case law requires dismissal here, too. The 4AC attempts to hold the Manufacturer Defendants liable for: (a) the cost of every City-reimbursed opioid prescription for chronic non-cancer pain, regardless of whether it was for one of the Manufacturer Defendants' opioids or whether it was medically necessary, 4AC ¶¶ 781, 811-12, 827, 844-46, 852, 855, 864-65, 876; (b) any addiction treatment costs associated with those prescriptions, *id.* ¶¶ 847-55; and (c) other unidentified municipal expenditures associated with the "opioid epidemic," including the costs from a "black market in prescription opioids" and "other criminal activities," *id.* ¶¶ 757, 789, 855,

---

[18] This standard is consistent with Illinois law, where proximate cause exists "only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *City of Chi. v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1127 (Ill. 2004); *see also Cty. of Cook v. Philip Morris*, 817 N.E.2d 1039, 1043 (Ill. App. 2004) (proximate cause "operates … through the remoteness doctrine, . . . sometimes called the 'direct-injury' test").

[19] *See also United Food & Commercial Workers Cent. Pa. & Reg'l Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 20 F. Supp. 3d 305, 323 (E.D.N.Y. 2014); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *6-9 (S.D. Ill. Aug. 5, 2010); *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1345 (M.D. Fla. 2008).

907. But the Manufacturer Defendants are not "insurers of their industry," *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 344 (Ill. 1990),[20] and cannot be liable for these purported harms given the many significant and independent intervening events and actors that render any such injury "too remote in time, and too contingent on later events . . . ." *Cty. of Cook*, 2018 WL 1561725, at *6.

Numerous intervening events break the causal chain between the Manufacturer Defendants' alleged misconduct and the City's payment for allegedly inappropriate opioid prescriptions, including: (1) the prescriber's medical judgment—itself influenced by many independent factors—as to the best treatment for the patient's condition; (2) the patient's preferences; (3) the pharmacist's decision to fill the allegedly inappropriate prescription; (4) the patient's decision whether and how to use the medication; and (5) the City's decision to cover the drug for the particular indication and to reimburse for the particular prescription. Because this causal chain "necessarily involves" multiple layers of "decision making [by] the patient, the prescribing physician, and the [City as a] third-party payor," among others, it is too attenuated as a matter of law to establish proximate causation. *In re Yasmin*, 2010 WL 3119499, at *6-9. In particular, the learned intermediary doctrine, which Illinois has long recognized, *see Kirk*, 513 N.E.2d at 392-93,[21] breaks the causal chain as a matter of law. *See also Summit* MTD at 14-16.

Liability is similarly foreclosed for the even more remote downstream costs that the City seeks to recover. The 4AC asserts that Manufacturer Defendants created "a new secondary market

---

[20] As a matter of law, Defendants cannot be responsible for the costs and claims associated with other manufacturers' opioid products. *See, e.g.*, *Smith*, 560 N.E.2d at 329, 337 (rejecting market share liability and requiring plaintiffs to identify the product causing their injuries).

[21] Contrary to its own implausible assertion that Defendants "subverted every 'input' physicians rely on," 4AC ¶ 674, the City concedes (as noted above) that physicians have available many sources of information about the risks and benefits of Defendants' products. *See supra* at 16-17. It also concedes that many of the Chicago doctors whom the City interviewed made prescribing decisions based on factors separate from Defendants' alleged misconduct. *See, e.g.*, 4AC ¶¶ 697, 704.

for opioids . . . [and] additional illicit markets in other opiates, particularly heroin," resulting in "concomitant crime and costs; unrealized economic productivity; and broken families and homes" and increased "costs for [unidentified] municipal services." 4AC ¶¶ 789(f)-(h), 907. But under Illinois law, proximate cause "will not be found where the criminal acts of third parties have broken the causal connection." *Beretta*, 821 N.E.2d at 1134; *see also Int'l Bhd. of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 662 (N.D. Ill. 1998). The Manufacturer Defendants sell highly regulated, FDA-approved medications that patients can lawfully obtain only by prescription. *See Summit* MTD at 20-23. The Manufacturer Defendants are "several times removed" from any criminal market, increase in illegal heroin usage, or any other costs associated with the misuse of opioid medicines. *Beretta*, 821 N.E.2d at 1137. Those social ills are "the aggregate result of numerous unforeseeable intervening criminal acts by third parties not under defendants' control." *Id*. at 1148. As a result, any claim seeking relief for such harms fails for lack of proximate cause. *See Summit* MTD §§ II.B.2, VII.B, IX, X.

## C.      The City Fails to Allege Any Cognizable Injury

Economic injury is an essential element of insurance fraud (Count 8). *See Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, 1997 WL 1106276, at *16 (N.D. Ill. Aug. 12, 1992). The false claims counts (Counts 4-6) seek both "damage[s]" and "restitution of any money acquired" (*see* 4AC ¶¶ 811, 825, 844, and associated "WHEREFORE" clauses), necessitating viable allegations of economic injury to the extent these claims seek such relief. *See In re Towers*, 162 F.3d 952, 955 (7th Cir. 1998) (defining "restitution [as] 'compensation for [a victim's] actual pecuniary loss'"). The 4AC, however, fails to allege any economic injury suffered by the City.

The 4AC, for example, fails to identify a single City-reimbursed opioid prescription that purportedly harmed a patient or was ineffective. Instead, the City predicates its theory of injury on

20

the implausible notion that long-term therapy for chronic, non-cancer pain is ***never*** medically nec-

essary or reasonably required and, therefore, never eligible for coverage. *See* 4AC ¶¶ 75, 671, 679,

683, 688, 694. This flies in the face of FDA's approval of many opioids for exactly that purpose—

which the 4AC itself acknowledges, *id.* ¶ 22—as well as the settled principle that off-label pre-

scribing is entirely permissible and often forms the optimal standard of care. *See supra* at 13-14.

In addition, the City concedes that for much of the relevant time period, it paid the ***same***

***amount*** for prescription drug benefits regardless of how many opioid prescriptions were reim-

bursed. 4AC ¶ 663. And it concedes that it has continued to pay—and will continue to pay—for

opioids prescribed for chronic pain. *Id.* ¶¶ 703-06. Both concessions further establish that the 4AC

does not plead an injury that could support the City's claims for relief in Counts 4-6 and 8.

### 1. The 4AC Does Not Allege Reimbursement of Any Ineffective or Harmful Prescriptions

Courts routinely dismiss similar complaints for failing to allege facts to show that any rel-

evant prescription was ineffective or harmful to a particular patient. *See Rivera v. Wyeth-Ayerst*

*Labs.*, 283 F.3d 315, 320 (5th Cir. 2002) (plaintiff who "paid for an effective pain killer, and …

received just that" got "the benefit of her bargain" and could not allege any injury); *Travelers*

*Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 555-56 (E.D. Pa. 2014), *aff'd*, 620 F. App'x 82

(3rd Cir. 2015) (applying rule to dismiss claims against pharmaceutical manufacturer). Even if a

prescription was off-label, the City's reimbursement costs still would not be recoverable unless

the prescription actually was ineffective for or harmed the patient. *See Travelers*, 32 F. Supp. 3d

at 555-56; *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2010 WL

2346624, at *7-8 (D.N.J. June 9, 2010) (third-party payor failed to allege injury absent factual

allegations that particular off-label prescriptions "were actually ineffective or unsafe"); *Ctr. Reg'l*

*Emps. Benefit Fund v. Cephalon, Inc.*, 2010 WL 1257790, at *3 (D.N.J. Mar. 29, 2010) (no cognizable injury where plaintiffs failed to allege facts showing that prescriptions were ineffective).

The City here fails to allege that the Manufacturer Defendants caused any doctor to write or the City to reimburse ***any*** ineffective or harmful opioid prescription, much less that ***every*** opioid prescription the City covered was ineffective or harmful. Nothing in the 4AC or its exhibits bridges this factual gap. The City does not claim that any of the prescriptions listed in those exhibits failed to alleviate the pain of or injured the patient to whom they were prescribed. *See* 4AC Exs. A.1-A.7, B.1-B.2; *see also id.* ¶ 677. The City's exhibits show only that it paid for FDA-approved opioid medications prescribed by licensed physicians. *See* 4AC Exs. A.1-A.7, B.1-B.2; *id.* ¶¶ 738-739. This establishes no injury at all. *See, e.g.*, *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 WL 5413105, at *8 (D.N.J. Dec. 23, 2008); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176-177 (D.D.C. 2003).

### 2. The City's Own Allegations Confirm That It Suffered No Cognizable Economic Harm

The 4AC shows that the City suffered no cognizable economic harm for two more reasons. First, the City admits that it "continues to pay" for opioid prescriptions. *See supra* § I.A.1. This precludes any cognizable injury. *See Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688, 695-696 (Del. 2016) (where a payor "claim[s] that false advertising injured them, but continue[s] to cover the allegedly falsely advertised drug on their formularies and reimburse members for prescriptions," they "cannot, as matter of law, establish that they were injured").

Second, the 4AC admits that the City did not pay direct costs for prescription drugs for its HMO plan during much of the period at issue. *See* 4AC ¶ 663. Instead, the City paid fixed premiums to a third party who in turn paid all prescription drug costs—meaning the City paid the same amount no matter how many opioid prescriptions were reimbursed. *See id.* (discussing periods

"[b]efore July 2006," "[b]etween July 2006 and December 2009," and "[f]rom January 2012 to December 2013" during which the City paid premiums for HMO plans, "which in turn covered the cost of prescription drugs"). The City cannot establish any injury for periods in which it paid fixed premiums. *See United States ex rel. Kennedy v. Aventis Pharm. Inc.*, 2008 WL 5211021, at *3 (N.D. Ill. Dec. 10, 2008) (dismissing complaint where "[t]he off-label uses of Lovenox … did not cause the government to pay any more money than it would have paid" absent the alleged misconduct); *United States ex rel. Zemplenyi v. Grp. Health Coop.*, 2011 WL 814261, at *2 (W.D. Wash. Mar. 3, 2011) (no actionable claim where "a health care provider is paid a contracted or fixed rate per patient regardless of the number or type of services provided").[22]

## II.     THE PUBLIC NUISANCE CLAIM FAILS (COUNT 11)

The City's public nuisance claim fails for three reasons: (i) it is not adequately pleaded under Illinois law, which takes a very narrow view of what constitutes a public nuisance; (ii) it is barred by the municipal cost recovery rule; and (iii) it is barred by the economic loss rule.

### A.     The City Does Not Adequately Plead the Elements of Public Nuisance

The City fails to and cannot plead the elements of a public nuisance claim for three primary reasons:

***No public right.*** Illinois law defines a public nuisance as "an unreasonable interference with a right common to the general public." *Beretta*, 821 N.E.2d at 1111 (quoting the Restatement (Second) of Torts § 821(C)(1)). That limitation forecloses the City's public nuisance claim because, as explained in the *Summit* MTD at 43-44, any rights with which the Manufacturer Defendants allegedly interfered—including the rights not to be injured through harmful or ineffective prescription medications—are strictly individual, and not "common to the general public." Indeed,

---

[22] Any allegations regarding indirect premium increases also fail to establish a cognizable injury. *See* 4AC ¶ 663; *In re Bextra*, 2012 WL 3154957, at *8.

the *Beretta* court found that there simply is no public right to be free from the risk of harm from the use of an otherwise legal product. 821 N.E.2d at 1115-16.

*No unreasonable interference.* Even if the City had alleged a public right, the City cannot plead that the Manufacturer Defendants **unreasonably interfered** with that right. Where an alleged nuisance involves an "enterprise [] highly regulated by state or federal law," there is no unreasonable interference unless "(1) the defendant violated the applicable statutes or regulations, (2) the defendant was otherwise negligent in carrying out the enterprise, or (3) the law regulating the defendant's enterprise is invalid." *Beretta*, 821 N.E.2d at 1124. The 4AC nowhere alleges unreasonable interference under the second or third prongs of that test. Instead, it focuses on the first prong, but as explained *supra* § I, and *infra* § IV, the 4AC fails to plead any underlying violations. 4AC ¶ 886.

Moreover, like Ohio law, Illinois law creates a safe harbor from nuisance liability for "conduct that is fully authorized by statute, ordinance or administrative regulation," *Beretta*, 821 N.E.2d at 11238,[23] and also permits physicians to prescribe opioid medications for chronic pain, 720 ILCS 570/312 (providing guidelines for the prescribing of controlled substances by physicians); *cf. Summit* MTD at 44-47. For the same reasons discussed in the *Summit* MTD § VII.C, these facts compel dismissal of the City's public nuisance claim here.

*No causation.* The City is required to plead both actual and proximate causation for its public nuisance claim. *Beretta*, 821 N.E.2d at 1113. The City does neither. *See supra* § I.B. This Court should follow the controlling logic of *Beretta* (and other cases cited in the *Summit* MTD at § VII) and dismiss the City's public nuisance claim, because there is simply no sufficient causal connection between the actions of the Manufacturer Defendants and the downstream harms alleged

---

[23] *See also Michigan v. U.S. Army Corps of Eng'rs*, 911 F. Supp. 2d 739, 750 (N.D. Ill. 2012).

by the City, including its expenditures for public services. Indeed, the City's public nuisance claim is based in large part (if not entirely) upon conduct "that is the result of [] criminal acts of many individuals over whom [defendants] have no control," including the illegal use and diversion of opioids, which cannot "be deemed a legal cause of a nuisance." *Beretta*, 821 N.E.2d at 1138. And the City even seems to concede that it "would have otherwise incurred these costs anyway." 4AC ¶ 907.

### B. This Claim Is Barred by the Municipal Cost Recovery Rule

Also known as the "free public services doctrine," the municipal cost recovery rule holds that "public expenditures made in the performance of governmental functions are not recoverable in tort." *Beretta*, 821 N.E.2d at 1144. Instead, the law contemplates that costs for such expenditures will be paid from municipal taxes:

> [W]here a system already exists for the rational allocation of costs, and where society as a whole relies upon that system, there is little reason for a court to impose an entirely new system of allocation. This is particularly true where, as here, allowing recovery of the costs of routine police and other emergency services could have significant unintended consequences.

*Id.* at 1145.

The public nuisance claim here seeks recovery of costs that fall squarely within the municipal cost recovery rule—namely, the costs of "investigating, monitoring, treating, policing, and remediating the opioid epidemic." 4AC ¶ 905. And while the City asserts that it is entitled to recover these costs under MCC § 1-20-020, *id.* ¶ 907, the 4AC does not allege a violation of that statute. *See infra* § III. The City purports to plead only a nuisance theory, and *Beretta* forecloses its recovery under that theory. 821 N.E.2d at 1143, 1145, 1147.

### C. This Claim Is Barred by the Economic Loss Doctrine

The economic loss doctrine "stems from the theory that tort law affords a remedy for losses occasioned by personal injuries or damages to one's property," but not for solely economic losses

25

"not coupled with injury to person or property." *In re Syngenta Mass Tort Actions*, 272 F. Supp. 3d 1074, 1084 (S.D. Ill. 2017) (quoting *Metro. Water Reclam. Dist. of Greater Chi. v. Terra Found. for Am. Art*, 13 N.E.3d 44, 59 (Ill. App. 2014)). *Beretta* applied the doctrine to dismiss the City's similar public nuisance claim seeking economic damages from gun violence, ruling that the City's alleged damages were "solely economic damages in the sense that they represent costs incurred in the absence of harm to a plaintiff's person or property." 821 N.E.2d at 1143. "[I]n the absence of *physical harm to city property or other direct injury*," the City's public nuisance claim failed as a matter of law. *Id.*

So too here. The City's nuisance claim seeks only economic damages "for municipal services it was forced to provide" in responding to the opioid crisis. 4AC ¶ 907. None of these alleged harms is "direct"; instead, all are entirely derivative of alleged injuries to Chicagoans abusing, misusing, and being addicted to opioids (including illicit ones). *See Summit* MTD § VII.A. Because the City's public nuisance claim does not allege any "physical harm to city property or other direct injury," the Court should dismiss it under the economic loss rule. *Beretta*, 821 N.E.2d at 1143.

## III. THE MUNICIPAL SERVICES CLAIM FAILS (COUNT 7)

MCC § 1-20-020 authorizes actions against persons who cause the City "to incur costs in order to provide services reasonably related to such person's violation of any federal, state or local law." The City's claim under this statute fails on three grounds outlined above: (1) the City fails to state a claim for a violation of state or municipal laws, *supra* § I; (2) the City fails to plead causation, *supra* § I.B, *Chicago II*, 211 F. Supp. 3d at 1083 (dismissing Count 7 on causation grounds); and (3) the costs the City seeks to recover for public expenditures, *see* 4AC ¶¶ 852-55, are barred by the municipal cost recovery rule. *See supra* § II.B; *see also Vodak v. City of Chicago*, 2006 WL 2524141, at *3 (N.D. Ill. Aug. 30, 2006). For each reason, Count 7 should be dismissed with prejudice.

## IV.    THE CONSPIRACY CLAIMS FAIL (COUNTS 6 AND 9)

The City's conspiracy claims should be dismissed because the City fails to allege an agreement to commit an illegal act, *see Tucker v. Soy Capital Bank and Trust* Co., 974 N.E.2d 820, 834-35 (Ill. App. 2012), including an agreement specifically "to get false claims paid," *Ibanez*, 874 F.3d at 917.[24] Likewise, the 4AC fails to specify the alleged conspiracy's "when, where, why, or how" as required by Rule 9(b). *Coley v. Lucas Cty., Ohio*, 2014 WL 272667, at *9 (N.D. Ohio Jan. 23, 2014); *Gaudie v. Countrywide Home Loans, Inc.*, 683 F. Supp. 2d 750, 758-60 (N.D. Ill. 2010). The City concedes that it has not amended its complaint to address these failings, which Judge Alonso did not reach.[25] *See* 4AC at 1 n.1. But these failings equally require dismissal.

### A.    The 4AC Fails to Allege an Agreement to Commit an Illegal Act

The essence of a conspiracy is an agreement to commit the allegedly unlawful act. *See Borsellino v. Goldman Sachs Grp.*, 477 F.3d 502, 509 (7th Cir. 2007); *Webb v. Local 73, Serv. Emps. Int'l Union*, 2002 WL 31049841, at *4 (N.D. Ill. Sept. 13, 2002). Failure to allege such an agreement is fatal. *See, e.g.*, *Hard Drive Prods., Inc. v. Does 1-55*, 2011 WL 4889094, at *5 (N.D. Ill. Oct. 12, 2011); *Segreti v. Lome*, 747 F. Supp. 484, 487 n.1 (N.D. Ill. 1990). The 4AC purports to allege multiple separate conspiracies between certain individual Manufacturer Defendants and various third parties. According to the 4AC, "by engaging in the conduct described in [the 4AC],

---

[24] *See also*, *e.g.*, *United States. ex rel. Wildhirt v. AARS Forever, Inc.*, 2011 WL 1303390, at *6 (N.D. Ill. Apr. 6, 2011) (dismissing because false claims conspiracy must be "formed . . . to defraud the government" and created "for the purpose of obtaining payment from the government."); *United States ex rel. Garst v. Lockheed Integrated Solutions Co.*, 158 F. Supp. 2d 816, 825 (N.D. Ill. 2001) (dismissing because relator failed to allege that the conspiracy was "one to 'get a false or fraudulent claim allowed or paid' by the government"); *Summit* MTD §§ XIII.

[25] Defendants raised these arguments in their joint motion to dismiss the SAC. *See* Dkt. No. 423, Jt. Mot to Dismiss 2AC at 30-34. Judge Alonso dismissed the City's conspiracy causes of action based on a failure to properly plead causation, without reaching these arguments. *Chicago II*, 211 F. Supp. 3d at 1082-83.

[Cephalon, Endo, Janssen, and Purdue] agreed" with "the various KOLs and Front Groups with which each of them was allied" to "deceptively promote the risks, benefits, and superiority of opioid therapy." 4AC ¶¶ 831-35. The 4AC asserts that these third parties' publications are the "products of these conspiracies," and that the "collaboration . . . in creating and disseminating these publications is further evidence of each conspiracy's existence." *Id*. ¶¶ 832-35.

These allegations fail on multiple grounds. First, a conspiratorial agreement "cannot be inferred from the averment that overt acts were committed in furtherance of the conspiracy," *Sweeney v. Bausman*, 1987 WL 45713, at *2 (N.D. Ill. Nov. 5, 1987), particularly when the City fails to specify which of the conduct described in its 347-page 4AC purportedly supports such an agreement.[26] Instead, a conspiracy claim must allege sufficient facts from which this Court may infer the existence of a conspiratorial agreement between the parties. *See Roehl v. Merrilees*, 2012 WL 1192093, at *8 (N.D. Ill. Apr. 10, 2012); *Lyttle v. Killackey*, 528 F. Supp. 2d 818, 831-32 (N.D. Ill. 2007). The City fails to satisfy this element.

The 4AC alleges in conclusory terms that Cephalon, Endo, Janssen, and Purdue had ties to various pain care organizations and publications, *see, e.g.*, 4AC ¶¶ 525, 539, 600-01, 603, 612, had contracts—some with parties who are not alleged to be coconspirators—related to the preparation of certain challenged publications, *id*. ¶¶ 542, 599, and, in some cases, funded, sponsored, pur-chased, and/or distributed the publications, *see, e.g.*, *id*. ¶¶ 350, 353, 359, 451, 453, 457, 463-65, 531, 549, 619, 624-25, 628-29, 632. But this is nothing more than parallel independent behavior

---

[26] This failure makes the conspiracy claims as they relate to KOLs particularly unintelligible. Even though the City asserts that "Defendants Cephalon, Endo, Janssen, and Purdue each conspired with various KOLs," it does not identify *any* KOLs with whom each Defendant allegedly conspired. *See* 4AC ¶¶ 866-67, 873. The remainder of the 4AC, in turn, refers to nearly a dozen KOLs, *see, e.g.*, *id.* ¶¶ 143, 148-154, 172, 204, 373, 378, 609 n.129, 633, and repeatedly refers to "KOLs" without identifying them at all, *see, e.g.*, *id.* ¶¶ 8-11, 24, 123, 132, 139-47, 205, 206-07, 228-29.

by competitive companies in a competitive industry. *See Twombly*, 550 U.S. at 556-57; *Summit MTD* at 52-53. The 4AC wholly lacks any non-conclusory allegations of any conspiratorial scheme, much less any allegations showing that the parties "understood the general objectives of the conspiratorial scheme, accepted them, and agreed, either explicitly or implicitly[,] to do [their] part to further those objectives." *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012); *see also McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 266 (Ill. 1999) ("Proof of a relationship . . . does not establish the required agreement").

Second, to plead a conspiracy, "[f]acts must be alleged to suggest the existence of an agreement *to violate the law*." *Lisitza v. Par Pharm. Cos.*, 2013 WL 870623, at *7 (N.D. Ill. Mar. 7, 2013). A "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 557. Here, the 4AC lacks any non-conclusory allegations of any agreement to act unlawfully, let alone any agreement specifically to defraud the City, and fails to identify any requisite "overt tortious or unlawful act" committed by one of the conspirators in furtherance of such a purported agreement. *Tucker*, 974 N.E.2d at 834-35; *see also Redelmann v. Claire Sprayway, Inc.*, 874 N.E.2d 230, 240-41 (Ill. App. 2007). After five attempts to plead a conspiracy, it is clear the City cannot; its conspiracy claims should be dismissed with prejudice.

### B.     The City Fails to Plead a Conspiracy with Particularity

Because the City's conspiracy claims sound in fraud, Rule 9(b)'s heightened pleading standard applies to all elements of those claims, including agreement. *See Summit* MTD § XIII (discussing pleading requirements for conspiracy claims). Yet, the 4AC's conspiracy allegations provide none of the requisite details of any Manufacturer Defendant's allegedly fraudulent conspiracy with third parties, including **when** or **how** the various schemes were formed, **which** indi-

viduals participated in the schemes, and **how** their acts furthered the conspiracy. The 4AC's conclusory allegations, including that "[a]s part of its agreements," each Manufacturer Defendant "provided support for [third parties'] deceptive statements promoting opioids," are insufficient to support this claim. 4AC ¶¶ 832-35; *see also id.* ¶¶ 24, 134, 206-10, 798. Because the 4AC does not allege any facts connecting the Manufacturer Defendants' various third-party interactions to any alleged conspiracy to defraud, the City's conspiracy claims fail. *See Summit* MTD § XIII; *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 666 (N.D. Ill. 2015) (dismissing FCA conspiracy claim for failure to allege "who the agreement was with, how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for").

## V. THE UNJUST ENRICHMENT CLAIM FAILS (COUNT 10)

To state an unjust enrichment claim under Illinois law, the City must allege facts showing that (1) the Manufacturer Defendants unjustly retained a benefit to the City's detriment, and (2) their retention of that benefit violates fundamental principles of justice, equity, and good conscience. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Rather than plead facts independently supporting these elements, the City premises this count on the same insufficient allegations underlying its other deficient claims. Under Illinois law, the failure of those claims (including for lack of causation) defeats the unjust enrichment count as well. *See id.* at 517 ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then . . . unjust enrichment will stand or fall with the related claim.").

Further, the City has pleaded nothing more than bare and formulaic recitations of the legal elements, which are insufficient. *See, e.g.*, *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 680 (Ill. 1989) (dismissing unjust enrichment claim where plaintiff failed to meet "his obligation to allege specific facts in support of his claim."); *Gombita v. Nationstar Mortg.,*

*LLC*, 2017 WL 374731, at *3 (N.D. Ohio Jan. 25, 2017) (same). As explained above, the City has not adequately alleged that the Manufacturer Defendants' conduct was wrongful or harmed the City, let alone that the Manufacturer Defendants somehow "unjustly retained a benefit." After multiple amendments, the City has repeatedly failed to allege facts that could support an unjust enrichment claim. The Court should dismiss Count 10 with prejudice.

## VI.   THE UNFAIR PRACTICES CLAIM (COUNT 2) SHOULD BE DISMISSED AND STRICKEN

Judge Alonso dismissed the City's unfair practices claim. *Chicago II*, 211 F. Supp. 3d at 1075-76. The City does not seek to revisit that ruling, but alleges that it has repleaded the claim, unamended, "solely for the purposes of appellate review." 4AC at 1 n.1. This is improper and only serves to complicate the proceedings unnecessarily. *See Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 618 (6th Cir. 2014) ("[I]t would be illogical to deny [plaintiffs] the right to appeal" their claims "simply because they failed to include them in subsequent pleadings."). The Court should dismiss with prejudice the City's unfair practices claim based on Judge Alonso's unchallenged prior ruling. *See Bastian v. Petren Res. Corp.*, 892 F.2d 680 (7th Cir. 1990); *Lantz v. Am. Honda Motor Co.*, 2008 WL 162759 (N.D. Ill. Jan. 17, 2008).

## CONCLUSION

For all the reasons stated above, the Court should dismiss with prejudice Counts 2 and 4-11 of the 4AC.

Dated: May 25, 2018

                                Respectfully submitted,

                                /s/ Charles C. Lifland (consent)

                                Charles C. Lifland
                                O'MELVENY & MYERS LLP
                                400 S. Hope Street

31

Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com

*Attorney for Defendants Janssen
Pharmaceuticals, Inc., Johnson &
Johnson, Janssen Pharmaceutica, Inc.
n/k/a Janssen Pharmaceuticals, Inc., and
Ortho-McNeil-Janssen Pharmaceuticals,
Inc. n/k/a Janssen Pharmaceuticals, Inc.*


/s/ Mark S. Cheffo (consent)

Sheila L. Birnbaum
Mark S. Cheffo
Hayden A. Coleman
QUINN EMANUEL URQUHART & SUL-
LIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
sheilabirnbaum@quinnemanuel.com
markcheffo@quinnemanuel.com
haydencoleman@quinnemanuel.com

*Counsel for Defendants Purdue Pharma L.P.,
Purdue Pharma Inc., and The Purdue Fred-
erick Company*


/s/ Jonathan L. Stern (consent)

Jonathan L. Stern
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
Phone: 202-942-5000
Fax: 202-942-5999
Email: jonathan.stern@arnoldporter.com

Sean O. Morris
Arnold & Porter Kaye Scholer LLP
777 S. Figueroa St., Suite 4400

Los Angeles, CA 90017
Phone: 213-243-4000
Fax: 213-243-4199
Email: sean.morris@arnoldporter.com

*Attorneys for Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc.*

/s/ Steven A. Reed (consent)

Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103-2921
T: 215.963.5603
F: 215.963.5001
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

Brian M. Ercole
MORGAN, LEWIS & BOCKIUS LLP
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
(305) 415-3000
brian.ercole@morganlewis.com

*Attorneys for Teva Pharmaceuticals, U.S.A., Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc.*

/s/ Donna M. Welch (consent)
Donna M. Welch, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000
donna.welch@kirkland.com

*Counsel for Allergan Finance, LLC f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.*

/s/ Brien T. O'Connor (consent)

Brien T. O'Connor
Andrew J. O'Connor
ROPES & GRAY LLP
Prudential Tower
800 Boylston St.
Boston, MA 02199-3600
(617) 235-4650
Brien.O'Connor@ropesgray.com
Andrew.O'Connor@ropesgray.com

*Attorneys for Defendant Mallinckrodt LLC*

## LOCAL RULE 7.1(F) CERTIFICATION

I certify that this case has been assigned to the "litigation track" pursuant to CMO One and that this Memorandum adheres to the page limitations set forth in CMO One § 6(f), CMO Four at 2-3, and L.R. 7.1(f).

Dated: May 25, 2018                          /s/ Charles C. Lifland

                                             Charles C. Lifland
                                             O'MELVENY & MYERS LLP
                                             400 S. Hope Street
                                             Los Angeles, CA 90071
                                             Telephone: (213) 430-6000
                                             Facsimile: (213) 430-6407
                                             clifland@omm.com

                                             *Attorney for Defendants Janssen
                                             Pharmaceuticals, Inc., Johnson &
                                             Johnson, Janssen Pharmaceutica, Inc.
                                             n/k/a Janssen Pharmaceuticals, Inc., and
                                             Ortho-McNeil-Janssen Pharmaceuticals,
                                             Inc. n/k/a Janssen Pharmaceuticals, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 25, 2018, a copy of the foregoing **Memorandum of Law in Support of the Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Fourth Amended Complaint** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: May 25, 2018

/s/ Charles C. Lifland

Charles C. Lifland
O'MELVENY & MYERS LLP
400 S. Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407
clifland@omm.com

*Attorney for Defendants Janssen
Pharmaceuticals, Inc., Johnson &
Johnson, Janssen Pharmaceutica, Inc.
n/k/a Janssen Pharmaceuticals, Inc., and
Ortho-McNeil-Janssen Pharmaceuticals,
Inc. n/k/a Janssen Pharmaceuticals, Inc.*