**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*City of Chicago v. Cardinal Health, Inc., et al.*<br>Case No. 18-op-45281-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**MEMORANDUM IN SUPPORT**
**OF DISTRIBUTORS' MOTION TO DISMISS**
**<u>FIRST AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................2

ARGUMENT .............................................................................................................3

I.    THE PUBLIC NUISANCE CLAIM SHOULD BE DISMISSED. ....................................3

      A.    The City Has Not Alleged Interference with a Public Right. ..................................3

      B.    The City Cannot Regulate Products—Especially Products That Already
            Are Heavily Regulated—Through Public Nuisance Litigation. .............................5

II.   THE NEGLIGENCE CLAIM SHOULD BE DISMISSED. ..............................................7

      A.    There Is No Private Right of Action. .......................................................7

      B.    There Is No Common Law Duty To Monitor and Report Suspicious
            Orders...............................................................................................10

III.  THE NUISANCE AND NEGLIGENCE CLAIMS SHOULD BE DISMISSED FOR
      ADDITIONAL REASONS. ...........................................................................13

      A.    The City Has Not Adequately Alleged Proximate Causation...............................13

      B.    The Economic Loss Doctrine Bars the City's Claims. ..........................................16

      C.    The Free Public Services Doctrine Bars the City's Claims. ...................................18

IV.   THE CONSUMER FRAUD CLAIM SHOULD BE DISMISSED...................................21

V.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. ...........................24

VI.   THE DRUG DEALER LIABILITY ACT CLAIM SHOULD BE DISMISSED.............26

      A.    A Prescription Opioid Medication Is Not an "Illegal Drug." ................................27

      B.    Distributors Did Not "Knowingly Participate in an Illegal Market." ....................28

VII.  THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED. ................................29

CONCLUSION....................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Belkow v. Celotex Corp.*, 722 F. Supp. 1547 (N.D. Ill. 1989) ........................................29

*Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) ............................19

*City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016) .........................21

*City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423 (N.D. Ill. May 8, 2015) ....................................................................................................23

*City of Flagstaff v. Atchison, Topeka & Santa Fe Railway Co.*, 719 F.2d 322 (9th Cir. 1983) ............................................................................................................18

*City of Philadelphia v. Beretta U.S.A., Inc.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000) ......................19

*Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011) .........................................25

*Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004) ...............................................11

*Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077 (D.C. Cir. 1984) ..............................19

*Doe ex rel. Doe v. White*, No. 08-cv-2169, 2009 WL 268823 (C.D. Ill. Feb. 3, 2009) ............................................................................................................11

*Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972) ....................23, 24

*Int'l Bhd. of Teamsters Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656 (N.D. Ill. 1998) ..............................................................15

*Logger Head Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775 (N.D. Ill. 2013) ............................................................................................................29

*Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920 (Ill. App. Ct. 2009) .........................25

*Mayer v. United States*, No. 89 C 3468, 1989 WL 152671 (N.D. Ill. Dec. 4, 1989) .................12

*Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680 (N.D. Ill. Nov. 22, 2005) ........................................................12

*Merit Ins. Co. v. Colao*, 603 F.2d 654 (7th Cir. 1979) ..............................................12

*Ringo v. Lombardi*, No. 09-4095-CV-C-NKL, 2010 WL 3310240 (W.D. Mo. Aug. 19, 2010) ............................................................................................................6

*Siegel v. Shell Oil Co.*, 612 F.3d 932 (7th Cir. 2010) ..............................................25

*Union Cnty. v. MERSCORP, Inc.*, 920 F. Supp. 2d 923 (S.D. Ill. 2013)......................................11

*Vesely v. Armslist, LLC*, No. 13 CV 00607, 2013 WL 12323443 (N.D. Ill. July 29, 2013) ................................................................................................................................12

*W. Ry. Devices Corp. v. Lusida Rubber Prods., Inc.*, No. 06 C 0052, 2006 WL 1697119 (N.D. Ill. June 13, 2006) ...................................................................................24

**STATE CASES**

*Baker v. Smith & Wesson Corp.*, No. Civ.A 99C-09-283-FS, 2002 WL 31741522 (Del. Super. Ct. Nov. 27, 2002) .....................................................................19, 20

*Bd. of Supervisors of Fairfax Cnty. v. U.S. Home Corp.*, No. 85225, 1989 WL 646518 (Vir. Cir. Ct. Aug. 14, 1989).................................................................19

*Bruns v. City of Centralia*, 21 N.E.3d 684 (Ill. 2014)......................................................7

*City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126 (Ill. App. Ct. 2005).................2, 3, 14, 17

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004)................................. passim

*City of Pittsburgh v. Equitable Gas Co.*, 512 A.2d 83 (Pa. Commw. Ct. 1986) ...........................19

*Commercial Nat'l Bank v. City of Chicago*, 432 N.E.2d 227 (Ill. 1982).......................................23

*County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004) .................15, 21, 22

*County of San Luis Obispo v. Abalone All.*, 223 Cal. Rptr. 846 (Ct. App. 1986).........................19

*Eldridge v. Eli Lilly & Co.*, 485 N.E.2d 551 (Ill. App. Ct. 1985)...........................................10, 12

*Ganim v. Smith & Wesson Corp.*, No. CV9901531985, 1999 WL 1241909 (Conn. Super. Ct. Dec. 10, 1999)...........................................................................................19

*Geimer v. Chi. Park Dist.*, 650 N.E.2d 585 (Ill. App. Ct. 1995) ...................................................12

*Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868 (Ill. App. Ct. 2016) ........................................16, 17

*Hernandez v. Walgreen Co.*, 49 N.E.3d 453 (Ill. App. Ct. 2015).................................................10

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672 (Ill. 1989) ...............................................................................................................................25, 26

*In re Chicago Flood Litig.*, 680 N.E.2d 265 (Ill. 1997).................................................................16

*Koch v. Consol. Edison Co.*, 468 N.E.2d 1 (N.Y. 1984) ........................................................18, 19

*Lewis v. Lead Indus. Ass'n Inc.*, 793 N.E.2d 869 (Ill. App. Ct. 2003) ..........................................25

*Martino v. Leiva*, 479 N.E.2d 955 (Ill. App. Ct. 1985).................................................................12

*Mayor & Council of City of Morgan City v. Jesse J. Fontenot, Inc.*, 460 So. 2d 685 (La. Ct. App. 1984) ...........................................................................................19

*McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242 (Ill. 1999) ..................................29

*McNeil v. Carter*, 742 N.E.2d 1277 (Ill. App. Ct. 2001) ...........................................................8, 9

*Moore v. Lumpkin*, 630 N.E.2d 982 (Ill. App. Ct. 1994) .................................................................9

*Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982) .........................................16, 17

*N.C. Highway & Pub. Works Comm'n v. Cobb*, 2 S.E.2d 565 (N.C. 1939) ..................................19

*NBD Bank v. Krueger Ringier, Inc.*, 686 N.E.2d 704 (Ill. App. Ct. 1997) .....................................9

*Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) .....................................6

*Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353 (Fla. Cir. Ct. Dec. 13, 1999)...........................................................................................................19

*People ex rel. Madigan v. United Constr. of Am., Inc.*, 981 N.E.2d 404 (Ill. App. Ct. 2012) ...........................................................................................................21

*Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951 (Ill. 2002)............................................23

*State v. Black Hills Power, Inc.*, 354 P.3d 83 (Wyo. 2015)..........................................................19

*Varela ex rel. Nelson v. St. Elizabeth's Hosp. of Chi., Inc.*, 867 N.E.2d 1 (Ill. App. Ct. 2006) ...........................................................................................................10

*Village of Chatham v. County of Sangamon*, 837 N.E.2d 29 (Ill. 2005) ......................................23

*Walker Cnty. v. Tri-State Crematory*, 643 S.E.2d 324 (Ga. Ct. App. 2007) ..........................19, 20

*West Virginia v. St. Clair*, 355 S.E.2d 418 (W. Va. 1987) ...........................................................20

*Young v. Bryco Arms*, 821 N.E.2d 1078 (Ill. 2004).......................................................5, 6, 14, 15

## OTHER AUTHORITIES

21 C.F.R. § 1301.74(b) ...................................................................................................................11

21 U.S.C. § 812..............................................................................................................................27

21 U.S.C. § 821................................................................................................................................5

21 U.S.C. § 826(a) ......................................................................................................................5, 27

325 Ill. Comp. Stat. 5/4 ..................................................................................................10

720 Ill. Comp. Stat. 570/100 *et seq.* ..............................................................................7

720 Ill. Comp. Stat. 570/206 ...........................................................................................27

720 Ill. Comp. Stat. 570/303(a) ....................................................................................7, 8

720 Ill. Comp. Stat. 570/501 .......................................................................................7, 8

720 Ill. Comp. Stat. 570/503 ............................................................................................8

740 Ill. Comp. Stat. 57/10 .........................................................................................26, 28

740 Ill. Comp. Stat. 57/15 ...............................................................................................27

740 Ill. Comp. Stat. 57/20(a) ..........................................................................................28

Ill. Admin. Code tit. 68, § 1510.40(a) ..............................................................................8

Ill. Admin. Code tit. 68, § 1510.50 ..................................................................................8

Municipal Code of Chicago § 1-20-020 .........................................................................21

Municipal Code of Chicago § 2-25-090 .....................................................................21, 22

Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively, "Distributors") move to dismiss the First Amended Complaint ("Complaint") dated May 10, 2018, and submit the following brief in support of the motion.

### PRELIMINARY STATEMENT

Unquestionably there is a public health crisis involving abuse of legal and illegal opioid drugs.  Plaintiff City of Chicago ("the City") alleges that it has been hard hit by the epidemic, and no doubt it has.  But, as the City knows from its experience with the problem of gun violence, not every social problem can be addressed by a lawsuit.  Twenty years ago, the City sued manufacturers and distributors of handguns, alleging that they oversupplied guns and seeking "compensation for the costs of emergency medical services, law enforcement efforts, the prosecution of violations of gun control ordinances, and other related expenses" incurred as the result of the increased gun violence in the City.  *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1106 (Ill. 2004).  The Illinois Supreme Court noted that "[t]he tragic personal consequences of gun violence are inestimable[, and t]he burdens imposed upon society as a whole in the costs of law enforcement and medical services are immense." *Id.* at 1105.  Yet, applying basic principles of nuisance law, duty, causation, derivative injury, and economic loss, as well as the municipal cost recovery rule, the court nevertheless dismissed the City's claims.

This case is, in many respects, a repeat of *Beretta*, and the outcome should be the same. Just as it did with guns in *Beretta*, the City claims that the "widespread availability and use of [opioids] is a national problem" and that in Chicago, opioids have created "a threat to [the City's] health, welfare, and safety" and generated a public nuisance.  *See id.* at 1107.  The City alleges, just as it did in *Beretta*, that "manufacturers and distributors knowingly oversuppl[ied] or 'saturate[d] the market' with their products," which allowed opioids to be misused.  *See id.* at 1108.  The City also claims, just as it did in *Beretta*, that Distributors failed "to exercise

1

reasonable care to prevent their [opioids] from ending up in the hands of persons who use and possess them illegally."  *Id.* at 1109.  But, just as in *Beretta*, the City cannot state a claim for public nuisance because the City has not alleged interference with a "public right," and the City has not adequately pled that Distributors' conduct proximately caused the City's alleged injuries. The City cannot state a negligence claim against Distributors because, in addition to the lack of proximate cause, Distributors do not owe the City any cognizable legal duties.  The City's claims also are barred by the economic loss and free public services doctrines, just as in *Beretta*. Indeed, in subsequent litigation against several lead paint manufacturers, the City "conceded that under *Beretta* it is foreclosed from seeking economic damages … in the absence of physical harm to city property or other direct injury."  *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 129 (Ill. App. Ct. 2005).  For these reasons, and the additional reasons explained below, the City's claims fail as a matter of law.[1]

## BACKGROUND

This action was filed by the City of Chicago on March 5, 2018 against (i) Distributors and (ii) "National Retail Pharmacies."  Compl. ¶¶ 33–45.  The City's Complaint asserts similar claims on similar grounds to those asserted by Summit County, Ohio in its complaint.  The City, like Summit County, asserts claims for public nuisance, negligence, unjust enrichment, and civil conspiracy.  Unlike Summit County, however, the City does not allege a RICO claim, but does allege claims for consumer fraud and violation of Illinois's Drug Dealer Liability Act.[2]

---

[1]  Distributors hereby adopt, as if set forth herein, the arguments made in support of the separate motions to dismiss filed today by the retail pharmacy defendants and on May 25, 2018 by the manufacturer defendants in Case No. 1:17-op-45169.  Unless otherwise noted, this Memorandum adds all emphasis in quotations and omits from quotations citations and internal quotation marks.

[2]  Distributors incorporate as if fully set forth herein (1) the federal "Regulatory Background" section and (2) the "Legal Standard" sections of their *Summit County* brief.  Dkt. 491-1 at 3–7.

2

**ARGUMENT**

**I.    THE PUBLIC NUISANCE CLAIM SHOULD BE DISMISSED.**

Courts throughout the country have rejected efforts by creative plaintiffs to transform public nuisance into an all-purpose remedy.  *See* Distributors' Mem. in Supp. of Mot. to Dismiss Summit Cnty. Second Am. Compl., Dkt. 491-1 (May 25, 2018) ("Summit Br.") at Part II. Nowhere is that more evident than in Illinois.  Illinois courts, including the Supreme Court, rejected the City of Chicago's prior two attempts to hold product distributors liable under a public nuisance theory.  *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126 (Ill. App. Ct. 2005).  The public nuisance claim advanced by the City in this lawsuit is essentially identical to those already rejected by the Illinois Supreme Court and should be dismissed.

**A.    The City Has Not Alleged Interference with a Public Right.**

Like Ohio, and virtually every other state, Illinois requires that a ***public*** nuisance claim involve invasion of a ***public*** right.  *Beretta*, 821 N.E.2d at 1114.  The Complaint does not even attempt to allege interference with any public right; the most it offers is a conclusory assertion that Distributors' conduct has "unreasonably interfered with the health, safety, peace, comfort, and convenience of the general public."  Compl. ¶ 252.  This allegation fails to allege a public right for the reasons explained in the *Summit County* brief, Dkt. 491-1 at Part II.B.1, and by the Illinois Supreme Court in *Beretta*.

In *Beretta*, the City alleged that the distributor defendants' conduct interfered with "the public's health, welfare and safety."  821 N.E.2d at 1114.  The Illinois Supreme Court concluded, however, that "there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by [the City]."  *Id.* at 1116.  Two particular concerns drove the Court's conclusion.  First, the Court suggested that the City's alleged harm

"was harm to individual members of the public, not to the public generally." *Id.* at 1115. The City alleged damages arising out of "crime, death and injuries to Chicago citizens," and the Court questioned whether "the public right asserted by plaintiffs is merely an assertion, on behalf of the entire community, of the individual right not to be assaulted." *Id.* at 1115–16 (citing Restatement (Second) of Torts § 821B cmt. g (Am. Law Inst. 1979) (a public right is "not like the individual right that everyone has not to be assaulted")). By contrast, where Illinois courts have found public nuisances, "[s]uch nuisances have affected the public generally." *Id.* at 1114 (citing cases involving "vicious dogs, the storage of explosives … disorderly houses, unruly taverns, and dance halls … odors, fumes, dust, and other sources of pollution"). In the Court's view, the City's alleged "public right"—which is identical to the one pled here—was "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it." *Id.* at 1116.

Second, the Court questioned "whether there is a public right, as opposed to an individual right, to be free from the threat of illegal conduct by others." *Id.* at 1114. To illustrate this concern, the Court drew an analogy to drunk driving. *Id.* at 1116. Alcohol consumption is legal, but driving under the influence is a crime. "If there is [a] public right to be free from the threat that others may use a lawful product to break the law, … [t]his public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars … all of whom could be said to contribute to an interference with the public right." *Id.* The Court noted that other products, like cell phones and DVD players, may be misused by drivers, and some state legislatures have banned their use on the road. "A public right to be free from the threat that [others] may defy these laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and

retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others." *Id.*  For this reason, the Court declined to recognize "a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another." *Id.*  There is even less reason to recognize as a ***public*** right an individual's right to be free from the threat that he may use an otherwise legal product (prescription opioids) to harm ***himself***.

The Attorney General of the United States is authorized to regulate distribution of lawful prescription opioids, *inter alia*, 21 U.S.C. § 821, and to determine the "total quantity and establish production quotas" for prescription opioids to meet the "estimated medical, scientific, research, and industrial needs of the United States." *Id.* § 826(a).  The City's alleged harm necessarily depends on individuals misusing or abusing lawful products, and under *Beretta*, there is no public right to be free from misuse of otherwise lawful products.

## B. The City Cannot Regulate Products—Especially Products That Already Are Heavily Regulated—Through Public Nuisance Litigation.

The City's claim fails for the additional reason that, as the Illinois Supreme Court held with respect to guns, "there are strong public policy reasons to defer to the legislature in the matter of regulating the manufacture, distribution, and sale of" prescription opioids. *Beretta*, 821 N.E.2d at 1121.

The Illinois Supreme Court's decisions dismissing the gun cases—*Beretta* and *Young v. Bryco Arms*, 821 N.E.2d 1078 (Ill. 2004), in which estates of individuals killed through gun violence sued firearms manufacturers, distributors, and retailers—were borne out of its "reluctan[ce] to interfere in the lawmaking process in the manner suggested by plaintiffs, especially when the product at issue is already so heavily regulated by both the state and federal

governments." *Beretta*, 821 N.E.2d at 1121; *see also Bryco Arms*, 821 N.E.2d at 1091.  The court noted that, "despite the existence of numerous statutes declaring various practices and conditions to constitute public nuisances, we have no indication from the legislature that it would be inclined to impose public nuisance liability for the sale of a product that may be possessed legally by some persons, in some parts of the state." *Beretta*, 821 N.E.2d at 1121.

The Supreme Court acknowledged that "an analysis of the harm caused by firearms versus their utility is better suited to legislative fact-finding and policymaking than to judicial assessment," *id.* at 1121, and on that basis rejected the City's "attempt to regulate firearms and ammunition through the medium of the judiciary." *Id.* at 1120–21 (quoting *Penelas v. Arms Tech., Inc.*, 778 So. 2d 1042, 1045 (Fla. Dist. Ct. App. 2001)).  The same result is warranted here.  The regulation of opioid medications is a complex matter of federal regulation and public policy.  The medications are designed to bring vital pain relief to patients, but if misused, can cause injury, addiction, or death.  The charge of regulators is to balance the legitimate medical need of patients against the risk of diversion into illegitimate channels.  Each policy decision by FDA, the U.S. Attorney General and DEA—i.e., the determination that prescription opioids are safe and effective for their intended use, how many pills are authorized, how "suspicious orders" are defined, how violations are policed—demands specific expertise, as each decision directly affects the supply of opioids.  Permitting the City to regulate through the medium of the judiciary would undermine the ability of statutorily authorized officials to balance the risks and benefits of prescription opioids.  *See Ringo v. Lombardi*, No. 09-4095-CV-C-NKL, 2010 WL 3310240, at *3 (W.D. Mo. Aug. 19, 2010) ("The bottom line is that Congress provided specific means of remedying CSA violations via the Attorney General.").

## II.      THE NEGLIGENCE CLAIM SHOULD BE DISMISSED.

The City's negligence claim, which focuses on Distributors' alleged failure to monitor pharmacy orders and to report or halt suspicious orders, Compl. ¶¶ 48–66, 297–300, fails for the same reasons that Summit County's negligence claim fails—namely, [1] failure to plead the existence of a legal "duty owed by the defendant to the plaintiff, [2] a breach of that duty, and [3] injury proximately resulting from the breach." *Bruns v. City of Centralia*, 21 N.E.3d 684, 688–89 (Ill. 2014); Summit Br., Dkt. 491-1 at Part III.B.

As in *Summit County*, the City's negligence claim rests on an alleged duty to halt or report suspicious pharmacy orders.  As in *Summit County*, the City's claim fails because these alleged duties are purportedly imposed by federal regulations that are not enforceable by a private right of action, are unknown at common law, and do not run to the City.

### A.      There Is No Private Right of Action.

As set forth in the *Summit County* brief, it is well established that the federal CSA does not create a private right of action.  *See* Dkt. 491-1 at Part III.B.1.

The City also alleges that Distributors violated the state law analogue, the Illinois Controlled Substances Act ("ICSA").  But the ICSA does not require reporting of suspicious orders to any state or local authority.  720 Ill. Comp. Stat. 570/100 *et seq.*  In any event, it is clear that the ICSA does not create a private right of action.  The Act makes clear that the legislature vested exclusive authority for enforcement of its provisions with the Department of Financial and Professional Regulation ("DFPR").  *See* 720 Ill. Comp. Stat. 570/501.  The ICSA requires the DFPR to license "an applicant to manufacture, distribute or dispense controlled substances … unless it determines that the issuance of that license would be inconsistent with the public interest."  *Id.* § 570/303(a).  The ICSA sets forth factors for the Department to consider in

7

issuing a license, including "maintenance of effective controls against diversion of controlled substances into other than lawful medical, scientific, or industrial channels." *Id.*

The ICSA expressly grants the power to enforce the provisions of the Act to "the [DFPR] and the Illinois State Police, and their agents, officers, and investigators." *Id.* § 570/501(a).  Any "agent, officer, investigator or peace officer" that the DFPR designates may "(1) make seizure of property pursuant to the provisions of this Act; and (2) perform such other law enforcement duties as the Secretary shall designate." *Id.* § 570/501(e).[3]  In addition to the ICSA, the Illinois Administrative Code sets forth certain requirements for storage, handling, and recordkeeping related to controlled substances.  Ill. Admin. Code tit. 68, § 1510.50.  Distributors also must comply with all applicable federal, state, and local laws and regulations, including "all applicable … DEA regulations." *Id.* § 1510.50(i).  The DFRP has the authority to "suspend, revoke or take other disciplinary action against any licenses granted [to wholesale distributors]." *Id.* § 1510.40(a).  Nowhere does the Act permit a city to bring a private action to enforce the ICSA.

Nor is there any basis for the Court to recognize an implied private right of action under the ICSA.  "To determine whether a statute creates a private right of action, the court must focus on the intent of the legislature.  When a statute does not expressly grant a private right of action, the court should infer a private cause of action cautiously." *McNeil v. Carter*, 742 N.E.2d 1277, 1280 (Ill. App. Ct. 2001).  Before a private cause of action will be inferred, the plaintiff must demonstrate that: "(1) the plaintiff is a member of the class for whose benefit the legislature enacted the statute; (2) the statute was designed to prevent the plaintiff's injury; (3) a private

---

[3]  The ICSA permits the State's Attorneys to "prosecute violations of this Act and institute legal proceedings authorized under [the] Act."  720 Ill. Comp. Stat. 570/501(e).  The Act also permits the Director or Secretary of the DFPR to file a complaint seeking injunctive relief. *Id.* 570/503.  Neither provision authorizes this lawsuit seeking money damages filed by the City of Chicago's Corporation Counsel, the City's Department of Law, and private contingency-fee attorneys.

right of action is consistent with the statute's underlying purpose; and (4) implying a private right of action is necessary to provide an adequate remedy for violations of the statute." *Id.* "In ascertaining legislative intent, a court first considers the language of the statute itself, as that is the best indication of the drafters' intent." *Moore v. Lumpkin*, 630 N.E.2d 982, 989 (Ill. App. Ct. 1994).

Nothing in the ICSA indicates that the statute was enacted for the benefit of municipalities or that it was designed to prevent municipalities from increased spending on public services.  Implying a private right of action also would be inconsistent with the regulatory scheme set forth in the statute and is unnecessary to provide an adequate remedy for violations of the statute because the DFPR is empowered to enforce the provisions of the ICSA and to determine whether to file a complaint or take other disciplinary action when the ICSA is allegedly violated.  The ICSA also includes provisions for enforcement by the State's Attorneys. A private right of action therefore should not be implied.  *See, e.g.*, *NBD Bank v. Krueger Ringier, Inc.*, 686 N.E.2d 704, 709 (Ill. App. Ct. 1997) ("[T]here is no clear need for civil actions under the statute; the existing legislative scheme [of the Illinois Environmental Protection Act] which provides for prosecution by the State of Illinois and allows contribution claims against third-party violators more than adequately serves the purpose of the statute, which is to protect the environment and minimize environmental damage."); *Moore*, 630 N.E.2d at 995 ("[A]n implied private right of action is inconsistent with the legislature's purpose to establish a regulatory scheme under the direction of the Department of Public Health and its ultimate function of protecting the public from the spread of disease in epidemic form [through the Department of Public Health Act].").

**B.**      **There Is No Common Law Duty To Monitor and Report Suspicious Orders.**

The City cannot plead around the absence of a private right of action by conflating the *federal regulatory* duty to report suspicious orders with a *state common law* duty.  *See* Summit Br., Dkt. 491-1 Part III.B.2–4.  Illinois courts have rejected similar attempts to create a statutory right of action by imposing common law liability for a statutory violation in circumstances where no common law duty exists.  *See, e.g.*, *Varela ex rel. Nelson v. St. Elizabeth's Hosp. of Chi., Inc.*, 867 N.E.2d 1 (Ill. App. Ct. 2006).

*Varela* concerned the Illinois Abused and Neglected Child Reporting Act ("Reporting Act"), which provides that physicians and other enumerated persons "having reasonable cause to believe a child known to them in their professional or official capacity may be an abused child or a neglected child shall immediately report or cause a report to be made to the Department [of Children and Family Services]."  325 Ill. Comp. Stat. 5/4.  The question in *Varela* was whether an emergency room physician and nurses owed a common law duty of care to their minor patient to discover a past injury and report it as suspected child abuse, which might have prevented the physical abuse later inflicted by the child's father.  867 N.E.2d at 2.  The Appellate Court noted that the child and his mother were asking the court "to create a new common law cause of action for violating the statute at issue."  *Id.* at 13.  Emphasizing that "Illinois state and federal courts ha[d] soundly rejected previous attempts to imply a private cause of action from the statutory language" of the Reporting Act, the court held that it had "no legal basis or authority to create common law liability for a statutory violation."  *Id.* ("[Plaintiffs'] common law action was based on the breach of a duty that does not exist.").[4]

---

[4]      Courts have previously declined to impose similar duties on pharmacists under the ICSA.  *See Hernandez v. Walgreen Co.*, 49 N.E.3d 453, 463 (Ill. App. Ct. 2015) ("[The ICSA] simply does not require any pharmacy to make use of the prescription monitoring program, let alone impose a duty to actively monitor a patient's history to detect abnormally large or frequent prescriptions."); *Eldridge v.*

The reasoning of *Varela* is fatal to the City's claim.  A federal regulation under the CSA provides that distributors must report suspicious orders to the DEA.  *See* 21 C.F.R. § 1301.74(b).  But, just as in *Varela*, there is no legal basis or authority to create common law liability for that regulatory violation.  *See id.*; *see also Union Cnty. v. MERSCORP, Inc.*, 920 F. Supp. 2d 923, 927, 932 (S.D. Ill. 2013) (dismissing complaint because Illinois' Conveyance Act does not create a private right of action for failure to record and plaintiffs cannot attempt to "sidestep" the absence of that right by filing common law claims), *aff'd*, 735 F.3d 730 (7th Cir. 2013); *Doe ex rel. Doe v. White*, No. 08-cv-2169, 2009 WL 268823, at *7 (C.D. Ill. Feb. 3, 2009) ("Defendant owed no duty to Plaintiff under the common law and Plaintiff has no private cause of action against Defendant under [the Illinois Reporting Act] based on Defendant's failure to report.  Accordingly, the Court recommends dismissing the claim [for negligent failure to report]."), *aff'd sub nom. Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507 (7th Cir. 2010).

Nor can the City rely upon its allegation that "Defendants['] conduct was negligence *per se*" to create a common law duty where none exists.  *See* Compl. ¶ 313.  Even if the cited statutes and regulations could be viewed as establishing ***a standard of care***, it would not follow that Distributors owed the City ***a duty of care***.  "[T]he mere fact that a statute defines due care does not in and of itself create a duty enforceable by tort law," *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) (Posner, J.) (emphasis omitted), let alone create a tort-law duty running to an entity nowhere mentioned in the statute.  The City has no special place in the federal or state regulatory schemes cited in the Complaint; and even if it did, those schemes do not create duties

---

*Eli Lilly & Co.*, 485 N.E.2d 551, 554–55 (Ill. App. Ct. 1985) ("[A] pharmacist has no common law or statutory duty to refuse to fill a prescription simply because it is for a quantity beyond that normally prescribed or to warn the patient's physician of that fact.").

enforceable by tort law.  *Cf. Eldridge*, 485 N.E.2d at 554–55 ("[A] pharmacist has no common law … duty to refuse to fill a prescription simply because it is for a quantity beyond that normally prescribed or to warn the patient's physician of that fact.").

Finally, the City's negligence claim is predicated on the alleged intervening criminal conduct of third parties.  *See* Compl. ¶¶ 302–304 (describing, *inter alia*, "an illegal, secondary opioid market").  As Distributors explained in the *Summit County* brief, there is no duty to control the actions of third parties absent a "special relationship."  *See* Dkt. 491-1 at Parts III.B.4, IV.C; *see also Martino v. Leiva*, 479 N.E.2d 955, 957 (Ill. App. Ct. 1985) (Any "duty to control another's conduct to prevent injury to a third party must be based upon a special relationship."); *Vesely v. Armslist, LLC*, No. 13 CV 00607, 2013 WL 12323443, at *2 (N.D. Ill. July 29, 2013) ("In general, one has no duty to control the conduct of another to prevent him from causing harm to a third party, but there are exceptions to this, based on 'special relationships.'"); *Geimer v. Chi. Park Dist.*, 650 N.E.2d 585, 589 (Ill. App. Ct. 1995) ("The foreseeability of intentional misconduct by a third party does not itself create any duty without a special relationship."); *Mayer v. United States*, No. 89 C 3468, 1989 WL 152671, at *8 (N.D. Ill. Dec. 4, 1989) ("special relation[s]" occur only in limited circumstances such as where one "takes charge of a third person").  Here, the City alleges no special relationship that could impose on Distributors a duty to control the conduct of third parties.[5]

---

[5] The City's allegation of gross negligence, Compl. ¶¶ 295–325, is also unavailing.  Illinois law does not recognize a distinction between negligence and gross negligence, let alone provide that allegations of gross negligence eliminate the need to establish that the defendant owed the plaintiff a common law duty.  *See Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979) ("Illinois does not recognize gross negligence as an independent ground for recovery."); *Mercury Skyline Yacht Charters v. Dave Matthews Band, Inc.*, No. 05 C 1698, 2005 WL 3159680, at *10 (N.D. Ill. Nov. 22, 2005) ("[L]ongstanding Illinois Supreme Court precedent instructs that the authorities establish the proposition that the rights of the parties are not affected by any question of the degree of … negligence.  Courts generally have interpreted [this holding] as eliminating the cause of action for gross negligence in Illinois.").

Under analogous circumstances in *Beretta*, the Illinois Supreme Court concluded that manufacturers and distributors of firearms had "no duty to the city of Chicago or its residents to prevent their firearms from 'ending up in the hands of persons who use and possess them illegally.'"  821 N.E.2d at 1126.  The Court explained that to "judicially impos[e] a duty upon commercial enterprises to guard against the criminal misuse of their products by others [would] be an unprecedented expansion of the law of public nuisance."  *Id.*  The same conclusion is warranted here:  wholesale distributors owe no duty to the City or its residents to prevent FDA-approved prescription medicines from ending up in the hands of people who use them illegally.

## III.  THE NUISANCE AND NEGLIGENCE CLAIMS SHOULD BE DISMISSED FOR ADDITIONAL REASONS.

In addition to the defects identified above, both the nuisance and negligence claims should be dismissed because the City has not adequately alleged proximate cause, and the claims run afoul of the economic loss and free public services doctrines.

### A.  The City Has Not Adequately Alleged Proximate Causation.

The Illinois Supreme Court's dismissal, on the pleadings, of the handgun cases for lack of proximate cause compels the conclusion that the City's nuisance and negligence claims against Distributors should be dismissed.  In *Beretta*, the City of Chicago brought public nuisance claims against handgun dealers, alleging that their negligence caused the City to incur increased costs arising from gun violence.  The Supreme Court rejected that claim, explaining that "[i]f a defendant's breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury."  821 N.E.2d at 1133; *see also id.* at 1137 ("[T]he existence of the alleged nuisance in the city of Chicago is several times removed from the initial sale of individual weapons by these defendants.").  So too here:  because the

13

independent actions of others who misuse or divert opioids after the medicines are delivered by wholesalers to retail pharmacies is the immediate cause of the City's claimed injury, and Distributors are several times removed from that immediate cause, the proximate causation requirement cannot be satisfied, and Plaintiff's claim must fail.  *See also Am. Cyanamid*, 823 N.E.2d at 139 (holding defendants' sale of a lawful product "cannot be a legal cause of plaintiff's complained-of injury, where the hazard only exists because Chicago landowners continue to violate laws that require them to remove deteriorated paint" (emphasis omitted)).

*Bryco Arms* is also instructive.  There, the Supreme Court dismissed claims brought by plaintiffs—namely, the estates of individuals killed from gun violence—who were one link **closer** in the causal chain than the City.  *See* 821 N.E.2d at 1080.  According to the Supreme Court, the question was whether "the business practices of [firearm dealers] should be deemed a legal cause of the nuisance, even though it results from the cumulative effect of numerous criminal acts by many third parties."  *Id.* at 1090.  As the Court recognized, those dealers (1) operated businesses that were "highly regulated" and (2) were "in the business of providing a lawful product that may be used unlawfully."  *Id.*.  While the court acknowledged that that the actions of the dealers could be said to "create a condition that makes the eventual harm possible," the Court held as a matter of Illinois law that their conduct "***cannot constitute a legal cause of the alleged nuisance***."  *Id.* at 1091.  As the Court explained, the handgun dealers could not be held liable because "the person whose criminal conduct directly caused the injury … was several steps removed from the defendant."  *Id.* at 1090.

Distributors of prescription opioids likewise are "in the business of providing a lawful product that may be used unlawfully, causing injury or death."  *Id.*  That business, too, is "highly regulated by law."  *Id.*  And, as in *Bryco Arms*, several independent actors and events stand

14

between Distributor's alleged conduct and the City's alleged harm.  Indeed, the chain of causation is even lengthier here than in *Bryco Arms*:  Unlike handgun dealers, who sell directly to consumers, Distributors sell to pharmacies, which, in turn, are responsible for dispensing to those consumers who present a legitimate prescription.  And, unlike the victims of gun violence who sued directly in *Bryco Arms*, the plaintiff here is the City, which sues derivatively to recover losses allegedly incurred as a result of personal injuries to its residents.  Accordingly, even more so than in *Bryco Arms*, Distributors' alleged conduct "cannot constitute a legal cause" of the City's alleged injury.  *Id.* at 1091; *see also* Summit Br., Dkt. 491-1 at Part IV.C.

This conclusion is further reinforced by *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1047–48 (Ill. App. Ct. 2004).  There, Cook County and the State of Illinois alleged that "they were injured by the defendants' conspiracy to cover up the effects of smoking in order to sell more cigarettes to [smokers], resulting in additional health costs to the plaintiffs, who provided the medical care necessary to treat the people who smoked."  *Id.* at 1047.  The Appellate Court affirmed the dismissal on remoteness grounds, explaining:

> The fact that the tobacco consumers have filed their own suits against defendants, such as the ones in this case, illustrates the indirectness of the injury suffered by the plaintiffs in this case.  The plaintiffs' position is virtually identical to that of an insurance company seeking to recoup its medical payments to its insured from the party at fault.  The insurance company must proceed via a subrogation action or not at all, as must these plaintiffs…. [G]*iven the derivative nature of the injuries alleged in the plaintiffs' second amended complaint, it was correctly dismissed on the basis of the remoteness doctrine*.

*Id.* at 1048; *see also Int'l Bhd. of Teamsters Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656, 662 (N.D. Ill. 1998) ("The Funds' alleged injury is far too attenuated from the alleged manipulation of the tobacco market.  The individual members, and not the Funds themselves, consumed tobacco products and relied on the defendants' allegedly false representations and product manipulation.  Moreover, even if the individual members'

injuries could be imputed to the Funds, the court would have to assume the existence of far too many variables to conclude that they were proximately caused by the tobacco industry."), *aff'd*, 196 F.3d 818 (7th Cir. 1999). The City's Complaint here suffers from the same infirmity and should be dismissed.  *See also* Summit Br., Dkt. 491-1 at Part IV.C.[6]

> **B.    The Economic Loss Doctrine Bars the City's Claims.**

"At common law, solely economic losses are generally not recoverable in tort actions."  *In re Chicago Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997).  "One of the policies behind the economic loss rule is the recognition that the economic consequences of any single accident are virtually limitless."  *Id.*  This is because, "[i]f defendants were held liable for every economic effect of their negligence, they would face virtually uninsurable risks far out of proportion to their culpability, and far greater than is necessary to encourage potential tort defendants to exercise care in their endeavors."  *Id.*  "The economic loss rule avoids the consequences of open-ended tort liability."  *Id.*; *see also Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868, 873 (Ill. App. Ct. 2016).

A plaintiff asserting claims predicated upon alleged defects in a product—like the City here, *see supra* at 1–2, 15–16— cannot recover solely for economic loss under the tort theories of strict liability and negligence.  *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982).  "The rationale behind the *Moorman* doctrine is that tort law provides a remedy for losses from personal injuries or property damage, and contract law and the Uniform Commercial Code (UCC) provide remedies for economic losses resulting from diminished commercial

---

[6]    As set forth more fully in the manufacturing defendants' *Summit County* brief, the City's claims are also too speculative to satisfy but-for causation because it has not alleged any facts suggesting that, had Distributors reported suspicious orders to the DEA, then the DEA would have relied on those reports and taken action that would have prevented opioid diversion.  *See* Dkt. 499-1 at 28–29.  Nor has the City alleged that, if one of the Distributors (or even all three) had refused to ship any particular order to a pharmacy, that pharmacy would not otherwise have been able to acquire the medications.

expectations without personal injury or property damage." *Hecktman*, 59 N.E.3d at 872–73 (citing *Moorman Mfg. Co.*, 435 N.E.2d at 452).

In similar litigation against lead-paint companies, the City conceded that the economic loss doctrine foreclosed its right to seek compensation for government expenditures.  While the City's lead-paint case was pending on appeal, the Illinois Supreme Court decided *Beretta*. Applying *Moorman*, the Supreme Court held that the City of Chicago could not recover economic losses absent "physical harm to city property or other direct injury."  821 N.E.2d at 1139–43.  The City of Chicago sought "compensation for the costs of emergency medical services, law enforcement efforts, the prosecution of violations of gun control ordinances, and other related expenses."  *Id.* at 1106.  Following a careful analysis of the doctrine under Illinois law, the Court concluded that the City's damages against firearm manufacturers and distributors were economic in nature and thus not recoverable under the economic loss doctrine.  *Id.* at 1139–43.  Then, in the pending lead-paint appeal, the court of appeals directed the parties "to address the effect, if any, that *Beretta* had on their respective positions."  *Am. Cyanamid*, 823 N.E.2d at 129.  The City dropped its request for compensatory damages, "conced[ing] that under *Beretta* it is foreclosed from seeking economic damages."  *Id.* ("Therefore, plaintiff no longer seeks monetary damages to compensate it for costs incurred in past lead-abatement efforts.").

According to the Complaint, the City does not seek to recover for any physical injury to its person or property.  Instead, it repeatedly references various economic harms, including the "costs" of emergency response services, addiction treatment, municipal programs, equipment, and wages and benefits.  Compl. ¶¶ 19, 290, 368.  These are identical to the alleged damages sought in *Beretta*, and which the City conceded in *American Cyanamid* are foreclosed by the economic loss doctrine.  The economic loss doctrine therefore bars the City's negligence and nuisance claims.

17

C.     **The Free Public Services Doctrine Bars the City's Claims.**

The City's claims are also barred by the "free public services doctrine," which precludes

municipalities from recovering in tort for the cost of providing public services to their citizens.

The leading case articulating the free public services doctrine—also known as the

municipal cost recovery rule—is *City of Flagstaff v. Atchison, Topeka & Santa Fe Railway Co.*,

719 F.2d 322 (9th Cir. 1983), in which a city attempted to recover emergency response costs

from an allegedly negligent railway after a derailment caused an explosion.  As the Ninth Circuit

explained, where public services

> are provided by the government and the costs are spread by taxes, the tortfeasor
> does not expect a demand for reimbursement.  This is so even though the
> tortfeasor is fully aware that private parties injured by its conduct, who cannot
> spread their risk to the general public, will have a cause of action against it for
> damages proximately or legally caused.

*Id.* at 323 (applying Arizona law).  Thus, the Court held that municipalities may not recover for

the "normal provision of police, fire, and emergency services."  *Id.* at 324.

In *Beretta*, the Illinois Supreme Court adopted the free public services doctrine.  The

Court held that claims brought by the City against gun manufacturers and distributors seeking to

recover compensation for law enforcement and medical expenditures incurred as a result of gun

violence were barred by the rule.  821 N.E.2d at 1147.  In so doing, the Court explained that the

doctrine precludes claims by municipalities even where they allege "ongoing misconduct is so

pervasive that it creates a public nuisance."  *Id.* at 1146.  According to the Court, "allowing

recovery of the costs of routine police and other emergency services could have significant

unintended consequences."  *Id.* at 1145.

*Beretta* is consistent with the weight of authority from other jurisdictions.  For example,

the rule in New York is that "public expenditures made in the performance of governmental

functions are not recoverable."  *Koch v. Consol. Edison Co.*, 468 N.E.2d 1, 7–8 (N.Y. 1984).  On

18

that basis, the State's highest court rejected an attempt by New York City "to recover costs incurred for wages, salaries, overtime and other benefits of police, fire, sanitation and hospital personnel from whom services (in addition to those which would normally have been rendered) were required" as a result of the defendant's alleged negligence. *Id.*[7]

---

[7]  *See State v. Black Hills Power, Inc.*, 354 P.3d 83, 86–87 (Wyo. 2015) ("We are convinced that the reasons for the common law's free public services doctrine as articulated in *City of Flagstaff, District of Columbia* and similar cases are sound. Accordingly, like many other jurisdictions, we adopt the free public services doctrine." (footnote omitted)); *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979–80 (9th Cir. 2008) (observing that "common law doctrine barring government recovery of the costs of public safety services in tort[s] supports" holding that "costs of [] law enforcement and public health care services are not recoverable damages under civil RICO"); *Walker Cnty. v. Tri-State Crematory*, 643 S.E.2d 324, 327 (Ga. Ct. App. 2007) ("Georgia, like many jurisdictions, has adopted the common-law free public services doctrine." (footnote omitted)); *Baker v. Smith & Wesson Corp.*, No. Civ.A 99C-09-283-FS, 2002 WL 31741522, at \*4–5 (Del. Super. Ct. Nov. 27, 2002) (adopting "the general rule in force in other jurisdictions [] that 'public expenditures made in the performance of governmental functions are not recoverable' from a tortfeasor in the absence of a specific statute" (footnotes omitted) (quoting *Koch*, 62 N.Y.2d at 8)); *City of Philadelphia v. Beretta U.S.A., Inc.*, 126 F. Supp. 2d 882, 895 (E.D. Pa. 2000) ("The City routinely provides police and law enforcement to protect its citizens from criminals who use guns and some health services to victims of youth firearm violence. These unquestionably are municipal costs which cannot be recovered."), *aff'd on other grounds*, 277 F.3d 415 (3d Cir. 2002); *Penelas v. Arms Tech., Inc.*, No. 99-1941 CA-06, 1999 WL 1204353, at \*2 (Fla. Cir. Ct. Dec. 13, 1999) ("[T]he County's claim for damages, based on the costs to provide 911, police, fire and emergency services [in response to gun violence] effectively seeks reimbursement for expenditures made in its performance of governmental functions. Costs of such services are not, without express legislative authorization, recoverable by governmental entities."), *aff'd on other grounds*, 778 So. 2d 1042 (Fla. App. 2001); *Ganim v. Smith & Wesson Corp.*, No. CV9901531985, 1999 WL 1241909, at \*6 & n.7 (Conn. Super. Ct. Dec. 10, 1999) (noting "general rule prohibiting recoupment of municipal expenditures"), *aff'd*, 780 A.2d 98 (Conn. 2001); *Bd. of Supervisors of Fairfax Cnty. v. U.S. Home Corp.*, No. 85225, 1989 WL 646518, at \*2–3 (Vir. Cir. Ct. Aug. 14, 1989) (adopting "general rule that a municipal corporation may not recover for emergency services rendered in situations caused by a private tortfeasor"); *County of San Luis Obispo v. Abalone All.*, 223 Cal. Rptr. 846, 851 (Ct. App. 1986) ("a government entity may not, as the County seeks to do in this case, recover the costs of law enforcement absent authorizing legislation"); *City of Pittsburgh v. Equitable Gas Co.*, 512 A.2d 83, 84 (Pa. Commw. Ct. 1986) ("[A] municipal corporation may not recover as damages the costs of services the provision of which was an important reason for its creation and maintenance by the people."); *Dist. of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984) (adopting rule against recovery of municipal costs; "where a generally fair system for spreading the costs of accidents is already in effect—as it is here through assessing taxpayers the expense of emergency services—we do not find the argument for judicial adjustment of liabilities to be compelling"); *Mayor & Council of City of Morgan City v. Jesse J. Fontenot, Inc.*, 460 So. 2d 685, 688 (La. Ct. App. 1984) (duty imposed on tortfeasors "to carefully handle flammable liquids does not include within the ambit of its protection the risk that public property and funds will be expended"); *N.C. Highway & Pub. Works Comm'n v. Cobb*, 2 S.E.2d 565, 567 (N.C. 1939) (law enforcement costs expended to capture fugitive not recoverable; "funds were legitimately spent for a public purpose, and there is no statute law, and certainly no common law principle, authorizing their

Here, the City brings suit not to recover any alleged damages to the City's own property, but instead as a "governmental entit[y] seeking to recover the costs of the services [it] routinely provide[s] to the public."  *Beretta*, 821 N.E.2d at 1145.  Specifically, it seeks to recover "expenses for police, emergency, health, prosecution, corrections, rehabilitation, and other services."  Compl. ¶¶ 281, 315.  These are precisely the sort of costs that were held to be non-recoverable in *Flagstaff*, *Beretta*, and numerous other cases.

To be sure, the City alleges that Defendants have created an ongoing nuisance and purports to seek "abatement of the public nuisance" as a remedy.  *See* Compl. ¶¶ 291, 293.  Conclusory labels aside, however, the police, medical, and other costs that the City seeks to recover are quintessential money damages, not abatement costs, and therefore cannot be recovered under the free public services doctrine.  *See Beretta*, 821 N.E.2d at 1147 ("money damages would not be available because the claimed damages do not represent the actual cost of abatement of the nuisance"); *accord Walker Cnty. v. Tri-State Crematory*, 643 S.E.2d 324, 328 (Ga. Ct. App. 2007) (rejecting "argument that there should be an exception to the free public services doctrine when the costs are incurred as part of the abatement of a public nuisance"; "[i]f such an exception were recognized, it would be the exception that swallows the rule, since many expenditures for public services could be re-characterized by skillful litigants as expenses incurred in abating a public nuisance"); *Baker v. Smith & Wesson Corp.*, No. Civ.A 99C-09-283-FS,l 2002 WL 31741522, at *6 (Del. Super. Ct. Nov. 27, 2002) ("[T]here is little basis for distinguishing between 'normal' municipal costs and other municipal costs.  A cost is either a municipal cost or it is not.").

---

recovery from this defendant"); *West Virginia v. St. Clair*, 355 S.E.2d 418, 420 (W. Va. 1987) ("Allowance and recovery of costs was unknown at common law, and therefore only costs specifically allowed by statute may be recovered.").

20

Finally, the City's reference to section 1-20-020 of the Municipal Code of Chicago ("MCC") cannot save its claims.  Through that provision, the City purports to reserve for itself the right to recover "costs" that it incurs "to provide services reasonably related to [the] violation of any federal, state or local law."  *See, e.g.*, Compl. ¶ 374 (citing MCC § 1-20-020).  The Complaint, however, wholly fails to establish that Distributors' alleged wrongdoing was the proximate cause of any particular item of cost purportedly incurred by the City.  *See supra* Part III.A.; *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1083 (N.D. Ill. 2016) (dismissing claim under section 1-20-020 because City failed to allege facts showing that opioid manufacturers' alleged misconduct "caused the City to incur costs").  At least absent any such allegations, Municipal Code section 1-20-020 does nothing to alter the bar imposed by the free public services doctrine.

## IV.    THE CONSUMER FRAUD CLAIM SHOULD BE DISMISSED.

The City brings a consumer fraud claim pursuant to section 2-25-090 of the Municipal Code of Chicago.  The sole alleged basis for that claim is that Distributors engaged in "unfair acts or practices" as that phrase is used in the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act").  *See* Compl. ¶¶ 360–362; MCC § 2-25-090(a) ("Any conduct constituting an unlawful practice under the [Consumer Fraud Act] … shall be a violation of this section.").  This claim fails for multiple overlapping reasons.

As a threshold matter, the City's consumer fraud claim fails because the Complaint does not adequately allege proximate causation.  In order to state a claim premised upon violations of the Consumer Fraud Act, the City must allege a "***direct*** relation between the injury asserted and the injurious conduct alleged."  *Philip Morris, Inc.*, 817 N.E.2d at 1043.  While this requirement may be relaxed when claims are asserted by the Attorney General, *see People ex rel. Madigan v. United Constr. of Am., Inc.*, 981 N.E.2d 404, 411 (Ill. App. Ct. 2012), it applies with full force to

claims asserted by municipalities such as the City, *see Philip Morris, Inc.*, 817 N.E.2d at 1042 ("[E]ven if a state has special rights of action, a political subdivision thereof is still subject to the proximate cause requirement.").  Here, as explained in Part III.A, above, the Complaint wholly fails to plead facts demonstrating that Distributors' alleged wrongdoing was a ***direct*** cause of the City's purported injury.

The claim also fails because the City does not allege ***consumer*** fraud or any other consumer-directed behavior.  The gravamen of the claim is that Distributors violated a regulatory duty to "maintain effective controls against opioid diversion."  Compl. ¶ 362.  But that is an obligation imposed by state and federal regulators, not a duty to consumers.  Indeed, Distributors have no dealings with consumers at all; they are middlemen that purchase pharmaceuticals from manufacturers and sell them to retail pharmacies.  The City can point to no authority authorizing it to stretch consumer fraud law far beyond its purpose of protecting consumers from unfair or deceptive merchandising practices to encompass the sort of regulatory violations alleged here.

Each of the "unfair practices" alleged in the Complaint also fails for additional reasons. The City alleges as "unfair practices" the failure of Distributors to take certain actions, such as the alleged failure to create and use "a compliance program that effectively detects and prevents suspicious orders."  *See* Compl. ¶ 362(a), (b), (d).  These allegations fail because the reach of the ordinance under which the City brings its claim is expressly limited to consumer fraud occurring "***in the city***."  MCC § 2-25-090(a); *see also id.* ("Nothing in this section shall be construed as permitting the regulation of any business to the extent that such regulation is not permitted under the statutory or home rule powers of the city.").  The Complaint does not allege any facts suggesting that the purported "acts or practices" alleged in the Complaint occurred in the City. Nor would any such allegation be plausible, given that Distributors are not Chicago residents or

citizens and do not operate distribution centers in Chicago.  *See* Compl. ¶¶ 34–40.  Accordingly, the Complaint fails to allege the required element of actionable conduct occurring ***in Chicago***. *See Commercial Nat'l Bank v. City of Chicago*, 432 N.E.2d 227, 243 (Ill. 1982) (holding that MCC provision purporting "to give extraterritorial effect to its taxing ordinance" was unconstitutional because it "exceeds the territorial limitations upon home rule powers found in" the Illinois constitution); *see also Village of Chatham v. County of Sangamon*, 837 N.E.2d 29, 45 (Ill. 2005) (explaining "cities have no jurisdiction beyond their corporate limits, and municipal ordinances are confined in their application to the territory of the municipality adopting them" unless the legislature has granted the city "special extraterritorial powers")."

The City next alleges that Distributors made misrepresentations regarding the effectiveness of their internal controls.  Compl. ¶ 362(e).  This allegation, too, fails to allege conduct occurring in Chicago.  It also runs afoul of the heightened pleading requirements applicable to averments of fraud under Rule 9(b).  There are no allegations in the Complaint about "when, how, and to whom in Chicago" Distributors' alleged misstatements were made. *City of Chicago v. Purdue Pharma L.P.*, No. 14 C 4361, 2015 WL 2208423, at *10 (N.D. Ill. May 8, 2015) (dismissing City's claim against opioid manufacturers because City did not allege factual details about any alleged misrepresentations).

Lastly, the City alleges that Distributors engaged in the "unfair practice" of "filling suspicious or invalid orders for prescription opioids," Compl. ¶ 362(c), but that is just a restatement of its negligence claim, not an unfair practice cognizable under the Consumer Fraud Act.  The Illinois Courts look to three factors set out by the United States Supreme Court in *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972), to determine whether a practice is unfair.  *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960

(Ill. 2002).  Under the first *Sperry* factor, the question is whether the alleged practice "offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness."  405 U.S. at 244 n.5.  Plainly, no established concept **of unfairness** is violated when a wholesaler delivers lawful goods to a retailer in exchange for the contractually-agreed payment.

The question under the second *Sperry* factor is whether the defendant's conduct was "oppressive," *see id.*, meaning that "it imposes a lack of meaningful choice or an unreasonable burden on the **consumer**," *W. Ry. Devices Corp. v. Lusida Rubber Prods., Inc.*, No. 06 C 0052, 2006 WL 1697119, at *5 (N.D. Ill. June 13, 2006).  Clearly, a wholesaler filling a retail pharmacy's order for an FDA-approved medicine does not impose a lack of meaningful choice on consumers—indeed, if anything, not filling the order would do so.

Under the third *Sperry* factor, the question is whether the alleged practice "cause[d] substantial injury to consumers."  405 U.S. at 244 n.5.  Distributors are middlemen.  They sell pharmaceutical products to retail pharmacies, not consumers.  Absent a doctor who writes a prescription, a patient who presents the prescription to a pharmacist, and a pharmacist who fills it, the products that wholesalers deliver would never reach consumers and could cause no harm.  Accordingly, the filling of wholesale orders by Distributors does not injure consumers.

In sum, Distributors are aware of no case holding that a wholesaler commits consumer fraud merely by fulfilling a retailer's "suspicious" order or by failing to maintain effective controls against diversion.  This Court should reject the City's invitation to be the first.

## V.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The City's unjust enrichment claim should be dismissed.  As a threshold matter, the City's unjust enrichment cause of action is based on the same alleged conduct underlying its

other claims and should be dismissed as duplicative.[8]

Even putting aside that threshold bar, the unjust enrichment claim fails because the Complaint does not adequately allege that Distributors have "unjustly retained a benefit to the [City]'s detriment." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). While the City alleges that it spent money on "the provision of healthcare services and treatment services," those expenditures conferred a benefit on resident opioid users, not Distributors. *See* Compl. ¶ 330.

According to the City, the expenditures conferred a benefit on Distributors by "paying for [their] externalities," i.e., the "cost of harms caused by Defendants' improper distribution practices." *Id.* ¶ 332. But that allegation cannot provide the necessary foundation for an unjust enrichment claim. Virtually every enterprise generates externalities. That, however, does not mean that the City could, for example, recover from fast food restaurants for increased health care costs associated with the consumption of their products via unjust enrichment. Nor could the City buy carbon offsets to pay for a delivery company's externalities (i.e., the release of carbon dioxide from their delivery trucks) and then seek to recoup those payments from the delivery service. This is because, unless a party has an independent legal obligation to pay for its own externalities, the party receives no benefit when someone else voluntarily elects to pay for them. *See, e.g.*, *Lewis v. Lead Indus. Ass'n Inc.*, 793 N.E.2d 869, 877 (Ill. App. Ct. 2003) ("In order for a cause of action for unjust enrichment to exist, there must be some independent basis which establishes a duty on the part of the defendant to act and the defendant must have failed to

---

[8]     *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516–17 (7th Cir. 2011) ("[I]f an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim [and] … will stand or fall with the related claim."); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("A claim of unjust enrichment 'is not a separate cause of action that, standing alone, will justify an action for recovery.'" (quoting *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009))).

abide by that duty.").  Absent an independent legal obligation on the part of Distributors to pay the medical bills of City residents (alleged nowhere in the Complaint), the City cannot take it upon itself to pay for the treatment of Chicago residents and then bill Distributors for its expenses via an unjust enrichment claim.

The City also has not properly alleged that its payments of healthcare and treatment costs are unjust or payment somehow "violates the fundamental principles of justice, equity, and good conscience," as Illinois law requires.  *HPI Health Care Servs., Inc.*, 545 N.E.2d at 679.  In Illinois, "public expenditures made in the performance of governmental functions" are understood to be the responsibility of state and local governments, which is why they are not recoverable.  *Beretta*, 821 N.E.2d at 1144.  Accordingly, it would not violate any fundamental principle of justice, equity, or good conscience for Chicago to bear those costs here.

## VI.      THE DRUG DEALER LIABILITY ACT CLAIM SHOULD BE DISMISSED.

The Illinois Drug Dealer Liability Act ("DDLA") claim is frivolous and demonstrates just how far the City is stretching the law in an attempt to hold Distributors legally responsible for the opioid epidemic.  The General Assembly created the DDLA to provide a cause of action for persons injured by *illegal* drug abuse who are typically unable to recover under existing tort law due to the "clandestine" nature of the illegal drug market.  *See* 740 Ill. Comp. Stat. 57/10(7).[9] The City's attempt to extend this statute to *legal* prescription opioid medications should be rejected for two reasons.  First and foremost, a prescription opioid medication is not an "illegal drug."  State and federal law expressly authorize distribution of these medications by licensed

---

[9]      *See* 740 Ill. Comp. Stat. 57/10(7) ("Unlike the chain of distribution for legal products, in which records identifying the parties to each transaction in the chain are made and shared among the parties, *the distribution of illegal drugs is clandestine.*  Its participants *expend considerable effort to keep the chain of distribution secret.*").

wholesalers like Distributors. Second, the City fails adequately to allege that Distributors "knowingly participated" in any "illegal drug market." The DDLA claim should be dismissed.

### A. A Prescription Opioid Medication Is Not an "Illegal Drug."

The Act defines an "[i]llegal drug" as "a drug whose distribution is a violation of State law," such as "cocaine, heroin, or methamphetamine." 740 Ill. Comp. Stat. 57/15. A prescription opioid medication is exactly the opposite of an "illegal drug." Federal and state laws *expressly authorize* distribution of these medications in light of their undeniable therapeutic benefits to numerous patients. *See* 21 U.S.C. § 812; 720 Ill. Comp. Stat. 570/206. Licensed Illinois physicians may lawfully prescribe opioid medications to their patients. Licensed wholesalers may lawfully distribute these medications to licensed pharmacies, which in turn may dispense them to patients pursuant to a lawful prescription from a doctor. The City does not allege otherwise, nor does it allege that Distributors ever distributed prescription opioids to anyone other than a licensed, DEA-registered pharmacy.

The City's only basis for claiming that prescription opioids are illegal is that Distributors allegedly "fail[ed] to comply with the CSA and ICSA." Compl. ¶ 389. But this alleged regulatory failure does not render "*the*[] *distribution of opioids* within the City illegal." *Id.* First, the City does not claim that every order of prescription opioids was suspicious, nor could it, because there is no dispute that there is legitimate medical need for prescription opioids. Indeed, every prescription opioid distributed by Distributors was manufactured pursuant to a quota set by the United States Attorney General based on medical and scientific need. 21 U.S.C. § 826(a). The City has not identified a single order filled by any Distributor that it claims was suspicious. Thus, even if a regulatory failure could render some otherwise lawful prescription drugs "illegal," the City has not adequately pled which opioids were "illegal" and which were "legal." Second, nothing in the statute or its legislative findings suggests that a distributor's non-

27

compliance with a regulatory requirement transforms a legal prescription medication into an "illegal drug," and neither the DEA nor the Board of pharmacy—whose regulations Distributors allegedly violated—have ever taken the position that failing to report some orders as "suspicious" renders a distributor's opioid shipments illegal.

### B.    Distributors Did Not "Knowingly Participate in an Illegal Market."

The City also fails to allege that Distributors "knowingly participate[d] in the illegal drug market," as is required to state a claim under the Act.  740 Ill. Comp. Stat. 57/20(a).

The Act describes an "illegal drug market" as "clandestine," wherein "participants expend considerable effort to keep the chain of distribution secret."  740 Ill. Comp. Stat. 57/10(7).  But Distributors distributed opioids only within a heavily-regulated closed distribution chain.  That system requires Distributors to record (and report to the DEA) every purchase and sale of opioid medications (separate and apart from the reporting of suspicious orders).  There is no allegation that they failed to do so.  Thus, the market for prescription opioids resembles not an "illegal drug market," but the "chain of distribution for legal products, in which records identifying the parties to each transaction in the chain are made and shared among the parties" described in the statute.  *See id.*[10]  There is no allegation that Distributors distributed opioids outside this closed system or did anything other than sell opioids to licensed, DEA-registered pharmacies.  Distributors have no control over—or even insight into—what happens to the prescription drugs they distribute to pharmacies.  Distributors do not know which patients receive them or what they do with them after filling their prescriptions.  The City alleges no facts

---

[10]  Nor would expanding the reach of the Drug Dealer Liability Act into the highly-regulated legal market for prescription opioids further the General Assembly's stated policy objectives.  The General Assembly has recognized that "[t]he market liability theory has been shown to be destructive of market initiative and product development when applied to legitimate markets.  *Because of its potential for undermining markets*, this Act adopts a legislatively crafted form of liability for those who intentionally join the illegal drug market."  740 Ill. Comp. Stat. 57/10(9).

suggesting otherwise.  Thus, while an "illegal drug market" for opioids may exist, the City has failed to allege that Distributors participated in it, much less did so "knowingly."

## VII.  THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

"Civil conspiracy is an intentional tort and requires proof that a defendant knowingly and voluntarily participate[d] in a common scheme to commit an unlawful act …."  *McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).  To state a cause of action for civil conspiracy under Illinois law, "a plaintiff must allege an agreement and a tortious act committed in furtherance of that agreement."  *Id.*  A "civil conspiracy sounding in fraud," moreover, "must be pled with particularity."  *Logger Head Tools, LLC v. Sears Holding Corp.*, 19 F. Supp. 3d 775, 784 (N.D. Ill. 2013).

The City alleges in conclusory fashion that Defendants "engaged in a civil conspiracy to engage in unfair and deceptive practices," "participate in the illegal drug market," and "unjustly enrich themselves at the City's expense."  Compl. ¶ 344.  Those claims fail for substantially the reasons explained in the *Summit County* brief.  *See* Dkt. 491-1 at Part VI.  While the Complaint alleges that Distributors engaged in routine commercial activities (such as participation in trade associations and conferences), *e.g.*, Compl. ¶¶ 74, 81–88, 91, none of those allegations comes close to suggesting that Distributors came to an agreement to violate the law, *e.g.*, *McClure*, 720 N.E.2d at 265 ("membership in industrywide trade organizations and participation in scientific conferences are common in most industries and do not support an interference of agreement").[11]

## CONCLUSION

The City of Chicago's claims should be dismissed with prejudice.

---

[11]  The civil conspiracy claim also fails because the underlying unjust enrichment, consumer fraud, and drug dealer liability claims fail.  *See Belkow v. Celotex Corp.*, 722 F. Supp. 1547, 1550 (N.D. Ill. 1989).

Dated:  June 8, 2018

Respectfully submitted,


<u>/s/ Robert A. Nicholas</u>
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation*
*and AmerisourceBergen Drug Corporation*


<u>/s/ Geoffrey Hobart</u>
Geoffrey Hobart
Mark Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com


*Counsel for McKesson Corporation*


<u>/s/ Enu Mainigi</u>
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Case Management Order Number Four (Dkt. 485, May 22, 2018), the Distributors are permitted to file motions to dismiss totaling 150 pages across the following five local government cases set for briefing:

- *Summit County, Ohio, et al. v. Purdue Pharma, L.P., et al.*, No. 18-op-45090;
- *City of Chicago, Illinois v. Cardinal Health, Inc., et al.*, No. 18-op-45281;
- *Cabell County Comm'n, West Virginia v. AmerisourceBergen Drug Corp. et al.*, No. 17-op-45053;
- *County of Monroe, Michigan v. Purdue Pharma L.P., et al.*, No. 18-op-4515;
- *Broward County, Florida v. Purdue Pharma L.P., et al.*, No. 18-op-45332;

This brief adheres to the limits set forth in Case Management Order Number Four, as the combined briefing in those five cases is 148 pages.

*/s/ Ashley W. Hardin*
Ashley W. Hardin

## CERTIFICATE OF SERVICE

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Ashley W. Hardin*
Ashley W. Hardin