# EXHIBIT B



## IN THE CIRCUIT COURT OF BOONE COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA
*ex rel.* PATRICK MORRISEY,
Attorney General, JOSEPH THORNTON,
In his capacity as the Secretary of the WEST
VIRGINIA DEPARTMENT OF MILITARY
AFFAIRS AND PUBLIC SAFETY, an agency
of the State of West Virginia, and KAREN
BOWLING, in her capacity as the Secretary of
the WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES, an
agency of the State of West Virginia,

                         Plaintiffs,

v.                                           Civil Action No.:16-C-1

McKESSON CORPORATION, a Delaware
Corporation doing business in West Virginia,

                         Defendant.

### AMENDED COMPLAINT

### PARTIES

1.      The State of West Virginia, through its Attorney General, Patrick Morrisey, is authorized by the West Virginia Constitution, the common law, and statutes to bring this action on behalf of the State of West Virginia and its citizens.

2.      Pursuant to W.Va. Code § 60A-5-501(c), the Attorney General ("WVAGO") is invested with the duty and authority to assist in the enforcement of the provisions of the Uniform Controlled Substances Act.

3.      Defendant, McKesson Corporation, is a publically traded corporation with its principal place of business in San Francisco, CA.

4.      Defendant is a Delaware Corporation.

5.      Defendant had net income in excess of $1.5 billion in 2015.

6.        Defendant distributes pharmaceuticals to retail pharmacies and institutional providers to customers in all 50 states.

7.        Defendant is the largest pharmaceutical distributor in North America.

8.        Defendant delivers 1/3 of all pharmaceuticals used in North America.

9.        Defendant's stock is traded on the New York Stock Exchange under the ticker symbol MCK.

10.        Defendant does substantial business in the State of West Virginia.

11.        Defendant distributed pharmaceuticals to at least 52 of West Virginia's 55 counties, including Boone County, WV.

12.        From 2007-2012, the Defendant distributed 46,179,600 doses of Hydrocodone and 54,304,980 doses of Oxycodone for a total of 99,484,580 doses of Hydrocodone and Oxycodone to West Virginia during the six year period.

13.        In addition to Oxycodone and Hydrocodone, Defendant distributed high quantities of several other scheduled narcotics to pharmacies throughout the state.

14.        Defendant has substantial contacts to the State of West Virginia.

15.        From 2007-2012, the Defendant distributed 670,090 doses of Hydrocodone to pharmacies and drug stores in Boone County, WV.

16.        From 2007-2012, the Defendant distributed 618,940 doses of Oxycodone to pharmacies and drug stores in Boone County, WV.

17.        From 2007-2012, the Defendant distributed 1,289,030 doses of Oxycodone and Hydrocodone to pharmacies and drug stores in Boone County, WV.

18.        According to the US Census, Boone County had a population of 24,629 in 2010.

19.     From 2007-2012, the Defendant distributed enough doses to provide 52.3 doses of Oxycodone or Hydrocodone to every man woman and child in Boone County, WV.

20.     The State of West Virginia, through its Attorney General, Patrick Morrisey, is authorized by the West Virginia Constitution, the common law, and statutes to bring this action on his own behalf in his official capacity, on behalf of the citizens of the State, and on behalf of the State Agency Plaintiffs who have been adversely affected by the tortious actions of the Defendant.

21.     Pursuant to W.Va. Code § 60A-5-501(c), the Attorney General ("WVAGO") is invested with the duty and authority to assist in the enforcement of the provisions of the Uniform Controlled Substances Act.

22.     In its role of assisting State Agencies in the enforcement of the provisions of the Uniform Controlled Substances Act, and in addition to the claims brought on behalf of the WVGO and on behalf of the citizens of the State of West Virginia WVAGO, the WVAGO brings this action on behalf of Secretary Karen Bowling, in her official capacity as Secretary of the West Virginia Department of Health and Human Resources ("DHHR") and Secretary Joseph Thornton, in his official capacity as the Secretary the West Virginia Department of Military Affairs and Public Safety ("DMAPS").

23.     Secretary Karen Bowling, in her official capacity as Secretary of the WV DHHR, an agency of the State of West Virginia established by W.Va. Code § 5F-1-2, is bringing this action on behalf of her agency and the Bureaus within the agency directly impacted by the tortious actions of the Defendant.  The Bureaus include, but are not limited to, the Bureau of Behavioral Health and Health Facilities ("BHHF"), the Bureau for Children

3

and Families ("BCF"), the Bureau for Medical Services ("BMS"), and the Bureau for Public Health ("BPH").

24. The West Virginia DHHR has been damaged by the Defendant's negligent actions in failing to investigate, report, and cease fulfilling suspicious orders to pharmacies and drug stores in the State of West Virginia.

25. The West Virginia DHHR has been damaged by the Defendant's intentional and reckless actions in failing to investigate, report, and cease fulfilling suspicious orders to pharmacies and drug stores in the State of West Virginia.

26. The actions of the Defendant have caused and will continue to cause the West Virginia DHHR to expend substantial sums of State money to deal with the effects of epidemic of prescription drug addiction that was substantially fueled by the Defendant's illegal, reckless, and malicious action in flooding the state with highly addictive prescription medications without regard for the consequences to West Virginia DHHR.

27. Defendant's actions of placing profits over the welfare of the citizens of the State of West Virginia have caused substantial damages to the West Virginia DHHR.

28. The Plaintiffs affirmatively express that they are not seeking any relief in this action for the federal share of funding for the State Medicaid Program. Claims for damages for any federal monies expended by the State are hereby expressly disavowed.

29. Joseph Thornton, in his capacity as Secretary of the West Virginia Department of Military Affairs and Public Safety, an agency of the State of West Virginia established by W.Va. Code 5F-1-2, is bringing this action on behalf of his agency and the divisions, facilities, and organizations within the agency directly impacted by the tortious actions of the Defendant, including, but not limited to the West Virginia State Police ("WVSP"),

the Division of Corrections ("DOC"), the Division of Homeland Security and Emergency Management ("DHS"), the West Virginia Regional Jail and Correctional Facilities Authority ("WVRJ"), the Division of Juvenile Services ("DJS"), and the Division of Protective Services ("DPS").

30.     DMAPS is the agency charged with responsibility for enforcing the Uniform Controlled Substances Act, W.Va. Code § 60A-5-501 *es seq.*, for housing the inmates who have violated the act and-or committed other crimes related to their violation of the Act.

31.     The West Virginia DMAPS has been damaged by the Defendant's negligent actions in failing to investigate, report, and cease fulfilling suspicious orders to pharmacies and drug stores in the State of West Virginia.

32.     The West Virginia DMAPS has been damaged by the Defendant's intentional and reckless actions in failing to investigate, report, and cease fulfilling suspicious orders to pharmacies and drug stores in the State of West Virginia.

33.     The actions of the Defendant has caused, and will continue to cause the West Virginia DMAPS to expend substantial sums of State money to deal with the effects of epidemic of prescription drug addiction that was substantially fueled caused by the Defendant's illegal, reckless, and malicious action in flooding the state with highly addictive prescription medications without regard for the consequences to the Plaintiffs.

34.     Defendant's actions of placing profits over the welfare of the citizens of the State of West Virginia have caused substantial damages to the DMAPS.

35.     Defendant's actions of placing profits over the welfare of the citizens of the State of West Virginia have caused substantial damages to the West Virginia.

36.       The Plaintiffs affirmatively expresses that the State is not seeking any relief in this action for the federal share of funding for the State Medicaid Program. Claims for damages for any federal monies expended by the State are hereby expressly disavowed.

37.       This Court has jurisdiction over this case and over this Defendant inasmuch as the claims and pleadings set forth herein are substantively the same claims that were previously plead by the plaintiffs against similarly situated defendants which were removed to the District Court for the Southern District of West Virginia, extensively litigated and ultimately remanded to this Court for want of jurisdiction on March 27, 2013. *See, Memorandum Opinion and Order* [DOC 22], *State of West Virginia, ex rel. Patrick Morrisey, Attorney General v. Cardinal Health* No. 2:12-3836, and *Memorandum Opinion and Order* [DOC 78] *State of West Virginia, ex rel. Patrick Morrisey, Attorney General v. AmerisourceBergen Drug Corporation, et al.,* No. 2:12-3760. Consequently, there is no objectively reasonable basis for jurisdiction in any other court. *Clutter v. Consolidation Coal Co.,* 2014 WL 1479199 (N.D. W.Va., April 15, 2014).

38.       This Court has personal jurisdiction over the Defendant pursuant to the provisions of W.Va. Code § 56-3-33.

39.       Venue is appropriate in Boone County, WV.

## FACTS

40.       Defendant was on notice that an epidemic of prescription drug abuse existed in West Virginia and in the specific areas of the State in which their customers were located.

41.       Defendant was on notice that the controlled substances it distributed were the kinds that were susceptible to being diverted for illegal purposes.

42.     Defendant was on notice that West Virginia law required it, *inter alia*, to provide effective controls and procedures to guard against diversion of controlled substances, pursuant to 15 C.S.R. § 2-4.21 and 2-4.4 and the WV Controlled Substances Act.

43.     Defendant was on notice that the Healthcare Distribution Management Association ("HDMA") "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" stressed the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines further provided: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

44.     Defendant knew, or should have known that West Virginia had an exceedingly high rate of illegal use and diversion of prescription opioids.

45.     Numerous publications, news sources and studies highlighted the epidemic rate of opioid abuse and overdose rates in West Virginia.

46.     According to a study from the Trust for America's Health and the Robert Wood Johnson Foundation that focused on overdose statistics from 2009-2013, West Virginia has the highest overdose rate in the country.

47.     Defendant shipped millions of doses of highly addictive controlled pain killers into the state, many of which should have been stopped and/or investigated as suspicious orders.

48.     Defendant failed to adopt any affirmative efforts to prevent diversion of its medicines to illegal purposes.

7

49.    Rather than outline each of the millions of suspicious orders that Defendant blindly filled, Plaintiffs will demonstrate, by example, the level of disregard Defendant had for attempting to protect the citizens of West Virginia from the detrimental effects of the Defendant's negligent, intentional, and/or reckless proliferation of highly addictive opioid-based prescription painkillers. The examples are indicative of other counties and small communities throughout the state:

<u>BOONE COUNTY</u>

50.    From 2007-2012, the Defendant distributed 670,090[1] doses of Hydrocodone to pharmacies and drug stores in Boone County, WV.

51.    From 2007-2012, the Defendant distributed 618,940 doses of Oxycodone to pharmacies and drug stores in Boone County, WV.

52.    From 2007-2012, the Defendant distributed 1,289,030 doses of Oxycodone and Hydrocodone to pharmacies and drug stores in Boone County, WV.

53.    According to the US Census, Boone County had a population of 24,629 in 2010.

54.    The Defendant distributed an excessive number of highly addictive controlled substances to Boone County, WV, when the population of the community is taken into consideration.

55.    According to the CDC, from 2003-2012, the percentage of adults over the age of twenty who used a prescription opioid analgesic rose from 5% to 6.9% in the United States.

---

[1] The data contained in this complaint was not derived from information supplied by the Defendant in response to the investigation conducted by the West Virginia Attorney General.

56. According to the CDC, while the individuals receiving the prescription for opioid analgesics may change, the average remained at 6.9% of the population from 2003 to 2012.

57. According to the US Census, 22.4% of the Boone County population was under the age of 18 in 2014, leaving 19,119 adults in Boone County, WV.

58. Based on the CDC statistics, the Defendant should expect 1319 (6.9%) of the residents of Boone County, WV to use a prescription opioid analgesic during any particular month.

59. Based on Defendant's estimates that it provides 1/3 of the prescription medications to North America, it should have anticipated that it was supplying approximately 1/3 of the prescription pain killers to West Virginia.

60. While the estimates (for the purpose of the examples used in this Complaint) use McKesson's figure of 33.3%, McKesson's actual share of the market (inclusive of all sources) in West Virginia for Oxycodone and Hydrocodone was 12.75%, which makes these statistics even more egregious.

61. In 2007, the Defendant distributed 33,100 doses of Hydrocodone and 107,900 doses of Oxycodone to Boone County, WV, for a total of 141,000 of the two medications.

62. In 2008, the Defendant distributed 115,560 doses of Hydrocodone and 112,800 doses of Oxycodone to Boone County, WV, for a total of 228,400 of the two medications.

9

63. In 2009, the Defendant distributed 216,500 doses of Hydrocodone and 145,200 doses of Oxycodone to Boone County, WV, for a total of 361,700 of the two medications.

64. In 2010, the Defendant distributed 89,260 doses of Hydrocodone and 100,700 doses of Oxycodone to Boone County, WV, for a total of 189,960 of the two medications.

65. In 2011, the Defendant distributed 98,170 doses of Hydrocodone and 74,500 doses of Oxycodone to Boone County, WV, for a total of 172,670 of the two medications.

66. In 2012, the Defendant distributed 117,500 doses of Hydrocodone and 77,840 doses of Oxycodone to Boone County, WV, for a total of 195,340 of the two medications.

67. Based on McKesson's represented market share and CDC estimates, McKesson supplied enough highly addictive prescription pain medication to provide each user with an average of 2,932 doses of Hydrocodone or Oxycodone between 2007 and 2012, or an estimated 586.4 doses per year.

68. Defendant undertook no efforts to determine whether the volume of prescription pain killers it was shipping to Boone County was excessive and whether any of the orders it filled qualified as suspicious orders, which should have been refused.

69. Upon information and belief, the Defendant did not refuse to fill any prescriptions from a Boone County pharmacy between 2007 and 2012.

70. Defendant knew or should have known that it was supplying opioid medications in excess of the legitimate needs for Boone County, WV.

10

71.     Defendant knew or should have known that there was a a high likelihood that a substantial number of the prescription pain killers it supplied to pharmacies and drug stores in Boone County, WV were being diverted to illegal use.

72.     Defendant had a legal duty to ensure it was not filling suspicious orders.

73.     The sheer volume of highly addictive opioid pain medications it shipped to Boone County from 2007-2012 was suspicious on its face.

74.     Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Boone County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

75.     Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Boone County.

76.     Defendant made substantial profits from the medicine it shipped to Boone County.

77.     Defendant knowingly filled suspicious orders in Boone County from 2007-2012.

78.     Upon information and belief, Defendant continued to knowingly fill suspicious orders in Boone County from 2012-2015.

79.     Defendant negligently filled suspicious orders in Boone County from 2007-2012.

80.     Upon information and belief, Defendant continued to negligently fill suspicious orders in Boone County from 2013-2015.

81.     Defendant intentionally, and with reckless disregard, filled suspicious orders in Boone County from 2007-2012.

11

82. Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Boone County from 2013-2015.

83. Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Boone County, WV and its residents.

## LOGAN COUNTY

84. In 2007, the Defendant distributed a total of 11,810,390 doses of Hydrocodone and 8,054,360 doses of Oxycodone to West Virginia.

85. In 2007, Defendant distributed more Hydrocodone to Logan County, WV than any other county in the state, distributing 2,321,000 doses.

86. From 2007 to 2012, Defendant shipped more Hydrocodone to Logan County, WV than to any other county in the state, distributing 8,624,280 doses.

87. In 2007, the Defendant distributed 264,900 doses of Oxycodone to Logan County, WV, for a total distribution of 2,585,000 Hydrocodone and Oxycodone doses during the year.

88. According to the 2010 US Census, Logan County has a population of 36,743.

89. In 2007, the Defendant distributed 70.4 doses of Hydrocodone and Oxycodone for every man, woman and child residing in Logan County.

90. According to the US Census, 20.7% of the Logan County, WV population is under the age of eighteen, leaving an adult population of 29,137.

91. Using Defendant's represented market share, it would have provided the prescription medication for 1/3 of the population of Logan County, or 9,712.3 patients.

12

92.     Using the CDC averages and the Defendant's representations of market share, the Defendant should have expected to supply opioids to 670 residents of Logan County with valid prescriptions for the pain killer in a given month.

93.     In 2007, Defendant supplied enough Hydrocodone and Oxycodone to provide each of its anticipated patients with 3,858.2 doses, or 10.57 doses for each anticipated patient per day.

94.     From 2007-2012, Defendant distributed an average of 12,872 doses of Oxycodone or Hydrocodone for each anticipated user in Logan County, WV.

95.     Defendant undertook no efforts to determine whether the volume of prescription pain killers it was shipping to Logan County was excessive and whether any of the orders it filled qualified as suspicious orders, which should have been refused.

96.     Upon information and belief, the Defendant did not refuse to fill any prescriptions from a Logan County pharmacy between 2007 and 2012.

97.     Defendant knew or should have known that it was supplying opioid medications in excess of the legitimate needs for Logan County, WV.

98.     Defendant knew or should have known that there was a high likelihood that a substantial number of the prescription pain killers it supplied to pharmacies and drug stores in Logan County, WV were being diverted to illegal use.

99.     Defendant had an obligation to ensure it was not filling suspicious orders.

100.    The sheer volume of highly addictive opioid pain medications it shipped to Logan County from 2007-2012 was suspicious on its face.

13

101.        Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Logan County.

102.        Defendant made substantial profits from the medicine it shipped to Logan County.

103.        Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Logan to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

104.        Defendant knowingly filled suspicious orders in Logan County from 2007-2012.

105.        Upon information and belief, Defendant continued to knowingly fill suspicious orders in Logan County from 2012-2015.

106.        Defendant negligently filled suspicious orders in Logan County from 2007-2012.

107.        Upon information and belief, Defendant continued to negligently fill suspicious orders in Logan County from 2012-2015.

108.        Defendant intentionally, and with reckless disregard, filled suspicious orders in Logan County from 2007-2012.

109.        Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Logan County from 2013-2015.

14

110.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Logan County, WV and its residents.

## MINGO COUNTY

111.     In 2007, the Defendant distributed 3,289,900 doses of Hydrocodone and 103,900 Oxycodone doses in Mingo County, WV, for a total of 3,393,800 doses of Hydrocodone and Oxycodone.

112.     According to the 2010 US Census, Mingo County had a population of 26,839.

113.     According to the US Census, 22.1% of the population of Mingo County is under the age of eighteen, leaving 20,908 adults.

114.     Using the CDC estimates, 1,045.4 Mingo County residents would be expected to obtain valid prescriptions for highly addictive prescription pain killers in a given month.

115.     According to McKesson's represented market share, the Defendant should expect to supply 1/3 of these patients with the prescription pain medication, or 481 residents.

116.     In 2007, McKesson supplied 7,057.2 for every customer it should have expected to serve based on its market share, number of residents, and the CDC averages of valid prescriptions.

117.     Based on CDC averages and McKesson's representation of market share, Defendant supplied enough Oxycodone and Hydrocodone to provide every expected Mingo County, WV patient with a dose of Hydrocodone or Oxycodone every 1 hour 15 minutes in 2007.

15

118.     Upon information and belief, physicians cannot write prescriptions with a frequency more often than once every four hours of Oxycodone or Hydrocodone.

119.     Upon information and belief, the majority of prescriptions for Oxycodone and Hydrocodone written nationally are for much smaller quantities than the maximum allowable dosage per patient.

120.     Based on CDC averages and McKesson's representations of market share, the quantity of Oxycodone and Hydrocodone supplied to Mingo County, WV exceed the number required to supply every expected patient with the maximum number of doses allowable per day in 2007.

121.     Based on CDC average and McKesson's representation of market share, Defendant supplied enough Oxycodone and Hydrocodone to provide every expected Mingo County, WV patient with 19.3 doses every day during 2007.

122.     This amount of prescription pain killers is far in excess of any rational need for it based on the population served.

123.     The number of highly addictive prescription pain killers defendant shipped to Mingo County in 2007 demonstrated either a substantially higher than average population receiving prescriptions or individuals receiving prescriptions for substantial quantities far in excess of the amount needed for legitimate purposes.

124.     Defendant's excess shipments to Mingo County in 2007 were prima facie suspicious orders.

125.     In 2007, the Defendant distributed enough pain medication to supply an average of 126.5 doses of Hydrocodone and Oxycodone for every man, woman and child in Mingo County, WV.

16

126.     From 2007-2012, Defendant shipped 5,177,030 doses of Hydrocodone and 442,820 doses of Oxycodone to Mingo County, WV, for a total of 5,619,850 doses of Hydrocodone and Oxycodone to a community with an adult population of only 20,908 residents.

127.     From 2007-2012, the Defendant supplied between 10,763 doses for each anticipated patient in Mingo County, WV.

128.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Mingo County, WV.

129.     Defendant knowingly filled suspicious orders in Mingo County from 2007-2012.

130.     Upon information and belief, Defendant continued to knowingly supply suspicious order in Mingo County from 2013-2015.

131.     Defendant negligently filled suspicious orders in Mingo County from 2007-2012.

132.     Upon information and belief, Defendant continued to negligently fill suspicious orders in Mingo County from 2013-2015.

133.     Defendant intentionally, and with reckless disregard, filled suspicious orders in Mingo County from 2007-2012.

134.     Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Mingo County from 2013-2015.

135.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Mingo County, WV and its resident.

17

136.     Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Mingo County.

137.     Defendant made substantial profits from the medicine it shipped to Mingo County.

138.     Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores to which it shipped substantial amounts of prescription medication in Mingo County to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

## SUMMERS COUNTY

139.     According to the 2010 US Census, Summers County, WV had only 13,417 residents.

140.     17.1% of Summers County residents were under the age of eighteen, leaving only 11,123 adults in the county.

141.     From 2007-2012, the Defendant distributed 1,222,550 doses of Hydrocodone to Summers County, WV.

142.     The Defendant distributed the following quantities of Hydrocodone to pharmacies and drug stores in Summers County, WV:

| | |
|---|---|
| 2007 | 154,980 |
| 2008 | 167,740 |
| 2009 | 230,400 |
| 2010 | 211,790 |
| 2011 | 183,880 |
| 2012 | 273,760 |

18

143.     Between 2007 and 2012, Defendant increased the amount of Hydrocodone it shipped to Summers County by more than 76%.

144.     From 2007-2012, Defendant shipped 1,012,820 doses of Oxycodone to Summers County, WV.

145.     The Defendant distributed the following quantities of Oxycodone to pharmacies and drug stores in Summers County, WV:

| | |
|---|---|
| 2007 | 85,720 |
| 2008 | 144,120 |
| 2009 | 162,300 |
| 2010 | 186,920 |
| 2011 | 206,600 |
| 2012 | 227,160 |

146.     The Defendant increased the amount of Oxycodone it shipped to Summers County by 265% between 2007 and 2012.

147.     In 2012, Defendant shipped 500,920 doses of Oxycodone and Hydrocodone to Summers County, WV.

148.     According to the CDC, in 2012, Defendant could have expected 6.9% of the adult residents of Summers County, WV to have been prescribed a prescription pain killer in the previous thirty days.

149.     Based on the Summers County adult population of 11,123, Defendant should have anticipated 767.5 adults to receive valid prescriptions for pain killers.

150.    According to Defendant's represented market share, it should have anticipated that it was supplying 1/3 of these patients with their prescription pain killers, or 256 patients.

151.    In 2012, Defendant provided enough Hydrocodone and Oxycodone to supply each anticipated patient with 1,956.7 doses.

152.    Defendant knew or should have known that the 500,920 doses of Oxycodone and Hydrocodone it supplied to Summers County, WV was far in excess of the doses needed for a community of only 11,123 adults.

153.    Defendant knew or should have known it was filling suspicious orders when the orders for Hydrocodone increased by 76% between 2007 and 2012.

154.    Defendant knew or should have known it was filling suspicious orders when the orders for Oxycodone increased by 265% between 2007 and 2012.

155.    Defendant knowingly filled suspicious orders in Summers County from 2007-2012.

156.    Defendant negligently filled suspicious orders in Summers County from 2007-2012.

157.    Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Summers County.

158.    Defendant made substantial profits from the medicine it shipped to Summers County.

159.    Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Summers County to which it shipped substantial amounts

20

of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

160.    Defendant knowingly filled suspicious orders in Summers County from 2007-2012.

161.    Upon information and belief, Defendant continued to knowingly fill suspicious orders in Summers County from 2012-2015.

162.    Defendant negligently filled suspicious orders in Summers County from 2007-2012.

163.    Upon information and belief, Defendant continued to negligently fill suspicious orders in Summers County from 2013-2015.

164.    Defendant intentionally, and with reckless disregard, filled suspicious orders in Summers County from 2007-2012.

165.    Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Summers County from 2013-2015.

166.    Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Summers County, WV and its residents.

167.    Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Summers County, WV and its residents.

<u>GRANT COUNTY</u>

168.    According to the 2010 US Census, Grant County, WV had a population of 11,937 citizens.

169.     According to the US Census, 19.9% of Grant County residents are under the age of eighteen, leaving an adult population of just 9,561.5 adult residents.

170.     Between 2007 and 2012, the Defendant distributed 246,940 doses of hydrocodone and 1,166,000 doses of Oxycodone, for a total of 1,412,940 doses of Oxycodone and Hydrocodone.

171.     Defendant distributed 118.4 doses of Hydrocodone and Oxycodone for every man, woman, and child in Grant County, WV between 2007 and 2012.

172.     Based on CDC statistics, Defendant should have expected 660 (6.9%) of patients would receive a valid prescription for opioid pain medication.

173.     Based on McKesson estimated market share, it should have anticipated on serving 1/3 of these patients, or between 220 patients.

174.     Based on US Census, CDC, and McKesson's represented market share, Defendant supplied Grant County patients with 6,425.4 doses of Oxycodone and Hydrocodone between 2007 and 2012, or an average of 1,285 doses per patient per year.

175.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Grant County, WV.

176.     Defendant knowingly filled suspicious orders in Grant County from 2007-2012.

177.     Upon information and belief, Defendant continued to knowingly supply suspicious orders in Grant County from 2013-2015.

178.     Defendant negligently filled suspicious orders in Grant County from 2007-2012.

179.     Upon information and belief, Defendant continued to negligently supply suspicious orders in Grant County from 2013-2015.

22

180.    Defendant intentionally, and with reckless disregard, filled suspicious orders in Grant County from 2007-2012.

181.    Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Grant County from 2013-2015.

182.    Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Grant County.

183.    Defendant made substantial profits from the medicine it shipped to Grant County.

184.    Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Grant County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

185.    Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Grant County, WV and its residents.

<u>RALEIGH COUNTY</u>

186.    In 2007, the Defendant distributed 741,770 doses of Hydrocodone and 1,254,100 doses of Oxycodone in Raleigh County, WV, for a total of 1,995,870 doses of Oxycodone and Hydrocodone.

187.    In 2008, the Defendant distributed 813,280 doses of Hydrocodone and 1,207,820 doses of Oxycodone in Raleigh County, WV, for a total of 2,021,100 doses of Oxycodone and Hydrocodone.

188. In 2009, the Defendant distributed 802,330 doses of Hydrocodone and 632,720 doses of Oxycodone in Raleigh County, WV, for a total of 1,434,950 doses of Oxycodone and Hydrocodone.

189. In 2010, the Defendant distributed 580,620 doses of Hydrocodone and 629,980 doses of Oxycodone in Raleigh County, WV, for a total of 1,210,600 doses of Oxycodone and Hydrocodone.

190. In 2011, the Defendant distributed 576,740 doses of Hydrocodone and 1,096,240 doses of Oxycodone in Raleigh County, WV, for a total of 1,672,980 doses of Oxycodone and Hydrocodone.

191. In 2012, the Defendant distributed 829,850 doses of Hydrocodone and 1,456,580 doses of Oxycodone in Raleigh County, WV, for a total of 2,286,430 doses of Oxycodone and Hydrocodone.

192. From 2007-2012, the Defendant distributed a total of 4,344,590 doses of Hydrocodone and 6,277,440 doses of Oxycodone to Raleigh County, WV, for a total of 10,622,030 doses of Hydrocodone and Oxycodone.

193. According to the 2010 US Census, Raleigh County had a population of 78,241, with 21.2% of this population being under the age of eighteen, leaving an adult population in Raleigh County of 61,654.

194. Based on national estimates established by the CDC, 4,254 individuals would have received valid prescriptions for opioid pain killers in any given thirty day period.

195. According to McKesson's represented market share, it should have expected to provide the prescription pain killers to 1/3 of these patients, or 1,418 patients.

196.     Between 2007 and 2012, the Defendant provided enough Oxycodone and Hydrocodone to supply each of the anticipated patients with 7,491 doses each.

197.     In 2012 alone, the Defendant provided enough Oxycodone and Hydrocodone to supply each of the anticipated patients with 1,612.4 doses.

198.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Raleigh County, WV.

199.     Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Raleigh County.

200.     Defendant made substantial profits from the medicine it shipped to Raleigh County.

201.     Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Raleigh County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

202.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Raleigh County, WV and its residents.

203.     Defendant knowingly filled suspicious orders in Raleigh County from 2007-2012.

204.     Upon information and belief, Defendant continued to knowingly supply suspicious orders in Raleigh County from 2013-2015.

205.     Defendant negligently filled suspicious orders in Raleigh County from 2007-2012.

206.    Upon information and belief, Defendant continued to negligently fill suspicious orders in Raleigh County from 2013-2015.

207.    Defendant intentionally, and with reckless disregard, filled suspicious orders in Raleigh County from 2007-2012.

208.    Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Raleigh County from 2013-2015.

209.    Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Raleigh County, WV and its residents.

McDOWELL COUNTY

210.    From 2007-2012, the Defendant supplied 2,337,660 doses of Hydrocodone and 1,457,400 doses of Oxycodone to McDowell County, WV, for a total of 3,795,060 doses of Hydrocodone and Oxycodone.

211.    According to the 2010 census, McDowell County had a population of 22,113, with 20.6% of those being under the age of eighteen, leaving an adult population of 17,558.

212.    According to McKesson's represented market share, it should have anticipated serving 1/3 of the population, or 5,853 individuals.

213.    According to CDC averages, the Defendant should have anticipated providing prescriptions for 404 of these McDowell County residents who received a valid prescription for a pain killer during any thirty day period.

214.    From 2007-2012, the Defendant supplied between 9,393.7 doses for each anticipated patient in McDowell County.

215. Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as McDowell County, WV.

216. Defendant knowingly filled suspicious orders in McDowell County from 2007-2012.

217. Upon information and belief, Defendant continued to knowingly fill suspicious orders in McDowell County from 2013-2015.

218. Defendant negligently filled suspicious orders in McDowell County from 2007-2012.

219. Upon information and belief, Defendant continued to negligently fill suspicious orders in McDowell County from 2013-2015.

220. Defendant intentionally, and with reckless disregard, filled suspicious orders in McDowell County from 2007-2012.

221. Upon information and belief, Defendant continued to intentionally, and with reckless disregard fill suspicious orders in McDowell County from 2013-2015.

222. Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to McDowell County.

223. Defendant made substantial profits from the medicine it shipped to McDowell County.

224. Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in McDowell County to which it shipped substantial amounts

27

of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

225.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of McDowell County, WV and its residents.

## WYOMING COUNTY

226.     From 2007-2012, the Defendant supplied 1,875,790 doses of Hydrocodone and 1,755,820 doses of Oxycodone to Wyoming County, WV, for a total of 3,631,610 doses of Hydrocodone and Oxycodone.

227.     According to the 2010 census, Wyoming County had a population of 23,801, with 21.4% of those being under the age of eighteen, leaving an adult population of 18,708.

228.     According to McKesson's statistics, it should have anticipated serving 1/3 of the population, or 6,236 individuals.

229.     According to CDC averages, the Defendant should have anticipated that 430 of these Wyoming County residents would receive a prescription for a pain killer during any thirty day period.

230.     From 2007-2012, the Defendant supplied 8,445.6 doses for each anticipated patient in Wyoming County.

231.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Wyoming County, WV.

28

232.    Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Wyoming County.

233.    Defendant made substantial profits from the medicine it shipped to Wyoming County.

234.    Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Wyoming County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

235.    Defendant knowingly filled suspicious orders in Wyoming County from 2007-2012.

236.    Upon information and belief, Defendant continued to knowingly fill suspicious orders in Wyoming County from 2012-2015.

237.    Defendant negligently filled suspicious orders in Wyoming County from 2007-2012.

238.    Upon information and belief, Defendant continued to negligently fill suspicious orders in Wyoming County from 2012-2015.

239.    Defendant intentionally, and with reckless disregard, filled suspicious orders in Wyoming County from 2007-2012.

240.    Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Wyoming County from 2013-2015.

29

241.    Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Wyoming County, WV and its residents.

## BARBOUR COUNTY

242.    From 2007-2012, the Defendant supplied 3,187,570 doses of Hydrocodone and 1,473,820 doses of Oxycodone to Ohio County, WV, for a total of 4,661,390 doses of Hydrocodone and Oxycodone.

243.    Based on the 2010 population of Barbour County, WV, the Defendant distributed enough Oxycodone and Hydrocodone to supply every man, woman, and child with 210 doses from 2007 to 2012.

244.    According to the 2010 census, Barbour County had a population of 16,589, with 20.9% of those being under the age of eighteen, leaving an adult population of 13,122.

245.    According to McKesson's statistics, it should have anticipated serving 1/3 of the population, or 4,374 individuals.

246.    According to CDC averages, the Defendant should have anticipated that 302 of these Barbour County residents would receive a prescription for a pain killer during any thirty day period.

247.    From 2007-2012, the Defendant supplied between 15,445.3 doses for each anticipated patient in Barbour County.

248.    Based on the quantity of Oxycodone and Hydrocodone Defendant supplied to Barbour County, WV, Defendant knew or should have known that the number of individuals receiving prescriptions for a prescription pain killer was far in excess of the averages identified by the CDC.

30

249.    Based on the quantity of Oxycodone and Hydrocodone Defendant supplied to Barbour County, WV, Defendant knew or should have known that the quantity supplied with each prescription of an opiate pain killer was far in excess of the average quantities for similar prescriptions nationwide.

250.    Based on CDC averages and McKesson's representation of market share, Defendant supplied enough Oxycodone and Hydrocodone to provide every expected Barbour County, WV patient with a dose of Hydrocodone or Oxycodone every 3 hours 24 minutes throughout the entire time period between 2007 and 2012.

251.    Based on CDC averages and McKesson's representations of market share, the quantity of Oxycodone and Hydrocodone supplied to Barbour County, WV exceed the number required to supply every expected patient with the maximum number of doses allowable per day.

252.    Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Barbour County.

253.    Defendant made substantial profits from the medicine it shipped to Barbour County.

254.    Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Barbour County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

31

255.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Barbour County, WV.

256.     Defendant knowingly filled suspicious orders in Barbour County from 2007-2012.

257.     Upon information and belief, Defendant continued to knowingly supply suspicious orders in Barbour County from 2013-2015.

258.     Defendant negligently filled suspicious orders in Barbour County from 2007-2012.

259.     Upon information and belief, Defendant continued to negligently supply suspicious orders to Barbour County from 2013-2015.

260.     Defendant intentionally, and with reckless disregard, filled suspicious orders in Barbour County from 2007-2012.

261.     Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Barbour County from 2013-2015.

262.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Barbour County, WV and its residents.

OHIO COUNTY

263.     From 2007-2012, the Defendant supplied 1,084,080 doses of Hydrocodone and 2,046,240 doses of Oxycodone to Ohio County, WV, for a total of 3,130,320 doses of Hydrocodone and Oxycodone.

264.     According to the 2010 census, Ohio County had a population of 44,443, with 19.2% of those being under the age of eighteen, leaving an adult population of 35,910.

32

265.     According to McKesson's statistics, it should have anticipated serving 1/3 of the population, or 11,930 individuals.

266.     According to CDC averages, the Defendant should have anticipated that 823 of these Ohio County residents would receive a prescription for a pain killer during any thirty day period.

267.     From 2007-2012, the Defendant supplied between 3,803.5 doses for each anticipated patient in Ohio County.

268.     Defendant paid its sales force and managers bonuses and commissions on the sale of most or all of the highly addictive prescription pain killers supplied to Ohio County.

269.     Defendant made substantial profits from the medicine it shipped to Ohio County.

270.     Upon information and belief, Defendant made little to no effort to visit the pharmacies and drug stores in Ohio County to which it shipped substantial amounts of prescription medication to do due diligence to ensure the medications it was shipping were not diverted to illegal uses.

271.     Defendant knew or should have known the amount of Oxycodone and Hydrocodone was in excess of any amount reasonable to serve a community as small as Ohio County, WV.

272.     Defendant knowingly filled suspicious orders in Ohio County from 2007-2012.

273.     Upon information and belief, Defendant knowingly continued to fill suspicious orders in Ohio County from 2013-2015.

274.     Defendant negligently filled suspicious orders in Ohio County from 2007-2012.

275.     Upon information and belief, Defendant continued to negligently fill suspicious orders in Ohio County from 2013-2015.

33

276.     Defendant intentionally, and with reckless disregard, filled suspicious orders in Ohio County from 2007-2012.

277.     Upon information and belief, Defendant continued to intentionally, and with reckless disregard, fill suspicious orders in Ohio County from 2013-2015.

278.     Defendant's intentional distribution of excessive prescription pain killers to a small community showed a reckless disregard to the safety of Ohio County, WV and its residents.

<u>WEST VIRGINIA</u>

279.     In 2007, the Defendant shipped 11,810,390 doses of Hydrocodone and 8,054,360 doses of Oxycodone to the State of West Virginia, for a total of 19,864,750 doses of Hydrocodone and Oxycodone.

280.     In 2008, the Defendant distributed 8,088,190 doses of Hydrocodone and 9,093,080 doses of Oxycodone to West Virginia, for a total of 17,181,270 doses.

281.     In 2009, the Defendant distributed 8,527,900 doses of Hydrocodone and 8,653,520 doses of Oxycodone to West Virginia, for a total of 17,181,420 doses.

282.     In 2010, the Defendant distributed 8,222,750 doses of Hydrocodone and 8,569,100 doses of Oxycodone to West Virginia, for a total of 16,791,850 doses.

283.     In 2011, the Defendant distributed 10,183,110 doses of Hydrocodone and 9,662,860 doses of Oxycodone to West Virginia, for a total of 19,845,970 doses.

284.     In 2012, the Defendant distributed 11,431,630 doses of Hydrocodone and 10,272,060 doses of Oxycodone to West Virginia, for a total of 21,703,690 doses.

34

285.    From 2007-2012, the Defendant distributed 46,179,600 doses of Hydrocodone and 54,304,980 doses of Oxycodone for a total of 99,484,580 doses of Hydrocodone and Oxycodone to West Virginia during the five year period.

286.    According to the 2010 US Census, West Virginia had a population of 1,850,326.

287.    According to the 2010 US Census, 79.1% of the state's population is over the age of eighteen---the adult population of West Virginia is 1,463,608.

288.    Based on CDC statistics, the Defendant should have expected between 100,989 state residents to have received a prescription for a controlled pain killer within the previous thirty days.

289.    According to Defendant's represented market share, it should have expected to serve 1/3 of these patient's prescriptions, or 33,663 patients.

290.    Between 2007 and 2012, the Defendant supplied enough Hydrocodone and Oxycodone to provide each anticipated patient with 2,955.3 doses.

291.    In 2012 alone, the Defendant supplied enough Hydrocodone and Oxycodone to supply each anticipated patient with approximately 645 doses.

292.    Defendant supplied 24.19% of all Oxycodone distributed to West Virginia through pharmacies and drug stores.

293.    Defendant supplied 8.31% of all Hydrocodone distributed to West Virginia through pharmacies and drug stores.

294.    Defendant supplied 12.75% of all Oxycodone and Hydrocodone that was legally distributed to West Virginia, including the amounts supplied by all large chain stores and pharmacies such as Rite Aid, CVS, Kroger, Walgreens, and Wal-Mart.

35

295.    Upon information and belief, Defendant supplied nearly 1/3 of the suspicious orders in the State of West Virginia between 2007 and 2012.

296.    Upon information and belief, Defendant continued filling suspicious orders in 2013, 2014, and 2015.

297.    Using the CDC statistics, McKesson should have anticipated serving 12,623.6 patients in West Virginia.

298.    Based on CDC averages and actual share of the total market by Defendant, between 2007 and 2012, the Defendant supplied enough Hydrocodone and Oxycodone to provide each patient in West Virginia with 7,880.9 doses over this period.

299.    Defendant abrogated its responsibility to monitor and report suspicious orders from 2007-2015.

300.    Defendant willfully ignored substantial orders for highly addictive prescription pain killers to the State of West Virginia and to counties where the rate of abuse was well documented.

301.    Defendant knew or should have known it was causing the epidemic of prescription drug abuse in West Virginia and in the sparsely populated areas into which it shipped millions of doses of this medication.

302.    Between 2007-2012, Defendant supplied more Hydrocodone to Logan County (population 36,743), Mingo County (population 26839) and Raleigh County (population 78,859) than to more populous counties like Kanawha (population 193,063), Berkley County (population 104,169), Cabell County (population 96,319), and numerous other larger counties.  This fact alone should have raised suspicion or heightened Defendant's

awareness that it was supplying smaller communities with excessive quantities intended for diversion or illicit use.

303.     From 2007-2012, Defendant supplied more Oxycodone to Raleigh County (population 78,859) than to Kanawha County (population 193,063). This fact alone should have raised suspicion or heightened Defendant's awareness that it was supplying smaller communities with excessive quantities intended for diversion or illicit use.

304.     From 2007-2012, Defendant supplied more Oxycodone to Ohio County (population 44,443), Wyoming County (population 23,801) and Logan County (population 36,743) than it did to Berkeley County (population 104,169).

305.     The Defendant knew or should have known multiple suppliers were supplying opioid narcotics to West Virginia pharmacies.

306.     The Defendant knew or should have known that it was supplying only a fraction of the total opioid narcotics to the areas it served.

307.     The Defendant distributed prescription drugs that it knew or should have known would contribute to the well-publicized prescription drug abuse problem in West Virginia.

308.     The Defendant knew or should have known that West Virginia was facing an epidemic of abuse of prescription pain killers.

309.     The Defendant knew or should have known that substantial amounts of opioid pain killers were being diverted to feed the epidemic of prescription drug abuse in West Virginia.

310.    The Defendant continued distributing large quantities of prescription drugs known for their addictive qualities and likely to be abused regardless of the fact that West Virginia drug abuse statistics had reached epidemic proportions.

311.    While West Virginia was drowning in millions of doses of highly addictive prescription pain killers, the Defendant continued to incentivize the sales of these same narcotics through compensation and commission packages that paid bonuses and commissions on the sales of controlled prescription narcotics such as Oxycodone and Hydrocodone.

312.    The Defendant distributed substantial amounts of other highly addictive prescription medication that it knew or should have known was being diverted to illegal use, including, but not limited to, dilaudid, fentanyl, hydromorphone, morphine, diazepam, methadone, and other medications containing opiates.

313.    In addition to opioids, the Defendant distributed numerous other highly addictive scheduled prescription medications that were likely to be abused, including, but not limited to, amphetam salt, oxazepam, benzodiazepines, and other highly addictive medications.

314.    The Defendant knew or should have known these medications were being diverted for illegal use.

315.    The Defendant had a legal duty to investigate and prevent the misuse of the highly addictive prescriptions medications with which it was flooding the State of West Virginia.

316.    The Defendant is one of the major distributors of controlled substances in West Virginia.

38

317. The Defendant has supplied controlled substances to drugstores and pharmacies that dispense these controlled substances.

318. The Defendant knew or should have known that many of the controlled substances that it was providing to West Virginia were being obtained through often fraudulent prescriptions from physicians who were prescribing controlled substances for illegitimate medical purposes.

319. The Defendant knew or should have known it was supplying pill-mill pharmacies throughout the state.

320. The Defendant was on notice of the suspicious orders it was receiving when it shipped substantial numbers of controlled substances to pharmacies in areas that lacked the population to support the claimed need.

321. The Defendant shipped these controlled substances to pharmacies and drug stores in sparsely populated areas in such quantities that it knew or should have known the controlled substances were being diverted for illegal use.

322. The Defendant received millions of dollars for the controlled substances it shipped into West Virginia.

323. The Defendant had little regard for the havoc it was reeking on the State and its agencies.

324. The Defendant acted negligently in failing to identify and suspend shipments that were suspicious orders.

325. The Defendant's actions were grossly negligent when it failed to identify and suspend shipments of highly addictive controlled substances that were suspicious orders.

326. The Defendant's actions in failing to identify and suspend shipment that were suspicious orders were intentional, oppressive, and with a malicious disregard for the damage it was causing.

327. As a proximate result of the acts and omissions of the Defendant, the Plaintiffs have incurred, and will continue to incur substantial losses, costs, and damages.

328. Plaintiff's actions giving rise to the averments in this Complaint involve a continuing or repeated injury through a series of continuing acts by Defendant.

329. While the examples listed in this Complaint refer to events dating back to 2007, upon information and belief, Defendant had a continuing practice of supplying substantial quantities of highly addictive controlled substances to sparsely populated areas throughout the state dating back to 2002 or earlier.

330. Upon information and belief, Defendant continued supplying suspicious orders through 2015. Thus, the last occurrence in these continuing torts occurred in 2015.

331. Plaintiffs affirmatively state that the continuing tort doctrine applies to all the averments in this Complaint.

## COUNT I
## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

332. Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-331 of this Complaint.

333. Pursuant to W.Va. Code § 60A-5-501(c), the Attorney General is invested with the duty and authority to assist in the enforcement of the provisions of the Uniform Controlled Substances Act.

40

334.     Pursuant to W.Va. Code§ 46A-7-101 *et seq.*, the Attorney General has investigatory powers and the authority to sue for violations of the West Virginia Consumer and Credit Protection Act (WVCCPA), including the right to seek civil penalties and other remedies.

335.     Pursuant to W.Va. Code § 46A-7-111(2), Defendant is liable to Plaintiffs for civil penalties for each violation of the WVCCPA, as determined by the Court.

336.     McKesson engaged in a course of repeated and willful violations of the WVCCPA.

337.     The Attorney General requests that the Court assess civil penalties against the Defendant of five thousand dollars ($5,000) for each violation.

338.     Plaintiffs are entitled to receive their costs and attorneys' fees for prosecuting this action under W.Va. Code §46A-5-104.

339.     The determination of civil penalties is a determination to be made by the Court and is in addition to any amount of damages awarded by the jury.

340.     The Court may also consider the fact that McKesson entered into a previous settlement agreement with six United States Attorney's Offices on May 2, 2008, in which it paid $13.25 million in civil penalties and "entered an administrative agreement with DEA in which it agrees to implement new policies and procedures to detect and prevent drug diversion beyond those currently required by federal regulation."

341.     In making this determination, the Court may consider the egregious behavior of McKesson which resulted in a second settlement with the United States Government in 2015 for $150 million for failure to report suspicious transactions, which also included a requirement for McKesson to develop and implement an effective anti-diversion policy.

41

342.     The volume of controlled substances shipped to West Virginia greatly dwarf the volume of controlled substances represented in this settlement.

343.     Defendant has faced prior investigations and settlement related to the failure to report suspicious sales of prescription medications.

344.     Defendant is one of the largest and most profitable distributors of pharmaceutical drugs in the world.

345.     McKesson receives substantial profits from the sale of its controlled pain killers to states like West Virginia.

346.     McKesson was in the position to develop and implement the most sophisticated and precise system of detecting and stopping the supply of prescription medicine which were suspicious orders.

347.     McKesson has willingly chosen to settle lawsuits as they arose rather than implement a system to prevent diversion of the controlled substances it supplied.

**COUNT II**
**UNFAIR METHODS OF COMPETITION AND/OR UNFAIR OR DECEPTIVE ACTS**
**OR PRACTICES**

348.     Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-347 of this Complaint.

349.     WVCCPA prohibits the use of unfair methods and/or competition or unfair or deceptive acts or practices in any trade or commerce.

350.     The Attorney General is specifically charged with the administration of this provision and may act *sua sponte* as the agent and legal representative of the State in civil proceedings to enforce the WVCCPA.

351.     Violations of statutes and regulations that are enacted to protect the Public or in the exercise of the State's police power constitute unfair or deceptive acts or practices.

352.     Regulations promulgated pursuant to the WV Uniform Controlled Substances Act, W.Va. Code § 60A-3-301(18) provide, *inter alia*, for Defendant to provide effective controls and procedures to guard against theft and diversion of controlled substances. 15 C.S.R. §§ 2-4.2.1; 3.1.1.

353.     Defendant is required to design and operate a system to identify suspicious orders of controlled substances and report such suspicious orders.

354.     Each violation of the mandatory duties in the West Virginia Uniform Controlled Substances Act and its corresponding regulations is an unfair or deceptive act or practice in the conduct of trade or commerce, as set forth in the WVCCPA.

355.     Defendant's repeated violations are willful, wanton, and with reckless disregard to rights of Plaintiffs.

356.     Plaintiffs are entitled to civil penalties under W.Va. Code § 46A-7-111(2) for each violation.

357.     Plaintiffs are entitled to receive its costs and attorneys' fees for prosecuting this action under W.Va. Code §46A-5-104.

## COUNT III
## INJUNCTIVE RELIEF FOR VIOLATIONS OF THE WEST VIRGINIA CONTROLLED SUBSTANCES ACT

358.     Plaintiffs incorporates, by reference, all allegations and averments in Paragraphs 1-357 of this Complaint.

359.     W.Va. Code § 60A-5-501(c) provides:  "All prosecuting attorneys and the attorney general, or any of their assistants, shall assist in the enforcement of all provisions of this act and shall cooperate with all agencies charged with the enforcement of the laws of the United States, of this state, and of all other states relating to controlled substances."

360.     W.Va. Code § 60A-5-503(a) gives this Court the authority to enjoin the Defendant from violations of the WV Controlled Substances Act ("CSA").

361.     Defendant is under an obligation to abide by the regulations promulgated pursuant to the WV CSA.

362.     Defendant is required to obtain a controlled substances permit each year.  15 C.S.R. § 2-4.2.1.

363.     Defendant is required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." 15 C.S.R. § 2-4.2.1

364.     Defendant is required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances. The registrant shall inform the Office of the West Virginia Board of Pharmacy of suspicious orders when discovered by the registrant." 15 C.S.R. § 2-4.4.

365.     Suspicious orders include any orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. 15 C.S.R. § 2-4.4.

366.     Defendant failed to diligently identify and report suspicious orders it received. Defendant continued to fill suspicious orders.

367.     Defendant either blindly ignored suspicious orders or failed to develop a system sufficient to adequately identify suspicious orders as they were received.

44

368.   Upon information and belief, Defendant continues to supply significant quantities of highly addictive prescription pain medication to sparsely populated areas where the population is insufficient to support the level of demand supplied by Defendant.

369.   Upon information and belief, Defendant only developed a plan to identify, detect, report, and cease shipments of suspicious orders as a result of a settlement with the United States in 2015.

370.   Upon information and belief, Defendant's current system to identify, detect, report, and cease shipments of suspicious orders is insufficient to fully protect against the shipment of suspicious orders into West Virginia.

371.   The Plaintiffs have sustained substantial damages as the proximate result of the failure by the Defendant to comply with the CSA and its regulations.

372.   The Plaintiffs will continue to suffer significant additional damages unless this Court issues an injunction preventing it from continuing to violate the law.

373.   The claims for damages for past losses and future costs sustained by the Plaintiffs are insufficient to prevent future losses that will result for the failure of the Defendant to comply with West Virginia and United States laws and regulations as detailed herein.

374.   Plaintiffs are entitled to a temporary injunction to prevent Defendant from continuing to violate West Virginia and United States laws and regulations.

375.   Plaintiffs are entitled to a permanent injunction to prevent Defendant from continuing to violate West Virginia and United States laws and regulations.

## Count IV
## NEGLIGENT VIOLATION OF LAW

376.   Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-375 of this Complaint.

377. The Defendant contributed to the epidemic prescription drug abuse problem in the State of West Virginia through repeated negligent violations of various provisions of the West Virginia Uniform Controlled Substances Act, to wit:

- Defendant negligently and improperly dispensed, and continues to dispense prescriptions contrary to W.Va. Code § 60A-3-308;

- Defendant negligently engaged in prohibited acts, contrary to W.Va. Code §§ 60A-4-401 through 403;

- Defendant negligently abetted and continue to abet individuals in deceiving and attempting to deceive medical practitioners in order to obtain prescriptions in violation of W.Va. Code § 60A-4-401.

- The Defendant negligently failed to meet the requirements of W.Va. Code § 60A-8-1 *et seq.*

- The Defendant negligently conspired to violate the WV Uniform Controlled Substances Act.

378. The Defendant is a distributor of controlled substance and must comply with both the laws of West Virginia and with industry customs and standards.

379. Industry standards require Defendant to:

- know its customers,

- know its customer base,

- know the population base served by a particular pharmacy or drug store,

- know the average prescriptions filled each day,

- know the percentage of diverted and/or abused controlled substances distributed as compared to overall purchases,

46

    • have a description of how the dispenser fulfills its responsibility to ensure that prescriptions filled are for legitimate medical purposes, and

    • know the identification of the physicians and bogus pain clinics and centers for the alleged treatment of pain that are the pharmacy or drug stores' most frequent prescribers.

380.    Defendant negligently failed to ensure its conduct conformed to industry standards.

381.    Defendant negligently failed to ensure its conduct conformed to West Virginia law and regulations.

382.    Defendant negligently failed to conform its conduct conformed to United States law and regulations.

383.    Defendant negligently turned a blind eye to the foregoing factors by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom reasonably can be expected to become addicted or to engage in illicit drug transactions.

384.    Defendant's negligent acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia.

385.    Defendant's negligent acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive

prescription pain killers to individuals with no medical evidence supporting the prescription.

386.     Defendant's negligent acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

387.     Defendant's negligent violations of West Virginia law make it liable for all the damages which are sustained therefrom.  W.Va. Code § 55-7-9.

388.     Defendant's negligent acts and omissions have proximately caused and substantially contributed to damage suffered by the State and its agencies, created conditions which contribute to the violation of West Virginia laws by others.

389.     Defendant's negligent acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiffs and were in violation of the customs, standards and practices within Defendant's own industry.

390.     Upon information and belief, Defendant continues to negligently violate West Virginia laws and regulations, United States laws and regulations, and Defendant's industry customs, standards and practices, which continue to proximately cause substantial damages to Plaintiffs.

## COUNT V
## INTENTIONAL ACTS AND OMISSIONS

391.     Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-390 of this Complaint.

392.     The Defendant intentionally contributed to the epidemic prescription drug abuse problem in the State of West Virginia through repeated intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act and through reckless disregard to the safety and well-being to the citizens of West Virginia, to wit:

48

- Defendant intentionally and improperly dispensed, and continues to dispense prescriptions contrary to W.Va. Code § 60A-3-308;

- Defendant intentionally engaged in prohibited acts, contrary to W.Va. Code §§ 60A-4-401 through 403;

- Defendant intentionally abetted and continue to abet individuals in deceiving and attempting to deceive medical practitioners in order to obtain prescriptions in violation of W.Va. Code § 60A-4-401.

- Defendant intentionally failed to meet the requirements of W.Va. Code § 60A-8-1 *et seq.*

- Defendant intentionally conspired to violate the WV Uniform Controlled Substances Act.

393. Defendant intentionally failed to ensure its conduct conformed to industry standards.

394. Defendant intentionally failed to ensure its conduct conformed to West Virginia law and regulations.

395. Defendants intentionally failed to conform its conduct conformed to United States law and regulations.

396. Defendant intentionally turned a blind eye toward the foregoing industry standards outlined in Paragraph 227 by regularly distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

49

397. Defendant's intentional acts and omissions have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in West Virginia.

398. Defendant's intentional acts and omissions supplied millions of doses of commonly-abused, highly addictive controlled substances that supported the demands of bogus pain clinics that did little more than provide prescriptions of highly addictive prescription pain killers to individuals with no medical evidence supporting the prescription.

399. Defendant's intentional acts and omissions fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

400. Defendant's intentional violations of West Virginia law make it liable for all the damages which are sustained therefrom. W.Va. Code § 55-7-9.

401. Defendant's intentional acts and omissions have proximately caused and substantially contributed to damage suffered by the State, and created conditions which contribute to the violation of West Virginia laws by others.

402. Defendant's intentional acts and omissions have proximately caused and substantially contributed to damages suffered by Plaintiffs and were in violation of the customs, standards and practices within Defendant's own industry.

403. Upon information and belief, Defendant continues to intentionally violate West Virginia laws and regulations, United States laws and regulations, and Defendant's industry customs, standards and practices which continue to proximately cause substantial damages to Plaintiffs.

50

## COUNT VI
## PUBLIC NUSIANCE

404.    Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-403 of this Complaint.

405.    Defendant, individually and acting through its employees and agents has created and continue to perpetuate and maintain a public nuisance to the citizens of West Virginia through it massive distribution of millions of doses of highly addictive, commonly abused prescription pain killers.

406.    Defendant's failure to put in place effective controls and procedures to guard against theft and diversion of controlled substances, and its failure to adequately design and operate a system to disclose suspicious orders of controlled substances, and by its failure to inform the State of suspicious orders when discovered by the registrant ("suspicious orders" include orders of unusual size, orders, deviating substantially from a normal pattern, and orders of unusual frequency) has created a public nuisance to the citizens of West Virginia.

407.    Defendant knew or should have known its conduct would cause harm or inconvenience to the State of West Virginia in a multitude of ways.

408.    As a direct and proximate result of the conduct of the Defendant, as set forth herein, Defendant has negligently, intentionally, and/or unreasonably interfered with the right of West Virginia Citizens to be free from unwarranted injuries, addictions, diseases and sicknesses, overdoses from prescription pain medication, and ongoing damage, harm, inconvenience and ongoing damage, harm and inconvenience to the State of West Virginia, its agencies, and its residents who have been exposed to the risk of addiction to prescription drugs, who have become addicted, and/or have suffered other adverse

51

consequences from the use of the addictive prescriptions drugs, and have been adversely affected by the addiction and abuse of others in their communities from highly addictive, prescription pain medication distributed by Defendant.

409.     Defendant's actions have and will continue to cause the State, its agencies, and will cause countless West Virginia citizens to suffer the same fate in the future if Defendant's conduct continues.

410.     As a direct result of Defendant's conduct, as set forth herein, Defendant has negligently, intentionally, recklessly, maliciously, oppressively, and/or unreasonably interfered with the public's right to be free from unwarranted injury, disease or sickness, criminal actions, and have cause ongoing damage, harm and/or inconvenience to the public health, the public safety, and the general welfare of the citizens of the State of West Virginia.

411.     The health and safety of the citizens of West Virginia, including those who have used or will use prescription drugs, is a matter of great public interest and of legitimate concern to the State and its citizens.

412.     The public nuisance created, perpetuated, and maintained by Defendant can be abated and fur occurrence of such harm and inconvenience can be prevented.

413.     Defendant was on notice that an epidemic from prescription drug abuse existed and has existed during all relevant times for this Complaint as the result of:

- A large amount of media coverage of prescription drug abuse and its consequences by both national and local print, television, and radio media;

- Multiple documentary movies depicting the state of prescription drug abuse in West Virginia;

52

- Publications received from government sources as well as warnings and recommendations contained in trade and professional journals; and

- Changes in law and regulations which were designed specifically to address the growing problem of prescription drug abuse.

414.    The widespread publicity contained many references and statistics concerning West Virginia's problems from prescription drug abuse, including, but not limited to, suffering the nation's highest per capita death rate from prescription drug overdose.

415.    Notwithstanding the knowledge of this epidemic of prescription drug abuse in West Virginia, Defendant persisted in a pattern and practice of distributing controlled substances of kinds which were well-known to be abused and diverted all while distributing the controlled substances in geographic areas, and in such quantities and with such frequency, that the Defendant knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes.

416.    As a direct and proximate result of the above-described conduct, Defendant negligently, recklessly, maliciously, oppressively, and/or intentionally, and acting with blind indifference to the facts, created and continue to propagate a public nuisance. More particularly, the public nuisance created by Defendant, injuriously, and in many areas pervasively, affects West Virginia communities and the State, and endangers the public health and safety and inconveniences the citizens of the State, including, but not limited to the following ways:

- Areas in certain communities have become congested with persons who gather in large groups outside of "clinics, pharmacies and physician offices"

53

that in fact are component parts of Pill Mills that exist only to prescribe and deliver drugs for illicit, non-medical purposes;

- Crimes and other dangerous activities have increased;

- Hospital services, especially those services provided by emergency rooms, are being consumed by persons with prescription drug abuse issues;

- Law enforcement and prosecutorial resources are being exhausted and consumed by having to address prescription drug abuse issues to the exclusion of other matters;

- Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the public at large;

- Court dockets are congested by prescription drug-related cases as well as by crimes committed by addicts, thereby diminishing access to the courts by others;

- Jails and prisons suffer from overcrowding as a result of the epidemic level of prescription drug abuse and crimes committed to support addiction to prescription drugs.

417.    As a direct result of the acts and/or omissions of Defendant in creating, perpetuating, and maintaining the public nuisance hereinabove described, the public nuisance described herein has damaged the health and safety of West Virginia citizens in the past will continue to do so in the future unless the nuisance is abated.

54

418.    Plaintiffs have sustained economic harm in the expenditure of massive sums of monies and will continue to suffer economic harm in the future unless the above-described public nuisance is abated.

**COUNT VII**
**NEGLIGENCE**

419.    Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-418 of this Complaint.

420.    The Defendant has a duty to exercise reasonable care in the distribution of controlled substance.

421.    Defendant has breached this duty by its conduct, as illustrated by the sampling of examples listed above.

422.    As a proximate result, Defendant and its agents have caused Plaintiffs to incur excessive costs related to diagnosis, treatment and cure of addiction or risk of addiction to such controlled substance, thus the State has borne the massive costs of these illnesses and conditions by having to provide necessary medical care, facilities and services for treatment of citizens of West Virginia who are unable to afford or otherwise obtain such necessary medical care, facilities and services.

423.    Defendant was negligent in failing to monitor and guard against third-party misconduct, e.g., the conduct of the Pill Mill physicians and staff as well as corrupt pharmacists and staff, and, in fact, by their actions Defendant participated and enabled such misconduct.

424.    Defendant's acts and omissions, as averred above, imposed an unreasonable risk of harm to others separately and/or as combined with the negligent and/or criminal acts of third parties.

55

425.    Defendant is in a class of a limited number of parties that can legally distribute controlled substances, which places it in a position of great trust by the State.

426.    The trust placed in Defendant by Plaintiffs through the license to distribute controlled substances in West Virginia creates a duty on behalf of Defendant to prevent diversion of the medications it supplies to illegal purposes.

427.    A negligent and/or intentional violation of this trust poses distinctive and significant dangers to the State and its citizens from the diversion of controlled substances for non-legitimate medical purposes and addiction to the same by consumers.

428.    Defendant was negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

429.    Controlled substances are dangerous commodities.

430.    Defendant is required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of controlled substances during distribution.

431.    Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

432.    The duty owed by Defendant to Plaintiffs cannot be delegated to another party.

433.    Defendant is in exclusive control of the management of the controlled substances it distributed to pharmacies and drug stores in the State of West Virginia.

434.    Plaintiffs are without fault and the injuries to the State of West Virginia and its citizens would not have happened in the ordinary course of events had Defendant used

due care commensurate to the dangers involved in the distribution of controlled substances.

## COUNT VIII
## UNJUST ENRICHMENT

435.    Plaintiffs incorporate, by reference, all allegations and averments in Paragraphs 1-434 of this Complaint.

436.    Because of prescription drug abuse, the Plaintiffs have expended substantial amounts of money annually that it would not have otherwise expended on numerous services through various agencies, including, but not limited to:  Increased law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, corrections and correctional facilities, probation and parole, public welfare and service agencies, healthcare and medical services and drug abuse education.

437.    Plaintiffs have lost revenue and incurred costs from workplace accidents, absenteeism, and decreased productivity from prescription drug abuse.

438.    Plaintiffs remain responsible for costs of prescriptions, health care, and other medically-related costs, rehabilitation, and work-related programs, workers' compensation, public insurance, law enforcement, prosecution costs, court related costs, public defender services, correctional institutions, probation and parole services, which costs have substantially increased as a result of the Defendant's acts and omissions.

439.    Plaintiffs will continue to incur these increased costs in the future as a result of the Defendant's conduct listed herein.

440.    Defendant made substantial profits while fueling the prescription drug epidemic in West Virginia.

441.     Defendant continues to receive considerable profits from the distribution of controlled substances in West Virginia.

442.     Defendant was unjustly enriched by its negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

443.     Defendant's sales of prescription medications other than those listed herein were increased by the Defendant's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing by its distribution of drugs which were diverted for purposes other than legitimate medical needs.

444.     Defendant's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing entitle Plaintiffs to disgorgement of the profits received by Defendant for all sales it made in West Virginia from 2007 to present.

445.     Defendant's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing have unjustly enriched the Defendant and are directly related to the damages, losses, and to the detriment of the Plaintiffs.

446.     Defendant is liable to Plaintiffs for all damages incurred as a result of Defendant's negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing contained herein.

**PRAYER**

**WEHREFORE,** the Plaintiffs prays that the Court grant the following relief:

1.  Judgment in favor of Plaintiffs;

2.  A temporary restraining order preventing Defendant from continuing to violate West Virginia laws and regulations and United States laws and regulations relating to the distribution of controlled substances in the State and mandate Defendant to promptly

58

notify the West Virginia Board of Pharmacy, Office of the Attorney General, and the WV Department of Military Affairs and Public Safety of any and all suspicious orders for controlled substances as received from parties who are located in West Virginia and to submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendant from distributing any controlled substance in West Virginia for any non-legitimate medical purpose;

3. A permanent restraining order preventing Defendant from continuing to violate West Virginia laws and regulations and United States laws and regulations relating to the distribution of controlled substances in the State and mandate Defendant to promptly notify the West Virginia Board of Pharmacy, Office of the Attorney General, and the WV Department of Military Affairs and Public Safety of any and all suspicious orders for controlled substances as received from parties who are located in West Virginia and to submit their system for determining suspicious order to those West Virginia authorities for prior approval, and to enjoin Defendant from distributing any controlled substance in West Virginia for any non-legitimate medical purpose;

4. Equitable relief, including, but not limited to restitution and disgorgement;

5. Order a jury trial on all issues so triable to determine costs, losses, and damages as a result of the Defendant's actions outlined in this Complaint. Including, but not limited to:

    a. Losses sustained as the proximate result of both negligent and conscious violations of the West Virginia Uniform Controlled Substances Act and regulations;

b. Damages sustained as the proximate result of nuisances created by the prescription drug abuse epidemic in the State;

c. Damages and losses sustained as a proximate result of tDefendant's negligence in marketing, promoting, and distribution of controlled substances in West Virginia;

d. Damages and losses sustained as a proximate result of Defendant's intentional actions in marketing, promoting, and distribution of controlled substances in West Virginia;

e. Disgorgement of profits from Defendant's unjust enrichment;

f. Civil penalties of up to $5,000 for each violation of the WVCCPA;

g. Civil penalties of up to $5,000 for each unfair and deceptive act in trade in West Virginia.

h. Pre- and post-judgment interest;

6. Such other relief, fees and costs as shall be available under the WVCCPA;

7. Punitive damages for Defendants willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

8. Attorneys' fees and costs;

9. And such other relief as this Court deems just and fair;

**PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE**

> **STATE OF WEST VIRGINIA**
> *ex rel.* **PATRICK MORRISEY,**
> Attorney General, **JOSEPH THORNTON,**
> In his capacity as the Secretary of the **WEST VIRGINIA DEPARTMENT OF MILITARY AFFAIRS AND PUBLIC SAFETY,** an agency of the State of West Virginia, and **KAREN BOWLING,** in her capacity as the Secretary of

60

the **WEST VIRGINIA DEPARTMENT OF
HEALTH AND HUMAN RESOURCES,** an
agency of the State of West Virginia,.

Vaughn T. Sizemore (WVSB #8231)
Deputy Attorney General
Office of the Attorney General
State Capitol Building 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021 Fax: (304) 558-0140
vaughn.t.sizemore@wvago.gov

L. Lee Javins, II (WVSB # 6613)
Special Assistant Attorney General
Bailey, Javins & Carter, LC
213 Hale Street
Charleston, WV 25301
(304) 345-0346 Main (304) 345-0375 Fax
LJavins@bjc4u.com