1                IN THE DISTRICT COURT OF THE UNITED STATES
                    FOR THE NORTHERN DISTRICT OF OHIO
2                             EASTERN DIVISION


3
        IN RE: NATIONAL                )
4       PRESCRIPTION                    )
        OPIATE LITIGATION,              )
5                                       )       Civil Action
                                        )       Number 1:17MD02804
6                                       )
         APPLIES TO ALL CASES           )
7                                       )
                                        )

8

9
                              - - - - -
10
            TRANSCRIPT OF TELECONFERENCE PROCEEDINGS HAD BEFORE
11
                          DAVID R. COHEN
12
                          SPECIAL MASTER
13
                    ON WEDNESDAY, JUNE 6, 2018
14                            - - - - -

15

16

17

18
        Official Court Reporter:         Shirle M. Perkins, RDR, CRR
19                                        U.S. District Court
                                          801 West Superior, #7-189
20                                        Cleveland, OH 44113-1829
                                          (216) 357-7106
21

22

23

24      Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.
25

```
 1    APPEARANCES:

 2      For the Plaintiffs:          PETER WEINBERGER, ESQ.,
                                      Spangenberg, Shibley &
 3                                    Liber
                                      Suite 1700
 4                                    1001 Lakeside Avenue, E
                                      Cleveland, OH 44114
 5                                    (216) 696-3232

 6      For Defendants               MARK S. CHEFFO, ESQ.,
        Purdue Pharma L.P.,          Dechert - New York
 7      Purdue Pharma Inc.,          Three Bryant Park
        And The Purdue               1095 Avenue of the Americas
 8      Frederick Company, Inc.:     New York, NY 11036
                                     (212) 698-3500
 9
      Also Present On Phone:
10
      Sal Badala, Esq.,
11    Paul Hanly, Esq.,
      Peter Mougey, Esq.,
12    Steve Reed, Esq.,
      Linda Singer, Attorney-at-Law
13    Sabrina Strong, Attorney-at-Law

14

15

16

17

18

19

20

21

22

23

24

25
```

1          WEDNESDAY SESSION, JUNE 6, 2018, AT 10:49 A.M.

2                    SPECIAL MASTER.  Good morning, everybody.

3     This is David Cohen.

4                    COUNSEL:  Good morning.

11:00:59  5                SPECIAL MASTER:  First, let me ask if we have

6     the most important person on the line.  Shirle, are you on?

7                    COURT REPORTER:  Yes, I am.

8                    SPECIAL MASTER:  Okay.

9          So let's talk just for a minute about logistics.

11:01:12 10         I'm hearing a lot of background noise.  Everybody

11    needs to not be on a speaker phone.  If you're on a speaker

12    phone, take it off speaker and pick it up.

13         The other thing that needs to happen is that if you're

14    not speaking, you need to mute so we're not picking up

11:01:32 15   anybody's conversations or background noises.  This is going

16    to be tricky because we have so many people on the phone.

17         And finally, as we proceed, we're going to be on the

18    record.  Right now I'm hearing a lot of background noise.  I

19    cannot have that.  Somebody's typing.

11:02:02 20        During the course of this conversation, we're going to

21    have a Court Reporter.  Obviously Shirle can't see who's

22    speaking or tell who's talking necessarily.  So that means

23    you need to, every time you begin to speak, say your name.

24    Okay.

11:02:21 25        Rather than take a roll call, I think we'll just find

1    out who's doing the talking as it -- as it occurs.

2        Shirle, if at any time you're having trouble figuring

3    out who's speaking or if somebody forgets to say their name

4    or you you're not hearing what's happening or there's

11:02:40  5    background noise, please interrupt us because I do want to

6    make sure we do get a transcript.  Okay.

7        So we're on the record, and we have a number of

8    discovery issues to address, some of which I may rule on

9    during the course of this call, some of which I may rule on

11:03:01 10    later.  But, this is all an issue by Defendants who are

11    essentially complaining about the productions they received

12    from Plaintiff so far.  And I'm guessing that Mark Cheffo

13    wants to take the lead on that.  So Mark you want to be

14    begin?

11:03:23 15        MR. CHEFFO:  Sure.  And hopefully I'm on the

16    record in the informality of -- we will be using first names

17    so I assume that that's okay for all of us if you want more

18    formal with Mr. and Mrs., we can do that, but you think

19    that's necessary.

11:03:39 20        SPECIAL MASTER:  I appreciate your asking, but

21    first names are fine.  Thank you.

22        MR. CHEFFO:  Great.  So and others --

23        COURT REPORTER:  I'm sorry.  I'm sorry.  I'm

24    hearing background noise.  I didn't get what you said.

11:04:01 25        MR. CHEFFO:  Okay.  Sorry.  Thanks for letting

1    me know.

2         This is Mark Cheffo, and I'll be speaking on behalf of

3    the Defendants, the manufacturing Defendants to the extent

4    that there are issues that impact us broadly.  If we get

11:04:19  5    into specific Defendant issues, I will defer to my

6    colleagues who are on the phone.

7         But, I know you and the others on the phone, the

8    Plaintiffs want to get into the meat of these issues

9    probably, but I would like to spend just a minute or two on

11:04:34  10    some background because I think it informs this

11    conversation.

12         The first, we have very diligently tried to comply

13    with the letter in the spirit of both the local rules, the

14    CMO Number 1, Judge Polster's admonitions and directions,

11:04:53  15    your, David, you know, kind of guidance on how we should

16    proceed, as well as Magistrate Judge Ruiz.

17         This essentially started this issue when we had

18    received responses to our requests for documents from the

19    Plaintiffs.

11:05:11  20         Frankly and candidly, they were embarrassingly

21    deficient.  They were just completely nonresponsive in many

22    respects.  The number of documents that were produced were,

23    again, shocking to us in light of the allegations and the

24    number of Plaintiffs' lawyers.  They were essentially a

11:05:32  25    collection of things thrown over in advance of the last

1    hearings that were publicly available.

2         So we would have been within our rights to essentially

3    have a pro forma type meet and confer and immediately come

4    to the Court, recognizing the extremely tight time frame.

11:05:50   5    However, we didn't do that.  We had an initial meet and

6    confer, which was largely unhelpful in the sense that the

7    Plaintiffs were not prepared to talk about anything,

8    couldn't make any commitments, couldn't tell us what they

9    were doing, and had a full bunch of questions about things

11:06:04  10    that we said that we would like to answer.  And we continued

11    the process.

12         As a footnote, there are, as you know, interrogatory

13    responses which are equally embarrassingly deficient, but we

14    did not kind of put those in our letter now because in good

11:06:21  15    faith and candor, we thought we hadn't fully gone through

16    the process that we'd expect the Court and Special Master to

17    adhere to.

18         So we're here today, from our perspective, to talk

19    about three lengthy meet and confers over the course of, I

11:06:37  20    think it's two weeks, trying to work out submissions.

21         Now again, in fairness, the reason why we have meet

22    and confers is that process can work.  So where we were

23    probably two weeks ago on some of our issues, some of them

24    had been resolved.  The Plaintiffs and us have explained to

11:06:52  25    make sure we worked on things, to make certain commitments,

1    we clarified and the process has worked.  Where we are today

2    is trying to narrow the specific issues that we think issue

3    has been joined.  I don't think you'll hear today that we

4    didn't give the Plaintiffs enough time to kind of go through

5    these issues.

6         And the final point on this background I'll raise is

7    -- one final point is that you know that this is directed to

8    two of the three counties or two of the three complaints

9    because we have been adding an ongoing dialogue with

10   Cleveland as late as yesterday.  They've indicated that

11   they're going to produce much of the information in terms of

12   individual data about certain criminal conduct and files

13   that they have, I think it's from the Prosecutor.  They're

14   basically agreeing to let us review those attorneys' eyes

15   only, while they redact and work through some of the issues.

16        So the things that you may hear today are impossible.

17   We can't do, they're irrelevant, they're not burdensome.  At

18   least one of the counties is, in fact, important -- I don't

19   know that we've reached agreement on all issues.  We may

20   come back, they may have other issues, but I think the point

21   here is that we don't think it's being precipitous is what

22   appropriate, and we've seen this, and I think -- my kind of

23   last comment on this is that we're going to all be having to

24   deal with each other for a long time, and this has been a

25   kind of a serial and recidivist sandbagging because whether

1    it's hearings that we hear things the first time or

2    conferences with the Judge or we basically tell them we're

3    going to tee this up on Friday, they don't say anything, and

4    they write a 21-page letter.  And some of it -- again,

11:08:43  5    almost comical.  Some of their -- there's actually a meet

6    and confer on some of the issues the Plaintiff has raised an

7    hour after this call.

8        We have other Defendants on the call you'll hear talk

9    to them about two hours I think people wrote the letter, and

11:08:58  10    none of these issues were raised.  From our perspective,

11    David, I'd like to -- again, you're the boss on this and

12    you'll tell us how you'd like to proceed -- but, we think

13    that there are some important but relatively discreet issues

14    with respect to certain document requests and the scope of

11:09:16  15    production and the time of production that we think are

16    incredibly ripe and overdue.

17        We think that with respect to other things, including

18    our own interrogatories, which are not ripe today, and the

19    Plaintiffs' letters -- they've admitted that there's a bunch

11:09:30  20    of meet and confers for that to happen.  We're not

21    suggesting they have no opportunity to deal with that, but

22    the process should be followed -- this is exactly what Judge

23    Polster said the last time they tried it at the status

24    conference that the meet-and-confer process should go

11:09:43  25    forward.  And if we reach an impasse, he can deal with it.

1          So I'd like to just, you know, if it's okay with you,

2     kind of proceed right now at least into the -- really I

3     think there's two main kind of broad areas of dispute with

4     respect to our document requests, and their responses, and

11:10:05  5     those relate to Number 6 and 7.

6          Before I jump into that, David, is it okay to proceed

7     or do you have questions at this point?

8               SPECIAL MASTER:  Nope.  Please continue.

9               MR. CHEFFO:  Okay.

11:10:17 10          So -- and I'm going to -- sorry.  Before we -- I mean

11     obviously, I'm not in the same room with all my colleagues

12     who are independently representing their own clients and

13     obviously as talked about, I'm -- you know, we talked about

14     this and tried to coordinate.  But I just say that because

11:10:32 15     at some point, I would at least like to, before we let the

16     Plaintiffs respond, just make sure that the other folks on

17     the phone don't have anything to add.  But I think I've

18     tried to at least get all comments to make this more

19     streamlined of what our positions are.

11:10:50 20          So you have this in front of you, David.  So I'm not

21     going to, you know, try to read to you necessarily the

22     document requests.  I think I would -- I would highlight

23     really two things.  Our frustration and our concern is

24     largely driven by time and kind of the lack of what we

11:11:09 25     perceive on these two issues any movement on the Plaintiffs.

1          And again, to their credit on this, from the first

2    time they basically said there's no movement; we're not

3    producing individual information whatsoever, at least these

4    two.  We know that Cleveland has taken a different and we

11:11:27  5    think a more appropriate response.  But here's kind of what

6    the Plaintiffs claim.  They say that the information is not

7    relevant, but of course, fourth Plaintiffs' claims are the

8    Defendant's conduct, quote, improper prescriptions to be

9    written, which in turn caused a spectrum of societal harms;

11:11:46 10    overdose, homelessness, crime, loss of revenue.

11          And the problem here is that Plaintiffs can at the

12    same time allege that thousands of their citizens became

13    addicted to or abused or harmed by improperly prescribed

14    opiate medication without producing the information about

11:12:03 15    those underlying medical histories and prescription and risk

16    factors.  And this seems to be to us very much like

17    Groundhog Day because we know from the CMO that was issued

18    by the Court the Plaintiffs had on July 13th, July 18th, to

19    provide the specific medically unnecessary prescriptions.

11:12:25 20    We also know for a fact the Plaintiffs have often out of the

21    Chicago litigation manufactured -- this is exactly what we

22    argued they lost.  I think they agreed to produce the

23    underlying claims database first, which they were on.

24    Apparently, the strength of this was dealing before the case

11:12:43 25    got sent to the MDL, and then from there, they were going to

1    have to produce the medically unnecessary.

2          And to be clear, we think that we're coordinate with

3    the CMO's obligation.  So they do have an obligation to

4    provide the specific medically unnecessary information in

5    July, but like anything else, I think like in your note

6    yesterday, it doesn't preclude them from giving what they

7    have currently identified.  And to be clear, we're not only

8    focused, I think medically, the medical information is very

9    important, but it's not the only issue, I think as Cleveland

10   has identified, whether it's seeking damages for

11   investigations, for overdoses, police intervention,

12   hospitalization, all of those things are within the

13   Plaintiffs' purview and they have it.  I'll talk in a minute

14   about why we know they have it.

15         And the other frustration from our point, frankly, is

16   that some of the best lawyers on the Plaintiffs' side in the

17   country, if not virtually all of them, huge law firms, have

18   spent their time running around the country signing up new

19   municipalities.  There's not a day that goes by without a

20   new lawsuit.  But yet, we were shocked to hear in our first

21   call, one, where we started looking two weeks ago, this is

22   hard, we -- this is premature, I think we heard initially,

23   which was kind of to me stunning since the fact we had a

24   discovery cut off.  I don't think we could ever comply with

25   this by the August cut off.  And even in light of that, we

1    didn't run before.  We said let's continue to work this out.

2    But you know what?  These people and these very good

3    lawyers, they have the resources.  And they need to do what

4    they're expecting the Defendants to do, which is to actually

11:14:35  5    go roll up their sleeves, do some interviews, produce some

6    documents, give us time lines; give us search terms, give us

7    the ESI, identify the databases that have all this

8    information, and produce it.

9         I mean that's not -- it may be a little bit of a

11:14:51 10   challenge, but you know, I think the Defendants would say

11   welcome to our world.  This is what happens when you

12   actually have clients who have documents, but it's perfectly

13   appropriate.

14        And the other issue that we've heard a lot about is

11:15:03 15   well, we may at some point use a model or statistical, you

16   know, but we're not sure what we can tell you.  We don't

17   have to tell you until expert time.

18        Well, look.  We have our issues and it would be no

19   surprise if I tell you that if they told us that we use a

11:15:20 20   model, we'd probably object to that and we might say we're

21   going to make it a valid motion or whatever we deal with,

22   but in the cases that they've cited, they don't basically

23   say the Plaintiff gets to tell the Defendant that they get

24   to use a model that they're not producing and somehow, that

11:15:36 25   essentially abrogates the Defendant's ability to take

1    discovery of the other side.  They can do what they want to

2    prove their case, but we have to get the information we need

3    to defend ourselves.

4         Also again, somewhat shockingly, the Plaintiffs have

11:15:52  5    no -- no problem.  They sent us out scores of deposition

6    notices on Monday.  But, at the same time, they have a

7    voracious appetite for every single document that our

8    clients ever produced and want to proceed with scores of

9    depositions.  We're at the deposition -- I probably should

11:16:10  10   have started with this.  We have like 500 documents.  One of

11   the -- I have the statistics here.  It's like we're not even

12   in a position -- if we wanted to send out deposition

13   notices, we could do it in a way that would be wholesome

14   because we don't have the most basic information.

11:16:32  15        And as you know, we talked about, our clients have

16   produced, you know, tens of millions of pages of documents.

17   So on the first point -- and I think two things I would

18   highlight, David, and I'm happy to go through it because I

19   really think you have to kind of -- I suspect you have our

11:16:51  20   submission.

21             SPECIAL MASTER:  Of course.

22             MR. CHEFFO:  Yes.  Thanks.

23        So if you look at -- this is one of the documents

24   that's produced.  As you can see, it's not -- it's pretty

11:17:05  25   interesting, but this is something that you pull off the

1    website.  It's a public report, and I think 25 pages, and

2    this is from Cuyahoga.  And virtually, every page of this,

3    whether everyone agrees with it or not, but the point is

4    every page is kind of a treasure trove of information.

11:17:27    5    Right?  I mean it's incredible -- they say we don't have it.

6    It's too hard to find individual information.  We can't give

7    you the medical records.  We don't know this.

8        Look at Page 1.  They're telling us in 2016, six, you

9    know, exactly how many, the number of deaths from this

11:17:47 10    fentanyl product.  From that, with incredible specificity.

11    656, 591, 557, and they go through each of -- they take it

12    out by each of the sentinels.  So there's only -- the

13    medical examiner didn't make that up.  That's all the

14    information that he or she has and should have been produced

11:18:02 15    to us a month ago.

16        Look at every single page.  Heroin, they know exactly

17    how many deaths are related to heroin.  Of course, that's

18    part of their claim.  Right?  They're claiming that the

19    whole opioid epidemic is caused by the Defendant.  So we're

11:18:17 20    entitled to all that underlying information; the heroin, the

21    fentanyl.

22        And somewhat ironically, you look at the third line,

23    the cocaine deaths are really striking.  I haven't heard

24    anything from the municipalities what they're doing to

11:18:33 25    address the huge increase in cocaine deaths, but that's also

1     something that is another factor that we're entitled to that

2     information to show what's being used in conjunction with

3     opioids.

4         And again, David, I'm not going to go through every

11:18:47 5    one of these, but you literally could look at each one of

6     these and you could probably have ten different

7     interrogatory and document requests, all of which I think

8     are probably covered by what we serve, but this level of

9     information is available, at least at the high level, the

11:19:04 10   Plaintiffs at this point tell us they have no idea, they

11    haven't looked and they've not produced, to my knowledge,

12    other than this publicly-available document, one single page

13    of underlying information as to any of this.

14        I mean when you look down to some of the middle of it,

11:19:18 15   it is demographic analysis.  You look at the level of

16    detail; black, white, Hispanic, you know, 19 to 29, 30 to

17    44, age groups are different, all different drugs.  I mean

18    all of this is exactly the kind of information that -- they

19    may disagree.  They may think they have some statistical

11:19:40 20   model that they can wave their hand over to prove their

21    entire case.  Great.  We'll look at that when we get it, but

22    we're entitled to basically show all the things that are

23    defenses, which are that these are individual issues.  These

24    are approximate causation issues.

11:19:54 25       There are hundreds of other factors.  Issues like

1    fentanyl and heroin are not connected to the prescription

2    medicines.  There are other prescription medicines.  And the

3    last one, if you look at the last page, some of the

4    information that they talk about, you know, it's irrelevant,

11:20:13  5    to have individual data, well, what they basically did is

6    their own medical examiner's comparison of heroin overdoses.

7    They look to me like every single one did what looks like --

8    can't say whether it's right or wrong or whether we agree

9    with it, but it looks like on paper to be extremely like a

11:20:33 10   forensic analysis of every single death, at least here from

11   heroin from 2012, '13 or '14, right with incredible

12   specificity on percentages.

13        So the fact that we are on the phone right now a month

14   after discovery, we've gotten a few hundred pages of

11:20:51 15   documents, we've gotten no commitments to when we're going

16   to get things, we know from their own documents that they

17   produced, they have this information.  They won't tell us

18   what they're going out to do it.  They're basically

19   stonewalling producing what we think is the most important

11:21:06 20   information for us in order to defend these cases, and

21   they're also preventing us from proceeding with depositions

22   because we don't have the information.

23        So the last thing I think I'll say is I would also,

24   again, highlight --- and I don't know if you've had a chance

11:21:25 25   to see it.  We just received the letter and I'm trying to --

1    I don't like reading letters.  But, I think I'm just going

2    to read this, David, for the benefit of the record and just

3    so you have it.  This is something that we received, dated

4    June 4th.  If you folks don't have it, I'm happy to send it

11:21:44    5    around, but it's from David Butler, and he represents

6    Cleveland.

7        And he said, "Counsel: Cleveland has approximately

8    2200 hard copy narcotics duty reports and approximately 1776

9    narcotics overtime records that contain duty reports, that

11:22:04   10    didn't make available for inspection and tagging at test

11    Cleveland office starting later this week.  These narcotics

12    duty reports contain extremely sensitive investigatory

13    reports and detailed investigatory techniques identified

14    victims and informants and identified active investigations.

11:22:24   15        "We are in the process of redacting and preparing

16    these documents for production.  But, because of the

17    confidential information so pervaded all bases throughout

18    these records and we are striving to make them available as

19    quickly as possible, we are making them available for

11:22:40   20    inspection.

21        "Additionally, we believe good call for this under

22    Paragraph 6H of CMO3 to make these records available in hard

23    copy format so that the Defense can review these records

24    immediately, rather than wait until wholesale redaction of

11:22:57   25    these records is performed.  That would be extremely taxing

1    of significant blocks of information that are contained on

2    these records.

3        "Finally, we also have compiled some Gingell's

4    records, G-I-N-G-E-L-L'S, that are of a similar nature, and

11:23:15  5    that will be included with the duty reports for inspection.

6    Anyone from the Defense that reviews these records should

7    not have criminal defense as part of their practice in the

8    case.  Thank you."

9        So again, the point there is the reason why we did not

11:23:28 10    move -- we still have some issues with Cleveland but that

11    shows, at least in this regard, fairly significant good

12    faith effort to provide.  And what you're going to hear and

13    you have read that no one else can do this, this is exactly

14    what everybody should be doing on their side, and it's

11:23:46 15    certainly doable and also shows you two things, David.

16        It shows you that there's a willingness on our side to

17    work around what we think are reasonable concerns from the

18    Plaintiffs' side about confidentiality, right, and also the

19    ability to be creative and not just look to fight for the

11:24:05 20    state of fighting but fighting.

21        You know, they basically made a proposal.  Not

22    perfect.  It's cumbersome.  We need to work through the

23    details, but we're willing to do that and we think everybody

24    should do that.

11:24:17 25        And finally, this is -- this is the kind of

1    information -- and like I said, when you look at this type

2    of stuff, and you look at what was agreed to be produced in

3    Chicago, the database and medical records, the fact that the

4    Plaintiffs have an insatiable appetite for every document

5    that the Defendants have ever created, and we really are in

6    a situation where we are hamstrung, is putting at risk, one,

7    our ability to defend ourselves but, two, this entire

8    schedule that the Plaintiffs were the ones who were

9    aggressively pushing.

10        So I'm going to stop there.  We have more than I

11   anticipated.  I apologize if I've been repetitive, but I

12   wanted you to understand this is an extremely important

13   issue to us.  And then I want to give my colleagues a chance

14   to talk and what I would say is object their -- I really

15   fundamentally and honestly believe that we can make a lot of

16   progress with respect to their requests.  I mean as an

17   example, I think they asked us, they raised something on May

18   22nd to do only, and we never heard, never got another phone

19   call from them on many of the things that are raised.

20        So our --

21            SPECIAL MASTER:  Mark, you're starting to get

22   into a different topic.  So let me --

23            MR. CHEFFO:  All right.  I'll stop there.  Can

24   I --

25            A VOICE:  I'm sorry, David.  I didn't mean to

1    talk over you.

2              MR. CHEFFO:  Can I just ask if my colleagues

3    have anything to add?  If not, I'll stop there.

4              SPECIAL MASTER:  Shirle, this is David.

11:25:59  5    Before I ask for a response from Plaintiffs, I just

6    want to ask a few questions.

7              One is that I know that, and the Plaintiffs have

8    suggested that, and you have suggested yourself that some of

9    the requests that you've made for production of documents

11:26:19 10   implicate some privacy concerns.  For example, it appears

11   that you're asking for medical records which obviously are

12   covered by HIPAA and so on.  And so I just want you to

13   address that.  How do you -- how do you propose that be

14   dealt with?

11:26:35 15             MR. CHEFFO:  Sure.  Two things.

16             One, I would say -- and thanks for reminding me.  It's

17   a lot of information, and I didn't want to draw on longer

18   than I did.  But, two things.  One is they cited some cases

19   and obviously we just got theirs, the papers.  The cases

11:26:47 20   that they cited are -- when they're addressed, the

21   provisions of when they're addressed to health care

22   providers.  We have not served any hospitals or doctors at

23   this point.  We think those don't apply.  And the idea that

24   they're kind of not relevant is in their cases, I think

11:27:04 25   again -- transform our ability.  I think your issue on

1    HIPAA, this is not an issue, David, right?  This is the

2    exact same argument that was raised in Chicago.  Right?

3    Just so you understand, and I wasn't involved the whole

4    time, but I do have a general understanding.  They were

5    first had to produce because you know, Chicago is a big city

6    like these.  They had databases of people who were going to

7    be -- who were reimbursed or had prescription for certain

8    medicines that were within the database that either the city

9    had or had possession, custody, and control through a

10   vendor.  And they were going to produce that entire -- and

11   of course, there's going to be issues of confidentiality

12   HIPAA.  This is not the first time that that's been raised

13   in litigation involving these types of claims.

14        So my answer to that would be one is we certainly have

15   a very wholesome protective order.  We second have -- if the

16   Plaintiffs basically came to us and said we're going to

17   produce, as we think they should, we'd like to work on some

18   issues as to how we might protect this information.  This is

19   not the first time the County or municipality or Defendant

20   has received this type of information.  So there are clearly

21   ways to do it.

22        Secondly, as you saw from our interactions with

23   Cleveland, if there is certain information that needs to be

24   redacted, we would certainly consider that.  At least in the

25   first instance.  There's also been discussions in this

1    litigation and others about how you could actually take off

2    patient names and kind of -- so say it was Mark Cheffo and

3    David Cohen, right, you could say you're Number 1, I'm

4    Number 2.  You could provide information that is -- doesn't

5    have descriptive, right, at least in the first instance so

6    we can actually understand what Patient Number 1 is and

7    Patient Number 2, and if it came to a point where we needed

8    that --

9            COURT REPORTER:  I'm sorry.  I'm sorry.

10   Someone -- excuse me.  Someone else is talking in the

11   background, and there are quite a few receivers that are up

12   on speaker.

13           MR. CHEFFO:  Sorry.  Thank you for that.

14       So my answer, David, and hopefully I have answered it.

15   It's really quite two or three issues.  One is some of this

16   is frankly not covered, not going to be covered by HIPAA or

17   the regulation.  There's information that the Plaintiffs

18   actually have, for example, if the medical examiner is using

19   it for all this detailed information to then publish a

20   25-page report, that underlying information can be protected

21   through a protective order.  If there's further questions

22   that you think are needed that are reasonable, we certainly

23   would consider that, and then even as to certain data or

24   information that, you know, whether it's looking at certain

25   fields, whether it's assigning certain numbers that are

1    not -- if it's Cheffo 1, David Cohen 2, all of those are

2    things that we understand, right.  We've been telling them

3    welcome to our world.  When you have a client who has

4    documents, there are things you need to work through, but

11:30:18   5    what we've gotten for the last two or three weeks in

6    addition to discovery is we're not producing any of it ever,

7    no way.

8        So this can be done.  This is not impossible.  It's

9    not the first time.  And there are probably ten other ways

11:30:32  10    that if we look -- and the smart people on this phone and

11    drawing from our past experience in other litigation, even

12    if it has to be some additional protective order or sequence

13    or protection, those are things that we would consider and

14    weigh in on cooperating with you and the Plaintiffs in

11:30:53  15    producing.

16        We have no interest, frankly, we have zero interest in

17    embarrassing any individual or human.  We have zero interest

18    in disclosing any individual persons of personal medical

19    information in a way that would be embarrassing or

11:31:10  20    inappropriate.  But at the same time, it is the -- remember

21    what the Plaintiffs are asking for.  They are basically

22    saying pay us for that individual hospitalization or death

23    or loss of time at the office.

24        And before we can -- you know, kind of ask to write a

11:31:27  25    check, if they're saying that it's our opioids that caused

1    that person or prescription written that caused bad things

2    to happen to that person and it's kind of a follow up events

3    of causation, if they can prove that caused damages, it's

4    not unreasonable to say okay if you're -- if your damages

5    and our alleged liability is essentially tethered directly

6    to a prescription written or not prescription written or

7    some conduct from an individual, because that's ultimately

8    what their claim is tied to.  They may argue 15 different

9    ways, but it's not individual.  It's a model.  But

10   ultimately, whether it's nuisance, whether it's a consumer

11   fraud claim, a whether it's a refill claim, the claim has to

12   be that you Defendants are responsible for certain conduct

13   that caused certain other bad acts and that has to go

14   through a doctor or an individual or some person in order to

15   create those costs.

16        As to the extent it goes through that person in some

17   way or fact, we're entitled to that information.

18             MR. REED:  Okay.

19        Mark, if I could interject for a second.  David, this

20   is Steve Reed from Morgan Lewis for the Teva Defendants.

21        In answer to your question, the May 15th order, the

22   CMO2 deals specifically with HIPAA materials, starting at

23   Section 12, Paragraph 70.  The Court obviously anticipated

24   this issue, understood that protected information would need

25   to be produced and laid out in a specific set of safeguards

1    in the protective order to address this exact issue.

2         As Mark said, there are other things we can do to

3    safeguard the information.  These are the kinds of things we

4    can discuss in a meet-and-confer, but this is something the

5    Court has already anticipated and provided for us.

6              SPECIAL MASTER:  Let me ask a different

7    question now.

8         It seems to me that this problem, to some extent,

9    carries its own solution, and here's what I mean.  The

10   Plaintiff has suggested they probably, without committing to

11   it, probably will try and prove up their cases with

12   statistical analysis, have some sort of models and experts

13   that explain what happened and what the results of what

14   happened are and what their damages are.

15        And the Defendants are asserting, you know, we need

16   data itself.  We need something more than simply a

17   statistical model.  We need more granular evidence.  We need

18   to discover all the things you've asked for.

19        I don't know.  I really have no idea.  And eventually,

20   I'm sure it will be up to Judge Polster whether the

21   Plaintiff will be allowed to prove the case, prove their

22   claims the way they say they want to.  The Judge may say

23   that's sufficient or he may not.  The Judge may say some or

24   all of the claims must be dismissed, you know, summary

25   judgment, whatever, because the -- they have not produced in

1    discovery evidence upon which those claims can proceed.  I

2    don't know what the Judge will decide.

3         So let's say I order everything that you asked for.

4    Let's say that the Plaintiffs say that they can't produce

11:34:59    5    it.  You know, it's not within their custody and control, or

6    they don't have it, or they just don't do good work, and

7    they don't produce it.  So it's not produced.  As I said, it

8    seems to me that the problem carries its own solution.

9    Either the Plaintiffs are right, they're allowed to pursue

11:35:16   10    their claims using some sort of statistical model, or

11    they're wrong and they have to produce the data you're

12    asking for.  And because they didn't, their claims are

13    dismissed.

14         MR. CHEFFO:  David, here's why I respectfully

11:35:31   15    -- I'm not saying I disagree, but I think I would put a

16    little more meat on the bones there.  Right?

17         The two issues.  One is -- this is not the case, but

18    even if the Plaintiffs came in, right, and said -- which

19    they haven't -- we're going to use the model, here it is.

11:35:47   20    Right?  And so we could chew that and understand it.  You

21    don't have that.  Right?  So what they're proposing, it

22    seems, is wait and see until after discovery, right.  After

23    discovery and depositions of fact are closed, then we're

24    apparently going to spring a model on you which you then

11:36:03   25    have no ability to get the discovery to deal with.  So that

1    would not be an optimal way of preparing a case for February

2    trial.  First.

3         Second, there's like I think a fundamental disconnect

4    too.  I think I can say my defense is that the moon is made

11:36:17  5    of swiss cheese, and that's my defense.  I may lose, but

6    it's not going to preclude the Plaintiffs from prosecuting

7    their claims as good lawyers in the way they think they need

8    to do it.  So I don't want us to get sidetracked too much on

9    the issue of -- because even if under your theory, even if

11:36:37 10    they said we have a model, and even if the Court said you

11    can try and use that model, that would not prevent us from

12    basically saying well here is the reason why that model

13    doesn't work; X, Y, and Z.  But also here's why we don't

14    have liability.

11:36:52 15         I think they are completely separate issues.  Our

16    issues go to defending ourselves from causation and many

17    other things, including liability.  Where they don't have a

18    damages model that could meet some threshold from the Court

19    or Daubert, it's interesting and maybe we'll get there at

11:37:09 20    some point, but right now, the only thing in front of you

21    and the Court is this discovery that is permissible under

22    the rules, tethered to the allegations.  And I think that's

23    the only answer from our perspective, and the answer to that

24    would be of course it is because Cleveland is producing the

11:37:27 25    same issues, the same kind of discovery, and we know that

1   Chicago, they agreed to produce it and the Court produced

2   it.

3        So the devastating thing would be if we got to a point

4   where -- I'm not being presumption.  I'm not suggesting how

5   you're going to rule, but if you said you know what, we'll

6   take care of itself, and I'm not going to require them and

7   maybe, in fact, they can't produce it, or whatever it is,

8   and we get to a point, you know, and then ultimately, we

9   need that information, we're never going to basically get to

10  a trial date.

11       And the final thing I'll say is this not a surprise,

12  right, David?  This is like -- we negotiated this kind of in

13  broad terms, this issue of prescriptions in the first CMO

14  that they had to identify things by July.  This was hotly

15  contested and fought by the lead lawyers in the Chicago

16  case.  They lost that issue.

17       There's a provision that Steve helpfully said in the

18  CMO to specifically address this.  This isn't something that

19  needs kind of a meet up with.  This has been a live issue

20  for over a year in these types of litigation.  And I think

21  the only -- again, not to be presumptuous, but on this one,

22  the only kind of efficient and appropriate course when you

23  have Plaintiffs seeking tens of millions of pages, not

24  producing documents is to say you have the resources, you

25  know, people around the country in MDL cases, make them file

1    and go and do some work to give the Defendants the

2    information that they need so that they can actually

3    appropriately defend these cases.

4              SPECIAL MASTER:  All right.  Well --

5              MR. REED:  Steve Reed.  If I may speak, just

6    to add -- I apologize, but just to echo what Mark has said,

7    David.  Regardless of how Plaintiffs choose to pursue their

8    claims and prove their claims, we're entitled to mount a

9    defense, and Rule 26(b)(1) specifically says we're permitted

10   to take discovery that is relevant to any party's claim or

11   defense.

12        So Plaintiffs would love to cabin discovery to what

13   they decide is relevant with respect to how they choose to

14   prove their case, but they cannot deprive us of our right to

15   defend ourselves, and we have the right under the rules to

16   take discovery that's relevant to those defenses.

17             MS. STRONG:  This is Sabrina Strong

18   representing Johnson and Johnson and Janssen.  And I would

19   add to that, to respond to your question, David, that you

20   posed, you know, at the end of the day, if they can't

21   produce or refuse to produce, the Government to fall on its

22   own weight, if they have data that is relevant to our

23   ability to challenge their model, whatever it may be, we are

24   entitled to that data.  They cannot withhold it from us.

25   And if they choose to withhold it from us, arguably, we go

1    down a path of a discovery sanction that says no, they don't

2    get to put on their model at all.

3         It doesn't --

4              SPECIAL MASTER:  I agree.

11:40:28  5              MS. STRONG:  -- because they fail to even

6    provide the underlying data that would allow us to challenge

7    that model.

8         So it's extremely important that if data exists out

9    there that we are entitled to receive, that we actually get

11:40:41 10    that data.  And if they refuse to produce it at that point,

11    there will be other sanctions and other mechanisms we can

12    use that will affect the case down the road.

13              SPECIAL MASTER:  I mean that's exactly my

14    point.  First of all, let me clarify, Mark.  This is David.

11:40:56 15         Mark, you said something earlier about a damages

16    model.  I wasn't referring to a damages model.  I was

17    referring to essentially a causation model.  But yeah,

18    Sabrina, I think that's the point I'm making, that if they

19    don't produce, if the Plaintiffs don't produce the kind of

11:41:15 20    information you're requesting, it could lead to dismissal of

21    claims, including all of them for a variety of reasons,

22    whether it's because the Judge requires proof through other

23    than a statistical model, or that the statistical model

24    itself, you didn't get what you need to challenge it.  So

11:41:36 25    I'm just pointing that out.

1          Let me change this a little bit.

2                    MS. STRONG:  And, David, can I -- just to be

3     clear.  This is Sabrina, but I think an important component

4     under that procedurally would be Defendants being diligent

11:41:50  5     in seeking that information, getting orders that it

6     requires -- that it be produced, and that they would violate

7     those orders by failing to produce.  I think that would be

8     an important component of the process.

9          With all that, I'll pass back to you.

11:42:05 10                    SPECIAL MASTER:  Thank you.  I understand.

11          So I believe that there's been a conflation of what

12     was ordered in CMO1 and what is being requested in the

13     request for production of documents.  And here's what I

14     mean.

11:42:22 15          If you look at CMO1 -- I have that language pulled up.

16     It says, and I'm reading Page 16, "No later than Monday,

17     July 16th.  Each Plaintiff in cases in Track 1 that alleges

18     money damages based upon unnecessary prescriptions shall

19     identify," et cetera.

11:42:51 20          And this seems to me to be speaking to -- from a very

21     specific type of claim for a very specific type of damage.

22     And so, for example, I think that there may be complaints

23     that don't allege damages based on unnecessary

24     prescriptions.

11:43:09 25          Further, my understanding is that this language kind

1    of was born of the Chicago case, and that the Chicago case

2    claim -- forgot exactly what it's called, but it was some

3    sort of targets specific municipal prescription claim or

4    something like that.

5        And by the way, I would like the parties to send me

6    the transcript of arguments that led to the two different

7    rulings in the Chicago case.  I think it might have been

8    Magistrate Judge Alonso or Judge Jaime DeLeonard, two

9    different amended entries on August 21th of 2017.

10       One of those was the entry that required the

11   Plaintiffs to produce prescription information.  I'd like to

12   get a transcript of the hearing that led to those two

13   rulings, and I believe that one of the other amended entries

14   actually also touches on something the parties have raised,

15   which is the beginning dates for discovery of marking

16   materials.  Anyway --

17               MR. CHEFFO:  It was Magistrate Judge Canyon,

18   too.  Magistrate Judge Canyon and the District Judge was

19   Judge Alonso, but we'll send you that stuff and copy the

20   Plaintiffs.

21               SPECIAL MASTER:  Thank you.

22       So my question comes back -- comes back to what

23   exactly CMO1 is requiring and why and how that differs from

24   your personal production, which I think are more broad and

25   different.

1          MR. CHEFFO:  Yes, I can address that.

2          I think you're right.  And that's -- that's kind of --

3     that's part of our concern as well, like I think the spirit

4     of what we are asking and entitled to -- and again, I can't

11:45:05  5     speak for the spirit of what you or the other Special Master

6     does or Magistrate Judge Ruiz, but the idea from our

7     perspective is not someone can say we're not specifically

8     asking for reimbursement for prescription; so, therefore, we

9     don't have to give you any information.  Right?  I think if

11:45:25 10     that is their reading or the claims, then this is even more

11     important because this information, I think for the reasons

12     I won't -- you've drawn that line I think appropriately --

13     is that this is a more fundamental core discovery aspect

14     that goes to really prescription of single claim that they

11:45:44 15     have.

16          And also from our defenses of it, I won't reiterate

17     other than to say you only have to look at -- we only have

18     one document that was publicly available for that medical

19     examiner's board or other service.  So this does go to all

11:45:59 20     of our defenses, whether they decide to use a model or no

21     model.  The kinds of information here are much broader than

22     just covering if someone were to say this is a medically

23     unnecessary complaint and, therefore, we need to understand

24     about that.

11:46:16 25          The idea here is if somebody alleges that there was a

1    prescription written to someone that based on unlawful or

2    acts or omissions or something else of one of the

3    Defendants, right, that that may cause that person to either

4    overdose or engage in other unfortunate conduct, that's kind

11:46:39  5    of essential to the entire claim.

6         So, frankly, what we're asking for is untethered to

7    the specifics of -- I shouldn't say untethered.  It's

8    independent of what they might otherwise have to do in

9    connection with July 18th.

11:46:57 10         And final thing again, what we're asking for, you

11   know, can't get blood from a stone.  We get that.  That's

12   the irony here.  Sometimes we need to tell them look, we're

13   looking -- this is taking a little bit of time.  I don't

14   think we frankly beyond -- I'm not sure we're beyond the

11:47:15 15   phone call if they basically say, you know, yes, we're

16   producing it.  Here's what we're doing.  Here's our thing.

17   We need a little more time blah, blah, blah.

18         So it's -- for all of those mechanics are going to be

19   difficult but we can kind of work with that.  But I think

11:47:30 20   what you're asking, is this independently that important,

21   and I think the answer is absolutely and appropriately.

22              SPECIAL MASTER:  Okay.  I think we need to

23   hear from Plaintiffs after 45 minutes.

24              MR. WEINBERGER:  Thank you, David.  This is

11:47:48 25   Pete Weinberger.  Thanks for the opportunity to have this

1    conversation.

2        Let me start by saying that if we're going to work

3    together on this case to meet the time frames that we are

4    all subjected to appropriately, we all need to have thick

5    skins.  And so when I hear descriptions of our conduct being

6    embarrassingly deficient and shocking and that we sandbag

7    and that we have this voracious and insatiable appetite for

8    obtaining discovery and our conduct is comical and that

9    we're going around the country signing up clients, I'm not

10    sure -- I've been in front of Judge Polster a number of

11    times.  And when he hears comments like that, he talks about

12    it in terms of noise.

13        First time he hears it, he says, "This is a lot of

14    noise, and I don't want to hear any noise from here on."

15    And so I'd appreciate if we're going to have productive

16    conversation about our bilateral obligations to respond to

17    discovery, that we not engage in this kind of name calling.

18    It's unproductive and inappropriate.

19        So in that -- in that context, specifically with

20    respect to the allegation that we have sandbagged by writing

21    this letter of June 5th and sandbagged at other times, you

22    know, you cannot look at discovery in a vacuum.  Both sides

23    have to demonstrate their good faith conduct, both in

24    relation to complying with CMO1, as well as in response to

25    these requests for documents and discovery.

1           And it is difficult to have conversations like this

2      when we know what the conduct was on the other side in terms

3      of discovery.  So we didn't sandbag anybody.  We gave fair

4      notice as of Friday that we intended to raise these three

11:50:13  5      specific issues we've heard from all the Defendants, both as

6      relates to CMO1, as well as the document and discovery

7      requests that we've issued Defendants.

8           But having said that, we're prepared to respond

9      specifically to the issues that, David, you have before you

11:50:33 10      today, and that is with respect to our responses to

11      Defendants' discovery to us.

12           So to do that, we have on the phone Linda Singer on

13      behalf of Summit, Peter Mougey on behalf of -- on behalf of

14      the City, of the City of Cleveland, and Sal Badala on behalf

11:50:59 15      of Cuyahoga County.

16           So, Linda, why don't you start off by responding on

17      behalf of your other client.

18                    MS. SINGER:  Sure.

19           Again, this is Linda Singer.  First, I think it might

11:51:11 20      be helpful to put out the facts of various documents.  And I

21      will speak on behalf of Summit but also talk about what some

22      of the other productions are.

23           So there had been five different document productions

24      by the Plaintiffs.  In Summit, we've produced 20,820 pages,

11:51:34 25      plus another 9,000 from the Summit political entities that

1    were dismissed; Cleveland, 80,425 pages; Cuyahoga, 18,600;

2    plus another 3675 documents that relate to allegations in

3    the complaint.

4         It includes documents, documents relating to budgets,

11:51:54 5    appropriation records, org charts so that Defendants can

6    issue deposition notices, financial statements, drug

7    overdose data, medical examiner records.  I know Mr. Cheffo

8    spoke very highly of the importance of those documents.

9    Sheriff's records, probation records, also administration

11:52:11 10    documents, service contracts with outside vendor, pediatric

11    investigations, juvenile court records, diversion program

12    records.

13         So Defendants have received significant information

14    from each of the Plaintiffs in this case.  There is no

11:52:30 15    category of documents that Plaintiffs have indicated they

16    will not produce, except those that aren't within our

17    custody and control.

18         We haven't even refused to produce medically

19    unnecessary claims, and we can come back to that question.

11:52:45 20    And also note that we have identified 36 county and city

21    employees for Summit County and Akron alone, which is more

22    custodians than any Defendant has volunteered to search

23    records for.  We have provided search terms to the

24    Defendants.  May 19th, given to the manufacturing

11:53:03 25    Defendants, we haven't even received comments back on those.

1          So, you know, there has been significant production

2     here; certainly beyond what has been represented in argument

3     or his letter to you, David, yesterday.

4          So let me talk then about what is coming in coming

11:53:25 5     productions.  We have represented this, I think to some

6     extent in the meet and confer, but because of this

7     conversation, we are happy to provide more detail.

8          Also to the extent we can do it consistent with state

9     and federal privacy protections, that I want to come back to

11:53:39 10     that issue.

11          The Defendants will be receiving from Plaintiffs over

12     the next couple of weeks for Summit County, they will

13     receive 911 calls versus calls responding to overdoses,

14     includes including the addresses, names, and phone numbers

11:53:53 15     of the callers.  They will receive EMS and fire records,

16     including the names of individuals, and the details of

17     overdose incident.  From children services, they will

18     receive social worker files for child custody cases that are

19     opioid-related.  Again, to the extent permitted by law, held

11:54:14 20     in substance abuse records with individuals' names.  They

21     will receive records from the Prosecutor's office, court,

22     and probation program, which includes health information

23     relating to probationers within the Prosecutor's files.

24          Some of the court records are sealed and contain

11:54:31 25     health information that will have to be worked through.

```
 1    They are filing -- maybe parents of children, substance
 2    abuse.
 3                 SPECIAL MASTER:  Linda.
 4                 MS. SINGER:  Yeah.
 5                 SPECIAL MASTER:  I'm sorry.  I think you're on
 6    speaker phone.  If you are, can you please not use the
 7    speaker phone.
 8                 MS. SINGER:  Okay.  I'm talking into the
 9    handset, but is that better, David?
10                 SPECIAL MASTER:  It is.  Thank you.
11                 THE WITNESS:  Okay.  Sorry about that.
12            Public health and addiction treatment agency data from
13    all of the hospitals, the quick response team records of
14    visits to people who recently survived an overdose, which
15    will also include individual names, waiting list for
16    addiction treatment programs.  That gives you a sense that
17    when --
18                 COURT REPORTER:  I'm sorry.  There is
19    something going on in the background that's blocking your
20    voice.  I don't know what's happening.
21                 MS. SINGER:  All right.  Can you hear me?
22                 COURT REPORTER:  Yes.  Thank you.
23                 MS. SINGER:  Sure.
24            All of those -- all of those records and information
25    are being produced to Defendants.
```

1      So let me talk then about where Defendants are in

2  their productions because I think that is the useful

3  contrast.  Though we have received --

4              SPECIAL MASTER:  No, no, no.  We're not going

11:55:52  5  there.  That's not the topic right now.

6              MS. SINGER:  Okay.  Fair enough.

7      In terms then of the other issues that had been raised

8  about the productions, I wanted to stop before returning to

9  the -- to the medically necessary claims.  Actually, I'm

11:56:11 10  sorry.  I will address that now unless anybody from Cuyahoga

11  or Cleveland would like to talk about their productions.

12              MR. MOUGEY:  This is Peter Mougey.  Linda, let

13  me just real quickly.

14      I think what's important also is in addition to the

11:56:35 15  85,000 pages, the 4500 documents we already produced, I have

16  18,600 documents with 164,000 pages at RICO in the cue with

17  20 active reviewers reviewing.  So this embarrassing

18  document, we've got a significant number in the cue, and

19  just as Linda elaborated on with the custodians, we have 48

11:57:03 20  custodians in the process of being harvested and pooled in

21  search terms that we did being run.

22      So there is, in addition it what's been produced,

23  there is a significant amount, or significant amount of

24  documents in the cue that have tremendous momentum based on

11:57:24 25  that the pace we're pulling the custodians and harvesting

1       those e-mails and running the search terms, this is --

2       you've got a lot of momentum on the Plaintiffs' side of

3       documents coming, and it's -- you look at the spread sheets

4       produced, I think we're keeping pace, especially if you take

11:57:46  5     away what was done in Chicago and what's been produced

6       specifically in this case.  The Plaintiffs are on track.

7              Thank you.

8              MR. BADALA:  And this is Sal Badala for

9       Cuyahoga.

11:58:02 10     Our productions have come from different departments,

11      including the Budget Office.  Like Linda mentioned, we've

12      produced organizational charts.  We've also produced

13      articles to give reference in the Cuyahoga section of the

14      complaint, reports and budget documents and the Alcohol Drug

11:58:21 15     Addiction and Mental Health Services Board, documents

16      related to death that's avoided with Naloxone, medical

17      examiner documents, the Cuyahoga County Opiate Task Force,

18      the Board of Health, Ohio EMS, and Metro Health, which is a

19      hospital within the County.

11:58:37 20     We've sent to the Defendants 22 custodians.  Their

21      titles range from we have 12 directors, an administrator,

22      the medical examiner for the County, deputy treasurer, the

23      drug court coordinator, the drug lab manager, and the

24      substance abuse case manager.

11:58:55 25     Also out next production will be from the Prosecutor's

1    office with the individual names related to any drug cases,

2    approximately 12,688 documents that are going to be produced

3    from there.  In addition, we're going to make productions

4    from Health and Human Services, Economic Opportunity and

11:59:13  5    Growth, family service, homeless services, the Office of

6    Child Support, benefits and compensation.

7         So medical examiner, we produced the reports.  We're

8    going to produce also the underlying information, public

9    safety, the fiscal office, the treasurer, the drug court

11:59:29 10    from the County Corrections, the drug lab, and also

11    additional documents from the Opiate Task Force.

12              MS. SINGER:  All right.

13         So with that, I wanted to step back and put in context

14    with what requests the Defendants have made, and David, you

11:59:46 15    made the point that this is distinct from the CMO provision

16    regarding medically unnecessary claims.  So there are, I

17    think, three key requests for production of documents, which

18    are incredibly broad and seek information far beyond what

19    would relate to claims paid for by either -- any of these

12:00:07 20    three jurisdictions, and certainly go beyond the scope of

21    what was requested in Chicago.

22         So Request for Production 6 from the manufacturers'

23    request, "With respect to any person that Plaintiff claims

24    was harmed in any way by any Defendant, all documents

12:00:23 25    concerning each such person's medical history, medical

1   treatment, exams, tests, therapies, medical insurance and

2   pharmacy records, et cetera.  That's Number 6.

3   Request for Production Number 7 are all documents and

4   communications identifying, referring to, or concerning any

5   patient whom Plaintiff believes received, obtained, or were

6   harmed by any improper or medically unnecessary prescription

7   for opioids.

8   Request for Production 11, which I think Mr. Cheffo

9   addressed in his letter to you, asks for any participant

10  level claims data that would show -- I'm sorry, any -- all

11  claims data showing Medicaid, which these jurisdictions do

12  not even reimburse, or other program claimed history for

13  prescription and other health care services.  So any

14  services submitted to Medicaid or any other program, whether

15  reimbursed or not, for all patients who received a

16  prescription for opioids.  So that means all medical and

17  prescription records for any patient in any of these

18  jurisdictions, whether paid for or not by these

19  jurisdictions if that patient ever received an opioid

20  prescription.

21  That is an enormously broad request.  So again, I

22  think that's an important contextual piece to have in mind.

23  And then in terms of Defendants' arguments about what

24  is reasonable and appropriate in this case, I'll just hit on

25  a few high level points here.

1          First, Plaintiffs have made clear to Defendants, and I

2     know we acknowledge this in our letter to you, that we are

3     investigating what information we can produce and intend to

4     comply with the Court's directive in CMO1, the provision

12:02:14  5     that you read earlier, by July 16th.

6          2.  I want to give a sense of what's involved in that

7     process.  Summit and Akron I think are far less complex, I'm

8     sure, than Cuyahoga, but it has had seven different vendors

9     administering its Justice Employees Health Benefits Program

12:02:36 10     since 2000.  Some of the vendors have health care

11     information, some have prescription drug information, they

12     ran different programs.  To determine whether a claim was

13     medically necessary, you have to know what the underlying

14     diagnosis was.  That requires combining those two databases,

12:02:53 15     prescription and medical records, patient by patient.

16          Just one of Summit's vendor, Medical Mutual of Ohio,

17     has electronic files for medical information that goes back

18     for three years.  Beyond that, they would have to search

19     paper files for each patient individually.

12:03:12 20          So I want to give a sense of the complexities that is

21     involved in doing this.  I'll also note, as you did, David,

22     that Summit is not seeking recovery for spending on opioids.

23     We don't think the CMO provision provides to us -- the other

24     jurisdictions are making their decisions about how they're

12:03:32 25     proceeding and may well make appropriate disclosures in

1    advance of the 7-16 deadline.

2         So again, that's the context of what we have and what

3    we're able to produce.  You know, we are certainly not in

4    Chicago in the Northern District of Ohio.  And Defendants'

12:03:52  5    comments, both Mark and Steve, about what protections are in

6    place, they have been sufficient for the City of Chicago

7    which operated under a different set of rules.  But, I want

8    to be clear that Ohio is a very different jurisdiction in

9    terms of its patient privacy protection, and I know we deal

12:04:10  10   with this at some length in our letter to you.  But the

11   relevant Ohio statutory, statute 317.02, Subsection B

12   protects individual identifying health care records from

13   disclosure.

14        It is drafted as a position patient testifying

12:04:31  15   privilege, but the courts in Ohio have applied that to have

16   a client that has patient records and not just a physician's

17   testimony.  That information can only be released where

18   there's consent or in the case of the patient's death, which

19   is why presumably Cleveland can produce the death-related

12:04:52  20   records and none of those exceptions, except for decedents,

21   apply here.

22        And the privilege is so strong that Ohio courts have

23   held that you can't even provide medical records pursuant to

24   a Grand Jury subpoena.  Now --

12:05:07  25             A VOICE:  What about the court order?

1      MS. SINGER:  -- the difference in a case

2   manufacturers say in their letter, Powell versus Tosh, which

3   was a claim for individual personal injuries.  Those

4   Plaintiffs consented to the disclosure of their information

12:05:19  5   and, you know, here obviously, the County and the counties

6   and the City are not seeking to or wouldn't have standing

7   frankly to advance personal injury claims.

8      And the residents of Cuyahoga and Cleveland and Summit

9   and Akron haven't consented to have their medical records

12:05:39 10   released.

11      SPECIAL MASTER:  Is there an exception --

12      MS. SINGER:  There's another --

13      COURT REPORTER:  I'm sorry.  Excuse me.  Two

14   people were talking and I missed it.

12:05:41 15      SPECIAL MASTER:  Linda, this is David.

16      I know there has to be an exception for a court order.

17   Is there an Ohio statute?

18      MS. SINGER:  So there is -- I want to -- there

19   is 5119.27.  So there is a subsequent provision that allows

12:06:06 20   PII, or Patient Identifying Information, to be disclosed

21   pursuant to a court order.  5119.27, the section immediately

22   before it requires patient consent.  And there's also a

23   federal privacy regime, not just HIPAA, but protections that

24   are even more protective that relate to records relating to

12:06:30 25   substance abuse treatment, and that's 42CFR2.12, Sub A, Sub

1    1, which indicates that the Court can order the disclosure

2    of information related to substance abuse treatment upon

3    good cause but requires that the Court provide patient --

4    patients of the record holder.  So physicians, hospitals,

12:06:57  5    notice of the potential disclosure and an opportunity to

6    respond.

7         So there are lots of hurdles to navigate on this, and

8    we are more than happy to talk with the Defendants about

9    their guidance on how we can work our way through them.  We

12:07:14 10    have a HIPAA expert we consult on these issues.  You know,

11    this is one that raises enormous policy and, frankly,

12    liability issues for the public entities.

13         You know, I think it's -- Defendants are looking to

14    get access to data that is governed by these kinds of

12:07:36 15    privacy protections but there has to be some assurance of

16    indemnification.  This information is related -- there's a

17    whole set of issues.  That said, we're working very hard to

18    figure out how we do that.  But, it's not just a matter of

19    putting a HIPAA protective order in place.  That doesn't

12:07:53 20    work for Ohio law and it doesn't work for substance abuse

21    records.

22         So I think those are the privacy issues.  I will move

23    very quickly with what Plaintiffs' claims are and how that

24    relates to our discovery obligations.  So, you know, I think

12:08:14 25    Defendants say repeatedly in their letter and in this

1   conversation that the counties are seeking to recover

2   essential theory -- I think that's the language used in the

3   letter -- essential theories that residents are harmed by

4   improper prescriptions are the basis for our recovery.

12:08:35  5   That's actually not true.  You know, to use Mr. Tevo's

6   words, the central theory is that the counties and city were

7   harmed by Defendants' unlawful marketing and distribution,

8   not seeking individual damages.  And again, we talked about

9   this model that the Plaintiffs will -- I think it is not

12:08:57 10   that hard to follow, and we've tried to be clear about it in

11   our conversations with Defendants in reaching back and

12   forth, and it's certainly an issue that was discussed in

13   Chicago.

14   So what we're going to have to prove is that the

12:09:11 15   Defendants engaged in marketing, and for the distribution

16   Defendants, distribution that was prescribed by law that the

17   conduct caused an increase in prescribing and diversion, and

18   that that increased prescribing and diversion caused

19   increased addiction, abuse, overdose, deaths, neonatal

12:09:30 20   abstinence, et cetera.

21   And again, while we don't want to tie ourselves to a

22   method of proof, early in discovery when there's still so

23   much discovery to come forward on both sides, frankly, I

24   think we can say with great confidence that we are not going

12:09:45 25   to be proving our claim through a series of individual

1  medical records, and that we're not going to show that this

2  prescription was improper or somebody was hurt.  And when

3  you add them all up, it becomes a public nuisance.

4       This is not what a public nuisance is.  And I know

12:10:05  5  that Defendants want to j we have to prove each doctor was

6  visited or saw a website or a publication and that that

7  interaction caused them to prescribe an opioid and that the

8  patient who received that opioid was harmed and not helped

9  and that the County paid for that care.

12:10:25  10       If that's the case, that they want us to have to

11  prove, if the case that isn't triable -- and what they've

12  essentially said is that we've committed fraud here so

13  complicated, so extensive, that it is unequivocal.  It is

14  too an enormous a task.  And as a matter of law and policy,

12:10:45  15  it is such a bad outcome, it's certainly not what courts

16  have required.

17       And we do have a model for this, and I know we talk

18  about it at some length in our letter.  It's not personal

19  injury cases like Powell versus Tosh.  It's public nuisance

12:11:01  20  cases, like lead paint and Conagra, the California case

21  involving lead paint, which we talked about, you don't have

22  to do that.  Right?

23       Defendants made just the same arguments in that case

24  and said we have to know every house and every homeowner and

12:11:16  25  every child and their medical records, that we can tie them,

1    we can interview the homeowners, we can examine the

2    property, we can look at the blood levels.

3         The Court said that's not a nuisance case, and due

4    process does not require you to examine every property.

12:11:34  5    Defend your case on a child-by-child basis.

6         And just to wrap up here, Defendants are going to

7    have, and they already have, a huge amount of information.

8    They're going to be able to attack, as you said, David, the

9    sufficiency of our evidence, whether it's -- whether we have

12:11:51  10   submitted enough to prove our claims here.  They can attack

11   our methodology and our report.  They can present 50 cases

12   or 500 cases, whatever the Court permits, where residents

13   will say, "I got opioids and I was helped," or doctors say,

14   "I wasn't influenced by the marketing."  Of course, you have

12:12:09  15   to wonder if doctors aren't employed by Defendant's

16   marketing, why they do it at all.

17        But, they have, and they will have the information to

18   do that.  They have in their records right now, the name of

19   every doctor they missed.  They buy IMS or now IQ data that

12:12:29  20   shows the prescribing history of every doctor in these

21   counties and city.  And the idea they are hindered in the

22   ability to drill down and defend themselves is simply

23   unrelated to the facts of this case.

24        So I think that deals with that argument.  I'll be

12:12:48  25   happy to answer any questions you have and I know there are

1   issues the Plaintiffs raised, but with the time left, we'd

2   love to turn to.

3            SPECIAL MASTER:  You referred to, just a

4   moment ago, your nuisance thing, but you stated Summit

12:13:11  5   County states 11 different claims, many of which have

6   nothing do with public nuisance.  And what about those

7   claims and the Defendant's ability to defend against them,

8   using the data they're asking for?

9            MS. SINGER:  So I think the data they'll have

12:13:25 10   is the data they will have regardless of the claim that the

11   counties and cities are advancing.

12       So all of that data on 911 records, on medical death

13   reports, you know, all of that information is being produced

14   to them.  Let's say they will have all the information they

12:13:41 15   already have about doctors they visited and doctors

16   prescribing generally.  They have the ability to issue

17   subpoenas to insurers and hospitals and other providers in

18   the City and counties.

19       So whatever our claim is, they're going to have more

12:14:02 20   than sufficient information to develop their defense.  You

21   know, what we're saying here is they can get all of that

22   information that we have and that is relevant and that we

23   are not prohibited by law from disclosing to them, but what

24   they can't make us do is go out and identify every person in

12:14:22 25   the County, counties and city, that is addicted to drugs and

1    point that out to them.

2         We can't -- we don't have to do discovery around their

3    theory of defense and gather that information for them.

4              SPECIAL MASTER:  When you say they're going to

12:14:41  5    have, you began by saying here's what we've produced so far,

6    here's what we're doing to produce more.  When are you going

7    to get them everything that you can?

8              MS. SINGER:  So again, you know, we have been

9    doing two productions a week over the last several weeks.

12:14:59 10   We continue to do that.  Again, speaking just for Summit

11   County, you know, we have six boxes from the Sheriff's

12   Department, 16 boxes of medical examiner files.  All of

13   those, as Peter Mougey was saying a minute or several

14   minutes ago, are being reviewed and will be produced.  We'll

12:15:19 15   have another big set of documents within two weeks, but we

16   have told Defendants persistently that we will complete our

17   production by the deadline identified in the Court's order.

18        And I -- we would also welcome Defendant's response to

19   our proposed terms so that we can make sure the searching

12:15:42 20   that we're doing is comprehensive and satisfactory.

21             SPECIAL MASTER:  Anything else from the

22   Plaintiffs on this topic?

23        Mark, you want to just take two minutes to respond?

24             MR. CHEFFO:  Yeah, if I can take myself off

12:16:08 25   speaker.  Sorry.  Can you hear me?

```
 1              THE COURT:  I can.

 2              MR. CHEFFO:  Let me first start maybe on a --

 3      I take either comments to heart, and I think I'm happy to be

 4      -- I don't think there's other cases.  So I'm happy to kind

 5      of raise the bar, if you will.  I do think, as I said, one

 6      thing that will go a long way from our perspective and maybe

 7      it's some of the frustration you saw is what we believe to

 8      be good faith efforts to resolve it and then getting what we

 9      thought early from our perspective was being sandbagged.  So

10      if we have an understanding we can work through things in

11      good faith, I think you'll see all of us doing that and

12      reaching agreement on a lot more of these things.

13              But on substance, let me say this, you would think for

14      a year that all the stuff that they produced, that there was

15      actually a lot of documents, right, for that long laundry

16      list.

17              I haven't heard a few things.  I think what's

18      noticeable is what I haven't heard.  So Cuyahoga -- again,

19      Linda can correct me if I'm wrong -- but it's four rolling

20      productions.  That's using 390 total documents, most of

21      which were public; 20,000 pages for the entire Summit and

22      Akron.  And for Cuyahoga, again that long list, there's 293

23      documents for 20,000 pages.  Again, mostly publicly

24      available documents.

25              Two things you didn't hear, I think one of the most
```

1    important, you didn't hear once saying we don't have this,

2    right, or we can't produce it, or somehow, it's not

3    available to us because obviously that would be an easy

4    answer.  But, obviously they have it.  They just don't want

12:17:51  5    to produce it.

6         And secondly, when I thought Linda was starting, you

7    know, I specifically -- I think everybody on this phone call

8    I specifically said two or three times, do we have an

9    impasse as to 6, 7 and 11?  Are you not -- any movement, and

12:18:08  10    I didn't hear then -- in fact, I heard the Plaintiff say,"

11    Look, we just fundamentally disagree."  And I thought when

12    Linda was starting, she was going to say, "And we're going

13    to produce all that stuff and we withdraw our objection."

14    If that's the case, then we probably didn't need these

12:18:23  15    letters and calls.  But I don't think that's the case I

16    think what you heard is we're producing a lot of stuff,

17    20,000 pages of kind of publicly available other stuff.

18    We're going to go and give you 911 records, right.  All of

19    that is what they want to give to prove.  911 records, we'll

12:18:42  20    take them, but that's going to be John Smith called,

21    overdosed, took him to the hospital.  That's not what 6, 7

22    and 11 talked about.  I think you asked the right question.

23    Plaintiff wants to go to the public nuisance theory.  I

24    fundamentally disagree we wouldn't be entitled to it.

12:18:58  25    Whether we're entitled to every single prescription, right,

1    reasonable minds and courts could disagree.  But, it doesn't

2    deem any, particularly if they have the information.  But

3    that doesn't take into account the 11 other causes of

4    action, which they clearly have to produce this information

12:19:15   5    because again, if somebody -- if somebody got called for a

6    911 call for a heart attack, they would take -- presumably

7    that has nothing to do with this.  But if there was an

8    overdose, the fact that somebody -- an ambulance went out

9    for an overdose, right, assuming their case is not going to

12:19:32  10   be every time somebody overdosed on whatever, Tylenol or any

11   medicine, we have to pay for it, there has to be some causal

12   connection.  And that's what 6, 7, and 11 squarely do.  And

13   you didn't hear anything about that.

14        Again, what you're hearing is we're going to try to

12:19:49  15   prove our case the way we're going to do it, but they cannot

16   -- I think under the law, I don't think anyone would say

17   otherwise -- they can't prevent us from basically getting

18   this important information which we know that they have.

19        Now, the conversation is -- let's talk about how we

12:20:06  20   can get in the six different medical providers.  Again, that

21   whole, I hadn't heard that before.  Then we can do it, but

22   ultimately the answer should be motion granted as to 6, 7

23   and 11; again, without being presumptuous, and the parties

24   should work onto the implementation.

12:20:21  25        And the last point I want to highlight because again,

1    I think it was a fair amount raised, if you need any kind of

2    loath to even suggest, you know, kind of more briefing

3    things, but -- and I'm not faulting because they had a

4    chance to respond, but they did highlight a number of issues

12:20:38  5    on this privilege or HIPAA, I think what -- again, when you

6    read those cases -- first of all, you know, you asked the

7    right question.  Is there an exception for court order.  I

8    think the answer is of course there is.  Clearly yes.

9        I think, again, what all those sections that Linda was

12:20:56 10   talking about, they talk about subpoenas and requests to

11   health care providers.  Right?  So even they are -- there

12   are exceptions, but that's not what this is.  They don't

13   apply, and I'm not aware of any court that basically said in

14   these type of cases, the Defendants are entitled to like

12:21:16 15   Question Number 1 or Document Number 1 as to anything

16   related to health care or medical records.

17       Plaintiffs haven't cited that, and the cases they cite

18   I think are opposite.  What they're basically saying is

19   they're trying to use the extremes.  I think you've had the

12:21:33 20   chance to look at some of those cases that basically say you

21   may not have to ultimately depose or look at every single

22   case.  So there may be some restriction but that's not what

23   we are talking about.  We'll get there at some point, but

24   what we're basically saying is this is information these

12:21:48 25   Plaintiffs squarely have in their possession, custody, and

1    control and should produce it.

2         And finally, this is part of our frustration I would

3    say.  You get this laundry list of things that sound like a

4    lot of stuff and then you say okay, 20,000 pages, not a lot

12:22:03  5    of stuff, and then you say when are we going to get it, and

6    the answer consistently is -- well, again, I'm carving out

7    Cleveland in this because I think Cleveland has this kind of

8    information.  Here's what we have.  Here's what we've

9    collected.  180,000 pages at RICO.  And that's fine.  I mean

12:22:21 10    we don't need much more than that so we can understand it.

11         What we're getting from Summit and Akron is we're

12    going to comply by the end of the discovery period.  Right?

13    And I'm pretty sure if that's what we said in all of our

14    meet and confers, the Plaintiffs wouldn't take that as an

12:22:37 15    appropriate answer.

16         So I do think the Plaintiffs, whether it's now or, you

17    know, within a few days, should basically just be able to

18    tell us when we're going to be getting stuff, volume, and

19    for nothing as basic as frankly we have a lot of stuff going

12:22:52 20    on just like Special Masters, the Court, the Plaintiffs.

21    And if we're going to get a production of your 100,000 pages

22    on Monday or Tuesday, it's just common professional courtesy

23    to know that so we can get the appropriate resources to

24    actually review it.  I don't think it's asking too much.

12:23:09 25         So I'm going to stop there because you've been very

1    gracious with your time.  I don't know if my other

2    colleagues have anything to add.  But I think just in

3    conclusion, everything that you heard is -- doesn't really

4    address kind of our points, which is yeah, okay, so they're

12:23:26  5    producing some documents that hopefully will tell us more,

6    but they have the documents.  They're clearly relevant under

7    the rules, and these are things that we absolutely 100

8    percent need in order to be able to defend our clients as

9    our clients expect us to.

12:23:45 10              MS. SINGER:  David, this is Linda again.

11         If I can just respond to a couple of quick points that

12    I think I -- one I misspoke on.  So I want to be clear that

13    in describing the Ohio Patient Privacy Statute which is

14    2317, our reading of that statute is that there's no

12:24:03 15    exception for court order.  And again, Ohio law is very

16    patient-protective on these issues.

17         We are happy, if Defendants think we are misreading

18    the plain language of the statute and case law that applies

19    to documents and not just to providers or testimony, we are

12:24:21 20    more than happy to hear their point of view on this.  So

21    that was one issue.

22         Two is I did want to come back to the point you raised

23    on Chicago and how this is different.  I mentioned the

24    patient privacy issues, which are subject to different

12:24:37 25    regulatory regime, but I do want to mention and confirm, as

1    you pointed out, that the city of Chicago has asserted a

2    claim for false claim.

3        And the claim it asserted was false was that the

4    opioid prescriptions that they were paying for were

12:24:54  5    medically appropriate or medically necessary under the terms

6    of their coverage.  That was a condition of coverage.

7    Right?  And those were distinct facts of Chicago.

8        I would also point out, as a matter of timing, and you

9    know, we will get you those transcripts as you requested,

12:25:10 10   that preceded the Magistrate Judge's minute order, but what

11   he ordered was the City identify those after the close of

12   written discovery.  And the party and third party, when

13   information about the scope of the conduct, the relevant

14   alleged misrepresentations were provided to the Plaintiff.

12:25:36 15       And then the last point I'll raise if you -- you asked

16   a question about the other claims here.  One of the things

17   that is common to all of them is that in none of those

18   claims are these public entities inserting claims, asserting

19   claims for individual damages, for individual claims.  They

12:25:52 20   are all aggregate proof claims, and they share that in

21   common.

22       That's all I wanted to address.

23            MR. CHEFFO:  If I could, David, very briefly

24   respond.

12:26:03 25       One, I suppose both sides, to some extent, but we hear

1    a lot about the City of Chicago, and they want to use that,

2    but now all of a sudden, it's kind of this irrelevancy.

3         A lot of different issues.  It's not irrelevant.  I

4    would agree that not every -- the cases are not all exactly

12:26:23  5    the same, but it wasn't from, you know, specific Chicago

6    kind of statutory or other provision that drove, in my view,

7    that ruling.  It was based on the broad discovery that the

8    Court expects from both sides.

9         I think also, again, we're happy to provide briefing

12:26:40 10    on this if you need a response, but I think if you look at

11    RC2317.01(b), it specifically prohibited health care

12    providers from releasing them.  There's no statutory

13    exception.  The privilege provide, I think that's the Ward

14    case.

12:26:59 15         And again, we've said over and over that this is

16    something that we can certainly work around.  You didn't

17    hear any response to what I suggested about even, you know,

18    restricting patients' names in the first instance while we

19    work through this.  They're basically trying to create this

12:27:17 20    and say well, we have this privilege and, therefore, there's

21    no way that we can provide any information whatsoever

22    because we have a different way of proving the case.  And I

23    think we address the fact that our workaround -- and if the

24    statute doesn't apply, it's very important for us to be able

12:27:32 25    to have this information, and we absolutely would work with

1   them; again, once we hear that they're going to be producing

2   at least some of this -- this information.

3               SPECIAL MASTER:  All right.  Let me jump in.

4   Let me just jump in because I think we've heard enough on

12:27:47   5   these three issues.

6        It's been almost an hour, and we still have some other

7   stuff yet to do.  First of all, I want the parties to

8   continue to discuss the extent to which these privacy laws,

9   HIPAA or other, prevent Plaintiffs from producing documents.

12:28:05  10   It sounds like there's a difference in opinion.  We're

11   talking about a statute or statutes.

12        And so I want you all to get together and talk about

13   exactly what can be done to call it, work around these

14   statutes to the extent that this information gets produced

12:28:23  15   or is ordered to be produced.  I want you to figure out how

16   that can happen.

17        I also want the Plaintiffs to by Friday let the

18   Defendants know what they expect they will produce and when.

19   Frankly, it sounds to me like the Plaintiffs are trying hard

12:28:42  20   to get stuff out, but they're -- I wish that they were

21   further along, just put it that way.  And I think it is fair

22   for the Defendants to ask other Plaintiffs, especially since

23   apparently the Defendants are relatively happy with what

24   Cleveland has been disclosing and doing, that the other

12:29:03  25   Plaintiffs in similar fashion as Cleveland has, explain what

1    they've got, when they expect to get it out.  All right?

2          That doesn't answer a lot of what we talked about.  I

3    understand that.  But I want to put those two things out

4    there.  I want the parties to work on that.

12:29:22  5          We have a bunch of other issues that were raised by

6    the Plaintiffs regarding the discovery by Defendants,

7    production of the discovery by Defendants.  If we were all

8    together -- it's been an hour and a half.  If we were all

9    together, I would say let's take a break.  And so we can

12:29:41 10   either -- Shirle, are you okay?  Are you -- do you need a

11   break, Shirle?

12                COURT REPORTER:  If I could have a two-minute

13   break, that would be good.

14                SPECIAL MASTER:  All right.

12:29:54 15                MR. REED:  David, I apologize.  It's Steve

16   Reed.

17          I know you want to move on so I promise to be brief,

18   but there's specific provision in the Court's order that I

19   think is important that you're aware of as we -- before we

12:30:04 20   wrap up the HIPAA discussion.

21          If you look at the last sentence of Paragraph 74 of

22   Judge Polster's order, his CMO2, it reads quote, "The Court

23   has determined the disclosure of such protected health

24   information is necessary for the conduct of proceedings

12:30:26 25   before it and that failure to make the disclosure would be

1    contrary to public interests or to the detriment of one or

2    more parties to the proceedings."

3        Now I understand that the specific question about what

4    needs to be produced, but the position that categorically

12:30:44  5    HIPAA material can't be produced has already been considered

6    and addressed by Judge Polster.

7        So if we are going to do something different, I think

8    it's on Plaintiff to seek reconsideration of the order of

9    Judge Polster.

12:30:55 10        SPECIAL MASTER:   Thank you.

11        We're not going to do something different.   The

12    question really is more how do you then do what is allowed

13    or required by the order.   So I assume that there still

14    might have to be redactions.   There still may have to be an

12:31:12 15    understanding of how information that is HIPAA private is

16    going to be used.

17        For example, one way is to redact it all.   One way is

18    to produce it all with an understanding.   So those kinds of

19    machinations that I think the parties still need to work

12:31:28 20    out, and to the extent that Plaintiffs believe that Ohio is

21    somehow different or I know that there was an argument that

22    the Ohio statute isn't preempted, that somehow, there's

23    still some sort of restrictions, the parties can talk about

24    all that, but I appreciate you, Steve, bringing that to

12:31:45 25    everyone's attention.   All right.

1          I have 12:33.  Let's take five minutes.  I'm just

2    going to leave the line open.  We'll come back at 12:38 and

3    we'll pick up.  So everybody smoke them if you got them.

4          (Thereupon, a recess was taken.)

12:37:45 5                  SPECIAL MASTER:  Okay.  Mark, are you there?

6                  MR. CHEFFO:  I am, David.  Thank you.

7                  SPECIAL MASTER:  And, Pete Weinberger, are you

8    there?

9                  MR. WEINBERGER:  Yes, I am.

12:37:55 10                  SPECIAL MASTER:  Okay.

11         I know that Mark and Pete, you may want to hand off

12   some of these topics, but we'll start with this group and I

13   assume they're going to help this on.  Okay.

14         So the letter of June 5th from Plaintiffs outlined a

12:38:17 15   number of issues they have, and I keep hearing seriously,

16   Mark Cheffo, your suggestion that these should first be

17   addressed in the meet and confers, and the process should be

18   given a chance to work.

19         And as you'll see, many of these issues I'm going to

12:38:37 20   ask you to go back and meet and confer.  I'm not going to

21   give you much time, though.

22         My impression is that the Plaintiffs wouldn't agree in

23   this letter, they didn't think there was impasse.  And so

24   I'm going to ask you to go back and chat and let me know

12:38:53 25   pretty quickly whether there's resolution or not and we'll

1    address it, but I do at least one want to ask questions

2    about some of this stuff.  And I think that maybe one or two

3    of these issues is appropriate for ruling now.  And the

4    first has to do with prior productions.

12:39:16  5         And the Plaintiffs assert that the Defendants are not

6    complying with the CMO1 instruction that all prior

7    productions need to be produced in this case and that they

8    are, maybe meaning the Defendants, are trying to impose

9    various sorts of restrictions, whether it's a date

12:39:39 10   restriction, exclusion of testimony, and so on.

11         So when I read the case management order, it -- the

12   language seems pretty clear to me.  I think it says "all."

13   And the restrictions that Plaintiffs are asserting need to

14   be left at "all."

12:40:10 15        And so, Mark, I'm going to ask you to explain about

16   that, and I'm going to note that I remember very

17   specifically addressing this question at the prior

18   productions with the parties and remember very specifically

19   representation from the Defendants that they wanted 60 days

12:40:32 20  and not have to do it immediately.  And we agreed to that,

21   that there would be a 60-day period instead of immediate

22   production of all prior productions so that the Defense

23   could have a chance to go through and cull documents they

24   asserted were privileged and create privilege laws.

12:40:53 25        But it was always my understanding that that 60-day

1    period was given only for that purpose.  And that "all"

2    meant "all."

3        So I'll stop there and ask you, Mark, to respond.

4            MR. WEINBERGER:  David, this is Pete

12:41:06  5    Weinberger.

6        Since Mark was allowed to go first, do you mind if

7    I --

8            SPECIAL MASTER:  No.  Go ahead.

9            MR. WEINBERGER:  -- if I go through?

12:41:15 10            SPECIAL MASTER:  Go ahead.

11            MR. WEINBERGER:  Thank you.

12            SPECIAL MASTER:  That's fine.

13            MR. WEINBERGER:  The CMO1 also says in

14    addition to a rolling production, that there should be a

12:41:29 15    rolling production of privilege logs and logical objections.

16    And then it gives us an opportunity, to the extent that we

17    believe that there were other documents that were produced

18    in prior productions, to notify the Defendant about that.

19        And I don't want to -- I'm not going to rehash what's

12:41:48 20    in the letter, but we've -- we've asked for an index of

21    prior productions.  We don't get that.  And the way that the

22    productions are being made, they're with new Bates stamp

23    numbers.  So we can't tell whether or not we're getting a

24    complete production of what was produced to other entities

12:42:09 25    in the past.  And I think the statistics are important also.

1      So the very first -- the very first production under

2   CMO1 was by Purdue on May 18th, 2018.  And they've made two

3   other subsequent productions.

4      The next earliest production was by Teva on May 25th

5   and Mallinckrodt on May 25th.

6      And each of the -- and there have been productions by

7   AmerisourceBergen on June 1, 864 documents; cardinal Health

8   on May 31st, 3,000 documents; Mallinckrodt on May 25th of

9   1100 documents.

10      McKesson's total production in two productions is

11   8,000 documents; Purdue, 20,000, of which some of them were

12   insurance information under the other provisions of CMO1;

13   and Teva, 20,000 documents.

14      Only -- several of the Defendants tell us to whom

15   these were produced in the past.  But, most of them don't.

16   And so Purdue does and McKesson does.  And so we -- at some

17   insistence, these are totally blind to us in terms of where

18   they're coming from, to whom they were produced, and since

19   they are now -- they now have new Bates stamp numbers, we

20   have no information as to whether these are all documents,

21   as we suspect they're not, or some of the documents, and we

22   have no indexes.

23      And in addition to -- so I'm highlighting the things

24   that we have concerns about that are in our letter, more

25   detailed in our letter.  So that's -- that's what we have so

1    far.

2              Allergan has produced documents on May 30th and

3    Janssen has also, but they're in the process.  The password

4    on Janssen was not provided until June -- until yesterday,

12:44:29  5    June 5th.  So that's the state of the production so far, not

6    only in terms of quantity but in terms of quality.

7              Thanks.

8                   MR. CHEFFO:  Want me to respond.

9                   THE COURT:  Please.  You're a little muffled.

12:44:47  10                   MR. CHEFFO:  Sure.  I'll speak a little

11    louder.  I'm actually not on my speaker phone.  But, so --

12    and thanks for that.

13              Let me see if I can address really the specifics

14    first.  Here's what I will say.  It's no surprise, right, I

12:45:02  15    mean to the extent there are any specific question about

16    specific companies, I can't talk about that.  That's where I

17    do think some of the points I think Peter raised if they

18    are, you know kind of what I would call mechanical, you

19    know, my guess is that all of the Defendants will be willing

12:45:16  20    to sit down and talk about what, you know, why -- I know for

21    example, we have issues of Bates ranges.  We're actually

22    trying to nullify different ways of doing it.

23              Again, those are the mechanics.  I frankly can't speak

24    to the details of it, but I'm sure we will be happy to put

12:45:34  25    somebody on the phone who can explain how you can figure out

1    or, you know, cross references.

2         So mechanically, we are not minimizing them.  I

3    understand the Plaintiffs want them.  My suspicion is that a

4    lot of that stuff can be worked out.  Same thing for Bates,

12:45:49 5    you know.  Kind of what -- where people are in terms of

6    production.  Again, a lot of those numbers ironically seem a

7    lot higher than what Plaintiffs have produced, but

8    nonetheless, they can talk about what they want to produce.

9         I think the rule -- individual Defendants, my guess

12:46:04 10   would be, willing to explain kind of where they are in the

11   process.

12        So let me see if I can go to a higher level and I'm

13   kind of glad that we raised this because I think that, you

14   know -- and I will take, you know, some personal

12:46:16 15   responsibility on this.  I think the -- we can't look to

16   some extent on both sides in the abstract.  I remember I was

17   very much involved with you, David, there were others

18   involved.  Some of the main entries, I just want to take us

19   back to kind of this provision, at least how I --

12:46:36 20             SPECIAL MASTER:  Mark, can I stop you for a

21   second.  There's -- somebody is not on mute and there's a

22   lot of background noise.  So if you could go on mute, we'd

23   appreciate that.

24        Go ahead, Mark.  Sorry.

12:46:50 25             MR. CHEFFO:  Thanks.  I was talking.  So I

1    couldn't hear.  I'm glad you pointed that out.

2         So, you know again, just by way of context because I

3    think there really has been, from my perspective, a good

4    faith effort to comply, and I think there may just be trains

12:47:08  5    passing in the night here or ships passing in the night.

6         So this started my recollection that there were two

7    things the Plaintiffs initially wanted:  They wanted Chicago

8    production and things that were largely things that were

9    produced in the AG that was the focus of issues because

12:47:22 10    those were things that some of the lawyers, who also

11    represented municipalities, had.  And there was a concern

12    about that.  Right?  And I think for our clients we were

13    basically saying we don't have fundamental objection to

14    providing, pulling ADAG information, but because some of

12:47:39 15    that might have been produced that was outside the scope of,

16    you know, an MDL, inadvertent production, we just wanted an

17    opportunity.  That was the 60 days.  And they're absolutely

18    right, we were doing this on a rolling basis, and I think as

19    Pete highlighted, our clients done that and certainly not

12:47:55 20    done but will continue to do that.

21         I think where there's just been some discrepancies, I

22    don't think we ever, in the context of that order, thought

23    that it was every single production ever made.  It was, the

24    whole conversation was about the AG production.  And in

12:48:14 25    fact, the set -- the provision right below it, and I'll use

1    again Purdue as an example, and I don't know if Paul is on.

2    I think he is.  So, Paul, without getting into the weeds,

3    had a prior litigation involving personal injuries.  And I

4    think in that provision, I don't have it in front of me, my

12:48:30 5    recollection was that the extent that they had that, rather

6    than put the burden on us to kind of produce all the

7    documents, if there was anything in that collection that

8    they had that they thought we hadn't produced, they would

9    bring that to the meet and confer, and all of that was to be

12:48:42 10    done on a truncated basis.

11        I think what's happening now -- and I will totally --

12    I will fully admit the language is what it is, but the

13    language kind of read literally says, you know, kind of all

14    productions.  But, I think you have to read the language

12:48:59 15    with the negotiations and the discussions of the production

16    because otherwise requiring everybody to produce all

17    productions within 60 days would have been an incredibly

18    Herculean task, almost impossible, just like you hear from

19    the Plaintiffs, kind of everybody going through all of

12:49:17 20    these.

21        Now, I would say this, David.  Obviously, you know, to

22    the extent that, you know, we -- this was meant or is meant

23    to be broader, I think we want an opportunity to talk to you

24    about it or if you order it, we'll have to figure out how to

12:49:30 25    do that in a method that kind of makes sense.  But frankly,

1    I think the reason why we got to this 60 days was, again, if

2    you start with the assumption -- because this was somewhat,

3    I believe, somewhat of an agreed provision.  We basically

4    said, you know, we can go through what I'll call the AG

12:49:49  5    productions, we can go through the Chicago productions.  You

6    know, Joe made the good point, he'd designate that or

7    designate it here.

8         There's -- all discussion around those was about AG.

9    So I think that we have understood it and we proceeded, and

12:50:05 10    that's what we've been focusing our efforts as well as the

11    other hundreds of documents and things.  It has not been,

12    you know, any potential investigation or production that any

13    Defendant might have, you know, a patent case or something

14    regarding opioid because one, that really, from our

12:50:24 15    perspective, wouldn't make sense in this.  It would divert

16    everybody from trying to give the documents that they want

17    to give.  I also think that the last thing -- I'll say you

18    may have some questions or Pete may as well, is that, you

19    know, the -- this -- these -- those -- whatever productions

12:50:42 20    or collections may exist, they're not independent of the

21    Plaintiffs' own very broad document requests.  In other

22    words, to the extent there are documents responsive to those

23    specific issues, you know, it would be, I believe, you know,

24    or speaking for myself, it would be something that we would

12:51:00 25    consider in terms of evaluating whether we needed to search

1    those and produce those, even if they were kind of documents

2    that were in another collection.  But not every, you know,

3    patent case or commercial dispute about X, Y, and Z would

4    necessarily bear upon any of the claims here.

12:51:17  5         And that's why I think the focus has been on what's

6    kind of most pertinent and relevant and responsive, which is

7    the AG issues.  And to Pete's point, from a produce

8    perspective, and I suspect from the other Defendants as

9    well, I'll let them speak to it, we have every expectation

12:51:36 10   at the end of this, which would be soon, is to say, you

11   know, either we've gone through the process and we've given

12   you everything we've given to AGX and there's nothing

13   withheld, or here's the 20 documents, the 30 documents, the

14   1000 documents that we haven't produced, and here's why.

12:51:54 15        So we do intend to do that.  I mean there's been the

16   crush of kind of everything else going on, that we, you know

17   wanted to kind of get the documents out first and make sure

18   that there were no issues.

19        So I'm going to stop there to see if you have

12:52:06 20   questions.  But I do think our understanding and the spirit

21   of what we've all been talking about is different admittedly

22   than using the word "all" and if "all" meant "all," I think

23   that the Defendants really, you know, have to go back to the

24   drawing board and kind of converge and figure out where that

12:52:24 25   is.  I can't speak to everybody for that.

1           MR. REED:  Mark this is -- and, David -- this

2      is Steve Reed.  If I could speak for Teva.  And I am looking

3      at the language from CMO1.

4           And the word "all" is in that provision, but it

12:52:37  5      modifies Defendants.  Everything that follows is qualified,

6      and the whole purpose of allowing, at least as we interpret

7      it, David, the purpose for allowing time and requiring

8      Defendants to review the documents previously produced was

9      to allow for a production of materials that are relevant,

12:52:55 10      not all material.

11           The order doesn't say all materials.  In fact, the

12      structure here is completely different.  And there's a

13      couple of important qualifiers here.  It talks about

14      investigations involving the marketing or distribution of

12:53:11 15      opioids.  So to use Mr. Cheffo's example, a patent case

16      wouldn't fit in that definition.  Probably some others that

17      we can imagine that wouldn't fit -- that don't involve

18      marketing or distribution of opioids.

19           There's also a qualifier at the end of that sentence

12:53:26 20      that talks about documents relevant to the claims of this

21      MDL proceeding.  Again, the goal here is not, at least as we

22      understood it, was not just to turn over every investigative

23      file involving opioids to the Plaintiffs but rather, to

24      apply a little bit of judgment and to produce documents that

12:53:43 25      are relevant, consistent with the federal rules.

1          In terms of the question about or the issue about how

2     these materials were produced, I just want to be clear again

3     these are -- there are companies, specific discussions going

4     on and has been actively engaged in meet and confers, which

12:54:01  5     frankly aren't complete on this issue, but one of the issues

6     that came up was the Bates labeling issue and the need to

7     have some kind of crosswalk with the original productions.

8          We made it clear in our meet and confers that our --

9     the way we've labeled our -- produced and labeled our

12:54:16 10     materials was the way that was required to under CMO3, but

11     we offered in our meet and confer to Plaintiffs to provide a

12     crosswalk so that the Plaintiffs could see, compare what we

13     produced with the MDL with what we produced previously.  And

14     in our discussions, which have been, I believe, conducted in

12:54:37 15     good faith, Plaintiff said that they would consider our

16     proposal Alan get back to us.  They haven't done that yet.

17     We expect to hear back from them, and I hope we can work it

18     out.

19          But the fact that the process isn't complete speaks to

12:54:51 20     the underlying issue, which is this is a premature, and

21     frankly I feel like it's a waste of a lot of people's time

22     to get into these issues when we should be completing our

23     meet and confer and see if we can resolve it.

24               MS. STRONG:  This is Sabrina Strong for

12:55:06 25     Johnson and Johnson and Janssen.

1          And just to reiterate that point, we do have original

2     Bates numbers.  So I think the big picture, there are a

3     lot -- we have one meet and confer they didn't push back on

4     really anything.  There was one issue where there was a

12:55:20    5     slight push back.  We asked on a date question.  We asked

6     for what their proposal was and the alternative.  We didn't

7     get it.  We barely started the meet and confer process.

8          And so it does seem, David, it might make sense for us

9     to meet and confer more thoroughly, all of us, because we

12:55:36   10     are differently situated, different positions, and I think a

11     lot of these issues will be set aside if we could further

12     the meet and confer process.

13                    SPECIAL MASTER:  Well --

14                    MR. WEINBERGER:  This is Pete.  This is Pete.

12:55:48   15                    THE COURT:  Hold on just a minute.  This is

16     David.

17          Let me just note that counsel kind of focused in on

18     the Bates numbering.  That's the least of it.  I figured

19     that we can figure out an easy way to, as Steve suggested,

12:56:01   20     create a crosswalk or some sort of understanding about how

21     the Bates numbering could happen.

22          I'm a lot more concerned about the geographic and the

23     date restrictions that are referenced in the letter.  And

24     I'm pretty sure the Plaintiffs aren't concerned about

12:56:19   25     productions that have to do with patent.

1           Everybody knows what this is about, what the case is

2      about and what the language of the CMO says, which is the

3      distribution and marketing of opioids and the claims in this

4      case.  And there are investigations that have to do with

12:56:35  5      marketing and distribution of opioids and the claims in this

6      case.

7           Then they have to be produced.  Those productions have

8      to be produced.  If Defendants produce those productions and

9      pull out documents they believe are privileged, and most of

12:56:53 10      them are privileged, that's fine.  But, the machinations of

11      that, which the Bates stamping is simple.  The substance of

12      this dispute is what has to be produced, and it's very easy

13      for me to put that order on, which I will do, but I'm going

14      to give you a couple days to meet and confer about that.

12:57:14 15           Did you want to say something else, Steve?

16                MR. REED:  Just one other thing, David.

17           And in relation to the CMO language, I think you can

18      understand how surprised we are when we're being told by

19      Purdue that they're only going to produce documents from

12:57:35 20      2007 to the present or Teva, the same, and Cardinal,

21      McKesson, and AmerisourceBergen, I'm sure their

22      representatives for them are on the phone, are telling us

23      they'll only produce documents January 1, 2013 forward.

24                A VOICE:  Not to interrupt you, but just so

12:57:56 25      you know, I think this is only manufacturers.  So I don't

1    want to have some conversation on the record where it's

2    about them and they're not represented.

3                    MR. REED:  Perhaps they're not on the phone,

4    but -- perhaps they're not on the phone, but I thought they

12:58:09  5    were.

6        But in any event, again, we've set forth our concerns

7    in this letter.  The only thing that I would add or would

8    ask, David, is that Paul Hanly, who I know is on the phone,

9    was part of the negotiations.  And if there's anything that

12:58:24 10    he wants to say in response to Mark's comments about the

11    negotiations that led to this provision, I invite him to do

12    so now.

13                    MR. HANLY:  Well --

14                    SPECIAL MASTER:  Paul, I want -- Paul, I do

12:58:38 15    want to hear from you.

16                    MR. HANLY:  Sorry.

17                    SPECIAL MASTER:  But I want to make a

18    distinction.

19        What I'm talking about right now are prior

12:58:45 20    investigations.  I think all prior investigations means all

21    prior investigations regardless of the date, as long as they

22    are relevant to the Plaintiffs in this case, the marketing

23    and distribution of opiate opioids.  That's a very easy

24    issue.

12:58:59 25        Separately, I understand that the manufacturers and

1    distributors have asserted that the responses to other

2    discovery should be limited by date.  That may be true.  For

3    example, maybe they didn't, distributor or manufacturer

4    wasn't in the business of manufacturing or distributing

12:59:19  5    opioids before -- taking a date out of the air -- 2007.

6    Well, maybe that's an appropriate date for them.  That's a

7    separate issue.  And that again has to be, I think,

8    addressed in meet and confers with each Defendant.  I don't

9    think that has to happen soon.  On an extremely tight leash,

12:59:37 10    as everybody knows.  So I want all of the issues that are

11    addressed in this letter from Paul Hanly to be addressed,

12    and I need a letter back from the Defendants or the

13    Plaintiffs or somebody by Monday saying here's where we are

14    on this stuff, and whatever you haven't resolved, I will

12:59:56 15    resolve.  But go ahead, Paul.

16                    MR. HANLY:  Thank you, David.

17        I just want to make a couple of points.  The first is

18    Mark discusses, and I think unfortunately, it is just

19    fanciful some sort of a loosey-goosey agreement that he had

13:00:16 20    with me that, notwithstanding language of CMO1, we were just

21    going to kind of get together and kick around what we would

22    do about the substantial production that was made between

23    the years 2003 and 2007.

24        I mean there was -- there were never such discussions.

13:00:35 25    And obviously, Mark is not a loosey-goosey type guy when it

1    comes to the practice of what we do, and I'm not either.

2    And the CMO speak for itself.  That's the first point.

3        The second point is, and this is, again, specifically

4    directed to Purdue, is that in one sense, it's not

13:00:58  5    surprising that Mark does not want to produce documents

6    which were produced prior to 2007 because as we all know, in

7    2007, Purdue pleaded guilty to criminal misbranding of the

8    oxycotin product.  And, therefore -- and we know that that

9    plea and those charges by the United States were predicated

13:01:25 10   upon all of the conduct of Purdue, beginning in the

11   early-to-mid 1990s through December the 12th, 1995, when the

12   drug was approved, and through the late 90's, and up to and

13   including 2006.

14       Now, to the extent that Mark is making some sort of a

13:01:51 15   burden argument, and he didn't say burden, but I think

16   the -- that was sort of the gist of it, the fact of the

17   matter is I can attest that the number of productions that

18   Purdue made, separate productions prior to the year 2007,

19   was probably no more than six.  There was my litigation,

13:02:13 20   there was West Virginia Attorney General litigation, there

21   were productions I believe to the United States early on,

22   there was antitrust litigation that did relate to the

23   marketing of opioids, there was patent litigation, which may

24   or may not fall within the language of CMO1.  But that was

13:02:39 25   it.  So we're talking about collectively six or so

1    productions prior to those years.  And that cannot be an

2    undue burden.

3         So those are the main points I wanted to make in

4    response to Mark.

13:02:58  5              MR. CHEFFO:  It's Mark.

6         I guess I would say, Pete, your rule answered about 30

7    minutes of raising the dialogue, but I'm not going to

8    respond.  I think David's told us what we need to do, which

9    is to meet and confer on this.  I didn't really suggest or

13:03:12 10   need to suggest there's some fanciful telling you of my

11   understanding was of the context.  I didn't think I said you

12   promised me or anyone.  I basically said here's our

13   understanding, here's our proceeding.  David has now given

14   us some instructions when we meet and confer, and then we'll

13:03:27 15   move on.  I don't know what else to tell you.

16              MR. WEINBERGER:  David, this is Pete

17   Weinberger.

18        One other thing.  To be clear, and this is on Page 2

19   of our letter, they have -- a number of the Defendants,

13:03:45 20   manufacturers, as well as the distributors, have proposed

21   date restrictions on these prior productions in our -- in

22   our meet and confers.  And I would assume that if what we've

23   represented in our letter of -- Paul's letter of June 5,

24   2018, regarding what their position is in this regard and

13:04:10 25   with regard to geographic limitations and the other things,

1       if any of that is inaccurate in terms of what their position

2       is, I'm assuming that they would have said something to you

3       indicating as such.

4              So I totally embrace, on behalf of the Plaintiffs, a

13:04:27   5       quick meet and confer and a report back to you by Monday on

6       the issues that we've raised.

7                    MR. CHEFFO:  Can I say this?  And that's

8       great.  I don't want to belabor this.  So that's fine that

9       we do that.  I think David's been clear that's what he

13:04:44  10       wants.  I just want to raise one issue.  I'm kind of at a

11       little bit of a disadvantage because I'm, nominally speaking

12       for both the manufacturers and even the distributors, and I

13       think it is something that, you know, as you said, David,

14       that I think this kind of what the language says, I do think

13:05:02  15       that the contrast of timing is something, that I think is a

16       legitimate issue that -- and maybe more legitimate for

17       certain Defendants than others, frankly, or not.  And I

18       think it also very much ties into the concept of, you know,

19       statute of limitations defenses.  And I also would suggest

13:05:21  20       to you that you know, under the Blue Standard Rule, if the

21       Plaintiffs are basically suggesting this litigation and

22       everything is about going back to the 80's and 90's, that

23       there's very strong arguments that they should have to

24       produce all of that information about what they were doing

13:05:39  25       and their conduct.

1      So I think this was a bigger discussion that I think

2   we should have individually because some of it may work out.

3   If the Defendant joined the business and, you know, in 1999

4   or 2006, this may not affect them.  You may have some

5   Defendants who will say even though we have objections, we

6   don't want to fight about it because we don't have any of

7   those documents.  We may have other Defendants that say we

8   think this is a legitimate issue here.  But I think the

9   scope of production is clear.  He told us what we need to

10  do.  But I would say that I don't think it's fair right now

11  to group the call to set specific time parameters, and

12  again, I'm not asking them to do that, we put this off for

13  three weeks.  I just think individual people have the right

14  folks and their clients on so they can discuss this, and if

15  there is disagreement about time or scope in particular, I

16  think that's something that should be keyed quickly to you

17  for resolution.

18      The broader issue that doesn't apply to us, you know,

19  across the all manufacturers or even all distributors.

20          SPECIAL MASTER:  I understand what you just

21  said and let me again make a distinction.

22      I'm talking now only about -- what I'm about to say

23  addresses only prior productions and not requests for

24  production, interrogatories, and so on.

25      With regard to the date limitation, I'm not going to

1    talk about the geographic limitation at the moment, but with

2    regard to date limitation, it may be for different

3    Defendants, there are different appropriate date limits with

4    regard to the request for production and interrogatories and

13:07:13 5    so on.

6         However, with regard to prior productions, I'm just

7    telling you right now my inclination, you can convince me

8    differently, my inclination is to read the case management

9    order very simply, which is --

13:07:34 10              MR. CHEFFO:  Sorry.

11         We understand that and appreciate the guidance.  I'm

12    just putting down a placeholder because, as I said, I'm

13    trying to represent the folks who may not be on the phone.

14              SPECIAL MASTER:  And I'm just -- as a Judge

13:07:46 15    might when they're saying, "Here is my inclination on a

16    summary judgment now.  What's your argument," I'm telling

17    you that's; where I'm going to land unless I'm given a good

18    reason otherwise.  I'm trying to give everybody --

19              MR. REED:  And, David, this is Steve Reed,

13:07:59 20    again for Teva.

21         I think we all appreciate that that does give insight,

22    and I do think some additional time to discuss with

23    Plaintiffs would make sense.

24         Let me just put down a placeholder on an issue, which

13:08:10 25    is again, there's the relevance qualifier in here and the

1    relevance qualifier obviously is drawn from the federal

2    rules and it has meaning.

3        We are, again, the issue of the production date is an

4    important one that applies to other issues besides this

13:08:26 5    investigative issue.

6        We are -- the Plaintiffs here are asking us to go back

7    20 years.  They've certainly not agreed to go back 20 years

8    themselves.  And we have to understand when we talk about

9    relevance, we have to view these claims in the context of a

13:08:43 10    statute of limitations.  In Ohio, for example, the longest

11    applicable period is five years.  They're asking us to go

12    back 20.  Their limitation is five years.

13        So I think it's -- there's a serious argument -- in

14    fact, I think it's the right argument that the documents

13:09:00 15    from those earlier time periods are simply not relevant and

16    not produceable under the federal rules.

17        I -- again, I appreciate you telling us where you're

18    leaning, but I'd ask you to think about the statute of

19    limitations when you consider what's relevant to these

13:09:13 20    already very unwieldy cases that are on a very fast track.

21        (Several voices speaking simultaneously.)

22            SPECIAL MASTER:  I don't need to hear echos

23    going.  I know it's there.

24            MR. WEINBERGER:  All right.

13:09:26 25        We've -- I think we've covered somewhat in our letter

1    -- this is Pete Weinberger again, but we -- it goes without

2    saying that we -- we totally disagree that some statute of

3    limitation arguments limit discovery in this case for a

4    whole lot of reasons, but I -- we can address that later.

13:09:48  5              SPECIAL MASTER:  Okay.

6         I'm starting to feel really sorry for Shirle Perkins.

7    So I think that it's probably as good a time as any to end

8    this telecon unless somebody else wants to bring up one last

9    issue.

13:10:04  10              MR. WEINBERGER:  This is Pete Weinberger.

11         David, trying to figure out logistically, this being

12    Wednesday, how it is we're going to meet and confer

13    individually with each of these Defendants on the content

14    and the issues raised in our letter of June 5, 2018 is a

13:10:26  15    significant logistical issue.

16         So my -- while I appreciate the fact that Mark can't

17    speak for everyone, it seems to me that if we're going to

18    have meet and confers and schedule them with all these

19    Defendants between now and the end of the day Friday or

13:10:43  20    through the weekend for that matter, that we should have --

21    they should group themselves together, and we can -- we

22    could do it on one call.

23         What has happened, David, is that -- it's obvious to

24    us that they have met together and taken -- because they've

13:11:06  25    taken very similar positions, if not identical positions, on

1    most -- many of the issues that we've raised in our letter.

2         So, Mark, do you have some suggestion as to whether --

3    some response as to whether that's a way to go about this.

4              MR. CHEFFO:  I actually -- I really don't

13:11:28 5    agree with the characterization.  I'm not sure if you meant

6    it as a pejorative.  Here's the reality.  We --

7              MR. WEINBERGER:  No pejorative about it.

8              MR. CHEFFO:  -- had a million phone calls.

9    Right?  This one was a prime example.  I'm no more qualified

13:11:39 10   than -- probably less than the people on my side.  So where

11   we humanly can, we file joint briefs.  When we file, every

12   one of the conversations, meet and confers, we haven't

13   tethered you all with those.

14        There are times when you guys -- not to be pejorative,

13:11:56 15   but you decided to sue a bunch of folks.  And it's -- we

16   don't have the time, frankly, and I think this would be the

17   same thing if we, down the road, got into a specific issue

18   of Cuyahoga versus Cleveland.  We don't need Summit to sit

19   on the phone for two hours while we talk how Cuyahoga

13:12:16 20   maintains its IT information or X, Y, and Z.

21        Normally they are very specific things.  The idea, you

22   know -- so I think it would be incredibly counterproductive

23   if you said to us well, we now need to get seven Defendants

24   on a call so we can talk about Teva, as opposed to saying

13:12:32 25   why don't I just call Teva or Purdue and figure it out.

1        So I would encourage you, and I would do like we're

2   doing.  If you guys are all aligned on your affirmative

3   discovery to us, then the three of you guys, right, you

4   know, whoever, from those two counties should get on the

13:12:48  5   phone and talk to Purdue and then talk to Teva.  And when we

6   have joint issues, we're doing that.

7        But I think if you talk specifically about Purdue, you

8   can do what I think would be most efficient is to send me a

9   note and say when are you available -- and look, timing is

13:13:03 10   not just for you.  We have interrogatories that we haven't

11   talked about today.  I'm not raising them.  But those are

12   things we've been looking to meet and confer on for a week,

13   too.

14        So there are issues.  I don't think you guys are

13:13:17 15   conducting us.  We are not conducting you.  So I would just

16   encourage you to do it individually with the Defendants.  I

17   think it would be far more productive.

18                MR. WEINBERGER:  Fair enough.  This is Pete

19   again, Shirle.

13:13:24 20        David, can we -- can we just make sure that we

21   understand our directive because, for example, we have

22   issues in our letter regarding discovery of all the opioids,

23   including generics as well as the geographic scope

24   limitation that the Defendants want to argue to impose on

13:13:50 25   this.  I'm assuming what you're talking about is our

89

1    addressing in meet and confers all of the issues that we've

2    raised in our letter of June 5 and reporting back to you.

3                SPECIAL MASTER:  Correct.

4                MR. WEINBERGER:  Okay.  Understood.  And,

13:14:06  5    Mark, I take your suggestion.  We'll do it on individual

6    Defendant basis.

7                MR. CHEFFO:  Okay.  Thanks.  This is --

8                SPECIAL MASTER:  Mark, I'm not -- sorry.

9    You're just not speaking into the speaker again.  This is --

13:14:24 10                MR. CHEFFO:  I'm sorry.  I was just going to

11    say we are, as I indicated, we are going to be scheduling

12    some meet and confers with the Plaintiffs on the

13    interrogatory responses.  So I just suspect to the extent we

14    can't reach agreement, we'll write you a letter on that as

13:14:40 15    well.

16                SPECIAL MASTER:  Yeah.  I suspect this won't

17    be the last time we chat.

18       Okay, everybody.  Thank you for your patience and for

19    your thoroughness.  I appreciate it.  A lot of very

13:14:56 20    complicated stuff, and we'll work on those.

21                MR. WEINBERGER:  David, do you want to

22    schedule another time for a conference or just you want to

23    wait until you receive our letter?

24                SPECIAL MASTER:  I don't want to do it right

13:15:05 25    now.  I will do it, but I don't want to do it at this

```
 1    moment.

 2          Thank you.

 3                MR. WEINBERGER:  Okay.  Thanks.

 4                SPECIAL MASTER:  Thanks, everybody.  Bye-bye.

 5                MR. CHEFFO:  Thank you, all.  Bye-bye.

 6          (Proceedings adjourned at 1:15 p.m.)

 7                     C E R T I F I C A T E

 8          I certify that the foregoing is a correct

 9    transcript from the record of proceedings in the

10    above-entitled matter.

11

12

13

14    s/Shirle Perkins_____
      Shirle M. Perkins, RDR, CRR
15    U.S. District Court - Room 7-189
      801 West Superior Avenue
16    Cleveland, Ohio 44113
      (216) 357-7106
17

18

19

20

21

22

23

24

25
```

13:15:13