**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE NATIONAL PRESCRIPTION | ) | MDL No. 2804 |
| OPIATE LITIGATION | ) | |
| | ) | Case No. 17-md-2804 |
| This document relates to: | ) | |
| *City of Chicago v. Purdue Pharma L.P., et al.* | ) | Hon. Dan Aaron Polster |
| *Case No. 1:17-op-45169* | ) | |
| ——————————————— | ) | |

**PLAINTIFF CITY OF CHICAGO'S OPPOSITION TO
"MANUFACTURER DEFENDANTS' JOINT MOTION TO
DISMISS FOURTH AMENDED COMPLAINT" (Doc. 500)**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT ....................................................................................................3

    A.   The City's Municipal False Statement Act, Municipal False Claims Act, and Insurance Fraud Claims (Counts 4-6 and 8) Are Sufficiently Pleaded ..............................5

       1.   The 4AC Sufficiently Pleads that Defendants' Deceptive Conduct Was Material under Universal Health ................................................................................5

         a.   Medical necessity is an express condition of payment for the City's health plans and workers' compensation program ...................................................7

         b.   Defendants' misrepresentations concern the "essence of the bargain" for coverage under the City's health plans and workers' compensation program..........................9

         c.   The City has taken concrete steps to prevent, reduce, and end its payment of medically unnecessary claims for prescription opioids ................................10

         d.   The City has not acquiesced to paying for medically unnecessary prescription opioids by continuing to operate its health plans and workers' compensation program ...................13

       2.   The City Has Otherwise Sufficiently Pleaded Defendants' Liability for Implied False Certifications................................................................................17

       3.   With the Amended Exhibits, the City Has Sufficiently Addressed the Court's Concern Regarding Causation (Counts 4-10) ..................................................19

         a.   The City has supplied the "missing link" identified by the Court ...................19

         b.   Defendants' Exhibit-based causation arguments lack merit........................22

         c.   As the Transferor Court previously determined, foreseeability is the correct standard for causation................................................................................26

       4.   The City Alleges Sufficient Injury to Proceed on Its Claims .........................29

    B.   The City's Public Nuisance Claim May Proceed ........................................32

       1.   Each Element of Public Nuisance Has Been Sufficiently Pleaded .......................33

       2.   The City's Public Nuisance Claim Is Not Barred by the Municipal Cost Recovery Rule...36

       3.   The City's Public Nuisance Claim Is Not Barred by the Economic Loss Doctrine...........37

    C.   The City's Claim for Recovery of Costs under MCC § 1-20-020 (Count 7) Is Sufficiently Pleaded................................................................................38

    D.   The City's Conspiracy Claims (Counts 6 and 9) May Proceed ........................39

    E.   The City's Unjust Enrichment Claim (Count 10) May Proceed................................41

    F.   The City's Unfair Practices Claim (Count 2) Should Not Be Stricken....................42

III.    CONCLUSION ................................................................................................43

i

# TABLE OF AUTHORITIES

## Cases

*Adcock v. Brakegate*, Ltd.
  645 N.E.2d 888 (Ill. 1994)................................................................................40

*American Hardware Mtrs. Ass'n v. Reed Elsevier, Inc.*
  2010 WL 55708 (N.D. Ill. Jan. 4, 2010) ..........................................................19

*Ashcroft v. Iqbal*
  556 U.S. 662 (2009) ...........................................................................................3

*Bank of America Corp. v. City of Miami*
  137 S. Ct. 1296 (2017)......................................................................................26

*Bell Atlantic Corp. v. Twombly*
  550 U.S. 555 (2007)............................................................................................3

*City of Chicago v. Beretta U.S.A. Corp.*
  821 N.E.2d 1099 (Ill. 2004)..................................28, 29, 32, 33, 34, 35, 36, 37, 38

*City of Chicago v. Cecola*
  3389 N.E.2d 526 (Ill. 1979)...............................................................................2

*City of Chicago v. Festival Theatre Corp.*
  438 N.E.2d 159 (Ill. 1982).................................................................................38

*City of Chicago v. Purdue Pharma L.P., et al. (Chicago I)*
  2015 WL 2208423 (N.D. I11. May 8, 2015) ......................................................1

*City of Chicago v. Purdue Pharma L.P., et al. (Chicago II)*
  211 F. Supp. 3d 1058 (N.D. I11. 2016)........................ 1, 2, 4, 5, 6, 16, 17, 20, 22, 23, 24, 27, 39, 43

*City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*
  863 F.3d 474 (6th Cir. 2017) ....................................................................... 25, 26

*Cty. of Cook v. Bank of Am. Corp.*
  2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ...................................................36

*Daou v. Sys., Inc.*
  411 F.3d 1006 (9th Cir. 2005)............................................................................3

*Edalatdju v. Guaranteed Rate, Inc.*
  748 F. Supp. 2d 860 (N.D. Ill. 2010) ...............................................................40

*Hansen v. Baxter Healthcare Corp.*
  764 N.E.2d 35 (Ill. 2002)...................................................................................28

*Hardeway v. City of Chicago*
  1991 WL 203857 (N.D. Ill. Oct. 4, 1991) ........................................................40

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*
  545 N.E.2d 672 (Ill. 1989).................................................................................42

*IASIS Healthcare*
  2016 WL 6610675 (D. Ariz. Nov. 9, 2016) ......................................................10

*Jackson v. Ford Motor Co.*
  842 F.3d 902 (6th Cir. 2016)..............................................................................4

*Johnson v. Myers*
  109 F. App'x 792 (7th Cir. 2004) .....................................................................43

*Keith v. Bobby*
618 F.3d 594 (6th Cir. 2010) ...........................................................................4
*Kuenz v. Goodyear Tire & Rubber Co.*
617 F. Supp. 1113 (N.D. Ohio 1985) ...............................................................5
*Lee v. Chic. Transit Auth.*
605 N.E.2d 493 (Ill. 1992).............................................................................35
*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*
238 F.3d 363 (5th Cir.2001) ...........................................................................4
*Mason v. Medline Indus., Inc.*
731 F. Supp. 2d 730 (N.D. Ill. 2010)1 ...................................................... 18, 24
*McClusky v. Lake Hosp. Sys., Inc.*
2015 WL 893360 (N.D. Ohio Mar. 3, 2015) ...................................................5
*McCoy v. McCoy*
3591 N.E.2d 124 (Ill. App. Ct. 1992) ..............................................................5
*Neurontin Mktg. & Sales Practices Litig.*
712 F.3d 21 (1st Cir. 2013).......................................................................27, 30
*Proctor v. Davis*
682 N.E.2d 1203 (Ill. App. Ct. 1997) ............................................................28
*Quinones v. Szorc*
771 F.2d 289 (7th Cir. 1985)..........................................................................40
*Rivera v. Wyeth-Ayerst Laboratories*
283 F.3d 315 (5th Cir. 2002) .........................................................................30
*Rose v. Stephens Inst.*
2016 WL 5076214 (N.D. Cal. Sept. 20, 2016).....................................10, 13, 14
*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*
559 U.S. 393 (2010) ........................................................................................4
*Stead v. Fortner*
99 N.E. 680 (Ill.1912) ...................................................................................32
*Steadfast Ins. Co. Inc. v. Auto Mktg. Network, Inc.*
1997 WL 1106276 (N.D. Ill. Aug. 12, 1997) ............................................ 29, 30
*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharmaceuticals, LP*
136 A.3d 688 (Del. 2016) ..............................................................................31
*Tongate v. Wyeth Labs*
580 N.E.2d 1220 (Ill. App. Ct. 1991) ............................................................28
*Travelers Indem. Co. v. Cephalon, Inc.*
32 F. Supp. 3d 538 (E.D. Pa. 2014)...............................................................30
*Tweet v. Syngenta AG (In re Syngenta Mass Tort Actions)*
32017 WL 2117728 (S.D. Ill. May 15, 2017) ...................................................5
*U.S. Citizens Ass'n v. Sebelius*
705 F.3d 588 (6th Cir. 2013) ...........................................................................3
*U.S. ex rel. Am. Sys. Consulting v. ManTech Advanced Sys. Int'l.*
600 Fed. App'x 969 (6th Cir. 2015) .......................................................... 14, 16
*U.S. ex rel. Badr v. Triple Canopy, Inc.*
857 F.3d 174 (4th Cir. 2017)..........................................................................12

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*
   501 F3d 493 (6th Cir. 2007) .................................................................................................3
*U.S. ex rel. Brooks v. Stevens-Henager Coll.*
   12018 WL 1614336 (D. Utah Mar. 30, 2018) .........................................................................7
*U.S. ex rel. Brown v. Celgene Corp.*
   226 F. Supp. 3d 1032 (C.D. Cal. 2016) ...............................................................................10
*U.S. ex rel. Brown v. Pfizer, Inc.*
   2017 WL 1344365 (E.D. Pa. Apr. 12, 2017) .......................................................................14
*U.S. ex rel. Campie v. Gilead Sciences, Inc.*
   862 F.3d 890 (9th Cir. 2017) ................................................................................................9
*U.S. ex rel. Escobar v. Universal Health Servs., Inc.*
   136 S. Ct. 1989 (2016 ...........................................................................................................7
*U.S. ex rel. Fisher v. IASIS Healthcare LLC*
   2016 WL 6610675 (D. Ariz. Nov. 9, 2016) ...........................................................................7
*U.S. ex rel. George v. Fresenius Medical Care Holdings, Inc.*
   2016 WL 5361666 (N.D. Ala. Sept. 26, 2016) ....................................................................18
*U.S. ex rel. Harman v. Trinity Indus., Inc.*
   872 F.3d 645 (5th Cir. 2017) ...............................................................................................13
*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*
   352 F.3d 908 (4th Cir. 2003) ...............................................................................................14
*U.S. ex rel. Kelly v. Serco, Inc.*
   846 F.3d 325 (9th Cir. 2017) ...............................................................................................13
*U.S. ex rel. Marcus v. Hess*
   317 U.S. 537 (1943) .............................................................................................................18
*U.S. ex rel. McBride v. Halliburton Co.*
   848 F.3d 1027 (D.C. Cir. 2017) ...........................................................................................13
*U.S. ex rel. Miller v. Weston Educ., Inc.*
   840 F.3d 494 (8th Cir. 2016) .................................................................................................7
*U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*
   1865 F.3d 29 (1st Cir. 2017) .................................................................................................2
*U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*
   2018 WL 1363487 (C.D. Cal. Feb. 12, 2018) .......................................................................9
*U.S. ex rel. Petratos v. Genentech Inc.*
   855 F.3d 481 (3d Cir. 2017) ................................................................................................13
*U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*
   2018 WL 2770598 (6th Cir. June 11, 2018) ...........................................................................6
*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*
   532 F.3d 496 (6th Cir. 2008) .................................................................................................3
*U.S. ex rel. Spay v. CVS Caremark Corp.*
   875 F.3d 746 (3d Cir. 2017) ................................................................................................13
*U.S. ex rel. Worthy v. E. Maine Healthcare Sys.*
   12017 WL 211609 (D. Me. Jan. 18, 2017) .................................................................... 14, 15
*United States v. Americus Mortg. Corp.*
   2017 WL 4117347 (S.D. Tex. Sept. 14, 2017) .....................................................................26

*United States v. Cervantes*
   466 F.2d 736 (7th Cir. 1972) ...................................................................................40
*United States v. Crumb*
   2016 WL 4480690 (S.D. Ala. Aug. 24, 2016) .......................................................10
*United States v. Luce*
   873 F.3d 999 (7th Cir. 2017) ...................................................................................27
*United States v. Quicken Loans, Inc.*
   2239 F. Supp. 3d 1014 (E.D. Mich. 2017) ..............................................................6
*United States v. Rogan*
   459 F. Supp. 2d 692 (N.D. Ill. 2006) .............................................................. 40, 41
*United States v. Sanford-Brown, Ltd.*
   840 F.3d 445 (7th Cir. 2016) ...................................................................................16
*United States v. United Techs. Corp.*
   782 F.3d 718 (6th Cir. 2015) ...................................................................................26
*Universal Health Services, Inc. v. U.S. ex rel. Escobar (Universal Health I)*
   136 S. Ct. 1989 (2016)........................................................1, 2, 6, 7, 9, 10, 14, 15, 16,17, 19
*Universal Health Services, Inc. v. U.S. ex rel. Escobar (Universal Health II)*
   842 F.3d 103 (1st Cir. 2016) ...........................................................................7, 9, 19
*Upjohn Co. Antibiotic Cleocin Prod. Liab. Litig.*
   664 F.2d 114 (6th Cir. 1981) .....................................................................................5
*Vodak v. City of Chicago*
   2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) .........................................................39
*Wayne v. Kirk*
   2015 WL 5950900 (N.D. Ill. Oct. 13, 2015) ..........................................................40
*Weberg v. Franks*
   229 F.3d 514 (6th Cir. 2000) ...................................................................................40
*Westside Mothers v. Olszewski*
   454 F.3d 532 (6th Cir. 2006) ................................................................................. 4, 5
*Woodbury v. Janssen Pharm., Inc.*
   994 WL 542769 (N.D. Ill. Oct. 3, 1994) ................................................................28

**Statutes**

31 U.S.C. § 3729(b)(4)) ...................................................................................................6
31 U.S.C. 3729(a)(1)(A) ................................................................................................18
720 ILCS 5/17-10.5 ........................................................................................................34
820 ILCS 305/8(a) ...........................................................................................................8
820 ILCS 305/8a ..............................................................................................................7
MCC § 1-20-020 .................................................................................................37, 38, 39
MCC § 1-21-010 .............................................................................................................34
MCC § 1-22-020 ....................................................................................................... 18, 34
MCC § 2-25-090 ......................................................................................................... 1, 34
MCC § 4-276-470 ....................................................................................................... 1, 34
MCC § 8-28-020 .............................................................................................................39
MCC §§ 1-20-010 and 1-20-020 ....................................................................................37

**Other Authorities**

5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1233 ...............................40

*In re: Opioid Litigation,* Index No. 40000/2017, *slip op,* .............................................................33

*Law of the Case Doctrine and the Effect of Transfer and Remand on Choice of Law*, 15 Fed. Prac. & Proc.
    Juris. § 3867 (4th ed.) .........................................................................................................5

Manual for Complex Litigation, Fourth § 20.132 ...............................................................................4

Restatement (Second) of Torts § 538, at 80........................................................................................6

Restatement (Second) of Torts §821B................................................................................................32

Restatement (Second) of Torts § 821B(2)(a) .....................................................................................32

Restatement (Second) of Torts, § 840E, cmt. c.................................................................................19

**Rules**

Rule 8(a) .............................................................................................................................................4

Rule 9(b)...................................................................................................................................2, 4, 40

## I.       INTRODUCTION

Defendants' motion to dismiss the City of Chicago's (the "City") Fourth Amended Complaint

("4AC") should be denied for the following reasons: (1) much of the motion is an attempt to revisit

issues previously raised before, and rejected by, the Northern District of Illinois (the "Transferor

Court"), which is in violation of the "law of the case" doctrine; (2) the two discrete pleading

deficiencies previously identified by the Transferor Court have both been cured; (3) the City's newly-

pleaded public nuisance claim (Count 11) properly states a claim under Illinois law; and (4) the City

has stated claims against newly-named Defendant, Mallinckrodt LLC ("Mallinckrodt").

### A.       Procedural Background to the City's Fourth Amended Complaint

This case is different from other cases in the MDL in that the City began actively litigating this

case in 2014, years before any other action in this multi-district litigation was filed.  In addition,

although it includes a public nuisance claim, this case differs in the nature of many of the other claims

it asserts.  For instance, the City's claims include municipal ordinance-based consumer protection

claims that provide for significant mandatory civil penalties without proof of reliance, injury, or

causation.

This case is not wholly untested.  It has already undergone two full briefing cycles on motions

to dismiss prior to its transfer from the Transferor Court to this Court.  *See City of Chicago v. Purdue

Pharma L.P., et al.*, 2015 WL 2208423 (N.D. Ill. May 8, 2015) ("*Chicago I*"); *City of Chicago v. Purdue

Pharma L.P., et al.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016) ("*Chicago II*").  In those decisions, the

Transferor Court declined to dismiss the City's claim for Deceptive Practices in Violation of MCC §

2-25-090 (Count 1) and its claim for Misrepresentations in Connection with Sale or Advertisement of

Merchandise in Violation of MCC § 4-276-470 (Count 3).  *See id.*  The Transferor Court dismissed the

remaining causes of action on the basis of two narrow, discrete pleading deficiencies.  *Chicago II*, 211

F. Supp. 3d at 1076-84.  Specifically, it found that: (1) the City had not adequately pleaded how the

falsity of the claims was "material" under *Universal Health Services, Inc. v. U.S. ex rel. Escobar* 136 S. Ct. 1989 (2016), which was decided while Defendants' second motion to dismiss was pending, and (2) there was a "missing link" in the manner in which the City had pleaded causation. Notably, this second pleading deficiency was merely technical: because the exhibits to the Second Amended Complaint ("2AC") identified prescribers by name, but the allegations in the 2AC itself used letter designations, the Transferor Court could not match the allegations to the exhibits and therefore could not determine whether the City had alleged that the prescribers who heard the misrepresentations were the same prescribers who wrote prescriptions for which the City paid. *Id.*

Importantly for the issues now before this Court, the Transferor Court rejected the majority of Defendants' challenges to the 2AC. For instance, in considering Counts 4-10, the Transferor Court explicitly found that: (1) the City had met Rule 9(b)'s heightened pleading standard, *Chicago II*, 211 F. Supp. 3d at 1079; (2) the City had met Rule 9(b)'s particularity requirement in alleging that false claims were presented for payment, *id.*; and (3) the various "intervening events" alleged by Defendants had not broken the causal chain. *Id.* at 1080-81.

The Transferor Court granted the City leave to amend to cure the discrete deficiencies. *Id.* at 1084 ("Plaintiff is given a final opportunity . . . to replead those counts *as directed herein.*") (emphasis added). Consistent with the Transferor Court's express direction, the City filed a Third Amended Complaint ("3AC") that cured the specific, limited pleading deficiencies identified by the Transferor Court. While the Transferor Court allowed additional motions to dismiss, it cautioned that "[t]he Court *will not consider* substantive arguments made on issues already decided in its prior order." Transferor Court Doc. 483 (emphasis added). Prior to the Transferor Court's ruling on Defendants' motion to dismiss the 3AC, this action was transferred to the MDL.

### B.      The City's Fourth Amended Complaint

Following transfer to this MDL, the City filed its 4AC.  Specifically, the City added further "materiality" allegations, re-provided the "missing causation link" information from the 3AC, added a cause of action for public nuisance (Count 11), and added a new defendant, Mallinckrodt.  The City did not alter the claims that the Transferor Court had already found satisfactorily pleaded.  *See* Doc. 669-C (redline comparing 4AC to 2AC).

## II.     ARGUMENT[1]

On a motion to dismiss, a court "must construe the allegations of the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true, and decide whether the complaint contains sufficient facts to state a claim for relief that is plausible on its face."  *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013).  Rule 8 requires that a complaint provide "'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'"  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007).  A complaint will not be dismissed when it states a "plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), that "raise[s] a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  As to allegations sounding in fraud, under Rule 9(b) those allegations must be pled with sufficient particularity "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading."  *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008).[2]

---

[1] Under CMO One, § 2.g., the City incorporates herein the cross-referenced sections of the Summit/Akron Omnibus Opposition to the Defendants' Motions to Dismiss ("Summit's Opposition to Defendants' MTD"), *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-45090.  Unless otherwise noted, this memorandum adds all emphasis in quotations and omits citations.

[2] Defendants assert that *all* of the City's claims, including the City's newly-pleaded public nuisance claim, are fraud-based.  Defs.' Mem. 5 n.8.  A claim "sounds in fraud," however, only if the plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005).  In contrast, "[i]n a case where fraud is not an essential element

As this case is predicated on diversity jurisdiction, it is governed by state substantive law and federal procedural law.  *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 409 (2010); *Jackson v. Ford Motor Co.,* 842 F.3d 902, 907 (6th Cir. 2016).  For diversity cases that are transferred in an MDL such as this case, "the law of the transferor district follows the case to the transferee district."  Manual for Complex Litigation, Fourth § 20.132.  Therefore, this Court must apply Illinois substantive law and federal procedural law.

This case implicates the law of the case doctrine.  In their motion to dismiss the 4AC, Defendants, despite the Transferor Court's admonition, have disregarded the previous decisions of the Transferor Court on a host of arguments, including causation, injury, the specificity and falsity of their marketing, the specificity of the City's conspiracy allegations, and the City's identification of false claims.[3]  However, the Transferor Court's decisions on these matters are the law of the case, which "precludes a court from reconsideration of issues 'decided at an early stage of the litigation, either explicitly or by necessary inference from the disposition.'"  *Westside Mothers v. Olszewski*, 454 F.3d 532, 538 (6th Cir. 2006).  The law of the case doctrine applies to "issues" decided, *Keith v. Bobby*, 618 F.3d 594, 599-600 (6th Cir. 2010), regardless of whether an entire count has been sustained.  In MDL

---

of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)."  *Id.*  "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."  *Id*.; *see also Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir.2001) ("Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of fraud does not mean that no claim has been stated.").  In any event, while it disputes Defendants' characterization, the allegations of the City's public nuisance claim -- like the City's other claims that the Transferor Court previously found satisfied Rule 9(b), *see, e.g., Chicago II*, 211 F. Supp. 3d at 1071, 1076, & 1079 -- meets Rule 9(b) pleading requirements.

[3] Defendants also reprise their mischaracterization of the City's allegations, wrongly claiming, for instance, that the FDA, by making opioid medications "available" for the treatment of chronic pain, condoned Defendants' deceptive and unfair marketing campaign.  *See* Defs.' Mem. 1.  As the Transferor Court has already explained, "the Court is not being asked to adjudicate whether opioids are appropriate for the treatment of chronic, non-cancer pain or whether defendants' drug labels are accurate."  *Chicago II*, 211 F. Supp. 3d at 1065.  Rather, the question is "whether defendants deliberately misrepresented the risks, benefits, and superiority of opioids when marketing them to treat chronic pain, 'contrary to . . . scientific evidence and their own labels[.]'"  *Id.* (quoting 2AC).

4

proceedings the doctrine applies with heightened force.  *See Law of the Case Doctrine and the Effect of Transfer and Remand on Choice of Law*, 15 Fed. Prac. & Proc. Juris. § 3867 (4th ed.) ("[E]xceptions to the law of the case principle should be especially rare in these circumstances, because refusal to follow the previous ruling would result in the sort of piecemeal decision making that MDL centralization is intended to avoid."); *see also In re Upjohn Co. Antibiotic Cleocin Prod. Liab. Litig.*, 664 F.2d 114, 118 (6th Cir. 1981).[4]  In short, in light of the Transferor Court's previous orders, there are only several specific, narrow issues properly before the Court, and each of them, for the reasons stated below, must be resolved in the City's favor.

### A.   The City's Municipal False Statement Act, Municipal False Claims Act, and Insurance Fraud Claims (Counts 4-6 and 8) Are Sufficiently Pleaded

The Transferor Court identified two discrete pleading deficiencies in the City's claims under the Municipal False Statement Act and Municipal False Claims Act (Counts 4 and 5).  First, it found that the City had failed to sufficiently plead "materiality" under *Universal Health.  Chicago II*, 211 F. Supp. 3d at 1078-79.  Second, it found that the City had failed to sufficiently plead "causation."  *Id.* at 1079-81.  As explained below, these two discrete pleading deficiencies have been addressed, and thus these two claims may proceed.  Relatedly, because the City's claims for Conspiracy to Defraud and Insurance Fraud (Counts 6 and 8) overlap with its Municipal False Claims Act claim, those two claims also may now proceed.  *See id.* at 1082-83.

### 1.   The 4AC Sufficiently Pleads that Defendants' Deceptive Conduct Was Material under Universal Health

---

[4]  Defendants do not argue -- nor could they -- that any of the three "extraordinary circumstances" that are exceptions to the law of the case doctrine are present here: "(1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice."  *Westside Mothers*, 454 F.3d at 538; *see also McClusky v. Lake Hosp. Sys., Inc.*, 2015 WL 893360, at *3 (N.D. Ohio Mar. 3, 2015) (refusing to re-decide issues in absence of extraordinary circumstances); *Kuenz v. Goodyear Tire & Rubber Co.*, 617 F. Supp. 11, 13-14 (N.D. Ohio 1985) ("When issues have been carefully considered and decisions rendered, the only reason which should commend reconsideration of that decision is a change in the factual or legal underpinnings upon which the decision was based.  For reasons of policy, courts and litigants cannot be repeatedly called upon to backtrack through the paths of litigation.").

*Universal Health* reaffirmed that the proper test for determining materiality in False Claims Act cases[5] is whether the conduct at issue has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." *Universal Health*, 136 S. Ct. at 2002 (quoting 31 U.S.C. § 3729(b)(4)).  Assessing materiality under the FCA is not a mechanical process.  *See Universal Health*, 136 S. Ct. at 2001-04 (noting that "proof of materiality can include" various categories of "evidence" and no "single fact or occurrence [i]s always determinative").  Rather, "[t]he analysis of materiality is 'holistic.'"  *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 2018 WL 2770598, at *6 (6th Cir. June 11, 2018).  Under *Universal Health*, a matter is material either "(1) '[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction'; or (2) if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action,' even though a reasonable person would not."  *Universal Health*, 136 S. Ct. at 2002-03 (quoting Restatement (Second) of Torts § 538, at 80).

As discussed below, the Supreme Court has identified several factors relevant to determining materiality, including (1) whether the relevant rule is deemed an express "condition of payment"; (2) whether the defendant's misrepresentation or omission goes to the "very essence of the bargain" versus being "minor or insubstantial"; and (3) how the government has reacted to the same or similar types of misconduct when it had "actual knowledge" of that misconduct.  *Universal Health*, 136 S. Ct. at 2003-04 & n5.  Each of these factors supports the proposition that Defendants' deceptive conduct was material to the City's healthcare expenditures.  Defendants, however, largely ignore these factors and instead focus on the Supreme Court's guidance that "if the Government regularly pays a particular type of claim in full despite [1] *actual knowledge* that certain requirements were violated, and [2] has *signaled no change in position*, that is strong *evidence* that the requirement was not material."  *See* Defs.'

---

[5] "Courts have held that [federal] False Claims Act ('FCA') case law is applicable to state false claims cases." *See* Defs.' Mem. 7 n.10 (quoting *Chicago II*, 211 F. Supp. 3d at 1077).

6

Mem. 9 (quoting *Universal Health*, 136 S. Ct. at 2003-04) (emphases added)).  Even if such "evidence" were present in this case (and it is not), it would not be determinative of materiality.  *See, e.g., U.S. ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 112 (1st Cir. 2016) ("*Universal Health II*") (rejecting similar argument and finding "no evidence" of "knowledge of actual noncompliance").  Indeed, Defendants point to no evidence that the City ever decided to pay for a particular opioid prescription that the City *actually knew* was medically unnecessary.[6]  Rather, it is the City's practice and policy *not* to pay for unnecessary healthcare, and far from signaling "no change in position," the City has taken a series of meaningful steps to prevent paying for unnecessary prescription opioids.  An entity the size of the City simply cannot "turn on a dime."  By endeavoring to address the opioid epidemic through multiple measures, the City has not acquiesced to paying unnecessary and unreasonable claims for prescription opioids.

> a.      **Medical necessity is an express condition of payment for the City's health plans and workers' compensation program**

The City's express conditioning of payment on compliance with the medical necessity requirement supports a finding of materiality.  *See Universal Health*, 136 S. Ct. at 2003; *Brookdale*, 2018 WL 2770598, at *6-7.  The medical necessity requirement is repeated in the documents governing the City's health plans and workers' compensation program.  *See* 4AC ¶¶ 667-68, 683-84.  These "similar, redundant, or identical provisions" confirm the importance of this requirement to the City's contractual and statutory scheme for reimbursement.  *See U.S. ex rel. Fisher v. IASIS Healthcare LLC*, 2016 WL 6610675, at *13 (D. Ariz. Nov. 9, 2016); *see also U.S. ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504-05 (8th Cir. 2016).

---

[6] The City uses the terms "medically unnecessary," "medically necessary," and "medical necessity" herein to refer to both the standard of medical necessity under the City's health plan and the standard of "reasonably required" care under the City's workers' compensation program.  4AC ¶¶ 667-68, 683-84 (quoting 820 ILCS 305/8a).

Under the City's health plans and workers' compensation program, coverage of medical treatments is limited to treatments that are medically necessary or reasonably required. 4AC ¶ 696. The City's health plans expressly limit coverage of prescription drugs to those that are "medically necessary and dispensed for a FDA-approved purpose." *Id.* ¶ 667 (prescription must be "consistent with generally accepted medical standards"). Similarly, the provider agreements governing doctors' participation in the City's health plans state that doctors may "charge *only* for treatments that are medically necessary . . . ." *Id.* ¶ 668 (defining "medically necessary"). The City's workers' compensation program contains similar limitations. *See id.* ¶ 684 (quoting 820 ILCS 305/8(a)); ¶ 685 ("services and supplies" must be "[m]edically appropriate so that expected health benefits . . . materially exceed the expected health risks").

Under both health benefits and workers' compensation programs, the City relies on prescribers' judgment regarding whether prescriptions are medically necessary as defined in the plan documents and provider agreements. *See id.* ¶¶ 670, 683, 686, 697, 704. Historically, medical practitioners generally regarded opioids as inappropriate for long-term use due to the risk of addiction. *See id.* ¶¶ 84-89. To change that prevailing belief and practice, Defendants carried out sustained multi-faceted campaigns of misinformation and marketing that entrenched their misrepresentations about the risks and benefits of opioids in the standard of care for chronic pain. *See, e.g., id.* ¶¶ 7-13, 90-122, 130-210, 270-75, 276-94, 330-31, 337, 340-46, 400-33, 504-21, 564, 567-73, 576-95, 638, 648. Defendants undermined and corrupted the "generally accepted standards of medical practice" on which a prescriber's medical necessity determination is based. *Id.* ¶¶ 84, 668, 685; *see also id.* ¶¶ 143-44, 155-77, 685, 688. These misrepresentations ultimately caused prescribers to submit thousands of claims impliedly certifying -- falsely -- that opioids were medically necessary to treat chronic pain. *Id.* ¶¶ 677-78 & nn.138-39.

8

Defendants nevertheless argue that the City has paid claims for their products "*with full knowledge of the alleged noncompliance.*"  Defs.' Mem. 10.  But this is incorrect.  "[M]ere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance."  *Universal Health II*, 842 F.3d at 112.  It is the City's "practice not to pay claims that are not medically necessary or reasonably required."  4AC ¶ 697.  Rather, the City requires its health care administrators (which are outside vendors) to review certain claims to determine whether treatments are "medically necessary" according to the express conditions of payment.  *Id.*  As a result, the City has not known whether any given prescriber has made an informed judgment that a particular claim for opioids was medically necessary, or, instead, prescribed based on Defendants' fraudulent and deceptive marketing.  *Id.*; *see also U.S. ex rel. Poehling v. UnitedHealth Grp., Inc.*, 2018 WL 1363487, at *12 (C.D. Cal. Feb. 12, 2018) (declining to "read[] too much into a government agency's continued payments" as government "could not identify which diagnoses were valid and which were not" based on "the allegedly fraudulent representations Defendants made"); *U.S. ex rel. Campie v. Gilread Sciences, Inc.,* 862 F.3d 890, 906 (9th Cir. 2017).[7]

> b.    **Defendants' misrepresentations concern the "essence of the bargain" for coverage under the City's health plans and workers' compensation program**

Whether a given treatment is medically necessary is not simply a picayune or ancillary technicality required for payment of a claim under the City's health plans and workers' compensation program; rather, it is *the most basic element* of eligibility for payment of a claim.  *See* 4AC ¶¶ 667-69, 684-87.  In *Universal Health*, the Court contrasted such matters that go "to the very essence of the bargain" with minor contractual or regulatory matters on the periphery of the parties' exchange.  *See* 136 S. Ct. at 2003 & n.5.  Looking to the importance a reasonable person would attach to the matter, as instructed

---

[7] Indeed, given the potentially lethal properties of prescription opioids, it would defy logic for the City to knowingly acquiesce to paying for a medically unnecessary prescription.

by *Universal Health*, *id.* at 2002-03, any reasonable person would consider the medical necessity of a treatment to be a threshold requirement for payment of a claim for that treatment. *See Brookdale*, 2018 WL 2770598, at *1, 9 (noting that physician certification which "attest[ed] to the need for the medical services," went to "the essence of the bargain between themselves and the government"); *IASIS Healthcare*, 2016 WL 6610675, at *11, 14 ("medical necessity" is "the *sine qua non* of government payment").

In *U.S. ex rel. Brown v. Celgene Corp.*, 226 F. Supp. 3d 1032 (C.D. Cal. 2016), a district court considered the materiality of Medicare Part D's "medically accepted indication" requirement. The court held that there was a genuine issue of fact as to materiality and permitted the relator's claims to proceed. *Id.* at 1049. Other courts have likewise agreed that basic eligibility requirements are material to government payment decisions under *Universal Health*. *See, e.g., Miller*, 840 F.3d at 504; *United States v. Crumb*, 2016 WL 4480690, at *24 (S.D. Ala. Aug. 24, 2016). Thus, the medical necessity requirement is an essential feature of the City's health plans and workers' compensation program. By impacting thousands of medical necessity determinations, Defendants' fraud was material to the City's decisions to pay for opioid prescriptions.

> **c.** **The City has taken concrete steps to prevent, reduce, and end its payment of medically unnecessary claims for prescription opioids**

As detailed below, the City has taken concrete and proactive steps that make clear that Defendants' fraudulent and deceptive marketing is material and will not be tolerated. *See Rose v. Stephens Inst.*, 2016 WL 5076214, at *6 (N.D. Cal. Sept. 20, 2016) (holding fact that government "took corrective actions" that "changed over time" signaled a "'change of position' that is relevant" under *Universal Health* and that it would thus "be a mistake to give too much weight to the [government's] record of past enforcement").

*First*, since becoming aware of Defendants' deceptive marketing, the City has asked its plan administrators "to limit its coverage of long-term opioid use for chronic pain and to increase the coverage and availability of treatment of opioid overdose and addiction, and to educate prescribers about the risks and benefits of opioids, all in an effort to limit its payment of false claims and to rein in the harm from the inappropriate prescribing of opioids." 4AC ¶ 698.  In response, "[t]he benefits administrators, which cannot arbitrarily limit access to benefits, requested that the City provide validated treatment guidelines to justify and direct any changes to their formulary." *Id.* ¶ 700.  It was not until the CDC Guideline for Prescribing Opioids for Chronic Pain ("CDC Guideline") was published in March 2016 that objective, peer-reviewed opioid treatment guidelines were available. *Id.* ¶ 701.  "Once the CDC Guideline was published, the City asked its vendors to adopt the CDC Guideline to govern the City's benefits and to widely publicize the Guideline to prescribers." *Id.* ¶ 702.  The City has requested that its vendors require that prescribers affirm that alternative non-opioid therapies have failed; that, after being prescribed for 30 days, prescribers obtain informed consent from patients; that coverage for / access to naloxone, buprenorphine, and methadone be increased; that there be prior authorization for concurrent use of opioids and benzodiazepines and that materials be provided to both the prescriber and patient on their risks; and that there be prior authorization for opioid doses at or above 90 MME; and, that, for chronic pain patients on opioids, the prescriber certify that attempts have been made to reduce the dose and to offer naloxone. *Id.*[8]

*Second*, the City has implemented education initiatives, including a campaign to educate residents and healthcare providers about opioid addiction "to ensure that the opioids are only prescribed and covered when medically necessary or reasonably required." *Id.* ¶¶ 695, 707 ("key

---

[8] Defendants asserts that the CDC Guideline's recognition that opioids may appropriately be prescribed for chronic pain under some circumstances undercuts "materiality." *See* Defs.' Mem. 11. This misapprehends the City's allegations. The City does not allege that opioids may never be prescribed to treat chronic pain, but rather that Defendants' misrepresentations fundamentally altered prescribers' judgment about whether prescribing opioids to treat chronic pain was medically necessary in a given instance.

strategy" implemented by the City "for reducing false and fraudulent claims for opioids [has been] to educate prescribers about the appropriate use of opioids."). "The City asked its health insurer, for example, to disseminate the CDC Guideline to Chicago prescribers treating City employees." *Id.* At the City's request, its outside vendors administering its health plans and workers' compensation program also published articles on the CDC Guideline in newsletters distributed to network prescribers throughout the City. *Id.* The City also announced its own campaign to educate residents and healthcare providers about opioid addiction and promote the CDC Guideline. *Id.* The Mayor also has proposed an increase in the City's annual spending on opioid addiction treatment. *Id.* ¶ 708.

*Third*, "[t]he City also has proposed to establish a pharmaceutical representative license, which would require specialized training for sales representatives . . . , provide the City with information on opioid sales and marketing, and allow the City to monitor and adjudicate complaints against sales representatives." *Id.*

*Fourth*, in July 2016, the City entered into an agreement with Pfizer, another opioid manufacturer, which commits Pfizer to accurately and completely disclose the risk of opioids in its own marketing materials, and to cooperate in the City's investigation of deceptive marketing of opioids." 4AC ¶ 708. *See U.S. ex rel. Worthy v. E. Maine Healthcare Sys.*, 2017 WL 211609, at *27 (D. Me. Jan. 18, 2017) (materiality supported by "previously taken action to prevent the [same] type of [misconduct] alleged here").

And *fifth*, the City filed this lawsuit against Defendants. By initiating and actively engaging in this lawsuit, the City distinguishes itself and this action from the cases cited by Defendants in which courts dismissed *qui tam* actions filed by private citizens based on lack of materiality *after the government decided not to intervene.*[9]  *Compare, e.g., U.S. ex rel. Badr v. Triple Canopy, Inc.*, 857 F.3d 174, 178-79 (4th Cir.

---

[9] Specifically, Defendants, in support of their materiality argument, rely upon a number of inapposite *qui tam* authority where the government declined to intervene in the litigation. *See* Defs.' Mem. 9 n.11. *See U.S. ex rel. Nargol v. DePuy Orthopaedics, Inc.*, 865 F.3d 29, 35 (1st Cir. 2017) (in non-intervened case, information regarding

2017) (holding that government's decision to "immediately intervene[]" was "evidence" of "materiality") *with Petratos*, 855 F.3d at 490 (in non-intervened case, FDA took no action on relator's disclosures and "added three more approved indications for the drug" and relator "essentially concede[d] that CMS would *consistently reimburse* these claims with full knowledge of the purported noncompliance").[10]

> ### d. The City has not acquiesced to paying for medically unnecessary prescription opioids by continuing to operate its health plans and workers' compensation program

By administering its health plans and workers' compensation program in the manner it has, the City has not acquiesced to paying for medically unnecessary prescription opioids.  If that were so, government programs would have to grind to a halt any time allegations of fraud arose in order to avoid forfeiting potential FCA claims.  That is not the law.  *See, e.g., Celgene Corp.*, 226 F. Supp. 3d at 1049-51 ("The fact that the government sometimes exercises its discretion to excuse non-compliance with a requirement [did] not establish that the requirement is immaterial as a matter of law"); *Rose*,

---

medical device was immaterial because FDA knew "every aspect of the design" yet "allowed the device to remain on the market"); *U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (in non-intervened case, information regarding drug was immaterial because FDA "not merely continued its approval" but "*added* three more approved indications"); *U.S. ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 764 n.112 (3d Cir. 2017) (in non-intervened case, pharmacy's use of "dummy" prescriber identifier numbers was immaterial because government had no "clear prohibition" on their use and "effectively indicated" that they "were permissible"); *U.S. ex rel. Harman v. Trinity Indus., Inc.*, 872 F.3d 645, 650-51 (5th Cir. 2017) (in non-intervened case, certifications regarding quality of highway guardrails were immaterial because government purchaser expressly stated that it had reviewed the allegations and would continue to purchase them anyway); *U.S. ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334 (9th Cir. 2017) (in non-intervened case, allegedly "unreliable" cost reports were immaterial because it was "undisputed" that the government "did not find [those] reports helpful and did not use them"); *U.S. ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1033 (D.C. Cir. 2017) (in non-intervened case, allegedly inflated "headcount data" was immaterial because "Army witnesses" testified that "false or not" it had "no bearing" on government billing).

[10] Defendants argue that the City's considerable evidence of materiality beyond its payment practices actually "defeat" materiality.  *See* Defs.' Mem. 9-11.  These arguments are nonsensical, would render any payor's subsequent remedial efforts irrelevant, and would require the City to have predicted Defendants' fraud and its consequences to the City.  From the start, the City *did* act to forestall its payment of dangerous and unnecessary treatments through its medical necessity requirement.  Since then, the City's actions to prevent and mitigate the harm caused by Defendants' deceptions are plainly relevant to demonstrate its view that the misrepresentations are material.

2016 WL 5076214, at *6-7 ("Nothing in [*Universal Health*] suggests that actions short of a complete revocation of funds are irrelevant to the court's materiality analysis."). Rather, a particular government agency's "decision to not take action . . . despite its awareness of the allegations in this case is not terribly relevant to materiality." *Id.* at *6; *accord U.S. ex rel. Brown v. Pfizer, Inc.*, 2017 WL 1344365, at *11 (E.D. Pa. Apr. 12, 2017) ("The mere fact that the government has continued to pay and approve claims . . . even after Relators' allegations . . . is insufficient to establish that Relators' claims lack materiality.").

In fact, a governmental agency's continued payments for goods or services despite suspicions of false certifications can result from many factors, including resource constraints, difficulties of proof, and the costs and practical difficulties and risks associated with quickly changing course. *See Rose*, 2016 WL 5076214, at *6; *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 917 (4th Cir. 2003); *see also U.S. ex rel. Am. Sys. Consulting v. ManTech Advanced Sys. Int'l*, 600 Fed. App'x 969, 978 (6th Cir. 2015) (determining that "a decision to continue under a contract after discovering misrepresentations is not necessarily dispositive" in addressing materiality). Here, any efforts the City takes to prevent false claims related to prescription opioids must be balanced against the competing goals of not disrupting or impeding the overall administration of its healthcare programs and end-goal of providing necessary medical goods and services to the City's employees and retirees. Numerous practical considerations make it impossible to expect the City's entire healthcare infrastructure to simply "turn on a dime" in response to the opioid crisis.

*First*, the City's healthcare programs involve hundreds of thousands of prescription drug claims each year. *Id.* ¶ 703. The City lacks the resources to double-check each claim for medical necessity. Rather, consistent with industry practice and the prudent use of resources, the City's plan administrators presume that prescriptions are consistent with the standard of care. *Id.* ¶ 704.

14

*Second*, because the City's health plans and workers' compensation program are administered by third-party vendors, the City cannot unilaterally change its formulary, but rather must request that its plan administrators implement such changes.  *Id.* ¶ 699.

*Third*, the City's workers' compensation program is governed by the Illinois Workers' Compensation Act.  *Id.* ¶ 705.  Under the Act, an employer (*i.e.,* the City) cannot direct treatment.  *Id.* Rather, an employee is treated by his or her physician of choice.  *Id.*  Challenging that treatment, including prescription drugs, commonly results in adjudication and arbitration proceedings that require independent medical examination.  *Id.*  The time and cost involved in a challenge must be weighed against the length and cost of the challenged treatment.  *Id.*

*Fourth*, in light of the ongoing opioid and heroin crisis affecting the City and the nation (caused in large part by Defendants), "it may no longer be medically prudent to deny an employee's opioid claim where, after years of use, the individual has become physically or psychologically dependent on the drug."  *Id.* ¶ 706.  "In those cases, abrupt cessation of coverage could cause employees to suffer withdrawal or transition to illegal narcotics."  *Id.*  Again, determining in each instance whether continued use of opioids would be in a patient's best interests would require resource-intensive judgments inappropriate for the City; thus, the City has focused on educating prescribers to correct Defendants' misconduct and help prescribers make appropriate judgments about whether to start or cease opioid treatment.

Ignoring the above considerations, Defendants argue that the City cannot -- as a matter of law -- establish materiality because the City continues to pay claims for opioids prescribed to treat chronic pain.  Defs.' Mem., pp. 8-9.  Defendants are incorrect.[11]  *Universal Health* requires courts to conduct

---

[11] Defendants incorrectly assert that the Transferor Court held that the City's continued payment of claims "shows as a matter of law that the alleged omissions were not material to the City's payment decisions."  Defs.' Mem. 8-9.  If that were so, it would have been illogical for the Transferor Court to have given the City leave to amend its materiality allegations because any amendment would have been futile.  Rather, the Transferor Court

an assessment of *all* evidence relevant to materiality, without giving dispositive weight to any one factor. *See* 136 S. Ct. at 2003-04. Courts before and after *Universal Health* have recognized that the government's continued payment of claims does not necessarily indicate that a defendant's misrepresentations are not material. *See, e.g.*, *Celgene*, 226 F. Supp. 3d at 1049-51. *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445 (7th Cir. 2016), the principal case upon which Defendants rely, is not to the contrary. In *Sanford-Brown*, the court concluded that the relator had "offered no evidence that the government's decision to pay [the defendant] would likely or actually have been different had it known of SBC's alleged noncompliance" with the regulations, noting that the government had "already examined SBC multiple times over and concluded that neither administrative penalties nor termination was warranted." *Id.* at 447. Put another way, the relator's only evidence of materiality was that the defendant's misrepresentations *entitled* the government to decline payment, and in the absence of any other evidence of materiality the failure by the government to take any action in response to the defendant's noncompliance demonstrated that the alleged noncompliance was not material. *Id.* at 447-78. Thus, *Sanford-Brown* does not stand for the proposition that, in plain contradiction to *Universal Health*, the government's continued payment of claims is dispositive of materiality in all cases; it is, as *Universal Health* held, simply one factor to be considered among others. *See Universal Health*, 136 S. Ct. at 2001-04.

Indeed, even when (unlike the City) a governmental entity takes *no* action against a defendant after learning of its material misrepresentations, courts have held that the government's inaction does not preclude false claims liability, recognizing there may be good reason for the government's decision.[12] This Court should decline Defendants' invitation to turn *Universal Health's* flexible

---

simply held that in the 2AC the City had not sufficiently alleged materiality under *Universal Health* (which was not available when the 2AC was filed) and granted leave to amend. *Chicago II*, 211 F. Supp. 3d at 1079.

[12] *See U.S. ex rel. Am. Sys. Consulting, Inc. v. ManTech Advanced Sys. Int'l*, 600 F. App'x 969, 977-78 (6th Cir. 2015) (noting that government's decision to continue contract despite misrepresentations is relevant but not dispositive because choice may be based on cost, availability of other contractors, or change in circumstances).

materiality inquiry into an inflexible, outcome determinative one.  In short, the totality of the factors detailed above weighs in favor of concluding, at the pleading stage,[13] that the City has plausibly alleged that Defendants' deceptive marketing of prescription opioids "had a natural tendency to influence" -- and was thus material to -- the City's decisions to make healthcare payments.

> **2.      The City Has Otherwise Sufficiently Pleaded Defendants' Liability for Implied False Certifications**

Defendants' other attacks on the City's implied false certification claim, *see* Defs.' Mem. 11-13, were already decided against them, with *Chicago II*'s finding that "[i]n light of the Supreme Court's ruling in *Universal Health*, the City can proceed under a theory of implied false certification."  211 F. Supp. 3d at 1078.  The Court should thus reject Defendants' attempt to re-argue purported flaws in the City's implied false certification claim beyond the discrete materiality issue identified by the Transferor Court.  *See supra* §§ II & II.A.1.

For instance, Defendants re-argue that the City has not alleged any claims for payment that made "specific representations" about opioids.  Defs.' Mem. 11-12.  This argument is meritless, misconstruing both the City's theory of the liability and the law that supports it.  The City alleges that Defendants made "specific misrepresentations" about the risks, benefits, and superiority of opioids to treat chronic pain to prescribers, who in turn submitted claims implicitly representing that the identified opioids were medically necessary to treat the patient's condition.  *See* 4AC ¶¶ 266-648. Through their deceptive marketing and promotional schemes, Defendants thus *caused* physicians and healthcare providers to submit false claims to the City -- a theory of liability expressly encompassed

---

[13] While *Universal Health* rejected the contention that materiality is necessarily too fact intensive to dismiss a case on a motion to dismiss or at summary judgment, 136 S. Ct. at 2004, n.6, the holistic nature of the materiality assessment and the role of the jury in making factual determinations counsels against the notion that courts should dispose of FCA cases at the dispositive-motion stage.  *See U.S. ex rel. Brooks v. Stevens-Henager Coll.*, 2018 WL 1614336, at *13-14 (D. Utah Mar. 30, 2018).

in the federal FCA and the City's false claims ordinance, which prohibit not just submitting, but *causing* the submission of, false claims to the government. *See* MCC § 1-22-020 (providing liability to "[a]ny person who . . . knowingly . . . causes to be presented" a "false or fraudulent claim"); *see also* 31 U.S.C. 3729(a)(1)(A) (same); *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45 (1943) (holding that FCA "reach[es] any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government"); *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 737-39 (N.D. Ill. 2010) ("The wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted to the government by another.") (collecting cases).

Defendants also incorrectly argue that it is "impossible to say" that a "prescription impliedly certifies anything more than a drug's necessity for a use approved by the FDA . . . ." Defs.' Mem. 12-13. Because claims for reimbursement under the City's health plans and workers' compensation program necessarily arise under the provisions of those plans, it is not "impossible to say" what those claims impliedly certify. Rather, they impliedly certify compliance with the material terms of the controlling plan documents and provider agreements, including the requirement of "medical necessity," as defined in those documents.

Defendants' arguments about the FDA approval of prescription opioids or the legality of off-label use, Defs.' Mem. 12-13, are likewise off-point as they misapprehend the City's allegations. *See supra* fn.3. Nothing in an FDA approval of a drug or in the legality of off-label use of a drug supports the proposition that these factors permit a manufacturer to engage in fraud in the marketing of that drug. The representations inherent in the claims at issue here were implicit -- that the opioid prescriptions were medically necessary -- when in fact they were the product of generally accepted standards of medical practice that had been corrupted by Defendants' misconduct. *See, e.g., U.S. ex rel. George v. Fresenius Medical Care Holdings, Inc.*, 2016 WL 5361666, at *17-18 (N.D. Ala. Sept. 26, 2016)

18

(under implied certification claim certain treatment information is "an inherent assumption" underpinning the reimbursement scheme); *Universal Health II*, 842 F.3d at 109-111 ("impliedly certif[ying]" that healthcare providers possessed requisite "training and professional credentials" was "textbook example of representations that would 'likely . . . induce a reasonable person to manifest his assent'") (quoting *Universal Health*, 136 S. Ct. at 2000-03 ("Anyone . . . would probably -- but wrongly -- conclude that the clinic had complied with core Massachusetts Medicaid requirements . . .").

In sum, the City's implied false certification claims should be allowed to proceed. The City has established materiality. The City has asserted facts that explain why its continued payment of claims does not indicate that defendants' fraud was not material to its payment decision. And case law makes clear that continued payment of claims is not the only factor courts are to examine, but rather one of several. Similarly, the City has shown that Defendants' rehashed attacks on the implied false certification claim are without merit. Therefore, Defendants have not established as a matter of law that claim should be dismissed.

### 3. With the Amended Exhibits, the City Has Sufficiently Addressed the Court's Concern Regarding Causation (Counts 4-10)[14]

#### a. The City has supplied the "missing link" identified by the Court[15]

---

[14] In connection with their causation arguments, Defendants suggest that they "cannot be responsible for the costs and claims associated with other manufacturers' opioid products." *See* Defs.' Mem. 19 n.20. Defendants are incorrect. Counts 6 and 9 of the 4AC sound in conspiracy. *See American Hardware Mtrs. Ass'n v. Reed Elsevier, Inc.*, 2010 WL 55708, at *10 (N.D. Ill. Jan. 4, 2010) ("Liability for civil conspiracy is joint and several"). And Count 11 of the 4AC sounds in public nuisance. *See* Restatement (Second) of Torts, § 840E, cmt. c (1979) ("When apportionment cannot be made . . . he is liable for the entire harm").

[15] The City argued in its responses to Defendants' motions to dismiss the 1AC and 2AC that this level of specificity was not required. *See* Transferor Court Docs. 252 at 43-44; 433 at 101-02. Unlike Defendants, however, the City has endeavored, consistent with the law of the case doctrine, not to reargue matters previously decided.

In *Chicago II*, the Transferor Court opined that "[i]f the City connects the named prescribers listed in Exhibits A and B to prescribers identified by letter in the [2AC] who were detailed with Defendants' alleged deceptive marketing, the Court would likely find that plaintiff has adequately alleged causation." 211 F. Supp. 3d at 1081.  The City has done exactly what the Transferor Court directed.  As indicated in the 4AC at 1, n.1 and at 269, n.138, the City submitted revised Exhibits A.1-A.7 and B.1-B.2, linking the letter designations to the prescribers' names used in the 4AC.  Each exhibit now contains a column, next to the prescriber's name, with the letter designation used to refer to that prescriber in the 4AC.[16]  The exhibits, together with the allegations in the 4AC, show:[17]

- Prescribers B, E, F, and H, whom the City alleges received misrepresentations from Actavis, wrote prescriptions for Actavis opioids (Kadian or generic hydrocodone) that the City reimbursed.  4AC ¶ 302; Exs. A.1, A.7.  For example, Actavis representatives told Prescriber B that opioids would improve patient function and minimized their potential for abuse, and wrote City-paid Kadian prescriptions from November 2009 to November 2011.  4AC ¶ 302(a); Ex. A.1.  Actavis representatives had similar dialogue with Prescribers E, F, and H during which Actavis either never warned of the risks of opioid addiction or represented that Kadian was less addicting or more difficult to abuse than other opioids.  4AC ¶ 302.  Prescribers E, F, and H wrote City-paid Kadian prescriptions from December 2010 to February 2012.  Ex. A.1.

---

[16] Exhibits A.1-A.5 identify, by the Defendant (except Mallinckrodt), City health plan-reimbursed prescriptions by providers who, as described in the 4AC, were exposed to that Defendant's deceptive marketing.  4AC ¶ 677 n.138.  Exhibit A.6 is a summary exhibit reflecting the information on Exhibits A.1-A.5.  Exhibit A.7 provides the same type of information based on data from the City's workers' compensation plan.  Exhibits B.1 and B.2 add further detail about prescriptions written to exemplar patients referenced in the 4AC.  As reflected in the 4AC, the City reimbursed far more opioid prescriptions by these providers than are listed in the exhibits.  *See id.* ¶¶ 302, 392, 488, 558, 646, 677-78, 738-39 (specifying numbers of prescriptions reimbursed).  The exhibits reference only a subset of the reimbursed prescriptions -- those written for patients with no cancer diagnoses who received an opioid prescription within 90 days of a diagnosis of joint or back pain, where the opioid treatment lasted 90 days or more.

[17] The Exhibits do not address Mallinckrodt.  As stated in the 4AC, however, the City has alleged that "[u]pon information and belief, based on Mallinckrodt's detailing of Chicago prescribers, the consistency of its deceptive marketing, and the fact that the City paid for prescriptions of Mallinckrodt opioids, including Exalgo and Xartemis XR, the City paid for opioids that resulted from Mallinckrodt's deceptive marketing," and identified two prescribers.  4AC ¶ 572.  While the City contends that this would be sufficient under the causation standard it advanced in connection with the 2AC, the Transferor Court disagreed.  As such, the City seeks leave to plead this one aspect of its claim against Mallinckrodt on information and belief.  *See id.* at n.127.  In any event, the City's claims against Mallinckrodt under Counts 1 and 3, which are not dependent on the links made in the Exhibits, may proceed.  *See Chicago II*, 211 F. Supp. 3d at 1070-74 & 1076.

- Prescribers M, R, and V, whom the City alleges received misrepresentations from Cephalon, wrote prescriptions for Cephalon opioids (Actiq or Fentora) that the City reimbursed. 4AC ¶¶ 392, 394; Ex. A.2.[18]  For example, Prescriber R was targeted and detailed by Cephalon in 2010, 2011, and 2013, and wrote City-paid Fentora prescriptions from 2011 to 2014 (as well as one in 2007). 4AC ¶¶ 393, 394; Ex. A.2.

- Prescribers A, B, D, M, U, V, and QQ, whom the City alleges received misrepresentations from Endo, wrote prescriptions for Endo's Opana ER that the City reimbursed. 4AC ¶¶ 488, 490, 492; Exs. A.3, A.7.[19]  For example, Prescriber QQ met with Endo representatives in the last five years (as of August 2015), heard misrepresentations indicating that Opana ER was unlikely to be diverted or misused, and wrote City-paid Opana ER prescriptions from 2011 to 2013. 4AC ¶ 488j.  Similarly, Prescriber D recalls Endo representatives indicating that its opioids were less addictive, and wrote City-paid opioid prescriptions from 2010 through 2012, including prescriptions for Endo's Opana ER throughout 2011. 4AC ¶ 488c; Ex. A.3.  Similarly, Prescriber U, who by 2010 had been told Endo's misrepresentations through Endo's speaker training, wrote City-paid Opana ER prescriptions from 2010 to 2015. 4AC ¶ 492; Ex. A.3.

- Prescribers B, D, G, H, J, R, Z, and CC, whom the City alleges received misrepresentations from Janssen, wrote prescriptions for Janssen opioids (Nucynta ER, Nucynta IR, or Duragesic) that the City reimbursed. 4AC ¶¶ 553, 558; Exs. A.4, A.7.[20]  For example, although Prescriber G spoke to Janssen representatives on multiple occasions, Janssen sales representatives did not warn him about the risk of addiction, and he wrote City-paid prescriptions for Janssen opioids from 2009 to 2015. 4AC ¶ 558d.

- Prescribers B, D, E, F, J, O, P, T, DD, HH, and QQ, whom the City alleges received misrepresentations from Purdue, wrote prescriptions for Purdue opioids (OxyContin and Butrans) that the City reimbursed. 4AC ¶ 646; Exs. A.5, A.7.  For example, Prescriber DD was detailed by Purdue sales representatives, who informed him that OxyContin would provide his patients with 12 hours of pain relief, and wrote City-paid prescriptions for Purdue

---

[18] The City alleges that Prescribers C, E, F, G, J, O, P, and Q received misrepresentations from Cephalon sales representatives. 4AC ¶ 392. These examples, along with the nationwide and uniform character of Cephalon's marketing, support the inference that Prescribers R and V (whom Cephalon specifically targeted and detailed) received similar misrepresentations. *See id.* ¶¶ 393-94. Prescriber M was a member of Cephalon's speakers bureau and, the City alleges, was instructed on the speaker misrepresentations detailed in the 4AC. *See id.* ¶¶ 382-83.

[19] The City alleges that Prescribers B, D, and QQ received misrepresentations from Endo sales representatives, 4AC ¶ 488, and that Prescribers A, M, U, and V were members of Endo's speakers bureau who were instructed on the speaker misrepresentations detailed in the 4AC. *See id.* ¶¶ 472, 490-93.

[20] The City alleges that Prescribers B, D, G, H, J, and Z received misrepresentations from Janssen sales representatives. 4AC ¶ 558. These examples, along with the nationwide, uniform character of Janssen's marketing, support the inference that Prescriber BB (detailed by Janssen on three specific occasions in 2013) received similar misrepresentations. *See id.* ¶¶ 559, 562. Prescribers R and CC were members of Janssen's speakers bureau and, the City alleges, were instructed on the misrepresentations detailed in the 4AC. *See id.* ¶¶ 553, 554, 561.

opioids from 2013 to 2015. 4AC ¶¶ 640, 646i; Exs. A.5, A.7. Similarly, Purdue representatives misrepresented Purdue opioids as less addictive or having less potential for abuse to Prescribers B, D, and J, who wrote City-paid Purdue prescriptions from 2009 to 2015. 4AC ¶ 646; Exs. A.5, A.6.

Together with the City's other causation allegations, *see, e.g.,* 4AC ¶¶ 6-13, 84-89, 302, 392, 488, 558, 646, 649-736, the amended exhibits establish that "prescribers relied on defendants' misrepresentations when they prescribed defendants' drugs." 211 F. Supp. 3d at 1080.[21] In addition, the 4AC provides additional specific causation allegations, including (1) the City's increased spending on opioids, (2) interviews with Chicago prescribers who acknowledged prescribing opioids as a result of Defendants' deceptive marketing, and (3) the City's exemplar false claims. *See* 4AC ¶¶ 709-31, 737-39. *Chicago II* specifically cited all of these allegations in concluding that "the alleged false statements made by prescribers that resulted in the City's payment of false claims *were foreseeable consequences of* -- *i.e.,* were proximately caused by -- "the alleged misrepresentations [Defendants'] representatives made to Chicago-area prescribers." 211 F. Supp. 3d at 1080-81.

**b.    Defendants' Exhibit-based causation arguments lack merit**

Defendants argue that the City's Exhibits, in some instances, do not establish that the prescribers identified in the 4AC wrote City-reimbursed prescriptions *after* receiving misrepresentations and *because* of those misrepresentations. *See* Defs.' Mem. 14-16. In support, Defendants undertake a highly fact-specific attempt to pick apart the minutiae of the City's allegations -- prescriber-by-prescriber, misrepresentation-by-misrepresentation, and prescription-by-prescription. *Id.* This level of heightened specificity is not the standard for pleading causation and was rejected in *Chicago II.* 211 F. Supp. 3d at 1081 (rejecting "direct relationship standard" and applying "foreseeability

---

[21] For purposes of demonstrating the causal link, Exhibits A.1-A.5 each shows only prescriptions of the Defendant's branded opioids indicated on the Exhibit. However, the City more broadly alleges that each Defendant's deceptive marketing caused increased prescribing of opioids as a class (including generics and other companies' branded opioids). *See, e.g.,* 4AC ¶¶ 132-33, 236, 268, 649-752. Exhibit A.7 does show prescriptions of both generic opioids and Kadian by providers who received Actavis misrepresentations.

standard"); *see also, infra,* § II.A.3.c. More importantly, this analysis improperly divorces the individual misrepresentation-prescription links established by the exhibits from the City's broader allegations of causation, which the Transferor Court has already credited. *See Chicago II,* 211 F. Supp. 3d at 1081 (finding "the City's payment of false claims were foreseeable consequences of the alleged misrepresentations"). Defendants' attempt to relitigate these issues should be rejected. *See supra* § II.

Even if Defendants' heightened pleading standard were valid (and it is not) the City's allegations and exhibits do in fact establish that specific prescriptions by specific prescribers were made after those prescribers received corresponding misrepresentations from each of Defendants.[22] Specifically, the City has provided representative examples -- including the precise dates of prescriptions from its own records -- showing that the deceptive marketing campaign described in the 4AC was pervasive and reached Chicago prescribers whose prescriptions of opioids were covered by the City.[23] As to Actavis, for example, the City has identified sales representative training materials from 2010 that contained numerous misrepresentations, multiple prescribers who received those same misrepresentations from Actavis sales representatives, and corresponding City-reimbursed prescriptions by those prescribers after 2010. *See* 4AC ¶¶ 278-84, 302 & Exs. A.1, A.7. Reviewing these and other allegations, the Transferor Court deemed it sufficient that the City had pleaded "generally when . . . those alleged misrepresentations were made." *Chicago II,* 211 F. Supp. 3d at 1071.[24]

---

[22] The sole exception is Mallinckrodt. *See supra* n.17.

[23] For example, (1) Prescriber F was detailed by Kadian representatives from 2005 to 2007 and wrote City-paid prescriptions in 2011, 4AC ¶ 302(d) & Exs. A.1, A.6; (2) Prescriber M became a member of Cephalon's speakers bureau in 2003 and wrote City-paid Fentora 2007, 4AC ¶ 383 & Ex. A.2; (3) Prescriber U was a member of Endo's speakers bureau in 2010 and wrote City-paid Opana ER prescriptions into 2013, 4AC ¶ 492 & Ex. A.3; (4) Prescriber H was detailed by representatives of Janssen in 2010-12, received a misrepresentation about withdrawal, and wrote a City-paid Nucynta prescription in 2015, 4AC ¶ 558(f) & Ex. A.6; and (5) Prescriber DD received a Purdue misrepresentation relating to a 2014 OxyContin sales aid and wrote a City-paid prescription for the drug in 2015, 4AC ¶ 646(i) & Ex. A.5.

[24] The Transferor Court's Order regarding the 2AC makes multiple references to a directive that the City amend its exhibits. Defendants seize on one of these formulations -- which uses the word "subsequently" -- to support their timing argument. *See Chicago II,* 211 F. Supp. 3d at 1080 ("If the prescribers who heard the

And in sustaining Counts 1 and 3, the Transferor Court acknowledged that although the dates of sales representative visits generally are unavailable to the City, they are closely tracked by Defendants, who will be expected to produce such information in discovery.  *See id.*; *see also, e.g.*, 4AC ¶ 302 n.97.

Defendants' "timing" argument also ignores that the City has pleaded, and need only plead, illustrative *examples* of their systemic fraud.  *See, e.g.*, *Mason v. Medline Indus.*, 731 F. Supp. 2d 730, 735 (N.D. Ill. 2010) ("A plaintiff who pleads a fraudulent scheme involving numerous transactions over a period of years need not plead specifics with respect to every instance of fraud, but he must at least provide representative examples.").  Rather, in view of the centralized and uniform sales training and marketing alleged in the 4AC, it is reasonable to infer that that representative sample of prescribers who received misrepresentations from opioid sales representatives during one detailing visit also received them during other visits, before and after false claims were submitted.  Similarly, that a doctor wrote a prescription before receiving a particular misrepresentation does not negate causation as to subsequent prescriptions; the misrepresentation could have influenced the doctor to continue prescribing opioids or to prescribe them more frequently or at higher doses.  Such details can be fleshed out in discovery.

Defendants also contend that the "City's exhibits" fail to link "each prescriber to specific misrepresentations . . . ."  Defs.' Mem. 15.  Although nominally directed at the updated Exhibits, this argument is merely another improper attempt to challenge the Transferor Court's ruling sustaining Counts 1 and 3.  *See Chicago II,* 211 F. Supp. 3d at 1071 (holding that plaintiffs had pleaded with sufficient particularity "to which Chicago-area prescribers Defendants' representatives made alleged misstatements, what those alleged misstatements were, and generally when and where those alleged misrepresentations were made").  Regardless, the City *has* linked its prescribers to the specific

---

misrepresentations are clearly identified as the same prescribers who subsequently prescribed Defendants' drugs . . . .").  This formulation is a distinct departure from the language used at multiple other places in the Order, which contained no such timing requirement at the repleading stage.  *See, e.g.*, *id.* at 1080, 1081, 1082-83.

misrepresentations they received.  First, the City has interviewed prescribers and set forth Defendants'
misrepresentations to those prescribers.  *See, e.g.,* 4AC ¶¶ 302, 392, 488, 558, 646, 712-36.  Second, the
City has alleged numerous prescribers who have (a) served on one of Defendants' speakers bureaus
where they received training by a Defendant, (b) attended lunch talks presented by a Defendant, or
(c) been visited by sales representatives for deceptive "detailing" on opioids.[25]  Third, the City has
alleged that prescribers received misrepresentations from the third-party co-conspirators.  *See, e.g.,*
4AC ¶¶ 347-53, 435-81, 524, 551-63, 596, 639-48.

A central thrust of the 4AC is that Defendants' deceptive marketing *allayed concerns about
addiction* that prescribers might otherwise have had and that their promotion of individual opioids
promoted opioids as a class.  *See, e.g.,* 4AC ¶¶ 132-33, 228-30, 236, 268, 649-752.  Thus, contrary to
Defendants' suggestion, Defs.' Mem. 16, the City need not allege that any particular prescription for
opioids was inappropriate; rather, the City need only allege -- as it has -- that Defendants'
misrepresentations and omissions were misleading to a prescriber.[26]  *See Chicago II,* 211 F. Supp. 3 at
1065, 1076-81.

In short, the City need not connect every single misrepresentation to a particular prescriber
and then to a City-paid prescription.  At this stage, the City's well-pleaded allegations and examples

---

[25] *See, e.g.,* 4AC ¶¶ 289-94, 302 (Actavis speaker events and speaker training); *id.* ¶¶ 342-44, 383 (Cephalon speakers bureau); *id.* ¶¶ 392-94 (prescribers visited by Cephalon); *id.* ¶¶ 426-32, 472, 490-93 (Endo speakers bureau); *id.* ¶¶ 518-21, 553, 558(d), 561 (Janssen speakers bureau); *id.* ¶¶ 559-62 (prescribers visited by Janssen); *id.* ¶ 646(o) (Purdue speaker event).

[26] Defendants also argue that the City "cannot allege that any Chicago Doctor wrote a medically inappropriate opioid prescription *because of* any Defendant's alleged false or misleading statement or omission, rather than the doctor's own independent medical judgment."  Defs.' Mem. 16.  But that is precisely what the doctors the City interviewed confirmed.  *See, e.g.,* 4AC ¶¶ 729-32 ("Chicago Prescriber SS" confirming that opioid industry-sponsored AAPM/APS Guidelines "made him more willing to prescribe opioids for chronic pain"); *id.* ¶¶ 722-23 ("family care physician" confirming that he previously "relied on sales representatives and the information they provide" in "understanding . . . that long-acting opioids were less addictive" before later learning "how addictive opioids could be").

sustain the inference that prescribers who received one or more misrepresentations in the course of Defendants' marketing also received others.

### c. As the Transferor Court previously determined, foreseeability is the correct standard for causation

Defendants attempt to relitigate the issue of the proper causation standard to apply in this case, arguing that the Supreme Court's decision in *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296 (2017), requires the imposition of a "direct-injury" proximate causation standard. See Defs.' Mem. 17-20. While *City of Miami* does adopt a "direct-injury" proximate causation standard in Fair Housing Act cases, the Court also notably held that "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action." 137 S. Ct. at 1305.[27]

With respect to claims under the False Claims Act, courts have repeatedly held that any proximate causation analysis turns on foreseeability.[28]  Most relevant here, the Seventh Circuit has held that the statutory language of the FCA "allows the Government to recover 'damages which the Government sustains because of the act of that person'" and adopts common-law causation in fraud cases where "[a] fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the

---

[27] The other cases citing *City of Miami* upon which Defendants rely fare no better.  The Sixth Circuit dismissed qualified nuisance claims brought by Cincinnati against Wells Fargo because the city's complaint "no longer identifie[d] any nuisance properties currently owned by Wells Fargo."  *City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474, 479 (6th Cir. 2017).  While citing to the "some direct relation" language regarding proximate causation, the Sixth Circuit found that the city had settled municipal-code violations providing costs of abatement for enumerated properties leaving the court with no knowledge of "what conditions, or even what properties, the City now challenges . . . ."  *Id.* at 480.

[28] *See, e.g.,United States v. Americus Mortg. Corp.*, 2017 WL 4117347, at *2 (S.D. Tex. Sept. 14, 2017) (post-*City of Miami* FCA case stating proximate cause determination requires showing that defendants' conduct was "(1) a substantial factor in inducing providers to submit claims . . . and (2) if the submission of claims . . . was reasonably foreseeable or anticipated as a natural consequence of the Defendants' conduct."); *United States v. Quicken Loans, Inc.*, 239 F. Supp. 3d 1014, 1041-42 (E.D. Mich. 2017) (stating that "the Sixth Circuit has endorsed (at least implicitly) the . . . proximate causation standard for damages under the False Claims Act" and holding held that such proximate cause analysis ultimately turns on foreseeability) (citing *United States v. United Techs. Corp.*, 782 F.3d 718, 728 (6th Cir. 2015)).

reliance" and "the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates." *United States v. Luce*, 873 F.3d 999, 1009, 1011-12 (7th Cir. 2017). *Luce* further holds that proximate causation in the FCA context turns on foreseeability. *Id.* at 1012, 1014 ("We . . . adopt the proximate cause standard for FCA cases."). The Transferor Court's application of the foreseeability standard -- not the direct relationship standard argued by Defendants -- thus was, and is, correct. *See Chicago II*, 211 F. Supp. 3d at 1081. The *City of Miami* decision, an FHA case, does not alter the Transferor Court's prior decision. Furthermore, the Transferor Court stated that "if the City connects the named prescribers listed in Exhibits A and B to prescribers identified by letter in the [2AC] who were detailed with Defendants' alleged deceptive marketing, the Court would likely find that plaintiff has adequately alleged causation." *Id.* As previously noted, the City has updated Exhibits A and B in the 4AC to make these precise connections.

Defendants' re-hashed (and undeveloped) argument that the City cannot prove causation due to a list of intervening events that purportedly break the causal chain should also be rejected.[29] *See id.* at 1080-81 (rejecting same five "intervening events" raised by Defendants). In fact, the only one that Defendants highlight -- with merely one sentence and a footnote -- is the learned intermediary doctrine, an argument previously raised and implicitly rejected. *See Chicago II*, 211 F. Supp. 3d at 1080-81. Defendants' argument lacks merit on its face because if Defendants' marketing "could not be expected to affect a single doctor's decision-making, the . . . choice to undertake the marketing campaign would be inexplicable." *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 46 (1st Cir. 2013).

The learned intermediary doctrine applies to product liability failure to warn claims, not the types of claims brought by the City here. Even if the doctrine were applicable here, it would not absolve the Defendants of liability because it requires that the intermediary be fully and adequately

---

[29] The City references and incorporates Summit's Opposition to Defendants' MTD, § I.B.2.c.

informed of the risks associated with a product or therapy. *See Woodbury v. Janssen Pharm., Inc.*, 1994 WL 542769, at *4 (N.D. Ill. Oct. 3, 1994) ("Illinois law treats a doctor's failure to advise of risk as an intervening cause only when the doctor is adequately warned of that risk by the manufacturer"); *accord Tongate v. Wyeth Labs.*, 580 N.E.2d 1220, 1228 (Ill. App. Ct. 1991) (same); *Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35, 43-44 (Ill. 2002) (same). When, as here, the drug manufacturers are alleged to have misrepresented or omitted the risks associated with the product, "physicians could not be deemed 'learned intermediaries' who were aware of [the] dangers" associated with the drug. *Proctor v. Davis*, 682 N.E.2d 1203, 1212 (Ill. App. Ct. 1997). Here, Defendants engaged in a scheme to distort the risks and benefits of opioids and to manipulate the judgment of doctors in favor of prescribing their drugs. Thus, the learned intermediary doctrine, even were it to apply, fails as a matter of law.

Finally, Defendants, relying upon *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), argue that they cannot be held liable for a secondary market for opioids and/or heroin, or the crimes and municipal services required to address this secondary market and its effects. Defs.' Mem. 19-20. First, Defendants offer no precedent or rationale for applying *Beretta's* treatment of the foreseeability of criminal acts of third parties outside of the nuisance context. In *Beretta*, the plaintiffs' public nuisance claim was completely reliant on the *criminal* conduct of third parties; in the absence of the use of firearms in criminal activity, the plaintiffs could not show any unreasonable harm to the public safety, a requirement for public nuisance. This case is the opposite; the heart of the City's claims (including the municipal ordinance-based claims) arise out of the legal (yet excessive) prescription and use of opioids precipitated by the Defendants' misconduct.

Second, even if *Beretta's* standard applies to the City's municipal ordinance-based claims, this case satisfies it. Defendants misinformed prescribers and the public regarding the risks of opioids such that the resultant criminal activity and secondary market that developed around opioids was not only a foreseeable outcome, but also a likely one. As one public health researcher wrote in *JAMA*, a

"substantial increase[] in the nonmedical use of opioids is a predictable adverse effect of substantial increases in the extent of prescriptive use."  4AC ¶ 756; *see also id.* ¶¶ 654-59, 709-10 (discussing increased prescriptive use); ¶ 740 ("the sharp increase in opioid use has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death").  Indeed, a typical course is that persons addicted to opioids will request more and more opioids from their doctors, who eventually cut them off.  4AC ¶ 759.  Many then doctor-shop for additional prescriptions, and when that source runs out they turn to the streets to buy opioids illicitly, and a number of them become heroin addicts.  *Id.*; *see also id.* ¶¶ 756-59 (discussing secondary market, street drugs, and gangs).  These facts show the City's claims made in connection with the secondary and illicit market for opioids arose out of the lawful prescription of opioids and thus are fundamentally different from the claims made in *Beretta*.  *See* 4AC ¶ 759 (foreseeable that persons addicted to lawful opioids will seek new sources and drugs when old sources become unavailable).  Again, as the Transferor Court previously implicitly held, the foreseeability test of proximate cause would encompass these secondary market claims.  *See also* Summit's Opposition to Defendants' MTD, §§ I.A.1.c, I.C.1.a, I.C.2.

### 4. The City Alleges Sufficient Injury to Proceed on Its Claims

Despite robust allegations permeating the 4AC that show the contrary, Defendants incorrectly argue that the City has failed to sufficiently allege an injury due to their deceitful conduct.  First, Defendants cite to *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, 1997 WL 1106276 (N.D. Ill. Aug. 12, 1997), for the proposition that economic injury is essential in an insurance fraud claim.  *Steadfast*, however, was vacated.  *See Steadfast Ins. Co. Inc. v. Auto Mktg. Network, Inc.*, 191 F.3d 457 (Table) (7th Cir. Aug 13, 1999).  In any event, *Steadfast* stands only for the proposition that, at the pleading stage, a sampling of evidence supporting an inference of fraud suffices to "provide[] a reasonable basis for assessing . . . the potential extent of . . . recoverable damages."  1997 WL 1106276, at *16.  Here, the City has offered a sufficient sampling of evidence of the causation leading to damages to provide a

reasonable basis for finding that Defendants' deceitful practices have resulted in real and cognizable economic loss by the City.[30] *See, e.g.,* 4AC ¶¶ 660-92 (City's increased spending on opioids); *id.* ¶¶ 740-55 (costs of addiction and abuse); *id.* ¶¶ 760-61 (Defendants' ill-gotten record profits); *see also supra* § II.A.3.

Next, Defendants resort to inapposite case citations when comparing this case to others. For example, in *Rivera v. Wyeth-Ayerst Laboratories.*, 283 F.3d 315, 320 (5th Cir. 2002), the Fifth Circuit dismissed plaintiffs' claims in a "no-injury products liability law suit" where the plaintiffs "aver[red] that the drug was not defective as to them." Here, however, the City alleges Defendants' false and misleading marketing caused it to pay opioid-related claims and a host of costs related to opioid addiction, abuse, and overdose. *See, e.g.,* 4AC ¶¶ 220-648, 651-53, 660-94, 740-61. Similarly, in *Travelers Indem. Co. v. Cephalon, Inc.*, 32 F. Supp. 3d 538, 549-50 (E.D. Pa. 2014), another case cited by Defendants, the court found that plaintiffs "have not identified any demonstrably false statement or material omission by the defendants about the safety or efficacy of" the drugs at issue or that they "received a different, less valuable drug than the one described by the defendants -- that is to say, the plaintiffs got what they paid for -- they have not established a cognizable injury." Here, however, the City has identified myriad false statements and material omissions.

Defendants also try to advance a flawed argument that the City cannot bring claims where the opioids were FDA-approved and prescribed by licensed physicians. *See* Defs.' Mem. 22. But this argument fundamentally misapprehends the City's theories of the case, *see supra* fn.3, and

---

[30] Defendants' contention (which rests on cherry-picked allegations from the 4AC) that the City suffered no injury from their conduct, is not credible. For example, the City alleges that "[s]ince 2005, the City has spent more than $13.9 million to pay for more than 320,000 prescriptions and suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain." 4AC ¶¶ 811, 825, 844. Moreover, Exhibits A.1-A.7 and B.1-B.2 provide specific examples of payments. The argument that *none* of these claims is based on the false and misleading representations of Defendants is inexplicable. *See In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d at 46.

inappropriately relies on the learned intermediary doctrine, *see supra* § II.A.3.c (discussing inapplicability of learned intermediary doctrine).

Next, citing *Teamsters Local 237 Welfare Fund v. AstraZeneca Pharmaceuticals, LP*, 136 A.3d 688 (Del. 2016), Defendants incorrectly argue that the City cannot establish injury or economic harm as a result of Defendants' conduct because the City continues to pay claims for chronic opioid therapy. Defs.' Mem. 22. In *Teamsters*, health insurers brought consumer fraud claims alleging that a pharmaceutical company had falsely advertised its more expensive drug, Nexium, as superior to the less expensive generic drug when the drugs were therapeutically equivalent. 136 A.3d at 691. Relying on the insurers' concession that they continued to pay for Nexium "years after they came to believe it was a fraudulent product," the court held that the insurers could not establish they had been injured by the defendant's false advertising because they continued to pay for the drug when they could have removed it from their formularies. *Id.* at 696 & nn.33-34. Unlike the insurers in *Teamsters*, the City cannot simply end its coverage of chronic opioid therapy, but has made efforts in its coverage and otherwise in order to mitigate the harm caused by Defendants' fraudulent marketing. *See supra* II.A.1.c-d.

And finally, Defendants incorrectly assert that the City did not incur injury or economic harm because it was insured. Defs.' Mem. 22-23. But in the cases upon which Defendants rely, the plaintiffs' expenses had no nexus to the number of procedures or prescriptions. Here, however, the City directly paid for prescription costs throughout most of the relevant time period. 4AC ¶ 663. Even when the City paid premiums to an HMO, those premiums were not priced at a "fixed rate," but rather reflected the rising cost of prescriptions for Defendants' drugs. *See id.* Simply put, the City has suffered injury and economic harm.

**B.** **The City's Public Nuisance Claim May Proceed**[31]

Contrary to Defendants' arguments, *see* Defs.' Mem. 23-25, the City has adequately pleaded each of the elements of a public nuisance.  Illinois (like Ohio) has adopted the definition of public nuisance set forth in §821B of the Restatement (Second) of Torts:

> A public nuisance has been defined as "'the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public.'"  . . .  Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the general public.  Such rights include the rights of public health, public safety, public peace, public comfort, and public convenience.

*Beretta*, 821 N.E.2d at 1113-14 (citing Restatement (Second) of Torts § 821B(2)(a) (1979)).  And in Illinois (like Ohio), public nuisance actions for abatement are equitable in nature.  *City of Chicago v. Cecola*, 389 N.E.2d 526, 528-29 (Ill. 1979) ("Equity has historically enjoined nuisances . . . .  A nuisance which affects the public welfare may be abated in equity on the application of the proper officer. . . ."); *Stead v. Fortner*, 99 N.E. 680, 684 (Ill.1912) ("A court of equity has jurisdiction to abate a public nuisance upon an information filed by the Attorney General or other public officer charged with the duty of seeing that the laws are enforced and the public protected, and the question to be considered by the court in a particular case is whether the facts stated are such as call for the exercise of the jurisdiction.").  Such actions are distinct from, and on a "plane above," claims for damages:

> The public authorities have a right to institute the suit where the general public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety and welfare is on a plane above mere pecuniary damage although not susceptible of measurement in money . . . .

*Id.* at 683-84.

Here, the City has pled a representative public nuisance action seeking abatement of the public nuisance and recovery of costs incurred by the City in abating the nuisance created by the Defendants.

---

[31] The City references and incorporates Summit's Opposition to Defendants' MTD, § I.A.

As set forth below, the City's claims are on all fours with the recognized law of public nuisance in Illinois as they have alleged that Defendants have created or contributed to the creation of a public health hazard within the City of Chicago.  Furthermore, this case is easily distinguishable factually from the court's holding in *Beretta,* the primary case relied on by Defendants.

    1.  **Each Element of Public Nuisance Has Been Sufficiently Pleaded**

   ***Public Right.***   Here, and as explained more fully in Section I.A.1.a of Summit's Opposition to Defendants' MTD, the 4AC sets forth acts and a condition that unreasonably interfere with the public health.  *See, e.g.,* 4AC ¶ 15 (detailing the "public health epidemic" caused by opioids both in the City and nationwide); ¶¶ 26-28 (detailing the public nuisance and its effects in the City); ¶ 898 ("Without each Defendant's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists and the injury to the City would have been averted or much less severe.")  As such, the City has adequately alleged an interference with a public right as required under Illinois law.[32]

   *Beretta* provides no refuge for Defendants.  Unlike *Beretta*, this lawsuit does not concern the "lawful sale of a nondefective product," 821 N.E.2d at 1117-18, but the deceptive, and thus unlawful marketing of opioids.  As the 4AC describes, Defendants' false and misleading promotion of their opioids, and opioids generally, led to a dramatic increase in the use of opioids, and, as a result, an unprecedented public health epidemic of opioid addiction, overdose, and death.  *See, e.g.,* 4AC ¶¶ 651-60, 712-59.  The prevalence of opioids and the corresponding increase in opioid abuse, including the

---

[32] *See In re: Opioid Litigation,* Index No. 40000/2017, *slip op,* (N.Y. Sup. Ct. June 18, 2018), wherein the New York court rejected the argument that plaintiffs had failed to allege interference with a public right, explaining that "it suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have created or contributed to a crisis of epidemic proportions, has affected a considerable number of persons."  *Id.* at 28 (attached as Exhibit 1).

use of heroin, was the foreseeable result of Defendants' conduct and not a superseding cause.  *See* 4AC ¶¶ 5, 15-16, 18-21, 61-74, 84-89, 740-52, 756-59, 789g.

       ***Unreasonable Interference.***  Here, and as explained more fully in Section I.A.1.b of Summit's Opposition to Defendants' MTD, Defendants' conduct that created the public nuisance was not authorized by law.  Under Illinois law:

> "[The] existence of an ordinance or other law purportedly making a nuisance legal does not automatically destroy a common law nuisance action where the defendant's conduct was not in compliance with the law, where the defendant was otherwise negligent, or where the law itself is invalid for allowing a nuisance." . . .  We conclude that it is possible to create a public nuisance by conducting a lawful enterprise in an unreasonable manner.

*Beretta*, 821 N.E.2d at 1124.

       Here, the 4AC specifically alleges that Defendants' conduct was not authorized by law and/or actually proscribed by statutes and regulations, including MCC § 2-25-090, MCC § 4-276-470, MCC § 1-21-010, MCC § 1-22-020, and 720 ILCS 5/17-10.5.  4AC ¶ 886.  As noted above, this case does not concern the lawful sale of opioids by these Defendants or allege that opioids are a defectively designed product.  *Compare Beretta,* 822 N.E.2d at 1124 (finding that the complaint "contains no specific factual allegations of actual violations of applicable statutes and regulations by any of the named defendants" and that while "the second amended complaint alleges lawbreaking [it was] not by any of these defendants.").  The 4AC also details at length Defendants' misconduct in using "unbranded" marketing to evade regulations and consumer protection laws, 4AC ¶¶ 123-219; Defendants' misconduct in engaging in misleading and unfair marketing, which is not regulated conduct, *id.* ¶¶ 220-265; and each Defendant's misconduct in engaging in deceptive branded and unbranded marketing that targeted and reached Chicago prescribers, *id.* ¶¶ 90-219, 266-648, 712-36.  Simply put, the 4AC is replete with numerous, specific allegations of conduct by Defendants that was proscribed by law or not the subject of regulation.

*Causation.*  Defendants make conclusory and unsupported statements that they cannot and should not be held liable for the public nuisance here.  However, here, and as explained more fully in Section I.A.1.c of Summit's Opposition to Defendants' MTD, the City has adequately pleaded that Defendants are a legal cause of the public nuisance alleged.[33]

Under Illinois law, the "term 'proximate cause' describes two distinct requirements: cause in fact and legal cause, which is a policy decision that limits how far a defendant's legal responsibility should be extended for conduct that, in fact, caused the harm."  *Lee v. Chic. Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992).  As explained in *Tweet v. Syngenta AG (In re Syngenta Mass Tort Actions)*:

> [L]egal cause is "essentially a question of foreseeability" and that when a party's injuries are claimed to be the result of a subsequent third party . . . the question is whether "the intervening efficient cause was of a type that a reasonable person would see as a likely result of his or her conduct."  . . .  Thus, the chain of causation is not broken because the acts of the purchasers of the . . . products . . . were no different than what a reasonable manufacturer would assume as a likely result of their conduct.

2017 WL 2117728, at *12 (S.D. Ill. May 15, 2017); *see also Lee*, 605 N.E.2d at 503 ("Legal cause 'is essentially a question of foreseeability: a negligent act is a proximate cause of an injury if the injury is of a type which a reasonable man would see as a likely result of his conduct.'").  Significantly, Defendants need not be the sole cause or even the predominate cause of the condition alleged to be a public nuisance: "[W]hen . . . there are multiple factors that may have combined to cause the injury, we ask whether defendant's conduct was a material element and a substantial factor in bringing about the injury."  *Beretta*, 821 N.E.2d at 1127; *see also Lee*, 605 N.E.2d at 502-03.  The robust factual allegations in the 4AC show that at a minimum, that Defendants were, and are, a material element and substantial factor in bringing about the public nuisance.  *See, e.g.,* 4AC ¶¶ 884, 886, 887, 898, 905.

---

[33] As to actual cause, a "defendant's conduct may be deemed the actual cause of a plaintiff's injury if, 'but for' the defendant's conduct, the injury would not have occurred.  Actual cause can also be established where the defendant's conduct is a material element and substantial factor in bringing about the plaintiff's injuries."  *McCoy v. McCoy,* 591 N.E.2d 124, 127 (Ill. App. Ct. 1992).  While Defendants argue in passing that they cannot be the actual cause of the nuisance, they offer no argument in support of their position.

Here, as discussed *supra* II.A.3.c, the City's public nuisance claim arises irrespective of the illegal conduct of others, not because of it. *Compare Beretta*, 821 N.E.2d at 1136 (discussing a public nuisance "caused directly and principally by the criminal activity of intervening third parties"). Further, to the extent that acts of third parties contributed to the public nuisance, the City has alleged such acts were not only foreseeable, but also actually foreseen. *See* 4AC ¶ 893 ("The injury inflicted by Defendants was of a type that a reasonable pharmaceutical manufacturer would see as a likely result of its conduct, and the acts of no third party broke the causal connection between Defendants' conduct and the resulting nuisance."); *id.* ¶ 894 ("Criminal acts of third parties have not broken the causal chain and the nuisance is not such as would not be anticipated by Defendants."); *id.* ¶ 895 ("The creation and maintenance of a public nuisance in the City would have been clearly foreseeable to Defendants."); *see also, e.g., id.* ¶¶ 5, 18-21, 61-74, 84-89, 740-52, 756-59, 789g (describing foreseeability of and Defendants' knowledge of risks of addiction and abuse); *see also supra* § II.A.3.c.

## 2. The City's Public Nuisance Claim Is Not Barred by the Municipal Cost Recovery Rule

Defendants incorrectly contend that the City's public nuisance claim is barred by the "municipal cost recovery rule." Defs.' Mem. 25. The municipal cost recovery rule is a common law doctrine that provides that "public expenditures made in the performance of governmental functions are not recoverable in tort." *Beretta*, 821 N.E.2d at 1144. The municipal cost recovery rule, however, has several significant exceptions. Of most immediate relevance, the municipal cost recovery rule is inapplicable: (1) where "recovery . . . [is] authorized by statute or regulation;" or (2) "'where the acts of a private party create a public nuisance which the government seeks to abate.'" *Id.* at 1145; *see also Cty. of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *8 (N.D. Ill. Mar. 30, 2018) (noting exceptions to the rule).

Here, unlike in *Beretta*, the City is seeking relief under its public nuisance claim in the forms of abatement of a public nuisance created by private parties, *see, e.g.,* 4AC ¶¶ 901-04, and recovery of costs

36

as authorized by statute under MCC § 1-20-020, *see, e.g.,* 4AC ¶ 906.[34]  *Compare Beretta*, 821 N.E.2d at 1147 (applying the municipal cost recovery rule under the facts pled in that case because the City had not identified a statute authorizing recovery and because the plaintiffs "admit that abatement is not feasible and that the damages they seek do not represent the cost of abatement").  Because these forms of relief being sought fit squarely within well-recognized exceptions to the municipal cost recovery rule, *see Beretta*, 821 N.E.2d at 1145, Defendants' argument that the City's public nuisance claim is barred by the municipal cost recovery rule fails.

<p style="text-align:center">**3.      The City's Public Nuisance Claim Is Not Barred by the Economic Loss Doctrine**</p>

Defendants' attempt to undercut the City's public nuisance claim by invoking the economic loss doctrine is similarly unavailing.  The Court in *Beretta* applied the economic loss doctrine to bar public nuisance claims because the City sought money damages, and not abatement.  *See Beretta*, 821 N.E.2d at 1147 (finding that "even if plaintiffs properly pleaded a cause of action in public nuisance, *money damages* would not be available because the claimed damages do not represent the actual cost of abatement of the nuisance or compensation for actual harm to the city's or county's property.") (emphasis added).

This suit is materially different from *Beretta* because the City has not pleaded a public nuisance claim for damages that are separate and apart from the actual cost of abatement of the public health hazard that exists in the City.  *See City of Chicago v. Festival Theatre Corp.*, 438 N.E.2d 159, 167 (Ill. 1982) ("The purpose of giving equity jurisdiction in public nuisance actions is to offer remedies more

---

[34] The Manufacturer Defendants' Motion, p. 25, asserts that the 4AC does not allege a violation of MCC § 1-20-020.  The Manufacturer Defendants are incorrect.  Count 7 of the 4AC is entitled "Recovery of City Costs of Providing Services -- Violations of MCC § 1-20-020 -- Against All Defendants," and contains allegations detailing Defendants' violations of MCC § 1-20-020.  One avenue for recovery of these MCC § 1-20-020 costs, as alleged in Count 11, is through the City's public nuisance claim.  *See* 4AC ¶ 906 ("By statute, the City is authorized to recover for these municipal costs from the Defendants, regardless of whether the City would have otherwise incurred these costs.  MCC §§ 1-20-010 and 1-20-020.").

complete than those available at law.").  Instead, the City has sought to abate the public nuisance by bringing a representative public nuisance action in its capacity as a governmental entity, a claim that was expressly disclaimed by the plaintiffs in *Beretta*.  *See Beretta*, 821 N.E. 2d at 1147 (noting that the plaintiffs were not seeking abatement of a public nuisance and also finding that claims for "money damages would not be available because the claimed damages do not represent the actual cost of abatement of the nuisance or compensation for actual harm to the city's or county's property").  Indeed, the 4AC outlines potential abatement remedies.  *See* 4AC ¶¶ 901-03.  Accordingly, the City's nuisance claims here fall outside the holding in *Beretta* and its claims for abatement and costs are not precluded by the economic loss doctrine.  *See also* Summit's Opposition to Defendants' MTD, § I.A.4.

C.    **The City's Claim for Recovery of Costs under MCC § 1-20-020 (Count 7) Is Sufficiently Pleaded**

In Count 7, the City asserts a claim for recovery of costs under MCC § 1-20-020.  Under MCC § 1-20-020, the City is entitled to recover costs that it incurred "in order to provide services reasonably related to [Defendants'] violation of any federal, state or local law, or [Defendants'] failure to correct conditions which violate any federal, state or local law . . . ."  Defendants assert three grounds for dismissal of Count 7.  Defs.' Mem. 26.  None has merit.  First, contrary to Defendants' contention, the City has indeed stated claims for underlying violations of federal, state, and local law.  *See, e.g.,* 4AC Counts 1-6, 8-11; *supra* §§ II.A-B; *infra*, §§ II.D-E.  Second, and relatedly, the City has satisfactorily pleaded the causation "missing link" with respect to the violations identified in Count 7.  *See supra* § II.A.3.  And third, the costs the City seeks to recover in Count 7 are not barred by the municipal cost recovery rule because the recovery of these costs is authorized by statute or regulation -- namely MCC § 1-20-020.  *See Beretta*, 821 N.E.2d at 1145 (statutory authorization for recovery is a recognized exception to the municipal cost recovery rule); *Cty. of Cook*, 2018 WL 1561725, at *8 (same); *see also Vodak v. City of Chicago*, 2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) (denying motion to dismiss City's

38

claim to recover costs incurred in connection with a protest march under MCC § 8-28-020 (subsequently renumbered as MCC § 1-20-020)).

### D. The City's Conspiracy Claims (Counts 6 and 9) May Proceed

Defendants raise issues previously considered and rejected by the Transferor Court regarding the City's conspiracy claims (Counts 6 and 9). *Compare* Defs.' Mem. 27-30 *with* Transferor Court Doc. 424 at 30-34 (Defs.' MTD brief re 2AC). Specifically, Defendants reargue that: (1) the City has failed to allege an agreement between any of the Defendants and a third party to commit an unlawful act; and (2) the City has pleaded the details of the conspiracy with insufficient particularity. The Transferor Court expressly acknowledged these two arguments, *see Chicago II*, 211 F. Supp. 3d at 1082-83, but necessarily declined to adopt them. Instead, the Transferor Court held that no repleading of Count 6 (false claims conspiracy) was necessary if the City repleaded its municipal false claim conspiracy allegations (which it has),[35] and all that was necessary to cure the only defect of Count 9 (civil conspiracy) was for the City to serve amended Exhibits (which it has). *Id.* Accordingly, the Court should reject Defendants' recycled conspiracy-related arguments. *See id.* at 1081-83.

Rather than re-argue this issue, the City briefly summarizes how Defendants' conspiracy arguments have already been addressed in the City's previous briefing. *See* Transferor Court Doc. 432 at 82-92 (agreements may be reasonably inferred from the circumstantial evidence alleged in the 4AC, which contains substantial particulars demonstrating Defendants' conspiracies); *see also, generally,* Summit's Opposition to Defendants' MTD, § I.G.

---

[35] The Transferor Court dismissed Count 6 because the underlying false-claim count was dismissed, but stated that "[i]f plaintiff repleads its false-claim count, it need not replead Count VI and may rely on its municipal false claim conspiracy allegations." *Id.* at 1082. The 4AC has cured the deficiencies identified by the Court in its false-claim count. *See supra* § II.A.

For either civil conspiracy or FCA conspiracy, the City must allege only sufficient facts from which the Court may infer[36] the existence of a single plan to act unlawfully, that the alleged co-conspirator shared in the general conspiratorial objective,[37] and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006); *accord Adcock v. Brakegate*, Ltd., 645 N.E.2d 888, 893-94 (Ill. 1994); *see also Hardeway v. City of Chicago*, 1991 WL 203857, at *6 (N.D. Ill. Oct. 4, 1991) ("Illinois requirements for pleading a conspiracy are similar to Federal requirements."). The City has done so.

The 4AC's allegations satisfy the City's burden to plead adequately conspiracy claims against each Defendant by alleging that each of Defendants engaged in parallel but separate conspiracies with key front groups -- AFP, FSMB, AAMP, and AGS -- to deceptively promote opioids for the broader chronic pain market, ultimately resulting in the City's injury. Though the coconspirators may have had different motives -- Defendants pursued profits while the front groups sought funding, enhanced reach and reputation, and access to opioids for patients, *see, e.g.,* 4AC ¶¶ 6-9, 190-210 -- they agreed to further their overlapping goals by working together. They did so by promoting the use of opioids to treat chronic pain through a series of specific, overt acts, including creating and disseminating false, unsubstantiated, and misleading statements to prescribers and consumers, carrying out a deceptive

---

[36] The City need only supply circumstantial evidence from which a conspiracy may be inferred. *See Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000). Because conspiracies often obscure most, or all, information about the alleged conspirators' agreement, circumstantial evidence of the conspiracy is all that is ordinarily obtainable before discovery and trial. *Quinones v. Szorc,* 771 F.2d 289, 291 (7th Cir. 1985); 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1233 (3d ed.) (reasoning discovery, not dismissal, is appropriate in these circumstances). Even under Rule 9(b), a complaint will survive dismissal if its conspiracy allegations provide a general outline of the fraudulent scheme sufficient to reasonably notify defendants of their purported role in it. *See Edalatdju v. Guaranteed Rate, Inc.,* 748 F. Supp. 2d 860, 866-68 (N.D. Ill. 2010).

[37] A conspirator need not "have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if [the conspirator] understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his or her] part to further them." *Wayne v. Kirk*, 2015 WL 5950900, at *3 (N.D. Ill. Oct. 13, 2015). Moreover, "that a conspiracy's various members may play different roles in executing it and may have dissimilar motives for participating in it, does not mean that a . . . conspiracy does not exist." *United States v. Cervantes*, 466 F.2d 736, 738 (7th Cir. 1972).

and unfair marketing campaign, and engaging in joint lobbying efforts. *See, e.g.*, *id.* ¶¶ 6-13, 190-210, 347-81, 435-81, 524-50, 596-638, 758-71, 773-81, 820-36, 857-65. The seemingly independent information disseminated through front groups was important to Defendants because it had enhanced credibility, *id.* ¶¶ 132, 137, 140, 190, 365, 524, and the front groups continued to publish messages promoting opioids to secure funding from Defendants and amplify their messages, *id.* ¶¶ 139-45, 148-54, 166, 170-77, 183-87, 191-93, 195-96, 203-04, even though they knew or should have known that these messages were deceptive, *id.* ¶¶ 147, 766, 862. Control over the front groups is unnecessary for liability as conspirators; it is enough that they worked together, agreeing with the front groups to engage in deceptive and unfair practices and actively participating in that joint conduct (*e.g.,* by editing, guiding, reviewing, approving, and funding the front groups' deceptive messaging). *See Rogan*, 459 F. Supp. 2d at 719 (setting forth the elements of civil conspiracy).

The 4AC contains particularized allegations detailing Defendants' conspiracies with various front groups. *See, e.g.*, 4AC ¶¶ 163-68, 190-201, 347-49, 350-64 (Cephalon's conspiracies with APF and FSMB); *id.* ¶¶ 165-68, 192-95, 439-61, 463-66, 525-34 (Endo's conspiracies with APF, FSMB and AGS); *id.* ¶¶ 192-95, 525-32, 535-50 (Janssen's conspiracies with APF, AAPM, and AGS); *id.* ¶¶ 165-168, 192-96, 596-626, 628-32 (Purdue's conspiracies with APF, FSMB, and AGS). Any one of the conspiracies suffices to allege an action versus the respective Defendant.

### E. The City's Unjust Enrichment Claim (Count 10) May Proceed

In seeking dismissal of the City's unjust enrichment claim, Defendants improperly reargue issues already ruled upon. There is only *one* issue properly before the Court: Has the City successfully repleaded the "missing [causation] link"? *See Chicago II*, 211 F. Supp. 3d at 1083-84. It has, *see supra* § II.A.3, and so the City's unjust enrichment claim may proceed.

Further, although not properly before the Court, *see supra* § II, the City has indeed pleaded the elements of its unjust enrichment claim sufficiently in all other respects. The City's allegations are

neither "bare" nor "formulaic," but rather rest upon robust factual allegations that show wrongful conduct by Defendants, resultant harm suffered by the City, and consequent unjust enrichment to Defendants. For example, the 4AC alleges specific facts showing that Defendants were enriched by the City's payment for opioid prescriptions because of their deceptive and unfair promotion of opioids to treat chronic pain. *See, e.g.,* 4AC ¶¶ 6-13, 654-59, 878-79. The 4AC further alleges specific facts showing that Chicago was a focus of Defendants' marketing efforts, *see, e.g.,* 4AC ¶¶ 114-122, that Chicago providers prescribed opioids as a result of those efforts, *see, e.g.,* 4AC ¶¶ 295-303, 382-95, 482-98, 551-563, 571-73, 639-648, 678, 692, 712-36, and that the City's spending on opioids and other costs consequently increased dramatically, *see* 4AC ¶¶ 651-53, 660-94, 753-59. And, the 4AC alleges specific facts showing that Defendants' efforts were successful and led to record profits. *See, e.g.,* 4AC ¶¶ 12, 654-92, 709-711, 740-61. These allegations establish a valid unjust enrichment claim, *see HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679-80 (Ill. 1989) (defining unjust enrichment). *See also, generally,* Summit's Opposition to Defendants' MTD, § I.F.

### F. The City's Unfair Practices Claim (Count 2) Should Not Be Stricken

Following the Court's dismissal of the City's unfair practices claim (Count 2), the City elected not to replead that cause of action, but nonetheless left that claim in the 4AC for purposes of appellate review only. *See* 4AC n.1. This is permissible. The City acknowledges that "[m]ost circuits refuse to require a plaintiff to replead dismissed claims in order to preserve the right to appeal the dismissal." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 617 (6th Cir. 2014). However, the *Hayward* court stated that "this Court has not clearly established a rule on this particular issue," and, in fact, did not do so in the case before it. *Hayward*, 759 F.3d at 617-18.[38] Until the Sixth Circuit announces a clear rule on

---

[38] Similarly, the Seventh Circuit in *Johnson v. Myers*, 109 F. App'x 792, 796 (7th Cir. 2004), noted that it had "yet to decide the question" of whether repleading a dismissed claim in an amended complaint was necessary for preservation purposes.

this issue, the City should be permitted to preserve appellate review of Count 2 by pleading it in its 4AC.

## III.     CONCLUSION

The City has cured the two pleading deficiencies identified by the Transferor Court in *Chicago II*, and has properly pleaded a claim under Illinois public nuisance law.  The other issues raised by Defendants were resolved, either expressly or by implication, by the Transferor Court's prior rulings. Accordingly, Defendants' motion to dismiss the City's 4AC should be denied in its entirety.

DATED:  June 22, 2018.

Respectfully submitted,

EDWARD N. SISKEL
**Corporation Counsel, City of Chicago**

BY: /s/ *Linda Singer*

Thomas P. McNulty
Fiona A. Burke
City of Chicago, Department of Law
30 N. LaSalle St., Suite 1240
Chicago, IL 60602
thomas.mcnulty@cityofchicago.org
fiona.burke@cityofchicago.org
Phone: (312) 744-6929
Fax:    (312) 742-3832

Linda Singer
Elizabeth Smith
David I. Ackerman
Jeffrey C. Nelson
MOTLEY RICE LLC
lsinger@motleyrice.com
esmith@motleyrice.com
dackerman@motleyrice.com
jnelson@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:    (202) 386-9622

Kenneth A. Wexler
Bethany R. Turke
Kara A. Elgersma
Thomas A. Doyle
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
kaw@wexlerwallace.com
brt@wexlerwallace.com
tad@wexlerwallace.com
Phone: (312) 346-2222
Fax:    (312) 346-0022

*Attorneys for Plaintiff City of Chicago*

44

## LOCAL RULE 7.1(F) CERTIFICATION

I certify that this case has been assigned to the "litigation track" pursuant to CMO One and that this Memorandum adheres to the page limitations set forth in CMO One § 6(f), CMO Four at 2-3, and L.R. 7.1(f).

Dated: June 22, 2018

<div style="margin-left:40%">

/s/ *Linda Singer*
Linda Singer
MOTLEY RICE LLC
lsinger@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:    (202) 386-9622

*Attorney for Plaintiff City of Chicago*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2018, a copy of the foregoing "Plaintiff City of Chicago's Opposition to 'Manufacturer Defendants' Joint Motion to Dismiss Fourth Amended Complaint' (Doc. 500)'" was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Linda Singer*
Linda Singer
MOTLEY RICE LLC
lsinger@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:    (202) 386-9622

*Attorney for Plaintiff City of Chicago*