**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | ) CASE NO. 1:17-MD-2804 ) ) JUDGE DAN A. POLSTER ) ) MAGISTRATE JUDGE DAVID A. RUIZ ) ) BRIEF IN SUPPORT OF DISCLOSURE ) OF ARCOS DATA ) ) FILED ON BEHALF OF THE ) WASHINGTON POST ) ) |

Now comes WP Company, LLC, d/b/a. The Washington Post ("the Post"), by and through undersigned counsel, and hereby submits its Brief in Support of Disclosure of ARCOS Data. The public interest in the opioid epidemic far outweighs any interest in secrecy sought to be protected by the Department of Justice ("DOJ") and the Drug Enforcement Administration ("DEA," collectively "Government") and the pharmaceutical manufacturers and distributors (collectively "Pharmaceutical Defendants"). The Post also supports the Brief in Support of Disclosure of the ARCOS Data filed by the HD Media Company, LLC, d/b/a Charleston Gazette-Mail. Both media companies have filed requests for the ARCOS data as public records from public entities that are

1

Plaintiffs in this case ("Public Entity Plaintiffs"). The Public Entity Plaintiffs have denied the requests and withheld the records based on this Court's Protective Order Re: DEA's ARCOS/DADS Database, entered March 6, 2018, (Doc. #167) and Order Regarding ARCOS Data, entered April 11, 2018. (Doc. #233.)

I. **Background**

The Automation of Reports and Consolidated Orders System (ARCOS) Database is an automated, comprehensive drug reporting system of records that monitors the flow of controlled substances from their point of manufacture through commercial distribution channels to the point of sale or distribution at the retail level. The data, from 1,200 manufacturers and distributors, includes the supplier's name, registration number, address, and business activity; buyer's name, registration number, and address; and drug code, the transaction date, total dosage units, and total grams. It does not include any discretionary thoughts or investigative materials, such as questions or observations. It is merely factual data. The ARCOS database does not contain information of any kind about individual patients or end users of the drugs, and thus does not implicate medical privacy issues in any plausible way.

The Plaintiffs – about 430 public entities that are suing drug manufacturers and distributors – sought disclosure of the Government's database from January 1, 2006, to December 31, 2014. At a hearing on February 26, 2018, the DEA led in objecting to providing the data; attorneys for the Pharmaceutical Defendants also objected. (Doc. #156.) Counsel for the Public Entity Plaintiffs had an opportunity to be heard.

Without input from the press or public, the Court determined that the ARCOS data "shall remain confidential and shall be used only for litigation purposes or in connection with state and local law enforcement efforts." (Doc. #167.) That order remained in effect even after the Court,

2

in an April 11, 2018, ruling, rejected DEA's arguments for continuing to withhold the ARCOS data – noting expressly that the data is "critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation." (Doc. #233, page 8.) Respectfully, that conclusion was made without the requisite balancing of the public's interest in disclosure against the Government's interest in secrecy. When that balancing is done, the public's interest in disclosure far outweighs any interest in secrecy, requiring disclosure, as discussed fully below.

## II. Standard for Sealing Court Records

The United States Supreme Court recognized a common law right to inspect and copy judicial records and documents in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306,1311 (1978). *Nixon* preceded a long line of Supreme Court decisions affirming the principle of open access to court proceedings, pre-trial proceedings and documents, including *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814 (1980); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613 (1982); *Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819 (1984) ("*Press-Enterprise I*"); *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735 (1986) *("Press-Enterprise II")*. Access is based both on common law and the Constitution, with the First Amendment affording more substantive protection to the press than the common law.

Under the common law, a trial court's denial of access to documents is reviewed for abuse of discretion. *In Re Washington Post Company,* 807 F.2d 383, 390, (4th Cir. 1986) (citing *Nixon,* 435 U.S. at 597, and *In Re The Knight Publishing Co.,* 743 F.2d 231, 235 (4th Cir. 1984)). Under the First Amendment, denial must be "necessitated by a compelling government interest, and . . . narrowly tailored to serve that interest." *Id.,* citing *Press-Enterprise I,* 464 U.S. at 510, and *Globe*

*Newspaper Co.,* 457 U.S. at 607. This applies to both civil and criminal proceedings, pre-trial through the final appeal.

At least two courts of appeals have held that the First Amendment right of access also applies to written documents submitted in connection with judicial proceedings which themselves implicate the right of access. *Washington Post,* 807 F.2d. at 389-390, citing both *United States v. Smith,* 776 F.2d 1104 (3rd Cir. 1985) and *Associated Press v. United States District Court,* 705 F.2d 1143 (9th Cir. 1983). In *Associated Press,* where fear of publicity led the district judge to place all documents related to the case under seal, the Ninth Circuit held that the First Amendment right of access extends to "pretrial documents in general." *Id.* at 390.

However, the mere existence of a First Amendment right of access to a particular kind of hearing or document does not entitle the press and public to access in every case. *Id.* Access may be denied if "closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id.* The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. *Id.,* citing *Press-Enterprise I,* 464 U.S. at 510.

The factors to be weighed in the balancing test include whether the records are sought for improper purposes, such as promoting public scandals or unfairly gaining a business advantage; whether release would enhance the public's understanding of an important historical event, and whether the public has already had access to the information contained in the records. *Nixon,* 435 U.S. at 597. Further, the court must engage in the three-part constitutional analysis to determine whether the document can be sealed or the procedure closed to the press and public without violating First Amendments rights. That requires findings on the record to show (1) that sealing serves a compelling state interest; (2) there is a "substantial probability" of irreversible harm in

4

the absence of sealing; and (3) there are no alternatives to closure that would adequately protect that compelling interest. The First Amendment right of access extends to documents as well as to hearings, thereby requiring that requests for the sealing or unsealing of documents must also be evaluated under this three-prong test. *Washington Post,* 807 F.2d at footnote 9. In the extraordinary case where sealing is deemed to be appropriate, the court must also support the sealing with specific, on-the-record factual findings so its decision may be reviewed by a higher court. *Press-Enterprise I,* 464 U.S. 510.

Judge William S. Thompson of the Circuit Court of Boone County, West Virginia, recognized this when he granted access to ARCOS data in *State of West Virginia, ex rel. Morrisey v. AmerisourceBergen Drug Corporation*[1] in May 2016, the result of a request by the Charleston Gazette-Mail. "Any party who seeks to keep under seal a judicial record carries the heavy burden of overcoming a strong presumption of public access and also of showing compelling reasons for keeping such documents under seal." *AmerisourceBergen* at ¶2. "A corporation very well may desire that the allegations lodged against it in the course of litigation be kept from public view to protect its corporate image, but the First Amendment right of access does not yield to such an interest." *Id.,* citing *Press-Enterprise I,* 464 U.S. at 510.

The key in these cases seems to be the character of the information being sought. Information that is genuinely personal and private in nature may sometimes be withheld. But courts have repeatedly required disclosure of records that are of interest to the public, regardless of whether such disclosure might result in embarrassment to the Government or to the Defendant. Two cases are precisely on point in the Sixth Circuit: *In Re Knoxville News-Sentinel Co.,* 723 F.2d 470 (6th Cir. 1983) and *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d. 1165, 1177 (6th

---

[1] Civil Action No. 12-C-141.

Cir. 1983). The former involved a banking scandal where individuals' personal financial information was withheld; the latter involved a health care crisis where documents pertaining to a cigarette's tar and nicotine content were released.

In *News-Sentinel,* the newspaper sought records pertaining to personal bank loans, which had been part of discovery in a lawsuit between United American Bank and the Federal Deposit Insurance Corporation (FDIC). The newspaper argued that the documents dealt with events of "immense public interest" – unethical lending practices. The Sixth Circuit reiterated that "every court has supervisory power of its own records and files," as first established in *Nixon, supra,* but it urged caution, saying "the power to exercise 'discretion' does not imply that discretionary powers can be exercised without restraint. . . .The District Court's discretion is circumscribed by a long-established legal tradition." *News-Sentinel,* 723 F.2d at 473-4. The Appeals Court seemed troubled that the District Court failed to afford the News-Sentinel "a reasonable opportunity to state their objections to its protective order." *Id.* at 474-5.

Further, though the Sixth Circuit ultimately allowed the sealing of two records sought by the News-Sentinel, it was careful to explain that its decision "was designed not to protect the business reputation of the bank, . . . but rather to protect the privacy rights of borrowers who dealt with the bank." *News-Sentinel,* 723 F.2d at 475. Unlike in *Brown & Williamson,* "the individuals protected by the closure order here are third parties who were not responsible for the initiation of the underlying litigation. Those individuals possessed a justifiable expectation of privacy that their names and financial records not be revealed to the public." *Id.*

The information sought in *Brown & Williamson,* where the tobacco company sued the Federal Trade Commission (FTC) over allegations of inaccurate assessments of the tar and nicotine yields of its cigarettes, is comparable to the information being sought by the Post here. Both cases

involve a public health crisis. In *Brown & Williamson,* the Court noted the public's strong interest in disclosure because the subject being litigated "potentially involves the health of citizens who have an interest in knowing the accurate 'tar' and nicotine content of the various brands of cigarettes on the market." *Brown & Williamson Tobacco Corp.,* 710 F.2d. at 1180.

After the District Court placed all documents filed by the FTC under seal, the Public Citizen's Health Research Group opposed the sealing, prompting the Sixth Circuit to vacate the sealing because the District Court "failed to state findings or conclusions which justify nondisclosure to the public." *Id.* at 1176. "Having 'supervisory power' or 'discretion' to deny access to documents does not, however, imply that the District Court operates without standards. . . . The District Court's decision is not insulated from review merely because the judge has discretion in this domain. The District Court's discretion is circumscribed by a long-established legal tradition." *Id.* at 1177. "Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *Id.* at 1179. The Sixth Circuit went on to vacate the sealing orders, saying:

> "We decline to carve out an exception to the right of access in order to protect the secrecy of an administrative record. The public has a strong interest in obtaining the information contained in the court record. The subject of this litigation potentially involves the health of citizens who have an interest in knowing the accurate 'tar' and nicotine content of the various brands of cigarettes on the market. The public has an interest in knowing how the government agency has responded to allegations of error in the testing program. The public has an interest in ascertaining what evidence and records the District Court and this Court have relied upon in reaching our decisions." *Id.* at 1180-81.

In this *Opiate Litigation*, only the drug is different. The decisional principles are much the same: Where releasing records would harm innocent people personally, those records

generally can be sealed.[2] Where releasing records would merely bring embarrassment or adverse publicity to a corporation or a governmental agency, the records must be disclosed. In this case, disclosure of the ARCOS data would cause no conceivable harm to patients or other innocent individuals; if anything, their interests would be advanced by the public accountability that would be demanded in the wake of such disclosures.

Further, Protective Orders should be enforced only upon a showing of good cause that the particular documents justify court-imposed secrecy. In the Northern District of Ohio, Judge James S. Gwin denied the litigants' joint motion for a protective order in a trademark dispute, saying:

> "[A] trial court's discretion to grant a protective order 'is circumscribed by a long-established legal tradition' which values public access to court proceedings. . . . Rule 26(c) allows the sealing of court papers only 'for good cause shown' to the court that the particular documents justify court-imposed secrecy. . . . The Sixth Circuit recognizes a presumption of public access to discovery materials. . . . As a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for denying the public access to the proceedings."
>
> *Solar X Eyewear, LLC v. Bowyer,* 2011 U.S. Dist. LEXIS 100421, 2011 WL 3921615 unpublished, September 7, 2011.

Judge Gwin said that the parties' representations that the information they want to have protected "may qualify as trade secrets or confidential information" or "could harm the other party's business interests" are "vague, conclusory representations [that] provide no basis for the Court to issue the proposed protective order." *Id.* at 4. "The Defendants appear to believe that merely alleging potential disclosure of trade secrets adequately justifies the imposition of a protective order. That is not so." *Id.* at 4.

"Defendants worry that the Plaintiff could publish sensitive information in a newspaper. But a party's preference that certain information 'be kept from the curious (including its business

---

[2] If Protected Health Information (PHI) is contained in the ARCOS data, it may be redacted.

rivals and customers)' does not establish cause for a protective order." *Id.* at 7, citing *Union Oil Co. of California v. Leavell,* 220 F.3d 562, 567 (7th Cir. 2000). "Without specific, definitive showings of cognizable harm, the Court has no basis to find good cause to issue a protective order." *Id.,* citing *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).

### III. Public Interest in the Opioid Epidemic and This Case

President Trump has declared the opioid epidemic a national emergency. Governor Kasich has declared it a statewide emergency, and many local leaders have declared emergencies in their communities. Even this Court acknowledges: "[T]he circumstances in this case, which affect the health and safety of the entire country, are certainly compelling." (Doc. #233, page 16.) Indeed, there has been no greater public health crisis in America in modern times.

For more than two years, The Washington Post has been investigating the companies behind the nation's widening opioid epidemic and the political influence they wield in Washington — the drug distributors, manufacturers and chain drugstores.[3] Releasing the data will further the Post's mission, allowing it to tell a more complete and accurate story.

According to the Centers for Disease Control ("CDC"), opioid prescriptions, as measured by the number of prescriptions and morphine milligram equivalents per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the United States. All told, narcotic painkiller addiction has resulted in nearly 200,000 overdose deaths since 2000 – more than three times the number of U.S. military deaths during the entire Vietnam War. The epidemic has led to a deluge of lawsuits consolidated in this MDL, all filed by public entities – ostensibly on behalf of their citizens who have been harmed by the drug

---

[3] See Affidavit of Jeffrey Leen attached as Appendix A.

manufacturers and distributors. It is those citizens who deserve an opportunity to see what the Pharmaceutical Defendants have done to their communities and to their families.

In the wake of the lawsuits, drug companies have been tightening controls over the manufacture, shipment and dispensing of painkillers, making it more difficult for addicts to find opioids on the street. The shortage has led to an epidemic of heroin and fentanyl overdoses, which killed 20,000 in 2016. Today, more than 115 people in the United States die *each day* from opioid overdoses. [4] The CDC estimates that the "economic burden of prescription opioid abuse alone costs the United States $78.5 billion a year, including the cost of healthcare, lost productivity, addiction treatment and criminal justice involvement." *Id.*

The ARCOS data shows the number of doses distributed in each county by each company each year. In Cabell County, West Virginia,[5] for example, Cardinal Health sent 526,700 doses in 2007 and more than double that – 1,139,260 doses – a mere three years later, in 2010, when the county's population was 96,319.[6] That's almost one dose every month for every single person in the county. In Summit County, Ohio, the number of deaths from drug overdoses surged from 56 in 2011 to 298 in 2016.[7] And then there are those who do not die. In 2016, there were 2,243 drug overdoses – an average of one every 3.9 hours all year long.[8] In October 2017, after a week in which 54 residents were treated at emergency rooms for overdosing, the county executive finally declared a public health emergency. This epidemic is on track to cost Summit County $155 million between 2012 and 2022 – or about 13.7 percent of its general fund budget each year.[9]

---

[4] https://www.drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis
[5] From ARCOS data that has already been publicly released.
[6] https://www.census.gov/quickfacts/fact/table/cabellcountywestvirginia/PST045217
[7] *County of Summit, Ohio et al. v. Purdue Pharma L.P. et al.,* complaint filed in Summit County Common Pleas Court, CV-2017-12-5235, on December 20, 2017, at ¶16.
[8] *Id.* at ¶16.
[9] *Id.* at ¶19.

But it is not just dollars or numbers. It is real people. People like Tyler Bornstein, whose parents started Hope United two years after addiction took his life. He was 23.[10] People like Sam McNeil, whose father, Greg McNeil, founded Cover2 Resources PPT Podcast – People, Places and Things Making a Difference in the Opioid Epidemic. Sam was 28 when he lost his eight-year battle with addiction.[11] And people like Ashtyn Andrade, Tara Williams and Courtney Collier – all dead on the day they were celebrating Ashtyn's 20th birthday.[12]

IV. **The Government's Interest in Secrecy**

The Government's objection to disclosure of the ARCOS data is especially puzzling now that it has voluntarily revealed some of the material it had redacted in its original brief. (Doc. #633, refiled as Doc. #717.) In response to the Post's Motion for Access to an unredacted version of its brief, the DEA refiled, voluntarily revealing that several of the previously redacted sections never needed to be redacted at all.[13] That includes an explanation of what the Government uses ARCOS data for, that the data may suggest "patterns . . . that raise red flags," that DEA investigations may last years, and that the data may give valuable information to criminals. (Doc. #717, pages 3, 9, 10, 15-16.) These innocuous revelations show that the Government is so keen to seal records that it does so without the slightest need. One can only wonder why the number of open cases from 2006 to 2014 remains a secret. (Doc. #717, page 10.) If the Government has compelling evidence that keeping these numbers secret is essential for the administration of justice or continued

---

[10] https://www.facebook.com/HopeUnited.life/
[11] https://cover2.org/about/
[12] https://www.clevescene.com/scene-and-heard/archives/2018/04/10/three-young-women-gathered-in-akron-for-a-birthday-celebration-then-they-overdosed
[13] The Post's Motion for Access to the Unredacted Brief in Support of Objections to Disclosure of ARCOS Data, filed June 27, 2018, was not ruled upon, therefore, effectively denied. (Doc. #672.) However, at 11:34 a.m. on July 9 – the day the Post's response was due – the DEA filed an amended, less redacted brief. (Doc. #717.)

functioning of the democracy, that evidence should have been shared with the press and public. But it has not. The Government has merely asserted objections to disclosure "[b]ecause there is substantial risk that release of the data would invalidate this Court's protections, undermine the United States' ability to combat the opioid crisis, undercut DEA's investigatory enforcement actions, violate the privacy and trade secret rights of third-parties, and facilitate criminal activity." (Doc. #717, page 2.) At least in what is publicly available, the Government does not come close to substantiating any of these assertions.

As Judge Gwin opined in *Solar X Eyewear, supra,* such an assertion is grossly insufficient. And as this Court found in issuing its Order Regarding ARCOS Data, the Government's objections to providing the ARCOS data fall far short of demonstrating a compelling need to seal:

> "This objection fails for three reasons. First, Plaintiffs seek ARCOS data with an end-date of January 1, 2015. Given that the most recent data is over three years old, it is untenable that exposure of the data will actually or meaningfully interfere with any ongoing enforcement proceeding. Second, the ARCOS data are not pure investigatory records compiled for law enforcement purposes. Rather, the data is simply business records of defendants . . . the database does not include any additional DEA analysis or work-product. . . . And third, simply saying that disclosure of ARCOS records dating back to 2006 would detrimentally affect law enforcement does not make it so." (Doc. #233, page 16.)

This Court has already wisely analyzed and discarded DEA's reasons for withholding the ARCOS data from the Public Entity Plaintiffs. It should employ the same rationale to deny the Government's objections to disclosure of the ARCOS data to the press and public, as there are no reasons cited in the Government's Brief in Support of Objections to Disclosure of ARCOS Data (Doc. #633 and Doc. #717) that were not adequately addressed and discounted in this Court's Order Regarding ARCOS Data. (Doc. #233.)

Indeed, if the records pertaining to West Virginia are any indication, the ARCOS data is likely to show an enormous surge in manufacturing and distribution of opiates, beginning in 2006

12

and extending through 2014, in rural areas where there would have been no legitimate reason for selling millions of pills to a population of fewer than 1,000. The data was collected by the DEA for law enforcement purposes, but apparently has not resulted in significant criminal prosecutions or even an effective crackdown. There is, therefore, a certain irony in the DEA's insistence that disclosure of the ARCOS database would somehow "undermine" unspecified enforcement actions and "facilitate criminal activity" – assertions that the Court should require DEA to specifically justify if they are to be given any weight at all. The more likely explanation is that disclosure of the data would be embarrassing. But potential embarrassment obviously does not outweigh the public's interest in knowing how this epidemic ravaged its communities, destroyed its families, and cost millions of dollars in health care, lost jobs and productivity.

V. **The Pharmaceutical Manufacturers' and Distributors' Interest in Secrecy**

The Chain Pharmacy, Distributor and Manufacturer Defendants ("Pharmaceutical Defendants") also object to public disclosure of the ARCOS data, claiming it is "sensitive from the perspective of both the pharmacies and distributors because it is confidential business information." (Doc. #665, page 4.) This Court has already adequately dispatched that argument, citing *Madel v. U.S. Dept. of Justice,* 784 F.3d 448 (8th Cir. 2015), "noting the assertion was conclusory and also that the market data over three years old carried no risk of competitive harm." (Doc. #233, page 17.) The data is stale for competitive purposes. But even more significantly, since it presumably was distributed to all the Pharmaceutical Defendants at the same time (or before) it was distributed to all the Public Entity Plaintiffs, any competitive advantage in receiving that data inures to all equally. There is no advantage.

### VI. No Right to Confidentiality Under Federal or State Law

The Pharmaceutical Defendants concede that there is no right of confidentiality in ARCOS data, as they rely on a 31-year-old executive order giving distributors "pre-disclosure notice upon receipt of a FOIA request seeking ARCOS data so to allow distributors to object to specific FOIA requests at issue." (Doc. #665, page 8.) Further, they fail to address 28 C.F.R. §16.7(b), which requires that: "A submitter of confidential commercial information must use good faith efforts to designate by appropriate markings *either at the time of submission or within a reasonable time thereafter,* any portion of its submission that it considers to be protected from disclosure under Exemption 4. These designations shall expire 10 years after the date of the submission unless the submitter requests and provides justification for a longer designation period." (Emphasis added.) If the Pharmaceutical Defendants had complied, they would have mentioned it. They did not. Their failure to do so means the information is not protected from disclosure.

Regarding the state's public records statute, the Ohio Supreme Court has a long practice of "resolv[ing] any doubts concerning the interpretation of the Public Records Act in favor of disclosure." *State ex rel. Cincinnati Enquirer v. Pike County Coroner's Office*, 2017-Ohio-8988, 2016-1115, 2016-1153, citing *State ex rel. Glasgow v. Jones,* 119 Ohio St.3d 391, 2008-Ohio-4788, 894 N.E.2d 686. Its decisions are "guided by the text of the statute and the duty to strictly construe exceptions to disclosure against the public-records custodian, who has the burden to prove that an exception applies." *Id.* at ¶ 10, citing *State ex rel. Carr v. Akron,* 112 Ohio St.3d 351, 2006-Ohio-6714, 859 N.E.2d 948, ¶ 30, and *State ex rel. Beacon Journal Publishing Co. v. Akron,* 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087.

The Pharmaceutical Defendants' reliance on two exceptions to O.R.C.§149.43 fails on both fronts. First, citing (A)(1)(v), "records the release of which is prohibited by state or federal law,"

they are unable to identify a single state or federal law that prohibits the records' release. Then, citing the "confidential law enforcement investigatory record" ("CLEIR") exception, they ignore the essential characteristics of a CLEIR required under O.R.C. §149.43(A)(2)(a)-(d). A CLEIR is generally any record that pertains to a law enforcement matter ***but only to the extent that the release of the record would create a high probability of disclosure*** of the identity of a suspect who has not been charged, or identity of a witness to whom confidentiality has been promised; information provided by an informant that would reasonably tend to disclose the source's identity; specific confidential investigatory techniques or work product; or information that would endanger law enforcement personnel, a victim, witness or source. See *State ex rel. Musial v. N. Olmsted,* 106 Ohio St. 3d 459, ¶17-20, 2005-Ohio-5521 (2005); *State ex rel. Beacon Journal Publishing Company Co. v. Maurer,* 91 Ohio St. 3d. 54, 56, 741 N.E. 2d 511 (2001); *State ex rel. Polovischak v. Mayfield* 50 Ohio St. 3d 51, 52, 552 N.E.2d 635 (1990). The ARCOS data, as described above, would do none of that.

## VII. Conclusion

It is curious that neither the Government nor the Pharmaceutical Defendants acknowledge the immense public interest in the opioid epidemic – how it started, where the drugs came from, how it will end. They have done nothing to rebut the presumption of access to court documents in general, or to the ARCOS data in particular. Lives have been destroyed; it's past time for secrecy. The Protective Order should be vacated,[14] paving the way for Cuyahoga and Summit counties to release the records, as they must pursuant to the Public Records Act.

---

[14] If the Court declines to vacate the Protective Order, the Post respectfully requests that it articulate its reasons on the record with enough specificity for review by a higher court, as required by *Press-Enterprise I,* 464 U.S. at 510.

Respectfully submitted,

THE LEFTON GROUP, LLC

*/S/ Karen C. Lefton*
KAREN C. LEFTON (0024522)
TIMOTHY D. SMITH (0007636)
3480 W. Market Street, Suite 304
Akron, Ohio 44333
330-864-2003 - office
330-606-8299 - cell
Karen@theleftongroup.com
tdsmith@kent.edu

*Attorneys for The W.P. Company, LLC*

## **CERTIFICATE OF SERVICE**

I certify that on July 9, 2018, a copy of the foregoing Brief in Support of Disclosure of ARCOS Data was electronically filed and served on all counsel of record for this case through the Court's electronic filing system.

*/s/ Karen C. Lefton*
KAREN C. LEFTON (0024522)
An Attorney for The W.P. Company, LLC