IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) CASE NO.  1:17-MD-2804 ) ) JUDGE DAN A. POLSTER ) ) MAGISTRATE JUDGE DAVID A. RUIZ ) ) AFFIDAVIT OF JEFFREY LEEN, *WASHINGTON POST* INVESTIGATIONS EDITOR, IN SUPPORT OF DISCLOSURE OF ARCOS DATABASE |

## AFFIDAVIT OF JEFFREY LEEN

JEFFREY LEEN, being first duly sworn, deposes and states as follows:

1. I am the Investigations Editor of The Washington Post ("the Post").

2. In that position, I oversee a team of twelve reporters within the Post who work exclusively on in-depth, investigative projects. I have run the Post's investigative unit since 1999.

3. During my time at the Post, I have edited or helped supervise eight Pulitzer Prize-winning investigations. In addition, I was part of a four-person reporting team that won

1

the 1999 Pulitzer Gold Medal for Meritorious Public Service for an investigation of fatal police shootings in Washington, D.C.

4. Before coming to the Post in 1997, I worked at the *Miami Herald* for 15 years. There I covered, among other things, the Medellin cartel in Colombia and the impact of drug trafficking in South Florida. I was part of an investigative team at the *Herald* that won the 1993 Pulitzer Gold Medal for Meritorious Public Service, for reporting on the devastation resulting from Hurricane Andrew.

5. Overall, I have more than 35 years of experience in journalism as a reporter and editor.

6. For the past two years, the growing opioid crisis in the United States has been one of the major investigative priorities of my unit at the Post. I have personally helped conceive of, assign, and supervise much of the sustained, day-to-day newsgathering and reporting that have been necessary for the Post to bring this story to its readers. Because of the sprawling breadth and complexity of the opioid problem, the Post's newsroom made a strategic decision to dedicate enormous resources to it – not just within the investigative unit, but throughout the company (including even legal resources, as evidenced in a successful FOIA lawsuit the Post brought last year[1]) as well as with outside collaborators like CBS News. The Post's major stories on the opioid crisis have included:

    a. In 2016, the Post published a three-part investigation that found that the Drug Enforcement Administration, in the face of pressure from the pharmaceutical industry, dramatically curtailed an enforcement campaign designed to crack down on companies that failed to monitor drug shipments. Those failures resulted in an unprecedented diversion of narcotics to the black market,

---

[1] *WP Company d/b/a The Washington Post v. United States Dep't of Justice*, Civil Action No. 1:17-cv-01340 (D.D.C., filed July 7, 2017) (lawsuit challenging Justice Department's withholding of more than 1,000 of pages of email correspondence with representatives of Cardinal Health, Inc. and CVS in connection with DEA investigations). The lawsuit was voluntarily dismissed after the Justice Department reversed its determination, produced the records, and reimbursed a portion of the Post's legal fees.

    flooding communities across the country with painkillers and resulting in an ever-escalating number of overdose deaths. (https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.5d1db392c47f)

b. Post reporters painstakingly assembled thousands of records – many scattered across the files of long-forgotten court cases – to show how some of the nation's largest drug distributors and manufacturers knew, or should have known, that massive amounts of their painkillers were quickly finding their way into the hands of illegal users and dealers. Even after the companies were warned and fined by DEA, they continued to do little to stop the flow of hundreds of millions of doses of oxycodone, hydrocodone and other powerful opioids into communities around the country. (https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.804f4d4d15cf)

c. Using monitoring reports obtained through the Freedom of Information Act, the Post reported that DEA's chief administrative law judge had become sharply critical of the agency's failure to bring tough enforcement cases even as the death toll from opioids climbed. The story led to intense public scrutiny of the agency's enforcement efforts. (https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html?utm_term=.5d1db392c47f)

d. In a Dec. 2016 report, the Post demonstrated that opioid manufacturers and distributors, and the law firms representing them, appeared to hobble federal law enforcement efforts in part by hiring away some of the best and brightest officials from the little-known DEA office responsible for policing the industry. Our reporting showed that the industry had hired 42 DEA officials, 31 of whom came from the Diversion Control Division, which is specifically dedicated to preventing the illegal diversion of prescription drugs. These hires included some of the key architects of the DEA's enforcement strategy. (https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html?utm_term=.0d6c6eeb02bf)

e. In Oct. 2017, the Post reported on the public health consequences of the opioid epidemic – noting, for example, that the U.S. epidemic of narcotic painkiller addiction had already resulted in more than three times as many deaths (nearly 200,000 at that time) as the number of U.S. military deaths in

3

the entire Vietnam War.  Today, more people perish from opioid overdoses than car accidents or gun-related incidents. (https://www.washingtonpost.com/news/politics/wp/2017/10/16/murder-and-crime-gets-trumps-attention-drug-overdoses-kill-far-more-people/?utm_term=.a8eb7cc5b50c)

f. In a joint investigation published and broadcast in Oct. 2017, the Post and CBS News ("60 Minutes") reported on the lobbying efforts of big drug companies in Washington, and how that influence helped lead Congress to strip the DEA of one of its most potent enforcement tools in combating the opioid epidemic. (https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.5abf6c539689; https://www.cbsnews.com/news/60-minutes-ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/)

g. A second collaboration between the Post and "60 Minutes," published in Dec. 2017, disclosed how lawyers from the Department of Justice and political appointees at DEA undermined one of the biggest diversion cases ever brought against a drug distributor.  DEA agents in the field believed they had collected more than enough evidence to warrant criminal charges against the McKesson Corp., particularly since McKesson had already been fined once for violations of anti-diversion laws.  Much to the investigators' dismay, their superiors decided not to pursue criminal charges; instead, McKesson agreed to pay another fine.  (https://www.washingtonpost.com/investigations/mckesson-dea-opioids-fine/2017/12/14/ab50ad0e-db5b-11e7-b1a8-62589434a581_story.html?utm_term=.16245ad03d03)

h. The Post has closely monitored and covered the legal proceedings surrounding opioid crisis, including this MDL and the individual legal actions that preceded it.  (https://www.washingtonpost.com/national/as-the-opioid-epidemic-rages-the-fight-against-addiction-moves-to-an-ohio-courtroom/2018/04/07/97b82b84-2636-11e8-874b-d517e912f125_story.html?utm_term=.7e0e93332a0b)

7. The strong response to these stories has made it clear that the opioid crisis has touched a nerve with the American public.  For example, the Post's October 15, 2017 report on the lobbying efforts of the big drug companies (¶ 6(f) above) had been viewed more than 662,000 times online as of July 6, 2018, according to the Post's research and analytics department.  The report on the McKesson case (¶ 6(g)) had been viewed more than

4

        232,000 times as of the same date. These figures do not include print readers or the television viewers and readers who came to the stories on "60 Minutes" and the CBS website.

8. The level of reader engagement with these stories is also apparent. For example, several of the stories above drew more than 1,000 reader comments, despite the fact that comment periods are closed 14 days after publication. (The story at ¶ 6(f), for instance, has more than 1,800 comments visible.) The Post's reporting also affected policymaking and debate in concrete ways – for instance President Trump's initial choice for drug czar, Representative Tom Marino of Pennsylvania, withdrew from consideration soon after his role in weakening the DEA's enforcement power was exposed in one of the Post's reports. (See *supra*, ¶ 6(f).)

9. The type of reporting the Post has done on the opioid epidemic is often described as "accountability" journalism – that is, journalism that seeks to hold powerful companies and high-ranking government officials accountable for their action (or, in some cases, inaction) on matters of great public importance. Such reporting depends not only on human sources, but on robust access to documents, particularly government data. That is why the Post has submitted public-records requests for the ARCOS records. No human source, no matter how knowledgeable or well-placed, could ever provide as authoritative and comprehensive a picture of exactly how, when, and where the opioid issue snowballed into a full-fledged public health epidemic as can be gleaned from the government's official records.

10. The ARCOS data would enable reporting into any number of follow-up stories that simply are not possible without it. For example, it would permit a much more thorough

       examination than is currently possible of which U.S. communities were hit the hardest by the opioid epidemic; whether there were obvious "red flags" that should have alerted particular manufacturers, pharmacies, or the DEA to suspicious orders (*e.g.*, massive increases in the number of pills going to particular stores or communities, or extreme imbalances between the size of particular populations and the volume of painkillers they were receiving); and which manufacturers, distributors, and pharmacies knew or should have known that their pills were clearly being diverted to the black market.

11. One concrete example of the usefulness of the ARCOS data has already been given by the work of *The Charleston (W. Va.) Gazette-Mail*, which published a series of stories based on the data after the state of West Virginia received it as part of a lawsuit. (As noted in the Post's brief, Boone County Circuit Judge William Thompson unsealed the data at the newspaper's request.) That disclosure was an enormous public service, as the *Gazette-Mail* was able to report that between 2007 and 2012, drug distributors shipped 780 *million* doses of oxycodone and hydrocodone into West Virginia. In one memorable example, the drug companies had shipped nine million doses of the drugs into a town (Kermit, West Virginia) with a population of 392. During the period examined by the *Gazette-Mail*, 1,728 West Virginians died of overdoses from those two painkillers. The *Gazette-Mail*'s work was recognized with a Pulitzer Prize for investigative reporting in 2017.

12. Notably, the release of the ARCOS data in West Virginia has not led to any of the dire consequences that those objecting to disclosure are asserting. There has been no genuine commercial or proprietary harm – as distinct from embarrassment or public criticism – that has resulted from disclosure of the data. To the contrary, allowing the public to see

the unvarnished historical record of what happened is an essential first step toward restoring some degree of faith in the institutions that have so severely let it down.

13. For these reasons, the Post respectfully submits that the ARCOS data is of enormous value to the public. As an editor, I can say with certainty that the data would be used extensively in further reporting by the Post (and likely other news organizations) to try to shed more light on the immense impact the opioid epidemic is having on every aspect of life in America.

FURTHER AFFIANT SAYETH NAUGHT.

_____
JEFFREY LEEN

CITY OF WASHINGTON      )
                        ) ss:
DISTRICT OF COLUMBIA    )

SWORN TO AND SUBSCRIBED in my presence this 9th day of July, 2018.

_____
NOTARY PUBLIC

10/31/2019

District of Columbia: SS
Subscribed and Sworn to before me this 9th day of July, 2018.

Jennifer A. Mitchell-Johnson, Notary Public, D.C.
My commission expires October 31, 2019

7