**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE NATIONAL PRESCRIPTION | ) | MDL No. 2804 |
| OPIATE LITIGATION | ) | |
| | ) | Case No. 17-md-2804 |
| This document relates to: | ) | |
| | ) | Hon. Dan Aaron Polster |
| *City of Chicago v. Cardinal Health, Inc., et al.* | ) | |
| Case No. 18-op-45281 | ) | |
| ——————————————————— | ) | |

**PLAINTIFF CITY OF CHICAGO'S CONSOLIDATED MEMORANDUM**
**IN OPPOSITION TO (1) DISTRIBUTORS' MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT (Master Doc. 571) AND**
**(2) MOTION TO DISMISS FIRST AMENDED COMPLAINT BY**
**DEFENDANTS WALMART INC. AND CVS HEALTH CORP. (Master Doc. 586)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTORY STATEMENT ........................................................................................... 1

LEGAL STANDARD ............................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

I.      THE CITY HAS STANDING TO BRING ITS CLAIMS ............................................. 3

II.     THE CITY HAS STATED VALID CAUSES OF ACTION ........................................ 4

     A.     The City Has Properly Pleaded a Claim for Public Nuisance ............................ 4

           1.     The City Has Alleged an Interference with a Public Right ................................ 5

           2.     The City's Public Nuisance Claim Does Not Seek to Regulate Any Product; Instead, It Seeks Abatement of a Public Health Epidemic ................................ 8

           3.     The City Has Adequately Alleged that Distributor Defendants Are a Substantial Cause of the Public Nuisance .......................................................... 9

     B.     The City Has Properly Pleaded a Claim for Negligence ................................ 12

           1.     The City Has Sufficiently Alleged a Common-Law Duty of Care ................. 12

           2.     The Criminal Acts of Third Parties Are Not at Issue When the City Is Not Alleging that Distributor Defendants Failed to Prevent Harm From a Third Party ................................................................................................................ 15

           3.     The Learned Intermediary Doctrine Does Not Break the Chain of Causation ........................................................................................................................ 16

           4.     The City Has Adequately Alleged Proximate Cause in Its Negligence Claim 17

     C.     Distributor Defendants' Alternative Grounds for Dismissal of the City's Public Nuisance and Negligence Claims Lack Merit ................................................ 18

           1.     The City's Public Nuisance and Negligence Claims Are Not Barred by the Economic Loss Doctrine .............................................................................. 18

           2.     The City's Public Nuisance and Negligence Claims Are Not Barred by the Municipal Cost Recovery Rule ...................................................................... 19

     D.     The City Has Properly Pleaded a Claim for Unjust Enrichment .................... 21

     E.     The City Has Properly Pleaded a Claim for Civil Conspiracy ........................ 23

     F.     The City Has Properly Pleaded a Claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ...................................................................... 26

     G.     The City Has Properly Pleaded a Municipal Services Claim .......................... 32

     H.     The City Has Properly Pleaded a Claim under the Drug Dealer Liability Act ........... 33

CONCLUSION ...................................................................................................................... 36

i

## TABLE OF AUTHORITIES

### CASES

*Adcock v. Brakegate, Ltd.*,
 645 N.E.2d 888 (Ill. 1994) ................................................................................ 23

*Allstate Insurance Co. v. Global Medical Billing, Inc.*,
 520 F. App'x 409 (6th Cir. 2013) ........................................................................ 3

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ............................................................................................ 2

*Bank of America Corp. v. City of Miami*,
 137 S. Ct. 1296 (2017) ........................................................................................ 4

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................ 2

*Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortgage Loan Trust, Series 2003-1*,
 787 F. Supp. 2d 747 (N.D. Ill. 2011) ................................................................ 29

*Centerline Equipment Corp. v. Banner Personnel Service, Inc.*,
 545 F. Supp. 2d 768 (N.D. Ill. 2008) ................................................................ 32

*City of Chicago v. American Cyanamid Co.*,
 823 N.E.2d 126 (Ill. App. Ct. 2005) ............................................................... 5, 9

*City of Chicago v. Beretta U.S.A. Corp*,
 821 N.E.2d 1099 (Ill. 2004) ........................................................................ passim

*City of Chicago v. Cecola*,
 389 N.E.2d 526 (Ill. 1979) .................................................................................. 4

*City of Chicago v. Purdue Pharma L.P.*,
 211 F. Supp. 3d 1058 (N.D. Ill. 2016) .............................................................. 30

*City of Flagstaff v. Atchison, Topeka & Santa Fe Railway Co.*,
 719 F.2d 322 (9th Cir. 1983) ............................................................................. 19

*Cleary v. Philip Morris Inc.*,
 656 F.3d 511 (7th Cir. 2011) ............................................................................. 22

*Commercial National Bank v. City of Chicago*,
 432 N.E.2d 227 (Ill. 1982) ................................................................................ 29

*Congregation of the Passion v. Touche Ross & Co.*,
 636 N.E.2d 503 (Ill. 1994) ................................................................................ 18

*Cooper v. Purdue Frederick Co.*,
 2008 WL 11355004 (E.D. La. Nov. 5, 2008) .................................................... 34

*County of Cook v. Bank of America Corp.*,
 2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) .............................................. 19, 33

*County of Cook v. Philip Morris, Inc.*,
 817 N.E.2d 1039 (Ill. App. Ct. 2004) ..................................................... 10, 17, 27

*Coyne v. American Tobacco Co.*,
  183 F.3d 488 (6th Cir. 1999) ................................................................................................4

*Elder v. Coronet Insurance Co.*,
  558 N.E.2d 1312 (Ill. App. Ct. 1990) ................................................................................28

*Eldridge v. Eli Lilly & Co.*,
  485 N.E.2d 551 (Ill. Ct. App. 1985) ..................................................................................15

*Falcon Assocs., Inc. v. Cox*,
  699 N.E.2d 203 (Ill. App. Ct. 1998) ..................................................................................26

*Federal Trade Commission v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972) ............................................................................................................31

*Ferentchak v. Village of Frankfort*,
  475 N.E.2d 822 (Ill. 1985) .................................................................................................12

*Fields v. Alcon Laboratories, Inc.*,
  2014 WL 1041191 (S.D. Ill. Mar. 18, 2014) ....................................................................32

*Geimer v. Chicago Park District*,
  650 N.E.2d 585 (Ill. App. Ct. 1995) ..................................................................................16

*Gladstone Realtors v. Village of Bellwood*,
  441 U.S. 91 (1979) ................................................................................................................4

*Happel v. Wal-Mart Stores*,
  766 N.E.2d 1118 (Ill. 2002) ...............................................................................................15

*Hardeway v. City of Chicago*,
  1991 WL 203857 (N.D. Ill. Oct. 4, 1991) .........................................................................23

*Hecktman v. Pacific Indemnity Co.*,
  59 N.E.3d 868 (Ill. App. Ct. 2016) ....................................................................................19

*Hernandez v. Walgreen Co.*,
  49 N.E.3d 453 (Ill. Ct. App. 2015) ....................................................................................15

*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*,
  545 N.E.2d 672 (Ill. 1989) ...........................................................................................21, 22

*In re Text Messaging Antitrust Litigation*,
  630 F.3d 622 (7th Cir. 2010) .............................................................................................25

*International Board of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
  34 F. Supp. 2d 656 (N.D. Ill. 1998) .............................................................................10, 17

*Ivanhoe Financial, Inc. v. Mortgage Essentials, Inc.*,
  2004 WL 856591 (N.D. Ill. Apr. 21, 2004) ......................................................................28

*Kirk v. Michael Reese Hospital & Medical Center*,
  513 N.E.2d 387 (Ill. 1987) .................................................................................................16

*Lewis v. Lead Industries Association, Inc.*,
  793 N.E.2d 869 (Ill. Ct. App. 2003) ..................................................................................22

*Liston v. King.com, Ltd.*,
    254 F. Supp. 3d 989 (N.D. Ill. 2017) ...................................................................22

*Martino v. Leiva*,
    479 N.E.2d 955 (Ill. App. Ct. 1985) ..................................................................16

*Mayer v. United States*,
    1989 WL 152671 (N.D. Ill. Dec. 4, 1989) .......................................................16

*Moorman Manufacturing Co. v. National Tank Co.*,
    435 N.E.2d 443 (Ill. 1982)..........................................................................18, 19

*Morrison v. YTB Interational, Inc.*,
    2010 WL 1558712 (S.D. Ill. Apr. 19, 2010) ...................................................28

*Mugler v. Kansas*,
    123 U.S. 623 (1887) ..........................................................................................6

*NAACP v. AcuSport, Inc.*,
    271 F. Supp. 2d 435 (E.D.N.Y. 2003) .............................................................10

*National Union Fire Insurance Co. of Pittsburgh v. DiMucci*,
    34 N.E.3d 1023 (Ill. Ct. App. 2015) ................................................................22

*People ex rel. Fahner v. Hedrich*,
    438 N.E.2d 924 (Ill. 1982) ...............................................................................28

*People ex rel. Hartigan v. E & E Hauling, Inc.*,
    607 N.E.2d 165 (1992) .....................................................................................28

*People ex rel. Madigan v. United Construction of America Inc.*,
    981 N.E.2d 404 (Ill. App. Ct. 2012) ................................................................27

*People v. City of St. Louis*,
    10 Ill. 351 (1848)................................................................................................5

*Quinones v. Szorc*,
    771 F.2d 289 (7th Cir. 1985) ............................................................................23

*Robinson v. Toyota Motor Credit Corp.*,
    775 N.E.2d 951 (Ill. 2002)....................................................................26, 27, 30

*Sanders v. Lincoln Service Corp.*,
    1993 WL 112543 (N.D. Ill. Apr. 5, 1993) .......................................................31

*Scott v. Association for Childbirth at Home, International*,
    430 N.E.2d 1012 (Ill. 1981) .............................................................................32

*Simpkins v. CSX Transportation, Inc.*,
    965 N.E.2d 1092 (Ill. 2012) .............................................................................13

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016).......................................................................................4

*State Street Bank & Trust Co. v. UAL Corp.*,
    2004 WL 784891 (N.D. Ill. Apr. 9, 2004)........................................................22

*Stead v. Fortner,*
  99 N.E. 680 (Ill. 1912) ........................................................................................5

*Tandy v. Marti,*
  213 F. Supp. 2d 935 (S.D. Ill. 2002) ................................................................26

*Triumph Packaging Group v. Ward,*
  2012 WL 5342316 (N.D. Ill. Oct. 29, 2012) ....................................................22

*U.S. Citizens Association v. Sebelius,*
  705 F.3d 588 (6th Cir. 2013) ..............................................................................2

*U.S. ex rel. Bledsoe v. Community Health Systems, Inc.,*
  501 F.3d 493 (6th Cir. 2007) ..............................................................................2

*United States v. Cervantes,*
  466 F.2d 736 (7th Cir. 1972) ............................................................................23

*United States v. Ritchie,*
  15 F.3d 592 (6th Cir. 1994) ................................................................................3

*United States v. Rogan,*
  459 F. Supp. 2d 692 (N.D. Ill. 2006) ................................................................23

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
  412 U.S. 669 (1973) ............................................................................................4

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ............................................................................................3

*Varela v. St. Elizabeth's Hospital of Chicago, Inc.,*
  867 N.E.2d 1 (Ill. App. Ct. 2006) .....................................................................15

*Vesely v. Armslist, LLC,*
  2013 WL 12323443 (N.D. Ill. July 29, 2013) ..................................................16

*Village of Chatham v. County of Sangamon,*
  837 N.E.2d 29 (Ill. 2005) ..................................................................................29

*Vodak v. City of Chicago,*
  2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) ...................................................33

*Wayne v. Kirk,*
  2015 WL 5950900 (N.D. Ill. Oct. 13, 2015) ....................................................23

*Weberg v. Franks,*
  229 F.3d 514 (6th Cir. 2000) ............................................................................23

*Widlowski v. Durkee Foods,*
  562 N.E.2d 967 (Ill. 1990) ................................................................................13

*Windy City Metal Fabricators & Supply, Inc. v. CIT Technology Financing Services, Inc.,*
  536 F.3d 663 (7th Cir. 2008) ............................................................................30

*Young v. Bryco Arms,*
  821 N.E.2d 1078 (Ill. 2004) ..............................................................................10

*Zapka v. Coca-Cola Co.*,
  2001 WL 1558276 (N.D. Ill. Dec. 5, 2001) ......................................................................31

## STATUTES

720 ILCS 570/100 ...............................................................................................................30

740 ILCS 57/15 ............................................................................................................ 34, 35

740 ILCS 57/20 ............................................................................................................ 33, 34

740 ILCS 57/5 ........................................................................................................31, 33, 36

815 ILCS 505/1(f) ....................................................................................................... 26, 29

815 ILCS 505/10d .............................................................................................................31

815 ILCS 505/2 ..................................................................................................................26

815 ILCS 505/2Z ...............................................................................................................29

815 ILCS 505/7 ..................................................................................................................28

MCC § 1-20-020 .....................................................................................................20, 22, 32

MCC § 1-20-060 ................................................................................................................27

MCC § 1-25-090(f) .............................................................................................................27

MCC § 2-25-090 .......................................................................................................... 26, 32

MCC § 2-25-090(a) ............................................................................................................28

MCC § 2-25-090(f) ............................................................................................................28

MCC § 2-25-0900(a) ..........................................................................................................29

## OTHER AUTHORITIES

Restatement (Second) of Torts § 821B(2)(a) (1979) ............................................................ 4, 7, 9

vi

## INTRODUCTORY STATEMENT

Prescription opioids are a powerful, addictive narcotic.  The pharmaceutical companies, which the City of Chicago (the "City") sued separately in 2014, *see* Case No. 1:17-op-45169, created a mass market for prescription opioids by aggressively and deceptively marketing opioids for common chronic conditions like back pain, migraines, and arthritis.  As alleged in the First Amended Complaint ("1AC") in this action, once created, Distributor Defendants[1] -- each of whom is a major distributor of prescription opioids -- flooded this market, despite the fact that each knew or should have known that there was an opioid epidemic.  Distributor Defendants had financial incentives to continue to supply excessive quantities of addictive prescription opioids into Chicago.  They put their profits ahead of the public health and well-being of Chicago, supplying opioids in quantities that they knew or should have known exceeded any legitimate market need for these powerful addictive narcotics.  Moreover, despite the addictive nature of opioids, they deliberately disregarded their legal obligations to maintain effective controls against diversion of these powerful narcotics, failing to report suspicious orders and prescribers and to cease supplying them, thereby fostering black markets for diverted prescription opioids and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire -- or simply could not afford -- prescription opioids.  It is this public health epidemic, of which Distributor Defendants' conduct was a substantial cause, that the City seeks to remedy with this lawsuit.

---

[1] Defendants in this action are Cardinal Health, Inc. ("Cardinal"), McKesson Corporation, ("McKesson"), AmerisourceBergen Drug Corporation ("AmerisourceBergen"), CVS Health Corp. ("CVS"), and WalMart Inc., f/k/a Walmart Stores, Inc. ("WalMart").  Defendants CVS and WalMart are referred to as the "National Retail Pharmacy Defendants."  (On July 5, 2018, the City filed an unopposed motion to dismiss CVS Health Corp. and add CVS Indiana, L.L.C. as a defendant, *see* Master Doc. 707, and as such arguments made herein should be construed to apply to CVS Indiana, L.L.C. as well.)  Collectively, Defendants Cardinal, McKesson, AmerisourceBeregen, and the National Retail Pharmacy Defendants are referred to as the "Distributor Defendants."  The cite "Distr. Mem." refers to the memorandum filed by Defendants Cardinal, McKesson, and AmerisourceBeregen.  The cite "Pharm. Mem." refers to the memorandum filed by the National Retail Pharmacy Defendants.

1

Defendants Cardinal, McKesson, and AmerisourceBergen have filed a motion to dismiss, *see* Master Doc. 571, as have the National Retail Pharmacy Defendants, *see* Master Doc. 586.  Contrary to this Court's instruction in Case Management Order One, Doc. 232, that, in this initial round of motions to dismiss, Distributor Defendants should "raise only those issues they believe are most critical and most relevant to the settlement process," CMO 1 ¶ 2.g. (5), they have taken a scattershot approach, moving to dismiss each of the City's seven causes of action, often making cursory arguments and providing little or no supporting legal analysis or authority.  Because the two motions largely overlap -- indeed, the National Retail Pharmacy Defendants' motion incorporates Defendants Cardinal, McKesson, and AmerisourceBergen's motion -- the City files this consolidated response.[2]

## LEGAL STANDARD

On a Rule 12(b)(6) motion, a court "must construe the allegations of the complaint in the light most favorable to plaintiffs, accept all well-pled factual allegations as true, and decide whether the complaint contains sufficient facts to state a claim for relief that is plausible on its face."  *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013).  Rule 8 requires that a complaint provide "'a short and plain statement of the claim' made by 'simple, concise, and direct allegations.'"  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007).  A complaint will not be dismissed when it states a "plausible claim for relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), that "raise[s] a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

National Retail Pharmacy Defendants have also raised a facial challenge to the City's standing.  An averment of lack of standing is treated as an attack on the court's subject matter jurisdiction and is considered under Rule 12(b)(1).  *Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 410-11

---

[2] Magistrate Judge Ruiz approved Plaintiffs' request to file a single consolidated response, in this and the other cases subject to motions practice.  To conform to the page limits established by the Court, Plaintiffs in all cases will collectively limit their responses to a total of no more than 400 pages.

(6th Cir. 2013).  "A *facial* attack is a challenge to the sufficiency of the pleading itself.  On such a motion, the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party."  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

## ARGUMENT[3]

### I.  THE CITY HAS STANDING TO BRING ITS CLAIMS

National Retail Pharmacy Defendants raise a cursory argument under the rubric of "standing," asserting that the City has suffered only a "generalized grievance" because the opioid epidemic is widespread, meaning that many have been harmed and the City has not sufficiently "set itself apart" from other injured parties or pleaded a direct injury to itself.  Pharm. Mem. 2-3.  Putting aside the cynicism underlying these Defendants' claim that they are responsible to no one because they have hurt so many, the City does not assert a "generalized grievance."[4]  The City has alleged that it has made, and will be required to make, direct payments from the public coffers to address the opioid crisis.  *See, e.g.*, 1AC ¶¶ 19-22, 223, 283-86, 318, 332, 334, 337-38, 354-55, 364, 367-68, 377-80, 394-95.  The City has a cognizable interest in maintaining its fiscal integrity and seeking recovery of abatement costs and other costs it necessarily and foreseeably incurred responding to the opioid crisis.  The Supreme Court and the Sixth Circuit have held that a plaintiff has standing to recover if it alleges something more than a harm that affects many *in the same way*.  *See, e.g., Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472-73 (1982); *Coyne v. Am. Tobacco*

---

[3] Under CMO One, § 2.g, the City incorporates herein any cross-referenced sections of the City of Chicago's Opposition to Manufacturing Defendants' Joint Motion to Dismiss Fourth Amended Complaint ("Chicago's Opposition to Manufacturing Defendants' MTD") filed in *City of Chicago v. Purdue Pharma L.P., et al.,* Case No. 1:17-op-45169 (Master Doc. 653) and the Summit/Akron Omnibus Opposition to the Defendants' Motions to Dismiss ("Summit's Opposition to Defendants' MTD") filed in *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 1:18-op-45090 (Master Doc. 654).  Further, the City incorporates by reference Chicago's Opposition to Manufacturing Defendants' MTD and Summit's Opposition to Defendants' MTD in response to any other arguments where Distributor Defendants incorporate or cross-reference the "Major Distributors' *Chicago* Brief," the "Moving Defendants' *Summit County* Brief," and/or the "Major Distributors' *Summit County* Brief."  Unless otherwise noted, this memorandum adds all emphasis in quotations and omits citations.

[4] The City incorporates by reference Summit's Opposition to Defendants' MTD § II.A.1.

*Co.*, 183 F.3d 488, 494 (6th Cir. 1999); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 n.7 (2016) ("The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687-88 (1973) (standing cannot be denied to plaintiffs actually injured "simply because many people suffer the same injury"; such a rule "would mean that the most injurious and widespread . . . actions could be questioned by nobody).

The specific monetary expenses the City alleges more than satisfy this requirement.  *See, e.g., Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1301-04 (2017) (city's allegations that unlawful racially-discriminatory mortgage lending practices impaired racial composition of city, frustrated city's interests in integration and in promoting fair housing, and disproportionately caused foreclosures and vacancies in minority communities, thereby decreasing property values, reducing property tax revenues and forcing city to spend more on municipal services sufficient to show that city was aggrieved and had standing); *see also Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 110-11 (1979).

## II.  THE CITY HAS STATED VALID CAUSES OF ACTION

### A.  The City Has Properly Pleaded a Claim for Public Nuisance

Contrary to Distributor Defendants' arguments, *see* Distr. Mem. 3-7, Pharm. Mem. 3-4, the City has adequately pleaded each of the elements of a public nuisance.  Illinois has adopted the definition of public nuisance set forth in § 821B of the Restatement (Second) of Torts:

> A public nuisance has been defined as "'the doing of or the failure to do something that injuriously affects the safety, health or morals of the public, or works some substantial annoyance, inconvenience or injury to the public.'"  . . .  Thus, the first element that must be alleged to state a claim for public nuisance is the existence of a right common to the general public.  Such rights include the rights of public health, public safety, public peace, public comfort, and public convenience.

*City of Chicago v. Beretta U.S.A. Corp*, 821 N.E.2d 1099, 1113-14 (Ill. 2004) (citing Restatement (Second) of Torts § 821B(2)(a) (1979)).  And in Illinois, public nuisance actions for abatement are equitable in nature.  *City of Chicago v. Cecola*, 389 N.E.2d 526, 528-29 (Ill. 1979) ("Equity has historically enjoined

nuisances . . . .  A nuisance which affects the public welfare may be abated in equity on the application of the proper officer. . . ."); *Stead v. Fortner*, 99 N.E. 680, 684 (Ill. 1912) ("A court of equity has jurisdiction to abate a public nuisance upon an information filed by the Attorney General or other public officer charged with the duty of seeing that the laws are enforced and the public protected, and the question to be considered by the court in a particular case is whether the facts stated are such as call for the exercise of the jurisdiction.").  Such actions are distinct from, and on a "plane above," claims for damages:

> The public authorities have a right to institute the suit where the general public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety and welfare is on a plane above mere pecuniary damage although not susceptible of measurement in money . . . .

*Stead*, 99 N.E. at 683-84.

Here, the City has pleaded a public nuisance action seeking abatement of the public nuisance and recovery of costs incurred by the City in abating the nuisance created by Distributor Defendants. As set forth below, the City's claim is on all fours with the recognized law of public nuisance in Illinois because it has alleged that Distributor Defendants have created or contributed to the creation of a public health hazard within the City.  Furthermore, this case is distinguishable factually from the holdings in *Beretta*, and *City of Chicago v. American Cyanamid Co.*, 823 N.E.2d 126 (Ill. App. Ct. 2005), the primary cases relied on by Distributor Defendants.  Accordingly, the City's public nuisance count can proceed.

### 1.    The City Has Alleged an Interference with a Public Right

For almost two centuries, courts in Illinois have recognized the right (indeed the obligation) of the government to bring claims to redress and prevent harm to the public health in Illinois.  *See, e.g.*, *People v. City of St. Louis*, 10 Ill. 351 (1848); *Stead*, 99 N.E. at 684.  This concept, deeply embedded in public nuisance law in Illinois, recognizes that issues affecting the public health raise important public rights that require governmental protection.  *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 672-673

(1887).  Here, and as explained more fully in Section I.A.1.a of Summit's Opposition to Defendants' MTD, the 1AC sets forth acts and a condition that unreasonably interfere with the public health.  *See, e.g.*, 1AC ¶¶ 8, 17 (discussing opioid epidemic as a "public health emergency," a "public health epidemic," and an "urgent health crisis."); *id.* ¶ 17 (detailing that "increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose, and death"); *id.* ¶¶ 46-49 (describing conduct of Distributor Defendants that created a public health crisis and a public nuisance); *id.* ¶ 263 (alleging that Distributor Defendants' conduct caused opioids to "flood the community"); *id.* ¶¶ 264-65, 307 (detailing conduct of Distributor Defendants in creating the public nuisance, including their control of the "instrumentality" of the nuisance), *id.* ¶ 270 (detailing that "opioid epidemic has received widespread publicity and Defendants' own surveillance, as well as government data and academic and other research, demonstrated the widening toll of opioid addiction, overdose, hospitalizations, and fatalities, first in specific regions and then across the country.")  Distributor Defendants' argument that the 1AC "does not even attempt to allege interference with any public right," Distr. Mem. 3, is thus disingenuous.  Even a cursory reading of the detailed 1AC demonstrates that it alleges that the conduct of these Distributor Defendants assisted in creating "the worst man-made epidemic in modern medical history -- the misuse, abuse, and over-prescription of opioids."  1AC ¶ 2.[5]  Such allegations meet the definition of "public right" set forth in the Restatement.

*Beretta*, relied on by Distributor Defendants, is factually distinguishable from this case.  *Beretta* involved guns, which generally pose no threat to public safety unless used illegally.  This case, in contrast, involves opioids, a powerful, addictive narcotic that poses a significant threat to public health

---

[5] The National Retail Pharmacy Defendants' argument that there are "no factual assertions as to any conduct affecting Chicago" is false.  *See* Pharm. Mem. 4.  There is an entire section of the 1AC entitled "Chicago-Specific Facts," § I.D, where the City alleges how Distributor Defendants breached their duties in Chicago and Illinois, 1AC ¶¶ 180-200, and how those violations caused injury in Chicago and Illinois, *id.* ¶¶ 201-23.

*even when used legally.*  In *Beretta*, the court considered whether "there is a public right, as opposed to an individual right, to be free from the threat of illegal conduct by others," and concluded that it had "found no Illinois case recognizing a public right to be free from the threat that members of the public may commit crimes against Individuals."  *Beretta*, 821 N.E.2d at 1114-15.  To claim that the "public right" claimed in *Beretta* "is identical to the one pled here," *see* Distr. Mem 4, reflects a fundamental mischaracterization of the allegations in this case.  In contrast to *Beretta*, the City here has clearly identified a condition that has interfered with the public heath -- the opioid epidemic within the City. This condition is not predicated on illegal conduct or crimes committed by others; it exists irrespective of any criminal conduct by anyone and is predicated on the prevalence of opioids within the community, which includes those used by consumers who become addicted to prescription opioids and those who have turned to other drugs to satisfy their addiction when they could no longer acquire opioids.  1AC ¶ 17 ("The increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose, and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or simply could not afford prescription opioids.").  Furthermore, the 1AC clearly sets forth the massive impact that the opioid epidemic has had on the public health, *see, e.g.*, 1AC ¶¶ 1-21, 202, 207-08, a clearly defined public right under Illinois public nuisance law.  *See* Restatement (Second) of Torts § 821B(2)(a).

Moreover, contrary to Distributor Defendants' assertions, this case does not concern individual injuries to City residents.  *See* Distr. Mem. 5 ("There is even less reason to recognize as a *public* right an individual's right to be free from the threat that he may use an otherwise legal product (prescription opioids) to harm *himself*.").  This case is not about whether each opioid pill, prescription, overdose, or patient is a separate public nuisance or separate "epidemic."  And it is not about whether particular individuals in particular circumstances with particular medical conditions abused or misused or were improperly prescribed opioids.  Instead, the public nuisance claims here concern whether the

totality of the harm inflicted on the *public* health rises to the level of a public nuisance.[6]  Thus, the

public right identified here is materially different from that alleged in *Beretta*, and *Beretta's* conclusion

about whether a specific public right existed under the allegations in that case has no bearing here.

> 2.   **The City's Public Nuisance Claim Does Not Seek to Regulate Any Product; Instead, It Seeks Abatement of a Public Health Epidemic**

Distributor Defendants' next strained argument -- that the City's nuisance action is an attempt

to legislate opioid distribution, *see* Distr. Mem. 5-7 -- is similarly flawed.  The distribution practices of

Distributor Defendants are *already* regulated; and, as alleged in detail in the 1AC, each of the

Distributor Defendants failed to abide by those regulations.  In other words, the public nuisance claim

does not attempt to impose additional regulations on Distributor Defendants; rather, it asserts a

parallel claim, seeking to hold them liable for creating a public nuisance while violating the regulations

that *already* exist.  *See* 1AC ¶ 54 (alleging that "Defendants were further required [by federal regulations]

to take steps to halt suspicious orders.  Defendants violated their obligations under federal law."); *id.*

¶ 76 (alleging that Distributor Defendants used agreements with manufacturers "as a tool to violate

their reporting and diversion duties in order to reach the required sales requirements."); *id.* ¶ 257

(alleging "Defendants violated the ICSA and CSA by failing to design and operate a system that would

disclose the existence of suspicious orders of controlled substances and/or by failing to report and

reject suspicious orders of opioids, and violated the Chicago Municipal Code (MCC 2-25-090) . . ."); 

*id.* ¶ 313 (alleging "Defendants violated federal law, including, but not limited to, 21 U.S.C. §§ 823 and

827(d)(1); 21 C.F.R. §§ 1301.74, 1304.21, 1304.22, and 1304.33(e); and Illinois law, including, but not

limited to, 720 ILCS 570/303 and Ill. Admin. Code tit. 68, § 1510.50."); *id.* ¶ 314 (alleging additional

violations of federal and state statutes and regulations).

---

[6] Logically, all public health-based public nuisances require injury to individuals, because without such individual injuries, there can be no effect on the public health.  It defies common sense to argue (as Distributor Defendants do here) that the existence of individual injuries alone defeats a public nuisance finding.  *See* Summit Opposition to Defendants' MTD § I.A.1a.

*Beretta*, the case on which Distributor Defendants principally rely, itself recognized that public nuisance liability can lie when a defendant's conduct is not authorized by law or is actually proscribed by statutes and regulations. 821 N.E.2d at 1123-24; *see also* Chicago's Opposition to Manufacturing Defendants' MTD § B(1). Furthermore, any broad reading of *Beretta* to suggest that only the legislature can determine what conditions constitute a public nuisance is belied by more than a century of common-law public nuisance precedent in Illinois. *See* Chicago's Opposition to Manufacturing Defendants' MTD § B(1). In reality, so long as it affects a public right, a public nuisance can be *either* something that interferes with the public health *or* conduct that is proscribed by statute. *See* Restatement (Second) of Torts § 821B(2)(a)-(b).

### 3. The City Has Adequately Alleged that Distributor Defendants Are a Substantial Cause of the Public Nuisance

Distributor Defendants' arguments that the City has failed to allege causation in its public nuisance claim, *see* Distr. Mem. 13-16; Pharm. Mem. 5-6, must also fail because they have misconstrued the City's public nuisance claim. Specifically, as explained in Chicago's Opposition to Manufacturing Defendants' MTD §§ III.A.3.c & III.B.1, the City's public nuisance claim is not dependent on the illegal conduct of others; instead it exists as a direct result of Distributor Defendants' conduct and exists notwithstanding the acts of any third parties (legal or illegal). *See also* Summit's Opposition to Defendants' MTD § I.A.1. Therefore, contrary to Distributor Defendants' contention, the conduct of Distributor Defendants is "not several steps removed," *see* Distr. Mem. 14, from the public nuisance alleged here.

Distributor Defendants' reliance on the conclusions of the *Beretta* and *American Cyanamid* courts is thus misplaced. Specifically, in *Beretta*, the court concluded that manufacturers and distributors of guns could not be held liable for creating a nuisance that arose "directly and principally by the criminal activity of intervening third parties. *Beretta*, 821 N.E.2d at 1136. Similarly, in *American Cyanamid*, the court concluded that manufacturers of lead pigment could not be held liable for a public

nuisance that "*only* exists because Chicago landowners continue to violate laws that require them to remove deteriorated paint." 823 N.E.2d at 139 (emphasis added). Here, the public nuisance does not arise from illegal conduct of third parties, but as a direct (and intended) consequence of Distributor Defendants' conduct in facilitating an excessive and frequently suspicious supply of opioids.

*Young v. Bryco Arms*, 821 N.E.2d 1078 (Ill. 2004), also provides no safe haven. In *Bryco Arms*, the court considered a public nuisance case brought by individual families whose loved ones had been killed due to criminal use of guns. The court concluded that it could not impose public nuisance liability on defendants "in the business of providing a lawful product that may be used unlawfully, causing injury or death." 821 N.E.2d at 1090. The court explained the condition-versus-cause analysis in proximate cause: "if the defendant's conduct merely furnishes a condition by which injury is made possible, and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury." *Id.* at 1087. This distinction is critical for the present case. The condition caused by Distributor Defendants here -- the oversupply of addictive opioid pills into and within Chicago -- is harmful in and of itself *without* any independent act of any third party. The filling of prescriptions and the use of opioids by patients was not only a possible result of Distributor Defendants' conduct, but also an intended result of the conduct. Many opioids were used *exactly* as intended -- ingested by patients for treatment of various medical conditions. As detailed in the 1AC, that prescription use led to the creation of a secondary market, as well as to a rise in heroin and fentanyl abuse by individuals who had first become addicted through prescription opioids.[7] 1AC ¶¶ 17, 19. Thus, *Beretta*, *American Cyanamid*, and *Bryco Arms* are factually

---

[7] Distributor Defendants' remaining cases, *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039 (Ill. App. Ct. 2004), and *Int'l Board of Teamsters Local 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 34 F. Supp. 2d 656 (N.D. Ill. 1998), are not public nuisance cases and are therefore irrelevant to whether Distributor Defendants' conduct is a proximate cause of the public nuisance alleged here. As explained in *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 497 (E.D.N.Y. 2003), "where the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases." *See also* Summit's Opposition to Defendants' MTD § I.A.1.c.

distinct from the City's case here.

Here, the City has alleged that conduct by Distributor Defendants created or contributed to the creation of the oversupply of addictive opioids in the City (used both to fill prescriptions and to supply the secondary market) -- that is, that their conduct was "a material element and a substantial factor," *see Beretta*, 821 N.E.2d at 1127, and, as explained above, not remote.  Specifically, the 1AC alleges that Distributor Defendants engaged in "deliberate efforts to evade restrictions on opioid distribution."  1AC ¶ 3.  The "suit takes aim at the distributors of opioids that, as an essential part of the supply chain, failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, thereby contributing to the oversupply of such drugs and fueling an illegal secondary market."  1AC ¶ 9; *see also id.* ¶ 13 ("[T]he Distributors, as the link between the pharmaceutical companies and pharmacies, fueled and sustained the opioid crisis by failing to maintain effective controls over the distribution of prescription opioids, and instead actively sought to evade such controls.  The Distributors have contributed substantially to the opioid crisis by selling and distributing far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders when they were identified, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market."); *id.* ¶¶ 16, 17, 19, 20, 49.

Furthermore, the 1AC details that each of these Distributor Defendants was in "control" of the conduct that created the public nuisance.  *See, e.g.*, 1AC ¶¶ 307-09.  The 1AC explicitly sets forth conduct by each of the Distributor Defendants that directly created the excessive and unreasonable supple of addictive opioids in the City; indeed, these Distributor Defendants had control over the supply of opioids through their distribution practices.  *See, e.g.*, 1AC ¶¶ 9, 13, 48, 61, 93, 111.

These allegations, in conjunction with the additional detailed facts set forth in the 1AC, clearly allege that each Distributor Defendant is a cause of the public nuisance alleged in this case.

## B.      The City Has Properly Pleaded a Claim for Negligence

### 1.      The City Has Sufficiently Alleged a Common-Law Duty of Care

Distributor Defendants make two arguments in connection with their contention that the City has not properly pleaded a duty of care in its negligence claim.  First, they contend that the common law imposes no duty here, *see* Distr. Mem. 10-13, and second, they argue that, to the extent that the City relies on statutory duties as the basis of the duty, the statutes in question provide no private right of action, *see* Distr. Mem. 7-9.  As set forth in other briefing in this track of cases, neither argument has merit.  *See* Summit's Opposition to Defendants' MTD § I.C.1.

As to their first contention, they are wrong because under Illinois law Distributor Defendants owe a common-law duty of care and, to the extent that the City references statutes that Distributor Defendants have violated, the City is not seeking thereby to enforce the statutes in this claim, but rather merely to define the standard of care applicable to that pre-existing duty.  The 1AC explicitly sets forth the core common-law duty underpinning the City's negligence claim: that Distributor Defendants had a common-law duty "to exercise reasonable care in delivering dangerous narcotic substances."[8]  1AC ¶¶ 52, 301; *see also id.* ¶ 296 ("Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in distributing highly dangerous opioid drugs in the City.  This includes a duty not to cause foreseeable harm to others."). Encompassed within this duty is a duty not to oversupply a market with highly addictive opioids and a duty to prevent diversion and report and reject suspicious orders.  Further, the 1AC alleges that "Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm."

---

[8] Whether a defendant has breached a duty is, of course, a question of fact for the jury to decide, *see Ferentchak v. Vill. of Frankfort*, 475 N.E.2d 822, 825 (Ill. 1985), and thus not appropriate for Rule 12(b)(6) treatment.

*Id.* ¶ 52.  Despite this, Distributor Defendants assert that they owed no duty to the City and that, therefore, the City's negligence claims must fail.

However, under Illinois law, "every person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons." *Widlowski v. Durkee Foods*, 562 N.E.2d 967, 968 (Ill. 1990).  When determining whether a duty exists in a particular case, a court must consider "(1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. The determination of such a 'relationship,' as sufficient to establish a duty of care, requires considerations of policy inherent in the consideration of these four factors and the weight accorded each of these factors in any given analysis depends on the circumstances of the case at hand." *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1098 (Ill. 2012).  With respect to these factors, the City has alleged that:

- The City's injuries were reasonably foreseeable by Distributor Defendants, 1AC ¶ 301 ("The City does not allege that Defendants were negligent for failure to protect from harm.  Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to the City."); *see also id.* ¶¶ 17, 52, 273, 275, 303, 306, 351;[9]

- The harm to the City was likely, *id.* ¶ 271 ("The injury inflicted by Defendants was of a type that a reasonable controlled-substances distributor would see as a likely result of its conduct."); *see also id.* ¶¶ 185, 264;

- There was no additional burden on Distributor Defendants to guard against the injury if they had complied with their already existing (yet separate) obligations under federal and state regulation, *id.* ¶¶ 62-63 ("State and federal statutes and regulations reflect a

---

[9] Furthermore, the harms that opioids have caused, including harms to communities -- including to the City -- and the public at large, was so foreseeable that federal and state laws were enacted in an effort to prevent these harms -- including addiction, abuse, and diversion -- from occurring.  Indeed, the DEA repeatedly reminded Distributor Defendants of their obligations and the need to prevent abuses and diversion and advised them that their responsibility was critical because "the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people" and that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."  *See id.* ¶ 71.  The harms for which the City now seek redress were thus not merely foreseeable, but actually foreseen.

standard of conduct and care below which reasonably prudent distributors would not fall. Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion of prescription narcotics when the supply chain is not properly controlled. Further, these laws and industry guidelines make clear that Defendants have a duty and responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market."); *see also id.* § I.B.1 (generally setting forth the overlapping common law duties and regulatory duties on Distributor Defendants).

Finally, as between the City and Distributor Defendants there is no legitimate argument why Distributor Defendants should not shoulder the burden of their own misconduct.

Distributor Defendants' second contention -- their argument that the City's claims should be dismissed because there is no private right of action to enforce the statutes and regulations referred to in the 1AC -- is flawed as well. This is because, as explained in Summit's Opposition to Defendants' MTD § III.C.1, the City does not look to the federal or state statutes or regulations cited in the 1AC as the source of Distributor Defendants' duties. Rather, as explained above, Distributor Defendants' duty is grounded in traditional Illinois common-law principles of negligence, foreseeability, and duty. The statutes are not the underlying source of Distributor Defendants' duties, and the City's negligence claim is not dependent on these statutes.

Instead the City references in its 1AC the federal Controlled Substances Act ("CSA") and related Illinois statutes governing the manufacture and distribution of opioids. It does so to identify an appropriate standard of care, not to create a duty. *See, e.g.,* 1AC ¶¶ 62, 297. Rather, as discussed above, the City's negligence claim arises from state common-law obligations, and those obligations, in this instance, parallel Distributor Defendants' statutory and regulatory duties.

Moreover, and contrary to Distributor Defendants' suggestion, the existence of a parallel statutory duty does not in any way undermine an existing common-law claim. It would be illogical for a party to gain immunity for otherwise actionable negligence because the legislature has also

14

recognized, and chosen to regulate, the same dangers that the common law protects against.  To that end, Distributor Defendants' reliance on *Varela v. St. Elizabeth's Hospital of Chicago, Inc.*, 867 N.E.2d 1 (Ill. App. Ct. 2006), is misplaced.  *Varela* merely reiterated the well-established proposition that "[a] conventional principle of tort law, in Illinois as elsewhere, is that if a statute defines what is due care in some activity, the violation of the statute either conclusively or (in Illinois) presumptively establishes that the violator failed to exercise due care."  867 N.E.2d at 10.  The court then concluded that "a plaintiff proceeding under the common law must first establish that the defendant owed a common law duty of care to the person he injured before a court will look to a statute to define the specific level of care that was owed."  *Id.* at 11.  Here, unlike the plaintiffs in *Varela,* the City has alleged that Distributor Defendants owed it a common-law duty to protect it from the foreseeable risk of harm.[10]

### 2. The Criminal Acts of Third Parties Are Not at Issue When the City Is Not Alleging that Distributor Defendants Failed to Prevent Harm From a Third Party

Distributor Defendants also argue that they owe no duty of reasonable care to the City because there is no "special relationship" that would give rise to a duty to protect against harm caused by third parties.  This argument fails on its face when compared with the plain language of the 1AC:  "The City does not allege that Defendants were negligent for failure to protect from harm.  Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to the City."  1AC ¶ 301.  No special relationship is required when the City's claims are based on Distributor Defendants'

---

[10] Distributor Defendants' reliance on *Hernandez v. Walgreen Co.*, 49 N.E.3d 453 (Ill. Ct. App. 2015), and *Eldridge v. Eli Lilly & Co.*, 485 N.E.2d 551 (Ill. Ct. App. 1985), is misplaced in that these cases involved analysis of statutory and common law duties of pharmacists to customers, including whether there was a duty to warn. This lawsuit, however, does not turn on the pharmacist-customer relationship or a failure to warn theory, and so Distributor Defendants' cases offer no guidance.  Moreover, in any event, Distributor Defendants do not cite to the Illinois Supreme Court's decision in *Happel v. Wal-Mart Stores*, 766 N.E.2d 1118 (Ill. 2002), which recognized that a pharmacy does have a duty to warn "where [it] has knowledge" of a potential adverse event  in a patient.  The City has alleged that each of the Distributor Defendants had actual knowledge that it was excessively supplying opioids into the City.  *See* 1AC ¶¶ 99-110.

*own* negligent conduct and not the conduct of third parties.[11]

Distributor Defendants' reliance on *Beretta* is again misplaced. *Beretta* stands for the proposition that there is no general duty to guard against the *criminal* misuse of one's product; the negligence claim in *Beretta* was completely reliant on the *criminal* conduct of third parties. 821 N.E.2d at 1126, 1148. In the absence of the use of firearms in criminal activity, the *Beretta* plaintiffs could not show any injury to the City. *Id.* This case is the opposite; the City does not allege that Distributor Defendants had any general duty to guard against criminal conduct. Instead, the heart of the City's negligence claim centers on Distributor Defendants' conduct in unreasonably providing an excessive supply of highly-addictive, legal opioids, including prescription opioids. *See, e.g.*, 1AC ¶¶ 16, 17, 19, 20, 48, 49, 61, 93, 111. The injury is not dependent on any criminal conduct; instead it arises largely from the costs borne by the City because residents used addictive opioids legally. Thus, *Beretta* does not shield these Distributor Defendants from liability.

### 3. The Learned Intermediary Doctrine Does Not Break the Chain of Causation

The National Retail Pharmacy Defendants also argue that the learned intermediary doctrine "precludes recognition of any common law duty on the part of distributors to protect the public . . . from unnecessary or unlawful prescription of lawful pharmaceuticals." Pharm. Mem. 8. The learned intermediary doctrine, however, is principally a defense in personal injury *failure to warn* cases against drug manufacturers. *See Kirk v. Michael Reese Hosp. & Med. Ctr.*, 513 N.E.2d 387, 392 (Ill. 1987) (learned

---

[11] The cases cited by Distributor Defendants are distinguishable. This is not a situation in which there was no "special relationship" between an "ordinary passenger" in a vehicle driven negligently by another individual not under his control who was involved in an accident (*Martino v. Leiva*, 479 N.E.2d 955 (Ill. App. Ct. 1985)), between a website advertising guns for sale and a victim of a shooting who was killed by a gun illegally purchased through an ad placed on the website (*Vesely v. Armslist, LLC*, 2013 WL 12323443 (N.D. Ill. July 29, 2013)), between referees in a touch football game and a player injured by the rough play of a third party (*Geimer v. Chi. Park Dist.*, 650 N.E.2d 585 (Ill. App. Ct. 1995)), or between a murder victim and the Marion, Indiana VA hospital that had discharged the mentally-ill murderer weeks before the murder (*Mayer v. United States*, 1989 WL 152671 (N.D. Ill. Dec. 4, 1989)). Here, the negligent acts carried out by Distributor Defendants themselves foreseeably resulted in the injuries sustained by the City.

16

intermediary doctrine "provides that manufacturers of prescription drugs have a duty to warn prescribing physicians of the drugs' known dangerous propensities, and the physicians, in turn, using their medical judgment, have a duty to convey the warnings to their patients").  Here, the City has not brought a failure to warn case against any Distributor Defendant and Distributor Defendants are not drug manufacturers.  Therefore, the doctrine has no bearing on this case.[12]

### 4. The City Has Adequately Alleged Proximate Cause in Its Negligence Claim

For the reasons discussed in section II.A.3 above, Distributor Defendants' arguments that the City has failed to allege proximate causation in its negligence claim, *see* Distr. Mem. 13-16; Pharm. Mem. 7-10, must fail.  In addition to those reasons previously discussed, the arguments further fail because the negligence cases principally relied on -- *County of Cook*, 817 N.E.2d 1039), and *Teamsters Local 734*, 34 F. Supp. 2d 656 -- are inapplicable.  In contrast to those cases, the City here is not seeking to recoup from Distributor Defendants "its medical payments to its insured" or for personal injuries suffered by members of the public.  *Compare County of Cook*, 817 N.E.2d at 1041, 1048 (finding that damages "for the cost of health care" that County was seeking were derivative of individual claims and therefore non-recoverable); *Teamsters Local 734*, 34 F. Supp. 2d at 662 (finding that labor union lacked standing to sue for damages from "the individual members' injuries" because labor union suffered no direct injury to itself).  Rather, the City is seeking to recoup its purely governmental costs associated with addressing the effects of the opioid epidemic in Chicago.  These injuries are directly traceable to Distributor Defendants' conduct and are not derivative of personal injuries suffered by others.  The City is not seeking, like a subrogee, to stand in the shoes of residents injured by opioids, with a right of recovery coextensive with theirs; instead, the City seeks to recover for its own distinct

---

[12] The inapplicability of the learned intermediary doctrine was extensively discussed in Chicago's Opposition to Defendants' MTD § II. A.3.c and Summit's Opposition to Defendants' MTD § I.C.2.b.  Moreover, the City did not bring a failure to warn claim against any of the Manufacturer Defendants, so Distributor Defendants cannot claim it even as a derivative defense.

injury.  *See, e.g.*, 1AC ¶ 20 ("The burdens imposed on the City are not the normal or typical burdens of government programs and services.  Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions. . . .").[13]

### C. Distributor Defendants' Alternative Grounds for Dismissal of the City's Public Nuisance and Negligence Claims Lack Merit

#### 1. The City's Public Nuisance and Negligence Claims Are Not Barred by the Economic Loss Doctrine

The economic loss doctrine bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations.  *See Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 448-49 (Ill. 1982).  Distributor Defendants argue that the economic loss doctrine serves as a bar to the City's recovery in this case under both a public nuisance and negligence theory.  *See* Distr. Mem. 16-17; Pharm. Mem. 8-9.  Distributor Defendants are wrong.

First, because under its public nuisance claim the City is seeking abatement, not compensatory damages, the economic loss doctrine is inapplicable.  *See* Chicago's Opposition to Defendants' MTD II.B.3; Summit's Opposition to Defendants' MTD § I.A.4; *compare Beretta*, 821 N.E.2d at 1147 (applying economic loss doctrine when City sought money damages, *not* abatement).

Second, because the City's negligence claim is predicated on breaches by Distributor Defendants of an independent tort duty, not a contractually-created duty, the economic loss doctrine is inapplicable.  *See Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 515 (Ill. 1994) ("The economic loss doctrine does not bar recovery in tort for the breach of duty that exists independently of a contract."); Summit's Opposition to Defendants' MTD § I.C.3.  Here, the independent tort duties breached by Distributor Defendants key off of the common-law duty "to exercise reasonable care in delivering dangerous narcotic substances."  *See* 1AC ¶¶ 52, 296, 301.  Moreover, MCC § 1-20-020

---

[13] The City incorporates by reference Summit's Opposition to Defendants' MTD § I.C.2.

expressly entitled the City to recover costs reasonably related to Distributor Defendants' state-law violations, further underscoring the inapplicability of the economic loss doctrine to the City's negligence claim.  Indeed, the plain intent of this code provision is to ensure that the types of costs the City is seeking here are recoverable.[14]

### 2. The City's Public Nuisance and Negligence Claims Are Not Barred by the Municipal Cost Recovery Rule

Distributor Defendants incorrectly contend that the City's public nuisance and negligence claims (Counts 1 and 2) are barred by the municipal cost recovery rule, also known as the "free public services doctrine."  Distr. Mem. 18.  The municipal cost recovery rule is a common-law doctrine that provides that "public expenditures made in the performance of governmental functions are not recoverable in tort."  *Beretta*, 821 N.E.2d at 1144.  The municipal cost recovery rule, however, has several significant exceptions.  Of most immediate relevance, the municipal cost recovery rule is inapplicable: (1) where "recovery . . . [is] authorized by statute or regulation;" or (2) "'where the acts of a private party create a public nuisance which the government seeks to abate.'"  *Id.* at 1145 (quoting *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983); *see also Cty. of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *7-8 (N.D. Ill. Mar. 30, 2018) (noting exceptions to the rule).

Distributor Defendants' attempt to invoke the municipal cost recovery rule fails for two reasons.  First, unlike in *Beretta*, here the City is seeking relief under its public nuisance claim in the form of abatement of a public nuisance created by private parties.  *See, e.g.*, 1AC ¶¶ 46-47, 291-93.  In contrast,

---

[14] Distributor Defendants' efforts to characterize the City's negligence claim as a product defect case are unavailing.  This is not a product-liability case, and the City is not seeking any of the enumerated "economic loss" categories: "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits" or "the diminution in the value of the product because it is inferior in quality and does not work for the general purposes for which it was manufactured and sold."  *See Moorman*, 435 N.E.2d at 449.  The City is not suffering from "diminished commercial expectations" as a result of Defendants' negligence, *see Hecktman v. Pac. Indem. Co.*, 59 N.E.3d 868, 873 (Ill. App. Ct. 2016), but rather from an unmitigated public health disaster resulting from Distributor Defendants' breaches of independent duties to the City.

in *Beretta* the court applied the municipal cost recovery rule because, under the facts pleaded in that case, the City "admit[ted] that abatement is not feasible and that the damages they seek do not represent the cost of abatement." 821 N.E.2d at 1147. Because abatement is a well-recognized exception to the municipal cost recovery rule, *id.* at 1145, Distributor Defendants' argument that the City's abatement relief under its public nuisance claim is barred by the municipal cost recovery rule fails.

Distributor Defendants' effort to invoke the municipal cost recovery rule also fails because the costs incurred by the City in abating the public nuisance created by Distributor Defendants, as well as the costs the City seeks to recover under its negligence claim, are both costs authorized by statute. Specifically, MCC § 1-20-020 allows for the recovery of costs "reasonably related" to "violation of any . . . state . . . law, or…failure to correct conditions which violate any . . . state . . . law . . ." -- as pertains here, Illinois public nuisance law and negligence law. *See, e.g.*, 1AC ¶¶ 281-92, 315, 319, 323-24. The City's identification of MCC § 1-20-020 in its claims is in direct contrast to *Beretta*, in which the court applied the municipal cost recovery rule because, under the facts pleaded, the City had not identified a statute authorizing recovery. *See* 821 N.E.2d at 1147. The City's nuisance and negligence claims therefore fit squarely within another one of the well-recognized exceptions to the municipal cost recovery rule, *id.* at 1145, thereby rendering the municipal cost recovery rule inapplicable to these claims.

Recognizing the futility of their municipal cost recovery rule arguments, Distributor Defendants next argue that the City has failed to establish proximate causation under MCC § 1-20-020. Distr. Mem. 21. The causation standard under MCC § 1-20-020 merely requires that the City's costs be "reasonably related" to Distributor Defendants' violation of state law. With respect to causation under its public nuisance claim, the City has addressed this issue in section II.A.3 above. And with respect to Distributor Defendants' breaches of duties under its negligence claim, the 1AC outlines the costs the City incurred -- including expenses for police, emergency, health, prosecution, corrections, rehabilitation, hospitalizations and other services -- and details how such costs are

20

reasonably related to such violations.  *See, e.g.*, 1AC ¶¶ 281-92, 313-325, 375-81.  Thus, the City has

satisfactorily pleaded causation under MCC § 1-20-020 for the violations identified in Counts 1 and 2.

### D.  The City Has Properly Pleaded a Claim for Unjust Enrichment

A plaintiff may recover on a theory of unjust enrichment under Illinois law when a defendant

(1) receives a benefit; (2) to the plaintiff's detriment; and (3) the defendant's retention of that benefit

would be unjust.  *See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill.

1989).  Here, the City has sufficiently pleaded these elements.  The City has alleged wrongful conduct

by Distributor Defendants in distributing opioids, *see, e.g.*, 1AC ¶¶ 9, 13, 15-20, 29, 48-169; resultant

harm suffered by the City, *see, e.g.*, *id.* ¶¶ 17-22, 201-23, 329-38; and consequent unjust enrichment to

Distributor Defendants, *see, e.g.*, *id.* ¶¶ 48-49, 73-98, 326-41.  The 1AC alleges that Distributor

Defendants have violated various federal, state, and municipal laws and failed to correct conditions

violating those laws when legally obligated to do so.  *See, e.g., id.* ¶¶ 48-72, 129, 133-48, 179-85.  The

1AC also outlines the costs the City has incurred -- including expenses for police, emergency, health,

addiction treatment, prosecution, corrections, rehabilitation, hospitalization, and other services.  *Id.*

¶¶ 18-22, 207-23, 328-38.  The City has alleged that by having the City pay for Distributor Defendants'

negative externalities -- the cost of the harms caused by their wrongful practices -- Distributor

Defendants were aware that they saved costs and expenses that allowed them to distribute more

opioids, and make more money, than if they had internalized the actual cost of their activities.  *Id.*

¶¶ 331-35.  These costs are rightly part of Distributor Defendants' businesses, but they do not bear

these costs -- the City does.  These costs are "not part of the normal and expected costs of a local

government's existence." *Id.* ¶¶ 337-38.

Distributor Defendants offer three arguments seeking to dismiss the City's claim for unjust

enrichment.  None has merit.  First, Distributor Defendants assert that the City's unjust enrichment

claim is derivative of its other claims and fails for the same reasons as those claims.  Distr. Mem. 24-

25.[15]  This argument lacks merit because the City has indeed pleaded valid claims.  *See, e.g.*, 1AC Counts 1-2, 4-7; *supra* §§ II.A-C & *infra* §§ II.E-H.  And even if those claims were to fail, the alleged improper conduct underlying those claims would still support a claim for unjust enrichment.  *See Triumph Packaging Grp. v. Ward*, 2012 WL 5342316, at *7 (N.D. Ill. Oct. 29, 2012).

Second, Distributor Defendants argue that there must be an independent legal duty that requires Distributor Defendants to pay for their own externalities (*e.g.*, the "staggering" healthcare costs borne by Chicago, 1 AC ¶ 223) for the City's unjust enrichment claim to survive.  Distr. Mem. 25-26.[16]  Essentially, it is Distributor Defendants' assertion that the City's payment of externalities -- created by Distributor Defendants' bad conduct -- did not confer a "benefit" on Distributor Defendants.  *Id.*  However, it is well established that the retention of a benefit is deemed to be unjust when the defendant procured the benefit from the third party through some type of wrongful conduct.  *See HPI Health Care Servs.*, 545 N.E.2d at 679.  Further, "[w]hat the concept of unjust enrichment . . . do[es] encompass, [is] to recover a 'negative unjust enrichment' consisting of the unjust avoidance of a loss."  *State St. Bank & Trust Co. v. UAL Corp.*, 2004 WL 784891 at *2 (N.D. Ill. Apr. 9, 2004).  Contrary to Distributor Defendants' argument, courts throughout this country have held that a defendant is unjustly enriched when a third party must bear the costs of correcting harm caused by a defendant (*i.e.*, externalities).[17]  Indeed, here, Distributor Defendants plainly have an obligation to pay for such externalities.  *See, e.g.*, MCC § 1-20-020; *see also* 1AC ¶¶ 338-41, 373-81; *infra* § II.G.

---

[15] Distributor Defendants' position is contradicted in *Cleary v. Philip Morris Inc.*, 656 F.3d 511 (7th Cir. 2011), which, despite holding that there was no need to definitively resolve the issue at that time, noted "[t]he Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action." *Id.* at 516, 518.

[16] Distributor Defendants rely on *Lewis v. Lead Industries Ass'n, Inc.*, 793 N.E.2d 869 (Ill. Ct. App. 2003) in support of this proposition.  However, as the Illinois Court of Appeals has subsequently noted, *Lewis* "is not an accurate statement of the law on the equitable claim for unjust enrichment."  *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 34 N.E.3d 1023, 1042, 1043 (Ill. Ct. App. 2015); *see also Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1004 n.5 (N.D. Ill. 2017) (the question of whether an unjust enrichment claim also requires that the defendant have an independent duty to act has not been definitively resolved).

[17] The City references and incorporates the Summit/Akron Opposition to the Motion to Dismiss § I.F.

Finally, Distributor Defendants reprise their argument that because the costs the City seeks to recover are allegedly barred under the municipal cost recovery rule, the payment of such costs does not violate the "fundamental principles of justice, equity, and good conscience." Distr. Mem. 26. As discussed previously, *see supra* § II.C.2, the costs the City seeks to recover in Count 3 are not barred by the municipal cost recovery rule because the recovery of these costs is authorized by statute or regulation, namely MCC § 1-20-020. Accordingly, the City's unjust enrichment claim may proceed.

## E.    The City Has Properly Pleaded a Claim for Civil Conspiracy

Distributor Defendants argue, Distr. Mem. 29, that the Court should dismiss the City's claim for civil conspiracy for substantially the same reasons set out in their Summit briefing. The City opposes for the reasons explained in Summit's Opposition to Defendants' MTD § I.G.

To successfully plead civil conspiracy, the City need only allege sufficient facts from which the Court may infer[18] the existence of a single plan to act unlawfully, that the alleged co-conspirator shared in the general conspiratorial objective,[19] and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *United States v. Rogan*, 459 F. Supp. 2d 692, 719 (N.D. Ill. 2006); *accord Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 893-94 (Ill. 1994); *see also Hardeway v. City of Chicago*, 1991 WL 203857, at *6 (N.D. Ill. Oct. 4, 1991) ("Illinois requirements for pleading a conspiracy are similar to Federal requirements."). The City has alleged such facts.

---

[18] The City need only plead circumstantial evidence from which a conspiracy may be inferred. *See Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000) ("[C]ircumstantial evidence may provide adequate proof of conspiracy"). Because conspiracies often obscure most, if not all, information about the alleged conspirators' agreement, circumstantial evidence of the conspiracy is all that is ordinarily obtainable before discovery and trial. *See Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985).

[19] A conspirator need not "have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if [the conspirator] understand[s] the general objectives of the scheme, accept[s] them, and agree[s], either explicitly or implicitly, to do [his or her] part to further them." *Wayne v. Kirk*, 2015 WL 5950900, at *3 (N.D. Ill. Oct. 13, 2015). Moreover, "that a conspiracy's various members may play different roles in executing it and may have dissimilar motives for participating in it, does not mean that a . . . conspiracy does not exist." *United States v. Cervantes*, 466 F.2d 736, 738 (7th Cir. 1972).

The 1AC's allegations satisfy the City's burden to plead adequately material facts from which a conspiracy may be inferred as to each Distributor Defendant, including the existence of a single plan to act unlawfully, a shared general conspiratorial objective among the co-conspirators, and overt acts performed in furtherance of the conspiracy. *See, e.g.*, 1AC ¶¶ 73-120, 179-200. In response, Distributor Defendants argue that "participation in trade organizations and conferences" and "industry organizations" is insufficient to allege an "agreement to violate the law." Distr. Mem. 29; Pharm. Mem. 12. Distributor Defendants simply ignore, however, the 1AC's detailed allegations of how all of the Distributor Defendants worked together as a united entity to inflate the quotas of opioids they could distribute and sell. 1AC ¶¶ 73-98. Examples of Distributor Defendants' collusive and conspiratorial conduct include:

- "Defendants [including both manufacturers and distributors] engaged in the common purpose of increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and distribution of their prescription opioids." *Id.* ¶ 73.

- "Defendants had financial incentives from the manufacturers to distribute higher volumes, and thus to refrain from reporting or declining to fill suspicious orders." *Id.* ¶ 75.

- Distributor Defendants are required to maintain certain security protocols and storage facilities for the distribution of their opioids. The manufacturers negotiated agreements whereby they installed security vaults for Defendants in exchange for agreements to maintain minimum sales performance thresholds. These agreements were used by Distributor Defendants as a tool to violate their reporting and diversion duties in order to reach the required sales requirements. *Id.* ¶ 76.

- "Defendants and manufacturers worked together to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF") and the [Healthcare Distribution Alliance] ("HDA")." *Id.* ¶ 77. "Taken together, the interaction and length of the relationships between and among the Distributors and manufacturers reflect a deep level of interaction and cooperation between two groups in a tightly knit industry. The Distributors and manufacturers were not two separate groups operating in isolation or two groups forced to work together in a closed system. They operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids." *Id.* ¶ 89; *see also id.* ¶¶ 77-89.

- "The HDA, NACDS, and the Pain Care Forum are examples of the overlapping relationships and concerted joint efforts to accomplish common goals, and demonstrate that the leaders of

each of the Defendants and manufacturers were in communication and cooperation." *Id.* ¶ 90.

- Publications, guidelines, and other statements by the HDA confirm that Distributor Defendants used their membership in the HDA to form agreements regarding the conduct under the conspiracy -- namely, for example, regarding their approach to reporting suspicious orders and preventing diversion of controlled substances. *Id.* ¶¶ 91-92.

- Distributor Defendants worked with manufacturers "to control the state and federal government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and identify suspicious orders and report them to the DEA," *id.* ¶ 93; "to control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement to rein in illicit or inappropriate prescribing and distribution;" *id.* ¶ 94; and "to ensure that the [quotas] allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA in order to ensure that the DEA had no basis for refusing to increase or decrease production quotas due to diversion," *id.* ¶ 95.

- Distributor Defendants worked together to avoid reporting suspicious orders, allowing the unimpeded flow of opioids. *Id.* ¶¶ 96-98.

In short, Defendants' conduct in and through the trade groups evidenced much more than mere participation in trade organizations and conferences.  Distr. Mem. 29; Pharm. Mem. 12-13.  For example, through their participation in the PCF and the HDA, Distributor Defendants worked together, with manufacturers, to mislead the public regarding their commitment to complying with their legal obligations and safeguarding against diversion, and to influence policymakers to enact laws and regulations supporting the use of opioids and curtailing the ability to limit illicit or inappropriate opioid prescription and distribution.  *See id.* ¶¶ 67-98.  The City's allegations regarding Distributor Defendants' participation in trade associations are not the only hallmarks of the conspiracy alleged, but rather are part of a raft of conduct that constitute sufficient "circumstantial evidence . . . at the complaint stage" to plead a "plausibl[e]" "inference of conspiracy."  *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

## F.     The City Has Properly Pleaded a Claim under the Illinois Consumer Fraud and Deceptive Business Practices Act

The City claims in Count 5 that Distributor Defendants violated MCC § 2-25-090 by engaging in unfair acts or practices in distributing opioids in the City.   None of Distributor Defendants' arguments for dismissal of this claim, *see* Distr. Mem. 21-24; Pharm. Mem. 14-15, withstands scrutiny.

MCC § 2-25-090 makes it unlawful to engage in "[a]ny conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act [CFDBPA]."  The CFDBPA makes unlawful, among other things, "[u]nfair . . . acts or practices . . . in the conduct of any trade or commerce."  815 ILCS 505/2.  Under the CFDBPA, "trade" and "commerce mean the . . . *sale, or distribution* of any services and any property . . . or thing of value wherever situated, and shall include any trade or *commerce directly or indirectly* affecting the people of this State."  815 ILCS 505/1(f) (emphases added).[20]  Distributor Defendants engaged in unfair acts or practices that included failing to maintain effective controls against opioid diversion.[21]  Such conduct is precisely the sort of practices

---

[20] In determining unfairness under CFDBPA, "consideration shall be given to the interpretations of the Federal Trade Commission [FTC] and the federal courts relating to Section 5(a) of the [FTC] Act."  815 ILCS 505/2. CFDBPA "is to be liberally construed," *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002), and "gives a 'clear mandate to the Illinois courts to utilize the Act to the greatest extent possible to eliminate all forms of deceptive or unfair business practices and provide appropriate relief for consumers,'" *Tandy v. Marti*, 213 F. Supp. 2d 935, 937 (S.D. Ill. 2002).  "The terms of the Act are incapable of precise definition; accordingly, whether a given set of circumstances is unfair or deceptive must be determined on a case-by-case basis."  *Falcon Assocs., Inc. v. Cox*, 699 N.E.2d 203, 209 (Ill. App. Ct. 1998).

[21] For example, Distributor Defendants:
   a.   Have failed to create, maintain, and use a compliance program that effectively detects and prevents suspicious orders of controlled substances, *see, e.g.*, 1AC ¶¶ 48-169;
   b.   Have failed to report suspicious orders of controlled substances, *see, e.g.*, *id.* ¶¶ 111-120;
   c.   Have failed to exercise due diligence to ensure that pharmacies and dispensers were not at risk for diversion, *see, e.g.*, *id.* ¶¶ 144-48;
   d.   Have publicly claimed to use "advanced analytics" and "best-in-class" technology to "monitor" and "identify" suspicious orders and prevent illegitimate use of prescription opioids while actually failing to maintain effective controls against diversion, *see, e.g.*, *id.* ¶¶ 121-28;
   e.   Have filled suspicious or invalid orders for prescription opioids, *see, e.g.*, *id.* ¶¶ 99-110; and in the case of CVS and WalMart, have sold massive amounts of retail opioids directly to Chicagoans without properly training pharmacists, using available data, or conducting adequate audits, *see id.* ¶¶ 129-48, resulting in massive diversion, recidivism, enforcement actions, and penalties, *see id.* ¶¶ 149-69, 362; and
   f.   Have conspired -- through "trade organizations," "alliances" with manufacturers, and "over

that the Illinois legislature intended to protect consumers against in enacting the CFDBPA. *Robinson*,
755 N.E.2d at 961.

Distributor Defendants first argue that the City has not adequately alleged proximate
causation. Distr. Mem. 21. But the City -- like the Illinois Attorney General -- need not plead or
prove proximate causation when it is not seeking "costs," but rather is seeking only statutory penalties
in the exercise of its home rule powers.[22] *See People ex rel. Madigan v. United Constr. of Am. Inc.*, 981
N.E.2d 404, 411 (Ill. App. Ct. 2012) ("[U]nlike a private litigant, the Attorney General need not
demonstrate that defendants' actions proximately harmed any consumers in order to establish her
standing to litigate a violation of the [Illinois Consumer Fraud] Act and to seek injunctive and other
relief as authorized[.]"). This is because the City has the "power" under the "home rule" provision of
the Illinois constitution to "to regulate for the protection of the public health, safety, morals and
welfare" of Chicagoans. Ill. Const. art. VII, § 6(a); *see also County of Cook*, 817 N.E.2d at 1046 (in
analyzing whether "a political subdivision" is "subject to the proximate cause requirement,"
distinguishing county's CFDBPA action brought "pursuant to State law" (just as any private citizen
could) from an action the county could bring pursuant to its *own* "legislation" that it had "enacted"
"pursuant to its home rule powers"). Here, in contrast to *County of Cook*, the City is properly exercising
its right to enforce its *own* ordinances pursuant to its "home rule powers." *Id.*

Distributor Defendants next argue (citing no authority) that as mere "middlemen" who "have
no dealings with customers," Distr. Mem. 22, their distribution of hundreds of millions of units of

---

"$740 million" in lobbying" in "all 50 statehouses" -- to artificially inflate DEA quotas for
prescription opioids, *see id.* ¶¶ 58, 73-98, 233.

[22] The City hereby no longer seeks "costs" under MCC § 2-25-090, 1AC ¶¶ 368-70, but rather only statutory
penalties. *See id.* ¶¶ 371-72; *see also* MCC § 1-25-090(f) (penalties up to "$10,000 for each offence"); MCC § 1-
20-060 ("penalty in an amount equal to the city's litigation and collection costs and attorney's fees"). And even
if the City were required to plead proximate cause for such penalties (which it is not), it has done so as explained
in Sections II.A.3 & II.B.4, above.

opioids into Chicago, 1AC ¶ 188, cannot, as a matter of law, constitute "consumer fraud or any other consumer-directed behavior." Distr. Mem. 22.[23] This is irrelevant. By enforcing its own ordinance, the City is acting exactly like the Illinois Attorney General does when enforcing CFDBPA. It is irrelevant, therefore, whether the conduct in question is "consumer-directed."[24] *See, e.g.*, *People ex rel. Fahner v. Hedrich*, 438 N.E.2d 924, 928 (Ill. 1982) ("[W]hile the definition of consumer . . . may be pertinent for determining whether a plaintiff has standing, it is not a question of importance in a case, like the present case, which has been brought by the Attorney General's Office."); *see also People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 172 (1992) (noting that the "Attorney General is not limited in regard to whose interests he may seek to protect under [CFDBPA]" and "[n]othing in [CFDBPA] indicates that the defrauded party must be a consumer or 'person' in order for the Attorney General to have standing").[25]

Distributor Defendants also argue that "no authority authoriz[es]" the City to use its "consumer fraud" ordinance to remedy conduct involving mere "regulatory violations." Distr. Mem.

---

[23] That Distributor Defendants characterize themselves as "middlemen" who "have no dealings with customers" (facts subject to dispute) is simply irrelevant to their liability. *See* MCC § 2-25-090(a) ("*No person* shall engage in any act of consumer fraud . . . or deceptive practice . . . ."); MCC § 2-25-090(f) ("*[A]ny person* who violates any of the requirements of this section shall be subject to a fine[.]"); 815 ILCS 505/7 (authorizing action by Attorney General against "*any person*" using "any method, act or practice" that is "unlawful" under CFDBPA)*; see also Elder v. Coronet Ins. Co.*, 558 N.E.2d 1312, 1321 (Ill. App. Ct. 1990) ("Nowhere [in CFDBPA] does the definition [of consumer] require that privity exist between the purchaser and the provider of the merchandise.").

[24] Indeed, the City is aware of no Illinois case mentioning "consumer-directed" as a term or concept.

[25] Even if the City were not acting as an attorney general enforcing its own laws (which it is) and were instead a private non-consumer business suing another non-consumer business, the City would still meet its pleading requirements for two reasons. *First*, the City has alleged that by expanding DEA quotas and distributing and filling prescriptions for opioids beyond what the Chicago market could bear, Distributor Defendants' conduct has directly affected the City's consumer-residents who have experienced opioid-related overdose deaths (741 in 2016 alone), emergency room visits, addiction, crimes, and arrests. *See, e.g.*, 1AC ¶¶ 22, 201-12. These allegations demonstrate a sufficient "consumer nexus" between Distributor Defendants' "trade practices and the market generally or consumer protections concerns." *Morrison v. YTB Int'l, Inc.*, 2010 WL 1558712, at *5 (S.D. Ill. Apr. 19, 2010). *Second*, the City has alleged that Distributor Defendants' conduct has "actually harmed" the City as well as its residents. 1AC ¶¶ 201-23; *see also Ivanhoe Fin., Inc. v. Mortg. Essentials, Inc.*, 2004 WL 856591, at *1 (N.D. Ill. Apr. 21, 2004) (noting that when a plaintiff pleads that it was "actually harmed" it "does not need to show a nexus between the alleged conduct and consumer protection concerns").

22. This is incorrect. Misconduct consisting of the violation of regulations can support a CFDBPA claim "if the alleged conduct is independently deceptive or unfair within the meaning of the [CFDBPA]." *Boyd v. U.S. Bank, N.A., ex rel. Sasco Aames Mortg. Loan Tr., Series 2003-1*, 787 F. Supp. 2d 747, 755 (N.D. Ill. 2011) (collecting cases). Here, the City has alleged that Distributor Defendants' conduct was unfair within the meaning of the CFDBPA. *See* 1AC ¶ 362. Also, the fact that the CFDBPA "enumerate[s]" a list of regulations whose violation "*automatically* constitutes" a "per se" "unlawful practice" under the CFDBPA illustrates that "regulatory violations" are often a strong predicate for liability under the CFDBPA. *Boyd*, 787 F. Supp. 2d at 755 (citing 815 ILCS 505/2Z).

Distributor Defendants next argue that they "are not Chicago residents or citizens and do not operate distribution centers in Chicago" and therefore did not engage in "unfair" or "deceptive" practices while conducting any trade or business *in the city*." Distr. Mem. 22. (quoting MCC § 2-25-0900(a)). This ignores, however, that each year "between 2006 and 2014," Distributor Defendants delivered millions of units of opioids distributed in Chicago. *See* 1AC ¶¶ 188-90; *see also, e.g., id.* ¶¶ 41-42 & 195 (National Retail Pharmacy Defendants' distribution of prescription opioids in Illinois and Chicago specifically). The CFDBPA regulates the "sale" or "distribution" of "any property . . . *directly or indirectly* affecting the people of this State," 815 ILCS 505/1(f) (emphasis added), and MCC § 2-25-090(a) states that "[a]ny conduct" violating CFDBPA "shall be a violation of this section".[26]

Next, although contending that the "sole" basis for the City's claim under MCC § 2-25-090 is "unfair acts or practices," Distr. Mem. 21, Distributor Defendants argue that the City's consumer fraud allegations "run[] afoul of the heightened pleading requirements applicable to averments of fraud

---

[26] Distributor Defendants' reliance on *Commercial National Bank v. City of Chicago*, 432 N.E.2d 227 (Ill. 1982) (addressing an extraterritorial tax), and *Village of Chatham v. County of Sangamon*, 837 N.E.2d 29, 45 (Ill. 2005) (addressing zoning and building code jurisdiction over annexed areas), is unavailing. Here, the City does not seek to extraterritorially tax or zone Distributor Defendants' income or land, but rather to hold them liable for opioids that they distributed "in the City." *See* 1AC ¶ 361.

under Rule 9(b)." *Id.* The Rule 9(b) pleading standard, however, is inapplicable to the City's unfair practices claims. Unlike its lawsuit against the Manufacturer Defendants, which the Court found was premised on fraudulent marketing, misrepresentations, and deceptive practices sounding in fraud, *see City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1075-76 (N.D. Ill. 2016) ("*Chicago II*"), the City's unfair practices claim against Distributor Defendants does not make allegations of fraudulent marketing, misrepresentations, or deceptive practices, *see* 1AC ¶¶ 359-72; *see also Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices . . . need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b).").

Finally, Distributor Defendants argue, Distr. Mem. 23-24, that the City has not sufficiently alleged that their acts or practices are "unfair." For an act or practice to be unfair, it must (1) offend public policy; (2) be immoral, unethical, oppressive, or unscrupulous; or (3) cause substantial injury to consumers. *See Robinson*, 775 N.E.2d at 961. "All three criteria do not need to be satisfied to support a finding of unfairness." *Id.* The City has alleged facts that satisfy these criteria.[27]

*First*, the City has alleged that Distributor Defendants' conduct offends public policy. *See* 1AC ¶¶ 361, 363. Specifically, Distributor Defendants' practices offend at least three clear public policies: (a) the policy of discouraging drug addiction, as reflected in the Illinois General Assembly's legislative statements[28] and federal law sharply limiting the distribution of Schedule II drugs, 21 U.S.C. §

---

[27] The City acknowledges that Judge Alonso dismissed the City's claim against the Manufacturer Defendants for unfair practices. *See Chicago II*, 211 F. Supp. 3d at 1074-76. Without waiving its position that that decision was incorrect, here the City's allegations supporting its contention that Distributor Defendants have engaged in unfair practices are more robust.

[28] *See, e.g.*, 1AC ¶¶ 262, 269 (recognizing that "the rising incidence in the abuse of drugs and other dangerous substances and its resultant damage to the peace, health, and welfare of the citizens of Illinois" requires a "system of control over the distribution and use of controlled substances") (quoting 720 Ill. Comp. Stat. 570/100); *id.* ¶ 363 (decreeing that "drug addiction [is] among the most serious health problem[] facing the

812(b)(2); (b) the public policy, enshrined in state and federal law, seeking to ensure that dangerous pharmaceuticals are marketed and utilized appropriately, 1AC ¶¶ 51-72[29]; and (c) Illinois' public policy against intentional victimization, for profit, of vulnerable populations such as veterans and the elderly, *id.* ¶ 363 (noting Illinois' policy to "shift, to the extent possible, the cost of the damage caused by the existence of the illegal drug market in a community to those who illegally profit from that market") (quoting 740 Ill. Comp. Stat. 57/5). Indeed, even if the City had failed to identify a statute offended by Distributor Defendants' misconduct, courts "consider[] public values beyond simply those enshrined in the letter or encompassed in the spirit of the . . . laws." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972). Distributor Defendants' arguments that the City may not rely on state and federal policies recognizing the scourge of addiction and encouraging treatment is thus misplaced.[30]

*Second*, the City has alleged that Distributor Defendants' conduct was immoral, unethical, oppressive, or unscrupulous. *See* 1AC ¶ 361. Specifically, the City has alleged conduct of Distributor Defendants that is oppressive because it has resulted in thousands of Chicagoans (each year) suffering life-threatening or -ending addictions and overdoses and leaving the City no choice but to contend with the consequences of a municipality saturated by an oversupply of opioids distributed by the Distributor Defendants. *See id.* ¶¶ 22, 201-23 (alleging that Distributor Defendants' conduct has resulted in massive addiction, overdoses, heroin use, crime, arrests, hospitalization, drug counseling,

---

people of the State of Illinois") (quoting 745 Ill. Comp. Stat. 35/2); *see also* 815 ILCS 505/10d ("find[ing] that consumer protection is vital to the health, safety, and welfare of Illinois consumers").

[29] For example, Congress enacted the Controlled Substances Act in 1970 in recognition of the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market." 1AC ¶ 56.

[30] The Distributor Defendants argue that no public policy is violated when a "wholesaler delivers lawful goods . . . ." Distr. Mem. 24; *see also* Pharm. Mem. 14 (arguing that Pharmacies were mere "participants in the 'chain of distribution for legal products'"). But courts routinely hold that the legality of some aspect of unfair or deceptive conduct does not insulate a defendant from liability under CFDBPA. *See, e.g., Zapka v. Coca-Cola Co.*, 2001 WL 1558276, at *5 (N.D. Ill. Dec. 5, 2001) (holding that soft-drink maker's "unfair or deceptive" marketing practices were not exempt from the CFDBPA, notwithstanding the fact that its products were labeled in accordance with federal law because that law "d[id] not 'specifically authorize' the marketing practices"); *see also Sanders v. Lincoln Serv. Corp.*, 1993 WL 112543, at *4, *13 (N.D. Ill. Apr. 5, 1993).

and even infants born addicted to opioids and experiencing withdrawals); *see also Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 780 (N.D. Ill. 2008) ("Conduct is oppressive only if it imposes a lack of meaningful choice or an unreasonable burden on its target").[31]  Further, the City has alleged conduct of Distributor Defendants that is immoral and unethical: "[B]y engaging in the conduct alleged above, Defendants profited from the opioid epidemic in the City, turning a blind eye to orders of opioids that Defendants knew or should have known were likely to be diverted.").  1AC ¶ 363; *see also id.* ¶¶ 99-178.

*Third*, the City alleges Distributor Defendants' practices have caused substantial injury to the City, including "lives lost to drug overdoses; addictions endured; emergency room visits; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken lives, families, and homes."  *Id.* ¶ 364; *see also id.* ¶¶ 22, 201-12.  These allegations meet and exceed the City's pleading burden, and the Court should sustain the City's unfair practices claim.

## G.    The City Has Properly Pleaded a Municipal Services Claim

In Count 6, the City asserts a claim for recovery of costs under MCC § 1-20-020.  *See* 1AC ¶¶ 373-81.  Under MCC § 1-20-020, the City is entitled to recover costs that it incurred "in order to provide services reasonably related to [Distributor Defendants'] violation of any federal, state or local law, or [Distributor Defendants'] failure to correct conditions which violate any federal, state or local law . . . ."  Distributor Defendants assert three grounds for dismissal of Count 6.  Pharm. Mem. 15-16.  None has merit.  First, contrary to Defendants' contention, the City has indeed stated claims for

---

[31] Distributor Defendants assert that the City has not adequately alleged that their conduct has been "oppressive" to consumers by imposing on them "a lack of meaningful choice or an unreasonable burden." Distr. Mem. 24; *see also* Pharm. Mem. 15. Effective enforcement of the CFDBPA -- and, by extension, MCC § 2-25-090 -- requires that the term "unfair practice" remain flexible and be defined case-by-case, *see, e.g., Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E.2d 1012, 1018 (Ill. 1981), and an unfair practices claim may survive, even without oppressive conduct leaving no alternatives, if the misconduct is immoral, unethical, or unscrupulous (or one of the other criteria is satisfied), *see Fields v. Alcon Labs., Inc.*, 2014 WL 1041191, at *3-4 (S.D. Ill. Mar. 18, 2014) (denying motion to dismiss even when plaintiff eye drop purchasers had numerous other treatment options).

underlying violations law.  *See, e.g.*, 1AC Counts 1-5, 7; *supra* §§ II.A-F; *infra* § II.H.  Second, and relatedly, the City has satisfactorily pleaded causation under MCC § 1-20-020 with respect to the violations identified in Counts 1-7.  *See, e.g.*, 1AC ¶¶ 256-58, 281-90, 312-24, 327-40, 343, 355-57, 360-63, 368-72, 374-81, 383-97; *see supra* §§ II.A.3 & II.B.4.  And third, the costs that the City seeks to recover in Count 6 are not barred by the municipal cost recovery rule because the recovery of these costs is authorized by statute or regulation -- namely MCC § 1-20-020.  *See Beretta*, 821 N.E.2d at 1145 (statutory authorization for recovery is a recognized exception to the municipal cost recovery rule); *Cty. of Cook*, 2018 WL 1561725, at *7 (same); *see also Vodak v. City of Chicago*, 2006 WL 2524141 (N.D. Ill. Aug. 30, 2006) (denying motion to dismiss City's claim to recover costs incurred in connection with a protest march under MCC § 8-28-020 (subsequently renumbered as MCC § 1-20-020)).

## H.    The City Has Properly Pleaded a Claim under the Drug Dealer Liability Act

To the extent that Distributor Defendants' efforts to sideline the City's claims as arising solely from unlawful conduct succeed, the Illinois Drug Dealer Liability Act ("DDLA") expressly provides the City with a right of recovery for those injuries resulting directly and exclusively from criminal conduct.  Distributor Defendants offer two arguments to suggest that Count 7, premised on the DDLA, 740 ILCS 57/5-57/85, should be dismissed, arguing that (1) the drugs they distribute are not "illegal," Distr. Mem. 26-28, and (2) the City has not adequately alleged that Distributor Defendants "knowingly participated" in an "illegal drug market," *id.* at 28-29.  Both arguments fail because they rely on Distributor Defendants' misuse of definitions within the DDLA, rather than straightforward application of the language of the DDLA and the City's allegations.

The DDLA provides a civil remedy for damages to persons, including governmental entities, who pay for drug treatment or employee assistance programs in a community injured because of illegal drug use.  *See* 740 ILCS 57/5.  Section 20 of the DDLA imposes liability for civil damages on "[a] person who knowingly participates in the illegal drug market within this State."  *Id.* 57/20.  The DDLA

33

defines an "[i]llegal drug" as "a drug whose distribution is a violation of State law." *Id.* 57/15. When sections 15 and 20 are read together, the DDLA imposes liability on anyone who knowingly participates in the market of drugs whose distribution is a violation of State law.

Distributor Defendants' arguments rest on misrepresentations of the terms "illegal drug" and "illegal drug market," rather than using the DDLA's definitions.[32] *First*, they conflate two separately defined terms -- "illegal drug" and "specified illegal drug," *compare* Distr. Mem. 27 *with* 740 ILCS 57/15 -- to suggest that the DDLA's use of the term "illegal drug" necessarily excludes opioids. The DDLA defines "illegal drugs" to include *all* drugs "whose distribution is a violation of State law," without reference to likening the drug to cocaine, heroin, or methamphetamine, as Distributor Defendants suggest. The sole reference to "cocaine, heroin, or methamphetamine" is in the separately defined term "specified illegal drug." 740 ILCS 57/15. Under the DDLA, a drug is illegal if its distribution is in violation of State law,[33] as the City has alleged. *See* 1AC ¶¶ 385, 390-91.

---

[32] National Retail Pharmacy Defendants cite to a decision from a Louisiana federal court, *Cooper v. Purdue Frederick Co.*, 2008 WL 11355004, at *3 (E.D. La. Nov. 5, 2008), contending that it addresses an analogous statute to find that the statute imposes liability on "drug dealers" only, not on "pharmaceutical companies." *See* Pharm. Mem. 16. But unlike the Illinois DDLA, which imposes liability on anyone who knowingly participates in the market of drugs whose distribution is a violation of State law (and never uses the term "drug dealer" except in the act's title), the Louisiana statute addressed in *Cooper* specifically provides that the act "establishes a cause of action against *drug dealers*." LSA-R.S. 9:2800.61(B) (emphasis added). Additionally, National Retail Pharmacy Defendants contend that Count 7 must be dismissed because the DDLA's definition of "individual drug user" requires that a DDLA claim "must be based on the illegal drug use by a *specific* individual user." *See* Pharm. Mem. 17. But the DDLA does not reference any requirement that an action identify any "specific" person, *see* 740 ILCS 57/20, and the City's 1AC alleges repeatedly that Distributor Defendants' conduct resulted in *many* individuals' illegal drug use, *see, e.g.*, 1AC ¶¶ 364, 377, 392. Distributor Defendants' assertion that they may be held accountable if their conduct causes injury due to a single individual drug user's drug use, but may not be held accountable if their conduct caused injury from a multitude of individual drug users' abuse, as the City alleges, turns the statute on its head.

[33] The DDLA does not exclude opioids from its definition of an "illegal drug" (*i.e.*, "a drug whose distribution is a violation of State law"), simply because, as Distributor Defendants suggest, opioids may be lawfully prescribed, distributed, and dispensed, or offer therapeutic benefits. The distinction that Distributor Defendants suggest collapses when one considers that Illinois undoubtedly has an identical interest in applying the statute to a street dealer whether the dealer is distributing a methamphetamine, like Desoxyn, an opioid, like OxyContin, or crack cocaine. This consideration is all that much more significant given the vast death toll attributed to prescription opioids. *See* 1AC ¶ 5.

34

*Second*, they likewise wrongly describe the DDLA's definition of "illegal drug market," suggesting that an "illegal drug market" *must* (1) be "clandestine" and (2) exclude markets of heavily regulated activities.  Distr. Mem. 28.  The DDLA defines the term "illegal drug market" as "the support system of [operations related to a drug whose distribution is a violation of State law], from production to retail sales, through which a [drug whose distribution is a violation of State law] reaches the user."  740 ILCS 57/15 (definitions of "illegal drug market," using definition of "illegal drug").  Nothing in the definition requires "clandestine" activity,[34] as Distributor Defendants suggest.  Distr. Mem. 28.  Moreover, an interpretation that excludes a market simply because market activity is regulated -- regardless of the actual wrongful conduct in the market (including violations of those regulations), as alleged here, *see* 1AC ¶¶ 48-148, 179-200 -- grossly distorts the stated definition used in the statute.

As alleged in the City's 1AC, Distributor Defendants have knowingly participated in the illegal drug market in Illinois, in violation of the DDLA, in that they have distributed opioids in Illinois in violation of federal, state, and local law, including the CSA, 21 U.S.C. § 801 *et seq.*; the ICSA, 720 ILCS 570 *et seq.*, their respective implementing regulations, and Chicago Municipal Code (MCC § 2-25-090).  *See* 1AC ¶¶ 179-200, 256-57, 389-91.  They violated the ICSA and CSA by knowingly distributing drugs, or knowingly participating in the chain of distribution of opioids, by failing to design and operate a system that would disclose the existence of suspicious orders of opioids and by failing to report and reject suspicious orders of opioids.  *Id.* ¶¶ 180-200.  As a result, they knowingly contributed to the oversupply of such drugs and fueled the unlawful market for opioids, fentanyl, and heroin in the City.  *Id.* ¶¶ 9, 13, 257, 389-91.  They violated the Chicago Municipal Code (MCC § 2-25-090) through their unfair practices as described throughout the City's 1AC.  *Id.* ¶ 257; *see, e.g.*, *id.* ¶¶ 359-72.

---

[34] Distributor Defendants' reference to the term "clandestine," Distr. Mem. 28, refers to a comment in the DDLA's "Legislative findings," which does not suggest that the definition is so limited.

Purposes of the DDLA, as described in the Act, include holding distributors accountable for their involvement in an illegal drug market -- a market of drugs in violation of State law -- to shift the cost of damage caused by that market, and deterring similar future involvement in that market. *See* 740 ILCS 57/5.  Application of the DDLA to Distributor Defendants' involvement here soundly meets that purpose, by shifting away from the City the costs that have been caused by Distributor Defendants' participation in the market of drugs in violation of State law.  Distributor Defendants trivialize the City's allegations about Distributor Defendants' involvement in the market, contending that the City alleges simply that Distributor Defendants engaged in mere regulatory non-compliance. But the gravamen of the City's allegations is that Distributor Defendants' illegal conduct "fueled the illegal drug market in the City," 1AC ¶¶ 375, 391; *see id.* ¶¶ 9, 13, 55, with "severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin," *id.* ¶ 19; *see id.* ¶¶ 121, 227, 308.  Their alleged role in "the worst man-made epidemic in modern medical history" can hardly be summed up as trivial regulatory non-compliance.

## CONCLUSION

The "Distributors' Motion to Dismiss First Amended Complaint" (Doc. 571) and "Motion to Dismiss First Amended Complaint by Defendants Walmart Inc. and CVS Health Corp." (Doc. 586) should be denied in their entirety.

DATED:  July 9, 2018                          Respectfully submitted,

                                              EDWARD N. SISKEL
                                              **Corporation Counsel, City of Chicago**

                                              BY: /s/ *Linda Singer*

                                              Thomas P. McNulty
                                              Fiona A. Burke
                                              City of Chicago, Department of Law
                                              30 N. LaSalle St., Suite 1240
                                              Chicago, IL 60602
                                              thomas.mcnulty@cityofchicago.org
                                              fiona.burke@cityofchicago.org
                                              Phone: (312) 744-6929
                                              Fax:    (312) 742-3832

                                              Linda Singer
                                              Elizabeth Smith
                                              David I. Ackerman
                                              Jeffrey C. Nelson
                                              MOTLEY RICE LLC
                                              lsinger@motleyrice.com
                                              esmith@motleyrice.com
                                              dackerman@motleyrice.com
                                              jnelson@motleyrice.com
                                              401 9th Street NW, Suite 1001
                                              Washington, DC 20004
                                              Phone: (202) 232-5504
                                              Fax:    (202) 386-9622

                                              Kenneth A. Wexler
                                              Bethany R. Turke
                                              Kara A. Elgersma
                                              Thomas A. Doyle
                                              WEXLER WALLACE LLP
                                              55 W. Monroe Street, Suite 3300
                                              Chicago, IL 60603
                                              kaw@wexlerwallace.com
                                              brt@wexlerwallace.com
                                              tad@wexlerwallace.com
                                              Phone: (312) 346-2222
                                              Fax:    (312) 346-0022

                                              *Attorneys for Plaintiff City of Chicago*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)**

Pursuant to Local Rule 7.1(f), I hereby certify that the foregoing "Plaintiff City of Chicago's Consolidated Memorandum in Opposition to (1) Distributors' Motion to Dismiss First Amended Complaint (Master Doc. 571) and (2) Motion to Dismiss First Amended Complaint by Defendants WalMart Inc. and CVS Health Corp. (Master Doc. 586)" is associated with a Track One case and is within the page limitations permitted by CMO-1 and CMO-4 in this matter.

Dated: July 9, 2018

/s/ *Linda Singer*

Linda Singer
MOTLEY RICE LLC
lsinger@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:    (202) 386-9622

*Attorney for Plaintiff City of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2018, a copy of the foregoing "Plaintiff City of Chicago's Consolidated Memorandum in Opposition to (1) Distributors' Motion to Dismiss First Amended Complaint (Master Doc. 571) and (2) Motion to Dismiss First Amended Complaint by Defendants WalMart Inc. and CVS Health Corp. (Master Doc. 586)" was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ *Linda Singer*

Linda Singer
MOTLEY RICE LLC
lsinger@motleyrice.com
401 9th Street NW, Suite 1001
Washington, DC 20004
Phone: (202) 232-5504
Fax:   (202) 386-9622

*Attorney for Plaintiff*