# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
| This document relates to: *The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.* Case No. 18-op-45090 | Hon. Dan Aaron Polster |

## DISTRIBUTORS' REPLY IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

ARGUMENT …………………………………………………………………………..3

I.       THE COUNTY'S RICO AND OCPA CLAIMS SHOULD BE DISMISSED. ................. 3

         A.       The County Fails To Allege an Injury to Business or Property............................. 3

                  1.       The County has abandoned its claims for medical and treatment
                           costs................................................................................................. 3

                  2.       The County cannot recover for police and fire services. ............................ 4

                  3.       The County cannot recover for lost taxes, revenue, and funding. .............. 4

         B.       The County Fails To Allege a Direct Injury. ...................................................... 6

                  1.       The direct injury rule bars the County's RICO claim................................. 6

                  2.       The direct injury rule bars the County's OCPA claim............................... 8

         C.       The County Fails To Allege "Racketeering Activity" or "Corrupt
                  Activity."........................................................................................................ 10

                  1.       The Complaint does not allege "racketeering activity." ........................... 10

                  2.       The Complaint does not allege "corrupt activity." ................................... 14

         D.       The County Fails To Allege Participation in an Enterprise................................ 15

II.      THE COUNTY'S PUBLIC NUISANCE CLAIMS SHOULD BE DISMISSED. .......... 16

         A.       The OPLA Bars the County's Public Nuisance Claims....................................... 16

                  1.       Absolute public nuisance. ..................................................................... 16

                  2.       Statutory Public Nuisance..................................................................... 18

         B.       The County's Absolute Public Nuisance Claim Fails in any Event. .................... 19

                  1.       There is no public right to be free from addiction. ................................... 19

                  2.       Licensed distributors can be liable only for qualified public
                           nuisance.............................................................................................. 21

         C.       The Statutory Public Nuisance Claims Should Be Dismissed or Limited............ 22

III.   THE COUNTY'S NEGLIGENCE CLAIM SHOULD BE DISMISSED. ...................... 23

    A.   The OPLA Bars the County's Negligence Claim. ................................................. 23

    B.   The Complaint Fails Adequately To Allege Duty. ............................................... 24

IV.   THE DIRECT INJURY TEST REQUIRES DISMISSAL OF THE
      NEGLIGENCE AND NUISANCE CLAIMS. ................................................................. 28

V.   THE ECONOMIC LOSS DOCTRINE BARS PLAINTIFFS' NUISANCE AND
      NEGLIGENCE CLAIMS. ............................................................................................... 32

    A.   The Doctrine Bars the Negligence Claim. ........................................................... 33

    B.   The Doctrine Bars the Nuisance Claim. ............................................................... 34

VI.   THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. .......................... 35

VII.  THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED. ............................... 36

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) ...............................................15

*Anza v. Ideal Steel Supply Co.*, 547 U.S. 451 (2006) .....................................................................31

*Atkins v. Hibernia Corp.*, 182 F.3d 320 (5th Cir. 1999) ................................................................12

*Ayres v. Gen. Motors Corp.*, 234 F.3d 514 (11th Cir. 2000) .........................................................12

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) ..........................................................8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .............................................................................6

*Bradley v. Miller*, 96 F. Supp. 3d 753 (S.D. Ohio 2015) ............................................................9, 14

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) .....................................................7

*Buckman Co. v. Plaintiffs' Legal Cmte.*, 531 U.S. 341 (2001) .......................................................21

*Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008) ........................................4, 5

*Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034
     (N.D. Ohio Apr. 6, 2011) ..........................................................................................................24

*City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474 (6th Cir. 2017) ..........2, 33, 35

*City of Cleveland v. Ameriquest Mortg. Sec.*, 615 F.3d 496 (6th Cir. 2010) ........................ passim

*City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425 (2d Cir. 2008) ..................................6

*Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990 (7th Cir. 2004) ..............................13

*County of Oakland v. City of Detroit*, 866 F.2d 839 (6th Cir. 1989) ..............................................5

*Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004) ..................................................................25

*Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007) ...............................................................................4

*Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577 (W.D. Tenn. 1997) ...........................................36

*Hemi Grp., LLC v. City of New York.*, 559 U.S. 1 (2010) ........................................................6, 7, 8

*Hempy v. Breg, Inc.*, 2012 WL 380119 (S.D. Ohio Feb. 6, 2012) ................................................18

*Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992) ......................................................6, 28, 29

iii

*Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985) .......................................5

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 2015 WL 4092866
(S.D. Ohio July 6, 2015) ..............................................................................................25

*In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21
(1st Cir. 2013) ................................................................................................................8

*Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556 (6th Cir. 2013) ......................3

*JBlanco Enter. v. Soprema Roofing & Waterproofing, Inc.*, 2016 WL 6600423
(N.D. Ohio Nov. 8, 2016) ............................................................................................34

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229
(2d Cir. 1999) ...............................................................................................................28

*Little Hocking Water Association v. E.I. du Pont de Nemours & Co.*,
91 F. Supp. 3d 940 (S.D. Ohio 2015) ..........................................................................36

*Marsh v. Genentech, Inc.*, 693 F.3d 546 (6th Cir. 2012) ...............................................21

*McKinney v. Microsoft Corp.*, 2011 WL 13228141 (S.D. Ohio May 12, 2011) ............24

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129
(S.D.N.Y. Mar. 15, 1994) ............................................................................................10

*Michigan v. Fawaz*, 848 F.2d 194, 1988 WL 44736 (6th Cir. May 9, 1988) ..................6

*Mitchell v. Proctor & Gamble*, 2010 WL 728777 (S.D. Ohio Mar. 1, 2010)................24

*Moore v. Texaco, Inc.*, 244 F. 3d 1229 (10th Cir. 2001) ...............................................36

*Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289 (E.D.N.Y. 2017) .....................15

*Myers v. United States*, 17 F.3d 890 (6th Cir. 1994) ....................................................25

*O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222 (S.D.N.Y. 1989) .............10

*O'Brien v. Price Waterhouse*, 740 F. Supp. 276 (S.D.N.Y. 1990) ...............................10

*Ohio Edison Co. v. Direct Energy Bus., LLC*, 2017 WL 3174347
(N.D. Ohio July 26, 2017) ...........................................................................................36

*Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481 (6th Cir. 1989) .......................................9

*Rahimi v. St. Elizabeth Med. Ctr.*, 1997 WL 33426269 (S.D. Ohio July 16, 1997)......14

*Shetiwy v. Midland Credit Mgmt.*, 15 F. Supp. 3d 437 (S.D.N.Y. 2014) ......................10

*Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76 (2d Cir. 2017) ........................................................13

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ................................................................13

*Stratford v. SmithKline Beecham Corp.*, 2008 WL 2491965
(S.D. Ohio June 17, 2008) ........................................................................................................23

*Tekavec v. Van Waters & Rogers, Inc.*, 12 F. Supp. 2d 672 (N.D. Ohio 1998) ..........................25

*United States ex rel. Barmak v. Sutter Corp.*, 2003 WL 21436213
(S.D.N.Y. June 20, 2003) ..........................................................................................................12

*United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493
(6th Cir. 2007) ..........................................................................................................................11

*United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59
(D.D.C. 2015) ............................................................................................................................12

*United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879 (6th Cir. 2017) ................................11

*United States v. Healy Tibbits Constr. Co.*, 607 F. Supp. 540 (N.D. Cal. 1985) ..........................36

*United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006) ..................................1

*United States v. Veal*, 23 F.3d 985 (6th Cir. 1994) ......................................................................14

*Wallace v. Midwest Financial & Mortgage Services, Inc.*, 714 F.3d 414
(6th Cir. 2013) ............................................................................................................................7

*Walther v. Patel*, 2011 WL 382752 (E.D. Pa. Feb. 4, 2011) ......................................................13

*Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383 (5th Cir. 2014) ..............................4, 5

*White v. Smith & Wesson*, 97 F. Supp. 2d 816 (N.D. Ohio 2000) ..............................................36

## STATE CASES

*Arcenio v. Youngstown State Univ.*, 68 N.E.3d 157 (Ohio Ct. App. 2016) ..................................18

*Brown v. Cty. Comm'rs of Scioto Cty.*, 622 N.E.2d 1153 (Ohio Ct. App. 1993) ........17, 20, 21, 22

*City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568
(Mass. Super. Ct. July 13, 2000) ..............................................................................................29

*City of Chicago v. Beretta U.S.A., Corp.*, 821 N.E.2d 1099 (Ill. 2004) ......................................20

*City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002) ..................2, 20, 27, 29

*City of Niles v. Evans*, 136 N.E.2d 177 (Ohio Ct. Com. Pl., Trumbull Cty. 1955) ......................17

v

*Clemens v. Nelson Fin. Grp., Inc.*, 2015 WL 1432604
  (Ohio Ct. App. Mar. 31, 2015)....................................................................34

*Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332
  (Ohio Ct. App. Mar. 21, 2013)......................................................................9

*Cleveland v. JP Morgan Chase Bank, N.A.*, 2013-Ohio-1035 ......................................33

*CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, 2012 WL 750972
  (Ohio Ct. App. Mar. 5, 2012)........................................................................9

*Digiknow, Inc. v. PKXL Cards, Inc.*, 2011 WL 2899600
  (Ohio Ct. App. July 21, 2011)......................................................................33

*Evans v. City of Johnstown*, 96 Misc. 2d 755
  (N.Y. Sup. Ct. 1978)……………………...................................................................36

*Fed. Steel & Wire Corp. v. Ruhin Constr. Co.*, 543 N.E.2d 769 (Ohio 1989)..............................32

*Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145
  (Ohio Ct. App. Nov. 10, 2005) ......................................................................9

*Hodges v. Ettinger*, 189 N.E. 113 (Ohio 1934) ........................................................17

*In re Foreclosure of Liens for Delinquent Land Taxes*, 18 N.E.3d 1151
  (Ohio 2014)........................................................................................15

*Indep. Ins. Agents of Ohio, Inc. v. Fabe*, 587 N.E.2d 814 (Ohio 1992) ................................19

*Johnson v. Microsoft*, 834 N.E.2d 791 (Ohio 2005)................................................35, 36

*Kramer v. Angel's Path, LLC*, 882 N.E.2d 46 (Ohio Ct. App. 2007).......................................21

*LaPuma v. Collinwood Concrete*, 661 N.E.2d 714 (Ohio 1996)............................................24

*Lesick v. Manning*, 1992 WL 380284 (Ohio Ct. App. Dec. 17, 1992) .......................................9

*Queen City Terminals, Inc. v. General American Transportation Corp.*,
  653 N.E.2d 661 (Ohio 1995)..............................................................32, 33, 35

*RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006 WL 2777159
  (Ohio Ct. App. Sept. 28, 2006) .....................................................................17

*RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006-Ohio-5014 ......................................33, 35

*Salem Iron Co. v. Hyland*, 77 N.E. 751 (Ohio 1906)....................................................17

*State ex rel. Carna v. Teays Valley Local Sch. Dist. Bd. of Educ.*, 967 N.E.2d 193
  (Ohio 2012).........................................................................................19

*State ex rel. Schoener v. Bd. of Comm'rs of Hamilton Cty.*, 619 N.E.2d 2
    (Ohio Ct. App. 1992) ............................................................................21, 22

*State v. Gardner*, 2008-Ohio-2787, 889 N.E.2d 995 (Ohio 2008) ..................................9

*Three-C Body Shops, Inc. v. Nationwide Mut. Fire Ins.*, 2017 WL 1407304
    (Ohio Ct. App. Apr. 20, 2017) .............................................................................36

*Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743 (Ohio Ct. App. 2016) ............................24

*Volter v. C. Schmidt Co.*, 598 N.E.2d 35 (Ohio Ct. App. 1991)....................................32

*Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018 (Ohio 2002) ...........................................25

## OTHER AUTHORITIES

21 C.F.R. §§ 1303.21 .............................................................................13

18 U.S.C. §§ 1341 ...............................................................................15

18 U.S.C. §§ 1343…………………...............................................................15

18 U.S.C. § 1961 ...............................................................................13

21 U.S.C. § 827...............................................................................12

21 U.S.C. § 843...............................................................................13, 14

Ohio Rev. Code § 2307.71...............................................................................18, 23

Ohio Rev. Code § 2913.05...............................................................................15

Ohio Rev. Code § 2923.34...............................................................................14, 15

Ohio Rev. Code § 4729.35...............................................................................22, 23

The Omnibus Memorandum in Opposition ("Opposition") confirms that this case is about the alleged deceptive marketing of prescription opioids by Manufacturers.  The County repeatedly insists that manufacturers (i) deceptively marketed opioids (ii) to doctors, (iii) changing their perceptions about the risks of the drugs, (iv) thereby causing sales to "skyrocket," and (v) leading many of Plaintiffs' residents into drug addiction."  Opp. 12, 50.  And it was this conduct by the Manufacturers, the County claims, that set the opioid crisis into motion: "Without Manufacturer Defendant's conduct, which caused prescribing of opioids … to skyrocket, *the opioid epidemic would not have occurred* …."  Opp. 1.[1]

The County does not and cannot say this about Distributors.  Nor does it allege that Distributors knew that the Manufacturers' marketing was deceptive or that doctors had been duped.  What Distributors knew was that DEA, the agency charged with gauging the medical need for prescription opioids, raised the annual quota every year from 1995 to 2013.  What Distributors did was supply licensed pharmacies with the drugs that doctors prescribed, and report *all* shipments of prescription opioids to DEA.  The County does not contend otherwise. When it reaches for relevant legal authority, the Opposition cites *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 28 (D.D.C. 2006), in which tobacco manufacturers "marketed and sold their lethal product with zeal, with deception, and with a single-minded focus on their financial success."  Similarly here, the County alleges that opioid manufacturers "pursu[ed] a deceptive marketing scheme that was designed to … change the perception of opioids … and mislead[] doctors and the public about the risks and benefits of opioids."  Opp. 12; *see also id.* 25, 50.  But there are—and could be—no comparable allegations regarding Distributors.  When the Opposition cites specific factual allegations to support its arguments, it cites those about

---

[1]  Unless otherwise stated, all emphasis in quotations herein has been added and internal quotation marks and citations omitted.

Manufacturers' conduct, or obfuscates by referring generically to "Defendants."

Beyond this problem, the Opposition defies recent developments in Ohio law, in cases and on matters uncannily similar to those here.  First, the County is not the first to attempt to recover public expenditures arguably traceable to deceptively marketed products.  Cleveland and Cincinnati brought such cases, and the Sixth Circuit dismissed them both.  *See City of Cleveland v. Ameriquest Mortg. Sec.*, 615 F.3d 496 (6th Cir. 2010); *City of Cincinnati v. Deutsche Bank Nat'l Trust Co.*, 863 F.3d 474 (6th Cir. 2017).   In both cases, it held that the cities' public nuisance claims were not viable.  There, as here, the cities' alleged harm was indirect because it was contingent on whether city residents had been injured.  There, as here, the economic loss doctrine foreclosed the cities' public nuisance claims.  There the city failed to "connect [the banks' conduct] to the existence of an actual nuisance" by failing to allege "why a particular property owned by [the bank] endanger[ed] the public."  *Deutsche Bank*, 863 F.3d at 480.  Similarly here, the Complaint fails to connect Distributors' conduct to the nuisance by failing to allege a single "suspicious" order that Distributors allegedly filled within the County.

Second, while the County dismisses this recent Sixth Circuit authority, it embraces *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002).  But *Beretta* is a decision that the General Assembly abrogated when it amended the OPLA in 2005 and 2007 and that the Supreme Court has not cited since for any proposition other than the motion-to-dismiss standard.

Third, the Opposition ignores altogether the well-developed body of products liability law designed to deal with allegedly dangerous or defective products.  But for the absence of the County residents who were mis-prescribed or abused opioids, and suffered addiction as a result, this is a classic personal injury litigation.  But the County does not go the products-liability route because it wants to distance itself from those users and lacks subrogation rights that would entitle

2

it to stand in the users' shoes.  This leaves the County trying to recover purely economic damages—which the economic loss doctrine bars, as the Sixth Circuit held in *Deutsche Bank*.

It is no wonder the Opposition talks so little about Distributors' conduct and roundly fails to cite authority holding liable entities, like Distributors, that did not design the product in question or promote it to doctors or patients, and that could not control the professionals who prescribed and dispensed it or the persons downstream who used and misused it.  The claims against Distributors should be dismissed.

## ARGUMENT

## I.    THE COUNTY'S RICO AND OCPA CLAIMS SHOULD BE DISMISSED.

Distributors' opening brief demonstrated that the RICO and OCPA claims fail as to Distributors because the County did not allege (1) an injury to its business or property; (2) a direct injury; (3) that each Distributor committed two or more predicate acts; or (4) that Distributors participated in the direction of a well-pled criminal enterprise.  The County's Opposition fails to resuscitate its claims against Distributors.

### A.    The County Fails To Allege an Injury to Business or Property.

The County's alleged injuries fall into three categories, none which constitute injury to "business or property" for purposes of RICO.

#### 1.    The County has abandoned its claims for medical and treatment costs.

The Complaint asserted as RICO injury, and sought as alleged damages, "[c]osts for providing healthcare and medical care."  Compl. ¶ 934(b); *accord id.* ¶ 934(c), (d), (f), (g) (also seeking medical and treatment costs).  The County's entitlement to recover these costs under RICO is foreclosed by binding Sixth Circuit precedent.  Dkt. 491-1 (hereinafter, "Br.") at 8–9; *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 565–66 (6th Cir. 2013) (en banc) (holding that "both personal injuries and ***pecuniary losses flowing from those personal injuries***

fail to confer relief under [RICO]").  The Opposition concedes that *Jackson* bars relief under RICO for "losses proximately resulting from personal injuries" and does not dispute that this includes the healthcare and medical expenses sought in the Complaint.  Opp. 36–37.  The Court therefore should dismiss the RICO claim to the extent that the County seeks to recover for medical and other expenses that flow from personal injury to County residents.  *See, e.g.*, *Doe v. Bredesen*, 507 F.3d 998, 1007 (6th Cir. 2007) (affirming dismissal of a claim as abandoned where opposition brief failed to respond to argument made in motion to dismiss).

### 2.      The County cannot recover for police and fire services.

The Court also should dismiss the RICO claim to the extent that the County seeks to recover costs of law enforcement and fire services.  The Opposition asserts in passing that the County's damages include amounts spent on "police and fire services," Opp. 37, but cites no case authorizing recovery under RICO for police, fire, or similar services.  Nor does it attempt to distinguish *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), which held that monies "expended on public health care and law enforcement services" by county governments do not constitute injuries to business or property under RICO.  The County thus wholly fails to rebut Distributors' showing that the costs of carrying out basic governmental services cannot constitute injury to "business and property" for purposes of RICO.  *See* Br. 10–11; *Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383, 387 (5th Cir. 2014) (per curiam) (a government can assert a RICO claim only for injury to its "***commercial*** interests"—i.e., "injuries suffered in its capacity as a consumer of goods and services"—but not for "general injury to the economy ***or to the Government's ability to carry out its functions***").

### 3.      The County cannot recover for lost taxes, revenue, and funding.

The County also is wrong that it may recover "lost taxes" under RICO.  The County cites *Welborn* to argue that a local government may assert a claim for injury to its "revenue-generating

functions, i.e., taxes, even if those injuries are not competitive or commercial."  Opp. 37.  But the County quotes a snippet from *Welborn* out of context while disregarding its actual holding.

In *Welborn*, officials responsible for maintaining local land records brought RICO claims alleging that fraudulent statements "caused fewer filings in their offices, which in turn injured them by decreasing fee revenues."  557 F. App'x at 386.  The court dismissed those claims as not "legally cognizable," explaining that, "[w]hen the government sues under the civil RICO statute, the 'business or property' element requires that the injury 'refer to *commercial* interests or enterprises.'"  *Id.* at 387–88 & n.4.  Applying that rule, the court reasoned that the fees generated by the land recording systems did not "serve a revenue-generating function" that amounted to "*commercial activity*," but rather "a public service" that constituted "a governmental function."  *Id.* at 387.  *Welborn* therefore does not hold that a local government may recover for lost taxes or other non-commercial injuries; it holds precisely the opposite.

The three additional cases the Opposition cites do not support a different conclusion.  In *County of Oakland v. City of Detroit*, 866 F.2d 839 (6th Cir. 1989), the county sued, not in its governmental capacity, but in a commercial capacity as a purchaser of sewer services from Detroit.  *Id.* at 848–51.  Thus, the Sixth Circuit's decision is entirely consistent with the rule that a local government may assert a RICO claim to vindicate its interests as a market participant, but not when it acts in its "sovereign or quasi-sovereign capacity" to "enforce the laws or promote the public well-being."  *Canyon Cty.*, 519 F.3d at 976; *accord Welborn*, 557 F. App'x at 387.  The Seventh Circuit's 33-year old decision in *Illinois Department of Revenue v. Phillips*, 771 F.2d 312, 314, 317 (7th Cir. 1985), was expressly rejected by the Sixth Circuit in a case involving "quite similar" circumstances.  *Michigan v. Fawaz*, 848 F.2d 194, 1988 WL 44736, at *2 (6th Cir. May 9, 1988) (unpublished table decision) ("Because our 'doubts' have ripened into

5

a conviction that RICO does not apply to the circumstances of this case, we are not persuaded to adopt the reasoning of [*Phillips*].").  Finally, *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 445 (2d Cir. 2008), decided by a divided panel, is at odds with a prior opinion by a different Second Circuit panel and was reversed by the Supreme Court.  *See Hemi Grp., LLC v. City of New York.*, 559 U.S. 1, 8 (2010).

### B.    The County Fails To Allege a Direct Injury.

None of the derivative injuries asserted by the County in its Complaint—and certainly not the "lost tax revenue" on which the Opposition is focused—was the direct result of Distributors' alleged conduct.  This compels dismissal of both the RICO and OCPA claims.

### 1.    The direct injury rule bars the County's RICO claim.

The Opposition repeatedly asserts that the County was "directly injured" by defendants' alleged conduct.  *E.g.*, Opp. 35–45.  But saying it does not make it so, and the County's *ipse dixit* cannot replace well-pled factual allegations of a plausible direct injury.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Neither the Complaint nor the Opposition adequately sets forth facts showing that the County was harmed as a direct result of Distributors' alleged predicate acts.  *See, e.g.*, *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

To state the County's theory of causation is to show that it impermissibly "go[es] ***beyond the first step***."  *Id*. at 271.  According to the Opposition, the core of Distributors' alleged misconduct consists of "fraudulent[] omissions," i.e., not reporting suspicious orders to the DEA.  Opp. 30–31.  But the Opposition makes no effort to explain how Distributors' alleged failure to report unidentified suspicious orders ***directly*** caused the County's loss of tax revenues (or any other of its alleged injuries).  Even if Distributors "flooded" all the pharmacies in Summit County with opioids, those medications would sit on the pharmacy shelves, and there would be no possible reduction in tax revenue or increase in law enforcement expenses without (i) doctors

6

who mis-prescribed opioid medications, (ii) pharmacists who dispensed the medicines to those who should not have received them, and/or (iii) individuals who misused the medications.  Only because of the conduct of those third parties could harm occur resulting ultimately in a reduction of property values or an increase in crime in the County.  This attenuated chain of causation goes well beyond what the case law allows.  *See Hemi*, 559 U.S. at 10–11 (substantially more direct claim for "lost tax revenue" held to be too "attenuated"); *see also* Br. 11–16.

*Wallace v. Midwest Financial & Mortgage Services, Inc.*, 714 F.3d 414 (6th Cir. 2013), is not to the contrary.  There, because the plaintiff alleged that he would not have refinanced his mortgage had its appraised value not increased, the court held that the fraudulent appraisal procured by the defendant bank could have "led directly" to the plaintiffs' decision to refinance.  *Id.* at 416–20.  Unlike the County's allegations against Distributors here, it was possible in *Wallace* "to trace a straight line between the alleged fraud and the asserted injury."  *Id.*

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), also is readily distinguishable.  The court in *Bridge* held merely that first-party reliance is not invariably required in order to establish proximate causation.  *Id.* at 656–58.  As the Supreme Court explained in *Hemi*, moreover, the causal link in *Bridge* was "straightforward": it involved a direct and easily identifiable connection between the fraud at issue and the plaintiffs' injury; the plaintiffs "were the only parties injured by [defendants'] misrepresentations"; and there were "no independent factors that account[ed] for [the plaintiff's] injury."  *Hemi*, 559 U.S. at 14–15 (emphasis omitted) (second and third alterations in original).

The County's reliance on *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21, 28 (1st Cir. 2013) is likewise unavailing.  There, the plaintiffs alleged that the manufacturers conspired with "a web of entities to market a dangerous prescription drug for off-

label use, deceiving doctors into prescribing it widely."  Opp. 25.  The court held that the intervening conduct of physicians did not break the causal chain because the manufacturers targeted doctors with a "fraudulent marketing" scheme designed and intended to influence the prescribing decisions of doctors.  *Neurontin*, 712 F.3d at 39.  The Complaint contains no factual allegations that Distributors worked in concert with front groups or "key opinion leaders," marketed opioid products to doctors, or did anything else to deceive doctors into prescribing opioids.  That case therefore is inapposite to the claims against Distributors.

Finally, the Court should reject the County's assertion that it adequately has pled proximate causation because it has alleged that its injury was a foreseeable consequence of Distributors' alleged conduct.  Opp. 41–42.  Even if that were true, it would not save the County's claims.  As the Supreme Court has explained, the concepts of directness and foreseeability are distinct, and in the RICO context it is not enough even to allege that an indirect injury was the "foreseeable" and "intended" consequence of the defendants' conduct.  *Hemi*, 559 U.S. at 12; *accord Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) ("foreseeability alone does not ensure the close connection that proximate cause requires").[2]

## 2.   The direct injury rule bars the County's OCPA claim.

The direct injury rule also bars the County's OCPA claim.  The County asserts that minor differences in the OCPA's language excuse it from pleading proximate causation in accordance with *Holmes* and its progeny.  Opp. 65.  But several Ohio appellate decisions belie that assertion.

In 2005, the Ohio Court of Appeals held that, because the OCPA "is patterned after the federal RICO law, *we adopt the same position as that in Holmes*[], *which requires proof of*

---

[2]   The County cites *City of Miami* to argue against dismissal "at this early stage."  Opp. 39.  The case, however, does not hold that it is inappropriate to dismiss a complaint on proximate causation grounds on a Rule 12(b)(6) motion—it plainly is.  *See, e.g.*, *Hemi*, 559 U.S. at 21.  Instead, the remand in *City of Miami* merely reflected the Supreme Court's established practice not to consider in the first instance questions that were not passed on by the courts below.  *See* 137 S. Ct. at 1306.

***proximate cause in an OPCA claim***." *Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145, at *5 (Ohio Ct. App. Nov. 10, 2005) (footnote omitted).  The Court of Appeals reiterated this rule in 2013, holding that "[t]he same proximate cause requirements"—i.e., "the 'direct relation' test set forth in *Holmes*"—apply to both RICO and OCPA claims.  *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *5 (Ohio Ct. App. Mar. 21, 2013).[3]

"[A] federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  *Puckett v. Tenn. Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir. 1989).  The County fails to identify any persuasive reason to disregard the clear court of appeals decisions cited above.[4]  The Ohio Supreme Court, moreover, "has adopted the Holmes Court's proximate cause analysis," *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 503 (6th Cir. 2010), and it would make no sense to conclude that the applicable standard for pleading causation under the OCPA is less demanding than the default common law rule.  This Court therefore should hold that the *Holmes* direct injury test applies to the County's OCPA claim, and thus that the OCPA claim fails for the same reasons that the RICO claim failed.  *See supra* Part I.B.1.

---

[3]  *See also CSAHA/UHHS-Canton, Inc. v. Aultman Health Found.*, 2012 WL 750972, at *9 (Ohio Ct. App. Mar. 5, 2012) (per curiam) ("[A] plaintiff bringing a claim under [the OCPA] must prove its damages were proximately caused by the defendant's corrupt activity."); *Lesick v. Manning*, 1992 WL 380284, at *3 (Ohio Ct. App. Dec. 17, 1992) ("[T]his court does not reach the conclusion that a person is relieved of the burden of demonstrating that the illegal conduct proximately caused their injury."); *Bradley v. Miller*, 96 F. Supp. 3d 753, 774 (S.D. Ohio 2015) ("Ohio courts apply traditional notions of proximate cause to civil OCPA actions.").

[4]  The County cites comments to pattern jury instructions, Opp. 66, but they are "not binding legal authority" in Ohio.  *E.g.*, *State v. Gardner*, 2008-Ohio-2787, ¶ 97, 889 N.E.2d 995, 1016 (Ohio 2008).

**C.      The County Fails To Allege "Racketeering Activity" or "Corrupt Activity."**

**1.      The Complaint does not allege "racketeering activity."**

The County argues that (1) it has properly pled that Distributors committed mail or wire fraud, Opp. 30–34, and (2) CSA violations are predicate acts, Opp. 59–64.  That is not so.

**Mail and Wire Fraud**.  The County's mail and wire fraud allegations fail for two reasons.  First, the County does not dispute that it must plead that Distributors acted with the specific "intent to deprive [the County] of money or property."  Br. 17; *O'Brien v. Price Waterhouse*, 740 F. Supp. 276, 280 (S.D.N.Y. 1990) (holding that "[a]llegations of negligence are insufficient"), *aff'd sub nom. O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674 (2d Cir. 1991).  The County fails to identify any allegation that satisfies this obligation.

Second, the County does not allege with the requisite particularity that Distributors committed predicate acts of mail or wire fraud.  "When bringing a RICO claim against multiple defendants, the plaintiff must allege that ***each defendant*** committed two or more predicate acts." *Shetiwy v. Midland Credit Mgmt.*, 15 F. Supp. 3d 437, 443 (S.D.N.Y. 2014).  Plaintiffs "cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud."  *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989).  "Even Rule 8(a) pleading requires plaintiffs to identify the specific defendant charged with committing a particular predicate act, rather than collectivizing a group of defendants as plaintiffs have done here."  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *15 (S.D.N.Y. Mar. 15, 1994).

The County obfuscates its failure to identify predicate acts by Distributors by asserting that "Defendants" or "Supply Chain Defendants" engaged in fraudulent conduct.  Opp. 25, 30–

10

31, 41, 43.[5]    But  in  the  rare  instance  where  the  County  purports  to  identify  "specific misrepresentations and omissions made by each of the **Distributor**[*s*]," Opp. 35 (citing Compl. ¶¶ 175–184), a review of the cited paragraphs reveals that they do not relate to Distributors at all, only Manufacturers.  The County thus fails to meet its most basic RICO pleading obligation— alleging "at least two acts of racketeering activity" **by Distributors**.

The County cites *United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 501 F.3d 493, 509 (6th Cir. 2007), for the proposition that it should be "excused" from Rule 9(b), Opp. 33, but *Bledsoe* holds just the opposite.  Although a plaintiff need not identify the who, what, where, when, and how of every fraudulent statement in cases involving "many allegedly false claims over a substantial period of time," the Sixth Circuit made clear that a pleading must at  least  (1) allege  the  "fraudulent  scheme  with  particularity,"  and  (2) provide  representative "examples of specific false claims" made by each defendant.  501 F.3d at 510; *see United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) ("We have no more authority to 'relax' the pleading standard established by Civil Rule 9(b) than we do to increase it.").

One can read the 326-page Complaint in vain for "examples of specific false claims" made by a Distributor.  It does not identify even a single pharmacy in the County that ever placed a "suspicious order," nor does it identify with specificity a single mailing or wire allegedly sent by a Distributor—let alone explain what was false about the communication or how it furthered the alleged fraudulent scheme.

---

[5]    The allegations cited by the County either (1) relate exclusively to the conduct of the Manufacturers, Opp. 28–29, 34–35 (citing Compl. ¶¶ 155–58, 181–84, 414, 516, 520–21, 555–70, 581, 660–66, 688– 89, 694–95, 849–54, 856, 859–61, 867–70, 875, 920–22, 928); (2) are wholly conclusory, Opp. 30– 31, 33–34 (citing Compl. ¶¶ 526-30, 688-89, 701-02, 705, 708, 769-70, 772, 849-50, 852-56, 859-63, 866–67, 870–72, 920–22, 928); or (3) do not plausibly constitute predicate acts of fraud, Opp. 31 (citing Compl. ¶¶  579–606, 684–708, 772, 775, 856, 858–59).

The Complaint also fails to plead with particularity a coherent "fraudulent scheme" involving Distributors.  While the County asserts that Distributors failed to file (unspecified) suspicious order reports, the Opposition does not explain how this purported failure constitutes mail or wire fraud.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521–25 (11th Cir. 2000) (alleged failure to make required Safety Act reports to government not actionable under mail and wire fraud statutes).  Nor is it plausible that Distributors' alleged failure constitutes fraud, given that Distributors (via the ARCOS database) undisputedly reported "'every sale, delivery or other disposal'" to the federal government.  *See* Br. 5 (quoting 21 U.S.C. § 827(d)(1)); *see also Atkins v. Hibernia Corp.*, 182 F.3d 320, 326 (5th Cir. 1999) (no claim for mail or wire fraud where "[a]ll of the information that the Plaintiffs contend was omitted was in fact revealed").[6]

The Opposition asserts that Distributors "made false statements about their compliance with the CSA obligations to identify and report suspicious orders," Opp. 67, but the Complaint fails to identify any such statement with the requisite specificity.[7]  Nor does the Opposition explain how generic public statements regarding the efficacy of Distributors' suspicious order reporting systems or their commitment to preventing diversion could conceivably constitute criminal mail or wire fraud.  They cannot.[8]

---

[6]   "Suspicious" orders are a subset of what Distributors reported ("every sale, delivery or other disposal" of prescription opioids).

[7]   According to the County, it need not identify these statements with particularity because the information is within "Distributor[s'] knowledge."  Opp. 32.  But the alleged *public statements* are plainly not within the *exclusive* knowledge and control of Distributors.  There thus is no basis on which to relieve the County of its obligation to plead these purported statements with particularity. *See, e.g.*, *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 66 (D.D.C. 2015) (no exception to particularity requirements applied where paystubs supposedly "solely within [the defendant's] possession and control" were actually available to plaintiff); *United States ex rel. Barmak v. Sutter Corp.*, 2003 WL 21436213, at *4, *6 (S.D.N.Y. June 20, 2003) (dismissing where details were allegedly "within the defendants' exclusive or particular control," but "other entities also possess[ed] th[e] information" and defendant "failed to exhaust all avenues for obtaining" it).

[8]   *See, e.g.*, *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1009 (7th Cir. 2004) (rejecting RICO claim predicated on mail fraud because "[a] generic promise to provide 'high quality' services"

Finally, the Opposition also argues that Distributors engaged in "lobbying and other activities" designed to influence Congress and federal regulators.  Opp. 43.  These allegations cannot give rise to a RICO claim; the *Noerr-Pennington* doctrine provides that speech designed to influence government action cannot serve as RICO predicate acts of mail or wire fraud.  *Singh v. NYCTL 2009-A Tr.*, 683 F. App'x 76, 77 (2d Cir. 2017) (*Noerr Pennington* "protects efforts to influence governmental action through litigation and lobbying."); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) (allegedly false statements in made in the course of petitioning activity cannot serve as RICO predicate acts of mail or wire fraud).[9]

**Controlled Substances Act Violations**.  The County's argument that violations of 21 U.S.C. § 843(a)(4) constitute RICO predicate acts borders on the frivolous.  Section 843(a)(4) makes it unlawful to "furnish false or fraudulent information in, or omit any material information from, ***any application, report, record, or other document required to be made, kept, or filed***."  The County asserts that a violation of Section 843(a)(4) falls within the RICO statute's ambit, which includes among its enumerated predicate acts the "felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  18 U.S.C. § 1961(1)(D).  Opp. 63.  But the felonious "concealment" that is actionable under Section 1961(1)(D) has to do with the drugs themselves, not recordkeeping.  *United States v. Veal*, 23

---

cannot "be the basis of a mail fraud claim"); *Walther v. Patel*, 2011 WL 382752, at *7 (E.D. Pa. Feb. 4, 2011) (dismissing RICO claim because representations that "services to be rendered were of high quality [and] well above minimal standards of acceptable care" were "not actionable as mail or wire fraud").

[9]    The County's suggestion that Distributors "appl[ied] for ever increasing quotas governing prescription opioids," Opp. 58, makes no sense.  Manufacturers, not Distributors, submit the quota applications referenced in the Complaint, and *DEA* sets the quotas.  21 C.F.R. §§ 1303.21-.23; *see generally*  https://www.deadiversion.usdoj.gov/quotas/quota_apps.htm.  Even if true, Distributors' actions would be protected under the *Noerr Pennington* doctrine.

F.3d 985 (6th Cir. 1994) (holding that ultimate fate of controlled substances, i.e., whether they were diverted to illegal use, has no bearing on Section 843(a)(4) "recordkeeping charges").

### 2.      The Complaint does not allege "corrupt activity."

The County agrees that the RICO and OCPA pleading requirements are identical.  Opp. 66–67.  The OCPA claim thus fails for the reasons the RICO claims fail.  Part I.C.1.

The OCPA claim also fails because the Complaint does not allege "at least one incident other than a violation of" the federal mail and wire fraud statutes.  *See* Ohio Rev. Code § 2923.34(A); *see also* Br. at 20.  Setting aside its facially infirm assertion that CSA violations constitute RICO predicate acts, *supra* pp. 14–15, the County makes no effort to argue that it has identified any predicate acts that could not be pled as mail or wire fraud.  Instead, the County argues that it has complied with Section 2923.34(A) merely by invoking Ohio's prohibition on telecommunications fraud.  Opp. 68.  But Section 2923.34(A) is not satisfied here, where the only "incidents" alleged by the County are purported omissions and misstatements made by Distributors in connection with their regulatory obligation to report suspicious orders—incidents that the County itself has claimed violate the mail and wire fraud statutes.  Because the "factual allegations which comprise the elements of [the County's telecommunications fraud claim] also comprise the elements of mail [and wire] fraud," the OCPA claim should be dismissed.  *Rahimi v. St. Elizabeth Med. Ctr.*, 1997 WL 33426269, at *2 n.1 (S.D. Ohio July 16, 1997) ("[T]he Plaintiff must be able to point to an incident of corrupt activity that is not actionable under laws which prohibit mail [or] wire fraud.").[10]

---

[10]   None of the cases cited by the County (Opp. 68–69) is to the contrary.  In those cases, the plaintiffs alleged predicate acts that—unlike telecommunications fraud—include materially different elements than mail or wire fraud.  *See Canterbury*, 2001 WL 1681132, at *10 (extortion and theft); *Bradley*, 2013 WL 13268688, at *7 (money laundering).  The County makes no effort to explain why the factual allegations in those cases adequately pled violations of the mail or wire fraud statutes, or could

The County's reading of Ohio Rev. Code § 2923.34(A) also does not comport with basic rules of statutory construction.  Any activity constituting mail or wire fraud under federal law also constitutes telecommunications fraud under Ohio law.  *Compare* Ohio Rev. Code § 2913.05 *with* 18 U.S.C. §§ 1341, 1343.  Thus, if the County's reading of the statute were right, Section 2923.34(A) would be meaningless—it would ***always*** be possible to comply with its requirement merely by relabeling a claim for mail or wire fraud as a claim for telecommunications fraud.  That is not a sensible reading of the statute.  *In re Foreclosure of Liens for Delinquent Land Taxes*, 2014-Ohio-3656, ¶ 16, 18 N.E.3d 1151, 1156 (Ohio 2014) (rejecting interpretation that "would cause the language and meaning of the … provision to be superfluous").

In short, because the County fails to allege as a "corrupt activity" at least one incident that could not be charged as mail or wire fraud, its OCPA claim fails as a matter of law.

### D.   The County Fails To Allege Participation in an Enterprise.

The County failed plausibly to allege that Distributors played a part in directing the affairs of the alleged criminal enterprise, and its arguments to the contrary are unavailing.[11]

As the County concedes, allegations of merely parallel conduct or routine business relationships are insufficient to establish the existence of an enterprise.  Opp. 58–59.  The fact that Distributors share a trade association, for example, does not give rise to a RICO claim.  *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010) ("participation in trade organizations provides no indication of conspiracy"); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 n.4 (E.D.N.Y. 2017) (similar).

---

be recast to do so.  In fact, in *Canterbury*, the court expressly held the complaint did *not* adequately plead mail or wire fraud.  2001 WL 1681132, at *11-12.

[11]   The County asserts that Distributors "waived" the argument that there was no Opioid Supply Chain Enterprise.  Opp. 57 n.38.  Case Management Order One [Dkt. 232] provides otherwise.  Also, Distributors incorporated the Manufacturers' arguments by reference.  Br. 3 n.8.

The County responds that Distributors failed to report suspicious orders and made public statements indicating that they were complying with their regulatory reporting obligations.  Opp. 58–59.  But the County does not explain how those allegations go beyond the parallel conduct that it concedes is insufficient—nor could it.  While the County also argues that Distributors engaged in anti-competitive conduct—i.e., not reporting suspicious orders filled by their competitors, *see id.*—it fails to identify any well-pled factual allegations indicating that **Distributors** had access to information that would enable them to determine what orders were filled by their competitors or whether those orders were "suspicious."

## II.    THE COUNTY'S PUBLIC NUISANCE CLAIMS SHOULD BE DISMISSED.

### A.    The OPLA Bars the County's Public Nuisance Claims.

In 2005, after *Beretta* allowed negligence and public nuisance claims against gun manufacturers, the General Assembly amended the OPLA to abrogate all common-law product liability claims.  Br. 22–23.  In 2007, the General Assembly amended the OPLA again, this time abrogating "any public nuisance claim **or** cause of action at common law" alleging that a product interfered with a public right.  *Id.*  The 2007 Amendment bars the County's nuisance claims.

#### 1.    Absolute public nuisance.

The County concedes that the OPLA requires dismissal of what they call "legal public nuisance claims."  Opp. 20.  The County purports instead to bring an "equitable nuisance claim," which it contends is not covered by the OPLA.  *Id.*  As support, the County argues that (1) there is a distinction between legal and equitable nuisance; (2) the legislature did not overrule *Beretta*; and (3) the 2007 Amendment applies only to claims for compensatory damages.  *Id.* at 19–20. The County is wrong in all respects.

First, the Opposition's distinction between legal and equitable nuisance is baseless.  The Ohio Supreme Court long ago held that "[t]here is no such thing as an equitable nuisance."

*Salem Iron Co. v. Hyland*, 77 N.E. 751, 752 (Ohio 1906).  Nuisance is "a theory of recovery in tort," i.e., a legal claim.  *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006); *see also Brown v. Cty. Comm'rs of Scioto Cty.*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993) (public nuisance is a "field[] of tort liability").  Moreover, "the distinction between legal and equitable causes of action [has] been abolished" in Ohio.  *Hodges v. Ettinger*, 189 N.E. 113, 115 (Ohio 1934).  Thus, in conceding that the OPLA applies to "legal public nuisance claims," the County effectively concedes that it applies to ***all*** public nuisance claims, regardless of the nature of relief sought.  *See Salem Iron Co.*, 77 N.E. at 752 ("If the plaintiff has no cause of action at law in the present case it can have none in equity ….").[12]

Second, the Opposition all but ignores *City of Toledo v. Sherwin-Williams Co.*, which dismissed a nearly identical public nuisance claim mere months after the 2007 Amendment became law.  Br. 24.  Toledo made the same argument as the Opposition—"that authority allowing it to bring a public nuisance action to seek abatement of a condition that is injurious to public health, safety, and welfare, is found in *City of Cincinnati v. Beretta*."  *Sherwin-Williams*, 2007 WL 4965044, at n.2 (Ohio Ct. Com. Pl., Lucas Cty. Dec. 12, 2007).  The court disagreed:

> *Beretta* was decided … prior to the enactment of [the 2005 Amendment] which provided that the [OPLA] were intended to abrogate common law product liability causes of action.  As noted above, ***the*** [***2007 Amendment***] ***intended to clarify the legislature***[***'***]***s original intent of including public nuisance claims within the OPLA***.

*Id.*  The Opposition relegates *Sherwin-Williams* to a footnote and seeks to diminish its significance on the basis that it was not appealed, has never been cited, and does not consider the County's statutory interpretation arguments.  But the County misses the big picture:  This

---

[12]  Seeking equitable relief does not transform a legal claim into an equitable one.  *See, e.g.*, *City of Niles v. Evans*, 136 N.E.2d 177, 181 (Ohio Ct. Com. Pl., Trumbull Cty. 1955) (noting that equity may "help where the legal remedy is incomplete"); *Salem Iron Co.*, 77 N.E. at 752 ("That nuisances are frequently enjoined results from the fact that they are frequently, if not usually, of such a nature as to present one of the recognized grounds of equitable jurisdiction ….").

decision put a stop to the ongoing, statewide lead paint litigation because the Attorney General dropped the State's case, and every municipality that had sued did the same. Br. 24. Since *Sherwin-Williams*, few litigants have even attempted to bring product-based public nuisance claims, and the claims of those that have readily were dismissed. *See, e.g.*, *Hempy v. Breg, Inc.*, 2012 WL 380119, at *2 (S.D. Ohio Feb. 6, 2012).[13]

Third, the County argues that language from the 2005 Amendment limiting product liability claims to claims seeking "compensatory damages" should be imported into the wholly separate definition added by the 2007 Amendments, Opp. 20, but offers no sensible explanation why. The 2005 Amendment defined product liability claims as claims for "compensatory damages." Ohio Rev. Code § 2307.71(13). The 2007 Amendment defined a separate category of product liability claims, one that did not include the "compensatory damages" limitation. If the General Assembly intended the County's interpretation, it would have been a simple matter to include the limitation as part of the 2007 Amendment. *See Arcenio v. Youngstown State Univ.*, 68 N.E.3d 157, 164 (Ohio Ct. App. 2016) (holding the exclusion of statutory language was a "deliberate choice, not inadvertence" where the two statutes are "sufficiently related").

### 2. Statutory public nuisance.

The County argues that the OPLA abrogates only common law nuisance claims, not statutory public nuisance claims. Opp. 19. Not so. The 2007 Amendment states:

> "Product liability claim" also includes any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public.

Ohio Rev. Code § 2307.71(A)(13). The County misconstrues the definition by reading its two

---

[13]  The County also contends that the legislature did not intend to overrule *Beretta* because the 2007 Amendment was not "substantive." Opp. 20. The 2007 Amendment was not substantive because it merely clarified the General Assembly's original intent to include public nuisance claims within the scope of the 2005 Amendment, which plainly was substantive.

halves—"any public nuisance claim *or* cause of action at common law"—as one and the same. In so doing, it ignores two basic rules of statutory construction.

First, in Ohio, "[r]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent." *Indep. Ins. Agents of Ohio, Inc. v. Fabe*, 587 N.E.2d 814, 817 (Ohio 1992). According to the last-antecedent rule, the limiting clause "at common law" modifies only the phrase "cause of action"—not the phrase "public nuisance claim." Thus, the OPLA term "product liability claim" encompasses "any public nuisance claim," including statutory public nuisance claims.

Second, not applying the last-antecedent rule would fail to give effect to, and render superfluous, portions of the statute, thereby contravening the well-settled rule against surplusage. *See State ex rel. Carna v. Teays Valley Local Sch. Dist. Bd. of Educ.*, 967 N.E.2d 193, 198 (Ohio 2012). If "at common law" modified both "any public nuisance claim" and "cause of action," then the phrase "any public nuisance claim" would be redundant; it would add nothing to the phrase "cause of action at common law."

### B. The County's Absolute Public Nuisance Claim Fails in Any Event.

Even without the OPLA (i.e., even if *Beretta* were good law still), the County's absolute public nuisance claim fails for two reasons. First, the County still has not identified a public right with which Distributors interfered and suggests instead that a "significant interference with public health"—a measure of unreasonableness, not a category of public right—is sufficient. Second, the County misunderstands that licensed persons cannot be liable for *absolute* nuisance (as distinct from *qualified*, which they have not pled), especially absent intentional conduct.

#### 1. There is no public right to be free from addiction.

As the Opposition rightly recognizes, conduct allegedly constituting a public nuisance must "interfere with those who come in contact with it *in the exercise of a public right*." Opp.

19

11; *Brown*, 622 N.E.2d at 1158 ("[T]here must be some interference with a public right which is common to all members of the general public."). But the County fails to identify a public right. According to the County, it pled interference with a public right by alleging that opioids have had "widespread public health consequences" and that Defendants "interfered with the public health in Akron and Summit County." Opp. 6, 10. But this argument confuses the requirement that an alleged nuisance interfere with a ***public right*** with the separate requirement that the interference be unreasonable. *See Beretta*, 768 N.E.2d at 1142 ("'Unreasonable interference' includes those acts that significantly interfere with the public health, safety, peace, comfort, or convenience."). Thus, while public nuisance law surely encompasses "acts that significantly interfere with the public health," that is true ***only if*** those acts interfere with a public right.

Interference with "public health," as that term is commonly used, may result from the invasion of public ***or*** private rights—from contaminating a public water reservoir, on the one hand, to a gas leak, on the other. The County does not satisfy the public right requirement merely by pointing to the public health consequences of Distributors' alleged conduct. A public health crisis is actionable under nuisance law only if it results from the invasion of public rights. Otherwise, the concept of "public right" would be "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it." *City of Chicago v. Beretta U.S.A., Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004).

Finally, even if some portion of *Beretta* remains good law, the County's reliance on that case fails to account for important differences between handguns and prescription opioids. Gun violence tragically and all-too-often interferes with innocent bystanders' right to travel safely on public roads and occupy public spaces, or with children's right to attend public school. *See Beretta*, 768 N.E.2d at 1151 (plaintiffs allege "an epidemic of handguns … has brought terror to

20

the streets, schoolyards, playgrounds and homes of Cincinnati"). Thus, although most of the gun cases were dismissed, the public nuisance claims presented a colorable public right. Not so here. While guns can injure innocent people exercising public rights, prescription opioids threaten no one, whether traveling on public roads or sitting at home, who does not choose to use them.[14]

### 2. Licensed distributors can be liable only for qualified public nuisance.

Ohio law recognizes two branches of common law public nuisance. Absolute nuisance, or nuisance per se, is a strict liability claim "based upon either intentional conduct or abnormally dangerous conditions," whereas qualified nuisance "is premised upon negligence." *Brown*, 622 N.E.2d at 1159. Persons (like Distributors) that engage in highly-regulated conduct cannot be liable under an absolute nuisance theory so long as they are duly licensed. *Id.* at 1158; *State ex rel. Schoener v. Bd. of Comm'rs of Hamilton Cty.*, 619 N.E.2d 2, 6 (Ohio Ct. App. 1992). The County responds that Distributors' actions "were not sanctioned by law and thus are not protected under *Brown*," Opp. 11, but this misunderstands the point of *Brown* and *Schoener*.[15] Defendants in both cases allegedly violated statutes and regulations, but nonetheless were held to be immune from liability on an absolute nuisance theory ***because they were licensed***.[16] As the *Schoener* court explained, when an agency licenses a person to engage in certain conduct, Ohio

---

[14] The County erroneously suggests that "the number of people affected … alone can establish that a public nuisance exists." Opp. 11. Settled Ohio law says otherwise. *Brown v. Cty. Comm'rs of Scioto Cty.*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993) ("Conduct does not become a public nuisance merely because it interferes with a large number of people."); *Kramer v. Angel's Path, LLC*, 882 N.E.2d 46, 52 (Ohio Ct. App. 2007) ("A public nuisance will not arise because a large number of people are affected; rather, it arises *only when a public right has been affected.*").

[15] Moreover, alleged violations of the federal CSA cannot serve as a predicate for stating a state law nuisance claim. *Buckman Co. v. Plaintiffs' Legal Cmte.*, 531 U.S. 341 (2001); *Marsh v. Genentech, Inc.*, 693 F.3d 546, 553 (6th Cir. 2012) (holding "failure to submit reports to the FDA that the FDA requires is arguably a species of fraud on the agency" that is preempted under *Buckman*).

[16] *Brown*, 622 N.E.2d at 1157 (noting that the "Ohio [EPA] cited the plant for violations"); *Schoener*, 619 N.E.2d at 4 ("Plaintiffs asserted theories of nuisance, … and violation of the Ohio Solid and Hazardous Waste Disposal Act ….").

law provides that the agency alone can police compliance with the regulatory scheme:

> [I]n order for a duly licensed and regulated sanitary landfill to be found liable for maintaining a nuisance, negligence must be established.  A standard of strict liability is not appropriate under these circumstances, where the public policy of Ohio has clearly chosen to allow operators such as Rumpke to do business in this state subject to the limitations imposed under what can only be termed a comprehensive and vigilant regulatory scheme.  ***Once an operator becomes licensed by the state, we think it fair to say in law that part of the* quid pro quo *for the submission to such exacting regulatory oversight is the operator's insulation from liability under a theory of strict liability***.

619 N.E.2d at 6.

Here, the DEA and the Ohio BOP have licensed Distributors to distribute prescription opioids to licensed pharmacies.  Therefore, their distribution can give rise only to a qualified public nuisance claim, which the County has not pled.  *Brown*, 622 N.E.2d at 1160 ("In order for a duly licensed and regulated sanitary landfill to be found liable for maintaining a nuisance, negligence must be established, i.e., a qualified nuisance.").[17]  As for an absolute nuisance claim, the County does not identify any intentional conduct by Distributors that could support it. *Brown*, 622 N.E.2d. at 1159 (absolute nuisance is "based upon either intentional conduct or abnormally dangerous conditions"); *see* Opp. 75 ("Defendants' liability arises from their failure to use reasonable care under the circumstances, not their failure to abide by … statutes.").

### C.    The Statutory Public Nuisance Claims Should Be Dismissed or Limited.

Summit County brings a statutory public nuisance claim pursuant to Ohio Rev. Code § 4729.35.  The Opposition does not dispute that Section 4729.35 authorizes only injunctive relief. Any claim for abatement costs and other monetary relief under Section 4729.35 fails.  Br. 31–32.

Akron's statutory public nuisance claim should also be dismissed.  Akron concedes that it may not bring a claim pursuant to Section 4729.35, Opp. 15, but argues it may enforce the

---

[17]   The County relies on *City of Cleveland v. Ameriquest Mortg. Sec. Inc.*, Opp. 11–12, but that was a *qualified* public nuisance case.  621 F. Supp. 2d 513, 521 (N.D. Ohio 2009).

substance of that section—which defines violations of federal and state controlled substances acts as public nuisances—pursuant to Sections 3767.03 and 715.44.  Opp. 16.  Section 4729.35 explicitly limits those who may maintain a public nuisance cause of action under the statute to "the attorney general, the prosecuting attorney *of any county* … or the state board of pharmacy." Ohio Rev. Code § 4729.35.  The County's reading contravenes clear legislative intent.

## III.  THE COUNTY'S NEGLIGENCE CLAIM SHOULD BE DISMISSED.

### A.  The OPLA Bars the County's Negligence Claim.

The County argues that its negligence claim is not a "product liability" claim under the OPLA because the County seeks only economic damages.  Opp. 88–90.  This argument elevates form over substance.  The reality is that the County's economic losses occurred only because its residents suffered personal injuries from prescription opioids.  Absent addiction of individuals and the concomitant harms caused by the addicted individuals, the County would have suffered no harm.  Had these directly harmed individuals brought negligence claims against Distributors, their claims unquestionably would be dismissed under the OPLA.  Yet the County suggests that its claim, which is identical in every respect—except that the harm is derivative and indirect— should survive.  The notion that downstream plaintiffs can bring common law negligence claims that the directly injured plaintiff is barred from pursuing is absurd.

After *Beretta*, the General Assembly amended the OPLA to abrogate all common law product liability causes of action.  Ohio Rev. Code § 2307.71(B); *see* 2004 Am. Sub. S.B. No. 80.  Ohio courts have since consistently looked askance at efforts to plead around the OPLA and, in applying the Act, focus on the nature of the allegations.  *See Stratford v. SmithKline Beecham Corp.*, 2008 WL 2491965, at *5 (S.D. Ohio June 17, 2008) ("The actionable conduct that forms the basis of the negligence claim … is the same conduct that the OPLA defines as giving rise to a 'products liability claim.'").  Where the allegations concern defective products and harm other

than to the product itself, the courts have held that the OPLA applies.  The allegations do not shed their character as a product liability claim merely because the plaintiff seeks to recover only downstream economic losses.  *Mitchell v. Proctor & Gamble*, 2010 WL 728777, at *4 (S.D. Ohio Mar. 1, 2010) ("[Plaintiffs] cannot separate out [their] claims from the purview of the OPLA simply by claiming only economic losses.").[18]

These post-*Beretta*, post-2005 Amendment cases establish the OPLA's scope.  Yet the Opposition ignores them.  It instead cites two cases for a proposition about which both parties agree—that the OPLA does not cover "claims for **purely** economic loss caused by defective products." *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996); *Volovetz v. Tremco Barrier Sols., Inc.*, 74 N.E.3d 743, 744 n.4 (Ohio Ct. App. 2016).[19]

Ultimately, the County's position highlights what Distributors have said all along: ***These are the wrong plaintiffs***.  Even assuming that Distributors caused injury by distributing opioids, then the injured users of those opioids are the proper parties. After *Beretta*, the General Assembly decided that such parties should proceed under the OPLA. To allow the County to bring a claim that those proper parties could not would frustrate that legislative judgment.

### B.    The Complaint Fails Adequately To Allege Duty.

The Opposition's argument regarding duty is flawed in four respects.  First, contrary to the County's assertion, Opp. 70, the question of whether a duty exists is not a question of fact for

---

[18]    *See McKinney v. Microsoft Corp.*, 2011 WL 13228141, at *7 (S.D. Ohio May 12, 2011) (dismissing negligence claim for purely economic damages as abrogated by the OPLA); *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 WL 1326034, at *12–13 (N.D. Ohio Apr. 6, 2011) (dismissing plaintiff's implied warranty claim for purely economic damages as abrogated by the OPLA; allowing negligent workmanship claim because it was "premised upon subsequent negligent actions").

[19]    Both cases are inapposite.  *LaPuma* involved damages that "relate[d] solely to the product itself." The concurrence made clear that the case stands for the proposition that this "very narrow class" of claims escapes the OPLA's broad abrogation of common law claims.  *Id.* at 717 (Cook, J., concurring).  *Volovetz* held that the OPLA *did* apply to the negligence claim, because the plaintiff sought "damages for property other than the defective product."  *Id.* at 744 & n.4.

the jury.  "The duty element of negligence … is a question of law for the court to determine."  *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1026 (Ohio 2002).

Second, while Distributors undeniably have regulatory obligations pursuant to state and federal law, the law is clear that (i) only the federal and state governments can sue to enforce them and (ii) there is no private right of action.  Br. 36–38.  The Opposition argues that the County relies on state and federal regulations to "inform[] the standard of care," not as establishing Distributors' duties.  Opp. 75.  But that is not what the Complaint says.  It cites the statutes and regulations for the "duties" they allegedly create.[20]  This disingenuousness aside, the County's problem is that it cannot identify a preexisting, parallel common law duty to report or halt shipment of suspicious orders.  Thus, while it may be correct that "the existence of a parallel statutory duty does not in any way undermine ***an existing common law claim***," *id.*, a duty to report suspicious orders to the DEA or the Ohio BOP has never existed at common law—it is purely a creature of statute and regulation.  If the duty were known at common law, it would be a simple matter for the County to cite an Ohio case recognizing it, yet the Opposition cites none.[21]

---

[20]  Compl. ¶ 107 (Distributors have a "fundamental duty … to detect and warn of diversion of dangerous drugs"); *id.* ¶ 684 ("In addition to the duties imposed by federal law, under Ohio law, distributors have a duty to detect, investigate, refuse to fill, and report suspicious orders of opioids.").

[21]  The Opposition misunderstands the cases Distributors cited on this point, arguing that they involved plaintiffs "specifically attempt[ing] to sue for statutory breaches."  Opp. 76 & n.49.  In fact, plaintiffs in those cases alleged negligence or negligence *per se*, and cited statutes or regulations as the ***source*** of defendants' purported duties.  Their claims failed because the statutes and regulations did not themselves create private rights of action, and allowing enforcement through common law negligence would violate legislative intent.  *Myers v. United States*, 17 F.3d 890, 901 (6th Cir. 1994); *Tekavec v. Van Waters & Rogers, Inc.*, 12 F. Supp. 2d 672, 682–83 (N.D. Ohio 1998); *see In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 2015 WL 4092866, at \*23–25 (S.D. Ohio July 6, 2015) ("[R]ecognition of state law negligence per se claims under these federal statutes is in essence permitting a private cause of action where Congress intended none to lie."); *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) (explaining state common law—not statute—must supply duty in negligence claim).  Similarly here, the County points to statutes that lack a private right of action— the federal and Ohio CSA—as the basis for its negligence claims.

Third, the Opposition fails to identify a duty running from Distributors **to the County**. The question is not whether Distributors had some duty to someone, but whether they had a duty to the County.  Br. 42–43.  According to the County, a duty runs to it merely because the harm it purportedly suffered was "foreseeable."  But the County's discussion of foreseeability relates exclusively to Manufacturers, a fact the Opposition masks by referring repeatedly to "Defendants."  The Opposition's theme is that deceptive marketing of prescription opioids encouraged their over-use and mis-use:

> Manufacturer Defendants … pursu[ed] a ***deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause***[*d*] ***their prescribing sales to skyrocket***; and mis[led] doctors and the public about the risks and benefits of opioids, including minimizing the risks of addiction and overdose ….

> The Opioid ***Marketing Enterprise*** … ***relied on front groups and key opinion leaders to spread pseudo-science that fostered opioid addiction*** ….

> Plaintiffs allege a multi-drug, ***false marketing scheme*** … ***in order to profit from increasing demand for opioids*** created by affirmatively and categorically misrepresenting the dangers of prescription opioid use.

Opp. 12, 25, 49. The Complaint alleges that Manufacturers engaged in this deceptive marketing to doctors. When the Opposition says that "Defendants ***themselves*** engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs," it cites 95 paragraphs of the Complaint that refer to alleged messaging and marketing "to encourage and pay doctors for increasing their prescriptions of opioids." Opp. 73–74. And, in summing up, the Opposition argues that "the harms resulted from the over-prescribing and over-use of opioid[s], and not only their abuse …." Opp. 74.  Thus, while the Complaint may attempt to connect the Manufacturers' alleged conduct to the alleged harm and allege that, if Manufacturers directly and deceptively marketed prescription opioids to doctors, then it was foreseeable to them that doctors would

over-prescribe the drugs, no comparable allegations connect Distributors' conduct to the over-prescription of opioids.

Had the Complaint alleged that Distributors failed to keep prescription opioids under lock and key, as required, diversion would be foreseeable.  Had it alleged that Distributors supplied the drugs to unlicensed pharmacies, diversion would be foreseeable.  Had it alleged that Distributors determined, when conducting site inspections, that a pharmacy did not have doctors' scripts to back up its orders, diversion would be foreseeable.  But the Complaint alleges none of these things.  When DEA was year after year increasing the quota for prescription opioids, Distributors had no reason to foresee harm by supplying the drugs to licensed pharmacies, which were filling legitimate prescriptions, and where DEA knew (as no Distributor did) the total amount of drugs going to each pharmacy, city, county, and state.

Finally, *Beretta* does not change this result.  The Opposition argues that *Beretta* is "squarely on point and controlling," Opp. 72, but this claims too much for a decision that the General Assembly effectively overruled, that the Supreme Court itself has not cited since for any substantive proposition, and which was out of step at the time with the great majority of "gun case" decisions.  Those considerations aside, *Beretta* is distinguishable.  The principal defendants in *Beretta* were fifteen firearms manufacturers.  762 N.E.2d at 1140.[22]  The Court held that the manufacturers had a duty to design guns in a way that would not lead to an illegal secondary market.  *Id.* at 1144.  Specifically, the Court noted that it would have been feasible for manufacturers to prevent "unauthorized users" from firing guns by incorporating safety features to "personalize" the guns (i.e., to make it impossible for anyone other than the original owner to fire the gun), thereby eliminating the illegal secondary market.  *Id*. at 1147 n.7; *see id*. at 1145

---

[22]  While there was a single distributor defendant in *Beretta*, neither the parties' briefs nor the Court's opinion provided any separate analysis relating to the duties of that defendant.

("[T]he question is whether a reasonably prudent gun manufacturer should have anticipated an injury to the Plaintiffs as a probable result of manufacturing, marketing, and distributing a product with an alleged negligent design[.]").  Only the gun manufacturers could have designed guns to "personalize" them, and the harm from failing to do so was thus foreseeable only to them.  Thus, at most, *Beretta* stands for the proposition that manufacturers have an obligation to incorporate feasible safety features into their products; it does nothing to establish a common law duty on the part of wholesale distributors to report or halt suspicious orders.

## IV. THE DIRECT INJURY TEST REQUIRES DISMISSAL OF THE NEGLIGENCE AND NUISANCE CLAIMS.

The Opposition misunderstands—and misapplies as ***to Distributors***—the test for proximate causation.  The touchstone for proximate causation is direct injury, as explained by the Supreme Court in *Holmes*.  The *Holmes* test, moreover, was adopted by the Ohio Supreme Court, as the Opposition acknowledges.  Opp. 79.  That test demands a "direct relation between the injury asserted and the injurious conduct," such that a plaintiff "who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover."  *Holmes*, 503 U.S. at 268–69.

The County is such a plaintiff because it complains of harm flowing from "the misfortunes visited upon … third person[s]."  *Id.* at 268.  "Without injury to the individual [opioid users], the [County] would not have incurred any increased costs."  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999).  Thus, ***had no County residents become addicted to opioids***—whether by reason of the Manufacturers' alleged over-promotion of the medications or otherwise—the County would have suffered no harm because it would have paid not a penny more for addiction treatment or related public services.

The Opposition falls back again on *Beretta*, asserting that "Plaintiff's injuries are even

more direct in this case than they were in *Beretta*."  Opp. 80.  The contrary is true.  The *Beretta* court reasoned that the injuries alleged by Cincinnati were direct, not derivative, because "[***e***]***ven if no individual is harmed***, Plaintiffs sustain many of the damages they allege due to the alleged conduct of Defendants fueling an illicit market."  768 N.E.2d at 1148 (quoting *City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568, at *6 (Mass. Super. Ct. July 13, 2000)).  That was because, even if no city residents were shot, the city still incurred additional law enforcement costs when criminals had more guns.  But the County makes clear that its harm results entirely from providing public services to individuals affected by opioid misuse and abuse.

Countless cases—cited by Distributors (*see* Br. 47 n.31) and ignored by the Opposition— interpret the direct-injury test for proximate causation to mean that "[t]he general tendency of the law … is not to go beyond the first step."  *Holmes*, 503 U.S. at 271.  To understand how that test applies here, however, this Court need not look further than the Sixth Circuit's application of *Holmes* in *City of Cleveland v. Ameriquest Mortgage Securities*.  The parallels between Cleveland's allegations (and rhetoric) and those of Summit County are uncanny.  Both allege a public nuisance, and both speak about an "epidemic" that has blighted communities.  In *Ameriquest*, the defendants were not the brokers who encouraged would-be homeowners to take subprime loans, nor the local banks who loaned the money, but bankers who securitized the mortgages.  And the plaintiffs were not the homeowners whose mortgages were foreclosed and who lost their houses, but the city, which complained about lost tax revenue.  Applying *Holmes*, the Sixth Circuit held that the connection between the harm to the City and the defendants' misconduct was "too indirect to warrant recovery."  615 F.3d at 506.  The Opposition argues that this case is different because the alleged misconduct "*matches the harm* [the County] suffered: by engaging in a fraudulent scheme to promote the widespread use of addictive opioids and …

29

fostering large-scale diversion, Defendants created the problem the Plaintiffs must spend money to combat."  Opp. 44 (emphasis in original).  But that purported distinction makes no difference at all, for the City of Cleveland alleged the same thing—that the defendant investment bankers engaged in a fraudulent scheme to promote the widespread use of subprime mortgages, fostering risky borrowing on a large-scale by homeowners who could not afford the mortgages and thereby creating a foreclosure problem the City had to spend money to combat.  *See Ameriquest*, 615 F.3d at 499.  This kind of connection, the Sixth Circuit confirmed, is too indirect.[23]

Just as the defendant banks in *Ameriquest* "'did not directly make subprime loans to the homeowners of Cleveland,'" Opp. 81 (quoting *Ameriquest*, 615 F.3d at 505), **Distributors** did not market and promote the use of opioid medications to doctors or patients, nor did they prescribe or dispense them.  When the Opposition attempts to distinguish *Ameriquest* by saying that "Defendants themselves inflated the demand for opioids through their fraudulent marketing," *id.*, the County is talking about Manufacturers.  By merely delivering the medications that doctors prescribed—as a result of Manufacturers' alleged fraudulent marketing—and pharmacies dispensed, Distributors are akin to the investment bankers in *Ameriquest*, who by securitizing the subprime mortgages originated by others only indirectly supplied the mortgage funding.

---

[23]  *Holmes* cited three reasons for the direct-injury rule.  The Opposition's attempt to show that those reasons are satisfied is as superficial as its attempt to distinguish *Ameriquest*. *First*, the indirectness of the County's injury does make it difficult to ascertain what expenditures are attributable to a particular Distributor. When the County responds to an overdose, does it know (and can it prove) that the overdose resulted from prescription opioids, not heroin?  If it did result from prescription opioids, how can the County attribute the drug to a particular pharmacy and Distributor? *See Ameriquest*, 615 F.3d at 506. *Second*, the court would indeed have to "adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury," not only because personal injury plaintiffs have sued, and continue to sue, but also because the plaintiff political subdivisions are not distinct, but overlap in geographical jurisdiction. *Third*, the directly injured victims (i.e., the drug users) have sued in the past and can sue now. *Id.* So can the States, which have *parens patriae* authority. In any event, "all three factors do not need to be present for remoteness to bar discovery."  *Id.* at 503.

Just as "home buyers chose to enter into a subprime mortgage and to default on their loans" and mortgage holders "chose to begin the foreclosure process" for "a variety of reasons unrelated to the Defendants," *Ameriquest*, 615 F.3d at 505, so too patients sought pain medications and doctors prescribed them for a variety of reasons unrelated to Distributors' delivery of prescription opioids to pharmacies.  And just as the alleged damages to Cleveland from the wave of foreclosures—"eyesores, fires, drug deals, and looting—were also not directly caused by the Defendants," so too here the public expenditures related to an upsurge in opioid addiction, which "could have occurred for 'any number of reasons unconnected to the asserted pattern of [misconduct],'" were not directly caused by Distributors' alleged conduct.  *Id.* (alteration in original) (quoting *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 458 (2006)).

This failure to distinguish between Distributors and Manufacturers also explains the County's mistaken analysis of superseding cause.  The Opposition does not dispute (i) that acts of diversion (e.g., a doctor's decision to write an improper prescription for commercial gain; a patient's sale of pills; or the theft of pills) necessarily occur after a Distributor supplies the pharmacy, and (ii) that diversion inherently involves illegal conduct.  The Opposition simply argues that the illegal conduct is foreseeable, and therefore not a superseding cause—an argument that goes astray for three reasons.

First, under the Holmes direct injury test (which has been adopted as the common law of Ohio), a complaint should be dismissed for failure to allege proximate causation, even where the injury was allegedly foreseeable, if it was not also the direct consequence of the defendant's wrongdoing.  *See supra* pp 9–10.

Second, the County ignores the traditional presumptions about the foreseeability of criminal conduct that are built into Ohio common law.  The Opposition, in discussing

foreseeability, cites *Queen City Terminals, Inc. v. General American Transportation Corp.*, 653 N.E.2d 661 (Ohio 1995), a decision that did not involve criminal conduct, and fails to quote the controlling language in *Feichtner v. Ohio Department of Transportation* about intervening criminal conduct (below):

> [T]here is no common-law duty to anticipate or foresee criminal activity. Thus, ***the law usually does not require a prudent person to expect the criminal activity of others***…. [O]nly when the totality of circumstances is "somewhat overwhelming" will a defendant be held liable for the criminal actions of a third party.

683 N.E.2d 112, 119–120 (Ohio Ct. App. 1995) (quoting *Fed. Steel & Wire Corp. v. Ruhin Constr. Co.*, 543 N.E.2d 769, 772–73 (Ohio 1989)).

The same presumption holds when the intervening conduct is not illegal, but intentional:

> ***Traditionally, an intentional tort committed by a third party constitutes an intervening act which supersedes the negligence of the party creating the risk of harm***, and relieves that party from liability. … [T]he intentional act is considered a superseding cause because ***such acts are typically not foreseeable***.

*Volter v. C. Schmidt Co.*, 598 N.E.2d 35, 39 (Ohio Ct. App. 1991) (per curiam).

Third, the County plausibly argues only that Manufacturers could have foreseen the illegal conduct:  Doctors' decisions to prescribe opioids "were the intended, actual, and entirely foreseeable **result** of the Manufacturer Defendants' fraudulent conduct."  Opp. 83; *see* Opp. 84 ("Widespread addiction was also an entirely foreseeable consequence of the Manufacturer Defendants' misrepresentations that opioids are rarely addictive….").  These arguments do nothing to establish that the alleged harm was foreseeable **to Distributors**.

## V.    THE ECONOMIC LOSS DOCTRINE BARS PLAINTIFFS' NUISANCE AND NEGLIGENCE CLAIMS.

There are two lines of authority regarding the economic loss doctrine, and the Opposition confuses them.  One line reflects a concern that tort law not be used to circumvent contractual

32

remedies when contractual duties lie at the heart of the dispute.  In those cases, the economic loss doctrine refers to the principle that "a party cannot recover purely economic damages in a tort action against another party based upon the breach of contractually created duties."  *Digiknow, Inc. v. PKXL Cards, Inc.*, 2011 WL 2899600, at *1 (Ohio Ct. App. July 21, 2011).

The second line—and the one relevant here—applies the economic loss doctrine to "bar[] tort plaintiffs from recovering purely economic loss that 'do[es] not arise from tangible physical injury' to persons or property."  *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (quoting *Queen City Terminals*, 653 N.E.2d at 667).  The rationale is that "tort law does not impose an independent duty to avoid consequential economic damages."  *Id.*

The Sixth Circuit's 2017 decision in *Deutsche Bank* makes clear that the economic loss doctrine applies here.  There, as here, the plaintiff local government asserted a negligence claim and sought solely damages for economic loss.  And there, as here, the plaintiff had no contractual relationship with the defendants.  The Sixth Circuit applied the economic loss doctrine to bar the negligence claim, and that decision is controlling authority.

### A.     The Doctrine Bars the Negligence Claim.

The County argues that the doctrine does not apply because the County and Distributors do not have any contractual or commercial relationships, and "[t]he economic loss doctrine has only limited application outside this context."  Opp. 86.  The Sixth Circuit held to the contrary in *Deutsche Bank*, as did the Ohio Court of Appeals in *Cleveland v. JP Morgan Chase Bank, N.A.*, 2013-Ohio-1035, ¶ 28.[24]  The County attempts to distinguish *Deutsche Bank* on the ground that it involved a qualified public nuisance claim and "[c]laims for qualified public nuisance and

---

[24]     The Sixth Circuit cited *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006-Ohio-5014, noting that the Ohio Court of Appeals rejected the plaintiff's argument that the economic loss doctrine "applied only in contractual disputes."  *Deutsche Bank*, 863 F.3d at 478.  Similarly, *JP Morgan* held that the doctrine barred the City of Cleveland's suit even though "the duty alleged to have been breached [was] not related to a contractual relationship."  *JP Morgan*, 2013-Ohio-1035, ¶ 28.

negligence are distinct causes of action under Ohio law." Opp. 87. But the Sixth Circuit squarely rejected this possible distinction, explaining that "qualified public nuisance mirrors a negligence tort." 863 F.3d at 477–78.

Otherwise ignoring *Deutsche Bank* and *JP Morgan*, Plaintiffs argue that they may pursue a tort claim "based exclusively upon [a] discrete, preexisting duty in tort," Opp. 86 (quoting *Clemens v. Nelson Fin. Grp., Inc.*, 2015 WL 1432604, at *8 (Ohio Ct. App. Mar. 31, 2015)), but that narrow exception does not apply here. As *Clemens* held, "exempt claims may include claims for negligent misrepresentation[.] … fiduciary duty, fraud, and conversion"; negligence claims, by contrast, cannot "escape the economic-loss rule." 2015 WL 1432604, at *8–9.[25]

Finally, the County argues that if "the economic loss had applied, Cincinnati's negligence claim [in *Beretta*] would have had to be dismissed." Opp. 87. But the County's attempt to divine by negative implication a rejection of the economic loss doctrine is unfounded. The court's opinion did not address that question, and *Deutsche Bank* rejected precisely the inference from silence that the County asks the Court to draw here. 897 F. Supp. 2d at 642.

### B.  The Doctrine Bars the Nuisance Claim.

The County argues that the economic loss rule does not apply to their "exclusively equitable absolute public nuisance claims" because they "seek only equitable relief." Opp. 22–23. As an initial matter, the County's claims are not "exclusively equitable" because public nuisance is a legal claim.[26] More fundamentally, the County's insistence that it can avoid the

---

[25] The Opposition points to Judge Lioi's restatement of general principles in *JBlanco Enter. v. Soprema Roofing & Waterproofing, Inc.*, 2016 WL 6600423, at *15 (N.D. Ohio Nov. 8, 2016), but ignores her holding, which dismissed the negligence claims as "barred by the economic loss rule," *id.* at *13.

[26] *See supra* Part II.A.1. Nor do Plaintiffs seek exclusively equitable relief. Their Complaint expressly seeks "all legal and equitable relief" for the alleged nuisance, including "compensatory and punitive damages, and all damages allowed by law." Compl. ¶ 1038; *see also id.* ¶ 996. Assuming Plaintiffs no longer seek compensatory damages, public nuisance is nevertheless a legal claim under Ohio law.

34

economic loss doctrine by seeking only equitable relief misunderstands the doctrine.  The doctrine "bars tort plaintiffs from recovering purely economic loss that 'do[es] not arise from tangible physical injury' to persons or property."  *Deutsche Bank*, 863 F.3d at 477 (alteration in original) (quoting *Queen City Terminals*, 653 N.E.2d at 667).  Application of the doctrine thus depends on the nature of the injury suffered by the plaintiff, not the type of recovery it seeks.

The economic loss rule compels dismissal of the County's nuisance claims.  In *RWP*, plaintiffs argued that the economic loss rule did not bar their claims "predicated upon an alleged 'absolute nuisance,' which is not dependent upon a showing of negligence."  *RWP*, 2006-Ohio-5014, ¶ 26.  The court held that even a claim of absolute nuisance "requires that a plaintiff sustain injury to property," not just economic damages.  *Id.*  The court thus concluded that there was "no basis for excusing application of the economic-loss rule in matters such as this where a public nuisance is alleged."  *Id.*  The same conclusion is warranted here.[27]

## VI.    THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The County's unjust enrichment arguments are unavailing.  The County concedes the absence of a transactional relationship between it and Distributors.  Opp. 96.  The County mistakenly contends that the requirement of a transactional relationship is "not the law" in Ohio.  The Ohio Supreme Court has said that it is.  *Johnson v. Microsoft*, 834 N.E.2d 791, 799 (Ohio 2005) (dismissing claim because "[t]he facts in this case demonstrate that no economic transaction occurred"); *see* Br. 50–51 (collecting cases).  The County cannot sidestep these

---

[27]    The County attempts to distinguish *RWP* by arguing that it "involved common law tort claims seeking compensatory damages for qualified public nuisance."  Opp. 22.  But there is no mention of qualified public nuisance in *RWP*.  It unmistakably is a claim for absolute public nuisance.

authorities by relying on *White v. Smith & Wesson*, 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000), which was effectively overruled by *Johnson*.  834 N.E.2d 791, 799 (Ohio 2005).[28]

The County's reliance on pollution cases is also unavailing.  *Little Hocking Water Association v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015), holds merely that a party may recover restitutionary-type relief for damage to its property where determining actual damages is not feasible—a scenario that is not relevant here.  The remaining out-of-state cases cited by the County are even further afield:  there, unjust enrichment claims were allowed to proceed only where (i) the plaintiff suffered property damage caused by the defendant, (ii) the defendant had a duty to remediate, and (iii) the plaintiff had undertaken remediation "with an intent to charge" the defendant—none of which applies here.[29]

For these reasons, and the additional reasons explained in the reply brief of the Pharmacy Defendants, the unjust enrichment claim should be dismissed.

## VII. THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

As further explained in the Pharmacy Defendants' reply, the conspiracy claim fails.[30]

## CONCLUSION

For all these reasons, the claims against Distributors should be dismissed with prejudice.

---

[28] Contrary to the County's suggestion, Opp. 98–99, *Johnson* is not limited to the antitrust context.  *See, e.g.*, *Ohio Edison Co. v. Direct Energy Bus., LLC*, No. 5:17-cv-746, 2017 WL 3174347, at *3 (N.D. Ohio July 26, 2017); *Three-C Body Shops, Inc. v. Nationwide Mut. Fire Ins.*, No. 16AP-742, 2017-Ohio-1461, ¶ 27, 2017 WL 1407304, at *6 (Ohio Ct. App. Apr. 20, 2017).

[29] *See Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 586 (W.D. Tenn. 1997); *United States v. Healy Tibbits Constr. Co.*, 607 F. Supp. 540, 542 (N.D. Cal. 1985); *cf. Moore v. Texaco, Inc.*, 244 F. 3d 1229, 1233 (10th Cir. 2001) (dismissing unjust enrichment claim where plaintiff "failed to show that … [defendant] has any responsibility for cleaning up the pollution on the property").  The one case that differs, *Evans v. City of Johnstown*, is nevertheless inapposite.  There, the court dismissed a property owners' unjust enrichment claims except insofar as plaintiffs alleged that the city had taken an easement on their properties—a theory of liability that plainly has no application here.  96 Misc. 2d 755 (N.Y. Sup. Ct. 1978).

[30] Distributors hereby adopt, as if set forth herein, the arguments made by the manufacturer and retail pharmacy defendants in the reply briefs filed by them today.

Dated:  July 13, 2018

Respectfully submitted,

/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation
and AmerisourceBergen Drug Corporation*

/s/ Geoffrey Hobart
Geoffrey Hobart
Mark Lynch
Christian Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
EMainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com
*Counsel for Cardinal Health, Inc.*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Case Management Order Number Four (Dkt. 485, May 22, 2018), the Distributors are permitted to file replies in support of their joint motions to dismiss totaling 90 pages across the following five local government cases set for briefing:

- *Summit County, Ohio, et al. v. Purdue Pharma, L.P., et al.*, No. 18-op-45090;
- *City of Chicago, Illinois v. Cardinal Health, Inc., et al.*, No. 18-op-45281;
- *Cabell County Comm'n, West Virginia v. AmersourceBergen Drug Corp. et al.*, No. 17-op-45053;
- *County of Monroe, Michigan v. Purdue Pharma L.P., et al.*, No. 18-op-4515;
- *Broward County, Florida v. Purdue Pharma L.P., et al.*, No. 18-op-45332;

This brief adheres to the limits set forth in Case Management Order Number Four, as it is the Distributors' first brief in the above cases and it totals 36 pages.

*/s/ Ashley W. Hardin*
Ashley W. Hardin

## CERTIFICATE OF SERVICE

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Ashley W. Hardin*
Ashley W. Hardin