# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | ) ) ) | **CASE NO. 1:17-MD-2804** |
| | ) | **SPECIAL MASTER COHEN** |
| **THIS DOCUMENT RELATES TO:** "*Track One Cases*" | ) ) ) ) | |
| | ) | **DISCOVERY RULING NO. 3** |
| | ) | |

On June 30, 2018, the undersigned issued *Discovery Ruling No. 2* (docket no. 693), which set certain parameters regarding the scope of discovery. Specifically, *Discovery Ruling No. 2* identified the temporal scope, geographic scope, product scope, and other requirements that applied to defendants' discovery production obligations.

In the wake of that *Ruling*, the Special Master received numerous letters from various defendants seeking reconsideration. Some of these submissions included confidential draft objections that, defendants stated, would be filed with the Court absent a change in ruling to further narrow the scope of discovery. Plaintiffs then responded to defendants' submissions, and some defendants replied; all told, the Special Master has reviewed about 75 pages worth of post-*Ruling* argument, not including exhibits. In light of those submissions, the Special Master now **AMENDS** his prior *Ruling* as set out below.

**Geographic Scope**

As stated in *Discovery Ruling No. 2*, "[t]he plaintiffs in the Track One cases are all located in the Northern District of Ohio, but Plaintiffs' discovery requests are largely national in scope." Docket no. 693 at 3. The Special Master concluded (and defendants largely conceded) that a national scope was appropriate for certain types of discovery, referred to as "Category One Discovery." *Id.* at 4. Specifically, the *Ruling* stated that "Defendants must produce on a national basis documents related to marketing and promotion, brand planning and strategy, sales training and sales bulletins, prescriber educational materials, distribution monitoring, advocacy groups, speakers bureau programs, continuing medical education, diversion, suspicious order reports, adverse event reports, and regulatory activity. The defendants' policies and actions regarding all of these subjects are (and were) primarily centralized and over-arching, applying broadly to their opioid products." *Id.*

The *Ruling* further addressed "Category Two Discovery," which "related to decentralized, customer-specific materials, such as sales call notes and transactional data." *Id.* Plaintiffs argued for at least a regional, if not national scope, while defendants sought "to limit geographic production of these materials to Ohio, where plaintiffs in the Track One cases are located." *Id.* The Special Master entered "a compromise ruling: defendants shall produce customer-specific information for the States of Ohio, Pennsylvania, West Virginia, Kentucky, Illinois, Georgia, and Florida." *Id.* at 5. This compromise was designed to limit the burden on defendants while still allowing plaintiffs to fully pursue their factual and legal theories, including the theory that opioids "migrate" between cities, counties, and States.

Nonetheless, defendants now unanimously implore the Special Master to limit further the

geographic scope of discovery, asserting that *Discovery Ruling No. 2* did not sufficiently account for the burden that a seven-State scope places on both defendants and other parties. Defendants note the bellwether trial scheduled for March of 2019 involves only two Ohio Counties, but there are over 650 Counties in the seven States listed in *Discovery Ruling No. 2*. Thus, not only will defendants have to produce a huge amount of transactional data and localized sales information for cities and counties whose claims are not being tried (which includes searching for documents from a great number of additional custodians), but defendants will also have to seek discovery from those non-party cities and counties as well.

Upon further reflection, the Special Master agrees that the seven-State geographic scope set out in *Discovery Ruling No. 2* is not "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Although the Special Master remains convinced that all of the evidence defendants would produce within the seven named States would have some relevance to the bellwether trial,[1] this scope is not proportional to the greatest needs and burdens of the parties

---

[1] The Special Master admits that *Discovery Ruling No. 2* was entered with one eye toward future bellwether cases and also State-court litigation – in other words, with ensuring plaintiffs and defendants begin now with discovery for *other* cases that have a fair chance of going to trial. This *Discovery Ruling No. 3* reflects a much-sharper focus on pursuing only the discovery that is absolutely necessary and appropriate for the bellwether trial cases. To some extent, the smaller geographic scope set out in this *Ruling* hampers plaintiffs' ability to prove their theory that opioids "migrate" between States, but the Special Master ultimately concludes the discovery burden on defendants associated with a greater geographic scope outweighs the plaintiffs' needs for discovery on this particular issue – in part because other discovery, such as ARCOS data, touches on the same theory.

3

preparing for that trial, especially in light of the Court's tight trial schedule.

Accordingly, the Special Master amends *Discovery Ruling No. 2* as follows. The national scope for Category One Discovery is unchanged. The geographic scope of Category Two Discovery is now changed to include only Cuyahoga and Summit Counties. This change is designed to produce a substantial reduction in discovery burden on the defendants.

**Temporal Scope**

In addition to asking the undersigned to place additional limits on the ***width*** of discovery (geographic scope), defendants also ask for additional limits on discovery ***depth*** (temporal scope). In *Discovery Ruling No. 2*, the Special Master acknowledged that "[t]he question of temporal scope is the most difficult of the issues" raised by the parties. Docket no. 693 at 8. Ultimately, the Special Master ruled that:

- manufacturer defendants shall produce Category One Discovery and Category Two Discovery with a cut-off date of one year prior to the launch date of the opioid product in question.

- manufacturer defendants shall produce Category One Discovery and Category Two Discovery for generic opioids with a cut-off date of one year before it first sold that generic product.

- manufacturer defendants shall produce transactional data (which is otherwise in Category Two) and Suspicious Order Reports (which is otherwise in Category One) with a cut-off date of January 1, 1996.

- distributor defendants shall produce transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996.

- distributor defendants shall produce all other discovery with a cut-off date of January 1, 2006.

*Id.* at 10-11. These rulings recognize that even decades-old procedures, polices, and actions may

4

be highly relevant to show important background, and even the actual causes, of the current tidal wave of opioid use in the United States. *See In re Welding Fume Products Liab. Litig*., 2010 WL 7699456 at *19 n.104 (N.D. Ohio June 4, 2010) (concluding that "certain historical documents discovered from defendants, trade organizations, and other entities dating back several decades" were relevant and admissible); *id.* at *89 ("a document that tends to show, for example, that a defendant knew in 1940 that exposure to welding fumes can cause brain damage is highly relevant; the fact that the document was created before the plaintiff was ever exposed to welding fumes does not reduce the document's relevance. To the contrary, the document is arguably more probative given its age, because it shows the defendant knew of the hazard in time to craft a meaningful warning for the plaintiff . . . .").

The Special Master recognized in *Discovery Ruling No. 2* that "the earlier the cut-off date for document production, the more burdensome is the discovery request on defendants, and potentially the less relevant," docket no. 693 at 8, and accordingly set different cut-off dates for different types of discovery using careful "calculation with an eye toward providing plaintiffs with evidence they need but no more than that, and with as little burden on defendants as this measure allows," *id.* at 10. Defendants assert the temporal scope described above is still "too deep," and argue again that the cut-off dates should be much sooner, such as 2006 or 2013. The Special Master rejects this argument for reconsideration. As noted, "Plaintiffs provide data showing opioid prescriptions and distributions began to increase dramatically in 1995, which is when Purdue launched Oxycontin." *Id.* at 9. If plaintiffs, the Court, and a fact-finder are only allowed to see (for example) evidence of Suspicious Order Reports ("SORs") beginning in 2006, but defendants determined whether an Order was Suspicious based on Orders placed in 2005, then the important

5

beginning of the story is completely missing. See 21 C.F.R. §1301.74(b) (defining Suspicious Orders as "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."). The cut-off dates set out above do tailor the defendants' burden. The fit may not be perfect, but it is entirely "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Finally, to the extent defendants insist these cut-off dates "compound" their burden because of the seven-State geographic scope, the Special Master has entirely relieved that compounding burden.

**Scope of Products and Prior Productions**

Defendants also offer arguments objecting to earlier rulings on the scope of opioid products that are subject to discovery ("all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act," including "branded, unbranded, and generic drugs"), and to the scope of prior discovery productions ("If a defendant produced discovery in any prior litigation that involved the marketing or distribution of opioids, that discovery must be produced in the MDL."). *Id.* at 3, 6.[2] Put simply, the Special Master finds well-taken none of the defendants' arguments for reconsideration. The Special Master find especially non-meritorious the argument that, because *Discovery Ruling No. 2* made explicit that discovery regarding **generic** products is relevant and must be produced, defendants will now have to "re-collect and re-review" various documents. It is and always has been clear that plaintiffs "allege theories of liability based on the manufacture, sale, or distribution of generic drugs," *id.* at 2, so defendants cannot use their earlier failure to undertake appropriate discovery to now claim excessive burden.

---

[2] Given some apparent confusion by a few defendants, the Special Master makes clear that this ruling includes discovery related to Schedule II drugs during earlier periods of time when they were listed as Schedule III drugs (e.g. hydrocodone combination products).

6

**Pharmacies**

The disputes resolved in *Discovery Ruling No. 2* were raised by the manufacturer and distributor defendants. The Special Master did not ask for position papers from the *pharmacy* defendants because "their meet-and-confers with plaintiffs [were] ongoing." *Id.* at 12. Still, all of the relevant factors regarding discovery from the pharmacies appeared likely to be much the same as for the other defendants. Thus, the Special Master stated in *Discovery Ruling No. 2* that he "expects the pharmacy defendants will adhere to the rulings set out above and will not bring a similar dispute to the undersigned unless there is very good cause for a different outcome." *Id.* at 12-13.

Four of the pharmacy defendants have since written the Special Master, asserting there is, in fact, good cause for different rulings. All of their arguments, except two, rehash those made by the manufacturer and distributor defendants. First, the pharmacies assert they were denied due process because the rulings in *Discovery Ruling No. 2* will apply to them even though they were not given a chance to submit position papers. This argument fails for two reasons: (1) the pharmacies' arguments regarding geographic, temporal, and product scope are almost entirely contiguous with those made by the manufacturers and distributors; and (2) more importantly, the Special Master has now read the pharmacies' position papers and issues this *Ruling* having considered their arguments.

Second, and more substantively, the pharmacies argue their discovery obligations should be more limited because, unlike the distributor defendants, they distributed opioids only to their own retail stores. The Special Master rejects this argument. The distribution function of a national retail pharmacy implicates exactly the same anti-diversion obligations as any other distributor defendant. The fact that a national retail pharmacy distributes opioids only to its own "captive" retail outlets,

7

as opposed to a wholesale distributor that sells opioids to independent customers, does not substantially change the duties the retailers shoulder, the nature of the claims they face, or the discovery that is relevant to those claims. Wholesale distributors and retail pharmacies occupy different points in the opioid supply chain, but the theories of liability each type of defendant faces in this litigation are essentially the same. *See Summit County* Second Amended Complaint (docket no. 513) at 148 ("defendants throughout the supply chain deliberately disregarded their duties to maintain effective controls and to identify, report, and take steps to halt suspicious orders;" and "the failure of [all of] the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, breached both their statutory and common law duties.") (emphasis added, some capitalization changed).

Accordingly, the Special Master declines to impose different discovery obligations on the pharmacy defendants than on the other distributor defendants.

**Other Rulings**

The letters received by the Special Master after issuing *Discovery Ruling No. 2* raised several other disputed matters, such as the scope and timing of 30(b)(6) depositions, sufficiency of identification of fact witnesses and document custodians, choice of document search terms, and so on. For the most part, these other matters are not wholly joined. To provide some guidance, however, the Special Master offers these directives:

- Dates offered for 30(b)(6) depositions that principally seek other sources of discovery (e.g., the topic is the structure of defendant's sales department and personnel, as opposed to the topic is defendant's own epidemiological research) should be set as soon as possible.

- In light of the amended ruling on geographic scope contained in this *Ruling*, each defendant must name appropriate document custodians for Ohio.

8

- Document search terms of single common words (e.g., produce documents that contain the words "opioid" and "analysis") are often unhelpful. Document search term design should be more refined (e.g., produce documents that contain the boolean phrase "analysis and ('opioid' within 10 words of 'addict!')"), and preferably should include Technology Assisted Review.

**Objections to *Discovery Ruling No. 2* or this *Discovery Ruling No. 3***

Federal Rule of Procedure 53(f)(2) sets a period of 21 days for parties to object to a ruling by a Special Master. The deadline for objecting to *Discovery Ruling No. 2* would therefore be July 21, 2018 (which is a Saturday). Because this *Ruling* amends *Discovery Ruling No. 2*, and because the parties' letters indicate they have already formed their objections, the Special Master rules that parties must file any objection to *Discovery Ruling No. 2* or *Discovery Ruling No. 3* on or before July 24, 2018. A successful objection must demonstrate abuse of discretion. *See* Fed. R. Civ. P. 53(f)(5); *Order of Appointment* (docket no. 69) at 5.

     **RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**Dated: July 17, 2018**