# EXHIBIT 3

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

Donna M. Welch, P.C.
To Call Writer Directly:
+1 312 862 2425
donna.welch@kirkland.com

300 North LaSalle
Chicago, IL 60654
United States

+1 312 862 2000

www.kirkland.com

Facsimile:
+1 312 862 2200

July 11, 2018

*Via Electronic Mail*

Special Master David Cohen
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, OH 44113-1837
david@specialmaster.law

Re:    *In re National Prescription Opiate Litigation*, MDL No. 2804

Dear Special Master Cohen:

As discussed briefly on the discovery teleconference yesterday, I write on behalf of Defendant Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) ("Allergan") as well as the other Manufacturer Defendants, with respect to your June 30, 2018 Discovery Ruling No. 2 ("June 30 Ruling"). We appreciated your comments during the discovery teleconference yesterday, and your indication that you are thinking anew about the scope and implications of the June 30 Ruling.

Under the current schedule, fact discovery closes on August 31, 2018. The June 30 Ruling, however, has exponentially increased the scope of discovery required to be produced by the Manufacturer Defendants—imposing a significant burden, jeopardizing the August 31 deadline, and endangering our ability to adequately defend our clients' interests. As a threshold matter, discovery under the Federal Rules must be limited in a manner that is proportional to the needs of the case while also considering the burden on the parties. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is . . . proportional to the needs of the case, considering . . . the parties' resources . . . and whether the burden or expense of the proposed discovery outweighs its likely benefit.").[1]  Further, due process requires that the

---

[1]    Chief Justice John Roberts, "2015 Year–End Report on the Federal Judiciary," Dec. 31, 2015, at 7, *available at* http://www.supremecourt.gov/publicinfo/year-end/2015year-endreport.pdf. (remarking on the amendments to the Federal Rules of Civil Procedure that added the proportionality requirement, "[T]he pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery. The key here is careful and realistic assessment of actual need. . . The amended rules accordingly emphasize the crucial role of federal judges in engaging in early and effective case management.")

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 2

Manufacturer Defendants be afforded the ability to conduct discovery sufficient to provide them the opportunity to be heard and to defend against Plaintiffs' claims.  *See Grannis v. Ordean*, 234 U.S. 385, 394 (1914) ("The fundamental requisite of due process of law is the opportunity to be heard."); *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal citation omitted).

As the June 30 Ruling acknowledges, the newly-ordered production imposes a significant burden.  *See* June 30 Ruling at 8 ("Obviously, the earlier the cut-off for document production, the more burdensome is the discovery request on defendants, and potentially the less relevant."). Despite that burden, Manufacturer Defendants have already begun to undertake significant efforts to comply with the Ruling.  And, as described in more detail in Exhibit D to this letter, some Manufacturer Defendants have proposed compromises to Plaintiffs that would comply with the spirit of the Ruling while maintaining August 31 as a realistic deadline.  Those proposals (which by nature must be tailored to specific defendants) include, for example, expanding search terms, adding additional custodians, and broadening the applicable date range, among other efforts. Those significant efforts aside, the prejudice to the Manufacturer Defendants in complying, goes well beyond burden.

For example, to date, Allergan has been served with a Rule 30(b)(6) notice of deposition that includes 48 detailed topics (and many detailed sub-topics), and which purports to seek testimony on every opioid product ever sold by Allergan or its predecessors for a period of nearly three decades, even though Allergan no longer owns the vast majority of these opioids and has not marketed others for over a decade.[2]

Plaintiffs also have notified Allergan that they are moving forward with subpoenas/notices of 10 individual witnesses employed or formerly employed by Allergan and have unilaterally issued subpoenas/notices before consulting with Allergan's counsel—notwithstanding the clear requirements of the Court-ordered deposition protocol.  *See* Dkt. No. 643 at § I.b ("Absent extraordinary circumstances, counsel for the noticing party should consult in advance with counsel for the deponent in an effort to schedule depositions at mutually convenient times and locations.").[3]

---

[2]  Plaintiffs originally served a 30(b)(6) notice on Allergan on June 4, 2018.  That notice was subsequently amended three times, with the operative notice not being served until July 1, 2018.  Although the July 1, 2018 notice raised the number of topics to 48, substantially revised or replaced the earlier topics, and added over 50 new subtopics, Plaintiffs nonetheless complained to the Special Master that they had not yet received a date for testimony. Despite this, Allergan has identified a witness and provided a date for testimony on 31 topics.

[3]  Indeed, Plaintiffs served these subpoenas at several witnesses' personal residences without attempting to procure cooperation from Allergan and inappropriately contacted several witnesses who are currently represented or in

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 3

Under any standard of reasonableness, these witnesses should not be deposed until custodial files are reviewed and non-privileged documents are produced; while this is well underway, given the breadth of the June 30 Ruling, custodial files likely cannot be produced in full for these witnesses until mid-August or even later.

Nonetheless, Plaintiffs are pushing aggressively for dates for these depositions within the next three weeks. Without relief, given the scope of additional production contemplated by the June 30 Ruling, Allergan will be forced to prepare (as best they can, without sufficient time and documents) witnesses to testify regarding decades of time and multiple products—for which they have only just begun to collect documents and about which there are **no allegations** in Plaintiffs' complaints. It is a violation of due process to require Allergan or the other Manufacturer Defendants to prepare and present witnesses before having an opportunity to (1) review these underlying documents and (2) understand the allegations against them.[4] *See Simon v. Craft*, 182 U.S. 427, 436 (1901) ("The essential elements of due process of law are notice and opportunity to defend. In determining whether such rights were denied we are governed by the substance of things, and not by mere form.").

Other Manufacturer Defendants have likewise received sweeping 30(b)(6) and individual deposition notices. As a further example, Plaintiffs served Teva[5] with a Rule 30(b)(6) deposition notice that seeks testimony on 50 extraordinarily broad topics, from five separate corporate entities. Combined with the June 30 Ruling, this Rule 30(b)(6) notice requires Teva to educate a witness or witnesses to testify in detail as to virtually all departments within the various corporate entities—regulatory, compliance, medical affairs, pharmacovigilance, sales, marketing, finance, legal, government affairs, and suspicious order monitoring—going back two decades and concerning more than 20 products. Teva compromised on Plaintiffs' request for documents relating to generics, and Plaintiffs have since disingenuously characterized this compromise as a

---

the process of obtaining representation. Allergan is nonetheless in the process of obtaining dates for their depositions.

[4] As discussed on the call today, the prejudice to the Manufacturing Defendants will also be compounded if Plaintiffs are allowed to take depositions now, and then complain that they need additional time with witnesses after documents have been produced. Plaintiffs should be ordered to proceed with depositions of a witness once, after the production of documents and, if they chose to proceed without the benefit of complete productions, they should forgo any additional questioning of defendant witnesses. *See* Dkt. No. 643, Order Establishing Deposition Protocol at Section I f.2 ("Depositions taken in this MDL pursuant to this Order shall not be retaken in this MDL without further order of the court upon good cause shown or an agreement of the parties.")

[5] "Teva" includes Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 4

concession that Plaintiffs have stated a claim as to generics.  Still, the combination of the expansion of products covered by the request and the newly-ordered time period is entirely untenable.

Mallinckrodt LLC ("Mallinckrodt") likewise was served with a 30(b)(6) notice on July 1, unilateral notices for depositions of six individual fact witnesses, and a request for deposition availability just this past Friday for a seventh individual witness.  The June 30 Ruling directly affects Mallinckrodt's ability to schedule and prepare its witnesses for deposition.  For example, Plaintiffs have demanded that witness custodial files such as emails be provided based on search terms.  However, Plaintiffs have insisted upon a list of over 7,300 words comprising over 200 search strings to date—many of which track the expanded list of products that the June 30 Ruling has encompassed in its scope.  That gargantuan list of search terms, combined with the lengthy time period encompassed by the June 30 ruling, multiplies by many times the volume of documents that Mallinckrodt would be required to review.  This is particularly true in light of the fact that, as a generics manufacturer, Mallinckrodt sold certain generic product lines decades before any conceivable statute of limitations reference point.  That compounded combination of expansive time periods, product lines, and search terms—buoyed by the June 30 Ruling, and sheer document volume—is making it not only burdensome, but practically infeasible, for Mallinckrodt to conform with the Court-ordered fact discovery framework.

Taking a step back, the Track One Plaintiffs allege that demand for opioids was improperly increased by alleged fraud, and by alleged lack of diversion controls.  With respect to the first theory of the Track One Complaints, Mallinckrodt has already agreed to provide documents regarding its marketing of opioids generally, as well as regarding Mallinckrodt's opioid products, in accordance with the Track One Plaintiffs' latest proposed definition of the term "Marketing." With respect to the second theory of the Track One Complaints, Mallinckrodt has already agreed to provide documents regarding its opioid diversion controls, including all of the documents that Mallinckrodt previously produced to the DEA in connection with its extensive dedicated investigation of precisely that subject matter.  But what appears to have occurred is that these two theories are not translating into a practical set of demanded search terms in light of the June 30 Ruling.  For example, there is a wide disconnect between the Track One Plaintiffs' claims and their search terms asking Mallinckrodt to review emails for any and all documents containing the words "Methadose" (an addiction treatment drug) or any other one of Mallinckrodt's 17 listed opioid products or any other manufacturers' opioid product names, on the one hand, and words such as "gorilla" or "aids" or "program" or "report" or "meeting" or "daily" or "sales rep" or "video" or "magazine" or "analysis" or "union" or "nurse" or "duration," on the other hand— anywhere in the document—to give just a small sampling of examples.  Mallinckrodt has already provided Plaintiffs with six productions totaling nearly 600,000 pages, with another production set to go out this week, and a further production planned to go out the following week.  It is not practical for Mallinckrodt to conform to this expanded discovery framework—while endeavoring to locate, collect, and produce documents while simultaneously preparing witnesses regarding

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 5

products and time periods and purported search terms for which the Track One Complaints are entirely and conspicuously silent, including many of Mallinckrodt's generic products sold in the 1990s throughout the United States.

Purdue has also been served with an overly broad 30(b)(6) notice on 50 broad subjects and purporting to cover decades of time, all while Plaintiffs are simultaneously demanding the broad production of tens of millions of pages of discovery. Collecting and reviewing that discovery is part and parcel of the preparations necessary for a 30(b)(6) deposition, and to demand that it occur all at once works unfair prejudice on Purdue's ability to meaningfully prepare its defenses, at the expense of due process. Purdue has nonetheless worked around the clock to produce thus far millions of pages of documents covering broad categories of company departments and substantive subjects.

Endo received a 30(b)(6) notice on July 1 that includes 50 topics, many of which have multiple subparts or are otherwise so broadly described that they constitute multiple discrete topics that should be separately enumerated and counted. Like the notices to other Manufacturer Defendants, the notice to Endo seeks testimony about nearly every aspect of Endo's operations relating to all opioid medications and covers effectively the entire duration of the company's existence. Plaintiffs are demanding that Endo produce witnesses on these topics this month. Doing so is impossible. Indeed, for many topics, producing a witness prior to August 31 is not achievable absent substantial narrowing and clarification by Plaintiffs. Many opioids about which testimony is sought have not been marketed or sold by Endo in years, and given turnover at the company, there are no knowledgeable witnesses readily accessible to Endo. Endo has only begun its investigation into the medications implicated by the June 30 Ruling, many of which are not even mentioned in the Track One complaints and none of which are the subject of substantive allegations.

The substantial prejudice and burden—both relating to collecting, reviewing and producing documents, and then to preparing witnesses to testify regarding such documents—is discussed more specifically below. The burden of these newly-imposed discovery obligations, compounded by the extremely aggressive litigation schedule, deprives defendants of their due process rights. This deprivation is particularly disturbing given Plaintiffs' refusal to provide discovery with respect to even the most basic elements of their claims. As just one example, we have never been involved in a case where plaintiffs asserting fraud-based claims have refused even to identify the parties who supposedly received and relied upon the alleged fraud, much less identify what fraudulent statements were made to them and explain their basis for alleging that that fraud caused them harm. We expect to address these truly-extraordinary issues with you shortly with a request for a ruling, but we think this context is important to provide in connection with the instant request.

## KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 6

### *Scope of Products Subject to Discovery*

With only approximately **60 calendar days** left of fact discovery, the June 30 Ruling greatly expanded the burden on Manufacturer Defendants to collect, review and produce non-privileged documents regarding products that are not the subject of Plaintiffs' allegations. For example, on its face, the June 30 Ruling requires Allergan to produce documents relating to Norco®—a branded Schedule II opioid that has not been promoted since 2003 and that is not the subject of a single allegation of wrongdoing in Plaintiffs' Track One Complaints.[6] Likewise, the June 30 Ruling could be read to require Allergan to produce documents relating to other Schedule II products that are not even mentioned in the Track One Complaints. Moreover, the June 30 Ruling could be read to include Schedule II generic opioids that Allergan no longer owns (for which the documents, employees and data went to Teva).

Accordingly, compliance with the strict terms of the June 30 Ruling as including all Schedule II opioids (both branded and generic) would require the re-collection and re-review of dozens of non-custodial sources for which collection had already been completed (*e.g.*, the collection of additional hard-copy documents from Iron Mountain). In addition, applying the tens of thousands of search terms Plaintiffs have proposed relating to the other Schedule II opioids would result in millions of documents that would need to be loaded, reviewed and potentially produced. Similarly, strict compliance with the June 30 Ruling would require the re-review of tens if not hundreds of thousands of custodial documents to determine which involve Schedule II opioids that are now within the scope of discovery. Even if Allergan were able to complete this discovery by August 31—which it does not believe is possible—it would be severely prejudiced in its ability to prepare witnesses and to defend itself on the current schedule.

Other Manufacturer Defendants are likewise faced with similar burden and prejudice.[7] For Janssen Pharmaceuticals, Inc., for example, the June 30 Ruling added Tylox to the permissible scope of discovery—a combination opioid from 1984 indicated for acute pain that Janssen discontinued in 2012 after the FDA changed dosing limits on Tylenol, which was a non-opioid component of Tylox. The time and expense of locating, collecting, and reviewing documents from a 34-year-old discontinued product far exceeds any potentially probative value to the allegations in Plaintiffs' complaints. Although it is public knowledge that Janssen manufactured Tylox,

---

[6]   Indeed, as described in detail in Allergan's June 12, 2018 letter to the Special Master, there are only two references to Norco® in each of the Track One Complaints, and these are merely passing references that "Actavis"—a conglomeration of entities, some of which are no longer affiliated with Allergan—manufactured Norco®. There is not a single allegation relating to misconduct with respect to the marketing or sale of Norco®.

[7]   Allergan and the other Manufacturer Defendants will be prepared to submit affidavits supporting the burden associated with compliance, to augment the record.

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 7

Plaintiffs chose not to even identify the combination drug after amending their complaint twice. Because of this undoubtedly intentional omission, Janssen long ago planned and organized its discovery efforts around three opioids and not four.  It is simply not possible to conduct the same investigation into Tylox and complete any serious discovery effort by the close of fact discovery. To date, Janssen has produced over 500,000 documents relating to Duragesic, Nucynta, Nucynta ER, and opioids generally.  An attempt to identify and review Tylox-related materials would be even more complex and time consuming given that Janssen discontinued Tylox six years ago and first marketed the product when computers were in their infancy.

For Mallinckrodt, the June 30 Ruling expands the scope of document collection from the products related to the allegations in the operative amended Track One Complaints (specifically, Exalgo and Xartemis, which are the subjects of the marketing allegations as well as the products underlying the diversion allegations) to *fifteen* Schedule II opioid products listed in one paragraph of the Track One Complaint, the majority of which are not mentioned anywhere else.  The inclusion of "Methadose" in the scope of discovery is particularly notable—the product is for addiction treatment; it works to prevent opiate effects and decrease the desire to take opiates, and is irrelevant to Plaintiffs claims.  Mallinckrodt is currently endeavoring to locate and collect documents related to all fifteen products, but the inclusion of the generics products combined with Plaintiffs' overbroad demands for expansive search terms have created an exponentially larger and ever-expanding universe of documents for Mallinckrodt to locate, collect, review, and produce prior to the Court-ordered fact discovery cutoff of August 31.

For Purdue, the indisputable focus of Plaintiffs' allegations against Purdue concerns OxyContin, and Purdue has thus focused its discovery efforts on OxyContin.  Although Purdue initially objected to expanding the scope of discovery to its other products, Purdue agreed as a good faith compromise to expand the scope of its discovery to reach other of its opioid medications, Butrans and Hysingla.  Purdue also added other opioid products to its search terms to sweep in additional discovery. Purdue is already being required to re-produce discovery from other litigations, which will include extensive discovery for other of its opioid medications and should be more than sufficient.  Purdue has thus already been extremely broad with its approach to discovery and requiring it to go even further is an unworkable extreme that cannot conform to the discovery schedule.

With respect to Endo, strict compliance with the June 30 Ruling would require the inclusion of 13 additional Endo Schedule II opioids, including both branded and generic medications, many of which Endo has not marketed or sold in over a decade.  Inclusion of all such Endo opioids for all aspects of discovery is likely to require substantial additional collection of both electronic and hard copy data.  Indeed, Plaintiffs have already requested that Endo add twelve *categories* of custodians based on the June 30 Ruling's product scope decision.  Simply identifying specific pertinent custodians is itself time-consuming and labor intensive.  Particularly given the temporal

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 8

scope rulings and the dates during which Endo sold several of the opioids now at issue, there are no employees at the company familiar with Endo's operations as they relate to these many of these medications. As a result, the June 30 Ruling necessitates substantial attorney time simply to investigate sources of information before any collection or review can begin. Further, the June 30 Ruling potentially requires inclusion of all Schedule II generic opioids that have been sold by Endo's generics affiliates, Par Pharmaceutical Inc. and Par Pharmaceutical Companies, Inc. ("Par"), notwithstanding the absence of a single substantive allegation about Par in the Track One Complaints. Adding these products to discovery would likewise necessitate a massive effort to identify, collect, process, review, and produce responsive information regarding medications about which there is not a single specific allegation. The burden on Endo under the compressed discovery schedule is already monumental—Endo currently has well in excess of 150 attorneys working full time to review for production the custodial files Endo had agreed to search for responsive information prior to the June 30 Ruling.

### *Temporal Scope*

The burden and prejudice from including all Schedule II opioids—regardless of whether they are the subject of Plaintiffs' allegations—are compounded by the significant change to the temporal scope of discovery required by the June 30 Ruling. While recognizing that the earlier the start date for production, the more burdensome and potentially less relevant the discovery will be (June 30 Ruling at 8), the June 30 Ruling nonetheless ordered the Manufacturer Defendants to produce documents extending back over two or even three decades on the theory that "[t]he amounts and degree of 'unnecessary prescriptions' and the extent of the 'inappropriate increase' of opioid distribution must be measured against a time before the allegedly wrongful activity began ...." It is notable that Plaintiffs, however, have failed to identify a *single prescription* for any Schedule II opioid that was written as a result of allegedly fraudulent marketing activity or that was medically "unnecessary" or "inappropriate." *See* Ex. A & B, D. Welch letter dated June 22, 2018, and D. Ackerman response letter dated June 27, 2018; Henry J. Friendly, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267, 1283 (1975) ("There can likewise be no fair dispute over the right to know the nature of the evidence on which the administrator relies."); *Fed. Energy Regulatory Comm'n v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 769–70 (E.D. Va. 2017) ("Respondents have not yet had the opportunity to engage in their own independent discovery which, if denied without a knowing and intelligent waiver by Respondents, could implicate their due process right to be heard in a meaningful manner.") (internal citation omitted).

As one example, Allergan appropriately objected to producing documents beyond one year before it acquired and began selling Kadian®, December 2007. As a result of the June 30 Ruling, Allergan is now required to collect and review for potential production documents dating back to 1995 for Kadian® and 1996 for Norco®, as well as transactional data and Suspicious Order reports (if any) dating back to January 1, 1996—expanding the time frame for production by over a decade.

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 9

Depending on the production scope as well as any additional search terms or custodial sources or noncustodial sources, this could require the collection and review of hundreds of thousands, if not millions, of additional documents.

Other Manufacturer Defendants likewise face significant burden and associated prejudice from the expansion of the temporal scope of discovery.  As another example, for Janssen, the June 30 Ruling will require a culling of at least 2,500 Banker Boxes going back to 1983 for Tylox and 1989 for Duragesic, which could contain upwards of 10,000,000 pages.  And this early assessment of burden may expand because Janssen is still attempting to locate and assess information sources connected to Tylox.  Janssen's investigation of potentially responsive materials will continue for at least two more weeks, at which time Janssen will still have to scan and review hardcopy documents—pushing document productions related to Tylox and Duragesic past the close of fact discovery.  Even if the burden were warranted (and it plainly is not based on the allegations of the Complaint), it simply is not possible to fulfill the newly-imposed discovery obligations for an additional product and a 35-year time period within the short time that remains of the discovery period.

As yet another example, Teva had objected to collecting, reviewing and producing data from prior to 2006.  This 12-year period is appropriate, given that the longest statute of limitations potentially applicable to any of Plaintiffs' claims is five years and Plaintiffs' allegations of wrongdoing concern purported conduct that occurred ***after*** January 1, 2006.[8]  Because of the June 30 Ruling, Teva now must investigate potentially responsive documents dating back to 1998.  Not only does this require Teva to collect, review and produce additional custodial email spanning two decades, but it imposes on Teva the obligation of identifying additional data sources, including paper files and records that are not available electronically, from the late 1990s and early 2000s; locating individuals with knowledge about those data sources, nearly all of whom have left the company many years or even decades ago; exploring whether those sources contain responsive information, likely without the assistance of those who worked with or understood the data sources; and extracting data from those sources which may no longer function properly, have been overwritten, or will generate corrupted or undecipherable data.  This undertaking would substantially increase the number of documents that Teva must collect, review, and produce in an already-highly compressed period.

For Mallinckrodt, the June 30 Ruling on temporal scope likewise significantly compounds the burden of the expanded product scope.  Mallinckrodt began producing its branded products that are the subject of the Track One Complaints less than a decade ago, and as discussed, it will be providing its Marketing documents for those products and regarding opioids generally.

---

[8]     Only a single paragraph of the 1,000-plus paragraph complaints concern pre-2006 activity.

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 10

However, Mallinckrodt started manufacturing generic opioid products in the 1990s.  By expanding Mallinckrodt's product scope to generic products for which there are no substantive allegations, the Ruling also more than doubles the number of years at issue.  As discussed, Mallinckrodt is agreeing to provide its suspicious order monitoring documents regarding its generic opioid products.  However, the Track One Plaintiffs' demanded substantive search terms as applied to Mallinckrodt's documents that concern those generic opioid products goes far beyond.  To put that practical burden in context, Mallinckrodt is a 150 year old company and maintains a great deal of hard copy documents at Iron Mountain facilities.  It is an enormously burdensome process to search those hard copy records for documents dating back to the 1990s, especially in light of the complete disconnect between Mallinckrodt's generic opioid products during this time frame and any substantive allegations or claims in the Track One Complaints themselves.

For Purdue, expanding the temporal scope of discovery beyond the already very broad scope that Purdue has negotiated is overly burdensome and unworkable.  Purdue's business primarily focuses on the research, manufacturing, and selling FDA-approved opioid medications, so to require Purdue to produce decades of documents across the entire company for such a broad topic as "opioid marketing" would be akin to asking a law firm for all documents for its existence related to lawyering.  Purdue had already agreed to lift limits to the temporal scope of discovery for many document categories, such as producing all the branded marketing for OxyContin since the product was launched in 1996.

Although the burden on Purdue is already extreme, it becomes nearly impossible—especially under the extremely compressed schedule—when any reasonable limit on temporal scope is lifted for all document categories.  Old documents are not available in databases or electronic collections that can be searched but reside in boxes or obsolete systems and archives.  For custodial files, Purdue has already offered to go back to 2006, which is a huge burden given how much of the employees' emails and documents relate to opioid medications like OxyContin.  Notably, because Purdue is being required to re-produce millions of pages of documents from old discovery from prior litigations, voluminous documents going back to at least the 1990s and likely further will be included, which should be more than sufficient.

As to Endo, prior to the June 30 Ruling, Endo and Plaintiffs reached an agreement that Endo would provide discovery beginning in 2004, two years before the launch of Opana ER, which is the only Endo product subject to substantive allegations in the Track One complaints. As a result of the June 30 Ruling, Plaintiffs now seek discovery from Endo effectively extending back to the company's formation in 1997.  As described above, this expanded temporal scope combined with the product scope ruling requires that significant resources be devoted to simply identify and locate sources of potentially responsive information before what is likely to be a significantly burdensome volume of documents and data can be collected, processed, reviewed, or produced. That burden is further compounded by the fact that certain of the potentially responsive documents

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 11

are not maintained in easily accessible electronic databases, but rather in boxes of hard copy documents stored off-site organized by individuals no longer with the company.

Especially when combined with the expanded product scope, the dramatically increased temporal scope of discovery not only places an undue and disproportionate burden on the Manufacturer Defendants, but also compromises their ability to prepare witnesses for depositions, including in response to 30(b)(6) notices, on the current schedule.

### *Prior Productions*

The June 30 Ruling also orders the Manufacturer Defendants to produce in the MDL productions made in "*any* prior litigation that involved the marketing or distribution of opioids . . . ." June 30 Ruling at 6. This expands the scope of CMO-1, which required production only of documents produced in prior matters "by federal (including Congressional), state, or local government entities . . . ." On its face, this portion of the June 30 Ruling may not seem overly burdensome, as it requires production of documents already produced elsewhere. However, it requires Defendants' counsel in this MDL—often not counsel for the respective companies in the "prior" litigations or investigations—to investigate whether documents were produced in litigations decades ago, concerning products not even referenced in the complaints, and to resurrect and reproduce those materials in this MDL.

We understand and appreciate that you are continuing to consider this portion of the June 30 Ruling, in connection with your review of the lists of prior production that each defendant has provided. We point out for your consideration, that burden of production aside, there is significant concern about what happens *after* these productions are made. Because of the unprecedented pace of this case, given its breadth and complexity, depositions are happening simultaneously with document collection and production. Defendants do not have adequate time to review the millions of documents from these prior productions, let alone identify documents from these productions that may be relevant to upcoming deponents. This greatly prejudices Defendants' ability to effectively prepare their witnesses, thereby further depriving Defendants of their ability to defend against Plaintiffs' claims.

           ***               ***               ***

Any one of the issues highlighted above imposes unfair prejudice and disproportionate burden on the Manufacturer Defendants. Taken together, this burden and prejudice is compounded greatly at the expense of due process, as it will substantially undermine the Manufacturer Defendants' ability to adequately defend against Plaintiffs' allegations. It is simply impossible to

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 12

comply with the June 30 Ruling while maintaining the current schedule.[9]  The Manufacturer Defendants therefore request that the June 30 Ruling be reconsidered, and that the ordered production be narrowed appropriately for each defendant.  The Manufacturer Defendants request a hearing on reconsideration on or before July 13, so that they can pursue an objection to Judge Polster if needed under Judge Polster's June 4, 2018 Order (*see* Dkt. No. 549) and so that the parties have clarification about the scope and timing of production before depositions begin in earnest.

Sincerely,

/s/ Donna M. Welch
Donna M. Welch
*Counsel for Defendant Allergan Finance,*
*LLC (f/k/a Actavis, Inc. f/k/a Watson*
*Pharmaceuticals, Inc.)*

cc:
Jennifer Levy, P.C. (jennifer.levy@kirkland.com)
Martin L. Roth (martin.roth@kirkland.com)
Timothy Knapp (timothy.knapp@kirkland.com)

---

[9]     The June 30 Ruling explicitly provided the parties with an ability "to negotiate different agreements going forward from the requirements set out herein."  (June 30 Ruling at 12).  Cognizant of your comments on the recent July 3 call scheduled with all parties, Allergan sought to negotiate a solution that would substantially expand its production consistent with the spirit of the June 30 Order, while nonetheless attempting to preserve its ability to complete discovery prior to August 31 and to collect and review documents sufficiently in advance of noticed depositions to adequately defend its interests.  *See* Ex. C, D. Welch letter dated July 6, 2018.  This compromise position is detailed for Allergan in Exhibit D.  Plaintiffs rejected this compromise and insisted on an unrealistic production scope.  *See* Ex. E, T. Egler email dated July 10, 2018.

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 13

## **Electronic Service List**

*Plaintiffs' Executive Committee*

Don Barrett
Barrett Law Group, P.A.
donbarrettpa@gmail.com

Elizabeth J. Cabraser
Lieff Cabraser Heimann & Bernstein
ecabraser@lchb.com

James E. Cecchi
Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.
jcecchi@carellabyrne.com

Erin Dickinson
Crueger Dickinson LLC
ekd@cruegerdickinson.com

James R. Dugan, II
The Dugan Law Firm, APLC
jdugan@dugan-lawfirm.com

Paul J. Geller
Robbins Geller Rudman & Dowd LLP
pgeller@rgrdlaw.com

Michael J. Fuller
McHugh Fuller
mike@mchughfuller.com

R. Eric Kennedy
Weisman Kennedy & Berris Co.
ekennedy@weismanlaw.com

Mark Lanier
Lanier Law Firm
wml@lanierlawfirm.com

## KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 14


Peter J. Mougey
Levin, Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA
pmougey@levinlaw.com

Ellen Relkin
Weitz & Luxenberg, P.C.
erelkin@weitzlux.com

Lynn Sarko
Keller Rohrback
lsarko@kellerrohrback.com

Hunter J. Shkolnik
Napoli Shkolnik PLLC
hunter@napolilaw.com

Christopher A. Seeger
Seeger Weiss LLP
cseeger@seegerweiss.com

Roland Tellis
Baron & Budd, P.C.
rbudd@baronbudd.com

James D. Young
Morgan & Morgan
jyoung@forthepeople.com

*Liaison Counsel for Plaintiffs*

Peter Henry Weinberger
SPANGENBERG SHIBLEY & LIBER LLP
1001 Lakeside Avenue East
Suite 1700
Cleveland, OH 44114-1149
(216) 696-3232
pweinberger@spanglaw.com


Steven J. Skikos

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 15


SKIKOS CRAWFORD SKIKOS & JOSEPH
One Sansome Street, Suite 2830
San Francisco, CA 94104
(415) 546-7300
sskikos@skikoscrawford.com

Troy A. Rafferty
LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR PA
316 S. Baylen Street
Suite 600
Pensacola, FL 32502
(805) 435-7000
trafferty@levinlaw.com


*Counsel for Plaintiff City of Cleveland*

Peter H. Weinberger (Ohio Bar No. 0022076)
Dustin Herman (Ohio Bar No. 0093163)
SPANGENBERG SHIBLEY &
LIBER, LLP
1001 Lakeside Ave East, Suite 1700
Cleveland, OH 44114
Tel: 216-696-3232
Fax: 216-696-3924
pweinberger@spanglaw.com
dherman@spanglaw.com

Paul T. Farrell, Jr. (Ohio Bar No. 0070257)
Bert Ketchum
GREENE, KETCHUM, FARRELL,
BAILEY & TWEEL, LLP
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, West Virginia 25724-2389
Tel.: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com
bert@greeneketchurn.com

Anthony J. Majestro

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 16


POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: 304-346-2889
Fax: 304-346-2895
amajestro@powellmajestro.com

Michael J. Fuller, Jr. (Ohio Bar No. 0090250)
Amy Quezon (Ohio Bar No. 0091798)
McHUGH FULLER LAW GROUP, PLLC
97 Elias Whiddon Rd.
Hattiesburg, MS 39402
Tel.: 601-261-2220
Fax: 601-261-2481
mike@mchughfuller.com
amy@mchughfuller.com

Peter J. Mougey
Troy Rafferty
Page A. Poerschke
Laura S. Dunning
Neil E. "Ned" McWilliams
Jeffrey Gaddy
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY &
PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com
trafferty@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
nmcwilliams@levinlaw.com
jgaddy@levinlaw.com

Russell W. Budd
J. Burton LeBlanc, IV

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 17


Laura J. Baughman
S. Ann Saucer
Christine C. Mansour
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 11 00
Dallas, TX 752 19
Tel.: 214-521-3605
Fax: 214-520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
lbaughman@baronbudd.com
asaucer@baronbudd.com
cmansour@baronbudd.com

*Counsel for Plaintiff County of Cuyahoga*

Robert J. Triozzi, Director
Cuyahoga County Department of Law
2079 East 9th Street, 7th floor
Cleveland, Ohio  44115
Telephone: (216) 698-6464
Facsimile: (216) 698-2744
rtriozzi@cuyahogacounty.us

Robin M. Wilson
County Administrative Headquarters
2079 East 9th Street, 7th Floor
Cleveland, Ohio 44115
Phone: (216) 443-7042 / (216) 698-2744 (Fax)
rwilson@cuyahogacounty.us

Frank Gallucci
PLEVIN & GALLUCCI COMPANY, L.P.A.
55 Public Square
Suite 2222
Cleveland, Ohio 44113
FGallucci@pglawyer.com


Paul J. Napoli

# KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 18


Joseph L. Ciaccio
Salvatore C. Badala
NAPOLI SHKOLNIK, PLLC
400 Broadhollow Road - Suite 350
Melville, New York 11747
pnapoli@napolilaw.com

Scott Elliot Smith
SCOTT ELLOT SMITH LP A
5003 Horizons Dr. Ste. 200
Columbus Oh. 43220
614-846-1700
ses@sestriallaw.com

Leo M. Spellacy, Jr., Esq.
THRASHER DINSMORE & DOLAN LPA
1111 Superior Avenue, Suite 412
Cleveland, OH 44114
Telephone: (216) 255-5431
Fax: (216) 255-5450
lspellacy@tddlaw.com

*Counsel for Plaintiffs County of Summit and City of Akron*

Joseph F. Rice
Lisa Saltzburg
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Tel: 843-216-9000
Fax: 843-216-9450
jrice@motleyrice.com
lsaltzburg@motleyrice.com

Linda Singer
Louis Bograd
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, DC 20004

## KIRKLAND & ELLIS LLP

Special Master David Cohen
July 11, 2018
Page 19


Tel: 202-232-5504
Fax: 202-386-9622
lsinger@motleyrice.com
lbograd@motleyrice.com

Donald W. Davis, Jr.
Adam D. Fuller
Elizabeth Shively Boatwright
BRENNAN, MANNA & DIAMOND,
LLC
75 East Market Street
Akron, OH 44308
Tel: 330-253-5060
dwdavis@bmdllc.com
adfuller@dmdllc.com
esboatwright@bmdllc.com

# Exhibit A

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

300 North LaSalle
Chicago, IL 60654

Donna M. Welch, P.C.
To Call Writer Directly:
(312) 862-2425
donna.welch@kirkland.com

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

June 22, 2018

*CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER*

*Via Electronic Mail*

Plaintiffs' Liaison Counsel and
Counsel for Track One Plaintiffs -
*See* Attached Service List

> Re: *In re National Prescription Opiate Litigation*, MDL No. 2804
> *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*, Case No. 18-OP-45090
> *City of Cleveland, Ohio, et al. v. Purdue Pharma L.P., et al.*, Case No. 18-OP-451312
> *County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004

Dear Counsel:

I write on behalf of Defendant Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) ("Allergan Finance"), as well as the other Manufacturer Defendants (each of which join this letter),[1] regarding the Track 1 Plaintiffs' Responses to the Manufacturer Defendants' Interrogatories and Requests for Production.

**Interrogatories:**  The Manufacturer Defendants have propounded to the three Track 1 Plaintiffs several interrogatories requesting information about which (if any) prescriptions of each Defendant's opioids were allegedly improper and who (if anyone) those prescriptions harmed.  For example, Interrogatory No. 6 requests:

---

[1] The Manufacturer Defendants joining this letter also include Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. ("Teva Defendants"); Purdue Pharma LP, Purdue Pharma Inc., and The Purdue Frederick Company Inc. ("Purdue"); Johnson & Johnson ("J&J") and Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. ("Janssen"); Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. ("Endo"); Insys Therapeutics, Inc. ("Insys"); and Mallinckrodt LLC ("Mallinckrodt").

Beijing   Boston   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

## KIRKLAND & ELLIS LLP

June 22, 2018
Page 2

> Identify and describe all prescriptions of opioids that were written in [Plaintiff's geographical area] in reliance on any alleged misrepresentations, omissions or other alleged wrongdoing by any Defendant.  Include in the response the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the specific misrepresentation, omission, or wrongdoing that allegedly caused the prescription to be written; the Defendant and the specific sales representative(s), employee(s), or agent(s) of the Defendant that made or committed the alleged misrepresentation, omission, or wrongdoing; the person or persons to whom the alleged misrepresentation or omission was made or to whom the alleged wrongdoing was directed; and whether, by whom, and for how much the prescription was approved for reimbursement.

Likewise, Interrogatory No. 7 requests:

> Identify every person who allegedly became addicted to any substance or was otherwise harmed as a result of any prescription of an opioid(s) in [Plaintiff's geographical area].  Include in the identification of each such individual: (i) the particular type of alleged harm that the individual experienced, (ii) the particular opioid(s) that he or she took and/or was prescribed, (iii) when each prescription at issue was written, (iv) the condition for which each prescription was written, and (v) the allegedly false, misleading, or deceptive statement or omission that purportedly caused the healthcare provider to write the prescription.

Finally, Interrogatory No. 10 requests:

> Identify and describe all prescriptions of opioid(s) that Plaintiff contends were unauthorized, medically unnecessary, ineffective, or harmful.  Include in the response as to each such prescription the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the basis for your assertion that the prescription was unauthorized, medically unnecessary, ineffective or harmful; and whether, by whom, and for how much the prescription was approved for reimbursement.

None of the Track 1 Plaintiffs provided any substantive information in response to these Interrogatories, which go to the very heart of Plaintiffs' allegations in this case.  These Requests seek information that is critical not only to the issue of causation but also to the Manufacturer

## KIRKLAND & ELLIS LLP

June 22, 2018
Page 3


Defendants' defenses.  With respect to Allergan Finance, for example, according to data from IMS, there were 617 prescriptions for Kadian® in Ohio in 2015, 469 in 2016 and 186 in the first half of 2017.  As another example, there are two specific Teva Defendants products identified in the Complaints: ACTIQ® and FENTORA®.  Based on the Teva Defendants' review of the IQVIA data obtained for all zip codes in each of the Plaintiffs' jurisdictions, the number of ACTIQ® and FENTORA® prescriptions between 2011 and 2016 (the only period for which we currently have zip-code level data) were:

- Cleveland and Cuyahoga County:[2] 39 total for ACTIQ® (14 in 2011; 24 in 2012; 0 in 2013; 1 in 2014; 0 in 2015; 0 in 2016), and 0 total for FENTORA®;

- Summit County: 48 total for ACTIQ® (4 in 2011; 14 in 2012; 13 in 2013; 17 in 2014; 0 in 2015; 0 in 2016), and 0 total for FENTORA®.

Defendants are entitled to, among other things, specific responses regarding which of the above prescriptions each of the Track 1 Plaintiffs contend were medically inappropriate; whether each physician writing one of the above prescriptions was exposed to some fraudulent statement that caused him or her to write the prescription and, if so, what was the statement, why was it false, and who made it; whether the patient who filled any one of the above prescriptions became addicted or was otherwise harmed by it; and whether Plaintiffs suffered harm for which they seek to recover in this litigation.

There are similar examples for the other Manufacturer Defendants—each of which is entitled to information regarding any prescriptions that Plaintiffs claim were the result of misrepresentations or other improper marketing, any persons who allegedly became addicted or were harmed by those prescriptions, and any prescription that Plaintiffs claim were medically unnecessary.  Among other reasons, Plaintiffs' claims require proof of causation.  *See, e.g.*, *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013) ("The Supreme Court has repeatedly held that plaintiffs attempting to assert an injury 'by reason of' a RICO violation must demonstrate both but-for causation and proximate causation."); *Uland v. S.E. Johnson Companies*, 1998 WL 123086, at *5 (Ohio Ct. App. Mar. 13, 1998) ("A qualified nuisance derives from negligence.

To be actionable, the harm must be proximately caused by the defendant's act. Similarly, nuisance *per se* requires proximate causation."); *see also Chance v. BP Chemicals, Inc.*, 1995 WL 143827, at *5 (Ohio Ct. App. Mar. 30, 1995) (plaintiffs failed to prove that defendants' actions "constituted extreme or outrageous conduct which proximately caused" the injuries); *Frey v*

---

[2] The numbers for Cuyahoga County are identical to those for the City of Cleveland because there were no prescriptions of ACTIQ® or FENTORA® in Cuyahoga County other than in the City of Cleveland.

## KIRKLAND & ELLIS LLP

June 22, 2018
Page 4

*Novartis Pharmaceuticals Corp.*, 642 F.Supp.2d 787, 792 (S.D. Ohio 2009) (recovery under the OPLA requires a showing that the product defect "was a proximate cause of harm for which the plaintiff seeks to recover compensatory damages."); *In re Zyprexa Products Liability Litigation*, 254 F.R.D. 50, 52 (E.D.N.Y. 2008) (in states' action stemming from alleged unlawful marketing, "[i]t is plainly evident that, given the disputed issue of causation, disclosure of the medical records is 'reasonably calculated to lead to the discovery of admissible evidence.'") (citation omitted).

The chain of causation between any allegedly wrongful conduct or wrongdoing by any Manufacturer Defendant, on the one hand, and any injury or damages suffered by Plaintiffs, on the other, necessarily includes, among others: (i) a prescription for opioids that Plaintiffs claim should not have been written, (ii) a physician or other prescriber who wrote that prescription, and (iii) an individual who was purportedly harmed by that prescription.  *See, e.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr.*, 863 F.3d 474, 480 (6th Cir. 2017) ("Proximate cause requires some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered.  In addition to foreseeability, it requires some direct relation between the injury and the injurious conduct…. The failure to tether the damages to nuisance-related problems on Wells Fargo's properties prevents us from assessing the 'directness' of the relationship between the two. That is particularly true for the City's attenuated theories of damage: decreased tax revenue, increased police and fire expenditures, and increased administrative costs.  When tied only to a general 'policy' of non-conformance, these damages are difficult to connect to Wells Fargo's actions and nearly impossible to disaggregate from other potential causes of these costs.") (internal quotation marks and citations omitted); *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 502–03 (6th Cir. 2010) ("[T]he Supreme Court's application of *Holmes* in its subsequent decision *Anza* is instructive and consistent with how we believe the Ohio Supreme Court would consider this matter because the Ohio Supreme Court has previously adopted the directness requirement precedent of the United States Supreme Court…. [In *Anza*] [t]he Court held that the complaint did not satisfy the directness requirement because the [defendant's] alleged violation [of law] did not lead directly to the plaintiff's injuries."); *see also Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1062 (N.Y. 2001) ("Such broad liability, potentially encompassing all gunshot crime victims, should not be imposed without a more tangible showing that defendants were a direct link in the causal chain that resulted in plaintiffs' injuries, and that defendants were realistically in a position to prevent the wrongs. Giving plaintiffs' evidence the benefit of every favorable inference, they have not shown that the gun used to harm plaintiff Fox came from a source amenable to the exercise of any duty of care that plaintiffs would impose upon defendant manufacturers.").

Whether or not Plaintiffs intend to use this information to support their claims, the Manufacturer Defendants are entitled to full discovery regarding each step in that causal chain. *See City of Los Angeles v. Wells Fargo & Co.*, 22 F. Supp. 3d 1047, 1054 (C.D. Cal. 2014) ("The City's lengthy Complaint relies on a regression analysis to support its claims and theory of causation…. In contrast to the City, Defendants describe the alleged causal chain as having seven

# KIRKLAND & ELLIS LLP

June 22, 2018
Page 5

'links' …. While the issues raised by Defendants' causal chain may be subject to proof at a later stage in the litigation, the pleading standards for Article III standing are not so burdensome. The City must be afforded an opportunity to conduct discovery and obtain more property-specific information to meet its burden of actually proving its claims."); *see also Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 214 F. Supp. 3d 808, 827 (N.D. Cal. 2016) ("How far the actual causal link stretches for each category of damages plaintiffs' allege is something that will need to be developed in discovery and tested on summary judgment."); *In re Zyprexa Products Liability Litigation*, 254 F.R.D. at 51 (in states' action stemming from alleged unlawful marketing, "[i]t bears repeating, then, that the [medical] records are in fact relevant to [Defendant's] defenses."); Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim **or defense** and proportional to the needs of the case.") (emphasis added).

Please promptly confirm that each Track 1 Plaintiff will supplement its responses to provide the information requested in Interrogatories 6, 7 and 10.

**Request for Production:**  In addition, Request for Production No. 10 requests "[a]ll Documents and communications relating to any evaluation, assessment, analysis, modeling, or review of any cost or financial or economic impact associated with the alleged improper prescribing of Opioids."  As an initial matter, this Request calls for any such evaluation, assessment, analysis, modeling or review by any individual or entity (to the extent in Plaintiffs' possession, custody or control), but Plaintiffs appear to limit what they will produce to those "performed by Plaintiff."  Please confirm that Plaintiffs will not withhold documents relating to such evaluations, assessments, analyses, modeling or reviews performed by others.  Similarly, this Request calls not only for the evaluations, assessments, analyses, models or reviews themselves but also for all documents, including communications, relating to them.  Please confirm that Plaintiffs will produce supporting and related documents, including communications.

In addition, please confirm that, to the extent they exist and are in Plaintiffs' possession, custody or control, you will provide documents relating to valuations, assessments, analyses, modeling or reviews of the cost or financial or economic impact associated with each individual allegedly improper prescription (including those prescriptions set out in response to the Interrogatories described above).  Further, please identify the non-custodial sources you are searching for such information and the types of documents or data within those sources.  For the same reasons that Plaintiffs must provide full answers to Interrogatories 6, 7 and 10, they must also provide all documents responsive to this Request for Production.  Please promptly confirm that each Track 1 Plaintiff will provide the information requested in Request for Production 10.

* * *

## KIRKLAND & ELLIS LLP

June 22, 2018
Page 6


      Please let us know if you are available to meet and confer on the above requests at 1:00 Eastern on Monday, June 25, or propose other times on Monday that you are available.

                             Sincerely,

                             /s/ Donna M. Welch
                             Donna M. Welch

cc:
Counsel for Defendants (via email)

# Exhibit B



**MotleyRice**®
LLC
ATTORNEYS AT LAW
www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

401 9th St. NW, Suite 1001
Washington, DC 20004
**o.** 202.232.5504  **f.** 202.232.5513

**David I. Ackerman**
*Licensed in DC, NJ, NY*
direct:  202.849.4962
dackerman@motleyrice.com

June 27, 2018

**VIA ELECTRONIC EMAIL**

Donna M. Welch
Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois  60654

      Re:    *In Re National Prescription Opioid Litigation*, Case No. 17-md-2804
              Response to June 22, 2018 Letter

Dear Donna:

This responds to your June 22, 2018 letter concerning the Bellwether Plaintiffs' Responses to the Manufacturer Defendants' First Set of Interrogatories and to the Response to Request for Production No. 10.

Your letter largely raises issues that Plaintiffs and the Manufacturer Defendants have already briefed to Special Master Cohen, and concerning which Special Master Cohen has already ruled.  Therefore, we fail to see how the information sought in your letter is consistent with Discovery Ruling No. 1.

The Manufacturer Defendants seek more detailed interrogatory responses on the theory that "[t]he chain of causation between any allegedly wrongful conduct or wrongdoing by any Manufacturer Defendant, on the one hand, and any injury or damages suffered by Plaintiffs, on the other necessarily includes, among others: (i) a prescription for opioids that Plaintiffs claim should not have been written, (ii) a physician or other prescriber who wrote that prescription, and (iii) an individual who was purportedly harmed by that prescription."  (p. 2).

As explained in both Paul Hanly's June 5 letter to Special Maser Cohen and in Discovery Ruling No. 1, Plaintiffs' claims center on the aggregate effect of opioids on the public health, safety and welfare within the jurisdictions.  Plaintiffs thus will prove causation through aggregate proof demonstrating the link between Defendants' unlawful and tortious conduct and the exponential increase in prescribing and diversion of opioids and the resulting harms on a jurisdiction-wide basis.  This method of causation is consistent with the approach in *People v. Conagra Grocery Prod. Co.*, 17 Cal.App.5th 51, 227 Cal.Rptr.3d 499 (Ct. App. 2017), *reh'g denied* (Dec. 6, 2017), *review denied* (Feb. 14, 2018).

There is little substantive difference between the information requested in Interrogatory Nos. 6 & 7 cited in your letter and the Requests for Production that were the subject of Discovery Ruling No. 1.  As the Special Master noted when largely sustaining the Plaintiffs' objections to the document requests as "largely well-taken," "[t]he common theme of the three RFPs at issue is that defendants seek highly detailed information related to all individuals who received or were harmed by opioids."  (p. 1, 3.)  Discovery therefore should be governed by the Special Master's instruction set forth below:

Donna M. Welch
June 27, 2018
Re: Response to June 22, 2018 Letter
Page 2

> At this juncture, it is possible only to observe that Plaintiffs current discovery productions must equal or surpass the proofs that will eventually be required. In other words, if Plaintiffs are correct that statistical and aggregate evidence is sufficient, then Plaintiffs must now produce all available statistical and aggregate evidence, and enough supporting particulars to allow the Court and Defendants and the parties' experts to understand the fundamental bases for those statistics and aggregated data; but Plaintiffs need not produce *all* discovery regarding *every* patient or *every* opioid prescription. (pp. 4-5.)

Consistent with the Special Master's instructions, the Bellwether Plaintiffs are producing "all relevant aggregate data and statistics" and have "undertake[n] a good-faith effort to produce sufficient particularized evidence to allow Defendants and their experts to understand the fundamental bases for these statistics and aggregated data." (Ruling, pp. 5-6.) The Plaintiffs are not required, however, to "identify and describe all prescriptions of opioids that were written in [Plaintiff's geographical area] in reliance on any alleged misrepresentations, omissions or other alleged wrongdoing by any defendant." (Interrogatory No. 6.) Nor are Plaintiffs required to "identify every person who allegedly became addicted to any substance or was otherwise harmed as a result of any prescription of an opioid(s) in [Plaintiff's geographical area]." (Interrogatory No. 7.)

Interrogatory Nos. 6 and 7 represent precisely the type of overbroad requests addressed in Discovery Ruling No. 1. Further, as noted in the Interrogatory Responses, the burden and cost of compiling this information is not proportional to the needs of the case. Plaintiffs will be producing documents as described above and as discussed in meet-and-confers with Defendants' counsel concerning these topics, but will not supplement their Interrogatory responses as demanded in your letter.

With respect to Interrogatory No. 11, Plaintiffs will comply with paragraph 9(l)(iii) of Case Management Order No. 1. This also is addressed in Discovery Ruling No. 1.

With respect to Request for Production No. 10, Plaintiffs will agree to produce any "evaluation[s], assessment[s], analys[es], modeling, or review[s] of any cost or financial or economic impact associated with" overprescribing of opioids that are within Plaintiffs' custody or control, and will not limit their document production to documents that were performed by Plaintiffs themselves.

Please contact me with any questions regarding this letter.

Sincerely,

David I. Ackerman

cc:    Defendants' Liaison Counsel
       Plaintiffs' Liaison Counsel
       Plaintiffs' Lead Counsel

Donna M. Welch
June 27, 2018
Re: Response to June 22, 2018 Letter
Page 3


        Counsel for Bellwether Plaintiffs

# Exhibit C

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

<table>
<tr><td>

Donna M. Welch, P.C.
To Call Writer Directly:
(312) 862-2425
donna.welch@kirkland.com

</td><td>

300 North LaSalle
Chicago, IL 60654

(312) 862-2000

www.kirkland.com

</td><td>

Facsimile:
(312) 862-2200

</td></tr>
</table>

July 6, 2018

*Via Electronic Mail*

Thomas E. Egler
Robbins Geller Rudman & Dowd
LLP
655 West Broadway
San Diego, CA 92101
tome@rgrdlaw.com

Re:    *In re National Prescription Opiate Litigation*, MDL No. 2804

Dear Tom:

I write on behalf of Defendant Allergan Finance, LLC  ("Allergan Finance") regarding Special Master Cohen's June 30, 2018 Order as well as his direction to the parties during the July 3, 2018 teleconference to agree to reasonable solutions regarding the same.  *See* Dkt. No. 693.  In light of that ruling and Special Master Cohen's subsequent comments, Allergan Finance is prepared to significantly expand its review and production of documents in a number of ways.  It thus offers the following proposed solution.

**First**, if Plaintiff accepts our proposal, we would agree to entirely remove the front-end date limitation from our review and production of collected documents and data.  Put differently, we will review and produce collected documents and data without ***any*** requirement that those documents or data be from after ***any*** date.  While Allergan Finance does not agree that this is required or necessary, Allergan Finance is willing to do so as part of this proposed compromise.

**Second**, we would expand our production to include documents and data related to the other opioid medication that Allergan Finance owns and has responsibility for that is identified in the Track One Complaints, Norco®.[1]

---

[1] With respect to the other opioids mentioned in relation to "Actavis" in the Complaints—all generic medications— as discussed in prior correspondence and in our many meet and confers, Allergan transferred all documents, data, employees, and liabilities related to those and all other generic opioids to Teva in 2016.  As such, we maintain our objection to searching for any leftover documents or data related to generics that may remain at Allergan as

Beijing   Boston   Hong Kong   Houston   London   Los Angeles   Munich   New York   Palo Alto   San Francisco   Shanghai   Washington, D.C.

# KIRKLAND & ELLIS LLP

July 6, 2018
Page 2


**Third**, while Allergan Finance does not agree to re-collect from non-custodial sources from which it has already collected, it will review and produce, to the extent appropriate (*e.g.*, not privileged), documents and data that it has collected from non-custodial sources to date related to Norco®.  Moreover, going forward, Allergan Finance will collect Norco® related documents and data from non-custodial sources from which it is currently collecting or from which it agrees to collect in the future.  Allergan Finance offers this compromise without prejudice to its position that discovery regarding Norco® is not relevant or proportional to this litigation.

**Fourth**, we would agree to add 12 additional document custodians associated with Legacy Watson (which owned Norco® prior to the combination of Legacy Actavis and Legacy Watson).  These individuals are listed in Appendix A.  By offering this compromise, Allergan Finance does not intend to prejudice its position that Norco® discovery is not relevant or proportional.

**Fifth**, we would agree to add 93 search terms related to Norco®.  These search terms are listed in Appendix B.  Here too Allergan Finance reserves all rights.

**Sixth**, and subject to unforeseen events, our current estimate is that we would be in a position to substantially complete Allergan Finance's document production by approximately early August 2018 under this proposal.  Please note, though, that any further expansion of the scope of Allergan Finance's production would almost certainly mean that substantial completion by the close of fact discovery is not possible.  Allergan Finance thus offers this compromise as one that stretches the scope of its production to the limit while nonetheless maintaining a realistic goal of timely completion.

* * *

Please promptly let us know if you accept our proposed solution.  Once you confirm, we will immediately begin our expanded review and production.

Sincerely,

/s/ Donna M. Welch
Donna M. Welch, P.C.

cc:
Timothy W. Knapp (timothy.knapp@kirkland.com)
Karl Stampfl (karl.stampfl@kirkland.com)
Carissa Dolan (cdolan@rgrdlaw.com)

---

unnecessary and not proportional to the needs of this case given that Teva is a party to this litigation and, we understand, has agreed to produce relevant and non-privileged documents related to these generic opioids.

# KIRKLAND & ELLIS LLP

July 6, 2018
Page 3


Matthew Melamed (mmelamed@rgrdlaw.com)
Mark Dearman (mdearman@rgrdlaw.com)
Aelish Baig (aelishb@rgrdlaw.com)
Dory Antullis (dantullis@rgrdlaw.com)
Jennifer Scullion (jscullion@seegerweiss.com)
Paul Geller (pgeller@rgrdlaw.com)

## KIRKLAND & ELLIS LLP

July 6, 2018
Page 4

### Appendix A - Additional Custodians

- Boyer, Andrew - Legacy Watson - Sales and Marketing

- Byrne, Burke - Legacy Watson - Regulatory Affairs

- Callahan, Tim - Legacy Watson - Marketing

- DelGaudio, Joyce - Legacy Watson - Regulatory Affairs

- Dieso, Robert - Legacy Watson - Regulatory Affairs/Labeling

- Ebert, Chuck - Legacy Watson - Research & Development

- Gochnour, Scott - Legacy Watson - Research & Development

- Matheny, Pamela - Legacy Watson - Regulatory and Quality Control

- Schaefer, Pamela - Legacy Watson - Regulatory Affairs

- Stewart, Robert - Legacy Watson - Global Operations (later Allergan Chief Operating Officer)

- Tykot, Ed - Legacy Watson - Business Development/Sales and Marketing

- Wilkinson, Fred - Legacy Watson - Executive Vice President of Global Brands

# KIRKLAND & ELLIS LLP

July 6, 2018
Page 5

## Appendix B - Additional Search Terms

| Search Term No. | Search Term |
|---|---|
| 370 | (("Norco") w/20 ("Alabama" or "AL" or "Arizona" or "AZ" or "California" or "CA" or "Colorado" or "CO" or "Connecticut" or "CT" or "Florida" or "FL" or "Georgia" or "GA" or "Hawaii" or "HI" or "Idaho" or "ID" or "Illinois" or "IL" or "Iowa" or "IA" or "Kansas" or "KS" or "Louisiana" or "LA" or "Maine" or "ME" or "Maryland" or "MD" or "Massachusetts" or "MA" or "Michigan" or "MI" or "Minnesota" or "MN" or "Montana" or "MT" or "Nebraska" or "NE" or "Nevada" or "NV" or "New Jersey" or "NJ" or "New York" or "NY" or "North Carolina" or "NC" or "North Dakota" or "ND" or "Oregon" or "Pennsylvania" or "PA" or "Rhode Island" or "RI" or "South Dakota" or "SD" or "Tennessee" or "TN" or "Texas" or "TX" or "Utah" or "UT" or "Vermont" or "VT" or "Virginia" or "VA" or "West Virginia" or "WV" or "Wisconsin" or "WI" or "Wyoming" or "WY" or "District of Columbia" or "DC")) |
| 371 | Norco AND "5th vital" |
| 372 | Norco AND "American Pain Society" |
| 373 | Norco AND "Centers {for} Disease Control {and} Prevention" |
| 374 | Norco AND "Drug Enforcement Administration" |
| 375 | Norco AND "Field Sales Team" |
| 376 | Norco AND "fifth vital" |
| 377 | Norco AND "med* necessary" |
| 378 | Norco AND "med* unnecessary" |
| 379 | Norco AND "Physicians {for} Responsible Opioid Prescribing" |
| 380 | Norco AND "Prescription* Monitor* Program*" |
| 381 | Norco AND "Suspicious Order Monitoring Task Force" |
| 382 | Norco AND (PhrMA NEAR5 Code) |
| 383 | Norco AND (suspicious NEAR3 order) |
| 384 | Norco AND (suspicious NEAR3 prescri*) |
| 385 | Norco AND APS |
| 386 | Norco AND CDC |
| 387 | Norco AND DEA |
| 388 | Norco AND JAMA |
| 389 | Norco AND PDMP |
| 390 | Norco AND PMP |

# KIRKLAND & ELLIS LLP

July 6, 2018
Page 6

| 391 | Norco AND PROP |
| 392 | Norco AND SOM |
| 393 | Norco NEAR100 "black market" |
| 394 | Norco NEAR100 "chronic pain" |
| 395 | Norco NEAR100 "continuing medical education" |
| 396 | Norco NEAR100 "Dear Doctor" |
| 397 | Norco NEAR100 "focus group" |
| 398 | Norco NEAR100 "Food {&} Drug Administration" |
| 399 | Norco NEAR100 "Food {and} Drug Administration" |
| 400 | Norco NEAR100 "front group" |
| 401 | Norco NEAR100 "key opinion leader" |
| 402 | Norco NEAR100 "non-cancer" |
| 403 | Norco NEAR100 "pain management" |
| 404 | Norco NEAR100 "pain relief" |
| 405 | Norco NEAR100 "Promotional Review Committee" |
| 406 | Norco NEAR100 "Speakers Bureau" |
| 407 | Norco NEAR100 (citizen NEAR3 petition*) |
| 408 | Norco NEAR100 (extended NEAR2 release) |
| 409 | Norco NEAR100 (health NEAR3 plan*) |
| 410 | Norco NEAR100 (steady NEAR2 state) |
| 411 | Norco NEAR100 abus* |
| 412 | Norco NEAR100 acetaminophen |
| 413 | Norco NEAR100 addiction |
| 414 | Norco NEAR100 ADF |
| 415 | Norco NEAR100 adjuvant |
| 416 | Norco NEAR100 advert* |
| 417 | Norco NEAR100 advisory |
| 418 | Norco NEAR100 APAP |
| 419 | Norco NEAR100 Buprenorphine |
| 420 | Norco NEAR100 CME |
| 421 | Norco NEAR100 Codeine |
| 422 | Norco NEAR100 DDMAC |
| 423 | Norco NEAR100 detail* |
| 424 | Norco NEAR100 diversion |
| 425 | Norco NEAR100 doctor |
| 426 | Norco NEAR100 elderly |
| 427 | Norco NEAR100 FDA |
| 428 | Norco NEAR100 Fentanyl |
| 429 | Norco NEAR100 fraud |

## KIRKLAND & ELLIS LLP

July 6, 2018
Page 7

| 430 | Norco NEAR100 geriatric |
| 431 | Norco NEAR100 Hydrocodone |
| 432 | Norco NEAR100 Hydromorphine |
| 433 | Norco NEAR100 Hydromorphone |
| 434 | Norco NEAR100 KOL |
| 435 | Norco NEAR100 magazine |
| 436 | Norco NEAR100 market* |
| 437 | Norco NEAR100 media |
| 438 | Norco NEAR100 Morphine |
| 439 | Norco NEAR100 narco |
| 440 | Norco NEAR100 Nonsteroidal* |
| 441 | Norco NEAR100 NSAID* |
| 442 | Norco NEAR100 OPDP |
| 443 | Norco NEAR100 Oxycodone |
| 444 | Norco NEAR100 Oxymorphone |
| 445 | Norco NEAR100 pain |
| 446 | Norco NEAR100 physician |
| 447 | Norco NEAR100 PRC |
| 448 | Norco NEAR100 prescrib* |
| 449 | Norco NEAR100 presentation* |
| 450 | Norco NEAR100 press |
| 451 | Norco NEAR100 research |
| 452 | Norco NEAR100 risk |
| 453 | Norco NEAR100 sale |
| 454 | Norco NEAR100 speaker |
| 455 | Norco NEAR100 survey* |
| 456 | Norco NEAR100 Tapentadol |
| 457 | Norco NEAR100 train* |
| 458 | Norco NEAR100 vet* |
| 459 | "(averse or adverse or AER) w/100 (Norco)" |
| 460 | "(formulary or "P&T" or "tier" or "preferred" or "United Health") w/100 (Norco)" |
| 461 | "(patient w/10 screen*) w/100 (Norco)" |
| 462 | "("order of interest") w/100 (Norco)" |
| 463 | "SWOT w/100 (Norco)" |

# Exhibit D

**ALLERGAN PROPOSED PRODUCTION**

| | |
|---|---|
| **Expanded Date Range** | Allergan would agree to entirely remove the front-end date limitation from our review and production of collected documents and data. Put differently, Allergan will review and produce collected documents and data without any requirement that those documents or data be from after any date. |
| **Expanded Opioid Products** | Allergan would expand our production to include documents and data related to the other opioid medication that Allergan owns and has responsibility for that is identified in the Track One Complaints, Norco®. |
| **Re-Review Already Collected Non-Custodial Sources** | Allergan will review and produce, to the extent appropriate (e.g., not privileged), documents and data that it has collected from non-custodial sources to date related to Norco®. Moreover, going forward, Allergan will collect Norco® related documents and data from non-custodial sources from which it is currently collecting or from which it agrees to collect in the future. |
| **Additional Custodians** | Allergan would agree to add 12 additional document custodians associated with Legacy Watson (which owned Norco® prior to the combination of Legacy Actavis and Legacy Watson). |
| **Additional Search Terms** | Allergan would agree to add 93 search terms related to Norco®. |

**ENDO PROPOSED PRODUCTION**

| | |
|---|---|
| **Expanded Date Range** | • Endo would agree to remove entirely the front-end date limitation from its ongoing review and production of collected documents and data. Put differently, Endo will review and produce collected documents and data without any requirement that those documents or data be from after any date. For newly collected documents, Endo will assess the date range on a request by request basis. In some cases, Endo will not apply a date range when searching available documents and data. For other requests, Endo will search available documents and data one year prior to the launch of the product (or to the formation of Endo in 1997 if the launch of the product does not post-date the company's formation by one year). For other requests, the appropriate date range will be determined by the burden of collecting responsive documents. For example, the burden associated with collecting and reviewing historic documents maintained off-site in hard copy may be outweigh the relevance of those documents. |
| **Expanded Product Scope for Production** | • Endo would expand its production to produce to Plaintiffs documents and data relating to any branded or generic Schedule II opioid medication that Endo has sold that are included in Endo's ongoing review and production of collected documents and data. In other words, Endo would produce documents and data concerning any of its branded or generic Schedule II opioid medications that are a part of Endo's ongoing review and that are responsive to any of Plaintiffs' current discovery requests (subject to any remaining objections Endo has made to those requests that were neither addressed in the June 30 Ruling nor have been resolved through Endo's ongoing meet and confers with Plaintiffs). In addition to expanding its review of previously collected documents, Endo will collect, review and produce to Plaintiffs documents and data relating to all Schedule II opioid medications sold by Endo pursuant to Endo's responses to Plaintiffs' Requests for Production. Endo will also collect and produce certain categories of documents and data related to Schedule II generic opioid medications sold by the Par entities as described below. |
| **Collection of Additional Non-Custodial Sources** | • Endo would, and is currently in the process of, collecting additional non-custodial data sources in order to expand the scope of its existing collection to capture information about Schedule II opioid medications other than Opana ER, including generic Schedule II opioid medications. |

| | |
|---|---|
| | • Specifically, Endo is identifying and collecting for production:<br><br>(i) the regulatory submissions files for all Endo branded or generic Schedule II opioids other than Opana ER marketed and sold by Endo;<br><br>(ii) promotional and sales training materials for all Endo branded or generic Schedule II opioids other than Opana ER marketed and sold by Endo, both electronically and in hard copy, and<br><br>(iii) call data for Endo branded or generic Schedule II opioid medications other than Opana ER marketed and sold by Endo.<br><br>• Endo is also evaluating the feasibility of collecting adverse event reports for all branded or generic Schedule II opioid medications marketed and sold by Endo. Given the resources that may be necessary to extract and collect the data for all Schedule II opioids, the burden of production beyond that related to Opana ER may outweigh the relevance of the data.<br><br>• Endo would also agree to collect and produce sales and prescription data for Par generic Schedule II opioid medications.<br><br>• Endo would also agree to produce suspicious order monitoring data for Par generic Schedule II opioid medications.<br><br>• Endo would not agree to produce regulatory submissions files for Par generic Schedule II opioid medications, as such files will not include material responsive information beyond what is contained in the regulatory submission files for each generic's Reference Listed Drug. |
| **Additional Custodians** | • Endo is in the process of identifying additional custodians with specific responsibility for Endo Schedule II opioids other than Opana ER.  To the extent that Endo is able to identify such custodians, it would add them to its custodian list.<br><br>• Given the lack of any specific allegations in the Track One complaints about the Par entities, and the fact that the allegations regarding generic opioid medications relate solely to the sales and prescription volume of those products and suspicious order monitoring and that information relevant to those issues can be collected through the non-custodial sources described above, Endo would not add Par custodians to its |

| | |
|---|---|
| | custodian list.  As described in the foregoing letter, the burden of doing so would be significant. |
| **Additional Search Terms** | • Endo would agree to incorporate the names and molecules of its branded and generic Schedule II opioid medications into the portion of the search term strings that captures the particular medication or molecule of interest for the search terms Endo has agreed to run across its custodial collections. |

# Exhibit E

**From:** Tom Egler <TomE@rgrdlaw.com>
**Date:** July 10, 2018 at 12:34:54 PM CDT
**To:** "'Stampfl, Karl'" <karl.stampfl@kirkland.com>, "Welch, Donna
M." <dwelch@kirkland.com>, "Levy, Jennifer"
<jlevy@kirkland.com>, "Roth, Martin L." <rothm@kirkland.com>,
"Knapp, Timothy" <tknapp@kirkland.com>
**Cc:** Carissa Dolan <CDolan@rgrdlaw.com>, Matthew Melamed
<MMelamed@rgrdlaw.com>, Mark Dearman
<MDearman@rgrdlaw.com>, Aelish Baig <AelishB@rgrdlaw.com>,
Dory Antullis <DAntullis@rgrdlaw.com>,
"jscullion@seegerweiss.com" <jscullion@seegerweiss.com>, Paul
Geller <pgeller@rgrdlaw.com>
**Subject: RE: In re National Prescription Opiate Litigation, MDL
No. 2804**

Donna:

Thank you for your proposed offer of compromise of July 6, 2018.  In
essence Allergan is offering to agree to expand discovery to include
Norco, which Allergan is required to do in light of Special Magistrate
Cohen's order of June 29, 2018.  However, we still need Allergan to
produce any and all relevant responsive documents it currently maintains
for the relevant time period as set forth in the June 29, 2018 order with
respect to all opioids including its generic business. The order was clear
that production of such information is required:

"Defendants shall produce discovery related to all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act. This includes branded, unbranded, and generic drugs. If a branded drug was
launched before 1995, then defendants need to produce documents related to that drug, and its nonbranded
and generic equivalents, only if the documents were created on or after January 1, 1995."

Please confirm that you are planning to comply with all aspects of Special Master Cohen's order.   This relates especially to your client's refusal to "re-collect" from "non-custodial sources" after refusing to make an adequate search the first time.  The special master's order makes clear that the prior collection was inadequate.

The "12 additional document custodians" you offer face the same inadequacies as the previous proposals - - we have no way of knowing whether these individuals are the correct individuals, especially as your client continually declines our requests to put the custodians it proposes to search in the context of an organizational chart, with regard to Kadian, Norco, the generics or other opioids.  Separately, the search terms you propose to add, but "reserve all rights" to, remain incomplete for the same reasons the current terms are incomplete - - if nothing else, the euphemisms and nicknames used by custodians and their correspondents would be left out of any production if any search is limited solely to capitalized brand names.  Further, to the extent your clients' employees are analyzing opioid competitors' successes or failures in the marketplace, such information is relevant to this action - - as the June 29, 2018 Order makes clear.  We ask again that Allergan run the search terms with the drug names proposed by plaintiffs, as these incorporate the brand names of the drugs Allergan and its predecessor entities sold, as well as generic names and the names of competitor brands and generics in the market – these match the scope of the Special Master's order.  They also match the scope of the allegations in the complaints at issue.

Thank you.

Tom Egler

---

**From:** Stampfl, Karl [mailto:karl.stampfl@kirkland.com]
**Sent:** Friday, July 06, 2018 12:00 PM
**To:** Tom Egler
**Cc:** Welch, Donna M.; Levy, Jennifer; Roth, Martin L.; Knapp, Timothy;

Carissa Dolan; Matthew Melamed; Mark Dearman; Aelish Baig; Dory Antullis; jscullion@seegerweiss.com; Paul Geller
**Subject:** In re National Prescription Opiate Litigation, MDL No. 2804

Tom,

Please see the attached correspondence from Donna Welch.

Best,
Karl

**Karl Stampfl**
-----------------------------------------------
**KIRKLAND & ELLIS LLP**
300 North LaSalle, Chicago, IL 60654
**T** +1 312 862 2595  **M** +1 708 369 8792
**F** +1 312 862 2200
-----------------------------------------------
**karl.stampfl@kirkland.com**

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly proh bited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**NOTICE: This email message is for the sole use of the intended recipient(s) and may contain information that is confidential and protected from disclosure by the attorney-client privilege, as attorney work product, or by other applicable privileges.  Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.**

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

This communication may contain information that is legally privileged, confidential or exempt from disclosure. If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited. Anyone who receives this message in error should notify the sender immediately by telephone or by return e-mail and delete it from his or her computer.

For more information about Arnold & Porter, click here:
http://www.arnoldporter.com