# EXHIBIT 11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804<br>Case No. 17-md-2804<br>Judge Dan Aaron Polster |

**DECLARATION OF ROBERT S. HOFF**

1. My name is Robert S. Hoff. I am an attorney at Wiggin and Dana LLP, with an office located at Two Stamford Plaza, 281 Tresser Boulevard, Stamford, CT 06901.

2. Since approximately March 2017, I have represented Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. (collectively, "Purdue") in legal matters relating to Purdue's manufacturing, promotion, marketing, and sale of opioid products. My work for Purdue has included overseeing discovery in this and numerous other matters.

3. I submit this declaration in support of the July 11, 2018 letter to Special Master Cohen regarding the June 30, 2018 Discovery Ruling No. 2. The statements herein are based on my personal knowledge or based on my review of documents and discussions with Purdue employees during the time I have represented Purdue.

**Status of Purdue's Discovery Efforts**

4. Purdue has produced over 4.2 million pages of documents in this case, comprising about 119,000 documents. Purdue is preparing to produce today more than 15 million pages that comprise an additional 900,000 documents. .

5. In a July 10, 2018 letter to Special Master Cohen and copying counsel, I identified the numerous categories of documents Purdue has produced so far, which include branded marketing materials, unbranded educational pieces, call notes for sales visits to Ohio prescribers,

IMS data showing the number and strength of prescriptions of Purdue's opioid medications nationwide and in Ohio, documents from Purdue's Abuse & Diversion Detection ("ADD") program for Ohio prescribers, marketing plans and budgets, sales training materials, scientific research, and Purdue's New Drug Application ("NDA") files for OxyContin, Butrans and Hysingla. These, and dozens of other categories of documents, were produced with varying date ranges depending on when Purdue collected and produced the documents in prior litigations, how the documents were organized and held by Purdue, and the burden associated with collection and review.

6. On May 22, 2018, Purdue proposed 19 custodians whose documents would be reviewed in this matter.

7. On June 6, 2018, Plaintiffs asked Purdue to add another 73 individuals as custodians. Between Purdue's proposal and Plaintiffs' request for additional custodians, Plaintiffs seek documents from over 90 custodians.

8. Of the custodians Purdue or Plaintiffs identified, Plaintiffs have noticed 10 individuals' depositions so far, in addition to the deposition they request on 50 30(b)(6) topics with many sub-topics.

9. Using search terms that Purdue and Plaintiffs have agreed upon, Purdue has been reviewing custodial documents for responsiveness and privilege for the first 10 deponents for the time period January 1, 2006 to the date of collection – the date Purdue has maintained as a start date due to the undue burden of going further. Documents from just these 10 custodians has resulted in the need for Purdue to review over *one million* documents. This number does not include additional custodians that Plaintiffs have proposed (and as to which Purdue will be objecting). I expect that adding the custodians Plaintiffs have sought may result in many

millions of additional documents to be reviewed.  Adding more years to the review by requiring the review to date to 1995 would greatly expand the scope.

10. Purdue has assigned over 150 lawyers and other resources to work on this discovery review nearly around the clock and at significant cost.

11. This custodial file document review is on top of the burdensome work for non-custodial documents Plaintiffs have demanded.  Purdue has been collecting, reviewing, and producing massive volumes of non-custodial documents as well.

12. These collection and production efforts regarding custodial and non-custodial documents are also in addition to Purdue's efforts to create and produce databases of documents from prior litigations, some of which are more than ten years old.  Given the age of these prior productions, and the volume associated with them, Purdue has had to hire additional resources to assist in recreating and re-producing prior productions, again, at significant cost.

13. In addition to the attorneys and vendor resources, additional counsel from several law firms have been working with Purdue almost exclusively on discovery every day.  Indeed, my law firm has dedicated resources to assisting Purdue with discovery, including several attorneys who do nothing but work on Purdue discovery.

**Discovery Ruling No. 2 Regarding Products and Temporal Scope**

14. In Discovery Ruling No. 2, Special Master Cohen ruled that: "Defendants shall produce discovery related to all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act.  This includes branded, unbranded, and generic drugs.  If a branded drug was launched before 1995, then defendants need to produce documents related to that drug, and its non-branded and generic equivalents, only if the documents were created on or after January 1, 1995."

15. Special Master Cohen also ruled that "the manufacturer defendants shall produce Category One Discovery and Category Two Discovery with a cut-off date of one year prior to the launch date of the opioid product in question. Thus, for example, Purdue must produce Categories One and Two Discovery related to OxyContin going back to the date one year before it began selling OxyContin; Purdue must produce Categories One and Two Discovery related to Hyslinga ER going back to the date one year before it began selling Hyslinga ER;… Further, the manufacturer defendants shall produce transactional data (which is otherwise in Category Two) and Suspicious Order Reports (which is otherwise in Category One) with a cut-off date of January 1, 1996."

16. Collectively, these rulings impose an incredible burden on Purdue and make it nearly impossible for Purdue to complete document discovery, much less all discovery, by August 31, 2018.

17. Purdue has been manufacturing, promoting, marketing, and selling branded medications for decades, and Purdue launched OxyContin in 1996. Purdue has launched other opioid medications since then as well, including Butrans and Hysingla. The gravamen of Plaintiffs' allegations focus on OxyContin, and Purdue has thus focused its discovery efforts on documents relating to OxyContin. During the meet-and-confer process, as an effort to compromise in good faith, Purdue also expanded the scope of its discovery to Butrans and Hysingla. And Purdue has also proposed that a time period of January 1, 2006 to present is a way to capture the broad discovery that is sought in the case and balance it against the substantial burden of the discovery.

18. Discovery Ruling No. 2 would increase Purdue's burdens and costs exponentially. Despite the massive amount of resources Purdue is devoting to its discovery efforts, it will be

extraordinarily difficult, if not impossible, for Purdue to comply with the discovery demands placed on it within the time frame for discovery in this case.

19. As discussed in more detail below, Plaintiffs seek a broad array of documents and communications across virtually every substantive area of Purdue's business, including marketing, sales, and scientific research. This means that, in order for Purdue to expand the scope of its discovery for all categories back to January 1, 1995, Purdue will have to perform searches and collections of hard copy and electronic documents across virtually every area of its business for all of its opioid medications. Purdue would have to search electronic sources, archives, thousands of boxes, file folders, and cabinets. Purdue would also have to collect and review hard copy and electronic documents from a large number of employees who have worked at Purdue over nearly the past 23 years, as roles and positions have changed significantly over time since 1995.

20. For example, requests for marketing materials, including drafts of materials and correspondence regarding materials, for all of Purdue branded products over 23 years would impose an enormous burden on Purdue. These requests, collectively, likely require Purdue to collect, review, and produce a vast majority of the work-related email, electronic, and hard copy documents, from a huge number of individuals who worked in marketing for Purdue over the past nearly 23 years. Given that Purdue has been in the business of marketing opioid medications during that entire time period, Purdue anticipates that this includes hundreds of individuals who each likely generated at least dozens of responsive documents and communications every day of their employment. It is difficult to even estimate how much time and expense it would take for Purdue attorneys and staff to review documents from so many

files. On the other hand, Purdue has already produced a lot of this material since January 1, 2006 for OxyContin, Butrans, and Hysingla.

21. As another example, Plaintiffs request materials relating to training sales representatives. Because Purdue has been training and educating sales representatives throughout the time period since 1995, this request seeks nearly 23 years' worth of training and educational materials. Many of the documents and other materials likely responsive to this request are no longer readily accessible at Purdue's premises. Purdue anticipates that its attorneys would have to search through and review hundreds of boxes, bins, or cabinets, including at offsite storage facilities, to locate responsive documents at substantial cost and time. Given the breadth of this request and the difficulty in locating all responsive documents for the time period, it is difficult to even quantify with specificity at this time how many attorneys would be necessary to undertake the discovery, how much time all this work would take, and how much of a cost Purdue will incur. Like marketing materials, Purdue has already produced a lot of this material since January 1, 2006 for OxyContin, Butrans, and Hysingla.

22. Yet another category of burdensome requests is Plaintiffs' requests for scientific studies and research, including related communications. Purdue has been conducting research concerning opioid medications for decades. Therefore, these requests seeks almost every document and communication generated by numerous individuals in Purdue's departments responsible for scientific research.

23. These are just some examples of the tremendous burden on Purdue of producing documents dating to 1995 for all of its opioid medications. To be sure, there are many other examples.

24. Importantly, Purdue's re-productions of discovery from prior cases will include extensive and voluminous responsive materials, including for the expanded time period to 1995. Purdue has been working diligently to locate and re-produce those discovery collections, and they should be more than sufficient for many of the burdensome requests at hand.

25. Purdue already has produced over 4.2 million pages of documents in this case, comprising about 119,000 documents – in addition to the further 15 million pages being produced today – and anticipates producing millions of pages of additional documents at substantial burden, expense, and time, even with a shorter time period in this case, and even for only OxyContin, Butrans, and Hysingla. Expanding the time period to January 1, 1995 and including all Purdue opioid medications within the scope of responsiveness would impose an incredible burden on Purdue given the extraordinary breadth of Plaintiffs' requests.

I declare under penalty of perjury that the statements in this declaration are true to the best of my knowledge and belief.

Dated July 13, 2018                               Respectfully submitted,

                                                  _____
                                                  Robert S. Hoff