# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
| | Case No. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO: *West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al.,* Case No. 1:18-op-45530 | Hon. Dan A. Polster |

**PLAINTIFF WEST BOCA MEDICAL CENTER, INC.'S OMNIBUS MEMORANDUM IN OPPOSITION TO (1) MEMORANDUM OF LAW IN SUPPORT OF THE MANUFACTURER DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT (DKT. No. 691-1); (2) MEMORANDUM IN SUPPORT OF DISTRIBUTORS' MOTION TO DISMISS (DKT. No. 684-1); AND (3) MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS CVS HEALTH CORPORATION, WALGREENS BOOTS ALLIANCE, INC., AND WALMART INC. (DKT. No. 686-1)**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iv

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 4

I.  The Marketing Defendants' Preemption Defense Fails as a Matter of Law...................... 4

II.  Defendants' Challenges to Plaintiff's RICO Claims Fail ................................................. 5

    A.  Plaintiff Has Alleged Direct Injury to Business or Property .................................. 5

    B.  Plaintiff Has Sufficiently Alleged Proximate Cause, Alleging Much More than the Requisite "Link" Between Defendants' Conduct and Its Injuries ........................ 11

        1.  The Injuries to Plaintiff and Other Hospitals Resulting from Defendants' Conduct Were Foreseeable ........................................................................ 13

            a.  Defendants Targeted Hospitals as an Integral Part of Their Supply Chain, and Inundated Them with Opioids .................................... 13

            b.  Defendants' Conduct Impaired Hospitals' Ability to Properly Manage the Use of Opioids............................................................. 14

            c.  The Cost of Treatment of Uninsured Persons, While Just One Element of the Hospital's Damages, Is Also Foreseeable ........... 16

            d.  The Modern Legal Obligations of Emergency Care Providers Render Their Injuries Foreseeable ................................................. 17

        2.  The Intervening Conduct of Others, if Foreseeable, Does Not Excuse a RICO Defendant from Liability............................................................... 18

        3.  The Tobacco Cases Upon Which Defendants Rely are Inapposite ......... 19

    C.  Plaintiff Has Pled Predicate Acts by Defendants and An Enterprise................... 21

    D.  Plaintiff Has Adequately Alleged Investment Injury for Its § 1962(a) Claim...... 25

        1.  Plaintiff's Allegations are Sufficient Under *Vemco*.................................. 25

        2.  Plaintiff Properly Pled a Claim Under 18 U.S.C. § 1962(d).................... 28

    E.  Plaintiff Has Properly Pleaded Conspiracy in Violation of § 1962(d) ................ 29

III.  Plaintiff Asserted an Actionable Public Nuisance Claim ................................................ 31

    A.  Plaintiff Has Alleged a Special Injury ................................................................ 32

    B.  Any Applicable Proximate Cause Requirement Does Not Provide a Basis for Dismissal of Plaintiff's Nuisance Claim.............................................................. 38

        1.  There are No Florida Decisions Applying a Negligence-Style Proximate Cause Requirement in a Public Nuisance Action ..................................... 38

        2.  Plaintiff's Allegations Are Sufficient to Allege Proximate Cause Under Any Standard That Might Apply ...................................................................... 39

IV.    Plaintiff Properly Pleaded Negligence ............................................................................ 39

    A.    Plaintiff Has Satisfied the "Minimal" Requirement of Pleading the Existence of a Duty of Care ......................................................................................................... 40

        1.    Defendants Owed Plaintiff a Common Law Duty of Care ....................... 40

    B.    Defendants Breached Their Duty of Care ............................................................ 43

        1.    Negligence in Marketing and Distribution is Actionable ......................... 44

        2.    The Distributor Defendants' Challenge to Count VII Fails With Their Challenge to Plaintiff's Other Negligence Claims.................................... 46

    C.    Plaintiff Has Sufficiently Pled that Its Injuries Were Proximately Caused by Defendants' Conduct ....................................................................................... 46

V.    Plaintiff Has Pled an Actionable Claim of Unjust Enrichment ....................................... 50

    A.    A Claim of Unjust Enrichment May Be Asserted Based on the Same Set of Facts as Other Claims .................................................................................................. 50

    B.    Plaintiff Has Conferred Benefits Upon the Defendants....................................... 51

        1.    Hospitals, Did Confer Affirmative Financial and Other Benefits to the Defendants, as Purchasers and Dispensers of Opioids and of Drugs Used to Treat Opioid Addiction .......................................................................... 51

        2.    Hospitals, Even More So Than Municipalities, were on the Front Lines of the "Cleanup" of the Externalities Caused by Defendants ....................... 53

    C.    The Benefits Conferred by the Hospital Were Not Incidental and Were Sufficiently "Direct" for Purposes of a Florida Unjust Enrichment Claim ............................. 55

    D.    Any Failure to Plead Knowledge and Acceptance is a Technical Defect that Can Be Cured.................................................................................................................. 57

    E.    It is Unjust for the Hospital to Bear the Costs of Remedying the Externalities of Defendants' Conduct, Regardless of Whether Some of its Costs Were Incurred in Fulfilling its Legal Obligations ............................................................................ 57

VI.    Plaintiff's FDUTPA Claim is Properly Pleaded ............................................................. 58

    A.    Plaintiff Has Properly Pled the Elements of a Claim under the FDUTPA ........... 59

        1.    Plaintiff Has Pleaded Unfair and Deceptive Acts in Trade or Commerce 59

        2.    Plaintiff's Allegations of Causation are Sufficient ................................... 63

        3.    Plaintiff Has Properly Pled Actual and Cognizable Damages.................. 64

    B.    FDUTPA's Safe-Harbor Provision Does Not Apply........................................... 65

VII.    Plaintiff's Misleading Advertising Claim is Properly Pleaded........................................ 66

VIII.    Plaintiff's Claims Are Not Barred Any Statutes of Limitations ...................................... 68

IX.    Plaintiff Sufficiently Alleged that Defendants' Actions Merit Punitive Damages........... 68

CONCLUSION..................................................................................................................... 69

# TABLE OF AUTHORITIES

**Cases**

*Aceto Corp. v. Therapeutics MD, Inc.*,
   No. 12-81253-CIV, 2013 WL 3761073 (S.D. Fla. July 17, 2013) ........................................... 66

*ADA v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ........................................................................................ 33

*ADT LLC v. Alarm Prot. Tech. Fla., LLC*,
   No. 12-80898-CIV-Ryskamp/Hopkins, 2013 WL 11276119 (S.D. Fla. Apr. 18, 2013).......... 76

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) .......................................................................... 20, 38, 39, 42

*Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*,
   839 F.3d 458 (6th Cir. 2016) ............................................................................................ 82

Anza v. Ideal Steel Supply Corp.,
   547 U.S. 451 (2006)........................................................................................................... 27

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*,
   241 F.3d 696 (9th Cir. 2001) ...................................................................................... 39, 40

*Auburn Mach. Works Co. v. Jones*,
   366 So. 2d 1167 (Fla.1979) ............................................................................................... 56

*Bailey v. St. Louis*,
   196 So. 3d 375 (Fla. 4th DCA 2016) ..................................................................... 70, 72, 77

*Baker v. Brunswick Corporation*,
   No: 2:17-cv-572-FtM-99MRM, 2018 WL 1947433 (M.D. Fla. 2018) ................................... 79

*Beck v. Prupis*,
   529 U.S. 494 (2000).......................................................................................................... 31

*BPI Sports, LLC v. Labdoor, Inc.*,
   No. 15-62212-CIV-BLOOM, 2016 WL 739652 (S.D. Fla. Feb. 25, 2016) ........................... 70

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008).................................................................................................... 12, 13

*Brown v. Cassens Transp. Co.*,
   546 F.3d 347 (6th Cir. 2008) ............................................................................................ 12

*Burgess v. M/V Tamano*,
    370 F. Supp. 247 (D. Me. 1973) ...................................................................... 39, 41

*Burton v. Hodgson Mill, Inc.*,
    No. 16-cv-1081-MJR-RJD, 2017 WL 12828826 (S.D. Ill. Apr. 6, 2017) ............................... 75

*Busby v. Crown Supply, Inc.*,
    896 F.2d 833 (4th Cir. 1990) ......................................................................... 30

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*,
    169 So. 3d 164 (Fla. 4th DCA 2015) ................................................................. 77

*Carriuolo v. Gen. Motors LLC*,
    72 F. Supp. 3d 1323 (S.D. Fla. 2014) ................................................................ 65

*Cent. Reg'l Emps. Ben. Fund v. Cephalon, Inc.*,
    No. 09-3418 (MLC), 2009 WL 3245485 (D.N.J. Oct. 7, 2009) ................................... 73

*Citadel Commerce Corp. v. Cook Sys., LLC*,
    No. 8:08-cv-1923-T-33TGW, 2009 WL 1230067 (M.D. Fla. May 5, 2009) ....................... 68

*City of Everett v. Purdue Pharma Ltd. P'ship*,
    No. C17-209RSM, 2017 WL 4236062 (W.D. Wash. Sep. 25, 2017) ................. 53, 61, 63, 69

*City of Los Angeles v. JPMorgan Chase & Co.*,
    No. 2:14-cv-04168-ODW(RZx), 2014 WL 6453808 (C.D. Cal. Nov. 14, 2014) ................... 62

*City of Seattle v. Monsanto Co.*,
    No. C16-107RSL, 2017 WL 698789 (W.D. Wash. Feb. 22, 2017) ................................. 53

*City of St. Louis v. American Tobacco Co.*,
    70 F. Supp. 2d. 1008 (E.D. Mo. 1999) .............................................................. 62

*Clay Elec. Co-op., Inc. v. Johnson*,
    873 So.2d 1182 (Fla. 2003) ......................................................................... 44

*Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*,
    332 F. App'x 565 (11th Cir. 2009) ................................................................... 75

*Continental 332 Fund, LLC v. Albertelli*,
    No. 2:17-cv-41-FtM-38MRM, 2018 WL 2849745 (M.D. Fla. June 11, 2018) ..................... 29

*Craighead v. E.F. Hutton & Co.*,
    899 F.2d 485 (6th Cir. 1990) ....................................................................... 29

*Day v. Fortune Hi-Tech Marketing Inc.*,
    No. 10-305, 2014 WL 4384443 (E.D. Ky. Sept. 3, 2014) ........................................ 30

*Ergon, Inc. v. Amoco Oil Co.*,
    966 F. Supp. 577 (W.D. Tenn. 1997) ................................................................. 62

*Evans v. City of Johnstown*,
    96 Misc. 2d 755 (Sup. Ct. Fulton Co. 1978) .......................................................... 63

*Fagundez v. Louisville Ladder, Inc.*,
    No. 10-23131, 2011 WL 6754089 (M.D. Fla. Dec. 22, 2011) ................................. 50

*Feiner v. Innovation Ventures LLC*,
    No. 12-62495-CIV-Dimitrouleas/Snow, 2013 WL 2386656 (S.D. Fla. May 20, 2013) ......... 65

*Fisher v. Bumbo Int'l Trust*,
    No.: 1:14-cv-22209-UU, 2014 WL 12026083 (S.D. Fla. Aug. 2014 ...................... 49

*Florida Dept. of Corrections v. Abril*,
    969 So.2d 201 (Fla. 2007) ................................................................................ 47

*Florida Power & Light Co. v. Periera*,
    705 So.2d 1359 (Fla. 1998) .............................................................................. 52

*Florida Power Corp. v. City of Winter Park*,
    887 So.2d 1237 (Fla. 2004) ............................................................................. 57

*Foman v. Davis*,
    371 U.S. 178 (1962) ......................................................................................... 83

*Gibbs v. Hernandez*,
    810 So.2d 1034 (Fla. 4th DCA 2002) ............................................................... 43

*Gibson v. Avis Rent–A–Car Sys., Inc.*,
    386 So.2d 520 (Fla. 1980) .......................................................................... 54, 55

*Glob. Tech LED, LLC v. HiLumz Int'l Corp.*,
    No: 2:15- cv-553-FtM-29CM, 2017 WL 588669 (M.D. Fla. Feb. 14 2017) ............ 76

*Godelia v. Doe 1*,
    881 F.3d 1309 (11th Cir. 2018) ....................................................................... 49

*Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc.*,
    863 F. Supp. 447 (E.D. Mich. 1994) ................................................................ 29

*Gregg v. Georgia*,
    428 U.S. 153 (1976) ......................................................................................... 20

*Guerrero v. Target Corp.*,
    889 F. Supp. 2d 1348 (S.D. Fla. 2012) ............................................................ 58

*Hageman v. Signal L.P. Gas, Inc.*,
 486 F.2d 479 (6th Cir. 1973) ..................................................................... 83

*Harbor Beach Surf Club, Inc. v. Water Taxi of Ft. Lauderdale, Inc.*,
 711 So. 2d 1230 (Fla. 1988) ...................................................................... 36

*Harris v. Nordyne, LLC*,
 No.14-CIV-21884-BLOOM/Valle, 2014 WL 12516076 (S.D. Fla. Nov. 14, 2014) ......... 59, 71

*Helman v. Seaboard Coast Line R. Co.*,
 349 So.2d 1187 (Fla. 1977) ........................................................................ 55

*Hemi Grp., LLC v. City of New York*,
 559 U.S. 1 (2010)...................................................................................... 20

*Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc.*,
 373 F.Supp.2d 1349 (S.D. Fla. 2005) ........................................................... 51

*Huff v. Firstenergy Corp.*,
 972 F. Supp. 2d 1018 (N.D. Ohio 2013)......................................................... 32

*Hunnings v. Texaco, Inc.*,
 29 F.3d 1480 (11th Cir. 1994) ............................................................... 49, 56

*Hutchings v. Nationstar Mortg., LLC*,
 No. 1:13 CV 00569, 2013 WL 5670939 (N.D. Ohio Oct. 16, 2013) ..................... 58

*Ideal Steel Supply Corp. v. Anza*,
 652 F.3d 310 (2d Cir.2011) ....................................................................... 30

*In re Auto. Parts Antitrust Litig. (Fuel Senders)*,
 29 F. Supp. 3d 982 (E.D. Mich. 2014).......................................................... 65

*In re Avandia Marketing, Sales Practices and Products Liability Litig.*,
 804 F.3d 633 (3rd Cir. 2015) ................................................................. 6, 14

*In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*,
 955 F. Supp. 2d 1311 (S.D. Fla. 2013) .................................................... 59, 78

*In re Neurontin Marketing and Sales Practices Litig.*,
 712 F.3d 21 (1st Cir. 2013)................................................................ 6, 13, 17, 19

*In re Opioid Litigation*,
 No. 400000/2017, 2018 WL 3115102 (Sup. Ct. Suffolk Co., N.Y. June 18, 2018).......... 34, 69

*In re Processed Eggs*,
 851 F. Supp. 2d 867 (E.D. Pa. 2012) ........................................................... 65

*In re Rezulin Prod. Liab. Litig.*,
  392 F. Supp. 2d 597 (S.D.N.Y. 2005) ................................................ 73

*Kohl v. Kohl*,
  149 So.3d 127 (Fla. 4th DCA 2014) ................................................ 47

*Kopel v. Kopel*,
  229 So. 3d 812 (Fla. 2017) ................................................ 66

*Lawson v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*,
  698 F.2d 250 (6th Cir. 1983) ................................................ 83

*Lewis v. City of Tallahassee*,
  No. 4:05cv268-WS, 2006 WL 231291 (N.D. Fla. Jan. 30, 2006) ................ 50

*Licul v. Volkswagen Group of Am. Inc.*,
  No. 13-61686-Civ-Cohn/Seltzer, 2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ...... 58

*Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*,
  91 F. Supp. 3d 940 (S.D. Ohio 2015) ................................................ 61

*Lutz v. Chesapeake Appalachia, L.L.C.*,
  717 F.3d 459 (6th Cir. 2013) ................................................ 81

*Marks v. United States*,
  430 U.S. 188 (1977) ................................................ 20

*McCain v. Fla. Power Corp.*,
  593 So.2d 500 (Fla.1992) ................................................ passim

*Melton v. Century Arms, Inc.*,
  243 F. Supp. 3d 1290 (S.D. Fla. Mar. 20, 2017) ................................ 58

*Melton v. Century Arms, Inc.*,
  No. 16-21008-CIV, 2017 WL 1063449 (S.D. Fla. Mar. 20, 2017) ................ 65

*Moore v. Texaco, Inc.*,
  244 F.3d 1229 (10th Cir. 2001) ................................................ 61

*Mosher v. Speedstar Div. of AMCA Int'l, Inc.*,
  979 F.2d 823 (11th Cir. 1992) ................................................ 55, 57

*NAACP v. AcuSport, Inc.*,
  271 F. Supp. 2d 435 (E.D.N.Y. 2003) ................................................ 42

*Newmyer v. Philatelic Leasing, Ltd.*,
  888 F.2d 385 (6th Cir.1989) ................................................ 27, 28

*Nicholas v. Miami Burglar Alarm Co.*,
    339 So.2d 175 (Fla. 1976) ................................................................................ 55

*Owens-Benniefield v. Nationstar Mortg. LLC*,
    258 F. Supp. 3d 1300 (M.D. Fla. 2017)........................................................... 74

*PCA Minerals, LLC v. Merit Energy Co., LLC*,
    Nos. 16-2598 and 16-2679, 2018 WL 846565 (6th Cir. Feb. 14, 2018) ............... 58

*Penelas v. Arms Technology, Inc.*,
    No. 99-01941 CA-06, 1999 WL 12043453 (11th Fla. Cir. Ct. Dec. 13, 1999)....... 42

*Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank, N.A.*,
    667 So. 2d 876 (Fla. 3d DCA 1996) ................................................................ 67

*Perry v. Am. Tobacco Co.*,
    324 F.3d 845 (6th Cir. 2003) ........................................................................... 20

*Pincus v. Speedpay, Inc.*,
    No. 15-80164-CIV-MARRA, 2017 WL 1153872 (S.D. Fla. Mar. 28, 2017) .......... 29

*Prohias v. Pfizer, Inc.*,
    490 F. Supp. 2d 1228 (S.D. Fla. 2007 ............................................................. 78

*Railway Express Agency, Inc. v. Garland*,
    269 So.2d 708 (Fla. 1st DCA 1972) ................................................................ 54

*Romano v. Motorola, Inc.*,
    No. 07-CIV-60517, 2007 WL 4199781 (S.D. Fla. Nov. 26, 2007)......................... 66

*Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*,
    668 So.2d 205 (Fla. 2d DCA 1995) ................................................................. 57

*Samuels v. King Motor Co. of Fort Lauderdale*,
    782 So. 2d 489, 496 (Fla. 4th DCA 2001) ....................................................... 81

*Se. Laborers Health & Welfare Fund v. Bayer Corp.*,
    655 F. Supp. 2d 1270 (S.D. Fla. 2009) ............................................................ 81

*Shepherd v. Am. Honda Motor*,
    822 F. Supp. 625 (N.D. Cal. 1993) .................................................................. 53

*Simon v. Shearson Lehman Bros.*,
    895 F.2d 1304 (11th Cir. 1990) ....................................................................... 52

*Smith v. Hinkley*,
    123 So. 564 (Fla. 1929) .................................................................................. 43

*Smith v. Mellon Bank*,
   957 F.2d 856 (11th Cir. 1992) ........................................................................ 81

*Sosa v. Coleman*,
   646 F.2d 991 (11th Cir. 1981) ........................................................................ 54

*State Farm Mut. Auto. Ins. Co. v. Brown*,
   No. 16-80793-CIV, 2017 WL 1291995 (S.D. Fla. Mar. 30, 2017) ...................... 64

*State Farm Mut. Auto. Ins. Co. v. Performance Ortho. & Neurosurgery*,
   278 F. Supp. 3d 1307 (S.D. Fla. 2017) ............................................................ 73

*State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*,
   427 Fed. App'x 714 (11th Cir. 2011) .............................................................. 59

*State v. Shapiro & Fishman, LLP*,
   59 So. 3d 353 (Fla. 4th DCA 2011) ................................................................ 74

*Stop and Shop Companies v. Fisher*,
   444 N.E. 2d 368 (Mass. 1983) ........................................................................ 36

*Tardif v. PETA*,
   829 F. Supp. 2d 1219 (M.D. Fla. 2011) .......................................................... 53

*Third Party Verification, Inc. v. Signaturelink, Inc.*,
   492 F. Supp. 2d 1314 (M.D. Fla. 2007) .......................................................... 79

*Traveler's Prop. Cas. Co. of Am. v. Actavis, Inc.*,
   225 Cal. Rptr. 3d 5 (Cal. Ct. App. 2017) ........................................................ 22

*Traxler v. PPG Indus.*,
   158 F. Supp. 3d 607 (N.D. Ohio 2016) ...................................................... 71, 72

*Trollinger v. Tyson*,
   370 F.3d 602 (6th Cir. 2004) ...................................................... 7, 12, 13, 14

*U.S.  v. Lopez*,
   880 F.3d 974, 982 (8th Cir. 2018) ................................................................ 15

*U.S.  v. Moore*,
   423 U.S. 122 (1975) ...................................................................................... 22

*U.S. v. Driver*,
   535 F.3d 424 (6th Cir. 2008) ........................................................................ 32

*U.S. v. Healy Tibbitts Const. Co.*,
   607 F. Supp. 540 (N.D. Cal. 1985) ................................................................ 63

*U.S. v. Stevens*,
   994 So.2d 1062 (Fla. 2008) ................................................................. 45

*Vemco, Inc. v. Camardella*,
   23 F.3d 129 (6th Cir. 1994) ........................................................... 27, 28

*Vining v. Avis Rent–A–Car Sys., Inc.*,
   354 So.2d 54 (Fla.1977) ................................................................... 54

*Wallace v. Dean*,
   3 So.3d 1035 (Fla. 2009) ................................................................. 45

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
   714 F.3d 414 (6th Cir. 2013) ........................................................ 12, 14

*Wallace v. Southern Cable Systems, LLC*,
   No.: 3:16cv209-RV/CJK, 2016 WL 9308535 (N.D. Fla. Nov. 4, 2016)................................. 72

*West v. Caterpillar Tractor Co.*,
   336 So. 2d 80 (Fla.1976) ................................................................. 56

*White v. Smith & Wesson Corp.*,
   97 F. Supp. 2d. 816 (N.D. Oh. 2000) (Ohio law) ................................. 62

*Williams v. Bear Stearns & Co.*,
   725 So.2d 397 (Fla. 5th DCA 1998) ................................................. 59

*Williams v. Gerber Products Co.*,
   552 F.3d 934 (9th Cir.2008) ........................................................... 75

*Williams v. Wells Fargo Bank N.A.*,
   No. 11-21233-CIV, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011)........................................ 66

*Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*,
   123 So.3d 1149 (Fla. 5th DCA 2012)................................................. 77

**Statutes**

18 U.S.C. § 1961 ............................................................................... 23

18 U.S.C. §1962 ............................................................................... 29

21 U.S.C. § 842 ............................................................................... 23

42 U.S.C. § 1395dd........................................................................... 35

Fla. Stat. § 395.1041 ....................................................................... 35

Fla. Stat. § 501.202 ........................................................................ 58

Fla. Stat. § 501.203 ........................................................................................... 62

Fla. Stat. § 501.204 ........................................................................................... 58

Fla. Stat. § 501.212 ........................................................................................... 64

Fla. Stat.. § 501.211 ........................................................................................... 64

**Other Authorities**

1970 U.S.C.C.A.N. 4566 ..................................................................................... 20

Prater, Joseph, "West Virginia's Painful Settlement: How the Oxycontin Phenomenon and
    Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for
    Black Markets," 100 Nw. U. L. Rev. 1409 (Spring 2006) ................................................. 45, 46

Restatement (Second) of Torts § 448 ............................................................................. 48

Restatement (Second) of Torts § 821 ............................................................................. 33

Restatement of Restitution § 115 (1937) ......................................................................... 54

William L. Prosser, Private Action for Public Nuisance, 52 VA. L. REV. 997, 1013-1015 (1966)
    ............................................................................................................ 33

**Rules**

Fed. R. Evid. 201 ............................................................................................... 14

## INTRODUCTION

Defendants have moved to dismiss, contending that West Boca Medical Center, Inc.'s ("West Boca," "the Hospital" or **"Plaintiff"**) claims are so deficient that, even accepting Plaintiff's allegations as true, no set of facts can be envisioned that would allow even a single claim to proceed. Defendants' arguments fail on every front. The gravamen of Defendants' moving papers is that West Boca's and other hospitals' injuries were not sufficiently linked to the mess that the Defendants created, and that hospitals are simply too remotely situated from Defendants' conduct to have their day in court.

But nothing could be further from the truth. As a result of the epidemic precipitated by Defendants' deceptive and negligent acts, hospital emergency rooms and beds are overrun with patients whose medical conditions result directly from or are made more difficult by a history of opioid use. To meet these needs, Plaintiff has had to add services, divert resources from other necessary areas of care, hire extra security personnel to control the pill seekers who crowd its emergency rooms demanding another opioid fix, and meet additional regulatory burdens. Increased human resource costs and lost employee productivity are among the consequences.  The demands of caring for these patients has strained the resources of West Boca and other hospitals, leaving them to bear tremendous direct and indirect unreimbursed costs in their businesses that they would not have incurred but for the crisis.

Defendants' misconduct is well documented throughout the Complaint ("Compl."), as well as in investigations, criminal proceedings, and suits by attorneys general, counties (including Palm Beach County and Broward County, Florida), and municipalities (including Chicago). In short, Defendants have engaged in a deceitful marketing and distribution campaign of titanic proportions

1

in support of their opioid products.[1]

Marketing Defendants[2] employed a sophisticated campaign to convince the medical community and the public that opioids were safe—essentially, that high doses of pharmaceutical-grade heroin could treat chronic pain, without significant risk of addiction. Defendants' deceptive messages tainted every source upon which doctors rely for information, and prevented doctors and medical institutions from making informed treatment decisions. Those doctors include physicians on staff at West Boca and doctors with privileges to practice there. This campaign undermined Plaintiff's efforts at stewardship as to the opiates it bought from Defendants.[3]

Once Marketing Defendants created the mass market for prescription opioids, Distributor Defendants[4] flooded it. Distributor Defendants had a major financial incentive to supply opioids to pill mills (doctors, clinics, or pharmacies that prescribe or dispense opioids inappropriately or for non-medical reasons). And they put that incentive ahead of patient health and their statutory and common law duties—supplying opioids in quantities that exceeded any legitimate market need.[5]

Distributor Defendants were not alone in this misconduct. Marketing Defendants and National Retail Pharmacy Defendants[6] alike deliberately disregarded their legal obligations to

---

[1] For descriptions of Defendants' misconduct, investigations and criminal settlements, *see*, *e.g.*, Compl. at ¶¶ 86, 164-184, 288-299, 498-500, 506, 793-794 (Purdue); ¶¶ 108, 185-192, 300-322, 501, 507 (Endo); ¶¶ 193-201, 502, 785-787 (Janssen); ¶¶ 90, 202-204, 503, 788-792 (Cephalon); ¶¶ 205-208, 323, 504 (Actavis); ¶¶ 209-213, 324-325, 508, 600, 724-732 (Mallinckrodt); ¶¶ 114, 466-480 (Insys); ¶¶ 144, 598-599, 630-638 (McKesson); ¶¶ 602, 646-648 (AmerisourceBergen); ¶¶ 602, 639-645 (Cardinal); ¶¶ 684-696 (CVS); ¶¶ 697-703 (Walgreens); ¶¶ 812-893 (RICO allegations).
[2] Collectively, Purdue, Actavis, Cephalon, Janssen, Endo, Insys, and Mallinckrodt are referred to as the "Marketing Defendants." *Id.* at ¶ 131.
[3] *Id.* at ¶¶ 155-459 (describing the Marketing Defendants' deceptive campaign), ¶ 814 (concealing risks and misrepresenting benefits of opioids to Plaintiff), ¶ 840 (same).
[4] Cardinal, McKesson, and AmerisourceBergen are collectively referred to as the "Distributor Defendants." *Id.* at ¶ 148.
[5] *Id.* at ¶¶ 509-514.
[6] Collectively, Defendants CVS, Kroger, Rite Aid, Walgreens, and Wal-Mart are referred to as "National Retail Pharmacies." *Id.* at ¶ 154.

maintain effective controls against diversion, to report suspicious orders and prescribers, and to cease supplying dangerous prescription opioids. Instead, they fostered the black market for diverted prescription opioids and the concomitant rise in heroin and fentanyl abuse by opioid addicts who could no longer legally acquire—or simply could not afford—prescription opioids.

Meanwhile, all of the Defendants worked together to shore up markets for their drugs by fraudulently increasing quotas that would otherwise limit the supply of prescription opioids. Defendants' conduct, including opioid diversion, meant economic diversion: profits from increased sales flowed to Defendants, while their carefully orchestrated misinformation campaign directed overuse of opioid products and saddled Plaintiff and similar hospitals with the enormous burden of caring for the increased number of the opiate-addicted, at the expense of other patients and without the reasonable prospect of cost recovery.[7]

We ask the Court to keep three things in mind when considering Defendants' meritless arguments. First, hospitals like West Boca are the front line of the opioid epidemic. As Defendants concede, hospitals are battling a true "public health crisis."[8]  And in those trenches, hospitals bear direct and foreseeable damages that are unlike those faced by any other party in this litigation. West Boca is a full-service surgical hospital. Federal and Florida laws mandate that West Boca assess and treat the many overdose victims and other opioid affected patients who pass through its doors, regardless of the patients' ability to pay. Plaintiff must also treat patients who have serious medical conditions that require extra care and expense because they have a history of opioid use. In providing these services, West Boca suffers millions of dollars in damages each year through non-payments and under-payments. West Boca also bears additional unreimbursed expenses in the

---

[7] *Id.* at ¶¶ 515-662.
[8] Memorandum In Support of Distributors' Motion to Dismiss Complaint (Dkt. No. 684-1) (hereinafter "Distrib. Mem."), at 1. All docket references are to entries in the master MDL docket, No. 1:17-md-2804.

form of increased security and other operating costs. This is the reality of hospital health care in the era of the opioid crisis—a crisis precipitated solely by Defendants' actions.

<u>Second</u>, Defendants' contention that West Boca's and other hospitals' injuries are too remote is particularly galling. This was no unhappy accident. Hospitals like West Boca operate full-service pharmacies, where patients fill their prescriptions before stepping outside the hospital doors onto what is often the path to addiction. Hospitals are not incidental victims, but, rather, are direct *targets* of the Defendants' marketing and distribution schemes—effectively part of the Defendants' marketing infrastructure.

<u>Third</u>, this is not *Tobacco* redux. Defendants seek to rely on precedent from the tobacco wars that booted hospital claims. But the similarity between those cases and this litigation ends with the identity of the plaintiffs. Here, Defendants targeted hospitals as a means to perpetuate their unlawful, profit-driven machine. No physician working at a hospital ever prescribed cigarettes—but hospital physicians prescribed Defendants' products every day based on misleading—indeed, fraudulent—information. And when addicts needed treatment, their first stop was often a hospital emergency room. The simple fact is that West Boca and other hospitals have uniquely borne damages that are directly and foreseeably related to Defendants' conduct.

This is not a close case. Respectfully, this Court should deny Defendants' motions to dismiss and permit the Hospital's claims to proceed to discovery and trial.

<b><u>ARGUMENT</u></b>

## I.    <u>The Marketing Defendants' Preemption Defense Fails as a Matter of Law</u>

Defendants spend half a page raising preemption arguments identical to those they made

4

in the *Broward* Motion to Dismiss and the *Summit* Motion to Dismiss.[9]  Plaintiff incorporates fully

the responses stated in the *Summit* and *Broward* oppositions.[10]  For the same reasons stated in both

oppositions, Defendants arguments must fail.

## II.    Defendants' Challenges to Plaintiff's RICO Claims Fail

Defendants argue that Plaintiff has failed to state a RICO claim, largely asserting the

same arguments they have raised as to the RICO claims alleged by the cities and counties.[11]

Defendants argue that Plaintiff (1) has not alleged an injury to "business or property" and that its

claims are too "remote" and "entirely derivative;" (2) that there is no actual or proximate cause;

and (3) that Plaintiff has not pleaded predicate acts or a plausible enterprise.

### A.    Plaintiff Has Alleged Direct Injury to Business or Property

Defendants argue that Plaintiff has failed to allege an injury to business or property to state

a claim for RICO damages, and that Plaintiff's injury is entirely "derivative" of the injuries of

---

[9] *Compare* Memorandum of Law in Support of the Manufacturer Defendants' Joint Motion to Dismiss Plaintiff's Second Amended Complaint, *Broward County, Florida v. Purdue Pharma L.P.*, Nos. 17-md-2804, 18-op-45332 (N.D. Ohio June 8, 2018) (Dkt No. 593-1) ("Mfr. *Broward* Mem."), at 5 *with* Memorandum of Law in Support of the Manufacturer Defendants' Joint Motion to Dismiss Plaintiff's Complaint ("Mktg. Mem."), Dkt. No. 691-1 at 8.

[10] Plaintiffs County of Summit, Ohio, and City of Akron, Ohio's Omnibus Memorandum in Opposition to (1) Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Motion to Dismiss (Doc. 491); (2) Motion to Dismiss Complaint by Defendants Walmart Inc., CVS Health Corp., Rite Aid Corp., and Walgreens-Boots Alliance, Inc. (Doc. 497); and (3) Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 499), *County of Summit, Ohio v. Purdue Pharma L.P.*, Nos. 17-md-2804, 1:18-op-45090 (N.D. Ohio June 22, 2018) (Dkt. No. 654) ("*Summit* Opp.") at 114-122; Plaintiff Broward County, Florida's Omnibus Memorandum in Opposition to (1) Manufacturer Defendants' Joint Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. # 593); Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Motion to Dismiss (Fed. R. Civ. P. 12(B)(6)) (Dkt. # 591); and (3) Motion to Dismiss by Defendants CVS Health Corp., Walgreens Boots Alliance, Inc., and Walmart Inc. (Dkt. # 582), *Broward County, Florida v. Purdue Pharma L.P.*, Nos. 17-md-2804, 18-op-45332 (N.D. Ohio July 9, 2018) (Dkt. No. 730) ("*Broward* Opp.") at 9.

[11] Mktg. Mem. at 4-6; Distrib. Mem. at 7-13; Memorandum in Support of Motion to Dismiss by Defendants CVS Health Corp., the Kroger Co., Walgreens Boots Alliance, Inc., and Walmart Inc. ("Pharm. Mem."), Dkt. No. 686-1, at 3-4.

others.[12] For the reasons explained in the *Summit* opposition brief, which are incorporated herein[13] and expanded upon below, Plaintiff has sufficiently alleged injury to its business or property to assert a claim under RICO. Plaintiff has alleged that it was injured in its business of providing health care by the opioid epidemic created by Defendants, specifically identifying financial and other impacts it has incurred.[14] These effects include, but are not limited to, increased operational costs such as expansion of its facility to meet the demands of the opioid epidemic, the substantial increased costs of care of patients, and the increased complication of care of patients.

Insurers and care providers have been successful in pleading injuries to their "business or property" for purposes of 18 U.S.C. § 1964(c) in actions asserted against pharmaceutical manufacturers and distributors who engaged in deceptive marketing practices. In *In re Avandia Marketing, Sales Practices and Products Liability Litig.*, 804 F.3d 633 (3rd Cir. 2015), the Third Circuit held that payors had alleged an injury to their "business or property," having paid for the drugs that were marketed deceptively by the defendants. *Id*. at 640. In *In re Neurontin Marketing and Sales Practices Litig.*, 712 F.3d 21 (1st Cir. 2013), the First Circuit affirmed a $140 million judgment for Kaiser Permanente (which operates health care facilities) against Pfizer, after the jury found that the defendants intended to increase Neurontin prescriptions through their deceptive marketing activity. *Id*. at 49. In fact, the existence of an injury to "business or property" was not seriously disputed, and the issues raised on appeal related principally to proximate cause (on which the First Circuit ruled favorably for plaintiffs, as discussed, *infra*).

The Sixth Circuit has rejected an argument, similar to the one asserted here, that an injured party cannot bring suit because the injury is allegedly "derivative" of that to another person who

---

[12] *See* Distrib. Mem. at 8-10.
[13] *Summit* Opp. at 35-38.
[14] Compl. at ¶¶ 51-66.

also could have brought suit. In *Trollinger v. Tyson*, 370 F.3d 602 (6th Cir. 2004) the Sixth Circuit reversed a district court dismissal of a case brought by four employees of Tyson who alleged that Tyson had violated RICO by "engaging in a scheme with several employment agencies to depress the wages of Tyson's hourly employees but hiring illegal immigrants." *Id.* at 605. Tyson moved to dismiss, contending that plaintiffs' claims were derivative of an injury to their union. In reversing, the Sixth Circuit rejected Tyson's arguments of the employees' injuries were exclusively derivative, even though the union also could have alleged a similar injury and brought suit, because of the employees' relationship with the employer. *Id.* at 616.

Plaintiff pleads categories of injuries to its own "business or property," and those injuries are direct, and not derivative of injuries to other persons.[15] As the Third Circuit found in *Avandia*, a business that pays additional costs as a result of pharmaceutical companies' fraudulent conduct has incurred injuries to *its own* "business or property," regardless of whether other persons might also have been harmed. But Plaintiff has considerably more direct injuries than the successful third party payor plaintiffs in *Neurontin* and *Avandia*, and also at least as direct as those injuries alleged in the meritorious claims brought by municipalities in this litigation, as Plaintiff's injuries extend well beyond the unreimbursed costs of treatment. As alleged in the Complaint, Defendants engineered a dramatic shift in how, when, and why opioids were prescribed by physicians, used by Plaintiff's patients, and purchased by Plaintiff to meet the increased demand.[16] Indeed, through deception and fraud, Defendants inundated Plaintiff with dangerous prescription opioids.[17] Plaintiff's physicians used those opioids to treat patients for chronic pain and prescribed opioid painkillers for patients to use at home, resulting in addiction and complications. When patients

---

[15] *See* Mktg. Mem. at 7 and Distrib. Mem. at 9.
[16] Compl. at ¶ 15.
[17] *Id.* at ¶ 63.

7

presented to the emergency room and/or were hospitalized, Plaintiff's in-house pharmacy had to fill those prescriptions. And Plaintiff's patients requested opioids for chronic pain, which further increased the demand and strained hospital resources. This resulted in injuries to the Plaintiff's business and property that can be identified and quantified through reference to the relevant billing and treatment codes.

Defendants rely heavily on *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556 (6th Cir. 2013) (en banc), alleging that Plaintiff's injuries are derivative of any possible personal injury claims its patients might have.[18] But *Jackson* is inapposite. In *Jackson*, the Sixth Circuit affirmed a district court dismissal of RICO claims brought by workers' compensation beneficiaries who alleged that their employer, third-party plan administrators, and doctors had engaged in a fraudulent scheme to avoid paying benefits, reasoning that, when the plaintiff's only injury is lost workmen's compensation benefits, which are inherently tied to his personal injury, s/he does not have an injury to "business or property." *Id.* at 565-66. But *Jackson* merely holds that personal injury damages are not an injury to "business or property," and its holding only applies to claims for "personal injuries and pecuniary losses proximately resulting from a personal injury." *Id.* at 565 (relying on *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), in which the Supreme Court considered similar language in the antitrust context). *Jackson* is further distinguishable as it was also driven in substantial part by concerns of protecting Michigan's workers' compensation scheme, as the court expressed concern that the plaintiffs' claims represented a collateral attack on the administrative scheme set up by Michigan to address workers' compensation claims. *Id.* at 567-68.

Unlike the claims asserted in *Jackson*, Plaintiff's claims are not for personal injuries to

---

[18] *See* Distrib. Mem. at 8-9.

anyone, but are for direct injury to its business and property. The harms that Defendants caused, which also impact Plaintiff's revenue-generating function, are direct injuries to its "business and property," which has been decisively and functionally construed as any form of economic loss: "anything of material value owned or possessed."  *Reiter*, 442 U.S. at 338. "Money, of course, is a form of property." *Id*.

Plaintiff's claims for increased costs, uncompensated care and overpayment for opioids are claims for injury to "business or property." In a series of recent cases filed by insurers, district courts have consistently held that *Jackson* does not bar claims by insurers seeking to recover damages under RICO for damages arising out of payment of claims and charges for healthcare.[19] As noted by the court in *Vital Cmty. Care*, "When a commercial enterprise suffers a loss of money

---

[19] *See State Farm Mutual Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-10266, 2014 WL 5427170, at *8 (E.D. Mich. Oct. 24, 2014) ("*Jackson* does not bar a corporation that sells insurance covering personal injury claims from bringing a RICO suit, because the injuries alleged in relation to an enterprise seeking fraudulent reimbursements for services performed are to the business or property of the corporation."); *Allstate Ins. Co., v. Medical Evaluations, P.C.*, No. 13-14682, 2014 WL 2559230, at *1 (E.D. Mich. June 6, 2014) ("Unlike the employee-plaintiffs in *Jackson*, Allstate is not seeking to recover for personal injuries in this action . . . Allstate is seeking to recover for alleged injuries to both its property and its business-injuries that arose when the Defendants allegedly fraudulently induced Allstate to pay large volumes of dishonest claims."); *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, No. 12-11500, 2014 WL 555199, at *2 (E.D. Mich. Feb. 12, 2014) (distinguishing *Jackson* and finding that "State Farm's injuries arise from the payment of allegedly fraudulent claims submitted by the Clinics . . . an injury [that] is clearly not "personal" and is an injury to State Farm's "business or property.") (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)); *State Farm Mut. Auto. Ins. Co. v. Kugler*, No. 11-80051, 2011 WL 4389915, at *10 (S.D. Fla. Sept. 21, 2011)("Because State Farm alleges it was the direct target and recipient of fraudulent bills and related medical documentation submitted by defendants in connection with unnecessary diagnostic tests and medical procedures allegedly performed by defendants throughout [the] course of the fraudulent scheme alleged in the complaint, and that it was injured in its business or property when it paid first and third party insurance claims on behalf of its insureds in reliance on those bills and reports, the court finds the allegations of a cognizable economic injury which supports its standing to sue under RICO."); *State Farm Mut. Auto. Ins. Co. v. Warren Chiropractic & Rehab Clinic P.C.*, 2015 WL 4724829, at *12 (E.D. Mich. Aug. 10 2015) (*Jackson* is distinguishable "because it is not the insured seeking to recover from the insurance company for his or her injuries, but rather the insurance company seeking to recover from the medical providers for purportedly fraudulent claims."); *State Farm Mut. Auto. Ins. Co. v. Vital Cmty. Care, P.C.*, 2018 WL 2194019, at *6 (E.D. Mich. May 14, 2018) (distinguishing *Jackson* as State Farm sought damages for money paid for fraudulent claims) ("*Vital Cmty. Care*").

[], it suffers an injury both in its 'business and its 'property,'" particularly when the commercial enterprise's property is diminished by a payment of money wrongfully induced[.]" *Id.* (quoting *Reiter*, 442 U.S. at 339-40).  Recovery simply is not barred because a business enterprise has a pecuniary injury that is in some way factually related to a third person's personal injury.  As noted by Judge Levy in *Universal Health Group*, "[i]f any claim merely derivative of a personal injury barred RICO liability, then not only would insurance companies be barred from seeking RICO recovery, but doctors, hospitals and any number of nonprofits directly injured in their business dealing involving personal injuries would as well. This not how the Court interprets the holding in *Jackson*." 2014 WL 5427170 at *8. Plaintiff's claims are no different from the claims asserted by the insurers in these cases. Plaintiff's claims do not derive from any personal injury which Plaintiff suffered, as it cannot suffer personal injury. Defendants' False Narrative Enterprise[20] caused Plaintiff to suffer a loss of money in its commercial enterprise. Moreover, Defendants marketed and continue to market their opiate products directly to Plaintiff and its doctors, and Plaintiff was and is a direct customer and victim of the Defendants' false, deceptive and unfair marketing of opioids.

Certain of the Defendants also cite *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). The *Anza* plaintiff did not have standing because the conduct alleged (defrauding the state tax authority) directly harmed the state, while competitive harm to the plaintiff (the defendant's ability to offer lower prices) was only an indirect side effect of the defendant's failure to pay taxes. *Anza*, 547 U.S. at 458. Here, in contrast, Defendants' RICO violations directly caused Plaintiff's

---

[20] Compl. at ¶¶ 812-846.

economic injuries, whereas in *Anza*, the Defendants' conduct only injured the state and gave an economic *benefit* to a competitor.[21]

Citing *Anza* and *Jackson*, the Marketing Defendants argue that Plaintiff's injuries are "more attenuated" than the municipalities' claims.[22] This is an odd argument, since (1) hospitals are purchasers and dispensers of opioids who do business with the Defendants,[23] and were part of their marketing and distribution infrastructure,  and (2) hospitals respond to opioid victims on the front line of the epidemic, render care which goes uncompensated, and expend capital and human resources in direct response to Defendants' conduct.

**B.    Plaintiff Has Sufficiently Alleged Proximate Cause, Alleging Much More than the Requisite "Link" Between Defendants' Conduct and Its Injuries**

Under RICO, proximate cause requires a "some direct relation between the injury asserted and the injurious conduct alleged." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Proximate cause is "a flexible concept that does not lend itself to 'a black-letter rule that will dictate the result in every case.'"  *Id.*; *accord Brown v. Cassens Transp. Co.*, 546 F.3d 347, 357 (6th Cir. 2008). The "direct injury" requirement simply requires a "link between the scheme and the type of injury [plaintiff] suffered." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013).

---

[21] In *Anza*, the Supreme Court was also concerned that another party held a better position to prove damages caused by the defendant than the plaintiff. *See Anza*, 547 U.S. at 460. ("Ideal accuses the Anzas of defrauding the State of New York out of a substantial amount of money. If the allegations are true, the State can be expected to pursue appropriate remedies. The adjudication of the State's claims, moreover, would be relatively straightforward; while it may be difficult to determine facts such as the number of sales Ideal lost due to National's tax practices, it is considerably easier to make the initial calculation of how much tax revenue the Anzas withheld from the State. There is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.") However, here, if Plaintiff were not to pursue the claims, no other party would be in the right position to pursue those claims.
[22] Mktg. Mem. at 4.
[23] The Marketing Defendants' intentional fraudulent misrepresentations and omissions regarding prescription opioids that caused the opioid epidemic directly injured Plaintiff. These misrepresentations were made to the medical community, including to Plaintiff directly. Compl. at ¶ 62.

In *Trollinger*, the Sixth Circuit rejected the defendant's contention that the plaintiffs' "chain of reasoning" in support of their claim (that their wages were depressed as a result of their employer's violation of immigration laws**)** was "largely speculative."  370 F.3d at 619. The court emphasized that, to prevail on the merits, a RICO plaintiff need show only that the defendants' "conduct was a substantial cause" of their injury, and need not show that it is the "sole cause." *Id.* at 620. The court determined that, notwithstanding the complexity of the plaintiffs' damage theory, their factual allegations had to be accepted as true for pleading purposes, and could ultimately be proven to be true. *Id*. at 619-20.

Courts have rejected proximate cause challenges to claims brought by health care providers and third party payors against pharmaceutical companies. In *Neurontin*, the First Circuit rejected the argument (also made here) that "there are too many steps in the causal chain between its misrepresentations and Kaiser's alleged injury to meet the proximate cause 'direct relation' requirements as a matter of law." 712 F.3d at 39. The court reasoned that

> the adoption of Pfizer's view would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct.
>
> In fact, the causal chain in this case is anything but attenuated. Pfizer has always known that, because of the structure of the American health care system, physicians would not be the ones paying for the drugs they prescribed. Pfizer's fraudulent marketing plan, meant to increase its revenues and profits, only became successful once Pfizer received payments for the additional Neurontin prescriptions it induced. Those payments came from Kaiser and other TPPs.

*Id*. at 38-39 (citing *Bridge*, 553 U.S. at 657) (other internal citations and footnote omitted). Pfizer's fraudulent marketing campaign resulted in the economic injuries alleged by Kaiser. *Id*. at 40. Similarly, in affirming the judgment of the district court denying GSK's motion to dismiss the plaintiff's RICO claims, the *Avandia* court found that there was a direct relationship between

12

GSK's wrongful conduct in marketing of Avandia and injuries to third party payors, noting that the "injury alleged by the TPPs is an economic injury independent of any physical injury suffered by Avandia users." 804 F.3d at 644.

Here, there is much more than merely a "link" between the Defendants' conduct and Plaintiff's injuries, *Wallace*, 714 F.3d at 420, as the factual allegations of the Complaint, if accepted as true, establish that Defendants' conduct was a "substantial cause" of those injuries. *Trollinger*, 370 F.3d at 615.

### 1.   The Injuries to Plaintiff and Other Hospitals Resulting from Defendants' Conduct Were Foreseeable

#### a.   Defendants Targeted Hospitals as an Integral Part of Their Supply Chain, and Inundated Them with Opioids

As a result of Defendants' longstanding fraud on physicians and consumers, the Hospital was made an unwitting part of the opioid supply chain. Plaintiff has pleaded that because of deception and fraud, Defendants inundated it with dangerous prescription opioids.[24] In fact, Defendant Purdue had an agreement with Abbott Laboratories to specifically target hospitals.[25] This inundation was by design and for profit, as the Marketing Defendants sold their prescription opioid painkillers to the physicians, pharmacists, and patients at the Hospital.[26] Defendants manipulated doctors to prescribe and patients to request opioids for the treatment of chronic pain. As Defendant McKesson admits, hospital pharmacies purchase from Defendants "huge" quantities of drugs, including opioids, to dispense to patients.[27] Indeed, McKesson "has grown by providing

---

[24] Compl. at ¶¶ 17, 52, 63, 66.
[25] *Id.* at ¶ 124.
[26] *Id.* at ¶ 62.
[27] *See generally*, *id.* at ¶ 526; "Health Systems Pharmacy Executive Alliance and McKesson Release Landmark High Performance Study, Empowering Health Systems Pharmacies to Improve Clinical Outcomes and Financial Performance." ("McKesson Memo"); *available at*

pharmaceutical[s] . . . [for] hospital and retail pharmacy automation. . . . ”[28] McKesson makes no bones that it targets hospital pharmacies, and that hospital pharmacies are major purchasers of prescription opioids.

Moreover, “[o]pioids are the *primary* analgesic treatment for patients experiencing mild to severe acute postoperative surgical pain.”[29] This produces a staggering number of potential epidemic victims as opioid users. “Although opioids are the mainstay for acute postoperative pain control, one study demonstrated that patients who receive an opiate prescription within 7 days of surgery are 44% more likely to still be using the medication 1 year after surgery than patients who do not receive an opioid prescription.”[30]

### b. Defendants' Conduct Impaired Hospitals' Ability to Properly Manage the Use of Opioids

Hospitals are integral to the solution to the opioid epidemic, because they can “aid in the proper treatment of postoperative pain while also helping to combat a nationwide epidemic.”[31] Indeed, “*[h]ospital* pharmacists…are in an ideal position to help address the opioid epidemic and

---

http://www.mckesson.com/about-mckesson/newsroom/press-releases/2006/health-systems-pharmacy-executive-alliance-and-mckesson-release-landmark-high-12-04-2006/ (last accessed July 25, 2018). Plaintiff cites the foregoing source, and other sources outside of the Complaint, primarily academic articles, for purposes of establishing general propositions applicable to hospitals that would appear to be beyond dispute – namely that they operate pharmacies, and regularly purchase and dispense opioids to patients. These would appear to be “legislative facts” which the Court may consider without need for them to be pled or judicially noticed, which would be required as to “adjudicative facts.” *See* Fed. R. Evid. 201, Advisory Note. *See also*, *e.g.*, *U.S. v. Lopez*, 880 F.3d 974, 982 (8th Cir. 2018) (Legislative facts “are established truths, facts or pronouncements that do not change from case to case but apply universally”). Alternatively, and in an abundance of caution, to the extent that the Court finds that it cannot properly consider any of these materials on a motion to dismiss, Plaintiff proffers them as additional factual allegations which Plaintiff would include in an amended complaint should an amendment be needed to address any defects in the Complaint.

[28] McKesson Memo, *supra* n.26.

[29] Cheryl Genord, et al., *Opioid exit plan: A pharmacist's role in managing acute postoperative pain*, Journal of the American Pharmacists Association (Jan. 2017), at 593, *available at* https://www.japha.org/article/S1544-3191(17)30016-X/fulltext (hereinafter “Opioid Exit Plan”).

[30] *Id.*

[31] *Id.*

make sure these agents are used appropriately."[32] But Defendants' wrongful conduct has jeopardized the ability of Plaintiff and other hospital purchasers to properly limit their purchasing and dispensing of opioids, particularly at the key junctures of patient admission and discharge. Indeed, by creating and fueling the opioid epidemic, Defendants have impaired the hospitals' ability to perform their integral responsibilities to patients.[33]

During admission, West Boca professionals routinely consult with the patient to assess which medications the patient is taking at home. But, due to Defendants' conduct, hospitals can no longer trust patients to self-report their prescriptions. West Boca pharmacists may also check Florida's prescription drug monitoring program (PDMP) database to ensure that patients are not stockpiling prescription opioids, but the PDMP often does not record the actual flow of opioids.[34] Hospital pharmacies' inability to rely on their patients' self-reporting, and having to take additional steps to independently verify their patients' purchases from other sources, imposes additional burdens on hospitals.

Then, before discharge, hospital professionals "obtain a list of planned outpatient prescriptions and perform a counseling session on how to safely and effectively control postoperative pain."[35] The hospitals' efforts to provide meaningful counseling is subverted by Defendants' sales practices described in the Complaint, pursuant to which Defendants have disseminated misinformation throughout all levels of the marketplace and fostered increased demand for their products.

---

[32] Joey Sweeney, *Hospital Pharmacists Can Help Reduce Opioid Prescriptions*, PHARMACY TODAY (July 2016) (emphasis added), *available at* https://www.pharmacytoday.org/article/S1042-0991(16)30505-9/fulltext.
[33] Compl. at ¶¶ 57-60.
[34] *Id.* at ¶ 32.
[35] Opioid Exit Plan, *supra* n.29.

c.    **The Cost of Treatment of Uninsured Persons, While Just One Element of the Hospital's Damages, Is Also Foreseeable**

Hospitals and their emergency rooms are indisputably on the front lines of the opioid crisis. Opioid seekers know that emergency rooms dispense opioids and that they will be examined. Moreover, Defendants here, as in *Neurontin*, knew that "because of the structure of the American health care system," 712 F.3d at 39-40, their conduct would immediately and foreseeably harm hospitals, as it would lead to opioid-using patients flooding emergency departments. This is because hospitals must admit opioid addicts who present in need of intensive care or who display symptoms of mental illness.[36] Defendants knew that federal and state law require hospitals to admit and treat opioid-addicted patients.[37] Similarly, if a pregnant opioid addict presents for treatment, the Hospital must provide care for both the opioid-addicted mother and the opioid-addicted baby.[38] Defendants relied on Plaintiff to provide a safety net to prevent overdose deaths and treat health consequences arising from opioid addictions and depended on hospitals themselves to mitigate the health consequences of their illegal activities.[39] In 2011, it is "estimated that [there were] greater than 420[,000 emergency room] visits related to the misuse of abuse of narcotic pain relievers" in the United States.[40] Hospitals bear an enormous burden in providing care, as insurance covers only a portion of the cost.[41]

Defendants' "goal was simple: to dramatically increase sales by convincing hospital doctors to prescribe and hospital patients to request opioids not only for palliative or short-term

---

[36] Compl. at ¶ 45.
[37] *Id.* at ¶¶ 40-43 (citing 42 U.S.C. §§ 1395dd (a) & (b); Fla. Stat. § 395.1041).
[38] *Id.* at ¶ 45.
[39] *Id.* at ¶ 19.
[40] Cindy Williams, Vice President and Chief Pharmacy Officer, Riverside Health System, *Establishment of an Opioid Stewardship Program*, *available at* http://www.vshp.org/uploads/6/3/6/0/6360223/williams-opioid_1_per_page.pdf (hereinafter described as the "Va. Hospital Pharmacists Paper").
[41] Compl. at ¶ 24.

post-operative pain, but also for common chronic pains, such as back pain and arthritis."[42] Employing certain Front Groups[43] and Key Opinion Leaders ("KOLs"),[44] the Marketing Defendants concealed the true dangers of opioids, downplayed the risk of addiction, and exaggerated the benefits of opioid use. Marketing Defendants relentlessly, methodically, and untruthfully asserted that the risk of addiction was low when opioids were used to treat chronic pain and overstated the benefits while trivializing the risks of long-term opioid use.[45]

### d. The Modern Legal Obligations of Emergency Care Providers Render Their Injuries Foreseeable

In 1986, Congress enacted the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, which requires hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status, or ability to pay. Participating hospitals may not transfer or discharge patients needing emergency treatment except with the informed consent or stabilization of the patient or when their condition requires transfer to a hospital better equipped to administer the treatment. Florida law, specifically Fla. Stat. § 395.1041, enacted in 1988, is to similar effect. The existence of these statutory obligations further establishes the foreseeability of injuries to hospitals from the widespread use of opioids.

Citing no authority, the Marketing Defendants argue that because Plaintiff has a duty to treat patients under state and federal law, causation is defeated.[46] This argument ignores the fact that but-for Defendants' false and deceptive marketing of prescription opioids, Plaintiff *never would have had to treat such an astonishing number of patients with opioid related conditions in*

---

[42] *Id.* at ¶ 16.
[43] *Id.* at ¶ 74.
[44] *Id.*
[45] *Id.* at ¶¶ 15, 65.
[46] Mktg. Mem. at 5.

17

*the first place*. Defendants cannot avoid liability simply because Plaintiff has a duty to treat the patients that Defendants made ill.

### 2. The Intervening Conduct of Others, if Foreseeable, Does Not Excuse a RICO Defendant from Liability

The Marketing Defendants argue that an opioid victim's inability to pay is an "intervening and independent" cause of Plaintiff's injury.[47] For the reasons set out in the *Summit* opposition, under RICO, as under the common law, the actions of an intervening actor do not break the chain of causation when, as here, the original tortfeasor's intentional acts contemplated and caused the intervening acts.[48] Additionally, similar arguments were rejected in *Neurontin*. There, Pfizer argued that because doctors "exercise independent medical judgment in making decisions about prescriptions, the actions of these doctors break the causal chain," but the court flatly rejected that argument:

> But Pfizer's scheme relied on the expectation that physicians would base their prescribing decisions in part on Pfizer's fraudulent marketing. The fact that some physicians may have considered factors other than Pfizer's detailing materials in making their prescribing decisions does not add such attenuation to the causal chain as to eliminate proximate cause. Rather than showing a lack of proximate causation, this argument presents a question of proof regarding the total number of prescriptions that were attributable to Pfizer's actions. This is a damages question.

*Neurontin*, 712 F.3d at 38–39.

Distributor Defendants contend that "[t]heories of causation cannot '*go beyond the first step*.'"[49] First, this is a terribly misleading quotation and a misstatement of the law. What *Hemi Group* actually says is that there is "a general tendency of the law" not to go beyond the first step, and the claim in *Hemi Group* failed because "the [plaintiff]'s causation theory require[d] the Court

---

[47] *Id.*
[48] *Summit* Opp. at 41-42.
[49] Distrib. Mem. at 8 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010)) (emphasis in Distrib. Mem.).

to move *well beyond* the first step." 559 U.S. 1, 10 (2010). (emphasis added).[50]  Second, in any event, Plaintiff is *not* going beyond any "first step."  Defendants' conduct in marketing their products was targeted at physicians, hospitals, and pharmacies (among others), had at least as much impact on health care providers as patients, and health care providers and hospital pharmacies served as part of their marketing and distribution infrastructure. Hospitals were damaged directly by this conduct.

### 3. The Tobacco Cases Upon Which Defendants Rely are Inapposite

Defendants rely heavily on decisions rendered in tobacco litigation brought about twenty years ago, citing, *e.g.*, *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000) and *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003). As an initial matter, Defendants neglect to mention that state third party payers achieved settlements in the hundreds of billions of dollars under theories similar to those in the Complaint.

But even excusing Defendants' omission, this case bears no relation to the hospital cases against the tobacco companies. Specifically, the differences between this litigation and the tobacco lawsuits are manifest:

- Cigarettes, unlike opiates, do not treat disease. As a result, hospitals and hospital pharmacies do not prescribe, buy, sell, employ, or dispense tobacco products for medical treatment.

---

[50] *Hemi* was a plurality opinion, in which the narrowest rationale in support of the judgment governs. *See Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rational explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'"(*quoting Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)). The narrowest rationale in *Hemi* was Justice Ginsburg's opinion, in which the issue of RICO proximate cause doctrine was not addressed at all. On the other hand, Justice Robert's plurality opinion did not state a new binding doctrine on "proximate cause." ("The City's theory thus requires that the Court extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City) . . . . The Court has never before stretched the causal chain of a RICO violation so far, and declines to do so today.") Thus, Defendants' arguments that *Hemi* was the controlling authority on RICO proximate cause and that *Hemi* required Plaintiff to allege a causation that did not "go beyond the first step" were unpersuasive.

- Hospitals, their physicians and their pharmacies were targeted directly by an overwhelming, sustained, multimedia, coordinated, and intense effort by Marketing Defendants to promote the prescription of opioids; there was no such campaign directed to physicians and hospitals with respect to tobacco.

- Hospitals are part of the distribution chain of opioid products, but not of tobacco products. Opioid addicts know that emergency rooms dispense opioids and therefore, attempt to obtain them there, imposing costs for diagnoses, security and other things.

- Tobacco consumers, unlike opioid consumers, are not patients who are prescribed "medications" from trusted sources with both professional training and an obligation to look out for patients beyond "caveat emptor."

- There is no comprehensive federal licensing of tobacco distributors and no federal registration and reporting system governing tobacco akin to the Controlled Substances Act ("CSA"). The CSA, in contrast, requires opioid manufacturers and distributors, including Supply Chain Defendants,[51] to design and operate a system to detect suspicious orders and report those suspicious orders to the DEA.[52] "Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[53] Supply Chain Defendants' failure to stop, suspend, or report suspicious orders facilitated the *exact* illegal sales that the CSA was designed to prevent.[54] While actions of the Defendants suggest that the regulatory framework applicable to their products puts some sort of imprimatur of legitimacy on their sales, marketing and distribution practices, the reality is that they have been repeatedly cited for *failures* to comply with the obligations imposed by this framework.[55]

- Unlike the opioid industry, tobacco manufacturers did not have a long and sordid history of federal indictments, guilty pleas, consent orders and regulatory actions relating to the distribution of their product.

- The harm caused to hospitals by the opioid epidemic is far more foreseeable than that caused by tobacco use. The effects of tobacco typically take many years, often decades, to materialize. As a result, illnesses caused by tobacco generally do not

---

[51] Compl. at ¶ 154.

[52] 21 C.F.R. § 1301.74(b).

[53] *Id.*

[54] *See, e.g., Traveler's Prop. Cas. Co. of Am. v. Actavis, Inc.*, 225 Cal. Rptr. 3d 5, 19 (Cal. Ct. App. 2017), *review granted*, 229 Cal. Rptr. 3d 2, 410 P.3d 1221 (2018); *see also*, 1970 U.S.C.C.A.N. 4566 ("a closed system should significantly reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotics and dangerous drug control"); *U.S. v. Moore*, 423 U.S. 122, 135 (1975) ("Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic").

[55] *Id.* at ¶¶ 86, 90, 114, 144, 789.

burden emergency rooms. Opioid addiction, in contrast, can materialize almost immediately. This results in acute medical emergencies that immediately burden hospital emergency rooms. Emergency care, moreover, is subject to mandatory treatment laws (discussed above, and which were enacted only on the eve of the *Tobacco* litigation) that are not applicable to other categories of care. Defendants, based on their knowledge both of their product, and of the American health care system, knew that this would place an immediate operational strain on emergency rooms and hospitals, generally, whereas the same simply could not be said for tobacco use.

- Unlike Plaintiff, the hospitals in the tobacco cases did not allege the purposeful inundation of health care facilities, health care professionals, and their patients, with a dangerous product.

- The harms caused by tobacco were publicized decades before the tobacco litigation was filed in the 1990s. The publicity around tobacco health effects and addiction rendered tenuous the causal link between the tobacco companies' conduct and the hospitals' (and insurers') damages – namely, the intervening cause that a consumer had made a knowing election to assume the risk of using a product known to be dangerous for some time. Here, in contrast, until very recently, users of prescription opioids could not be said to have assumed any risk related to prescription opioid usage. To the contrary, the conventional wisdom – thanks to Defendants' deceptive marketing campaign – was that opioids were the *proper treatment* for both acute and chronic pain. There was no knowing election by any person to use a dangerous substance, a break in the causal link that was central to the failure of the tobacco cases.

## C.     Plaintiff Has Pled Predicate Acts by Defendants and An Enterprise

Defendants make the bare argument that Plaintiff has not pleaded predicate acts with sufficient particularity to state a RICO claim.[56] Plaintiff incorporates by reference the discussion concerning the governing Rule 9 standard found in the *Summit* opposition.[57]

Plaintiff has alleged detailed facts in support of its RICO claim, setting out specific allegations concerning the False Narrative Enterprise.[58] Plaintiff alleged predicate acts committed by the Marketing Defendants[59] and identified 15 categories of documents which Defendants

---

[56] Mktg. Mem. at 5; Distrib. Mem. at 10.
[57] *Summit* Opp. at 26-35.
[58] Compl. ¶¶ 812-874.
[59] *Id.* ¶ 841.

transmitted, delivered or shipped using mail or wires.

Plaintiff has also alleged predicate acts by Distributor Defendants with specificity. Plaintiff alleges that Defendants, including Distributors, disseminated false and misleading statements to state and federal regulators in order to maintain the flow of opioids through high production quotas.[60] Plaintiff's Complaint further alleges with specificity Defendants' (including the Supply Chain Defendants) use of mail and wires to carry out their illegal scheme.[61] These "predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs."[62] "The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff's business or property, while simultaneously generating billion-dollar revenue and profits for the Defendants. The predicate acts were committed or caused to be committed by the Defendants through their participation in the False Narrative Enterprise and in furtherance of its fraudulent scheme."[63]

The National Retail Pharmacy Defendants contend that Plaintiff's RICO allegations as against them "are even more implausible than RICO claims against the other defendants," and that "no such claim is feasible against" them.[64] But West Boca's allegations as against the Retail Defendants are on all fours with those asserted against the other Distributor Defendants – they participated in the False Narrative conspiracy through their intentional acts designed (among other things) to conceal[65] conspicuous anomalies in the distribution patterns of opioids, and reaped

---

[60] *Id.* at ¶ 854.
[61] *Id.* at ¶ 861.
[62] *Id.* at ¶ 870.
[63] *Id.* at ¶ 871.
[64] Pharm. Mem. at 3.
[65] *Id*. at ¶ 870.

22

tremendous profits[66] in the process.[67]

The Marketing Defendants suggest that Plaintiff only alleges predicate acts based on the CSA, but that assertion is incorrect. Plaintiff has alleged violations of federal wire fraud statute, the federal mail fraud statute, and the CSA. The Marketing Defendants argue that a violation of the CSA cannot serve as a predicate act for RICO liability.[68] For the reasons stated in the *Summit* opposition, Plaintiff's allegation that Defendants' violation of the CSA is a sufficient predicate act, in addition to the others alleged by Plaintiff, and Plaintiff hereby incorporates by reference those arguments.[69]

The Distributor Defendants argue that Plaintiff does not allege that they shared a common purpose with the Marketing Defendants or directed the affairs of the False Narrative Enterprise.[70] Plaintiff adopts by reference the discussion of the governing law on RICO enterprises set out in the *Summit* opposition.[71]

Distributor Defendants have misread Plaintiff's Complaint. Plaintiff has alleged in detail how the Distributor Defendants joined the False Narrative Enterprise and shared in the common

---

[66] *Id.* at ¶¶ 509-514, 519-569, 663-707.

[67] And even if there were not a viable independent §§ 1962(a) or (c) claim against the National Retail Pharmacy Defendants, for the reasons stated in §§ II(D)(2) and (E), *infra*, they also conspired with the other Defendants.

[68] Plaintiff pleaded that the Defendants violated 18 U.S.C. § 1961(1)(D) by engaging in an "offense involving fraud … or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance … punishable under any law of the United States," including a violation of 21 U.S.C.A. § 842. When "a violation referred to in subparagraph (A) was committed after one or more prior convictions of the offender for an offense punishable under this paragraph (2), or for a crime under any other provision of this subchapter or subchapter II or other law of the United States *relating to narcotic drugs*, marihuana, or depressant or stimulant substances, have become final," "such person shall be sentenced to a term of imprisonment of *not more than 2 years*, a fine under Title 18, or both." 21 U.S.C. § 842(c)(2)(B). Therefore, contrary to Defendants' argument, violation of section 842 falls within the definition of section 1961(1)(D), and a violation of the CSA can serve as a predicate act for RICO liability.

[69] *Summit* Opp. at 59-64.

[70] Mktg. Mem. at 11.

[71] *Summit* Opp. at 50-53.

purpose of fraudulently increasing the quotas and therefore supply of opioids.[72] Plaintiff has alleged that the "Marketing and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Defendants operated as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids."[73] For example, Plaintiff has alleged in detail the Distributors Defendants' membership and participation in the Pain Care Form ("PCF") and the Healthcare Distribution Alliance ("HDA").[74] Defendants' "predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs."[75] Plaintiff's 306-page Complaint alleges more than sufficient detail showing a common purpose.

Distributor Defendants' argument that Plaintiff has not alleged that they participated in any direction of the enterprise fails for the same reasons. Plaintiff has alleged in detail how Distributor Defendants, using the PCF and HDA, developed a "deep level of interaction and cooperation"[76] and had a "decision-making structure driven by the Marketing Defendants and corroborated by the Distributor Defendants."[77] For example, Plaintiff has alleged that Distributor Defendants worked with Marketing Defendants to "control the flow of information and influence state and federal governments to pass legislation that supported the use of opioids and limited the authority of law enforcement,"[78] that all of the Defendants "worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA remained

---

[72] Compl. at ¶¶ 762-768.
[73] Id. at ¶ 763.
[74] Id. at ¶¶ 549-569.
[75] Id. at ¶ 870.
[76] Id. at ¶ 559.
[77] Id. at ¶ 564.
[78] Id. at ¶ 565.

artificially high"[79] and collaborated to refuse to report suspicious orders.[80]

**D.      Plaintiff Has Adequately Alleged Investment Injury for Its § 1962(a) Claim[81]**

Section 1962(a) makes it illegal for any person to "use or invest" any income or the proceeds that were "derived, directly or indirectly, from a pattern of racketeering activity" in the "acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

Defendants used proceeds generated through a pattern of racketeering activity including "engaging in multiple, repeated, and continuous violations of the federal mail fraud statute, 18 U.S.C. § 1341, the federal wire fraud statute, 18 U.S.C. § 134, and the CSA, 21 U.S.C. § 801 *et seq.*"[82] to acquire huge "interests" for their businesses. The investments included the Front Groups that they controlled and KOLs that they paid and also controlled. The business that Defendants are engaged in affected interstate commerce. Thus, Plaintiff has alleged that Defendants violated 18 U.S.C. § 1962(a).[83]

Relying on *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir. 1994), Defendants argue that Plaintiff failed to allege an "investment injury" that is wholly unrelated to the injury caused by Defendants' racketeering activities. Defendants also argue that merely alleging that they used racketeering income to operate a purported enterprise, and that the enterprise harmed Plaintiff is not enough. These arguments must fail for two reasons.

**1.      Plaintiff's Allegations Are Sufficient Under *Vemco***

---

[79] *Id.* at ¶ 566.
[80] *Id.* at ¶¶ 567-68.
[81] *Id.* at ¶¶ 126-134.
[82] *Id.* at ¶ 132.
[83] Plaintiff acknowledges that it must assert an injury under § 1964(c). *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461-62 (2006) ("[P]rivate actions for violations of § 1962(a), like actions for violations of § 1962(c), must be asserted under § 1964(c)").

In *Vemco*, the Sixth Circuit found that the plaintiff failed to state a claim under 1962(a) because it failed to allege an injury "stemming from the investment, distinct from injuries stemming from predicate acts." 23 F.3d at 133. To clarify this ruling, the Sixth Circuit compared the allegations in *Vemco* against allegations made in *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir.1989), and made clear that:

> *Newmyer* is distinguishable from the case at hand. Unlike the plaintiffs in *Newmyer*, *Vemco* does not allege that Flakt itself was built with racketeering proceeds amassed from others *prior* to *Vemco's* association with Flakt. Such an allegation would make *Vemco's* claim against Flakt analogous to that against the investment plan in *Newmyer*. Rather, *Vemco* alleges that the income Flakt derived from its racketeering *against Vemco* was *subsequently* used to operate the enterprise. *Vemco* never alleges that the reinvestment into the enterprise resulted in an injury separate from the "predicate acts" injuries.

*Id.* (emphasis in original).

Plaintiff's allegations are analogous to those asserted in *Newmyer*. Plaintiff alleged, among other facts, that the False Narrative Enterprise continued to operate and generate profits, which in turn, enabled Defendants to make payments to Front Groups and KOLs and otherwise to promote the use of opioids. Plaintiff was injured in its business and property in a number of ways, including purchases of opioids made based on false representations by Defendants, Front Groups and KOLs.

*Vemco* does not support Defendants' position that Plaintiff must allege an "investment injury" that is *entirely* unrelated to the injury that Plaintiff sustained through the acts of racketeering by Defendants. *Vemco* only requires Plaintiff to allege an injury that is traceable to the investment of Defendants' illegal gain. Nowhere does *Vemco* dictate that the "investment injury" must not be associated with the injury caused by Defendants' racketeering conduct. The required allegation missing in *Vemco* was *any* "injury stemming from the investment" prohibited under Section 1962(a). The Sixth Circuit indicated that this injury might well be an injury stemming from the racketeering activity of Flakt, the defendant – if only *Vemco* had pled that Flakt

26

"itself was built with racketeering proceeds amassed from others *prior* to *Vemco's* association with Flakt." 23 F.3d at 133. Here, no such deficiency exists in Plaintiff's allegations, as Plaintiff pled that "Defendants, having income derived, directly or indirectly, from a pattern of racketeering, in which it participated as a principal within the meaning of 18 U.S.C.§ 2, used or invested, directly or indirectly, part of such income in itself, an enterprise."[84] This enterprise "marketed and continues to market their opiate products directly to Plaintiff and other hospitals, and to doctors on staff at those hospitals, and thus Plaintiff was and is a direct customer and victim of the Defendants' false, deceptive and unfair marketing of opioids."[85]

---

[84] Compl. at ¶ 892.

[85] *Id.* at ¶ 62. For the same reason, *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 494 (6th Cir. 1990) and *Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc.*, 863 F. Supp. 447, 461 (E.D. Mich. 1994) do not support Defendants' argument. *See Craighead*, 899 F.2d at 494 ("plaintiffs have alleged only injuries traceable to the alleged predicate acts"); *Gotham Print, Inc.*, 863 F. Supp. at 461 ("The real source of plaintiffs' purported injury is that defendants supposedly made certain misrepresentations and failed to disclose certain facts—*not* that they were injured by defendants' investment of money generated by those actions in the operation of ASPCI, the alleged RICO enterprise."). Further, unlike the instant action, *Craighead* concerned securities fraud, and *Gotham Print* concerned claims based on franchise agreement, and neither had any allegation relating to manufacturing, marketing or sales of a controlled substance.

More recent authorities, including authorities from district courts in Florida and within the Sixth Circuit that followed *Vemco*, support Plaintiff's position. *See, e.g., Continental 332 Fund, LLC v. Albertelli*, No. 2:17-cv-41-FtM-38MRM, 2018 WL 2849745, at *12 (M.D. Fla. June 11, 2018) (finding that allegation of "Defendants secured income through a pattern of racketeering activity that began with bribery, and that they invested that income by establishing new entities, … and by funding contractors operating under false pretenses. . . that were intended to further the Scheme . . . These entities then furthered the Scheme and harmed plaintiffs by committing other acts of bribery, submitting falsified documents and payment requests, and self-dealing" was sufficient to state a claim under § 1962(a)); *Pincus v. Speedpay, Inc.*, No. 15-80164-CIV-MARRA, 2017 WL 1153872, at *2 (S.D. Fla. Mar. 28, 2017) (finding that plaintiff's allegation satisfied the investment injury rule when she alleged that "Defendant received proceeds from its pattern of criminal activity and used or invested the proceeds in the operation of its enterprise thereby injuring plaintiff."); *Day v. Fortune Hi-Tech Marketing Inc.*, No. 10-305, 2014 WL 4384443, at *8 (E.D. Ky. Sept. 3, 2014) ("The Complaint alleges that the defendants reinvested income from racketeering profits to expand the operations of Fortune, facilitate continued operation of Fortune, and then convince current members of Fortune to continue recruiting new members like the Day Plaintiffs. In the Sixth Circuit, this is enough to state a claim under § 1962(a), and the Fortune Defendants' motion to dismiss on this ground shall, therefore, be denied.").

If the Court were to find that Plaintiff did not properly plead a claim under § 1962(a), Plaintiff wishes to challenge the ruling in *Vemco* and preserve the arguments on this issue for future proceedings. Plaintiff

In conclusion, whether Plaintiff identified a particular type of injury that is distinct from any types of injury caused by Defendants' racketeering activities does not affect the viability of the claim.

### 2.    Plaintiff Properly Pled a Claim Under 18 U.S.C. § 1962(d)

Plaintiff, in the alternative, draws the Court's attention to its claim under 18 U.S.C. §1962(d). In the event that Plaintiff's §1962(a) claim is not successful as against one or more Defendants, Plaintiff has, at a minimum, properly pled a claim that the Defendants conspired to violate §1962(a), under §1962(d).

---

would draw the Court's attention to *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310 (2d Cir.2011) and *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990).

The Second Circuit rejected the same argument that the Defendants raised here in *Ideal Steel Supply Corp*, holding:

> Given the breadth with which RICO is to be interpreted, we reject for two reasons defendants' contention that § 1962(a)'s prohibition against the use or investment of racketeering activity proceeds is inapplicable to their alleged use of pattern-of-racketeering-activity proceeds to open National's Bronx facility on the theory that that section does not apply when such proceeds are simply used or reinvested in the same entity that engaged in the racketeering activity.

*Id.* at 322.

The Fourth Circuit in *Busby* supported Plaintiff's construction of § 1962(a):

> To allege a violation of § 1962(a), a plaintiff must show (a) receipt of income from a pattern of racketeering activity, and (b) the use or investment of this income in an enterprise. Nothing in the "by reason of" language of § 1964(c), however, limits the compensable racketeering injuries to those sustained by the second prong, i.e., *after* the investment and/or use of the income. To be sure, individuals may be injured by the investment and use of the illegally obtained income. However, this is not the only injury that plaintiffs sustain "by reason of" a § 1962(a) violation.

*Id. (emphasis in original)*.

Plaintiff need not establish an additional or distinct "investment injury" in order to bring a claim under § 1962 (a), when Plaintiff already pleaded that Defendants conducted activities forbidden by § 1962 (a) and that Defendants' racketeering activities injured Plaintiff in its business or property. The statutes include no additional, amorphous "investment injury" requirement. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495 (1985).

18 U.S.C. §1962(d) declares that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." In *Beck v. Prupis*, 529 U.S. 494 (2000), the Supreme Court held that "a person may not bring suit under § 1964(c) predicated on a violation of § 1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute."[86]

Thus, under *Beck*, Plaintiff need only allege an injury by reason of Defendants' conspiracy to "violate any of the provisions of subsection (a), (b), or (c)," which is an injury caused by the predicate acts of the Defendants. The assertion of independently actionable claims under § 1962 (a), (b), or (c) is *not* required under *Beck*.[87] Defendants' argument for an additional pleading on an "investment injury" for a claim under § 1962(d) would require Plaintiff to not only plead a "predicate act injury," but also an independent claim under § 1962(a). This argument, if followed, would necessarily read § 1962(d) out of the statute. Because terms of a statute should not be construed so as to render any provision of that statute meaningless or superfluous, this argument must be rejected.

###   E.     Plaintiff Has Properly Pled Conspiracy in Violation of § 1962(d)

The Marketing Defendants and the Distributor Defendants argue that Plaintiff's § 1962(d) must be dismissed because Plaintiff's §§ 1962(a) and (c) claims fail. As discussed herein in Section II. D., these arguments fail, as Plaintiff has properly pled those claims. And even if Plaintiff had *not* pled actionable claims against one or more Defendants under §§ 1962(a) and (c), the Sixth

---

[86] The Supreme Court left open the question of whether a §1962(a) claim requires any allegation of an "investment injury."

[87] To be clear, § 1962(d) prohibits any acts of conspiracy by Defendants to violate other subsections under § 1962. A conspiracy to commit a crime does not require that the crime be actually completed. Defendants' argument that Plaintiff failed to plead a § 1962(d) claim because it did not plead an "investment injury" in addition to pleadings on predicate act injury, would require Plaintiff to have pled not only a conspiracy offense but also a substantive offense under subsection (a). It is, therefore, unfounded and illogical.

Circuit has expressly held that a defendant may be liable for RICO conspiracy under Section 1962(d) even where the defendant has not personally committed a substantive RICO violation. *See U.S. v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008) (holding that even if the defendant did not violate Section 1962(c), he could still be found to have violated Section 1962(d)).

As they did in *Summit* and *Broward*, Defendants rely on *Huff v. Firstenergy Corp.*, 972 F. Supp. 2d 1018, 1039 (N.D. Ohio 2013) for their argument that Plaintiff's RICO conspiracy claims fail because Plaintiff failed to allege the existence of any agreement between any Defendants. Plaintiff expressly incorporates the *Summit* and *Broward* oppositions herein.[88]

In addition, contrary to the conclusory allegations in *Huff*, Plaintiff has alleged "when, where, or between whom" the illicit agreements were made. Specifically, Plaintiff alleged that the Marketing and Distributor Defendants (including the National Retail Pharmacy Defendants) entered into express and/or implied agreements among themselves to subvert the public's knowledge and understanding of the health effects and addictive nature of opioids.[89] The Marketing Defendants performed overt acts and/or omissions by engineering the nine categorized falsehoods outlined in the Complaint as well as ensuring their dissemination.[90] Distributor and National Retail Pharmacy Defendants performed overt acts by deliberately disregarding their responsibilities of monitoring and reporting suspicious activity, maintaining performance metrics and bonuses that incentivized pharmacists to disregard safety concerns and violations of the law, failing to safely and appropriately dispense the opioids, all of which furthered the conspiracy's goal to increase demand and, in turn, profits to all Defendants.[91]

---

[88] *Broward* Opp. at 61-62; *Summit* Opp. at 51-53.
[89] Compl. at ¶¶ 749, 762-768, 971–975.
[90] *Id.* at ¶¶ 161-327.
[91] *Id.* at ¶¶ 509-514, 519-569, 663-707.

The Distributor Defendants also argue that participation in a trade organization alone is not enough to allege conspiracy.[92] Contrary to the allegations in *ADA v. Cigna Corp.*, 605 F.3d 1283, 1295 (11th Cir. 2010), Plaintiff has alleged more than just membership in a trade organization. Plaintiff has alleged that the Defendant members of the PCF spent "over $740 million" in lobbying on opioid-related measures in an effort to continue the False Narrative Enterprise.[93] Plaintiff also alleged that the Marketing and Distributor Defendants participated in HDA webinars to exchange information regarding prescription "opioid sales, including purchase orders, acknowledgements, ship notices, and invoices."[94] Plaintiff's Complaint also alleges that Defendants' participation in these trade groups reflects "a deep level of interaction and cooperation between two groups in a tightly knit industry . . . operat[ing] together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids."[95] These arguments were also addressed in the *Summit* opposition and Plaintiff incorporates those herein.[96]

## III.    Plaintiff Asserted an Actionable Public Nuisance Claim

Defendants argue that Plaintiff's public nuisance claim should be dismissed for reasons also asserted in the *Summit* and *Broward* motions to dismiss. In response to each of these arguments, Plaintiff hereby adopts and incorporates by reference the sections cited for each argument in the *Summit* and *Broward* oppositions:

(1)    A public nuisance does not have to involve the use and enjoyment of property;[97]

---

[92] Distrib. Mem. at 13.
[93] Compl. at ¶ 551.
[94] *Id.* at ¶ 559.
[95] *Id.* at ¶ 560.
[96] *Summit* Opp. at 56-57.
[97] *Summit* Opp. at 6-15, *Broward* Opp. at 16-21.

31

(2)     Plaintiff sufficiently alleges an interference with a public right;[98]

(3)     Plaintiff does not seek to regulate subject matter properly within the jurisdiction of state and federal agencies;[99]

(4)     Plaintiff can establish a public nuisance claim without showing that the Defendants exercised control of the prescription opioids at the time of injury;[100]

(5)     Acts of third parties do not prevent Plaintiff from sufficiently alleging causation;[101]

(6)     The learned intermediary doctrine does not prevent Plaintiff from sufficiently alleging causation;[102]

(7)     Plaintiff is not seeking to recover for damages because of "paying for" health care needs and as such is not asserting a subrogation claim;[103] and

(8)     Florida law does not contain a "safe harbor" doctrine that bars the application of public nuisance law to the design, manufacture, and distribution of a lawful product.[104]

Plaintiff supplements the foregoing incorporated arguments with the additional points, below.

A.     **Plaintiff Has Alleged a Special Injury**

---

[98] *Summit* Opp. at 6-11, *Broward* Opp. at 16-21. Additionally, "The distributor defendants' arguments are insufficient to warrant dismissal. Initially, with respect to their claim that the plaintiffs have failed to plead substantial interference with a public right, it suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have created or contributed to a crisis of epidemic proportions, has affected "a considerable number of persons." *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102 (Sup. Ct. Suffolk Co., N.Y. June 18, 2018).

[99] *Summit* Opp. at 11-12, *Broward* Opp. at 16-21.

[100] *Summit* Opp. at 11-12., *Broward* Opp. at 16-21.

[101] *Summit* Opp. at 82-85, *Broward* Opp. at 30-37.

[102] *Summit* Opp. at 82-85, *Broward* Opp. at 34-35.

[103] *Broward* Opp. at 35-37.

[104] *Broward* Opp. at 16-21.

In addition to the arguments listed above that are addressed by the briefing in the *Summit* and *Broward* oppositions, Distributor Defendants argue that there was no "special" injury to the hospital sufficient to support a public nuisance claim. As explained fully below, that argument fails.

Florida law has recognized for over one hundred years that if a public nuisance causes special, particular or peculiar injury to an individual, different in kind and not merely degree from the injury to the public at large, and the injury is substantial in its nature, an individual has standing to make a public nuisance claim. *Brown v. Florida Chautauqua Ass'n*, 52 So. 802, 805 (Fla. 1910); s*ee also*, *Harbor Beach Surf Club, Inc. v. Water Taxi of Ft. Lauderdale, Inc.*, 711 So. 2d 1230 (Fla. 1988) (finding that water taxi service established "special injury" by showing that footbridge did not obstruct all navigation and water taxi services inability to navigate resulted in loss of income and injury to business opportunities); a*ccord* Restatement (Second) of Torts § 821C(1) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference").

Courts have found a "special" injury to have occurred even when the immediate harm or inconvenience is to a third person, but that ultimately adversely impacts the plaintiff. *See*, *e.g.*, *Stop and Shop Companies v. Fisher*, 444 N.E. 2d 368 (Mass. 1983) (holding that a business could maintain a public nuisance claim for loss of business as a result of its customers' inability to use a drawbridge while it was being repaired); William L. Prosser, Private Action for Public Nuisance, 52 VA. L. REV. 997, 1013-1015 (1966) (listing cases allowing recoveries for pecuniary losses of businesses with specialized relationships to public rights).

West Boca as a hospital has properly alleged that it has suffered such a "special, particular

or peculiar injury" as required by Florida law. The economic burden from the opioid epidemic includes substantial costs associated with the medical treatment of opioid users.[105]  In addition to the costs of unreimbursed treatment borne by hospitals, Plaintiff and other hospitals incur and will continue to incur substantial damages from costs related to opioid addiction and opioid overdoses:

(1)     capital improvement costs necessary to address the increasing number of patients with opioid-related conditions,[106]

(2)     additional security costs due to patients with opioid addictions,[107]

(3)     offering naloxone and training to opioid addicted patients' family and friends,

(4)     conducting substance abuse assessments and initiating addiction treatment for patients in the emergency department and facilitating follow-up treatment and aftercare,[108] and

---

[105] "Opioid users have higher numbers of [emergency department] visits, more inpatient hospital stays, along with almost double the inpatient costs compared to their non-opioid using counterparts." President's Commission on Combating Drug Addiction and the Opioid Crisis, *Health, Financial, and Social Consequences*, at 30 (Nov. 2017), *available at* https://vdocuments.net/the-presidents-commission-on-combating-presidents-commission-on-combating.html.

[106] *See* Compl. at ¶¶ 51-58. As an example of the requirement for additional capital improvement costs, the rate of hospital inpatient stays related to opioid overuse among adults increased 153% from 1993 to 2014. Pamela L. Owens, et al., *Hospital Inpatient Utilization Related to Opioid Overuse Among Adults*, 1993-2012, HEALTHCARE COST & UTIL. PROJECT, (Aug. 2014), https://hcup-us.ahrq.gov/reports/statbriefs/sb177-Hospitalizations-for-Opioid-Overuse.pdf.

[107] *See* Compl. at ¶¶ 51-58. Arthur Allen, et al., *We had a nurse almost strangled with IV tubing' Opioid Crackdown, mental health crises aggravate violence in ERs*, POLITICO (July 7, 2018), *available at* https://www.politico.com/story/2018/07/07/emergency-room-violence-opioid-crackdown-700816; *see also*, Megan Knowles, *Violence in the ER: 8 ways unresolved healthcare issues harm hospital staff*, BECKER'S HOSPITAL REVIEW (July 16, 2018), https://www.beckershospitalreview.com/eds/violence-in-the-er-8-ways-unresolved-healthcare-issues-harm-hospital-staff.html.

[108] *See* Compl. at ¶¶ 51-58. Examples of formalized programs implementing these mandates are the Levels of Care Programs implemented by the Rhode Island Department of Health/Department of Behavioral Healthcare and Hospitals Developmental Disabilities, *Levels of Care for Rhode Island Emergency Departments and Hospitals for Treating Overdose and Opioid Use Disorder*, *available at* http://health.ri.gov/publications/guides/LevelsOfCareForTreatingOverdoseAndOpioidUseDisorder.pdf, Baltimore City Health Department, *Levels of Care*,  https://health.baltimorecity.gov/levels-care.

(5)     additional training and educational cost for hospital personnel treating
        opioid addicted patients.[109]

Plaintiff, as a hospital, is uniquely affected by the opioid epidemic as Plaintiff is required

by law to treat every patient that presents at the hospital regardless of their ability to pay. 42 U.S.C.

§ 1395dd;[110] *see also*, Fla. Stat. § 395.1041. While the opioid epidemic affects the public at large,

most members of the public do not suffer the type of direct costs borne by Plaintiff as a hospital.

Non-healthcare related businesses are not required by federal law to provide goods and/or services

to persons with opioid addictions. The additional fact that even non-hospital health care providers

have the option of declining treatment to patients addicted to opioids if such treatment would

require unreimbursed care, require additional infrastructure expense, require additional training or

result in other monetary losses establishes that Plaintiff, as a hospital, has suffered a special,

particular or peculiar injury, different in kind and not merely degree from the injury to the public

at large under Florida law.

Defendants cite three cases in support of their argument that Plaintiff has not suffered a

special injury sufficient to bring a public nuisance claim: (1) *Allegheny Gen. Hosp.*, (2) *Ass'n of*

*Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696 (9th Cir. 2001), and (3) *Burgess v.*

---

[109] *See* Compl. at ¶¶ 51-58. Centers for Disease Control and Prevention, *Opioid Overdoses Treated In Emergency Departments* (Mar. 2018), *available at* https://www.cdc.gov/vitalsigns/opioid-overdoses/; Mollie Durkin, *Hospitalist Involvement Needed To Treat Opioid Epidemic*, ACP Hospitalist (Oct. 2017), https://acphospitalist.org/archives/2017/10/hospitalist-treat-opioid-epidemic.htm.

[110] Under the requirements imposed by 42 U.S.C. § 1395dd, (1) hospitals must perform a medical screening examination (MSE) on any person who comes to the hospital and requests care to determine whether an emergency medical condition (EMC) exists, (2) if an EMC exists, hospital staff must either stabilize that condition to the extent of their ability or transfer the patient to another hospital with the appropriate capabilities and (3) hospitals with specialized capabilities or facilities (e.g., burn units) are required to accept transfers of patients in need of such specialized services if they have the capacity to treat them. *Id.*

*M/V Tamano*, 370 F. Supp. 247 (D. Me. 1973), *vacated by Burgess v. M/T Tamano*, 564 F.2d 964 (1st Cir. 1977).

In *Allegheny*, the Third Circuit affirmed the district court's dismissal of a complaint filed by hospitals against tobacco companies that contained a cause of action for public nuisance under Pennsylvania law. 228 F.3d at 446. In affirming the dismissal of the public nuisance count, the Third Circuit cited the Pennsylvania special injury requirement[111] for standing and agreed with the district court "that the hospitals did not sufficiently allege [in their complaint] that they suffered a harm different from and of greater magnitude than the harm suffered by the general public." *Id.*[112]

*Washington*, like *Allegheny*, involved the affirmance of a dismissal of a complaint making public nuisance allegations against tobacco companies. 241 F.3d at 707. But the Ninth Circuit did not make any determination regarding whether the hospitals suffered a special injury, instead affirming based upon application of the law of the State of Washington that recognizes proximate cause as an essential element of a nuisance claim. *Id.*

The holdings in both *Allegheny* and *Washington* are fact specific to the allegations of conduct by tobacco companies, the types of medical conditions caused by tobacco products, the allegations of damages made by the plaintiffs and the law of the state in which the wrongful conduct occurred. The conduct alleged, the types of medical conditions, the damages alleged and the law to be applied in this case are all different from those in *Allegheny* and *Washington.* In this litigation, the allegations in the Complaint, the conduct of the Defendants, the relationships

---

[111] "In order to recover damages in a private action for public nuisance, a plaintiff must have suffered a harm of greater magnitude and of a different kind than that which the general public suffered." *Allegheny Gen. Hosp.*, 228 F.3d at 446 (citations omitted).
[112] The Third Circuit expressly stated that the "Hospitals' remaining claims of public nuisance . . . do[es] not require proximate cause." *Id.*

between the parties and the damages alleged by the Plaintiff are all easily distinguishable from the allegations in the tobacco cases.

First, Plaintiff sufficiently alleges that the public nuisance created by the Defendants has a causal connection to the damages it claims.[113]  In addition, there is substantial scientific evidence of such a causal connection.[114]

Second, Plaintiff sufficiently alleges intentional conduct by Defendants and provides citations in the Complaint to enforcement actions by governmental agencies reflecting the intentional nature of such conduct.[115]

Third, as addressed in Sections II.A. and III.A of this memorandum, Plaintiff has alleged direct injuries that only a hospital could have sustained.[116]

Fourth, Plaintiff directly purchased opioids from the Defendants, and dispensed opioids to its own patients as treatment for their medical conditions.[117]

Fifth, opioids are substantially different from tobacco in their effects. Tobacco-related illnesses result from chronic, continued use of tobacco products and are, almost without exception, illnesses that have a multitude of potential causes. Unlike tobacco-related medical conditions, adverse conditions resulting from opioid use can and often do emerge almost immediately, and it is relatively easy to determine opioid related medical conditions.[118] Plaintiff has actual cost data

---

[113] Compl. at ¶¶ 990-1004.

[114] *See, e.g.*, The Council of Economic Advisers, *The Underestimated Cost of the Opioid Crisis* (Nov. 20, 2017),  https://www.whitehouse.gov/briefings-statements/cea-report-underestimated-cost-opioid-crisis/; *see also*, Pat Beall and Mike Stucka, *Cost of heroin epidemic tops $1 billion a year in Florida*, PALM BEACH POST, (Dec. 17, 2016), https://www.mypalmbeachpost.com/news/cost-heroin-epidemic-tops-billion-year-florida/WYamI7pzwlHMkFkf3mzY8H/.

[115] Compl. at ¶¶ 497-514, 627, 696, 735, 739, 748, 770, 839-846, 860, 872.

[116] *Id.* at ¶¶ 1001-1002.

[117] *Id.* at ¶¶ 52, 65.

[118]  In fact, numerous federal agencies and affiliated groups publish such data relating to hospitals on a regular basis. *See, e.g.*, *Hospital Inpatient Utilization Related to Opioid Overuse Among Adults*, *supra* n.99.

and medical evidence relating to the costs it has and will incur as a result of Defendants' conduct.

Defendants' reliance on *Burgess v. M/V Tomano*, 370 F. Supp. 247 (D. Me. 1973) is also misplaced. In *Burgess*, the United States District Court for Maine held that although the right to harvest fish and clams from public waters was impaired as to both commercial and non-commercial fishermen and clam diggers, the fact that commercial fishermen and clam diggers were making commercial use of the public right made this a special injury for public nuisance purposes. *Id*. This ruling actually supports Plaintiff's claim that the opioid epidemic causes special injury to Plaintiff as a hospital and as a commercial enterprise involved in public health.

**B.**     **Any Applicable Proximate Cause Requirement Does Not Provide a Basis for Dismissal of Plaintiff's Nuisance Claim**

**1.**     **There are No Florida Decisions Applying a Negligence-Style Proximate Cause Requirement in a Public Nuisance Action**

The Defendants have not cited a single case under Florida law holding that a traditional proximate causation requirement is applicable to a public nuisance action. Other jurisdictions are divided on the question. In *Allegheny*, *supra*, the Third Circuit (apparently applying Pennsylvania law), held that "public nuisance . . . do[es] not require proximate cause." 228 F.3d at 446. Other courts have suggested a relaxed causation requirement when compared with common law negligence. *NAACP v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 496-97 (E.D.N.Y. 2003) ("The rule employed with respect to limitations on liability, whatever label is used, in public nuisance actions must be less restrictive than in individual tort actions," and holding that negligence proximate cause principles are "not determinative" in nuisance actions). The Marketing Defendants, in the *Broward* action, cite *Penelas v. Arms Technology, Inc.*, No. 99-01941 CA-06, 1999 WL 12043453 (11th Fla. Cir. Ct. Dec. 13, 1999) for the proposition that "[a] party cannot be held liable for

nuisance absent control of the activity which creates the nuisance."[119] But *Penelas* is an unreported 18-year old trial court decision that contains no internal citations to *any* authority on this point. Plaintiff adopts and incorporates by reference plaintiff's arguments in the *Broward* opposition.[120]

### 2.     Plaintiff's Allegations Are Sufficient to Allege Proximate Cause Under Any Standard That Might Apply

Even if the Court were to apply the same proximate cause standard applicable to negligence claims, or some variation of that standard, Plaintiff's factual allegations are more than sufficient. *See* Section IV.C., *infra* (discussing proximate causation with respect to Plaintiff's negligence claim), and Section III.A (discussing special injury). As discussed in those sections, Plaintiff's injuries were sufficiently foreseeable under Florida proximate causation principles. In fact, Plaintiff's injuries are far more foreseeable than the hospitals' alleged injuries in responding to the chronic long term effects of the slow-moving tobacco problem or injuries allegedly incurred by municipalities in response to tobacco or opioid problems.

### IV.     Plaintiff Properly Pleaded Negligence

Negligence is "a failure to exercise the degree of care demanded by the circumstances." *Smith v. Hinkley*, 123 So. 564, 566 (Fla. 1929), *superseded by statute on other grounds*, Fla. Stat. § 90.803. The elements of a claim of negligence are a duty of care, breach of that duty, causation and damages. *Gibbs v. Hernandez*, 810 So.2d 1034, 1036 (Fla. 4th DCA 2002). Plaintiff's negligence claims are asserted in the Complaint.[121]

Defendants have moved to dismiss these claims. Several of the Defendants have incorporated by reference points made in their moving papers in the *Broward* and *Summit* actions.

---

[119] Mfr. *Broward* Mem. at 6.
[120] *Broward* Opp. at 17-18.
[121] Compl. at ¶¶ 929-936, 983-989.

Plaintiff adopts and incorporates by reference the *Broward* and *Summit* arguments in opposition to the motions to dismiss in those cases, as follows:

(1)     Plaintiff is Not Asserting a Statutory Cause of Action under the regulatory regimes cited in the Complaint (but, rather, cites the violation of statutory obligations as evidence of negligence);[122]

(2)     The Subsequent Intervening Conduct of Others, if foreseeable, Does Not Absolve Defendants of Their Duty of Care;[123] and

(3)     The Learned Intermediary Doctrine Does Not Disrupt Causation.[124]

To the extent any Defendant has sought to dismiss Plaintiff's negligence claim on grounds of preemption, we address preemption separately, in Section I, *supra*.[125]

### A.     <u>Plaintiff Has Satisfied the "Minimal" Requirement of Pleading the Existence of a Duty of Care</u>

Defendants argue that they did not owe Plaintiff a common-law duty of reasonable care, but they are mistaken.

### 1.     Defendants Owed Plaintiff a Common Law Duty of Care

In Florida, "a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others." *McCain v. Fla. Power Corp.*, 593 So.2d 500, 503 (Fla.1992). The Florida Supreme Court has recognized four general sources from which such a duty may arise: "(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Clay Elec. Co-op., Inc. v. Johnson*, 873 So.2d 1182, 1185 (Fla. 2003). Duty is a

---

[122] *Broward* Opp. at 27-30.
[123] *Id.* at 24-27.
[124] *Id.* at 34-35.
[125] *See also*, *Summit* Opp. at 76–77 n.49, 90, 111, 120–122.

"*minimal* threshold legal requirement for opening the courthouse doors." *Wallace v. Dean*, 3 So.3d 1035, 1046 (Fla. 2009) (emphasis added).

First, Plaintiff relies principally on the general facts of this case as the source of Defendants' common-law duty. As the Supreme Court of Florida has explained:

> In *McCain*, we explained that the determination of the existence of a common law duty flowing from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged, which is a threshold question of law. *See*, *id.* at 502-04. We have explained, where a person's conduct is such that it creates a "foreseeable zone of risk" posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably. *Id.* at 503. We have also explained that as a general proposition the greater the risk of harm to others that is created by a person's chosen activity, the greater the burden or duty to avoid injury to others becomes. "Thus, as the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken." *Id.* at 503 (citing *J.G. Christopher Co. v. Russell*, 63 Fla. 191, 58 So. 45 (1912)).

> Importantly, this Court has emphasized that "reliance on the *McCain* foreseeability test [is] appropriate because we had intended *McCain* to function 'as a restatement of the law of negligence.'" *Williams v. Davis*, 974 So.2d 1052, 1058 (Fla. 2007) (quoting *Whitt v. Silverman*, 788 So.2d 210, 218 (Fla.2001)). Again, we reaffirm our previous declarations that the "foreseeable zone of risk" test discussed in *McCain* is the test to be applied under Florida law to determine whether a duty exists under our negligence law.

*U.S. v. Stevens*, 994 So.2d 1062, 1066-67 (Fla. 2008). The Complaint explains in considerable detail how Defendants owed Plaintiff a duty of care as a result of their creation of a foreseeable zone of risk. As alleged in the Complaint, Defendants (1) created a foreseeable opportunity for wrongful conduct by third parties, (2) grossly oversupplied pharmaceutical opioids, and (3) had superior and exclusive knowledge of just how dangerous and addictive opioids were when used for the purposes Defendants touted and enabled.[126] Plaintiff has alleged that the sale and distribution of prescription opioids are closely monitored and regulated because of the clear public-

---

[126] Compl. at ¶¶ 16-17, 47, 58, 60.

health danger presented by the manufacturing and distribution of these drugs.[127] Given the widespread recognition of these dangers, it was entirely foreseeable that if not marketed, distributed, and sold with requisite care, opioids could cause serious harm to third parties.

This harm was especially true with respect to hospitals. Plaintiff has alleged that hospitals "are on the front line of treatment" for the epidemic of patients with opioid-related conditions.[128] This role of hospitals was an entirely predictable consequence of Defendants' activities, as were the additional costs hospitals incur for treating these additional opioid patients.[129] The Florida Supreme Court's concept of duty, as explained in *McCain*, is expansive, and makes foreseeability the *sole determinant* of whether a duty exists. Under that criterion, Defendants clearly owed Plaintiff a duty not to burden Plaintiff with uncompensated costs for the treatment of ever-increasing numbers of non-paying patients with opioid-related problems.

Moreover, under *McCain*, because of the great risk posed by dangerous and addictive prescription opioids, Defendants' duty to avoid injury to others became correspondingly greater. Under all of these circumstances, Plaintiff's injuries were clearly within the "foreseeable zone of risk" created by Defendants' activities.

Second, Plaintiff further relies on the existence of statutory obligations concerning the administration and distribution of controlled substances. The violation of such statutes establishing a duty of care constitutes *prima facie* negligence. *Kohl v. Kohl*, 149 So.3d 127, 132 (Fla. 4th DCA 2014) ("Florida courts permit proof of a statutory violation to serve as *prima facie* evidence of negligence because the standard of conduct or care embraced within such [a] legislative . . . measure [] represent[s] a standard of at least reasonable care which should be adhered to in the

---

[127] *Id.* at ¶ 130.
[128] *Id.* at ¶ 60.
[129] *Id.*

42

performance of any given activity.") (alterations in original) (internal quotation marks omitted); *Florida Dept. of Corrections v. Abril*, 969 So.2d 201, 205 (Fla. 2007) ("The courts of Florida have long recognized that the violation of a statute may be utilized as evidence of negligence").

The National Retail Pharmacy Defendants summarily contend, without elaboration, that they do "not owe [Plaintiff] a duty."[130]   But they were just as involved as any of the Distributor Defendants in the administration and distribution of opioids, and there can be little question that Plaintiff meets the "minimal" requirement under Florida law of pleading that the Retail Pharmacy Defendants' conduct created a "foreseeable zone of risk" that exposed hospitals to injuries. *McCain*, 593 So.3d at 502-04.

Because Plaintiff has sufficiently alleged that Defendants owe it a common law duty to use reasonable care in the marketing, manufacture, distribution, and sale of opioids, Plaintiff's negligence claims should not be dismissed.

### B.    Defendants Breached Their Duty of Care

The Marketing and National Retail Pharmacy Defendants do not challenge the adequacy of the allegations of a breach of the duty of care. The Distributor Defendants summarily contend that "[t]he Hospital's allegation that Distributor Defendants breached their purported duties is wholly conclusory."[131] But Distributor Defendants offer only a conclusory statement to that effect, supported by no authority. Plaintiff has pled that Defendants engaged in a continued course of deceptive marketing, flooded the marketplace with opioids, and violated statutory schemes that imposed specific administrative and reporting obligations. These allegations are more than sufficient, for notice pleading purposes, to allege breaches of Defendants' duty of care.

---

[130] Pharm. Mem. at 4.
[131] Distrib. Mem. at 21.

The Distributor Defendants assert two more specific arguments relating to Plaintiff's allegations of breaches of duty – they contend (1) that no negligence claim will lie based on allegations of negligent distribution, and (2) that Plaintiff's separate count of wanton negligence[132] is not actionable.[133] And the Marketing Defendants contend that a negligence claim will not lie based on allegations of negligent marketing. These arguments are addressed below.

### 1. Negligence in Marketing and Distribution is Actionable

In an abundance of caution, Plaintiff has pled simple negligence claims in three counts: generalized negligence,[134] negligent marketing[135] and negligent distribution.[136] Whether considered (in aggregate) as components of a single negligence count or as separate claims, there is ample authority confirming that allegations of negligence in marketing and distribution are actionable.

Longstanding Florida negligence law provides a basis for Plaintiff's negligent marketing and distribution claims. Just about any act can be performed negligently, and marketing and distribution are no exception. Thus, the fact that Plaintiff has labeled two separate counts as negligent marketing and negligent distribution should not matter. Each of the Defendants in the opioid supply chain were negligent when manufacturers blatantly misrepresented the risks and benefits of opioids in marketing materials; distributors failed to report shipments; and, pharmacies simply looked the other way when presented with an incongruent number prescriptions from "pill mills." Florida law imposes a duty to exercise reasonable care not to create a broader "zone of risk" of harm to others.

---

[132] Compl. at ¶¶ 937-940.
[133] Distrib. Mem. at 21-22.
[134] Compl. at ¶¶ 937-940.
[135] *Id.* at ¶¶ 970-982.
[136] *Id.* at ¶¶ 990-1004.

44

Negligent marketing claims have been recognized under Florida law. *See Godelia v. Doe 1*, 881 F.3d 1309 (11th Cir. 2018) (reversing dismissal of negligent marketing claims brought under both the common law of negligent misrepresentation and the FUDTPA); *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1487 (11th Cir. 1994) (reversing summary judgment as to negligent marketing claim); *Fisher v. Bumbo Int'l Trust*, No.: 1:14-cv-22209-UU, 2014 WL 12026083, at *15 (S.D. Fla. Aug. 2014) (denying summary judgment when "there is a genuine issue of material fact as to whether negligent marketing may have proximately caused Plaintiffs' injuries"). A prescient commentator argued in 2006 that this theory of negligence liability would lay a predicate for liability of pharmaceutical companies, reasoning that the theory of negligent marketing "'assumes that [manufacturers and sellers] have a duty to market their products in a manner that will not affirmatively increase a product's inherent risk to consumers and third parties.'" Prater, Joseph, "West Virginia's Painful Settlement: How the Oxycontin Phenomenon and Unconventional Theories of Tort Liability May Make Pharmaceutical Companies Liable for Black Markets," 100 Nw. U. L. Rev. 1409, at 1422-23, n.3 (Spring 2006) (although seeking to minimize the link, concluding that the "causal link between Purdue's advertising and deliberate OxyContin abuse is … the fueling of drug diversion via an increase in the total amount of pills available to divert").

Negligent distribution (and analogous) claims have been recognized as well. *Fagundez v. Louisville Ladder, Inc.*, No. 10-23131, 2011 WL 6754089, at *1-2 (M.D. Fla. Dec. 22, 2011) (denying summary judgment as to negligent distribution claim against retailer); *Lewis v. City of Tallahassee*, No. 4:05cv268-WS, 2006 WL 231291, at *3-4 (N.D. Fla. Jan. 30, 2006) (denying motion to dismiss as to, among other claims, claim of negligent distribution of taser product); *compare Hewlett-Packard Co. v. Brother's Trucking Enterprises, Inc*., 373 F.Supp.2d 1349, 1352-

45

53 (S.D. Fla. 2005) (denying summary judgment and stating that "a reasonable factfinder might find that [Defendant] failed exercise due care" in transporting cargo that was stolen). *See also*, *Prater*, *supra*, 100 Nw. U. L. Rev. at 1422-23, n.3 ("Distribution-centered strains of negligent marketing stem not from the advertising or promotion of a product per se but, rather, on the actual distribution of the product").

> ### 2.     The Distributor Defendants' Challenge to Count VII[137] Fails With Their Challenge to Plaintiff's Other Negligence Claims

The Distributor Defendants separately challenge Plaintiff's claim that Defendants acted with wanton negligence.[138] That claim, if successful, entitles Plaintiff to recover punitive damages. But the Distributor Defendants merely incorporate the conclusory statements made in summary form elsewhere that there was no breach of duty, provide no support for those statements, and offer no independent grounds for dismissal of that count.[139]

> ### C.     Plaintiff Has Sufficiently Pled that Its Injuries Were Proximately Caused by Defendants' Conduct

The issue of proximate cause is generally a question of fact concerned with "whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *McCain*, 593 So.2d at 502; *see also*, *Florida Power & Light Co. v. Periera*, 705 So.2d 1359, 1361 (Fla. 1998). The Florida Court has stated that "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain*, 593 So.2d at 503. For a defendant to be relieved of liability, the proper question is whether the injured party's conduct is "so unusual, extraordinary or bizarre (*i.e.*, so 'unforeseeable') that the policy of the law will

---

[137] Compl. at ¶ 937-940.
[138] *Id.* at 941-969.
[139] Distrib. Mem. at 21.

relieve the [defendant] of any liability for negligently creating this dangerous situation." *Palm Beach Cty. Bd. of Cty. Comm'rs v. Salas*, 511 So. 2d 544, 547 (Fla. 1987). As stated by the *McCain* court, "[t]he law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." 593 So.2d at 503. When reasonable persons could differ as to whether the facts establish proximate causation, the issue must be left to the fact finder. *Id.* at 504.

Under Florida law, questions of proximate cause and whether a defendant's negligence was a substantial factor in causing injury are questions for the jury, unless reasonable people could not differ. *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1316 (11th Cir. 1990) ("Issues of causation are problematic and, under most circumstances, should be left to the jury"); *Tardif v. PETA*, 829 F. Supp. 2d 1219 (M.D. Fla. 2011); (quoting *McCain*, 593 So.2d at 503–04) ("The question of foreseeability as it relates to proximate causation must be left to the fact-finder to resolve.").

Many courts have noted the difference between RICO and common law proximate cause standards and have "recognized that the more stringent requirements for RICO claims are not applicable to common-law claims." *City of Seattle v. Monsanto Co.*, No. C16-107RSL, 2017 WL 698789, at *26 n.11 (W.D. Wash. Feb. 22, 2017) (citing *Shepherd v. Am. Honda Motor*, 822 F. Supp. 625, 633 (N.D. Cal. 1993) ("Parties who . . . are unable to satisfy RICO's stringent proximate cause and concrete loss requirements remain free to pursue common law or statutory state law claims.")). In *City of Everett v. Purdue Pharma Ltd. P'ship,* No. C17-209RSM, 2017 WL 4236062, at *1, *9 (W.D. Wash. Sep. 25, 2017), a district court recently sustained common law negligence (and other) claims brought by a municipality against Defendant Purdue.

Certain of the Defendants argue, in motion papers incorporated by reference, that there is no proximate causation because of the actions of an intervening actor. But "[i]f an intervening

47

cause is foreseeable the original negligent actor may still be held liable." *Gibson v. Avis Rent–A–Car Sys., Inc.*, 386 So.2d 520, 522 (Fla. 1980). The question of whether an intervening cause is foreseeable is for the trier of fact. *See id.* In reaching this determination, the question is "whether the harm that occurred was within the scope of the danger attributable to the defendant's negligent conduct." *Id.* (determining that a reasonable person would conclude that stopping a car on a multilane highway would create a risk that other cars would collide in an effort to avoid impacting the stopped vehicle); *see also*, *Vining v. Avis Rent–A–Car Sys., Inc.*, 354 So.2d 54 (Fla.1977) (determining that it was reasonable to foresee the theft of an automobile left unattended with the keys in the ignition in a high crime area and the increased danger of injury to those using the highways should such theft occur). *See also*, *Sosa v. Coleman*, 646 F.2d 991, 993 (11th Cir. 1981) ("where the intervening act is itself probable or foreseeable, causal connection is not broken") (citing *Railway Express Agency, Inc. v. Garland*, 269 So.2d 708 (Fla. 1st DCA 1972), *cert. denied*, 275 So. 2d 14 (Fla. 1973)); *see also*, *Nicholas v. Miami Burglar Alarm Co.*, 339 So.2d 175, 177 (Fla. 1976).[140]

Florida law does not require Plaintiff to demonstrate that Defendants' conduct was the *sole* cause of its injury. *Helman v. Seaboard Coast Line R. Co.*, 349 So.2d 1187, 1190 (Fla. 1977) (holding it was an error for a lower court to apply this doctrine to displace a jury verdict when the defendant may have been partially responsible). Accordingly, "one who is negligent is not absolved of liability when his conduct 'sets in motion' a chain of events resulting in injury to the plaintiff." *Gibson*, 386 So. 2d at 522. Plaintiff's purported negligence—or some third party's

---

[140] The Florida rule conforms with the approach taken in the Restatement (Second) of Torts. *See* Restatement (Second) of Torts § 448 (explaining that "[t]he act of a third person committing an intentional tort or crime" will not supersede the original actor's negligence if "the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime").

negligence—is properly considered by the jury only in its comparative fault determination. *Mosher v. Speedstar Div. of AMCA Int'l, Inc.*, 979 F.2d 823, 825 (11th Cir. 1992) ("Florida law does not suggest that misuse will 'negate liability' as the district court instructed. Instead, misuse is simply to be considered as part of the comparative fault calculus.") (*Tjoflat, J.*) (citing *Auburn Mach. Works Co. v. Jones*, 366 So. 2d 1167, 1171–72 (Fla.1979) and *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla.1976)); *accord Hunnings*, 29 F.3d at 1487 .[141]

Here, Plaintiff's allegations are sufficient to support a finding that "prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain*, 593 So.2d at 503. It would not take an extraordinary amount of "prudent human foresight" to foresee that hospitals would be on the front lines of having to respond to the immediate adverse effects that the Defendants knew their products would produce. This harm would include incurring the cost of treating uninsured patients. But it would go far beyond that, to also include capital improvement costs, security costs, revising treatment procedures, conducting substance abuse assessments and initiating addiction treatment for patients in the emergency department and facilitating follow-up treatment and aftercare, and costs associated with offering naloxone and training to opioid addicted patients' family and friends. Plaintiff's allegations are also more than sufficient to plead that the actions of others (such as patients or care providers), even if they materially affected Plaintiff's injuries, were foreseeable. At most, this creates a comparative fault question for a jury, but it certainly does not warrant

---

[141] Moreover, as discussed above, patients may become addicted to opioids without any misuse by them whatsoever. Once that occurs, all of the ills that accompany this addiction follow. Defendants' fraudulent scheme to increase the volume of opioids prescribed and consumed in the United States and in Plaintiff alone caused an increase in the number of persons addicted to these drugs, leading inevitably and foreseeably to the other harms associated with addiction.

dismissal of this claim on the pleadings. *Mosher*, 979 F.2d at 825 ("misuse is simply to be considered as part of the comparative fault calculus").

## V.    Plaintiff Has Pled an Actionable Claim of Unjust Enrichment

In Count XII, Plaintiff pleads a claim of unjust enrichment.[142] Under Florida law, the "elements of an unjust enrichment claim are 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" *Florida Power Corp. v. City of Winter Park*, 887 So.2d 1237, 1241 n.4 (Fla. 2004). (citing *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*, 668 So.2d 205, 207 (Fla. 2d DCA 1995)).

### A.    A Claim of Unjust Enrichment May Be Asserted Based on the Same Set of Facts as Other Claims

The Distributor Defendants contend that this claim should be dismissed as duplicative of other claims.[143] But under federal pleading rules as interpreted by the Sixth Circuit, "nothing prohibits a plaintiff from pleading multiple claims when there are, in fact, multiple theories of liability that are legally viable and consistent with the facts; where a plaintiff has a contract claim, tort claim, and a claim for statutory violation, all may be pled." *PCA Minerals, LLC v. Merit Energy Co., LLC*, Nos. 16-2598 and 16-2679, 2018 WL 846565, at *6 (6th Cir. Feb. 14, 2018); *see also*, *Hutchings v. Nationstar Mortg., LLC*, No. 1:13 CV 00569, 2013 WL 5670939, at *3 (N.D. Ohio Oct. 16, 2013) ("a plaintiff is not precluded from arguing or pursuing multiple theories in the alternative throughout the course of the litigation"). Even if Florida law were to govern this question, the cases cited by the Distributor Defendants are inapposite,[144] and the great weight of

---

[142] Compl. at ¶¶ 1005-1011.
[143] Distrib. Mem. at 22-23.
[144] In *Licul v. Volkswagen Group of Am. Inc.*, No. 13-61686-Civ-Cohn/Seltzer, 2013 WL 6328734 (S.D. Fla. Dec. 5, 2013), the court dismissed an unjust enrichment claim as "duplicative" when the defendant

recent authority holds that a claim of unjust enrichment may be pled based on the same facts that support a claim at law, regardless of whether the legal claim is viable.[145]

## B.    Plaintiff Has Conferred Benefits Upon the Defendants

Defendants claim, with relatively little analysis, that the Hospital "does not plausibly allege any … benefit" that it conferred upon the Defendants, and that the Hospital only conferred benefits on its patients.[146] This is not correct, as the Hospital has (a) conferred affirmative pecuniary benefits upon the Defendants by purchasing and dispensing their products and (b) conferred further benefits upon the Defendants by ameliorating adverse externalities caused by the Defendants' wrongful conduct.

### 1.    Hospitals, Did Confer Affirmative Financial and Other Benefits to the Defendants, as Purchasers and Dispensers of Opioids and of Drugs Used to Treat Opioid Addiction

Hospitals are *purchasers* and *dispensers* of pharmaceutical products.[147] As purchasers, hospitals provide a financial benefit directly to distributors, and up the chain of distribution to the

---

conceded the existence of the express warranty governing the relationship between the parties regarding a defective door lock. 2013 WL 6328734, at *8. *But see*, *Melton v. Century Arms, Inc*., 243 F. Supp. 3d 1290, 1306–07 & n.6 (S.D. Fla. Mar. 20, 2017) (distinguishing *Licul* when plaintiff alleged all elements of unjust enrichment). In *Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348 (S.D. Fla. 2012), the court dismissed the unjust enrichment claim because it was duplicative of and based on the identical facts underpinning the plaintiff's FDUTPA claim. *Id*. at 1356–57. *See also*, *Harris v. Nordyne, LLC*, No.14-CIV-21884-BLOOM/Valle, 2014 WL 12516076, at *4 (S.D. Fla. Nov. 14, 2014) ("It is generally true that equitable remedies are not available under Florida law when adequate legal remedies exist. However, that rule does not apply to unjust enrichment claims" and explaining that the analysis in *Licul* and *Guerrero* was "improper").

[145] *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.*, 427 Fed. App'x 714, 722 (11th Cir. 2011) ("It is generally true that equitable remedies are not available under Florida law when adequate legal remedies exist. However, that rule does not apply to unjust enrichment claims") (citing *Williams v. Bear Stearns & Co*., 725 So.2d 397, 400 (Fla. 5th DCA 1998)), *abrogated on other grounds by State Farm Mut. Auto. Ins. v. Williams*, 824 F.3d 1311 (11th Cir. 2014); *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013) (noting that "to the extent that a plaintiff has adequate legal remedies under theories of liability other than a claim of breach of an express contract, those remedies do not bar an unjust enrichment claim.").

[146] Mktg. Mem. at 17; *accord* Distrib. Mem. at 22-23.

[147] Compl. at ¶ 62.

51

manufacturers – such purchasing of opioids is a benefit that is not conferred upon any other person selling anything else. As dispensers, hospitals have commonly dispensed opioids, among other things, (1) to patients suffering from acute injuries upon admission to hospital emergency departments, and (2) to patients (both inpatient and outpatient) following surgical procedures to ameliorate the pain associated with post-surgery recovery.[148] These are junctures at which patients might become exposed to opiates for the first time, and, dreadfully, may become addicted to them.. But the Defendants' incessant and misleading marketing campaigns certainly had their effects on hospitals, which had to respond to the demand for opioids fueled by Defendants' conduct.

Hospitals also are purchasers and dispensers of pharmaceutical products used to *treat* patients suffering from opioid addiction and withdrawal. The purchase of these products, often at inflated prices, further enriches the manufacturers and distributors of pharmaceutical products. This issue was highlighted by Congresswoman Schakowsky recently during recent testimony before the United States House of Representatives Subcommittee on Oversight and Investigations:

> **Ms. Schakowsky**. [I]t is apparent now that pharmaceutical corporations are taking advantage of the opioid epidemic by spiking the price of life-saving drugs like naloxone, and that that, in my view, is unacceptable. Pharmaceutical corporations can't start this epidemic with irresponsible and reckless on one day – recklessness one day – and then turn around and profit the next.

> So I wanted to again ask Mr. Hammergren, McKesson distributes Evzio [naloxone], which has raised its price from $690 to $4,500. So what does McKesson earn net per unit for Evzio?

> **Mr. Hammergren**. I can't answer that question, Ms. Congresswoman. I would say that we don't set the prices for branded drugs. Those are set by the manufacturers.

> **Ms. Schakowsky**. And how much does McKesson net annually for the distribution of Evzio?

---

[148] Opioid Exit Plan, *supra* n.28 at 593.

> **Mr. Hammergren**. Congresswoman, I don't have that information. I'd be happy
> to get it for you.[149]

Such testimony highlights externalization of costs by Defendants. The statement from Mr. Hammergren regarding the availability of evidence further establishes Plaintiff's position that through reasonable discovery it will be able to quantify and show this Court exactly how much Defendants have been unjustly enriched.

### 2. Hospitals, Even More So Than Municipalities, were on the Front Lines of the "Cleanup" of the Externalities Caused by Defendants

Several courts have held the benefit conferred by the plaintiff upon the defendant may be something other than an affirmative transfer of goods, services, or cash – it may be in the nature of ameliorating adverse conditions (sometimes referred to as "externalities") created by the defendant's conduct that the defendant might otherwise be held responsible for. *Moore v. Texaco, Inc.*, 244 F.3d 1229, 1233 (10th Cir. 2001) ("The performance of another's statutory duty to remediate pollution can give rise to a claim for unjust enrichment."); *City of Everett*, 2017 WL 4236062, at *1-9 (opioid crisis); *Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015) (Ohio law); *City of Los Angeles v. JPMorgan Chase & Co.*, No. 2:14-cv-04168-ODW(RZx), 2014 WL 6453808, at *10 (C.D. Cal. Nov. 14, 2014); *White v. Smith & Wesson Corp.*, 97 F. Supp. 2d. 816, 829 (N.D. Oh. 2000) (Ohio law) (allowing unjust-enrichment claim when city sued gun manufacturer for failing to incorporate safety devices into handguns and negligent marketing practices)); *City of St. Louis v. American Tobacco Co.*, 70 F. Supp. 2d. 1008, 1011 (E.D. Mo. 1999) (holding that "reasonable basis exists" for plaintiffs having

---

[149] *Hearing on Combating the Opioid Epidemic: Examining Concerns About Distribution and Diversion*. May 8, 115th Cong. (2018), https://energycommerce.house.gov/hearings/combating-the-opioid-epidemic-examining-concerns-about-distribution-and-diversion/.

stated a claim under section 115[150] of the first *Restatement* of Restitution for reimbursement of unreimbursed health care costs associated with tobacco use); *Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 586 (W.D. Tenn. 1997) (plaintiff stated an unjust enrichment claim because "[b]y remediating the contamination which was allegedly caused by Amoco, Ergon arguably confers upon Amoco a benefit of which it is aware."); *U.S. v. Healy Tibbitts Const. Co.*, 607 F. Supp. 540, 542-43 (N.D. Cal. 1985) (in case involving party refusing to clean up oil spill, court noted that the "portrait of [the defendant] indifferently standing idle while its [harm] is neutralized at public expense – and thereafter spiritedly disavowing any responsibility for recompensing the [county]— offers as compelling an example of unjust enrichment as has lately been brought before the Court."); *Evans v. City of Johnstown*, 96 Misc. 2d 755, 766-70 (Sup. Ct. Fulton Co. 1978) (holding that plaintiff could proceed on claim for unjust enrichment against municipalities for money saved by not properly disposing of waste materials). In *City of Everett*, a federal district court recently held that a municipality stated an actionable unjust enrichment claim (among other claims) against Defendant Purdue arising out of its wrongful conduct and contribution to the opioid crisis. 2017 WL 4236062, at *9.

Plaintiff is at least as well positioned to seek recovery for the damage control benefits bestowed on the Defendants than the municipal plaintiffs were in the *Everett*, *Los Angeles*, and *St. Louis* cases cited above. Hospital emergency departments are on the "front lines" of the opioid

---

[150] Section 115 of the first *Restatement* Provides:

A person who has performed the duty of another by supplying things or services, although acting without the other's knowledge or consent is entitled to restitution from the other if

    (a)    He acted unofficiously and with intent to charge therefor, and

    (b)    The things and services supplied were immediately necessary to satisfy the requirements of public decency, health or safety.

Restatement of Restitution § 115 (1937).

crisis, charged with the foreseeable and sadly frequent acute effects of opioid abuse.[151] Defendants continue to reap billion-dollar profits not only selling opioids but also selling *the antidote*, and they pass the responsibility on to entities such as Plaintiff to clean up their crisis. It was foreseeable to Defendants that their products and their willful malfeasance would cause overdose and addiction and it was foreseeable to Defendants that when individuals were in trouble they would go to the hospital.

### C. The Benefits Conferred by the Hospital Were Not Incidental and Were Sufficiently "Direct" for Purposes of a Florida Unjust Enrichment Claim

The Distributor Defendants contend that any benefits conferred by the Hospital upon Defendants were conferred upon the patients, and not Defendants, and, thus, were not sufficiently direct.[152] This is incorrect.

First, the Plaintiff, *was* in privity with at least some of the Defendants, as it is a regular dispenser of their products and interacts with their sales personnel.

Second, and more importantly, the provision of a "direct" *benefit* to a recipient does *not* mean direct *contact* between the plaintiff and the defendant, but merely that the benefit be something other than an incidental or fortuitous one. Many recent decisions addressing unjust enrichment claims brought under Florida law have held that a benefit is sufficient even if it passes through an intermediary. *See e.g.*, *State Farm Mut. Auto. Ins. Co. v. Brown*, No. 16-80793-CIV, 2017 WL 1291995, at *7 (S.D. Fla. Mar. 30, 2017); *Melton v. Century Arms, Inc.*, No. 16-21008-CIV, 2017 WL 1063449, at *9 (S.D. Fla. Mar. 20, 2017); *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014) ("[I]t would not serve the principles of justice and equity to

---

[151] *See*, *e.g.*, Compl. at ¶ 19 ("Defendants depended on the hospitals to mitigate the health consequences of their illegal activities - at no cost to the Defendants - thereby permitting the Defendants to perpetuate their scheme").
[152] Distrib. Mem. at 22.

preclude an unjust enrichment claim merely because the 'benefit' passed through an intermediary before being conferred on a defendant."); *In re Auto. Parts Antitrust Litig. (Fuel Senders)*, 29 F. Supp. 3d 982, 1017 (E.D. Mich. 2014) (Florida law); *Feiner v. Innovation Ventures LLC*, No. 12-62495-CIV-Dimitrouleas/Snow, 2013 WL 2386656, at *5  (S.D. Fla. May 20, 2013) ("while there was no direct contact between the manufacturer [Defendant] and Plaintiff by purchasing the [product], plaintiff directly conferred a benefit on [Defendant] in the form of payment"); *In re Processed Eggs*, 851 F. Supp. 2d 867, 929 (E.D. Pa. 2012) (Florida law); *Aceto Corp. v. Therapeutics MD, Inc.*, No. 12-81253-CIV, 2013 WL 3761073, at *17 (S.D. Fla. July 17, 2013); *Williams v. Wells Fargo Bank N.A.*, No. 11-21233-CIV, 2011 WL 4368980, at *9 (S.D. Fla. Sept. 19, 2011); *Romano v. Motorola, Inc.*, No. 07-CIV-60517, 2007 WL 4199781, at *2 (S.D. Fla. Nov. 26, 2007) ("Defendant erroneously equates direct *contact* with direct *benefit* in arguing that "[b]ecause plaintiff here did not purchase either his phone or his batteries from Motorola, plaintiff conferred no direct benefit on Motorola."'"). The *Aceto* court explained that "[i]n other words, just because the benefit conferred by plaintiffs on defendants did not pass directly from plaintiffs to defendants—but instead passed through a third party—does not preclude an unjust-enrichment claim. Indeed, to hold otherwise would be to undermine the equitable purpose of unjust enrichment claims."  2013 WL 3761073, at *17.

*Kopel v. Kopel*, 229 So. 3d 812 (Fla. 2017), cited by certain Defendants in the *Broward* case, is inapposite, and does not represent a change in Florida law. In *Kopel*, the claim failed because no benefit was conferred upon the defendant *at all*, as the benefit was conferred on a business entity and not the named (natural person) defendant, which are two separate juridical persons. In *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank, N.A.*, 667 So. 2d 876 (Fla.

3d DCA 1996), also cited by certain of the Defendants, the court concluded that it was *not the plaintiff* who conferred the benefit. *Id.* at 879.

The benefits conferred by the Hospital upon the Defendants – both the affirmative pecuniary benefits of increased product sales and the amelioration of externalities – were hardly incidental. The Hospital conferred direct *benefits* upon all of the Defendants, both those with whom the hospital was in direct *contact*, and those with whom it was not.

### D.   Any Failure to Plead Knowledge and Acceptance is a Technical Defect that Can Be Cured

The Distributor Defendants contend that Plaintiff failed to allege that they were aware of the benefit conferred. But, at the same time, they concede that Plaintiff has made such an allegation, pleading their state of mind generally, which is expressly permitted under Fed. R. Civ. P. 9(b).[153] Moreover, Plaintiff, as the nonmovant, is entitled to all reasonable inferences that might be drawn from its factual allegations, including an abundantly reasonable inference that the Defendants were aware that hospitals (among others) have been cleaning up the mess generated by their wrongful conduct. *See Citadel Commerce Corp. v. Cook Sys., LLC*, No. 8:08-cv-1923-T-33TGW, 2009 WL 1230067, at *8 (M.D. Fla. May 5, 2009) (reasoning regarding a complaint that did not expressly plead knowing or voluntary acceptance, "[i]f Defendants honestly contend that they had no knowledge of the benefits conferred …, Defendants can present this factual argument in a motion for summary judgment"). In any event, this is, at most, a technical pleading defect that can easily be cured through amendment.

### E.   It is Unjust for the Hospital to Bear the Costs of Remedying the Externalities of Defendants' Conduct, Regardless of Whether Some of its Costs Were Incurred in Fulfilling its Legal Obligations

---

[153] Distrib. Mem. at 22 (citing Compl. at ¶ 1007).

In only two sentences of argument, and without citation to authority, the Distributor Defendants contend that because the Hospital was obligated to provide care to many, if not all, persons adversely affected by opioids, there is nothing "unjust" about the Hospital's having to incur costs associated with that care.[154] But courts have tacitly and expressly rejected this line of argument in sustaining unjust enrichment claims brought by municipalities and others addressing harmful externalities, including the *Everett* action brought against Defendant Purdue.[155] The fact that hospitals are required to perform some of these services merely establishes the foreseeability of that result (and would appear to contradict the Distributor Defendants' contention in the prior paragraph that they were unaware of the benefits conferred by the Hospital), and says nothing about whether the result is "unjust."  Moreover, the benefits conferred by the Hospital extend beyond remedying the externalities caused by Defendants' conduct – as noted above, the Hospital is also a purchaser and dispenser of opioids which conferred pecuniary benefits upon the Defendants *independently* of the Hospital's role in addressing the externalities caused by Defendants' products.

## VI.     Plaintiff's FDUTPA Claim is Properly Pleaded

Courts in other jurisdictions have recently sustained claims arising out of the opioid crisis under state consumer protection laws. *See*, *e.g.*, *City of Everett*, 2017 WL 4236062, at *2, *9 (sustaining claim brought by a municipality under the Washington Consumer Protection Act, RCW 19.86, *et seq.*) ; *In re Opioid Litigation*, 2018 WL 3115102 (Sup. Ct. Suffolk Co., N.Y. June 18, 2018) (denying defendants' motion to dismiss claims brought by third party payors under New York's statute, G.B.L. §§ 349-50). Plaintiff brings similar claims under the Florida Deceptive and

---

[154] Distrib. Mem. at 22.
[155] *See* cases cited in Section II(C)(2)(b), *supra*.

Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"). For the reasons stated below, Defendants' motions to dismiss this claim should be denied. [156]

### A.    Plaintiff Has Properly Pled the Elements of a Claim under the FDUTPA

The FDUTPA provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. Fla. Stat. § 501.204 (1). Courts are directed to construe the FDUTPA liberally to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices." Fla. Stat. § 501.202(2). FDUTPA's protection policies are "to be construed liberally to promote [that] policy," and an aggrieved party affected by a defendant's FDUTPA violations is permitted to seek damages and injunctive relief. *Bailey v. St. Louis*, 196 So. 3d 375, 382 (Fla. 4th DCA 2016).

"Courts have uniformly described the elements required to state a claim under FDUTPA to be threefold: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages." *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212-CIV-BLOOM, 2016 WL 739652, at *7 (S.D. Fla. Feb. 25, 2016) (citations omitted). Plaintiff has satisfied the pleading requirement through allegations of the three required elements.[157]

### 1.   Plaintiff Has Pleaded Unfair and Deceptive Acts in Trade or Commerce

Plaintiff alleged that "[e]ach of the Defendants have engaged in unfair and/or deceptive trade practices by omitting the material fact of its failure to design and operate a system to disclose suspicious orders of controlled substances, as well as by failing to actually disclose such suspicious orders, as required of "registrants" by the federal CSA, 21 C.F.R. § 1301.74(b), which is

---

[156] To the extent that the arguments that the FDUTPA arguments in the *Summit* and *Broward* oppositions inure to Plaintiff's benefit, they are hereby adopted, incorporated and republished in full herein.
[157] Compl. at ¶¶ 895-913.

incorporated into Florida law by the FL DCA, including Fla. Stat. § 499.0121."[158] Plaintiff also

alleged that "Defendants' unfair or deceptive acts or practices in violation of the FDUTPA offend

Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious,

wanton and manifesting of ill will, and they caused substantial injury to Plaintiff."[159] In addition,

"[b]y reason of their reliance on Defendants' misrepresentations and omissions of material fact,

Plaintiff, physicians, patients, and/or others suffered actual pecuniary damage."[160]

     Recognizing that Plaintiff has alleged the three elements sufficiently, Defendants argue

that these allegations failed to state a claim under the FDUTPA because Plaintiff is allegedly

subject to a heightened pleading requirement. This argument was rejected by a Florida district

court in *Harris v. Nordyne, LLC*, 2014 WL 12516076, at *4 (finding that "even where a FDUTPA

claim includes allegations which implicate fraudulent conduct, it need not meet the heightened

pleading requirements of Rule 9(b)"). As explained in *Harris*, this Court should reject Defendants'

argument here. Assuming *arguendo* Rule 9(b) applied, Plaintiff's allegations were still sufficient.

Plaintiff alleged misrepresentations and omissions by Defendants with specific time and place and

identified contents and consequences of the deceptive conducts.[161]

     Moreover, as Judge Polster found in *Traxler v. PPG Indus.*, 158 F. Supp. 3d 607 (N.D.

Ohio 2016):

> The Court also denies PPG's request to dismiss these state-law claims because
> Plaintiffs have failed to sufficiently allege fraudulent or deceptive conduct
> under Rule 9(b). ***Rule 9(b)'s purpose is to ensure fair notice to the defendant, not
> to test a claim's factual allegations***. *Advocacy Org. for Patients & Providers v.
> Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir.1999). Plaintiffs are required, at a
> minimum, to identify the "who, what, when, where, and how" of the alleged
> fraud. *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th
> Cir.2006) (citation omitted). Additionally, "Rule 9(b)'s particularity requirement

---

[158] *Id.* at ¶ 902
[159] *Id.* at ¶ 903
[160] *Id.* at ¶ 911
[161] *See, e.g.*, Compl. at ¶¶ 161-213; 630-662; 683-717.

may be relaxed *when certain information is solely within the defendant's knowledge.*" *U.S. Securities and Exchange Comm'n v. Blackwell*, 291 F.Supp.2d 673, 691 (S.D. Ohio 2003) (citing *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680–81 (6th Cir.1988)) ("We will not demand clairvoyance from pleaders.")

*Id.* at 630  (emphasis added).

Defendants' argument that Plaintiff must identify any specific orders that should have been reported or any specific prescriptions for which it paid goes directly against Judge Polster's ruling in *Traxler* and should be rejected here.

Defendants also argue that Plaintiff failed to allege that it was a "consumer" under FDUTPA.[162] For reasons stated in *Broward's* opposition,[163], Defendants' argument must fail. Moreover, Florida courts recognize no such requirement. In fact, "effective July 1, 2001, the legislature amended section 501.211(2), Florida Statutes (2001), by inserting the word 'person' in place of the word 'consumer'" *Bailey* 196 So. 3d at 383. Thus, "the statute is not limited to consumers but, rather, it applies to all individuals and entities that are able to prove the three elements of a FDUTPA claim" and "no appellate court in Florida has held otherwise." *Wallace v. Southern Cable Systems, LLC*, No.: 3:16cv209-RV/CJK, 2016 WL 9308535, at *2 (N.D. Fla. Nov. 4, 2016) (collecting cases, citations omitted).

Defendants cite *Cent. Reg'l Emps. Ben. Fund v. Cephalon, Inc.*, No. 09-3418 (MLC), 2009 WL 3245485, at *3 (D.N.J. Oct. 7, 2009) and *In re Rezulin Prod. Liab. Litig.*, 392 F. Supp. 2d 597, 616-17 (S.D.N.Y. 2005), but on this point, which is specific to FDUTPA, these cases brought under New Jersey and New York statutes are irrelevant.[164]

---

[162] Plaintiff hereby incorporates responses stated in *Broward* Opp. at 42-45.
[163] *Id.*
[164] The New Jersey district court in *Cent. Reg'l Emps. Ben. Fund* first stated that "[t]he nature of the transaction, not the identity of the purchaser, determines whether the [New Jersey's Consumer Fraud Act] is applicable." Then, the court found that under New Jersey law, "[b]ecause third-party payors do not use or consume prescription medications themselves, they are not [']consumers['] within the meaning of the NJCFA, and that statute is therefore inapplicable to the circumstances alleged in the Complaint." 2009 WL

Defendants further argued that their violations of 21 C.F.R. § 1301.74(b) did not constitute a violation of FDUTPA.[165] For reasons stated in the *Broward* opposition,[166] Defendants' argument must fail. Further, "[w]hether [specific] conduct constitutes an unfair or deceptive trade practice is a question of fact for the jury to determine." *State Farm Mut. Auto. Ins. Co. v. Performance Ortho. & Neurosurgery*, 278 F. Supp. 3d 1307, 1316 (S.D. Fla. 2017).

The Distributor Defendants argue that their fraudulent omissions were not made to consumers or to businesses or for any commercial purpose, and thus were not conduct made "in trade or commerce" under FDUTPA. This argument is disingenuous. The FDUTPA defines "trade and commerce" as "the advertising, soliciting, providing, offering, ***or distributing***, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated." Fla. Stat. § 501.203(8) (emphasis added). Because Distributor Defendants made fraudulent omissions in the distribution of opioids, their acts fall under the FDUTPA. Whether fraudulent omissions were first made to Plaintiff or another party does not exclude the conduct from the definition of conduct made "in trade or commerce" under the FDUTPA. Thus, the two cases cited by Distributor Defendants, neither of which addresses the liability of persons engaged in distribution, do not support their argument. *See Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1320 (M.D.

---

3245485, at *3. The New York district court in *In re Rezulin Prod. Liab. Litig.*, analyzed the meaning of "consumer" under Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA") and the New Jersey Consumer Fraud Act (the "CFA"), and found Plaintiff LCB, a third-party payor, was not a "consumer" under the statutes. *See Rezulin*, 392 F. Supp. 2d at 616-17 ("LBC certainly did not engage in any transaction intended for its own personal, family, or household use. Nor did it use, purchase, or lease <u>Rezulin</u> from WL. Accordingly, LBC was not a "consumer." "Although the courts are not in uniform agreement, a frequently used definition of [']consumer['] in New Jersey is [']one who uses (economic) goods, and so diminishes or destroys their utilities.[']Under this definition, LBC was not a consumer of prescription drugs.").

[165] Plaintiff hereby incorporates the responses stated in *Broward* Opp. at 45-48.
[166] *Id.*

Fla. 2017) (finding that "debt collection activities are not 'trade or commerce' for FDUTPA purposes"); *State v. Shapiro & Fishman, LLP*, 59 So. 3d 353, 357 (Fla. 4th DCA 2011) (affirming a trial court's decision in quashing a civil investigative subpoena issued by Florida AG because the information sought "had no connection or nexus to [']trade or commerce[']").

The Distributor Defendants also argue that the claim should be dismissed for failure to expressly plead that it or any consumer was "likely to be deceived" by Distributors Defenants' fraudulent and deceptive conduct. But any failure to literally recite the magic words "likely to deceive" is irrelevant, as this is an objective, and quite lenient, standard common to many states' consumer protection laws that is rarely appropriate for resolution on the pleadings. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir.2008); *Burton v. Hodgson Mill, Inc.*, No. 16-cv-1081-MJR-RJD, 2017 WL 1282882, at \*6 (S.D. Ill. Apr. 6, 2017).[167] Plaintiff pled that the broader general public, including patients, health care providers and municipalities, *was actually deceived.* Plaintiff has alleged "Defendants intended that Plaintiff, physicians, patients, and/or others would rely on their misrepresentations and omissions" as well as "Plaintiff, physician, patients and/or others reasonably relied upon Defendants' misrepresentations and omissions."[168] If accepted as true, these allegations are more than sufficient to meet Plaintiff's very modest pleading burden.

### 2.    Plaintiff's Allegations of Causation Are Sufficient

The Marketing Defendants' argument on causation simply references arguments they stated in their motion to dismiss in *Broward*,[169] where they incorporated their arguments in opposition to *Broward's* negligence claim and concerning RICO causation. For the reasons stated

---

[167] *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565 (11th Cir. 2009) (per curiam), cited by the Distributor Defendants, was a summary judgment decision.
[168] Compl. at ¶¶ 908-909.
[169] Mfr. *Broward* Mem. at 12-13

in the above Sections II.B and IV, and for the reasons stated in the *Broward* opposition,[170] Defendants' arguments must fail.

### 3. Plaintiff Has Properly Pled Actual and Cognizable Damages

Plaintiff alleged that Defendants' deceptive and unfair trade practices resulted in unreimbursed costs to the Hospital, as well as purchases of opioids and their antidotes, among other expenses.[171] These are all direct harm to Plaintiff for which it is entitled to actual damages, and these types of damages have been recognized by Florida courts. *See*, *e.g.*, *Glob. Tech LED, LLC v. HiLumz Int'l Corp.*, No: 2:15- cv-553-FtM-29CM, 2017 WL 588669, at *9 (M.D. Fla. Feb. 14 2017) (past lost profits are proper form of actual damages under the FDUTPA); *ADT LLC v. Alarm Prot. Tech. Fla., LLC*, No. 12-80898-CIV-Ryskamp/Hopkins, 2013 WL 11276119, at *5 (S.D. Fla. Apr. 18, 2013) (noting that actual damages could include lost profits and lost business instead of applying the market-value or valueless product approaches).

Further, the FDUTPA permits recovery of actual damages as well as declaratory and injunctive relief to any person aggrieved by a defendant's unconscionable, deceptive, or unfair acts. Fla. Stat.. § 501.211. Thus, regardless of whether Plaintiff can recover "actual damages" under § 501.211(2), it may obtain injunctive relief under §501.211(1). *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So.3d 1149 (Fla. 5th DCA 2012). Causation is not a required element for declaratory or injunctive relief. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 166-67 (Fla. 4th DCA 2015); *Bailey*, 196 So. 3d at 382.

To the extent that Defendants argue that Plaintiff has not alleged a direct injury caused by Defendants' fraudulent and deceptive conduct, or that Plaintiff's injury is derivative of personal

---

[170] *Broward* Opp. at 48-49
[171] Compl. at ¶¶ 937-940; 1005-1011.

injuries suffered by opioid users, or that Plaintiff's damages were incidental or consequential, Plaintiff has responded to these arguments in previous sections.[172]

Defendants also raise arguments that they made in *Broward* motions to dismiss. For reasons stated in the *Broward* opposition,[173] Defendants' arguments fail.

### B.      FDUTPA's Safe-Harbor Provision Does Not Apply

FDUTPA's prohibition on deceptive act or unfair practice does not apply to "an act or practice required or specifically permitted by federal or state law." Fla. Stat. § 501.212(1). As many courts have noted, "[t]he safe harbor provisions apply only to conduct approved or specifically authorized by law." *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.*, 955 F.Supp.2d at 1323 n. 8 (citations omitted).

This safe-harbor provision cannot be applied to Defendants' conduct in violation of FDUTPA, because there existed no federal or state law that requires or permits Defendants to actively promote and market the use of opioids for indications not approved, or to spread false and misleading information concerning opioid's safety and efficacy, or to downplay or omit the risk of addiction arising from opioid use.

*Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007), cited by Defendants, is unhelpful. The court in *Prohias* applied the safe-harbor provision when the defendant's advertisement "marketed an approved use for the drug." *Prohias*, 490 F. Supp. 2d at 1234. *Prohias* recognized that the safe-harbor provision did not apply when a defendant failed to demonstrate that "its conduct is protected by the relevant safe harbor provisions" and when the defendant engaged in an advertising scheme "which is contrary to that sanctioned by the FDA, and does not allege that their misleading advertisements were ever approved, or even viewed by the FDA." *Id.*

---

[172] *See* Sections II.A., IV.C., *supra*.
[173] *Broward* Opp. at 49-50.

at 1233-34 . Here, in contrast, the substance of the misleading statements made by Defendants was never approved or reviewed by the FDA, or anyone else. Very much to the contrary, Plaintiff alleges Defendants' misleading advertisements including Defendants' continuous fraudulent marketing scheme despite repeated admonitions, warnings, and prosecutions by federal and state government, the safe-harbor provision did not apply.[174] In addition, for the reasons stated in the *Broward* opposition, Defendants' arguments must fail.[175]

## VII.  Plaintiff's Misleading Advertising Claim is Properly Pleaded

To state a claim for damages under Fla. Stat. §§ 817.40(5) and 817.41(1), a plaintiff must plead that "the party relied on some identifiable alleged misleading advertising plus, where appropriate, all of the other elements of the common law tort of fraud in the inducement," including: (1) the representor made material misrepresentation, (2) the representor knew or should have known the falsity of the statement, (3) the representor intended inducement, and (4) the plaintiff justifiably relied and suffered damages. *Baker v. Brunswick Corporation*, No: 2:17-cv-572-FtM-99MRM, 2018 WL 1947433, at *7 (M.D. Fla. 2018) (citing *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1322 (M.D. Fla. 2007)). Plaintiff's allegations satisfy the pleading standard.[176] As stated in the above Section VI.A, Plaintiff's allegation also satisfy Fed. R. Civ. P. 9(b), if the court were to find that Rule 9(b) applies.

To the extent that the Marketing Defendants argue that Plaintiff fail to allege actual or proximate causation, Plaintiff responded to the same argument in Section III.A., *supra*.

To the extent that Marketing Defendants argue that Plaintiff fails to allege that it was exposed to, and relied on, any alleged misrepresentations by Defendants, Defendants failed to read

---

[174] *See*, *e.g.*, Compl. at ¶¶ 72, 179-183, 288-299.
[175] Plaintiff hereby incorporates responses stated in *Broward* Opp. at 50-51.
[176] *See*, *e.g.*, Compl. at ¶¶ 914-921.

the allegations in Plaintiff's Complaint. For example, Plaintiff clearly alleges that Defendant "Purdue has continued to distort or omit the risk of addiction while failing to correct its earlier misrepresentations, leaving many doctors with the false impression that pain patients will only rarely become addicted to opioids included sufficient."[177] Plaintiff also alleges that "[t]he doctors had a strong recollection of the sales representatives' discussion of the low-abuse potential. Actavis's sales representatives' misstatements on the low-abuse potential was considered an important factor to doctors, and was most likely repeated and reinforced to their patients."[178] "Additionally, doctors reviewed visual aids that the Kadian sales representatives use during the visits, and Actavis noted that doctors associate Kadian with less abuse and no highs, in comparison to other opioids. Numerous marketing surveys of doctors in 2010 and 2012, for example, confirmed Actavis's messaging about Kadian's purported low addiction potential, and that it had less abuse potential than other similar opioids."[179] "Physicians attended or reviewed CMEs sponsored by the Marketing Defendants during the relevant time period and were misled by them."[180] Besides, none of the cases cited by the defendants stated a rule for Plaintiff to "identify any statement [of the Defendants] that *it* received and relied upon."[181]

---

[177] *Id.* at ¶ 178.

[178] *Id.* at ¶ 207.

[179] *Id.*

[180] *Id.* at ¶ 436.

[181] Mktg. Mem. at 11. *Samuels v. King Motor Co. of Fort Lauderdale*, required that "the misleading statement [be] made with the purpose of selling or disposing of any property," *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 496 (Fla. 4th DCA 2001). *Smith v. Mellon Bank*, required that a plaintiff's reliance upon a defendant's misrepresentation to be "reasonable," 957 F.2d 856, 858 (11th Cir. 1992) (finding "[plaintiffs'] reliance upon that statement alone was not reasonable and was not justified). *Se. Laborers Health & Welfare Fund v. Bayer Corp.* required that a plaintiff allege misleading statements made by a defendant. 655 F. Supp. 2d 1270, 1289 (S.D. Fla. 2009) (finding "the individual patient suits against Bayer . . . failed to allege specific statements upon which the individual patients or their physicians had relied upon" and granting "the individual plaintiffs thirty (30) days within which to amend their individual complaints to set forth allegations specifying particular statements made by Bayer").

67

Plaintiff, further, incorporates those points stated in the *Broward* opposition.[182]

**VIII.    Plaintiff's Claims Are Not Barred Any Statutes of Limitations**

The Marketing Defendants argue that all of Plaintiff's claims must be dismissed because they are time-barred.[183]

But Defendants' statute of limitations defense cannot be resolved on a motion to dismiss. When, as here, the plaintiff asserts various tolling exceptions to the operative statutes of limitation, the applicability of those exceptions "are questions for summary judgment or for trial, and they should not be resolved on a motion to dismiss." *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 476 (6th Cir. 2013); *see also Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) ("courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date . . . includ[ing, for example,] claims that the defendant fraudulently concealed facts").

With respect to Plaintiff's federal RICO claims, Plaintiff incorporates by reference those points made in both the *Summit* and *Broward* oppositions.[184]

With respect to Plaintiff's state law claims, (1) to the extent that the statute of limitations is governed by Florida law, Plaintiff incorporates the *Broward* opposition, and (2) to the extent that the statute of limitations is governed by Ohio law, Plaintiff incorporates the *Summit* opposition.[185]

**IX.    Plaintiff Sufficiently Alleged that Defendants' Actions Merit Punitive Damages**

The Marketing Defendants argue that Plaintiff's request for punitive damages should be

---

[182] Plaintiff incorporates responses stated in *Broward* Opp. at 57-60.
[183] Mktg. Mem. at 17.
[184] *Summit* Opp. at 122-128; *Broward* Opp. at 3-9.
[185] *See Broward* Opp. at 3-9; *Summit* Opp. at 122-128.

stricken because the Complaint contains only "conclusory allegations."[186] However, this argument clearly ignores the detailed facts giving rise to the claims for punitive damages set forth in the Complaint.[187] Plaintiff has detailed the Marketing Defendants' "deliberate," "willful," and "knowing" promotion of falsehoods in order to increase the market for their addictive drugs. *Id.* Indeed, Plaintiff's Complaint set forth many illustrative falsehoods that were promoted by Defendants, detailed the way in which that misleading information was distributed, explained how certain vulnerable groups were targeted, and further described how these actions created a public health epidemic.[188] For the reasons set forth in the *Broward* opposition, incorporated herein, the Marketing Defendants' request to strike Plaintiff's request for punitive damages should be denied.[189]

## **CONCLUSION**

Based on the foregoing, Plaintiff respectfully requests that Defendants' motions to dismiss be denied in their entirety. In the alternative, should the Court determine Plaintiff's Complaint is in any way deficient, Plaintiff respectfully requests the opportunity to cure any defects in an amended pleading.[190]

Dated: July 27, 2018                                     Respectfully submitted,

                                                         */s/ Don Barrett*
                                                         John W. ("Don") Barrett
                                                         David McMullan, Jr.
                                                         Richard Barrett
                                                         Sterling Starns

---

[186] Mktg. Mem. at 20.
[187] *See, e.g.*, Compl. at ¶¶ 781-811.
[188] *See* Compl. at ¶¶ 155-327 (nine falsehoods); ¶¶ 328-459 (channels used to disseminate the deceptive scheme); ¶¶ 460-465 (targeting elderly and veterans).
[189] *See Broward* Opp. at 62.
[190] Defendants will suffer no substantial prejudice, nor is there any other reason Plaintiff should not be freely given leave to amend. *See, e.g.*, *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lawson v. Truck Drivers, Chauffeurs & Helpers, Local Union 100*, 698 F.2d 250, 256 (6th Cir. 1983); *Hageman v. Signal L.P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973).

BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com
rrb@rrblawfirm.net
sstarns@barrettlawgroup.com

G. Robert Blakey
WILLIAM J. & DOROTHY T. O'NEILL
PROFESSOR OF LAW EMERITUS
NOTRE DAME LAW SCHOOL*
7002 East San Miguel Avenue
Paradise Valley, Arizona 85253
Ph: 574-514-8220
E-mail: blakey.1@nd.edu
*For purposes of identification only

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2018, a copy of the foregoing document was filed

electronically. Notice of this filing will be sent by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt. All other parties will be served by

regular U.S. mail. Parties may access this filing through the Court's system.

/s/ Don Barrett
John W. ("Don") Barrett
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com

70