UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: | Judge Dan Aaron Polster |
| *City of Cleveland, et al. v. Purdue Pharma L.P., et al.*, Case No. 18-OP-45132; | |
| *County of Cuyahoga, et al. v. Purdue Pharma L.P., et al.*, Case No. 17-OP-45004; | |
| *County of Summit, et al. v. Purdue Pharma, L.P., et al.*, Case No. 18-OP-45090 | |

# PLAINTIFFS' OMNIBUS OPPOSITION TO MANUFACTURER DEFENDANTS' JOINT OBJECTIONS AND PHARMACY DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S DISCOVERY RULINGS NO. 2 AND 3

July 30, 2018

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES.................................................................................................... II

INTRODUCTION .............................................................................................................. 1

THE SPECIAL MASTER'S RULINGS .................................................................................. 1

    Procedural Background .............................................................................................. 1

    I.    THE SPECIAL MASTER'S RULINGS CALL FOR DISCOVERY THAT IS BOTH
        RELEVANT AND PROPORTIONAL TO THIS CASE.................................................... 4

    II.   THE MODIFICATIONS PROPOSED BY THE INDIVIDUAL MANUFACTURERS SHOULD
        BE REJECTED ................................................................................................... 9

        A.    Allergan's Discovery Obligations Should Not Be Limited to
             Kadian Nor to the Time Period in Which Kadian Was Marketed .... 9

        B.    Mallinckrodt's Discovery Obligations Should Include Its
             Generic Products and the Time Period in Which Those
             Products Were Marketed ....................................................................... 11

        C.    The Discovery Rulings Should Not Be Modified for Teva .............. 14

        D.    Purdue's Obligations with Respect to Prior Productions and
             Product Scope Should Not Be Modified............................................ 15

        E.    Janssen Should Be Required to Produce Information about Its
             Generic Products ................................................................................... 16

        F.    Endo Should Be Required to Provide Discovery Regarding All
             of Its Relevant Products during the Entire Time Period those
             Products Were Marketed ....................................................................... 17

    III.  THE PHARMACY DEFENDANTS' OBJECTIONS SHOULD BE OVERRULED............. 19

        A.    The Geographic Scope Required by the Rulings Is Appropriate.... 19

        B.    The Pharmacies Should Not Be Exempt from the Requirement
             that They Produce Documents Pertaining to All Schedule II
             Opioids ................................................................................................... 21

        C.    The Statute of Limitations Does Not Define the Proper Scope of
             Discovery................................................................................................. 29

i

# TABLE OF AUTHORITIES

*Page*

## Cases

*Com. and Indust. Ins. Co. v. Century Surety Co.*, 2017 WL 946984 (S.D. Ohio Mar. 10, 2017) ............................................................................................................................. 32

*Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-3957 N.E.2d 875 (Ohio Ct. App. 2008) ...................................................................................................................... 30

*Elmer v. S.H. Bell Co.*, 127 F. Supp. 3d 812 (N.D. Ohio 2015) ................................................ 30

*In re Fair Fin. Co.*, 834 F.3d 651 (6th Cir. 2016), *reh'g denied* (Sept. 23, 2016) ..................... 31

*In re Takata Airbags Prods. Liab. Litig.*, 2016 WL 1460143 (S.D. Fla. Feb. 24, 2016) .............. 5

*Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389 (6th Cir. 1998) ...................................................... 5

*Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240 (N.D. Ohio 2017) ......................... 5

*MV Circuit Design, Inc. v. Omnicell, Inc.*, No. 1:14 CV 2028, 2015 WL 1321743 (N.D. Ohio Mar. 24, 2015) ................................................................................................... 31

*Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 2002-Ohio-2007, 766 N.E.2d 977 (Ohio 2002) ....................................................................................................................... 31

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978) ........................................................ 31

*Oracle Am., Inc. v. Google, Inc.*, 2015 WL 7775243 (N.D. Cal. Dec. 3, 2015) ......................... 32

*Owens v. Sprint/United Mgmt. Co.*, 221 F.R.D. 649 (D. Kan. 2004)........................................... 21

*People v. Conagra Grocery Prods. Co.*, 17 Cal. App. 4th 51, 227 Cal. Rprtr. 3d 499 (2017)............................................................................................................................... 30

*Ray v. Waste Mgmt. of Ky., LLC*, 2010 WL 11545747 (W.D. Ky. Dec. 15, 2010) ................. 31

*Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36487-01, 2007 WL 1886484 (July 3, 2007) ............................................................................................................................... 28

*State v. Swartz*, 723 N.E.2d 1084 (Ohio 2000) ......................................................................... 9

*The Little Miami RR Co. v. Comm'rs of Greene Cty.*, 31 Ohio St. 338 (Ohio Dec. 1, 1877) ............................................................................................................................... 30

*Thornton v. State Farm Mut. Auto Ins. Co.*, 2006 WL 3499986 (N.D. Ohio Dec. 5, 2006) ............................................................................................................................... 21

*Zatko v. Rogers Mfg. Co.*, 37 F.R.D. 29 (N.D. Ohio 1964) ....................................................... 31

## Rules

Fed. R. Civ. P. 26.................................................................................................................... 6

Fed. R. Civ. P. 53.................................................................................................................... 1

ii

## INTRODUCTION

After extensive briefing from the parties, Special Master Cohen issued two discovery rulings defining the scope of discovery in this case. The rulings resolved disputes among the parties regarding, *inter alia,* the opioid products as to which Defendants must provide discovery; the time periods for which Defendants must provide discovery; and the geographic scope of the information for which Defendants must provide discovery. Pursuant to Fed. R. Civ. P. 53, the Manufacturer Defendants and the Pharmacy Defendants have objected to the rulings. The rulings of the Special Master were correct and the Special Master did not abuse his discretion. Therefore, the rulings should be adopted in their entirety. [1]

## THE SPECIAL MASTER'S RULINGS

### Procedural Background

In ruling on the Defendants' key failures to provide discovery, Special Master Cohen conducted a robust process, including extensive written submissions, [2] meet and confers among the parties, repeat status updates, a transcribed telephonic hearing, and full briefing on Defendants' requests to reconsider his rulings over the course of almost two months. [3]

---

[1] This Court's Appointment Order provides: "As provided in Rule 53(f)(4, 5), the Court shall decide de novo all objections to conclusions of law made or recommended by the Special Masters; and the Court shall set aside a ruling by the Special Masters on a procedural matter only for an abuse of discretion." ECF No. 69 at 5.

[2] Defendants' filings provide this Court with the relevant correspondence with the Special Master. Rather than provide additional copies of these documents, in order to complete the record, Plaintiffs submit only the transcript of the June 6th hearing (Exhibit A).

[3] In their July 2, 2018 letter, the Chain Pharmacies complained that they had not had an opportunity to be heard on the issues that were the subject of dispute. In their July 6 response, Plaintiffs pointed out that, even if that had been true, the point had become moot, as the Defendants had, by virtue of their July 2 letter, had that opportunity.

Discovery Ruling 2

On June 30, 2018, the Special Master issued Discovery Ruling No. 2, ECF No. 693 ("Ruling 2"), covering key disputed discovery items.

With respect to product scope, the Special Master ruled that Defendants are required to provide information about "all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act." Ruling 2 at 3. As the Special Master explained, "[t]his includes branded, unbranded, and generic drugs." *Id.* In reaching this conclusion, the Special Master found it "simply untenable" that the complaints in the Track 1 cases do not allege theories of liability based on the manufacture, sale, or distribution of generic drugs. *See id.* at 2.

As to temporal scope, the Special Master held that discovery should be provided for the relevant time period for each opioid product at issue, requiring the Manufacturers to provide discovery back to one year before product launch for each opioid product; all Defendants to provide transactional data back to January 1, 1996 (the launch of OxyContin); and the Distributor Defendants (including the Pharmacy Defendants) to provide all other discovery back to January 1, 2006. *See* Ruling 2 at 10-11.

As to the geographic scope of discovery materials, the Special Master struck a compromise, requiring that Defendants produce on a national basis materials concerning "marketing and promotion, brand planning and strategy, sales training and sales bulletins, prescriber educational materials, distribution monitoring, advocacy groups, speakers bureau programs, continuing medical education, diversion, suspicious order reports, adverse event reports, and regulatory activity." However the Special Master limited production of "decentralized, customer-specific materials, such as sales call notes and transactional data" to seven states, in recognition of the Plaintiffs' allegations that opioids "migrated" across state lines and into Ohio. Ruling 2 at 4-5.

Defendants objected to this ruling, largely because of the alleged burden of searching and producing documents from the relevant time period would cause these

large corporations, not because the drugs at issue were not relevant to the case.  Based on these objections, Defendants asked for reconsideration and full briefing was conducted on Defendants' request for reconsideration.  The parties' post-ruling submissions on reconsideration were voluminous, including more than 75 pages of briefing, not including exhibits.

<u>Discovery Ruling 3</u>

Following briefing on Defendants' request for reconsideration, on July 17, 2018, the Special Master issued Discovery Ruling No. 3, ECF No. 762 ("Ruling 3").  (Together, Ruling 2 and Ruling 3 are referred to as the "Rulings.").  In Ruling 3, the Special Master modified Ruling 2 allowing Defendants to limit the geographic scope of discovery for some categories of discovery, but declined to modify Ruling 2 with respect to product scope, temporal scope, or the applicability of the ruling to the Pharmacy Defendants.[4] Particularly relevant to the Pharmacies, the Rulings provide that Defendants must produce on a national basis documents related to distribution monitoring, diversion, suspicious order reports, and regulatory activity.  Ruling 2 at 4.  The Rulings further provide that Defendants need only provide decentralized, customer-specific materials, such as sales call notes and transactional data for Summit and Cuyahoga Counties. Ruling 2 at 3-5; Ruling 3 at 2-4.

---

[4] The Special Master adjudicated another discovery dispute to require the production of claims data by the Track 1 cases.  These issues were also the subject of the June 6th telephonic hearing and letter briefs by the parties.  Relying on the limits that the Special Master placed on the use of that information for further discovery, Plaintiffs did not object to the Special Master's ruling.

The Instant Motion

On July 24, 2018, the Pharmacy Defendants and the Manufacturer Defendants (but not the Distributor Defendants) filed objections to the Rulings with this Court. The Manufacturer and Pharmacy Defendants focus their objections on two aspects of the Rulings: the scope of products as to which the Manufacturers must provide discovery and the temporal scope of that discovery. The Pharmacies also object to the geographic scope of discovery. Especially in light of the substantial modification of the geographic scope of discovery set forth in Ruling 3, Plaintiffs submit that no further modification to the scope of discovery is warranted.[5] The Special Master correctly ruled that all documents from the time period relevant to the case should be produced and that discovery as to all products alleged to have caused the opioid epidemic is appropriate. These rulings are manifestly correct.

## I.      THE SPECIAL MASTER'S RULINGS CALL FOR DISCOVERY THAT IS BOTH RELEVANT AND PROPORTIONAL TO THIS CASE

The Special Master's Rulings were based on an ample record from all parties, provide for discovery that is both relevant and proportional to this case, and reflect a reasoned exercise of discretion.

Rule 26 authorizes discovery of

> any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the

---

[5] Although the Manufacturers complain, without foundation, about the "undue" burden of providing documents they previously produced, Objection by Manufacturer Defendants to the Special Master's Discovery Rulings Nos. 2 and 3, ECF No. 786 ("Manufacturers' Objection"), at 4-5, Defendants do not seek to modify the Special Masters' Rulings with respect to prior productions. Therefore, Plaintiffs do not address their arguments, except to note that the Special Master's Ruling correctly applied CMO 1 by requiring Defendants to provide prior productions in any "civil investigation, litigation, and/or administrative action" regarding the marketing and distribution of opioids. CMO 1 at ¶ 9(k).

discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26. The rule further notes that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable."  "[T]he scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (citing *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389 (6th Cir. 1998)).  *In re Takata Airbags Prods. Liab. Litig.*, 2016 WL 1460143 (S.D. Fla. Feb. 24, 2016), cited by Manufacturer Defendants, does not hold to the contrary. In that case, the court ordered the production of "highly relevant information" over the defendants' objections regarding competitive harm in recognition of "the importance of the issues at stake in this action and the importance of the discovery in resolving the issues at hand."  2016 WL 1460143, at *2.  To the extent this analysis applies, it supports affirming the Special Master's ruling.

The discovery required by the Special Master is undoubtedly relevant.  As discussed in detail below, the allegations of the complaints in the Track 1 cases pertain to *all* opioid products, including branded, unbranded, and generic products. Discovery as to all of these products is thus relevant to Plaintiffs' claims.  Similarly, there can be no dispute that the complaints allege that the Defendants' unlawful conduct reaches back into the 1990's, rendering all of the information called for by the Rulings relevant. Moreover, Defendants' defenses, such as those regarding the FDA approval of the drugs, put the time period just prior to each drug's FDA approval squarely at issue.

As to geographic scope, Plaintiffs' complaints allege that Defendants' decades-long nationwide practices with respect to the marketing and distribution of opioids; that Defendants' corporate knowledge of the effects of their unlawful conduct, not just in Ohio but through the United States, could and should have guided their actions; that opioids distributed and sold in one location often migrate to other locations; and that, in particular, opioids marketed, distributed and sold elsewhere were diverted into Ohio and

Summit and Cuyahoga Counties.  All of the information called for by the Special Master's Rulings on the geographic scope of discovery is thus relevant to the claims set forth in the complaints.

The discovery required by the Rulings is certainly proportional to the issues of this case, which seeks remedy for the most significant man-made public health crisis in modern history.  Rule 26 requires that proportionality be assessed with reference to "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26.  Defendants do not contest most of the proportionality factors.  They do not, and could not, disagree that the issues at stake in this action are of the utmost importance.  Similarly, the amount in controversy—the amounts needed to address the opioid epidemic—are large by any conceivable measure.  The information sought is in the exclusive possession of the Defendants, which are substantial, for-profit corporations; Plaintiffs, by contrast, are municipal and state entities whose already limited resources have been further taxed by the need to address the public health crisis in their communities.  The discovery being sought—fundamental information about the marketing and distribution of each opioid product during the period that the epidemic was created—is important to resolution of the questions raised in this case.

The remaining issue is one of burden.[6]  Defendants insist that the discovery called for in the Rulings is too burdensome; many have submitted declarations documenting

---

[6] To provide context on the relative burdens, as of Friday, July 27th, the Track 1 Plaintiffs have produced 2.72 million pages of documents, all of which were newly gathered and produced for this litigation.  Based upon Plaintiffs' review and Defendants' production letters, Defendants collectively have produced 1.66 million

that alleged burden.  However burdensome the discovery may be, that burden must be weighed against the magnitude of the crisis the Defendants are alleged to have created and the scale of profits Defendants are alleged to have earned while doing so.  As set forth in the Summit County Second Amended Complaint, ECF No. 514 ("Complaint" or "SAC"),[7] "[i]n 2012 alone, opioids generated $8 billion in revenue for drug companies. By 2015, sales of opioids grew to approximately $9.6 billion."  SAC, ¶ 13; *see also id.* at ¶ 160 ("Purdue has generated estimated sales of more than $35 billion from opioids since 1996, raking in more than $3 billion in 2015 alone."); ¶ 170 ("Opana ER alone generated more than $1 billion in revenue for Endo in 2010 and again in 2013. Janssen also passed the $1 billion mark in sales of Duragesic in 2009").  It may be impossible to bring Defendants to account for the harm they have caused if they are not required to provide the evidence in their possession establishing their misconduct.  Having wreaked havoc on Plaintiffs' communities and created a public health crisis of such scale, Defendants cannot now argue that they should be shielded from discovery of their actions because it is "too burdensome" to disclose.

Plaintiffs are, however, mindful of at least one aspect of Defendants' arguments concerning the burden of this discovery.  Defendants state that discovery as required under the Rulings cannot be completed in the time allotted.[8]  Plaintiffs note that the discovery crunch that Defendants face in reviewing and producing documents while

---

pages in discovery that are not prior productions.  Pharmacies have produced fewer than 13,000 pages in all, virtually all from Walgreens.

[7] As has been the practice in other submissions, Plaintiffs cite to the Summit County Complaint only in the interest of brevity. The Complaints in each of the Track 1 cases contain virtually identical allegations to the Summit County allegations set forth here.

[8] Defendants repeatedly claim that the Special Master's Rulings expanded the scope of discovery, exacerbating the burden of completing discovery in the time that remains. *See, e.g.*, Manufacturers' Objection at 10-11; Pharmacy Defendants' Objections to Discovery Rulings No. 2 and No. 3, ECF No. 785 (Pharmacies' Objection"), at 1.  The Special Master's Rulings did not expand discovery, but rejected Defendants' efforts to inappropriately narrow it.

preparing witnesses for depositions is, in large measure, a problem of their own making. CMO 1 opened discovery on April 24th.  Plaintiffs promptly served discovery and met and conferred, individually, collectively, and in good faith on Defendants' objections, and contested Defendants' efforts to narrow discovery in the manner rejected to by the Rulings.  Nonetheless, Defendants apparently unreasonably limited their document collection and review, even though Plaintiffs clearly requested documents from the time period, geographic scope, and categories of drugs the Special Master has now ordered them to produce.  The Special Master specifically rejected Defendants' argument because "[i]t is and always has been clear that plaintiffs 'allege theories of liability based on the manufacture, sale, or distribution of generic drugs,' so defendants cannot use their earlier failure to undertake appropriate discovery to now claim excessive burden."  Ruling 3 at 6 (quoting Ruling 2 at 2.)  Having ignored Plaintiffs' requests and arbitrarily limited the scope of their discovery collection, Defendants should not now avoid discovery because their actions have left them scrambling now to gather the always-requested documents.[9]

Furthermore, if the time-period is too short for Defendants to disclose the relevant information they have regarding their conduct, the solution is not to deny Plaintiffs vital discovery.  If the Court finds the burden of discovery in the time remaining to be undue, Plaintiffs believe that the proper solution is a short extension of the deadline for production (and related deadlines).  Such an extension, and not a truncation of the scope of discovery that would deny Plaintiffs information critical to proving their claims, would be the proper approach to burden arguments Defendants raise.

---

[9] For this reason, Manufacturer Defendants' passing reference to "due process" concerns is meritless.  They are solely to blame for their refusal to produce relevant discovery.

## II. THE MODIFICATIONS PROPOSED BY THE INDIVIDUAL MANUFACTURERS SHOULD BE REJECTED

The Manufacturer Defendants object to the product and temporal scope of discovery as set forth in the Rulings.  In addition to their arguments about the burden of discovery (discussed above), the Manufacturers claim that the information sought is also not relevant.  As discussed below for each individual Manufacturer, this is not so.[10]

Each Defendant's arguments also shares two common flaws.  First, Manufacturer Defendants' objections to the time-period of discovery ignore Plaintiffs' nuisance claims.  The Manufacturers' conduct represents a continuing nuisance, and therefore tolls any limitation period applicable to nuisance.  *See, e.g., State v. Swartz*, 723 N.E.2d 1084, 1087 (Ohio 2000).  The Manufacturers' arguments regarding the temporal scope of discovery as disproportionate to the limitation period for Defendants' other claims fail for that reason alone.

### A. Allergan's Discovery Obligations Should Not Be Limited to Kadian Nor to the Time Period in Which Kadian Was Marketed

Allergan's argument that its discovery should be limited to its branded drug, Kadian, should be rejected.  Its contention that "[t]he only other Allergan opioid mentioned in the Complaints is Norco" is simply untrue.  In addition to Kadian and Norco, Allergan "manufactures or has manufactured . . . generic versions of Kadian, Duragesic, and Opana in the United States."  SAC ¶ 72.  The Complaint clearly and specifically alleges that the prescription opioid painkillers responsible for more than 200,000 opioid deaths from 1999 through 2016 include "OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, *as well as generics like oxycodone, hydrocodone, and fentanyl*."  *Id.* at ¶ 5 (emphasis added).[11]  The Complaint further alleges that, following the success of

---

[10] Although the Manufacturers complain that their individual circumstances were not considered in the Rulings, the similarity of the objections they raise demonstrate the degree to which the Rulings are appropriately applicable to each of them.

[11] Duragesic is a form of fentanyl.  *See id.* at ¶¶ 83, 864.

OxyContin, "[t]he other Marketing Defendants . . . positioned themselves to take advantage of the opportunity Purdue created, developing *both branded and generic opioids* to compete with OxyContin, while, together with Purdue and each other, misrepresenting the safety and efficacy of their products." *Id.* at ¶ 164 (emphasis added). Plaintiffs also allege that Manufacturers engaged in unbranded marketing; unbranded marketing both relates to and benefits sales of generic and branded products alike. *See* SAC ¶¶ 228-229, ¶ 444 ("[t]hrough unbranded materials, the Marketing Defendants expanded the overall acceptance of and demand for chronic opioid therapy"), ¶¶ 746-52 (Manufacturers used unbranded marketing "to mislead physicians, patients, health care providers, and health care payors through misrepresentations and omissions regarding the appropriate uses, risks, and safety of opioids, to increase sales revenue, and profit from their opioid products.").[12]

With respect to the supply chain, moreover, Plaintiffs allege that each of the Defendants were obligated but failed to prevent diversion, report suspicious orders, or "halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids." *Id.* at ¶ 518; see also *id.* at ¶¶ 553, 555. These allegations are not limited to particular products, but rather pertain to *all* of the opioids shipped by each Manufacturer; indeed, generic opioids were a significant portion of the total opioids distributed in trial track jurisdictions. *See, e.g.,* SAC ¶¶ 690-696. Moreover, in identifying the specific products with respect to which each Defendant "for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier," the

---

[12] Despite its argument that it did not promote its generic products, as Plaintiffs pointed out to Special Master Cohen, Allergan's SEC Form 10-K for the fiscal year ended December 31, 2013 provides: "In the U.S., we predominantly market our generic products to various drug wholesalers, mail order, government and national retail drug and food store chains utilizing a small team of sales and marketing professionals.'" Form 10-K, Actavis plc (2013), http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9NTM5MDk2fENoaWxkSUQ9MjI4NjI0fFR5cGU9MQ==&t=1, at 10. Allergan does not refer to, let alone refute, its own disclosure.

Complaint specifically identifies not only Kadian and Norco, but also "Generic Duragesic" and "Generic Opana." *Id.* at ¶ 864.

In short, only by ignoring the plain and specific allegations of the Complaint can Allergan pretend that the scope of Plaintiffs' claims pertains only to Kadian, or even to Kadian and Norco alone. Allergan's "proposed production," at Appendix A of Manufacturer Defendants' Joint Objections, was also offered in its request for reconsideration to the Special Master. It continues to limit its production to branded Kadian and Norco, excluding its generic versions of Kadian, Opana and Duragesic. Although Plaintiffs do not doubt that disregarding substantial and important portions of the case would simplify discovery, there is no justification for denying Plaintiffs discovery of any kind with respect to this aspect of their claims.[13]

### B. Mallinckrodt's Discovery Obligations Should Include Its Generic Products and the Time Period in Which Those Products Were Marketed

Mallinckrodt now agrees that it will produce documents related to its full product line of Schedule II opioids identified in the Complaint, including both generic (morphine, fentanyl, oxycodone, hydrodocone, hydromorphone, methadone and oxymorphone) and

---

[13] Allergan argues that because it did not acquire Kadian until 2008, it is unduly burdensome to require it to provide documents dating back one year prior to the launch of the product in 1997. This argument should be rejected for two reasons. First, to the extent that Allergan acquired rights to the drug, but not the documents of the prior manufacturer, it will have no documents from the earlier period to produce. And if Allergan did acquire the documents from the prior manufacturer, there is no reason why it is any more burdensome for Allergan to produce those documents than if the documents had been created at Allergan to begin with. Second, although Allergan did not acquire the rights to Kadian until 2008, for some period prior to 2008, Allergan was the contract manufacturer for Kadian.

Allergan also argues it need not produce generics documents because it sold those drugs and various subsidiaries holding the documents to Teva in 2015, and says Teva has agreed to indemnify Allergan against judgments in this MDL. Manufacturers' Objection at 5. Allergan, however, has admitted it has documents separate from those sold to Teva and admits it collected copies of transferred documents prior to the sale under a litigation hold. It has a duty to produce relevant documents from those sources. If Allergan and Teva control identical forensic sources, Plaintiffs are (and have been) willing to accept production from only one of those sources. Allergan has never explained how an indemnification agreement should relieve it from any discovery duties.

branded products (Exalgo, Roxicodone, Methadose and Xartemis XR).  Mallinckrodt has long been a leading manufacturer of generic opioids; it estimated that in 2015 it received approximately 25% of the U.S. Drug Enforcement Administration's ("DEA") entire annual quota for controlled substances that it manufactures and that its generics claimed an approximately 23% market share of DEA Schedules II and III opioid and oral solid dose medications. SAC ¶¶ 101-102.

Thus, there can be no question that discovery regarding Mallinckrodt's generic opioid products is both proportionate to the needs of this case and justified by Plaintiffs' allegations against Mallinckrodt.  The Complaint alleges that "Mallinckrodt promoted its branded opioids Exalgo and Xartemis XR, *and opioids generally*, in a campaign that consistently mischaracterized the risk of addiction." *Id.* at ¶ 228 (emphasis added). Moreover, Plaintiffs allege that Mallinckrodt carried out this promotion "through its website and sales force, *as well as through unbranded communications* distributed through the 'C.A.R.E.S. Alliance' it created and led." *Id.* (emphasis added).  The Complaint describes in detail — including specific quotations — Mallinckrodt's *unbranded* misrepresentations pertaining to opioids generally, and not specific to Exalgo, Roxicodone, or Xartemis.  *Id.* at ¶¶ 229-231; *see also id.* at ¶ 280.  The Complaint also describes Mallinckrodt's involvement with, and funding of, front groups that spread misrepresentations about opioids generally, *see id.* at ¶¶ 383-84, 391.  These activities promoted branded and generic opioids alike, without distinction. Thus, the Complaint clearly alleges that it promoted opioids generally, including generic opioids, through a campaign of misrepresentations.

On the supply side, the Complaint alleges that, after reaching a settlement with the DEA, "Mallinckrodt specifically agreed 'to notify DEA of any diversion and/or suspicious circumstances involving *any Mallinckrodt controlled substances* that Mallinckrodt discovers.'"  *Id.* at ¶ 521 (emphasis added).  The Complaint also describes Mallinckrodt's failure, generally, to control the supply chain for its controlled substances,

*see id.*, at ¶¶ 583, 702, 712, as well as specifically with respect to Roxicodone, *see id.* at ¶ 666.  As alleged in the Complaint, "[t]he route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the Blue Highway, *a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.*" *Id.* at ¶ 666 (emphasis added).

As Mallinckrodt has now agreed to produce documents related to its generic products, Mallinckrodt's temporal restriction, which was pegged to the launch and marketing of two of its branded products, is indefensible.   As laid out above, Mallinckrodt promoted and distributed massive amounts of opioids ██████████████ ████████████████████████████████████████████████████████████ ███████████████████████████.  The majority of this market share is due to its generic products. This makes its marketing- and diversion-related conduct from one year prior to the launch (or initial sale) of its products, including some of its generic products in the mid-1990s, indisputably relevant and proportionate to its role in the opioid crisis in Plaintiffs' jurisdictions.

Mallinckrodt's assertion that DEA limited its diversion investigation to 2008 forward has no bearing on the discovery period relevant to *this case*.  The settlement agreement between Mallinckrodt and DEA indicates that DEA believes it has claims based on misconduct by Mallinckrodt between 2008 and July 2017.  *See* Administrative Memorandum of Agreement between DOJ, DEA and Mallinckrodt, plc. (July 2017), at ¶ 2 p. 2.[14]  But DEA's conclusion regarding its specific claims is not a determination by the agency that there is no relevant information that pre-dates 2008 regarding Plaintiffs' claims.  The scope of the DEA's investigation is unclear, and may have been influenced by a range of additional factors that have nothing to do with the relevant time period for

---

[14] Available at https://www.justice.gov/usao-edmi/press-release/file/986026/download.

civil discovery. Mallinckrodt does not assert that the only information it provided to the DEA post-dated 2008, and nothing in the settlement indicates that DEA's claims were based solely on information that post-dated 2008. In any event, the DEA's claims are narrower than Plaintiffs' claims in this case. The DEA's claims are based on Mallinckrodt's diversion and distribution of its products, whereas Plaintiffs have alleged claims based on a broad range of misconduct, including their direct and indirect marketing of their products and opioids generally (which occurred in the 1990s for certain products). [15]

## C. The Discovery Rulings Should Not Be Modified for Teva

Teva argues that the current scope of its discovery obligations is burdensome, and suggests that the discovery period be limited to 2006 forward.[16] Otherwise, Teva's focus is on the difficulty of completing its production in the time allotted, which is addressed above.

However, the proposed temporal scope is inadequate and excludes indisputably relevant conduct that contributed to the ongoing harms to Plaintiffs. In addition to the allegations common to the other Manufacturers, the Complaint alleges that Teva promoted Actiq and Fentora, which were approved only for breakthrough cancer pain

---

[15] In the "proposed production" appendix, Mallinckrodt raises for the first time its intent not to produce certain "non-custodial data sources" that contain relevant documents relating to this case, such as suspicious order monitoring data, which, especially given Mallinckrodt's known history regarding diversion, should be produced. Mallinckrodt's custodian and search terms proposals appear to be out-of-date and differ from proposals communicated to Plaintiffs on Thursday, July 26th, subsequent to Defendants' filing. Parties continue to meet and confer on specific search term and custodial issues, which, Plaintiffs respectfully submit, are outside of the scope of Defendants' objections and can be defined by the Court's ruling on the overarching questions.

[16] Virtually all of Teva's production in this litigation have been prior productions that imposed no real burden of production; by Plaintiffs' count, as of Friday, Teva had produced 5,063 pages of documents that are not prior productions. As to its prior productions, Teva has been on notice since CMO 1 was entered on April 11th of its responsibility to produce the prior productions, and should have had ample time to provide these documents.

for non-opioid naïve patients, broadly for chronic pain.  SAC ¶¶ 786-790.  In 2008, Cephalon was assessed penalties of $425 million for wrongful marketing of Actiq from 2001 to 2006, when Actiq turned generic and Cephalon transitioned doctors to Fentora, which was approved by the FDA in 2006.  Thus, the pre-2006 documents are highly relevant to this period of wrongful marketing when doctors were led by Cephalon to believe that Actiq could be safely used for non-approved uses and that the risks of addiction were minimal and could be controlled.  Pre-2006 documents also are highly relevant as to the final stages of Cephalon's approval of Fentora in 2006 and its pre-market planning and launch of Fentora, including preparations to transition off-label marketing and use of Actiq to Fentora.

> ### D.    Purdue's Obligations with Respect to Prior Productions and Product Scope Should Not Be Modified

Purdue proposes, with certain important exceptions, to limit its production of documents to the period 2006 to the present and to three of its branded drugs.[17]  As noted, no Defendant challenges the Special Master's ruling requiring Defendants to produce in the MDL all prior productions "in any prior litigation that involved the marketing or distribution of opioids."  Ruling 2 at 6.  For Purdue, that ruling requires production of, *inter alia*, documents related to a 2007 plea agreement with the Department of Justice, documents produced in connection with a 2003 civil litigation involving misleading marketing claims, and documents produced to the State of Kentucky in connection with a lawsuit filed in 2007 and settled in 2015.

Plaintiffs are willing to accept Purdue's prior productions in lieu of searching documents prior to 2006, with three conditions.  First, Purdue must confirm that its prior

---

[17] Defendants have, in the context of their Joint Objections, offered new proposals that should have been presented in the parties' frequent meet and confers to avoid unnecessarily raising issues before this Court.  In the interest of resolving or narrowing disputes, Plaintiffs have accepted proposed compromises that ensure reasonable discovery.

productions, including those to the U.S. Department of Justice, will be or have been fully produced without withholding documents, and that Purdue is producing call notes and other marketing materials related to Track 1 cases for the entire prior period, back to one year prior to the launch of OxyContin.  Second, Purdue should not apply a 2006 start date when producing custodial files for deposition witnesses whose tenure at Purdue includes the period prior to 2006.  Third, Plaintiffs reserve the right to request that Purdue undertake additional searches of pre-2006 documents if Plaintiffs determine that categories of documents are not included in the prior productions.

E.  **Janssen Should Be Required to Produce Information about Its Generic Products**

Janssen offers two objections to the Special Master's Orders.  First, Janssen objects to production of information concerning one additional Janssen product, Tylox, which Janssen contends is a "discontinued product from the 1980s" for which "nearly all relevant documents would be in hardcopy form."  Plaintiffs accept Janssen's representation and are willing to forego production of *hard copy* documents related to Tylox.  To the extent Tylox-related documents appear in electronic files, however, they should be produced.

Plaintiffs do not agree with Janssen's second objection, however.  Janssen requests that this Court excuse it from its responsibility to search hard copy files relating to Janssen's marketing of Duragesic, a fentanyl-based, Schedule II opioid that Janssen launched in 1989.  SAC ¶ 83; Manufacturers' Objection at 13.  Instead, Janssen proffers that it has "already added and will review an additional eight custodians to target pre-2000 documents about the marketing and promotion of Duragesic." Objection, Appendix A, at 23.  However, Janssen's efforts to limit its supplemental production of post-NDA document production to an electronic review of eight additional custodians is insufficient.

Janssen's early marketing efforts and internal communications related to Duragesic are highly relevant to Plaintiff's claims.  For example, in 2000, the FDA issued a warning letter to Janssen criticizing its promotion of Duragesic using the tag line "It's not just for cancer anymore!"  SAC ¶ 168.  Internal documents, including documents found only in hard copy, may establish that Janssen, specifically, and the pharmaceutical community at large, were aware that opioids were not an appropriate treatment for chronic, non-cancer pain.  Such documents also may inform Janssen's misleading marketing of its later-launched opioid products, Nucynta and Nucynta ER.

Additionally, Plaintiffs allege that Janssen engaged in unbranded advertising, including two unbranded websites, *Let's Talk Pain*, and *Prescribe Responsibly,* which contained misrepresentations about opioids and addiction.  *See* SAC ¶¶ 212-214; *see also id.* at ¶¶ 249-50.  Plaintiffs also allege that Janssen distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* that similarly misrepresented the risks of opioids.  *Id.* at ¶¶ 215, 275, 288.  Given that Janssen did not limit its marketing specifically to Nucynta and Duragesic, but rather engaged in unbranded marketing designed to increase the use of all opioids, including Janssen's generic products, Janssen cannot limit its disclosures to "the original NDA with marketing materials" for Duragesic, because that document does not contain these unbranded promotional materials or internal correspondence related thereto.  Nor does Janssen explain how its eight additional custodians would capture these highly relevant documents, which otherwise would not get produced in this litigation.

### F.  Endo Should Be Required to Provide Discovery Regarding All of Its Relevant Products during the Entire Time Period those Products Were Marketed

Like the other manufacturers, Endo complains about production of information about all of its Schedule II opioid products.  Endo contends that the Complaint refers to only *one* Endo opioid product, Opana ER, but that is not the case.   The Complaint alleges

that "Endo also manufactures and sells generic opioids, both directly and through its subsidiaries, Par Pharmaceutical and Qualitest Pharmaceuticals, Inc., *including generic oxycodone, oxymorphone, hydromorphone, and hydrocodone products[,]*" SAC ¶ 93 (emphasis added); *see also, id.* at ¶ 864 (alleging, for purposes of RICO claims, shipment of Opana, Opana ER, Percodan, Percocet, generic oxycodone, generic oxymorphone, generic hydrocodone, and generic hydromorphone). As with other manufacturers, Plaintiffs allege that Endo engaged in unbranded advertising that included misrepresentations about the risks and benefits of opioid medications generally, and sponsored front groups that distributed these misrepresentations. *See id.* at ¶¶ 206-211, 239. Plaintiffs also allege that Endo was among the manufacturers who promoted the myth of "pseudoaddiction" to persuade doctors that behavior indicative of addiction should be treated by administration of *more* opioids, and sponsored CME programs and articles that exaggerated the risks of non-opioid pain medications while downplaying the risks of opioids *See, e.g., id.* at ¶¶ 243, 247; ¶¶ 289-93. These were all "generic" materials discussing opioids generally.

Given that Endo did not limit its promotional activities specifically to Opana, but rather engaged in general promotion of opioids that was designed to increase sales of *all* of its opioid products, the requirement that Endo produce documents pertaining to all of its Schedule II opioids is appropriate. Thus, Endo's offer to produce certain materials (regulatory submission files, promotional materials, and call data) for both its branded and generic Schedule II opioids, but not others (adverse event data and only sales and prescription data and no custodians, FDA regulatory submissions, or strategy plans, for example, for generic opioids produced by its Par subsidiary) is insufficient.

Endo's argument for a limited time scope for its production, beginning in 2006 with Opana ER's approval, is dependent on its product scope arguments. Because Opana is not the only Endo product at issue in this litigation, however, the proper time scope for production is not limited to the period during which Endo manufactured and distributed

Opana. Endo's proposal, in the appendix to the Manufacturers' Objection, to withhold a begin date on previously collected documents and "assess the date range" for newly collected documents "on a request by request basis" provides neither a foundation for nor clarity regarding its intentions.[18]

## III.  THE PHARMACY DEFENDANTS' OBJECTIONS SHOULD BE OVERRULED

### A.  The Geographic Scope Required by the Rulings Is Appropriate

The Pharmacy Defendants complain that Ruling 3 fails to impose an appropriate geographic limitation on discovery because it requires the production of documents related to, among other thing, distribution, monitoring, diversion, suspicious order reports, and regulatory activity nationally, "even if those documents have no connection whatsoever to distribution in Ohio." Pharmacies' Objection at 3.  In so arguing, the Pharmacy Defendants simultaneously overstate the geographic scope of discovery under the Rulings and understate the geographic scope of the Track 1 Plaintiffs' claims. The geographic scope of discovery for "Category One Discovery" under the Rulings is appropriately tailored to the matters at issue and proportional to Plaintiffs' claims.

First, to the extent the Pharmacy Defendants characterize the Discovery Rulings as providing for unlimited national discovery on topics such as distribution, diversion, and suspicious order reports, they are wrong. The Rulings expressly establish that Defendants must provide nationwide discovery only in response to the enumerated subjects for which "defendants' policies and actions . . . are (and were) primarily centralized and over-arching, applying broadly to their opioid products." Ruling 2 at 4. As for decentralized, customer-specific materials, the Rulings limit discovery to Summit and Cuyahoga Counties. Ruling 3 at 2-4.  By their objections, however, the Pharmacy

---

[18] Endo has withheld pre-2004 discovery of its branded products, Percocet and Percodan, which were key to Endo's product line when it began in 1997.  It is not clear whether Endo has withdrawn that objection, but Plaintiffs maintain that this restriction, whether for previously- or newly-collected documents, would be without basis.

Defendants seek to overly narrow discovery, by limiting Plaintiffs only to "documents *that were used* within [Summit and Cuyahoga Counties] or documents *that were used* throughout the entire country." Pharmacies' Objection at 10 (emphasis added). Because the national discovery relates to systemic policies and practices that would bear on Defendants' conduct in the Track 1 jurisdictions, it is indisputably relevant to Plaintiffs' claims.

Moreover, the Pharmacy Defendants' argument flows almost entirely from their erroneous claim that "[i]n this case, the 'source' of the complained-of injury lies entirely within Summit and Cuyahoga Counties." Pharmacies' Objection at 10. As detailed in the Complaint, opioids migrate. *See* SAC ¶¶ 660-70. In particular, "opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways," *id.* at ¶ 660, "including into Ohio from West Virginia, Kentucky, Illinois, Georgia, and Florida." *Id.* at ¶ 670. Thus, the Pharmacy Defendants' distribution activities and practices even outside of Summit and Cuyahoga Counties are at issue: diversion elsewhere directly contributed to the flow of opioids into Cuyahoga and Summit Counties. Moreover, the Pharmacy Defendants' knowledge of and response to diversion elsewhere in the United States—and most particularly along the opioid pipeline into northern Ohio—bears on their culpability for the harms caused by their distribution activities within Summit and Cuyahoga Counties. As the Special Master noted in Ruling 3, the Plaintiffs are able to obtain certain transactional data regarding these issues from the nationwide ARCOS data, and therefore his ruling that Defendants only are required to produce "Category Two Discovery" from the specific Track 1 jurisdictions strikes a balance that allows Plaintiffs to obtain some necessary information without overly burdening Defendants. Ruling 3 at 3, n.1. Defendants themselves remain the sole source for documents and information concerning how Defendants responded to and how their own policies and procedures contributed to such diversion and oversupply.

The facts here are thus distinguishable from *Thornton v. State Farm Mut. Auto Ins. Co.,* 2006 WL 3499986, *3 (N.D. Ohio Dec. 5, 2006) and *Owens v. Sprint/United Mgmt. Co.,* 221 F.R.D. 649 (D. Kan. 2004).  In *Thornton*, no out-of-state activities were alleged to have contributed to the plaintiffs' injury. In *Owens*, there were no relevant policies or practices that applied beyond the plaintiffs' geographic area.  Here, the Special Master recognized both that the Defendants had centralized, nationwide policies and practices in connection with the subjects of Category One Discovery, and that "tracing opioid migration to Ohio from other locations, especially high-supply areas, is relevant to plaintiffs' claims." Ruling 2 at 4-5.  The Pharmacy Defendants have not shown any abuse of discretion in the Special Master's "compromise ruling." *See, e.g.,* Ruling 2 at 5.

## B. The Pharmacies Should Not Be Exempt from the Requirement that They Produce Documents Pertaining to All Schedule II Opioids

The Special Master's ruling "includes discovery related to Schedule II drugs during earlier periods of time when they were listed as Schedule III drugs (e.g. hydrocodone combination products.)" Ruling 3 at 6, n.2.  The Special Master's discovery ruling strikes a careful and appropriate balance which recognizes the high abuse potential of hydrocodone combination products (hereinafter "HCPs") which precipitated their up-scheduling to Schedule II, but excludes less relevant drugs which are not now and never have been Schedule II drugs. *Id.* The Pharmacies contend that discovery related to these drugs when they appeared on Schedule III is irrelevant and that the burden of collecting, reviewing, and producing such discovery would significantly outweigh any benefit. Pharmacies' Objection at 11.

The Pharmacies' argument is hinged upon the false contention that "Plaintiffs' theory of liability as to the Pharmacies is that they improperly distributed 'opioids

classified as Schedule II drugs by the DEA' that 'were known to be highly dangerous.'" *Id.* at 11. Plaintiffs' claims against the Pharmacies are based on their failure to comply with their obligations to "provide effective controls and procedures to guard against theft and diversion of controlled substances" which resulted in the flooding of communities with prescription opioids. SAC ¶¶ 607-659. Notwithstanding the Pharmacy Defendants' reference to a single cherry-picked statement from Summit's Omnibus Response brief,[19] Plaintiffs have, in fact, consistently contemplated the inclusion of both Schedule II and Schedule III drugs in their claims.  *See, e.g.,* SAC at 16, n. 5 ("Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II."), ¶ 706 (specifically referencing hydrocodone/APAP tablets).

The federal statutes and regulations requiring monitoring, reporting, and halting suspicious orders and effectively preventing diversion apply to *all* controlled substances, not just those listed in Schedule II. *See* 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1301.74(b). So, the pharmacies' obligations did not begin with the Schedule III to Schedule II transition, nor were they limited to Schedule II's. Moreover, according to a DEA "Drug Fact Sheet,"

---

[19] The full text of the sentence relied upon: "[h]ere as in Beretta, Defendants' products – opioids classified as Schedule II drugs by the DEA—were known to be potentially highly dangerous." Plaintiffs County of Summit, Ohio, and City of Akron, Ohio's Omnibus Memorandum In Opposition to (1) Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Motion to Dismiss (Doc. 491); (2) Motion to Dismiss Complaint by Defendants Walmart Inc., CVS Health Corp., Rite Aid Corp., and Walgreens Boots Alliance, Inc. (Doc. 497); and (3) Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 499), ECF No. 654 at 72.

"[h]ydrocodone is the most frequently prescribed opioid in the United States and *is associated with more drug abuse and diversion than any other licit or illicit opioid.*"[20] Information about hydrocodone and HCPs is undoubtedly relevant to the claims in this case.

Nor should the Court be distracted by the Pharmacy Defendants' suggestion that the categorization of HCPs as Schedule III drugs at an earlier point in time somehow precludes Plaintiffs from proving that the Pharmacy Defendants knew the great harm these drugs were causing.  For example, the Pharmacies rely on an out of context comment by the Special Master that Schedule III drugs have a "lower potential for abuse than substances in Schedule II". Manufacturers' Objection at 11. Taken in context, the Special Master was discussing Schedule III drugs that have never been classified as Schedule II—*e.g.*, Tylenol with codeine—which the Special Master determined were peripheral to Plaintiff's claims. Ruling 2 at 2-3. Indeed, Plaintiffs only seek discovery regarding opioids which are now, or ever were, Schedule II drugs.

Nor can the Pharmacy Defendants avoid their discovery obligations merely because the Department of Health and Human Services recommended that HCPs remain classified as Schedule III in 2008.  These drugs were ultimately deemed to have a potential for abuse and reclassified as Schedule II. Contrary to the HHS (which ultimately reversed its decision and recommended upscheduling), the DEA strongly and consistently supported the upscheduling of HCPs to Schedule II. *See* DEA Notice of Proposed

---

[20] *See* Attachment A to Paul J. Hanly, Jr.'s July 6, 2018 letter to David R. Cohen (emphasis added).

Rulemaking: Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II [Docket No. DEA-389] at 11042.[21] ("Currently HCPs are widely diverted and abused throughout the United States as demonstrated in national and regional drug-abuse-related databases. HCPs and oxycodone products (schedule II) are the two most common opioid analgesic products encountered by law enforcement.").  Indeed, DEA found that such abuse was not "new" in 2014, but that the potential for abuse had long existed and been known:

> The DEA notes that initial reports of abuse of HCPs in the U.S. were published in the 1960s. Since the 1990s, the diversion and abuse of HCPs has escalated in the country. By the late 1990s, there were large increases in the diversion and abuse of HCPs. HCPs, similar to oxycodone products, are widely diverted and abused pharmaceutical opioid analgesics. HCPs are associated with significant illicit activity and abuse. Federal, State and local forensic laboratory data rank HCPs as one of the two most frequently encountered opioid pharmaceuticals in submissions to the laboratories. For example, in 2012, there were over 34,000 exhibits for HCPs (NFLIS). All DEA field divisions across the U.S. have reported that HCPs are among the most sought after pharmaceuticals.

> In 2012, according to the poison control centers data (NPDS), there were over 29,390 toxic exposures involving HCPs. In 2002, there were over 25,000 DAWN ED visits associated with HCPs and it was ranked sixth among all controlled substances. According to DAWN, the nonmedical use related ED visits for HCPs were 86,258; 95,972; and 82,480 in 2009, 2010, and 2011, respectively. A number of data sources indicate that abuse of HCPs is associated with a large number of deaths. According to NSDUH, there were large numbers of lifetime and past year initiates of HCPs for nonmedical purposes and these numbers exceeded those of oxycodone. According to the MTF, about 8% to 10% of high school seniors reported nonmedical use of Vicodin[supreg], an HCP, in recent years.

*Id.*

---

[21] Available at https://www.deadiversion.usdoj.gov/fed_regs/rules/2014/fr0227.htm.

The Pharmacies' argument is further belied by the fact that they knew or had reason to know that HCPs were dangerous drugs of abuse long before the reclassification was formally implemented. The reclassification from Schedule III to Schedule II was proposed 15 years prior to implementation. One reason the reclassification took so long to implement was significant resistance from drug manufacturers and distributors, such as the Pharmacy Defendants, because HCPs were the most highly prescribed drug in the United States, and thus highly lucrative for the pharmaceutical industry. The Pharmacy Defendants are not objective observers, but strongly opposed the reclassification of HCPs to Schedule II directly and through trade organizations.  For example, trade organizations including the National Association for Chain Drug Stores (NACDS), of which Defendant Walgreen Co.'s current Co-Chief Operating Officer, Alex Gourlay, is a past Chairman, submitted a strong opposition, citing "increased costs" to the health system as the primary consideration against such re-scheduling.[22]

The extremely limited documents produced by the Pharmacy Defendants to date, moreover, demonstrate that the Pharmacy Defendants' themselves understood that HCPs required careful control and monitoring due to their potential for abuse, regardless of the fact that they had been listed as Schedule III rather than Schedule III drugs:

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[22] *See* April 28, 2014 letter from Alex Gourlay to DEA, located at https://www.pharmacist.com/sites/default/files/files/Joint_Pharmacy_Stakeholders_HCP_Rescheduling_Comments%20to%20DEA_0.pdf.



In the October 31, 2012 "Government's Prehearing Statement" submitted in the DOJ Action, *In the Matter of Walgreen, Co.* (Docket 13-01), the government provided a Summary of Testimony for The DEA Deputy Assistant Administrator, Joseph Rannazzisi. Therein, the government stated that Rannazzisi would testify that, in 2010, the Florida Medical Examiner's Office data showed "4,091 persons died in Florida alone from an overdose caused by just five drugs: methadone, oxycodone, **hydrocodone,** benzodiazepines, or morphine."  *Id.* at p. 5 (emphasis added).  Rannazzisi would also testify that oxycodone and hydrocodone were interchangeable components in a "cocktail" of abused drugs which also included certain benzodiazepines. *Id.*  The Government also asserted that Rannazzisi would testify that "of all prescription drugs,

narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently."[23]

Indeed, the DEA's landmark *Southwood Pharmaceuticals* decision in 2007 (Docket 07-7) principally concerns distribution of schedule III HCPs, suspicious orders of HCPs, and the distributor's knowledge that such products were likely to be diverted. *Southwood Pharmaceuticals, Inc.*, 72 Fed. Reg. 36487-01, 2007 WL 1886484 (July 3, 2007).  Of course, 2007 was well before such products were rescheduled to schedule II.  The *Southwood* decision finds that the distributor's "sales of extraordinary quantities of controlled substances [including hydrocodone combination products] to entities which it had reason to know were diverting the drugs caused extraordinary harm to public health and safety," thus the distributor's registration was revoked. *Id.* at 36488. The *Southwood* decision is specifically referenced in the DEA's December 27, 2007 letter to all manufacturers and distributors regarding their suspicious order obligations.  Both the *Southwood* decision and the December 2007 DEA letter (from Joseph Rannazzisi) are specifically referenced in Plaintiffs' Complaint. *See, e.g.*, SAC at ¶ 525.

Finally, the Pharmacy Defendants claim that they face an increased burden of searching for and producing relevant documents due to the different recordkeeping requirements for Schedule II and III substances under federal law, and the fact that

---

[23] While pure hydrocodone was already schedule II, it is clear that these references to hydrocodone above are to HCPs because there were no pure hydrocodone products approved for sale in the United States until March 2014. *See, e.g.,* Drug Enforcement Administration, *Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II, Final Rule*, 79 Fed. Reg. 49661, 49662, n. 4.

"most" pharmacies terminated distribution of hydrocodone combination products when they were reclassified as Schedule II in October 2014.  The Pharmacy Defendants have made no actual showing of burden, however, and no basis to excuse them from their discovery obligations because they only distributed these particular opioids prior to the time they were re-classified. The Pharmacies should be required to provide information about hydrocodone and HCPs, regardless of when and from what distribution center they were distributed.

For all of the above reasons, the Special Master's Rulings were correct.  The distribution function of a national retail pharmacy implicates exactly the same anti-diversion obligations as any other distributor defendant and thus declining to impose different discovery obligations on the Pharmacy Defendants than on the other distributor defendants. Ruling 3 at 7-8.

### C. The Statute of Limitations Does Not Define the Proper Scope of Discovery

The Pharmacy Defendants contend that information predating the limitations period is not relevant to Plaintiffs' claims.  This argument should be rejected.

First, as laid out below, the distribution by Pharmacies of hydrocodone prior to the rescheduling was subject to the same failures of compliance as other controlled substances and substantially contributed to the harm suffered by Plaintiffs.  Because Pharmacy Defendants distributed HCPs throughout the time-period required for discovery, the time-period set by the Rulings is appropriate and not disproportionate to the Pharmacy Defendants' potential liability or the needs of the litigation.

29

Second, the Pharmacies seek to restrict discovery to what they contend is the proper limitations period when there has been no ruling by this Court as to what the applicable limitations period is.[24]  Plaintiffs have asserted claims with differing statutes of limitations,[25] and have alleged that Defendants are equitably estopped from asserting a statute of limitations defense because they purposefully concealed their unlawful conduct and fraudulently assured the public, including Plaintiffs, that they were actively working to comply with their obligations under controlled substances laws and to curb

---

[24] With respect to the underlying statute of limitations arguments, Plaintiffs respectfully refer the Court to *Plaintiffs County of Summit, Ohio, and City of Akron, Ohio's Omnibus Memorandum In Opposition to (1) Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Motion to Dismiss (Doc. 491); (2) Motion to Dismiss Complaint by Defendants Walmart Inc., CVS Health Corp., Rite Aid Corp., and Walgreens Boots Alliance, Inc. (Doc. 497); and (3) Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. 499)*, ECF No. 654, at 122-128.   Additionally, the statute of limitations only "begins to run at the time that the [tortious conduct] begins or is first noticed, *provided that the permanent nature of the [tortious conduct] can be ascertained at that time*." *Elmer v. S.H. Bell Co.*, 127 F. Supp. 3d 812, 823 (N.D. Ohio 2015) (emphasis added).

[25] For example, unjust enrichment has a 6-year statute of limitations, which "does not accrue until the last point in time that the plaintiff conferred and a defendant unjustly received a benefit." *Desai v. Franklin*, 177 Ohio App.3d 679, 2008-Ohio-3957, 895 N.E.2d 875, ¶ 22 (Ohio Ct. App. 2008).  *See also, The Little Miami RR Co. v. Comm'rs of Greene Cty.*, 31 Ohio St. 338 (Ohio Dec. 1, 1877) ("no length of time can legalize a public nuisance"); *cf. People v. Conagra Grocery Prods. Co.*, 17 Cal. App. 4th 51, 227 Cal. Rptr. 3d 499 (2017) (upholding public nuisance verdict against lead paint companies based on marketing for residential use more than fifty years earlier).  Pharmacies' argument about the relevant statute of limitations turns, in part, on their contention that the Ohio Product Liability Act ("OPLA") abrogates Plaintiffs' nuisance claims, but the question of abrogation is also beyond the proper scope of a discovery ruling.  Further, the period for which Plaintiffs may recover damages and/or the costs of abatement is not necessarily conterminous with the period that is relevant to establishing Defendants' liability for the problem that now exists. *Wood v. Am. Aggregates Corp.*, 67 Ohio App. 3d 41, 45 (1990) (statute of limitations did not bar suit because damages were ongoing even though allegedly tortious conduct was not).   For all of these reasons, Pharmacy Defendants' proportionality calculations do not add up.

the opioid epidemic, and that Defendants' conduct constitutes a continued violation. SAC ¶769-777.; s*ee e.g. In re Fair Fin. Co.*, 834 F.3d 651, 672–73 (6th Cir. 2016), *reh'g denied* (Sept. 23, 2016) ("the crux of the inquiry was not at what point in time the defendant engaged in the allegedly wrongful conduct but at what point in time the plaintiff possessed or should have possessed, upon the exercise of reasonable diligence, 'actual knowledge not just that [she] has been injured but also that the injury was caused by the conduct of the defendant.'") (citations omitted); *MV Circuit Design, Inc. v. Omnicell, Inc.*, No. 1:14 CV 2028, 2015 WL 1321743 at *11 (N.D. Ohio Mar. 24, 2015); *Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 2002-Ohio-2007, 766 N.E.2d 977, ¶ 9 (Ohio 2002) ("the discovery rule entails a two-pronged test—i.e., discovery not just that one has been injured but also that the injury was 'caused by the conduct of the defendant'—and that a statute of limitations does not begin to run until both prongs have been satisfied.") (citations omitted).

In any event, the Pharmacy Defendants are simply wrong that the statute of limitations sets the limits of discovery.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978) ("it is proper to deny discovery of . . . events that occurred before an applicable limitations period, *unless the information sought is otherwise relevant to issues in the case*") (emphasis added); *Ray v. Waste Mgmt. of Ky., LLC*, 2010 WL 11545747 at *1 (W.D. Ky. Dec. 15, 2010) (denying a motion to limit discovery to the limitations period, because discovery into earlier events could lead to relevant and admissible evidence); *Zatko v. Rogers Mfg. Co.*, 37 F.R.D. 29, 32 (N.D. Ohio 1964) (not proper to deny discovery where activities prior to the limitations period may have had an effect on the period not barred by statute).

Finally, as to each of Pharmacy Defendants' claims for limiting discovery, it is notable that they offer no argument as to why or to what extent collecting the information would be unduly burdensome. *Com. and Indust. Ins. Co. v. Century Surety Co.*, 2017 WL 946984, at *2 (S.D. Ohio Mar. 10, 2017) (rejecting boilerplate objections); *Oracle Am., Inc. v. Google, Inc.*, 2015 WL 7775243, *2 (N.D. Cal. Dec. 3, 2015) (a responding party must meet its burden of explaining how costly or time-consuming responding to a set of discovery requests will be, and uniquely possesses that information).

## Conclusion

For the reasons laid out above, Plaintiffs respectfully request that this Court reject Defendants' objections to Ruling 3 and permit the relevant and proportional discovery ordered by the Special Master to proceed without further delay.

Respectfully submitted,

Dated: July 30, 2018

/s/ *Linda Singer*
Linda Singer
Motley Rice LLC
401 9th St NW, Suite 1001
Washington, DC 20004
202-232-5504
lsinger@motleyrice.com

Paul J. Hanly, Jr.
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Avenue
New York, NY 10016
212-784-6401
phanly@simmonsfirm.com
jconroy@simmonsfirm.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2018, I electronically filed the foregoing Plaintiffs'
Omnibus Opposition to Manufacturer Defendants' Joint Objections and Pharmacy
Defendants' Objections to the Special Master's Discovery Rulings No. 2 and 3 with the
Clerk of Court by using the CM/ECF System.  Copies will be served upon counsel of
record by, and may be obtained through, the Court's CM/ECF System.

/s/ *Linda Singer*
Linda Singer
Motley Rice LLC
401 9th St NW, Suite 1001
Washington, DC 20004
202-232-5504
lsinger@motleyrice.com

*Counsel for Plaintiffs*