**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*State of Alabama v. Purdue Pharma, L.P., et al.,*<br>Case No. 18-OP-45236 | MDL 2804<br>Hon. Dan Aaron Polster |

THE STATE OF ALABAMA'S COMBINED RESPONSE TO
MCKESSON'S & THE MANUFACTURERS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

STATEMENT OF THE ISSUE ............................................................................................... 3

LEGAL STANDARD ............................................................................................................. 3

ADOPTION OF PREVIOUS ARGUMENTS ......................................................................... 3

ARGUMENT .......................................................................................................................... 4

    I.   **The Defendants' Global Arguments Fail** ........................................................... 4

        A. The Derivative Injury Rule does not bar Alabama's claims ............................... 4

        B. The Municipal Cost Recovery Rule does not bar Alabama's claims ..................... 7

        C. Statutes of limitation do not bar Alabama's claims ....................................... 9
            1. The *Nullum Tempus* rule immunizes the State from limitation periods ................. 9
            2. A ruling on statutes of limitation is premature at this Rule 12(b) stage ................ 12
            3. Defendants' fraudulent concealment tolls any time limitation ........................ 13
               a. The State's claims are not barred by the so-called First-Injury Rule
                 because the Defendants engaged in fraudulent concealment ......................... 13
               b. The State did not have constructive knowledge of the
                 Manufacturers' misconduct ............................................................. 15
            4. The State's DPTA claim is not time-barred ......................................... 15

        D. The State's claims are not preempted .................................................. 18

        E. The State sufficiently pleaded causation ............................................... 19
            1. The State adequately pleaded actual and proximate causation ...................... 19
            2. The Learned Intermediary Doctrine does not break the causal chain .................. 22

    II.   **The Defendants' Count-Specific Arguments Fail** ......................................... 24

        A. <u>Count 1:</u> The State adequately pleaded its Public Nuisance claim ....................... 24
            1. The State alleged an interference with a public right ................................ 24
            2. Defendants' control argument is without merit .................................... 24

B. Underline Count 2: The State adequately pleaded its claim under the Alabama Deceptive Trade Practices Act..................................................................... 26

1. The State sufficiently pleaded multiple DPTA violations .................................... 26

    a. The Manufacturers violated the DPTA ........................................................ 26

    b. McKesson violated the DPTA.................................................................... 28

2. Claims brought under the DTPA are not subject to Rule 9(b)'s heightened pleading standard for fraud claims.................................. 29

3. The State does not have to plead an "unconscionable act".................................. 31

4. The State's DTPA claim is not precluded by its unjust enrichment claim ............. 31

5. The *Noerr-Pennington* doctrine is a red herring.................................................... 32

6. The State complied with the DTPA's non-jurisdictional pre-litigation conference provision ............................................................................... 33

C. Underline Count 3: The State's drug-related nuisance claim should be dismissed ..................... 34

D. Underline Count 4: The State adequately pleaded a claim under the Alabama Uniform Controlled Substances Act. ................................................................ 34

1. The State sufficiently alleged that McKesson violated the ACSA ......................... 34

2. The State sufficiently alleged that the Manufacturers violated the ACSA ............. 36

3. The State's ACSA claim seeks declaratory relief, more so than damages ............. 37

E. Underline Count 5: The State adequately pleaded its negligence claim ...................................... 38

1. The State adequately pleaded the existence of multiple duties.............................. 38

    a. The Defendants owed a common-law duty of reasonable care........................ 38

    b. The Defendants breached a statutory duty of care............................................ 40

    c. The Manufacturers owed a contractual duty.................................................... 43

    d. The State sufficiently alleged that Defendants breached their duties.............. 43

F. Underline Count 6: The State adequately pleaded its Unjust Enrichment claim ......................... 44

G. Underline Count 7: The State adequately pleaded its wantonness claim ...................................... 45

**CONCLUSION** ................................................................................... 49

**LOCAL RULE 7.1 (F) CERTIFICATE** ...................................................... 51

**CERTIFICATE OF SERVICE** .............................................................. 51

# TABLE OF AUTHORITIES

## Cases

*Alabama Farm Bureau Mut. Cas. Ins. Co. v. Griffin*,
  493 So. 2d 1379 (Ala. 1986) ................................................................. 12

*Alabama Power Co. v. Taylor*,
  306 So. 2d 236 (Ala. 1975) ................................................................. 21

*Alexander v. Eagle Manufacturing Co., LLC*,
  714 Fed. Appx. 504 (6th Cir. 2017) ....................................................... 8

*Altrust Financial Services, Inc.*,
  76 So. 3d 228 (Ala. 2011) ................................................................... 4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................... 19, 20, 21, 26

*Auburn Univ. v. Int'l Bus. Mach., Corp.*,
  716 F. Supp. 2d 1114 (M.D. Ala. 2010) ................................................. 11

*Bd. of Sch. Comm'rs of Mobile Cty.*,
  752 So. 2d 491 ................................................................................. 15

*Bd. of School Com'rs v. Architects Group*,
  752 So. 2d 489 (Ala. 1999) ................................................................. 10

*Berrington v. Wal-Mart Stores, Inc.*,
  696 F.3d 604 (6th Cir. 2012) ................................................................ 7

*Boyce v. Cassese*,
  941 So. 2d 932 (Ala. 2006) ................................................................. 11

*Boyle & Co., Inc. v. Fasano*,
  2006 WL 572183  (W.D.N.C. Mar. 3, 2006) .......................................... 11

*BP America v. Burton*,
  549 U.S. 84 (2006) ..................................................................... 12, 17

*Brown v. Endo Pharmaceuticals, Inc.*,
  38 F. Supp. 3d 1312 (S.D. Ala. 2014) .................................................. 41

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ........................................................................... 17

*Canyon County v. Syngenta Seeds, Inc.*,
  2005 WL 3440474 (D. Idaho 2005) ....................................................... 8

*Cipollone v. Liggett Group, Inc.*,
  505 U.S. 504 (1992) ......................................................................... 18

*City of Birmingham v. Crow*,
  101 So. 2d 264 (Ala. 1958) ................................................................. 4

*City of Chi. v. Purdue Pharma, L.P.*,
  211 F. Supp. 3d 1058 (N.D. Ill. 2016) .................................................. 20

*City of Chicago v. Beretta U.S.A. Corp.*,
   821 N.E. 2d 1099 (Ill. 2004) ............................................................................................ 8

*City of Everett v. Purdue Pharma, L.P.*,
   No. C17-209RSM, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) ............................... 9

*City of Mobile v. Largay*,
   346 So. 2d 393 (Ala. 1977) .......................................................................................... 40

*City of Philadelphia v. Beretta U.S.A. Corp.*,
   277 F. 3d 415 (3rd Cir. 2002) ........................................................................................ 8

*Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.*,
   114 F. Supp. 3d 1342 (N.D. Ga. 2015) ......................................................................... 29

*Cox v. Board of Trustees of the University of Alabama*,
   49 So. 814 (Ala. 1909) .................................................................................................. 9

*Deng v. Scroggins*,
   169 So. 3d 1015 (Ala. 2014) ......................................................................................... 29

*DGB, LLC v. Hinds*,
   55 So. 3d 218  (Ala. 2010) ............................................................................................ 13

*Dixon v Hot Shot Express*,
   44 So.3d 1082 (Ala. 2010) ............................................................................................ 42

*Durr v. Strickland*,
   602 F.3d 788 (6th Cir. 2010) ........................................................................................ 37

*English v. General Elec. Co.*,
   496 U.S. 72 (1990) ....................................................................................................... 18

*E-Shops Corp. v. U.S. Bank Nat. Ass'n*,
   678 F.3d 659 (8th Cir. 2012) ........................................................................................ 29

*Ex parte Capstone Bldg. Corp.*,
   96 So.3d 77 (Ala. 2012) ................................................................................................ 11

*Fields v. Eli Lilly and Co.*,
   116 F. Supp. 3d 1295 (N.D. Ala. 2015) ........................................................................ 22

*Flagstaff v. Atchison, Topeka, and Sante Fe Ry. Co.*,
   719 F.2d 322 (9th Cir. 1983) .......................................................................................... 8

*Fogarty v. Parker, Poe, Adams, & Bernstein, L.L.P.*,
   961 So. 2d 784 (Ala. 2006) ........................................................................................... 41

*Glass v. Birmingham Southern R. Co.*,
   905 So. 2d 789 (Ala. 2004) ........................................................................................... 38

*Green v. Alabama Power Co.*,
   597 So. 2d 1325 (Ala. 1992) ......................................................................................... 22

*Guaranty Trust Co. v. United States*,
   304 U.S. 126 (1938) ................................................................................................. 9, 10

*Guerrero v. Target Corp.*,
   889 F. Supp. 2d 1348 (S.D. Fla. 2012) ......................................................................... 29

*Horner v. Mortg. Elec. Registration Sys., Inc.*,
711 F. App'x 817 (9th Cir. 2017)..................................................... 29

Hornsby v. Sessions,
703 So.2d 932 (Ala.1997) ............................................................ 49

*In re New York state Opioid Litigation*,
No. 40000/2017 (N.Y. Sup. Ct. June 18, 2018) ....................................... 9

*In re Opioid Litig.*,
Index. No. 40000/2017 ............................................................... 18

*Industrial Tile v. Stewart*,
388 So.2d 171 (Ala. 1980) .......................................................... 40

*King v. National Spa and Pool Institute, Inc.*,
570 So. 2d 612 (Ala. 1990) ..................................................... 40, 43

*La Grasta v. First Union Secs., Inc.*,
358 F.3d 840 (11th Cir. 2004) ...................................................... 11

*Lemley v. Wilson*,
178 So.3d 834 .............................................................. 45, 47, 48, 49

*Lollar v. Poe*,
622 So.2d 902 (Ala. 1993) .......................................................... 41

*Louisville & Nashville R.R. Co. v. State*,
159 So. 2d 458 (Ala. 1963) ......................................................... 11

*Lowe v. General Motors Corp.*,
624 F.2d 1373 (5th Cir. 1980) ...................................................... 41

*Martinson v. Cagle*,
454 So.2d 1383 (Ala. 1984) ......................................................... 41

*Medtronic, Inc. v. Lohr*,
518 U.S. 47 (1996) ................................................................. 17

*New Jersey Carpenters Health Fund v. Philip Morris, Inc.*,
17 F.Supp. 324 (D.N.J. 1998) ........................................................ 6

*Omar ex rel. Cannon v. Lindsey*,
334 F.3d 1246 (11th Cir. 2003)...................................................... 12

*Pace v. Armstrong World Indus. Inc.*,
578 So.2d 281 (Ala. 1991) .......................................................... 28

*Parker Bldg. Service Co., Inc. v. Lightsey ex rel. Lightsey*,
925 So.2d 927 (Ala. 2005) ..................................................... 40, 42, 43

*Payton v. Monsanto Co.*,
801 So.2d 829 (Ala.2001) ........................................................... 13

*PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.*,
No. 3:12-CV-1366-J-20JBT, 2013 WL 12172912, (M.D. Fla. Aug. 28, 2013) ............... 29

*PCA Minerals, LLC v. Merit Energy Company LLC*,
725 Fed. Appx. 342 (6th Cir. Feb. 14, 2018) ........................................ 44

*Pelman ex rel. Pelman v. McDonald's Corp.,*
  396 F.3d 508 (2d Cir. 2005) ........................................................................ 29, 30

*Porter v. Smith,*
  65 Ala. 169 (1880) ........................................................................................ 13

*Reid v. Unilever U.S., Inc.,*
  964 F. Supp. 2d 893 (N.D. Ill 2013) ............................................................ 29

*Safe Sts. V. Alternative Holistic Healing, LLC,*
  No. 1:15-cv-00349-REB-CBS, 2016 WL 223815, (D. Colo. Jan. 19, 2016),
  *aff'd*, 859 F.3d 865 (10th Cir. 2017) ............................................................ 37

*Smith v. AmSouth Bank, Inc.,*
  892 So.2d 905 (Ala. 2004) .......................................................................... 38

*Southeastern Greyhound Lines v. Callahan,*
  13 So.2d 660 (Ala. 1943) ............................................................................ 38

*State of Oklahoma v. Purdue Pharma, L.P.,*
  No. 2017-816 .............................................................................................. 18

*State of Washington v. Purdue Pharma, LP. et. al,*
  No. 17-2-25505-0 SEA, (Wash. Sup. Ct. May 14, 2018) ...................... 9, 19

*State v. Crocker's Estate,*
  83 So. 2d 261 (Ala. App. 1955) .................................................................. 16

*State v. Mudd,*
  143 So. 2d 171 (Ala. 1962) .......................................................................... 17

*State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.,*
  869 So. 2d 592 (Fla. Dist. Ct. App. 2004) .................................................. 29

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,*
  171 F.3d 912 (3rd Cir. 1999) ........................................................................ 6

*Taylor v. Smith,*
  892 So.2d 887 (Ala. 2004) ...................................................................... 39, 40

*Tipler v. McKenzie Tank Lines,*
  547 So.2d 438 (Ala. 1989) ...................................................................... 24, 25

*Tolbert v. Tolbert,*
  903 So.2d 103 (Ala. 2004) .......................................................................... 48

*Toole v. McClintock,*
  999 F.2d 1430 (11th Cir. 1993) .................................................................. 23

*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
  501 F.3d 493 (6th Cir. 2007 ........................................................................ 30

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.,*
  532 F.3d 496 (6th Cir. 2008) ...................................................................... 30

*United Food and Commercial Workers Unions, Employers Health & Welfare Fund v. Philip
  Morris, Inc.,* 223 F.3d 1271 (11th Cir. 2000) .............................................. 4

*United States v. Halifax Hosp. Medical Center,*
  2013 WL 6017 (M.D. Florida Nov. 13, 2013) ........................................... 44
*United States v. Weintraub,*
  613 F.2d 612 (6th Cir. 1979)......................................................................... 9
*Vines v. Plantation Motor Lodge,*
  336 So.2d 1338 (Ala. 1976) ........................................................................ 20
*Wiltgen v. Ethicon, Inc.,*
  No 12-CV-2400, 2017 WL 4467455, (N.D. Ill. Oct. 6, 2017)................... 23
*Wyeth v. Levine,*
  555 U.S. 555 (2009) ..................................................................................... 18
*Wyeth, Inc. v. Weeks,*
  159 So.3d 649 (Ala. 2014) ........................................................................... 22

**Statutes**

15 U.S.C. § 45 .................................................................................................. 28
33 U.S.C. § 2702 ................................................................................................ 5
ALA. ADMIN. CODE R. 680-X-3-.05 ....................................... 34, 35, 36, 37, 40
ALA. CODE § 6-2-3 ........................................................................................... 13
ALA. CODE § 6-5-121 .............................................................................. 5, 8, 23
ALA. CODE § 6-5-122 ....................................................................................... 24
ALA. CODE § 6-5-155 ....................................................................................... 33
ALA. CODE § 8-9-14 ......................................................................................... 15
ALA. CODE § 8-19-2 ........................................................................................... 5
ALA. CODE § 8-19-3 ......................................................................................... 15
ALA. CODE § 8-19-4 ..................................................................................... 5, 16
ALA. CODE § 8-19-5 ................................................................................. passim
ALA. CODE § 8-19-8 .................................................................................... 16, 33
ALA. CODE § 8-19-9 ......................................................................................... 15
ALA. CODE § 8-19-10 ....................................................................................... 16
ALA. CODE § 8-19-11 .................................................................................... 5, 29
ALA. CODE § 8-19-14 ....................................................................................... 10
ALA. CODE § 8-19-15 ....................................................................................... 31
ALA. CODE § 20-2-56 .................................................................................. 34, 36
ALA. CODE § 20-2-90 .................................................................................. 11, 43

**Other Authorities**

Restatement (Second) of Torts § 302B ............................................................ 40

**Rules**

32 A.L.R. 6th 261, §1 ................................................................................. 7

Ala. R. Civ. P 8(e) ..................................................................................... 45

Ala. R. Civ. P. 12(b) ................................................................................. 49

Fed. R. Civ. P. 8(a) ................................................................................... 30

Fed. R. Civ. P. 8(c) ................................................................................... 11

**Treatises**

Scalia, Antonin  & Bryan Garner,
  *Reading Law: the Interpretation of Legal Texts* 93 (2012)................................................. 29, 32

**INTRODUCTION:** ███████████████████████

Defendants would have this Court believe that Alabama has an opioid problem; it's just not *their* problem. Throughout their briefs, Defendants assert that Alabama's complaint should be dismissed because we pleaded no facts that tie them to the opioid epidemic.  For example:

- McKesson Mem. at 19[1]: "The complaint, for example, does not identify any particular order that McKesson should have identified as suspicious but did not.  Nor does it allege that, had McKesson halted a particular order, it would have reduced the total quantity of opioids available to Alabamians."

- Manufacturers Mem. at 5[2]: "[T]he FAC does not identify a specific suspicious orader that the Manufacturer Defendants supposedly had a duty, but failed, to report.  Absent such allegations, the State has failed to plead even the first step in the causal chain necessary to plead a plausible claim that the alleged conduct caused *any* harm."

So, we begin with an example from our complaint that explains why McKesson, Purdue, and Endo are Defendants here—and why their deficient pleading arguments should fall on deaf ears.

The Alabama pharmacies that dispensed ███████████████████████

███████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

---

[1] Doc. 689-1 ("McKesson Mem.")
[2] Doc. 690-1. ("Manufacturers' Mem.")

█████████████████████████████████████████████████

█████████████████ One customer received more than 3,600 oxycodone pills ███ █

██████████████████████ FAC ¶ 409, and Purdue and Endo manufactured and deceptively

marketed oxycodone pills in Alabama.  *See, e.g.*, FAC ¶¶ 22, 32, 111.

██████████████████████████████████ a number we expect to

expand when we receive the 14-drug ARCOS data—it's no wonder that Alabama is the #1 State

for prescriptions per person, FAC ¶ 357, or that a recent Harvard study found that Alabama

possesses the #1 and #5 congressional districts for opioid prescribing rates.  *See* American Journal

of Public Health, *Opioid Prescribing Rates by Congressional Districts, United States, 2016* (July

19, 2018) (attached as Exhibit A).  Nor, sadly, is it surprising that this flood of opioids has resulted

in nearly one Alabamian dying each day from an opioid overdose.  FAC ¶ 357.

As you can see, the notion that Alabama "failed to plead even the first step in the causal

chain necessary to plead a plausible claim that the alleged conduct caused *any* harm" in its 128-

page complaint is specious at best.  Manufacturers' Mem. at 5.  The facts are there, and we will

continue to add more facts—and likely more Defendants—as more ARCOS data and documents

roll in.  So, from here forward, Alabama spends most of its limited briefing space focusing on the

Defendants' legal arguments (as opposed to their pleading arguments), as this Court requested.

*See* CMO-1, §2(a) (ordering motions to focus on "threshold legal issues on common claims").

## STATEMENT OF THE ISSUE

Has the State sufficiently pleaded one or more claims that could entitle the State to relief?

## LEGAL STANDARD

Pursuant to CMO-1, § 2(g)(4), the State adopts the Legal Standard section from pages 4-6 of the Summit County, Ohio response. *See* Doc. 654 at 4-6 (Summit response).

Alabama has not pleaded any fraud claims that trigger Rule 9(b)'s heightened pleading standard, so Rule 8(a)(2) applies throughout.

## ADOPTION OF PREVIOUS ARGUMENTS

Pursuant to CMO-1, § 2(g)(4), Alabama adopts the arguments made by other test Plaintiffs, including but not limited to, Chicago (Docs. 653, 726), Summit County (Doc. 654), Monroe County (Doc. 729), Broward County, (Doc. 730), Cabell County Commission (Docs. 727, 728), and West Boca Medical Center (Doc. 806).

Alabama focuses its arguments on the arguments raised by the Defendants in their motions to dismiss Alabama's amended complaint and supporting memorandum.  To the extent that the Court believes that an argument raised against a local government Plaintiff but not Alabama warrants dismissal of one or more of the State's claims, the State reserves, and requests the right to address, that argument in a subsequent filing.

<u>**ARGUMENT**</u>

State and local governments from Alaska, Oklahoma, Washington, Tennessee, Kentucky, Missouri, New York, and Mississippi have survived motions to dismiss that raised many of the same arguments that Defendants levy against Alabama. *See* Exhibits B-J. Defendants offer no reason that Alabama's case should be the first to be dismissed outright. Nor can they.

**I.     The Defendants' Global Arguments Fail.**

**A.  The Derivative Injury Rule does not bar Alabama's claims.**

All Defendants argue that the "Derivative Injury Rule" precludes Alabama from recovering damages that would not exist but-for injuries to a third party, unless Alabama files a subrogation claim on behalf of the injured third party (we didn't). This argument fails for several reasons.

1. *Direct, not Derivative, Injuries*:  The derivative injury doctrine does not apply here because Alabama seeks compensation for its *own* injuries, injuries that are distinct from an individual citizen's injuries.  While it is true that most of the State's damages would not exist but-for its citizens being injured by Defendants' bad acts, those private citizens do not have standing to recover the ***public*** monies and remedy the ***public*** epidemic at issue here.[3]   Citizens do not hire additional law enforcement agents, create the infrastructure for treatment programs, or place naloxone in the hands of first responders; the State does. *See* FAC ¶ 363-64 (listing some of the State's damages).   In other words, the State stands in its own shoes here, not in the shoes of others.

The Court need look no further than the Manufacturers' first quotation of Alabama law: "An insurer's claim is 'dependent on its liability to the insured, which in turn is dependent upon the tortfeasor's liability to the insured.'"  Manufacturers' Mem. at 2 (quoting *Lady Corinne*

---

[3] The Derivative Injury Rule appears to have evolved from corporate shareholder claims and, to the State's knowledge, has not been applied to bar an action similar to this one. Courts have held that, absent a claim of fraud or oppression on the shareholder, shareholders do not have standing because their injuries are derivative of the corporation's injury, and corporations are separate/distinct entities. *See Altrust Financial Services, Inc.*, 76 So. 3d 228, 241-42 (Ala. 2011).

*Trawlers, Inc. v. Zurich Ins. Co.*, 507 So. 2d 915, 918 (Ala. 1987)).    This cite starts a pattern of cases in which the Plaintiff sued a tortfeasor to recover monies the Plaintiff owed or paid to the injured party. *See City of Birmingham v. Crow*, 101 So. 2d 264 (Ala. 1958) (rejecting lawsuit filed by city government to recoup the salary it paid to a police officer injured by the third-party defendant); *United Food and Commercial Workers Unions, Employers Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271 (11th Cir. 2000) (rejecting lawsuit filed by employee insurance fund seeking to recover costs allegedly due to tobacco-related illnesses). But unlike those cases, the State does not seek monies it has paid or must pay injured citizens and/or their families; the State seeks to recover its direct, independent costs.

2. *Statutes trump common law*:  Even if Defendants were right that Alabama common law shielded Defendants from liability to the State, the Alabama Legislature has trumped that law by statute.   With regard to Counts 1 and 2, for example, the Alabama Legislature vested the State with the right to abate a public nuisance, *see* ALA. CODE § 6-5-121 ("Generally, a public nuisance gives no right of action to any individual"), and to penalize the deceptive marketing of drugs. *See* ALA. CODE §§ 8-19-4, 8-19-11.  By statutorily granting this power to the State, the Legislature vitiated any common law bar to Defendants' liability to the State.[4]

3. *Parens Patriae*:  If you take their argument to its logical conclusion, Defendants ask the Court to undermine (if not vitiate) the well-accepted, inherent authority of States to protect their citizens under the *parens patriae* doctrine.  The amici States' brief will expand on this critical point, so we argue it no further here.

---

[4] In another example of how statutes undo the alleged common law bar, Alabama sued BP for lost tax revenues resulting from the 2010 oil spill's impact on third party individuals and businesses, who consequently paid less taxes to the State. No one argued in that case that the common law "derivative injury" rule precluded relief because the Oil Pollution Act permitted Alabama to seek "damages equal to the net loss of taxes[.]" *See* 33 U.S.C. § 2702(b)(2)(D).

4. *Medicaid payments*: Finally, the Defendants make additional "derivative injury" arguments to carve out public monies spent for opioid prescriptions covered by the State's employee health plan and Medicaid Program.

McKesson claims that Section 22-6-6 of the Alabama Code requires the State to file a subrogation action to recoup expenses incurred by the Alabama Medicaid Program and alleges that the State's failure to identify the individual Medicaid recipients on whose behalf the State is suing is fatal to its claim. McKesson Mem. at 9-10. Section 22-6-6 states, in pertinent part:

> If medical assistance is provided to a recipient under the Alabama Medicaid Program for injuries, disease or sickness caused under circumstances creating a cause of action in favor of the recipient against any person, firm or corporation, then the State of Alabama shall be subrogated to such recipient's rights and shall be entitled to recover the proceeds that may result from the exercise of any rights of recovery which the recipient may have against any such person, firm or corporation[.]

By its plain text, this statute does not apply for two reasons. First, as we have noted throughout, the State is not trying "to recover the proceeds that may result from the exercise of [the injured person's] rights of recovery[.]" *Id.* The State is exercising *its own* right of recovery. Second, if recipients have a cause of action against Defendants, it is not the result of Defendants hitting them with a car or some other tortious act that required the State to furnish opioids to treat the resulting "injury, disease, or sickness." *Id.* The opioids *are* the "injury, disease, or sickness."

The Manufacturers, on the other hand, cite *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3rd Cir. 1999)—not Alabama law—to argue that the derivative injury rule bars a claim where the defendant fraudulently induces health funds into reimbursing participants for undergoing harmful medical procedures. But the court in *Steamfitters* did not make any such finding. Instead, the court distinguished a hypothetical situation posed in

another case, *New Jersey Carpenters Health Fund*,[5] from the facts before it. Unlike the hypothetical scenario where the health funds were fraudulently induced to pay for harmful procedures, the plaintiff in *Steamfitters* alleged that the tobacco companies fraudulently induced the fund ***not*** to spend money on the smoking-cessation products, which would have diminished the tobacco companies' revenue stream. *Id.* at 927-28. The *Steamfitters* court determined this constituted an indirect and remote connection that was much weaker than the hypothetical posed by the *New Jersey Carpenters Health Fund* court. Our allegations share more in common with the *New Jersey Carpenters Health Fund* case than the *Steamfitters* case. And, of course, neither of those cases constitutes substantive Alabama law, which is all that binds the State here.

### B. The Municipal Cost Recovery Rule does not bar Alabama's claims.

Defendants (primarily McKesson) assert that the State's common law claims are barred by the Municipal Cost Recovery Rule, also known as the Free Public Services Doctrine. The Municipal Cost Recovery Rule is "a common-law rule which provides that, absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." 32 A.L.R. 6th 261, § 1. The rule does not bar Alabama's claims for three reasons.

1. *Not Alabama law*: As the name implies, the Municipal Cost Recovery Rule generally applies to local, not state, governments. McKesson acknowledges this but points out that one state appellate court (Wyoming) and one state trial court (Delaware) have applied the rule to their states.

---

[5] *New Jersey Carpenters Health Fund v. Philip Morris, Inc.*, 17 F.Supp. 324 (D.N.J. 1998). The hypothetical presented in the opinion involved a defendant who fraudulently induced the plaintiff health funds into reimbursing participants for undergoing dangerous medical procedures that harmed the patients. In that case, the court determined that the health fund would have a cause of action against the defendant for their economic damages, which the fund was wrongfully induced to cover. In other words, the health fund was fraudulently induced to spend money that directly benefited the defendant. Moreover, the fraud induced the plaintiffs to enter into the relationship with the defendant that caused their injury.

McKesson Mem. at 10.  Of course, that suggests that courts in 48 States—including Alabama—have not adopted/applied this common law rule to their State. Indeed, McKesson fails to point to one Alabama case that addresses the Municipal Cost Recovery Rule.

Respectfully, federal courts should not be innovators of state law.  *See Alexander v. Eagle Manufacturing Co., LLC*, 714 Fed. Appx. 504, 507 (6th Cir. 2017) ("As always, we must be wary of adopting substantive innovations in state law."); *Berrington V. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012) ("Federal courts should be extremely cautious about adopting substantive innovation in state law.").  If Alabama courts have not applied this common law rule to the State, then this Court should not force this rule upon the State.

Putting aside the fact the doctrine does not apply to Alabama, even the courts that have applied the doctrine acknowledge two instances where the governmental entity may recover "the cost of its services:" (1) "where it is authorized by statute," and (2) "where the acts of a private party create a public nuisance which the government seeks to abate."  *Flagstaff v. Atchison, Topeka, and Sante Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983).  Both apply here.

2. *Statutory causes of action*:  Alabama meets the first exception because it pleaded four statutory claims: public nuisance (Count 1), deceptive trade practices (Count 2), drug-related nuisance (Count 3), and controlled substances act violations (Count 4).  FAC ¶¶ 367-416.  In fact, McKesson acknowledges that the doctrine would only apply to "the State's common law claims."  McKesson Mem. at 10.  So, even if Alabama courts had adopted the Municipal Cost Recovery doctrine to the State, it would not apply to Counts 1-4.

3.  *Public Nuisance*:  Alabama also meets the second exception—*i.e.* it seeks to abate a public nuisance created by Defendants.  *See, e.g. Flagstaff*, 719 F. 2d at 324; *Canyon County v. Syngenta Seeds, Inc.*, 2005 WL 3440474 (D. Idaho 2005); *City of Chicago v. Beretta U.S.A. Corp.*,

821 N.E. 2d 1099 (Ill. 2004); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F. 3d 415 (3rd Cir. 2002) (applying Pennsylvania law). Alabama seeks damages for, and abatement of, the public health epidemic caused by the Defendants. *See, e.g.* FAC ¶¶ 16, 334, 336, 337, 364, 375, 378, 379, 397, 400. And as previously noted, a state statute expressly authorizes the State to file suit to abate a public nuisance in such circumstances, *see* ALA. CODE § 6-5-121, thereby granting the State statutory authorization to recoup damages incurred in abating the public nuisance. Consequently, the doctrine does not bar the recovery of damages / abatement costs here.

4. *Other courts*: Finally, we note that numerous courts in this litigation have already refused to apply the Defendants' interpretation of the Municipal Cost Recovery Rule to bar claims brought by a State[6], county[7], and/or a municipality[8] for many of the reasons outlined above.

## C. Statutes of limitation do not bar Alabama's claims.

The Manufacturers argue that the State's claims "are entirely or predominately barred by the applicable statutes of limitations." Manufacturers' Mem. at 20. Below, we show why the Manufacturers are wrong for three reasons that apply to all of the State's claims, and then explain why the Manufacturers' DTPA-specific argument lacks merit.

### 1. The *Nullum Tempus* rule immunizes the State from limitation periods.

As it does for the United States,[9] the doctrine of *nullum tempus occurrit reipublicae*—

---

[6] *State of Washington v. Purdue Pharma, LP. et. al*, No. 17-2-25505-0 SEA, slip op. (Wash. Sup. Ct. May 14, 2018) (attached as Exhibit D). Although the Court did not specifically address Purdue's Municipal Cost Recovery Rule argument, it "fully considered and rejected all other arguments presented by Purdue" and "[a]ny basis for the motion to dismiss not specifically mentioned in the Court's Order is denied.

[7] *In re New York state Opioid Litigation*, No. 40000/2017, slip. Op. (N.Y. Sup. Ct. June 18, 2018) (attached as Exhibit H). The Court determined that prohibiting the counties' recovery for opioid manufacturers' "intentional, persistent course of deceptive conduct…would distort the doctrine beyond recognition." *Id.* at 12.

[8] *City of Everett v. Purdue Pharma, L.P.*, No. C17-209RSM, 2017 WL 4236062 at *7 (W.D. Wash. Sept. 25, 2017).

[9] *See Guaranty Trust Co. v. United States*, 304 U.S. 126, 132-33 (1938); *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979) ("The rule that the government is exempt from the consequences of its laches and from the operation of statutes of limitations *Nullum tempus occurrit regi* had its genesis in English common law notions of prerogative of the Crown. The principle is well established in this country[.]").

"no time runs against the State"—immunizes the State of Alabama from the application of statutes of limitation, unless the State "is expressly or by necessary implication included within the operation of the statute." *Bd. of School Com'rs v. Architects Group*, 752 So. 2d 489, 491 (Ala. 1999); *see also Cox v. Board of Trustees of the University of Alabama,* 49 So. 814, 820 (Ala. 1909) ("It is a cardinal rule that the statute of limitations, unless so expressed, does not run against the state; but it is equally a cardinal rule that [statutes of limitations] do run against the state, if so expressed."). The State and Federal governments receive this special immunization "based upon the important public policy of preserving public rights and revenues from the negligence of public officers." *United States v. Weintraub*, 613 F.2d 612, 618 (6th Cir. 1979) (*citing Guaranty Trust Co. v. United States*, 304 U.S. 126, 132-33 (1938)). This case is a prime example.

While state officials were not negligent in failing to sue the Defendants a decade ago, let's assume briefly that Defendants are right that we should have. Does that mean that the opioid crisis can continue in perpetuity because the sovereign governments are powerless to stop it? The *nullum tempus* rule ensures that the answer to that question is "no." As the Supreme Court put it, a rule protecting the Government's ability to protect the People is a "benefit and advantage [that] extend[s] to every citizen, including the defendant[.]" *Guaranty Trust*, 304 U.S. at 132.

Again, there is one exception: If the sovereign has voluntarily subjected itself to time limit by statute, then that self-imposed limit applies. *See Architects Group*, 752 So. 2d at 491. But Alabama has not voluntarily subjected itself to a statute of limitation for any of its pleaded counts.

Count 1 (Public Nuisance): Section 6-5-120, *et. seq.* of the Alabama Code statutorily vests "the state" with the ability to abate a public nuisance. The Legislature did not include within that Act a statute of limitations governing the State's ability to bring a public nuisance claim or otherwise abate a public nuisance. Therefore, the *nullum tempus* rule mandates that no time

10

limitation exists on this claim. *See also* Doc. 654 at 123-24 (Summit County explaining that statutes of limitation do not apply to public nuisance actions).

Count 2 (Deceptive Trade Practice):  As explained in greater detail on pages 26-33, the Alabama Legislature did include a one-year statute of limitation in the Alabama Deceptive Trade Practice Act, but that limitation only applies to private actions, not actions brought by the Attorney General on behalf of the State. *See* ALA. CODE § 8-19-14.

Count 3 (Drug-related nuisance):  The State agrees that this count should be dismissed for other reasons, *see infra* at 34, so there's no need for a limitation argument.

Count 4 (Alabama Uniform Controlled Substance Act):  The Alabama Uniform Controlled Substances Act ("ACSA") authorizes the State to enforce its provisions. ALA. CODE § 20-2-90(a). The Legislature did not include a statute of limitations governing the State's filing of ACSA claims, so the *nullum tempus* doctrine mandates that no time limitation applies to this action.

Counts 5-7 (Negligence, Unjust Enrichment, Wantonness):  Counts 5-7 are the State's common law claims, which are generally governed by Section 6-2-38(l)'s two-year catch-all provision.[10]  Importantly, no express mention is made of the State in this section, so there is no necessary implication that the State is included within the provision's operation. *See Louisville & Nashville R.R. Co. v. State*, 159 So. 2d 458, 464 (Ala. 1963) ("As a general rule of statutory construction, without any express legislative declaration, general words in a statute do not apply to the state, nor affect its rights, unless an intention to the contrary appears.").  And, even if the Court believes that the general two-year statute is ambiguous in its application to the State, the

---

[10]  "All actions for any injury to the…rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."; *see also Boyce v. Cassese,* 941 So. 2d 932, 945 (Ala. 2006) (negligence); *Ex parte Capstone Bldg. Corp.*, 96 So.3d 77, 88 (Ala. 2012) (wantonness); *Auburn Univ. v. Int'l Bus. Mach., Corp.*, 716 F. Supp. 2d 1114, 1118 (M.D. Ala. 2010) (unjust enrichment); *Boyle & Co., Inc. v. Fasano*, No. 5:03cv47-V, 2006 WL 572183 at *7 (W.D.N.C. Mar. 3, 2006) (holding state statute of limitations applies to federal unjust enrichment claims).

State prevails because "when the sovereign elects to subject itself to a statute of limitations, the sovereign is given the benefit of the doubt if the scope of the statute is ambiguous." *BP America v. Burton*, 549 U.S. 84, 95-96 (2006).

### 2. A ruling on statutes of limitation is premature at the Rule 12(b) stage.

Asserting that a claim is time-barred is an affirmative defense, which a plaintiff is not required to negate in the complaint. Fed. R. Civ. P. 8(c)(1); *La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004). Therefore, dismissal on these grounds at this stage is disfavored unless "it is apparent from the face of the complaint" that the claim is time-barred. *Id.* (quoting *Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 2003)). Where there is a factual issue as to when the statute of limitations begins to run, the question is to be decided by the jury. *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Griffin*, 493 So. 2d 1379, 1382 (Ala. 1986).

The State described in detail the Manufacturers' fraudulent conduct and asserted various tolling exceptions to Alabama's statute of limitations, thus making it not "apparent from the face of the complaint" that its claims are time-barred. FAC ¶¶ 341-354. The court must go beyond the pleadings to determine exactly when the State learned of the Defendants' wrongful conduct, making, making dismissal at this stage premature. *See Omar*, 334 F.3d at 1251-52 (refusing to dismiss a complaint based on statute of limitations grounds when the plaintiff asserted tolling exceptions based on the defendant's concealment of their wrongful conduct).

The Manufacturers' alternative argument— that the Court should at least bar any request for damages that occurred before February 6, 2016 (*i.e.* two years before the State filed its initial complaint)—is likewise an inappropriate basis for Rule 12(b)(6) dismissal. If anything, this argument should be raised in a motion to strike allegations or to limit the introduction of evidence, neither of which were contemplated by CMO-1.

### 3. Defendants' fraudulent concealment tolls any time limitation.

That Alabama had to file this response under seal—and had to redact much of the first two pages because the public is ***still*** barred from seeing certain evidence of the Defendants' misdeeds—vitiates any argument that Alabama could have discovered and fully pleaded its facts and claims years ago. To the contrary, it's just one example of why Defendants' acts of concealment warrant against applying a time bar to claims brought on the public's behalf.

### a. The State's claims are not barred by the so-called First-Injury Rule because the Defendants engaged in fraudulent concealment.

Assuming *arguendo* that the State's claims are subject to a time limit, Alabama courts have long accepted fraudulent concealment as an equitable exception to such limits. *See Porter v. Smith*, 65 Ala. 169 (1880). So too has the Alabama Legislature. For example, ALA. CODE § 6-2-3 provides:

> In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.

This exception is not limited to causes of action for fraud. The Alabama Supreme Court has held that a plaintiffs' shareholder oppression, breach of fiduciary duty, civil conspiracy, and negligence claims were subject to the fraudulent concealment exception and thus not time barred:

> We have recognized that § 6-2-3 may be 'applied to other torts not arising in fraud in appropriate cases, and applies to a fraudulent concealment of the existence of a cause of action.' [citations omitted] More specifically, this Court has explained, regarding a predecessor of § 6-2-3:

> 'While this statute is usually applicable to cases wherein fraud is the basis of the cause of action, ***it is the settled construction that its purpose is to make available at law the rule theretofore prevailing in equity; and applies to a fraudulent concealment of the existence of a cause of action from the party in whose favor the cause of action exists.*** A party cannot profit by his own wrong in concealing a cause of action against himself until barred by limitation. The statute of limitations cannot be converted into an instrument of fraud.' [citations omitted].

13

*DGB, LLC v. Hinds*, 55 So. 3d 218, 225-226 (Ala. 2010). Similarly, in *Payton v. Monsanto Co.*, the Alabama Supreme Court recognized that claims for negligence, wantonness, breach of a duty to warn, fraud, misrepresentation and deceit, private and public nuisance, trespass, battery, assault, negligent and intentional infliction of emotional distress, and strict liability, were subject to the fraudulent concealment exception, which includes "fraud on the part of the defendant in concealing the wrongdoing". 801 So.2d 829, 834 (Ala.2001).

Alabama's complaint is replete with allegations that the Defendants' fraudulently concealed their wrongdoing. For example, we pleaded that:

¶ 228: The Manufacturers "had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear to them the harms caused by long-term opioid use…"

¶ 229: "Notwithstanding this knowledge…the Manufacturer Defendants have taken steps to avoid detection of, and to fraudulently conceal their conduct" including disguising "their role in the deceptive marketing of chronic opioid therapy by funding and working through biased science, unbranded marketing, third party advocates, and professional associations."

¶ 297: "By misleading the public about the effectiveness of its controlled substance monitoring program, McKesson successfully concealed the facts sufficient to arouse suspicion of the claims" asserted by the State.

¶¶ 343-44: Defendants "undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State of Alabama, that they were undertaking efforts to comply with their obligations under state and federal controlled substances laws…to continue generating profits."

¶ 348: The Manufacturers "distorted the meaning or import of studies they cited and offered them as evidence for propositions that studies did not support," including inventing the term "pseudoaddiction" and "promoted it to the unsuspecting medical community." They also "spent millions of dollars…on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising risks, and promoting sales," thereby duping "the medical community, consumers, and the State of Alabama through their campaign to misrepresent and conceal the truth[.]"

And these are just a few examples. We pleaded many more in paragraphs 31-63, 65-154, 167-

227, 287, 295, 297, 334-350, 353-354, and 387.

Alabama plainly pleaded sufficient facts that, if proved true, would amount to fraudulent concealment that overcomes any statute of limitations issue.

> **b. The State did not have constructive knowledge of the Manufacturers' misconduct.**

The Manufacturers contend that the State had "constructive" knowledge of its claims prior to February 6, 2016, based on a report of the Alabama Drug Abuse Task Force in February 2013.[11] They are wrong. The 2013 report discussed all forms of drug abuse in the State; opioids were only a small part of the report. While the report does note that Alabama had a high number of citizens with prescribed pain medications, it does not even intimate that the volume of opioids in the State in 2013 was due to the Manufacturers' undisclosed efforts to boost opioid sales through deceptive/ false marketing. The Defendants' bad acts are the foundation of Alabama's claims, *see, e.g.,* FAC ¶¶ 64, 67, 71, 77, 81-83, 155-57, 161, 175-76, and those acts were unknown to Alabama in 2013.

The Manufacturers' assertion that their clandestine activities "were in no way concealed or hidden, and would easily have been discoverable by the State" is untenable. Manufacturers' Mem. at 24. How would the State have known in 2013 that the Defendants were feeding the public with false and misleading data, articles, and studies that they wrote or financially sponsored? The Defendants didn't tell us then, and they won't tell us now—at least, not without a court order. That's why States have fought for critical information (*e.g.* ARCOS data) well into 2018.

> **4. The State's DTPA claim is not time-barred.**

In addition to the reasons outlined above, the Defendants' argument that Alabama's Deceptive Trade Practice Claim (Count 2) is time barred is wrong for four reasons.

---

[11] The report is accessible at http://www.alabamaprosecutor.com/Documents/2013_ADTF_Report.pdf.

First, the Defendants wrongly assume that the Attorney General is a "person" to whom the one-year limit applies. The limitation period applies to "the person bringing the action[.]" ALA. CODE § 8-9-14. When filing a DTPA action, the Attorney General is not a "person" bringing an action; he is an extension of the State of Alabama. This dichotomy is supported by the fact that the Act defines "Attorney General" and "Persons" separately, *see* ALA. CODE § 8-19-3(1), (5), and that the definition of "person" makes no mention of the State or the Attorney General: "Person includes but is not limited to natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity" ALA. CODE § 8-19-3(5). Thus, actions brought by the Attorney General are not expressly included in the DTPA's limitations period.

Second, actions brought by the Attorney General are not included in the DTPA's limitations period by "necessary implication." *See, e.g., Bd. of Sch. Comm'rs of Mobile Cty.*, 752 So. 2d at 491. The State Legislature treated the Attorney General differently than private "persons" throughout the DTPA. For example:

- Private "persons" are barred from filing class actions while the Attorney General is allowed "to bring an action in a representative capacity on behalf of any named person or persons." ALA. CODE § 8-19-10(f).

- Unlike private "persons," the Attorney General can receive and investigate complaints, and state agencies, officers, and employees must cooperate with the Attorney General's investigations. ALA. CODE § 8-19-4(a)-(b).

- Unlike private "persons," the Attorney General can also seek temporary restraining orders, preliminary injunctions, and permanent injunctions. ALA. CODE § 8-19-8

- Unlike private "persons," the Attorney General can engage in pre-litigation discovery, seek civil penalties against certain violators, and seek "dissolution", "suspension", or "forfeiture" of "the franchise of any corporation, partnership, or sole proprietorship" after continued violations of an injunctions issued under the DTPA. ALA. CODE § 8-19-9, 11(a)-(c), (f).

The DTPA's statute of limitations is just one of many limits that the Legislature imposed on private plaintiffs, but not on the Attorney General when he represents the State.

Third, if there is **any** question whether the Attorney General is a "person" to whom the limitation applies, the *nullum tempus* doctrine dictates that the limitation does not apply. *Burton*, 549 U.S. at 95-96 ("when the sovereign elects to subject itself to a statute of limitations, the sovereign is given the benefit of the doubt if the scope of the statute is ambiguous").

Fourth, McKesson's cited cases do not change the analysis. McKesson cites only two cases (from 200 years of caselaw) that apply a time bar against the State when it invoked *nullus tempus*: *State v. Mudd*, 143 So. 2d 171 (Ala. 1962), and *State v. Crocker's Estate*, 83 So. 2d 261, 262-64 (Ala. App. 1955).[12] Those cases have no application here. In *Crocker's Estate*, the Alabama Court of Appeals ruled the State could not recover "old age assistance payments" it alleged were illegally paid to the deceased because it failed to make its claim "'within six months after the grant of letters testamentary or of administration[.]'" 83 So. 2d at 261, 262-64 (citation omitted). The court determined that it would be unworkable to give the State the ability to make claims against an estate in perpetuity. *Id.* at 236-64. In *Mudd*, the Alabama Supreme Court determined that the State was barred from collecting unpaid taxes on property more than twenty years after the original property owner's failure to pay the taxes. 143 So. 2d at 172-76. In the absence of a statutory limitations period, the Court determined that a 20-year period of prescription (a rule of repose previously established by case law) applied to the State. *Id*. at 174-76. Even then, the Court limited its holding to the specific facts of that case. *Id*. at 176. But this case is not about collecting unpaid taxes or recovering "old age assistance payments" from a deceased individual; it is a straightforward civil enforcement action governed by an ordinary statute of limitations that, for the reasons set out above, simply does not operate against the State.

---

[12] To the State's knowledge, the Alabama Supreme Court has applied a time-bar in only one other case where the State was named as a party; but in that case the Court applied the bar because it found that the State, though nominally a party, had no real interest in the litigation. *See Miller v. State*, 38 Ala. 600 (1863).

### D. The State's claims are not preempted.

In different sections of their brief, the Manufacturers mention in passing that Alabama's state law claims are preempted by the FDA's approval of their opioids to treat chronic pain, *see* Manufacturers' Mem. at 5-6, 17-18, and incorporate the preemption argument from their supporting memorandum in the Summit County case. *See* Doc. 499-1 at 34-38. The State therefore incorporates the arguments asserted by the Plaintiff Summit County, *see* Doc. 654 at 114-122, and only briefly addresses the preemption argument here.

1. *Presumption against preemption*: As an initial matter, the Court must presume that Alabama's claims are not preempted. States "have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 47, 475 (1996) (citation omitted). This is particularly true where a State protects its consumers from deceptive business practices, *see California v. ARC Am. Corp.*, 490 U.S. 93 (1989), including drug promotion. *See Wyeth v. Levine*, 555 U.S. 555 (2009).

That a drug meets FDA approval does not shield the Manufacturers from state law liability. *See English v. General Elec. Co.*, 496 U.S. 72, 87 (1990) ("the mere existence of a federal regulatory or enforcement scheme…does not by itself imply pre-emption of state remedies."). In *Wyeth*, the United States Supreme Court held that "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Wyeth*, 555 U.S. at 575. To the contrary, Congress "determined that widely available state rights of action provided appropriate relief for injured consumers," *id.* at 574, because "the FDA traditionally regarded state law as a complimentary form of drug regulation." *Id.* at 578. Indeed, the "FDA long maintained that the state law offers an additional, and important, layer of consumer protection" because "[s]tate tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose

18

safety risks promptly." *Id.* at 579.

2. *Not preempted*: FDA approval is a red herring because Alabama's claims are not based on the words the Manufacturers put on their labels; they're based on Manufacturers' conduct toward physicians and consumers. For example, in FAC ¶ 386, the State enumerated 14 "deceptive practices" that the Manufacturer Defendants "aimed … at both prescribing physicians and consumers." None of the 14 alleges false labeling; they are instead based "on a more general obligation – the duty not to deceive." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 506 (1992).

The FDA's approval is bound by the four corners of the label, so FDA-based preemption should share the same boundary. Because the State alleges deception outside the label, the FDA's seal of approval cannot serve as a basis for preemption here—just as other courts have found.[13]

### E. The State sufficiently pleaded causation.

As noted in the introduction, Defendants argue that dismissal is required because Alabama did not plead specific suspicious orders and specific deceptive statements that they made to Alabama physicians. Manufacturers' Mem. at 4-5; McKesson Mem. at 19-20. But the Supreme Court has held that Rule 8 "does not require detailed factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Instead, Alabama's complaint need only plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and that our claim to relief is "plausible on its face." *Id.* Our 128-page complaint easily does that.

### 1. The State adequately pleaded actual and proximate causation.

1. *Actual (but-for) causation*: Due to page limitations, we cannot cite/quote every factual allegation made in our 128-page complaint. Instead, we direct the Court to paragraphs 65-154 for

---

[13] *See In re Opioid Litig.*, Index. No. 40000/2017, slip op. at 9 (Ex. H); *State of Washington v. Purdue Pharma. L.P.*, No. 17-2-25505-8, slip op. at 2 (Ex. D). *State of Oklahoma v. Purdue Pharma, L.P.*, No. 2017-816, slip op. at 1 (Ex. C);

specific deceptive messages that Purdue made to physicians and the public and paragraphs 155-227 for similar deceptive messaging from Endo.  Examples of these detailed allegations include:

> ¶ 72:  Purdue pleaded guilty to a federal felony because "it had lied to doctors about OxyContin's abuse potential;"

> ¶ 74: "Purdue inundated Alabama prescribers with promotional sales visits to deliver its message that opioids were appropriate for the treatment of chronic pain;"

> ¶ 78:  Purdue used the American Pain Foundation and American Pain Society as "front groups" to put out patient education materials and treatment guidelines that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks;"

> ¶ 160:  Endo trained its sales representatives to tell Alabama prescribers that "Endo's opioids had a lower potential for abuse because they were 'designed to be crush resistant,' even though the 'clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER;' and that drug seeking behavior was a sign  of undertreated pain rather than addiction;"

> ¶ 167:  Endo operated a website, www.opana.com, that deceptively stated that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

> ¶ 170: Endo operated another website, www.painaction.com, that similarly stated that "most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

These allegations—and dozens more like them—meet *Iqbal's* low standard for pleading deceptive statements that were a but-for cause of Alabama's injuries/claims.[14]

The same is true regarding the failure to report suspicious orders.  We opened this brief with the pleaded example of ████████████████████████████████████ and not reporting these suspicious orders to the State.  *See* FAC ¶ 273, 403, 409.  That example alone

---

[14] The Manufacturers cite the earlier Chicago decision—*City of Chi. v. Purdue Pharma, L.P.*, 211 F. Supp. 3d 1058 (N.D. Ill. 2016)—for the proposition that Alabama also had to plead instances where medically unnecessary prescriptions were written because of their deceptive acts.  But that decision is distinguishable because Chicago alleged that Purdue violated Chicago's False Statement Act (MCC §§ 1-21-010) and Chicago's False Claims Act (MCC §§ 1-22-020), which are both premised on fraud and conspiracy. *Id.* at 1079-84.  Alabama's complaint (at present) does not plead a fraud or conspiracy-based claim, so even if it's correct (and we dispute it), the *Chicago* ruling is inapposite.

"allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. But we also pleaded that ███████████████████████████████████ ███████████████████████████████████, FAC ¶ 270, and "this high volume alone should have alerted McKesson that it was filling suspicious orders." FAC ¶ 272. And, as we pleaded in the complaint, Alabama "expects other egregious examples of McKesson failing to fulfill its statutory duty to prevent diversion will be discovered as additional ARCOS data and other relevant information is obtained as the litigation progresses." FAC ¶ 274.

2. *Proximate Cause*: Under Alabama law, "foreseeability is the cornerstone of proximate cause." *Alabama Power Co. v. Taylor*, 306 So. 2d 236, 249 (Ala. 1975). While Defendants are correct that a subsequent intervening act can break the causal chain, Alabama law requires that the subsequent act must have been unforeseeable and must have been sufficient in and of itself to have been the sole "cause in fact" of the injury. *Vines v. Plantation Motor Lodge*, 336 So.2d 1338, 1339 (Ala. 1976). If Defendants could have reasonably foreseen the subsequent act(s) might occur, then Defendants' actions are still considered a proximate cause under Alabama law. *Id.* Thus, contrary to Defendants' assertions, "[f]or the cause of an injury to be its proximate cause it need not be the sole proximate cause." *Alabama Power Co.*, 306 So. 2d at 249.

Alabama sufficiently pleaded facts that, if proved true at trial, would show that the State's injuries were a foreseeable result of Defendants' actions, regardless of whether other acts occurred after the Defendants acted. Again, it is impossible with the page limitation to recite every pleaded fact that makes it "plausible on its face," *Iqbal,* 556 U.S. at 678, that Defendants could have foreseen that their actions could result in an opioid epidemic. But here are a few examples:

> ¶ 74: Purdue could have foreseen that "inundat[ing] Alabama prescribers with promotional sales visits to deliver its message that opioids were appropriate for the treatment of pain" would cause more doctors to prescribe more opioids. That was the point, after all.

¶ 76:   Purdue could have foreseen that influencing the American Pain Foundation and American Pain Society to release "materials and treatment guidelines that supported the use of opioids for chronic pain" would cause more doctors to prescribe more opioids.  Again, that's the point.

¶ 92:   Purdue could have foreseen that advising doctors on the false concept of "pseudoaddiction" would prevent doctors from backing off the ever-growing number opioid prescriptions.  Again, that's why they did it.

¶ 160:  Endo could have foreseen that telling prescribers that "drug seeking behavior was a sign of undertreated pain rather than addiction" would exacerbate the growing crisis.  That's why they said it.

¶ 167:  Endo could have foreseen that creating the website, www.opana.com, that deceptively stated that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted" would ensure that more doctors would prescribe it.  That's why they wrote it.

¶ 273, ¶ 409:  McKesson could have foreseen that distributing ███████ █████████████████ would lead to diversion and/or addiction and death.  And that's what happened.

In short, a State flooded with opioids was not only a foreseeable result of the Defendants' actions; it was the ***reason*** they acted.  More pills meant more money, consequences be damned.

Causation is a very fact-intensive analysis, so proximate cause is generally "a question of fact to be determined by a jury." *Green v. Alabama Power Co.*, 597 So. 2d 1325 (Ala. 1992).  Indeed, "[p]roximate cause becomes a question of law only when there is a ***total lack of evidence*** from which the factfinder can reasonably infer" a causal relation exists between the defendant's conduct and the resulting injury to the plaintiff.  *Id.* at 1328 (emphasis added).  300+ paragraphs of facts, *see* FAC ¶¶ 31-336, is not a "total lack of evidence."  *Id.*  It's enough to let a jury decide.

### 2. The Learned Intermediary Doctrine does not break the causal chain.

The Manufacturer Defendants cite the Learned Intermediary Doctrine ("LID") to argue that prescribing physicians were learned, intervening actors who broke the chain of causation.  Their argument fails to warrant Rule 12(b) dismissal because Alabama pleaded that the intermediary

prescribers were not learned; they were "duped."[15]  FAC ¶ 348.  That creates a jury question.

Under Alabama law, if the Manufacturers' warning is "inadequate or misrepresents the risk, the manufacturer remains liable for injuries sustained by the patient." *Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 673 (Ala. 2014).  Indeed, in *Wyeth*, the allegation that a pharmaceutical company "falsely and deceptively misrepresented or knowingly suppressed facts" about the medication that "materially misinformed and misled" the prescriber about the side effects of the drug was sufficient to circumvent the LID. *Id.* at 655.  We pleaded the same allegation: "the Manufacturer Defendants duped the medical community, consumers, and the State of Alabama through their campaign to misrepresent and conceal the truth about the opioid drugs they were aggressively pushing in the State." FAC ¶ 348. In fact, we quoted several specific examples of Defendants' misinformation campaign in the previous section regarding proximate cause. *See supra* at Section I(E)(1).

Defendants' contrary assertion that prescribers were sufficiently "learned" constitutes a factual dispute for a jury to decide.  *See, e.g., Wiltgen v. Ethicon, Inc.*, No 12-CV-2400, 2017 WL 4467455, at *7 (N.D. Ill. Oct. 6, 2017) ("Doctors who have not been sufficiently warned of the harmful effects of a drug cannot be considered learned intermediaries and the adequacy of warnings is a question of fact, not law, for the jury to determine.") (citation omitted); *Toole v. McClintock*, 999 F.2d 1430, 1433 (11th Cir. 1993) (the adequacy of the warning was examined by a jury, which concluded a different warning would have caused the physician to warn the patient).

---

[15] Alabama courts have applied the LID to failure to warn cases, not deceptive marketing cases.  *See Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 674 (Ala. 2014) (The LID is "an absolute defense for 'failure to warn' cases."); *Fields v. Eli Lilly and Co.*, 116 F. Supp. 3d 1295, 1303 (N.D. Ala. 2015) (Alabama applies the LID where the plaintiff asserts a failure to warn claim against a manufacturer).  So, it is debatable whether this federal court should even apply the state-law LID to the State's complaint.

## II.    The Defendants' Count-Specific Arguments Fail.

### A.  <u>Count 1</u>:  The State adequately pleaded its Public Nuisance claim.

Neither of the Defendants' attacks against the State's public nuisance claim has merit.

#### 1.  The State alleged an interference with a public right.

Public nuisance is statutory in Alabama and is defined as a nuisance "which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." ALA. CODE § 6-5-121 (1975).

Defendants' first argument is that Alabama fails to allege an interference with a "public right" and instead alleges damages to a collection of private rights.  *See* McKesson Mem. at 21; Manufacturers' Mem. at 16.  But Alabama pleaded that Defendants' actions continue to threaten the public's "health, safety, and welfare," FAC ¶ 373, and have caused public injuries such as statewide "addiction and abuse," "an elevated level of crime," and "loss of tax revenues for the State[.]" FAC ¶ 376.  The People's right to "health, safety, and welfare" is the most public of public rights.  The Alabama Legislature even said so, in the public nuisance statute, when it extended to municipalities the ability to "abate or enjoin any public nuisance injurious to the ***health***, morals, ***comfort, or welfare*** of the community."  ALA. CODE § 6-5-122.

That the State invoked a statutorily enumerated list of public rights is more than enough to satisfy Rule 8's general pleading requirement.  That Alabama ranks #1 in the nation in opioid prescriptions per person establishes that the nuisance has spread wide enough to affect the general public, FAC ¶ 357, rather than a handful of private individuals.  So, the Court should reject this argument, just as the state courts did in Kentucky and Alaska.  *See* Exhibits B and F.

#### 2.  Defendants' control argument is without merit.

Defendants' second argument is that they cannot be liable for abating the public nuisance

because other parties controlled the opioid distribution at some point. McKesson Mem. at 20-21; Manufacturers' Mem. at 16-17. Both cite the same Alabama case, *Tipler v. McKenzie Tank Lines*, 547 So. 2d 438 (Ala. 1989), to support their argument. But the Defendants misread *Tipler*.

James Tipler was injured by a truck that was driving to pick up liquid sulfur from an Exxon facility. Tipler added Exxon as a Defendant under the theory that the trucks driving to and from its facility created a public nuisance. Importantly, the Alabama Supreme Court applied Alabama's proximate cause standard to determine whether Exxon had "control" over a public nuisance:

> we must look to the particular facts of each case to determine whether the party charged with creating and maintaining a nuisance has engaged in a course of conduct, or has permitted to exist a set of circumstances, that, in its natural and foreseeable consequences, proximately caused the hurt, inconvenience, or damage complained about.

547 So.2d at 440-41. The Court said Exxon did not exert sufficient control because

> [i]t is undisputed that Exxon had no agency relationship with either of the other defendants; that Exxon had no right of control, and exercised no control, over the hauling activities from its facility; and that Exxon did not engage in any activity relating to the construction or maintenance of the public roads here involved or relating to traffic control upon those roads.

*Id.* at 440. In other words, Exxon had nothing to do with the accident.

That's not the case here. Unlike Exxon, the State pleaded that the Manufacturers exercised control over their production and marketing of opioids, and that the opioid epidemic was a foreseeable result of their deceptive marketing campaign. Unlike Exxon, McKesson was in control of the distribution of nearly ████████████████████████████████

████████████████ The opioid epidemic was a foreseeable result of these controlled acts.

In short, "control" equals "proximate cause" under Alabama law. *See id.* at 440-41. Because the State adequately pleaded that each Defendant was a proximate cause of the opioid epidemic, the State adequately pleaded that each Defendant had control of the public nuisance.

**B.** **Count 2**:  **The State adequately pleaded its claim under the Alabama Deceptive Trade Practices Act.**

Defendants levy multiple attacks on the State's DTPA claim.  None have merit.  But before we address the specific attacks, we alleviate any notion that the State failed to plead sufficient facts to meet the statutory elements of its DTPA claims.

### 1.  The State sufficiently pleaded multiple DTPA violations.

Alabama's DTPA prohibits 26 specific acts of deception, plus one catch-all provision.  *See* ALA. CODE § 8-19-5. The State alleged that Defendants violated (at least) the following provisions:

- Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services. ALA. CODE § 8-19-5(2);
- Representing that goods have characteristics, uses, benefits, or qualities that they do not have. ALA. CODE § 8-19-5(5);
- Representing that goods or services are of a particular standard, quality, or grade, if they are of another. ALA. CODE § 8-19-5(7);
- Advertising goods or services with the intent not to sell them as advertised. ALA. CODE § 8-19-5(9); and
- Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce. ALA. CODE § 8-19-5(27).

FAC ¶ 384.  The State pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" for each.  *Iqbal,* 556 U.S. at 678.

#### a.  The Manufacturers violated the DTPA.

Again, the State lacks the briefing space to cite/quote all the pleaded facts that would permit a factfinder to determine that the Manufacturers violated Alabama's DTPA.  So, we again direct the Court to paragraphs 65-154 for Purdue's specific acts and paragraphs 155-227 for Endo's deceptive acts.  Examples of these detailed allegations include:

- ¶ 72:  Purdue admitted, in court, that "it had lied to doctors about OxyContin's abuse potential;"

¶ 74:  Purdue "inundated Alabama prescribers with promotional sales visits to deliver its message that opioids were appropriate for the treatment of chronic pain;"

¶ 78:  Purdue used the American Pain Foundation and American Pain Society as "front groups" to "to put out patient education materials and treatment guidelines that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks;"

¶ 160:  Endo trained its sales representatives to tell Alabama prescribers that "Endo's opioids had a lower potential for abuse because they were 'designed to be crush resistant,' even though the 'clinical significance of INTAC Technology or its impact on abuse/misuse has not been established for Opana ER;' and that drug seeking behavior was a sign of undertreated pain rather than addiction;"

¶ 167:  Endo operated a website, www.opana.com, that deceptively stated that "most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."

¶ 170:  Endo operated another website, www.painaction.com, that similarly stated that "most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

If proved true, these facts would establish that both Manufacturers violated subsections (5), (7), and (9) of Section 8-19-5, which deal with various forms of false advertising.

As for Section 8-19-5(2), which prohibits Defendants from causing confusion as to "the approval or certification of goods and services," the State alleged that Endo wrongly promoted Opana ER as "crush-resistant," (and thus abuse resistant), even though "the FDA advised Endo that it could not market the new Opana ER as abuse-deterrent."  FAC ¶ 175.  As for Purdue, the State alleged that its deceptive marketing messages and deceptive third-party, unbranded materials were neither "reviewed or approved by the FDA."  FAC ¶ 80.  The State also alleged that Purdue touted its "FDA-approved label [that] directs 12-hour dosing," even though Purdue knew that "OxyContin fails to provide 12 hours of pain relief to many patients."  FAC ¶ 131.

And, even if these facts do not fit within the four corners of the DTPA's specific, enumerated subsections, each one constitutes a violation of the catch-all provision.

### b. McKesson violated the DTPA.

1. The State alleged that McKesson (who hired away 5 DEA employees) claimed that it had "put significant resources towards building a best-in-class controlled monitoring program to help identify suspicious order and prevent prescription drug diversion," FAC ¶ 296, even though McKesson failed to report 'suspicious orders' originating from the State, FAC ¶ 275, including the example of ███████████████████████ FAC ¶ 273. McKesson's deception regarding its commitment to reporting suspicious orders violates ALA. CODE § 8-19-5(7)'s prohibition against "representing that goods or services are of a particular standard, quality, or grade, if they are of another." And if that section does not apply, then the same acts meet the catch-all's prohibition against "any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5(27).

2. McKesson argues that the pleaded deceptive statements are nothing more than "broad promotional statements" that are not actionable because the State did not allege "that such statements were likely to be relied upon by or posed any harm to members of the public." McKesson Memo at 24. This argument has three flaws.

First, "broad promotional statements" can be deceptive, and thus actionable, under the DPTA. All Alabama must show is that (a) McKesson represented its services were of one standard or quality (*i.e.* "best-in-class"), while in reality, (b) they were of another (*i.e.* non-existent). ALA. CODE § 8-19-5(7). Whether the State can prove this divide is a question for a factfinder.

Second, unlike federal law, which requires proof that Defendants' acts "mislead customers," 15 U.S.C. § 45(a)(1), Alabama's DTPA contains no such requirement. To add such a requirement to Alabama's statute, when the Legislature did not, would violate the omitted case canon of construction. *See Pace v. Armstrong World Indus. Inc.*, 578 So.2d 281, 284-85 (Ala.

1991); Antonin Scalia & Bryan Garner, *Reading Law: the Interpretation of Legal Texts* 93 (2012).

Third, even if the court reads this extra requirement into Alabama's statute, Alabama has pleaded that McKesson's deceptive acts harmed the public. McKesson's deceptive public statements concealed its failure to investigate and report suspicious orders, and as a result, placed Alabama consumers in the path of the opioid crisis. *See* FAC at ¶¶ 295-98, 387-88. Put another way, McKesson's "nothing to see here" attitude had the effect of assuring consumers that there was no cause for alarm, and that the pharmaceutical industry could be trusted—thus fueling the opioid crisis.

### 2. Claims brought under the DTPA are not subject to Rule 9(b)'s heightened pleading standard for fraud claims.

All Defendants assert that the State's DTPA claims fail because they do not meet Rule 9(b)'s heightened pleading requirement for fraud claims. *See, e.g.* McKesson Mem. at 23. This argument fails for two reasons.

First, Rule 9(b) does not apply because a DTPA claim is not a fraud claim. Candidly, courts are split as to whether state deceptive trade practice claims are subject to the heightened pleading requirement of Rule 9(b).[16] We believe that the Second Circuit's reasoning in *Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005) is most on point, and the Court should apply it here. In *Pelman*, the Second Circuit determined that claims raised by New York under its general consumer fraud statute are not subject to the requirements of Rule 9(b) because

---

[16] *See, e.g., Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005)(holding that Rule 9(b) does not apply to state deceptive trade practice claims); *Consumer Fin. Prot. Bureau v. Frederick J. Hanna & Assocs., P.C.,* 114 F. Supp. 3d 1342, 1372 (N.D. Ga. 2015)(same); *Guerrero v. Target Corp.,* 889 F. Supp. 2d 1348, 1354–55 (S.D. Fla. 2012)(same); *E-Shops Corp. v. U.S. Bank Nat. Ass'n,* 678 F.3d 659, 665 (8th Cir. 2012)(holding that Rule 9(b) does apply); *Horner v. Mortg. Elec. Registration Sys., Inc.,* 711 F. App'x 817 (9th Cir. 2017)(same); *PB Prop. Mgmt., Inc. v. Goodman Mfg. Co., L.P.,* No. 3:12-CV-1366-J-20JBT, 2013 WL 12172912, at *6 (M.D. Fla. Aug. 28, 2013)(same); *Reid v. Unilever U.S., Inc.,* 964 F. Supp. 2d 893, 916 (N.D. Ill 2013)(same).

an action brought under the statute "does not require proof of the same essential elements (such as reliance) as common-law fraud[.]" *Id.*[17]

The same is true in Alabama. Alabama law has a distinct action for fraud, with distinct elements: "(1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation." *Deng v. Scroggins*, 169 So. 3d 1015, 1024 (Ala. 2014). The DTPA requires different proof—*i.e.* that Defendants knowingly engaged in "unconscionable, false, misleading, or deceptive act[s] or practice[s] in the conduct of trade or commerce." ALA. CODE §§ 8-19-5(27); 8-19-11(b). Unlike fraud, the State need not prove that the false statement was made regarding a material fact, nor does it need to prove reliance.[18] Because DTPA claims do not require the same proof as fraud claims, they are not subject to Rule 9(b)'s pleading standard for fraud claims.[19] *See Pelman*, 396 F.3d at 511.

Second, even if Alabama must meet Rule 9(b)'s requirement, it has. Despite its additional pleading requirement, Rule 9(b) "should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 503 (6th Cir. 2008). Indeed, "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2);

---

[17] *See also State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla. Dist. Ct. App. 2004) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

[18] One provision under the DTPA not alleged in the FAC does require specific intent to defraud a consumer. *See* ALA. CODE § 8-19-5(25). This is the only provision in the DTPA that requires such intent, meaning that no other provisions—including the violations alleged by the State—require reliance by implication.

[19] The *Pelman* court did indicate that claims raised under New York's false advertising statute would be subject to the provisions of Rule 9(b) because that statute does require proof of reliance. *Pelman*, 396 F.3d at 511. However, that does not affect the application of *Pelman* to this case because the DTPA claims related to the Defendants' deceptive conduct do not require proof of reliance.

and, when Rule 9(b) is "read against the backdrop of Rule 8, it is clear that the purpose of Rule 9 is not to reintroduce formalities to pleading, but is instead to provide defendants with a more specific form of notice as to the particulars of their alleged misconduct." *Bledsoe*, 501 F.3d at 503.

Applying these principles, Alabama's 128-page complaint provides Defendants with ample, fair notice of the deceptive marketing at issue—particularly the 89 paragraphs of detailed allegations against Purdue, *see* FAC ¶¶ 65-154, and the 72 detailed paragraphs against Endo, *see* ¶¶ 155-227. These detailed allegations, which we have quoted from elsewhere, make it possible for Defendants to prepare an informed and responsive answer. *SNAPP, Inc.*, 532 F.3d at 504.

### 3. The State does not have to plead an "unconscionable act."

The Manufacturers argue that the State's DTPA catch-all claim (FAC ¶ 384(e)) must be dismissed because the State failed to plead an "unconscionable act." Manufacturers' Mem. at 15. The catch-all provision, ALA. CODE § 8-19-5(27), prohibits "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." The use of the word "or" in the statute is disjunctive, meaning that the State can prove its claim by proving that the Defendants' conduct was unconscionable *or* false *or* misleading *or* deceptive; it need not prove all four. And even if we did, the State has alleged that the Manufacturers engaged in a course of conduct that created, exacerbated, and continues to fuel an opioid epidemic that kills nearly one Alabamian per day. It's not hard to imagine a juror finding that conduct "unconscionable."

### 4. The State's DTPA claim is not precluded by its unjust enrichment claim.

McKesson argues that the State's DTPA claim is precluded because the State pleaded an unjust enrichment claim. McKesson Mem. at 27. McKesson is correct that the Alabama DTPA takes the place of certain, ***statutorily enumerated*** causes of action:

> An election to pursue any civil remedies available at common law, by statute or otherwise, for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under this chapter shall exclude and be a surrender of all rights and remedies available under this chapter.

ALA. CODE § 8-19-15(b). But, as the Court can see from the statute's plain text, "unjust enrichment" is not one of the enumerated claims that the DTPA replaces. Thus, McKesson's argument violates the omitted case canon: "Nothing is to be added to what the text states or reasonably implies (*casus omissus pro omisso habendus est*). That is, a matter not covered is not covered." Scalia, *Reading Law* 93; *see also Pace*, 578 So.2d at 284-85 (applying the canon). Had the Legislature intended to force the State to choose between the DTPA and an unjust enrichment claim, it could have. That it didn't force the State to choose means that the State can plead both claims. *See Scalia, supra* at 94 ("What the legislature would have wanted it did not provide, and that is the end of the matter.")

### 5. The *Noerr-Pennington* doctrine is a red herring.

Citing the *Noerr-Pennington* doctrine, McKesson argues that "insofar as the State's claim is based on [its] alleged advocacy before courts, regulators, or Congress, it is barred by the First Amendment and should be dismissed on that basis." McKesson Mem. at 24 (internal citation omitted). We agree with McKesson's recitation of the doctrine; it's simply a red herring.

Count 2 (FAC ¶¶ 382-88) does not raise a claim that McKesson deceived the Department of Justice, the D.C. Circuit Court, or any other federal agency. Rather, Alabama claims that McKesson unlawfully deceived Alabamians with public statements received by Alabamians. *See* FAC ¶ 387. Thus, none of the State's DTPA claims are due to be summarily dismissed, and the question of whether the State can offer evidence of false statements made to the government and heard by the public can be handled at the appropriate time—*i.e.* motions in limine.

### 6. The State complied with the DTPA's non-jurisdictional pre-litigation conference provision.

Section 8-19-8(a) of the Alabama Code states that the Attorney General "shall, before initiating any legal proceedings is contemplated, allow such person a reasonable opportunity to appear before the Attorney General or district attorney and solve the dispute to the parties' satisfaction." McKesson argues that dismissal is required because Alabama "has not pled compliance" with this provision. McKesson Mem. at 27. This argument fails for four reasons.

First, a pre-complaint meeting of the parties is not a requisite element of a DTPA claim; thus, the State was not required plead compliance with the statute to satisfy Rule 8(a)(2).

Second, Alabama gave McKesson "a reasonable opportunity to appear before the Attorney General to resolve the dispute." ALA. CODE § 8-19-8(a). Alabama was a member of the multistate group that investigated and attempted to resolve its issues with McKesson. McKesson had an on-going opportunity to resolve this dispute with the group—and thus with Alabama—but never did.

Third, the Attorney General is not required to meet with a Defendant if he determines that the Defendant "designs…to continue practices unlawful under this chapter." *Id.* The State has invoked this exception by requesting an injunction preventing McKesson from continuing its "unfair and deceptive acts and practices[.]" FAC ¶ 451. Frankly, how could we make any other decision when McKesson continues conducting business as usual, notwithstanding multidistrict litigation, a multistate investigation, federal investigations, a 60 Minutes exposé, public outcry, and ARCOS evidence that confirms McKesson's role in the opioid epidemic?

Fourth, nothing in Section 8-19-8(a) requires dismissal of an action—or any other jurisdictional punishment—if the Attorney General does not meet with a Defendant before filing suit. At most, the failure to plead satisfaction of Section 8-19-8(a) is harmless error given that McKesson is actively meeting with the State Attorneys General by order of the Court.

**C.  Count 3:  The State's drug-related nuisance claim should be dismissed.**

Defendants' acts constitute a "drug-related nuisance" as that term is defined by statute:
"[t]he use, sale, distribution, possession, storage, transportation, or manufacture of any controlled
substances in violation of the controlled substances acts, or similar act of the United States or any
other state."  ALA. CODE § 6-5-155.1(3)(b).  Thus, the State pleaded Count 3 in good faith.

That said, upon reflection, the State agrees that the statute is perhaps better read to target
"properties used in connection with the illegal trade, *i.e.* drug houses," McKesson Mem. at 28,
rather than a statewide public nuisance.  Because the remainder of Alabama's claims are viable
and grant the same remedy, the State does not oppose dismissal of Count 3.

**D.  Count 4:  The State adequately pleaded a claim under the Alabama Uniform
Controlled Substances Act.**

Count 4 generally alleges that each of the Defendants violated Alabama's Controlled
Substance Act ("ACSA") by failing to report statutorily-required suspicious orders.  FAC ¶¶ 401-
16.  None of their arguments to the contrary warrants Rule 12(b) dismissal.

**1.  The State sufficiently alleged that McKesson violated the ACSA.**

1. The ACSA requires that registered distributors like McKesson must keep records in
conformance with "federal law and with any additional rules issued by the State Board of Medical
Examiners, the State Board of Health, or the State Board of Pharmacy."  ALA. CODE § 20-2-56.
Rule 680-X-3-.05(2) of the State Pharmacy Board rules requires

> Such manufacturers, wholesalers, or distributors doing business in the State of
> Alabama who sell, furnish, give away, or otherwise dispose of controlled
> substances drugs enumerated in Schedule I, II, III, IV, or V or precursor agents used
> to manufacturer such controlled substances to a registrant other than another
> manufacturer or wholesaler, shall submit to the Alabama State Board of Pharmacy
> legible copies of records and reports required by the Drug Enforcement
> Administration concerning increases in purchases or high or unusual volumes
> purchased by pharmacies within 30 days.

By its plain text, this rule imposes a duty on McKesson to submit to the Pharmacy Board a copy of every suspicious order "report required by the [DEA]." The State pleaded numerous facts that would prove McKesson violated this rule when it should have, but did not, submit suspicious order reports to the DEA and state Pharmacy Board—including, but not limited to, reports regarding its shipment of ███████████████████████████████████████████████ ███████████████ FAC ¶ 409.

2. McKesson counters that the rule "merely requires McKesson to forward to BOP *legible copies* of the records and reports that it submits to the DEA and that it does not create an independent obligation under Alabama law to generate reports concerning 'suspicious orders' of opioids." McKesson Mem. 13. But McKesson's emphasis on "legible copies" is sleight of hand, designed to shift focus away from the Rule's truly operative phrase, "required by." Again, here's the rule, with the proper emphasis:

> Such manufacturers, wholesalers, or distributors … shall submit to the Alabama State Board of Pharmacy legible copies of records and reports *required by the Drug Enforcement Administration* concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days.

ALA. ADMIN. CODE r. 680-X-3-.05(2) (emphasis added). As the plain text shows, any time DEA/ federal rules require McKesson to submit a suspicious order report, McKesson must submit a report to the state Pharmacy Board. It does not matter whether McKesson *actually* submitted a report to the DEA; all that matters is that McKesson was "*required by*" federal rules to submit a report. If the Pharmacy Board merely wanted legible copies of McKesson's submissions to DEA, as McKesson argues, the Board would have written the rule this way:

> Such manufacturers, wholesalers, or distributors … shall submit to the Alabama State Board of Pharmacy legible copies of records and reports ~~required by~~ **submitted to** the Drug Enforcement administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days.

But McKesson must take the Rule as it's written, not as McKesson wants it written.

>    **2.   The State sufficiently alleged that the Manufacturers violated the ACSA.**

1. *The violation*: The same ACSA provision and State Pharmacy Board Rule impose the same duty to report suspicious orders on "manufacturers" like Endo and Purdue. *See* ALA. CODE § 20-2-56; ALA. ADMIN. CODE r. 680-X-3-.05(2).

The State pleaded sufficient facts to establish that the Manufacturers had knowledge of suspicious orders and failed in their statutory duty to report them. For example, the State alleged that the Manufacturers agreed with McKesson to give charge-back rebates in exchange for information about individual doctors who were overprescribing opioids. FAC ¶ 267. Armed with this charge-back data, the Manufacturers had specific knowledge about suspicious orders, and they had detailed information to monitor those orders. FAC ¶¶ 306, 316, 317. Further, the Manufacturers knew about the unprecedented volume of addictive opioids being funneled to Alabama between 2006 and 2014, yet despite that knowledge, they did not report any suspicious orders to the state Pharmacy Board. FAC ¶¶ 75, 272, 275. When taken as true, any of these pleaded facts (individually or collectively) would establish a violation of the ACSA.

2. *Knowledge of orders*: The Manufacturers argue that their only duty is "to monitor pharmacy orders *only* on the distributors who sell to pharmacies." Manufacturers' Mem. at 10 (emphasis in original). Even if that was true—and such a limitation is not contained in the rule's plain text—it makes no difference. The State alleged that the Manufacturers "had knowledge of increases in purchases or high or unusual volumes purchased by pharmacies such as Star Discount Pharmacy, Inc., Propst Discount Drugs, Inc. and Hazel Green Pharmacy." FAC ¶ 409. So, under the Manufacturers' reading of the rule, the State has sufficiently pleaded a claim. If Defendants dispute its truth, that's a question for the factfinder.

3. *Manufacturers' Duty*: It is possible that Manufacturers are instead arguing that only distributors have a duty to report suspicious orders while manufacturers and wholesalers do not. Again, here's the rule, with the portion Manufacturers highlight in bold:

> Such manufacturers, wholesalers, or distributors doing business in the State of Alabama who sell, furnish, give away, or otherwise dispose of controlled substances drugs enumerated in Schedule I, II, III, IV, or V or precursor agents used to manufacturer such controlled substances ***to a registrant other than another manufacturer or wholesaler***, shall submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days.

ALA. ADMIN. CODE r. 680-X-3-.05(2). If the Manufacturers believe the highlighted phrase eliminates manufacturers' and wholesalers' duty to report; they are mistaken. The bold language modifies the phrase "precursor agents used to manufacturer or wholesaler," not the whole rule. To read that phrase to exempt manufacturers and wholesalers from the entire rule would be to nullify the opening phrase "Such manufacturers, wholesalers, or distributors." If the Pharmacy Board had wanted the duty to report to apply only to distributors, it would have written the rule thusly:

> ~~Such manufacturers, wholesalers, or d~~ [20]**D**istributors doing business in the State of Alabama . . . shall submit to the Alabama State Board of Pharmacy legible copies of records and reports required by the Drug Enforcement administration concerning increases in purchases or high or unusual volumes purchased by pharmacies within 30 days.

ALA. ADMIN. CODE r. 680-X-3-.05(2). But the Pharmacy Board included "Such manufacturers, [and] wholesalers" in the rule, and this Court must give some effect to the its choice.

### 3. The State's ACSA claim seeks declaratory relief, more so than damages.

All Defendants note that the ACSA does not provide for damages as a remedy. But that argument is largely beside the point. In its Prayer for Relief, the State cited its DTPA, nuisance,

---

[20] The State intentionally struck through this phrase to illustrate how the rule would have to have been written to suit the Manufacturers' interpretation.

negligence, and wantonness claims—not the ACSA—as warranting damages.  FAC ¶ 456.  The State only requested "a declaration that all Defendants have violated the Alabama Uniform Controlled Substances Act."  FAC ¶ 452.  And with good reason: securing a declaration that Defendants violated the ACSA establishes duty and (further) proves negligence *per se*.

That said, nothing in the ACSA prohibits or precludes the State from seeking damages that result from a violation.  Indeed, the Defendants' failure to cite any Alabama caselaw foreclosing that opportunity—and instead relying on two non-Alabama cases[21]—seemingly confirms that the State is not prohibited from seeking damages under the ACSA.  Regardless, the ACSA's silence on a damages remedy is not a reason to dismiss the State's viable claim for declaratory relief.

### E. Count 5:  The State adequately pleaded its negligence claim.

Under Alabama law, an actionable negligence claim requires the State to show that the Defendants owed a duty, the Defendants breached that duty, causation, and damages.  *Glass v. Birmingham Southern R. Co.*, 905 So. 2d 789, 794 (Ala. 2004).  The Defendants argue that the State failed to plead sufficient facts to establish the first three elements.  The State has established that Defendants' actions caused the State's injuries in other parts of this brief; we do not duplicate those efforts here.  Instead, we focus on the Defendants' duties and their breach of those duties.

### 1.  The State adequately pleaded the existence of multiple duties.

The Defendants owed multiple duties to the State and/or its citizens, any one of which is sufficient to avoid summary dismissal under Rule 12(b).

### a.  The Defendants owed a common-law duty of reasonable care.

1. In Alabama, "every person owes every other person a duty imposed by law to be careful"

---

[21] *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010); *Safe Sts. V. Alternative Holistic Healing, LLC*, No. 1:15-cv-00349-REB-CBS, 2016 WL 223815, at *3 (D. Colo. Jan. 19, 2016), *aff'd*, 859 F.3d 865 (10th Cir. 2017).

not to harm one another. *Southeastern Greyhound Lines v. Callahan*, 13 So.2d 660, 663 (Ala. 1943). The "key factor" for determining whether this common-law duty of care exists is the "foreseeability" of the harm that might result if care is not exercised. *Taylor v. Smith*, 892 So. 2d 887, 892 (Ala. 2004) (emphasis original) (quoting *Key v. Compass Bank, Inc.*, 826 So.2d 159, 170 (Ala. Civ. App. 2001)). "In determining foreseeability, it is not necessary to anticipate the *specific* event that occurred, but only that some general harm or consequence would follow." *Smith v. AmSouth Bank, Inc.*, 892 So.2d 905, 910 (Ala. 2004) (emphasis original). Therefore, at the pleading stage, the State need only allege facts that, if taken as true, establish that Defendants could foresee that their lack of care would harm the State and/or its citizens.

As addressed throughout this brief, Alabama's opioid epidemic was a foreseeable result of Defendants' bad acts. This should be beyond dispute, as the federal and state laws governing the manufacture, distribution, and marketing of controlled substances like opioids were promulgated to prevent harms such as addiction, abuse, and diversion from occurring. For example, as pleaded in our complaint, the DEA reminds registrants that their failure to meet federal requirements could result in a "substantial and detrimental effect on the health and general welfare of the American people." FAC ¶ 252.

2. McKesson tries to avoid its duty of care by passing it off onto others—*i.e.* criminal diversion eliminates McKesson's duty. For starters, not all of McKesson's bad acts lead to criminal diversion. Sometimes, it leads to overdosing, as it did in the wrongful death lawsuit of the person who, as previously mentioned, received 3,600 oxycodone pills. FAC ¶ 409.

As for the pills that are criminally diverted, foreseeability controls the duty analysis—just as it does for causation. More specifically, the conduct of a third party intending to cause harm, even if criminal, does not vitiate the duty of care owed by a defendant—as long as that defendant

realized or should have realized that its conduct involves an unreasonable risk of harm to another.[22]
*City of Mobile v. Largay*, 346 So. 2d 393, 402 (Ala. 1977); *see also* Restatement (Second) of Torts
§ 302B, cmt. e (providing examples of actions sufficient to sustain liability, including where "the
actor's own affirmative act has created or exposed the other to a recognizable high degree of risk
of harm through such misconduct, which a reasonable man would take into account"); *Taylor v.
Smith*, 892 So. 2d 887 (Ala. 2004) (medical director of a methadone clinic owed a duty to plaintiff
injured in a car accident caused by one of the clinic's patients).   McKesson realized, or at least it
should have realized, the danger its conduct posed to the health and welfare of the people of
Alabama, including the danger of diversion.   Again, this known risk is the reason suspicious order
reporting exists.   Therefore, McKesson's attempt to pass off its duty of care fails.

### b.  The Defendants breached a statutory duty of care.

1. Statutes can create a duty of care, *see King v. National Spa and Pool Institute, Inc.*, 570
So. 2d 612, 614 (Ala. 1990) ("a legal duty to exercise care, therefore, arises… where the
obligations are expressly or impliedly imposed by statute, municipal ordinance, or by
administrative rules or regulations, or by judicial decisions"), and proof that a person violated that
statute is proof of a breach of duty/negligence. *See Parker Bldg. Service Co., Inc. v. Lightsey ex
rel. Lightsey*, 925 So.2d 927, 930 (Ala. 2005).

As detailed in the previous section regarding the State's ACSA claim, each Defendant has
a statutory duty to report suspicious orders to the Pharmacy Board.  ALA. ADMIN. CODE r. 680-X-
3-.05(2).  This statute/rule puts each Defendant on notice that harm to Alabamians is a foreseeable
result from "increases in purchases or high or unusual volumes purchased by pharmacies."  *Id.*

When Defendants failed to meet the statutory duty to report suspicious orders, they breached

---

[22] Whether the supposed intervening acts were foreseeable is a jury question. *See Thetford v. City of Clanton*, 605
So.2d 835, 839-40 (Ala. 1992).

a duty owed to the State.  *See Industrial Tile v. Stewart*, 388 So.2d 171 (Ala. 1980) (Court used OSHA regulations along with the fact that a defendant had been fined for violating OSHA's safety regulations with respect to the injury in question in deciding whether the defendant had violated the applicable standard of care).  In a similar context, one court pointedly stated that "[i]nsofar as Endo's position is that an Alabama negligence claim is unsustainable against a defendant who has acted in violation of law, that premise is demonstrably invalid." *Brown v. Endo Pharmaceuticals, Inc.*, 38 F. Supp. 3d 1312, 1325 (S.D. Ala. 2014).[23]

2.  The Defendants contend that because (a) the ACSA does not create a private right of action, then (b) any attempt to enforce statutory or regulatory obligations through common law tort claims must fail.  Even if one accepts this first proposition as true, the second is wrong because Alabama law has long recognized that a criminal act that injures another's person or property "may still be the basis of a civil action for damages." *Martinson v. Cagle*, 454 So.2d 1383, 1385 (Ala. 1984); *see Lowe v. General Motors Corp.*, 624 F.2d 1373, 1379 (5th Cir. 1980) ("The concept that violation of a criminal or penal statute can be evidence of negligence in a civil action is not new to tort law.").  Courts have applied this principle to permit civil actions in various contexts.  *See Fogarty v. Parker, Poe, Adams, & Bernstein, L.L.P.*, 961 So. 2d 784 (Ala. 2006) (a private cause of action was recognized for the unauthorized practice of law—a criminal act under ALA. CODE § 34-3-6); *Lollar v. Poe*, 622 So.2d 902 (Ala. 1993) (a violation of a municipal ordinance was the basis of a civil action).

3.  Just because the Legislature passed a law prohibiting certain conduct does not prevent the State from seeking redress under traditional tort principals.  This concept is bolstered by the

---

[23] The Court rejected Endo's contention that the plaintiff could not possibly prove the duty element of the negligence claim against a local co-defendant since it was against someone who was not authorized by law to prescribe Section II narcotic drugs like Opana.

availability of negligence *per se* under Alabama law, which requires the following four elements for the claim to be actionable: "(1) [t]he statute must have been enacted to protect a class of persons, of which the plaintiff is a member; (2) the injury must be of the type contemplated by the statute; (3) the defendant must have violated the statute; and (4) the defendant's statutory violation must have proximately caused the injury." *Lightsey*, 925 So.2d at 931.

The Defendants claim the first element is not satisfied because the ACSA was enacted to protect the general public rather than a "class of persons." Manufacturers' Mem. at 18; McKesson Mem. at 18. To support this position, the Defendants mostly ignore the ACSA and, instead, focus on the federal CSA. *See id.* The two Alabama cases McKesson does cite, do not state the ***ACSA*** cannot be used to establish a duty or negligence *per se* but, instead, involve distinguishable statutes that are entirely inapplicable to the case at hand.[24] Those cases simply do not stand for authority that the ACSA cannot serve as a basis for the establishment of a duty and negligence *per se*.

The Manufacturers are as dismissive as McKesson. Their one sentence conclusion states: "As discussed, those statutes did not impose a duty ***as expansive*** as the State claims. *Supra* S II.A." (emphasis added). Apparently, the Manufacturers argue any duty created under the ACSA is a matter of degree, not existence. The previously referenced section (Part II.A) is not at all illuminating because there are no cases cited, and the Manufacturers argue only that the allegations pertain to distributors of controlled substances, not manufacturers.

The ACSA is broader in context and application than the building code ordinance in

---

[24] In *Dixon v Hot Shot Express*, 44 So.3d 1082 (Ala. 2010), the plaintiff wanted a regulation under the Federal Motor Carrier Safety Act to preempt Alabama's common law causes of action, negligence and wantonness, to avoid Alabama's guest statute. The *Dixon* Court denied plaintiff's preemption request, stating "[t]he federal regulation at issue . . . does not purport to create a cause of action for the failure to exercise 'extreme caution' in 'hazardous conditions.'" Accordingly, it was not negligence *per se*. In *Lightsey* the issue was whether violation of a municipal building code ordinance was negligence *per se*. *Lightsey*, 925 So. 2d 927. The facts of that case simply did not meet the requirements of negligence *per se*, not that it could not under different circumstances

*Lightsey* or the traffic laws in *Dixon*. It is designed to protect the State of Alabama, and its citizens as the public at large, from the consequences of the illicit diversion of opioids. The ACSA specifically tasks those involved in the manufacture and distribution chain to ensure they have implemented "effective controls against diversion" to prevent the unfortunate consequences the State is now enduring. FAC ¶ 240. This obligation is "expressly" imposed by statute, thus creating a duty under Alabama law. *See King*, 570 at 614. Failure to abide by the ACSA's anti-diversion obligations predictably harmed the State by fueling the opioid crisis and forcing the State to incur additional costs to abate that crisis. *See* FAC ¶ 72, 272, 275, 362, 375-81, 409. Recognizing the statewide harm, the diversion of controlled substances posed, the ACSA expressly charges "all prosecuting attorneys," including the Attorney General, to enforce its provisions. *See* ALA. CODE § 20-2-90(a). This is also why the Attorney General is authorized to bring this action under its *parens patriae* authority, a status the Defendants fail to adequately distinguish from a private citizen's right of action. Therefore, the Defendants owed a duty imposed by the ACSA, in addition to their duty under common law.

### c. The Manufacturers owed a contractual duty.

Finally, as pleaded in FAC ¶ 422, a legal duty also "arises where the parties are bound by contract." *King*, 570 So. 2d at 614 (citations and internal quotation marks omitted). Based on available information, the Alabama Medicaid Agency has entered into contracts with the Manufacturer Defendants to sell their respective products; thereby creating a contractual duty to exercise care. *See id*. This means three duties exist: common law, statutory, and contractual.

### d. The State sufficiently alleged that Defendants breached their duties.

The Defendants primarily base their breach arguments on the position that they did not owe any duties to breach. Once the duty is found, finding the breach is easy. For reasons stated

throughout this brief, the FAC provides detailed allegations explaining how all Defendants breached their respective duties. *See, e.g.* FAC ¶¶ 3, 230-236, 264-286, 323-340, 431-435, 445.

**F.  Count 6:  The State adequately pleaded its Unjust Enrichment claim.**

1. The State alleged that Defendants have been unjustly enriched at the State's expense. FAC ¶¶ 439-44.  Specifically, the State alleged that the cost of Defendants' wrongful acts includes increased health care services and treatments, which the State has paid for with public funds. FAC ¶ 441.  While Defendants' businesses create these costs, Defendants are not paying for them. Instead, Defendants are saving money at the State's expense, money they have used to sell, market, and/or distribute more opioids and make more money.  FAC ¶ 442.  Defendants have therefore received an unjust benefit, and "society's reasonable expectations of person and property would be defeated by nonpayment" of these savings back to the Government.  *United States v. Halifax Hosp. Medical Center*, 2013 WL 6017 at *7 (M.D. Florida Nov. 13, 2013) (citing *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 993–94 (4th Cir.1990)).

2. Defendants' primary argument is that the State failed to plead that Defendants are holding monies that the State expended. *See* McKesson Mem. at 21-22; Manufacturers' Mem. at 19-20.  Or, put another way, the Parties have not engaged in a direct transaction that benefitted Defendants at the State's expense.  But, like its fellow bellwether Plaintiffs, Alabama bases its unjust enrichment claim on Defendants' retention of "externalities"—*i.e.* the cost of harms caused by Defendants' actions but paid for by the Government—not on monies the State directly gave to Defendants.  The State thus adopts Summit County's externalities argument, and its citation of cases from around the country that survived Rule 12(b) dismissal when pleading an externalities-based claim of unjust enrichment.  *See* Doc. 654 at 96-97.

3. McKesson argues that unjust enrichment is unavailable because the State has pleaded

other claims that provide a legal remedy. McKesson Mem. at 22. But "nothing prohibits a plaintiff from pleading multiple claims when there are, in fact, multiple theories of liability that are legally viable and consistent with the facts; where a plaintiff has a contract claim, tort claim, and a claim for statutory violation, all may be pled." *PCA Minerals, LLC v. Merit Energy Company LLC*, 725 Fed. Appx. 342, 349 (6th Cir. Feb. 14, 2018). In fact, Rule 8 expressly permits it: "A party may state as many separate claims or defenses it has, regardless of consistency." FED. R. CIV. P. 8(d)(3). Duplicative pleading thus cannot support Rule 12(b) dismissal.

4. Finally, we note that the Manufacturers' arguments relied on federal law, while McKesson relied on state law. While the arguments are the same, the State pleaded Count 6 under federal law. *See* FAC ¶ 26, 439-43. If state law controls, however, the State reserves the right to argue supplemental jurisdiction under 28 U.S.C. § 1367(c) and/or amend its complaint. *See* CMO-1 § 2(k) ("Nothing in this Order is intended to waive any Plaintiff's right to move to file further amended pleadings in the above-listed cases if deemed appropriate").

**G. Count 7: The State adequately pleaded its wantonness claim.**

In its final count, the State pleaded a common-law claim of wantonness, which in Alabama, is distinct from negligence. "To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Lemley v. Wilson*, 178 So.3d 834, 841-42. The State has sufficiently pleaded a wantonness claim against all Defendants, as strongly suggested by the fact that both defense briefs contain just one paragraph attacking the State's wantonness claim.

1. *Manufacturers*: The State pleaded sufficient facts to establish that the Manufacturers "consciously and intentionally" committed their bad acts, with "reckless indifference to the

consequences." *Id.* For example, the State alleged that both Purdue and Endo knew about the addictive character of their opioids FAC ¶¶ 43-46; 47-49. They knew opioids were a dangerous health risk for people taking high doses. FAC ¶¶ 50-53. They knew that their products would not be suitable for long term, chronic non-cancer pain. FAC ¶¶ 37-41. And they knew extended-release opioids were susceptible to abuse and addiction. FAC ¶¶ 55-56. Despite knowing those opioid traits, both Purdue and Endo made public statements opposite, including hiring KOLs and front groups to misrepresent the facts about opioids. FAC ¶ 79.

More specifically, the State alleged that, in 2007, Purdue admitted lying to doctors about OxyContin's abuse potential when it pleaded guilty to the federal felony of misbranding a drug with intent to defraud or mislead. FAC ¶ 74. Undaunted, Purdue continued to falsely market its opioids in Alabama. FAC ¶ 81. The CDC guidelines stated there was insufficient evidence of the long-term benefits of opioid therapy for chronic pain, FAC ¶ 105, yet Purdue continued to tout the purported benefits of long-term opioid use. FAC ¶ 106. Purdue knew that its twelve-hour dose of OxyContin would wear off well short of twelve hours, yet it continued to say that it would not. FAC ¶¶ 133-134,136. Purdue launched a reformulated OxyContin that was labeled "abuse deterrent" stating the pills were harder to crush and inject and promised doctors in Alabama that these were safer for patients. Yet, Purdue chose not to inform Alabama physicians that many users were still able to tamper with OxyContin FAC ¶ 139. The FDA warned Purdue that the tamper-resistant properties would have no effect on abuse by the oral route (the most common mode of abuse), nevertheless Purdue's national marketing campaign continued to tout OxyContin's tamper-resistant properties. FAC ¶¶141-142. Purdue knew that claiming abuse-deterrent formulations reduce abuse was not supported by evidence. FAC ¶ 149.

Endo used the same marketing tactics as Purdue—deceptive messages concerning addition

risks, addiction screening tools, and the safety of alternatives to opioids. FAC ¶ 155. Endo knew that its Opana ER would not help patients regain lost function due to chronic pain, yet Endo trained its sales force to say it would. FAC ¶ 161. Endo's internal documents showed that Opana ER had liability potential for abuse similar to other opioid analgesics, yet Endo told physicians that it had less of a potential for abuse or misuse. FAC ¶¶ 163, 174. Endo knew that Opana ER was crushable, yet failed to say that in its promotional materials. FAC ¶ 176. Endo was warned *via* letter on January 4, 2011 from the FDA disciplinary review committee that its claims that Opana ER offered a therapeutic advantage over the original formula had not been demonstrated by substantial evidence or clinical experience. FAC ¶ 181. Endo knew that its original Opana ER was dangerous yet it refused to recall those pills. Endo knew that its Opana ER was widely abused and injected, yet Endo marketed the drug as tamper-resistant and abuse-deterrent. FAC ¶ 186. Endo withdrew Opana ER from the market after the FDA reported links to outbreaks of HIV and TTP. FAC ¶ 192. Endo engaged in the described deceptive marketing intending for Alabama prescribers and customers to rely on them in choosing Endo for chronic pain. FAC ¶ 157.

We could go on, but the point is made: scientific studies, detailed prescription data, reports of adverse effects and warnings from the FDA establish that the Manufacturers knew what they were saying was wrong—and they knew what the consequences of their actions could be. They simply did not care. That makes their actions wanton. *See Lemley*, 178 So.3d at 841-42. ("To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty").

2. *McKesson*: As for McKesson, the State pleaded that the DEA sent two letters in 2006 and 2007 warning Purdue, Endo, and McKesson to exercise diligence and avoid filling suspicious orders that might be diverted into illegitimate medical scientific and industrial channels. FAC ¶¶

47

251-253. Yet, McKesson sold prescription opioids to retailers in the State of Alabama that McKesson knew would likely be diverted. FAC ¶ 257. McKesson knew that its orders were excessive for the medical needs of the communities in Alabama and were facially suspicious. FAC ¶ 265. Yet, McKesson failed to take meaningful action to stop the diversion that was occurring in Alabama. FAC ¶ 267.

The State pleaded that McKesson provided data, including the names of individual doctors, to the Manufacturer Defendants and in exchange were given rebates and other forms of consideration. FAC ¶ 268. McKesson knew there were suspicious orders originating from its customers in Alabama, yet McKesson failed to report it to the DEA or the State Board of Pharmacy. FAC ¶ 275.

We could go further, but again the point is made: McKesson knew that is was shirking its duty to report suspicious orders, and it knew what the consequences of its actions could be. McKesson simply did not care because it was making so much money. That makes McKesson's actions wanton. *See Lemley*, 178 So.3d at 841-42.

3. *Defendants' Arguments*: Again, each defense brief spends only one paragraph on this claim. *See* McKesson Mem. at 20; Manufacturers' Mem. at 19. Both are wrong for the same reason—*i.e.* both argue that Alabama's failure to adequately plead the elements of a negligence claim bars proof of a wantonness claim.

But, in Alabama, negligence and wantonness are distinct claims. As the Alabama Supreme Court explained: "Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability." *Tolbert v. Tolbert*, 903 So. 2d 103, 114 (Ala. 2004). Each action has its own elements:

> To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or

48

injury. To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.

*Lemley*, 178 So.3d at 841-42. So, even if Defendants were right that Alabama failed to sufficiently plead all four elements of a negligence claim (and they are not), Alabama could still sufficiently plead a wantonness claim. And the fact the Defendants do not criticize the State's pleading of the wantonness elements is strong evidence that the State sufficiently pleaded the claim under Rule 8.

\* \* \*

Over the span of 128 pages, the State detailed how Defendants' bad acts led Alabama to become the #1 State in the nation for opioid scripts per person. If a problem exists within those pages; it's not the sufficiency of the State's pleading; it's the depravity of Defendant's actions.

## CONCLUSION

For the foregoing reasons, the State respectfully requests the Court deny both Motions to Dismiss. Alternatively, if the Court determines that the State's First Amended Complaint is in any way deficient, the State respectfully requests leave to amend.

Respectfully submitted,

Steve Marshall
*Attorney General*
By:

/s/ Rhon E. Jones
Rhon E. Jones
*Deputy Attorney General*

/s/ Joshua P. Hayes
Joshua P. Hayes
*Deputy Attorney General*

Attorneys for Plaintiff, State of Alabama

ADDRESS OF COUNSEL:

Steve Marshall                              Office of the Attorney General of Alabama
*Attorney General*                          501 Washington Avenue
                                            Montgomery, Alabama 36130
Corey L. Maze                               Phone: (334) 242-7300
*Special Deputy Attorney General*           Fax: (334) 242-4891
                                            cmaze@ago.state.al.us
Winfield J. Sinclair                        wsinclair@ago.state.al.us
*Assistant Attorney General*                mdean@ago.state.al.us

Michael G. Dean
*Assistant Attorney General*


OF COUNSEL:

Jere L. Beasley – ASB 1981A35J              Robert F. Prince – ASB-2570-C56R
Rhon E. Jones – ASB 7747E52R                Joshua P. Hayes – ASB-4868-H68H
J. Parker Miller – ASB 7363H53M
Richard D. Stratton – ASB 3939T76R          **Prince, Glover & Hayes**
William R. Sutton – ASB 3903L74S            1 Cypress Point
J. Ryan Kral – ASB 9669N70K                 701 Rice Mine Road North
Jeff Price – ASB 8190F60P                   Tuscaloosa, Alabama 35406
                                            Telephone: (205) 345-1234
**Beasley, Allen, Crow, Methvin,**          Fax: (205) 752-6313
**Portis & Miles, P.C.**                    rprince@princelaw.net
218 Commerce Street                         jhayes@princelaw.net
Post Office Box 4160 (36103-4160)
Montgomery, Alabama 36104
Telephone: (334) 269-2343
Fax: (334) 954-7555
Jere.Beasley@BeasleyAllen.com
Rhon.Jones@BeasleyAllen.com
Rick.Stratton@BeasleyAllen.com
William.Sutton@BeasleyAllen.com
Ryan.Kral@BeasleyAllen.com

Parker.Miller@BeasleyAllen.com
Jeff.Price@BeasleyAllen.com

## LOCAL RULE 7.1(F) CERTIFICATE

I hereby certify that this case was chosen by the Court as a bellwether trial, *see* CMO-1, §

2(d), and that this memorandum complies with the 50-page limit ordered by this Court. *See*

Doc. 796

/s/ Rhon E. Jones
Rhon E. Jones
*Deputy Attorney General*
Attorney for Plaintiff, State of Alabama

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018, I electronically filed the foregoing with the Clerk

of Court by using the CM/ECF system. Copies will be served up counsel of record by, and may

be obtained through, the Court CM/ECF system.

/s/ Rhon E. Jones
Rhon E. Jones