# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*West Boca Medical Center, Inc. v. AmerisourceBergen Drug Corp., et al.,*<br>Case No. 181-op-45330 | MDL No. 2804<br><br>Case No. 1:17-MD-2804<br><br>Hon. Dan A. Polster |

**BRIEF OF *AMICUS CURIAE* MISSISSIPPI HOSPITAL ASSOCIATION ("MHA") IN SUPPORT OF PLAINTIFF WEST BOCA MEDICAL CENTER, INC.'S OMNIBUS MEMORANDUM IN OPPOSITION (DKT No. 806) TO (1) MEMORANDUM OF LAW IN SUPPORT OF THE MANUFACTURER DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT (DKT. No. 691-1); MEMORANDUM IN SUPPORT OF DISTRIBUTORS' MOTION TO DISMISS (DKT. No. 684-1); AND (3) MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY DEFENDANTS CVS HEALTH CORPORATION, WALGREENS BOOTS ALLIANCE, INC., AND WALMART INC. (DKT. No. 686-1)**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTEREST OF *AMICUS CURIAE* ...................................................................................... 2

ARGUMENT .......................................................................................................................... 3

     A.  The Harm to Hospitals is Directly Related to Defendants' Conduct .....................4

     B.  Hospital Damages Are Ascertainable ....................................................................6

     C.  Hospital Plaintiffs Have Pled Viable Claims ........................................................7

CONCLUSION ...................................................................................................................... 10

# TABLE OF AUTHORITIES

**Case Law**

*Allegheny General Hospital v. Philip Morris, Inc.,* 228 F. 3d 429 (3d. Cir. 2000)..........................4,5

*Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 272 (1992).....................................4, 5

*In re Neurontin Marketing and Sales Practice Litigation ("Harden")*, 712 F. 3d 60
 (1st Cir. 2013) .........................................................................................................................5

**Statutes**
Fla. Stat. § 501.201 et seq....................................................................................................................9

## INTEREST OF *AMICUS CURIAE*

The Mississippi Hospital Association ("MHA") is a trade association of hospitals and health care providers in the State of Mississippi that are dedicated to effectively serving the health care needs of Mississippi.  MHA's members have undoubtedly sustained damages that are directly related to the opioids crisis caused by Defendants' negligent and deceptive acts.  Several of MHA's members have cases pending in this Multi-District Litigation ("MDL") that seek recovery of these damages.[1]

According to the National Institute on Drug Abuse, the number of opioid prescriptions in Mississippi exceeds the national average, with data from 2015 revealing that there were 107.5 prescriptions per 100 persons (for a total of 3.2 million) in Mississippi versus 70 prescriptions per 100 persons nationwide.    National Institute on Drug Abuse, *Mississippi Opioid Summary*, Revised February 2018 (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/mississippi-opioid-summary).  The numbers remained high in 2017 with over 3.3 million opioid prescriptions dispensed in that year, which is greater than the number of residents in the state overall.    The Mississippi Opioid and Heroin Data Collaborative, *2017 Provisional Data Report*, April 6, 2018, at 2 (available at https://msdh.ms.gov/msdhsite/_static/resources/7511.pdf).  Deaths related to opioid overdoses in Mississippi reached a total of 256 in 2017.  *Id.* at 3.

---

[1] *See, e.g., North Mississippi Medical Center, Inc., et al v. McKesson Corp., et al*, Case No. 1:18-op-_____-DAP; *South Central Regional Medical Center v. McKesson Corp., et al,* Case No. 1:18-op-45763-DAP; *Rush Health Systems, Inc. v. McKesson Corp., et al*, Case No. 1:18-op-45034-DAP; *Greenwood Leflore Hospital v. McKesson Corp., et al*, Case No. 1:18-op-45551-DAP; and *Sharkey-Issaquena Hospital v. McKesson Corp., et al*, Case No. 1:18-op-45765-DAP.

The crisis has strained the resources of MHA members by greatly increasing the number of patients with opioid-related injuries, including overdoses, who require immediate treatment to save lives and prevent life-altering injuries.  Because hospitals have a legal obligation to provide emergency care in such circumstances, and because it is their mission and business to provide quality care for their patients, MHA members have incurred huge costs to cover additional medical staff, security, and services to meet the expanded patient needs.  With this harsh impact, health care providers like MHA's members have been burdened financially and otherwise by the demands for treatment, the strain on personnel, and the need to implement innovative ways to cope with the crisis.  These increased costs, including the costs of treating patients, are in great part unreimbursed.

Given the interests of its members in this crisis, MHA offers these points in support of Plaintiff West Boca Medical Center, Inc.'s ("West Boca") opposition to Defendants' motions to dismiss with particular focus on the fallacy of Defendants' arguments on proximate cause and damages.

## ARGUMENT

In their attempts to dismiss the claims pending in this MDL—including those brought by local governments and hospitals such as West Boca—the Manufacturer, Distributor, and Pharmacy Defendants all assert that Plaintiffs' claims should be dismissed because:  1) there is no causal nexus between the harms alleged and the Defendants' conduct that fueled the opioids epidemic; and 2) plaintiffs' damages are speculative and cannot be ascertained.  These specious arguments fail most especially in the case of hospitals that must combat the crisis daily in their emergency rooms and beds while rendering face-to-face treatment for patients afflicted with

opioid addition.  As shown herein, the causal connection is even clearer for hospitals than for local governments, and hospitals are well-positioned to prove their damages.

### A.  The Harm to Hospitals is Directly Related to Defendants' Conduct

In *Holmes v. Securities Investor Protection Corp.*, involving RICO and violations of the Securities Exchange Act, the United States Supreme Court recognized that "[b]ecause of the infinite variety of claims that may arise in which a court must analyze proximate causation, it is virtually impossible to announce a black-letter rule that will dictate the result in every case."  503 U.S. 258, 272 (1992).  Hence, much of the case law that Defendants rely upon is distinguishable on the facts supporting hospital claims.  The hospitals do not present an infinite variety of claims but instead present claims for care with measureable and known costs associated with that care.

In *Allegheny General Hospital v. Philip Morris, Inc.*, for example, the Third Circuit found that hospital plaintiffs lacked standing to bring their RICO and various state law claims against tobacco companies for unreimbursed expenses incurred in the treatment of patients harmed by smoking because the causal link between the defendants' acts and the plaintiffs' harm was too remote and the damages too speculative.   228 F. 3d 429 (3d. Cir. 2000).   On the remoteness point, the court noted that the hospitals provide free medical care directly to patients and that they have a duty to provide that care, but the court  also focused on the fact that the "Hospitals dealt solely with the nonpaying patients, and not with the Tobacco Companies." *Id.* at 441.

The facts in West Boca, and as to other hospitals harmed by the Defendants' conduct in fueling the opioids epidemic, are quite different from the facts in *Allegheny*.   Unlike the hospital plaintiffs in *Allegheny,* here, the hospitals did deal directly with Defendants as the hospitals purchased opioids as required to meet the increased demands for opioid prescriptions fueled by

Defendants' misrepresentations and fraudulent marketing schemes.   As purchasers of Defendants' pharmaceutical products, hospitals, along with their medical staff, were therefore the direct objects of Defendants' misrepresentations and deceptive messages about the safety and efficacy of opioids.  In *Allegheny*, the hospital plaintiffs had no such direct contact with the tobacco company defendants.

The First Circuit's decision in *In re Neurontin Marketing and Sales Practice Litigation* ("*Harden*"), 712 F. 3d 60 (1st Cir. 2013), is instructive and relevant to the proximate cause issue in this case.  There, the First Circuit described the proximate cause inquiry as one that "includes both the question of whether there is 'some direct relation between the injury asserted and the injurious conduct alleged,' and the consideration of three functional factors that reflect concerns of justice and administrability."  *Id.* at 67 (citations omitted).  The three functional factors to consider are the difficulty of ascertaining the amount of plaintiff's damages; the need to avoid complicated damages rules to apportion damages among many plaintiffs; and the general interest in deterring injurious conduct.  *Id.*; *see also Holmes* 503 U.S. at 269-70.

As with the Defendants here, Pfizer, the defendant in *Neurontin (Harden)*, engaged in deceptive and fraudulent marketing designed to increase the number of prescriptions for its product, which thereby increased the amounts that the plaintiff third party payors paid for Pfizer's product.  712 F. 3d at 67.   As a result, the First Circuit reasoned that:

> The causal chain in this case is not so attenuated as to support summary judgment for Pfizer because  . . . Pfizer knew that the structure of the American health care system meant that almost all off-label Neurontin prescriptions written by physicians would be paid for by TPPs . . . Under these circumstances, drawing all reasonable inferences in the plaintiffs' favor, a factfinder could conclude that the Harden plaintiffs' injury was a 'foreseeable and natural consequence' of Pfizer's scheme.

*Id.* (citations omitted).

5

The same holds true here.  Defendants are well versed in the structure of the American health care system and know the plight of hospitals in bearing unreimbursed costs necessary to serve their patients and meet their legal obligations.  Defendants nonetheless pursued their profit-driven schemes to saturate the market for opioids and foreseeably drive hospital's unreimbursed opioid-related costs up even higher.

### B.  Hospital Damages Are Ascertainable

Not only is the link between the harm suffered by hospitals and Defendants' wrongdoing sufficiently direct to establish the chain of causation, the damages sustained by hospitals are ascertainable.

For example, statistics support the level of the epidemic's impact on hospitals with regard to co-existing morbidities.  An analysis of Hospital Discharge Data by the Mississippi State Department of Health revealed that "[c]ompared to all other hospitalizations, patients hospitalized with a diagnosis of opioid misuse were more likely to have a coexisting diagnosis of mental health disorders (71.4% versus 23.5%), nonspecific chronic pain (18.6% versus 2.4%), and low back pain (11.5% versus 2.5%)."  *See* Mississippi State Department of Health, *The Mississippi Opioid Epidemic: Data Brief*, May 11, 2017. (available at https://msdh.ms.gov/msdhsite/_static/resources/7292.pdf).  The costs of caring for patients with these and other opioid-related conditions can be identified through hospital billing codes.  Those costs can then be factored into a reliable model to establish the damages sustained by hospitals as a result of the opioids crisis.

Likewise, the costs of emergency room treatment for opioid overdoses and opioid-related conditions are readily identifiable.  The increase in these visits has also been also well-documented as demonstrated by a March, 2018 federal Center for Disease Control ("CDC")

report stating that emergency room visits had increased by over 30% in just the last year because of the opioid epidemic.  *See*  Vivolo-Kantor AM, Seth P, Gladden RM, et al., *Vital Signs: Trends in Emergency Department Visits for Suspected Opioid Overdoses — United States, July 2016–September 2017*, MMWR Morb Mortal Wkly Rep 2018;67:279–285 (available at DOI:http://dx.doi.org/10.15585/mmwr.mm6709e1).

Others have documented the increased costs of in-patient care as rising from $700 million in 2002 to $15 billion in 2012 as a result of opioid abuse and addiction.  Ronan MV, Herzig SJ., *Hospitalizations Related To Opioid Abuse/Dependence And Associated Serious Infections Increased Sharply, 2002-12*, Health Aff (Millwood), 2016 May 1;35(5):832-7 (available at https://www.healthaffairs.org/doi/abs/10.1377/hlthaff.2015.1424).

These data provide examples of the extensive information and analyses available for use in calculating the damages sustained by hospitals as a result of the opioids crisis.  Ascertainment of damages therefore raises no bar to hospital claims.

### C.  Hospital Plaintiffs Have Pled Viable Claims

Contrary to the Defendants' assertions, the claims of West Boca and similarly situated hospitals, including MHA's members, are viable and directly tie Defendants' conduct to the harm suffered by hospitals.

Hospitals have a common right to be free from conduct that creates an unreasonable threat to the health, welfare, and safety of their workforce, and patients.  Yet, the Defendants' intentional acts have caused and permitted highly dangerous drugs, under their control, to flood the market in ways that injure hospitals and their patients.  By over-supplying opioids and failing to control diversion, Defendants have unreasonably interfered with the economic rights of hospitals to successfully run their businesses and manage their resources.  Because hospitals are

overwhelmed with opioid addicted patients and consumed with efforts to combat the prescription drug abuse epidemic, hospitals have been forced to allocate resources for the treatment of addictions, overdoses, and complications all attributable to opioids. The unreimbursed costs and loss of resources associated with this effort would not have occurred but for Defendants' conduct. These facts, which support hospitals' nuisance claims, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

The Manufacturer and Distributor Defendants have affirmative duties to exercise due care in the manufacturing, distributing, and selling of their opioids products. A reasonably prudent manufacturer and/or distributor would have known that opioid addiction would wreak havoc on communities and that flooding these communities with unconscionable amounts of highly addictive drugs for the treatment of chronic pain would result in severe forms of addiction requiring emergency treatment and often hospital admissions. Nonetheless, Defendants sold escalating amounts of opioids while misrepresenting their compliance with laws, such as the Controlled Substance Act, that impose non-delegable duties of reporting and flagging suspicious opioid orders. The Defendants' conduct substantially contributed to the cause of the opioid epidemic that has become one of the worst health crises in the history of the United States. Hospitals across the nation, including MHA members, have struggled and are continuing to struggle, to treat the huge number of patients who have fallen victim to opioids as a result of Defendants' conscious effort to oversupply the market. As a direct result, hospitals have incurred, and are continuing to incur, billions of dollars in unreimbursed healthcare costs. These facts, which support hospitals' claims of negligence, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

Defendants' false representations and concealment of material facts concerning the use of opioids for the treatment of chronic pain form the basis of hospitals' claims of fraud. Through their marketing campaigns and advertisements, Defendants falsely promoted the efficacy of opioids under the guise of misleading and fraudulent studies.  These fraudulent campaigns masked the dangers of overdose and addiction and led to higher rates of addiction and deaths due to overdose, which dramatically increased the number of patients pouring into hospitals for treatment.  These facts, which support hospitals' claims of fraud, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

There can be no doubt that Defendants conspired to oversupply the markets with opioids. Cooperation from all chains of manufacture and distribution were critical to their profit-driven goals.  Without this concerted action, Defendants would not have succeeded in profiting so significantly from the opioid epidemic.  These facts, which support hospitals' claims of conspiracy, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

Defendants' representations to the public that were untrue, deceptive, and misleading, and were intended to induce the public to purchase more and more opioids likewise constitute violations of state unfair and deceptive trade practices acts, including in West Boca's case violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"), Fla. Stat. § 501.201 *et seq.*  Defendants' filling of suspicious or invalid orders at both the wholesale and retail level, failing to maintain effective controls against opioid diversion, failing to report suspicious orders, and falsely promoting the safety and efficacy of opioids for the treatment of chronic pain support exemplify such deceptive practices.  These facts, which support the

hospitals' claims of unfair and deceptive trade practices, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

Hospitals have expended substantial amounts of money to address, remedy and/or mitigate the societal harms caused by Defendants.  The expenditures by hospitals in providing care to patients who use opioids have added to defendants' wealth and have operated to sustain Defendants' businesses, while burdening hospitals with unreimbursed costs.  Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.  Defendants made substantial profits while fueling the opioid epidemic and continue to receive considerable profits from the distribution of these drugs.  Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.  It would be inequitable to allow Defendants to retain the benefit or financial advantage of their wrongdoing.  These facts, which support the hospitals' claims of unjust enrichment, are directly attributable to Defendants' conduct and linked to the harm sustained by hospitals.

## CONCLUSION

For the foregoing reasons, and those set forth in West Boca's opposition to Defendants' motions to dismiss, MHA respectfully requests denial of Defendants' motions to dismiss.

Respectfully submitted,

/s/ T. Roe  Frazer
T. Roe Frazer II, (MSB #5519)
Patrick D. McMurtray (MSB#2775)
FRAZER PLC
1 Burton Hills Blvd., Suite 215
Nashville, TN  37215
(615) 647-6464
roe@frazer.law
patrick@frazer.law

Attorneys for Mississippi Hospital Association

10

Additional Attorneys for Mississippi Hospital Association:

Armin Moeller (MSB# 3399)
Walter H. Boone (MSB#8651)
BALCH & BINGHAM LLP
188 East Capitol Street
Suite 1400
Jackson, MS 39201
(601) 961-9900
(601) 961-4466
wboone@balch.com

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE, RLLP
501 Commendencia Street
Pensacola, FL 32502
(850) 432-2451
jnd@beggslane.com
jrz@beggslane.com

Alan T. Rogers (ASB-2577-R79A)
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203
(205) 251-8100
(205)226-8799
arogers@balch.com

Thomas Roe Frazer III (TN #33296)
FRAZER PLC
1 Burton Hills Blvd., Suite 215
Nashville, TN 37215
(615) 647-6464
trey@frazer.law

Frederick T. Kuykendall, III
THE KUYKENDALL GROUP
2013 1st Avenue North, Ste 450
Birmingham, Alabama 35203
(205) 252-6127
ftk@thekuykendallgroup.com