# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE:  NATIONAL PRESCRIPTION | ) | |
| OPIATE LITIGATION | ) | |
| | ) | |
| WEST BOCA MEDICAL CENTER, INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | MDL 2804 |
| v. | ) | |
| | ) | No. 17-md-2804 |
| AMERISOURCEBERGEN DRUG CORP., | ) | |
| ET. AL., | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF 44 HOSPITAL AMICI**

**IDENTIFICATION AND STATEMENT OF INTEREST OF AMICI**

The Amici Hospitals include the following: Allegiance Behavioral Health Center of
Plainview, Allegiance Specialty Hospital of Greenville, Allegiance Health Center of Ruston,
Allegiance Health Center of Monroe, Bailey Medical Center, Bienville Medical Center, BSA
Hospital, BSA Physicians, Centennial Hills Hospital Medical Center, CLHG-Avoyelles dba
Avoyelles Hospital, Corona Regional Medical Center, Desert Springs Hospital, Eureka Springs
Hospital, The George Washington University Hospital, Harrington Cancer Center, Heart
Hospital of New Mexico at Lovelace Medical Center, Henderson Hospital, Hillcrest Hospital
Claremore, Hillcrest Hospital Cushing, Hillcrest Hospital Henryetta, Hillcrest Hospital Pryor,
Hillcrest Hospital South, Hillcrest Medical Center, Lovelace Medical Center, Lovelace Medical
Group, Lovelace Regional Hospital Roswell, Lovelace Westside Hospital, Lovelace Women's
Hospital, Manatee Memorial Hospital, North Metro Medical Center, Oakdale Community

1

Hospital, Oklahoma Heart Institute, Physicians Surgical Hospitals, River Valley Medical Center, Sabine Medical Center, Seton Medical Center Harker Heights, Spring Valley Hospital Medical Center, Southwest - Inland Valley Medical Center, Summerlin Hospital Medical Center, Temecula Valley Medical Center, Tulsa Spine & Specialty Hospital, Utica Park Clinic, Valley Hospital Medical Center, and Winn Parish Medical Center.

The Amici Hospitals are located in rural, suburban, and urban communities throughout the United States.  And much like the communities they serve, they have been severely affected by the opioid epidemic.  The Amici Hospitals have served on the front lines of this public health crisis and expended substantial resources and human capital in providing unreimbursed and under-reimbursed care to thousands of patients who have suffered from opioid overdoses or other opioid-related health emergencies.

In addition to serving this role over the last several years, the Amici Hospitals and other hospitals like them will play an important role in the future as a critical part of any comprehensive plan to address the opioid crisis.  The motions to dismiss filed by the manufacturer and distributor defendants [1] seek to exclude all hospitals from serving any prophylactic role through this litigation.  In so doing, the defendants rely heavily on past court decisions arising out of the tobacco mass tort litigation.  Amici Hospitals respectfully file this brief to explain important differences between the medical and legal circumstances surrounding the present opioid public health crisis and those that surrounded the tobacco litigation.  They also file this amicus brief to demonstrate how the exclusion of the medical community from the

---

[1]  This amicus brief is filed only in connection with those two motions to dismiss and takes no position on any other defendants' request to be dismissed.

tobacco litigation resulted in a fundamental failure of the recoveries in those cases from ever actually reaching those on the front lines of tobacco healthcare treatment and prevention.

## FACTUAL DISCUSSION

It is difficult to comprehend that more than 115 people die each day from opioid-related overdoses.[2]  Unfortunately, that alarming statistic understates the full nature of the opioid crisis.  For every opioid-related death, there are on average 10 hospital admissions for abuse, 26 emergency department visits for misuse, and at least $4,350,000 in healthcare-related costs.[3]  And these numbers are growing exponentially.

Hospital emergency departments have been drafted to the front lines of the opioid crisis. Adult hospitalizations due to opioid misuse or dependence have climbed at a troubling pace. From 2005 to 2014, emergency departments saw a 99.4 percent cumulative increase in opioid-related visits.[4]  This trend continues.  A report issued by the Centers for Disease Control and Prevention ("CDC") earlier this year found an increase in opioid-related emergency department visits of over 30% in the last year alone.[5]  This rate increased on average by 5.6% per quarter.[6]

---

[2]    National Institute on Drug Abuse, *Opioid Overdose Crisis*, https://drugabuse.gov/drugs-abuse/opioids/opioid-overdose-crisis (last updated March 2018) (citing to 2017 data from the National Center for Health Statistics, a division of the U.S. Centers for Disease Control and Prevention).

[3]    Loretta Fala & John A. Welz, *New Perspectives in the Treatment of Opioid-Induced Respiratory Depression*, 8(6 suppl. 3) Am. Health & Drug Benefits S51-S63 (Oct. 2015); *see also* Ctrs for Disease Control and Prevention, *Prescription Drug Abuse and Overdose: Public Health Perspective*, (Oct. 24, 2012), https://www.ctti-clinicaltrials.org/files/ctti-opioid_meeting-jones_cdc.pdf; Substance Abuse & Mental Health Servs Admin., U.S. Dep't of Health & Human Servs, *Drug Abuse Warning Network, 2011: National Estimates of Drug-Related Emergency Department Visits*, U.S. Dep't of Health & Human Servs Pub. No. (SMA) 13-4760, DAWN Series D-39 (2013).

[4]    Jennifer Bresnick, *Hospitals Face Higher Costs, More ED Visits from Opioid Abuse*, HealthITAnalytics (Dec. 21, 2016), https://healthitanalytics.com/news/hospitals-face-higher-costs-more-ed-visits-from-opioid-abuse.

[5]    *See* Vivolo-Kantot, et al., Ctrs for Disease Control & Prevention, U.S. Dep't of Human & Health Servs., *Vital Signs: Trends in Emergency Department Visits for Suspected Opioid Overdoses – United States, July 2016-September 2017* (Mar. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6709e1.htm (noting that the CDC found that from July 2016 through September 2017, the surveyed 52 jurisdictions experienced a total of 142,557 emergency visits involving suspected opioid-involved overdoses.).

[6]    *Id.*

The nation's hospitals not only serve as the primary destination for first responders to bring suspected cases of opioid-related overdoses, but they also serve the primary medical needs for persons lacking insurance and/or primary care physicians.   Approximately 80 percent of adults visiting emergency rooms do so because of a lack of access to other providers.[7]

The cost of providing opioid-related patient care is staggering.   Inpatient care due to opioid use was estimated at $700 million in 2002.   By 2012, that number grew to $15 billion. And the estimates for 2017 exceed $25 billion.[8]   If anything, these numbers underestimate the expense.   A comprehensive, peer-reviewed study found that the cost of an opioid-related adult ICU admission rose from an average of $58,517 to $92,408 between 2009 and 2015.   For opioid addicted newborns, the cost is much higher.   Today, an addicted baby is born in the United States every 25 minutes.[9]   Among 28 states with publically available data as provided by the Healthcare Cost and Utilization Project between 1999-2013, the overall incidence of Neonatal Abstinence Syndrome from maternal opiate use increased 300% from 1.5 per 1,000 hospital births in 1999 to 6.0 per 1,000 hospital births in 2013.[10]   Average hospitalization for babies studied between 2008-2011 was 23 days for opioid addicted newborns, compared to 1-2 days for other newborns;

---

[7]      *See, e.g.,* CDC, *Emergency Room Use Among Adults Aged 18–64: Early Release of Estimates From the National Health Interview Survey, January–June 2011*, (May 2012) https://www.cdc.gov/nchs/data/nhis/.../emergency_room_use_january-june_2011.pdf ("About 79.7% of adults visited the emergency room due to lack of access to other providers, significantly more than the 66.0% who visited due to seriousness of the medical problem.").

[8]      Matrix Global Advisors, LLC, *Health Care Costs from Opioid Abuse: A State-by-State Analysis*, (April 2015) http://drugfree.org/wp-content/uploads/2015/04/Matrix_OpioidAbuse_040415.pdf.

[9]      Nat'l Instit. on Drug Abuse, Nat'l Instits. of Health, U.S. Dep't of Health & Human Sers, *Dramatic Increases in Maternal Opioid Use and Neonatal Abstinence Syndrome*, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/dramatic-increases-in-maternal-opioid-use-neonatal-abstinence-syndrome    (last updated Sept. 2015).

[10]      Jean Y. Ko, et al., *Incidence of Neonatal Abstinence Syndrome-28 States, 1999-2013*, 65 MMWR Morb Mortal Weekly Report 799-802 (Aug. 12, 2016) https://www.cdc.gov/mmwr/volumes/65/wr/mm6531a2.htm#suggestedcitation.

a 2015 review of data showed costs for medical treatment while hospitalized exceeded $200,000 per newborn,[11] with yearly treatment costs pushing $2 million by the third year.[12]

While third-party insurers and state Medicaid programs provide some reimbursement to hospitals for such care, a significant amount of the expense goes un- or under-compensated.  Amici Hospitals are concerned that if the medical community is excluded from this MDL proceeding, recoveries against the manufacturer and distributor defendants will never actually reach the front lines, especially for prevention and future care.   This concern is not theoretical; a recent study of the tobacco settlement fund found that as little as 3% of the monies recovered were actually used for tobacco prevention.[13]   Instead, the plaintiffs in those cases—primarily state governments—are spending the recoveries on other things, which sets a troubling precedent in light of the parallels being drawn to this proceeding.

In their motions to dismiss, the manufacturer and distributor defendants ask this Court to apply case law from the tobacco litigation to exclude hospitals from participating in this litigation.  As a threshold matter, the case law from the tobacco litigation is inapposite and distinguishable on factual, medical, and even technological grounds.  But even were that law on point, the tobacco litigation serves as a case study of the consequences that flow from excluding hospitals and other direct claimants; if anything, the tobacco litigation demonstrates why public policy is served and the goals of tort litigation are advanced by allowing those with the most direct harm and the most direct role in addressing future harm—such as the hospital community—to have the most direct involvement in the present opioid MDL litigation.

---

[11]      Libby Lyons, *The Cost of Neonatal Abstinence on Healthcare*, Addiction Hope, Addiction Hope (Jan. 28, 2017), https://www.addictionhope.com/blog/cost-neonatal-abstinence-healthcare/.

[12]      *Id.*

[13]      See *Broken Promises to Our Children: A State-by-State Look at the 1998 Tobacco Settlement 19 Years Later*, Dec. 13, 2017, available at https://www.acscan.org/sites/default/files/docs/FY2018_state_settlement_report.pdf.

**LEGAL DISCUSSION**

The underlying principle of tort law, and indeed the "purposes for which actions of tort actions are maintainable," is to provide "compensation, indemnity or restitution for harms." Restatement (Second) of Torts § 901(a) (1979); *see also Rockwood v. Allen*, 5 Mass. 254, 256 (Mass. 1811) ("[W]here an injury has been sustained, for which the law gives a remedy, that remedy shall be commensurate to the injury sustained."). Tort law also has a "deterrent" function, "accomplished through the setting of standards of conduct and the punishment by means of damage awards, compensatory and punitive, of those who deviate from them[.]" *Jones v. Reagan*, 696 F.2d 551, 554 (7th Cir. 1983) (explaining this "main function of tort law…was the implicit view of Holmes"). "It is not surprising, then, that courts now employ tort law to address the long-term social ramifications that a finding of liability will engender." Alan Calnan, *Justice and Tort Law* 4 (1997) (explaining that "most judges recognize that product liability judgments do not merely censure a single, random act of carelessness, but amount to a condemnation of an entire product line or way of doing business").

To obtain recovery for past damages and seek redress to prevent future damages, hospitals have filed suit against the opioid manufacturers and distributors. This Court has selected a bellwether case to proceed on a litigation track. In seeking dismissal of the bellwether complaint, the manufacturer and distributor defendants go so far as to assert that the hospital bellwether case "presents a textbook example of a plaintiff whose claims should be dismissed because the claims are indirect and derivative." (Distributor Memo. in Supp. of Mot. to Dismiss, DE # 684-1, at 2.) The essential thrust of the motions is that hospitals are "remote" victims with speculative damages. In making these assertions, the defendants rely almost exclusively on court decisions from "[t]wenty years ago and more" that dismissed hospital and third-party payor

claims during the tobacco litigation. (*Id.*).    Those cases held that those plaintiffs' claims were either too remote for the legal system to recognize, that the cases were too complex to ascertain damages, and/or that there was too great a risk of multiple recoveries.

None of these three rationales apply to hospital involvement in the present opioid MDL proceedings.  Hospitals have been directly injured and continue to incur damages on a daily basis. The advent of comprehensive diagnosis and procedure codes along with the widespread adoption of electronic records allows hospitals to precisely ascertain their damages.  And the fact that hospitals seek to only recover unreimbursed or under-reimbursement expenses for providing medical care and treatment—for which they have a legal duty to provide[14]—eliminates any risk of multiple recoveries.  Indeed, without hospital involvement in this litigation, the manufacturer and distributor defendants will be able to avoid any liability for billions of dollars of unreimbursed care provided by hospitals and the billions of dollars that hospitals will expend in the coming years.  No one other than hospitals can recover these damages.

A.    **The Tobacco Litigation Cases Relied upon by the Defendants Are Inapposite.**

A review of that case law and the underlying factual claims in the tobacco litigation era cases relied upon by the defendants demonstrates fundamental differences between the tobacco cases and the present opioid litigation.  For example, the defendants' motion papers discuss at length the Seventh Circuit opinion in *International Brotherhood of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 821 (7th Cir. 1999).  That case neither involved hospital plaintiffs nor sought payment for unreimbursed medical care.  Instead, *Teamsters* involved claims brought by third-party insurers against the tobacco manufacturers for

---

[14]    *See, e.g.,* Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd); *Harry v. Marchant,* 291 F.3d 767, 772 (11th Cir. 2002) (discussing EMTALA obligations placed on hospitals); *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 7892 (2d Cir. 1999) (noting that EMTALA's legislative history shows it was intended to fill vacuum by imposing duty on hospitals to provide treatment to all).

the healthcare claims paid by the insurers on behalf of their insureds. The insurers did NOT base their claims on subrogation grounds, a point that was emphasized by the Seventh Circuit, but instead sought to recover under their own theory of liability. *Id.* at 821-22,

In finding that these plaintiffs had not actually suffered an injury, the Seventh Circuit observed that "[s]mokers, employers, and other purchasers of insurance, not the [insurers], foot the medical bill in the end." *Id*. at 821. Because the insurers collected premiums from their insureds and then paid out those premiums for medical claims, the Court held that the insurers had not actually incurred any damages. In other words, the insurers were "just financial intermediaries [who] collect the premiums and spend them to provide the contracted-for care; their books balance whether the costs of care are high or low." *Id*. at 824. Accordingly, the Court essentially held that the insurer plaintiffs had not been injured as all costs had been borne by the smokers themselves, who paid for their own medical care by paying more for insurance.

The claims asserted by hospitals in this MDL proceeding are fundamentally different than those asserted by the third-party payors in *Teamsters*, as the hospitals seek recoveries for the direct costs of care that they expended *and for which they have not been paid*. Unlike the insurers in *Teamsters*, hospitals are not financial intermediaries collecting money from patients on the front end and then expending that money later. Instead, hospitals seek to recover for care they provided for which they have neither been reimbursed nor pre-paid.

This distinction has been readily recognized in decisions subsequent to *Teamsters*, in which "the Seventh Circuit made it clear that where a suit is brought by the direct victim and the plaintiff 'suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct,' it is inappropriate to grant summary judgment (and, therefore, inappropriate to dismiss under Rule 12(b)(6)) based on the purported absence of proximate cause." *In re*

*Testosterone Replacement Therapy Prods. Liab. Litig. Coordinated Pretrial Proceedings*, 159 F. Supp. 3d 898, 919 (N.D. Ill. 2016) (quoting *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011)).  This is consistent with "[t]he cardinal principle of damages in Anglo-American law [which] is that of compensation for the injury caused to the plaintiff by defendant's breach of duty" where compensation consists of "repairing plaintiff's injury or . . . making him whole as nearly as that may be done by an award of money."  John C. Goldberg, *Two Conceptions of Tort Damages: Fair v. Full Compensation*, 55 DePaul L. Rev. 435 (2006) (quoting 4 Fowler V. Harper et al., The Law of Torts § 25.1, at 490, 493 (2d ed. 1986)).  Accordingly, the defendants' reliance on *Teamsters* and its progeny is misplaced.

The defendants also cite a handful of tobacco-litigation era cases brought by hospitals, most notably the Third Circuit's decision in *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429 (3d Cir. 2000).  In *Allegheny*, a group of non-profit hospitals sued to recover for the costs of medical care provided to patients who had used tobacco products.  Those hospitals asserted—like the bellwether case—a RICO claim, along with claims arising under state law and federal antitrust law.[15]

The Court in *Allegheny* observed that hospitals "may be the best party to vindicate a RICO claim."  *Id.* at 444.  However, the Court was troubled by the remoteness between the defendants' conduct and the hospitals' injuries.  The Third Circuit observed that tobacco companies had not sought to mislead or otherwise involve the medical community in their alleged scheme but instead directed their deception solely to smokers, to whom they sold directly.

---

[15]     The Courts in both *Allegheny* and *Teamsters* devoted much of their opinions analyzing the antitrust claims brought in those cases, which are not at issue in the opioid MDL proceedings and which involve the unique concept of "antitrust injury."

Because the medical community had not been also targeted by the tobacco companies, the Third Circuit found an insufficient nexus between the alleged conduct and the alleged damages.

This insufficient nexus was highlighted by the hospitals attempt to establish a causal connection, in which they asserted: "without the Hospitals, the nonpaying patients would have died more quickly from tobacco-related disease. By keeping them alive, the Hospitals were defrauded by the Tobacco Companies into maintaining a ready supply of tobacco users." *Id.* at 438. This was, to say the least, a unique and macabre theory of liability that the Court, not surprisingly, found too attenuated. The factual allegations here are much different, as the bellwether case alleges not only that the medical community was a direct target of the defendants' marketing scheme, but also that the hospitals' damages were directly caused by the results of that marketing scheme. (*See, e.g.,* Compl., DE # 760, at Factual Background §§ V, VII, VIII, and XIV.)

Accordingly, the two lines of case law relied upon by the defendants are legally and factually distinguishable. Indeed, the entire attempt to draw parallels between the tobacco litigation and the present opioid MDL proceedings are misplaced for several reasons, which are discussed next.

> **B.** **Fundamental Factual Differences Distinguish Hospitals' Claims in this Proceeding from those made 30 Years Ago Against the Tobacco Companies.**

Hospital claims in the present proceedings are not only legally distinguishable from those made in the tobacco litigation, but they are also factually different.

First, the widespread adoption of comprehensive and standardized diagnosis and procedure codes coupled with the advancement of electronic medical records take the guesswork out of ascertaining damages for unreimbursed opioid-related care. Whereas thirty years ago hospitals in cases such as *Allegheny* had to rely on imprecise estimates and suspect modeling

(and plaintiff insurers in cases such as *Teamsters* were required to demonstrate flaws in their own actuarial calculations that resulted in premium shortfalls), hospitals today can precisely and efficiently calculate the damages they have incurred—and accurately estimate damages they are likely to incur in the future—from the opioid crisis.

Hospitals subscribe to the International Classification of Disease ("ICD"), which consists of internationally standardized alphanumeric codes for recording diagnoses.[16]  These codes, and especially the ICD-10 codes that have become the standard within the last three years, provide a consistent and reliable method of identifying patient encounters based on specific opioid-related diagnoses.  Hospitals can also use Current Procedural Terminology ("CPT") coding to identify the services provided to patients with the applicable ICD diagnosis codes.  Based on these data, hospitals can demonstrate everything from admission rates for opioid-related care to the average length of stay to detailed cost calculations for unreimbursed care.

Indeed, a team of medical, billing, and database experts retained by the undersigned counsel has already undertaken the exercise of examining certain of the Amici Hospitals' patient and billing data in order to calculate damages with a level of precision never fathomed by the hospital plaintiffs in the tobacco litigation.  By mining the electronic databases of these hospitals, the expert team was about to provide an in-depth analysis of past damages while identifying the requisite resources and care to be needed in the future.  These experts were also able to avail themselves of the now-standard use of electronic medical records to double-check their work for accuracy and account for the full extent of opioid-related care provided by hospitals, including post-emergency and behavioral treatment.

---

[16]    An earlier version of ICD codes, called "ICD-9," was replaced in 1999 by "ICD-10," although its use was not mandated in the United States until 2015.

Second, the causal connection between opioid use and the medical care provided by hospitals is considerably more clear than when hospitals sought to recover for tobacco-related care.  After all, and unfortunately, a single opioid overdose requires immediate medical care. The presentment in an emergency department from an opioid overdose leaves no doubt as to its cause. By contrast, the health issues arising from tobacco and smoking, including those related to cardiovascular health, respiratory health, and cancer, do not manifest themselves until years or decades after a person begins smoking.[17]  Indeed, most tobacco users are not treated for medical complications until decades after they used tobacco products and their more advanced age coupled with the vastly different tobacco products on the market can make causation complex and uncertain.  At the end of the day, the same qualities of opioids that have quickly created the present health crisis also create a direct causal link between use and the need for medical treatment.

Finally, the nature of the conduct alleged by the manufacturer and distributor defendants differs in important ways from those of the tobacco companies.  The bellwether complaint asserts that hospitals were the direct targets of the manufacturer and distributor defendants. Whereas the hospitals and third-party payors in the tobacco litigation complained that the tobacco companies had misled individual smokers, the bellwether hospital complaint maintains that the medical community itself was misled and indeed specifically targeted by the manufacturer and distributor defendants.[18]

---

[17]    See U.S. Dep't of Health & Human Servs, *The Health Consequences of Smoking-50 Years of Progress, A Report of the Surgeon General* (2014), https://www.surgeongeneral.gov/library/reports/50-years-of-progress/full-report.pdf.

[18]    For example, the complaint alleges that the manufacturer and distributor defendants conspired "to dramatically increase sales by convincing doctors to prescribe opioids not only for the kind of severe pain associated with cancer or short-term post-operative pain, but also for common chronic pains, such as back pain and arthritis…even though they knew that opioids were addictive and subject to abuse, and that their other claims

(continued…)

Accordingly, from a damages, causation, and liability perspective, the tobacco cases relied upon by the defendants are factually distinguishable.

### C.    The Benefit of Hindsight Affords this Court the Foresight to Ensure Hospitals Are not Excluded from this Litigation

The motion to dismiss papers correctly observe that hospitals were largely dismissed as plaintiffs in the tobacco mass tort litigation.   However, defendants are incorrect as to the conclusion this Court should draw from that experience.   Rather than serving as a basis for excluding hospitals from the present opioid MDL proceeding, the tobacco litigation experience provides a compelling case study for explicitly including hospitals and other frontline responders. As Louis D. Brandeis wrote more than a century ago: "That the individual shall have full protection in person and in property is a principle as old as the common law; but it has been found necessary from time to time to define anew the exact nature and extent of such protection. Political, social, and economic changes entail the recognition of new rights, and the common law, in its eternal youth, grows to meet the demands of society."[19]

After hospitals were excluded from the tobacco litigation, the states settled their lawsuits against the major tobacco companies. This settlement imposed certain restrictions on the tobacco industry, such as bans on targeting children and limits on advertising. The tobacco companies were also required to make annual, perpetual payments to the states to fund beneficial programs, such as anti-smoking campaigns and public health initiatives. These settlement funds had an estimated value of $246 billion dollars over the first 25 years, and the states can collect

---

regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded." (Compl., DE # 760, at ¶ 16.)  The complaint then explicitly alleges: "The Defendants have marketed and continue to market their opiate products directly to Plaintiffs and other hospitals, and to doctors on staff at those hospitals, and thus Plaintiff was and is a direct customer and victim of the Defendants' false, deceptive and unfair marketing of opioids described hereafter." (Compl. DE # 760, at ¶ 62.)  The hospital plaintiffs in the tobacco litigation made no such allegations.

[19]      Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy* 4 Harvard Law Rev. 5 (Dec. 15, 1890).

additional revenue from tobacco taxes.  This fiscal year alone, the states will collect $27.5 billion from the settlement payments and taxes.

Unfortunately, rather than spend the money on prophylactic measures, the states will spend upwards of 97% of this fiscal year's funds on other things, including projects such as shipping docks (Alaska), golf course sprinklers (New York), and modernizing tobacco farming (North Carolina).[20]  Despite the availability of funds, not a single state is funding tobacco prophylactic measures at the level the CDC recommends.  Estimations indicate that if every state met the CDC's minimum tobacco expenditure recommendation (which are just a fraction of the settlement proceeds received each year by the states), declines in youth smoking alone would see a future reduction of $31 billion in health care costs.[21]  Despite such evidence, most states have decreased funding for these initiatives, and some have no allocations at all.  Meanwhile, tobacco companies' efforts have greatly outpaced prevention spending, with companies spending about twelve times as much to promote their tobacco products as the states spend on prevention and cessation initiatives. Today, smoking remains the leading cause of preventable deaths in the United States, but about 70% of adult smokers indicate that they would like to quit smoking.[22]

The tobacco case study illustrates what can happen when important stakeholders are excluded from litigation involving a national health crisis: the defendants were released from liability, states were paid extraordinary sums, and yet tobacco usage remains the leading cause of preventable death and a scourge on healthcare providers and payors alike.  With opioid usage now vying to overtake tobacco as the leading cause of preventable death, hospitals must be

---

[20]    *See* Jim Estes, *How the Big Tobacco Deal Went Bad*, The New York Times (Oct. 6, 2014), https://www.nytimes.com/2014/10/07/opinion/how-the-big-tobacco-deal-went-bad.html.

[21]    *Broken Promises to Our Children*: *A State-by-State Look at the 1998 State Tobacco Settlement 16 Years Later* (2014), at 85, https://www.acscan.org/sites/default/files/docs/FY2018_state_settlement_report.pdf.

[22]    *See*  U.S. Food & Drug Admin, *4 Tips to Quit Smoking* (last updated Jan. 5, 2018), https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm590868.htm.

afforded the opportunity to play a meaningful opportunity in these MDL proceeding. Not only have they suffered direct and ascertainable injury, but they will also play a critical role in communities throughout the United States in the coming months and years to stem the opioid crisis.

## CONCLUSION

Defendants acknowledge that "persons who have experienced dependence, addiction, and episodes of overdose" are "direct victims of the crisis."  (Distributor Memo ISO MTD at 1). Despite acknowledging these victims, defendants fail to recognize where these victims are inevitably treated: this nation's hospitals. Hospitals, which have a legal duty to provide emergency care regardless of reimbursement, have provided billions of dollars of unreimbursed medical care.  This is a natural and foreseeable result of the defendants' alleged conduct and raises the fundamental question of who should bear the cost of providing such care: hospitals or the defendants? The Amici Hospitals respectfully submit it should be the latter.

Respectfully submitted,

/s/ Theresa A. Richthammer
**JAMES T. TYMINSKI, JR. (0070516)**
**THERESA A. RICHTHAMMER (0068778)**
**Gallagher Sharp LLP**
Sixth Floor – Bulkley Building
1501 Euclid Avenue
Cleveland, OH  44115
(216) 241-5310 (Telephone)
(216) 241-1608 (Facsimile)
E-Mail:  jtyminski@gallaghersharp.com
　　　　trichthammer@gallaghersharp.com
*Counsel for Amici Curiae Bailey Medical Center, BSA Hospital, BSA Physicians, Harrington Cancer Center, Centennial Hills*

*Hospital Medical Center, Corona Regional Medical Center, Desert Springs Hospital, Heart Hospital of New Mexico at Lovelace Medical Center, The George Washington University Hospital, Henderson Hospital, Hillcrest Hospital Claremore, Hillcrest Hospital Cushing, Hillcrest Hospital Henryetta, Hillcrest Hospital Pryor, Hillcrest Hospital South, Hillcrest Medical Center, Lovelace Medical Center, Lovelace Medical Group, Lovelace Regional Hospital Roswell, Lovelace Westside Hospital, Lovelace Women's Hospital, Manatee Memorial Hospital, Oklahoma Heart Institute, Physicians Surgical Hospitals, Seton Medical Center Harker Heights, Southwest - Inland Valley Medical Center, Spring Valley Hospital Medical Center, Summerlin Hospital Medical Center, Temecula Valley Medical Center, Tulsa Spine & Specialty Hospital, Utica Park Clinic, Valley Hospital Medical Center, Allegiance Behavioral Health Center of Plainview; CLHG-Avoyelles d/b/a Avoyelles Hospital; Allegiance Specialty Hospital of Greenville; Allegiance Health Center of Ruston; Allegiance Health Center of Monroe; Bienville Medical Center; Eureka Springs Hospital; Oakdale Community Hospital; River Valley Medical Center; Sabine Medical Center; Winn Parish Medical Center; and North Metro Medical Center*

/s/Phillip F. Cramer

**PHILLIP F. CRAMER**
**LAUREN Z. CURRY**
**Sherrard Roe Voigt & Harbison, PLC**
150 3rd Avenue South, Suite 1100
Nashville, TN 37219
(615) 742-4200 (Telephone)
(615) 742-4539 (Facsimile)
E-Mail: pcramer@srvhlaw.com
           lcurry@srvhlaw.com
*Counsel for Amici Curiae Bailey Medical Center, BSA Hospital, BSA Physicians, Harrington Cancer Center, Centennial Hills*

*Hospital Medical Center, Corona Regional Medical Center, Desert Springs Hospital, Heart Hospital of New Mexico at Lovelace Medical Center, The George Washington University Hospital, Henderson Hospital, Hillcrest Hospital Claremore, Hillcrest Hospital Cushing, Hillcrest Hospital Henryetta, Hillcrest Hospital Pryor, Hillcrest Hospital South, Hillcrest Medical Center, Lovelace Medical Center, Lovelace Medical Group, Lovelace Regional Hospital Roswell, Lovelace Westside Hospital, Lovelace Women's Hospital, Manatee Memorial Hospital, Oklahoma Heart Institute, Physicians Surgical Hospitals, Seton Medical Center Harker Heights, Southwest - Inland Valley Medical Center, Spring Valley Hospital Medical Center, Summerlin Hospital Medical Center, Temecula Valley Medical Center, Tulsa Spine & Specialty Hospital, Utica Park Clinic, and Valley Hospital Medical Center*

/s/Craig L. Williams

**CRAIG L. WILLIAMS**
**LUCIEN H. MARIONEAUX, JR**.
**Marioneaux & Williams, LLC**
1201 Hawn Avenue
Shreveport, LA 71107
(318) 963-5980 (Telephone)
(318) 963-5980 (Facsimile)
E-Mail: craig@mandwlegal.com
           lucien@mandwlegal.com
*Counsel for Amici Curiae Allegiance Behavioral Health Center of Plainview; CLHG-Avoyelles d/b/a Avoyelles Hospital; Allegiance Specialty Hospital of Greenville; Allegiance Health Center of Ruston; Allegiance Health Center of Monroe; Bienville Medical Center; Eureka Springs Hospital; Oakdale Community Hospital; River Valley Medical Center; Sabine Medical Center; Winn Parish Medical Center; and North Metro Medical Center*

17

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018 the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Theresa A. Richthammer

**THERESA A. RICHTHAMMER (0068778)**
**GALLAGHER SHARP LLP**
*Counsel for Amici Curiae for Bailey Medical Center, BSA Hospital, BSA Physicians, Harrington Cancer Center, Centennial Hills Hospital Medical Center, Corona Regional Medical Center, Desert Springs Hospital, Heart Hospital of New Mexico at Lovelace Medical Center, The George Washington University Hospital, Henderson Hospital, Hillcrest Hospital Claremore, Hillcrest Hospital Cushing, Hillcrest Hospital Henryetta, Hillcrest Hospital Pryor, Hillcrest Hospital South, Hillcrest Medical Center, Lovelace Medical Center, Lovelace Medical Group, Lovelace Regional Hospital Roswell, Lovelace Westside Hospital, Lovelace Women's Hospital, Manatee Memorial Hospital, Oklahoma Heart Institute, Physicians Surgical Hospitals, Seton Medical Center Harker Heights, Southwest - Inland Valley Medical Center, Spring Valley Hospital Medical Center, Summerlin Hospital Medical Center, Temecula Valley Medical Center, Tulsa Spine & Specialty Hospital, Utica Park Clinic, Valley Hospital Medical Center, Allegiance Behavioral Health Center of Plainview; CLHG-Avoyelles d/b/a Avoyelles Hospital; Allegiance Specialty Hospital of Greenville; Allegiance Health Center of Ruston; Allegiance Health Center of Monroe; Bienville Medical Center; Eureka Springs Hospital; Oakdale Community Hospital; River Valley Medical Center; Sabine Medical Center; Winn Parish Medical Center; and North Metro Medical Center*