**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*State of Alabama v. Purdue Pharma, L.P., et al.,*<br>Case No. 18-OP-45236 | MDL 2804<br><br>Hon. Dan Aaron Polster |

**BRIEF OF AMICI STATES OF CONNECTICUT, NORTH CAROLINA,
PENNSYLVANIA, ARIZONA, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA,
HAWAI'I, IDAHO, ILLINOIS, IOWA, LOUISIANA, MAINE, MARYLAND,
MICHIGAN, MINNESOTA, MISSISSIPPI, MONTANA, NEBRASKA, NEVADA,
NEW MEXICO, NEW YORK, NORTH DAKOTA, OHIO, OREGON, RHODE ISLAND,
SOUTH CAROLINA, TENNESSEE, TEXAS, VIRGINIA, AND WASHINGTON
IN OPPOSITION TO MCKESSON'S MOTION TO DISMISS
THE STATE OF ALABAMA'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

INTERESTS OF *AMICI* STATES.................................................................................. 1

INTRODUCTION ......................................................................................................... 2

ARGUMENT ................................................................................................................ 3

      I.     State Laws, Enforced by State Attorneys General, Require Distributors to
           Prevent Diversion and Detect Suspicious Orders ................................................... 3

           A.     State Law Requires that Opioid Distributors Prevent Diversion and
                    Detect Suspicious Orders ............................................................................ 3

           B.     The Uniform Act and Federal Controlled Substances Act
                    Specifically Contemplate State Regulation of Distributors ...................... 7

           C.     States Properly Impose Duties to Prevent Diversion and Detect
                    Suspicious Orders that Parallel Those of the Federal Controlled
                    Substances Act ............................................................................................ 8

           D.     State Attorneys General Have Common-Law or Statutory
                    Authority to Enforce State Controlled Substances Laws and to
                    Seek Monetary Remedies Under Those Laws .......................................... 10

      II.    McKesson's Remaining Scattershot Arguments Do Not Apply to
           Sovereign Enforcement of State Consumer Protection Laws or to State
           Common-Law Claims ......................................................................................... 11

           A.     States Have Broad Authority to Protect Consumers Through
                    *Parens Patriae* Authority and Under State UDAP Statutes .................... 11

           B.     The Free Public Services Doctrine Does Not Bar State Claims .............. 12

           C.     Sovereign Enforcement Actions Under UDAP Statutes Do Not
                    Require a Showing of Proximate Cause .................................................. 15

           D.     The Derivative Injury Rule Does Not Apply to Sovereign Actions
                    Under UDAP Statutes ............................................................................... 16

CONCLUSION............................................................................................................ 17

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) ............................................................................................. 9

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ..................... 1, 11

*AU Optronics Corp. v. South Carolina,* 699 F.3d 385 (4th Cir. 2012) ................................... 11, 16

*Auer v. Robbins*, 519 U.S. 452 (1997) ........................................................................................ 5

*California v. Zook*, 336 U.S. 725 (1949) ...................................................................................... 9

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322 (9th Cir. 1983) ........... 13

*In re Std. & Poor's Rating Agency Litig.,* 23 F. Supp. 3d 378 (S.D.N.Y. 2014) .................... 12, 16

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d Cir. 1999) ......................................................................................................................... 16

*Masters Pharm., Inc. v. DEA*, 861 F.3d 206 (D.C. Cir. 2017) ........................................................ 6

*Mississippi ex rel. Hood v. AU Optronics Corp,* 571 U.S. 161 (2014) ......................................... 11

*Nevada v. Bank of Am. Corp.,* 672 F.3d 661 (9th Cir. 2012) ........................................................ 11

*United States v. Moore*, 423 U.S. 122 (1975) .............................................................................. 8

*Worm v. Am. Cyanamid Co.*, 970 F.2d 1301 (4th Cir. 1992) ......................................................... 9

**State Cases**

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) ......................................... 14

*Elipas Enters. v. Silverstein*, 612 N.E.2d 9 (Ill. App. Ct. 1993) ................................................... 15

*James v. Arms Tech., Inc*., 820 A.2d 27 (N.J. Super. Ct. App. Div. 2003) ................................... 13

*Koch v. Consol. Edison Co. of N.Y., Inc*., 468 N.E.2d 1 (N.Y. 1984) ............................................ 14

*Maryland v. Philip Morris, Inc.,* No. 96122017, 1997 WL 540913 (Md. Cir. Ct. May 21, 1997) ...................................................................................................................... 17

*Mayton v. Hiatt's Used Cars, Inc.*, 262 S.E.2d 860 (N.C. Ct. App. 1980) ................................... 12

*People ex rel. Harris v. Rizzo*, 154 Cal. Rptr. 3d 443 (Cal. Ct. App. 2013) ................................. 10

*Pharm. Mfrs. Ass'n v. N.M. Bd. of, Pharm.*, 525 P.2d 931 (N.M. Ct. App. 1974) ........................ 8

*State ex rel. Derryberry v. Kerr-Mcgee Corp.*, 516 P.2d 813 (Okla. 1973) ................................ 10

*State ex rel. Miller v. Philip Morris Inc.,* 577 N.W.2d 401 (Iowa 1998) .................................... 16

*State v. Lead Ind. Ass'n, Inc.,* No. 99-5226, 2001 WL 345830 (R.I. Super. Ct. Apr. 2, 2001) .......................................................................................................................... 15

*Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783 (N.J. 2005) ........................................ 15

*Weinberg v. Sun Co.*, 777 A.2d 442 (Pa. 2001) ........................................................................... 15

**Administrative Adjudications**

Masters Pharms., Inc., 80 Fed. Reg. 55,418 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017) ................................................................................. 5

Southwood Pharms., Inc., 72 Fed. Reg. 36,487 (DEA July 3, 2007) ............................................. 5

**Federal Statutes**

21 U.S.C. § 903 ............................................................................................................................... 9

**State Statutes**

Ala. Code § 8-19-8 ........................................................................................................................ 12

Ala. Code § 8-19-11 ...................................................................................................................... 12

Ala. Code § 20-2-50 ........................................................................................................................ 5

Ala. Code § 20-2-51 ........................................................................................................................ 4

Ala. Code § 20-2-52 ........................................................................................................................ 4

Cal. Bus. & Prof. Code § 4169.1 .................................................................................................... 5

Conn. Gen. Stat. § 21a-70 ............................................................................................................... 5

Idaho Code Ann. § 54-1753 ............................................................................................................ 5

Tenn. Code Ann. § 53-10-312 ........................................................................................................ 5

Va. Code Ann. § 54.1-3435 ............................................................................................................ 5

**Federal Regulations**

21 C.F.R. § 1301.71 ........................................................................................................................ 5

21 C.F.R. § 1301.74 ............................................................................................................. 6

**State Regulations**

Ala. Admin. Code r. 680-X-2-.23 ...................................................................................... 6, 7

Ala. Admin. Code r. 680-X-3-.05 ......................................................................................... 7

Idaho Admin. Code r. 27-01-01-615 ..................................................................................... 5

Ill. Admin. Code tit. 77, § 3100.310 ..................................................................................... 5

856 Ind. Admin. Code 2-3-30 ............................................................................................... 5

856 Ind. Admin. Code 2-3-33 ............................................................................................... 5

Iowa Admin. Code r. 657-10.13 ............................................................................................ 5

Kan. Admin Reg. § 68-20-15a ............................................................................................... 5

La. Admin Code tit. 46, § 2713 ............................................................................................. 5

La. Admin Code tit. 46, § 2715 ............................................................................................. 5

Md. Code Regs. 10.19.03.12 ................................................................................................. 5

Minn. R. 6800.1440 .............................................................................................................. 6

Mo. Code Regs. Ann. tit. 19, § 30-1.031 .............................................................................. 5

Mo. Code Regs. Ann. tit. 19, § 30-1.032 .............................................................................. 5

Mont. Admin. R. 24.174.1201 .............................................................................................. 6

N.J. Admin. Code § 13:45H-2.1 ........................................................................................... 5

N.J. Admin. Code § 13:45H-2.4 ........................................................................................... 5

N.M. Code R. § 16.19.20.48 ................................................................................................. 5

N.Y. Comp. Codes R. & Regs. tit. 10, § 80.17 .................................................................... 5

N.Y. Comp. Codes R. & Regs. tit. 10, § 80.22 .................................................................... 5

10A N.C.A.C. 26E.0129 ....................................................................................................... 6

Ohio Admin. Code 4729:9-16 ............................................................................................... 5

Okla. Admin. Code § 475:20-1-5 .......................................................................................... 5

Or. Admin. R. 855-65-10 ........................................................................................ 5

28 Pa. Code § 25.61 ............................................................................................... 5

216-20-20 R.I. Code R. § 4.7 ................................................................................ 5

S.C. Code Ann. Regs. 61-4-401 ............................................................................ 5

S.C. Code Ann. Regs. 61-4-404 ............................................................................ 5

W. Va. Code R. § 15-2-5 ....................................................................................... 5

Wash. Admin. Code 246-879-050 ......................................................................... 6

Wis. Admin. Code Phar § 8.10 .............................................................................. 5

59-2-3 Wyo. Code R. § 24 ..................................................................................... 5

59-2-3 Wyo. Code R. § 27 ..................................................................................... 5

**Other Authorities**

116 Cong. Rec. 35,551 (Oct. 7, 1970) .................................................................. 8

7 Am. Jur. 2d *Attorney General* § 5 .................................................................. 10

Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis: A Public Health
    Approach to an Epidemic of Addiction*, 36 Ann. Rev. Pub. Health 559 (2015),
    *available at* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-
    031914-122957 ........................................................................................... 2

Centers for Disease Control and Prevention, *Opioid Overdose: Understanding the
    Epidemic* (2017), *available at* https://www.cdc.gov/drugoverdose/epidemic/ .................. 1

Council of Economic Advisors, *The Underestimated Cost of the Opioid Crisis* 1 (2017) .......... 14

Jonathan Sheldon et al., Nat'l Consumer Law Ctr., *Unfair and Deceptive Acts and
    Practices* §§ 1.1, 12.2.1, 13.1 (9th ed. 2016) .................................................. 12

Prentiss Cox et al. *Strategies of Public UDAP Enforcement*, 55 Harv. J. on Legis. 37
    (2017) .................................................................................................... 12

Special Message to the Congress on Control of Narcotics and Dangerous Drugs, Pub.
    Papers of the Presidents of the United States: Richard Nixon (July 14, 1969) .................. 7

Uniform Controlled Substances Act (1970) .......................................................... 4, 8

Uniform Controlled Substances Act (1994) .............................................................. 7

## INTERESTS OF *AMICI* STATES

The State of Connecticut, the State of North Carolina, the Commonwealth of Pennsylvania, the State of Arizona, the State of Delaware, the District of Columbia, the State of Florida, the State of Hawaii, the State of Idaho, the State of Illinois, the State of Iowa, the State of Louisiana, the State of Maine, the State of Maryland, the State of Michigan, the State of Minnesota, the State of Mississippi, the State of Montana, the State of Nebraska, the State of Nevada, the State of New Mexico, the State of New York, the State of North Dakota, the State of Ohio, the State of Oregon, the State of Rhode Island, the State of South Carolina, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of Washington respectfully submit this *amici curiae* brief in support of Alabama's opposition to McKesson's motion to dismiss. States have compelling interests in protecting the health, safety, and welfare of their citizens. State attorneys general routinely promote these interests by enforcing consumer protection statutes and other state laws. In doing so, they often rely on statutory authorization or *parens patriae* authority to prevent or remedy harm to the health and well-being of their residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

Opioid abuse and addiction are fueling the deadliest drug crisis in American history. The Amici States' attorneys general represent communities with some of the highest opioid and heroin abuse rates in the country. These abuses have inflicted catastrophic injury to the health and welfare of their residents. Millions of the residents of the Amici States are now addicted to prescription opioids and tens of thousands die annually from overdoses.[1] Each of the States—through various public health programs and law enforcement efforts—has also borne substantial costs to mitigate and respond to the opioid epidemic.

---

[1] Centers for Disease Control and Prevention, *Opioid Overdose: Understanding the Epidemic* (2017), *available at* https://www.cdc.gov/drugoverdose/epidemic/ (last visited Aug. 3, 2018).

1

In response to the crisis, more than 40 state attorneys general, including the Attorney General of Alabama, formed a coalition to investigate opioid distributors.  On September 18, 2017, the multistate group requested documents and information related to distribution practices from three drug distributors, including McKesson.[2]  This investigation continues, with the multistate group presently receiving and reviewing productions from the distributors and opioid distribution data made available through the Court's ARCOS Protective Order.  Additionally, like Alabama, several Amici States have filed lawsuits against McKesson and other distributors.

## **INTRODUCTION**

There is no doubt—and indeed, McKesson does not dispute—that prescription opioids are widely diverted from legitimate distribution channels to illegal ones.  The sheer volume of diverted opioids has wrought havoc throughout the Amici States and has plagued Amici States' communities.  There is a direct correlation between the sale and distribution of opioids and opioid-induced deaths and hospitalizations.[3]

McKesson—controlling approximately one-third[4] of the drug distribution market— claims that it bears no responsibility for the opioid epidemic because it is merely the truck driver between a manufacturer that makes the opioid and a pharmacy that stocks the opioid.  This claim is belied by the extensive role that massive distribution companies like McKesson actually play in the pharmaceutical industry.  But, more importantly for purposes of this brief, McKesson

---

[2] http://myfloridalegal.com/webfiles.nsf/WF/JMAR-ARBR24/$file/McKesson+Inquiry+Letter.pdf (last visited Aug. 3, 2018).

[3] Andrew Kolodny et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Ann. Rev. Pub. Health 559 (2015), *available at* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957 (last visited Aug. 3, 2018).

[4] Company Profile & Description, https://www.mckesson.com/about-mckesson (last visited Aug. 3, 2018).

ignores the distributor's legal duties to prevent diversion and to monitor, detect, investigate, refuse, and report suspicious orders of opioids.

Accordingly, the Amici States urge this Court to deny McKesson's Motion to Dismiss.

## ARGUMENT

**I.**     **State Laws, Enforced by State Attorneys General, Require Distributors to Prevent Diversion and Detect Suspicious Orders.**

Alabama has alleged that McKesson violated its duties under the federal Controlled Substances Act to prevent diversion and detect suspicious orders. *See* Compl. ¶¶ 244-286. Even so, McKesson argues that the federal Controlled Substances Act does not provide states a private right of action against distributors and that state common law does not incorporate distributors' duties under the federal Controlled Substances Act. *See* McKesson Br. at 15-18. But states do not rely solely on the federal Controlled Substances Act to regulate distributors. State laws themselves prohibit opioid distributors from facilitating diversion and from turning a blind eye to suspicious orders.[5] State attorneys general, including the Attorney General of Alabama, are empowered to enforce violations of those laws. McKesson's arguments, therefore, are without merit.

### A.     **State Law Requires that Opioid Distributors Prevent Diversion and Detect Suspicious Orders.**

State law imposes freestanding duties upon opioid distributors separate from the federal Controlled Substances Act. The substance of the duties to prevent diversion and detect suspicious orders imposed by state law are generally similar among the states and parallel federal law duties. Accordingly, McKesson is wrong in arguing that "there is no duty under [state] law

---

[5] This brief discusses only the Uniform Act's duties imposed on distributors. However, it also imposes duties on manufacturers to prevent diversion and detect suspicious orders. *See* Alabama Br. at 35-37.

to halt or report suspicious orders" or that states "may not assert tort claims against McKesson based on its federal regulatory obligation" when those duties parallel state law duties.  McKesson Br. at 15.

State regulation of distributors is largely uniform:  48 states (all but New Hampshire and Vermont), the District of Columbia, Puerto Rico, and the U.S. Virgin Islands have adopted a model state statute, the Uniform Controlled Substances Act of 1970 ("Uniform Act").[6]  *See* Exhibit A; *see also e.g.*, Ala. Code §§ 20-2-1 to -190.

The Uniform Act requires that every distributor of controlled substances, like opioids, must obtain an annual registration from the appropriate state agency.  Uniform Act § 302(a); *see also* Ala. Code § 20-2-51(a).  The Uniform Act then requires those registered distributors to follow its substantive requirements.  Uniform Act § 302(b); *see also* Ala. Code § 20-2-51(b).

The Uniform Act imposes substantive duties to prevent diversion and detect suspicious orders in two ways.  First, the Uniform Act conditions the lawful registration of distributors on the "maintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels," and "the existence in the applicant's establishment of effective controls against diversion."  Uniform Act § 303(a)(1), (4); *see also* Ala. Code § 20-2-52(a)(1), (4).  Second, the Uniform Act specifically grants to third parties (including state agencies and officials) the authority to establish regulations policing the distribution of controlled substances in the state.  Uniform Act § 301; *see also* Uniform Act prefatory note ("The Uniform Act updates and improves existing State laws and insures

---

[6] This count is based on the "table of jurisdictions wherein either the 1970, 1990, or 1994 versions of the act or a combination thereof has been adopted" available in Westlaw.

legislative and administrative flexibility to enable the States to cope with both present and future drug problems."); Ala. Code § 20-2-50(a).

Many states have used their regulatory powers under the Uniform Act to promulgate regulations related to diversion and suspicious orders.  In approximately half of the states, these regulations are verbatim, or nearly verbatim, copies of Drug Enforcement Administration ("DEA") regulations related to diversion and suspicious orders.  One such regulation that states have implemented as a matter of state law[7] requires explicitly that distributors "provide effective controls and procedures to guard against . . . diversion of controlled substances."  21 C.F.R. § 1301.71(a).[8]  Another such regulation that states have implemented as a matter of state law[9]

---

[7] See, e.g., Ill. Admin. Code tit. 77, § 3100.310(a); 856 Ind. Admin. Code 2-3-30(a); Iowa Admin. Code r. 657-10.13; Kan. Admin Reg. § 68-20-15a(a); La. Admin Code tit. 46, § 2713(a); Md. Code Regs. 10.19.03.12(a)(1); Mo. Code Regs. Ann. tit. 19, § 30-1.031(1); N.J. Admin. Code § 13:45H-2.1(a); N.M. Code R. § 16.19.20.48(a); N.Y. Comp. Codes R. & Regs. tit. 10, § 80.17; 28 Pa. Code § 25.61(a); 216-20-20 R.I. Code R. § 4.7; S.C. Code Ann. Regs. 61-4-401(a); W. Va. Code R. § 15-2-5.1.1; 59-2-3 Wyo. Code R. § 24(a).

[8] Through formal administrative adjudication entitled to deference, see Auer v. Robbins, 519 U.S. 452, 461 (1997), the DEA has interpreted this regulation to require each distributor "to perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer."  Masters Pharms., Inc., 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), petition for review denied, 861 F.3d 206 (D.C. Cir. 2017).  Pursuant to this duty, "a distributor must conduct a reasonable investigation to determine the nature of a potential customer's business before it sells to the customer, and the distributor cannot ignore information which raises serious doubt as to the legality of a potential or existing customer's business practices."  Id. (alterations and internal quotation marks omitted) (quoting Southwood Pharms., Inc., 72 Fed. Reg. 36,487, 36,498 (DEA July 3, 2007)).

[9] See, e.g., Idaho Admin. Code r. 27-01-01-615(4); 856 Ind. Admin. Code 2-3-33(b); Kan. Admin Reg. § 68-20-15a(c)(2); La. Admin Code tit. 46, § 2715(c)(2); Mo. Code Regs. Ann. tit. 19, § 30-1.032(2); N.J. Admin. Code § 13:45H-2.4(b); N.Y. Comp. Codes R. & Regs. tit. 10, § 80.22; Ohio Admin. Code 4729:9-16(h)(1)(e); Okla. Admin. Code § 475:20-1-5(b); Or. Admin. R. 855-65-10(9); S.C. Code Ann. Regs. 61-4-404(b); W. Va. Code R. § 15-2-5.3; Wis. Admin. Code Phar § 8.10; 59-2-3 Wyo. Code R. § 27(b).  Additionally, in recent years several states have codified the requirements of 21 C.F.R. § 1301.74(b) into their statutes.  See, e.g., Cal. Bus. & Prof. Code § 4169.1; Conn. Gen. Stat. § 21a-70(i); Idaho Code Ann. § 54-1753(7); Tenn. Code Ann. § 53-10-312(c); Va. Code Ann. § 54.1-3435(b).

requires distributors to "design and operate a system to disclose to the [distributor] suspicious orders of controlled substances.  The [distributor] shall inform [DEA] of suspicious orders when discovered by the [distributor].  Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."  21 C.F.R. § 1301.74(b).  The United States Court of Appeals for the District of Columbia Circuit has held that these regulations require distributors to either 1) report to DEA and refuse to ship each suspicious order or 2) dispel any suspicions based on "actually undertak[ing] [an] investigation" of the order that "must dispel all of the 'red flags' that gave rise to the suspicion that the customer was diverting controlled substances."  *Masters Pharms.*, 861 F.3d at 222-23.

Other states have incorporated DEA's anti-diversion and suspicious order requirements into their state law in slightly different ways.  Some states have done so by cross-referring to DEA regulations.[10]  Alabama, for its part, adopts a slightly more shorthand version of 21 C.F.R. § 1301.74(b) in its regulations.  Alabama's regulations state that distributors "shall submit to the Alabama State Board of Pharmacy legible copies of records and reports *required by the Drug Enforcement Administration* concerning increases in purchases or high or unusual volumes

---

[10] *See, e.g.*, 10A N.C.A.C. 26E.0129(a) ("Any person who . . . distributes . . . any controlled substance shall comply with Part 1301 of Title 21 of the Code of Federal Regulations . . . ."); Wash. Admin. Code 246-879-050(7) ("All applicants for a license as a controlled substances wholesaler must comply with the security requirements as found in 21 CFR . . . 1301.71 through 1301.74 . . . .").  Other states, including Alabama, provide an overarching state law requirement that distributors comply with DEA regulations.  *See, e.g.*, Ala. Admin. Code r. 680-X-2-.23(2)(k)(3) ("Wholesale drug distributors shall operate in compliance with applicable Federal . . . laws and regulations."); Minn. R. 6800.1440, subp. 11 ("Wholesale drug distributors who deal in controlled substances . . . shall comply with all applicable . . . Drug Enforcement Administration regulations."); Mont. Admin. R. 24.174.1201(6) (same as Minnesota).

purchased by pharmacies within 30 days."[11]  Ala. Admin. Code r. 680-X-3-.05(2) (emphasis added); *see also* Ala. Admin. Code r. 680-X-2-.23(2)(e)(5) (similar requirement).

### B.    The Uniform Act and Federal Controlled Substances Act Specifically Contemplate State Regulation of Distributors.

As the previous section shows, states have adopted statutes that require the regulation of distributors' diversion and suspicious order mechanisms.  The drafters of the Uniform Act and the federal Controlled Substances Act specifically contemplated an independent enforcement role for state law.

The Uniform Act and the federal Controlled Substances Act, which were passed at approximately the same time,[12] were meant to "provide an interlocking trellis of laws which will enable government at all levels to more effectively control the [narcotic and dangerous drug] problem."  Special Message to the Congress on Control of Narcotics and Dangerous Drugs, Pub. Papers of the Presidents of the United States: Richard Nixon, 1969, at 513, 514 (July 14, 1969).

The drafters of the Uniform Act identified a concern—similar to the issues the country faces again today—about the role that the diversion of pharmaceutical drugs played in the rise in drug abuse in the United States during the 1960s.  At the time of the adoption of the Uniform Act and the federal Controlled Substance Act, "[o]ver 50 percent of the 'legally' manufactured

---

[11] McKesson erroneously claims that "[t]here is no obligation under Alabama law to report suspicious orders" notwithstanding this regulation.  McKesson Br. at 13 (bold omitted).  By the plain text of this regulation, a distributor is out of compliance with state law *either* if it fails to submit required reports to the DEA or to provide legible copies of those reports to the Alabama Board of Pharmacy.  In other words, the regulation is violated if the state fails to receive a legible copy of a report that McKesson is required under federal law to submit to DEA, regardless if McKesson fails in the first instance to make the report to DEA or simply to provide a copy to the state.  *See also* Alabama Br. at 34-35.

[12] Both the Uniform Act and the federal Controlled Substances Act have been amended since their original 1970 versions.  *See, e.g.*, Uniform Controlled Substances Act (1994).  However, the relevant provisions related to regulating the distribution of controlled substances have remained largely unchanged.

amphetamines in the United States [were being] diverted into illegal channels," and that "this extraordinarily high diversion rate ha[d] continued for at least 5 years" but that "[d]rug companies ha[d] not voluntarily curtailed production."  116 Cong. Rec. 35,551 (Oct. 7, 1970) (statement of Sen. Eagleton).

In an effort to address diversion in their model legislation for states, the drafters specifically identified a main objective of the Act:  to establish a closed regulatory system for the legitimate handlers of controlled drugs in order better to prevent illicit drug diversion.  Uniform Act, prefatory note.  Specifically, the Act was designed to "close the gaps in State laws and thus eliminate many of these sources of diversion, both actual and potential."  Uniform Act § 302 cmt.  By incorporating the Uniform Act into state law, state legislators achieved their purpose in combating diversion by establishing a closed regulatory system within each state that prevented controlled substances going from legitimate channels to illegitimate channels.  *Pharm. Mfrs. Ass'n v. N.M. Bd. of Pharm.*, 525 P.2d 931, 936 (N.M. Ct. App. 1974); *see also United States v. Moore*, 423 U.S. 122, 135 (1975) (observing that Congress intended the federal Controlled Substances Act to guard against diversion of abuse-prone prescription medications "from legitimate channels to illegitimate channels" because entities with access to medications moving through legitimate channels "were responsible for a large part of the illegal drug traffic").

By adopting the Uniform Act, the states have created closed systems to prevent the diversion of controlled substances and regulated the distributors of these substances.

### C.    States Properly Impose Duties to Prevent Diversion and Detect Suspicious Orders that Parallel Those of the Federal Controlled Substances Act.

McKesson argues that Alabama's claims fail because Alabama has no federal law right of action against distributors.  McKesson is wrong because states may through their state laws impose duties similar to federal law.  Pursuant to the scheme established by the Uniform Act,

8

they have done so with respect to opioid distributors' duties to prevent diversion and detect suspicious orders.

States may adopt federal requirements as their own laws and regulations unless a constitutionally valid provision of federal law preempts states from doing so.  *See, e.g.*, *California v. Zook*, 336 U.S. 725, 735 (1949) (holding that a state statute was not preempted when "there is no conflict in terms, and no possibility of such conflict, for the state statute makes federal law its own in this particular").  And the state law provisions that adopt federal requirements may authorize the state (or its citizens) to sue to enforce noncompliance with those duties, again unless a constitutionally valid provision of federal law preempts states from doing so.  *See, e.g.*, *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005) ("[I]f state law adopts or imposes a . . . requirement that is the same as the federal standard, even if the state law provides compensation or other remedies for a violation, so long as Congress chooses not to explicitly preempt the consistent law, it will not be said to be in conflict with federal law." (quoting *Worm v. Am. Cyanamid Co.*, 970 F.2d 1301, 1307 (4th Cir. 1992))).

The federal Controlled Substances Act neither preempts states from incorporating distributors' federal requirements into state law nor preempts states from making those requirements judicially enforceable.  In fact, the federal Controlled Substances Act specifically disavows any interpretation that would preempt states from regulating in the same area "unless there is a positive conflict between that provision of this title and that State law so that the two cannot consistently stand together."  21 U.S.C. § 903.  This point only bolsters the conclusion that the federal Controlled Substances Act is enforced in concert with state regimes of regulation and enforcement.

9

**D.      State Attorneys General Have Common-Law or Statutory Authority to Enforce State Controlled Substances Laws and to Seek Monetary Remedies Under Those Laws.**

Perhaps anticipating that it will not be successful in denying the states' authority to prevent diversion and monitor suspicious orders, McKesson argues, alternatively, that the Court should dismiss Alabama's complaint because "nothing in the [Alabama] statute . . . authorizes the State to seek compensatory or consequential 'damages' on the basis of alleged violations of the Alabama CSA."  McKesson Br. at 11-12.  This argument is wrong, because state attorneys general have full authority to take civil action seeking monetary remedies—including damages for past harm, civil penalties, and future costs necessary to remediate harm—to enforce the duties imposed on distributors by state controlled substance laws.[13]

Most state attorneys general derive their power, at least in part, from the common law. *See State ex rel. Derryberry v. Kerr-Mcgee Corp.*, 516 P.2d 813, 818-19 (Okla. 1973) (citing law from numerous states).  "Under the common law, the attorney general has the power to bring any action which he or she thinks necessary to protect the public interest, a broad grant of authority which includes the power to act to enforce the state's statutes."  7 Am. Jur. 2d *Attorney General* § 5.  The California courts have also noted that "[t]he attorney-general, as the chief law officer of the state . . . in the absence of any legislative restriction, has the power to file any civil action . . . which he deems necessary for the enforcement of the laws of the state . . . ."  *People ex rel. Harris v. Rizzo*, 154 Cal. Rptr. 3d 443, 458 (Cal. Ct. App. 2013).  In those states where the Attorney General lacks inherent common-law powers, "the statutes in the various jurisdictions are, as a rule, more or less declaratory of the common law."  7 Am. Jur. 2d *Attorney General* § 5.

---

[13] With respect to at least some causes of action, other governmental and private parties may have the legal right to enforce these state-law duties.  This issue, which may have varying answers in different states, is beyond the scope of this brief.

As Alabama explains, it can obtain monetary remedies for violation of distributors' anti-diversion and suspicious order reporting duties under the Uniform Act through its claims for nuisance, negligence, and wantonness.  Alabama Br. at 37, 40-43.  Moreover, as explained below, in addition to common-law authority, state consumer protection statutes—including Alabama's—provide specific authority to enforce distributors' anti-diversion and suspicious order reporting duties under the Uniform Act and to obtain monetary remedies for their violations.

II.     **McKesson's Remaining Scattershot Arguments Do Not Apply to Sovereign Enforcement of State Consumer Protection Laws or to State Common-Law Claims.**

McKesson argues that Alabama is not eligible for relief because the free public services doctrine bars its claims, because it does not adequately plead proximate causation, and because its injuries are supposedly derived from harm to others.  McKesson's arguments are largely based on principles that apply to private parties enforcing private rights of action in tort.  But states, unlike private parties, have broad authority under consumer laws that prohibit unfair and/or deceptive business practices ("UDAP") and under common law to protect consumers and safeguard the integrity of state industries.  Accordingly, states need not allege proximate cause when bringing enforcement actions under UDAP statutes.  Likewise, states' consumer protection claims are not barred by the derivative injury rule or the free public services doctrine.

A.     **States Have Broad Authority to Protect Consumers Through *Parens Patriae* Authority and Under State UDAP Statutes.**

States protect their consumers and the integrity of their marketplaces under their state UDAP statutes or as *parens patriae*.  *See generally Mississippi ex rel. Hood v. AU Optronics Corp,* 571 U.S. 161 (2014); *AU Optronics Corp. v. South Carolina,* 699 F.3d 385 (4th Cir. 2012); *Nevada v. Bank of Am. Corp.,* 672 F.3d 661 (9th Cir. 2012).  The Supreme Court has long recognized states' standing to bring suits based on sovereign interests.  *See Alfred L. Snapp &*

11

*Son, Inc.*, 458 U.S. at 607 (recognizing a state's interest in preventing and/or remedying harm to "the health and well-being—both physical and economic—of its residents in general").

In addition to states' standing as *parens patriae*, all fifty states have enacted UDAP laws that may be enforced by the sovereign. State attorneys general bring actions under these UDAP statutes to target deceptive business conduct. *See* Jonathan Sheldon et al., Nat'l Consumer Law Ctr., *Unfair and Deceptive Acts and Practices* §§ 1.1, 12.2.1, 13.1 (9th ed. 2016); Prentiss Cox et al. *Strategies of Public UDAP Enforcement*, 55 Harv. J. on Legis. 37 (2017). The sovereign enforcement provision of Alabama's Deceptive Trade Practices Act ("DTPA"), Ala. Code § 8-19-8, parallels the UDAP sovereign enforcement provisions in other states. Ala. Code §§ 8-19-8, 8-19-11.

McKesson disregards the special role state attorneys general play in protecting consumers by conflating private UDAP claims with sovereign UDAP enforcement. But courts have uniformly recognized that the purpose of sovereign enforcement actions is eliminating unfair or deceptive practices "to vindicate the public interest rather than to redress individual grievances" or to act as a proxy for individual citizens' private claims. *Mayton v. Hiatt's Used Cars, Inc.*, 262 S.E.2d 860, 863 (N.C. Ct. App. 1980). The court in *In re Standard & Poor's Rating Agency Litigation*, for example, expressly recognized the distinctions between private and sovereign UDAP actions and highlighted the objective of states in enforcing UDAP statutes to eliminate unfair and deceptive business practices from the marketplace. *In re Std. & Poor's Rating Agency Litig.,* 23 F. Supp. 3d 378, 407 (S.D.N.Y. 2014).

**B.    The Free Public Services Doctrine Does Not Bar State Claims.**

The "free public services" doctrine does not bar recovery under Alabama's common-law claims to recover its expenditures related to the opioid epidemic. Nor does the doctrine preclude states from enforcing UDAP statutes.

12

The free public services doctrine is potentially applicable when a government entity seeks recovery for unremarkable emergency services whose costs are commonly levied on the public. Courts have found that the rule typically applies in those cases in which a single negligent event or act causes increased costs to governmental entities as they respond to one-off crises.  *See, e.g.*, *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983) (government costs incurred in evacuating residents after a train derailment).[14]

The costs incurred by Alabama, the Amici States, and every state nationwide to address the opioid crisis are substantial, wide-ranging, and ongoing.  *See* Compl. ¶¶ 355-66.  The conduct alleged in this case and the costs incurred render the doctrine inapplicable in this context.

Where, as here, a tortfeasor's continued misconduct causes a state to expend a significant amount of resources to mitigate the consequences of the misconduct, the state may recoup those costs.  *See, e.g.*, *James v. Arms Tech., Inc.*, 820 A.2d 27, 48-49 (N.J. Super. Ct. App. Div. 2003) (refusing to apply the free public services doctrine where the plaintiff claimed a repeated course of conduct by gun manufacturers, distributors, and retailers that required the government to expend substantial sums on a continual basis).

Here, the costs that Alabama and other states are seeking to recover are not associated with run-of-the-mill emergency services within the ambit of the free public services doctrine.[15] As Alabama's complaint alleges, the opioid epidemic has increased governmental costs

---

[14] The brief addresses only McKesson's claim that the free public services doctrine applies to the State of Alabama's causes of action, McKesson Br. at 10-11, and not the separate "municipal cost recovery rule" that is inapplicable to states.

[15] Additionally, many of the monetary remedies that states are seeking are civil penalties and future costs necessary to remediate harm, and not the recovery of past costs.  States, like Alabama, are uniquely situated in being authorized to pursue recoveries in this matter under their UDAP statutes and the Uniform Act.

nationwide, in areas ranging from healthcare treatment costs to losses of productivity and tax revenue.  *See* Compl. ¶¶ 360-63.  In fact, a recent estimate by the Council of Economic Advisers places the true cost of the opioid epidemic at $504.0 billion nationwide for the year 2015 alone.  *See* Council of Economic Advisors, *The Underestimated Cost of the Opioid Crisis* 1 (2017).  The free public services doctrine should not apply to bar the recovery of states' costs related to McKesson's continuous, intentional, and deceptive conduct.

Moreover, courts have routinely found that the free public services doctrine does not apply where recovery is authorized by statute or regulation or where a state is seeking to recover the costs of public services expended to abate a nuisance.  *See* Alabama Br. at 8-9.  Alabama alleges that the opioid epidemic is a public nuisance that was fueled, in part, by McKesson's actions, and these actions continue to threaten the health, safety, and welfare of Alabamans.  The damages that Alabama seeks relate directly to the abatement of the public nuisance it alleges McKesson caused.  Accordingly, the free public services doctrine does not apply to Alabama's common law claims.[16]

The Court should also reject McKesson's application of the free public services doctrine to sovereign enforcement of UDAP statutes.  The doctrine does not diminish states' authority under UDAP statutes to bring consumer protection enforcement actions.  *Koch v. Consol. Edison Co. of N.Y., Inc.*, 468 N.E.2d 1, 8 (N.Y. 1984).

---

[16] Alabama alleges that recovery from McKesson will directly abate the nuisance.  *See* Compl. ¶¶ 369, 375, 378-79.  As a result, the Illinois Supreme Court's use of the free public services doctrine to preclude a governmental plaintiff from recovering damages against a gun manufacturer is inapposite.  *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004).  In that case, the Illinois Supreme Court expressly held that the reason it applied the free public services doctrine was that the governmental plaintiff admitted that recovery would not abate the nuisance.  *Id*. at 1147.

None of the cases on which McKesson relies applies the doctrine to bar sovereign enforcement of a UDAP statute.  On the contrary, in the one reported case in which a defendant challenged a UDAP statute claim based on the free public services doctrine, the court summarily rejected the challenge.  *See State v. Lead Ind. Ass'n, Inc.*, No. 99-5226, 2001 WL 345830, at *5 (R.I. Super. Ct. Apr. 2, 2001).  Accordingly, the free public services doctrine does not bar a claim under a UDAP statute by a sovereign.

### C.   Sovereign Enforcement Actions Under UDAP Statutes Do Not Require a Showing of Proximate Cause.

McKesson conflates the requirements for private and sovereign UDAP actions by arguing that Alabama did not adequately allege that its injuries were proximately caused by McKesson's deceptive conduct.  McKesson's efforts to impose requirements for private plaintiffs under the DTPA on Alabama's sovereign enforcement claim should be rejected.

Inherent in the distinction between private and sovereign actions is the more relaxed showing that sovereigns must make to state a claim under UDAP statutes.  Private actions and sovereign actions under state UDAP statutes involve different elements.  Courts have routinely found, for example, that sovereigns need not prove reliance or proximate causation to obtain relief under state UDAP statutes.  *See, e.g., Weinberg v. Sun Co.*, 777 A.2d 442, 445 (Pa. 2001) (under Pennsylvania's UDAP statute, private plaintiffs must show reliance and causation, but the State need only prove that a practice is unlawful and that proceedings would be in the public interest); *Elipas Enters. v. Silverstein*, 612 N.E.2d 9, 12 (Ill. App. Ct. 1993) (private consumers could not prevail on claims under Illinois' UDAP statute without establishing reasonable reliance on deceptive conduct, but the State need not establish reasonable reliance); *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 790-92 (N.J. 2005) (recognizing that private plaintiffs

15

must plead an "[ascertainable] loss attributable to conduct made unlawful by the [Consumer Fraud Act]" but Attorney General need not).

None of the cases that McKesson relies on contradicts this tenet of UDAP enforcement. This is because none of the cases McKesson cites involved sovereign enforcement of state UDAP claims. This Court should reject McKesson's claim that failure to allege proximate causation is fatal to a state's UDAP claims.

## D. The Derivative Injury Rule Does Not Apply to Sovereign Actions Under UDAP Statutes.

McKesson also incorrectly claims that the "derivative injury rule" applies to sovereign UDAP claims. But the derivative injury rule is inapplicable in sovereign actions under UDAP statutes.

The derivative injury rule tests whether a party has standing to sue. When putative harm suffered by a private plaintiff is entirely derivative of harm to others, the harm may be "too remote" to support standing. *See, e.g.*, *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236-38 (2d Cir. 1999).

But a state's standing under a UDAP statute is not based on individual injuries at all. Instead, a state's standing is based on explicit enforcement authority conferred by the UDAP statute. State UDAP statutes authorize states to seek injunctive and equitable relief—in the states' own names—to eliminate unfair and deceptive business practices. *In re Std. & Poor's Rating Agency Litig.*, 23 F. Supp. 3d at 406; *AU Optronics Corp.*, 699 F.3d at 394.

Tellingly, neither of the cases upon which McKesson relies applies the derivative injury rule to a sovereign UDAP claim. *See* McKesson Br. at 7. In *State ex rel. Miller v. Philip Morris Inc.*, the court applied the derivative injury rule to Iowa's common law claims but not to Iowa's UDAP claims. *State ex rel. Miller v. Philip Morris Inc.*, 577 N.W.2d 401 (Iowa 1998).

16

Similarly, in *Maryland v. Philip Morris, Inc.*, the court applied the derivative injury rule to Maryland's common law claims but not to its UDAP or antitrust claims. *Maryland v. Philip Morris, Inc.*, No. 96122017, 1997 WL 540913 (Md. Cir. Ct. May 21, 1997). This Court should reject McKesson's application of the derivative injury rule to state UDAP claims.

## CONCLUSION

The Court should deny McKesson's motion to dismiss Alabama's first amended complaint.

Respectfully submitted,

/s/ _____
George Jepsen
*Attorney General*
*State of Connecticut*

Jeremy Pearlman
*Assistant Attorney General*

Michael C. Wertheimer
*Assistant Attorney General*

55 Elm Street
Hartford, Connecticut 06106

/s/ _____
Josh Shapiro
*Attorney General*
*Commonwealth of Pennsylvania*

Neil Mara
*Chief Deputy Attorney General*

Patrick Greene
*Deputy Attorney General*

Strawberry Square
Harrisburg, Pennsylvania 17120

(Counsel list continues on next page.)

/s/ _____
Josh Stein
*Attorney General*
*State of North Carolina*

Sripriya Narasimhan
*Deputy General Counsel*

Daniel P. Mosteller
*Special Deputy Attorney General*

114 W. Edenton Street
P.O. Box 629
Raleigh, North Carolina 27602

/s/ _____
Michael DeWine
*Attorney General*
*State of Ohio*

Jonathan R. Fulkerson (OH SC 0068360)
*Deputy Chief Counsel*

30 E. Broad Street, 17th Floor
Columbus, Ohio 43215

17

Mark Brnovich
*Attorney General*
*State of Arizona*
2005 North Central Avenue
Phoenix, Arizona 85004

Michael L. Vild
*Director*
*Fraud and Consumer Protection Division*
*Delaware Department of Justice*
820 North French Street
Wilmington, Delaware 19801

Karl A. Racine
*Attorney General*
*District of Columbia*
One Judiciary Square
441 4th Street, N.W.
Washington, D.C. 20001

Pamela Jo Bondi
*Attorney General*
*State of Florida*
PL-01, The Capitol
Tallahassee, Florida 32399

Russell A. Suzuki
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, Hawaii 96813

Lawrence G. Wasden
*Attorney General*
*State of Idaho*
700 West Jefferson Street
P.O. Box 83720
Boise, Idaho 83720

Lisa Madigan
*Attorney General*
*State of Illinois*
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601

Tom Miller
*Attorney General*
*State of Iowa*
1305 East Walnut Street
Des Moines, Iowa 50319

Jeff Landry
*Attorney General*
*State of Louisiana*
1885 North Third Street
Baton Rouge, Louisiana 70802

Janet T. Mills
*Attorney General*
*State of Maine*
6 State House Station
Augusta, Maine 04333

Brian E. Frosh
*Attorney General*
*State of Maryland*
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202

Bill Schuette
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

Lori Swanson
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, Minnesota 55155

Jim Hood
*Attorney General*
*State of Mississippi*
550 High Street, Suite 1200
Jackson, Mississippi 39205

Tim Fox
*Attorney General*
*State of Montana*
215 North Sanders
Helena, Montana 59620

Doug Peterson
*Attorney General*
*State of Nebraska*
2115 State Capitol
Lincoln, Nebraska 68509

Adam Paul Laxalt
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, Nevada 89701

Hector H. Balderas
*Attorney General*
*State of New Mexico*
201 3rd Street, NW, Suite 300
Albuquerque, New Mexico 87102

Barbara D. Underwood
*Attorney General*
*State of New York*
28 Liberty Street
New York, New York 10005

Wayne Stenehjem
*Attorney General*
*State of North Dakota*
600 East Boulevard Avenue
Bismarck, North Dakota 58505

Ellen F. Rosenblum
*Attorney General*
*State of Oregon*
1162 Court Street, N.E.
Salem, Oregon 97301

Peter F. Kilmartin
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, Rhode Island 02903

Alan Wilson
*Attorney General*
*State of South Carolina*
P.O. Box 11549
Columbia, South Carolina 29211

Herbert Slatery, III
*Attorney General and Reporter*
*State of Tennessee*
P.O. Box 20207
Nashville, Tennessee 37202

Ken Paxton
*Attorney General*
*State of Texas*
300 W. 15th Street
Austin, Texas 78701

Mark R. Herring
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, Virginia 23219

Robert Ferguson
*Attorney General*
*State of Washington*
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2018 the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ *Steve W. Berman*
Steve W. Berman