# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION <br><br> This document relates to: <br><br> *Cleveland Bakers & Teamsters Health & Welfare Fund and Pipe Fitters Local Union No. 120 Insurance Fund v. Purdue Pharma L.P., et al.*, <br> Case No. 18-op-45432 (N.D. Ohio) | MDL No. 2804 <br><br> Case No. 17-md-2804 <br><br> Judge Dan Aaron Polster |

**PLAINTIFFS CLEVELAND BAKERS AND TEAMSTERS HEALTH AND WELFARE FUND AND PIPE FITTERS LOCAL UNION NO. 120 INSURANCE FUND'S OMNIBUS MEMORANDUM IN OPPOSITION TO:**

**(1) MANUFACTURER DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT; (2) DISTRIBUTOR DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT; AND (3) MOTION TO DISMISS COMPLAINT BY DEFENDANTS WALMART INC., CVS HEALTH CORP., RITE AID OF MARYLAND, INC., AND WALGREENS BOOTS ALLIANCE, INC.**

# TABLE OF CONTENTS

**PAGE**

I.   INTRODUCTION ...................................................................................................1

II.  LEGAL STANDARD ............................................................................................2

III. ARGUMENT ..........................................................................................................2

    A.    Plaintiffs Have Sufficiently Pled Causation for All Claims ..........................2

        1.    Plaintiffs Adequately Alleged Direct Injuries ...................................3

        2.    Plaintiffs Adequately Alleged that Defendants Actually and Proximately Caused Their Injuries .....................................................11

            a.    Plaintiffs Adequately Alleged that Defendants' Conduct Directly Targeted Them and Substantially Contributed to Their Injuries ......12

            b.    Foreseeable Intervening Acts and Criminal Conduct Do Not Break the Causal Chain ........................................................15

    B.    Plaintiffs Have Sufficiently Pled Their RICO Claims...............................19

        1.    Plaintiffs Adequately Alleged Direct Injuries to Business or Property..........19

        2.    Plaintiffs Adequately Alleged Proximate Cause as Required Under RICO ...22

        3.    Plaintiffs Adequately Alleged a RICO Enterprise and Predicate Acts ..........25

            a.    Plaintiffs Adequately Alleged a RICO Enterprise ............................25

            b.    Plaintiffs Adequately Alleged Actionable Racketeering Activity.......27

    C.    Plaintiffs Have Pled Cognizable Claims Under OCPA .............................29

    D.    The OPLA Abrogates Neither Plaintiffs' Public Nuisance Claims nor Their Negligence Claims.........................................................................29

    E.    Plaintiffs Have Pled Cognizable Equitable Claims for Abatement of a Public Nuisance ........................................................................................34

        1.    Plaintiffs Adequately Alleged a Special Injury .................................34

        2.    Defendants' Remaining Public Nuisance Challenges Lack Merit ................35

    F.    Plaintiffs Have Sufficiently Pled Their Negligence Claims Against All Defendants .........................................................................................36

        1.    Plaintiffs Adequately Alleged the Existence of a Common Law Duty .........37

        2.    Plaintiffs Seek to Enforce Ohio Common-Law Duties................................41

        3.      Plaintiffs Adequately Alleged Proximate Causation ......................................43

    G.    The Economic Loss Rule Bars Neither Plaintiffs' Public Nuisance Claims
          nor Their Negligence Claims ..........................................................................43

    H.    Plaintiffs Have Sufficiently Pled Their Claim for Fraud Against the
          Manufacturer Defendants ................................................................................45

    I.    Plaintiffs Have Sufficiently Pled Their Claim for Injury from Criminal Acts
          Under R.C. §2307.60 .......................................................................................47

    J.    Plaintiffs Have Sufficiently Pled Their Unjust Enrichment Claim...........................48

    K.    Plaintiffs Have Sufficiently Pled Their Civil Conspiracy Claim ...............................52

    L.    Plaintiffs' Claims Are Not Preempted ..................................................................55

    M.    Plaintiffs' Claims Are Not Time-Barred ................................................................57

        1.      Plaintiffs Adequately Alleged Fraudulent Concealment ...............................58

        2.      The Continuous Violations Doctrine Applies to Plaintiffs' Claims ..............60

IV.   CONCLUSION......................................................................................................62

## TABLE OF AUTHORITIES

**CASES**                                                             **PAGE**

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
    228 F.3d 429 (3d Cir. 2000) ............................................................................25

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ......................................................................27

*American Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*,
    839 F.3d 458 (6th Cir. 2016) ...........................................................................57

*Anctil v. Ally Fin., Inc.*,
    998 F. Supp. 2d 127 (S.D.N.Y. 2014) .............................................................27

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ........................................................................................21

*Berdyck v. Shinde*,
    613 N.E.2d 1014 (Ohio 1993) .........................................................................38

*Bible v. United Student Aid Funds, Inc.*,
    799 F.3d 633 (7th Cir. 2015) ...........................................................................26

*Bohme, Inc. v. Sprint Int'l Commc'ns Corp.*,
    686 N.E.2d 300 (Ohio Ct. App. 1996) ......................................................38, 41

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) .............................................................................23, 24, 25

*Brown v. Cty. Comm'rs*,
    622 N.E.2d 1153 (Ohio Ct. App. 1993) ..........................................................34

*Buddenberg v. Weisdack*,
    No. 1:18-cv-00522, 2018 WL 3159052
    (N.D. Ohio June 28, 2018) ..............................................................................47

*Campbell v. Krupp*,
    961 N.E.2d 205 (Ohio Ct. App. 2011) ............................................................48

*Carrel v. Allied Prods. Corp.*,
    677 N.E.2d 795 (Ohio 1997) ......................................................................30, 33

*Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters., Inc.*,
    50 N.E.3d 955 (Ohio Ct. App. 2015) ..............................................................50

*CCB Ohio LLC v. Chemque, Inc.*,
    649 F. Supp. 2d 757 (S.D. Ohio 2009) ...........................................................31

*Chambers v. St. Mary's Sch.*,
   697 N.E.2d 198 (Ohio 1998) ............................................................. 38, 42

*Chandler v. Wackenhut Corp.*,
   465 F. App'x 425 (6th Cir. 2012) .............................................................61

*Chapman v. Tristar Prods., Inc.*,
   1:16-CV-1114, 2017 WL 1433259
   (N.D. Ohio Apr. 24, 2017) .............................................................31

*Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*,
   No. 1:10-CV-01902, 2011 WL 1326034
   (N.D. Ohio Apr. 6, 2011) .............................................................32

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*,
   537 N.E.2d 624 (Ohio 1989) .............................................................44

*City of Boston v. Smith & Wesson Corp.*,
   No. 199902590, 2000 WL 1473568
   (Mass. Super. Ct. July 13, 2000) .............................................................39

*City of Cincinnati v. Beretta U.S.A. Corp.*,
   768 N.E.2d 1136 (Ohio 2002) .............................................................*passim*

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
   863 F.3d 474 (6th Cir. 2017) ............................................................. 33, 44, 45

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
   No. 1:12-CV-104, 2016 WL 2897472
   (S.D. Ohio May 18, 2016) .............................................................58

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
   615 F.3d 496 (6th Cir. 2010) ............................................................. 14, 15, 33, 36

*City of Everett v. Purdue Pharma L.P.*,
   No. C17-209RSM, 2017 WL 4236062
   (W.D. Wash. Sept. 25, 2017) ............................................................. 37, 43, 49

*City of L.A. v. JPMorgan Chase & Co.*,
   No. 2:14-cv-04168-ODW, 2014 WL 6453808
   (C.D. Cal. Nov. 14, 2014) .............................................................49

*City of New York v. Lead Indus. Ass'n, Inc.*,
   190 A.D.2d 173 (N.Y. Sup. Ct. May 13, 1993) .............................................................49

*City of Toledo v. Sherwin-Williams Co.*,
   No. CI 200606040, 2007 WL 4965044
   (Ohio Com. Pl. Dec. 12, 2007) .............................................................34

*Cleveland Housing Renewal Project v. Deutsche Bank Trust Co.,*
   621 F.3d 554 (6th Cir. 2010) ................................................................... 33, 35

*Cleveland Housing Renewal Project, Inc. v. Wells Fargo Bank, N.A.,*
   934 N.E.2d 372, 380 (Ohio Ct. App. 2010) ............................................. 35

*Cromer v. Children's Hosp. Med. Ctr. of Akron,*
   29 N.E.3d 921 (Ohio 2015) .................................................................... 36

*Desiano v. Warner-Lambert Co.,*
   326 F.3d 339 (2d Cir. 2003) ................................................................... 2

*Digiknow, Inc. v. PKXL Cards, Inc.,*
   No. 96034, 2011 WL 2899600
   (Ohio Ct. App. July 21, 2011) ................................................................ 44

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.,*
   784 F. Supp. 2d 508 (D.N.J. 2011) ........................................................ 21

*Dunlap v. Medtronic, Inc.,*
   47 F. Supp. 2d 888 (N.D. Ohio 1999) .................................................... 17

*Eysoldt v. ProScan Imaging,*
   957 N.E.2d 780 (Ohio Ct. App. 2011) .................................................... 44, 48

*Feichtner v. Ohio Dep't of Transp.,*
   683 N.E.2d 112 (Ohio 1995) .................................................................. 18, 41

*Gould Elecs., Inc. v. Livingston Cty. Road Comm'n,*
   No. 09-CV-12633, 2012 WL 5817937
   (E.D. Mich. May 25, 2012) .................................................................... 61

*Great N. Ins. Co. v. BMW of N. Am. LLC,*
   84 F. Supp. 3d 630 (S.D. Ohio 2015) .................................................... 31, 32

*Greenberg v. Life Ins. Co. of Va.,*
   177 F.3d 507 (6th Cir. 1999) ................................................................. 46

*Hale v. Enerco Grp., Inc.,*
   No. 1:10 CV 00867-DAP, 2011 WL 49545
   (N.D. Ohio Jan. 5, 2011) ................................................................... 31, 44, 52, 54

*Hambleton v. R.G. Barry Corp.,*
   465 N.E.2d 1298 (Ohio 1984) ............................................................... 51

*Hemi Grp., LLC v. City of New York,*
   559 U.S. 1 (2010) .................................................................................. 22, 24

*Hoffer v. Cooper Wiring Devices, Inc.*,
   No. 1:06CV763, 2007 WL 1725317
   (N.D. Ohio June 13, 2007) ........................................................................50

*Holmes v. Sec. Inv'r Prot. Corp.*,
   503 U.S. 258 (1992) ...........................................................................2, 22

*Horvath v. Ish*,
   979 N.E.2d 1246 (Ohio 2012) ...................................................................38

*Huffman v. Electrolux N. Am., Inc.*,
   961 F. Supp. 2d 875 (N.D. Ohio 2013) ........................................................31

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
   804 F.3d 633 (3d Cir. 2015) ................................................................*passim*

*In re Neurontin Mktg. & Sales Practices Litig.*,
   712 F.3d 21 (1st Cir. 2013) ..................................................................*passim*

*In re Opioid Litig.*,
   No. 400000/2017, 2018 WL 3115102
   (N.Y. Sup. Ct. June 18, 2018) ...................................................36, 37, 43, 44

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
   No. 14 C 1748, 2018 WL 3586182
   (N.D. Ill. July 26, 2018) .....................................................................11, 22

*In re Testosterone Therapy Replacement Prods. Liab. Litig. Coordinated Pretrial Proceedings*,
   159 F. Supp. 3d 898 (N.D. Ill. 2016) ..................................................21, 22, 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   No. MDL 2672 CRB (JSC), 2017 WL 4890594
   (N.D. Cal. Oct. 30, 2017) .......................................................................22

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   684 F. Supp. 2d 942 (N.D. Ohio 2009) ...............................................31, 44, 50

*Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*,
   No. 13-7167, 2014 WL 2115498
   (E.D. Pa. May 21, 2014) .........................................................................28

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*,
   196 F.3d 818 (7th Cir. 1999) ....................................................................52

*Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*,
   634 F.3d 1352 (11th Cir. 2011) ...........................................................9, 10, 21

*Jackson v. Sedgwick Claims Mgmt. Servs., Inc.,*
    731 F.3d 556 (6th Cir. 2013) ............................................................................... 19

*Johnson v. Microsoft Corp,*
    834 N.E.2d 791, 799 (Ohio 2005). ............................................................... 49, 50

*Kramer v. Angel's Path, L.L.C.,*
    882 N.E.2d 46 (Ohio Ct. App. 2007) .................................................................. 35

*LaPuma v. Collinwood Concrete,*
    661 N.E.2d 714 (Ohio 1996) .......................................................................... 30, 31

*Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.,*
    91 F. Supp. 3d 940 (S.D. Ohio 2015) ................................................................. 49

*Lucarell v. Nationwide Mut. Ins. Co.,*
    97 N.E.3d 458 (Ohio 2018) ................................................................................. 46

*Lutz v. Chesapeake Appalachia, L.L.C.,*
    717 F.3d 459 (6th Cir. 2013) ............................................................................... 57

*McKinney v. Microsoft Corp.* ................................................................................. 32
    No. 1:10-cv-354, 2011 WL 13228141
    (S.D. Ohio May 12, 2011) ................................................................................... 32

*Menifee v. Ohio Welding Prods., Inc.,*
    472 N.E.2d 707 (Ohio 1984) ............................................................................... 38

*Miller v. City of W. Carrollton,*
    632 N.E.2d 582 (Ohio Ct. App. 1993) ................................................................ 35

*Moore v. Texaco, Inc.,*
    244 F.3d 1229 (10th Cir. 2001) ........................................................................... 49

*Mut. Pharm. Co., Inc. v. Bartlett,*
    570 U.S. 472, 788 (2013) .................................................................................... 56

*New Jersey Carpenters Health Fund v. Philip Morris, Inc.,*
    17 F. Supp. 2d 324 (D.N.J. 1998) ......................................................... 14, 16, 28

*Ohio Edison Co. v. Direct Energy Bus., LLC,*
    2017 WL 3174347 (N.D. Ohio July 26, 2017) ................................................... 50

*Ornella v. Robertson,*
    237 N.E.2d 140 (Ohio 1968) ............................................................................... 42

*Perry v. Am. Tobacco Co.,*
    324 F.3d 845 (6th Cir. 2003) ..................................................................... 5, 6, 7, 14

*Philadelphia Fire & Marine Ins. Co. v. Hirschfield Printing Co.*,
    53 N.E.2d 827 (Ohio Ct. App. 1943) ........................................................37

*Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
    653 N.E.2d 661 (Ohio 1995) ............................................................. 12, 16

*Randleman v. Fid. Nat'l Title Ins. Co.*,
    465 F. Supp. 2d 812 (N.D. Ohio 2006) ..................................................50

*Ray v. Spirit Airlines, Inc.*
    836 F.3d 1340 (11th Cir. 2016). ...........................................................26

*Rogozinsky v. Danek Med., Inc.*,
    No. 4:96CV2572, 1999 WL 33537323
    (N.D. Ohio July 8, 1999) ........................................................................42

*RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*,
    No. 87382, 2006 WL 2777159
    (Ohio Ct. App. Sept. 28, 2006) ..............................................................45

*Savoy v. Univ. of Akron*,
    No., 11AP-183, 2012 WL 3085515
    (Ohio Ct. App. May 3, 2012) ..................................................................57

*Schwartz v. Sun Co., Inc.*,
    276 F.3d 900 (6th Cir. 2002) ..................................................................13

*Se. Laborers Health & Welfare Fund v. Bayer Corp.*,
    655 F. Supp. 2d 1270 (S.D. Fla. 2009) ..................................................21

*Seafarers Welfare Plan v. Philip Morris*,
    27 F. Supp. 2d 623 (D. Md. 1998) .........................................................52

*Seley v. G.D. Searle & Co.*,
    423 N.E.2d 831 (Ohio 1981) ..................................................................17

*Sidney Hillman Health Ctr. v. Abbott Labs.*,
    873 F.3d 574 (7th. Cir. 2017) ........................................................... 11, 22

*Simpson v. Big Bear Stores Co.*,
    652 N.E.2d 702 (Ohio 1995) ..................................................................41

*State ex rel. Kenney v. City of Toledo*,
    No. L-17-1149, 2018 WL 2085099
    (Ohio Ct. App. May 4, 2018) ..................................................................58

*State ex rel. Morrisey v. AmerisourceBergen Drug Corp.*,
    No. 12-C-141, 2014 WL 12814021
    (W. Va. Cir. Ct. Dec. 12, 2014) ...............................................36, 37, 43

*State ex rel. R.T.G., Inc. v. State,*
    780 N.E.2d 998 (Ohio 2002) ............................................................... 45

*State of Washington State v. Purdue Pharma L.P.,*
    No. 17-2-25505-0, slip op. (Wash. Super. Ct. May 14, 2018) ............................... 36, 37, 43

*Strayhorn v. Wyeth Pharms., Inc.,*
    737 F.3d 378 (6th Cir. 2013) ............................................................... 56

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,*
    171 F.3d 912 (3d Cir. 1999) ............................................................... 14

*Stevens v. Parke, Davis & Co.,*
    507 P.2d 653 (Cal. 1973) ............................................................... 17

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharms., LP,*
    136 A.3d 688 (Del. 2016) ............................................................... 9

*Tefft v. Seward,*
    689 F.2d 637 (6th Cir. 1982) ............................................................... 62

*Tekavec v. Van Waters & Rogers, Inc.,*
    12 F. Supp. 2d 672 (N.D. Ohio 1998) ............................................................... 42

*Texas Carpenters Health Ben. Fund v. Philip Morris Inc.,*
    199 F.3d 788 (5th Cir. 2000) ............................................................... 15

*Thompson v. Argent Mortg. Co., LLC,*
    No. 94613, 2010 WL 3747601
    (Ohio Ct. App. Sept. 23, 2010) ............................................................... 34, 35

*Traxler v. PPG Indus., Inc.,*
    158 F. Supp. 3d 607 (N.D. Ohio 2016) ............................................................... 31

*Trollinger v. Tyson Foods, Inc.,*
    370 F.3d 602 (6th Cir. 2004) ...............................................................*passim*

*United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris Inc.,*
    223 F.3d 1271 (11th Cir. 2000) ............................................................... 15

*United States v. Faulkenberry,*
    614 F.3d 573 (6th Cir. 2010),
    *aff'd*, 461 F. App'x 496 (6th Cir. 2012) ............................................................... 51

*United States v. N. Trust Co.,*
    372 F.3d 886 (7th Cir. 2004) ............................................................... 57

*Vaccariello v. Smith & Nephew Richards, Inc.,*
    763 N.E.2d 160 (Ohio 2002) ..................................................................17

*Vill. of Cardington v. Fredericks' Adm'r,*
    21 N.E. 766 (Ohio 1889) ......................................................................34

*Volovetz v. Tremco Barrier Sols., Inc.,*
    74 N.E.3d 743 (Ohio Ct. App. 2016) ............................................. 30, 31

*Volter v. C. Schmidt Co., Inc.,*
    598 N.E.2d 35 (Ohio Ct. App. 1991) ............................................. 18, 41

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.,*
    714 F.3d 414 (6th Cir. 2013) ................................................................22

*Wallace v. Ohio Dep't of Commerce,*
    773 N.E.2d 1018 (Ohio 2002) ..............................................................38

*White v. Smith & Wesson,*
    97 F. Supp. 2d 816 (N.D. Ohio 2000) ..................................................49

*Williams v. Aetna Fin. Co.,*
    700 N.E.2d 859 (Ohio 1998) ................................................................54

*Williams v. Purdue Pharma Co.,*
    297 F. Supp. 2d 171 (D.D.C. 2003) .....................................................21

*Wireman v. Keneco Distribs., Inc.,*
    661 N.E.2d 744 (Ohio 1996) ................................................................42

*Wyeth v. Levine*
    555 U.S. 555 (2009) ..............................................................................56

*Young v. Carrier Corp.,*
    No. 4:14CV0974, 2014 WL 6617650
    (N.D. Ohio Nov. 21, 2014) ...................................................................50

*Zogenix, Inc. v. Patrick,*
    No. 14-11689-RWZ, 2014 WL 1454696
    (D. Mass. Apr. 15, 2014) ......................................................................56

## STATUTES, RULES AND REGULATIONS

Federal Rules of Civil Procedure
>> Rule 8(c)(1) ...........................................................................................................57
>> Rule 9 ....................................................................................................................27
>> Rule 9(b) .................................................................................................45, 54, 55
>> Rule 12(b)(6) .........................................................................................................57
>> Rule 15(a) ..............................................................................................................62
>> Rule 23(a)(4) .........................................................................................................22
>> Rule 23(b)(3) .........................................................................................................22

Ohio Revised Code
>> §715.44 ..................................................................................................................36
>> §2305.07 ................................................................................................................58
>> §2307.60 ................................................................................................................54
>> §2307.71(A)(2) ......................................................................................................30
>> §2307.71(A)(7) ......................................................................................................31
>> §2307.71(A)(13) ....................................................................................29, 32, 33
>> §2307.71(B) ...........................................................................................................30
>> §2307.72(C) .....................................................................................................30, 33
>> §2307.75 ................................................................................................................17
>> §2307.76 ................................................................................................................17
>> §2925.02(A) ...........................................................................................................47
>> §2925.02(B) ...........................................................................................................47
>> §2925.03(A) ...........................................................................................................47
>> §2925.03(B) ...........................................................................................................47
>> §3767.03 ...........................................................................................................36, 58

## SECONDARY AUTHORITIES

*Restatement (Second) of Torts*
>> §281 .......................................................................................................................38
>> §821C(1) ................................................................................................................34

*Restatement (Third) of Torts*
>> §7 ...........................................................................................................................37

## I.      INTRODUCTION

Cleveland Bakers and Teamsters Health and Welfare Fund and Pipe Fitters Local Union No. 120 Insurance Fund (collectively, "Plaintiffs" or "TPPs") herein respond to the Manufacturer, Distributor, and Pharmacy Defendants' motions to dismiss. Defendants'[1] conduct in deceptively and negligently promoting and distributing opioids has had severe and far-reaching public health consequences. Indeed, Ohio, where Plaintiffs and most of their beneficiaries are located, is among the states hardest hit by the opioid epidemic, which is the most pressing public health issue facing the state. Plaintiffs, directly targeted by Defendants' conduct, were unwitting direct victims of Defendants' scheme; Plaintiffs have been forced to pay for opioids they otherwise would not have and to bear the costs associated with increased and intensified responses to addiction, treatment, and overdose. Defendants, through their motions,[2] seek to dismiss Plaintiffs' action entirely. However, Plaintiffs have pled in the FAC facts sufficient to allege cognizable injuries, causation, and each of the other elements specific to their claims. For the reasons set forth herein, and in the *Summit* and *West Boca* oppositions,[3] Defendants' motions should be denied.

---

[1]   "Defendants" shall refer to all defendants in the Amended Complaint ("Complaint" or "FAC"), unless otherwise more narrowly defined in the context of the specific argument section. "Manufacturer Defendants" refers to those defendants who are referenced in the FAC, ¶¶35-78. "Distributor Defendants" refers to those defendants who are referenced as such in the FAC. ¶¶79-94. And as used in this Memorandum, "Pharmacies" or "Pharmacy Defendants" is a reference to the following Defendants: Walmart Inc., CVS Health Corp., Rite Aid of Maryland, Inc., and Walgreens Boots Alliance, Inc., the "Moving Defendants" referenced in ECF No. 773.

[2]   Memorandum in Support of Distributors' Motion to Dismiss Amended Complaint, ECF No. 774-1 ("Dist. Mem."); Memorandum in Support of the Manufacturer Defendants' Joint Motion to Dismiss the Amended Complaint, ECF No. 777-1 ("Mfr. Mem."); Memorandum of Law in Support of Motion to Dismiss Complaint by Defendants Walmart Inc., CVS Health Corp., Rite Aid of Maryland, Inc., and Walgreens Boots Alliance, Inc., ECF No. 773-1 ("Pharm. Mem.").

[3]   In an effort to avoid repetition, this memorandum expressly incorporates, where applicable, overlapping portions of the County of Summit, Ohio and City of Akron's Omnibus Memorandum in Opposition to: (1) Defendants AmerisourceBergen Drug Corp., Cardinal Health, Inc., and McKesson Corp.'s Motion to Dismiss (ECF No. 491); (2) Motion to Dismiss Complaint by Defendants Walmart Inc., CVS Health Corp., Rite Aid Corp., and Walgreens Boots Alliance, Inc. (ECF No. 497); and (3) Manufacturer Defendants' Joint Motion to Dismiss Plaintiffs' Second Amended Complaint (ECF No. 499). ECF No. 654 ("*Summit* Opp."). This memorandum also expressly incorporates, where applicable, overlapping portions of Plaintiff West Boca Medical Center, Inc.'s Omnibus Memorandum in Opposition to (1) Memorandum of Law in Support of the Manufacturer Defendants' Joint Motion to Dismiss Plaintiff's Complaint (Dkt. No. 691-1);

## II.  LEGAL STANDARD

Plaintiffs specifically incorporate the legal standards of review as discussed in the *Summit Opp.* at 4-6.

## III.  ARGUMENT

### A.  Plaintiffs Have Sufficiently Pled Causation for All Claims

In the many years since the tobacco cases, where some courts rejected efforts by institutional plaintiffs to seek derivative recovery for health care expenses incurred in treating smokers who were injured by cigarette maker misconduct, federal circuit courts have concluded in the pharmaceutical marketplace that false and deceptive marketing has a direct impact on third-party payors such that full recovery by them is available.  In *Desiano*, the Second Circuit analyzed the sufficiency of a third-party payor's causation allegations under *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258 (1992), and reversed dismissal of the payor's state-law claims based on defendant manufacturers' fraudulent marketing of their Type II diabetes drugs.  *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 340 (2d Cir. 2003).  In *Neurontin*, the First Circuit affirmed jury verdicts in favor of a third-party payor against the defendant pharmaceutical manufacturer for claims based on misrepresentations concerning effectiveness of off-label use of its anticonvulsant drug.  *In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 25 (1st Cir. 2013).  And most recently, in *Avandia*, the Third Circuit affirmed a denial of a motion to dismiss a third-party payor's claims based on the payor's allegations that the defendant manufacturer misrepresented and concealed safety risks associated with use of its Type II diabetes drugs.  *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633 (3d Cir. 2015).  In each of these cases, like here, and unlike in those Defendants cite, the third-party payor plaintiffs alleged that the defendant drug manufacturers made misrepresentations to the TPPs.  *See id.* at 644; *Neurontin*, 712 F.3d at 37; *Desiano*, 326 F.3d at 350.

---

(2) Memorandum in Support of Distributors' Motion to Dismiss (Dkt. No. 684-1); and (3) Memorandum in Support of Motion to Dismiss by Defendants CVS Health Corporation, Walgreens Boots Alliance, Inc., and Walmart Inc. (Dkt. No. 686-1).  ECF No. 806 ("*West Boca* Opp.").

Ignoring this case law altogether, Defendants incorrectly assert that Plaintiffs' injuries are unrecoverable here because they are "purely derivative" of the injuries of affected individuals. Mfr. Mem. at 3-7; Dist. Mem. at 3-6; Pharm. Mem. at 2-4. They repeat their ineffectual arguments from *Summit* and *West Boca* and rely largely on the out-of-date, inapposite, and largely out-of-circuit tobacco cases to assert that Plaintiffs' direct financial injuries are too far removed from Defendants' conduct, as a matter of law, to plead either traceability (Pharm. Mem. at 2-3)[4] or causation. At heart, Defendants incorrectly assert the law leaves Plaintiffs without legal recourse for the obvious and severe harms resulting from Defendants' actions. The Court should deny Defendants' requests to dismiss based on a purported lack of sufficiently direct injuries.

### 1. Plaintiffs Adequately Alleged Direct Injuries

Plaintiffs allege direct injuries that they sustained as a result of Defendants' conscious and deliberate misconduct, which not only increased the demand and supply of opioids, but also specifically targeted Plaintiffs to fund the unlimited flow of opioids and bear the burden of paying for the resultant fallout, precisely the harm for which Plaintiffs now seek recompense. Defendants reframe Plaintiffs' injuries to suit their arguments[5] as money spent exclusively and voluntarily on treatment for harm caused to their insureds. First, Plaintiffs have clearly pled recoverable and direct injuries from payments for prescription opioids that would not have been paid absent the fraud because: (1) the opioids would not have been approved on Plaintiffs' formularies or would have been subject to additional controls and guidance; (2) Plaintiffs would have had more control over preexisting controls, such as preauthorization requirements; (3) doctors would not have prescribed opioid medications at the same rate; and (4) Plaintiffs would have been on notice that medications were being diverted to a secondary market. Second, Plaintiffs adequately allege injury in the form of

---

[4]  While all Defendants challenge the purportedly derivative nature of Plaintiffs' injuries, only the Pharmacy Defendants attempt to articulate an Article III standing argument. Pharm. Mem. at 2-3. That argument also fails here for the reasons explained in *Summit*. *See Summit* Opp. at 106-09.

[5]  Distributors and Pharmacies both ignore Plaintiffs' allegations that they paid for opioids that were listed and approved on their formularies only through Defendants' misconduct. *See* Dist. Mem. at 3; Pharm. Mem. at 2. Accordingly, they have waived their right to challenge Plaintiffs' injuries based on payments for the opioid medications.

payments for opioid-related treatments, hospitalizations, and illnesses that were a direct and foreseeable result of the crisis Defendants engineered, which went far beyond the provision of payments that third-party payors would ordinarily and customarily incur in paying for insureds' medical expenses.

All Defendants couch one or both of these injuries as derivative of harms caused to Plaintiffs' insureds without addressing Plaintiffs' actual allegations.  They do not explain how misrepresentations **made to Plaintiffs and/or their agents** and Defendants' deliberate actions taken **to conceal from Plaintiffs and their agents** vital information about the safety and efficacy of the prescription opioids, and the inordinate amount of opioids being diverted to a secondary market, could and would not foreseeably result in Plaintiffs paying more for opioids.  Indeed, increasing those payments was Defendants' decades-long mission.  Defendants have also failed to explain how Plaintiffs' allegations that Defendants engineered an opioid crisis that affects every company, political subdivision, and state in this country – a crisis that goes far beyond anything our medical, governmental, and social services systems were designed to compensate – do not sufficiently plead injury for the costs of paying for opioid-related healthcare services.  Plainly, none of those payments, or far fewer, would have been necessary but for Defendants' actions.

In fact, Defendants ignore nearly 30 pages of allegations wherein Plaintiffs explain, in assiduous detail, the myriad ways in which Defendants jointly and individually targeted them, and how Plaintiffs were directly harmed.  *See generally* ¶¶682-770.[6]  Defendants could not have engineered such a massive scheme to inflate demand and supply for prescription opioids absent the deception they perpetrated on third-party payors.  Specifically, Plaintiffs allege:

- Each Manufacturer Defendant developed a dedicated managed care sales groups whose sole function it was to convince Plaintiffs, through their pharmacy directors and pharmacy and therapeutics committees, including Medical Mutual of Ohio ("MMO"), to add or elevate Manufacturer Defendants' drugs on Plaintiffs' formularies.  *See, e.g.,* ¶¶712-719 (Purdue); 720-730 (Teva); 731-734 (Janssen); 735-738 (Endo); 739-740 (Actavis); 741-758 (Insys); 759-760 (Mallinckrodt).  Each knowingly presented false and misleading information to achieve this goal.  *Id.*

---

[6]     References to "¶" or "¶¶" are to the FAC unless otherwise noted.

- Marketing Defendants frequently contacted MMO personnel to discuss formulary coverage for their opioids and made numerous misrepresentations to ensure coverage for those opioids, including, for instance, representing to MMO that purportedly abuse-deterrent and extended-release formulations would result in healthcare cost savings (for Plaintiffs), *see., e.g.*, ¶¶697-698.

- Manufacturer Defendants' account managers "coordinated and reported the success for their multiple contacts with MMO" to their supervisors, sales teams, and others, ¶694.

- Manufacturer Defendants made numerous misrepresentations about the safety and efficacy of the drugs and their cost-effective benefits (benefits meant to entice Plaintiffs) at industry events, such as Academy of Managed Care Pharmacy ("AMCP") conferences that TPPs, third-party administrators ("TPAs"), and pharmacy benefits managers ("PBMs"), including Plaintiffs' agents, attended, and submitted misleading abstracts "calculated to be received and reviewed" by the attendees, ¶¶700-709.

- Manufacturer Defendants placed false and misleading information about their prescription opioids and omitted information about those opioids required to make those statements not misleading in industry periodicals regularly reviewed by Plaintiffs' agents, *see, e.g.*, ¶¶710, 714-718, 737-738.

- Manufacturer Defendants actively engaged their account management teams to find ways to deceptively circumvent Plaintiffs' controls on opioid prescribing and coverage, *see, e.g.*, ¶¶723-730, 733, 744-758, 763-766.

Plaintiffs also allege at length how Defendants worked together to conceal evidence of diversion and to circumvent their obligations to monitor, report, and prevent that diversion. And, Plaintiffs explicitly allege that "[a]bsent this concealment" Plaintiffs' agents "would not have made the coverage and formulary placement decisions they did with respect to opioid drugs, and Plaintiffs would have spent far less on the reimbursement of opioid drugs." ¶¶761-762. Further, Plaintiffs clearly pled that payment for treatment and care for opioid-related conditions is a direct result of the crisis Defendants created, which goes far beyond business as usual. It stretches the bounds of reason to accept Defendants' argument that Plaintiffs may not recover for the costs of involuntarily footing the bill for an epidemic that Defendants knowingly and purposefully engineered and from which they significantly profited at Plaintiffs' expense.

Defendants do not address these allegations. Instead, they incorrectly assert that Plaintiffs may not recover for the costs of their insureds' injuries and cite the Sixth Circuit's decision in *Perry v.*

*Am. Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003), to support the assertion that third-party payors' injuries for payment for medical care are (always) derivative of their insureds and, therefore, unrecoverable as a matter of law. Mfr. Mem. at 3-4; Pharm. Mem. at 2; Dist. Mem. at 4. The Pharmacies go so far as to write that "the Sixth Circuit – and **every other circuit** to have taken up the question – has rejected suits by third-party payors to recover health-care related costs **incurred by smokers**." Pharm. Mem. at 4.[7] This assertion is misleading and highlights the obvious weakness in the argument. This case is not about "costs incurred by smokers" or about TPPs' payment for those costs. Rather, this case is about injuries suffered by Plaintiffs as a result of false marketing (and other misconduct) specifically directed at them, their agents, and other people in the medical community who rely on accurate and scientifically validated information when making formulary and prescribing decisions. Indeed, no third-party payor in a tobacco case ever paid for the cigarettes. As discussed in *Summit* and *West Boca*, and further herein, no circuit to have considered **this** issue has rejected the suit, especially where, as here, defendants directly targeted the third-party payors. *See, e.g.*, *Summit* Opp. at 25, 41; *West Boca* Opp. at 5-8, 12-13.

Further, for reasons addressed in both *Summit* and *West Boca*, *Perry* is clearly inapposite. *See Summit* Opp. at 45; *West Boca* Opp. at 19-21. Indeed, the plainly different factual scenario in *Perry* demonstrates why Plaintiffs' case **cannot** be dismissed. In *Perry*, two individual subscribers of Blue Cross Blue Shield ("BCBS") health insurance sought to certify a class of BCBS **plan members** who were forced to pay increased insurance premiums as a result of smoking-related illnesses afflicting fellow plan members. The Court found that these plan members' injuries were too remote to support a finding of proximate causation. 324 F.3d at 849. Central to the Court's holding was its analysis that the plaintiffs' claims "not only are contingent on harm to a third party, but also on BCBS's increasing their premium amounts due to smoking-related medical costs." *Id.* In other words, the *Perry* plaintiffs sought to recover for conduct by the tobacco company that injured other plan members, not them, and which, in turn, led BCBS to raise their premiums – a chain of

---

[7] Citations, internal quotations, and footnotes omitted and emphasis added unless noted otherwise.

causation multiple steps more attenuated than exists here.  Specifically in contrast, here: (1) the third-party payors themselves, not premium payors, allege they were injured; and (2) Plaintiffs do not seek to recover increased premiums but rather the costs they actually spent, both on the prescription opioids themselves and on the medical care necessitated by Defendants' acts that created and sustained the opioid epidemic.[8]

Moreover, the causal connection between opioid use and the medical care provided by doctors and hospitals and covered by health plans is more direct than the causal connection between smokers, tobacco-related care, and payors.[9]  A single opioid overdose requires immediate medical care – a point the Manufacturer Defendants acknowledge.  Mfr. Mem. at 4.  A patient who presents in an emergency department from an opioid overdose leaves no doubt as to his or her ailment's cause.  Hospitals must then provide care, and third-party payors must pay for that care.  By contrast, the health issues arising from tobacco and smoking, including those related to cardiovascular health, respiratory health, and cancer, do not manifest themselves until years or decades after a person begins smoking.  Indeed, most tobacco users are not treated for medical complications until decades after they used tobacco products, and their more advanced age coupled with the vastly different tobacco products on the market can make causation complex and uncertain.  Defendants' unlawful false marketing to the third-party payors and others, and Defendants' failure to report suspicious sales of opioids, created a direct causal link between the unlawful conduct, the need for medical treatment, and the third-party payors' payment for that treatment.

---

[8]    While other circuits have limited health care providers' right to recover for their members' health care costs, the Sixth Circuit has not done so, which is why Pharmacy Defendants cite no controlling case for the blanket proposition that a health care provider has no tort cause of action against one who injures its member.  Pharm. Mem. at 6.  Here, in any event, Plaintiffs allege direct injuries to themselves: Marketing Defendants' tortious conduct specifically targeted them and other third-party payors, Defendants suppressed evidence of diversion, Plaintiffs took actions as a result of that conduct, and Plaintiffs were financially injured when they had to pay for the harms caused by the flood of prescription opioids.  Pharmacy Defendants were thus a substantial contributing cause of Plaintiffs' injuries; they cannot now claim a fact-specific proximate causation analysis absolves them from responsibility as a matter of law.

[9]    Defendants do not argue that *Perry* precludes Plaintiffs from seeking injuries due to payments for opioids, but instead focus on TPPs' injuries for payment of opioid-related medical care.

The Sixth Circuit has not prevented third-party payors from seeking relief for the financial injuries they sustained in paying for subsequent and resulting medical treatment.  To the extent the Sixth Circuit has addressed the issue of derivative injuries, it has actually held that where two parties in direct relationship to each other could bring suit for the same underlying conduct and injuries, one party's claims are not necessarily derivative of the other.  *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 616 (6th Cir. 2004).  In *Trollinger*, the Sixth Circuit considered a situation in which both employees and a union could bring suit for an employer's failure to abide by a collective bargaining agreement.  It held that the employees' claims for unpaid wages were not barred as derivative of a union's claims, particularly where, like here, the plaintiffs in that case were more directly able to sue and recover for their own injuries.  *Id.*  Similarly, in *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148 (Ohio 2002), the Ohio Supreme Court held that a city could recover for its own harms suffered as a result of gun manufacturers' negligent marketing and distribution of firearms, which created a public health epidemic.  Here, as in *Beretta*, Plaintiffs' financial injuries can be easily computed; there is no risk of double recovery since Plaintiffs are not seeking remuneration for harms to insureds but only for their own losses.  Even if the Court were to hold that Plaintiffs' suit is designed in part to protect their insureds, there is a strong interest in deterring Defendants' conduct that is not better served through millions of individual personal injury suits brought by insureds.  *Id.  See also Summit* Opp. at 79-82.

Manufacturer Defendants – the only Defendants to acknowledge or address Plaintiffs' alleged injuries for payments for prescription opioids – purport to distinguish between Plaintiffs' "voluntary" payment for opioids for long-term, chronic, non-cancer pain and hospitals' provision of emergency opioid-related services.  Mfr. Mem. at 4.  However, TPPs are no more permitted to deny medical care than hospitals.  They are both contractually obligated to pay for medical treatment and operate in a regulated field that requires numerous steps be taken before and after the denial of a claim.  Regardless, Plaintiffs allege that Manufacturer Defendants deliberately misled Plaintiffs and their agents through unsubstantiated and blatantly untrue claims regarding the safety, superiority, and efficacy of the opioids they pushed Plaintiffs to include (and prefer) on their formularies –

claims Defendants presented as scientifically valid through traditionally legitimate industry channels like the AMCP events and abstracts.  Defendants also prevented Plaintiffs from realizing the degree to which the drugs they paid for were diverted into an illegal, secondary market.  All Defendants simply ignore these allegations.  ¶¶696, 761-762.

Manufacturing Defendants point to two non-controlling cases in a futile effort to buttress their assertion that Plaintiffs have not stated an injury due to the "voluntary" nature of their payment for prescription opioids.  Mfr. Mem. at 4, 6 (citing *Teamsters Local 237 Welfare Fund v. AstraZeneca Pharms., LP*, 136 A.3d 688 (Del. 2016), and *Ironworkers Local Union 68 v. AstraZeneca Pharms., LP*, 634 F.3d 1352 (11th Cir. 2011)).  Neither case supports their argument.  Unlike in *Teamsters Local 237*, which Manufacturing Defendants cite for the proposition that Plaintiffs' continued payment for Defendants' drugs somehow negates their argument that they would not have purchased the drugs absent the fraud, Plaintiffs' injury here is not only their payments for opioids but also includes their continued payments for opioid addiction, abuse, and overdose treatment (discussed *supra*).  Moreover, this case is in its infancy.  Plaintiffs, like the rest of the nation, have only recently realized the degree and breadth of Defendants' scheme.  Defendants' presumption that Plaintiffs continue to make inappropriate payments, and further assertion that Plaintiffs now have the knowledge and expertise necessary to parse out appropriate from inappropriate payments, in light of the magnitude of the alleged fraud, has no support in the record and thus cannot be grounds for dismissal on a 12(b)(6) motion.  *Avandia*, 804 F.3d at 644 (declining on a motion to dismiss to "assume, in the absence of contrary allegations, that plaintiffs did not change their coverage" after learning of the defendants' fraud).

Further, unlike in *Teamsters Local 237* and *Ironworkers Local Union 68*, Plaintiffs' alleged injuries do not derive from their inability to purchase a cheaper version of the same drugs.  Rather, all Schedule II opioid medications in this litigation, branded and generic, carry with them the risk of addiction and death.  Defendants' contentions would require third-party payors to navigate the morass of Defendants' false statements to determine which they should no longer pay for and would shift the burden from the parties misleading, to those being misled, and present an impossible

challenge.  Defendants' assertion that third-party payors may not recover for the costs of involuntarily footing the bill for an epidemic that Defendants knowingly and purposefully engineered, and from which they significantly profited by specifically targeting third-party payors and their agents, strains credulity.

Manufacturing Defendants further argue that Plaintiffs cannot allege injury because they voluntarily exposed themselves to paying for their insureds' prescription drug coverage and had the ability to adjust premiums to account for high volume reimbursable opioid prescriptions.  Mfr. Mem. at 6 (citing *Ironworkers Local Union 68*).  However, as Plaintiffs alleged throughout the FAC, Manufacturing Defendants deliberately misled Plaintiffs and their agents through unsubstantiated and blatantly untrue claims regarding the safety, superiority, and efficacy of the drugs in order to induce Plaintiffs to include (and prefer) opioids on their formularies.  Manufacturing Defendants presented these claims as scientifically sound using numerous traditional industry channels to disseminate their false messaging.  ¶¶316-430.  Plaintiffs further allege that they and their agents relied on Defendants' misrepresentations and omissions when they listed the drugs on their formularies, that Defendants' deception prevented them from properly evaluating the appropriateness of that decision, that Defendants deceptively circumvented preauthorization requirements, and that Defendants knowingly created and supplied a secondary market, all to Defendants' benefit and at Plaintiffs' unwitting expense.  In other words, Plaintiffs paid for prescription opioids that they otherwise would not have, but for Defendants' conduct.  ¶¶695, 762. Plaintiffs' allegations are markedly different from plaintiffs' allegations in *Ironworkers Local Union 68*, who approved the at-issue drug and placed it on their formulary for on-label purposes, challenging not that placement but only the difference in price paid for off-label prescriptions of the more expensive drug, where cheaper options were available.  634 F.3d at 1367.

Indeed, *Trollinger* and *Beretta* both suggest that the Sixth Circuit and Ohio courts would likely follow the decisions of courts that hold a third-party payor can recover for injuries it suffered due to conduct directed at them, which was intended to, and did, cause precisely the harm the payor suffered – as is the case here – including payment for the opioid medications.  *See Neurontin*, 712

F.3d at 37, 39-40 (evidence supported finding of but for and proximate cause where TPP was "the primary and intended victim" of defendant drug manufacturer's scheme to "fraudulently inflate the number of Neurontin prescriptions for which TPPs paid" and holding that first-party reliance was not necessary); *Avandia*, 804 F.3d at 640, 644 (TPP adequately pled direct injury where it alleged pharmaceutical manufacturer's deceptive behavior caused it to pay inflated prices). *See also* §III.B.1., *infra*.

Manufacturer and Distributor Defendants' reliance on *Sidney Hillman Health Ctr. v. Abbott Labs.*, 873 F.3d 574 (7th. Cir. 2017), is also misplaced. Mfr. Mem. at 5; Dist. Mem. at 19 (arguing that *Sidney Hillman* supports the conclusion that representations made to physicians cannot support proximate cause). In *Sidney Hillman*, plaintiffs' claims rested solely on misrepresentations made to physicians. Here, Plaintiffs allege misrepresentations and omissions made not only to prescribers but to regulators, the public at large, and, critically, to Plaintiffs and Plaintiffs' agents. *See also In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 14 C 1748, 2018 WL 3586182, at *10 (N.D. Ill. July 26, 2018) ("*Testosterone II*") (reiterating prior rulings that TPPs allege direct injury caused by defendants' fraud when they receive the misrepresentations).

As pled, Defendants' misrepresentations and omissions led to overprescribing, caused the placement of Defendants' opioid medications onto Plaintiffs' formularies, thwarted Plaintiffs' attempts to control illegitimate prescriptions (*i.e.*, sales scripts to circumvent TPPs' pre-authorization rules), and directly resulted in Plaintiffs' paying more for opioid medications and opioid-related care. Thus, Plaintiffs' alleged injuries are sufficiently direct and not derivative of harms caused to their insureds.

2.    **Plaintiffs Adequately Alleged that Defendants Actually and Proximately Caused Their Injuries**

Ohio law defines proximate cause as "an act or failure to act that in natural and continuous sequence directly produced the [injury] and without which the [injury] would not have occurred." *Ohio Jury Instructions (Civil)* ("*OJI CV*") 405.01. "The fact that some other cause combined with the negligence of a defendant in producing the [injury] does not relieve a defendant from liability so long

as the plaintiff proves that the conduct of the defendant was a substantial factor in producing the harm." *OJI CV* 405.01(3) (Multiple Contributing Causes). Under Ohio law, questions of proximate cause and whether defendants' negligence was a substantial factor in causing the injury are questions for the trier of fact. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 669 (Ohio 1995); *Trollinger,* 370 F.3d 602 (analysis may be too speculative at the pleadings stage).

Reprising their arguments in *Summit*, Distributor and Pharmacy Defendants argue that Plaintiffs cannot demonstrate proximate cause here for two primary reasons: (1) Plaintiffs' injuries as third-party payors are too attenuated to have been proximately caused by Defendants' conduct; and (2) proximate cause cannot exist as a matter of law in this case due to intervening acts of third parties such as doctors (learned intermediaries) and people who are addicted to opioids and secure them illegally (criminals). Dist. Mem. at 18-20; Pharm. Mem. at 5-8.[10] These arguments fail when measured against the well-pled allegations in the FAC including the allegations that Defendants specifically targeted Plaintiffs and falsely marketed their opioids to them.

### a. Plaintiffs Adequately Alleged that Defendants' Conduct Directly Targeted Them and Substantially Contributed to Their Injuries

In *Trollinger*, the Sixth Circuit distinguished the issue of whether an injury was direct or "passed on by another party that had a more direct relationship with the defendant" from proximate causation. Whereas failure to plead the former could be grounds for dismissal, proximate causation is more appropriately "fodder for a summary-judgment motion." 370 F.3d at 615, 618. Here, Plaintiffs allege that: (1) Marketing Defendants ***directly targeted*** Plaintiffs, who acted in reliance on these representations by giving prescription opioids preferred status on their formularies and agreeing to pay for them; and (2) all Defendants' actions in breaching their duty to monitor, assess, report, and halt suspicious orders substantially contributed to Plaintiffs' injuries in paying for opioid abuse, addiction, and overdose care – all of which were foreseeable to Defendants. Thus, Plaintiffs

---

[10] Manufacturer Defendants reincorporate the causation arguments they advanced in *Summit*, and Plaintiffs submit that those arguments fail for the same reasons discussed in the *Summit* Plaintiffs' brief in opposition. *See Summit* Opp., §§I.B.1.b., I.C.2.

allege their own injuries, not merely those passed on by another party with a more direct relationship.

Further, Plaintiffs' allegations are sufficient to plead proximate causation and defeat Defendants' motions to dismiss.  Proximate cause does not require alleging "that [Defendants'] conduct was the sole cause of their injury"; rather, Plaintiffs need only allege "that the conduct was a substantial cause." *Trollinger*, 370 F.3d at 620 (citing, *inter alia*, *Schwartz v. Sun Co., Inc.*, 276 F.3d 900, 904 (6th Cir. 2002) ("Where there is evidence, as in this case, which tends to show that [plaintiff's] losses were a result of [defendant's] conduct, as well as evidence which tends to show that his losses were attributable to other factors, it is normally up to the trier of fact to decide which is the case.")).  Under the Sixth Circuit's analysis in *Beretta*, Defendants' unlawful conduct – which was specifically directed at Plaintiffs and other third-party payors – proximately caused Plaintiffs to pay increased costs associated with the opioid epidemic.  *See Summit* Opp., §I.C.2.a.

Here, Plaintiffs allege that but for Defendants' actions in negligently and fraudulently marketing opioids to Plaintiffs, and because Defendants failed to report and prevent suspicious orders and diversion, Plaintiffs paid for and provided opioid prescriptions that they otherwise would not have, forcing them, in turn, to bear the costs of widespread addiction, abuse, and overdose – all of which was foreseeable to Defendants.  Indeed, Plaintiffs devote more than 90 paragraphs of the FAC to detailing the many ways Defendants' conduct substantially contributed to Plaintiffs' injuries and the nature of the injuries themselves.  *See generally* ¶¶20, 682-770.  Defendants misled Plaintiffs and their TPAs, PBMs, and other agents in order to enrich themselves.  ¶¶696, 771-791.  Plaintiffs were subjected to false and misleading information directed at third-party payors.  ¶¶693-710 (describing conferences and publications directed at third-party payors and their agents); ¶¶711-770 (specific false and misleading statements by Marketing Defendants).  Plaintiffs relied to their detriment on Defendants' statements; as a result, opioids secured preferred status on Plaintiffs' formularies.  ¶¶689-691, 762.  Likewise, the National Retail Pharmacies' "actions and omissions in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have contributed significantly to the opioid crisis by enabling, and failing to prevent, the diversion of

opioids," leading to the addiction epidemic.  ¶622.  The FAC plausibly alleges that Plaintiffs' economic injuries were directly caused by Defendants' conduct – conduct that was specifically directed at Plaintiffs.

These facts closely resemble the hypothetical fact pattern discussed with approval in *New Jersey Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324, 332-33 (D.N.J. 1998).  There, "a defendant fraudulently induced health funds into reimbursing participants" for a certain dangerous procedure, which then harmed the participants, causing the funds to pay money related to that procedure.  *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 927-28 (3d Cir. 1999) (discussing this scenario).  Proximate cause was found where "the fraud essentially induced the plaintiffs to enter into the relationship that caused their injury."  *Id.*  Here, Plaintiffs' injuries can be traced to Marketing Defendants' conduct in inducing them to pay for these drugs and Supply Chain Defendants' conduct in ignoring and suppressing evidence of diversion.

Outside of *Perry*, discussed above, the only other Sixth Circuit authority Distributor Defendants cite in support of their contention that proximate cause is lacking supports the opposite conclusion.  In *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010), Cleveland asserted that defendants' financing, purchasing, and pooling of subprime mortgages led to a foreclosure crisis that devastated the city's neighborhoods and economy.  *Id.* at 498-99.  The court held that the city's claims against the defendant banks were too remote, because the defendant banks did not originate the rash of mortgages that created the foreclosure crisis.  In so doing, the court specifically distinguished *Beretta*:

> [I]n Beretta, the plaintiffs accused the defendants of creating and supplying an illegal firearms market in Cincinnati through their marketing, distribution, and selling of firearms. . . .  By contrast, the complaint concedes that, for the most part, the Defendants did not directly make subprime loans to the homeowners of Cleveland. The Defendants are instead accused of financing a legal market for these loans. Thus, for Beretta to be analogous to the instant case, the Ohio Supreme Court would have had to allow a suit against the banks that provided financing to the gun manufacturers that allegedly created the illegal secondary market.

*Id.* at 505.

Here, Defendants **are** the manufacturers and direct suppliers of the opioids which created and perpetuated the opioid epidemic. Defendants themselves inflated the demand and sale of opioids through their fraudulent marketing and supplied both the lawful and the unlawful market for opioids by failing to prevent diversion. They stand in the shoes of the firearms defendants in *Beretta* that manufactured and sold the guns and created an illegal secondary market for them, not in the shoes of the bankers in *Ameriquest* that only financed sales. Under *Beretta*, Defendants' conduct is a sufficiently direct cause of Plaintiffs' injuries to establish proximate causation.[11]

### b. Foreseeable Intervening Acts and Criminal Conduct Do Not Break the Causal Chain

Defendants argue that the acts of third parties break the causal chain between their misconduct and Plaintiffs' injuries. Defendants pose a discursive set of hypotheticals, pointing both to physicians who wrote prescriptions for opioids and third parties who engaged in criminal diversion of opioids as purported superseding causes. However, the acts of both groups were entirely foreseeable. Indeed, their conduct was **not** independent of, but specifically triggered by, Defendants' malfeasance. In neither instance was the causal chain broken.

Under Ohio law, the negligent or intentional act of any other person is not a defense to the negligence of the defendant, unless the non-defendant's negligence or intentional act was an independent and superseding cause of the plaintiff's harm. *OJI CV* 405.01(3)(B). Moreover, the causal connection is only "broken when another's [negligent or intentional] act, which **could not have been reasonably foreseen** and is **fully independent of the defendants' negligence**, intervenes and completely removes the effect of the defendant's negligence and becomes itself [a proximate] cause of the [injury/damages]." *OJI CV* 405.05(4). As the Ohio Supreme Court has

---

[11]  Pharmacy Defendants' attempts at subrogation as a reason for dismissal are unavailing. In support of this contention, they cite only two out-of-circuit tobacco cases, *Texas Carpenters Health Ben. Fund v. Philip Morris Inc.*, 199 F.3d 788 (5th Cir. 2000), and *United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris Inc.*, 223 F.3d 1271, 1273-74 (11th Cir. 2000), in which the subrogation comments were *dicta*. Unlike here, where Defendants targeted their tortious conduct by seeking to have opioids added to Plaintiffs' formularies leading to foreseeable economic injuries, the claims the tobacco payors' sought were wholly derivative of their insureds' personal injuries.

explained, "[t]he test used to determine foreseeability of the intervening cause to the original negligent actor is whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a *new* and *independent* act." *Queen City*, 653 N.E.2d at 671 (emphasis in original). "[T]he term 'independent' means the 'absence of any connection or relationship of cause and effect between the original and subsequent act of negligence.'" *Id.* Thus, Defendants would be relieved of liability for their negligent conduct only if the actions of physicians and criminal actors could not have been reasonably foreseen and were fully independent of Defendants' negligence.

Here, the conduct of doctors in prescribing opioids was not in any sense independent of the wrongs of Defendants. On the contrary, Plaintiffs specifically allege that the Manufacturer Defendants misled prescribers by misrepresenting the risks and benefits of their opioids. *See, e.g.,* ¶145 ("Each Marketing Defendant's conduct, and each misrepresentation, contributed to an overall narrative that aimed to – and did – mislead doctors, patients, and payors about the risk and benefits of opioids"); ¶340 (guidelines drafted by Front Groups funded by Defendants influenced doctors); ¶365 (through use of key opinion leaders ("KOLs"), Manufacturer Defendants controlled information to doctors); ¶¶395-407 (Manufacturer Defendants used continuing medical education ("CME") programs to mislead doctors); ¶408 (branded advertising directed at doctors); *see also* ¶¶568, 635, 795-797, 972, 1029, 1035. Physicians' decisions to prescribe opioids were thus not independent of Defendants' wrongdoing; the decisions to prescribe Defendants' products were not only necessarily linked but the intended, actual, and entirely foreseeable **result** of the Manufacturer Defendants' fraudulent conduct.[12]

---

[12]  Distributor Defendants' claim that **they** cannot be a proximate cause of Plaintiffs' harm because "[r]eporting this or that pharmacy order as 'suspicious,' even halting it, would not have meant that the pharmacy would not have filled the doctor's well-intentioned prescription." Dist. Mem. at 19. This conjecture is both unsupported and makes no sense: had Distributor Defendants fulfilled their duty to put appropriate systems in place to monitor suspicious orders as well as to report and not fill

Nor does a doctor's role as a "learned intermediary" break the causal chain.  The learned intermediary doctrine is an exception to a manufacturer's duty to warn the ultimate consumer by providing adequate and accurate information to a "learned intermediary," such as a prescribing doctor.  *Dunlap v. Medtronic, Inc.*, 47 F. Supp. 2d 888, 898 (N.D. Ohio 1999); *see Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160, 164 (Ohio 2002) ("The learned intermediary doctrine does not relieve the manufacturer of liability to the ultimate user for an inadequate or misleading warning; it only provides that the warning reaches the ultimate user through the learned intermediary.")  It is a doctrine of products liability law, *see Seley v. G.D. Searle & Co.*, 423 N.E.2d 831 (Ohio 1981), and Defendants cite no basis for applying it outside that context.  Moreover, the doctrine only applies where the manufacturer provides **adequate** information to the doctor.  *See* R.C. §§2307.75, 2307.76.  Here, Plaintiffs have alleged that the warnings in opioid labeling were overcome by the Manufacturer Defendants' aggressive and deceptive marketing of their drugs.  *See, e.g.*, ¶¶568, 635, 795-797, 972, 1029, 1035.  This fraudulent over-promotion, which substantially overstated the benefits and severely understated the risks of opioids, negated the adequacy and effectiveness of any label warnings.  *See Stevens v. Parke, Davis & Co.*, 507 P.2d 653 (Cal. 1973) (warnings may be rendered inadequate by over-promotion).  Because physicians were foreseeably (and intentionally) misled by Defendants' misrepresentations, the learned intermediary doctrine does not break the chain of causation.

Nor do the actions of individuals participating in the illegal secondary market break the causal chain.  There, too, the illegal conduct of those engaged in drug abuse and diversion is not

---

suspicious orders – instead of flouting this duty on a colossal, nationwide scale – the pharmacies would not have had access to an excessive supply of opioids to continue pumping into the community.  Distributor Defendants are a key link in the causal chain, and their actions in continuing to provide pharmaceuticals to fill suspicious orders actually and proximately caused the harms alleged here in perpetuity and permitted the opioid crisis to escalate.  An illogical hypothetical scenario cannot negate the well-pled allegations in the FAC.

independent of the Defendants' conduct, but the natural result of it. "When the wilful, malicious or criminal act of a third person intervenes between the defendant's conduct and a plaintiff's injuries, the defendant's negligence is the proximate cause of the plaintiff's injuries if the defendant could have reasonably foreseen the intervening act of the third person." *Feichtner v. Ohio Dep't of Transp.*, 683 N.E.2d 112, 120 (Ohio 1995). Thus, the analysis is precisely the same with respect to the illegal secondary drug market as for prescribing physicians: the issue is the extent to which the criminal conduct was a foreseeable consequence of the defendants' behavior or was, instead, entirely independent of it.[13] In this case, as described in §III.A.2.b., it is clear that the illegal drug activity was an entirely foreseeable consequence of Defendants' failure to control the opioid supply chain. Indeed, Defendants' failure to control these substances as required meant that they participated, and profited from, the criminal activity as the supplier, particularly when they took action to obfuscate the suspicious nature of the orders. Widespread addiction was also an entirely foreseeable consequence of the Manufacturer Defendants' misrepresentations that opioids are rarely addictive when taken for chronic pain. *See* ¶¶143-144, 146-198; *see also* ¶¶96-111. Criminal conduct, including abuse and diversion, is, in turn, an entirely foreseeable consequence of addiction. *See, e.g.*, ¶98.

Once again, *Beretta* forecloses Defendants' argument. In *Beretta*, nearly all of the harm the City of Cincinnati alleged involved criminal use of firearms. Yet, because the defendants were alleged to have helped create the illegal secondary market for guns, the Ohio Supreme Court held that the plaintiff had sufficiently alleged proximate cause. 768 N.E.2d at 1144-46. If criminal conduct did not break the causal chain in *Beretta*, it does not do so here.

---

[13] *Volter v. C. Schmidt Co., Inc.*, 598 N.E.2d 35 (Ohio Ct. App. 1991), relied on by Defendants, is not to the contrary. Rather, the court in *Volter* applied precisely the same test – whether the intervening acts were foreseeable – to determine whether the causal chain was broken.

### B.     Plaintiffs Have Sufficiently Pled Their RICO Claims

Defendants repeat many of the same unsuccessful arguments they previously raised with respect to the RICO claims alleged by the cities and counties and West Boca Medical Center; namely, that Plaintiffs have not: (1) alleged a "business or property" injury and their injuries are indirect; (2) pled direct or proximate causation; and (3) pled predicate acts or a plausible enterprise. Defendants' arguments fail for substantially the same reasons stated in the *Summit* and *West Boca* oppositions, which are fully incorporated herein.  To avoid redundancy and for the ease of the Court, Plaintiffs will address below only unique arguments and any additional law cited by Defendants.

### 1.     Plaintiffs Adequately Alleged Direct Injuries to Business or Property

As explained in the *Summit* and *West Boca* opposition briefs and expanded upon herein, Plaintiffs have alleged injuries that are direct, not derivative.  *Summit* Opp. at 35-38; *West Boca* Opp. at 5-11; §III.A.1.  Critically, Plaintiffs are not seeking to recover for personal or physical injuries to their enrollees, but rather for direct injury to their business and property.  As noted in *West Boca*, the Sixth Circuit has rejected an argument that an injured party cannot bring a RICO suit because the injury is allegedly "derivative" of that to another person who also could have brought suit.  *Trollinger*, 370 F.3d at 616.  *West Boca* Opp. at 6-7.[14]

Plaintiffs allege that they were directly injured in their business or property by the opioid epidemic that was created by: (1) the Manufacturer Defendants' fraudulent marketing of prescription

---

[14]   The Distributor Defendants cite *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013), for the proposition that Plaintiffs' injuries are entirely derivative of personal injuries and therefore are too remote to establish direct and proximate causation.  Dist. Mem. at 8-9; Mfr. Mem. at 8.  They argue that because Plaintiffs' medical expenditures flow entirely from the personal injuries of their members, such injuries are not injuries to "business or property" for purposes of RICO.  *Summit* and *West Boca* explain at length why *Jackson* is distinguishable, *Summit* Opp. at 36-37; *West Boca* Opp. at 8-10, and *West Boca* cites a series of cases in which courts have held that "*Jackson* does not bar claims by insurers seeking to recover damages under RICO for damages arising out of payment of claims and charges for healthcare," *West Boca* Opp. at 9-10.  As explained herein, Plaintiffs' damages arise directly, foreseeably, and traceably from Defendants' misrepresentations and omissions, and conduct around the opioid prescriptions that Plaintiffs paid for that all Defendants allowed to divert into illegitimate channels when they failed to identify, report, and reject suspicious orders.

opioids directly targeted at Plaintiffs and other third-party payors to ensure formulary access for chronic, non-cancer pain, and other conditions, notwithstanding the lack of evidence of opioids' safety or efficacy for these conditions; and (2) the Manufacturer and Distributor Defendants' failure to identify and report suspicious orders as required by the Comprehensive Drug Abuse Prevention and Control Act of 1970 ("CSA" or "Controlled Substances Act"), which prevented Plaintiffs from being on notice that a significant amount of opioid drugs for which they had paid were not prescribed for legitimate medical need but rather made their way to the black market.  ¶¶682-791.

The resulting opioid epidemic created and sustained by Defendants' fraudulent conduct caused Plaintiffs injuries that include, but are not limited to: (1) payments for hospital and/or urgent care emergency department visits and other treatment for opioid misuse, addiction, and/or overdose; (2) payments for emergency department visits for infections related to opioid misuse, addiction, and/or overdose; (3) payments for hospitalizations related to the misuse, addiction, and/or overdose of opioids; (4) payments for medicines to treat HIV, hepatitis C, and other issues related to opioid misuse, addiction, and/or overdose; and (5) payments for opioid overdose reversal medication.  ¶¶928, 960.  The Distributor Defendants are incorrect that only if one of Plaintiffs' enrollees first became addicted to or overdosed on opioids would the Plaintiffs incur any costs, because Plaintiffs also allege they would have spent far less on the payment of opioid drugs if all Defendants had not illegally suppressed evidence of drug diversion and the Manufacturer Defendants had not made direct misrepresentations and omissions to Plaintiffs' TPAs for the purpose of securing preferred status on Plaintiffs' formularies and payments resulting therefrom. *See, e.g.*, ¶¶693-699, 761-762.

The Manufacturer Defendants make the baffling argument that Plaintiffs allege injuries that are "entirely derivative of harms" caused by opioids prescribed to individual enrollees, while at the same time arguing that Plaintiffs fail to allege that its enrollees' opioid prescriptions were inappropriate or harmful.  Mfr. Mem. at 7-8.  This makes no sense.  Not only is the argument inherently contradictory, but it is also contradicted by the FAC, which is replete with allegations that the Manufacturer Defendants engaged in a multi-pronged scheme designed to conceal the

harmfulness and inappropriateness of opioids for chronic, non-cancer pain and other conditions for the purpose of increasing demand for opioids. Each of the cases cited by the Manufacturer Defendants in support of their argument is distinguishable, because, unlike in those cases, Plaintiffs here are alleging that opioids prescribed to Plaintiffs' enrollees **were** harmful and inappropriate, and not simply less cost-effective than the alternative medications. Mfr. Mem. at 8 (citing *Ironworkers Local Union 68*, 634 F.3d 1352; *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 522-23 (D.N.J. 2011); *Se. Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1287 (S.D. Fla. 2009); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 176 (D.D.C. 2003)).[15] Indeed, it is precisely the harmfulness and inappropriateness of opioids concealed by the Manufacturer Defendants that allowed them to achieve favorable formulary status for their opioid drugs and thereby caused Plaintiffs' injuries.

Third-party payors, like Plaintiffs, have been successful in pleading injuries to their "business or property" for purposes of RICO in actions asserted against pharmaceutical manufacturers and distributors that engaged in deceptive marketing practices. For example, in *In re Testosterone Therapy Replacement Prods. Liab. Litig. Coordinated Pretrial Proceedings*, the court found that the plaintiff insurer, the putative representative of a proposed class of third-party payors, sustained a direct RICO injury to its business or property caused by the nationwide campaign launched by manufacturers, sellers, and promoters of testosterone replacement therapy ("TRT") drugs to make false representations about their drugs to consumers, physicians, and third-party payors. 159 F. Supp. 3d 898, 920 (N.D.

---

[15] The Manufacturer Defendants also cite *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460 (2006), for the proposition that Plaintiffs' claims are entirely derivative of harms to individual enrollees. Mfr. Mem. at 7-8. For the reasons explained in *Summit*, *Anza* is distinguishable, because there the Court held that the cause of plaintiff's harm was a set of actions (the defendant's ability to offer lower prices) entirely distinct from the alleged RICO violation (defrauding the state tax authority). *Anza*, 547 U.S. at 458; *Summit* Opp. at 36. Here, the actions causing Plaintiffs' harm **are** the alleged RICO violations, including the Manufacturer Defendants' intentional misrepresentations directly aimed at Plaintiffs and other TPPs, and all Defendants' suppression of evidence of diversion to ensure favorable formulary access. And as noted *supra*, in *Trollinger*, the Sixth Circuit rejected an argument that an injured party cannot bring suit because the injury is allegedly "derivative" of that to another person who also could have brought suit. 370 F.3d at 616.

Ill. 2016) ("*Testosterone I*").[16]  The court found that the plaintiff had suffered direct economic injuries in paying for unnecessary TRT drugs, despite the fact that the complaint refers to the cost of treating certain patients.  *Id.*  Similarly, in *Avandia*, the Third Circuit held that TPPs had alleged an injury to their "business or property" in paying for drugs deceptively marketed by the defendants. 804 F.3d 633.  And in *Neurontin*, the First Circuit affirmed a $140 million judgment for Kaiser Permanente against Pfizer, after the jury found that the defendants intended to increase Neurontin prescriptions through their deceptive marketing activity.  712 F.3d at 49.  As noted in *West Boca*, the existence of an injury to property was not seriously in dispute.  *West Boca* Opp. at 6.

> ### 2.  Plaintiffs Adequately Alleged Proximate Cause as Required Under RICO

Defendants contend that Plaintiffs fail to adequately plead proximate causation because Plaintiffs' injuries are too attenuated to establish causation.  Mfr. Mem. at 8-9, 11-12; Dist. Mem. at 7-8.  For RICO purposes, proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 2 (2010) (quoting *Holmes*, 503 U.S. at 268).  The direct injury requirement simply requires a "link between the scheme and the type of injury [plaintiff] suffered." *Wallace v. Midwest Fin. & Mortg. Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013).  "What matters . . . is not whether there is a direct relationship between the plaintiff and defendant, but whether there is a 'sufficiently direct relationship between the defendant's wrongful *conduct* and the plaintiff's injury. . . .'" *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *9 (N.D. Cal.

---

[16]  On July 26, 2018, the court denied class certification of the proposed nationwide class and Ohio sub-class of TPPs, because the plaintiff "has not demonstrated that it can adequately represent the class, Fed. R. Civ. P. 23(a)(4), and because it has not met Rule 23(b)(3)'s predominance requirement." *Testosterone II*, 2018 WL 3586182, at *1. The court found that the expert's regression model, which was used to simulate what the level of prescribing of the drug at issue would have been without the defendants' alleged misrepresentations, ran afoul of *Hillman*, because the regression model did not account for direct misrepresentations to TPPs and thus did not support the plaintiff's causation theories. The court noted that as it explained in its previous opinion (*Testosterone I*, 159 F. Supp. 3d at 919), TPPs are "direct victim[s]" of the fraud, and their injuries are the expected consequence of defendants' conduct when they receive direct misrepresentations. It further stated that direct misrepresentations to TPPs, and TPPs' reliance on them, are crucial links in the causal chain.

Oct. 30, 2017) (quoting *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 657 (2008)) (emphasis in original).

In third-party payor cases, courts have found proximate cause satisfied where, as here, defendants make direct misrepresentations to TPPs.  *Neurontin*, 712 F.3d at 39; *Avandia*, 804 F.3d at 645; *see also Testosterone I*, 159 F. Supp. 3d at 919-20 (finding that, like *Avandia* and *Neurontin*, "the TPP relied on misrepresentations the defendants made directly that induced the TPP to place the defendants' drugs on formulary and pay for prescriptions for which it otherwise would not have paid").

*Avandia* is instructive here. The Third Circuit reasoned that, as in *Bridge*, the TPPs were the primary intended victims of the scheme to defraud, and their injury was a foreseeable and natural consequence of the scheme.  804 F.3d at 645.

> Plaintiffs allege that drug manufacturers are well aware that TPPs cover the cost of their drugs and describe the alleged RICO scheme of consisting of deliberately misrepresenting the safety of Avandia so that Plaintiff and members of the Class paid for this drug.  This fraudulent scheme could have been successful only if plaintiffs paid for Avandia, and this is the very injury that plaintiffs seek recovery for. We conclude therefore that plaintiffs' alleged injury is sufficiently direct to satisfy the RICO proximate cause requirement at this stage.

*Id.*  Here, the FAC contains detailed allegations of how the Marketing Defendants made direct misrepresentations to Plaintiffs and other TPPs, and all Defendants suppressed evidence of diversion so as to maintain formulary access and status for opioids.  ¶¶682-770.  For example, Plaintiffs allege that:

> The Marketing Defendants were aware that MMO and other TPAs wanted to restrict availability of certain highly addictive opioid medications to those suffering from cancer pain. The Marketing Defendants were further aware that healthcare and related costs associated with opioid use were of paramount importance to TPAs.  To circumvent these concerns, the Marketing Defendants planned and implemented false and misleading marketing campaigns to target Plaintiffs and other TPPs through their TPAs to ensure formulary access for chronic non-cancer pain and other conditions, notwithstanding the lack of evidence of opioids' safety or efficacy for those conditions, ¶695;

> All Defendants were also aware that the growing evidence of prescription opioid diversion could lead TPAs to make formulary decisions that would drastically reduce the access to opioids and to implement controls to prevent drug diversion.

Defendants suppressed evidence of diversion so as to maintain formulary access and status for opioids, ¶696;

[T]he Marketing Defendants frequently contacted MMO personnel to discuss formulary coverage for their opioids. MMO documented a March 16, 2009 meeting with Purdue Regional Account Executive Kendra Price, who contacted MMO to discuss gaining favorable formulary access for Purdue's "[n]ew drug coming out [in] '09 for moderate pain," ¶697;

[T]he Marketing Defendants often discussed formulary management options with MMO in order to obtain and maintain favorable formulary status for opioid medications, employing the misrepresentations and omissions alleged herein, ¶698; and

The Marketing Defendants also tried to manipulate and influence MMO's use of potential utilization management restrictions through direct misrepresentations or through misleading publications intended for managed care audiences.  For example, Endo sales representatives Todd Berner and Ken Vergara engaged in discussions with MMO on September 3, 2009 regarding the formulary status for opioid drugs, providing MMO personnel with information on "pain management controls."  Defendants presented similar information through Academy of Managed Care Pharmacy ("AMCP") events and publications alleged herein, ¶699.

The FAC also details how the Manufacturer Defendants made misrepresentations and omissions about their opioid drugs through presentations and exhibits at AMCP events, which were calculated to be received and reviewed by the TPPs, TPAs, and PBMs in attendance, including MMO, and thereby influence decisions to establish, continue, or expand coverage of the opioid drugs on their formularies, ¶¶700-709, and through managed care periodicals received by MMO's pharmacy and medical personnel, ¶710.  In addition, the FAC details false and misleading messages targeting Plaintiffs made by each Manufacturer Defendant.  ¶¶711-762.  Finally, the FAC explains how the Manufacturer Defendants used managed care contracts to garner favorable formulary access and coverage without restrictions.  ¶¶763-766.  Plaintiffs allege that, absent all Defendants' suppression of diversion, and the Manufacturer Defendants' direct misrepresentations and omissions, MMO would not have made the coverage and formulary placement decisions it did with respect to opioid drugs, and Plaintiffs would have spent far less on the payment of opioid drugs. Thus, the FAC alleges that the relationship between the alleged injury and the injurious conduct here is direct, satisfying *Bridge* and *Hemi*.

As in *Summit* and *West Boca*, Defendants' contentions concerning intervening causes are unavailing. *Summit* Opp. at 41-42; *West Boca* Opp. at 18-19.[17]  The actions of an intervening actor do not break the chain of causation when, as here, the original tortfeasor's intentional acts contemplated and caused the intervening acts.  *See Neurontin*, 712 F.3d at 39.  Indeed, in the "causal chain" and "intervening links" set forth by the Manufacturer Defendants, Mfr. Mem. at 8-9, and the Distributor Defendants, Dist. Mem. at 7 n.8, each portion was either a target of Defendants' misrepresentations and omissions (*i.e.*, PBMs, TPAs, third-party payors, doctors, and patients) or a Defendant in these proceedings (*i.e.*, distributors and pharmacies).  In *Neurontin*, the First Circuit rejected an argument that there were too many steps in the causal chain between the defendant's misrepresentations and the plaintiff's alleged injury, reasoning:

> [T]he adoption of Pfizer's view would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct.

> In fact, the causal chain in this case is anything but attenuated.  Pfizer has always known that, because of the structure of the American health care system, physicians would not be the ones paying for the drugs they prescribed.  Pfizer's fraudulent marketing plan, meant to increase its revenues and profits, only became successful once Pfizer received payments for the additional Neurontin prescriptions it induced.  Those payments came from Kaiser and other TPPs.

712 F.3d at 38-39 (citing *Bridge*, 553 U.S. at 657).

### 3. Plaintiffs Adequately Alleged a RICO Enterprise and Predicate Acts

#### a. Plaintiffs Adequately Alleged a RICO Enterprise

Defendants argue that Plaintiffs' RICO enterprise allegations fail because Plaintiffs fail to plead a "'common purpose'" and a "'framework or superstructure'" for carrying out the enterprise's unlawful common purpose.  Mfr. Mem. at 9, 12; Dist. Mem. at 10-11.  Defendants' arguments are addressed in *Summit*, which Plaintiffs incorporate herein.  *Summit* Opp. at 50-59.

---

[17]  The Manufacturer Defendants' reliance on *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 443-44 (3d Cir. 2000), is misplaced for the reasons set forth in *West Boca*.  *West Boca* Opp. at 19-21.

The Distributor Defendants also contend, citing to a single paragraph in the FAC, that the allegation that the Supply Chain Defendants conspired together for the purpose of increasing the quota set by the U.S. Drug Enforcement Administration ("DEA") is "conclusory" and "implausible." Dist. Mem. at 10-11. They claim that Manufacturers, not Distributors, submit the quota applications referenced in the FAC; and because Plaintiffs do not allege that the Distributor Defendants submitted public comment to the DEA prior to their setting annual quotas, they conclude that Plaintiffs fail to allege facts to support the allegation that they acted to increase quotas. *Id.* In addition to being a factual argument inappropriate for resolution at this stage, whether the Distributor Defendants submitted quota applications to the DEA or provided public comment is neither necessary nor sufficient for determining whether they worked together with the Manufacturer Defendants to increase the quota set by the DEA. The Distributor Defendants ignore Plaintiffs' allegations of Defendants' financial and personal ties and the ways in which they worked together to ensure that the quotas allowed by the DEA remained artificially high and ensured that suspicious orders were not reported to the DEA so that the DEA had no basis for refusing to increase or decrease production quotas due to diversion. *See, e.g.*, ¶¶494-521, 785-791.

The Distributor Defendants again assert that allegations of parallel, profit-seeking activity among competitors are insufficient to establish the existence of a RICO enterprise. Dist. Mem. at 10-11. In support of this contention, the Distributor Defendants now cite *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655-56 (7th Cir. 2015), and *Ray v. Spirit Airlines, Inc.* 836 F.3d 1340, 1352 n.3 (11th Cir. 2016). Dist. Mem. at 11. Neither case is applicable here, as Plaintiffs have alleged that Defendants' conduct went far beyond what could be considered ordinary business conduct. The Distributor Defendants simply ignore Plaintiffs' allegations that Defendants refrained from competitive activities like reporting their competitors' suspicious orders and struck exactly the same balance of identifying and reporting suspicious orders, including the decision to completely ignore their obligations. ¶¶875-879.

As further explained in the *Summit* opposition,[18] the Distributor Defendants' argument that Plaintiffs fail to identify the requisite relationship among the members of the RICO enterprise similarly ignore allegations that they had formed an association-in-fact enterprise and, at a minimum, participated in the conduct of that enterprise.  ¶¶487-569, 875-879.  These allegations demonstrate that the Distributor Defendants had close financial relationships with the Manufacturer Defendants and also interacted through organizations that encouraged personal relationships, and used those organizations to form agreements about subjects like the duty to identify and report suspicious orders.  ¶¶494-521.  Defendants' reliance on *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295-96 (11th Cir. 2010), and *Anctil v. Ally Fin., Inc.*, 998 F. Supp. 2d 127, 142 (S.D.N.Y. 2014), is misplaced because Plaintiffs have alleged more than just membership in a trade organization.  Plaintiffs allege that the Defendant members of the Pain Care Forum spent over $740 million in lobbying on opioid-related measures.  ¶501.  Plaintiffs further allege that Defendants participated in Healthcare Distribution Alliance webinars to exchange information regarding "prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices."  ¶510.  Plaintiffs also allege that Defendants' participation in these trade groups "reflects a deep level of interaction and cooperation between two groups in a tightly knit industry . . . operat[ing] together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids."  ¶511.

**b.** **Plaintiffs Adequately Alleged Actionable Racketeering Activity**

Defendants make substantially the same arguments as they did in *Summit*.  Mfr. Mem. at 9-11; Dist. Mem. at 9.  Plaintiffs hereby incorporate the discussion concerning the governing Rule 9 standard in the *Summit* opposition, and that concerning CSA violations, as predicate acts.  *Summit* Opp. at 26-35, 59-64.[19]  Plaintiffs have alleged detailed facts in support of their RICO claims, setting out specific allegations concerning the Opioid Marketing Enterprise.  ¶¶839-903. Plaintiffs allege

---

[18]  *Summit* Opp. at 56-57.

[19]  The Manufacturer Defendants also argue that Plaintiffs lack standing because their obligations are to the DEA, and not to Plaintiffs.  This argument was previously raised in *Summit* and is addressed in the opposition.  *Summit* Opp. at 59-64.

predicate acts committed by the Manufacturer Defendants and identified nine categories of documents which Defendants transmitted, delivered, or shipped using mail or wires.  ¶869.

Plaintiffs also alleged predicate acts by the Distributor Defendants with specificity.  Plaintiffs allege that Defendants, including Distributors, disseminated false and misleading statements to state and federal regulators in order to maintain the flow of opioids through high production quotas. ¶882.  Plaintiffs further allege with specificity the Supply Chain Defendants' use of the mail and wires to carry out their illegal scheme.  ¶889.  These "predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs."  ¶899. "The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business or property, while simultaneously generating billion-dollar revenue and profits for the RICO Supply Chain Defendants. The predicate acts were committed or caused to be committed by the Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme."  ¶900.

As in *Summit*, the Manufacturer Defendants cite *Ind./Ky./Ohio Reg'l Council of Carpenters Welfare Fund v. Cephalon, Inc.*, No. 13-7167, 2014 WL 2115498 (E.D. Pa. May 21, 2014), in purported support of the argument that Plaintiffs have failed to plead actionable racketeering activity. Mfr. Mem. at 10. As explained in the *Summit* opposition,[20] *Carpenters* is factually inapplicable, which involved vague and incomplete pleading of purely off-label marketing claims.[21]  Here, as explained in *Summit,* not only do Plaintiffs provide detailed and specific examples of patently false claims that the Manufacturer Defendants made to the market in general, ¶¶140-430, but, as noted *supra*, Plaintiffs also allege in detail the misrepresentations the Manufacturer Defendants made that directly targeted Plaintiffs, ¶¶682-760, 763-766.  Thus, contrary to the Manufacturer Defendants' assertion, Plaintiffs

---

[20]   *Summit* Opp. at 48-49.

[21]   As explained further in *Summit*, the court in *Carpenters* found that the plaintiff third-party payor only referenced three communications concerning Fentora that Cephalon allegedly directed at the market for the drug.  2014 WL 2115498 at *5.  The court further found that plaintiffs failed to allege the content, timing, and circumstances of advertisements alleged to be misleading.  *Id.*

provide both the "who, what, when, where" of such misrepresentations, and Plaintiffs' agents' reliance thereon.

The Manufacturer Defendants also appear to make a learned intermediary argument, stating that because Plaintiffs and their TPAs are "sophisticated entities" that employ pharmacists, physicians, and practicing participating providers, they could not have reasonably relied on any alleged fraudulent statements or omissions.  For the reasons set forth in *Summit* and §III.A.2.b. above, the Manufacturer drug labels and the learned intermediary doctrine do not absolve Defendants of liability.  *Summit* Opp. at 45-50, 83-84; s*ee also* ECF No. 653 (*Chicago* Mfr. Opp.) at 27-31; ECF No. 721 (*Monroe* Opp.) at 48; ECF No. 730 (*Broward* Opp.) at 34-35.

### C. Plaintiffs Have Pled Cognizable Claims Under OCPA

Defendants raise no new arguments and no additional law than in their *Summit* motions to dismiss; thus, for the reasons given in the *Summit* opposition, which is fully incorporated herein, Plaintiffs have successfully pled their Ohio Corrupt Practices Act claims. *Summit* Opp. at 64-69.

### D. The OPLA Abrogates Neither Plaintiffs' Public Nuisance Claims nor Their Negligence Claims

Defendants argue that the Ohio Products Liability Act ("OPLA") abrogates Plaintiffs' common law and statutory public nuisance claims, as well as Plaintiffs' negligence claims, relying primarily on citations to Defendants' *Summit* briefing.  Dist. Mem. at 12-14; Mfr. Mem. at 15; Pharm. Mem. at 5.  Defendants' arguments fail to recognize the textual bounds of the OPLA, which exclude, and thus do not abrogate, claims for economic harm, as Ohio and Sixth Circuit courts have consistently held.  *See Summit* Opp. at 18-21, 88-90.

The OPLA establishes parameters for a particular set of statutory product liability claims, specifically defined as "a claim or cause of action . . . that seeks to recover compensatory damages from a manufacturer or supplier for ***death, physical injury to person, emotional distress, or physical damage to property*** other than the product in question" arising from traditional product liability fact patterns (*e.g.*, flawed design or production of a product).  R.C. §2307.71(A)(13).  The OPLA's text explicitly recognizes that its reach is bounded to claims seeking physical or emotional

"[h]arm" as distinguished from "[e]conomic loss," stating that recovery "for economic loss based on a claim . . . other than a product liability claim, is not subject to [the OPLA], but may occur under the common law of this state or other [Ohio statutes]."  R.C. §2307.72(C); *see also* R.C. §§2307.71(A)(2), (7) (separately defining "[e]conomic loss" and "[h]arm").  A 2005 amendment clarified that the OPLA "abrogate[s] all common law product liability claims," R.C. §2307.71(B), but did not alter the definitional bounds of the "product liability claims" to which the OPLA applies.[22]

Despite Defendants' attempts to reframe Plaintiffs' public nuisance and negligence claims as product liability claims, Plaintiffs' claims fall outside the definition of the OPLA.  *See Summit* Opp. at 88-90.  Plaintiffs do not seek to recover for physical injuries caused by Defendants' products; they exclusively seek to obtain relief for economic harms – such as Plaintiffs' payment of unnecessary and improper healthcare costs – caused by Defendants' conduct in falsely marketing and recklessly distributing their products.  *See, e.g.,* ¶¶19-20, 692-693, 695-696, 698, 758, 761-762, 928, 960, 974, 998, 1018, 1046-1047, 1051, 1059, 1084-1085, 1089, 1138.[23]  Plaintiffs seek compensation for their own payments, not for third parties' physical injuries.  *See, e.g.,* ¶¶1054, 1059.  Such economic loss claims are expressly exempted from the OPLA.  R.C. §2307.72(C).

Both before and after the OPLA amendments in 2005 and 2007, Ohio courts have recognized that "a claim for purely economic loss" – like Plaintiffs' claims here – "is not included in [the OPLA's] statutory definition of 'product liability claim,' and, consequently, a plaintiff with such a claim may pursue a common-law remedy."  *Volovetz v. Tremco Barrier Sols., Inc.,* 74 N.E.3d 743, 753 n.4 (Ohio Ct. App. 2016); *see also LaPuma v. Collinwood Concrete,* 661 N.E.2d 714, 716 (Ohio 1996)

---

[22]  The Ohio legislature expressly declared that the 2005 amendment "intended to supersede . . . *Carrel v. Allied Prods. Corp.*[, 677 N.E.2d 795 (Ohio 1997)]," an Ohio Supreme Court ruling that the OPLA permitted plaintiffs to bring claims under the OPLA and/or common law concurrently. 2004 Ohio Laws File 144 (S.B. 80) (Am. Sub. S.B. 80); *see also Summit* Opp. at 20 n.16, 89 n.61.

[23]  The Distributor Defendants argue that Plaintiffs' claims here are more apt for the OPLA abrogation than those in *Summit* because the *Summit* plaintiffs sought medical costs plus other expenses, while Plaintiffs here seek only "medical costs."  Dist. Mem. at 13. Defendants do not explain how this alters the analysis under the OPLA's definition of economic loss.  R.C. §2307.71(A)(2).  Besides, Plaintiffs have alleged a variety of economic harms listed in the FAC paragraphs cited above.

(OPLA, by its "plain language," neither cover[s] nor abolish[es] claims for purely economic loss");
*accord Beretta*, 768 N.E.2d at 1146; *see also Summit* Opp. at 88-89 & n.61.[24]  In fact, the OPLA "makes
it clear that although a cause of action may concern a product, it is not a product liability claim
within the purview of Ohio's product liability statutes unless it alleges damages other than economic
ones." *LaPuma*, 661 N.E.2d at 716.  Federal courts in Ohio have consistently recognized this
principle, concluding that claims for economic loss were not abrogated by the OPLA and could
proceed.  *See Chapman v. Tristar Prods., Inc.*, 1:16-CV-1114, 2017 WL 1433259, at *12 n.97 (N.D. Ohio
Apr. 24, 2017) (citing *LaPuma*, 661 N.E.2d at 716, and certifying class of negligence claims); *Traxler
v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 628 (N.D. Ohio 2016) (denying motion to dismiss Ohio
Consumer Sales Practices Act claims) (Polster, J.); *Hale v. Enerco Grp., Inc.*, No. 1:10 CV 00867-DAP,
2011 WL 49545, at *7 (N.D. Ohio Jan. 5, 2011) (denying motion to dismiss negligence claims)
(Polster, J.).[25]  This principle also applies to public nuisance claims.  *See Beretta*, 768 N.E.2d at 1143,
1146.

 To counter this case law, the Distributor Defendants point to a footnote in their *Summit*
briefing, which cited cases concluding that the OPLA abrogated the common law negligence claims
there.  Dist. Mem. at 14 (citing ECF No. 491-1 ("*Summit* Dist. Mem.") at 33 n.24).  As explained in
the *Summit* opposition, each case cited in that footnote involved prototypical product liability claims
involving physical injuries or death, and thus fell within the OPLA's definition in precisely the way

---

[24] In their *Summit* reply, the Distributor Defendants cited a non-controlling concurrence in *LaPuma*
that would have held that the OPLA excludes only "'a very narrow class' of claims" alleging
damages related "'solely to the product itself.'"  *See* ECF No. 744 at 24 n.19 ("*Summit* Dist. Reply")
(citing *LaPuma*, 661 N.E.2d at 717 (Cook, J., concurring)).  The controlling majority opinion
included no such limitation, which would contradict the OPLA's text.  *See LaPuma*, 661 N.E.2d at
716.  The Distributor Defendants' *Summit* reply also sought to distinguish *Volovetz*, noting that
*Volovetz* applied the OPLA because the plaintiff there sought physical "'damages [to] property other
than the defective product'" in question.  *See Summit* Dist. Reply at 24 n.19; *Volovetz*, 74 N.E.3d at
753 n.4 (quoting R.C. §2307.71(A)(7)).  That, however, is precisely why the OPLA applied in
*Volovetz* and does not apply here, where Plaintiffs do not seek to recover for "physical damage to
property."

[25] *See also Great N. Ins. Co. v. BMW of N. Am. LLC*, 84 F. Supp. 3d 630, 649 (S.D. Ohio 2015);
*Huffman v. Electrolux N. Am., Inc.*, 961 F. Supp. 2d 875, 880 (N.D. Ohio 2013); *CCB Ohio LLC v.
Chemque, Inc.*, 649 F. Supp. 2d 757, 763 (S.D. Ohio 2009); *In re Whirlpool Corp. Front-Loading Washer
Prods. Liab. Litig.*, 684 F. Supp. 2d 942 (N.D. Ohio 2009).

Plaintiffs' claims do not.  *See Summit* Opp. at 90 n.62 (responding to cases in Distributor Defendants' *Summit* motion to dismiss).  The Distributor Defendants also cite their *Summit* reply brief, which raised two outlier cases, but both are distinguishable from Plaintiffs' case.  Dist. Mem. at 14 (citing *Summit* Dist. Reply, §III.A. at 24 n.18).  In *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, the court concluded that **common law implied warranty** claims are product liability claims abrogated by the OPLA (but that a claim for negligent workmanship was not).  No. 1:10-CV-01902, 2011 WL 1326034, at *12 (N.D. Ohio Apr. 6, 2011); *but see Great N. Ins.*, 84 F. Supp. 3d at 649 (permitting plaintiffs to pursue common law implied warranty claims for purely economic damages in the alternative to their OPLA claims).  Again, the key issue for *Chem. Solvents* is whether plaintiffs' claims were for economic loss, and so its holding does not alter the analysis here.  In *McKinney v. Microsoft Corp.*, the court dismissed various common law claims brought alongside an OPLA product liability claim for a defective video game system, without discussing how the claims met the OPLA's definition of harm absent allegations of physical injury.  No. 1:10-cv-354, 2011 WL 13228141, at *7 (S.D. Ohio May 12, 2011).  Plaintiffs contend the *McKinney* court erred, but regardless, its holding does not alter the analysis here because it involved a clear and simple product liability claim (which was brought alongside the common law claims) distinguishable from Plaintiffs' non-product liability claims here.

Defendants further argue that Plaintiffs' public nuisance claims are abrogated by the 2007 amendment to the OPLA.  *See, e.g.*, Dist. Mem. at 12 (citing *Summit* Dist. Mem., §II.A.).  The 2007 amendment clarified that the OPLA's definition of "'[p]roduct liability claim' also includes any public nuisance claim or cause of action at common law" alleging that a product caused a public nuisance.  R.C. §2307.71(A)(13).  Defendants misinterpret the 2007 amendment.

First, the amendment applies only to certain public nuisance claims "at common law" (not those seeking economic loss, as explained below), but plainly does not apply to Plaintiffs' **statutory** nuisance claims.  *See Summit* Opp. at 19.  The legislature declared that the 2007 amendment was "not intended to be substantive" but merely clarified that the OPLA's original intent was "to abrogate all common law product liability causes of action including **common law** public nuisance causes of

action" allegedly caused by a product. 2006 Ohio Laws File 198 (Am. Sub. S.B. 117). In their reply in *Summit*, the Distributor Defendants tried to avoid this clear statement of legislative intent by arguing that in the 2007 amendment's language "'any public nuisance claim or cause of action at common law'" the limiting clause "at common law" modifies only the phrase "cause of action," not the phrase "public nuisance claim." *Summit* Dist. Reply at 19. As the legislature made clear, the 2007 amendment was meant to abrogate certain "common law" public nuisance claims, such that the clause "at common law" applies to the entire preceding phrase. Reading "any public nuisance claim or cause of action" as a single phrase modified by "at common law" would not render "any public nuisance claim" surplusage, as the Distributor Defendants argued in *Summit*. *Id.* at 19. For example, the OPLA's basic definition of "[p]roduct liability claim" is "a ***claim or cause of action***," which does not create surplusage there. R.C. §2307.71(A)(13).

Second, the 2007 amendment also does not abrogate Plaintiffs' common law public nuisance claims. These claims seek only economic losses, and the 2007 amendment did not amend the definition of "product liability claim" to remove the non-economic "harm" requirement or alter the exclusion of economic loss claims in §2307.72(C). *See Summit* Opp. at 20. Those sections of the statute apply as equally after as before the ***non-substantive*** amendment. *See* 2006 Ohio Laws File 198 (Am. Sub. S.B. 117). Applying those sections, which remain key to the OPLA today, the Ohio Supreme Court made clear in *Beretta* that the OPLA did not abrogate common law public nuisance claims seeking only economic losses. 768 N.E.2d at 1143, 1146. If the legislature had intended the 2007 amendment to overrule *Beretta*, it would have explicitly said so, as it did in explicitly overturning *Carrel*, 677 N.E.2d 795, when passing the 2005 amendment. *See supra* n.1; *Summit* Opp. at 20 n.16.

Moreover, both Ohio courts and the Sixth Circuit continue to cite *Beretta* as good law. *See, e.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474 (6th Cir. 2017); *Cleveland Housing Renewal Project v. Deutsche Bank Trust Co.*, 621 F.3d 554, 565 (6th Cir. 2010); *Ameriquest*, 615 F.3d at 505; *see also Summit* Opp. at 81 n.51. Defendants' reliance on one trial court decision that failed to

analyze the economic damages issue cannot outweigh this case law.  *See City of Toledo v. Sherwin-Williams Co.*, No. CI 200606040, 2007 WL 4965044, at n.2 (Ohio Com. Pl. Dec. 12, 2007).

**E.      Plaintiffs Have Pled Cognizable Equitable Claims for Abatement of a Public Nuisance**

**1.      Plaintiffs Adequately Alleged a Special Injury**

Defendants make only one new argument in opposition to Plaintiffs' nuisance claims: they attack Plaintiffs' standing to bring a public nuisance claim.  Plaintiffs are entitled to bring their public nuisance claim because Defendants inflicted harms upon them different in kind from those suffered by the public at large.  *Brown v. Cty. Comm'rs*, 622 N.E.2d 1153, 1160 (Ohio Ct. App. 1993). Defendants' largely unsupported arguments to the contrary on this point are unavailing and fail for the same reasons they do in *Summit* and *West Boca* as well as for the reasons below.  *See Summit* Opp. at 8 n.6 (citing *Restatement (Second) of Torts* §821C(1); *Brown*, 622 N.E.2d at 1160); *West Boca* Opp., §III.

For over 120 years, Ohio law has recognized the ability of a private actor to bring a claim of public nuisance.  *Vill. of Cardington v. Fredericks' Adm'r*, 21 N.E. 766, 767 (Ohio 1889) ("We conclude that the generally accepted rule is that, although the nuisance be a public one, yet it is private also, if an individual sustain[s] a special injury thereby, [then] he may maintain an action and recover his special damage, whether it be direct or only consequential.").  All that is required is that the private plaintiff allege to have suffered a "special injury," one "which is ***different in kind rather than degree*** from that suffered by other members of the public."  *Thompson v. Argent Mortg. Co., LLC*, No. 94613, 2010 WL 3747601, at *2 (Ohio Ct. App. Sept. 23, 2010).  Plaintiffs have alleged in detail the special injuries they suffered as a third-party payor because, *inter alia*, Plaintiffs were specifically targeted by the Marketing Defendants, ¶¶682-791; they themselves were misled by these false and misleading statements, ¶¶406, 797, 1036; and their medical care costs increased directly because of the Manufacturer Defendants' misrepresentations and omissions, all Defendants' concealment of diversion, and the increased need to treat their insureds affected by the opioid epidemic created and advanced by Defendants, ¶¶20, 28-29, 639, 692-699, 761-762, 1046-1047, 1051.

Defendants' arguments to the contrary are little more than restatement of the very law that supports Plaintiffs' case moving forward.  In fact, many of the cases cited show examples of private plaintiffs successfully bringing claims of public nuisance.  *See Miller v. City of W. Carrollton*, 632 N.E.2d 582, 586 (Ohio Ct. App. 1993) (holding that a resident was "especially damaged" by the potential construction of a car wash in the area and had standing to bring a public nuisance claim.); *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 55-56 (Ohio Ct. App. 2007) (holding that plaintiffs' claims could proceed at summary judgment stage because "genuine issues of material fact remain in dispute as to whether or not the particular damages alleged by appellants are specific to them or suffered by the public in general").  In *Cleveland Housing Renewal Project, Inc. v. Wells Fargo Bank, N.A.*, the court did not reach the issue of whether the non-profit plaintiff CHRP had standing because plaintiff had already adopted a contrary position in earlier briefing in federal court and was judicially estopped from arguing it had standing at a later proceeding in state court.  934 N.E.2d 372, 380 (Ohio Ct. App. 2010) ("The injury suffered by Plaintiff CHRP **is not distinct from the injury to the public at large**.").  Finally, unlike the plaintiff in the unpublished *Thompson* case, Plaintiffs here have indeed alleged more than that they were affected by only the "blighted conditions in [their] community."  2010 WL 3747601, at *3.  Plaintiffs have alleged they are shouldering a portion of the economic burden created by the opioid epidemic, and their particular injuries are sufficient for this claim to survive dismissal.

### 2.  Defendants' Remaining Public Nuisance Challenges Lack Merit

The remainder of Defendants' nuisance briefing merely restates, in summary form, the arguments they advanced in *Summit*.  *See* Dist. Mem. at 12 (OPLA bars the claims; no interference with public right; licensed persons in highly regulated conduct not liable for absolute public nuisance; no standing to bring statutory public nuisance claim under Ohio Dangerous Drug Act or federal CSA); Mfr. Mem. at 16 (economic loss rule; actual and proximate causation; preemption); Pharm. Mem. at 8 (citing ECF No. 497 ("*Summit* Pharm. Mem.") at 17-21 (no statutory standing; conclusory pleading; no intentional unlawful conduct; no interference with public right)).

Defendants' OPLA and economic loss arguments are respectively addressed herein at §§III.D. and
III.G.  Defendants' remaining challenges fail for the same reasons they failed in *Summit*:

- Plaintiffs' public nuisance claim alleges interference with a public right, and does not seek recovery based on, or for, the personal injuries of individuals.  *Summit* Opp., §I.A.1.a.

- Regulated conduct is not insulated from a public nuisance claim where, as here, Defendants' actions **were not performed in conformance with the regulations**. *Id.*, §I.A.1.b (citing *City of Cleveland*, 621 F. Supp. 2d at 528; *Beretta*, 768 N.E.2d at 1143).

- Plaintiffs adequately alleged proximate causation, the standard for which is lessened in the public nuisance context.  *Id.*, §I.A.1.c (citing *Beretta*, 768 N.E.2d at 1143).

- Plaintiffs adequately alleged intentional conduct.  *Id.*, §I.A.1.d.

- Plaintiffs' statutory nuisance claim is proper under R.C. §§3767.03 and 715.44, and abatement relief is proper.  *Id.*, §I.A.2.

- Plaintiffs sufficiently pled their statutory nuisance claim.  *Id.*

For these reasons, Plaintiffs' common law and statutory public nuisance claims should not
be dismissed at the pleading stage.  *Cf. In re Opioid Litig.*, No. 400000/2017, 2018 WL 3115102, at
*20-*22 (N.Y. Sup. Ct. June 18, 2018) (denying motion to dismiss public nuisance claims for lack of
proximate cause or substantial interference with a public right); *State ex rel. Morrisey v.*
*AmerisourceBergen Drug Corp.*, No. 12-C-141, 2014 WL 12814021, at *8-*10 (W. Va. Cir. Ct. Dec. 12,
2014) (denying motion to dismiss public nuisance claims); *State of Washington State v. Purdue Pharma*
*L.P.*, No. 17-2-25505-0, slip op. at 3 (Wash. Super. Ct. May 14, 2018) (attached hereto as Exhibit A)
(same).

## F.    Plaintiffs Have Sufficiently Pled Their Negligence Claims Against All Defendants

Plaintiffs assert claims for negligence against all Defendants.  The elements of a negligence
claim in Ohio are: (1) a duty requiring the defendant to conform to a certain standard of conduct;
(2) breach of that duty; (3) a causal connection between the breach and injury; and (4) damages.
*Cromer v. Children's Hosp. Med. Ctr. of Akron*, 29 N.E.3d 921, 928 (Ohio 2015).  Defendants challenge
Plaintiffs' pleading of every element, largely reincorporating and/or repeating the myriad scattershot

arguments they advanced in *Summit*. With respect to the arguments Defendants mention, but do not elaborate on, *see* Mfr. Mem. at 17; Dist. Mem. at 14-15; Pharm. Mem. at 5, Plaintiffs incorporate arguments advanced previously in the *Summit* opposition. *See Summit* Opp., §I.C.[26] The additional arguments Defendants put forth in opposition to Plaintiffs' negligence claims all fail for the reasons explained below.

### 1. Plaintiffs Adequately Alleged the Existence of a Common Law Duty

Manufacturer and Distributor Defendants both contend that they owe no duty **to Plaintiffs**, either because Plaintiffs fail to allege one (as Manufacturer Defendants contend), or because Defendants lacked the requisite relationship with Plaintiffs or owed no duty to protect Plaintiffs from intervention by third parties or superseding causes (as Distributor Defendants contend). None of these arguments – which largely restate arguments Defendants advanced in *Summit*[27] – has merit: at the very least, Defendants owe a common law duty of reasonable care that all people and entities owe to each other. *See, e.g.*, *City of Everett v. Purdue Pharma L.P.*, No. C17-209RSM, 2017 WL 4236062, at *4 (W.D. Wash. Sept. 25, 2017) (denying motion to dismiss negligence claims for lack of duty); *Opioid*, 2018 WL 3115102, at *25-*26 (same); *Morrisey*, 2014 WL 12814021, at *6-*8; *State of Washington*, slip op. at 3-4 (same). The level of care needed is heightened where, as here, the drugs in question were addictive and dangerous and had the potential to be abused and diverted, causing widespread harms to communities and requiring Plaintiffs to bear the cost, all of which was entirely foreseeable.

Under Ohio law, every person is required to use reasonable care to avoid injuring another person or his/her property. *See OJI CV* 401.01; *see also Restatement (Third) of Torts*, §7; *Philadelphia Fire & Marine Ins. Co. v. Hirschfield Printing Co.*, 53 N.E.2d 827 (Ohio Ct. App. 1943). Reasonable care "is

---

[26] Defendants also contend that the OPLA abrogates Plaintiffs' negligence claims. This is incorrect, as explained more fully above and in the prior *Summit* briefing. *See supra* §III.D.; *Summit* Opp., §I.C.4

[27] Correspondingly, Plaintiffs hereby incorporate the full version of their arguments, which were previously presented in the *Summit* Opp., §I.C.1.a.

the care that a reasonably careful person would use under the same or similar circumstances." *OJI CV* 401.01(2); *see also Restatement (Second) of Torts* §281.

"[A] duty may be established by common law, legislative enactment, or by the particular facts and circumstances of the case." *Horvath v. Ish*, 979 N.E.2d 1246, 1255 (Ohio 2012) (citing *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198 (Ohio 1998)). The duty of care the common law requires is commensurate with the risk of harm the conduct creates. *Berdyck v. Shinde*, 613 N.E.2d 1014, 1020-21 (Ohio 1993) ("In negligence cases the duty is always the same: to conform to the legal standard of reasonable conduct in the light of apparent risk."). Moreover, the question of whether Defendants owe a duty of reasonable care to Plaintiffs here is a question for the trier of fact. *See, e.g.*, *Beretta*, 768 N.E.2d at 1145 ("It is often for a jury to decide whether a plaintiff falls within the range of a defendant's duty of care and whether that duty was fulfilled.").

Distributor Defendants' contentions that they did not owe a duty to Plaintiffs because they had "no relationship" with Plaintiffs, and Manufacturer Defendants' related claim that Plaintiffs failed to identify any common-law or statutory duty owed to Plaintiffs, Dist. Mem. at 16; Mfr. Mem. at 17, misstate the duty analysis and overlook the well-pled duty allegations in the FAC. *See* ¶¶574-589 (duties of National Retail Pharmacies), 464-493 (duties of Manufacturers and Distributors).

In Ohio, it is well settled that "[t]he existence of a duty depends on the foreseeability of the injury." *Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984); *accord Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1026 (Ohio 2002). "The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee*, 472 N.E.2d at 710; *see also Bohme, Inc. v. Sprint Int'l Commc'ns Corp.*, 686 N.E.2d 300, 303 (Ohio Ct. App. 1996) ("Injury is foreseeable if a defendant knew or should have known that its act was likely to result in harm to someone."). "[I]n order to owe a duty of care, it is not necessary that the defendant foresee the injury in the precise form in which it occurred. Rather, it is sufficient if defendant's action or inaction was likely to result in an injury to someone." *Id.*

In *Beretta* – a leading case Defendants entirely fail to cite in their duty analysis – the Ohio Supreme Court considered whether the City of Cincinnati could sue gun manufacturers and distributors for, among other things, negligence in the manufacturing, marketing, and distribution of firearms. The Court found the harms at issue sufficiently foreseeable to impose a duty of care, citing with approval the rationale of a similar case in Boston:

> Taking Plaintiffs' allegations as true, Defendants have engaged in affirmative acts (*i.e.*, creating an illegal, secondary firearms market) by failing to exercise adequate control over the distribution of their firearms. . . . The method by which Defendants created this market, it is alleged, is by designing or selling firearms without regard to the likelihood the firearms would be placed in the hands of juveniles, felons or others not permitted to use firearms . . . . Taken as true, these facts suffice to allege that Defendants' conduct unreasonably exposed Plaintiffs to a risk of harm. Worded differently, the Plaintiffs were, from Defendants' perspective, foreseeable plaintiffs.

768 N.E.2d at 1144 (quoting *City of Boston v. Smith & Wesson Corp.*, No. 199902590, 2000 WL 1473568, at *15 (Mass. Super. Ct. July 13, 2000)).

*Beretta* is squarely on point and controlling. Here, as in *Beretta*, Defendants failed to exercise adequate control over the marketing and distribution of their wares, in this case, opioids. Here, as in *Beretta*, Defendants' products – opioids classified mostly as Schedule II drugs by the DEA – were known to be highly dangerous. *See, inter alia*, ¶474 ("Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970. The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals. Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market."); and ¶39 n.3 ("Opioids generally had been categorized as Schedule II or Schedule III drugs . . . . Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence."). It was entirely foreseeable that, if not marketed, distributed, and sold with requisite care, they could cause serious harm. *See* ¶¶464-486 (describing Defendants' required duties under the CSA to maintain effective controls, and to identify, report, or halt suspicious orders in order to prevent diversion of dangerous drugs); ¶¶487-493 (noting Defendants' conduct in marketing, distributing, and selling

dangerously addictive drugs required a high degree of care and placed them in a position of great responsibility).  Here, as in *Beretta*, Defendants disregarded that danger, in this case the likelihood of overprescribing and diversion of opioids, causing Plaintiffs to expend more on opioid prescriptions and opioid-related healthcare costs.  Just as the Ohio Supreme Court held that the *Beretta* defendants owed a duty of care to the City of Cincinnati, here, too, Defendants owed a duty of care to Plaintiffs – the parties that were foreseeably, even contractually obligated, to bear the costs of Defendants' negligent conduct.

For similar reasons, Distributor Defendants' contentions that they have no duty to prevent harm to **Plaintiffs** from third parties because they lack a "special relationship" with Plaintiffs, and that they have no duty as a result of intentional or illegal acts after the drugs left Distributor Defendants' control, likewise fail.  No special relationship is required where, as here, Plaintiffs' claims are based on **Defendants' own negligent conduct**, not the conduct of third parties.  That was the specific holding of the Ohio Supreme Court in *Beretta*, 768 N.E.2d at 1144. Responding to the same argument, the Court observed:

> [T]he issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury. Consequently, the "special relationship" rule is not determinative of the issue presented here.

*Id.*

Here, Plaintiffs do not allege that Defendants failed to protect them from harm caused by others.  Rather, they allege that Defendants **themselves** engaged in conduct the foreseeable result of which was to cause harm to Plaintiffs.  *See, inter alia*, ¶¶120-136, 140-315, 408-411, 418-430, 438-452 (by spreading deceptive messaging about the safety and addictiveness of opioids); ¶¶316-394 (by spreading this false and misleading information through front groups and "key opinion leaders"); ¶¶395-407, 412-417, 446-452 (by funding CME programs and medical scholarships to encourage and pay doctors for increasing their prescriptions of opioids); ¶¶445, 523, 536, 608, 618-622 (providing incentives to sales representatives with pill mills in their territories and ignoring red flags of diversion during regular visits to pharmacies and doctors); ¶¶487-573, 590-622 (failing to report

suspicious orders or otherwise act to prevent diversion); ¶¶431-437 (by targeting vulnerable populations such as veterans and the elderly).  Under *Beretta*, these allegations are sufficient to establish Defendants' duty of care.

While Defendants contend that Plaintiffs' injuries derive from the conduct of, and injury to, others who, for example, abused opioids, Defendants ignore Plaintiffs' well-pled allegations that the harms resulted from the over-prescribing and over-use of opioids, and not only their abuse, and that Defendants' own conduct both caused and made foreseeable these precise harms.  To the extent intentional and criminal acts by third parties – including abuse and diversion – are at issue, Plaintiffs allege that these are entirely foreseeable consequences of Defendants' conduct which do not relieve them of their duty here. *Bohme*, 686 N.E.2d at 303; *Feichtner*, 683 N.E.2d at 120 (reasonably foreseeable willful, malicious, or criminal acts of a third person do not cut off negligence analysis).[28]

## 2.    Plaintiffs Seek to Enforce Ohio Common-Law Duties

Plaintiffs allege that Defendants violated common-law duties to exercise reasonable care in delivering dangerous narcotic substances, ¶¶469-486, and to prevent the foreseeable misuse and diversion of these dangerous drugs, ¶¶487-493.[29]

Defendants persistently attempt to recast Plaintiffs' negligence claims as "in effect" enforcing statutes and regulations that contain no private right of action.  This is incorrect for two reasons.  First, Plaintiffs seek to enforce their own common law claims against Defendants, not

---

[28]   By contrast, the cases Defendants cite all involve purported duties to protect against harm caused by third parties. The question in *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 705 (Ohio 1995), for example, was whether a supermarket had a duty to warn patrons of criminal dangers on property they did not own or control. Plaintiffs do not allege that Defendants failed to protect them from third parties, but rather that Defendants' own conduct caused them harm. The court in *Volter*, 598 N.E.2d 35, meanwhile, applied precisely the same test – whether the intervening acts were foreseeable – to determine whether the causal chain was broken.

[29]   Not only was the harm foreseeable, Defendants were able to see it happening in real time. *See* ¶¶522-547 (alleging Defendants' superior knowledge of prescribing and order data).  Instead of using this knowledge (and the detailed data they purchased) ***to stop*** suspicious prescriptions and orders, Marketing Defendants used the information in order to find the prolific prescribers and sell to them. ¶¶526, 539-547.  Distributor Defendants used similar information-gathering tactics not to improve their "anti-diversion" programs, but instead to better compete for market share, ¶¶527-534, 559, and increase their profits, ¶¶570-574.

federal statutory claims.  As explained above, and more fully in *Summit*, Defendants' duties are asserted as bases for these claims grounded in traditional Ohio common law principles.  Plaintiffs reference statutes and regulations as informing the standard of care, *see, e.g.*, ¶1064, and to show the foreseeability of the harms that flowed from Defendants' breach of their duties, *see, e.g.*, ¶¶926-927, 955, 957-959, 997-998 – not to demonstrate conclusively that Defendants committed the tort of negligence because they violated certain statutes and regulations.  The statutes provide a standard of care for the underlying common law duty by establishing how a reasonable manufacturer or distributor of dangerous drugs would and should behave under the circumstances.  Defendants' liability arises from their failure to use reasonable care under the circumstances, not their failure to abide by federal or state statutes.

Second, to the extent Plaintiffs contend that the violation of certain statutes can constitute negligence *per se*, Defendants are wrong – both here and in their *Summit* reply briefing, *see* ECF No. 746 ("*Summit* Mfr. Reply") at 31 – that a negligence *per se* claim can only be based on a statute containing a private right of action.  A claim for negligence *per se* is still a claim based on a common law duty; in negligence *per se*, the breach of that duty can be established by showing the violation of a statute that imposes a specific standard of care "for the safety of others."  *Chambers*, 697 N.E.2d at 201; *see also Ornella v. Robertson*, 237 N.E.2d 140, 143 (Ohio 1968).  Here, Plaintiffs allege violations of statutes intended to prevent the widespread diversion of illicit drugs, *see Summit* Opp. at 35-36 (discussing Congressional intent in enacting CSA), which "has a substantial and detrimental effect on **the health and general welfare of the American people**," ¶¶491-493 (citing DEA guidance).  These allegations state a claim for negligence *per se*, not a claim under the CSA.[30]

---

[30]  Defendants muster only one case, *Rogozinsky v. Danek Med., Inc.*, No. 4:96CV2572, 1999 WL 33537323 (N.D. Ohio July 8, 1999), for the proposition that a private right of action is required for negligence *per se*.  In *Rogozinsky*, the court dismissed the plaintiff's negligence *per se* claim only after two rounds of summary judgment briefing.  In doing so, it relied solely on *Tekavec v. Van Waters & Rogers, Inc.*, 12 F. Supp. 2d 672, 683 (N.D. Ohio 1998), in which the district court improperly imported a private cause of action requirement into the negligence *per se* analysis – contravening a long line of Ohio authority holding that negligence *per se* can be based on a violation of any statute that was "intended to affect the duties owed for the safety and protection of others."  *Wireman v. Keneco Distribs., Inc.*, 661 N.E.2d 744, 749 (Ohio 1996) (cited in *Tekavac*).

In any event, it is premature at this stage for the Court to determine whether Defendants' breaches of their statutory duties, as properly alleged in the FAC, conclusively establish their negligence, or merely provide evidence of it.  In neither circumstance does Plaintiffs' negligence claim arise directly under the statutes or regulations, and the use of these enactments as a measure of the standard of care in no way justifies dismissal of these claims.[31]

### 3.    Plaintiffs Adequately Alleged Proximate Causation

Plaintiffs have plausibly pled that Defendants' negligence proximately caused their injuries, as discussed more fully in §III.A.2.  *See also Everett*, 2017 WL 4236062, at *6 (denying motion to dismiss negligence claims for lack of proximate cause); *Opioid*, 2018 WL 3115102, at *26-*28 (same); *Morrisey*, 2014 WL 12814021, at *6-*10 (defendants knew or should have known their conduct would create unreasonable risk of harm); *State v. Purdue Pharm.*, slip op. at 4 (defendant's violation of duty resulted in foreseeable harm).

### G.    The Economic Loss Rule Bars Neither Plaintiffs' Public Nuisance Claims nor Their Negligence Claims

Distributor and Manufacturer Defendants argue that the economic loss rule bars Plaintiffs' public nuisance and negligence claims, relying solely on their primary and reply briefs in *Summit*. Dist. Mem. at 20-21; Mfr. Mem. at 15-16.  As explained in *Summit*, Defendants fundamentally misapply the economic loss doctrine.  *See Summit* Opp. at 21-23, 85-88.  The doctrine is based on the principle that parties in contractual privity do not owe each other duties beyond their contractual

---

[31]    Distributor Defendants also maintain that Plaintiffs fail to allege that they breached their duty to report and halt suspicious orders.  Dist. Mem. at 17.  This contention – which cites no legal authority – is incorrect.  In fact, Plaintiffs allege that Distributors' breach of their duty was one of the "two primary causes of the opioid epidemic."  ¶9.  Plaintiffs detailed the Distributor Defendants' duties to: (1) control the supply chain; (2) maintain sufficient systems to monitor, identify, and assess suspicious orders; (3) prevent diversion; (4) report suspicious orders; and (5) halt shipments of opioids in quantities they knew or should have known could not be justified and were indicative of serious problems of overuse of opioids, ¶¶464-486; their awareness of these obligations, ¶¶487-493, 677-681; that they meticulously tracked prescribing information but did nothing to stop diversion, ¶¶522-556; and that they pretended to cooperate with law enforcement, ¶¶557-569.

Additionally, Plaintiffs are not individuals suing for particular personal injuries, so the specific orders that should not have been filled are entirely beside the point.  Plaintiffs allege that Defendants' laxity in fulfilling their duties resulted in the wide-scale diversion, addiction, and abuse that now plagues Ohio and the nation.

---

agreement, and thus cannot sue each other in tort for economic losses.  *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624, 630-31 (Ohio 1989); *accord Digiknow, Inc. v. PKXL Cards, Inc.*, No. 96034, 2011 WL 2899600, at*1 (Ohio Ct. App. July 21, 2011) ("[A] party cannot recover purely economic damages in a tort action against another party based upon the breach of contractually created duties.").  By contrast, when Ohio "parties are not in privity of contract," they may "bring negligence claims for solely economic injuries." *Hale*, 2011 WL 49545, at *7 (Polster, J.) (quoting *Whirlpool*, 684 F. Supp. 2d at 950).  The economic loss rule does not apply to bar any of Plaintiffs' claims, because Plaintiffs are not in privity with Defendants and are not seeking to impose a tort duty based on any contractual agreement.  *See Opioid*, 2018 WL 3115102, at *27-*28 (denying motion to dismiss negligence claims under economic loss rule for same reasons).

The economic loss rule also does not apply to Plaintiffs' ***absolute*** nuisance claims because "the economic-loss doctrine does not apply to intentional torts," *Eysoldt v. ProScan Imaging*, 957 N.E.2d 780, 785 (Ohio Ct. App. 2011), and Plaintiffs allege that "Defendants' nuisance-creating conduct was intentional," ¶1024.  The cases cited by Defendants applying the doctrine to nuisance claims all involved ***qualified*** public nuisance claims (*i.e.*, nuisance based on negligence).  *Summit* Opp. at 22 (distinguishing Defendants' cases).

On reply in *Summit*, the Distributor Defendants argued that plaintiffs there confused two lines of economic loss doctrine law, citing *Cincinnati v. Deutsche Bank*, 863 F.3d at 477.  Defendants are correct that there are two lines, but incorrect about what they are – the two lines distinguish between claims for absolute and qualified public nuisance claims, as explained above, in the *Summit* opposition, and in *Cincinnati v. Deutsche Bank*, 863 F.3d at 477 ("Ohio law recognizes two types of public nuisances: qualified and absolute.").  Defendants argue that *Cincinnati v. Deutsche Bank* controls and makes clear that the economic loss rule applies here, when, in fact, that case stated: "Some uncertainty, it is true, exists under Ohio law over whether the economic-loss doctrine applies to intentional torts or to absolute nuisance claims." *Id.* at 478.  The Sixth Circuit explicitly did "not

need to step into that thicket" and, instead, resolved the absolute nuisance claims on other grounds. *Id.* No case contradicts *Eystoldt* or applies Ohio's economic loss rule to absolute nuisance claims.[32]

### H. Plaintiffs Have Sufficiently Pled Their Claim for Fraud Against the Manufacturer Defendants

As a threshold matter, Manufacturer Defendants (as the only Defendants seeking dismissal of the fraud claim) assert that the fraud claim fails for reasons addressed elsewhere in the parties' briefs, and as set forth in §X of ECF No. 499-1 ("*Summit* Mfr. Mem.") and §IX of the *Summit* Mfr. Reply: because Plaintiffs have not adequately pled actual and proximate causation, Plaintiffs have not pled any actionable conduct with the particularity required by Rule 9(b), and federal law preempts this claim. Mfr. Mem. at 18. For the reasons addressed in §§III.A., III.B., III.K., and III.I. herein, these assertions are unfounded. As set forth below, the Manufacturer Defendants' remaining objection regarding Plaintiffs' fraud claim is similarly meritless.

Manufacturer Defendants also incorrectly contend that the fraud claim cannot proceed because Plaintiffs did not plead justifiable reliance. Mfr. Mem. at 18. As a factual proposition, this is simply untrue. Paragraph 1103 of the FAC expressly alleges that "Plaintiffs . . . did in fact rightfully, reasonably, and justifiably rely on [Manufacturer] Defendants' representations and/or concealments . . . ." And ¶1104 explains that Plaintiffs' reliance on Defendants' misrepresentations and/or omissions caused them to "misapprehen[d] that the opioid crisis was simply a result of conduct by persons other than Defendants," thereby "prevent[ing] Plaintiffs from a more timely and effective response to the opioid crisis." Defendants' contentions to the contrary amount to a factual

---

[32] In *Summit,* Defendants argue that the Ohio Court of Appeals has held that the economic loss rule barred absolute nuisance claims, citing *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, No. 87382, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006). *Summit* Dist. Mem. at 44; *Summit* Mfr. Reply at 27; *see also* Dist. Mem. at 20. Not so. *RWP* acknowledged that the rule might **not** apply to absolute nuisance claims but dismissed the claim there on the separate ground that the plaintiffs failed to show injury to property. *Id.* at *4. Besides, *RWP* incorrectly stated the law on that point: the case cited by *RWP* stated that an "absolute nuisance is based on either intentional conduct or an abnormally dangerous condition that cannot be maintained without injury to property, no matter what care is taken." *State ex rel. R.T.G., Inc. v. State*, 780 N.E.2d 998, 1010 (Ohio 2002). In other words, "cannot be maintained without injury to property" was describing an inherent quality of an "abnormally dangerous condition," **not** stating a legal element of an absolute nuisance claim. *See Cincinnati v. Deutsche Bank*, 863 F.3d at 477 (correctly quoting *R.T.G.*).

---

dispute that is inappropriate for resolution on a motion to dismiss.  *See Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 516-17 (6th Cir. 1999) (noting that justifiable reliance is a factual issue and reversing dismissal of fraud claim for lack of justifiable reliance as a matter of law).

Manufacturer Defendants contend that a fraud claim cannot be predicated on alleged misrepresentations made to third parties.  Mfr. Mem. at 18-19 (quoting *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 474 (Ohio 2018)).  As explained in the *Summit* opposition, however, this is not an accurate statement of Ohio law, and the explanation provided there applies with equal weight here.  *Summit* Opp. at 91-92.  Indeed, Plaintiffs have alleged a sufficient factual basis to satisfy the legal standards outlined therein.  *See* ¶¶1101-1104.  To support their contention to the contrary, Manufacturer Defendants rely on the same authority referenced in the *Summit* Mfr. Mem.  *See* Mfr. Mem. at 18-19; *Summit* Mfr. Mem., §X.  Accordingly, for the same reasons stated in the *Summit* opposition, such reliance is misguided.  *Summit* Opp. at 92.

Manufacturer Defendants' objection to Plaintiffs' reliance on authority that pre-dates *Lucarell*, *see* Mfr. Mem. at 19 and *Summit* Mfr. Reply, §IX, is untenable where the legal holdings of such authority are not inconsistent with those in *Lucarell* and have not been overruled or otherwise circumscribed by an appropriate court in Ohio.  Moreover, Manufacturer Defendants cannot genuinely contend, as they do in §IX of the *Summit* Mfr. Reply, that the FAC fails to allege that Defendants made any misrepresentations or omissions with the intent that they be conveyed to Plaintiffs.  Indeed, that is precisely what Plaintiffs have alleged.  ¶¶682-770, 1101-1104.

Finally, Manufacturer Defendants contend that Plaintiffs' fraud claim fails because they have "not identified ***any*** Ohio physician who was exposed to the allegedly deceptive marketing and who then wrote a harmful or medically unnecessary opioid prescription for one of plaintiffs' enrollees as a result of that marketing."  Mfr. Mem. at 19 (emphasis in original).  Defendants, however, provide no authority requiring Plaintiffs to connect misrepresentations directly to a prescription, prescriber, or injured enrollee in order to plead fraud.  To be sure, Plaintiffs' alleged failure to identify specific prescribers, prescriptions, or enrollees in this massive, years-long fraudulent scheme is irrelevant where the FAC alleges publicly available information that is also obviously within the Manufacturer

Defendants' knowledge regarding their own marketing practices, detailing visits, and payments to doctors in Plaintiffs' community.  *See* ¶¶634-676.  Thus, Plaintiffs' fraud claim has been adequately pled and should not be dismissed.

I.   **Plaintiffs Have Sufficiently Pled Their Claim for Injury from Criminal Acts Under R.C. §2307.60**

Defendants assert that Plaintiffs fail to state a claim under R.C. §2307.60 because Plaintiffs do not allege prior criminal convictions.  Mfr. Mem. at 19; Pharm. Mem. at 9.  For the reasons set forth in the *Summit* opposition, Defendants are incorrect.  *See Summit* Opp. at 92-94.

In addition, since the *Summit* briefing, this Court addressed this same issue when ruling on a motion to dismiss in *Buddenberg v. Weisdack*, No. 1:18-cv-00522, 2018 WL 3159052 (N.D. Ohio June 28, 2018) (Polster, J.) (denying motion to dismiss §2307.60 claim based on absence of prior convictions).  After reviewing the law (including the same case law relied upon by Defendants in *Summit)*, the Court concluded that the law was unclear:

> Interestingly, in 2007, the Ohio General Assembly amended ORC §2307.60 to create a *presumption* of civil liability when the defendant had been convicted of a criminal violation. Am. Sub. S.B. 117.  Had the General Assembly wanted to make a criminal conviction a condition precedent to establishing an ORC §2307.60 claim, they presumably could have done so.

*Id.* at *5-*6 (emphasis in original).  This Court should deny Defendants' motion to dismiss for the same reason.

Plaintiffs assert a claim for civil liability against Defendants for criminal acts in violation of numerous federal and Ohio criminal laws, including R.C. §§2925.02(A) and 2925.03(A).  ¶¶1114-1120.  In seeking dismissal, the Pharmacies claim that they are exempt from criminal liability under R.C. §§2925.02(A) and 2925.03(A), based on exemptions which apply to "pharmacists, owners of pharmacies, and other persons whose conduct is in accordance with Chapters 3719., 4715., 4723., 4729., 4730., 4731., and 4741."  *See* R.C. §§2925.02(B), 2925.03(B).  But, the FAC alleges that the Defendants are not in compliance with these chapters, are not entitled to these exemptions, and details why.  ¶¶494-556, 1083, 1117, 1119.  It also alleges that Defendants have pled guilty, agreed to

pay substantial fines and penalties, been indicted, and engaged in numerous violations of controlled substances regulations. *See, e.g.*, ¶¶42, 816, 1124 (Purdue); ¶71 (Insys); ¶¶592-603 (CVS); ¶¶605, 610 (Walgreens); ¶614 (Rite Aid); ¶811 (Cephalon); ¶¶824, 1124 (McKesson). For these reasons, Defendants are neither exempt from criminal liability under Ohio law nor for potential civil liability under Count Nine. *See Summit* Opp. at 95.

Last, Count Nine should not be dismissed under the economic loss doctrine. It does not bar recovery in tort where, as here, the duty does not arise under contract. *Campbell v. Krupp*, 961 N.E.2d 205, 211 (Ohio Ct. App. 2011). And, it does not apply, as here, to intentional torts – let alone to violations of criminal statutes. *Eysoldt*, 957 N.E.2d at 785. *See Summit* Opp. at 95 n.65.

### J. Plaintiffs Have Sufficiently Pled Their Unjust Enrichment Claim

Defendants claim that Plaintiffs have not stated a claim for unjust enrichment because they have not adequately pled that they conferred a benefit upon Defendants. Mfr. Mem. at 19; Dist. Mem. at 21; Pharm. Mem. at 8. As in *Summit*, Defendants contend that, under Ohio law, Plaintiffs must allege that they engaged in economic transactions with Defendants and that paying for Defendants' "externalities" – the harm they caused – is insufficient to state a claim. Mfr. Mem. at 19-20; Dist. Mem. at 21. Defendants are wrong regarding the law. They also ignore key allegations in the FAC regarding the relationship between the parties and the benefits Defendants sought and obtained from Plaintiffs.

As a preliminary matter, Defendants misstate the law; it is not necessary to allege a direct economic transaction between the parties to state a claim for unjust enrichment under Ohio law. "Unjust enrichment . . . arises not only where an expenditure by one person adds to the property of another but also where the expenditure saves the other from expense or loss." 18 John J. Dvorske, et al., *Ohio Jurisprudence 3d Contracts* §303 (2018). And a benefit may be conferred by paying for the harm caused by the defendant.

In *White v. Smith & Wesson*, the City of Cleveland was able to bring an unjust enrichment claim against gun manufacturers for the harm they caused it, despite the absence of any direct transaction between the parties. 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000). The court held that by paying for "the Defendants' externalities – the costs of the harm caused by [their] failure to incorporate safety devices into their handguns and negligent marketing practices" – the City of Cleveland conferred a cognizable benefit on the gun manufacturers and stated a claim for unjust enrichment. *Id.*  Other courts in Ohio agree. *See Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015) (unjust enrichment claim can be brought against manufacturer who dumps waste on plaintiff's property).  So do courts in other jurisdictions, including with regard to the externalities caused by defendants' opioid sales.  *See Everett*, 2017 WL 4236062, at *9 (allowing claim for unjust enrichment based on paying for externalities of defendants' opioid sales). *See also Moore v. Texaco, Inc.*, 244 F.3d 1229, 1233 (10th Cir. 2001) ("The performance of another's statutory duty to remediate pollution can give rise to a claim for unjust enrichment."); *City of L.A. v. JPMorgan Chase & Co.*, No. 2:14-cv-04168-ODW (RZx), 2014 WL 6453808, at *10 (C.D. Cal. Nov. 14, 2014) (paying for the cost of the harm caused by defendants' predatory lending constitutes a "benefit[] conferred"); *City of New York v. Lead Indus. Ass'n, Inc.*, 190 A.D.2d 173, 177 (N.Y. Sup. Ct. May 13, 1993) (city entitled to restitution from lead-based paint manufacturers and their trade association for expenditures "in abating the hazard, and treating its victims"); *see also Summit* Opp. at 97.

Defendants suggest that the Ohio Supreme Court's decision in *Johnson v. Microsoft Corp.* altered the law in Ohio so that paying for a defendant's externalities is no longer a sufficient benefit. 834 N.E.2d 791, 799 (Ohio 2005). Mfr. Mem. at 19-20. That is not true. *Johnson* did not address negative externalities. It was a putative class action against Microsoft for monopolistic pricing by consumers who had bought computers from Gateway with Microsoft's operating system.  In *Johnson*,

the Ohio Supreme Court held – consistent with well-established antitrust law principles that an indirect purchaser may not bring anti-trust claims – that being an indirect purchaser alone is not sufficient to confer a benefit upon a manufacturer: "The rule of law is that an indirect purchaser cannot assert a common-law claim for restitution and unjust enrichment against a defendant without establishing that a benefit had been conferred upon that defendant by the purchaser." *Id.* at 799. Thus, the Court recognized that benefits may be conferred in other ways, even by indirect purchasers.

The other cases upon which Defendants rely also involve indirect purchasers who conferred no other benefit upon the manufacturer, allege no other interactions between the parties, and do not allege that the plaintiffs paid negative externalities caused by the defendant. Mfr. Mem. at 19-20; Dist. Mem. at 21. *See Young v. Carrier Corp.*, No. 4:14CV0974, 2014 WL 6617650 (N.D. Ohio Nov. 21, 2014) (customer sued manufacturer regarding air conditioner bought from retailer); *Whirlpool*, 684 F. Supp. 2d 942 (customer sued manufacturer regarding washer bought from retailer); *Hoffer v. Cooper Wiring Devices, Inc.*, No. 1:06CV763, 2007 WL 1725317 (N.D. Ohio June 13, 2007) (customer sued manufacturer regarding wiring receptacles). *See also Ohio Edison Co. v. Direct Energy Bus., LLC*, 2017 WL 3174347 (N.D. Ohio July 26, 2017) (customer paid wrong supplier); *Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters., Inc.*, 50 N.E.3d 955 (Ohio Ct. App. 2015) (purchaser sued financing company for defective product). *But see Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812 (N.D. Ohio 2006) (allowing unjust enrichment claim by indirect payor).

In short, Defendants cite no law holding that payment of a defendant's externalities is not sufficient to confer a benefit under Ohio law, and Plaintiffs are aware of none. And Plaintiffs allege that they conferred such a benefit upon the Defendants. ¶¶1131-1139.

More importantly, Defendants completely ignore key allegations in the Complaint, which describe how Plaintiffs conferred a benefit upon Defendants beyond paying for their externalities.

For instance, Plaintiffs allege that: Defendants specifically "[t]argeted" them, ¶682; Defendants intentionally made misrepresentations to Plaintiffs' agents, the TPAs whom Plaintiffs hired to manage their prescription drug programs, regarding opioids, ¶¶682-699; and many of Defendants' misrepresentations were made directly to Plaintiffs' agents, ¶¶693-699, or to groups that included Plaintiffs' agents, ¶¶700-709.  Defendants' purpose in making misrepresentations to Plaintiffs' agents was to gain a benefit for themselves.  Defendants sought to get Plaintiffs' agents to change the coverage and formulary status of opioids in Plaintiffs' drug benefit programs, which would make more money for Defendants.  ¶¶693-699, 709.  Defendants knew that Plaintiffs' agents would rely on their misrepresentations in making these decisions.  ¶¶695, 761.  And, in fact, Plaintiffs' agents did rely on Defendants' misrepresentations in managing Plaintiffs' prescription drug benefit program with regard to the status of opioids, including whether, when, and how opioid medications should be covered.  ¶¶689-691, 762.

Defendants had a duty to provide accurate information to Plaintiffs' agents.  They also had a duty to correct misinformation which they had provided. Thus, when they learned of the growing evidence of prescription opioid diversion, they had a duty to tell not just government regulators, but also Plaintiffs and/or Plaintiffs' agents.  ¶¶469-486.  They did neither.  Instead, Defendants conspired to mislead the Plaintiffs, through their agents, in order to obtain money for themselves, and they succeeded.  ¶¶696, 771-791.

Plaintiffs thereby conferred a benefit upon Defendants, Defendants knew of the benefit, and Defendants have retained the benefit under circumstances where it is unjust. *See Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984) (elements of unjust enrichment). These allegations also dispose of Defendants' argument that there is no injustice to be remedied.  The conduct alleged – making intentional misrepresentations to obtain money – is not only unjust, it is criminal. *See, e.g., United States v. Faulkenberry*, 614 F.3d 573, 580 (6th Cir. 2010) (wire fraud involves any scheme for

"obtaining money or property by means of false or fraudulent pretenses"), *aff'd*, 461 F. App'x 496 (6th Cir. 2012).[33]

Defendants also seek dismissal of Plaintiffs' claim for unjust enrichment on the grounds that it is "derivative" of the other claims.  Mfr. Mem. 19.  But, Plaintiffs may plead multiple causes of action arising from the same facts.  *See Summit* Opp. at 95-96.  To the extent Defendants seek to dismiss the unjust enrichment claim because it is "premised" on well-pled allegations they substantively dispute (*see, e.g.*, *Summit* Mfr. Reply at 33), it is not proper grounds to dismiss.

### K.      Plaintiffs Have Sufficiently Pled Their Civil Conspiracy Claim

In arguing that Plaintiffs' civil conspiracy claim should be dismissed, Defendants simply rehash and incorporate their arguments to dismiss the civil conspiracy claim under Ohio law in *Summit*.  Mfr. Mem. at 20; Dist. Mem. at 23; Pharm. Mem. at 9.  These arguments fail here for the reasons set forth in *Summit* Opp. at 99-105.

First, Plaintiffs pled a malicious combination – the first element of a civil conspiracy claim in Ohio, *Hale*, 2011 WL 49545, at *5 – with regard to both marketing and diversion.  Specifically, Plaintiffs allege that the Manufacturer Defendants: (1) shared a common design to promote prescription opioids through misrepresentations and omissions regarding their appropriate uses, risks, and safety, ¶¶771, 773; (2) through a network they developed and funded, *see, e.g.*, ¶¶694, 772,

---

[33]   These allegations also make clear why the case law from other jurisdictions involving the tobacco defendants, upon which the Distributor Defendants rely, is inapposite.  The Distributor Defendants cite these cases for the proposition that "defendant's externalities cannot provide the necessary foundation for an unjust enrichment claim," because "[v]irtually every enterprise generates externalities."  Dist. Mem. at 21-22.  But in addition to not applying Ohio law, the tobacco defendants had not made direct misrepresentations to the plaintiffs or their agents, and had not sought to alter the plaintiffs' coverage for their products to obtain money, as Plaintiffs allege they did here. *See Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) ("These [allegedly false] statements were not made to the [insurers]; they were made to society as a whole, and affected the [insurers] (if at all) only because they may have influenced smokers."); *Seafarers Welfare Plan v. Philip Morris*, 27 F. Supp. 2d 623, 635 (D. Md. 1998) (no benefit conferred on tobacco companies where plaintiffs already legally obligated to pay smoking-related medical costs of plan participants).

775-778, 796; (3) to accomplish the goal of misleading MMO, PBMs, and TPPs, including Plaintiffs, physicians, and patients, ¶¶771, 799; (4) in order to secure placement on TPPs' formularies, *see, e.g.*, ¶¶693-695, 705; and (5) increase sales, revenue, and profit from their opioid products, ¶773. Plaintiffs pled that to accomplish this goal, the Manufacturer Defendants collectively used unbranded marketing materials, such as KOLs, scientific literature, CME programs, patient education materials, and Front Groups developed and funded collectively by the Manufacturer Defendants. ¶¶775, 779-783. *See also* ¶¶682-770, 839-874, 905-931, 966-975, 1145-1158.

As to diversion, Plaintiffs also allege all Defendants shared a common design to illegally increase the supply of prescription opioids beyond any reasonable, legitimate need and, again, that they did so to satisfy their own greed. For instance, Plaintiffs allege that all Defendants capitalized on a tight-knit industry, reflecting a deep level of cooperation and interaction, ¶¶786, 788-789; to increase the quotas that governed the manufacture and supply of opioids, ¶¶785, 790; to expand the opioid market, ¶787; and to profit from an unimpeded flow of large quantities of opioids, ¶¶786, 791. *See also* ¶¶761-762, 875-903, 933-964, 977-999, 1145-1158.

As in *Summit*, Plaintiffs here also allege that neither the Manufacturer Defendants' marketing conduct, nor all Defendants' diversion conduct, is consistent with ordinary and rational business behavior and that their participation in industry-wide trade associations goes well beyond routine commercial activities. *See, e.g.*, ¶¶789, 803-838, 875-879. *See* Mfr. Mem. at 20. Indeed, Plaintiffs allege that Defendants knowingly and deliberately took steps to conceal knowledge of each other's wrongdoing. *See, e.g.*, ¶¶696, 784, 789, 796-797.

In *Summit* Mfr. Reply, §XII, which they cite here (Mfr. Mem. at 20), the Manufacturer Defendants reiterate their wrongful assertions that an express agreement is required in order to plead a common understanding and that participation in industry trade associations cannot serve as the basis for inferring such a common understanding. An express agreement is not required under

Ohio law to plead a claim for civil conspiracy.  If it were, almost no plaintiff would ever be able to plead a claim, because the conduct underlying the conspiracy itself prevents plaintiffs from knowing the details of such an express agreement.  Here, Plaintiffs' allegations clearly rise far beyond allegations of "mere participation" in trade association or "parallel conduct."

Second, Plaintiffs pled numerous unlawful acts apart from the conspiracy – the only other element of civil conspiracy that any Defendant challenges.  *Hale*, 2011 WL 49545, at *5.  *See* Mfr. Mem. at 20; *Summit* Mfr. Mem. at 51-53; *Summit* Dist. Mem. at 52-54; *Summit* Pharm. Mem. at 21-23. These include violations of RICO, ¶¶904-964; the OCPA, ¶¶965-999; and Injury Through Criminal Acts, R.C. §2307.60, ¶¶1112-1129, as well as statutory or common law violations of public nuisance, ¶¶1000-1060; negligence, ¶¶1061-1093; and fraud, ¶¶1094-1111.  As Plaintiffs allege, multiple Defendants have settled or been fined in excess of millions of dollars for their unlawful violations taken in furtherance of their conspiracies.  *See* ¶¶807-838.  So, they have clearly pled Defendants committed purposeful, wrongful acts "without a reasonable or lawful excuse."  *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).

To the extent that Manufacturers attempt to incorporate their argument in the *Summit* reply that Plaintiffs fail to plead "unlawful conduct by [the] associations" to which they jointly belong, Plaintiffs respond that Manufacturer Defendants again misstate both Plaintiffs' allegations and the law.  First, Plaintiffs allege that Defendants used their participation in industry trade groups to further their conspiracy, not that the trade groups themselves engaged in unlawful acts (they certainly may have).  Second, it is enough under Ohio law that Plaintiffs allege even a single Defendant committed an unlawful act in furtherance of the conspiracy.  *Hale*, 2011 WL 49545, at *5. As explained above, Plaintiffs have certainly done so.

Third, to the extent Defendants intend to incorporate their arguments that Plaintiffs have failed to meet Rule 9(b), to the extent that Rule 9(b) is required, Plaintiffs have satisfied that

standard.  *See* §§III.B., III.H.; *Summit* Opp. at 5-6, 23-35.  Beyond fraud-based allegations, Plaintiffs need not plead the other elements of their civil conspiracy claim with Rule 9(b) particularity (though, they do).  *See Summit* Opp. at 99-100.

### L.       Plaintiffs' Claims Are Not Preempted

For the reasons set forth in the *Summit* opposition, Plaintiffs' state law claims are not preempted.  *Summit* Opp. at 114-22.

The Marketing Defendants again assert that federal law, specifically FDA labeling and approval of their opioids, preempts Plaintiffs' state law claims.  Mfr. Mem., §IV.  For reasons fully addressed in the *Summit* opposition, the Marketing Defendants are again wrong.  *Summit* Opp., §II.B.1.  There are two primary flaws with the Marketing Defendants' assertions: they misconstrue Plaintiffs' claims and they cite inapt case law.

According to the Marketing Defendants, the FAC alleges that they "falsely represented opioids as safe and effective for the long-term treatment of chronic, non-cancer pain even though [the] FDA has approved most of the medications at issue here for ***exactly*** that purpose."  Mfr. Mem. at 13 (emphasis in original).  This assertion is a red herring for two reasons.  First, few of the drugs at issue in the FAC were approved for chronic pain.  Second, of the nine identified categories of misrepresentations in the FAC, none concerns the representation that certain opioids cannot be safe and effective for the long-term treatment of chronic, non-cancer pain.  FAC, §III.D.1.a.-i.  Indeed, the Marketing Defendants do not identify any FDA determination that conflicts with the nine categories of misrepresentations the FAC identifies.

So, too, is the assertion that any claim the Marketing Defendants had a duty not to sell their prescription opioids would undermine the FDA's decision to make them available for sale.  Mfr. Mem. at 14.  The Marketing Defendants' brief identifies two paragraphs they contend allege a duty not to sell.  *Id.* (citing ¶¶958, 964).  Neither does.  Paragraph 958 alleges that the RICO Supply Chain Defendants engaged in a scheme of deception by refusing to identify or report suspicious orders of prescription opioids.  Paragraph 964 lists aspects of the relief sought by Plaintiffs for their RICO claim.  The claims do not arise from the fact that the Marketing Defendants made their prescription

opioids available for sale.  Rather, they arise from the manner in which the Marketing Defendants marketed the opioids and the failure of all Defendants to comply with the suspicious order requirements of the Controlled Substances Act.

Like their factual contentions, the cases on which the Marketing Defendants rely don't respond to the Complaint's allegations.  In *Mut. Pharm. Co., Inc. v. Bartlett*, the Supreme Court held that an order to stop selling a federally approved drug was preempted by the FDCA.  570 U.S. 472, 788 (2013).  And the *Zogenix, Inc. v. Patrick* court issued a preliminary injunction against Massachusetts' emergency order prohibiting the prescription and dispensing of an FDA-approved drug.  No. 14-11689-RWZ, 2014 WL 1454696, at *1 (D. Mass. Apr. 15, 2014).  None of Plaintiffs' claims would require the Marketing Defendants to cease sales of approved prescription opioids, only to stop marketing them deceptively.  As such, neither *Mutual Pharmaceutical* nor *Zogenix* supports dismissal.

*Strayhorn v. Wyeth Pharms., Inc.* is similarly inapt.  *Strayhorn* stands for the proposition that where a pharmaceutical company could not meet its alleged state-law obligation without violating its federal duties under an FDA-approved label, the state-law obligation is preempted.  737 F.3d 378, 394 (6th Cir. 2013).  None of Plaintiffs' allegations asks Manufacturer Defendants to violate their labels.  Indeed, courts have consistently refused to find preemption of fraud-based marketing claims involving FDA-approved drugs.  In *Wyeth v. Levine*, the Supreme Court held that "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."  555 U.S. 555, 575 (2009).  Rather, Congress "determined that widely available state rights of action provided appropriate relief for injured consumers."  *Id.* at 574.  So has the FDA.  *Id.* at 579; *see also Summit* Opp.at 117 (citing cases refusing to find preemption of fraud-based marketing claims involving FDA-approved drugs).

## M.        Plaintiffs' Claims Are Not Time-Barred

Manufacturer Defendants, but no others, move to dismiss – "in part"[34] – all of Plaintiffs' claims as time-barred by the applicable status of limitations.  Mfr. Mem. at 20-22.  Manufacturer Defendants' motion should be denied for the reasons set forth below.

Initially, because the statute of limitations is an affirmative defense, Fed. R. Civ. P. 8(c)(1), it is rarely an appropriate subject for a motion to dismiss.  *See United States v. N. Trust Co.*, 372 F.3d 886, 888 (7th Cir. 2004) ("Dismissal under Rule 12(b)(6) was irregular, for the statute of limitations is an affirmative defense.").  A complaint may be dismissed under Rule 12(b)(6) for failing to comply with the statute of limitations only when "the complaint on its face **conclusively** indicates that the action is time-barred."  *Savoy v. Univ. of Akron*, No., 11AP-183, 2012 WL 3085515, at *1 (Ohio Ct. App. May 3, 2012) (emphasis in original).  Where, as here, Plaintiffs assert various tolling exceptions to Ohio's statutes of limitation, ¶¶792-802, the applicability of those exceptions "are questions for summary judgment or for trial, and they should not be resolved on a motion to dismiss."  *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 476 (6th Cir. 2013); *see also American Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016) ("courts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date[] . . . includ[ing, for example,] claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury").  The fact that Defendants seek to partly (as opposed to completely) dismiss claims, only serves to introduce further factual disputes that militate against dismissal at this stage.  For this reason alone, the motion should be denied.

---

[34]   Manufacturer Defendants do not appear to argue that any of Plaintiffs' claims are completely time-barred.  They instead seek to "dismiss [P]laintiffs' claims to the extent they rely on alleged conduct committed before April 13, 2013," or June 18, 2013.  This is not an appropriate basis for a Rule 12(b)(6) motion, but rather more in the nature of a motion to strike allegations or to limit the introduction of evidence, neither of which were contemplated by CMO 1.

Moreover, with respect to Plaintiffs' statutory nuisance claim under R.C. §3767.03, the appropriate statute of limitations is six years.  *See* R.C. §2305.07; *also see State ex rel. Kenney v. City of Toledo*, No. L-17-1149, 2018 WL 2085099, at *4-*6 (Ohio Ct. App. May 4, 2018) (affirming trial court's finding that relators asserting a claim under a municipal statute filed their claims within the applicable six-year statute of limitations of R.C. §2305.07); *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, No. 1:12-CV-104, 2016 WL 2897472, at *11-*12 (S.D. Ohio May 18, 2016) (finding that the proper limitations period for the plaintiff's claims, which included claims under a municipal code and statutory public nuisance claims, were contained in R.C. §2305.07).  Manufacturers assert that Plaintiffs' allegations regarding exceptions to the applicable statutes of limitations should be "disregarded under *Twombly* and do not suspend or toll the applicable limitations periods for the reasons given in the *Summit* [Mfr. Mem.] §XIV.B and *Summit* [Mfr. Reply] §XIII."  Mfr. Mem. at 22. Accordingly, Plaintiffs incorporate by reference those points made in §II.C.2-3 of the *Summit* opposition, which, along with the allegations detailed below, demonstrate that Defendants' contentions have no merit.

### 1.    Plaintiffs Adequately Alleged Fraudulent Concealment

As to Plaintiffs' other claims against the Manufacturer Defendants, Plaintiffs have alleged that Defendants are equitably estopped from asserting a statute of limitations defense, because they purposefully concealed their unlawful conduct and fraudulently assured the public, including Plaintiffs, that they were actively working to comply with their obligations under controlled substances laws and to curb the opioid epidemic.  ¶¶792-802.

As discussed above, Plaintiffs allege the existence of a coordinated and concealed Opioid Marketing Enterprise, which included: the exchange of information, payment of rebates, and/or chargebacks with Distributor Defendants, ¶497; collaboration to ensure that the opioid production and procurement quotas set by the DEA remained high, ¶518; efforts to surreptitiously undermine

policies and prescribing recommendations that limited opioid use, ¶¶848-850; and creating and providing a body of misleading medical literature, advertising, training materials, and CME programs and speaker presentations, ¶854.  The scheme alleged by Plaintiffs could not have succeeded without the close collaboration of the Manufacturer Defendants, Distributor Defendants, Front Groups, and KOLs, and this close collaboration was concealed from Plaintiffs and the public.  ¶843.

Moreover, Plaintiffs sufficiently allege that the Manufacturer Defendants disseminated many of their misrepresentations through the guise of ostensibly objective third parties, KOLs, and Front Groups, while hiding the fact that the Manufacturer Defendants were funding them and controlling their messaging.  *See* ¶¶318-361 (discussing Front Groups); ¶¶362-394 (discussing KOLs). Manufacturer Defendants' role in directing the Front Groups was hidden from the public and intended to stay that way.[35]

Additionally, when some information about the dangers of opioids began to filter through Defendants' pervasive misrepresentations, Defendants responded by: (1) blaming a few "bad actor[]" physicians and patients, *see, e.g.*, ¶544; and (2) claiming that their new, patent-protected formulations of opioid medication would deter abuse and resist tampering, ¶¶274-315.  Not one Manufacturer Defendant has taken action to correct its misrepresentations.

Finally, Manufacturer Defendants (along with Distributor Defendants) also hid their lack of cooperation with law enforcement, while making public assurances that they were committed to working with public authorities to preventing diversion.  ¶¶559-569.  Purdue, for example, asserted a need for secrecy about its supposed anti-diversion programs, stating that "[i]mproperly disclosing the workings of these programs is irresponsible and only aids those seeking to divert and abuse

---

[35]   Indeed, one major front group, the American Pain Foundation, disbanded as soon as its financial ties to the Manufacturer Defendants became public.  ¶330.

prescription opioids, potentially worsening a national health crisis."  *See* Purdue, *Setting The Record Straight On Our Anti-Diversion Programs* (July 11, 2016) (cited at ¶565 n.162).

Thus, Plaintiffs have alleged each of the elements of equitable estoppel based on fraudulent concealment.  As Plaintiffs allege, Manufacturer Defendants deprived Plaintiffs of actual or implied knowledge of facts sufficient to put Plaintiffs on notice of potential claims, and Plaintiffs did not discover the nature and magnitude of Defendants' misconduct, nor could they have acquired such knowledge earlier through the exercise of reasonable diligence.  ¶¶797-798.  Manufacturer Defendants do not dispute that Plaintiffs have made these allegations, but contend that they are not "sufficient to support" application of the doctrine.  Mfr. Mem. at 21. That argument improperly seeks to shift the burden to Plaintiffs on this motion to dismiss.  As explained in §II.C.2 of the *Summit* opposition, "even the authorities on which Defendants rely recognize[] [that] 'these are questions . . . [that] should not be resolved on a motion to dismiss.'"  *Summit* Opp. at 125-26.  Accordingly, Plaintiffs have pled more than sufficient facts to support tolling the statute of limitations based on Defendants' fraudulent concealment.

### 2.  The Continuous Violations Doctrine Applies to Plaintiffs' Claims

Plaintiffs' claims are also timely under the continuing violations doctrine.  As Manufacturer Defendants object to the application of this doctrine on the same grounds asserted in the *Summit* Mfr. Mem. and the *Summit* Mfr. Reply, *see* Mfr. Mem. at 21, Plaintiffs incorporate by reference those points made in §II.C.3 of the *Summit* opposition.  Indeed, like the *Summit* second amended complaint, the FAC demonstrates that Defendants' deceptive campaign was well orchestrated and continuous, and that it continues to harm Plaintiffs' communities and countless other communities across the United States.  *See Summit* Opp. at 127; *see also*, *e.g.*, ¶¶852, 860, 949, 952.

Moreover (as in the *Summit* second amended complaint), Plaintiffs allege that the harms from the opioid epidemic are ongoing.  Addiction continues to spread, including as a result of

Defendants' reformulated and supposedly abuse-deterrent opioids, which, contrary to Manufacturer Defendants' representations, are just as addictive as their predecessors and still subject to abuse. ¶¶635-651.  Cuyahoga County has been working to address the unfolding crisis, including forming an Opiate Task Force in 2010 to find solutions to the increasing number of accidental drug-related deaths caused by opioids.  ¶640.  But even after Cuyahoga County committed substantial resources to address the crisis, the opioid epidemic is nowhere near contained.  *Id.*  Cuyahoga County's first responders continue to have to respond to overdose calls, and the county must purchase additional supplies of naloxone.  ¶¶671-676.  Accordingly, Plaintiffs have properly alleged facts sufficient to invoke the continuous violations doctrine.

Because the FAC sufficiently alleges exceptions to the applicable statutes of limitations, any acts that Defendants contend took place after the limitations periods may apply to suspend such periods.  Defendants' reliance on *Gould Elecs., Inc. v. Livingston Cty. Road Comm'n*, No. 09-CV-12633, 2012 WL 5817937, at *12 (E.D. Mich. May 25, 2012), to argue otherwise is misplaced, where the court in that case discussed the application of ***Michigan's*** fraudulent concealment statute. Defendants' reliance on *Chandler v. Wackenhut Corp.*, 465 F. App'x 425, 428 (6th Cir. 2012), to contend that allegations involving acts by third parties cannot suspend any limitations periods as a matter of law is erroneous for the same reason.  *Id.*  (discussing the applicability of Michigan's fraudulent concealment statute).  For this reason as well, Manufacturer Defendants' motion to dismiss Plaintiffs' claims based on the statute of limitations should be denied.

## IV.      CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'
motions to dismiss.[36]

DATED:  August 20, 2018                    Respectfully submitted,

                                           ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           AELISH M. BAIG
                                           MATTHEW S. MELAMED


                                                    *s/ Aelish M. Baig*
                                           AELISH M. BAIG

                                           Post-Montgomery Center
                                           One Montgomery Street, Suite 1800
                                           San Francisco, CA  94104
                                           Telephone:  415/288-4545
                                           415/288-4534 (fax)
                                           aelishb@rgrdlaw.com
                                           mmelamed@rgrdlaw.com

                                           ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                           PAUL J. GELLER
                                           MARK J. DEARMAN
                                           DOROTHY P. ANTULLIS
                                           120 East Palmetto Park Road, Suite 500
                                           Boca Raton, FL  33432
                                           Telephone:  561/750-3000
                                           561/750-3364 (fax)
                                           pgeller@rgrdlaw.com
                                           mdearman@rgrdlaw.com
                                           dantullis@rgrdlaw.com

---

[36]     Should the Court determine that the FAC is in any way deficient, Plaintiffs respectfully request
leave to amend.  Pursuant to Fed. R. Civ. P. 15(a), leave to amend a complaint shall be freely given
when justice so requires.  *See Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982).

ROBBINS GELLER RUDMAN
 & DOWD LLP
THOMAS E. EGLER
CARISSA DOLAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
tome@rgrdlaw.com
cdolan@rgrdlaw.com

GEORGE H. FAULKNER (0031582)
JOSEPH C. HOFFMAN, JR. (0056060)
JOSEPH D. MANDO (0082835)
FAULKNER, HOFFMAN & PHILLIPS, LLC
20445 Emerald Parkway Drive, Suite 210
Cleveland, OH  44135
Telephone:  216/781-3600
216/781-8839 (fax)
faulkner@fhplaw.com
hoffman@fhplaw.com
mando@fhplaw.com

*Attorneys for Plaintiff*

SPANGENBERG SHIBLEY & LIBER LLP
PETER H. WEINBERGER (0022076)
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
Telephone:  216/696-3232
216/696-3924 (fax)
pweinberger@spanglaw.com

*Plaintiffs' Co-Liaison Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of August, 2018, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

*s/ Aelish M. Baig*
Aelish M. Baig