**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45459-DAP | MDL No. 2804<br><br><br>Hon. Dan Aaron Polster |

**MEMORANDUM IN SUPPORT OF
<u>DISTRIBUTORS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

I.      THE NATION'S RICO CLAIM SHOULD BE DISMISSED. ...........................................3

II.     THE LANHAM ACT CLAIM SHOULD BE DISMISSED. .............................................5

     A.     The Nation Is Not a Proper Plaintiff. ....................................................................6

     B.     The Nation Fails To Plead Actionable False Advertising. .....................................7

III.    THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED. ............................................9

     A.     The Negligence Claims Are Barred by Oklahoma Statute. ....................................9

     B.     The Complaint Fails To Allege a Duty Owed by Distributors to the Nation....................................................................................................................10

            1.     No private right of action. ........................................................................10

            2.     No negligence *per se*...............................................................................11

            3.     No common-law duty. ...............................................................................13

     C.     The Complaint Fails Plausibly To Allege that Distributors Breached Any Duty........................................................................................................................15

IV.    THE NATION FAILS TO STATE A NUISANCE CLAIM............................................15

     A.     The Nation Fails To Allege that Distributors Controlled the Instrumentality of the Nuisance. ...................................................................15

     B.     The Nation Fails Adequately To Allege a Connection to Land or Interference with a Public Right. ........................................................................16

            1.     No connection to property rights. .............................................................17

             2.     No interference with a public right. ..........................................................19

V.      THE COMMON LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE ADEQUATELY TO ALLEGE PROXIMATE CAUSATION. ......................................21

VI.    THE NATION'S UNJUST ENRICHMENT CLAIM FAILS.........................................23

VII.   THE NATION'S CIVIL CONSPIRACY CLAIM FAILS.............................................25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Acad. of Doctors of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644
(E.D. Mich. 2017) ................................................................................................6

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000)....................................24

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric
Surgery, Inc.*, 185 F.3d 606 (6th Cir. 1999).............................................................7

*Arnett v. Mylan, Inc.*, 2010 WL 2035132 (S.D. W. Va. May 20, 2010)..........................................5

*Best v. AT & T Mobility, LLC*, 2015 WL 1125539 (S.D. Ohio Mar. 12, 2015)..............................7

*Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013 (10th Cir. 2007)..............................15

*City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000),
*aff'd*, 277 F.3d 415 (3d Cir. 2002) .........................................................................18

*Energy Fluids, Inc. v. Cimarex Energy Co.*, 2008 WL 2404226
(W.D. Okla. June 10, 2008) ..................................................................................25

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015) ...................................................8

*Halpin v. David*, 2009 WL 1753759 (N.D. Fla. June 22, 2009).....................................................4

*Henry v. Merck and Co., Inc.*, 877 F.2d 1489 (10th Cir. 1989)....................................................22

*Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249
(W.D. Okla. 2012) ..............................................................................................25

*Hoagland v. Okla. Gas & Elec. Co.*, 2016 WL 3523755
(W.D. Okla. June 22, 2016) ..................................................................................12

*Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258 (1992) ...................................................21

*Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687
(6th Cir. 2003)..................................................................................................9

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x
778 (10th Cir. 2016)........................................................................................8, 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ...............................6

*NL Indus., Inc. v. Gulf & W. Indus., Inc.*, 650 F. Supp. 1115 (D. Kan. 1986)..............................4

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489 (5th Cir. 2000)........................................8

*Rewis v. United States*, 401 U.S. 808 (1971) ...............................................................................4

*Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88 (4th Cir. 2011)......................................20

*Roadtec, Inc. v. Rd. Sci., LLC*, 2013 WL 12123358 (E.D. Tenn. Aug. 29, 2013).........................7

*Steinbeck v. Dollar Thrifty Auto. Grp., Inc.*, 2008 WL 4279798
 (N.D. Okla. Sept. 15, 2008) ......................................................................................................5

*Walkabout v. Midland Funding LLC*, 2015 WL 2345308
 (W.D. Okla. May 14, 2015) .......................................................................................................5

*Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900 (S.D. Ohio 2007) .........................7

*Zagorski v. McAdam*, 2014 WL 2982669 (W.D. Okla. July 1, 2014) ...........................................26

### STATE CASES

*Brill v. Walt Disney Co.*, 246 P.3d 1099 (Okla. Civ. App. 2010)...................................................23

*Brock v. Thompson*, 948 P.2d 279 (Okla. 1997) ..........................................................................26

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004)...................................18, 19

*City of McAlester v. Grand Union Tea Co.*, 98 P.2d 924 (Okla. 1940)............................18, 19, 21

*City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314 (Okla. 2011) ..........................................24

*Claborn v. Plains Cotton Coop. Ass'n*, 211 P.3d 915 (Okla. Civ. App. 2009),
 *overruled on other grounds by Howard v. Zimmer, Inc.*, 299 P.3d 463
 (Okla. 2013) ............................................................................................................................12

*Delbrel v. Doenges Bros. Ford*, 913 P.2d 1318 (Okla. 1996) .......................................................14

*Estate of Doyle v. Sprint/Nextel Corp.*, 248 P.3d 947 (Okla. Civ. App. 2010) .............................14

*Estate of Hicks ex rel. Summers v. Urban E., Inc.*, 92 P.3d 88 (Okla. 2004) ................................5

*Fairlawn Cemetery Ass'n v. First Presbyterian Church, U. S. A.*, 496 P.2d 1185
 (Okla. 1972) ............................................................................................................................17

*Gaines v. Providence Apartments*, 750 P.2d 125 (Okla. 1987) ..............................................21, 22

*Goodall v. City of Clinton*, 161 P.2d 1011 (Okla. 1945) ..............................................................19

*Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013) ............................................................12, 13

*Hummel v. State*, 99 P.2d 913 (Okla. Crim. App. 1940) ..............................................................17

*Joyce v. M & M Gas Co.*, 672 P.2d 1172 (Okla. 1983) ....................................................22

*King v. State*, 109 P.2d 836 (1941) ..............................................................................17

*Larrimore v. Am. Nat'l Ins.*, 89 P.2d 340 (Okla. 1939) ...................................................12

*Lockhart v. Loosen*, 943 P.2d 1074 (Okla. 1997) ...........................................................12

*Lowery v. Echostar Satellite Corp.*, 160 P.3d 959 (Okla. 2007) ................................13, 15

*Lumber 2, Inc. v. Ill. Tool Works, Inc.*, 261 P.3d 1143 (Okla. 2011) ...............................5

*Meinders v. Johnson*, 134 P.3d 858 (Okla. Civ. App. 2005) .............................................19

*Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272 (1996) ........................................16

*Revard v. Hunt*, 119 P. 589 (Okla. 1911).......................................................................20

*Roberson v. Paine Webber, Inc.*, 998 P.2d 193 (Okla. Civ. App. 1999) ..........................26

*Rosson v. Coburn*, 876 P.2d 731 (Okla. Civ. App. 1994), *overruled on other
  grounds by Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013)............................12

*Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158 (Okla. 2008)......................25, 26

*Shlirf v. Loosen*, 232 P.2d 928 (Okla. 1951)....................................................................19

*State ex rel. Andersons v. Masheter*, 203 N.E.2d 325 (Ohio 1964)..................................20

*State v. Lead Indus. Ass'n*, 951 A.2d 428 (R.I. 2008) ...................................................20

*Territory v. Long Bell Lumber Co.*, 99 P. 911 (Okla. 1908)....................................17, 19

*Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260 (Okla. 1982) .....................21, 22, 23

*Thompson v. Williams*, 406 P.3d 599 (Okla. Civ. App. 2017) ......................................12

*Tucker v. Lam*, 313 P.3d 1011 (Okla. Civ. App. 2013) ................................................15

*Twyman v. GHK Corp.*, 93 P.3d 51 (Okla. Civ. App. 2004) ........................................21

*Young v. Bob Howard Auto., Inc.*, 52 P.3d 1045 (Okla. Civ. App. 2002) ...............13, 14

## OTHER AUTHORITIES

21 C.F.R. § 1301.74(b) ...................................................................................................10

15 U.S.C. § 1125(a) ..................................................................................................6, 7, 8

15 U.S.C. § 1125(a)(1)(B) ...............................................................................................6

18 U.S.C. § 1952 ...............................................................................................3

DEA, Aggregate Production Quota History for Selected Substances 2003–2013
    (Oct. 2, 2012) ..............................................................................................2

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin.
    L. Rev. 741 (2003) .....................................................................................17

Fed. R. Civ. P. 9(b) ......................................................................................4, 25

Okla. Admin. Code § 475:1-5-1 ........................................................................11

Okla. Admin. Code § 475:15-1-2 ......................................................................11

Okla. Stat., Chapter 56, §§ 1-2 (1890) ...............................................................16

Okla. Stat., Title 15, § 754(2) .............................................................................5

Okla. Stat., Title 50, § 1 ....................................................................................16

Okla. Stat., Title 50, § 2 ....................................................................................19

Okla. Stat., Title 63, § 2-101 *et. seq.* ................................................................11

Okla. Stat. Title 63, § 2-401(1) ...........................................................................4

Okla. Stat., Title 63, § 2-406(4) ..........................................................................4

Okla. Stat., Title 63, § 2-501 .............................................................................11

Okla. Stat., Title 63, § 2-503.1h(A) ...................................................................11

Okla. Stat., Title 76, § 57.2(G) ..........................................................................10

Restatement (Second) of Torts § 821B ...............................................................19

U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The
    Surgeon General's Report on Alcohol, Drugs, and Health* (2016) ...........................2

The Muscogee (Creek) Nation's ("the Nation") Complaint makes plain that this case is about a public health crisis caused by a sea-change in medical practice—a change that the Nation alleges resulted from the Manufacturers' "multi-million dollar marketing campaign to minimize and misstate the risks of addiction," causing an "epidemic of prescription opioid abuse" that has "significantly impacted" American Indians.  Compl. ¶¶ 15, 102.  The Nation alleges that the Manufacturers (i) deceptively marketed opioids (ii) to doctors, (iii) changing their perceptions about the benefits and risks of the drugs and (iv) thereby causing sales to skyrocket, (v) resulting in increased addiction and overdose deaths.  *Id.* ¶¶ 5–6.

The Nation does not—cannot—say this about Distributors, whose role as wholesalers is to move drugs from manufacturers to retail pharmacies, not to market drugs to doctors.  Indeed, the Nation's theory against the Manufacturers—that they changed the "longstanding medical consensus" about the safe use of the drugs by influencing "promotional materials, conferences, [and] guidelines for doctors," *id.* ¶¶ 4–5—is wholly at odds with the Nation's claim that Distributors are to blame for failing to report and stop shipment of prescription opioids because pharmacies were ordering too much.  If, as the Nation contends, doctors acting with the best of intentions were duped by allegedly deceptive marketing to over-prescribe the drugs for chronic pain, their prescriptions reflected a legitimate exercise of professional judgment for an appropriate purpose.  That is what the DEA thought at the time about the steady upward trend of opioid prescriptions.  Seeing the same trend Distributors were seeing, the DEA—the agency exercising power delegated by the Attorney General of the United States to gauge the legitimate medical need for prescription opioids and control the supply of prescription opioids—steadily

increased the production quota for opioids from 1995 to 2013.[1]  After all, as required by law, each Distributor was reporting to DEA *all* shipments of prescription opioids to its pharmacy-customers, permitting DEA (and DEA alone) to know the total amount of prescription opioids being shipped to each pharmacy, county, and state.  The Nation does not contend otherwise (nor does any plaintiff in the litigation), and DEA does not deny that it had this information.

Thus, what Distributors did was supply licensed pharmacies with the drugs that doctors prescribed, in an overall amount that DEA had pre-determined was appropriate, and not a pill more.  To claim that Distributors should have reported the steady upsurge in pharmacy orders for prescription opioids as "suspicious" is to contend that Distributors (who have no special knowledge about the design, formulation, and operation of the thousands of drugs they transport) should have second-guessed both the doctors who prescribed the medications and DEA, which determined that there was an increasing legitimate medical need for them.

The Nation's further contention that Distributors should have prevented diversion of opioid medications makes no better sense.  Drug diversion, by definition (and as the Nation acknowledges), is the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use."[2]  However, in alleging that the Manufacturers' deceptive marketing caused a sea-change in the way opioid medications were prescribed by doctors acting in good faith, the Nation is describing ***legal***, albeit misguided,

---

[1]    *See, e.g.*, DEA, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012), https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj.gov/quotas/ quota _history.pdf (showing approved quota for sale of oxycodone tripled between 2003 and 2013).

[2]    U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health*, glossary at 2 (2016), https://addiction.surgeongeneral.gov/sites/ default/files/surgeon-generals-report.pdf.   The Nation's simultaneous claim that, "[a]t the distributor level, diversion occurs whenever opioid distributors fill suspicious orders from retailers such as pharmacies," Compl. ¶ 11, is demonstrably false because it is at odds with the actual definition.  "Diversion" does not occur when a wholesale distributor ships opioids to a DEA-licensed and registered pharmacy, no matter how many pills are shipped.

prescribing practices.[3]  If, as a general rule, doctors legally prescribed the drugs, then pharmacies legally dispensed them and Distributors legally supplied them to pharmacies.  If patients with legal prescriptions diverted the drugs by failing to safeguard them, by selling them, or by giving them to family and friends, wholesale distributors cannot be liable for failing to stop that downstream conduct.

In the end, no matter whether it bases its claims on legal or illegal opioid use, the Nation's individual claims fail on the merits for the reasons explained below.

## I. THE NATION'S RICO CLAIM SHOULD BE DISMISSED.

The Nation's RICO claim is largely predicated on the same allegations and legal theories as the Blackfeet Tribe's RICO claim, and fails for the same reasons.  *See* Blackfeet Br. at Part I.

In addition to alleged predicate acts of mail and wire fraud and purported Controlled Substances Act violations, the Nation alleges as RICO predicate acts violations of the Travel Act.  For the reasons explained below, those additional allegations fail as a matter of law.

The Travel Act prohibits use of "the mail or any facility in interstate or foreign commerce, with intent to … carry on, or facilitate the … carrying on, of any unlawful activity." 18 U.S.C. § 1952.  "[U]nlawful activity" is defined to include "any business enterprise involving … controlled substances … in violation of the laws of the State in which they are committed." *Id.*  The Nation alleges that Distributors committed RICO predicate acts by using the mails and wires to "carry on" an "unlawful activity."  Compl. ¶ 389.  Specifically, according to the Nation, Distributors committed "unlawful activity" by violating (1) the Oklahoma Uniform Controlled

---

[3]  There is little doubt that some doctors mis-prescribed opioids, but it is to be expected that most doctors are honest professionally and seek to do what is best for their patients.  Plaintiffs' experts have written (and told the Court) that the public health crisis is the result of *misuse* resulting from *mis-prescribing*, not *abuse* resulting from *illegal prescribing*.

3

Dangerous Substances Act ("OCSA") and (2) the Oklahoma Consumer Protection Act ("OCPA").  Compl. ¶ 392(d).

***Oklahoma CSA.***  The OCSA makes it unlawful to "knowingly or intentionally … furnish false or fraudulent material information in, or omit any material information from, any application, report, or other document required to be kept or filed under this act."  Okla. Stat., tit. 63, § 2-406(4)..  As a threshold matter, Distributors are aware of no support for the proposition that alleged regulatory reporting violations by licensed wholesale distributors fall within the ambit of the Travel Act—a criminal statute aimed at (though not limited to) conduct of the illegal drug trade by "organized crime."  *See generally Rewis v. United States*, 401 U.S. 808, 811–12 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity").  In any event, the Complaint does not identify even a single instance in which a Distributor knowingly submitted a false or fraudulent report that was required under the OCSA—let alone do so with the particularity required under Rule 9(b).[4]  The Nation's wholly conclusory allegation of OCSA violations is thus unavailing.[5]

***Oklahoma CPA.***  Even assuming arguendo that a violation of the OCPA could give rise to liability under the Travel Act, the Nation's claim fails because it does not allege any such violation.

---

[4]  *See, e.g.*, *Halpin v. David*, 2009 WL 1753759, at *9 (N.D. Fla. June 22, 2009) (dismissing RICO claim as not satisfying "the particularity required by Rule 9 the facts needed to support an allegation of a Travel Act violation as a predicate act"); *NL Indus., Inc. v. Gulf & W. Indus., Inc.*, 650 F. Supp. 1115, 1127 (D. Kan. 1986) (applying Rule 9(b) to Travel Act claims).

[5]  The Nation also alleges in conclusory fashion that Distributors violated Oklahoma Statutes title 63, § 2-401(1), which makes it unlawful to "distribute, dispense, transport with intent to distribute or dispense … a controlled dangerous substance," "[e]*xcept as authorized by the Uniform Controlled Dangerous Substances Act.*"  But this argument fails because, as registered distributors of controlled substances, Distributors are authorized by law to distribute them.

First, the Complaint's allegations are wholly conclusory. The Nation asserts—in a single, throw-away half-sentence—that Distributors violated the OCPA, *see* Compl. ¶ 392(d), but makes no effort to identify any unfair or deceptive conduct actionable under that statute.

Second, "[t]he OCPA prohibits the use of certain false and misleading practices in consumer transactions," which must occur in Oklahoma. *Walkabout v. Midland Funding LLC*, 2015 WL 2345308, at *2 (W.D. Okla. May 14, 2015); *Steinbeck v. Dollar Thrifty Auto. Grp., Inc.*, 2008 WL 4279798, at *3 (N.D. Okla. Sept. 15, 2008). The Nation does not plead the existence of a ***consumer*** transaction involving Distributors, let alone a consumer transaction that took place ***in Oklahoma***. Nor could it, given that Distributors are wholesalers that sell prescription medicines not to consumers but to retailers such as pharmacies. *See Lumber 2, Inc. v. Ill. Tool Works, Inc.*, 261 P.3d 1143, 1149 (Okla. 2011) (retailers are not "consumer[s]" under the OCPA). Third, OCPA liability cannot be premised on conduct "regulated under laws administered by … any … regulatory body … acting under statutory authority of this state or the United States." Okla. Stat., tit. 15, § 754(2). The applicability of this safe-harbor exemption turns "solely on whether there is regulation [covering an action or transaction], not whether there is compliance." *Arnett v. Mylan, Inc.*, 2010 WL 2035132, at *3 (S.D. W. Va. May 20, 2010) (applying Oklahoma law); *see also Estate of Hicks ex rel. Summers v. Urban E., Inc.*, 92 P.3d 88, 95 (Okla. 2004) (holding that claim for nursing-home neglect was excluded by the OCPA because of existing state regulation of nursing homes). Because the wholesale distribution of controlled substances is extensively regulated by federal law, the safe harbor would bar any claim against Distributors under the OCPA.

## II.    THE LANHAM ACT CLAIM SHOULD BE DISMISSED.

The Nation alleges that Defendants violated the Lanham Act by "'misrepresent[ing] the nature, characteristics [or] qualities … of [their] or another person's goods, services or

5

commercial activities.'" Compl. ¶ 410 (quoting 15 U.S.C. § 1125(a)(1)(B)). The gist of the claim is that Manufacturers made misrepresentations regarding "the safety and efficacy of prescription opioids," but—as the Complaint acknowledges—Distributors played no role in those alleged misrepresentations. *See* Compl. ¶ 413. For multiple reasons, the Nation fails to state a false advertising claim against Distributors.

### A. The Nation Is Not a Proper Plaintiff.

The Nation's false advertising claim should be dismissed because the Complaint fails to allege "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). As a result, the Nation is not within the class of plaintiffs authorized to sue by 15 U.S.C. § 1125(a).

First, the Nation lacks statutory standing to bring the claim because it does not "fall within the zone of interests protected by the law invoked." *Id.* at 129. In *Lexmark*, the Supreme Court held that the right to sue for violations of the false advertising provision of the Lanham Act, 15 U.S.C. § 1125(a), is limited to plaintiffs who "allege an injury to a commercial interest in reputation or sales." *Id.* at 132. Even consumers or businesses who were themselves deceived into "purchasing a disappointing product … cannot invoke the protection of the Lanham Act." *Id.* ("[A] business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the Act's aegis."). Because the Nation has not alleged—and could not allege—an injury to a commercial interest resulting from Distributors' conduct, its Lanham Act claim fails as a matter of law. *See, e.g.*, *Acad. of Doctors of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644, 663 (E.D. Mich. 2017) (dismissing false advertising claim where plaintiff did not allege "competitive injury, i.e., … [a loss of] business customers or … financial revenue").

6

Second, even assuming that Distributors advertised opioid medications, the Nation has not pled that any such advertising was the proximate cause of its alleged injuries.  In *Lexmark*, the Supreme Court held that a plaintiff suing under § 1125(a) must allege an "injury flowing ***directly***" from the defendants' alleged misrepresentations.  For substantially the reasons explained in Distributors' other submissions, the Complaint fails to allege a direct causal connection between Distributors' alleged misrepresentations and the Nation's alleged harm.  *See, e.g.*, Summit Br., Dkt. 491-1 at Part I.B; Blackfeet Br. at Part I.A.

## B.  The Nation Fails To Plead Actionable False Advertising.

In order to state a claim for false advertising, a plaintiff must allege that "1) the defendant has made false or misleading statements of fact concerning his own product or another's; 2) the statement actually or tends to deceive a substantial portion of the intended audience; [and] 3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions."  *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999).  The Nation's Lanham Act claim should be dismissed because the Complaint fails to identify any such statements by Distributors—let alone to do so with the requisite particularity.[6]

The sole asserted basis for the Nation's claim against Distributors is that they "misleadingly represented that they were taking effective steps to prevent diversion."  Compl. ¶ 413.[7]  But those alleged misstatements concern Distributors' regulatory compliance, ***not*** a

---

[6]  The great weight of authority holds that "some degree of particularity is required" to state a claim for false advertising.  *Roadtec, Inc. v. Rd. Sci., LLC*, 2013 WL 12123358, at *5 (E.D. Tenn. Aug. 29, 2013); *see also Best v. AT & T Mobility, LLC*, 2015 WL 1125539, at *6 (S.D. Ohio Mar. 12, 2015) (dismissing Lanham Act claim where complaint failed to "allege with any particularity when or how [the defendant] purportedly made misrepresentations to the marketplace"); *Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900, 909 (S.D. Ohio 2007) (similar).

[7]  *See also* Compl. ¶ 209 ("A Cardinal executive recently claimed that Cardinal uses 'advanced analytics' to monitor its supply chain; Cardinal assured the public it was being 'as effective and

7

product.  Moreover, the only statements identified with any specificity were made in 2016 (after most if not all of the wrongdoing alleged in the complaint had occurred), *see* Compl. ¶¶ 209–10 & nn.88–89, and nothing in the Complaint provides any basis for an inference that the statements either were false or were likely to deceive.  And, most significantly, Distributors' alleged statements were not material:  the Complaint does not allege, and could not plausibly allege, that a consumer's decision whether or not to purchase opioids was likely to be influenced by Distributors' broad public statements regarding the effectiveness of their anti-diversion efforts.

The claim also fails for another reason:  Distributors' alleged misstatements were not made "in commercial advertising or promotion."  15 U.S.C. § 1125(a); *see* Compl. ¶ 413.  In the Sixth Circuit, "commercial advertising or promotion" consists of "(1) commercial speech; (2) for the purpose of influencing customers to buy the defendant's goods or services; (3) that is disseminated either widely enough to the relevant purchasing public to constitute advertising or promotion within that industry or to a substantial portion of the plaintiff's or defendant's existing customer or client base."  *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015).  Because the Complaint fails to allege any false statements made by Distributors in "commercial speech" for the "purpose of influencing customers to buy the[ir] goods or services," the Nation's claim fails.

Finally, "assertions of superiority or general statements of opinion cannot form the basis of Lanham Act liability."  *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495–96 (5th Cir. 2000).  Such "vague generalities" or "expression[s] of an exaggerated opinion" are not actionable.  *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x

---

efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."); *id.* ¶ 210 ("McKesson has publicly stated that it has a 'best-in-class controlled substance monitoring program to help identify suspicious orders,' and is 'deeply passionate about curbing the opioid epidemic in our country.'").

778, 787 (10th Cir. 2016). Thus, for example, claims that a medical facility "follows 'best medical practices,' provides the 'best possible care,' and has a mission of '[p]roviding excellent care of the highest quality at an affordable cost'" fail "as a matter of law" because such "general statements cannot be material[ly] false or misleading representations of fact." *Id.* at 780, 785 (alteration in original) (citation and emphasis omitted); *see also Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 699–700 (6th Cir. 2003) (statement that product was "redesigned and improved" was not actionable because the statement was "mere opinion, which is not actionable under the Lanham Act"). For this additional reason, broad statements by Distributors regarding their effectiveness in "eliminating … criminal activity" or commitment to "curbing the opioid epidemic," Compl. ¶¶ 209–210, are not actionable under the Lanham Act.

## III. THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED.

The Complaint purports to assert negligence and negligence *per se* claims against the so-called "Diversion Defendants." These claims fail as to Distributors because: (1) the claims are barred by Oklahoma statute; (2) the Nation fails adequately to identify a duty that Distributors owe to it; and (3) the Nation fails adequately to allege that Distributors breached any duty.

### A. The Negligence Claims Are Barred by Oklahoma Statute.

Distributors do not manufacture opioid products; rather, as explained above, Distributors' role in the opioid supply chain is limited to filling orders placed by DEA-registered and state-licensed pharmacies. In a statutory provision effective November 1, 2014, Oklahoma codified the elements of a negligence claim against such non-manufacturing product sellers:

> A product seller other than a manufacturer is liable to a claimant on the basis of negligence if the claimant establishes that:
>
> 1. The product seller sold the product involved in such action;
>
> 2. The product seller did not exercise reasonable care:

9

      a.  in assembling, inspecting, or maintaining such product, or

      b.  in passing on warnings or instructions from such product's manufacturer about the dangers and proper use of such product; and

3.  Such failure to exercise reasonable care was a proximate cause of the harm complained of by the claimant.

Okla. Stat., tit. 76, § 57.2(G).  The Complaint contains no allegation that any Distributor failed to exercise reasonable care in "assembling, inspecting, or maintaining" any opioid product it sold or in "passing on" the manufacturers' warnings or instructions for those products.  The Nation therefore has failed to satisfy the statutory elements of a negligence claim against Distributors, and its negligence claims should be dismissed on this basis alone.

### B.      The Complaint Fails To Allege a Duty Owed by Distributors to the Nation.

The gravamen of the Nation's Complaint is that Distributors breached a duty to monitor and report suspicious pharmacy orders.  This duty is the exclusive creation of federal and state statutes and regulations, and there is no private right of action to enforce any of those statutes or regulations.  Thus, only if there is a pre-existing, parallel common-law duty to report or halt shipment of suspicious orders can the Nation sue in negligence.  But no such duty has ever been recognized under Oklahoma law.  As such, the Nation's negligence claim is an improper attempt to circumvent the prohibition on private enforcement of the Controlled Substances Act—a prohibition that reflects the determination of Congress that enforcement should be exercised solely by the Attorney General and the DEA.

### 1.      No private right of action.

The genesis of Distributors' alleged duty to report or halt suspicious orders is an implementing regulation of the federal CSA, 21 C.F.R. § 1301.74(b).  As explained in

Distributors' *Summit County* brief, however, there is no private right of action to enforce that federal reporting requirement.  *See* Summit Br. at Part III.B.1.

The Nation also purports to base its negligence claim on the Oklahoma analogue to the federal CSA, the Oklahoma Uniform Controlled Dangerous Substances Act, Okla. Stat., tit. 63, § 2-101 *et. seq.*, and its implementing regulations.  *See, e.g.*, Comp. ¶¶ 178–185.  But there is likewise no private right of action to enforce this statute or these regulations.  To the contrary, the Oklahoma CSA is a criminal statute subject to enforcement only by the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control[8] and other law enforcement bodies.[9]  The Nation therefore cannot enforce the federal CSA, the Oklahoma CSA, or their implementing regulations under the guise of a negligence claim.

### 2. No negligence *per se*.

The Nation also alleges that Distributors were "negligent per se by virtue of having violated laws and regulations pertaining to the diversion of prescription opioids."  Compl. ¶ 475.  This effort to recast the negligence claim also fails because violation of a statute or regulation

---

[8]  The Bureau's implementing regulations outline a detailed, administrative remedial scheme for revoking Bureau registrations for failure to conform to the Oklahoma CSA or its implementing regulations.  *See* Okla. Admin. Code §§ 475:1-5-1 *et seq.*; *id.* § 475:1-5-1 ("The rules of this Subchapter explain the administrative hearing process at the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control when said agency seeks to limit, condition, suspend, revoke or deny an OBN registration and/or impose a fine."); *id.* at 475:1-5-2 (stating that in administrative hearing process, the Bureau has the burden of proving grounds for revocation of a registration by clear and convincing evidence); *see also* Okla. Admin. Code § 475:15-1-2 ("If the Director finds there is imminent danger to the public health or safety, he/she may immediately suspend any registration simultaneously with the institution of show cause proceedings.").

[9]  *See* Okla. Stat., tit. 63, § 2-503.1h(A) ("Unless otherwise provided, any person convicted of violating any of the provisions of this act is guilty of a felony and may be punished by imprisonment for not less than two (2) years nor more than ten (10) years or by a fine of not more than Fifty Thousand Dollars ($50,000.00) or an amount equal to twice the dollar amount of each transaction, whichever is greater, or by both such fine and imprisonment." (footnote omitted)); Okla. Stat., tit. 63, § 2-501 (granting authority to "any peace office" to "Make an arrest without warrant of any person the officer has probable cause for believing has committed any felony under the Uniform Controlled Dangerous Substances Act or a violation of Section 2-402 of this title").

can constitute negligence *per se* under Oklahoma law only if the plaintiff can demonstrate that the "claimed injury (a) was caused by the law's violation, (b) was of the type intended to be prevented by the statute, and (c) the injured party was a member of the class meant to be protected by the statute." *Lockhart v. Loosen*, 943 P.2d 1074, 1078 (Okla. 1997). "Discernment of legislative intent is required to place the plaintiff within the class of persons meant to be protected by the ambit of" a statutory provision. *Id.* The Complaint does not and cannot allege that the federal and Oklahoma CSAs or their implementing regulations were intended to protect Indian Nations from spending more on addiction-related public services when rates of addiction increase. Under similar circumstances, Oklahoma courts have routinely dismissed negligence *per se* claims.[10] This Court should do the same.

Even if the cited "laws and regulations pertaining to the diversion of prescription opioids" were intended to protect the Nation from spending more, "negligence *per se* does not equate to liability *per se*" under Oklahoma law. *Howard v. Zimmer, Inc.*, 299 P.3d 463, 474

---

[10] *See, e.g.*, *Claborn v. Plains Cotton Coop. Ass'n*, 211 P.3d 915, 919 (Okla. Civ. App. 2009) (finding that non-employee plaintiff did not fall within the class of persons meant to be protected by OSHA regulations), *overruled on other grounds by Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013); *Rosson v. Coburn*, 876 P.2d 731, 736 (Okla. Civ. App. 1994) (no negligence per se under Social Security Act and its implementing regulations because it was not enacted to protect specific individuals), *overruled on other grounds by Howard*, 299 P.3d 463; *Hoagland v. Okla. Gas & Elec. Co.*, 2016 WL 3523755, at *3 (W.D. Okla. June 22, 2016) ("The particular rule plaintiff references appears to be directed only to employees, and he has offered no authority supporting a conclusion that the referenced regulation necessarily defines the duty of care owed to him, a third party non-employee. As a result, []violation of OSHA standards …. are not a basis for applying a negligence per se standard in the circumstances of this case."); *Lockhart*, 943 P.2d at 1078–79 ("When the straightforward language of the act is considered, it is obvious (1) that the plaintiff is not a member of the class meant to be protected by the statute's language and (2) the act' language does not create a duty of care which is owed to someone other than a sexual partner."); *Larrimore v. Am. Nat'l Ins.*, 89 P.2d 340, 343 (Okla. 1939) (no negligence per se in case involving rat poison that caught on fire because "the purpose of the [asserted] statute is to protect persons and animals from injury by being poisoned" and "[t]he injury here was not the class of injury intended to be prevented by the statute"); *Thompson v. Williams*, 406 P.3d 599, 600–01 (Okla. Civ. App. 2017) (where statute "was enacted for the purpose of protecting agricultural crops," its violation "does not constitute negligence per se because bodily harm from a motor vehicle accident is not the type of injury intended to be prevented by the statute, and Plaintiff is not within the class of persons the Legislature intended to protect").

(Okla. 2013).  "Simply because the law may presume negligence from a person's violation of [a statute or regulation] does not mean that the law presumes that such negligence was the proximate cause of the harm inflicted."  *Id.*  Thus, "to prevail on a claim for negligence per se, the [plaintiff] must not only demonstrate violation of [a statute or regulation] but also that the violation caused his injury along with the extent to which the injury may support an award of damages."  *Id.*  As set forth *infra* at Part V, the Nation has not adequately pled that Distributors' conduct, including the alleged violation of any statute or regulation, proximately caused injury to the Nation.

### 3.    No common-law duty.

Under Oklahoma law, "[t]he elements of the tort of negligence are 1) a duty of care owed by defendant to plaintiff, 2) defendant's breach of that duty, and 3) injury to plaintiff caused by defendant's breach of that duty."  *Lowery v. Echostar Satellite Corp*., 160 P.3d 959, 964 (Okla. 2007).  Because the Nation cannot bring a private action to enforce the duties created by the federal and state CSAs, it can pursue a common law negligence claim based on the same duty to report or halt suspicious pharmacy orders only if such a duty was recognized at common law.  It was not because the duty to report to a government agency is inherently the creation of statute, not a common law duty.

The existence of a duty of care is a question of law, *Young v. Bob Howard Auto., Inc.*, 52 P.3d 1045, 1047 (Okla. Civ. App. 2002), and is "the threshold question in any negligence action," *Lowery*, 160 P.3d at 964.  "The most important consideration in determining the existence of a duty of care is foreseeability of harm to the plaintiff."  *Id.*  The Complaint alleges facts that demonstrate just why the Nation's alleged harm was not foreseeable to Distributors: The Nation contends that the Manufacturers' marketing campaign altered the way the medical community understood opioid medications and prescribed them.  Allegedly deceived to believe

13

that opioids could be prescribed for chronic pain on a long-term basis, and at increasingly higher doses, doctors over-prescribed the medications.  The DEA, in turn, viewed the upward trajectory of opioid prescriptions as reflecting a greater legitimate medical need for the drugs, and it increased the production quota.  If harm to the Nation was not foreseeable to the DEA—if, indeed, the DEA understood increased prescriptions and increased pharmacy orders as a sign of increased legitimate medical need—then it was not foreseeable to Distributors, *according to the Nation's own theory of liability*.

The court may also find a duty based on a relationship between the parties.  *See, e.g.*, *Young*, 52 P.3d at 1047; *Delbrel v. Doenges Bros. Ford*, 913 P.2d 1318, 1320–21 (Okla. 1996).  But there is no allegation that any Distributor had any relationship with the Nation.  Under such circumstances, Oklahoma courts have declined to impose duties, even in cases in which the harm was more foreseeable than was the harm the Nation alleges here.  *See, e.g.*, *Estate of Doyle v. Sprint/Nextel Corp.*, 248 P.3d 947, 950–51 (Okla. Civ. App. 2010) (affirming trial court order granting motion to dismiss and declining to impose duty on cell phone manufacturer for car accidents involving users distracted by their phones, reasoning that "[s]imply because an action may have some degree of foreseeability does not make it sound public policy to impose a duty"); *id.* at 951 (adopting reasoning from a similar out-of-state case which had "concluded that [cell phone company] owed no duty of care to the plaintiff because the plaintiff's attenuated relationship with [the cell phone company] and the foregoing public policy considerations substantially outweigh any foreseeability of the harm at issue").

Finally, the Complaint asserts that the Nation's alleged injuries are the direct result of the bad acts of third parties:  manufacturers that allegedly engaged in a misleading marketing campaign, black market diversion enterprises that illegally sold and trafficked opioids, and

physicians that unscrupulously prescribed opioids to members of the Nation.  *E.g.*, Compl. ¶¶ 4–6, 12, 148.  In the absence of any "special relationship"—and none is alleged—Distributors have no duty to control the conduct of any of these entities.  *See, e.g.*, *Tucker v. Lam*, 313 P.3d 1011, 1014 (Okla. Civ. App. 2013).

### C.      The Complaint Fails Plausibly To Allege that Distributors Breached Any Duty.

As an element of its negligence claim, the Nation must establish that Distributors breached a duty to it.  *Lowery*, 160 P.3d at 964.  The Complaint fails to allege any facts suggesting that Distributors breached their purported duty to report and halt suspicious opioid orders.  It does not identify any pharmacy that placed excessive orders, and it does not identify any specific order that Distributors should have reviewed or refused to fill, let alone tie any such order to the Nation's alleged injuries.  For this reason, too, the negligence claim fails as a matter of law.

## IV.      THE NATION FAILS TO STATE A NUISANCE CLAIM.

The Nation's nuisance claim, like those of bellwether-briefing Plaintiffs before it, fails to state a claim against Distributor Defendants for two primary reasons.

### A.      The Nation Fails To Allege that Distributors Controlled the Instrumentality of the Nuisance.

Under Oklahoma law, an element of a nuisance claim is that the defendant must have exercised control over the instrumentality of the nuisance at the time it causes harm.  As the Tenth Circuit has recognized, an "individual[] may be held liable to the extent he was responsible for the maintenance of a nuisance that was under his ***possession or control***."  *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1026 (10th Cir. 2007).

According to the Nation, harm occurs, not when opioids are under Distributors' possession or control, but afterward—either when pharmacies fill illegitimate prescriptions or

patients "misuse[] or abuse[]" them.  Compl. ¶¶ 96, 288.  Distributors control opioid medications when they take possession of shipments from manufacturers, ship them to regional warehouses, and then ship orders to retail pharmacies.  During all that time, Distributors enforce strict procedures to ensure the physical security of the medications, as required by federal regulations.  There is no allegation that any Distributor was lax in that regard.  Once Distributors deliver the medications to a pharmacy, however, they relinquish control.  Distributors do not control (i) to whom pharmacists dispense the medications, (ii) on what basis, or (iii) with what instructions.  Distributors certainly do not control what the patient does with the medications after the pharmacist dispenses them—use them as instructed or misuse, give away, or sell them.

Distributors were (and are) the "middlemen" who move prescriptions and over-the-counter drugs from a relatively small number of manufacturers to more than 75,000 pharmacies and dispensaries.  That very fact of being "in the middle" underscores that Distributors cannot control the medications after they have been delivered and entrusted to pharmacies.  The simple fact is that the Nation has not pled, and cannot show, that Distributors exercised control over the medications *after* delivery to their pharmacy customers, which is when the medications allegedly created a nuisance.  The nuisance claim thus should be dismissed against Distributors.

**B.** **The Nation Fails Adequately To Allege a Connection to Land or Interference with a Public Right.**

Oklahoma codified common law nuisance in 1890, and the State's understanding of the cause of action has remained constant since.[11]  That fact is significant for two reasons.

---

[11]    *Compare* Okla. Stat., tit. 50, §§ 1-2, *with* Okla. Stat., ch. 56, §§ 1-2 (1890).  Oklahoma's nuisance statute "encompasses the common law's *private and public* nuisance concepts."  *Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272, 276 (1996) (emphasis in original).

### 1.    No connection to property rights.

Nuisance has been understood historically to concern the misuse of, or interference with, property.  As the Oklahoma Supreme Court has recognized, "[a] nuisance, public or private, arises where a person *uses his own property* in such a manner as to cause injury to the *property of another*."  *Fairlawn Cemetery Ass'n v. First Presbyterian Church, U. S. A.*, 496 P.2d 1185, 1187 (Okla. 1972).[12]  This understanding is consistent with the traditional understanding of public nuisance, which, for nearly 900 years, almost exclusively protected rights connected to public property.  Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 800–01 (2003).

The Complaint acknowledges the requirement that the Nation connect the alleged nuisance to the use of property, for it pleads that Distributors have caused a nuisance by "using property for repeated unlawful sales of prescription opioids."  Compl. ¶ 452(d).  But the allegation is perfunctory:  It does not say what property was used, who used it, or how it was used.  The only sales that Distributors make are to pharmacies, and those sales are not unlawful.  Certainly the delivery of prescription drugs to a pharmacy is nothing like the case of a factory that emits noxious smells or a farm that dumps pesticides into the water supply or a gambling house that attracts criminals to a neighborhood.

Oklahoma courts have not treated product-based injury claims as nuisance claims.  Needless to say, there is a separate body of law that provides redress when products cause

---

[12]  *See also Territory v. Long Bell Lumber Co.*, 99 P. 911, 919 (Okla. 1908) ("Anything which is an obstruction to the free use of *property*, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood, or any considerable number of persons, is a public nuisance."); *King v. State*, 109 P.2d 836, 838 (1941) (public nuisance based upon "noises … made in or near the [defendant's] *premises*" that were offensive to "citizens of the adjoining and nearby *premises*"); *Hummel v. State*, 99 P.2d 913, 917 (Okla. Crim. App. 1940) ("[Nuisance] is a class of wrongs which arises from an unreasonable, unwarranted, or unlawful use by a person of his own *property* ….").

personal injury because they are not accompanied by proper warnings or are deceptively marketed.  Courts generally have been alert to the danger of applying nuisance principles to harms caused by products, and most have rejected the attempt.  *See, e.g.*, *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882, 910 (E.D. Pa. 2000) ("The refusal of many courts to expand public nuisance law to the manufacturing, marketing, and distribution of products conforms with the elements of public nuisance law."), *aff'd*, 277 F.3d 415 (3d Cir. 2002).  In *City of McAlester v. Grand Union Tea Co.*, the Supreme Court of Oklahoma struck down a municipal ordinance that declared it a public nuisance to go into private residences to sell goods because municipalities are not empowered "to declare a thing a nuisance which is clearly not one."  98 P.2d 924, 926 (Okla. 1940).  If methods of distributing products, although they might cause "annoyance" to individuals, are not public nuisances, the mere act of profiting from the sale of products or from effectuating their use cannot be public nuisances either.

The courts have recognized that if the misuse of a product were deemed to interfere with "public rights" because it resulted in widespread harm, the concept of "public right" would be "so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it."  *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004).  The Illinois Supreme Court held:

> [*W*]*e are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product* (be it gun, liquor, a car, a cell phone, or some other instrumentality) *in a manner that may create a risk of harm to another*.
>
> For example, the purchase and consumption of alcohol by adults is legal, while driving under the influence is a crime.  If there is [a] public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and

18

> distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.

*Id.*  The basis for asserting a nuisance claim here is even weaker, for the threat posed by opioid misuse is not that "some individuals may use an otherwise legal product … in a manner that may create a risk of harm to another," *id.*, where that other person is moving about in public or consuming public goods, but that the individual will use opioid medication in private to harm himself.  This failure to allege any plausible connection to the misuse or interference with property rights is the first reason why the nuisance claim should be dismissed.

## 2. No interference with a public right.

Oklahoma, like most states (and as recognized by § 821B of the Restatement (Second) of Torts), holds that "[a] common or public nuisance is one that affects the people at large, and is a violation of a ***public right***[.]"  *Territory v. Long Bell Lumber Co.*, 99 P. 911, 917 (Okla. 1908); Okla. Stat., tit. 50, § 2 (defining a public nuisance as "affect[ing] at the same time an entire community or neighborhood, or any considerable number of persons").  A public right is not like the right to be free from negligent or intentional torts like trespass.  *See City of McAlester*, 98 P.2d at 926 (explaining that the presence of a door-to-door solicitor in a community does not constitute a public nuisance because it "cannot reasonably be said to disturb at the same time an entire community or neighborhood or any considerable number of persons"); Restatement (Second) of Torts § 821B cmt. g (Am. Law. Inst. 1979) (defining a private right as "the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured").  Instead, a public right is a right that is shared equally by all members of the public, like access to air, water, or rights-of-way.  *See, e.g.*, *Meinders v. Johnson*, 134 P.3d 858, 868 (Okla. Civ. App. 2005) (saltwater contamination of aquifer); *Shlirf v. Loosen*, 232 P.2d 928, 930 (Okla. 1951) (encroachment on highway right-of-way); *Goodall v. City of Clinton*, 161 P.2d

1011, 1013 (Okla. 1945) (private toilets directing sewage into water supply); *Revard v. Hunt*, 119 P. 589, 591 (Okla. 1911) (fences obstructing access to public streets).

The Complaint purports to identify six "common rights of the public" at issue. None qualifies if the term "public right" is to have any meaning. Five of the six simply describe in different words the same "right" to avoid personal injury, disease, or adverse health effects.[13] These formulations reflect a misunderstanding of the difference between a public and a private right.

Opioid misuse and abuse are not like the airborne spread of a toxin a train derailment, or the spread of bacterial disease through contamination of a city's water supply, or a community-wide blackout from a computer hack that shuts down the power grid. Negligent acts of this type threaten public rights because they affect the right of the general public safely to move about and be "in public." *E.g.*, *State v. Lead Indus. Ass'n*, 951 A.2d 428, 453 (R.I. 2008) (a public right is affected when a harm "deprive[s] all members of the community of a right to some resource to which they otherwise are entitled."); *State ex rel. Andersons v. Masheter*, 203 N.E.2d 325, 327 (Ohio 1964) (recognizing that "[n]avigation on public waters is exclusively a public right" because "[e]veryone has an equal right to the use of the water for travel and transportation"); *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011) (a public right is "an interest shared equally by members of the public"). Opioid addiction, in contrast—whether a result of well-intentioned mis-prescribing or criminal diversion—occurs in the private sphere. An individual cannot be subject to injury from opioids unless he makes a private choice to use

---

[13]   *See* Compl. ¶ 453 (alleging rights (1) "to be free from reasonable apprehension of danger to person and property"; (2) "to be free from the spread of disease within the community"; (3) "to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Nation"; (4) "to be free from blights on the community created by areas of illegal drug use and opioid sales," and (5) to live in a community in which residents "are not under the influence of narcotics unless they have a legitimate medical need to use them").

them.  That private choice does not stop anyone else from exercising his or her public rights, and any resulting injury (e.g., addiction or overdose) does not affect the public's ability to exercise its rights.  That is true no matter how many people use opioids.  *See City of McAlester*, 98 P.2d at 926 (activity that affects people individually cannot be a public nuisance).

The remaining purported public right is no more truly "public."  The Nation contends that Distributors have interfered with the right "to live or work in a community in which local business do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions."  Compl. ¶ 453(f).  But this allegation has nothing to do with Distributors, which are not local businesses with local premises.

## V.  THE COMMON LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE ADEQUATELY TO ALLEGE PROXIMATE CAUSATION.

The Nation's common law claims should be dismissed for the additional reason that they run afoul of the proximate causation requirement, a necessary element of the common-law claims asserted here.  *See, e.g.*, *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 263 (Okla. 1982) (negligence); *Twyman v. GHK Corp.*, 93 P.3d 51, 61 (Okla. Civ. App. 2004) (nuisance). Under Oklahoma law, "[t]he proximate cause of an event must be that which in a natural and continuous sequence, unbroken by an independent or supervening cause, produces the event and without which the event would not have occurred."  *Gaines v. Providence Apartments*, 750 P.2d 125, 126–27 (Okla. 1987); *see also Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992) ("among the many shapes th[e] concept [of proximate cause] took at common law was a demand for some direct relation between the injury asserted and the injurious conduct alleged").  When, by contrast, this direct relation is absent—when "the negligence complained of only creates a condition which thereafter reacts with subsequent, independent, unforeseeable, distinct agency and produces an injury"—the Oklahoma Supreme Court has said that "the original

[conduct] is the remote rather than the proximate cause thereof." *Gaines*, 750 P.2d at 127.  A court may determine as a matter of law that intervening factors break the causal nexus between a defendant's alleged conduct and the resulting injury is a question of law, to be decided by the court. *Thompson*, 652 P.2d at 264.

"An intervening factor sufficient to break the causal nexus is a supervening cause." *Henry v. Merck and Co.*, *Inc.*, 877 F.2d 1489, 1495 (10th Cir. 1989) (applying Oklahoma law). When there is a "supervening cause," the defendant's conduct is deemed a "mere condition" that cannot serve as the basis for an actionable tort claim. *Thompson*, 652 P.2d at 264.  A subsequent cause is supervening if it is: "(1) independent of the original act; (2) adequate of itself to bring about the result; and (3) one whose occurrence was not reasonably foreseeable." *Id.* (finding anesthesiologist administering Demerol to be supervening cause in medical malpractice claim against the prescribing surgeon).  A third party's subsequent negligent or criminal activity meets these criteria. *See, e.g.*, *Henry*, 877 F.2d at 1496 (holding that a subsequent independent criminal act was a supervening cause that broke the causal nexus); *Joyce v. M & M Gas Co.*, 672 P.2d 1172, 1173 (Okla. 1983) (holding that subsequent criminal and negligent acts were supervening causes that broke causal nexus).

Here, the Nation's explanation of what caused the opioid public health crisis is inconsistent with the allegation that Distributors proximately caused the epidemic of addiction and, in turn, the Nation's expenditures.  That explanation is that Manufacturers' marketing campaign caused doctors, acting in good faith, to prescribe opioid medications for too many patients, too frequently, for too long, and in doses that were too high.  The same allegedly deceptive marketing led public and private insurers to pay for these prescriptions, and DEA to increase the annual production quota to meet what was perceived to be the increased legitimate

medical need for the medications.  Given this explanation, Distributors' supplying of the medications to pharmacies was not the cause of doctors' over-prescribing.

On the other hand, insofar as the Nation alleges that the crisis was caused, not by good-faith over-prescribing, but by illegal diversion, it follows that there were supervening causes in play.  Diversion inherently involves unlawful conduct, and unlawful conduct is a supervening cause.  Thus, for substantially the reasons explained in the *Summit County* brief and reply, Distributors' alleged conduct—which was followed in the chain of causation by the independent negligent or unlawful conduct of doctors, pharmacists, and patients—was not a proximate cause of the County's alleged injuries.  *See* Summit Br., at Part IV.C; Summit Reply, Dkt. 744 at Part IV.[14]  Distributors' conduct was a "mere condition" for the independent actions (often criminal) of several third parties further down the chain of causation.  *Thompson*, 652 P.2d at 264.  Distributors simply moved boxes of prescription drugs from their own warehouses to pharmacy storerooms.  The notion that such conduct is a proximate cause of the harms asserted here strains credulity.

## VI.  THE NATION'S UNJUST ENRICHMENT CLAIM FAILS.

The Nation's unjust enrichment claim is based upon the same conduct as its other claims; for this reason, it is "derivative of" those claims and "likewise fail[s]" for the same reasons that they do.  *Brill v. Walt Disney Co.*, 246 P.3d 1099, 1106 (Okla. Civ. App. 2010).

In any event, the Nation's unjust enrichment claim fails because the Distributors have not received a benefit from the Nation.  Under Oklahoma law, unjust enrichment occurs "where an

---

[14]  As set forth more fully in the Manufacturing Defendants *Summit County* brief, the Nation's claims are also too speculative to satisfy but-for causation because it has not alleged any facts suggesting that, had Distributors reported suspicious orders to the DEA, then the DEA would have relied on those reports and taken action that would have prevented opioid diversion. *See* Dkt. 499-1 at Part III.B.1. Nor has the Nation alleged that, if one of the Distributors (or even all three) had refused to ship any particular order to a pharmacy, that pharmacy would not otherwise have been able to acquire the medications.

expenditure by one person adds to the property of another," or "where the expenditure saves the other from expense or loss," and there exists "a resulting injustice."  *City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314, 319 (Okla. 2011).  The Nation claims that it has conferred a benefit on Distributors because its "expenditures in providing healthcare services to people who use opioids have added to Diversion Defendants' wealth."  Compl. ¶ 481.  But those expenditures are not a benefit to Distributors because Distributors were not obligated to provide those same healthcare services.  *See Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 447 (3d Cir. 2000) (hospital's payments for tobacco-related health costs did not unjustly enrich tobacco companies because they "had no legal obligation to pay the medical expenses of smokers").[15]  The Nation alleges that it is "paying for what may be called Diversion Defendants' externalities," Compl. ¶ 482, but that theory sweeps too broadly.  Virtually every commercial activity creates economic "externalities" of some sort.  But there is no support in Oklahoma law for the proposition that the Nation (or the State or any government entity) can wield unjust enrichment law, in effect, to tax businesses for what the Nation *ex post facto* defines as "externalities."  Unjust enrichment law, in other words, is not a free-floating externality fixer where no recognized legal duty mandates payment.  *See* Chicago Br., Dkt. 571-1 at Part V; *cf. City of Tulsa*, 280 P.3d at 319–20 ("One is not unjustly enriched … by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution.").  Accordingly, the Nation's unjust enrichment claim should be dismissed.

---

[15]  If what the Nation means is that it paid for medical services for its members, who had personal injury claims that Distributors had an obligation to pay, then the Nation is asserting a derivative claim, dependent on (i) the member's proof of its individual claim and (ii) the Nation's having subrogation rights.

## VII.  THE NATION'S CIVIL CONSPIRACY CLAIM FAILS.

The essential elements of a civil conspiracy claim under Oklahoma law are "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Schovanec v. Archdiocese of Okla. City*, 188 P.3d 158, 175 (Okla. 2008); *accord Hitch Enters., Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1259, 1268 (W.D. Okla. 2012).  The Nation's civil conspiracy claim fails because the Complaint does not adequately allege either that Distributors arrived at a common understanding to engage in unlawful activity or that there was an underlying wrongful act.

In Oklahoma, "[c]ivil conspiracy is an intentional tort"; mere negligence is not enough. *Schovanec*, 188 P.3d at 175 (emphasis omitted).  Further, where (as here) the acts alleged as the basis for the conspiracy sound in fraud—"misrepresentations and omissions," Compl. ¶ 491—the circumstances constituting the fraud must be stated with particularity.  *See* Fed. R. Civ. P. 9(b); *Energy Fluids, Inc. v. Cimarex Energy Co.*, 2008 WL 2404226, at *1 (W.D. Okla. June 10, 2008).  The Nation's conclusory allegation that the defendants "agreed with each other to accomplish the unlawful purposes of marketing, selling, distributing, and retailing prescription opioids through violations of law and misrepresentations," Compl. ¶ 491, does not suffice to meet this standard, for at least two reasons.  *See Energy Fluids*, 2008 WL 2404226, at *1 ("At a minimum" Rule 9(b) requires pleading of "the time, place, and contents of the false representation, the identity of the party making the false statements and consequences thereof.").

First, the Nation has failed to plead the alleged agreement among the Defendants with the requisite specificity.  The Complaint alleges that Distributors engaged in routine commercial activities, such as participation in trade associations and conferences, commercial contractual relationships, and development of industry compliance guidelines.  *See, e.g.*, Compl. ¶¶ 206–207

25

(industry compliance guidelines); *id.* ¶ 330 (participation in trade association). But none of those activities are suspicious, and the Nation's allegations never come close to raising any inference that Distributors came to an agreement or "meeting of minds" to commit fraud. *Schovanec*, 188 P.3d at 175; *see also* Blackfeet Br. at Part I.E.

"Moreover, 'a conspiracy between two or more persons to injure another is not enough; an underlying unlawful act is necessary to prevail on a civil conspiracy claim.'" *Zagorski v. McAdam*, 2014 WL 2982669, at *6 (W.D. Okla. July 1, 2014) (quoting *Roberson v. Paine Webber, Inc.*, 998 P.2d 193, 201 (Okla. Civ. App. 1999)). On this score, too, the Nation's pleading falls short. "Unlike its criminal counterpart, civil conspiracy itself does not create liability. To be liable the conspirators must pursue an independently unlawful purpose or use an independently unlawful means." *Brock v. Thompson*, 948 P.2d 279, 294 (Okla. 1997). The Complaint identifies as "overt acts" in furtherance of the conspiracy "marketing, selling, distributing, and retailing prescription opioids by means of representations and omissions, violating Federal and state laws, and turning a blind eye to diversion of prescription opioids." Compl. ¶ 491. But the Nation fails to plead any specific "overt act"—a specific suspicious order, a specific act of diversion—that ever affected it. Moreover, it is not an "unlawful purpose" for Distributors to distribute their goods to pharmacies (the CSA explicitly allows them to do so), nor do Distributors use "unlawful means" by selling their goods to pharmacies in the manner that the CSA permits—sales about which the Distributors give full information to DEA through the ARCOS system. In addition, as explained above, the Complaint fails sufficiently to plead any underlying cause of action arising from these conspiracy allegations. The civil conspiracy claim therefore should be dismissed.

## CONCLUSION

The Nation's claims against Distributors should be dismissed with prejudice.

Dated:  August 31, 2018

Respectfully submitted,

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation[16] and AmerisourceBergen Drug Corporation*

*/s/ Geoffrey Hobart*
Geoffrey Hobart
Mark Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
EMainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc. and Cardinal Health 110, LLC*

---

[16]   By filing this Motion, AmerisourceBergen Corporation does not concede that it is a proper party to this action.

**LOCAL RULE 7.1(F) CERTIFICATION**

I, Ashley W. Hardin, hereby certify that this brief conforms to the page limitations set forth in the Court's July 26, 2018 order (Doc. No. 791) regarding briefing in this case because the brief does not exceed 50 pages.

*/s/ Ashley W. Hardin*

Ashley W. Hardin

**CERTIFICATE OF SERVICE**

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Ashley W. Hardin*

Ashley W. Hardin