# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*State of Alabama v. Purdue Pharma L.P., et al.*<br>Case No. 18-OP-45236 | MDL No. 2804<br><br><br>Hon. Dan Aaron Polster |

## MCKESSON'S REPLY IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

ARGUMENT .......................................................................................................................... 3

I.     THE STATE'S CLAIMS FAIL FOR SEVERAL THRESHOLD REASONS. .................. 3

     A.     The State Fails To Allege But-For Causation. ......................................................... 3

     B.     The State Fails To Allege Facts That Establish Proximate Causation.................... 5

     C.     The Derivative Injury Rule Bars Recovery of the State's Medical Payments. ............................................................................................................... 7

     D.     The Free Public Services Doctrine Bars the State's Damages Claims. .................. 9

II.     THE ALABAMA CSA CLAIM SHOULD BE DISMISSED. ..................................... 12

III.     THE PUBLIC NUISANCE, NEGLIGENCE, AND WANTONNESS CLAIMS SHOULD BE DISMISSED. .......................................................................................... 14

     A.     The State's Duty Arguments Fail. ........................................................................ 14

           1.     No common-law duty ............................................................................... 14

           2.     No statutory duty...................................................................................... 16

     B.     The State's Breach Arguments Fail. ..................................................................... 18

     C.     The State's Wantonness Arguments Fail. ............................................................. 18

     D.     The State's Nuisance Arguments Fail................................................................... 19

IV.     THE UNJUST ENRICHMENT CLAIM FAILS............................................................ 21

V.     THE DECEPTIVE TRADE PRACTICES CLAIM SHOULD BE DISMISSED........... 22

     A.     The State's Claim Is Barred by the Statute of Limitations. ................................. 22

     B.     The State Failed To Plead an Actionable Misrepresentation................................ 25

     C.     The State Failed To Comply with the Statute's Notice Requirement................... 28

VI.     THE DRUG-RELATED NUISANCE CLAIM SHOULD BE DISMISSED. ................. 28

CONCLUSION...................................................................................................................... 29

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adams v. Office of Attorney Gen.*,
  2012 WL 1067978 (M.D. Ala. Mar. 29, 2012) ....................................................................22

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011) ..............................................................................................................22

*Benefield v. Int'l Paper Co.*,
  2009 WL 2601425 (M.D. Ala. Aug. 21, 2009) ....................................................................19

*BP Am. Prod. Co. v. Burton*,
  549 U.S. 84 (2006) .................................................................................................................24

*Carrethers v. Speer*,
  698 F. App'x 266 (6th Cir. 2017) ...........................................................................................4

*Carter v. DeKalb County*,
  521 F. App'x 725 (11th Cir. 2013) ..........................................................................................4

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
  719 F.2d 322 (9th Cir. 1983) .........................................................................................10, 12

*City of Miami v. Citigroup Inc.*,
  801 F.3d 1268 (11th Cir. 2015) ............................................................................................21

*County of Erie v. Colgan Air, Inc.*,
  711 F.3d 147 (2d Cir. 2013) ..................................................................................................11

*Deerman v. Fed. Home Loan Mortg. Corp.*,
  955 F. Supp. 1393 (N.D. Ala. 1997), *aff'd*, 140 F.3d 1043 (11th Cir. 1998) .........................28

*Doe v. Bredesen*,
  507 F.3d 998 (6th Cir. 2007) .................................................................................................21

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...............................................................................................................25

*E S Robbins Corp. v. Eastman Chem. Co.*,
  912 F. Supp. 1476 (N.D. Ala. 1995) .....................................................................................21

*Edmonson v. Cooper Cameron Corp.*,
  374 F. Supp. 2d 1103 (M.D. Ala. 2005) ...............................................................................18

*In re Gen. Motors LLC Ignition Switch Litig.*,
  257 F. Supp. 3d 372, 409 (S.D.N.Y. 2017) ..........................................................................22

*Holmes v. Behr Process Corp.*,
    2015 WL 7252662 (N.D. Ala. Nov. 17, 2015) ......................................................................27

*Hooper v. City of Montgomery*,
    482 F. Supp. 2d 1330 (M.D. Ala. 2007) ............................................................................14

*Mukamal v. Bakes*,
    378 F. App'x 890 (11th Cir. 2010) ....................................................................................18

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)...........................................................................................................13

*Raley v. Bank of Am., N.A.*,
    2014 WL 6684906 (N.D. Ala. Nov. 25, 2014) ..................................................................18

*Sembly v. U.S. Bank Nat'l Ass'n*,
    2012 WL 32737 (E.D. Mich. Jan. 6, 2012), *aff'd*, 508 F. App'x 443 (6th Cir.
    2012) ..................................................................................................................................26

*Shutter Shop, Inc. v. Amersham Corp.*,
    114 F. Supp. 2d 1218 (M.D. Ala. 2000) ...........................................................................27

*Southwell v. Summit View of Farragut, LLC*,
    494 F. App'x 508 (6th Cir. 2012) ......................................................................................28

*St. Paul Fire & Marine Ins. Co. v. Cox*,
    583 F. Supp. 1221 (N.D. Ala. 1984) ...................................................................................9

*State v. Ctrs. for Medicare & Medicaid Servs.*,
    2010 WL 1268090 (M.D. Ala. Mar. 30, 2010)..................................................................13

*State v. Lexington Law Firms*,
    1997 WL 367409 (M.D. Tenn. May 14, 1997)..................................................................26

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979)............................................................................................................13

*United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v.
Philip Morris, Inc.*,
    223 F.3d 1271 (11th Cir. 2000) ..............................................................................5, 7, 8

*Walnut Lake Land Co., Inc. v. Petro Stopping Ctrs., LP*,
    2009 WL 10689908 (N.D. Ala. Jan. 21, 2009)..................................................................19

*In re Wellbutrin XL Antitrust Litig.*,
    260 F.R.D. 143 (E.D. Pa. 2009)........................................................................................22

*Woods v. Wyeth, LLC*,
  2016 WL 1719550 (N.D. Ala. Apr. 29, 2016) ..........................................................................7

## STATE CASES

*Alabama Power Co. v. Taylor*,
  306 So. 2d 236 (Ala. 1975) ..........................................................................................6, 16

*Am. Pioneer Life Ins. Co. v. Sherrard*,
  477 So. 2d 287 (Ala. 1985) ................................................................................................27

*Avis Rent A Car Sys., Inc. v. Heilman*,
  876 So. 2d 1111 (Ala. 2003) ..............................................................................................21

*Baker v. Smith & Wesson Corp.*,
  2002 WL 31741522 (Del. Super. Ct. Nov. 27, 2002) ..........................................................12

*BellSouth Mobility, Inc. v. Cellulink, Inc.*,
  814 So. 2d 203 (Ala. 2001) ................................................................................................27

*Birmingham Ry., Light & Power Co. v. Ely*,
  62 So. 816 (Ala. 1913) ........................................................................................................5

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) ..............................................................................11, 12, 21

*City of Mobile v. Largay*,
  346 So. 2d 393 (Ala. 1977) ................................................................................................15

*Indus. Tile, Inc. v. Stewart*,
  388 So. 2d 171 (Ala. 1980) ..........................................................................................14, 17

*Johnson v. Brunswick Riverview Club, Inc.*,
  39 So. 3d 132 (Ala. 2009) ..................................................................................................14

*Ex parte Kirkpatrick*,
  495 So. 2d 1095 (Ala. 1986) ..............................................................................................13

*Knight v. Burns, Kirkley and Williams Construction Inc.*,
  331 So. 2d 651 (Ala. 1976) ................................................................................................17

*Lauderdale Cty. Bd. of Educ. v. Alexander*,
  110 So. 2d 911 (Ala. 1959) ..........................................................................................9, 11, 20

*Martinson v. Cagle*,
  454 So. 2d 1383 (Ala. 1984) ..............................................................................................17

*Miller v. Mobile Cty. Bd. of Health*,
  409 So. 2d 420 (Ala. 1981) ................................................................................................24

*State ex rel. Miller v. Philip Morris Inc.*,
  577 N.W.2d 401 (Iowa 1998) ............................................................................9

*Nance v. Southerland*,
  79 So. 3d 612 (Ala. Ct. App. 2010) ...................................................................6

*Parker Bldg. Servs. Co., Inc. v. Lightsey ex rel. Lightsey*,
  925 So. 2d 927 (Ala. 2005)..............................................................................16

*People v. ConAgra Grocery Prods. Co.*,
  17 Cal. App. 5th 51, 132 (Ct. App. 2017)........................................................11

*Pugh v. Butler Tel. Co.*,
  512 So. 2d 1317 (Ala. 1987).............................................................................16

*Russell Corp. v. Sullivan*,
  790 So. 2d 940 (Ala. 2001)...............................................................................19

*Ex parte Se. Ala. Med. Ctr.*,
  835 So. 2d 1042 (Ala. Civ. App. 2002) ...........................................................13

*Ex parte Simpson*,
  36 So. 3d 15 (Ala. 2009)...................................................................................25

*Southeastern Greyhound Lines v. Callahan*,
  13 So. 2d 660 (Ala. 1943)...........................................................................14, 15

*State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*,
  919 A.2d 1116 (Del. 2007) ................................................................................9

*State v. Bradford*,
  368 So. 2d 317 (Ala. Crim. App. 1979)............................................................13

*State v. Crocker's Estate*,
  83 So. 2d 261 (Ala. Ct. App. 1955) ..................................................................24

*State v. Mudd*,
  143 So. 2d 171 (Ala. 1962)...............................................................................24

*Taylor v. Smith*,
  892 So. 2d 887 (Ala. 2004)...............................................................................15

*Tipler v. McKenzie Tank Lines*,
  547 So. 2d 438 (Ala. 1989)..........................................................................20, 21

*Vines v. Plantation Motor Lodge*,
  336 So. 2d 1338 (Ala. 1976).............................................................................6, 7

*Walker County v. Tri-State Crematory*,
    643 S.E.2d 324 (Ga. Ct. App. 2007) ..................................................................11

## STATUTES

15 U.S.C. § 45(a)(1) ..................................................................................................27

21 U.S.C. § 826(a) .....................................................................................................2

Ala. Code § 6-5-121 .................................................................................................19

Ala. Code § 8-19-3 ...................................................................................................23

Ala. Code § 8-19-3(5) ..............................................................................................22

Ala. Code § 8-19-3(7) ..............................................................................................27

Ala. Code § 8-19-4(a)(2) ..........................................................................................22

Ala. Code § 8-19-5(7) ..............................................................................................27

Ala. Code § 8-19-6 ...................................................................................................27

Ala. Code § 8-19-8(a) ..............................................................................................28

Ala. Code § 8-19-10 .................................................................................................23

Ala. Code § 8-19-14 ............................................................................................22, 24

Ala. Code § 20-2-50(a) ............................................................................................12

Ala. Code § 20-2-65 .................................................................................................17

Ala. Code § 20-2-71 .................................................................................................17

Ala. Code § 20-2-213 .............................................................................................3, 4

Ala. Code § 22-6-6 .....................................................................................................8

## OTHER AUTHORITIES

21 C.F.R. § 1303.21(a) ...............................................................................................2

Fed. R. Civ. P. 9(b) .............................................................................................24, 26

Uniform Controlled Substances Act of 1970 ...........................................................12

Drug Enf't Admin., Aggregate Production Quota History for Selected Substances
(Oct. 2, 2012),
https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj
.gov/quotas/quota_history.pdf......................................................................................................2

Health & Human Servs., *Facing Addiction in America: The Surgeon General's
Report on Alcohol, Drugs, and Health* (2016),
https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-
report.pdf..............................................................................................................................2

Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the
Agency Tried To Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016,
https://www.washingtonpost.com/investigations/key-officials-switch-sides-
from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-
949c5893595e_story.html....................................................................................................26

The State insists that it has properly pled its claims because it has "described in detail the Manufacturers' fraudulent conduct." *E.g.*, Opp. 12. It points to "detailed allegations" of alleged "deceptive messaging" on the part of manufacturers, *id.* at 19–20, including "89 paragraphs of detailed allegations against Purdue" and "72 detailed paragraphs against Endo," *id.* at 30. According to the Opposition, manufacturers "spent millions of dollars … on a misinformation campaign aimed at highlighting opioids' alleged benefits, disguising risks, and promoting sales, thereby duping the medical community" into over-prescribing opioid medicines. *Id.* at 14; *see id.* at 19–20.

The State does not and cannot say any of that ***about McKesson***. The Opposition, like the Complaint, fails to identify even a single fraudulent or misleading statement on the part of McKesson. Instead, it merely points to the purported "high volume" of opioids that McKesson (which is allegedly responsible for less than one-third of Alabama's opioids) supplied to State-licensed and State-regulated pharmacies to assert that it "flooded" Alabama with these medicines. Opp. 20, 22. But that makes no sense. If, as the State alleges, manufacturers' deceptive marketing practices resulted in a new standard of care for prescribing opioids, then the vast increase in prescriptions written by Alabama doctors reflects the misguided, but nevertheless considered, professional judgment of Alabama physicians about the proper treatment of chronic pain. In other words, if, as alleged, the marketing campaign duped the State-licensed doctors to prescribe these drugs, then the prescriptions written by those doctors were legitimate, pharmacies had a responsibility to dispense them, and McKesson did nothing wrong in supplying the pills the pharmacies ordered to fill those prescriptions.

That DEA steadily and publicly increased the production quota for opioids from 1995 to 2013 reflected its determination that increased production of opioids was necessary "to provide

for the estimated medical, scientific, research, and industrial needs of the United States." 21 U.S.C. § 826(a).[1]  This determination, which Congress has entrusted to the DEA, is consistent with the conventional wisdom of the time that the rise in opioid prescriptions was prompted by past under-treatment of pain and a growing medical need for prescription opioids.  The claim that McKesson should have reported the steady upsurge in pharmacy orders for prescription opioids to the DEA as "suspicious" suggests that McKesson (which has no special knowledge about the design, formulation, and operation of the thousands of drugs it transports) was in a position to second-guess both the State's doctors, who were prescribing the medications pursuant to the new medical consensus, and the DEA, which had determined that there was an increasing legitimate medical need for the medications and issued quotas "authorizing" manufacturers to produce the drugs in question.  21 C.F.R. § 1303.21(a).

The State fares no better with its assertion that McKesson may be held liable for the downstream diversion of the FDA-approved medicines that it lawfully delivered to DEA-registered and State-licensed pharmacies.  Diversion is the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use."[2]  Under the State's theory, it occurred only after McKesson relinquished control over opioid medicines—when, for instance, a pharmacist dispensed the medication in the absence of a legitimate prescription or a patient sold the drugs to another.  Under established Alabama law, McKesson cannot be held liable for failing to prevent the criminal conduct of third parties over

---

[1]    *See, e.g.*, Drug Enf't Admin., Aggregate Production Quota History for Selected Substances (Oct. 2, 2012), https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj. gov/quotas/quota_history.pdf (showing approved quota for sale of oxycodone more than tripled between 2003 and 2013).

[2]    U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health*, glossary at 2 (2016), https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf.

whom it exercises no control, let alone for the remote and derivative injuries claimed by the State as a consequence of that criminal activity.

## ARGUMENT

**I.     THE STATE'S CLAIMS FAIL FOR SEVERAL THRESHOLD REASONS.**

**A.     The State Fails To Allege But-For Causation.**

The sole basis for the State's common-law claims against McKesson is that McKesson allegedly failed to report suspicious pharmacy orders.  However, as the Opposition acknowledges, the Complaint does not identify even a single pharmacy order that McKesson should have reported—let alone tie that order to any of the State's purported damages.  That failure is fatal to its claims.

In response, the State principally points to allegations suggesting that ***manufacturers*** misled doctors regarding the benefits and addictive properties of opioid medicines.  *See* Opp. 19–20.  As to McKesson, the State does nothing more than reference a handful of paragraphs alleging that McKesson shipped a "high volume" of opioids to Alabama pharmacies, including two specific pharmacies in Madison County.  Opp. 1–2, 20.[3]

Those threadbare allegations are insufficient.  Neither the Complaint nor the Opposition identifies even a single improper order that those two pharmacies (or any pharmacy) placed with McKesson.  Notably, at all times since at least 2006, the State itself has maintained a database showing every single opioid prescription filled by those two pharmacies (and every other pharmacy in Alabama), *see* Ala. Code § 20-2-213, yet the State does not allege that it took any action whatsoever.

---

[3]     For this reason, the State's assertion that it has alleged more than "300+ paragraphs of facts" (Opp. 22)—even assuming *arguendo* that it were accurate—is unavailing *as to McKesson*.

According to the State, moreover, the number of opioid prescriptions being written by the State's doctors was increasing substantially during the relevant time period as a result of the manufacturers' allegedly deceptive marketing campaign.  If (as the State alleges) the number of opioid prescriptions being written by doctors was growing as a result of that marketing campaign, then the prescriptions those doctors wrote were legitimate, pharmacies did nothing wrong in dispensing medicines based on those prescriptions, and McKesson did nothing wrong in supplying pharmacies with the drugs they ordered.  In other words, especially where DEA (unlike McKesson) knew the total volume of opioids entering Alabama and was increasing the production quota for opioids from 1995 to 2013, *see supra* note 1, McKesson had no reason to believe that the purportedly "high volume" of opioids being shipped to Alabama pharmacies represented anything other than a growing need for the treatment of previously undertreated pain.

The State also asserts that it expects to find evidence to support its claim through discovery.  *See* Opp. 20–21.  The State, however, has had access to a vast database identifying every opioid dispensed in Alabama by a pharmacist or doctor—including the drug code of the prescribed opioid and the amount dispensed, the name of the patient, the name of the prescribing doctor, the name of the dispensing pharmacy or doctor, the date the prescription was filled, and the method of payment—for the past decade.  Ala. Code § 20-2-213.  If facts existed connecting McKesson to the State's damages, the State could have (and would have) pled them.  In any event, it is black-letter law that a party may not initiate a lawsuit without an adequate basis and then seek support for its claims through discovery.  *Carrethers v. Speer*, 698 F. App'x 266, 270 (6th Cir. 2017) ("[I]n order to 'unlock the doors of discovery,' a plaintiff must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009))); *Carter v. DeKalb County*, 521 F. App'x

725, 728 (11th Cir. 2013) ("[D]iscovery follows the filing of a well-pleaded complaint.  It is not a device to enable the plaintiff to make a case when his complaint has failed to state a claim.").

### B. The State Fails To Allege Facts That Establish Proximate Causation.

The Complaint alleges in conclusory fashion that McKesson failed to report unspecified "suspicious" pharmacy orders, which led to wide-ranging injuries, such as "social services spending such as representing parents and children in neglect proceedings," on the part of the State. *E.g.*, Compl. ¶ 363.  But the State's assertion that McKesson's alleged reporting failures proximately caused the State to spend money on a host of social services does not withstand scrutiny.

McKesson's opening brief demonstrated that proximate causation under Alabama law requires a ***direct*** relationship between a plaintiff's injury and a defendant's wrongdoing—i.e., that courts must "***stop[] at the first link in the chain of causation***."[4]  *Birmingham Ry., Light & Power Co. v. Ely*, 62 So. 816, 819 (Ala. 1913); *see* Br. 3–4 (collecting cases); *see also United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1273 (11th Cir. 2000) (citing *Ely* with approval).  Tellingly, the Opposition fails to distinguish any of the cases cited by McKesson or offer any cogent response to McKesson's showing that the State's theory of causation goes well beyond the "first link in the chain."  Instead, without articulating the chain of causation, the State merely asserts that its injuries were the "foreseeable" consequence of McKesson's alleged reporting failures.

Alabama law, however, does not allow plaintiffs simply to invoke foreseeability to "trace back the chain of causes indefinitely," attaching liability at each stage along the way.  *Ely*, 62 So.

---

[4]   Unless otherwise noted, this brief adds all emphasis in quotations and omits citations and internal quotation marks.

at 819.  Rather, a plaintiff must allege and prove the defendant was "***the direct and immediate***, ***efficient cause of the injury***."  *Nance v. Southerland*, 79 So. 3d 612, 624 (Ala. Ct. App. 2010) (quoting *Mobile City Lines, Inc. v. Proctor*, 130 So. 2d 388, 394 (Ala. 1961)).

*Vines v. Plantation Motor Lodge*, 336 So. 2d 1338 (Ala. 1976)—one of only two proximate causation cases cited by the State—itself proves the point.  There, proximate causation was lacking where the defendant's truck was stolen and, a short time later, the thief collided with a motorcycle, killing its rider.  *Id.* at 1339.  The Supreme Court of Alabama observed that, not only did the defendant violate a city ordinance by leaving his keys in the ignition of an unlocked truck, but also that "auto theft is a high incident crime of which an alarming number occur when keys are left in the vehicle" and "a substantial proportion of stolen vehicles are involved in accidents."  *Id.*  The court nonetheless held that "the consequences of the theft were ***too remote to be reasonably foreseeable*** by the defendant."  *Id.* at 1340; *see also id.* ("defendant's negligence … was too remote to be a proximate cause" of the injuries).[5]

The connection between McKesson's alleged misconduct (failure to report suspicious orders) and the State's alleged harm (increased expenditures for opioid-related social services) is far more attenuated than in *Vines*.  The State does not dispute that McKesson's delivery of FDA-approved medicines to licensed pharmacies cannot itself injure anyone.  Rather, it is only after the intervening criminal act of a third party—be it a doctor who writes a prescription without a

---

[5]      The only other case cited by the State—*Alabama Power Co. v. Taylor*, 306 So. 2d 236 (Ala. 1975)—is not to the contrary.  There, a child was injured when she climbed a tree and grabbed an exposed power line that the Alabama Power Company had negligently failed to insulate.  *Id.* at 249.  On those facts, the court held that "a proximate cause of plaintiff's injury was the failure of Alabama Power Company to insulate its wire or trim the tree."  *Id.  Taylor* thus exemplifies the sort of close connection that is required under Alabama law and which is lacking here.

legitimate medical need, a patient who gives or sells lawfully prescribed medicines to another, or a thief who steals lawfully prescribed drugs—that diversion and potential injury occur.  Just as the downstream conduct of a thief rendered "too remote" the connection between plaintiff and defendant in *Vines*, so too does the downstream criminal activity of third parties render too remote the connection between McKesson's alleged wrongdoing and the State's asserted injury.[6]

Finally, the State suggests that proximate causation should not be decided on a motion to dismiss.  Opp. 22.  That assertion, however, misapprehends the State's pleading burden in federal court.  *See, e.g.*, *Philip Morris*, 223 F.3d at 1275 (affirming dismissal of complaint for failure to plead proximate causation under Alabama law); *Woods v. Wyeth, LLC*, 2016 WL 1719550 (N.D. Ala. Apr. 29, 2016) (similar).  Where the facts alleged in the complaint are insufficient as a matter of law to establish proximate causation, the plaintiff has failed to state a claim upon which relief can be granted, and the complaint must be dismissed.

### C.    The Derivative Injury Rule Bars Recovery of the State's Medical Payments.

The State talks out both sides of its mouth when it seeks to recover for "increased health care services and treatments," Opp. 43, but then argues that it need not proceed in subrogation because it is "exercising its own right of recovery," Opp. 6.  The State cannot have it both ways: if it seeks damages based on payments made for medical treatment of its citizens, including treatment provided under its insurance programs, those damages can only be pursued through

---

[6]     The State suggests in passing that "not all of McKesson's bad acts lead to criminal diversion," referencing a single incidence in which a patient overdosed (Opp. 39), but the argument makes no sense.  If an overdose occurs because someone took pills that were not prescribed to them or that were prescribed by a doctor for other than legitimate medical purposes, then—by definition—diversion occurred.  If, by contrast, the person took the medicines as lawfully prescribed, then there is no basis for holding *McKesson* liable in tort for the overdose, even if the doctor who wrote the prescription was influenced by the manufacturers' allegedly fraudulent marketing campaign.

7

subrogation and fall squarely within the scope of the derivative injury rule.  *E.g.*, *Philip Morris*, 223 F.3d at 1273 n.5 (holding as a matter of Alabama law "that—absent subrogation—a healthcare provider has no cause of action against a defendant who injures the health-care provider's ward, causing the health-care provider to incur increased expenses"); *see* Br. 6–8 (collecting cases).

The State does not dispute that the derivative injury rule is part of the common law of Alabama; instead, it argues that the rule does not apply here because "the State does not seek monies it has paid … injured citizens."  Opp. 5.  The Complaint, however, expressly seeks to recover "costs related to opioid addiction treatment," Compl. ¶ 377, and "funds to reimburse opioid prescriptions covered by the State of Alabama's employee health plan and Medicaid Program." *id.* ¶ 441; *see also id.* ¶ 377 ("The State of Alabama and its residents have sustained … damages includ[ing] … health services").[7]  Under settled Alabama law, those categories of damages are barred and should be dismissed.

Alabama and its amici argue that the State's *parens patriae* authority to enforce consumer protection statutes would be undermined if the derivative injury rule barred such claims.  Opp. 5; Brief of Amici States in Opposition to McKesson's Motion to Dismiss ("Amici Br."), Dkt. 875, at 16–17.  But that argument is a non sequitur because McKesson did not argue that the derivative injury rule applies to the State's ADTPA claim.  *See* Br. 7 (derivative injury rule bars State's "nuisance, negligence, wantonness, and unjust enrichment claims").  Neither the State nor its amici argue that the derivative injury rule does not apply to the State's common-law claims—nor could

---

[7]     The State contends that Ala. Code § 22-6-6 does not require the State to proceed in subrogation to recover Medicaid payments it made to its citizens because any cause of action its citizens may have against McKesson "is not the result of [McKesson] hitting them with a car or some other tortious act that required the State to furnish opioids to treat the resulting 'injury, disease, or sickness.'"  Opp. 6.  But nothing in the statute suggests that it is limited to "car accidents," nor is the derivative injury rule so limited.  *See* Br. 6–8 & nn.2–3 (collecting cases).

they. *See, e.g.*, *State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116, 1122 (Del. 2007) (plaintiff asserting *parens patriae* authority must "assert all the elements of a prima facie tort case in the same manner as the citizens on whose behalf they are acting"); *State ex rel. Miller v. Philip Morris Inc.*, 577 N.W.2d 401, 403 (Iowa 1998) (State precluded from bringing "derivative" claim to recoup costs of providing "health care and other services to citizens").

Similarly, the State strains credibility when it contends that "the Alabama legislature has trumped [the derivative injury rule] by statute." Opp. 5. The State cites the ADTPA, which, as just explained, does not help the State because McKesson has not argued that the derivative injury rule bars the ADTPA claim. The only other statute cited by the State, the public nuisance statute, is "declaratory of the common law ***and does not supersede it***." *Lauderdale Cty. Bd. of Educ. v. Alexander*, 110 So. 2d 911, 915 (Ala. 1959). Moreover, it is well settled that a statute will not be interpreted as abrogating the common law unless such an intent is stated with "irresistable clearness." *St. Paul Fire & Marine Ins. Co. v. Cox*, 583 F. Supp. 1221, 1227 (N.D. Ala. 1984) ("The presumption is that the legislature does not intend to make any alteration in the law beyond what it explicitly declares, either in express terms or by unmistakable implication, and that it does not intend to overthrow fundamental principles, infringe rights, or depart from a general system of law without expressing its intention with irresistable clearness." (citing *Duncan v. Rudulph*, 16 So. 2d 313, 314 (Ala. 1944))). Here, the State has not identified a statute that expresses ***any*** intent— let alone a clear one—to override the derivative injury rule.

### D.     The Free Public Services Doctrine Bars the State's Damages Claims.

The State gets it exactly backwards when it suggests the default rule is to ***allow*** recovery of public expenditures from tortfeasors absent statutory authority. To the contrary, it is the State— not defendants—that asks this Court to "innovate" and create a new liability where none exists at

9

common law.  If any Alabama case authorized the State to recover municipal expenditures of the sort it seeks here, it would be a simple matter for the State to cite it, yet it cites nothing.

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322 (9th Cir. 1983), is instructive.  In that case, the Ninth Circuit, sitting in diversity, refused to "impos[e]" a "new liability" on the tortfeasor in favor of the City, reasoning that "[w]here [public] services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement."  *Id.* at 323.  The court went on to say that it "doubt[ed] judicial intervention is needed to call the attention of Arizona's legislative authorities to the cost allocation presented by what we find to be the existing rule, for the state and its municipalities presently feel the pinch when they pay the bill."  *Id.* at 324.

Similarly, in *United States v. Standard Oil Co.*, the federal government sued a tortfeasor to recover expenses it incurred in providing medical services to a third party.  332 U.S. 301 (1947).  The U.S. Supreme Court declined "to create a new substantive legal liability without legislative aid," and observed that the government was attempting to use tort law to "establish[] the federal fiscal and regulatory policies which the Government's executive arm thinks should prevail in a situation not covered by traditionally established liabilities."  *Id.* at 302, 314.  The Court refused to apply its "creative touch" to the law, holding instead that "Congress, not this Court or the other federal courts" has "primary and often exclusive" authority for "securing the treasury or the government against financial losses however inflicted, including requiring reimbursement for injuries creating them."  *Id.* at 314–15, 317.[8]

---

[8]       *See also id.* at 316–17 ("And the United States has power at any time to create the liability…. That decision, for the reasons we have stated, is in this instance for the Congress, not for the courts.  Until it acts to establish the liability, this Court and others should withhold creative touch.").

The same analysis applies here.  Where the Alabama legislature "thought it necessary to take steps to prevent interference with [state] funds … it has taken positive action to that end."  *Id.* at 315; *see* Opp. 5 n.4 (citing Alabama statute allowing recovery of damages under the Oil Pollution Act).[9]  In absence of action by the Alabama legislature, this Court should not disturb settled rules and create new state tort liabilities where none exist.

The State argues that the free public services doctrine does not apply to its public nuisance claim, Opp. 8–9, but it is mistaken.  First, the public nuisance statute is a codification—not an abrogation—of the common law.  *Alexander*, 110 So. 2d at 915.  That statute therefore does nothing to displace application of traditional common-law principles to the State's public nuisance claim.

Second, the State and its amici argue that the free public services doctrine does not apply to claims seeking abatement of a nuisance.  *See* Opp. 8; Amici Br. 14.  The costs that the State seeks to recover, however, are quintessential money damages—not abatement costs.  *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1147 (Ill. 2004).[10]  The exception proposed by the State, moreover, "would be the exception that swallows the rule, since many expenditures for public services could be re-characterized by skillful litigants as expenses incurred in abating a public nuisance."  *Walker County v. Tri-State Crematory*, 643 S.E.2d 324, 328 (Ga. Ct. App. 2007); *see also County of Erie v. Colgan Air, Inc.*, 711 F.3d 147, 152 (2d Cir. 2013) (same).

---

[9]     Indeed, the State does not in fact dispute the general principle that public expenditures made in the performance of governmental functions are not recoverable from a tortfeasor, absent statutory authority, but argues that the rule does not apply to *states* (as opposed to local) governments.  Opp. 7–8.  Alabama offers no principled reason for this limitation and indeed there is none.  As *Standard Oil* makes clear, the rule applies to all levels of government.

[10]     "An abatement order is an equitable remedy, while damages are a legal remedy.  An equitable remedy's sole purpose is *to eliminate the hazard that is causing prospective harm* to the plaintiff."  *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 132 (Ct. App. 2017).  Accordingly, the State may not recover retrospective damages under the guise of abatement.

Finally, amici contend that the free public services doctrine applies only to "single negligent event[s]." Amici Br. 13. However, as the Ninth Circuit explained in *City of Flagstaff*, "it is the identity of the claimant and the nature of the cost that combine to deny recovery"—not the supposed length of the purported misconduct. 719 F.2d at 324. For that reason, numerous courts have rejected the proposition that the free public services doctrine applies only to discrete negligent events. *E.g.*, *Beretta U.S.A. Corp.*, 821 N.E.2d at 1146–47 ("we reject the distinction between single, discrete disasters, such as fires and explosions, and the unfortunately frequent incidents of handgun violence"); *see Baker v. Smith & Wesson Corp.*, 2002 WL 31741522, at *6 (Del. Super. Ct. Nov. 27, 2002) (similar).

## II. THE ALABAMA CSA CLAIM SHOULD BE DISMISSED.

While the State's amici argue that the Uniform Controlled Substances Act of 1970 (on which they claim the Alabama CSA is modeled) "imposes substantive duties to prevent diversion and detect suspicious orders," neither of the Alabama provisions they cite does any such thing. *See* Amici Br. 4. In fact, neither provision imposes any obligations on distributors whatsoever— both provisions are directed at "certifying boards." *See* Ala. Code § 20-2-50(a) ("The certifying boards shall promulgate rules and charge reasonable fees to defray expenses incurred in registration and administration of the provisions of this article in regard to the manufacture, dispensing, or distribution of controlled substances within the state."); *id.* § 20-2-52(a) (providing a list of "factors" for certifying boards to "consider" when determining whether to register "persons manufacturing, distributing, or dispensing controlled substances"). The State does not dispute that McKesson was, at all relevant times, properly registered by the relevant "certifying board" as a wholesale distributor under the Alabama CSA—nor could it.

The State similarly errs in reading an independent obligation to generate suspicious order reports into regulations implementing the Alabama CSA. A regulation implementing the Alabama

CSA requires distributors to "submit to the Alabama State Board of Pharmacy **legible copies** of records and reports required by the Drug Enforcement Administration." Ala. Admin. Code r. 680-X-3-.05(2). The State does not allege that McKesson failed to provide such "legible copies" to the State. Instead, it seeks to read the regulation as creating an independent obligation for McKesson to generate reports for the State that comply with federal law. But this reading would violate what the State has called "one of the most basic interpretive canons" by treating the words "legible copies" as "inoperative or superfluous, void or insignificant."[11]

Finally, the State's half-hearted suggestion that it may seek money damages pursuant to the Alabama CSA borders on the frivolous. The State concedes that the Alabama CSA "does not provide for damages as a remedy." Opp. 37. And it acknowledges that its prayer for relief did not seek money damages on its Alabama CSA claim. *Id.* The State nonetheless asserts that "nothing in the ACSA prohibits or precludes the State from seeking damages that result from a violation." *Id.* But that argument ignores basic canons of statutory construction.

"[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979); *Ex parte Kirkpatrick*, 495 So. 2d 1095, 1096 (Ala. 1986) ("[T]he legal maxim *expressio unius est exclusio alterius* … is frequently applied to aid this Court in interpreting statutory language"). Further, the Alabama CSA is a penal statute, *State v. Bradford*, 368 So. 2d 317, 324 (Ala. Crim. App. 1979), and the Alabama Supreme

---

[11] *State v. Ctrs. for Medicare & Medicaid Servs.*, 2010 WL 1268090, at *8 (M.D. Ala. Mar. 30, 2010); *see also Ex parte Se. Ala. Med. Ctr.*, 835 So. 2d 1042, 1068 (Ala. Civ. App. 2002) ("All provisions of a statute must be given effect."). This interpretive canon applies equally to regulations. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) (disagreeing with a reading of a regulation that would render a word in it "mere surplusage," explaining that "we have cautioned against reading a text in a way that makes part of it redundant").

Court has held that "penal statutes are to be strictly construed in favor of the persons sought to be subjected to their operation," *Johnson v. Brunswick Riverview Club, Inc.*, 39 So. 3d 132, 138 (Ala. 2009). The court should therefore reject the State's invitation to read a damages remedy into the Alabama CSA.

## III. THE PUBLIC NUISANCE, NEGLIGENCE, AND WANTONNESS CLAIMS SHOULD BE DISMISSED.

### A. The State's Duty Arguments Fail.

The State implicitly concedes that there is no private right of action to enforce the federal CSA or its implementing regulations. *See Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (because plaintiff "has not responded to Defendants' arguments concerning the dismissal of the state law claims …, the court finds that [plaintiff] has abandoned these claims"). The State similarly fails to dispute that a state-law tort action cannot be based on the failure to comply with these federal obligations. *Id.*; *see also Indus. Tile, Inc. v. Stewart*, 388 So. 2d 171, 173 (Ala. 1980) ("[T]his Court held that a plaintiff did not have a private civil remedy because of a violation of [a federal statute] or the regulations promulgated thereunder."). The State instead argues that it has "adequately pleaded the existence of multiple duties" under state law, *see* Opp. 38, but that is not so.

#### 1. No common-law duty

The State asserts that McKesson had a common-law duty to report and halt suspicious orders, but the Opposition fails to cite a single Alabama case imposing any such duty.

The Opposition (at 38) quotes *Southeastern Greyhound Lines v. Callahan*, 13 So. 2d 660, 663 (Ala. 1943), for the proposition that "every person owes every other person a duty imposed by law to be careful." But the State misleadingly omits the next sentence of the court's opinion:

> [E]very person owes every other person a duty imposed by law to be careful not to hurt him. ***If he personally owes a third person no***

14

> *duty to be watchful of his safety, then an omission to be watchful*
> *is not a legal wrong to him.*

*Id.*  Here, no patient suffers an injury merely as a result of McKesson's delivery of medicines to a retail pharmacy.  And, as explained in McKesson's opening brief, wholesale distributors have no common-law duty to prevent the downstream criminal diversion of opioid medicines after they are delivered by McKesson to licensed pharmacies.  *See* Br. 18–19.  Thus, any failure by McKesson to prevent downstream diversion is "not a legal wrong" because McKesson owes no common-law duty to be watchful of the safety of strangers who misuse prescription medicines—let alone a common-law duty to the State to be watchful for social services expenditures that it might elect to incur as a result of that misuse.

The State next cites *City of Mobile v. Largay*, 346 So. 2d 393, 402 (Ala. 1977), but fails to acknowledge that the language on which it relies appears **in the dissent**.  Opp. 39.  There, a rape victim sued the City of Mobile, alleging that the city negligently failed to maintain the building where the assault occurred.  The majority opinion in *Largay* expressed "grave doubts" about the existence of a duty on the part of the city, but did not reach that question, instead holding as a matter of law that the defendant's alleged negligence was not the proximate cause of the plaintiff's injury.  *See* 346 So. 2d at 394–95 (citing *Vines*, 336 So. 2d at 1339); *see also supra* Part I.B.  The **majority** opinion thus counsels against the conclusion that McKesson is liable in negligence here.[12]

---

[12]    *Taylor v. Smith*, 892 So. 2d 887 (Ala. 2004), likewise fails to support the State's duty arguments.  There, the court concluded that a physician owed a duty to a non-patient motorist injured in a car accident with his patient that "*derive[d] from* the physician's duty to the *patient*" where the physician engaged in the "affirmative act" of negligently administering medication to the patient.  *Id.* at 895–96.  The court distinguished cases alleging omissions by physicians, explaining that "[i]n those situations, whether the patient takes the medication and then drives is beyond the doctor's control."  *Id.* at 895 ("[I]mposition of a duty to unidentifiable third parties under those circumstances would create a zone of risk which would be impossible to define.").  Here, McKesson is not in a physician-patient relationship with anyone; has allegedly engaged in

The State's duty arguments also fail for another reason:  the State does not identify any authority suggesting that McKesson owes *it* any common-law duty.  It is a fundamental principle of law that, to state a claim for negligence, a complaint must allege that the defendant owed the plaintiff a duty.  *See, e.g.*, *Pugh v. Butler Tel. Co.*, 512 So. 2d 1317, 1319 (Ala. 1987) ("Fundamental to the maintenance of a negligence action is the existence of a legal duty of care owed by the defendant *to the plaintiff*.").  Even assuming *arguendo* that McKesson owed end-users of opioids a common-law duty to protect them from harm, that would do nothing to establish that McKesson owed any common-law duty to the State.

In sum, if McKesson owed the State a common-law duty to report or halt suspicious orders, it would have been a simple matter for the State to cite an Alabama case saying so.  Its failure to do so is dispositive.

### 2.    No statutory duty

The State argues that statutes "can create a duty of care," Opp. 40, but that argument is unavailing here for two fundamental reasons.

First, a statute can supply a duty of care only if the statute was enacted to protect a specific "class of persons."  *See Parker Bldg. Servs. Co., Inc. v. Lightsey ex rel. Lightsey*, 925 So. 2d 927, 931 (Ala. 2005).  Here, as the State acknowledges, the Alabama CSA was "designed to protect the State of Alabama[] and its citizens as the public at large," rather than any narrower class of persons. Opp. 42.  Because "the purpose of [the statute] is to protect the general public … negligence per se is … inapplicable in this case."  *Lightsey*, 925 So. 2d at 931.

---

omissions (i.e., the failure to prevent downstream diversion), rather than any affirmative acts; and has no control over whether anyone consumes opioid medications.  *Taylor* is thus inapposite.

Contrary to the State's assertion (at Opp. 40), *Industrial Tile v. Stewart*, 388 So. 2d 171 (Ala. 1980), does not hold that failure to comply with statutory reporting obligations establishes "breach[]" of "a duty owed to the State." That case concerns neither regulatory reporting obligations nor duties owed to the State. The Alabama Supreme Court, moreover, reaffirmed in *Stewart* that federal statutes and regulations ***cannot*** supply the duty element of a negligence claim.[13] Rather, the court merely held that it was not reversible error to admit evidence of Occupational Safety and Health Act violations as relevant, not to the question of duty, but to the question whether the defendant violated the applicable standard of care.[14]

Second, the State is wrong that the Alabama CSA creates a duty to report suspicious orders to the State. Under basic rules of statutory interpretation, the Alabama CSA requires McKesson only to provide "legible copies" of reports provided to the DEA. *See supra* Part II. To be sure, the Alabama CSA authorizes the State to take various actions against wholesale distributors, including revoking their licenses and imposing criminal liability for specified violations. *See, e.g.*, Ala. Code §§ 20-2-65, 20-2-71. But nothing in the Alabama CSA authorizes the State to bring a common-law tort claim against wholesale distributors—let alone a tort claim based on a non-existent state-law duty to report suspicious orders.

---

[13]     *See Stewart*, 388 So. 2d at 173 ("In *Knight v. Burns, Kirkley and Williams Construction Inc.*, 331 So. 2d 651 (Ala. 1976), this Court held that a plaintiff did not have a private civil remedy because of a violation of the Occupational Safety and Health Act of 1970 or the regulations promulgated thereunder.").

[14]     The remaining cases cited by the State, *see* Opp. 41, are equally unavailing. For example, *Martinson v. Cagle*, 454 So. 2d 1383, 1385 (Ala. 1984), merely holds that a criminal act may also "be the basis of a civil action for damages"—but only where the act "violate[s] the legal rights of the plaintiff, constitute a breach of duty owed to the plaintiff, or constitute some cause of action for which relief may be granted." In other words, conduct that violates a criminal statute may also constitute actionable negligence, but only if the conduct separately constitutes a breach of duty owed by the defendant to the plaintiff.

**B.      The State's Breach Arguments Fail.**

The State suggests (Opp. 40) that pleading a breach requires no more than the conclusory allegation that McKesson "failed to meet the statutory duty to report suspicious orders," but it is mistaken.  *See, e.g.*, *Mukamal v. Bakes*, 378 F. App'x 890, 900 (11th Cir. 2010) (finding "conclusory allegations concerning breach" insufficient to state a claim).  The State does not dispute that the Complaint failed to identify even a single "suspicious" pharmacy order that McKesson should have reported, let alone tie any such failure to the State's alleged injury.  This failure is fatal to the State's claims against McKesson.

**C.      The State's Wantonness Arguments Fail.**

The State's wantonness claim should be dismissed.  The Opposition (at 48) argues that "negligence and wantonness are distinct claims," but this was never in dispute.  McKesson has explained that duty, breach and causation are elements of both negligence and wantonness claims. *See* Br. 14; *see also Edmonson v. Cooper Cameron Corp.*, 374 F. Supp. 2d 1103, 1106 (M.D. Ala. 2005) ("Under Alabama law, there are four elements to establish a case of negligence or wantonness:  (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury."); *Raley v. Bank of Am., N.A.*, 2014 WL 6684906, at *4 (N.D. Ala. Nov. 25, 2014) ("A wantonness cause of action imposes similar requirements to a negligence claim, but with the enhanced culpability requirement that the conduct be done recklessly or in conscious disregard of others' rights.").[15]  Because the State fails to allege duty, breach, or causation, its wantonness claim fails as a matter of law.

---

[15]      The cases the State cites are not to the contrary.  *Tolbert v. Tolbert* distinguished negligence from wantonness only on the basis of the degree of culpability required,  903 So. 2d 103, 114–15 (Ala. 2004), an issue not in dispute here.  Similarly, while *Lemley v. Wilson* stated that recklessness is required to establish wantonness, it otherwise provided similar requirements for a wantonness claim as for a negligence claim.  178 So. 3d 834, 841–42 (Ala. 2015).  Indeed, the State does not point to any specific differences between the elements of the two claims.  *See* Opp. 48.

D.    The State's Nuisance Arguments Fail.

The State's failure properly to allege (1) a duty owed by McKesson to the State, (2) a breach by McKesson, and (3) proximate causation requires dismissal of its public nuisance claim. *See* Br. 14; *Walnut Lake Land Co., Inc. v. Petro Stopping Ctrs., LP*, 2009 WL 10689908, at *9 (N.D. Ala. Jan. 21, 2009) ("the duty and causation analyses in a nuisance claim are conducted the same way as they are in a negligence claim").  The public nuisance claim also fails for additional reasons, and none of the State's contrary arguments has merit.

First, the State fails to allege interference with a ***public right***.  Under the Alabama statute, a "public nuisance is one which damages ***all persons*** who come within the sphere of its operation." Ala. Code § 6-5-121.  "[I]f a nuisance affected one person less than the entire community, it would not be public because not all were affected."  *Benefield v. Int'l Paper Co.*, 2009 WL 2601425, at *4 (M.D. Ala. Aug. 21, 2009).  Here, the State alleges it incurred costs resulting from opioid addiction, which it alleges exists at "rates in primary care settings as high as 26%."  Compl. ¶ 43. Thus the State does not allege that opioid medications damage "all persons"—nor could it.  *Cf. Russell Corp. v. Sullivan*, 790 So. 2d 940, 952–53 (Ala. 2001) (finding that the "discharge of contaminants into a public body of water constitutes a public nuisance" because it "affects anyone who would want to use and enjoy Lake Martin, not just those who live on its banks").

The Opposition responds that the State has alleged interference with a public right because opioid "addiction and abuse" threaten the public's "health, safety, and welfare."  Opp. 24.  But a threat to public health is not the same as interference with a public right.  Sugary soft drinks may threaten public health, but their presence in convenience stores does not interfere with a public right.  The State's argument conflates a legal term with a specific meaning ("public right") with a colloquial expression ("public health").  For substantially the reasons explained in Distributors' *Monroe County* and *Summit County* replies, the "right" to be free from opioid addiction and abuse

is a quintessentially ***private*** right, notwithstanding the public health consequences of opioid misuse.  Monroe Br., Dkt. 572-1 at Part III.B; Summit Br., Dkt. 491-1 at Part II.B.1; *see also Alexander*, 110 So. 2d at 915.

Second, the State fails to allege that McKesson had control over the instrumentality of the alleged nuisance—i.e., opioid medications—at the time the nuisance was created.  Wholesale distributors control opioid medications when they take possession of shipments from manufacturers, ship them to regional warehouses, and then ship orders to retail pharmacies. During all that time, they enforce strict procedures to ensure the physical security of the medications, as required by federal regulations.  There is no allegation that McKesson was lax in that regard.  Once McKesson delivers the medications to a pharmacy, however, it relinquishes control.  It does not control (i) to whom pharmacists dispense the medications, (ii) on what basis, or (iii) with what instructions.  And it certainly does not control what the patient does with the medications after the pharmacist dispenses them—use them as instructed or misuse, give away, or sell them.  Under established law, McKesson's lack of control over the opioid medicines at the time the nuisance is created requires dismissal of the nuisance claim.  See *Tipler v. McKenzie Tank Lines*, 547 So. 2d 438 (Ala. 1989); *see also* Monroe Br., Dkt. 572-1 at Part III.C.

The State strains, unsuccessfully, to distinguish *Tipler*.  There, the plaintiff alleged that Exxon created a nuisance condition when the operation of its facility "caused both lanes of traffic on [a highway] to be blocked," but the Alabama Supreme Court held that "Exxon cannot be charged and held liable either for maintaining, or for failing to prevent, a chain of events and circumstances over which it had no reasonable means of control."  *Tipler*, 547 So. 2d at 441.  So too here:  McKesson has "no reasonable means of control" over opioid medications after it delivers them to pharmacies, and thus cannot be held liable for "failing to prevent" the diversion of those

medicines after delivery.  *See id.*; *see also E S Robbins Corp. v. Eastman Chem. Co.*, 912 F. Supp. 1476, 1494 (N.D. Ala. 1995) (manufacturer not liable for chemical spill because it "had no control over the off-loading of [its] product by its carriers").[16]

## IV. THE UNJUST ENRICHMENT CLAIM FAILS.

The State does not dispute that McKesson neither "holds money which … belongs to the plaintiff" nor "was improperly paid" money by the State "because of mistake or fraud." *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 2d 1111, 1123 (Ala. 2003) (emphasis omitted).  These tacit admissions are fatal to its unjust enrichment claim under Alabama law.  *See* Br. 21.

In an attempt to sidestep that conclusion, the State contends its unjust enrichment claim is premised on "externalities," but the Complaint does not plead an unjust enrichment claim based on that theory.  Compl. ¶¶ 440–43.[17]  In any event, the externalities theory is inconsistent with Alabama law, *Heilman*, 876 So. 2d at 1122–23, and, for the reasons stated in Distributors' *City of Chicago* briefs, being "forced to pay for [a defendant's] externalities" does "not fit within an unjust enrichment framework," *City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1274, 1277 (11th Cir. 2015); *see* Chicago Br., Dkt. 571-1 at Part V; Chicago Reply, Dkt. 817 at Part V.

---

[16]    The State argues that *Tipler* turns on the question of proximate causation.  Opp. 25. McKesson agrees that *Tipler* is highly relevant to that question, as it provides further support for its proximate causation argument.  *See* 547 So. 2d at 441 ("The problem is one of remoteness…. [T]he facts do not supply the requisite nexus between Exxon's activities and the ultimate events and circumstances of the accident in question."); *see also supra* Part I.B (demonstrating that the State fails to allege the requisite nexus between McKesson's activities and the State's alleged injury).

[17]    The State's unjust enrichment claim, as pled in the Complaint, was premised on reimbursement of opioid prescriptions covered by the State's employee health plans and Medicaid Programs.  Compl. ¶ 441; *see* Br. 22.  The Opposition, however, abandons that theory—which alone requires dismissal of the unjust enrichment claim.  *Doe v. Bredesen*, 507 F.3d 998, 1007-08 (6th Cir. 2007) (plaintiff "abandoned … claims by failing to raise them in his brief opposing the [defendant's] motion to dismiss the complaint").

Moreover, the State ignores Alabama law when it argues that it may plead an unjust enrichment claim in tandem with its other claims.  The rule in Alabama is just the opposite:  an unjust enrichment claim must be dismissed where a plaintiff's other claims would provide a legal remedy.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 409 (S.D.N.Y. 2017) (granting motion to dismiss unjust enrichment claim because plaintiff "brings claims for the same damages under the ADPTA and for common law fraudulent concealment") (applying Alabama law).

Finally, the State insists that it pleads its unjust enrichment claim "under federal law," but there is no free-floating unjust enrichment cause of action under federal law.  *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 167 (E.D. Pa. 2009) ("Unjust enrichment is not a catch-all claim existing within the narrow scope of federal common law.").  In addition, any such federal common law claim would be displaced by the federal Controlled Substances Act.  *See Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011); Blackfeet Br., Dkt. 924 at Part III.

## V.  THE DECEPTIVE TRADE PRACTICES CLAIM SHOULD BE DISMISSED.

### A.  The State's Claim Is Barred by the Statute of Limitations.

McKesson established in its opening brief that the one-year statute of limitations set forth in the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code § 8-19-14, applies to claims brought by the Attorney General on behalf of the State and requires dismissal here.  *See* Br. 25– 27.  The State's contrary arguments lack merit.

*First*, the State is incorrect that the statute of limitations does not apply to the Attorney General.  As McKesson demonstrated, the definition of "person" sweeps broadly to include "any … legal entity," Ala. Code § 8-19-3(5), and the statute expressly refers to the office of the Attorney General and district attorneys *as persons*.  Ala. Code § 8-19-4(a)(2); s*ee* Br. 25; *see also Adams v. Office of Attorney Gen.*, 2012 WL 1067978, at *3 (M.D. Ala. Mar. 29, 2012) (holding that the

office of the Attorney General is a "legal entity").  The Opposition entirely ignores those dispositive arguments.

Instead, the State asserts that the Attorney General cannot be a person because "person" and "Attorney General" are defined separately.  Opp. 15–16.  But that argument rests on a logical fallacy.  For example, the statute also separately defines the term "consumer," Ala. Code § 8-19-3, but that obviously does not mean that "consumers" are not "persons" under the ADTPA.

Similarly, the State argues that the statute "treat[s] the Attorney General differently than private 'persons.'"  Opp. 16.  While that is true, it does nothing to establish that the office of the Attorney General is not a person, and thus not subject to the statute of limitations.  Take, for example, the statutory provisions cited by the State prohibiting class actions—

> (f) A consumer or other person bringing an action under this chapter may not bring an action on behalf of a class….

> (g) Notwithstanding the limitation in subsection (f), only the office of the Attorney General or district attorney shall have the right and authority to bring action in a representative capacity on behalf of any named person or persons.

Ala. Code § 8-19-10.  Nothing in those provisions gives any indication that the Attorney General is not a person.  To the contrary, if the Attorney General were not a person, then there would be no need to clarify in subsection (g) that the Attorney General may bring a representative action, because subsection (f) by its terms would not apply to the Attorney General.

The State also argues that "any question" as to the application of the limitations period to the State should be resolved in its favor.  Opp. 16.  But the sole case it cites does not apply Alabama law and holds only that the sovereign should receive the "benefit of the doubt if the scope of the

23

statute is ambiguous."  *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 96 (2006).  No such ambiguity exists here.[18]

*Second*, the State has not adequately pled fraudulent concealment.  The State does not dispute that allegations of fraudulent concealment must be pled with Rule 9(b) particularity to toll the limitations period—nor could it.  *See* Br. 26; *see also Miller v. Mobile Cty. Bd. of Health*, 409 So. 2d 420, 422 (Ala. 1981) ("When, as in this case, the plaintiff's complaint on its face is barred by the statute of limitations, the complaint must also show that he or she falls within the savings clause of s 6-2-3.").  The Complaint, however, is entirely devoid of non-conclusory allegations that ***McKesson*** concealed its alleged misconduct.

When the State seeks to argue that it has properly pled fraudulent concealment, it relies principally on allegations relating to manufacturers and their purportedly deceptive marketing campaign.  Opp. 14.  As to McKesson, the State points only to wholly conclusory allegations that it "misle[d] the public about the effectiveness of its controlled substance monitoring program" and its regulatory compliance efforts.  *Id.*  Those non-specific allegations—which fail to explain what "prevented the [State] from discovering the facts surrounding [its] injury"—are insufficient to toll the statute of limitations as a matter of law.  *See, e.g.*, *Miller*, 409 So. 2d at 422 (affirming dismissal where complaint failed adequately to allege facts demonstrating fraudulent concealment).

---

[18]     The State unpersuasively attempts to limit *State v. Crocker's Estate*, 83 So. 2d 261 (Ala. Ct. App. 1955) and *State v. Mudd*, 143 So. 2d 171 (Ala. 1962) to their facts.  In *Crocker's Estate*, the court applied "a plain rule of construction, recognized everywhere in the common law" to find that a statute of limitations applied to the State when the statute said it applied to "[a]ll claims" and provided "[n]o express exception … in favor of the State."  143 So. 2d at 262, 264.  The ADTPA statute of limitations similarly states that "[n]o action" may be brought after the limitations period and provides no express exception for the State.  Ala. Code § 8-19-14.  As for *Mudd*, the State is incorrect that the court there limited its holding "to the specific facts of that case."  *See* Opp. 17.  Instead, the court merely stated that the specific limitations period at issue there did not necessarily "appl[y] in all cases against the State."  143 So. 2d at 176.

Nor could the State plausibly allege that McKesson's conduct somehow prevented it from learning about its injury—i.e., the "high volume" of opioids entering the State. As McKesson explained in its opening brief, the State itself has maintained a comprehensive database detailing every opioid prescription that has been filled in Alabama (along with the prescribing doctor and dispensing pharmacy) for over a decade. *See* Br. 2. Thus, if McKesson's pharmacy customers were ordering too many opioids, no one knew that better than the State itself. Its fraudulent concealment claims therefore fail as a matter of law, at least insofar as McKesson is concerned.

*Third*, the State makes no effort to argue that it has alleged an actionable ADTPA violation on the part of McKesson occurring after May 18, 2017, i.e., one year before the date on which the State first sued McKesson. Br. 26. Accordingly, the State's ADTPA claim against McKesson is time-barred in its entirety.

## B. The State Failed To Plead an Actionable Misrepresentation.

The State first "agree[s] with McKesson's recitation of the [*Noerr-Pennington*] doctrine," Opp. 32, which holds that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Ex parte Simpson*, 36 So. 3d 15, 26 (Ala. 2009). But the State then tries to avoid the implication of the doctrine, arguing its ADTPA claim should survive because it "does not raise a claim that McKesson deceived" the government but instead "that McKesson unlawfully deceived Alabamians with public statements received by Alabamians." Opp. 32. The *Noerr* decision itself, which concerned a "publicity campaign," rejects this very distinction, and the State offers no authority to support its position. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961) (barring claim arising from "publicity campaign … designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business").

25

Putting aside McKesson's alleged advocacy before courts, regulators, or Congress, *see* Compl. ¶¶ 287–88, 294, the State is left with only one non-conclusory allegation relating to a December 2016 McKesson press statement (which the Complaint misrepresents) saying that "McKesson has put significant resources towards building a best-in-class controlled substance monitoring program to help identify suspicious orders and prevent prescription drug diversion in the supply chain."[19]  *See* Opp. 27.  For several reasons, this (and any similar) statement cannot give rise to liability under the ADTPA.[20]

First, the Complaint provides no basis from which the Court might infer that the statement was false or misleading when made.  It does not point to any suspicious pharmacy orders that McKesson filled *in or after December 2016*.  Nor does it identify other, superior controlled substance monitoring programs.  And it does not allege that McKesson failed to devote significant resources to anti-diversion efforts during the relevant time-frame.[21]

Second, the Opposition misapprehends the law regarding broad promotional statements (or what the cases sometimes refer to as "puffery").  Statements attesting, for example, to the "high

---

[19]     Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried To Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html.

[20]     Contrary to the State's assertions, Rule 9(b) applies to ADTPA claims where they sound in fraud.  *See, e.g.*, *Sembly v. U.S. Bank Nat'l Ass'n*, 2012 WL 32737, at *4 (E.D. Mich. Jan. 6, 2012) (dismissing unjust enrichment claim in part because "to the extent Plaintiffs allege that Defendant's conduct 'constituted a deceptive act[,]' this claim sounds in fraud and fails to pass muster under Rule 9(b)"), *aff'd*, 508 F. App'x 443 (6th Cir. 2012); *State v. Lexington Law Firms*, 1997 WL 367409, at *2 (M.D. Tenn. May 14, 1997) (holding that because a statute's prohibitions on deceptive telemarketing practices "sound in fraud, Rule 9(b) requires Plaintiff to allege violations of [the statute] with particularity").  Here, there can be no question that the State's claims against McKesson sound in fraud:  the Complaint alleges that "McKesson undertook to *fraudulently* convince the public that it was complying with its legal obligations."  Compl. ¶ 295.

[21]     Lest the confines of a motion to dismiss leave any doubt, McKesson's statement was true:  as the Court is well aware, McKesson *has* in recent years invested significant resources in preventing diversion and in enhancing its controlled substance monitoring program.

quality" of a product cannot give rise to liability under Alabama law, and this is so even if a plaintiff alleges that, "in reality," the product was of low quality.  *Compare Holmes v. Behr Process Corp.*, 2015 WL 7252662, at *3 (N.D. Ala. Nov. 17, 2015), *with* Opp. 28; *see also BellSouth Mobility, Inc. v. Cellulink, Inc.*, 814 So. 2d 203, 217 (Ala. 2001) (claim that cellular telephone company was "committed to its agents" not actionable); *Am. Pioneer Life Ins. Co. v. Sherrard*, 477 So. 2d 287, 291 (Ala. 1985) (similar).  This is because such statements are "simply an expression of opinion" rather than "a misrepresentation of fact."  *Shutter Shop, Inc. v. Amersham Corp.*, 114 F. Supp. 2d 1218, 1227 (M.D. Ala. 2000).  Statements that McKesson is "deeply passionate" about resolving the opioid crisis and has a "best-in-class" monitoring program are no different.[22]

Third, the State asserts that the ADTPA does not require an allegation that McKesson's statement "misl[ed] consumers," unlike 15 U.S.C. § 45(a)(1).  Opp. 28.  But the Alabama statute explicitly instructs courts to afford "due consideration and great weight" to that provision of federal law "in construing" the ADTPA.  Ala. Code § 8-19-6.  Consequently, the State cannot plead a deceptive trade practice without plausibly alleging a likelihood of consumer deception.  *See* Br. 24–25.

---

[22]     The Opposition argues that McKesson's statement may be a violation of Alabama Code § 8-19-5(7) as a "[r]epresentati[on] that goods or services are of a particular standard, quality, or grade, … if they are of another."  Opp. 28.  But representations about McKesson's suspicious order monitoring program and compliance with regulatory reporting obligations are not representations about "goods or services" made in "the conduct of … trade or commerce."  *See* Ala. Code § 8-19-3(7) (defining services as "[w]ork, labor, and other services, including but not limited to services furnished in connection with the sale or repair of goods"); *id.* § 8-19-5 ("trade or commerce" requirement).

### C. The State Failed To Comply with the Statute's Notice Requirement.

The State's failure to comply with the ADTPA's pre-litigation notice requirement is fatal to its claim. *See* Br. 27. The State's insistence—unsupported by any authority—that such a failure is "[a]t most … harmless error" (Opp. 33) runs contrary to the mandatory language employed by the statute. *See* Ala. Code § 8-19-8(a) ("[The Attorney General] **shall**, before initiating any legal proceedings …, allow such person a reasonable opportunity to appear …."). Indeed, courts often hold that the failure to comply with pre-suit notice requirements is grounds for dismissal.[23]

The State's attempt to invoke an exception for "continu[ing] practices" lacks merit, as the last allegedly deceptive statement by McKesson identified by the State was made in 2016. Br. 26. Similarly, the State's claim that it satisfied the requirement by joining the multistate group of attorneys general investigating the Defendants falls short, as the State does not even assert that the multistate group of attorneys general raised McKesson's alleged non-compliance with Alabama's deceptive trade practices act as an issue.

## VI. THE DRUG-RELATED NUISANCE CLAIM SHOULD BE DISMISSED.

In light of the State's concession that it "does not oppose dismissal" of its claim for violation of the drug-related nuisance statute (Opp. 33), and for the reasons set out in McKesson's opening brief, the drug-related nuisance claim should be dismissed.

---

[23]     *See, e.g.*, *Southwell v. Summit View of Farragut, LLC*, 494 F. App'x 508, 511 (6th Cir. 2012) (affirming dismissal of claim under Tennessee law and observing "[f]ailure to follow these [pre-suit notice] requirements ordinarily results in the dismissal of the … claim"); *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1399–1400 (N.D. Ala. 1997) (holding that consumer plaintiffs' failure to comply with similar ADTPA notice requirement was "fatal to their claim under the Alabama law"), *aff'd*, 140 F.3d 1043 (11th Cir. 1998) (table).

**CONCLUSION**

The State's claims against McKesson should be dismissed with prejudice.


Dated:  September 7, 2018                    Respectfully submitted,


                                             */s/ Geoffrey E. Hobart*
                                             Geoffrey E. Hobart
                                             Mark H. Lynch
                                             Christian J. Pistilli
                                             **COVINGTON & BURLING LLP**
                                             One CityCenter
                                             850 Tenth Street N.W.
                                             Washington, DC 20001
                                             Tel: (202) 662-6000
                                             ghobart@cov.com
                                             mlynch@cov.com
                                             cpistilli@cov.com

                                             *Counsel for McKesson Corporation*

**LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to the Court's order setting page limits for briefing in this case (Dkt. 699),

McKesson is permitted to file a reply brief of up to 30 pages.  This brief adheres to that limit.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

**CERTIFICATE OF SERVICE**

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart