**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*Cleveland Bakers & Teamsters Health & Welfare Fund, et al. v. Purdue Pharma, L.P., et al.*<br>Case No. 1:18-op-45432-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
<u>DISTRIBUTORS' MOTION TO DISMISS AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

I.      THE DERIVATIVE INJURY RULE BARS THE FUNDS' CLAIMS. ..........................1

II.     THE RICO AND OCPA CLAIMS SHOULD BE DISMISSED. ...................................2

      A.      The Funds Fail To Allege a Direct Injury. ........................................................2

      B.      The Funds Fail To Allege an Injury to Business or Property. ............................6

      C.      The Funds Fail To Allege Predicate Acts or an Enterprise. ...............................6

III.    THE NUISANCE CLAIMS SHOULD BE DISMISSED. .............................................7

IV.     THE NEGLIGENCE CLAIM SHOULD BE DISMISSED. ..........................................8

      A.      The OPLA Bars the Funds' Negligence Claim. ..................................................8

      B.      There Is No Common-Law Duty To Monitor and Report Suspicious
            Orders. ..............................................................................................................10

      C.      There Is No Private Right of Action To Enforce the CSA. ...............................11

V.      THE FUNDS' CLAIMS FAIL FOR ADDITIONAL REASONS. ..............................122

      A.      The Funds Fail To Plead Causation..................................................................122

      B.      The Economic Loss Doctrine Bars the Funds' Claims. .....................................15

VI.     THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED...........................16

VII.    THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED. ..............................19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*,
  2011 WL 1357690 (M.D. Tenn. Apr. 11, 2011) ...................................................7

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
  804 F.3d 633 (3d Cir. 2015) ....................................................................5

*Chapman v. Tristar Prods., Inc.*,
  2017 WL 1433259 (N.D. Ohio Apr. 24, 2017) ..................................................9

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
  863 F.3d 474 (6th Cir. 2017) ...........................................................16, 17

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.*,
  615 F.3d 496 (6th Cir. 2010) ..................................................................15

*City of Everett v. Purdue Pharma L.P.*,
  2017 WL 4236062 (W.D. Wash. Sept 25, 2017) .............................................11

*City of Miami v. Citigroup Inc.*,
  801 F.3d 1268 (11th Cir. 2015) ...............................................................18

*Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*,
  508 F.3d 327 (6th Cir. 2007) ....................................................................7

*Desiano v. Warner-Lambert Co.*,
  326 F.3d 339 (2d Cir. 2003) ...............................................................1, 5

*In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,
  2015 WL 4092866 (S.D. Ohio July 6, 2015) ...............................................12

*Eaton v. Newport Bd. of Educ.*,
  975 F.2d 292 (6th Cir. 1992) ....................................................................7

*Hale v. Enerco Grp., Inc.*,
  2011 WL 49545 (N.D. Ohio Jan. 5, 2011)..................................................9

*In re Ins. Brokerage Antitrust Litig.*,
  2006 WL 2850607 (D.N.J. Oct. 3, 2006) .......................................................20

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Zantop
    Air Trans. Corp.*,
  394 F.2d 36 (6th Cir. 1968) .....................................................................7

*Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*,
196 F.3d 818 (7th Cir. 1999) ........................................................................... 1, 18

*Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*,
91 F. Supp. 3d 940 (S.D. Ohio 2015) .................................................................. 19

*Meta v. Target Corp.*,
74 F. Supp. 3d 858 (N.D. Ohio 2015) ................................................................... 9

*Mitchell v. Proctor & Gamble*,
2010 WL 728222 (S.D. Ohio March 1, 2010) ....................................................... 9

*Moore v. Texaco, Inc.*,
244 F.3d 1229 (10th Cir. 2001) ......................................................................... 19

*In re Neurontin Mktg. & Sales Practices Litig.*,
712 F.3d 21 (1st Cir. 2013) ................................................................................. 5

*Ohio Edison Co. v. Direct Energy Bus., LLC*,
2017 WL 3174347 (N.D. Ohio July 26, 2017) ............................................. 6, 17, 18

*Perry v. Am. Tobacco Co.*,
324 F.3d 845 (6th Cir. 2003) .............................................................................. 3

*Pinney Dock & Transp. Co. v. Penn Cent. Corp.*,
196 F.3d 617 (6th Cir. 1999) ............................................................................. 20

*Randleman v. Fidelity Nat'l Title Ins. Co.*,
465 F. Supp. 2d 812 (N.D. Ohio 2006) ............................................................... 18

*Rogzinsky v. Danek Med., Inc.*,
1999 WL 33537323 (N.D. Ohio July 8, 1999) ..................................................... 12

*Sidney Hillman Health Ctr. v. Abbott Labs.*,
873 F.3d 574 (7th Cir. 2017) .............................................................................. 5

*Singh v. NYCTL 2009-A Trust*,
683 F. App'x 76 (2d Cir. 2017) ........................................................................... 7

*Sosa v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) .............................................................................. 7

*Tekavec v. Van Waters & Rogers, Inc.*,
12 F. Supp. 2d 672 (N.D. Ohio 1998) ................................................................. 12

*Traxler v. PPG Indus., Inc.*,
158 F. Supp. 3d 607 (N.D. Ohio 2016) ................................................................. 9

*Trollinger v. Tyson Foods, Inc.*,
   370 F.3d 602 (6th Cir. 2004) ............................................................................3

*United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v.*
   *Philip Morris, Inc.*,
   223 F.3d 1271 (11th Cir. 2000) .........................................................................1

*Wallace v. Midwest Fin. & Mortg. Serv., Inc.*,
   714 F.3d 414 (6th Cir. 2013) ............................................................................3

*In re Welding Fume Prods. Liab. Litig.*,
   526 F. Supp. 2d 775 (N.D. Ohio 2007) ...........................................................20

*White v. Smith & Wesson*,
   97 F. Supp. 2d 816 (N.D. Ohio 2000) ..............................................................18

*Wilhite v. Howmedica Osteonics Corp.*,
   833 F. Supp. 2d 753 (N.D. Ohio 2011) ..............................................................4

## STATE CASES

*Abrams v. Worthington*,
   861 N.E.2d 920 (Ohio App. 2006) ...................................................................10

*Brown v. Cnty. Comm'rs of Scioto Cnty.*,
   622 N.E.2d 1153 (Ohio Ct. App. 1993)............................................................16

*Caterpillar Fin. Servs. Corp. v. Harold Tatman & Son's Enters.*,
   50 N.E.3d 955 (Ohio Ct. App. 2015) ...............................................................17

*Chambers v. St. Mary's Sch.*,
   697 N.E.2d 198 (Ohio 1998) ...........................................................................12

*City of Cincinnati v. Beretta U.S.A. Corp.*,
   768 N.E.2d 1136 (Ohio 2002) ..........................................................9, 10, 11, 15

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
   2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ..........................................11

*Johnson v. Microsoft Corp.*,
   834 N.E.2d 791 (Ohio 2005) ......................................................................17, 18

*Menifee v. Ohio Welding Prods., Inc.*,
   472 N.E.2d 707 (Ohio 1984) ...........................................................................10

*In re Opioid Litig.*,
   2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018) ...........................................11

*In re Opioid Litig.*,
  Order, Index No. 400000/2017,  NYSCEF Doc. No. 468
  (N.Y. Sup. Ct. July 17, 2018) ............................................................................11

*Ornella v. Robertson*,
  237 N.E.2d 140 (Ohio 1968) ...............................................................................12

*RWP, Inc. v. Fabrizi Trucking & Paving Co.*,
  2006 WL 2777159 (Ohio Ct. App. Sept. 28, 2006)............................................17

*State ex rel. Schoener v. Bd. of Comm'rs of Hamilton Cnty.*,
  619 N.E.2d 2 (Ohio Ct. App. 1992) ...................................................................16

*Simpson v. Big Bear Stores Co.*,
  652 N.E.2d 702 (Ohio 1995) ...............................................................................10

*Three-C Body Shops, Inc. v. Nationwide Mut. Fire Ins.*,
  2017 WL 1407304 (Ohio Ct. App. Apr. 20, 2017)............................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 8(a)..........................................................................................................6

Fed. R. Civ. P. 9(b)...................................................................................................6, 20

## I.     THE DERIVATIVE INJURY RULE BARS THE FUNDS' CLAIMS.

The Opposition makes clear that the Funds seek to recover "payments [made] for opioid-related treatments, hospitalizations, and illnesses" incurred by their members. Opp. 4. The Funds concede that they would not have incurred such medical expenses (other than the purchase of opioids themselves) unless one of its "enrollees first became addicted to or overdosed on opioids." *Id*. at 20. Under settled law, those purely derivative claims are barred.

Distributors' opening brief ("Br.") cited myriad cases—dating as far back as 1846—holding that "a ***health-care provider has no direct cause of action in tort against one who injures the provider's beneficiary, imposing increased costs upon the provider***."[1] Thus, "[f]or more than 100 years state and federal courts have adhered to the principle (under both state and federal law) that the victim of a tort is the proper plaintiff, and that insurers or other ***third-party providers of assistance and medical care to the victim may recover only to the extent their contracts subrogate them to the victim's rights***."[2] Plaintiffs make no meaningful effort to distinguish those authorities. The Funds are third-party payors of medical expenses; they seek to recover the increased costs of care they allegedly incurred as a result of Distributors' wrongdoing; accordingly, the Funds' members, and not the Funds, are the proper plaintiffs to assert those claims. *See* Br. 3–6; *see also Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349 (2d Cir. 2003) (claims by third-party payors for expenses incurred due to their members' "health injuries" are "entirely derivative").

---

[1]    *United Food & Commercial Workers Unions, Emp'rs Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 (11th Cir. 2000) (citing *Anthony v. Slaid*, 52 Mass. 290, 290–91 (1846)); *see* Br. 4–6. Unless otherwise stated, all emphasis in quotations herein has been added and internal quotation marks and citations omitted.

[2]    *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 822 (7th Cir. 1999) (collecting cases).

The Opposition asserts that the Funds have also pled "direct" injury in the form of "payments for prescription opioids." Opp. 3. But that argument is belied by the Complaint, which forthrightly acknowledges that Plaintiffs "*indirectly* purchased, paid, and reimbursed for opioids intended for consumption by its covered participants." Compl. ¶¶ 28–29. The Funds' payments for opioid medications—every bit as much as their payments for other medicines and medical treatments—were made on behalf of their member patients, and thus are derivative.

The Funds also argue that the tobacco cases cited in Distributors' opening brief are distinguishable because opioid-related conditions such as overdoses "manifest themselves" more quickly than smoking-related conditions. Opp. 7. But they offer no explanation as to why that alleged fact is relevant or makes the Funds' claim to recover costs of treating opioid users any less derivative than claims to recover the costs of treating smokers—nor could they.

## II.     THE RICO AND OCPA CLAIMS SHOULD BE DISMISSED.

### A.     The Funds Fail To Allege a Direct Injury.

The Opposition argues that the Funds suffered two categories of injury:  (1) "injury in the form of payments for opioid-related treatments, hospitalizations, and illnesses," and (2) injury in the form of "payments for prescription opioids that would not have been paid absent [Defendants' alleged] fraud." Opp. 3–4. Neither injury is sufficiently direct for purposes of RICO and the OCPA.[3]

***Medical Expenses.***  The Funds seek to recover "(1) payments for hospital and/or urgent care emergency department visits and other treatment for opioid misuse, addiction, and/or overdose; (2) payments for emergency department visits for infections related to opioid misuse,

---

[3]   For the reasons explained in Distributors' *Summit County* reply, RICO's direct injury requirement applies with full force to the Funds' OCPA claim. *See* Summit Reply, Dkt. 744 at Part I.B.2.

addiction,  and/or  overdose;  (3)  payments  for  hospitalizations  related  to  the  misuse,  addiction,  and/or overdose of opioids;  (4) payments for medicines  to treat HIV, hepatitis C, and other issues related to opioid  misuse, addiction,  and/or overdose; and (5) payments for opioid  overdose reversal medication."  Opp. 20.  In addition to being derivative, *see supra* Part I, the Funds' RICO claim to recover those medical expenses should be dismissed on remoteness grounds.

Distributors'  opening  brief  cited  numerous  cases rejecting  RICO claims by third-party payors as too remote and indirect to state a claim.  Br. 7–8. The Funds make no meaningful  effort to distinguish  those cases.  Indeed, they acknowledge  that "other circuits have limited  health care providers'  right to recover for their members'  health care costs," but invite  this Court to depart from the unanimous  consensus  of at least eight courts of appeals because, they claim, "the Sixth Circuit  has not done so."  Opp. at 7 n.8.  The Sixth Circuit,  however, expressly "agree[d] with the essential  holdings  of th[os]e other circuits,"  rejecting  claims by third-party payors seeking  to recover costs of health-related expenses as "too remote."  *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003) (collecting  cases from eight courts of appeals).  The Court therefore should decline the Funds' invitation.

Moreover,  for  the  reasons  explained  in  Distributors'  *West Boca Hospital*  and *Summit County*  replies,  the Funds'  reliance on *Trollinger v. Tyson Foods, Inc.*,  370 F.3d 602 (6th Cir. 2004) and *Wallace v. Midwest Financial & Mortgage Services, Inc.*, 714 F.3d 414 (6th Cir. 2013), as well as the assertion  that their purported injuries  were the foreseeable result of Distributors' alleged conduct, are unavailing.  *See* West Boca Reply, Dkt. 887 at Part II.A; Summit  Reply, Dkt. 744 at Part I.B.1.

***Opioid Purchases.***  The Opposition  asserts, without citation,  that the Complaint  "clearly pled recoverable and direct injuries  from payments for prescription opioids."  Opp. 3.  No such

allegations of direct payments, however, appear in the Complaint. To the contrary, what the Funds actually allege is that they "*indirectly* purchased, paid, and reimbursed for opioids intended for consumption by its covered participants." Compl. ¶¶ 28–29. The Court therefore should reject the Funds' attempt to "amend their complaint by means of the argument in their opposition." *Wilhite v. Howmedica Osteonics Corp.*, 833 F. Supp. 2d 753, 762 (N.D. Ohio 2011).

Even if pled, the Funds' theory would be unavailing *as to Distributors*. The crux of the Opposition's argument is that "*Manufacturer Defendants* deliberately misled Plaintiffs and their agents through unsubstantiated and blatantly untrue claims regarding the safety, superiority, and efficacy of the opioids they pushed Plaintiffs to include (and prefer) on their formularies."[4] Tellingly, however, neither the Opposition nor the Complaint asserts that Distributors made any misrepresentations—either to the Funds or anyone else—regarding the safety, efficacy, or addictive properties of opioid medications. Nor could they.[5]

For this fundamental reason, virtually all of the case law relied on by the Funds is inapposite *as to Distributors*. Each of the cited cases concerned allegations that pharmaceutical

---

[4]   Opp. 8; *see also id.* at 4–5 (bullet-point list of alleged misrepresentations made by manufacturers); *id.* at 10 ("Manufacturing Defendants presented these claims as scientifically sound using numerous traditional industry channels to disseminate their false messaging."); *id. at* 12 ("Marketing Defendants *directly targeted* Plaintiffs, who acted in reliance on these representations by giving prescription opioids preferred status on their formularies and agreeing to pay for them.") (emphasis in original); *id.* at 16 ("Plaintiffs specifically allege that the Manufacturer Defendants misled prescribers by misrepresenting the risks and benefits of their opioids .... Physicians' decisions to prescribe opioids were thus not independent of Defendants' wrongdoing; the decisions to prescribe Defendants' products were not only necessarily linked but the intended, actual, and entirely foreseeable *result* of the Manufacturer Defendants' fraudulent conduct") (emphasis in original); *id.* at 20 ("Manufacturer Defendants … made direct misrepresentations and omissions to Plaintiffs' TPAs for the purpose of securing preferred status on Plaintiffs' formularies").

[5]   The Funds suggest that Distributors' alleged regulatory reporting failures misled the Funds as to the extent of opioid diversion. *See, e.g.*, Opp. 5. That makes no sense. Distributors' suspicious order reporting obligations run to the DEA, not the Funds, and the contents of Distributors' reports to DEA are non-public and confidential.

manufacturers made misrepresentations regarding their products, resulting in more prescriptions being written for the drugs than otherwise would have been the case. In *Desiano*, for example, the Second Circuit held (under New Jersey law) that third-party payors could assert claims against drug manufacturers where the payors alleged that they "would not have bought [manufacturers'] product, rather than available cheaper alternatives, had they not been misled by [the manufacturers'] misrepresentations" regarding the safety of a diabetes medication. 326 F.3d at 349; *accord In re Neurontin Mktg. & Sales Practices Litig.*, 712 F.3d 21, 39 (1st Cir. 2013) (manufacturers' fraudulent marketing caused doctors to write prescriptions they would not have otherwise written); *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 636 (3d Cir. 2015) (same). Whatever the significance of these cases as to the Funds' claims against Manufacturers, they are irrelevant to their claim against Distributors, who are not alleged to have caused doctors to over-prescribe opioid medicines.

As the court explained in *Avandia*, where "the conduct ***directly*** causing the harm [i]s distinct from the actions that gave rise to the fraud," proximate causation is lacking. 804 F.3d at 642; *see also Sidney Hillman Health Ctr. v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (holding "that improper representations made to physicians do not support a RICO claim by Payors, several levels removed in the causal sequence"). For present purposes, the purported harm is the Funds' purchase of more opioid medications than they otherwise would have bought. Distributors' alleged fraud, by contrast, consists of "conceal[ing] evidence of diversion" and "circumvent[ing] their obligations to monitor, report, and prevent that diversion." Opp. 5. The Opposition, however, offers no cogent explanation of how Distributors' alleged failures to halt or report suspicious orders ***directly*** caused the Funds to pay for inappropriate opioid prescriptions. To the contrary, the Opposition argues that the conduct that ***directly*** caused the over-prescription

of opioids  (for which the Funds purportedly  paid) was the "Manufacturer Defendants' aggressive  and deceptive  marketing of their drugs." Opp. 17.[6]

**B.      The Funds Fail To Allege an Injury to Business or Property.**

For substantially  the reasons explained  in Distributors'  *West Boca Hospital* reply,  the  Funds have failed  to allege  an injury  to business  or property.  *See* West Boca Reply, Dkt. 887 at  Part II.B.

**C.      The Funds Fail To Allege Predicate Acts or an Enterprise.**

The  Opposition  asserts that  the Funds  "allege[d]  with specificity  the Supply  Chain  Defendants'  use of the mail and wires to carry out their illegal  scheme." Opp. 28 (citing Compl.  ¶ 889).  The only  paragraph  of the Complaint  the Funds cite, however,  is anything  but specific,  alleging  predicate  acts such as use of the mails  and wires to "transmit[], deliver[]  or ship[] …  documents and things, including  electronic  communications."  Compl. ¶ 889.  Notably absent from  the Complaint  are any  specific  allegations  relating  to even  (1) a single  pharmacy  order that  Distributors  filled  in Ohio or (2) a single  fraudulent  statement  made by Distributors  to regulators  or anyone else.  The Fund's allegations  thus fail to satisfy Rule 8(a), let alone the heightened  pleading  requirement  applicable  under Rule 9(b).

The  Opposition  also  asserts that  "Distributors[]  disseminated  false  and misleading  statements  to state and federal regulators  in order to maintain  the flow of opioids  through high  production  quotas."  Opp. 28; *see id.* at 26.  But the Funds' quota-related allegations  are wholly  conclusory.  Moreover,  the Funds do not dispute that the quotas are set by DEA upon submission

---

[6]   The Funds suggest that Distributors' alleged conduct in failing  to prevent diversion contributed  to the overall opioid  epidemic.  Even if that were true (it is not), it does nothing  to establish  that Distributors'  conduct was a *direct* cause of the Funds' purported  purchases of opioid  medicines.

of applications by manufacturers, not wholesale distributors. *Id.* at 26.[7]  In any event, any purported efforts on the part of Distributors to influence DEA's quota determinations cannot give rise to a RICO claim under the *Noerr-Pennington* doctrine. *See, e.g.*, *Singh v. NYCTL 2009-A Trust*, 683 F. App'x 76, 77 (2d Cir. 2017) (*Noerr-Pennington* "protects efforts to influence governmental action through litigation and lobbying"); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) (allegedly false statements made in course of petitioning activity cannot serve as RICO predicate acts of mail or wire fraud); *see also Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) ("first amendment right of petition" protects efforts to "influence the legislative, executive, or judicial branches of government or administrative agencies").

For these reasons, and the additional reasons given in the *West Boca Hospital* and *Summit County* replies, the Funds have failed to allege either predicate acts on the part of Distributors or an enterprise in which they participated. *See* West Boca Reply, Dkt. 887 at Part II.C; Summit Reply, Dkt. 744 at Part I.C, D.

## III.    THE NUISANCE CLAIMS SHOULD BE DISMISSED.

The Funds raise no new arguments, beyond what Summit County wrote in its Opposition, concerning the viability of a product-based public nuisance claim under the Ohio Product Liability

---

[7]    Contrary to the Funds' assertion (Opp. 26), the fact that Distributors play no role in the setting of DEA quotas is a regulatory fact that this Court may consider on a motion to dismiss. *See, e.g.*, *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Zantop Air Trans. Corp.*, 394 F.2d 36, 40 (6th Cir. 1968) ("Many cases have recognized that a Court may take judicial notice of the rules, regulations and orders of administrative agencies issued pursuant to their delegated authority."); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment."); *Ass'n Concerned Over Res. & Nature, Inc. v. Tenn. Aluminum Processors, Inc.*, 2011 WL 1357690, at *2 n.1 (M.D. Tenn. Apr. 11, 2011) ("In considering a motion to dismiss, a Court may 'consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.'" (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999))).

Act ("OPLA").  Thus, for the reasons stated in Distributors' *Summit County* reply, the Funds' public nuisance claim is barred.  *See* Summit Reply, Dkt. 744 at Part II.A.

The Funds also incorporate by reference Summit County's arguments regarding common-law public nuisance.  Thus, for the reasons stated in Distributors' *Summit County* reply, the Funds' claim fails to satisfy the common-law elements of public nuisance, including interference with a public right, control, and proximate cause.  *See, e.g.*, *id.* at Part II.B.

The Funds' only substantive response to Distributors' argument is their assertion that they have alleged a special injury and thus have standing to pursue a nuisance claim.  On this point, the Funds' argument is indistinguishable from West Boca Hospital's arguments.  For the reasons stated in Distributors' *West Boca Hospital* reply, the Funds lack standing to pursue a public nuisance claim based on injuries that are derivative of, and thus indistinct from, the alleged injuries to the public at large.  *See, e.g.*, West Boca Reply, Dkt. 887 at Part III.

## IV.  THE NEGLIGENCE CLAIM SHOULD BE DISMISSED.

The negligence claim fails for three reasons.  First, the claim is preempted by the OPLA.  Second, the Funds fail to identify any common-law duty that Distributors owed to them.  Third, there is no private right of action to enforce the statutes or regulations cited in the Complaint.  None of the Funds' contrary arguments has merit.

### A.  The OPLA Bars the Funds' Negligence Claim.

The Funds' common-law negligence claim is abrogated by the OPLA.  They argue that the claim does not fall within the "particular set of statutory product liability claims" that the OPLA abrogates because the Funds seek only economic damages.  Opp. 29.  But, as explained in Distributors' *Summit County* reply, this argument elevates form over substance and fails to salvage the Funds' negligence claims.  *See* Summit Reply, Dkt. 744 at Part III.A.

The additional cases the Opposition cites are inapposite. *Chapman v. Tristar Products, Inc.*, dealt with "pure" economic loss, not downstream damages derivative of personal injuries. 2017 WL 1433259, at *1 (N.D. Ohio Apr. 24, 2017) ("Plaintiffs forego claims for any class-wide claims for personal injury damages. Instead, Plaintiffs argue the [product's] defect makes the [product] worthless."). In *Traxler v. PPG Industries, Inc.*, 158 F. Supp. 3d 607, 628 (N.D. Ohio 2016), the Court declined to reach the issue of OPLA abrogation because the plaintiffs stated an alternate claim for relief under the Ohio Consumer Sales Practices Act. Finally, in *Hale v. Enerco Group, Inc.*, 2011 WL 49545, at *1 (N.D. Ohio Jan. 5, 2011), the alleged losses stemmed from damage to the product itself, a recognized exemption from abrogation by the Act with no relevance here. *See Meta v. Target Corp.*, 74 F. Supp. 3d 858, 862 (N.D. Ohio 2015) (distinguishing *Hale* and holding that claim for economic loss caused by a product was abrogated by the OPLA) (citing R.C. § 2307.71(A)(2)); *see also Mitchell v. Proctor & Gamble*, 2010 WL 728222, at *4 (S.D. Ohio Mar. 1, 2010) (Plaintiff seeking recovery for "treatments for food-borne illnesses, as well as the purchase price of the product" and "damages equal to the difference in the market value of the product actually received and the value it represented" could not "separate out his claims from the purview of the OPLA simply by claiming only economic losses. His claims … [were] products liability claims. And the injury he [was] alleged to have suffered relate[d] directly to that product.").

Ultimately, the Funds' position highlights what Distributors have said all along: ***These are the wrong plaintiffs***. Even assuming that Distributors caused injury by distributing opioids, then the injured users of those opioids are the proper parties. After *Beretta*, the General Assembly decided that such parties should proceed under the OPLA. To allow the Funds to bring a claim that those proper parties could not would frustrate that legislative judgment.

- 9 -

### B.      There Is No Common-Law Duty To Monitor and Report Suspicious Orders.

The Funds argue that Distributors owed a common-law duty to them because their alleged injuries were "foreseeable." Opp. 38–40. While it is true that, under Ohio law, there can be no duty without foreseeability, "foreseeability alone does not necessarily impose a duty to act." *Abrams v. Worthington*, 861 N.E.2d 920, 923 (Ohio Ct. App. 2006). As the Ohio Supreme Court has commented, if foreseeability were the only criterion, "there could conceivably be no limit to any … business owner's liability." *Simpson v. Big Bear Stores Co.*, 652 N.E.2d 702, 705 (Ohio 1995). "Even if an injury is foreseeable, a defendant has no duty to protect a plaintiff from or to control the conduct of a third person." *Abrams*, 861 N.E.2d at 923. "In such situations, a duty arises only if the defendant shares a 'special relation' with the plaintiff or the third person that justifies the imposition of the duty." *Id.* The Funds concede that they have no relationship with Distributors, let alone a "special" one that could give rise to a duty.

Second, even if foreseeability could create a common-law duty (it cannot), the Complaint's "foreseeability" allegations are wholly conclusory as to Distributors. The Funds plead no facts showing that an unreasonable risk of harm to anyone was the foreseeable result of supplying licensed pharmacies with medicines within DEA-established production quotas. *See* Summit Reply, Dkt. 744 at Part III.B; *see also Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984).

Third, the Funds' wholesale reliance on *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), is misplaced. *Beretta*, which was effectively overruled by the General Assembly and has been limited by numerous courts, is distinguishable for the reasons set forth in Distributors' *Summit County* reply. *See* Summit Reply, Dkt. 744 at Part II.A; *see also City of*

*Cleveland v. JP Morgan Chase Bank*, N.A., 2013 WL 1183332, at *6 (Ohio Ct. App. Mar. 21, 2013) (distinguishing *Beretta*).

The other cases cited by the Funds—which do not arise under Ohio law—likewise fail to save the negligence claim. Unlike here, *City of Everett v. Purdue Pharma L.P.* involved a drug manufacturer, as opposed to a distributor, who was alleged to have engaged in affirmative acts that created or exposed the plaintiff to a high degree of risk of harm. 2017 WL 4236062, at *4 (W.D. Wash. Sept 25, 2017). Similarly, *In re Opioid Litig.*, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018), addressed only the obligations of opioid **manufacturers**, holding that it was a "critical consideration" that **manufacturers** were in the best position to protect against the risk of harm because they "had knowledge of the actual risks and benefits of their products, including their addictive nature, which they did not disclose." *Id.* at *26.[8]

### C. There Is No Private Right of Action To Enforce the CSA.

The Opposition argues that the Funds are not trying privately to enforce Defendants' statutory and regulatory duties, but rather that the statutes and regulations the Complaint cites merely "inform the standard of care." Opp. 41–42. But that is not what the Complaint says. Br. 15; *see also, e.g.,* Compl. ¶¶ 475, 519, 884, 1064 (emphasizing violations of CSA). In any event, Ohio law does not permit enterprising plaintiffs to enforce federal statutes via "state law negligence per se claims" because doing so would "in essence permit[] a private cause of action where

---

[8] The same New York trial court later denied Distributors' motion to dismiss (without any substantive analysis) based on "the concerted efforts of all the defendants to market and promote their products for sale and distribution." Order, *In re Opioid Litig.*, Index No. 400000/2017, NYSCEF Doc. No. 468, at 14 (N.Y. Sup. Ct. July 17, 2018). Distributors disagree with that conclusion. The conclusion is also irrelevant here because the Funds' Complaint does not allege—and could not allege—any facts even remotely suggesting that Distributors took steps to market or promote opioids by making claims about their safety, efficacy, or addictive properties.

Congress intended none to lie." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*, 2015 WL 4092866, at *23–25 (S.D. Ohio July 6, 2015); *see Rogzinsky v. Danek Med., Inc.*, 1999 WL 33537323, at *1–2 (N.D. Ohio July 8, 1999) (rejecting negligence *per se* claim based on a violation of the Food, Drug and Cosmetics Act because there is no private right to enforce that statute); *Tekavec v. Van Waters & Rogers, Inc.*, 12 F. Supp. 2d 672, 682–83 (N.D. Ohio 1998) (similar); *see also* Summit Reply, Dkt. 744 at III.B.

The Funds counter that those decisions were wrongly decided—that the federal courts "improperly" contravened "a long line of Ohio authority holding that negligence *per se* can be based upon a violation of any statute that was intended to affect the duties owed for the safety and protection of others." Opp. 42. But none of the cases they cite supports imposition of negligence per se here. For example, in *Chambers v. St. Mary's Sch.*, the court **rejected** the assertion that regulatory violations can constitute negligence per se under Ohio law. *See* 697 N.E.2d 198, 202–03 (Ohio 1998). Similarly, in *Ornella v. Robertson*, the court held that violation of state traffic laws can support a negligence per se claim, but only if the conduct in question "proximately results in injury to one **to whom a legal duty is owed**." 237 N.E.2d 140, 143 (Ohio 1968). Here, Distributors' alleged duty to report and halt suspicious opioid orders runs to DEA, not to the Funds, and thus their purported regulatory violations cannot give rise to a negligence per se claim by the Funds.

## V. THE FUNDS' CLAIMS FAIL FOR ADDITIONAL REASONS.

### A. The Funds Fail To Plead Causation.

The Complaint fails to plead proximate cause, and the Opposition does not explain away or excuse that failure. First, the Funds' explanation of their injury—that Manufacturers' allegedly deceptive marketing campaign created a new standard of care for prescribing opioid medications, with the result that doctors prescribed the medications for too many patients for too long, in doses

- 12 -

that were too high, Opp. 11—is inconsistent with the claim that Distributors proximately caused that injury. If doctors were themselves the victims of deceptive marketing, then they mis-prescribed or over-prescribed the medications in good faith, and pharmacies cannot be faulted for filling the prescriptions or Distributors for supplying the pharmacies—or, for that matter, the DEA, for raising the annual production quotas for the medications. Thus, although the Funds affect incredulity at the argument that Distributors cannot be said to have proximately caused their injury by supplying pharmacies that were filling good-faith prescriptions, Opp. 16–17 n.12, that argument follows logically from the Funds' theory of Manufacturers' liability.

Second, the Funds contend that, if "Distributor Defendants fulfilled their duty to put appropriate systems in place," then "the pharmacies would not have had access to an excessive supply of opioids to continue pumping into the community." *Id.* But there was nothing "excessive" about the supply if, as the Funds allege, it met the apparently legitimate medical need as reflected by doctors' good-faith (albeit allegedly misguided) prescriptions. The DEA, after all, authorized the available supply because it understood the increased level of prescriptions to reflect legitimate medical need. In addition, the Funds suggest that, had Distributors not filled suspicious orders, the Funds' members may have still received, ***but would not have filled***, some prescriptions. Opp. 16–17 n.12. Nonsense. This assertion would mean that, although the DEA consistently raised the annual production quotas for opioids because it determined there was a legitimate medical need for the drugs, Distributors should have second-guessed the DEA (and doctors) and withheld the drugs from pharmacies—and, thus, both from patients who had a legitimate need for them, and those who may not have. This problem aside, the Funds' argument assumes that, if McKesson, Cardinal Health, and AmerisourceBergen—the only distributors sued—did not supply pharmacies, none of the other scores of distributors would do so. And the argument assumes that

Fund members with opioid prescriptions from their doctors would throw up their hands and say, "Oh well, never mind," if their corner pharmacy could not fill the prescription.

Third, the Funds complain about an excessive supply to the community, *id.*, but they do not represent "the community" into which Distributors allegedly "pumped" opioids, and they are not entitled to recover for harm to "the community." To the extent the Funds incurred increased costs, it was because they paid for the opioid prescriptions of a Fund member. The Funds have failed to identify any such member or plausibly to allege how a Distributor's refusal to supply this or that pharmacy, or to report this or that pharmacy order as suspicious, would have prevented the member from having his or her prescription filled.

Fourth, the Funds' argument that Distributors caused their injury by influencing Pharmacy Benefit Managers (PBMs) and doctors is likewise misplaced. The Funds assert that doctors over-prescribed opioids and PBMs paid for the prescriptions because of fraud. *See* Opp. 14 (citing *N.J. Carpenters Health Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 324 (D.N.J. 1998)). But it was Manufacturers, not Distributors, that carried out the allegedly deceptive marketing campaign. About Distributors, the Funds say only that their alleged "conduct in ignoring and suppressing evidence of diversion" affected the decisions of PBMs and doctors. Opp. 14. But the Funds do not explain how. Distributors' suspicious order reports are not public, after all. They are made to the DEA, which treats them as confidential. PBMs and doctors are in no position to rely on the making, or failure to make, such reports. Because the Funds have failed plausibly to plead that Distributors' conduct had any causal effect on doctors' decisions, Distributors cannot have caused the prescriptions from which the Funds claim harm.

Finally, the Funds allege that Distributors caused their injury by over-supplying pharmacies, thereby giving rise to an illicit secondary market. Opp. 17–18. This is just another

way of saying that Distributors supplied the good-faith orders by pharmacies necessary to fill doctors' good-faith prescriptions.  The secondary market arose, not because of anything Distributors did, but because patients with prescriptions sold or gave away their pills or were not careful to keep them away from family and friends.  And, insofar as the Funds complain that they were injured by paying for unnecessary prescriptions, the secondary market is irrelevant.  The Funds paid for prescriptions that doctors wrote and pharmacies filled, not for opioids purchased illegally in the secondary market.  Insofar as the Funds complain that they incurred medical costs for the addiction of their members, the secondary market is relevant only to the extent that members participated in it, i.e., purchased or used opioids illegally.  Such activity breaks the chain of causation.  *Beretta* thus is nothing like this case because the city in *Beretta* claimed damages on behalf of the public, not participants in the illegal, secondary market.  Moreover, just as in *City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, it is "impossible to ascertain" how many of the Funds' members would have made the independent decision to abuse opioids had the Distributors done things differently.  615 F.3d 496, 505 (6th Cir. 2010).  The Funds, therefore, have not pled causation adequately.

Given these pervasive failures adequately to allege proximate cause, the Court should dismiss the Funds' claims.  *See id.* at 503 (while causation is typically a jury question, "there is no per se rule against dismissing a complaint for failure to adequately plead proximate cause").

### B.  The Economic Loss Doctrine Bars the Funds' Claims.

The Funds argue that the economic loss doctrine does not bar their nuisance and negligence claims because the doctrine applies only to tort claims based on contractual duties, between parties in privity.  Opp. 43–44.  But, as explained in Distributors' *Summit County* reply, there are two lines of economic loss doctrine decisions under Ohio law.  Summit Reply, Dkt. 744 at Part V.  The second line—and the one relevant here—applies the economic loss doctrine to "bar [] tort plaintiffs

from recovering purely economic loss that 'do[es] not arise from tangible physical injury' to persons or property." *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (quoting *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 653 N.E.2d 661, 667 (Ohio 1995)).  The rationale is that "tort law does not impose an independent duty to avoid consequential economic damages." *Id.*  In *Deutsche Bank*, the plaintiff local government asserted a negligence claim and sought solely damages for economic loss.  There, as here, the plaintiff had no contractual relationship with the defendants.  The Sixth Circuit held that the economic loss doctrine barred the negligence claim.  Under *Deutsche Bank*'s controlling authority, the Funds' negligence claim is barred.

The Opposition implicitly concedes this, attempting to distinguish *Deutsche Bank* only in the context of the Funds' nuisance claim.  The Opposition argues that the Complaint asserts claims of "absolute nuisance," rather than qualified public nuisance, based on Defendants' "intentional" nuisance-creating conduct, and that the *Deutsche Bank*'s line of decisions "does not apply to intentional torts."  Opp. 44.  Under Ohio law, however, drug distributors cannot be liable under an absolute nuisance theory so long as they are duly licensed.  *Brown v. Cnty. Comm'rs of Scioto Cnty.*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993); *State ex rel. Schoener v. Bd. of Comm'rs of Hamilton Cnty.*, 619 N.E.2d 2, 6 (Ohio Ct. App. 1992); *see also* Summit Reply, Dkt. 744 at Part II.B.2.  Moreover, even absolute nuisance clams are barred if they allege only economic damages and not "injury to [the plaintiff's] property." *RWP, Inc. v. Fabrizi Trucking & Paving Co.*, 2006 WL 2777159, at *4 (Ohio Ct. App. Sept. 28, 2006).  Accordingly, under *Deutsche Bank* and its progeny, the economic loss doctrine bars the Funds' negligence and nuisance claims.

## VI.  THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

Plaintiffs do not dispute the absence of any economic relationship between themselves and Distributors—a tacit admission that is fatal to their unjust enrichment claim. *Caterpillar Fin.*

*Servs. Corp. v. Harold Tatman & Son's Enters.*, 50 N.E.3d 955, 967 (Ohio Ct. App. 2015) ("The Ohio Supreme Court has held that in order for a plaintiff to confer a benefit on a defendant, an economic transaction must exist between the parties." (citing *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005))); *accord Ohio Edison Co. v. Direct Energy Bus., LLC*, 2017 WL 3174347, at *3 (N.D. Ohio July 26, 2017) ("To show that a plaintiff conferred a benefit upon a defendant, an economic transaction must exist between the parties.").

Plaintiffs misstate the law when they argue that *Johnson* and its progeny are confined to "indirect purchaser" cases. Opp. 49–50. None of the decisions suggests such a limitation and, indeed, a number of the cases cited by Distributors do not involve indirect purchasers. For example, the plaintiff in *Ohio Edison*, like the Funds here, argued that it paid millions of dollars in service charges that "should have been charged to [the defendant]," and thus had "conferred a benefit upon [the defendant] by paying for [the defendant's] … costs." 2017 WL 3174347, at *1, 3. The court rejected that argument, concluding that the plaintiff "allege[d] no facts and provide[d] no argument to support the idea that [its predecessor in interest] ***sent any money to*** [the defendant]" and thus failed to demonstrate the necessary "***transactional nexus***" between itself and the defendant. *Id.*[9] The same conclusion applies equally to the Funds' claim that they "conferred a benefit upon Defendants by paying for Defendants' … costs." Compl. ¶ 1136.[10]

---

[9]     Similarly, in *Three-C Body Shops, Inc. v. Nationwide Mutual Fire Insurance*, the plaintiff alleged that it conferred a benefit on defendant Nationwide by performing Nationwide's obligation to repair a customer's car. 2017 WL 1407304, at *6 (Ohio Ct. App. Apr. 20, 2017). The Ohio Court of Appeals dismissed the unjust enrichment claim, holding that the plaintiff had "conferred a benefit only on its customer," not Nationwide, and the "connection between [plaintiff] and Nationwide [was] too indirect to constitute a 'benefit conferred' for purposes of a common law claim of unjust enrichment." *Id.* (quoting and citing *Johnson*, 834 N.E.2d at 799).

[10]     Plaintiffs misread *Randleman v. Fidelity Nat'l Title Ins. Co.*, 465 F. Supp. 2d 812 (N.D. Ohio 2006), when they contend that the court there allowed an "indirect payor" to assert an unjust

Plaintiffs' reliance on *White v. Smith & Wesson*, 97 F. Supp. 2d 816, 829 (N.D. Ohio 2000) is misplaced. That case—whose unjust enrichment analysis has never been cited by an Ohio court—was decided five years before the Ohio Supreme Court held in *Johnson* that an economic transaction must exist between the parties to establish a claim of unjust enrichment. 834 N.E.2d at 799. Even if *White* had not been overtaken by *Johnson* and its progeny, the reasoning of *White* is fatally flawed on its own terms: for the reasons stated in Distributors' *City of Chicago* briefs, being "forced to pay for [a defendant's] externalities" does "not fit within an unjust enrichment framework," *City of Miami v. Citigroup Inc.*, 801 F.3d 1268, 1274 (11th Cir. 2015); *see* Chicago Br., Dkt. 571-1 at Part V; Chicago Reply, Dkt. 817 at Part V.[11]

The remaining cases cited by Plaintiffs are likewise inapposite. For instance, *Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.* merely holds that a party may recover restitutionary-type relief for damage to its property where determining actual damages is not feasible—a scenario that has no application here.[12] Similarly, *Moore v. Texaco, Inc.* noted that

---

enrichment claim. Opp. 50. In fact, unlike the Funds here, the plaintiffs in *Randleman* "alleged that they engaged in an economic transaction with the defendant." *Randleman*, 465 F. Supp. 2d at 825. And as Ohio courts have explained, "[t]he plaintiffs [in *Randleman*] maintained that though they did not transact directly with the defendant, they were actually the defendant's direct customers …. [I]n that scenario, a sufficient 'transactional nexus' existed between the plaintiffs and the defendant, such that the plaintiffs conferred a benefit directly on the defendant." *Ohio Edison*, 2017 WL 3174347, at *3 (quoting *Randleman*, 465 F. Supp. 2d at 825).

[11] *See also Int'l Bhd. of Teamsters, Local 734 Health & Welfare Fund v. Philip Morris, Inc.*, 196 F.3d 818 (7th Cir. 1999) ("no rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs"). Plaintiffs attempt to distinguish *Local 734* on grounds that defendants in that case "had not made direct misrepresentations to the plaintiffs or their agents." Opp. 52 n.33. But that is no distinction at all **as to Distributors**. Unlike Manufacturers, Distributors are not alleged to have made any misrepresentations to the Funds regarding the efficacy or addictive properties of opioid medications. *See, e.g.*, Compl. ¶¶ 682–760 (describing Manufacturer Defendants' alleged misrepresentations).

[12] *See* 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015) ("A Plaintiff whose property has been used as a dumping site may plead unjust enrichment as an alternative theory of damages in the chance

"performance of another's statutory duty to remediate pollution can give rise to a claim for unjust enrichment," but that is irrelevant here because the Funds did not allegedly perform any statutory duty of Distributors.[13]

Finally, Plaintiffs cannot salvage their unjust enrichment claim by purporting to predicate it on "intentional misrepresentations" made to the Funds and their "agents." Opp. 51. The Funds do not allege that *Distributors* made any such misrepresentations, nor could they. *See id.* (citing Compl. ¶¶ 693–709 (alleging that "each *Marketing Defendant*, through its various enterprises, targeted Plaintiffs")).

## VII.   THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

The Funds' civil conspiracy claim fails for the reasons given in Distributors' *Summit County* brief, and the Pharmacy Defendants' *Summit County* reply brief. Summit Br., Dkt. 491-1 at Part VI; Pharmacy Summit Reply Br., Dkt. 742 at Part VII.

In short, Plaintiffs' allegations of conspiracy amount to bare assertions that Distributors were members of the same industry, Compl. ¶ 786, and participated in trade associations, *id.* ¶ 788. None of that conduct remotely suggests a conspiratorial agreement.[14] The Funds also assert that "Defendants shared a common design to … increase the quotas that governed the manufacture and

---

that the plaintiff is unable to establish actual damages because such a determination may be too difficult.").

[13]  244 F.3d 1229, 1233 (10th Cir. 2001) (rejecting unjust enrichment claim because the plaintiff "failed to show that" the defendant had "any responsibility for cleaning up the pollution on the property").

[14]  *In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775, 805 (N.D. Ohio 2007) ("[C]ircumstances that are just as consistent with a lawful purpose as with an unlawful undertaking are insufficient to establish a conspiracy, and it is certainly lawful to associate with other industry participants in trade organizations."); *In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607, at *16 (D.N.J. Oct. 3, 2006) ("The mere allegations that the Defendants did business with one another or contracted together does not suffice to establish the existence of an enterprise.").

supply of opioids."  Opp. 53.  But that assertion is wholly conclusory and implausible ***as to Distributors***, who play no role in the quota-setting process.  *See supra* note 7 and accompanying text.

Moreover, civil conspiracy is an "intentional tort" and thus cannot be "grounded solely on a claim of negligen[ce]."  *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 622 (6th Cir. 1999); *see also* Summit Br., Dkt. 491-1 at Part VI.  Accordingly, the only causes of action asserted by Plaintiffs that could even potentially support a claim of conspiracy sound in fraud and thus must pled with particularity.  *See* Fed. R. Civ. P. 9(b).  For the reasons given above, Plaintiffs have failed to meet that standard.  *See supra* Part II.

Dated: September 10, 2018

Respectfully submitted,

/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation
and AmerisourceBergen Drug Corporation*

/s/ Geoffrey E. Hobart
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Tel: (202) 662-6000
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Local Rule 7.1(f), I hereby certify that this Court has ordered that length limitations applicable to complex cases apply to this matter, ECF No. 232 (No. 1:17-MD-2804), and that this memorandum adheres to the page limitations for complex cases set forth in Local Rule 7.1(f).

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart