UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45459,<br><br>and<br><br>*The Blackfeet Tribe of The Blackfeet Indian Reservation v. AmerisourceBergen Drug Corporation, et al.*<br>Case No. 1:18-op-45749. | MDL No. 2804<br><br>Master Docket No.:<br>1:17-MD-02804-DAP<br><br>Hon. Dan Aaron Polster |

**BRIEF *AMICI CURIAE* OF 448 FEDERALLY RECOGNIZED TRIBES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS TRIBAL CLAIMS**

## TABLE OF CONTENTS

INTERESTS OF *AMICI* .................................................................................................1

INTRODUCTION AND SUMMARY ...........................................................................2

ARGUMENT ...................................................................................................................3

    I.  The Unique Standing of Indian Tribal Nations in the Opioid Litigation ........................3

        A.  Sovereign Indian Tribes in the United States.................................................3

        B.  Historical, Legal, and Political Context ........................................................5

            1.  A History of Violence and Dispossession, Strength and Resilience ..................6

            2.  Modern Tribal Self-Determination and Self-Governance ....................................9

            3.  Tribal Jurisdictional Authority and Ongoing Challenges to Tribal Self-Government..........................................................................................................13

    II.  The Devastating Impacts of the Opioid Crisis on Tribal Communities and Tribal Governmental Functions .......................................................................16

        A.  Health Care ......................................................................................................20

        B.  Public Safety and Tribal Justice Systems ..................................................27

        C.  Housing ...........................................................................................................31

        D.  Economic Development and Governmental Revenue ..............................34

        E.  Social Services, Child Welfare, and Elder Care.........................................37

        F.  Tribal Identity .................................................................................................42

    III.  Remedying the Damages and Changing the Trajectory of the Opioid Crisis in Indian Country..................................................................................44

        A.  Implementation of Solutions Must Be Driven by Tribal Sovereignty and Self-Determination—Not by the Interests of States or Other Governments .............................................................................44

        B.  Existing and Emerging Models for Addressing the Opioid Crisis in Indian Country..........................................................................................47

            1.  Integrated Treatment: The Didgʷálič Model..................................................47

2.  CHAP and Telehealth for Remote Communities.................................................49

3.  Wellness Courts and Other Alternative, Culturally
    Appropriate Justice Models ....................................................................50

4.  Culturally Grounded Community Prevention: The Healing of the Canoe ..........52

C.  Resources Are Needed to Address Barriers to Treatment and Implement
    Holistic Solutions..................................................................................52

D.  Acknowledgement and Apology is Necessary to Promote
    Community Healing................................................................................58

CONCLUSION........................................................................................................59

| GLOSSARY OF ABBREVIATIONS AND ACRONYMS USED | |
|---|---|
| ADAI | Alcohol and Drug Abuse Institute |
| BHA | Behavioral Health Aide |
| BIA | Bureau of Indian Affairs |
| CDC | Centers for Disease Control and Prevention |
| CDP | Chemical Dependency Professional |
| CHAP | Community Health Aide Program |
| FEMA | Federal Emergency Management Agency |
| FWC | Family Wellness Court |
| HUD | Department of Housing and Urban Development |
| ICWA | Indian Child Welfare Act, 25 U.S.C. §§ 1901-1963 |
| IHA | Indian Housing Authorities |
| IHCIA | Indian Health Care Improvement Act, 25 U.S.C. §§ 1601-1685 |
| IHS | Indian Health Service |
| IRA | Indian Reorganization Act, 48 Pub. L. No. 73-383, Stat. 984–88 (1934) (codified as amended at 25 U.S.C. §§ 461–479) |
| ISDEAA | Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 5301–5399 |
| MAT | Medication Assisted Treatment |
| NAGPRA | Native American Graves Protection and Repatriation Act, Pub. L. 101-601, 104 Stat. 3048, codified at 25 U.S.C. §§ 3001-3013 |
| NAHASDA | Native American Housing and Self-Determination Act, 25 U.S.C. §§ 4101-4243 |
| NAS | Neonatal Abstinence Syndrome |
| OUD | Opioid Use Disorder |
| PRC | Purchased/Referred Care |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SCIA | Senate Committee on Indian Affairs |
| WONDER | Wide-ranging OnLine Data for Epidemiologic Research |

## INTERESTS OF *AMICI*

*Amici* include American Indian and Alaska Native Tribes, inter-tribal organizations representing Tribes and tribal interests, and tribal organizations designated by tribal governments to carry out health care and other governmental functions.  In total, 448 individual, federally recognized Tribes are represented herein, either under their own names or through their membership in *amici* tribal organizations.  All tribal *amici* are identified in Appendix A to this brief.  Each *amicus* has submitted a short statement of interest, all of which are attached as Appendix B to this brief.

The opioid crisis has shattered communities throughout the United States, as evidenced by the size and scope of this multidistrict litigation.  Tribes have a strong, independent interest in this litigation and appreciate the opportunity to submit this *amicus* brief.  Tribes are unique sovereign governments that retained their preexisting sovereignty through the founding of the Republic.  They are not subsumed within, nor are they political subdivisions of, any State or of the United States federal government, with which Tribes have historically complex relationships. As independent sovereigns and plaintiffs in this litigation, Tribes share in the common goal of abating a nationwide nuisance and public health crisis that has disproportionately affected their populations and strained their governmental resources to the breaking point.  The unique standing that Tribes bring to this litigation will contribute to a better resolution for American Indian and Alaska Native people across the Country, and for all plaintiffs and community partners, if their sovereignty and self-determination are respected and reflected in the process.

## INTRODUCTION AND SUMMARY

The Tribes' claims in this litigation are tragic and stunning. By every measure, Tribes and their populations have been more gravely impacted on a proportionate basis than any other segment of America. According to the Centers for Disease Control and Prevention, American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of deaths over time from 1999-2015 among all racial and ethnic groups.[1] In some areas, the American Indian and Alaska Native mortality rate due to opioids runs six times that of non-Hispanic whites.[2] This impact comes on top of two centuries of abuse that, until recent decades, largely sought to annihilate the very existence of the Tribes, not just figuratively but literally—to kill them off by war, privation, and starvation. The ongoing legacy of this not-so-distant past makes resolution of the opioid crisis in Indian Country all the more complicated. Further adding to the costly challenge is the extreme remoteness of many Tribes, who reside in some of the least populous and most inaccessible corners of rural America. Any fair resolution of tribal claims in this litigation must account for these conditions, which are far from mere marginal considerations.

Equally imperative is that Tribes have their own "seat at the table" in the resolution of this massive litigation. Tribal interests are not represented by the States, which the Supreme Court once described as the Tribes' "deadliest enemies."[3] Even today, States are often staunchly opposed to tribal interests and hostile to Tribes' independent sovereignty, particularly in the contexts of litigation and resource distribution. In the upcoming term of the Supreme Court, for

---

[1] Karin A. Mack et al., *Illicit Drug Use, Illicit Drug Use Disorders, and Drug Overdose Deaths in Metropolitan and Nonmetropolitan Areas – United States*, CDC MORBIDITY AND MORTALITY WEEKLY REPORT 1, 1 (Oct. 20, 2017), https://www.cdc.gov/mmwr/volumes/66/ss/pdfs/ss6619.pdf.
[2] Robin Tipps et al., *The Opioid Epidemic in Indian Country*, 46 J.L. MED. & ETHICS 422, 424 (2018) (reporting Indian mortality rate in Minnesota of 47.6 per 100,000, compared to 7.3 for non-Hispanic whites).
[3] *United States v. Kagama*, 118 U.S. 375, 384 (1886).

example, States are opposing tribal interests in all four pending Indian rights cases.[4]  The claims of Indian Tribes and tribal organizations in this litigation must therefore be considered on a distinct basis, separate and apart from the States and the States' constituent cities and counties. As history has shown, if the opioid crisis is to be remedied and abated in Indian Country, it will be through empowering Tribes themselves to control and direct resources as they deem appropriate, and to implement solutions that respond to the specific needs of their citizens and communities.

This brief is submitted in the context of the bellwether Tribes' oppositions to Defendants' motions to dismiss tribal claims—motions that should be defeated for all the reasons articulated in the Muscogee and Blackfeet briefs.  We look beyond this pleading skirmish, however, to the ultimate resolution of this and related litigation, to describe the unique and disproportionate tragedy the Defendants' misconduct has visited upon Indian Country, to demonstrate the right and necessity of the participation of Tribes, as sovereigns, in any comprehensive resolution, and to provide the Court and the parties with information on what the Tribes are doing, and what more must be done, to abate the opioid nuisance in Indian Country and nationwide.

## ARGUMENT

### I.  The Unique Standing of Indian Tribal Nations in the Opioid Litigation

#### A.  Sovereign Indian Tribes in the United States

Indian tribal governments continue to survive and thrive as sovereign entities, governed by their own laws and customs, within the borders of the United States.  Tribal sovereignty comes, first and foremost, from tribal law and from the fact that tribal nations existed before

---

[4] *See Sturgeon v. Frost*, 872 F.3d 927 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 2648 (2018); *Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017), *cert. granted*, 138 S. Ct. 2026 (2018); *Herrera v. Wyoming*, No. 2016-242 (Wyo. 4th Dist. Apr. 25, 2017), *cert. granted*, 138 S. Ct. 2707 (2018); *Cougar Den, Inc. v. Wash. Dep't of Licensing*, 392 P.3d 1014. (Wash. 2017), *cert. granted*, 138 S. Ct. 2671 (2018).

European contact.  Sovereignty was not conferred on Tribes by the United States, but it is recognized and protected under federal law to the extent not expressly limited by treaty or Act of Congress.[5]  When the United States was formed, Tribes were not parties to the Constitutional Convention, and, unlike the States, they did not consent to incorporation into the United States, nor did they surrender any sovereign rights as part of that Convention.[6]  The independent status of Tribal Nations was enshrined in the Constitution, which reserves for Congress the exclusive power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[7]  The Supreme Court has consistently upheld that understanding, acknowledging not only that Indian Tribes are "separate sovereigns pre-existing the Constitution[,]"[8] but also that they persist as "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government."[9]  As governments, Tribes exercise their retained sovereignty over their territory and citizens for the betterment of their people.[10]  The harm that has been inflicted upon tribal governments in this capacity as a result of Defendants' actions is the reason why they have joined this litigation as plaintiffs and *amici*.

As it does with other sovereigns, the United States extends formal recognition to 573 federally recognized Tribes.[11]  All recognized Tribes "maintain[] a government-to-government relationship" with the United States, which in turn "recognizes the sovereignty of those Tribes[.]"[12]  Tribal governments are varied and diverse: they include small Rancherias in California, with ultimate decisionmaking authority vested in general councils consisting of the

---

[5] *See United States v. Wheeler*, 435 U.S. 313, 323 (1978).
[6] *Michigan v. Bay Mills Indian Cmty.,* 134 S. Ct. 2024, 2031 (2014).
[7] U.S. CONST. art. I, § 8, cl. 3.
[8] *Bay Mills Indian Cmty.*, 134 S. Ct. at 2030 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)).
[9] *Santa Clara Pueblo*, 436 U.S. at 55 (quoting *Worcester v. Georgia*, 6 Pet. 515, 559 (1832)).
[10] *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141 (1982).
[11] *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 34,863 (July 23, 2018).
[12] Federally Recognized Indian Tribe List Act of 1994, Pub. L. No. 103–454, § 103(2), 108 Stat. 4791.

entire membership; large and small Tribes with elected representative Tribal Councils or Business Councils, which may or may not exercise adjudicative as well as legislative functions; Pueblos led by Governors selected according to tribal custom; the Navajo Nation, with a three-branch system of national government and 110 local governing Chapters; and Native Villages in Alaska that exist separately from but alongside village and regional corporations formed under the Alaska Native Claims Settlement Act.[13] Their citizens are ethnically, linguistically, and culturally diverse in every respect. But one thing all federally recognized Tribes share is their status as sovereign governments with a duty to protect and advance the health, welfare and future prosperity of their citizens.

## B. Historical, Legal, and Political Context

For Tribes, the opioid crisis is the latest in a series of existential threats that have challenged their physical, cultural and political survival. The crisis must be considered in the context of historical and intergenerational trauma wrought by colonial violence and attempted genocide, which magnifies the harms that opioid dependence and addiction now cause to Indian individuals, families, and communities. As tribal governments take responsibility for addressing the harm brought by outsiders to their citizens and communities, they must do so within the unique framework of federal Indian law and policy that arose from that same history. Further, as independent sovereigns, Tribes must compete with the States and their subdivisions— traditionally hostile entities—for resources and opportunities. It is this context that makes the Tribes' claims in this litigation unique. The extraordinary circumstances faced by Tribes call for

---

[13] The Alaska Native Claims Settlement Act of 1971 (ANCSA), 43 U.S.C. §§ 1601-1629, extinguished aboriginal title in the State of Alaska and, in exchange, created 13 regional corporations and more than 200 village corporations to select and take title to 28 million acres of land, and to accept and administer settlement funds. ANCSA did not affect the political status of Tribes in Alaska, which continue as federally recognized Tribes.

special consideration of their claims, and for a *meaningful* remedy—one that considers more than mere population share or other faceless statistics.

### 1.  A History of Violence and Dispossession, Strength and Resilience

"In many ways, the past is the present in native history."[14]  Professor Clifford Trafzer writes, "Turtle Island was not a utopia at the time of the first invasion.  Native people knew about war and death, hatred and greed, slavery and conquest.  But there was something markedly different in the invasion of America by the Spanish, something more systematic and institutional, something more dangerous and long-term than anything native people had known before or since."[15]  By the time the Republic was founded, Native people from every region of the present-day United States had experienced—and remarkably, survived—the horrors of slavery, rape, torture, murder, and disease brought to their lands by the Spanish, French, Russian, Dutch, and English seeking, for the most part, new sources of material wealth.

United States independence in 1776 did little to reverse that trend.  From the beginning, northeastern States engaged in a regular practice of seizing tribal lands without Congressional oversight or approval in blatant violation of the Nonintercourse Act.[16]  Although early treaties reserved homelands and exclusive jurisdictional authority for many Tribes in the southeast, the States in that region engaged in a concerted, aggressive, and ultimately deadly campaign to remove those Tribes to west of the Mississippi River, in order to open up their tribal homelands for white settlement and commercial exploitation.  As American settlers themselves moved further west, the United States generally sought either to exterminate Native populations through

---

[14] CLIFFORD E. TRAFZER, AS LONG AS THE GRASS SHALL GROW AND RIVERS FLOW: A HISTORY OF NATIVE AMERICANS vii (2000).  (Unless another source is specifically cited, the history that follows is outlined in Professor Trafzer's (Wyandot) book, although it is catalogued in many other sources and maintained through tribal oral histories.)
[15] *Id.* at 18.  Turtle Island is a name for North America used in reference to creation stories of Iroquoian and other Tribes, telling that the earth was created on Turtle's back after Sky Woman fell from the Sky World.
[16] *See* 25 U.S.C. § 177.

war (an effort that largely failed, but not without devastating costs), or confine them to reservations.  Over time, however, federal policy shifted from war and isolation to forced assimilation.  As part of this effort, Congress passed the General Allotment Act (or Dawes Act) of 1887.[17]  The Dawes Act provided for the breakup and allotment of reservation lands in order to speed the "civilization" of Indians by ending communal tribal life and turning them into individualistic farmers.  Reservation lands that were not allotted and assigned to individual Indians were deemed "surplus" and ceded or sold off to non-Indian settlers and corporations, while many allotments lost federal protection and were acquired by non-Indians through purchase, fraud, and other "legal" and illegal means.  Under Allotment, nearly two-thirds of tribal lands were taken: the Indian land base dwindled from 138 million acres in 1887 to forty-eight million acres by 1934.

The Allotment Era also saw the rise of federal domination of life on the reservations and the suppression of tribal governments.  The Bureau of Indian Affairs (BIA)—originally housed in the War Department and later moved to the Department of the Interior—became the primary administrative force in Indian Country.  Its officials "assumed the role of colonial administrators on the reservations," squelching as much as possible the exercise of tribal cultural practices, religions, and governing authority.[18]  Central to the assimilation program were the military-style Indian schools, infamous for forcibly removing young children from their homes and placing them far from their communities, cutting their hair, punishing them for speaking their native languages, subjecting them to unspeakable abuse, and generally attempting to "kill the Indian . . . and save the man."[19]

---

[17] 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 334–358).
[18] H.R. REP. NO. 93-1600 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7775, 7781.
[19] Richard H. Pratt, *The Advantages of Mingling Indians with Whites* (1892), *in* AMERICANIZING THE AMERICAN INDIANS: WRITINGS BY THE "FRIENDS OF THE INDIAN" 1880-1900, at 261 (Francis Paul Prucha ed., 1973).  Captain

The assimilation policy led to poverty, malnutrition and starvation, high death rates, and appalling health conditions among American Indians.  In 1934, Congress generally repudiated the failed policy by passing the Indian Reorganization Act (IRA).[20]  The IRA halted further allotment, provided a mechanism for the reacquisition of tribal homelands, and recognized tribal rights to self-government by providing for the reorganization of tribal governments under written "model" constitutions, which would be approved and recognized by the Secretary of the Interior. But just two decades after enacting the IRA, Congress shifted course once again and embarked on the Termination Era, during which the United States formally disclaimed government-to-government relations with over one hundred federally recognized Indian Tribes.[21]  The goal of termination was to end federal supervision and control over the Indian "wards," weaken tribal governments, and again to assimilate Indians, this time through government-sponsored relocation programs that moved Indians from reservations to large cities such as Seattle, Los Angeles, Chicago and Minneapolis.  Relocated individuals were offered minimal services and frequently suffered from poor health, poverty, exposure to racial prejudice and pressure to assimilate, a sense of isolation, and increased vulnerability to dependence on alcohol and drugs.

But the story of Tribes in the United States is also a story of strength, resilience, and determination.  Tribes survived attempts at extermination, assimilation, and acculturation, remaining intact as distinct entities serving the needs of their citizens on tribal lands.  Adapting to relocation, urban Indians organized themselves and created new community centers and associations to offer vital services that the federal and state governments failed to provide, such

---

Pratt was the founder of the Carlisle Indian School in Pennsylvania.  Boarding schools are not the only policy to have resulted in the theft of Native children during this time; in California, for example, the 1850 Act for the Government and Protection of Indians permitted programs that kidnapped children for the purposes of providing slave labor to farmers, ranchers, and family homes.  *See generally* BENJAMIN MADLEY, AN AMERICAN GENOCIDE (2016).

[20] 48 Pub. L. No. 73-383, Stat. 984–88 (1934) (codified as amended at 25 U.S.C. §§ 461–479).

[21] *See* H.R. Con. Res. 108, 83d Cong., 67 Stat. B132 (1953).

as health care, substance abuse counseling, and job counseling and assistance.  Tribes also continued to advocate for legal and policy change in the courts and before Congress, as they had in the famous "Cherokee Cases" challenging the State of Georgia's attempt to extinguish Indian title and criminalize Cherokee tribal governance in that State.[22]

By the 1960s, in response to Indian activism and the utter failure of termination policy, greater recognition of Indian tribal rights to self-determination began to take hold.  Several Tribes that had been "terminated" by Congress secured restoration of their federal recognition status.[23]  A watershed moment came in 1970, when tribal leaders persuaded President Richard Nixon to announce a new era of federal Indian policy.[24]  President Nixon acknowledged the corrosive effects of termination on tribal communities, as well as the failures of the paternalistic federal bureaucracy.  The solution was neither termination nor assimilation—which amounted to the same thing—but tribal self-determination.

### 2.  Modern Tribal Self-Determination and Self-Governance

Tribal governments today operate, for the most part, in the rubric of self-determination and self-governance.  In terms of federal law, the Indian Self-Determination and Education Assistance Act (ISDEAA), passed by Congress in 1975 and strengthened through later amendments, establishes the statutory framework for the self-determination policy.[25]  The ISDEAA allows Tribes to take control over federal programs for Indians by contracting with the

---

[22] *See Worcester v. Georgia*, 31 U.S. 515 (1832); *Cherokee Nation v. Georgia*, 30 U.S. 1 (1831).
[23] *See* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[8][c] (Nell Jessup Newton, ed., 2012) [hereinafter COHEN'S HANDBOOK].
[24] PRESIDENT NIXON'S MESSAGE TO CONGRESS TRANSMITTING RECOMMENDATIONS FOR INDIAN POLICY, H.R. DOC. NO. 91-363, at 3 (1970), www.presidency.ucsb.edu/ws/?pid=2573.
[25] 25 U.S.C. §§ 5301–5399.

federal government to carry out those programs, "[i]n effect . . .  step[ping] into the shoes of the federal [agencies]" that formerly provided those programs and services.[26]

Through self-determination contracts and self-governance compacts under the ISDEAA, tribal governments, as well as tribal organizations designated by tribal governments to act on their behalf,[27] carry out a broad range of governmental services for American Indians and Alaska Natives that were previously administered by the Bureau of Indian Affairs (BIA), the Indian Health Service (IHS) and, in some cases, by other federal agencies.  These include, among others, health care, law enforcement, tribal courts, education, social services, natural resources management, and child welfare programs.  Taking over these programs has allowed Tribes to rebuild their capacity to perform essential governmental functions as well as to improve the programs themselves by making them more responsive to local tribal needs.  The ISDEAA emphasizes this tribal control by authorizing Tribes to reallocate program funding to best serve their communities.[28]  Further, Congress provides each year in the appropriations act that funds transferred to Tribes through ISDEAA contracts and compacts "shall remain available to the tribe or tribal organization without fiscal year limitation."[29]  Tribes carrying out programs under the ISDEAA are thus not mere contractors, but tribal governments carrying out their ordinary governmental functions—albeit under a unique legal framework.

The ISDEAA is the centerpiece of the modern self-determination policy, but it functions in concert with other legislation designed to empower tribal governments to play a greater role in the provision of trust services to their communities.  One of these is the Indian Health Care

---

[26] Geoffrey D. Strommer & Stephen D. Osborne, *The History, Status, and Future of Tribal Self-Governance Under the Indian Self-Determination and Education Assistance Act*, 39 AM. INDIAN L. REV. 1, 21 (2015).
[27] *See* 25 U.S.C. § 5304(*l*).
[28] 25 U.S.C. §§ 5386(e), 5363(b)(3), 5325(o).
[29] *E.g.*, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 122 Stat. 2242, 2565 (2015).

Improvement Act (IHCIA),[30] which, along with the ISDEAA, led to a transformation of the Indian health care delivery system.  Prior to the adoption of self-determination policy, the federal government—first through the BIA, and later through the IHS—directly operated discretionary health care services for Indians on or near reservations, with little to no tribal input.  In 1976, in response to the "deplorable status of Indian health" that persisted under this system,[31] Congress enacted the IHCIA.[32]  The IHCIA was the first federal legislation to enact specific statutory programs for Indian health care, and it was intended not only to increase the "quantity and quality of health services" available to Indians, but also to "encourage the maximum participation of Indians in the planning and management of those services."[33]  Although chronic funding shortages and major health disparities remain, a new Indian health care delivery system has emerged through the IHCIA and the ISDEAA, driven more than ever before by Tribes and tribal priorities.

Another cornerstone of self-determination policy is the Indian Child Welfare Act (ICWA).[34]  In enacting the ICWA in 1978, Congress recognized "that there is no resource that is more vital to the continued existence and integrity of Indian Tribes than their children[.]"[35]  The ICWA was prompted by decades of widespread, forced removals of Indian children from Indian families, mostly by state child welfare agencies.[36]  In a tragic reflection of the earlier boarding school policies, studies referenced in ICWA's legislative history revealed that large numbers of Indian children (between 25% - 35%) were being separated from their parents, with an overwhelming percentage (approximately 90%) placed outside of their families and tribal

---

[30] 25 U.S.C. §§ 1601–1685.
[31] S. Rep. No. 94-133 (1975).
[32] Pub. L. No. 94-437, 90 Stat. 1400 (1976).
[33] 25 U.S.C. § 1601.  The IHCIA required periodic reauthorization until it was amended and permanently reenacted in 2010, as part of the Affordable Care Act. Pub. L. No. 111-148, § 10221, 124 Stat. 119, 935–36 (2010).
[34] 25 U.S.C. §§ 1901–1963.
[35] 25 U.S.C. § 1901(3).
[36] *See* 25 U.S.C. § 1901(4)–(5).

communities—even when relatives were available.[37]  To help end these abusive practices, ICWA clarified the jurisdictional framework for child custody proceedings involving Indian children and families, and provided procedures to help reverse these trends and protect tribal children, families, and cultures.  In conjunction with ICWA and ISDEAA, Tribes utilize their own authority and resources to protect the rights of children and families in tribal and state court proceedings, and meet other child welfare and development needs (including foster care and adoption) through tribal child welfare programs and agencies.

Likewise, the Native American Housing and Self-Determination Act (NAHASDA) implements self-determination policy with respect to housing on tribal lands.[38]  From the early 1960s through the mid-1990s, in response to a 1961 Department of the Interior Task Force Report illustrating the dire conditions of housing in Indian Country, the Department of Housing and Urban Development (HUD) developed and operated a program that provided funding under the 1937 Housing Act to Indian Housing Authorities.  While this approach resulted in some success, there were many criticisms of the patchwork, HUD-dominated program, including a lack of flexibility and, most critically, lack of tribal control over program planning and operations.[39]  NAHASDA was thus enacted in 1996 to consolidate funding available to Indian Housing Authorities through federal housing programs into a single block grant program that provides Tribes with a much greater degree of control in the operation of tribal housing programs.[40]

---

[37] *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–33 (1989) (summarizing legislative history and associated reports).

[38] 25 U.S.C. §§ 4101–4243.

[39] NANCY PINDUS ET AL., U.S. DEP'T OF HOUSING & URBAN DEV., HOUSING NEEDS OF AM. INDIANS & ALASKA NATIVES IN TRIBAL AREAS: A REP. FROM THE ASSESSMENT OF AM. INDIAN, ALASKA NATIVE, AND NATIVE HAWAIIAN HOUSING NEEDS at xviii (January 2017), https://www.huduser.gov/portal/sites/default/files/pdf/HNAIHousingNeeds.pdf.

[40] 25 U.S.C. §§ 4151–4152.

–12–

The self-determination era has also seen the success of Tribes in reclaiming treaty-reserved hunting and fishing rights, and authority to manage natural resources.[41]  Tribes have also been successful in assuming greater control over cultural resources and ancestral burials,[42] and obtaining "treatment as States" to regulate air and water quality and to address the impacts of hazardous materials on their lands.[43]

### 3. *Tribal Jurisdictional Authority and Ongoing Challenges to Tribal Self-Government*

Grounded in recognition of and respect for inherent tribal sovereignty, self-determination policy has allowed virtually all Tribes to preserve and develop their governmental capacities to provide services for their citizens and others in order to address seemingly intractable problems within their jurisdictions.  Still, Tribes face exceptional barriers in meeting the needs of their citizens and communities.  Woefully inadequate funding (including for self-determination and self-governance programs), competition and conflict with neighboring States and local governments, and a confusing and contradictory patchwork of federal law resulting from the history of chaotic federal policy swings all impede the progress that Tribes seek to make through the exercise of self-determination and self-governance.

These impediments can be seen, for example, in the rules governing criminal jurisdiction on tribal lands—a question that directly bears on the ability of Tribes to respond to public health crises like the opioid epidemic.  Under a series of nineteenth century laws, the federal government continues to exercise jurisdiction over crimes involving Indians and non-Indians on

---

[41] *See generally* Ed Goodman, *Protecting Habitat for Off-Reservation Tribal Hunting and Fishing Rights: Tribal Comanagement as a Reserved Right*, 30 ENVT'L L. 279 (2000).

[42] *See, e.g.*, Archaeological Resources Protection Act of 1979, Pub. L. 96–95, 93 Stat. 721 (codified as amended at 16 U.S.C. §§ 470aa–470mm); Native American Graves Protection and Repatriation Act (NAGPRA), Pub. L. 101-601, 104 Stat. 3048 (1990)(codified at 25 U.S.C. §§ 3001–3013).

[43] *See* Clean Air Act, 42 U.S.C. § 7601(d); Clean Water Act, 33 U.S.C. § 1377(e); Safe Drinking Water Act, 42 U.S.C. § 300J-11.

tribal lands, as well as "major crimes" committed by Indians in Indian Country.[44]  As part of its

Termination Era agenda, Congress passed (and never repealed) Public Law 280, which delegated

that federal jurisdictional authority to five (later six) States with respect to most, but not all, of

the reservation lands in those States.[45]  Later, Congress permitted additional states to "opt in."[46]

However, "Public Law 280" states often fail to investigate or prosecute crimes in Indian

Country, as they do not receive funding from Congress for such purposes and thus consider law

enforcement in Indian Country to be an "unfunded mandate."  Tribes are often powerless to fill

in the gaps, since Congress limited tribal sentencing authority as part of the Indian Civil Rights

Act of 1968 and, in *Oliphant v. Suquamish Indian Tribe*,[47] the U.S. Supreme Court stripped

Tribes of criminal jurisdiction over non-Indians, even for crimes committed in Indian Country

against Indians.  Congress has acted incrementally to restore tribal criminal jurisdiction over

non-Indian perpetrators of domestic violence,[48] and to expand sentencing authority under the

Indian Civil Rights Act,[49] but major gaps remain.  Jurisdictional questions are further

complicated by the high fractionalization of ownership and the jurisdictional "checkerboard" of

many reservations that is a result of the implementation and incomplete reversal of the allotment

policy.  The convergence of all these factors creates a "jurisdictional maze," leading to what the

---

[44] 18 U.S.C. §§ 1152, 1153, 3243.

[45] 18 U.S.C. § 1162(a); 28 U.S.C. § 1360(a).

[46] 25 U.S.C. §§ 1321-22.  In addition, Public Law 280 jurisdiction has been extended to Indian Country in other States as a result of legislation "recognizing" and "restoring" Indian Tribes, and in other locations, separate legislation authorizes State criminal jurisdiction without reference to Public Law 280.  For a discussion of Public Law 280 and these other statutes, *see* COHEN'S HANDBOOK, *supra* note 23, at § 6.04.

[47] 435 U.S. 191 (1978).

[48] The Violence Against Women Reauthorization Act of 2013 extended tribal criminal jurisdiction over a limited category of non-Indian domestic violence offenders.  *See* 25 U.S.C. § 1304.

[49] Tribal Law and Order Act of 2010 (TLOA), Pub. L. 111-211, 124 Stat. 2258.  TLOA expanded tribal sentencing authority to include felonies, and allowed "stacked" sentences for up to three years per offense.

congressionally chartered Indian Law and Order Commission calls "an institutionalized public safety crisis."[50]

Jurisdictional checkerboarding also brings Tribes into frequent conflict with surrounding States over matters relating to civil and regulatory authority, like taxation, land use planning and natural resources management.  In particular, States and their subdivisions have aggressively sought to extend their taxing authority over reservation lands.  *See, e.g.*, *Bryan v. Itasca County*, 426 U.S. 373 (1976) (holding that Public Law 280 did not extend State taxing authority in Indian Country); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 151 (1980) (employing preemption test to hold that the State could not apply licensing and fuel taxes to non-Indian logging company operating on tribal lands); *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251 (1992) (relying on the Dawes Act, as amended, to permit county's ad valorem tax on sale of fee lands within reservation boundaries).  As a result of these cases, the Supreme Court has permitted State taxation of non-Indians on tribal lands in some instances, *see Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 459 (1995), leading to further litigation and a "double taxation" problem that hampers Tribes' ability to raise governmental revenues through taxation.[51]

Perhaps one of the most enduring and damaging legacies of the past is the loss of tribal homelands.  Although the IRA authorized the Secretary of the Interior to acquire land in trust on

---

[50] INDIAN LAW & ORDER COMMISSION, A ROADMAP FOR MAKING NATIVE AMERICA SAFER, REPORT TO THE PRESIDENT & CONGRESS OF THE UNITED STATES, at 5 (2013) [hereinafter ILOC REPORT], https://www.aisc.ucla.edu/iloc/report/ (last visited Oct. 4, 2018).

[51] In addition, States regularly challenge treaty-protected off-reservation hunting and fishing rights, *United States v. Washington*, 853 F.3d 946 (9th Cir. 2017), *aff'd,* 138 S. Ct. 1832 (2018); implementation of the Indian Child Welfare Act, *see, e.g.,* Order, *Texas v. Zinke*, No. 4:17-cv-00868-O (N.D. Texas, Oct. 4, 2018); and other aspects of tribal sovereignty and self-determination, *e.g.*, *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) (rejecting invitation by the State to, among other things, overturn binding precedent on tribal sovereign immunity.).  In recent years, States have gone so far as to argue that tribal reservations have been diminished or disestablished.  *Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017), *cert. granted,* 138 S. Ct. 2026 (2018); *Nebraska v. Parker*, 136 S. Ct. 1072 (2016).

–15–

behalf of Tribes as a response to the failed allotment policy, less than 10% of the 90 million acres lost to Allotment has been restored.[52]  For the most part, in order to restore their own homelands to tribal control, Tribes must now purchase that land on the open market, with their own resources, then petition the Secretary to take the land into trust.  It is a protracted and expensive process governed by regulations that, among other things, require the Secretary to solicit and consider the views of neighboring non-Indian governments—which frequently oppose tribal trust land acquisition.[53]  Tribal financial and other resources that are devoted to the repatriation of tribal homelands, including sacred sites and treaty-protected lands, are diverted from potential use for governmental services like health care and public safety—and vice versa. Yet both are critical to the physical, cultural, and spiritual survival of the Tribe as a distinct entity.

Tribal governments thus face excruciating choices, operating with a bare minimum of resources and an overflow of needs that are unlike those faced by other governments.  The opioid crisis exacerbates this problem by putting an incredible strain on the few resources that tribal governments do have available, to the extent that it has overwhelmed the capacity of tribal governmental programs and services and threatens tribal self-governance.  Tribal governments contend with many challenges, but the opioid crisis is proving to be one of the most costly of the modern era—in terms of dollars and also in terms of the human costs to American Indian and Alaska Native lives, communities, and cultures.

## II.  The Devastating Impacts of the Opioid Crisis on Tribal Communities and Tribal Governmental Functions

As a result of Defendants' actions, Indian Country has been purposely flooded with prescription opioids, leading directly to escalating rates of addiction, disability, death, and harm

---

[52] *See* 25 U.S.C. § 5108; S. REP. NO. 112-166, 5 (2012).
[53] 25 C.F.R. § 151.1-15.

to the health and welfare of tribal communities.  The statistics are staggering and tell a horrific story: American Indians and Alaska Natives make up only about 2 percent of the U.S. population,[54] but have suffered a grossly disproportionate share of opioid-related impacts compared to the overall American public.

This disparity is reflected in the climbing death rates attributable to opioid overdoses among American Indians and Alaska Natives over the last few years.  In recent testimony before the U.S. Senate Committee on Indian Affairs (SCIA), Dr. Michael Toedt, who serves as the Chief Medical Officer for the IHS, observed that "[t]he Centers for Disease Control and Prevention ("CDC") reported that American Indians and Alaska Natives had the highest drug overdose death rates in 2015 and the largest percentage increase in the number of deaths over time from 1999-2015 compared to other racial and ethnic groups"—an increase greater than 500 percent.[55]  This steep rise can be attributed in large part to opioids: the CDC WONDER database on causes of death reveals that the age-adjusted annual mortality rate for opioid overdose deaths among American Indians and Alaska Natives rose from 2.9 per 100,000 in 1999 to 13.9 per 100,000 in 2016.[56]  The opioid overdose death rates in the counties composing the Pine Ridge Reservation of the Oglala Lakota Tribe are telling: In 2016, Oglala Lakota County had one of the highest opioid overdose death rates in South Dakota, at 21 people per 100,000, compared with the state average of 8 deaths per 100,000.  The overdose death rates in Bennet and Jackson Counties in South Dakota were 16 and 10 per 100,000, respectively.  In 2016, Sheridan County had an opioid overdose death rate of 11 per 100,000, five times the Nebraska average of 2.2.[57]

---

[54] U.S. CENSUS BUREAU (Nov. 2, 2016), https://www.census.gov/newsroom/facts-for-features/2016/cb16-ff22.html.
[55] Opioids in Indian Country: Beyond the Crisis to Healing the Community: Hearing Before the SCIA, 115th Cong. 3 (2018) (statement of RADM Michael E. Toedt, Chief Medical Officer, Indian Health Service), https://www.indian.senate.gov/sites/default/files/upload/HHS%20IHS%20testimony%20Opioids%20Indian%20Country%20SCIA%203-14-18%20revised.pdf (citing MACK ET AL., *supra* note 1).
[56] Tipps et al., *supra* note 2, at 422-436.
[57] SOI of the Oglala Sioux Tribe (App. B at 83b).

Sadly, due to race and ethnicity misclassifications on death certificates, these alarming statistics likely underestimate the true number of deaths by as much as 35 percent.[58]  For example, the United South and Eastern Tribes, Inc., an organization of 27 Tribal Nations from Texas to Maine, has discovered through its Tribal Epidemiology Center that national statistics likely underestimate the rates of opioid overdose among its member Tribal Nations: Based on data collected over the past 12 years, USET has learned that 9% of all deaths among USET member Tribal Nations were related to substance abuse between 2002 and 2012; that almost one in five substance use deaths were attributable to opioids, including heroin; and that 93% of opioid deaths were prescription drug-related.[59]

In some parts of Indian Country, the mortality statistics are truly unnerving.  For example, in Minnesota the American Indian and Alaska Native mortality rate from opioids was 47.6 per 100,000, compared with 7.3 for non-Hispanic whites.  Urban American Indians and Alaska Natives are suffering as well.  In the counties containing Seattle and Minneapolis—two prominent destinations for relocation during the Termination Era—the death rates for that group were 31.2 and 42.4 per 100,000, respectively, compared to 13.6 and 5.7 for non-Hispanic whites. And even these figures are likely understated due to racial misclassification.[60]

Drawing on data from the 2016 National Survey on Drug Use and Health, Dr. Christopher Jones, with the Substance Abuse and Mental Health Services Administration (SAMHSA), testified in the recent SCIA hearing that "5.2 percent (72,000) of [American Indians and Alaska Natives] aged 18 and older reported misusing a prescription drug in the past year and 4.0 percent (56,000) aged 18 and older reported misusing a prescription pain reliever in the past

---

[58] MACK ET AL., *supra* note 1.
[59] SOI of the United South and Eastern Tribes, Inc. (App. B at 134b).
[60] Tipps et al., *supra* note 2, at 424-425.

–18–

year."[61]  American Indian and Alaska Native youth likewise face increased risk: a recent population-based study surveyed American Indian students in the 8th, 10th, and 12th grades living on or near reservations and found that they "reported substantially higher lifetime and last-30 day substance use" than a national sample of students of comparable age.[62]  SAMHSA also found in its 2013 survey that American Indians and Alaska Natives ages 12 and over used illicit drugs, including non-medical use of prescription pain relievers, at a rate of 12.3 percent, the second highest of any one ethnic group.[63]

The depth of the crisis in Indian Country reflects the high volume of opioid prescriptions dispensed to American Indians and Alaska Natives.  Statistics on the Cherokee Nation, the largest federally recognized Tribe in the United States, exemplify the alarming trend.  The Oklahoma Bureau of Narcotics reported that in 2015 over 97 million dosage units (defined as one pill) of opioids were distributed in the 14 Oklahoma counties comprising part of the Cherokee Nation's tribal jurisdiction.  This amounts to *107 opioid pills per adult* in those counties.  Data for 2016 reveal only a slight drop, with distribution of over 87 million opioid pills, or *96 per adult*, in these same counties.[64]

The data thus makes clear that the harsh realities of the opioid crisis have drastically and disproportionately impacted American Indian and Alaska Native communities.  The devastating impact is exacerbated by the shortage of resources and funding not only for opioid abuse

---

[61] Opioids in Indian Country: Beyond the Crisis to Healing the Community: Hearing Before the SCIA, 115th Cong. 1 (2018) (statement of Christopher M. Jones, Director, National Mental Health and Substance Use Policy Laboratory), https://www.indian.senate.gov/sites/default/files/3.14.18_Opioids_SAMHSA%20Testimony.pdf (citing SAMHSA, RESULTS FROM THE 2016 NATIONAL SURVEY ON DRUG USE AND HEALTH: DETAILED TABLES (Sept. 2017), (https://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2016/NSDUH-DetTabs-2016.pdf).
[62] Randall C. Swaim, et al., *Substance Use Among American Indian Youths on Reservations Compared With a National Sample of US Adolescents,* JAMA NETWORK (May 2018), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2682593.
[63] SAMHSA, RESULTS FROM THE 2013 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF NATIONAL FINDINGS (Sept. 2014), at 15, 26, https://www.samhsa.gov/data/sites/default/files/NSDUHresultsPDFWHTML2013/Web/NSDUHresults2013.pdf.
[64] Declaration of Chrissi R. Nimmo in Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction, *McKesson Corp. v. Hembree*, No. 4:17-cv-00323-TCK-FHM (N.D. Okla., July 21, 2017).

treatment, but also for treatment of the root causes of chronic pain that lead to opioid use and related problems.  In 2003, the U.S. Commission on Civil Rights examined the state of federal assistance programs for American Indians and Alaska Natives and concluded that "federal funding directed to Native Americans through programs at these agencies has not been sufficient to address the basic and very urgent needs of indigenous peoples[,]" including heath care, education, public safety, housing, and rural development.[65]  In hearings held by the Commission in 2016 to update the status of these unmet needs, the National Congress of American Indians (NCAI) noted that while funding has increased somewhat, "many Tribes have faced continued emergencies in meeting the basic public service needs of their citizens."[66]  In light of these existing deficits, the opioid crisis has pushed health care, law enforcement, social services, and other systems in many tribal communities to the breaking point, and diverted scarce resources from other critical tribal priorities.

## A.  Health Care

The modern Indian health care delivery system includes programs and services operated directly by the IHS (referred to as "direct service" facilities); programs and services operated by Tribes and tribal health programs under ISDEAA Title I ("self-determination") contracts and Title V ("self-governance") compacts; and Urban Indian Health Programs operated by Indian health organizations and funded through Title V of the IHCIA.  The vast majority of Tribes now carry out at least a portion of the health care programs and services provided to their communities through an ISDEAA contract or compact, and many have assumed control over all health care services and programs under Title V compacts (except for certain inherently federal

---

[65] U.S. COMMISSION ON CIVIL RIGHTS, A QUIET CRISIS: FEDERAL FUNDING AND UNMET NEEDS IN INDIAN COUNTRY, at 5 (July 2003), https://archive.org/details/ERIC_ED480450.
[66] NATIONAL CONGRESS OF AMERICAN INDIANS, U.S. COMMISSION ON CIVIL RIGHTS BRIEFING (Feb. 19, 2016), http://www.ncai.org/attachments/Testimonial_IjKocIPeClgYbRyqRUHwbKbLKaOPOpxgjXhliElDHxtqwlGkvZG_USCCR%20Briefing%20JJP%2002.19.16.pdf.

functions that may not be transferred to Tribes under the ISDEAA).  In Alaska, for example, nearly all of the IHS's previous budget has been transferred to Tribes and tribal health programs through one ISDEAA agreement: the Alaska Tribal Health Compact.  In some cases, Tribes also design and carry out programs outside the scope of their ISDEAA contracts and compacts, pursuant to their sovereign authority and with funds from a variety of sources.

Although the Indian health system as a whole provides a comprehensive range of services, including behavioral health and substance abuse, not all programs and services are available in all locations.[67]  Most tribal communities are served by small health centers or clinics that are limited in what they can provide, and many only operate a few days a week or less. When IHS and tribal health facilities cannot provide needed services, they refer patients to, and purchase care from, outside providers through the "Purchased/Referred Care" or "PRC" program whenever possible.[68]  But the majority of tribal communities are located in remote and rural areas, where access to other providers is limited or requires travel over a great distance.  In many areas, PRC funding infamously runs out before the end of the fiscal year, after which point it is up to the Tribe to fund additional contract care.  This phenomenon is the origin of the well-known saying in Indian Country, "don't get sick after June."[69]

The Indian health system always has been chronically underfunded.  The U.S. Commission on Civil Rights reported that for 2003, the IHS spending for Indian medical care was 62 percent lower than the U.S. per capita amount.[70]  It also reported that the per capita

---

[67] See, e.g., 42 C.F.R. § 136.11.

[68] See INDIAN HEALTH SERV., JUSTIFICATION OF ESTIMATES FOR APPROPRIATIONS COMMITTEES, FISCAL YEAR 2018, at CJ-100 (2017), https://www.ihs.gov/budgetformulation/includes/themes/responsive2017/display_objects/documents/FY2018CongressionalJustification.pdf.

[69] In FY 2016, for example, the PRC program denied an estimated $371,521,000 for an estimated 80,000 needed PRC referrals.  Id.  The underfunding of the PRC program leads to the widespread rationing of care, with funds often available only for priority "level I" care necessary to preserve "life or limb."

[70] U.S. COMM'N ON CIVIL RIGHTS, BROKEN PROMISES: EVALUATING THE NATIVE AMERICAN HEALTH CARE SYSTEM 98 (Sept. 2004), https://www.usccr.gov/pubs/docs/nabroken.pdf.

amount spent on IHS medical care ($1,194) was only *half the per capita amount spent on health care for federal prisoners* ($3,803), and at the bottom of the list of all federal health programs.[71] In the fall of 2009, when introducing legislation that would become the permanent reauthorization of the IHCIA, Senator Byron Dorgan observed that the health care system for Native Americans is "only funded at about half of its need."[72]  Earlier this year, the National Tribal Budget Formulation Workgroup noted, in its published Recommendations on the Indian Health Service Fiscal Year 2020 Budget, that while the Veterans' Health Administration serves a population four times that of IHS, it has a budget more than *fourteen* times larger.[73]

When possible, Tribes supplement the meager funding obtained through their ISDEAA contracts and compacts with other tribal governmental revenues or general funds.  They also seek funding from other sources such as federal, state, and private grants in order to meet the health care needs of their citizens and communities—an effort that comes with administrative costs.  Compounding the problem of inadequate funding, tribal health care providers face an array of challenges, including small and outdated facilities and equipment, remote locations, lack of infrastructure, and serious challenges to recruitment and retention.  Indeed, physician vacancies at many IHS and tribal health facilities far exceed those encountered in the private sector and can even result in patients being turned away.[74]  The system as a whole is in dire need of additional resources.

---

[71] *Id.*  The other federal programs in the comparison were: Medicare ($5,915); Veterans Affairs users ($5,214); U.S. per capita ($5,065); Medicaid acute care ($3,879); and the Federal Employees Health Benefit program benchmark ($3,725).
[72] 155 Cong. Rec. S10493 (daily ed. Oct. 15, 2009) (statement of Sen. Dorgan).
[73] Tribal Budget Formulation Workgroup, *Recommendations on the Indian Health Service Fiscal Year 2020 Budget*, at 7 (2018), https://www.nihb.org/docs/04122018/265620_NIHB%20IHS%20Budget%20Book_WEB.pdf.
[74] DEP'T OF HEALTH & HUMAN SERVS., OEI-06-14-00011, INDIAN HEALTH SERVICES: LONGSTANDING CHALLENGES WARRANT FOCUSED ATTENTION TO QUALITY CARE (Oct. 2016), https://oig.hhs.gov/oei/reports/oei-06-14-00011.pdf.  *See also*, INDIAN HEALTH SERVICE, 2011 CLINICAL STAFFING AND RECRUITING SURVEY, http://www.npaihb.org/images/resources_docs/QBM%20Handouts/2013/April/8A%20-%20IHS%20Administrative%20Survey%20Final.pdf.

Since the Indian health system is designed specifically to help implement the federal trust responsibility for Indian health, eligible American Indian and Alaska Native beneficiaries are generally exempt from payment for services at IHS and tribal facilities.[75]  To supplement limited direct funding, however, Congress has worked to remove barriers to IHS and tribal access to other governmental and third-party resources.  In first enacting the IHCIA in 1976, for example, Congress amended the Social Security Act to allow IHS and tribal health programs to bill Medicare and Medicaid, while providing that such collections must not be considered in determining IHS appropriations.[76]  These amendments were necessary to exempt IHS and tribal facilities from otherwise applicable restrictions on payments to federal contract providers.[77]  In 2000, following a successful demonstration program, Congress enacted permanent authority permitting Tribes and tribal health programs to elect to directly bill and collect their own third-party reimbursements, so they would not have to collect reimbursements through the IHS.[78]

Congress has likewise sought to expand access to private insurance in light of low coverage rates among American Indians and Alaska Natives.[79]  In amending and permanently reauthorizing the IHCIA in 2010, Congress made it easier for Tribes to sponsor health insurance coverage for the beneficiaries they serve, either through the purchase of private insurance or

---

[75] For several years, Congress reinforced this policy with language in the annual IHS appropriations act that prohibited the agency from charging for services without Congressional consent, and that is still IHS policy today. *See, e.g.,* Pub. L. No. 104-134, 110 Stat. 1321 (1996).  While Tribes and tribal health programs may choose to charge beneficiaries for services, within certain limitations, most do not.  Federal regulations define who is an eligible beneficiary, 42 C.F.R. § 136a.12, although under Section 813 of the IHCIA Tribes and tribal organizations operating under an ISDEAA contract or compact can elect to serve non-beneficiaries provided they determine that doing so will not result in a denial or diminution of services to beneficiaries.  25 U.S.C. § 1680c(c)(2).

[76] *See* 42 U.S.C. §§ 1395qq, 1396j.

[77] *See* 42 U.S.C. § 1395f(c), n(d).

[78] *See* 25 U.S.C. § 1641.

[79] IHS beneficiaries have a less incentive to seek out (and pay for) health insurance coverage compared with the general population, since they are entitled to IHS or tribal health care services regardless of coverage.  Further, IHS beneficiaries were exempt from the individual coverage mandate under the Affordable Care Act because the federal government owes a trust responsibility to provide health care services to Indians, 26 U.S.C. § 5000A(e)(3), and some American Indian and Alaska Native individuals object to paying for third-party coverage for the same reasons.

through creation of self-insured plans,[80] and provided that Tribes carrying out ISDEAA contracts or compacts may purchase health insurance for their employees through the Federal Employees Health Benefits Program.[81]  Simultaneously, Congress provided in the Affordable Care Act a number of special protections for Indians enrolling in a health insurance Marketplace, such as special monthly enrollment periods and cost-sharing exemptions, to incentivize enrollment.[82]

As a result of these provisions, some Tribes—but not all—provide health insurance coverage for their employees, many of whom are tribal citizens, and for tribal citizens regardless of whether or not they work for the Tribe.  They do so both through self-funded plans and through premium sponsorship (i.e., paying insurance premiums on behalf of beneficiaries). Third party coverage can help extend scarce PRC dollars when referrals to non-Indian facilities are necessary, and Tribes can often realize an increase in third party collections for their own tribal health programs when they offer premium sponsorship.  However, as a consequence of the opioid epidemic, Tribes that do provide insurance coverage—particularly those who operate self-funded plans—are seeing the cost of that coverage increase and are struggling to maintain their

---

[80] 25 U.S.C. § 1642.

[81] 25 U.S.C. § 1647b.

[82] 42 U.S.C. § 18031(c)(6)(D); 42 U.S.C. § 18071(d).

To ensure that increased beneficiary enrollment would actually result in increased funding for the Indian health system, Congress also codified longstanding administrative policy providing that the IHS and tribal health programs are the payers of last resort, notwithstanding any Federal, State, or local law to the contrary, *see* 25 U.S.C § 1623(b)), and strengthened Section 206 of the IHCIA, 25 U.S.C. § 1621e.  Section 206 gives Indian Tribes and tribal organizations a statutory right to recover from any responsible or liable third-party (including private insurance carriers as well as third-party tortfeasors, among others) the higher of their reasonable billed charges or the highest amount the third-party payer would pay to any non-governmental provider—even in the absence of a provider contract that would otherwise be a prerequisite to insurance reimbursement.  25 U.S.C. § 1621e(a).  Among other things, Section 206 creates a federal cause of action to enforce the right of recovery, 25 U.S.C. § 1621e(e)(1), giving Tribes and tribal health organizations a critical point of leverage with private insurance companies that might otherwise refuse to engage with tribal health programs.

Defendants wrongfully suggest that Section 206 *limits* a Tribe's or tribal health program's right of recovery against third-party tortfeasors by recognizing a cause of action in accordance with the Federal Medical Care Recovery Act. Manufacturer Defendants' Br. at 21, ECF No. 933-1.  As more fully discussed in the Muscogee (Creek) Nation's brief, Pl.'s Opp'n Br. at 38-45, ECF No. 1008, that interpretation is entirely at odds with both the statutory text and the intent of Congress in enacting and amending Section 206, among the other provisions discussed herein, specifically to *increase* access to other sources of funding for the Indian health system.

programs.[83]  Other Tribes cannot afford to offer coverage, so many of the beneficiaries utilizing

their tribal health programs remain uninsured—meaning that a significant amount of care goes

unreimbursed and a critical source of supplemental funding cannot be accessed.

In response to the opioid crisis, Tribes have also been forced to divert resources that

could otherwise have been used for basic preventative and other health care—including

insurance coverage—into drug treatment centers and other response measures.  The Eastern

Band of Cherokee Indians (EBCI) has committed $14 million for a residential treatment facility,

and plans a $30 million crisis-stabilization unit, "because emergency rooms across the state are

full."[84]  In 2010, the EBCI community suffered a rate of narcotic overdose of 118 per 100,000,

10 times the U.S. all-races rate.[85]  From 2001 through 2012, there was a 38% increase in the

number of American Indians and Alaska Natives within the EBCI territory who had a drug-

related issue, and in 2012 there were more than 1500 patients with at least one visit with a drug-

related diagnosis code–over 4 patients every day.[86]  The problem has grown so dire that the

---

[83] *See, e.g.*, SOI of the Prairie Island Indian Community (App. B at 90b); SOI of the Cow Creek Band of Umpqua Tribe of Indians (App. B at 27b); SOI of the Menominee Indian Tribe of Wisconsin (App. B at 61b); SOI of the Shakopee Mdewakanton Sioux Community (App. B at 108b).

[84] Tanner Hall, *More local funds needed to fight opioid epidemic*, THE MOUNTAINEER, Oct.1, 2017, http://www.themountaineer.com/news/more-local-funds-needed-to-fight-opioid-epidemic/article_f44fd286-a6be-11e7-be85-8770398a8f87.html (last visited Oct. 4, 2018).  Likewise, The Mandan, Hidatsa and Arikara Nation, also known as the Three Affiliated Tribes (North Dakota), have recently constructed a new drug abuse treatment center, which cost $24.8 million.  *See Three Affiliated Tribes Opening Bismarck Treatment Center*, U.S. NEWS & WORLD REPORT, Sept. 4, 2018, https://www.usnews.com/news/best-states/north-dakota/articles/2018-09-04/three-affiliated-Tribes-opening-bismarck-treatment-center (last visited Oct. 4, 2018).  The Pascua Yaqui Tribe Health Division (Arizona) developed and operates the Centered Spirit Program to provide culturally compatible mental health and substance abuse services, including methadone/suboxone maintenance, to tribal members and their families.  *See* PASCUA YAQUI TRIBE, http://www.pascuayaqui-nsn.gov/index.php/centered-spirit (last visited Oct. 4, 2018).  The Muckleshoot Tribe (Washington) operates a behavioral health center that currently treats 170 people for opioid addiction.  *See* Christine Vestal, *Fighting Opioid Abuse in Indian Country*, The Pew Charitable Trusts, Dec. 6, 2016, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2016/12/06/fighting-opioid-abuse-in-indian-country (last visited Oct. 4, 2018).

[85] *Cherokee Indian Hospital Substance Abuse Task Force recognized*, Cherokee One Feather, Aug. 6, 2012, https://theonefeather.com/2012/08/cherokee-indian-hospital-substance-abuse-task-force-recognized/ (last visited Oct. 4, 2018).

[86] EASTERN BAND OF CHEROKEE INDIANS HEALTH AND MEDICAL DIVISION, EASTERN BAND OF CHEROKEE INDIANS TRIBAL HEALTH ASSESSMENT (2013), https://www.naccho.org/uploads/downloadable-resources/Tribal-Health-Assessment-FINAL.pdf (last visited Oct. 4, 2018).

Cherokee Indian Hospital Pharmacy has begun distributing free naloxone to reduce the number of deaths from overdose.[87]  Other Tribes and tribal health programs, like the Southeast Alaska Regional Health Consortium, have recently added Medication Assisted Treatment (MAT) to their array of services.[88]  The drugs used to treat addiction in these types of programs are expensive, ranging from $80 - $1300 per patient per month, depending on the drug and dosage. Ironically, for some Tribes, these costs are in addition to the costs of opioid prescriptions for chronic pain previously paid directly through the Tribe's self-insurance program.

Tribes have also had to divert scarce health care resources to hire additional substance abuse professionals.  The Viejas Band of Kumeyaay Indians has found that the need to hire new substance abuse counselors and physicians to facilitate addiction and recovery treatment has diverted resources away from other tribal needs.[89]  The Cow Creek Band of Umpqua Tribe of Indians hired an extra behavioral health counselor and a prevention specialist for the Clinics in response to increased demand.[90]  The Kodiak Area Native Association has recently added a substance use counselor to focus on MAT assessments and clients, and a full-time case manager to focus on case management services for substance abuse clients.[91]  The Port Gamble S'Klallam Tribe had to hire a nurse specializing in substance abuse disorders for case management related to the opioid epidemic, and to train physicians to provide MAT for opioid addiction and abuse.[92] The need to hire and train additional staff is highly prevalent, if not universal.  The costs of

---

[87] Scott McKie, *Cherokee Hospital Pharmacy distributing Narcan,* CHEROKEE ONE FEATHER, Aug. 10, 2017, https://theonefeather.com/2017/08/cherokee-hospital-pharmacy-distributing-narcan/ (last visited Oct. 4, 2018).
[88] Complaint at ¶ 252, *Southeast Alaska Regional Health Consortium v. Purdue Pharma L.P.*, No. 3:18-cv-00217-TMB (D. Ak. Sept. 20, 2018) [hereinafter *SEARHC Complaint*].
[89] SOI of the Viejas Band of Kumeyaay Indians (App. B at 136b).
[90] Complaint at ¶ 259, *Cow Creek Band of Umpqua Tribe of Indians v. Purdue Pharma*, No. 1:18-op-45417-DAP (N.D. Ohio Mar. 28, 2018).
[91] SOI of Kodiak Area Native Association (App. B at 47b).
[92] Complaint at ¶ 276, *Port Gamble S'Klallam Tribe v. Purdue Pharma L.P.*, No. 1:18-op-45271, (N.D. Ohio Mar. 5, 2018) [hereinafter *Port Gamble Complaint*].

emergency response is also skyrocketing for many tribal communities.[93] As a whole, the impact to tribal health programs is overwhelming and unsustainable.

### B. Public Safety and Tribal Justice Systems

Over 200 tribal police departments operate in Indian Country, with forces ranging from two to more than 200 officers.[94] Many Tribes also operate tribal courts, some of which have implemented locally, culturally relevant approaches as alternatives to traditional prosecution and detention, including wellness and rehabilitation-focused drug courts addressing addiction issues, restorative "peacemaker" courts to repair community ties broken by violence, and re-entry programs to address recidivism.[95]

In Indian Country, however, a dearth of funding and the complexity of criminal jurisdiction challenges law enforcement's authority and effectiveness. On trust lands, Tribes must share criminal jurisdiction with the federal government and, in some cases, the States; however, this has not resulted in improved or even increased law enforcement, as neither federal nor State governments have devoted the necessary resources, leading to a high number of crimes going uninvestigated and unprosecuted.[96] Tribes themselves do not have the resources to make up the difference. Limited tribal police funding is available through ISDEAA contracts and compacts and through Department of Justice grants, but grant-based funding is inconsistent and not necessarily needs-based. Further, Tribes in Public Law 280 States have historically been

---

[93] *See, e.g.*, Complaint at ¶¶ 139, 152, 254, 287, *Yurok Tribe v. Purdue Pharma L.P.*, No. 1-18-op-45311-DAP, (N.D. Ohio March 12, 2018) [hereinafter *Yurok Complaint*]; Complaint at ¶¶ 541, 550, 560, 563, *Passamaquoddy Tribe-Indian Township v. Purdue Pharma L.P.*, No. 1:18-op-45876-DAP, (N.D. Ohio July 25, 2108); SOI of the Saint Regis Mohawk Tribe (App. B at 102b). These include emergency evacuation costs, as well. *See, e.g.*, SOI of the Aleutian Pribilof Islands Association (App. B at 5b); Complaint at ¶ 45, *Cherokee Nation v. McKesson Corporation*, No. CJ-2018-11 (Okla. Jan. 19, 2018).
[94] TRIBAL LAW & POLICY INST., http://www.tribal-institute.org/lists/enforcement.htm (last visited Oct. 4, 2018).
[95] Tipps et al., *supra* note 2, at 431-32; ILOC REPORT, *supra* note 50, at 129-137.
[96] ILOC REPORT, *supra* note 50, at 108.

deprived of law enforcement funding through the BIA.[97]  Tribes thus seek funding for law

enforcement and tribal justice systems from a variety of sources, including the Tribe's general

fund.

Every element of tribal justice systems, including law enforcement, tribal courts, and

jails, has been stretched thin by the opioid epidemic.  Tribal police departments, which are

regularly understaffed and often must patrol vast territories in remote locations, have been

overwhelmed by the prevalence of opioid abuse in their jurisdictions.[98]  In many tribal

communities, police encounter opioid abuse daily, finding used syringes, responding to opioid

overdoses, and making arrests for opioid-related crimes.[99]  Chief Carlos Echevarria of the police

department for the Tulalip Tribes stated in 2016 that *nearly every crime* responded to was

heroin-related.[100]  The opioid epidemic has caused a surge in arrests not only for the unlawful

possession or sale of opioids, but also for property crimes including burglary, theft, and car

prowls committed by individuals who seek money to fund their opioid addictions.[101]  The

Sisseton-Wahpeton Oyate report that drug and drug-related arrests on the Lake Traverse

Reservation have increased by 548% since 2008.[102]

Tribes have also incurred costs, and diverted the time of law enforcement officers from

regular policing efforts, for training to administer the overdose-reversal drug naloxone.  As use

---

[97] *See Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1031 (9th Cir. 2013) (explaining that the BIA "generally does not allocate funds for direct law enforcement services to Tribes in Public Law 280 states" because the federal government has ceded jurisdiction to the States).

[98] *See, e.g.*, Complaint at ¶ 9, *Lac du Flambeau Band of Chippewa Indians v. McKesson Corp.*, No. 3:18-cv-00228 (W.D. Wis. Mar. 30, 2018) [hereinafter *Lac du Flambeau Complaint*]; SOI of the Kootenai Tribe of Idaho (App. B at 48b) (discussing creation of tribal police force "to battle the rising impacts of opioid abuse and sales").

[99] *See, e.g.*, Complaint at ¶ 383, *Lummi Tribe of the Lummi Reservation v. Purdue Pharma, L.P.*, No. 1:18-op-45955 (N.D. Ohio July 19, 2018) [hereinafter *Lummi Nation Complaint*].

[100] Complaint at ¶ 383, *Tulalip Tribes v. Purdue Pharma, L.P.*, No. 1:18-op-45589 (N.D. Ohio Apr. 27, 2018) [hereinafter *Tulalip Complaint*] citing Kim Kalliber, *Opioids and Heroin Forum helps inform and heal communities*, Tulalip News (Sept. 28, 2016), http://www.tulalipnews.com/wp/tag/opioids-and-heroin-forum-health-tulalip-Tribes/.

[101] *See, e.g.*, *Lummi Nation Complaint*, *supra* note 99, at ¶¶ 384, 388; SOI of the Keweenaw Bay Indian Community (App. B at 45b); SOI of the Saint Regis Mohawk Tribe (App. B at 102b).

[102] SOI of the Sisseton-Wahpeton Oyate (App. B at 111b).

of the synthetic opioid fentanyl has increased, Tribes have had to devote resources to train officers how to handle that drug, which can be absorbed through the skin; exposure to even a miniscule amount can be fatal.[103]  For those Tribes who exercise hunting and fishing rights off-reservation, their natural resources officers also must be trained as first responders dealing with opioid abuse and overdose.[104]  Despite the need for tribal officers to act as first responders, however, many Tribes simply lack the resources to prioritize community policing and interaction with individuals who need assistance but may not have engaged in criminal behavior.

The increase in arrests for unlawful opioid possession or for opioid-related crimes not only burdens law enforcement but also intensifies demand on tribal court systems.  The caseload for opioid-related offenses has skyrocketed because of the epidemic—raising costs for tribal courts and for providing prosecutors, public defenders, and conflict counsel.[105]  Many Tribes also provide diversionary programs specifically to address drug-related offenses.  The Tulalip Tribes, for example, offers a Healing to Wellness Court for non-violent offenders who are apprehended for crimes related to substance abuse.[106]  The Healing to Wellness Court is an intensively supervised program including medical, mental health, and chemical dependency treatment. The program is tailored for the needs of addicted tribal members, ensuring an emphasis on culture and community.  Because of the opioid epidemic, the Tulalip Tribes has incurred great expense in funding the increased need for the program.  Likewise, the Penobscot Nation operates a Healing to Wellness Court open to citizens charged with non-violent crimes.[107]  Recidivism is

---

[103] *See, e.g.*, *Lummi Nation Complaint*, *supra* note 99, at ¶ 385.
[104] *Port Gamble Complaint, supra* note 92, at ¶ 278 (describing Port Gamble S'Klallam Tribes' program of providing natural resource officers with training in the use of Narcan).
[105] *See, e.g.*, *Tulalip Complaint*, *supra* note 100, at ¶¶ 392-93; SOI of the Kootenai Tribe of Idaho (App. B at 48b).
[106] *Tulalip Complaint, supra* note 100, at ¶¶ 394-95.
[107] *See Testimony of United South and Eastern Tribes Sovereignty Protection Fund Submitted to the SCIA for the Record of the March 14, 2018 Comm. Oversight Hearing, Opioids in Indian Country: Beyond the Crisis to Healing the Community,* 115th Cong. 5, https://www.usetinc.org/wp-

extremely low among individuals who complete the program, but the Penobscot Nation does not have sufficient resources to accommodate all the Penobscot citizens who wish to participate. More often, Tribes are financially unable to provide such programs at all, despite their demonstrable effectiveness.

Incarcerating offenders who committed crimes related to opioids has also significantly added to Tribes' jail costs, whether those costs are incurred through tribally operated jails or through fees paid to county jails pursuant to a contract (which are often charged on a per-detainee basis).[108] Tribes have incurred increased ancillary jail costs as well. If a Tribe contracts to use a county jail off the reservation, as many do, the Tribe must pay for its police officers to transport offenders to and from jail and for their medical appointments, which can be a significant loss in resources for Tribes located on remote reservations.[109] Tribal police officers must guard arrestees at hospitals until they are medically cleared to be booked, and Tribes must provide medical care for offenders suffering from opioid withdrawal and other conditions related to opioid abuse and addiction.[110] Because of the prevalence of opioid abuse and addiction in Indian Country, these additional costs of incarceration pose a significant burden on overtaxed tribal justice systems.

The dramatic rise in opioid abuse and addiction has also forced some Tribes to make additional public-safety expenditures, such as the expense of increasing security at health clinics. At the Nez Perce Tribe's health clinics in Idaho, for example, staff members have been

---

content/uploads/bvenuti/WWS/2018/April%202018/April%202/USET%20SPF%20Testimony%20for%20the%20Record_SCIA%20Opioids%20in%20Indian%20Country%20FINAL%203_28_18.pdf [hereinafter *USET Testimony*].

[108] *See, e.g.*, *Lummi Nation Complaint, supra* note 99, at ¶¶ 387–88 (costs for housing offenders pursuant to contracts with counties increased); Complaint at ¶¶ 382–83, *Makah Indian Tribe v. Purdue Pharma, L.P.*, No. 1:18-op-46022 (N.D. Ohio Aug. 14, 2018) [hereinafter *Makah Complaint*] (costs for housing offenders in tribally funded jail increased); SOI of the Oglala Sioux Tribe (App. B at 83b).

[109] *See, e.g.*, Complaint at ¶ 384, *Nez Perce Tribe v. Purdue Pharma, L.P.*, No. 1:18-op-45730 (N.D. Ohio May 18, 2018) [hereinafter *Nez Perce Complaint*].

[110] *Tulalip Complaint, supra* note 100, at ¶ 390.

threatened, including at knifepoint, by people seeking prescription opioids.  Staff members are afraid to walk to their cars at night because of the danger of being attacked by people trying to gain access to prescription opioids, and patients have been robbed while leaving the pharmacy parking lot with opioids.[111]  To protect staff members and the community, the Nez Perce Tribe added panic buttons and multiple security doors to the main health clinic, shuttered the prescription pick-up counter, and built a room with a closed door that patients must enter individually to obtain their prescriptions without other patients knowing what drugs were dispensed.  Structural changes alone to the Nez Perce Tribe's two clinics cost approximately $100,000 and were carried out directly in response to the opioid crisis.[112]  Other Tribes around the country have incurred similar public safety costs in direct response to the opioid crisis; the Southeast Alaska Regional Health Consortium, for example, recently purchased nine high-security dispensing cabinets for opioids, costing $21,000 per cabinet, and increased security due to recent break-ins.[113]

## C.  Housing

The opioid epidemic has also intensified an already-dire housing crisis in Indian Country.  Tribes have made great strides since NAHASDA increased tribal flexibility and control, and each tribal housing program has developed its own tribal-specific approach to carrying out affordable housing activities: some focus on modernizing or maintaining existing low-income housing; others seek to leverage funding to build new affordable housing stock; still others focus on down-payments and rental assistance, enabling tribal members and other Indian families to

---

[111] *Nez Perce Complaint*, *supra* note 109, at ¶ 371.
[112] *Id.* at ¶ 23.
[113] *SEARHC Complaint, supra* note 88, at ¶ 260.  *See also*, SOI of Chugachmiut (App. B at 17b) (increased security surveillance at health clinics).

obtain housing in the private market.[114]  Many tribal housing programs supplement underfunded

tribal law enforcement budgets with NAHASDA funds that support public safety and crime

prevention specifically for tribal housing, including buying equipment or office space, hiring

additional officers, or installing surveillance devices.[115]

Yet despite progress under NAHASDA, housing needs in Indian Country are substantial,

and Indian Country is plagued by an acute shortage of safe, sanitary and quality affordable

housing.  Existing housing stock is in bad repair and often lacks proper plumbing and electricity,

and overcrowding is endemic.  According to HUD's recent and comprehensive study of housing

needs in Indian Country, "physical housing problems for [American Indian and Alaska Native]

households in tribal areas remain much more severe than for U.S. households, on average, in

almost all categories."[116]  For more than 10 years, the annual appropriations under the

NAHASDA Indian Housing Block Grant program remained level, meaning a decrease in the real

dollars available to Indian housing programs.[117]  Thus, the resources available for dealing with

the severe housing problems in Indian Country are already stretched thin, even when Tribes

supplement these funds with other resources.

The arrival of the opioid epidemic in Indian Country has intensified the problem.  Many

federal, state, tribal and even private housing providers require and prosecute eviction of tenants

for drug-related activity.[118]  Thus, opioid abuse results in evictions for such activity, as well as

the inevitable side-effects of drug use: no money to pay rent and the failure to properly maintain

---

[114] U.S. DEP'T OF HOUSING AND URBAN DEV., HOUSING NEEDS OF AMERICAN INDIANS AND ALASKA NATIVES IN TRIBAL AREAS: A REPORT FROM THE ASSESSMENT OF AMERICAN INDIAN, ALASKA NATIVE, AND NATIVE HAWAIIAN HOUSING NEEDS xxii-xxvii (January 2017), www.huduser.gov/portal/sites/default/files/pdf/HNAIHousingNeeds.pdf [hereinafter 2017 HOUSING NEEDS STUDY].
[115] See, e.g., COQUILLE INDIAN HOUSING AUTHORITY, INDIAN HOUSING PLAN 19-20 (July 13, 2017), www.coquilletribe.org/wp-content/uploads/2017/04/Coquille-FY18-IHP.pdf.
[116] 2017 HOUSING NEEDS STUDY, supra note 114, at xviii.
[117] Id. at xxii-xxiii.
[118] See NAHASDA, 25 U.S.C. § 4137(a)(6) (requiring language in Indian housing leases that provide for eviction for "drug-related criminal activity").

–32–

units.  Evicted families, which include not only the drug user but spouses, siblings, parents and children—whether or not they abuse opioids—are now homeless or piled into another family's home, increasing overcrowded conditions that are already pervasive in Indian Country.[119]  The causes of homelessness are multi-faceted and complex, and substance abuse is both a contributing cause and result of homelessness.  But whether tribal members become homeless because they are addicted to opioids, or are introduced to opioids once they are homeless, the end result is the same: a growing homeless population creating significant added challenges for Tribes to address.[120]

When possible, Tribes have invested in the construction and maintenance of sober housing for those seeking to transition out of homelessness and addiction, like the Healing Lodge opened by the Tulalip Tribes and the halfway house currently under construction by the Keweenaw Bay Indian Community.[121]  But Tribes also bear other costs of an expanded homeless population.  For example, the Tulalip Tribes has incurred cleanup costs and costs to update its laws to properly address the growing homeless population on the Tulalip Reservation and the environmental impacts from unlawful encampment sites, improper garbage and sewage disposal (including used needles), and trespassing, in addition to costs for temporary housing in motels for homeless families.[122]  The Puyallup Tribe is facing "streets lined with inoperable RV's, cars, tents and other living spaces" and an "influx of people who lack sanitary facilities and leave drug paraphernalia in common areas" of tribal buildings, causing safety concerns and requiring cleanup.[123]

---

[119] 2017 HOUSING NEEDS STUDY, *supra* note 114, at xx.
[120] *See, e.g.*, *Port Gamble Complaint*, *supra* note 92, at ¶ 279*;* SOI of the Cloverdale Rancheria of Pomo Indians of California (App. B at 18b); SOI of the Central Council of Tlingit and Haida Indian Tribes of Alaska (App. B at 11b); SOI of the Oglala Sioux Tribe (App. B at 83b); SOI of the Elk Valley Rancheria (App. B at 29b).
[121] *Tulalip Complaint, supra* note 100, at ¶ 377; SOI of the Keweenaw Bay Indian Community (App. B at 45b).
[122] *Tulalip Complaint, supra* note 100, at ¶¶ 379, 380.
[123] SOI of the Puyallup Tribal Health Authority (App. B at 91b).

–33–

Addressing these massive new impacts will require resources targeted for that purpose. For those Tribal members recovering from opioid abuse, the transition back into the community will be difficult without adequate housing.  Compounding the problem, those with criminal and/or drug abuse history will often be ineligible for housing for many years.

### D.  Economic Development and Governmental Revenue

Tribes, like other governments, use tax and other revenues to provide essential services to their citizens.  Nevertheless, legal and practical problems, largely relating to State encroachment in tribal jurisdictions, prevent Tribes from relying solely or even primarily on tax revenues. Since double taxation by States and Tribes inhibits economic growth, Tribes cannot, as a practical matter, impose taxes where State and local governments are already doing so.  Further, the universe of individually owned businesses on tribal land that would pay such taxes is limited for a variety of reasons, including the inability of entrepreneurs to obtain home mortgage loans due to the inalienable status of Indian trust land.  Tribes also cannot levy property taxes on trust lands within their jurisdictions, and most do not impose income taxes on tribal citizens in light of high rates of poverty and unemployment within their communities.  Thus, despite their ostensible right to do so,[124] Tribes are frequently unable to fund their government functions through taxation and rely to a greater degree than other governments on revenues derived from direct tribal ownership of economic enterprises.[125]

Indian Tribes have invested in a wide variety of businesses, whose revenues, in turn, fund tribal government programs.  These businesses engage in government contracting, construction, energy and natural resource development, gaming, manufacturing and service businesses, tourism, retail, and myriad other activities.  Indeed, following the Supreme Court's decision in

---

[124] *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982).
[125] *See generally*, NATIONAL CONGRESS OF AMERICAN INDIANS, *Taxation*, http://www.ncai.org/policy-issues/tribal-governance/taxation (last visited Oct. 4, 2018).

*California v. Cabazon Band of Mission Indians*,[126] Congress passed the Indian Gaming

Regulatory Act (IGRA) in order to provide a statutory basis for Indian gaming and also to

promote "tribal economic development, self-sufficiency, and strong tribal governments."[127]

This model, of course, has its own challenges.  Tribal workforces suffer from lack of

education and employment experience, as well as the lowest life expectancy and the worst health

outcomes of any group in the United States.  Recognizing that a functional workforce is vital to

successful economic development, Tribes have invested in their workforces through tribal

employment rights ordinances and other workforce development programs.[128]  Now, Tribes like

the Makah Indian Tribe are finding that, due to the sharp increase in opioid use on their

reservations in recent years, many otherwise qualified persons are not employable or are unable

to retain their employment due to failure to pass drug tests.[129]  Tribes have suffered damages in

the form of lost productivity of members and employees, increased administrative costs, and lost

opportunity for growth and self-determination because of the wave of opioid abuse and addiction

affecting existing and potential employees.[130]

Further, Tribes must find the right balance between reinvesting to sustain and grow tribal

businesses and maximizing funding for governmental programs.  Major public health crises, like

the opioid epidemic, exacerbate these difficulties by demanding increasing amounts of

governmental funding that could otherwise be reinvested to better serve tribal needs over the

---

[126] 480 U.S. 202 (1987).

[127] 25 U.S.C. § 2702.  NAT'L INDIAN GAMING COMMISSION, TRIBAL GAMING REVENUES BY REGION FISCAL YEAR 2017 AND 2016, www.nigc.gov/images/uploads/reports/Chart2017GamingRevenueDistributedbyRegion.pdf (last visited Oct. 3 2018).  In passing the IGRA, Congress recognized that "numerous Indian Tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue[.]"  25 U.S.C. § 2701(1).

[128] Robert J. Miller, *Sovereign Resilience: Reviving Private Sector Economic Institutions in Indian Country*, BYU L. REV. 2018 Issue 6 (July 15, 2018), https://ssrn.com/abstract=3214206.

[129] *Makah Complaint, supra* note 108, at ¶ 395.  *See also*, SOI of the Flandreau Santee Sioux Tribe (App. B at 32b).

[130] *E.g., Tulalip Complaint, supra* note 100, at ¶¶ 399-400; SOI of the Squaxin Island Tribe (App. B at 118b); Complaint at ¶ 268, *Flandreau Santee Sioux Tribe v. Purdue Pharma L.P.,* No. 1:18-op-45095-DAP (N.D. Ohio Jan. 25, 2018).

long term.  Each dollar spent on the opioid crisis represents a lost opportunity to invest elsewhere, including economic development.[131]  For some Tribes, like the Cow Creek Band of Umpqua Tribe of Indians, such business expansion and development spending brings people from outside the reservation into the community, to spend dollars there, and enables the Tribe to capture outside funds and turn them into tribal revenue.[132]  For other Tribes, growing tribal businesses would allow the Tribe to capture money already in the community, rather than allowing it to "leak" to entities outside the tribal community.  The diversion of such funds to address the opioid crisis is likely to have a significant impact as "[t]he lack of economic development on reservations is a major factor in creating the extreme poverty, unemployment, and the accompanying social issues that Indian nations face."[133]

In addition to the direct loss, diverting funds that could have been used for economic development for the opioid crisis deprives Tribes of the multiplier effect that using such money for business could have provided.  Investment in tribal businesses would have a greater multiplier effect on the local economy, and thus on other tribal businesses and revenues, than funds spent to address the crisis, particularly where those funds are spent on goods and services from outside the reservation (such as naloxone).[134]  Further, employment-related impacts of the opioid crisis often create secondary and tertiary costs the Tribes must shoulder, which again divert funding from reinvestment in tribal business.  For example, when a tribal member fails a

---

[131] *See, e.g.*, SOI of the Coquille Indian Tribe (App. B at 26b) (noting the diversion of limited resources away from economic development due to the opioid crisis); Jim Nowlan, *What are opportunity costs of health care?,* Moline Dispatch & Rock Island Argus (Mar. 22, 2015), https://qconline.com/opinion/what-are-opportunity-costs-of-health-care/article_ec87c802-d6aa-51be-9b77-a672f0974147.html (last visited Oct. 3, 2018).

[132] ECONORTHWEST, THE ECONOMIC BENEFITS OF THE COW CREEK TRIBE TO DOUGLAS COUNTY, OREGON (Nov. 18, 2005), www.finance.senate.gov/imo/media/doc/052306testwsappen.pdf.

[133] Robert J. Miller, *Creating Economic Development on Indian Reservations*, PROPERTY AND ENVIRONMENT RESEARCH CENTER, Vol. 30, No. 2, Fall 2012 (Sept. 14, 2012), www.perc.org/2012/09/14/creating-economic-development-on-indian-reservations.

[134] WILLIAM W. RIGGS ET AL., UNIVERSITY OF NEVADA-RENO, IMPORTANCE OF ECONOMIC MULTIPLIERS (2004), https://www.unce.unr.edu/publications/files/cd/2004/fs0459.pdf (last visited Oct. 3, 2018).

pre-employment drug screening, not only does the Tribe incur the expense of processing a job applicant who is precluded from taking the position, the Tribe often ends up providing support for the jobless individual and his or her family through welfare assistance programs.[135]  The economic impacts threaten to spiral out of control: as the opioid epidemic stifles economic activity, Tribes are left with fewer resources to address the opioid epidemic.  This downward spiral can end only when the opioid crisis is reined in.

### E.  Social Services, Child Welfare, and Elder Care

In addition to health and public safety costs, Tribes have incurred significant expenses providing social services to affected community members.  Frequently, however, Tribes lack the resources to meet increased demand for these programs, because funds intended for basic human services such as elder programs, housing services and heating assistance, vocational training and the like are being redirected to pay for additional law enforcement, overloaded court dockets, and a seemingly never-ending turnstile of treatment facilities and programs.  "[T]he money that we're spending on treatment alone has impacted us to the point that we have exhausted all of our funding," says Kathleen Preuss, director of social services for the Upper Sioux Community in Granite Falls, Minnesota.  "We spend approximately 70 to 80 percent of our time and resources on dealing with problems related to opiates," says Preuss.  "We see what's happening to our people, and we are overwhelmed."[136]

In particular, the impact to children and families is devastating.  In the years since ICWA was passed (1978), Tribes have established formal child welfare programs grounded in culturally based approaches to protecting Indian children and keeping Indian families intact.  As Tribes

---

[135] *E.g., Nez Perce Complaint, supra* note 109, at ¶ 399.
[136] Suzette Brewer, *Tribes lead the battle to combat a national opioid crisis,* HIGH COUNTRY NEWS, May 9, 2018, www.hcn.org/articles/tribal-affairs-tribes-lead-the-battle-to-combat-a-national-opioid-crisis.  (Lasted visited Oct. 3, 2018).  *See also, Yurok Complaint, supra* note 93, at ¶ 152(d).

vary widely in terms of the resources they have available, they also vary in the scope and size of their child welfare programs.  However, most Tribes will have one or more child care caseworkers who work directly with children and families, coordinating supportive services, interfacing with State agency counterparts, appearing in court (as advocates and as "ICWA expert witnesses"), and working with foster parents, guardians, and other out-of-home placement resources for children who are removed from their families.  Tribes with more available resources will also provide additional supportive or treatment services that collaborate with their child welfare departments, providing mental health services, substance abuse treatment and counseling, parenting services and trainings, and financial and housing counseling.  Funding for these programs comes from a variety of sources, including through ISDEAA contracts or compacts with the BIA and IHS, Social Security Act Titles IV-A (temporary assistance to needy families), IV-B (child safety and preventive services), IV-D (child support) and IV-E (foster care and adoption assistance), State and local contracts and grants, and, increasingly, tribally generated revenue.  Even with a variety of federal funding sources available to tribal governments, Tribes receive just under 1% of the total annual expenditure of federal child welfare funds while their children represent over 2% of the United States foster care population.[137]

The opioid epidemic is draining those resources and triggering a haunting reenactment of the same massive removal of Indian children that led to the passage of ICWA.  In many tribal communities, there has been a significant rise in the number of children born to opioid-addicted parents.  Often, this means that the parents are unable to care for the child and that the child is born dependent on opioids.  As a result, the Tribe becomes responsible for taking care of

---

[137] NAT'L INDIAN CHILD WELFARE ASS'N, Written Testimony of Dr. Sarah Hicks Kastelic, Hearing of the Task Force on American Indian/Alaska Native Children Exposed to Violence, at 29, Dec. 9, 2013, www.nicwa.org/wp-content/uploads/2016/11/NICWATestimonyTaskForceonAIANChildrenExposedtoViolence_Dec2013.pdf.

children who are particularly vulnerable and in need of critical and continuing medical and emotional attention.  It is widely recognized in the fields of child welfare and child development that removal from the family, even when necessary to protect against threats of harm, exposes a child to trauma.  The opioid epidemic has increased the risk of this trauma for Indian children, on top of the already higher rates of trauma they experience.  Tribes spend significant resources on staff who work directly on child dependency and placement issues and also incur the cost of therapy and other treatments and services to help affected children and their families in the hopes of keeping those families together and preserving the Tribe's cultural heritage.  When children must be separated from their parents, Tribes often face a shortage of substitute care placements for these children, as their immediate and extended families have also been impacted by this destructive epidemic.  The end result is increased and continued trauma for an extremely vulnerable child population in communities with insufficient resources to effectively combat the insidious effects of opioid addiction.

This terrifying scenario is playing out for Tribes all across the country, as more and more American Indian and Alaska Native parents struggle with addiction and are unable to provide adequate care and supervision for their children.[138]  The Lummi Nation, for example, estimates that addiction is the primary or secondary safety issue for approximately 95% of its child welfare cases.[139]  The St. Regis Mohawk Tribe reports that over the past five years, opioid abuse and addiction have accounted for approximately 85-90% of child welfare cases,[140] and the Kodiak

---

[138] *See, e.g.*, SOI of the National Indian Child Welfare Association (App. B at 72b); SOI of the Cloverdale Rancheria of Pomo Indians of California (App. B at 18b); SOI of the Gila River Indian Community (App. B at 36b); SOI of the Kenaitze Indian Tribe (App. B at 44b); SOI of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians (App. B at 50b); SOI of the Mississippi Band of Choctaw Indians (App. B at 65b); SOI of the Prairie Island Indian Community (App. B at 90b); SOI of the Klamath Tribes (App. B at 129b); SOI of the Turtle Mountain Band of Chippewa Indians (App. B at 133b).  Most Tribes cite the impact to families and children as one of the most devastating consequences of the opioid epidemic.
[139] *Lummi Nation Complaint, supra* note 99, at ¶ 19.
[140] SOI of the Saint Regis Mohawk Tribe (App. B at 102b).

Area Native Association reports that the percentage of ICWA cases where opioid use is an issue has gone from 0% to 80% in the last five years.[141]  Relatedly, Tribes have witnessed a growing number of infants born with substance addiction and neonatal abstinence syndrome (NAS).  The Lac du Flambeau Band of Chippewa Indians reports that approximately 60 percent of the Tribe's annual births result in opioid-addicted babies, and that in 2017 alone 48 of the Tribe's 80 births resulted in opioid-addicted babies.[142]

Many Tribes are finding it difficult to keep up with the number of children who end up in their care as a result of opioid addiction.  For example, as part of its social services, the Nez Perce Tribe's Children's Home provides short-term care for children who have been removed from parental care.[143]  In prior years, six weeks might pass when no Nez Perce children were in the care of the Children's Home, allowing social workers and caregivers to clean and restock the facility.  Because of the opioid epidemic, however, the Children's Home has not been empty at any time in the last *two years*.[144]  In those last two years, staff at the Children's Home estimate that they have cared for at least ten infants experiencing symptoms of drug withdrawal.  The Nez Perce Tribe has had to send its employees for training on caring for these infants, and the Children's Home added a nursery to accommodate the increased number of infants who cannot stay with their families because of drug abuse.  According to staff, one hundred percent of the children at the Children's Home are referred because of drug abuse.[145]

Tribes are also finding that they do not have enough appropriate foster homes; because the crisis of addiction has swept up multiple generations of family members, often there is no

---

[141] SOI of the Kodiak Area Native Association (App. B at 47b).
[142] *Lac du Flambeau Complaint, supra* note 98, at ¶ 8.  *See also, e.g.,* SOI of the Confederated Salish and Kootenai Tribes (App. B at 20b); SOI of the Leech Lake Band of Ojibwe (App. B at 52b); SOI of the Lower Elwha Klallam Tribe (App. B at 53b); SOI of the Spokane Tribe of Indians (App. B at 117b); SOI of the Yukon-Kuskokwim Health Corporation (App. B at 140b).
[143] *Nez Perce Complaint, supra* note 109, at ¶ 394.
[144] *Id., at* ¶ 20.
[145] *Id., at* ¶ 395.  *See also,* SOI of the Forest County Potawatomi Community (App. B at 34b).

safe placement for children even with grandparents or other elders in the community.[146]  When

children are placed outside of Native homes, even for short amounts of time, they risk losing

significant connections to their culture and heritage, which has historically resulted in the

impairment of their ability to function as successful adults.  The problems of boarding school

dislocations and the adoption epidemic, still felt, are bound to intensify.  The impact on small

Tribes cannot be overstated–they are once again facing a real risk of extinction as more and more

American Indian and Alaska Native children are placed in non-Native foster homes.[147]

        The opioid epidemic has also affected tribal elders with particular ferocity.  Sadly, some

elders themselves are addicted to opioids.  Tribes have incurred substantially increased costs

serving these elders, including costs for medical and support care.[148]  Many addicted elders

require extra tribal resources for housing and other services.  Not only that, but many such elders

turn to services from the tribal government at a younger age, having lost the ability to care for

themselves as a result of opioid addiction.[149]

        Elders also feel the impacts of the epidemic indirectly.  For example, many children of

opioid-addicted parents who have been removed from their homes have come under the care of

their grandparents, which causes significant cost and disruptions.  Instead of addressing their

own needs, the elders must put their time and resources toward caring for their children and

grandchildren, who likely have special medical and other needs as a result of their experiences

---

[146] *See, e.g.*, *Nez Perce Complaint, supra* note 109, at ¶ 393; *Lac du Flambeau Complaint, supra* note 98, at ¶ 20; Complaint at ¶ 20, *Chitimacha Tribe of Louisiana v. Purdue Pharma, L.P.*, No. 1:18-op-45825-DAP (N.D. Ohio July 16, 2018) [hereinafter *Chitimacha Complaint*]; SOI of the Fond du Lac Band of Lake Superior Chippewa Indians (App. B at 33b); Tom Howell, Jr., *Indian tribes fear being killed off by opioid epidemic*, The Washington Times (Apr. 16, 2018), www.washingtontimes.com/news/2018/apr/16/native-americans-opioid-epidemic-killing-indian-tr/ (lasted visited Oct. 4, 2018); Jan Hoffman, *In Opioid Battle, Cherokee Want Their Day in Tribal Court*, NY Times (Dec. 17, 2017), www.nytimes.com/2017/12/17/health/cherokee-opioid-addiction-pharmacies.html (last visited Oct. 4, 2018).
[147] *See, e.g.*, SOI of the Squaxin Island Tribe (App. B at 118b).
[148] *Makah Complaint*, *supra* note 108, at ¶¶ 392–93.
[149] *Lummi Nation Complaint, supra* note 99, at ¶ 399.

with opioids.  Many elders require increased support from their Tribe that they would not otherwise need because they are supporting children and grandchildren who are struggling with substance abuse.  And it is not uncommon for those children and grandchildren who are addicted to support their addictions in part by stealing from their elders, who in turn must look to the Tribe for financial and other assistance.[150]

In addition to these financial costs to Tribes, the opioid crisis's impacts on tribal elders affect Tribes in other, more fundamental ways.  For example, as tribal elders suffer from addiction or expend their energy caring for their grandchildren or struggling adult children, they are unable to spend that time passing on their knowledge of the Tribe's history and culture to the rest of the community.  As a social worker for the Nez Perce explained, while some grandparents who are forced to take care of their grandchildren are able to "feed and water" the younger generation, keeping them physically nourished, they are not able to pass down the fundamental elements of Nez Perce culture, including fishing, hunting, drumming, and dancing.[151]  In short, the opioid crisis has deprived the Tribes of the knowledge and vitality of many elders, a loss that will echo across generations.

### F.  Tribal Identity

The cumulative harms of the opioid crisis are fundamentally affecting tribal identities: the epidemic tears at the social fabric of Tribes, prevents transmission of cultural knowledge, and undermines the health of the entire community.  These pernicious impacts may far outweigh the economic and other effects.  The loss of tribal history and knowledge is irreplaceable and could fundamentally change the identity of Tribes for generations to come.  Tragically, the cultural impacts of the opioid crisis are apparent throughout Indian Country: In a painful echo of

---

[150] *Id.*; SOI of the Confederated Tribes of Siletz Indians (App. B at 22b).
[151] *Nez Perce Complaint, supra* note 109, at ¶ 6.  *See also*, SOI of the Swinomish Indian Tribal Community (App. B at 124b).

historical traumas—from the mass casualties of foreign disease and the Indian Wars, to removal, allotment and assimilation, boarding schools, adoption, termination and relocation—the opioid epidemic poses an existential threat to tribal cultures.

The opioid epidemic has forced many tribal members to leave their families and reservations, physically tearing apart native communities.  In addition to the removal of Indian children from opioid-affected parents and families, tribal members must often travel significant distances to find adequate substance abuse treatment because many Tribes are unable to provide addiction treatment on the reservation.  Not only does this remove the individual from the tribal community, it usually means the individual is at a non-native facility that does not provide culturally relevant forms of treatment and support.  The result is a loss of cultural identity for both the individual and the Tribe.[152]

As some tribal members die of opioid overdoses and some are forced to leave reservations, others are thrust into the role of caretaker and tribal identities are undermined.  Lost cultural knowledge may never be recovered.  And the feelings of loss and dependency that the crisis has created or amplified may overwhelm those who remain and are attempting to pass on those cultural identities, leading to a loss of cultural health and spiritual connectedness.  For this horrific and painful process to be halted, the opioid epidemic must be abated.[153]

---

[152] *See, e.g.*, *Makah Complaint, supra* note 108, at ¶ 376; *Lummi Nation Complaint*, *supra* note 99, at ¶ 381; Jan Hoffman, *In Opioid Battle, Cherokee Want Their Day in Tribal Court*, N.Y. TIMES (Dec. 17, 2017), www.nytimes.com/2017/12/17/health/cherokee-opioid-addiction-pharmacies.html (last visited Oct. 3, 2018).

[153] *See* SOI of the Alaska Native Health Board (App. B at 3b) ("… the opioid crisis tears at our families and social fabric[.]"); SOI of the Bad River Band of Lake Superior Tribe of Chippewa Indians (App. B at 7b) ("The opioid crisis and its devastating effects are suffocating the Bad River Band's way of life."); SOI of the Confederated Salish and Kootenai Tribes (App. B at 20b) ("… there have been serious repercussions on the social/cultural fabric of our communities."); SOI of the Hopland Band of Pomo Indians of California (App. B at 40b) ("This evil must be addressed head-on in order to preserve the Tribe's way of life."); SOI of the Kootenai Tribe of Idaho (App. B at 48b) ("The Kootenai Tribe has suffered immeasurable harm from individual addiction and death, damaging family and community connections and lost participation in cultural activities and tribal life."); SOI of the Metlakatla Indian Community (App. B at 63b) ("The invasion of opioids has impacted our ability to continue to improve our members lives and to preserve our heritage and culture[.]"); SOI of the Native Village of Port Heiden (App. B at 74b) ("The opioid crisis has directly impacted our small Tribe, affecting every family and the overall lifeblood of

### III.  Remedying the Damages and Changing the Trajectory of the Opioid Crisis in Indian Country

The opioid crisis that Defendants created has caused extensive harm throughout Indian Country.  Because that harm arises in a unique and specific legal, political, and cultural context, the remedies for that harm, as well as the means for changing the trajectory of the opioid crisis, are also specific to Indian Country.

#### A.  Implementation of Solutions Must Be Driven by Tribal Sovereignty and Self-Determination—Not by the Interests of States or Other Governments

The lessons of our past are clear: No successful resolution of the crisis or of this litigation can be achieved without providing Tribes with the means to implement appropriate immediate and long-term solutions and to tailor those measures to the particular circumstances of their diverse communities.  As Tribes across the United States have very different histories, perspectives, cultures, and languages, so too must the solutions be culturally specific.

For this to happen, the resources to implement such response measures must flow directly to tribal governments, not through the States.  The peculiar and often strained relationships between Tribes and States means that American Indian and Alaska Native people suffer when Tribes must seek program funding or authority through a State.  To illustrate, prior to FY 2018, Tribes could only access the federal Crime Victims Fund through the States, leaving Tribes largely shut out.  Tribes pushed for, and received, a direct tribal allocation of 3% of the Fund, or about $133 million, in the FY 2018 omnibus appropriations act.[154]  The Senate Report explained the necessity of this change:

---

our Tribe.”); SOI of the Red Cliff Band of Lake Superior Chippewa (App. B at 95b) (“The opioid crisis poses a clear and direct threat to the existence of Red Cliff Band’s tribal culture, identity, and membership.”); SOI of the Reno-Sparks Indian Colony of Nevada (App. B at 97b); (“[The Tribe’s] way of life is under attack…”); SOI of the Shinnecock Indian Nation (App. B at 109b) (“A successful resolution to the opioid crisis is desperately needed in order for the Shinnecock to preserve its way of life, culture, and heritage, as well as its peoples.”); SOI of the Yurok Tribe (App. B at 141b) (“The Yurok Tribe is once again locked in a battle to survive.”).
[154] Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, Div. B, § 510.

> This sub-grant system results in less than 1% of the annual CVF funding cap reaching Indian tribes, leaving crime victims in Indian country substantially underserved by the CVF.  States that do award CVF sub-grants to tribes often place significant restrictions on the types of activities for which these funds may be used, which further hinder Indian tribes in their ability to provide services to victims of crime on their lands.[155]

Similarly, prior to a 2013 amendment to the Stafford Act, Tribes experiencing a major disaster had to rely on their state's governor to petition the President for aid from the Federal Emergency Management Agency (FEMA).  Often when the disaster was restricted to a reservation and did not have a broader impact on the state, Tribes had trouble accessing federal aid.  For example, during the devastating Las Conchas wildfire of 2011, which burned 17,000 acres of Santa Clara Pueblo lands, the New Mexico Governor still had not requested a federal emergency declaration almost a month after the fire began, and it was a year before the Tribe received disaster funds from the State.[156]  The 2013 amendment authorized the chief executive of a federally recognized Tribe to petition the President for FEMA aid directly as well as through the governor, in order to avoid these problems.[157]

In the tobacco litigation and settlement—a process that provides an important precedent for the opioid litigation—Tribes were largely cut out because the settlement funds were funneled through the States.[158]  The master settlement also induced States to attack Tribes by aggressively enforcing State taxes that arguably did not apply to tribal tobacco businesses in Indian Country,

---

[155] S. Rep. No. 115-220, at 2 (2018).

[156] Oversight Hearing on Facing Floods and Fires – Emergency Preparedness for Natural Disasters in Native Communities, Before the SCIA, 112th Cong. (July 21, 2011) (statement of Walter Dasheno, Governor, Santa Clara Pueblo), www.indian.senate.gov/sites/default/files/upload/files/Walter-Dasheno-testimony-2.pdf; Hearing on When Catastrophe Strikes: Responses to Natural Disasters in Indian Country, Before SCIA, 113th Cong. (July 30, 2014) (testimony of J. Michael Chavarria, Governor, Santa Clara Pueblo), www.indian.senate.gov/sites/default/files/upload/files/7.30.14%20SCIA%20Witness%20Testimony%20-%20J.%20Michael%20Chavarria%20-%20Pueblo.pdf.

[157] Disaster Relief Appropriations Act, Pub. L. No. 113-2, § 1110 (amending 42 U.S.C. § 5170).

[158] See, e.g., Table Bluff Reservation (Wiyot Tribe) v. Philip Morris, Inc., 256 F.3d 879, 884 (9th Cir. 2001) (quoting complaint asserting that "there is no provision [in the Master Settlement Agreement]. . . for providing any benefits, economic or otherwise, to Native American Tribes.").

–45–

undermining the government-to-government compacting process.[159]  Accordingly, in recognition

of tribal sovereignty and of the often contentious relationship between Tribes and States,

resources to implement the needed solutions for the opioid crisis in Indian Country must be

targeted directly to tribal governments.  Not only do Tribes and States have differing and often

competing interests, but only the Tribes themselves understand the tribal geographic, economic,

and cultural contexts within which the crisis grew and must be met.

       This Court's decision to establish a separate bellwether track for litigation of tribal claims

was critically important for all of these reasons.  Ultimately, however, this entire consolidated

action, including the collective tribal claims on file (and to be filed), cries out for settlement.

Should that occur, Tribes—as an independent group—must receive their own share of the

settlement funds.  Although there are hundreds of federally recognized Tribes, in addition to

tribal organizations carrying out health care and other tribal governmental functions, such a

separate tribal settlement resolution would be manageable and is not unprecedented.[160]

Moreover, it is the only resolution with any real chance of making a meaningful difference to

stem the tide of the opioid crisis in Indian Country.  So long as tribal representatives are fully

involved in both the negotiation of a settlement amount with the Defendants and in the

development of an allocation plan, there is every reason to believe that a negotiated resolution of

this case can be successful.  Further, although the Tribes emphasize that separate treatment of

their claims is necessary, they also understand that all governmental entities are facing this

uniquely tragic crisis together and that it will require coordinated and cooperative efforts to

---

[159] Ryan D. Dreveskracht, *Forfeiting Federalism: The Faustian Pact with Big Tobacco*, 18 RICHMOND J. OF L. & PUB. INTEREST 291, 305 (2015).
[160] In recently concluded tribal litigation against the United States, the claims of 700 Tribes and tribal organizations were resolved for $940 million on a collective basis pursuant to Rule 23.  *Ramah Navajo Chapter v Jewell*, 167 F. Supp. 3d 1217 (D.N.M. 2016) (on remand from *Salazar v. Ramah*, 567 U.S. 182 (2012)).  Not one class member objected to the final allocation of the settlement funds once all eligible class members had been identified.

address and defeat it nationwide.  Tribes stand as allies in these efforts and are ready, willing, and able to join in coalition with States, cities, and counties to do so, provided that Tribes are recognized and respectfully treated as sister sovereigns throughout the process.

**B.      Existing and Emerging Models for Addressing the Opioid Crisis in Indian Country**

Although Indian Country as a whole currently lacks the resources to fully address the opioid crisis, many tribal governments have begun to institute promising solutions that could be expanded upon as well as serve as models for other Tribes.  These examples further illustrate the kinds of tribally driven solutions that could be most impactful and the progress that Tribes could make if so empowered, although there is no "one-size-fits-all" solution for Indian Country.

*1.      Integrated Treatment: The Didgʷálič Model*

After suffering a series of devastating losses in the Tribal community due to opioid overdoses, the Swinomish Tribe designed and developed a unique treatment program called didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD).[161]  Didgʷálič provides a full array of MAT, primary medical care, dental care (currently in development), mental health counseling, treatment of co-occurring disorders, and social worker assistance to deal with domestic violence, legal, housing, employment, parenting and other issues both causing and resulting from OUD.  Didgʷálič also provides on-site child care and free transportation to eliminate barriers to treatment.  The didgʷálič model embraces a team approach to care: each patient is treated by a medical doctor, a certified chemical dependency professional (CDP) counselor, nursing staff, a mental health counselor, and a social worker (if needed).

---

[161] The word didgʷálič is a Lushootseed word translating to "place where camas was dug."

The didgʷáličˇ model of care centers on and incorporates the Tribe's culture and values. For example, didgʷáličˇ places no time limit on treatment, unlike many mainstream programs that limit access to a specific number of days.  The program promotes long-term, sustainable treatment rather than short-term fixes, allowing patients to stay in the community with their families during treatment.  The program offers training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.  The Tribal government and individual Tribal members also provide cultural leadership and advice on the use of Native language and practices in the program.

The didgʷáličˇ model of treatment differs from the state-based Hub-and-Spoke models currently under development.  The Hub-and-Spoke model relies on a system of referrals across and among providers within a robust existing inventory of providers.  To deal with structural disaggregation of necessary OUD treatment components in the health care system, the Hub-and-Spoke model creates a network of coordinated and referred care.  Patients may receive MAT in one place, counseling in another, primary care in another, and the provider network is coordinated by navigators.  Didgʷáličˇ, in contrast, embraces fully integrated care, placing all components of effective OUD treatment under one roof.  This model works well for Swinomish, because prior attempts at providing referred care resulted in very low rates of care delivery when patients were required to travel even short distances and overcome friction in the health care system to obtain the various components of OUD care.  In this way, the didgʷáličˇ model responds to the specific needs of Swinomish community members.

Other Tribes are working to improve integration or coordination of care and services for better treatment outcomes, including intensive case management, medical care, transitional and substance-free housing to members rejoining the tribal community, and other support services

delivered in a culturally competent manner.  The Mille Lacs Band of Ojibwe, for example, planned and has begun implementation of an interdisciplinary program of medical, chemical dependency, public health, social services and child welfare known as Nenda-Noojimig ("Those ones who seek healing") Mino Gigizheb ("It is a good morning"), which will integrate a coordinated plan of care for Native American community members aged 18 or older who self-identify as experiencing OUD.[162]  In addition to providing stable housing and medical care, these kinds of tribal wellness centers and programs can offer, or connect individuals to, educational and vocational services, family services, financial services, and legal services in order to help tribal members successfully reintegrate into the community.

### 2.  CHAP and Telehealth for Remote Communities

Not all Tribes have the same resources, and some are too small and remote to make large-scale infrastructure expenditures cost effective.  In these locations, Tribes are implementing alternative models for successful, flexible, and community-focused care.  For example, in Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people.[163]  Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals.  This "provider pyramid" allows for lower level staff to treat less complex needs while highly skilled professionals address more complicated problems.  Behavioral health aides (BHAs) are trained

---

[162] MILLE LACS BAND OF OJIBWE, Mille Lacs Band Receives Grant to Address Opioid Crisis, (Nov. 8, 2017), www.millelacsband.com/news/mille-lacs-band-receives-grant-to-address-opioid-crisis (last viewed Oct. 4, 2018); MINN. DEP'T OF HUMAN SERVS., STATE TARGETED RESPONSE TO THE OPIOID CRISIS GRANTS (updated Apr. 12, 2018), https://mn.gov/dhs/assets/grants-by-catagory_tcm1053-334421.pdf.
[163] ALASKA COMMUNITY HEALTH AIDE PROGRAM, www.akchap.org/html/home-page.html (last visited Oct. 4, 2018).

as counselors, educators and advocates to help address mental health and addiction issues.[164]
The expansion of CHAP to the continental United States and further training of BHAs to treat
OUD would not only address the shortage of chemical dependency counselors (CDPs) in many
rural areas, but provide tribally driven and culturally competent care from within Indian
communities, while also addressing some of the barriers to recruitment and retention faced by
tribal health programs.

Other tribal communities have had success with telehealth programs that connect
physicians and other health professionals to communities that cannot physically recruit them to
live in remote areas.  These programs have greater efficacy when combined with on-site access
to lower- and mid-end providers who can collaborate with physicians for specialized treatments,
as with CHAP.

   3.  *Wellness Courts and Other Alternative, Culturally Appropriate Justice Models*

Many Tribes have had success treating opioid offenders using traditional healing practices
and alternative institutions, sometimes called wellness courts or peacekeeping courts.  From
2009 through 2015, 83% of individuals who completed probation requirements through wellness
courts remained clean and sober.[165]

The Tulalip Tribes and Penobscot Nation Healing to Wellness Courts, cited above, are two
successful examples.  These institutions are focused on healing rather than punishment.
Individuals accepted into the Penobscot Nation's program, for example, must agree to enter a
guilty plea for the crime charged against them, but their sentence is "deferred" to allow them to

---

[164] ALASKA NATIVE TRIBAL HEALTH CONSORTIUM, Behavioral Health Aide Program, http://anthc.org/behavioral-health-aide-program (last visited Oct. 4, 2018).  BHAs are trained to utilize set protocols under the general supervision of masters level professionals and help address the shortages of CDPs.
[165] NATIONAL AMERICAN INDIAN COURT JUDGES ASSOCIATION, EMERGING PRACTICES IN TRIBAL CIVIL AND CRIMINAL LEGAL ASSISTANCE 16 (Nov. 2016), www.naicja.org/resources/Pictures/Final%20Revised%20Emerging%20Practices%2011.8.2016%20copy.pdf.

go through the program.[166]  Then, a comprehensive, holistic plan is developed in collaboration between ten tribal government departments to address the individual's treatment needs in four phases: Phase I is focused on detoxification and beginning treatment and generally lasts 180 days.  Phase II is focused on stabilization and treatment and generally lasts 120 days.  Phase III is focused on maintenance and treatment and generally lasts 120 days.  Phase IV is focused on graduation and aftercare and generally lasts 120 days.  Successful completion of the program results in a dismissal of the participant's guilty plea.  Over two dozen individuals have gone into the program since 2011, and recidivism is extremely low.

In some areas, Joint Jurisdictional Courts have aided both Tribes and the surrounding communities in addressing issues that arise as a result of the opioid crisis.  For example, the Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, is in the process of developing Family Wellness Courts (FWC) as collaborative, joint jurisdictional wellness courts available to Yurok families suffering from opioid abuse problems.  The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems.  Cases that would normally be heard at the county courthouse can be transferred to the joint jurisdictional FWC, which in Humboldt County is presided over jointly by the Chief Judge of the Yurok Tribal Court and the Presiding Judge of the Humboldt County Superior Court.[167]  This intergovernmental partnership focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.  The FWC utilizes an established, coordinated team approach that connects children and families to their cultures, creates culturally competent services, and helps families, in order to improve justice outcomes in tribal communities.

---

[166] *USET Testimony*, *supra* note 107.
[167] The FWC in Del Norte is scheduled to open in 2020.

Likewise, the Kenaitze Indian Tribe has seen success in the first eighteen months of operating its

Henu' Community Wellness Court under an agreement with the State of Alaska.  The Henu'

Court is a joint-jurisdictional therapeutic court that serves those who face legal ramifications

stemming from substance use by placing a focus on wellness and treatment versus jail time.[168]

#### 4.  *Culturally Grounded Community Prevention: The Healing of the Canoe*

Culturally competent prevention programs, tailored to each tribal community, can play an

important role in stopping and reversing the spread of the opioid epidemic.  The Healing of the

Canoe (http://healingofthecanoe.org/) is a collaborative project between the Suquamish Tribe,

the Port Gamble S'Klallam Tribe, and the University of Washington Alcohol and Drug Abuse

Institute (ADAI).  It has led to the development and dissemination of the Culturally Grounded

Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for

Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect

its youth to their tribal community and culture.  It teaches Native youth the skills they need to

navigate their life's journey without being pulled off course by alcohol or drugs, using tribal

values, traditions, and culture both as a compass to guide them and an anchor to ground them.[169]

By reversing the historical trauma of forced assimilation, this approach attacks the root cause of

so much substance abuse among tribal youth.[170]

### C.  Resources Are Needed to Address Barriers to Treatment and Implement Holistic Solutions

For Tribes across the country to be able to implement such effective solutions, they will

need access to resources to expand treatment services and options and to implement prevention

---

[168] *See* SOI of the Kenaitze Indian Tribe (App. B at 44b); Henu' Community Wellness Court, https://public.courts.alaska.gov/web/therapeutic/docs/kenai-joint-juris-court.pdf (last visited Oct. 4, 2018).
[169] Dennis Donovan, *Healing of the Canoe*, NORTHWEST PORTLAND AREA INDIAN HEALTH BOARD: HEALTH NEWS & NOTES, January 2018, http://healingofthecanoe.org/wp-content/uploads/2018/02/Jan.2018_Final_NPAIB.pdf.
[170] Jessenia Funes, *Drug Use Down, Hope Up: A Canoe Journey Inspires Native Youth*, YES! MAGAZINE, Dec. 10, 2015, www.yesmagazine.org/issues/good-health/drug-use-down-hope-up-a-canoe-journey-inspires-native-youth-20151210/.

and public safety responses. Resources are needed for a wide variety of programs and services to both respond to and address the root causes of opioid addiction, and the needs will vary by Tribe. These needs include:

**Local, Tribally Controlled Treatment Facilities.** To begin with, addressing a public health crisis of this magnitude and scale demands rapid expansion of quality OUD treatment services in Indian Country. While American Indians and Alaska Natives experience the highest rates of opioid overdose deaths of any recorded group, they also face significant disparities in access to effective treatment services. Only one in eight American Indians and Alaska Natives needing substance use disorder treatment receives it.[171] And those who do receive treatment are less likely than non-Natives to have access to high-quality, effective services. Native communities suffer particularly in their access to evidence-based treatments for OUD. Only 28% of substance use disorder programs serving American Indians and Alaska Natives offer evidence-based practices such as MAT, a rate substantially lower than in programs serving the general population.[172] This is especially concerning given that MAT, a combination of psychosocial therapy and pharmacological treatment, produces the highest measured rates of success in OUD treatment.[173]

Compounding the problem is the geographic and economic isolation of most Tribes and the need for locally accessible services. Relying on States to implement solutions for Indian

---

[171] Legha Rupinder et al., *Challenges to providing quality substance abuse treatment services for American Indian and Alaska Native Communities: Perspectives of Staff from 18 Treatment Centers*, 14 BMC PSYCHIATRY 181 (2014), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/1471-244X-14-181.

[172] Traci Rieckmann et al., *National Overview of Medication Assisted Treatment for American Indians and Alaska Natives with Substance Use Disorders*, 68 PSYCHIATRIC SERVS. 1136 (2017), https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.201600397.

[173] Thomas R. Kosten & Tony P. George, *The Neurobiology of Opioid Dependence: Implications for Treatment*, 1 SCIENCE AND PRACTICE PERSPECTIVES 13–20 (2002); AM. SOCIETY OF ADDICTION MED., *The ASAM National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use* (2015), http://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-supplement.pdf?sfvrsn=24.

Country simply will not work; States will focus their efforts on their own population centers, not remote and isolated tribal lands.  Further, tribal members face unique barriers that hinder their access to treatment, and that may not be effectively addressed by non-Native facilities.  OUD is a chronic, relapsing medical condition with complex psychosocial components, and effective treatment must address both the physiological and psychological components.[174]  Because Native Americans suffer from high rates of abuse, neglect and trauma, including historical trauma, as well as overall lower health outcomes, the course of treatment for OUD in Tribal communities is inherently more complex than for other patient populations.  Sending tribal members away to geographically distant treatment programs, separating them from their families and further eroding their bonds to community and culture, is generally not an effective treatment model.  Rather, there is a need for local, tribally specific treatment facilities (including inpatient facilities and mobile MAT units) with culturally appropriate treatment and prevention practices.

**Culturally Competent Care.**  Culturally competent care adapts services to meet the culturally unique needs of community members by acknowledging and integrating patient and community values, beliefs and behaviors into the health care model.  Many existing Tribal substance use disorder programs have taken decades to adapt Western abstinence-based alcoholism treatments to make them compatible with traditional Tribal healing practices; to educate and train Native counselors in these modalities; and to build community support, infrastructure and funding sources to support such programs.  This process of developing culturally competent pathways and adaptive evidence-based practices must be repeated for OUD treatment by giving Tribes access to available scientific resources and empowering them to tailor

---

[174] Karen Casper et al., *Models of Integrated Patient Care Through OTPs and DATA 2000 Practices*, AM. ASS'N FOR THE TREATMENT OF OPIOID DEPENDENCE (Feb. 22, 2016), http://www.aatod.org/wp-content/uploads/2016/10/whitepaper-1.doc.

such treatments to the unique needs of their communities.  Again, this is not something States would or could do—underscoring again the need for tribally targeted resources.

**Professional Training for Tribal Members.**  A related barrier to effective treatment in Indian Country is the lack of community-based and culturally competent, Native, midlevel professionals properly trained to treat OUD.  There is a nationwide shortage of CDPs, an even greater shortage of CDPs trained in MAT, and even fewer properly trained CDPs in Indian Country.  With the resources to train tribal citizens and community members, Tribes could address this shortage and overcome many of the obstacles associated with recruitment and retention of health professionals in Indian Country, following the CHAP model.

**Law Enforcement and Wellness Courts.**  Tribal communities facing the opioid crisis need resources to effectively meet their policing needs, including localized and properly trained law enforcement personnel as well as appropriate infrastructure, facilities, and equipment.  The Spokane Tribe's circumstances in this regard are typical: "We need to hire additional substance abuse counselors and police officers.  It is difficult to recruit and retain necessary personnel due to our rural location and limited resources." [175]  Many Tribes also want to provide alternatives to incarceration for offenders when treatment and monitoring are more appropriate.  Criminalizing opioid use disorder is contrary to the overwhelming research demonstrating that it is a disease requiring treatment.[176]  Prison exacerbates the ill effects of opioids on communities by splitting families apart and draining resources, and treatment is an alternative that reduces crime and

---

[175] SOI of the Spokane Tribe of Indians (App. B at 117b).

[176] Redonna K. Chandler et al., *Treating Drug Abuse and Addiction in the Criminal Justice System: Improving Public Health and Safety*, 301(2) J. AM. MED. ASS'N 183 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2681083/; Yngvild Olsen & Joshua M. Sharfstein, *Confronting the Stigma of Opioid Use Disorder—and Its Treatment*, 311(14) J. AM. MED. ASS'N 1393 (2014), https://jamanetwork.com/journals/jama/article-abstract/1838170.

makes more effective use of those resources.[177]  Many Tribes already offer wellness courts, which can also provide a culturally appropriate response to individual and community problems, but need additional resources to increase the capacity of their programs in response to the opioid crisis.

**Community Prevention and Education.**  Tribes need resources to prevent opioid misuse through community programs, especially those focused on youth and elders.  Community education and prevention will be most effective if it is culturally competent and tribally driven to meet the needs of each community.  Examples include Seneca Strong, the Seneca Nation's program promoting drug prevention and recovery, peer outreach and recovery support,[178] and the Mashpee Wampanoag Tribe's multi-media marketing campaign to educate the community on substance abuse prevention, treatment, and recovery.[179]  Additionally, training a broad range of the community to use naloxone (and making naloxone available to them) will help prevent overdose deaths.  Because many tribal communities are sparsely populated, naloxone training must often extend beyond medical personnel, first responders, and community leaders.

**Integrated Care, Housing, and Social Services.**  Barriers to treatment in Indian Country include lack of transportation, lack of childcare, homelessness, co-occurring mental illness, medical complications, and histories of abuse and trauma.  Clinicians in tribal substance use treatment programs report that struggles to meet their patients' basic survival needs, such as housing, food, and safety, often supersede or impede substance use disorder treatment.  Programs and services that focus on holistic care, like the didgʷáličˇ model and the Mille Lacs Band's

---

[177] Emmanuel Krebs et al., *The costs of crime during and after publicly-funded treatment for opioid use disorders: a population-level study for the state of California*, 112(5) ADDICTION 838 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5382102/.

[178] SENECA NATION OF INDIANS, http://senecastrong.org/ (last visited Oct. 4, 2018).

[179] MASHPEE WAMPANOAG TRIBE, https://mashpeewampanoagtribe-nsn.gov/opioid-education/ (last visited Oct. 4, 2018).

project, can help to remove common obstacles to lasting recovery.  Further, many Tribes need to develop or expand programming to provide accessible housing, as well as transitional housing for tribal citizens returning to their communities from inpatient treatment and/or incarceration. Vocational training can also be a powerful tool to remedy and limit opioid abuse, as employment is tied both to successful treatment and to the avoidance of substance abuse in the first place.[180]

**Special Programs for Rural Areas.**  The Defendants have caused huge numbers of opioid pills to reach even the most rural areas of this country, and many tribes lack the infrastructure to provide an immediate response to emergencies caused by opioids.[181]  Rural areas of Indian Country require remedial measures tailored to curb opioid abuse in their particular communities.  For example, mobile health and counseling units can bring crucial services to remote areas—including response to overdoses and MAT services.  These units can also provide access to naloxone and training in its use, along with references to educational programs, including online resources, designed to help these communities resolve and avoid opioid-related effects.  Providing naloxone and naloxone training to at-risk individuals and their peers is an effective (and cost-efficient) way to prevent overdose deaths, and is especially important where emergency services may not respond quickly.[182]  The CHAP model could also be expanded with additional resources.

---

[180] SUBSTANCE ABUSE & MENTAL HEALTH SERVICES ADMIN., INTEGRATING SUBSTANCE ABUSE TREATMENT & VOCATIONAL SERVICES, at xv (rev. 2014), https://store.samhsa.gov/shin/content/SMA12-4216/SMA12-4216.pdf.
[181] For example, in each year from 2007 to 2016, there were at least 58.9 opioid prescriptions given per 100 Alaska residents, with a high point of 68.5 per 100 Alaska residents in 2008.  CDC, U.S. STATE PRESCRIBING RATES (2016), https://www.cdc.gov/drugoverdose/maps/rxstate2016.html (includes links to previous years).  These pills reached the most remote Native Villages of Alaska, impacting Alaska Natives disproportionately among Alaskans.
[182] Shane R. Mueller et al., *A Review of Opioid Overdose Prevention and Naloxone Prescribing: Implications for Translating Community Programming into Clinical Practice*, 36 (2) SUBSTANCE ABUSE 240 (Apr. 2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4470731/.  It is also a cost-effective measure. *Id.* (citing Phillip O. Coffin & Sean D. Sullivan, *Cost-effectiveness of Distributing Naloxone to Heroin Users for Lay Overdose Reversal*, 158 ANNALS OF INTERNAL MED. 1 (Jan. 1, 2013)).

Meeting the challenge of the opioid crisis will require large-scale capacity building and systems transformation and development in Indian Country.  Tribes will need more physicians, CDPs, counselors, psychotherapists, social workers, and clinical administrators with experience in OUD treatment to work in Indian Country, as well as ongoing workforce development and training for the doctors, nurses, counselors, and CDPs already working there.  In particular, clinical staff must receive training and education about the unique cultural needs of the tribal communities they serve, so that they can design and deliver care in culturally competent ways. Through projects like the didgʷáličʔ integrated treatment model and others, Tribes have proven their capacity to undertake this kind of work.  But one remaining and often insurmountable barrier standing in the way is access to sufficient resources to support these efforts.

### D.    Acknowledgement and Apology is Necessary to Promote Community Healing

Defendants' introduction of opioids through the conduct complained of in this litigation, and the resulting addiction, health issues, and deaths, have disproportionately impacted Tribes. Tribal communities are plagued by grief caused by the losses and disruptions to their family structures and traditional lifeways.  From traditional perspectives of conflict resolution, acknowledgment and acceptance of responsibility in causing harm is the first step in resolution and peace making.  An apology that originates from a place of understanding why actions were harmful and articulating remorse allows the community to begin the process of rebuilding.  An acknowledgment and apology from the Defendants, who are responsible for this crisis, is therefore an important first step in healing tribal communities from the scourge of the opioid

crisis. While they do not remedy the harms inflicted on Native cultures, such statements of apology are a critical part of the healing process.[183]

## CONCLUSION

In many ways, the opioid epidemic has become yet another painful reenactment of past harm and abuse inflicted on Indian Country, compounding historical trauma from which Tribal Nations have not fully healed. As in the past, that abuse has been inflicted by outsiders in order to extract great wealth from Indian communities and homelands, at the expense of tribal citizens and with no regard for their wellbeing. In the face of these recurring invasions, Tribes have shown their resiliency, but too often they have done so without accountability or recompense from those responsible for the harm. That history should not be repeated here, and these actions should not be dismissed until a fair settlement is reached. American Indian and Alaska Native lives depend on it: with the proper resources, Tribes have the tools, the knowledge, and the wisdom to reverse the trajectory of the crisis and begin the healing that is so desperately needed throughout Indian Country, and indeed the whole United States.

Respectfully Submitted:

By:

Geoffrey D. Strommer
Edmund Clay Goodman
Stephen D. Osborne
Dawn E. Winalski

Caroline P. Mayhew
HOBBS, STRAUS, DEAN, & WALKER LLP
2120 L St. NW, Suite 700
Washington, DC 20037
Telephone: (202) 822-8282
Facsimile: (202) 296-8834

HOBBS, STRAUS, DEAN & WALKER, LLP
516 SE Morrison St., Suite 1200
Portland, OR 97214
Telephone: (503) 242-1745
Facsimile: (503) 242-1072

---

[183] *See, e.g.*, INDIGENOUS AND NORTHERN AFFAIRS CANADA, *Indian Residential Schools Statement of Apology - Phil Fontaine, National Chief, Assembly of First Nations*, https://www.aadnc-aandc.gc.ca/eng/1100100015697/1100100015700 (last viewed Oct. 4, 2018).

cmayhew@hobbsstraus.com

gstrommer@hobbsstraus.com
egoodman@hobbsstraus.com
sosborne@hobbsstraus.com
dwinalski@hobbsstraus.com

*Counsel for Amicus Curiae*


Steven J. Skikos*
Jane E. Joseph*
Mark G. Crawford*
Autumn D. Monteau*
SKIKOS, CRAWFORD, SKIKOS & JOSEPH
LLP
One Sansome Street, Suite 2830
San Francisco, CA  94104
Telephone: (415) 546-7300
Facsimile:  (415) 546-7301
sskikos@skikos.com
jjoseph@skikos.com
mcrawford@skikos.com
amonteau@skikos.com

Gregory M. Utter*
Joseph M. Callow, Jr.*
Thomas F. Hankinson*
Sarah V. Geiger*
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
Telephone: (513) 579-6400
Facsimile: (513) 579-6457
gmutter@kmklaw.com
jcallow@kmklaw.com
thankinson@kmklaw.com
sgeiger@kmklaw.com


Scott D. Gilbert*
Richard Shore*
Michael B. Rush*
Jenna A. Hudson*
GILBERT LLP
1100 New York Avenue, NW, Suite 700
Washington, DC  20005
Telephone: (202) 772-2200
Facsimile: (202) 772-3333
gilberts@gotofirm.com
shorer@gotofirm.com
rushm@gotofirm.com
hudsonj@gotofirm.com

Archie C. Lamb, Jr.*
Peter J. Mougey*
Troy Rafferty*
Page A. Poerschke*
Laura S. Dunning*
Neil E. "Ned" McWilliams*
Jeffrey Gaddy*
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL  32502-5996
Telephone: 850-435-7068
Facsimile: 850-436-6068
alamb@levinlaw.com
pmougey@levinlaw.com
trafferty@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
nmcwilliams@levinlaw.com
jgaddy@levinlaw.com

Lloyd B. Miller*
Donald J. Simon*
Whitney A. Leonard*
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
Telephone: (202) 682-0240
Facsimile: (202) 682-0249
lloyd@sonosky.net
dsimon@sonosky.com
whitney@sonosky.net

Lynn L. Sarko
Alison Gaffney
Gabe Verdugo
KELLER ROHRBACK, LLP
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
lsarko@kellerrohrback.com
agaffney@KellerRohrback.com
gverdugo@KellerRohrback.com

James C. Peterson*
HILL, PETERSON, CARPER, BEE&
DEITZLER, PLLC
NorthGate Business Park 500 Tracy Way
Charleston, WV 25311
Telephone: (304) 345-5667
Facsimile: (304) 345-1519
jcpeterson@hpcdb.com

Anthony J. Majestro*
POWELL & MAJESTRO, PLLC
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Telephone: (304) 346-2889
Facsimile: (304) 346-2895
amajestro@powellmajestro.com

William S. Ohlemeyer*
Patricia Melville*
Tyler Ulrich*
Stephen N. Zack*
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY  10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
wohlemeyer@bsfllp.com
pmelville@bsfllp.com
tulrich@bsfllp.com
szack@bsfllp.com

J. Nixon Daniel, III
Mary Jane Bass
John R. Zoesch, III
BEGGS & LANE
501 Commendencia Street
Pensacola, FL  32502
Telephone: (850) 432-2451
Facsimile: (850) 469-3331
jnd@beggslane.com
mjb@beggslane.com
jrz@beggslane.com

Roland K. Tellis*
Mark P. Pifko*
BARON & BUDD, P.C.
15910 Ventura Boulevard, Suite 1600
Los Angeles, CA 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
rtellis@baronbudd.com
mpifko@baronbudd.com

Russell W. Budd*
J. Burton LeBlanc, IV*
Laura J. Baughman*
S. Ann Saucer*
Christine C. Mansour*
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
Telephone: (214) 521-3605
Facsimile: (214) 520-1181
rbudd@baronbudd.com
bleblanc@baronbudd.com
lbaughman@baronbudd.com
asaucer@baronbudd.com
cmansour@baronbudd.com

Michael J. Fuller, Jr.*
Amy J. Quezon*
McHUGH FULLER LAW GROUP, PLLC
97 Elias Whiddon Rd.
Hattiesburg, MS 39402
Telephone: (601) 261-2220
Facsimile: (601) 261-2481
mike@mchughfuller.com
amy@mchughfuller.com

Paul T. Farrell, Jr.*
Bert Ketchum*
GREENE, KETCHUM, FARRELL, BAILEY
& TWEEL, LLP
419 - 11th Street (25701)/ P.O. Box 2389
Huntington, WV 25724-2389
Telephone: (800) 479-0053 or (304) 525-9115
Facsimile: (304) 529-3284
paul@greeneketchum.com
bert@greeneketchum.com

Elizabeth J. Cabraser
Eric B. Fastiff
Abby R. Wolf
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
ecabraser@lchb.com
efastiff@lchb.com
awolf@lchb.com

T. Roe Frazer II
Trey Frazer
Frazer PLC
1 Burton Hills Blvd.
Suite 215
Nashville TN 37215
Telephone: (615) 647-6464
roe@frazer.law
trey@frazer.law

Mark P. Chalos
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN  37201-2379
Telephone: (615) 313-9000
Facsimile:  (615) 313-9965
mchalos@lchb.com


Dan Drachler
Zwerling, Schachter & Zwerling, LLP
1904 Third Avenue
Suite 1030
Seattle, WA 98101-1170
Telephone: (206) 223-2053
Facsimile: (206) 343-9636
ddrachler@zsz.com


Kim D. Stephens
Rebecca L. Solomon
Tousley Brain Stephens PLLC
1700 Seventh Avenue, Ste 2200
Seattle, WA 98101-4416
Telephone: (206) 682-5600
Facsimile: (206) 682-2992
kstephens@tousley.com
rsolomon@tousley.com


Richard W. Fields*
FIELDS PLLC
1700 K Street, NW, Suite 810
Washington, DC 20006
Telephone: (800) 878-1432
fields@fieldslawpllc.com


Tara D. Sutton*
Timothy Q. Purdon*
ROBINS KAPLAN LLP
800 LaSalle Avenue
Suite 2800
Minneapolis, MN  55402
Telephone: 612 349 8500
Facsimile: 612 339 4181
TSutton@RobinsKaplan.com
TPurdon@RobinsKaplan.com


Sona R. Shah
Zwerling, Schachter & Zwerling, LLP
41 Madison Avenue, 32nd Floor
New York, NY 10010
Telephone: (212) 223-3900
sshah@zsz.com


David Domina
DominaLaw Group PC LLO
2425 South 144th Street
Omaha, NE 68144
Telephone: (402) 493-4100
DAD@dominalaw.com


Rachel Sage
Office of the Tribal Attorney
Swinomish Indian Tribal Community
11404 Moorage Way
La Conner, WA 98257
Telephone: (360) 466-1134
rsage@swinomish.nsn.us

*These law firms are directly involved in the bellwether cases and also represent a number of amici Tribes. They are signing this brief on behalf of their amici clients.

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to Case Management Order Number Six (Dkt. 770, July 23, 2018), *Amici* are

permitted to file a consolidated opposition to Defendants' motions to dismiss totaling 60 pages.

This brief adheres to that limit.


        /s/ Steven J. Skikos
        Steven J. Skikos

## CERTIFICATE OF SERVICE

I, Steven J. Skikos, hereby certify that the foregoing document was served via the Court's

ECF system to all counsel of record.


 /s/ Steven J. Skikos
Steven J. Skikos

# APPENDIX

**APPENDIX A**

**LIST OF *AMICI* TRIBES AND MEMBER TRIBES OF *AMICI* TRIBAL ORGANIZATIONS**

**Affiliated Tribes of Northwest Indians**, whose member Tribes include:
Blackfeet Nation (MT)**
Burns-Paiute Tribe (OR)
Chehalis Tribe (WA)
Chippewa Cree Tribe of the Rocky Boy Reservation (MT)
Coeur d'Alene Tribe (ID)
Confederated Tribes and Bands of Yakama Indian Nation (WA)
Confederated Tribes of Coos, Lower Umpqua & Siuslaw (OR)
Confederated Tribes of Grand Ronde (OR)
Confederated Tribes of Salish & Kootenai (MT)
Confederated Tribes of Siletz Indians (OR)
Confederated Tribes of the Colville Reservation (WA)
Confederated Tribes of Umatilla Indians (OR)
Confederated Tribes of Warm Springs (OR)
Coquille Tribe (OR)
Cow Creek Band of Umpqua (OR)
Cowlitz Tribe (WA)
Crow Tribe (MT)
Hoh Tribe (WA)
Hoopa Valley Tribe (CA)
Jamestown S'Klallam Tribe (WA)
Kalispel Tribe (WA)
Karuk Tribe (CA)
Klamath Tribe (OR)
Kootenai Tribe of Idaho (ID)
Lower Elwha S'Klallam Tribe (WA)
Lummi Indian Nation (WA)
Makah Indian Nation (WA)
Metlakatla Tribe (AK)
Muckleshoot Indian Tribe (WA)
Nez Perce Tribe (ID)
Nisqually Tribe (WA)
Nooksack Indian Tribe (WA)
Northwestern Band of Shoshone Nation (ID)
Organized Village of Kassan (AK)
Port Gamble S'Klallam Tribe (WA)
Puyallup Tribe (WA)
Quileute Tribe (WA)
Quinault Indian Nation (WA)

Samish Indian Nation (WA)
Sauk-Suiattle Tribe (WA)
Shoalwater Bay Tribe (WA)
Shoshone-Bannock Tribes (ID)
Shoshone-Paiute Tribes (NV)
Skokomish Tribe (WA)
Smith River Rancheria (CA)
Snohomish Tribe (WA)*
Snoqualmie Tribe (WA)
Spokane Tribe of Indians (WA)
Squaxin Island Tribe (WA)
Steilacoom Tribe (WA)*
Stillaquamish Tribe (WA)
Summit Lake Paiute Tribe (NV)
Suquamish Tribe (WA)
Swinomish Tribe (WA)
Tlingit & Haida Indian Tribes (AK)
Tulalip Tribe (WA)
Upper Skagit Tribe (WA)
Yurok Tribe (CA)

**Akiak Native Community**

**Alaska Native Health Board**, whose members include:
Alaska Native Tribal Health Consortium
Aleutian Pribilof Islands Association
Arctic Slope Native Association
Bristol Bay Area Health Corporation
Chickaloon Village Traditional Council
Chugachmiut
Copper River Native Association
Council of Athbascan Tribal Governments
Eastern Aleutian Tribes, Inc.
Karluk IRA Tribal Council
Kenaitze Indian Tribe
Ketchikan Indian Community
Kodiak Area Native Association
Maniilaq Association
Metlakatla Indian Community
Mt. Sanford Tribal Consortium
Native Village of Eklutna
Native Village of Eyak
Native Village of Tyonek
Ninilchik Village Traditional Council

Norton Sound Health Corporation
Seldovia Village Tribe
Southcentral Foundation
SouthEast Alaska Regional Health Consortium
Tanana Chiefs Conference
Valdez Native Tribe
Yakutat Tlingit Tribe
Yukon Kuskokwim Health Corporation

**Alaska Native Tribal Health Consortium**

**Aleutian Pribilof Islands Association, Inc.,** whose member Tribes include:
Agdaagux Tribal Council for the Agdaagux Tribe of King Cove
Akutan Tribal Council for the Native Village of Akutan
Atka IRA Council for the Native Village of Atka
Belkofski Tribal Council for the Native Village of Belkofski
False Pass Tribal Council for the Native Village of False Pass
Nelson Lagoon Tribal Council for the Native Village of Nelson Lagoon
Nikolski IRA Council for the Native Village of Nikolski
Pauloff Harbor Tribe
Qagan Tayagungin Tribe of Sand Point
Qawalangin Tribal Council for the Qawalangin Tribe of Unalaska
St. George Traditional Council for the Pribilof Island Aleut Community of St. George
Tribal Government of St. Paul Island for the Pribilof Island Aleut Community of St. Paul
Unga Tribal Council for the Native Village of Unga

**Asa'carsarmiut Tribal Council (Mountain Village)**

**Bad River Band of Lake Superior Tribe of Chippewa Indians**

**Big Sandy Rancheria of Mono Indians of California**

**Big Valley Band of Pomo Indians of California**

**California Rural Indian Health Board,** whose member Tribes include:
Agua Caliente Band of Cahuilla Indians
Bear River Band of Rohnerville Rancheria
Berry Creek Rancheria
Big Lagoon Rancheria
Big Pine Paiute Tribe of the Owens Valley
Bishop Paiute Tribe
Blue Lake Rancheria
Bridgeport Indian Colony
Cahuilla Band of Indians

-3a-

Cher-Ae Heights Indian Community of the Trinidad Rancheria
Chicken Ranch Rancheria
Cloverdale Rancheria of Pomo Indians
Death Valley Timbisha Shoshone Tribe
Dry Creek Rancheria Band of Pomo Indians
Elk Valley Rancheria
Enterprise Rancheria
Federated Indians of Graton Rancheria
Fort Bidwell Indian Community of the Fort Bidwell Reservation
Fort Independence Indian Community of Paiute Indians of the Fort Independence
Greenville Rancheria
Hoopa Valley Tribe
Karuk Tribe
Kashia Band of Pomo Indians of the Stewarts Point Rancheria
Lone Pine Paiute Shoshone Tribe
Lytton Rancheria
Manchester Band of Pomo Indians of the Manchester Rancheria
Mooretown Rancheria
Morongo Band of Mission Indians
Pechanga Band of Luiseno Indians
Pit River Tribe
Quartz Valley Indian Reservation
Ramona Band of Cahuilla Indians
Redding Rancheria
Resighini Rancheria
San Manuel Band of Mission Indians
Santa Rosa Band of Cahuilla Indians
Soboba Band of Luiseno Indians
Tolowa Dee-ni' Nation
Torres Martinez Desert Cahuilla Indians
Tule River Indian Tribe
United Auburn Indian Community of the Auburn Rancheria
Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation
Wiyot Tribe
Yurok Tribe of the Yurok Reservation
Table Mountain Rancheria

**Central Council of Tlingit & Haida Indian Tribes of Alaska**

**Chapa-De Indian Health,** whose member Tribe is the United Auburn Indian Community of the
Auburn Rancheria of California

**Cheyenne and Arapaho Tribes**

**Cheyenne River Sioux Tribe of South Dakota**

**Chickaloon Native Village**

**Chitimacha Tribe of Louisiana**

**Chugachmiut,** whose member Tribes include:
       Native Village of Chenega
       Native Village of Eyak
       Native Village of Nanwalek (aka English Bay)
       Native Village of Port Graham
       Native Village of Tatitlek
       Qutekcak Native Tribe*
       Valdez Native Tribe

**Cloverdale Rancheria of Pomo Indians of California**

**Coeur d'Alene Tribe**

**Confederated Salish & Kootenai Tribes**

**Confederated Tribes of the Grand Ronde Community of Oregon**

**Confederated Tribes of Siletz Indians**

**Confederated Tribes of the Colville Reservation**

**Confederated Tribes of the Umatilla Indian Reservation**

**Copper River Native Association,** whose member Tribes include:
       Gulkana Village
       Native Village of Cantwell
       Native Village of Gakona
       Native Village of Kluti Kaah (aka Copper Center)
       Native Village of Tazlina

**Coquille Indian Tribe**

**Cow Creek Band of Umpqua Tribe of Indians**

**Coyote Valley Band of Pomo Indians of California**

**Elk Valley Rancheria, California**

**Ely Shoshone Tribe of Nevada**

**Fallon Paiute Shoshone Tribe of Nevada**

**Flandreau Santee Sioux Tribe**

**Fond du Lac Band of the Lake Superior Chippewa**

**Forest County Potawatomi Community**

**Fort Belknap Indian Community**

**Gila River Indian Community**

**Grand Traverse Band of Ottawa and Chippewa Indians**

**Great Plains Tribal Chairmen's Health Board,** whose member Tribes include:
> Cheyenne River Sioux Tribe
> Crow Creek Sioux Tribe
> Flandreau Santee Sioux Tribe
> Lower Brule Sioux Tribe
> Mandan, Hidatsa & Arikara Nation (Three Affiliated Tribes)
> Oglala Sioux Tribe
> Omaha Tribe of Nebraska
> Ponca Tribe of Nebraska
> Rosebud Sioux Tribe
> Sac & Fox Tribe
> Santee Sioux Tribe of Nebraska
> Sisseton-Wahpeton Oyate
> Spirit Lake Tribe
> Standing Rock Sioux Tribe
> Trenton Indian Service Area
> Turtle Mountain Band of Chippewa Indians
> Winnebago Tribe of Nebraska
> Yankton Sioux Tribe

**Guidiville Rancheria of California**

**Hopland Band of Pomo Indians of California**

**Indian Health Council, Inc.,** whose member Tribes include:
> Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation
> La Jolla Band of Luiseño Indians
> Iipay Nation of Santa Ysabel

-6a-

       Los Coyotes Band of Cahuilla and Cupeño Indians of the Los Coyotes Reservation
       Mesa Grande Band of Diegueno Mission Indians
       Pala Band of Mission Indians
       Pauma Band of Luiseño Indians
       Rincon Band of Luiseño Indians
       San Pasqual Band of Mission Indians

**Jamestown S'Klallam Tribe**

**Jicarilla Apache Nation**

**Kenaitze Indian Tribe**

**Keweenaw Bay Indian Community**

**Kickapoo Tribe in Kansas**

**Kodiak Area Native Association,** whose member Tribes include:
       Alutiiq Tribe of Old Harbor
       Kaguyak Village
       Native Village of Afognak
       Native Village of Akhiok
       Native Village of Larsen Bay
       Native Village of Ouzinkie
       Native Village of Port Lions
       Sun'aq Tribe of Kodiak
       Tangirnaq Native Village

**Kootenai Tribe of Idaho**

**La Posta Band of Mission Indians**

**Lac Courte Oreilles Band of Lake Superior Chippewa Indians**

**Lac Du Flambeau Band of Lake Superior Chippewa Indians**

**Leech Lake Band of Ojibwe**

**Lower Elwha Klallam Tribe**

**Lower Sioux Indian Community in the State of Minnesota**

**Lummi Nation**

**Makah Indian Tribe**

**Mandan, Hidatsa and Arikara Nation – Three Affiliated Tribes**

**Maniilaq Association,** whose member Tribes include:
> Native Village of Ambler
> Native Village of Buckland
> Native Village of Deering
> Native Village of Kiana
> Native Village of Kivalina
> Native Village of Kobuk
> Native Village of Kotzebue
> Native Village of Noatak
> Noorvik Native Community
> Native Village of Point Hope
> Native Village of Selawik
> Native Village of Shungnak

**Mashantucket (Western) Pequot Tribal Nation**

**Mechoopoda Indian Tribe of Wisconsin**

**Menominee Indian Tribe of Wisconsin**

**Mescalero Apache Tribe**

**Metlakatla Indian Community**

**Mille Lacs Band of Ojibwe**

**Mississippi Band of Choctaw Indians**

**Modoc Tribal Nation**

**Mt. Sanford Tribal Consortium,** whose member Tribes include:
> Cheesh-Na Tribe
> Mentasta Traditional Council

**Muckleshoot Indian Tribe**

**National Council of Urban Indian Health (NCUIH)**

**National Indian Health Board (NIHB)**

**Native Village of Port Heiden**

**Navajo Nation**

**Nez Perce Tribe**

**Nisqually Indian Tribe**

**Northern Arapaho Tribe**

**Northwest Portland Area Indian Health Board (NPAIHB),** whose member Tribes include:
Burns-Paiute Tribe
Chehalis Tribe
Coeur d¹Alene Tribe
Colville Tribe
Coos, Siuslaw, & Lower Umpqua Tribe
Coquille Tribe
Cow Creek Tribe
Cowlitz Tribe
Grand Ronde Tribe
Hoh Tribe
Jamestown S¹Klallam Tribe
Kalispell Tribe
Klamath Tribe
Kootenai Tribe
Lower Elwha Tribe
Lummi Tribe
Makah Tribe
Muckleshoot Tribe
Nez Perce Tribe
Nisqually Tribe
Nooksack Tribe
NW Band of Shoshoni Tribe
Port Gamble S¹Klallam Tribe
Puyallup Tribe
Quileute Tribe
Quinault Tribe
Samish Indian Nation
Sauk-Suiattle Tribe
Shoalwater Bay Tribe
Shoshone-Bannock Tribe
Siletz Tribe
Skokomish Tribe
Snoqualmie Tribe

      Spokane Tribe
      Squaxin Island Tribe
      Stillaguamish Tribe
      Suquamish Tribe
      Swinomish Tribe
      Tulalip Tribe
      Umatilla Tribe
      Upper Skagit Tribe
      Warm Springs Tribe
      Yakama Nation

**Norton Sound Health Corporation**

**Oglala Lakota Sioux Tribe (Pine Ridge)**

**Omaha Tribe of Nebraska**

**Otoe-Missouria Tribe**

**Pala Band of Mission Indians**

**Pascua Yaqui Tribe**

**Ponca Tribe of Nebraska**

**Port Gamble S'Klallam Tribe**

**Prairie Island Indian Community**

**Puyallup Tribal Health Authority (PTHA)**

**Puyallup Tribe of Indians**

**Pyramid Lake Paiute Tribe of Nevada**

**Quinault Indian Nation**

**Red Cliff Band of Lake Superior Chippewa**

**Redwood Valley Rancheria Tribe of California**

**Reno-Sparks Indian Colony of Nevada**

**Rincon Band of Luiseno Indians**

**Robinson Rancheria of Pomo Indians of California**

**Rosebud Sioux Tribe**

**Round Valley Indian Tribe of California**

**Saint Regis Mohawk Tribe**

**Salt River Pima-Maricopa Indian Community**

**San Carlos Apache Tribe**

**Santee Sioux Tribe of the Sioux Nation of the State of Nebraska**

**Sault Ste. Marie Tribe of Chippewa Indians**

**Scotts Valley Band of Pomo Indians of California**

**Shakopee Mdewakanton Sioux Community**

**Shinnecock Indian Nation**

**Shoshone-Bannock Tribes**

**Sisseton-Wahpeton Oyate**

**Sitka Tribe of Alaska**

**Sokaogon Chippewa Community**

**Southcentral Foundation,** whose member Tribes include:
      Igiugig Village
      Kokhanok Village
      McGrath Native Village
      Newhalen Village
      Nikolai Village
      Nondalton Village
      Pedro Bay Village
      Pribilof Islands Aleut Communities of St. Paul & St. George Islands
      Takotna Village
      Telida Village
      Village of Iliamna

**SouthEast Alaska Regional Health Consortium,** whose member Tribes include:
      Angoon Community Association
      Central Council of Tlingit & Haida Indian Tribes of Alaska
            (through Juneau Tlingit & Haida Community Council)
      Chilkat Indian Village
      Chilkoot Indian Association
      Craig Tribal Association
      Douglas Indian Association
      Hoonah Indian Association
      Hydaburg Cooperative Association
      Organized Village of Kake
      Organized Village of Kasaan
      Klawock Cooperative Association
      Petersburg Indian Association
      Sitka Tribe of Alaska
      Skagway Traditional Council
      Wrangell Cooperative Association

**Spirit Lake Tribe**

**Spokane Tribe of Indians**

**Squaxin Island Tribe**

**St. Croix Chippewa Indians of Wisconsin**

**Standing Rock Sioux Tribe**

**Stockbridge-Munsee Community**

**Suquamish Tribe**

**Susanville Indian Rancheria**

**Swinomish Indian Tribal Community**

**Tanana Chiefs Conference,** whose member Tribes include:
      Alatna Village
      Allakaket Village
      Anvik Village
      Arctic Village
      Beaver Village
      Birch Creek Tribe
      Chalkyitsik Village

Circle Native Community
Evansville Village (aka Bettles Field)
Galena Village (aka Louden Village)
Healy Lake Village
Holy Cross Village
Hughes Village
Huslia Village
Koyukuk Native Village
Manley Hot Springs Village
McGrath Native Village
Native Village of Eagle
Native Village of Fort Yukon
Native Village of Minto
Native Village of Ruby
Native Village of Stevens
Native Village of Tanacross
Native Village of Tanana
Native Village of Tetlin
Native Village of Venetie Tribal Government
Nenana Native Association
Nikolai Village
Northway Village
Nulato Village
Organized Village of Grayling (aka Holikachuk)
Rampart Village
Shageluk Native Village
Takotna Village
Telida Village
Village of Dot Lake
Village of Kaltag

**The Association of Village Council Presidents,** whose member Tribes include:
Akiachak Native Community
Akiak Native Community
Algaaciq Native Village (St. Mary's)
Asa'carsarmiut Tribe
Chevak Native Village
Chuloonawick Native Village
Emmonak Village
Iqurmuit Traditional Council
Kasigluk Traditional Elders Council
Lime Village
Native Village of Chuathbaluk
Native Village of Eek

-13a-

Native Village of Georgetown
Native Village of Goodnews Bay
Native Village of Hamilton
Native Village of Hooper Bay
Native Village of Kipnuk
Native Village of Kongiganak
Native Village of Kwigillingok
Native Village of Kwinhagak (aka Quinhagak)
Native Village of Marshall
Native Village of Mekoryuk
Native Village of Napaimute
Native Village of Napakiak
Native Village of Napaskiak
Native Village of Nightmute
Native Village of Nunam Iqua
Native Village of Nunapitchuk
Native Village of Paimiut
Native Village of Pitka's Point
Native Village of Scammon Bay
Native Village of Tuntutuliak
Native Village of Tununak
Newtok Village
Nunakauyarmiut Tribe
Organized Village of Kwethluk
Orutsaramiut Traditional Native Council
Oscarville Traditional Village
Pilot Station Traditional Village
Platinum Traditional Village
Tuluksak Native Community
Umkumiut Native Village
Village of Alakanuk
Village of Aniak
Village of Atmautluak
Village of Bill Moore's Slough
Village of Chefornak
Village of Crooked Creek
Village of Kalskag
Village of Kotlik
Village of Lower Kalskag
Village of Ohogamiut
Village of Red Devil
Village of Sleetmute
Village of Stony River
Yupiit of Andreafski

**The Confederated Tribes of the Warm Springs Reservation of Oregon**

**The Klamath Tribes**

**Tonto Apache Tribe**

**Torres Martinez Desert Cahuilla Indians**

**Tulalip Tribes**

**Turtle Mountain Band of Chippewa Indians**

**United South and Eastern Tribes, Inc.,** whose member Tribes include:
      Alabama-Coushatta Tribe of Texas (TX)
      Aroostook Band of Micmac Indians (ME)
      Catawba Indian Nation (SC)
      Cayuga Nation (NY)
      Chitimacha Tribe of Louisiana (LA)
      Coushatta Tribe of Louisiana (LA)
      Eastern Band of Cherokee Indians (NC)
      Houlton Band of Maliseet Indians (ME)
      Jena Band of Choctaw Indians (LA)
      Mashantucket Pequot Indian Tribe (CT)
      Mashpee Wampanoag Tribe (MA)
      Miccosukee Tribe of Indians of Florida (FL)
      Mississippi Band of Choctaw Indians (MS)
      Mohegan Tribe of Indians of Connecticut (CT)
      Narragansett Indian Tribe (RI)
      Oneida Indian Nation (NY)
      Pamunkey Indian Tribe (VA)
      Passamaquoddy Tribe at Indian Township (ME)
      Passamaquoddy Tribe at Pleasant Point (ME)
      Penobscot Indian Nation (ME)
      Poarch Band of Creek Indians (AL)
      Saint Regis Mohawk Tribe (NY)
      Seminole Tribe of Florida (FL)
      Seneca Nation of Indians (NY)
      Shinnecock Indian Nation (NY)
      Tunica-Biloxi Tribe of Louisiana (LA), and
      Wampanoag Tribe of Gay Head (Aquinnah) (MA)

**Upper Sioux Community**

**Viejas Band of Kumeyaay Indians**

**Walker River Paiute Tribe**

**Winnebago Tribe of the Winnebago Reservation**

**Yavapai-Apache Nation, Camp Verde Arizona**

**Yukon-Kuskokwim Health Corporation,** whose member Tribes include:
     Akiachak Native Community
     Akiak Native Community
     Algaaciq Native Village (aka St. Mary's)
     Anvik Village
     Asa'carsarmiut Tribe (aka Native Village of Mountain Village)
     Chevak Native Village
     Chuloonawick Native Village
     Emmonak Village
     Holy Cross Village
     Iqurmuit Traditional Council (aka Native Village of Russian Mission)
     Kasigluk Traditional Elders Council (aka Native Village of Kasigluk)
     Lime Village
     Native Village of Chuathbaluk
     Native Village of Eek
     Native Village of Georgetown
     Native Village of Hamilton
     Native Village of Hooper Bay
     Native Village of Kipnuk
     Native Village of Kongiganak
     Native Village of Kwigillingok
     Native Village of Kwinhagak (aka Quinhagak)
     Native Village of Marshall (aka Fortuna Ledge)
     Native Village of Mekoryuk
     Native Village of Napaimute
     Native Village of Napakiak
     Native Village of Napaskiak
     Native Village of Nightmute
     Native Village of Nunapitchuk
     Native Village of Paimiut
     Native Village of Pitka's Point
     Native Village of Scammon Bay
     Native Village of Sheldon's Point (aka Nunam Iqua)
     Native Village of Tuntutuliak
     Native Village of Tununak
     Newtok Village

Nunakauyarmiut Tribe (aka Native Village of Toksook Bay)
Organized Village of Grayling (aka Holikachuk)
Organized Village of Kwethluk
Orutsararmuit Native Council (aka Bethel)
Oscarville Traditional Village
Pilot Station Traditional Village
Shageluk Native Village
Tuluksak Native Community
Umkumiute Native Village
Village of Alakanuk
Village of Aniak
Village of Atmautluak
Village of Bill Moore's Slough
Village of Chefornak
Village of Crooked Creek
Village of Kalskag
Village of Kotlik
Village of Lower Kalskag
Village of Ohogamiut
Village of Red Devil
Village of Sleetmute
Village of Stony River
Yupiit of Andreafski

**Yurok Tribe**

**National Congress of American Indians (NCAI) and National Indian Child Welfare
Association (NICWA)**
These two national organizations represent the views of many Tribes around the country on
health care, child welfare and other policy issues. Their memberships overlap and include the
following:
Absentee-Shawnee Tribe of Indians of Oklahoma
Agdaagux Tribe of King Cove
Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation,
        California
Ak-Chin Indian Community
Akiak Native Community
Alabama-Coushatta Tribe of Texas
Alatna Village
Anvik Village
Association of Village Council Presidents
Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River
        Reservation, Wisconsin
Beaver Village

Bering Straits Native Corporation
Big Pine Paiute Tribe of the Owens Valley
Big Sandy Rancheria of Western Mono Indians of California
Big Valley Band of Pomo Indians of the Big Valley Rancheria, California
Birch Creek Tribe
Burns Paiute Tribe
Buena Vista Rancheria of Me-Wuk Indians of California
Cahuilla Band of Indians
Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California
Cedarville Rancheria, California
Central Council of the Tlingit & Haida Indian Tribes
Cher-Ae Heights Indian Community of the Trinidad Rancheria, California
Cheroenhaka Nottoway Indian Tribe*
Cherokee Nation
Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota
Chickahominy Indian Tribe
The Chickasaw Nation
Chinook Indian Nation*
Chitimacha Tribe of Louisiana
The Choctaw Nation of Oklahoma
Chugachmiut, Inc.
Circle Native Community
Citizen Potawatomi Nation, Oklahoma
Clatsop-Nehalem Confederated Tribes*
Coharie Intra-Tribal Council, Inc.*
Comanche Nation, Oklahoma
Confederated Salish and Kootenai Tribes of the Flathead Nation
Confederated Tribes and Bands of the Yakama Nation
Confederated Tribes of Chehalis Reservation
Confederated Tribes of Colville Reservation
Confederated Tribes of Coos, Lower Umpqua and Siuslaw Indians
Confederated Tribes of Grand Ronde Community of Oregon
Confederated Tribes of Siletz Indians of Oregon
Confederated Tribes of the Umatilla Indian Reservation
Confederated Tribes of the Warm Springs Reservation of Oregon
Cook Inlet Tribal Council
Copper River Native Association
Coquille Indian Tribe
Cortina Band of Wintun Indians*
Coushatta Tribe of Louisiana
Cow Creek Band of Umpqua Tribe of Indians
Cowlitz Indian Tribe
Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota
Crow Tribe of Montana

Curyung Tribal Council
Delaware Nation, Oklahoma
Delaware Tribe of Indians
Eastern Band of Cherokee Indians
Eastern Pequot Tribal Nation*
Eastern Shoshone Tribe of the Wind River Reservation, Wyoming
Echota Cherokee Tribe of Alabama*
Nikolai Village
Ely Shoshone Tribe of Nevada
Enterprise Rancheria of Maidu Indians of California
Evansville Village (aka Bettles Field)
Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada
Federated Indians of Graton Rancheria, California
Flandreau Santee Sioux Tribe of South Dakota
Forest County Potawatomi Community, Wisconsin
Fort McDowell Yavapai Nation, Arizona
Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana
Galena Village (aka Louden Village)
Gila River Indian Community of the Gila River Indian Reservation, Arizona
Grand Traverse Band of Ottawa and Chippewa Indians, Michigan
Greenville Rancheria
Habematolel Pomo of Upper Lake, California
Haliwa-Saponi Indian Tribe*
Ho-Chunk Nation of Wisconsin
Hoh Indian Tribe
Holy Cross Village
Houlton Band of Maliseet Indians
Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona
Huslia Village
Ione Band of Miwok Indians of California
Iowa Tribe of Oklahoma
Jamestown S'Klallam Tribe
Juaneño Band of Mission Indians, Acjachemen Nation*
Kalispel Indian Community of the Kalispel Reservation
Kaw Nation, Oklahoma
Kenaitze Indian Tribe
Ketchikan Indian Community
Keweenaw Bay Indian Community, Michigan
Kiowa Indian Tribe of Oklahoma
Klamath Tribes
Kootenai Tribe of Idaho
Koyukuk Native Village
Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin
Lac Vieux Desert Band of Lake Superior Chippewa Indians of Wisconsin

Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada
Lenape Indian Tribe of Delaware*
Lipan Apache Tribe of Texas*
Little River Band of Ottawa Indians, Michigan
Little Traverse Bay Bands of Odawa Indians, Michigan
Lower Brule Sioux Tribe  of the Lower Brule Reservation, South Dakota
Lower Elwha Tribal Community
Lumbee Tribe of North Carolina*
Lummi Tribe of the Lummi Reservation
Ma-Chis Lower Creek Indian Tribe of Alabama
Mashantucket Pequot Indian Tribe
Mashpee Wampanoag Tribe
Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan
Mat-Su Health Foundation
Menominee Indian Tribe of Wisconsin
Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation,
       California
Metlakatla Indian Community, Annette Island Reserve
Miami Tribe of Oklahoma
Middletown Rancheria of Pomo Indians of California
Minnesota Chippewa Tribe, Minnesota (individually Bois Forte Band (Nett Lake), Mille
       Lacs Band, White Earth Band, and Fond du Lac Band)
The Modoc Tribe of Oklahoma
Mohegan Tribe of Indians of Connecticut
Monacan Indian Nation
Morongo Band of Mission Indians, California
MOWA Band of Choctaw Indians*
Muckleshoot Indian Tribe
The Muscogee (Creek) Nation**
Nanticoke-Lenni Lenape Tribal Nation*
Native Village of Afognak
Native Village of Ambler
Native Village of Buckland
Native Village of Deering
Native Village of Eagle
Native Village of Eyak (Cordova)
Native Village of Karluk
Kasigluk Traditional Elders Council
Native Village of Kiana
Native Village of Kivalina
Native Village of Kobuk
Native Village of Kotzebue
Native Village of Noatak
Noorvik Native Community

Native Village of Pitka's Point
Native Village of Point Hope
Native Village of Port Lions
Native Village of Selawik
Native Village of Shungnak
Native Village of Tanacross
Native Village of Tanana
Native Village of Tetlin
Native Village of Unalakleet
Navajo Nation, Arizona, New Mexico & Utah
Nenana Native Association
Newtok Village
Nez Perce Tribe
Nooksack Indian Tribe
Nome Eskimo Community
Northfork Rancheria of Mono Indians of California
Nottawaseppi Huron Band of the Potawatomi, Michigan
Nottoway Indian Tribe of Virginia*
Nulato Village
Oglala Sioux Tribe
Ohkay Owingeh, New Mexico
Omaha Tribe of Nebraska
Oneida Indian Nation
Oneida Nation
Organized Village of Saxman
Orutsararmiut Traditional Native Council
The Osage Nation
Ottawa Tribe of Oklahoma
Paiute Indian Tribe of Utah
Pala Band of Mission Indians
Pamunkey Indian Tribe
Pascua Yaqui Tribe of Arizona
Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California
Pawnee Nation of Oklahoma
Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California
Penobscot Nation
Picayune Rancheria of Chukchansi Indians of California
Piqua Shawnee Tribe*
Piscataway Conoy Tribe of Maryland*
Pit River Tribe, California
Poarch Band of Creeks
Pointe-Au-Chien Indian Tribe*
Pokagon Band of Potawatomi Indians, Michigan and Indiana
Ponca Tribe of Nebraska

Port Gamble S'Klallam Tribe
Prairie Band Potawatomi Nation
Prairie Island Indian Community in the State of Minnesota
Pueblo of San Ildefonso, New Mexico
Pueblo of Acoma, New Mexico
Pueblo of Isleta, New Mexico
Pueblo of Jemez, New Mexico
Pueblo of Laguna, New Mexico
Pueblo of Pojoaque, New Mexico
Pueblo of San Felipe, New Mexico
Pueblo of Santa Ana, New Mexico
Pueblo of Santa Clara, New Mexico
Kewa Pueblo, New Mexico
Pueblo of Tesuque, New Mexico
Puyallup Tribe of the Puyallup Reservation
Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada
Qagan Tayagungin Tribe of Sand Point Village
Quileute Tribe of the Quileute Reservation
Quinault Indian Nation
Ramapough Lenape Nation*
Rampart Village
Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin
Red Lake Band of Chippewa Indians, Minnesota
Redding Rancheria, California
Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria
        California
Reno-Sparks Indian Colony, Nevada
Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California
Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota
Native Village of Ruby
Sac & Fox Nation, Oklahoma
Saginaw Chippewa Indian Tribe of Michigan
Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona
Samish Indian Nation
San Manuel Band of Mission Indians, California
Santa Rosa Band of Cahuilla Indians, California
Santa Rosa Indian Community of the Santa Rosa Rancheria, California
Santee Sioux Nation, Nebraska
Sappony*
Sauk-Suiattle Indian Tribe
Sault Ste. Marie Tribe of Chippewa Indians, Michigan
Scotts Valley Band of Pomo Indians of California
Seldovia Village Tribe
Seminole Tribe of Florida

Seneca Nation of Indians
Shageluk Native Village
Shakopee Mdewakanton Sioux Community of Minnesota
Shawnee Tribe
Sherwood Valley Rancheria of Pomo Indians of California
Shinnecock Indian Nation
Shoshone-Bannock Tribes of the Fort Hall Reservation
Shoshone-Paiute Tribes of the Duck Valley Indian Reservation, Nevada
Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota
Sitka Tribe of Alaska
Skokomish Indian Tribe
Snoqualmie Indian Tribe
Soboba Band of Luiseno Indians, California
Sokaogon Chippewa Community, Wisconsin
Southeastern Mvskoke Nation*[1]
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane Reservation
Squaxin Island Tribe of the Squaxin Island Reservation
St. Croix Chippewa Indians of Wisconsin
Saint Regis Mohawk Tribe
Stockbridge Munsee Community, Wisconsin
Sun'aq Tribe of Kodiak
Suquamish Indian Tribe of the Port Madison Reservation
Susanville Indian Rancheria, California
Swinomish Indian Tribal Community
Sycuan Band of the Kumeyaay Nation
Table Mountain Rancheria
Tejon Indian Tribe
Telida Village
Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota
Death Valley Timbi-sha Shoshone Tribe
Tohono O'odham Nation of Arizona
Tolowa Dee-ni' Nation
Tulalip Tribes of Washington
Tule River Indian Tribe of the Tule River Reservation, California
Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California
Twenty-Nine Palms Band of Mission Indians of California
United Auburn Indian Community of the Auburn Rancheria of California
United Houma Nation*
Upper Mattaponi Tribe
Upper Skagit Indian Tribe
Ute Indian Tribe of the Uintah & Ouray Reservation, Utah
Village of Stony River
Waccamaw Siouan Tribe*

Walker River Paiute Tribe of the Walker River Reservation, Nevada
Wampanoag Tribe of Gay Head (Aquinnah)
White Mountain Apache Tribe of the Fort Apache Reservation, Arizona
Winnebago Tribe of Nebraska
Wrangell Cooperative Association
Wyandotte Nation
Yakutat Tlingit Tribe
Yankton Sioux Tribe of South Dakota
Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona
Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada
Yupiit of Andreafski
Yurok Tribe of the Yurok Reservation, California

---

\* These Tribes are not on the BIA list of federally recognized Tribes. *Indian Entities Recognized and Eligible To Receive Services from the United States Bureau of Indian Affairs*, 83 Fed. Reg. 34,863 (July 23, 2018).

\*\* Member of a Tribal organization but not *amici* since the Tribe is a party to the case.

# Appendix B

# Tribal Statements of Interest

**Statement of Interest: Affiliated Tribes of Northwest Indians**

The Affiliated Tribes of Northwest Indians ("ATNI") is a nonprofit organization, established in 1953, that represents nearly fifty Northwest tribal governments from Oregon, Idaho, Washington, southeast Alaska, Northern California and Western Montana. Its purpose is to provide a forum for sharing information on matters of interest to its member Tribes, develop consensus on matters of mutual importance, assist member Tribes in their governmental and programmatic development consistent with their goals for self-determination and self-sufficiency and provide effective public relations and education programs with the non-Indian communities.

ATNI's work is committee-driven with 19 organized committees and subcommittees, including a Drug Prevention Committee. Part of the mission of the Drug Prevention Committee is to address and seek solutions to the opioid crisis that is affecting ATNI member Tribes. This year, the Drug Prevention Committee held a drug prevention summit that focused on the opioid crisis. ATNI member Tribes agree that the opioid epidemic is of critical concern to all our tribal communities and we must work together to exchange ideas and discuss best practices for addressing this epidemic.

In January 2018, ATNI passed Resolution #18-01 at our Winter Convention: "Support for Tribal Nations taking on Big Pharma to Combat the Opioid Epidemic in Indian Country." The ATNI Tribes recognize the importance of tribal participation in the national litigation against drug manufacturers and distributors. Many member Tribes have already filed or are planning to file lawsuits in the National Prescription Opiate Litigation. In the ATNI resolution, the Tribes recognize that tribal governments have been forced to allocate a disproportionate level of government resources to opioid-related services including medical treatment, rehabilitation, social services, prevention and education, law enforcement, tribal court and justice services. The Tribes stand in support of any effort to bring additional resources to this health crisis to ensure the continued perseverance of our people, our traditions, our languages and our land.

**Statement of Interest: Akiak Native Community**

Akiak Native Community is located 20 air miles upstream from the regional hub of Bethel, Alaska, along the Kuskokwim River. It is located 500 miles west of Anchorage, Alaska. The community is only accessible by planes, boats, snow machines, four wheelers and dog teams.  The Ancestral territories extend from the community to the Kuskokwim and Kilbuck Mountains, the Kisaralek River, Gweek River to the Yukon River up to Russian Mission, Nushagak River and Mountains, and the Holitna River. There are approximately 360 Tribally enrolled citizens, and almost all still reside in our community. Akiak Native Community employs approximately 50 individuals throughout the year in health care, social and wellness health, public safety, Tribal Courts, environmental services, water and sewer services, Violence Against Women program, natural resources, educational support, and community activities such as dog racing.

Akiak has seen increase of prescription opioids and heroin in recent times. We are attending increased funerals due to accidental overdoses of substances. Because of addiction, the majority of our young people are being raised by their grandparents, who are free from substances. We are short of public safety personnel and treatment services to prevent deaths. We must rely on the Alaska State Troopers for investigations, yet their capacity is limited to addressing felonies, and poor weather conditions often prevent an immediate response.

To address the opioid crisis, Akiak Native Community needs more resources to mitigate the issues with substance abuse and to provide prevention services through our Tribal Government. We are coordinating services with three other communities to combat these issues.

**Statement of Interest: Alaska Native Health Board**

Alaska Native Health Board (ANHB) was established in 1968 to promote the spiritual, physical, mental, social, and cultural well-being and pride of Alaska Natives. ANHB is the statewide voice on Alaska Native health issues and is the advocacy organization for the Alaska Tribal Health System (ATHS). The ATHS is a voluntary affiliation of over 30 Alaska Tribes and Tribal Health Organizations (THOs) that have fully assumed the administration of health programs previously provided by the Indian Health Service and have developed a truly comprehensive, statewide health system serving over 168,000 Alaska Native and American Indian (AN/AI) people. Each Tribe and THO is autonomous and serves a specific geographical area, altogether totaling over 660,000 square miles and over 200 facilities, many of which are the only health provider in their community. This fact makes the ATHS an integral part of the Alaska Public Health System.

The opioid crisis in Alaska adversely impacts all areas of ANHB's Mission. The impact is not limited to the physical and mental health of our people: the opioid crisis tears at our families and social fabric; involves the judicial and criminal systems; and threatens employability, productivity, and educational prospects. It is eating away at our cultural health and spiritual connectedness. The human costs include addiction, broken families, trauma, premature deaths from injury and overdose, suicide, and homicide, to name a few. Combined with historical traumas, the crisis has increased exposure to adverse childhood experiences that will affect the well-being of generations to come.

The associated monetary costs are substantial. Furthermore, the disparities in access to care and treatment between rural and urban are great. Those fighting addiction in rural areas often have little to no access to treatment in their local communities, requiring travel and expensive stays away from home. The total cost to the State, employers, and families in 2015 amounted to $1.22 billion, of which 45%, or $543 million was due to productivity losses.

**Statement of Interest: Alaska Native Tribal Health Consortium**

Alaska Native Tribal Health Consortium (ANTHC) is an inter-tribal consortia and Tribal Health Organization providing health care to American Indians, Alaska Natives and other eligible individuals pursuant to Title V of the ISDEAA. ANTHC is operated for the benefit of the 229 federally recognized Alaska Native Tribes. ANTHC provides a wide range of medical, community health, and other services for more than 166,000 Alaska Native and American Indian people across the State. ANTHC co-manages the Alaska Native Medical Center (ANMC), including a 173-bed tertiary-care hospital located in Anchorage, through which it provides comprehensive inpatient, specialty care and other medical services for the entire Alaska Tribal Health System. Many of these services are not available in rural areas, so ANTHC's patients must travel (generally, by air or boat) to Anchorage to receive these services at ANMC. Further, ANTHC provides a range of additional health services for the benefit of Alaska Natives throughout the State.

Native communities throughout Alaska have been devastated by the opioid epidemic. In 2012, Alaska's prescription opioid overdose death rate was more than double the rate in the U.S., and Alaska's heroin-associated overdose death rate was over 50% higher than the national rate. Much of that impact has landed on the Tribes in Alaska.

ANTHC has diverted substantial resources to address the crisis, including: creating an Opioid Use Safety Committee to monitor opioid prescribing (in partnership with the Southcentral Foundation); creating a pain management team (PMT) and hiring a pain pharmacist and pain nurse practitioner; hosting an Opioid Epidemic Research Symposium that brought together Tribal leadership, subject matter experts, investigators and funding agency representatives; providing training to nearly all ANMC physicians to prescribe suboxone; providing semiannual and quarterly feedback on opioid prescribing practices to department heads; conducting semiannual reviews of opioid prescribing data; and implementing a harm reduction needle exchange project.

**Statement of Interest: Aleutian Pribilof Islands Association, Inc.**

The Aleutian Pribilof Islands Association, Inc. (APIA) is the federally recognized tribal organization of the Aleut people in Alaska. It was created by the merger of two predecessor organizations: The Aleut League, formed in 1966, and the Aleutian Planning Commission, formed a few years later. APIA was chartered in 1976. APIA represents 13 communities located in the Aleutian Islands, which extend westward over 1,100 miles from the southwestern corner of the Alaska mainland, and include the Pribilof Islands, which lie to the north. This area is distributed over an area of approximately 100,000 square miles. APIA contracts with federal, state and local governments as well as securing private funding to provide a broad spectrum of services throughout the region.

Our mission is: "To promote self-sufficiency and independence of the Unangan/Unangas by advocacy, training, technical assistance and economic enhancement; To assist in meeting the health, safety and well-being needs of each Unangan/Unangas community; To promote, strengthen and ensure the unity of the Unangan; and To strengthen and preserve Unangax cultural heritage." These services include health, education, social, psychological, employment and vocational training, and public safety services.

The opioid crisis has impacted our remote region. The crisis has placed hardship on our healthcare system which is already underfunded and understaffed. Opioid related encounters most often occur in the urgent/emergency care setting that our system is not adequately prepared for. This results in excessive travel (including Medevacs), logistical expenses and staff time. We are currently investing in planning and implementing a Medication Assisted Treatment program in all of our communities to provide treatment for individuals diagnosed with opioid disorder. We had to secure grant funding to finally be able to provide substance abuse treatment to our rural communities. In partnership with the Eastern Aleutian Tribes, we are now offering the Intensive Outpatient Program (IOP) in the pilot communities of Sand Point, Unalaska and Anchorage. APAI also participates with other regional organizations on the Aleutian and Pribilof Island Opioid and Substance Misuse Task Force, to work collaboratively to identify which opioid and substance misuse prevention, treatment + recovery, and harm reduction activities are needed in Aleutian/Pribilof Island communities.

**Statement of Interest:  Asa'carsarmiut Tribal Council (Mountain Village)**

The Asa'carsarmiut Tribal Council is the governing body for the Native Village of the Asa'carsarmiut Tribe of Mountain Village, a federally recognized native entity. Most of the Village's members live in Mountain Village, which is located along the Yukon River in the Kusilvak Census Area.

The opioid crisis has devastated the Asa'carsarmiut Tribe. Opioids have contributed to Mountain Village's suicide crisis. At least five percent of the population of Mountain Village has attempted suicide in the last year. While overdoses and opioid related crime increase, Mountain Village does not have the resources to adequately police the community. The Village's few first responders work around the clock for very little pay and with almost no training. The Village does not have the infrastructure or staff to treat opioid addiction locally. We must fly members of our community to Bethel (over 100 miles away) or Anchorage for behavioral health treatment.

Mountain Village has created its own Department of Justice, which includes substance abuse counseling and a court that provides restorative justice to struggling members of the community. We have created programs and events to address our behavioral health crisis. Incredibly devoted members of the Village staff these initiatives, but they are understaffed and underfunded. We face a formidable challenge as opioids flood into the community.

**Statement of Interest: Bad River Band of Lake Superior Tribe of Chippewa Indians**

The Bad River Band of Lake Superior Tribe of Chippewa Indians is one of six Ojibwe bands in Wisconsin. The Ojibwe people are traditionally known as semi-nomadic people. Their respect for nature is reflected in their 125,000 plus acre reservation that is rigorously maintained to be 90% wild land. The Bad River Band's goal is to preserve its peoples, culture, and way of life for over 8,000 members to the seventh generation.

The Bad River Band owns and operates a casino and lodge. The Band provides social services, law enforcement, court systems, a preschool Headstart program, and healthcare for the Band's members.

The opioid crisis and its devastating effects are suffocating the Bad River Band's way of life. Opioid abuse, addiction, and overdoses are rampant, causing incalculable damages and an existential threat to the Band and its members. Families are being torn apart; children are left parentless; children born with Neonatal Abstinence Syndrome are facing lifetime problems. The resources, human and financial, of the Bad River Band are being depleted due to the opioid epidemic. The Band is struggling to carry on this vitally important fight against opioids. The Band needs, among other things, a successful, financially impactful resolution to the opioid crisis in order to protect and preserve its members, specifically needed financial resources for addiction treatment – facilities, physicians, counselors, operations personnel, and community-based care.

**Statement of Interest: Big Sandy Rancheria of Mono Indians of California**

Big Sandy Rancheria of Mono Indians has a storied past. The Tribe's future is now in jeopardy because of the opioid crisis. A catastrophic addiction rate within the Tribe has resulted in substandard housing conditions, low incomes, high unemployment, and low educational attainment levels to this day. Despite these setbacks, the Tribe has fought to maintain an economic presence within the Fresno County area of California. The Tribe owns the Mono Wind Casino and operates a fuel distribution center. This fuel distribution center practices nation to nation trading and thus not only strengthens tribal relations, but also prevents state interference in the form of state taxes on fuel products.

The opioid epidemic poses a clear and direct threat to the existence of tribal culture, identity, and membership. This epidemic has forced the tribal government to incur costs of providing increased medical care and service, social services, child welfare, law enforcement, and public safety measures to tribal members. These additional costs divert funds from other necessary programs the Tribe has created. The Big Sandy Rancheria of Mono Indians has been placed in an extremely difficult financial position. These additional programs to combat the opioid crisis are absolutely necessary in order to maintain the tribal integrity of the Big Sandy Rancheria of Mono Indians, as the Tribe is struggling to meet its members' needs.

**Statement of Interest: Big Valley Band of Pomo Indians of California**

The Big Valley Band of Pomo Indians strives to maintain and perpetuate its tribal identify, culture, and lifestyle. The Tribe has been able to hold classes taught by elders to younger tribal members in order to pass on the knowledge, culture, and integrity of the Big Valley Band of Pomo Indians Tribe.

The Tribe has achieved economic success through the creation of the Konocti Vista Casino, a hotel, marina, RV park, the Ku-Hu-Gui Café, and a bar. The Tribe also annually hosts a Tule Boat Festival with boat building, environmental programs, and races among participating Tribes. This festival fosters relations amongst the Tribes and promotes the key cultural aspects of the Tribe that Big Valley Band strives to maintain.

The opioid crisis has had a disparate impact on the Tribe and its members. The crisis has become a deep rooted problem that has spread to every aspect of tribal life. The Big Valley Band is addressing the opioid issue head on, but these endeavors have cost, and will continue to cost, the Tribe a significant amount of financial resources. The Tribe's way of life is being threatened by this crisis and the Tribe is struggling to continue the fight against opioid use and abuse from which its members suffer.

**Statement of Interest: California Rural Indian Health Board**

The California Rural Indian Health Board (CRIHB) is committed to the needs and interests that elevate and promote the health status and social conditions of the Indian people of California. CRIHB does this by providing advocacy, shared resources, training, and technical assistance that enhances the delivery of quality comprehensive health related services. CRIHB also advocates for the Tribal perspective while monitoring state and federal legislative and regulatory developments, and opening opportunities to network with other health care organizations to engage their support on Indian health care issues.

Incorporated in 1969, CRIHB is sanctioned by 27 federally recognized Tribal governments in California to operate under ISDEAA to provide administrative and technical assistance to Tribal Health Programs. CRIHB membership also includes 17 Tribal governments that participate in other health related services. CRIHB is a non-profit 501(c)(3) organization. CRIHB also undertakes programs related to prevention and education, public health nursing and suicide prevention.

According to the California Tribal Epidemiology Center (2018), Indians in California are treated for opioid use at a higher rate than their non-Indian counterparts. Mortality data indicates American Indians and Alaska Natives in California have rates of opioid overdose deaths higher than the State average. Between 2006 and 2016, AIANs between the ages of 45-54 years old had the highest burden of opioid overdose deaths compared to all other age groups. Addressing the opioid epidemic is a nationwide priority; however, critical opioid prevention and treatment dollars are not reaching many of the Tribal communities that are in serious need of these funds. CRIHB advocates for increased funding and a multi-layered approach at the state and federal level to address this crisis, which must include funding for culturally appropriate services, adequate government-to-government consultation for programs and protecting tribal sovereignty.

**Statement of Interest: Central Council of Tlingit & Haida Indian Tribes of Alaska**

Central Council of Tlingit & Haida Indian Tribes of Alaska (Tlingit & Haida) is Alaska's largest federally recognized Tribe, representing over 30,000 tribal citizens. The Tlingit and Haida people were recognized by an Act of Congress in 1935, but have resided in Southeast Alaska since time immemorial. We are a self-governing Tribe with over 20 departments and offices in multiple Southeast communities.

Tlingit & Haida has been harmed by the opioid epidemic. The Tribe is seeing an increase in child welfare cases, Tribal Court guardianships and homelessness. In addition, our citizens across Southeast Alaska are facing increased crime in their communities, and many communities lack any law enforcement presence. Though Tlingit & Haida does not operate its own health facility, our citizens have consistently been turning to the Tribe looking for treatment resources. Ultimately, the majority of Southeast communities lack any treatment options.

Tlingit & Haida has formed an Addiction Action Committee to increase capacity to address and help reduce opioid and other substance addictions in Tlingit & Haida's communities. The Tribe has also hired an expert to improve the Tribe's capacity to serve families with child welfare issues. And, the Tribe has sought grant funding for projects to prevent addiction and support healthy families.

Tlingit & Haida believes that our strong resilient tribal citizens combined with the necessary resources will defeat the opioid epidemic. But additional resources are necessary to repair and reunify the families that have been damaged by opioid addiction. We have a vested interest in seeing a resolution for this crisis – our families and future are on the line.

## Statement of Interest: Chapa-De

Chapa-De was founded in 1974 after a study showed American Indians in California suffered from a higher incidence of diabetes, depression, and substance abuse. American Indians were also found to suffer from higher rates of infant mortality and have drastically shorter life expectancy rates. This study also revealed that American Indians had not had regular access to healthcare services, including basic dental care, since the 1950s.

These findings compelled a group of local American Indians to open Northern Sierra Indian Health, later to be renamed Chapa-De Indian Health. Today Chapa-De operates two private, non-profit community health centers and is governed by an American Indian Board of Directors. The Board of Directors includes members of the United Auburn Indian Community (UAIC), which is Chapa-De's supporting Tribe. Under UAIC's authority, Chapa-De contracts with Indian Health Services (IHS) to provide no-cost or low-cost services and medications to verified American Indians and Alaska Natives from federally recognized Tribes. We also now welcome low-income individuals and families. We serve over 20,000 active patients and continue to expand our services based on the needs of our communities.

Chapa-De provides services to treat addiction. This includes routine screenings, education, brief interventions and referrals to treatment for drug and alcohol addiction. We offer referrals to all levels of care, including outpatient treatment, intensive outpatient treatment and residential treatment. To address the Opioid Crisis and the increase in opioid use disorders, we have expanded our services to offer Medication-Assisted Treatment (MAT). We have a team of specially trained doctors, addiction nurses and behavioral health specialists dedicated to supporting our patients in their recovery from addiction to opioid pain medications and/or heroin. The MAT program offers a comprehensive three-phased approach, which includes: medication to suppress cravings and alleviate the symptoms of withdrawal (we use buprenorphine/naloxone, also known as suboxone); Behavioral Health Assessment and Care; and Nurse Case Management & Weekly Stabilization Group Visits.

**Statement of Interest: Cheyenne and Arapaho Tribes**

The Cheyenne and Arapaho Tribes, an autonomous, self-governing unification of two Tribes, are headquartered in Concho, Oklahoma. The federally-recognized Tribes have over 12,000 members. Once known as a formidable military force, successful hunters, and active traders, the Tribes have been able to carve out an autonomous and prosperous existence for its members. The Tribes own and operate four casinos, and they also issue their own tribal vehicle tags. The Tribes have a substantial economic impact on the lives of their members and the greater communities for which they serve.

This success is now in peril by the opioid crisis that has grown and grown over the last two decades. The Tribes are being crippled by the effects and ravages of opioids on every facet of the Tribes' society and community. In order to combat this malicious problem, the Tribes are using considerable resources to help their members overcome the grave peril of opioid addiction, treatment, recovery, and all of the vast tragic consequences. Outreach programs, increased law enforcement presence, foster care, addiction treatment, social services, educational programs, and opioid abuse groups are all being used to provide remedies for the Tribes. Despite the Tribes' attempts, this crisis is oppressively vast in scope and reach. Only a major financial award to the Cheyenne and Arapaho Tribes directly, independent of state and local governments, will initiate the long path of recovery for its peoples, community, and future.

**Statement of Interest: Cheyenne River Sioux Tribe of South Dakota**

The Cheyenne River Sioux Tribe governs the people of the Battle of the Little Big Horn, and the victims of the Wounded Knee Massacre. They are Lakota people who suffered religious persecution, and battle today, as for centuries, to protect their land, resources and culture. The culture is threatened by deficient resources, and unemployment estimated at 80%.

The Tribe's story is a story of awareness of the crisis all mankind faces in the path of destruction of our planet. The Lakota Sioux believe greed is killing Mother Earth and that all ancient texts teach of a time of peace after a great travail. They know the Earth is in labor trying to deliver a new and enlightened people. A part of this enlightenment is overcoming the dramatic national opioid crisis. This tragedy grips the Cheyenne River Lakotas.

Today, the people cope with addictions, poverty and despair with Child Welfare programs, community health services, education programs, and some IHS support from a hospital on the reservation. In 2012, the Eagle Butte, South Dakota hospital was replaced with a newly constructed alternative rural health center, including 8 in-patient beds and a 2 bed low risk birthing unit. A strained Counseling Services Program is designed to provide non-medical psychological treatment services to individuals, families, and agencies such as the courts and school systems.

## Statement of Interest: Chickaloon Native Village

Chickaloon Native Village (CNV) is a federally recognized Ahtna Tribal Government in southcentral Alaska governed by Chickaloon Village Traditional Council (CVTC). CNV gained Federal recognition in 1973 and on November 24, 1982. CVTC provides a variety of governmental services to CNV Tribal citizens and the surrounding community including primary and behavioral health services, social services, housing, scholarship assistance, natural resource management, culture and language resources, while operating the only Tribal school in Alaska, and employing more than 45 staff members yearly.

As a Tribe located in the Matanuska-Susitna Borough, the fastest growing borough within the state of Alaska, our community has been hit hard by the opioid crisis. CNV has lost Tribal citizens to addiction, and children have ended up in foster care. The opioid abuse doesn't just impact the user, but also their immediate family, and our entire community. When one person in our Tribe is struggling, we all struggle together.

CVTC has had to refocus our priorities to deal with the opioid crisis in our community. This crisis has consumed a tremendous amount of staff-time and resources. This crisis impacts families in CVTC's low-income housing development and their ability to remain housed. Thefts in our community are on the rise impacting the resources of our Tribal peace officers. Almost every ICWA case we manage is the result of opioid addiction, which impacts the resources of our Tribal Court System. CVTC's Health and Social Services Department has become a Narcan distribution center; the only one in our local community. We hired a substance abuse assessor, and our behavioral health aide spends the majority of her time handling these complex cases.

CVTC's government is providing culturally-centered care to our Tribal citizens, other Alaska Native people(s) residing in our service area, and community members suffering from opioid addiction, including wellness activities, talking circles, individual therapy and case management. We are collaborating with local non-profits to provide cohesive and comprehensive services. We do not have adequate resources to handle the needs for health and social services and emergency response.

## Statement of Interest: Chitimacha Tribe of Louisiana

The Chitimacha Tribe, according to oral history, has always been in Louisiana. Over the course of time, the Chitimacha Tribe's land decreased, however over the past several decades the Tribe has not only excelled, but flourished. The Chitimacha Tribe owns and operates an exceptional Tribal school and Early Learning Center as well as owning the first land based casino in Louisiana. Today, the Tribe has many successful enterprises, but this growth is threatened by the effects of the Opioid Crisis.

The Tribe has established its own police department, fire department, health clinic, pharmacy, elderly assisted living facility, housing program, and scholarship program, all of which are critically vital to the Tribe's way of life. The Chitimacha Tribe is the second largest employer in its area.

The Opioid Crisis is gravely affecting the Tribe by killing its members, destroying tribal families, and placing a severe strain on the resources that are direly needed to combat the viscous effects of opioids. The Tribe must combat the abrasive tolls, both on its members and on its finances that this highly addictive drug has caused. The Tribe's future depends on a successful resolution of the opioid crisis. The Tribe is struggling to allocate its resources, and soon there will be nothing left to allocate.

## Statement of Interest: Chugachmiut

Chugachmiut is the Tribal consortium created to promote self-determination to the seven Native communities of the Chugach region, incorporated in 1974. Chugachmiut provides health and social services; education and training; and technical assistance to the Chugach Native people in a way which is acceptable to Native cultural values and tradition, in order to enhance the well-being of the people by continuing to strengthen the Tribes and increase self-determination opportunities for community operated Tribal programs. Chugachmiut is governed by a seven member Board of Directors made up of one Director from each of the seven Tribes in the Chugach region which consists of an area approximately 50,000 square miles, located in south central Alaska's Lower Cook Inlet (Kachemak Bay and Resurrection Bay of the Kenai Peninsula) and Prince William Sound communities.

The abuse of opioids is recognized as those most abused substance in this region. This, coupled with the corresponding addictions, poses a serious health emergency for our region, bordering on epidemic proportions. This opioid crisis has impacted the overall health and wellness of our communities and every person within our Region. Our Tribes have lost loved ones due to this opioid epidemic. Tribes currently lack the expertise, resources and support needed to help fight this epidemic and are victims to this opioid crisis.

Chugachmiut has been forced to divert scarce resources away from existing priorities to staff and address this serious health crisis. We have had to increase the security surveillance in our local health clinics to help monitor and deter people from breaking into the rooms where pharmaceuticals are stored. We have shifted local clinics' focus towards identifying and treating withdrawals safely, including increased education and distribution of Narcan kits for locals responding to opioid overdoses and have purchased medication lock boxes to help safeguard prescribed medications.

Chugachmiut has been applying for SAMHSA, DOJ and HHS grant funds to stem the flow of opioids into our region while providing much needed counseling by our Behavioral Health practitioners throughout the region in concert with efforts by our Health Services Division and the Village-based VPSO officers.

**Statement of Interest: Cloverdale Rancheria of Pomo Indians of California**

The Cloverdale Rancheria of Pomo Indians of California is located on the northern tip of Sonoma County in Cloverdale, California. Our Tribe has approximately 600 Tribal Members. We have a social service department that has a high demand for basic needs to assist our Tribal Members. We have one Indian Child Welfare Advocate (ICWA) who works thirty-two hours a week due to our funding and it isn't enough. Our Tribal Members utilize the Tribal Health Clinics where they reside, but those services are also limited. Our People fall short on their rents leaving them at the brink of homelessness. We have limited Housing Assistance funds to help them with rent, water, and electricity. Our children are the ones who suffer most when they are removed from their homes and we try to locate Tribal homes for them in the area which sometimes is impossible.

The opioid crisis has been a silent storm that turned into an uncontrollable hurricane to our families in one way or another. Our Tribe has lost so many adults to addiction, but it is our children who suffer the effects the most, as well as our elders. This crisis is close to the breaking point to our programs, and is straining nearly every governmental and cultural service we provide. We have been forced to divert scarce resources away from existing priorities to address the needs to the opioid crisis. Drug-related evictions are on the rise, leaving those families and children homeless. We are in need of a full-time and a part-time ICWA Advocate to help the families who are affected by this crisis.

Our Tribal government is focused on providing culturally appropriate treatment to our members, including wellness activities, talking circles, and group therapy. Unfortunately, we do not have the resources to combat the flow of the crisis, particularly since these drugs continue to pour into our community. Additional funds for beds at treatment centers such as the Friendship House are desperately needed. Without the proper resources we will barely put a band-aid on this crisis. We need long-term care and aftercare along with assistance to put people back into stable homes with their families. We must address the issues as a community to resolve this opioid crisis.

### Statement of Interest: Coeur d'Alene Tribe

The Coeur d'Alene Tribe is located in the State of Idaho on its reservation covering 345,000 acres of mountains, lakes, timber and farmland, spanning the western edge of the northern Rocky Mountains. The Tribe provides direct governmental services to its 2,500 members as well as the surrounding communities that include primary health care, housing, transportation, public safety, social services, economic development, natural resource management, cultural preservation, and more.

The entire community of the Coeur d'Alene Tribe has been impacted by the opioid crisis. We are addressing the crisis on many fronts including intervention, treatment, and prevention. The Tribe has allocated many resources toward the opioid epidemic, primarily through the Tribe's medical center, Marimn Health, but also through the tribal court system, social services, and tribal police department. The Tribe's health center has hired mental health clinicians who specialize in treating substance abuse and the Tribe also provides our members and employees with access to outpatient programs, detox facilities, inpatient treatment, and sober living homes, at great expense to the Tribe. The Tribe's Behavioral Health Department partners with other community resources such as the Wellness Center and the Natural Resources and Culture Departments to provide culturally appropriate treatment such as canoe building and White Bison Wellbriety groups.

The Tribe has had to train its law enforcement to deal with opioid overdose. The pharmacy at Marimn Health coordinates with the Coeur d'Alene Tribal Police Department to stock enough Narcan (Naloxone) for each of our tribal police officers to carry at all times.

Sadly, a majority of our tribal babies born over the last year were born addicted to drugs, including opioids. The Tribe collaborates with a hospital in the region to bring treatment programs specifically for pregnant mothers and to see fewer babies born addicted in the coming years. The Tribe is building a Medication Assisted Treatment program as well as a Re-Entry Program to help those returning from jail or residential inpatient treatment facilities to re-integrate into the community and live clean and productive lives.

The Tribe is dedicated to solutions that prevent our youth from becoming addicted to opioids, like the Healing of the Canoe Project and opening a Boys & Girls Club. Additionally, Marimn Health and the Tribe's government departments provide preventative programs, youth sports and other after school activities with the hope of giving our youth safe and positive places to learn and grow.

While the Tribe has put every effort toward allocating adequate resources to fight this multifront battle, the opioid crisis continues to cause a serious financial strain across many of our government and community resources. Unfortunately, the devastation these drugs have on our community will continue to usurp whatever resources we can allocate and additional resources will be required.

**Statement of Interest: Confederated Salish and Kootenai Tribes**

The Confederated Salish and Kootenai Tribes (CSKT) consist of the Bitterroot Salish, Kalispel (Pend d'Oreille), and Ksanka Band of Kootenai. Pursuant to the Hellgate Treaty of 1855, CSKT resides on the 1,250,000-acre Flathead Indian Reservation in western Montana. CSKT consists of around 8,000 Tribal member citizens. The Flathead Reservation is home to around 30,000 people, a majority of whom are non-Indian – a legacy of federal homesteading and land allotment laws. CSKT has contracted operation of federal programs on the Reservation under the Indian Self-Determination and Education Assistance Act, as amended, and subsequently provides a wide variety of services to Tribal and non-tribal citizens alike.

Like most governments, CSKT has had many of its programs impacted by the opioid crisis. Programs from law enforcement to social services to health services have had to provide services to victims of the opioid epidemic. In addition to fiscal impacts, there have been serious repercussions on the social/cultural fabric of our communities. One example is an increase in newborns at risk for neonatal abstinence syndrome, including positive drug screens for mothers at delivery. Repercussions of the epidemic will often be felt for generations.

CSKT has engaged its agencies and support programs in order to both: 1) respond to individuals and their families who have been impacted by the opioid epidemic; and 2) prevent further escalation or continuation of the epidemic. For example, in an effort to make it more difficult to illegally divert opioids, CSKT has proposed improvements to its controlled substance utilization and dispensation limitation policy. Similarly, in addition to its two full-time drug investigators, who spend a significant portion of their time on opioid-related situations, CSKT Law & Order works extensively with CSKT's drug-endangered children program and social services regarding situations involving opiates. These are just two examples of the Tribes' efforts.

**Statement of Interest: Confederated Tribes of Grand Ronde**

The Confederated Tribes of the Grand Ronde Community of Oregon's (CTGR's) reservation is located in southwestern Yamhill and northwestern Polk County, Oregon, approximately 25 miles from the Oregon Coast. As a self-governance Tribe, CTGR has been providing direct governmental services to its more than 5,000 members and the Grand Ronde community, including health, social, housing, culture, public safety and education services for more than two decades.

The opioid crisis is having a devastating effect on our Tribal children, families, and community and has resulted in significant financial costs for CTGR. An increasing number of our resources are being directed toward medical care for opioid-related conditions, the treatment of opioid dependence, prevention services, custodial services for children with opioid addicted parents and other social services, as well as police and public safety resources related to the opioid epidemic. In 2017 alone, we spent more than $400,000 just on opioid treatment services – not including costs of all outpatient care or related services. The number of child welfare interventions due to opioid dependence and the housing instability and criminal activity which often follows has grown exponentially and we continue to hear of overdoses involving Tribal parents. We have supplied our Tribal police with Narcan, an opioid blocking agent, and have administered it to reverse overdoses in the community.

CTGR will continue to focus efforts on drug prevention, addiction recovery, and outreach to opioid dependent members of our community using, among other things, culturally appropriate wellness activities, treatment, our transitional living centers, and events aimed at healing those affected by opioid misuse. We are committed to fighting opioid addiction, but we are ill-equipped and underfunded to deal with the effects of this growing epidemic in our community.

## Statement of Interest: Confederated Tribes of Siletz Indians

The Confederated Tribes of Siletz Indians (Tribe) has an 11-county service area within Oregon. Currently there are 5,314 enrolled tribal members, 1,209 members live in Lincoln County which includes the City of Siletz, where the tribal government and majority of services are located. The Tribe operates the Siletz Community Health Clinic which serves tribal members and the surrounding community.

Opioid Use Disorder (OUD) is a problem in Lincoln County. The 2016 Lincoln County Community Health Assessment reported 291 opioid prescriptions per 1,000 Oregon residents. Lincoln County had 318 opioid prescriptions per 1,000 residents. Of 289 tribal child abuse reports, 9% or 25 of these involved parental opioid abuse, including use while pregnant. Drug affected infants require placement in medical foster homes. Younger opioid abusers prey on elders; moving in with them and creating chaos in their neighborhood. Elders end up in eviction, one elder overdosed on heroin and fortunately recovered. A young woman died from an overdose in an elder's home. Opioid abuse creates unsafe environments for children—used needles littering school playgrounds, baseball and football fields, park areas, and even at the tribal ceremonial dance house.

Our community will be impacted for years from the direct and indirect impacts of OUD. The Tribe has addressed OUD through pain contracts, methadone treatment, mental health counseling, and in-patient/out-patient treatment. Recently the Tribe established a basic Medication-Assisted Therapy program to provide basic treatment services in our community. In two years, 300 pain contracts have reduced to 120 for non-cancer patients. Yet many still struggle with OUD. In the second quarter of 2018, the Tribal Clinic saw 101 patients for OUD. The Tribe's Behavioral Health Program reports 6% of their clients misuse opioids. These numbers only scratch the surface and require more resources.

**Statement of Interest: Confederated Tribes of the Colville Reservation**

The Confederated Tribes of the Colville Reservation occupy a 1.4 million acre reservation in north-central Washington. Approximately half of its 10,000 members live on or near the Reservation. The Tribes provides a wide variety of healthcare, social, and other governmental services to its tribal members and other community members.

The opioid crisis has deeply affected the community. The devastating effects of this crisis know no bounds. The consequences of this addiction have affected all residents of the Reservation including the most vulnerable – our elders and our youth. Existing tribal programs, already operating on limited resources, have been forced to continually address the immediate problems of the crisis to the detriment of addressing deeper and longer-term problems. Often it is difficult to get someone suffering from opioid addiction into detox and an inpatient treatment facility (often located hours away) because it can take so long that the person relapses or changes their mind and the opportunity to help passes. Beyond simply treating addiction, the Tribes has seen opioid use move from pills to heroin, which has created a new public health concern with the spread of Hepatitis.

The Tribes takes this crisis seriously. We are doing all we can to improve existing services and add the additional services necessary to ensure public health and safety. For example, the Tribes is building an inpatient treatment center on the Reservation among other expansions of health and social services. The cultural, demographic, and geographic realities of the Colville Reservation require that the Tribes take control of building, improving, and operating the wide range of services necessary to protect its people. But without the resources needed to do this in a manner that is supportive of its sovereignty, the Tribes is at a disadvantage in this fight.

**Statement of Interest: Confederated Tribes of the Umatilla Indian Reservation**

The Confederated Tribes of the Umatilla Indian Reservation ("CTUIR") is a union of three Tribes:  Cayuse, Umatilla, and Walla Walla. The CTUIR has over 3,100 tribal members. Nearly half of those tribal members live on or near the Umatilla Reservation, which spans nearly 172,000 acres in northeastern Oregon. The Reservation is also home to another 300 non-member Indians and about 1,500 non-Indians. The Tribal government has a staff of nearly 500 employees (48% tribal members, 14% non-member Indians, and 38% non-Indians). More than 800 individuals are employed at CTUIR's Wildhorse Casino & Resort and nearly 300 are employed by Cayuse Technologies.

Members of our community have dealt with opioid abuse in one way or another. The CTUIR has endured loss due to opioid abuse, including that of the worst kind - the loss of life. The CTUIR has also experienced loss in the productivity of our citizens and employees, a decline in the overall health and safety of our people, decreased participation in tribal cultural activities, and in the financial burden of finding solutions for opioid abuse. Tribal government resources have had to be taken away from many important government programs and redirected toward addressing this health issue.

The CTUIR recently completed construction on a new self-funded Yellowhawk Tribal Health Center. The CTUIR funds the Wellbriety Program within the Yellowhawk Behavioral Health Department, which provides Medication-Assisted Treatment on an outpatient basis. However, Yellowhawk clients must be sent off the reservation for inpatient services. The CTUIR would like to provide inpatient treatment and sober living services on our reservation homeland in a culturally appropriate manner. The CTUIR is doing everything possible to implement stronger opioid prescription monitoring and to expand our pain management services to include complimentary services like physical therapy and holistic medicine.

While the CTUIR continues to drive as many resources as possible toward assisting community members that are affected by opioid abuse, additional resources will be required to prevent opioid abuse and change the destructive path created by prescription opioids.

**Statement of Interest: Copper River Native Association**

Copper River Native Association ("CRNA") is an intertribal organization that provides health services, child and youth development, and life-enhancing resources to the Ahtna people of Alaska's Copper River Basin. CRNA's health services include primary medical care, behavioral health, and dental care services. CRNA also provides elders home services and congregate meals, employment and training services, public safety, and other social programs for tribal members within the region. CRNA's service area includes the communities of Cantwell, Gakona, Gulkana, Kluti-Kaah, and Tazlina.

The opioid crisis has had devastating impacts on the communities served by CNRA. The increased use of prescription opioids across Alaska has led to a corresponding increase in the use of and addiction to non-prescription opioids, including heroin. Heroin deaths in Alaska more than quadrupled between 2009 and 2015, and CRNA's communities have not been immune to the destructive impacts of these drugs. The health and public safety challenges associated with the opioid epidemic threaten to destroy communities and strain CRNA's ability to provide adequate services to its members.

CRNA has undertaken an aggressive effort to confront the opioid epidemic head-on, though we desperately need more resources for these efforts. We offer outpatient services for people struggling with substance abuse, but we are not currently able to offer inpatient treatment. We also offer resilience training as part of our goal to create a healthy community through training, education, and therapy. We recently initiated a "Call It Out" public outreach campaign directed at the use and abuse of heroin and other opioids. The campaign focuses on preventing opioid abuse, increasing awareness, and empowering individuals to seek treatment for themselves and others. As the impacts of the opioid crisis continue to unfold, we will need significant resources to expand our services and help heal the people and communities we serve.

**Statement of Interest: Coquille Indian Tribe**

The Coquille Indian Tribe has resided in Southwestern Oregon since time immemorial. In the 19th Century, federal policies deliberately moved many Tribal members from their ancestral lands. In 1954, Congress terminated the Tribe's federal recognition, further displacing our membership. In 1989, Congress restored federal recognition, and since then the Tribe has focused its efforts on its long-term welfare and recovery from the effects of intergenerational trauma. In addition to providing an array of health care, social, housing and emergency services for its members, the Tribe has also pursued a multi-faceted economic development strategy to generate revenue to support those programs.

The opioid epidemic has hit our Tribe and its membership hard. American Indians/Alaska Natives (AI/AN) throughout the Northwest, including our members, have suffered consistently higher drug and opioid overdose mortality rates, particularly among younger people (nearly twice the rate of non-Hispanic Whites). AI/AN in the Northwest have also had over double the opioid overuse hospitalization rate. Our Tribe along with many others in the Northwest, have identified the opioid crisis as a priority health issue for our communities.

We have not stood still in the face of this crisis. We are implementing policy for our Medical Clinic, Pharmacy and Purchase and Referred Care program, aiming to prevent over-prescribing of opioids, enhancing monitoring, promoting alternative pain management, and improving access. We are also participating in a Tribal Opioid Response Consortium, and we have developed our own Tribal-specific programs with grants and other funding. Our efforts aim to grow our capacity to address the complex factors associated with a comprehensive opioid response, including: increasing access (and reducing barriers) to culturally appropriate prevention, treatment and recovery; eliminating opioid-related deaths; using cultural and community strengths to halt the crisis; distributing Naloxone and training personnel in its use; and integrating evidence-based prevention programs into the community. We are still in the early stages, but our Tribe has already been placed in the uncomfortable position of having to allocate and divert limited time, resources, and funds from other critically important Tribal issues (including economic development) to combat this epidemic.

**Statement of Interest: Cow Creek Band of Umpqua Tribe of Indians**

      The Cow Creek Band of Umpqua Tribe is located in southwestern Oregon with approximately 1800 members. The Tribe itself has approximately 140 employees and affiliated businesses have about 760 employees. Cow Creek was one of the first two Tribes in Oregon to secure a Treaty with the United States of America. This Treaty, ratified by the U.S. Senate on April 12, 1854, established the Government-to-Government relationship between two sovereign governments. Under the Treaty the Tribe ceded more than 800 square miles of Southwestern Oregon to the United States. Like other Oregon Tribes, Cow Creek was terminated in the 1950s and has had to fight back through restoration and rebuilding its lands and government.

      The costs of treating those addicted to opioids have been particularly heavy for the Tribe, the Tribe's health insurance plan, and the two clinics it operates. The Tribe provides health insurance for tribal members, tribal employees, and their dependents. The Tribe's health insurance plan is self-insured. In addition to increased health care costs, the Tribe has suffered as a result of the rise in addiction treatment and social services. As the Tribe struggles to fund its response to the opioid epidemic, other areas of essential services receive lower funding, depriving these other areas of Tribal government of valuable, and necessary resources.

**Statement of Interest: Coyote Valley Band of Pomo Indians of California**

Nestled in the foothills alongside the Russian River in California, the Coyote Valley became home to the Coyote Valley Band of Pomo Indians. Where others only saw a bare tract of land covered in brush, the Coyote Valley Band of Pomo Indians saw a thriving environment. They built their lives, culture, and history around this area. Despite attempted removals and numerous legal actions, the Tribe has held true to its identity and culture to this day.

Like other Tribes, the members of the Coyote Valley Band of Pomo Indians have first-hand experience of the debilitating effects of opioid use. The Tribe's members are suffering through this crisis. The effects are felt in the housing, health care, and emergency services the Tribe provides to its members. But resources are limited, and the tools used against opioid addictions are quickly consuming these resources. The Tribe needs help to combat the toll opioids have levied against its members, culture, and tribal government.

**Statement of Interest: Elk Valley Rancheria, California**

The Elk Valley Rancheria, California, a federally recognized Indian Tribe ("Tribe") is located in Del Norte County, California, along the Pacific coast and approximately equal distance between San Francisco, California and Portland, Oregon. The Tribe was illegally terminated by the United States pursuant to the California Rancheria Act. The Tribe was restored to recognition through litigation. Since formal re-organization, the Tribe has sought to reclaim land within is former restored Reservation boundaries. Del Norte County and the Reservation is home to approximately one-half of the Tribe's enrolled members. The Tribe is a self-governing Tribe providing direct governmental services to its members, including health insurance, education, housing, economic development, natural resource management, cultural resources, and jobs.

The opioid crisis has impacted every family in our community. Addiction and death have resulted in loss of family members. Drug-related job loss and evictions are on the rise, leaving those families and children homeless.

As a Tribal government, we recognize that we do not have the resources to stop the flow of opioids and other drugs that continue to pour into our community. Unfortunately, the issue is so prevalent that drug addiction is viewed by many as a teenage "rite of passage" and otherwise viewed as a new, debilitating community standard. We work closely with health care providers and law enforcement in an effort to proactively address this matter of community-wide importance.

### Statement of Interest: Ely Shoshone Tribe of Nevada

Nestled within the Great Basin National Heritage Area, the Ely Shoshone Tribe continues their heritage and culture proudly. The Shoshone were once pushed off their lands and forced to work for miners or ranchers in the area. Now, the Tribe operates a smoke shop and a textile business, among other endeavors.

Each year the Ely Shoshone Tribe honors their heritage by hosting a fandango. Members come to gather, share stories, sing traditional songs, and participate in traditional dances and games. Six dancers of Ely proudly participated in the 2002 Winter Olympics in Salt Lake City, Utah.

Like others in the Great Basin area, the members of the Ely Shoshone Tribe have come to know first-hand the pain caused by opioids. The Tribe's resources, its courts, its housing, and its health care and emergency services are being devoured by the opioid crisis. A necessary battle, the fight against opioids is taking an unconscionable toll on the people of the Ely Shoshone. The Tribe is struggling to maintain this fight with the scarce resources it has. A successful resolution to the opioid crisis gripping this Tribe is direly needed.

**Statement of Interest: Fallon Paiute Shoshone Tribe of Nevada**

The Fallon Paiute Shoshone Tribe strives to promote and revitalize the traditional ways of life that are the very heart of their people. The task of preserving and maintaining the many aspects of the Toi-Ticutta's native culture is an ongoing struggle. Nonetheless, the Tribe actively invests and promotes its tribal history, languages, the land, cultural values, goals, and traditions of the Fallon Paiute Shoshone Tribe.

The Fallon Paiute Shoshone Tribe's thousands of members are being threatened by a gripping crisis. Opioid use and abuse has permeated throughout the Tribe and is currently draining the resources of the Fallon Paiute Shoshone Tribe. The effects are far reaching. Affecting almost every area within the Tribe, from health care services to child services to law enforcement and even cultural preservation, the Tribe's resources are buckling under this great weight created by the Opioid Crisis. The Tribe is struggling through this crisis, and will not be able to maintain its cultural values, traditions, and heritage unless the Opioid Crisis is successfully resolved.

## Statement of Interest: Flandreau Santee Sioux Tribe

The Flandreau Santee Sioux Tribe is a federally recognized Indian Tribe, organized under the authority of the Indian Reorganization Act of 1934, as amended. The Tribal Constitution and By-laws were ratified by the Tribe on April 4, 1936, and approved by the Secretary of the Interior on April 24, 1936. The Tribe's headquarters are located in Flandreau, South Dakota. The total area of the Tribe's reservation is approximately 6,000 acres, of which approximately half is trust land and the other half is owned by the Tribe in fee simple. The total membership of the Tribe is approximately 765 members, of which approximately 428 live on, or near, the Tribe's reservation.

The health status of the Tribe and other American Indians residing in the Flandreau Santee Sioux Service Area is typical of an economically depressed and medically underserved reservation area. The health delivery system is a combination of programs operated by the Tribe under its Self Determination Agreement with IHS and various grants secured from other sources. Ambulatory patient data indicates that the leading medical problems for the population are: diabetes mellitus, infectious diseases, respiratory infections, hypertension, depression, and injuries. Many health conditions progress to the point they cannot be treated locally. High rates of cardiovascular disease, malignant neoplasms, and alcohol and drug abuse can be attributed to a poor socioeconomic environment. Lack of adequate care and access to specialist and specialty care contributes to the poor health of patients. The Tribe's new health facility is a 39,055 square foot outpatient facility, and it opened in 2017. The facility expanded existing primary health care at the Flandreau Santee service area to include additional ancillary, community health, preventative, and diagnostic screening services.

The allegations contained in the Tribe's complaint reflect a myriad of opioid-related issues from criminal convictions stemming from pharmacy-shopping to elder abuse. There is an increased health cost for tribal members, impacts on the tribal police and court system from increased crime, and a labor shortage for the Tribe and its businesses because people are unable to pass mandatory drug tests. Children have been neglected because of addiction, and the Tribe's behavioral health department is overrun with mental health issues aggravated by opioid abuse. The conditions on Reservations are notoriously poor, but they have been amplified by the wrongdoing of the Defendants in this matter.

**Statement of Interest: Fond du Lac Band of Lake Superior Chippewa**

The Fond du Lac Band of Lake Superior Chippewa is one of six Chippewa Indian Bands that make up the Minnesota Chippewa Tribe. The Fond du Lac Band's Reservation was officially established in the very important 1854 treaty with the United States Government. Yet, archeologists know that the ancestors of the present-day Chippewa have resided in the Great Lakes area since 800 A.D.

Today, the Fond du Lac Band has almost 5,000 members. The Band has a significant economic, social, and community presence for the benefit of all its members. Notwithstanding significant efforts to remedy the ravages of opioid pill addiction on the Reservation, the opioid crisis continues to devastate the Band and its resources. Foster care resources have been completely exhausted, requiring the Band to send foster children away from the Reservation for care in different areas of the Country. The Band's annual burial and funeral budget gets completely consumed by late spring every year due to the number of opioid-related deaths. The Band's school is under severe pressure due to the developmental and social challenges of NAS-born children, from pre-K through high school.

Opioids have had a severely disparate impact on the Tribe and have caused a staggering increase in opioid-related abuse, addiction, and suicides. The Fond du Lac Band is using its resources to fight this oppressive and crushing malady. Resources are scarce, and the Tribe is struggling to maintain vital preventative programs against opioids and their regular operations. The Fond du Lac Band is in dire need of a major financial resolution to the opioid crisis.

**Statement of Interest: Forest County Potawatomi Community**

The Forest County Potawatomi Community ("FCPC") is a Federally-recognized, self-governing Indian Tribe located in rural, northeastern Wisconsin. Its reservation land, located in Forest County, Wisconsin, is home to 736 of the Tribe's 1,621 enrolled members.

The opioid epidemic has had a devastating impact on the Tribe. As of this filing, for calendar year 2018, there have been five fatal overdoses of Tribal members attributable to opioids. In 2017, twenty-eight Tribal members overdosed, three of whom died. With the rapid deployment of Narcan to the community, law enforcement, and first responders many overdoses were non-fatal but that does not imply the end of the individual's struggle with addiction; according to the Forest County Sheriff's Office some of those resuscitated with Narcan had been previously resuscitated. The Tribe conservatively estimates that 18% of its membership is opioid dependent. AODA new patient counts have risen month over month. For FY 2016 and 2017, the Tribe spent over $900,000 for various programs and staff to combat addiction. For FY18 alone, nearly $1 million dollars has been spent on inpatient drug detoxification and treatment. The toll that the opioid epidemic has had on FCPC families is immeasurable. Of the 79 active Indian Child Welfare cases, all are related in part to drug and alcohol-related neglect or abuse. Because our Tribe is perceived by outsiders as having financial resources, drug dealers shamelessly target our Trial community, going as far as to wait outside of local banks for Tribal members to withdraw cash for drugs.

As a close-knit community, regardless of ethnicity, FCPC has a unique opportunity to identify individuals in opioid addiction crises, as well as provide immediate intervention specific to the clients' needs. Our mix of services is continually evaluated and modified to meet the addiction concerns and needs of the *Nishnebek* (people). Recognizing the lingering impact of historical trauma, the Red Road provides a holistic approach to sobriety, integrating talking circles, sweat lodges for purification, sacred pipe ceremonies, and smudging. Another trauma-informed approach, the Healing Journey, is a monthly offering that supports grief through many stages and sources, whether mourning the loss of a loved one to addiction or mourning the loss of an addictive lifestyle. Talking circles are used in this setting and are successful in encouraging sharing of feelings even in traditionally stoic individuals who've been unwilling to communicate feelings they've long kept suppressed. The overall theme of this programming is to incorporate tradition into Western medicine as many Native Americans feel that the erosion, or loss, of their culture has brought them to the place of "addiction, trauma, violence, suicide, and other behavioral health conditions and consequences that continue to disproportionately affect Native communities." Even with the efforts of every Tribal Executive Council member, every Division Administrator, every employee of every department focused on ending the death of our Tribal brothers and sisters, opioids continue to be the leading cause of death for our Tribal community.

## Statement of Interest: Fort Belknap Indian Community

The Gros Ventre (Aaniiih) and Assiniboine (Nakoda) Tribes of the Fort Belknap Indian Community ("FBIC") of the Fort Belknap Indian Reservation is a federally-recognized Indian Tribe governed under a constitution pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 476. The FBIC's Reservation encompasses nearly 675,147 acres in northcentral Montana between the Canadian border and the Missouri River. Pursuant to the Treaty of 1855 (11 Stat. 657), the full powers of internal sovereignty and self-government are vested in the Fort Belknap Indian Community Council, which is responsible for protecting the health, security, and general welfare of approximately 8,000 citizens.

Prescription opioid drug abuse and related crimes are contributing to a public health crisis that threatens to undermine the safety and wellbeing of the entire community. As with other Tribes in Montana, opioid prescribing rates for FBIC citizens are far higher than those for the state as a whole. Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, the increasing distribution of opioids to members of the FBIC has led to heroin addiction, abuse, and death. Opioid use in FBIC has also led to use of methamphetamine and other synthetic opioids such as fentanyl.

Costs to the FBIC related to the opioid crisis include, but are not limited to:

a. Emergency medical visits and hospitalizations, including for related infections, injuries, and illnesses;
b. Increased costs to FBIC's social services department to aid (1) citizens addicted to opioids; (2) children and elders whose parents/guardians are enmeshed in opioid addiction; and (3) foster or adoptive guardians;
c. Increased costs to the FBIC law enforcement to respond to increased drug trafficking, human trafficking and property crimes;
d. Care, education, and support of pregnant women addicted to opioids and of their children born with neonatal abstinence syndrome (NAS); including ongoing support to address long-term consequences; and
e. Treatment of victims and criminal offenders in the FBIC Court, including holistic community-based treatment programming and regular drug screening.

Addressing the impacts of the crisis will continue to require enormous work and resources for the foreseeable future. While FBIC currently has one outpatient drug treatment facility, more resources are desperately needed to expand the available services and provide emergency housing and sober-living facilities. Efforts to develop better-integrated medical and behavioral health care, including innovative peer-support systems, will also require significant resources. Finally, the Community will need funding and support for a wide range of services to care for children whose parents suffer from opioid addiction, for whom the impacts of the crisis will continue to reverberate indefinitely.

**Statement of Interest: Gila River Indian Community**

The Gila River Indian Community (the "Community") is composed of the Pima (Akimel O'otham) and Maricopa (Pee-Posh) people. The Community's Reservation is located in southern Arizona and was first established by the United States Congress Act of February 28, 1959, ch. 66. 11 Stat. 388,401. The Community's Constitution and Bylaws were approved by the United States Secretary of the Interior on March 17, 1960. The Community is a federally-recognized Indian Tribe eligible to receive services from the United States Bureau of Indian Affairs. *See* 83 Fed. Reg. 4235 (Jan. 30, 2018). There are 22,351, enrolled Community members, with over half of those members living on the Gila River Indian Reservation. The Community is self-governing, delivering direct governmental services to its members and surrounding communities, including medical and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and employment opportunities.

The opioid crisis has impacted the Community in many areas, resulting most significantly in negative outcomes for the Community's children and families. This crisis has also affected the operations of many of the Community's departments including police, social services, courts, detention and health care systems. The Community has had to train Community employees to coordinate and implement responses to this epidemic. The Community has had to redirect funds, time and resources from current priorities to confront the opioid crisis and this has become a substantial issue for the Health & Social Standing Committee of the Community Council and for the Gila River Health Care Corporation. the Community's services focus on providing quality and culturally appropriate treatment to its members suffering from substance use and abuse, including to those that are impacted by the opioid epidemic. Sadly, the impacts of this crisis are on the rise in Indian Country and the true impacts are immeasurable.

**Statement of Interest: Grand Traverse Band of Ottawa and Chippewa Indians**

The Grand Traverse Band of Ottawa and Chippewa Indians (Band) is located in the Northwestern section of the lower peninsula of the State of Michigan. The Band's original reservations (both the 1836 and 1855 treaty reservations and additional trust land) is home to about one-half of the Tribe's 4100 enrolled citizens. The Band has been a self-governing Tribe for many years, providing direct governmental services to its members and the surrounding community, including primary and behavioral health services, social services, housing, law enforcement and court services, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has resulted in significant overdose deaths and related social, medical and law enforcement costs that have impacted our Band and community. Our Band has lost sons and daughters, mothers and fathers, brothers and sisters to addiction and death. We have had to purchase Narcan in large quantities and train our law enforcement, natural resource officers, and other tribal officials and members to use it. We have had to increase our health budget to address the related medical issues. Drug-related evictions are on the rise, family dissolution, child care costs and treatment costs are rising at an unsustainable rate.

Our tribal government provides culturally appropriate treatment to our members suffering from the opioid crisis, including wellness activities, talking circles, and group therapy. Our tribal government participates in an intertribal intuitive state-wide treatment program (Access to Recovery) in an attempt to meet the treatment need. Unfortunately, we do not have the resources to address the scope of the crisis.

**Statement of Interest: Great Plains Tribal Chairmen's Health Board**

Established in 1986, the Great Plains Tribal Chairmen's Health Board (GPTCHB) is an organization representing the 18 tribal communities in the four-state region of South Dakota, North Dakota, Nebraska and Iowa. The Tribes and tribal communities we represent comprise nearly 170,000 individuals. Through public health practices and the formation of tribal partnerships, we work to improve the health of the American Indian peoples we serve by providing public health support and health care advocacy. These efforts include critical health promotion and education outreach services through our various programs and departments, as well as national-level advocacy on a wide range of tribal health issues. The Great Plains Tribal Epidemiology Center, a core component of GPTCHB, collects and evaluates public health data in order to help our tribal communities identify priorities and eliminate health disparities.

Like many Native communities across the nation, the Tribes and communities served by GPTCHB have experienced the impacts of the opioid crisis first-hand. In South Dakota, for example, preliminary data show that tribal communities suffered 87 deaths due to opioid abuse from 2012-2016 (out of a total of 294 opioid deaths in the state). And in 2017, American Indians accounted for 109 out of 506 hospital admissions in the state. Tragically, the highest number of opioid-related hospital admissions occurred among 21 to 25-year-olds.

GPTCHB strives to help the communities in its region address the crisis through programs aimed at prevention, education, and treatment of opioid dependence and related drug-abuse issues. Even so, the Tribes and tribal communities served by GPTCHB will continue to feel the impact of the crisis far into the future, and more resources are desperately needed to address the public health and safety challenges brought about by this epidemic.

## Statement of Interest: Guidiville Rancheria of California

Much of Guidiville Rancheria's history is tragic. The Tribe was forced from their ancestral lands by a wave of non-Indian settlers during the California Gold Rush. They saw the rich ecosystem that they had maintained and evolved over time plundered and destroyed by non-Tribe members. The Tribe was subjected to fraud and legal chicanery which left them landless. The Tribe persevered, however, and has been able to regain land and recognition from the U.S. government of their status. Guidiville Rancheria's members continue to struggle to survive and to protect and to preserve their culture and wisdom for a time when it will again be recognized and honored.

The latest and perhaps most challenging battle in the Tribe's storied history is now the opioid crisis. Faced with crippling opioid abuse, the Tribe now must fight to survive and to protect its way of life for its members. Opioids, as a highly addictive drug, infect every aspect of tribal life. These drugs have a disastrous toll on familial ties, domestic violence, educational levels, and suicide rates. The crisis has placed a large financial drain on Guidiville Rancheria's resources. It has stripped the Tribe of funds for other vital needs. The Tribe will continue to struggle until a successful resolution is found in the opioid crisis.

**Statement of Interest: Hopland Band of Pomo Indians of California**

The Hopland Band of Pomo Indians has been devastated by the opioid crisis. This crisis has placed an exorbitant strain on the Tribe's resources. Additionally, the health and welfare of the Tribe's members is deteriorating at an alarming rate. This evil must be addressed head-on in order to preserve the Tribe's way of life.

The opioid crisis has resulted in sky rocketing costs for child welfare, medical costs, foster care, education and addiction therapy. This new burden has drained the Tribe's funding for the health and welfare programs that it runs separate to any opioid related program. Opioids are the curse of the Hopland Band people. The resources of the Tribe are overextended and at a breaking point trying to remedy the opioid issue the Tribe is facing. Additional help is needed in order to combat the evils of addictions that opioids have created within the Hopland Band of Pomo Indians.

## Statement of Interest: Indian Health Council, Inc.

Indian Health Council, Inc. (IHC) is a consortium of nine Tribes in northern San Diego County, California; we provide a full spectrum of on-site and outreach services to our Council's reservations.[1] We serve 15,000 clients with a range of programs, including culturally appropriate health care and related services including direct medical care, wellness, fitness, prevention, and intervention. We also provide counseling, behavioral health, child welfare, and related services.

The rates of opioid deaths among Native Americans in San Diego County is 22 people per 100,000 – more than double the rate in the County. The overall rate in one zip code in our service area is 92 per 100,000; the face of the epidemic in San Diego County truly is a Native one. We also see the effects of use and addiction, as the social services, behavioral health, and substance use disorder services IHC provides are straining under the workload resulting from families torn by the crisis.

IHC has a multidisciplinary approach to opioids in our communities. IHC's chronic pain management program has evolved, advanced and expanded based on evidence collected over ten years; lessons learned there strengthened the program.[2] IHC is now referring out all chronic pain management to Pain Management Specialists for treatment planning. IHC has implemented a pill takeback project which provides outreach and education, provides an opioid disposal dropbox at tribal events, and distributes medication lock boxes to help secure prescriptions. We also engage our patients where they are, using cultural resources like drum groups and a mentorship program with tribal cultural performers to prevent and reduce opioid use. IHC has limited resources to provide the prevention, intervention, and treatment services to our tribal communities affected by opioids. Limitations on repayment for Medically Assisted Treatment and Substance Use Disorder Prevention/Services, as examples, hamper our efforts to expand all options to our patients.

---

[1] The following Tribes comprise IHC's tribal Board of Directors: Inaja-Cosmit, La Jolla, Los Coyotes, Mesa Grande, Pala, Pauma, Rincon, San Pasqual, and Santa Ysabel.
[2] https://www.cdc.gov/tribal/documents/consultation/summer-2016-executive-summary.pdf

**Statement of Interest: Jamestown S'Klallam Tribe**

The Jamestown S'Klallam Tribe is a federally recognized Tribe located on reservation and other Tribal lands on the northern Olympic Peninsula in Washington. The Tribe seeks to be self-sufficient, to provide quality governmental programs and services to address the unique needs of our people. The Tribe's leadership has a high priority to protect our sovereignty, homelands and treaty rights, while preserving and enhancing the Tribe's historical and cultural identity as a strong, proud and self-reliant community. The opioid epidemic poses one of the most significant challenges our Tribe has ever faced.

Clallam County, one of the counties where we are located, had the highest rate of opioid-related deaths of any county in Washington between 2012 and 2016, at 16.5 people per 100,000.[1] That County averages more than one opioid prescription per resident, with 1,164 prescriptions per 1,000 Clallam County residents.[2] There are similarly catastrophic numbers in Jefferson County as well.[3]

The Tribe's Department of Health Services has implemented a number of critical programs to combat this crisis, including following new CDC guidelines for opioid prescriptions, operating a pain management program that seeks to decrease dependency on controlled substances, coordinating referrals for substance use disorders with counseling and treatment, as well as for alternative pain management care, and participating in a new program for safer opioid prescribing sponsored by the University of Washington. We operate a small Medication Assisted Therapy (MAT) clinic for approximately 100 patients, but are planning and seeking approximately $5 million to develop a 30,000 square foot MAT facility to treat opioid disorder through broad, integrated set of services for both the Indian and non-Indian community.

---

[1] *Opioid-related Deaths in Washington State, 2006-2016*, Washington State Department of Health (May 2017), *available at*
https://www.doh.wa.gov/Portals/1/Documents/Pubs/346-083-SummaryOpioidOverdoseData.pdf.
[2] *See Population and Total Controlled Substances Prescriptions*, *Clallam County, CY 2014,* Washington State Department of Health 630-126 (May 2017), *available at*
https://www.doh.wa.gov/Portals/1/Documents/2600/PMPcountyProfiles/630-126-ClallamCountyProfile2014.pdf.
[3] *Population and Total Controlled Substances Prescriptions*, *Jefferson County, CY 2014,* Washington State Department of Health 630-126 (May 2017), *available at*
https://www.doh.wa.gov/Portals/1/Documents/2600/PMPcountyProfiles/630-126-JeffersonCountyProfile2014.pdf.

**Statement of Interest: Jicarilla Apache Tribe**

The Jicarilla Apache Nation is located in the Northern-Central Region of New Mexico. The Jicarilla Apache Reservation, which was established February 11, 1887, is approximately 85,000 acres. The Reservation is located within two northern New Mexico counties: Rio Arriba County and Sandoval County. Many tribal members live in the rural community of Dulce, which houses at least one-half of the 4,000 enrolled members. There are two clans in the Tribe: The Llaneros, or plains people and The Olleros, or Mountain people.

The negative impact of the opioid epidemic can be seen throughout the reservation. A simple trip to the grocery store or anywhere else on the reservation is a constant reminder of the children, siblings, parents, cousins, grandparents and other loved ones who have lost someone due to opioid abuse and overdose. The sadness that touches the Tribe is profound, even as opioid overdoses continue to rise and impact every Jicarilla Apache Nation tribal member. This epidemic must stop.

The Jicarilla Apache Nation is trying to combat the epidemic by providing individual substance abuse counseling, phase 1 and phase 2 group substance abuse counseling, referrals to inpatient counseling and family/couples counseling. The Tribe is committed to confronting this crisis but requires additional resources to provide necessary treatment and services.

## Statement of Interest: Kenaitze Indian Tribe

The Kenaitze Indian Tribe is located on the central Kenai Peninsula in Kenai, Alaska. The Tribe is a federally recognized Tribal Government reorganized in 1971 under the statutes of the Indian Reorganization Act of 1934, as amended for Alaska in 1936. The Tribe has established long-term goals which enhance the health, social and economic well-being, cultural language and governmental concerns of its people, and serves over 5,000 Alaska Native, American Indian and other residents in the central and upper Kenai Peninsula, including approximately 1,634 Tribal Members. The Tribe provides governmental services to its members, including primary and behavioral health services, social services, education services, housing services, economic development, tribal fisheries and employment as well as culture and language resources.

Like many other communities across the nation, the opioid crisis has been strongly felt by our community, impacting every family. The Tribe has lost sons and daughters, mothers and fathers, brothers and sisters to addiction, homelessness, incarceration and death. This crisis has caused financial stress on families and our community, and our children are encountering drugs at a much earlier age. Our children are being raised by single parents, fragmented families, grandparents and great-grandparents or being taken into Tribal and State custody. The crisis is straining nearly every governmental and cultural service we provide to the breaking point. We have been forced to divert scarce resources away from existing priorities to staff new positions needed to address the opioid crisis, including substance abuse counselors, nurses and physicians specializing in addiction.

The opioid epidemic has created a dependence of uncontrollable behavior. Understanding the severity of the opioid epidemic has the Tribal Council moving in the direction of healing-based on a long-term plan. The Council is focused on providing culturally appropriate treatment to our members suffering from the opioid crisis, including wellness activities, talking circles, and group therapy. The Council has an agreement with the State of Alaska which established the Henu' Community Wellness Court. The Henu' Court is a joint-jurisdictional therapeutic court that serves those who face legal ramifications stemming from substance use by placing a focus on wellness and treatment versus jail time. To be able to provide the services and support needed, we plan to expand our services to bring healing full circle for our Tribal Members and community. We have completed our first 18 months of the Henu' Court and will have our first participants graduating in October. Families have been reunited and success stories are what we are celebrating. Unfortunately, we do not have the resources to staunch the flow of the crisis, particularly since these drugs continue to pour into our community.

**Statement of Interest: Keweenaw Bay Indian Community**

The Keweenaw Bay Indian Community is located in the area near the base of the Keweenaw Bay in Michigan's Upper Peninsula. The Community's reservation is home to 1,044 of its 3,624 enrolled members. The Community has been a self-governing Tribe for many years, providing direct governmental services to its members and the surrounding community. Our services are expansive and include police protection, natural resource management, environmental protection, housing, healthcare, social service programs, justice administration, education, day-care, road maintenance, and public works. We are proud of what we are able to provide for our members.

The opioid crisis has impacted every family in our community. We have lost sons, daughters, mothers, fathers, brothers, and sisters to addiction and death. The crisis is straining nearly every governmental and cultural service we provide to the breaking point. Crime has been on the rise in our community as many have turned to theft and fraud to fuel their addiction. We have had to place many of the Community's children in foster care, further straining our government and causing turmoil in the children's lives. Drug-related evictions are on the rise as well, leaving those families and children homeless.

Our Community has responded in full force to combat the addiction crisis. Our tribal government is focused on providing culturally appropriate treatment to our members suffering from the opioid crisis. The Community is in the process of building a halfway house for our members as a means of helping them re-enter society. We are also operating aggressive and costly inpatient and outpatient programs. Our Healing-to-Wellness Court has provided an alternative to the criminal justice system and has had success in fighting addiction. Unfortunately, we do not have the resources to staunch the flow of the crisis, particularly since these drugs continue to pour into our community.

**Statement of Interest: Kickapoo Tribe in Kansas**

The Kickapoo Tribe in Kansas is a federally recognized sovereign nation located in Brown County in a rural community approximately five miles west of Horton, Kansas. The Tribe has approximately 1,600 enrolled members, not including those bands located in Oklahoma, Texas and Mexico.

The opioid epidemic has affected all of our Tribal members and the surrounding communities with its debilitating affects. Our Tribe has lost tribal members to opioid overdose and addiction and nearly every member of our Tribe has been affected in one way or another. Every Tribal department has been affected by the opioid epidemic and no amount of Tribal resources will ever be enough to address the havoc wreaked by opiate addiction. As a Tribal government, we understand that we are at a critical point in the sustainability of the health and welfare of our people.

The Tribe is dedicated to helping our members and our community fight the opioid epidemic as we continue to expend valuable government resources toward tribal health care, prevention, behavioral health services, law enforcement and justice services. As a Tribe, we see our youth as a top priority because they will be entrusted to carry on our culture, our traditions and our way of life. The Tribe maintains programs that educate our future generations about the dangers of prescription opioids and its direct effects on our families and communities. The Tribe is organizing a community-based approach to dealing with addiction and recovery, but we lack the resources and funding to adequately provide services within our community.

While the Tribe has put every effort toward allocating adequate resources to fight this multifront battle, the opioid crisis continues to place a serious financial strain across many of our government and community resources. Unfortunately, the devastation these drugs have on our community will continue to usurp whatever resources we can allocate and additional resources will be required.

**Statement of Interest: Kodiak Area Native Association**

Kodiak Area Native Association (KANA) is a non-profit corporation providing health care to American Indians and Alaska Natives, and to other eligible individuals in the State of Alaska, pursuant to Title V of ISDEAA, and the Alaska Tribal Health Compact. KANA provides services in the Koniag region, including the City of Kodiak and six remote Alaska Native villages, encompassing ten federally recognized Tribes. KANA also provides services for the entire Kodiak Island community, with a focus on Alaska Native beneficiaries and implementation of Sugpiaq Alutiiq cultural values. In addition, KANA provides social services, and implements the Village Public Safety Officer Program as a means of providing rural Alaskan communities with needed public safety services at the local level.

KANA has seen a significant increase in opioid use among its service population in recent years. The percent of Indian Child Welfare Act cases where opioid use is an issue has gone from zero to 80% of cases in the last 5 years. In response to the increase in patients seeking care for opioid use disorder, KANA has implemented a Medication-Assisted Treatment (MAT) program. KANA added a substance use counselor to focus on MAT assessments and clients, and a full-time case manager to focus on case management services for substance abuse clients.

KANA has also had set aside funding to support travel by patients to inpatient substance abuse treatment facilities when necessary, as these services are not available locally. KANA has instituted additional testing measures and moved to a more expensive urine drug test due to the prevalence of opioid misuse and abuse among its patients. KANA is also providing Deterra® Drug Deactivation System pouches to the community, to safely dispose of unwanted or expired prescription painkillers at home.

## Statement of Interest: Kootenai Tribe of Idaho

Kootenai Tribe elders pass down the history of the beginning of time, which tells that the Ktunaxa people were created by Quilxka Nupika, the Supreme Being, and placed on earth to keep the Creator-Spirit's Covenant – to guard and keep the land forever. Bands of the Ktunaxa Nation have inhabited Ktunaxa Territory, including portions of north Idaho, northwest Montana, northeast Washington, southeast British Columbia and southwest Alberta since time immemorial. The Kootenai Tribe of Idaho is one of seven modern Ktunaxa communities. The Kootenai Tribal Council governs the Kootenai Tribe of Idaho and its citizens on the Kootenai Indian Reservation in north Idaho. The population of the Kootenai Tribe of Idaho is 154. The Kootenai Tribe possesses Treaty-reserved hunting, fishing and gathering rights in Ktunaxa Territory.

It is difficult to quantify the harm opioids have caused the Kootenai Tribe. The Kootenai Tribe has suffered immeasurable harm from individual addiction and death, damaging family and community connections and lost participation in cultural activities and tribal life. The community suffers from concerns about public safety, increased crime and diminished quality of life on the reservation. To meet these challenges, the Tribe has created its own police force to battle the rising impacts of opioid abuse and sales. This, in turn has led to increased government expenses related to tribal court, prosecuting attorney, and jail and probation costs. The Kootenai Tribe has expended government resources sending its citizens to rehabilitation facilities well away from the Territory, due to the lack of culturally appropriate facilities within the Territory. Additional government resources have been consumed by increased need for family and child services, greater need for medical treatment, and increased funeral costs.

## Statement of Interest: La Posta Band of Mission Indians

The La Posta Band of Mission Indians is located in East San Diego County in Boulevard, CA. The reservation consists of 3800 acres. There are 19 enrolled members and their children, many of whom live on the reservation. The Tribe is self-governing and provides many services to its members as well as the surrounding community. Some of these resources include monthly family nights where important discussions take place on topics such as drug abuse and suicide prevention as well as healthy living and job opportunities. Other resources provided include Kumeyaay language and cultural classes and social and health services.

The opioid crisis has affected many of our Tribal members and the surrounding community with its destructive affects. Among our small Tribe, we have lost one member and many others have been and still are affected by this crisis. This drug among others has divided families, taken lives and left children without parents, brothers and sisters.

Our tribal government is actively involved in providing assistance and treatment to our members as well as the surrounding community through our substance abuse center located beside our Tribal office as well as talking circles, wellness events and therapy. We also work closely with Southern Indian Health Clinic to implement groups, counseling and provide resources to overcome addiction. We are dedicated to helping our members and the surrounding communities overcome addiction and educate our future generations about opioids as well as other harmful substances.

**Statement of Interest: Lac Courte Oreilles Band of Lake Superior Chippewa Indians**

The Lac Courte Oreilles Band of Wisconsin is one of the six bands of the Lake Superior Band of Chippewa Indians who entered into multiple treaties with the United States. Despite being victims of deforestation by lumber barons, the Tribe has always been instrumental in showing how to safeguard Mother Earth and providing for the education, health, social welfare, and economic stability of the present and future generations.

With more than 8,000 members, the Tribe owns and operates a tribal college that has been instructive in the youth members of the tribal community. The Sevenwinds Casino owned by the Tribe generates revenue for the welfare of the Lac Courte Oreilles' members. Lac Courte Oreilles preserves and promotes its culture by hosting an "Honor the Earth" Pow Wow every summer.

Opioids have devastated the lives of the Lac Courte Oreilles. The Tribe suffers from widespread abuse, addiction, NAS children, and deaths by drug overdose. The opioid epidemic has broken familial ties resulting in child neglect. The Tribe's own foster care units are beyond maximum capacity with children whose parents fell victims to the opioid epidemic. In order to combat this crippling force, tribal resources have been strained to provide education, public health, law enforcement, child protection programs and many other vitally important corrective measures. Resources are limited; and the Tribe is struggling to barely provide for its members' needs. The Tribe must continue these programs so that the integrity and culture of the Lac Courte Oreilles may continue. The opioid crisis must be successfully resolved.

**Statement of Interest: Lac Du Flambeau Band of Lake Superior Chippewa Indians**

The Lac Du Flambeau has a rich past. The name itself was given to the Tribe by the French and means Lake of Torches. This name refers to the gathering practice of harvesting fish at night by torchlight. The Tribe's mission is simple: to provide leadership for the betterment of tribal membership and descendants in the areas of health, education, welfare, economic/job development, and the protection of natural resources. As a sovereign nation, the Tribe is responsible for the well-being of thousands of members.

The opioid crisis now poses a grave threat to the Tribe and all that it has stood for over its history. The Lac Du Flambeau provides essential programs to its members including health care, child services, law enforcement, and educational programs. These programs, however, are struggling to function due to the opioid crisis. Combating the opioid crisis has consumed the resources that once funded these regular programs. The Tribe's future is in jeopardy. Simply put, resources are too scarce and the Tribe cannot continue to struggle with balancing the needs of its people for regular programs with the needs required to combat the opioid crisis. Successful resolution of the opioid crisis is direly needed.

**Statement of Interest: Leech Lake Band of Ojibwe**

The Leech Lake Band of Ojibwe ("LLBO") is one of six Bands that comprise the Minnesota Chippewa Tribe. The Leech Lake Tribe holds the smallest percentage of its reservation of any of the State's Tribes. County, state, and federal governments own well over half of the original land. Of the 864,158 original acres, nearly 300,000 acres are surface area of three big lakes. The National Chippewa Forest has the largest portion of the land. Seventy-five percent of the National Forest is within the reservation. This leaves less than 5% of land owned by the Band. As of September 2015, Leech Lake Reservation enrollment was 9,509.

LLBO has declared a State of Emergency for the Reservation three times in the past seven years as an attempt to combat the devastating effects of the opiate crisis. According to the Leech Lake Addictions and Dependencies Program, 80% of substance abuse on the Leech Lake Reservation involve opioid addiction, with heroin making an astounding come back. Most of the child protection cases involving Leech Lake children stem from neglect because parents are unable to care for children when they are living with the daily realties of chemical addiction. A 2017 needs assessment conducted by the Leech Lake Justice Department found that 96% of Leech Lake Reservation families report being touched by addiction. One Minnesota Department of Human Services study found that from 2010-2016, Native American children in Minnesota were born suffering from neonatal abstinence syndrome as a result to in utero drug exposure at a rate that was at least **10 times higher** than was found during births of infants from other races/ethnicities.

Leech Lake is a community built on hope, strength and connection to each other. We are survivors. LLBO has made it a priority to bring together professionals and community members in various fields to create a targeted response to the opioid crisis on the Reservation; realizing that without a concerted effort to rebuild from the ground up, there is no hope for lasting healing. Leech Lake has established a medication-assisted opiate treatment program using suboxone. It was the first tribal treatment program in the Upper Midwest and is now only one of three. Narcan training has been made available community-wide to help save the lives of those who may overdose.

**Statement of Interest: Lower Elwha Klallam Tribe**

The Lower Elwha Klallam Tribe ("Elwha") is a western Washington Treaty Tribe located on the northern coast of the Olympic Peninsula, with a government organized under the Indian Reorganization Act of 1934. Over 70% of Elwha's 877 tribal citizens reside on or near the 1,015-acre Lower Elwha Reservation. Elwha's governmental services to its citizens include primary medical and behavioral health services, social services, housing, natural resource management, cultural and language preservation, economic development, and jobs.

The opioid crisis has exploded within Elwha's small community, impacting every family and generation, including the unborn. Particularly heartbreaking is the marked increase in newborn children suffering from neonatal abstinence syndrome (NAS), infants who become addicted *in utero* and upon birth experience severe withdrawal. Such children are usually removed from their parents and often continue to suffer seizures more than a year after birth.

This crisis has strained every relevant Elwha governmental, medical, and cultural service and diverted scarce resources from other priorities. Even so, Elwha lacks its own facility to provide medicated assisted treatment (MAT) for either infants or adults; such facilities are few and far-between and quickly reach capacity after putting only a small dent in the problem. Drug-related offenses and convictions, as well as drug-related evictions, are on the rise, contributing to family break-up and dysfunction.

Elwha has always provided culturally appropriate treatment for substance abuse, including direct participation in Klallam language and culture, as well as more conventional wellness activities. But we are not gaining on the opioid crisis. The opioids pouring into the community are powerfully addictive and Elwha simply does not have the resources to fund the positions we need in law enforcement, counseling, and medical services to respond to the crisis at even a minimum level of adequacy.

**Statement of Interest: Lower Sioux Indian Community in the State of Minnesota**

Lower Sioux Indian Community in the State of Minnesota (Lower Sioux) is located on bluff lands along the Minnesota River in rural southwestern Minnesota. The Community's 1,743-acre reservation is home to 81% of the Tribe's 1,147 enrolled members. Lower Sioux was incorporated in 1934 and over the past two decades has seen a steady rise in population. Today almost half of the Community is under 25 years. The Tribe operates a broad range of direct government services, including social services for families, a comprehensive medical clinic, and a recreation center for youth. In 2016, the Tribe developed a long-range strategic plan with a vision, a mission, and nine healthy community goals. Addressing the underlying causes of substance abuse and addiction is a critical need to achieve our long range goals and vision.

Lower Sioux Chemical Dependency (CD) experts report that 70% of all adults in the Community are substance dependent. Of these 55% are *not* in recovery and Lower Sioux faces an epidemic of opioid and prescription drugs. While alcohol was once the main substance abused, the Tribe's CD experts report that at least 40% of all assessments are now opioid related. This deeply impacts the well-being of the Tribe. The LSIC Police Department has seen the number of annual calls for service they receive double. Drug/alcohol-related crimes account for the majority of police calls and drug-related calls to the police rose 55% between 2015 and 2017. In 2015 and 2016, 75% of all new births at LSIC were infants with Neonatal Abstinence Syndrome (NAS) and 81% of out-of-home placement cases in a single year are related to addiction. Our teens struggle as well. Since 2000, LSIC has multiple cluster suicides among young people, with 5 Native deaths by suicide since 2013. Suicide ideation is also on the rise. In nearly every case, Lower Sioux youth who struggle with suicide also struggle with addiction.

To address the harsh and tragic impact of the opioid crisis and addiction at Lower Sioux, the Community led a community-wide initiative to develop and adopt a Tribal Justice Strategic Plan in 2017. This plan calls for expanding resources for addicts, for family members, youth, women, and elders. At present, the Tribe only has outpatient and aftercare treatment available to those struggling with addiction. There are no mental health services or treatment services available on the reservation. Furthermore, there are no services that address the underlying root causes of addiction or promote strong cultural identity among our youth and families. Lower Sioux is actively seeking support to implement new programs to address these gaps and collaborating with the 4 Dakota Tribes in Minnesota to develop an opioid treatment center. But unless we have support to reduce the level of opioids entering in the Community, our plans will not succeed.

## Statement of Interest: Lummi Nation

The Lummi Nation is the largest fishing Tribe in the Puget Sound region and the third-largest Tribe in Washington State, with 5,242 enrolled members. Approximately 3,822 people live on the Lummi Nation reservation, which is located in northwest Washington State. The Lummi Nation is a self-governing Tribe, providing services including a court system, law enforcement, a housing authority, and a child welfare system. The Lummi Nation also offers health services, including substance abuse and mental health programs.

The opioid epidemic is devastating our families, putting our children at risk, and endangering our people. The Lummi Nation, like other Tribes, has been disproportionately affected by the epidemic as a result of historical trauma. We see a direct link between the opioid epidemic in our Tribe and the decline of our salmon and our natural resources since we signed the 1855 Treaty with the United States. The rate of opioid overdose deaths in the Lummi Nation is several times higher than the rate in Washington State overall. The epidemic is also significantly affecting the next generation of tribal members. Addiction is the primary or secondary safety issue for approximately 95% of the Lummi Nation's child welfare cases, and the number of babies born with opioid dependence has increased.

The Lummi Nation has made great efforts to combat the opioid crisis, with a focus on a restorative approach to healing our people from this disease. The Lummi Nation's Healing Spirit Opioid Treatment Program offers medication-assisted treatment, counseling, and accountability through drug testing when treating opioid dependence. We also distribute naloxone in the community and provide training on administering the drug to reduce the number of overdose deaths. But more resources are needed to fully address the epidemic, including prevention, a medical detox facility, and transitional housing to strengthen the foundation following inpatient treatment.

**Statement of Interest: Makah Indian Tribe**

The Makah Indian Tribe is located on the Makah Indian Reservation within the borders of Clallam County and the State of Washington, at the extreme northwest corner of the State, bordered by the Strait of Juan de Fuca and Canada to the North and the Pacific Ocean to the West. The Reservation was created under the 1855 Treaty with the Makah and was later expanded. The Tribe is self-governing under its Constitution and provides direct governmental services including health care, social services, children's programs, housing, police and fire, a tribal court, natural resource management and employment. There are 2,949 enrolled members, 1,545 of whom reside on the Reservation. The total Reservation population is 1,770.

The opioid crisis has disproportionally impacted our community. Clallam County has been affected by the crisis more than any other county in Washington, and Indian Reservations, including the Makah, have been impacted more than the general population. Our Tribe suffers substantial loss from addiction and death due to the use and abuse of prescription and non-prescription opioids. The monetary, social and related costs to our Tribe are substantial and devastating, affecting virtually every Reservation family. Our tribal government's ability to adequately respond is limited by available funds and the difficulty stemming the free flow of opioids into our community. The Makah Tribe is not a gaming Tribe. The opioid crisis has put a substantial strain on the Tribe's ability to provide government services. Our tribal court is inundated with opioid-related cases, and our health clinic and first responders are unable to keep up.

The Tribe dedicates resources to address the crisis, but we cannot fully address it without help. The Tribe offers culturally sensitive counseling and outpatient drug treatment, for example, but lacks the funds to provide inpatient treatment on the Reservation. The Tribe also distributes naloxone to individuals and the police department. Despite our efforts, the opioid crisis continues to plague our community.

## Statement of Interest: Three Affiliated Tribes

The Mandan, Hidatsa and Arikara Nation, also known as the Three Affiliated Tribes ("MHA Nation"), is located on the Fort Berthold Indian Reservation in central North Dakota on the Missouri River in McLean, Mountrail, Dunn, McKenzie, Mercer and Ward counties. The reservation spans 988,000 acres; 457,837 acres are owned by American Indians, either as individual allotments or by the Tribe. The Tribe has over 16,000 enrolled members with over 5,000 members living on the reservation. MHA Nation is a self-governing tribe, providing direct governmental services to members and the surrounding community.

The opioid crisis has hit every corner of the reservation and plagues our people living off the reservation as well. It crosses all age groups, from the unborn to the elders. The Tribe has lost so many, including our most precious resource – our youth – to addiction and death from opioid overdose. In recent years, the Tribe has been forced to allocate a disproportionate level of government resources to opioid-related services including medical treatment, rehabilitation, social services, prevention and education, law enforcement, tribal court and justice services.

In the last 90 days, our behavioral health center has had 37 opioid-related encounters with 22 people being recommended for treatment. MHA Nation recently opened the Good Road Recovery Center, a 20,000 square-foot in-patient drug and alcohol treatment center for tribal members in Bismarck. The Tribe self-funded this $25 million center to provide desperately-needed treatment services. The Tribe has also opened a sobriety wellness center called "The Door" to provide support to addicts after treatment. Our long-term goal is to build sober living apartments and a sweat lodge to help other tribal members and eventually, our non-tribal neighbors.

The opioid epidemic has also put a strain on law enforcement and judicial services. Currently, over half of all arrests are for opioid-related offenses. Last year the Tribe opened the MHA Nation Public Safety and Judicial Center, which houses our jail and courts. The Tribe also built and operates a Juvenile Justice Center to address the increasing needs of children affected by opioid abuse.

MHA Nation is committed to slowing down the opioid epidemic and its debilitating effects on our Tribe. Additional resources will be required to ensure the continued perseverance of our people, our traditions, our languages and our land.

### Statement of Interest: Maniilaq Association

Founded in 1966, Maniilaq Association is headquartered in Kotzebue, Alaska, located 30 miles above the Arctic Circle on the Chukchi Sea. Maniilaq is a nonprofit organization and a "Tribal Organization" as defined by the Indian Self Determination and Education Assistance Act ("ISDEAA"). Through ISDEAA compacts with the Indian Health Service and Bureau of Indian Affairs, and various grants, Maniilaq provides health, social, and tribal government services to twelve Tribes located in our 38,000 square mile service area (about the size of Indiana). We serve a population of 8,400, with 86% of the population Alaska Native.

Maniilaq is the sole primary and behavioral health care provider in our service area. Maniilaq owns and operates a clinic in each of our 11 member villages, and a critical access hospital in Kotzebue. Our hospital provides inpatient, outpatient, emergency, dental, eye, physical therapy, and other services, and is the facility of referral from our village clinics. Our social services staff provide culturally relevant mental health and substance abuse treatment throughout our service area. Services are family-centered, and include individual and family therapy, play therapy, crisis counseling, and other modalities. We operate a wellness program with the goal of preventing suicide, supporting community members in recovery, and fostering healthy communities through talking circles, regular sober gatherings, and other community activities.

Substance abuse and addiction impacts every family in our service area, with heartbreaking results in the form of broken families and hopelessness. Additionally, Maniilaq incurs related operational costs such as those required to secure opioids in our hospital and clinics and in transport, and in the form of staff time to review patients on chronic pain contracts, pill counts, urine drug screens, chart reviews, and other monitoring activities to help prevent drug diversion.

**Statement of Interest: Mashantucket (Western) Pequot Tribal Nation (MPTN)**

The Mashantucket (Western) Pequot Tribal Nation is a federally recognized Indian Tribe located at one of America's oldest Indian reservations, Mashantucket, in Southeastern Connecticut. The Tribe has 1065 enrolled members, many of whom live at the Mashantucket Pequot Indian Reservation or in surrounding towns. The Tribe conducts gaming at Foxwoods Resort Casino under the federal regulatory framework of the Indian Gaming Regulatory Act ("IGRA"). As required by IGRA, the Tribe uses gaming revenue to fund a wide range of governmental services on the reservation such as police, fire, 911 dispatch and emergency medical services, a child development center and youth programs, a community center, child protective services, social services, court services and a tribal health services clinic. Due to economic impacts of increased competition, gaming revenues continue to decline, leaving less revenue to fund critical governmental services. Federal funding from Indian Health Service is grossly inadequate. The Tribe bears the heavy burden of providing additional health insurance coverage to its community at a big cost that amounts to 20% of its entire government budget, curtailing its ability to provide more socioeconomic, educational programming.

The opioid epidemic has had a devastating impact on the Mashantucket Pequot community and has disrupted many families. Addressing this multi-faceted problem is expensive and has put a significant strain on the Tribe's resources. In 2016 and 2017 alone, the Tribe spent $1.39 million on opioid-related matters for Tribal Members and its employees and that does not include the cost of providing treatment medications such as Suboxone. The Tribe's court system and Child Protective Services have also been impacted due to the separation of families that often occurs when a parent is battling addiction.

Establishing culturally appropriate interventions that address historical and inter-generational trauma is paramount to addressing this issue. One such initiative is the Good Medicine Project which uses traditional Native American methods of healing with an aim of preventing substance abuse. The Tribe is studying other ways to address the epidemic through the tribal justice system, including making changes to tribal laws and policies. The Tribe also is reviewing safer pain management options for patients at the Tribal Health Services clinic, as well as increased training of tribal police officers and EMTs on how to administer Narcan. Finally, the Tribe is increasing its data collection to track the effects of this ever-expanding crisis on community and government resources. So many families rely on the Tribe's programs and services and those programs are being stretched thin as the opioid crisis continues to devastate the Tribe.

**Statement of Interest:  Mechoopda Indian Tribe of Chico Rancheria**

The Mechoopda Indian Tribe of Chico Rancheria is a federally recognized Indian Tribe. The ancestral village of the Mikćʔapdo was located on Little Butte Creek, less than 4 miles south of downtown Chico, California. Today, the Tribe is comprised of 560 Tribal Members and governed by a Tribal Council elected by the General Membership.

After twenty-five years of exile, the Mechoopda became an officially federally-recognized Tribe in 1992 as the result of a successful lawsuit filed against the United States in 1986 (along with three other Tribes). Since 1998, the Mechoopda Tribe has made several steps towards greater economic self-sufficiency and independence, developing the Chico Rancheria Housing Corporation; purchased land and constructed a tribal office complex and community building; and developed the Mechoopda Economic Development Corporation. In 2003 the Tribe successfully acquired 650 acres of land south of Chico. Characterized as "restored lands," it represents another step in the political, economic, and social rebuilding and restoration of the original people of the region.

The opioid epidemic here and in surrounding Butte County has affected many of our Tribal members and the surrounding communities with its destructive affects. Among our Tribe, we have lost tribal members to opioid addiction and many others have been and still are affected by this crisis.

We are dedicated to helping our members and the surrounding communities overcome addiction and educate our future generations about the dangers of prescription opioids and its direct effects on our families and our communities. Most recently, we began organizing a community-based approach to dealing with addiction and recovery but we lack the resources and funding to adequately provide services within our Community.

**Statement of Interest: Menominee Indian Tribe of Wisconsin**

The Menominee Indian Tribe's 235,000-acre Reservation is located in northeastern Wisconsin comprising all of Menominee County and part of Shawano County. The reservation is home to about one-half of the Tribe's over 9,100 enrolled members. The Tribe provides direct governmental services to the Menominee community both through self-determination contracts with the Department of Interior and Department of Health and Human Services, and through appropriation of revenues earned by the Tribe through economic development. These services include, but are not limited to: health services, social services, law enforcement, judiciary, housing, economic development, natural resource management, culture and language resources, AODA services, head start, and K-8 school. The Tribe, and its instrumentalities are the largest employer in Menominee County with over 1,700 employees, and they provide self-funded health insurance to its full-time employees and their dependents.

The opioid epidemic has had devastating effects on the Menominee community. Over the last five years there have been at least eighteen opioid related deaths of Tribal members. The Tribal Legislature has declared an opioid crisis on the Reservation and is dedicated to working on a sustainable, comprehensive public health approach by directing all tribal programs to work diligently to end the opioid epidemic.

Addressing this crisis comes with a cost. The Tribe has seen child welfare and foster care costs associated with opioid-addicted parents skyrocket. Our health services have been overwhelmed, education and addiction therapy costs have substantially increased, and almost every tribal member has been affected. The costs associated with our self-funded health insurance have increased as a result of having to pay for the costs associated with opioid addiction. The Tribe's substance abuse treatment facility has also seen marked increases in the number of patients seeking treatment for opioid-dependence which has come with increased associated costs. The Tribe's homeless and domestic violence centers have experienced increases in use due to the opioid crisis, and consequently have increased costs. The increase in crime and mental-health incidents has caused the Tribe to incur additional costs related to its police force, detention center, courts and prosecutors' office. Further, the Tribe is taking over Child Protection Services, which was historically provided by the County, in part because of the increased need for Child Protection Services necessitated by the opioid epidemic.

**Statement of Interest: Mescalero Apache Tribe**

The Mescalero Apache Tribe is located in southern New Mexico, a three-hour drive south of Albuquerque and a two-hour drive northeast of El Paso, Texas and the Mexican border. The Tribe's 460,661-acre reservation is home to a vast majority of its roughly 5,100 members. The Tribe operates its own: criminal courts and conservation law enforcement; a small in-patient/out-patient drug and alcohol abuse rehabilitation center; prevention, youth and behavioral health programs; and emergency response services.

Many members of the community, especially among the younger generations, have been lost to the opioid crisis. Many families have watched helplessly as addicts are not able to overcome their addiction. Many of these families are not aware of the source of the addiction much less the type of treatment needed. Children of addicts are being raised by relatives, in overcrowded homes and with little hope for the future.

The Tribe is working to raise awareness in order to address the lack of knowledge and stigma surrounding opioid abuse. Law enforcement and emergency response providers have received training and supplies to administer naloxone. The Tribe is looking to expand its rehabilitation center and hopes to re-open its drug court program. The Tribe is also working to strengthen its relationships with surrounding communities.

While the Tribe has many different health concerns to address, opioid abuse has become a major focus of our resources. Despite the efforts made, the Tribe simply does not have the resources to address the crisis effectively and fears the loss of many more Tribal members.

## Statement of Interest: Metlakatla Indian Community

The Metlakatla Indian Community (MIC) is located on Annette Islands Reserve. The Reserve is 20 miles south of Ketchikan, in Southeastern Alaska, and can only be reached by seaplane, boat or ferry. The entire island comprises the MIC reservation, and is the only Indian reservation in Alaska. Membership in the MIC is primarily by lineage; it consists primarily of Tsimshian people but also includes those from other Alaskan Native Tribes who wish to join the Metlakatla Indian Community as a bona fide member.

The mission of MIC is to improve the lives of our members, and preserve our heritage and culture, through effective self-governance, a commitment to self-sufficiency, and the exercise and strengthening of our tribal sovereignty. We encourage progress while honoring our ancestors, and protecting our land and water for future generations; we promote sustainability by utilizing and respecting our natural resources, developing economic and social opportunities for our members, and implementing efficient and effective systems of governance to enhance our members' safety, health, and welfare. In addition to these general governance responsibilities, MIC is one of the Alaska Tribal Health System Regional Health Consortia. MIC has a medical facility for its members, with a medical clinic and a permanent medical and dental staff. Even though access to the Annette Islands is limited, and despite our best efforts at interdiction, the scourge of the opioid epidemic has still come ashore here. Our close-knit community has been hit hard by the epidemic. The invasion of opioids has impacted our ability to continue to improve our members lives and to preserve our heritage and culture, as our time and energy has been diverted to dealing with the opioid crisis. Further, as the main provider of health care and related services in this remote area, MIC has had to divert a substantial part of our scarce resources to addressing the growing opioid crisis.

**Statement of Interest:  Mille Lacs Band of Ojibwe**

The Mille Lacs Band of Ojibwe (MLBO) is a constituent of the federally-recognized Minnesota Chippewa Tribe, has 4,699 enrolled members and is located in northeast central Minnesota. The reservation is dispersed over 160 non-contiguous rural miles and overlaps the Aitkin, Mille Lacs, and Pine Counties.

MLBO's top health and human services priority is attacking the opioid crisis with a comprehensive approach. The opioid epidemic is sweeping across every community in the United States, hitting Native American populations like ours especially hard. Since mid-2016, the Mille Lacs Band community has had 70 overdoses (15 fatal), compared to 7 in all of 2015. A study commissioned by the Mille Lacs Band found that our members are rapid metabolizers of addictive drugs, resulting in a more intense but shortened high – planting the seed for addiction.

The MLBO is implementing a Harm Reduction Response Action Plan designed to approach opioid prevention and healing from a cultural perspective. The plan consists of 30 prevention and treatment initiatives ranging from precision-tailored medications for each individual to specialized training for health professionals to transitional housing programs. Last year the MLBO assumed operational responsibility of Four Winds Treatment Center and Healing Lodge in Brainerd – the only tribally owned residential treatment center in the region. The monetary cost of these programs is high.

A Tribal-State Opioid Summit and continued partnership between the state and tribal nations led to the $4 million budget proposal for Preventing Opioid Overdoses in American Indian Communities. The Minnesota legislature did not fully fund the Governor's proposal so we continue to support efforts to secure additional funds. At the state and federal levels, we urge improved data-sharing and partnership among different levels of government, greater support for culture-based inpatient and outpatient treatment, and improved protocols for opioid prescriptions, which are a common starting point of addiction.

**Statement of Interest: Mississippi Band of Choctaw Indians**

The Mississippi Band of Choctaw Indians (MBCI) is a federally-recognized Indian Tribe with over 11,000 enrolled citizens and is headquartered in Choctaw, Mississippi. The MBCI Reservation consists of approximately 35,000 acres over ten counties in east central Mississippi and 168 acres in western Tennessee.

The MBCI, under a Self Determination Agreement with the Indian Health Service, manages the Choctaw Health Center (CHC), a 180,000 square-foot facility, and operates three rural health clinics. The CHC serves adults and children of all ages, with approximately 6,055 Indian patients 18 years old and older. Preliminary data show that opioids have hit this patient population hard, with prescriptions dispensed at a rate of 84 prescriptions per 100 patients in 2017. Since 2008, there have been 104 patients diagnosed with Opioid Use Disorder. And 97 patients are on continuous opioid therapy. Parents who abuse opioids leave children at risk of neglect and/or abuse. Illicit and prescription opioids in the home of minors are all too easily accessible to those minors. Children are ending in foster homes or relative placements due to addiction by parents. Children are becoming addicted to opioids and are not able to be productive citizens of the Tribe. It is a vicious cycle that addicted members of the Tribe cannot break without extensive assistance.

The Tribe desperately needs additional funding so that it can develop and implement a comprehensive plan including education, outreach, and community activities to increase awareness at a level and degree appropriate for all age groups. Healthcare providers, public school educators, social services, law enforcement personnel, and community leaders need training on the opioid crisis issues and to be provided best practice management and treatment related to the intricate aspects of the crisis. The Tribe will need funding for the appropriate professionals with the knowledge and capability to assist the Tribe in achieving these objectives.

**Statement of Interest: Modoc Tribe**

The Modoc Tribal Nation resides in rural Miami, Oklahoma, in Ottawa County. There are currently 297 Modoc Tribal Nation members. Our community consists of and is heavily influenced by the high population of American Indians from the local Tribes. Ottawa County is also home to eight other Tribes and an estimated 22,492 tribal members. The Modoc Tribal Nation is committed to extending services to neighboring Tribes as resources are available.

The opioid epidemic has affected all of our Tribal members and the surrounding communities with its destructive affects. Among our Tribe, we have lost tribal members to opioid addiction and many others have been and still are affected by this crisis. The sadness that touches the Tribe is profound, as opioid overdose and abuse continue to rise. This epidemic must stop.

The Modoc Tribe is dedicated to helping our members and the surrounding communities overcome addiction and educate our future generations about the dangers of prescription opioids and its direct effects on our families and our communities. The Tribe is organizing a community-based approach to dealing with addiction and recovery, but we lack the resources and funding to adequately provide services within our community.

The Modoc Tribal government has expended a great deal of resources fighting the epidemic as it is our inherent duty to foster an environment where our Tribe, our culture and our traditions may live on for centuries to come.

## Statement of Interest: Mt. Sanford Tribal Consortium

Mt. Sanford Tribal Consortium (Kelt'aeni) (MTSC) is a tribal consortium of two federally recognized Tribal Councils of Chistochina and Mentasta Lake. The consortium was established on June 26, 1992 under a joint effort by Chistochina Village and Mentasta Village to advance and protect common interests of the descendants of the Upper Ahtna indigenous people. Our mission is: "With honor, dignity, and respect, empowering our people and enhancing our traditional values to ensure a healthier and more positive future for our children." We are the Taa'tl'aa Denaé (Headwater People) of Chistochina and Mentasta, located in eastern south-central Alaska. The economy of the area is mainly subsistence, with cash employment being limited and seasonal, and consisting mostly of firefighting, highway maintenance and construction. The schools and Tribe employ a few residents.

MSTC has developed educational programs about proper nutrition, effective sanitation habits, and Elder care to empower our people to make healthy lifestyle choices. These programs have improved partnerships with local schools and opened doors to community involvement. Examples of programs include Community Health Care, Health Clinics, Childcare Development, Diabetes Programs, EPA/IGAP Programs, and Tribal Courts Programs. MSTC has a compact with the Federal Government for health services provided to Tribal members from Chistochina and Mentasta.

Native communities throughout Alaska have been devastated by the opioid epidemic. MTSC has diverted substantial resources to address the crisis.

**Statement of Interest: Muckleshoot Indian Tribe**

The Muckleshoot Indian Tribe is a federally recognized Indian Tribe, located within the State of Washington. The Tribe has approximately 2,900 enrolled members. The Muckleshoot Indian Reservation is located southeast of Auburn in King and Pierce Counties. The Tribe is self-governing and maintains a cohesive community and government structure, while also preserving its culture. The Tribe provides many resources to its members and community, including but not limited to: health services, behavioral health services, social services, housing, education, jobs, and police. The Tribe also manages natural resources.

The opioid epidemic has hit the tribal community with full force. It has impacted every family that lives in the Muckleshoot community. The Muckleshoot Tribe has lost many members to addiction. Mothers and fathers have lost their children; children have been abandoned by their addicted parents. Every family has been affected in some way.

The Tribe has been fighting tirelessly against the epidemic. The Tribe has put a focus on remedying the harm of opiates by using its resources to fund: three recovery homes (two for families), individual inpatient treatment at many different treatment centers, outpatient treatment on the Reservation, wellness activities, group therapy, Narcan purchases and training, law enforcement, expansion of the Tribal Court, housing, and child welfare. Recently, the Tribe has also founded an Anti-Drug Task Force to further address the influx of opiates and other drugs to the Muckleshoot Reservation.

Every Tribal department has truly been affected by the opiate epidemic and no amount of Tribal resources will ever be enough to address the havoc wreaked by opiate addiction.

**Statement of Interest: National Congress of American Indians**

Founded in 1944, the National Congress of American Indians (NCAI) is the oldest, largest, and most representative American Indian and Alaska Native organization serving the broad interests of tribal governments and communities. NCAI's purpose is to serve as a forum for unified policy development among tribal governments in order to: (1) protect and advance tribal governance and treaty rights; (2) promote the economic development and health and welfare in American Indian and Alaska Native communities; and (3) educate the public toward a better understanding of American Indian and Alaska Native Tribes.

NCAI is dedicated to improving the welfare of all indigenous peoples in the United States, which includes working with Tribes to help end the opioid epidemic in tribal communities. The opioid epidemic is devastating American Indian and Alaska Native communities, and solutions to this complex problem require collaboration across multiple sectors. Through its Opioid Initiative, NCAI produces policy briefs and reports; provides webinars and other trainings; and collects resources to assist tribal governments in tackling the opioid epidemic. NCAI has identified a variety of opportunities for positive change, including:

1) Health provider/system education, training, monitoring, security
   - Providers – pain management education, drug prescribing guidelines, drug monitoring programs
   - Pharmacy – education/counseling patients on proper use, potential for abuse, security measures to prevent diversion, double signatures for dispensing
   - Identification and treatment for impaired providers
   - Increased access to specialty care, referral funding for conditions requiring pain management
2) Opioid addiction prevention, treatment, recovery strategies
   - Better diagnosis of addiction, access to treatment/recovery services, inpatient/outpatient treatment, medication assisted therapy, naloxone use
   - Strategies to address root causes: trauma, chronic stress, mental health counseling/treatment
   - Additional funding for grants to communities for interventions
   - Education and treatment guidelines for neonatal abstinence syndrome
3) Law enforcement strategies
   - Enhanced arrest/convention of drug trafficking, diversion, theft, illegal manufacturing
   - Alternative sentencing options for addicts instead of jail/prison time
   - Increased access to treatment/recovery services for the incarcerated
   - Collaborate with other municipalities to decrease jurisdictional burdens
4) Community strategies
   - Community opioid emergency declaration
   - Community needs assessment, strategic planning, collaboration with other stakeholders
   - Community awareness, education, wellness and prevention activities
   - Create culturally appropriate efforts with community collaboration

- Naloxone distribution
- Community economic development strategies
- Implementation of the recommendations of the Tribal Behavioral Health Agenda

5) Federal/State/Local government efforts
- Education and awareness of opioid crisis, available resources, collaboration with Tribes
- More data/research on needs, solutions, sharing of best and promising practices
- Increased resources for provider, treatment/recovery, law enforcement and community strategies

### Statement of Interest: National Council of Urban Indian Health (NCUIH)

The National Council of Urban Indian Health (NCUIH) is the premier national representative of the 40 Urban Indian Organizations (UIOs) providing health care services pursuant to a grant or contract with the Indian Health Service under Title V of the Indian Health Care Improvement Act (25 U.S.C. 1651 et seq.). Founded in 1998, NCUIH is a 501(c)(3) organization created to support the development of quality, accessible, and culturally sensitive health care programs for American Indians and Alaska Natives (AI/AN) living in urban communities. NCUIH fulfills its mission by serving as a resource center providing advocacy, education, training, and leadership for Urban Indian health care providers. More than 70% of AI/AN now live in urban areas. NCUIH strives to improve their health with quality, accessible health care centers.

The opioid epidemic facing the U.S. poses one of the most significant public health threats in recent history and has particularly damaging impacts on AI/AN communities. Addressing the epidemic necessarily must include ensuring that critical funding reaches the AI/AN communities that are in dire need. Furthermore, any resolution must include the over 70% of the AI/AN population that reside in urban areas, many due to forced relocation or in search of economic or educational opportunities.

NCUIH works to help address these health disparities and combat the opioid crisis. NCUIH supports vital programs that enable UIOs, as well as the other facets of the Indian Health Service/Tribal/ Urban Indian health system, to provide critical opioid treatment and prevention services to AI/ANs, including technical assistance, education, research, advocacy and materials, NCUIH also helps UIOs become an instrumental force in the war against opioids. In addition, NCUIH promotes efforts to further assist UIOs in providing quality care related to opioid use and treatment, including proposals to increase funding to the Indian Health system in dealing with this public health emergency.

**Statement of Interest: National Indian Child Welfare Association**

The National Indian Child Welfare Association ("NICWA") is a non-profit membership organization founded in 1987 and dedicated to the well-being of American Indian and Alaska Native (AI/AN) children and families. NICWA achieves its mission through trainings, technical assistance, research, advocacy, and information sharing. NICWA works with tribal, state, and federal governments and with private organizations that provide services to this population. While NICWA does not provide front line services to they are a provider of technical assistance and training to improve child welfare and children's mental health services to public and private agencies that serve American Indian and AI/AN children and families directly.

The impact of substance abuse in tribal communities is widely documented, but nowhere is the impact felt more closely than the breakup of families and trauma to children due to child abuse and neglect linked to parental abuse of substances. Studies indicate that 85% of child welfare cases involving AI/AN children and families involve substance abuse and removal rates of AI/AN children in child welfare systems are disproportionately high. The opioids epidemic is ravaging tribal families and their children while pushing already extremely low resourced tribal child welfare systems to the brink. Currently, tribal governments receive less than 1% of the federal child welfare funding available for states and Tribes even though they comprise over 2% of the child welfare population in the United States.

NICWA is working closely with advocacy organizations, both tribal and non-tribal, to improve access to federal resources for tribal child welfare and children's mental health programs. A number of key federal programs that provide funding for these services are not available to tribal governments or only in very small amounts. NICWA also provides ongoing technical assistance to tribal governments on how to develop new services in these two program areas or improve existing services. NICWA uses a model of practice that supports development of community-based, culturally specific, and financially sustainable programs. This also includes helping tribal political leadership enhance their governance structures to support more effective services.

**Statement of Interest: The National Indian Health Board (NIHB)**

The National Indian Health Board (NIHB) is a tribally-created and governed organization that is dedicated to strengthening health care delivery and access for American Indians and Alaska Natives across the United States. NIHB represents all federally recognized Tribes. NIHB provides a variety of services including advocacy, policy formation and analysis, research, program development and assessment, training, technical assistance, and project management. NIHB also advocates for the Tribal perspective while monitoring federal legislative and regulatory developments, and opening opportunities to network with other national health care organizations to engage their support on Indian health care issues.

Addressing the opioid epidemic is a nationwide priority; however, critical opioid prevention and treatment dollars are not reaching Tribal communities that are in serious need of these funds. Addressing the impacts in Indian Country will involve a multi-layered approach. NIHB recommends:

1) Access to funding and technical assistance:
   - Creating Tribally-specific prevention and treatment funding streams
   - Establishing pathways for reimbursement for delivery of traditional and cultural healing services
   - Supporting Tribal sovereignty through technical assistance to improve public health surveillance, delivery of health services, and public health prevention activities
   - Establishing a Special Behavioral Health Program that parallels the structure of the existing Special Diabetes Program for Indians

2) Prevent opioid misuse and addiction:
   - Strengthening provider education in addiction science including the signs and symptoms of opioid misuse and addiction
   - Expanding community outreach and education efforts to destigmatize addiction and treatment
   - Strengthening Tribal capacity to address root causes of addiction such as historical and intergenerational trauma
   - Strengthening provider capacity to address risk factors for addiction Building health literacy to empower Tribal citizens to prevent substance misuse and addiction

3) Intervention and treatment:
   - Increasing access to life-saving antidotes such as naloxone
   - Building stronger care coordination networks to improve access to inpatient and outpatient treatment
   - Increasing access to trauma-informed care for patients with substance dependency or addiction
   - Expanding provider education in the benefits of medication assisted treatment (MAT) and increasing the number of MAT providers
   - Strengthening provider capacity to deliver culturally appropriate treatment care
   - Expanding harm reduction efforts to prevent co-occurring infections

**Statement of Interest: Native Village of Port Heiden**

The Native Village of Port Heiden Tribe is located on the Alaska Peninsula in Southwest Alaska.  The Alaska Peninsula Corporation owns 63,387 acres surrounding Port Heiden.  The village is comprised of 51.4 square miles, with 0.7 miles of it being water.  This area is home to 1/3 of our tribal members. We have been a self-governing Tribe for many years, providing direct governmental services to our members and the surrounding community, including primary and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has directly impacted our small Tribe, affecting every family and the overall lifeblood of our Tribe.  Our Tribe has lost sons and daughters, mothers and fathers, brothers and sisters to addiction and death.  From a health, economic, and overall resource availability, our Tribe was not prepared for such a devastating impact to our people.  We have grandparents and great-grandparents caring for their children and grandchildren's babies.  The already stretched resources needed to provide for our community have become a health and economic crisis for our Tribe and tribal members.

The nearest local law enforcement or treatment resources are 424 air miles away. Therefore, drug-related crimes are on the rise without consequences. We are in a state of reaction most of the time, unable to properly plan or guide our Tribe to wellness. This crisis has strained every governmental and cultural service we provide. Prior to the infusion of opioids into our community, we were able to act proactively and obtain treatment for tribal members who were in need.  Now, the necessary resources to combat this scourge are rarely available. Access to treatment is further limited by inclement weather and transportation issues.

Our tribal government is focused on providing culturally appropriate treatment to our members suffering from the opioid crisis, including wellness activities, talking circles, and group therapy.  We have obtained three grants this year, including one which will provide a Behavioral Health Consultant for prevention, treatment, and an overall community wellness program, in collaboration with 3 surrounding Tribes.  The obstacle will be to provide treatment for all individuals in need. Another obstacle is stopping the flow of these drugs into our community.  The best solution is to provide intentional, effective and available proactive prevention and treatment.

## Statement of Interest:  Navajo Nation

The Navajo Nation has a reservation of over 27,000 square miles, the largest in the United States, and has one of the largest populations of any federally recognized Tribe. The Nation's territory extends into Arizona, Colorado, New Mexico, and Utah, and the Nation has over 300,000 enrolled citizens, some 175,000 of whom live within the Nation's sovereign territory.

The Nation has two ratified treaties with the United States.  In the Treaty of 1850, the United States and Navajo Nation sought peace after hostilities arose following the Mexican-American war. In that treaty, the United States promised to "legislate and act as to secure the permanent prosperity and happiness of said Indians." Article XI. The negotiated peace did not last, as the United States waged a scorched-earth campaign destroying Navajo homes and crops, and starving out and marching many Navajo men, women, and children at gunpoint on the Long Walk to Bosque Redondo in southeastern New Mexico, far from the Navajo homeland. Through negotiations with Navajo leaders, the United States and the Nation entered into the Treaty of 1868 to end the Navajos' internment as prisoners of war at Bosque Redondo. The 1868 treaty created the Navajo Reservation and affirmed the Nation's sovereign authority over that territory, including its authority to regulate non-Navajo presence. Through executive orders and congressional legislation, the Navajo Nation's sovereign territory has expanded beyond the treaty boundaries to encompass much of the Navajo homeland.

Today, 150 years later, there are 10 hospitals and various clinics located on or near the Nation, some of which are operated by authority of the Nation under the Indian Self-Determination and Education Assistance Act and some of which are operated directly by the Indian Health Service. Additionally, the Navajo Nation Department of Health has a substance use treatment center in Shiprock, New Mexico. These facilities provide health and medical services to a substantial number of Navajo tribal members.

The Nation has experienced significant negative effects from the opioid epidemic. The Nation, through its hospitals and its Department of Health, has created an Opioid Task Force and implemented culturally-appropriate programs to assist individuals affected by the opioid epidemic. In addition, the Navajo Treatment Center for Children and Their Families received one-time funding from the Arizona Governor's Office to provide prevention education to Navajo youth on prescription medication abuse. These are just a few of the many ways in which the Nation will need to continue addressing opioid use and abuse as the effects of the crisis continue to unfold.

## Statement of Interest: Nez Perce Tribe

The Nez Perce Tribe ("Tribe") has occupied a 13-million-acre homeland in what is now Idaho, Washington, Oregon, and parts of Montana since time immemorial.  In its 1855 Treaty with the U.S., the Tribe ceded much of its original homeland and now occupies the 770,000-acre Nez Perce Reservation ("Reservation") located in north-central Idaho. In exchange for treaty land cessions, the U.S. promised the Tribe, among other provisions, schools, health care, and other services.  Today the Tribe operates two health clinics. The Tribal government provides other services, including law enforcement, social services, housing, natural resource management, and employment. Of the approximately 3,500 enrolled Tribal members, two-thirds live on or near the Reservation and avail themselves of these Tribal services.

The introduction of opioids has impacted the Reservation community in profound and irreversible ways. Prescriptions are being stolen or wrestled away from Tribal elders before they even leave the health clinic parking lot. Demand for addiction services is skyrocketing. Children are being neglected and abused at unprecedented levels. The Tribe's judicial system is overwhelmed with addressing drug-related offenses. The problems created by the opioid drug manufacturers' clever and effective campaign have reached alarming levels.

The Tribe is doing what it can to stem the opioid tide. The pharmacy has developed more restrictive policies for dispensing opioids. Behavioral health providers assist users in finding treatment facilities. Social Services is working to ensure that children of users are safe. The Tribe, however, is not immune from the national shortage of foster homes. The Tribe is making every effort to address the problems that have arisen from opioid addiction, but resources are limited and will be in demand well into the future. The opioid crisis is here to stay. The Tribe is currently unable to provide all of the resources to fight the opioid wave.

### Statement of Interest: Nisqually Indian Tribe

For 10,000 years the Nisqually Indian Tribe, or the Squalli-absch, People of the Grass Country/People of the River, lived in relative peace and prosperity in our aboriginal homeland of about 2 million acres near the present-day towns of Olympia, Tenino, and Dupont, and extending to Mount Rainier. Tribal life changed radically with the advent of Euro-American settlement about 150 years ago. Forced to compromise its interests and rights over the years, the Tribe has always sought to maintain its integrity and dignity. The Nisqually are a fishing people and have an approximately 5,000-acre reservation on the Nisqually River in rural Thurston County, 15 miles east of Olympia, Washington. The Tribe provides a wide range of services to its community and takes pride in caring and providing for its more than 800 members.

The opioid crisis has severely impacted our community and no family has been left untouched. We see the devastation of opioid addiction in our work as health providers, behavioral health and substance abuse counselors, child welfare workers, case managers, and law enforcement officers. The Tribe struggles to provide sufficient resources to its members and support to those in the community suffering from addiction, and many services are not available on the Reservation. In addition to the immeasurable impacts of addiction on the spirits of Nisqually people, we have seen exorbitant increases in financial need stemming from the Opioid epidemic, including: child welfare and protections care costs associated with opioid-addicted parents; overwhelmed health services; increased education and addiction therapy costs; increased costs of health insurance; and homelessness response costs.

Our Tribe strives to support and serve all members and descendants who are suffering from opioid addiction. We provide traditional healing opportunities, behavioral health programs, group therapy, and adult case management. We also have a newly formed Task Force and have created a new position specifically focused on the crisis of homelessness and opioid abuse on the reservation. Unfortunately, our community needs much more resources in terms of staff, programming, funding, and support, in order to adequately address the overwhelming opioid crisis in our community.

**Statement of Interest: Northern Arapaho Tribe**

The Northern Arapaho Tribe (the "Tribe") is located on the Wind River Reservation in the central-western portion of Wyoming. Tribal lands at Wind River Reservation have encompassed as much as 2.3 million acres making it one of the largest Indian reservations in the United States. Over 60% of the Tribe's 10,350 enrolled members live on the reservation. The Tribe is self-governing, offering direct governmental services to its members and the surrounding community, including social services, medical care, medical insurance, housing, economic development, natural resource management, culture and language resources, and over 1,150 jobs.

The Tribe has a strong culture and ethic of helping tribal members. However, the Tribe's long-standing goal of working to improve the lives of future generations has been significantly impeded by the opioid epidemic. Fueled by Defendants' unlawful acts, the Tribe has been overwhelmed by opioids. In fact, data collected by the Tribe from the Indian Health Services (IHS), plainly demonstrates that for many years the Tribe received far more opioid pills than it required. For example, in 2007 alone (the year Defendant Purdue Pharma pled guilty to using misleading opioid marketing) at least 366,237 opioid pills were distributed to members of the Northern Arapaho Tribe. Comparatively, in 2017, as awareness of Defendants' illegal actions increased and doctors were being adequately educated regarding the risk of addiction, the number of opioids dispensed to tribal members was only 29,293 pills. As such, this data clearly indicates that in just one year the Tribe was inundated with at least 12.5 times more opioid pills than the Tribe required. The IHS data attached below demonstrates a similar over supply of opioids going back to at least 2000.

The opioid epidemic, created by Defendants' illegal acts, has overwhelmed the Tribes' limited funding for social services and addiction treatment. As a result, tribal members have not only been unnecessarily exposed to these dangerous opioids, but are now also unable to secure the treatment necessary to overcome an opioid addiction. Despite the Tribe's best efforts to assist all those negatively affected by opioids, the community has still been decimated by the loss of sons and daughters, mothers and fathers, brothers and sisters, friends and co-workers, to opioid addiction and death. Beyond the severe physical and emotional damage that opioids have caused in the community, they have also financially crippled the Tribe. Money that was otherwise intended for important tribal public works and programs has had to be diverted to combat the opioid epidemic. Without proper funding to offset and remedy Defendants' unlawful actions, the opioid epidemic is going to continue its deadly impact on the community and will leave all those who have been permanently impacted by opioids without justice.

The Tribe has collected the following data regarding the number of opioid pills dispensed to a member of the Tribe since 2000:

| Year | Number of Opioid Pills |
|------|------------------------|
| 2000 | 109,162.00 |
| 2001 | 116,652.00 |
| 2002 | 149,848.00 |
| 2003 | 188,469.80 |
| 2004 | 226,466.00 |
| 2005 | 274,968.70 |
| 2006 | 335,573.90 |
| 2007 | 366,237.50 |
| 2008 | 314,818.20 |
| 2009 | 346,856.80 |
| 2010 | 193,755.50 |
| 2011 | 158,327.50 |
| 2012 | 146,801.50 |
| 2013 | 149,742.40 |
| 2014 | 190,967.00 |
| 2015 | 220,773.50 |
| 2016 | 137,509.00 |
| 2017 | 29,293.00 |
| 2018* through 8/10/2018 | 14,314.00 |



**Statement of Interest: Northwest Portland Area Indian Health Board**

Established in 1972, the Northwest Portland Area Indian Health Board (NPAIHB) is a tribal organization formed under the Indian Self-Determination and Education Assistance Act (ISDEAA), P.L. 93-638, representing the 43 federally-recognized Indian Tribes in Idaho, Oregon, and Washington on health care issues. Our 43 board members are tribal delegates appointed by their respective Tribes through the tribal resolution process. NPAIHB's mission is "to eliminate health disparities and improve the quality of life of American Indians and Alaska Natives (AI/ANs) by supporting Northwest Tribes in their delivery of culturally appropriate, high quality healthcare." The opioid epidemic has significantly impacted our Northwest Tribes and NPAIHB is committed to partnering with our Tribes to combat this epidemic.

From 2006-2012, AI/AN age-adjusted death rates for drug and prescription opioid overdoses were nearly twice the rate for non-Hispanic white (NHW) in the region. From 2013–2015 mortality rates that were 2.7 times higher than those of NHW for total drug and opioid overdoses and 4.1 times higher for heroin overdoses. Because of these data, as well as the lived experience and stories of Northwest Tribes, NPAIHB delegates have identified substance over-use – specifically increasing opioid dependence and overdoses – as a priority health issue in the Northwest Tribal communities.

Currently, the NPAIHB Tribal Epidemiology Center has four funded projects to address the opioid epidemic both regionally and nationally. These projects focus on strengthening data, strategic planning, documentation of evidence-based and culturally responsive health systems interventions, innovative community-based strategies, development of an Indian Country Opioid/Addiction ECHO to increase the number of AI/AN patients receiving MAT and the number of DATA 2000-waivered providers who are actively prescribing buprenorphine to AI/AN patients. NPAIHB also plays a key role in supporting our delegates, and other Northwest Tribal leaders, in federal and state advocacy efforts on opioid policy and funding.

**Statement of Interest: Norton Sound Health Corporation**

Norton Sound Health Corporation (NSHC) is a tribally owned and operated, independent, not-for profit health care organization, founded in 1970 to meet the health care needs of the Inupiat, Siberian Yup'ik and Yu'pik people of the Bering Strait region. NSHC is governed by a 22-member board of directors who represent all communities and areas of the Bering Strait region, a 44,000 square-mile section of northwestern Alaska. The Bering Strait region has 9,492 residents, according to 2010 US Census Bureau report. We are fortunate to continue to live our way of life and practice our traditional customs that have sustained our communities for millennia. Integral to community health is our ability to hunt and gather both on our lands and the ocean that surrounds us. We harvest and share across families and communities bowhead whale, walrus, and various species of seals. The well-being, health and spirituality of our people is intricately defined by where and how we live.

Alcohol and opiates continue to impact our families of the Bering Strait region in pervasive and debilitating ways. The economic costs to our society are real with increased high school and vocational drop outs, the high rate of suicide (six times the national average) and lost productivity. Substance abuse is present in 92% of cases involving child protective services, meaning children are taken out of their families and extended families, while the appropriate level of care for local treatment services is unavailable for the majority of parents to become healthy. In Nome, 95% of referrals to the only women's shelter in our region involve substance abuse.

Addressing substance abuse remains our top priority. In 2019, NSHC will begin the construction of a new Wellness and Training Center to provide a full continuum of treatment locally, addressing substance use and treatment options in a culturally sensitive manner. The services at the Center will include detoxification, outpatient and intensive outpatient services, day treatment and sober housing.

## Statement of Interest: Oglala Sioux Tribe

The Oglala Sioux Tribe is a constituent Tribe of the Great Sioux Nation and a signatory to the Fort Laramie Treaty of 1868. The Pine Ridge Indian Reservation is the eighth-largest reservation in the United States, covering 11,000 square miles in southwestern South Dakota and northwestern Nebraska. The reservation is located in some of the poorest counties in the nation: Oglala Lakota County (which is the poorest county in the nation), Bennett County, and Jackson County in South Dakota, and Sheridan County in Nebraska. The Tribe and its people have limited access to resources. There are an estimated 41,147 enrolled members, with an estimated 20,014 of them living on the reservation.

In 2016, Oglala Lakota County had one of the highest opioid overdose death rates in South Dakota, at 21 people per 100,000, compared with the state average of 8 deaths per 100,000. The overdose death rates in Bennet and Jackson Counties in South Dakota were 16 and 10 per 100,000, respectively. In 2016, Sheridan County had an opioid overdose death rate of 11 per 100,000, five times the Nebraska average of 2.2. High rates of opioid use within the Oglala Sioux Tribe have put extraordinary demands on many services provided by the Tribe, including: ambulance service; burial assistance; child protective services; tribal justice (courts); health services; department of public safety (police); department of corrections; homeless shelters; and native healing and substance abuse treatment programs.

For members living on the reservation, the closest Medication Assisted Treatment facility is over 100 miles away. To combat the opioid epidemic, the Tribe needs access to Medication Assisted Treatment in its own community incorporating tribal values; funding for the purchase and training on Naloxone; and additional resources to help educate, prevent, and treat the opioid epidemic.

**Statement of Interest: The Omaha Tribe of Nebraska**

The Omaha Tribe of Nebraska is in a pitch battle with addictions among its 8,500 members. The Tribe offers Project HOPE, a community-based initiative that will focus upon the prevention of suicides among the Omaha youth, focusing on 200, 10-24 year olds. Suicide is a serious public health concern. It results in about 4,400 lost lives each year as the second leading cause of death among American Indian adolescents and young adults.

Suicide on the Omaha Reservation is a reality that was, not many years ago, rarely even talked about within the community. Suicide attempts are often seen as severe bouts of depression or substance abuse related issues. The current tribal system of care is overburdened and overwhelmed. Opioids are a major drain on much needed resources. Unemployment and poverty are prevalent and resources are limited.

The Tribe's Carl T. Curtis Health Education Center, Omaha Nation Law Enforcement, Omaha Tribal Court, and Omaha Nation Child Protective Services, provide much-needed services to Tribal members. Community-based prevention efforts provide community education and awareness trainings, forums, and cultural gatherings to cope with addictions and teach the dangers of opioids and other addictive substances. Foster care services are a material part of the Tribe's efforts. The Tribe needs financial help with every one of its public health, education, outreach and enforcement programs.

**Statement of Interest: Otoe-Missouria Tribe**

The Otoe-Missouria Tribe is a federally recognized Indian Tribe, located in Red Rock, Oklahoma. Today most of the nearly 3,000 tribal members still live in the state of Oklahoma, but there are members who live throughout the United States. The Otoe-Missouria Tribal Council is the elected governing body of the Tribe. The primary duties of the Tribal Council are to enforce the Tribal laws and policies and to serve as the decision-making authority on budgets and investments.

The Tribe is one of the smaller Tribes in Oklahoma, but, led by a progressive Tribal Council, it has parlayed its gaming revenue into long-term investment in other sustainable industries including retail ventures, loan companies, agriculture, natural resource development, hospitality, entertainment and several other projects still in development. Tribal members perpetuate tribal traditions with feasts, dances, an annual powwow and song leaders continue lineage, clan and tribal ties.

The opioid epidemic in the State of Oklahoma has affected many of our Tribal members and the surrounding communities with its destructive affects. Among our Tribe, we have lost tribal members to opioid addiction and many others have been and still are affected by this crisis.

We are dedicated to helping our members and the surrounding communities overcome addiction and educate our future generations about the dangers of prescription opioids and its direct effects on our families and our communities. Most recently, we began organizing a community-based approach to dealing with addiction and recovery but we lack the resources and funding to adequately provide services within our Community.

## Statement of Interest: Pala Band of Mission Indians

The Pala Band of Mission Indians ("Tribe") is a federally recognized sovereign Indian nation. Its homeland consists of a 12,273-acre reservation located in and around the town of Pala in southern California, approximately 40 miles northeast of the City of San Diego. The Tribe has 1,143 enrolled members who are Cupeño and Luiseño Indian, a majority of whom reside on the Tribe's reservation. Pursuant to its inherent governmental authority, memorialized in the Pala Constitution and tribal ordinances, the Tribe operates a wide range of public safety and community service programs, including law enforcement, fire department, tribal court and social services, pre-school, learning and housing programs, and programs for its senior and veteran members. The Tribe's primary source of economic development is the Pala Casino Resort and Spa, which it operates pursuant to the Indian Gaming Regulatory Act.

San Diego County has the largest number of Tribes and Reservations of any county in the United States. Overall, San Diego County had 1,701,077 opioid prescriptions in 2017.  The annual prescribing rate during that period was 509.5 per 1,000 residents, which represents a 13% decrease in prescribing from 2015. County-wide, there were 272 deaths due to all opioid-related overdoses in 2017. From 2009 to 2017, at least five Tribal members have gone to the Emergency Room for opioid problems, including abuse, withdrawal and overdose. During this same period, at least 27 people have required in-patient services, requiring as many as 149 bed days, at various local and national facilities. These individuals will require continued treatment and their families may require additional services to support them.

The Tribe seeks to develop and expand new tribal business enterprises that will provide jobs and long-term employment opportunities for Native Americans, including gaming, entertainment, and real estate. The opioid epidemic has adversely impacted the Tribe in achieving its goals, through reduced work force participation, health, and self-sufficiency of tribal members. In addition, the Tribe has been forced to divert scarce tribal resources away from existing priorities to address the effects of the opioid crisis on its community.

**Statement of Interest:  Pascua Yaqui Tribe**

The Pascua Yaqui Tribe is located in Southern Arizona.  The Tribe has 22,000 citizens, with 5,185 living on reservation. The Tribe provides direct governmental services to its members and the surrounding community, including primary and behavioral health services, law enforcement, social services, housing, economic development, culture and language resources, and jobs. Yaquis inhabit eight traditional pueblos in Sonora, Mexico in the Rio Yaqui Valley and nine communities in the State of Arizona in the United States.  In Rio Yaqui, the Yaquis battled with the Spanish for close to 200 years and continue to battle the Mexican government over land and water rights.  In the United States, the Yaquis were involved in the last Indian battle with the U.S. Calvary in 1918.

The Pascua Yaqui Tribe, like other Native American communities, is facing increasing pressure from the opioid epidemic.  The opioid-related death rate for Native Americans is higher than the national average and has increased at a four-fold rate since the turn of the century.  The burden of the epidemic has been high emotionally, socially, psychologically, financially, and medically, touching all aspects of the community.  The Tribe responded early on with the New Beginnings Clinic, a methadone clinic that provides individual and group substance abuse counseling for opiate addiction, prevention education, referrals to detox, and methadone dosing.

The Tribe also participates in the Arizona Department of Health Services Tribal Opioid Workgroup along with state officials and other Tribes.  We have also started a naloxone program; an antidrug initiative to reach out to tribal members to involve the community in potential solutions; utilization of Traditional Healers and encouraging spiritual and traditional approaches to healing; a Healing to Wellness court initiative that encourages treatment and recovery in place of incarceration; and a harm reduction treatment focus which includes assisting with a needle exchange program and regular testing for STDs and other communicable diseases. The Tribe has extended significant resources to these and other efforts in order to address this epidemic.  However, tribal resources alone are not a solution to this problem.

**Statement of Interest: Ponca Tribe of Nebraska**

The Ponca Tribe of Nebraska has been among the most effective voices from Indian Country for nearly 150 years. Fourteen (14) years after the civil war ended, for the first time in American history, a Native American was considered a human being and not a savage under the law of United States. This occurred when Ponca Chief Standing Bear sued in Federal Court in Nebraska for a writ of habeas corpus and was recognized in a federal court as a human being. As a result of Standing Bear's victory establishing the humanity of Native people under the Constitution, the "relocation" of Native people stopped when the Federal Court in Omaha enjoined the President of United States.

Like others, the thousands of Ponca Tribal members know the anguish of and its multiplication by opioids. Tribal resources for housing, health care and emergency services are consumed by the consequences of the opioids crisis. The Ponca Tribe of Nebraska operates the Fred LeRoy Health & Wellness Center in Omaha NE and the Ponca Hills Health & Wellness Center in Norfolk NE. The mission of these clinics is to provide holistic, caring, family-centered and culturally sensitive services through a quality clinical and educational approach to health care. The tools used against other addictions are deployed against opioids. The battle scars are deep and the struggle is hard. Resources are limited. Help is needed.

## Statement of Interest: Port Gamble S'Klallam Tribe

The Port Gamble S'Klallam Tribe is located on the northern tip of the Kitsap Peninsula in Northwestern Washington. The Tribe's 1,700-acre reservation is home to about two-thirds of the Tribe's 1,200 enrolled members. The Tribe has been a self-governing Tribe for many years, providing direct governmental services to its members and the surrounding community, including primary and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has burst upon our small community, impacting every family. Our Tribe has lost sons and daughters, mothers and fathers, brothers and sisters to addiction and death. The crisis is straining nearly every governmental and cultural service we provide to the breaking point. We have been forced to divert scarce resources away from existing priorities to staff new positions needed to address the opioid crisis, including substance abuse counselors, nurses specializing in addiction, and physicians to provide Medication-Assisted Treatment. We have had to purchase Narcan in large quantities and train our law enforcement, natural resource officers, and other tribal officials and members to use it. Drug-related evictions are on the rise, leaving those families and children homeless.

Our tribal government is focused on providing culturally appropriate treatment to our members suffering from the opioid crisis, including wellness activities, talking circles, and group therapy. We have implemented an aggressive and comprehensive response to the epidemic through our cross-governmental Tribal Healing Opioid Response program, convening monthly workgroup meetings with Tribal Council Members, Department Directors, staff, and other community members. We also operate the Healing of the Canoe Project in collaboration with the Suquamish Tribe and the University of Washington. Unfortunately, we do not have the resources to staunch the flow of the crisis, particularly since these drugs continue to pour into our community.

## Statement of Interest: Prairie Island Indian Community

The Prairie Island Indian Community (the "Tribe" or "Prairie Island") is located in southeastern Minnesota along the banks of the Mississippi River, approximately 30 miles from the Twin Cities of Minneapolis and St. Paul. It has just over 1,000 enrolled members. The Tribe has pulled itself out of extreme poverty, and now focuses on self-governance, strengthening its sovereignty, and improving life for its members.

The opioid epidemic has hit this small Mdewakanton Dakota community with force. Generations of the Tribe's future are mired in addiction and the wreckage that it leaves on our family units. Babies are being born addicted to opioids at higher-than-ever rates. Many parents cannot care for their children. Our Family Services Department is overloaded, resulting in a constant hiring cycle to address the need and the high turnover rate due to the stressful nature of those positions. Adult tribal members are in need of conservatorships and guardianships due to the grip that addiction has on them. Treatment costs and associated medical costs continue to increase, increasing the cost the Tribe pays for its self-funded medical insurance program. The Prairie Island Police Department deals with the ugly realities of the opioid epidemic on a daily basis. Overdoses (fatal and non-fatal), and drug-related crimes have increased. The Tribal Court is also being hit with an increased case load. The opioid epidemic has impacted the Tribe's economic development, in that its businesses need committed and educated future leaders, which are in short supply due to opioid use.

All departments of the Tribe have been called on to help be a part of the solution. There has been an increase in staffing and policing.  The Tribal Council is passing new and revised legislation and increasing social services offered. Also, for the past year, Prairie Island has worked with the three other Minnesota Dakota Tribes on a joint project to develop a culturally-based healing center for members of the four Tribes to go to heal from opioid and other addictions. Despite its best efforts, the Tribe does not have enough resources to deal with the power of this epidemic. Lives are being lost, and every day the Tribe is fighting to prevent this national health crisis from derailing its future.

**Statement of Interest: Puyallup Tribal Health Authority (PTHA),
an entity of the Puyallup Tribe of Indians**

The Puyallup Tribal Reservation is a largely urban area at the south end of Puget Sound in Pierce County, Washington. Portions of the Cities of Federal Way, Fife, Milton, Puyallup and Tacoma are located within the Reservation's 28.5 square miles, containing 41,341 people. There are approximately 4,000 Puyallup Tribal Members and 5,000 other American Indian/Alaska Natives living within or near the Reservation. The Puyallup Tribe was the first Tribe in the nation to execute a P.L. 638 contract for PTHA to assume from the Indian Health Service the duty to provide health care to its Members and other AI/ANs in Pierce County.

The opioid crisis is especially harmful for the ever-growing urban homeless and addicted population within the Puyallup Reservation. Our streets are lined with inoperable RV's, cars, tents and other temporary living spaces; Tribal buildings daily experience an influx of people who lack sanitary facilities and leave drug paraphernalia in common areas, creating safety issues; and every Tribal family is affected by someone struggling with opioid addiction. The ready availability of opioids in our urban community only worsens the harmful effects of documented adverse childhood experiences on our children, teens and family structures; with 20% of Puyallup children in out-of-home placement, we expect the impact will be long-lasting for our community.

PTHA is committed to combating the opioid crisis, but the problem is too big and growing too quickly. We currently provide comprehensive medical, dental, and behavioral health services, including wellness programs and addictions treatment, at our Clinic, the Tribal school and the Tribal jail. And we continue improving our service delivery model through collaborations with tribal and non-tribal entities. But we lack the resources to address all the physical, emotional, spiritual, and enviromental aspects needed to stop this epidemic on our Reservation.

**Statement of Interest: Puyallup Tribe**

The Puyallup Tribe of Indians is a federally-recognized sovereign Indian Tribe and Tribal government, recognized pursuant to the Treaty of Medicine Creek with the United States (10 Stat. 1132). The Tribe is located in and around the urban core of Tacoma, Washington and governed by its own Constitution and Bylaws, a comprehensive code of laws including family protection, housing, fishing, hunting, and land use, as well as civil and criminal matters. Nearly half of our approximately 5,300 Tribal citizens live within a 25-mile radius of the reservation.

Our community has experienced an exponential increase in opioid use and the detrimental effects that come with it. Opioids affect every generation: we have babies who are born addicted to opiates; overdoses resulting in hospitalization and death; increased unemployment; evictions; elevated crime rates; and increased diseases like HIV or Hepatitis.

We have responded to this crisis through community outreach and harm reduction services such as a partnership with the Tacoma Needle Exchange, community events such as Gathering of Native Americans, and National Night Out. Additionally, we also conduct at-risk screenings, drug and alcohol assessments, supportive short-term counseling, inpatient treatment referrals, medication-assisted treatment (MAT) and active follow-up of treatment. We provide training and hand out Naloxone-opioid overdose reversal kits, work with incarcerated inmates at the Puyallup Tribal jail and with our Wrap-Around Program to coordinate treatment care. We also provide outreach services through Chief Leschi Schools and the Flames of Recovery, a homeless drop-in center where we provide AA and NA meetings as well as treatment coordination.

Opioids are affecting every aspect of our community from birth to death, no one is immune from the effect of opioid use and addiction. Our resources and governmental services are strained as a result of combating this deadly epidemic.

**Statement of Interest: Pyramid Lake Paiute Tribe of Nevada**

The Pyramid Lake Paiute Tribe and its members are deeply grounded in their environment and believe that power may reside in any natural object including animals, plants, stones, water, and geographical features. They also believe power resides in natural phenomena such as the sun, moon, thunder, and wind. The Tribe exceeds a thousand members.

Much of the economy is centered around fishing and recreational activities at Pyramid Lake. The Tribe also utilizes the reservation desert open range to operate and manage cattle herds.

The Tribe faces a grave threat to its most valuable resource – its people. Nearly 45% of the Tribe's members are unemployed which is directly related to the catastrophic opioid crisis. With a meager median income, poverty is prevalent and the Tribe's resources are limited. The opioid crisis is to blame, and the Tribe requires finances to combat the crisis and prevent the collapse of its health, education, outreach, and enforcement programs. The Tribe will struggle until a successful resolution has been found to the opioid crisis.

**Statement of Interest: Quinault Indian Nation**

Quinault Indian Nation is headquartered in Taholah, Washington and consists of the Quinault and Queets Tribes and descendants of five other coastal Tribes: Quileute, Hoh, Chehalis, Chinook, and Cowlitz. The Quinault Indian Reservation occupies land in Grays Harbor and Jefferson counties in Washington. The Reservation consists of beautiful forests, rivers, Lake Quinault, and 23 miles of pristine Pacific coastline. Its boundaries enclose over 208,150 acres of some of the most productive conifer forest lands in the United States. Quinault Indian Nation is a sovereign nation with the inherent right to govern itself and deal with other Tribes and nations on a government-to-government basis. Quinault Indian Nation has several enterprises: Quinault Pride Seafood, Quinault Land and Timber, Quinault Beach Resort and Casino, and several retail outlets, including the Mercantile and two QMarts, all of which promote the growth and develop the potential of the Quinault people and Reservation. There are an estimated 3,122 enrolled members, with an estimated 1,630 of them living on the Reservation.

Between 2012 and 2016, both Grays Harbor and Jefferson Counties had opioid-related overdose death rates that exceeded the Washington state average of 9.6 deaths per 100,000 people. The opioid-related overdose death rates in Grays Harbor and Jefferson Counties were 12.3 and 10.3 per 100,000 people, respectively. High rates of opioid use within Quinault Indian Nation have put extraordinary demands on many services provided by the Tribe, including: health services; emergency medical services; child and adult protective services; judiciary; law enforcement; and substance abuse prevention and treatment programs.

To combat the opioid epidemic, the Tribe needs access to Medication-Assisted treatment in its own community incorporating tribal values; funding for the purchase of and training on Naloxone; and additional resources to help educate, prevent, and treat the opioid epidemic.

**Statement of Interest: Red Cliff Band of Lake Superior Chippewa**

The Red Cliff Band of Lake Superior Chippewa is a band of Ojibwe Native Americans. Tracing its foundational origins back to Chief Buffalo, the Tribe's Reservation was created through an 1856 executive order. Early in its history, Tribe members were forced to make their living working for employers in the commercial fishing industry. The Tribe preserved and today, Red Cliff is the site of a fish hatchery run by the Red Cliff Band of Lake Superior Chippewa. The Tribe also runs the Legendary Waters Resort and Casino on the banks of Lake Superior.

Despite the Tribe's success, the opioid crisis is devastating the Tribe's members and way of life. The Red Cliff Band battles opioid addictions amongst its people, including hundreds of NAS children. The opioid crisis poses a clear and direct threat to the existence of Red Cliff Band's tribal culture, identity, and membership. This epidemic has forced the tribal government to incur costs of providing increased medical care, social services, child welfare, law enforcement, and public safety measures. The effects of opioid addiction, abuse, and suicides is felt throughout the tribal community. The Tribe has dedicated resources to root out the pernicious evil of opioids, but resources are scarce. The programs created to battle the opioid crisis are quickly consuming the limited resources of the Red Cliff Band. The Tribe is struggling to combat the toll opioids have levied against its members, culture, and tribal government.

**Statement of Interest: Redwood Valley Rancheria Tribe of California**

The Redwood Valley Pomo once lived in the Little River area in California, but the arrival of settlers displaced most Pomo people from their ancestral lands. The Tribe has suffered through much, but is now an established presence in its area.

Opioids have devastated the lives of the Redwood Valley Rancheria. The Tribe suffers from widespread abuse, addiction, and drug overdose. The opioid crisis has broken families, reduced the standard of living, and crushed the Tribe's community. In order to combat this crippling force, tribal resources have been strained to provide education, public health, law enforcement, child protection programs, and many other vitally important corrective measures. However, resources are limited and the Tribe is struggling to fulfill all of its obligations to its members. These programs must continue so that the integrity and culture of the Redwood Valley Rancheria may continue. A successful resolution to the opioid crisis is of upmost importance.

**Statement of Interest: Reno-Sparks Indian Colony of Nevada**

Consisting of members from three Great Basin Tribes, the Paiute, the Shoshone, and the Washoe, the Reno-Sparks Indian Colony has a rich culture, and they often refer to themselves as "The People." The Colony holds that its people have been around since the beginning of time. The People continue to recognize their special place on Earth and all the life cycles.

Recently, the Tribe received an additional 13,400 acres of land. This has provided the Tribe with more sustainable bases for its people, as well as an opportunity for growth. The Reno-Sparks Indian Colony honors the past yet embraces the future by using both traditional teachings and practices as well as contemporary business methods and governmental practices. The Tribe employs more than 300 people.

Their way of life is under attack by a new threat: the opioid crisis. Unlike previous conflicts that the Reno-Sparks Indian Colony has been involved with, the opioid crisis is a multifaceted problem that is eroding all that the Tribe has built. The Tribe maintains a tribal court system, a police force, and a health clinic for its members, but these resources are being destroyed by opioid abuse. The Reno-Sparks Indian Colony must protect its way of life, and "The People", but needs a successful resolution of the opioid crisis.

## Statement of Interest: Rincon Band of Luiseno Indians

The Rincon Band of Luiseno Indians are the *Payómkawichum* – the people of the West, located in southern California. The Tribe's 5,500-acre reservation is home to one-quarter of the Tribe's 485 enrolled members and several hundred lineal descendants. Over the last 50 years, the Tribe has been asserting its sovereignty by building its institutional capacity and infrastructure to protect its right to self-government. The Tribe acts through its Tribal Council, five democratically elected members that serve two-year terms. The Tribal Government employs approximately 135 personnel to provide governmental services on- and off-reservation, including:  fire and public safety, cultural and natural resource protection, housing, education, human resources, elder care, information technology, public relations, legal affairs, finance and economic development. The Rincon Reservation is home to the Indian Health Council Clinic and the Intertribal Court of Southern California, both tribal consortium organizations providing health care and judicial services to their member Tribes like the Rincon Band.

The opioid crisis has devastated several families in the Tribe. Whether through misuse or abuse, opioids have caused tragic (and preventable) injuries, including member addiction, overdose and death. Indian reservations are vulnerable communities to begin with, on every indicia of socio-economic well-being. At Rincon, the road to addiction, overdose and death often begins with legitimate "medical purpose" prescriptions. Upon overdose and death, the cause of death is often masked, e.g., morbid obesity, multi-organ failure, to avoid the stigma of drug addiction.

The Tribal Government is overwhelmed and struggling with the development of a comprehensive response to combat this epidemic. The Tribe bears 100% of the disastrous economic/social consequences of widespread opioid use on the Rincon Reservation, including the costs of: counseling for grief, depression and despair; basic provisions for orphaned children and those removed from the home; rehabilitation and health care for addicted parents and their infants born addicted at birth; training and equipment (average of 12 Narcan kits monthly); and implementation of effective pain abatement methodologies that avoids increased illegal drug use and Medication-Assisted Treatment.

**Statement of Interest: Robinson Rancheria of Pomo Indians of California**

Robinson Rancheria of Pomo Indians has had a storied past. The Tribe had their federal recognition revoked. Despite this, the Tribe carried on and shouldered the burden to preserve their culture and way of life. When federal recognition was restored to the Tribe, the Tribe began to rebuild once again. Now, Robinson Rancheria has a large economic presence within its area. The Tribe operates several enterprise businesses such as the Robinson Rancheria Resort and Casino, R Pomo Pumps, and Robinson recycling. The Tribe is concerned with the environment and operates a native plant nursey in order to maintain the wildlife that is special to the culture of the Tribe. The Tribe also maintains local tribal roads and monitors local water quality.

Amidst all this economic and cultural development, the opioid crisis threatens to derail all the progress that the Robinson Rancheria of Pomo Indians have created. The opioid crisis has created a direct threat to the lifestyle of the Tribe's members by creating an epidemic of abuse that has led to alarming rates of death, illness, and suicide. The Tribe is now struggling to maintain the resources it desperately needs to combat this spreading epidemic. The fight against opioids diverts necessary funds from other programs and has placed the Robinson Rancheria in a dire struggle where it must attempt to balance resources between regular operations and opioid related programs. Resources are simply too scarce to cover both adequately. A successful resolution to the opioid crisis is needed in order for the Robinson Rancheria to provide for its people.

**Statement of Interest:  Rosebud Sioux Tribe**

The Rosebud Sioux Tribe (Sicangu Lakota Oyate) is located in south central South Dakota and is one-of-the-nine Tribes of the Oceti Sakowin (Seven Council Fires) located in the state of South Dakota.  The Rosebud Sioux Tribe is federally recognized and was established in 1889 after the United States partition of the Great Sioux Reservation.  Created in 1868 by the Treaty of Fort Laramie, the Great Sioux Reservation originally covered all of West River, South Dakota, which included all lands west of the east bank of the Missouri River, as well as part of northern Nebraska and eastern Montana.  The Tribe's one million-acre reservation is home to about one-third of the Tribe's 46,000 members.

The opioid crisis has had a detrimental effect on our Tribe, overall.  Our Tribe has lost membership due to the opioid epidemic, which has only compounded our high addiction rates, namely with methamphetamine and alcohol.  This emerging problem has been very taxing on every governmental and cultural service that our Tribe offers, as a whole.  Since we are underfunded, understaffed, and underserved in every area, we are forced to divert scarce resources away from existing priorities to staff new positions needed to respond to this crisis.  Ultimately, we can only be reactionary due to the strains of being underfunded.  Currently, we are partnering with addiction specialists and physicians to provide Medication-Assisted Treatment through different sources of grants and collaborations, both federal and state alike.

Due to lack of IHS funding, pain management is handled through medicating the problem, rather than treating the cause of the pain.  Over-prescribing has been a major factor to the opioid crisis on our reservation.  Our tribal government makes due with what we have to offer our members with the best possible treatment models that are based in our culture and traditions because we believe strongly that is the best source of recovery.

**Statement of Interest: Round Valley Indian Tribe of California**

Round Valley Indian Tribe is one of the largest Tribes in California and a confederation of 6 smaller, older Tribes: the Yuki, Wailacki, Concow, Little Lake Pomo, Nomlacki, and Pit River. These Tribes were forced onto Yuki land and forced to coexist despite different cultural and spiritual beliefs. The Tribes came together and formed the present day Round Valley Indian Tribe. Their heritage is a rich combination of different cultures with a common reservation experience and history.

Another force has fallen upon the Round Valley Tribe: opioids. The opioid crisis has created a threat to the lifestyle of the Tribe's members by increasing the amount of opioid addiction, abuse, and suicides. The Tribe is now struggling to maintain the resources it desperately needs to combat this spreading epidemic. The fight against opioids diverts necessary funds from other programs and has placed the Round Valley Indian Tribe in a dire struggle where it must attempt to balance resources between regular operations and opioid-related programs. Resources are simply too scare to cover both adequately. A successful resolution to the opioid crisis is needed in order for the Round Valley Indian Tribe to provide for its people and to protect its culture.

**Statement of Interest: Saint Regis Mohawk Tribe**

The Saint Regis Mohawk Tribe is a federally recognized Indian Tribe with a federal reservation located in northern New York along the Saint Lawrence River and intersected by the Canadian border. The Tribe has over 15,900 enrolled tribal members, approximately 8,000 of whom live on the reservation. The Tribe provides government services including a court system, law enforcement, a housing authority, a child welfare system, and additional social services. The Tribe also offers health services, including a dental clinic and substance abuse and mental health programs.

The Tribe has been hard hit by the opioid epidemic. Over the past five years, opioid abuse and addiction have accounted for approximately 85-90% of child welfare cases. Community members have died from opioid overdoses, leaving tribal children to be raised by a single parent, or, frequently, to enter foster care through the Tribe's social services. Property crimes, such as theft, have increased because of the high number of community members who are addicted to opioids and steal to fund their drug use. The Tribe also has incurred expenses for emergency services in responding to overdoses and injuries related to opioid abuse.

The Tribe has undertaken great efforts to combat the opioid epidemic, but it cannot provide all the services needed to confront the crisis. It provides a chemical dependency prevention program, for example, to discourage youth from abusing substances. The Tribe also offers inpatient and outpatient addiction programs. Tribal police officers receive training on how to administer naloxone to reverse the effects of opioid overdoses. The Tribe will continue its efforts to reduce the impacts of the opioid crisis, but it does not have the resources to provide all the support the tribal community needs.

**Statement of Interest: Salt River Pima-Maricopa Indian Community**

The Salt River Pima-Maricopa Indian Community ("Community") is comprised of two distinct Indian Tribes, the Onk Akimel O'odham and the Xalychidom Piipaash. The Community is located in heart of the Phoenix metropolitan area as it is surrounded by the cities of Tempe, Mesa, Scottsdale, and Fountain Hills. The Community's location is a mixed blessing as it encourages economic opportunity but also allows for drugs and crime to easily cross over. The Community has about 10,600 members, half of which are under the age of 18.

The opioid epidemic has taken a heavy and painful toll on the Community. In 2016 and 2017, the Community responded to 10 incidents where the preliminary cause of death was believed to be a drug overdose. In 2016, the Community responded to 50 overdose calls for service and in 2017, 100 overdose calls for service. In 2016, there were 14 suicides and suicide attempts in the Community. In 2017, there were 18 suicides and suicide attempts in the Community. The Community has also determined that a high number of deaths for men and women age 40 and younger are related to overdose, suicide and trauma as a result of alcohol use.

During 2017, the frequency of drug-related arrests, overdoses and suicides increased so significantly that the Community Council adopted a Proclamation to "Battle the Increasing Trend of Illegal Drug Use and the Resulting Deaths from Alcohol, and Illegal Drug Use occurring in the Salt River Pima Maricopa Indian Community." The Community Council sanctioned a detailed government-wide strategic plan to take active steps to reduce the use of opioids in the Community. Some of the efforts the government is undertaking are to tighten medical provider practices, statutory revisions, prevention/education initiatives, and other steps to prevent opioid use and addiction.

**Statement of Interest: San Carlos Apache Tribe**

The San Carlos Apache Tribe (the "Tribe") has 16,500 enrolled citizens, three-quarters of whom reside on the Tribe's 1.8 million-acre Reservation in the Northeast corner of Arizona. The Tribe has been a self-governing Tribe for many years, having contracted with the U.S. Indian Health Service ("IHS") pursuant to federal P.L. 93-638, providing direct governmental services to our citizens and the surrounding community.

At times, opioids have been over-prescribed in our community to such a degree as to adversely impact every family. From 2008 to mid-2015, for instance, preliminary data show that approximately 11,408 patients were treated and 20% were prescribed opioids. Of those, half received two or more opioid prescriptions and may need substance abuse treatment. The San Carlos Apache Healthcare Corporation ("SCAHC") assumed operation of the former IHS hospital in 2015 and has initiated multiple efforts to control opioid use (both before and after that date), but we continue to feel the impacts of opioid use, over-use, and abuse.

The opioid crisis has taken the lives and livelihoods of tribal citizens through addiction and even death. The crisis is straining the Tribe's governmental services, forcing us to divert scarce resources away from other priorities and into new efforts to address the crisis. These efforts involve all areas of the Tribe's government, from our tribal healthcare system to behavioral health services, law enforcement, EMS, and natural resource departments. We have implemented an aggressive response to the epidemic through passage of tribal legislation, including the Substance Abuse Control Act in 2015, and through our Tribal Opioid Task Force, which convenes workgroup meetings with San Carlos Tribal Council Members, Department Directors, staff, and other community citizens in partnership with our medical leadership from SCAHC. Unfortunately, we do not have the resources necessary to adequately combat the harmful effects of the crisis on our community, and we will continue to feel the impacts of the crisis long into the future.

**Statement of Interest: Santee Sioux Tribe of the Sioux Nation of the State of Nebraska**

The "frontier guardians of the Sioux Nation." This is how the Santee Sioux Tribe of Nebraska is known in Indian Country. Despite severe punishment from the US Government and removal from their traditional homelands in 1862, the Santee Sioux nation continues to strive toward self-determination through economic development and education. The Santee Public School District and the Nebraska Indian Community College provide education.

The Santee Tribe battles addictions, including opioids, among its people. The Tribe provides truancy, juvenile, delinquency prevention, parenting training, drug and alcohol education for women of child-bearing age, and efforts against historical trauma that has ravaged the population and threatened the culture. Opioids are a clear and present new challenge. The Tribe's Medical Clinic, teachers, health workers, judicial officers and law enforcement services deal with the opioids crisis daily.

Opioids, like alcohol, disrupt families, and produces staggeringly hostile statistics in areas of foster care, domestic violence, teen pregnancy and high school dropout rates. The financial drain on resources that it produces strips the Tribe of funds for other urgent needs.

## Statement of Interest: Sault Ste. Marie Tribe of Chippewa Indians

The Sault Ste. Marie Tribe of Chippewa Indians remains the largest Tribe East of the Mississippi River. The Tribe has 43,000 enrolled tribal citizens, and the Tribe has always suffered from a shortage of reservation land compared to its population. The Tribe began with a self-governance compact almost as soon as the program was enacted. The Sault Ste. Marie Tribe operates hundreds of programs aimed at supporting its citizens and assisting the people of our communities to rise above the historical poverty and hopelessness. Still today, the Upper Peninsula of Michigan, the aboriginal homeland for the Tribe, remains deeply burdened with unemployment. This area is sparsely populated, and the 2016 total population estimate of 302,981 is the lowest since the beginning of the 20th century.

The continuing scourge of opioid abuse, dependency, and addiction has created severe problems for our citizens, and the community as a whole. The Tribe provides many services to its members to assist them to fight the opioid abuse and to assist in recovery. The Tribe provides medical assistance through federally and tribally funded programs, housing assistance, job training and assistance, and a robust child welfare and protection network to intervene with families that have been torn apart by opioid abuse. In areas of low population and high under-employment, attracting and retaining physicians and other professionals to deal with the opioid crisis is especially difficult. Our relatively low patient counts also make it difficult to recruit treatment specialists to open private practices.

Because there are very few medical and psychological services available in the Upper Peninsula to deal with the opioid epidemic, the Tribe has explored establishing a rehabilitation hospital to bring in resources which have not moved to the area through market forces. The shortage of these resources nationwide, and the enormity of the epidemic, has driven up the costs of care and rehabilitation. The Tribal Government has committed itself to combating this crisis and healing our people of this illness. However, the Tribe's resources will not be sufficient to stand against these problems if the Nation as a whole is not also focused on solving the problems created by these drugs.

**Statement of Interest: Scotts Valley Band of Pomo Indians of California**

Scotts Valley Band of Pomo Indians is invested in serving its members to protect the Tribe's past and provide for the Tribe's future. In 2008, the Scotts Valley Tribal Assistance for Needy Families program opened its doors to provide services and benefits to allow for complete economic self-sufficiency.

The program serves to prepare members for many different crucial life tasks such as job preparation, life skills training, and nutrition and parenting classes. However, these objectives have been drastically impacted by the current opioid crisis that is crippling the Indian nations. The crisis has had a disparate impact on the already impoverished Tribe. The Scotts Valley Band is thoroughly committed to providing for its members, but the opioid crisis has far reaching roots that have permeated into every aspect of tribal life. To combat this force, the Tribe has created programs aimed to reduce the harmful effects of the opioid crisis – including reducing opioid abuse, addiction, and suicides. However, these programs place a heavy burden on the already strained resources the Tribe possesses. Scotts Valley Band of Pomo Indians is struggling to maintain the necessary funding for its regular operations while also funding the vitally important opioid related programs. Resources are scarce and assistance is needed if the Scotts Valley Band wishes to be able to continue to protect its members from this crippling epidemic.

## Statement of Interest: Shakopee Mdewakanton Sioux Community

The Shakopee Mdewakanton Sioux Community (the "Community") is a federally recognized Indian Tribe located within the Twin Cities Metropolitan Area in Prior Lake, Minnesota. The Community exercises inherent governmental authority on behalf of itself and its members. Based upon its sovereignty, the Community has made significant advancements towards self-sufficiency and provides governmental services to its members including comprehensive health care services, social services, education, public safety, public works, and conservation enforcement. Some of these services are made available to Community employees and Native American residents of the surrounding area. The Community is the largest employer in Scott County, Minnesota and provides jobs to more than 4,100 people.

The opioid epidemic has taken a significant toll on the Community and its members. The negative impacts of opioid addiction are not limited to single drug users. The crisis has led to an increased demand for public safety, child protective services, guardianships and conservatorships, health services, and legal services. Costs for treatment services paid directly through the Community's self-insurance program have also increased. Opioid addiction has led to other less tangible social costs that negatively impact family relationships and the cultural fabric of the Tribe. The Community will be dealing with the negative impacts of the opioid epidemic for years to come.

The Community has responded to the opioid epidemic in a number of ways. The Community has worked diligently to establish and implement appropriate programming for Community members to respond to substance abuse and addiction. The Community has banded together with the other Dakota Tribes in Minnesota in an effort to create a substance abuse treatment facility to provide culturally appropriate treatment to Community members.

**Statement of Interest:  Shinnecock Indian Nation**

The Shinnecock Indian Nation has a very simple mission: To promote the public awareness of Shinnecock Indian Nation and to provide its Citizens on and off the Reservation with the resources they need to foster a strong and stable relationship amongst themselves and the surrounding community. The opioid crisis, which is incredibly intense on Long Island, New York, is threatening the Shinnecock in every phase of their society.

Opioids are a pervasive, highly addictive drug that have infiltrated every aspect of the Nation's community. No one knows this more than the Shinnecock, as even the sons of its leaders have suffered from addiction and death due to the opioids epidemic. Opioids are causing rampant abuse, addiction, and deaths to Shinnecock men, women, and children. The Nation is suffocating from the ravages of opioids, daily trying to break free from the pervasive evils of opioids. Tribal government is desperately battling to combat the crisis but the Nation struggles due to scarce resources. A successful resolution to the opioid crisis is desperately needed in order for the Shinnecock to preserve its way of life, culture, and heritage, as well as its peoples. There must be a financially impactful solution directly to the Shinnecock in order to allow this proud Nation to alleviate the effects of the opioid epidemic.

**Statement of Interest: Shoshone-Bannock Tribes**

The Shoshone-Bannock Tribes are a federally recognized Indian Tribe with a reservation located in southeastern Idaho. The Tribes have over 6,000 enrolled tribal members, approximately 3,000 of whom live on the reservation. The Tribes provide government services including a court system, law enforcement, a housing authority, a child welfare system, and additional social services. The Tribes also offer health services, including a dental clinic and substance abuse and mental health programs.

The Tribes have been hard hit by the opioid epidemic and it affects nearly every tribal member. Over the past five years, opioid abuse and addiction have accounted for approximately 85-90% of child welfare cases. Community members have died from opioid overdoses, leaving tribal children to be raised by a single parent, or, frequently, enter foster care through the Tribes' social services. Property crimes, such as theft, have increased because of the high number of community members who are addicted to opioids and steal to fund their drug use. The Tribes have had to expend much-needed government resources toward law enforcement and emergency services in responding to crime, overdoses and injuries related to opioid abuse. Tribal police officers receive training on how to administer naloxone to reverse the effects of opioid overdoses.

The Tribes have undertaken great efforts to combat the opioid epidemic, but it cannot provide all the services needed to confront the crisis. The Tribes offer inpatient and outpatient addiction programs and provide a chemical dependency prevention program to educate and discourage the youth from ever abusing opioid substances. The Tribes continue to develop culturally appropriate treatment and prevention strategies for tribal members. While the Tribes continue to drive as many resources as possible toward assisting community members who are affected by opioid abuse, additional resources will be required to prevent opioid abuse and change the destructive path created by prescription opioids.

## Statement of Interest: Sisseton-Wahpeton Oyate

The Sisseton-Wahpeton Oyate of the Lake Traverse Reservation is a treaty Tribe located in northeast South Dakota and southeast North Dakota. Its formalized government and Constitution reflect the Tribe's sovereignty and inherent authority. The Lake Traverse Reservation currently includes over 118,000 acres that span over seven counties in South Dakota and North Dakota. The Tribe's enrollment is over 14,000 members with over 6,000 members living on or near the reservation.

The need to combat drug-related crimes on the Lake Traverse Reservation has become increasingly vital. Tribal law enforcement drug and drug related arrests have increased by 548% since 2008. Opioid related addiction contributes to a vast array of social and economic hardships in the tribal communities. Another contributing factor, Interstate-29 runs though the reservation boundaries allowing non-Indian criminal predators access a jurisdictional void. A growing number of Indian women are victims of human trafficking and many are forced to traffic drugs into the reservation.

In an effort to address this astronomical increase in drug and drug related crimes, the Tribe funded the development and operation of a behavioral health treatment program. However, there is not enough funding or programming to adequately address the opioid epidemic plaguing the community. All areas of tribal government are impacted, and the entire community is affected. The ability to provide treatment for the members of the Tribe has become increasingly difficult. The Tribe's small treatment facility cannot meet the increase of addiction that has been caused by the opioid epidemic. The Tribe has experienced an increase in heroin use in its members as result of the opioid overexposure. The Tribal community has been devastated as a result of opioid abuse and it has related to other serious and long-term negative impacts. It is evident that this epidemic will impact our future generations.

**Statement of Interest: Sitka Tribe of Alaska**

Sitka Tribe of Alaska is a federally-recognized tribal government for over 4,400 citizens located in Sitka, Alaska, where one-third to one-half of the Tribe's citizens reside. The Tribe is governed by a Tribal Council that seeks to exercise sovereign rights and powers, to preserve the integrity of tribal society, and to improve the lives of individual Tribal Citizens. Sitka Tribe has several departments that encompass activities in tribal government services, economic development, natural resources, education and cultural resources, and social services. The Social Services Department oversees child welfare and provides assistance, a food pantry, and preventative activities to preserve healthy families. The Tribal Court hears cases on a variety of topics including child welfare.

Sitka Tribal citizens, particularly children, are greatly affected by alcohol and drug abuse. The vast majority of needs for assistance and children in care are due to alcohol, opioids, or illegal drugs. While opioids are not the only issue, they have a significant impact on tribal citizens and the needs served by the Tribe; for example, opioids are reported as an issue in one-third of general assistance requests and two-thirds of childcare assistance requests. At any one time, there are about eighty (80) children in guardianship or foster placement situations, nearly all of which are linked to substance abuse, and the majority of the Tribal Court caseload is child welfare where substance abuse is a primary factor.

Sitka Tribe provides temporary assistance and activities and classes that place a focus on fostering healthy families and relationships. Sitka Tribe also provides staff who case-manage all children in care. However, Sitka Tribe does not have the resources to implement long-term interventions or provide substance abuse counseling, and the Tribe cannot meet the needs of its citizens who struggle with the effects of opioid addiction.

**Statement of Interest:  Sokaogon Chippewa Community**

The Sokaogon Chippewa Community (SCC), or the Mole Lake Band of Lake Superior Chippewa, is a band of the Lake Superior Chippewa, many of whom reside on the Mole Lake Indian Reservation, located in the Town of Nashville, in Forest County, Wisconsin. The reservation is located partly in the community of Mole Lake, Wisconsin, which lies southwest of the city of Crandon.  The community occupies a land base of approximately 4,904 acres consisting of Reservation, Trust and Fee Lands.  As of March 2018, the total number of enrolled tribal members is 1,568.

Today, the Sokaogon Chippewa Community continues to harvest wild rice and spear fish in traditional ways. The Tribe uses its money wisely by investing in cultural preservation and restoration projects, environmental planning of its resources, education of its community members, and social programs.  The Tribe is dedicated to making decisions based on the impact on seven generations ahead.  The SCC provides direct government services to its members and residents, including primary and limited behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has impacted the SCC as it has most communities – it is like a stone thrown in a pond, the ripple effects are inevitable.  As a small community, almost every tribal member can point to a relative or loved one who is overcome by addiction, or who has already been lost as a result of this crisis.  Those losses affect the entire community.  There are significantly increased needs for social services, out of home placements, culturally appropriate chemical health treatment services, Medication-Assisted Treatment (MAT), human resources, law enforcement services, community policing and many, many more needs.  Tribal members and employees have been affected to the detriment of the entire community. It is overwhelming.

**Statement of Interest: Southcentral Foundation**

Southcentral Foundation is an Alaska Native tribal health organization designated by 11 federally recognized Tribes to provide healthcare services to beneficiaries of the Indian Health Service pursuant to a compact with the United States government under the authority of P.L. 93-638, as amended, the Indian Self Determination and Education Assistance Act. Services provided by SCF include outpatient medical care, home health care, dentistry, optometry, psychiatry, mental health counseling, substance abuse treatment, residential treatment facilities for adolescents and for women, suicide prevention and domestic violence prevention.

Southcentral Foundation provides services to more than 65,000 Alaska Native and American Indian people living in the Municipality of Anchorage, the Matanuska-Susitna Borough and 55 rural Alaskan villages. Our service area encompasses more than 100,000 square miles – an area the size of Wyoming (or more than twice the size of Ohio). Southcentral Foundation has long worked to directly address breaking the cycles of violence, addiction, and families with problematic patterns of relating. We see the effects of the opioid crisis across our broad and varied service area and have been trying to expand our programs in both capacity and integration into all locations within Southcentral Foundation with limited resources.

Recent interventions include expansion of detoxification, residential treatment, and intensive outpatient substance use disorder services; stronger opioid prescribing patterns monitoring; widespread certified use of Suboxone for addictions; an expansion of Complementary Medicine, Physical Therapy, and Exercise; the addition of an interventionalist pain specialist; the addition of a physical medicine and rehabilitation pain specialist to work within Primary Care; expanded use of Learning Circles and traditional methods of healing mind/body/spirit; and the widespread use of Wellness Care Plans for patients on long term opioids.

**Statement of Interest: SouthEast Alaska Regional Health Consortium**

SouthEast Alaska Regional Health Consortium (SEARHC) is a Tribal Health Organization providing health care services to American Indians and Alaska Natives and to other eligible individuals in Southeast Alaska, pursuant to Title V of the ISDEAA, and the Alaska Tribal Health Compact. SEARHC is an inter-tribal consortium of fifteen Alaska Native Tribes, and provides health care and health-related services in 28 communities. SEARHC operates 16 primary care clinics and provides seasonal primary care services in the most remote locations—many can be reached only by boat or airplane. SEARHC also operates the Ethel Lund Medical Center in Juneau and the Mt. Edgecumbe Hospital in Sitka, a regional 25-bed critical access hospital that is open to everyone in Sitka and Southeast Alaska.

Communities throughout Alaska have been devastated by the opioid epidemic. At the Mt. Edgecumbe Hospital in Sitka, emergency department visits involving opioid abuse and/or dependence have dramatically increased since the early 2000s, with a high of fifteen such admissions in 2017 and eight so far in 2018, as compared with an average of 1-3 such visits between 2000 and 2007.

To address the crisis, SEARHC began providing MAT Services in 2013 in its Sitka Behavioral Health Clinic. However, its medical staff estimates that 1,400 individuals have a need for treatment for substance use disorder and/or serious mental illness, based on the number of opiates that are being dispensed from local pharmacies. SEARHC foresees the need to expand these programs to communities, like Juneau, as opioid use appears to be increasing in the communities it serves.

## Statement of Interest: Spirit Lake Tribe

The Spirit Lake Tribe is a federally recognized Tribe located in northeastern North Dakota. There are approximately 7,256 enrolled members of the Spirit Lake Tribe and approximately 2,069 members reside on the Spirit Lake Tribe Reservation which consists of approximately 231,000 acres of trust and fee land. The Spirit Lake Tribe has maintained its self-governance throughout colonization to present day.

The Spirit Lake Tribal Council has many governmental agencies providing essential services that include, but are not limited to, justice system services, primary and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

Addiction and associated criminal activity on the Spirit Lake Reservation has been a significant drain on many of our governmental resources. In particular the opioid epidemic has placed a burden on our healthcare system, justice system, social services and overall economy. As opioid addictions rise in our community the need for law enforcement services to respond to crimes of intoxication, drug trafficking, and related violent crimes such as assault, firearms and even homicide has drastically increased. Additionally, family violence, abuse and neglect have continued to rise to levels well beyond the national averages. The addiction, violence, and crimes directly related to the increase of opioids further burdens our social services programs, housing and workforce.

Although we strive to meet the needs of our community in terms of health, welfare and community safety, the fact is we lack access to the funds needed to adequately staff programs and provide the services necessary to combat the direct and indirect effects of the opioid epidemic on our reservation. What limited services we do have are not sufficient to meet the needs of the individuals and families impacted by opioid addiction.

The healthcare and addiction services needed to address withdrawal; primary treatment and long-term recovery from opioids are not readily available in our community. The Spirit Lake Tribe does not have an adequate law enforcement or justice system presence to respond to opioid related crimes, and more importantly to the violent crime related to the unlawful sale of these drugs. Finally, there needs to be education of physicians in the community who prescribe opioids.

## Statement of Interest: Spokane Tribe of Indians

The Spokane Tribe of Indians' 157,376-acres Reservation is located approximately 40 miles northwest of the City of Spokane, Washington, and is home to many of the Tribe's 2,884 enrolled members. The Tribe has been a self-governing Tribe for many years, providing direct governmental services to its members and the surrounding community, including primary and behavioral health services, social services, law enforcement, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has burst upon our small community, impacting every family. Families have lost members to opioid related deaths. Tribal children have been removed from their homes at an alarming rate due to parental opioid abuse. Babies are born addicted to opioids and suffer withdrawal and related medical problems. Child-only TANF cases have increased. Tribal elders are increasingly victims of opioid-related crime.

The opioid crisis strains nearly every governmental and cultural service we provide, exasperating an already severe resource gap. We need to hire additional substance abuse counselors and police officers. It is difficult to recruit and retain necessary personnel due to our rural location and limited resources. Drug-related eviction and homelessness are on the rise. We have redirected limited resources to purchase Narcan in large quantities and train our law enforcement and other tribal officials to use it.

Our tribal government is committed to a comprehensive, community-based approach to resolving our opioid crisis. The Children of the Sun Prevention Coalition holds monthly meetings between multiple sectors of the Tribe and local community and provides ongoing drug-identification training. We have partnered with the Wellpinit School District to implement strategies targeted at local youth. Tribal police regularly partner with surrounding jurisdictions to address ongoing criminal drug operations. Bottom line: we need substantial additional resources to combat this crisis.

**Statement of Interest: Squaxin Island Tribe**

The Squaxin Island Tribe ("Tribe") is a federally recognized Indian Tribe, and a signatory to the 1854 Treaty of Medicine Creek. The Tribe is comprised of the peoples from each of the seven inlets in Southern Puget Sound, and has 1,112 enrolled members, of which 500 live on or near the Reservation. Together with other Medicine Creek Treaty Tribes, the Squaxin Island Tribe ceded lands in excess of 4,000 square miles of land in exchange for the small island – four and a half miles long and one-half mile wide – with no potable water, now known as Squaxin Island. The Squaxin Reservation consists of the island and subsequently acquired off-island properties in southern Mason County, Washington.

The opioid crisis has permeated the Tribe and community, causing loss and trauma to every family. Those suffering addiction have also lost their connection to their tribal culture and the community. Children whose parents are addicted to opioids often suffer the most trauma, they are removed from their parents' care and sometimes placed outside of the tribal community. This loss of culture and heritage threatens the future of the Tribe itself.

The Tribe's health clinic dedicates two full days a month to opioid-related treatment. The Tribe operates the Northwest Indian Treatment Center which provides in-patient and aftercare services to tribal members and other Indians attempting to heal from addiction. The Tribe operates robust vulnerable adult and child welfare programs, which combine to assist adults suffering from opioid addiction and the children of parents addicted to opioids. In response to the opioid epidemic, the Tribe has created a Drug Task Force to hold preventive education trainings and cultural events for the tribal community. The Tribe has created a suicide intervention program that, in conjunction with the substance abuse service, seeks to address co-occurring diagnoses within the drug-affected population. The tribal police and first responders have seen increased demand due to opioids, and have been trained in the use of Nalaxone. All of these programs, initiatives, and treatments have stressed the Tribe's resources and required the Tribe to slow or halt other priorities. The opioid epidemic has also had a detrimental effect on several of the Tribe's businesses through lost employee productivity.

**Statement of Interest: St. Croix Chippewa Indians of Wisconsin**

The St. Croix Chippewa Indians of Wisconsin Tribe, once known as the "Lost Tribe," suffered forceful removal from their ancestral lands; but since that time, St. Croix has persevered to become proven business leaders with a rich tradition and culture. The opioid epidemic presents an existential crisis that the St. Croix must endure and overcome in order to protect their way of life, culture, and members.

The St. Croix battles addictions, including opioids, amongst its people. Opioids place a forceful opposition and drain on the infrastructure, as well as the culture, of the St. Croix people. Opioid addiction is rampant and has disrupted and destroyed families within the Tribe and crippled St. Croix's resources. Combating opioid addiction within the Tribe has placed an unimaginable strain on the available resources of the St. Croix people and has stripped critical funding from other pivotal areas and programs within the Tribe. The Tribe is struggling to maintain the balance of resources between the two competing needs and will not be able to continue its way of life unless the opioid crisis is successfully resolved.

**Statement of Interest: Standing Rock Sioux Tribe**

The Standing Rock Sioux Tribe is a successor to the Great Sioux Nation, or Oceti Sakowin. Tribal history reflects the misdeeds of the federal government, which - in violation of the 1851 and 1868 Treaties of Fort Laramie, 11 Stat. 749 and 15 Stat. 635 - took lands promised to the Tribe. *See United States v. Sioux Nation*, 448 U.S. 371, 388 (1980). Even within living memory, the United States continued to take lands promised to the Tribe when it flooded, for the Oahe Dam project, 56,000 prime acres of resource rich, Reservation land, forcing hundreds of families to relocate. *Act of Sept. 2, 1958,* Pub. L. No. 85-915, 72 Stat. 1762. Today, approximately 8,500 Tribal members reside on the 2.3-million-acre Reservation, primarily in eight widely scattered communities. Despite the Tribe's best efforts, the unemployment rate remains above 80%, and over 40% of Indian families live in poverty.

Trauma endured by past generations contributes to social problems today: poverty, crime, depression, substance abuse, suicide. Many tribal members, including elderly and children, have been impacted by the consequences of opioid abuse. Standing Rock seeks to address this problem, but the rising levels of opioid abuse on the Reservation overwhelm the Tribe's limited resources for health care, counseling, and law enforcement. Vast distances between communities within the reservation, as well as the reservation's remote location in relation to more populous off-reservation communities, are significant impediments to providing the personnel and services needed to address the opioid problem. For example, there are only eleven law enforcement officers and three addiction counselors to service the Reservation's entire 3500 square miles. The Tribe is facing extensive harm from opioids and needs substantial additional resources to address this challenge.

**Statement of Interest: Stockbridge-Munsee Community**

The Stockbridge-Munsee Community has a reservation in Shawano County in Northeastern Wisconsin. The Tribe's lands comprise about 24,000 acres with a membership of 1,400 of which 39% live on tribal lands. The Tribe has been in Wisconsin since the 1800s after being removed from its original homelands by the Hudson River on the East Coast. The Tribe has been a self-governing Tribe for many years, providing direct governmental services to its members and the surrounding community, including primary and behavioral health services, social services, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has directly impacted our Tribe, the local community and the communities of our approximately 730 employees. The Tribe is not only allocating resources to aid with the impacts of the opioid crisis but is also taking the lead in an inter-tribal project to bring a treatment center to the region that will have a focus on healing the native community in a culturally appropriate manner. This approach is crucial to continuing the native community's survival from this latest genocidal scourge.

## Statement of Interest: Suquamish Tribe

The Suquamish Tribe is located on the 7000-plus acre Port Madison Indian Reservation on Washington's Kitsap Peninsula, a 35-minute ferry ride from Seattle. The Suquamish Tribe takes its name from the traditional Lushootseed phrase for "people of the clear salt water". The Suquamish people have lived on the lands and waterways along Washington's Central Puget Sound Region for time immemorial.

The opioid epidemic has hit the Suquamish Tribe particularly hard. In 2014, in Kitsap County, there were 788.3 opioid prescriptions per every 1,000 residents. [1] Among tribal communities, the overdose rate is more than twice as high as that among white Washingtonians,[2] and the Suquamish Tribe has incurred substantial increased costs and social services to address the crisis.

The Suquamish Police Department is a leading agency in the region in attempting to find solutions to the epidemic. Suquamish PD was the first agency in Washington State to implement ODMAP (Overdose Detection Mapping Application Program), a digital app designed to reduce deaths resulting from opioid overdose. ODMAP tracks known and suspected overdoses in real time; it also enables public safety managers and health officials to "see" when bad batches of heroin, fentanyl or other dangerous opioids are leading to spikes of overdoses in a defined geographic area, and to take steps to prevent or mitigate the impacts.[3] The Squamish Police Chief is Vice Chair of the Opioid Steering Committee for Clallam/Jefferson/Kitsap Counties. The Suquamish Police Department officers were also the first in the region to carry and administer of nasal naloxone.[4] Suquamish Police have now resuscitated several over-dosed individuals on the Reservation. Finally, the Police department is the only full time DEA "Drug Take Back" location in Kitsap County.

---

[1] *Population and Total Controlled Substances Prescriptions*, *Kitsap County, CY 2014,* Washington State Department of Health 630-126 (May 2017), https://www.doh.wa.gov/Portals/1/Documents/2600/PMPcountyProfiles/630-126-KitsapCountyProfile2014.pdf.

[2] Austin Jenkins, *Inslee Wants Washington State to Declare Opioid 'Public Health Crisis,'* KUOW.org (Jan 12, 2018), *available at* http://kuow.org/post/inslee-wants-washington-state-declare-opioid-public-health-crisis.

[3] https://suquamish.nsn.us/suquamish-police-announce-new-tool-fight-opioid-deaths/

[4] https://suquamish.nsn.us/naloxone-saves-lives/

**Statement of Interest: Susanville Indian Rancheria**

The Susanville Indian Rancheria is located in Lassen County, California, in the rural northeastern corner of the state. Our Tribe's 1,700 acre in reservation and tribal lands support our 1,230 enrolled members from four primary tribal cultures: Maidu, Washoe, Pit River, and Paiute. The Tribe was an early leader in self-governance in providing direct services to its members and its community, ranging from health care and behavioral health programs, social services, housing, transportation, development, cultural resources, and employment.

Opioids addiction and overdoses have hit Native communities in California hard, particularly those in rural areas; Susanville Indian Rancheria is no exception. The numbers of opioid death and overdoses in Lassen County were growing until there was a concerted effort in 2014 to intervene in opioid prescription and management began reversing the trend. Over the last decade we have lost 14 tribal members or community members we serve to opioid-related causes. Additionally, we have felt the strain of addiction and abuse in our communities, from increased health care needs (like hiring behavioral and substance abuse treatment professionals and specialists in addiction), to pressure on our social services, foster care and adoption services, and housing programs.

Our Tribe is focused on continuing the trend of reversing addiction, preventing addiction in the first place, and healing our families and people who have been touched by the crisis. We are focusing on providing culturally appropriate and holistic care based on families to engage everyone in recovery. To this end, we've received $418,000 from the Substance Abuse and Mental Health Services Administration for the Tribe's "Honoring our Children and Our Families" Initiative that will last through 2020. We continue to struggle, however, as the problem is constantly bubbling up in our community that requires quick and labor-intensive responses from all quarters of the Tribe and our programs.

**Statement of Interest:  Swinomish Indian Tribal Community**

  The Swinomish Indian Tribal Community is located on Fidalgo Island in northwest Washington.  Most of the Tribe's approximately 1,000 members live together on the Swinomish Reservation established by the Treaty of Point Elliott.  The Tribe provides a broad array of governmental and social services, including housing, police, utilities, natural resources management, medical and dental clinics, education support, counseling, substance use disorder treatment, cultural programs, and economic development enterprises to provide revenue and employment.

  Our community lives in a near-constant state of grief from the death and destruction caused by the opioid crisis.  Most recently, we lost a beloved 40-year old Tribal member who died of an overdose and left her small children motherless.  Indeed, the last three deaths in our community were all opioid-related.  This affects our families, and also our culture.  Fishing remains central to our way of life, but as Tribal members die or become incarcerated, our fishing traditions are at risk.  Even our native food is threatened: researchers recently found opioids in Pacific salmon and shellfish.  We are a strong people, but we are fighting for our individual and collective survival.

  In response, the Tribe has devoted significant financial resources to design and build the didgʷáličʔ Wellness Center, a new treatment clinic that offers holistic, integrated treatment services to Tribal and local community members, including primary care, chemical dependency counseling, mental health counseling, Medication-Assisted Treatment, group therapy, dental care, on-site childcare, transportation, and social worker assistance with housing, employment, and legal issues.  The Tribe continues to provide transitional housing for Tribal members in recovery; a Wellness Court with diversion to treatment; a full-time youth prevention program; free educational and vocational assistance; and Naloxone distribution and training.  Even with all these efforts, we must continue to fight against a constant flood of opioids into our community.

### Statement of Interest: Tanana Chiefs Conference

Tanana Chiefs Conference is an intertribal organization formed by 37 federally-recognized Tribes and occupying the Brooks Range and the Yukon and Tanana River watersheds in Interior Alaska. TCC provides a wide range of health and social services in a way that balances traditional Athabascan and Alaska Native values with modern demands. TCC serves 20,000 tribal members in Alaska's in a region roughly the size of Texas. TCC is a signatory to the Alaska Tribal Health Compact with the Secretary of Health and Human Services, and carries out various programs benefitting Alaska Natives, American Indians, and other eligible individuals, through funding agreements with the Indian Health Service and the Bureau of Indian Affairs, as authorized by, *inter alia*, the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq.*, and Titles IV and V of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 5301 *et seq.* ("ISDA"). Pursuant to the ISDA, TCC operates the Chief Andrew Isaac Health Center, a state-of-the-art regional health clinic in Fairbanks, Alaska, and operates additional village clinics and subregional clinics across the Interior region.

TCC is governed by the Full Board of all forty-two tribal delegates; an Executive Board comprised of leaders from each subregion; an advisory Health Board; and advisory subregional boards. In addition TCC has two Traditional Chiefs, an Executive Board elder adviser, and a tribal youth adviser. The Chief and Chairman of TCC is elected by our tribal delegates every three years and can serve two terms.

TCC is working towards a 2020 five-year strategic plan aiming to reverse health and social disparities for the Interior people. TCC's vision is *Healthy, Strong, Unified Tribes*. Substance abuse continues to be significant in our region and has increased because of the opioid epidemic. The 2020 plan includes goals and objectives specifically to address the widespread opioid abuse occurring in the region. Anecdotal evidence suggests opioid abuse has also increased the use of methamphetamines and alcohol. The impacts of opioid use in the region also require TCC to increase programming for other areas including child protection, public safety, and burial assistance.

**Statement of Interest: The Association of Village Council Presidents**

The Association of Village Council Presidents (AVCP) is the nation's largest tribal consortium with 56 federally recognized member Tribes located in southwest Alaska along the Yukon and Kuskokwim Rivers and Bering Sea coast. The AVCP region is approximately 55,000 square miles. AVCP's tribal members are of Yup'ik, Cup'ik, and Athabascan descent. Our mission is to work in partnership, to provide community development, education, social services, culturally relevant programs and advocacy for the people and Tribes in our region to promote self-determination, protection and enhancement of our cultural and traditional values.

Alaska is grappling with the opioid epidemic. In 2017, there were 108 opioid-related deaths statewide – 93% of these deaths were due to overdose. From 2010 to 2017, 623 opioid overdose deaths were identified.[1] The ability of tribal communities in our Region to respond to this epidemic is compounded by the challenges we face in our region:

1.  Severe lack of law enforcement– a quarter of our communities have no law enforcement presence at all. Most communities are only able to afford law enforcement officers on a part-time basis.
2.  Notoriously limited public health facilities and local treatment resources.
3.  Transportation unreliability and prohibitive costs. Our villages are not connected to the road system, the only modes of transportation connecting us, to one another and the rest of the state, are via air, water or ice roads (in winter). All modes are frequently interrupted by weather conditions. This makes it difficult to access what limited treatment options are available.

At our last two annual conventions, our member Tribes have collectively identified public safety and community wellness as two of their top three priorities for the Region. Both of these priorities are negatively impacted by the opioid crisis. Our leaders struggle to understand how opioids are so accessible to our youth; which resources are available; and where to turn for help.

AVCP has responded to this crisis through our Healthy Families Program which promotes and supports whole health through the sharing, teaching, and practice of our traditional values through *Elluarluteng Illakutellriit* - a framework illustrating the Yup'ik life cycle of traditional practices, values, and beliefs from our Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently. Currently, this program is limited to our regional "hub community," and whenever possible, Elders and facilitators travel to communities with even greater transportation challenges, by invitation. We need more resources to make Healthy Families available as a permanent fixture in each of our communities.

Another way AVCP is responding to this crisis is by advocating for public safety resources for our villages. AVCP operates the Village Public Safety Officer (VPSO) Program, where we receive funding from the State of Alaska to provide 9-10 VPSOs for an area the size of the State of New York. Villages without VPSOs struggle to hire their own Tribal Police Officers or Village Police Officers with funds cobbled together from donations, limited grant funds, and

---

[1] "Health Impacts of Opioid Misuse in Alaska" State of Alaska Epidemiology Bulletin, August 8, 2018.

bingo proceeds. AVCP works to stretch limited funds to recruit and retain law enforcement professionals and help Tribes find funding sources for other law enforcement options, public safety buildings, holding cells, etc.

**Statement of Interest:  The Confederated Tribes of the Warm Springs Reservation of Oregon**

The Confederated Tribes of the Warm Springs Reservation of Oregon ("Tribe") is a federally recognized, self-governing, sovereign Indian Tribe. The Tribe consists of three Indian tribal bands: the Warm Springs, the Wasco and the Paiute.  The Tribe has the inherent sovereign authority to make its own laws and to provide for the welfare of its members.

The Tribe has approximately 5,300 members.  Most Tribal members reside on the Reservation. The Tribe has significant levels of unemployment exceeding thirty percent (30%) and high rates of poverty. The Tribe is confronted with substantial social challenges associated with such unemployment and poverty, including, without limitation, diminished life expectancy, poor health indicators, low high school graduation rates, crime, and drug use.

The pervasiveness of opioids has caused significant damage to the social and cultural fabric of the Tribe and has created and exacerbated an urgent health crisis on the Reservation. The health crisis affects tribal members of all ages, from those yet unborn to our elderly and threatens the cultural sustainability of the Warm Springs Tribe. Families watch helplessly as addicts are not able to overcome their addiction. Elders are among the most valued members in the community, but they have become a target for abuse and manipulation by addicts wanting to obtain their drugs or obtain other resources with which to acquire drugs.

The true extent of the effects of the opioid crisis on the Tribe's members has yet to be seen.  The Tribe is dedicated to slowing down and addressing the havoc caused by opioid abuse and addiction. To combat the effects of the opioid crisis, the Tribe must undertake investigations into how to address the complex problem as well as develop treatment and prevention strategies culturally appropriate for the Tribe's members.  In a time of limited resources, combatting the opioid crisis has placed great strain on the Tribe and its members.

## Statement of Interest:  The Klamath Tribes

The Klamath Tribes are a federally recognized Indian Tribe that has been located in the area of South Central Oregon since time immemorial.  We currently have over 5,000 enrolled tribal members.  The Tribes contract with the Indian Health Service to provide direct health care services to eligible Native Americans and Alaska Natives within the Tribes' Service Area of Klamath County.  Direct health care services include medical, dental, pharmacy, and behavioral health.

Our patients have long experienced lower health status, lower life expectancy and disproportionate disease burden with chronic pain being a major problem. The opioid manufacturers and distributors misled physicians by spreading the notion that these substances were not addictive while using them to treat pain. Through no fault of their own, patients became physiologically addicted. IHS opioid procurement data show that we were highest in opioid prescribing compared to other IHS Portland Area sites in 2016-2017. For the same period, our data shows we had over 640 out of 3000 patients on opioids. Many of our patients have developed an opioid use disorder (OUD).  We have seen an increase in child abuse and neglect cases, with 80 of our children in open state child welfare cases.  In addition, we have seen an increase in opioid-related suicide and homicide rates in our community. Due to lack of resources, law enforcement is often unable to respond to calls for several hours.

Without resources it is difficult to address this opioid epidemic. Our short-term plans are to:

1. Train our primary care providers for substance abuse certification and implement Medication-Assisted Treatment (MAT).
2. Integrate a Master's Level Therapist into our primary care provider teams.
3. Provide training/education for our Tribal Government, employees and Tribal community.
4. Improve our internal prescribing guidelines and pain management agreements.
5. Provide opportunity for alternative treatments such as Behavioral Health treatment, physical therapy, chiropractic, acupuncture, massage, and meditation/mindfulness.

**Statement of Interest: Tonto Apache Tribe**

The Tonto Apache Tribe is located adjacent to Payson, Arizona (in Apache: Te-go-suk - "Place of the Yellow Water" or "Place of the Yellow Land") in ancestral territory of one of the principal Dilzhe'e Apache clans - the "People of the Yellow Speckled Water," was created in 1972 within the Tonto National Forest northeast of Phoenix. As Tonto Apache people, we are the direct descendants of the *Dilzhe'e Apache* who lived in the Payson vicinity long before the arrival of Europeans.

Today, our Reservation consists of 85 acres (344,000 m²) and is governed by the Tonto Apache Tribal Council, as defined and described pursuant to our Tribal Constitution and law. We are a young Tribe, with roughly 33 percent of all members under 18 years of age. The median age for the community is 26.7, compared to a median age of 35.9 for the State of Arizona. Our Tribe is made up of diverse households and we service 140 enrolled tribal members, of which, approximately 102 members live on the reservation.

The opioid crisis has affected many of our Tribal members and the surrounding communities with its destructive effects. Among our small Tribe, we have lost tribal members to opioid addiction and many others have been and still are affected by this crisis.

We are dedicated to helping our members and the surrounding communities overcome addiction and educate our future generations about the dangers of prescription opioids and its direct effects on our families and our communities. Most recently, we began organizing a community-based approach to dealing with addiction and recovery, but we lack the resources and funding to adequately provide services within our Community.

**Statement of Interest: Torres Martinez Desert Cahuilla Indians**

The Torres Martinez Desert Cahuilla Indians is a federally recognized Indian Tribe located in the Coachella Valley at the northern end of the Salton Sea in Southern California. The Torres Martinez Indian Reservation was established by Executive Order on May 15, 1876 and now comprises about 24,000 acres (much of which is located under the Salton Sea). The Tribe has almost 900 members with about 140 members living on the Reservation.

The Tribe is governed by a General Council consisting of adult members. The day-to-day operations are handled by an elected Tribal Council. The Tribe provides governmental services to its members and the surrounding community, including social services, TANF, ICWA, housing, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has impacted the Tribe. For example, the Tribe has an Indian Health Service clinic on the Reservation that has had to divert dollars to provide outpatient substance abuse treatment for members. The clinic offers referrals for inpatient substance abuse treatment offsite. The Tribe has also had to use its own dollars to supplement the cost of child protective services and tribal court in part because of the opioid epidemic.

The Tribe is focused on providing culturally appropriate treatment to its members suffering from the opioid crisis. The Tribe is also dedicated to helping families impacted by the crisis through TANF, ICWA, housing assistance, and job training. The Tribe needs more funds to help its people deal with this opioid epidemic.

## Statement of Interest: Tulalip Tribes

The Tulalip Tribes are the successors in interest to the Snohomish, Snoqualmie, Skykomish, and associated dependent Tribes and bands signatory to the 1855 Treaty of Point Elliott with the United States government. The Tulalip Tribes' reservation is located in Snohomish County, Washington. The Tulalip exercise inherent sovereign authority over their 22,000-acre reservation and over 4,800 enrolled tribal members, approximately 2,600 of whom reside on the reservation. The total population on the reservation is 10,631. Tulalip provides comprehensive services to its community and enrolled members, including healthcare, behavioral health, child welfare intervention and case management, housing, and public safety services including a police department and tribal court system.

Located along the I-5 corridor north of Seattle, the Tulalip reservation community has been severely and disproportionately impacted by the ongoing opioid crisis. Tulalip has been devastated by multiple deaths caused by opioid addiction and overdose. The opioid crisis has deprived Tulalip children of parents. Tulalip families have suffered the untimely loss of loved ones. The increasing need for emergency response to overdoses, both fatal and non-fatal, has taken a heavy toll on first responders and on the Tribes' resources. The Tulalip Tribes and its members have suffered increases in criminal activity and homelessness related to drugs.

In response to this crisis, Tulalip has been forced to redirect scarce resources to emergency and police response, drug treatment programs, a Suboxone program, child welfare case management, criminal law enforcement and court proceedings, jail costs, and health and wellness care. In 2015, recognizing the need for intensive treatment to limit the harm from addiction, the Tulalip opened the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. Despite tremendous efforts and resources expended, Tulalip continues to suffer daily from the scourge of the opioid epidemic and its attendant societal ills.

**Statement of Interest: Turtle Mountain Band of Chippewa Indians**

The Turtle Mountain Band of Chippewa Indians ("TMBCI") is a federally recognized sovereign Indian nation. The main Turtle Mountain Reservation is located primarily in Rolette County, North Dakota. The TMBCI makes up the majority of the population in Rolette County. The TMBCI also has lands throughout North Dakota, Montana, and South Dakota. There are approximately 34,000 enrolled members, and about 18,300 live on the reservation, or on off-reservation trust land. Unemployment on the Reservation is estimated to be at 59.45 % according to the 2016 Bureau of Indian Affairs (BIA) Labor Force Statistics. According to the 2010 Census, over 40% of TMBCI families were living below the poverty level, and 882 households were headed by single mothers struggling to raise 1,392 children under the age of 18. It is an understatement to say that TMBCI has limited resources with which to fight the opioid epidemic.

In 2016, Rolette County had an opioid overdose death rate of 22 per 100,000, which is a substantially higher rate than any other county in North Dakota, except for one. High rates of opioid use within TMBCI have put extraordinary demands on many services provided by the TMBCI, including: health service; health insurance coverage (which the Tribe provides and self-funds); policing; child protective services; tribal courts; substance abuse treatment center; domestic violence shelter; and burial benefits. As a result of the opioid epidemic there has been an increased demand for prosecutor services, as about 75% of the Tribe's prosecutions are drug-related. Drug incarceration has left hundreds of children in foster care, to the point where foster care numbers have doubled in the past eight years.

To combat the opioid epidemic, the TMBCI needs access to Medication Assisted treatment in its own community which will integrate its cultural values into the treatment. Right now, the only available Medication Assisted Treatment is forty miles away. Additionally, the Tribe needs additional funding for the purchase of and training on Naloxone, and the hiring of additional child protection and court staff. Finally, additional resources to help educate, prevent, and treat the opioid epidemic, including reeducating medical staff, is necessary to help stop the epidemic.

**Statement of Interest: United South and Eastern Tribes, Inc.**

United South and Eastern Tribes, Inc. (USET) was incorporated in 1969. The vision of USET's founding Tribal Nations was to build strength by working together in unity to ensure that there was a strong voice for Tribal Nations in the south and eastern regions of the United States. USET's "Because there is Strength in Unity" motto continues to be the foundation of its efforts. Today, USET is an intertribal organization comprised of twenty-seven federally recognized Tribal Nations, ranging from Maine to Florida to Texas.[1] USET is dedicated to enhancing the development of federally recognized Tribal Nations, to improving the capabilities of Tribal governments, and assisting USET Member Tribal Nations in dealing effectively with public policy issues and in serving the broad needs of Indian people.

Based on reports from Tribal/IHS health facilities within the USET region, our Tribal Epidemiology Center (TEC), and law enforcement agencies, USET suspects that rates of opioid overdose among our member Tribal Nations are likely much higher than national statistics and current data reveal. For the last 12 years, USET's TEC has been conducting a mortality analysis, and now has a limited amount of data that speaks to opioid abuse among our member Tribal Nations. From that data, we learned that 9% of all deaths among USET Tribal Nations were related to substance abuse between 2002 and 2012. Almost one in five substance use deaths were attributable to opioids, including heroin, and 93% of opioid deaths were prescription drug-related.

Comprehensively addressing the opioid epidemic is a major priority for USET, including addressing the lack of resources, inadequate data, historical trauma, and other issues Tribal communities face. Despite the disproportionate impact the opioid epidemic has had within Tribal communities, Tribal Nations are frequently left out of the conversation.  It is critical that Tribal Nations are fully included and considered in seeking to treat and prevent opioid addiction in our communities.

---

[1] USET member Tribal Nations include: Alabama-Coushatta Tribe of Texas (TX), Aroostook Band of Micmac Indians (ME), Catawba Indian Nation (SC), Cayuga Nation (NY), Chitimacha Tribe of Louisiana (LA), Coushatta Tribe of Louisiana (LA), Eastern Band of Cherokee Indians (NC), Houlton Band of Maliseet Indians (ME), Jena Band of Choctaw Indians (LA), Mashantucket Pequot Indian Tribe (CT), Mashpee Wampanoag Tribe (MA), Miccosukee Tribe of Indians of Florida (FL), Mississippi Band of Choctaw Indians (MS), Mohegan Tribe of Indians of Connecticut (CT), Narragansett Indian Tribe (RI), Oneida Indian Nation (NY), Pamunkey Indian Tribe (VA), Passamaquoddy Tribe at Indian Township (ME), Passamaquoddy Tribe at Pleasant Point (ME), Penobscot Indian Nation (ME), Poarch Band of Creek Indians (AL), Saint Regis Mohawk Tribe (NY), Seminole Tribe of Florida (FL), Seneca Nation of Indians (NY), Shinnecock Indian Nation (NY), Tunica-Biloxi Tribe of Louisiana (LA), and the Wampanoag Tribe of Gay Head (Aquinnah) (MA).

**Statement of Interest: Upper Sioux Community**

The Upper Sioux Community is a federally recognized Indian nation located in southwest Minnesota near Granite Falls, Minnesota. The Community's 517 members live on or near the Community's reservation. As a tribal government exercising its retained rights of self-government and self-determination, the Community provides direct governmental services to its members and the surrounding community including social services, housing, economic development, cultural resource management and development, police protection, and employment. Through the tribal government and the Community's various economic enterprises, the Community employs 435 people. All Community members and tribal employees are offered medical and dental benefits by the Community. The Community's medical and dental plans are self-funded.

The opioid crisis has impacted the Community and its surrounding neighbors in a countless number of ways. Each family that comprises the Community's membership has experienced the tragedy of opioid addiction in some form or another. Opioid addiction has resulted in lost jobs, incarceration, broken families, and the loss of life of Community members. The crisis is straining nearly every governmental and cultural service the Community provides including the Community's continuing ability to provide full medical coverage to its members and employees. The Community, among other negative impacts caused by opioid addiction, has been forced to divert scarce resources away from existing priorities to provide additional training and resources to the Community's social service, housing and police departments.

The Upper Sioux Community is focused on providing culturally appropriate treatment to our members and employees suffering from the opioid crisis. The Community, along with the other three Dakota communities located in the State of Minnesota, are working collectively to construct, manage and fund a tribally based treatment center to combat the ravages of opioid and other chemical addictions. The treatment facility and treatment curriculum being developed by the four Dakota communities in the State of Minnesota will help combat opioid addiction; however, a treatment center will not eliminate the past, present, and future costs, expenses, and damages caused by the opioid crisis.

**Statement of Interest: Viejas Band of Kumeyaay Indians**

The Viejas Band of Kumeyaay Indians is located in the hills east of San Diego, in a region that has been inhabited for at least the last 12,000 years. The Viejas Band's 1600-acre reservation is home to about two-thirds of the Tribe's members. The Viejas Band has been a self-governing Tribe for decades, providing governmental services to its members and the reservation community, including health insurance and specialized behavioral health resources, social services, public safety, economic development, natural resource management, culture and language resources, and jobs.

The opioid crisis has been a pox on our community, impacting every family. The Viejas Band has lost members—sons and daughters, mothers and fathers, brothers and sisters—to addiction and death. The crisis has also brought drug-related crime to the reservation, further destabilizing public order and well-being on our reservation. The Viejas Band has been forced to divert scarce resources away from other tribal needs to staff new positions focused on addressing the opioid crisis, including substance abuse counselors and physicians to facilitate addiction and recovery treatment. The crisis is straining nearly every governmental and cultural service available to the breaking point.

The Viejas Band's tribal government is focused on combating the opioid crisis by providing culturally appropriate treatment to members suffering from opioid addictions, including in-patient treatment, out-patient wellness activities, talking circles, and group therapy. Unfortunately, the onslaught of the opioid crisis is relentless. The Viejas Band's efforts can only hope to slow—but cannot by themselves stop or reverse—the impact of the opioid crisis in our community because only drug manufacturers and distributors can stop to the production of these drugs and their distribution into our community.

**Statement of Interest: Walker River Paiute Tribe**

The Walker River Paiute Tribe, located within the boundaries of Nevada, strives to maintain their Agai Dicutta heritage while carrying it into the future. The Tribe is dedicated and committed to advocating and protecting tribal sovereignty. The Walker River Tribe holds that it will foster the ideal of community, self-determination, and self-sufficiency for its present members and future members.

The Walker River Tribe maintains a tribal health clinic with the stated purpose of providing the highest level of comprehensive ambulatory and community health care to its members. To combat the spreading effects of the opioid crisis in the Tribe's community, the Walker River Tribe has created outreach programs such as substance abuse counseling and educational activities. While the Tribe believes in self-sufficiency, these critical programs drain the resources from the other programs that the Tribe has created. In these trying times, the struggle for resources is at a breaking point. The only hope to maintain the lifestyle and culture of the Walker River Tribe is a successful resolution of the opioid crisis.

**Statement of Interest: Winnebago Tribe of the Winnebago Reservation in the State of Nebraska**

The Winnebago Tribe traces its proud history to 500 BC in the central part of North America. Breached treaties cost the Tribe most of its land, and left its people impoverished. After a hundred years of battle, the Tribe prevailed in a multimillion-dollar lawsuit against the federal government for taking its land. Today, the Winnebago Tribe owns Ho-Chunk, Inc. its economic development corporation. Established in 1994 in Winnebago, Nebraska with one employee, Ho-Chunk, Inc. has grown to over 1,000 employees with operations in 24 states and 10 foreign countries.

In 2017, the Winnebago people completed major renewable energy projects, helping create one of the largest infrastructures in Nebraska. The Tribe launched a new food sovereignty initiative in 2017 in partnership with the Ho-Chunk Community Development Corp. Early stages include a planned raised bed gardening project and proposed farmers market location. The initiative goals include access to healthy foods and promotion of wellness.

In 2018, the Tribe took control of the former IHS Reservation Hospital to assure improved services and increased controls to curb addictions. Opioids are a curse of the Winnebago people, and all people during this time of abuse and crisis. Employment is the chief tool against addictions. Resources are strained and funds diverted to evils of addictions. Efforts to improve the Hospital, healthcare, and health education are high priorities.

**Statement of Interest: Yavapai-Apache Nation, Camp Verde Arizona**

The Yavapai-Apache Nation is located in the Verde Valley of central Arizona on the Camp Verde Indian Reservation.  The Nation's 1850-acre reservation is home to about 800 of the Nation's 2,500 enrolled members. The Nation has exercised sovereignty and self-government over its lands since before the founding of the United States and has operated under a constitution since 1937. The Nation provides many essential governmental services to our citizens, including primary and behavioral health services, social services, housing, law enforcement, education, economic development, natural resource management, culture and language resources, and employment.

The national opioid crisis has impacted our small community, affecting every family either directly or indirectly. Many of our families have lost someone to addiction, and sometimes death. The crisis has placed added strains on the already struggling governmental and cultural service programs we provide. Our limited financial resources have been diverted to address the opioid crisis, including providing substance abuse counselors, training for medical professionals, court programs aimed at addressing substance abuse, and increased law enforcement responses to addiction related events. We have had to purchase Narcan and train our law enforcement, and other tribal officials and members to use it.  Drug-related evictions are increasing, putting families and children further at risk.

Our Nation is working to provide culturally appropriate treatment for our members suffering from the opioid crisis, including wellness activities, and group therapy. We are taking steps to develop a comprehensive response to the crisis through our tribal government and coordination of the various resources within our communities. We are learning in the midst of an unfolding crisis how to deal with the problem. Unfortunately, the drugs continue to find their way into our community from surrounding areas and there is no clear end in sight.

## Statement of Interest: Yukon-Kuskokwim Health Corporation

The Yukon-Kuskokwim Health Corporation ("YKHC") is an intertribal consortium established, controlled, and sanctioned by 58 federally recognized Tribes located in and around the confluence of the Yukon and Kuskokwim Rivers in southwest Alaska, known as the Yukon-Kuskokwim Delta.  YKHC's region covers approximately 75,000 square miles, and is a roadless area roughly the size of South Dakota.  The overwhelming majority of the region's 30,000 inhabitants are Yupik , Cupik and Athabascan.  YKHC administers a comprehensive health care delivery system which includes a central regional hospital in Bethel, five sub-regional clinics and a number of community clinics in villages throughout the region. Through this network, YKHC provides a wide array of inpatient and outpatient medical services, dental care, behavioral health counseling and treatment, and environmental health services.

The opioid crisis has hit YKHC's region with increasing fervor in recent years, taking a devastating toll on our communities and straining YKHC's ability to adequately address this growing problem.  As opioids and related drugs seep into our communities, we have seen the full range of health and public safety impacts stemming from abuse and addiction, including deaths from opioid overdoses.  Sadly, no child is too young to feel the effects of this crisis, as we have also begun seeing babies born with neonatal abstinence syndrome (NAS) after becoming addicted to opioids *in utero*.

YKHC is attempting to combat the crisis to the extent possible, though the epidemic continues to grow.  YKHC provides both inpatient treatment and outpatient counseling for people suffering from addiction, along with other types of behavioral health support.  Unfortunately, devoting resources to fight the opioid epidemic necessarily means diverting funds and effort away from the other pressing health needs of the people we serve.  Vastly more resources will be needed if we are to stem the rising tide of opioid addiction and all the challenges it brings.

**Statement of Interest: Yurok Tribe**

The Yurok Tribe has been located in remote northern California since time immemorial. It is the largest Tribe in California, with over 6,200 enrolled members. Its current reservation occupies one mile on each side of the Klamath River from the Pacific Ocean upstream for about 45 miles. This location reflects the Tribe's cultural identity as a river people and includes approximately 55,000 acres in two counties.

After millennia of traditional governance, the Tribe adopted a written Constitution in 1993. The Tribe has quickly built itself up as a self-governing Tribe with the help of grants and similar funds, providing direct governmental services to its members and the surrounding community, including social services, housing, natural resource management, culture and language resources, education, law enforcement, tribal courts, and economic development. The Tribe is one of the largest employers in the region.

The opioid crisis has ravaged our community, impacting every family. Our Tribe continues to lose numerous relatives to addiction and death, forcing the diversion of scarce resources away from existing priorities to address the opioid crisis. Drug-related evictions, child welfare cases, and job terminations are on the rise, leaving families and children in crisis. The tidal wave of opioids is the latest step in the assault against this tribal community. To these invaders, our ancestral land is merely a place to exploit our citizens for financial benefit. As the decades have passed, the results are the same--our deaths and their profits.

The Yurok Tribe is once again locked in a battle to survive. Residents in Humboldt County die from drug poisoning at more than double the national rate, with Native Americans largely responsible for that troubling statistic.

The Tribe is focused on providing culturally appropriate treatment to our members suffering from the opioid crisis, including traditional ceremony, cultural revitalization, collaboration with all medical providers, and other wellness work. It is prepared to build an infrastructure that will allow our people to regain all aspects of their health and welfare. Unfortunately, it is without the resources to staunch the flow of the crisis, as drugs and the effects of the opioid crisis continue to destroy our community.