# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**SUMMIT COUNTY, OHIO AND THE CITY OF AKRON, OHIO
FIRST AMENDED RESPONSES AND OBJECTIONS TO
<u>MANUFACTURER DEFENDANTS' FIRST SET OF INTERROGATORIES</u>**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Case

Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt No.

232), the County of Summit, Ohio and the City of Akron, Ohio (collectively "Plaintiff") hereby

respond to the Manufacturer Defendants'[1] First Set of Interrogatories (the "Interrogatories" and,

each individually, an "Interrogatory"), as follows:

---

[1] The Manufacturer Defendants are Endo Pharmaceuticals Inc.; Endo Health Solutions Inc.; Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Insys Therapeutics, Inc.

## **OBJECTIONS**

The following objections apply to each Interrogatory. To the extent that certain specific objections are cited in response to an individual Interrogatory, those specific objections are provided because they are applicable to that specific Interrogatory and are not a waiver of the other objections applicable to information falling within the scope of such Interrogatory.

1.      Plaintiff objects to each Interrogatory to the extent they are overly broad, vague, unduly burdensome, seek information that is not relevant to any party's claim or defense, or seek to impose obligations or require actions beyond those required by the Rules of Civil Procedure, the ESI Protocol entered in this matter or the Local Rules of the United States District Court of the Northern District of Ohio.

2.      Plaintiff objects to each Interrogatory to the extent they seek information restricted from dissemination pursuant to court order, statute, or regulation. Further, any response made by Plaintiff to the Interrogatories is not intended to waive, and does not constitute any waiver of, any objection to the admissibility, authenticity, competency or relevance of the information produced or identified.

3.      These responses are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained or document provided herein. All such objections and the grounds therefore are hereby reserved.

4.      No admission of any nature whatsoever is to be implied or inferred in these responses. The fact that any of the Interrogatories herein may have been answered should not be taken as an admission or a concession of the existence of any facts set forth or assumed by the Interrogatories, or that such answer constitutes evidence of any fact thus set forth or assumed.

5.      Plaintiff objects to each Interrogatory to the extent Plaintiff has not yet completed its investigation of the facts relating to this action and has not yet completed its preparation for

trial. Accordingly, these responses are necessarily limited in nature, and reflect only that information known to Plaintiff at this time.

6.     Plaintiff objects to each Interrogatory to the extent they purport to require Plaintiff to disclose information or produce documents that are in the public domain or otherwise available to Manufacturer Defendants as easily from other sources as from Plaintiff, and thus would impose an undue cost and burden on Plaintiff to collect such information.

7.     Plaintiff objects to each Interrogatory to the extent they purport to state facts, assumptions, or characterizations that are disputed.

8.     Plaintiff objects to each Interrogatory to the extent they seek information more appropriately obtained through other methods of discovery.

9.     Plaintiff objects to each Interrogatory to the extent that they seek information that is proprietary or confidential or that is protected from discovery as attorney work product or attorney-client communication, information gathered or prepared in anticipation of litigation, the public interest privilege, law enforcement privilege, public official privilege, and/or by any other privilege or immunity from disclosure (collectively, "Privileged Information").

10.     Plaintiff objects to each Interrogatory to the extent they seek confidential investigative, personal, or health information in Plaintiff's possession, custody, or control (collectively, "Confidential Information").

11.     Whenever in the responses Plaintiff employs the phrase "subject to and without waiving all objections," Plaintiff is responding to the Interrogatory as it may be narrowed by its general and specific objections and without waiver of any objection.

12.     Any response stating that Plaintiff will produce documents shall be deemed followed by the phrase "as are within Plaintiff's possession, custody, or control."

13.     Plaintiff objects to each Interrogatory to the extent that they imply the existence of facts or circumstances that do not or did not exist, and to the extent that it states or assumes legal

conclusions.  In providing these objections and responses, Plaintiff does not admit the factual or legal premise of any Interrogatory.

14.     Plaintiff's lack of objection to any specific Interrogatory is not an admission that Plaintiff has possession, custody or control over any such information; and any statement by Plaintiff that it will search for or produce documents does not mean that Plaintiff has possession, custody or control of any responsive document, or that any such documents exist.

15.     Plaintiff objects to each Interrogatory to the extent they seek information that is not within Plaintiff's possession, custody, or control, seek documents that do not already exist, or which purport to require a response by Plaintiff on behalf of an entity or individual other than Plaintiff.

16.     Plaintiff intends to complete its responses by the time agreed upon by the parties for the completion of discovery, or by the date ordered by the Court. Upon request by the requesting party, Plaintiff is willing to meet and confer regarding its responses to the Interrogatories. All final decisions regarding whether any information will be withheld pursuant to any objection shall be made, and notice thereof provided, before the completion of written discovery.

17.     Plaintiff objects to the Manufacturer Defendants' instruction that: "Each Plaintiff must individually respond to each of these Interrogatories."  No federal rule prevents Plaintiff from submitting collective answers to Manufacturer Defendants' collective Interrogatories. Where the responses and objections to these Interrogatories are the same for each Plaintiff, a collective response herein will in no way prejudice Defendants.  In each instance where the answers are not the same for each Plaintiff, any differences have been set forth herein with particularity.

## NON-WAIVER

1.      Plaintiff's responses are made without waiving its right to object (on the grounds of relevancy, hearsay, materiality, competency or any other ground) to the use of its responses in any subsequent stage or proceeding in this action or any other action.

2.      If Plaintiff, in response to any Interrogatory, inadvertently discloses information that is or could be the subject of the objections stated herein, such disclosure is not intended to be, nor is it deemed to be, a waiver of the objections with respect to such information disclosed.

3.      Plaintiff's failure to object to a specific Interrogatory on a particular ground or grounds shall not be construed as a waiver of its rights to object on any additional grounds.

4.      Plaintiff responds herein based upon information it has been reasonably able to gather at the time of making these responses.  Plaintiff reserves its right to amend and/or to supplement its objections and responses to the Interrogatories, consistent with further investigation and discovery.

## SPECIFIC RESPONSES AND OBJECTIONS

### INTERROGATORY NO. 1:

Identify each and every doctor or other healthcare provider who Plaintiff alleges participated in "speaker programs" or "speakers' bureaus" on behalf of or in relation to any Defendant, as alleged in Plaintiff's Complaint. For each identified doctor or other healthcare provider, please also identify in the response the events or programs that Plaintiff alleges the doctor or other healthcare provider attended or spoke at and identify the amount of payment allegedly provided by each Defendant.

### PLAINTIFFS' RESPONSE:

Plaintiff objects to this Interrogatory as vague, overly broad and unduly burdensome to the extent it requests "each and every" doctor or healthcare provider who "participated" in "speaker programs" or "speakers' bureaus".  Further objecting, Plaintiff objects to this Interrogatory as

overly broad and also to the extent it seeks information that is in Defendants' possession or publicly available, and thus seeks to impose an undue burden and unnecessary expense on Plaintiff.  Each Defendant has, or should have, records that identify each and every doctor or other healthcare provider who participated in "speaker programs" or "speakers' bureaus" on behalf of or in relation to the subject Defendant.  Therefore, Defendants have far superior access to this information which is also the subject of Plaintiff's discovery in this case.  Notwithstanding and without waiving this objection, Plaintiff will conduct a reasonable and diligent search for and, if such information is in Plaintiff's possession, custody, or control, will produce documents that identify doctors and healthcare providers wo participated in "speaker programs" or "speakers' bureaus".  Subject to and without waiving objections, Plaintiff responds:

| Name | Title | Event Description | Payment |
|---|---|---|---|
| J. David Haddox | Doctor, Committee Chair of AAPM | A "consensus" statement issued in 1997 endorsing opioids to treat chronic pain and claiming the addiction risk to patients was low. | Unknown at this time |
| Russel Portenoy | Doctor, Chairman of the Department of Pain Medicine and Palliative Case at Beth Israel Medical Center in New York, Consultant to AAPM, spokesperson for Purdue | A "consensus" statement issued in 1997 endorsing opioids to treat chronic pain and claiming the addiction risk to patients was low. | Unknown at this time |
| Lynn Webster | Doctor, co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah, spokesperson for Cephalon, Endo and Purdue | Numerous Continuing Medical Education ("CME") programs | Over $2 million |

| Name | Title | Event Description | Payment |
|------|-------|-------------------|---------|
| Perry Fine | Doctor, co-chair of APS/AAPM Opioid Guideline Panel, spokesperson for Endo and Johnson & Johnson | Numerous CMEs for Endo and promotional talks for Johnson & Johnson | $32,017 from Johnson & Johnson |
| Scott Fishman | Doctor, served as a board member of APF and president of AAPM | Participated in numerous CMEs | Unknown at this time |
| Steven Simon | Doctor at Mid-America Physiatrists in Overland Park, Kansas | Wrote prescriptions for Subsys and Fentanyl and was a designated paid "speaker" for Insys | > $200,000 from August 2013 to December 2015 |
| Robert Yapundich | Neurologist in Hickory, NC | Board member of the Alliance for Patient Access and paid "speaker" | > $300,000 from 2013 to 2016 |
| Howard Hoffberg | Doctor at Rosen-Hoffberg Rehabilitation and Pain Management Associates in Townson, Maryland | Wrote prescriptions for opioids and received "speaker" fees from Insys, Purdue and Teva | > $175,000 from 2013 to 2016 |
| Heather Alfonso | Nurse practitioner in Connecticut | Wrote prescriptions for Subsys in exchange for "speaker" fees from Insys. | $83,000 |
| Jerrold Rosenberg | Doctor in Rhode Island | Wrote prescriptions for Subsys in exchange for "speaker" fees from Insys | > $188,000 |
| Gordon Freedman | Doctor in New York, New York | Wrote prescriptions for Fentanyl in exchange for "speaker" fees from Insys | > $100,000 annually |
| Jeffrey Goldstein | Doctor in New Rochelle, New York | Wrote prescriptions for Fentanyl in exchange for "speaker" fees from Insys | > $100,000 annually |
| Todd Schlifstein | Doctor in New York, New York | Wrote prescriptions for Fentanyl in exchange for | > $100,000 annually |

| Name | Title | Event Description | Payment |
|------|-------|-------------------|---------|
|  |  | "speaker" fees from Insys |  |
| Dialecti Voudouris | Doctor in New York, New York | Wrote prescriptions for Fentanyl in exchange for "speaker" fees from Insys | > $100,000 annually |
| Alexandru Burducea | Doctor in Little Neck, New York | Wrote prescriptions for Fentanyl in exchange for "speaker" fees from Insys | > $100,000 annually |
| Michael Frey | Doctor in Florida | Wrote prescriptions for Subsys in exchange for "speaker" fees from Insys | Unknown at this time |
| Jeffrey Kesten | Doctor in Boulder, Colorado | Wrote prescriptions for Subsys in exchange for "speaker" fees from Insys | $294,000 |
| Gordon Freedman | Doctor in White Plains, New York | Wrote prescriptions for Subsys in exchange for "speaker" fees from Insys | $283,000 |

In addition, Plaintiff identifies the following:

- Physicians identified by Insys Therapeutics, Inc. as having received compensation from Insys "for speaking about, endorsing or promoting SUBSYS in the State of Ohio." (*See* Insys Therapeutics, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories);

- Physicians identified by Janssen Pharmaceuticals, Inc., its predecessor companies Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceutica, Inc., and its parent company Johnson & Johnson as having received compensation "for Nucynta IR and Nucynta ER speaker programs." (*See* Janssen Pharmaceuticals, Inc.'s Responses and Objections to Plaintiff's First Set of Interrogatories); and

8

- Physicians identified through ProPublica as payments publically disclosed in Ohio from August 2013 until December 2015.[2]

Plaintiff reserves the right to supplement or modify this list as discovery proceeds.

**INTERROGATORY NO. 2:**

Identify each entity or natural person, including without limitation healthcare providers, patients, addiction treatment specialists, alleged key opinion leaders (as that term is used throughout the Complaint), alleged front groups, or any other third party, from whom Plaintiff received or attempted to obtain documents, testimony, sworn affidavits, or any other form of information in connection with Plaintiff's investigation of any Defendant's advertising or marketing of opioids, or otherwise in connection with this litigation, and include in the response identification of all information sought or received from each entity or natural person.

**PLAINTIFF'S RESPONSE:**

Plaintiff objects to this Interrogatory as overly broad, vague and ambiguous in that it fails to adequately or specifically define the term "entity or natural person" from whom each Plaintiff received information, and Plaintiff therefore will construe the term to exclude entities and natural persons who are part of the subject Plaintiff's governmental structure.  Plaintiff also objects to this Interrogatory on the grounds that it calls for production of information subject to the work-product doctrine, especially to the extent the Interrogatory seeks the identification of entities and natural persons from whom Plaintiff "attempted" to obtain information in furtherance of Plaintiff's "investigation."   Disclosure of such information necessarily would reveal Plaintiff's and its counsel's mental impressions and legal strategies formed in anticipation of this litigation, and is therefore objectionable.  Lastly, discovery continues and Plaintiff will produce a trial witness list and expert reports pursuant to CMO No. 1 and the Federal Rules of Civil Procedure.

---

[2] This document will be Bates labeled and produced to Defendants.

Notwithstanding and without waiving all objections, Plaintiff responds:

| Name | Title | General description |
|------|-------|---------------------|
| Dr. William Reed | Doctor | Visited by drug reps:  Nucynta, Purdue, Actiq, Opana, Kadian |
| Dr. William Lonsdorf | Doctor | Visited by Purdue, Opana, Nucynta, |
| Dr. Kendrick Bashor | Doctor | Visited by drug reps:  Purdue |
| Dr. Michael Louwers | Doctor | Visited by drug reps:  Purdue, Xtampza, Nucynta, Actiq/Fentora |
| Dr. Syed Ali | Doctor | Visited by drug reps:  Purdue, Xtampza, Nucynta-Janssen/Depomed, Teva, Subsys, Endo, Cephalon, Xalgo, Kadian, Insys |
| Dr. Clayton Seiple | Doctor | Visited by drug reps:  Purdue.  Was a speaker for Endo, Depomed (Nucynta) |
| Bernie Rochford | Executive Vice President of Administrative Services and Business Relations, Oriana House | Treatment center for those suffering from OUD, knowledgeable on trends, prevalence and impact of opioids |
| Galen Sievert | Clinical Supervisor, Mature Services | Treatment center for those suffering from OUD, knowledgeable on trends, prevalence and impact of opioids |
| Laura Kidd | Behavioral Health Clinical Coordinator, AxessPointe Community Health Center at Arlington | Treatment center for those suffering from OUD, knowledgeable on trends, prevalence and impact of opioids |
| James Orlando | President of Summit Psychological Associates | Treatment center for those suffering from OUD, knowledgeable on trends, prevalence and impact of opioids |
| Brittney Becker | Doctor, Community Health Center | Treatment center for those suffering from OUD, knowledgeable on trends, prevalence and impact of opioids |
| Michael M. Huges | President, Summa Health System, Barberton Campus | Illnesses related to opioid use |
| Joseph P. Myers | Doctor, Vice President of Medical Affairs, Summa Barberton and Summa Wadsworth-Rittman Hospitals | Illnesses related to opioid use |
| Roslyn Greene | Family member | Personal loss |
| Charlene Maxen | Pediatric oncologist nurse, Akron Children's Hospital | Personal loss |
| Travis Bornstein | Family member | Personal loss |

Plaintiff also refers Defendants to its responses to Interrogatory No 5.  Plaintiff reserves the right to supplement or modify this list as discovery proceeds.

**INTERROGATORY NO. 3:**

Identify any doctors, addiction treatment specialists, healthcare providers, and law enforcement and public health officials who Plaintiff contends agree with the proposition that prescription opioids have caused or contributed to the opioid epidemic (as that term is used throughout the Complaint).

**PLAINTIFF'S RESPONSE:**

Plaintiff objects to this Interrogatory as vastly overly broad and unduly burdensome. Plaintiff objects to the extent it requests "any" doctors, addiction treatment specialists, health care providers and law enforcement and public health officials that agree with the proposition that prescription opioids have caused or contributed to the opioid epidemic.  Plaintiff further responds that this Interrogatory is contention discovery more appropriately answered once discovery is complete, or until a pre-trial conference.  See FRCP 33(a)(2).  Therefore, Plaintiff will construe this phrase to refer to any such contentions in Plaintiff's Second Amended Complaint, and Plaintiff refers Defendants to Plaintiff's Second Amended Complaint for this information.

Plaintiff objects to this Interrogatory as vague, ambiguous and calling for speculation in seeking information about the beliefs or opinions of individual third parties.  Plaintiff notes that there is a vast amount of peer-reviewed and other literature, testimony before public entities, and on-line information in the public domain, equally available to Defendants, which may provide the answer, at least in large part, to Defendants' Interrogatory.   Notwithstanding and without waiving all objections, Plaintiff responds as follows:

Vivek H. Murthy, M.D., M.B.A., 19th U.S. Surgeon General;

Centers for Disease Control and Prevention;

National Institute on Drug Abuse;

Theodore J. Cicero, M.D.;

Robert M. Califf, M.D.;

Russell Portenoy, M.D.

Thomas Gilson, M.D.;

Andrew Kolodny, M.D.;

Special Agent David Schiller.

Plaintiff reserves the right to supplement or modify this list as discovery proceeds.  As discovery continues and Plaintiff will produce a trial witness list and expert reports pursuant to CMO No. 1.

## INTERROGATORY NO. 4:

Describe each cost, expenditure, damage, loss, or harm for which Plaintiff seeks equitable or monetary relief, including any penalty or fine, from each Defendant. For each cost, expenditure, damage, loss, penalty, fine or harm for which Plaintiff seeks relief, provide (i) the nature and amount of that cost, expenditure, damage, loss, penalty, fine or harm; (ii) the Defendant or Defendants from which the relief is sought; and (iii) how and by whom the cost, expenditure, damage, loss, penalty, fine, or harm was determined and calculated, and the specific conduct of that Defendant or those Defendants that allegedly caused the cost, expenditure, damage, loss, penalty, fine, or harm.

## PLAINTIFF'S RESPONSE:

Plaintiff objects to this Interrogatory as overly broad as propounded, and to the extent that it is vague and ambiguous in failing to adequately and specifically define the term "harm" and in that it calls for Plaintiff to identify the specific conduct of each Defendant.  Subject to and without waiving objections, for the identification of the Defendant or Defendants from which

relief is sought, Plaintiff refers Defendants to Plaintiff's Second Amended Complaint. Plaintiff further responds as follows:

Subject to and without waiving all objections, Plaintiff will conduct a reasonable and diligent search for and will produce all non-privileged documents and communication that are sufficient to identify, describe and quantify the monetary and other relief Plaintiff seeks in this case.

In addition, Plaintiff's investigation of its damages caused by the Defendants is ongoing and will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO No. 1 and the Federal Rules of Civil Procedure.

Further subject to and without waiving all objections, Plaintiff identifies the following non-exhaustive list of programs and other expenditures either that have been initiated because of the opioid crisis or which have experienced increased funding needs because of the opioid crisis. Such programs and expenditures include, but are not limited to, the following:

| Jurisdiction | Efforts to Address Opioid Epidemic |
|---|---|
| Summit County | • Summit County Alcohol, Drug Addiction and Mental Health Board: Quick Response Teams, DAWN, Addiction Helpline; Opiate Task Force and the planning, maintaining and executing responses to the opioid epidemic; purchase of Narcan; manages waitlists for residential treatment facilities; additional training, education and treatment;<br><br>• Summit County Medical Examiner: increased number of deaths caused by the opioid epidemic for the Summit County Medical Examiner's office to process and investigate; additional staffing and resources, additional costs for contractors/vendors;<br><br>• Summit County Prosecutors: increased caseload and prosecutions relating to the opioid epidemic;<br><br>• Summit County Court of Common Pleas (including probation and specialty courts, like drug court): increased caseload and probation services relating to the opioid epidemic; Opioid Unit in adult probation department; two drug court judges do community outreach re opioids and other drugs; Indigent Defense – increased County expenditures to fund this Court program for indigent defendants;<br><br>• Summit County Juvenile Court (including probation and specialty courts): increase in number of parents participating in Family |

| Jurisdiction | Efforts to Address Opioid Epidemic |
|---|---|
| | Reunification Through Recovery Court due to opioid use; increase in staff trainings related to opioid use; <br><br> • Summit County Children Family Services: host Northeast Ohio Regional Training Center which provides trainings related to opioids, 25% of the staff trainings they do relate to opioids; social workers who exclusively deal with families and substance abuse issues; collaborate with juvenile court program, Family Reunifications through Recovery; Oriana House; provides licensure hours for Close Up which addresses opioids increased costs due to increased placement of children abused and neglected due to opioid addictions; <br><br> • Summit County Sheriff:  services, including but not limited to, training, investigations, staffing, jail expenses, dispatch services, task force as a result of the opioid epidemic; members of Quick Response Team; DARE education; drug task force members meet with community organizations to discuss opioids; drug take back days; implement House Bill 277 aka Good Samaritan Law; receive Narcan training; <br><br> • Summit County General Health District: purchase of Narcan; Quick Response Team; Syringe Harm Reduction Program; educational campaigns, expanded medically assisted treatment programs; <br><br> • Summit County Executive: Incident Management Assistance Team ("IMAT") coordinates activities of the Opiate Task Force and the Addiction Counsel |
| | |
| Akron | • Opioid-focused Quick Response Team (QRT); <br><br> • Purchases of Narcan, drug testing kits, and Immunity Hearing Requirement forms; <br><br> • Increased Police/Fire/EMS service calls for overdoses; <br><br> • Increased Police Division services for opioid investigations, including training, detailing of staff to task forces; <br><br> • Safety Communications handling of increased dispatches and related Police/Fire/EMS support; <br><br> • Law Department Criminal Division's increased prosecutions relating to the opioid epidemic; <br><br> • Municipal Court's increased caseload and probation load relating to the opioid epidemic; <br><br> • Planning and executing a response to the opioid  epidemic, including community educational awareness by Police, the Mayor's office, and other city departments; |

14

| Jurisdiction | Efforts to Address Opioid Epidemic |
|---|---|
|  | • Funding of third party entities that provide various support services related to the opioid epidemic, including Oriana House, Interval Brotherhood Home, etc. |

Plaintiff reserves the right to supplement or modify this list as discovery proceeds.


## INTERROGATORY NO. 5:

Identify and describe all alleged key opinion leaders (as that term is used throughout the Complaint), alleged front groups, and other third parties with whom any Defendant allegedly conspired or acted in concert in furtherance of the alleged misconduct described in the Complaint, including the identity of each Defendant that allegedly conspired and all facts supporting Plaintiff's contention that such Defendant(s) did so.

## PLAINTIFF'S RESPONSE:

Plaintiff objects to this Interrogatory as overly broad and unduly burdensome in that it seeks information that is uniquely in Defendants' possession, and thus imposes an undue burden and unnecessary expense on Plaintiff.  Plaintiff further objects to this Request as vague, overly broad and unduly burdensome to the extent it requests Plaintiff to identify and describe all key opinion leaders, alleged front groups and other third parties. Further objecting, the Interrogatory contains a reference to several ambiguous phrases, namely, "alleged front groups," "allegedly conspired," "acted in concert," "in furtherance of," and "alleged misconduct".

Plaintiff responds that this Interrogatory is contention discovery more appropriately answered once discovery is complete.  See FRCP 33(a)(2).  Plaintiff responds discovery continues and Plaintiff will produce a trial witness list and expert reports pursuant to CMO No. 1 and the Federal Rules of Civil Procedure.  Plaintiff also refers Defendants to Plaintiff's Second Amended Complaint, which identifies key opinion leaders, alleged front groups, and other third parties

acting in concert with Defendants.  Notwithstanding and without waiving all objections, Plaintiff

responds as follows:

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| Russell Portenoy | Doctor, Chairman of the Department of Pain Medicine and Palliative Case at Beth Israel Medical Center in New York | In 1986, Dr. Russell Portenoy, who later became Chairman of the Department of Pain Medicine and Palliative Care at Beth Israel Medical Center in New York while at the same time serving as a top spokesperson for drug companies, published an article reporting that "[f]ew substantial gains in employment or social function could be attributed to the institution of opioid therapy." <br><br> Writing in 1994, Dr. Portenoy described the prevailing attitudes regarding the dangers of long-term use of opioids: <br><br> *The traditional approach to chronic non-malignant pain does not accept the long-term administration of opioid drugs.*  This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction.  According to conventional thinking, the initial response to an opioid drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter.  It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life.  *Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects.  There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.* <br><br> According to Dr. Portenoy, the foregoing problems could constitute "compelling reasons to reject long-term opioid administration as a therapeutic strategy |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | in all but the most desperate cases of chronic nonmalignant pain." |
| | | Despite having taken this position on long-term opioid treatment, Dr. Portenoy ended up becoming a spokesperson for Purdue and other Marketing Defendants, promoting the use of prescription opioids and minimizing their risks.  A respected leader in the field of pain treatment, Dr. Portenoy was highly influential.  Dr. Andrew Kolodny, cofounder of Physicians for Responsible Opioid Prescribing, described him "lecturing around the country as a religious-like figure.  The megaphone for Portenoy is Purdue, which flies in people to resorts to hear him speak. It was a compelling message:  'Docs have been letting patients suffer; nobody really gets addicted; it's been studied.'" |
| | | As one organizer of CME seminars who worked with Portenoy and Purdue pointed out, "had Portenoy not had Purdue's money behind him, he would have published some papers, made some speeches, and his influence would have been minor. With Purdue's millions behind him, his message, which dovetailed with their marketing plans, was hugely magnified." |
| | | Dr. Portenoy was also a critical component of the Marketing Defendants' control over their Front Groups.  Specifically, Dr. Portenoy sat as a Director on the board of the APF.  He was also the President of the APS. |
| | | In recent years, some of the Marketing Defendants' KOLs have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature.  Dr. Portenoy has now admitted that he minimized the risks of opioids, and that he "gave innumerable lectures in the late 1980s and '90s about addiction that weren't true."  He mused, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation?  Well, against the standards of 2012, I guess I did . . ." |
| | | In a 2011 interview released by Physicians for Responsible Opioid Prescribing, Portenoy stated |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|      |       | that his earlier work purposefully relied on evidence that was not "real" and left real evidence behind: |
|      |       | I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite, and I would cite six, seven, maybe ten different avenues of thought or avenues of evidence, *none of which represented real evidence*, and yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in [total] and feel more comfortable about opioids in a way they hadn't before.  *In essence this was education to destigmatize [opioids], and because the primary goal was to destigmatize, we often left evidence behind.* |
|      |       | Several years earlier, when interviewed by journalist Barry Meier for his 2003 book, *Pain Killer*, Dr. Portenoy was more direct:  "It was pseudoscience.  I guess I'm going to have always to live with that one." |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| Lynn Webster | Doctor, co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah | Another Key Opinion Leader, Dr. Lynn Webster, was the co-founder and Chief Medical Director of the Lifetree Clinical Research & Pain Clinic in Salt Lake City, Utah.  Dr. Webster was President in 2013 and is a current board member of AAPM, a Front Group that ardently supports chronic opioid therapy.  He is a Senior Editor of *Pain Medicine*, the same journal that published Endo's special advertising supplements touting Opana ER.  Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo, and Purdue.  At the same time, Dr. Webster was receiving significant funding from Defendants (including nearly $2 million from Cephalon).<br><br>Dr. Webster created and promoted the Opioid Risk Tool ("ORT"), a five question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids.  The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to prescribe opioids long-term, and for this reason, references to screening appear in various industry-supported guidelines.  Versions of Dr. Webster's ORT appear on, or are linked to, websites run by Endo, Janssen, and Purdue.  In 2011, Dr. Webster presented, via webinar, a program sponsored by Purdue titled, *Managing Patient's Opioid Use:  Balancing the Need and the Risk*.  Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements to prevent "overuse of prescriptions" and "overdose deaths."  This webinar was available to and was intended to reach doctors in Plaintiffs' communities.<br><br>Dr. Webster was himself tied to numerous overdose deaths.  He and the Lifetree Clinic were investigated by the DEA for overprescribing opioids after twenty patients died from overdoses.  In keeping with the Marketing Defendants' promotional messages, Dr. Webster apparently believed the solution to patients' tolerance or |

19

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | addictive behaviors was more opioids: he prescribed staggering quantities of pills. <br><br> At an AAPM annual meeting held February 22 through 25, 2006, Cephalon sponsored a presentation by Webster and others titled, "Open-label study of fentanyl effervescent buccal tablets in patients with chronic pain and breakthrough pain: Interim safety results." The presentation's agenda description states: "Most patients with chronic pain experience episodes of breakthrough pain, yet no currently available pharmacologic agent is ideal for its treatment." The presentation purports to cover a study analyzing the safety of a new form of fentanyl buccal tablets in the chronic pain setting and promises to show the "[i]nterim results of this study suggest that FEBT is safe and well-tolerated in patients with chronic pain and BTP." This CME effectively amounted to off-label promotion of Cephalon's opioids—the only drugs in this category—for chronic pain, even though they were approved only for cancer pain. <br><br> Cephalon sponsored a CME written by Dr. Webster, *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007 through December 15, 2008. The CME taught that non-opioid analgesics and combination opioids containing non-opioids such as aspirin and acetaminophen are less effective at treating breakthrough pain because of dose limitations on the non-opioid component. |
| Perry Fine | Doctor, co-chair of APS/AAPM Opioid Guideline Panel | Dr. Perry Fine's ties to the Marketing Defendants are well documented. He has authored articles and testified in court cases and before state and federal committees, and he, too, has argued against legislation restricting high-dose opioid prescription for non-cancer patients. He has served on Purdue's advisory board, provided medical legal consulting for Janssen, and participated in CME activities for Endo, along with serving in these capacities for several other drug companies. He co-chaired the APS/AAPM Opioid Guideline Panel, served as treasurer of the AAPM from 2007 to 2010 and as president of that group from 2011 to 2013, and was on the board of directors of APF. |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|      |       | Multiple videos feature Fine delivering educational talks about prescription opioids.  He even testified at trial that the 1,500 pills a month prescribed to celebrity Anna Nicole Smith for pain did not make her an addict before her death.<br><br>He has also acknowledged having failed to disclose numerous conflicts of interest.  For example, Dr. Fine failed to fully disclose payments received as required by his employer, the University of Utah—telling the university that he had received under $5,000 in 2010 from J&J for providing "educational" services, but J&J's website states that the company paid him $32,017 for consulting, promotional talks, meals and travel that year.<br><br>Dr. Fine and Dr. Portenoy co-wrote *A Clinical Guide to Opioid Analgesia*, in which they downplayed the risks of opioid treatment, such as respiratory depression and addiction:<br><br>> At clinically appropriate doses, . . . respiratory rate typically does not decline.  Tolerance to the respiratory effects usually develops quickly, and doses can be steadily increased without risk.<br><br>> Overall, the literature provides evidence that the outcomes of drug abuse and addiction are rare among patients who receive opioids for a short period (ie, for acute pain) and among those with no history of abuse who receive long-term therapy for medical indications.<br><br>In November 2010, Dr. Fine and others published an article presenting the results of another Cephalon-sponsored study titled "Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study."  In that article, Dr. Fine explained that the 18-month "open-label" study "assessed the safety and tolerability of FBT [Fentora] for the [long-term] treatment of BTP in a large cohort . . . of opioid-tolerant patients receiving around-the-clock . . . opioids for noncancer pain."  The article acknowledged that:  (a) "[t]here has been a steady increase in the use of opioids for the management |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| | | of chronic noncancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."

The article concluded: "[T]he safety and tolerability profile of FBT in this study was generally typical of a potent opioid. The [adverse events] observed were, in most cases, predictable, manageable, and tolerable." They also conclude that the number of abuse-related events was "small."

Multiple videos feature Dr. Fine delivering educational talks about the drugs. In one video from 2011 titled "Optimizing Opioid Therapy," he sets forth a "Guideline for Chronic Opioid Therapy" discussing "opioid rotation" (switching from one opioid to another) not only for cancer patients, but for non-cancer patients, and suggests it may take four or five switches over a person's "lifetime" to manage pain. He states the "goal is to improve effectiveness which is different from efficacy and safety." Rather, for chronic pain patients, effectiveness "is a balance of therapeutic good and adverse events *over the course of years*." The entire program assumes that opioids are appropriate treatment over a "protracted period of time" and even over a patient's entire "lifetime." He even suggests that opioids can be used to treat *sleep apnea*. He further states that the associated risks of addiction and abuse can be managed by doctors and evaluated with "tools," but leaves that for "a whole other lecture." |
| Scott Fishman | Doctor, served as a board member of APF and president of AAPM | Dr. Scott Fishman is a physician whose ties to the opioid drug industry are legion. He has served as an APF board member and as president of the AAPM, and has participated yearly in numerous CME activities for which he received "market rate honoraria." As discussed below, he has authored publications, including the seminal guides on opioid prescribing, which were funded by the Marketing Defendants. He has also worked to |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|  |  | oppose legislation requiring doctors and others to consult pain specialists before prescribing high doses of opioids to non-cancer patients.  He has himself acknowledged his failure to disclose all potential conflicts of interest in a letter in the *Journal of the American Medical Association* titled "Incomplete Financial Disclosures in a Letter on Reducing Opioid Abuse and Diversion."

In 2007, Dr. Fishman authored a physician's guide on the use of opioids to treat chronic pain titled *Responsible Opioid Prescribing*, which promoted the notion that long-term opioid treatment was a viable and safe option for treating chronic pain.

In 2012, Dr. Fishman updated the guide and continued emphasizing the "catastrophic" "under-treatment" of pain and the "crisis" such under-treatment created:

> Given the magnitude of the problems related to opioid analgesics, it can be tempting to resort to draconian solutions: clinicians may simply stop prescribing opioids, or legislation intended to improve pharmacovigilance may inadvertently curtail patient access to care.  As we work to reduce diversion and misuse of prescription opioids, it's critical to remember that the problem of unrelieved pain remains as urgent as ever.

The updated guide still assures that "[o]pioid therapy to relieve pain and improve function is legitimate medical practice for acute and chronic pain of both cancer and noncancer origins."

In another guide by Dr. Fishman, he continues to downplay the risk of addiction:  "I believe clinicians must be very careful with the label 'addict.'  I draw a distinction between a 'chemical coper' and an addict."  The guide also continues to present symptoms of addiction as symptoms of "pseudoaddiction." |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| American Pain Foundation ("APF") | | The most prominent of the Front Groups was the American Pain Foundation ("APF").  While APF held itself out as an independent patient advocacy organization, in reality it received 90% of its funding in 2010 from the drug and medical-device industry, including from defendants Purdue, Endo, Janssen and Cephalon.  APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012.  By 2011, APF was entirely dependent on incoming grants from Defendants Purdue, Cephalon, Endo, and others to avoid using its line of credit.  Endo was APF's largest donor and provided more than half of its $10 million in funding from 2007 to 2012.<br><br>For example, APF published a guide sponsored by Cephalon and Purdue titled *Treatment Options:  A Guide for People Living with Pain*, and distributed 17,200 copies of this guide in one year alone, according to its 2007 annual report.  This guide contains multiple misrepresentations regarding opioid use, which are discussed below.<br><br>APF also developed the National Initiative on Pain Control ("NIPC"), which ran a facially unaffiliated website, *www.PainKnowledge.com*.  NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field.  NIPC published unaccredited prescriber education programs (accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies), including a series of "dinner dialogues."  But it was Endo that substantially controlled NIPC, by funding NIPC projects, developing, specifying, and reviewing its content, and distributing NIPC materials.  Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan Endo submitted to the FDA.  Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or *www.PainKnowledge.com*.  Endo estimated it would reach 60,000 prescribers through NIPC. |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|      |       | APF was often called upon to provide "patient representatives" for the Marketing Defendants' promotional activities, including for Purdue's "Partners Against Pain" and Janssen's "Let's Talk Pain."  Although APF presented itself as a patient advocacy organization, it functioned largely as an advocate for the interests of the Marketing Defendants, not patients.  As Purdue told APF in 2001, the basis of a grant to the organization was Purdue's desire to strategically align its investments in nonprofit organizations that share [its] business interests. |
|      |       | In practice, APF operated in close collaboration with Defendants, submitting grant proposals seeking to fund activities and publications suggested by Defendants and assisting in marketing projects for Defendants. |
|      |       | This alignment of interests was expressed most forcefully in the fact that Purdue hired APF to provide consulting services on its marketing initiatives.  Purdue and APF entered into a "Master Consulting Services" Agreement on September 14, 2011.  That agreement gave Purdue substantial rights to control APF's work related to a specific promotional project.  Moreover, based on the assignment of particular Purdue "contacts" for each project and APF's periodic reporting on their progress, the agreement enabled Purdue to be regularly aware of the misrepresentations APF was disseminating regarding the use of opioids to treat chronic pain in connection with that project.  The agreement gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.  Even for projects not produced during the terms of this Agreement, the Agreement demonstrates APF's lack of independence and willingness to harness itself to Purdue's control and commercial interests, which would have carried across all of APF's work. |
|      |       | APF's Board of Directors was largely comprised of doctors who were on the Marketing Defendants' payrolls, either as consultants or speakers at medical events.  The close relationship between |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | APF and the Marketing Defendants demonstrates APF's clear lack of independence, in its finances, management, and mission, and its willingness to allow Marketing Defendants to control its activities and messages supports an inference that each Defendant that worked with it was able to exercise editorial control over its publications—even when Defendants' messages contradicted APF's internal conclusions.  For example, a roundtable convened by APF and funded by Endo also acknowledged the lack of evidence to support chronic opioid therapy.  APF's formal summary of the meeting notes concluded that:  "[An] important barrier[] to appropriate opioid management [is] the lack of confirmatory data about the long-term safety and efficacy of opioids in non-cancer chronic pain, amid cumulative clinical evidence."<br><br>In May 2012, the U.S. Senate Finance Committee began looking into APF to determine the links, financial and otherwise, between the organization and the manufacturers of opioid painkillers.  Within days of being targeted by the Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances."  APF then "cease[d] to exist, effective immediately."  Without support from Marketing Defendants, to whom APF could no longer be helpful, APF was no longer financially viable. |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| American Academy of Pain Medicine and American Pain Society ("AAPM" and "APS," respectively) | | The American Academy of Pain Medicine ("AAPM") and the American Pain Society ("APS") are professional medical societies, each of which received substantial funding from Defendants from 2009 to 2013.  In 1997, AAPM issued a "consensus" statement that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.  The Chair of the committee that issued the statement, Dr. J. David Haddox, was at the time a paid speaker for Purdue.  The sole consultant to the committee was Dr. Russell Portenoy, who was also a spokesperson for Purdue.  The consensus statement, which also formed the foundation of the 1998 Guidelines, was published on the AAPM's website. |
| | | AAPM's corporate council includes Purdue, Depomed, Teva and other pharmaceutical companies. AAPM's past presidents include Haddox (1998), Dr. Scott Fishman ("Fishman") (2005), Dr. Perry G. Fine ("Fine") (2011) and Dr. Lynn R. Webster ("Webster") (2013), all of whose connections to the opioid manufacturers are well-documented as set forth below. |
| | | Fishman, who also served as a KOL for Marketing Defendants, stated that he would place the organization "at the forefront" of teaching that "the risks of addiction are . . . small and can be managed." |
| | | AAPM received over $2.2 million in funding since 2009 from opioid manufacturers.  AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. |
| | | AAPM describes the annual event as an "exclusive venue" for offering CMEs to doctors.  Membership in the corporate relations council also allows drug company executives and marketing staff to meet |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|      |       | with AAPM executive committee members in small settings.  Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended this annual event.  The conferences sponsored by AAPM heavily emphasized CME sessions on opioids—37 out of roughly 40 at one conference alone. |
|      |       | AAPM's staff understood that they and their industry funders were engaged in a common task.  Defendants were able to influence AAPM through both their significant and regular funding and the leadership of pro-opioid KOLs within the organization. |
|      |       | AAPM and APS issued their own guidelines in 2009 ("2009 Guidelines").  AAPM, with the assistance, prompting, involvement, and funding of Defendants, issued the treatment guidelines discussed herein, and continued to recommend the use of opioids to treat chronic pain.  Fourteen of the 21 panel members who drafted the 2009 Guidelines, including KOL Dr. Fine, received support from Defendants Janssen, Cephalon, Endo, and Purdue.  Of these individuals, six received support from Purdue, eight from Teva, nine from Janssen, and nine from Endo. |
|      |       | One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the Guidelines were influenced by contributions that drug companies, including Purdue, Endo, Janssen, and Teva, made to the sponsoring organizations and committee members. |
|      |       | Dr. Gilbert Fanciullo, now retired as a professor at Dartmouth College's Geisel School of Medicine, who also served on the AAPM/APS Guidelines panel, has since described them as "skewed" by drug companies and "biased in many important respects," including the high presumptive maximum dose, lack of suggested mandatory urine |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | toxicology testing, and claims of a low risk of addiction. |
| | | The 2009 Guidelines have been a particularly effective channel of deception.  They have influenced not only treating physicians, but also the scientific literature on opioids; they were reprinted in the *Journal of Pain*, have been cited hundreds of times in academic literature, were disseminated during the relevant period, and were and are available online.  Treatment guidelines are especially influential with primary care physicians and family doctors to whom Marketing Defendants promoted opioids, whose lack of specialized training in pain management and opioids makes them more reliant on, and less able to evaluate, these guidelines.  For that reason, the CDC has recognized that treatment guidelines can "change prescribing practices." |
| | | The 2009 Guidelines are relied upon by doctors, especially general practitioners and family doctors who have no specific training in treating chronic pain. |
| | | The Marketing Defendants widely cited and promoted the 2009 Guidelines without disclosing the lack of evidence to support their conclusions, their involvement in the development of the Guidelines or their financial backing of the authors of these Guidelines.  For example, a speaker presentation prepared by Endo in 2009 titled *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain* relies on the AAPM/APS Guidelines while omitting their disclaimer regarding the lack of evidence for recommending the use of opioids for chronic pain. |
| Federation of State Medical Boards ("FSMB") | | The Federation of State Medical Boards ("FSMB") is a trade organization representing the various state medical boards in the United States.  The state boards that comprise the FSMB membership have the power to license doctors, investigate complaints, and discipline physicians. |
| | | The FSMB finances opioid- and pain-specific programs through grants from Defendants. |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | Since 1998, the FSMB has been developing treatment guidelines for the use of opioids for the treatment of pain. The 1998 version, Model Guidelines for the Use of Controlled Substances for the Treatment of Pain ("1998 Guidelines") was produced "in collaboration with pharmaceutical companies." The 1998 Guidelines that the pharmaceutical companies helped author taught not that opioids could be appropriate in only limited cases after other treatments had failed, but that opioids were "essential" for treatment of chronic pain, including as a first prescription option.

A 2004 iteration of the 1998 Guidelines and the 2007 book, *Responsible Opioid Prescribing*, also made the same claims as the 1998 Guidelines. These guidelines were posted online and were available to and intended to reach physicians nationwide, including in Summit County.

FSMB's 2007 publication *Responsible Opioid Prescribing* was backed largely by drug manufacturers, including Purdue, Endo and Cephalon. The publication also received support from the American Pain Foundation and the American Academy of Pain Medicine. The publication was written by Dr. Fishman, and Dr. Fine served on the Board of Advisors. In all, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards (and through the boards, to practicing doctors). The FSMB website describes the book as "the leading continuing medical education (CME) activity for prescribers of opioid medications." This publication asserted that opioid therapy to relieve pain and improve function is a legitimate medical practice for acute and chronic pain of both cancer and non-cancer origins; that pain is under-treated, and that patients should not be denied opioid medications except in light of clear evidence that such medications are harmful to the patient..

The Marketing Defendants relied on the 1998 Guidelines to convey the alarming message that "under-treatment of pain" would result in official discipline, but no discipline would result if opioids were prescribed as part of an ongoing patient |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | relationship and prescription decisions were documented.  FSMB turned doctors' fear of discipline on its head:  doctors, who used to believe that they would be disciplined if their patients became addicted to opioids, were taught instead that they would be punished if they failed to prescribe opioids to their patients with chronic pain. |
| The Alliance for Patient Access ("APA") | | Founded in 2006, the Alliance for Patient Access ("APA") is a self-described patient advocacy and health professional organization that styles itself as "a national network of physicians dedicated to ensuring patient access to approved therapies and appropriate clinical care."  It is run by Woodberry Associates LLC, a lobbying firm that was also established in 2006.  As of June 2017, the APA listed 30 "Associate Members and Financial Supporters."  The list includes J&J, Endo, Mallinckrodt, Purdue and Cephalon.<br><br>APA's board members have also directly received substantial funding from pharmaceutical companies.  For instance, board vice president Dr. Srinivas Nalamachu ("Nalamachu"), who practices in Kansas, received more than $800,000 from 2013 through 2015 from pharmaceutical companies—nearly all of it from manufacturers of opioids or drugs that treat opioids' side effects, including from defendants Endo, Insys, Purdue and Cephalon.  Nalamachu's clinic was raided by FBI agents in connection with an investigation of Insys and its payment of kickbacks to physicians who prescribed Subsys.  Other board members include Dr. Robert A. Yapundich from North Carolina, who received $215,000 from 2013 through 2015 from pharmaceutical companies, including payments by defendants Cephalon and Mallinckrodt; Dr. Jack D. Schim from California, who received more than $240,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Mallinckrodt and Cephalon; Dr. Howard Hoffberg from Maryland, who received $153,000 between 2013 and 2015 from pharmaceutical companies, including defendants Endo, Purdue, Insys, Mallinckrodt and Cephalon; and Dr. Robin K. Dore from California, who received $700,000 |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| | | between 2013 and 2015 from pharmaceutical companies. |

Among its activities, APA issued a "white paper" titled "Prescription Pain Medication: Preserving Patient Access While Curbing Abuse."  Among other things, the white paper criticizes prescription monitoring programs, purporting to express concern that they are burdensome, not user friendly, and of questionable efficacy:

> Prescription monitoring programs that are difficult to use and cumbersome can place substantial burdens on physicians and their staff, ultimately leading many to stop prescribing pain medications altogether.  This forces patients to seek pain relief medications elsewhere, which may be much less convenient and familiar and may even be dangerous or illegal.
>
> *   *   *
>
> In some states, physicians who fail to consult prescription monitoring databases before prescribing pain medications for their patients are subject to fines; those who repeatedly fail to consult the databases face loss of their professional licensure.  Such penalties seem excessive and may inadvertently target older physicians in rural areas who may not be facile with computers and may not have the requisite office staff.  Moreover, threatening and fining physicians in an attempt to induce compliance with prescription monitoring programs represents a system based on punishment as opposed to incentives. . . .
>
> We cannot merely assume that these programs will reduce prescription pain medication use and abuse.

The white paper also purports to express concern about policies that have been enacted in response to the prevalence of pill mills:

> Although well intentioned, many of the policies designed to address this problem have made it

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| | | difficult for legitimate pain management centers to operate.  For instance, in some states, [pain management centers] must be owned by physicians or professional corporations, must have a Board certified medical director, may need to pay for annual inspections, and are subject to increased record keeping and reporting requirements. . . . [I]t is not even certain that the regulations are helping prevent abuses.<br><br>In addition, in an echo of earlier industry efforts to push back against what they termed "opiophobia," the white paper laments the stigma associated with prescribing and taking pain medication:<br><br>Both pain patients and physicians can face negative perceptions and outright stigma.  When patients with chronic pain can't get their prescriptions for pain medication filled at a pharmacy, they may feel like they are doing something wrong—or even criminal. . . . Physicians can face similar stigma from peers.  Physicians in non-pain specialty areas often look down on those who specialize in pain management—a situation fueled by the numerous regulations and fines that surround prescription pain medications.<br><br>In conclusion, the white paper states that "[p]rescription pain medications, and specifically the opioids, can provide substantial relief for people who are recovering from surgery, afflicted by chronic painful diseases, or experiencing pain associated with other conditions that does not adequately respond to over-the-counter drugs."<br><br>The APA also issues "Patient Access Champion" financial awards to members of Congress, including 50 such awards in 2015.  The awards were funded by a $7.8 million donation from unnamed donors.  While the awards are ostensibly given for protecting patients' access to Medicare, and are thus touted by their recipients as demonstrating a commitment to protecting the rights of senior citizens and the middle class, they appear to be given to provide cover to and reward |

| Name | Title | Facts Alleged in Support |
|---|---|---|
| | | members of Congress who have supported the APA's agenda.

The APA also lobbies Congress directly.  In 2015, the APA signed onto a letter supporting legislation proposed to limit the ability of the DEA to police pill mills by enforcing the "suspicious orders" provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. §801 *et seq.* ("CSA" or "Controlled Substances Act").  The AAPM is also a signatory to this letter.  An internal U.S. Department of Justice ("DOJ") memo stated that the proposed bill "could actually result in increased diversion, abuse, and public health and safety consequences" and, according to DEA chief administrative law judge John J. Mulrooney ("Mulrooney"), the law would make it "all but logically impossible" to prosecute manufacturers and distributors, like the defendants here, in the federal courts.  The bill passed both houses of Congress and was signed into law in 2016. |
| The U.S. Pain Foundation ("USPF") | | The U.S. Pain Foundation ("USPF") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants.  The USPF was one of the largest recipients of contributions from the Marketing Defendants, collecting nearly $3 million in payments between 2012 and 2015 alone.  The USPF was also a critical component of the Marketing Defendants' lobbying efforts to reduce the limits on over-prescription.  The U.S. Pain Foundation advertises its ties to the Marketing Defendants, listing opioid manufacturers like Pfizer, Teva, Depomed, Endo, Purdue, McNeil *(i.e.,* Janssen), and Mallinckrodt as "Platinum," "Gold," and "Basic" corporate members. Industry Front Groups like the American Academy of Pain Management, the American Academy of Pain Medicine, the American Pain Society, and PhRMA are also members of varying levels in the USPF. |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
| American Geriatrics Society ("AGS") | | The American Geriatrics Society ("AGS") was another Front Group with systematic connections and interpersonal relationships with the Marketing Defendants.  AGS was a large recipient of contributions from the Marketing Defendants, including Endo, Purdue and Janssen.  AGS contracted with Purdue, Endo and Janssen to disseminate guidelines regarding the use of opioids for chronic pain in 2002 (*The Management of Persistent Pain in Older Persons*, hereinafter "2002 AGS Guidelines") and 2009 (Pharmacological Management of Persistent Pain in Older Persons, hereinafter "2009 AGS Guidelines").  According to news reports, AGS has received at least $344,000 in funding from opioid manufacturers since 2009.  AGS's complicity in the common purpose with the Marketing Defendants is evidenced by the fact that AGS internal discussions in August 2009 reveal that it did not want to receive-up front funding from drug companies, which would suggest drug company influence, but would instead accept commercial support to disseminate pro-opioid publications.<br><br>The 2009 AGS Guidelines recommended that "[a]ll patients with moderate to severe pain . . . should be considered for opioid therapy."  The panel made "strong recommendations" in this regard despite "low quality of evidence" and concluded that the risk of addiction is manageable for patients, even with a prior history of drug abuse.  These Guidelines further recommended that "the risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."  These recommendations are not supported by any study or other reliable scientific evidence.  Nevertheless, they have been cited over 1,833 times in Google Scholar (which allows users to search scholarly publications that would have been relied on by researchers and prescribers) since their 2009 publication and as recently as this year.<br><br>Representatives of the Marketing Defendants, often at informal meetings at conferences, suggested activities, lobbying efforts and publications for AGS to pursue.  AGS then submitted grant |

| Name | Title | Facts Alleged in Support |
|------|-------|--------------------------|
|      |       | proposals seeking to fund these activities and publications, knowing that drug companies would support projects conceived as a result of these communications.<br><br>Members of AGS Board of Directors were doctors who were on the Marketing Defendants' payrolls, either as consultants or speakers at medical events. As described below, many of the KOLs also served in leadership positions within the AGS. |

Plaintiff reserves the right to supplement or modify this list as discovery proceeds.

**INTERROGATORY NO. 6:**

Identify and describe all prescriptions of opioids that were written in the Plaintiff's county, city, village, or township in reliance on any alleged misrepresentations, omissions or other alleged wrongdoing by any Defendant. Include in the response the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the specific misrepresentation, omission; or wrongdoing that allegedly caused the prescription to be written; the Defendant and the specific sales representative(s), employee(s), or agent(s) of the Defendant that made or committed the alleged misrepresentation, omission, or wrongdoing; the person or persons to whom the alleged misrepresentation or omission was made or to whom the alleged wrongdoing was directed; and whether, by whom, and for how much the prescription was approved for reimbursement.

**PLAINTIFF'S RESPONSE:**

Plaintiff objects to this Interrogatory because of its vast over breadth and in that it seeks information that is not relevant to any party's claim or defense, as Plaintiff is not representing the interests of any individuals who were harmed by opioids or the interests of any payor of opioid prescription costs; nor has Plaintiff alleged any False Claims Act or other individualized damage counts.  Plaintiff also objects to this Interrogatory because it is not proportional to the needs of the case considering (1) the marginal importance of the materials to the claims and defenses in this

litigation, as described above, and (2) the substantial cost and burden to the Plaintiff to identify and describe responsive materials on all prescriptions of opioids in Summit County, and the substantial risk of harm to the privacy interests and rights held by the individuals whose private medical files are the subject of this request.  Plaintiff also responds that this Interrogatory is contention discovery more appropriately answered once written discovery is completed.  See FRCP 33(a)(2).  Plaintiff will produce a trial witness list and expert reports pursuant to CMO No. 1 and the Federal Rules of Civil Procedure.

Subject to and without waiving all objections, Plaintiff answers with the following list of prescription opioids at issue in the case:

| | |
|---|---|
| OxyContin | MS Contin |
| Dilaudid | Dilaudid-HP |
| Butrans | Hysingla ER |
| Targiniq ER | Kadian |
| Norco | Actiq |
| Fentora | Duragesic |
| Nucynta | Nucynta ER |
| Opana ER | Opana |
| Percodan | Percocet |
| Generic Oxycodone | Generic Oxymorphone |
| Generic Hydromorphone | Generic Hydrocodone |
| Fentanyl | Exaglo |
| Roxicodone | Xartemis XR |
| Methadose | Generic Methadone Hydrochloride |
| Generic Morphine Sulfate Oral Solution | Generic Fentanyl Transdermal System |
| Generic Oral Transmucosal Fentanyl Citrate | Generic Oxycodone and Acetaminophen |
| Generic Hydrocodone Bitartrate and Acetaminophen | Generic Hydromorphone Hydrochloride |
| Generic Hydromorphone Hydrochloride ER | Generic Naltrexone Hydrochloride |
| Generic Oxymorphone Hydrochloride | Generic Methadone Hydrochloride |
| Generic Oxycodone Hydrochloride | Generic Buprenorphine and Naloxone |

Plaintiff further responds that the increased volume of opioid prescribing correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescription opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer

legally acquire or simply could not afford prescription opioids.  Plaintiff also responds and incorporates the answers to Interrogatories No. 5 and No 9.  Plaintiff reserves the right to supplement or modify this list as discovery proceeds.


## INTERROGATORY NO. 7:

Identify every person who allegedly became addicted to any substance or was otherwise harmed as a result of any prescription of an opioid(s) in the Plaintiff's county, city, village, or township. Include in the identification of each such individual: (i) the particular type of alleged harm that the individual experienced, (ii) the particular opioid(s) that he or she took and/or was prescribed, (iii) when each prescription at issue was written, (iv) the condition for which each prescription was written; and (v) the allegedly false, misleading, or deceptive statement or omission that purportedly caused the healthcare provider to write the prescription.

## PLAINTIFF'S RESPONSE:

Plaintiff objects to this Interrogatory as grossly overly broad and unduly burdensome as propounded.  Plaintiff objects because this Interrogatory seeks information not relevant to any party's claim or defense or the legal theories in this case.  Subject to and without waiving objections, Plaintiff responds that Plaintiff is not representing the interests of any individuals who were harmed by opioids or the interests of any payor of opioid prescription costs; nor has Plaintiff alleged any False Claims Act counts or other individual claims that justify the burden of an Interrogatory this broad in scope.  Plaintiff objects to this Interrogatory because it is not proportional to the needs of the case considering (1) the lack of relevance or importance of the materials to the claims and defenses in this litigation, as described above, and (2) the substantial cost and burden to identify and describe responsive materials, which would cause substantial harm to the privacy interests and rights held by the individuals whose private medical files are the subject of this request.  Plaintiff further objects to the extent this Interrogatory calls for

Confidential Information not in the Plaintiff's possession and protected by privacy laws,

including but not limited to, the federal Health Insurance Portability and Accountability Act

("HIPAA").  Subject to and without waiving all objections, Plaintiff responds and incorporates

the answer to Interrogatories No. 5 and No. 6.  As discovery continues and Plaintiff will produce

a trial witness list and expert reports pursuant to CMO No. 1


**INTERROGATORY NO. 8:**

Identify any "unbranded advertising" or "unbranded marketing" (as those terms are used

throughout the Complaint) disseminated in the Plaintiff's county, city, village, or township in

which any Defendant participated or to which any Defendant contributed in any way. Include in

the response the identity of the Defendant(s) that participated or contributed and the identity of

the person or persons to whom the "unbranded advertising" or "unbranded marketing" was

distributed.

**PLAINTIFF'S RESPONSE:**

Plaintiff objects to this Interrogatory as vague, overly broad and unduly burdensome to the

extent it requests Plaintiff to identify any "unbranded advertising" or "unbranded marketing"

disseminated in Plaintiff's jurisdiction in which any Defendant participated or contributed.

Plaintiff further objects to this Interrogatory to the extent it seeks information that is in

Defendants' possession or publicly available, and thus imposes an undue burden and unnecessary

expense on Plaintiff.

Notwithstanding and without waiving all objections, Plaintiff responds: Defendants

Purdue, Endo and Teva sponsored a publication entitled, *Responsible Opioid Prescribing*, which

promoted the prescription of opioids for non-cancer patients.  This publication was distributed by

Endo sales representatives throughout Plaintiff's jurisdiction with a special introductory letter

from Dr. Scott Fishman.  Purdue also promoted its pain-management website –

www.InTheFaceOfPain.com – which included testimonials from several paid "advocates" urging more pain treatment.  Yet another Purdue unbranded website – Partners Against Pain – stated "Current Myth:  Opioid addiction (psychological dependence) is an important clinical problem in patients with moderate to severe pain treated with opioids.  Fact:  Fears about psychological dependence are exaggerated when treating appropriate pain patients with opioids."  "Addiction risk also appears to be low when opioids are dosed properly for chronic, noncancer pain."  A Janssen unbranded website – www.PrescribeResponsibly.com – stated that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients."  In 2012, Mallinckrodt promoted a book through its unbranded C.A.R.E.S. Alliance website entitled "Defeat Chronic Pain Now!" which stated false claims such as "Only rarely does opioid medication cause a true addiction when prescribed appropriately…" and "Studies have shown that many chronic pain patients can experience significant pain relief with tolerable side effects from opioid narcotic medication when taken daily and no addiction."

In addition, Defendants sponsored multiple CMEs in or near Plaintiff's jurisdiction to promote the use of opioids and downplay any risks or adverse effects; including Cephalon-sponsored CMEs made widely available through organizations such as Medscape LLC and a Teva-sponsored CME that was published in a supplement of *Pain Medicine News* in 2009.

Plaintiff reserves the right to supplement or modify this list as discovery proceeds. Plaintiff further responds discovery continues and Plaintiff will produce a trial witness list and expert reports pursuant to CMO No. 1 and the Federal Rules of Civil Procedure.


**INTERROGATORY NO. 9:**

Identify and describe all statements or omissions made or disseminated in the Plaintiff's county, city, village, or township by any Defendant (or any other person whose statements you attribute, in whole or in part, to a Defendant) that you claim were false, misleading, unfair,

deceptive or otherwise actionable. Include in your identification of each statement or omission: (i) the name, employer, and position(s) of the speaker, writer, or other person who issued the statement; (ii) the name(s) and position(s) of the recipient(s) of such statement; (iii) when and where the allegedly false, misleading, or deceptive statement was made; (iv) a description of the content of the statement; and (v) all reasons you claim the statement was false, misleading, or deceptive.

**PLAINTIFF'S RESPONSE:**

Plaintiff objects to this Interrogatory as vague, overly broad and unduly burdensome to the extent it requests Plaintiff to identify and describe "all" statements or omissions made or disseminated in Plaintiff's jurisdiction by any Defendant that were false, misleading, unfair, deceptive or otherwise actionable. Further objecting, the Interrogatory contains a reference to an undefined phrase, "otherwise actionable."

Plaintiff further objects to the extent it seeks information that is in Defendants' possession or publicly available, and thus imposes an undue burden and unnecessary expense on Plaintiff.  Notwithstanding and without waiving all objections, Plaintiff responds:

| Falsehood | Explanation |
|---|---|
| The risk of addiction from chronic opioid therapy is low | When it launched OxyContin, Purdue cited in promotional and educational materials a single paragraph from a letter published in 1980 by Dr. Hershel Jick and Jane Porter in the New England Journal of Medicine as evidence of the low risk of addiction to opioids.  In fact, Purdue included reference to this letter in a 1998 promotional video entitled, "I got my life back," in which Dr. Alan Spanos states, "In fact, the rate of addiction amongst pain patients who are treated by doctors is much less than 1%."<br><br>Until April 2012, Endo stated on its website that "…patients treated with prolonged opioid medicines usually do not become addicted;" a statement echoed on the website of its close affiliate, APF.  Endo also published and distributed multiple pamphlets and brochures downplaying addiction as it related to opioids, including but not limited to "Pain: Opioid Facts," "Understanding Your Pain: Taking Oral Opioid Analgesics" and "Pain: Opioid Therapy." |

| Falsehood | Explanation |
| --- | --- |
|  | Janssen claimed on its unbranded website – www.PrescribeResponsibility.com – that concerns about opioid addiction are "overestimated" and that "true addiction occurs only in a small percentage of patients." Janssen also published a patient education guide entitled "Finding Relief: Pain Management for Older Adults" describing opioid addiction as a myth and that "many studies show opioids are *rarely* addictive…" which, until recently, was available online. |
|  | Cephalon sponsored a 2007 publication from APF entitled "Treatment Options: A Guide for People Living with Pain" which taught that opioid addiction is rare. |
|  | Actavis published material that claimed it is "less likely" to become addicted to opioids in those who "have never had an addiction problem."  The same publication notes that a need for a "dose adjustment" is the result of tolerance, and "not addiction."  A 2007 guide for prescribers published under Actavis's copyright states that Kadian is more difficult to abuse and less addictive than other opioids. |
|  | Mallinckrodt created the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance in 2010 which promoted a book entitled "Defeat Chronic Pain Now!" in which opioids were stated to "rarely" cause addiction. |
| To the extent there is a risk of addiction, it can be easily identified and managed | Purdue and Cephalon sponsored the APF's publication, "Treatment Options: A Guide for People Living with Pain" in 2007, which falsely reassured patients that opioid agreements between doctors and patients can "ensure that you take the opioid as prescribed."  Janssen stated on its website – www.PrescribeResponsibly.com – that opioid addiction "can usually be managed" through tools such as opioid agreements between patients and doctors.  Purdue also sponsored a 2011 webinar taught by Dr. Lynn Webster entitled "Managing Patient's Opioid Use: Balancing the Need and Risk" wherein prescribers were told that screening tools, urine tests, and patient agreements have the effect of preventing "overuse of prescriptions" and "overdose deaths."  Endo paid for a 2007 supplement for continuing education credit in the "Journal of Family Practice" entitled "Pain Management Dilemmas in Primary Care: Use of Opioids" which recommended screening patients and the use of the Opioid Risk Tool. |
| Signs of addictive behavior are "psuedoaddiction," requiring more opioids | Cephalon, Endo and Purdue sponsored the Federation of State Medical Board's ("FSMB") publication entitled "Responsible Opioid Prescribing" in 2007 which stated that such behaviors as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to |

| Falsehood | Explanation |
|---|---|
| | obtain opioids and hoarding are all signs of "pseudoaddiction" (not genuine addiction).  Purdue published an unbranded pamphlet entitled "Clinical Issues in Opioid Prescribing" in 2005 which was circulated through 2007 and available on its website through 2013.  This pamphlet stated that "illicit drug use and deception" were not evidence of true addiction, but rather "pseudoaddiction."  Endo sponsored a CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which promoted pseudoaddiction.  Janssen sponsored, funded and edited a website entitled "Let's Talk Pain" which in 2009 stated that pseudoaddiction "…refers to patient behaviors that may occur when pain is undertreated…" |
| Opioid withdrawal can be avoided by tapering | Endo sponsored an educational program entitled "Persistent Pain in the Older Adult" which claimed that withdrawal symptoms could be avoided by simply tapering a patient's opioid dose over ten days.  Similarly, Purdue sponsored APF's publication "A Policymaker's Guide to Understanding Pain & Its Management" which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation."  Neither Defendant explained the significant hardships associated with cessation of use. |
| Opioid doses can be increased without limit or greater risks | Purdue omitted the increased risk of respiratory distress and death from increasing opioid dosage from its 2010 "Risk Evaluation and Mitigation Strategy" for OxyContin.  Endo published on its website a patient education pamphlet entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" that responds to the question, "If I take the opioid now, will it work later when I really need it?" with "The dose can be increased…You won't 'run out' of pain relief."  Purdue and Cephalon also sponsored APF's 2007 "Treatment Options: A Guide for People Living with Pain" which taught patients that opioids have "no ceiling dose" and are therefore safer than NSAIDs. |
| Long-term opioid use improves functioning | Janssen promoted Duragesic through an ad campaign as improving a patient's functioning and work productivity.  Janssen's "Let's Talk Pain" website featured a video interview claiming that opioids were what allowed a patient to "continue to function."  Similarly, Purdue ran a full-page ad for OxyContin in the Journal of the American Medical Association stating, "There Can Be Life With Relief" and implying that OxyContin would help users' function; however the FDA noted that Purdue failed to warn that patients could die from taking OxyContin.  Purdue also ran advertisements in medical journals in 2012 touting that OxyContin would help a "writer with osteoarthritis of the hands" work more effectively.  Since May 2011, Endo has |

| Falsehood | Explanation |
|---|---|
| | distributed and made available on its website – www.Opana.com – a pamphlet implying that patients with physically demanding jobs would achieve long-term pain relief and functional improvement.  Mallinckrodt's website claims that "[t]he effective pain management offered by our [opioids] helps enable patients to stay in the workplace, enjoy interactions with family and friends, and remain an active member of society." |
| Alternative forms of pain relief pose greater risks than opioids | Purdue and Cephalon sponsored APF's publication entitled "Treatment Options: A Guide for People Living with Pain" warning of increased risks if NSAIDs are "taken for more than a period of months;" falsely attributing 10,000 to 20,000 deaths annually to NSAID overdoses when the figure is closer to 3,200.  In 2009, Janssen sponsored a publication entitled, "Finding Relief: Pain Mangement for Older Adults" which listed dose limitations as "disadvantages" of other pain medicines.  It also listed a number of serious health effects as disadvantages of NSAIDs while only listing "upset stomach or sleepiness" and constipation as disadvantages of opioids.  Purdue and Endo sponsored a CME issued by the AMA in 2003, 2007, 2010 and 2013 entitled "Overview of Management Options" which taught that NSAIDs and other drugs, but not opioids, are unsafe at high doses. |
| OxyContin provides twelve hours of pain relief | In 2000, Purdue advertised that OxyContin provides "Consistent Plasma Levels Over 12 Hours;" however the oxycodone does not enter the body at a linear rate, releasing a greater proportion upon administration and gradually tapering over 12 hours.  These 12-hour dosing advertisements ran in the *Journal of Pain* in February 2005 and the *Clinical Journal of Pain* in 2006. |
| New formulations of certain opioids successfully deter abuse | Purdue presented an article in 2013 based on a review of data from poison control centers concluding that its ADF OxyContin can reduce abuse, but failed to acknowledge that abuse merely shifted to other drugs and that there were actually more harmful exposures to opioids after the reformulation.  In 2016, Dr. J. David Haddox, VP of Health Policy for Purdue, falsely claimed that the evidence does not show Purdue's ADF opioids are being abused in large numbers.

Endo's promotion of its Opana ER also tended to omit material facts according to a May 2012 letter from the FDA to Endo.  Endo submitted a citizen petition asking the FDA for permission to label Opana ER as abuse-resistant, and also went so far as to sue the FDA to force expedited consideration of this change.  Endo falsely promoted Opana ER as having been designed to be crush-resistant, knowing that this would (falsely) imply that it was actually crush- |

| Falsehood | Explanation |
|---|---|
| | resistant and less likely to be abused (as stated in a June 14. 2012 press release).  Endo initiated journal advertisements that appears in April 2013 stating Opana ER was "designed to be crush resistant." |
| | Likewise, Actavis copyrighted a guide for prescribers representing that Kadian is more difficult to abuse and less addictive than other opioids.  Mallinckrodt promoted both Exalgo and Xartemis XR as specifically formulated to reduce abuse, going so far as to state, "XARTEMIS XR has technology that requires abusers to exert additional effort to extract the active ingredient from the large quantity of inactive and deterrent ingredients." |

Plaintiff reserves the right to supplement or modify this list as discovery proceeds.


**INTERROGATORY NO. 10:**

Identify and describe all prescriptions of opioid(s) that Plaintiff contends were unauthorized, medically unnecessary, ineffective, or harmful. Include in the response as to each such prescription the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the basis for your assertion that the prescription was unauthorized, medically unnecessary, ineffective, or harmful; and whether, by whom, and for how much the prescription was approved for reimbursement.

**PLAINTIFF'S RESPONSE:**

See answer to Interrogatory No. 6.  Plaintiff objects to this Interrogatory as overly broad and unduly burdensome as propounded.  Plaintiff objects because this Interrogatory seeks information not relevant to any party's claim or defense, or the legal theories in this case. Subject to and without waiving objections, Plaintiff responds that Plaintiff is not representing the interests of any individuals who were harmed by opioids or the interests of any payor of opioid prescription costs; nor has Plaintiff alleged any False Claims Act counts or other claims that justify the burden of an Interrogatory this broad in scope.  Plaintiff objects to this Interrogatory because it is not proportional to the needs of the case considering (1) the lack of relevance or importance of the materials to the claims and defenses in this litigation, as described above, and

45

(2) the substantial cost to identify and describe responsive materials, which would cause

substantial harm to the privacy interests held by the individuals whose private medical files are

the subject of this request.  Plaintiff further objects to the extent this Interrogatory calls for

Confidential Information not in the Plaintiff's possession and protected by privacy laws.

As discovery continues and Plaintiff will produce a trial witness list and expert reports

pursuant to CMO No. 1.  Subject to and without waiving all objections, Plaintiff will comply

with the procedure and deadline as set forth in ¶ 9(1)(iii) of Case Management Order No. 1.

Dated: June 12, 2018                                      Respectfully submitted,

                                                         By:  /s/  Linda Singer
                                                         Linda Singer

                                                         Joseph F. Rice
                                                         Jodi Westbrook Flowers
                                                         Anne McGinness Kearse
                                                         David I. Ackerman
                                                         Jeffrey C. Nelson
                                                         MOTLEY RICE LLC
                                                         401 9th Street NW, Suite 1001
                                                         Washington, DC 20004
                                                         Tel: (202) 232-5504

## <u>CERTIFICATE OF SERVICE</u>

       I, Jeffrey Nelson, certify that on June 12, 2018, I caused the foregoing to be served via electronic mail on Defendant's Liaison Counsel pursuant to the Case Management Order in this case (ECF #232).

                         <u>*/s/* Jeffrey Nelson_____</u>

## Verification

I, _Deborah S. Matz_, declare:

I am the _Law Director_ for the County of Summit, Ohio.  I am authorized to make this verification on behalf of Plaintiff the County of Summit, Ohio.  The foregoing **Plaintiff's Entities First Amended Responses and Objections to Manufacturer Defendants' First Set of Interrogatories** represents a municipal corporate response, based on information, in part, assembled by the County of Summit, Ohio employees and/or representatives.  Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual.  Subject to these limitations, the information contained in the foregoing response is, to the best of the County of Summit, Ohio's knowledge, true and correct.  The County of Summit, Ohio reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Summit, Ohio on this _13th_ day of June, 2018

_Deborah Matz_
Signature

_Deborah S. Matz_
Print Name

_Law Director_
For Summit County

**Verification**

I, _Charles Twigg_, declare:

I am the _Deputy Chief, Fire Administration_ for the City of Akron, Ohio.  I am authorized to make this verification on behalf of Plaintiff the City of Akron, Ohio.  The foregoing **Plaintiff's Entities First Amended Responses and Objections to Manufacturer Defendants' First Set of Interrogatories** represents a municipal corporate response, based on information, in part, assembled by the City of Akron, Ohio employees and/or representatives.  Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual.  Subject to these limitations, the information contained in the foregoing response is, to the best of the City of Akron, Ohio's knowledge, true and correct.  The City of Akron, Ohio reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Akron, Ohio on this ___13___ day of June, 2018

_____ DCAF

Deputy Chief Charles Twigg
Akron Division of Fire

Sworn to before me and subscribed in my presence on this _13th_ day of June, 2018.

_____
Notary Public

KAROL E. HATCH
Resident of Summit County
Notary Public, State of Ohio
My Commission Expires _8/16/19_

## Verification

I, *Mike Caprez* declare:

    I am the *Deputy Chief of Police* for the City of Akron, Ohio.  I am authorized to make this verification on behalf of Plaintiff the City of Akron, Ohio.  The foregoing **Plaintiff's Entities First Amended Responses and Objections to Manufacturer Defendants' First Set of Interrogatories** represents a municipal corporate response, based on information, in part, assembled by the City of Akron, Ohio employees and/or representatives.  Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual.  Subject to these limitations, the information contained in the foregoing response is, to the best of the City of Akron, Ohio's knowledge, true and correct.  The City of Akron, Ohio reserves the right to make any changes should it appear that any omissions or errors have been made.

    I declare under penalty of perjury that the foregoing is true and correct.

    Executed at Akron, Ohio on this *14th* day of June, 2018

                                    Deputy Chief Michael Caprez
                                    Akron Division of Police

Sworn to before me and subscribed in my presence on this *14th* day of June, 2018.

Marlene E. Long
Resident Summit County
Notary Public, State of Ohio
My Commission Expires: April 18, 2022

                                    Notary Public