# EXHIBIT 15

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 2 of 86. PageID #: 26121
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 1 of 85. PageID #: 24573

1

1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
2                          EASTERN DIVISION

3

4     IN RE:                       Case No. 1:17-md-2804
      NATIONAL PRESCRIPTION         Cleveland, Ohio
5     OPIATE LITIGATION
                                    Friday, September 28, 2018
6                                   3:40 p.m.

7

8

9       TRANSCRIPT OF HEARING ON MANUFACTURERS' MOTION TO COMPEL
              BEFORE SPECIAL MASTER DAVID ROSENBLUM COHEN
10

11

12    APPEARANCES:              David Rosenblum Cohen,
                                Special Master
13                              Law Office of Dave R. Cohen
                                24400 Chagrin Blvd., Ste.300
14                              Cleveland, Ohio   44122
                                216-8331-0001
15

16

17    (Appearances continued to Page 2.)

18

19

20    Official Court Reporter:  Heidi Blueskye Geizer
                                Certified Realtime Reporter
21                              United States District Court
                                801 West Superior Avenue
22                              7-178 U.S. Court House
                                Cleveland, Ohio   44113
23                              216-357-7092

24    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
25

```
 1      APPEARANCES:  (Continued)

 2      For the Plaintiffs:      Peter H. Weinberger

 3                               Linda Singer

 4                               Jayne Conroy

 5                               Andrea Bierstein

 6                               Paull JJ Hanly, Jr.

 7                               Ami Patel

 8                               David I. Ackerman (By telephone)

 9                               Salvatore C. Badala (By telephone)

10

11      For the Defendants:      Donna M. Welch

12                               Mark S. Cheffo

13                               Steven A. Reed

14                               Sonya Winner

15                               Eric R. Delinsky

16                               Carole S. Rendon

17                               John Alten

18                               Paul Boehm

19

20

21                      -   -   -   -   -

22

23

24

25
```

```
  1        AFTERNOON SESSION, FRIDAY, SEPTEMBER 28, 2018   3:40 P.M.
  2               SPECIAL MASTER COHEN:  Thank you everybody for
  3    coming here.  I appreciate all the people here in the room
  4    being here to inform me and educate me on a difficult
  5    complicated issue.  And thank you also for coming at short
  6    notice.  I'm gratified that everybody is here to help me
  7    with this issue even though I issued an invitation only
  8    three days ago.
  9        It's my understanding that you have agreed to a format
 10    through which you're going to try and talk me through the
 11    issues that have to do with discovery from plaintiffs of
 12    prescription-related information.  Am I right about that?
 13               MS. SINGER:  Yes.
 14               SPECIAL MASTER COHEN:  And who's going to
 15    start?  Donna?
 16               MS. WELCH:  Yes.  Do you want me to move to
 17    the podium?
 18               SPECIAL MASTER COHEN:  Wherever you are more
 19    comfortable doing it, but it makes sense to have a
 20    microphone in front of you.  Whichever place you're more
 21    comfortable is fine.
 22               MS. WELCH:  So thank you --
 23               SPECIAL MASTER COHEN:  Let me just add one
 24    thing I just remembered.  So I sent out an e-mail, I think
 25    it was early this morning or late last night, saying that I
```

1    had planned to spend a bunch of time to educate myself by

2    re-reading everything you submitted, but then the Kavanaugh

3    confirmation hearing was on TV, and so that was a little bit

4    of a distraction; but I did spend much of today re-reading

5    the letters that you sent, so I think I am up on the curve a

6    little bit.

7          And so I just want to make sure that everyone

8    understands that this is going to be a bit of a colloquy,

9    that I will interrupt and ask questions, and some of what

10   you are going to say I hope I already know.  So I'm just

11   letting you know the state of where my head is at.

12                MS. WELCH:  Very good.

13                MS. SINGER:  And David, just to help guide the

14   argument, I think there are going to be 30 minutes on

15   defendants' side all in, 30 minutes on our side -- we'll try

16   to keep everybody honest -- and then a five to ten-minute

17   rebuttal by defendants.

18                SPECIAL MASTER COHEN:  Thank you.

19                MS. WELCH:  So thank you for agreeing to

20   hearing this in person, we appreciate it as well.

21          This is a key discovery issue from the defendants'

22   perspective.  It's discovery that we believe, as you know,

23   goes to the heart of not only the claims, but our defenses

24   in the case, where plaintiffs among other things allege

25   fraud against the manufacturer defendants.

1    And as a shorthand, we've talked about this at a high

2    level as the motion to compel prescription-level data.

3    Specifically, we are talking about responses to three

4    discrete interrogatories.  And we are seeking identification

5    of which prescriptions plaintiffs claim, first, were written

6    in reliance on a defendant's misrepresentation or

7    wrongdoing.  That's interrogatory number 6.  Second, which

8    prescriptions were medically not appropriate, interrogatory

9    number 10.  And which prescriptions led someone in the

10   community in the Track One jurisdictions to become addicted,

11   thus causing the alleged damage in the community or the

12   harm, that's interrogatory number 7.

13       In addition, we've sought to compel production of

14   documents in response to requests for production 10, but I

15   think the argument here really centers around the three core

16   interrogatories.

17       As you know, and as is laid out in the papers, we've

18   been seeking the discovery since the outset.  With respect

19   to the interrogatories, plaintiffs in the Track One cases

20   have now supplemented their responses twice, but they have

21   still failed to identify even a single prescription that

22   they claim was medically improper or written in reliance on

23   a misrepresentation by one of our clients.

24       For example, Cuyahoga in their supplemental response,

25   their final one in August, identified a number of categories

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 7 of 86. PageID #: 26126
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 6 of 85. PageID #: 24366

6

1    of documents from which they say we can go out and figure

2    out this information ourselves.

3              SPECIAL MASTER COHEN:  Documents which they

4    produced, right?

5              MS. WELCH:  Yes, documents they say they

6    produced, some categories where they say production is

7    ongoing.  Among those they've identified 4,300 overdose

8    deaths from 2006 to 2017, but they haven't told us of those

9    which were even an overdose death from someone who had been

10   prescribed an opioid, let alone prescribed an opioid that

11   was manufactured by one of our clients; let alone took an

12   opioid and was prescribed an opioid by a doctor to whom a

13   misrepresentation had been made, or a prescription was in

14   their belief not medically proper; and thus we sought relief

15   from you on August 4th.

16        And I want to be clear, that while we believe there's

17   an issue here that is broader that relates to plaintiffs'

18   burden of proof and what we think they'll ultimately need to

19   do to prove their claims, that's not what we're here about

20   today.  We are here on a discovery issue, and it relates to

21   whether we are entitled as defendants in this case to

22   responses to those interrogatories now while fact discovery

23   is ongoing.

24        We believe there are two central questions that you

25   need to answer in order to make a decision on that issue,

1    and the first is obviously is this information relevant, and

2    second, is it proportional to the needs of the case.

3        With respect to relevance, candidly, we don't think

4    there's a lot to say here.  They concede in their responsive

5    letter brief that this is relevant to our defenses and that

6    we're free to mount the defenses we choose.  They've never

7    contended this information isn't relevant to the defenses

8    here.

9        And to be clear, for each of the manufacturers, the

10   defenses include, for example, that our client didn't make

11   any misrepresentations to a doctor writing prescriptions in

12   the Track One jurisdictions.

13       Our defenses include that in writing prescriptions for

14   our clients' opioids no doctor in the Ohio Track One

15   jurisdictions relied on any misrepresentation.  They include

16   that the prescriptions written for the opioids marketed and

17   sold by our clients were not medically inappropriate, that

18   the addiction-related harm in the communities that these

19   plaintiffs are seeking as damages was not caused by

20   prescriptions written for our clients' opioids, but rather

21   by something else, and that the majority of harm alleged by

22   the cities and counties is not a result of prescription

23   opioids at all.

24       We believe that both CMO-1 and your prior discovery

25   rulings specifically contemplated that we'd be given the

1     ability to get this very type of critical information to

2     support our defenses during fact discovery, and plaintiffs

3     essentially claim they don't seek damages for personal harm,

4     and therefore they should be allowed not to respond.  They

5     should be able to avoid this relevant discovery because

6     they're not seeking personal harm for any individual.

7     Candidly, we believe that misses the point.  They are

8     seeking harm for prescription-level harm.  They are seeking

9     harm for what resulted from a prescription being written to

10    an individual, not to the harm that that individual may have

11    suffered him or herself, but to a slightly more attenuated

12    harm felt in the community.  But it is not aggregate harm

13    that is not tied to prescriptions, it is harm from a

14    prescription written to a person who either overdosed or a

15    prescription written to a person who became addicted, and

16    thus took services or took other services from the community

17    that they wouldn't have taken.  But it all at the end of the

18    day boils down to the question of whether the prescription

19    at issue, proper or not, was the prescription at issue

20    written based on a misrepresentation.

21    SPECIAL MASTER COHEN:  So let me ask you two

22    questions.  You listed a number of defenses that defendants

23    would seek to interpose that have to do with, you know,

24    particular prescriptions.  To what extent are those fraud

25    based?  In other words, the defenses that you named and in

1    your letters have made reference to the fraud claims.

2              MS. WELCH:  They relate to the fraud claims,

3    they also relate to the other claims in the case, including

4    nuisance.  At the end of the day, we are entitled to

5    understand what the alleged nuisance is and we're entitled

6    to understand which if any prescriptions written of our

7    clients' opioids prescribed by a doctor inappropriately

8    contributed to the nuisance.

9              SPECIAL MASTER COHEN:  So their theory seems

10   to be, the plaintiffs' essential claim seems to be, you

11   know, they say every prescription, every prescription that

12   was written for an opioid was tainted.  Every prescription

13   was tainted because of the marketing activity of the

14   defendants as a whole gave the wrong message to doctors in

15   the medical community.

16       So for example, that a prescription that might have

17   otherwise been legitimate was tainted because -- and again,

18   this is an example -- it should have been written for three

19   days and not 30, and the message to the medical community

20   was you can write as many days as you want without fear of

21   addiction except for extreme cases.

22       So for them to say in response to what you're

23   demanding, every prescription, every prescription was

24   tainted, I get that that doesn't address every single one of

25   the points that you made, but does that at least address

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 11 of 86 PageID #: 26130
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 11 of 85 PageID #: 24594

10

1    some of them so that now we're looking at a smaller subset.

2         For example, just a subset of prescriptions that led

3    to somebody's death in Cuyahoga County because of having

4    used an opioid, and not somebody who, for example, is only a

5    heroin user and never had a prescription opioid.

6         Do you follow that question?

7              MS. WELCH:  I think I do, and I think it's an

8    important question.

9         Let me start by saying I think we wish we knew what

10   they meant when they said every prescription is tainted.

11   From a liability standpoint, our clients cannot be liable

12   for manufacturing and lawfully selling FDA-approved

13   products.  And I think even the lawyers on that side of the

14   room would agree that not every prescription written in the

15   Track One jurisdictions for an opioid was tainted or wrong,

16   or shouldn't have been written in some fashion.

17        There are prescriptions out there that everyone should

18   be able to agree were fine, were medically appropriate, were

19   written for a person who needed them by a doctor exercising

20   their judgment that was not relying on misinformation or

21   misrepresentations, and we're entitled to know which ones

22   are and which ones aren't.

23        But I think you're right, and I think what your

24   question gets to is that there are two different ways to go

25   about doing what we're asking that you require them to do.

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 12 of 86. PageID #: 26151
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 11 of 85. PageID #: 24595

11

1    And I think there's been discussion and meet and confers

2    about the notion that this is an impossible task:  You can't

3    expect us to look at 10 billion prescriptions or 10 million

4    prescriptions and tell you for each one was it medically

5    appropriate or not.

6        But what they can do is first look at the

7    prescriptions for which they've reimbursed, and I know

8    they're not seeking damages based on reimbursement, but

9    that's a universe of defined information that they know.

10   And they can tell us for those reimbursed prescriptions,

11   which ones do they think should not have been written.

12   That's something that's relevant potentially to liability,

13   to their claims, and to our defenses.

14       Telling us that they believe there's a taint or a

15   swirl around all of the prescriptions doesn't help us

16   defend, and we don't think gets them over the line, because

17   causation is an element of every single one of the claims.

18       So on the one hand, they can start with some smaller

19   universe.  They did it in Chicago.  In the Chicago case

20   where they were ordered to provide this information, they

21   didn't start with a billion prescriptions or a million

22   prescriptions written in the city of Chicago.  They started

23   with the prescriptions that had been reimbursed, and they

24   looked at those, and they applied a construct, prescriptions

25   that had been written for over three months for

1    non-cancer-related reasons, and they came up with just over

2    250,000 claims.  And from there --

3                 SPECIAL MASTER COHEN:  What database?  More

4    importantly, what would the equivalent database be in the

5    Track One cases?

6                 MS. WELCH:  I believe here it's a combination

7    of the CMS-reimbursed claims database with an overlay of the

8    medical claims databases that give us the prescription

9    reason, the diagnosis code is I think what it's called in

10   many of these databases.  And it's that universe of

11   information I think from which they can start.

12       And let's use the 250,000 claims as an example.  They

13   whittled it down to there, but it was clear in Chicago that

14   plaintiffs didn't believe that all 250,000 prescriptions

15   written for over three months for non-cancer-related

16   reasons, they didn't contend that all of those were

17   improper.  And they were ordered to identify which ones were

18   improper and to explain the basis.

19                 SPECIAL MASTER COHEN:  Wasn't that only

20   because they were seeking money damages in Chicago though?

21                 MS. WELCH:  I don't think the order was

22   because they were seeking money damages for reimbursement of

23   the claims.  It was in the context of a case where one of

24   the things they were seeking was reimbursement for those

25   claims, but what they're telling you here is that even

1    though they are seeking even more attenuated damages, they

2    shouldn't be required to identify the prescriptions that

3    caused the harm.

4         So we think the rationale for why the Court ordered

5    the identification of those prescriptions is equally

6    relevant whether or not they're seeking reimbursement or

7    not, and we think that the Court understood that when it

8    issued CMO-1.  The CMO-1 requirement likewise wasn't tied to

9    whether or not they were seeking reimbursement.  CMO-1 was

10   tied to whether they were seeking damages relating to

11   prescriptions that allegedly caused harm.

12        So we believe that it is clear that they can do it.

13   That's one way.

14             SPECIAL MASTER COHEN:  So let me ask you a

15   question.  There are three different interrogatories, as you

16   said.  Whether they were written on reliance from messages

17   given by the defendants, whether they were medically

18   necessary or unnecessary, inappropriate, and whether they

19   led to addiction, let's just take the last one for a moment.

20        The addiction question, it seems like you can come at

21   it two different ways.  The addiction question, you can look

22   at all of those cases where the plaintiffs had to deal with

23   addicts, right?

24             MS. WELCH:  We agree.

25             SPECIAL MASTER COHEN:  And then look at

1    whether those addicts in fact ever took an opioid product

2    manufactured or distributed by the defendants.  So that's

3    coming at it kind of from the population backwards.

4         Written on reliance, you could look at all of the

5    scripts and basically say every single one, every single one

6    a doctor in some way relied on.  In other words, it's just

7    that you might not like the answer, but it's a different

8    direction at coming at the answer.

9         What I'm trying to figure out is how you would ask

10   them to determine which ones are appropriate and which ones

11   were not, and whether that ties more to the question of

12   reliance or more to the question of addiction, if that makes

13   any sense.

14              MS. WELCH:  I think I understand the question,

15   and I think with respect to which of the prescriptions were

16   medically inappropriate or medically proper, it's not a

17   question there of reliance on a misrepresentation.  I think

18   that is a related but separate question.

19              SPECIAL MASTER COHEN:  Agreed.

20              THE WITNESS:  I think when you're talking

21   about medically appropriate or medically proper

22   prescriptions, there are criteria that one might use to

23   determine based on Mr. Reed's medical history whether the

24   prescription written for two months or three months of

25   opioids was appropriate given the medical circumstances.

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 16 of 86. PageID #: 26135
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 15 of 85. PageID #: 24599

15

1          We can't do that for them.  The burden shifting, they

2     would seek under Rule 33(d) to say we'll give you all the

3     information, and you go sort it out if that's something that

4     you want to see, but we don't know what criteria they're

5     using.  And again, the starting point in Chicago was three

6     months, prescriptions three months or longer for non-cancer;

7     but even of that population they seem to concede that not

8     all of them were medically improper.

9          And so the next exercise was for them to look at those

10     prescriptions, for them to look at the diagnosis code; why

11     was the prescription written, and to tell us if they contend

12     that it was a medically improper or medically inappropriate

13     prescription.

14               SPECIAL MASTER COHEN:  Are you saying they did

15     do that in Chicago?

16               MS. WELCH:  They were ordered to do that.  We

17     believe that work was in process when the MDL was formed and

18     the case was transferred here.

19               SPECIAL MASTER COHEN:  And then put on hold.

20               MS. WELCH:  Correct.

21               SPECIAL MASTER COHEN:  Go ahead.

22               MS. WELCH:  Notably, the plaintiffs want to

23     position this case as a case where it's going to be

24     aggregate proof and so they don't need to do any of this and

25     we're not entitled to it, but they themselves have demanded

Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 1 of 86 PageID #: 26136
Case: 1:17-md-02804-DAP Doc #: 931-15 Filed: 10/01/18 16 of 85 PageID #: 24596

16

1    vast amounts of individualized discovery in this case.

2    They've demanded call notes and marketing communications,

3    and virtually every document that would suggest that there

4    was a communication to individual doctors.  Why on earth

5    would that be necessary in a case of aggregate proof?

6         They've demanded detailed transactional data.  They

7    haven't limited their requests for marketing materials to

8    aggregate materials or materials that are sufficient to show

9    what the messages were.  They've wanted transaction and

10   communication-level data that's highly individualized.

11        And they can't have their cake and eat it too.  They

12   can't say on one hand they're entitled to 20 years of

13   individualized discovery, and we get none because of their

14   theory of the case.

15        They also seek to avoid doing it now.  And on the one

16   hand, they may suggest to you that this is impossible.  I

17   think the two ways that you've discussed and that we've

18   tried to frame how they could go about doing this shows it's

19   possible.  And there's not an affidavit in the record

20   suggesting that it's not possible or even suggesting the

21   burden.  There's nothing in the record before the Court

22   substantiating burden, let alone substantiating

23   impossibility.

24        So perhaps recognizing that ultimately they will need

25   to do this they try to avoid at least doing it now, saying

1     this is premature, these are contention interrogatories;

2     maybe at the end of fact discovery, maybe in expert

3     discovery.  That's not enough, we need the information now.

4                    SPECIAL MASTER COHEN:  So your letters have

5     said -- by the way, were you reserving five or ten minutes?

6                    MS. WELCH:  The discussion we had was 30

7     minutes for principal arguments --

8                    SPECIAL MASTER COHEN:  Okay.

9                    MS. WELCH:  -- and five to ten minutes for

10    rebuttal.

11                   SPECIAL MASTER COHEN:  That's fine.

12                   MR. BRADY:  I was going to try to stop in two

13    or three minutes to let the pharmacies --

14                   SPECIAL MASTER COHEN:  Well, as Kavanaugh did,

15    I'll take two of them to ask or answer a question.

16         So your letters suggest -- and I think you wrote this,

17    and I don't remember who else might have -- things along the

18    lines of "or at least they should say so in the

19    interrogatory."  At least they should say we can't produce

20    this, we can't do this.  Okay?

21         So what if their response -- and I think it might be

22    this -- is, look, we're not coming at the case this way.

23    We're going to try and prove our case using aggregate proof,

24    which perhaps the Court might not let them.  Maybe it's a

25    summary judgment or a *Daubert* issue and the case goes away;

1    but let's not get to that, we're not there yet.

2         They say we are going to commit to not using

3    individual scripts to prove our case, we are going to commit

4    to aggregate proof, and experts testifying about multiple

5    regression analysis, and so on and so forth, to prove our

6    case, as they did in other cases like Neurontin.

7         And if the ruling is, okay, fine, if that's how you

8    contend you're going to pursue your case, then you can't use

9    any individual prescription analysis, you can't point to

10   any.  You have to say so in an interrogatory.  You have to

11   commit in writing that you're not seeking damages based on

12   individual prescriptions.  And if it comes to trial and you

13   want to rely on any of that, you are not going to be allowed

14   to.

15        Okay.  Why isn't that enough?

16             MS. WELCH:  Well, first, even in Neurontin,

17   which is the case that they rely on --

18             SPECIAL MASTER COHEN:  I disagree with

19   your -- I saw what you said, and I don't think that's right.

20   I don't think that -- I should put it this way.  I haven't

21   read the whole case, but the quotation that you gave me that

22   talks about individual proof, I don't think that there was

23   individual proof.  I think that it was a statement that

24   there wasn't.  I'd have to go back and read it; I admit I

25   haven't done that.

Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 20 of 86 PageID #: 26139
Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 19 of 85 PageID #: 24939

19

1          MR. CHEFFO:  I was one of the lead lawyers --

2          SPECIAL MASTER COHEN:  You were there?

3          MR. CHEFFO:  -- in the Neurontin case, yes.

4   So there was individual proof.  In fact, there was

5   depositions of doctors that were used and shown.

6          SPECIAL MASTER COHEN:  To whom by whom?

7          MR. CHEFFO:  During the course of the

8   discovery there was transcripts and depositions of doctors.

9   The case involved Kaiser at the time, but doctors who

10  prescribed.

11         SPECIAL MASTER COHEN:  All right.  So would

12  you agree though that, again, I didn't read it, I was just

13  given two or three lines from what I'm sure was a much more

14  complicated opinion, but the essence of that opinion seemed

15  to be the Court spurning of that level of proof, that kind

16  of proof to get anywhere.

17         MR. CHEFFO:  Well, there was a few things.  I

18  don't want to take up too much time, but I think -- and we

19  can address Neurontin separately.

20      I think Neurontin was very different for a number of

21  reasons.  First of all, the case was all about off label

22  marketing and promotion, and the theory was if it was used

23  for and prescribed for certain disease end points that were

24  not approved, then their claim was essentially that they

25  were snake oil.

Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 1 of 86 PageID #: 26140
Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 2 of 85 PageID #: 25594

20

1      So then their methodology was to basically say if it
2  was approved, if it was used for this type of disease and
3  ICD 9 code, that therefore we think it was categorically
4  improper.

5      Here it's approved for chronic pain, which is
6  drastically different.  You're right, this is also a *Daubert*
7  issue, but there clearly was a lot of discovery in the case
8  that went on.  No one suggested that you couldn't raise
9  these individual issues.

10     We ultimately in that Court -- and I think, you know,
11 again, it is a case, it's there, we think it's
12 distinguishable.  It's frankly an anomaly and an outlier in
13 all the other cases, and I think the difference there, as I
14 said, was that Neurontin, gabapentin, the underlying
15 medicine, was an antiepileptic drug that was approved for
16 epilepsy and post-herpatic neuralgia, which is the disease
17 -- or the pain from after you get herpes, and it was widely
18 prescribed.

19     The claim was it was all as a result of off-label
20 marketing and promotion and it shouldn't have, but it was
21 very, very different than a medicine that's been approved
22 for many, many years for pain, and the claim here is that
23 you shouldn't, it didn't work for pain.  So it's a
24 completely different situation, I think, but we can brief
25 that if you'd like.

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 22 of 86. PageID #: 26141
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 22 of 85. PageID #: 24595

21

1          Can I add two quick things?  And we may want to turn

2     it over.

3               SPECIAL MASTER COHEN:  Ask Donna, not me.

4               MR. CHEFFO:  Do you mind, Donna?

5               MS. WELCH:  No, go ahead.

6               MR. CHEFFO:  Just really two points.  One was

7     I think it's not correct, frankly, to say, you know, they

8     may argue, they may say that it's impossible or they can't

9     do it.  In fact, and again, there's nothing in the record

10    where they know how to find affidavits, and they haven't

11    said that this is the time, we've kind of been through this

12    before.  There is no affidavit that says this is impossible.

13         In fact, we have given you evidence that it is

14    possible.  If you read the transcript from the Summit County

15    Medical Examiner, they said that there's 213 deaths,

16    overdose deaths in Summit County in 2015.  We regularly look

17    at the medical records, we look at the PDMP, OOARS as I

18    think it is called here, and we actually do this analysis,

19    and we have the right to get medical records.

20         So in fact, everything in the record says just the

21    opposite, that it is possible.  So it would not be right --

22               SPECIAL MASTER COHEN:  That's the led to

23    addiction question.

24               MR. CHEFFO:  And the other point was I think

25    you said with respect to can they just say, you know,

1    everything, can they just say it all.  Right?  I think that

2    was the first point.  And I would just address that briefly

3    by saying this:  Maybe in a complaint you can do that, I

4    suppose, and just say we think everything was tainted, but I

5    don't think -- and you know, again, they haven't done it,

6    but I don't think they could say under Rule 11 or verified

7    interrogatory response that we think every prescription that

8    was written is somehow improper, without talking to any

9    doctors, without looking at the prescriptions, without

10   talking to the patients to find out if they actually

11   benefited from these medicines.

12       Think about it.  Patients continue to take a pain

13   medication for years and years and years because it didn't

14   work?  And they didn't know it?  And they somehow didn't

15   work?  Doctors continued to prescribe it for years and years

16   and years to patients in chronic pain, and it didn't work?

17       So I don't know how you can make the allegation under

18   essentially the rules that would apply and say we think

19   every prescription written in Cleveland, Cuyahoga, Summit,

20   or Akron, was somehow improper, and we're just going to wave

21   our hand over it without actually doing the type of work

22   that we're talking about, which is actually defining the

23   narrow universe.

24       The last thing I'll say, David, what we're really

25   asking for is if we don't have this type of information it's

1    a needle in a haystack, because essentially what we then

2    have to say is here is this potential universe of thousands

3    or millions of claims.  Maybe we think some of them we want

4    to hold you responsible for billions of dollars and all this

5    types of relief, injunctive relief, but we'll tell you

6    later, or maybe we won't know, or maybe when you get our

7    expert report.

8        That's not the way it's supposed to work.  You've

9    asked us to produce tens of millions of pages of documents

10   and information.  We basically said you've made a claim that

11   many people were injured, that many people were harmed, that

12   there were these prescriptions that led to bad things.

13       I think it's a plain vanilla kind of argument we are

14   making, which is show us those prescriptions.  We shouldn't

15   be required to look at every prescription ever written and

16   try and divine which ones might be at issue here.

17                   SPECIAL MASTER COHEN:  30 seconds to wrap?

18                   MS. WELCH:  Yes.  I'll wrap up by saying it's

19   not sufficient for them to just say we can't do it or we

20   shouldn't have to do it.  It's clearly relevant to Mark's

21   point.  We have produced millions of pages, and the

22   discovery rulings that are relevant to the defendants set

23   the frame for proportionality here.

24                   SPECIAL MASTER COHEN:  I agree.  I agree.

25       I see some folks in the back row kind of looking at

1   each other like maybe they want a turn, and I don't know

2   what the agreement is, so I'm looking to you to tell me.

3                    MR. DELINSKY:  David, if it's appropriate.

4                    MS. SINGER:  Two minutes.

5                    MS. WINNER:  I think we have three.

6                    SPECIAL MASTER COHEN:  I'll let you have four.

7                    MS. WINNER:  Thank you.

8                    MR. DELINSKY:  Thank you, Special Master.

9   Eric Delinsky on behalf of CVS.  I'm speaking on behalf of

10  the other major pharmacy defendants, as well; Rite Aid,

11  Walgreens, Walmart.

12       Special Master, we have comparable interrogatories and

13  we join in the manufacturers' arguments.  All

14  interrogatories are different.  We have two of them, they're

15  set forth in the two letters we've provided to you on the

16  subject.  I won't get into them unless it would be helpful

17  to you.

18       But suffice it to say, our two interrogatories are

19  very tethered to plaintiffs' claims.  In other words, they

20  seek the prescriptions, the filling of which plaintiffs

21  contend caused them harm, and for which they seek recovery.

22  They're narrow in that fashion.

23       The reason why I requested a few minutes to speak is

24  simply to explain how this category of discoverable

25  information pertains to the pharmacy defendants, and frankly

Case: 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 26 of 86. PageID #: 26145
Case: 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 23 of 83. PageID #: 24599

25

1    to our distributor defendants as well, because it's

2    different than as to how it pertains to the manufacturer

3    defendants.

4         The pharmacy defendants and the distributor defendants

5    aren't claimed, aren't alleged to have engaged in a fraud.

6    Those aren't the claims against us.  Thus there's no room

7    for a claim by plaintiffs that all prescriptions that

8    involved any of us are somehow tainted.

9         Cases like Neurontin and cases like ConAgra, all of

10   which involved sales and promotional activity, do not

11   pertain to the claims against the pharmacies and other

12   distributors.  The claims against us are based on the idea

13   that we shipped orders of prescription opioids to pharmacies

14   that were allegedly suspicious, and that we therefore should

15   not have released from the warehouse.  Even as pharmacies

16   that's the allegation against us because, as you know,

17   Special Master Cohen, we are sued in our capacity as

18   distributors.  The allegation is not that all of the

19   shipments were improper, it's that some slice of them were

20   suspicious and shouldn't have been shipped.

21        For plaintiffs to make their claim, the next step is

22   they then have to show that pills or controlled substances

23   from these suspicious orders caused them harm, and the link

24   to that claim are the prescriptions that were filled.  In

25   other words, the prescriptions that were illegitimate in

Case: 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 27 of 86. PageID #: 26146
Case: 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 26 of 85. PageID #: 24506

26

1    nature, that pills from these allegedly suspicious orders

2    were used to fill.  Those prescriptions are the link,

3    Special Master Cohen, between the conduct alleged against

4    us, the suspicious orders that we allegedly shipped, and

5    plaintiffs' harm.

6         In the pharmacies' interrogatories --

7              SPECIAL MASTER COHEN:  Let me ask you a

8    question.  If the plaintiffs can identify for you the

9    suspicious orders alone -- just those, right, which

10   presumably they would do using ARCOS data or some other

11   mechanism; but they come back and give you a spreadsheet,

12   here are all the orders that are suspicious -- why do you

13   then need any additional link of which pill from which

14   prescription caused harm?

15             MR. DELINSKY:  That's a good question, and the

16   answer is as follows:  An order can be deemed suspicious,

17   we're talking about the wholesale level, so an order can be

18   suspicious due to its wholesale size, its frequency, and

19   other characteristics about it, none of which have anything

20   to do about how those pills ultimately are used.

21        So in theory and as a practical matter, this is most

22   often how it very well turns out, a suspicious order can be

23   shipped from a wholesaler to a pharmacy and result in no

24   ground level diversion at all.  Every single pill in a

25   suspicious order could be used to fulfill a perfectly

1    legitimate prescription, and the order is simply deemed

2    suspicious because from a wholesale perspective it was too

3    large.

4         So that's why identification of the suspicious orders

5    or the alleged suspicious orders themselves are not enough.

6    It doesn't provide us any information about the core theory

7    is that the drugs in the suspicious orders then were

8    diverted, and diverted in a way that caused the counties or

9    the cities harm.

10        SPECIAL MASTER COHEN:  So I think your time is

11   up.  Thank you for that.  When we come back to you, another

12   thing that we haven't touched on but is clearly on the

13   horizon are the 30(b)(6) topics.  And one of the things that

14   I would ask you if we had two more hours to go into is to

15   what extent can the information that you're seeking be

16   sufficiently answered in writing.  So remember to address

17   that when we come back to it, and if you would address that

18   to some extent, Linda, during your presentation, that would

19   help me.

20        MS. SINGER:  All right.  I am just going to

21   stand here.

22        So first of all, actually I think there are three

23   basic issues that are raised by defendants' interrogatories.

24   And by defendants, I am principally referring to the

25   manufacturer defendants.

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 29 of 86. PageID #: 26148
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 28 of 85. PageID #: 24402

28

1    The first is that we don't have a list, the CT-1

2    bellwethers do not have a list of medically unnecessary

3    prescriptions to produce to defendants, and we cannot

4    produce what we don't have.  That's first.

5    Second, we have provided, however, the underlying data

6    to the extent that we have it, and I'll describe what that

7    is, and a host of individualized information from which

8    defendants can draw their own conclusions.  And under

9    Federal Rule of Civil Procedure which defendants have not

10   addressed, that is sufficient to identify the business

11   records.

12   And third, you know, this idea of medically

13   unnecessary prescriptions is really a creature of

14   defendants' making in this case.  You will never find it in

15   any of the CT-1 bellwether cases, it is not how we intend to

16   prove our claim.  It is different than the city of Chicago

17   case.

18   And I'll stop there for one minute since you asked

19   about it, and I know Miss Welch spoke about it for some

20   time.  In that case there were false claims allegations, and

21   those false claims allegations turned on whether the claim

22   was false because it caused doctors to submit and certify

23   and the city to pay prescriptions that couldn't be covered

24   by their plan which required that they be medically

25   necessary or appropriate.  That's not the claim here.  The

Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 30 of 86. PageID #: 26149
Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 29 of 85. PageID #: 24603

29

1    cities and counties have specifically disclaimed seeking

2    reimbursement for those claims.  So those are the three core

3    issues that I'm going to speak to.

4         One other thing I just wanted to note, you addressed

5    some of these issues when they came up in the context of

6    RMPs in discovery ruling 1, and so we're not coming to this

7    issue on a blank slate, though a discovery ruling six weeks

8    or two months ago feels like dog years in this case.  But

9    you know, there defendants were seeking medical records,

10   insurance records, pharmacy records for any individual we

11   claimed was harmed; documents related to any patient who

12   received, obtained, or were harmed by improper or medically

13   unnecessary prescription and claims data.

14        And there you made the same analogy I think you drew

15   from your questions today, which was that we can't conflate

16   discovery with sufficiency of proof.  And I think many of

17   the arguments defendants are making relate to the fact that

18   they think a case proved by aggregate proof is insufficient,

19   but that doesn't go to the core discovery issues.

20                   SPECIAL MASTER COHEN:  Well, they clearly

21   think it's insufficient, but they interpose a different

22   issue, which is that regardless of which way you choose

23   proving your case, they're allowed to defend it the way they

24   want to, and the information they're asking for is highly

25   relevant to their defense.

1            MS. SINGER:  And I will get to that.  I think

2     the short answer to that, which I'll come back to, is first

3     of all, we've produced lots of claims data for defendants to

4     provide their own analysis of; and two, we have provided

5     265,000 documents with individualized proof information in

6     it.  And I will talk about what some of that is.  So it is

7     not the defendants don't have information, what they don't

8     have is our identification of prescriptions according to

9     their theory of defense.

10           SPECIAL MASTER COHEN:  Well, would you even be

11    willing to say, okay, here are all the 265,000 documents

12    that reflect, for example, whether -- I'm not sure what they

13    reflect, but I assume for example that they would reflect

14    that a given patient was prescribed opioids and had some

15    sort of bad outcome.

16           MS. SINGER:  So I thought it might be helpful

17    to talk about this a little more concretely, so I will jump

18    ahead.  I'm sorry, I only have one copy.

19           MS. WINNER:  Do you have a copy for us?

20           MS. SINGER:  I only have one.

21           MS. WINNER:  Can you tell us what it is?

22           MS. SINGER:  Yes, I'm going to talk about it.

23           SPECIAL MASTER COHEN:  Is this in the

24    record --

25           MS. WELCH:  Well, this was not provided in

1    advance.

2                    MS. SINGER:  I'm going to go through it.

3                    MS. WINNER:  The top summary isn't Bates

4    stamped.  Is this a produced document?  Because some of the

5    remainder appears to be hearsay --

6                    MS. SINGER:  I promise that I will explain

7    what's here.

8         So what's here is a summary that was created by

9    counsel of some of the individualized proof that has been

10   provided in the case with Bates numbers to give you a sense

11   of the kind of information that is had, and then examples

12   with Bates numbers from defendants' produced documents.

13        And I raise this only to your point about the kind of

14   information that defendants have available to them.  And let

15   me come back to that later.  I did have one other thing that

16   I wanted to submit.

17                   MS. WELCH:  Special Master, we object to the

18   introduction of this evidence here at the hearing.  It's

19   lawyer-created, it wasn't provided in advance, and we've had

20   no opportunity to go back and look at what this information

21   is and how it would be used.

22                   MR. CHEFFO:  This has been pending for months

23   and months.  I think you know that, David.  Obviously it'll

24   be decided at the time of jury trial, but this is highly

25   improper to basically spring this on us in the middle of the

1   hearing when you haven't seen it, and we don't even know

2   what it is.

3              MS. SINGER:  I could not agree with that

4   more -- to get back to the microphone.  You know, we

5   received letters this week that defendants have come here to

6   argue about that we haven't even responded to.

7              MR. CHEFFO:  That's not true.

8              SPECIAL MASTER COHEN:  We're getting off

9   topic.  So I don't need to see these.

10       To go back to my original question.  Okay?  So I

11  assume that in here are autopsy reports, are medical records

12  of the decedent, are prescription records of the decedent,

13  but that seems to be insufficient for them to do what you

14  say they can do.  It seems like they would also need at

15  least this:  There are the records, you can do it as well as

16  we can, but our conclusion is that anyone who was

17  prescribed -- perhaps this is what you think -- our

18  conclusion is that anyone who was prescribed an opiate

19  product that you manufactured or distributed and ended up

20  dying is someone who falls within the category of someone

21  who was responsive to your interrogatory, that is they

22  received medically inappropriate treatment.  Is that --

23             MS. SINGER:  So again, with you for almost all

24  of that except the concept of medical necessity, which is

25  not again an element of our proof or claims here.

1          SPECIAL MASTER COHEN:  Okay, so let's take off

2     the last little bit.  My question is, you haven't given that

3     description.  You haven't said what I just said in an

4     interrogatory response.

5          MS. SINGER:  That we contend that all -- I'm

6     sorry, say it again, David.

7          SPECIAL MASTER COHEN:  You know, I'm not

8     suggesting what answer you should give, but one of them

9     could be --

10          MS. SINGER:  A description of the types of

11     conduct and prescriptions and injuries that we consider

12     covered by our complaint.  I think our complaint lays that

13     out, and we can certainly respond to an interrogatory to say

14     that.  I think we have said that repeatedly in

15     correspondence with defendants.

16          I understand that interrogatory responses are

17     different --

18          SPECIAL MASTER COHEN:  Yes.

19          MS. SINGER:  -- but I think here the core

20     issue that defendants have been talking about is not a

21     description of a class of conduct and claims, but specific

22     identification of prescriptions, providers, pharmacies,

23     patients.  And that's what we don't have.  And I think it

24     might be helpful to think about their request in two

25     categories.  One is data we don't have, information we don't

1    have.

2              SPECIAL MASTER COHEN:  And that you could say

3    in an interrogatory we do not have, correct?

4              MS. SINGER:  That's right.  And I think again

5    we have said that in our objections and responses.

6              SPECIAL MASTER COHEN:  Okay.

7              MS. SINGER:  Two is underlying business

8    records, claims data, autopsy records, medical reports,

9    addiction treatment records to the extent that they can be

10   produced under federal law, EMS runs, police records, court

11   files; all of which very specifically cover individual X,

12   typically named, picked up on this corner with prescriptions

13   of opioids bearing CVS pharmacy dispensing.

14             SPECIAL MASTER COHEN:  Some of them do, but I

15   presume some don't.

16             MS. SINGER:  That's true.

17             SPECIAL MASTER COHEN:  You know, there are,

18   I'm sure, without having gone through any of the data, that

19   there are folks who overdosed on heroin and never took an

20   opioid prescribed, manufactured, or distributed by the

21   defendants.  Right?

22             MS. SINGER:  Of course.

23             SPECIAL MASTER COHEN:  And would you claim, do

24   you claim -- that's kind of part of their question -- that

25   the cost that stems from that particular event is something

1    they should pay for because it's part of the nuisance, for

2    example?

3                MS. SINGER:  So the complaint alleges, and I

4    think the scientific evidence on this is clear, that roughly

5    75 to 80 percent of people who use heroin first started with

6    a prescription opioid.  And you know, I think this is one of

7    the difficulties of mapping defendants' arguments to ours.

8         When defendants marketed their opioids, first of all,

9    a lot of it was unbranded, right?  It wasn't specific to a

10   particular product.  As you pointed out, a lot of the impact

11   of their marketing, it may have been Janssen that was doing

12   the marketing or Teva, but could have led to a generic or a

13   Purdue prescription that may have caused the physician or

14   the patient to stay on the drug longer or go to higher

15   doses, both of which are far more dangerous.  That becomes

16   the real difficulty of teasing that out from the data.

17        What we do allege is that the defendants engaged in

18   pervasive marketing campaign.  It touched virtually every

19   source of information.  Defendants did it because it worked,

20   they watched it work, and in their internal documents is

21   lots of information where they talk about increased

22   prescribing and the impact that their marketing is having.

23        You know -- and I think the example that Miss Welch

24   gave is an instructive one, call notes.  You know, we've

25   asked for individualized proof.  We should be expected to

1    produce it ourselves.

2        Defendants maintained call notes in the course of

3    their business and they have produced them to us.  We

4    haven't told them to go out and have their sales reps write

5    down everything they said to doctors and doctors they

6    visited, but where they've kept those records they're

7    responsible for producing them.  That's exactly what we have

8    done here, and I think Federal Rule of Civil Procedure 33(d)

9    specifically says that where the response for an

10   interrogatory can be found in a business record then you're

11   entitled to direct the requesting party to those business

12   records.  And we have done that at great length.

13       And one of the things we looked at prior to this

14   hearing, because after defendants raised these issues we

15   asked them some of the same questions, because they clearly

16   articulated that it is relevant to their own defense

17   strategy, and that, you know, we think they have information

18   that they are asserting we have.

19       So we asked them the same questions, and interesting

20   to look at how they responded to that, if I can find it.  So

21   Allergan, Miss Welch's client, represented that it was a

22   contention interrogatory that was not ripe.  Purdue promised

23   to produce IMS data, so the sales data that they buy, and

24   their abuse and diversion detection data, so that we could

25   assess that ourselves.

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 38 of 86. PageID #: 26157
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 37 of 85. PageID #: 24157

37

1          Janssen --

2                    SPECIAL MASTER COHEN:  I missed something.

3    These are responses to what?

4                    MS. SINGER:  Interrogatories that plaintiffs

5    served.

6                    SPECIAL MASTER COHEN:  Asking what?

7                    MS. SINGER:  Asking for prescription data.

8         So I think by defendants' own theory, their own

9    responses, they say they can't do it.  They say it's

10   information in the hands of third parties, they're

11   contention interrogatories, and they're premature because

12   discovery is not done.  And we don't even have, again, these

13   lists.

14        I also want to offer, because defendants have raised

15   as an argument that we have not built a factual record here,

16   and I just got this this afternoon, but it is a declaration

17   on the fact that --

18                   MR. CHEFFO:  We're going to object.

19                   MS. SINGER:  Can I finish speaking?

20                   MR. CHEFFO:  Usually people wait until there's

21   an objection heard before they give the evidence to the

22   Judge.

23                   MS. SINGER:  He hasn't looked at it.

24                   MR. CHEFFO:  So again, David, same rules.

25                   MS. WINNER:  Again, on behalf of the

1    distributor defendants, may I ask for a copy of this

2    declaration, please?

3              MR. CHEFFO:  I think it's the same objection.

4    I can't even get through it to know what it is.  There's not

5    even been a proffer.  It is clearly highly unusual, if not

6    highly improper.  We've been at this for a very long time.

7    The record is what it is, and if we allow this type of

8    conduct, this will never end.

9         You know, if counsel had something that was probative

10   or interesting or useful, they know where to find us.  They

11   could have just sent this, and we could have evaluated it.

12   But to kind of spring it in the middle of hearing -- they

13   didn't even come to us before and say, oh, by the way, we

14   have this information, we'd like you to look at it.  They

15   are just trying to spring it on us, and you, in the middle

16   of a hearing.

17             MS. SINGER:  Again, defendants are making the

18   argument that we haven't provided a record.  We're here at

19   the hearing.  If defendants want to keep the record open --

20   but to say that we haven't identified a burden in compiling

21   information that we've produced to them --

22             SPECIAL MASTER COHEN:  Let's talk about

23   burden.  How would you characterize the burden that was

24   placed on the defendants in discovery production?

25             MS. SINGER:  In what regard?

1          SPECIAL MASTER COHEN:  What adjective would

2    you apply to characterize the discovery burden that I placed

3    on defendants?

4          MS. SINGER:  This is a large complex case.

5    Defendants have produced significant number of documents.

6          SPECIAL MASTER COHEN:  Tens of millions.

7    Would you say it was a heavy burden?

8          MS. SINGER:  I think it is a burden that's

9    proportional to the complexity and significance of this

10   case.  And I would also note that much of the production

11   that defendants have made in this case is of material that

12   was previously produced in other investigations of their

13   conduct, while plaintiffs have responded with I think for

14   Summit County and Akron close to 3 million pages of

15   documents, each of which have been gathered in the course of

16   this litigation for this litigation.  So both parties have

17   engaged in significant discovery.

18        I think the inquiry that's relevant for FRC 33 is

19   where the answer to interrogatory can be found in the

20   business records of a party that the question is who bears

21   the burden of answering that question.  And again, Federal

22   Rules say if the answer to an interrogatory may be

23   determined by examining, auditing, compiling, abstracting,

24   or summarizing a party's business records, and if the burden

25   of deriving or ascertaining the answer will be substantially

1    the same for either party, which is certainly the case here,

2    we don't have the answer in our records, we would have to do

3    exactly what defendants would have to do here.

4              SPECIAL MASTER COHEN:  Well, even as to the

5    prescriptions, okay, so defendants have databases, they have

6    access to data, IMS, whatever it is, that identifies every

7    script written of opioids.  Okay?  They have that.  And so

8    if we just look at that, they've got it, they can get it;

9    you've got similar data, you can get it.  But you said 70

10   percent of those, 70 percent of heroin users started out

11   with -- I think that's what you said -- started out with an

12   opioid script; that they don't know.

13             MS. SINGER:  So again, with many of these,

14   kinds of questions they are only knowable at an aggregate

15   level.  Maybe one way to think about this, when defendants

16   set out to market opioids for chronic pain to dramatically

17   expand the market, they didn't know if you were going to end

18   up with a script or I was going to end up with a script.

19   They didn't know whether it would go to somebody with a

20   mental health history or a history of substance abuse, or

21   childhood trauma.

22       What they knew was that a significant portion of those

23   patients would become addicted.  And to try to go back

24   person by person and figure out who that was, the fact is,

25   on an aggregate basis, on an epidemiological basis, we know

1     that 20 percent of the population is going to have those

2     characteristics because of the nature of this drug,

3     particularly when taken long term and at high dose.  They're

4     going to become addicted, they're going to overdose, and

5     they're going to die, and that's just what happens.

6          And this building and parsing of this case

7     prescription by prescription is not how it works in the real

8     world because, again, it wasn't marketed to you, it wasn't

9     marketed to me.

10               SPECIAL MASTER COHEN:  Do you think

11    that -- I'm going to jump way down the road, kind of a

12    theoretical hypothetical.  Do you think the defendants

13    should be precluded as an evidentiary matter from bringing

14    in doctors and asking them if they relied on any of the

15    marketing messages that they sent out?

16               MS. SINGER:  You know, not having that

17    question in front of us and just as an immediate reaction to

18    that, I think if defendants can identify doctors who they

19    want to bring in -- and again, they know who they visited,

20    they know who wrote prescriptions -- if they want to bring

21    them in to say that, sure.  I think the fact-finder will

22    have to assess the probity and the relevance, the value of

23    that evidence.  And that was I think one of the findings in

24    the Neurontin case.

25               SPECIAL MASTER COHEN:  Right.  But if they're

1   allowed to do it as a matter of a defense, which maybe is a

2   worthless defense, okay, I can imagine all the arguments you

3   would make as to why that is an irrelevant piece of evidence

4   in the case, but if they're allowed to do it, then can't

5   they discover the information necessary to find out who the

6   doctors were and which scripts were written, and which ones

7   you say are wrong and inappropriate, and whether they relied

8   on messages from the defendants?

9           MS. SINGER:  I think three answers to that.

10  One is they're entitled to do it from the information they

11  have, and they have vast amounts of that information.  They

12  were the ones out there doing that marketing.

13      Two is they can do it from the information that's in

14  the documents we produced to them, so we've produced

15  Cuyahoga, Cleveland, Summit, and Akron's claims data.  We

16  have produced that to them.

17      There are limits on how they can use it, but they have

18  that information from us, and they can come back to you.

19  We'll argue against it, but they have information on those

20  doctors, and then they have these 265,000 documents just

21  from Summit alone that show autopsies that often identified

22  the prescribing doctor, that showed the individual, arrest

23  reports, court records, all of those places.  Prosecutions

24  of doctors for running pill mills.  There is lots of raw

25  information in that discovery that let's them build this

1    defense and.

2        I think, again, the core difference here is that

3    defendants are permitted to pursue their defense.  They're

4    permitted to seek relevant evidence from us, and we're

5    producing that evidence in significant volumes, and we've

6    pointed them to that evidence.

7        What they can't do is require us to go out and create

8    that evidence so they have it in an organized fashion to do

9    that.  Again, asking us to apply a medical necessity screen,

10   which is not something we used in that complaint, I don't

11   even know how we'd define medical necessity because we don't

12   use it.  So how do we go about doing that?

13       And again, I want to come back to the FRCP 33(d)

14   argument, which I think is really at the center of this

15   question that we're grappling with.  You know, the rule

16   directs that the responding party may specify the records

17   that must be reviewed in sufficient detail to enable the

18   interrogating party to locate and identify them as readily

19   as the responding party could.

20       The advisory committees from 1970 note the subdivision

21   gives the party an option to make the records available and

22   places the burden of research on the party who seeks the

23   information.  Quote, this provision, without undermining the

24   liberal scope of interrogatory discovery, places the burden

25   of discovery on its potential benefitee.

1      SPECIAL MASTER COHEN:  I know how 33(d) works,

2    and I've applied it before.  And I am having trouble

3    understanding how -- it's a question of how -- it's an issue

4    of how the question is framed.  They're framing a question

5    that is different than the question you want to answer, but

6    the questions that they're asking, for example, "led to

7    addiction," how are they supposed to take the records that

8    you have provided and figure out which scripts led to

9    addiction and which ones didn't?

10      MS. SINGER:  Often the records will say.

11    Patient admitted with history of Opana use or prescription

12    opioid use, or oxycodone.

13      SPECIAL MASTER COHEN:  So is it your position

14    that in every instance where --

15      MS. SINGER:  No.

16      SPECIAL MASTER COHEN:  Then how are they

17    supposed to know?

18      MS. SINGER:  So I think where we have a clash

19    here is that, again, we have chosen to proceed on the basis

20    of aggregate proof because, again, that's how this marketing

21    and that's how the harm works in the real world.  Defendants

22    want to offer a defense, and they're getting literally reams

23    of information from us to help them build that defense.

24    They will have a chance to challenge the sufficiency and the

25    methodology of our proof.  They will have a chance to offer

1    their own evidence, doctors they want to bring in, patients

2    they want to bring in, addiction treatment experts, their

3    own regression analysis.  They'll have lots of ways to prove

4    their defense.

5         And I note, one of the cases we cite in our letter to

6    you is a case by the United States Department of Justice

7    against Life Care, a nursing home, and it played out in

8    exactly the same way in that case.  It was a false claims

9    case, so a case where in any case the burden was on the

10   government to say these are the claims that are medically

11   unnecessary.  And there the district court said in denying

12   defendants' motion to compel, defendant is not simply

13   requesting that the government disclose discovery.  They're

14   essentially requesting that the Court impose the affirmative

15   burden on the government to identify each claim in the total

16   universe of claims which could be categorized as false.

17        It goes on to say, simply because the defendant may

18   choose among these options -- and it goes through all the

19   ones I just discussed -- to pursue a litigation strategy

20   that relies on a claim-by-claim review does not justify

21   placing the burden on the government to be the party that

22   performs that review.

23        They will have the claims data.  They've also issued

24   subpoenas to the state Medicaid agency, state board of

25   health, the state addiction treatment agency.  They've asked

1      for all of this information.  They among their own records

2      have dispensing data, you know, all of that information, IMS

3      data.  CVS has PBM data on treatment.

4          And we've provided them, by the way, not just with

5      prescription claims data, but medical claims records that

6      can be matched up.  I mean, it is for our slice of the

7      universe that we see, which is a fraction of the population

8      of Cuyahoga and Summit, because the only claims data we have

9      is for the people who worked for the cities and counties.

10         Defendants actually through their own records have a

11     lot more information than we do, but we've provided what we

12     have.

13                  SPECIAL MASTER COHEN:  So let me ask you about

14     that.  The claims data is data for county and city

15     employees, right?

16                  MS. SINGER:  That's right, and their

17     dependents.

18                  SPECIAL MASTER COHEN:  And it includes whether

19     they ever received a prescription for opioids --

20                  MS. SINGER:  That's right.

21                  SPECIAL MASTER COHEN:  -- and whether there

22     was any -- well, do any of the databases also reflect for

23     those people whether they ever had addiction issues?

24                  MS. SINGER:  It includes their medical

25     records, where the provider -- right -- typically the city

1    and county have different prescription vendors from medical

2    claims, but we've produced them both for the periods we have

3    those records.

4              SPECIAL MASTER COHEN:  I guess I am trying to

5    figure out whether it's your position that every single one

6    of those prescriptions of opioids was part of the opioid

7    crisis.

8              MS. SINGER:  Part of the opioid crisis:  I

9    want to say back to you the way we would say it and the way

10   we have articulated it in the complaint, which is defendants

11   through their marketing and distributing of the opioids

12   caused an oversupply, an overuse of opioids in the cities

13   and counties, which caused an increase in all sorts of

14   public health and public safety issues that the cities and

15   counties had to pay for.

16        And so that happens, again, at an epidemiological

17   basis, and it is the difference between defendants saying we

18   have to prove every script and add them all up together, but

19   that's again not how the harm is created, because it's not

20   about whether you got the script or I got the script, but

21   that we knew that a percentage of the population was going

22   to get it, and we caused harm.

23        It is a sideshow of personal injury cases that are

24   very different standard of proof in those claims instead of

25   what these plaintiffs have asserted in this case.

1      And I guess the one other way I'd say it is that

2    defendants are entitled to their defense, and that is the

3    reason that we are producing all of the documents; the raw

4    data, the records of the sheriff, the police, the EMS runs,

5    the Narcan, courts, all of that stuff for them to go

6    through; but what they're not entitled to is to decide on

7    our offense what information we have to put together and

8    categorize in order for them to proceed with their defenses.

9    We can give them the raw data, we can give them the

10    documents.  And just as we have to put our case together

11    from their documents and our investigation, they have to do

12    that themselves.

13      And so again, if we were asking defendants to create

14    records of what every sales rep said, or -- I guess that's

15    the best example that comes to me -- and they didn't have

16    them, we couldn't under 33(d) or Rule 26 proportionality

17    require them to create it.  And that's what they're seeking

18    to have you require us to do, and there's no reason we

19    should bear the burden for their defense.

20                SPECIAL MASTER COHEN:  If I disagree with you,

21    let's get to the topic of answering in writing in 30(b)(6)

22    topics.  How do you address that?

23                MS. SINGER:  Answer which question in writing?

24                SPECIAL MASTER COHEN:  I'm not even sure.

25    There are a whole bunch of interrogatories that touch on

1   this.

2                    MS. SINGER:  So the interrogatory that asks

3   for us to identify medically necessary claims, again, I

4   don't know how we would do that when we don't apply a

5   medical necessity definition in our case.

6                    SPECIAL MASTER COHEN:  I said interrogatories,

7   I meant 30(b)(6) topics.  There are a whole bunch of

8   30(b)(6) topics where they say, well, at least plaintiffs

9   can do it in writing.

10                   MS. SINGER:  I mean, to the extent that we

11  have created the information or someone who can answer the

12  questions as one would in a 30(b)(6), but we can't instruct

13  someone to answer medical necessity questions when it's not

14  information that the city or cities or counties keep in

15  their regular course and they don't have the expertise to

16  do.

17       And to the extent that any of these things are going

18  to get created, it's not going to be through city and county

19  employees, it's going to be through expert testimony.

20                   SPECIAL MASTER COHEN:  Okay.  I think that's a

21  half an hour.  Is anybody keeping track?

22                   MS. SINGER:  It felt longer.

23                   SPECIAL MASTER COHEN:  That's my job.

24                   MS. BIERSTEIN:  Actually I wanted to just say

25  about one-and-a-half minutes on pharmacies, but before I do

1    that I wanted to underscore something that Linda just said

2    which I think is maybe getting a little lost here, which is

3    that what Mark argued earlier was that the burden should be

4    on the plaintiffs to find this -- to identify the medically

5    unnecessary ones, because he said we don't know what you

6    mean by medically necessary.

7         And I think what Linda was saying, and I just want to

8    underscore it, is no, we don't know what you mean by

9    medically unnecessary because it's not our term.  You can

10   word search the complaint, it's not there.  And because it's

11   not our term, we don't know what they mean.  And if we don't

12   know what they mean, it's not in terms of who would be more

13   appropriate to do it.

14             SPECIAL MASTER COHEN:  Let's change the

15   phrasing then.  What I think you do say in the complaint is

16   that there was an oversupply, that there were excess

17   prescriptions written, or at least excess pills prescribed.

18   So let's change it a little bit to say, okay, guys,

19   plaintiffs, identify those that are excess.

20             MS. BIERSTEIN:  Well, I think -- and that is a

21   question that actually segues into I think what I was going

22   to talk about, which is the pharmacy questions, because

23   that's not a question manufacturers have asked, but it is a

24   question that pharmacies are asking.

25        They're asking us to define what the appropriate

1    number of pills into any jurisdiction would have been,

2    that's in one of the interrogatories.  So I want to answer

3    it again quickly, because I don't want to push on the time

4    thing here.  In the context --

5              MS. WINNER:  Just to save time, this is Sonya

6    Winner for the distributors, I believe you're referring to

7    something that's not ripe, we've all agreed is not ripe.  It

8    has been submitted.

9              SPECIAL MASTER COHEN:  You objected to this.

10             MS. WINNER:  Yes.

11             MS. BIERSTEIN:  Okay.  So if we're not going

12   to argue about that, let me say I believe your question goes

13   to that particular interrogatory.  It's not one that the

14   manufacturers have asked, and it is one that the

15   distributors have asked, and we're not going to argue about

16   that one today.  That's fine.

17        What I would like to say about the pharmacies though

18   is you heard an argument, and I know this is switching

19   gears, you heard an argument about why even if the

20   pharmacies are only sued as distributors the dispensing

21   information is necessary, because what counsel is arguing is

22   that you don't know that the shipment of a suspicious order

23   led to harm unless you have the dispensing information.

24        That's not the position the pharmacies take when we

25   ask for dispensing information, so when we've requested

1  information about their dispensing records the answer we get

2  is, well, you haven't sued us as a dispensary, so you can't

3  get the records.  So either they're relevant they're or not,

4  the two issues are tied together or they're not.  But what

5  we're hearing is they're tied together when they want it,

6  but they're not tied together when we want it.

7       I think separate and apart from that, the issues

8  raised by the pharmacy interrogatories are actually not

9  similar to the issues raised by the manufacturers.  There's

10  an overall similarity in the sense that they're

11  individualized data, one dealing with prescriptions and the

12  other dealing with shipments, but when you drill into the

13  issue I think they're not similar, because the issues that

14  are overarching are theses contention interrogatories, when

15  is the appropriate time to answer them and who has the

16  records look very different.

17       The question about suspicious orders, which ones are

18  suspicious, suspicious prescribing, these are clearly expert

19  analysis questions.  They're not questions that would be

20  done upfront at this point in discovery because any analysis

21  you would do of suspicious ordering is clearly an expert

22  question.  So those interrogatories would call for expert

23  analysis, and to the extent that that is part of our case,

24  and that's another big difference, to the extent that that

25  is a term we use and is part of our case, it may be an

1    analysis we need to do, but it's an analysis our experts are

2    going to do.  So the deadline for us to do that is when we

3    provide our expert report, not when we answer upfront early

4    interrogatories.  So I think that is a key difference

5    between what's happening with the manufacturers and what's

6    happening with the prescribers.

7        The other difference is we need the discovery from

8    them to do it.  They want us to say which prescriptions they

9    dispensed we say were diverted.  They won't give us the

10   prescription information.  So it's another reason besides

11   the issue of expert analysis, it's another reason that it's

12   a question that would be answered later in the discovery

13   process after we get the information.

14                SPECIAL MASTER COHEN:  So that --

15                MS. BIERSTEIN:  I think that's it, I'm going

16   to sit down.

17                SPECIAL MASTER COHEN:  So you're saying then

18   that if you do get the information from the pharmacies that

19   you can answer the question.

20                MS. BIERSTEIN:  I believe -- as to whether we

21   can answer -- it may be that there will be one or more of

22   the questions that say we are unable to answer at some

23   point, but it's premature for us to figure out whether we

24   can answer it or we would abandon some aspects of our claims

25   if we couldn't answer it.  I think this is not the time to

1   know that until we have both the underlying information and

2   the expert analysis to tell us what we have.

3                  SPECIAL MASTER COHEN:  Before we go back to

4   defendants, Linda, I just want to ask you this question:  If

5   we frame it just a little bit differently and we say

6   identify for us the prescriptions that represent an

7   oversupply, not the ones that are medically inappropriate,

8   which is their terminology, or unnecessary, which is their

9   terminology, but the ones that represent an oversupply, the

10  ones that shouldn't have been written because it's more than

11  should have been written, whether it's the script as a whole

12  or the number of pills, or however you want to define it,

13  how about that?

14                 MS. SINGER:  I think that is -- A, it's a

15  little difficult because that's not the question they've

16  asked, and I think they're trying to pursue a theory of

17  defense that is about turning this into lots of personal

18  injury cases, and proving each -- creating a trail of proof

19  that is marketing to script to patient to harm, right, to

20  payment by the city and county, which is again not our case.

21       That said, oversupply is going to be an expert

22  question.  It's not going to be something that we could

23  answer on the basis of fact written discovery.

24                 SPECIAL MASTER COHEN:  Okay.  Let me ask you,

25  I want to be cognizant of your time.  When do people need to

1      leave to get flights, and so on?  When does everybody want

2      to be sure this is over?

3                      MR. CHEFFO:  I can't speak for the plaintiffs,

4      I think we've all assumed that it would be two hours, so I

5      think we're going to try to keep it within that.

6                      SPECIAL MASTER COHEN:  5:30 everybody wants to

7      be up, walking out.

8                      MR. CHEFFO:  I think we started at 3:40.

9                      SPECIAL MASTER COHEN:  I just want to make

10     sure nobody is missing planes.

11                     MS. WINNER:  5:30 is what we were

12     anticipating.

13                     MR. REED:  Special Master Cohen, I've tried to

14     honor the time agreement.  We're going over a bit, but I

15     would like to have a couple of minutes.  I think this is a

16     very important issue.

17                     MS. WINNER:  And as would I, if possible.

18                     SPECIAL MASTER COHEN:  If your compatriots are

19     late it's your fault, I want to get it clear, it's not my

20     fault.

21                     MR. REED:  Understood, I'm willing to accept

22     that.

23                     MS. WELCH:  I will start briefly, and let

24     Steve and Mark chime in.

25          The choice by plaintiffs to proceed by way of

1    aggregate proof does not relieve them of their obligation to

2    participate in discovery.  They can choose the way they

3    prove their case, they cannot deny us the discovery we need

4    to defend, and this is critical discovery that we need to

5    defend.  It's critical discovery that we can't do ourselves.

6         I want to take Miss Singer's three points.

7              SPECIAL MASTER COHEN:  Let's say you win

8    across the board, you get every ruling you could wish for.

9    Explain to me how you use it at trial.

10             MS. WELCH:  Let me give you an example of 230

11   overdose deaths in Summit during a particular time period.

12   Theoretically they are asking us to pay for the harm

13   associated with a national crisis.  They're asking us to pay

14   for the harm associated potentially with every single

15   overdose death.

16        We should be entitled at trial to say of 230 overdose

17   deaths, one, or perhaps zero, were of a person who took a

18   prescription for one of my client's products or one of the

19   other defendants' products.  That one or zero were

20   prescribed an opioid inappropriately.

21        And they want to talk about medically unnecessary

22   being our term.  It's not our term.  The term in their

23   complaint is necessary for legitimate medical uses.  So we

24   need to understand which prescriptions they claim were not

25   necessary for legitimate medical uses in a framework where

1     our clients marketed and sold lawful drugs that were FDA

2     approved.  And if a doctor wrote a prescription for someone

3     and it was necessary for a legitimate medical use, we are

4     entitled to defend on that basis.  And if a doctor wrote a

5     prescription for one of our clients' products and that

6     prescription didn't result in any harm, we're entitled to

7     defend on that basis.

8                    SPECIAL MASTER COHEN:  So why can't you say,

9     well, Court, jury, here are the 230 scripts that we wrote,

10    they were all legitimate.

11                   MS. WELCH:  The universe of prescriptions in

12    total for each of the defendants is a large number.

13                   SPECIAL MASTER COHEN:  It's equal for them to

14    identify them, or you?

15                   MS. WELCH:  It's not equal because we don't

16    know which ones they believe were not necessary for a

17    legitimate medical use.  To allow us to start with the ones

18    that they claim resulted in harm or that they claim were not

19    necessary for legitimate medical use narrows the universe to

20    something that then we can begin to seek third-party

21    discovery on.  But that is a relevant question, it's framed

22    by their pleadings, and it goes to the heart of our ability

23    to defend.

24        They talk about an overall taint and an overall

25    supply, but what we didn't hear them say is that they

1    believe every prescription for an opioid written in the

2    Track One jurisdictions during the relevant time period

3    shouldn't have been written or weren't for a legitimate

4    medical use, or that they did all result in harm.

5          And they are the ones in a position to know which ones

6    they think shouldn't have been written because they weren't

7    for a legitimate medical use, they are the ones in the

8    position to know which ones caused the harm, because we

9    don't even know what harm they are seeking reimbursement for

10    or seeking damages for right now.

11          They need to identify that universe so that we can do

12    the third party and other discovery to come to trial and

13    say, of those 5,000 they've identified, here's the answer.

14    Number one out of 5,000 was Mr. Jones.  Mr. Jones had X

15    condition.  Mr. Jones' doctor will testify that the

16    prescription was necessary.  If Mr. Jones died, it was for

17    X, Y, or Z other reasons; or perhaps Mr. Jones is living a

18    productive life, and the prescription did not result in any

19    harm to the communities here.

20                    SPECIAL MASTER COHEN:  What about the problem

21    of -- well, let's just put it this way:  What about Life

22    Care, how do you deal with Life Care where the Court says I

23    don't have the time -- I can imagine the Judge saying this,

24    I can imagine a judge I know pretty well saying this -- we

25    don't have the time to allow you to go through 5,000

1    prescriptions one by one and prove they're all legitimate,

2    and in Life Care the Court said we're not coming at it that

3    way, we're just not coming at it that way.

4              MS. WELCH:  Ultimately how we put on the

5    defenses is a question for another day.  This is a discovery

6    question about what relevant information we're entitled to

7    to determine what defenses we put on and how, and to show

8    why the aggregate proof model that Miss Singer and the

9    plaintiffs want to use doesn't work and why it's

10   inappropriate.

11             SPECIAL MASTER COHEN:  I don't think you'd

12   prove that an aggregate model doesn't work and is

13   inappropriate by going through -- maybe I'm wrong, I'm not

14   committing to this position -- but it seems like you prove

15   the methodology is wrong perhaps or that the assumptions and

16   inferences are wrong, but not by going through one bit by

17   one bit by one bit, and all thousand million data points are

18   wrong.

19             MS. WELCH:  We need to be able to challenge

20   the inputs, and if an expert is using an aggregate proof

21   model that suggests every prescription opioid on the work

22   we've done, were necessary for a legitimate medical use, but

23   we can't get to that level of proof without individualized

24   discovery.

25             SPECIAL MASTER COHEN:  Okay.

1           MS. SINGER:  Can I clarify a factual question?

2    I know that they have time, but since Miss Welch raised the

3    death reports, I think that's a perfect example of the kind

4    of information that has been produced.

5           So 230 overdose deaths, whatever the number is in

6    Summit County, it's too many, but so we have produced data

7    and documents from the Medical Examiner's Office that

8    includes the name of the individual, their medical records,

9    as I know you know well; the type of drugs they were taking,

10   including the prescription number, the doctor who prescribed

11   it; the cause of death, the toxicology reports.

12          You know, if you look at this data, the medical

13   examiner file has a drug list that includes the prescriber

14   name, the drug, name, the amount of strength, the

15   quantity --

16          MR. REED:  Your Honor, at some point -- Miss

17   Singer has had her opportunity.

18          SPECIAL MASTER COHEN:  Go ahead, Steve.

19          MR. REED:  I'll be very brief.  I think Miss

20   Welch covered this.

21          I will start by stating the obvious.  We are here on a

22   discovery motion.  I have not heard the plaintiffs say that

23   this evidence that we have asked for -- that this discovery

24   that we've asked for is irrelevant, they simply could not.

25   These are relevant facts that we're entitled to ask.  We

1     think they're relevant to their claims; these facts are

2     plainly relevant to our defenses.  That should be the end of

3     the discussion on relevance.

4          Proportionality, I think, Special Master, your

5     questions suggest that you get the point.  We think this is

6     clearly proportionate.

7          In terms of whether they should be required to put in

8     the effort to create something, their interrogatory

9     requests, I think Miss Welch has already addressed that, but

10    this notion, if you look, step back, look at their

11    complaint, I think they studiously avoid using the phrase

12    medically unnecessary or medically inappropriate, but their

13    entire case is founded on this notion that these FDA drugs

14    were prescribed in inappropriate ways because of something

15    each of our clients did.

16         And setting aside the question whether these

17    fraud-based claims should have been pled with particularity,

18    that's a different issue.  I'm past that for now.  I'm

19    entitled to ask for the facts.  I'm entitled to ask them

20    what they contend my client said or did that caused them

21    harm.  Each of their claims requires causation as an

22    element.  It is clearly relevant to this case.

23         And they do use the phrase, and I'll point you to each

24    of the Track One complaints, paragraphs 9 and 14; 14, in

25    each of the three complaints, is where they talk about

1    prescriptions that were not necessary for legitimate medical

2    uses.

3         We've heard today that the plaintiffs don't know what

4    "necessary" means.  If that's true then they shouldn't have

5    alleged it in their complaint.  I don't believe it's true,

6    and the only way that we're going to focus this massive case

7    on the facts -- on the disputes at issue is if they tell us

8    what they think is in contention, what is at issue, and then

9    we have a chance to attack it.

10        We can't tell them what they think is necessary or

11   unnecessary.  They're the plaintiffs with the burden.  We

12   need to know what the basis of their claims is so that we

13   can actually join issue at trial if we get that far.

14             SPECIAL MASTER COHEN:  And what if their

15   response is we simply cannot answer that question and do not

16   know?

17             MR. REED:  Special Master, I think the issue

18   for you is whether they should be ordered to do it.  What

19   they do once they're ordered to we can deal with on another

20   day if we have to.

21             MR. CHEFFO:  I have three quick points,

22   Special Master Cohen.  The first is this idea that -- the

23   idea that it is not on somebody's word processor or list,

24   there is a lot of interrogatories responses, I can assure

25   you, all the defendants have answered that didn't just pop

1    up on some list; and they didn't exist before, yet we have

2    had to do it.  So it is not a document request where -- if

3    it exists, we are not making them create new documents.  But

4    their interrogatories, just like 30(b)(6)s, that's what you

5    do.  Lawyers go out, they do the work, and they find the

6    information.

7        The second is we spent a lot of time, and I think my

8    colleagues have done -- I really have nothing more to add on

9    this issue of necessary for legitimate medical use.  As you

10   can see, if you were to write an order and characterize it

11   exactly the way it's in the complaint, we certainly wouldn't

12   quibble with that.

13       But I think the other point I would just raise, and

14   you highlighted this earlier on, that's one of the three

15   prongs, right, just this kind of medical necessity or

16   legitimate medical use.  The other is remember they're

17   saying basically anybody who was addicted or anyone who

18   overdosed or died, right?  So those would be something,

19   that's the reason why we need these records.

20       And there's always some irony, because Miss Singer,

21   who I don't think answered one of your questions, got up and

22   said, well, look, there's only 210 of these deaths, or 250;

23   so our answer should be then it should be easy, because if

24   you were to look at the document, and I know that because I

25   took the deposition, the vast majority will say, I think

1   there's five or six oxycodone or hydrocodone when you look

2   at the tox reports.  All right?  So if you were to look at

3   the cause of death you would not find -- you'd find heroin,

4   methadone, cocaine.

5       So of the 210 deaths, I think it was, in 2015 in

6   Summit County, for example, it's exactly the point you've

7   been raising.  What are we supposed to do with that?  What

8   are we supposed to do with that?  We say, okay, we now know

9   ten people have oxycodone in their system, or hydrocodone,

10  when they died.  Okay?

11      But this idea that somehow mysteriously they're going

12  to bubble up and we're going to understand their theories,

13  what we're really coming down to is, again, this is

14  discovery.  We did not frame the complaint.  Our discovery

15  is only as broad as the breadth of their claims.  They are

16  basically saying this huge panoply of people sustained harm

17  and damage, and we want compensation for that.

18      And all we're asking, as in any case, is okay, tell us

19  which ones, so we can then do our homework in the limited

20  time that we have, as opposed to what they continue to say

21  is trust us, some percentage of people, not all; we don't

22  really know, we don't want to tell you right now, but not

23  all.  At some point we're going to tell you 60 percent, 70

24  percent.

25      And then what are we supposed to with that?  Are we

1    then supposed to reopen discovery, move the trial date,

2    because when we get an expert report in six months from now?

3    Now is the time to basically say, you've made these

4    allegations, you said omissions, misrepresentations, fraud

5    led to people doing things that caused us harm.  And if this

6    was a plain vanilla any other case you would say, yeah, you

7    have to basically tell them so they can do the discovery to

8    find out if in fact that happened.

9                MS. WINNER:  May I speak very briefly?

10               SPECIAL MASTER COHEN:  Sonya, I know you have

11   been waiting patiently, kind of patiently.

12               MS. WINNER:  I won't take very much of your

13   time.  And I'm speaking for the distributors here, and we

14   have joined in this motion.

15        And I would echo what Mr. Delinsky said earlier about

16   how this discovery is also very important to the

17   distributors and to the pharmacies even though the claims

18   against us are different.  And the reason for this is that

19   the claims against the distributors rest on an extremely

20   attenuated chain of causation.

21        And I think it's important, again, not to confuse, as

22   Miss Singer said, how the harm was created, what their

23   theory of the case was, as opposed to how they intend to

24   prove their case.

25        In terms of their theory of the case, as I understand

1    it, their theory is that there were inappropriate, excess,

2    however you want to put it, prescriptions that were written

3    by doctors who were influenced by the manufacturers.  Those

4    prescriptions were then improperly filled by pharmacies who

5    shouldn't have filled them.  The pharmacies in turn obtained

6    the medications that they used to fill those prescriptions

7    through what the distributor should have recognized as

8    suspicious orders; that some of the patients who filled

9    those prescriptions at those pharmacies became addicted to

10   the medications; that those people then did things that

11   caused the plaintiffs to spend money on emergency services,

12   treatment, and other things that they claim as damages and

13   harm here.

14        This entire edifice is built on there being bad

15   prescriptions out there.  And whatever phrase you use to

16   describe the bad prescriptions, we're entitled to know what

17   those bad prescriptions are, because without that

18   information we can't trace whether anything we did several

19   links down the chain has anything to do with the damages

20   that are alleged here.

21             SPECIAL MASTER COHEN:  Well, that's not quite

22   true, because without knowing precisely which prescriptions

23   were not medically necessary, at some point the inference

24   becomes so strong that a prescription was not legitimate

25   that a fact-finder could conclude that the order was

Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 68 of 86 PageID #: 26187
Case: 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 67 of 85 PageID #: 24418

67

1        suspicious.  I mean, wouldn't you agree that -- I'm just

2        thinking theoretically -- if a given pharmacy is blowing out

3        a million pills a day, okay, then you kind of have to

4        suspect maybe this isn't legit.

5                     MS. WINNER:  Well, it could be, it could be

6        that it is not.  Probably not a million pills a day.

7                     SPECIAL MASTER COHEN:  Purposely I'm being

8        ridiculous.

9                     MS. WINNER:  A very large number.  It could be

10       that is a pharmacy supplying a large hospice, for example.

11       It could be a pharmacy that for a variety of reasons

12       actually has very good reason to send out large volumes.

13                    SPECIAL MASTER COHEN:  I purposely chose a

14       ridiculous number just to make a point, that you don't need

15       to know for sure every script, you can infer it.

16                    MS. WINNER:  If the claims against us are

17       limited to orders that are pharmacies putting out a million

18       pills a day, you know, I think this case would get pretty

19       short though.  So that's really not what the claims come

20       down to.  It's much subtler than that, and so we need to be

21       able to know whether what is being called a suspicious order

22       actually did end up in the hands of people who shouldn't

23       have gotten the pills, shouldn't have been given the pills;

24       then went out and did something wrong that caused harm to

25       these plaintiffs.

Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 69 of 86. PageID #: 26188
Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 69 of 85. PageID #: 24428

68

1          SPECIAL MASTER COHEN:  Okay.  I think we spent

2     enough time on this, and I don't have any more questions,

3     and we have roughly 20 minutes more.

4          What else should we talk about?

5          MR. CHEFFO:  I think, and we could do this

6     very quickly, I think we covered many of the things.  I

7     think we would like to since we're here talk about the

8     30(b)(6) topics; again, unless you have anything on the

9     other one.  And I think we could skip over some of them that

10     may have been covered.  And I would be happy to try to do my

11     portion in 6 or 7 minutes, give my colleagues 3 or so

12     minutes, and give the plaintiffs 10, and we could finish at

13     around 5:30, if that works for you.

14          SPECIAL MASTER COHEN:  Well, just so that

15     we're on the same page, Mark, I'm looking at the July 18th

16     letter from you, and starting on page 5 it lists specific

17     topics, and the first one is topic 3.

18          MR. CHEFFO:  That's correct.  I can give you a

19     quick little score sheet that might make it easier for you.

20     There are 13 topics --

21          MS. CONROY:  I hope there are Bates numbers on

22     them.

23          MR. CHEFFO:  No, I meant verbally; and I don't

24     hand things up during the middle of hearings.

25          MS. BIERSTEIN:  If he writes it down we'll

1    object.

2                    MR. CHEFFO:  That's funny.

3         There are 13 topics, I believe, that the plaintiffs

4    have indicated they have refused to put up a witness, and

5    they are 4, 5, and 6 -- these are a little bit out of

6    order -- 19, 29, 3, 13, 7 and 8, 9, and 34, 14, and 30.

7         So what we've done, David, you know, I won't kind of

8    cover too much old ground, but you had -- just to remind

9    you -- as to Purdue, I'll use that for example, you had

10   overruled our objections as to 39 of these 30(b)(6) topics.

11   The plaintiffs have essentially said they want to reduce us

12   to 20, so there's 13.  I will tell you, of the 6 -- because

13   we do listen and we did try to work with the plaintiffs; and

14   sometimes we work things out, and that's great, sometimes we

15   don't -- as to 6 of the 13 we basically said, for example,

16   we will take a written response.

17        Like so for example, on the 30(b)(6)s 4, 5, and 6,

18   which broadly deal with the issues we've been talking about

19   so we don't need a 30(b)(6) on all of the prescriptions --

20   in other words, someone to talk about those -- what we've

21   said is we would then to the extent that we have follow-up

22   questions, we would talk about the process.  Right?  So if

23   you give us the list, then we would talk about those process

24   issues.  So that's 4, 5, and 6.

25        I think we've done the same for what I'll call this

1   hybrid approach, and that's identifying individuals who

2   became overdosed or addicted to opioids to the extent that

3   there was a written document about that.  We would of course

4   then ask for the process, how you know, how you came to

5   that, so that we could understand.

6        And as we've talked about I think at some length,

7   Summit County, for example, does do this, we know it.  We

8   haven't gotten through it.  We've highlighted Summit County

9   because, frankly, that's the only one we have taken the

10  deposition of.  I fully expect there will be a similar

11  process for others, but we'll find that out when we take

12  additional depositions; but they have this type of

13  information.

14       So that's 19 is the "Identify individuals who

15  overdosed or became addicted to opioids."  Again, the issue

16  here is there's probably -- and you know, you pick up the

17  paper, and obviously it talks about opioids, no one is

18  disputing that, but to the extent, as you said for example,

19  someone unfortunately took carfentanil or fentanyl,

20  overdosed, never had an opioid prescription, nothing to do

21  with it, that's going to wind up in the overdose statistics.

22  We want to understand which ones are they carving out and

23  then find out how they did that.

24                  SPECIAL MASTER COHEN:  Let me interrupt you.

25                  MR. CHEFFO:  Sure.

1            SPECIAL MASTER COHEN:  You rattled off the

2     numbers pretty quickly.  I'm just going back to your letter.

3            MR. CHEFFO:  Yes.

4            SPECIAL MASTER COHEN:  Many of these overlap

5     with the topics we have already spent an hour and a half

6     chatting about, but some of them are different, some of them

7     don't.

8            MR. CHEFFO:  Correct.

9            SPECIAL MASTER COHEN:  It's those I want to

10     focus on.  For example, topic 3.

11            MR. CHEFFO:  Okay.  That's marketing,

12     promotional issues.

13            SPECIAL MASTER COHEN:  Right.  So the way it's

14     I assume paraphrased, maybe not, in the letter is "Any

15     promotion, marketing, or educational activities concerning

16     prescription opioids in or concerning plaintiffs' geographic

17     area."  This seems to be asking them to tell you what you

18     did.

19            MR. CHEFFO:  Correct.  And so let me just --

20     so the answer is -- and again, to the point of you have

21     given us guidance previously, right, don't ask things that

22     are too overly broad, what we basically did -- and I don't

23     frankly know if you have it in your letter, but certainly I

24     can tell you -- what we basically did, they objected on

25     overbreadth grounds, and we agreed to limit the testimony to

1    place the plaintiffs' knowledge of and efforts relating to

2    the concerns or complaints regarding the marketing or

3    prescription of opioids in the community.  So in other

4    words, as opposed to them saying that the question is, you

5    know, you're asking us to tell us what you did, that's too

6    broad.  Right?

7         We said, okay.  What we're really asking for and what

8    our intention was, and we'll clarify, is what we're asking

9    for is you to tell us the information that you're aware of.

10   So for example, if they received complaints from doctors,

11   you know, that goes to statute of limitations issues, it

12   goes from others, it goes to their efforts.

13             SPECIAL MASTER COHEN:  Complaints from

14   doctors, I mean, I'm not saying that as narrowed it's not

15   inappropriate now.

16             MR. CHEFFO:  Yes.

17             SPECIAL MASTER COHEN:  Complaints from doctors

18   isn't promotion, marketing, or educational activities.  It

19   sounds like what you're asking for under topic 3 is of all

20   of those promotional, marketing, educational activities in

21   which we engaged, tell us about the ones you knew of.

22             MR. CHEFFO:  Well, not -- yes, to the extent

23   that they were tracking it.  I mean, again, if the answer is

24   they weren't and they don't know, it should be an easy

25   answer.

Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/10/18 74 of 86. PageID #: 26193
Case 1:17-md-02804-DAP Doc #: 1031-15 Filed: 10/01/18 73 of 85. PageID #: 24193

73

1          What we are trying to understand is tell us, in at

2     least this question, tell us the promotional activities that

3     you had information about.  Right?  So again, if someone is

4     claiming we didn't know you were doing X, Y, and Z, we are

5     entitled to understand, again, because you've just heard one

6     of their claims seems to be that there's this ubiquitous

7     kind of marketing machine of all the defendants together,

8     and we've basically asked them to the extent that they were

9     tracking our information about that, because again there are

10    other manufacturers and folks who would market and perhaps

11    distribute, that we think we're entitled to that

12    information.

13         I mean, again, in the grand scheme, David, these are

14    relatively discrete, I think narrow.  Theirs are similar.

15    But we're trying to build obviously a defense on various

16    things.  This should be presumably very easy.  If someone

17    tracked this information then they should have someone who

18    can tell us about that.  If they didn't, then they'll tell

19    us that, as well.

20              SPECIAL MASTER COHEN:  Topics 24, 25, and 26

21    concern communications from plaintiffs and various parties,

22    entities, and members of plaintiffs' communities.  Talk to

23    me about that.

24              MR. CHEFFO:  Sure.

25              SPECIAL MASTER COHEN:  It is on page 8 of your

Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 75 of 86 PageID #: 26194
Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 74 of 85 PageID #: 24494

74

1       letter.

2                       MS. WINNER:  That's not at issue.

3                       MR. CHEFFO:  Those aren't at issue, David.

4           Do you want me to read them again slowly?

5                       SPECIAL MASTER COHEN:  If they're not at

6       issue --

7                       MR. CHEFFO:  Those are not at issue.

8                       MS. WINNER:  Perhaps it could be helpful if

9       you refer to -- the letter dated August 31 has a summary

10      chart attached to it, and the plaintiffs submitted their own

11      chart dated September 4th, and that will list the specific

12      topics that are at issue at this point.

13                      SPECIAL MASTER COHEN:  And I don't have that

14      quickly available.

15                      MS. WINNER:  I have a clean copy which I'll be

16      glad to show to the plaintiffs, if they're willing to let me

17      give it to you.

18                      SPECIAL MASTER COHEN:  Well, this is a letter

19      I already received, correct?

20                      MS. WINNER:  Yes.

21                      MR. CHEFFO:  What date is this?  This is a

22      plaintiffs document, this is yours.  This is the plaintiffs'

23      letter.

24                      SPECIAL MASTER COHEN:  Thank you.  I'm sorry.

25                      MR. CHEFFO:  That's okay, there's a lot of

1    paper floating around.

2                SPECIAL MASTER COHEN:  Yes, I looked at this

3    this morning and didn't bring it.

4                MR. CHEFFO:  Like I said, lots of paper.  But

5    there are 13 topics that are still -- you know, the good

6    news is I don't recall exactly how they got resolved, but

7    probably through a meet and confer, which is good.

8                SPECIAL MASTER COHEN:  Yes, it is.  And topic

9    30, plaintiffs' knowledge of the DEA setting quotas, again,

10   explain to me what you're really after here.

11               MR. CHEFFO:  I'm happy to try to.  This is one

12   I was probably going to punt to my colleagues, the

13   distributors.

14               SPECIAL MASTER COHEN:  Anybody on the left

15   side?

16               MS. WINNER:  Okay.  We were going to punt to

17   our papers on this one, frankly.

18               MR. CHEFFO:  I can address it if you want.

19               MS. WINNER:  We can address it.  As you know,

20   the DEA, I'm sure you know the DEA sets quotas for

21   prescription opioids, and we want to know, we agreed to

22   limit this topic to testimony about information about their

23   discussion or their evaluation of any involvement with

24   actions relating to the DEA's actions.

25        In other words, did they try to get involved with the

1    DEA, saying you're allowing too much?  Did they evaluate

2    internally whether they should have talked to the DEA about

3    it, that sort of thing.  I wouldn't think -- this would

4    probably be a very short topic.

5                SPECIAL MASTER COHEN:  It is conceivable that

6    their answer, that the deponent's answer would be we have no

7    knowledge of any quotas that the DEA set, right?

8                MS. WINNER:  That's entirely possible, which

9    would make it a very short topic.

10               MR. CHEFFO:  Or a writing to that effect.  I

11   mean, if that was, you know --

12               SPECIAL MASTER COHEN:  And so causes of,

13   quote, the opioid crisis?

14               MR. CHEFFO:  That is 9 and 34, that's what I

15   have.  I think, David, generally the factors other than the

16   conduct of any defendant that you believe affected

17   prescribing.  So again, you know --

18               SPECIAL MASTER COHEN:  China and the Internet.

19               MR. CHEFFO:  Right.  Again, if the plaintiffs

20   want to stipulate that they were aware of that, that they

21   know that, that they've known it for 20 years.  These are

22   issues that I can tell you why --

23               MS. WINNER:  I think we're entitled though to

24   some deposition testimony about what knowledge they have

25   about other causes of the crisis.

Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/10/18 77 of 86. PageID #: 26197
Case 1:17-md-02804-DAP Doc #: 1931-15 Filed: 10/01/18 77 of 85. PageID #: 24511

77

1          MR. CHEFFO:  Yeah.  I wasn't saying that we're

2     going to take just a running, but I'm saying these are

3     factors that are within very important areas, including

4     statute of limitations, alternate causation, you know.

5          To the extent that there are factors here and to the

6     extent they're going to have a model, you asked about that

7     earlier, you know, to find out and to be able to depose

8     whoever it is they're going to proffer for that as to

9     whether they have accounted for these various issues.  So

10    there's multiple ways, both in our defenses, but also a lot

11    of this information is going to be needed, you know,

12    ultimately for our experts, and frankly in discovery and

13    depositions of their experts.  And these are not

14    particularly broad topics.

15          SPECIAL MASTER COHEN:  Do plaintiffs want to

16    address the topics that I just listed?

17          MS. SINGER:  That would be David Ackerman and

18    Sal Badala.

19          SPECIAL MASTER COHEN:  Ah-hah.  Let me see if

20    I can figure out how to press the button on the phone.

21          I'm going to un-mute you, and hopefully Sal and David

22    will be able to respond.

23          Are you guys there?

24          MR. ACKERMAN:  This is David Ackerman, I am

25    here.  Sal, are you there as well?

1          MR. BADALA:  Hi, Special Master Cohen, this is

2     Sal Badala.

3          SPECIAL MASTER COHEN:  Greetings.  Welcome

4     into the courtroom.

5          MR. ACKERMAN:  Thank you.

6          SPECIAL MASTER COHEN:  So whoever wants to hit

7     that tennis ball back over the net.

8          MR. BADALA:  That's fine.  Special Master

9     Cohen, I will first address topic 3.  Plaintiffs did offer a

10    written response to this topic, defendants refused to accept

11    a written response.  We think it would be more appropriate

12    for them to accept a written response at least on this

13    topic.

14         To produce a witness would be overly burdensome in the

15    sense that a witness would have to go through the entire

16    defendants' production just to prepare for this 30(b)(6), so

17    we think a written response would be better.

18         As for topic 30, we're kind of confused there's even

19    an issue here.  It was the defendants that proposed limiting

20    this topic to what efforts, if any, plaintiffs may have made

21    to --

22         COMPUTERIZED VOICE ON PHONE:  -- has left the

23    conference.

24         MR. BADALA:  -- the quota setting process, and

25    the defendants put it in their July 18th letter, and then

1   they went back and expanded even further their topic.  So we

2   think that to the extent that we have to put up a witness on

3   this subject that it be restricted to what they had actually

4   proposed in their July 18 letter, not to the expanded

5   version that they now offer.

6       And I believe going back, now I believe the next topic

7   you referred to was topic 9.  We actually offered a written

8   response, and I just want to get some context about written

9   responses.  We had offered written responses for eight

10  topics.  The defendants haven't accepted all of those, but

11  just in context of the litigation, for plaintiffs 30(b)(6)s

12  served on defendants, some of the defendants have ranged up

13  to 13 to 26 topics that they're providing written responses

14  on.  So you can see that it's not equal in the sense that

15  we're being forced to put up more witnesses on these topics

16  where defendants are actually providing written responses

17  for up to 26 topics.

18      And I'm sorry, I believe the next one was topic 34.

19              MR. ACKERMAN:  Can I jump in real quick on 9?

20      There's an issue, Special Master, with number 9, that

21  it's just not described with particularity.  The factors

22  other than the conduct of any defendant, I don't know how to

23  prepare a witness for that.  If there are specific factors

24  that they want to talk about, they could describe --

25              COMPUTERIZED VOICE ON PHONE:  -- has left the

1    conference.

2              MR. ACKERMAN:  But to just say the word

3    "factors" is too vague for Summit County or Cuyahoga or

4    Cleveland or Akron to effectively educate a witness to

5    testify.

6              SPECIAL MASTER COHEN:  Okay.  And what was the

7    next one?  34?

8              MR. BADALA:  Yes.  David, I don't know if you

9    wanted to go, but I think 34 is the same issue.

10             MR. ACKERMAN:  I think 34 and 9, that's almost

11   the same topic, right?  Nine is the factors other than the

12   conduct of the defendant, and 34 is causes of the opioid

13   crisis, and then there's an italicized paragraph that says,

14   identification of any individuals other than defendants.

15        So they seem to me to be the same topic, and I think

16   the same arguments we've made with respect to 9 apply to 34.

17             MR. CHEFFO:  I think 9 and 34 are actually

18   quite different.  I know they're related to impact, but 9

19   talks about the factors, the conduct of the defendant that

20   you believe affected prescribing practices for prescription

21   opioids in your community.  So that talks about factors

22   impacting doctors' prescriptions.  It shouldn't be that

23   hard, these are the kind of claims they're talking about.

24   Are there any other claims that they think or any other

25   influences on doctors, that's one.

1          The other is the causes of the opioid crisis.  And as

2     that term is defined, that's what it says in the second

3     amended complaint.  So to the extent, for example, they have

4     information about trying to interdict postal deliveries from

5     China or Mexico, or whether it's pill mills, or whether

6     doctors are engaging in illegal conduct, or any host of

7     issues that one would think have been considered by these

8     sophisticated municipalities, those are the types of things,

9     because again their complaint doesn't say that, you know,

10    there's these 50 other constituent causation and then

11    there's these two or three groups.

12         They're basically saying the opioid crisis was caused

13    by the defendants in this case, and it's certainly, I think,

14    a legitimate cause of inquiry to say, okay, are you aware of

15    other causes.

16         And then the same thing, their claim appears to be

17    many of these doctors prescribed based apparently on some

18    type of detail or messaging or omission, and to the extent

19    that they have information then I think we will find in

20    these depositions that there are other causes of these.

21    Those are legitimate areas of inquiry.

22         The last thing I will say on this is that this has to

23    be balanced.  We're not looking in the context of what you

24    have seen, the incredible breadth of the types of

25    information; you know, tell us every process that went into

1    marketing messages, and people that you funded or lobbying

2    activities.  So there is an element of these are important

3    issues to us, and I don't think that -- if the answer is

4    they don't have it, they don't know, then they could just

5    basically tell us that and give a sworn statement on that,

6    and then we'll kind of move on.

7              MR. BADALA:  Special Master Cohen, if I may

8    respond to that just quickly.

9         I think that Mr. Cheffo's argument demonstrates the

10   problem with the topic.  There are clearly some sort of

11   underlying causes that defendants want to focus on, but

12   they're not going to tell us.  They're going to play hide

13   the ball, and somehow we have to educate a witness on, you

14   know, guess the topic, and if somebody shows up in a

15   deposition and starts asking questions about some unknown

16   thing that the defendants claim caused the opioid crisis and

17   our witness says, well, I don't really know anything about,

18   you know, migration from this particular pill mill in

19   Oklahoma or something, then we're going to get a letter that

20   says, oh, your witness wasn't fully informed to testify on

21   this, and you have to bring them back.

22        This is exactly the problem and why the topic isn't

23   described with particularity to allow us to functionally

24   educate a witness to testify as to the knowledge of the

25   governmental entities.

1          SPECIAL MASTER COHEN:  If the deponent says

2    "We don't know that question, we don't know the answer to

3    that question, we don't know what other causes of the opioid

4    crisis is, we don't know," that's a sufficient answer.  You

5    don't have to prepare them to know anything they don't

6    already know.

7          MR. CHEFFO:  Exactly.  That would be our

8    position.  Their obligation is to poll the people who would

9    literally know and ask them.  My guess is we're not going to

10   find no one in Cleveland who is going to say we have no

11   idea.  Someone will likely say here is the various causes,

12   they will be questioned about those, and if they're asked

13   are you aware that this is a cause, or do you believe it, if

14   their answer is no or I don't know, it's next question.

15         MR. REED:  Could I jump in for a second?  If

16   you look at the topic, it says "The factors other than the

17   conduct of any defendant that you believe affected

18   prescribing practices."  That's 9, right?  So on that,

19   they're not going to be sandbagged because we're asking what

20   they believe.  They can't be surprised by that.  By

21   definition, we're asking about what they believe.

22         SPECIAL MASTER COHEN:  But they could believe

23   it is because the moon is made of green cheese, so I'm not

24   sure I like that either.

25         MR. CHEFFO:  You know, these are corporate

1    type reps, so this would have to be the position of

2    Cleveland or Cuyahoga, and presumably Cleveland doesn't

3    believe that it's caused by something, you know, kind of

4    outrageous or impractical.

5              SPECIAL MASTER COHEN:  Well, I get it.

6              MR. BADALA:  And if I -- just one more very

7    brief point on this.  You know, as Mr. Cheffo said, it's a

8    representative of the governmental entity, and this is not

9    an issue where it's lobbying, and where you can go to the

10   lobbying department of the defendant and figure out who

11   knows everything about lobbying.  This is a question of

12   causes of the opioid crisis.  In order to provide testimony

13   regarding that on behalf of Summit County, you have to go to

14   virtually every single agency or employee of Summit County.

15             MR. CHEFFO:  That's just not true.  There's

16   reports that are on the Internet about the opioid crisis,

17   about deaths, about overdoses.  If you ask the medical

18   examiner what she believes is the cause of death of many of

19   the people who overdose, she would say it's the fentanyl

20   problem.  These are not questions that are unanswerable.

21             SPECIAL MASTER COHEN:  Okay.

22             MR. BOEHM:  If I may, at least --

23             COURT REPORTER:  (Interrupted.)

24             MR. BOEHM:  I was just making the point that

25   at least some of plaintiffs have set up task forces charged

1    with the very purpose of trying to determine what the causes

2    of the opioid crisis is.  This is truly not an issue that

3    should be a challenging one, at least in those instances.

4                    SPECIAL MASTER COHEN:  All right, folks.  It's

5    a little bit after 5:30, and as I said, I am determined not

6    to make anybody late to a plane.

7          So thank you all for your input.  There are a lot of

8    issues here, I will get to them as soon as I can.  I am not

9    going to issue anything from the bench, and I will think

10   very hard about everything you've given me.

11         Thank you all very much.

12                            -  -  -  -  -

13

14                    C E R T I F I C A T E

15

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19            s/Heidi Blueskye Geizer_____October 1, 2018

20            Heidi Blueskye Geizer                Date
             Official Court Reporter
21

22

23

24

25