UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Cherokee Nation v. McKesson Corp., et al.*, No. 1:18-OP-45695 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

**DEFENDANT MCKESSON CORPORATION'S OPPOSITION TO THE CHEROKEE NATION'S MOTION FOR RECONSIDERATION**

# INTRODUCTION[1]

The Court already ruled that McKesson properly removed this case under the federal officer removal statute. That decision was correct and should not be disturbed. Federal officer jurisdiction exists because the Nation's claims against McKesson encompass and necessarily implicate McKesson's distribution of prescription opioids pursuant to a federal contract that is directed, monitored, and overseen by a federal contracting officer.

In its Motion for Reconsideration, the Nation asks the Court to re-examine just one of the three requirements for federal officer removal jurisdiction—the "low hurdle" requiring that the Nation's claims against McKesson bear some "causal nexus" to McKesson's acts taken at the behest of a federal officer (here, McKesson's distributions of opioids to federal facilities pursuant to the detailed "PPV Contract" between McKesson and the federal government). The sole basis for the Nation's extraordinary request is the Nation's contention that it "has discovered new evidence" that McKesson's PPV Contract distributions within the Cherokee Nation area were "*de minimis*" and thus insufficient to clear the low hurdle of the causal nexus requirement. The Nation is wrong, and reconsideration of the Court's reasoned decision is unwarranted.

*First*, the supposedly "new" evidence on which the Nation purports to rely was already reasonably accessible to the Nation at the time it moved to remand this case to state court, and thus cannot support the extraordinary remedy of reconsideration.

*Second*, the Nation is simply wrong as a matter of substance. Far from being "*de minimis*," McKesson's PPV Contract distributions to the Cherokee Nation area have consistently

---

[1] In this opposition, "McKesson" is Defendant McKesson Corporation. "The Nation" is Plaintiff Cherokee Nation, and "Cherokee Nation" refers to the Cherokee Nation Tribal Jurisdiction Area, which consists of Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Tulsa, Wagoner, and Washington counties, consistent with the allegations in the Nation's Complaint. Compl., ¶ 11.

comprised a *substantial* proportion of McKesson's total opioids distributions to the area—*22.48%* (*not* "less than one percent") since 2006. McKesson's federal-officer-directed opioid distributions therefore bear a strong causal nexus to the Nation's claims against McKesson. The Nation's argument to the contrary is founded on fallacy—it has taken the wrong data, performed the wrong comparison, and therefore failed to measure anything relevant to the legal requirement of a causal nexus.

*Finally*, the Nation's preference and ability to litigate in state court is not a new argument, and is legally irrelevant to the federal officer removal analysis.

## LEGAL STANDARD

Motions for reconsideration are "extraordinary in nature and, because they run contrary to notions of finality and repose, should be discouraged." *Walker v. Conseco Servs., LLC*, 252 F. Supp. 2d 524, 527 (N.D. Ohio 2003) (quoting *In re August, 1993 Regular Grand Jury*, 854 F. Supp. 1403, 1406 (S.D. Ind. 1994)). "It is not the function of a motion for reconsideration either to renew arguments already considered and rejected by a court or to proffer a new legal theory or new evidence to support a prior argument when the legal theory or argument could, with due diligence, have been discovered and offered during the initial consideration of the issue." *Younglove Const., LLC v. PSD Dev., LLC*, 767 F. Supp. 2d 820, 824 (N.D. Ohio 2011) (citation and internal quotation marks omitted). As all of the evidence and legal arguments supplied by the Nation in its Motion for Reconsideration could, with due diligence, have been discovered and offered during initial consideration, the Court should disregard them. In any event, the Nation's arguments are not substantively meritorious.

**ARGUMENT**

I. **The Nation Has Long Had the Data on Which It Relies—That Data Is Not "Newly Discovered Evidence."**

The Nation seeks reconsideration of the Court's Order on the sole ground that it "has discovered new evidence" purportedly showing that the Nation purchased only a "*de minimus* [*sic*] amount of opioids through the IHS" via McKesson's PPV Contract. ECF No. 75 at 6. In light of this "new evidence," the Nation wrongly argues that there can be no "causal nexus" between McKesson's distributions to PPV Contract facilities and the Nation's claims. *Id.* at 7. The evidence, however, is not "new." Putting aside for a moment the multiple fallacies and data misinterpretations that underlie the Nation's argument, the Nation's reconsideration motion fails at the threshold because the Nation had access to *all* of the data on which it now relies at the time its motion to remand was initially considered by the Court. As such, there is no basis for reconsideration. *McConocha v. Blue Cross and Blue Shield Mut. of Ohio*, 930 F. Supp. 1182, 1184 (N.D. Ohio 1996) ("Because a motion to reconsider should not be used to proffer new evidence to support a prior argument when it could have been offered initially, this new evidence should be disregarded.").

The purportedly "new evidence" on which the Nation bases its assertion that it purchased only "*de minimis*" opioids from the IHS is ARCOS data supplied by the DEA showing the total number of opioids distributed (by *any* distributor, not limited to McKesson) to dispensaries within the Cherokee Nation. (The Nation asserts that this number is very large compared to the number of opioids distributed by McKesson to twelve specific IHS facilities.[2]) Contrary to the

---

[2] The Nation does not appear to claim that this latter number—which is shown in Exhibit A of the Declaration of John Chapman Young, ECF No. 75-1—is "new evidence," nor could it. The Nation has always had access to the number of opioids McKesson distributed to the Cherokee Nation IHS facilities, since the Nation operates those facilities and initiates their opioid orders.

Nation's presentation, however, the Nation appears to have had access to total opioid distribution data long before "the summer of 2018." *See* ECF No. 75 at 6. On July 21, 2017, Chrissi R. Nimmo, the Deputy Attorney General for the Cherokee Nation Office of the Attorney General, submitted a sworn Declaration stating that "the Oklahoma Bureau of Narcotics and Dangerous Drugs maintains data that shows the number of opioid prescriptions that are filled annually in the 14 Oklahoma counties that are contained within or overlap with the tribal jurisdiction area of the Cherokee Nation." *McKesson Corp. v. Hembree*, No. 4:17-cv-00323-TCK-FHM (N.D. Okla. July 21, 2017), ECF 87 ¶ 5 (attached hereto as **Exhibit 1**). And Ms. Nimmo's declaration indicates that the Nation had access to that data, since Ms. Nimmo proceeded to recite the total number of opioid pills that "were shipped by wholesale distributors . . . and then dispensed by pharmacies . . . in the 14 Oklahoma counties that are at least partially within the Cherokee Nation's tribal jurisdiction area" in 2015 and 2016. *Id.* ¶¶ 6-7. Thus, even if the Nation's preferred comparison were the correct one (and it is not, as explained *infra* Section II), the Nation apparently already had access to data relating to total opioid distributions from an alternative source, from which the Nation could have derived and raised its "*de minimis*" argument in its original remand briefing.

II.     **The Nation's "*De Minimis*" Conclusion Is Based on the Wrong Numbers; McKesson's PPV Contract Distributions Actually Represent a *Substantial* Proportion of Its Opioid Distributions Within and Around the Cherokee Nation.**

The Nation claims that its Complaint put only "*de minimis*" federal-officer-directed opioid distributions at issue because—it incorrectly posits—McKesson's distributions of opioids to Cherokee Nation IHS facilities under the federal PPV contract constituted less than one

---

*See id.* ¶¶ 8-9 (stating that the twelve facilities are "Cherokee Nation facilities" who "purchase[] prescription drugs through IHS").

percent of the total opioids distributed (by anyone) within the Cherokee Nation's fourteen counties. *See* ECF No. 75 at 6. The Nation's methodology is flawed for several reasons. In addition to using incomplete data, the Nation is comparing apples to oranges by measuring McKesson's federal-officer-directed opioid distributions against *all distributors' opioid distributions*. Because federal officer removal jurisdiction requires a "causal nexus" between McKesson's actions taken at the behest of a federal officer and the Nation's claims *against McKesson*, the relevant comparison is between McKesson's federal-officer-directed opioid distributions and *McKesson's* other distributions within the scope of the Nation's claims. That proportion is not "*de minimis*": from January 1, 2006 through June 30, 2018, McKesson's opioid distributions to federal PPV Contract facilities account for *22.48%* (not "less than one percent") of McKesson's total opioid shipments in the fourteen-county area.

In its flawed calculation, the Nation points to ARCOS data reflecting distributions of units of certain opioids that were directly dispensed to twelve Cherokee IHS facilities and divides that number by the total opioid units that the ARCOS data indicates were distributed "in the Cherokee Nation's fourteen counties during this same period." *Id.*[3] Neither the Nation's "numerator" nor its "denominator" are appropriate inputs to measure the strength of the nexus

---

[3] McKesson does not re-state the specific ARCOS data values in this brief, because ARCOS data is governed by a Protective Order in this action. ECF No. 167. As such, McKesson may not file the numbers relied upon by the Cherokee Nation on the public docket. *See id.* at § 8 ("If contained in a pleading, motion, or other document filed with this Court, any Designated [ARCOS] Information must be marked with the applicable confidentiality designation, designated as 'Subject to Protective Order,' and filed under seal with prior Court authorization."). The Cherokee Nation did not file the ARCOS data under seal in its Motion, ECF No. 75-1. McKesson refers the Court to that representation of the ARCOS data.

between McKesson's federal-officer-directed actions and the Nation's claims against McKesson.[4]

### A. The ARCOS Data on Which the Nation Relies Severely Understates McKesson's Federal-Officer-Directed Distributions.

The Nation's "numerator" (ARCOS data reflecting distributions of certain opioids that were directly dispensed to twelve Cherokee IHS facilities) severely understates McKesson's federal-officer-directed opioid distributions, for two major reasons. *First*, ARCOS data does not include numerous prescription opioid products that are within the scope of the Nation's claims, such as Tramadol, propoxyphene, and others. *See* Compl., ¶ 29 (defining the "opioid[s]" put at issue by the Nation's claims as "*all* drugs derived in whole or in part from the opium poppy"). McKesson distributed a large number of dosage units for these prescription opioid products to federal government facilities in the Cherokee Nation's counties, and the Nation's calculation ignores those opioid distributions.

*Second*, because the Nation's Complaint alleges that its harms are proximately caused by *all* of McKesson's distributions to "the market in and around the Cherokee Nation," Compl., ¶ 87, it is inappropriate to limit the numerator to distributions made to *only* the twelve facilities the Nation chose to analyze. The full list of facilities that participate in the PPV Contract is publicly available on the Department of Veterans Affairs' website, and shows that there are a total of 23 PPV Contract facilities in the fourteen counties that comprise the Cherokee Nation, including a sizeable VA facility in Muskogee County.[5] Declaration of Lori White

---

[4] In any event, as the Order recognizes, "[t]he hurdle erected by [the causal nexus] requirement is quite low." Order at 16 (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).

[5] *See* Department of Veterans Affairs, PPV Frequently Asked Questions, *available at* https://www.va.gov/opal/nac/ncs/faqPpv.asp#q001, leading to a spreadsheet listing PPV Contract participants, *available at* https://www.va.gov/opal/docs/nac/ncs/ppvEligibilityListing.xls.

(hereinafter "White Decl.,"), attached as **Exhibit 2**, at ¶ 3. Of those 23 facilities, seventeen are related to the Indian Health Service. *Id.* Based on the allegations in the Complaint, the Nation cannot reasonably argue that *none* of the prescription opioids it alleges were diverted into the hands of tribal members arose out of the non-Cherokee PPV Contract supply chains. Order at 17 ("[T]he Tribes' claims put *all* prescription opioids at issue and allege that diversion can occur at *any* point in the supply chain, including those opioids supplied pursuant to the PPV Contract."). The Complaint necessarily implicates all of McKesson's PPV Contract distributions in the area, not just the Cherokee facilities. Thus, the correct "numerator" by which to calculate the relative proportion of PPV Contract distributions should be *all* prescription opioid orders fulfilled by McKesson to *all* PPV Contract facilities in the fourteen counties in the Cherokee Nation's jurisdictional area. *That* number is **48,685,863** over the course of 2008-2014, *not* the much-lower number represented by the Nation.[6] White Decl., ¶ 6.

### B. The ARCOS Data on Which the Nation Relies Severely Overstates the Relevant Non-Federal-Officer-Directed Distributions.

McKesson removed this case to federal court on the ground that the Nation's claims *against McKesson* necessarily put at issue *McKesson*'s federal-officer-directed opioid distributions in and around the Cherokee Nation area. No other distributor removed the case on that basis or asserted that any of its opioid distributions were directed by a federal officer or governed by a federal contract. To determine whether McKesson's federal-officer-directed distributions were *de minimis* as compared to the full scope of the Nation's claims against

---

[6] As previously stated, the ARCOS data on which the Nation relies does not include data for the opioid tramadol or several other opioids that fit the Nation's broad definition of the term. *See* Compl., ¶ 29. For its calculations of PPV Contract distributions, McKesson has included tramadol and all other prescription opioid products ordered by the Cherokee Nation facilities and other PPV Contract facilities in the fourteen-county area.

7

McKesson, therefore, the appropriate "denominator" would be the total number of dosage units of prescription opioids that *McKesson* distributed within the fourteen-county Tribal area. *That* number, from 2006-2014, is **211,474,090**, *not* the substantially higher number represented by the Nation. White Decl., ¶ 6.

The Nation arrives at its much larger denominator (and thus its misleadingly small proportion) by adding up *all* opioid distributions made by *all* pharmaceutical distributors within the fourteen-county area. That number is grossly overinclusive, since the *majority* of those distributions were made by entities other than McKesson and are thus *irrelevant* to the Nation's claims against McKesson and their nexus to McKesson's actions taken at the behest of a federal officer.

      **C.**    **McKesson's Federal-Officer-Directed Distributions Constitute a *Substantial Proportion—22.48%—of Its Opioid Distributions to the Cherokee Nation.***

Using the correct numerator and denominator, the data shows that McKesson's federal-officer-directed opioid distributions constitute a *substantial* proportion of its total opioid distributions in the fourteen counties at issue, giving rise to a *substantial* causal nexus with the Nation's claims. From January 1, 2006 through June 30, 2018, McKesson's opioid distributions to federal PPV Contract facilities account for 22.48% of McKesson's total prescription opioid shipments in the fourteen-county area taken as a whole. White Decl., ¶ 5.[7] For some counties in the Nation's jurisdictional area, the proportion is even more pronounced. For example, during the same time period, McKesson's PPV Contract distributions accounted for 35.43% of McKesson's

---

[7] Even if the Court were to accept the Nation's suggestion the data should be limited to distributions directly to Cherokee Nation facilities (which it should not), McKesson's PPV Contract distributions to those facilities are also not *de minimis*. Limiting the data to the Cherokee Nation-specific IHS facilities listed in Exhibit A to the Young Declaration, opioid orders for those facilities account for 8.01% of McKesson's total shipments in the area, and those facilities received more opioids than any single other McKesson customer in the area. White Decl., ¶¶ 9-10.

total prescription opioid shipments to Nowata County and 37.49% of McKesson's total prescription opioid shipments to Ottawa County. *Id.* ¶ 7. Most strikingly, a full **63.25%** of McKesson's total distributions in Muskogee County were to PPV Contract facilities. *Id.* Federal PPV Contract facilities, taken collectively, received more prescription opioids from McKesson than any single other McKesson customer in the Cherokee Nation's fourteen-county area in each year from 2006 to the present. *Id.* ¶ 8. These substantial distributions are plainly within the scope of the Nation's claims against McKesson. *See* Compl. ¶ 33 ("Opioid 'diversion' occurs *whenever* the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. *Diversion can occur at any point in the opioid supply chain . . . .*") (emphasis added).[8]

In sum, the relevant data (which is not the ARCOS shipment data) demonstrates a clear and compelling causal nexus between McKesson's PPV Contract distributions and the Nation's claims against McKesson. Such a causal connection is certainly sufficient to clear the low hurdle erected by the "causal nexus" prong of federal officer removal jurisdiction.

### III. The Nation's Preference to Litigate in State Court Is Neither New, Nor Relevant.

In addition to its primary legal argument, the Nation also advances a disagreement with the Court's statements regarding whether it is to the Nation's benefit to be in the MDL. ECF No. 75 at 8-9. These arguments are not newly discovered and thus provide no basis for reconsideration. *See, e.g.*, *McConocha*, 930 F. Supp. at 1184. The Nation emphasized in its remand briefing that it believed that, as a sovereign nation, its preferred forum should be given

---

[8] In passing, the Nation repeats its contention from the previous remand briefing that "its Complaint . . . does not seek damages for prescription opioids supplied to tribal and federal facilities." ECF No. 75 at 6 n.2. The Court correctly rejected that contention, *see* Order at 17, and the Nation has offered no newly discovered factual or legal basis for reconsideration.

9

special deference. The Court rejected those arguments, and properly so—the Nation's forum preference, even as a sovereign, is not relevant to the legal standard for federal officer removal as articulated by the federal officer removal statute and governing case law. The right to federal officer removal is "absolute"—the inquiry does not change if the plaintiff is a sovereign entity, and the test is not subject to a balancing of interests between the parties, including a plaintiff's resources to litigate in state court. *See Arizona v. Manypenny*, 451 U.S. 232, 242 (1981).

## CONCLUSION

For the foregoing reasons, and the reasons articulated in its briefing on the Nation's remand motion and this Court's September 4 Order, the Nation's Motion for Reconsideration should be denied, and this Court should maintain jurisdiction over the Nation's claims.

Dated: October 22, 2018

Respectfully submitted,

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart