# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CVS HEALTH CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; and WAL-MART STORES, INC., | ) ) ) ) ) ) | No. 4:17-cv-00323-TCK-FHM |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TODD HEMBREE, ATTORNEY GENERAL OF THE CHEROKEE NATION, in his official capacity; JUDGE CRYSTAL R. JACKSON, in her official capacity; and DOE JUDICIAL OFFICERS 1-5, | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF CHRISSI R. NIMMO IN SUPPORT DEFENDANTS'
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Chrissi R. Nimmo, declare:

1.      I am the Deputy Attorney General for Cherokee Nation Office of the Attorney General, a Defendant in this cause of action.  I have been employed by the Office of the Attorney General for eight years. I hold a J.D. from the University of Tulsa College of Law and M.B.A. from Northeastern State University. I am an enrolled citizen of the Cherokee Nation. I have personal knowledge of the facts set forth in this Affidavit.

2.      I make this Affidavit in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction

3.      According to data provided by the Center of Disease Control and Prevention,

between 1999 and 2015, approximately 433 Cherokees in Oklahoma died from prescription

opioid overdoses.[1]  Moreover, at least one CDC official has acknowledged that "the (opioid)

epidemic, which is already quite severe, could potentially be even worse" because "[w]hile [the]

research cannot speak to what percent we are underestimating, [the CDC] know[s] we are

missing cases."[2]

4.      While alive, opioid abusers "have 4 times as many visits to the emergency

department, 11 times as many mental health outpatient visits, 12 times as many inpatient hospital

stays, and 63 times as many outpatient visits."[3]  This would impact hospitals such as the

Cherokee National W.W. Hastings Hospital, which is located in the tribal jurisdiction area of the

Cherokee Nation.

5.      Additionally, the Oklahoma Bureau of Narcotics and Dangerous Drugs maintains

data that shows the number of opioid prescriptions that are filled annually in the 14 Oklahoma

counties that are contained within or overlap with the tribal jurisdiction area of the Cherokee

Nation.[4]  Of those 14 counties, six (Craig, Nowata, Washington, Adair, Cherokee, and Sequoyah

counties) are entirely within the tribal jurisdiction area, three (Delaware, Mayes, and Rogers

counties) are almost entirely within the tribal jurisdiction area, and five (Tulsa, McIntosh,

Muskogee, Wagoner, and Ottawa counties) partially overlap with the tribal jurisdiction area.

6.      According to the Oklahoma Bureau of Narcotics and Dangerous Drugs, in 2015:

---

[1] Centers of Disease Control and Prevention, Multiple Cause of Death Data (1999-2015),
available at: https://wonder.cdc.gov/mcd-icd10.html.
[2] Susan Scutti, Opioid Epidemic may be Underestimated, CDC report says, CNN.com (Apr. 25,
2017).
[3] Roxanne Meyer, et al., *Prescription Opioid Abuse: A Literature Review of the Clinical and
Economic Burden in the United States*, 17.6 Population Health Management 372, 380 (2014).
[4] *See* Oklahoma Bureau of Narcotics and Dangerous Drugs Control Data, May 2017 ("OBNDD
Data") (attached as Exh. 1).

a.    A total of 97,068,513 opioid pills (assuming that a "dose," as used in the
Bureau's report, is one pill) were shipped by wholesale distributors
(including the Plaintiff distributors) and then dispensed by pharmacies
(including the Plaintiff pharmacies) in the 14 Oklahoma counties that are
at least partially within the Cherokee Nation's tribal jurisdiction area.[5]   At
the time, 1,198,809 people lived in those counties,[6] and 75.3% of those
people were adults.[7]   Thus, in 2015, approximately 107 opioid pills were
sold for each adult in the counties that are at least partially within the
Cherokee Nation's tribal jurisdiction area.[8]

b.    While this per capita measure of the opioids sent to the 14 counties is not
precisely a measure of the opioids shipped and dispensed in the tribal
jurisdiction area, the measures are essentially the same for 9 counties that
are entirely or almost entirely within the tribal jurisdiction area, and very
similar for the 5 counties that partially overlap with the Cherokee Nation's
tribal jurisdiction area.   For example:

i.    In Cherokee County (which is entirely within the tribal jurisdiction
area), 5,108,873 total opioid pills were shipped and dispensed for

---

[5] *See id.*

[6] *See* U.S. Census Bureau, Population, population change, and estimated components of
population change: April 1, 2010 to July 1, 2016, available at:
https://www.census.gov/data/datasets/2016/demo/popest /counties-total.html (last accessed July
11, 2017). ("Population Data").

[7] *See* U.S. Census Bureau, Quickfacts, available at: https://www.census.gov/quickfacts/ (last
accessed July 11, 2017) ("Adult Population Data").

[8] Children are rarely prescribed opioids.  Therefore, a calculation of number of pills prescribed
based on the adult population is appropriate.

only 37,486 adults, the equivalent of 136 pills for each adult in the county.[9]

    ii.    In Sequoyah County (which is entirely within the tribal jurisdiction area), 3,945,666 total opioid pills were shipped and dispensed in 2015 for only 31,549 adults, the equivalent of 125 pills for each adult in the county.[10]

    iii.    In Mayes County (which is almost entirely within the tribal jurisdiction area), 4,236,475 total opioid pills were shipped and dispensed in 2015 for only 31,016 adults, the equivalent of 137 pills for each adult in the county.[11]

    iv.    In McIntosh County (which overlaps with the tribal jurisdiction area), 2,299,211 total opioid pills were shipped and dispensed in 2015 for only 15,944 adults, the equivalent of 144 pills for each adult in the county.[12]

    v.    In Muskogee County (which overlaps with the tribal jurisdiction area), 7,569,499 total opioid pills were shipped and dispensed in 2015 for only 52,541 adults, the equivalent of 144 pills for each adult in the county.[13]

7.    According to the Oklahoma Bureau of Narcotics and Dangerous Drugs, in 2016:

---

[9] *See* OBNDD Data; Population Data; Adult Population Data.
[10] *See* OBNDD Data; Population Data; Adult Population Data.
[11] *See* OBNDD Data; Population Data; Adult Population Data.
[12] *See* OBNDD Data; Population Data; Adult Population Data.
[13] *See* OBNDD Data; Population Data; Adult Population Data.

a.   A total of 87,198,519 opioid pills were shipped by wholesale distributors (including the Plaintiff distributors) and then dispensed by pharmacies (including Plaintiffs' pharmacies) in the 14 Oklahoma counties that are at least partially within the Cherokee Nation's tribal jurisdiction area.[14]   At the time, 1,205,109 people lived in those counties,[15] 75.3% of whom were adults.[16]  Thus, the data show that for the 14 Oklahoma counties that are at least partially within the Cherokee Nation's jurisdiction, approximately 96 opioid pills were sold for each adult in the counties that are at least partially within the Cherokee Nation's tribal jurisdiction area.

b.   While this per capita measure of the opioids sent to the 14 counties is not precisely a measure of the opioids shipped and dispensed in the tribal jurisdiction area, the measures are essentially the same for nine counties that are entirely or almost entirely within the tribal jurisdiction area, and very similar for the five counties that partially overlap with the Cherokee Nation's tribal jurisdiction area.  For example:

i.   In Cherokee County (which is entirely within the tribal jurisdiction area), 4,848,607 opioid pills were shipped and dispensed in 2016 for only 37,743 adults, the equivalent of 128 pills for each adult.[17]

ii.   In Sequoyah County (which is entirely within the tribal jurisdiction area), 3,171,797 total opioid pills were shipped and dispensed in

---

[14] See OBNDD Data.
[15] See Population Data.
[16] See Adult Population Data.
[17] See OBNDD Data; Population Data; Adult Population Data.

2016 for only 31,590 adults, the equivalent of 100 pills for each adult in the county.[18]

   iii.   In Mayes County (which is almost entirely within the tribal jurisdiction area), 3,762,563 opioid pills were shipped and dispensed in 2016 for only 31,099 adults, the equivalent of 121 pills for each adult.[19]

   iv.   In McIntosh County (which overlaps with the tribal jurisdiction area), 2,036,209 total opioid pills were shipped and dispensed in 2016 for only 15,872 adults, the equivalent of 128 pills for each adult in the county.[20]

   v.   In Muskogee County (which partially overlaps with the tribal jurisdiction area), 6,873,809 opioid pills were shipped and dispensed in 2016 for only 52,455 adults, the equivalent of 131 pills for each adult.[21]

8.    According to the 2013 National Survey on Drug Use and Health ("NSDUH"), 4.2 percent of Americans aged 12 or older engaged in the nonmedical use of prescription pain relievers in the past year.[22]   In comparison to the national average, 6.9 percent of American

---

[18] *See* OBNDD Data; Population Data; Adult Population Data.
[19] *See* OBNDD Data; Population Data; Adult Population Data.
[20] *See* OBNDD Data; Population Data; Adult Population Data.
[21] *See* OBNDD Data; Population Data; Adult Population Data.
[22] Substance Abuse and Mental Health Services Administration, National Surveys on Drug Use and Health: The CBHSQ Report (June 26, 2015), http://www.samhsa.gov/data/sites/default/files/report_1972/Spotlight-1972.html

Indian/Alaskan Natives ("AI/AN") aged 12 or older used prescription pain relievers for nonmedical use.[23]

9.      If the nonmedical prescription opioid rate for AI/AN is applied to the population of Cherokee citizens age 12 or older (which I understand to be approximately 318,164 people), the data would indicate that an average of 21,953 Cherokee citizens use prescription opioids for nonmedical purposes each year.[24]

10.      Attached as Exhibit 2 is a true and correct copy of excerpts of the Cherokee Nation Code Annotated.[25]

11.      Attached as Exhibit 3 is a true and correct copy of an excerpt of the 2006 Compact between the Secretary of Health and Human Services and the Cherokee Nation.

12.      Attached as Exhibit 4 is a true and correct copy of an excerpt of, and a map that is attached to, the "Law Enforcement Agreement Between and Among the Cherokee Nation, the United States of America, the State of Oklahoma and its Political Subdivisions, et al." (July 8, 1992), which depicts the "Cherokee Nation's boundaries" for purposes of the Agreement.

13.      Attached as Exhibit 5 is a true and correct copy of an excerpt of, and a map that is attached to, the "Motor Vehicle Licensing Compact for Lands Located Within the Compact Jurisdictional Area of the Cherokee Nation," (October 1, 2002), which is titled "Cherokee Nation 14-County Jurisdiction" for purposes of the Agreement.

14.      On July 19, 2017, with the prior consent of the defendants in the underlying matter and permission from the Tribal Court, the Cherokee Nation filed a First Amended Petition

---

[23] *Id.*

[24] 6.9% of 318,164.

[25] A complete copy of the Code may be found on the website of the Cherokee Nation Office of the Attorney General, http://www.cherokee.org/attorneygeneral/Tribal-Code.

in Tribal Court adding four defendants.  A true and correct copy of the First Amended Petition is

attached as Exhibit 6.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 20 2017, at Tahlequah, Oklahoma.


Chrissi R. Nimmo

# EXHIBIT 1

## Adair County

| Primary Active Ingredient | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| codeine | 755 | 689 | 655 | 758 | 788 | 645 | 573 | 609 | 587 | 46,279 | 37,115 | 31,465 | 44,801 | 53,062 | 35,715 | 28,122 | 39,624 | 48,069 |
| dihydrocodeine | 3 | 1 | 2 | | 1 | 1 | | 4 | 7 | 162 | 12 | 180 | 2 | 2 | 2 | | 8 | 162 |
| fentanyl | 116 | 134 | 134 | 141 | 122 | 117 | 111 | 118 | 122 | 1,227 | 1,363 | 1,344 | 1,375 | 1,299 | 1,169 | 1,114 | 1,111 | 1,263 |
| hydrocodone | 2,339 | 2,302 | 2,185 | 2,408 | 2,348 | 1,999 | 2,083 | 2,045 | 1,867 | 203,173 | 202,473 | 198,743 | 211,877 | 205,484 | 170,062 | 176,148 | 175,622 | 163,036 |
| hydromorphone | 36 | 60 | 35 | 44 | 51 | 31 | 29 | 23 | 31 | 2,648 | 4,379 | 2,104 | 3,064 | 4,411 | 1,854 | 1,747 | 1,817 | 2,195 |
| morphine | 242 | 264 | 262 | 295 | 280 | 237 | 263 | 285 | 273 | 22,171 | 19,423 | 18,848 | 21,458 | 21,232 | 17,226 | 17,896 | 19,142 | 20,234 |
| oxycodone | 1,220 | 1,307 | 1,356 | 1,546 | 1,508 | 1,381 | 1,455 | 1,494 | 1,390 | 103,175 | 105,819 | 111,849 | 123,326 | 117,400 | 103,225 | 109,997 | 113,814 | 108,538 |
| oxymorphone | 15 | 11 | 14 | 18 | 14 | 19 | 22 | 17 | 14 | 1,260 | 1,020 | 1,170 | 1,560 | 1,325 | 1,692 | 1,882 | 1,422 | 1,380 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

## Cherokee County

| | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| | Filled Date | | | | | | | | | Filled Date | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| Primary Active... | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 1,886 | 1,409 | 1,205 | 1,359 | 1,399 | 1,157 | 1,046 | 1,199 | 1,594 | 170,341 | 102,524 | 83,259 | 121,028 | 146,977 | 93,693 | 78,646 | 122,523 | 167,499 |
| dihydrocodeine | 13 | 30 | 23 | 15 | 16 | 15 | 9 | 16 | 24 | 273 | 882 | 758 | 260 | 399 | 172 | 64 | 454 | 660 |
| fentanyl | 475 | 554 | 575 | 563 | 548 | 505 | 474 | 497 | 460 | 4,881 | 5,692 | 5,782 | 5,684 | 5,643 | 5,426 | 5,048 | 5,150 | 4,697 |
| hydrocodone | 7,823 | 7,949 | 7,601 | 7,576 | 7,219 | 7,121 | 6,666 | 6,866 | 6,721 | 695,082 | 704,495 | 687,105 | 689,011 | 661,465 | 648,069 | 598,631 | 628,800 | 610,963 |
| hydromorphone | 95 | 111 | 76 | 73 | 86 | 86 | 101 | 108 | 101 | 7,624 | 9,893 | 8,178 | 6,899 | 7,834 | 10,659 | 10,878 | 10,369 | 11,482 |
| morphine | 994 | 1,119 | 1,127 | 1,115 | 1,087 | 1,023 | 1,082 | 1,081 | 1,012 | 77,866 | 86,571 | 64,499 | 85,314 | 79,981 | 75,630 | 76,335 | 74,604 | 70,800 |
| oxycodone | 3,793 | 4,253 | 4,245 | 4,428 | 4,349 | 4,393 | 4,130 | 4,698 | 4,429 | 327,882 | 370,141 | 364,362 | 382,423 | 378,351 | 374,588 | 347,411 | 390,510 | 375,910 |
| oxymorphone | 59 | 68 | 74 | 82 | 84 | 58 | 70 | 65 | 54 | 4,400 | 5,014 | 5,321 | 5,429 | 5,367 | 3,993 | 4,397 | 4,310 | 3,640 |

Count of Rx and DOSAGE UNITS broken down by Filled Date Year and Filled Date Quarter vs Primary Active Ingredient. The view is filtered on Filled Date Year which keeps 2015, 2016 and 201~

## Craig County

**Filled Date**

| Primary Active | Count of Rx 2015 Q1 | Q2 | Q3 | Q4 | 2016 Q1 | Q2 | Q3 | Q4 | 2017 Q1 | Dosage Units 2015 Q1 | Q2 | Q3 | Q4 | 2016 Q1 | Q2 | Q3 | Q4 | 2017 Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 936 | 702 | 698 | 844 | 856 | 582 | 604 | 614 | 146 | 79,595 | 55,282 | 48,532 | 71,653 | 77,860 | 43,655 | 43,691 | 52,418 | 15,568 |
| dihydrocodeine | 1 | 2 | 6 | 2 | 1 | 1 | | 1 | 1 | | 100 | 90 | 170 | 60 | 30 | | 60 | 54 |
| fentanyl | 197 | 228 | 187 | 230 | 176 | 151 | 154 | 111 | 17 | 2,360 | 2,391 | 2,042 | 2,307 | 1,866 | 1,567 | 1,543 | 1,135 | 165 |
| hydrocodone | 2,177 | 2,322 | 2,253 | 2,386 | 2,278 | 1,784 | 1,895 | 1,614 | 368 | 166,984 | 176,129 | 167,700 | 182,796 | 172,544 | 134,710 | 140,818 | 123,929 | 27,902 |
| hydromorphone | 37 | 38 | 37 | 39 | 57 | 32 | 45 | 39 | 2 | 3,410 | 3,236 | 2,772 | 4,640 | 4,108 | 2,244 | 3,615 | 3,232 | 172 |
| morphine | 234 | 223 | 259 | 247 | 262 | 223 | 237 | 185 | 46 | 17,489 | 15,450 | 17,963 | 17,950 | 17,379 | 15,243 | 15,669 | 12,299 | 3,089 |
| oxycodone | 663 | 909 | 921 | 1,068 | 1,010 | 714 | 839 | 711 | 155 | 70,981 | 75,683 | 74,978 | 85,176 | 79,216 | 57,969 | 65,520 | 58,725 | 12,374 |
| oxymorphone | 28 | 29 | 47 | 38 | 35 | 28 | 26 | 18 | 8 | 2,136 | 1,700 | 2,895 | 2,762 | 2,582 | 1,942 | 1,734 | 1,326 | 475 |

Count of Rx and DOSAGE UNITS broken down by Filled Date Year and Filled Date Quarter vs Primary Active Ingredient. The view is filtered on Filled Date (year which keeps 2015, 2016 and 201~

## Delaware Co

| | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| | Filled Date | | | | | | | | | | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| Primary Active... | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 1,030 | 550 | 442 | 642 | 686 | 418 | 384 | 500 | 167 | 121,915 | 53,484 | 38,610 | 69,196 | 76,790 | 39,335 | 30,101 | 48,821 | 22,271 |
| dihydrocodeine | 1 | | | | | | | | | 30 | | | | | | | | |
| fentanyl | 247 | 252 | 259 | 269 | 239 | 236 | 233 | 208 | 65 | 3,076 | 2,723 | 2,999 | 2,933 | 2,534 | 2,660 | 2,326 | 2,171 | 648 |
| hydrocodone | 3,613 | 3,754 | 3,602 | 3,705 | 3,460 | 3,073 | 3,054 | 3,174 | 858 | 285,614 | 300,516 | 280,802 | 293,682 | 269,631 | 234,305 | 233,469 | 241,491 | 63,480 |
| hydromorphone | 76 | 64 | 74 | 57 | 66 | 69 | 63 | 78 | 21 | 5,879 | 4,709 | 5,215 | 4,314 | 4,904 | 5,057 | 4,753 | 5,925 | 2,048 |
| morphine | 484 | 462 | 535 | 498 | 452 | 411 | 388 | 412 | 112 | 37,464 | 35,068 | 40,850 | 37,925 | 33,913 | 31,585 | 28,593 | 30,655 | 8,741 |
| oxycodone | 1,696 | 1,762 | 1,870 | 1,808 | 1,814 | 1,716 | 1,687 | 1,665 | 456 | 148,747 | 149,373 | 161,377 | 157,640 | 159,856 | 146,610 | 142,904 | 140,266 | 39,340 |
| oxymorphone | 59 | 74 | 75 | 81 | 71 | -33 | 48 | 40 | 9 | 4,739 | 5,548 | 5,724 | 5,912 | 4,900 | 3,020 | 3,322 | 2,928 | 640 |

Count of Rx and DOSAGE UNITS broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient. The view is filtered on Filled Date Year which keeps 2015, 2016 and 2017.

## Mayes Co

| | Filled Date | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 | |
| Primary Active... | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | |
| codeine | 1,918 | 1,076 | 827 | 1,206 | 1,251 | 552 | 726 | 963 | 1,096 | 229,620 | 108,039 | 73,687 | 132,334 | 139,695 | 78,212 | 57,470 | 98,159 | 129,993 | |
| dihydrocodeine | 1 | | | | | | | | 1 | 30 | | | | | | | | 1 | |
| fentanyl | 485 | 505 | 485 | 480 | 456 | 405 | 448 | 437 | 417 | 5,779 | 5,535 | 5,477 | 5,211 | 5,017 | 4,406 | 4,406 | 4,486 | 4,179 | |
| hydrocodone | 6,758 | 6,942 | 6,756 | 6,786 | 6,519 | 6,072 | 6,098 | 6,178 | 5,783 | 535,094 | 548,158 | 530,563 | 538,941 | 505,789 | 467,466 | 468,425 | 468,886 | 438,451 | |
| hydromorphone | 125 | 123 | 118 | 114 | 134 | 134 | 120 | 143 | 127 | 9,700 | 8,464 | 8,088 | 8,022 | 10,349 | 10,367 | 9,984 | 11,173 | 10,614 | |
| morphine | 887 | 929 | 970 | 934 | 869 | 794 | 767 | 825 | 752 | 69,293 | 70,279 | 74,396 | 71,033 | 64,736 | 60,483 | 57,144 | 61,138 | 57,423 | |
| oxycodone | 3,145 | 3,379 | 3,487 | 3,408 | 3,352 | 3,322 | 3,377 | 3,397 | 3,325 | 273,668 | 269,245 | 297,228 | 297,452 | 289,351 | 283,055 | 285,175 | 289,973 | 279,595 | |
| oxymorphone | 134 | 142 | 132 | 132 | 123 | 68 | 82 | 100 | 90 | 10,713 | 10,734 | 10,239 | 9,854 | 8,369 | 6,210 | 5,612 | 6,942 | 6,254 | |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient. The view is filtered on Filled Date Quarter which keeps Q1, Q2, Q3 and Q4.

## McIntosh Co

| | Filled Date | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| Primary Active … | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| codeine | 1,167 | 932 | 854 | 1,104 | 1,052 | 771 | 670 | 857 | 904 | 126,067 | 79,448 | 67,269 | 99,970 | 100,542 | 64,052 | 47,585 | 76,682 | 89,507 |
| dihydrocodeine | | 1 | | | 3 | | | | | | 2 | | | 240 | | | | |
| fentanyl | 193 | 199 | 209 | 184 | 216 | 205 | 204 | 186 | 154 | 2,287 | 2,326 | 2,231 | 2,127 | 2,536 | 2,631 | 2,785 | 2,663 | 1,825 |
| hydrocodone | 3,700 | 3,835 | 3,835 | 3,602 | 3,461 | 3,601 | 3,098 | 3,324 | 3,133 | 323,559 | 328,518 | 322,138 | 316,360 | 301,883 | 318,678 | 263,669 | 285,560 | 270,280 |
| hydromorphone | 45 | 41 | 52 | 57 | 33 | 30 | 48 | 35 | 37 | 3,639 | 2,891 | 3,953 | 6,190 | 4,417 | 3,094 | 3,970 | 2,635 | 2,265 |
| morphine | 379 | 381 | 407 | 378 | 350 | 343 | 343 | 349 | 313 | 27,628 | 27,040 | 28,559 | 27,712 | 25,078 | 25,611 | 23,149 | 24,863 | 22,248 |
| oxycodone | 1,174 | 1,302 | 1,381 | 1,310 | 1,321 | 1,262 | 1,204 | 1,255 | 1,198 | 113,597 | 123,864 | 127,055 | 120,368 | 116,878 | 111,791 | 104,529 | 105,194 | 98,556 |
| oxymorphone | 39 | 50 | 54 | 50 | 59 | 56 | 44 | 35 | 31 | 2,720 | 3,690 | 4,035 | 3,990 | 4,664 | 4,626 | 3,528 | 2,676 | 2,406 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

## Muskogee Co

**Filled Date**

| Primary Active | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 3,231 | 2,311 | 2,197 | 2,726 | 2,646 | 2,103 | 1,939 | 2,426 | 2,689 | 389,826 | 238,556 | 201,546 | 297,035 | 287,650 | 191,454 | 165,578 | 237,796 | 288,868 |
| dihydrocodeine | 3 | 8 | 7 | 7 | 6 | 9 | 17 | 8 | 5 | 44 | 230 | 336 | 456 | 442 | 506 | 888 | 562 | 61 |
| fentanyl | 717 | 697 | 679 | 620 | 560 | 536 | 539 | 535 | 482 | 7,731 | 7,432 | 7,332 | 7,214 | 6,481 | 5,833 | 5,495 | 5,670 | 5,097 |
| hydrocodone | 12,194 | 12,983 | 12,250 | 12,283 | 11,634 | 11,602 | 10,887 | 11,301 | 10,665 | 1,061,480 | 1,099,777 | 1,013,366 | 1,039,196 | 955,845 | 986,958 | 933,587 | 978,995 | 911,921 |
| hydromorphone | 176 | 160 | 138 | 143 | 157 | 114 | 113 | 116 | 97 | 17,637 | 15,474 | 13,410 | 14,284 | 14,806 | 12,125 | 10,851 | 11,230 | 10,331 |
| morphine | 1,275 | 1,327 | 1,286 | 1,281 | 1,239 | 1,217 | 1,076 | 1,062 | 1,036 | 97,599 | 98,803 | 95,505 | 94,029 | 89,525 | 90,300 | 77,788 | 80,920 | 77,130 |
| oxycodone | 4,393 | 4,751 | 4,848 | 4,787 | 4,800 | 4,835 | 4,871 | 5,095 | 4,912 | 425,059 | 444,752 | 418,961 | 411,509 | 409,619 | 410,667 | 402,706 | 421,081 | 410,038 |
| oxymorphone | 152 | 177 | 186 | 184 | 165 | 174 | 140 | 138 | 117 | 11,360 | 13,270 | 13,777 | 14,513 | 12,512 | 13,342 | 11,237 | 11,361 | 9,816 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient.

Nowata Co

**Filled Date**

### Count of Rx

| Primary Active... | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | 2017 Q1 | 2017 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 321 | 227 | 208 | 274 | 300 | 217 | 213 | 251 | 263 | 22 |
| fentanyl | 108 | 98 | 118 | 136 | 103 | 99 | 98 | 102 | 85 | 10 |
| hydrocodone | 1,663 | 1,531 | 1,561 | 1,689 | 1,554 | 1,533 | 1,495 | 1,443 | 1,364 | 162 |
| hydromorphone | 9 | 8 | 4 | 5 | 5 | 5 | 4 | 3 | 3 | |
| morphine | 140 | 127 | 119 | 124 | 125 | 119 | 111 | 124 | 122 | 13 |
| oxycodone | 435 | 472 | 500 | 553 | 522 | 517 | 544 | 570 | 515 | 60 |
| oxymorphone | 12 | 9 | 10 | 7 | 8 | 10 | 10 | 6 | 8 | |

### DOSAGE UNITS

| Primary Active... | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | 2017 Q1 | 2017 Q2 |
|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 31,320 | 16,527 | 14,131 | 22,394 | 27,576 | 15,390 | 14,190 | 18,883 | 24,458 | 1,995 |
| fentanyl | 1,179 | 1,105 | 1,314 | 1,437 | 1,176 | 1,150 | 1,110 | 1,138 | 950 | 110 |
| hydrocodone | 121,280 | 118,140 | 112,253 | 123,599 | 116,109 | 109,434 | 107,184 | 106,776 | 93,775 | 12,022 |
| hydromorphone | 329 | 345 | 180 | 150 | 90 | 124 | 50 | 178 | 340 | |
| morphine | 11,690 | 11,105 | 10,252 | 10,683 | 10,285 | 9,447 | 8,092 | 8,962 | 7,999 | 880 |
| oxycodone | 34,427 | 38,525 | 39,240 | 43,845 | 42,685 | 42,726 | 41,009 | 45,554 | 44,006 | 4,631 |
| oxymorphone | 1,110 | 774 | 828 | 660 | 679 | 840 | 870 | 538 | 576 | |

Count of Rx and DOSAGE UNITS broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient.

## Ottawa Co

### Count of Rx

Filled Date

| Primary Active | 2015 | | | | 2016 | | | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| codeine | 1,601 | 1,275 | 1,092 | 1,437 | 1,451 | 1,043 | 971 | 1,178 | 1,336 | 132 |
| dihydrocodeine | 9 | 14 | 16 | 17 | 12 | 13 | 13 | 19 | 15 | 3 |
| fentanyl | 287 | 286 | 280 | 303 | 260 | 230 | 276 | 264 | 260 | 19 |
| hydrocodone | 4,217 | 4,416 | 4,408 | 4,331 | 4,149 | 3,944 | 3,902 | 3,811 | 3,642 | 376 |
| hydromorphone | 66 | 60 | 68 | 62 | 48 | 41 | 39 | 42 | 49 | 5 |
| morphine | 355 | 383 | 356 | 347 | 330 | 286 | 364 | 341 | 331 | 34 |
| oxycodone | 1,196 | 1,237 | 1,310 | 1,365 | 1,287 | 1,224 | 1,255 | 1,325 | 1,198 | 131 |
| oxymorphone | 32 | 36 | 42 | 61 | 47 | 43 | 57 | 45 | 36 | 2 |

### DOSAGE UNITS

Filled Date

| Primary Active | 2015 | | | | 2016 | | | | 2017 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |
| codeine | 209,296 | 138,073 | 114,596 | 152,047 | 164,090 | 108,714 | 88,358 | 129,042 | 152,714 | 16,002 |
| dihydrocodeine | 580 | 792 | 980 | 980 | 782 | 752 | 820 | 1,092 | 910 | 180 |
| fentanyl | 3,055 | 2,942 | 2,750 | 2,575 | 2,604 | 2,259 | 2,742 | 2,593 | 3,025 | 180 |
| hydrocodone | 312,155 | 313,988 | 304,702 | 312,883 | 300,139 | 293,629 | 285,501 | 281,497 | 269,977 | 28,114 |
| hydromorphone | 5,406 | 4,664 | 5,101 | 5,153 | 4,948 | 3,856 | 2,940 | 3,695 | 4,291 | 540 |
| morphine | 29,511 | 31,042 | 28,253 | 27,492 | 25,362 | 21,927 | 24,850 | 23,220 | 22,387 | 2,162 |
| oxycodone | 98,376 | 102,051 | 101,608 | 109,333 | 100,689 | 97,346 | 98,517 | 102,801 | 96,292 | 12,019 |
| oxymorphone | 2,460 | 3,064 | 3,335 | 4,837 | 3,846 | 3,194 | 3,835 | 2,870 | 2,774 | 117 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient.

Rogers Co

| | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
| | 2015 | | | | 2016 | | | | 2017 | 2015 | | | | 2016 | | | | 2017 |
| Primary Active ... | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| codeine | 3,538 | 2,160 | 1,736 | 2,482 | 2,380 | 1,777 | 1,546 | 2,072 | 2,702 | 388,342 | 203,820 | 148,501 | 247,318 | 238,413 | 146,139 | 104,791 | 197,670 | 270,286 |
| dihydrocodeine | | | | | | | | | 1 | | | | | | | | | 20 |
| fentanyl | 961 | 995 | 945 | 988 | 937 | 933 | 854 | 837 | 802 | 12,153 | 12,550 | 11,809 | 12,201 | 11,315 | 11,033 | 10,141 | 10,308 | 9,319 |
| hydrocodone | 13,720 | 13,923 | 13,682 | 13,319 | 13,032 | 12,323 | 12,341 | 12,851 | 12,363 | 1,009,862 | 998,116 | 968,376 | 963,040 | 932,868 | 895,911 | 865,935 | 923,844 | 877,522 |
| hydromorphone | 167 | 161 | 170 | 174 | 149 | 150 | 156 | 165 | 189 | 16,400 | 14,744 | 14,670 | 14,451 | 13,703 | 14,080 | 13,849 | 15,166 | 16,610 |
| morphine | 1,810 | 1,873 | 1,811 | 1,948 | 1,917 | 1,815 | 1,778 | 1,847 | 1,794 | 143,916 | 145,325 | 138,613 | 145,950 | 143,067 | 134,500 | 134,175 | 135,775 | 128,477 |
| oxycodone | 5,260 | 5,527 | 5,670 | 5,760 | 5,607 | 5,298 | 5,383 | 5,819 | 5,537 | 401,481 | 420,070 | 421,507 | 432,886 | 416,735 | 406,691 | 401,821 | 440,266 | 422,521 |
| oxymorphone | 223 | 265 | 268 | 246 | 247 | 211 | 186 | 193 | 166 | 19,662 | 22,498 | 22,361 | 20,065 | 18,980 | 14,999 | 13,305 | 13,653 | 13,506 |

Filled Date

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

## Sequoyah Co

### Count of Rx

| Primary Active... | 2015 | | | | 2016 | | | | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| codeine | 1,715 | 1,213 | 1,111 | 1,247 | 1,271 | 1,012 | 858 | 999 | 1,049 |
| dihydrocodeine | 3 | 2 | 3 | | 1 | 1 | | | |
| fentanyl | 272 | 266 | 251 | 232 | 198 | 198 | 217 | 212 | 209 |
| hydrocodone | 5,905 | 5,940 | 5,604 | 5,824 | 5,507 | 4,947 | 4,745 | 4,993 | 4,502 |
| hydromorphone | 135 | 149 | 137 | 139 | 95 | 96 | 93 | 92 | 84 |
| morphine | 624 | 667 | 650 | 677 | 616 | 490 | 554 | 618 | 554 |
| oxycodone | 3,225 | 3,520 | 3,465 | 3,589 | 3,321 | 2,879 | 3,043 | 3,178 | 3,204 |
| oxymorphone | 84 | 85 | 99 | 104 | 60 | 65 | 64 | 78 | 73 |

### DOSAGE UNITS

| Primary Active... | 2015 | | | | 2016 | | | | 2017 |
|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| codeine | 152,407 | 89,806 | 74,202 | 96,282 | 103,048 | 73,325 | 60,002 | 77,188 | 91,804 |
| dihydrocodeine | 170 | 140 | 6 | | 2 | 2 | | | |
| fentanyl | 2,723 | 2,765 | 2,521 | 2,395 | 2,042 | 2,062 | 2,352 | 2,150 | 2,039 |
| hydrocodone | 495,001 | 488,067 | 448,640 | 460,556 | 411,111 | 362,354 | 355,645 | 386,074 | 341,280 |
| hydromorphone | 13,211 | 13,424 | 11,503 | 11,088 | 7,198 | 7,929 | 6,940 | 7,139 | 7,002 |
| morphine | 49,381 | 50,868 | 48,225 | 47,569 | 45,140 | 34,523 | 37,913 | 40,976 | 35,017 |
| oxycodone | 323,440 | 348,756 | 330,588 | 354,337 | 319,272 | 257,238 | 266,296 | 284,009 | 293,292 |
| oxymorphone | 6,296 | 6,132 | 6,957 | 7,310 | 5,601 | 4,599 | 4,386 | 5,081 | 4,704 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

Tulsa Co Jan-Jun 2015

| | Count of Rx | | | | | DOSAGE UNITS | | |
| | | | | Filled Date | | | | |
| Primary Active ... | 2015 | | | | | 2015 | | |
| | Q1 | | Q2 | | | Q1 | | Q2 |
| codeine | 21,620 | | 14,600 | | | 2,472,996 | | 1,388,111 |
| dihydrocodeine | 4 | | 9 | | | 300 | | 710 |
| fentanyl | 5,178 | | 5,427 | | | 69,989 | | 71,747 |
| hydrocodone | 92,290 | | 93,060 | | | 6,580,949 | | 6,537,381 |
| hydromorphone | 1,317 | | 1,367 | | | 118,456 | | 121,598 |
| morphine | 8,637 | | 9,043 | | | 676,035 | | 697,056 |
| oxycodone | 33,537 | | 34,865 | | | 2,609,593 | | 2,694,250 |
| oxymorphone | 1,111 | | 1,199 | | | 85,484 | | 90,134 |

Count of Rx and DOSAGE UNITS broken down by Filled Date Year and Filled Date Quarter
vs. Primary Active Ingredient. The view is filtered on Filled Date Quarter which keeps Q1
and Q2.

## Tulsa Co Jul-Dec 2015

| | Filled Date | | | |
|---|---|---|---|---|
| | Count of Rx | | DOSAGE UNITS | |
| | 2015 | | 2015 | |
| Primary Active... | Q3 | Q4 | Q3 | Q4 |
| codeine | 12,800 | 16,921 | 1,135,357 | 1,794,573 |
| dihydrocodeine | 19 | 22 | 1,352 | 1,260 |
| fentanyl | 5,385 | 5,632 | 70,700 | 72,604 |
| hydrocodone | 90,921 | 89,218 | 6,384,831 | 6,425,694 |
| hydromorphone | 1,236 | 1,300 | 106,561 | 109,321 |
| morphine | 9,525 | 9,374 | 711,501 | 702,938 |
| oxycodone | 35,520 | 36,537 | 2,705,205 | 2,805,473 |
| oxymorphone | 1,221 | 1,250 | 91,693 | 92,460 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs.
Primary Active Ingredient. The view is filtered on Filled Date Year which keeps 2015

## Tulsa Co Jan-Jun 2016

| | Filled Date | | | |
| Primary Active... | Count of Rx | | DOSAGE UNITS | |
| | 2016 | | 2016 | |
| | Q1 | Q2 | Q1 | Q2 |
|---|---|---|---|---|
| codeine | 16,104 | 12,019 | 1,683,870 | 1,111,574 |
| dihydrocodeine | 19 | 14 | 1,190 | 942 |
| fentanyl | 5,241 | 4,854 | 66,958 | 62,892 |
| hydrocodone | 86,042 | 82,298 | 6,110,076 | 5,833,293 |
| hydromorphone | 1,177 | 1,111 | 98,176 | 95,613 |
| morphine | 8,980 | 8,491 | 662,398 | 631,490 |
| oxycodone | 35,384 | 34,768 | 2,712,395 | 2,612,002 |
| oxymorphone | 1,171 | 1,073 | 83,687 | 77,860 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient. The view is filtered on Filled Date Quarter, which keeps Q1 and Q2.

## Tulsa Co Jul-Dec 2016

| | Filled Date | | | |
|---|---|---|---|---|
| | Count of Rx | | DOSAGE UNITS | |
| | 2016 | | 2016 | |
| Primary Active | Q3 | Q4 | Q3 | Q4 |
| codeine | 10,155 | 14,206 | 844,669 | 1,495,699 |
| dihydrocodeine | 13 | 11 | 590 | 645 |
| fentanyl | 4,673 | 4,610 | 60,433 | 60,735 |
| hydrocodone | 79,401 | 80,613 | 5,576,644 | 5,767,293 |
| hydromorphone | 1,101 | 1,210 | 97,325 | 107,883 |
| morphine | 8,225 | 8,410 | 606,882 | 619,566 |
| oxycodone | 33,890 | 35,578 | 2,572,005 | 2,696,291 |
| oxymorphone | 982 | 967 | 69,674 | 68,715 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

Tulsa Co Jan-Mar 2017

| | Count of Rx | | DOSAGE UNITS | |
|---|---|---|---|---|
| **Primary Active** | 2017 | Q1 | 2017 | Q1 |
| codeine | | 17,377 | | 1,934,166 |
| dihydrocodeine | | 18 | | 870 |
| fentanyl | | 4,165 | | 52,176 |
| hydrocodone | | 78,053 | | 5,566,372 |
| hydromorphone | | 1,058 | | 96,303 |
| morphine | | 8,302 | | 595,534 |
| oxycodone | | 34,249 | | 2,599,582 |
| oxymorphone | | 968 | | 69,907 |

Filled Date

DOSAGE UNITS and count of Rx broken down by Filled Date Year and
Filled Date Quarter vs Primary Active Ingredient

## Wagoner Co

| Primary Active | Count of Rx | | | | | | | | | DOSAGE UNITS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | | | | 2016 | | | | 2017* | 2015 | | | | 2016 | | | | 2017* |
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| codeine | 3,044 | 2,036 | 1,741 | 2,472 | 2,485 | 1,744 | 1,534 | 2,177 | 2,557 | 358,558 | 198,529 | 163,709 | 274,969 | 272,592 | 157,133 | 129,899 | 237,055 | 302,761 |
| dihydrocodeine | 2 | 8 | 9 | 3 | | 4 | 4 | 15 | 11 | 40 | 422 | 600 | 180 | | 390 | 480 | 1,142 | 622 |
| fentanyl | 783 | 834 | 817 | 777 | 746 | 687 | 673 | 697 | 655 | 9,774 | 10,170 | 9,251 | 6,978 | 8,362 | 7,693 | 7,662 | 7,822 | 7,277 |
| hydrocodone | 11,774 | 11,976 | 11,785 | 11,636 | 11,194 | 11,046 | 10,527 | 11,011 | 10,722 | 912,160 | 943,586 | 906,172 | 897,116 | 853,450 | 543,978 | 798,963 | 846,256 | 824,573 |
| hydromorphone | 168 | 181 | 174 | 174 | 156 | 119 | 103 | 114 | 96 | 13,530 | 14,685 | 13,280 | 13,881 | 15,160 | 17,126 | 13,363 | 15,369 | 15,001 |
| morphine | 1,169 | 1,312 | 1,368 | 1,390 | 1,392 | 1,263 | 1,231 | 1,320 | 1,249 | 97,002 | 101,272 | 103,840 | 107,585 | 103,995 | 92,782 | 89,856 | 96,158 | 89,586 |
| oxycodone | 4,178 | 4,554 | 4,685 | 4,750 | 4,633 | 4,653 | 4,594 | 4,865 | 4,557 | 354,090 | 376,643 | 379,199 | 384,069 | 369,171 | 371,046 | 353,306 | 388,659 | 368,305 |
| oxymorphone | 146 | 180 | 175 | 179 | 132 | 123 | 107 | 107 | 109 | 10,691 | 13,204 | 12,944 | 12,220 | 9,302 | 8,728 | 7,141 | 7,560 | 7,482 |

DOSAGE UNITS and count of Rx broken down by Filled Date Year and Filled Date Quarter vs. Primary Active Ingredient

## Washington Co

### Count of Rx

| Primary Active | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | 2017 Q1 |
|---|---|---|---|---|---|---|---|---|---|
| codeine | 1,772 | 1,022 | 990 | 1,290 | 1,287 | 1,018 | 902 | 1,195 | 1,399 |
| dihydrocodeine | | 1 | | | | | | 1 | |
| fentanyl | 452 | 473 | 475 | 496 | 490 | 482 | 459 | 457 | 450 |
| hydrocodone | 8,507 | 8,647 | 8,211 | 8,069 | 7,917 | 7,729 | 7,263 | 7,445 | 7,423 |
| hydromorphone | 93 | 95 | 75 | 89 | 85 | 77 | 95 | 99 | 99 |
| morphine | 803 | 814 | 834 | 843 | 870 | 855 | 824 | 838 | 781 |
| oxycodone | 2,541 | 2,917 | 2,985 | 3,073 | 3,116 | 3,114 | 3,023 | 3,187 | 3,070 |
| oxymorphone | 92 | 105 | 109 | 119 | 101 | 99 | 82 | 77 | 71 |

### Filled Date — DOSAGE UNITS

| Primary Active | 2015 Q1 | 2015 Q2 | 2015 Q3 | 2015 Q4 | 2016 Q1 | 2016 Q2 | 2016 Q3 | 2016 Q4 | 2017 Q1 |
|---|---|---|---|---|---|---|---|---|---|
| codeine | 201,026 | 97,449 | 87,832 | 135,210 | 150,031 | 92,639 | 73,472 | 119,113 | 154,043 |
| dihydrocodeine | | 30 | | | | | | 30 | |
| fentanyl | 5,374 | 5,516 | 5,698 | 5,862 | 5,977 | 5,773 | 5,484 | 5,284 | 5,142 |
| hydrocodone | 593,465 | 592,997 | 558,475 | 567,373 | 549,327 | 520,195 | 482,848 | 527,131 | 517,991 |
| hydromorphone | 8,595 | 7,776 | 6,027 | 6,964 | 6,339 | 5,549 | 6,397 | 7,466 | 7,760 |
| morphine | 63,322 | 64,182 | 64,156 | 63,653 | 55,413 | 61,504 | 60,342 | 63,296 | 55,894 |
| oxycodone | 201,690 | 227,613 | 227,661 | 233,513 | 234,799 | 234,242 | 232,971 | 236,752 | 233,037 |
| oxymorphone | 7,741 | 9,314 | 8,992 | 9,861 | 8,420 | 7,514 | 6,426 | 5,867 | 5,300 |

DOSAGE UNITS and count of Rx broken down by Filled Date year and Filled Date Quarter via Primary Active ingredient

# EXHIBIT 2

# CNCA

## Title 27—

## Environmental Quality

## § 104

amendments, modifications or replacements thereof, shall be consistent with the goals, purposes and provisions of this Title and the Constitution of Cherokee Nation. Provided, however, that prior to becoming effective, such rules and regulations, and any amendments, modifications or replacements thereof, shall be first submitted to and approved in writing by the Principal Chief of Cherokee Nation.

### § 103. Personal jurisdiction

For purposes of enforcing the provisions of the Cherokee Nation Environmental Act, Cherokee Nation shall have jurisdiction over all persons who by their actions violate the provisions of the Cherokee Nation Environmental Act.

### § 104. Territorial jurisdiction

For purpose of enforcing the provisions of the Cherokee Nation Environmental Act, the Cherokee Nation shall have jurisdiction in the territorial boundaries of Cherokee Nation as defined in the Patent of 1838, and other places determined to be Indian Country within Cherokee Nation jurisdiction.

The CN EPC shall have jurisdiction to regulate and enforce the provisions of this title with respect to any activity conducted on trust land or in Indian Country within Cherokee Nation to the fullest extent allowed by law.

### § 105. Repealed by LA 31–04, eff. July 16, 2004

### § 106. EPA authorization

Cherokee Nation authorization by EPA. The CN EPC with the approval of the Principal Chief shall establish Tribal Implementation Programs (Tribal Authorization) to the extent allowed by federal law and may, where appropriate, establish programs for which there is no corresponding federal law or program.

### § 107. Severability

The provisions of this title are severable, and if any part or provision hereof shall be held void, the decision of any Court so holding shall not affect or impair any of the remaining parts or provisions of this title.

### § 108. Applicability

This title shall apply to all causes within the jurisdiction of Cherokee Nation.

### § 109. Review of Commission actions

Any affected party may seek review in the District Court of Cherokee Nation of any final order or

# CNCA

## Title 27—

## Environmental Quality

## § 902

hundred (600) feet of the highest water line of the reservoir.

12. **"Effluent limitation"** means any established restriction on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into waters of the nation, including schedules of compliance.

13. **"Environment"** includes but is not limited to the air, land, wildlife, cultural and archaeological resources, and waters of the Nation.

14. **"Environmental Code"** means the Cherokee Nation Environmental Quality Code and shall refer to 27 CNCA § 100 et seq.

15. **"Indirect discharge"** means the introduction of pollutants to a treatment works from a nondomestic source.

16. **"Indian"** means a person who is a citizen or is eligible for citizenship in a federally-recognized Indian tribe or nation.

17. **"Indian country"** means as defined by federal statutory and case law.

18. **"Indian tribe or nation"** means a federally-recognized Indian tribe or nation.

19. **"Jurisdiction"** means jurisdiction of Cherokee Nation over the territory legally described in the treaties of 1828, 1835 and 1838 and the Cherokee Nation patent issued in 1846, and other such lands acquired by Cherokee Nation since 1838.

20. **"Lands of Cherokee Nation"** means tribal lands and those lands under the jurisdiction of Cherokee Nation.

21. **"Nation"** means Cherokee Nation.

22. **"Nonpoint source"** means the contamination of the environment with a pollutant for which the specific point of origin may not be well defined.

23. **"Person"** means any individual, trust, joint stock company, corporation (including a government corporation), partnership, association, government or any other legal entity or an agent, employee, representative, assignee or successor thereof.

24. **"Point source"** means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, or vessel or other floating craft, from which pollutants or wastes are or may be discharged. The term **"point source"** does not include stormwater discharges and return flows from normal agricultural practices, but may include those associated with agri-industry practices such as concentrated animal feeding operations.

# CNCA

## Title 26—

## Elections

## § 3

propose constitutional amendments.

7. **"Council"** means the Council of Cherokee Nation.

8. **"Council Member"** means a Member of the Council of Cherokee Nation.

9. **"Counting device"** means an electronic device used for the purpose of accepting and counting ballots and for all other legitimate purposes related to the conduct of an election.

10. **"Election Commission"** means the Cherokee Nation Election Commission created pursuant to Article IX, Section 1 of the Cherokee Nation Constitution.

11. **"Election outcome"** means the determination of the candidate winning an election for office; and the determination of the passage of failure of an initiative or referendum question.

12. **"Election results"** means the number of votes in favor of each candidate for office; and the number of votes in favor of and opposed to each constitutional amendment or initiative or referendum question.

13. **"Election Services Office"** means the Cherokee Nation Election Services Office established under 26 CNCA § 14.

14. **"Elective office"** means the office of Principal Chief, Deputy Principal Chief, and Tribal Council.

15. **"Election period"** shall include the primary election and the runoff election.

16. **"General election"** means a regular election for offices of the Principal Chief and Deputy Principal Chief and for seats on the Cherokee Nation Council as provided by law on a date certain; provided that elections for the following purposes may also occur during a general election: consideration of referendum and initiative petitions pursuant to Article XV, Sections 3 and 4 of the Cherokee Nation Constitution, and consideration of constitutional amendments pursuant to Article XV, Sections 1 and 2 of the Cherokee Nation Constitution.

17. **"Initiative petition"** means a petition submitted by the registered voters of the Cherokee Nation for purposes of proposing any legislative measure and constitutional amendment pursuant to Article XV, Sections 1, 3, 5 and 6 of the Cherokee Nation Constitution.

18. **"Jurisdictional boundaries"** means the boundaries described by the patents of 1838 and 1846 diminished only by the Treaty of July 19, 1866, and the Act of March 3, 1893, which encompasses all or portions of the northeastern fourteen (14) counties of Oklahoma.

19. **"Officer"** means the Principal Chief and Deputy Principal Chief.

20. **"Original enrollee"** is as defined by 11 CNCA § 4.1, derived only through proof of Cherokee

865

# CNCA

## Title 18—

## Corporations

## § 208

name in Cherokee Nation.

4. A limited liability company may use the name, including a fictitious name, of another domestic or foreign company which is used in Cherokee Nation if the other company is organized or authorized to transact business in Cherokee Nation and the company proposing to use the name has:

a. merged with the other company;

b. been formed by reorganization with the other company; or

c. acquired substantially all of the assets, including the name, of the other company.

## § 207. Reservation of limited liability company name

A. A person may reserve the exclusive use of the name of a limited liability company, including a fictitious name for a foreign company whose name is not available, by delivering an application to the Office of the Principal Chief for filing. The application must set forth the name and address of the applicant and the name proposed to be reserved. If the Office of the Principal Chief or his authorized representative finds that the name applied for is available, it must be reserved for the applicant's exclusive use for a period of sixty (60) days.

B. The owner of a name reserved for a limited liability company may transfer the reservation to another person by delivering to the Office of the Principal Chief a signed notice of the transfer, executed by the applicant for whom the name was reserved and specifying the name and address of the transferee.

## § 208. Designated office and agent for service of process

A. A limited liability company and a foreign limited liability company authorized to do business in Cherokee Nation shall designate and continuously maintain in Cherokee Nation:

1. a principal office, which need not be a place of its business; and

2. a resident agent for service of process on the limited liability company that is an individual resident of Cherokee Nation, or a domestic or qualified foreign corporation limited liability company, or limited partnership.

B. An agent must be an individual resident of Cherokee Nation, a domestic corporation, another limited liability company, or a foreign corporation or foreign company authorized to do business in Cherokee Nation.

C. For purposes of this section, "in Cherokee Nation" and "of Cherokee Nation" means the historic reservation boundaries defined in the 1838 fee patent signed by President Martin Van Buren, or any other lands which are, or become, subject to tribal jurisdiction.

# CNCA

## Title 68—

## Revenue and Taxation

## §§ 102-103

———————————————

Secretary of State

———————————————

Brad Henry, Governor

State of Oklahoma

## CHAPTER 6

### LANDFILL USER FEE

#### § 101. Short title

This chapter shall be known and may be cited as the Cherokee Nation Landfill Out-of-Nation User Fee.

#### § 102. Purpose

It is the purpose of this chapter to impose a certain fee for waste materials generated outside the original territorial jurisdiction of the Cherokee Nation; providing for the fee to be in addition to any other charges; providing for the fee to be deposited in a certain account; and providing for a statement of purpose for the fees collected.

#### § 103. Definitions

As used in this chapter, unless the context otherwise requires:

1. **"Disposers"** means any person, company, business or organization that disposes of waste.

2. **"Fee"** means Out-of-Nation user fee.

3. **"Landfill"** means the Cherokee Nation Landfill.

4. **"Original territorial jurisdiction"** means all land within the fourteen (14) county area of northeastern Oklahoma as defined by the treaties of 1828, 1833 and 1835 and the Patent of 1838 between the United States of America and Cherokee Nation.

#### § 104. Assessment

A. There is imposed and assessed a One Dollar and Fifty Cent ($1.50) per ton fee for waste disposed of at the Cherokee Nation Landfill where the said waste is generated from outside the original territorial jurisdiction of Cherokee Nation.

# CNCA

## Title 68—

## Revenue and Taxation

## § 1353

comprehensive annual budget for the applicable fiscal year. Any revenue distributions to Sequoyah High School or the Cherokee Nation Head Start program pursuant to this act shall first be used to meet any matching requirements for federal funds, if applicable. The Controller, with the assistance of any officer designated by the Principal Chief, shall be responsible for calculating and making all expenditures authorized by this subsection.

## DUTIES OF TAX COMMISSION—REGISTRATION OF VEHICLES—FEES AND TAXES— CERTIFICATES OF TITLE—LICENSE PLATES—PENALTIES

### § 1351. General powers and duties of Tax Commission

The Commission is hereby vested with the power, authority and duty to administer and enforce this Cherokee Nation Motor Vehicle Licensing and Tax Code. This power, authority and duty includes, but is not limited to, the calculation of all taxes, fees, penalties and fines assessed in accordance with the provisions of this act, as well as contracting with Oklahoma tag agents to distribute motor vehicle tags and process motor vehicle registration documents, if the Commission determines that utilizing Oklahoma tag agents for such purposes is in the best interests of the Nation. The Administrator shall be responsible for carrying out the rules, regulations and directives of the Commission and the Commission may delegate to the Administrator such authority as it deems proper for said purpose, provided that the authority to adopt rules and regulations pursuant to 68 CNCA § 1352 shall not be delegable to the Administrator or any other person.

### § 1352. Rules and regulations

The Commission shall adopt such rules and regulations, and amendments thereto, as it deems necessary to administer and enforce this code, which rules and regulations need not be approved by the Tribal Council, provided that said rules and regulations and any amendments thereto shall not be inconsistent with this code and shall be made available to the Council immediately after adoption. The Commission shall adopt such rules and regulations no later than one hundred fifty (150) days after the earlier of (i) the approval of a compact pursuant to 68 CNCA § 1305(A), or (ii) May 31, 2001. The rules and regulations shall provide for a process to appeal decisions of the Administrator assessing any fees, taxes, fines or penalties authorized by this act. Any decision by the Commission on a question so presented on appeal shall be final. The rules and regulations shall also set forth the procedures and requirements for perfecting the lien of a secured party against any vehicle registered pursuant to this act.

### § 1353. Registration of vehicles required

It shall be unlawful for any person, including without limitation any tribal citizen, to operate any vehicle on the public streets, alleys, roadways or highways within the reservation boundaries of Cherokee Nation unless such vehicle is properly registered and tagged under the provisions of this act or under the laws of the United States, a territory, a state or a federally-recognized Indian tribe with jurisdiction over the lands where such vehicle is principally garaged. Except as expressly authorized by tribal compact between Cherokee Nation and another federally-recognized Indian tribe, it shall be unlawful for the purposes of this section for any Indian to operate a motor vehicle

on any tribal fee or trust or individual Indian trust or restricted land within the reservation boundaries of Cherokee Nation if (i) said motor vehicle is tagged by another federally-recognized Indian tribe and (ii) the owner of said motor vehicle resides within the reservation boundaries of Cherokee Nation and the motor vehicle is principally garaged within the reservation boundaries of Cherokee Nation.

### § 1354. Registration fees and taxes

Eligible vehicles and trailers may be registered with Cherokee Nation, subject to the following fees and taxes:

1. Registration fees. There is hereby levied on every eligible vehicle registered with Cherokee Nation, an annual registration fee of the following:

| | |
|---|---|
| Registration years 1–4: | $75.00 |
| Registration years 5–8: | $65.00 |
| Registration years 9–12: | $45.00 |
| Registration years 13–16: | $25.00 |
| Registration years 17 and over: | $10.00 |

a. The registration fee on an eligible vehicle previously registered with any other tribe or with any state or territory will be calculated as if the vehicle had been registered with Cherokee Nation for the same number of years it had been so previously registered.

b. Exceptions.

i. The annual registration fee for tribal citizens who present documentation that they are entitled to veteran status shall be as follows:

(I) Any active or former member of a branch of the United States military, not including veterans of foreign wars or disabled veterans, Special Fee: $65.00 for registration years 1–4; $45.00 for registration years 5–12; and for registration years 13 and over, the same fees as provided above in this subdivision 1 for other eligible vehicles;

(II) Veterans of foreign wars, Special Fee: $60.00 for registration years 1–4; $40.00 for registration years 5–12; and for registration years 13 and over, the same fees as provided above in this subdivision 1 for other eligible vehicles;

(III) Disabled veterans, Special Fee: $5.00 for registration years 1–8; and for registration years 9 and over, no fee;

(IV) Winners of medals of honor, bronze or silver stars, equivalent medals for bravery or heroism in combat, Special Fee: $7.00 for registration years 1–8; and for registration years 9 and over, no fee;

# EXHIBIT 3

# COMPACT
### BETWEEN
## THE CHEROKEE NATION
### AND THE
## UNITED STATES OF AMERICA

### EXECUTED JUNE 30, 1993 AND
### AMENDED AND RESTATED EFFECTIVE OCTOBER 1, 2005

## Table of Contents

Recitals ............................................................................................................. 1

Article 1 – Authority and Purpose ......................................................................... 3
    Section 1.1 – Authority ....................................................................................... 3
    Section 1.2 – Purpose ......................................................................................... 3
    Section 1.3 – Territorial Jurisdiction of the Cherokee Nation ................................ 4
    Section 1.4 – Applicable Law and Forums ........................................................... 4

Article 2 – Obligations of the United States ............................................................ 4
    Section 2.1 – Trust Responsibility ....................................................................... 4
    Section 2.2 – Programs Retained ......................................................................... 4
        2.2.1 Secretarial Responsibility ........................................................................ 4
        2.2.2 Information regarding Services of the IHS ................................................. 4
    Section 2.3 – Eligibility for New Programs, Service Increases, and Non-Recurring
        Resources ...................................................................................................... 5
    Section 2.4 – [RESERVED] .................................................................................. 5
    Section 2.5 – Savings ......................................................................................... 5
    Section 2.6 – Reports to Congress........................................................................ 5

Article 3 – Term and General Provisions ................................................................. 5
    Section 3.1 – Term and Effective Date .................................................................. 5
    Section 3.2 – Funding Amount ............................................................................. 5
    Section 3.3 – Payment ........................................................................................ 5
        3.3.1 – Payment Schedule ................................................................................ 5
        3.3.2 – Interest on Advances ............................................................................ 6
        3.3.3 – Investment ........................................................................................... 6
    Section 3.4 – [RESERVED] .................................................................................. 6
    Section 3.5 – Audits ........................................................................................... 6
        3.5.1 Single Audit ........................................................................................... 6
        3.5.2 Cost Principles ....................................................................................... 6
    Section 3.6 – Records ......................................................................................... 6
        3.6.1 Incorporation of the Privacy Act ............................................................... 6
            3.6.1.1 Records Disclosure .............................................................................. 6
            3.6.1.2 Records Storage ................................................................................... 6
        3.6.2 Confidentiality Standards ........................................................................ 6
        3.6.3 Record Keeping System ........................................................................... 7
        3.6.4 Preemption............................................................................................. 7
    Section 3.7 Property ........................................................................................... 7
        3.7.1 In General .............................................................................................. 7
        3.7.2 [RESERVED] .......................................................................................... 7
        3.7.3 Access to Federal Property ....................................................................... 7
        3.7.4 Participation in "Project Transam" ........................................................... 7
        3.7.5 Leases .................................................................................................... 7

COMPACT BETWEEN THE CHEROKEE NATION AND THE UNITED STATES OF AMERICA
EXECUTED JUNE 30, 1993 AND AMENDED AND RESTATED EFFECTIVE OCTOBER 1, 2005

America for the Heads of Executive Departments and Agencies; Executive Order 13175 on Consultation and Coordination with Indian Tribal Governments; the September 23, 2004, Memorandum from the President of the United States of America for the Heads of Executive Departments and Agencies; and the Department of Health and Human Services Tribal Consultation Policy, the Secretary hereby pledges that the Indian Health Service will conduct all relations with the Nation on a government-to-government basis.

SECTION 1.3 – TERRITORIAL JURISDICTION OF THE CHEROKEE NATION. The boundaries of the Cherokee Nation territory shall be those described by the patents of 1838 and 1846, diminished only by the Treaty of July 19, 1866, and the Act of March 3, 1893, and expanded by lands acquired in trust since 1893. For purposes of this Compact and Funding Agreement, the service area does not include the lands acquired in trust since 1893 and the service area is fully contained within all or part of a fourteen county area located in the Claremore and Tahlequah Service Units of the Oklahoma City Area Indian Health Service.

SECTION 1.4 – APPLICABLE LAW AND FORUMS. The parties agree that the laws of the United States shall apply to any dispute between the United States and the Nation arising out of the Compact or Funding Agreement. The duly enacted laws of the Nation shall be applied with regard to any matter or action involving a party other than the United States in the execution of this Compact and the powers and decisions of the Nation's Court shall be respected, to the extent that Federal law, construed in accordance with the applicable rules of construction and Title V, as amended, is not inconsistent.

## ARTICLE 2— OBLIGATIONS OF THE UNITED STATES

SECTION 2.1 – TRUST RESPONSIBILITY. The Secretary is prohibited from waiving, modifying, or diminishing in any way the trust responsibility of the United States with respect to the Cherokee Nation and individual Indians that exists under treaties, Executive orders, other laws or court decisions. 25 U.S.C. § 458aaa-6(g).

SECTION 2.2 – PROGRAMS RETAINED.

2.2.1 SECRETARIAL RESPONSIBILITY. The Secretary hereby retains the responsibility for the programs, services, functions, and activities that are not assumed by the Nation through its Funding Agreement, and the Nation shall continue to be entitled to the full benefit of those programs, services, functions, and activities retained by the Indian Health Service. 25 U.S.C. § 450*l*(c).

2.2.2 INFORMATION REGARDING SERVICES OF THE INDIAN HEALTH SERVICE. At the written request of the Nation, the Indian Health Service shall provide the Nation with a written list of the programs, services, functions, and activities that continue to be operated by the Indian Health Service that the Nation is eligible to assume. To the fullest extent permitted by law, the Secretary will respond to requests from the Nation to provide information, including financial data, relevant to IHS's ongoing programs, services, functions, or activities. The Secretary will cooperate with the Nation to facilitate the inclusion of programs, services, functions, and activities in future Funding Agreements.

# EXHIBIT 4

FILED
JUL - 8 1992
OKLAHOMA SECRETARY OF STATE

**A LAW ENFORCEMENT AGREEMENT BETWEEN AND AMONG THE CHEROKEE NATION, THE UNITED STATES OF AMERICA, THE STATE OF OKLAHOMA AND ITS POLITICAL SUBDIVISIONS, THE VARIOUS BOARDS OF COUNTY COMMISSIONERS, AND VARIOUS LAW ENFORCEMENT AGENCIES[1]**

**WHEREAS,** the Congress of the United States has provided authority for the United States Secretary of Interior, to enter into agreements between the United States and Indian tribes and nations, states and their political subdivisions in accordance with the Indian Law Enforcement Reform Act of August 18, 1990, Public Law 191-379, 25 U.S.C.A., Section 2804 et seq., 104 U.S. Stat. 473;

**WHEREAS,** the Legislature of the State of Oklahoma has provided authority for the State, its political subdivisions to enter into agreements between the State, its political subdivisions, the federal government, and Indian tribes and nations in accordance with the Oklahoma Inter-local Cooperation Act, Oklahoma Statutes Title 74, sections 1001 et seq. and the State-Tribal Relations Act, Oklahoma Statutes title 74 sections 1221 et seq. (1989);

**WHEREAS,** the Council of the Cherokee Nation on the 8th day of March, 1991, provided authority for the Principal Chief of the Cherokee Nation to enter into agreements for cooperative law enforcement between the Cherokee Nation and other governmental entities, for cross-deputization, and for the Secretary of Interior to enforce tribal law pursuant to Cherokee Nation Tribal Resolution No. 25-91;

**WHEREAS,** the parties herein intend to provide comprehensive police protection and law enforcement for all residents of Oklahoma and Indian country;

**WHEREAS,** the parties herein wish to establish an organization to coordinate activities under this Agreement regarding law enforcement and police protection between the various law enforcement agencies and governmental entities within the boundaries of the Cherokee Nation;

**WHEREAS,** it is in the best interest of the residents of the State of Oklahoma and citizens of the United States of America and the Cherokee Nation that the parties herein declare and agree that each government and agency under this Agreement shall fully cooperate, each with the other, to provide efficient, effective, and thorough law enforcement and police protection to the populations of the State of Oklahoma and the Cherokee Nation regardless as to the status of the land; and

---

[1]Revised to include enforcement of Juvenile Code adopted by the Council of the Cherokee Nation on May 13, 1991, and minor technical changes on January 29, 1992; and last minor technical changes on April 21, 1992.

application of child welfare laws, together with any other yet unknown concerns, to determine whether amendments to the Agreement are needed or required.

IT IS FURTHER AGREED by the parties hereto that upon approval by the Governor of the Law Enforcement Agreement between the Cherokee Nation and the State of Oklahoma that the parties hereto will negotiate in good faith each with the other toward a mutual resolution of any bonafide perceived need to amend or alter the terms of the Law Enforcement Agreement the need for which may arise in the future during implementation of the same.

IT IS FURTHER AGREED that the Law Enforcement Agreement is hereby amended to reflect the following technical changes:

1. In Section 3(b) (1) (d) the omitted phrase "conditions which might adversely affect his or her" is inserted between the words "mental" and "performance," and

2. A Map of the Cherokee Nation's boundaries is attached hereto as Exhibit "A".

"STATE OF OKLAHOMA"

*Jerry J. Matlock*

BY: _____
    Governor David Walters

"CHEROKEE NATION"

BY: _____
    Wilma Mankiller, Principal Chief

3

# CHEROKEE NATION AT A GLANCE



# EXHIBIT 5



**F I L E D**

OCT 0 1 2002

OKLAHOMA SECRETARY
OF STATE

### Cherokee Nation
### And
### State of Oklahoma

# Tribal-State Motor Vehicle
# Licensing Compact

## 2001 - 2011



vehicles for the benefit of schools and certain counties and municipalities within the Nation's jurisdictional area .

**Section 3:  Definitions.**   Wherever used in this Compact, the words and phrases set forth below shall have the following meanings:

a) *Citizen* shall mean a person who is an enrolled member of the Cherokee Nation as provided in section 103S of the CN Motor Vehicle Code.

b) *CN Motor Vehicle Code* shall mean L.A. 01-01 and the amendments thereto which are attached to this Compact as Exhibit A.

c) *Indian country* shall mean "Indian country" as that term is defined in 18 USC §1151 and has been interpreted by the Supreme Court of the United States in *Oklahoma Tax Commission vs. Sac and Fox Nation*, 508 U.S. 114 (1993), and other decisions of said Court.

d) *Jurisdictional Area of the Cherokee Nation* shall mean the area in the State of Oklahoma that lies within the boundaries of the Cherokee Nation as more particularly described in Exhibit B attached to this Compact.

e) *Motor Vehicle* or *Vehicle* shall have the same meaning given to the term "Eligible Vehicle" in section 103T of the CN Motor Vehicle Code and any other vehicle eligible for registration thereunder.

f) *Tribal Motor Vehicle License* shall mean a license plate or tag issued by the Cherokee Nation for a particular Motor Vehicle or other Vehicle in accordance with provisions of the CN Motor Vehicle Code and of section 3 of this Compact.

g) *Nation* shall mean Cherokee Nation.

h) *State* shall mean the State of Oklahoma.

**Section 4:  Tribal Motor Vehicle License.**   The parties stipulate and agree that the Nation, as a federally recognized Indian tribe, has the sovereign authority to issue motor vehicle licenses in accordance with the United States Supreme Court's decision in *Oklahoma Tax Commission vs. Sac and Fox Nation*, 508 U.S. 114 (1993).  However, the Nation and the State disagree in their respective interpretations of the Court's decision in *Sac and Fox Nation*, including without limitation the question of what lands or territory are to be considered "Indian country" in light of the Court's decision in that case, and by entering into this Compact the Nation and State do not intend to resolve that question. However, the Nation and State both recognize the practical difficulty in determining whether a vehicle is principally garaged in Indian country, under either party's legal interpretation of the term Indian country.  Accordingly, in order to avoid the uncertainties



# EXHIBIT 6

FILED

**THE DISTRICT COURT
OF THE CHEROKEE NATION**

2017 JUL 19  PM 3: 46

CHEROKEE NATION
DISTRICT COURT
KRISTI MOHCOOYEA
COURT CLERK

| | | |
|---|---|---|
| THE CHEROKEE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MCKESSON CORPORATION; | ) | CV-2017-203 |
| CARDINAL HEALTH, INC.; | ) | |
| CARDINAL HEALTH 110, LLC; | ) | |
| AMERISOURCEBERGEN DRUG | ) | |
| CORPORATION; | ) | |
| CVS HEALTH CORPORATION; | ) | |
| CVS PHARMACY, INC.; | ) | |
| OKLAHOMA CVS PHARMACY, LLC; | ) | |
| WALGREENS BOOTS ALLIANCE, INC.; | ) | |
| WALGREEN CO.; | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED PETITION

1.      There is an epidemic of prescription opioid abuse sweeping through Indian country and across the United States. It is an epidemic of unprecedented proportions in the recent history of the Cherokee Nation, leaving in its wake a substantial loss of resources, addiction, disability, and death.

2.      Today in the Cherokee Nation, as elsewhere in the country, prescription opioids are more deadly than heroin. According to reports from the National Institutes of Health, prescription opioids killed 22,598 people in the United States in 2015, as compared to 12,989 deaths from heroin. Prescription opioids are the driving force behind skyrocketing rates of drug-overdose deaths, which now surpass car accident deaths nationwide.  In 2016, the U.S. Surgeon General visited with tribal representatives in Oklahoma, where most Cherokee Nation citizens

1

reside, and declared that the "prescription opioid epidemic that is sweeping across the U.S. has

hit Indian country particularly hard."

3.      The brunt of the epidemic could have been, and should have been, prevented by

the defendant companies acting within the U.S. drug distribution industry, which are some of the

largest corporations in America. These drug wholesalers and retailers have profited greatly by

allowing the Cherokee Nation to become flooded with prescription opioids.

4.      The distribution industry is supposed to serve as a "check" in the drug delivery

system, *i.e.*, by securing and monitoring opioids at every step as they travel through commerce,

protecting them from theft, and refusing to fulfill suspicious or unusual orders by downstream

pharmacies, doctors, or patients. But Defendants utterly failed in this duty; they have habitually

turned a blind eye to known or knowable problems in their own supply chains.

5.      By doing so, Defendants created conditions in which vast amounts of opioids

have flowed freely from manufacturers to abusers and drug dealers—with distributors regularly

fulfilling suspicious orders from pharmacies, and pharmacies regularly ignoring "red flags" in

prescription presentation that would require further investigation and resolution before

dispensing the pills.

6.      This kind of behavior by Defendants has allowed massive amounts of opioid pills

to be diverted from legitimate channels of distribution into the illicit black market in quantities

that have fueled the opioid epidemic in the Cherokee Nation. This is the phenomenon known as

"opioid diversion." Acting against their common law and statutory duties, Defendants have

created an environment in which drug diversion can flourish. As a result, unauthorized opioid

users in and around the Cherokee Nation have ready access to illicit sources of diverted opioids.

7.      For years Defendants and their agents[1] have had the ability to substantially reduce the death toll and adverse economic consequences of opioid diversion in the Cherokee Nation—including the deaths of hundreds of Cherokee citizens and expenditures of hundreds of millions of dollars by the Cherokee Nation in dealing with the problem—but the Defendants pursued corporate revenues instead. All the Defendants in this action share responsibility for perpetuating the epidemic.

8.      Defendants have foreseeably caused damages to the Cherokee Nation including the costs of providing: (1) medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) counseling and rehabilitation services; (3) treatment of infants born with opioid-related medical conditions; (4) welfare for children whose parents suffer from opioid-related disability or incapacitation; and (5) law enforcement and public safety relating to the opioid epidemic within the Cherokee Nation.  The Cherokee Nation has also suffered substantial damages relating to the lost productivity of Cherokee Nation citizens and businesses.

9.      The Cherokee Nation, through Attorney General Todd Hembree, brings this civil action under the statutory and common law of the Cherokee Nation for injunctive relief, compensatory damages, statutory damages, punitive damages, and any other relief allowed by law against the Defendant opioid drug distributors and retailers that, by their actions, have knowingly or negligently distributed and dispensed prescription opioid drugs within the Cherokee Nation in a manner that foreseeably injured, and continues to injure, the Cherokee Nation and its citizens.

---

[1]    Throughout this petition, when reference is made to a defendant or defendants, this includes the officers, agents, or employees of said defendants, as well as predecessor and successor entities to the named defendants.

## PARTIES

### I.   Plaintiff

10.     The Cherokee Nation is a federally-recognized sovereign Indian nation. It is governed by the Cherokee Nation Constitution and the laws of the Cherokee Nation and exercises inherent governmental authority within the Cherokee Nation.

11.     Attorney General Todd Hembree brings this action pursuant to Article VII, Section 13 of the Cherokee Nation Constitution, Title 51, sec. 101 et al. of the Cherokee Nation Code and in the exercise of his other statutory and common law powers on behalf of the Cherokee Nation in its proprietary capacity and under its *parens patriae* authority in the public interest to protect the health, safety, and welfare of all Cherokee Nation citizens to stop the growing prescription opioid epidemic within the Cherokee Nation and to recover damages and seek other redress for harm caused by Defendants' improper sales, distribution, dispensing, and reporting practices relating to prescription opioids. Defendants' actions have caused and continue to cause a crisis that threatens the health, safety and welfare of the citizens of the Cherokee Nation.

### II.   Distributor Defendants

12.     **McKesson Corporation:** McKesson Corporation ("McKesson") is a publicly-traded company headquartered in California and incorporated under the laws of Delaware. During all relevant times, McKesson has distributed substantial amounts of prescription opioids to providers and retailers in the Cherokee Nation. McKesson has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

13.     **Cardinal Health, Inc.:** Cardinal Health, Inc. is a publicly-traded company headquartered in Ohio and incorporated under the laws of Ohio. Cardinal Health, Inc. has

distributed or caused to be distributed substantial amounts of prescription opioids to providers and retailers in the Cherokee Nation. Cardinal Health, Inc. has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

14.     **Cardinal Health 110, LLC:** Cardinal Health 110, LLC is a Delaware Limited Liability Company and a wholly-owned subsidiary of Cardinal Health, Inc. It is headquartered in Ohio. During all relevant times, Cardinal Health 110, LLC has distributed substantial amounts of prescription opioids to providers and retailers in the Cherokee Nation. Cardinal Health 110, LLC has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.[2]

15.     **AmerisourceBergen Drug Corporation:** AmerisourceBergen Drug Corporation ("AmerisourceBergen") is a publicly-traded company headquartered in Pennsylvania and incorporated under the laws of Delaware.  During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids to providers and retailers in the Cherokee Nation. AmerisourceBergen has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

III.    **Pharmacy Defendants**

16.     **CVS Health Corporation:** CVS Health Corporation, f/k/a CVS Caremark Corporation ("CVS Health") is a publicly-traded Delaware corporation with its principal place of

---

[2]     Cardinal Health, Inc. and Cardinal Health 110, LLC are individually and collectively referred to as "Cardinal."

5

business in Rhode Island. CVS Health has sold or caused to be sold prescription opioids at locations within the Cherokee Nation, including in close proximity to the Nation's hospitals, clinics and other health care facilities serving patients of the Cherokee Nation's healthcare system. CVS Health has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

17.    **CVS Pharmacy, Inc.**: CVS Pharmacy, Inc. is a Rhode Island corporation, with its principle place of business in Rhode Island. It is a wholly-owned subsidiary of CVS Health and is the sole member of Oklahoma CVS Pharmacy LLC.  During all relevant times, CVS Pharmacy, Inc. has sold or caused to be sold prescription opioids at locations within the Cherokee Nation, including in close proximity to the Nation's hospitals, clinics and other health care facilities serving patients of the Cherokee Nation's healthcare system. CVS Pharmacy, Inc. has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

18.    **Oklahoma CVS Pharmacy, LLC**: Oklahoma CVS Pharmacy, LLC ("Oklahoma CVS") is an Oklahoma Limited Liability Company and a wholly-owned subsidiary of CVS Pharmacy, Inc., with its principal place of business in Rhode Island. During all relevant times, Oklahoma CVS has sold and continues to sell prescription opioids at locations within the Cherokee Nation, including in close proximity to the Nation's hospitals, clinics and other health care facilities serving patients of the Cherokee Nation's healthcare system. Oklahoma CVS has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has

purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.[3]

19.   **Walgreens Boots Alliance, Inc.:** Walgreens Boots Alliance, Inc. is a publically-traded Delaware corporation with its principal place of business in Illinois. Walgreens Boots Alliance, Inc. at all relevant times has sold or caused to be sold prescription opioids at locations within the Cherokee Nation, including in close proximity to the Nation's hospitals, clinics, and other healthcare facilities serving patients of the Cherokee Nation's healthcare system. Walgreens Boots Alliance, Inc. has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

20.   **Walgreen Co.:** Walgreen Co. is an Illinois corporation and a wholly-owned subsidiary of Walgreens Boots Alliance, Inc. During all relevant times, Walgreen Co. has sold and continues to sell prescription opioids at locations within the Cherokee Nation, including in close proximity to the Nation's hospitals, clinics and other health care facilities serving patients of the Cherokee Nation's healthcare system. Walgreen Co. has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.[4]

21.   **Wal-Mart Stores, Inc.:** Wal-Mart Stores, Inc. ("Walmart") is a publicly-traded Delaware corporation with its principal place of business in Arkansas. At all relevant times, Walmart has sold and continues to sell prescription opioids at locations within the Cherokee

---

[3]   CVS Health Corporation, CVS Pharmacy, Inc. and Oklahoma CVS Pharmacy, LLC are individually and collectively referred to as "CVS."

[4]   Walgreens Boots Alliance, Inc. and Walgreen Co. are individually and collectively referred to as "Walgreens."

Nation, including in close proximity to the Nation's hospitals, clinics and other healthcare facilities serving patients of the Cherokee Nation's healthcare system. Walmart has engaged in consensual commercial dealings with the Cherokee Nation and its citizens, and has purposefully availed itself of the advantages of conducting business with and within the Cherokee Nation.

## JURISDICTION AND VENUE

### I.      Subject matter jurisdiction

22.     This court has subject matter jurisdiction over this case pursuant to Article VIII, Sec. 6 of the Constitution of the Cherokee Nation, which provides that the district courts of the Cherokee Nation "shall be courts of general jurisdiction and shall be vested with original jurisdiction . . . to hear and resolve disputes arising under the laws or Constitution of the Cherokee Nation in both law and equity. . . ."

23.     This court also has subject matter jurisdiction over this case pursuant to Title 20, § 24 of the Cherokee Nation Code, which provides that the district court of the Cherokee Nation "shall have general jurisdiction and is vested with original jurisdiction, not otherwise reserved to the Supreme Court, to hear and resolve disputes arising under the laws or Constitution of the Cherokee Nation in both law and equity. . . ."

### II.     Jurisdiction under the Treaty of 1866

24.     Article 13 of the 1866 Treaty of Washington, July 19, 1866, 14 Stat. 799, between the United States and the Cherokee Nation, recognizes the inherent jurisdiction of the courts of the Cherokee Nation over causes of action that "arise in the Cherokee Nation." Article 13 of the Treaty states (emphasis added):

> The Cherokees also agree that a court or courts may be established by the United States in [the Indian] Territory, with such jurisdiction and organized in such manner as may be prescribed by law: Provided, That the judicial tribunals of the nation shall be

> allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the nation, by nativity or adoption, shall be the only parties, or where the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty.

25.     Under Article 13 of the 1866 Treaty, this Court has jurisdiction over the causes of action set forth in this Complaint because such causes of action against Defendants "arise in the Cherokee Nation."

## III.     Jurisdiction over causes of action arising in Indian country

26.     The courts of the Cherokee Nation exercise jurisdiction over non-Indians in civil actions brought under the laws or Constitution of the Cherokee Nation where the cause of action arises on land that constitutes Indian country within the Cherokee Nation.

27.     The Cherokee Nation has inherent sovereignty over unlawful conduct by non-Indians on land that constitutes Indian country within the Cherokee Nation, including on land owned by or held in trust for the Cherokee Nation.

28.     Defendants engaged in activities that take place on, or have direct impacts on, land that constitutes Indian country within the Cherokee Nation.

29.     This Court has jurisdiction over the causes of action set forth in this Complaint because such causes of action against Defendants arise on land that constitutes Indian country within the Cherokee Nation.

## IV.     Jurisdiction over causes of action arising in the Cherokee Nation jurisdictional area

30.     The courts of the Cherokee Nation can exercise jurisdiction over non-Indians in civil actions brought under the laws or Constitution of the Cherokee Nation where the cause of action arises in the Cherokee Nation jurisdictional area and where the conduct of such non-Indians is based on consensual relationships with the Cherokee Nation or poses a threat to the political integrity, economic security, or health or welfare of the Cherokee Nation.

31.     The Cherokee Nation jurisdictional area is recognized in federal, state and tribal law as the territorial area of the Cherokee Nation established by prior treaties between the United States and the Cherokee Nation.

32.     This Cherokee Nation jurisdictional area encompasses the whole or part of 14 Oklahoma counties—Adair, Cherokee, Craig, Delaware, Mayes, McIntosh, Muskogee, Nowata, Ottawa, Rogers, Sequoyah, Tulsa, Wagoner, and Washington—all in northeastern Oklahoma, as shown on the map attached as **Exhibit A,** entitled "Tribal Jurisdictions in Oklahoma" prepared by the State of Oklahoma Department of Transportation.[5]

33.     The Cherokee Nation has approximately 335,000 citizens. Of these, there are approximately 177,000 Cherokee Nation citizens residing within the 14-county Cherokee Nation jurisdictional area. Cherokee Nation citizens comprise a significant percentage of the population in these counties.

34.     The 14-county Cherokee Nation jurisdictional area is widely recognized in federal law as territory in which the Cherokee Nation has governmental authority to administer a variety of federal programs and to exercise sovereign rights.

35.     For example, the Cherokee Nation has the authority under the Indian Self-Determination Act to enter annual self-governance compacts and funding agreements to run Bureau of Indian Affairs programs located throughout the 14-country Cherokee Nation jurisdictional area where such programs are of "special . . . significance" to the Nation. *See* 25 U.S.C. § 5384-85; 25 C.F.R. §§ 1000.125-.126.  The 2006 Compact between Indian Health Service and the Cherokee Nation, for instance, in a section titled "Territorial Jurisdiction of the Cherokee Nation," describes "the boundaries of the Cherokee Nation territory" as the areas set

---

[5]   Also available at http://www.okladot.state.ok.us/maps/tribal/map_tribal_jurisdictions.pdf.

by the patents of 1838 and 1846, as modified, and further describes the Cherokee Nation "service area" under the Compact as "within all or part of a fourteen county area located in the Claremore and Tahlequah Service Units of the Oklahoma City Area Indian Health Service". *See* 2006 Compact at §1.3.

36.     The federal government has authorized the Cherokee Nation to receive federal funding to support the exercise of "tribal control in all matters relating to the education of Indian children" within the 14-county Cherokee Nation jurisdictional area. 25 U.S.C. § 2020(d)(1).

37.     Federal law authorizes the Nation to implement federal grants within the 14-county Cherokee Nation jurisdictional area where such grants further the development and support of tribal courts exercising jurisdiction within the jurisdictional territory. 25 U.S.C. §§ 3653(3), 3681.

38.     Federal law also recognizes Cherokee Nation authority in the 14-county Cherokee Nation jurisdictional area for multiple other purposes. *See, e.g.,* 25 U.S.C. § 4302(4)(B)(i) (the Cherokee Nation's "jurisdictional areas" is equivalent to a "reservation" for purposes of receiving grants under the Native American Business Development, Trade Promotion, and Tourism Act of 2000); *id.* §§ 3201(b)(4), 3202(9), 3208(a) (the Cherokee Nation has authority to implement federal grants for treatment programs for victims of child sexual abuse within the Cherokee Nation jurisdictional area); *id.* §§ 3102, 3103(12), 3104(b)(2), (4) (recognizing the Cherokee Nation's interest in use of national forest lands and proceeds from sale of products of national forests within the Cherokee Nation jurisdictional area); *id.* § 3115 (providing that Secretary of Interior can enter cooperative agreements with tribes for the management of national forest lands in their jurisdictional areas); 40 U.S.C. § 523(b)(2) (recognizing the Cherokee Nation jurisdictional area for purposes of transferring excess federal government owned lands into tribal trust status); *see also* 25 C.F.R. § 151.2(f) (treating the 14-county

11

Cherokee Nation jurisdictional area as its "reservation" for purposes of acquiring trust land for the Cherokee Nation).

39.     Similarly, the 14-county Cherokee Nation jurisdictional area is recognized by the State of Oklahoma as territory in which the Cherokee Nation has governmental authority to administer certain state programs and to exercise sovereign rights.

40.     For instance, an extensive "Law Enforcement Agreement Between and Among the Cherokee Nation, the United States of America, the State of Oklahoma, and Its Political Subdivisions, the Various Boards of County Commissioners, and Various Law Enforcement Agencies," dated July 8, 1992, creates an inter-governmental Cherokee Nation Law Enforcement Compact that establishes the terms for cross-deputization of federal, state and tribal law enforcement personnel "within the boundaries of the Cherokee Nation."  Agmt. at 1.   For purposes of the agreement, the "Cherokee Nation's boundaries" are depicted on a map attached to the Compact as the 14-county Cherokee Nation jurisdictional area.

41.     The State of Oklahoma and the Cherokee Nation have also entered into a "Motor Vehicle Licensing Compact for Lands Located Within the Compact Jurisdictional Area of the Cherokee Nation," dated August 16, 2013, which allows the Nation to license motor vehicles owned by citizens of the Cherokee Nation pursuant to Cherokee Nation law within the "Compact Jurisdictional Area of the Cherokee Nation."   The Compact defines the boundaries of the "Cherokee Nation Compact Jurisdictional Area" by reference to a map attached to the Compact, depicting the same 14-county Cherokee Nation jurisdictional area discussed above.

42.     Similarly, the 14-county Cherokee Nation jurisdictional area is recognized by the Cherokee Nation as territory in which the Cherokee Nation has governmental authority to administer tribal programs and to exercise sovereign rights.

12

43.   The Constitution of the Cherokee Nation defines the boundaries of "the Cherokee Nation territory" as "those described by the patents of 1838 and 1846 diminished only by the Treaty of July 19, 1866, and the Act of March 3, 1893." Cherokee Const., Art. II. This area is co-extensive with the 14-county Cherokee Nation jurisdictional area described above.

44.   The Code of the Cherokee Nation asserts the Cherokee Nation's jurisdiction over activity within this 14-county Cherokee Nation jurisdictional area for multiple purposes. For instance, Title 27, § 104 of the Cherokee Nation Code states that "[f]or purposes of enforcing the provisions of the Cherokee Nation Environmental Act, the Cherokee Nation shall have jurisdiction in the territorial boundaries of the Cherokee Nation as defined in the Patent of 1838...." *See also* Title 33, § 5(3) (defining authority of Cherokee Nation Housing Authority); Title 68, §§ 102, 103(4) (imposing tax on waste "generated outside the original territorial jurisdiction of the Cherokee Nation," which is described as "all land within the fourteen (14) county area of northeastern Oklahoma as defined by the treaties of 1828, 1833 and 1835 and the Patent of 1838...."); Title 68, § 1353 (imposing motor vehicle licensing requirement on vehicles "within the reservation boundaries of Cherokee Nation").

45.   The courts of the Cherokee Nation have jurisdiction over causes of action arising from the conduct of non-Indians within the Cherokee Nation jurisdictional area where the non-Indians enter consensual relationships with the Nation or its citizens through commercial dealings, contracts, leases or other arrangements.

46.   Defendants have substantial contacts and business relationships with the Cherokee Nation, the citizens of the Cherokee Nation, employees of the Cherokee Nation, and/or Cherokee Nation businesses. Defendants have purposefully availed themselves of business opportunities within the Cherokee Nation jurisdictional area. This includes activities in

13

communities of high Cherokee Nation citizen population density that have a unique and undeniable tribal character.

47.     The Distributor Defendants have entered into consensual relationships with the Cherokee Nation and its citizens. For example, they have done so through contracts for the sale of prescription medication directly to the Nation, commercial dealings for the distribution of prescription medication for sale to employees of the Cherokee Nation, and through a continued course of conduct of doing business within the Cherokee Nation.

48.     Likewise, the Pharmacy Defendants have entered into consensual relationships with Cherokee Nation citizens by annually filling millions of dollars' worth of prescriptions for medication for Cherokee Nation citizens, and by hiring Cherokee Nation citizens to work as pharmacists and pharmacy technicians in the Cherokee Nation jurisdictional area, and by engaging in a continued course of conduct of doing business within the Cherokee Nation.

49.     In addition, the courts of the Cherokee Nation have jurisdiction over causes of action arising from the conduct of non-Indians within the Cherokee Nation jurisdictional area when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the Cherokee Nation.

50.     Defendants' conduct has caused and is causing damages to the Cherokee Nation's proprietary and sovereign interests by imposing significant costs on the Cherokee Nation's health system, undermining the economic productivity of its citizens, and harming the long-term health and welfare of Cherokee Nation citizens.

51.     Defendants' conduct has caused and is causing a health crisis in the Cherokee Nation that threatens the health, welfare, economic security and political integrity of the Cherokee Nation and all its citizens. As a result of Defendants' actions, the citizens of the Cherokee Nation have become addicted to prescription opioid drugs, causing serious injury or

14

death, requiring rehabilitation and medical treatment for substance use disorder, causing children to be born addicted to prescription opioids and other controlled substances, and causing short and long term emotional and physical damage that requires treatment, long term care, and in some instances foster care or adoption. The financial impact on the Cherokee Nation has been enormous.

52.     The negative impacts on the next generation of Cherokee Nation citizens caused by the conduct of Defendants—in particular, the ruinous effects on the health of Cherokee Nation children, and the removal of Cherokee Nation children from their parents—threatens the continuation of Cherokee Nation culture, identity, and self-government into the future. These impacts are so severe, cumulatively, that Defendants' conduct threatens to decimate the Cherokee Nation.

## V.     Personal jurisdiction

53.     This Court has personal jurisdiction over Defendants, each of which has substantial contacts and business dealings throughout the Cherokee Nation by virtue of their distribution, dispensing, and sales of prescription opioids within the Cherokee Nation territorial and political jurisdiction.

## VI.     Venue

54.     Venue is proper in this district because a substantial part of the events giving rise to the claim occurred here.

## FACTS COMMON TO ALL CLAIMS

## I.     The prescription opioid crisis

55.     Opioid literally means "opium-like" and the term includes all drugs derived in whole or in part from the opium poppy.

56.     The United States Food and Drug Administration's website describes this class of drugs as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, they can cause serious harm, including addiction, overdose and death."

57.     Prescription opioids with the highest potential for addiction are categorized under Schedule II of the Controlled Substances Act.  They include non-synthetic derivatives of the opium poppy (such as codeine and morphine, which are also called "opiates"), partially-synthetic derivatives (such as hydrocodone and oxycodone), or fully-synthetic derivatives (such as fentanyl and methadone).

58.     The supply chain for prescription opioids begins with the manufacture and packaging of the pills. The manufacturers then transfer the pills to distribution companies, including Defendants Cardinal, McKesson, and AmerisourceBergen, which together account for 85 to 90 percent of all revenues from drug distribution in the United States, estimated to be at $378.4 billion in 2015. The distributors then supply opioids to hospitals, pharmacies, doctors, and other healthcare providers, which then dispense the drugs to patients.

59.     Each participant in the supply chain shares the responsibility for controlling the availability of prescriptions opioids. Opioid "diversion" occurs whenever the supply chain of prescription opioids is broken, and the drugs are transferred from a legitimate channel of distribution or use, to an illegitimate channel of distribution or use. Diversion can occur at any point in the opioid supply chain, including at the pharmacy level when prescriptions are filled for any reason other than a legitimate medical purpose.

60.     For example, at the wholesale level of distribution, diversion occurs whenever distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from retailers or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency.

61.     Diversion also occurs at the pharmacy level, including whenever a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose and not in the usual course of professional practice.  Some of the signs of a prescription that may have been issued not for a legitimate medical purpose include when the patient seeks to fill multiple prescriptions from different doctors (known as doctor shopping), when they travel great distances between the doctor and the pharmacy to have the prescription filled, when they present multiple prescriptions for the largest dose of more than one controlled substance or when there are other "red flags" surrounding the transaction. These signs or "red flags" should trigger closer scrutiny of the prescriptions by the pharmacist and require a determination that the patient is not seeking the medication for purposes other than to treat a legitimate medical condition. In addition to diversion via prescription, opioids are also diverted from retail outlets when they are stolen by employees or others.

62.     Diversion also occurs through the use of stolen or forged prescriptions at pharmacies, or the sale of opioids without prescriptions. At the patient level, seeking prescription opioids under false pretenses can also be a route through which prescription opioids are deflected from medical sources into the illicit market.

63.     Opioid diversion occurs in the United States at an alarming rate.  In recent years, the number of people who take prescription opioids for non-medical purposes is greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.

64.     Every year, millions of people in the United States misuse and abuse opioid pain relievers that can lead to addiction, overdose and death. The overdose rate among American Indians, including Cherokee Nation citizens, is significantly higher than the rest of the population.

65.     Within the last 20 years, the abuse of prescription narcotic pain relievers has emerged as a public health crisis in the United States.  Overdose deaths involving prescription opioids have quadrupled since 1999, and so have sales of these prescriptions.

66.     In 2011, the Centers for Disease Control ("CDC") reported that overdose deaths from prescription opioids had reached epidemic levels. That year, 16,917 people died from a prescription opioid related overdose, according to the National Institutes of Health. Since then, the death toll has continued to rise. In 2014, 18,893 people died from a prescription opioid related overdose. In 2015, that number increased again to 22,598.

67.     The dramatic rise in heroin use in recent years is a direct result of prescription opioid diversion. The CDC recently reported that the strongest risk factor for a heroin use disorder is prescription opioid use. In one national study covering the period 2008 to 2010, 77.4% of the participants reported using prescription opioids before initiating heroin use. Another study reports that 75% of those who began their opioid abuse in the 2000s started with a prescription opioid. The CDC has reported that people who are dependent on prescription opioid painkillers are 40 times more likely to become dependent on heroin.  Heroin deaths are on a tragic upswing:  In 2015, over 12,989 people died from heroin overdose—up more than 20% from approximately 10,574 overdose deaths in 2014.

68.     The Cherokee Nation has taken proactive measures in its own healthcare system to fight against prescription opioid abuse. The Cherokee Nation was an early adopter of using information technologies to combat opioid diversion. Cherokee Nation healthcare providers

implemented and relied on a prescription monitoring program ("PMP") before use of PMP was required elsewhere. Cherokee Nation doctors access and review their patients' prescription histories directly at the point of care. Cherokee Nation also cracked down on opioid distributors promoting Cherokee Nation doctors to prescribe opioids, and modified its prescription drug "formulary" to eliminate certain prescription opioids such as hydrocodone that are most widely abused. Additionally, healthcare providers at Cherokee Nation facilities stopped using hardcopy prescription forms, and transitioned to using electronic prescriptions, thus eliminating the risk of forgery or alteration.

69.      American Indians in general are more likely than other racial/ethnic groups in the United States to die from drug-induced deaths. Among American Indian tribes, the Cherokee Nation has been particularly hard hit by the effects of Defendants' opioid diversion. Oklahoma, where the vast majority of Cherokee Nation citizens reside, leads the country in opioid abuse. In recent years, it has ranked number one nationally for the nonmedical use of prescription opioids for adults, and it currently ranks as the fifth highest state with drug overdose deaths in the United States. From 2007 to 2012, more overdose deaths in Oklahoma involved hydrocodone or oxycodone than alcohol, methamphetamine, cocaine, heroin and all other illegal drugs combined. Deaths of Cherokee Nation citizens significantly contribute to these statewide statistics.

70.      Between 2003 and 2014 there were over 350 opioid-related deaths within the Cherokee Nation. Annual deaths from opioid-related overdoses more than doubled within the Cherokee Nation between 2003 and 2014.  For adults within the Cherokee Nation, overdose deaths now outnumber deaths due to car accidents.

71.      And deaths are just a part of the opioid abuse epidemic.  The CDC reports that for every opioid-related death, there are on average 10 hospital admissions for abuse, 26 emergency department visits for misuse, 108 people who are dependent on opioids, and 733 non-medical

users. If these nationwide averages reflect the numbers in Oklahoma and in Cherokee Nation, that means there were over ten thousand hospital admissions or emergency-room visits and hundreds of thousands of instances of non-medical use of or addiction to opioids by Cherokee Nation citizens during the period between 2003 to 2014.

72.     According to public data from the U.S. Drug Enforcement Agency ("DEA"), over 2.75 billion milligrams of opioids were distributed in Oklahoma in 2015. Of that, an estimated 845 million milligrams were distributed in the 14 counties that make up the Cherokee Nation jurisdictional area. That amount would average out to be approximately 703 milligrams per Cherokee Nation citizen within those counties. Obviously most people do not take opioids, so this per capita average can be spread across the approximate estimate of Cherokee Nation citizens who actually use opioids to give a more accurate picture of the level of opioid diversion in the Cherokee Nation.

73.     In 2015, based on Mayo Clinic computations of the percentage of people actually taking opioids, the Defendants would have distributed an estimated 7,200 milligrams of prescription opioids per opioid user in the Cherokee Nation. That would translate into an average of 360 to 720 prescription opioid pills for every prescription opioid user in Cherokee Nation, assuming an average opioid dose of 10 to 20 milligrams per pill.

74.     In 2016, the U.S. Surgeon General visited with tribal representatives in Oklahoma and declared that the "prescription opioid abuse epidemic that is sweeping across the U.S. has hit Indian country particularly hard."  The impact to young Cherokee Nation citizens in Oklahoma has been the hardest of all. It has been reported that by 12th grade, nearly 13 percent of American Indian teens have used OxyContin, one of the most deadly opioids when misused. The use of OxyContin by American Indian 12th-graders was about double the national average.

75. A 2014 study funded by the National Institute on Drug Abuse found a much higher prevalence of drug and alcohol use in the American Indian 8th and 10th graders compared with national averages. American Indian students' annual heroin and OxyContin use was about two to three times higher than the national averages in those years.

76. The fact that American Indian teens, including Cherokee Nation children, are easily able to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created an illegal secondary market for opioids.

77. Sadly, even the Cherokee Nation's youngest citizens—its newborn infants—bear the consequences of the opioid abuse epidemic fueled by Defendants' conduct. Many Cherokee women have become addicted to prescription opioids and have used these drugs through their pregnancies. As a result, many Cherokee infants are born addicted to prescription opioids and suffer from opioid withdrawal and Neonatal Abstinence Syndrome.

78. Neonatal Abstinence Syndrome babies are immediately separated from their families and placed into the custody of the Cherokee Nation Indian Child Welfare ("ICW") or receive governmental services of the Cherokee Nation so that they can be afforded medical treatment and be protected from their drug-addicted mothers (and in many cases, their drug-addicted fathers, too).

79. The impact of Neonatal Abstinence Syndrome can be life-long. Most Neonatal Abstinence Syndrome babies are immediately transferred to a neonatal intensive care unit for a period of days, weeks or even months, depending on the severity of the symptoms and complications related to the prenatal exposure to opioids. This often requires an emergency helicopter evacuation from the Cherokee Nation hospital to Tulsa for extraordinary emergency care to save the life of the newborn child. This helicopter transport alone costs the Cherokee Nation thousands of dollars each time. Many of the babies have short-term and long-term

developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. In preschool, many of the affected children will suffer from vision and digestive issues; some are unable to attend full days of preschool because of the severity of their behavioral and cognitive issues. These disabilities follow these children through elementary school and beyond.

80.    It has been reported that pregnant American Indian women are up to 8.7 times more likely to be diagnosed with opioid dependency or abuse compared to the next highest race/ethnicity; and it been reported that in some communities upwards of 1 in 10 pregnant American Indian women has a diagnosis of opioid dependency or abuse.  On information and belief, these statistics apply similarly to pregnant women who are Cherokee citizens or the mothers of Cherokee children.

81.    Many of the parents of these the Cherokee Nation children continue to relapse into prescription opioid use and lose custody of the children. As a result, many of these children are placed in foster care or adopted.

82.    Defendants' opioid diversion in and around the Cherokee Nation contributes to a range of social problems including violence, delinquency, and mortality. Adverse social outcomes include child abuse and neglect, family dysfunction, criminal behavior, poverty, property damage, unemployment, and social despair. As a result, more and more Cherokee Nation resources are devoted to addiction-related problems, leaving a diminished pool of available resources to devote to positive societal causes like education, cultural preservation, and social programs. Meanwhile, the prescription opioid crisis diminishes the Cherokee Nation's available workforce, decreases productivity, increases poverty, and consequently requires greater government assistance expenditures by the Cherokee Nation.

83.    Cherokee Nation society is saturated with highly-addictive opioid painkillers diverted from Defendants' supply chains, thereby ensuring that Cherokee Nation citizens will continue to suffer from addiction rates higher than national averages and, commensurately, that Defendants will continue to profit by supplying opioids to the area. This civil lawsuit is the Cherokee Nation's only remaining weapon to fight against the worsening opioid abuse epidemic that Defendants have caused in the Cherokee Nation.

## II.    Liability of Distributor Defendants

### A.    Duties of Distributor Defendants

84.    Like all people, Distributors Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct—and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another—is under a duty to exercise reasonable care to prevent the threatened harm.

85.    In addition to having common law duties, the Distributor Defendants are governed by the statutory requirements of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations. These requirements were enacted to protect society from the harms of drug diversion. The Distributor Defendants' violation of these requirements shows that they failed to meet the relevant standard of conduct that society expects from them.

86.    By violating the CSA, the Distributor Defendants are also liable to Cherokee Nation under the Cherokee Nation Unfair and Deceptive Trade Practices Act, which specifically makes it a civil offense to violate federal statutes affecting or impacting chattels bought for medical purposes.

87.    The CSA creates a legal framework for the distribution and dispensing of controlled substances. Congress passed the CSA partly out of a concern about "the widespread

diversion of [controlled substances] out of legitimate channels into the illegal market." *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 4572.

88.    Accordingly, the CSA acts as a system of checks and balances from the manufacturing level through delivery of the pharmaceutical drug to the patient or ultimate user. Every person or entity who manufactures, distributes, or dispenses opioids must obtain a "registration" with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA, otherwise controlled substances move from the licit to the illicit marketplace, and there is great potential for harm to the general public.

89.    All opioid distributors are required to maintain effective controls against opioid diversion. They are also required to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

90.    To prevent unauthorized users from obtaining opioids, the CSA creates a distribution monitoring system for controlled substances. At the heart of this system are registration and tracking requirements imposed upon anyone authorized to handle controlled substances. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system which monitors the flow of Schedule II controlled substances from their point of manufacture through commercial distribution channels to point of sale. ARCOS accumulates data on distributors' controlled substances acquisition/distribution transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution. Each person or entity that is

registered to distribute ARCOS Reportable controlled substances must report acquisition and distribution transactions to the DEA.

91.    Acquisition and distribution transaction reports must provide data on each acquisition to inventory (identifying whether it is, e.g., by purchase or transfer, return from a customer, or supply by the Federal Government) and each reduction from inventory (identifying whether it is, e.g., by sale or transfer, theft, destruction or seizure by Government agencies) for each ARCOS Reportable controlled substance. *See* 21 U.S.C. § 827(d)(1); 21 C.F.R. §§ 1304.33(e), (d). Inventory that has been lost or stolen must also be reported separately to the DEA within one business day of discovery of such loss or theft.

92.    In addition to filing acquisition/distribution transaction reports, each registrant is required to maintain on a current basis a complete and accurate record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of. *See* 21 U.S.C. §§ 827(a)(3), 1304.21(a), 1304.22(b). It is unlawful for any person to negligently fail to abide by the recordkeeping and reporting requirements.

93.    In order to maintain registration, distributors must also maintain effective controls against diversion of controlled substances into other than legitimate medical, scientific and industrial channels.  When determining if a distributor has provided effective controls, the DEA Administrator refers to the security requirements set forth in §§ 1301.72-1301.76 as standards for the physical security controls and operating procedures necessary to prevent diversion. *See* 21 CFR § 1301.71.

### B.    Distributor Defendants knew or should have known they were facilitating widespread opioid diversion

94.    The problem of opioid diversion in the supply chain has been widely publicized for years.  Numerous publications, studies, federal agencies, and professional organizations have

highlighted the epidemic rate of opioid abuse and overdose rates in communities in Oklahoma, including in Indian country, as well as throughout the United States.

95.     To combat the problem of opioid diversion, the DEA has provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions.

96.     Since 2006, the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, their due diligence responsibilities, and their legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders to the DEA). The DEA provided distributors with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA pointed out the "red flags" distributors should look for in order to identify potential diversion. This initiative was created to help distributors understand their duties with respect to diversion control.

97.     Since 2007, the DEA has hosted at least five conferences to provide registrants with updated information about diversion trends and regulatory changes that affect the drug supply chain, the distributor initiative, and suspicious order reporting. All of the major distributors attended at least one of these conferences. The conferences allowed the registrants to ask questions and raise concerns. Registrants could also request clarification on DEA policies, procedures, and interpretations of the CSA and implementing regulations.

98.     Since 2008, the DEA has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and

distributors. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.[6]

99.     On September 27, 2006 and again on December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion.

100.     The September 27, 2006 letter reminded registrants that they are required by law to exercise due diligence to avoid filling orders that may be diverted into the illicit market. It explained that as part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of all orders prior to filling. It also described circumstances that could be indicative of diversion including ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; disproportionate ratio of ordering controlled substances to non-controlled prescription drugs; the ordering of excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors. The letter went on to describe what questions should be answered by a customer when attempting to make a determination if the order is indeed suspicious.

101.     On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the

---

[6]   HDMA, "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," (2008).

September 2006 correspondence. The letter reminded registrants that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility. Finally, the letter directed the registrant community to review a recent DEA action called *Southwood Pharmaceuticals, Inc.*, 72 FR 36487 (2007) that addressed criteria in determining suspicious orders and their obligation to maintain effective controls against diversion.

102.     The Distributor Defendants were on notice that their own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" that stressed the critical role of each member of the supply chain in distributing controlled substances.

103.     These industry guidelines further provided: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

104.     Opioid distributors have themselves recognized the magnitude of the problem and, at least rhetorically, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

105.     For example, a Cardinal executive recently claimed that it uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and

efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

106.   McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

107.   At the very least, these assurances about constantly eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to reasonably follow through.

108.   Thus, in addition to the obligations imposed by law, through their own words and actions, the Distributor Defendants have voluntarily undertaken a duty to protect the public at large against diversion from their supply chains, and to curb the opioid epidemic.

109.   Despite these kinds of statements, the Distributors Defendants have knowingly or negligently allowed diversion. Their misconduct has resulted in numerous civil fines and other penalties recovered by state and federal agencies—including actions by the DEA related to violations of the Controlled Substances Act.

110.   In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven warehouses around the United States. Again in 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states. Just several months ago, in December 2016, a Department of Justice press released announced that, in connection with the CSA violations, the United States "Reaches $34 Million Settlement With Cardinal Health For Civil Penalties Under The Controlled Substances Act." In connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Florida that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut

off the supply of drugs to the suspect pharmacy. Instead, Cardinal's opioid shipments to the pharmacy increased—to almost 2 million doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

111.    In May 2008, McKesson entered into a settlement agreement with the DEA to settle claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson agreed to pay a $13.25 million civil fine. After the 2008 settlement, McKesson was supposed to change its ways and act tougher towards opioid diversion. But it did not do so. It was later revealed that McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from only a single consumer. Again in 2015, McKesson found itself in the middle of allegations concerning its "suspicious order reporting practices for controlled substances." In early 2017 it was reported that McKesson agreed to pay $150 million to the government to settle certain opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.

112.    In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of particular controlled substances into non-medically necessary channels. It has been reported that the U.S. Department of Justice has subpoenaed AmerisourceBergen for documents in connection with a grand jury proceeding seeking information on the company's

"program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

113.   The Oklahoma Board of Pharmacy has directly disciplined the wholesale distributors of prescription opioids for failure to prevent diversion. On June 17, 2009, Cardinal was disciplined in two separate cases for violations in pharmacies that it operates. In Case No. 926, a pharmacy technician at Oklahoma State University Medical Center Pharmacy was allowed to illegally purchase 30,800 prescription opioids. As a result, Cardinal was cited for failing to prevent diversion and agreed to "maintain a compliance program designed to detect and prevent diversion of controlled substances… [which] shall include procedures to review orders for controlled substances. Orders that exceed established thresholds and criteria will be reviewed by a Cardinal employee trained to detect suspicious orders for the purposes of determining whether (i) such orders should not be filled and reported to the DEA and Board of Pharmacy (ii) based on a detailed review, the order is for a legitimate purpose and the controlled substances are not likely to be diverted into other than legitimate medical, scientific, or industrial channels." In Case No. 927, a pharmacy technician at Hillcrest Medical Center Pharmacy diverted 399,500 tablets (street value of $3,966,500.00) of hydrocodone. The Board again cited Cardinal for failing to prevent diversion and Cardinal again agreed to implement a system to detect and prevent further diversion.

114.   Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry which generates billions of dollars in revenue.

C.    **Distributor Defendants' misconduct has injured and continues to injure Cherokee Nation**

115.    The Distributor Defendants had the ability and duty to prevent opioid diversion, which presented a known or foreseeable danger of serious injury to the Cherokee Nation. But they failed to do so.

116.    The Distributor Defendants have supplied quantities of prescription opioids in and around the Cherokee Nation with the actual or constructive knowledge that the opioids were ultimately being consumed by Cherokee Nation citizens for non-medical purposes. Many of these shipments should have been stopped or investigated as suspicious orders, but the Distributor Defendants negligently or intentionally failed to do so.

117.    Each Distributor Defendant knew or should have known that the amount of opioids that it allowed to flow into the Cherokee Nation was far in excess of what could be consumed for medically-necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only opioid distributor servicing those communities).

118.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Cherokee Nation; providing information to pharmacies and retailers about opioid diversion; and

in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies.

119.    On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the Cherokee Nation to perform due diligence inspections to ensure that the controlled substances the Distributors Defendants had furnished were not being diverted to illegal uses.

120.    On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the Cherokee Nation, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

121.    It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around the Cherokee Nation with highly-addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

122.    It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable many of these injuries will be suffered by Cherokee Nation citizens, and that the costs of these injuries will be shouldered by the Cherokee Nation.

123.    The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic of the Cherokee Nation, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, and illegal transactions.

124.    The Distributor Defendants knew or should have known that a substantial amount of the opioids dispensed in and around the Cherokee Nation were being dispensed based on invalid or suspicious prescriptions. It is foreseeable that filling suspicious orders for opioids will cause harm to individual pharmacy customers, third-parties, and the Cherokee Nation.

125.    The Distributor Defendants were aware of widespread prescription opioid abuse in and around the Cherokee Nation, but they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas—and in such quantities, and with such frequency—that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

126.    The use of opioids by Cherokee Nation citizens who were addicted or who did not have a medically-necessary purpose could not occur without the knowing cooperation and assistance of the Distributor Defendants. If any of the Distributor Defendants adhered to effective controls to guard against diversion, Cherokee Nation and its citizens would have avoided significant injury.

127.    The Distributor Defendants made substantial profits over the years based on the diversion of opioids into the Cherokee Nation. Their participation and cooperation in a common enterprise has foreseeably caused injuries the citizens of the Cherokee Nation and financial damages to the Cherokee Nation.  The Distributor Defendants knew full well that the Cherokee Nation would be unjustly forced to bear the costs of these injuries and damages.

128.    The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids to relatively small communities primarily serving Cherokee Nation citizens showed an intentional or reckless disregard for the safety of the Cherokee Nation and its citizens. Their conduct poses a continuing threat to the health, safety, and welfare of the Cherokee Nation.

III.    **Liability of The Pharmacy Defendants**

    A.    **Duties of The Pharmacy Defendants**

    129.    Like all people, pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

    130.    Pharmacists are the "last line of defense" in keeping drugs from entering the illicit market. They are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor, even one registered under the CSA to dispense opioids, if the prescription is not for a legitimate medical purpose.

    131.    The CSA imposes duties and requirements on the conduct of the Pharmacy Defendants. These requirements, along with their related regulations and agency interpretations, set a standard of care for pharmacy conduct.

    132.    The CSA requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

    133.    Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* rests with the pharmacist who fills the prescription."

35

134.    Therefore, pharmacists are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.

135.    By filling prescriptions of questionable or suspicious origin in violation of the CSA, the Pharmacy Defendants have violated the Cherokee Nation Unfair and Deceptive Trade Practices Act, which specifically makes it a civil offense under Cherokee law to violate federal statutes affecting or impacting chattels bought for medical purposes.

136.    The DEA's 2010 "Practitioner's Manual" section on "Valid Prescription Requirements" instructs that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription." Filling such a prescription is illegal. The manual states: "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted."

137.    The DEA (as well as state pharmacy boards and national industry associations) have provided extensive guidance to pharmacists concerning their duties to the public. The guidance teaches pharmacists how to identify red flags, which indicate to the pharmacist that there may be a problem with the legitimacy of a prescription presented by a patient.  The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

138.    The industry guidance tells pharmacists how to recognize stolen prescription pads; prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; prescriptions written using fictitious patient names and addresses, and so on.

139.     Questionable or suspicious prescriptions include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (5) prescriptions with quantities or dosages that differ from usual medical usage; (6) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (7) photocopied prescriptions; or (8) prescriptions containing different handwritings. Most of the time, these attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

140.     Signs that a customer is seeking opioids for the purpose of diversion include customers who: (1) appear to be returning too frequently; (2) are seeking to fill a prescription written for a different person; (3) appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; (4) are not regular patrons or residents of the community, and show up with prescriptions from the same physician; (5) drive long distances to have prescriptions filled; (6) seek large volumes of controlled substances in the highest strength in each prescription; (7) seek a combination of other drugs with opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and (8) pay large amounts of cash for their prescriptions rather than using insurance. Ignoring these signs violates industry standards and DEA guidelines.

141.     Other "red flags" include when prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; prescriptions written in excess of the amount needed for proper therapeutic purposes; prescriptions obtained through

disreputable or illegal web-based pharmacies; and patients receiving multiple types of narcotic pain killers on the same day.

142.    All of these issues have been presented by the DEA in pharmacist training programs throughout the United States and have been used as examples by individual state boards of pharmacy and the National Association of Boards of Pharmacy.

143.    Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription order. If a pharmacist is ever in doubt, he or she must ask for proper identification. If a pharmacist believes the prescription is forged or altered, he or she should not dispense it and call the local police. If a pharmacist believes he or she has discovered a pattern of prescription diversion, the local Board of Pharmacy and DEA must be contacted.

144.    A standard of care for the Pharmacy Defendants is also set by applicable professional regulations in Oklahoma. Oklahoma Statute § 535:10-3-1.2 requires pharmacies to "establish and maintain effective controls against the diversion of prescription drugs into other than legitimate medical, scientific, or industrial channels"; and it is a violation of professional standards not to attempt to address the suspected addiction of a patient to a drug dispensed by the pharmacist, if there is reason to believe the patient may be addicted.

**B.    Pharmacy Defendants' misconduct has injured and continues to injure Cherokee Nation**

145.    On information in belief, the Pharmacy Defendants regularly filled prescriptions in circumstances where red flags were present (and sometimes many red flags).

146.    On information and belief, the Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably-prudent pharmacy.

147.     On information and belief, the Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid prescriptions, or protect against corruption or theft by employees or others.

148.     On information and belief, the Pharmacy Defendants utilize monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed. This type of compensation creates economic disincentives within the companies to change their practices. For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

149.     The Pharmacy Defendants have violated a voluntarily-undertaken duty to the public which they have assumed by their own words and actions.  In news reports and other public documents, it has been reported that the Pharmacy Defendants, through their words or actions, have assured the public that issues affecting public health and safety are the highest priority for the defendants.

150.     For example, in 2015, CVS publically stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities. Pharmacists have a legal obligation under state and federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."

151.     In failing to take adequate measures to prevent substantial opioid-related injuries to the Cherokee Nation, the Pharmacy Defendants have breached their duties under the "reasonable care" standard, professional duties under the relevant standards of professional practice, and requirements established by federal law under the CSA.

39

152.    It is foreseeable to the Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to individual pharmacy customers, the Cherokee Nation citizens who may use the wrongfully-dispensed opioids, and the Cherokee Nation itself.

153.    It is reasonably foreseeable to the Pharmacy Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including overdoses and death. It is also reasonably foreseeable many of these injuries will be suffered by Cherokee Nation citizens and the Cherokee Nation.

154.    At all relevant times, the Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing full well they could take measures to substantially eliminate their complicity in opioid diversion.

155.    At all relevant times, the Pharmacy Defendants engaged in these activities, and continue to do so, knowing full well that the Cherokee Nation, in its role of providing protection and care for its citizens, would provide or pay for additional medical services, emergency services, law enforcement, and other necessary services, as well as by the loss of substantial economic productivity that contributes to the health and well-being of the Cherokee Nation.

156.    It is reasonably foreseeable to the Pharmacy Defendants that the Cherokee Nation would be forced to bear substantial expenses as a result of the Pharmacy Defendants' acts.

157.    The Pharmacy Defendants were on notice of their ongoing negligence or intentional misconduct towards the Cherokee Nation in part because of their history of being penalized for violating their duties and legal requirements in other jurisdictions.

158.    In 2013, Defendant CVS agreed to pay $11 million to avoid civil charges for violating federal laws relating to the sales of prescription opioids at pharmacies in the state of Oklahoma. Specifically, CVS allegedly violated the recordkeeping requirements for tracking and dispensing prescription drugs including oxycodone and hydrocodone.

159.    In August of 2013, Defendant CVS was fined $350,000 by the Oklahoma Pharmacy Board for improperly selling prescription narcotics in at least five locations in the Oklahoma City metropolitan area which is in close proximity to the Cherokee Nation.

160.    In January 2014, Defendant Walgreens was fined $178,500 by the Oklahoma Pharmacy Board for destroying years' worth of pharmacy records.

161.    Nationally, Walgreens has settled investigations with the DEA related to controlled substances in both Florida and California. The Florida settlement involved an $80 million civil fine.

162.    Defendants CVS, Walgreens, and Walmart each have one or more pharmacies ranked in the top ten of Oklahoma pharmacies that fill prescriptions for opioids, some of which are operating within or in close proximity to the Cherokee Nation.

163.    Since 2013, the Oklahoma Board of Pharmacy has also prosecuted and disciplined numerous pharmacists and pharmacy technicians employed by the Pharmacy Defendants, including but not limited to Walmart, Walgreens, and CVS—all of which have stores located within the Cherokee Nation—for diversion of prescription opioids.

164.    Defendant Walmart has had two orders entered against it and its employees. In January of 2015, Walmart was cited for "failing to have a pharmacy manager who established and maintained effective controls against the diversion of prescription drugs and failing to have a pharmacy manager who supervises employees as they related to the practice of pharmacy." Notably, this particular Walmart is not only within the Cherokee Nation, but is also number eight on the top-ten list of opioid dispensing pharmacies in Oklahoma. Then, on June 15, 2016, a pharmacy technician employed by Walmart in Broken Arrow, Oklahoma had an order entered against her and her license revoked stemming from diversion of prescription opioids.

165.    Defendant Walgreens has had six orders entered against pharmacists and pharmacy technicians. On April 27, 2015, a pharmacy technician at Walgreens #6268 within the Cherokee Nation admitted to diversion of 500 tablets of Alprazolam. On February 20, 2015, a pharmacist at Walgreens #6551 in Broken Arrow, Oklahoma had an order entered against him for diversion of Oxycodone from three different Walgreens stores in the area. On February 23, 2015, a pharmacy technician at Walgreens #15811 in Tulsa, Oklahoma had an order entered against him for diversion of Promethazine with Codeine Syrup. On June 17, 2015, a pharmacy technician at Walgreens #7821 in Broken Arrow, Oklahoma had an order entered against her for diversion of 1,000 and 1,500 hydrocodone tablets. That same day, another pharmacy technician at the same Walgreens had an order entered against her for diversion of hydrocodone and alprazolam. On April 7, 2016, a pharmacy technician at Walgreens #7889 in Miami, Oklahoma had an order entered against her for diversion of Clonazepam and Tylenol with codeine.

166.    CVS has had at least one order entered against a pharmacy technician. On February 24, 2016, a pharmacy technician at a CVS pharmacy within the Cherokee Nation had an order entered against him for diversion of various prescription opioids from the stock bottles.

167.    The Pharmacy Defendants were also aware of the magnitude of the opioid diversion crisis based on investigations into their practices elsewhere. For example, in 2013, Walgreens settled with the DEA for $80 million, resolving allegations that it committed an unprecedented number of record-keeping and dispensing violations at various retail locations and a distribution center. As part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to no longer compensate its pharmacists based on the volume of prescriptions filled.

168.    Similarly, in 2015, CVS agreed to pay a $22 million penalty following a DEA investigation that found that employees at two pharmacies in Sanford, Florida had dispensed

prescription opioids, "based on prescriptions that had not been issued for legitimate medical purposes by a health care provider acting in the usual course of professional practice. CVS also acknowledged that its retail pharmacies had a responsibility to dispense only those prescriptions that were issued based on legitimate medical need."[7]

169.    Later that year, CVS agreed to pay $450,000 to resolve allegations that pharmacists were filling opioid prescriptions written by unauthorized medical personnel.  More recently, in 2016, CVS settled a case pending in Massachusetts, by agreeing to pay $3.5 million to resolve allegations that 50 CVS stores violated the CSA by filling forged oxycodone prescriptions more than 500 times between 2011 and 2014.

## COUNT I—ALL DEFENDANTS

### VIOLATION OF THE CHEROKEE NATION
### UNFAIR AND DECEPTIVE PRACTICES ACT
### TITLE 12 § 25

170.    The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-165.

171.    The Cherokee Attorney General is entitled to bring a suit on behalf of the Cherokee Nation or its citizens to enforce Cherokee consumer protection laws, and to collect up to $10,000 for each violation.

172.    Section 25 of the Cherokee Nation Deceptive and Unfair Trade Practices Act ("CNDUPA") prohibits deceptive acts or practices in the conduct of any trade or commerce.

173.    Defendants were in the position to implement effective business practices to guard against diversion of the highly-addictive opioid products they sell and distribute. Instead, they profited off the prescription drug epidemic in the Cherokee Nation by ignoring anti-

---

[7]    Press release by Office of the United States Attorney in the Middle District of Florida dated May 13, 2015.

diversion laws, while burdening the Cherokee Nation with the externalities created by their conduct.

174. Defendants turned a blind eye to the problem of opioid diversion and profited from the sale of prescription opioids to the citizens of the Cherokee Nation in quantities that far exceeded the number of prescriptions that could reasonably have been used for legitimate medical purposes, despite having notice or actual knowledge of widespread opioid diversion from prescribing records, pharmacy orders, field reports, and sales representatives.

175. The foregoing conduct constitutes an unfair, deceptive, unscrupulous, and immoral trade practice that is against public policy, in violation of CNDUPA.

176. Section 25 also lists certain acts that categorically violate CNDUPA. One of them is violating any United States federal law "affecting or impacting on consumer goods, supplies, and services." *Id.* § 25(B)(25). The terms "goods" and "services" are defined, respectively, as "any tangible chattels bought [for] medical or household purposes"; and "any work, labor, and services for a commercial or business use." *Id.* § 24(B)(1-2).

177. The federal Controlled Substances Act is a federal law affecting or impacting both chattels bought for medical purposes, and services for commercial or business use.

178. Each act by any Defendant that violated federal law under the CSA constitutes a violation of the CNUDTA. Defendants violated the CSA and its implementing regulations by:

      a. Filling suspicious or invalid orders for prescription opioids at both the wholesale and retail level;

      b. Failing to maintain effective controls against opioid diversion;

      c. Failing to operate an effective system to disclose suspicious orders of controlled substances;

      d. Failing to report suspicious orders of controlled substances;

      e. Failing to reasonably maintain necessary records of opioid transactions;

f.  Deliberately ignoring questionable and/or obviously invalid prescriptions and filling them anyway.

179.  The aforementioned actions of Defendants each constitute a violation of the CNDUPA and each caused substantial damage and injury to the Cherokee Nation or the citizens of the Cherokee Nation.

180.  On behalf of the Cherokee Nation, the Attorney General is entitled to recover civil penalties for each of Defendants' violations, as well as injunctive relief, reasonable attorneys' fees, and whatever other relief may be deemed appropriate.

<u>COUNT II—ALL DEFENDANTS</u>

NUISANCE

181.  The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-165 and 167-176.

182.  The nuisance is the over-saturation of opioids in the Cherokee Nation for non-medical purposes, as well as the adverse social and environmental outcomes associated with widespread illegal opioid use.

183.  All Defendants substantially participated in nuisance-causing activities.

184.  Defendants' nuisance-causing activities include selling or facilitating the sale of prescription opioids from premises in and around the Cherokee Nation to unintended users in the Cherokee Nation—including children, people at risk of overdose or suicide, and criminals.

185.  Defendants' nuisance-causing activities also include failing to implement effective controls and procedures in their supply chains to guard against theft, diversion and misuse of controlled substances, and their failure to adequately design and operate a system to detect, halt and report suspicious orders of controlled substances.

45

186.    Defendants' activities unreasonably interfere with the following common rights of the public, including the citizens of the Cherokee Nation:

    a.  To be free from reasonable apprehension of danger to person and property;

    b.  To be free from the spread of disease within the community including the disease of addiction and other diseases associated with widespread illegal opioid use;

    c.  To be free from the negative health and safety effects of widespread illegal drug sales on premises in and around the Cherokee Nation;

    d.  To be free from blights on the community created by areas of illegal drug use and opioid sales;

    e.  The right to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and to foster a secondary market of illegal transactions; and

    f.  The right to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

187.    The Defendants' interference with these public rights of Cherokee Nation is unreasonable because it:

    a.  Has harmed and will continue to harm the public health and public peace of the Cherokee Nation;

    b.  Has harmed and will continue to harm Cherokee Nation neighborhoods and communities by increasing the levels of vagrancy, property, and property crime, and thereby interfering with the rights of the community at large;

    c.  Is proscribed by statutes and regulation, including the CSA, pharmacy regulations, and the consumer protection statute;

    d.  Is of a continuing nature, and it has produced a long-lasting effects; and

    e.  Defendants have reason to know their conduct has a significant effect upon the public rights of Cherokee Nation citizens and the Cherokee Nation.

188.    The nuisance undermines Cherokee citizens' public health, quality of life, and safety. It has resulted in increased crime and property damage within the Cherokee Nation. It has

resulted in high rates of addiction, overdoses, dysfunction, and despair within Cherokee Nation families and entire communities, which threatens the fabric of Cherokee Nation society.

189.   Public resources are being unreasonably consumed in efforts to address the prescription drug abuse epidemic, thereby eliminating available resources which could be used to benefit the Cherokee Nation public at large.

190.   Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimately-recognized societal interest in failing to identify, halt, and report suspicious opioid transactions.

191.   At all times, all Defendants possessed the right and ability to control the nuisance-causing outflow of opioids from pharmacy locations or other points of sale into the surrounding Cherokee Nation. Distributor Defendants had the power to shut off the supply of illicit opioids into the Cherokee Nation.

192.   As a direct and proximate result of the nuisance, Cherokee Nation citizens have suffered in their ability to enjoy rights of the public.

193.   As a direct and proximate result of the nuisance, the Cherokee Nation has sustained economic harm by spending a substantial amount of money trying to fix the societal harms caused by Defendants' nuisance-causing activity, including, but not limited to, costs of hospital services, healthcare, child services and law enforcement.

194.   The Cherokee Nation has also suffered unique harms of a kind that is different from Cherokee Nation citizens at large, namely, that the Cherokee Nation has been harmed in its proprietary interests.

195.   The effects of the nuisance can be abated, and the further occurrence of such harm and inconvenience can be prevented. All Defendants share in the responsibility for doing so.

196.    Defendants should be required to pay the expenses the Cherokee Nation has incurred or will incur in the future to fully abate the nuisance, and punitive damages.

## COUNT III—ALL DEFENDANTS

## NEGLIGENCE/GROSS NEGLIGENCE

197.    The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-165 167-176, and 178-192.

198.    Defendants owe a non-delegable duty to the Cherokee Nation to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

199.    There is no social value to Defendants' challenged behavior. In fact, Defendants' behavior is against the law, i.e., facilitating the diversion of opioids to the illicit black market.

200.    On the other hand, there is immense social value to the interests threatened by Defendants' behavior, namely the health, safety, and welfare of the Cherokee Nation and its citizens.

201.    There is an extremely high likelihood of Defendants' behavior causing a substantial injury to the Cherokee Nation's interests. The harmful consequences of opioid diversion are apparent from the statistics related to prescription opioid overdoses and deaths.

202.    Defendants' conduct fell below the reasonable standard of care. Their negligent acts include:

    a.  Consciously oversupplying the market in and around Cherokee Nation with highly-addictive prescription opioids,

    b.  Using unsafe distribution and dispensing practices;

    c.  Affirmatively enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

    d.   Inviting criminal activity into Cherokee Nation by disregarding precautionary measures built into the CSA, pharmacy board regulations, and the law of the Cherokee Nation;

    e.   Failing to properly train or investigate their employees;

    f.   Failing to properly review prescription orders for red flags;

    g.   Failing to report suspicious orders or refuse to fill them;

    h.   Failing to provide effective controls and procedures to guard against theft and diversion of controlled substances; and

    i.   Failing to police the integrity of their supply chains.

203.    Each Defendant had an ability to control the opioids at a time when it knew or should have known it was passing control of the opioids to an actor further down in the supply chain that was incompetent or acting illegally and should not be entrusted with the opioids.

204.    Each Defendant sold prescription opioids in the supply chain knowing both that (1) there was a substantial likelihood many of the sales were for non-medical purposes, and (2) opioids are an inherently dangerous product when used for non-medical purposes.

205.    Defendants were negligent or reckless in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent or ameliorate such distinctive and significant dangers.

206.    Controlled substances are dangerous commodities. Defendants breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business.

207.    Defendants were also negligent or reckless in failing to guard against foreseeable third-party misconduct, e.g., the foreseeable conduct of: corrupt prescribers, corrupt pharmacists and staff, and/or criminals who buy and sell opioids for non-medical purposes.

49

208.     Defendants are in a limited class of registrants authorized to legally distribute controlled substances in the Cherokee Nation. This places Defendants in a position of great trust and responsibility vis-à-vis the Cherokee Nation. Defendants owe a special duty to the Cherokee Nation; the duty owed cannot be delegated to another party.

209.     The Cherokee Nation is without fault, and the injuries to the Cherokee Nation and its citizens would not have happened in the ordinary course of events if the Defendants used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

210.     The aforementioned conduct of Defendants proximately caused damage to the Cherokee Nation including increased healthcare and law enforcement costs, lower tax revenue, and lost productivity.

## COUNT IV—ALL DEFENDANTS

### UNJUST ENRICHMENT

211.     The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-165, 167-176, 178-192, and 194-206.

212.     The Cherokee Nation has expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

213.     The expenditures by the Cherokee Nation in providing healthcare services to people who use opioids have added to Defendants' wealth. The expenditures by the Cherokee Nation have helped sustain Defendants' businesses.

214.     The Cherokee Nation has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities—the costs of the harm caused by Defendants' negligent distribution and sales practices.

215.    Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

216.    Defendants made substantial profits while fueling the prescription drug epidemic in the Cherokee Nation.

217.    Defendants continue to receive considerable profits from the distribution of controlled substances in the Cherokee Nation.

218.    Defendants have been unjustly enriched by their negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

219.    It would be inequitable to allow Defendants to retain benefit or financial advantage.

220.    The Cherokee Nation demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

<div align="center">COUNT V—ALL DEFENDANTS</div>

<div align="center">CIVIL CONSPIRACY</div>

221.    The Cherokee Nation re-alleges and incorporates by reference paragraphs 1-165, 167-176, 178-192, 194-206, and 208-216.

222.    The Distributor Defendants continuously supplied prescription opioids to the Pharmacy Defendants despite having actual or constructive knowledge that said pharmacies were habitually breaching their common law duties and violating the CSA.

223.    Without the Distributor Defendants' supply of prescription opioids, the Pharmacy Defendants would not be able to fill and dispense the increasing number of prescription opioids throughout the Cherokee Nation.

224.    The Pharmacy Defendants continuously paid the Distributor Defendants to supply large quantities of prescription opioids in order to satisfy the demand for the drugs.

<div align="center">51</div>

225.   Neither side would have succeeded in profiting so significantly from the opioid epidemic without the concerted conduct of the other party.

226.   As a result of the concerted action between the Distributor Defendants and the Pharmacy Defendants, the Cherokee Nation and its citizens have suffered damage.

227.   The Cherokee Nation demands judgment against each defendant for compensatory and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, the Cherokee Nation prays that the Court grant the following relief:

    a.   Injunctive Relief;

    b.   Civil Penalties;

    c.   Compensatory damages;

    d.   Restitution;

    e.   Punitive damages;

    f.   Attorneys' fees and costs; and

    g.   All such other relief this Court deems just and fair;

    h.   Plaintiff seeks a trial by jury for all counts so triable.

Dated this 19th day of July, 2017.

Respectfully Submitted,

Attorney General Todd Hembree
Assistant Attorney General Chrissi Nimmo
Assistant Attorney General John Young
Assistant Attorney General Chad Harsha
THE CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74464

William S. Ohlemeyer
CNBA No. 0611

52

BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY  10504
wohlemeyer@bsfllp.com
Tel: (914) 749-8440

Stephen N. Zack
Tyler Ulrich
CNBA No. 0618
Patricia A. Melville
CNBA No. 0617
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, Florida  33131
szack@bsfllp.com
tulrich@bsfllp.com
pmelville@bsfllp.com
Tel: (305) 539-8400
Fax: (305) 539-1307

Richard Fields
CNBA No. 0613
FIELDS LAW PLLC
2000 Massachusetts Ave
Washington, D.C. 20036
fields@fieldslawpllc.com
Tel: (917) 297-3610

Curtis "Muskrat" Bruehl
CNBA No. 0375
THE BRUEHL FIRM
3216 NW 177th St.
Edmond, OK 73012
cbruehl@bruehllaw.com
Tel.: (405) 509-6300

Lloyd B. Miller
Donald J. Simon
CNBA No. 0623
Frank S. Holleman
CNBA No. 0624
SONOSKY, CHAMBERS, SACHSE,
ENDRESON & PERRY, LLP
1425 K Street NW, Suite 600
Washington, D.C. 20005
Lloyd@sonosky.net
DSimon@sonosky.com

fholleman@sonosky.com
Tel.: (202) 682-0240

*ATTORNEYS FOR PLAINTIFF*