```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3      - - - - - - - - - - - - - -

 4      IN RE:                      Case No. 1:17-md-2804
                                    Cleveland, Ohio
 5      NATIONAL PRESCRIPTION
        OPIATE LITIGATION           TUESDAY, OCTOBER 23, 2018
 6
        - - - - - - - - - - - - - -
 7

 8          TRANSCRIPT OF DISCOVERY CONFERENCE PROCEEDINGS
                     BEFORE SPECIAL MASTERS
 9                    DAVID ROSENBLUM COHEN
                             and
10                    CATHERINE A. YANNI

11
        APPEARANCES:
12
        Special Masters:         David Rosenblum Cohen, Esquire
13                               Law Office of David R. Cohen
                                 24400 Chagrin Boulevard
14                               Suite 300
                                 Cleveland, Ohio 44122
15                               (216) 831-0001
                                 david@davidrcohen.com
16
                                 Catherine A. Yanni, Esquire
17                               2 Embarcadero Center
                                 Suite 1500
18                               San Francisco, California 94111
                                 (415) 215-6572
19                               Cathy@cathyyanni.com

20
        Chief Court Reporter:    Sarah E. Nageotte, RDR, CRR, CRC
21                               United States District Court
                                 801 West Superior Avenue
22                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
23                               (216) 357-7186
                                 sarah_nageotte@ohnd.uscourts.gov
24

25         Proceedings recorded by mechanical stenography, transcript
                produced by computer-aided transcription.
```

1      **APPEARANCES CONTINUED:**

2

3      For Plaintiffs:            David L. Ackerman

4                                 Aelish Marie Baig

5                                 Mark G. Crawford

6                                 Paul T. Farrell, Jr.

7                                 Michael J. Fuller, Jr.

8                                 Frank L. Gallucci, III

9                                 Daniel P. Goetz

10                                 Paul J. Hanly, Jr.

11                                 Anthony D. Irpino

12                                 Evan M. Janush

13                                 Anne McGinness Kearse (telephone)

14                                 Steven J. Kikos

15                                 Peter James Mougey

16                                 Paul F. Novak (telephone)

17                                 Mark P. Pifko

18                                 Joseph F. Rice

19                                 Jennifer R. Scullion

20                                 Hunter J. Shkolnik

21                                 Linda J. Singer

22                                 Peter H. Weinberger

23

24

25

1    **APPEARANCES CONTINUED:**

2

3    For Defendants:           Paul E. Boehm

4                              Matthew Brewer

5                              Mark S. Cheffo (telephone)

6                              Joshua M. Davis

7                              Wendy West Feinstein

8                              Tara A. Fumerton (telephone)

9                              Dolores P. Garcia-Prignitz

10                             Paul B. Hynes, Jr.

11                             Timothy D. Johnson

12                             Katy E. Koski (telephone)

13                             Paul A. LaFata

14                             John P. Lavelle, Jr.

15                             Joseph J. Mahady

16                             Enu Mainigi

17                             Tariq Naeem

18                             Robert A. Nicholas

19                             Carole S. Rendon

20                             Sabrina H. Strong

21                             Katherine M. Swift

22                             Donna M. Welch

23                             Laura Flahive Wu

24

25

4

```
            1              (Proceedings commenced at 1:07 p.m.)

            2                        - - -

            3              SPECIAL MASTER COHEN:  Good afternoon,

            4    everybody.

13:07:20    5         A lot of people here.  Thank you all for coming.

            6         So this is a discovery teleconference and conference.

            7    We have people on the phone.

            8         Does anybody know whether folks on the phone are

            9    actually going to be participating in the discussion or do

13:07:38   10    we have most of the people here who are going to be

           11    addressing the issues?  Anybody know?

           12              MS. WELCH:  I believe Mark Cheffo from the

           13    manufacturers is on the phone and will be participating.

           14              SPECIAL MASTER COHEN:  All right.  So right

13:07:57   15    now, it's muted.

           16         Because there are so many folks here, just as though

           17    we were on the telephone and the court reporter can't see

           18    you, even though she can see you, she doesn't know who you

           19    are, so every time that somebody speaks, even if it's the

13:08:11   20    seventh time you've done it, you should probably identify

           21    yourself so we can keep the transcript clean.

           22         So right now, I have it on mute inbound, and my

           23    concern is that if I unmute it, then we're going to get

           24    beeps and sounds and so forth.

13:08:24   25         Is there anybody else besides Mark?
```

1          MR. MOUGEY:  Peter Mougey.

2      Anne Kearse is arguing agenda item 4, the expedited

3  depositions, and she is telephonic.

4          SPECIAL MASTER COHEN:  Okay.  Do you know, as

13:08:40  5  far as Mark Cheffo, whether it's a certain agenda item?  I

6  mean, so my thinking is I can unmute it just for that.  Or

7  is that not going to be working?

8          MS. WELCH:  My guess is items 2 and 3 for

9  sure.  I don't know if he will hope to chime in on others.

13:09:01  10          MS. STRONG:  And this is Sabrina Strong.

11      I anticipate others may need to chime in as well at

12  times, Special Master Cohen.

13          SPECIAL MASTER COHEN:  Yeah.  So I just

14  unmuted the phone call.

13:09:09  15      Can you folks hear us I assume on the phone?

16          MS. KEARSE:  This is Anne Kearse.

17      I'm on agenda number 4.  I'm not sure it will be on

18  this agenda.  I did send a letter this morning, but I can

19  address it as an issue to be addressed at item number 4.

13:09:21  20          MS. FUMERTON:  And, Special Master Cohen, this

21  is Tara Fumerton on behalf of Walmart.

22      I'm actually out of the country calling in, so I

23  apologize for not being there in person.  But if there's any

24  Walmart issues that come up, I may need to speak up.

13:09:41  25          SPECIAL MASTER COHEN:  Who is that?

1           MS. FUMERTON:  This is Tara Fumerton from

2      Walmart.

3           Can you hear me okay?

4           SPECIAL MASTER COHEN:  Yes.  It's harder for

13:09:54 5      me to hear you from the system.  If you're on the phone,

6      when you're speaking, if you can be a little bit more slow

7      and enunciate, I think it will help us all, especially the

8      court reporter.

9           I'm going to leave you unmuted, which is to say, if

13:10:07 10     you sneeze, we'll hear you.

11          Everybody should mute their phone.  If you're on the

12     phone, you should mute your phone unless you're speaking.  I

13     think that will help.

14          Okay.  So here's the deal, guys.

13:10:20 15     We have an agenda with at least 17 items.  I didn't

16     count, but I probably received 50 e-mails or letters in the

17     last 24 hours having to do with these agenda items.  I've

18     done my very best to read everything.

19          But I think the way we're going to have to do this is

13:10:44 20     I'm going to have to take some pauses and go into the agenda

21     and pull up a letter just to remind myself of what I've

22     read.

23          So you're going to need to be comfortable with silence

24     a little bit.  I'm just going to take a couple minutes here

13:10:56 25     and there and read and get my head into what it contains,

1    and then we'll pick up.

2         Because we're on the record, I'm going to try and

3    rule.  I'm going to call balls and strikes the best I can

4    today.  To the extent that things need to be pushed off, we

13:11:14 5    can do that.

6         As all of you know, I'm going to be out of the country

7    for a little over two weeks, so I'm pretty much out of the

8    box, and so, it really is -- I'm just going to mute this --

9    it is my goal to rule on as much as I can so that you guys

13:11:32 10    can move forward as best you can.

11              SPECIAL MASTER YANNI:  And I'm going to be the

12    substitute teacher, Cathi Yanni.

13              SPECIAL MASTER COHEN:  Right.  So Special

14    Master Yanni is the person to whom you should address

13:11:44 15    letters, e-mails, and telephone calls in my absence.

16         I'll -- you know, I'm going to try and be available,

17    but given where I'm going and what I'm doing, it's going to

18    be limited.

19         I suppose the easiest way to go through the agenda is

13:12:04 20    just in order, numerical order, unless somebody thinks that

21    there are things that we should address first that maybe

22    will end up mooting some of the things -- some of the other

23    things.

24         Any thoughts there?

13:12:19 25         Otherwise, I'm just going to start down the list.

1    Nobody.

2    Okay.  All right.  So the first agenda item is -- has

3    to do with discovery of Discount Drug Mart.

4    And Sarah has asked everybody who is going to be

13:12:35 5    speaking to actually get up to the lectern, it actually

6    makes it easier for her.

7    So I guess, Peter, if you'll start on this.  I just

8    had a chat with Mr. Johnson to kind of get a feeling for

9    where he is at.

13:12:48 10    Peter, if you could tell me your perspective on where

11    things are and maybe the last time that you chatted with

12    counsel for DDM.

13    MR. MOUGEY:  Yes, sir.  Peter Mougey.

14    SPECIAL MASTER COHEN:  Can you go to the

13:13:03 15    lectern, please?

16    We're going to be here a while, so if anybody wants

17    take off their jacket and get themselves comfortable, feel

18    free.

19    MR. MOUGEY:  The last time I had a telephone

13:13:24 20    conversation with DDM, either counsel, was within the last

21    ten days, two weeks.

22    Special Master Cohen, we did, as you directed, had a

23    series of telephone conferences after our initial filings

24    asking for sanctions due to the fact that DDM hasn't

13:13:42 25    responded to any discovery, has produced less than 100

1    documents, hasn't had any written filings in response to the

2    interrogatories, hasn't filed any of the priority responses

3    the last two weeks.

4        We've been pretty much up in arms since the end of

13:14:00   5    July with reminding DDM's counsel and DDM that we have to

6    get moving.  Obviously, that's spilling over into our

7    ability to do -- and meet any deadlines.

8        So the last time I spoke to -- and the consistent

9    drumbeat from DDM has been their counsel's in trial, I have

13:14:16  10    deadlines, I'm in federal court in this city or that county,

11    and we're just behind.

12        And after two months, I really don't have any other

13    choice than to come back in front of you and ask that

14    sanctions be imposed against DDM by barring any objections

13:14:35  15    to our discovery, waiving attorney-client privilege, and

16    ordering it to produce responses to our interrogatories

17    before we are so far behind we're never going to be able to

18    catch up.

19        That's the -- the status of where we are right now.

13:14:51  20    So despite repeated, multiple meet and confers, dating all

21    the way back to the end of July, I'm now standing here in

22    the middle of October with the exact same issues that we

23    raised in July.

24        You asked them to put together a proposed schedule of

13:15:08  25    when they're going to catch up.  The schedule doesn't even

1    include a date when they're going to produce their first

2    document.

3        I -- I'm always inclined to give the other side the

4    benefit of the doubt, whether it's a week, two weeks, to

13:15:21   5    catch up.  Everybody has deadlines.  We all have family

6    issues.  Totally understand.  But it literally has been

7    since the end of July, so we are now in almost our 90th day

8    of asking for meaningful participation in this litigation.

9        And, unfortunately, that has, if it hasn't already to

13:15:38  10    the point of no return, impacted our ability to -- to put on

11    our plaintiffs' cases against DDM.

12        So I'd ask for an order that they have to file

13    responses by this Friday.  Special Master Cohen, I think you

14    have been diligent with reminding DDM of its discovery

13:15:58  15    obligations.  You've given them multiple warnings, multiple

16    opportunities to catch up.  So discovery responses by

17    Friday, waiving attorney-client, waiving any objections to

18    our discovery, and give you and us a meaningful schedule

19    about when, in fact, the document production's going to

13:16:18  20    begin so we can all do our jobs.

21            SPECIAL MASTER COHEN:  You want -- when you

22    say responses, are you talking about interrogatories and

23    requests for production?

24            MR. MOUGEY:  Yes, sir.

13:16:26  25            SPECIAL MASTER COHEN:  Mr. Johnson, you're in

1    the hot seat.

2                    MR. JOHNSON:  I understand that.

3         Can you hear me okay?

4                    SPECIAL MASTER COHEN:  I can.  Thank you.

13:16:39  5             MR. JOHNSON:  Okay.  All of that is sort of

6    true.  A lot of this -- a lot of the delays -- well, first

7    of all, we were one of the latecomers to this party, and the

8    first time this hit our radar screen was June.  So although

9    the plaintiffs here were very prompt in supplying their

13:17:03 10   discovery requests, albeit -- and, actually, we did start on

11   it right away.

12        And a lot of the delays have been my schedule.  And

13   I've talked to you about those previously.  I just came out

14   of a two-week trial.  And I know you're tired of those

13:17:21 15   excuses, and, actually, I'm tired of the schedule myself.

16        So -- but I've done best I can and we can.  I've

17   brought some additional people on from the firm to assist

18   me.  We are -- we've run -- well, we've run the searches.

19   We have 65,000 documents that have turned up already.

13:17:47 20        We tried to narrow the search terms with the

21   plaintiffs, but they wouldn't agree to any modifications,

22   so -- and so, we knew that this was going to take a long

23   time.  We are -- it may be done today, but we are --

24                    SPECIAL MASTER COHEN:  What may be done today?

13:18:09 25                    MR. JOHNSON:  -- but we have been running, and

1    I don't know how long it's going to take until it's over,

2    but we have been searching for the additional documents.

3        I believe, according to my IT people and my client's

4    IT people, that we will have all of the documents for review

13:18:25 5    by next week, by Monday.  And I believe that's what the

6    reference was, you were asking me in our sidebar what was

7    the 29th, and that's when they were saying we'll have all

8    the documents.

9        We are starting the -- the privilege and relevancy

13:18:44 10    review with a number of people on Monday.  I have been --

11    I'm basically through the answers to interrogatories, and

12    I'm most of the way through the requests for production, and

13    I just need to get those to my technical people to produce.

14        We have a while ago, I don't know, at least several

13:19:06 15    weeks ago, we did identify our custodians.  Our -- I guess

16    I'm not sure if we actually identified the 30(b)(6)

17    witnesses, but they're one in the same or they're from

18    that --

19                SPECIAL MASTER COHEN:  Let me interrupt you

13:19:24 20    and ask some questions.

21                MR. JOHNSON:  Sure.

22                SPECIAL MASTER COHEN:  How many people are

23    working on this right now with you?

24                MR. JOHNSON:  Two of my partners, and my

13:19:33 25    paralegal who is very adept at -- at --

1           SPECIAL MASTER COHEN:  You said you just hired

2  a couple folks to help.  Who are they?

3           MR. JOHNSON:  Well, we didn't hire anybody.  I

4  brought on -- oh, I don't have their names.  The reviewers

13:19:49  5  you're talking about?

6           SPECIAL MASTER COHEN:  I think you said

7  something about bringing two people on.

8           MR. JOHNSON:  Yes.  That's -- Hans Foster, who

9  is handling the more technical side of this, has hired them.

13:20:02  10     I don't have it with me.  I'd have to -- I don't have

11  their names.  I do not know them personally.

12           SPECIAL MASTER COHEN:  But, I mean, they're

13  contract attorneys for privilege review?

14           MR. JOHNSON:  Yes.

13:20:11  15           SPECIAL MASTER COHEN:  When are you going to

16  have finished interrogatory responses produced to the

17  plaintiffs?

18           MR. JOHNSON:  Can we have until the end of

19  next week?

13:20:19  20           SPECIAL MASTER COHEN:  No.

21           MR. JOHNSON:  Okay.  I -- he's in trial today.

22  He's supposed to be out tomorrow or Thursday, and I don't

23  know -- I don't know the technique for actually producing

24  them.

13:20:38  25           SPECIAL MASTER COHEN:  I'm not saying RFPs.

1    I'm just saying the answers to interrogatories.

2                    MR. JOHNSON:  I'm sorry.  I missed that.

3                    SPECIAL MASTER COHEN:  I'm not saying the

4    requests for production.  I'm saying the answers to

13:20:48  5    interrogatories, which I was told two weeks ago by your

6    partner that --

7                    MR. JOHNSON:  They're essentially done.  I

8    think I was waiting for one thing from the client.  But we

9    can produce those and then supplement them with the --

13:20:59 10                    SPECIAL MASTER COHEN:  Roll them out.

11                    MR. JOHNSON:  Okay.  We can do that this week.

12                    SPECIAL MASTER COHEN:  Requests for

13    production, tell me why I shouldn't say give everything over

14    with clawback so at least the plaintiffs can start looking

13:21:13 15    at them?

16                    MR. JOHNSON:  Well, I don't know if that's

17    appropriate.  I mean, we're certainly --

18                    SPECIAL MASTER COHEN:  I mean, my problem is

19    that I've been hearing, as Peter has, the same story ever

13:21:28 20    since I got involved over a month ago.

21                    MR. JOHNSON:  I understand.

22        Two of those weeks I was in trial.  I serve as -- as

23    outside general counsel for Discount Drug Mart, and so, I am

24    unfortunately, I guess, a pivotal person.

13:21:46 25                    SPECIAL MASTER COHEN:  Does DDM have any folks

1    in house who can start working on this, because I think it's

2    undermanned?

3              MR. JOHNSON:  Yeah.  It's a family-owned

4    company.  They've never been involved in anything like this.

13:21:59  5    They do not have any in-house legal.  There's one individual

6    that's primarily in the Pharmacy Department that has a law

7    license, but he doesn't -- you know, he doesn't really act

8    as counsel for them.

9         So -- but we have a lot of this.  Hans is -- while

13:22:18 10    I've been in trial, Hans has been collecting the various

11    documents from them.  We just have to get together and

12    produce the stuff, and we're going to have pretty much

13    mostly everything.

14         We -- we need some time to review -- I don't know what

13:22:36 15    their first priority is, whether it's custodial files or the

16    requests for production of documents, but we should have all

17    that information by next week.

18              And then, as we go through the review, we'll roll it

19    out.

13:22:54 20              SPECIAL MASTER COHEN:  All right.  So you --

21              MR. JOHNSON:  I can't predict how long that

22    will take, unfortunately, to be truthful.

23              MR. MOUGEY:  Special Master Cohen, may I say

24    something just quickly?

13:23:14 25              SPECIAL MASTER COHEN:  That's fine.  Please,

1    at least go to a microphone.

2              MR. MOUGEY:  I like your idea of the clawback,

3    and I like your idea of the production.  The problem that we

4    have, obviously, is we're at the end of October.  We heard

13:23:27  5    from DDM at the end of August in an e-mail to you it's

6    coming within the next two weeks.  That was the end of

7    August.

8         If we wait until the privilege review is finished and

9    the doc review is finished with two doc reviewers, it could

13:23:37  10    be 30, 45 days before we start seeing meaningful production,

11    meaning end of November, beginning of December, before we

12    even get it.

13         So, at this point, I think I like the production with

14    the clawback, let's get the documents moving, give us an

13:23:50  15    opportunity to catch up, that's the only way for us to catch

16    up at this point.

17         There is no in-house counsel.  The only outside

18    counsel is -- I'm sorry -- Mr. Johnson, and, I mean, that

19    makes the easiest -- that's the easiest solution.  That

13:24:06  20    should be able to speed this up and get us back on track to

21    where we can catch up with the document review, in addition

22    to getting the discovery responses, both the interrogatories

23    and the RFPs.

24              SPECIAL MASTER COHEN:  Mr. Johnson, here's

13:24:21  25    what I think you need to do.  I want you to get answers to

1    interrogatories.  If you've got some finished, send them.

2    If there's others you need to work on, then fine.  I'd like

3    you to shoot by next Monday to be completely finished with

4    answers to interrogatories, which, I suggest, don't mince

13:24:35  5    words and put a lot of boilerplate in there.  They need to

6    be good answers so that we don't have to find ourselves back

7    here as much as possible.

8        With respect to document production --

9            MS. RENDON:  Special Master Cohen, could I

13:24:50  10   just interrupt for one second.

11       Is this supposed to be an open-to-the-public hearing?

12           SPECIAL MASTER COHEN:  Yes.

13           MS. RENDON:  Okay.  I -- we just didn't know

14   that, because there are non-lawyers in the room.

13:25:00  15           SPECIAL MASTER COHEN:  Yeah.  I mean, this --

16   we're in the courtroom and this is open to the public.

17       Thank you for asking.

18           MR. JOHNSON:  I don't recall many, if any,

19   objections.

13:25:16  20           SPECIAL MASTER COHEN:  Good.

21           MR. JOHNSON:  Our answers are pretty

22   straightforward.  There's things we don't have, but --

23           SPECIAL MASTER COHEN:  You need to start

24   rolling out as quickly as possible document responses.

13:25:32  25           MR. JOHNSON:  I will give that the first

1    priority.

2                        SPECIAL MASTER COHEN:  I mean, my concern is

3    you said they're going to be ready for review the 29th, and

4    we have a deadline of the 31st.  I want you to produce -- I

13:25:51  5    want you to produce half of those documents by the 2nd.  If

6    you produce them with a clawback, that's fine.  But they

7    need to start looking at your documents to see what you've

8    got and who your custodians are and so forth.

9         All right?

13:26:03  10                        MR. JOHNSON:  That's fine.

11                        SPECIAL MASTER COHEN:  Okay.  I'll ask you and

12   Peter to continue to confer.  I really think that this has

13   been a problem, not of hardware or software, but wetware,

14   they call it, which is to say, you know, human bodies

13:26:17  15   working on it.  I get that you're busy.  Everybody is busy.

16   This needed more people working on it beginning a while

17   back.

18        Okay?

19                        MR. JOHNSON:  Yes.

13:26:26  20                        SPECIAL MASTER COHEN:  All right.  Thank you

21   very much.

22                        MR. JOHNSON:  Okay.  Thank you.

23                        SPECIAL MASTER COHEN:  All right.  That is not

24   fun.  It had to happen.

13:26:47  25        All right.  What I was hoping to have received, and I

1       don't think I did, was a list party by party of the

2       custodial issues, and when I say -- I probably did receive

3       it, one from each party.  I was hoping to have a master

4       list.

13:27:15   5          So the agenda item number 2, which is the custodian

6       issue, I'm trying to figure -- trying to figure out the best

7       way to attack that issue, and so, I'm happy to hear

8       suggestions.

9              Part of me thinks we should push that to the end and

13:27:34  10    deal with it defendant by defendant or plaintiff by

11      plaintiff.  Part of me says we should just do it now.  But

12      it's going to be, I think it has to be party by party.

13             Any thoughts?

14                 MR. MOUGEY:  Peter Mougey.

13:27:50  15         Special Master Cohen, I think it has to be party by

16      party, and the problem is we were continuing to get updates

17      until, I mean, literally a half an hour ago.

18                 SPECIAL MASTER COHEN:  Right.

19                 MR. MOUGEY:  So I think a -- a master kind of

13:28:02  20    omnibus list would have been great, but it was moving until

21      today at noon and it was almost impossible.

22             I do think you can break this out into three

23      categories, whether you hear it now or at the end of the day

24      today.  One, you have the individual granular factual

13:28:16  25    disputes on individual custodians.  You have the Apex

1    custodians.  And then, we have attorneys filling compliance

2    roles.

3         I think we can make a couple of those easier.  The

4    attorneys filling compliance role, the one issue that's

13:28:30  5    framed up today is Purdue.  We received the privilege log I

6    think last night, and our suggestion would be is to push

7    that back, get you some additional examples, and frame that

8    up, whether that be in the next week or two, because I do

9    think it's an important issue that needs to be addressed.

13:28:46 10    But the attorney issue, filling compliance functions, we

11    think we can push that back for a week or two, so that

12    narrows it down significantly.

13         The issue on the Apex custodians, our suggestion was

14    that at this point that each party be prepared to produce

13:29:06 15    five Apex custodians, just their -- the raw e-mail, and that

16    at another week or two down the line, as we continued to

17    receive production and produce to the other side, both the

18    plaintiffs and defendants, and the -- the robust production

19    hopefully either continues or starts in some cases, that

13:29:25 20    we'll be able to put some meat on the bones around the Apex

21    custodians.  But at least this keeps things moving, because

22    we didn't want to delay that.

23         So I think if you break them into those three issues,

24    the factual granular disputes we do need to hit one by one,

13:29:42 25    I think there are four or five defendants and a couple of

1    the plaintiffs that we do need to address; otherwise, I

2    think they have been resolved.

3              SPECIAL MASTER COHEN:  Anybody else want to

4    chat about this?

13:29:52  5              MR. CHEFFO:  David, it's Mark, and tell me if

6    you -- I'm actually going to address the Apex issue, so I

7    agree with Peter, to the extent he wants to move the other

8    issue, that's fine.

9         And -- and the -- here's what I would say.  Look, I

13:30:07  10   understand completely that -- that you want to decide

11   things, and we all support that, and I don't want to kind of

12   get -- I don't want to disclose kind of informal

13   conversations that we've all had because I think it's

14   healthy to have those conversations, but what I would

13:30:26  15   suggest, at least for you to consider and maybe some or all

16   of the plaintiffs to consider, is, frankly, is some -- I

17   think there's some view on both sides of this, kind of the

18   V, that, you know, the idea that people should have to

19   produce, you know, kind of what are called Apex, and even

13:30:45  20   that is, frankly not -- I think it's in the eyes of the

21   beholder, but I'll use it for now.

22        To the extent that there are some legitimate Apex

23   issues, traditionally, having to produce custodial files is

24   not what we do.  And I understand you have kind of tried to

13:31:00  25   figure out an efficient way of dealing with that.

1          So my proposal is, or at least thought, and I think to

2     some -- I think there's some -- some kind of receptivity to

3     this on both sides of the V, is to maybe give us a little

4     more time to negotiate this issue and see if there's some

13:31:22 5     horse trading that can be done or some accommodation,

6     because I don't think it's an all or nothing issue.

7          But I've heard enough people and talked to enough

8     folks that at least the -- the door is open, to see if we

9     can try and get something done, you know, in the next week

13:31:38 10    or so.

11         But, you know, that's kind of what I would propose.

12    If you want to -- if you want to argue it, then we can do

13    that as well.

14              SPECIAL MASTER COHEN:  Well, every time that

13:31:50 15    this topic has come up, I've urged the parties to continue

16    to confer, and it seems like there are, you know, baby

17    steps, but nonetheless steps taken at least with some of the

18    defendants towards additional agreement, even within the

19    last 24 hours.

13:32:03 20         I can tell you that my inclination with regard to the

21    attorneys, having read the submissions from the parties and

22    some of the case law, is that I'm probably not going to

23    order them -- their custodial files be produced.

24              Having said that, you know, I just heard an agreement

13:32:25 25    that we should kick that can down the road for a week or two

1    and that plaintiffs want to produce some additional

2    documents showing why that shouldn't be the ruling.  I'm

3    just telling you my current inclination.  And so, that's

4    fine.  In other words, I'm agreeing with you that we can

13:32:42  5    wait on this, because I think that you are making additional

6    progress.

7        I said I think in my e-mail to the parties also that

8    in addition to my inclination against ordering production of

9    custodial files of in-house attorneys, that I thought that

13:33:01 10    many of the other plaintiffs' asks seem reasonable.  The

11    issue is the timing, and, you know, maybe it becomes the

12    case where because defendants are complaining that there's

13    no way that they can meet deadlines, that -- that the

14    deadlines are released as to those additional custodians.

13:33:18 15        And there has to be an understanding that that is

16    going to affect, you know, discovery down the road.  You're

17    just going to be taking -- I'm sure that if the plaintiffs

18    have a choice between not getting documents or getting

19    documents and maybe not having them in time for some of the

13:33:34 20    depositions, they'd still prefer the latter course.

21        And, ultimately, it comes down to a question of is it

22    appropriate for those custodial files to be produced in

23    discovery?  And my sense was that to many of the ones, not

24    all of them, the plaintiffs were asking, that the answer was

13:33:49 25    yes.

1          So with those observations, I'm asking you to go back

2     to the drawing board and see if you can come to additional

3     agreement.

4          Any comments?

13:34:01  5          MR. CHEFFO:  No.  I think that's fine, David.

6          And just to be clear, and maybe it's teed up on the

7     agenda with respect to defendants' issues, but I think there

8     is a reciprocal issue here of --

9          SPECIAL MASTER COHEN:  I agree.

13:34:13  10          MR. CHEFFO:  Right.  To interrogatories.

11     That's what I was suggesting.  I'm not going to -- I'm not

12     going to match the seat here from what may be, for all of

13     us, the jaws of victory.

14          So if I'm hearing you is that we should continue to

13:34:28  15     talk about if a deal can be made, and, if not, how we would

16     stage this in terms of timing so that we can meet

17     obligations?

18          SPECIAL MASTER COHEN:  Correct.

19          And, you know, I've always said that I'm happy for you

13:34:38  20     all to horse trade.

21          MR. ACKERMAN:  Special Master Cohen, it's

22     David Ackerman on behalf of the plaintiffs.

23          I hear what Mr. Cheffo is saying.  My concern is, to

24     be frank, that we have pushed this can down the road a

13:34:53  25     couple of times.

1          SPECIAL MASTER COHEN:  Yeah.

2          MR. ACKERMAN:  And that when you have said go

3    back and meet and confer, while there are some parties who

4    have made additional concessions, there are some who have

13:35:03  5    not.

6        And so, to be clear, the message that we've gotten

7    from Purdue has been we have no authority to give you anyone

8    beyond who we've already given you.  If that's still the

9    response, then another ten days of meeting and conferring

13:35:18  10   doesn't do us any good with respect to that defendant.  It

11   may not be.

12       But I think you should be aware of that because it

13   doesn't make any sense, given the deadlines, given the --

14   the upcoming depositions, for us to wait another ten days to

13:35:34  15   have the same argument that we very well could have today.

16          SPECIAL MASTER COHEN:  So, David, can you

17   point me to the most recent correspondence, e-mail from

18   Purdue on that topic?  Is it in the agenda?

19          MR. ACKERMAN:  I would need to get my agenda,

13:35:50  20   which is on the table.

21       I know that Mr. LaFata sent an e-mail, I want to say,

22   October 20th.  In fact, or -- let me -- let me just grab my

23   folder.  I think I have it.

24              (Pause in Proceedings)

13:36:21  25          SPECIAL MASTER COHEN:  Mark, do you know what

1        it is that I'm asking for?

2                    MR. CHEFFO:  Yeah.  Here's the thing.  If

3        people want to speak up, I've had some conversations -- like

4        I said, I don't want to be too coy.  But I also -- you know,

13:36:34  5        I think it's important to kind of respect all parties, at

6        least to talk with one another.

7            So I've had communications as late as, you know, two

8        hours ago with people on the defense side and people on the

9        plaintiffs' side.

13:36:48 10            So while I think, you know, David and I may be talking

11        a little bit apples and oranges what kind of the formal

12        position is, what I'm kind of representing is that I think

13        an ability to kind of determine whether we can stage this in

14        a way, or whether there can be any agreements, is something

13:37:07 15        that I think is still a very live issue.

16            So, you know, I think, yeah, if I didn't think there

17        was any chance of discussion or movement, I would just say

18        let's just argue it and you call balls and strikes, but I

19        think there may be.

13:37:24 20                    MR. ACKERMAN:  So the last communication I

21        have from Purdue with respect to Apex custodians is an

22        October 15th letter from Mr. LaFata.

23                    SPECIAL MASTER COHEN:  What about non-Apex?

24                    MR. ACKERMAN:  That's the last communication I

13:37:38 25        have on all custodians, with -- but other than the in-house

1    attorneys, which I think we addressed in some letters that

2    got exchanged last week, which are the ones that you

3    referred to.

4                    SPECIAL MASTER COHEN:  I'm sorry.  You said

13:37:49  5    what was the date?

6                    MR. ACKERMAN:  So I've got an October 15th

7    letter from Mr. LaFata dealing with all custodians, and then

8    there were some last week, I think there was an

9    October 16th, 17th letter from us, and an October 20th

13:38:03 10    letter from Mr. LaFata dealing only with those in-house

11    attorney legal issues.

12                    SPECIAL MASTER COHEN:  Right.  So skipping the

13    in-house attorney legal issues, was there any additional

14    agreement that happened after the 15th?

13:38:20 15                    MR. ACKERMAN:  With Purdue, no, there was not.

16                    SPECIAL MASTER COHEN:  All right.  Do you have

17    that letter?

18                    MR. ACKERMAN:  The October 15th letter?

19                    SPECIAL MASTER COHEN:  Yes.

13:38:28 20                    MR. ACKERMAN:  I have a copy right here.

21                    SPECIAL MASTER COHEN:  Can I see it, please?

22                    MR. ACKERMAN:  Sure.

23                         (Pause in Proceedings)

24                    SPECIAL MASTER COHEN:  Did I also see, maybe

13:39:25 25    it was an e-mail, Mr. Ackerman, that itself included some

1    e-mails of Dr. Richard Sackler?

2                   MR. ACKERMAN:  Yes.  There was an e-mail that

3    I sent last night.  I will be weary because the document

4    attached to that e-mail was labeled as confidential by

13:39:42  5    Purdue.

6                   SPECIAL MASTER COHEN:  Right.  I don't want to

7    discuss it.  I want to make sure I'm remembering things

8    correctly.

9                   MR. ACKERMAN:  Yes.

13:39:55 10                   SPECIAL MASTER COHEN:  So just to play tennis

11    a little bit, would it be you, Hunter, who would talk about

12    Apex custodians for Cuyahoga County?

13                   MR. SHKOLNIK:  Hunter Shkolnik on behalf of

14    Cuyahoga County.

13:40:14 15         Special Master Cohen, yes, I'll be the one addressing

16    as to Cuyahoga County.

17         One of the issues, I don't want to sound like a broken

18    record, is we keep getting pressed that Cuyahoga should be

19    producing the Apex files immediately, faster than everything

13:40:29 20    else, and as we said on the phone last time, it should be

21    going both ways.  If there's going to be expedited, it

22    should be both ways.  If it's not going to be expedited,

23    it's going to take some time.

24         Whether it's 10 days, 15 days, 30 days, whatever it

13:40:44 25    is, we just want to be on parity, because we, as of today,

1    have produced over 10 million pages of documents.  We're

2    talking 60-plus custodians.  We just want to be on the same

3    footing as the defendants.

4        And with respect to the Apex witnesses, it's no

13:40:59  5    different.  You know, we have a CEO.  They have a CEO.  We

6    have a CFO.  They have a CFO.  If custodians are going to be

7    produced, we want parity.  If we need time -- if they need

8    time, we would like the same amount of time.

9            SPECIAL MASTER COHEN:  Peter, I think you said

13:41:15  10   something like -- you had an idea.  I think it was something

11   like everybody produces five?

12           MR. MOUGEY:  Yes, sir.

13       My concern -- Peter Mougey.  My concern is that if we

14   keep kicking this can down the road, we're just -- this is

13:41:30  15   going to spill in -- we're going to have the same

16   conversation in January about not being able to meet the

17   close of depositions.

18       So my thought was that each party agree to produce

19   five, and let's continue to review the documents as they

13:41:42  20   come in.  That's not too onerous on anyone.  It's actually

21   as burdensome on the plaintiffs as it is on the defendants.

22   Let's get those -- those files moving and get the documents

23   flowing so we can continue framing up the facts.

24       So it would be five from every party, plaintiff and

13:41:59  25   defendant, and a place to start, and then come back in front

1   of you if, in fact, we think we need to deviate from that

2   number in the next few weeks.

3                    SPECIAL MASTER COHEN:  How do you choose the

4   five?

13:42:09  5              MR. MOUGEY:  At this point, I think it would

6   be based on the information that we've received to date, as

7   far as any production to date, based on what --

8                    SPECIAL MASTER COHEN:  Who chooses I mean?

9                    MR. MOUGEY:  The opposite party.

13:42:20 10       So the defendants would choose for the plaintiffs, and

11  vice versa, based on what our research indicates.  And if

12  there's any specific issue to a specific custodian, somebody

13  can raise it.

14       But other than that, let's -- this is a way to kind of

13:42:34 15  equally share the burden from both sides and keep the

16  documents flowing.  And if there's some granular issue that

17  we haven't identified here that would warrant deviation from

18  the five, we can come back in front of you.  That would at

19  least keep the ball moving.

13:42:50 20                   MR. DAVIS:  Special Master Cohen, this is Josh

21  Davis on behalf of Endo.

22       I just want to say, I like the idea that we're trying

23  to figure this issue out.  Unfortunately, the idea of

24  picking five doesn't reflect at all at least our

13:43:01 25  negotiations for Endo, and I suspect doesn't reflect the

1    negotiations between plaintiffs and many of the other

2    defendants.

3          That is, right now, of the custodians that are at

4    dispute with plaintiffs, there is only one that could be

13:43:15  5    considered an Apex custodian.  I suspect the issue is

6    similar, if not even more different, than -- or fewer Apex

7    custodians at dispute for other defendants.

8          I'm just not sure that picking five gets us anywhere.

9    It seems like it opens up a whole new can of worms, and

13:43:30 10    we're talking about a whole new set of custodians that are

11    not currently on the table.

12          And I think the idea that we can sort of lump all of

13    the defendants together in these negotiations and just say

14    pick five ignores all of the discussions we've had over the

13:43:43 15    past several months, all of the compromises the parties have

16    made, and I think sets us back even further than if you say

17    -- I agree with Mr. Cheffo that, you know, allowing us some

18    additional time -- and I think this was perhaps what Hunter

19    was suggesting, but I'm not entirely sure, I don't want to

13:44:00 20    speak for him -- that if we have just a bit more time, this

21    is probably something we can work out without trying to come

22    up with a sort of one-size-fits-all deal right now.

23          SPECIAL MASTER COHEN:  I think I agree with

24    you.  Hold on just a minute.

13:44:12 25          MR. CHEFFO:  Yeah, this is Mark.  And someone

1    has music on --

2               SPECIAL MASTER COHEN:  Yeah.  Somebody on the

3    phone -- everybody on the phone needs to mute your phone

4    unless your name is Mark Cheffo.

13:44:23  5               MR. CHEFFO:  Yeah.  I think the person

6    probably got into their music and went on hold.  I'll try to

7    talk quickly and loud over that annoying music.

8         I agree, this is not kind of a -- of trying to find a

9    resolution.  Just for Purdue, for example, the issues, from

13:44:42 10   what I recall, the Apex, we have the lawyer issue, we have

11   the CEO issue, and we have the board issue.

12        So if we really -- if we don't want to kind of have a

13   discussion about this, I think this is really -- they're

14   going to be very separate, very specific.  We've all had

13:44:56 15   different conversations.  The law is going to apply perhaps

16   very differently after some of these issues.

17        So, you know, I don't think this is something we just

18   wave our hand, because the idea of producing five, that's

19   basically saying we win, right?  You know, heads you win,

13:45:11 20   tails you lose.  But there's -- I don't think anybody has

21   more than five.  So if you basically -- you know, if you do

22   this, it's basically just saying give the plaintiffs exactly

23   what they want.

24        So I think in this situation, what I would say is the

13:45:22 25   lawyers and just kind of what I would call CEO types, and at

1   least -- and I don't know if others are similarly situated

2   or not, but people like Richard Sackler, we got this e-mail

3   last night, right, as I think David admitted, as to this

4   issue, the Sackler issue, we think we would like an

13:45:45 5   opportunity to look at that and respond.

6       I think we would be uniquely situated here.  I don't

7   think you can wave your hand and say -- and do this as

8   broad-based.  I think this is really something we should

9   talk about on an individual basis, either now or, you know,

13:45:59 10   schedule a separate call for whenever you think is most

11   efficient.

12           SPECIAL MASTER COHEN:  All right.  So here's

13   what's going to happen.  I'm not -- I'm not -- Mark, I'm

14   going to put you on mute, but I'll take you off again in a

13:46:14 15   second.

16       I'm not going to order anything except that you keep

17   conferring for now.  I'm not -- I was thinking maybe we

18   could do less than five.  I'm not going to order anything

19   except that you keep conferring for now.

13:46:28 20       I am going to strongly urge Purdue and the plaintiffs,

21   in particular, to find one or two Apex custodians each and

22   hand them over as a starting point.  I want you to do that

23   and that will get us going.

24       I'm coming back on November 11th, and what I'd like to

13:46:45 25   see is a lot of progress made, and, if not, then I'm just

1    going to start calling balls and strikes on it and I will do

2    it on an individual basis.  And when I say individual basis,

3    I mean on an individual custodian basis and not a -- you

4    know, not any broad-brush rules against all parties or a

13:47:01  5    party but custodian by custodian.

6         I think there's room, clearly, for a trade to be made

7    between Purdue and the plaintiffs, so I'm going to start by

8    asking y'all to -- to try and make some progress on that.

9    And I'm also asking everybody to try and work on this in the

13:47:19  10    next two, three weeks.

11              MR. ACKERMAN:  Special Master Cohen, this is

12    David Ackerman.

13         Can I just ask for clarification, because I know that

14    Summit and Akron I believe have already designated council

13:47:30  15    members or other individuals who would be considered Apex

16    custodians.

17         So are you asking them to then designate one or two

18    more on top of the ones we've already designated, whereas

19    defendants who haven't designated any would be starting from

13:47:44  20    zero and going to two?

21              SPECIAL MASTER COHEN:  I'm pretty much

22    thinking of Cuyahoga County.

23              MR. CHEFFO:  Okay.  David, we'll do that.

24    Thank you for that.  We'll try and work cooperatively with

13:48:02  25    everybody and see if we can reach a deal.

1          MR. PIFKO:  Special Master Cohen, I just --

2     Mark Pifko from Baron & Budd on behalf of Cleveland.

3          I just want to understand -- we've offered eight or

4     nine Apex custodians, all the city council members plus the

13:48:13  5     mayor, and I just want to understand what you're expecting.

6          Do you expect us to produce all those?  Or do you want

7     us to walk back on that and only give a few like they're

8     doing?  I just want to clarify.

9          SPECIAL MASTER COHEN:  Yeah.  Walk it back.

13:48:32 10          MR. PIFKO:  Thank you.

11          MR. BOEHM:  If I may on that point, Special

12     Master Cohen.

13          This is Paul Boehm from Williams & Connolly for

14     Cardinal.

13:48:40 15          Plaintiffs and defendants have already briefed the

16     question of whether or not the depositions of mayors, chief

17     county executives, and city and county council members

18     should be deposed.

19          SPECIAL MASTER COHEN:  Correct.

13:48:55 20          MR. BOEHM:  Plaintiffs brought an argument as

21     to the mayors and chief executives based on the Apex

22     doctrine.

23          Based on an entirely separate legal doctrine,

24     plaintiffs also argued that city and county council members

13:49:09 25     should not be deposed.  The basis of that request was the

            1    legislative privilege doctrine.  That's not the Apex

            2    doctrine.

            3           One of the issues that I'm noticing here as we talk

            4    about Apex depositions is that there's no precision at all

13:49:23    5    in how that term is being used.  That's why this really

            6    needs to be to a party by party decision.

            7           Plaintiffs are now saying, oh, yeah, we meant to

            8    include the city and the county council members, those are

            9    Apex deponents as well.  There's no justification for that

13:49:37   10    and that's why plaintiffs can argue that when this was

           11    already discussed in our letter submissions to you.

           12           They've also made claims as to other individuals who

           13    they now want to stuff into the bucket of so-called Apex

           14    doctrines, including budget, the budget directors of the

13:49:54   15    various jurisdictions.  Those individuals weren't even

           16    referenced in the letters that were submitted to Special

           17    Master Cohen -- to you, Special Master Cohen, when this

           18    issue first was addressed.

           19           So in terms of walking it back, I understand to the

13:50:06   20    extent we're talking about mayors and the chief county

           21    executives, but as to city and county council members, those

           22    were not legal arguments that were ever brought, they

           23    wouldn't be meritorious.

           24                 SPECIAL MASTER COHEN:  I agree with you.  I

13:50:20   25    agree with you.

1          MR. BOEHM:  So I think --

2          SPECIAL MASTER COHEN:  So when I say walk it

3     back, let me ask, I guess it was Mr. Pifko, you said that

4     you've offered seven or eight depositions of what you termed

13:50:33 5     Apex.  So who exactly?

6          MR. PIFKO:  Well, to be clear, I didn't offer

7     their depositions, just custodial files, and that was

8     because of your directive on the telephone conference on

9     October 1st, and those are city council members and the

13:50:48 10     mayor.

11          And, I mean, we contend, for all the same reasons that

12     CEO is Apex, they're elected officials, they're high-level

13     people running the city, I don't see a lack of parity there.

14          SPECIAL MASTER COHEN:  Well, at the same time

13:51:02 15     I'm trying not to get into the weeds on this, you're kind of

16     asking me to get into the weeds on this.  And so, the best I

17     can say is I want you guys to work on this, and I think that

18     at least some of these should clearly be produced within the

19     next week or two from Purdue and from Cuyahoga County.

13:51:19 20          And the question of whether a councilmen is an -- it

21     sounds like you haven't made the argument that a councilmen

22     before is an Apex custodian.  You've only asserted the

23     legislative privilege.  And, frankly, I don't remember.  I'm

24     taking what you say, you know, and I'm giving you credit for

13:51:37 25     that and that's fine.

1     And, you know, for a city, sure, the mayor and the

2     chief financial officer are Apex.  I don't know who else is.

3     All I know is I want to see some trading done, okay, and

4     that's as far as I want to go right now.

13:51:51  5          MR. PIFKO:  Okay.  I didn't make the argument

6     just because it wasn't out there.  I assumed they would give

7     us their people.  And they're the ones that made the

8     argument.  We were trying to be transparent, so --

9          MR. BOEHM:  One of the arguments we've made --

13:52:00 10     this is Paul Boehm again, for the record.

11         One of the arguments we've made in light of your

12     ruling that we would need to wait to take the depositions of

13     mayors, of chief county executives, and of city and county

14     council members, is that we need to see documents of other

13:52:17 15     individuals in order to make the determination.  We need to

16     see those individuals' documents in order to make that

17     determination.

18         SPECIAL MASTER COHEN:  And that ruling stands.

19         MR. BOEHM:  And I think that's true with

13:52:25 20     respect to Cuyahoga County's chief budget officer.  Now it's

21     called a chief financial officer.  But one of the issues

22     that we're having right now with Cuyahoga County, not to

23     skip ahead, is related to this question of which files ought

24     to be produced and when.

13:52:38 25         Dennis Kennedy is the chief budget officer for the

1    county.  And plaintiffs are bringing claims alleging damages

2    of public expenditures in a variety of categories.  We've

3    got one witness from Cuyahoga County already deposed, Chris

4    Murray, who pointed us specifically to Mr. Kennedy to answer

13:52:55  5    questions that he could not respond to.

6         Cuyahoga County right now is taking the position that

7    -- they didn't take this position in the letter submissions,

8    but they're now taking the positions that even Mr. Kennedy

9    is a so-called Apex witness and we can't have his custodial

13:53:10  10   file either.  And we're asking that, pursuant to this issue

11   having already been addressed and the order that you've

12   already issued on this, that his custodial file also be

13   provided to us as we discussed.

14              SPECIAL MASTER COHEN:  I'm sorry.  Tell me

13:53:23  15   again who you represent.

16              MR. BOEHM:  Cardinal.

17              SPECIAL MASTER COHEN:  Pardon me?

18              MR. BOEHM:  Cardinal.

19              SPECIAL MASTER COHEN:  Okay.

13:53:34  20              MR. SHKOLNIK:  Let me go back to -- Hunter

21   Shkolnik on behalf of Cuyahoga County.

22         Let me go back to the issue that was first being

23   addressed.

24         We will take your directive and discuss with defense

13:53:42  25   counsel, Purdue, the exchange of custodians of what we call

1    Apex witnesses.

2        As to the issue of whether or not our council members

3    are Apex, that's not an issue that has been agreed with --

4    as counsel suggests.  We strongly believe they are no

13:53:57  5    different.

6        And, by the way, when they say the council members,

7    they're not just asking for the current.  We've been asked

8    for past, going back decades.  So it's -- it's going to have

9    to be a -- it really should be an issue by issue or -- or

13:54:12  10    position by position analysis, which hasn't been done yet as

11    to the county council.

12        With respect to Mr. Kennedy, the issue of whether or

13    not a -- an Apex file should be produced is why we're here

14    today and one of the issues that the defense counsel want to

13:54:30  15    punt for upwards of 30 days, and now, once again, this is

16    the point I was trying to make, we are being pressed at

17    Cuyahoga County that we have to produce and agree to produce

18    custodians of an Apex quickly and agree to these or be

19    ordered to be produced immediately while the defendants are

13:54:46  20    not.

21        Their CFO has been requested, not just Cardinal, but

22    in other defendants here.  No one wants to voluntarily

23    produce those.  And they're arguing whether or not the CFOs

24    are appropriate.  I think these issues should be combined,

13:55:00  25    as you suggested, and we should come back to you on

1    November 11th and -- and tell you where we are.

2                    SPECIAL MASTER COHEN:  Here's some thoughts.

3    Here's a final thought on this topic.

4         I think it's probably appropriate, Hunter, that the --

13:55:21  5    I don't know what his title is exactly, Mr. Kennedy, the

6    CFO.

7                    MR. SHKOLNIK:  CFO.

8                    SPECIAL MASTER COHEN:  I think it's probably

9    appropriate that his custodial file be produced.  I think

13:55:31  10   that it should be produced only in exchange.  So I'm kind of

11   saying there has to be a trade.  Now you guys got to figure

12   out, in baseball terms, what the player who is being traded

13   for is worth.

14        And so, the defendants, as I've suggested, need to

13:55:48  15   figure out which Apex custodians or close to Apex custodians

16   they're going to give up in exchange for that, and that you

17   should be able to do without me while I'm gone.

18                    MR. SHKOLNIK:  We will.

19        Thank you.

13:56:01  20                   SPECIAL MASTER COHEN:  All right.  Okay.  I

21   think that we have just gone through agenda items 2, 3, and

22   4, which are identification of custodians, production of

23   Apex files, and requests for expedited depositions.

24                    MS. SCULLION:  Special Master Cohen?

13:56:17  25                   SPECIAL MASTER COHEN:  Yes.

         1           MS. SCULLION:  Jennifer Scullion for the

         2    plaintiffs.

         3         With respect to the more granular -- sorry.  With

         4    respect to the more granular non-Apex, non-lawyer

13:56:26 5    custodians, I know you had questioned whether you want to

         6    address those at the end or the beginning.  I wasn't sure

         7    where you wanted to do those.

         8           SPECIAL MASTER COHEN:  I guess I think I was

         9    hearing from the parties that they thought that there could

13:56:42 10   be continued negotiation.

        11         Are you saying you don't believe that's true?

        12           MS. SCULLION:  My understanding is we are

        13    talking about continuing negotiation on the Apex custodians.

        14           SPECIAL MASTER COHEN:  I was trying to include

13:56:50 15   everybody, but if you -- I'm very serious.  If you tell me

        16    that you think there's been as much negotiation as there can

        17    be and that the parties are at an impasse, we need to start

        18    looking at them one by one.

        19           MS. SCULLION:  I can speak for my negotiations

13:57:03 20   with Endo.  We have tried a number of times to make some

        21    progress, and I -- I don't think we've been able to make

        22    any.  I don't see another week making any particular

        23    difference.  And we've narrowed our custodians down, putting

        24    aside the Apex issue for Endo, to just four.

13:57:24 25           SPECIAL MASTER COHEN:  Right.

1          MS. SCULLION:  And I think we've laid out in

2     detail their personal involvement in critical, central

3     issues in the case.  These are the chief medical officers,

4     the VP of sales, the -- the VP for clinical development, the

13:57:44  5     former senior medical officer.  There's really no dispute

6     that they were involved in core issues in the case,

7     personally involved.

8          The response we've heard, principally, from Endo has

9     been twofold.  One is, well, Endo shouldn't have to give a

13:58:04 10     certain number of custodians more than the plaintiffs have.

11     I think we've explained, if you're looking at this from a

12     numbers perspective --

13          SPECIAL MASTER COHEN:  That's a losing

14     argument.

13:58:13 15          Go ahead.

16          MS. SCULLION:  It -- because with Endo, they

17     are nowhere near where Janssen or Mallinckrodt is, for

18     example, with 80 custodians.  Again, we've really come down

19     to just these four.

13:58:26 20          And the other argument we've heard is that, well,

21     these four, their e-mails, for example, would overlap with

22     other custodians.  And, again, we're talking about, these

23     are the sub-Apex individuals, and our expectation is that,

24     number one, to the extent that the e-mails overlap, there's

13:58:44 25     de-duping.  We're not concerned about that.

1          We're talking about their higher-level discussions on

2     issue of what Endo was doing with respect to medical

3     guideline influence, what Endo was doing with respect to

4     research and conferences on opioids, what Endo was doing

13:59:03  5     with respect to its distribution arrangement through UPS.

6               SPECIAL MASTER COHEN:  When is your last

7     correspondence to me on this topic?

8               MS. SCULLION:  Sure.  That was this weekend.

9     That was the Saturday update.  And we included there the one

13:59:20 10     pager with respect to Endo.

11               SPECIAL MASTER COHEN:  Did that come from you?

12               MS. SCULLION:  That did come from me, correct.

13          And to be clear, that included both Endo -- Endo,

14     Teva, and Purdue.

13:59:34 15               SPECIAL MASTER COHEN:  You said Sunday?  Did

16     you say Sunday or Saturday?

17               MS. SCULLION:  Saturday.

18               SPECIAL MASTER COHEN:  I've got six from you

19     in the last 24 hours.

13:59:41 20               MS. SCULLION:  Yes.

21               SPECIAL MASTER COHEN:  Saturday at 12:04?

22               MS. SCULLION:  Yes.  Noon.  Correct.

23               SPECIAL MASTER COHEN:  In your e-mail to me,

24     there are five custodians that you list?

14:00:12 25               MS. SCULLION:  There are five, one of which is

1    Apex.  We've only asked for one Apex.

2                    SPECIAL MASTER COHEN:  Campanelli?

3                    MS. SCULLION:  Mr. Campanelli is the Apex.

4                    SPECIAL MASTER COHEN:  Right.  So this is

14:00:22  5    where, I think it was just after I received this e-mail, but

6    I don't remember when, that I sent out, I think it was later

7    that evening, that I sent an e-mail out and said, you know,

8    I think that the in-house counsel, I'm not buying.  I think

9    that there's too many issues there.  And I think that the

14:00:37 10    case law cited by defendants is strong.  But that the other

11    ones -- it seems to me there are a lot of the ones you

12    identified that look like they're appropriate custodians.

13         And I have said earlier today, if it's the timing

14    issue, we can figure that out.  You know, maybe you get the

14:00:54 15    documents but you're just going to have to go ahead with

16    depositions maybe not having received all of them.

17         I see Endo's counsel wants to have a turn, so why

18    don't you tell me what you think.

19                    MR. DAVIS:  Yes.  Special Master Cohen, this

14:01:08 20    is Josh Davis again for Endo.

21         I think we might be able to make this fairly easy.

22    I've been having conversations with Ms. Scullion up until

23    just walking into this room today.

24         Putting aside Mr. Campanelli, who is wrapped up in the

14:01:19 25    Apex issues, there are four custodians on that list.  We've

1    offered to produce two of them in exchange for them to take

2    two off the -- off the list.  I think that represents a

3    fairly fair trade here.

4         And we've offered to produce documents from Ron

14:01:37  5    Wickline in exchange for taking off Frank Casty.  That was

6    an offer that Ms. Scullion made to us that we agreed to

7    accept.

8         In exchange for them agreeing to withdraw their

9    requests for documents from Bradley Galer, and we would

14:01:50  10   produce documents from Robert Reiter.  Mr. Reiter was

11   prioritized at a higher level than Mr. Galer was in our

12   correspondence with plaintiffs.  We think that represents a

13   fairly -- a fair compromise here, without having to get into

14   the weeds, of these specific custodians.

14:02:05  15   I would note, though, as we've mentioned to you, we've

16   already produced between 7-, 8-, 9,000 documents from all of

17   these witnesses already, and I think that supports our

18   position that these are duplicative witnesses.  Nonetheless,

19   in the interest of compromise, we're willing to add half of

14:02:22  20   the four witnesses, putting aside Mr. Campanelli, that the

21   plaintiffs have requested.

22             MS. SCULLION:  Your Honor, we are willing to

23   take Mr. Casty off, but we do request production of Dr.

24   Reiter, Dr. Galer, and Mr. Wickline.

14:02:39  25   Again, Mr. Wickline is actually set to be deposed

1    because he later became a Mallinckrodt employee.  He was VP

2    of sales during a critical period.

3         And with Mr. -- sorry -- Dr. Reiter and Dr. Galer,

4    again, each of them were involved, particularly Dr. Reiter,

14:02:58  5    in going outside of Endo to conferences, to speaking with

6    scientists, other physicians, and we -- so we would expect

7    he would have information that others would not.

8         And with respect to Dr. Galer, he was the lead on the

9    new drug application for Opana ER, which is the principal

14:03:21  10   branded opioid at issue here, and that -- so it was not a

11   trade that we thought was a fair trade.

12             SPECIAL MASTER COHEN:  All right.  I'm

13   ordering the production of custodial files of Reiter, Galer,

14   and Wickline.

14:03:35  15            MS. SCULLION:  Thank you, Your Honor.

16        And, Your Honor, would you like to hear with respect

17   to the granular on the others?  I think we have Teva.

18             SPECIAL MASTER COHEN:  Yeah.  Yes.  Let's get

19   to it.

14:03:45  20            MS. SCULLION:  And Mr. Crawford will address

21   the Teva custodians.

22        One of the issues I do know is of concern is that for,

23   especially for Teva and I think for Allergan and others,

24   documents are only just starting to roll.

14:03:57  25            As you know, Mallinckrodt, there may still be an issue

1    about search terms, so we're mindful that these are the

2    current -- current disputes and this is without prejudice to

3    our ability to identify additional custodians later.

4         Again, obviously, we're mindful of the realities of

14:04:13  5    the schedule, and of, you know, what we already have.  But

6    this -- people did want me to remind that this is without

7    prejudice to being able to identify additional custodians.

8              MR. CRAWFORD:  Good morning.

9         Mark Crawford for the plaintiffs.

14:04:30 10         (Off-the-record discussion between counsel)

11              MR. CRAWFORD:  It is morning.  So I normally

12    do this on the phone.  So good afternoon.  Thank you, Peter.

13         I'll make this really brief.

14         So Teva consists of basically three defendant groups:

14:04:47 15    It's Teva, the entity that sells generic products extending

16    before 2011; Cephalon, which Teva acquired in 2011; and then

17    the Actavis entities, which they acquired in 2016.

18         What we're seeking here, and it's attached to Ms.

19    Scullion's Saturday e-mail, is basically eight custodians

14:05:07 20    additional that we can't agree on.  Four of them are sales

21    representatives.  We've asked for four Ohio-based sales

22    representatives who we believe detail pill mills and are

23    very relevant in this case.

24         My understanding is the other defendants are already

14:05:22 25    producing sales rep custodial files.

1          SPECIAL MASTER COHEN:  Why four?

2          MR. CRAWFORD:  Pardon me?

3          SPECIAL MASTER COHEN:  Why four?

4          MR. CRAWFORD:  Because we were at six and we

14:05:32  5   compromised and came down to two, and these four, we think

6   -- you know, we've identified them specifically now from

7   databases.

8      We know the two that we want to depose right now

9   detailed a pill mill doctor.

14:05:42 10          SPECIAL MASTER COHEN:  You can have three.

11   Pick them and tell them.

12          MR. CRAWFORD:  Okay.  I can --

13          SPECIAL MASTER COHEN:  What's next?

14          MR. CRAWFORD:  The next is Marianne Geiger,

14:05:51 15   who was customer service at Teva, and she was charged in the

16   DEA compliance realm.  When an order was flagged as

17   suspicious, she was -- they had customer service contact --

18   under their procedures, as I understand them, contact the

19   offending party and do the interview.

14:06:10 20      So she has unique information, would report back to

21   their DEA compliance group, who would make a decision.  So I

22   think she's pretty critical here in that realm of -- of

23   pursuit there.

24          SPECIAL MASTER COHEN:  You said her name is

14:06:24 25   Marianne Ginger?

1          MR. CRAWFORD:  Geiger.

2          SPECIAL MASTER COHEN:  Geiger.  Sorry.

3      Might as well do it one by one.

4      Who will be responding?

14:06:34  5          MR. CRAWFORD:  Okay.

6          MS. FEINSTEIN:  Hi, Special Master Cohen.  My

7  name is Wendy West Feinstein, I'm with Morgan, Lewis, on

8  behalf of the Teva defendants.

9      First, to address the sales reps that Mr. Crawford

14:06:52 10  just referenced.

11          SPECIAL MASTER COHEN:  It's already done.  I'm

12  past it.

13          MS. FEINSTEIN:  Well, with respect to the

14  remaining outstanding witnesses, Ms. Geiger, they've

14:07:02 15  requested her custodial file.  We haven't even gotten to the

16  issue of, you know, whether these folks will be deposed.

17      So, you know, we haven't -- there is no dispute about

18  whether or not there would be a deposition.  It's -- it's

19  the burden of collecting and reviewing the custodial files.

14:07:18 20          SPECIAL MASTER COHEN:  Right.

21          MS. FEINSTEIN:  Ms. Geiger's file would be

22  duplicative of several other custodians that we've already

23  agreed to with Mr. Crawford.  We've been in discussions with

24  him, very productively, since the summer.  And just -- just

14:07:32 25  recently, the plaintiffs in their October 1 letter requested

1      Ms. Geiger, in addition to a number of other custodians,

2      many of whom we've agreed to, in addition to the generic

3      custodians that have been added from the other entities.

4          So Ms. Geiger's custodial file not only would be

14:07:51  5      incredibly burdensome for us to collect at this late date in

6      particular, but also duplicative of other custodians that

7      they've already requested, that we've already agreed to, and

8      that we've already been processing.

9                  SPECIAL MASTER COHEN:  Let me ask you about

14:08:03 10      burden.

11          Why would it be especially burdensome for you to

12      produce Ms. Geiger's file at this late date?

13                  MS. FEINSTEIN:  Because we've got the cutoff

14      of October 25.

14:08:11 15                  SPECIAL MASTER COHEN:  Let's say I gave you

16      another two weeks.

17                  MS. FEINSTEIN:  We would do whatever the Court

18      requires us to do, obviously, but just with the -- the

19      additional, since -- let me kind of back up.

14:08:24 20          So we've agreed to a total of 62 custodians, 12 of

21      which we've agreed to since October 15th.  So we've got a

22      lot of custodians that we've just recently discussed with

23      the plaintiffs, we've recently agreed to produce, and we're

24      processing.

14:08:42 25          So the more we add on to that, the more the burden is

1     on our already, you know, stretched resources.  Everybody's

2     stretched at this point.

3                SPECIAL MASTER COHEN:  Let me ask you a

4     question that I want everyone to think about it while you

14:08:56  5     think about it and answer it, and this is kind of dialling

6     back.

7          Right now, you know, we're looking at this case and

8     we're looking at these custodians and we're looking at where

9     we are relative to a deadline and so forth.  And I have

14:09:11 10     said, and will continue to say in every ruling that I make,

11     that I'm making it at this juncture within the span of the

12     MDL, which may, God forbid, last ten years, and may, God

13     forbid, have ten bellwether trials, right?  And I'm calling

14     balls and strikes and trying to be fair, really, as much as

14:09:29 15     I can to both parties and make sure that the burdens are

16     relatively equal and that everybody's getting 80 percent of

17     what they need for this first trial.

18          But in every MDL -- you know, I think of the hip --

19     hip implant MDLs down in front of Judge Kinkeade, which have

14:09:49 20     had I don't know how many trials.  With each success at

21     trial, there's more discovery and there's additional

22     discovery done.

23          And so, it could easily be that I say, fine, you don't

24     have to produce Geiger right now, but you're going to have

14:10:03 25     to produce Geiger the next time when the parties have now

1    done more discovery and now can point to documents that are

2    apparently in her custodial file that they now realize must

3    be important because they've had time to live with all of

4    this.

14:10:16  5        And -- and it's going to go both ways.  You know,

6    defendants are going to get additional discovery too, and

7    so, part of what I'm trying to weigh in my calculus is does

8    it make sense to just do it now because it's likely that it

9    will have to be done eventually anyway, and so, why not do

14:10:34  10   it now while everybody's doing it?

11             MS. FEINSTEIN:  I can appreciate that

12   perspective, Your Honor, but the distinction here is that

13   the rationale for the request for Ms. Geiger's file is that

14   she's got DEA knowledge.  There are at least three other

14:10:47  15  custodians for whom we are undergoing the evaluation and

16   production of documents on that very issue.  It's likely

17   that some of Ms. Geiger's information will be included in

18   that.  She could be deposed in the case as well.

19        And I'll just point you, if you'd like to review my

14:11:09  20  colleague Rebecca Hillyer's letter from October 15, and

21   that's where a lot of detail on these specific custodians

22   are laid out.

23        So I think the duplicative nature, the additional

24   burden to add another custodian on at this point, in

14:11:21  25  addition to the three that you've just ordered, is not

1    proportional to any demonstration of need on the plaintiffs'

2    part in this case at this time.  And if at a later date

3    there is a need and it makes sense to add Ms. Geiger as a

4    custodian, we can address it at that point.  But under the

14:11:45  5    circumstances at this point, it doesn't make sense to add

6    Ms. Geiger into the mix.

7              MR. CRAWFORD:  Your Honor, Special Master,

8    there is a need to get Ms. Geiger's file.  She had the

9    direct contact with these employees.  I understand they're

14:12:07  10    de-duping documents.  We're not going to get duplicates.

11    That gets rid of the duplication.

12         Also, they're supposed to have all of their documents

13    by the 25th.  They got reviewers in place.  I told them in

14    the past I'm willing to give reasonable extensions for these

14:12:22  15    custodians.  She's a critical custodian at this point to

16    round it out that the other ones do not give us.  They did

17    not have the personal contact.  And most of these orders

18    sailed through, and that's the whole --

19              SPECIAL MASTER COHEN:  What do you mean they

14:12:33  20    didn't have the personal contact?

21              MR. CRAWFORD:  The way they had it structured

22    is they would flag a suspicious order, this is my

23    understanding, they would have customer service contact

24    directly the customer whose order was flagged, interview

14:12:46  25    them, and then report back what they -- what they found.

1          Now, I just -- I think her custodial file, because she

2     had the personal contact, I want to be sure that I'm getting

3     everything she understands, what her job was, everything

4     that she may have typed up about the interview, and I'm not

14:13:03  5     confident I'm getting that with the DEA people.  These

6     orders sailed through based on these interviews and I think

7     she's critical.

8               SPECIAL MASTER COHEN:  So can you explain to

9     me, if you know, how Colleen McGinn and Ms. Geiger, what

14:13:18 10     their reporting was and the extent to which they had

11     different obligations, job responsibilities?

12               MR. CRAWFORD:  Yeah.  My understanding of Ms.

13     McGinn, she was in the DEA Compliance Department.  They did

14     not report a single suspicious order prior to 2013.  2013,

14:13:34 15     they had some more structure put in place.  My understanding

16     is Ms. Geiger was the one that interviewed the customers and

17     reported back to her in the DEA department and they made the

18     call.

19               SPECIAL MASTER COHEN:  Who reported to whom?

14:13:48 20               MR. CRAWFORD:  Geiger I think reported to

21     McGinn in that department what she found.

22          And I just want to be sure I'm getting all the

23     interview notes and -- and her understanding of what she's

24     supposed to be talking about and -- and why these are

14:14:04 25     sailing through, and I think she's an important piece of the

1       puzzle.

2           And also, too, these other custodians, these are

3       Actavis/Allergan custodians that they are producing.  This

4       will be 24 of them.  So these recent ones, I wasn't even in

14:14:24  5       the discussion about it.  I just learned about eight today.

6       Those are Allergan custodians.  And Teva, for those 24, just

7       -- I assume they just carried on at Teva.

8           And I'm getting a year of e-mails, but those aren't

9       full custodians that are Teva.  Those are Allergan

14:14:39 10       negotiated ones.  Teva's agreed to produce 38 for Teva and

11       Cephalon.  So we have a very reasonable number.  I've tried

12       to be reasonable here.  We are below what the other

13       defendants are by far.

14                   SPECIAL MASTER COHEN:  Who -- are there any

14:14:48 15       other folks besides these sales -- the sales -- six sales

16       persons you asked for?  We've got three.  Ms. Geiger.  Who

17       else?

18                   MR. CRAWFORD:  There's Napoleon Clark, who is

19       a sales and marketing person of generics.  We don't have a

14:15:03 20       whole lot of that.  We hear a lot of discussion that they

21       don't market generic products, but we need to take -- take

22       their depositions, at least of a couple, and get their

23       custodial files.  We think he's very important.

24                   SPECIAL MASTER COHEN:  Anyone else?

14:15:15 25                   MR. CRAWFORD:  There are two lawyers, and we

 1    understand that's been shelved.

 2                    SPECIAL MASTER COHEN:  Besides in-house

 3    counsel.

 4                    MR. CRAWFORD:  Yeah, that's it.

14:15:24  5             SPECIAL MASTER COHEN:  That's it?

 6                    MR. CRAWFORD:  That's all we're asking for

 7    right now.

 8                    SPECIAL MASTER COHEN:  If you're allowed to

 9    get one, between Geiger and Clark, who would you choose?

14:15:31 10             MR. CRAWFORD:  Well, if I had to choose one,

11    it would be Geiger.

12                    SPECIAL MASTER COHEN:  Did you want to add

13    anything else, Ms. Feinstein?

14                    MS. FEINSTEIN:  Thank you.  Yes.

14:15:49 15        Just for consideration, just listening to Mr.

16    Crawford's discussion, and, you know, his -- our discussions

17    between my office and his office have been very productive.

18         But just listening to the discussion now and his

19    presentation to you, it sounds as if he wants to talk to Ms.

14:16:08 20    Geiger, take her deposition, not necessarily scour her

21    documents that are likely duplicative of the other

22    custodians.

23         So, you know, I would suggest that it may not be

24    necessary for her to be a document custodian for purposes of

14:16:24 25    paper discovery but rather subject to examination and

1  deposition.

2  SPECIAL MASTER COHEN:  What's the -- what rule

3  are the parties using, I just don't remember, with regard to

4  production of custodial files of deponents?

14:16:39  5  MS. FEINSTEIN:  We have -- we have discussed,

6  and Mr. Crawford can step in if I misstate anything about

7  our agreements, but we are producing custodial files for

8  individuals identified as custodians.  If the -- if a

9  witness, a deposition witness is also a custodian, we will

14:16:59 10  make sure that that file has either previously been produced

11  or will be produced 14 days in advance.

12  In addition to that, the plaintiffs, pursuant to

13  CMO-1, have a lot of depositions that they can take.  So,

14  you know, not all of those deponents will be custodians.

14:17:16 15  So, you know, there may not be custodial files for many, and

16  likely won't be custodial files for many, of the witnesses.

17  SPECIAL MASTER COHEN:  Okay.  What do you

18  think about the idea of deposing her without getting the

19  custodial files?

14:17:30 20  MR. CRAWFORD:  Absolutely not.  We need the

21  custodial file to be able to evaluate whether to depose her

22  and to what extent.  It's non-duplicative documents we're

23  looking for, not duplicative documents.

24  SPECIAL MASTER COHEN:  All right.  So I

14:17:42 25  actually think that both Clark and Geiger's, that's what I

1    would choose, but I'm only going to order the production of

2    Geiger.

3              MR. CRAWFORD:  All right.  Thank you.

4              SPECIAL MASTER COHEN:  And I say that without

14:17:53 5   prejudice to trial, too, or sometime down the road, Clark's

6    custodial file being produced as well.

7         I really think that a lot of these folks have relevant

8    and important positions that I would guess suggest they have

9    documents in their custodial file that are relevant and

14:18:12 10  could easily end up as a -- as an exhibit.  That's kind of

11   what I'm thinking when I'm making these rulings.

12        And I'm telling you, I try not to broad-brush things,

13   but that has been my general observation as to all of these,

14   so I'm letting you know this is how I'm coming out.  If you

14:18:30 15  want me to take a pause and you can take what I've done so

16   far and see if you can make further progress, I'm happy for

17   you to do that.

18        This -- but I'm trying to give you an indication of

19   what I'm thinking and why so that you can use that going

14:18:44 20  forward yourselves.

21        Is that it for Teva?

22             MR. CRAWFORD:  There's one additional issue.

23        Custodial file -- what we agreed to initially was

24   because we were under a two-month tight time frame, was a

14:18:58 25  custodial file would be their e-mail files, but a custodial

1       file is generally considered to be much more than that.

2                    SPECIAL MASTER COHEN:  Right.  Right.

3                    MR. CRAWFORD:  That's the stuff they keep in

4       their office, it's on their hard drive, it's on their user

14:19:09 5       files, and we have reserved, because we tried to be

6       accommodating to Teva, just to get the e-mail files, but

7       always reserve primarily to get the rest.

8            But we have asked for, and we would like to have, just

9       the user files and the hard drive files for the deponents to

14:19:29 10       complete the custodial file so we have the full file.  Not

11       even the full.  We're not asking even for the hard copy

12       stuff they keep, because they didn't want to go back to them

13       and try to dig that up.

14            I said, okay, I'll just take the user files on the

14:19:43 15       system and I'll take the hard drive, run the search terms

16       through them for just our deponents, and produce that

17       14 days before, or whenever is reasonable, so we can have

18       the full file to review before the deposition.

19            So that's the additional Teva custodial issue out

14:19:58 20       there.

21                    SPECIAL MASTER COHEN:  Well, is that an issue?

22       It just sounds like you explained to me what you've agreed

23       to avoid it being an issue for now.

24                    MR. CRAWFORD:  They have not agreed to produce

14:20:09 25       anything beyond their e-mail for the deponents, so I think

1      that's the dispute.

2                    MS. FEINSTEIN:  Actually, there is one

3      clarification to that.

4                    MR. CRAWFORD:  Okay.

14:20:18  5                    MS. FEINSTEIN:  So I think the dispute is very

6      narrow, the remaining dispute.  We've agreed, and this is in

7      the October 15 letter I believe, but we have agreed to

8      produce the full custodial file as described by Mr. Crawford

9      for employee custodians.

14:20:34  10          Former employees present an additional -- an

11     additional burden that's just -- that I think my colleague

12     has explained to Mr. Crawford, not only in time, it would

13     really stretch out the process, because to locate those

14     former employee hard drives, for example, and system files

14:20:56  15     would really extend the process.

16          What we've offered to compromise on on this point is

17     to provide to the plaintiffs for current employee custodians

18     the complete file, so the dispute is really just that area

19     then in between.

14:21:11  20                    MR. CRAWFORD:  I think we can meet and confer

21     on this issue a little bit more.

22                    SPECIAL MASTER COHEN:  I think you can too.

23          Thank you.

24                    MR. CRAWFORD:  Thank you.

14:21:18  25                    MS. FEINSTEIN:  Thank you.

1          SPECIAL MASTER COHEN:  What's next?

2          MR. ACKERMAN:  I need a copy of my letter back

3    in order to do that.  I'd like to address Purdue.

4          SPECIAL MASTER COHEN:  And I need to get

14:21:33 5    Cheffo back on the line, which he isn't at the moment.  Hold

6    on just one minute.

7               (Pause in Proceedings)

8          SPECIAL MASTER COHEN:  Mark, are you still

9    there?

14:22:17 10         MR. CHEFFO:  I am.  Thank you.

11         MR. ACKERMAN:  Again, this is David Ackerman

12   for the plaintiffs.

13        There are two non-Apex, non-lawyer custodial issues

14   with respect to Purdue, and the names are Steven May and Mo

14:22:39 15   Mulcahy.  Both are -- Mr. May is a former sales

16   representative.  Mr. Mulcahy is a former district manager.

17        Both are individuals for whom we have requested

18   depositions and for whom Purdue has agreed to provide

19   deposition dates, but has not agreed to provide their

14:22:57 20   custodial files.

21        Especially with respect to Mr. May, he is a sales

22   representative who has been quoted publicly regarding the

23   instructions he was given by Purdue management.  Those

24   are -- that is testimony that we would like to get on the

14:23:14 25   record.

1          SPECIAL MASTER COHEN:  I guess you said

2    former.  When was he released from his job?

3          MR. ACKERMAN:  I don't know.

4          SPECIAL MASTER COHEN:  How many sales reps do

14:23:21  5    you have?

6          MR. ACKERMAN:  We have six sales reps from

7    Ohio.  We would not question Mr. May regarding his -- his

8    transactional dealings within his territory, but, rather,

9    the question would be with respect to category 1 discovery

14:23:39 10    with respect to the overall messages and instructions that

11    he received regarding that marketing.

12          SPECIAL MASTER COHEN:  Okay.  And Mr. Mulcahy?

13          MR. ACKERMAN:  Mr. Mulcahy is a former

14    district manager.  And I apologize that I do not have more

14:23:54 15    information on him other than that.

16          SPECIAL MASTER COHEN:  Ohio?

17          MR. ACKERMAN:  Is he Ohio?  I --

18          MS. SCULLION:  Yes.

19          MR. ACKERMAN:  Yes, he is Ohio.

14:24:05 20       Thank you.

21          SPECIAL MASTER COHEN:  Nothing more on him?

22          MR. ACKERMAN:  I have nothing more, other than

23    that he is a district manager in Ohio.

24          SPECIAL MASTER COHEN:  Does anybody in the

14:24:12 25    room want to add anything about Mulcahy as to why, in

1    particular, they think a custodial file from him is

2    appropriate?

3         Okay.  Who is going to talk about Purdue?

4              MR. CHEFFO:  Special Master Cohen, this is

14:24:23  5    Mark, and I think Paul LaFata is actually in the courtroom,

6    so with your indulgence, we would like to sort of tag team

7    just for the reason that he may have a few more details.

8         I think you asked the exact right question, all right,

9    which is of -- and Mr. Ackerman kind of danced around it,

14:24:39  10   but the reality is there's -- you have to have some

11   limitations here in terms of the geographic scope.

12        We now have kind of Ohio-only producing.  We have all

13   of the other, you know, municipalities now producing.  And

14   now they want to go get sales reps kind of outside even Ohio

14:24:59  15   in connection with this.  So I think there's borders that

16   are supposed to be limited to kind of Ohio-related issues.

17        And I -- and as I said, I think to the extent that he

18   can take the deposition, my understanding, and Paul will

19   correct me if I'm wrong, and I think they had conceded this,

14:25:17  20   that we didn't object to that.

21        But the idea that we're now, with everything else

22   going on and all these custodial parts, we still have to go

23   collect custodial files for sales reps, for district

24   managers who were not even kind of in the jurisdiction, I

14:25:32  25   think it's so far field that we're literally never going to

1    get things done and I think it's inappropriate.

2        Let me stop there and see if -- if Paul LaFata has

3    anything else to add on this, because I think he was

4    prepared to talk directly to this.

14:25:45  5              SPECIAL MASTER COHEN:  He's waiting for you to

6    finish.

7              MR. CHEFFO:  Okay.  Good.  Then I'm done.

8              MR. LAFATA:  Paul LaFata from Dechert for

9    Purdue.

14:25:57 10       So there was a question you asked, Special Master,

11   earlier about the number of requests.  I identified this in

12   the October 15th letter that the plaintiffs had requested 11

13   extra files from sales representatives, sales managers, and

14   in the meet and confer process, it was very, you know, in

14:26:14 15  good faith, the plaintiffs had identified those that were

16   the people who called on the most, made the most number of

17   calls.  So in this October 15th letter, we just took the top

18   six of those, that's more than half of what they requested,

19   and said we'll agree to those.

14:26:27 20       These two individuals they're talking about now are

21   not ones that they have identified as having made calls.  If

22   they did, it certainly wasn't the degree to which those

23   other ones had been making calls.  If there is interest --

24   and as Mark said, Mark Cheffo had said, these are former

14:26:42 25  employees.  So it's -- if plaintiffs are going to depose

1      them, they're going to depose them.

2          But with respect to the number of files, we've given

3      so many of these sales representatives and sales managers

4      that eventually it becomes overkill.  So what we did is we

14:26:56  5      picked the top six they had asked for out of 11 and

6      identified that as a compromise in the October 15 letter.

7                  SPECIAL MASTER COHEN:  I'm sorry.  How many

8      district managers' custodial files is Purdue producing?

9                  MR. LAFATA:  Special Master Cohen, I don't

14:27:10 10      have that exact number, and maybe Mr. Ackerman has the

11      number.  Is it around the neighborhood of two to four,

12      something like that.

13          And some of these on this list, frankly, to me, we've

14      been grouping these together because they often cover a lot

14:27:21 15      of overlapping areas.  A district manager may cover multiple

16      representatives.  But we've -- we've been -- in addition to

17      these 11, we've given several other district managers

18      besides the ones that the plaintiffs have asked for.  This

19      was back during the summertime, so it was already part of

14:27:36 20      the file.

21                  SPECIAL MASTER COHEN:  I may have asked this,

22      I apologize, is Mulcahy a -- a district manager in the track

23      one jurisdictions?

24                  MR. LAFATA:  I don't know.

14:27:48 25                  MS. SINGER:  This is Linda Singer, plaintiffs.

1          I believe so.

2                    SPECIAL MASTER COHEN:  And there are other

3     track one district managers whose custodial files you're

4     receiving?

14:27:57  5                    MR. LAFATA:  Yes.  We've -- yes.

6                    SPECIAL MASTER COHEN:  All right.  So, again,

7     I've said this before and I'll say it again, and this

8     applies to all discovery rulings I make, I am not going to

9     order the production of the custodial files of either of

14:28:10  10    these two individuals, but they have to be preserved so that

11    if that ruling changes in the span of this MDL, they're

12    still there to be produced.

13                    MR. LAFATA:  Yes, sir.

14                    SPECIAL MASTER COHEN:  Who's next?

14:28:24  15                    MR. PIFKO:  Yes.  Special Master Cohen, real

16    quick.  I think that -- Mark Pifko from Baron & Budd.

17          From AmerisourceBergen, I think your guidance guides

18    the way, but I made this offer to them over on Friday and

19    they rejected it, and I don't think there's any more to meet

14:28:41  20    and confer, so if you could order this, unless they stand up

21    here and agree.

22          There's five custodians in dispute, three of which

23    they claimed were Apex and two of which were lawyers.  In

24    the spirit of compromise, I'm willing to accept the three

14:28:56  25    Apex and drop the lawyers, if you're willing to order that.

1    SPECIAL MASTER COHEN:  Can you tell me what

2    letter it was that I may have received that would list them

3    and their positions?

4    MR. PIFKO:  I sent you an update on Saturday

14:29:10  5    at noon which attached our portion of the letter on that

6    issue.

7    SPECIAL MASTER COHEN:  Just a minute, please.

8    That's only 150 e-mails ago.

9    (Pause in Proceedings)

14:30:12  10    SPECIAL MASTER COHEN:  So this is the one that

11    lists Collis, Mauch, and Neu, as well as the two attorneys?

12    MR. PIFKO:  Right.

13    So in the spirit of compromise and taking your

14    guidance, I'm willing to give up the two lawyers, which was

14:30:24  15    an offer I made to them on Friday and they rejected.

16    Do you want to hear argument or --

17    SPECIAL MASTER COHEN:  I'll hear from opposing

18    counsel first.

19    Thank you.

14:30:37  20    MR. NICHOLAS:  Good afternoon.  It's Bob

21    Nicholas, Reed Smith, for AmerisourceBergen.

22    First of all, with -- I guess I would have disagreed

23    that there's no room for discussion.  It's been my

24    impression, from some of the back channel conversations that

14:30:56  25    I'm aware of and I've participated in, that there are both

1    macro discussions about horse trading and micro discussions.

2         So I think there are, without being specific because I

3    can't really speak for anyone until I can talk for everyone,

4    I think there's room for discussion at a macro level in

14:31:18  5    terms, in particular, of Apex people.  There's just horse

6    trading that can be done, you know, at a high -- you know,

7    one side to the other side, not just party by party.

8         I don't think that the compromise that Mr. Pifko is

9    referring to right now is that much of a compromise.

14:31:41  10   They've asked for, most recently, in this most recent round,

11   three Apex people.  One is our CEO.  Another is the current

12   president of the -- another is the current president of our

13   pharmaceutical distribution company.  And the other is the

14   former president of that company.

14:32:06  15        So asking for all three of them, because those are

16   really the three Apex people that they've asked for at this

17   time, is not, in my view, a whole huge compromise.  I would

18   like to continue to keep meeting and conferring about these,

19   about all three of them.

14:32:23  20        I can argue individually about each one, if you'd

21   like.

22             SPECIAL MASTER COHEN:  Let me ask you what you

23   think about the observation I made earlier about these --

24   that I'm ruling at this juncture in the MDL and that it may

14:32:38  25   be simply a matter of whether it happens now or during the

1    next case?

2              MR. NICHOLAS:  I understand that point of

3    view.  I'm not prepared to conclude that there will be a

4    next case.  I don't know how this is -- you know, I don't

14:32:52  5    know where all of this is going.  Maybe I'm stupidly

6    optimistic or something, but I am more -- I think maybe it

7    sounds narrow, but I want to deal with what's in front of us

8    and what's live right now.

9         I don't know what's going to happen, whether there are

14:33:11 10    going to be future cases where these files and custodians

11    and deponents are going to be at -- at issue.  Maybe.  But

12    we can deal with those when we deal with those.  But I'm

13    looking at this right now, and, you know, I would -- that's

14    kind of how I'd like to approach it.

14:33:28 15              SPECIAL MASTER COHEN:  I think this dispute

16    falls into the category of the Apex custodians, because I

17    think they all are Apex custodians, different from the ones

18    we just discussed a minute ago, and, therefore, I'm not

19    going to order production of these custodial files at this

14:33:44 20    time.  I think it falls within the ruling that there should

21    be some horse trading.

22         And just in the same way that I think that there's

23    probably at least one Apex custodian that Purdue should

24    produce in exchange for getting some custodians, Apex

14:33:59 25    custodians from the plaintiffs, it's probably equally true

1    to you, and I'll leave you to try and work that out over the

2    next week or two.

3        Thank you.

4            MR. NICHOLAS:  Thank you.

14:34:09  5            SPECIAL MASTER COHEN:  Who's next?

6            MR. WEINBERGER:  Good afternoon.

7        Peter Weinberger.

8        Peter Mougey and I are going to handle item number

9    5 --

14:34:26 10            SPECIAL MASTER COHEN:  Let me just interrupt

11    you.

12            MR. WEINBERGER:  -- which is production

13    charts.

14        Yes, sir.

14:34:31 15            SPECIAL MASTER COHEN:  I just want to make

16    sure that we've dealt with everybody with regard to

17    custodial files.

18            MR. MOUGEY:  We still have Walgreens, which is

19    Pete's issue also, which we can go back.

14:34:45 20            SPECIAL MASTER COHEN:  Okay.  Fine.

21            MR. BOEHM:  We also have Summit County.

22            SPECIAL MASTER COHEN:  You said also Summit

23    County?

24            MR. BOEHM:  Summit County.

14:34:54 25            SPECIAL MASTER COHEN:  All right.  I kind --

1    unless there's a reason we shouldn't, I want to stay on

2    topic.

3                   MR. WEINBERGER:  Fine.

4                   MR. MOUGEY:  Peter Mougey on behalf of the

14:35:10  5    plaintiffs regarding Walgreens.

6         We have a problem with the Walgreen production, both

7    geographic scope and a temporal scope, and let's see if I

8    can frame some of these issues up.

9         What has become abundantly clear from the discovery

14:35:30 10    and the first deposition we took, I cut and pasted a portion

11    of that transcript for Your Honor on the October 20th

12    correspondence that we submitted to the Court, the very

13    first deposition we took -- we've asked for 36 custodial

14    files, we've agreed to 21, there's 15 in dispute.  Walgreens

14:35:52 15    has asked or offered -- and there was an offer as little as

16    an hour ago -- to give us nine if we take the other six

17    down, and here's why that won't work.

18         The very first depo we take, manager of Pharmaceutical

19    Integrity Department at Walgreens, which began in earnest in

14:36:14 20    2013 as the result of a DEA investigation and settlement

21    agreement, it was one of the criteria that they create and

22    implement a Pharmaceutical Integrity.

23         The very first depo, the western manager of

24    Pharmaceutical Integrity said that we divide duties based on

14:36:33 25    our areas of expertise.  The western manager gave the

1    suspicious order reports after 2013 to the DEA.  That's the

2    western manager.

3         So, arguably, you can say the western manager was out

4    of the geographic scope, it's only Ohio, but his area was

14:36:52 5    I'm the one that gives the suspicious order reports.  I

6    asked him:  Well, were, in fact, they not shipped subject to

7    some due diligence?

8         And he said:  I don't know the answer to that.  All I

9    do is run the reports.  And the depo clip that I cut said:

14:37:07 10   You'll have to go ask the distribution centers.  And he

11   identified 50, 75, 100 people that had knowledge about the

12   specific distribution centers' shipments.

13        Now, clearly, that's a ton of custodial files.

14        Why are different distribution centers important to

14:37:26 15   the trial track one cases?  Jupiter, which is Walgreens'

16   distribution center out of Florida, supplied Schedule II and

17   Schedule III to Summit and Cuyahoga as recently as 2006 and

18   2007.

19        One of the distribution centers in the D.C. area

14:37:48 20   supplied Schedule II and Schedule III to Summit and

21   Cuyahoga.

22        And this gentleman relayed:  If we want information

23   about the suspicious orders, we need to go to those specific

24   distribution centers because they're responsible, in

14:38:03 25   addition to others, for performing the due diligence.

1    So all of a sudden, the scope or the mushroom of what

2    we were looking at to date started to expand in the very

3    first deposition.

4    The other issue is a temporal scope or time.

14:38:19   5    Pharmaceutical Integrity began in 2013. Prior to that,

6    different departments and different people were responsible

7    for identifying suspicious orders or orders of interest in

8    performing due diligence. So there was a clean break in

9    2013 where they started on a new kind of route of what they

14:38:37  10    were pulling.

11    And, keep in mind, we only have 21 custodians is what

12    we've asked for, and we've only asked for 15 more. Now,

13    initially, we asked for about 25. We backed down to 15.

14    And we continue to have discussions that, quite frankly, are

14:38:50  15    no longer making any progress.

16    So you have the -- you had the geographic, we can't

17    just cleanly define this as right around in Ohio and the

18    distribution centers.

19    SPECIAL MASTER COHEN: Let me interrupt you

14:39:01  20    just to ask you where the letter is that would list those 15

21    that you're still asking for?

22    MR. MOUGEY: It's the October 20th, 2018.

23    Let me get my agenda. I can give you a page number.

24    (Pause in Proceedings)

14:39:16  25    SPECIAL MASTER COHEN: Are we at like 30B?

1          MR. MOUGEY:  Yes.  1131.

2          SPECIAL MASTER COHEN:  Go ahead.

3          MR. MOUGEY:  And that was -- the first page of

4    that letter is where I gave you the block quote from Mr.

14:39:33 5    Stahmann who was the western manager of Pharmaceutical

6    Integrity.

7          So what we've done, Your Honor, is we have 15

8    additional custodians that are broken down into different

9    departments.  One, the distribution centers, and that's who

14:39:48 10    Mr. Stahmann told us was responsible for performing the due

11    diligence.  Two we've agreed to.  The one that is still

12    disputed is the SAIL coordinator.  And the SAIL coordinator,

13    the CII manager, the controlled substance Schedule II, he's

14    the coordinator for Mount Vernon DC.  This is one of the

14:40:06 15    ones in dispute.

16          Mount Vernon DC distributed hydro to Cuyahoga and

17    Summit, and that's the individual that we understand was

18    responsible for performing additional due diligence on the

19    orders of interest.  So that's one that's in dispute.

14:40:23 20          I'm going to focus on the six.  We've asked for 25, we

21    reduced to five after this deposition.  We thought that was

22    eminently reasonable when their own witness said go talk to

23    75 people, we asked for 15.

24          SPECIAL MASTER COHEN:  Let me interrupt you

14:40:39 25    once more.

1          MR. MOUGEY:  Sure.

2          SPECIAL MASTER COHEN:  I want to make sure I'm

3     exactly on the same page as you are literally.  So I'm

4     looking at an October 12th letter that you sent.  And I'm

14:40:48 5    not seeing any quote from -- am I on the wrong letter?

6          MR. MOUGEY:  It's October 20th, and it begins

7     at page 1131.  It's probably a few pages behind that.  I

8     don't have the exact page number that corresponds with the

9     PDF, but --

14:41:07 10         SPECIAL MASTER COHEN:  So I'm at page 1131,

11    the October 12th letter.

12         MR. MOUGEY:  If you continue to scroll back, I

13    think they should be in chronological order.

14         SPECIAL MASTER COHEN:  Scrolling backwards or

14:41:20 15   forwards?

16         MR. MOUGEY:  Forwards.  Sorry.

17         SPECIAL MASTER COHEN:  Towards 1132, 1133?

18         MR. MOUGEY:  May I approach and just show you

19    the quote?

14:41:39 20        SPECIAL MASTER COHEN:  Yes, please.

21              (Pause in Proceedings)

22         SPECIAL MASTER COHEN:  For the record, that's

23    page 1284 of the agenda, the October 23rd, 2018 agenda.

24         MR. MOUGEY:  So you see the quote that we put

14:42:36 25   in front of you, and, quite frankly, I was taken aback.

1    This was after refusing to put up these custodians.  This is

2    a manager of the western region says -- and I'm asking him

3    about due diligence on suspicious orders, and his -- I said:

4    So you're talking maybe 50, 75, even possibly 100 people

14:42:53  5    that may have specific information about suspicious orders

6    and the due diligence provided or performed on those orders,

7    right?

8        He goes:  They would possibly have some knowledge,

9    yes.

14:43:02  10        And it would be your recommendation that we should

11    probably talk to them to find out what kind of information

12    they have on due diligence on suspicious orders, right?

13        Witness:  That would be my personal recommendation.

14        And this is a manager of the Pharmaceutical Integrity

14:43:20  15    Department saying I don't have any information.  After I

16    identify the order of interest, I burn the report, I send it

17    to the DEA, and I also send it to the distribution centers.

18    I don't know if those distribution centers -- this is their

19    own witness saying:  I don't know if they did due diligence.

14:43:37  20    You'll have to ask them.

21        So then we come back to Walgreens and we said, look,

22    we're not going to ask for 75 or 100, but if you give us

23    these 15, and we parse them out to different areas in the

24    company, and as I understand it right now, we have one

14:43:56  25    individual that we've asked for that's in dispute from the

1    distribution centers, that was the -- a SAIL coordinator,

2    and those are in the distribution centers for Mount Vernon

3    DC, and we don't even have a name.  All we have is an empty

4    org chart.

14:44:13  5        And that's another issue, and I raised that in my

6    correspondence on Sunday, in that the org charts that we've

7    gotten from Walgreens either, A, just came or, B, cover 2012

8    to current.  So prior to 2012, we have almost no documents

9    and no org charts.

14:44:30 10        So what we've been doing for the last 60 days is -- we

11    literally have just a few hundred pages on some of these

12    specific custodians pre-'12 -- we've literally been pouring

13    through LinkedIn trying to find and piece together org

14    charts.

14:44:46 15                 SPECIAL MASTER COHEN:  Are the folks who you

16    want listed on page four in those charts, four and five of

17    your October 20th letter?

18                 MR. MOUGEY:  They are, yes, sir.

19        And there's charts that went back and forth as

14:44:59 20    recently as an hour before today.

21        But there's essentially 15 individuals that are in a

22    few different departments that are focused on specifically

23    due diligence, distribution centers, suspicious orders, and

24    policy.  So that would give us a total of 36 custodians.

14:45:16 25                 You just heard Teva stand up and say that they have

1    60.  We're asking for 36.  This is the fourth -- third

2    largest distributor in Summit and Cuyahoga County, so --

3                 SPECIAL MASTER COHEN:  I'm only seeing eight

4    where it says disputed in your chart.  I need to know

14:45:33  5    exactly who we're talking about on page four and five of

6    your letter.

7                 MR. MOUGEY:  The difference -- that's the

8    difference between -- there's 15.  We offered 15.  They

9    offered six.  Nine.  I think it depends which hour.  And the

14:45:51 10    difference between the two.

11        And standing here right now, I'm not exactly sure from

12    the last hour -- I literally had another offer as we were

13    walking into court today and I had that printed out --

14                 SPECIAL MASTER COHEN:  Can you go through --

14:46:03 15    I'm just trying to understand who right now there is a

16    dispute, where there is no agreement where Walgreens has

17    said no.

18                 MR. MOUGEY:  My understanding, and I had my

19    office put this together as we were walking into court,

14:46:14 20    these are the ones in dispute:

21        A SAIL coordinator that we've not been able to put the

22    name on for the Mount Vernon Distribution Center.  That's

23    one.

24                 SPECIAL MASTER COHEN:  Right.

14:46:22 25                 MR. MOUGEY:  And SAIL is S-A-I-L coordinator

1    from Mount Vernon DC.

2        Ed Lanzetti, who is the Market Loss Prevention

3    director for Florida.

4                SPECIAL MASTER COHEN:  Go ahead.

14:46:34   5                MR. MOUGEY:  Market Loss Prevention director

6    for Ohio, and that's unknown.  We don't know the actual name

7    of the person.  I just have an empty box in an org chart.

8                SPECIAL MASTER COHEN:  Got it.

9                MR. MOUGEY:  That's number three.

14:46:48  10        Number four is Joseph Prignano, he's the director of

11    Pharmacy and Retail, Cleveland/Akron Pharmacy Operations.

12                SPECIAL MASTER COHEN:  Let me just go through

13    the rest of them.

14        Jeff Berkowitz.

14:47:02  15                MR. MOUGEY:  Jeff Berkowtiz.

16                SPECIAL MASTER COHEN:  Kermit Crawford.

17                MR. MOUGEY:  Kermit Crawford.

18                SPECIAL MASTER COHEN:  Dwayne Pinon.

19                MR. MOUGEY:  Yes, sir.

14:47:02  20                SPECIAL MASTER COHEN:  And a compliance person

21    from -- it doesn't say where -- regarding diversion and

22    suspicious orders.

23                MR. MOUGEY:  Yes, sir.

24                SPECIAL MASTER COHEN:  Unknown.

14:47:12  25                MR. MOUGEY:  That's compliance persons

 1    identified by Walgreens, yet ascertained who those

 2    individuals are.

 3                    SPECIAL MASTER COHEN:  Those are all the ones

 4    that are in dispute at this moment, correct?

14:47:21  5                    MR. MOUGEY:  Yes, sir.

 6         And these are the same categories of people we've been

 7    asking for since July and still don't even have names in

 8    some of these categories.

 9         The point I want to get across is we're asking for 36,

14:47:32 10   36 custodians.  That's not unreasonable given the scope and

11    breadth of Walgreens' operations.

12         And just in one last -- 78 percent of the U.S.

13    population lives within a five-minute drive of a Walgreens.

14    It's huge.  They're absolutely huge.  There's 7,800 retail

14:47:51 15   operations with dozens of distribution centers.  36

16    custodians is eminently reasonable given some of the numbers

17    you're hearing kicked around, both on the plaintiffs' side

18    and defendants'.

19                    MS. SWIFT:  Good afternoon, Special Master

14:48:07 20   Cohen.

21         Kate Swift for Walgreens.

22         May I approach?

23                    SPECIAL MASTER COHEN:  Sure.  You guys don't

24    have to ask that.  You can just do it.

14:48:17 25                    MS. SWIFT:  I just handed you a copy of the

         1    chart that I e-mailed you this morning with some checkmarks

         2    that I made on it as I was listening to Mr. Mougey.

         3         The chart is titled:  Status of negotiations of

         4    Walgreens' custodians, October 22nd, 2018.

14:48:42 5         We have been doing our best to keep these negotiations

         6    going.  They have, frankly, advanced beyond where what Mr.

         7    Mougey just represented to you.

         8         My understanding as of last night, when we were

         9    together in Chicago for a deposition, is that the plaintiffs

14:49:04 10   have taken Mr. Pinon off the table.  He's an in-house

         11   lawyer.

         12        We have also, as you can see from my chart, offered --

         13   we've offered a couple of the people that Mr. Mougey said

         14   are still in dispute.  These are, you know, real live

14:49:24 15   negotiations.

         16        I want to take a step back, though, before going

         17   through the individuals that are still in dispute.

         18             SPECIAL MASTER COHEN:  Here's what I want to

         19   do.

14:49:35 20        Let's take a break.  Ten minutes.  I want you and

         21   Peter to talk and figure this out.  I think you can probably

         22   boil it down.

         23        I mean, Pinon is already off the list from the eight

         24   that you just mentioned.  It sounds like this is very much

14:49:55 25   an active discussion.  I do think that you should probably

 1     agree to some more, but I will leave it at that.

 2          Okay?

 3                    MS. SWIFT:  Happy to do it.

 4                    SPECIAL MASTER COHEN:  So let's take a

14:50:03  5     ten-minute break.  It's literally 2:50.  We'll be back at

 6     3:00.

 7          Thank you, all.

 8                         - - -

 9                    (Recess taken at 2:50 p.m.)

15:01:34 10                       - - -

11                    (Court resumed at 3:01 p.m.)

12                         - - -

13                    SPECIAL MASTER COHEN:  Welcome back,

14     everybody.

15:02:01 15          Did you want to begin talking about Summit?

16                    MR. BOEHM:  Yeah.  Sure.  I can jump in to do

17     that while we're waiting for the others to return.

18          This is, again, Paul Boehm from Williams & Connolly.

19          I think on this issue I'm speaking on behalf of the

15:02:16 20     defendants collectively; although, others can jump in and

21     clarify or correct anything I say that doesn't match their

22     understanding.

23          I'm speaking on the question of a handful of witnesses

24     for Summit County where we've reached an impasse.  The

15:02:32 25     letter that we submitted to you, Special Master Cohen and

1       Special Master Yanni, I hope that you have it too.

2            And welcome.  I don't think we've officially welcomed

3       you today.  Thank you for being here today.

4            It is an October 20th letter from Sara Roitman.

15:02:47  5                  SPECIAL MASTER COHEN:  Sara?

6                  MR. BOEHM:  Sara Roitman from Dechert.

7                  SPECIAL MASTER COHEN:  Right.

8                  MR. BOEHM:  That's the letter that identifies

9       the six custodians in four different subject matter

15:02:55 10      categories where we've reached an impasse.

11           Two of the witnesses are in substance abuse services.

12      That's Donna Barrett and Yvette Edwards.  There's one

13      witness who is in child services.  One witness in the budget

14      and finance category.  And then two witnesses who are staff

15:03:16 15      to the Summit County County Council.

16           So I'll start with the substance abuse services

17      witnesses, Donna Barrett and Yvette Edwards.  Ms. Barrett is

18      the director of substance abuse for the Department of Public

19      Health for that county.  She's the one who manages that

15:03:37 20      program, which are housed in the Community Health

21      Department.  And none of the other public health custodians

22      hold that particular position, so that's why we've asked for

23      the production of Ms. Barrett's custodial file.

24           Ms. Edwards, as I understand it, works with Ms.

15:03:54 25      Barrett very closely.  She's more hands on the ground,

1    supervising substance abuse services provided to the

2    residents of Summit County through the Summit County Public

3    Health Department.

4                SPECIAL MASTER COHEN:  What is it that you

15:04:08  5    expect their files would reveal that you want to see?

6                MR. BOEHM:  We expect their files to reveal

7    several different things.  One, given that they are

8    responsible for substance abuse services in the county, we

9    ought to see in their files when and how the county was

15:04:24 10    actually addressing opioid abuse and use, in what forms were

11    they doing it, what requests for expenditures were made to

12    the county budget officials, how were -- how were those

13    monies actually spent.  This is a category of damages that

14    Summit County is claiming.

15:04:46 15                SPECIAL MASTER COHEN:  Why do you think you

16    need Edwards and Barrett?  I think -- I agree with you that

17    Barrett's files would likely reveal that information.  Why

18    Edwards also?

19                MR. BOEHM:  In part, it's because they cover

15:04:57 20    different periods of time.  So that's an aspect of it.  If

21    we had to choose, Special Master Cohen, I think we'd choose

22    Ms. Barrett, who seems to be the program director for

23    substance abuse services, but Yvette Edwards does cover a

24    slightly different period of time.

15:05:13 25                SPECIAL MASTER COHEN:  So you wrote would

1    likely cover a time period not covered by Barrett.  What do

2    you -- what do you mean?

3              MR. BOEHM:  I don't have the dates, and Tariq

4    might know the exact date, but my understanding is that Ms.

15:05:27  5    Edwards was in this -- in her role at the county Public

6    Health Department during the period of time when Ms. Barrett

7    wasn't.  I believe Ms. Barrett joined a bit later.

8         But, Tariq, do you have more on that?

9              MR. NAEEM:  Yes.  So there is -- sorry.  Tariq

15:05:42  10   Naeem for Janssen.

11        The temporal scope of it is a small issue there.

12   There is a little overlap in the middle.  Ms. Edwards, I

13   believe, and I may have them backwards, one started in 2014,

14   one in 2015.

15:06:01  15       But the bigger issue is where they are placed

16   vertically in the organization.  Summit County actually only

17   started providing substance abuse treatment and prevention

18   services in 2011 when it merged with Akron's Health

19   Department, so we're not talking about the availability of a

15:06:12  20   long period of time for these records.

21        Really, it's a vertical issue in terms of, you know,

22   you have somebody who's higher placed in the organization

23   who would be having organizational type discussions, budget,

24   et cetera, the things that Mr. Boehm was talking about.

15:06:27  25       Ms. Edwards, though, is placed closer to the -- to the

1    people who are actually providing treatment services,

2    prevention services to members of the community, which is

3    something that Summit Public Health does, and so, she would

4    be having the interface with the -- with the community

15:06:42  5    members.

6         And so, it's an issue of determining is -- is all of

7    Summit County spend related to opioid related substance

8    abuse issues or is it alcohol, is it marijuana, et cetera,

9    et cetera, et cetera?

15:06:55  10         And so, that little bit more fine tuned data is

11    critical to defendants' arguments in these cases, and she's

12    really the only person at that level that we've requested

13    that information from.

14              SPECIAL MASTER COHEN:  Is there anybody else

15:07:08  15    from -- I'm not quite sure exactly what this entity is --

16    whose custodial files you're receiving?

17              MR. NAEEM:  Yeah, there are.

18         There are I think five, five or six total, but if you

19    look at them, they're all placed in different -- they're in

15:07:25  20    different parts of the organization.

21         So there were five certified by plaintiffs' counsel.

22    One was the head of Summit Public Health, which is the

23    organization.  We did take her deposition already.  She has

24    very broad knowledge regarding the entire department's

15:07:44  25    operations, but -- but less specific knowledge about

1    substance abuse issues, which is just a small part of what

2    Summit Public Health does.

3         There is an epidemiologist they certified who will

4    have very, very narrow knowledge regarding the tracking of

15:08:02  5    data that Summit Public Health does.

6         There was somebody in the budget office who obviously

7    has very, very narrow knowledge that is not covered by the

8    two witnesses we just were talking about.

9         There was somebody in a Department of Clinical

15:08:18 10    Services or Clinical Health, which, you know, vertically is

11    not one of the parts of Summit Public Health that directly

12    provides substance abuse and treatment services.

13         And the --

14              SPECIAL MASTER COHEN:  That was Leanne

15:08:34 15    Beavers?

16              MR. NAEEM:  I'm sorry?

17              SPECIAL MASTER COHEN:  That was Ms. Beavers?

18              MR. NAEEM:  Ms. Beavers, yes, is the Clinical

19    Health director --

15:08:38 20              SPECIAL MASTER COHEN:  Okay.

21              MR. NAEEM:  -- which provides things like

22    immunizations and things like that, which are --

23              SPECIAL MASTER COHEN:  You said you did the

24    depo of the head.  Is that somebody above Donna Barrett?

15:08:49 25              MR. NAEEM:  Yeah.  Donna Skoda.  So she is the

1    head of Summit Public Health, has been in that position

2    since only 2015.

3                 SPECIAL MASTER COHEN:  Let's move on.

4         Thank you for that.

15:09:00  5                 MR. BOEHM:  Thank you, Tariq.

6         So moving to the next category, I'll just go to the

7    two individuals who are staff to the councils.  One, Mark

8    Potter is chief of staff to Summit County's Council.

9         In Summit County, we actually have not requested a

15:09:17 10   large number of custodial files from Summit County council

11   members.  And we thought that in light of that, a way to

12   kind of substitute for the fact that we're not going to get

13   those custodial files, getting this individual's custodial

14   file would substitute for the lack of custodial files we

15:09:36 15   were going to get from the actual council members.

16        Again, chief of staff who is going to have some

17   interface across the board with members of the Summit County

18   Council.

19                 SPECIAL MASTER COHEN:  Go ahead.

15:09:49 20                 MR. BOEHM:  An equivalent person but only for

21   the City of Akron is Mr. Bob Keith.  So same points I made

22   for Mr. Potter I would make again for Mr. Keith, only for

23   the City of Akron.

24                 SPECIAL MASTER COHEN:  Go ahead.

15:10:01 25                 MR. BOEHM:  With respect to the two remaining

1    on our list, Mr. Donofrio is the former county treasurer, he

2    retired in 2011, so he covers a period of time that we're

3    not otherwise going to have access to; and Ms. Anna Arvay,

4    who is in the Children Services Division but also,

15:10:24  5    importantly, was on the Alcohol, Drug, and Mental Health

6    Board as the chair of the finance committee for Summit

7    County, and that's why we've asked for her custodial file as

8    well.

9                    SPECIAL MASTER COHEN:  Okay.

15:10:47 10                   MR. ACKERMAN:  Good afternoon.

11        David Ackerman again, this time for Summit County and

12    Akron.

13        Special Master Cohen, I think it's important to note

14    two things here.  First, I want to note the history and the

15:10:57 15   number of custodians that Summit County and Akron have

16    provided.

17        Summit County and Akron certified 102 custodians on

18    September 14th.  Defendants then came back and requested an

19    additional 93 custodians.  We agreed, Summit County and

15:11:15 20   Akron, to add 11 custodians from their list of 93.

21    Defendants then narrowed their list to 12.  From that list

22    of 12, we added another three.  So now we're at 14

23    additional custodians.  Now defendants have come back and

24    asked for six.

15:11:34 25        It appears every time we agree to custodians,

1    defendants double the number and come back to us again.

2    This is the type of horse trading that Summit County and

3    Akron believed they were engaging in, but were not receiving

4    reciprocal horse trading from defendants.  That's the first

15:11:50    5    point.

6        The second point I'd like to make is the difference

7    in -- is to contrast the arguments that defendants are

8    making with respect to Summit County custodians with the

9    arguments they make in defending against the plaintiffs'

15:12:07   10    request for custodians.

11        And in doing so, I want to remind Your Honor that this

12    is Summit County's one shot.  While there may be other

13    bellwether cases, Summit County, Akron, Cleveland, Cuyahoga

14    have to litigate their cases based on this record.  And so,

15:12:26   15    if the Court is of the opinion that defendants may provide

16    one person from a department but not another, that rule

17    should apply as well to Summit County.

18        With that in mind, let me -- let me address each of

19    the custodians that Mr. Boehm just went through.

15:12:45   20        With respect to the Public Health custodians, Summit

21    County has designated eight custodians from its Public

22    Health Department, including the head who they took the

23    deposition and whose custodial file was produced in advance

24    of that deposition.  We do not believe that another two

15:13:05   25    custodians, especially two who have, frankly, not much

1    temporal overlap, are warranted here.

2        Ms. Barrett began with the Summit Public Health

3    Department in 2015.  Ms. Edwards was only with Summit Public

4    Health for two years, from 2014 to 2016.  We believe Ms.

15:13:26  5    Barrett's file would be duplicative of the other custodians,

6    and we do not believe the addition of Ms. Edwards would be

7    warranted here.

8        With respect to the two chiefs of staff, this is

9    another issue where we are -- both Summit County and Akron

15:13:44 10    have added members of their county council.  We added David

11    Hamilton from the Summit County Council.  We added Mike

12    Freeman from the Akron City Council.  But now defendants

13    say, well, we also want the chief of staff from that

14    council.

15:13:59 15            SPECIAL MASTER COHEN:  Maybe I misheard.  I

16    thought that opposing counsel had said that nobody on those

17    councils had been marked for custodial production?

18            MR. BOEHM:  No.  That's not correct.

19        The councils are quite large.  We've made a small

15:14:14 20    number of requests for targeted individuals on those

21    councils who have specific responsibility where plaintiffs

22    are alleging damages that are relevant to those

23    responsibilities.

24            SPECIAL MASTER COHEN:  Okay.

15:14:25 25            MR. BOEHM:  So the point I was making was that

1    there are many council members whose custodial files we're

2    not getting and this would be a substitute for that because

3    these would be individuals who would be interfacing across

4    the board.

15:14:37  5              SPECIAL MASTER COHEN:  Okay.  Go ahead.

6              MR. ACKERMAN:  So, again, we would view the

7    county councils as equivalent, frankly, to a board of

8    directors of a defendant.  And if defendants are not willing

9    to give us members of their board of directors, we have

15:14:51  10   already, on behalf of Summit and Akron, given our county

11   council members.  We don't believe that it is necessary or

12   appropriate to also add the chiefs of staff.

13        With respect to Ms. Arvay -- I apologize -- Ms. Arvay

14   is at Summit County Children Services.  They have eight

15:15:16  15   custodians from Summit County Children Services.

16        There is a point at which in order to prosecute this

17   case we need to draw lines.  We have provided -- these

18   aren't to fill gaps.  We have provided custodians from each

19   of these areas.  They just want more.  And there is a point

15:15:35  20   at which Summit County and Akron, having designated 102

21   custodians additionally, now up to about 115, having

22   produced three million pages, none of which are prior

23   productions, but all of which were collected and reviewed

24   for purposes of this litigation, there is a point where the

15:15:54  25   collection of custodians has to reach a reasonable end, and

1       we believe that in agreeing to add 14 custodians from the

2       original list of 93, we've reached that point.

3            Mr. Donofrio is a former treasurer.  To the extent

4       that he has information about the budgets, the budgets are

15:16:14  5       public.  We're not clear why his custodial file would be

6       necessary to discuss information that what -- what the

7       county spends and how it is spent are public budget

8       documents.

9                      SPECIAL MASTER COHEN:  Thank you.

15:16:29 10           So, you know, this is a little bit of be careful what

11      you ask for.  I almost feel like I should say you can have

12      all these folks if you increase the number of custodians

13      that you're producing by ten percent.

14                     MR. BOEHM:  Your Honor, I do think there's a

15:16:43 15      little bit of a false equivalency narrative that's going on

16      here, and I want to respond to that in a broad sense and

17      then return back to the specific request, because I do think

18      what's important here is we look at the specific requests.

19           Who are these individuals?  What are they doing?  Are

15:16:57 20      we already getting documents that are from other custodians

21      that would be redundant?  If the answer to those questions

22      is yes, we already are getting those documents, then, fine.

23           And, indeed, I think that with respect there was a

24      little bit -- I'd like to just clarify the process here.

15:17:13 25      It's not right that we waited for them to agree to some and

1      then piled on.  I mean, we have a large list, admittedly,

2      and, in part, when we told them about the list, we said

3      right up front we actually don't know all the details about

4      everybody on this list.  We think we kind of know where

15:17:29  5      people fit, but we're going to need your help, we're going

6      to need to meet and confer, and you got to tell us if we're

7      wrong.

8          And in some cases, we were wrong.  We thought they had

9      a responsibility, we thought they were not redundant, and

15:17:41 10      they told us that we were incorrect and --

11                  SPECIAL MASTER COHEN:  Here's the problem.

12          My sense is you all have said that to each other.

13      Certainly, the plaintiffs have said the exact same thing to

14      you with respect -- you, the defendants, broadly, and when

15:17:54 15      I'm making these calls, I'm looking at the extent to which

16      they're getting the same kinds of custodians already.

17          And they have far fewer custodians that they're

18      receiving information from in organizations that are much

19      larger.  Am I wrong?

15:18:16 20                  MR. BOEHM:  I think in -- it's important,

21      again, to understand the way the counties are set up and how

22      that's different from maybe how a defendant might be set up.

23          We've been told by multiple witnesses -- and, look,

24      Your Honor, or Special Master Cohen, my view is here we're

15:18:29 25      going to win some, we're going to lose some.  That's how

1       it's always been.  We've done that with respect to some of

2       the other parties that have been up here.  I don't know that

3       when we're talking about plaintiffs it should be different.

4                     SPECIAL MASTER COHEN:  It isn't different.

15:18:40  5   I'm just trying, as I said from the very beginning, to make

6       it more or less equal for both sides.

7              And when I hear that there are 120 custodians from

8       Summit County already and you're asking for more, as opposed

9       to 50 or 60 from an organization that is much, much, much

15:19:01 10  larger, then I begin to scratch my head and wonder if I am

11      being fair.

12                    MR. BOEHM:  So a couple points about that.

13             Number one, we are here actually talking about two

14      separate plaintiffs in this litigation.  One's Summit

15:19:13 15  County, the other is the City of Akron.  And they're

16      represented by the same counsel, so they oftentimes get

17      lumped together.  So that's one point, that the cumulative

18      numbers that are being addressed I believe account for two

19      separate plaintiffs in the litigation, not one.

15:19:26 20         Secondly, again, our view is about these particular

21      individuals.  When you look at them individual by

22      individual, we're just going to be left without information

23      that we think are important to our defenses in this case,

24      and, frankly, to investigating the claims that are being

15:19:41 25  made.

1        Damages.  When did you find out about these issues?

2    How did you find out about them?  How did you address them?

3              SPECIAL MASTER COHEN:  Well, as to damages, we

4    also have on the agenda the interrogatory number 18 topic.

15:19:53  5    I don't know if that's your topic, but what about that?

6    What about getting the information on damages in particular

7    you want through my ordering that the interrogatories get

8    answered instead of this mechanism?

9              MR. BOEHM:  I would be happy to withdraw

15:20:13 10    defendants' request for Mr. Donofrio, who is the former

11    county treasurer, if the Special Master intends to rule in

12    defendants' favor on interrogatory number 18 certainly.

13    That would certainly help.

14        I mean, we're obviously not getting all the custodial

15:20:29 15    file documents, but we understand there's a give and take

16    here and that we're not going to win every last issue.

17              SPECIAL MASTER COHEN:  Okay.  Anything else?

18              MR. BOEHM:  I think Ms. Wu has stood up

19    because she is actually responsible for interrogatory 18.

15:20:47 20              SPECIAL MASTER COHEN:  Yeah.  I don't want to

21    get to that yet.  Thank you.  I know they are interrelated.

22              MR. ACKERMAN:  The only point that I would

23    make is that the argument that they are not getting

24    information they need is the very same argument that Mr.

15:20:58 25    Crawford made with respect to Teva, that Ms. Scullion made

1    with respect to Endo, that Mr. Mougey is making with

2    respect -- I forget whether it was Walmart or Walgreens and

3    I apologize.

4         But this is -- if we're doing complete files, then

15:21:13  5    we -- then it's got to be complete on both sides; otherwise,

6    Summit County is fighting with one hand tied behind its

7    back.

8                        (Pause in Proceedings)

9                   SPECIAL MASTER COHEN:  Let's jump to

15:22:30  10   interrogatory 18 because I do want to talk about that.  I do

11   think that it is going to affect how I decide this other

12   topic.

13        That is agenda item number 9.

14                   MR. PIFKO:  Special Master Cohen, I e-mailed

15:22:46  15   you I believe yesterday, we're not prepared to talk about

16   it.  We haven't responded to that, their letter yet, and we

17   are going to produce additional information, and we believe

18   if they're dissatisfied with the information we produce in

19   our amended response, then we can -- we can tee it up then.

15:23:03  20   But it's not ripe at this point.

21                   MS. WU:  Special Master Cohen, this is Laura

22   Wu from McKesson and the distributors.

23        I'd ask you to take up this issue today.  We served

24   the interrogatory back in June.  It's been sitting for

15:23:15  25   months while we've conferred with the plaintiffs repeatedly.

1    We submitted our letter to you on October 15th.  We

2    requested that the plaintiffs submit a response so you'd be

3    able to take this issue up today, and as I e-mailed with you

4    last night, we request that you do that now.

15:23:31    5    We are entitled to damages calculations during fact

6    discovery so that we can follow up on the factual bases for

7    the damages assertions of the plaintiffs.  Only fact

8    witnesses in this case will have the foundation in order to

9    allow us to test those damages calculations, and, therefore,

15:23:53   10    we need this information now.  We can't wait any longer.

11    SPECIAL MASTER COHEN:  I'm going to ask you to

12    just take a swing at that.  I understand that you are going

13    to amend your responses.

14    MR. PIFKO:  David just talked about it, one

15:24:09   15    hand tied behind his back, I definitely feel that way

16    because we really haven't looked at this yet.

17    We do say that as far as the facts, if that's what

18    they're interested in, we're giving the facts.  I mean,

19    we're producing the data.  We're producing the -- the

15:24:23   20    financial reports.  You know, anything -- any facts upon

21    which our damages calculations are based, we're giving it to

22    them.

23    So, you know, they're asking us for more than that.

24    They're asking for the conclusions and what ultimately, you

15:24:36   25    know, we contend would be expert opinions and analysis, that

1    it's premature at this stage in the case.

2                 SPECIAL MASTER COHEN:  Hunter, did you want to

3    amend that?

4                 MS. WU:  Special Master Cohen, can I just

15:24:49  5    respond to Mr. Pifko's comment?

6                 SPECIAL MASTER COHEN:  No.  I want to hear

7    from Hunter, and then please respond to them both.

8          Thank you.

9                 MR. SHKOLNIK:  Hunter Shkolnik on behalf of

15:25:00  10   Cuyahoga County.

11          I would agree with Mr. Pifko that we are still going

12   to provide a formal response, but to suggest that we have

13   not provided the factual basis for which the defendants can

14   start challenging the damages claims is -- is really, really

15:25:18  15   unfair.

16          We can start with the suggestion that we've given them

17   extensive documentation from budget and management

18   specifically on the issues as to what costs are associated

19   with this opioid epidemic.

15:25:31  20         We've also given them medical -- I'm sorry -- costs as

21   well as countywide budgets broken down by year calculations.

22   We've given them the workbooks.  They've literally drilled

23   down to every single line item that could possibly be

24   related to the factual basis for the claimed losses for the

15:25:51  25   opioid epidemic.  They've already started taking depositions

1    of those individuals.

2         I'll continue.  We also have the county council

3    resolutions regarding the specific items and how the county

4    has adopted resolutions or rejected resolutions, as well as

15:26:07   5    the annualized MetroHealth reports, audited financials with

6    respect to each one of those items.

7         We can continue.  They've also gone into the county

8    medical examiners, as well as all of the cost bases, as well

9    as all of the costs associated with that office with respect

15:26:25  10    to the deaths and the overdoses as a result of this

11    epidemic.

12         To suggest we have not given them the factual basis

13    for the damages loss in this case is really just

14    unreasonable.  Can we give the ultimate conclusion?  What is

15:26:39  15    the total numbers that our experts are going to say?  We

16    cannot do that right now.

17         We are working with our experts.  We will supplement

18    with the -- with the final numbers.  But we have given them

19    the factual basis over and over and over again.  And that's

15:26:55  20    only just to touch on some of the damages -- sorry -- the

21    dollar amounts associated with the epidemic.

22              MS. WU:  Special Master Cohen, interrogatory

23    number 18, distributors' interrogatory number 18 exactly

24    tracks the requirements for initial disclosures in a federal

15:27:14  25    case under Rule 26(a).

1          SPECIAL MASTER COHEN:  Yeah.  I read your

2     letter.

3          MS. WU:  And that requires a computation of

4     damages.  To date, no plaintiff has provided any computation

15:27:23 5     of damages in response to interrogatory number 18.

6          I appreciate the list of materials that Mr. Shkolnik

7     identified for us today, and it's true, there's been a lot

8     of paper exchanged in this case.  But, to date, no one has

9     been able to identify any line item in the budgets Mr.

15:27:42 10     Shkolnik referenced that relates to opioids directly.

11          In addition, I'd like to just provide an antidote from

12     a recent deposition.  The Akron chief EMS officer was

13     deposed, Mr. Natko, last week.  During his deposition,

14     defendants inquired about the expenses related to Narcan,

15:28:03 15     which is one of the damages categories that Akron has

16     identified in this litigation.  Mr. Natko testified that, in

17     fact, Akron does not pay anything out-of-pocket, does not

18     make any expenditure in order to purchase Narcan, which

19     leaves the defendants puzzling, what is the damages

15:28:22 20     computation for Akron's alleged damages associated with the

21     purchase of Narcan?

22          This is the exact reason that defendants need this

23     discovery now so that we have the opportunity in fact

24     discovery to explore the damages calculations that

15:28:38 25     plaintiffs intend to put forward.

1         And on that point, the law is clear in the Sixth

2    Circuit and across the country that there -- that the expert

3    discovery is no replacement for fact discovery overall and

4    specifically with regard to damages.

15:28:51 5         Plaintiffs come forward saying that it's too

6    burdensome and impossible for them to provide damages

7    calculations now.  This interrogatory simply asks plaintiffs

8    to do what every plaintiff in a federal case is obligated to

9    do under Rule 26 at the outset of a litigation and that's to

15:29:12 10   provide damages calculations.

11             SPECIAL MASTER COHEN:  All right.  Let me go

12   back to where we started.

13        I'm going to order that Ms. Barrett's custodial file

14   be produced.  I'm not going to order anybody else's

15:29:27 15   custodial file be produced.  That's without prejudice to

16   coming back to me later.

17        In the meantime, I want to see what the plaintiffs do

18   with -- with regard to interrogatory 18.  I think that

19   defendants have a very good argument on that point.

15:29:44 20   You've -- you've said that you're going to amend your

21   responses.  I think that that's appropriate that you amend

22   your responses, and I think that the Federal Rules of Civil

23   Procedure do require you to give much more than you have.

24        It's my hope that after that, I won't need -- I won't

15:30:02 25   hear from defendants that they need some of these custodians

1    who at this time I am not ordering production.

2        Okay?

3                MS. WU:  Special Master, could we ask that we

4    receive those amended responses within a week?  We have very

15:30:16 5    important depositions on the calendar upcoming and will need

6    those written amended responses to evaluate the state of the

7    damages case.

8                MR. SHKOLNIK:  Would it be possible to have

9    two weeks on that, Special Master Cohen?

15:30:38 10                SPECIAL MASTER COHEN:  What kind of depos do

11    you have?

12                MS. WU:  I --

13                SPECIAL MASTER COHEN:  And when are they?

14                MR. SHKOLNIK:  I don't think as to Cuyahoga

15:30:47 15    there's anyone that's really going to be jeopardized, but I

16    could be wrong on that.

17                MR. BOEHM:  I don't -- I'm stepping up, but

18    not because I know the schedule by heart.  I do know that

19    there's at least one finance director, I believe it's for

15:31:05 20    Summit County, who's going to be deposed on November 6th.

21    So that's the earliest I can think of just off the top of my

22    head.

23                SPECIAL MASTER COHEN:  Can you do it by

24    November 5th?

15:31:18 25                MR. SHKOLNIK:  Yes, Special Master.

1           SPECIAL MASTER COHEN:  All right.

2           MR. ACKERMAN:  Yeah.

3           SPECIAL MASTER COHEN:  Thank you, all.

4           MS. WU:  Thank you.

15:31:29  5           SPECIAL MASTER COHEN:  All right.  I think we

6    are all the way back now to where Peter Weinberger stood up.

7           MR. BOEHM:  Not yet, Special Master Cohen.

8       Actually, there's agenda item number 4 which we would

9    be skipping over if we -- we went to where Peter was going,

15:31:44  10   I believe.

11          SPECIAL MASTER COHEN:  I thought we touched on

12   this?

13          MR. BOEHM:  Not quite.  Not today.

14          SPECIAL MASTER COHEN:  Go ahead.

15:31:50  15          MR. BOEHM:  I think last week we had hoped

16   that we would be able to work this out completely and

17   wouldn't have it on the agenda at all.  The good news is we

18   have worked this out 99 percent of the way.

19       So we had the 14 --

15:32:02  20          SPECIAL MASTER COHEN:  Better than we have

21   done anything else.

22          MR. BOEHM:  I agree, it is.

23       We had a list of people for whom we wanted earlier

24   depositions, and I know you're familiar with that, that

15:32:13  25   issue.

1          We've narrowed it down really to three, and I spoke

2     with counsel for Cleveland today and they told me they're

3     going to be getting us earlier dates for two of those three.

4     So that gets us down to one.  And this is somebody who

15:32:27  5     Cuyahoga County has said we shouldn't get a deposition of at

6     all, and you're going to hear his name, you've already heard

7     his name today, so I'm going to come back to it.  It's Mr.

8     Kennedy, the chief budget person for Cuyahoga County.

9          And I just want to -- so we've already addressed that

15:32:42 10     in the context of his custodial file production.  The

11     question that this raises is whether or not we can take his

12     deposition, and, if so, can we take his deposition earlier?

13     This is somebody who we asked for an expedited deposition of

14     because we believe his deposition and his testimony will be

15:32:56 15     informative of the question of whether or not the council

16     members, the mayors, the chief executives for the counties

17     ought to be deposed at all.

18          And the reason we think that is because he has been

19     identified by Chris Murray, the treasurer for Cuyahoga

15:33:12 20     County, as being the one who can answer questions that he

21     couldn't ask, having to do with the claimed damages that

22     come in the form of the increased public expenditures in a

23     variety of categories:  Law enforcement, public health,

24     child and family services, and so on.

15:33:26 25          And I know there's been this talk about how, well,

1    he's the budget guy for Cuyahoga County and we got to get

2    the budget guy for somebody else, but I just want to be

3    clear that we're looking at him particularly based on the

4    specific allegations at issue in this case.  We ought not be

15:33:42  5    so simplistic that we say this guy has this title, so on the

6    other side we should find somebody with the same title.

7        The question is:  Do they have information that is

8    material to the claims and defenses in this case?  And in

9    the instance of Mr. Kennedy, I don't think there can be any

15:33:58 10    question about that.  He is somebody who has express

11    authority in terms of the requests for expenditures and the

12    actual expenditures by Cuyahoga County when it comes to the

13    claims where they're alleging specific damages in the form

14    of public expenditures.

15:34:16 15            SPECIAL MASTER COHEN:  This is just a question

16    of when not whether, right?

17            MR. BOEHM:  This is -- well, I think if you

18    ask Mr. Shkolnik, he might say it's a question of whether.

19    But I don't speak for him.  I think up until now it has been

15:34:29 20    a question of when.

21        We were surprised to find out that Cuyahoga County's

22    counsel was taking the position that Mr. Kennedy ought not

23    be deposed at all, and I think that's a relatively recent

24    developed position, so I'll let Mr. Shkolnik speak to that.

15:34:43 25        Our position had been under the presumption that we

1    were going to get his deposition at some point, that we

2    ought to get it sooner than later for the reasons that we

3    already explained.

4                MR. SHKOLNIK:  Hunter Shkolnik on behalf of

15:34:58  5    Cuyahoga County.

6         After a while, I think we haven't done anything right

7    in this litigation in terms of discovery.

8         I thought the CFO issue was dealt with already,

9    whether it's deposition or custodial file.  We're talking

15:35:12 10    about Mr. Kennedy, who is -- who is the CFO of the county.

11        What Mr. Boehm fails to point out is they asked for

12   three.  They asked for other expedited depositions, one of

13   whom was supposedly the important witness on financial

14   issues, and that was Maggie Keenan, the actual real person

15:35:34 15    that should be getting deposed, if anything, quickly over

16   anybody else, and that was the director of Office of Budget

17   and Management.  We gave that date.  They didn't exercise

18   it.  They didn't ask us for a new date.  We gave it to them

19   on an expedited basis.

15:35:49 20        They have this witness.  It's coming up.  The issue of

21   whether or not Mr. Kennedy, the CFO, should be deposed or

22   whether his custodial file should be produced is exactly

23   what we were talking about over two hours ago, and I think

24   it should be handled in that context, so that we decide if

15:36:06 25   Cardinal wants to put up their CFO on an expedited basis as

1    well, I'm sure one of my colleagues here will take that

2    deposition, and we'll put them up back to back on the same

3    day.

4         I think we should wait until this whole issue is

15:36:19  5    resolved the way we talked about before.

6              MR. BOEHM:  Special Masters Cohen and Yanni, I

7    just need to address again that last point.

8         If our clients were bringing claims against Mr.

9    Shkolnik's clients where we were alleging damages in the

15:36:36  10   form of increased expenditures made by us, I think that,

11   yeah, the person who is responsible for those expenditures

12   and those budgeting will probably need to be deposed.

13        It's a false equivalency to say on one side you've got

14   a party who is bringing claims alleging damages in the form

15:36:52  15   of public expenditures and we don't get to depose the person

16   who is responsible for that, and -- unless on the other side

17   you find somebody with the same title, not withstanding the

18   actual allegations or defenses at issue in the case.

19             SPECIAL MASTER COHEN:  Well, here's the thing.

15:37:05  20   It's a false equivalency, I agree, to the extent that their

21   CFO is equivalent to your CFO.  I think that is, to some

22   extent, a false equivalency.

23        I don't think it's a false equivalency to say that the

24   number of custodians that they're producing in the areas

15:37:22  25   that they're producing shouldn't be more or less equal on --

1    on the appropriate topic matters, which may be different

2    across the aisle.

3        It seems to me that if we go back to the reason that

4    we were doing early depositions of folks, it was that we

15:37:42  5    were doing early depositions of folks to see if we got what

6    we needed without deposing the Apex, and I think that he's

7    an Apex, and so, I'm going to say that this is not

8    appropriate at this time.

9        I'm not saying that it can't happen.  I'm just saying

15:37:55 10    that I'm not going to order that it happen early.

11                MR. BOEHM:  Okay.  Thank you.

12                SPECIAL MASTER COHEN:  All right.  Where are

13    we?

14                MR. MOUGEY:  We could bring Walgreens in for a

15:38:09 15    landing.

16                SPECIAL MASTER COHEN:  Are you guys smiling at

17    each other or not?

18                MS. SWIFT:  Sorry?

19                SPECIAL MASTER COHEN:  Are you smiling at each

15:38:20 20    other or not?

21                MS. SWIFT:  I was smiling at you, Special

22    Master Cohen.

23        Kate Swift for Walgreens.

24        We made a little bit of headway.  Mr. Mougey has

15:38:28 25    agreed to walk away from two of the custodians on the

1    remaining list.  He can't tell me right now who those two

2    are, which is fine.  I think that means we need to keep

3    talking.  I think we very well may be able to reach an

4    agreement.

15:38:42  5    And the only other thing I would say right now is with

6    respect to the types of custodians that the plaintiffs have

7    asked for, we have given them people in every single

8    category.  In most cases, more than one.  They've asked for

9    distribution center people, we've given them several.

15:38:59  10   They've asked for people in loss prevention and asset

11   protection, which was one of the categories the witness Mr.

12   Mougey referred to testified about.  We've given them SAIL

13   coordinators because they've asked for those.

14                SPECIAL MASTER COHEN:  Right.  You guys have

15:39:14  15   until noon.  Get as far as you can, send me an e-mail tell,

16   me what's left, I'll rule.

17                MS. SWIFT:  Thank you very much.

18                MR. MOUGEY:  May I respond very quickly?

19                SPECIAL MASTER COHEN:  No.  I got it, I

15:39:25  20   promise.

21                MR. WEINBERGER:  I --

22                SPECIAL MASTER COHEN:  I went to the dentist

23   this morning and had nitric oxide, so I'm very mellow, guys.

24   I promise I'm not being a hard ass.

15:39:44  25                MR. MOUGEY:  I thought you were going to say

1    it was better than this.

2              SPECIAL MASTER COHEN:  It actually was in some

3    ways.

4              MR. WEINBERGER:  So this topic is fairly

15:39:52  5    simple, but it is so important.  So a lot --

6              SPECIAL MASTER COHEN:  I'm sorry.  What agenda

7    item are we on?

8              MR. WEINBERGER:  So production of documents --

9              SPECIAL MASTER COHEN:  Go ahead.

15:40:02 10              MR. WEINBERGER:  -- item five.

11              SPECIAL MASTER COHEN:  Yes.

12              MR. WEINBERGER:  Peter Weinberger.  Sorry.

13         And it has to do with our charts and it has to do with

14    CMO-7 and it has to do with part -- partly with what we've

15:40:19 15    been talking about today in terms of kicking some of these

16    issues down the road.

17              SPECIAL MASTER COHEN:  You said CMO-7.  You

18    mean discovery ruling 7?

19              MR. WEINBERGER:  No.  I'm talking about CMO-7,

15:40:31 20    the deadlines under CMO-7.

21              SPECIAL MASTER COHEN:  Okay.

22              MR. WEINBERGER:  And we all need to be

23    reminded, plaintiffs and defendants, that we have a deadline

24    two days from now for substantial completion of documents,

15:40:44 25    except with respect to the retail -- retailers and those

1    that were added late to the litigation, and the deadline for

2    that is November 9th.

3         So we devised on our side a number of ways to get

4    reports from the defendants as to where they were with

15:41:06    5    respect to completion of the production of documents over

6    the last six weeks.  We've been somewhat successful in

7    getting information, and less successful with respect to

8    some of the defendants.

9         But I think we need to be reminded of the fact, going

15:41:21    10    back to, let's just take the distributors' case and our

11    discovery against the distributors, we, starting on

12    August 17th, in Mr. Farrell's letter, asked for

13    transactional data.  We wanted prioritization of tractional

14    data back to 1996, suspicious order reports from the CT-1

15:41:45    15    bellwethers from 1996 to the present, and the controlled

16    substance monitoring program or the suspicious order

17    monitoring system from 2006 to the present, and we devised a

18    chart to try to get information as to where we were on those

19    productions.

15:42:02    20         So now we're two days from what is supposed to be

21    substantial completion and we really don't know where we are

22    in terms of these priority items, let alone complete

23    production, which is what, you know -- I mean, I helped

24    negotiate this and you approved it.  CMO-7 was to

15:42:25    25    substantially complete production of documents by

1   October 25th or November 9th.

2        So I'm looking at this from a -- from 30,000-foot

3   perspective.  Peter Mougey can maybe add some of the

4   granular statistics.

15:42:43  5        Here's our proposal.  October 25th is in two days.

6   With respect to all the defendants, except the retailers and

7   those -- those recently added, we suggest that both sides,

8   this applies to the bellwethers as well as the defendants,

9   report to the Court by Monday, October 29th, what percentage

15:43:09 10  of documents have been produced with a description.

11       And assuming we're going to have a discovery

12  conference with the -- with Special Master Yanni on the next

13  day, if we're going to do on Tuesdays instead of Monday, we

14  can then discuss it at that time as to where we are.

15:43:27 15       Because the whole purpose of CMO-7, and we're

16  starting, you know, depositions in earnest as of

17  November 1st under CMO-7, and then we have less than three

18  months to complete --

19                  SPECIAL MASTER COHEN:  What do you mean a

15:43:42 20  description?

21                  MR. WEINBERGER:  Pardon me?

22                  SPECIAL MASTER COHEN:  You said with a

23  description.  What do you mean?

24                  MR. WEINBERGER:  What -- what still needs to

15:43:48 25  be produced and what are the categories of documents.

1          So let's just take, with respect to the distributors

2     and the priority items, you know, where are we on suspicious

3     orders going back -- reports going back to 1996?  Where are

4     we on the transactional data?  I mean, that's just an

15:44:06  5     example.  But we need specifics, Special Master Cohen.

6               SPECIAL MASTER COHEN:  How would you, the

7     plaintiffs, answer the question:  What percentage of the

8     documents that are going to be produced have been produced?

9     How would you do that?  How do you know how many are going

15:44:21 10     to be produced?

11               MR. WEINBERGER:  I'm assuming that knowing

12     that we wanted to prioritize these documents, using these as

13     examples, that they have pulled them and that they are

14     reviewing them and that they have, you know, estimates of

15:44:38 15     numbers and they know what they produced and what they

16     haven't.

17          I don't think that's -- that's not rocket science.  I

18     mean, that's -- and, you know, we have to be able to review

19     the documents to prepare for the deposition.

15:44:52 20          Now, you ordered us within a limited amount of time to

21     produce our data on the suspicious orders based upon the

22     ARCOS data and you gave us a limited amount of time to do

23     that.  They've had months and months to do this.  All we're

24     asking is that all the defendants, with respect to the

15:45:17 25     categories that we've prioritized as well as those that

1    we've requested in our requests for production of documents,

2    report to us what it -- what has been completed and what

3    hasn't.

4        I mean, we -- we both negotiated, both sides

15:45:35  5    negotiated this in good faith, that we would have this done

6    by October 25th so that we can take targeted, effective, and

7    efficient depositions.  We're -- you know, we're going to be

8    starting those depositions -- we've been taking depositions,

9    but the depositions in earnest in large numbers are supposed

15:45:58 10    to start immediately.

11        So that's our proposal.

12                SPECIAL MASTER COHEN:  Let me -- what is the

13    provision in the CMO?  And which CMO?

14                MR. WEINBERGER:  So CMO-7 says by October 25th

15:46:23 15    for all parties, except retail pharmacy defendants,

16    production of documents shall be substantially complete.

17        And the date is November 9th with respect to the

18    retail pharmacy defendants and those other defendants that

19    were subsequent or late joined to the litigation.

15:47:02 20                (Pause in Proceedings)

21                SPECIAL MASTER COHEN:  I'm just thinking about

22    your proposal and wondering about what you would propose

23    with regard to full completion?

24                MR. WEINBERGER:  Well, again, going back to

15:47:38 25    the negotiations that led to this order, I mean, I think it

1    was contemplated that there would be complete production by

2    these dates, realize -- and that substantial meant more than

3    90 percent production.

4         Mr. Cheffo's on the line.  He can -- he can confirm

15:47:57  5    that.  It certainly didn't mean 50 or 60 percent.

6              MR. CHEFFO:  Yeah.  This is Mark.

7         So I don't know if anyone else -- you seem like you

8    were directing it more to the distributors, but I don't know

9    if that was by way of an example, and I can't see,

15:48:16 10   obviously, into the courtroom.

11        But here's what I would say.  One, the context of

12   reporting and status, you know, doesn't seem whacky to me

13   and basically applies to each side.

14        I think you'd find, I may be wrong, but I think you'd

15:48:32 15   fine that the --

16              SPECIAL MASTER COHEN:  Mark, you've got to

17   slow down.  It's really hard to hear you.  So if you can

18   just talk a little bit more slowly.

19              MR. CHEFFO:  Okay.  I'll try to be very brief

15:48:53 20   and very slow.

21        What I said was that I don't materially disagree with

22   the concept of a reporting where the parties basically would

23   say, you know, here's what we generally have to do, here's

24   what we're working on, and here's -- I think that the idea

15:49:12 25   of percentages when you don't know the numerator and

1   denominator I think is kind of a little bit of a challenge,

2   it would just be busywork.

3       So if the idea is, you know, for the parties to by the

4   deadline they set try to give a report and say here's what

15:49:31 5  we've done, here's what we're working on, as long as that's

6   done for everyone, including the plaintiffs, then I think,

7   you know, obviously, from our perspective, that's consistent

8   with the spirit of what we -- we entered into.

9       I don't think any of us, though, really want to add

15:49:46 10 lots of, you know, calculations and work, because I do

11  disagree with one thing.  If you know you have to search

12  John Smith's custodial file and you haven't done that yet,

13  you haven't collected it, you don't really know what's in it

14  and how percentages and things like that -- let me stop

15:50:07 15 there.

16      MR. WEINBERGER:  So, absolutely, this applies

17  to the bellwethers as well as to the defendants, and -- and

18  I didn't hear Mark answer the question, but I really do

19  believe that it was our intent, and I know that we have

15:50:26 20 negotiations as to custodial files that are new custodians,

21  you know, over the last couple weeks, but the fact of the

22  matter is it was the -- the whole reason for the schedule

23  was that we would have, you know, 90 percent of the

24  documents in our possession from the defendants by

15:50:48 25 October 25th, realizing -- and that it wasn't going to be

1    back, you know, back loaded.

2         And, you know, you may recall, Special Master Cohen,

3    that we had those discussions about that kind of language

4    and we agreed that we weren't going to back load, and we --

15:51:07  5    both sides understood that we needed to have documents

6    reviewed and we wanted to target depositions.

7         And part of the reason for all the charts that we were

8    doing was to try to get specific as to where we were on the

9    production of these documents.  Well, that hasn't happened.

15:51:25 10    I'm not faulting anybody, any defendant in particular, but

11    we're up against the deadline and we have three months to

12    complete our discovery depositions.

13         And so, we need some finality or some certification

14    ultimately that the production has been completed, and to

15:51:45 15    the extent that there are not -- there are documents that

16    are not produced, they can't ultimately be used, you know,

17    in the trial of this case.

18              SPECIAL MASTER COHEN:  Well, let's talk about

19    that for a second.

15:51:56 20         So in some instances that is the cure, that is, to say

21    if they don't produce a document, then they can't use it.

22    If it helps them, then it's a cure.

23         But it sounds like what part of your complaint is or

24    that your worry is or even suspicion is is that you haven't

15:52:17 25    received documents timely, that you're going to get a report

1    that says we've only produced 50 percent, or something like

2    that, of what we think we'll eventually produce, or there

3    are whole areas that we haven't really done much on yet, and

4    those are documents that -- that could be helpful to you.

15:52:35  5    So how does that -- I mean, I'd like to think that

6    maybe there are rules to put in place that act as a carrot

7    and a stick.  I'm just not sure that's right all the time.

8         MR. WEINBERGER:  I agree wholeheartedly with

9    the concept, and the only thing I can tell you, we'll

15:52:55  10    respond at the time that we find out what the documents are,

11    how far -- how far along they are in producing the documents

12    and what documents they haven't produced, and then we can

13    decide at that time, you know, what our remedy is.

14    But, you know, it doesn't -- this doesn't take away

15:53:12  15    from the fact that part of the reason why we -- both sides

16    agreed to postpone the trial date and to build in this

17    schedule was that we would complete the -- the document

18    production by this date.  And, you know, not 50 percent, not

19    40 percent, but substantially, meaning 80 or 90 percent.

15:53:38  20    And I -- I just can't fathom that these sophisticated

21    defendants can't provide us with an estimate within the next

22    couple days of where they are in the production,

23    particularly of the -- well, of everything we've asked for,

24    but particularly those that we've prioritized as set forth

15:54:01  25    in the letter of August 17th.

1          MR. CHEFFO:  This is Mark.  I apologize.  I'm

2     in a bad spot and keep dropping, so I'm just going to say

3     this briefly.

4          SPECIAL MASTER COHEN:  Mark --

15:54:14  5          MR. CHEFFO:  I don't know there's -- I don't

6     know if Pete knows there's an issue.  He's basically saying

7     that he hasn't gotten some visibility into what's there or

8     not, and we're talking about 40, 50 and 80, and I don't know

9     from each defendant what the percentage will be.

15:54:31 10          But where I think and I agree, and where I think the

11     spirit was, is that the sides would use this not as a -- the

12     25th not as a kind of -- that everybody would be working

13     very hard on both sides to get things done.  I think it's

14     fair to take stock and say what needs to be done.

15:54:52 15          I think it's also -- you know, on all sides, frankly,

16     there's a lot that we talked about just today where you

17     ordered parties to produce, there's things you ordered three

18     days ago for the defendants to produce, things for the

19     plaintiffs, so this idea of trying to -- you know, it's

15:55:07 20     currently a moving target except there's new information.

21          But where I think we agree is that we do go ahead with

22     depositions, we want information from them, they want

23     information from us, and the parties, basically on both

24     sides, indicate what remains to be done and -- and continue

15:55:25 25     to talk about it, and then, if there's priority issues, we

1    can identify those.

2         And like Pete said, if anybody feels --

3              SPECIAL MASTER COHEN:  Hold on a minute,

4    please.

15:55:45  5              MS. STRONG:  This is Sabrina Strong

6    representing Janssen.

7         And, first, I want to point out something here.  This

8    is the first that I have ever heard of this request.  And

9    I've talked to some colleagues over here, and this is the

15:55:56 10   first that any of the folks I've just whispered to in the

11   room has heard of this request.

12        And from my perspective, this has happened multiple

13   times, and I think it's a waste of your time and it's a

14   waste of all of our time.  If plaintiffs have a proposal,

15:56:09 15   you heard Mark Cheffo speaking, and I think consistently

16   with the -- with the principal of the defendants, we agree

17   that maybe something can be done here.

18        But, please, we think it's appropriate to approach us

19   outside of your presence so we can talk it through and

15:56:26 20   discuss the issue.  Because if we want to get into issues --

21   something that came up in the context of the discovery

22   disputes that we have yet to talk about here today is that

23   we learned that Cleveland, for example, has and is still

24   collecting and reviewing three to four terabytes of data

15:56:44 25   from at least the following network drives:  Finance,

1      police, municipal court, fire department, none of which has

2      been produced yet.  And, yes, we are two days away from the

3      deadline.

4           So we too believe that there are significant problems

15:56:57  5      with plaintiffs' production and being substantially complete

6      by the 25th.  In fact, we asked -- we talked about this in a

7      meet and confer discussion last week in connection with

8      Cleveland and we asked the question:  Please let us know

9      when it is that you believe that you will be substantially

15:57:14  10      complete given that the deadline is coming up.  We're meet

11      and conferring.  That's ongoing.  That wasn't teed up to be

12      brought to your attention today.

13           But I say that to take a pause and I think the parties

14      should discuss this outside your presence and bring to you

15:57:27  15      disputes that are properly ripe.  There are many other

16      examples of this that we could go into, but it's -- it's

17      frustrating and it's not productive.

18                MR. WEINBERGER:  Well, with all due respect,

19      this has been an ongoing conversation.  It has been your

15:57:42  20      directive almost every time we have had a discovery

21      conference, you've either in the middle or at the end,

22      you've talked about the fact that we have deadlines that

23      have to be met and you were expecting substantial completion

24      of the document production, multiple times during discovery

15:58:01  25      conferences.

1      So to suggest that we're bringing this up, you know,

2  for the first time and that we need to meet and confer, we

3  have a CMO-7.

4           SPECIAL MASTER COHEN:  All right.  Here's --

15:58:10  5           MR. WEINBERGER:  That's -- that's an order to

6  both sides.

7           SPECIAL MASTER COHEN:  Here's what I'm going

8  to suggest.  This is what I want you to do.  I don't know by

9  when I want you to do it, because I'm not sure exactly what

15:58:31  10  I'm asking, I'm not sure I know how long it would take to do

11  this, and I don't want to set a deadline for anybody that

12  can't be done or that's oppressive.

13      But I think it makes sense, given where we are in the

14  discovery process, for everybody to write down for everybody

15:58:51  15  else how much more they think they have to do.  What's left?

16  It doesn't have to be in a percentage.  It doesn't have to

17  be this is how many documents we think we're going to end up

18  producing when we're all finished and this is how far along

19  we are.

15:59:06  20      But everybody should write down this is what we still

21  have to do to meet the obligations in discovery to the other

22  side, so that if Cleveland believes that it still has four

23  terabytes worth of data to go through, write it down.  This

24  is what we still have to do before we're finished.

15:59:23  25      And probably, I guess I'm just making this up as I go,

1    it should also include a -- an estimate of when that will be

2    done, when it will be finished.

3        Now, it seems to me that that can probably be

4    something that everybody can produce in five days or less.

15:59:42    5    And now I'm kind of looking around the room and asking for

6    folks to tell me what makes sense and whether that's a good

7    idea or if there's a way to improve it.

8                    MR. RICE:  Joe Rice for the plaintiff.

9        The problem is it's got to be targeted.  We've sent

16:00:00   10    letters three or four times over the last two or three

11    months to the defendants giving priority to category of

12    documents that we needed and what we get is everything but

13    those categories.  So we need to know what marketing

14    materials they have left to produce.  Let's find out what

16:00:16   15    the targeted items are.

16        So your idea is fine as a beginning point, but this

17    can't be we think we've got, you know, 6,000 documents left.

18    It needs to be targeted so we know what we're looking at so

19    we can then address the problem specifically.  Just giving

16:00:31   20    us a general number is not going to get us anywhere.

21                    MR. MOUGEY:  Let me give you an example.

22        Peter Mougey.

23        We have these priority charts we all negotiated.  I

24    mean, it's almost -- I mean, it was almost kindergarten, we

16:00:44   25    were negotiating charts to keep track.

1       But now we're to the third week of getting these, and

2    I'll give you two -- this was in Paul's August 17th letter,

3    substantial order monitoring policies and procedures.  Just

4    tell us where they are and where you're in the process of

16:00:58  5    producing them.

6        This is Anda.  Suspicious -- substantial completion by

7    11-9-2018.  So we're still -- this is from August.  This was

8    our number one priority, in the top five, files containing

9    due diligence for suspicious orders.  The answer,

16:01:14 10    substantial completion by 11-9-2018.  Those were our top

11    five and those are the answers we're getting.

12       So all of this infrastructure is in place for, just

13    like Joe just said, detailed reporting, give us the top

14    five, give us the priorities, tell us where they are.  Can

16:01:30 15    we start here?  Those are the foundational building blocks

16    and those are the answers we're getting in our -- in our

17    charts, and they're not helpful.

18       So we have -- we can do all of these processes, Pete's

19    idea is a good one, but all of this together is what we

16:01:44 20    need.  Give us detailed answers.  And if ours aren't

21    detailed, let us know and we'll update them.  But these

22    answers, hey, we'll give it to you by 11-9, is I don't think

23    what anyone envisioned when we put this together.

24            MS. STRONG:  And this is Sabrina Strong again.

16:01:59 25       One of the points I wanted to bring to your attention,

127

1    again, this goes to why the parties ought to meet and confer

2    and talk about these issues before discussing with you, is

3    that we just learned recently that apparently plaintiffs'

4    vendor Ricoh is unable to upload more than five gigabytes of

16:02:19  5    data.

6         And we are thinking that some of the disconnect

7    between plaintiffs' documents, saying we're concerned you

8    haven't produced X, is really a problem with their vendor,

9    that things haven't been uploaded.  And I say this to say

16:02:29  10    that I don't know the answer to this, Special Master Cohen.

11    It's issues that the parties ought to be talking about and

12    discussing and coming up with something that we -- we all

13    want production, so, absolutely, we've got to figure this

14    out because we want their documents just as much as they

16:02:42  15    want ours.

16         So I just -- there are issues here that need to be

17    fleshed out among the parties.

18              MR. MOUGEY:  We have given that tracking,

19    document tracking, and this morning is a great example.

16:02:54  20    I --

21              SPECIAL MASTER COHEN:  Yeah.  I don't need to

22    hear about Ricoh and document tracking and numbers, and I

23    get that, you know, it depends on the day and, literally,

24    Monday is different from Sunday.

16:03:06  25         There will come a point, I promise, where I am going

1       to say if the suspicious order monitoring policies have not

2       been produced, you cannot rely on them.  Now maybe it is the

3       case that there aren't any and that's -- and it enures to

4       the plaintiffs' benefit.  That time will come, and it's not

16:03:27  5     too far away.

6            And the same thing happens with every other category

7       of information, and that works both ways.  It goes against

8       plaintiffs and defendants.  What I'm going to suggest is, in

9       fact, that you do confer and you come to an agreement on

16:03:41 10     what kind of report everybody is going to give everybody

11      else, broken down by category, suspicious order reports,

12      transactional data, whatever else it is that was in

13      Farrell's letters as far as what plaintiffs want from

14      defendants with its -- I think it was a dozen different

16:03:57 15     categories of discovery, and the extent to which those have

16      been produced.

17           If I were in town, I'd help you do it.  I'd sit in a

18      room with you and we'd figure out exactly what categories

19      and what has to be reported.  I'm sure you all can do that.

16:04:17 20     This isn't a new topic at all.  But it is time for us to get

21      a very good understanding of what's been finished and what

22      is still to come.  And there will be -- there will have to

23      be, there must be eventually some final deadlines and

24      sanctions for not meeting obligations.

16:04:38 25               MR. WEINBERGER:  So I think we should, with

1    all due respect, put a deadline on this, put a time frame.

2                     SPECIAL MASTER COHEN:  I agree.

3                     MR. WEINBERGER:  So my suggestion is that we

4    meet and confer and that we create this reporting document

16:04:54  5    by Monday.  In other words, what's the form look like?

6                     SPECIAL MASTER COHEN:  So ordered.

7                     MR. WEINBERGER:  We can meet with Special

8    Master Yanni --

9                     SPECIAL MASTER COHEN:  So ordered.  You got

16:05:04 10    it.  Monday.

11                     MR. RICE:  He said yes.

12                     MR. WEINBERGER:  Okay.  I heard.  I heard.

13                     SPECIAL MASTER COHEN:  Monday is fine.  Monday

14    is reasonable.  I don't think Monday should be any problem.

16:05:14 15    It's going to be a lot of parties, but you're all going to

16    have to get together and figure out a mechanism to report to

17    each other what you have done and what there is left to do

18    by category.

19        Okay?

16:05:32 20                     MR. WEINBERGER:  Thank you.

21                     SPECIAL MASTER COHEN:  The good news is that

22    we're challenging my computer's RAM.  I've got so many

23    documents open I can't find them now.

24                     MR. WEINBERGER:  While you're looking, since

16:06:00 25    everybody's here who I think we'd have to have discussions

1    with, our suggestion is that whenever we close this session,

2    that we sit with the other side and try to come up with a

3    document with these categories.

4               SPECIAL MASTER COHEN:  Please remind me of

16:06:17  5    that when we adjourn.

6                    (Pause in Proceedings)

7               SPECIAL MASTER COHEN:  All right.  Are we --

8    where are we?  Only up to 6, number 6, dispensing

9    information.

16:06:57  10       As I mentioned before, I've actually written several

11   pages on this but wasn't ready to send it out because I just

12   thought I needed to hear a bit more from the parties.

13        Assume I've read everything, assume I thought hard

14   about it.  If you have anything more you want to add, that's

16:07:14  15   fine.  And I did want to focus on those -- those two

16   requests for production.

17               MR. PIFKO:  Thank you.

18        I mean, I think all my arguments hopefully were

19   clearly stated in our -- in our written submission.  I'm

16:07:26  20   happy to answer any questions, and, of course, respond to

21   anything that the defendants want to raise.

22        But I think this data is indisputably relevant.  It

23   always has been.  It pertains to the red flag issue.  It's

24   called for in both the policy and procedure type of requests

16:07:43  25   for productions because it -- knowing about these

1   potentially illegal dispensing practices was part of their

2   suspicious order monitoring programs, and it's certainly

3   called for with respect to documents concerning their

4   registrations, and it's also called for under CMO.

5   16:08:04      This does relate to distribution because, as you saw

6   in some of the U.S. Attorney's quotes I put with some of the

7   press releases, the -- these dispensing violations pertain

8   directly to diversion, so I really don't think this should

9   be a controversial issue.  I'm surprised that the other side

10  16:08:24  is mounting such a --

11            SPECIAL MASTER COHEN:  So how do you address

12  the defendants', it's not even a position, it's an

13  assertion, which has gone unchallenged as far as I can tell,

14  that there was a very specific prior production provision

15  16:08:46  that was included in the case management order which did not

16  include the word dispensing?

17            And, in fact, there had been a draft provision that

18  talked about dispensing that wasn't a part of the CMO.  That

19  seems like a very strong indication that the parties

20  16:08:58  specifically did not believe that prior productions

21  regarding dispensing should be produced.

22            MR. PIFKO:  If you look at the provision that

23  they're talking about, it has nothing to do with production

24  from -- it's not about that provision.  It was some other

25  16:09:13  issue pertaining to dispensing.  And indisputably, again,

1    these types of documents relate to distribution. That's

2    what that provision in the CMO says.

3              SPECIAL MASTER COHEN: But dispensing and

4    distribution are different things in this context. They are

16:09:27 5    different things.

6              MR. PIFKO: But these -- if you don't comply

7    with the red flags test that the DEA has articulated on

8    countless occasions to both manufacturers, pharmacies,

9    distributors, then you're not complying with the suspicious

16:09:42 10    order requirements.

11         It pertains to distributing the products and -- and

12    that's only one thing. That's the CMO. We also have the

13    RFPs, which it clearly pertains to as well. So I think

14    there's a number of ways to get there. We don't have to get

16:10:00 15    there just through the CMO. You can get there through the

16    RFPs.

17              SPECIAL MASTER COHEN: Let's be careful about

18    what we're talking about. There's a difference between some

19    of what you've asked for with regard to dispensing

16:10:12 20    information, which is just a rubric, right, and prior

21    productions regarding dispensing violations, which is very

22    specific.

23         So I'm still trying to understand exactly what you're

24    asking for and exactly what you think is allowed after the

16:10:25 25    CMO said what it said and also after -- I mean, you've read

1    it -- what the defendants cite as your own assertions and

2    responses in the motion to dismiss briefing regarding

3    dispensing and the claims that you're making.

4              MR. PIFKO:  When you look at the quote I put

16:10:41  5    in there from Judge Ruiz, he clearly thinks that dispensing

6    is relevant to the case.  It's indisputably in there.

7              SPECIAL MASTER COHEN:  Partly.

8              MR. PIFKO:  It says dispensing.

9              SPECIAL MASTER COHEN:  What we're talking

16:10:51 10    about is not zero or all, it's somewhere in between, and I'm

11    trying to figure out where.

12              MR. PIFKO:  Okay.

13              SPECIAL MASTER COHEN:  I'm thinking that prior

14    productions, maybe not.  I'm trying to understand what is.

16:11:01 15              MR. PIFKO:  There's -- there's two -- let me

16    articulate -- two I guess somewhat narrow views of what we

17    are requesting here.

18         One would be anything concerning a violation or an

19    alleged violation.  If there was an investigation that was

16:11:20 20    just an investigation or it resulted in some sort of

21    settlement or consent order and it concerned dispensing

22    violations and there were documents produced by defendants

23    to the Government, any governmental entity in connection

24    with that dispute, I'm entitled to that.

16:11:34 25              SPECIAL MASTER COHEN:  So let me stop you

1    there.

2         Does that not end up including every single document

3    that has anything to do ever that would be in a prior

4    production?

16:11:43  5              MR. PIFKO:  No.  I don't think so at all.

6         I talked about alleged violations of dispensing

7    conduct.  I'm not talking about anything.  I mean, you saw

8    some of the examples we're talking about; record keeping,

9    selling prescriptions -- or selling to customers who don't

16:12:00 10   have valid prescriptions, forged prescriptions, failures to

11   report theft, inventory violations, they're all enumerated

12   in these settlement agreements.

13        You're supposed to know your customer.  The

14   distributors should have known that about the chain

16:12:18 15   pharmacy, or any pharmacy, and, obviously, the chain

16   pharmacies should have known that about themselves, and

17   failure to recognize that is -- is against the law and part

18   of what contributed to the problem here.

19        I don't see how it's not -- it's facially relevant.  I

16:12:34 20   mean, again, you look at the quotes from some of these U.S.

21   Attorneys.  If you don't keep accurate records and you don't

22   report theft, you're contributing to diversion.  And it's --

23   it's not a controversial issue.

24              SPECIAL MASTER COHEN:  What's second?

16:12:50 25              MR. PIFKO:  And then -- and so, that's one

1    aspect of it.

2         The second issue is that some of these defendants have

3    said that they monitor dispensing activity in connection

4    with their suspicious order monitoring program.

16:13:07  5                   SPECIAL MASTER COHEN:  That one you get.

6                   MR. PIFKO:  Okay.  That's a twofold issue.

7    Just -- we need to know what they're monitoring, and then,

8    if they're monitoring it, I need to see what they are.  What

9    if I disagree with the outcome of their conclusion?  If

16:13:18  10   you're saying that I'm collecting this data and evaluating

11   that to determine if an order is suspicious, I should be

12   entitled to that data to determine if I agree with your

13   evaluation and whether you're complying with your own

14   policy.

16:13:30  15                  SPECIAL MASTER COHEN:  And I think some of the

16   defendants said they have produced that or they are

17   producing it, that they're producing dispensing data to the

18   extent that it was part of their suspicious order monitoring

19   program.

16:13:41  20        Right, that's what you're talking about?

21                  MR. PIFKO:  That is that category.

22        But I don't think we're getting all the backup data

23   from all the defendants on that, and we're not getting all

24   the categories from all the defendants on that.

16:13:52  25                  SPECIAL MASTER COHEN:  Okay.

1          MR. PIFKO:  Do you have any questions about

2     the violations again?

3          SPECIAL MASTER COHEN:  Not yet.  I'll probably

4     come back to it.

16:14:02  5          MR. PIFKO:  Okay.

6          MR. LAVELLE:  Good afternoon, Special Master.

7     John Lavelle from Morgan, Lewis representing Defendant

8     Rite Aid of Maryland, doing business as Mid-Atlantic

9     Customer Support Center.  I'm going to explain why I gave

16:14:18 10     you the full name of my client in a minute.

11          But I think, Special Master, you pointed out what the

12     nub of the problem is here.  The premise of this, the

13     request by plaintiffs, is that dispensing and distribution

14     are the same.  They're not.  The Controlled Substances Act

16:14:36 15     makes clear that they are two very different things.  In

16     fact, dispensing is specifically excluded from the

17     definition of what distribution is.

18          The DEA issues licenses for distribution.  It also

19     issues licenses for dispensing.  They are two different

16:14:53 20     things.  And an entity that holds a license for distribution

21     may or may not have a license for dispensing.

22          I mentioned the full name of my client earlier because

23     the reasons that the plaintiffs have sued my client, Rite

24     Aid, Maryland, Mid-Atlantic, is because it is a holder of a

16:15:14 25     distribution license from the DEA and is a distributor into

1    Ohio.  It does not dispense in Ohio.  In fact, plaintiffs

2    chose not to sue the Rite Aid entity, Rite Aid of Ohio,

3    which has the dispensing licenses in Ohio.

4        Dispensing information isn't relevant to plaintiffs'

16:15:33  5    claims and we know this for two things.  One, they sued Rite

6    Aid Mid-Atlantic, which is a distributor.  They didn't sue

7    the -- the owner of the dispensing licenses.  The same is

8    true for CVS, which is another defendant.

9        And, second, we've asked plaintiffs, and they've said

16:15:48 10    repeatedly to us and to the Court, that they are not

11    pursuing claims for dispensing.

12            SPECIAL MASTER COHEN:  Why is that?

13            MR. LAVELLE:  Why is that?

14            SPECIAL MASTER COHEN:  Yeah.

16:15:58 15            MR. LAVELLE:  I don't have any intimate

16    knowledge of what goes on in their discussions, I haven't

17    been invited, but my guess is they do not wish to be -- to

18    be meeting the additional requirements of pursuing claims

19    with respect to dispensing.

16:16:17 20        To the contrary, the claims against my client and

21    against the other pharmacies have been based on the

22    suspicious order monitoring requirement of the Controlled

23    Substances Act.  That's what they frame their claim about,

24    that's what's in the complaint, and that's what they have

16:16:32 25    said to the Court that they're pursuing.

1          And, by the way, this reference to the know your

2     customer requirement is just erroneous, and Mr. Pifko

3     himself elicited the testimony from a witness earlier which

4     established that, with input from the DEA, retail chain

16:16:50 5     pharmacies are exempt from the know your customer

6     requirement.

7          And we've produced and are going to continue to

8     produce dispensing information that's directly related to

9     suspicious order monitoring, such as due diligence, to

16:17:01 10    increase the distribution threshold for a particular

11    pharmacy based on dispensing info.

12         But the broader type of discovery that Mr. Pifko seems

13    to be asking for here would impose a disproportionate

14    burden, and, Special Master Cohen, I think --

16:17:14 15              SPECIAL MASTER COHEN:  Is it irrelevant?

16              MR. LAVELLE:  Well, it isn't relevant, and one

17    of the problems we have here is we don't even know what

18    they're pursuing.

19         The two requests, Special Master, that you asked us to

16:17:26 20    address, we're the ones that presented them to you because

21    we attached them to our opposition.

22         Mr. Pifko's made two submissions so far.  He still

23    hasn't identified a single request that was served on any of

24    the chain pharmacies or any of the other defendants that

16:17:40 25    he's seeking to compel.  That alone, under the local rules,

1       should be enough to deny this request.

2            But the data that would be relating to dispensing here

3       would potentially be a fishing expedition in an entire new

4       ocean.

16:17:56  5            Specifically with respect to this issue of dispensing

6       violations, first, as, Special Master, you pointed out, it's

7       outside the bounds of CMO #1.  It only provided for

8       production of investigations concerning marketing or

9       distribution of opioids.  Dispensing is not in there.  And

16:18:13 10      that's, of course, consistent with what plaintiffs' claims

11      are.

12           Second, the two specific requests that we put into the

13      record before Your Honor, that are requests for production

14      16 and 17, they don't require production, and that's for two

16:18:26 15      reasons.  One, as written, they're not addressed to the Rite

16      Aid pharmacy registrant in Ohio because they're addressed to

17      Rite Aid, Maryland, Mid-Atlantic.

18           Second, this specific 2009 settlement that the -- that

19      Mr. Pifko referenced isn't responsive.  It doesn't concern

16:18:43 20      distribution practices.  It concerns only dispensing, and it

21      concerns only dispensing in pharmacies in other

22      jurisdictions, not in Ohio.

23           So, Your Honor, we would submit that we tried to

24      discuss this with plaintiffs, we made it clear, I think it's

16:18:58 25      clear from the DOJ's press release that that's what it is,

1     it's just not responsive and it wouldn't advance the ball

2     here.

3          The other pharmacies I believe do want to be heard on

4     this as well, so I will turn over the mic to them.

16:19:13  5          SPECIAL MASTER COHEN:  Let me -- I want to go

6     back to the plaintiffs because this is actually confounding

7     to me.  I don't understand why the CMO specifically excludes

8     dispensing from prior productions.  I don't understand why

9     there are not claims brought against the pharmacies as

16:19:38 10    dispensers as opposed to distributors.

11          There are -- it seems like there are two different

12    kinds of claims that you would make against the

13    distributor/pharmacies or pharmacies qua distributors, and

14    that is that their suspicious order monitoring from the

16:20:00 15    warehouse to the retail pharmacy wasn't working, and also

16    that the last step of where those pills end up, that is,

17    from the pharmacy to the patients, wasn't working.

18          And the -- they apparently have separate claims with

19    separate laws and separate discovery, at least a little bit,

16:20:19 20    and so, I'm just kind of confused.

21          MR. FARRELL:  This is Paul Farrell, Jr., on

22    behalf of the plaintiffs.

23          As a preamble to this, the -- the retail distributors

24    and pharmacies are in a little bit of a different bucket

16:20:33 25    than, say, Cardinal Health, McKesson, and AmerisourceBergen.

1          So if you think about what's happened here, if we

2     would go to Cardinal Health and we would say:  For all of

3     the pharmacies that you sold to, give us the dispensing

4     data, Cardinal Health would say:  We don't have any control

16:20:53 5     or operation over those pharmacies.  And that gets into

6     other records that may be protected or privileged.  The

7     focus for that is on -- from Cardinal Health to each of the

8     pharmacies.

9          Now, as part of their due diligence, as part of their

16:21:09 10     own discovery responses, what we're seeing is they have an

11     obligation to look at the dispensing data when they make

12     their decisions on whether there is something suspicious.

13               SPECIAL MASTER COHEN:  Where does that

14     obligation come from?

16:21:24 15               MR. FARRELL:  That obligation comes from the

16     federal regulations and it's set forth in the 30(b)(6)

17     notice responses that are on the record.

18          Now, when you look over at the chain pharmacies, you

19     don't have those problems because they are selling to

16:21:38 20     themselves.  They have vertically integrated.

21          So I would posit that if Rite Aid was selling to its

22     own Rite Aid pharmacies and one or more of them got cited by

23     the DEA for dispensing practices, that should be another red

24     flag for the distributor operations that, hey, perhaps we're

16:22:02 25     selling to places that don't have safeguards in place.  So

1      it's all a component of the distribution practice.

2          When they took on the obligation, when they took on

3      the benefit of being vertically integrated and saving

4      themselves money, they also took on the obligation to comply

16:22:22  5      with federal law.

6          And so, what we're suggesting is that if, in fact, say

7      Walgreens has a number of stores that are being cited for

8      its dispensing practices --

9                  SPECIAL MASTER COHEN:  In Ohio, in track one

16:22:35 10      jurisdictions, what are you looking exactly for?

11                  MR. FARRELL:  We're looking for institutional

12      failures that have resulted in an epic institutional

13      disaster across the country.

14          That's the -- that's what we're trying to identify is

16:22:50 15      we're trying to identify what Judge Polster said back in

16      January:  Where did this go wrong?  What happened?

17          And so, by looking at the institutional failures, it's

18      at least discovery that allows us to be able to examine what

19      went wrong.  Now, whether it's admissible is a completely

16:23:09 20      different story.  But for discovery purposes, if Walgreens

21      has multiple pharmacies that are being cited by the DEA and

22      Walgreens is selling to those pharmacies, we think we should

23      be entitled to take a look at that or at least put it in the

24      record.

16:23:27 25                  SPECIAL MASTER COHEN:  So can you give me --

           1              MR. LAVELLE:  Special Master, may I respond
           2       briefly?
           3              SPECIAL MASTER COHEN:  Let me ask one more
           4       question and then you may.
16:23:35   5          I want you to list for me very precisely under the
           6       rubric of dispensing violations what documents you want,
           7       examples.
           8              MR. MOUGEY:  I'll give you some examples.
           9       What we're seeing already.
16:23:50  10          Peter Mougey.
          11          Some e-mails that have come out with custodians, what
          12       we're looking for is red flags on the distribution side of
          13       understanding what's your customer, and in some of the
          14       retail pharmacies, their own clients, here's what we're
16:24:03  15       seeing.
          16          Our pharmacists are scared to walk to their cars
          17       because prescriptions that we failed -- refused to fill are
          18       waiting in the parking lot.  People smoking Oxycontin in the
          19       bathroom.  Drug deals openly being conducted in the parking
16:24:24  20       lots of the pharmacies.  This is being discussed at the
          21       pharmacist level, the pharmacy, inside the pharmacy, going
          22       up the pharmacy food chain.
          23          So what we're looking for, in part, are examples of
          24       pharmacists and the techs discussing the systemic problems
16:24:43  25       within the pharmacies openly that are clearly red flags on

1    the distribution side.

2         Now, you mentioned are these in Ohio or trial track

3    one cases?  As an example, the document that we gave you

4    this weekend, Walgreens' MOA specifically discusses the

16:25:03  5    Walgreens pharmacies in Florida that there were -- and uses

6    Ohio as an example.  Because of the stronger or more

7    stringent state reporting regulations, people were loading

8    up cars and going to Florida and picking them up and

9    bringing them back to Ohio and distributing them on the

16:25:25 10   streets in Ohio.  That's specifically mentioned in

11   Walgreens' MOA.

12        So what we're looking for are red flags, suspicious

13   conduct, anything that the distributors performing due

14   diligence -- and you asked Paul about where those duties

16:25:41 15   fall and Paul mentioned the regs.  There's also a list on

16   the DEA's website that includes looking at practitioner

17   level, prescription level type data.  The data about

18   understanding and knowing your customer goes all the way

19   down to the pharmacy level and what's occurring.

16:25:59 20        That's -- those are examples of what we're looking for

21   and what we're seeing already and what's being discussed

22   inside the pharmacies.

23             MR. PIFKO:  And I want to respond to a couple

24   comments he made.

16:26:09 25        First, you asked what we were looking for.  I propose

1    this.  Why don't we -- we'll tell you the violations, I

2    already cited some of them in our letter, Peter's mentioning

3    one, I've got a Rite Aid settlement agreement, I'll tell you

4    which -- which, you know, violations and settlements that

16:26:26  5    we're interested in.  It's not the universe, the entire

6    universe.  They're discrete and we can identify them.

7         Second, they mentioned the deposition of

8    AmerisourceBergen an example of why we don't need this

9    information.  That completely -- I took the deposition.  I

16:26:44  10    know exactly what I was after when I was asking those

11    questions.  He's completely misconstruing the outcome of

12    that testimony.  AmerisourceBergen exempted chain pharmacies

13    from its due diligence requirements.  I find that to be an

14    outrageous failure of their system.

16:27:01  15         And the proof of the failure of that system is all

16    these violations.  What, you trust Rite Aid, you trust CVS,

17    you trust Walgreens, so we don't do any due diligence on

18    them?  Well, look what they were doing.  They're worse than

19    the mom and pop pharmacy that you think has no controls.

16:27:18  20    These pharmacies were filling prescriptions to people with

21    forged prescriptions, no prescriptions, they -- this stuff

22    was stolen out the back and they didn't keep records.  It's

23    outrageous.

24              SPECIAL MASTER COHEN:  All right.  But what is

16:27:28  25    the document that you're looking for?

```
  1              MR. PIFKO:  I would like any documents that

  2     they produced to any governmental entity in connection with

  3     the settlements that I can identify for you.  If you want,

  4     we can put together a letter and I'll enumerate them for

  5     you.

  6              SPECIAL MASTER COHEN:  I'll need it by 8:00

  7     tonight.  Is that all right?

  8              MR. PIFKO:  Yeah.  We can do that.

  9              SPECIAL MASTER COHEN:  Okay.

 10              MR. LAVELLE:  Special Master, I'm kind of

 11     fighting three on one here.  I think three plaintiffs

 12     lawyers in a row got up to argue.  None of them actually

 13     answered the questions that you asked.

 14         You asked why didn't they pursue dispensing claims in

 15     this case, why is it not in CT-1.  I don't have the answer

 16     to that, but I have a suspicion.  My suspicion is it's

 17     because they do not want to get into the question of whether

 18     individual prescriptions were medically necessary.

 19         And that's the road that you go down if you end up

 20     opening the -- this -- this area, because you're going to

 21     have to drill down and find out for each pharmacy, if you're

 22     questioning the dispensing, you've got to look at was this

 23     particular prescription medically necessary?  What did the

 24     doctor have in mind when -- when this patient went to them?

 25     It's a can of worms that I think they don't want to get
```

1    into.

2         And I will say that counsel for CVS and Walgreens have

3    been very patient and they've let me speak first, but they

4    should have an opportunity to address Your Honor as well.

16:28:49  5         SPECIAL MASTER COHEN:  Thank you.

6         I just want to remind you, I promise you, I've read

7    everything, and so, you don't need to repeat.  You don't

8    need to tell me what I've read.

9         MS. SWIFT:  Thanks very much, Special Master.

16:29:01  10        Kate Swift for Walgreens.

11        Plaintiffs have still never identified a single

12   document request that we haven't responded to.  They asked

13   for the dispensing policies.  We've given them.  They asked

14   for documents used in due diligence or evaluation of orders

16:29:14  15   from pharmacies.  To the extent those exist, we're producing

16   them.

17        I just heard for the first time what they -- the --

18   the comments that they made about the Walgreens settlement

19   that Mr. Mougey referenced a few minutes ago.  That

16:29:32  20   settlement related to distribution.  There is a prior

21   production related to it.  We produced that prior

22   production.

23        I am unaware of anything that they think we haven't

24   produced that they want and I didn't hear it today.

16:29:45  25        With respect to the two RFPs that you flagged for the

1    parties and asked us to address, Rite Aid RFP number 16 and

2    number 17, only number 16 was served on Walgreens.  We

3    responded to it and they never complained about our

4    response, so I'm not sure what else they're looking for from

16:30:10   5    us.

6        That's all I have to say.

7            SPECIAL MASTER COHEN:  I'm trying to remember

8    what happened.  One of the -- one of the retail pharmacies

9    did and one of them didn't, and I'm not sure -- with

16:30:22  10    pharmacy -- pharmacists' compensation, where are you guys on

11    that?

12            MS. SWIFT:  I'm sorry.  What's the question?

13            SPECIAL MASTER COHEN:  Whether you produced

14    documents related to the compensation of pharmacists.

16:30:35  15            MS. SWIFT:  I believe they asked for

16    compensation policies and we did -- we produced the

17    compensation policies that we have.

18            SPECIAL MASTER COHEN:  Okay.  So you're not

19    the one who didn't produce those?

16:30:43  20            MS. SWIFT:  I don't believe so, no.

21            SPECIAL MASTER COHEN:  Okay.  Thank you.

22            MR. HYNES:  Just real quick, Special Master.

23        Paul Hynes for CVS.

24        If -- we don't think the CMO applies here at all, it

16:30:58  25    sounds like you might not either, and to the extent that you

1    think it may, I think there are differences in terms of

2    scope that would make producing this information at this

3    late stage very difficult from a burden perspective.

4         We have thousands of stores across the country and to

16:31:13  5    try to comply with that provision on a nationwide basis

6    would be incredibly difficult right now.

7                   SPECIAL MASTER COHEN:  What about -- what

8    about those that either have to do with stores in CTO-1 or

9    specifically mention Ohio?

16:31:29 10                   MR. HYNES:  That would obviously be easier.

11                   SPECIAL MASTER COHEN:  Thank you.

12                   MR. HYNES:  Thank you.

13                   MR. NICHOLAS:  I'm Bob Nicholas,

14    AmerisourceBergen.

16:31:44 15         This isn't our issue.  We were kind of sitting there

16    minding our own business, but I don't want --

17                   SPECIAL MASTER COHEN:  You're in my crosshairs

18    is why you're standing up there.

19                   MR. NICHOLAS:  I will say this.  There is --

16:31:59 20    there is no regulatory requirement that the distributors

21    collect dispensing data, and I'm not sure where that came

22    from, but there is not.

23         And the other thing I want to say is, you know,

24    without getting into a debate about testimony, Mr. Pifko

16:32:20 25    started to characterize testimony he elicited in a

1    deposition I defended.  He described it inaccurately.

2                    SPECIAL MASTER COHEN:  You can stop there.

3                    MR. NICHOLAS:  For the record, I just -- I

4    have to say it; otherwise, it's hanging out there.

16:32:32  5                    SPECIAL MASTER COHEN:  Okay.

6                    MR. NICHOLAS:  So I said I'm not going to

7    argue with him about what was said, but I can't let it go.

8                    SPECIAL MASTER COHEN:  All right.  I think

9    I've heard enough on that topic, especially --

16:32:45  10                    MR. HYNES:  Paul Hynes for CVS.

11        You said CT-1 or Ohio, and, I mean, that's a big

12    difference just in terms of number of stores, so I just want

13    to clarify, I think there's a difference between CT-1 stores

14    and Ohio stores in terms of burden.  I spoke too quickly.

16:33:00  15                    SPECIAL MASTER COHEN:  Okay.  I think you

16    misheard me.

17                    MR. PIFKO:  If I may, just 30 more seconds.

18        One, CT-1 jurisdictions will not be sufficient because

19    of the migration issue.  And like Peter said, we want to

16:33:11  20    show systemic failures.  These practices -- just because

21    there was a violation in California doesn't mean they

22    weren't doing the same thing here and they didn't get caught

23    for it.

24        And I just want to add one other thing.  When they

16:33:21  25    made the comment that we didn't sue the people, we did sue

1    the parent companies of these and they asked us to dismiss

2    them and we did.  And we understood that they weren't going

3    to use that to their advantage in discovery and then try to,

4    you know, say, well, you don't have the right party from us.

16:33:36  5    So we had the parents of these companies and they

6    asked us to dismiss and we did, and for them to now use that

7    is gamesmanship.

8         SPECIAL MASTER COHEN:  All right.  We need to

9    move on.

16:33:46 10    The next one is very specific, Eric Brantley

11   deposition.  I would love for you to tell me that that's

12   resolved, Enu.

13        MR. FULLER:  Special Master Cohen, Mike Fuller

14   on behalf of the plaintiffs.

16:34:09 15    And, yes, we have discussed that and they're going to

16   be giving us dates for Mr. Brantley by the end of the week.

17        SPECIAL MASTER COHEN:  That's fine.  We'll

18   move to the next one.  Thank you.

19        Number 8 is production of documents and et cetera from

16:34:23 20   state proceedings.

21        I think I saw an e-mail even this morning that

22   suggested that this was -- that some progress had been made

23   and maybe was even fully resolved.

24        MR. FULLER:  Fortunately, or unfortunately,

16:34:36 25   you're still stuck with Mike Fuller for the plaintiffs on

1      this issue too, Your Honor.

2           Yes, we have made some headway.  There was three --

3      well, basically, two different issues.  One was similar

4      productions going on in state proceedings.

16:34:50  5           As far as the document productions, the defendants

6      have agreed to that up through I think it's January 26th,

7      2019, which is our discovery cutoff.

8           The other issue still remaining is basically sworn

9      testimony, any sort of sworn testimony or declarations has

16:35:10  10   not been agreed to by the defendants.

11          If you'll recall, back early October, this went back

12     and forth in some e-mails.  We finally got -- and I e-mailed

13     Your Honor on Sunday trying to get the defendants to

14     respond.  We got their positions with that one agreement,

16:35:27  15   the two other nos to the other requests.  You were sent an

16     e-mail at about 6:15 this morning from Jennifer on the same

17     issue setting out where we left that.

18          I don't know if you've got it pulled up in front of

19     you or not.

16:35:52  20               SPECIAL MASTER COHEN:  This was the redlined

21     one?

22               MR. FULLER:  Yeah.  The one that has the red

23     in it below, but Jennifer summarized where we are this

24     morning.

16:36:03  25               SPECIAL MASTER COHEN:  Right.  And I thought

1    that this was a clarification, which I was hoping that you

2    would say was okay.

3                  MR. FULLER:  No.  Well, Jennifer is with the

4    plaintiff, and we were --

16:36:12  5                  SPECIAL MASTER COHEN:  No.  I understand.

6          Category 2 simply seeks copies of sworn statements, et

7    cetera.

8                  MR. FULLER:  That's correct.  And defendants I

9    think still disagree with that.

16:36:21 10                  SPECIAL MASTER COHEN:  Okay.  And Category 3

11    similarly seeks relevant materials in the form of public

12    transcripts, however, in the spirit of compromise, et

13    cetera, so --

14                  MR. FULLER:  So I think just to try to

16:36:35 15    simplify it and make it succinct, what we're seeking is any

16    sworn statements by any of the defendants' employees going

17    on in the state proceedings.

18          And I know this was an issue that was discussed some

19    with Special Master Yanni in the coordination issue and

16:36:49 20    she's made her ruling on that.  Certainly, anything that's

21    not coordinated we wouldn't necessarily have access to.

22    We're asking the defendants to be required to produce it.

23                  SPECIAL MASTER COHEN:  Okay.  Who is going to

24    address this?  I'm sorry.  I did -- I was confused for a

16:37:08 25    second.  Go ahead.

1          MS. STRONG:   This is Sabrina Strong.

2          On this issue, I do think there has been progress that

3    has been made, Special Master Cohen, and I -- as you noted,

4    there was some developments this morning.  The defendants as

16:37:22  5    a group have not had a chance to really discuss the recent

6    proposal by Jennifer.

7          But at a high level, the concern here is it's really

8    at odds with the cross-noticing protocol and the discussions

9    from our perspective that have happened there.  The state

16:37:36 10   AGs have really objected to the coordination efforts here

11   and have prevailed in that regard and that there won't be

12   coordination, at least pursuant to the protocol with the

13   state AGs.

14          Yet, on the other side of the coin, they would like to

16:37:52 15   have anything that happens in the state cases produced for

16   purposes of this litigation, and so, we really think there's

17   a lot of issues here, perverse incentives of what may

18   happen, and really at odds and an end run around the

19   cross-noticing protocol that's been established in this case

16:38:07 20   that Special Master Yanni has been focused on.

21          I do think -- I should just note I do think that

22   there's an opportunity for more discussion among the

23   defendants and the plaintiffs.  And you're right, this is

24   very much a live issue.  It was first brought to our

16:38:22 25   attention on October 11th with a -- an e-mail request to you

1      and all of us, and I actually took that offline and removed

2      you from the e-mail chain, Special Master Cohen, and asked

3      the plaintiffs what is the specific ask, because it was a

4      Paul Farrell one sentence e-mail making a request and we

16:38:40  5      were not totally clear on what it was.

6           So on the 19th, Jennifer gave us a very clear e-mail

7      and we've gone from there.  But if you --

8                SPECIAL MASTER COHEN:  If you got one sentence

9      from Farrell, you should consider yourself lucky.

16:38:51 10                MS. STRONG:  I should have been cheering.

11           We took it offline to try to get clarity and work

12      through it with them, and we got Jennifer's clearer e-mail

13      about what the request was on the 19th, just a few days ago.

14           So I do think if given a little bit more time on this

16:39:06 15      we may be --

16                SPECIAL MASTER COHEN:  I'm thinking that

17      Special Master Yanni may have a question or two.

18                SPECIAL MASTER YANNI:  Well, I was going to --

19      does anybody else want to speak?  Mr. Skikos?

16:39:16 20                MR. FULLER:  We're ready for questions from

21      you, Your Honor.

22                SPECIAL MASTER YANNI:  Ready for questions.

23           Aren't we just looking for a specific thing, which is

24      sworn statements?

16:39:27 25                MR. FULLER:  That -- so they've already agreed

1    for all other production going on in the state cases.

2                    SPECIAL MASTER YANNI:  Right.

3                    MR. FULLER:  The defense have agreed to that,

4    yes.  Now the only thing at issue is any sworn testimony,

16:39:40  5    any sworn statements.

6                    MS. STRONG:  My understanding is that that

7    would include depositions, at least of those folks who are

8    being deposed in this case, and so, we start to think what

9    is the point of that, what -- it really is at odds with the

16:39:54 10    cross-noticing protocol.

11          And, you know, you'd have to get into concerns about

12    how would it be used, would they try and introduce it at a

13    depo and take advantage of the time limits or -- or get an

14    unfair advantage here in terms of time limit issues that the

16:40:09 15    parties have heavily negotiated and that you have weighed in

16    on.

17          So there's a lot of concerns about what's the

18    significance of this and what's the purpose when it's

19    something that otherwise ought not be permitted.  And like I

16:40:20 20    said, otherwise, why do we have the cross-noticing protocol?

21    What's that about?  That's the method of coordinating with

22    these state cases.

23                    MR. SKIKOS:  Steve Skikos.

24          So, first, are the fundamental rule that I have with

16:40:40 25    Sara Roitman is that we meet and confer before we do this.

1          But the issue here is testimony, and it's interesting

2     because the production of testimony is not related to the

3     coordination between state and federal courts.  It's -- it's

4     testimony.  It's not work product.  It's not some magic.

16:41:10  5     It's testimony.  And the testimony has to be produced.

6          If you're at trial and you have a witness on the stand

7     and the witness is -- has previous testimony, that previous

8     testimony is available to cross-examine that witness.  We

9     are trying to build consent for state/federal cooperation.

16:41:31 10          With respect to testimony itself, that is part of what

11     must be produced in order to try to reduce the amount of

12     time that people are being deposed as opposed to increase

13     the amount of time.

14          I do think we can have further discussion about this

16:41:47 15     issue and maybe come back next week, but I will say this:

16     It was never discussed or anticipated or even considered

17     that testimony would somehow be exempted from production in

18     this MDL, and it will have a horrible impact on the state

19     court litigants if they are prohibited or the MDL litigants

16:42:15 20     are prohibited from actually getting testimony from

21     previous -- from -- sworn testimony from witnesses who are

22     going to be testifying in this trial, in these cases.

23               SPECIAL MASTER COHEN:  Okay.  We have so many

24     things that we still have left to talk about that I think we

16:42:29 25     heard enough on that topic.

1        Special Master Yanni's bailiwick is specifically the

2   state/federal court coordination.  I do ask the parties

3   continue to confer about this.  I'll tell you that,

4   personally, I think it only makes sense to me that testimony

16:42:48  5   would be available.  But that's --

6        SPECIAL MASTER YANNI:  And I, as the Special

7   Master who is doing the joint state and federal, I have to

8   agree with Special Master Cohen, testimony should be

9   available.

16:43:06  10       MR. FULLER:  So what we'll do, Special

11  Masters, if it's okay with the Court, is we'll push this,

12  we'll continue our talks, and we'll put it on next week's

13  agenda for Special Master Yanni to address?

14       SPECIAL MASTER COHEN:  That's fine.

16:43:17  15       SPECIAL MASTER YANNI:  Thank you.  That's

16  fine.

17       SPECIAL MASTER COHEN:  Agenda item number 9 we

18  already discussed.  That's interrogatory number 8.

19            (Pause in Proceedings)

16:43:44  20       SPECIAL MASTER COHEN:  Agenda item number 10

21  has to do with four different interrogatories from the

22  pharmacies.  And, really, it's -- it's the first two that

23  are the key because interrogatories 11, 12, and 13 all

24  depend off of numbers 9 and 10.

16:44:05  25       Is this something -- I think I've gotten the letter,

1    October 18th, from the pharmacies, but did not really

2    receive a response yet from the plaintiffs.  I'm trying to

3    understand where we are on this.

4            MR. ACKERMAN:  David Ackerman for the

16:44:22 5    plaintiffs.

6        I believe that the letter came in last night.  I think

7    it came from Christopher Moriarty, if you are searching your

8    e-mails.

9            SPECIAL MASTER COHEN:  Right.

16:44:33 10            MR. ACKERMAN:  But I'm not positive about

11    that.

12            SPECIAL MASTER COHEN:  If it came in, I read

13    it.

14                (Pause in Proceedings)

16:45:31 15            SPECIAL MASTER COHEN:  Why can't this be

16    addressed via third-party discovery directed at MetroHealth?

17            MR. BREWER:  Matthew Brewer from Bartlit Beck

18    on behalf of the pharmacy defendants.

19        The problem here, Special Master, is that on numerous

16:45:48 20    occasions you've talked about and warned against mincing

21    words to avoid interrogatories, and that's what we have

22    here.

23        We loosely use the term affiliated with pharmacies and

24    physicians affiliated with the plaintiffs.  What we're

16:46:04 25    really referring to are pharmacies that are owned, operated,

1    supported by, or affiliated with the plaintiffs, and,

2    similarly, physicians who practice at or are employed by

3    facilities that are owned, operated, supported by, or

4    affiliated with the plaintiffs.

16:46:18  5    We know that the plaintiffs have control over this

6    information.  They haven't denied that.  And, in fact, they

7    have the legal right to request the information, to obtain

8    the information.  They control how the -- let's take

9    MetroHealth, for example.

16:46:40  10    Cuyahoga County has control over how the hospital is

11    governed.  They appoint the board of directors.  And just

12    sitting here in today's discussion, when Mr. Shkolnik spoke

13    about the information they're providing in response to

14    distributors' interrogatory number 18, he listed a number of

16:47:02  15    different types of documents that they're providing to help

16    calculate damages, and one of those categories was records

17    from MetroHealth.

18    So we know they have access to the information.  They

19    can provide the information.  They can't pick and choose

16:47:16  20    what information they want to produce.  And the information

21    is clearly relevant to our defenses, and so, that's our

22    request.

23    SPECIAL MASTER COHEN:  But you didn't really

24    answer my question, which is:  Why can't you get it -- maybe

16:47:29  25    you would prefer to get it the way you just described.

1    Couldn't you get it through third-party discovery directed

2    at MetroHealth?

3        And also, I guess I should ask this question as well,

4    I'm sorry, at least -- at least as to interrogatory number

16:47:43  5    10, identify pharmacies, and possibly interrogatory number

6    9, identify physicians, this seems to me likely that you

7    have that information already or can get it just as easily.

8                MR. BREWER:  Well, we can get some pieces of

9    the puzzle, but they have control in a way that we don't.

16:48:04 10    They can request it in a way that we can only request

11    through this discovery process.

12        And so, that's -- with respect to number 9, the --

13    excuse me, yeah, number 9, the physicians, with respect to

14    number 10 -- I mean, 9 and 10 are the basis for all the

16:48:21 15    additional requests.

16                SPECIAL MASTER COHEN:  Right.

17                MR. BREWER:  We want to know instances of

18    diversion that we don't have access to in the way that they

19    would.

16:48:26 20                SPECIAL MASTER COHEN:  What about going

21    directly to MetroHealth?

22                MR. BREWER:  We can try to go directly to

23    MetroHealth, but they have an obligation and they have

24    control.  I don't know why they can't do it themselves.

16:48:39 25                SPECIAL MASTER COHEN:  Okay.

1          MR. SHKOLNIK:  On behalf of Cuyahoga again.

2      We do not have control over MetroHealth.  MetroHealth

3  has its own separate lawsuit pending here against these

4  defendants.  They have their own separate counsel.  They are

16:48:57 5  not within our control, within the meaning of being able to

6  obtain all of their data, all of their records, all of their

7  prescriptions.

8      This is a very simple issue.  They have counsel who

9  are -- who have made appearances.  And as you suggested,

16:49:15 10  Special Master Cohen, a subpoena on them for these items

11  through their counsel I am sure will get them as much

12  information as possible.

13      We at the county do not control the prescribing, the

14  dispensing, or any of those issues for MetroHealth.  It is a

16:49:31 15  separate entity.  Yes, we do provide a small percentage of

16  money.  A $1.4 billion budget and I think the county

17  provides them somewhere between 30 and $40 million as a

18  general grant, not to any specific area.

19      We do not control.  We do not have the ability to

16:49:50 20  produce this information without going to court and getting

21  an order just like they would have to do at this point in

22  time.  They're just -- it's not there for us.

23          SPECIAL MASTER COHEN:  What data are you

24  producing that is related to MetroHealth?

16:50:02 25          MR. SHKOLNIK:  We have some financial

1    information that deals with the -- the -- specifically, the

2    request was how much money do you give to MetroHealth?  And

3    if I understand it, we identified that there is a line item

4    of about 40 -- I think it's 40 million.  Mr. Gallucci

16:50:16  5    probably knows the number better than I do.  I think it's 40

6    out of 1.4 billion.  And we gave them that information,

7    which is what we have.

8                     SPECIAL MASTER COHEN:  All right.  I'm going

9    to deny the motion for plaintiffs to respond to these five

16:50:32 10    interrogatories.

11        I actually have a problem separately with 11, 12, and

12    13.  I think it asks for information that I'm not sure

13    anybody could answer, and it's probably, to some extent,

14    particularly in the hands of the defendants anyway, but I

16:50:49 15    just think that the -- that it makes a lot more sense for

16    the defendants to obtain this information directly from

17    MetroHealth.  I think you're more likely to get what you

18    need more quickly.

19                     MR. SHKOLNIK:  Thank you.

16:51:07 20                     SPECIAL MASTER COHEN:  All right.  The next

21    one is agenda item number 11, which has to do with Janssen's

22    responses to interrogatories.

23                     MR. ACKERMAN:  Thank you, Special Master.

24        David Ackerman for the plaintiffs.

16:51:48 25        I'll note that there was a letter that came in, well,

1    early this morning this time, but I think Janssen's counsel

2    is in California, where they have agreed to answer three of

3    the six interrogatories that are at issue.

4        I think -- I've just spoke with Ms. Strong and they're

16:52:07  5    going to do it on a rolling basis and get it done by

6    November 5th, and we're okay with that as to those three.

7        There are three interrogatories left.  The history of

8    this, just to briefly --

9            SPECIAL MASTER COHEN:  Sorry.  Can you tell me

16:52:20  10    the sender of the letter that came in this morning?

11            MR. ACKERMAN:  Seth Baglin I believe.

12            SPECIAL MASTER COHEN:  B-A-G?

13            MR. ACKERMAN:  B-A-G-L-I-N.

14            SPECIAL MASTER COHEN:  Go ahead.

16:52:35  15        Wait.  I'm sorry.  I got the wrong one.  I think he

16    sent two different ones.

17            MR. ACKERMAN:  I think it's a letter that is

18    signed by Amy Lucas, but it was -- Seth Baglin was the

19    e-mailer.

16:52:51  20            SPECIAL MASTER COHEN:  Go ahead.

21            MR. ACKERMAN:  Okay.  So there are at this

22    point three interrogatories that are still in dispute.

23    These are interrogatories that plaintiffs pointed out in a

24    July 3rd letter.  They relate to the first set of

16:53:08  25    interrogatories that were served in April.  We sent a second

1    letter on September 28th when Janssen did not supplement

2    these three interrogatories in the response that we received

3    last night.  I can walk through each of them briefly.

4                    SPECIAL MASTER COHEN:  Which numbers are they?

16:53:24    5        MR. ACKERMAN:  Sure.  It is interrogatory

6    number 6, interrogatory number 10, and interrogatory number

7    13, which they amended, but we don't believe the amendment

8    met the substance of the interrogatory.

9        Interrogatory number 6 says:  Identify each and every

16:53:42   10    time --

11                    SPECIAL MASTER COHEN:  I got it.  You don't

12    have to read it.

13                    MR. ACKERMAN:  I won't read it then.

14        As you are aware, the plaintiffs have alleged that

16:53:51   15    citing to this Porter and Jick article, which was actually a

16    letter to the editor, is in and of itself a

17    misrepresentation and we want to know when Janssen did it.

18    The only answer that we've received from Janssen is that we

19    can look at publicly available databases.  Publicly

16:54:09   20    available databases don't get us an answer to that question.

21                    SPECIAL MASTER COHEN:  Go ahead.

22                    MR. ACKERMAN:  Number 10 deals with scientific

23    research that Janssen decided not to publish.  The letter

24    that we received last night says for the first time that

16:54:30   25    Janssen doesn't track that information.  If that's the

1   answer, we are at least entitled to it in a verified

2   interrogatory.

3        The last one, frankly, and the most -- well, not -- I

4   won't categorize it, but interrogatory number 13, which they

16:54:48  5   have amended, is an interrogatory that asks Janssen:  Have

6   you ever placed limits on the amount of opioid products you

7   supplied to distributors, retailers, or endusers because of

8   reports of addiction, abuse, potential diversion,

9   overprescribing, adverse events, or potential suspicious

16:55:07  10  orders?

11       And Janssen didn't answer that interrogatory.

12  Instead, Janssen substituted its own answers, which was:

13  Janssen has abided by the DEA quotas.

14       That's not the question that's asked in the

16:55:20  15  interrogatory.  We're entitled to a response as to whether

16  Janssen has placed limits on the amount of opioid products

17  it supplied for those reasons.

18                 SPECIAL MASTER COHEN:  Okay.

19                 MS. STRONG:  Sabrina Strong.

16:55:34  20       As to number 6, Special Master Cohen, that's the one

21  dealing with the Porter and Jick article --

22                 SPECIAL MASTER COHEN:  Right.

23                 MS. STRONG:  -- that request is extremely

24  broad.  It speaks to -- it asks about everybody who has

16:55:48  25  cited that article, whether they worked for Janssen, whether

1    they've been compensated by Janssen in any way, so, in other

2    words, non-Janssen employees.  And this isn't something that

3    we track when folks cite articles or don't cite articles.

4                    SPECIAL MASTER COHEN:  Just a moment.

16:56:02  5         MS. STRONG:  We understand -- yes.

6                    SPECIAL MASTER COHEN:  I'm not sure exactly

7    what I'm reading, but what it says is -- I assume that it's

8    plaintiffs' characterization of its own interrogatory.  This

9    interrogatory sought identification of every instance that a

16:56:14  10   Janssen employee cited the publication.

11                   MS. STRONG:  That's not the request.  The

12   request is identify each and every time you, a person

13   employed by you, or a person or entity who received

14   compensation from you cited this article.

16:56:28  15        SPECIAL MASTER COHEN:  If it's limited to

16   employee, how does that work for you?

17                   MS. STRONG:  We don't track what our employees

18   cite.  What we have offered to do is that -- we've directed

19   them in the letter -- I don't know if you had an opportunity

16:56:38  20   to read the letter that came in last night, I would expect

21   that you have not, but there's a PubMed database that

22   actually tracks when articles are cited.

23                   SPECIAL MASTER COHEN:  Right.

24                   MS. STRONG:  To the extent that -- we've

16:56:49  25   directed them there.  If there was materials -- we haven't

1    limited the production in any way.  If there's materials in

2    the production that reference it, it would be there.  We

3    could search.  They could search.  But it's equally

4    available to them, as it is to us, but this is not something

16:57:02  5    that we track in any way, so --

6              SPECIAL MASTER COHEN:  So have you produced

7    already in discovery all documents where an employee cited

8    Porter and Jick?

9              MS. STRONG:  I would imagine that would be

16:57:16 10    encompassed.  I haven't asked my team that specific

11    question.  But to the extent that it would have been -- the

12    production in this case is quite comprehensive, and so, it

13    would not surprise me if there are references to that, to

14    the extent that it was cited, in the production.

16:57:30 15              SPECIAL MASTER COHEN:  All right.  If you can

16    confirm you've done that, and then you're done.

17              MS. STRONG:  Okay.

18         As to number 10, the scientific research studies that

19    we decided not to publish.  The studies, tests, clinical

16:57:51 20    trials, analyses regarding the safety and efficacy of your

21    opioid products that you decided not to publish.

22         Again, that's not something that we track.  We would

23    not have eliminated any materials that relate to that in the

24    production.  To the extent that there's an indication that

16:58:02 25    something was not published or was published, it's available

1    in the materials that have been produced and they can search

2    for it just as easily as anyone else could search for it,

3    but it isn't something that we track or identify.

4        And there's other arguments here, Special Master

16:58:18  5    Cohen, that go to the proportionality of this request.

6    Something cannot be published for numerous reasons, and the

7    notion to think that it has anything to do with something

8    pertinent to the case is really a bit of a stretch, if

9    you're trying to measure the proportional needs of whose

16:58:37 10    obligation it is to take on this burden to try and search

11    the materials for any glimmer of something that wasn't

12    published.

13            SPECIAL MASTER COHEN:  So let's stop before

14    whether it was published.  In other words, if the

16:58:52 15    interrogatory asks for any scientific research, tests,

16    trials, analysis regarding the safety and efficacy of

17    Janssen opioids, okay, regardless of when it was published,

18    is that something that you have already produced?  I would

19    think probably so.

16:59:06 20            MS. STRONG:  Again, given the scope of the

21    production in these cases, I would think that kind of thing

22    would be produced and would be available in the materials

23    that have been produced in this litigation.

24            SPECIAL MASTER COHEN:  And then whether it was

16:59:16 25    published, plaintiffs can kind of figure it out?

1      MS. STRONG:  Correct.

2      SPECIAL MASTER COHEN:  So, again, if you can

3 confirm that your production has already done that much,

4 which is to produce documents relating to scientific

16:59:30 5 research, et cetera, et cetera, regarding Janssen opioids,

6 then I think that you're done.

7      MS. STRONG:  Okay.  And then, the last is 13.

8 This is placed limits -- let me get to the request.

9    It says:  Since 1990, have you ever placed limits on

16:59:47 10 the amount of opioid products you supplied to distributors,

11 retailers, or endusers because of reports of addiction,

12 abuse, potential diversion, overprescribing?

13    On this one, this is a very -- we objected to this

14 question as vague and ambiguous as to what exactly --

17:00:03 15      SPECIAL MASTER COHEN:  Not buying it.  I'm not

16 really buying that.

17      MS. STRONG:  In terms of limits, and so, our

18 reasonable interpretation of this was to turn to the quota

19 data and provide them information about quotas and what

17:00:15 20 we've done to comply with the limitations, assuming that

21 those are some of the reasons why quotas would be imposed on

22 the products.

23    Beyond that, again, I think this goes to the same

24 issue, which is to the extent that there's discussion or

17:00:30 25 documents or materials that speak to a particular response

1    to something, I don't quite know what they mean in terms of

2    limits.

3          What -- what does that mean?  What -- and to the

4    extent that there's something in the documents that

17:00:44  5    indicated that there was an incident that happened and

6    that -- and that a limit resulted, that would be in the

7    materials.

8          But I don't know what they're looking for, and so, if

9    they could better articulate what it is that they're looking

17:00:56  10   for, maybe there is something there, or maybe this is

11   appropriate for a deposition.

12               SPECIAL MASTER COHEN:  Right.  So let me --

13   let me ask plaintiffs.

14          You know, have you ever placed limits on the amount of

17:01:05  15   opioids you supplied?  Well, you know, there isn't an

16   infinite amount, even though it may seem that way some days,

17   of opioids that are being given to, you know, supplied to

18   these folks.

19          And, really, again, regardless of reason, okay, were

17:01:22  20   there any limits?  Sure.  There might have been some limits

21   because we can't make any more than that.  There might have

22   been limits because we -- you know, because they couldn't

23   afford more.  So this is a little bit vague.

24          But I agree that if there are limits in response to

17:01:38  25   something in particular, that that's something they should

1    produce.

2                    MR. ACKERMAN:  And that's what the

3    interrogatory says.  The interrogatory says:  Have you ever

4    placed limits on the amount of opioid products you supplied

17:01:47 5    to distributors, retailers, or endusers because of reports

6    of addiction, abuse, potential diversion, et cetera, et

7    cetera?

8        So it's not have you ever placed limits period.  It

9    has -- it's have you placed limits for these particular

17:02:02 10   reasons, all of which, frankly, relate to diversion and

11   relate to the allegations in the plaintiffs' bellwether

12   complaints.

13       With respect to the question of what does limit mean,

14   I think -- I think that word is pretty clear.  Have you ever

17:02:18 15   not filled an order?  Have you ever decided to ship fewer

16   products than you have in the past?  I think -- I think we

17   can use a dictionary definition of the word limit and get to

18   where we need to be.

19                    SPECIAL MASTER COHEN:  Any response?

17:02:32 20                   MS. STRONG:  And, again, I mean, this isn't --

21   to think that there's some kind of document saying this is a

22   moment when we're limiting, I think the quotas are really

23   the best indication of the limit of the amount of product

24   that we can produce as a company with respect to any of

17:02:49 25   these products, and so, that's why we're -- you know, to the

1   extent that there was a one-off incident that maybe

2   plaintiffs would perceive as a, quote, limit on something

3   with respect to a particular product, maybe there was a

4   short batch for some reason, I just -- it's an odd request

17:03:05  5   in terms of I don't know how to answer the question.

6        And to the extent that documents speak to it, we

7   certainly would not have limited the documents in any way

8   that would have pulled out materials that they could examine

9   to determine if there's something that they find was a

17:03:19  10   limitation responsive to this request.

11             SPECIAL MASTER COHEN:  Explain to me how the

12   quotas work.

13             MS. STRONG:  The quotas?

14             SPECIAL MASTER COHEN:  Yes.

17:03:28  15             MS. STRONG:  So to the extent -- and I'm not a

16   quota expert, but these are quotas that are imposed by the

17   federal government about how much of the molecule can be

18   manufactured by any company.

19             SPECIAL MASTER COHEN:  And that quota applies

17:03:42  20   to the amount you manufacture.  I'm talking about what a

21   quota to the -- a quota limiting the amount that is sent to

22   any given user, any given client.

23             MS. STRONG:  I don't know the details on that,

24   Special Master Cohen.

17:03:56  25             MR. ACKERMAN:  I am sure that a bunch of

1    people over here can speak to DEA quotas and can correct me

2    if I am wrong, my understanding is that the DEA quotas are

3    aggregate into what can be distributed wholesale in one

4    year.

17:04:11  5         This is, again, products you supplied to distributors,

6    retailers, or endusers.  This is --

7              SPECIAL MASTER COHEN:  How about this.  How

8    about this.

9         Have you ever reduced amounts?  That's really what

17:04:28  10   we're after.

11             MR. ACKERMAN:  Yes.  For those reasons.  This

12   is almost -- this is the flip side of what's been asked of

13   plaintiffs.

14             MS. STRONG:  And I would just say, I'm looking

17:04:39  15   at the response that we gave, we cited to an extensive

16   amount of documents that speak to the question of our

17   clients' compliance with the DEA quotas in the response.

18             SPECIAL MASTER COHEN:  Yeah.  But that's a

19   different quota.

17:05:02  20        It seems to me that you should be able to answer the

21   question:  Have you ever reduced amounts of opioid products

22   that you supplied to a given distributor, retailer, or

23   enduser because of et cetera?

24

17:05:16  25             MS. STRONG:  Okay.  Well, we wouldn't be

1    providing to any enduser.

2                    SPECIAL MASTER COHEN:  Fine.  Retailer or

3    distributor.  Have you ever reduced the amount of opioid

4    products that you supplied to a distributor or retailer

17:05:27  5    because of et cetera?  I think that's a question you should

6    be able to answer.

7                    MS. STRONG:  Okay.  And it wouldn't be a

8    retailer either.  Distributor I think is the --

9                    SPECIAL MASTER COHEN:  Whatever.  Any person

17:05:37 10    to whom you supply, whatever characterization you give them.

11                    MS. STRONG:  Okay.

12                    SPECIAL MASTER COHEN:  Okay?

13                    MS. STRONG:  Understood.

14                    SPECIAL MASTER COHEN:  All right.  Thank you.

17:05:48 15        All right.  I believe 12 has been resolved?

16                    MR. ACKERMAN:  Correct.

17                    SPECIAL MASTER COHEN:  Thank you.

18        And as long as we're talking about resolved, I believe

19    15 has been resolved too?

17:06:19 20                    MS. WELCH:  That's our understanding, Your

21    Honor.

22                    SPECIAL MASTER COHEN:  Thank you.

23        So we have 13, 14, 16, and 17.

24                    MR. ACKERMAN:  Special Master Cohen, 17 has

17:06:27 25    been resolved.

```
          1              SPECIAL MASTER COHEN:  Beautiful.  So we have

          2    three more.

          3              MR. ACKERMAN:  We did that at the break.

          4              SPECIAL MASTER COHEN:  Just because I want to

17:06:37  5    do one that's a little bit more discrete, number 16, with

          6    Anda search terms, are folks here to talk on that?  Is that

          7    going to be on the phone?  Anybody here in the room talking

          8    about it?

          9         Hold on just a minute.

17:06:58 10         Hi, this is Special Master Cohen.  I just unmuted the

         11    folks on the phone.  Is anybody on the phone ready to talk

         12    about the question?

         13              MR. NOVAK:  Yes.  Yes.  This is Paul Novak on

         14    behalf of the plaintiffs, Your Honor.

17:07:11 15         Although, I think the discussion will be fairly brief.

         16    We're still conferring on these issues and we'll probably

         17    have another session tomorrow.

         18              MS. KOSKI:  This is Katy Koski on behalf of

         19    Anda.

17:07:25 20         I agree.  This should be tabled.  We have a call set

         21    for tomorrow.

         22              SPECIAL MASTER COHEN:  All right.  Would it

         23    help you folks if I set a deadline?  I mean, it's been on

         24    the agenda for over a week.  You can tell me no.

17:07:38 25              MR. NOVAK:  No.  I -- I think a deadline would
```

1    be fine.

2                        (Pause in Proceedings)

3                SPECIAL MASTER COHEN:  All right.  All right.

4    You know, this is one of the things where -- well, let me

17:07:54 5    just dig into it just a little bit.

6        Is the only issue that's left the question of whether

7    the street names are going to be included in the search

8    terms or is there something more than that?

9                MR. NOVAK:  Street names, as well as some of

17:08:10 10    the branded equivalent product names for which I believe

11    Anda only sells generic versions.

12                MS. KOSKI:  This is Katy Koski again on behalf

13    of Anda.

14        We did have a discussion about branded product names

17:08:28 15    and we -- that's the area that we did have some substantive

16    discussion about, including branded products that we do, in

17    fact, sell into the CT-1 jurisdictions.

18        The separate issue where we haven't really had any

19    substantive discussion between the parties is with respect

17:08:46 20    to the street names.

21        So I think we're really close on the addition of some

22    of the brand name drugs, but we haven't had any real

23    discussion about the street name issue.

24                SPECIAL MASTER COHEN:  Okay.  Well, I do think

17:09:03 25    you need to fully resolve this soon.  Until you resolve it,

1    you're not doing searches, at least not some searches, and,

2    therefore, productions aren't coming in, and, therefore,

3    documents aren't available for deposition and so on.  This

4    needs to be tied up.

17:09:17  5       A couple observations.  One is I know that the comment

6    has been made:  Why do we have to look for -- excuse me --

7    search names when no one else was asked for street names?  I

8    suppose the answer might be that somebody got smart and

9    asked for things that everybody else maybe should have asked

17:09:35 10    for.  I'm not sure that that's a reason not to include them.

11       I also observed, as I said before, you know, sometimes

12    you might be better off doing it now because, otherwise, I'm

13    going to have to perhaps conclude that, yeah, maybe that

14    should have been done, and the second time around it gets

17:09:51 15    done.  So you're better off just doing it now.

16       Those are -- I'm not telling you that that's the way

17    that you should decide this.  I'm just giving you some of my

18    thinking and hopefully it will help you lead to a

19    resolution.

17:10:03 20       In any event, we will decide at the end of this

21    conference when you all are going to meet next with Special

22    Master Yanni, and by that time you're either going to need

23    to fully resolve this or give it to her for resolution.

24              SPECIAL MASTER YANNI:  I can give you the

17:10:21 25    answer to that.

```
 1        The conference -- conference with me will be held on

 2   October 30th at 2:30 Pacific, which is 5:30 Eastern.

 3                MR. NOVAK:  Okay.  Speaking again for the

 4   plaintiffs, I think the Special Master's comments were

 5   helpful and I'm hopeful that we'll be able to resolve this

 6   shortly, before the 30th in any event.

 7                SPECIAL MASTER YANNI:  Thank you.

 8                SPECIAL MASTER COHEN:  All right.  I think we

 9   have two and a half things left.

10        I'm going to put the phone back on mute.

11        All right.  Allergan's responses to plaintiffs'

12   interrogatories, who wants to take a swing at this one?

13        And I'm also curious whether this is ripe.  I just

14   don't remember whether I've seen positions from both sides.

15                MS. BAIG:  Good afternoon, Special Master.

16        Aelish Baig on behalf of plaintiffs.

17        This is an issue that is continuing from last week.

18   Last week, you will recall that you ordered that the parties

19   meet and confer regarding language that Allergan should use

20   to provide assurances that it is affirmatively looking for

21   discovery information from all Allergan entities that have

22   had -- that have had opioid involvement.

23        So the day after your hearing, we proposed language to

24   Allergan.  We sent it over.  And the language we proposed

25   would provide essentially those assurances.  We heard
```

1    nothing back regarding our proposed language.  We asked

2    again to meet and confer on the issue, didn't hear back

3    until last night when they supplemented all of their

4    discovery responses with their proposed language, which, in

17:12:29  5    our view, is insufficient for these reasons.

6        First, it carves out all of the entities that it sold

7    to Teva, even prior to the 2015 sale.  So while Teva can

8    respond certainly to interrogatories post-2015, Teva can't

9    respond to what Allergan and its predecessors' procedures

17:12:52  10   were in place prior to the 2015 sale.

11       Additionally, it states that -- the language that they

12   proposed states that they are not withholding info, but it

13   does not state that they are affirmatively searching for

14   responsive discovery information from the various Allergan

17:13:14  15   entities.

16       Moreover, with respect to the supplemental

17   interrogatory responses that were served last night, those

18   are responses which we have been waiting now for five months

19   because, as you're aware, we were -- they had carved out

17:13:30  20   generics completely from those responses and from all other

21   discovery responses, so we had not yet received any

22   interrogatory or other discovery responses with respect to

23   generics at all.

24       Last night, when we got the supplemental

17:13:44  25   interrogatories, and I have them here for you if you'd like

1       a copy, the substantive response that updates with respect

2       to generics for each and every question basically states,

3       after a boilerplate paragraph of objections that's included

4       each time:  Pursuant to Federal Rule of Civil Procedure 33,

17:14:06  5       Allergan Finance LLC refers plaintiffs to its production of

6       products.

7            So after waiting for five months for supplemental

8       interrogatories and other discovery responses, this is just

9       an example, six were served last night, each and every one

17:14:20 10       basically states:  See the documents, without even

11       identifying which documents we should be looking to.

12            And I will -- I would also point out that the very

13       first production of generics documents came in last week.

14       It was very limited.

17:14:33 15            And as you know from your discovery ruling number 5,

16       you have previously ruled that simply pointing to business

17       records is not sufficient in terms of an interrogatory

18       response.

19            And if you'd like a copy of it, I can approach and

17:14:47 20       hand it to you.

21                 SPECIAL MASTER COHEN:  Sure.

22                 MS. BAIG:  This particular copy just has the

23       statement that I read to you marked in yellow for the

24       response.

17:15:20 25            You will see there language also which is listed in

1    footnote one with respect to the Allergan entities issue.

2    We would simply ask that you order them to include in the --

3    in footnote one the Allergan's entity issues that they are

4    producing herein in response to the discovery requests, all

17:15:41  5    responsive discovery from all Allergan entities that have

6    had any opioid involvement.

7            SPECIAL MASTER COHEN:  This one really does

8    make my head hurt.  I think maybe my hard drive just got

9    full.

17:15:56 10        Who's going to respond?

11           MS. WELCH:  Donna Welch for Allergan Finance,

12   Special Master Cohen.

13       And I think there are two separate issues here.  The

14   first is the footnote that you requested that we amend to

17:16:21 15   make clear that we were, in fact, searching for custodial

16   and noncustodial documents, not withstanding entity, for any

17   Allergan affiliate that might have touched opioids, and we

18   have done that.  I'll get into the details of the footnote

19   amendment in just a moment.

17:16:44 20       The second issue is the substantive responses on

21   generics, which I thought we had agreement on, would be

22   tabled until after the 30(b)(6) deposition that is taking

23   place later this week.  Apparently, that is not correct.

24   But I'll attempt to address it and to explain again the box

17:17:04 25   that Allergan Finance is in on that issue and what we're

1    attempting to do as quickly as we can to provide the

2    information that plaintiffs want.

3        Ms. Baig has said that in the footnote that we

4    amended, which we believed was fully accurate and

17:17:23  5    comprehensive, that we are carving out the entities we sold.

6    We are certainly not carving out the entities, the Actavis

7    generics entities that were sold, with respect to any

8    documents that relate to those entities that Allergan

9    Finance or any Allergan affiliate may continue to possess.

17:17:46  10        Those are the documents that have been ordered,

11    produced in your discovery ruling 4.  They are being made as

12    part of a joint production with Teva on behalf of Allergan

13    Finance and the Actavis generics entities given the

14    duplicate nature of the documents and the requests.

17:18:08  15        So we are not carving out those entities for purposes

16    of production.  We have carved out those entities to say we

17    don't represent them, we cannot respond to discovery

18    requests on their behalf.

19        But we have made abundantly clear, as I represented

17:18:29  20    and as we state in the footnote, that when we have gone to

21    look for documents, we are looking at any documents that are

22    currently possessed by any Allergan affiliate that relate to

23    those entities, subject to the agreed upon search terms and

24    custodians.  And by agreed upon search terms, I mean the

17:18:52  25    ordered search terms from discovery ruling 4 that had been

1    agreed to by Teva and the plaintiffs.

2         Next, Ms. Baig says that we say we are not withholding

3    documents but we don't say we are affirmatively searching

4    for documents.  First, that's incorrect.  We state clearly

17:19:16  5    in the footnote that Allergan Finance has searched, has

6    searched, not that we're not withholding, but that we have

7    searched custodial and noncustodial sources regardless of

8    whether those documents or information are owned by Allergan

9    Finance or another Allergan affiliate.

17:19:37 10         We go on:  Allergan Finance has not limited its

11    searches to Allergan Finance or employees who are Allergan

12    Finance employees.  Indeed, many of the custodians from whom

13    documents and information are being produced were never

14    employed by Allergan Finance.

17:19:55 15         Further, Allergan Finance -- here is where we do say

16    it's not withholding.  We hoped that was helpful in addition

17    to what we were searching, that we were also not withholding

18    on that basis, that we are not withholding responsive,

19    non-privileged documents or information from affiliated

17:20:13 20    entities or employees working for affiliated entities,

21    including PLC.

22              SPECIAL MASTER COHEN:  All right.  I get it.

23    You're good on that.  There's -- it would be nice if you

24    said searching and producing, but I'm assuming that that's

17:20:25 25    true, so --

1          MS. WELCH:  It's true.

2          SPECIAL MASTER COHEN:  Okay.  Go ahead.

3          MS. WELCH:  With respect to the -- so I think

4     that addresses the footnote.

17:20:33 5          With respect to the substantive responses, again,

6     we're responding to interrogatories that were posed to

7     Allergan Finance.  Allergan Finance does not have a

8     businessperson there or a person available to the entity

9     that we can go to to get substantive answers about generics.

17:20:58 10         That is why we said we are working literally day in,

11    day out to prepare a 30(b)(6) witness on the topics that

12    they've given us.  That witness is being deposed this week.

13    We hope that will go a long way to or fully resolve the

14    issue.

17:21:18 15         But in terms of substantively responding to the

16    interrogatories, there was no physical way for us to do

17    that, and that's why we sought clarification from you about

18    what you were seeking in your discovery ruling 4.  And what

19    we thought it was --

17:21:37 20         SPECIAL MASTER COHEN:  Let me just cut this

21    off.  We need to get on the other side of this deposition.

22    There's nothing I can do.  We've gotten to an equipoise last

23    week.  We have to have this deposition first and then we're

24    going to see what happens.  I can't think of anything else

17:21:53 25    to do.  Maybe it's just because I'm tired, but I think we

1    have to get on the other side of that depo.

2              MS. WELCH:  We agree.  The witness is being

3    prepared, materials are being prepared with the witness to

4    hand to counsel to help aid in the deposition.  We're

17:22:06  5    working hard to do it.

6              SPECIAL MASTER COHEN:  Yep.  I mean, there's a

7    lot riding on it, but let's --

8              MS. WELCH:  Anything further than that is

9    going to have to be based on review of the documents that

17:22:17 10    are being produced, and we're -- we're not in a position to

11    do that today.

12              MS. BAIG:  May I have a moment in response?

13              SPECIAL MASTER COHEN:  Yep.

14              MS. BAIG:  We're fine with -- we're preparing

17:22:29 15    to take the deposition on Friday, and that's fine, we can

16    revisit the entities issue after that deposition.

17         With respect to the interrogatory responses, you know,

18    I would -- I would point out that we don't actually need the

19    deposition in order to get substantive information about

17:22:44 20    generics from Allergan.

21         Right now, each one of those interrogatory responses

22    refuses to provide such information, and -- and it's

23    important information.  If we're asking about, for example,

24    scientific research, studies that they relied upon, and

17:23:04 25    they're carving out the Actavis entities -- and I know you

1    want to get to the entities issues later.  That's fine.

2    Teva will respond post-merger.  But who is responding to

3    that information prior to 2016?  Nobody is.

4        And who's telling us what type of involvement Allergan

17:23:22  5    had with the front groups, with the American Pain Foundation

6    prior to 2016?  Allergan and its predecessors.  Nobody is

7    responding to that because they're punting that off to Teva

8    and Teva will respond post-2016.

9                SPECIAL MASTER COHEN:  I'm not denying

17:23:39 10    anything that you've asked for.  I'm just saying I think we

11    have to wait until after the depo.

12                MS. BAIG:  Understood.

13        Can we get substantive responses to the

14    interrogatories, though, within the next week on the

17:23:51 15    generics issue?

16                MS. WELCH:  There's no physical way to do it.

17                SPECIAL MASTER COHEN:  Yeah.  The answer is

18    no.

19                MS. WELCH:  What we --

17:23:59 20                SPECIAL MASTER COHEN:  Let's get on the other

21    side of the depo.

22        All right.  That was 13.

23        Number 14 is the production of -- and, Sarah, this

24    is -- I'm going to say IQVIA, I-Q-V-I-A.  We're all going to

17:24:12 25    talk about IMS and IQVIA data.

1           MR. JANUSH:  Good afternoon, Special Master

2    Cohen and Special Master Yanni.

3           This is Evan Janush appearing.

4           So this began as a letter to the defendants following

17:24:28  5    up on an interrogatory that was universally served many

6    months ago seeking sales tracking data, seeking suspicious

7    order monitoring data, electronic data, marketing data,

8    physician perspectives that were tracked by companies like

9    IQVIA.

17:24:49  10          To put this into perspective, IQVIA is the successor

11   to IMS and Quintiles.  They are the largest data mining

12   company in the nation, if not in the world.  Many of the

13   defendants in this room, and outside of this room, utilize

14   IQVIA and other companies like them.

17:25:07  15          So to start with my letter, my letter on October 11th

16   just sought to kick off, can you confirm for us the -- the

17   years that you have provided your IQVIA data for the drugs

18   that are covered?  If you have missing data, if -- if there

19   is missing data, that you'll produce it.  And if you can't

17:25:26  20   produce it, that you'll confirm you'll be like Allergan and

21   go back to IQVIA and ask for the data to be produced.

22          And we heard virtually crickets.  We got a couple

23   of -- a couple of responses, Mallinckrodt and Purdue, and at

24   2:00 a.m. this morning, after teeing up this issue further

17:25:45  25   with the Court, we got a response from Janssen acknowledging

1    that they are missing years of data and that they will be

2    looking for that data, the prescription level data, and if

3    they can't find it, that they will seek to have it

4    repopulated by their vendor.

17:26:00   5         Now, that only really addresses one part of this

6    equation.  That's the granular.  Most of these defendants

7    that are responding are addressing prescriber level data.

8    That's not the only thing that I'm seeking to address before

9    this Court.  That is just a part of the equation.

17:26:22  10         Special Master Cohen, you've gone to some great

11   lengths to elucidate and advise the folks that are in this

12   room that you understand what marketing means.  You get

13   marketing.  In fact, you didn't find problems with the

14   plaintiffs' definition of marketing and included a broad

17:26:44  15   definition in your ruling, your discovery ruling number 2.

16         And in that discovery ruling number 2, and in the

17   definition of marketing, you specifically kept the notion of

18   reports.  What I am speaking to are the sales reports, the

19   marketing and sales reports nationally that these

17:27:04  20   defendants, many of these defendants, subscribe to.

21         I gave you just the three that I -- that I had from

22   IQVIA, and only portions thereof, that confirm the DDD

23   database, the NSP database, and the National -- the National

24   Sales database.  One Key is also mentioned.

17:27:27  25         Why did I do that?  Because this is not granular sales

1    data.  NSP is a six-year audit.  You get the NSP report, you

2    get six years of audit data in that report.

3         Why is that NSP relevant?  Which I have not yet seen.

4    I have not seen a six-year data report from any defendant in

17:27:50  5    this litigation.  But why is it important?

6         Because it provides contract pricing, including such

7    discounts processed via wholesalers, chargeback

8    transactions.  Chargeback transactions, which are at the

9    very epicenter of how did we get here, how did we get to

17:28:10  10    this problem, because we had drug wholesalers contracting

11    with manufacturers, selling a drug -- to sell a drug at a

12    contract price, and then they would sell it for less than

13    that contract price and get a rebate, a chargeback that

14    encouraged them to keep selling that product.

17:28:32  15         Well, who -- who did it better?  We don't know.  We

16    don't have the NSP data.  We know they subscribed to it.  We

17    don't have it.

18         DDD.  Best thing I can say about the DDD database is

19    the depiction that I gave you from IMS in that very brief

17:28:52  20    pictorial that I sought to just kind of provide a little

21    more detail to the Court with pictures so you're not buying

22    my words.  This is what IMS, predecessor to IQVIA, is

23    saying, this is what we did.  We populate data that shows

24    every transaction in the stream of pharmaceutical commerce,

17:29:15  25    we populate the report, and these folks bought it, and we

1      don't have it.

2            Now, the defense to that is, well, you have pieces of

3      it in noncustodial productions.  I saw that in Janssen's

4      response and I commented back, so hopefully, Special Master,

17:29:32  5  you saw my e-mail in response to that.

6            Getting a slide of what happened in a given region

7      showing we need to target these physicians in the context of

8      a PowerPoint is woefully different than getting the entire

9      report and understanding how manufacturers, how distributors

17:29:56  10  looked at the market.

11            Where were they weak?  Where were they strong?  Where

12      were physicians' perceptions analyzed?  Who got those

13      reports?  What physicians to target based on -- based on

14      potential?

17:30:12  15            Don't believe my words.  Go on IQVIA's website.  Look

16      up One Key.  One Key, it's illuminating to read what One Key

17      offers the pharmaceutical defendants.

18                  SPECIAL MASTER COHEN:  So the point you've

19      been making is that it's relevant and you've asked for it,

17:30:28  20  right?

21                  MR. JANUSH:  And not received it.

22                  SPECIAL MASTER COHEN:  Why?

23                  MR. JANUSH:  That's why I'm here today before

24      Your Honor.

17:30:34  25                  SPECIAL MASTER COHEN:  All right.  So has it

1      been objected to?

2                    MR. JANUSH:  Well, not that I -- not that I'm

3      aware of as being -- you know, this is --

4                    SPECIAL MASTER COHEN:  You said you've gotten

17:30:46  5      some of it, pieces parts?

6                    MR. JANUSH:  What we got was prescriber level

7      data.  So what the focus has been on defendants is focusing

8      on what that electronic data means, we're giving you

9      prescriber level data, sales data, except for Mallinckrodt

17:31:00 10      that gave sales to distributors.

11                    SPECIAL MASTER COHEN:  One of --

12                    MR. JANUSH:  It's been ignored is what I would

13      posit.

14                    SPECIAL MASTER COHEN:  One of the

17:31:10 15      communications that I got talked about repopulating and

16      costs.

17                    MR. JANUSH:  Yes.  So, absolutely, if a

18      defendant does not have this -- I had numerous meet and

19      confers with IQVIA, and to be completely forthright so you

17:31:24 20      understand, earlier you asked a question of a -- an attorney

21      up here and your question was:  Why wouldn't you just go to

22      the third party?  I did.  I could show you a laundry list of

23      meet and confers.  I could show you multiple e-mails.  I can

24      make you a binder until your eyes are more exhausted than

17:31:40 25      you feel right now.

1          But the problem is this:  IQVIA, they are correct in

2     one small point, they don't -- they say we don't keep the

3     data once we populate the report.  We would have to re-run

4     that data for you --

17:31:57  5          SPECIAL MASTER COHEN:  Right.

6               MR. JANUSH:  -- and you're not our client.

7               SPECIAL MASTER COHEN:  Right.

8               MR. JANUSH:  So we won't re-run it for you.

9     But you can go back to the defendant and you can ask them

17:32:05 10    for it, and if they don't have it, they can come back to us,

11    pursuant to their licensing agreement and for a fee, they

12    can repopulate the data.

13          Allergan, to their credit, did just that.  They got

14    prescriber level data repopulated.  They are, through this

17:32:27 15    date, the only defendant that I'm aware of that has taken

16    that action.

17               SPECIAL MASTER COHEN:  All right.  I think I

18    get it.

19          Who wants to respond?

17:32:42 20          MS. STRONG:  I'll take a stab.  It's Sabrina

21    Strong.

22          I do believe that this would benefit from additional

23    meet and confer, Special Master Cohen, because we responded

24    to what we thought the requests were in his recent letter.

17:32:58 25    There were three specific topics.  We provided responses and

1    actually believed that the issue would have been resolved

2    pursuant to the responses.

3         We received a response back I think this morning that

4    was very extensive and very much into the details about

17:33:12 5    this, and I think it would be best to have the folks who are

6    in the details on this on the respective teams talking about

7    it.

8         I can tell you at a high level that we produced all of

9    the IMS data that we had.  And to the extent -- and it was

17:33:25 10   for a certain period of years.  That's all that we were able

11   to find in reasonably accessible sources, and we then we've

12   noted that there may be additional IMS data in custodian

13   files, that's correct.

14        As to the repopulation question, we were not aware

17:33:39 15   that the company would even consider repopulating, but we

16   represented that we would contact the company and engage in

17   a discussion with them about that.

18        One question -- one issue that I do believe is

19   something that will have been to be fleshed out is that

17:33:52 20   company provides information that goes beyond opioids, and

21   we believe it's possible that some of the data that the

22   plaintiff has some insight to from the company may not

23   pertain to opioids.  So that's something we'll have to work

24   out, but I think this is something that can be addressed on

17:34:09 25   a one on one basis with each of the defendants and likely

1    resolved.

2                    SPECIAL MASTER COHEN:  Let me hear from other

3    counsel.

4                    MR. JANUSH:  My apologies.

17:34:20  5                MS. MAINIGI:  Good afternoon, Special Masters

6    Cohen and Yanni.

7        I'm Enu Mainigi on behalf of Cardinal.

8        If you look at the document cited in the agenda next

9    to item 14, which is page 1950, and you also look at, which

17:34:31 10  I don't believe is included and I unfortunately don't have a

11   copy, but the October 11th letter that Mr. Janush refers to

12   here, they are both letters from plaintiffs' committee to

13   manufacturers.

14       This issue has not been raised with Cardinal before.

17:34:49 15  I was surprised last night at 10:45 p.m. to receive an

16   e-mail sweeping Cardinal into this issue.  If Mr. Fuller and

17   the plaintiffs' counsel with whom we have our meet and

18   confers and discuss discovery disputes with wishes to come

19   and meet and confer with Cardinal about this issue, we are,

17:35:10 20  of course, all ears and happy to speak with them.

21       But I don't think it is fair to draw in Cardinal and

22   any other defendant who has not been subject to those meet

23   and confer letters and has not been speaking with the

24   plaintiffs about this.

17:35:23 25                SPECIAL MASTER COHEN:  So here's what I think

1    needs to happen.  I agree that this is a pretty new issue

2    that would benefit from additional meet and confers and

3    discussion with the parties.

4        I think that this topic needs to be a discrete topic

17:35:40   5    that is included in the discussion about letters that the

6    parties are going to share.  I'm looking for Pete.  This is

7    important, and this needs to be discussed discretely in the

8    letters that talk about where we are on production of these

9    things.

17:36:01  10                    MR. JANUSH:  May I posit something to the

11    Court?

12                    SPECIAL MASTER COHEN:  Go ahead.

13                    MR. JANUSH:  Given the passage of time, given

14    the notion that this is in our interrogatories and that the

17:36:11  15    data that we're seeking is -- should not be unexpected from

16    the defendants, I think it would be beneficial if the Court

17    would be willing to enter some type of determination

18    requiring each defendant to confirm the data vendors that

19    they utilized for such reports, such as the DDD, such as the

17:36:36  20    NSP, such as the National Sales Audit, the NSA, such as the

21    prescription reports where the -- where prescriber habits

22    are identified and populated regionally and nationally so

23    that companies can get a sense of prescriber likes,

24    dislikes, et cetera --

17:36:59  25                    SPECIAL MASTER COHEN:  So --

1          MR. JANUSH:  -- just so that we can move the

2     ball forward.

3          SPECIAL MASTER COHEN:  Right.  So at the end

4     of your letter, you list -- there are three paragraphs

17:37:07  5     saying plaintiffs seek from each manufacturing defendant, et

6     cetera, right?

7          MR. JANUSH:  At the end of my letter, I do

8     list three paragraphs, correct.

9          SPECIAL MASTER COHEN:  And the first one is a

17:37:16  10     confirmation that the defendants have produced all of the

11     prescription level and other sales tracking data files?

12          MR. JANUSH:  Correct.

13          SPECIAL MASTER COHEN:  Right.  So what you

14     just suggested is different from any of these three

17:37:26  15     paragraphs, correct?

16          MR. JANUSH:  It just provides more detail.

17     Not -- not different.  Not fundamentally different at all.

18     If you read the -- the -- a confirmation -- the confirmation

19     that defendants have produced all the prescription level and

17:37:43  20     other sales tracking data files that they acquired, the

21     sales tracking data files are precisely what I'm speaking

22     to.

23          SPECIAL MASTER COHEN:  Right.  It is so ruled

24     that at the end of your letter, the paragraph numbered 1 is

17:37:59  25     something that all defendants need to do.

1    I think of that as part of the letter that's going to

2    happen already.  I just think of that as something that's --

3    I -- that I expect will occur by virtue of the earlier

4    directive.

17:38:15  5    MR. JANUSH:  May I move on to subparagraph 2,

6    because I think that that would help cut to the chase a bit

7    at this late date as well?

8    SPECIAL MASTER COHEN:  Well, as to 2 and 3,

9    which I have read, I think that that falls close to the part

17:38:28 10    of things where you need to meet and confer.  I'm not saying

11    you won't get it.  I just want to -- I want you all to meet

12    and confer and talk about this before we address it again.

13    MR. JANUSH:  Okay.  Thank you, Your Honors,

14    for your time.

17:38:44 15    SPECIAL MASTER COHEN:  Okay.  I think, Pete,

16    that I asked you to remind me of something that I didn't

17    want to remember at the end of this?

18    MR. WEINBERGER:  Yes.  Before the room empties

19    out, that you have an opportunity to talk with them about

17:38:56 20    the priorities and --

21    MR. RICE:  We wanted to start the meet and

22    confer while everybody's in town.

23    SPECIAL MASTER COHEN:  Right.  Right.  And

24    people are leaving even as we speak.

17:39:04 25    MR. RICE:  As soon as you say we'll talk about

```
           1    it later, everybody left.

           2                    MS. STRONG:  There's flights.  People have

           3    flights.

           4                    MS. WELCH:  Yeah, I have a flight.

17:39:14   5                    SPECIAL MASTER COHEN:  I'm not going to make

           6    anybody miss a flight.  Do your best.  You all really should

           7    hit that hard.  We are at the end of a very important

           8    period, and the next one begins right after it.

           9        And as I said, I don't have many tools left in my

17:39:32  10    toolkit except to spank people, and I really don't want to

          11    do it.

          12                    MR. MOUGEY:  Special Master Cohen, the issue

          13    about the amended complaints and ARCOS, the number of

          14    defendants we're going to have on the deadline by

17:39:43  15    November 15th, I've talked to Enu quickly, it was, what,

          16    today's -- just in the last 24, 48 hours, I spoke with Mark

          17    Cheffo as well, can we get some mechanism set up to figure

          18    out what the next step is, if any, or just --

          19                    MS. MAINIGI:  I'm waiting to hear back from --

17:40:10  20    I sent your request out, Peter, and I'm just waiting to hear

          21    back from people with thoughts.

          22                    MR. MOUGEY:  My concern today, Special Master

          23    Yanni, you said that we weren't going to get together again

          24    until 10-30.  If we can't get any resolution, we're two

17:40:25  25    weeks in front of that amended complaint deadline.
```

1           SPECIAL MASTER COHEN:  Is the counsel from

2     Mallinckrodt here still?

3           SPECIAL MASTER YANNI:  No.

4           SPECIAL MASTER COHEN:  I didn't think so.

17:40:37  5        All right.  Everybody, thank you all very much for

6     your patience and long attention spans.

7          Safe travels to you.

8           SPECIAL MASTER YANNI:  Thanks, everybody.

9                           -  -  -

10             (Proceedings concluded at 5:40 p.m.)

11

12

13

14                     **C E R T I F I C A T E**

15          I certify that the foregoing is a correct transcript
      of the record of proceedings in the above-entitled matter
16     prepared from my stenotype notes.

17          */s/ Sarah E. Nageotte*          *10/24/2018*
           SARAH E. NAGEOTTE, RDR, CRR, CRC          DATE

18

19

20

21

22

23

24

25