**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The Blackfeet Tribe of the Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al.*<br>Case No. 1:18-op-45749 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**REPLY MEMORANDUM IN SUPPORT**
**OF DISTRIBUTORS' MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.     THE RICO CLAIM SHOULD BE DISMISSED. ............................................................ 1

    A.    The Tribe Fails To Allege a Direct Injury. ........................................................ 1

        1.    The remoteness doctrine requires dismissal of Distributors. ...................... 1

        2.    The *Holmes* factors also counsel in favor of dismissal. ............................ 7

    B.    The Tribe Fails To Allege an Injury to Business or Property. ............................... 8

        1.    Medical and healthcare costs ..................................................................... 9

        2.    Costs of providing social services............................................................. 10

        3.    Injury to the Tribe's "revenue-generating function" ................................. 11

        4.    Decreased funding for non-opioid public services ................................... 12

    C.    The Tribe Fails To Allege "Racketeering Activity." ........................................... 13

        1.    Mail and wire fraud.................................................................................. 13

        2.    Controlled Substances Act violations ...................................................... 15

    D.    The Tribe Fails To Allege Participation in an Enterprise. ................................... 15

II.    THE FEDERAL NUISANCE CLAIM SHOULD BE DISMISSED. ............................. 16

III.   THE STATE-LAW NUISANCE CLAIMS SHOULD BE DISMISSED. ...................... 19

    A.    The Absolute Nuisance Claim Fails. .................................................................. 19

    B.    The Qualified Nuisance Claim Fails................................................................... 19

        1.    The Tribe fails to plead damage to a property right.................................. 20

        2.    The Tribe fails to plead the existence of a public right............................. 21

        3.    The Tribe fails to plead negligence........................................................... 22

IV.   THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED. ........................................ 22

    A.    The Tribe Cannot Identify a Common-Law Duty Distributors Owe to It. .......... 22

    B.    The Tribe Cannot Use Common-Law Negligence or Negligence *Per Se* To Remedy Alleged Violations of Federal and State Statutes. ................................. 24

C.      The Tribe Has Failed Adequately To Plead its Negligent
        Misrepresentation Claim against Distributors. ..................................................... 26

V.      THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED. .......................... 26

VI.     THE COMMON-LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE
        ADEQUATELY TO ALLEGE PROXIMATE CAUSATION. ...................................... 27

VII.    THE CONSUMER PROTECTION ACT CLAIM SHOULD BE DISMISSED. ............ 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ................................................................................................30

*Am. Dental Ass'n v. Cigna Corp.,*
    605 F.3d 1283 (11th Cir. 2010) .................................................................5, 6, 14, 16

*American Electric Power Co. v. Connecticut,*
    564 U.S. 410 (2011) ............................................................................................17, 18

*Ayres v. Gen. Motors Corp.,*
    234 F.3d 514 (11th Cir. 2000) ...............................................................................14

*Bank of Am. Corp. v. City of Miami,*
    137 S. Ct. 1296 (2017) ...............................................................................................6

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ............................................................................................1, 16

*Bennett v. Berg,*
    685 F.2d 1053 (8th Cir. 1982) ................................................................................11

*Canyon County v. Syngenta Seeds, Inc.,*
    519 F.3d 969 (9th Cir. 2008) ............................................................................10, 12

*City of Cleveland v. Ameriquest Mortgage Securities, Inc.,*
    615 F.3d 496 (6th Cir. 2010) ......................................................................... passim

*City of Everett v. Purdue Pharma L.P.,*
    2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) ..................................................24

*City of Milwaukee v. Illinois (Milwaukee II),*
    451 U.S. 304 (1981) ......................................................................................16, 17, 18

*City of New York v. BP P.L.C.,*
    325 F. Supp. 3d 466 (S.D.N.Y. 2018) ....................................................................17

*City of New York v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425 (2d Cir. 2008) ...................................................................................12

*Combs v. Int'l Ins. Co.,*
    354 F.3d 568 (6th Cir. 2004) ..................................................................................21

*County of Oakland v. City of Detroit,*
    866 F.2d 839 (6th Cir. 1989) ............................................................................11, 12

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*,
    528 F.3d 1001 (8th Cir. 2008) ................................................................6, 14

*Doe v. Bredesen*,
    507 F.3d 998 (6th Cir. 2007) ...................................................................9, 29

*Gross v. Waywell*,
    628 F. Supp. 2d 475 (S.D.N.Y. 2009)............................................................5

*Guaranteed Rate, Inc. v. Barr*,
    912 F. Supp. 2d 671 (N.D. Ill. 2012) .............................................................6

*Gucwa v. Lawley*,
    731 F. App'x 408 (6th Cir. 2018) ..................................................................9

*Hawaii v. Standard Oil Co. of Cal.*,
    405 U.S. 251 (1972)......................................................................................10

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
    668 F.3d 393 (6th Cir. 2012) .......................................................................13

*Hemi Grp., LLC v. City of New York*,
    559 U.S. 1 (2010)....................................................................................2, 6, 7

*Holmes v. Sec. Inv'r Prot. Corp.*,
    503 U.S. 258 (1992)................................................................................1, 7, 8

*Illinois Department of Revenue v. Phillips*,
    771 F.2d 312 (7th Cir. 1985) .......................................................................12

*Illinois ex rel. Scott v. City of Milwaukee*,
    366 F. Supp. 298 (N.D. Ill. 1973) ................................................................17

*In re Ingram Barge Co.*,
    2016 WL 1450027 (N.D. Ill. Apr. 13, 2016) ...............................................18

*In re Neurontin Marketing & Sales Practices Litigation*,
    712 F.3d 21 (1st Cir. 2013)............................................................................5

*In re Porsche Cars N. Am., Inc.*,
    880 F. Supp. 2d 801 (S.D. Ohio 2012) ........................................................14

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
    684 F. Supp. 2d 942 (N.D. Ohio 2009)........................................................14

*Jackson v. Sedgwick Claims Mgmt. Servs.*,
    731 F.3d 556 (6th Cir. 2013) (en banc) ...................................................9, 10

*Kerrigan v. ViSalus, Inc.*,
   112 F. Supp. 3d 580 (E.D. Mich. 2015)....................................................................5

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
   191 F.3d 229 (2d Cir. 1999)..................................................................................4

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
   1994 WL 88129 (S.D.N.Y. Mar. 15, 1994) ...........................................................13

*Michigan v. Fawaz*,
   848 F.2d 194, 1988 WL 44736 (6th Cir. May 9, 1988) (unpublished table decision)............12

*Michigan v. U.S. Army Corps of Engineers*,
   667 F.3d 765 (7th Cir. 2011) ...............................................................................18

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*,
   453 U.S. 1 (1981)................................................................................................18

*Moss v. BMO Harris Bank, N.A.*,
   258 F. Supp. 3d 301 (E.D.N.Y. 2017) ..................................................................16

*Native Village of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012) ..........................................................................16, 17

*O'Brien v. Nat'l Prop. Analysts Partners*,
   719 F. Supp. 222 (S.D.N.Y. 1989) ......................................................................13

*Oberson v. U.S. Department of Agriculture*,
   514 F.3d 989 (9th Cir. 2008) ...............................................................................28

*Perry v. Am. Tobacco Co.*,
   324 F.3d 845 (6th Cir. 2003) ............................................................................3, 6

*Price v. Pinnacle Brands, Inc.*,
   138 F.3d 602 (5th Cir. 1998) ...............................................................................12

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)............................................................................................10

*Schacht v. Brown*,
   711 F.2d 1343 (7th Cir. 1983) .............................................................................11

*Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*,
   249 F.3d 1068 (D.C. Cir. 2001)............................................................................8

*Shetiwy v. Midland Credit Mgmt.*,
   15 F. Supp. 3d 437 (S.D.N.Y. 2014).....................................................................13

*United States v. Fowler*,
   535 F.3d 408 (6th Cir. 2008) ................................................................................15

*United States v. Gimbel*,
   830 F.2d 621 (7th Cir. 1987) ................................................................................12

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006) ..........................................................................4

*United States v. Walgreen Co.*,
   846 F.3d 879 (6th Cir. 2017) ................................................................................13

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*,
   529 U.S. 765 (2000) ...............................................................................................8

*Wallace v. Midwest Financial & Mortgage Services, Inc.*,
   714 F.3d 414 (6th Cir. 2013) ................................................................................3

*Welborn v. Bank of N.Y. Mellon Corp.*,
   557 F. App'x 383 (5th Cir. 2014) (per curiam) ......................................10, 11, 12

## STATE CASES

*Barnes v. City of Thompson Falls*,
   979 P.2d 1275 (Mont. 1999) .................................................................................19

*Belue v. State*,
   649 P.2d 752 (Mont. 1982) ...................................................................................19

*City of Cincinnati v. Beretta U.S.A. Corp.*,
   768 N.E.2d 1136 (Ohio 2002) ...............................................................................21

*County of Cook v. Philip Morris, Inc.*,
   817 N.E.2d 1039 (Ill. App. Ct. 2004) ...................................................................3

*Doyle v. Clark*,
   254 P.3d 570 (Mont. 2011) ...................................................................................25

*Emanuel v. Great Falls Sch. Dist.*,
   209 P.3d 244 (Mont. 2009) ...................................................................................24

*Government of United States Virgin Islands v. Takata Corp.*,
   2017 WL 3390594 (V.I. Super. Ct. June 19, 2017) ..............................................21

*Hinebauch v. McRae*,
   264 P.3d 1098 (Mont. 2011) .................................................................................26

*Hinkle v. Shepherd Sch. Dist. No. 37*,
   93 P.3d 1239 (Mont. 2004) ...................................................................................22

*In re Opioid Litigation*,
    2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018)...................................................24

*Kiger v. State*,
    802 P.2d 1248 (Mont. 1990) ...................................................................................27, 29

*Mont. Petroleum Release Compensation Bd. v. Capitol Indem. Co.*,
    137 P.3d 522 (Mont. 2006) ...........................................................................................27

*N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*,
    296 P.3d 450 (Mont. 2013) ...........................................................................................27

*Osterman v. Sears, Roebuck & Co.*,
    80 P.3d 435 (Mont. 2003) .............................................................................................26

*Patten v. Raddatz*,
    895 P.2d 633 (Mont. 1995) ...........................................................................................25

*People v. Conagra Grocery Prods. Co.*,
    227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) ................................................................21

*Poole ex rel. Meyer v. Poole*,
    1 P.3d 936 (Mont. 2000) ...............................................................................................24

*State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*,
    919 A.2d 1116 (Del. 2007) .............................................................................................3

*State v. Lead Indus. Ass'n*,
    951 A.2d 428 (R.I. 2008) ..............................................................................................21

*State v. Philip Morris*,
    1998 Mont. Dist. LEXIS 732 (Mont. Dist. Ct. Sept. 22, 1998) .............................19, 20

*Stipe v. First Interstate Bank-Polson*,
    188 P.3d 1063 (Mont. 2008) .........................................................................................25

*Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC*,
    228 P.3d 1134 (Mont. 2010) .........................................................................................19

*U.S. Fidelity & Guaranty Co. v. Camp*,
    831 P.2d 586 (Mont. 1992) ...........................................................................................27

*Volk v. Goeser*,
    367 P.3d 378 (Mont. 2016) ...........................................................................................26

## STATUTES

18 U.S.C. § 1961(1)(D)..................................................................................................15

18 U.S.C. § 1964(c) ...........................................................................................8

21 U.S.C. § 843(a)(4)(A) ...............................................................................15

21 U.S.C. § 871 ..............................................................................................14

21 U.S.C. § 903 ..............................................................................................17

Mont. Code Ann. § 27-30-103 .......................................................................20

Mont. Code Ann. § 27-30-204 .......................................................................20

Mont. Code Ann. § 45-9-101 .........................................................................25

# OTHER AUTHORITIES

40 C.F.R. § 60.22 ...........................................................................................17

40 C.F.R. § 60.23 ...........................................................................................17

40 C.F.R. § 60.24(f)) .....................................................................................17

40 C.F.R. § 60.22(b)(5) ..................................................................................17

Fed. R. Civ. P. 8(a) ........................................................................................13

Fed. R. Civ. P. 9(b) ....................................................................13, 14, 29, 30

Fed. R. Civ. P. 12(b)(6) ...................................................................................9

Restatement (Second) of Torts § 302(B) .......................................................24

U.S. Dep't of Health & Human Servs., Facing Addiction in America:
    *The Surgeon General's Report on Alcohol, Drugs, and Health* (2016),
    https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf ..............2

Distributors incorporate by reference here the Introduction to their *Muscogee* reply brief.

## I.  THE RICO CLAIM SHOULD BE DISMISSED.

Distributors' opening brief demonstrated that the Tribe's RICO claim fails as to Distributors because the Tribe did not allege (1) a direct injury, (2) an injury to its business or property, (3) that each Distributor committed two or more predicate acts, or (4) that Distributors participated in the direction of a well-pled criminal enterprise.  The Tribe's Opposition fails to resuscitate its claims against Distributors.

### A.  The Tribe Fails To Allege a Direct Injury.

#### 1.  The remoteness doctrine requires dismissal of Distributors.

The Opposition asserts that the Tribe "suffered direct injury," Opp. 47, but no well-pled factual allegation involving Distributors supports this assertion.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Neither the Complaint nor the Opposition adequately sets forth ***facts*** showing that the Tribe was harmed as a ***direct*** result of Distributors' alleged predicate acts.  *See, e.g.*, *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

To state the Tribe's theory of causation is to show that it impermissibly "go[es] ***beyond the first step***." *Id*. at 271.[1]  According to the Opposition, the core of Distributors' alleged misconduct consists of "the failure to identify and report suspicious orders" to DEA.  Opp. 131 n.70.  But the Opposition makes no effort to explain how Distributors' alleged failure to report unidentified suspicious orders ***directly*** harmed the Tribe's revenue-generating function (or caused any other of its alleged injuries).  Even if Distributors "flooded" pharmacies in the Blackfeet Geographic Region with opioids, those medications would sit on pharmacy shelves, and there would be no possible reduction in tax revenue or increase in social services expenses without (i) doctors who

---

[1]    Unless otherwise noted, this Memorandum adds all emphasis in quotations and omits citations and internal quotation marks.

mis-prescribed opioid medicines, (ii) pharmacists who dispensed the medicines to those who should not have received them, (iii) patients who unlawfully sold or gave away their medicines, and/or (iv) individuals who stole the medicines from those to whom they were lawfully prescribed. Only because of the ***criminal*** conduct of those third parties could harm occur to the Tribe's members, and only as a result of harm to those members could the Tribe lose tax revenue or incur increased expenses.[2]  This attenuated chain of causation goes well beyond what the case law allows.  *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10–11 (2010) (substantially more direct claim for "lost tax revenue" held to be too "attenuated"); *see also* Br. 3–4 (discussing *Hemi*).

The Sixth Circuit's decision in *City of Cleveland v. Ameriquest Mortgage Securities, Inc.*, 615 F.3d 496 (6th Cir. 2010), underscores this conclusion.  There, the defendants were not the brokers who encouraged would-be homeowners to take subprime loans, or the local banks who loaned the money, but bankers who securitized the mortgages.  And the plaintiffs were not the homeowners whose mortgages were foreclosed and who lost their houses, but the city, which complained about lost tax revenue.  Applying *Holmes*, the Sixth Circuit held that the connection between the harm to the City and the defendants' misconduct was "too indirect to warrant recovery."  615 F.3d at 506.

The Opposition argues that this case is different because the alleged misconduct "matches the harm [the Tribe] suffered:  by engaging in a fraudulent scheme to promote the widespread use

---

[2]  Where Distributors are concerned, the Tribe's claim concerns "diversion"—that they "flood[ed] Montana and the Blackfeet Reservation" with opioids "by filling and failing to report orders that … were being diverted for illicit purposes."  Opp. 77.  By definition, diversion involves criminal activity.  *See* U.S. Dep't of Health & Human Servs., Facing Addiction in America:  *The Surgeon General's Report on Alcohol, Drugs, and Health*, glossary at 2 (2016), https://addiction.surgeongeneral.gov/sites/ default/files/surgeon-generals-report.pdf (defining "diversion" as the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use").  Thus, it is necessarily the case that the intervening criminal conduct of a third party stands between Distributors' alleged wrongdoing and any injury to the Tribe.

of addictive opioids[] and … fostering large-scale diversion, Defendants created the addiction problem that injures [the Tribe's] money or property." Opp. 47. But that purported distinction makes no difference at all, for the City of Cleveland alleged the same thing—that the defendant investment bankers engaged in a fraudulent scheme to promote the widespread use of subprime mortgages, fostering risky borrowing on a large scale by homeowners who could not afford the mortgages, and thereby creating a foreclosure problem the City had to spend money to combat. *See Ameriquest*, 615 F.3d at 499. This kind of connection, the Sixth Circuit confirmed, is too indirect.[3]

The decision of the Sixth Circuit in the tobacco litigation—as well as the unanimous decisions of eight other Circuits—similarly belies the Tribe's contention that it alleged a direct injury resulting from Distributors' alleged conduct. *E.g.*, *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849 (6th Cir. 2003) (affirming dismissal of RICO claim "because the alleged injuries [we]re too remote" from the conduct of the tobacco company defendants). Courts in those cases "unanimously" invoked the *Holmes* rationale to reject claims seeking to recover monies that plaintiffs had expended on the smoking-related healthcare costs of their citizens, members, and insureds.[4] As these many decisions recognize, the harms claimed by the third party payors "are

---

[3]  *Wallace v. Midwest Financial & Mortgage Services, Inc.*, 714 F.3d 414 (6th Cir. 2013), is not to the contrary. There, because the plaintiff alleged that he would not have refinanced his mortgage had its appraised value not increased, the court held that the fraudulent appraisal procured by the defendant bank could have "led directly" to the plaintiffs' decision to refinance. *Id.* at 420. Unlike the County's allegations against Distributors, it was possible in *Wallace* "to trace a straight line between the alleged fraud and the asserted injury." *Id.*

[4]  *State of São Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116, 1125 (Del. 2007) ("Multitudinous other state and federal appellate courts have unanimously invoked the same rationale in eighteen separate opinions, all holding that third-party payors or providers of medical services, including U.S. States and political subdivisions, … have no cognizable claims … to recover medical expenses from the tobacco companies…."); *see, e.g.*, *County of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1043 (Ill. App. Ct. 2004) (applying "direct-injury test" to affirm dismissal of claims by county seeking to recover increased healthcare costs).

entirely derivative"—that is, "[w]ithout injury to the individual smokers, the [plaintiffs] would not have incurred any increased costs …." *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999).  The same is true here:  without injury to individual opioid users, the Tribe would not have incurred increased expenses or lost any tax revenue.

The Opposition attempts to distinguish *Perry*, asserting that in "the Tobacco Cases … there were a host of causes that may have led to smoking and/or cancer."  Opp. 49.  But, even if that fact were relevant to the Court's holding (it was not), the same is true here:  numerous factors other than Distributors' alleged failure to report or halt suspicious orders contribute to opioid addiction and overdose.  Indeed, the Tribe itself emphasizes one such factor, asserting that "the increase in opioid prescriptions and addiction is directly traceable to the Manufacturers' unlawful and fraudulent marketing."  Opp. 49–50.  This alleged cause is entirely independent from Distributors, who are not alleged to have engaged in any alleged unlawful or fraudulent marketing.[5]

For this reason, the Tribe's observation (at Opp. 49) that *Perry* predates *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006), is not relevant to the Tribe's claim against Distributors.  In that case, the plaintiffs alleged that tobacco manufacturers "marketed and sold their lethal product with zeal, with deception, [and] with a single-minded focus on their financial success."  *Id.* at 28.  Similarly, the Tribe alleges that opioid manufacturers pursued a deceptive marketing campaign designed to "change … prescribing habits and public perception" of opioids and thereby "increase the demand for opioids."  Opp. 55; *see also id.* 2.  But there are— and could be—no comparable allegations regarding Distributors.

---

[5]  Nor does the fact that the Tribe seeks not only medical expenses but also injuries to its "revenue-generating functions" meaningfully distinguish the Tobacco Cases.  If a government's payment of medical expenses incurred by its citizens is too remote, then surely a reduction in tax revenues resulting from lost productivity on the part of citizens likewise is too remote.

The Tribe's reliance on *In re Neurontin Marketing & Sales Practices Litigation*, 712 F.3d 21, 28 (1st Cir. 2013), likewise is unavailing.  There, the plaintiffs alleged that a manufacturer conspired with "a web of entities to market a dangerous prescription drug for off-label use, deceiving doctors into prescribing it widely …."  Opp. 118.  The court held that the intervening conduct of physicians did not break the causal chain because the manufacturer targeted doctors with a "fraudulent marketing" scheme designed and intended to influence the prescribing decisions of doctors.  *Neurontin*, 712 F.3d at 39.  The Complaint, however, does not allege that **Distributors** played any role in the alleged campaign to change the prescribing habits for opioid medicines or made any misrepresentations regarding the risks or benefits of opioids.  Thus, even assuming that the Tribe's marketing-related allegations establish a direct link between Manufacturers' alleged conduct and the Tribe's injury, they provide no support for its claims against Distributors.

To be sure, the Complaint generically alleges a "conspiracy" among Distributors and Manufacturers, but those allegations provide no support for imposing RICO liability on Distributors.  The Tribe's allegation that Manufacturers and Distributors "were not two separate groups operating in isolation" but rather "operated together as a united entity … to engage in the unlawful sale of prescription opioids," Compl. ¶ 715, is wholly conclusory, and should not be credited by the Court.  *See, e.g.*, *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1293–94 (11th Cir. 2010); *see also infra* Part I.D.  Moreover, "each Defendant is entitled to an individualized analysis of his, her, or its own RICO liability."  *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 602 (E.D. Mich. 2015) (dismissing RICO conspiracy claim due to "group pleading deficiencies"); *accord Gross v. Waywell*, 628 F. Supp. 2d 475, 495 (S.D.N.Y. 2009) ("lumping the defendants into collective allegations results in a failure to demonstrate the elements of § 1962(c) with respect

to each defendant individually, as required") (collecting cases).[6]  It would thus be clear error for the Court to lump Distributors in with Manufacturers—call them "Defendants"—and on that basis fail to undertake an independent analysis of each Distributors' RICO liability.

At bottom, the Tribe's argument amounts to little more than the suggestion that it adequately alleged proximate causation because the Tribe was impacted by the opioid crisis. Under established precedent, that simply is not enough.  For instance, it was undisputed in *Hemi* that the City of New York lost tax revenue as a result of the defendants' failure to provide information about its customers' purchases.  559 U.S. at 5–6.  Similarly, in *Ameriquest*, there was no question that the City of Cleveland was adversely impacted by the foreclosure crisis that defendants allegedly helped create.  615 F.3d at 506.  And in the Tobacco Cases, it was well understood that the government, hospital, and insurer plaintiffs all had incurred dramatically increased costs as a result of smoking-related illness.  Yet in each instance, the mere fact that plaintiffs had been impacted by the defendants' alleged conduct was held insufficient as a matter of law.  Controlling precedent requires the same result here.[7]

---

[6]   *See Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 685 (N.D. Ill. 2012) ("Where, as here, the plaintiff brings RICO claims against multiple defendants, the plaintiff must plead sufficient facts to notify each defendant of his alleged participation in the scheme."); *see also Am. Dental Ass'n*, 605 F.3d at 1291 ("The plaintiff must allege facts with respect to each defendant's participation in the fraud."); *Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008) (similar).

[7]   The Tribe also suggests that it adequately pled proximate causation under RICO because its injury was a foreseeable consequence of Distributors' alleged conduct.  Opp. 45–46.  Even if that were true—and it is not, *see infra* Part IV.A—it would not save the Tribe's claims.  As the Supreme Court has explained, the concepts of directness and foreseeability are distinct, and in the RICO context it is not enough to allege that an indirect injury was the "foreseeable" and "intended" consequence of the defendants' conduct.  *Hemi*, 559 U.S. at 12; *see also Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017) ("foreseeability alone does not ensure the close connection that proximate cause requires"); *Perry*, 324 F.3d at 850 ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury.").

## 2. The *Holmes* factors also counsel in favor of dismissal.

The attenuated and derivative chain of causation alleged in the Complaint requires dismissal, irrespective of how the three *Holmes* policy factors apply. *See, e.g.*, *Hemi*, 559 U.S. at 8–11 (dismissing allegations on remoteness grounds without applying the *Holmes* factors); *Ameriquest*, 615 F.3d at 503 ("all three factors do not need to be present for remoteness to bar discovery"). In any event, the *Holmes* factors also favor dismissal.

***Directness.*** The first *Holmes* factor is grounded in the recognition that "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." 503 U.S. at 269. As explained above, the connection between Distributors' alleged conduct and the Tribe's alleged injury is highly attenuated and indirect. It therefore is unsurprising that the problems of proof identified in *Holmes* would be acute if the Tribe's claims are allowed to proceed.

Take, for example, the Tribe's claim for lost "tax revenue due to the decreased efficiency … of the working population." Compl. ¶ 852(k). In order to establish that a given Distributor is responsible for lost tax revenue, it would be necessary, at least, to determine whether:

- the decrease in efficiency is due to opioid use or abuse, or some other cause;

- the user (and/or her doctor) was a victim of Manufacturers' alleged deceptive marketing campaign (in which case no Distributor would be liable);

- criminal acts—be it the user herself stealing or otherwise improperly obtaining the drugs or a "pill mill" doctor writing prescriptions in the absence of a legitimate medical need— were the immediate cause of the user's addiction or overdose; and

- a given Distributor was responsible for supplying a "suspicious pharmacy" order that had any impact on the user's efficiency.

In short, it would be impossible to tell whether the Tribe's purported injuries are due to a given Distributor's failure to report or halt a suspicious pharmacy order, as opposed to the myriad other, independent factors that might have led to the Tribe's purported harm.

*Apportionment of damages.*  The second *Holmes* factor is based on the concern that "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages ***among plaintiffs*** removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries."  503 U.S. at 269.  Thus, the Tribe's argument that its alleged "damages may be properly and efficiently apportioned ***among the Defendants***," Opp. 46, even if it were true, is irrelevant.  The concern animating this *Holmes* factor is present here: absent a prohibition on recovery for indirect and derivative injuries, myriad parties—including the directly injured opioid user, his health insurer, the hospital that treats him, and the city, county, and state where he lives—could all seek recovery based on the same underlying injury.

*Directly injured victims can sue.*  The third *Holmes* factor is based on the recognition that "directly injured victims can generally be counted on to vindicate the law."  503 U.S. at 269.  There can be no real dispute here that if, as the Complaint alleges, Distributors' conduct led individual Blackfeet Geographic Region residents to become addicted to opioids, or to overdose on opioids, those immediate victims can sue.  The ability of those third parties to bring suit counsels against allowing claims by the Tribe.  *E.g.*, *Serv. Emps. Int'l Union Health & Welfare Fund v. Philip Morris Inc.*, 249 F.3d 1068, 1074 (D.C. Cir. 2001) ("[I]ndividual smokers may be counted on to vindicate the public interests at stake in the third factor by asserting various theories of recovery against the tobacco industry."); *Ameriquest*, 615 F.3d at 506 (dismissing RICO claim in part because "more immediate victims can sue to the extent that the Defendants violated any laws"); *see* West Boca Br., Dkt. 684-1 at Part I (discussing lawsuits brought by individual opioid users).

## B.     The Tribe Fails To Allege an Injury to Business or Property.

Only a "***person***" injured in his "business or property" may bring a RICO claim.  18 U.S.C. § 1964(c).  The Tribe does not dispute that, absent an "affirmative showing of statutory intent," the term "'person' does not include the sovereign."  *Vt. Agency of Nat. Res. v. United States ex rel.*

*Stevens*, 529 U.S. 765, 780–81 (2000). The Tribe does not—and cannot—point to any such statutory intent here. Because it is not a "person" insofar as it seeks to vindicate its sovereign interests in the collection of tax revenue and the like, the Tribe's RICO claim fails as a matter of law. *See* Br. 6–8.

Even setting aside this threshold defect, none of the fifteen discrete forms of injury—which can be grouped into four broad categories—is cognizable under RICO.

### 1.  Medical and healthcare costs

Under controlling Sixth Circuit precedent, "both personal injuries ***and pecuniary losses flowing from those personal injuries*** fail to confer relief under [RICO]." *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 565–66 (6th Cir. 2013) (en banc). The Complaint asserts as RICO injury, and seeks as alleged damages, "[c]osts for providing healthcare and medical care." Compl. ¶ 883(b); *accord id.* ¶ 883(c), (d), (e), (f), (g) (also seeking medical and treatment costs). The Opposition, however, makes no effort to defend these categories of injury as recoverable under *Jackson*—nor could it. The Tribe's claim for healthcare and medical care expenses therefore should be dismissed as abandoned. *See Doe v. Bredesen*, 507 F.3d 998, 1007–08 (6th Cir. 2007) (affirming dismissal of a claim as abandoned where opposition brief failed to respond to argument made in motion to dismiss).

Any contention that discovery is needed prior to dismissing the Tribe's claims for medical expenses would be erroneous. *Jackson* itself, for example, was decided on a Rule 12(b)(6) motion. So, too, was *Gucwa v. Lawley*, 731 F. App'x 408, 412 (6th Cir. 2018), in which the Sixth Circuit applied *Jackson* to hold that "***medical expenses*** … ***do not confer relief under*** [***RICO***]." No amount of discovery possibly could convert a claim seeking "[c]osts for providing healthcare and

medical care" to the Tribe's members into a claim that is cognizable under settled Sixth Circuit precedent.

### 2.    Costs of providing social services

The Complaint asserts as RICO injury, and seeks as alleged damages, costs for providing social services—including police, fire and emergency response services—to the Tribe's members. Compl. ¶ 883(c), (e), (h), (i), (j), (m).  For two separate reasons, these categories of alleged injury are not cognizable under RICO.

First, those purported injuries, too, "flow from" personal injury.  *Jackson*, 731 F.3d at 566. Were it not for the personal injury of opioid users, there would be no need, for example, to "provid[e] police officers, firefighters, and emergency and/or first responders with naloxone" or to "train[] emergency and/or first responders in the proper treatment of drug overdoses."  Compl. ¶ 883(c)–(d).  The Opposition offers no meaningful response to this argument.

Second, the weight of circuit authority holds that a government can assert a RICO claim only for injury to its "commercial interests"—i.e., "injuries suffered in its capacity as a consumer of goods and services"—but not for "general injury to the economy or to the Government's ability to carry out its functions."  *Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383, 387 (5th Cir. 2014) (per curiam).  In other words, money "expended on public health care and law enforcement services" by local governments does not constitute an injury to business or property under RICO. *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 971–72 (9th Cir. 2008).  The Opposition does not argue otherwise.  While there is no Sixth Circuit or Supreme Court authority directly on point, the Supreme Court has held that the phrase "business or property" refers "to commercial interests or enterprises."  *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972).  This holding was not undermined, but rather reaffirmed, in *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979), where the Supreme Court again made clear that a government may recover only in its

10

capacity "as a party to a commercial transaction," not for damage to its "general economy." *Id.* at 341–42. Nor is there even a single court of appeals decision that has permitted a claim for governmental expenditures under RICO. *Schacht v. Brown*, 711 F.2d 1343, 1357–58 (7th Cir. 1983), and *Bennett v. Berg*, 685 F.2d 1053, 1059 (8th Cir. 1982), merely hold that—while a "competitive injury" is required in the antitrust context—it is not required under RICO. Neither decision considers whether—let alone holds that—a governmental body may recover for costs incurred in providing government services to residents.

### 3. Injury to the Tribe's "revenue-generating function"

The Tribe also is wrong that it may recover "lost taxes" resulting from decreased productivity or diminished property values under RICO. *See* Compl. ¶ 883(k), (l), (n), (o). It cites *Welborn* to argue that it may assert a claim for injury to its "revenue-generating function[s]," Opp. 120–21, but the Opposition quotes a snippet from *Welborn* out of context while disregarding its actual holding. In *Welborn*, officials responsible for maintaining local land records brought RICO claims alleging that fraudulent statements "caused fewer filings in their offices, which in turn injured them by decreasing fee revenues …." 557 F. App'x at 386. The court dismissed those claims as not "legally cognizable," explaining that, "[w]hen a government sues under the civil RICO statute, the 'business or property' element requires that the injury 'refer to ***commercial*** interests or enterprises.'" *Id.* at 387–88 & n.4. Applying that rule, the court reasoned that the fees generated by the land recording systems did not "serve a revenue-generating function" that amounted to "***commercial activity***," but rather "a public service" that constituted "a governmental function." *Id.* at 387. *Welborn* therefore does not hold that a local government may recover for lost taxes or other non-commercial injuries; it holds precisely the opposite.

The additional cases the Opposition cites do not support a different conclusion. In *County of Oakland v. City of Detroit*, 866 F.2d 839 (6th Cir. 1989), the county sued, not in its governmental

capacity, but in a commercial capacity as a purchaser of sewer services from Detroit.  *Id.* at 841. Thus, the Sixth Circuit's decision is entirely consistent with the rule that a local government may assert a RICO claim to vindicate its interests as a market participant, but not when it acts in its "sovereign or quasi-sovereign capacity" to "enforce the laws or promote the public well-being." *Canyon Cty.*, 519 F.3d at 976; *accord Welborn*, 557 F. App'x at 387.  And the Seventh Circuit's 33-year-old decision in *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985), was expressly rejected by the Sixth Circuit in a case involving "quite similar" circumstances. *Michigan v. Fawaz*, 848 F.2d 194, 1988 WL 44736, at *2 (6th Cir. May 9, 1988) (unpublished table decision) ("Because our doubts have ripened into a conviction that RICO does not apply to the circumstances of this case, we are not persuaded to adopt the reasoning of [*Phillips*].").

Finally, the Opposition cites *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 445 (2d Cir. 2008), in support of its claim for "lost taxes."  That case, however, stands only for the proposition that the government has a property interest in taxes that are legally due.  The Tribe does not—and, to Distributors' knowledge, could not—point to any case standing for the dubious proposition that governments have a property interest in taxes that might have become due but for declines in property values or the productivity of their residents.  *See, e.g.*, *United States v. Gimbel*, 830 F.2d 621, 626–27 (7th Cir. 1987) (no "business or property" interest in tax revenues that might have become due but for defendant's alleged misconduct); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests … is not sufficient to confer RICO standing.").

### 4.      Decreased funding for non-opioid public services

Lastly, the Complaint alleges as RICO injury "[l]osses caused by the decrease in funding available for Plaintiff's public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic."  Compl. ¶ 883(a).  But that is not a

12

discrete category of damages; it is double-counting.  If, for example, the Tribe spent $100,000 in order to provide opioid-related public services, and that led to a $100,000 reduction in the budget for public parks, the Tribe plainly would not be entitled to $200,000 in damages.  The Court should thus disregard the Tribe's purported "decrease in funding" injury.

### C.  The Tribe Fails To Allege "Racketeering Activity."

For the reasons explained in Distributors' *Summit County* reply, the Tribe fails adequately to allege that Distributors each committed two or more RICO predicate acts.  Dkt. 744 at Part I.C.

### 1.  Mail and wire fraud

The Tribe admits that Rule 9(b) applies to its mail and wire fraud allegations.  Opp. 53. "[I]n order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012).  Because the Complaint does not identify with particularity any alleged misrepresentation or omissions on the part of Distributors, its RICO claim fails as a matter of law.[8]

The Tribe argues that Rule 9(b) should be "relaxed" in this case.  Opp. 52.  But, as the Sixth Circuit made clear just last year, this Court has "no more authority to 'relax' the pleading standard established by Civil Rule 9(b) than [it does] to increase it."  *United States v. Walgreen*

---

[8]  *Shetiwy v. Midland Credit Mgmt.*, 15 F. Supp. 3d 437, 443 (S.D.N.Y. 2014) ("When bringing a [RICO] claim against multiple defendants, the plaintiff must allege that *each defendant* committed two or more predicate acts."); *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (holding that a RICO plaintiff "cannot satisfy Rule 9(b) by masking the lack of factual allegations against each defendant through broad allegations which combine the acts of several defendants to create the impression that all engaged in every aspect of the alleged fraud."); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1994 WL 88129, at *15 (S.D.N.Y. Mar. 15, 1994) ("Even Rule 8(a) pleading requires plaintiffs to identify the specific defendant charged with committing a particular predicate act, rather than collectivizing a group of defendants as plaintiffs have done here.").

*Co.*, 846 F.3d 879, 881 (6th Cir. 2017).  Nor does the assertion that the Tribe's "Supply Chain" claim is "omission-based," Opp. 60, provide any basis for relaxing the requirements of Rule 9(b).  *See, e.g.*, *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 848 (S.D. Ohio 2012) (applying Rule 9(b) equally to alleged omissions as to alleged misrepresentations).[9]  According to the Tribe, the "omissions and misrepresentations that form the basis of the mail and wire fraud claims [against Distributors] are the failure to identify and report suspicious."  Opp. 131 n.70.  But the Complaint fails to provide even a single example of a "suspicious" order that a Distributor purportedly failed to report.  While the Tribe points out that Distributors have paid civil penalties relating to the failure to support suspicious orders, Compl. ¶¶ 750–57, those allegations do nothing to establish the existence of any reporting failures regarding orders placed by pharmacies within the Blackfeet Geographic Region.[10]

Finally, it is of no moment that the Complaint makes a conclusory allegation of a conspiracy among Distributors and Manufacturers.  Under Rule 9(b), Plaintiffs' obligation to "state with particularity the circumstances constituting fraud" extends to "each defendant's participation in the fraud."  *Am. Dental Ass'n*, 605 F.3d at 1291; *see also Craig Outdoor Advert.*, 528 F.3d at 1027 ("The requirements of § 1962(c) must be established as to each individual defendant.").  The absence of particularized allegations relating specifically to Distributors thus is fatal to the RICO claim against them.

---

[9]  To the extent that *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009) holds otherwise, it effectively has been overruled by *Walgreen*.

[10]  The failure to report suspicious orders to DEA also cannot serve as a RICO predicate act because the alleged failure to make required disclosures to the federal government is not actionable under mail and wire fraud statutes.  *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 521–25 (11th Cir. 2000).  The Tribe purports to distinguish *Ayres* on the ground that the statute at issue there contained its own enforcement mechanisms.  Opp. 132.  But the same is true here:  under the federal CSA, the Attorney General is entitled to bring an enforcement action in the event that a wholesale distributor fails to comply with its suspicious order reporting requirements.  21 U.S.C. § 871.

### 2.    Controlled Substances Act violations

The Tribe alleges that Distributors violated 21 U.S.C. § 843(a)(4)(A), which makes it unlawful to "furnish false or fraudulent material information in, or omit any material information from, any application, report, record, or other document required to be made, kept, or filed" under the Controlled Substances Act ("CSA").  Violations of 21 U.S.C. § 843(a)(4)(A), however, do not qualify as RICO predicate acts.  Those record-keeping provisions do not involve "the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical."  18 U.S.C. § 1961(1)(D).  Even assuming (contrary to fact) that Distributors concealed information from DEA, that is not the same as concealing controlled substances themselves.  While the felonious concealment of a controlled substance is a RICO predicate act, the alleged concealment of information relating to "suspicious" orders of a controlled substance plainly is not.

### D.    The Tribe Fails To Allege Participation in an Enterprise.

The Tribe fails properly to allege the existence of an enterprise involving Distributors—let alone one whose affairs they had "some part in directing."  *United States v. Fowler*, 535 F.3d 408, 419 (6th Cir. 2008); *see* Summit Reply, Dkt. 744 at Part I.D.

The Tribe suggests that the RICO enterprise had the common purpose of expanding prescription opioid use by altering the medical community's prescribing practices of opioids through repeated fraudulent statements.  But those allegations relate exclusively to the so-called Opioid Marketing Enterprise.  Distributors are not alleged to be participants in that enterprise, and so the marketing-related allegations are irrelevant as to Distributors.

To be sure, the Complaint alleges that the Manufacturers and Distributors were "not two separate groups operating in isolation or two groups forced to work together in a closed system," but rather they "operated together as a united entity, working together on multiple fronts, to engage

15

in the unlawful sale of prescription opioids."  Compl. ¶ 52.  But that allegation is wholly conclusory and should be disregarded by the Court.  *See Twombly*, 550 U.S. at 555.  Nor does the allegation that Distributors and Manufacturers participated in trade associations provide any support for the enterprise allegations.  *See, e.g.*, *Am. Dental Ass'n*, 605 F.3d at 1295 ("participation in trade organizations provides no indication of conspiracy"); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 n.4 (E.D.N.Y. 2017) (similar).  That those trade associations purportedly enabled Manufacturers and Distributors to form "interpersonal relationships," "strengthen[] alliances," and "hold strategic business discussions," Compl. ¶¶ 521–22, 526, moreover, proves nothing.  The whole point of trade associations is to form relationships and provide a forum for business discussions.  Thus, while the Tribe's claim may be "consistent with conspiracy," in the absence of "further factual enhancement[,] it stops short of the line between possibility and plausibility," and thus should be dismissed.  *Twombly*, 550 U.S. at 554, 557; *see supra* Part I.A.1.

## II.  THE FEDERAL NUISANCE CLAIM SHOULD BE DISMISSED.

The Tribe's nuisance claim is displaced by the federal CSA.  Its attempts to argue otherwise are meritless.  First, the Tribe makes the remarkable claim that DEA's regulations, including the suspicious order regulation that forms the foundation of its claims against Distributors, are irrelevant to the displacement analysis.  Opp. 72.  The Tribe relies for this argument on a statement by the Ninth Circuit in *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 858 (9th Cir. 2012), that "Congressional action, not executive action, is the touchstone of displacement analysis."  But the court in *Kivalina* (which found displacement) noted only that the ***failure*** of the executive to act, in a situation where Congress had delegated it the power to do so, affected the displacement analysis.  *Id.* at 857.  Where the agency ***has*** acted, in contrast, its regulations help explain the scope of the "comprehensive regulatory program" that Congress has ordained.  *City of Milwaukee v. Illinois (Milwaukee II)*, 451 U.S. 304, 317 (1981).  Thus, the Supreme Court in

*American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011), cited to the EPA's regulations multiple times in discussing the scope of Congress's delegation under the Clean Air Act.  *Id.* at 424, 427–28 (citing 40 C.F.R. §§ 60.22, 60.23, 60.24(f), 60.22(b)(5)).

Second, the Tribe suggests that the CSA must not displace federal common law because it believes that the CSA has been ineffective.  Opp. 72–73.  But courts have had no trouble finding that the Clean Air Act displaces federal common law over climate change, even though many would argue that current federal law is inadequate to address the problem.  *Am. Elec. Power*, 564 U.S. at 415; *Kivalina*, 696 F.3d at 856; *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 472 (S.D.N.Y. 2018).  The Tribe cannot evade displacement merely by arguing that Congress's delegation does not work, because it is the delegation itself that displaces.

Third, the Tribe argues that the CSA does not displace federal law because it explicitly protects an avenue for state regulation of controlled substances.  Opp. 73 (citing 21 U.S.C. § 903).  The case that the Tribe relies upon for this principle, *Illinois ex rel. Scott v. City of Milwaukee*, 366 F. Supp. 298 (N.D. Ill. 1973), is not good law.  The court in that case held that the Clean Water Act Amendments of 1972 did not displace federal nuisance law, *id.* at 299, a conclusion that the Supreme Court squarely rejected in *Milwaukee II*.  451 U.S. at 317.

Similarly, the Tribe is incorrect that the lack of a "private enforcement mechanism" implies that the CSA does not displace federal common law.  Opp. 75.  The Supreme Court has never conditioned displacement on the existence of such a mechanism.  Moreover, the private enforcement mechanism in the Clean Air Act, which the Supreme Court mentioned in *AEP*, is a "petition for a rulemaking"—not an action for damages.  564 U.S. at 425.  Displacement can occur even where it would extinguish a private damages remedy.  *Kivalina*, 696 F.3d at 857 (holding that "the type of remedy asserted is not relevant to the applicability of the doctrine of displacement"

17

and finding damages action displaced); *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 22 (1981) (dismissing damages claims because "federal common law of nuisance in the area of water pollution is entirely pre-empted" by the Clean Water Act).

The Tribe engages in an extended treatment of *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765 (7th Cir. 2011), but the differences between that case and this one are significant. In *Michigan*, the Seventh Circuit held that nuisance claims survived displacement because federal law does not speak with sufficient clarity to the issue of invasive species. *Id.* at 778. The "regulatory program" there, the Seventh Circuit recognized, consisted of little more than "study[ing] the invasive species problem and propos[ing] solutions," not of actually regulating the issue. *Id.* at 780. The CSA's regulation of controlled substances distributions, in contrast, goes far beyond mere studies; its provisions touch each sale of controlled substances that Distributors make. The Tribe also relies upon *In re Ingram Barge Co.*, 2016 WL 1450027 (N.D. Ill. Apr. 13, 2016), but that case addresses displacement in the context of the United States' rights under maritime law, which presents issues not at all like those implicated here. *Id.* at *18.

Lastly, in a footnote, the Tribe makes the remarkable claim that the CSA does not displace federal common law because "the CSA does not govern *every* distributor or manufacturer transaction or statement." Opp. 74 n.37 (emphasis in original). Distributors are being sued for their distribution of controlled substances, and the CSA does, in fact, individually monitor (through ARCOS) and regulate each and every shipment of controlled substances made by Distributors. Because the CSA "speaks directly to the question" of whether Distributors' appropriately distributed controlled substances, any federal common law claim is displaced. *Am. Elec. Power*, 564 U.S. at 424; *Milwaukee II*, 451 U.S. at 317.

18

## III.   THE STATE-LAW NUISANCE CLAIMS SHOULD BE DISMISSED.[11]

### A.   The Absolute Nuisance Claim Fails.

To plead an absolute nuisance, the Tribe must allege a nuisance "***the substance*** [] ***of which is not negligence***." *Barnes v. City of Thompson Falls*, 979 P.2d 1275, 1278 (Mont. 1999). That is, an activity or condition can be an absolute nuisance only if it is a nuisance even when performed or maintained without fault. The Tribe ignores this requirement. As Montana law recognizes, this doctrine cannot be applied to conduct, like the distribution of controlled substances, which a governing statute explicitly permits. Br. 14. *Tally Bissell Neighbors, Inc. v. Eyrie Shotgun Ranch, LLC*, 228 P.3d 1134 (Mont. 2010), is distinguishable because the statute there did not explicitly permit shooting ranges; rather, it exempted shooting ranges from certain laws, but not from civil nuisance. *Id.* at 393. The CSA, in contrast, expressly permits DEA-licensed distributors to distribute controlled substances. *State v. Philip Morris*, 1998 Mont. Dist. LEXIS 732 (Mont. Dist. Ct. Sept. 22, 1998), is distinguishable because it did not mention absolute nuisance. Because the Tribe must show fault for Distributors to be liable for nuisance, their claim may proceed (if at all) only as one for qualified nuisance. *E.g.*, *Barnes*, 979 P.2d at 1278.

### B.   The Qualified Nuisance Claim Fails.

The Tribe's qualified nuisance claim cannot succeed because (1) the Tribe fails to plead an injury to a property right, (2) its claims do not implicate a public right, and (3) the Tribe fails to plead negligence. In addition, because Montana and federal nuisance law stem from the same

---

[11]   As in their opening brief, Distributors treat the Tribe's "statutory" and "common law" nuisance claims together because "Montana has codified common-law public nuisance." Br. 14. Distributors disagree with the Tribe's argument that these should be considered wholly separate causes of action. Opp. 89. Rather, as the Montana Supreme Court has made clear, the state's nuisance statute embodies and incorporates common-law nuisance principles. *Belue v. State*, 649 P.2d 752, 754 (Mont. 1982). The statute and common law are thus inseparable. This reading of Montana law does not "repeal" any part of the common law. Opp. 89. It merely recognizes that Montana has merged the common law into a statute.

general principles, the federal common-law nuisance claim, if it is not displaced, fails for these reasons as well.  *See* Br. 18 n.16.

### 1.    The Tribe fails to plead damage to a property right.

To be a proper plaintiff for a nuisance action under Montana law, a plaintiff must be a "person whose property is injuriously affected or whose personal enjoyment is lessened by the nuisance."  Mont. Code Ann. § 27-30-103.  The Tribe falls into neither of the two enumerated categories; it instead seeks compensation for pecuniary harms.  *See* Br. 15–16.

The Tribe nevertheless argues that "there is no requirement that public nuisance must involve an interference with land or property."  Opp. 84.  Thus, citing *State v. Philip Morris*, 1998 Mont. Dist. LEXIS 732, the Tribe relies on the "personal enjoyment" prong, arguing that it can bring a nuisance claim because "a public entity can suffer a loss of 'personal enjoyment' and interference with 'life.'"  Opp. 84–85.  That case is inapplicable to the Tribe for two reasons.  First, the State of Montana brought the *Philip Morris* case, and the State is not bound by the requirements of Section 27-30-103.  *Cf.* Mont. Code Ann. § 27-30-204 (permitting "public bod[ies]" to abate all public nuisances but permitting others to abate nuisances only if the nuisance is "specially injurious" to them).  Second, even assuming the Tribe could in theory piggyback on the "personal enjoyment" interests of its members—who, after all, are themselves capable of suing—the Tribe specifically disclaims that it is asserting its members' rights.  *See* Opp. 78–79 ("[T]he Tribe's public nuisance claim does not seek recovery based on, or for, the personal injuries of any individual resident.").

In any event, as described in Distributors' opening brief, the types of property or personal enjoyment harms that public nuisance traditionally contemplates are connected with the use of land or public resources.  Br. 15–16.  The Tribe argues that this is wrong and attempts to distinguish Manufacturers' examples of this principle, *see* Opp. 85–86, but *State v. Philip Morris* is its only

counterexample in Montana law. That case—in addition to being an unpublished state trial court decision that apparently does not analyze the relevant argument—dealt with the very different situation of a claim by the State, which traditionally enjoys broader powers in addressing alleged nuisances than private parties. It thus is not instructive here.

### 2. The Tribe fails to plead the existence of a public right.

The Tribe argues that the "public right" which it seeks to vindicate through its nuisance claims is the public health. Opp. 79–81. But, as explained in Distributors' Muscogee (Creek Nation) Reply, "public health" and "public right" are not synonymous. *See* Muscogee Reply at Part IV.C; *State v. Lead Indus. Ass'n*, 951 A.2d 428, 436, 448 (R.I. 2008) ("lead poisoning constitutes a public health crisis," but does not involve "public rights").

The Tribe further argues that Defendants are incorrect to suggest that this type of individual, products-liability-type of nuisance claim is not recognized in Montana because Defendants have not shown that a Montana court has rejected it. Opp. 81. But it is *the Tribe* who must justify the adoption by a federal court of "substantive innovation in state law." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004). As Distributors have explained, most courts to have considered the issue have declined to extend nuisance law to products-based claims. *See* Br. 16; Summit Br., Dkt. 491-1 at Part II.A.[12]

---

[12] The cases that have recognized products-based nuisance claims, moreover, are distinguishable. For example, in *People v. Conagra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 529 (Cal. Ct. App. 2017), the court found that a nuisance claim could be maintained because it was based on "affirmative promotion of lead paint for interior use, not [its] mere manufacturer and distribution … or [defendants'] failure to warn of its hazards." The Tribe does not contend that Distributors engaged in any affirmative promotion of opioids. And gun violence, the subject of *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), often affects citizens' ability to be safe in public spaces. In any event, common-law nuisance claims have been abrogated in Ohio by the Ohio Products Liability Act. *Summit County* Report and Recommendation, Dkt. No. 1025 at 65–66. And the subject of the nuisance claims in the Virgin Islands trial court decision in *Government of United States Virgin Islands v. Takata Corp.*, 2017 WL 3390594 (V.I. Super. Ct. June 19, 2017), was a defective airbag which could affect any

### 3.      The Tribe fails to plead negligence.

As Distributors explain in Part IV below, the Tribe's negligence claims fail.  Consequently, its qualified nuisance claim also must fail.

## IV.      THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED.

The Opposition fails to save the Tribe's negligence claims for three reasons.  First, the Tribe cannot identify a common-law duty Distributors owe to it.  Second, the Tribe cannot use common-law negligence or negligence *per se* as a back door to remedy alleged violations of statutes that do not have private rights of action.  Finally, the Tribe cannot state a claim for negligent misrepresentation against Distributors because the misrepresentations alleged in the Complaint were made by Manufacturers.

### A.      The Tribe Cannot Identify a Common-Law Duty Distributors Owe to It.

Under Montana law, as the Tribe concedes, "[d]uty is a legal issue."  Opp. 90.  Citing no authority, the Tribe alleges that "Defendants owe a duty of care not to deceitfully market dangerously addictive drugs nor to deliver them into illicit channels."  Opp. 91.  This is because, the Tribe argues, its alleged injuries were "foreseeable."  Opp. 92–93.  But "[f]oreseeability constitutes a limitation"—not an expansion—"on the otherwise potentially infinite liability which would follow every alleged negligent act …."  *Hinkle v. Shepherd Sch. Dist. No. 37*, 93 P.3d 1239, 1244 (Mont. 2004).  The Complaint's allegations explain, in explicit detail, why harm to the Tribe was *not* foreseeable to Distributors.  The Tribe alleges that Manufacturers' multi-pronged marketing campaign was designed to, and did, change the standard of care for prescribing opioid medications, creating a new orthodoxy under which opioids safely could be prescribed to the vastly larger number of persons with chronic pain, for long periods of time, in ever higher doses.  *E.g.*,

---

individual who happened to ride in a vehicle with it.  To the extent that opioids cause harm, in contrast, they do so to those who voluntarily take them.

22

Compl. ¶¶ 11–13, 124–30, 144–67, 173–201.  Precisely because the standard of care changed (allegedly due to Manufacturers' marketing), DEA authorized ever-increasing manufacturing quotas for prescription opioids between 1993 and 2015, based on its expert judgment that there was an increasing legitimate medical need.  Accordingly, the Tribe's own allegations establish that the increasing volume of prescriptions and increasing pharmacy orders were not "suspicious" but were a reflection of the new prescribing orthodoxy.  The harm the Tribe alleges was no more foreseeable to Distributors than it was to DEA.

Second, where Distributors are concerned, the allegation is that they failed to prevent "diversion" by failing to report and halt shipment of "suspicious" orders.  The problem with this argument is that Distributors have no duty to prevent the criminal misconduct of third parties.  The Tribe urges the Court to discount this argument, asserting that Distributors' liability is "based on their own conduct."  Opp. 93 (emphasis omitted).  To the contrary, as the Tribe concedes, Distributors stand near the top of a lengthy distribution chain.  Distributors' "own conduct" is limited to delivering controlled substances to licensed pharmacies within quotas set by DEA.  Pharmacists are required, by federal and state laws, to dispense the controlled substances only to patients with a valid prescription, signed by a licensed physician upon a determination of the patient's legitimate medical need.  For the Tribe to be injured, patients must then use (or, rather, misuse) the controlled substances in a manner that necessitates use of the Tribe's resources.  Thus, where "diversion" is concerned, standing between Distributors and the Tribe are pharmacists, doctors, and opioid users—at least one of whom necessarily has engaged in criminal wrongdoing.  The harm the Tribe alleges could not have occurred without the malfeasance of these other actors with whom Distributors have no relationship and whose misconduct could not have been foreseeable to Distributors.  This case therefore "stands in sharp contrast to the facts in … *Lopez*,"

which the Tribe cites (at 92, 94), "where a reasonable person in the shoes of the defendant should have foreseen that their action or inaction was likely to result in harm to someone in the community." *See Emanuel v. Great Falls Sch. Dist.*, 209 P.3d 244, 248 (Mont. 2009).[13]

Finally, even assuming that Distributors have a duty to report or prevent suspicious orders, that duty does not run to the Tribe. To state a claim for negligence, a complaint must plead that the defendant owes a duty **to the plaintiff**. *See, e.g.*, *Poole ex rel. Meyer v. Poole*, 1 P.3d 936, 940 (Mont. 2000) ("In order to sustain a claim for negligence, a plaintiff must establish a legal duty on the part of the defendant, a breach of that duty, causation, and damages. Thus, we must first address whether Don owed a legal duty to David."). The Complaint fails to allege that Distributors have any relationship with the Tribe that conceivably could give rise to such a duty.

### B.     The Tribe Cannot Use Common-Law Negligence or Negligence *Per Se* To Remedy Alleged Violations of Federal and State Statutes.

The Tribe argues that it does not "seek to enforce statutory duties"; rather, that the statutes and regulations it cites are "relevant to the standard of care to be applied in determining whether Defendants have breached their common-law duties." Opp. 99. As an initial matter, that is not what the Complaint says. *See, e.g.*, Compl., ¶ 1010 ("These federal regulations impose a non-delegable duty …."); *id.* ¶ 1016 ("Each Defendant had a duty under, *inter alia*, these laws to

---

[13]   In the absence of Montana authority for its "duty" argument, the Tribe urges the Court to be guided by cases from other jurisdictions. These decisions are factually and legally inapposite and should not inform this Court's decision. For example, the Tribe cites *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017), as an example of a federal court finding that the City adequately stated a duty owed by defendants under § 302(B) of the Restatement (Second) of Torts. Opp. 98. *City of Everett* involved claims against a manufacturer defendant arising under Washington law, and the complaint included detailed allegations that the manufacturer knew its product was being diverted to the black market. 2017 WL 4236062, at *2–5. Similarly, the decision of the New York trial court in *In re Opioid Litigation*, 2018 WL 3115102, at *26–27 (N.Y. Sup. Ct. June 18, 2018), refers almost entirely to allegations against manufacturer defendants and fails to acknowledge or apprehend the distinctions between distributors and manufacturers. *See* Dkt. 1008-7 at 19–21.

maintain effective controls ….").  More fundamentally, statutes and regulations cannot establish the "standard of care to be applied" to a common law duty that does not exist.

The Opposition also argues that the Tribe "pleads the elements of negligence *per se*."  Opp. 99.  To the contrary, the Tribe cannot allege that it is within the specific class of persons the statutes and regulations it cites were enacted to protect.  *See Stipe v. First Interstate Bank-Polson*, 188 P.3d 1063, 1066 (Mont. 2008).  In this regard, *Patten v. Raddatz*, 895 P.2d 633 (Mont. 1995) is directly on point.  There, the plaintiff asserted claims for negligence *per se* against a defendant for "giving his prescription drugs to [her] and causing her to become addicted to them," based on a statute that criminalized selling or giving away dangerous drugs.  *Id.* at 635 (citing Mont. Code Ann. § 45-9-101).  The Court concluded that the plaintiff could not pursue a negligence *per se* claim based upon that statute because she could not demonstrate that the general criminal statute "was enacted to protect a class of persons of which [she] belonged, nor was there evidence that her injury is the sort the statute was enacted to prevent."  *Id.* at 638.  Similarly, the Tribe cannot demonstrate that federal and state regulations that provide general schemes for the licensing of wholesale distributors, and that may be enforced and administered only by DEA or the Montana Board of Pharmacy, were enacted to protect a federally-recognized Indian tribe from the costs of drug diversion.

The Tribe's negligence *per se* claim also fails because the regulations on which it relies do not contain a private right of action.  Under clear Montana law, a negligence *per se* claim cannot be used to enforce a statute that does not "allow[] a private right of action."  *Doyle v. Clark*, 254 P.3d 570, 577 (Mont. 2011).  For all of these reasons, the Court should reject the Tribe's attempts to enforce federal and state statutes and regulations through a common-law negligence or negligence *per se* claim.

### C. The Tribe Has Failed Adequately To Plead its Negligent Misrepresentation Claim against Distributors.

The Opposition argues that the Complaint adequately states a claim for negligent misrepresentation against Distributors without identifying any false or misleading statement any Distributor made to the Tribe.  Binding Montana law holds otherwise.  In *Osterman v. Sears, Roebuck & Co.*, 80 P.3d 435 (Mont. 2003), the Montana Supreme Court held that a claim for negligent misrepresentation requires a plaintiff to point to a specific false statement the defendant allegedly made.  *See id.* at 443 ("Here, Osterman's claim fails to offer evidence demonstrating the primary element of the cause of action; namely, that Sears or K–Designers made a false representation of material fact.  Her claim for negligent misrepresentation accordingly fails ….").  The Tribe similarly has failed to satisfy this requirement, and its negligent misrepresentation claim therefore should be dismissed.

## V. THE UNJUST ENRICHMENT CLAIM SHOULD BE DISMISSED.

The Tribe fails to state an unjust enrichment claim against Distributors.  To state a claim for unjust enrichment, a Montana plaintiff must allege that the defendant received a benefit from the plaintiff, knew about the benefit, and accepted or retained the benefit under circumstances where it was inequitable for the defendant to do so.  *See, e.g.*, *Volk v. Goeser,* 367  P.3d 378, 389 (Mont. 2016).  In addition, "a plaintiff must show the element of misconduct or fault on the part of the defendant or that the defendant somehow took advantage of the plaintiff."  *Hinebauch v. McRae*, 264 P.3d 1098, 1103–04 (Mont. 2011).

The Opposition asserts that the Tribe conferred benefits on Distributors by paying for "increased healthcare service and addiction treatment for opioid users."  Opp. 109.  These costs, according to the Opposition, "are part of [Distributors'] business, yet [Distributors] are not paying" for these "negative externalities" that they have "imposed" on the Tribe.  Opp. 109–110.  Tellingly,

26

however, the Tribe fails to cite even a single Montana case supporting its "externalities" theory. Nor does the theory make any sense. Distributors' "business" is filling wholesale drug orders placed by pharmacies. It is not part of Distributors' "business" to pay the costs of services that allegedly become necessary after the intervening misconduct of third parties causes some of those medicines to be misused. In other words, to the extent that the Tribe pays those costs, its payments confer no "benefit" on Distributors because Distributors had no legal obligation to pay them. *See Mont. Petroleum Release Compensation Bd. v. Capitol Indem. Co.*, 137 P.3d 522, 529 (Mont. 2006) ("One cannot be unjustly enriched by failing to pay a debt one does not owe."); Chicago Br., Dkt. 571-1 at Part V; Chicago Reply, Dkt. 817 at Part V.[14]

## VI. THE COMMON-LAW CLAIMS SHOULD BE DISMISSED FOR FAILURE ADEQUATELY TO ALLEGE PROXIMATE CAUSATION.

The Tribe bases its proximate causation arguments on two inconsistent bases. Sometimes, it argues that its claims are based upon the over-prescribing of otherwise legal opioids by well-intentioned doctors whom the Manufacturers allegedly deceived. *See* Opp. 43 ("Physicians' decisions to prescribe opioids were not independent of the Marketing Defendants' wrongdoing: those decisions were the intended, actual, and foreseeable result of the defendants' fraudulent conduct."). At other times, the Tribe attempts to base its claims on a supposed illegal market. *See id.* ("[I]llegal drug activity was an entirely foreseeable consequence of Defendants' failure to control the opioid supply chain as required by law."). Neither theory is sufficient to plead proximate cause as a matter of law against Distributors. *Kiger v. State*, 802 P.2d 1248, 1251 (Mont. 1990); *U.S. Fidelity & Guaranty Co. v. Camp*, 831 P.2d 586, 590 (Mont. 1992); *see* Br. 27–28.

---

[14] The sole case the Tribe cites in support of its "unjust enrichment" argument, *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d 450 (Mont. 2013), does not alter this conclusion. In *N. Cheyenne Tribe*, a factually inapposite case involving constructive trust, the Montana Supreme Court cautioned that a claim for "unjust enrichment, of the type asserted by [the tribe], should be limited to situations in which no other remedy exists." *Id.* at 457.

If the Tribe's allegations about the change in prescribing practices are credited, then its allegations about Distributors' knowledge and foresight are not plausible.  The Tribe cannot plausibly claim that Distributors should have foreseen that opioids increasingly would be misused and diverted, while at the same time claiming that Distributors were receiving consistent signals from their customers, the market, and the medical community that opioid use legitimately ***should*** be increasing.  Distributors are not qualified to judge what is the size of the "legitimate market for opioids," Compl. ¶ 542, and the Tribe has not pled any factual basis to support a conclusion that they were not led to believe—as apparently DEA (when it increased opioid production quotas) and many doctors did—that the overall trend of increasing use was acceptable.

The Ninth Circuit's opinion in *Oberson v. U.S. Department of Agriculture*, 514 F.3d 989 (9th Cir. 2008), is inapposite.  There, the Ninth Circuit held that an accident on a dangerous section of snowmobile trail was foreseeable because the Forest Service knew of the danger.  *Id.* at 1000–01.  Here, there are no facts pled that support an allegation that Distributors knew that doctors should not be increasing prescriptions of opioids for their patients.  Moreover, given that the Tribe itself claims that it is the "Marketing Defendants' wrongdoing" that foreseeably affected doctors' behavior, Opp. 43, those doctors' conduct is a superseding cause as to Distributors.  And to the extent that the opioid problem stems from doctors making bad (but understandable) judgments about the use of opioids, Distributors do not control or influence the actions of doctors and have no ability to second-guess their judgments.

Likewise, when the Tribe speaks of the alleged illegal opioid market, the Tribe suggests that its existence is a foreseeable result of a breach of the "'closed system' for the distribution of opioids" caused by Defendants.  *Id.*  But the Tribe never alleges that Distributors breached that "closed system" by shipping to an unlicensed person who was not permitted to possess controlled

substances.  Rather, the alleged breach of that system is that too many opioids were shipped.  That takes the argument back, full circle, to the alleged change in prescribing practices, in which Distributors played no part.[15]

If the issue is "diversion" after prescriptions are written, criminal acts are necessarily involved (including either a pharmacist who dispenses without a valid prescription, a patient who gives or sells his or her opioids to someone else, or someone who later steals them).  This complicated causal chain presents "too many 'what ifs' that are superseding events that break the chain of causation."  *Kiger*, 802 P.2d at 1251 (holding that parolee's criminal act was unforeseeable because of "numerous interruptions in the chain of events" between the wrongdoing and the harm).  Accordingly, the Tribe's common-law claims fail for lack of proximate causation.

## VII.  THE CONSUMER PROTECTION ACT CLAIM SHOULD BE DISMISSED.

The Tribe wholly failed to respond to several of Distributors' arguments relating to the Montana Consumer Protection Act ("MCPA").  The Opposition ignores the arguments that the MCPA claim fails because Distributors' alleged conduct (i.e., the failure to report suspicious orders) (1) did not occur "in the conduct of any trade or commerce," and (2) was not "likely to mislead consumers."  *See* Br. 30–31.  The claim therefore should be dismissed as abandoned.  *See Bredesen*, 507 F.3d at 1007–08.

The MCPA claim also should be dismissed because the Tribe's allegations regarding Distributors do not satisfy Rule 9(b).  The Tribe acknowledges that Rule 9(b) applies to its MCPA claim.  Opp. 53.  As to Manufacturers, the Opposition attempts to explain how the Tribe satisfied

---

[15]  In a footnote, the Tribe contends that, had Distributors acted differently, "pharmacies would not have had access to an excessive supply of opioids …."  Opp. 43 n.20.  But Distributors shipped only the amounts that pharmacies ordered, and pharmacies ordered the amounts that doctors were prescribing.  The Tribe never alleges how it was foreseeable to Distributors that diversion would occur if pharmacies had the amounts of pills they ordered when doctors, pharmacies, and DEA did not foresee that.

its obligations under the rule, pointing to allegations regarding "nine categories of falsehoods that the Manufacturer Defendants employed to advance their multi-pronged scheme to change and sustain prescribing habits and public perception, and to increase the demand for opioids."  Opp. 55.  Neither the Complaint nor the Opposition, however, asserts that Distributors made misrepresentations designed to change doctors' or the public's perceptions of the risks and benefits of opioid medications.  *See* Br. 29.  Nor does the Opposition otherwise make any effort to argue that the Complaint's allegations ***regarding Distributors*** satisfied Rule 9(b).  For this additional reason, the MCPA claim against Distributors should be dismissed.

Finally, the MCPA claim fails because the Tribe lacks standing.  The Opposition does not dispute that the statute authorizes only the Montana Department of Justice and a "consumer who suffers an[] ascertainable loss of money or property" to bring suit.  *See* Br. 30.  Nor does it assert that the Tribe itself is a "consumer" for purposes of the MCPA claim.  *Id.*  Instead, it purports to assert a *parens patriae* claim "on behalf of its consumer citizens."  Opp. 8.  But the Tribe points to no authority—and Distributors are aware of none—suggesting that an Indian Tribe may use its *parens patriae* authority to enforce a state-law consumer protection statute.  Because standing under the MCPA is limited to "consumers," moreover, the Tribe's MCPA claim necessarily seeks to vindicate only the "private" interests of its citizens—which under established law is insufficient to establish *parens patriae* standing.  *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 602 (1982) ("Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party.").

Dated:  November 2, 2018

Respectfully submitted,

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation
and AmerisourceBergen Drug Corporation*

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
EMainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc.*

**LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to Case Management Order Number Six (Dkt. 770, July 23, 2018) and the Court's subsequent Order Regarding Page Limitations for Briefing on Motions to Dismiss (Dkt. 791, July 26, 2018), Distributors are permitted to file replies in each of the Tribal Track Cases of up to 30 pages.  This brief adheres to that limit.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

**CERTIFICATE OF SERVICE**

I, Geoffrey Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart