# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
| This document relates to: *The Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.* Case No. 18-op-45459-DAP | Hon. Dan Aaron Polster |

## REPLY IN SUPPORT OF
## <u>DISTRIBUTORS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

I.    THE NATION'S RICO CLAIM SHOULD BE DISMISSED. ........................................... 3

II.   THE NATION'S LANHAM ACT CLAIM SHOULD BE DISMISSED. ......................... 5

    A.    The Nation Is Not a Proper Plaintiff. ...................................................................... 5

    B.    The Nation Fails To Plead Actionable False Advertising. ..................................... 6

III.  THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED. ............................................ 8

    A.    Oklahoma's Innocent Seller Statute Bars the Nation's Negligence Claims. .......... 8

    B.    The Nation Cannot Identify a Common-Law Duty Distributors Owe to It. ........... 9

    C.    The Nation Cannot Assert Claims for Negligence *Per Se* Based on State and
         Federal Controlled Substances Laws. .................................................................. 11

IV.   THE NUISANCE CLAIM SHOULD BE DISMISSED. .................................................. 12

    A.    The Nation Fails To Plead Control. ...................................................................... 13

    B.    The Nation Fails To Allege the Requisite Connection with Property. ................. 14

    C.    The Nation Fails To Allege Interference with a Public Right. ............................. 15

V.    THE NATION FAILS TO PLEAD PROXIMATE CAUSATION. ................................. 17

VI.   THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED. ............................... 21

    A.    No Agreement to Achieve an Unlawful Object. .................................................... 21

    B.    No Well-Plead Allegation of Intentional and Unlawful Overt Acts. .................... 23

VII.  THE NATION'S UNJUST ENRICHMENT CLAIM FAILS. ......................................... 23

CONCLUSION ....................................................................................................................... 25

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Acad. of Doctors of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644 (E.D. Mich. 2017) ................................................................................................................5

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3d Cir. 2000) ...................24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................22

*Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013 (10th Cir. 2007) .........13, 14

*Chilton v. Robert Bosch Fuel Sys., LLC*, 2017 WL 2491759 (W.D. Mich. June 9, 2017) ..............................................................................................................................5

*City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017) ............................................................................................................................11

*City of Miami v. Bank of America Corp.*, 800 F.3d 1262 (11th Cir. 2015) ...................24

*CTI Servs. LLC v. Haremza*, 797 F. Supp. 2d 1257 (N.D. Okla. 2011) .........................4

*Dill v. City of Edmond, Okla.*, 155 F.3d 1193 (10th Cir. 1998) .....................................21

*Dow Corning Corp. v. Jie Xiao*, 2011 WL 2015517 (E.D. Mich. May 20, 2011) ..........6

*Duro Corp. v. Canadian Standards Ass'n*, 2017 WL 6326862 (N.D. Ohio Dec. 11, 2017) ........................................................................................................................7

*Elcometer, Inc. v. TQC-USA, Inc.*, 2013 WL 1433388 (E.D. Mich. Apr. 9, 2013) .........6

*Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785 (6th Cir. 2015) .....................................6, 7

*Henry v. Merck and Co., Inc.*, 877 F.2d 1489 (10th Cir. 1989) ...............................19, 21

*Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992) ..............20

*Int'l Brotherhood of Teamsters v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ...................24

*Johnson v. Fankell*, 520 U.S. 911 (1997) ......................................................................14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ................5

*Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338 (11th Cir. 1999) ............23

*Perry v. Am. Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003) ..............................................24

*Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619 (6th Cir. 2018) ...............................14

*Roadtec, Inc. v. Rd. Sci., LLC*, 2013 WL 12123358 (E.D. Tenn. Aug. 29, 2013).........................6

*Southern Rock, Inc. v. Summers*, 2012 WL 6722356 (E.D. Okla. Nov. 15, 2012).......................24

*Trans Rail Am., Inc. v. Hubbard Twp.*, 478 F. App'x 986 (6th Cir. 2012)...................................22

*United States ex rel. Knisely v. Cintas Corp.*, 298 F.R.D. 229 (E.D. Pa. 2014)...........................7

*United States v. Picklesimer*, 585 F.2d 1199 (3d Cir. 1978) ..........................................12

*Williams v. Biomet, Inc.*, 2016 WL 806559 (N.D. Ind. Feb. 29, 2016) ......................................8, 9

## STATE CASES

*Brill v. Walt Disney Co.*, 246 P.3d 1099 (Okla. Civ. App. 2010)..................................25

*Briscoe v. Harper Oil Co.*, 702 P.2d 33 (Okla. 1985) ...................................................23

*Champlin Ref. Co. v. Dugan*, 270 P. 559 (Okla. 1928) ................................................15

*City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004)..........................17

*City of McAlester v. Grand Union Tea Co.*, 98 P.2d 924 (Okla. 1940)...........................17

*City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314 (Okla. 2011) ...................................23, 24

*Dill v. Rader*, 583 P.2d 496 (Okla. 1978) ....................................................................21

*Fairlawn Cemetery Ass'n v. First Presbyterian Church, U. S. A.*, 496 P.2d 1185 (Okla. 1972) ..............................................................................................................14, 15

*First Nat'l Bank in Durant v. Honey Creek Entm't Corp.,* 54 P.3d 100 (Okla. 2002) ..............................................................................................................................11

*Gaines v. Providence Apartments*, 750 P.2d 125 (Okla. 1987) ....................................21

*Graham v. Keuchel*, 847 P.2d 342 (Okla. 1993)...........................................................19

*In re Opioid Litigation*, 2018 WL 3115102 (N.Y. Sup. Ct. June 18, 2018)...................11

*Johnson v. State,* 587 A.2d 444 (Del. 1991) ...............................................................12

*Joyce v. M & M Gas Co.*, 672 P.2d 1172 (Okla. 1983) .........................................19, 21

*Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 946 P.2d 241 (Okla. 1996) .................20

*Lockhard v. Loosen*, 943 P.2d 1074 (Okla. 1997) ...................................................11, 19

iii

*N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 929 P.2d 288 (Okla. Civ. App. 1996) ....................................................................................................................25

*Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272 (Okla. 1996) ...........................................15

*Nicholson v. Tacker*, 512 P.2d 156 (Okla. 1973)..........................................................................11

*Schlobohm v. Rice*, 510 N.E.2d 43 (Ill. Ct. App. 1987)...............................................................12

*State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008) .........................................................16

*Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260 (Okla. 1982) ...........................17, 19, 20, 21

*Tomlinson v. Love's Country Stores, Inc.*, 854 P.2d 910 (Okla. 1993) ...................................20, 21

*Williams v. Hook*, 804 P.2d 1131 (Okla. 1990) ............................................................................20

## OTHER AUTHORITIES

DEA, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012) ..............................................................................................................1, 10

Defs.' Joint Mot. to Dismiss for Failure to State a Claim, *State of Oklahoma ex rel. Hunter v. Purdue Pharma L.P.*, No. CJ-2017-816 (Dist. Ct. Cleveland Cty. Sept. 22, 2017) .......................................................................................................14

Okla. Stat. tit. 15, § 754(2)...........................................................................................................4

Okla. Stat. tit. 50, § 1 .................................................................................................................15

Okla. Stat. tit. 50, § 5 .................................................................................................................15

Okla. Stat. tit. 63, § 2-401(A)(1)...................................................................................................3

Okla. Stat. tit. 63, § 2-406(4) ......................................................................................................3

Okla. Stat. tit. 76, § 57.2 .............................................................................................................9

Restatement (Second) of Torts § 821B (1979) ............................................................................16

U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health* (2016) ...........................................2

The Nation's Opposition makes plain what the Complaint so strongly suggested:  this case is about a public health crisis caused by a sea-change in medical practice—a change that the Nation alleges resulted from Manufacturers' "massive marketing campaign that misstates and conceals the risks of treating chronic pain with opioids."  Opp. 3.  This campaign led to a "quadrupl[ing]" of the number of opioids prescribed nationwide between 1999 and 2016.  *Id.* 1.  This core theory against Manufacturers is inconsistent with the Nation's claims against Distributors.  The Nation alleges that Distributors failed to prevent "diversion," *id.* 4, but that claim makes no sense in light of the Nation's assertion that the epidemic was caused by doctors "writing an excessive number of opioid prescriptions."  *Id.* 2.  If those prescriptions were written, as the Nation alleges, because Manufacturers "overc[a]me the longstanding medical consensus that opioids are highly addictive and, therefore, unsafe for the treatment of chronic pain," *id.* 3, then the vast increase in prescriptions that paralleled Manufacturers' alleged marketing campaign reflected the misguided, but nevertheless well-intentioned, professional judgment of physicians about the proper treatment of chronic pain—not "diversion" to illegal channels.

That is what DEA thought at the time about the steady upward trend of opioid prescriptions.  Exercising the power delegated by the Attorney General of the United States to gauge the legitimate medical need for prescription opioids and control the supply of prescription opioids, the DEA steadily increased the production quota for opioids from 1995 to 2013.[1]  Each Distributor, after all, was reporting to the DEA ***all*** shipments to its pharmacy-customers of prescription opioids, as required by law, permitting the DEA (and it alone) to know the total

---

[1]    *See, e.g.*, DEA, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012);  https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj.gov/quotas/ quota_history.pdf (showing approved quota for sale of oxycodone tripled between 2003 and 2013).

amount of prescription opioids being shipped to each pharmacy, county, and state.  The Nation does not contend otherwise, and the DEA does not deny that it had this information.

Thus, what Distributors did was supply licensed pharmacies with the drugs that doctors prescribed, in an overall amount that the DEA had pre-determined was appropriate.  To claim that Distributors had a duty to report the steady upsurge in pharmacy orders for prescription opioids as "suspicious" or as evidence of "diversion" is to contend that Distributors (who have no special knowledge about the design, formulation, and operation of the thousands of drugs they transport) should have second-guessed both the doctors who prescribed them and the DEA.

The Nation's further contention that Distributors should have prevented diversion of opioid medications makes no better sense.  Drug "diversion," by definition, is the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use."[2]  Under the Nation's theory, it occurred only after Distributors relinquished control over opioid medicines—when, for instance, a pharmacist dispensed the medication in the absence of a legitimate prescription or a patient sold the drugs to another. Under established law, Distributors cannot be held liable for failing to prevent the criminal conduct of third parties over whom they exercise no control, let alone for the remote and derivative injuries claimed by the Nation as a consequence of that criminal activity.

---

[2]    U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health*, glossary at 2 (2016), https://addiction.surgeongeneral.gov/sites/ default/files/surgeon-generals-report.pdf.    The Nation's claim that diversion occurs when "distributors fill and fail to investigate suspicious orders from pharmacy retailers," Opp. 4, is demonstrably false because it is at odds with the actual definition.  Drug "diversion" does not occur when a wholesale distributor ships opioids to a DEA-licensed and registered pharmacy, no matter how many pills are shipped.

## I.      THE NATION'S RICO CLAIM SHOULD BE DISMISSED.

The Nation's RICO claim fails for the reasons explained in Distributors' *Blackfeet Tribe* reply brief.  *See* Blackfeet Reply at Part I.  The Nation also fails to allege violations of the Travel Act as RICO predicate acts.

According to the Nation, Distributors violated the Oklahoma Controlled Substances Act ("OCSA") and the Oklahoma Consumer Protection Act ("OCPA"), and these violations in turn constitute violations of the federal Travel Act.  The Nation, however, does not cite any authority supporting its assertion that the Travel Act applies to the regulatory reporting violations that constitutes the core of Distributors alleged wrongdoing—nor could it.  Opp. 131.  Even setting that defect aside, the Nation's allegations fail because it has not properly pled violations of the OCSA or the OCPA.

***Oklahoma CSA.***  The Nation fails to identify with the particularity required by Rule 9(b) even a single, allegedly fraudulent "application, report, or other document required to be kept or filed under th[e OCSA]," Okla. Stat. tit. 63, § 2-406(4).  Tellingly, the Opposition effectively concedes that the OCSA does not itself contain a suspicious order reporting requirement.  The Nation's claim based on Oklahoma Statutes title 63, § 2-406(4) thus fails as a matter of law.

The Nation fares no better with its claim based on Oklahoma Statutes title 63, § 2-401(A)(1).  The Complaint does not contain any non-conclusory allegation that Distributors "distribute[d]" controlled substances in violation of the OCSA—nor could it.  Distributors are licensed wholesalers, and the Nation fails to point to any substantive provision of the OCSA that they purportedly violated by delivering opioids to their retail pharmacy customers.  Instead, the gist of the Complaint is that Distributors failed to satisfy federal regulatory reporting requirements and sought to increase federal quotas for prescription opioids. *E.g.*, Compl. ¶¶ 200–

23, 329–36. These allegations, even if true, would not violate Section 2-401(A)(1) of the OCSA.[3]

**Oklahoma CPA.** The Nation fails to allege that Distributors violated the OCPA. The Nation argues that it has alleged a "consumer transaction" because it "has alleged that **Defendants** engaged in a marketing and advertising campaign." Opp. 133. But the Complaint is devoid of any well-pled allegations that **Distributors** engaged in any promotional or marketing activities. The Nation thus fails to allege any actionable "consumer transaction" in Oklahoma on the part of Distributors.[4]

The OCPA allegations also fail because the OCPA's safe-harbor for conduct "regulated under laws administered by … any … regulatory body … acting under statutory authority of … the United States" applies. *See* Okla. Stat. tit. 15, § 754(2). The Nation argues that "when a defendant can use false, non-FDA approved information to sell its products," that conduct does not fall within the safe-harbor. Opp. 133–34. But the Complaint does not allege that **Distributors** used false information to sell opioids in Oklahoma—nor could it. Rather, Distributors' alleged wrongdoing consists of failing to report or halt suspicious pharmacy orders—failures which, the Nation claims, violated federal regulations enforced by the DEA. Thus, no discovery is needed to conclude that the OCPA safe-harbor applies to the Nation's claim against Distributors.

---

[3] Any alleged lobbying efforts or applications to increase quotas also are immunized under the *Noerr-Pennington* doctrine. *See* Blackfeet Br., Dkt. 924, at Part I.D.

[4] Nor is it relevant that the Nation supposedly "purchase[d], or pa[id] for, opioids in Oklahoma" because there is (and could be) no allegation that the Nation used the opioids itself. *See CTI Servs. LLC v. Haremza*, 797 F. Supp. 2d 1257, 1263 (N.D. Okla. 2011) ("[A] person must have *consumed* a commodity or service in order to be an 'aggrieved consumer' with a private right of action" under the OCPA).

## II.     THE NATION'S LANHAM ACT CLAIM SHOULD BE DISMISSED.

The Nation lacks statutory standing to bring a false advertising claim under the Lanham Act and fails to plead key elements of the claim.  The Nation's efforts to demonstrate otherwise lack merit.

### A.     The Nation Is Not a Proper Plaintiff.

The Nation has not alleged a cognizable injury.   Under *Lexmark*, the type of injury necessary to bring a Lanham Act plaintiff within the "zone of interests in a suit for false advertising" is "an injury to a commercial interest in ***reputation or sales***."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014); *see also Acad. of Doctors of Audiology v. Int'l Hearing Soc'y*, 237 F. Supp. 3d 644, 663 (E.D. Mich. 2017) (injury must be "competitive injury").   The Complaint does not plausibly allege an injury to the Nation's commercial interests, much less an injury to the Nation's commercial interest in reputation or sales.

The Nation argues that it has alleged a competitive injury because Distributors' statements regarding their anti-diversion efforts "had the practical effect of diverting patients away from hospitals and clinics run by the Nation, and the patients instead sought care from outside doctors and clinics who prescribed high doses of opioids."  Opp. 141.  As a threshold matter, the argument should be rejected because it has no basis in the Complaint.  While the Complaint alleges in conclusory fashion that, "[b]ut for [Distributors'] false statements regarding their prevention of diversion," patients "would not have sought treatment from doctors and clinics who prescribed high dosages of opioids," Compl. ¶ 416, it nowhere alleges that Distributors' conduct diverted patients from hospitals and clinics run by the Nation.  Compl. ¶ 416.  *Chilton v. Robert Bosch Fuel Sys., LLC*, 2017 WL 2491759, at *3 (W.D. Mich. June 9,

2017) ("[I]t is axiomatic that a plaintiff may not amend his complaint through allegations made in a response to a motion to dismiss.").

Nor is it plausible to suggest that statements reported in late-2016 Washington Post articles critical of Distributors—for instance, that Distributors use "'advanced analytics' to monitor [the] supply chain," Compl. ¶ 209, or have "best-in-class controlled substance monitoring program[s] to help identify suspicious orders," *id.* ¶ 210—caused members of the Nation (who live in Oklahoma) to forego seeking care at the Nation's hospitals and clinics.  The Opposition makes no effort to explain why or how Distributors' alleged statements about their monitoring of pharmacy orders cause members of the Nation to choose one doctor or clinic rather than another.  Because the assertion lacks "facial plausibility," the Nation's Lanham Act claim should be dismissed.  *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    The Nation Fails To Plead Actionable False Advertising.

Even if the Nation had alleged a cognizable injury, its Lanham Act claims would still fail for at least three reasons.  First, the only statements by Distributors that the Nation identifies with any particularity are statements of opinion not actionable under the Lanham Act.[5]  *See* Br. 8–9. The Opposition is wrong that Distributors' alleged statements "went beyond mere puffery, and were objectively false." Opp. 144.  As the case cited by the Nation itself makes clear, while "specific and measurable" claims that "may be tested" are potentially actionable under the

---

[5]    The Nation's extended discussion of whether Rule 9(b) applies, Opp. 140–41 & nn.373–75, is beside the point.  As Distributors have explained, Br. 6 n.6, it is clear that "some degree of particularity is required" to state a claim for false advertising.  *Roadtec, Inc. v. Rd. Sci., LLC*, 2013 WL 12123358, at *5 (E.D. Tenn. Aug. 29, 2013) (looking to "specific statements" alleged in the Complaint to decide motion to dismiss).  Consequently, the Nation can proceed only on the basis of statements specifically identified in the Complaint.  The false advertising cases cited by the Nation (Opp. 140 & n.374) are fully consistent with this requirement.  *See Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 802 (6th Cir. 2015) (describing content of specified "e-mails and mailings"); *Elcometer, Inc. v. TQC-USA, Inc.*, 2013 WL 1433388, at *1 (E.D. Mich. Apr. 9, 2013) (quoting from website); *Dow Corning Corp. v. Jie Xiao*, 2011 WL 2015517, at *10 (E.D. Mich. May 20, 2011) (discussing "communications identified in Plaintiffs' complaint").

Lanham Act, "general claim[s] of superiority" are not. *United States ex rel. Knisely v. Cintas Corp.*, 298 F.R.D. 229, 243 (E.D. Pa. 2014).[6]  Under this standard, the statements identified by the Complaint—e.g., that Distributors have "best-in-class controlled substance monitoring program[s]" or use "'advanced analytics' to monitor [the] supply chain," Compl. ¶¶ 209–10—are not actionable.

Second, the Nation is wrong that Distributors' alleged statements constituted "commercial advertising or promotion" because the Lanham Act reaches statements related to "goods, services, or commercial activities." Opp. 142. The statute does not extend beyond "commercial speech … for the purpose of influencing customers to buy the defendant's goods or services." *Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015). Here, Distributors' statements (made in connection with news articles denigrating the industry published by The Washington Post) relate only to the effectiveness of their anti-diversion efforts, not the qualities of any goods or services offered for sale, and the Nation does not plausibly allege that such statements were designed to "influenc[e] customers." *See Duro Corp. v. Canadian Standards Ass'n*, 2017 WL 6326862 (N.D. Ohio Dec. 11, 2017) (dismissing false advertising claim because "[t]he Complaint … fails to allege or infer that this statement was made for the purpose of influencing customers to buy [the defendant's] goods or services").

---

[6]   Contrary to the Nation's suggestion, *Cintas* did not consider or reject the argument that the defendant's claim to employ "stringent … security practices" when it destroyed documents was non-actionable puffery. Rather, it held that the claim was potentially misleading based on the allegation that defendant itself did not perform the services at all (instead relying on subcontractors). The opinion separately rejected a puffery argument, but the allegation at issue there—that defendant's document destruction methods "'meet the highest (DIN Level 6) security standards,' where DIN Level 6 is the National Security Agency's standard for shredding top-secret documents"—was specific and measureable.

Finally, neither the Complaint nor the Opposition provide any basis to conclude that Distributors' statements were false or likely to deceive, or were material to any member of the Nation's purchasing decisions.  *See* Br. 7–8.

## III.    THE NEGLIGENCE CLAIMS SHOULD BE DISMISSED.

The negligence claims fail for three reasons.  First, contrary to the Nation's argument, Oklahoma's "Innocent Seller" statute bars the Nation's negligence claims against Distributors. Second, the Nation cannot identify a common-law duty Distributors owe it, or any breach of any duty by Distributors.  Third, the Nation cannot assert claims for negligence *per se* based on alleged violations of federal and state statutes.

### A.    Oklahoma's Innocent Seller Statute Bars the Nation's Negligence Claims.

The Nation argues that Oklahoma's Innocent Seller statute "has no application to the present facts because Distributors' negligence is not premised on the sale of opioids per se, but its failure to take steps to prevent the diversion of opioids."  Opp. 98.  The Nation cites no Oklahoma authority supporting its argument; instead, it relies on a Northern District of Indiana case, *Williams v. Biomet, Inc.*, 2016 WL 806559, at *2 (N.D. Ind. Feb. 29, 2016), construing ***Missouri's*** Innocent Seller statute.[7]  The Nation states that *Williams* "held that these types of statutes do not protect entities such as the Distributors from claims that 'depend on their own culpable conduct.'"  *Id.* (citing *Williams*, 2016 WL 806559, at *2).

*Williams* held nothing of the sort.  *Williams* was decided in the context of a fraudulent joinder argument opposing a motion to remand.  *See Williams*, 2016 WL 806559, at *1–3.  The court in *Williams* did not even reach the question of whether the plaintiff's negligence claims were barred because it held that joinder was proper if any state court claim had a "reasonable probability of success," and that the Innocent Seller statute did not "seem to apply" to a claim

---

[7]    The Nation erroneously states that *Williams* construes "Indiana's version of the statute."  Opp. 98.

titled "Misrepresentation against Seller."  The court commented, however, "the Innocent Seller Statute may apply to several of the [Plaintiffs'] claims."  *Id.* at *2.

Nor is the Nation correct when it argues that the Oklahoma Innocent Seller statute bars only "products liability claims."  Opp. 98.  To the contrary, in a provision separate from the subsection of the statute addressing "products liability actions," *see* Okla. Stat. tit. 76, § 57.2(E), the statute expressly addresses negligence claims against non-manufacturing sellers and provides that a non-manufacturing seller can be liable in negligence only if it fails to exercise reasonable care "in assembling, inspecting, or maintaining" the product or "in passing on warning or instructions from the product's manufacturer."  Okla. Stat. tit. 76, § 57.2(G)(2).  Here, the Complaint contains no allegation that any Distributor failed to exercise reasonable care in "assembling, inspecting, or maintaining" any opioid product or that it failed to pass on a manufacturer's warnings or instructions.  As such, under the plain terms of the Innocent Seller statute, Distributors cannot be liable in negligence to the Nation, and the negligence claims should be dismissed for this reason alone.

**B.      The Nation Cannot Identify a Common-Law Duty Distributors Owe to It.**

Even if Oklahoma's Innocent Seller statute did not bar the Nation's negligence claims against Distributors, the claims would fail because the Nation has not identified, and cannot identify, any common law duty Distributors owed the Nation to report or halt suspicious opioid orders.  Citing no authority, the Nation argues that "Diversion Defendants had a common law duty to prevent the diversion of dangerous opioid products."  Opp. 92.  The Nation suggests that a duty exists because its alleged injuries were "foreseeable."  Opp 90–91.  But the Complaint's allegations explain why harm to the Nation was ***not*** foreseeable to Distributors.  The Nation alleges that Manufacturers' multi-pronged marketing campaign was designed to, and did, change the standard of care for prescribing opioid medications, creating a new medical orthodoxy under

which opioids safely could be prescribed to the vastly larger number of persons with chronic pain, for long periods of time, in ever-higher doses.  *See, e.g.*, Compl. ¶¶ 4–6, 103–110, 120–137.  Precisely because the standard of care changed (allegedly due to Manufacturers' marketing), the DEA authorized ever-increasing manufacturing quotas for prescription opioids between 1993 and 2015, based on its expert judgment that there was an increasing legitimate medical need for opioids.[8]  The Nation's own allegations thus establish that the increasing volume of prescriptions and increasing pharmacy orders were not "suspicious" but were a reflection of the new prescribing orthodoxy.  The harm the Nation alleges was no more foreseeable to Distributors than it was to the DEA or to any other regulator.

What is left is the allegation that Distributors failed to prevent "diversion" by persons over whom Distributors have no control and, for the most part, whom they do not know.  The problem with this argument is that Distributors have no duty to prevent the criminal misconduct of third parties.  As the Nation concedes, Distributors stand near the top of a lengthy distribution chain.  Distributors' conduct is limited to delivering controlled substances to licensed pharmacies within quotas set by the DEA.  Pharmacists are required, by federal and state laws, to dispense the controlled substances only to patients with a valid prescription, signed by a licensed physician upon a determination of the patient's legitimate medical need.  For the Nation to be injured, patients must then use (or, rather, misuse) the controlled substances in a manner that necessitates use of the Nation's resources.  Thus, where "diversion" is concerned, standing between Distributors and the Nation are pharmacists, doctors, and opioid users—at least one of whom necessarily has engaged in criminal wrongdoing.  The harm the Nation alleges could not

---

[8]  *See, e.g.*, DEA, Aggregate Production Quota History for Selected Substances 2003–2013 (Oct. 2, 2012);  https://web.archive.org/web/20121016220702/https://www.deadiversion.usdoj.gov/quotas/quota_history.pdf (showing approved quota for sale of oxycodone tripled between 2003 and 2013).

have occurred without the malfeasance of these other actors with whom Distributors have no relationship and over whom they have no control.[9]

Finally, even assuming that Distributors had a duty to report or prevent suspicious orders, the Complaint should be dismissed because that duty did not run to the Nation.  To state a claim for negligence, a complaint must plead that the defendant owes a duty **to the plaintiff**.  *See, e.g., Nicholson v. Tacker*, 512 P.2d 156, 158 (Okla. 1973) (The elements of the tort of negligence are 1) a duty of care owed by defendant to plaintiff, 2) defendant's breach of that duty, and 3) injury to plaintiff caused by defendant's breach of that duty.).  If the defendant did not owe a duty of care to the plaintiff, there can be no liability for negligence as a matter of law.  *First Nat'l Bank in Durant v. Honey Creek Entm't Corp.,* 54 P.3d 100, 105 (Okla. 2002).  The Complaint fails to allege that Distributors have any relationship with the Nation that conceivably could give rise to such a duty.

### C.    The Nation Cannot Assert Claims for Negligence *Per Se* Based on State and Federal Controlled Substances Laws.

Under Oklahoma law, a claim for negligence *per se* requires proof that the injury the plaintiff alleges is "of the type intended to be prevented by the statute" and that "the injured party was a member of the class meant to be protected by the statute."  *Lockhard v. Loosen*, 943 P.2d 1074, 1078 (Okla. 1997).  The Nation argues that it satisfies these requirements—that

---

[9]    In the absence of Oklahoma authority for its "duty" argument, the Nation urges the Court to be guided by cases from other jurisdictions.  These decisions are factually and legally inapposite and should not inform this Court's decision.  For example, the Nation cites *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017), as an example of "a federal court [finding] that the City adequately stated a duty owed by defendants under § 302 (B) of the Restatement (Second) of Torts."  Opp. 92.  *City of Everett* involved claims against a manufacturer defendant arising under Washington law.  The complaint included detailed allegations that the manufacturer knew its product was being diverted to the black market.  *See City of Everett*, 2017 WL 4236062, at *2–5.  Similarly, the decision of the New York trial court in *In re Opioid Litigation*, 2018 WL 3115102, at *26–27 (N.Y. Sup. Ct. June 18, 2018) refers almost entirely to allegations against manufacturer defendants and fails to acknowledge or apprehend the distinctions between distributors and manufacturers.  *See* Dkt. 1008, Ex. G. at 19–21.

federal and Oklahoma controlled substances laws "were designed to avoid the harm suffered by the Nation" and "are clearly meant to prevent the very crisis Defendants have caused and are fueling." Opp. 96. As the Nation concedes, however, "the question of whether a particular statutory violation may support a claim for negligence per se is an issue of state law…," Opp. 95, and the Opposition fails to cite any Oklahoma authority in support of its argument. Instead, the Opposition cherry-picks language from out-of-state cases that, on examination, do not elucidate these issues even under their own states' laws.[10] In contrast to the Opposition's dearth of Oklahoma authority, Distributors' opening brief cites numerous Oklahoma authorities demonstrating that Oklahoma courts construe negligence *per se* claims narrowly. *See* Br. at 12 & n.10. Quite simply, the Nation cannot plausibly allege that the federal and Oklahoma CSAs were enacted to prevent federally-recognized Indian tribes from incurring increased public expenditures as a result of opioid addiction and abuse. As such, the Nation's negligence *per se* claim fails under Oklahoma law, and it should be dismissed.

## IV. THE NUISANCE CLAIM SHOULD BE DISMISSED.

Controlling Oklahoma case law—law the Opposition just ignores—requires dismissal of the Nation's nuisance claim. The only Oklahoma cases it cites are two trial court orders, neither of which mentions nuisance. The first, a 1998 order in a tobacco case (Nation's Ex. L), has nothing to do with public nuisance. The second, an order in the State of Oklahoma's pending

---

[10] *See United States v. Picklesimer*, 585 F.2d 1199, 1202–03 (3d Cir. 1978) (interpreting whether possessing only certain quantities of schedule III controlled substances was proscribed under the federal CSA in the context of an appeal of a criminal conviction for possession with intent to distribute); *Schlobohm v. Rice*, 510 N.E.2d 43, 46 (Ill. Ct. App. 1987) (rejecting an interpretation of Illinois's CSA as proscribing only specific isomers of cocaine, in the context of a police officer's appeal of a police board's decision ordering the officer discharged for use and possession of cocaine); *Johnson v. State*, 587 A.2d 444, 452 (Del. 1991) (addressing Delaware's controlled substances act in the context of an appeal of a criminal conviction for possession with intent to distribute). If anything, the cases the Nation cites underscore the reality that federal and state controlled substances laws are criminal statutes that do not provide for a private, civil causes of action.

suit against opioid manufacturers (Nation's Ex. C), contains no reasoning at all.  It simply states that "the State's Petition sufficiently states its claims."  That bare conclusion is not persuasive authority, particularly given that the case does not involve Distributors and the defendants did not make any of the legal arguments that Distributors make here.

### A.    The Nation Fails To Plead Control.

The Nation concedes that control is an element of a nuisance claim.  Opp. 86.  But in order to argue that Distributors had control over the instrumentality of the nuisance at the time it caused the nuisance, the Nation makes a tortured argument that "the Nation is not alleging that the nuisance occurred when individual users ingested opioids."  Opp. 85.  That makes no sense.  Using opioids is what leads to addiction and overdose deaths, and, if there were not more addicts and deaths the Nation would not need to increase spending on healthcare costs, criminal justice costs, or anything else.  That statement is also contrary to the allegations of the Complaint, in which the Nation expressly pleads that its injury is the costs of individual "addiction, overdoses, and death" shouldered by the Nation.  Compl. ¶¶ 275, 282.

Even if the "nuisance" is, as the Nation now claims, an "illegal market" created and supplied by Distributors, the Nation has pled no facts suggesting that Distributors control such a market.  To allege control, the Nation plausibly must allege that Distributors "directed, sanctioned, or actively participated or cooperated in" the harm-producing conduct of the illegal market. *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1026 (10th Cir. 2007).  The Nation's allegation that Distributors failed to prevent others from diverting opioids into an illegal market falls far short of this standard.  Indeed, the Opposition makes Distributors' lack of control clear.  The Nation alleges that "Distributors' and Pharmacies' actions and omissions that occurred (or did not occur) when they were in control of the opioid drug, prior to the sale of drugs to individual users that resulted in an illegal market for opioids … created a nuisance in

13

and around the Nation."  Opp. 86.  Thus, by the Nation's own theory, Distributors are at least four steps removed from the alleged nuisance—they deliver prescription opioids to (1) pharmacies, which dispense opioids to (2) individual users, who then create (3) an illegal market by diverting the drugs, which in turn gives rise to (4) opioid abuse.  Distributors' theoretical ability to stop the alleged nuisance by halting all shipments of FDA-approved prescription medicines does not satisfy the control requirement.  *See Grant*, 505 F.3d at 1026.

**B.    The Nation Fails To Allege the Requisite Connection with Property.**

The Nation contends that Distributors "fail to cite a single Oklahoma case" establishing that Oklahoma limits public nuisance claims to those involving property, Opp. 75, but Distributors' opening brief cited four Oklahoma cases establishing just that.  Br. 17 & n.12. Controlling Oklahoma precedent directs that "[a] nuisance, public or private, arises where a person ***uses his own property*** in such a manner as to cause injury to the ***property of another***." *Fairlawn Cemetery Ass'n v. First Presbyterian Church, U. S. A.*, 496 P.2d 1185, 1187 (Okla. 1972).  The Nation ignores this clear precedent.  As explained, it relies on two orders that do not analyze nuisance and are not persuasive authority.  As for the State of Oklahoma's opioid suit, the manufacturer defendants in that case did not argue that Oklahoma nuisance law requires a connection with property.  *See* Defs.' Joint Mot. to Dismiss for Failure to State a Claim at 33–34, *State of Oklahoma ex rel. Hunter v. Purdue Pharma L.P.*, No. CJ-2017-816 (Dist. Ct. Cleveland Cty. Sept. 22, 2017) (attached as Ex. 1).  This Court should infer nothing from the Oklahoma court's decision not to dismiss for a legal defect that was not briefed.[11]

---

[11]   Nor should this Court follow the Nation's invitation to adopt out-of-state cases that contradict Oklahoma Supreme Court precedent.  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 636 (6th Cir. 2018); *see Johnson v. Fankell*, 520 U.S. 911, 916 (1997) ("Neither this Court nor any other federal tribunal has any authority to place a construction on a state statute different from the one rendered by the highest court of the State.").

The Nation also contends that Oklahoma's nuisance statute does not require a connection with property. Not so. Oklahoma's nuisance statute has been on the books, unchanged in any material respect, since 1890. Br. 16 & n.11. For the past 128 years, Oklahoma courts have read that statute to be consistent with traditional common law nuisance principles that limit nuisance to harmful uses of property. *E.g.*, *Nichols v. Mid-Continent Pipe Line Co.*, 933 P.2d 272, 276 (Okla. 1996); *Champlin Ref. Co. v. Dugan*, 270 P. 559, 560–61 (Okla. 1928). The statute incorporates the property-based limitations of nuisance, which would have been universally understood when the statute was adopted in 1890. Furthermore, while the specific section of the statute that defines nuisance, Okla. Stat. tit. 50, § 1, does not expressly limit nuisance to harmful uses of property, the statute as a whole expressly adopts a property-based limitation. For instance, Section 5, titled "Persons liable," says, "Every successive owner of ***property*** who neglects to abate a continuing nuisance upon, or in the use of such ***property***, created by a former owner, is liable therefor in the same manner as the one who first created it." This section demonstrates that the statute requires a connection with property and does not extend to products-based claims.

The Nation's alternative argument—that it has separately alleged a property-based public nuisance, Opp. 81–82—fails for two reasons. First, Oklahoma nuisance law requires that the nuisance arise from the defendant's use of its own property. *Fairlawn Cemetery Ass'n*, 496 P.2d at 1187. The Nation pleads no facts that its harms arise from Distributors' use of property, nor does the Opposition make that contention. Second, the Nation's allegations that it has experienced "property damage" and "public blight" (Opp. 82) are conclusory, identifying neither properties damaged nor the nature of the property damage that allegedly occurred.

### C.    The Nation Fails To Allege Interference with a Public Right.

The Nation has not alleged interference with a public right. The "rights" identified by the

15

Nation in paragraph 453 of the Complaint are either individual rights, or not recognized "rights" of any kind.  For example, the Nation claims that Distributors interfered with the right "[t]o be free from reasonable apprehension of danger" and to be "free from the negative health and safety effects of widespread illegal drug sales."  Compl. ¶ 453.  But, as the Restatement recognizes, the right to be free from danger and the right not to be assaulted or harmed by others (because they are on drugs or for some other reason) are quintessential *individual* rights.  Restatement (Second) of Torts § 821B cmt. g (1979).  They are not public rights, and they do not become so by aggregating a large number of individual rights together.  *See id.* ("[c]onduct does not become a public nuisance merely because it interferes with" the individual rights of "a large number of persons").  As for the Nation's other asserted rights—such as the right to be "free from blights on the community created by illegal drug use" or to "live and work in a community in which members are not under the influence of narcotics"—no case in the country (to Distributors' knowledge) has ever recognized those as either public or private rights.  The Nation certainly has not cited any authority in support of the existence of such rights.

The Nation also claims that "public health" is a public right with which Distributors interfered.  But, as the Rhode Island Supreme Court has explained, "public health" and "public right" are not synonymous.  *See State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 436, 448 (R.I. 2008) ("lead poisoning constitutes a public health crisis," but does not involve public rights).  "Public health" is a colloquial term that refers to the health of the public and is invoked in discussions of a wide variety of problems such as obesity, cancer, and smoking.  "Public right," on the other hand, is a legal term, with a special limiting function in the definition of a public nuisance.  The prevalence of obesity, for example, is a public health concern, but it does not implicate a public right and does not give rise to a public nuisance claim against McDonald's.

*E.g.*, *City of McAlester v. Grand Union Tea Co.*, 98 P.2d 924, 926 (Okla. 1940) (activity causing widespread individual harms is not a public nuisance because it "cannot reasonably be said to disturb ***at the same time*** an entire community or neighborhood or any considerable number of persons").

Nor is there a "public right" to be free from the "disease of addiction." Addiction is not contagious and cannot be contracted unwittingly by walking down the street or drinking public water. The public has a right to use public spaces without getting sick, but that is because there is a public right to use the public space, not because there is a general right not to be sick. There is no "public right" to be free from the threat that individuals will misuse FDA-approved opioid medicines in a way that creates a risk of harm to themselves or others. *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004) ("[*W*]*e are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product* (be it gun, liquor, a car, a cell phone, or some other instrumentality) *in a manner that may create a risk of harm to another*.").

## V. THE NATION FAILS TO PLEAD PROXIMATE CAUSATION.

In an attempt to defeat Distributors' arguments about the lack of proximate cause, the Nation skips back and forth between arguing that their case is (1) based on "diversion" and an "illegal secondary market" for opioids and a claim and that it is (2) based upon the overall legal overprescribing of opioids brought about by Manufacturers' alleged fraudulent marketing. Opp. 32. No matter which it is, the Nation has not, and cannot, sufficiently allege proximate causation ***as to Distributors*** because there are supervening causes between Distributors and the Nation's alleged harms. Each of these supervening causes is "(1) independent of the original act; (2) adequate itself to bring about the result; and (3) one whose occurrence was not reasonably foreseeable." *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 264 (Okla. 1982).

If "the opioid crisis was not caused by rogue prescription-happy physicians acting alone," Opp. 32, but rather, because "physicians prescribed opioids in accordance with [Manufacturers'] misrepresentations" about "the risks and benefits of opioids and opioid addiction," Opp. 31, then the issue is not one of "diversion" and "fail[ure] to control the supply of dangerous Schedule II drugs," Opp. 26.  "Diversion" concerns the "transfer of any legally prescribed controlled substance from the person for whom it was prescribed to another person for any illicit use."  Br. n.2.  Diversion thus has nothing to do with prescriptions written in accordance with current medical guidelines, albeit guidelines allegedly influenced by Manufacturers' deceptive marketing.  Opp. 31.  Under that theory, the act of supplying the medications to pharmacies was not a *cause* of doctors' over-prescribing; if anything, the causal arrow runs in the other direction—the increased level of prescribing pursuant to new guidelines led both to increased production quotas by the DEA and increased orders by pharmacies.  Distributors had no more reason to suspect the orders than to suspect the quotas.

This holds true whether or not prescribing physicians can be deemed a superseding cause of Manufacturers' alleged conduct, because the Nation's claim is that Manufacturer's marketing targeted the physicians and undermined their "learned" judgment.  Opp. 31–32.  That claim has nothing to do with Distributors, and does not alter the fact that the physician's decision to prescribe breaks the causal chain between Distributors' alleged conduct and the Nation's alleged harms.  The Nation offers no other explanation of how harm to the Nation flowing from these increased prescriptions could have been foreseeable to Distributors, who are not alleged to have participated in the fraudulent marketing.

To the extent that the Nation's theory is that illegal diversion caused the opioid crisis, supervening causes were necessarily at issue because diversion inherently involves unlawful

conduct.  *See* Br. 22.  Taking all of the Nation's allegations as true, no matter how many pills pharmacies ordered and Distributors supplied, those medicines would sit on the shelf and cause no harm to anyone without the independent acts of third parties, including (if diversion is at issue), a pharmacist who dispenses the medication in the absence of a valid prescription, a user who knowingly gives or sells the pills to someone else, or a third party who steals the pills.  The deliberate conduct of those actors is independent of any act of shipping, even over-shipping, by Distributors.  *Thompson*, 652 P.2d at 264.

*Joyce v. M & M Gas Co.*, 672 P.2d 1172, 1173 (Okla. 1983), is instructive.  There, the Oklahoma Supreme Court held that a third party's subsequent unlawful acts—stealing a car and running a red light—were supervening causes that broke the causal chain between the defendant who left the keys in the car's ignition and the accident.  Similarly, in *Henry v. Merck and Co., Inc.*, 877 F.2d 1489, 1496 (10th Cir. 1989), the Tenth Circuit held, as a matter of Oklahoma law, that a subsequent independent criminal act was a supervening cause.

The Nation ignores *Joyce* and *Henry*, instead quoting a snippet from *Lockhart v. Loosen*, 943 P.2d 1074, 1080 (Okla. 1987).  Opp. 33.  *Lockhart* endorsed the general rule that intentional conduct is a supervening cause, but, given the unusual facts before it, held that the intentional conduct had to be knowing conduct as well.[12]  Here, the illegal diversion of prescription opioids

---

[12]  *Lockhart*, 943 P.2d at 1080 ("A person is not generally deemed liable at common law for a third party's deliberate act.  A third person's intentional tort is a supervening cause of the harm that results—even if the actor's negligent conduct created a situation that presented the opportunity for the tort to be committed." (quoting *Graham v. Keuchel*, 847 P.2d 342 (Okla. 1993)) (emphases omitted)).  The plaintiff in *Lockhart* was a wife who contracted a venereal disease after sexual relations with her husband, who unknowingly contracted the disease from the defendant.  943 P.2d at 1081.  The court expressly based its holding on the fact that the husband did not know "that he had contracted a venereal disease before he engaged in sex with his wife."  Had he known, the defendant's alleged conduct would have been "a mere condition" for the harm alleged rather than its proximate cause because "it would not [have been] reasonably foreseeable that [the husband] would [knowingly] engage in sexual relations with the plaintiff," and as a result, "his copulation with his wife would become a supervening cause."  *Id.*

19

is a superseding cause because it is intentional and knowing.  Distributors' alleged conduct was at most a "mere condition" for these superseding causes.  *Thompson*, 652 P.2d at 264.

The Nation also goes to great lengths to distinguish the "direct injury" test for proximate cause set forth in *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992), from the test for proximate cause under Oklahoma law.  *See* Opp. 27–30.  But there is no significant difference between the two.  The Supreme Court in *Holmes* premised its decision on the "common law" concept of proximate cause, which "demand[ed] … some direct relation between the injury asserted and the injurious conduct alleged."  503 U.S. at 268.  That same common law concept is found in Oklahoma's test for proximate causation.[13]  Indeed, the Oklahoma Uniform Jury Instruction concerning proximate causation (which the Nation cites, Opp. 26) refers to a "direct cause" both in its title and in the instruction itself.[14]  There can be no question, then, that under Oklahoma law, conduct is a "remote rather than proximate cause" when it is indirect—that is, when it "only creates a condition which thereafter reacts with

---

[13] The Nation contends that *Holmes* cannot apply because then "there would be no such thing as a loss of consortium claim, nor a bystander tort … [because] the injury in these kinds of claims … are derivative or partly derivative of a predicate injury inflicted on someone other than the plaintiff." Opp. 28 n.74.  These types of claims only serve to highlight how far removed the Nation is from any direct conduct of Distributors.  Only close relatives may recover under loss of consortium or bystander theories of liability—and in fact, no one may recover as a mere bystander under Oklahoma law.  *See Williams v. Hook*, 804 P.2d 1131, 1134–38 (Okla. 1990) (explaining that parents, children, and spouses may recover for loss of consortium); *Kraszewski v. Baptist Med. Ctr. of Okla., Inc.*, 946 P.2d 241, 246–47 (Okla. 1996) (rejecting bystander liability under Oklahoma law, and noting that, even in jurisdictions that accept the theory, a familial relationship is a necessary element).  The Nation has no relationship with Distributors whatsoever—not even an arms-length commercial one, much less the type of close familial relationship that would support loss of consortium or bystander liability.

[14] *See Instruction No. 9.6: Direct Cause—Definition*, Vernon's Oklahoma Forms (2d ed. June 2018) (defining a "[d]irect cause" as "a cause [that], in a natural and continuous sequence, produces injury and without which the injury would not have happened" and that was a "reasonably foreseeable result of" the tortious conduct); *see also Tomlinson v. Love's Country Stores, Inc.*, 854 P.2d 910, 915 n.6 (Okla. 1993) (discussing this instruction).

subsequent, independent, unforeseeable, distinct agency and produces an injury."  *Gaines v. Providence Apartments*, 750 P.2d 125, 124 (Okla. 1987).[15]

## VI.    THE CIVIL CONSPIRACY CLAIM SHOULD BE DISMISSED.

### A.    No Agreement to Achieve an Unlawful Object.

Under Oklahoma law, "[c]ircumstances which are just as consistent with lawful purposes as with unlawful purposes are insufficient to establish a conspiracy."  *Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1208 (10th Cir. 1998) (citing *Dill v. Rader*, 583 P.2d 496, 500 (Okla. 1978)).  The central allegation of the Nation's civil conspiracy claim is perfectly consistent with lawful purposes and therefore fails to state a claim.  The Nation alleges that Manufacturers "continuously supplied" opioids to Distributors, which then "continuously supplied" opioids to Pharmacies, which then dispensed opioids to consumers.  Compl. ¶ 487.  This allegation describes Defendants engaging in the core of their business and the precise activity that the DEA licenses them to perform.  Carrying out one's DEA-licensed role in the pharmaceutical supply chain is a quintessentially lawful purpose.

None of the Nation's well-pled allegations against Distributors are inconsistent with the lawful purpose of carrying out DEA-authorized activities.  The bulk of the allegations that the Nation says "support an inference that there was a conspiracy" are allegations against **Manufacturers**, not Distributors, and concern Manufacturers' allegedly deceptive marketing.

---

[15]    The Nation also suggests that proximate cause is rarely decided as a matter of law under Oklahoma law.  Yet the case on which it principally relies for this proposition itself acknowledges that there are instances when proximate cause fails as a matter of law.  *See Tomlinson*, 854 P.2d at 916 (recognizing that proximate cause can be legally deficient if there is not a reasonable "casual nexus between the negligent act and the resulting injuries").  And there are many examples of such instances.  *See, e.g.*, *Thompson*, 652 P.2d at 264 (concluding as matter of law that the supervening negligence of an anesthesiologist administering Demerol defeated the proximate causation element of a negligence claim against the prescribing physician); *Joyce*, 672 P.2d at 1173 (holding that subsequent criminal and negligent acts were supervening causes that broke causal nexus in a negligence claim); *see also Henry*, 877 F.2d at 1496 (holding that, as a matter of Oklahoma law, a subsequent independent criminal act was a supervening cause).

Opp. 108–09 (citing Compl. ¶¶ 4, 5, 486). Nowhere does the Nation allege that Distributors had any role in Manufacturers' alleged fraudulent marketing efforts. Similarly, the allegation that Manufacturers' misrepresentations created demand that Distributors filled, *id.* (quoting Compl. ¶ 488), does not suggest that Distributors played any role in Manufacturers' allegedly fraudulent marketing or had an unlawful purpose in filling the pharmacy orders. Other allegations do not suggest that any sort of agreement or shared purpose existed. A bare allegation that Defendants violated regulatory requirements concerning diversion, Opp. 109 (quoting Compl. ¶ 14), does not suggest there was a conspiracy to do so. Nor do conclusory allegations that Defendants engaged in "concerted conduct" and "agreed with each other to accomplish the unlawful purposes of marketing, selling, distributing, and retailing prescription opioids through violations of the law and misrepresentations" state a claim. Opp. 108 (quoting Compl. ¶¶ 490–91). This is precisely the sort of pleading that *Twombly* prohibits. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (an allegation of "parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *Trans Rail Am., Inc. v. Hubbard Twp.*, 478 F. App'x 986, 988 (6th Cir. 2012) ("It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient ….").[16]

The Nation has failed to do more than describe conduct consistent with lawful, DEA-licensed activity or make conclusory allegations of illicit agreements, and the Nation's claim fails as a result. The Opposition's suggestion that it has pled "unlawful purpose" because it has pled that Distributors violated the law (Opp. 106) misses the point. The Nation must plead that Distributors agreed with others to violate the law. The Nation has failed to do so.

---

[16] The Nation cites an Oklahoma state court case on the pleading standard for civil conspiracy claims, Opp. 109, but the state pleading standard is irrelevant to an action in federal court.

### B.     No Well-Plead Allegation of Intentional and Unlawful Overt Acts.

The Nation does not dispute that it must allege that Distributors agreed to engage in *intentional* unlawful acts.  Opp. 110.  It identifies five legal claims that it says constitute intentional unlawful conduct:  (1) fraud, (2) violations of RICO, (3) violations of the Lanham Act, (4) nuisance, and (5) unjust enrichment.  None constitutes a valid overt act.  The fraud claim fails for the reasons explained in Part I.C of Distributors' separate reply in the *Blackfeet* case.  Violations of federal statutes like RICO and the Lanham Act, which have their own complex statutory remedial schemes, cannot be enforced through state civil conspiracy claims.  *See Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1342 (11th Cir. 1999).  Intent is irrelevant to liability for nuisance and unjust enrichment.  *Briscoe v. Harper Oil Co.*, 702 P.2d 33, 36 (Okla. 1985); *City of Tulsa v. Bank of Oklahoma, N.A.*, 280 P.3d 314, 319 (Okla. 2011).  Moreover, the Nation fails to adequately plead overt acts because it vaguely invokes broad categories of illegal conduct and does not identify any specific overt acts.  Br. 26.[17]

## VII.    THE NATION'S UNJUST ENRICHMENT CLAIM FAILS.

The Nation defends its unjust enrichment claim on the basis of its "externalities" theory, under which it asserts that Distributors must pay for the Nation's costs because those costs were in some remote way the "externalities" of Distributors' conduct.  Opp. 102–103.  While Magistrate Judge Ruiz recommended that Summit County's unjust enrichment claim be permitted to proceed on this theory, Distributors contend that the "externalities" theory is unsound and without basis in Oklahoma law.  R&R 92–93.  Although the Nation (and the R&R) cites a handful of state and federal trial courts which have accepted the theory, and the Nation

---

[17]    The claim must also be dismissed because all of the underlying legal claims fail.  Br. 26. Distributors' and Pharmacies' arguments for dismissal establish that the Nation cannot state a claim against any of the distributor or pharmacy entities named in the Complaint, so the fact that some distributor and pharmacy defendants have not responded does not save the Nation's claim.

cites one Oklahoma trial court decision which (without analysis) permitted an opioid-related unjust enrichment claim to proceed against manufacturers, the Nation does not cite any Oklahoma decision that explicitly accepts this "externalities" theory.  *Cf. City of Miami v. Bank of America Corp.*, 800 F.3d 1262, 1288 (11th Cir. 2015) (rejecting externalities theory under Florida law where the City "has not cited to a single Florida case" supporting unjust enrichment claim in similar circumstances), *vacated in part on other grounds by Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017).

"[U]njust enrichment arises … where an expenditure by one person adds to the property of another," or "where the expenditure saves the other from expense or loss."  *City of Tulsa*, 280 P.3d at 319.[18]  So-called externalities do not add anything to Distributors' property, nor do they protect Distributors from any "expense or loss" that they otherwise would have been obligated to pay.  Moreover, "[o]ne is not unjustly enriched … by retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution."  *Id.*  To the extent an externality is a benefit at all, it is one "involuntarily acquired"—otherwise it would not be an externality.  And law and equity do not, in the absence of some other duty, impose any general obligation for anyone to pay restitution for the "externalities" they cause.  "[N]o rule of law requires persons whose acts cause harm to cover all of the costs, unless these acts were legal wrongs."  *Int'l Brotherhood of Teamsters v. Philip Morris Inc.*, 196 F.3d 818, 832 (7th Cir. 1999); *see also Perry v. Am. Tobacco Co.*, 324 F.3d 845, 851 (6th Cir. 2003) (rejecting suggestion that tobacco companies are unjustly enriched by medical costs of tobacco smokers in absence of "legal duty" to pay them); *Allegheny Gen. Hosp. v. Philip Morris, Inc.*,

---

[18]  The Nation cites to *Southern Rock, Inc. v. Summers*, 2012 WL 6722356 (E.D. Okla. Nov. 15, 2012), for a version of Oklahoma's unjust enrichment test, but the cited document is a party's brief, not a court decision.

228 F.3d 429, 447 (3d Cir. 2000) (similar).  Externalities, after all, are everywhere in our economy.  Determining whether and how society should address externalities is a matter for the democratic process to solve through taxation, legislation, or regulation, not individual courts or juries.

The Nation further claims that it can bring its unjust enrichment claim in the alternative to its other claims.  Opp. 103–04.  In *Brill v. Walt Disney Co.*, 246 P.3d 1099 (Okla. Civ. App. 2010), however, the Oklahoma Court of Appeals clarified that an unjust enrichment claim cannot stand if it is "merely derivative" of legal claims that also fail, *id.* at 1106.  That is the case here. The Court of Appeals' earlier decision in *N.C. Corff Partnership, Ltd. v. OXY USA, Inc.*, 929 P.2d 288 (Okla. Civ. App. 1996), is distinguishable because the court there held that the plaintiff had additionally stated a nuisance claim, *id.* at 294–95.

## CONCLUSION

The Nation's claims against Distributors should be dismissed with prejudice.

Dated:  November 2, 2018

Respectfully submitted,


/s/ Robert A. Nicholas
Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation*[19] *and AmerisourceBergen Drug Corporation*


/s/ Geoffrey Hobart
Geoffrey Hobart
Mark Lynch
Christian J. Pistilli
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*


/s/ Enu Mainigi
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, NW
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
EMainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Cardinal Health, Inc. and Cardinal Health 110, LLC*

---

[19]  By filing this Motion, AmerisourceBergen Corporation does not concede that it is a proper party to this action.

26

## LOCAL RULE 7.1(F) CERTIFICATION

I, Ashley W. Hardin, hereby certify that this brief conforms to the page limitations set forth in the Court's July 26, 2018 order (Doc. No. 791) regarding briefing in this case because the reply does not exceed 30 pages.

*/s/ Ashley W. Hardin*
Ashley W. Hardin

## CERTIFICATE OF SERVICE

I, Ashley W. Hardin, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Ashley W. Hardin*
Ashley W. Hardin