Exhibit A

**OFFICE OF THE COUNTY COUNSEL**
**COUNTY OF SANTA CLARA**
Orry P. Korb (SBN 114399)
Danny Y. Chou (SBN 180240)
Greta S. Hansen (SBN 251471)
Kavita Narayan (SBN 264191)
Marlene Dehlinger (SBN 292282)
70 West Hedding Street
East Wing, 9th Floor
San Jose, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

**ORANGE COUNTY DISTRICT ATTORNEY**
Tony Rackauckas, District Attorney
Joseph D'Agostino, Senior Assistant District Attorney
Consumer and Environmental Protection Unit
Tracey Hughes (SBN 180494)
Deputy District Attorney
401 Civil Center Drive
Santa Ana, CA 92701-4575
Telephone: (714) 834-3600
Facsimile: (714) 648-3636

*[Additional Counsel Listed on Signature Page]*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Orange

**05/21/2014** at 02:17:55 PM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ORANGE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas,<br><br>Plaintiff,<br><br>v.<br><br>PURDUE PHARMA L.P.; PURDUE, INC.; THE PURDUE FREDERICK COMPANY, INC; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ACTAVIS, PLC; AND DOES 1 THROUGH 100, INCLUSIVE,<br><br>Defendants. | No. 30-2014-00725287-CU-BT-CXC<br>Judge Steven L. Perk<br><br>COMPLAINT FOR VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW, CALIFORNIA UNFAIR COMPETITION LAW, AND PUBLIC NUISANCE, SEEKING RESTITUTION, CIVIL PENALTIES, ABATEMENT, AND INJUNCTIVE RELIEF |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  JURISDICTION AND VENUE .............................................................................. 6

III. PARTIES ................................................................................................................ 7

    A.   Plaintiff ......................................................................................................... 7

    B.   Defendants .................................................................................................... 7

IV.  FACTUAL ALLEGATIONS ................................................................................. 10

    A.   Before Defendants' Deceptive Marketing Campaign, Opioids Were Rarely
         Prescribed by Physicians Because of Their Known Serious Side Effects and
         Substantial Risk of Addiction ..................................................................... 10

    B.   Defendants' Marketing of Opioids for Long-Term Use to Treat Chronic
         Non-Cancer Pain was False, Misleading, Imbalanced,
         and Unsupported by Science ....................................................................... 11

         1.   Defendants' misrepresentations regarding the benefits of opioids for
             chronic pain. ..................................................................................... 13

         2.   Defendants' misrepresentations regarding the adverse outcomes and
             risks of opioids. ................................................................................ 18

             a.   Risk of addiction and abuse. ................................................... 18

                  (1)   Minimizing the risk of addiction. ............................. 19

                  (2)   Claiming the risk of addiction can be
                        identified and managed ............................................. 21

                  (3)   Deflecting attention to "undertreated" pain .............. 23

                  (4)   Physical dependence vs. addiction. ........................... 24

                  (5)   Pseudoaddiction. ...................................................... 27

               b.   Other adverse effects. ............................................................. 30

         3.   Misrepresentations regarding superiority. ....................................... 34

    C.   Defendants, Directly and Through Their Agents and Front Organizations,
         Made and Caused Their Misrepresentations to Be Made and Broadly
         Disseminated ............................................................................................... 35

          1.   Method 1: Key opinion leaders ("KOLs"). ..................................... 36

         2.   Method 2:  Co-opting of chronic pain advocacy and research groups to
             promote opioid use. ......................................................................... 39

COMPLAINT

    a.   American Pain Foundation. ............................................................ 40

    b.   American Academy of Pain Medicine. ........................................ 42

  3.   Method 3: Treatment guidelines.............................................................. 43

  4.   Method 4:  Continuing medical education. ........................................... 47

  5.   Method 5:  Scientific articles................................................................ 51

  6.   Method 6:  Patient education. ............................................................... 52

       (1)   Elderly patients. ..................................................................... 54

       (2)   Veterans. .................................................................................. 55

D.   Defendants Often Acted Together in Promoting Opioids, Opposing Regulation,
     and Facilitating Supportive Standards to Approve Opioids ...............................57

E.   Defendants Also Acted Individually to Deceptively Promote Their Opioids for
     Chronic Pain ...................................................................................................59

  1.   Cephalon fraudulently marketed Actiq and Fentora. ............................ 60

       a.   Cephalon launches its fraudulent marketing scheme of Actiq. ........... 60

       b.   Cephalon engaged in deceptive, off-label marketing efforts to
            expand the use of Actiq. ..................................................................... 61

       c.   Government investigations also confirm Cephalon's deceptive
            marketing strategy. ............................................................................. 63

       d.   Cephalon attempted to cover-up evidence of its deceptive,
            unlawful scheme. ................................................................................. 64

       e.   Cephalon fraudulently marketed Actiq's successor drug, Fentora. ...... 65

       f.   October 1, 2006 – Cephalon launches Fentora and immediately
            begins deceptive marketing campaign................................................. 66

       g.   September 2007 – Reports of death and serious side effects lead
            the FDA to issue a public health warning for Fentora........................ 67

       h.   Cephalon sponsored CMEs used to promote the off-label use of
            Actiq and Fentora – 2007-2008, in spite of the FDA warnings. ......... 68

       i.   May 6, 2008 – The FDA rejects Cephalon's request for expanded
            approval of Fentora. ............................................................................ 69

       j.   March 26, 2009 – the FDA's Division of Drug Marketing,
            Advertising and Communications ("DDMAC") warned Cephalon
            about its misleading advertising of Fentora........................................ 70

       k.   Cephalon continues to knowingly, deceptively, and illegally
            promote Fentora for off-label uses. .................................................... 71

- ii -
COMPLAINT

    2.    Purdue's role in deceptively promoting opioids for treatment of chronic pain. ............................................................................................ 72

        a.    Purdue's marketing of OxyContin was deceptive from the start. ....... 72

        b.    Purdue continued to engage in false marketing, misrepresenting OxyContin's benefits and the risk of addiction when taken long-term for chronic pain. ..................................................... 75

        c.    Purdue was aware of, and has profited from, misuse and diversion of its opioids. ................................................................ 75

F.    Defendants Knew That Their Marketing of Chronic Opioid Therapy Was False, Unfounded, and Dangerous and would Harm California Residents ...................... 77

G.    Defendants Fraudulently Concealed their Misrepresentations .................................... 78

H.    Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to California Communities .................................................................. 80

FIRST CAUSE OF ACTION  FALSE ADVERTISING  Violations of California Business and Professions Code Section 17500, *et seq.* ..................................................... 86

SECOND CAUSE OF ACTION  UNFAIR COMPETITION  Violations of the Unfair Competition Law, California Business and Professions Code Section 17200 ....................... 91

THIRD CAUSE OF ACTION  PUBLIC NUISANCE  Violations of California Civil Code Section 3479, *et seq.* .......................................................................... 94

V.    PRAYER FOR RELIEF ....................................................................... 97

## I.     INTRODUCTION

1.      A pharmaceutical manufacturer should never place its desire for profits above the health and well-being of its customers.  When marketing a drug, a pharmaceutical manufacturer must tell the truth, which means ensuring that its marketing claims are supported by science and medical experience.  Defendants broke these simple rules.

2.      By the 1990s, Defendants had the ability to cheaply produce massive quantities of opium-like painkillers ("opioids"), but the market was small.  Defendants knew that opioids were effective treatments for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.  They knew – and had known for years – that opioids were too addictive and too debilitating for long-term use for chronic non-cancer pain (pain lasting three months or longer),[1] particularly because their effectiveness waned with prolonged use and because of the substantial risk of significant side effects and addiction, especially with high-dose use.[2]  They also knew that controlled studies of the safety and efficacy of opioids were limited to short-term use (not longer than 90 days), and in managed settings (*e.g.*, hospitals), where the risk of addiction and other adverse outcomes was much less significant.

3.      Even the doctors who published articles suggesting that opioids might be useful for chronic pain treatment recognized the substantial concerns about long-term opioid use and counseled for "[a]stute ongoing assessment of functional outcomes if opioids are administered."[3]

4.      Prescription opioids, which include well-known brand-name drugs like OxyContin and Percocet, are narcotics.  They are derived from or possess properties similar to opium and heroin – which is why they are regulated as controlled substances.  Like heroin, prescription opioids work by binding to receptors on the spinal cord and in the brain, dampening the perception of pain.  Opioids also can create a euphoric high, which can make them addictive.  At certain doses, opioids can slow the user's breathing, causing respiratory depression and, ultimately, death.

---

[1] Chronic pain, as used in this Complaint, refers to chronic non-cancer pain.

[2] R.K. Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain:  Current Status*, Progress in Pain Research and Management, Vol. 1, ed. H.L. Fields & John C. Liebeskind, IASP Press, Seattle, 1994.

[3] *Id.*

5.      In order to expand the market for opioids and realize blockbuster profits, Defendants needed to create a sea-change in medical and public perception that would permit the use of opioids for long periods of time to treat more common aches and pains, like lower back pain, arthritis, and headaches.  Opioid makers Purdue, Janssen, Endo, Cephalon, and Actavis, through a common, sophisticated, and deeply deceptive marketing campaign that continues to the present, set out to, and did, reverse the popular and medical understanding of opioids.

6.      Beginning over 20 years ago, Defendants seized on anecdotal accounts of opioid use to treat chronic pain to begin a reeducation campaign about opioids.  They spent millions of dollars funding, assisting, and encouraging doctors and front groups that would pioneer a new and far broader market for their potent and highly addictive drugs – the chronic pain market. Defendants persuaded doctors and patients that what they had long known – that opioids are addictive drugs and unsafe in most circumstances for long-term use – was untrue, and quite the opposite, that the compassionate treatment of pain *required* opioids.  They overstated the benefits of using opioids long-term to treat chronic non-cancer pain, promising improvement in patients' function and quality of life, and dismissed or minimized the serious risks and adverse outcomes of chronic opioid use, including the risk of addiction, overdose, and death.  There was and is no reliable scientific evidence supporting Defendants' marketing claims at issue, and there is a wealth of scientific evidence to the contrary.  They also deceptively marketed the drugs for indications and benefits that were prohibited by the drugs' labels.

7.      Defendants' efforts were wildly successful; the United States is now awash in opioids.  In 2010, 254 million prescriptions for opioids were filled in the U.S. – enough to medicate every adult in America around the clock for a month.  Twenty percent of all doctors' visits result in the prescription of an opioid (nearly double the rate in 2000).[4]  Opioids – once a niche drug – are now the most prescribed class of drugs – more than blood pressure, cholesterol, or anxiety drugs.  While Americans represent only 4.6% of the world's population, they have

---

[4] Daubresse M, *et al.*, *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, Medical Care, 2013; 51(10):870-878.

consumed 80% of the opioids supplied around the world and 99% of the global hydrocodone supply.[5]  Together, opioids generated $8 billion in revenue for drug companies in 2010.

8.      Roughly 87% of these prescriptions are for chronic opioid therapy – a prescribing practice doctors previously considered not just ineffective, but even reckless given the substantial risk of addiction chronic opioid use creates.

9.      It was Defendants' marketing – and not any medical breakthrough – that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse.  The result has been catastrophic.  According to the U.S. Centers for Disease Control and Prevention ("CDC"), the nation has been swept up in an opioid-induced "public health epidemic." Prescription opioid use contributed to 16,651 overdose deaths nationally in 2010 – more than twice as many deaths as heroin and cocaine combined and surpassing motor vehicle accidents as a cause of death.  In Orange County alone there is an opioid-related death every other day.[6]  For every death, more than 30 individuals are treated in the emergency room.  But even these alarming statistics do not fully communicate the toll of prescription opioid abuse on patients and their families.

10.      The dramatic increase in opioid prescriptions to treat common chronic pain conditions has resulted in a population of addicts who seek drugs from doctors or from the secondary criminal market, and a pipeline of drugs that can be diverted to supply them.  Sixty percent of opioid abusers report that their drugs came originally from prescriptions.[7]  According to the CDC, more than 12 million Americans age 12 or older have used prescription painkillers without a prescription in the past year, and adolescents are abusing opioids in alarming numbers.

11.      In addition, opioid abuse has triggered a resurgence in the use of heroin, which has imposed additional burdens on the public and the state and local agencies that serve them.  Heroin produces a very similar high to prescription opioids, but is often cheaper.  While a single opioid

---

[5] Manchikanti, *et al.*, *Therapeutic Use, Abuse, and Nonmedical Use of Opioids: A Ten-Year Perspective*, Pain Physician, 2010; 13:401-435.

[6] David Whiting, *Whiting:  FDA Finally Starts to Tackle Opioid Epidemic*, ORANGE COUNTY REGISTER, Oct. 26, 2013, *available at* www.ocregister.com/articles/fda-533176-drug-country.html.

[7] Katz M, *Opioids After Thousands of Years, Still Getting to Know You*, Clin J Pain 2007; 23:303-306.

pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price.  It is hard to imagine the powerful pull that would cause a law-abiding, middle-aged person started on prescription opioids for a back injury, to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

12.     Dr. Robert Dupont, former director of the National Institute on Drug Abuse and the former White House drug czar, opines that opioids are more destructive than crack cocaine:

> [Opioid abuse] is building more slowly, but it's much larger.  And the potential for death, in particular, [is] way beyond anything we saw then. … [F]or pain medicine, a one-day dose can be sold on the black market for $100.  And a single dose can [be] lethal to a non-patient.  There is no other medicine that has those characteristics.  And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem.

13.     To shift medical convention and unleash this epidemic, Defendants engaged in a campaign of deception that:  (1) misrepresented the efficacy of opioids, (2) trivialized or obscured their serious risks and adverse outcomes, and (3) overstated their superiority, compared with other treatments.  Defendants supported, encouraged, and directed employees, front groups, and doctors they identified as "Key Opinion Leaders" ("KOLs") to publicize biased and misleading studies and promotional materials and conduct thousands of medical education programs that were deceptive and lacked balance.  These "educational" efforts were designed not to present a fair view of how and when opioids could be safely and effectively used, but rather to convince doctors and patients that the benefits of using opioids to treat chronic non-cancer pain outweighed their risks and that opioids could be used safely by most patients.

14.     Defendants' representations regarding the benefits, risks, and relative superiority of opioids were – and are – untrue and unsupported by competent scientific evidence.  In fact, even Defendants' KOLs initially were very cautious about whether opioids were safe and effective to treat chronic pain.  Some of these same KOLs have since recanted their pro-opioid marketing messages and acknowledged that Defendants' marketing went too far.  Yet despite the voices of renowned pain specialists, researchers and physicians who have sounded the alarm on the long-

term use of opioids to treat chronic non-cancer pain, Defendants continue to disseminate their false and misleading marketing claims even today.

15. Defendants' marketing not only ignored contrary evidence, but also failed to acknowledge risks disclosed on their own labels and sometimes exceeded the approved indications. Defendant Cephalon, for example, marketed its opioid, Fentora, for chronic non-cancer pain even though it was approved *only* to treat cancer pain. Defendants also promised that opioids would improve patients' ability to function, even though such benefits had not been proven and were specifically disputed by the FDA.

16. Many of Defendants' strategies are modeled on the standard promotional activities for prescription drugs that have been deemed unlawful, and for which the drug companies have paid billions of dollars in settlements and judgments. What makes this effort particularly nefarious – and dangerous – is that unlike most other prescription drugs, opioids are highly addictive controlled substances. Defendants deceptively engaged a patient base that – physically and psychologically – could not turn away from their drugs; many of whom were not helped by the drugs or were profoundly damaged by them.

17. There are millions of Californians who suffer from chronic pain, which takes an enormous toll on their health, their lives, and their families. These patients deserve both appropriate care and the ability to make decisions based on accurate, complete information about treatment risks and benefits. But Defendants' deceptive marketing campaign deprived California patients and their doctors of the ability to make informed medical decisions and, instead, caused important, sometimes life-or-death decisions to be made based not on science, but on hype. Defendants deprived patients, their doctors, and health care payers of the chance to exercise informed judgment, and subjected them to enormous suffering and costs.

18. Defendants' course of conduct, individually and collectively, has violated and continues to violate one or more of the following laws of the State of California:

- California False Advertising Law, BUS. & PROF. CODE
§ 17500, in that Defendants made and disseminated untrue,
false, or misleading statements about the use of opioids to
treat chronic non-cancer pain, or caused untrue, false, or

- 5 -

COMPLAINT

misleading statements about opioids to be made or disseminated to the public;

- California Unfair Competition Law, BUS. & PROF. CODE § 17200, in that Defendants engaged in unlawful, unfair, and fraudulent business acts and practices and deceptive, untrue, and misleading advertising in their promotion of opioids to treat chronic non-cancer pain; and

- California Public Nuisance Law, CAL. CIV. CODE §§ 3479, 3480, in that Defendants, through their untrue, misleading, false, fraudulent, and deceptive promotion of opioids, have created or assisted in the creation of a condition that is injurious to health and substantially interferes with the comfortable enjoyment of life and property of the people of Santa Clara and Orange County and the State of California.

19.     To redress and punish these violations of law the People of the State of California, by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas, seek a judgment requiring Defendants to pay restitution, civil penalties, and attorneys' fees, costs, and expenses.  The People also request that the Court issue an order requiring Defendants to cease their unlawful promotion of opioids, to correct their misrepresentations, and to abate the public nuisance they have created, in addition to granting any other equitable relief authorized by law.

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over the People's claims for restitution, including disgorgement of profits, civil penalties, trebling of relief, injunctive relief, and other equitable relief under the California Unfair Competition Law (BUS. & PROF. CODE § 17200, *et seq.*), California False Advertising Law (BUS. & PROF. CODE § 17500, *et seq.*), and California Civil Code section 3345; and over the People's claim for abatement under the California Public Nuisance law (CAL. CIV. CODE §§ 3479, 3480).

21.     This Court has personal jurisdiction over Defendants under California Code of Civil Procedure § 410.10.  Defendants have submitted to jurisdiction by conducting and transacting business in Santa Clara and Orange Counties on a regular and continuous basis, by marketing and selling opioids to doctors, pharmacies, payers, and patients in Santa Clara and Orange Counties,

- 6 -
COMPLAINT

and by committing acts within Santa Clara and Orange Counties against their citizens and residents that are in violation of the laws of California and the United States.

22.     Venue as to each Defendant is proper in this judicial district, pursuant to California Code of Civil Procedure §§ 395 and 395.5.

## III.     PARTIES

### A.     Plaintiff

23.     Plaintiff is the People of the State of California, acting by and through Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas ("the People").

24.     The People bring this action for violations of the Unfair Competition Law pursuant to California Business and Professions Code Sections 17200, 17204, and 17206, and for violations of the False Advertising Law pursuant to California Business and Professions Code Sections 17500, 17535, and 17536.

25.     The People bring this action to abate a public nuisance pursuant to California Code of Civil Procedure Section 731.

### B.     Defendants

26.     Defendant Purdue Pharma L.P. is a limited partnership organized under the laws of Delaware, Defendant Purdue, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut, and Defendant The Purdue Frederick Company, Inc. is a Delaware corporation with is principal place of business in Stamford, Connecticut (collectively, "Purdue"). Purdue is primarily engaged in the manufacture, promotion, and distribution of opioids, including OxyContin, its largest selling opioid, in both California and the nation.  Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (painkillers).

27.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million – at the time, one of the largest settlements with a drug company for marketing misconduct.  Pursuant to its misbranding

1  settlement, Purdue operated under a Corporate Integrity Agreement with the Office of Inspector

2  General of the U.S. Department of Health and Human Services, which required the company, *inter*

3  *alia*, to ensure that its marketing is fair and accurate and to monitor and report on its compliance

4  with the Agreement.

5      28.    Defendant Teva Pharmaceutical Industries, Ltd. is an Israeli corporation with its

6  principal place of business in Petah Tikva, Israel.  In 2011, Teva Pharmaceutical Industries, Ltd.

7  acquired Cepahlon, Inc.  Defendant Cephalon, Inc. is a Delaware corporation with its principal

8  place of business in Frazer, Pennsylvania (Teva Pharmaceutical Industries, Ltd. and Cephalon, Inc.

9  are collectively referred to herein as "Cephalon").  Cephalon is in the business of manufacturing,

10  selling and distributing pharmaceutical drugs, including opioids Actiq and Fentora, nationally and

11  in California.

12      29.    In November 1998, the FDA granted restricted marketing approval for Actiq,

13  limiting its lawful marketing to cancer patients experiencing pain "with malignancies who had

14  developed a tolerance to less dangerous therapies."  The FDA specified that Actiq should not be

15  marketed for off-label uses, stating that the drug "must not be used in opioid non-tolerant patients"

16  and must be prescribed solely to cancer patients by oncologists and pain specialists specifically

17  trained in the use of Schedule II opioids to treat pain in cancer patients.  In 2008, Cephalon plead

18  guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading

19  promotion of Actiq and two other drugs and agreed to pay $425 million.

20      30.    Cephalon also entered into a five-year Corporate Integrity Agreement with the

21  Office of Inspector General of the U.S. Department of Health and Human Services.  The

22  agreement required Cephalon to send doctors a letter advising them of the settlement terms and

23  giving them a means to report questionable conduct of sales representatives; to post payments to

24  doctors on its web site; and to regularly certify that the company has an effective compliance

25  program.

26      31.    Defendant Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its

27  principal place of business in Titusville, New Jersey, and a wholly owned subsidiary of Defendant

28

- 8 -
COMPLAINT

Johnson & Johnson, a New Jersey corporation with its principal place of business in New Brunswick, New Jersey (Janssen Pharmaceuticals, Inc. and Johnson & Johnson are collectively referred to herein as "Janssen"). Janssen manufactures, sells, and distributes a range of medical devices and pharmaceutical drugs in California and nationally, including the opioids Duragesic, Nucynta, Ultracet, and Ultram. Duragesic is the largest selling opioid of the group, with revenue of $1 billion in 2008, which dropped to $589 million in 2011. Sales of Janssen's opioids collectively commanded between $1.3 billion in revenue in 2009 and $1.2 billion in 2012 – a total of $4.7 billion dollars over the four-year period.

32.      Defendant Endo Health Solutions Inc. ("Endo") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Endo develops, markets, and sells prescription drugs, including opioids Opana, Percocet, and Percodan, in California and throughout the U.S. These opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana yielded revenue of $1.16 billion between 2008 and 2012, and alone accounted for 10% of Endo's total 2012 revenue.

33.      Defendant Actavis plc is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis plc was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott plc. Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012 and the combined company name was changed to Actavis, Inc. as of January 2013, and then Actavis plc in October 2013. Throughout the Complaint, "Actavis," collectively refers to Actavis, Inc. and Actavis plc. During the relevant time period, Actavis engaged in the business of marketing and selling opioids in California and across the country, including the branded drug Kadian and generic versions of Duragesic and Opana.

COMPLAINT

## IV.  FACTUAL ALLEGATIONS

A.  **Before Defendants' Deceptive Marketing Campaign, Opioids Were Rarely Prescribed by Physicians Because of Their Known Serious Side Effects and Substantial Risk of Addiction**

34.     Opioids have long been approved and accepted for the treatment of chronic cancer pain.  Opioids are appropriate for this use given the severity of pain often associated with cancer and the recognition that the benefits of treating that pain outweigh the potential risk of addiction, especially for terminal patients.  The same is not true for chronic non-cancer pain.  Among other differences, the pathology responsible for cancer pain is distinct from the pathology that causes chronic pain.  For patients with cancer, the source of their pain is likely to be the tumor and pressure on, or erosion of nerves or bones, which can be extremely painful, while chronic pain arises from multiple sources – including musculoskeletal (from joints, ligaments, or muscles), neuropathic (or nerve-related, occurring in diseases like diabetes or shingles), headache, or functional pain (arising from disease states such as irritable bowel) – that respond differently (or not at all) to opioids.

35.     However, over the past twenty years, fueled by aggressive marketing from the pharmaceutical industry, opioid use for the management of chronic non-cancer pain has become commonplace.  As set forth below, use of opioids for long-term non-cancer pain management is based on "unsound science and blatant misinformation … and dangerous assumptions that opioids are highly effective and safe, and devoid of adverse events when prescribed by physicians."[8]

36.     As admitted in 1994 by Dr. Russell Portenoy, a KOL who went on to tirelessly promote opioid therapy for the treatment of chronic non-cancer pain (also called chronic nonmalignant pain), the medical consensus before Defendants' "reeducation" campaign was decidedly against the use of opioids to treat chronic non-cancer pain:

> *The traditional approach to chronic nonmalignant pain does not accept the long-term administration of opioid drugs*.  This perspective has been justified by the perceived likelihood of tolerance, which would attenuate any beneficial effects over time, and the potential for side effects, worsening disability, and addiction.  According to conventional thinking, the initial response to an opioid

---

[8] *Available at* http://www.ncbi.nlm.nih.gov/pubmed/22786464?report.

- 10 -
COMPLAINT

drug may appear favorable, with partial analgesia and salutary mood changes, but adverse effects inevitably occur thereafter.  It is assumed that the motivation to improve function will cease as mental clouding occurs and the belief takes hold that the drug can, by itself, return the patient to a normal life.  ***Serious management problems are anticipated, including difficulty in discontinuing a problematic therapy and the development of drug seeking behavior induced by the desire to maintain analgesic effects, avoid withdrawal, and perpetuate reinforcing psychic effects.***  There is an implicit assumption that little separates these outcomes from the highly aberrant behaviors associated with addiction.[9]

37.  Dr. Portenoy left no doubt about the 1994 state of knowledge concerning the safety and efficacy of opioid therapy for long-term chronic non-cancer pain:

At the present time, neither the medical literature nor clinical experience provides compelling evidence that long-term opioid use would be salutary for more than a very small number of patients with chronic nonmalignant pain…[10]

38.  But the lack of any credible science supporting opioid therapy for chronic non-cancer pain did not stop Defendants from marketing opioid therapy for that use.  Working with and through KOLs like Dr. Portenoy, Defendants seized on anecdotal accounts of opioid efficacy in limited populations and methodically, through numerous publications, programs, and spokespeople, overstated the benefits and understated the risks of opioids in order to create and defend a broad market for opioids that never should have and never would have come to exist absent Defendants' concerted, deliberate, and patently misleading efforts.

**B.  Defendants' Marketing of Opioids for Long-Term Use to Treat Chronic Non-Cancer Pain was False, Misleading, Imbalanced, and Unsupported by Science**

39.  For years, Defendants systematically violated state laws requiring that the promotion of pharmaceutical drugs not be false or misleading.  Defendants manipulated and ignored scientific evidence to formulate and broadcast the misrepresentations described below, each of which was instrumental in:  (1) overcoming longstanding medical and legal barriers to opioid therapy for chronic pain; and (2) making high-dose, long-term opioid use the new "gold standard" of treatment of chronic non-cancer pain.

---

[9] Portenoy, R.K., *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, Progress in Pain Research and Management, Vol. 1, p. 247, ed. H.L. Fields & John C. Liebeskind, IASP Press, Seattle, 1994 (emphasis added).

[10] *Id*. at 278 (emphasis added).

40. Defendants disseminated much of their false, misleading, imbalanced, and unsupported statements through unbranded marketing materials – materials that generally promoted opioid use but did not name a specific opioid drug name. Upon information and belief, Defendants used these unbranded materials, which are not reviewed by the FDA, to disseminate messages that were inaccurate, were inconsistent with their branded marketing materials and the drugs' labels and package inserts, and would not pass muster with the FDA. Had they relied on branded materials, the FDA-required drug labels and package inserts would have been included to more fully describe the risks and administration of opioids (such as OxyContin).

41. Defendants marketed directly to patients to: (1) encourage them to ask doctors for opioids to relieve chronic pain; and (2) allay their well-founded concerns that opioids were dangerous and addictive. Defendants targeted particularly vulnerable, but usually well-insured, groups of patients, such as veterans and the elderly. Defendants leveraged and funded patient organizations and communities – promoting opioids particularly for common conditions, such as headaches, arthritis, fibromyalgia, and back pain. Unlike other direct-to-consumer marketing, Defendants, as a group, focused on unbranded advertising – promoting opioids for chronic pain knowing that the creation of a new, expansive market for opioids would benefit all manufacturers.

42. Doctors are the gatekeepers for all prescription drugs so, not surprisingly, Defendants focused the bulk of their marketing efforts, and their multi-million dollar budgets, on the professional medical community. Particularly because of barriers to prescribing opioids, which are regulated as controlled substances, Defendants knew doctors would not treat patients with common chronic pain complaints with opioids unless doctors were persuaded that opioids had real benefits and minimal risks. Through misleading medical education programs, treatment guidelines, and other efforts, Defendants "reeducated" general practitioners and family doctors, knowing that these doctors reach the vast majority of patients with common chronic pain complaints, but are less likely than specialists to have the time or knowledge to evaluate Defendants' deceptive messages or to closely monitor patients for signs of improvement or adverse outcomes (such as addiction).

43.    Individually and collectively, Defendants promoted a series of misrepresentations aimed broadly at reversing the ultimately well-founded fears and beliefs of doctors and patients.

**1.    Defendants' misrepresentations regarding the benefits of opioids for chronic pain.**

44.    Defendants deceptively promoted opioids as improving chronic non-cancer pain patients' function by allowing them to get back to "normal" and reducing their pain long-term. Defendants misrepresented the efficacy of opioids in an effort to persuade doctors and patients that their benefits outweigh their risks.

45.    Although opioids may initially improve patients' function by providing pain relief in the short term, there were – and are – no controlled studies of the use of opioids beyond 16 weeks and no evidence that opioids improve patients' function in the long-term.  Indeed, research such as a 2008 study in *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.  Despite this lack of evidence, and evidence to the contrary, Defendants consistently promoted opioids as capable of improving patients' function and quality of life.

46.    The FDA has recognized that claims that opioids improve patients' function are misleading.  For example, a company claimed that its opioid "Improved Overall Function" and offered "Long Lasting Improvements in Physical Function" and would enable patients to be better able to engage in a list of daily activities, such as walking, standing, and climbing stairs.  In a warning letter sent March 24, 2008, the FDA publicly made clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities … as not been demonstrated by substantial evidence or substantial clinical experience."

47.    In marketing Kadian, Actavis made implied claims that the drug would allow chronic pain patients to return to work, relieve "stress on your body and your mental health," and help them enjoy their lives.  The FDA found the Actavis had misrepresented the scientific evidence:  "[W]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug has in alleviating pain, taken together

- 13 -
COMPLAINT

with any drug-related side effects patients may experience ... results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[11]

48.     Janssen also distributed a series of posters to doctors' offices that showed pictures of people dressed for a variety of active professions suggesting that doctors prescribe Ultracet because "Pain doesn't fit into their schedules." Despite the lack of scientific evidence in support of such a claim, the posters falsely implied that Ultracet was appropriate for help in maintaining an active lifestyle. Several of the posters contained the tagline "Ultracet lets them perform."

49.     In spite of the complete lack of scientific basis, in 2011, Purdue sponsored the *Policymaker's Guide*, published by the American Pain Foundation ("APF"), which asserted that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients. To support this claim, APF cited *Opioids for chronic noncancer pain: a meta-analysis of effectiveness and side effects*, a review published in 2006 in the Canadian Medical Association Journal. However, the review concludes: "For functional outcomes, the other analgesics were significantly more effective than were opioids." The Purdue-sponsored *Guide* failed to disclose both this conclusion and the fact that the review analyzed studies that lasted, on average, five weeks, and therefore could not support the long-term use of opioids.

50.     ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In 2009, one of the campaign's marquee components was a "first-of-its-kind Web-based series called the *Let's Talk Pain* show hosted by veteran TV journalist Carol Martin. The resource brings together medical doctors, nurses, psychologists, social workers and people with pain to discuss a host of issues from managing health care for pain to exploring integrative treatment approaches to addressing the psychological aspects associated with pain."

---

[11] Feb. 18, 2010 Warning Letter.

51.     The *Let's Talk Pain* talk show ████████████████████████ ████████████████████████ is still available online.  In the very first episode of this talk show, the following exchange took place:

> **Teresa Shaffer (APF Action Network Leader)**:  As a person who has been living with pain for over 20 years, opioids are a big part of my pain treatment.  And I have been hearing such negative things about opioids and the risk factors of opioids.  Could you talk with me a little bit about that?
>
> **Dr. Al Anderson (AAPM Board of Directors)**:  The general belief system in the public is that the opioids are a bad thing to be giving a patient.  Unfortunately, it's also prevalent in the medical profession, so patients have difficulty finding a doctor when they are suffering from pain for a long period of time, especially moderate to severe pain.  And that's the patients that we really need to use the opioids methods of treatment, because they are the ones who need to have some help with the function and they're the ones who need to have their pain controlled enough so that they can increase their quality of life.
>
> **Teresa Shaffer**:  This is what has allowed me to continue to function and is what has allowed me to have somewhat of a normal life, is the opioids.[12]

There simply is no scientific evidence that opioids taken long-term improve function or quality of life for chronic pain patients, and there is significant evidence that opioids impose significant risks and adverse outcomes on long-term users.

52.     Similarly, the National Initiative on Pain Control ("NIPC"), an APF initiative ██████████████, ran a facially unaffiliated website called www.painknowledge.org.  NIPC billed itself as "an integrated education initiative" and promoted its expert leadership team, including "nationally respected experts in the pain management field." ████████████████████ ████████████████████████████Painknowledge.org promised that, on opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."  Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy.[13]

---

[12] *Available at* http://www.youtube.com/watch?v=zeAlVAMRgsk (0:35 to 1:09).
[13] www.painknowledge.org_patiented_pdf_8679_PatientHandout_Final.

- 15 -

53.     APF's *Policymaker's Guide*, supported and sponsored by Purdue and published only two years ago, also includes claims that opioids "help alleviate pain, restore functioning and improve quality of life."

54.     Defendants' misrepresentations about increased function are particularly misleading for specific indications for which they promoted opioids, such as migraines and low back pain. For instance, research indicates that as many as 30% of patients who suffer from migraines have used opioids to treat their headaches.[14]  Despite this, users of opioids had the highest increase in headache days per month, scored significantly higher on the Migraine Disability Assessment (MIDAS), and had higher rates of depression, compared to non-opioid users.[15]  A survey by the National Headache Foundation found that migraine patients who used opioids were more likely to experience sleepiness, confusion, and rebound headaches, and reported a lower quality of life than patients taking other medications.[16]  Studies of the use of opioids long-term for chronic lower back pain similarly have been unable to demonstrate an improvement in patients' function.[17]

55.     There also is evidence that, over the long-term, opioid therapy fails to lessen, and sometimes increases, patients' pain – important facts that Defendants fail to include in their marketing literature.  For example, Defendants have failed to disclose scientific evidence that establishes that many patients on chronic opioid therapy continue to experience significant pain and dysfunction.[18]  Defendants also have failed to disclose research and clinical experience demonstrating that:  (1) the analgesic (pain relieving) efficacy of opioids often declines over time;

---

[14] Buse D, *Opioid Use and Dependence Among Persons With Migraine: Results of the AMPP Study*, Headache: The Journal of Head and Face Pain, 2012, 52: 18-36.

[15] *Id.*

[16] Press Kits – Migraine Patients Taking Addictive Or Non Approved FDA Migraine Treatment, National Headache Foundation, http://www.headaches.org/press/NHF_Press_Kits/Press_Kits_-_Migraine_Patients_Taking_Addictive_Or_Non_Approved_FDA_Migraine_Treatments.

[17] Chaparro, *Opioids compared to placebo or other treatments for chronic low-back pain*, Cochrane Database System Review, 2013, *available at* http://www.ncbi.nlm.nih.gov/pubmed/23983011.

[18] Mark D. Sullivan, *et al.*, *Problems and concerns of patients receiving chronic opioid therapy for chronic non-cancer pain*, 149(2) Pain 345-353 (2010); Jorgen Erikson, *et al.*, *Critical issues on opioids in chronic non-cancer pain*, 125(1-2) Pain 172-179 (2006); *see also*, IOM, Relieving Pain in America:  A Blueprint for Transforming Prevention, Care, Education and Research, Comm. on Advancing Pain Research, Care, & Educ. Board on Health Sci. Policy, *Relieving Pain in America:  A Blueprint for Transforming Prevention, Care, Education, and Research*, Institute of Medicine (2011); Dillie KS, *et al.*, *Quality of life associated with daily opioid therapy in a primary care chronic pain sample*, J Am Bd Fam Med, 21:108-117 (2008).

- 16 -
COMPLAINT

(2) patients on opioids long-term may develop greater sensitivity to pain ("hyperalgesia"); and (3) research showing that because they develop tolerance to the medication over time, many chronic pain patients require ever higher doses of opioids to obtain relief and are on doses that doctors have described as "frighteningly high."[19]

56.    Consistently, in their marketing, Defendants failed to disclose the lack of evidence to establish that opioids are safe and effective long-term, as well as the growing body of evidence that the risks of opioids increase and their benefits decline over time.  The studies relied on by Defendants in marketing their drugs are short-term, typically for less than 12 weeks.  For example, an ad run by Janssen in the October 2010 issue of *American Family Physician* included the claim: "Opioid efficacy meets unexpected tolerability in patients with end-stage degenerative joint disease of the hip or knee."  The study cited was only conducted over a five-day period, and thus provided no support for long-term efficacy.

57.    As one California pain specialist noted in an article titled, *Are We Making Pain Patients Worse*, "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning.  Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."  Instead, at higher doses, patients are much more likely to develop dependence or addiction, experience pain deterioration due to hyperalgesia, and are three to nine times more likely to die from opioid-related causes than those on low doses.[20]  Additionally, epidemiological data suggest that only a minority of patients on chronic opioid therapy benefit from the drugs and most continue to suffer significant pain and limitations on their activities.  Defendants have never disclosed these facts.

---

[19] Katz M, *Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, Arch Intern Med 2010; 170(16):1422-1424.

[20] Gomes, *Opioid dose and drug-related mortality in patients with nonmalignant pain*, Arch Intern Med 2011;171:686-691A; Dunn KM, *et al.*, *Opioid prescriptions for chronic pain and overdose: a cohort study*, Annals of Int. Med. 2010;152:85-92.  Most overdoses were medically serious and 12% were fatal.  *Id.  See also*, Braden JB, Russo JE, Fan MY, Edlund MJ, Martin BC, DeVries A, Sullivan MD, *Emergency Department visits among recipients of chronic opioid therapy*, Arch Intern Med, 2010; 170(16):  1425-1432 (finding that higher doses of opioids doubled the risk of adverse drug events).

COMPLAINT

**2.    Defendants' misrepresentations regarding the adverse outcomes and risks of opioids.**

58.    In an effort to persuade doctors to prescribe opioids for chronic non-cancer pain, Defendants deceptively overstated the safety and minimized the adverse outcomes, particularly the risk of abuse and addiction, of using opioids long-term.

**a.    Risk of addiction and abuse.**

59.    Defendants' fraudulent representation that opioids are rarely addictive is central to Defendants' scheme.  To reach chronic non-cancer pain patients, Defendants had to overcome doctors' legitimate fears that opioids would addict their patients.  The risk of addiction is an extremely weighty risk – condemning patients to, among other things, dependence, compulsive use, haziness, a lifetime of battling relapse, and a dramatically heightened risk of serious injury or death.  But for Defendants' campaign to convince doctors otherwise, finding benefits from opioid use for common chronic pain conditions sufficient to justify that risk would have posed a nearly insurmountable challenge.

60.    Remarkably, Defendants were able to do it.  Even though opioids are controlled substances – classified under the federal Controlled Substances Act as having "high potential for abuse" and a "risk of severe psychological and physical dependence"[21] Defendants:  (1) brazenly maintained that the risk of addiction for patients who take opioids long-term was low; and (2) omitted the risk of addiction and abuse from the list of adverse outcomes associated with chronic opioid use, even though the frequency and magnitude of the risk – and Defendants' own FDA labels – compelled disclosure.

61.    Contrary to Defendants' claims, numerous studies support that, though these patients may not presently show signs of abuse or addiction, at least 15% and as many as 40% of patients will become addicted to opioids.[22]  Research has shown that opioids are even more

---

[21] 21 U.S.C. § 812(b).

[22] *E.g.*, Boscarino, J, Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system, Addiction 2010 (105): 1776-1782; Boscarino J, Prevalence of prescription opioid-use disorder among chronic pain patients: comparison of the DSM-5 vs. DSM-4 diagnostic criteria, J Addict Dis. 2011, 30(3): 185-194; Prescription Drugs: Abuse and Addiction, National Institute on Drug Abuse, http://www.drugabuse.gov/sites/default/files/rrprescription.pdf.

- 18 -
COMPLAINT

addictive than cocaine and alcohol.  One in three to five users who self-administer short-acting opioids will become addicted, versus one in eight to 15 for users of cocaine or alcohol.[23]

### (1)   Minimizing the risk of addiction.

62.    In order to answer questions about increasingly well-publicized incidents of opioid addiction, Defendants falsely reassured doctors and patients that, when taken properly under a doctor's supervision, opioids are not addictive.  Defendants' representations that opioid addiction can be effectively managed by competent physicians not only had the effect of increasing the number of opioid prescriptions, but also deflected the responsibility from Defendants' marketing to doctors' prescribing and treatment practices.

63.    Defendants' efforts to minimize the risk of addiction from taking opioids long-term are evident in their unbranded materials, which dramatically understate or deny the risk of addiction, as compared to their branded materials, overseen by the FDA, which include stronger addiction warnings from the drugs' labels.  Upon information and belief, Defendants took advantage of this less regulated marketing channel to disseminate their deceptive messages regarding the risk of addiction from long-term opioid use.  For example (emphasis added):

| | What You Should Know About Treating Your Pain With Opioids (2012) | Opana ER Advertisement (2011/2012/2013) |
|---|---|---|
| | unbranded patient education material created by Endo | branded Endo advertisement |
| | "**The risk of becoming addicted to your opioid medicine is reduced** if you take your medicine exactly as prescribed by your healthcare provider. | "contains oxymorphone, an opioid agonist and Schedule II controlled substance with an abuse liability similar to other opioid agonists, legal or illicit." |
| | | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use.**" |

---

[23] Kreek, et al., Pharmacotherapy of Addictions, 1:710-726, 2002.

64.     Defendants also sought to deceptively downplay the risk of addiction to chronic pain patients by defining opioid addicts as people who get the drugs illicitly and take them improperly – not patients taking drugs they were prescribed.  According to Defendants, patients who take opioids prescribed to them are not addicted.  A 2004 Endo patient education publication edited by KOL Dr. Russell Portenoy titled *Understanding Your Pain:  Taking Oral Opioid Analgesics*, which is still available online, answers the hypothetical patient question:  "What should I know about opioids and addiction?" by focusing on explaining what addiction is ("a chronic brain disease") and is not ("Taking opioids for pain relief").  It goes on to explain that "[a]ddicts take opioids for other reasons, such as unbearable emotional problems.  Taking opioids as prescribed for pain relief is not addiction."

65.     More graphically, a Purdue brochure, still provided to doctors today, makes the point visually in advising doctors of *Indications of Possible Drug Abuse*; the brochure shows the stigmata of injecting or snorting opioids – skin popping, track marks, or perforated nasal septa.[24] In fact, opioid addicts who resort to these extremes are uncommon; the far more typical reality is patients who become dependent and addicted through oral use.  Thus, these misrepresentations wrongly reassured doctors that as long as they did not observe those signs, they need not worry that their patients were becoming addicted to opioids.

66.     These deceptive messages gave doctors and patients a false sense of security that as long as patients are only taking opioids a doctor gives them – regardless of the dose or frequency ingested – and not manipulating them, snorting, or injecting them, they are not addicted.  That is dangerously false.  Many opioid users who become addicted to the drugs began using them when a doctor prescribed them.  Pain patients and opioid addicts are not separate universes, but overlapping circles.  As one study noted, "a potential side effect from chronic use can be abuse and addiction … [I]n fact, correct use and abuse of these agents are not polar opposites – they are complex, inter-related phenomena."[25]  A review of studies of urine drug monitoring for opioid

---

[24] *Providing Relief, Preventing Abuse*, p. 13.

[25] Compton/Volkow, Major increases in opioid analgesic abuse in the United States:  Concerns and Strategies (2006), p 106.

patients showed that at least 11% of patients with chronic pain were misusing opioids and at least 12% were not taking their medication as prescribed.[26]

67.    Dr. Scott Fishman, another KOL previously funded by opioid makers, acknowledged that data supporting the contention that addiction is rare "have been found to be inadequate and seriously flawed.  Although we currently do not know the exact rate of addiction in patients legitimately prescribed opioids for pain or the rate of overall misuse, we know that rates are high enough that they should be considered a significant potential adverse effect."[27]  Despite these acknowledgements, Defendants continued to market opioids to doctors and patients as rarely addictive and failed to disclose the significant risk of addiction.

(2)    **Claiming the risk of addiction can be identified and managed.**

68.    Defendants continue to maintain to this day that *most* patients can safely take opioids long-term for chronic pain without becoming addicted.  However, over time, needing to explain why so many doctors encountered chronic pain patients addicted to opioids, Defendants admitted that *some* patients *could* become addicted.  Defendants claimed that if doctors use screening tools or questionnaires with their patients to identify those with higher addiction risks (stemming from personal or family histories of substance abuse, mental illness, or abuse), opioids can be given safely and addiction can be avoided.[28]

69.    Dr. Russell Portenoy, a pro-opioid, Defendant-funded KOL described above, appeared on *Good Morning America* in 2010 to discuss the use of opioids long-term to treat non-cancer chronic pain.  He claimed that, "Addiction, when treating pain, is distinctly uncommon.  If a person does not have a history, a personal history, of substance abuse, and does not have a

---

[26] Katz N, *Prescription Opioid Abuse:  Challenges and Opportunities for Payers*, AmJManagCare, April 19 2013, p. 8, *available at*  http://www.ajmc.com/publications/issue/2013/2013-1-vol19-n4/Prescription-Opioid-Abuse-Challenges-and-Opportunities-for-Payers/.Katz, AmJManagCare.

[27] *Responsible Opioid Prescribing: A Clinician's Guide* (2012).

[28] The FDA's Blueprint for Prescriber Education for Extended-Release and Long-Acting Opioid Analgesics directs doctors to "assess each patient's risk of abuse."  However, it does not excuse drug companies' misrepresentations that the screening tools allow them to prevent low-risk or high-risk patients from abusing or becoming addicted to opioids.

1  history in the family of substance abuse, and does not have a very major psychiatric disorder, most

2  doctors can feel very assured that that person is not going to become addicted."

3       70.    A guide created by Cephalon, *Opioid Medications and REMS: A Patient's Guide*,

4  similarly promised: "Some people are nervous about taking opioids because they are afraid they

5  will become addicted. However, patients without a history of abuse or a family history of abuse

6  do not commonly become addicted to opioids."

7       71.    Pro-opioid KOL Lynn Webster developed a basic five-question risk screening tool

8  called the Opioid Risk Tool. In 2011, Dr. Webster presented, via webinar, a program sponsored

9  by the American Academy of Pain Management and defendant Purdue, titled, *Managing Patient's*

10  *Opioid Use: Balancing the Need and the Risk.* Dr. Webster recommended use of risk screening

11  tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and

12  "overdose deaths." This webinar was available to doctors in California during the relevant

13  limitations period.

14       72.    An Endo-sponsored 2007 supplement to the *Journal of Family Practice* contained

15  an article, *Pain Management Dilemmas in Primary Care: Use of Opioids*, by a physician who was

16  on all of Defendants' speakers bureaus, which recommends risk screening by use of the Opioid

17  Risk Tool (developed by another pro-opioid KOL, Dr. Lynn Webster), or the Screener and Opioid

18  Assessment for Patients with Pain. Medium to high-risk patients should be treated by "a

19  maximally structured approach" including toxicology screens and pill counts.

20       73.    That same doctor also gave a Purdue-sponsored continuing medical education

21  presentation ("CME") in 2012, *Chronic Pain Managing and Opioid Use: Easing Fears,*

22  *Managing Risks, and Improving Outcomes*, in which he discussed the treatment of a high-risk

23  chronic pain patient demonstrating aberrant behavior, recommending screening, reducing the

24  prescription fills, and also switching to a different opioid as management strategies – all to

25  maintain a course of chronic opioid therapy.

26       74.    There are three fundamental flaws in Defendants' assurances that doctors could

27  identify and manage the risk of addiction. First, there is no reliable scientific evidence that

28

- 22 -

COMPLAINT

screening alone substantially limits the risk of addiction.  Second, there is no reliable scientific evidence that high-risk patients can be given opioids safely, even with enhanced monitoring. Third, there is no reliable scientific evidence that patients without red flags can take opioids long-term without significant danger of addiction.

75.     Defendants' misrepresentations regarding the risk of addiction from chronic opioid therapy were particularly dangerous because they were aimed at general practitioners or family doctors (collectively "GPs"), who treat many chronic conditions, but who lack the time and expertise to closely manage patients on opioids by reviewing urine screens, counting pills, or conducting detailed interviews to identify other signs or risks of addiction.  Defendants have made a concerted effort to reach GPs through continuing medical education programs ("CMEs"), office visits, and literature specifically aimed at them, and most opioids are prescribed by primary care physicians like GPs.[29]

76.     Further, GPs do not have the specialized training to fully address the needs of patients taking opioids long-term for chronic non-cancer pain.  Defendants put together training for GPs on prescribing opioids to chronic pain patients, but provided no guidance on recognizing opioid abuse or weaning patients off opioids.  Since GPs are especially reliant on CMEs to equip them to manage patients on opioids, this critical learning gap makes it even less likely that, once on opioids, chronic pain patients will have the chance to get off them.

(3)     **Deflecting attention to "undertreated" pain.**

77.     Rather than honestly disclose the risk of addiction, Defendants attempted to portray those who were concerned about that risk as unfairly denying treatment to needy patients.  They claimed that purportedly overblown worries about addiction caused pain to be under-treated and opioids to be over-regulated and under-prescribed.  One APF publication funded by Purdue, *A Policymaker's Guide to Understanding Pain & its Management*, stated that: "[u]nfortunately, too many Americans are not getting the pain care they need and deserve.  Some common reasons for

---

[29] Wolters Kluwer Health, *Sharp rise in opioid drugs prescribed for non-cancer pain*, ScienceDaily, Sept. 16, 2013, http://www.sciencedaily.com/releases/2013/09/130916091218.htm.

difficulty in obtaining adequate care include … misconceptions about opioid addiction."  The Purdue *Guide* further alleged that resulting regulatory constraints (like the FDA's recently mandated prescriber education program, or REMS ("Risk Evaluation and Mitigation Strategies")) have a "chilling effect" on prescribing and that abuse of opioids injured and "jeopardize[d] effective pain management by impeding patient access to opioids."

78.     Janssen-sponsored *Let's Talk Pain* – a multi-media patient education campaign – warned that "strict regulatory control has made many physicians reluctant to prescribe opioids. The unfortunate casualty in all of this is the patient, who is often undertreated and forced to suffer in silence."  The program went on to say, "[b]ecause of the potential for abusive and/or addictive behavior, many healthcare professionals have been reluctant to prescribe opioids for their patients … This prescribing environment is one of many barriers that may contribute to the under treatment of pain, a serious problem in the United States."

79.     For example, under the heading of "Protecting Access," *In the Face of Pain*, a Purdue website, complained through at least mid-2013 that policy governing the prescribing of opioids was "at odds with" best medical practices by "unduly restricting the amounts that can be prescribed and dispensed; "restricting access to patients with pain who also have a history of substance abuse;" "requiring special government-issued prescription forms only for the medications that are capable of relieving pain that is severe."[30]  This unsupported and untrue rhetoric aimed to portray doctors who did not prescribe opioids as uncaring, protecting themselves at the expense of their patients.

### (4)     Physical dependence vs. addiction.

80.     In an effort to underplay the risk and impact of addiction, Defendants frequently explain that, while patients become physically "dependent" on opioids, physical dependence is not the same as addiction and can be addressed by gradually tapering patients' dosage to avoid the adverse effects of withdrawal.

---

[30] *Available at* www.inthefaceofpain.com_content_uploads_2011_12_factsheet_ProtectingAccess.

81.     For example, in the April 2, 2010, version of its OxyContin label, Purdue states: **"Cessation of Therapy.** When the patient no longer requires therapy with OxyContin, taper the dose gradually to prevent signs and symptoms of withdrawal in the physically-dependent patient." The APF *Policymaker's Guide* (2011) funded by Purdue states:  "Symptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation."  These representations are false and misleading.

82.     Defendants' so-called guidance overstates the ease of withdrawing from long-term use of opioids and the adverse effects that accompany their discontinuance.  Withdrawal from opioids after long-term use can trigger severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms.  The dependence on opioids can be so severe that withdrawal symptoms may persist for months, or even years, after a complete withdrawal from opioids.

83.     Defendants also fail to disclose that long-term opioid use often causes psychological, as well as physical, dependence.  Addiction is not a switch that is either off or on. Indeed, as the most recent, authoritative Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") acknowledges, there is a spectrum of disorders that range from misuse and abuse of drugs to addiction, and patients suffer negative consequences wherever they fall on that spectrum.[31]

84.     This is certainly true of opioids.  Anxiety over ending opioid use can trigger cravings for opioids, even after a patient is no longer physically dependent and despite the fact that he or she is not deriving benefits from the treatment.  As Dr. Andrew Kolodny, Chief Medical Officer of Phoenix House, a national addiction treatment program, explains, opioids "hijack[] the brain's reward system," convincing users that "the drug is needed to stay alive."[32]  Even absent

---

[31] For that reason, references to "addiction" in this Complaint refer to this spectrum of substance abuse disorders.

[32] David Montero, *Opioid deaths plague O.C.; Actor's overdose shows danger of drugs that claim a local life every two days*, ORANGE COUNTY REGISTER, February 4, 2014.

physical dependence, a patient's fear of the unpleasant effects of discontinuing opioids can cause patients to seek the drugs.[33]

85.     Thus, ending opioid therapy is not, as Defendants claim, simply a matter of gradually lowering a patient's dosage over time.  In fact, one of the significant risks in beginning chronic opioid therapy is that, once patients become physically dependent, it will be difficult for them to ever stop using opioids.  According to one study, more than half of patients who continuously use opioids for more than 90 days remain on opioids after more than five years.[34] Most patients who become physically dependent after long-term use will require opioid maintenance (through methadone or buprenorphine) for years or decades.

86.     A publication in Purdue's current catalog of publications for providers, *Providing Relief, Preventing Abuse*, cautions against the "common error" of confusing physical dependence with addiction.  It analogizes physical dependence on opioids to physical dependence on antihypertensives (blood pressure medicine) or decongestants.

87.     This analogy has no basis in fact.  With non-addictive drugs, like blood pressure medicine, patients may experience withdrawal symptoms, but they are rarely difficult to get over, and there is no craving for the drug.  However, with long-term use of opioids, even in the absence of a formal diagnosis of addiction, patients often crave the drug long after they have discontinued use.  Patients on opioids long-term will often experience symptoms that arguably may not qualify as full blown addiction, but are certainly not mere physical dependence.  Defendants' marketing failed to acknowledge the spectrum of substance abuse disorders short of full blown addiction, which are also cause for concern, and created the sense that doctors need only concern themselves with signs of addiction.

88.     As with the claimed low incidence of addiction, the misrepresentation that chronic opioid therapy is easy to stop is important to Defendants' fraudulent marketing scheme.  Honestly

---

[33] Ballantyne J., *New Addiction Criteria:  Diagnostic Challenges Persist in Treating Pain With Opioids*, IASP, 2013 Dec.; 21(5), p. 2.

[34] BC Martin, *Long-Term Chronic Opioid Therapy Discontinuation Rates from the TROUP Study*, J Gen Intern Med 2011 Dec.; 26(12):1450-7, *available at* www.ncbi.nlm.nih.gov/pubmed/21751058.

- 26 -

describing the difficulty of removing patients from opioids after long-term use and the complexity of patients' dependence would rebalance the risk-benefit analysis and stoke doctors' and patients' well-grounded concerns that once on opioids, severe physical and psychological dependence would make it extremely difficult for patients to ever stop their use.  It might also motivate the general practitioners to whom Defendants generally marketed opioids for long-term use to refer patients requesting opioids to pain management specialists who would not so easily prescribe them.  Defendants also gave GPs a false sense of confidence that they could identify addiction, distinct from physical dependence, which, again, allowed them to believe that they could continue to responsibly prescribe opioids.  Defendants chose not to tell the truth so that they could sell more drugs.

(5)   **Pseudoaddiction.**

89.    Defendants needed a way to explain why so many chronic pain patients on opioids seem to be addicted:  they ask for drugs by name, seek refills earlier than their supplies should have run out, hoard drugs, or self-escalate their doses.  Defendants, led by Purdue, managed masterfully to turn these recognized signs of addiction into a way to sell more opioids through the concept of "pseudoaddiction."

90.    Purdue discussed pseudoaddiction in a publication called *Providing Relief, Preventing Abuse*, in which it falsely and misleadingly claimed that the concept of pseudoaddiction had "emerged in the literature" "to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."  And Purdue went even farther, saying that pseudoaddiction is unproblematic and may occur "occasionally even with successful opioid therapy for pain."  This gave doctors confidence that signs of addiction that do not resolve when more opioids are prescribed might not be cause for concern.  It also misled doctors into believing that the proper response to pain that has not been "effectively treated" through opioid prescriptions is *more* opioids.  Purdue's unbranded website – PartnersAgainstPain.com – also issued a pamphlet in 2005 titled, *Clinical Issues in Opioid*

- 27 -
COMPLAINT

*Prescribing*, that included a list of conduct including "illicit drug use and deception" as examples of unproblematic pseudoaddiction-related behavior, not problematic addiction.

91.     Defendants also managed to work the misleading concept of pseudoaddiction into medical literature.  In a 1994 article, Defendant-sponsored KOL Russell Portenoy described common signs of addiction as potential signs of mere *therapeutic dependence* – which he likened to a diabetic's response to insulin – or *pseudoaddiction*.[35]  Portenoy claimed that "*Pseudoaddiction* describes a specific phenomenon that has also been observed in the population with cancer pain." But his authority for this statement was limited to a single citation to an article by another KOL and later Purdue executive J. David Haddox.[36]  Dr. Haddox's article did not concern a population study at all, but rather, simply reported the possible phenomenon in a single cancer (leukemia) patient with pneumonia and chest wall pain.[37]

92.     Portenoy took the deception of pseudoaddiction one step farther, separating from a list of commonly accepted signs of drug addiction those he claimed were "probably less predictive of addiction."[38]  Portenoy's "less predictive of addiction" list included:

i.      Aggressive complaining about the need for more drugs;

ii.     Drug hoarding during periods of reduced symptoms;

iii.    Requesting specific drugs;

iv.     Openly acquiring similar drugs from other medical sources;

v.      Unsanctioned dose escalation or other noncompliance with therapy on one or two occasions;

vi.     Unapproved use of the drug to treat other symptoms;

vii.    Reporting psychic effects not intended by the clinician; and

viii.   Resistance to a change in therapy associated with 'tolerable' adverse effects with expressions of anxiety related to the return of severe symptoms.

---

[35] Portenoy, R.K., *Opioid Therapy for Chronic Nonmalignant Pain:  Current Status*, pp. 266-67.

[36] *Id*. at 267.

[37] Haddox, J.D. and Weissman, D.E., *Opioid pseudoaddiction – an iatrogenic syndrome*, Pain, 36 (1989) pp. 363-366.

[38] Portenoy, R.K., *Opioid Therapy for Chronic Nonmalignant Pain:  Current Status*, p. 267, Table III.

- 28 -

93.    Portenoy cited no authority for his "less predictive of addiction" conclusion and is not himself a specialist or authority in addiction medicine.  Yet his list encouraged doctors to ignore obvious signs of addiction and prescribe more opioids.

94.    Similarly, in his book, *Responsible Opioid Prescribing* (2007), which was funded by Defendants Cephalon and Purdue and is still distributed in California, Dr. Scott Fishman asserts:  "It may be tempting to assume that patients with chronic pain and a history of recreational drug use who are not adherent to a treatment regimen are abusing medications.  But other causes of non-adherence should be considered before a judgment is made."  Thus, according to Defendants, even patients at high risk for opioid addiction should be given the benefit of the doubt (and more opioids).

95.    Defendants' common marketing messages and concerted efforts were evident in the nearly identical language they used to describe pseudoaddiction (emphasis added):

| *Let's Talk Pain* (2009) | *A Policymaker's Guide* (2011) | *Clinical Issues in Opioid Prescribing* (2005) |
|---|---|---|
| funded by Janssen | funded by Purdue | funded by Purdue |
| "A related term is pseudoaddiction, which refers to patient behaviors that may occur when **pain is under-treated** … Pseudoaddiction is **different from true addiction** because such behaviors can be resolved with effective pain management." | "Pseudo-addiction describes patient behaviors that may occur when **pain is undertreated** … Pseudo-addiction can be **distinguished from true add[i]ction** in that this behavior ceases when pain is effectively treated." | "Pseudoaddiction is a term which has been used to describe patient behaviors that may occur when **pain is undertreated** … Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be **distinguished from true addition** in that the behaviors resolve when the pain is effectively treated." |

96.    Despite Defendants' claims, pseudoaddiction has no scientific basis; there is no competent study documenting its existence.  Indeed, the list of behaviors that Defendants identified as the symptoms of pseudoaddiction are the same symptoms of addiction.  Based on a single cancer pain case observed by Purdue executive and KOL David Haddox, Defendants have counseled doctors to treat chronic pain patients on opioids who seem to be addicted *with more opioids*.

97.    KOL Dr. Lynn Webster recommended just this course in his book, *Avoiding Opioid Abuse While Managing Pain* (2007).  He advised giving patients more medication when unsure whether a patient is showing signs of addiction or untreated pain.  He asserted that pseudoaddiction was the cause "*in most cases and should be the clinician's first response*."  Lynn R. Webster, Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007) (emphasis added).  Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication.… It led us down a path that caused harm.  It is already something we are debunking as a concept."

**b.    Other adverse effects.**

98.    Defendants also misrepresent the risks of long-term opioid use by describing them as minor and short-term.  Defendants most frequently highlight the risk of constipation, which they advise can be addressed with laxatives or other treatments.  The other side effects Defendants typically disclose are drowsiness, nausea and vomiting, mental clouding (sometimes disclosed), and itching, though Defendants promise that these symptoms will go away in a matter of days.

99.    Below is a representative example of how Defendants disclose potential side effects from opioid use in unbranded material.  This is taken from a 2009 patient education publication distributed by the NIPC and funded by Endo and which was distributed in California during the applicable limitations period:

> As with any medication, there are some side effects that are associated with opioid therapy. The most common side effects that occur with opioid use include the following:
>
> - Constipation
> - Drowsiness
> - Confusion
> - Nausea
> - Itching
> - Dizziness
> - Shortness of breath
>
> Your healthcare provider can help to address and, in some cases, prevent side effects that may occur as a result of opioid treatment. Less severe side effects, including nausea, itching, or drowsiness, typically go away within a few days without the need for further treatment. If you experience any side effects, you should let your healthcare provider know immediately.

COMPLAINT

100.     Notably absent from this list are far more significant adverse outcomes linked to long-term opioid use, including:  hyperalgesia, immunologic and hormonal dysfunction, respiratory depression, apnea, tolerance/loss of analgesic efficacy, endocrinopathies (most notably testosterone depletion, which, among other impacts, may decrease pain tolerance and the effectiveness of opioids),[39] cognitive impairment, dependence, and addiction.  These adverse outcomes can result in an increase in falls and fractures in the elderly (which can shorten the lives of elderly patients), overuse, overdose, and death.  Defendants also fail to disclose the risk that infants born to pregnant women using opioids will be dependent on opioids as well, suffering a condition called neonatal abstinence syndrome when they painfully withdraw from the drug after birth.[40]  In addition, though the labels for opioids contain numerous warnings about use of opioids for patients who have certain conditions, are opioid naïve (new to opioids), or use other drugs, Defendants' marketing materials contain no similar cautions.

101.     These omitted side outcomes are not, as Defendants claim, fleeting or minor.  A Cochrane Collaboration review of evidence relating to the use of opioids for chronic pain found that 22% of patients in opioid trials dropped out before the study began because of the "intolerable effects" of opioids.[41]  Defendants were aware of this high drop-out rate as they pushed the FDA to allow them to exclude these patients from clinical trial data, a method of research known as "enriched enrollment," which allowed drug companies to study only those patients who could tolerate opioids.

102.     Janssen's marketing campaign for Nucynta was particularly deceptive in that it promoted Nucynta's "tolerability," which is completely at odds with and misrepresents its serious side effects.  In an ad that Janssen currently is running, including on its website, it claims that

---

[39] Daniell HW, *Hypogonadism in men consuming sustained-action oral opioids*, J Pain, 3:377-384 (2002); Katz N, Mazer M, *Impact of opioids on the endocrine system*, Clin J Pain, 25:170-175 (2009).

[40] The FDA now requires a boxed warning on all extended release and long acting opioids, cautioning that chronic use of those drugs by pregnant women can result in neonatal opioid withdrawal syndrome ("NOWS"), which may be life-threatening and require specialized care.

[41] Noble M, *et al.*, *Long-term opioid management for chronic noncancer pain (Review)*, Cochrane Database of Systematic Reviews, Issue 1, 2010.

- 31 -

COMPLAINT

1  Nucynta ER has "Efficacy you need, Tolerability you want."  However, each of the studies

2  included in the drugs approval were only conducted over a 12-week period, using a pre-seeded

3  patient group; thus none provide support for a claim of long-term efficacy in the population at

4  large.

5        103.    Defendants' misleading treatment of the serious risks of opioid treatment in

6  unbranded materials directly contradicts the disclosures they made on their own labels.  The label

7  for Purdue's OxyContin, for example, acknowledges that its use may increase the risk of serious

8  adverse reactions "including respiratory depression, apnea, respiratory arrest, circulatory

9  depression, hypotension, or shock[.]"  Likewise, the label for Janssen's Duragesic includes the

10  warning that "[r]espiratory depression is the chief hazard of" Duragesic, and it "has a narrow

11  indication and should be prescribed only by healthcare professionals who are knowledgeable in the

12  administration of potent opioids and management of chronic pain."  The labels even include

13  warnings for interactions with substances as commonly used as alcohol, as in the Nucynta ER

14  label, which says that the drug "may be expected to have additive effects when used in conjunction

15  with alcohol … [and] respiratory depression, hypotension, and profound sedation, coma or death

16  may result."  Yet upon information and belief, these risks are not highlighted in the educational

17  programs and marketing materials Defendants have sponsored and disseminated; materials that are

18  much more widely read and relied on than the drug labels.

19        104.    The table below (emphasis added) highlights the differences, described above,

20  between how Defendants (in this instance, Janssen) disclosed side effects in unbranded materials

21  and front-group materials versus how they disclosed side effects in their branded advertisements:

| Finding Relief: Pain Management for Older Adults (2009) | Let's Talk Pain Website (2009) | Nucynta IR Advertisement (2010) |
|---|---|---|
| unbranded publication funded by Janssen | APF website funded by Janssen | branded Janssen advertisement |
| "At first, the drugs can cause **upset stomach or sleepiness**. These side effects often go away as you get used to the drugs. Some other side effects, such as **constipation**, don't lessen with time.  Constipation can be | "The most common side effects of opioids include **constipation, nausea and vomiting, sedation (sleepiness), mental clouding, and itching**. Some people may also experience **dizziness** or difficulty urinating … The good | Prescriber information in the ad states:  "**Respiratory depression** is the **primary risk** of mu-opioid agonists." |

- 32 -

COMPLAINT

| prevented or lessened by taking a laxative on a regular basis." | news is that most side effects go away after a few days. However, side effects may continue in some people. Constipation is likely to persist." | |

105.    In a 2008 warning letter, the FDA recognized that these strategies deceptively represented the side effects of opioids – in that case, Avinza.  The FDA complained that one of the company's marketing materials (a file card) lists common adverse effects "including constipation, nausea, and somnolence," but omitted all of the other risks listed in the drug's package insert.  According to the FDA, the file card with a page headed "Managing Side Effects"

> creates the misleading impression that the risk information contained in that section is a comprehensive presentation of the risks associated with Avinza therapy and the steps needed to address those risks.  The fact that the File Card contains no other disclosure of drug risks reinforces this misleading impression.  Furthermore, the File Card – in direct contradiction of the [Package Insert] for Avinza – implies that no serious or life-threatening risks (e.g., risk of respiratory depression, overdose, or death) can be caused by Avinza, both by disclosing only 'common adverse events' (e.g., constipation, nausea, and somnolence) and by emphasizing the drug's 'proven safety and tolerability' throughout the piece.  Finally, by framing its discussion of common adverse reactions as one of 'managing' them, and by providing no disclosure to the contrary, the File Card misleadingly implies that common adverse reactions associated with the use of Avinza may ordinarily be alleviated or mitigated, and therefore do not pose a risk to patients…. Your minimization of the serious risk profile associated with your drug raises significant public health concerns.

106.    In promoting their opioids, Defendants have engaged in the same marketing practices warned against by the FDA – highlighting only minor risks, emphasizing the ability to manage those risks, failing to disclose serious risks, and generally declaring the safety of their drugs.  As the FDA made clear, that message is dangerously deceptive.  By deliberately understating the risks of opioids, Defendants exposed patients to extremely dangerous adverse effects and deprived doctors and patients of the ability to make informed, appropriate choices about using opioids.

107.    Defendants' pattern of understating the risks of chronic opioid therapies marred the continuing medical education programs and studies they funded or sponsored and left providers with the impression that opioids were much safer than they are and should be used more

frequently.  One study by a Georgetown University Medical Center professor compared the messages retained by medical students who reviewed an industry-funded article on opioids versus another group who reviewed a non-industry-funded article.  The industry-funded article did not mention opioid-related death once; the non-industry-funded article mentioned opioid-related death 26 times.  A summary of the study notes that students who read the industry-funded article more frequently cited the impression that opioids were underused in chronic pain.  Those reading the non-industry-funded article, in reporting their "take-aways," mentioned the risk of death and addiction much more frequently than the other group.  Neither group could accurately identify whether the article they read was industry-funded, making clear the difficulty providers have in screening and accounting for source bias.[42]

### 3.    Misrepresentations regarding superiority.

108.    Defendants' deliberate misrepresentation of the risks of opioids is particularly evident when compared to Defendants' description of the risk of over-the-counter nonsteroidal anti-inflammatory drugs ("NSAIDs"), such as ibuprofen (Advil, Motrin) or naproxen (Aleve).  While NSAIDs can pose significant gastrointestinal and renal risks, particularly for elderly patients, Defendants' exaggerated descriptions of those risks make their omissions regarding the risks of opioids all the more striking and misleading.  In the Cephalon and Purdue-sponsored 2007 APF *Treatment Options*, NSAIDs are described as "life threatening," – a term never used in connection with opioids – and are said to have caused 10,000 to 20,000 deaths each year.  The CDC reports that the actual number of deaths even possibly related to the use of NSAIDs in 2008, the most recent year available, is roughly 3,400, and that number includes all gastrointestinal bleeding deaths regardless of cause.[43]  The Defendant-funded brochure, excerpted below, was distributed to doctors and patients in California during the applicable limitations period:

---

[42] Fugh-Berman A, *Marketing Messages in Industry-Funded CME*, Pharmedout, June 25, 2010, *available at* http://pharmedout.org/conferencematerials htm.

[43] John Fauber, *NSAID Bleeding Risk: Smoke But No Fire*, MedPage Today, May 30, 2012, *available at* www.medpagetoday.com/Geriatrics/PainManagement/32971.

COMPLAINT

*Finding Relief: Pain Management for Older Adults*, sponsored by Defendant Janssen (2009)

109. As with the preceding misrepresentations, Defendants' false and misleading claims regarding the comparative risks of NSAIDs and opioids had the effect of shifting the balance of opioids' risks and purported benefits. While opioid prescriptions have exploded over the past two decades, the use of NSAIDs has declined during that same time.[44]

**C.     Defendants, Directly and Through Their Agents and Front Organizations, Made and Caused Their Misrepresentations to Be Made and Broadly Disseminated**

110. Defendants have polluted virtually every resource for information on the use of opioids to treat chronic non-cancer pain, and have created a deceptively solid foundation of core materials, cited and relied upon by others, to minimize the risks and overstate the benefits of using opioids to treat chronic pain. Both directly and indirectly – through doctors, medical education courses, seemingly independent patient advocacy groups, and professional societies – Defendants have ensured that their messages reach and expand the market for opioids. Upon information and belief, these strategies and players are deployed according to marketing plans that Defendants developed. Defendants have identified, encouraged, and compensated high profile KOLs to give

---

[44] Olson M, *et al.*, *National trends in the office-based prescription of schedule II opioids*, J Clin Psychiatry, 2013 Sept.; 74(9):932-9, *available at* http://www.ncbi.nlm.nih.gov/pubmed/24107767.

- 35 -

COMPLAINT

1    talks and advice and author books and articles.  Defendants' KOLs offer and serve on the program

2    committees that choose continuing medical education programs, and develop and promote

3    treatment guidelines that promote chronic opioid therapy.  Many of these groups and KOLs have

4    been misled by Defendants in the same manner as general practitioners and family doctors.

5         111.    Directly and through public relations firms they hire and advocacy groups and

6    professional societies they finance and influence, Defendants have funded, drafted, edited,

7    approved, published, and distributed websites, books, patient education brochures, videos, and

8    other materials that carry their misrepresentations to targeted groups of doctors (such as family

9    doctors), and patients – particularly veterans and the elderly.  Defendants carry out their fraudulent

10   promotions both individually and in concert with industry front groups and each other, and make

11   and disseminate these misrepresentations throughout the State of California.

12       **1.    Method 1: Key opinion leaders ("KOLs").**

13       112.    Defendants routinely rely on a small circle of doctors to promote the use of opioids

14   for the treatment of chronic pain.  These doctors have been at the hub of Defendants' promotional

15   efforts, presenting the appearance of unbiased and reliable medical research in order to support the

16   broad use of opioid therapy for chronic non-cancer pain.  Known by industry shorthand as

17   "KOLs," they have written, consulted on, edited, and lent their names to books and articles and

18   given speeches and continuing medical education programs supportive of chronic opioid therapy.

19   They served on committees that developed treatment guidelines that, even while acknowledging

20   the lack of evidence for their positions, strongly encourage the use of opioids to treat chronic pain.

21       113.    Defendants' KOLs have served on the boards of the advocacy groups and

22   professional societies that develop and offer continuing medical education programs and publish

23   patient education materials on opioids.

24       114.    What Defendants and the KOLs rarely disclose is the substantial sums of money

25   Defendants have paid to the KOLs for consulting and speaking arrangements and to serve on

26   various panels and boards; as well as through purported "research grants."  Some KOLs have even

27   gone on to become direct employees and executives of Defendants.  Dr. Haddox, for example, was

28

1    a KOL who, as a physician in private practice, promoted widespread opioid use for common non-

2    cancer chronic pain. He was a paid speaker and consultant for Purdue, then became a Purdue

3    employee and executive.

4       115.    While some KOLs may initially have advocated for more permissive opioid

5    prescribing with honest intentions, Defendants cultivated and promoted only those KOLs who

6    could be relied on to help broaden the opioid therapy market. Defendants selected and funded

7    doctors whose public positions were unequivocal and supportive of using opioids to treat chronic

8    pain.[45] These doctor's professional reputations were then dependent on continuing to promote a

9    pro-opioid message, even in activities that were not directly funded by the drug companies.

10       116.    The KOLs' association with Defendants provided not only money, but also

11    prestige, recognition, research funding, and avenues to publish. This positioned them to exert even

12    more influence in the medical community. Upon information and belief, using these KOLs is a

13    central part of Defendants' marketing plans and critical to persuading regulators and doctors – who

14    rely heavily and more uncritically on their peers – that the benefits of chronic opioid therapy

15    outweigh its risks.

16       117.    Dr. Russell Portenoy, Chairman of the Department of Pain Medicine and Palliative

17    Care at Beth Israel Medical Center in New York, is one example of a KOL who Defendants

18    identified and co-opted to further their marketing campaign. With Defendants' support, Dr.

19    Portenoy was dubbed the "King of Pain" by Time Magazine. He co-authored *Chronic Use of*

20    *Opioid Analgesics in Non-Malignant Pain: Report of 38 Cases (1986)*, which asserted, based

21    solely on 38 cases, that chronic opioid therapy was a safe and effective treatment for patients with

22    intractable non-malignant pain. His 1994 writings also strongly promoted opioid use long-term for

23    non-cancer pain, although even he suggested opioid therapy should be used for chronic pain only

24    as a last resort, after an initial limited trial period and with intense observation.[46]

25    [45] Opioid-makers were not the first to mask their deceptive marketing efforts in purported science. The tobacco

26    industry also used key opinion leaders in its effort to persuade the public and regulators that tobacco was not addictive or dangerous. For example, the tobacco companies funded a research program at Harvard and chose as its chief

27    researcher a doctor who had expressed views in line with industry's views. He was dropped when he criticized low tar cigarettes as potentially more dangerous, and later described himself as a pawn in the industry's campaign.

     [46] Portenoy, R.K., *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, pp. 274-75, Table IV.

28

COMPLAINT

118.    Dr. Portenoy thus helped to open the door for the use of opioids to treat chronic pain. He served on the American Pain Society/American Academy of Pain Medicine Guidelines Committee, which endorsed the use of opioids to treat chronic pain, and the FDA Anesthetic and Life Support Drugs Advisory Committee, one of a host of FDA advisory committees that serve to provide expertise and technical assistance to assist the FDA decision-making.  While he held these positions he also was receiving "research support," consulting fees or honoraria from Cephalon, Endo, Janssen, and Purdue (among others), and was a paid consultant to Cephalon and Purdue.

119.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research.  He is a Senior Editor of the *Pain Medicine* Journal, which published numerous articles supportive of chronic opioid therapy.  He was President, and is a current board member, of the American Academy of Pain Medicine, an ardent supporter of chronic opioid therapy.

120.    Dr. Webster is the author of numerous CME programs, sponsored by Defendants, that contained virtually all of Defendants' misrepresentations described above.  At the same time, Dr. Webster was receiving significant funding from Defendants.

121.    Dr. Webster has been under investigation by the U.S. Drug Enforcement Administration, which raided Dr. Webster's clinic in 2010.  More than 20 of Dr. Webster's former patients at the Lifetree Clinic died of opioid overdoses.  Ironically, Dr. Webster created and promoted an opioid risk tool, which purportedly allows a doctor to manage the risk that their patient will become addicted to or abuse opioids.[47]

122.    In a striking blow to Defendants' marketing campaign, Drs. Portenoy and Webster recently acknowledged shortcomings in their pro-opioid positions. Dr. Webster has admitted that the concept of pseudoaddiction – taking patients at their word and assuming they are not addicts, but just need more pain relief "– obviously became too much of an excuse to give patients more medication[.]"[48] Dr. Portenoy has admitted that he gave "innumerable lectures in the late 1980s

[47] Stephanie Smith, *Prominent pain doctor investigated by DEA after patient deaths*, CNN HEALTH, Dec. 30, 2013, *available at* http://www.cnn.com/2013/12/20/health/pain-pillar/.

[48] Silverman E, *Opioids & An Overdue Senate Probe: Kolodny Explains*, Pharmalot.com.

- 38 -

and '90s" in which he asserted that fewer than 1% of patients would become addicted to opioids that "weren't true." Because the primary goal was to "destigmatize" opioids, he said, "we often left evidence behind." Dr. Portenoy also conceded that "data about the effectiveness of opioids does not exist."

2. **Method 2:  Co-opting of chronic pain advocacy and research groups to promote opioid use.**

123.    A key component of Defendants' plans to promote the long-term use of opioids was co-opting pain management organizations and societies and pain patient advocacy groups.  Taking a page from the tobacco industry's play book, which had created and used front groups to proclaim tobacco was not harmful, Defendants harnessed and warped existing organizations to disseminate their deceptive messages with the expectation that these messages would circulate among and influence the conduct of prescribing physicians and other members of the medical community. These front organizations appeared to be legitimate scientific and patient advocacy organizations (and perhaps started out as such) and publicized seemingly scientific, balanced, and accurate information on opioid use.  In fact, the information was false and misleading and paid for and encouraged by Defendants for the purpose of creating a vast market for the use of opioids for chronic pain.

124.    The role of these organizations in promoting opioid use and their ties to opioid makers was highlighted when, on May 8, 2012, Senators Grassley and Baucus wrote to a half-dozen of these organizations:

> There is growing evidence pharmaceutical companies that manufacture and market opioids may be responsible, at least in part, for this epidemic [of opioid use and abuse] by promoting misleading information about the drugs' safety and effectiveness.  Recent investigative reporting from the *Milwaukee Journal Sentinel/MedPage Today* and *ProPublica* revealed extensive ties between companies that manufacture and market opioids and non-profit organizations such as the American Pain Foundation, the American Academy of Pain Medicine, the Federation of State Medical Boards, the University of Wisconsin Pain and Policy Study Group, and the Joint Commission.
>
> In a *ProPublica* story published in the *Washington Post*, the watchdog organization examined the American Pain Foundation, a "health advocacy" organization that received "nearly 90 percent of

- 39 -
COMPLAINT

its $5 million funding from the drug and medical device industry."[49]
*ProPublica* wrote that its review of the American Pain Foundation's
"guides for patients, journalists, and policymakers play down the
risks associated with opioids and exaggerate their benefits.  Some of
the foundation's materials on the drugs include statements that are
misleading or based on scant or disputed research.

According to the *Milwaukee Journal Sentinel/MedPage Today*, a
"network of national organizations and researchers with financial
connections to the makers of narcotic painkillers … helped create a
body of dubious information" favoring opioids "that can be found in
prescribing guidelines, patient litigators, position statements, books
and doctor education courses."[50]

125.    These front groups, aided by millions of dollars in grants from Defendants and
assistance from public relations firms hired by Defendants, spread the misrepresentations central to
Defendants' fraudulent promotion of opioids.  Indeed, Defendants influenced, if not outright
controlled, the messages disseminated by many of these front groups.

a.    **American Pain Foundation.**

126.    The most prominent of Defendants' front groups was the American Pain
Foundation ("APF"), which received ███████████ in funding from Defendants from
2007 until it closed its doors in May 2012. ████████████████████
████████████████████████████████

127.    APF issued education guides for patients, reporters, and policymakers that
promoted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of
addiction.  APF also launched a campaign to promote opioids for returning veterans, described in
greater detail below; promotion of opioids to treat veterans has contributed to high rates of
addiction among our returning soldiers.  APF engaged in a significant multimedia campaign –
through radio, television and the web – to educate patients about their "right" to pain treatment –
namely opioids.  KOLs funded by Defendants, including Drs. Perry Fine, Scott Fishman and
Kathleen Foley, also served on APF's Board of Directors.

---

[49] ProPublica, *The Champion of Painkillers*, Dec. 23, 2011, *available at* http://www.propublica.org/article/the-champion-of-painkillers.

[50] John Fauber, *Follow the Money: Pain, Policy, and Profit*, MILWAUKEE JOURNAL SENTINEL/ MEDPAGE TODAY Feb. 19, 2012, *available at* http://www.medpagetoday.com/Neurology/PainManagement/31256.

128.    In 2009 and 2010, ▮▮▮▮▮▮▮▮▮ APF's operating budget came from industry sources.  Including industry grants for specific projects, in 2009, APF received ▮▮▮▮▮▮▮▮ from industry sources out of total income of ▮▮▮▮▮▮▮▮; its budget for 2010 projected receipts of ▮▮▮▮▮▮▮ from drug companies, out of total income of ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.

129.    But the control was even more direct than the money. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

130.    ▮▮▮▮▮▮▮▮▮▮▮▮ opioid "tool-kit" for the National Initiative on Pain Control ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ included two of Defendants' key misrepresentations:

- After starting opioid therapy, you may see the following positive improvements:  - Your pain level may decrease[;] -Your level of function should improve: you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse[;] - Your sleep may improve.

- People who take opioids as prescribed usually do not become addicted.

131.    At a July 2007 hearing before the Senate Judiciary Committee, "evaluating the propriety and adequacy of the oxycontin criminal settlement," APF aggressively defended Purdue,

- 41 -
COMPLAINT

repeatedly denying that patients prescribed opioids abuse or become addicted to the drugs.  APF's board chairman, Dr. James Campbell, described addiction as a "rare problem" for chronic pain patients and asserted that "the scientific evidence suggests that addiction to opioids by legitimate chronic pain patients without prior histories of substance abuse using the medication as directed is rare.  Furthermore, no causal effect has been demonstrated between the marketing of oxycontin and the abuse and diversion of the drug."

132.    Despite APF's unequivocal pro-opioid positions, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

133.    On May 8, 2012, Senators Grassley and Baucus wrote the Chairman of APF seeking information about the source of its funding and asked for a response by June 8, 2012.  APF shuttered its offices and dissolved before that deadline.

**b.    American Academy of Pain Medicine.**

134.    The American Academy of Pain Medicine, with the assistance, prompting, involvement, and funding of Defendants, issued treatment guidelines and sponsored and hosted medical education programs critical to Defendants' deceptive marketing of chronic opioid therapy.  Upon information and belief, the American Academy of Pain Medicine received significant funding from opioid manufacturers in a two-year period.

135.    The American Academy of Pain Medicine maintained a corporate relations council, whose members paid $25,000 a year (on top of other funding) to participate.  The benefits included allowing members to present educational programs at off-site dinner symposia in connection with the American Academy of Pain Medicine's marquee event, its annual meeting in Palm Springs.

█████████████████████████████████████████████████████

███████████████████████████████████████████████████████

- 42 -
COMPLAINT

The American Academy of Pain Medicine describes the annual event as an "exclusive venue" for offering education programs to doctors.  Defendants Endo, Purdue, Cephalon, and Actavis were members of the council and presented deceptive programs to doctors who attended this annual event.

136.    The American Academy of Pain Medicine and American Pain Society issued a consensus statement in 1997, *The Use of Opioids for the Treatment of Chronic Pain*, that endorsed opioids to treat chronic pain and claimed that the risk that patients would become addicted to opioids was low.  The co-author of the statement, Dr. Haddox, was at the time a paid speaker for Defendant Purdue; three years later, he became Vice President for Health Policy at Purdue.  American Academy of Pain Medicine and APS revised their guidelines in 2009 and continued to recommend the use of opioids to treat chronic pain.  Fourteen of the 21 panel members who drafted the guidelines, including KOL Dr. Portenoy, received support from Defendants Janssen, Cephalon, Endo, and Purdue.  Upon information and belief, the consensus statement remained on The American Academy of Pain Medicine's website until 2011, and was taken down only after a doctor complained.

**3.    Method 3: Treatment guidelines.**

137.    Treatment guidelines have been particularly important in securing acceptance for chronic opioid therapy.  They are relied upon by doctors, especially the general practitioners and family doctors targeted by Defendants, who are otherwise not experts in, nor trained in, the treatment of chronic pain.  Treatment guidelines used in making treatment decisions are cited throughout the scientific literature and are referenced by third-party payers in determining whether they should cover treatments for specific indications.

138.    Initially, even Defendants' KOLs were reasonably balanced and cautious in their proposed guidelines.  For example, Dr. Portenoy's 1994 proposed guidelines stated as follows:

**Table IV**
**Proposed guidelines in the management of opioid maintenance therapy for nonmalignant pain**

1.    Should be considered only after all other reasonable attempts at analgesia have failed.

- 43 -
COMPLAINT

2. A history of substance abuse, severe character pathology and chaotic home environment should be viewed as relative contraindications.

3. A single practitioner should take primary responsibility for treatment.

4. Patients should give informed consent before the start of therapy; points to be covered include recognition of the low risk of true addiction as an outcome, potential for cognitive impairment from the drug alone or from co-administration of sedative/hypnotics, likelihood that physical dependence will occur (abstinence possible with acute discontinuation), and understanding by female patients that children born when the mother is receiving opioid drugs will likely be physically dependent at birth.

5. After drug selection, doses should be given on an around-the-clock basis; several weeks should be agreed upon as the period of initial dose titration, and although improvement in function should be continually stressed, all should agree to at least partial analgesia as the appropriate goal of therapy.

6. Failure to achieve at least partial analgesia at relatively low initial doses in the non-tolerant patient raises questions about the potential treatability of the pain syndrome with opioids.

7. Emphasis should be given to attempts to capitalize on improved analgesia by gains in physical and social function; opioid therapy should be considered complementary to other analgesic and rehabilitative approaches.

8. In addition to the daily dose determined initially, patients should be permitted to escalate dose transiently on days of increased pain; two methods are acceptable: a) Prescription of an additional 4-6 "rescue doses" to be taken as needed during the month; b) Instruction that one or two extra doses may be taken on any day, but must be followed by an equal reduction of dose on subsequent days.

9. Initially, patients must be seen and drugs prescribed at least monthly. When stable, less frequent visits may be acceptable.

10. Exacerbations of pain not effectively treated by transient, small increases in dose are best managed in the hospital, where dose escalation, if appropriate, can be observed closely and return to baseline doses can be accomplished in a controlled environment.

11. Evidence of drug hoarding, acquisition of drugs from other physicians, uncontrolled dose escalation, or other aberrant behaviors must be carefully assessed. In some cases, tapering and discontinuation of opioid therapy will be necessary. Other patients may appropriately continue therapy within rigid guidelines. Consideration should be given to consultation with an addiction medicine specialist.

12. At each visit, assessment should specifically address:

    a. Comfort (degree of analgesia)

    b. Opioid-related side effects

    c. Functional status (physical and psychosocial)

- 44 -

COMPLAINT

    d.    Existence of aberrant drug-related behaviors

13.   Use of self-report instruments may be helpful but should not be required.

14.   Documentation is essential and the medical record should specifically address comfort, function, side effects and the occurrence of aberrant behaviors repeatedly during the course of therapy.[52]

139.   The measured precaution evident in Dr. Portenoy's early guidelines was excluded from later guidelines funded and sponsored by Defendants. As noted above, in 2009 the American Pain Society, together with the American Academy of Pain Medicine, issued their *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-cancer Pain*. Though Dr. Portenoy served on the panel, the Guidelines represented a marked departure from previous guidelines for the promotion of opioids. The APS/AAPM guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients with and without past abuse histories. One member of the panel, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and the founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the guidelines were influenced by contributions by Defendants to the sponsoring organizations and committee members. These guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but the body of scientific evidence on opioids; the APS/AAPM guidelines have been cited 732 times in academic literature that was disseminated in California during the applicable limitations period are still available on the internet, and were reprinted in the *Journal of Pain* in 2009.

140.   In 2009, the American Geriatric Society ("AGS") revised its guidelines for the *Pharmacological Management of Persistent Pain in Older Persons*. Upon information and belief, these guidelines were funded by Defendants Purdue and Janssen, and included the following recommendations:

- "All patients with moderate to severe pain … should be considered for opioid therapy (low quality of evidence, strong recommendation)."

---

[52] Portenoy, R.K., *Opioid Therapy for Chronic Nonmalignant Pain: Current Status*, pp. 274-75, Table IV.

COMPLAINT

- "[Th]e risks [of addiction] are exceedingly low in older patients with no current or past history of substance abuse."

These recommendations, which continue to appear on AGS's website, are not supported by any study or other reliable scientific evidence and they are contrary to Dr. Portenoy's 1994 guidelines which noted opioid therapy as a last resort and required disclosure of the risk of addiction and other significant risks of the therapy.

141.    According to one news report, the American Geriatric Society received $344,000 in funding from opioid makers since 2009.[53]  Five of 10 of the experts on the guidelines panel disclosed financial ties to Defendants, including serving as paid speakers and consultants, presenting CMEs sponsored by Defendants, receiving grants from Defendants and investing in Defendants' stock.[54]

142.    In contrast, treatment guidelines that did not receive industry backing are much more reserved and endorse chronic opioid therapy only in narrow circumstances.  The 2012 *Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain*, issued by the American Society of Interventional Pain Physicians, included a remarkable disclaimer that "[t]he recent revelation that the pharmaceutical industry was involved in the development of opioid guidelines as well as the bias observed in the development of many of these guidelines illustrate that the model guidelines are not a model for curtailing controlled substance abuse and may, in fact, be facilitating it."  The American Society of Interventional Pain Physicians Guidelines further advise that "therapeutic opioid use, specifically in high doses over long periods of time in chronic non-cancer pain starting with acute pain, not only lacks scientific evidence, but is in fact associated with serious health risks including multiple fatalities, and is based on emotional and political propaganda under the guise of improving the treatment of chronic pain."  They recommend long-acting opioids in high doses only "in specific circumstances with severe intractable pain … with

---

[53] John Fauber, *Narcotic Painkiller Use Booming Among Elderly*, Milwaukee Journal Sentinel, May 30, 3012.

[54] The Institute of Medicine recommends that, to ensure an unbiased result, that fewer than 50% of the members of a guidelines committee should have financial relationships with drug companies.

COMPLAINT

1  continuous adherence monitoring, in well-selected populations, in conjunction with or after failure

2  of other modalities of treatments with improvement in physical and functional status and minimal

3  adverse effects."

4  143.    Similarly, the 2011 *Guidelines for the Chronic Use of Opioids*, issued by the

5  American College of Occupational and Environmental Medicine, recommended against "routine

6  use of opioids for treatment of chronic pain patients," finding "at least moderate evidence that

7  harms and costs exceed benefits based on limited evidence," while conceding there may be

8  patients for whom opioid therapy is appropriate.

9  144.    Industry supported guidelines, in contrast, separate the strength of the

10  recommendation from the strength of evidence supporting the recommendation.  For instance,

11  most of the "strong" recommendations of the APS/AAPM guidelines are backed by only weak

12  evidence.  Further, the guidelines Defendants supported fail to adequately take into account the

13  potential adverse effects and specific label warnings that a physician should take into consideration

14. in deciding on a treatment for any medical condition.  As a result, they present a distorted picture

15  of treatment options.

16    **4.    Method 4:  Continuing medical education.**

17  145.    The millions of doctors and other health care professionals[55] who participate in

18  accredited CMEs constitute an enormously important audience for opioid reeducation.  Defendants

19  have sponsored thousands of CME programs that promote chronic opioid therapy and support and

20  disseminate the deceptive and biased messages described in this Complaint.  Upon information and

21  belief, Defendants' grant making to fund and sponsor CMEs has been influenced by their

22  marketing strategies and harnessed to the goal of increasing opioid sales.  Upon information and

23  belief, Defendants are more than passive funders of these programs, which reached tens of

24  thousands of doctors; they have influenced, if not outright controlled, the messages on topics and

25  in the fields of practice Defendants targeted.

26

27  [55] Schwart, *et al.*, *Medical Communication Companies and Continuing Medical Education:  Clouding the Sunshine*, JAMA Intern Med., Dec. 18, 2012, p. 2507.

28

- 47 -

COMPLAINT

146.    Defendants have long-standing relationships with the professional associations, advocacy organizations, presenters, and CME development companies that select and develop opioid-related CMEs.  These organizations have depended upon Defendants' financial support for their activities and, in some cases, their very existence.  It stands to reason that each of these organizations and the individuals running them know and believe that future financial support from Defendants depends upon producing programs that support the use of Defendants' products.

147.    Defendants are able to influence CMEs because they funded: (1) the KOLs who serve on the program committees of the professional societies that select the presentations and speakers and promote the views on which the presentations rely; (2) the KOLs who serve as speakers for the CMEs; and (3) the professional societies that host the conferences at which the presentations are given.  Upon information and belief, many of these programs focus exclusively on prescribing opioids, and do not fairly present reasonable alternative treatments (except to discount them), nor do they fairly present (or present at all) the risks or benefits of chronic opioid therapy, nor how to take patients off opioids, once prescribed.

148.    Defendants' sales representatives participated in these conferences, encouraged doctors to attend the programs, and held auxiliary events that reinforced and amplified the distorted messaging of the CMEs.  The CMEs themselves, however, buttressed by printed disclaimers by Defendants, were marketed to appear evidence-based and unbiased.  In fact, like KOLs, the CMEs are particularly effective for disseminating Defendants' messages because doctors rely on these peer-led professional events to deepen their understanding of clinical issues.[56]

149.    *Path of the Patient, Managing Chronic Pain in Younger Adult at Risk for Abuse*, a CME program sponsored, in part, by Purdue and edited by KOL Dr. Perry Fine, provides one example of Defendants' use of CMEs to spread deceptive messages supportive of chronic opioid therapy.  *Path of the Patient* aimed to educate primary care doctors about managing chronic pain

---

[56] This is especially true in the Counties and State since all California-licensed physicians (except pathologists and radiologists), beginning in 2001, have been required to take a full-day course on "pain management."

- 48 -

with opioids.  The presentation is devoted entirely to opioid prescribing and, despite its title, presents *no other* potential treatments.  Far from a therapy of last resort, as conventional medical thought advised, *Path of the Patient* promotes opioid therapy as the only solution, even for common chronic pain issues such as back pain.  This CME was available on-line for California physicians, and others, to view during the relevant statute of limitations period.

150.    In a role play in *Path of the Patient*, a patient who suffers from back pain tells his doctor that he is taking twice as many hydrocodone pills a day as directed.  The doctor reports that the pharmacy called him because of the patient's early refills.  The patient has a history of drug and alcohol abuse.  Even given these facts, an authoritative narrator notes that, because of a condition known as pseudoaddiction, the doctor should not assume his patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses."  The doctor in the role play treats this patient by prescribing a high-dose, long-acting opioid.

151.    An Endo-sponsored continuing medical education program put on by the American Pain Foundation's National Initiative for Pain Control, *Persistent Pain in the Older Adult*, also reprises several of Defendants' misrepresentations.  The program was first made available on-line, including to California residents, in 2011 and continued to be available during the relevant statute of limitations period.  The CME describes fear of addiction, safe use, and drug-drug interactions – all factors relating to addiction, abuse, and overdose – as the most significant barriers to treating "persistent" or chronic pain in the elderly.  The presentation counsels that acetaminophen should be used only short-term and includes five slides on the FDA's restrictions on acetaminophen and its adverse outcomes, including severe liver injury and anaphylaxis (shock).  Citing the American Geriatric Society's treatment guidelines as its sole support, the CME describes the "chronic use of opioids in older adults" as "effective" and notes "possibly less potential for abuse than in younger patients."  Its listed adverse outcomes simply omit addiction, overdose, respiratory depression, or death, among others, and the slides note that tolerance to opioids more mild side effects (such as

COMPLAINT

dizziness or nausea) "develops within days to weeks."  The CME never discloses the heightened risks opioids pose to elderly patients (see below).



152.    In 2012, the American Academy of Pain Medicine offered a *Safe Opioid Prescribing Course* in connection with its annual conference.  The course promised that participating doctors would "get the answers from the leading experts in pain" and offered up to 36 hours of CME credit.  The course was sponsored by Defendants Purdue and Endo, and the faculty included noted pro-opioid KOLs such as Drs. Fine, Fishman, Haddox and Webster.  Indeed, Dr. Webster, two other doctors from Dr. Webster's clinic, and Dr. Haddox, a Purdue executive, all served on the course program planning committee.

153.    The course materials included a 560-page syllabus, which contained selected studies, literature and slide decks from the presenters.  The syllabus also contained numerous misrepresentations including, for example:  pseudoaddiction; risk of addiction can be managed (use of screening tools; high-risk patients may be considered for chronic opioid therapy); taking

opioids long-term to treat chronic non-cancer pain improves quality of life and physical function; promotion of the American Academy of Pain Medicine's guideline recommendations.

154.   Dozens of CMEs, that were and continue to be available to doctors in California and during the relevant limitations period, also promoted the false concept that the risk of addiction to opioids is low and that doctors can identify and manage patients at higher risk of addiction.  The programs train doctors to use specific risk training tools without disclosing that the tools are unproven or the lack of evidence that high-risk – or any – patients can take opioids long-term without becoming addicted.

### 5.   Method 5:  Scientific articles.

155.   Defendants rely on misleading and deceptive citation of purported authorities to overstate the benefits of chronic opioid therapy and minimize its serious risks and fail to disclose contrary evidence.  For instance, APF's *Policymaker's Guide* (2011) makes the particularly callous representation that less than 1% of children prescribed opioids will become addicted.  In support of this contention it misleadingly cites a 1996 article by Dr. Kathleen Foley concerning cancer pain. The purpose of the *Guide* was to support opioid therapy generally; it was not focused on or restricted to cancer pain patients – the only population addressed in Dr. Foley's article, which also did not reference pediatric cancer patients or include *any* statistics on addiction rates.  Defendants funded and distributed the Guide with this misleading citation, knowing that there was no evidence to support the general assertion that children will not become addicted to opioids, even when taken long-term.  The Guide was disseminated in the State of California within the applicable limitations period.

156.   Similarly, a 2003 scientific study funded by Purdue and co-authored by a Purdue employee concluded that OxyContin is "effective and safe for the management of [chronic diabetes-related pain] and improves QOL [quality of life]."  The study asserts that there is "evidence that the risk of psychological dependence or addiction is low in the absence of a history of substance abuse."  The authors cite a single article by Porter and Jick, *Addiction Rare in Patients Treated with Narcotics*, published in the prestigious New England Journal of Medicine.

- 51 -
COMPLAINT

What the authors fail to disclose is that the "evidence" is actually a letter to the editor, not a peer reviewed article.  Moreover, the letter describes not a study but a chart review of hospitalized patients; if medical charts failed to note that the patients exhibited documented signs of addiction while on opioids, the authors concluded that they were not addicted.  Not only did the study not support the authors' assertion, but the authors' misleading citation of it created a false impression of its reliability.  The Porter and Jick letter and the 2003 Purdue study have been cited 819 and 455 times, respectively, in the medical literature since 2008.

157.  Practicing doctors, particularly the busy family doctors and general practitioners targeted by Defendants, do not have the time to look behind seemingly authoritative sources, particularly in scientific literature.  They do – and must be able to – rely on citations to scientific literature, a fact that Defendants use to their advantage.  Moreover, the misleading use of studies – to give them weight or meaning they do not have – is like a virus; once embedded in the literature, it takes on a life of its own.  Studies that assert addiction is rare, relying either on the Foley or Porter-Jick analyses, themselves are cited for the proposition.  Thus, with a few key manipulations and deceptive citations, Defendants were able to seed a scientific consensus supportive of chronic opioid therapy.

**6.  Method 6:  Patient education.**

158.  Defendants reach chronic pain patients through written publications, websites, and videos designed to present the purported "facts" about opioids in a simple, user-friendly manner.  As Defendants know, these materials are accessed by both patients doing their own research and doctors, who read them when distributing them to patients.  The materials Defendants produced concerning opioids include numerous fraudulent representations, overstate the benefits of chronic opioid therapy and fail to fully disclose its risks, particularly the risks of addiction.

159.  For example, Janssen funded a patient education pamphlet produced by public relations firm Conrad & Associates.  The pamphlet, *Finding Relief:  Pain Management for Older Adults*, 2009 (also sponsored by AGS, and American Academy of Pain Medicine) is unbranded.

160.    Because the piece is general and does not seem to promote a particular drug, and because it is co-sponsored by a credible and seemingly neutral professional organizations (the American Geriatric Society and the American Academy of Pain Medicine), patients are more likely to read and credit it.  The pamphlet was distributed in the State of California within the applicable limitations period.

161.    *Finding Relief* promises:  "Used properly, opioid medications may make it possible for people with chronic pain to "return to normal" – get back to work, walk or run, and play sports, and participate in other activities." *Finding Relief* describes opioids as "rarely addicting when used properly for the management of chronic pain" and assures that "unless the underlying cause of your pain gets worse … you will probably remain on the same dose or only need small increases over time."  As described above, these contentions are wholly lacking in scientific or clinical support.  Upon information and belief, Defendants were involved in developing and approving the deceptive messages in patient education booklets such as this one.

162.    Defendants created campaigns – including literature, websites, community groups, and programs – related to chronic non-cancer pain from illnesses such as low back pain, shingles, migraines, osteoarthritis, phantom limb pain, fibromyalgia and multiple sclerosis.  These conditions affect significant numbers of people, who have formed affinity groups and on-line communities for support in seeking to address conditions that produce persistent pain and may necessitate long-term treatment.  Defendants used this community-building to promote the use of opioids in the treatment of these conditions, despite the fact that there was little or no scientific evidence supporting the use of opioids for these conditions, and little or no evidence supporting or even suggesting that the use of opioids for these conditions would provide more benefit from pain relief than harm from the many known and significant opioid treatment risks.  None of these conditions reflect indications approved to appear on Defendants' drug labels, supporting the inference that Defendants did not have evidence to obtain such approval.

163.    In addition to their general marketing efforts, Defendants made special efforts to market to two particularly vulnerable patient groups:  the elderly and veterans.  While obvious

markets for chronic pain medications, each of these patient populations has risk factors that make long-term opioid use particularly dangerous.

### (1)     Elderly patients.

164.     Elderly patients taking opioids have been found to suffer elevated fracture risks, a greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression, which, as Defendants acknowledge in their labels, occurs more frequently in elderly patients.[57]  A 2010 paper in the Archives of Internal Medicine reported that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs.  Defendants' targeted marketing to the elderly and the absence of cautionary language in its promotional materials flies in the face of scientific evidence and even their own labels.

165.     In their effort to reach elderly patients, who experience pain associated with arthritis and other aging-related conditions, Defendants supported the American Geriatric Society, which produced the treatment guidelines discussed at ¶¶ 140-41 and education materials focused on elderly patients.  *Finding Relief: Pain Management for Older Adults*, a 2009 publication sponsored by Janssen, repeated the same unsubstantiated, deceptive statements that opioids are "rarely addictive" and increase patients' function, allowing them to get back to work or participate in recreational activities.

166.     Defendants also promoted the notion – also without adequate scientific foundation – that the elderly are particularly unlikely to become addicted to opioids.  The American Geriatric Society's 2009 Guidelines, for example, described addiction rates as "exceedingly low in older patients with no current or past history of substance abuse."  Yet, a 2010 study that examined overdoses among long-term opioid users found that the largest number of patients among those with serious overdoses were 65 or older.[58]

---

[57] Saunders/Dunn, *et al.*, *Relationship of opioid use and dosage levels to fractures in older chronic pain patients*, J Gen Intern Med 2010; 25:310-5.

[58] Dunn, *et al.*, *Opioid Prescriptions for Chronic Pain and Overdose: A Cohort Study*, Annals of Internal Medicine. 2010, *available at* http://www.rsds.org/2/library/article_archive/pop/DunnKM_AnnInternMed_2010.pdf.

167.     Defendants' efforts have paid off.  Since 2007, prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59.

### (2)     Veterans.

168.     Veterans, too, are suffering greatly from the effects of Defendants' targeted marketing.  A 2008 survey showed prescription drug abuse among military personnel doubled from 2002 to 2005 and then nearly tripled again over the next three years.  In 2009, military doctors wrote 3.8 million prescriptions for narcotic pain pills – four times as many as they did in 2001.  Although, upon information and belief, many of these veterans are returning from service with traumatic injuries, the increase in opioid prescribing is disproportionate to the population and, in far too many cases, unsuited for their treatment.  Among former service members receiving Veterans' Administration ("VA") services nationally in a single year (2005), 1,013 had died of accidental drug overdoses – double the rate of the civilian population.  Between 2001 and 2012, the VA hospital in Santa Clara County – the Palo Alto Health Care System – provided 80.3 opioid prescriptions for every 100 patients.  That amounts to 681,290 patients who received 546,793 prescriptions – in a single hospital in one county.[59]

169.     Opioids are particularly dangerous to veterans.  According to a study published last year in the Journal of American Medicine, veterans returning from Iraq and Afghanistan prescribed opioids have higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries; 40% of veterans with post-traumatic stress disorder received opioids and benzodiazepines (anti-anxiety drugs) that, when mixed with alcohol, can cause respiratory depression and death.[60]  Again, as with elderly patients, Defendants both purposefully sought to increase opioid prescribing to this vulnerable group and failed to disclose in their promotional materials the known, serious risks opioids posed to them.

---

[59] Aaron Williams, *et al.*, *Veterans Affairs:  Painkillers*, U.S. Census Bureau, Sept. 28, 2013, *available at* http://va-opiates.apps.cironline.org/#/system/118.

[60] Seal KH, *Association of Mental Health Disorders with Prescription Opioids and High-Risk Opioid Use in US Veterans of Iraq and Afghanistan*, JAMA Intern Med., 2012; 307(9); 940-947.

COMPLAINT

170.    Defendants have targeted veterans with fraudulent and unproven representations. As early as 2001, a Purdue promotional plan described spending hundreds of thousands of dollars to target the Veterans Administration and admitted that it was using "education" for what was actually marketing.[61]  "Corporate initiatives and partnering efforts were very successful with the Veterans Administration.  In addition to building sales for OxyContin Tablets, it also positioned Purdue as the leader in pain management education."[62]

171.    *Exit Wounds*, a 2009 publication ███████████████████████████████ ███████████████ promoted as a personal narrative by one veteran writing to others, describes opioids as "under-used" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury.  It notes that opioid medications "*increase* your level of functioning" (emphasis in original) and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are very unlikely to become addicted to opioid pain medications."  The book also asserts that "denying a person opioid pain medications because he or she has a history of substance abuse or addiction is invalid and contrary to the guidelines for the prescription of opioids published by the U.S. Federation of State Medical Boards."  The U.S. Federation of State Medical Boards itself received support from Defendants during the time it created and published its guidelines for prescription of opioids.  Upon information and belief, *Exit Wounds* was disseminated in the State of California within the applicable limitations period.

172.    *Exit Wounds* minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with anti-anxiety medications taken by a significant number of veterans.  ███████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

---

[61] *Critics say pharmaceutical firms spurred the increase in prescriptions for narcotic painkillers*, STATESMAN.COM, Sept. 29, 2012, *available at* http://www.statesman.com/news/news/local-military/critics-say-firms-spurred-painkiller-prescriptions/nSPNL/.
[62] *Id.*

173.    The deceptive nature of *Exit Wounds* is made obvious in comparing it to guidance on opioids published by the VA and Department of Defense ("DOD") in 2010 and 2011.  The VA's *Taking Opioids Responsibly* describes opioids as "dangerous."  It cautions against taking extra doses or using multiple doctors for prescriptions and mentions the risk of overdose and the dangers of interactions with alcohol.  The list of side effects from opioids includes decreased hormones, sleep apnea, hyperalgesia, addiction, immune system changes, birth defects and death – none of which are disclosed in *Exit Wounds*.  *Clinical Guidelines on Management of Opioid Therapy for Chronic Pain*, issued by the DOD, discloses that its review "revealed the lack of solid evidence based research on the efficacy of long-term opioid therapy.  Almost all of the randomized trials of opioids for chronic non-cancer pain were short-term efficacy studies.  Critical research gaps … include:  lack of effectiveness studies on long-term benefits and harms of opioids …; insufficient evidence to draw strong conclusions about optimal approaches to risk stratification …; lack of evidence on the utility of informed consent and opioid management plans …; and treatment of patients with chronic noncancer pain at higher risk for drug abuse or misuse."  These disclosures are missing from Defendants' marketing to veterans.

**D.    Defendants Often Acted Together in Promoting Opioids, Opposing Regulation, and Facilitating Supportive Standards to Approve Opioids**

174.    As laid out above, Defendants supported, assisted, encouraged and/or facilitated the same front groups and KOLs to disseminate the same deceptive messages about the use of opioids to treat chronic pain.  In fact, the similarity of their messages, language, and even their formatting (*e.g.*, the myth/fact formulation) suggests that Defendants participated in a common scheme to disseminate misleading information about opioids.

175.    This inference is supported by Defendants' cooperation in other activities to promote opioids, including successful efforts to set standards for measuring and treating pain, training and regulating doctors, and approving new opioids.

COMPLAINT

176.    Defendants' efforts to shift the paradigm on opioids and pain treatment began soon after their branded opioids were launched.  In 2000, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), in conjunction with the University of Wisconsin Pain and Studies Group, declared that pain was the "5th Vital Sign" and required all healthcare practitioners to make pain assessment and management a priority in daily practice.

177.    Upon information and belief, the impetus behind the new pain standard began with June Dahl, then a professor of pharmacology at the University of Wisconsin-Madison.  Dr. Dahl approached JCAHO with a proposal and helped identify pain management experts and key organizations to act as advisors to JCAHO, as well as promoters of Pain as the 5th Vital Sign.  Those experts and key organizations are many of the same heavily funded KOLs and front groups that ultimately helped bring about the change in attitudes towards opioids and, subsequently, the rise in opioid prescribing.  Purdue was one of two companies that paid for programs across the country to educate hospital physicians and staff about complying with the new pain standards and had exclusive rights to distribute certain education materials to JCAHO members.[63]

178.    Once health practitioners were required to consider a patient's pain along with other vitals, the next step was to convince practitioners that all pain must be treated – preferably with opioids.  In 2004, the Federation of State Medical Boards revised and updated its Model Policy for the Use of Controlled Substances for the Treatment of Pain.  In support of those efforts, noted KOL Dr. Scott Fishman was tapped to author a companion piece, titled *Responsible Opioid Prescribing:  A Physician's Guide*.

179.    The Guide was sponsored by Defendants Endo and Purdue, and was distributed to state medical boards, healthcare regulatory boards, medical organizations, hospitals and physicians across the country, including in California.  The 2007 *Physician's Guide* contained many of the misrepresentations described above, notably the concept of "pseudoaddiction" and the claim that opioids improve function.

---

[63] GAO, *OxyContin Abuse and Diversion*, Dec 2003, *available at* http://www.gao.gov/htext/d04110.html.

COMPLAINT

180.    Defendants also worked together to promote opioids through the Pain Care Forum, which is comprised of representatives from opioid manufacturers and distributors (including each of the Defendants); doctors and nurses in the field of pain care; health care professional organizations (*e.g.*, the American Academy of Pain Management, APS, and American Society of Pain Educators); patient advocacy groups (*e.g.*, APF, American Chronic Pain Association, and the Northern California Pain Initiative); and other like-minded organizations (*e.g.*, Federation of State Medical Boards and Wisconsin Pain & Policy Studies Group), almost all of which received substantial funding from Defendants.  Upon information and belief, the Pain Care Forum was started, and continues to be run, by Defendant Purdue's in-house lobbyist Burt Rosen, previously in conjunction with APF. ████████████████████████████████████ ████████████████████████████████████

181.    Upon information and belief, Defendants collaborated on a common campaign to build a market for opioids for chronic non-cancer pain.

**E.    Defendants Also Acted Individually to Deceptively Promote Their Opioids for Chronic Pain**

182.    In addition to participating in a shared campaign to expand the market for opioids by reaching chronic pain patients and conditions, each Defendant acted on its own to deceptively market its specific opioids for chronic pain and to capture a larger share of the chronic pain market.  Separately, in their branded materials and on seemingly independent websites, they each overstated the benefits and understated the risks of their drugs (including the risk of addiction) in the various ways described above, often causing the FDA to formally admonish them. On top of this, Cephalon engaged in additional unlawful conduct, marketing its opioid Fentora for unapproved chronic pain uses despite only recently settling a case involving almost identical activities with respect to its predecessor, Actiq.  Likewise, Purdue also quickly began to violate a consent judgment with the federal government and State of California by continuing to misrepresent the risks and benefits of OxyContin and its other opioids.

1.     **Cephalon fraudulently marketed Actiq and Fentora.**

183.     Cephalon also engaged in a distinctive effort to market its opioids for chronic pain despite having labels that specifically limited their use to cancer pain.  As a result of its successful marketing efforts, Cephalon reaps significant revenue from selling its opioids for treatment of chronic pain.  However, neither of its two opioid drugs – Actiq or Fentora – is approved for this purpose.  Instead, both have indications that are very clearly and narrowly defined to limit their use to a particular form of cancer pain.  Despite this restriction and in order to claim its piece of the broader chronic pain market, Cephalon deceptively and unlawfully marketed Actiq and then Fentora for patients and uses for which they were not safe, effective, or allowed, causing prescriptions to be written and paid and, grievously, patients to be injured and die.

a.     **Cephalon launches its fraudulent marketing scheme of Actiq.**

184.     Cephalon's Actiq is a powerful opioid narcotic that is delivered to the bloodstream by a lollipop lozenge that dissolves slowly in the mouth.  As described by one patient, Actiq "tastes like the most delicious candy you ever ate." [64]

185.     Actiq is appropriately used only to treat "breakthrough" cancer pain that cannot be controlled by other medications.  Breakthrough pain is a short-term flare of moderate-to-severe pain in patients with otherwise stable persistent pain.  Actiq is a rapid onset drug that takes effect within 10-15 minutes but lasts only a short time.  It is also an extremely strong drug, considered to be at least 80 times more powerful than morphine.  Fentanyl, a key ingredient in Actiq, has been linked to fatal respiratory complications in patients.  Actiq is not safe in any dose for patients who are not opioid tolerant, that is, patients who have taken specific dosages of opioids for a week or longer and whose systems have acclimated to the drugs.

186.     In 1995, the FDA approved Actiq "**ONLY** for the management of breakthrough cancer pain in patients with malignancies who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain." (Emphasis in FDA document.)  Because of Actiq's dangers, wider, off-label uses – as the FDA label makes clear – are not permitted:

---

[64] *See* John Carreyrou, *Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs,* WALL STREET JOURNAL, Nov. 3, 2006.

Because life-threatening hypoventilation could occur at any dose in patients not taking chronic opiates, *Actiq* is contraindicated in the management of acute or postoperative pain.  This product **must not** be used in opioid non-tolerant patients."

Actiq is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

(Emphasis in original.)  Unlike other drugs, where off-label uses are permitted but cannot be promoted by the drug maker, Actiq is so potent that off-label use to opioid naïve patients is strictly forbidden.

187.   Notwithstanding the drug's extreme potency and related dangers and the FDA's explicit limitations, Cephalon actively promoted Actiq for chronic pain – an unapproved, off-label use.  Cephalon marketed Actiq as appropriate for the treatment of various conditions including back pain, headaches, pain associated with sports related injuries, and other conditions not associated with cancer for which it was not approved, appropriate, or safe.

188.   Actiq's initial sales counted in the tens of millions of dollars, corresponding to its limited patient population.  But by 2005, Actiq sales reached $412 million, making it Cephalon's second highest selling drug.  As a result of Cephalon's deceptive, unlawful marketing, sales exceeded $500 million by 2006.

**b.   Cephalon engaged in deceptive, off-label marketing efforts to expand the use of Actiq.**

189.   Cephalon knew that Actiq's market potential for the treatment of breakthrough cancer pain in opioid-tolerant patients with malignancies was limited.  Rather than seek FDA approval for a broader set of indications, Cephalon launched an illegal marketing campaign to capture the lucrative chronic pain market.  Cephalon also actively concealed the illegal means that it used to market the drug.

190.   Despite the FDA's mandate that Actiq be prescribed only by oncologists or pain specialists skilled in the use of Schedule II opioids to treat cancer pain, Cephalon implemented a marketing scheme aimed at a wide range of doctors, including general practitioners, neurologists and sports medicine specialists.  Cephalon failed to disclose the fact that Actiq was not approved

or safe for the treatment of general aches and pains and is inappropriate for anything besides persistent cancer pain in certain opioid-tolerant cancer patients.

191.    Cephalon drove Actiq prescriptions by providing coupons to doctors in this wide range of specializations.  According to the WALL STREET JOURNAL, an ImpactRx survey showed that Actiq sales visits to non-cancer physicians increased six-fold between 2002 and 2005.  The surveyed doctors reported more than 300 Actiq sales visits in both 2004 and 2005.  One general practitioner reported that a Cephalon sales representative visited his office once a month, delivering 60 to 70 coupons for free Actiq at a time.  Each coupon was good for six Actiq lollipops.  A package of 30 Actiq lollipops, each containing 200 micrograms of fentanyl, would otherwise cost about $500.

192.    Within two years, Cephalon's off-label marketing campaign had borne fruit. According to data from NDCHealth, a health-care information company, Actiq prescriptions in the United States rose from 77,478 in 2001 to 321,463 in 2003.  By 2003, 26% of Actiq prescriptions were written by family-practice doctors or internists – five times the number written by that same group in 2001.  During the first six months of 2006, 99% of the prescriptions for Actiq filled by retail pharmacies were prescribed by non-oncologists.  According to one physician survey, 80% of patients who were prescribed Actiq between June 2004 and October 2006 were non-cancer patients.[65]

193.    Cephalon even targeted workers' compensation programs, which usually handle relatively few cases of cancer.  By 2003, Actiq catapulted to 15th on The Hartford Financial Services Group's list of total medication costs in workers' compensation claims.  Just two years earlier, it ranked 66th.

194.    A June 16, 2007 report by Prime Therapeutic LLC, a company dedicated to providing pharmacy solutions for third-party payers, also confirm the off-label marketing scheme. The study analyzed a Midwestern commercial health plan's Actiq claims for April through June 2005.  Of the 95 patients who received prescriptions for Actiq during that period, only 21 had a

---

[65] According to Cephalon, at its peak, there were 9,000 Actiq prescriptions filled per week.

COMPLAINT

diagnosis of cancer or AIDS.  And only 10 of 21 patients were taking a long-acting opioid

painkiller (opioid tolerant).  Altogether, 84 of the 95 Actiq prescriptions – nearly 90% – were for

off-label purposes.  The study also found that more than 15% of Actiq prescriptions exceeded the

FDA's recommended 120 lollipops per month, signaling widespread overuse of the drug.

      **c.**    **Government investigations also confirm Cephalon's deceptive marketing strategy.**

195.    Internal company documents uncovered during an investigation by the State of

Connecticut revealed that:

    a.    Cephalon instructed its sales representatives to ask non-cancer doctors whether they had the potential to treat cancer pain.  Even if the doctor answered "no," the Cephalon-created decision tree instructed the sales representatives to give the physician free Actiq coupons to distribute to their patients.

    b.    Cephalon encouraged neurologists to prescribe Actiq to patients with migraine headaches.  An internal document titled *Actiq in Migraine*, instructed salespersons to tout the berry-flavored narcotic as "an ER on a stick."

    c.    Outside pain management specialists were enlisted to pitch Actiq to non-cancer physicians.  A retained "independent" pain management specialist would accompany the Cephalon salesperson on sales calls to non-cancer physicians.  The "independent" pain management specialist would deceptively assure the physician that Actiq did not cause patients to feel "high" and, unlike other narcotic painkillers, carried a low risk of diversion toward recreational use.

    d.    Cephalon set sales quotas for its sales and marketing representatives that could be met only by promoting Actiq for off-label uses.

    e.    Cephalon encouraged physicians to ignore the label's maximum dosage, which limited new patients to six lollipops containing a 200-microgram dose of fentanyl, and instead encouraged physicians to start patients with 24 lollipops containing 400 micrograms.

    f.    Cephalon promoted Actiq by funding and controlling CME seminars that promoted and misrepresented the efficacy of the drug for nonmalignant pain.  CME topics included "Opioid Use in Headache" and "Use of Actiq in Opioid-Naïve Patients."

    g.    Cephalon paid speakers' fees and expenses to present topics promoting off-label uses for Actiq at these conferences.

COMPLAINT

h.   Cephalon also funded, promoted, and distorted studies to promote Actiq for noncancer pain.  The methodologies used in the studies would not pass scientific muster.  For example, two Cephalon-touted studies tested fewer than 28 patients and had no control group.  One of the doctors involved in the studies pitched Cephalon products in paid speaking engagements; another received help from Cephalon with conducting his study.  At least one of the studies was published in the medical journal "Headache."

196.   Actiq's widespread use led the FDA's Office of Criminal Investigations and the U.S. Attorney for the Eastern District of Pennsylvania to investigate Cephalon's marketing practices.  That investigation found that from 2001 through at least 2006, Cephalon promoted Actiq off-label to treat migraines, back pain, and even injuries.  The investigation also confirmed that Cephalon had structured its sales quotas and bonuses such that a sales representative could only reach sales goals by selling the drug for chronic non-cancer pain.  In 2008, Cephalon entered a criminal plea for its off-label promotion of Actiq.

**d.   Cephalon attempted to cover-up evidence of its deceptive, unlawful scheme.**

197.   The FDA conditioned its approval of Actiq upon Cephalon's agreement to conditions enumerated in the FDA's Risk Management Program.  This Program required Cephalon to:  (1) make sure that informational packets describing the limited uses for Actiq were given to everyone who was prescribed Actiq; (2) conduct patient surveys and spot check pharmacies to ensure that the informational packets were being distributed; (3) monitor prescribing physicians to make sure only appropriate patients received Actiq; and (4) if it turned out that more than 15% of the prescriptions were written by doctors who should not have been prescribing Actiq, Cephalon was to report that fact to the FDA and embark on a physician training program to stop and prevent physicians from prescribing Actiq for broader use.

198.   But a report drafted by a compliance auditor hired by Cephalon revealed that Cephalon was failing to meet the Program's conditions.  Rather than come into compliance, Cephalon buried the report.[66]  The report was submitted to the company in October 2003, and

---

[66] The allegations in this section are made on information and belief based on the allegations in the Second Amended Complaint filed on April 7, 2005 in the lawsuit *David Brennan v. Cephalon, Inc.*, No. 4 CV 3241 (D.N.J.).

various management members directed the auditor to remove from the report his conclusion that Cephalon was not in compliance with the Program.  He refused and was terminated.

  **e.**  **Cephalon fraudulently marketed Actiq's successor drug, Fentora.**

199. Actiq was set to lose its patent protection in September 2006.  To replace the revenue stream that would be lost once generic competitors came to market, Cephalon purchased a new opioid drug, Fentora, from Cima Labs and, in August 2005, submitted a New Drug Application (NDA) to the FDA for approval.

200. Like Actiq, Fentora is an extremely powerful opioid.  It is administered by placing a tablet in the mouth until it disintegrates and is absorbed by the mucous membrane that lines the inside of the mouth.  Like Actiq, Fentora is a rapid onset opioid.

201. On September 25, 2006, the FDA approved Fentora, like Actiq, only for the treatment of breakthrough cancer pain in cancer patients who were already receiving and were tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.

202. Fentora's inherent danger is confirmed by the unusually strong and detailed black box warning label – the most serious medication warning required by the FDA.  The warning makes clear that, among other things:

> Reports of serious adverse events, including deaths in patients treated with *FENTORA* have been reported.  Deaths occurred as a result of improper patient selection (e.g., use in opioid non-tolerant patients) and/or improper dosing.  The substitution of *FENTORA* for any other fentanyl product may result in fatal overdosing.
>
> *FENTORA* is indicated only for the management of breakthrough pain in patients with cancer who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain.
>
> FENTORA is contraindicated in the management of acute or postoperative pain including headache/migraine.  Life-threatening respiratory depression could occur at any dose in opioid non-tolerant patients.  Deaths have occurred in opioid non-tolerant patients,"
>
> …
>
> *FENTORA* is intended to be used only in the care of opioid tolerant cancer patients and only by healthcare professionals who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain.

(Emphasis in original.)

      **f.**     **October 1, 2006 – Cephalon launches Fentora and immediately begins deceptive marketing campaign.**

203.    When Cephalon launched Fentora on October 1, 2006, it picked up the playbook it developed for Actiq and simply substituted in Fentora.  Cephalon immediately shifted 100 general pain sales representatives from selling Actiq to selling Fentora to the very same physicians for uses that would necessarily and predictably be off-label.

204.    Cephalon's marketing of Actiq "primed the market" for Fentora.  Cephalon had trained numerous KOLs to lead promotional programs for Fentora, typically including off-label uses for the drug.  Cephalon billed Fentora as a major advance that offered a significant upgrade in the treatment of breakthrough pain generally – not breakthrough cancer pain in particular – from Actiq.

205.    On February 12, 2007, only five months after the launch, Cephalon CEO Frank Baldino told investors:

> [W]e've been extremely pleased to retain a substantial portion, roughly 75% of the rapid onset opioid market.  We executed our transition strategy and the results in our pain franchise have been better than we expected.  With the successful launch of FENTORA and the progress in label expansion program, we are well positioned to grow our pain franchise for many years to come.[67]

206.    On May 1, 2007, just seven months after Fentora's launch, Cephalon's then-Executive Vice President for Worldwide Operations, Bob Roche, bragged to financial analysts that Fentora's reach would exceed even Actiq's.  He described the company's successful and "aggressive" launch of Fentora that was persuading physicians to prescribe Fentora for ever broader uses.  He identified two "major opportunities" – treating breakthrough cancer pain and:

> The other opportunity of course is the prospect for FENTORA outside of cancer pain, in indications such as breakthrough lower back pain and breakthrough neuropathic pain....

> We believe that a huge opportunity still exists as physicians and patients recognize FENTORA as their first choice rapid onset opioid

---

[67] *See* http://seekingalpha.com/article/26813-cephalon-q4-2006-earnings-call-transcript (last visited Jan. 28, 2014).

medication…. Noting that opioids are "widely used in the treatment of … non-cancer patients," Roche continued:

Of all the patients taking chronic opioids, 32% of them take that medication to treat back pain, and 30% of them are taking their opioids to treat neuropathic pain.  In contrast only 12% are taking them to treat cancer pain, 12%.

We know from our own studies that breakthrough pain episodes experienced by these non-cancer sufferers respond very well to FENTORA.  And for all these reasons, we are tremendously excited about the significant impact FENTORA can have on patient health and wellbeing and the exciting growth potential that it has for Cephalon.

In summary, we have had a strong launch of FENTORA and continue to grow the product aggressively.  Today, that growth is coming from the physicians and patient types that we have identified through our efforts in the field over the last seven years.  In the future, with new and broader indications and a much bigger field force presence, the opportunity that FENTORA represents is enormous.[68]

**g.    September 2007 – Reports of death and serious side effects lead the FDA to issue a public health warning for Fentora.**

207.    On September 10, 2007, Cephalon sent letters to doctors warning of deaths and other "serious adverse events" connected with the use of Fentora and indicating that "[t]hese deaths occurred as a result of improper patient selection (*e.g.*, use in opioid non-tolerant patients), improper dosing, and/or improper product substitution."  The warning did not acknowledge Cephalon's deliberate role in the "improper patient selection."

208.    Two weeks later, the FDA issued its own Public Health Advisory.  The FDA emphasized, once again, that Fentora only should be prescribed for approved conditions and that dosage guidelines should be carefully followed.  The FDA Advisory made clear that several Fentora-related deaths had occurred in patients who were prescribed the drug for off-label use.  The FDA Advisory warned that Fentora should not be used for any off-label conditions, including migraines, post-operative pain or pain due to injury, and that it should be given only to patients who have developed opioid tolerance.  The Advisory reiterated that because Fentora contains a

---

[68] *See* http://seekingalpha.com/article/34163-cephalon-q1-2007-earnings-call-transcript (last visited Aug. 23, 2010).

- 67 -
COMPLAINT

much greater amount of fentanyl than other opiate painkillers, it is not a suitable substitute for other painkillers.

### h. Cephalon sponsored CMEs used to promote the off-label use of Actiq and Fentora – 2007-2008, in spite of the FDA warnings.

209. Cephalon also used the CME programs it sponsored to promote the off-label use of their Actiq and Fentora. In 2007 and 2008, Cephalon sponsored three CMEs that each positioned Actiq and Fentora, and only Actiq and Fentora, as "rapid onset opioids" that would provide effective analgesia within the time period during which "breakthrough pain" was at its peak intensity. Although the CMEs only use the generic names of the drugs, the description of the active ingredient and means of administration means that a physician attending the CME would know to prescribe Actiq or Fentora.

210. The CMEs each taught attendees that there was no sound basis for the distinction between cancer and non-cancer "breakthrough pain," and one instructed patients that Actiq and Fentora were commonly used in non-cancer patients, thus effectively endorsing this use. *Optimizing Opioid Treatment for Breakthrough Pain*, offered by Medscape, LLC from September 28, 2007, through December 15, 2008, was prepared by KOL Dr. Lynn R. Webster and M. Beth Dove. It recommends prescribing a "short-acting opioid" (e.g., morphine, hydromorphone, oxycodone) "when pain can be anticipated," or a rapid onset opioid when it cannot. The only examples of rapid onset opioids then on the market are oral transmucosal fentanyl citrate (*i.e.*, Actiq) or fentanyl effervescent buccal tablet (*i.e.*, Fentora): "Both are indicated for treatment of [breakthrough pain] in opioid-tolerant cancer patients *and are frequently prescribed to treat [breakthrough pain] in noncancer patients as well*." (Emphasis added.)

211. Similarly, *Breakthrough Pain: Improving Recognition and Management*, offered between March 31, 2008, and March 31, 2009, by Medscape, LLC completely omitted tolerance limitations, cited examples of patients who experienced pain from accidents, not from cancer, and, like the "Optimizing Opioid Treatment" CME, taught that Actiq and Fentora were the only products on the market that would take effect before the breakthrough pain episode subsided. Lastly, KOL Dr. Fine authored a CME, sponsored by Cephalon, *Opioid-Based Management of*

- 68 -
COMPLAINT

*Persistent and Breakthrough Pain*, with Dr. Christine A. Miaskowski, Professor and Associate Dean for Academic Affairs, Department of Physiological Nursing, University of California – San Francisco.  They instruct their audience, "Clinically, broad classification of pain syndromes as either cancer- or noncancer-related has limited utility," and recommend "rapid onset opioids" for "episodes that occur spontaneously" or unpredictably, including "oral transmucosal fentanyl," *i.e.*, Actiq, and "fentanyl buccal tablet," *i.e.*, Fentora, including specifically in patients with chronic non-cancer pain.[69]

212.    Dr. Miaskowksi disclosed in 2009, in connection with the APS/AAPM Opioid Treatment Guidelines that she served on Cephalon's speakers' bureau.  Dr. Fine and Dr. Webster also received funding from Cephalon for consulting services, and upon information and belief, Drs. Fine and Webster continued to receive funding from other opioid manufacturers, too.

### i.    May 6, 2008 – The FDA rejects Cephalon's request for expanded approval of Fentora.

213.    Cephalon filed a supplemental new drug application, (sNDA), asking the FDA to approve Fentora for the treatment of non-cancer breakthrough pain.  To support its application, Cephalon admitted that Fentora already had been heavily prescribed for non-cancer pain, but argued that such widespread use demonstrated why Fentora should be approved for these wider uses.[70]  Cephalon argued for the expanded approval even though, as it acknowledged, "[t]o date, no medication has been systematically evaluated in clinical studies or approved by the FDA for the management of [breakthrough pain] in patients with chronic persistent non-cancer-related pain." *Id.*

214.    The FDA presented data showing that 95% of all Fentora use was for treatment of non-cancer pain.[71]  By a vote of 17-3, the relevant Advisory Committee – a panel of outside

---

[69] *See Opioid-Based Management of Persistent and Breakthrough Pain*, Aug. 20, 2008, pp. 9-10.

[70] *See* Joint Meeting: Anesthetic and Life Support Drugs, Advisory Committee and Drug Safety and Risk Management Advisory Committee, May 6, 2008, *available at,* http://wwwv.fda.gov/ohrms/dockets/ac/08/briefing/2008-4356b2-02-Cephalon.pdf (last visited Aug. 17, 2010).

[71] *See* Review of Fentora® and Actiq® Adverse Events from the Adverse Event Reporting System ("AERS") Database, May 6, 2008, *available at,* http://www.fda.gov/ohrms/dockets/ac/08/slides/2008-4356s2-02-FDA-corepresentations.ppt#289,1 (last visited Aug. 17, 2010).

- 69 -

COMPLAINT

experts – voted against recommending approval of Cephalon's sNDA for Fentora, citing the potential harm from broader use.  On September 15, 2008, the FDA denied Cephalon's application and requested, in light of its already off-label use, that Cephalon implement and demonstrate the effectiveness of proposed enhancements to Fentora's Risk Management Program.  In December 2008, the FDA followed that up with a supplemental request, asking that the company submit a Risk Evaluation and Mitigation Strategy for Fentora as well.

> **j.    March 26, 2009 – the FDA's Division of Drug Marketing, Advertising and Communications ("DDMAC") warned Cephalon about its misleading advertising of Fentora.**

215.    Undeterred by the rejection of its sNDA, Cephalon continued to use its general pain sales force to promote Fentora off-label to pain specialists as an upgrade over Actiq for the treatment of non-cancer breakthrough pain.  Deceptively and especially dangerously, Cephalon also continued to promote Fentora for use by all cancer patients suffering breakthrough cancer pain, and not simply those who were opioid tolerant.

216.    On March 26, 2009, the DDMAC issued a Warning Letter to Cephalon, telling Cephalon that its promotional materials for Fentora amounted to deceptive, off-label promotion of the drug.  Specifically, the Warning Letter asserted that a direct-to-patient advertisement found on the internet was improper because it "misleadingly broaden[ed] the indication for Fentora by implying that any patient with cancer who requires treatment for breakthrough pain is a candidate for Fentora therapy ... when this is not the case."  DDMAC emphasized that Fentora's label was limited to cancer patients with breakthrough pain **"who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."** (Emphasis in original.)  DDMAC explained that the advertisement was "especially concerning given that Fentora **must not** be used in opioid non-tolerant patients because life-threatening hypoventilation and death could occur at any dose in patients not on a chronic regimen of opioids." (Emphasis in original.)  DDMAC also warned Cephalon that, based on a review of Cephalon-sponsored links for Fentora on internet search engines, the company's advertisements were "misleading because they make representations and/or suggestions about the efficacy of Fentora,

- 70 -
COMPLAINT

but fail to communicate **any** risk information associated with the use" of the drug.  (Emphasis in original.)

### k. Cephalon continues to knowingly, deceptively, and illegally promote Fentora for off-label uses.

217.    Cephalon's own market research studies confirm that its Fentora promotions were not focused on the physicians who treat breakthrough cancer pain.  Cephalon commissioned several market research studies to determine whether oncologists provided an "adequate" market potential for Fentora.  These studies' central goal was to determine whether oncologists treat breakthrough cancer pain themselves, or whether they refer such patients to general pain specialists.  The first study, completed in 2007, reported that 90% of oncologists diagnose and treat breakthrough cancer pain themselves, and do not refer their breakthrough cancer pain patients to pain specialists.  The second study, completed in 2009, confirmed the results of the 2007 study, this time reporting that 88% of oncologists diagnose and treat breakthrough cancer pain themselves and rarely, if ever, refer those patients to general pain specialists.  (One reason that general pain specialists typically do not treat oncological pain is that the presence of pain can, in itself, be an indicator of a change in the patient's underlying condition that should be monitored by the treating oncologist.)

218.    Yet Cephalon continued to use its general pain sales force (which numbered over 110 representatives) to promote Fentora to general pain specialists.  This only makes sense because the off-label sales are so vast that missing out on 90% of the potential on-label market is inconsequential to Cephalon's bottom line.

219.    Cephalon-set sales quotas for its general pain sales force would be unattainable if they did not deceptively promote Fentora off-label.  The general pain sales representatives have, from the outset, been required to adhere to call lists that include numerous pain doctors and other physicians who do not, and would not, prescribe Fentora on-label.  These same call lists contain few, if any, oncologists.

COMPLAINT

220.    A 2009 PowerPoint presentation by Kathy Roman, Cephalon's Associate Director of Oncology for Strategic Analysis & Planning, reported that only 4% of Fentora prescriptions were written by oncologists.

221.    Cephalon's conduct in marketing Actiq and Fentora for chronic pain, despite their clear (and deadly) risks and unproved benefits, was an extension of, and reaped the benefits of, Cephalon's generally deceptive promotion of opioids for chronic pain.

**2.    Purdue's role in deceptively promoting opioids for treatment of chronic pain.**

222.    Like Cephalon, Purdue also undertook its own separate campaign to deceptively market opioids.  Purdue is the maker of OxyContin, which, over time, has been the most used and abused opioid.  Today, with one exception, all of the drugs marketed by Purdue are opioids.

**a.    Purdue's marketing of OxyContin was deceptive from the start.**

223.    OxyContin was approved by the FDA in 1995 for "management of moderate to severe pain where use of an opioid analgesic is appropriate for more than a few days."  Purdue immediately began promoting OxyContin as less addictive than other opioids.  The drug's extended-release mechanism, according to Purdue, meant it was less likely to provide a euphoric high, and therefore was less likely to be abused, create addiction, or cause withdrawal.  However, Purdue "did not have, and did not provide the FDA with any clinical studies demonstrating that OxyContin was less addictive, less subject to abuse and diversion, or less likely to cause tolerance and withdrawal than other pain medications."  When crushed, dissolved in water, or injected, OxyContin's extended-release mechanism could be bypassed to produce a heroin-like high.  In fact, OxyContin was more likely than other opioids to be abused and diverted because it had more oxycodone than other non-controlled release opioids (and oxycodone already is twice as potent as morphine).

224.    Purdue's marketing persuaded primary care physicians that it was safe to prescribe OxyContin for chronic pain.  By 2003, according to the Government Accountability Office ("GAO"), general practitioners represented half of all OxyContin prescribers.  A GAO report noted that, between 1997 and 2002, OxyContin prescriptions for non-cancer pain increased nearly

ten-fold, from 670,000 to 6.2 million, versus an increase in prescriptions for treatment of cancer pain from 250,000 to 1 million; non-cancer prescriptions represented 85% of total OxyContin prescriptions.  At the same time, Purdue doubled the number of its sales representatives, who received bonuses based on sales quotas and were directed to target the most prolific opioid prescribers.  Total sales bonuses in 2001 were $40 million, up from $1 million in 1996.  Purdue also used speakers bureaus, which put on programs at resort locations, starter coupons to attract new patients, funded new front group websites, and, even distributed plush toys and hats, which the Drug Enforcement Administration ("DEA") says had never been done before for a controlled substance.  The DEA blamed Purdue's "aggressive marketing of OxyContin" for "fuel[ing] demand for the drug and exacerbat[ing] the drug's diversion.

225.    In 2001, the FDA required Purdue to narrow its approved indication to "moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time" and added new warnings relating to the drug's potential for misuse and abuse.  In August of that year, the FDA wrote to Purdue to make clear that all promotional materials should prominently disclose the new label information.  Yet, not 18 months later, in January 2003, in response to two ads Purdue ran in the Journal of the American Medical Association, the FDA issued a sharply worded warning letter to Purdue:

> Your advertisements thus grossly overstate the safety profile of OxyContin by not referring in the body of the advertisements to serious, potentially fatal risks associated with OxyContin, thereby potentially leading to prescribing of the product based on inadequate consideration of risk. In addition, your journal advertisements fail to present in the body of the advertisements critical information regarding limitations on the indicated use of OxyContin, thereby promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug. The combination in these advertisements of suggesting such a broad use of this drug to treat pain without disclosing the potential for abuse with the drug and the serious, potentially fatal risks associated with its use is especially egregious and alarming in its potential impact on the public health.[72]

---

[72] January 17, 2003 Warning Letter from Thomas W. Abrams, Director, Division of Drug Marketing, Advertising, and Communications , U.S. Food and Drug Administration, to Michael Friedman, Executive Vice President and Chief Operating Officer, Purdue Pharma L.P.

226.    The FDA's strong language seemed to have little impact on Purdue's behavior.  In 2007, Purdue entered into a $635 million settlement with the federal government to resolve civil and criminal allegations relating to its marketing of OxyContin.  This is a drop in the bucket compared to the $27 billion in sales revenue generated since the introduction of OxyContin in 1996.[73]  News reports assert that federal prosecutors originally intended to charge the company with multiple felonies, including conspiracy, mail and wire fraud and money laundering, but that the Department of Justice agreed to allow Purdue to plead guilty to a single felony count of misbranding.  Purdue's chief executive officer, chief medical officer, and general counsel individually pled guilty to misdemeanor counts of misbranding and subsequently left the company.  Purdue admitted in its plea that its promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science.

227.    As part of its settlement, Purdue entered into a Corporate Integrity Agreement with the United States Department of Health and Human Services-Office of Inspector General ("HHS-OIG").  Purdue agreed to refrain from deceptively marketing OxyContin, to train its employees regarding compliance with the Agreement, monitor its own compliance, and report its compliance (both independently and through an independent review organization or "IRO") to HHS-OIG.

228.    In 2007, Purdue also agreed to pay $19.5 million to 26 states, including California, to settle these states' consumer protection claims which likewise stemmed from Purdue's promotion and marketing of OxyContin.  As part of the consent judgment with California and the other states ("Consent Judgment"), Purdue likewise agreed to, among other things, refrain from deceptively marketing OxyContin; to refrain from providing to health care professionals written information describing off-label use of OxyContin; to disclose any educational or research grants relating to OxyContin; and to refrain from sponsoring any event that will discuss off-label use.

---

[73] *See* http://www.latimes.com/opinion/la-ed-oxycontin-overprescribing-database-20130-001-photo.html.

**b.** **Purdue continued to engage in false marketing, misrepresenting OxyContin's benefits and the risk of addiction when taken long-term for chronic pain.**

229.  Despite its guilty plea, Purdue continued to deceptively market opioids.  And, as a result, its sales continued to grow.  OxyContin yielded $3.1 billion in revenue for Purdue in 2010, up four-fold from its 2006 sales of $800 million.



230.  Purdue's direct misrepresentations and its relationship with front groups and KOLs who advanced its deceptive marketing, are described above.  Upon information and belief, Purdue deployed these doctors and front groups according to marketing strategies it developed, and also funded, directed, shaped, approved, and disseminated their misrepresentations regarding the risks, benefits, and superiority of opioids' use to treat chronic pain.

**c.** **Purdue was aware of, and has profited from, misuse and diversion of its opioids.**

231.  According to the GAO, the first public news of diversion and abuse of OxyContin became known in 2000.  Among them were reports of patients arriving in emergency rooms with

- 75 -
COMPLAINT

severe withdrawal or overdoses, hundreds of deaths, and increases in drug treatment admissions for individuals on OxyContin.  Since 2000, there have been countless news reports, lawsuits, and government and other data describing the rising toll of addiction, overdose, and death from OxyContin specifically and opioids generally.

232.    In 2010, Purdue reformulated OxyContin to reduce tampering and make it less subject to abuse.  The new OxyContin cannot be reduced to a powder and does not dissolve; when water is added to it, it becomes gelatinous and cannot be injected.

233.    While an important step, Purdue knew that even the reformulation of OxyContin did not resolve issues of abuse and addiction.  A recent article in the LOS ANGELES TIMES revealed that Purdue – since 2002 – has kept a database of 1,800 doctors suspected of inappropriately prescribing its drugs, but did not alert law enforcement or medical authorities to all but a few of these doctors.[74]  This database, according to the news report, was whittled down from 3,200 doctors reported as suspicious by Purdue's sales representatives (conduct that must have been so egregious that the sales representatives forewent the chance to earn commissions on the doctors' prescriptions).

234.    Purdue did not use its database of problem doctors to reduce OxyContin abuse, to rein in dangerous doctors, or to stop the potentially unlawful distribution of a controlled substance. Instead, the company presented the evidence of rogue prescribing in an effort to persuade the FDA that generic drug makers should not be allowed to copy the earlier, non-tamper resistant version of OxyContin – the same OxyContin that Purdue originally promoted as less addictive – as it is too subject to abuse.

235.    As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services said in the LOS ANGELES TIMES article, "Any drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it."  Instead, on information and belief, Purdue continued to

---

[74] Scott Glover and Lia Girion, *Oxycontin maker closely guards is list of suspect doctors*, LA TIMES, Aug. 11, 2013.

profit from the prescriptions of these suspicious prescribers.  Psychologist, researcher, and Stanford University professor Keith Humphreys noted, "[t]hose doctors are a gold mine for Purdue Pharma.  And the whole time they're taking the money, knowing that something is wrong, and not telling anyone until it gives them a market advantage to do so.  That is really disgusting."[75]

**F.    Defendants Knew That Their Marketing of Chronic Opioid Therapy Was False, Unfounded, and Dangerous and would Harm California Residents**

236.    Defendants made, promoted, and profited from their misrepresentations – individually and collectively – knowing that their statements regarding the risks, benefits, and superiority of opioids for chronic pain were untrue and unproven.  The history of opioids, as well as research and clinical experience over the last 20 years, established that they were deeply addictive and responsible for a long list of very serious adverse outcomes.  The FDA and other regulators warned Defendants of this, and Cephalon and Purdue entered into settlements in the hundreds of millions of dollars to address nearly identical conduct.  Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the significant adverse outcomes from opioids and that patients were suffering from addiction, overdoses, and death in alarming numbers.

237.    Moreover, Defendants knew and should have known about the harm that their efforts had caused.  Defendants closely monitored their sales and the habits of prescribing doctors, which allowed them to see sales balloon, overall, in individual practices, and for specific indications.  Their sales representatives, who visited doctors and attended continuing medical education programs, knew what types of doctors were receiving their messages and how they were responding.  Moreover, Defendants had access to and also watched carefully government and other data that tracked the explosive rise in opioid use, addiction, injury, and death.  They knew – and, indeed, intended – that their misrepresentations would persuade doctors to prescribe and patients to use their opioids for chronic pain.

---

[75] *Id.*

- 77 -
COMPLAINT

238.    Defendants' actions are not permitted or excused by the fact that their labels (with the exception of the Actiq/Fentora labels) may have allowed or did not exclude the use of opioids for chronic non-cancer pain.  However, the FDA's approval did not give Defendants license to misrepresent the risks, benefits, or side effects of opioids; if that were the case, there would be few limits on what a drug company could say about its product and little use for the FDA's rules on fair promotion.

239.    Nor is Defendants' causal role broken by the involvement of doctors, professionals with the training and responsibility to make individualized medical judgments for their patients. Defendants' marketing efforts were ubiquitous and highly persuasive.  Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions.  Defendants also were able to harness – and indeed hijack – what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

**G.    Defendants Fraudulently Concealed their Misrepresentations**

240.    At all times relevant to this Complaint, Defendants took steps to avoid detection of and fraudulently conceal their deceptive marketing and conspiratorial behavior.

241.    First, and most prominently, Defendants disguised their own roles in the deceptive marketing of chronic opioid therapy by funding and working through patient advocacy and professional front organizations and KOLs.  Defendants purposefully hid behind the assumed credibility of the front organizations and relied on them to vouch for the accuracy and integrity of Defendants' untrue and unsupportable statements about opioid use for chronic pain.

242.    Upon information and belief, while Defendants were listed as sponsors of many of the publications described in this Complaint, they never disclosed their role in shaping, editing, and approving their content.  Upon information and belief, Defendants exerted their considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with key opinion leaders, front groups, and public relations companies that were not, and have not yet become, public.

243.    Contrary to their competitive interest in promoting their own opioid products, Defendants disseminated their deceptive messages through websites that were unbranded (did not promote a specific drug) and therefore could not easily be tied to a particular drug company sponsor.  Unbranded messaging created the appearance of neutrality and gave Defendants' marketing messages the appearance of neutral medical science.  ████████████ ████████████████████████████████████████████████████████ ████████████████████ Upon information and belief, Defendants, including Purdue and Janssen, ran similar websites that masked their own direct role in developing the content.

244.    Upon information and belief, Defendants also obscured their participation by extensively using the public relations companies they hired to work with front groups to produce and disseminate deceptive materials.  Also upon information and belief, Defendants may have created their own seemingly independent public relations or marketing companies to create campaign and education materials for opioids.

245.    Much of Defendants' deceptive marketing occurred at medical conferences and through continuing medical education programs that were open only to registered medical professionals.  Therefore, the People would have had no access to or awareness of their content.

246.    Further, in addition to hiding their own role in the deceptive conduct, Defendants manipulated their promotional materials to make it appear that they were accurate, truthful, and supported by substantial scientific evidence.  Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support.  The true lack of support for Defendants' deceptive messages was not apparent to the medical professionals who relied upon them in making treatment decisions, nor could they have been detected by the People.  Only in recent months have some of the KOLs whom Defendants relied upon and promoted to spread their deceptive messages acknowledged the lack of support for their positions.

247.    Important elements of Defendants' unlawful conduct are only now becoming known.  Revelations, for example, of Defendants' role in paying third parties for access to the

FDA and a voice in formulating standards for the clinical trials for approving new opioid drugs and indications was revealed only recently in an article in the WASHINGTON POST.[76] Defendants were well-aware of their activities, intent, and impact, but hid their influence from the public and from law enforcement and regulatory agencies.

248.     Thus, while the opioid epidemic was evident, Defendants, in furtherance of their marketing strategy, intentionally concealed their own role in causing it.  Defendants successfully concealed from the medical community, patients, and health care payers facts sufficient to arouse suspicion of the existence of claims that the People now assert.  The People were not alerted to the existence and scope of Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.  Through their public statements, marketing, and advertising, Defendants' deceptions deprived the People of actual or presumptive knowledge of facts sufficient to put them on notice of potential claims.

## H.     Defendants' Fraudulent and Deceptive Marketing of Opioids Directly Caused Harm to California Communities

249.     Defendants' misrepresentations prompted doctors to prescribe, patients to take, and payers to cover opioids for the treatment of chronic pain.  Defendants set out to overcome barriers to widespread prescribing of opioids – and succeeded – through a series of deceptive messages designed to address fears that opioids were dangerous for long-term use and addictive.

250.     Defendants' fraudulent marketing caused consumers to purchase and use opioids believing they were safe and effective.  In addition, consumers have had to bear the costs of the immediate and foreseeable results of chronic opioid therapy, including addiction treatment, emergency department admissions, intensive care treatment for infants born addicted to opioids, and other hospitalizations.

251.     Defendants' deceptive marketing caused the use of opioids to explode.  Approximately 20% of the population between the ages of 30 and 44 and nearly 30% of the

---

[76] Peter Whoriskey, *Pharmaceutical firms paid to attend meetings of panel that advises FDA*, THE WASHINGTON POST, Oct. 6, 2013, *available at* http://www.washingtonpost.com/business/economy/pharmaceutical-firms-paid-to-attend-meetings-of-panel-that-advises-fda-e-mails-show/2013/10/06/a02a2548-2b80-11e3-b139-029811dbb57f_story.html.

population over 45 have used opioids."[77]  Indeed, "[o]pioids are the most common means of treatment for chronic pain; 20% of office visits now include the prescription of an opioid, and 4 million Americans per year are prescribed a long-acting opioid."[78]  A study of 7.8 million doctor visits found that prescribing for pain increased by 73% between 2000 and 2010 even though the number of office visits in which patients complained of pain did not change; prescribing of non-opioid pain medications decreased over the same time.[79]  For back pain alone – one of the most common chronic pain conditions – the percentage of patients prescribed opioids increased from 19% to 29% between 1999 and 2010, even as the use of NSAIDs or acetaminophen declined and referrals to physical therapy remained steady.[80]  This increase corresponds with, and was caused by, Defendants' marketing push.

252.    The sharp increase in opioid use has led directly to a dramatic increase in opioid abuse, addiction, overdose, and death throughout the United States.  Scientific evidence demonstrates a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse.[81]  "Deaths from opioid overdose have risen steadily since 1990 in parallel with increasing prescription of these drugs."[82]  Opioids are involved in 40% of fatal drug overdoses – including overdoses due to illegal drugs.[83]  Contrary to Defendants' misrepresentations, most of the illicit use stems from *prescribed* opioids; in 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from drug dealers or the internet.[84]  According to the CDC, the 80% of opioid patients who take low-

[77] Stagnitti, M.N., *Trends in Outpatient Prescription Analgesics Utilization and Expenditures for the U.S. Civilian Noninstitutionalized Population, 1996 and 2006*, Statistical Brief #235, Agency for Healthcare Research and Quality, Fig. 6 (Feb. 2006).

[78] Grady D, *et al.*, *Opioids for Chronic Pain*, 171 Arch. Intern. Med. 1426, 1426 (Sept. 2011).

[79] Daubresse M, *et al.*, *Ambulatory Diagnosis and Treatment of Nonmalignant Pain in the United States, 2000-2010*, Med. Care 2013; 51(10):870-78.

[80] Mafi J, *Worsening Trends in Management and Treatment of Back Pain*, JAMA Intern Med., 2013; 173(17):1573-1571.

[81] Cicero T, *Relationship between therapeutic use and abuse of opioid analgesics in rural, suburban, and urban locations in the United States*, Pharmacoepidemiology and Drug Safety, 2007; 16:827-840.

[82] Grady D, *et al.*, *Opioids for Chronic Pain*, 171 Arch. Intern. Med. 1426, 1426 (Sept. 2011).

[83] Margaret Warner, Ph.D., Li Hui Chen, M.S., Ph.D., & Diane M. Makuc, Dr. P.H., *Increase in Fatal Poisonings Involving Opioid Analgesics in the United States, 1999-2006*, U.S. Dep't of Health & Human Servs., 2 (Sept. 2009), *available at* www.cdc.gov/nchs/data/databriefs/db22.pdf.

[84] U.S. Dep't of Health & Human Servs., *2011 National Survey on Drug Use and Health* (Sept. 2012).

dose opioids from a single prescriber (in other words, who are not illicit users or "doctor-shoppers") account for 20% of all prescription drug overdoses.[85]  In 2009, there were more than twice as many deaths from prescription opioid overdoses (15,597) than from cocaine (4,350) and heroin (3,278) put together.

253.     In California, the numbers are equally dramatic.  There were just over 10 deaths from opioids for every 100,000 California residents in 2008, amounting to roughly 4,000 people.[86]  That is almost double the number of homicides in the state (2,143) in the same year.[87]  Santa Clara and Orange Counties have not been spared from this rise in opioid-related deaths.  Indeed, in Orange County prescription opioids are responsible for a death every other day.[88]

254.     Death statistics represent only the tip of the iceberg.  According to 2009 data, for every overdose death that year there were nine abuse treatment admissions, 30 emergency department visits for opioid abuse or misuse, 118 people with abuse or addiction problems, and 795 non-medical users.[89]  Recent analysis by the CDC has documented increased rates of opioid abuse and addiction among women; nationally, every three minutes a woman goes to the emergency department for prescription painkiller misuse or abuse.[90]  Every year since 2005, opioid use has caused 1,000 additional emergency room visits in California.[91]  Nationally, there were more than 488,000 emergency room admissions for opioids other than heroin in 2008 (up from almost 173,000 in 2004).[92]

---

[85] Paulozzi L, *et al.*, *CDC Grand Rounds:  Prescription Drug Overdoses, a U.S. Epidemic*, Morbidity and Mortality Weekly Report, Jan. 13, 2012; 61(1):10-13.

[86] *Opioid Analgesics in California:  Relieving Pain, Preventing Misuse, Finding Balance*, CMA, June 2013, at p. 4.

[87] Edmund G. Brown, Jr., Attorney General, *Homicide in California 2008*, California Department of Justice, 1 (March 2010), ag.ca.gov/cjsc/publications/homicide/hm08/preface.pdf.

[88] David Whiting, *Whiting:  FDA Finally Starts to Tackle Opioid Epidemic*, ORANGE COUNTY REGISTER, Oct. 26, 2013, *available at* www.ocregister.com/articles/fda-533176-drug-country.html.

[89] Wilson M. Compton, M.D., M.P.E., *Prescription Drug Abuse:  It's Not What the Doctor Ordered*, Nat'l Inst. On Drug Abuse, 11 (May 3, 2013), *available at* www.apa.org/about/gr/science/spin/2013/05/prescription-drug-abuse.pdf.

[90] CDC, Prescription overdose deaths are a growing problem among women, *available at* http://www.cdc.gov/vitalsigns/PrescriptionPainkillerOverdoses/.

[91] Substance Abuse and Mental Health Services Administration [SAMHSA], Treatment Episode Data Set [TEDS] 2000-2010, State Admissions to Substance Abuse Treatment Services, Table 1.9.a.

[92] *See* http://www.samhsa.gov/data/dawn/nations/Nation_2011_NMUP.xls.

- 82 -

COMPLAINT

255.    The deceptive marketing and overprescribing of opioids also have had a significant detrimental impact on children in California.  The overprescribing of opioids for chronic pain has given young children access to opioids, nearly all of which were prescribed for adults in their household.  One study documented over 9,000 children nationally exposed to prescription opioids, with a median age of two years old; the number of exposures in young children correlated to the number of prescriptions in the area.[93]  In addition, surveys of adolescents have shown that an alarming percentage of California teenagers have used prescription painkillers illicitly.  The most recent California State Survey, conducted by the Attorney General, found that 12% of 9th graders and 19% 11th graders had used an opioid without a prescription and finds that opioids are "the most popular class of drugs after marijuana among high school students."  Four percent and 7% of students, respectively, reported using opioids seven or more times.[94]  Other research has found that more than half of the teenagers obtained the drugs from their own home and report that the drugs are easy to obtain.[95]  A significant percentage of adolescents' suicide attempts are carried out with opioids.

256.    Even infants have not been immune to the impact of opioid abuse.  There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born and cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms.  The long-term developmental effects are still unknown, though research in other states has indicated that these children are likely to suffer from continued, serious neurologic and cognitive impacts, including hyperactivity, attention deficit disorder, lack of

---

[93] Bailey, JE, Campagna, E, Dart, RC, *The under recognized toll of prescription opioid abuse on young children*, Ann. Emerg. Med., 2009 Apr. 53(4), 419-24.

[94] *See* http://www.wested.org/online_pubs/hhdp/css_13th_highlights.pdf.

[95] *See* http://www.adp.ca.gov/director/pdf/PDM_Tips_for_Educators.pdf.

1    impulse control, and a higher risk of future addiction.[96]  When untreated, NAS can be life-

2    threatening.[97]  In 2009, more than 13,000 infants in the United States were born with NAS, or

3    about one every hour.[98]  According to data from Tennessee, which has most closely studied the

4    issue, 52% of mothers of NAS newborns used only drugs prescribed to them; another 20% used a

5    mix of their own prescriptions and illicitly obtained drugs.[99]

6        257.    Opioid addiction is the primary reason that individuals seek substance abuse

7    treatment at California facilities, and admissions into treatment facilities more than doubled from

8    2006-07 to 2010-11.[100]  Nationally, in 2012, nearly 8 billion prescriptions of the two drugs

9    commonly used to treat opioid addiction – buprenorphine and naltrexone  – were written and paid

10   for.  Studies estimate the total medical and prescription costs of opioid addiction and diversion to

11   public and private healthcare payers at $72.5 billion.[101]

12       258.    Defendants' creation through false and misleading advertising of a virtually

13   limitless opioid market has imposed significant burdens on the community at large.  Defendants'

14   success in extending the market for opioids to new patients and chronic conditions has created an

15   abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and

16   injury.  Defendants' scheme supplied both ends of the secondary market for opioids – providing

17   both the inventory of narcotics to sell and the addicts to buy them.  One researcher who has closely

18   studied the public health consequences of opioids has found, not surprisingly, that "substantial

19   increases in the nonmedical use of opioids is a predictable adverse effect of substantial increases in

20

21

22   [96] Roland Gray presentation to FDA; *See* citations in FDA decision on Docket Nos. FDA-2013-P-1288 and FDA-
     2013-P-1289.

23   [97] *See*, FDA decision on Docket Nos. FDA-2013-P-1288 and FDA-2013-P-1289.

24   [98] Patrick S, *et al*., *Neonatal Abstinence Syndrome and Associated Health Care Expenditures, United States 2000-
     2009*, JAMA Intern Med. May 9, 2012; 307(18).

25   [99] Jonel Aleccia, *'Just Flooding US': Tenn. Spike in drug-dependent newborns is warning to nation*, NBC NEWS,
     October 11, 2013.

26   [100] California Department of Alcohol and Drug Programs (ADP), Fact Sheet:  Prescription Opioid Users in
     Treatment, Oct. 2012, at p. 2.

27   [101] Katz N, *Prescription Opioid Abuse:  Challenges and Opportunities for Payers*, AmJManagCare, April 19
     2013, p. 2, *available at*  http://www.ajmc.com/publications/issue/2013/2013-1-vol19-n4/Prescription-Opioid-Abuse-
     Challenges-and-Opportunities-for-Payers/.

28

the extent of prescriptive use."[102]  It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.[103]

259.    In California counties like Orange County, the street value for a single tablet of OxyContin may range from $10 to $15.  These prices have given rise to a significant black market in prescription opioids, which have not only created and supplied additional addicts, but fueled other criminal activities.  In Orange County, for example, rings of "cappers and handlers" prey on homeless, indigent and seniors to buy their Medicare numbers or MediCal information to get prescription opioids.

260.    In addition, because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin.  According to one user interviewed by a local television station, "If you're doing 4, 5, 6, 7 Vicodin a day, you're already spending $30 or $40 on the pills.  You know a bag of heroin is $20."  Self-reported heroin use nearly doubled between 2007 and 2012, from 373,000 to 669,000 individuals and, in 2010, more than 3,000 people in the U.S. died from heroin overdoses, also nearly double the rate in 2006; nearly 80% of those who used heroin in the past year previously abused prescription opioids.[104]  Patients become addicted to opioids and then move on to heroin because these prescription drugs are roughly four times more expensive than heroin on the street."  In the words of one federal Drug Enforcement Agency official, "[w]ho would have ever thought in this country it would be cheaper to buy heroin than pills and obtain them more easily.  That is the reality we're facing."[105]

261.    The toll on patients who abuse or become addicted to opioids does not lend itself to quantification, or even easy descriptions.  Many of them will lose their jobs and some of them will

---

[102] Alexander, *et al.*, *Rethinking Opioid Prescribing to Protect Patient Safety and Public Health*, JAMA Intern Med., Nov. 14, 2012; 208(18):1865-66.

[103] Katz N, *Prescription Opioid Abuse:  Challenges and Opportunities for Payers*, AmJManagCare, April 19 2013, p. 5 ("The most common source of abused [opioids] is, directly or indirectly, by prescription."), *available at* http://www.ajmc.com/publications/issue/2013/2013-1-vol19-n4/Prescription-Opioid-Abuse-Challenges-and-Opportunities-for-Payers.

[104] NPR Staff, *With Rise of Painkiller Abuse, A Closer Look At Heroin*, NPR, Nov. 2, 2013, *available at* www.npr.org/2013/11/02/242594489/with-rise-of-painkiller-abuse-a-closer-look-at-heroin.

[105] Matt Pearce and Tina Susman, *Philip Seymour Hoffman dies amid major comeback of heroin in the U.S.*, LA TIMES, Feb. 3, 2014.

lose their homes and their families.  Some of them will get treatment and fewer will successfully complete it; many of those patients will relapse, returning to opioids or some other drug.  As noted above, some will become so desperate for drugs that they will switch to heroin – moving from taking prescription drugs, to buying and even injecting illegal drugs.  Of those who continue to take opioids, some will overdose – some fatally, some not.  Others will die prematurely from related causes – falls, traffic accidents, or assaults or from premature heart or neurological disease that hastens their death by 10 or 20 years.

## FIRST CAUSE OF ACTION

## FALSE ADVERTISING

### Violations of California Business and Professions Code Section 17500, *et seq.* Against all Defendants

262.    The People reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

263.    California Business and Professions Code Section 17500 ("Section 17500") makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning … real or personal property … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

264.    At all times relevant to this Complaint, Defendants, directly or indirectly, violated Section 17500 by making and disseminating untrue, false, and misleading statements about the use of opioids to treat chronic non-cancer pain, or by causing untrue, false, and misleading statements about opioids to be made or disseminated to the general public.  In addition, Defendants repeatedly failed to disclose material facts about the risks of opioids.

265.    Defendant Purdue made and/or disseminated untrue, false and misleading statements, including, but not limited to, the following:

- 86 -

COMPLAINT

- • Endorsing and sponsoring patient education materials that contained misleading statements;

- • Posting misleading statements and pamphlets, concerning the risk of addiction and the misleading concept of pseudoaddiction;

- • Distributing brochures to doctors that included misleading statements concerning the indicators of possible opioid abuse;

- • Endorsing, directly distributed and assisted in the distribution of publications that promoted the misleading concept of pseudoaddiction, even for high-risk patients;

- • Providing significant financial support to pro-opioid key opinion leader doctors who made untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- • Providing significant financial support to pro-opioid pain organizations that made untrue, false and misleading statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- • Assisting in the distribution of guidelines that contained misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- • Endorsing and assisting in the distribution of CME programs containing untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- • Assisting in the dissemination of scientific studies that misleading concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life;

- • Targeting veterans in disseminating patient education marketing materials that contained untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain; and

COMPLAINT

- Exclusively disseminating misleading statements in education materials to California hospital doctors and staff while purportedly educating them on new pain standards created by JCAHO.

266. Defendant Endo made and/or disseminated untrue, false and misleading statements, including, but not limited to, the following:

- Endorsing and sponsoring patient education materials and programs that contained misleading statements;

- Facilitating the posting of misleading statements and pamphlets concerning the risk of addiction, the misleading concept of pseudoaddiction and misleading claims that long-term treatment of opioids improves function;

- Providing significant financial support to pro-opioid key opinion leader doctors who made untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing significant financial support to pro-opioid pain organizations – including over $10 million to the most egregious organization – that made untrue, false and misleading statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

- Assisting in the dissemination of scientific studies that misleading concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life; and

- Targeting veterans in disseminating patient education marketing materials that contained untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain.

267. Defendant Janssen made and/or disseminated untrue, false and misleading statements, including, but not limited to, the following:

- Endorsing and sponsoring patient education materials and programs that contained misleading statements concerning the risk of addiction;

- Facilitating the posting of misleading statements and pamphlets, concerning the risk of addiction, the misleading concept of pseudoaddiction and misleading claims that long-term treatment of opioids improves function;

- Assisting in the distribution of guidelines that contained misleading statements concerning the use of opioids to treat chronic non-cancer pain in the elderly;

- Providing significant financial support to pro-opioid key opinion leader doctors who made untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing significant financial support to pro-opioid pain organizations that made untrue, false and misleading statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain; and

- Targeting veterans in disseminating patient education marketing materials that contained untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain.

268.     Defendant Cephalon made and/or disseminated untrue, false and misleading statements, including, but not limited to, the following:

- Endorsing and sponsoring patient education materials that contained misleading statements;

- Endorsing, directly distributing and assisting in the distribution of publications that promoted the misleading concept of pseudoaddiction, even for high-risk patients;

- Providing significant financial support to pro-opioid key opinion leader doctors who made untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain;

- Providing significant financial support to pro-opioid pain organizations that made untrue, false and misleading statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain;

COMPLAINT

- Endorsing and assisting in the distribution of CME programs containing untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain, and which did not concern cancer pain;

- Assisting in the dissemination of scientific studies that misleadingly concluded Cephalon's opioids (approved only for cancer pain) are safe and effective for the long-term treatment of chronic non-cancer pain; and

- Targeting its marketing to a wide range of doctors, including general practitioners, neurologists, sports medicine specialists and workers' compensation programs.

269.    Defendant Actavis made and/or disseminated untrue, false and misleading statements, including, but not limited to, the following:

- Endorsing and sponsoring patient education materials that contained misleading statements;

- Providing significant financial support to pro-opioid key opinion leader who made untrue, false and misleading statements concerning the use of opioids to treat chronic non-cancer pain; and

- Providing significant financial support to pro-opioid pain organizations that made untrue, false and misleading statements, including in patient education materials, concerning the use of opioids to treat chronic non-cancer pain.

270.    Such omissions, which are deceptive and misleading in their own right, render even Defendants' seemingly truthful statements about opioids untrue, false, and misleading.  All of this conduct, separately and collectively, was likely to deceive California payers who purchased, or covered the purchase of, opioids for chronic pain.

271.    Defendants engaged in the widespread promotion of opioids for the treatment of chronic pain directly through their own publications and employees, and indirectly through seemingly independent thought-leaders, advocacy groups, and professional societies, by making, funding, suggesting, editing, approving, and distributing untrue, false, and misleading statements

and representations to doctors and patients.  Defendants made untrue, false, and misleading statements and representations about the benefits, risks, and superiority of opioids.

272.    Defendants knew, or by the exercise of reasonable care should have known, at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were untrue, false, or misleading and therefore likely to deceive the public.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the benefits, risks, and superiority of opioids.

273.    Pursuant to California Business and Professions Code Section 17535, Plaintiff requests an order from this Court enjoining Defendants from any further violations of Section 17500, *et seq.*;

274.    Pursuant to California Business and Professions Code Section 17535, Plaintiff requests restitution of any money acquired by Defendants' violations of Section 17500, *et seq.*;

275.    Pursuant to California Business and Professions Code Section 17536, Plaintiff requests an order assessing a civil penalty of two thousand five hundred dollars ($2,500) against Defendants for each violation of Section 17500, *et seq.*

## SECOND CAUSE OF ACTION

## UNFAIR COMPETITION

### Violations of the Unfair Competition Law
### California Business and Professions Code Section 17200
### Against all Defendants

276.    The People reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

277.    Each Defendant is named in this Count for its activities that occurred within four years of the filing of this action.

278.    California Business and Professions Code Section 17200 ("Section 17200") prohibits any "unlawful, unfair or fraudulent business act or practices."  Defendants have engaged

COMPLAINT

in unlawful, unfair and fraudulent business practices in violation of Section 17200 as set forth above.

279.    Defendants' practices as described in this Complaint are deceptive business practices that violate Section 17200 because the practices are likely to deceive consumers in California.  Such practices include, but are not limited to, the following:

> Defendants engaged in the widespread promotion of opioids for the treatment of chronic pain directly through their own publications and employees, and indirectly, through seemingly independent thought-leaders, advocacy groups, and professional societies, by making, funding, suggesting, editing, approving, and distributing untrue, false, and misleading statements and representations to doctors and patients.  Defendants' untrue, false, and misleading statements and representations involve overstating the benefits of opioids to treat chronic pain and their superiority over alternate treatments and minimizing their serious risks, including the risks of addiction, overdose, and death.

280.    Defendants knew, or by the exercise of reasonable care should have known, at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were untrue, false, or misleading and therefore likely to deceive the public.  In addition, Defendants knew or should have known that their marketing and promotional efforts created an untrue, false, and misleading impression of the risks of opioids.

281.    Such omissions, which are deceptive and misleading in their own right, render even Defendants' seemingly truthful statements about opioids false, and misleading.  All of this conduct, separately and collectively, was likely to deceive California payers who purchased, or covered the purchase of, opioids for chronic pain.

282.    Defendants' practices as set forth in this Complaint are also unlawful business practices that violate Section 17200.  These unlawful practices include, but are not limited to:

> a.    Defendants falsely advertised opioids in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 110390.
>
> b.    Defendants manufactured, sold, delivered, held, or offered for sale opioids that had been falsely advertised in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 110395.

c.    Defendants advertised misbranded opioids in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 110398.

d.    Defendants received in commerce opioids that were falsely advertised or delivered or proffered for delivery opioids that were falsely advertised in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 110400.

e.    Defendants manufactured, sold, delivered, held, or offered for sale opioids that had been misbranded in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 111440.

f.    Defendants misbranded opioids in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 111445.

g.    Defendants received in commerce opioids that were misbranded in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 111450.

h.    Defendants proffered for delivery opioids that were misbranded in violation of the Sherman Food, Drug, and Cosmetic Laws, CAL. HEALTH & SAFETY CODE § 111450.

i.    Defendants failed to adopt a Comprehensive Compliance Program in violation of CAL. HEALTH & SAFETY CODE § 19402.

j.    Defendants represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of the Consumer Legal Remedies Act, CAL. CIV. CODE § 1770(a)(5).

k.    Defendants represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Consumer Legal Remedies Act, CAL. CIV. CODE § 1770(a)(7).

l.    Defendants disparaged the goods of another by false or misleading representation of fact in violation of Consumer Legal Remedies Act, CAL. CIV. CODE § 1770(a)(8).

m.    Defendants made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of Section 17500.

n.    Defendants formed and operated a conspiracy, committed wrongful acts pursuant to that conspiracy, and damaged the People in violation of the California Common Law of Civil Conspiracy.

o.    Defendant Purdue continued to deceptively market OxyContin after 2007, in violation of the terms of the 2007 Consent Judgment with the State of California.

- 93 -

COMPLAINT

283.    Defendants' practices as set forth in this Complaint are also unfair business practices that violate Section 17200 because they offend established public policy, and because the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

284.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of Unfair Competition Law described in this Complaint.

285.    As a direct and proximate result of the foregoing acts and practices, Defendants have obtained a competitive unfair advantage over similar businesses that have not engaged in such practices.

286.    Each time a Defendant marketed opioids in violation of Section 17200 constituted a separate violation.  CAL. BUS. & PROF. CODE § 17206(b).  Plaintiff therefore seeks civil penalties up to $2,500 per violation pursuant to Section 17206 for each violation of Section 17200.  Plaintiff also seeks civil penalties up to $2,500 per violation under Section 17206.1.

### THIRD CAUSE OF ACTION

### PUBLIC NUISANCE

**Violations of California Civil Code Section 3479, *et seq.***
**Against all Defendants**

287.    The People reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

288.    California Civil Code Section 3479 provides that "[a]nything that is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance."

289.    California Civil Code Section 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of

1    persons, although the extent of the annoyance or damage inflicted upon individuals may be

2    unequal."

3        290.    Pursuant to Section 731 of the California Civil Code, this action is brought by the

4    People to abate the public nuisance created by the Defendants.

5        291.    Defendants, individually and in concert with each other, have contributed to, and/or

6    assisted in creating and maintaining a condition that is harmful to the health of Californians or

7    interferes with the comfortable enjoyment of life in violation of California Civil Code Sections

8    3479 and 3480.

9        292.    The public nuisance created by Defendants' actions is substantial and unreasonable

10   – it has caused and continues to cause significant harm to the community and the harm inflicted

11   outweighs any offsetting benefit.  The staggering rates of opioid use resulting from Defendants'

12   marketing efforts have caused harm to the community, includes, but is not limited to:

    a.    Upwards of 30% of all adults have used them.  These high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.  In recent years, California deaths from opioids have exceeded deaths by homicide by nearly a factor of two.

    b.    Children too have been harmed by opioids.  They have been exposed to medications prescribed to family members or others, resulting in injury, addiction, and death.  Easy access to prescription opioids has made opioids a recreational drug of choice among California teenagers; opioid use among teenagers is only outpaced by marijuana use.  Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c.    Californians who have never taken opioids also have suffered the costs of Defendants' public nuisance.  Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

    d.    More broadly, opioid use and misuse have driven Californians' health care costs higher.

    e.    Employers have lost the value of productive and healthy employees who suffered from adverse consequences from opioid use.

- 95 -
COMPLAINT

  f.  Defendants' success in extending the market for opioids to new patients and chronic conditions has also created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury. Defendants' scheme created both ends of a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them.

  g.  This demand also has created additional illicit markets in other opiates, particularly heroin. The low cost of heroin has led some of those who initially become addicted to prescription opioids to migrate to cheaper heroin, fueling a new heroin epidemic in the process.

  h.  The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids have increased the demands on emergency services and law enforcement in the Counties.

  i.  All of this has caused significant harm to the community – in lives lost; addictions endured; the creation of an illicit drug market and all its concomitant crime and costs; unrealized economic productivity; and broken families and homes.

  j.  These harms have taxed the human, medical, public health, law enforcement, and financial resources of the People of California.

  k.  The Defendants' interference with the comfortable enjoyment of life of a substantial number of people is entirely unreasonable because there is little social utility to opioid use and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

293. Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

  a.  Defendants have engaged in massive production, promotion and distribution of opioids for use by the People of the State of California.

  b.  Defendants' actions created and expanded the market for opioids, promoting its wide use for pain management.

  c.  Defendants misrepresented the benefits of opioids for chronic pain and by fraudulently concealing, misrepresenting, and omitting the serious adverse effects of opioids, including the addictive nature of the drugs.

  d.  Defendants knew or should have known that their promotion would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

294. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the least, a substantial factor in

doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.  Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

295.    The health and safety of the citizens of the jurisdictions, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the jurisdictions' citizens and residents.

296.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

297.    Defendants' conduct has affected and continues to affect a considerable number of people within the Counties and is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

298.    Pursuant to California Code of Civil Procedure Section 731, Plaintiffs request an order from the Court on behalf of the People of the State of California providing for abatement of Defendants' ongoing violations of California Civil Code Sections 3479 and 3480, and enjoining Defendants from future violations of California Civil Code Sections 3479 and 3480.

299.    Each Defendant created or assisted in the creation of the epidemic of opioid use and injury and each Defendant is jointly and severally liable for abating it.

## V.    PRAYER FOR RELIEF

THE PEOPLE pray that the Court:

300.    Declare that Defendants have made, disseminated as part of a plan or scheme, or aided and abetted the dissemination of false and misleading statements in violation of the False Advertising Law.

301.    Enjoin Defendants from performing or proposing to perform any further false or misleading statements in violation of the False Advertising Law.

302.    Order Defendants to pay restitution of any money acquired by Defendants' false and misleading advertising, pursuant to Business and Professions Code sections 17500 and 17535 of the False Advertising Law.

303.    Order Defendants to pay civil penalties for each act of false and misleading advertising, pursuant to Business and Professions Code Sections 17500 and 17536 of the False Advertising Law.

304.    Declare that Defendants have engaged in unlawful, unfair, and deceptive business acts and practices in violation of the Unfair Competition Law.

305.    Enjoin Defendants from performing or proposing to perform any acts in violation of the Unfair Competition Law.

306.    Order Defendants to pay restitution of any money acquired by Defendants' unlawful, unfair, and deceptive business practices, pursuant to Business and Professions Code section 17203 of the Unfair Competition Law.

307.    Order Defendants to pay civil penalties for each act of unfair and unlawful competition, pursuant to Business and Professions Code section 17206 of the Unfair Competition Law.

308.    Order Defendants to pay civil penalties for each act of unfair and unlawful competition perpetrated against senior citizens or disabled persons, pursuant to Business and Professions Code section 17206.1 of the Unfair Competition Law.

309.    Order Defendants to pay treble the amount of all relief awarded by the Court, pursuant to California Civil Code section 3345.

310.    Declare that Defendants have created a public nuisance in violation of California Civil Code Sections 3479 and 3480.

311.    Enjoin Defendants from performing any further acts in violation of California Civil Code Sections 3479 and 3480.

312.    Order Defendants to abate the public nuisance that they created in violation of California Civil Code Sections 3479 and 3480.

- 98 -

COMPLAINT

313.  Order Defendants to pay the cost of the suit, including attorneys' fees.

314.  Provide such further and additional relief as the Court deems proper.

DATED: May 21, 2014.

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA

By_____
      Danny Chou

70 West Hedding Street
East Wing, 9th Floor
San Jose, CA  95110
Telephone: (408) 299-5900
Facsimile:  (408) 292-7240


ORANGE COUNTY DISTRICT ATTORNEY


By_____
      Tony Rackauckas

401 Civil Center Drive
Santa Ana, CA  92701-4575
Telephone:  (714) 834-3600
Facsimile:  (714) 648-3636

ROBINSON CALCAGNIE ROBINSON SHAPIRO
DAVIS, INC.
Mark P. Robinson, Jr. (SBN 54426)
mrobinson@rcrlaw.net
Kevin Calcagnie (SBN 108994)
kcalcagnie@rcrlaw.net
Daniel S. Robinson (SBN 244245)
drobinson@rcrlaw.net
Scot D. Wilson (SBN 223367)
swilson@rcrlaw.net
19 Corporate Plaza Drive
Newport Beach, CA  92660
Telephone:  (949) 720-1288
Facsimile:  (949) 720-1292

COMPLAINT

313. Order Defendants to pay the cost of the suit, including attorneys' fees.

314. Provide such further and additional relief as the Court deems proper.

DATED: May 21, 2014.

OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA

By_____
Danny Chou

70 West Hedding Street
East Wing, 9th Floor
San Jose, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

**ORANGE COUNTY DISTRICT ATTORNEY**

By _____
Tony Rackauckas

401 Civil Center Drive
Santa Ana, CA 92701-4575
Telephone: (714) 834-3600
Facsimile: (714) 648-3636

**ROBINSON CALCAGNIE ROBINSON SHAPIRO
DAVIS, INC.**
Mark P. Robinson, Jr. (SBN 54426)
mrobinson@rcrlaw.net
Kevin Calcagnie (SBN 108994)
kcalcagnie@rcrlaw.net
Daniel S. Robinson (SBN 244245)
drobinson@rcrlaw.net
Scot D. Wilson (SBN 223367)
swilson@rcrlaw.net
19 Corporate Plaza Drive
Newport Beach, CA 92660
Telephone: (949) 720-1288
Facsimile: (949) 720-1292

- 99 -

COMPLAINT

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Linda Singer
lsinger@cohenmilstein.com
*Pro hac* to be submitted
Eric Harrington (SBN 257178)
eharrington@cohenmilstein.com1100 New York Ave
NW, Suite 500 West
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman
steve@hbsslaw.com
*Pro hac* to be submitted
Thomas E. Loeser (SBN 202724)
tomloeser@hbsslaw.com
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Elaine Byszewski (SBN 222304)
elaine@hbsslaw.com
301 North Lake Avenue, Suite 203
Pasadena, CA  91101
Telephone:  (213) 330-7150

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Jennifer Fountain Connolly
jenniferc@hbsslaw.com
*Pro hac* to be submitted
1701 Pennsylvania Ave., NW, Suite 300
Washington, DC  20006
Telephone:  (202) 248-5403
Facsimile:  (202) 580-6559

COMPLAINT