# EXHIBIT 1

# THE STATE OF NEW HAMPSHIRE
## JUDICIAL BRANCH
### SUPERIOR COURT

Merrimack Superior Court
163 North Main St./PO Box 2880
Concord NH  03302-2880

Telephone: 1-855-212-1234
TTY/TDD Relay: (800) 735-2964
http://www.courts.state.nh.us

## NOTICE OF DECISION

**File Copy**

|  |  |
|---|---|
| Case Name: | **State of New Hampshire v Purdue Pharma, L.P., Purdue Pharma Inc., and The Purdue Frederick Company** |
| Case Number: | **217-2017-CV-00402** |

Enclosed please find a copy of the court's order of September 18, 2018 relative to:

ORDER

September 18, 2018

Catherine J. Ruffle
Clerk of Court

(485)

C: James T. Boffetti, ESQ; David Andrew Vicinanzo, ESQ; W. Daniel Deane, ESQ; Linda Singer, ESQ; David I. Ackerman, ESQ; Sheila L. Birnbaum, ESQ; Mark S. Cheffo, ESQ; Mara C. Cusker Gonzalez, ESQ

**THE STATE OF NEW HAMPSHIRE**
**SUPERIOR COURT**

**MERRIMACK, SS.**                                                   **No. 217-2017-CV-00402**

State of New Hampshire

v.

Purdue Pharma Inc., Purdue Pharma L.P.,
and The Purdue Frederick Company

## ORDER

The State of New Hampshire (the "State") alleges Purdue Pharma Inc., Purdue

Pharma L.P., and The Purdue Frederick Company (collectively "Purdue") are culpable

for the deleterious effects of widespread opioid abuse within the State and asserts the

following claims: Count I, deceptive and unfair acts and practices contrary to the

Consumer Protection Act; Count II, unfair competition contrary to the Consumer

Protection Act; Count III, false claims in violation of the Medicaid Fraud and False

Claims Act; Count IV, public nuisance; Count V unjust enrichment; and Count VI,

fraudulent or negligent misrepresentation.  Purdue moves to dismiss all claims and the

State objects.  The Court held a hearing on this matter on April 24, 2018.  For the

following reasons, Purdue's motion to dismiss is DENIED regarding Counts I, II, III, IV,

and VI, and GRANTED regarding Count V.

### I.     Background

Prescription opioids are derived from and possess properties similar to opium

and heroin and, by binding to receptors on the spinal cord and brain, they dampen the

perception of pain following absorption. (Compl. ¶ 2.) Opioids can also be addictive, produce euphoria, and, in high doses, slow a user's breathing and possibly cause death. (Id.) Withdrawal symptoms such as anxiety, nausea, headaches, tremors, delirium, and pain often result if sustained opioid use is discontinued or interrupted, and users generally grow tolerant of opioids' analgesic effects after extended continuous use, thereby necessitating progressively higher doses. (Id.) Purdue manufactures, advertises, and sells prescription opioid medications, including the brand-name drug OxyContin. (Id. ¶ 1.)

Due to the drugs' downsides, the State maintains that before the 1990s opioids were generally used only to treat short-term acute pain and during end-of-life care. (Id. ¶ 3.) At odds with this understanding, however, Purdue developed OxyContin in the mid-1990s to treat chronic long-term pain. (Id. ¶ 4.) To foster the drug's market for this then unconventional use, the State alleges Purdue instigated a deceptive multidimensional marketing effort to unlawfully alter the public's and the medical community's perception of the risks, benefits, and efficacy of opioids for treating chronic pain. (E.g., id. ¶¶ 4–41.)

The State claims Purdue's efforts resulted in a dramatic increase in ill-advised or unlawful opioid prescriptions and, correspondingly, in pervasive opioid abuse. (E.g., id. ¶¶ 168–86.) The State further claims that Purdue's manipulative conduct wrongfully caused the State's Medicaid program to pay for opioid prescriptions it would have otherwise not or sought to avoid, (e.g., id. ¶ 248), necessitated that the State implement costly social, law enforcement, and emergency services to support, police, and treat those impacted by opioid abuse, (e.g., id. ¶ 261), and generally hampered the wellbeing

and productivity of many individuals, families, and businesses within New Hampshire,

(e.g., id. ¶ 261).

## II.    Analysis

Purdue raises three categories of arguments in favor of dismissal.  Initially,

Purdue contends that federal law preempts all the State's claims.  Next, Purdue argues

that, to the extent causation is a necessary element of the State's legal theories, the

State has failed to sufficiently plead that Purdue proximately caused the harms for

which the State seeks to hold Purdue responsible.  Lastly, Purdue raises a series of

claim specific arguments.  The Court will address these matters in turn.

### i.    Preemption

Article VI, Clause 2 of the Federal Constitution provides that federal law "shall be

the supreme Law of the Land."  The Federal Constitution, therefore, "preempts state

laws that interfere with, or are contrary to, federal law."  In re Fosamax (Alendronate

Sodium) Prod. Liab. Litig., 852 F.3d 268, 282 (3d Cir. 2017) (quotations omitted).  There

are three general varieties of preemption:

> (1) express preemption, which occurs when the language of the federal
> statute reveals an express congressional intent to preempt state law; (2)
> field preemption, which occurs when the federal scheme of regulation is
> so pervasive that Congress must have intended to leave no room for a
> State to supplement it; and (3) conflict preemption, which occurs either
> when compliance with both the federal and state laws is a physical
> impossibility, or when the state law stands as an obstacle to the
> accomplishment and execution of the full purposes and objectives of
> Congress.

Cerveny v. Aventis, Inc., 855 F.3d 1091, 1097–98 (10th Cir. 2017) (quotation and

ellipsis omitted).

Purdue raises only a conflict preemption theory.  Specifically, Purdue argues that

the United States Food and Drug Administration's (the "FDA") various decisions

regarding OxyContin's risks and medically appropriate uses conflict with the State's claims that Purdue improperly promoted its opioid medications because "[a] plaintiff cannot maintain a claim that a prescription medicine's . . . marketing consistent with the [drug's FDA sanctioned] labeling is inadequate or misleading unless the manufacturer could have unilaterally changed the labeling — that is, changed the labeling without first obtaining FDA approval." (Defs.' Mem. of Law and Authorities in Support of Mot. to Dismiss [hereinafter "Mot. to Dismiss"] at 10.)

Purdue is correct that numerous courts have concluded that state law claims involving an FDA approved prescription drug are preempted when a plaintiff asserts that a defendant unlawfully included misleading information, or failed to include important warnings, in the drug's "label"[1] and where the defendant could not unilaterally alter the drug's label and/or there is "clear evidence" that the FDA would not approve a change to the label if sought by the defendant. See, e.g., PLIVA, Inc. v. Mensing, 564 U.S. 604, 623 (2011); Wyeth v. Levine, 555 U.S. 555, 571 (2009); Cerveny v. Aventis, Inc., 855 F.3d 1091, 1095 (10th Cir. 2017); In re Celexa & Lexapro Mktg. & Sales Practices Litig., 779 F.3d 34, 38 (1st Cir. 2015); Seufert v. Merck Sharp & Dohme Corp., 187 F. Supp. 3d 1163, 1165–66 (S.D. Cal. 2016); Dobbs v. Wyeth Pharm., 797 F. Supp. 2d 1264, 1266 (W.D. Okla. 2011).

---

[1] The federal Food, Drug, and Cosmetic Act requires that drug manufacturers obtain FDA approval prior to marketing or selling a drug in interstate commerce.  21 U.S.C. § 355(a).  The FDA only approves a drug if the manufacturer demonstrates "substantial evidence that the drug will have the effect it purports or is represented to have."  21 U.S.C. § 355(d)(5).  A drug manufacture must also submit for approval "the labeling proposed to be used for [a] drug."  21 U.S.C. § 355(b)(1)(F); 21 C.F.R. § 314.50(c)(2)(i).  The FDA will approve a proposed label if, "based on a fair evaluation of all material facts," it is not "false or misleading in any particular."  21 U.S.C. § 355(d)(7); 21 C.F.R. § 314.125(b)(6).  Once approved, a manufacturer may distribute a drug without violating federal law as long as it uses the approved labeling.  See 21 U.S.C. §§ 331(c), 333(a), and 352(a), (c).  Pursuant to 21 U.S.C. § 321(m), a drug's "labeling" means "all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."

Notably, these cases involved purported misrepresentations within, or material omissions from, a drug's label; meaning to ameliorate the wrongdoing alleged under state law, the drug manufacturer defendants would have been required to alter their product's FDA approved label.  In this instance, however, the State maintains that it "does not seek a change to the FDA-approved labeling of Purdue's drugs," but rather that the State "contend[s] that Purdue aggressively marketed its opioids for long-term use to treat chronic pain through misrepresentations that were intended to lead doctors to prescribe the drugs even in circumstances where they were inappropriate, *i.e.*, to disregard cautions that the FDA itself has recognized as appropriate and necessary." (Pl.'s Resp. in Opp'n to Purdue Defs.' Mot. to Dismiss Pl.'s Compl. [hereinafter "Obj."] at 8.)  In other words, the State alleges "Purdue marketed opioids in a manner that *is contrary to, inconsistent with, or outside of* their FDA-approved labels." (Id. at 10 (emphasis in original).)

Notwithstanding the State's characterization of its claims, Purdue insists it is nevertheless entitled to dismissal because "each of the . . . alleged misrepresentations the State has identified involves statements or conduct that *are consistent* with the FDA-approved labeling for its medications or with other regulatory decisions of the FDA." (Defs.' Reply in Supp. of Mot. to Dismiss [hereinafter "Reply"] at 7 (emphasis added).) Thus, at bottom, Purdue grounds its preemption argument on the notion that the Court should decide that Purdue's marketing of its opioid medications was consistent, as opposed to inconsistent, with FDA decisions relating to the drugs' labeling.  Even assuming it is proper to take up such a necessarily fact intensive inquiry in a motion to dismiss, it is reasonable to construe Purdue's purported marketing efforts as

*inconsistent* with the FDA's approvals when drawing all inferences in the State's favor. See Tessier v. Rockefeller, 162 N.H. 324, 330 (2011) (setting forth the Court's standard for reviewing motions to dismiss).

For example, beginning sometime in the mid-2000s, Purdue updated OxyContin to include a new coating designed to make the drug difficult to crush and added certain elements intended to make the drug unsuitable for injection.  (Compl. ¶ 110.)  These changes were purportedly meant to deter OxyContin abuse via snorting and injection. The State alleges, however, that evidence shows, and "Purdue knew or should have known," that the "reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused," (id. ¶ 114 (quotation omitted)), because the abuse-deterrent "properties can be defeated" and the drug "can be abused orally notwithstanding their abuse-deterrent properties," (id. ¶ 113). Therefore, the State claims Purdue deceptively marketed OxyContin, considering its "sales representatives regularly use the so-called abuse-deterrent properties . . . as a primary selling point" to differentiate the drug from its competitors, (id. ¶ 112), and, more specifically, that Purdue's sale representatives:

> (1) claim that Purdue's [abuse-deterrent] formulation *prevents* tampering and that its [abuse-deterrent] products *cannot be* crushed or snorted; (2) claim that Purdue's [abuse-deterrent] opioids *prevent or reduce* opioid abuse, diversion, and addiction; (3) assert or suggest that Purdue's [abuse-deterrent] opioids are "safer" than other opioids; and (4) fail to disclosed that Purdue's [abuse-deterrent] opioids do not impact oral abuse or misuse and that its [abuse-deterrent] properties are and can be easily overcome.

(Id. (emphasis in original as well as added).)

Purdue counters that these allegations are "consistent with FDA-approved labeling," (Mot. to Dismiss at 17), because, in 2013, the FDA approved a change to

6

OxyContin's label, stating "OXYCONTIN is formulated with inactive ingredients intended to make the tablet more difficult to manipulate for misuse and abuse."  (Mot. to Dismiss, Ex. 6 § 9.2.)

Drawing all inferences in the State's favor, statements to the effect that OxyContin's abuse-deterrent properties "*prevent* tampering," result in a drug that "*cannot* be crushed or snorted," and in practice "*prevent or reduce* opioid abuse" may reasonably be read as attributing more significance to the abuse-deterrent properties than the FDA intended when it seemingly found the abuse-deterrent properties merely make the drug somewhat "more difficult to manipulate."  In this way, Purdue's alleged conduct could be found materially inconsistent with FDA approved labeling.

The parties' dispute over the proper inferences to draw from the State's claims regarding OxyContin's abuse-deterrent properties relates to only one of many allegations of wrongdoing raised in the complaint.  It is inappropriate at this stage to comprehensively parse each of the remaining allegations in writing.  However, having thoroughly reviewed the complaint and its many allegations, and considered the parties' voluminous filings relevant to Purdue's motion and their accompanying exhibits, the Court concludes Purdue has not shown that the State's allegations wholly reflect conduct consistent with FDA approved labeling.  Accordingly, because Purdue's conflict preemption theory presupposes its alleged marketing efforts were consistent with its drugs' labeling, Purdue's motion is DENIED to the extent it raises preemption.

  *ii.*  <u>Causation</u>

Next, Purdue maintains that the State has not properly pled causation for three general reasons.  First, Purdue argues that "the State fails to adequately allege a causal

connection between any misrepresentation by Purdue and any reimbursement decision by, or other alleged harm to, the State." (Mot. to Dismiss at 19.)  Second, Purdue contends that, even if the State has articulated a "causal connection," independent acts and actors necessarily intervened such as to "break any connection between any alleged misrepresentation by Purdue and the litany of alleged harms." (Id. at 3.)  Lastly, Purdue asserts that "[e]ven if the State had alleged a causal chain linking any alleged wrongdoing with any alleged harm . . . its claims would still fail because any such chain would be far too attenuated as a matter of law." (Id. at 3–4.)

### a. *Alleged Causal Connection*

As a preliminary matter:

> It is axiomatic that in order to prove actionable negligence,[2] a plaintiff must establish that the defendant['s wrongdoing] proximately caused the claimed injury.  The proximate cause element involves both cause-in-fact and legal cause.  Cause-in-fact requires the plaintiff to establish that the injury would not have occurred without the negligent conduct.  The plaintiff must produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed.

Estate of Joshua T., 150 N.H. 405, 407–08 (2003) (citations and quotations omitted).

Contrary to Purdue's position, the State has in fact articulated a causal connection linking Purdue's purported misconduct to the State's alleged harms.  For example, the State asserts that, beginning in approximately 2011, an "increase in prescribing opioids correspond[ed] with [a] Purdue[] marketing push." (Compl. ¶ 171.) Allegedly, "the largest component of this [marketing push] was sale representative visits to individual prescribers," (id.), because Purdue "knows that in-person marketing works,"

---

[2] The parties dispute to what extent causation is an element of all or some of the State's claims. However, given the Court's conclusion that the State has sufficiently pled causation, it need not reach these issues.

(id. ¶ 173.)  Indeed, an Amherst, New Hampshire, physician opines in the complaint that Purdue's in-person sales representatives impact prescribing behavior because, "[i]f it didn't, they wouldn't do it."  (Id. ¶ 176.)  Furthermore, as detailed in the previous section, the State alleges Purdue's sale representatives misleadingly marketed OxyContin.  (See also, e.g., id. ¶ 30 ("To spread its false and misleading messages supporting chronic opioid therapy, Purdue marketed its opioids directly to health care providers and patients . . . in New Hampshire.  It did so principally through its sales force . . . who made in-person sales calls to prescribers in which they misleadingly portrayed chronic opioid therapy.").)

> The State also alleges that
>
> Purdue buttressed its direct promotion of its opioids with an array of marketing approaches that bolstered the same deceptive messages by filtering them through seemingly independent and objective sources. Purdue recruited and paid physician speakers to present talks on opioids to their peers at lunch and dinner events.  It funded biased research and sponsored [continuing medical education ("CME")] that misleadingly portrayed the risks and benefits of chronic opioid therapy.  It collaborated with professional associations and pain advocacy organizations, such as the American Pain Foundation ("APF"), to develop and disseminate pro-opioid educational materials and guidelines for prescribing opioids.  And it created "unbranded" websites and materials, copyrighted by Purdue but implied to be the work of separate organizations, that echoed Purdue's branded marketing.  Among these tactics, all of which organized in the late 1990s and early 2000s, three stand out for their lasting influence on opioid prescribing nationwide and in New Hampshire: Purdue's capture, for its own ends, of physicians' increased focus on pain treatment; its efforts to seed the scientific literature on chronic opioid therapy; and its corrupting influence on authoritative treatment guidelines issued by professional associations.[3]

(Id. ¶¶ 40–41.)

---

[3] Purdue argues that the State has failed, as a matter of law, to allege that Purdue "controlled" these third-parties.  (Mot. to Dismiss at 25–26.)  Taking all reasonable inferences in the State's favor, the Court disagrees.

Considering the State claims that "[s]cientific evidence demonstrates a close link between opioid prescriptions and opioid abuse,"[4] and because the allegations outlined above indicate Purdue successfully increased opioid prescriptions using misleading methods, the complaint asserts a prima facie causal connection between Purdue's purported wrongdoing and increased opioid prescriptions and abuse.[5]

Nevertheless, Purdue contends that the State's supposedly "general allegations do not satisfy the State's burden to plead the essential element of a causal connection between an actual alleged fraudulent or improper statement or action by Purdue and an actual alleged injury to the State" and that the State cannot "avoid its pleading obligation by arguing that it will be able to rely on statistical evidence and extrapolation to prove causation and injury at trial."  (Reply at 10 (quotation omitted).)  In other words, Purdue seemingly maintains that to satisfy its burden the State must principally rely upon individualized evidence, i.e. evidence that specific doctors were influenced by specific Purdue misconduct and that any alleged injury to the State must be tied directly to these specific incidents.

---

[4] For example, the State cites a 2007 study that found "a very strong correlation between therapeutic exposure to opioid analgesics,'as measured by prescriptions filled, and their abuse, with particularly compelling data for . . . OxyContin." (Id. (quotation omitted).)  The State also relies upon a 2016 letter issued by the then United States Surgeon General opining "that the push to aggressively treat pain, and the devastating results that followed, had coincided with heavy marketing to doctors many of whom were even taught — incorrectly — that opioids are not addictive when prescribed for legitimate pain." (Id. ¶ 182 (quotations, ellipsis, and brackets omitted).)

[5] Additionally, the State provides numerous examples of expenditures, i.e. harms, it has borne in combating opioid abuse. (E.g., id. ¶ 191 ("The number of children removed from homes with substance abuse problems went from 85 in 2010 to 329 in 2015 — a 387% increase."); ¶ 192 ("From 2007–2013 . . . state Medicaid spending on drugs to counter overdose or addiction increased six-fold.").  As another example, the State maintains "damages from false claims submitted, or caused to be submitted, by [Purdue]," and indicates that "[f]rom 2011-2015, the State's Medicaid program spent $3.5 million to pay for some 7, 886 prescriptions and suffered additional damages for the costs of providing and using opioids long-term to treat chronic pain." (Id. ¶ 254.)

Purdue, however, cites no authority mandating such a standard.[6]  Conversely, the First Circuit found "aggregate" evidence of the sort the State apparently intends to rely sufficient to prove wrongdoing on the part of a different drug manufacturer alleged to have undertaken comparable deceptive marketing efforts.  See In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21, 46 (1st Cir. 2013); State v. Exxon Mobil Corp., 168 N.H. 211, 255–56 (2015) ("[T]he trial court's determination that the use of statistical evidence and extrapolation to prove injury-in-fact was proper was not an unsustainable exercise of discretion."  (Citing Neurontin, 712 F.3d at 42 ("[C]ourts have long permitted parties to use statistical data to establish causal relationships.")))  Accordingly, the Court is not persuaded that the State has insufficiently articulated a causal connection nor that it has referenced inadequate factual support for its assertions at this stage.

### b. *Intervening Acts or Actors*

Purdue next argues that "any connection between Purdue's alleged misconduct and the State's alleged injuries depends on multiple independent, intervening events and actors."  (Mot. to Dismiss at 21.)  Specifically, Purdue maintains that, in New Hampshire, individuals may only legally obtain opioids via a prescription following an in-person doctor's visit and, therefore, "the role of the prescribing physician as a 'learned intermediary' breaks the causal chain that the State attempts to use to connect Purdue to the State's payments for prescriptions."  (Id.)

"The 'learned intermediary' doctrine creates an exception to the general rule that one who markets goods must warn foreseeable ultimate users about the inherent risks

---

[6] For example, Jane Doe No. 1 v. Backpage.com, LLC, 817 F.3d 12, 25 (1st Cir. 2016), is easily distinguishable, considering the court in that case found the plaintiffs' allegations insufficient not because they were based upon aggregate or statistical analysis, but rather because they were wholly lacking in *any* factual support and were, therefore, "mere conjecture."

of his products" and, in the prescription drug context, "provides that a drug manufacturer's duty is limited to the obligation to advise the prescribing physician of any potential dangers that may result from the use of the drug." Bodie v. Purdue Pharma Co., 236 F. App'x 511, 519 (11th Cir. 2007) (emphasis omitted).  In other words, "application of the 'learned intermediary doctrine' may have the effect of destroying the causal link between the allegedly defective product, and the plaintiff's claimed injury." Id.

Under the doctrine, however, a drug manufacturer's duty is only fulfilled "once it *adequately* warns the physician." Garside v. Osco Drug, Inc., 976 F.2d 77, 80 (1st Cir. 1992) (emphasis added).  The State argues that "the adequacy of any warning provided by Purdue is an issue of fact that cannot be resolved on a motion to dismiss." (Obj. at 19.)  Given the fact intensive nature of such an inquiry, the Court agrees.  See McNeil v. Wyeth, 462 F.3d 364, 368 (5th Cir. 2006) (reasoning that where, as here, the plaintiff's claim is not whether a prescription drug warning "is inadequate because [certain dangers were] not mentioned" but, "[r]ather, [that the warning was] misleading as to the risk level [of those dangers]," the "adequacy questions [should] go to the jury"); see generally Carignan v. New Hampshire Int'l Speedway, Inc., 151 N.H. 409, 414 (2004) ("Proximate cause is generally for the trier of fact to resolve.").

Moreover, "[o]ne escape hatch from the application of the learned intermediary rule is if the Plaintiff can demonstrate it was reasonably foreseeable that physicians, despite awareness of the dangers of [the drug], would be consciously or subconsciously *induced* to prescribe the drug when it was not warranted." Doe v. Solvay Pharm., Inc., 350 F. Supp. 2d 257, 272 (D. Me. 2004) (quotation omitted) (emphasis added).  Indeed,

the court attributed as the first to formulate the doctrine[7] only did so after making the following observation:

> it is difficult to see on what basis this defendant can be liable to plaintiff.  It made no representation to plaintiff, nor did it hold out its product to plaintiff as having any properties whatsover.   To physicians it did make representations. *And should any of these be false it might be claimed with propriety that they were made for the benefit of the ultimate consumers.* But there is no such claim.

Marcus v. Specific Pharm., 77 N.Y.S.2d 508, 509 (N.Y. Spe. Term 1948) (emphasis added).

The State alleges here that Purdue's purported deceptive marketing efforts were "intended to lead doctors to prescribe [opioids] even in circumstances where they were inappropriate, *i.e.*, to disregard cautions that the FDA itself has recognized as appropriate and necessary." (Obj. at 8.)  Thus, because the State maintains that Purdue sought to induce physicians to ignore or rely less heavily on the well understood risks of opioid use when making prescribing decisions, the learned intermediary doctrine may offer no safe harbor notwithstanding Purdue's contention that "it is beyond dispute that FDA-approved labeling for Purdue's opioid products discloses [the drugs'] risks prominently." (Mot. to Dismiss at 22.)

This conclusion finds support in jurisdictions that have considered the issue.  As referenced in the previous section, several years ago the First Circuit considered comparable claims of wrongdoing on the part of a different drug manufacturer.  In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 21 (1st Cir. 2013).[8]  Like Purdue, that

---

[7] See Larkin v. Pfizer, Inc., 153 S.W.3d 758, 762 (Ky. 2004).

[8] The court in that case summarized the defendant's purported misconduct as a "fraudulent marketing" scheme, which "included, but was not limited to, three strategies, each of which included subcomponents: (1) direct marketing . . . to doctors, which misrepresented [the relevant prescription drug's] effectiveness for off-label indications; (2) sponsoring misleading informational supplements and continuing medical education ("CME") programs; and (3) suppressing negative information about [the drug] while publishing

drug manufacturer "agrue[d] that because doctors exercise independent medical judgment in making decisions about prescriptions, the actions of these doctors are independent intervening causes." Id. at 39.  The Neurontin court rejected this argument, concluding that the defendant's "scheme relied on the expectation that physicians would base their prescribing decisions in part on [its] fraudulent marketing" and "[t]he fact that some physicians may have considered factors other than [the defendant's] detailing materials in making their prescribing decisions does not add such attenuation to the causal chain as to eliminate proximate cause." Id.

More recently, the District of California also addressed claims akin to the State's. U.S. ex rel. Brown v. Celgene Corp., No. CV 10-3165-GHK SSX, 2014 WL 3605896 (C.D. Cal. July 10, 2014).  In that case, the drug manufacturer defendant similarly argued that the court should "presume that physicians based their prescription decisions on their own independent medical judgment and the needs of their patients." Id. at *8. That court likewise rejected this argument, reasoning that "[t]o suggest that [the defendant's] alleged expansive, multi-faceted efforts to create an off-label market for [certain relevant drugs] did not cause physicians to prescribe [the drugs] for [those] uses strains credulity.  It is implausible that a fraudulent scheme on the scope of that alleged . . . would be entirely feckless." Id.; see also U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc., No. 1:09-CV-1086 AJT, 2011 WL 3911095, at *5 (E.D. Va. Sept. 6, 2011) (remarking that causation will be sufficiently pled, notwithstanding the learned intermediary doctrine, where there are "allegations that the judgment of a physician was altered or affected by the defendant's fraudulent activities"); see generally Stevens v.

---

articles in medical journals that reported positive information about [the drug's] off-label effectiveness." Id. at 28.

Parke, Davis & Co., 507 P.2d 653, 661 (Cal.1973) ("[A]n adequate warning to the profession may be eroded or even nullified by overpromotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given.").

        c.  *Attenuation*

Lastly on the topic of causation, Purdue cites cases from other jurisdictions it contends demonstrate that claims founded upon overly attenuated and/or indirect chains of causation may be dismissed as a matter of law and that the rationales of these cases demand such a result in this instance.  (See Motion to Dismiss at 23–26; Reply at 11–13.)  The Court finds Purdue's argument unavailing.

Purdue principally relies on Bank of America Corporation v. City of Miami, Florida, 137 S. Ct. 1296, 1305 (2017), in which the City of Miami accused certain banks of unlawfully "lending to minority borrowers on worse terms than equally creditworthy nonminority borrowers and inducing defaults by failing to extend refinancing and loan modifications to minority borrowers on fair terms."  Miami asserted that this "misconduct led to a disproportionate number of foreclosures and vacancies in specific Miami neighborhoods," causing Miami to "lose property-tax revenue when the value of the properties in those neighborhoods fell and [forced it] to spend more on municipal services in the affected areas."  Id.  In that case, the United States Supreme Court concluded that the Eleventh Circuit erred in solely considering the foreseeability of the City's alleged injury when determining whether the City had adequately pled causation. Id. at 1306.  Citing Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 268 (1992), the United States Supreme Court reasoned that the Eleventh Circuit should

have also examined whether "some direct relation between the injury asserted and the injurious conduct alleged" existed and remanded the issue for further deliberation.  City of Miami at 137 S. Ct. at 1306.

In Holmes, the plaintiff brought a statutory action against a defendant it claimed participated in a scheme to manipulate prices of certain stocks, which the plaintiff alleged ultimately necessitated its payment of claims to the clients of various broker-dealers who became insolvent as a result of the defendant's fraud.  503 U.S. at 262–63. The United States Supreme Court concluded that the relevant statute only conferred the plaintiff standing under the circumstances if the defendant's fraud was the "proximate cause" of the plaintiff's injury.  Id. at 268.  The United State Supreme Court employed "proximate cause" in this context as a stand-in for the common law "judicial tools used to limit a person's responsibility for the consequences of that person's own acts," and noted that, "[a]t bottom, the notion of proximate cause reflects ideas of what justice demands, or of what is administratively possible and convenient."  Id. (quotation omitted).  Further gleaning that "among the many shapes this concept [has taken] at common law, [is] a demand for some direct relation between the injury asserted and the injurious conduct alleged," the United States Supreme Court summarized that "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." Id. at 268–69 (citation omitted); see also generally Perry v. Am. Tobacco Co., 324 F.3d 845, 850 (6th Cir. 2003) ("Because the Holmes Court emphasized that the RICO statute incorporates general common law principles of proximate causation, remoteness principles are not limited to cases involving the RICO statute."  (Citation omitted)).

Applying this standard, the United States Supreme Court held that, even assuming the plaintiff in that case could "stand in the shoes" of the clients injured as a result of the broker-dealers' insolvency, such a "link . . . between the stock manipulation alleged and the customers' harm" was nonetheless "too remote" because it was "purely contingent on the harm suffered by the broker-dealers."  Id. at 271.  That is, the alleged wrongdoers "injured the[] customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims."  Id.

Relying upon this line of authority, Purdue now maintains that, "[g]iven the series of intervening acts and actors involved in the State's allegations, including the independent decisions and actions of prescribing physicians, patients, and even criminals, there is no 'direct relation' between Purdue's alleged marketing statements and the injuries alleged by the State" and, therefore, "[t]he State fails to plead facts showing how Purdue — as opposed to the various superseding actors at issue here — proximately caused the injuries it alleged."  (Mot. to Dismiss at 25.)

To properly consider this challenge, it is necessary to further construe the United States Supreme Court's basis in Holmes for holding that proximate cause ordinarily demands a direct relation between the alleged wrongdoing and the plaintiff's injury.  To that end, the United State Supreme Court articulated three policy rationales justifying its conclusion:

> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries.  And, finally, the need to grapple with these problems is simply unjustified by the general interest in

deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

Holmes, 503 U.S. at 269–70.

It is equally necessary to differentiate the State's two general alleged chains of causation, *i.e.* that Purdue's purportedly deceptive marketing efforts resulted in the State: (1) paying for or reimbursing the costs of medically unnecessary and/or improper opioid prescriptions; and (2) bearing the costs of responding to societal strife wrought by increased opioid abuse.

Regarding the first chain, Purdue emphasizes that the "Complaint does not allege any facts that would support a conclusion that the State or any of its agents was ever exposed to or relied on any alleged misrepresentation when reimbursing opioid prescriptions." (Reply at 12.) Indeed, "[c]ourts considering [third-party payor]'s off-label . . . claims have reached differing conclusions as to whether the link between the alleged misrepresentations made by pharmaceutical company defendants and the ultimate injury suffered by [the third-party payor] plaintiffs is sufficiently direct to meet [the] proximate cause requirement," and "[o]ne key distinction between the facts in these . . . cases is whether the defendant pharmaceutical companies made the alleged misrepresentations directly to the [third-party payor] or indirectly to physicians who then prescribed the drugs that the [third-party payor] covered." Sidney Hillman Health Ctr. of Rochester v. Abbott Labs. & Abbvie Inc., 192 F. Supp. 3d 963, 968–69 (N.D. Ill. 2016).

The First Circuit's reasoning on this issue in In re Neurontin Marketing & Sales Practices Litigation., 712 F.3d 21 (1st Cir. 2013) is persuasive. Comparable to the State's allegations here, in that case a healthcare third-party payor ("TPP") alleged a pharmaceutical company's deceptive marketing efforts had resulted in the TPP wrongly

reimbursing prescriptions.  Also like this case, the pharmaceutical company argued "that its supposed misrepresentations went [only] to prescribing doctors, and so the causal link to [the TPP] must have been broken."  Id. at 37.

The Neurontin court rejected this argument, finding that proximate cause's direct relation mandate does not impose a "direct reliance requirement."  Id.; accord Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., 873 F.3d 574, 576 (7th Cir. 2017). This conclusion was influenced by Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 657–58 (2008), which expressly held that "first-party reliance [is not] necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles articulated in Holmes."

The Neurontin court next went on to apply the three Holmes factors laid-out above, ultimately concluding that they did not demand dismissal because "the causal chain [was] anything but attenuated," considering the defendant's "fraudulent marketing plan, meant to increase its revenues and profits, only became successful once [the defendant] received payments for the additional . . . prescriptions it induced" and that "[t]hose payments came from [the plaintiff] and other TPPs."  Neurontin, 712 F.3d at 38– 39.  Thus, the court reasoned, "the adoption of [the defendant's] view would undercut the core proximate causation principle of allowing compensation for those who are directly injured, whose injury was plainly foreseeable and was in fact foreseen, and who were the intended victims of a defendant's wrongful conduct."  Id. at 38.

This reasoning resonates here.  Because at least some doctors presumably exercised independent medical judgment in choosing to prescribe Purdue's opioids and

some patients prescribed these medications for long-term chronic pain likely benefited, the State will seemingly shoulder a heavy burden at trial.  The Court is aware that other jurisdictions consider these impediments as proximate cause maladies demanding dismissal.  See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., 873 F.3d 574, 578 (7th Cir. 2017) (collecting cases and noting that the First Circuit's stance is unique among the Federal Courts of Appeals to consider the issue).  The Court nevertheless adopts the First Circuit's view that, "[r]ather than showing a lack of proximate causation, this [issue] presents a question of proof regarding the total number of prescriptions that were attributable to [the defendant's] actions" and that, ultimately, "[t]his is a damages question."  Neurontin, 712 F.3d at 39.

The Court next turns to the State's second general chain of causation, which alleges Purdue is culpable, *inter alia*, for "high rates of opioid abuse, injury, overdose, and death, and their impacts on New Hampshire families and communities; lost employee productivity; the creation and maintenance of a secondary, criminal market for opioids; greater demand for emergency services, law enforcement, addiction treatment, and social services; and increased health care costs for individuals, families, and the State."  (Compl. ¶ 261 (list-headings omitted).)  Purdue contends that "[t]hese are serious challenges facing the State, fueled by any number of third-party actions, both innocent and criminal, but they are too remote from Purdue's alleged marketing activity to satisfy the proximate cause requirement."  (Mot. to Dismiss at 24.)

Some of these alleged injuries are less remote from Purdue's purportedly deceptive marketing efforts than others, considering a significant percentage of the State's claims are not necessarily derivative of harm suffered by third parties.  For

20

instance, where municipalities accuse gun manufacturers of fostering illicit firearm markets, courts often reason that, "[e]ven if no individual is harmed, [the municipalities] sustain many of the damages they allege," including "costs for law enforcement, increased security, prison expenses and youth intervention services," and that the municipalities' claims, therefore, do not fail for lack of a direct relation to the gun manufacturers' alleged wrongdoing.  City of Boston v. Smith & Wesson Corp., No. 199902590, 2000 WL 1473568, at *6 (Mass. Super. July 13, 2000); accord, e.g., Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1148 (Ohio 2002) ("The complaint in this case alleged that as a *direct* result of the misconduct of appellees, appellant has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services." (Emphasis added and quotation omitted)).[9]  This reasoning is applicable here because, for example, the State's law enforcement efforts to combat the illegal distribution and possession of opioids are not purely contingent on harm from opioid abuse to any third party.

Moreover, although some of the State's supposed damages — for example the costs of administering emergency medical services to overdose victims — are contingent on the injuries of third persons, the Court is simply not persuaded that application of the Holmes factors to this case demands dismissal.[10]

---

[9] The court in City of Boston illustrated this point with the following example:
> Plaintiffs allege that Defendants' conduct places firearms in the hands of juveniles causing Plaintiffs to incur increased costs to provide more security at Boston public schools.  Thus, wholly apart from any harm to the juvenile (who may even believe himself to be benefited by acquisition of a firearm), and regardless whether any firearm is actually discharged at a school, to ensure school safety Plaintiffs sustain injury to respond to Defendants' conduct.

[10] Separately, the Court is not bound by the United States Supreme Court's judgment on these issues, nor has Purdue cited New Hampshire authority explicitly echoing Holmes's reasoning.  Indeed, Purdue's

Regarding the first factor — which concerns the difficulty of ascertaining what percentage of the plaintiff's damages are attributable to the defendant — given the preliminary stage of this litigation, the Court does not yet fully grasp the State's trial strategy and the precise manner it hopes to prove its allegations.  It is, therefore, premature to foreclose the State's endeavor purely on the assumption that the scope of its allegations and the harms for which it seeks to hold Purdue accountable are so expansive that its efforts may hypothetically prove too complex for the Court to oversee.

The second factor considers the difficulty of forestalling multiple recoveries.  In light of the multitudes seemingly implicated within the State's allegations, there is likely some risk of multiple recoveries.  Nevertheless, for many of these individuals — such as those who abused opioids via illegal means or with sufficient understanding of the drug's harmful effects — it is possible their conduct and/or knowledge precludes their right to seek redress.  As well, many of the State's alleged injuries, although contingent on the harm to third parties, are easily distinguishable from such wrongs.  For example, the State claims that "[f]rom 2007–2013 [its] Medicaid spending on drugs to counter overdose or addiction increased six-fold."  (Compl. ¶ 192.)  Should the State prove this increase is sufficiently attributable to Purdue's alleged wrongdoing and should the State recover damages in the amount of this increase, there would be little apparent risk that

---

briefing on this issue (and the State's for that matter) does not even directly address the Holmes factors. Considering, moreover, that the New Hampshire Supreme Court maintains that legal cause simply "requires the plaintiff to establish that the negligent conduct was a *substantial factor* in bringing about the harm" and that this requirement does not demand that "[t]he negligent conduct . . . be the sole cause of the injury," but rather merely a "contribut[ion]," the Court is not inclined to adopt Holmes at this time. Carignan v. New Hampshire Int'l Speedway, Inc., 151 N.H. 409, 414 (2004) (emphasis added); Young v. Clogston, 127 N.H. 340, 342 (1985) ("The jury determines the facts, *i.e.* . . . whether the defendant's conduct is a legal cause of the plaintiff's injuries, [and] the trial judge's discretion to remove questions of fact from the jury is very limited."); see also City of Boston v. Smith & Wesson Corp., No. 199902590, 2000 WL 1473568, at *6 (Mass. Super. July 13, 2000) (discussing exceptions to the direct relation requirement that may be applicable to this case).

an individual who received such drugs at the State's expense would herself recover damages based on the costs of their administration.

The third factor asks whether deterring wrongdoing justifies grappling with the difficulties covered by the first two factors.  It is no secret that opioid abuse is a particularly pernicious problem in New Hampshire.  The State alleges Purdue shoulders significant blame for this reality.  Considering the gravity of this matter and the scope of Purdue's alleged wrongdoing, the Court is not convinced there are parties other than the State better suited to litigate these issues and that the interests of justice weigh in favor of dismissal.

Accordingly, Purdue's motion to dismiss is DENIED to the extent it raises lack of causation.[11]

    *iii.*    *Claim Specific Arguments*

    *a.*    *Consumer Protection Act*

Purdue challenges the State's Consumer Protection Act ("CPA") claims on several grounds.  First, Purdue maintains that statements and transactions before August 6, 2012, cannot form the basis of a CPA claim.  Pursuant to RSA 358-A:3, IV-a "transactions . . . exempt from the provisions of [the CPA]" include

> [t]ransactions entered into more than 3 years prior to the time the plaintiff knew, or reasonably should have known, of the conduct alleged to be in violation of this chapter; provided, however, that this section shall not ban the introduction of evidence of unfair trade practices and deceptive acts prior to the 3-year period in any action under this chapter.

---

[11] The Court's conclusion is in keeping with those of recent trial courts across the country that have considered similar claims against Purdue.  See, e.g., State v. Purdue Pharma L.P., No-3AN-17-09966CI (Alaska Super. Ct. July 12, 2018); In re Opioid Litigation, Index No. 400000/2017 (N.Y. Sup. Ct. March 21, 2018).

Relying on this provision, Purdue contends that "the latest the State knew or reasonably should have known of the [complaint's allegations] is August 6, 2015," because, "[o]n that date, the State served Purdue with a subpoena" relating to the State's investigation into these matters, and, therefore, all alleged statements and transactions attributed to Purdue more than three years prior to that date, *i.e.* August 6, 2012, are exempt from the CPA's ambit.  (Mot. to Dismiss at 28.)  The State counters that the date it knew or should have known of Purdue's actions is a question of fact not appropriate for resolution at this time.  The Court agrees.[12]

Next Purdue argues that neither the State's allegation that Purdue failed to report its knowledge of suspicious opioid prescriptions nor its assertion that Purdue should be held accountable for unbranded publications properly state a CPA claim.  (Mot. to Dismiss at 26–27, 29–30.)  Purdue's positions are both unavailing.  The former issue requires little analysis considering the State acknowledges — contrary to Purdue's characterization — that it does not premise its CPA claim on Purdue's purported failure to comply with the federal Controlled Substances Act and associated regulations.  (See Obj. at 23.)  The Court finds the State's stance is fairly reflected in the complaint.  Regarding its latter position, Purdue cites Green Mountain Realty Corporation v. Fifth Estate Tower, LLC, 161 N.H. 78 (2010) seemingly for the proposition that marketing efforts that do not directly include offers to sell or distribute a product as part of an entity's day-to-day business are not actionable under the CPA.  Green Mountain,

---

[12] Although the State raises additional counterarguments for the proposition that RSA 358-A:3, IV-a's exception provision does not apply to the State at all pursuant to the doctrine of *nullum tempus* (see Index # 29 at 1–2; Defs.' Reply to Pl.'s Supp. Oppo. to Mot. to Dismiss at 1–3) and that, in any case, the provision is inapplicable to "misleading marketing statements," (Obj. at 24), the Court need not reach these issues at this time as it is undisputed, even crediting Purdue's August 6, 2012, cutoff, that the State's CPA claims do not wholly rely on exempted transactions.

however, offers no such support, considering the New Hampshire Supreme Court in that case merely concluded that "a publicity campaign directed at a general electorate" for the purpose of influencing "the passage of . . . warrant articles does not violate the CPA" and the New Hampshire Supreme Court did not contemplate whether all marketing efforts presented in not-strictly-business arenas fall outside the CPA's scope. 161 N.H. at 87.  Because Purdue offers no additional support, the Court will not consider the issue further.

Lastly, Purdue seeks to strike the State's request — pursuant to RSA 358-A:4, III(b) — of "an order assessing a civil penalty of $10,000 against Purdue for each violation of the [CPA]."  (Compl. ¶ 225; Mot. to Dismiss at 30–31.)  Purdue maintains that, although New Hampshire courts have yet to consider the issue, some jurisdictions apply an "individualized proof rule" to statutes comparable to the CPA and that this rule purportedly "prevents civil penalties where calculating them would require individualized proof as to each transaction at issue."  (Mot. to Dismiss at 30 (citing In re Zyprexa Prods. Liab. Lititg., 671 F. Supp. 2d 397, 456, 458–59 (E.D.N.Y. 2009)).)  Purdue argues that the State cannot sustain such a burden and, therefore, its request for civil penalties must be stricken.  Even assuming that it is appropriate to adopt an individualize proof rule with regards to the CPA (notwithstanding the New Hampshire Supreme Court's holding in Exxon Mobil that it is otherwise proper to employ "statistical evidence and extrapolation to prove injury-in-fact"), it is nevertheless inappropriate to strike the State's request at this time as discovery could provide the State the individualize proof it may ultimately require.  168 N.H. at 255–56.

### b.  *Medicaid Fraud and False Claims Act*

Purdue advocates for the complete dismissal of the State's Medicaid Fraud and False Claims Act ("FCA") count for two alternative reasons.  Initially, Purdue reiterates its position that the State's claims, including its FCA count, demand individualized proof. In the FCA context, Purdue contends this proof must at least comprise specifically identified instances of "a physician or pharmacy submitting a claim for reimbursement for opioid medications to New Hampshire's Medicaid program."  (Mot. to Dismiss at 32.) The Court disagrees.  Even assuming Purdue is correct that the pleading requirements imposed by some federal jurisdictions on claims implicating the federal analogue to the FCA equally apply in this matter, where, as here, "the defendant allegedly induced third parties to file false claims with the government" the plaintiff can satisfy these requirements merely "by providing factual or statistical evidence to strengthen the inference of fraud . . . without necessarily providing details as to each false claim." United States ex rel. Nargol v. DePuy Orthopaedics, Inc., 865 F.3d 29, 39 (1st Cir. 2017) (quotations, emphasis, and ellipsis omitted).  The State's allegations satisfy this standard and contain "reliable indicia that lead to a strong inference that [false] claims were actually submitted for . . . reimbursement" despite the absence of any specific claim for reimbursement being described in the complaint.  Id. at 41 (quotation and citation omitted).

Purdue also argues that, because the State supposedly "admits that it continues to pay for opioid medications prescribed for chronic pain, despite the Attorney General's belief that Purdue has been falsely marketing opioid medications for years," the State does not sufficiently plead that Purdue's alleged wrongdoing was "material" to the

State's purported reimbursement decisions.  (Mot. to Dismiss at 33 (citing Compl. ¶

254).)  These are issues of fact not amenable for consideration at this stage.  See

generally Ellis v. Candia Trailers & Snow Equip., Inc., 164 N.H. 457, 466 (2012)

("[M]aterial[ity] is a question of fact . . . .").

c.  <em>Public Nuisance</em>

Regarding the State's public nuisance claim, Purdue contends that such a cause

of action must "arise from the active or passive use of real property, whereas the State

challenges only manufacturing and marketing activity."  (Mot. to Dismiss at 33.)  In

Robie v. Lillis, 112 N.H. 492, 495 (1972), the New Hampshire Supreme Court explained

that "[a] public nuisance . . . is 'an unreasonable interference with a right common to the

general public'" and "is *behavior* which unreasonably interferes with the health, safety,

peace, comfort or convenience of the general community."  (Quoting Restatement

(Second) of Torts § 821B(1)) (emphasis added).  The use of "behavior" in this context

suggests Purdue's position, *i.e.* that the origin of a public nuisance must arise from the

use of real property, is a too narrow reading of the law.  Indeed, numerous other

jurisdictions that, like the New Hampshire Supreme Court, look to the Restatement

(Second) of Torts to guide their analysis of public nuisance claims have expressly

concluded that "[a]n action for public nuisance may lie even though neither the plaintiff

nor the defendant acts in the exercise of private property rights."  Philadelphia Elec. Co.

v. Hercules, Inc., 762 F.2d 303, 315 (3d Cir. 1985) (reasoning further that "'[a] public

nuisance is a species of catch-all low-grade criminal offense, consisting of an

interference with the rights of the community at large, which may include anything from

the blocking of a highway to a gaming-house or indecent exposure.'"  (Quoting Prosser,

27

Private Action for Public Nuisance, 52 Va. L. Rev. 997, 999 (1966))); see, e.g.,

Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1142 (Ohio 2002) ("[T]here need

not be injury to real property in order for there to be a public nuisance."); City of Boston

v. Smith & Wesson Corp., No. 199902590, 2000 WL 1473568, at *14 (Mass. Super.

July 13, 2000) ("[A] public nuisance is not necessarily one related to property.");

Restatement (Second) of Torts §821B, Comment h ("Unlike a private nuisance, a public

nuisance does not necessarily involve interference with use and enjoyment of land.").

Purdue also maintains that the State's claim fails because "the alleged public

nuisance identified in the complaint is not reasonably subject to abatement." (Mot. to

Dismiss at 33.)  This issue demands little consideration as it is a question of fact

whether Purdue can abate the alleged public nuisance for which the State seeks to hold

it liable and, drawing all inferences in the State's favor, the complaint adequately alleges

that Purdue is in fact capable of doing so.  (See Compl. ¶ 266 ("This public nuisance

can be abated through health care provider and consumer education on appropriate

prescribing, honest marketing of the risks and benefits of long-term opioid use, addiction

treatment, disposal of unused opioids, and other means.").)

> d. *Unjust Enrichment*

Purdue argues that the State's claim for unjust enrichment must be dismissed

because "unjust enrichment generally does not form an independent basis for a cause

of action." (Mot. to Dismiss at 35 (quoting Gen. Insulation Co. v. Eckman Const., 159

N.H. 601, 611 (2010)).)  The New Hampshire Supreme Court has not categorically

barred independent unjust enrichment claims, however, it has made clear that such

claims are predominately rooted in quasi-contract theory.  See Gen. Insulation, 159

N.H. at 611 ("[U]njust enrichment [is] allowed by the courts as [an] alternative remed[y] to an action for damages for breach of contract." (Quotation omitted)). Although a fair reading of the complaint is that Purdue may have enriched itself via "deceptive and illegal acts," (Compl. ¶ 272), this inference alone is insufficient to state a claim. See Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210 (2009) ("Unjust enrichment is not a boundless doctrine, but is, instead, narrower, more predictable, and more objectively determined than the implications of the words 'unjust enrichment.'" (Quotation omitted)); Am. Univ. v. Forbes, 88 N.H. 17, 19 (1936) ("The doctrine of unjust enrichment is that one shall not be allowed to profit or enrich himself at the expense of another contrary to equity. While it is said that a defendant is liable if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized to bring a case within the scope of the doctrine."). Considering the State has not articulate an underlying "specific legal principle" nor cited authority allowing an unjust enrichment claim to proceed under comparable circumstances, the Court must agree with Purdue on this issue.

### e. *Fraudulent or Negligent Misrepresentation*

Finally, Purdue argues that the State's fraudulent and negligent misrepresentation claim demands dismissal "because the State fails to allege that it justifiably relied on any statement made by, or attributable to, Purdue." (Mot. to Dismiss at 35; see also Reply at 12.) The Court disagrees. The United States Supreme Court in Bridge considered and rejected a similar argument, finding that "while it may be that first-party reliance is an element of a common-law fraud claim, there is no general

29

common-law principle holding that a fraudulent misrepresentation can cause legal injury only to those who rely on it. . . . And any such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation."  553 U.S. at 656–57 (citing Restatement (Second) of Torts §§ 435A, 548A, 870).

Likewise, the New Hampshire Supreme Court has relied upon the Restatement (Second) of Torts to conclude that "[t]he fact that [an] alleged misrepresentation was not made directly to the plaintiff does not defeat [the] cause of action."  Tessier v. Rockefeller, 162 N.H. 324, 333 (2011) (citing Restatement (Second) of Torts § 533 ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."[13])).

In light of this authority, the State's claim — which, inter alia, alleges that Purdue made misrepresentations to health care providers and patients for the purpose of inducing opioid prescriptions, along with the common sense understanding that some would in turn seek reimbursements from the State for these opioid prescriptions — is satisfactory.

_____

[13] This rule "is applicable not only when the effect of the misrepresentation is to induce the other to enter into a transaction with the maker, but also when he is induced to enter into a transaction with a third person."  Restatement (Second) of Torts § 533, Comment c.

## Conclusion

For the foregoing reasons, Purdue's Motion to Dismiss is DENIED as it pertains to Count I (deceptive and unfair acts and practices contrary to the Consumer Protection Act), Count II (unfair competition contrary to the Consumer Protection Act), Count III (false claims in violation of the Medicaid Fraud and False Claims Act), Count IV (public nuisance), and Court VI (fraudulent or negligent misrepresentation), and GRANTED as it relates to Count V (unjust enrichment).

**SO ORDERED.**

_9/18/18_
**Date**

John C. Kissinger, Jr.
**Presiding Justice**

31

# EXHIBIT 2

COMMONWEALTH OF KENTUCKY
FRANKLIN CIRCUIT COURT
DIVISION II



*Order*
ENTERED
JUL 1 0 2018
FRANKLIN CIRCUIT COURT
AMY FELDMAN, CLERK

CIVIL ACTION No. 17-CI-1147

COMMONWEALTH OF KENTUCKY, ex rel.
ANDY BESHEAR, ATTORNEY GENERAL                          **PLAINTIFF**

vs.

ENDO HEALTH SOLUTIONS INC.; and
ENDO PHARMACEUTICALS INC.                               **DEFENDANTS**

## ORDER

This matter is before the Court upon Defendants' *Motion to Dismiss* and Defendants' *Motion to Strike*. The case was called before the Court during for a hearing on Tuesday, May 22, 2018 at 10:00 a.m. Upon review of the parties' briefs and papers, and after being sufficiently advised, the Court hereby **DENIES** Defendants' *Motion*.

## STANDARD OF REVIEW

Under Kentucky law, when a court considers a motion to dismiss under Civil Rule 12.02, "the pleadings should be liberally construed in a light most favorable to the plaintiff and all allegations taken in the complaint to be true." *Gall v. Scroggy*, 725 S.W.2d 867, 869 (Ky. Ct. App. 1987) *citing Ewell v. Central City*, 340 S.W.2d 479 (Ky. 1960). "The court should not grant the motion unless it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim." *Mims v. W.-S. Agency, Inc.*, 226 S.W.3d 833, 835 (Ky. Ct. App. 2007) *quoting James v. Wilson*, 95 S.W.3d 875, 883-84 (Ky. Ct. App. 2002). In *D.F.Bailey, Inc. v. GRW Engineers Inc.*, 350 S.W.3d 818 (Ky. Ct. App. 2011), the Kentucky Court of

Appeals discussed a trial court's standard of review when ruling on a motion to dismiss. "[T]he question is purely a matter of law. [...] Further, it is true that in reviewing a motion to dismiss, the trial court is not required to make any factual findings, and it may properly consider matters outside of the pleadings in making its decision. *Id.* at 820 (internal citations omitted).

## ANALYSIS

### I. Causation

Defendants argue that the Commonwealth's claims require more specific proof of causation than what it pled in its complaint. The Commonwealth alleged a causal theory of loss it has suffered because Defendants misrepresented the risks of opioid medications it manufactured and marketed; physicians heard and believed the representations Defendants made about the product, which undermined the warning labels contained on the medication packaging; the misrepresentations caused physicians to administer pharmaceutical opioids to patients in higher doses, which created a greater risk of addiction; the effects of this over prescription of opioids caused a concurrent rise in opioid-related criminal activity as well as an increase in addiction and opioid-related health problems; and the activity caused Kentucky Medicaid program to spend over $117 million in 2016 to treat opioid addiction while Defendants continue to profit on drug sales in the Commonwealth. The Court will address Defendants' specific arguments for dismissal based on the causation alleged in the Commonwealth's argument below.

#### a. Remoteness of damages

Defendants argue that the derivative injury rule, the doctrine that precludes recovery against an alleged wrongdoer for losses derived from an injury to a third-party,

bars the Commonwealth's suit. *Fireman's Fund Ins. Co. v. Gov't Emps. Ins. Co.*, 635

S.W.2d 475, 475 (Ky. 1982). In *Kentucky Laborers District Council v. Hill & Knowlton,*

*Inc.*, 24 F. Supp. 2d 755 (W.D. Ky. 1998), the Western District Court held that the

plaintiff could not bring an aggregate claim on behalf of thousands of individuals, both

directly and indirectly injured, who did not meet the class certification requirements.

Duplicative recovery would occur for directly injured plaintiffs who had already brought

suit against the tobacco company. *Id.* at 763. Defendants assert that the third-party payor

claims, just like those in *Kentucky Laborers*, cannot be brought against the drug

manufacturer because the Commonwealth's damages are too remote to seek third party

recovery for damages in the form of Medicaid and workers' compensation programs in

an indirect injury setting.

Conversely, the Commonwealth contends that its suit does not fall under the

derivative injury rule. The Commonwealth brings suit under the law of public nuisance

and the Kentucky Consumer Protection Act (KCPA) in its role as *parens patriae*, rather

than as an insurer. The Office of the Attorney General is uniquely situated to take legal

action on behalf of citizens of the Commonwealth, and it asserts claims against

Defendants for their actions related to the marketing and sale of their products in

Kentucky. Further, the Commonwealth argues that, even if the rule did apply, the

derivative injury rule would not bar its claim against Defendants. The Commonwealth

contends that an insurance "carrier's rights against a third-party tortfeasor are entirely

derivative and are not independent of the injured party's tort claim. *Fireman's Fund Ins.*,

635 S.W.2d at 476.

The Court holds that the Commonwealth's claims do not fail for remoteness. First, the Court holds that the derivative injury rule does not bar the Office of the Attorney General from redress in this matter. This Court has previously addressed this issue in *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Fresenius Medical Care Holdings, Inc., et al.*, Civ. Action No. 16-CI-946, Order on Motion to Dismiss at 6-7 (Franklin Circuit Court Feb. 15, 2017). In that case, the defendant "cites *Kentucky Laborers Dist. Council Health & Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755 (W.D. Ky. 1998), for the proposition that the remoteness doctrine bars insurers, and other benefit providers, from bringing claims and recovering for injuries to third parties." This argument is strikingly similar to that which Defendants raise in the current case make. However, the Court distinguished the Fresenius matter from that in *Kentucky Laborers* because in *Kentucky Laborers* the Western District, which based its decision in the "law of anti-trust, held that strong anti-competitive consequences to the marketplace from which the fund suffered must be present to recover for a claim based on misrepresentation. Id. at 766." *Id.*

The Court reaches the same conclusion in this case as it did in its February 15, 2017 order on the issue of remoteness of injury for the Attorney General's claim:

> Unlike <u>Kentucky Laborers</u>, in this case the Commonwealth raised claims based upon the alleged misrepresentations of Fresenius, none of which are based in the law of anti-trust. The Court, taking the pleadings in the light most favorable to the Commonwealth, at this juncture, finds that remoteness does not bar the Commonwealth's claims. The Commonwealth seeks to recover for expenditures it made in purchasing GranuFlo with Medicaid funds based upon Fresenius' misrepresentations. The Court finds that the expenditures constitute a claim of injury unique to the Commonwealth that is not founded upon the medical expenses or bills the Fresenius users acquired. Therefore, remoteness does not bar the Commonwealth's claims.

*Id.* The injury the Commonwealth has allegedly suffered due to Defendants' marketing and alleged misrepresentations of the health effects and consequences is an injury specific to the Commonwealth. The expenditures made in workers compensation and Medicaid claims to treat Kentuckians who, after receiving improper medical prescriptions and advisement, became addicted and experienced various opioid related injuries and illnesses, are injuries the Commonwealth allegedly inured, despite not being the individual who experienced opioid addiction. Therefore, the Commonwealth's claims are not too remote for the Commonwealth's theory of causation.

### b. Knowledge of risks and the causal chain

Next, Defendants contend that the Commonwealth's long-standing knowledge of the risk of opioid medications breaks the causal connection between Defendants' marketing and representations about their products and the injuries suffered by Kentuckians. Defendants cite *Sandoz Inc. v. Commonwealth*, 405 S.W.3d 506 (Ky. App. 2013), for the proposition that if the state knew of the risks of the prescription drugs and did nothing with that knowledge to prevent the widespread use and misuse of the products, the state cannot recover damages. In *Sandoz*, the Commonwealth knew of inflated average wholesale pricing for drugs. The state used this inflated formula for over-reimbursing pharmacies. The Court of Appeals held that the Commonwealth's awareness of the inflation prevented the state from proving that the defendants caused harm in the state's systematic over-reimbursing pharmacies. *Id.* In this case, Defendants argue that the Commonwealth knew of the risks of addiction, abuse, and diversion of opioids from FDA-approved warnings, statewide drug taskforces and policy investigations, and other reported information. Thus, Defendants contend that the

Commonwealth cannot now, after having significant information relating to the dangers of opioid addiction, seek redress for Defendants' alleged misrepresentations.

The Commonwealth argues that it never "acquiesced" in this case, as the state did in *Sandoz* to the inflation information. *Id.* at 511. Over the last fifteen years, the state has taken measures to combat opioid abuse. Here, the Commonwealth contends that when it learned of Defendants' alleged fraudulent conduct it timely acted to fight Defendants' conduct. Further, the Attorney General avers that whether the Commonwealth took action in a timely fashion against Defendants or acquiesced to Defendants' conduct is a matter of fact that is improper for decision at this time.

The Court holds that the Attorney General timely brought suit in this matter. The Commonwealth notably knew of the dangers and ongoing societal problems caused by the abuse of opioids by Kentuckians over the past fifteen years. However, the Court agrees with the Commonwealth that knowing of the harm a product may create does not equate to knowing of specific alleged misrepresentations made about the properties of Defendants' products nor the improper, unnecessarily induced prescriptions of Defendants' drugs for which the state paid. The date the Commonwealth learned of any alleged malfeasance by Defendants tolled the statute of limitations for bringing this action. Neither party has presented the Court with any factual pleadings related to Defendants' claim that the Commonwealth acquiesced to Defendants' specific marketing and prescription strategies. The Commonwealth learned of Defendants' alleged misconduct and timely brought this lawsuit.

### c.  Doctors as learned intermediaries and the chain of causation

Next, Defendants argue that the learned intermediary doctrine bars the

Commonwealth's liability theory. A physician is an intermediary between Defendants

and the patient, and the intermediary bears the responsibility to 'read and understand all

warnings from the manufacturer and relay them to the patient." *See Larkin v. Pfizer, Inc.*,

153 S.W.3d 758, 770 (Ky. 2004). Defendants contend that their products contained

adequate warning labels, which therefore absolves them of liability. *Id.* The FDA

approved Defendants' warning labels on their products; and, Defendants contend,

because the Commonwealth recognizes the presence of the warnings on the prescription

bottles it cannot state a claim against Defendants based upon misleading physicians. *See*

*Larkin*, 153 S.W.3d at 763.

The Commonwealth, alternatively, argues that the learned intermediary doctrine

requires Defendants to provide an adequate warning to doctors about the potential effects

of their products. *Id.* at 764. Defendants' warnings on the prescription bottles, the

Attorney General avers, failed to apprise physicians of the harmful nature of the product.

Further, the Commonwealth asserts that the adequacy of warnings provided to physicians

constitutes an issue of material fact that cannot be dealt with on a motion to dismiss.

In *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Johnson*

*& Johnson, et al.*, Civ. Action No. 16-CI-867, Order on Motion to Dismiss at 6-7

(Franklin Circuit Court June 7, 2017), this Court held that

> ...the learned intermediary doctrine applies in this jurisdiction. Physicians,
> who have studied medicine, are better learned in medical science than the
> average consumer to interpret Defendants' marketing of products.
> Therefore, Plaintiff must distinguish claims brought on behalf of
> physicians who relied on the alleged misrepresentations when prescribing
> the surgical mesh product to patients, and claims brought on behalf of

consumers who relied on Defendants' specific representations about the
product when choosing to use the product.

The Court holds that the Office of the Attorney General must distinguish claims that it

brings on behalf of physicians who relied on Defendants' representations, and those on

which the consumers of the prescriptions relied. To hold in opposition to the *Johnson &*

*Johnson* ruling in this matter would imply that doctors issuing prescription opioids are

held to a different standard than those who treat any other ailment Kentuckians suffered.

Therefore, the Court requires the Commonwealth, pursuant to the learned intermediary

doctrine, to specify claims of misrepresentation as they relate to consumers who chose to

use Defendants' products and physicians who prescribed opioids to patients.

### d. Causation and costs of Commonwealth addressing consequence of diversion and abuse

Defendants' final attack on the Commonwealth's causation argument is that the

Office of the Attorney General cannot prove a causal link between Defendants' alleged

misrepresentations and all opioid diversion and abuse costs that the state has incurred.

Defendants contend that under the theory of proximate causation other illegal acts

surrounding the misuse of opioids and other opiate abuse and problems in the

Commonwealth constitute superseding causes and intervening acts that break the chain of

causation from any alleged misrepresentations Defendants made about their products.

*Bruck v. Thompson*, 131 S.W.3d 764, 767-69 (Ky. App. 2004).

The Commonwealth counters Defendants' arguments with the notion that

intervening acts only break the causal chain if an act is a superseding cause, which is

rooted in an event entirely independent of the original liability and that the original actor

could not reasonably foresee. *Bruck v. Thompson*, 131 S.W.3d at 767-68. The Attorney

General contends that the third-party actions that contributed to Kentucky's opioid crisis

were foreseeable and were, in fact, a direct consequence of Defendants' alleged misrepresentations. The Commonwealth asserts that it has adequately alleged that Defendants' conduct served as the proximate cause for the harms.

The Court holds that the issue of proximate cause is a factual determination that is unsuited for a decision at the juncture of a motion to dismiss. The Commonwealth has adequately pled that the results of Defendants' alleged misrepresentations served as a proximate cause for the harms the Commonwealth has endured from the opioid epidemic. The presence of intervening causes and the relative foreseeability of each superseding event is a factual question that is inappropriate for the Court to decide at this time.

## II.    Particularity

Defendants next assert that the Commonwealth's claims do not meet the particularity required by CR 9.02, Kentucky's pleading standard for claims based in fraud. Conversely, the Office of the Attorney General contends that CR 9.02 does not apply to the Commonwealth's claims for public nuisance, unjust enrichment, which do not sound in fraud and are subject to CR 8.01(1); nor the claims founded in the Kentucky Consumer Protection Act, which contains its own standard for pleading.

The Court holds that the Commonwealth is not required to meet the pleading standards in CR 9.02 because the Attorney General does not bring fraud claims, but rather it asserts claims based on other common law causes of action or the Kentucky Consumer Protection Act. This Court previously addressed this issue, as it pertained to the Kentucky Consumer Protection Act in *Commonwealth of Kentucky ex rel. Andy Beshear, Attorney General v. Johnson & Johnson, et al.*, Civ. Action No. 16-CI-867, Order on Motion to Dismiss at 4-5 (Franklin Circuit Court June 7, 2017):

> The KCPA deems "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. Ky. Rev. Stat. § 367.170(1). To bring a claim under the KCPA against Defendants for misleading and omitted representations about a surgical mesh device, Plaintiff must show that Defendants committed an act or engaged in a practice in the conduct of trade or commerce of the surgical mesh product that was unfair, false, misleading, or deceptive. *Id.* The legislature enacted this statute with the intention to provide a remedy for consumers who have allegedly suffered wrongs based upon consumer transactions with an entity engaged in commerce. The nature of the claim, limited in this way to "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" specify the nature of the claims that qualify under the KCPA. Unlike common law fraud claims for which CR 9.02 requires heightened pleading particularity standards, the legislature has determined the qualities of claims brought under the KCPA. Therefore, the Court rejects Defendants' argument that Plaintiff's claims are based in fraud and must comply with CR 9.02. This matter falls under the purview of KCPA, and the pleading particularity enumerated in CR 9.02 is irrelevant.

Similarly, in this case, the Court holds that the Commonwealth need not meet the heightened fraud pleading requirements contained in CR 9.02. Rather, the state must meet the requirements set forth in CR 8.01 for the nuisance and unjust enrichment claims and the requirements set forth in the Kentucky Consumer Protection Act for the consumer protection claims.

The Court holds the Commonwealth's pleadings to be sufficient to plead claims for which relief may be granted, and the Court denies Defendants' arguments that the Commonwealth must be required to abide by a standard of heightened particularity in pleading. However, as noted above, this is a jurisdiction that recognizes the learned intermediary doctrine. The Commonwealth must specify the claims of misrepresentation that relate to doctor and those that relate to patients.

### III. Claim Specific Reasons
#### a. Statutory false claims

Defendants contend that the Medicaid Fraud Statute, KRS § 205.8451(2), imposes

civil liability exclusively for providers, which the statute defines as an entity "which is

providing or has been approved to provide medical services, goods, or assistance to

recipients under the Medical Assistance Program." *Id.*, at (17). Defendants manufacture

pharmaceutical drugs and do not supply patients with prescriptions, therefore they argue

that they are not liable under KRS § 205.8451 for any alleged Medicaid Fraud. Further,

Defendants similarly assert that they are not liable under the Assistant Program Fraud

Statute and the Fraudulent Insurance Acts Statute because they do not receive benefits

from any assistance program. Ky. Rev. Stat. § 194.A505(6); Ky. Rev. Stat. § 304.47-

020(1)(a). Reimbursement for these assistance programs exclusively goes to physicians

who participate in the Kentucky Medicaid Program, not drug manufacturers. 907 KAR

3:010 § 2. Courts in other jurisdictions, Defendants aver, have dismissed analogous

claims against pharmaceutical drug manufacturers because they do not meet the statutory

definitions for providers or recipients of payments from state assistance funds. *See In re*

*Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 857-58 (Miss.

2015).

Conversely, the Attorney General asserts that Defendants' arguments fail for three

reasons. First, the Commonwealth contends that the scopes of each of the fraud statutes in

question reach any defendant that causes physicians to submit false claims for payment or

participate in fraudulent schemes. Defendants' alleged misrepresentations, according to

the Commonwealth, satisfy this component of liability. Next, the Commonwealth argues

that KRS 446.070, Kentucky's negligence *per se* statute, allows recovery for damages

even if the violated statute does not explicitly provide civil damages. Third, the Attorney General argues that the Medical Fraud Statute and the Fraudulent Insurance Act do not require the Commonwealth to prove the six element of common law fraud.

The Kentucky Medicaid Fraud Statute imposes civil liability against any person who "intentionally, knowingly, or wantonly…cause to be made or presented to an employee or officer of the Cabinet for Health and Family Services any false, fictitious, or fraudulent statement, representation, or entry in any application, claim, report, or document used in determining rights to any benefit or payment. Ky. Rev. Stat. § 205.8463(2). The Court holds that the Commonwealth has sufficiently pled allegations against Defendants that satisfy this component of Medicaid Fraud liability. Further, under the Kentucky Assistance Program Fraud Statute, the Court holds that the Commonwealth has sufficiently pled allegations as to Defendants "scheme or artifice to obtain benefits from any assistance program by means of false or fraudulent representations…" Ky. Rev. Stat. § 194.A505(6). Similarly, under the Fraudulent Insurance Acts Statutes, the Attorney General has sufficiently pled allegations that would impose potential liability against Defendants. Ky. Rev. Stat. § 304.47-020(1)(a). Whether or not Defendants were "providers," as defined by the statute, the Court is persuaded that KRS 446.070 creates a cause of action for civil damages is irrelevant because the statutes on which the Commonwealth relies serve the purpose of ferreting out fraudulent behavior in Kentucky. Therefore, any allegedly fraudulent action conducted in concert with the causes of action in each statute create a viable claim for civil liability.

### b. Public nuisance

Defendants also assert that the Commonwealth failed to plead an essential element of public nuisance: the interference with a public right. "A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured." Restatement (Second) of Torts § 821B cmt. G (Am. Law Inst. 1979). Defendants contend that the injuries experienced by individual patients by the mis-prescription of Defendants' pharmaceuticals constitute private rights, not public rights. Defendants also express concern about the policy of potentially expanding the public nuisance doctrine.

The Attorney General argues that the Restatement identifies three circumstance that may "sustain a holding that an interference with a public right is unreasonable":

> (a) whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon a public right.

Restatement (Second) of Torts § 821B. The Commonwealth argues that Defendants' alleged conduct interferes with public health, violates Kentucky laws, and has produced harmful effects in the state, and therefore Defendants violated Kentucky's public rights.

The Court holds that the Commonwealth has sufficiently pled its public nuisance claim. The Kentucky Supreme Court adopted the Restatement Second of Torts' definition of public nuisance. The opioid crisis in Kentucky has caused a public health crisis and crime crisis throughout the Commonwealth. The Commonwealth's pleadings have

alleged a claim that Defendants have interfered with public health, Defendants have violated a Kentucky statute, and Defendants misrepresented the effects of its products to physicians in the Commonwealth. The Court holds that the Attorney General has clearly pled that Defendants' conduct allegedly violates a public right in the state and may proceed with the public nuisance claim.

### c. Kentucky Consumer Protection Act

Finally, Defendants argue that the claim under the Kentucky Consumer Protection Act fails to allege conduct that would qualify as an unfair act or practice, and the Attorney General conflates restitution and damages with the remedy it prays from the Court.

The Court holds that the Attorney General's Kentucky Consumer Protection Act pleadings are sufficient to survive a motion to dismiss. The Commonwealth pled that the Defendants' conduct was "false, misleading, and deceptive," which meet the statutory language of the Kentucky Consumer Protection Act, in addition to being "unfair." Next, the Court holds that the Commonwealth has pled a remedy adequate for the claim it brings in its complaint. The Court, at the final disposition of the case, if a remedy is in fact warranted from the merits of this case, will resolve any problems related to damages or restitution at that time.

*Order*
*17-CI-1147*

## CONCLUSION

The Court **DENIES** Defendants' *Motion to Dismiss*. Plaintiff has alleged claims for which relief may be granted against Defendants. The Commonwealth, however, must specify any claims of misrepresentation Defendants made to physicians directly and to consumers of opiate prescription drugs directly.

**SO ORDERED**, this ____10____ day of July, 2018.

THOMAS D. WINGATE
Judge, Franklin Circuit Court

*Order*
*17-CI-1147*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Order was mailed, this 16 day of July, 2018, to the following:

**Hon. Robert J. Benvenuti III**
**Wesley R. Butler**
**Holly R. Iaccarino**
Barnett Benvenuti & Butler PLLC
489 East Main Street, Suite 300
Lexington, Kentucky 40507

**Hon. Jonathan L. Stern**
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001

**Hon. John Lombardo**
Arnold & Porter Kaye Scholer LLP
44th Floor
777 South Figueroa Street
Los Angeles, California 90017

**Hon. LeeAnne Applegate**
**Hon. Elizabeth U. Natter**
**Hon. Charlie Rowland**
Office of the Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601

**Hon. C. David Johnstone**
**Hon. Brian C. Thomas**
Office of the Attorney General
1024 Capital Center Drive, Suite 200
Frankfort, Kentucky 40601

**Amy Feldman, Franklin County Circuit Court Clerk**

# EXHIBIT 3

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| STATE OF ALASKA,<br><br>     Plaintiff,<br><br>vs.<br><br>PURDUE PHARMA L.P., PURDUE<br>PHARMA INC., THE PURDUE<br>FREDERICK COMPANY INC., and<br>JANE DOES 1-10,<br><br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 3AN-17-09966CI

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S COMPLAINT (Case Motion #8)**

**I.  INTRODUCTION**

  Defendants Purdue Pharma L.P., et al., move to dismiss State of Alaska's
Complaint under Alaska Rule of Civil Procedure 12(b)(6) for failure to state a claim
upon which relief may be granted.[1]  After reviewing the memoranda of the parties and
after oral argument on the issues, the court GRANTS IN PART the motion.

**II.  BACKGROUND**

  The State of Alaska ("the State") filed this action on its own behalf against drug
manufacturer Purdue Pharma L.P., et al., ("Purdue") alleging the opioid epidemic and a

---

[1]  Defendant Rhodes Pharmaceuticals, L.P., was dismissed by Plaintiff without
prejudice prior to answer.

SOA v. Purdue Pharma, L.P.
Page **1** of **19**

public health crisis in Alaska was caused, in large measure, by a fraudulent and deceptive marketing campaign intended by Purdue to increase sales of its opioid products.  The State alleges it has paid and will pay expenses for the medical care of Alaska's population due to overuse, addiction, injury, overdose, and death.  The State seeks damages, injunctive relief, and civil penalties.[2]

The State's complaint asserts six claims:  (1) violations of Alaska's Unfair Trade Practices and Consumer Protection Act (AS § 45.50.471 *et seq.*);  (2) violations of Alaska's Medical Assistance False Claim and Reporting Act (AS § 09.58.010 *et seq.*);  (3) public nuisance;  (4) fraud, negligence, and negligent misrepresentation;  (5) strict products liability for design defect and failure to warn;  and (6) unjust enrichment.

Purdue moves to dismiss the complaint asserting seven grounds:  (1) the State's claims are preempted by federal law; (2) the State's claims fail to adequately establish causation;  (3) all claims must be dismissed, in part, as time-barred; (4) all claims fail because the State does not adequately plead fraud;  (5) the State's allegation of failing to report suspicious orders does not state a claim;  (6) the State does not allege a cognizable injury;  and (7) other additional grounds.[3]

---

[2]    The original complaint was filed under seal.  Portions with confidential information have been redacted.  The complaint is 85 pages long with 237 points.

[3]    Purdue has attached 13 exhibits to its motion and two more to its reply.  Purdue requests the court take judicial notice of the exhibits as they are publically available.  The exhibits are FDA publications and prescription information sheets.  No materials outside of the pleadings have been submitted by the parties.

### III.  LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief may be granted, filed pursuant to Alaska Rule of Civil Procedure 12(b)(6), tests the legal sufficiency of the complaint's allegations.[4]  Motions to dismiss under CR 12(b)(6) are viewed with disfavor.[5]  In determining the sufficiency of the stated claim in a 12(b)(6) motion, it is enough that the complaint set forth allegations of fact consistent with some enforceable cause of action on any possible theory.[6]

In resolving the merits of such motions, the court considers only well pled allegations of the complaint, while ignoring unwarranted factual inferences and conclusions of law.[7]  Generally, such a motion is determined solely on the pleadings; however, the court may consider public record, including court files from other proceedings.[8]

The court must construe the complaint in the light most favorable to the non-moving party and presume the pleading's allegations to be true.[9]  The court can affirm

---

[4]  *Dworkin v. First Nat. Bank of Fairbanks*, 444 P.2d 777, 779 (Alaska 1968).

[5]  *State, Dep't of Health & Soc. Services, Div. of Family and Youth Serv. v. Native Village of Curyung*, 151 P.3d 388, 397 (Alaska 2006) (internal citations omitted).

[6]  *Id.*

[7]  *Dworkin* at 779.

[8]  *Nizinski v. Currington*, 517 P.2d 754, 756 (Alaska 1974) (internal citation omitted).

[9]  *Valdez Fisheries Development Ass'n, Inc. v. Alyeska Pipeline Service Co.*, 45 P.3d 657, 664 (Alaska 2002) (citing *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1998)).

dismissal for failure to state a claim only if "it appears beyond doubt" that the plaintiff can prove no set of facts which would entitle relief.[10]

## IV. DISCUSSION

### A. Specific Claims

#### 1. The Unfair Trade Practices and Consumer Protection Act

The Unfair Trade Practices and Consumer Protection Act ("UTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."[11]  To establish a prima facie case of unfair or deceptive acts, the State must allege facts which if proven would establish: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred.[12]

Whether an act or practice is deceptive is determined simply by asking "whether it has the capacity to deceive."[13]  The plaintiff need not prove that the defendant intended to deceive; it is enough to show that the acts and practices were "capable of being interpreted in a misleading way."[14]  As a remedial statute intended to provide consumers more protection than its federal counterpart, Alaska's UTPA is applied broadly.[15]

---

[10]  *Id.*
[11]  AS § 45.50.471(a).
[12]  *Kenai Chrysler Center, Inc. v. Denison,* 167 P.3d 1240, 1255 (Alaska 2007) (quoting *State of Alaska v. O'Neill Inv., Inc.*, 609 P.2d 520 at 534-35 (Alaska 1980)).
[13]  *Id.*
[14]  *Id.*
[15]  *Id.*

The State claims Purdue has violated the UTPA by engaging in deceptive trade practices through its marketing and advertising of opioids.[16]  The State alleges Purdue:

> [M]isrepresents, even today, to Alaska doctors and patients the risk of opioid addiction.  Specifically, Purdue affirmatively misrepresents that: (a) pain patients do not become addicted to opioids; (b) its long-acting opioids are steady-state and less addictive; (c) doctors can identify and manage the risk of addiction; (d) patients who seem addicted are merely 'pseudo-addicted,' and should be treated with more opioids; (e) opioid addiction is the product not of narcotic opioids, but problem patients and doctors; and (f) opioid abuse and addiction manifest in snorting and injecting the drugs, when oral abuse is far more common.[17]

Paragraph 162(a)-(i) of the complaint has alleged facts sufficient to establish a prima facie case of deceptive trade practices under the UTPA.

The State also claims Purdue violated the UTPA by engaging in unfair trade practices.[18]  An act or practice can be unfair without being deceptive.[19]  Unfairness is determined by a variety of factors, including: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise, whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of fairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers (or competitors or other businessmen).[20]

---

[16]    Complaint ¶ 161; violations of §§ 45.50.471(b)(4), (7), (11), (12).  It appears undisputed that Purdue is "engaged in trade or commerce."

[17]    *Id.* at ¶ 45.

[18]    *Id.* at ¶ 164; a violation of § 45.50.471(a).

[19]    *State v. O'Neill* at 535.

[20]    *Id.* (internal citation omitted).

The State alleges Purdue's promotion of addictive drugs was contrary to public policy in Alaska, was immoral and unethical, and caused substantial injury to consumers.[21] For example, the State cites the Governor's "Declaration on Disaster" due to a "public health disaster emergency" as evidence that Alaska policy and facts alleged in paragraph 164(a)-(i) are sufficient to establish a claim for unfair practices.

The State also alleges violations of the UTPA's prohibition of unfair methods of competition.[22] The State alleges Purdue has promoted "OxyContin as providing 12 hours of pain relief and promoted abuse deterrent formulations of its opioids as more difficult to abuse and less addictive as a means of maintaining a competitive advantage against other opioids."[23] The State also alleges Purdue promoted opioids as superior to other analgesics, such as NSAIDS, by exaggerating the risks of NSAIDS, and omitting the risks of opioids.[24]

The State has alleged facts sufficient to establish a claim for unfair methods of competition.

### 2. The Alaska Medical Assistance False Claim and Reporting Act.

The State's second cause of action raises an issue of first impression. The Alaska Medical Assistance False Claim and Reporting Act ("FCA") was enacted by the Alaska Legislature in 2016 as part of a package of Medicaid reform.[25] The effective date of the

---

[21]     *Id*. at ¶ 164.

[22]     *Id*. at ¶¶ 165 - 168.

[23]     *Id*. at ¶ 165.

[24]     *Id*.

[25]     Senate Bill 74, SLA 2016, ch. 25, § 18, effective September 19, 2016. AS 09.58.010, *et seq*.

statute is September 19, 2016.[26]  The Alaska FCA provides for civil penalties, in addition to criminal penalties, for filing false or fraudulent claims for medical services or products for reimbursement by the State's medical assistance programs.

Purdue raises a number of objections to the State's FCA cause of action, but one is dispositive.  Purdue argues the claim must be dismissed as time-barred because a retroactive application of the statute is prohibited.  While statute of limitations is usually pled as an affirmative defense, a complaint may be subject to dismissal under Rule 12(b)(6) when "an affirmative defense appears clearly on the face of the pleading."[27] The court will consider whether the statute of limitations subjects the cause of action to dismissal because the issue of retroactivity appears clearly on the face of the pleadings.

In Alaska, a statutory presumption is that "[n]o statute is retrospective unless expressly declared therein."[28]  The Alaska Supreme Court has held that "[a]bsent clear language indicating legislative intent to the contrary, a law is presumed to operate prospectively only[.]"[29]  The court will "presume that statutes only have prospective effect 'unless a contrary legislative intent appears by express terms or necessary implication.'"[30]  There is neither an express statement nor a necessary implication in AS § 09.58.010 which would lead the court to automatically apply it retroactively.

---

[26]   *Id.*

[27]   *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 152 (Alaska 1987) (internal citation omitted).

[28]   AS § 01.10.090.

[29]   *State, Dep't. of Rev. v. Alaska Pulp America, Inc.*, 674 P.2d 268, 272 (Alaska 1983) (internal citation omitted).

[30]   *Thompson v. U.P.S.*, 975 P.2d 684, 688 (Alaska 1999) (quoting *Pan Alaska Trucking, Inc. v. Crouch*, 773 P.2d 947, 948 (Alaska 1989)).

The State argues for application of the FCA because the State alleges Purdue's conduct consists of an ongoing course of deceptive activities that began at least ten years ago, and continues today.[31]  After review of the Complaint, the court cannot find specific allegations of conduct occurring after September 16, 2016.[32]  Accordingly, the court finds the State's cause of action for violations of Alaska's FCA is time-barred.  The State will be granted leave to amend, should it so wish, to allege violations occurring after the effective date of the statute.

### 3.  Public Nuisance

The State's third claim for relief alleges Purdue has created a public nuisance.[33] The Alaska Supreme Court has indicated its agreement with federal common law defining a public nuisance as an unreasonable interference with a right common to the general public, such as a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.[34]

---

[31]  Plaintiff's *Amended Response in Opposition to Purdue Defendants' Motion to Dismiss Plaintiff's Complaint*, p. 27.

[32]  Complaint at ¶ 186.  The State cites data from 2013-2016.

[33]  *Id.* at ¶ 192.

[34]  *Friends of Willow Lake, Inc. v. State, Dept. of Transp. & Public Fac., et al.*, 280 P.3d 542, 548 (Alaska 2012) (quoting Restatement (Second) of Torts §821B(1) (1979) (defining public nuisance)).  *See also, Taha v. State*, 366 P.3d 544, 547 (Alaska Ct App. 2016) (defining public nuisance according to Black's Law Dictionary (10th ed. 2014) as "[a]n unreasonable interference with a right common to the general public, such as a condition dangerous to health, offensive to community moral standards, or unlawfully obstructing the public in the free use of public property").

The State alleges Purdue's conduct, as described in the complaint, has "been a substantial factor" in creating a public health crisis and state of emergency in Alaska.[35] The State alleges opioid use, overuse, and addiction has injured the State by causing deaths,[36] overwhelming medical resources and emergency rooms,[37] increasing illegal activity and law enforcement activities,[38] increasing costs for medical care of infants born with neonatal abstinence syndrome and requiring foster treatment,[39] and incurring significant expenses in addiction treatment.[40]

The court finds the facts as alleged could reasonably be construed as demonstrating a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience and therefore an interference with a right common to the general public.

The State has alleged facts sufficient to state a claim for public nuisance.

4. Fraud and Negligence/Negligent Misrepresentation

*a. Negligence*

The State has pled claims for strict products liability and negligence. Even if Purdue were found strictly liable for its products, Alaska permits a claim of negligence if

---

[35]  Complaint at ¶ 196.
[36]  *Id.* at ¶ 9.
[37]  *Id.* at ¶ 10.
[38]  *Id.* at ¶ 11.
[39]  *Id.* at ¶¶ 13-14.
[40]  *Id.* at ¶ 156.

a plaintiff shows that a defendant breached a duty owed to the plaintiff, and that the breach caused the plaintiff harm.[41]

The State argues Purdue had a duty to the State and its residents: (1) to exercise due care in the advertising, marketing, promotion, and sale of opioid drugs; (2) not to make false, misleading, or deceptive statements about opioids and treatment for chronic pain; and (3) to report suspicious prescribers.[42]  The State alleges Purdue breached those duties through its misrepresentations, causing the State to pay not only for the opioids, but also costs to mitigate the public health crisis.[43]

The State alleges facts sufficient to support a claim of negligence.

### b.  Fraud and Negligent Misrepresentation

The torts of fraud and negligent misrepresentation are similar in many ways.  To prevail on a claim of fraud, a plaintiff must establish: (1) misrepresentation; (2) made fraudulently; (3) for the purpose of inducing another to act in reliance on it; (4) justifiable reliance by the recipient; and (5) causing loss.[44]  A statement can be literally true and still be a fraudulent misrepresentation if the maker knows the statement is materially misleading.[45]

---

[41]   *Cusack v. Abbott Lab. Inc., et al.*, 2017 WL 3688149 (D. Alaska 2017) (citing *Silvers v. Silvers*, 999 P.2d 786, 793 (Alaska 2000)).

[42]   Complaint at ¶¶ 204, 205, 206.

[43]   *Id.* at ¶ 208.

[44]   *Asher v. Alkan Shelter, LLC.,* 212 P.3d 772, 781 (Alaska 2011) (abrogated on other grounds, *Shaffer v. Bellows*, 260 P.3d 1064 (2011) (citing *Lightle v. State, Real Estate Comm'n,* 146 P.3d 980, 983 (Alaska 2006)).

[45]   *Id.* (citing *Lightle* at 986).

A claim of negligent misrepresentation requires showing that:  (1) defendant made the statement in the course of his business, profession or employment, or in any other transaction in which he had a pecuniary interest; (2) the representation supplied false information; (3) plaintiff justifiably relied on that false  information; and (4) defendant failed to exercise reasonable care or competence in obtaining or communicating the information.[46]  In both causes of action, the alleged misrepresentation must relate to a past or present fact "susceptible of exact knowledge" at the time it was made.[47]

The State alleges Purdue engaged in false representation and concealment of material facts about the use of opioids to treat chronic pain.[48]  The State alleges Purdue knew "its statements about the risks and benefits of opioids to treat chronic pain were false or misleading," that Purdue intended to induce reliance among doctors, knowing doctors would rely on the misrepresentations, leading to damages caused by overuse of opioids.[49]

The State alleges facts sufficient to support a claim of fraud and negligent misrepresentation.

### 5. Strict Products Liability, Design Defect and Failure to Warn

In Alaska, "a manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a

---

[46]  *Bubbell v. Wien Air Alaska, Inc.,* 682 P.2d 374, 380 (Alaska 1984) (quoting Restatement (Second) of Torts §552(1) 1977).

[47]  *Cousineau v. Walker*, 613 P.2d 608, 611 n.4 (Alaska 1980).

[48]  Complaint at ¶ 200.

[49]  *Id.* at ¶¶ 201-214.

defect that causes injury to a human being."[50]  The defect can be a manufacturing defect, a design defect, or a failure to provide adequate warnings.[51]  The State alleges design defect and failure to warn.

Strict liability claims against manufacturers of prescription drugs for design defect and failure to warn are allowed in Alaska.[52]  In *Shanks v. Upjohn*, the Alaska Supreme Court established "that a prescription drug is defectively designed and strict liability should be imposed on its manufacturer if the prescription drug failed to perform as safely as an ordinary doctor would expect, when used by the patient in an intended and reasonably foreseeable manner."[53]  Regarding failure to warn, the Court found "the warnings should be sufficient to put the physician on notice of the nature and extent of any scientifically knowable risks or dangers inherent in the use of the drug."[54]  Strict liability may also attach to the inadequacy of the directions or instructions for the safe use of the product.[55]

---

[50]     *Shanks v. The Upjohn Co.*, 835 P.2d 1189, 1194 (Alaska 1992) (internal citation omitted).

[51]     *Id.*

[52]     *Id.* at 1198: "Alaska recognizes such claims and makes no exception for prescription drugs.  Neither policy nor reason supports the approach taken by some courts in barring such claims."

[53]     *Id.* at 1195.  The Court noted that in some cases, the ordinary consumer standard may apply, instead of the ordinary doctor standard.

[54]     *Id.* at 1200 (quoting *Polley v. Ciba-Geigy Corp.*, 658 F.Supp. 420 (D. Alaska 1987)).

[55]     *Id.* (quoting *Gosewisch v. American Honda Motor Co.*, 737 P.2d 376 (1987)).

The State alleges Purdue's opioid products are defectively designed because they fail to perform as safely as an ordinary consumer would expect.[56]  The State alleges Purdue's opioids failed to perform safely because they "carry a far greater risk and actual rate of addiction" than the public was led to believe, failed to provide "functional improvement" in patients, and OxyContin failed to provide the promised 12 hour relief.[57]

The State also alleges Purdue failed to "provide adequate warnings that clearly indicate the scope of the risk" and used "misrepresentations and omissions that contradicted and undermined its drug label."[58]

The State has alleged facts sufficient to state a claim for strict products liability.

6. Unjust Enrichment

In *Alaska Sales and Service v. Millet*, the Alaska Supreme Court explained unjust enrichment as follows:

> [a] person who has been unjustly enriched at the expense of another is required to make restitution to that person.  A person is enriched if he receives a benefit; a person is unjustly enriched if the retention of the benefit without paying for it would be unjust.[59]

The Court then set forth three elements of unjust enrichment: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation of such benefit; and (3)

---

[56]     Complaint at ¶ 217.  The State has used the consumer as the standard.  However, the Court in *Shanks* uses the ordinary doctor standard.  The Court did note that in some cases, the ordinary consumer standard might apply, instead of the ordinary doctor standard. *See Shanks*, fn7.

[57]     Complaint at ¶ 217.

[58]     Complaint at ¶¶ 218-219.

[59]     735 P.2d 745, 746 (Alaska 1987).

acceptance and retention by the defendant of such benefit under circumstances that it would be inequitable for the defendant to retain it without paying the value thereof.[60] Additionally, "[t]he courts are in accord in stressing that the most significant requirement for recovery in quasi-contract is that the enrichment to the defendant must be unjust; that is, the defendant must receive a true windfall or something for nothing."[61] Unjust enrichment is an equitable doctrine, which ordinarily falls within the court's broad discretion.[62]  Whether there has been unjust enrichment is generally a question of fact.[63]

In the instant case, the State argues that Purdue has unjustly retained a benefit, in revenue, while the State absorbed the cost of healthcare, addiction, and illegal activity related to the opioid epidemic.[64]

The State has alleged facts sufficient to state a claim for unjust enrichment.

## B. Purdue's Objections

Purdue moved to dismiss the Complaint under CR 12(b)(6) on seven grounds, as outlined above in Section II.  Because a Rule 12(b)(6) motion is only intended to

---

[60]  *Id.*

[61]  *Id.* (the Court uses the term quasi-contract, explaining  "[c]ourts generally treat actions brought upon theories of unjust enrichment, quasi-contract, contracts implied in law, and quantum meruit as essentially the same.").

[62]  *Id.* at 747.

[63]  *State, Dep't of Rev. Child Sup. Enfc't Div. v. Wetherelt,* 931 P.2d 383, 390 fn. 11 (Alaska 1997).

[64]  Complaint at ¶ 223.

test the sufficiency of a Complaint's allegations, not all of Purdue's arguments are properly considered at this stage of proceedings.[65]

As previously discussed, the court did consider Purdue's argument that the statute of limitations barred the State's cause of action for violations of the False Claims Act.[66]

The court will also consider Purdue's arguments relating to the applicability of Alaska Rule of Civil Procedure 9(b) as these relate directly to sufficiency of complaint.

Purdue argues for dismissal of all claims because the State does not adequately plead fraud. Because the State centers its claims around Purdue's alleged "deceptive and fraudulent" marketing, Purdue argues the State must plead all claims to the heightened standard of CR 9(b).

Rule 9(b) provides: "[I]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be pled with particularity." This standard is not high.[67] The rule "simply requires a claim of fraud to specify the time and place where the fraud occurred; it seeks to prevent conclusory pleading by requiring a complaint to

---

[65] Though presented as grounds for failure to state a claim, Purdue's remaining arguments, specifically, Purdue's objections on the grounds of federal preemption, as well as objections to the State's method of proving injury, are premature. Purdue may properly renew their arguments in further motion practice.

[66] The court will not consider the statute of limitations regarding the State's UTPA claim, as it does not appear clearly on its face from the Complaint that the claim is time-barred. Purdue may raise it an affirmative defense or renew the argument by further motion practice.

[67] *Asher v. Alkan Shelter*, LLC, 212 P.3d 772, 778 (Alaska 2009).

do more than 'recit[e] without specificity that fraud existed.'"[68]   The rule does not prevent plaintiffs from filing complaints based on available information and belief.[69]

The State's complaint meets the requirement of CR 9(b).  It alleges Purdue knowingly misrepresented the efficacy, safety, and risk of its products, through marketing and direct promotion to doctors, for the purpose of increasing sales.  The State alleges Purdue intended doctors to rely on their misrepresentations, knew doctors did rely on the misrepresentations, causing prescriptions for medically unnecessary opioids to be paid for by the State. The State has alleged all the elements of fraud with sufficient specificity.[70]

The court will also address Purdue's argument concerning causation because Purdue contends that all of the State's claims fail as a matter of law because the State has not and cannot adequately plead a causal nexus between Purdue's alleged misconduct and the State's alleged injuries.

In essence, Purdue argues the State's injuries are too remote from Purdue's alleged activities to ascribe any liability to Purdue.  Holding Purdue liable for the "opioid epidemic disregards many intervening actors and superseding events in the casual chain."[71]  Purdue urges this court to find "proximate cause cannot be established

---

[68]   *Id.* (internal citation omitted).

[69]   *Id.*

[70]   Purdue asserts the State must identify, for example, specific doctors who relied on Purdue marketing materials, or specific sale representatives who allegedly made misleading statements.  Such a level of detail is not required; the State may through discovery develop its evidence through any method of proof it chooses.

[71]   Purdue's *Memorandum of Law in Support of the Purdue Defendants' Motion to Dismiss Plaintiff's Complaint* at p.19.

as a matter of law because the chain of causation is too attenuated, too indirect, too remote, and speculative…"[72] and to reject a "fraud on the market theory."[73]

The State opposes, arguing that Purdue should not escape liability simply because Purdue has developed a "sophisticated and deceptive marketing scheme." The State's point is well taken and the court is not persuaded to dismiss the complaint for lack of causation.

The State's main argument is that Purdue created a market for long term opioid use for non-acute pain where none existed before, and then filled that market with its products.  The State alleges a very sophisticated fraudulent and deceptive marketing scheme to influence the medical community, which included direct marketing of its products to doctors.  The State alleges Purdue helped to change the perception of opioid risk and benefit and promoted its use to general practitioners through marketing materials, medical literature, articles, symposia, and direct approach to doctors.

It is sufficient that the complaint alleges there is a connection between Purdue's marketing of its opioid products and the injuries to the State.  In Alaska, the issue of proximate cause is usually reserved for the trier of fact.[74]

The State has alleged adequate facts to support its theory of causation.

---

[72]     *Id.* at p. 21.

[73]     *Id.* at p. 22.

[74]     *See Winschel v. Brown*, 171 P.3d 142, 148 (Alaska 2017) (holding fact questions as to proximate cause and superseding causation precluded summary judgment).

## V. CONCLUSION

In order to prevail against the Rule 12(b)(6) motion, the State would have to set forth allegations of fact consistent with some enforceable cause of action on any possible theory.  With the exception of the claim for violations of Alaska's False Claim Act, the State has done so.  It does not appear beyond doubt that the State can prove no set of facts which would entitle relief for unfair trade practices, public nuisance, fraud, negligence, negligent misrepresentation, strict products liability, and unjust enrichment.[75]

Therefore, the *Motion to Dismiss* is GRANTED IN PART.  The State's second cause of action for violations of Alaska's Medical Assistance and False Claims Act is DISMISSED, with LEAVE TO AMEND.

The *Motion to Dismiss* is DENIED in all other respects.

**Defendants' Answer to the Complaint is due TWENTY DAYS from the date of this order.**

IT IS SO ORDERED.

DATED at Anchorage, Alaska this 12 July 2018.

_____
Dani Crosby
Superior Court Judge

---

[75]    Purdue also argued the State's allegation for reporting suspicious orders did not state a claim.  The Complaint did not include a cause of action for the alleged violations; the allegations were made to support the State's claim of unfair and deceptive trade practices.  Complaint at ¶ 147.

I certify that on __7/12/18__ a copy
of the above was mailed to each of the
following at their address of record:
L. SINGER / M. MICHALETZ / D. GROSS / C. FRANKLIN / K. PARKER
R. RICHMOND

Judicial Assistant

# EXHIBIT 4

**FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM**        INDEX NO. 400000/2017

NYSCEF DOC. NO. 468                                        RECEIVED NYSCEF: 07/17/2018



SHORT FORM ORDER                                    INDEX No. ___400000/2017___

SUPREME COURT - STATE OF NEW YORK
NEW YORK STATE OPIOID LITIGATION PART 48 - SUFFOLK COUNTY

*PRESENT*:

Hon. _____JERRY GARGUILO_____
Justice of the Supreme Court

-----------------------------------------------------------X
                           :     MOTION DATE ___2/7/18 (#008, #012, #016)___
                           :     MOTION DATE ___3/22/18 (#022, #023)___
                           :     ADJ. DATE ___3/21/18 (#008, #012, #016)___
                           :     ADJ. DATE ___3/28/18 (#022, #023)___
IN RE OPIOID LITIGATION         :     Mot. Seq. #008 - MD
                           :     Mot. Seq. #012 - MD
                           :     Mot. Seq. #016 - MD
                           :     Mot. Seq. #022 - MD
                           :     Mot. Seq. #023 - MD
-----------------------------------------------------------X

        Upon the reading and filing of the following papers in this matter: (1) Notice of Motion by defendants McKesson Corp., Cardinal Health, Inc., Kinray, LLC, AmerisourceBergen Drug Corp. s/h/a Amerisource Drug Corp., and Bellco Drug Corp. (Mot. Seq. #008), dated November 10, 2017, and supporting papers (including Memorandum of Law); (2) Affirmation in Opposition (Mot. Seq. #008), dated January 19, 2018, and supporting papers (including Memorandum of Law); (3) Reply Memorandum of Law (Mot. Seq. #008), dated February 23, 2018; (4) Notice of Motion by defendant Rochester Drug Cooperative, Inc. (Mot. Seq. #012), dated November 29, 2017, and supporting papers (including Memorandum of Law); (5) Affirmation in Opposition by the plaintiffs (Mot. Seq. #012), dated February 9, 2018, and supporting papers (including Memorandum of Law); (6) Reply Memorandum of Law (Mot. Seq. #012), dated March 16, 2018; (7) Notice of Motion by defendant Kinray, LLC (Mot. Seq. #016), undated; (8) Notice of Motion by defendant PSS World Medical, Inc. (Mot. Seq. #022), dated December 21, 2017, and supporting papers; (9) Affirmation in Opposition by the plaintiffs (Mot. Seq. #022), dated February 14, 2018; (10) Reply Affirmation by defendant PSS World Medical, Inc. (Mot. Seq. #022), dated February 23, 2018; (11) Notice of Motion by defendant American Medical Distributors, Inc. (Mot. Seq. #023), dated January 8, 2018, and supporting papers; and (12) Affirmation in Opposition by the plaintiffs (Mot. Seq. #023), dated March 21, 2018; it is

        ***ORDERED*** that the motion by defendants McKesson Corp., Cardinal Health, Inc., Kinray, LLC, AmerisourceBergen Drug Corp. s/h/a Amerisource Drug Corp., and Bellco Drug Corp., the motion by defendant Rochester Drug Cooperative, Inc., the motion by defendant Kinray, LLC, the motion by defendant PSS World Medical, Inc., and the motion by defendant American Medical Distributors, Inc., are hereby consolidated for purposes of this determination; and it is

        ***ORDERED*** that defendants' motions for an order pursuant to CPLR 3211, dismissing as against each and all of them the master form long complaint filed in this action, are denied.

        The plaintiffs are counties within the State of New York that have commenced separate actions against certain pharmaceutical manufacturers and distributors for harm allegedly caused by false and misleading marketing campaigns promoting semi-synthetic, opium-like pharmaceutical pain relievers

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 2

(hereinafter referred to as prescription opioids or opioids) as safe and effective for long-term treatment of chronic pain, and by the sale and distribution of those medications in such counties.  Also named as defendants in those actions are certain individual physicians allegedly "instrumental in promoting opioids for sale and distribution nationally" and in such counties.  Briefly stated, the plaintiffs allege that tortious and illegal actions by the defendants fueled an opioid crisis within such counties, causing them to spend millions of dollars in payments for opioid prescriptions for employees and Medicaid beneficiaries that would have not been approved as necessary for treatment of chronic pain if the true risks and benefits associated with such medications had been known.  They also allege that the defendants' actions have forced them to pay the costs of implementing opioid treatment programs for residents, purchasing prescriptions of naloxone to treat prescription opioid overdoses, combating opioid-related criminal activities, and other such expenses arising from the crisis.

One such lawsuit was commenced in August 2016 by Suffolk County and assigned to the Commercial Division of the Supreme Court.  By order dated July 17, 2017, the Litigation Coordinating Panel of the Unified Court System of New York State directed the transfer of eight opioid-related actions brought by other counties, and any prospective opioid actions against the manufacturer, distributor, and individual defendants, to this court for pre-trial coordination.  That same day, the undersigned issued a case management order reiterating that the individual actions are joined for coordination, not consolidated, and directing that a master file, known as "In re Opioid Litigation" and assigned index number 400000/2017, be established for the electronic filing of all documents related to the proceeding. The undersigned further directed the plaintiffs to file and serve a master long form complaint subsuming the causes of action alleged in the various complaints, and directed the manufacturer defendants, the distributor defendants, and the individual defendants to file joint motions pursuant to CPLR 3211, seeking dismissal of the master complaint, all by certain dates.

The master long form complaint filed by the plaintiffs names as defendants the pharmaceutical distributors McKesson Corp., Cardinal Health, Inc., Kinray, LLC, AmerisourceBergen Drug Corp. s/h/a Amerisource Drug Corp., Bellco Drug Corp., Rochester Drug Cooperative, Inc., Kinray, LLC, PSS World Medical, Inc., and American Medical Distributors, Inc. (hereinafter collectively referred to as the distributor defendants).  As relevant to the motions that are the subject of this order, the plaintiffs allege in the master long form complaint (hereinafter the complaint) that the distributor defendants, acting in concert with the codefendants to maximize profits, intentionally misrepresented to the public the risks and benefits of prescription opioids for the treatment of chronic pain.  More particularly, the plaintiffs allege that the distributor defendants participated in developing deceptive marketing campaigns to reverse the stigma historically associated with opioid use, to create a false body of medical literature, to undermine information on drug labels, and to falsely portray prescription opioids as a preferred treatment option–all the while disguising their roles in such marketing by funding, working through, and hiding behind professional front organizations and key opinion leaders (KOLs).  The plaintiffs claim that those representations and campaigns were material to and influenced their decisions to pay claims for prescription opioids, and compelled them, ultimately, to bear the costs of the ensuing opioid epidemic. The plaintiffs further allege that the distributor defendants delivered or allowed to be delivered an excessive and unreasonable amount of opioid pain medications to the plaintiff counties, despite knowing that such substances were particularly susceptible to abuse and diversion, and that they failed to

NYSCEF DOC. NO. 468

In re Opioid Litig.
Index No. 400000/2017
Page 3

investigate or take steps necessary to prevent the counties from being flooded with prescription opioids.

The complaint also names as defendants the pharmaceutical manufacturers Purdue Pharma L.P., Purdue Pharma, Inc., and The Purdue Frederick Company, Inc.; Teva Pharmaceuticals USA, Inc. and Cephalon, Inc.; Johnson & Johnson, Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., n/k/a Janssen Pharmaceuticals, Inc., and Ortho-McNeil-Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals, Inc.; Endo Health Solutions, Inc., and Endo Pharmaceuticals, Inc.; Allergan plc f/k/a Actavis plc, Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; and Insys Therapeutics, Inc.  Their motion to dismiss the complaint is the subject of a prior order dated June 18, 2018.  In addition, the complaint names as defendants the physicians Russell Portenoy, Perry Fine, Scott Fishman, and Lynn Webster.  The court notes that a stipulation discontinuing the claims against Dr. Portenoy without prejudice to any related action was filed by the plaintiffs on March 16, 2018.

The complaint sets forth seven causes of action against all defendants.  The first cause of action alleges deceptive business practices in violation of General Business Law § 349, and the second cause of action alleges false advertising in violation of General Business Law § 350.  The third cause of action asserts a common-law public nuisance claim, the fourth cause of action asserts a claim for violation of Social Services Law § 145-b, and the fifth cause of action asserts a claim for fraud.  The sixth cause of action is for unjust enrichment, and the seventh cause of action is for negligence.

The distributor defendants now jointly and separately move, pre-answer, for an order dismissing the complaint pursuant to CPLR 3211 (a) (5) and (7).  While the court recognizes that subdivision (e) of CPLR 3211 permits a defendant to make only one motion under subdivision (a), it also recognizes the complexity of this matter as well as its unusual procedural framework; as the plaintiffs have been afforded ample opportunity to respond and have, in fact, submitted substantive opposition to each of the motions, the court will, for current purposes, waive compliance with the single-motion rule.

When considering a motion to dismiss, a court must give the pleading a liberal construction, presume the allegations of the complaint are true, afford the plaintiff the benefit of every favorable inference, and determine only whether the facts as alleged fit within a cognizable legal theory (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19, 799 NYS2d 170 [2005]; *Leon v Martinez*, 84 NY2d 83, 87-88, 614 NYS2d 972 [1994]).  "Whether a plaintiff can ultimately establish [the] allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d at 19, 799 NYS2d at 175).

A party seeking dismissal under CPLR 3211 (a) (5) based on a statute of limitations defense bears the initial burden of establishing a prima facie case that the time to commence the cause of action expired (*see Texeria v BAB Nuclear Radiology, P.C.*, 43 AD3d 403, 840 NYS2d 417 [2d Dept 2007]).  On a motion to dismiss under CPLR 3211 (a) (7), the initial test is whether the pleading states a cause of action, not whether the plaintiff has a cause of action (*Guggenheimer v Ginzburg*, 43 NY2d 268, 401 NYS2d 182 [1977]; *Sokol v Leader*, 74 AD3d 1180, 904 NYS2d 153 [2d Dept 2010]).  If documentary proof is submitted by a party seeking relief under CPLR 3211 (a) (7), the truthfulness of the pleadings

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 4

need not be assumed. Instead, the test applied by the court is whether the plaintiff has a cause of action, not whether one is stated in the complaint (*Guggenheimer v Ginzburg*, 43 NY2d at 275, 401 NYS2d at 185; *Peter F. Gaito Architecture, LLC v Simone Dev. Corp.*, 46 AD3d 530, 530, 846 NYS2d 368, 369 [2d Dept 2007]; *Rappaport v International Playtex Corp.*, 43 AD2d 393, 395, 352 NYS2d 241, 243 [3d Dept 1974]).

In the analysis that follows, the court will first discuss those issues bearing on multiple causes of action before examining each of the causes of action separately for legal sufficiency.

Particularity in Pleadings

The distributor defendants argue that the first five causes of action must be dismissed against them, because the county plaintiffs "do not allege with the requisite specificity (or any specificity) that any distributor defendants made any misrepresentations or engaged in any misleading marketing activity." More particularly, they contend that the complaint fails to provide details of any claimed misrepresentations by them or to make specific and separate allegations against them, and instead simply lumps them together in generically crafted paragraphs. They claim that the plaintiffs' failure to plead those causes of action with the requisite specificity warrants dismissal under CPLR 3013 and 3016 (b).

The court disagrees. CPLR 3013 requires, in pertinent part, only that statements in a pleading "be sufficiently particular to give the court and parties notice" of the transactions and occurrences to be proved. And although CPLR 3016 (b) requires that a cause of action based in fraud "must sufficiently detail the allegedly fraudulent conduct, that requirement should not be confused with unassailable proof of fraud. Necessarily, then, the mandate of CPLR 3016 (b) may be met when the facts are sufficient to permit a reasonable inference of the alleged conduct" (*Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 492, 860 NYS2d 422, 425 [2008]). Even in fraud, a plaintiff is not required to allege specific details of an individual defendant's participation where those details are peculiarly within the defendant's knowledge (*id.*; *Jered Contr. Co. v New York City Tr. Auth.*, 22 NY2d 187, 194, 292 NYS2d 98, 103-104 [1968]).

Moreover, the plaintiffs allege that all of the defendants–the manufacturers, the distributors, and the individual physicians–cooperated in an integrated scheme promoting the use of prescription opioids for chronic pain that helped give rise to the current opioid epidemic. They allege, in part, that the defendants engaged in deceptive marketing, geared to both the medical community and the public, about the dangers and benefits of long-term opioid therapy for the treatment of chronic pain, and that the distributor defendants assisted in the unbranded marketing portion of the scheme by providing funds to front groups. Such united efforts to increase the market for prescription opioids, the plaintiffs assert, make all defendants subject to liability under the concerted action theory. "The theory of concerted action 'provides for joint and several liability on the part of all defendants having an understanding, express or tacit, to participate in a common plan or design to commit a tortious act'" (*Rastelli v Goodyear Tire & Rubber Co.*, 79 NY2d 289, 295, 582 NYS2d 373, 375 [1992], quoting *Hymowitz v Eli Lilly & Co.*, 73 NY2d 487, 507, 541 NYS2d 941, 946 [1989]; *see Ravo v Roatnick*, 70 NY2d 305, 309, 520 NYS2d 523, 535 [1987] ["concerted wrongdoers are considered 'joint tort-feasors' and in legal

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM
NYSCEF DOC. NO. 468

INDEX NO. 400000/2017
RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 5

contemplation, there is a joint enterprise and a mutual agency, such that the act of one is the act of all and liability for all that is done is visited upon each"]; *Herman v Wesgate*, 94 AD2d 938, 464 NYS2d 315 [4th Dept 1983]). As explained in the Restatement (Second) of Torts § 876, a defendant is liable for harm to a third person resulting from the tortious conduct of another if (1) it commits a tortious act in concert with or pursuant to a common design with the other, (2) it knows the other's conduct constitutes a breach of duty and provides substantial assistance or encouragement to the other to commit such conduct, or (3) it gives substantial assistance to the other in achieving a tortious result and its own conduct, separately considered, constitutes a breach of a duty of care owed to the third person (*see Bicher v Eli Lilly & Co.*, 55 NY2d 571, 450 NYS2d 776 [1982]; *see also* Prosser & Keeton, Torts § 46 [5th ed 1984]).

For liability to be imposed under a concerted action theory, it is essential that each defendant charged with acting in concert acted tortiously and that at least one of the defendants "committed an act in pursuance of the agreement which constituted a tort" (*Rastelli v Goodyear Tire & Rubber Co.*, 79 NY2d 289, 295, 582 NYS2d 373, 375; *see Small v Lorillard Tobacco Co.*, 94 NY2d 43, 698 NYS2d 615 [1999]; *Herman v Wesgate*, 94 AD2d 938, 464 NYS2d 315). Here, the plaintiffs allege that the manufacturer defendants, seeking mass-market opportunities for their opioid products, devised and implemented deceptive marketing campaigns designed to eliminate the historic stigma of opioid use so that the medical community and the public would embrace prescription opioid therapy for noncancer-related pain. They allege, among other things, that the manufacturer defendants, through print and digital marketing strategies that included undermining information on branded labels, giving out misleading promotional materials, creating a false body of medical literature, and withholding information, deceived the medical community and the public about the effectiveness and dangers of long-term opioid therapy for the treatment of chronic pain. They further allege that the manufacturer defendants disguised their roles in that scheme by funding, working through, and hiding behind professional organizations, referred to as front groups, and KOLS, supposed experts in the field of pain management. Significantly, the plaintiffs also allege that the distributor defendants conspired with the manufacturer defendants in their unbranded marketing campaigns by joining and funding the same front groups that disseminated deceptive messages about the dangers and benefits of prescription opioids.

Additionally, the plaintiffs allege that the distributor defendants–which are licensed to act as intermediaries between manufacturers and pharmacies, or other persons or entities licensed to accept delivery of Schedule II controlled substances, and which play a carefully defined role in the federal- and state-regulated pharmaceutical distribution system–were integral to the scheme to expand the market for prescription opioids by shipping suspicious orders and by not investigating or taking other actions to prevent the plaintiff counties from becoming oversaturated with these drugs. The court finds these allegations in the complaint, and the inferences that can be drawn therefrom, sufficient for the plaintiffs to proceed against the distributor defendants for misrepresentations and deceptive marketing based on the theory of concerted action (*see Rodriguez v City of New York*, 35 AD3d 702, 827 NYS2d 220 [2d Dept 2006]; *cf. Rastelli v Goodyear Tire & Rubber Co.*, 79 NY2d 289, 582 NYS2d 373; *Hymowitz v Eli Lilly & Co.*, 73 NY2d 487, 541 NYS2d 941).

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 6

Municipal Cost Recovery Rule

The distributor defendants' assertion that the plaintiffs are barred under the municipal cost
recovery rule from recovering the costs of governmental services incurred in connection with the opioid
crisis is rejected. The municipal cost recovery rule, also known as the free public services doctrine,
precludes municipalities from recovering as damages from a tortfeasor the cost of public services, such
as police and fire protection, required as a consequence of an accident or emergency (*see Koch v
Consolidated Edison Co. of N.Y.*, 62 NY2d 548, 560, 479 NYS2d 163 [1984]; *Austin v City of Buffalo*,
182 AD2d 1143, 586 NYS2d 841 [4th Dept 1992]; *City of Buffalo v Wilson*, 179 AD2d 1079, 580
NYS2d 679 [4th Dept 1992]; *see also e.g. County of Erie, New York v Colgan Air, Inc.*, 711 F3d 147
[2d Cir 2013]; *City of Flagstaff v Atchison, Topeka & Santa Fe Ry. Co.*, 719 F2d 322 [9th Cir 1983]).
In *Koch*, the Court of Appeals held that New York City could not recover as damages from Consolidated
Edison the costs it incurred "for wages, salaries, overtime and other benefits of police, fire, sanitation
and hospital personnel from whom services (in addition to those which would normally have been
rendered) were required" as a consequence of a 25-hour blackout caused by the company's gross
negligence, holding "[t]he general rule is that public expenditures made in the performance of
governmental functions are not recoverable" (*Koch v Consolidated Edison Co. of N.Y.*, 62 NY2d at
560, 479 NYS2d at 170). And in *City of Flagstaff*, a seminal case for the municipal cost recovery rule,
the Ninth Circuit held that the cost of providing police, fire, and emergency services "from fire or safety
hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence
creates the need for the services," reasoning that a rule allocating such expenses to the tortfeasor who
caused an accident or other public emergency would upset "[e]xpectations of individuals and businesses,
as well as their insurers," and that the legislature, not the court, is the appropriate forum in which to
address whether the costs related to public emergencies should be shifted to the responsible party (*City
of Flagstaff v Atchison, Topeka & Santa Fe Ry. Co.*, 917 F2d at 323-324). The municipal cost
recovery rule, however, does not bar a cause of action for public nuisance (*see County of Erie, New
York v Colgan Air, Inc.*, 711 F3d 147; *see also State of New York v Schenectady Chems.*, 117 Misc 2d
960, 459 NYS2d 971 [Sup Ct, Rensselaer County 1983]), and an exception exists permitting recovery
for public expenses authorized by statute or regulation (*Koch v Consolidated Edison Co. of N.Y.*, 62
NY2d at 561, 479 NYS2d at 170).

The plaintiffs allege, among other things, they were harmed by having to pay the costs of
prescription opioid therapy for employees and Medicaid beneficiaries complaining of chronic, non-
cancer pain when such treatment was not medically necessary or reasonably required, and that, but for
the misrepresentations made by the defendants and their front groups about the benefits and risks of
long-term prescription opioid therapy, they would not have approved payment for such therapy. A
review of the current state of the law reveals no case law supporting the contention that the municipal
cost recovery rule bars recovery for expenses incurred, not by reason of an accident or an emergency
situation necessitating "the normal provision of police, fire and emergency services" (*City of Flagstaff v
Atchison, Topeka & Santa Fe Ry. Co.*, 719 F2d at 324), but to remedy public harm caused by an
intentional, persistent course of deceptive conduct.

The court now turns to an examination of the legal sufficiency of the plaintiffs' causes of action.

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM
NYSCEF DOC. NO. 468

INDEX NO. 400000/2017
RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 7

First Cause of Action/General Business Law § 349

General Business Law § 349 (a) provides that it is unlawful to perform "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." Although the statute's scope is broad, applying to virtually all types of economic activity (*Karlin v IVF Am., Inc.*, 93 NY2d 282, 290, 690 NYS2d 495, 498 [1999]), its application is strictly limited to deceptive acts or practices leading to consumer transactions in New York (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 746 NYS2d 858 [2002]). Enacted in 1970 to protect New York consumers and to secure "'an honest market place where trust prevails between buyer and seller'" (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 24-25, 623 NYS2d 529, 532 [1995], quoting Mem of Governor Rockefeller, 1970 Legis Ann, at 472), the statute initially was enforceable only by the Attorney General. Subsequently, recognizing that the Attorney General's resources only allowed for limited enforcement of the consumer protection provisions of General Business Law article 22-A, the Legislature amended the statute to allow private plaintiffs to bring consumer fraud actions (General Business Law § 349 [h]; *Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d 200, 205, 785 NYS2d 399, 402 [2004]; *Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 324, 746 NYS2d 858, 863; *Karlin v IVF Am., Inc.*, 93 NY2d 282, 690 NYS2d 495, 499).

To state a cause of action under General Business Law § 349, a plaintiff must allege (1) that the defendant engaged in an act that was directed at consumers, (2) that the act engaged in was materially deceptive or misleading, and (3) that the plaintiff was injured as a result (*Stutman v Chemical Bank*, 95 NY2d 24, 29, 709 NYS2d 892, 895 [2000]; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d at 24-25, 623 NYS2d at 532). As to the first element, for pleading purposes, the claim of consumer-oriented conduct must be premised on allegations of facts sufficient to show the challenged acts or practices are "directed at the consuming public" (*Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 343, 704 NYS2d 177, 182 [1999]) or have a broad impact on consumers at large (*see Karlin v IVF Am., Inc.*, 93 NY2d 282, 690 NYS2d 495; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 623 NYS2d 529). "Consumer-oriented conduct does not require a repetition or pattern of conduct" (*id.* at 25, 623 NYS2d at 533; *see New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 639 NYS2d 283 [1995]). Sufficient consumer-oriented conduct has been found where a defendant employed "multi-media dissemination of information to the public" (*Karlin v IVF Am., Inc.*, 93 NY2d at 293, 690 NYS2d at 500), or employed an "extensive marketing scheme" that had a broad impact on consumers (*Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d at 344, 704 NYS2d at 182). And though the term "consumers" has been construed to mean those who purchase goods and services for personal, family or household use (*see Benetech, Inc. v Omni Fin. Group, Inc.*, 116 AD3d 1190, 984 NYS2d 186 [3d Dept 2014]), courts have recognized the standing of business entities and business-like entities to sue under General Business Law § 349 for actions and practices which were "directed at or had a broader impact on consumers at large" and caused them harm (*see Accredited Aides Plus, Inc. v Program Risk Mgt., Inc.*, 147 AD3d 122, 46 NYS3d 246 [3d Dept 2017]; *Pesce Bros., Inc. v Cover Me Ins. Agency of NJ, Inc.*, 144 AD3d 1120, 43 NYS3d 85 [2d Dept 2016]; *North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD3d 5, 953 NYS2d 96 [2d Dept 2012]; *see also Securitron Magnalock Corp v Schnabolk*, 65 F3d 256, 265 [2d Cir 1995]). "The

In re Opioid Litig.
Index No. 400000/2017
Page 8

critical question [] is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer" (*id.* at 265; *see North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD3d 5, 953 NYS2d 96).

As to the second element, a plaintiff must allege the challenged act or practice was "misleading in a material way" (*Stutman v Chemical Bank*, 95 NY2d at 29, 709 NYS2d at 895). "In determining whether a representation or omission is a deceptive act, the test is whether such act is 'likely to mislead a reasonable consumer acting reasonably under the circumstances'" (*Andre Strishak & Assoc. v Hewlett Packard Co.*, 300 AD2d 608, 609, 752 NYS2d 400, 402 [2d Dept 2002], quoting *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d at 26, 623 NYS2d at 533; *see Amalfitano v NBTY, Inc.*, 128 AD3d 743, 9 NYS3d 372 [2d Dept 2015]). The statutory phrase "deceptive acts or practices" does not apply to "the mere invention of a scheme or marketing strategy, but [to] the actual misrepresentation or omission to a consumer" (*Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d at 325, 746 NYS2d at 865). Thus, General Business Law § 349 is limited to conduct which undermines a consumer's ability "to evaluate his or her market options and to make a free and intelligent choice" in the marketplace (*North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD3d at 13, 953 NYS2d at 102). And while businesses are not required to guarantee that a consumer has all the relevant information specific to its particular situation, an omission-based claim under section 349 is appropriate "where the business alone possesses material information that is relevant to the consumer and fails to provide this information" (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d at 26, 623 NYS2d at 533; *see Bildstein v Mastercard Intl., Inc.*, 2005 WL 1324972 [SD NY 2005]). Significantly, while the evidence must show a representation or omission by the offending party likely to mislead a reasonable consumer acting reasonably under the circumstances, the conduct need not rise to the level of common-law fraud to be actionable (*Stutman v Chemical Bank*, 95 NY2d at 29, 709 NYS2d at 896; *Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d at 343, 704 NYS2d at 182), and no proof of intent to defraud by the defendant or justifiable reliance by a consumer is required (*see Koch v Acker, Merrall & Condit Co.*, 18 NY3d 940, 944 NYS2d 422 [2012]; *Small v Lorillard Tobacco Co.*, 94 NY2d 43, 698 NYS2d 615 [1999]; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 623 NYS2d 529; *Valentine v Quincy Mut. Fire Ins. Co.*, 123 AD3d 1011, 1 NYS3d 161 [2d Dept 2014]).

As to the third element, a plaintiff is required to allege and prove "actual injury," though not necessarily pecuniary harm, to such plaintiff as a result of the defendant's deceptive act or practice (*City of New York v Smokes-Spirits.Com, Inc.*, 12 NY3d 616, 623, 883 NYS2d 772 [2009]; *Stutman v Chemical Bank*, 95 NY2d at 29, 709 NYS2d at 896; *Small v Lorillard Tobacco Co.*, 94 NY2d at 55-56, 698 NYS2d at 620; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d at 26, 623 NYS2d at 533; *see Wilner v Allstate Ins. Co.*, 71 AD3d 155, 893 NYS2d 208 [2d Dept 2010]). A plaintiff need not quantify the amount of harm to the public at large or specify consumers who suffered pecuniary loss due to the defendant's alleged deceptive conduct (*see North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD3d 5, 953 NYS2d 96). The courts, however, have rejected efforts to expand the scope of General Business Law § 349 to include recovery for derivative or indirect injuries, finding that a plaintiff asserting such a claim must establish an actual loss or harm that is separate from the deception (*see City of New York v Smokes-Spirits.Com, Inc.*, 12 NY3d 616, 883

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 9

NYS2d 772; *North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD3d 5, 953 NYS2d 96; *Smith v Chase Manhattan Bank, USA*, 293 AD2d 598, 741 NYS2d 100 [2d Dept 2002]). Stated differently, a plaintiff lacks standing to bring an action under General Business Law § 349 if the claimed loss "arises solely as a result of injuries sustained by another party" (*Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d 200, 207, 785 NYS2d 399, 404 [2004]). Thus, an insurer or third-party payor of medical expenditures may not recover derivatively, but must proceed by way of an equitable subrogation action for injuries allegedly suffered by its insured due to a violation of General Business Law § 349 (*id.* at 206, 785 NYS2d at 403).

Initially, contrary to the assertions by the distributor defendants, the strict pleading requirements imposed by CPLR 3016 are inapplicable to a cause of action premised on General Business Law § 349 (*see Joannou v Blue Ridge Ins. Co.*, 289 AD2d 531, 735 NYS2d 786 [2d Dept 2001]; *McGill v General Motors Corp.*, 231 AD2d 449, 647 NYS2d 209 [1st Dept 1996]). Moreover, like its sister statute General Business Law § 350, General Business Law § 349 is a remedial statute (*Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d at 207, 785 NYS2d at 403; *see Morelli v Weider Nutrition Group*, 275 AD2d 607, 712 NYS2d 551 [1st Dept 2000]). Thus, it should be "liberally construed to carry out the reforms intended and to promote justice" (McKinney's Cons Laws of NY, Book 1, Statutes § 321).

The allegations in the complaint are legally sufficient to state a cause of action under General Business Law § 349 as against the distributor defendants. The plaintiffs allege that the defendants, acting in concert, employed assiduously crafted, multi-pronged marketing strategies that targeted the general public through websites, print advertisements, and educational materials and publications as part of their scheme to change the perception of the risks associated with prescription opioids and to de-stigmatize and normalize the long-term use of opioids for chronic nonmalignant pain. According to the complaint, marketing strategies designed to affect physicians' prescribing practices included advertising in print journals and online, sponsoring continuing medical education courses, and hiring KOLs to act as consultants and serve as lecturers.

The plaintiffs further allege that the defendants' marketing scheme included funding so-called front groups, such as the American Pain Foundation and the American Academy of Pain Medicine, which wrote and disseminated favorable educational materials, published "scientific literature" without scientific bases, and created opioid treatment guidelines supporting opioid therapy for chronic pain. They allege that the distributor defendants collaborated with the manufacturer defendants in their unbranded marketing efforts by funding and joining front groups, like the Pain Care Forum, a coalition of manufacturers, distributors, healthcare providers, patient advocacy groups, and others created to influence public opinion and policies regarding prescription opioids. The plaintiffs assert that, in addition to providing substantial funding to the front groups, the defendants exercised significant influence over the written materials, such as journal articles and treatment guidelines, and the educational programs presented by front groups and KOLs. Moreover, the plaintiffs allege that the defendants sponsored websites created by front groups and accessible by the public that promoted prescription opioids as a means for improving patients' normal daily functions and quality of life. Such allegations are sufficient to plead consumer-oriented conduct within the scope of General Business Law

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 10

§ 349 (*see Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 704 NYS2d 177; *Karlin v IVF Am., Inc.*, 93 NY2d 282, 690 NYS2d 495; *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d 20, 623 NYS2d 529; *Accredited Aides Plus, Inc. v Program Risk Mgt., Inc.*, 147 AD3d 122, 46 NYS3d 246 [3d Dept 2017]).

The plaintiffs also sufficiently allege materially deceptive acts and practices by the distributor defendants that undermined consumers' ability to assess the benefits and dangers of prescription opioids and to make informed decisions as to the efficacy and safety of opioid therapy for chronic pain (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 746 NYS2d 858; *Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 704 NYS2d 177; *Goldman v Simon Prop. Group, Inc.*, 58 AD3d 208, 869 NYS2d 125 [2d Dept 2008]). Among the allegations of materially deceptive practices set forth in the complaint are claims that the distributor defendants, acting in concert with the manufacturer defendants, made and disseminated statements online, in advertisements, in publications, and in educational materials that misrepresented the risks of opioid addiction and falsely portrayed prescription opioids as a preferred treatment option for chronic pain, in particular by depicting such drugs as appropriate for long-term use and effective in improving patients' quality of life and ability to function on a day-to-day basis. The plaintiffs also allege that the distributor defendants, together with the manufacturer defendants, employed front groups and KOLs to disseminate misleading information through educational forums, publications, and websites that reinforced such marketing messages, and to deceive the medical community and the public about the effectiveness of opioids in treating chronic pain, the proper dosing and titration of opioids, and the danger of addiction. In addition, the plaintiffs allege that the misleading communications by the defendants, the front groups, and the KOLs were made or disseminated within the plaintiff counties or were posted on public websites.

Moreover, the plaintiffs adequately allege that they suffered direct injuries as a result of the defendants' alleged materially deceptive acts or practices (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 746 NYS2d 858; *North State Autobahn, Inc. v Progressive Ins. Group Co.*, 102 AD2d 5, 953 NYS2d 96; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 2007 WL 1051642 [D Mass 2007]). It is sufficiently alleged that the plaintiffs, as a result of the deceptive marketing campaigns regarding opioid effectiveness, misuse, and addiction, paid for medications that were not medically necessary and that would not have been approved for the treatment of chronic, non-cancer pain if all the relevant facts about such medications had been known by them. For example, the plaintiffs allege that they paid for brand-name opioid prescriptions, such as OxyContin, Opana, Nucynta, and Kadian, for employees covered by county-funded health insurance plans and for residents receiving Medicaid benefits based on material misrepresentations disseminated by the defendants to the public and the health care community that such products had lower potential for abuse and addiction based on their supposed "long-acting" or "steady-state" properties, and that they paid for brand-name prescriptions of "rapid-onset" or short-acting opioids, such as Actiq, Fentora, and Duragesic, based on material misrepresentations that such medications are safe for treating non-cancer, chronic-pain patients complaining of "breakthrough" pain episodes (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 746 NYS2d 858; *cf. Baron v Pfizer, Inc.*, 42 AD3d 627, 840 NYS2d 445 [3d Dept 2007]). Further, it can be inferred from the allegations in the complaint that the plaintiffs, having been deceived by the defendants about the risks associated with long-term prescription opioid use, were injured by

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM
NYSCEF DOC. NO. 468

INDEX NO. 400000/2017
RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 11

having to pay for more prescriptions than would have otherwise been necessary as patients, particularly county employees and Medicaid beneficiaries, became addicted to such painkillers (*see Wilner v Allstate Ins. Co.*, 71 AD3d 155, 893 NYS2d 208 [2d Dept 2010]).  In addition, it is alleged that the defendants' deceptive marketing scheme created a public health crisis within the plaintiff counties, leading to substantial increases in opioid addiction, abuse, overdose, and death among residents, and that such crisis has forced the plaintiffs to allocate substantial resources to implement measures to reduce opioid abuse and opioid-related crimes, and to combat opioid addiction and overdoses with medications, such as naltrexone, naloxone, and buprenorphine, and with treatment programs.  Thus, the plaintiffs here are not simply seeking to recoup medical and drug costs incurred by their employees and Medicaid beneficiaries (*cf. Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d 200, 785 NYS2d 399).  The court, therefore, finds that the plaintiffs' allegations that the distributor defendants participated in the deceptive marketing scheme to promote prescription opioids as an effective and safe long-term treatment option for chronic pain, evidenced by their joining and funding of front groups promoting prescription opioids for such use, are sufficient to state a General Business Law § 349 claim against them based on concerted action (*see Rodriguez v City of New York*, 35 AD3d 702, 827 NYS2d 220 [2d Dept 2006]; *Weldon v Rivera*, 301 AD2d 934, 754 NYS2d 698 [3d Dept 2003]; *see also Prough v Olmstead*, 201 AD2d 603, 619 NYS2d 404 [3d Dept 1994]).

Second Cause of Action/General Business Law § 350

Having a scope as broad as that of General Business Law § 349 (*Karlin v IVF Am., Inc.*, 93 NY2d at 290, 690 NYS2d at 498), the statute defines false advertising as "advertising, including labeling, of a commodity" which is "misleading in a material respect."  As with a General Business Law § 349 claim, a plaintiff asserting a claim under this statute must establish that the alleged false advertisement had an impact on consumers at large, was deceptive or misleading in a material way, and caused injury (*Andre Strishak & Assoc. v Hewlett Packard Co.*, 300 AD2d at 609, 752 NYS2d at 402; *Scott v Bell Atl. Corp.*, 282 AD2d 180, 183-184, 726 NYS2d 60, 63 [1st Dept 2001], *lv granted in part, dismissed in part* 97 NY2d 698, 739 NYS2d 95, *mod* 98 NY2d 314, 747 NYS2d 858 [2002]).  General Business Law § 350-a (1) provides that, in determining whether advertising is misleading, "there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal [material facts] in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."  The defendant's conduct need not rise to the level of a fraud to be actionable (*Matter of People v Applied Card Sys., Inc.*, 27 AD3d 104, 107, 805 NYS2d 175, 178 [3d Dept 2005]).  Further, a claim of false advertising must be premised on an advertisement published within the state that "is likely to mislead a reasonable consumer acting reasonably under the circumstances" (*Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 NY2d at 26, 623 NYS2d at 533).  Reliance by the plaintiff on an advertisement is not a required element of a General Business Law § 350 claim (*Koch v Acker, Merrall & Condit Co.*, 18 NY3d 940, 941, 944 NYS2d 452, 453 [2012]; *Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d at 324 n. 1, 746 NYS2d 858, 865; *but see Pesce Bros., Inc. v Cover Me Ins. Agency of NJ, Inc.*, 144 AD3d 1120, 43 NYS3d 85); rather, the plaintiff must show the false advertisement caused it to suffer injury or loss (*cf. Stutman v Chemical Bank*, 95 NY2d 24, 709

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM
NYSCEF DOC. NO. 468

INDEX NO. 400000/2017
RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 12

NYS2d 892).

The plaintiffs sufficiently allege that the defendants, by way of branded and unbranded print advertisements, public websites, and patient education materials, made materially misleading statements regarding the benefits of prescription opioid therapy for chronic pain and the risks associated with opioid use, particularly the potential for abuse (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 746 NYS2d 858; *Karlin v IVF Am., Inc.*, 93 NY2d 282, 290, 690 NYS2d 495). They allege that, as marketing research showed physicians are more likely to prescribe a drug if specifically requested by a patient, the defendants published misleading advertisements for both the general consuming public and prescribers. According to the complaint, the manufacturer and distributor defendants collaboratively engaged in false advertising through unbranded advertisements, public websites, and various publications issued by front groups that they funded and controlled. It alleges, for example, that the defendants falsely represented on public websites aimed at patients and prescribers that warnings about the risks of opioid addiction were "overstated," and promoted the concept of pseudoaddiction, for which there is no scientific basis. Significantly, the plaintiffs allege that the false advertisements materially misled consumers and prescribers about the benefits and risks of prescription opioid therapy for chronic pain, including by failing to reveal that opioids pose a higher risk of abuse and addiction than other analgesics and that there was no scientific basis for many of the claims contained therein.

As to the "impact on consumers" element of General Business Law § 350, it may be inferred from the allegations in the complaint that defendants' false advertising dramatically increased consumer demand for and consumption of prescription opioids, and that it created public misperception about the safety and efficacy of such prescription drugs. As to the causation element, it likewise may be inferred that the opioid epidemic allegedly spawned in part by such false advertising caused the plaintiffs to suffer extraordinary losses, including the costs related to the care and treatment of residents suffering from prescription opioid addiction, and the costs of opioid prescriptions for employees receiving county-funded health insurance benefits and residents receiving Medicaid benefits that would not have been approved had the risks associated with long-term opioid therapy for chronic, non-cancer related pain been known (*see Karlin v IVF Am., Inc.*, 93 NY2d 282, 690 NYS2d 495; *cf. Stutman v Chemical Bank*, 95 NY2d 24, 709 NYS2d 892).

Third Cause of Action/Public Nuisance

The distributor defendants contend that the plaintiffs' third cause of action, alleging public nuisance, is deficient as a matter of law for failure to plead either proximate causation or substantial interference with a public right; that the plaintiffs' theory, as pleaded, would improperly expand public nuisance law to lawful, commercial activity; and that the plaintiffs cannot bring a public nuisance claim, as here, predicated on the violation of a statute–the New York State Controlled Substances Act (Public Health Law art 33)–that does not authorize a private right of action to enforce its terms.

A public or "common" nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency (*Copart Indus. v Consolidated Edison Co. of N.Y.*, 41 NY2d 564, 394 NYS2d 169 [1977]). It consists of conduct or omissions which offend,

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 13

interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons (*id.*).

Section 821B of Restatement (Second) of Torts provides:

(1) A public nuisance is an unreasonable interference with a right common to the general public.

(2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

(a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or

(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or

© whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

The distributor defendants' arguments are insufficient to warrant dismissal. Initially, with respect to their claim that the plaintiffs have failed to plead substantial interference with a public right, it suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have created or contributed to a crisis of epidemic proportions, has affected "a considerable number of persons" (*Copart Indus. v Consolidated Edison Co. of N.Y.*, 41 NY2d at 568, 394 NYS2d at 172). Regarding the claimed lack of proximate causation, the defendants rely primarily on *People v Sturm, Ruger & Co.* (309 AD2d 91, 761 NYS2d 192 [1st Dept], *lv denied* 100 NY2d 514, 769 NYS2d 200 [2003]), a case involving public nuisance claims against handgun manufacturers, wholesalers, and retailers. There, the plaintiff alleged, in part, that despite the defendants having been placed on notice that the guns sold, distributed, and marketed by them were being used in crimes, they were deliberately designing and marketing their product in a way that placed a disproportionate number of guns in the possession of people who use them unlawfully. In dismissing the public nuisance claims, the court, based on its reading of *Hamilton v Beretta U.S.A. Corp.* (96 NY2d 222, 727 NYS2d 7 [2001] [involving a negligent marketing claim against handgun makers]), relied primarily on a proximate cause analysis, noting that the harms alleged were too indirect and remote from the defendants' conduct and expressing a general reluctance to "open the courthouse doors to a flood of limitless, similar theories of public nuisance" in matters involving commercial activity (*People v Sturm, Ruger & Co.*, 309 AD2d at 96, 761 NYS2d at 196). The court did, however, recognize that public nuisance might be an appropriate

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 14

tool, in other contexts, to address consequential harm from commercial activity.  And the court also noted, as in **Hamilton**, a break in the causative chain by the criminal activity of intervening third parties, i.e., that the parties most directly responsible for the unlawful use of handguns were the individuals unlawfully using them.

Here, by contrast, it is alleged that the plaintiffs have been damaged not only by the illegal use of opioids but also by their legal use, consistent with the concerted efforts of all the defendants to market and promote their products for sale and distribution.  As to such legal use, it is at least arguable that the distributor defendants were in a position to anticipate or prevent the claimed injuries; it does not seem unfair, therefore, to hold them potentially accountable.  The court is doubtful, in any event, whether a discussion of proximate cause in a case based on negligence should even apply in a case based on public nuisance.  "[W]here the welfare and safety of an entire community is at stake, the cause need not be so proximate as in individual negligence cases" (*City of New York v A-1 Jewelry & Pawn, Inc.*, 247 FRD 296, 347-348 [ED NY 2007]).

Finally, and contrary to the assertions of the distributor defendants, it suffices to note that this cause of action is not premised solely on alleged violations of the New York State Controlled Substances Act but also on their deceptive conduct, in concert with their codefendants, to mislead the plaintiffs and the public about the risks and benefits of prescription opioids; whether, then, the statute does not provide for a private right of action but vests enforcement authority exclusively with the New York State Department of Health, as they contend, is immaterial for purposes of this analysis.  "Mere overlap" between the common law on the one hand, and a statute and its implementing regulations on the other, "is not enough to extinguish the common-law remedies" (*Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 NY3d 341, 353, 939 NYS2d 274, 279-280 [2011]).

Fourth Cause of Action/Social Services Law § 145-b

The distributor defendants contend that the plaintiffs' fourth cause of action, alleging violation of Social Services Law § 145-b, must be dismissed for failure to plead that the defendants made a "false statement or representation" of any type listed in the statute.

Social Services Law § 145-b states that "[i]t shall be unlawful for any person, firm or corporation knowingly by means of false statement or representation, or by deliberate concealment of any material fact, or other fraudulent scheme or device, on behalf of himself or others, to attempt to obtain or to obtain payment from public funds for services or supplies furnished or purportedly furnished" under the Social Services Law.  A "statement or representation" includes, but is not limited to

> a claim for payment submitted to the State, a political subdivision
> of the state, or an entity performing services under contract to the
> state or a political subdivision of the state; an acknowledgment,
> certification, claim, ratification or report of data which serves as
> the basis for a claim or a rate of payment[;] financial information
> whether in a cost report or otherwise[;] health care services available

**FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM**

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 15

> or rendered[;] and the qualifications of a person that is or has
> rendered health care services.

(Social Services Law § 145-b [1] [b]; *see generally **State of New York v Lutheran Ctr. for the Aging, Inc.***, 957 F Supp 393 [ED NY 1997]).  A person, firm or corporation "has attempted to obtain or has obtained" payment from public funds "when any portion of the funds from which payment was attempted or obtained are public funds, or any public funds are used to reimburse or make prospective payment to an entity from which payment was attempted or obtained" (Social Services Law § 145-b [1] [c]).

The court finds no basis to warrant an order of dismissal.  To the extent the distributor defendants claim that this cause of action is deficient for want of specific allegations that they participated in any of the marketing campaigns or promotional efforts underlying the complaint, the court notes that all issues pertaining to particularity requirements for pleadings have already been addressed and squarely rejected in this order.  The defendants do not explain, moreover, why the allegedly false statements and representations underlying the plaintiffs' other causes of action would not serve to support this cause of action as well.

Fifth Cause of Action/Fraud

The elements of a cause of action for fraud are (1) a misrepresentation or material omission of fact, (2) which was false and known to be false by the defendant, (3) made for the purpose of inducing the plaintiff to rely upon it, (4) upon which the plaintiff justifiably relied, (5) causing injury (***Pasternack v Laboratory Corp. of Am. Holdings***, 27 NY3d 817, 37 NYS3d 750 [2016]; ***Eurycleia Partners, LP v Seward & Kissel, LLP***, 12 NY3d 553, 883 NYS2d 147 [2009]; ***Lama Holding Co. v Smith Barney***, 88 NY2d 413, 646 NYS2d 76 [1996]; ***Ozelkan v Tyree Bros. Envtl. Servs., Inc.***, 29 AD3d 877, 815 NYS2d 265 [2d Dept 2006]; ***Clearview Concrete Prods. Corp v S. Charles Gherardi, Inc.***, 88 AD2d 461, 453 NYS2d 750 [2d Dept 1982]).  A cause of action rooted in fraud must meet the pleading requirement set forth in CPLR 3016 (b) that "the circumstances constituting the wrong shall be stated in detail."  Although "unassailable proof" is not required at the pleading stage, a complaint alleging fraud must set forth "the basic facts to establish the elements of the cause of action" (***Pludeman v Northern Leasing Sys., Inc.***, 10 NY3d 486, 492, 860 NYS2d 422, 425 [2008]).  And while conclusory language may be insufficient (*see **Eurycleia Partners, LP v Seward & Kissel, LLP***, 12 NY3d 553, 883 NYS2d 147; ***Heffez v L & G Gen. Constr., Inc.***, 56 AD3d 526, 867 NYS2d 198 [2d Dept 2008]; ***Friedman v Anderson***, 23 AD3d 163, 803 NYS2d 514 [1st Dept 2005]), CPLR 3016 (b) requires only that the complaint set forth the alleged misconduct "in sufficient detail to clearly inform a defendant with respect to the incidents complained of and is not to be interpreted so strictly as to prevent an otherwise valid cause of action in situations where it may be impossible to state in detail the circumstances constituting a fraud" (***Lanzi v Brooks***, 43 NY2d 778, 780, 402 NYS2d 384, 385 [1977] [internal quotation marks omitted]; *see **Pludeman v Northern Leasing Sys., Inc.***, 10 NY3d 486, 860 NYS2d 422).

Here, the allegations in the complaint are sufficient to set forth a cognizable claim for fraud against the distributor defendants.  The plaintiffs allege that the distributor defendants, acting in concert

In re Opioid Litig.
Index No. 400000/2017
Page 16

with their codefendants, purposefully misrepresented that opioids improve function and quality of life, that addiction risks can be managed, that withdrawal is easily managed, that higher doses of opioids pose no greater risks to patients, and that the defendants deceptively minimized the adverse effects of opioids while overstating the risks of NSAIDs (nonsteroidal anti-inflammatory drugs). The plaintiffs further allege that the defendants, working together to maximize their profits from the sale of opioids, created a body of false, misleading, and unsupported medical and popular literature about opioids; that they disguised their roles in the deceptive marketing of opioid therapy for chronic pain by funding and working through patient advocacy and professional front organizations; that they funded false and misleading marketing campaigns to improperly influence individual prescribers; and that they omitted material information related to the dangers of long-term opioid use. In addition, the plaintiffs allege that the strategies employed by the defendants "were intended to, and did, knowingly and intentionally distort the truth regarding the risks, benefits and superiority of opioids for chronic pain relief resulting in distorted prescribing patterns." They also allege that the defendants' "misrepresentations were material to, and influenced, the plaintiffs' decisions to pay claims for opioids for chronic pain (and, therefore, to bear its consequential costs in treating overdose, addiction, and other side effects of opioid use)."

To the extent the distributor defendants contend that the rule barring recovery of indirect or derivative injuries sustained by others bars this cause of action, the court reiterates that the plaintiffs are not simply seeking to recoup medical and drug costs incurred by their employees and Medicaid beneficiaries (*cf. Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d 200, 785 NYS2d 399 [2004]).

Sixth Cause of Action/Unjust Enrichment

The distributor defendants contend that the plaintiffs' sixth cause of action, sounding in unjust enrichment, must be dismissed because it is premised on the same factual allegations as those underlying their tort and statutory claims and does not provide an independent basis for liability. The distributor defendants further contend that this cause of action is an improper attempt to circumvent the absence of a private right of action under the New York State Controlled Substances Act and its implementing regulations, and that the parties lack a sufficiently close relationship to support a cause of action for unjust enrichment.

In order to adequately plead a cause of action for unjust enrichment, it must be alleged that the defendant was enriched, at the plaintiff's expense, and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered (*Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173, 919 NYS2d 465 [2011]). The theory of unjust enrichment "lies as a quasi-contract claim" and contemplates "an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties" (*Georgia Malone & Co., Inc. v Rieder*, 19 NY3d 511, 516, 950 NYS2d 333, 336 [2012] [internal quotation marks omitted]). "Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated" (*Mandarin Trading Ltd. v Wildenstein*, 16 NY3d at 182, 919 NYS2d at 472; *accord Sperry v Crompton Corp.*, 8 NY3d 204, 831 NYS2d 760 [2007]).

**FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM**   INDEX NO. 400000/2017

NYSCEF DOC. NO. 468                                           RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 17

Here, the plaintiffs plead that the distributor defendants, as an expected and intended result of their conscious wrongdoing alleged elsewhere in the complaint, were enriched from opioid purchases made by the plaintiffs. They also allege that it would be unjust and inequitable to permit them to enrich themselves at the plaintiffs' expense.

The court finds the pleading sufficient to withstand the distributor defendants' claims. It does not appear, for purposes of this determination, that this cause of action is either derivative or duplicative of any other cause of action. As pleaded, it is the only cause of action by which the plaintiffs seek disgorgement of profits and other monetary benefits resulting from the distributor defendants' alleged misconduct; moreover, as New York law specifically allows for the pleading of alternative causes of action and alternative forms of relief (CPLR 3014, 3017), the plaintiffs need not elect any theory over another at this preliminary stage. To the extent the distributor defendants urge the application of the rule barring recovery of indirect or derivative injuries sustained by others, the court notes, as discussed elsewhere in this order, that the plaintiffs here are not simply seeking to recoup medical and drug costs incurred by their employees and Medicaid beneficiaries (*cf. **Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.**, 3 NY3d 200, 785 NYS2d 399). The distributor defendants have also failed to explain why, as a pleading matter, the retention of profits wrongfully obtained would not be unjust. As for the relationship between and among the parties, the plaintiffs allege, in relevant part, that the distributor defendants helped to create a body of false and misleading literature intended to shape the perceptions of third-party payors such as the plaintiffs, encouraging them to pay for long-term opioid prescriptions and effectively depriving them of the chance to exercise informed judgment; implicit in those allegations is that the distributor defendants knew that the plaintiffs were to be the source of a significant portion of their profits. Accepting those facts as true and according the plaintiffs the benefit of every favorable inference (***Leon v Martinez***, 84 NY2d 83, 614 NYS2d 972 [1994]), it is evident that the plaintiffs have pleaded a relationship–or "at least an awareness" by the distributor defendants of the plaintiffs' existence (***Mandarin Trading Ltd. v Wildenstein***, 16 NY3d at 182, 919 NYS2d at 472)–sufficient to maintain their cause of action. And since the cause of action, as pleaded, is not premised solely on violations of the New York State Controlled Substances Act, whether a private right to enforce that statute exists is irrelevant for purposes of this determination (*see **Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.**, 18 NY3d 341, 939 NYS2d 274).

<u>Seventh Cause of Action/Negligence</u>

Before addressing the substantive issues raised by the distributor defendants, the court finds, to the extent it is claimed that this cause of action is barred by the three-year statute of limitations, that the defendants' arguments are insufficient to warrant dismissal.

"To dismiss a cause of action pursuant to CPLR 3211 (a) (5) on the ground that it is barred by the statute of limitations, a defendant bears the initial burden of establishing prima facie that the time in which to sue has expired. Only if such prima facie showing is made will the burden then shift to the plaintiff to aver evidentiary facts establishing that the case falls within an exception to the statute of limitations. In order to make a prima facie showing, the defendant must establish, inter alia, when the plaintiff's cause of action accrued" (***Swift v New York Med. Coll.***, 25 AD3d 686, 687, 808 NYS2d 731,

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 18

732-733 [2d Dept 2006] [internal citations and quotation marks omitted]; *accord* **Pace v Raisman & Assoc., Esqs., LLP**, 95 AD3d 1185, 945 NYS2d 118 [2d Dept 2012]).

"In general, a cause of action accrues, triggering commencement of the limitations period, when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief" (**Gaidon v Guardian Life Ins. Co. of Am.**, 96 NY2d 201, 210, 727 NYS2d 30, 35 [2001]).   While a claim for breach of contract accrues on the date of the breach, irrespective of the plaintiff's awareness of the breach (**Ely-Cruikshank Co. v Bank of Montreal**, 81 NY2d 399, 599 NYS2d 501 [1993]), a tort claim accrues only when it becomes enforceable, that is, when all the elements of the tort can be truthfully alleged in the complaint (**Kronos, Inc. v AVX Corp.**, 81 NY2d 90, 595 NYS2d 931 [1993]).  When damage is an essential element of the tort, the claim is not enforceable until damages are sustained (*id.*).  Actual damages are an essential element of a negligence claim (*e.g.* **IGEN, Inc. v White**, 250 AD2d 463, 672 NYS2d 867 [1st Dept], *lv denied* 92 NY2d 818, 684 NYS2d 489 [1998]).  A cause of action sounding in negligence, therefore, accrues not at the time of the alleged breach but only when the claimed negligence causes a plaintiff to sustain damages (*see* **Brooks v AXA Advisors, LLC**, 104 AD3d 1178, 961 NYS2d 648 [4th Dept], *lv denied* 21 NY3d 858, 970 NYS2d 748 [2013]).

Here, the distributor defendants have failed to establish when the cause of action accrued. Instead, they argue that the plaintiffs knew of the facts underlying their claims (i.e., the existence of the opioid epidemic and the role of the distributor defendants in the supply chain) "since at least 2012"–an argument they apparently seek to extend to the plaintiffs' other causes of action as well–as if discovery of facts is somehow tantamount to sustainment of injury.  Even a cause of action for fraud, which is subject to a discovery rule (*see* CPLR 203 [g]; 213 [8]), cannot accrue until every element of the claim, including injury, can truthfully be alleged (**Carbon Capital Mgt., LLC v American Express Co.**, 88 AD3d 933, 932 NYS2d 488 [2d Dept 2011]).  While they also claim that the plaintiffs knew they were experiencing increased costs relating to the epidemic more than three years prior to the commencement of this action, this bears only on the extent of the plaintiffs' recovery, the plaintiffs having alleged a continuing wrong in allowing the counties to be flooded with suspiciously large amounts of opioids (*see generally* **Affordable Hous. Assoc., Inc. v Town of Brookhaven**, 150 AD3d 800, 54 NYS3d 122 [2d Dept 2017]).  And while some recovery of damages may be time-barred, dismissal–even partial dismissal–is not appropriate at this juncture, as the court is not yet able to determine the precise nature and timing of the plaintiffs' respective claims (*see* **Airco Alloys Div. v Niagara Mohawk Power Corp.**, 76 AD2d 68, 430 NYS2d 179 [1980]).

As to the substantive issues raised, it is settled law that to plead a cause for negligence, a plaintiff must allege the existence of a duty, a breach of that duty, and that the breach of such duty was a proximate cause of his or her injuries (*see* **Pulka v Edelman**, 40 NY2d 781, 390 NYS2d 393 [1976]; **Miglino v Bally Total Fitness of Greater N.Y., Inc.**, 92 AD3d 148, 937 NYS2d 63 [2d Dept 2011], *affd* 20 NY3d 342, 961 NYS2d 364 [2013]).  A duty of reasonable care owed by the alleged tortfeasor to the plaintiff is essential to any recovery in negligence (**Eiseman v State of New York**, 70 NY2d 175, 187, 518 NYS2d 608, 613 [1987]; *see* **Espinal v Melville Snow Contrs.**, 98 NY2d 136, 746 NYS2d 120 [2002]).

In re Opioid Litig.
Index No. 400000/2017
Page 19


The distributor defendants contend that the plaintiffs' cause of action for negligence must be dismissed because they do not owe a duty running directly to the plaintiffs, and that they do not have a duty to control the actions of third persons. They further contend that the plaintiffs failed to adequately plead that their acts or omissions are the proximate cause of plaintiffs' injuries, and that the plaintiffs are barred from recovering for indirect or derivative injuries.   To the extent it is argued that the distributor defendants have no control over the eventual distribution of pharmaceutical products to individuals once they deliver those products to pharmacies, and that they have no way of knowing the total number of opioid prescriptions dispensed in any given county, the court finds such arguments are not appropriate in the context of a CPLR 3211 motion.

"A critical consideration in determining whether a duty exists is whether 'the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm'" (*Davis v South Nassau Communities Hosp.*, 26 NY3d 563, 572, 26 NYS3d 231, 236 [2015], quoting *Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 233, 727 NYS2d 7 [2001]). Unlike *Hamilton*, where the Court of Appeals found that gun manufacturers were not in the best position to protect against the risk of harm from the misuse of its product by third parties, here the plaintiffs allege facts sufficient to support the existence of a duty of care owed to them by the distributor defendants. Specifically, the plaintiffs allege that the distributor defendants had knowledge, which they did not disclose, of the actual dangers associated with the long-term use of the prescription opioids they were distributing–particularly their addictive nature. They allege that such defendants, as suppliers to retail pharmacies and healthcare facilities, were in the best position to protect the plaintiffs both against the expenses incurred for opioids prescribed for their employees and for Medicaid beneficiaries that would not have been approved for payment, and against the extraordinary amounts expended to combat the opioid crisis allegedly caused by the defendants' deceptive marketing campaigns.

> [W]henever one person is by circumstances placed in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he [or she] did not use ordinary care and skill in his [or her] own conduct with regard to the circumstances he [or she] would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger . . . [W]hile the existence of a duty involves scrutiny of the wrongfulness of a defendant's action or inaction, it correspondingly necessitates an examination of an injured person's reasonable expectation of the care owed and the basis for the expectation and the legal imposition of a duty.

(*Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d 579, 585, 611 NYS2d 817, 820 [1994] [internal quotation marks omitted]).

Here, the plaintiffs have adequately pled the existence of a duty owed by the distributor defendants by alleging that societal expectations required different behaviors on their part, including, but not limited to, refusing to fill suspicious orders for opioids (*id.*). The plaintiffs also allege sufficient facts to support a separate duty not to deceive (*see Tomasino v American Tobacco Co.*, 23 AD3d 546,

FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM
NYSCEF DOC. NO. 468

INDEX NO. 400000/2017
RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 20

807 NYS2d 603 [2d Dept 2005]; *Miele v American Tobacco Co.*, 2 AD3d 799, 803, 770 YS2d 386 [2d Dept 2003]; *see also Cipollone v Liggett Group, Inc.*, 505 US 504, 112 S Ct 2608 [1992]; *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369 [SD NY 2015]).  In addition, the court having determined in its June 18, 2018 order that the allegations in the complaint are sufficient to state a negligence cause of action against the manufacturer defendants, the plaintiffs' claims of concerted action suffice to state a basis to support the existence of yet another breach of duty by the distributor defendants.  "The concerted action theory of liability for injury to a third party will attach when one knows that another's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other, and '[t]his is true both when the act done is an intended trespass . . . and when it is merely a negligent act'" (*Miele v American Tobacco Co.*, 2 AD3d 799, 805, 770 NYS2d 386, 392, quoting Restatement [Second] of Torts § 876 [b], Comment d, Illustration 6; *see also Silvercreek Mgt., Inc. v Citigroup, Inc.*, 248 F Supp 3d 428 [SD NY 2017]).

The distributor defendants' contention that the plaintiffs have failed to adequately allege "but for" causation is without merit, as the test for legal causation is proximate cause (*see Burlington Ins. Co. v NYC Tr. Auth.*, 29 NY3d 313, 57 NYS3d 85 [2017]).  Similarly, the distributor defendants' contention that the plaintiffs have failed to adequately allege causation in a general sense is not dispositive herein.  "Generally, issues of proximate cause are for the fact finder to resolve" (*Adams v Lemberg Enters., Inc.*, 44 AD3d 694, 695, 843 NYS2d 432, 433 [2d Dept 2007]).  Even at the more advanced stage of litigation, "the absence of direct evidence of causation [does] not necessarily compel a grant of summary judgment in favor of the defendant, as proximate cause may be inferred from the facts and circumstances underlying the injury, the evidence must be sufficient to permit a finding based on logical inferences from the record and not upon speculation alone" (*Hartman v Mountain Val. Brew Pub*, 301 AD3d 570, 570, 754 NYS2d 31, 32 [2003]; *see also Schneider v Kings Hwy. Hosp. Ctr.*, 67 NY2d 743, 500 NYS2d 95 [1986]; *Mitchell v Mongoose, Inc.*, 19 AD3d 380, 796 NYS2d 421 [2d Dept 2005]).  Here, the allegations in the complaint support an inference that the distributor defendants' breach was a proximate cause of the plaintiffs' injuries.

The distributor defendants also contend that the cause of action for negligence must be dismissed, because the plaintiffs may not enforce the New York State Controlled Substances Act.  This argument is rejected, as the cause of action is not predicated solely on a violation of the statute (*Assured Guar. (UK) Ltd. v J.P. Morgan Inv. Mgt. Inc.*, 18 NY3d 341, 353, 939 NYS2d 274, 279 [2011]).  "It is well settled that when the common law gives a remedy, and another remedy is provided by statute, the latter is cumulative, unless made exclusive by the statute" (*id.* at 350-351, 939 NYS2d at 278 [internal quotation marks omitted]).

Finally, the plaintiffs allege that the distributor defendants' negligence caused them direct injury, as they have incurred costs related to opioid addiction and abuse, including health care costs, criminal justice and victimization costs, social costs, and lost productivity costs.  To the extent the distributor defendants urge the application of the rule barring recovery of indirect or derivative injuries sustained by others, the court again notes that the plaintiffs are not simply seeking to recoup medical and drug costs incurred by their employees and Medicaid beneficiaries (*cf. Blue Cross & Blue Shield of N.J., Inc. v Philip Morris USA Inc.*, 3 NY3d 200, 205, 785 NYS2d 399).  Accordingly, the branch of the distributor

**FILED: SUFFOLK COUNTY CLERK 07/17/2018 03:07 PM**

NYSCEF DOC. NO. 468

INDEX NO. 400000/2017

RECEIVED NYSCEF: 07/17/2018

In re Opioid Litig.
Index No. 400000/2017
Page 21

defendants' motion which seeks dismissal of the plaintiffs' seventh cause of action is denied.

Conclusion

In accordance with the foregoing analysis, the distributor defendants' motions are denied.

The distributor defendants shall serve their answer(s) to the complaint within 10 days after the date on which this order is uploaded on the NYSCEF site (*see* CPLR 3211 [f]).

Dated: _July 17, 2018_

_____
J.S.C.

HON. JERRY GARGUILO

# EXHIBIT 5

COURT OF COMMON PLEAS

tls

IN THE COURT OF COMMON PLEAS

ROSS COUNTY, OHIO

2018 AUG 22  AM 11: 04

FILED
ROSS COUNTY COMMON PLEAS
CLERK OF COURTS
TY D. HINTON

STATE OF OHIO, EX REL.
MIKE DEWINE, OHIO ATTORNEY GENERAL,

              PLAINTIFF,

    VS

PURDUE PHARMA L.P., ET AL,

              DEFENDANT.

CASE NO. 17 CI 261

<u>DECISION AND ENTRY</u>

\*     \*     \*     \*     \*     \*

This action came on for hearing on the Defendants' various motions to dismiss, Defendant Endo's motion to strike, certain defendants' motion for judicial notice, Defendants' motion to stay, Plaintiff's responses, and the Defendants' replies thereto. All parties were represented and heard through counsel.

The Plaintiff's Complaint alleges that Defendants misrepresented to the general public, physicians, and the State of Ohio the effectiveness of opioids for the treatment of chronic pain and the dangers of opioid addiction.  Plaintiff alleges that these misrepresentations were directly and indirectly communicated by the Defendants, their representatives, and various third parties.  The Complaint alleges the following claims:

1. Public nuisance under the Ohio Product Liability Act, 2307.71 ORC.

2. Public nuisance – common law.

3. Ohio Consumer Sales Practices Act, 1345.02 ORC et seq.

4. Medicaid Fraud, 2913.40/2307.60 ORC.

5. Common Law Fraud.

6.  Ohio Corrupt Practices Act, 2923.31 ORC et seq.

Plaintiff seeks declaratory judgment, injunctive relief, compensatory damages, punitive damages, civil penalties, pre and post-judgment interest, and attorney fees.

Defendants argue that all of Plaintiff's claims fail for a multitude of reasons and that the Complaint should be dismissed.

STANDARD

A motion to dismiss for failure to state a claim is procedural and tests the sufficiency of the complaint.  A trial court reviews only the complaint and accepts all factual allegations as true.  Every reasonable inference is made in favor of the non-moving party.  This Court must assume the Plaintiff's allegations are true.  However, the unsupported conclusions of the Complaint are not sufficient to withstand a motion to dismiss the complaint.  The Complaint must be construed as a whole within the four corners of the Complaint.  A trial court may not dismiss a complaint "unless it appears **beyond doubt** that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (Emphasis added)  O'Brien v Univ. Community Tenants Union, Inc., 42 Ohio State 2d, 242 (1975).  (Emphasis added). Gannett GP Media, Inc. v Chillicothe, Ohio Police Department, 2018 Ohio 1552; State, ex rel. Hanson v Guernsey Cty. Bd. of Commrs., 65 Ohio State 3d 545 (1992); Struckman v Bd. of Edn. of Teays Valley Local Sch. Dist., 2017 Ohio 1177; Martin v. Lamrite W., Inc., 2015 Ohio 3585.

Ohio remains a notice pleading state.  Civil Rule 8(A) requires only the following:

"(1)  A short and plain statement of the claim showing that the pleader is entitled to relief, and

(2) A demand for judgment for the relief to which he deems
himself entitled."

Ohio courts have rejected the heightened federal pleading standard set forth in Bell
Atlantic Corp. v Twombly, 550 U.S. 544, and have acknowledged that Ohio remains a
notice pleading state. Smiley v City of Cleveland, 2016-Ohio 7711; Mangelluuzzi v
Morley, 2015 Ohio 3143. This Court notes the language of the Eighth District Court of
Appeals in Smiley, supra wherein the court stated that "(the) motion to dismiss is
viewed with disfavor and should rarely be granted" and that "few complaints fail to
meet the liberal (pleading) standards of Rule 8 and become subject to dismissal,".

Civil Rule 9(B) does impose upon a plaintiff a heightened standard of pleading
in cases of fraud.

"(B) **Fraud, mistake, condition of mind.** In all averments of
fraud or mistake, the circumstances constituting fraud or mistake shall
be stated with particularity…"

In Ohio, a complaint alleging fraud must allege with particularity the
"circumstances constituting fraud." The complaint must assert "the time, place, and
content of the false representation; the fact misrepresented; the identification of the
individual giving the false representation; and the nature of what was obtained or
given as a consequence of a fraud." Aluminum Line Prods. Co. v Brad Smith Roofing
Co., 109 Ohio App. 3d 246 (1996); Dottore v Vorys, Sater, Seymour & Pease, LLP.
2014 Ohio 25; First-Knox Nat'l Bank v MSD Props., Ltd., 2015 Ohio 4574.

Civil Rule 9(B) should be read in conjunction with the general directive of Civil
Rule 8, that pleadings should be "simple, concise, and direct." Even if the pleadings
are vague, so long as defendants have been placed on notice of the claims, a strict
application is not necessary. Aluminum Line Prods. Co., supra; F&J Roofing Co. v

McGinley & Sons, Inc., 35 Ohio App. 3d 16 (1987). This Court notes that the Complaint in Aluminum Line Prods. Co., supra, asserted that the fraud occurred over the course of several years. There was no specific assertion of the date of the fraud. Similarly, the Ninth District Court of Appeals found that a complaint alleging fraud within a six year period did not violate the requirements of Civil Rule 9(B). Bear v Bear, 2014 Ohio 2919. See also Pierce v Apple Valley, Inc., 597 F. Supp. 1480.

A determination whether a complaint satisfies the heightened pleading standards of Civil Rule 9(B) should be made on a case by case basis depending upon the facts of each case. City of Chicago v Purdue Pharma L.P., et al, 14C4361211 F. Supp. 3d. 1058 (N.D. Ill. 2016).

The heightened pleading standards of Civil Rule 9(B) may also be relaxed in circumstances where relevant facts lie exclusively within the control of the opposing party. Wilkins, ex rel. U.S. v State of Ohio, 885 F. Supp. 1055; Craighead v E.F. Hutton and Co., 899 F. 2d. 485.

GROUP PLEADING

In State of Missouri, ex rel. Joshua D. Hawley v Purdue Pharma, LP, Case No. 1722-CC10626, the 22nd Circuit Court of the State of Missouri found that there was no rule against "group pleading" in Missouri. Similarly, this Court finds that there is no specific rule against "group pleading" in the state of Ohio. The Dottore case cited by the Defendants, does not mention "group pleading" and more specifically addresses the heightened pleading requirements of Civil Rule 9(B) in mail fraud cases. The Plaintiff's 101 page Complaint sufficiently asserts that all defendants engaged in conduct which would constitute a claim under the pleading rules in the State of Ohio.

CIVIL RULE 9(B)

In the case at bar, the prima facia case for fraud is:

(1)  A representation or concealment of a fact;

(2)  Material to the transaction at hand;

(3)  Made falsely with knowledge of its falsity;

(4)  Intent to mislead another into relying upon it;

(5)  Justifiable reliance;

(6)  Injury proximately caused by the reliance.
 Marjul, LLC v. Hurst, 2013 Ohio 479.

As previously stated, this Court will examine the Plaintiff's compliance with Civil Rule 9(B) under the Ohio pleading standards.  The Plaintiff's complaint must assert the time, place, and content of the false representation; the fact misrepresented; the identification of the individual giving the false representation; and the nature of what was obtained or given as a consequence of a fraud.  Aluminum Line Prods. Co., supra.

The Plaintiff's complaint adequately identifies the Defendants and their actions and representations.  The complaint sufficiently asserts the time frame which in the representations were made and that they were made in the state of Ohio.  The complaint sufficiently identifies that the representations were made by representatives of the Defendants and various groups and third parties sponsored by the Defendants.

The complaint contains over 40 pages which explain in detail the marketing tactics utilized by Defendants, their representatives, and various groups connected to Defendants.  Similarly, the complaint adequately sets forth the representations made, how these representations were distributed to physicians and citizens of Ohio, that the representations were false and that the Defendants knew the falsity of the representations.

5

Under Ohio pleading standards, it is not necessary for the complaint to identify physicians who relied upon the misrepresentations of the Defendants. Even so, as argued by Plaintiff, the identification of prescribing physicians is solely within the knowledge of Defendants and can be obtained through discovery. Further, the complaint adequately states that the Plaintiff specifically relied upon the misrepresentations in issuing reimbursement payments under the Medicaid program. Further, reliance is a question of fact or appropriately addressed in a motion for summary judgment. Kelly v. Georgia-Pac. Corp., 46 Ohio St. 3d 134. Lastly, the Plaintiff has sufficiently pled causation in compliance with City of Cincinnati v. Beretta USA Corp., 95 Ohio St. 3d 416 and the damages suffered by the state of Ohio. In summary, this Court finds that Plaintiff has sufficiently pled the fraud related claims under Civil Rule 9(B).

PREEMPTION/FDA APPROVAL

The parties agree that the FDA approved the labeling for opioids for long-term treatment. However, it is evident in the Plaintiff's complaint that its claims are based upon misrepresentations made by the Defendants concerning the use and safety of opioids which go far beyond the labeling. As noted by the court in City of Chicago v. Purdue Pharma LP, supra, the allegations of the Plaintiff's complaint primarily sound in fraud and not the propriety of the labeling of opioids. The Chicago court also concluded that drug labeling does not preclude fraud claims. See also Wyeth v. Levine, 555 U.S. (2009).

The claims set forth in Plaintiff's complaint are not barred by the FDA's approval of labeling or the doctrine of preemption as to Defendants' branded or unbranded labeling.

## PUBLIC NUISANCE

This Court finds that <u>Cincinnati vs Beretta</u>, 95 Ohio St. 3d 416, is not substantially distinguishable and applies to the case at bar.  In <u>Beretta</u>, supra, the Ohio Supreme Court adopted a broader definition of public nuisance.  The court determined that the restatement of the law of torts (2nd) sets forth a broad definition of public nuisance allowing an action to be maintained "for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unnecessarily interferes with a right common to the general public."  Under the broad definition of public nuisance and the liberal pleading rules of the state of Ohio, this Court finds that the Plaintiff has adequately pled public nuisance under Ohio common law and the Ohio Product Liability Act.

## OHIO CONSUMER SALES PRACTICES ACT

Section 1345.07 ORC specifically authorizes the Ohio Attorney General to initiate an action under the OSCPA.  The statute also sets forth the remedies which the Attorney General can seek:  declaratory judgment; injunction; and civil penalties.  The provisions of the OSCPA must be liberally construed.  <u>State, ex rel Celebreeze v. Hughes</u>, 58 Ohio St. 3rd 273.  The complaint sets forth a "consumer transaction" as defined by the statute.  The complaint need not, at this stage, identify an Ohio citizen as a consumer.  A consumer action is alleged by the complaint regardless of whether the plaintiff is an actual consumer.  The complaint, as previously stated, sets forth in detail over 40 pages of allegations which are prohibited by Sections 1345.02 and 1345.03 and the administrative regulations promulgated thereunder.  Plaintiff's prayer for civil penalties should not be stricken, at this stage, because they are statutorily authorized.

It is premature at this time to determine whether the plaintiff's OSCPA claim is time barred. Savoi v. Univ. of Akron, 2012 Ohio 1962; The complaint alleges a continuing course of conduct by the defendants. Where a plaintiff alleges a continuing violation of the OSCPA, the statute of limitations does not begin to run until the date when the violation ceases. Roelle v. Orkan Exterminating Co., 2000 WL 1664865; Martin v. Servs. Corp. Int'l, 2001 WL 68896.

## ABROGATION

Section 2307.72(C) ORC specifically exempts claims for economic loss from abrogation under the Ohio Products Liability Act. Further, "product liability claim" is statutorily defined as a claim seeking "compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress or physical damage to property." Reviewing the four corners of the complaint, it does not appear that the plaintiff is seeking these types of damages. The plaintiff's common law nuisance claim, OSCPA claim, and fraud claims are not abrogated under the OPLA. See Catepillar Fin. Servs. Corp. v. Harold Tatman and Sons Ents., Inc., 2015 Ohio 4884.

## MEDICAID FRAUD

Section 2901.23 ORC provides that a corporation may be criminally liable if it meets one of the criteria set forth in subsection (A)(1)-(4). Section 2913.40(B) provides:

> "No person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the Medicaid program."

This language clearly includes persons who cause false or misleading statements or representations to be made for the purpose of reimbursement for the Medicaid program. The complaint adequately sets forth that defendants, their employees or agents and third parties under defendant's control knowingly made or caused to be

8

made false or misleading statements for the purpose of obtaining for defendants reimbursement under the Medicaid program. These allegations meet the requirements of the liberal pleading rules in the state of Ohio.

Section 2307.60(A)(1) ORC provides:

"Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law,..."

This Court construes this section liberally to include the state of Ohio. To construe this section to exclude a state from seeking damages from criminal actions would prohibit the state from initiating litigation to collect damages from persons who have been convicted of causing damage to public property. This Court finds that at this juncture, the plaintiff is not barred by this section from pursuing an action for damages caused as the result of the commission of Medicaid fraud. See Jacobson v. Kaforey, 149 Ohio St. 3rd 398.

The plaintiff's Medicaid fraud claim is not time barred. There is no specific statutory provision which imposes a time bar against the state in this case. The only time bar is set forth in a generally worded statute, 2305.11(A) ORC. As stated in State, Dep't. of Transp. v. Sullivan, 38 Ohio St. 3d (1988), the Ohio Supreme Court approved the continued exception of the state from generally worded statutes of limitation.

OHIO CORRUPT PRACTICES ACT

Section 2929.32(A)(1) ORC states:

"No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity..."

Section 2923.31(C) defines "Enterprise" as follows:

"Any individual, sole proprietorship, partnership, limited partnership, corporation..."

9

"Enterprise" includes an illicit or licit enterprises.  "Person" includes a corporation.

Section 2923.31(E) ORC defines "Pattern of corrupt activity" as:

"Two or more incidents of corrupt activity whether or not there has been
a prior conviction, that are related to the affairs of the same enterprise,
are not isolated, and are not so closely related to each other and
connected in time and place that they constitute a single event."

A prima facia case for a civil claim under the OCPA requires:

(1)"(v)" Conduct of the defendant involves the commission of two or more
specifically prohibited state or federal offenses;

(2)  The prohibited criminal conduct of the defendant constitutes a pattern;

(3)  The defendant has participated in the affairs of an enterprise or has
acquired and maintained an interest in or control of an enterprise."  Morrow v.
Reminger & Reminger Co. L.P.A., 2009 Ohio 2665.

The plaintiff's complaint sets forth in detail the conduct of the defendants in
violating federal mail fraud provisions (18 U.S.C. 1341), federal wire fraud (18 U.S.C.
1343), and telecommunications fraud in violation of Section 2913.05 ORC.  This Court
has previously determined that the plaintiff has met the particularity requirements of
Civil Rule 9(B) in pleading fraud and similarly finds that the plaintiff has met these
particularity requirements in pleading the predicate acts of federal mail fraud and wire
fraud and telecommunications fraud under the Ohio Revised Code.  This Court finds
that the liberal pleading rules in Ohio do not require the plaintiff to set forth specific
communications and identify senders and recipients and their locations.  Further, this
specific information would be within the defendants' knowledge and not available to
plaintiff.  Further, the plaintiff's complaint sets forth the defendants' intent in
committing various criminal acts.  Wilkins, supra; Swanson v. McKenzie (4th District
Scioto County) 1988 WL 50478.

10

Section 2923.31 defines "Enterprise" as **any** corporation which may engage in illicit or licit conduct.  As stated by plaintiff, the definition of an enterprise is "open-ended" and "should be interpreted broadly."  State vs Beverly, 143 Ohio St. 3d, 2015 Ohio 219; CSAHA/UHHS-Canton, Inc. v Aultman Health Found., 2012-Ohio-897.  At the pleading stage, the complaint adequately sets forth the purpose of defendants in engaging in a loosely structured hierarchy to achieve a stated purpose.  Further, the complaint sets forth in detail the pattern of criminal conduct in violating federal and state laws.  The plaintiff's complaint adequately pleads a violation of Ohio's Corrupt Practices Act.

ENDO'S MOTION TO STRIKE

Civil Rule 12(F) allows a party to move for an order striking language from a pleading that is redundant, immaterial, impertinent, or scandalous.  Although this Court questions the inclusion of the New York settlement in the complaint, this Court cannot find that it is immaterial, impertinent, or scandalous.  Endo's Motion to Strike is overruled.

JANSSEN PHARMACEUTICALS, INC. AND JOHNSON & JOHNSON

The allegations in plaintiff's complaint are very similar to the allegations contained in the complaint considered by the United States District Court, Northern Division, Illinois, Eastern Division.  City of Chicago v Purdue Pharma LLP, 211 F. Supp. 3d.  Plaintiff's complaint does not seek to pierce the corporate veil of Janssen but rather to hold Johnson & Johnson liable under agency doctrines.  The court, in City of Chicago, found that for the purposes of a motion to dismiss, the plaintiff's complaint had sufficient allegations to infer an agency relationship between Johnson & Johnson and Janssen and to assert vicarious liability for Janssen's conduct.  This

11

Court adopts that reasoning and the Motion of Janssen and Johnson & Johnson is overruled.

JURISDICTION ALLERGAN PLC

The parties agree upon the law which this Court must employ in determining jurisdiction over Allergan PLC.  The Plaintiff must show that the exercise of jurisdiction complies with Ohio's long-arm statute, Section 2307.382, and the related Civil Rule 4.3(A).  U.S. Sprint Commc,n Co. Ltd. P'ship v. Mr. K's Foods, Inc., 3d 181, 1994 Ohio 504.  This Court must go further and determine whether the grant of jurisdiction under the long-arm statute and civil rule comports with due process under the 14th Amendment to the United States Constitution.  Goldstein v. Christiansen, 70 Ohio St. 3d 232, 1994 Ohio 229; Joffe v. Cable Tech., Inc., 163 Ohio App. 3d 479, 2005 Ohio 4930.

Section 2307.382(A) provides in pertinent part:

"(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's:

(1)  Transacting any business in this state
(2)  Contracting to supply services or goods in this state
(3)  Causing tortious injury by an act or omission in this state
(4)  Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business or engages in any persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state;"

In the case at bar, the Plaintiff must establish a prima facia showing that jurisdiction exists over Allergan PLC.  The Court must consider the "allegations in the pleadings and documentary evidence in a light most favorable to the Plaintiff and resolving all reasonable competing inferences in favor of the Plaintiff." Kauffman Racing Equip., L.L.C. v. Roberts, 126 Ohio St. 3d 81, 210 Ohio 2551; Fallang v. Hickey, 40 Ohio St. 3d 106.

12

In determining whether this Court has jurisdiction over Allergan PLC, this Court must consider whether there are minimum contacts with the state of Ohio so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice under Goldstein v. Christiansen supra.  The Court must employ a tri-partite test to establish minimum contacts.

"1.  The defendant must purposefully avail himself of the privilege of acting in the foreign state or causing a consequence in the foreign state.

2.  The cause of action must arise from the defendant's activities there.

3.  The acts of the defendant or consequences caused by the defendant must have a substantial connection with the foreign state to make the exercise of jurisdiction over the defendant reasonable." Kauffman, supra.

This Court has considered the affidavits submitted by the parties on this issue and the request by Plaintiff for this Court to take judicial notice of the Plaintiff's exhibits 40-49 attached to the Troutman affidavit.  The Court takes judicial notice of these filings.

These filings establish, by the requisite degree of proof necessary on a motion to dismiss for lack of jurisdiction, the following:  Actavis, Inc. and Actavis PLC are predecessors to Allergan PLC.  Both entities referenced the United States as it's "largest commercial market."  Allergan PLC maintains a "major manufacturing" site in Cincinnati, Ohio.  All three entities maintain that they are engaged in the "global market."  This Court also adopts the reasoning of the court in City of Chicago v. Purdue Pharma L.P.N.D. Ill. No. 14C4361, 215 WL 2208423, finding the evidence sufficient at the stage of a motion to dismiss that Actavis PLC is the successor to Actavis, Inc.  The same reasoning applies that Allergan PLC is the successor to Actavis PLC and Actavis, Inc.

This Court finds that the Plaintiff has established a prima facia case for jurisdiction over Allergan PLC under the long-arm statute, Section 2307.382(A) ORC. Further, this Court finds that the Plaintiff has established by the requisite degree of proof that the defendant, Allergan PLC, acted and caused consequences in the state of Ohio.  This Defendant's actions and the consequences therefrom alleged by the Plaintiff create a sufficient substantial connection with Ohio and allow the assertion of personal jurisdiction over this Defendant to be reasonable.

ACQUIRED ACTAVIS ENTITIES

As already set forth in this opinion, this Court finds that the Complaint meets the relaxed pleading requirements of Ohio set forth in Civil Rules 8 and 9.  This applies also to the "Acquired Actavis Entities."  The Complaint in Section III(B) sufficiently identifies the entities and sets forth allegations concerning the individual entities and their representation/misrepresentations and actions concerning opioid uses and dangers.  These entities are placed on notice, like all of the other defendants, of the claims against them.  This is sufficient to overcome the challenges at the pleading stage.  However, it might be a different story under different standards in dispositive motion practice.

JURISDICTION-TEVA PHARMACEUTICAL INDUSTRIES LTD.

This Court has in the previous section has set forth the law which governs the analysis concerning jurisdiction under Ohio's Long-arm Statute, the Ohio Civil Rules, and due process under the 14th Amendment to the United States Constitution.  This Court takes judicial notice of exhibits 50-59 attached to the Troutman affidavit as requested by the Plaintiff under Evidence Rule 201(B).  This Court notes that Teva Ltd. published its "2016 Social Impact Report" stating that the company had 10,855 employees employed in the United States and Canada.  Exhibit #50 at #12, Exhibit

#51 to the Troutman affidavit is Teva Limited's filing with the United States Securities and Exchange Commission. This filing states:

> "The specialty business may continue to be affected by price reforms and changes in the political landscape, following recent public debate in the U.S. We believe that our primary competitive advantages include our commercial marketing teams,..."

This filing further states:

> "Our U.S. specialty medicines revenues were 6.7 billion in 2016, comprising the most significant part of our specialty business."

The Court notes that Teva's specialty medicines revenues in the U.S. were almost six times that of its revenue in the European market. Page 46 of Exhibit #51 states that Teva Limited's "worldwide operations are conducted through a network of global subsidiaries." Teva Pharmaceuticals USA, Inc. is listed as a subsidiary in the United States which is owned by Teva Limited. Exhibit #54 to the Troutman affidavit lists Teva USA as the North American headquarters of Teva Limited.

As stated in the previous section, the Plaintiff is required only to make a prima facia showing of jurisdiction. This Court must view the pleadings and documentary evidence in a light most favorable to Plaintiff. At this point in the litigation, the evidentiary materials support the Plaintiff's prima facia showing of personal jurisdiction under 2307.382 ORC, Civil Rule 4.3(a) and the due process clause of the 14th Amendment to the United States Constitution.

All Defendants' Motions to Dismiss are overruled.

<u>JUDICIAL NOTICE</u>

Pursuant to Ohio Evidence Rule 201, the Motions of all parties for judicial notice are granted. The Court takes judicial notice of all materials filed by the moving parties with their Motions.

15

<u>MOTION TO STAY</u>

The Defendants have filed a joint Motion to Stay this litigation pursuant to the doctrine of primary jurisdiction and this Court's inherent power to control litigation pending in its court. <u>State, ex rel Banc One Corp. v. Rocker</u>, 86 Ohio St. 3d 169 (1999); <u>United States v. W. Pacific R.R. Co.</u>, 352 U.S. 59 (1956); <u>Lazarus v. Ohio Cas. Group</u>, 144 Ohio App. 3d 716 (2001); <u>Pacific Chem. Prods. Co. v. Teletronics Servs., Inc.</u>, 29 Ohio App. 3 45 (1985). Defendants claim that a stay of litigation should be enacted when claims are pending in a court and the resolution of issues pertaining to the claims are also before the special expertise of an administrative body. A trial court should defer action on an issue when there are administrative proceedings pending before a government regulatory agency which can resolve the lawsuit. The claims pending in the court must require a body of experts capable of handling the complex facts of the case before the court. The stay of litigation under the primary jurisdiction doctrine or the inherent authority of the court rests with the sound discretion of the trial court.

Article VII of the Ohio Rules of Evidence provides for and governs the presentation of evidence by expert witnesses in litigation. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, establishes that the trial court is the gatekeeper in determining what expert testimony from witnesses is admissible at trial. The <u>Daubert</u> Court sets forth numerous factors to consider in evaluating the reliability of scientific evidence. The Supreme Court expressed confidence in the ability of trial courts to evaluate complicated scientific evidence.

Defendants are correct that the FDA currently has pending before it numerous complex issues concerning the application of opioids and the addictive nature of

opioids. There is no guarantee when the FDA will complete its review of the numerous complex issues before it.

This Court agrees with the United States District Court in <u>City of Chicago v. Purdue Pharma LP</u>, supra, that the issue before this Court is whether opioids were marketed truthfully in the state of Ohio and whether Defendants misrepresented the risks, benefits, and superiority of opioids to treat long-term chronic pain. This Court agrees with the district court that federal and state courts are equipped to adjudicate these types of claims. See also <u>State of Missouri v. Purdue Pharma, LP</u>, Missouri Circuit Court, 22nd Judicial Circuit, Case No. 1722-CC10626. This Court is not aware of any pending stay order in any state or federal court concerning these issues. The Court further finds that the Plaintiff would be unduly prejudiced by an open-ended court order which stays these proceedings pending the determination of the FDA. This Court is equipped to handle the issues raised in this litigation. A stay order would unduly prejudice the Plaintiff. The Motion to Stay is overruled. The stay on discovery is vacated. Discovery in this action may commence forthwith.

DATE: _8/21/18_

_Scott W Nusbaum_
SCOTT W. NUSBAUM, JUDGE
COMMON PLEAS COURT #2
ROSS COUNTY, OHIO
SITTING BY ASSIGNMENT

<u>Recipients of Decision and Entry</u>:

Mark H. Troutman
Attorney at Law
Two Miranova Place, Suite 700
Columbus, OH 43215-5098

John R. Mitchell
Attorney at Law
3900 Key Center
127 Public Square

Albert J. Lucas
Attorney at Law
1200 Huntington Center
41 South High Street
Columbus, OH 43215

John Q. Lewis
Attorney at Law
950 Main Avenue
Suite 1100

17

Cleveland, OH  44114-1291

Carole S. Rendon
Attorney at Law
Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214

Cleveland, OH  44113-7213

Daniel J. Buckley
Attorney at Law
301 East Fourth Street
Suite 3500, Great American Tower
Cincinnati, OH  45202