IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*THIS DOCUMENT RELATES TO:*<br>*ALL CASES* | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

### McKESSON'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF THE OHIO AUTOMATED Rx REPORTING SYSTEM DATABASE

**I.     INTRODUCTION**

As is well known to this Court by now, the cases at issue arise from federal and state claims brought by Summit County, Cuyahoga County, the City of Akron, and the City of Cleveland ("Plaintiffs") in the Track One MDL against wholesale manufacturers and distributors of prescription opioid medications ("Defendants"). Plaintiffs claim that Marketing Defendants[1] engaged in a "massive false advertising campaign to drastically expand the market for prescription opioids" and that Distributor Defendants "failed to monitor and restrict the improper distribution of those drugs," thus causing widespread diversion and abuse of prescription opioids. Sec. Am. Compl. ¶ 1–2. Plaintiffs blame Defendants directly for the ensuing opioid crisis, and they seek a colossal reimbursement of hundreds of millions of dollars for various health and law enforcement services they have employed in fulfilling their public duties and responsibilities to address the crisis over the years. *See* Sec Am. Compl. ¶ 715–750.

---

[1] For continuity, hereinafter the "Marketing Defendants" will be referred to as "Manufacturing Defendants" in keeping with the practice in the case to date.

Over five months have passed since McKesson first requested by subpoena the Ohio Automated Rx Reporting System ("OARRS") database. Established in 2006, OARRS is Ohio's prescription drug monitoring program ("PDMP"). As the Board is the Ohio state agency responsible for administering and enforcing laws governing the practice of pharmacy and the legal distribution of drugs, the Ohio legislature directed the Board to develop this database to serve as both a screening tool for physicians and pharmacists to assist them in making treatment decisions about their patients and an investigative tool for law enforcement officers working drug cases. At the time, the state realized that a prescription drug problem existed, but had no way of monitoring it.

OARRS hosts two types of data: (1) out-patient prescription data reported by retail dispensers of opioids and other controlled substances, including certain physicians, pharmacies (such as hospital out-patient pharmacies) and pharmacists, and (2) wholesale prescription data of sales to prescribers or pharmacies reported by certain manufacturers and distributors of opioids, like McKesson. The out-patient data reflect properties such as the drug, quantity, strength, dosage, and refills authorized associated with each prescription that is written by a prescriber and filled by a dispenser as well as demographic information such as the age and residence of the patient, the locations, identities, and DEA registration numbers of the prescribers, pharmacies, and the payor. The current iteration even includes the diagnosis for which the prescription is written. The wholesale data reflect properties such as the drug, quantity, frequency, and locations of shipments and transactions between manufacturers and distributors and their customers. The database does not include any discretionary information or investigative materials, such as questions or observations. It contains only factual data. Analyzing these data, the Board is able to generate a number of reports relevant to the subject matter of this litigation.

Given its extraordinary capacity to address drug abuse and diversion across the state by, for example, identifying "doctor shoppers" and "overprescribers," Ohio law allows for a host of users to request and review the patient history reports that OARRS generates.[2] This list of potential requestors includes physicians, dentists, nurse practitioners, pharmacists, drug court judges, probation officers, state law enforcement officers, federal law enforcement officers, investigators, coroners, medical examiners, and administrators of worker's compensation. The list goes on to even include directors of various state agencies like the Department of Medicaid and the Department of Health. Individuals are also able to request their own patient history reports. Almost every entity connected to the opioid epidemic in Ohio can access the data that McKesson has sought since July—data from which an abundance of analyses can be performed to identify possible sources of diversion and other illicit practices and intervening and superseding causes that are relevant to defending against Plaintiffs' claims. The Board is in the unique position of being the only entity that can produce some of the most pertinent information necessary for resolving critical issues in this litigation.

The Board has produced information that is only partially responsive to McKesson's Rule 45(a)(1)(D) Subpoena for Documents ("subpoena"). While the Board has produced discipline records, newsletters, annual reports, and OARRS-specific literature, it has categorically refused to produce the database. The Board maintains that the database is prohibited from disclosure by state and federal law. But by refusing to produce the database, the Board essentially denies all parties to this litigation the opportunity to examine the only source of comprehensive information regarding where the actual diversion at issue in this litigation occurs—downstream from the distributors and dispensers, where prescribers and patients determine demand for

---

[2] *See* Ohio Rev. Code Ann. § 4729.80.

prescription opioids, and where those opioids leave the closed system and are transferred to individuals.

In accordance with Local Rule 37, counsel for McKesson has conferred in good faith with counsel for the Board on several occasions. For the reasons below, and to prevent material prejudice to McKesson and other Defendants, the Court should compel the Board to immediately produce the OARRS database.

## II.   BACKGROUND

On July 11, 2018, McKesson served the Board with a subpoena that sought, *inter alia*, "all documents reflecting the Board's receipt of data or information from the Ohio Automated Rx Reporting System ("OARRS") related to prescription opioids" and "all documents reflecting or describing efforts of any kind (including any processes involving review of OARRS data) by the Board to identify, investigate, and report to other Ohio state agencies, federal agencies, or to federal, state, or local law enforcement any of the following regarding prescription opioids in Ohio: doctors or other prescribers who appear to be overprescribing; patients who appear to be doctor shopping or counterfeiting prescriptions; or Terminal Distributors of Dangerous Drugs ("TDDDs"), pharmacists, or pharmacy interns who appear to be improperly dispensing prescription opioids." (Ex. A).

The Board objected on August 3, 2018 pursuant to Fed. R. Civ. P. 45(d)(2)(B), maintaining that records from and generated by OARRS are "prohibited from disclosure by Ohio Rev. Code. § 4729.80 and § 4729.86." (Ex. B). Nonetheless, the Board made document productions on August 10, 2018 and September 7, 2018.

On August 2, 2018, McKesson served the Board with a Subpoena to Testify that sought, *inter alia*, testimony regarding "the OARRS database, including why it was created; what purpose it serves; the data it contains; and the evolution of its capabilities and utilization from 2006 to the present." (Ex. C). McKesson entered discussions regarding which witnesses the Board would put forth on October 15, 2018.

On August 22, 2018, McKesson followed up with the Board in writing, offering to discuss by telephone the Board's concerns with producing the database. (Ex. D). The Board responded in writing on August 24, 2018, again refusing to produce the database and instead offering that if McKesson could provide it with a description of the specific information sought, it would "see if it could produce the information from another source." (Ex. E).

Despite the comprehensive protections of the May 15, 2018 Protective Order already in effect in this action (Ex. F), the Board sought a further order. McKesson began negotiating the terms of that order on August 31, 2018, intending that it would cover "data" and "investigative techniques" in addition to the documents, testimony, and records already protected by the existing Protective Order. Negotiations over the terms of an additional order directed to the OARRS data continue, the most recent proposed version having been sent to counsel for the Board on November 27, 2018. (Ex. G). The Board has yet to respond to McKesson's proposal.

On October 22, 2018, the Board offered its first deponent—the Director of OARRS, Chad Garner—to testify regarding the OARRS database, including why it was created, the purpose it serves, the data it contains, and the evolution of its capabilities and utilization from 2006 to the present. The purpose of this deposition was to determine whether McKesson could narrow its request for the OARRS data without jeopardizing its defense or if the need for the data still existed. McKesson then served Mr. Garner with a Subpoena to Testify in his individual

5

capacity on October 29, 2018 (Ex. H) and deposed him on November 14, 2018. The testimony reaffirmed that Defendants' forensic experts need the underlying data in order for Defendants to adequately defend against claims that prescription opioids they either manufactured or distributed caused the opioid crisis in the Track I jurisdictions.

Defendants learned from Mr. Garner that OARRS has the capacity to perform a number of analyses relevant to this litigation based on computer code that he writes himself, but that there are also a number of analyses it either does not or cannot perform automatically. Examples of the latter include analyses that can trace specific prescriptions and those that can identify irregular prescribing and dispensing patterns associated with those prescriptions. His testimony also revealed that based on the prescriber, patient, and dispenser geographic information the PDMP collects, the data could also be used to identify purchasing and dispensing trends discernable *only* through the OARRS database. After reviewing the testimony and conferring with their experts, Defendants learned that their forensic teams could perform several of these analyses and more, generated by their own code, and that the results could be used to defend against claims that Defendants' marketing and distribution practices precipitated the opioid crisis because those results could both identify actual likely sources of diversion and substantiate the inability of manufacturers and distributors to distinguish, based on their limited information, those pharmacies and other dispensers that were "suspicious" from those that were not—results that would counter Plaintiffs' theory of causation. Defendants further learned that their expert teams cannot perform these analyses without the database itself because OARRS is the *only* repository that captures all of the distributor, prescriber, patient, and dispenser geographic information and prescription characteristics necessary to perform those analyses.

6

On December 12, 2018, McKesson conferred with the Board yet again, this time reiterating that under the current Case Management Order, fact discovery closes on January 25, 2019; that Defendants' expert reports are due on March 26, 2019; and that the only way to perform the analyses necessary to uncover the full extent of the intervening and superseding causes of the opioid crisis, as well as the tardiness and inadequacy of government entities' and regulators' response to it, is to analyze the OARRS data (Ex. I). The Board again refused production, citing Ohio Rev. Code. § 4729.80 and § 4729.86 as well as the Health Insurance Portability and Accountability Act ("HIPAA") as prohibiting disclosure (Ex. J). After months of conferring, and with the tight discovery schedule only getting tighter, McKesson now brings this timely motion.

### III. DISCOVERY STANDARD

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The rules do not differentiate between information that is private and that which is not, and allow for inquiry into the affairs of both litigants *and* third parties. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30 (1984) (emphasis added). Thus, "[a] command in a subpoena to produce documents, electronically stored information, or tangible things requires the responding person to permit inspection, copying, testing, or sampling of the materials." Fed. R. Civ. P. 45(a)(1).

Under Rule 45, the party refusing to comply bears the burden of showing good cause. 9A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. §2463.2 (3rd ed. Sept. 2017). "At any time, on notice to the commanded person, the serving party may move the court . . . for an order compelling production or inspection," Fed. R. Civ. P. 45(d)(B)(i), and the court "may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena," Fed. R. Civ. P. 45(g).

## IV. ARGUMENT

McKesson has unsuccessfully sought the OARRS data for over five months, and despite McKesson's willingness to accord a Protective Order that would allow for the highest level of protection, the Board continues to refuse to produce it. OARRS is the only repository in existence that contains all of the necessary dispenser-prescriber-patient-payor-prescription information for Defendants to support their defense and for the Court to understand the full extent of the critical information available to the State of Ohio, its agencies, arms of its political subdivisions, and various law enforcement entities regarding the opioid crisis—information that has never been available to manufacturers or distributors. The Court should find the Board's objections inadequate to excuse production because the legal justifications on which it relies are either inapplicable in this action or have been addressed by the existing Protective Order. Accordingly, as it previously did regarding the ARCOS database requested by the Plaintiffs, the Court should compel production of the OARRS database under similar terms.

### A. The OARRS Data is Necessary to Understand the Full Extent of the Opioid Crisis

McKesson's request is proportional to the needs of this case considering the significance of the issues. President Trump has declared the opioid epidemic a national emergency, Governor Kasich has declared it a statewide emergency, and many local leaders have declared emergencies

8

in their communities. Despite the many causes of the opioid crisis,[3] Plaintiffs want to hold Defendants solely and wholly responsible for this crisis, seeking as purported "damages" hundreds of millions of dollars for past and recurring expenditures Plaintiffs made to perform their public duties and responsibilities. *See* Sec Am. Compl. ¶ 715–750.

This litigation is not about whether an opioid crisis exists. It is about what forces played a role in fashioning it and which entities had access to all of the critical information necessary to recognize the crisis, possessed the power to take effective action to combat it, but either did nothing or did too little too late. The Board's production to date, consisting of documents reflecting disciplinary action taken against pharmacists, informational literature on the capabilities of OARRS, and public reports and newsletters prepared by the Board, has not provided Defendants with enough information to explore these issues in full. The disciplinary records, for example, identify a few local pharmacists who forged prescriptions, but they do not reflect activity over the most recent years, nor do they come close to capturing even a near-complete list of individuals, identifiable only through comprehensive and detailed dispensing data, who were responsible for diversion. On the other hand, dispensers currently report to OARRS daily and the information diffuses instantaneously to those who have access to the database. The publicly-available OARRS informational literature sheds light on some of the patient risk information OARRS can generate (such as "overdose risks scores") and identifies a number of government entities with access to that information, but it does not provide an understanding of *all* of the information known to those entities. The OARRS database does.

[3] *See Report of the President's Commission on Combatting Drug Addiction and the Opioid Crisis.*

Mr. Garner's testimony revealed that the database could identify, among other facts, individuals receiving a prescription from five or more prescribers in one calendar month ("doctor shoppers"), physicians who prescribe more opioids than is medically necessary ("overprescribers"), patients engaging in criminal behavior like pill trafficking, and prescribers who had one or more patients die from a prescription overdose. No category of documents or combination of witnesses can present this type of cumulative information. No category of documents or combination of witnesses can be used to generate trends that identify intervening and superseding causes of diversion—which are relevant to whether or not Plaintiffs in this action have named the proper Defendants and the extent to which the Plaintiffs and others must also bear responsibility for Plaintiffs' claimed injuries. Only analysis of the prescription data will allow Defendants a fair opportunity to fully explore and present this evidence.

Indeed, this Court has already recognized that the ARCOS database is "critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation." (Doc. #233, page 8) (Ex. J). ARCOS contains only distributing information. In addition to containing the identical information as was reported to ARCOS for Ohio, the OARRS database also contains all of the information regarding each prescription for controlled substances that was dispensed to outpatients in the State of Ohio since 2006—information that has never been, and still is not, available to any of the Defendants. McKesson's request for the OARRS database is driven by similar justifications that this Court recognized as supporting Plaintiffs' request for the ARCOS database. Similar to ARCOS on the distributing side, OARRS collects identifying information that can be used to assess trends on the prescribing and dispensing side.

## B. Defendants Require the Data to Perform Independent Causal Analyses

The outcome of this litigation turns on whether Plaintiffs can meet their burden to prove all of the elements of their claims, including whether Defendants' marketing and distribution practices factually and proximately caused the prescription drug diversion and its sequelae for which Plaintiffs seek to recover past and projected expenditures made or anticipated to be made to perform their associated public duties and responsibilities. The OARRS data is necessary for McKesson and other Defendants to support their defenses in several ways.

For example, Plaintiffs allege that "publicly available information confirms that Distributor and [Manufacturing] Defendants funneled far more opioids into communities across the United States than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders" and that "this information, along with the information known only to Distributor and [Manufacturing] Defendants, would have alerted them to potentially suspicious orders of opioids." Sec. Am. Compl. ¶ 555. McKesson asserts the contrary. First, McKesson and other Defendants had access to information about their own distribution of prescription opioids, but not to information about the distribution of prescription opioids by other Defendants. In contrast, OARRS contains information about the distribution and dispensing of every defendant *and* others who are not named as defendants. Second, since 2006, the Board has had at its computer fingertips full access to the ARCOS data and detailed information as described above for every prescription written by every prescriber and filled by every dispenser for every patient in Ohio. In addition, state and local law enforcement officers, local drug court judges, regulatory bodies, and various directors of state health agencies have been able to access OARRS' patient history reports, doctor prescribing histories, drug prescribing trend information, and other data, any and all of which indicate or confirm signs of abuse, addiction, overdose risk and, ultimately, pill diversion. *See* Ohio Rev. Code Ann. §

11

4729.80. Mr. Garner's testimony also confirmed that the Board publishes county-level statistical reports on its website and has been known to publish these reports and others to the state legislature and Governor. This testimony indicates that Plaintiffs' representatives and a host of state and local government officials had access to information that would have alerted them to sources of drug diversion and abuse. But to understand the full extent of accessible information, the sources of diversion it reveals, and the failures of those with access to appropriately analyze and utilize that information to combat diversion, Defendants' forensic teams need full access to analyze the data.

The forensic teams intend to perform a number of analyses, the full measure of which cannot be envisioned until they actually have access to the database. For example, they intend to determine the existence and extent of doctor shopping in Summit, Cuyahoga, Akron, and Cleveland. OARRS monitors when prescribers and pharmacies access patients' prescription history reports before prescribing or dispensing an opioid, an action they are required by law to perform. By linking prescriptions to prescribers or dispensers who failed to abide by this obligation, the forensic analysts can point to illicit prescribing behavior as a cause of diversion and fully examine the extent of such prescribing. They also intend to identify patterns in overprescribing or improper prescribing of combinations of opioids and other controlled substances and determine if those patterns were visible outside the OARRS database. While Mr. Garner testified that OARRS already performs these analyses, their results are not shared with Defendants and even if they were, Defendants' experts cannot be expected to rely on reports generated from the Board's codes and algorithms if they are to confidently understand the capabilities and methodology of the reports and the reliability of the results. Moreover, Defendants' experts should not be forced to rely on the Board's definition of "doctor shopping"

or "overprescribing." Defendants' teams need the data, and not just some subset, to conduct their own independent analyses.

The forensic analysts also intend to identify prescriptions written by prescribers who were later accused or convicted of criminal wrongdoing (or should have been), and prescriptions filled for patients who were later accused or convicted or criminal wrongdoing (or should have been) or who were treated for substance abuse.  These analyses are only possible because OARRS collects full identifying information for prescribers, dispensers, and patients.  The analysts also intend to use the OARRS data to compare and potentially match those data against the respective Defendants' own records and the ARCOS data to determine how many shipments (perhaps from multiple distributors) were sold to particular pharmacies and then distributed to particular residents.  Lastly, the analysts intend to cross-reference the OARRS data with suspicious order data and the ARCOS data this Court has already ordered produced, another analysis that is only possible if the Board complies with the subpoena.

All of these analyses and others can serve several purposes helpful for the Court's understanding and McKesson's defenses—they could identify other sources of diversion such as prescribers who engaged in illicit practices; they could highlight the depth and extent to which Plaintiffs knew or should have known of potential or actual diversion; and they can dispel claims that McKesson's distributing practices caused diversion if the orders of McKesson's customers are determined to have been validly prescribed and filled—all information that could counter Plaintiff's theory of causation.

C. **The Board's Objections Are Inadequate to Excuse its Production Obligations**

Despite the data's obvious significance to this case and the ease with which the Board can produce it, the Board cites two reasons for its refusal: (1) it is specifically prohibited by Ohio Rev. Code. § 4729.80 and § 4729.86 from disclosing any OARRS data or reports generated therefrom, and (2) disclosure of the OARRS database would constitute the public release of the protected health information of millions of individuals who are both unrelated to and unaware of this case, and that disclosure of that information by the Board would be a violation of HIPAA. These objections are insufficient to excuse production under Rule 45(g).

1. **Ohio state law does not apply to discovery in this litigation**

In its initial objections, the Board cited two provisions of the Ohio Revised Code that would ordinarily govern its authority to disclose the OARRS data. Section 4729.80(A) provides that "if the state board of pharmacy establishes and maintains a drug database pursuant to section 4729.75 of the Revised Code, the board is authorized or required to provide information from the database only as follows . . . ." The statute then goes on to list specific instances that apply. Likewise, Section 4729.86(B) provides that "a person shall not use information obtained pursuant to division (A) of section 4729.80 of the Revised Code as evidence in any civil or administrative proceeding."

Though these confidentiality provisions are clear in their mandate, the Board cannot rely on them in this litigation because it is wholly settled that discovery in a federal court is governed "only by the Federal Rules of Civil Procedure" and that state law is of "very little relevance." 8 *Wright, Miller & Marcus, Federal Practice and Procedure*: Civil 2d § 2005 (1994). *See E.E.O.C. v. Honda of Am. Mfg., Inc.*, No. 2:06-CV-0233, 2006 WL 2934072, at *1 (S.D. Ohio Oct. 12, 2006) (denying the Ohio Department of Jobs and Family Services' third party motion to quash Defendant corporation's subpoena to produce a complete copy of the unemployment

14

compensation file for Plaintiff in an E.E.O.C. action because the provisions of Ohio Rev. Code § 4141.21 that prohibit the disclosure or use of information supplied to the Department in connection with a claim for unemployment benefits or any other proceeding did not apply in federal court).

Only federal privilege law applies in federal question jurisdiction cases. *See Hancock v. Dodson*, 958 F.2d 1367, 1372–73 (6th Cir. 1992) ("Federal courts are not permitted to apply state privilege law, regardless of the importance of implicated policy concerns; rather, they are obligated to apply federal privilege law"); *Gen. Motors Corp. v. Dir. of Nat. Inst. for Occupational Safety & Health, Dep't of Health, Ed. & Welfare*, 636 F.2d 163, 165 (6th Cir. 1980) ("[T]he Ohio privilege statute is not the controlling principle of law here. This case presents a federal question; the applicability of a privilege must, accordingly, be ascertained by reference to federal statutes and the common law. The common law did not recognize a physician-patient privilege at all. Neither has Congress codified the concept in a federal statute.").

This Court has already affirmed that the federal rules apply to discovery in this litigation when it first ordered the DEA to produce the ARCOS database that Plaintiffs sought, (Doc. #233, page 9) (Ex. K), and should likewise do so regarding the OARRS database McKesson seeks from the Board because under the balancing test under the federal rules, this Court can ensure that the unique interests of third parties are adequately considered. *See Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994). Because this litigation is in federal court and is based in part on federal claims, § 4729.80 and § 4729.86 do not apply to the Board's disclosure of the OARRS data.

## 2. Protected health information is already covered in this litigation

The Board's attempt to justify its refusal to produce the OARRS database on HIPAA grounds must also fail. This Court has already entered a Protective Order that recognizes, *inter alia*, "discovery in this litigation may involve production of 'protected health information' as that term is defined and set forth in 45 C.F.R. § 160.103" as well as "information covered by the privacy laws of any individual states." (Ex. F). Pursuant to 45 C.F.R. § 164.512(e)(1), the Protective Order authorizes "all covered entities and their business associates (as defined in 45 C.F.R. § 160.103), or entities in receipt of information from such entities" to disclose protected health information pertaining to this litigation because "the Court has determined that disclosure of such Protected Health Information is necessary for the conduct of proceedings before it and that failure to make the disclosure would be contrary to public interest or to the detriment of one or more parties to the proceedings."

Because Defendants are bound by this Protective Order, they have already agreed not to disclose any of the data produced for any purpose other than the litigation. If the Board seeks additional protection beyond the existing Protective Order, the Court can consider such a request, as it has with respect to the DEA's concerns over the ARCOS database. But, the Board has dragged its feet regarding negotiations on the additional order it seeks.

Considering the unprecedented nature, extent, and high stakes of this litigation, and the ease with which the Board can supply the OARRS database, the public interest far outweighs any burden to the Board. According to Mr. Garner, the Board is required to make five years of information available to OARRS users, but it stores the data internally for much longer. Data identifying individuals are available back to at least 2014, and anonymized data exists as far back as 2006 or 2007. Mr. Garner also testified that many of the specific searches or analyses the Board performs can be completed within seconds to minutes, and the Board has not cited any

specific reason why production of the database would be overly burdensome. Indeed, providing the database would undoubtedly be the most efficient and least burdensome method of providing the information—another aspect recognized by this Court when Plaintiffs were seeking the ARCOS database.

Without a sufficient legal basis to object, the Board's refusal to comply with the subpoena violates Rule 45(g) of the Federal Rules of Civil Procedure, and it should be compelled to produce the data.

## V.  CONCLUSION

For the foregoing reasons, McKesson respectfully requests this Court to grant an order compelling the Board to immediately produce the OARRS database.

Date: <u>December 31, 2018</u>

Respectfully submitted,

<u>/s/ *Geoffrey Hobart*</u>
Geoffrey E. Hobart
Mark H. Lynch
Maureen F. Browne
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
mbrowne@cov.com

*Counsel for McKesson Corporation*

## CERTIFICATION

I HEREBY CERTIFY under Local Rule 37.1 that counsel has made good faith efforts to resolve the dispute described herein, as set forth below:

McKesson first requested that the Board to produce the OARRS database on July 11, 2018, to which the Board objected on August 3, 2018.

McKesson has conferred with the Board thereafter on several occasions:

McKesson wrote to the Board on August 22, 2018, offering to discuss its concerns by telephone. The Board responded in writing on August 24, 2018, categorically refusing to produce the database.

McKesson began negotiating the terms of an additional protective order covering the OARRS database on August 31, 2018. Negotiations over the terms of that additional order continue, the most recent proposed version having been sent to counsel for the Board on November 27, 2018. The Board has yet to respond to this proposal.

McKesson wrote to the Board on December 12, 2018, reiterating the need for the database, the impending deadline for fact discovery, and the Board's unresponsiveness to McKesson's proposed protective order. The Board again refused production.

Date: <u>December 31, 2018</u>　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　<u>/s/ *Geoffrey Hobart*</u>
　　　　　　　　　　　　　　　　　　　　　　　Geoffrey E. Hobart
　　　　　　　　　　　　　　　　　　　　　　　Mark H. Lynch
　　　　　　　　　　　　　　　　　　　　　　　Maureen F. Browne
　　　　　　　　　　　　　　　　　　　　　　　**COVINGTON & BURLING LLP**
　　　　　　　　　　　　　　　　　　　　　　　One CityCenter
　　　　　　　　　　　　　　　　　　　　　　　850 Tenth Street NW
　　　　　　　　　　　　　　　　　　　　　　　Washington, DC 20001
　　　　　　　　　　　　　　　　　　　　　　　Tel: (202) 662-5281
　　　　　　　　　　　　　　　　　　　　　　　ghobart@cov.com
　　　　　　　　　　　　　　　　　　　　　　　mlynch@cov.com
　　　　　　　　　　　　　　　　　　　　　　　mbrowne@cov.com

　　　　　　　　　　　　　　　　　　　　　　　*Counsel for McKesson Corporation*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record and via email to counsel for the State of Ohio Board of Pharmacy on December 31, 2018.

/s/ Geoffrey Hobart
Geoffrey E. Hobart
Mark H. Lynch
Maureen F. Browne
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
mbrowne@cov.com

*Counsel for McKesson Corporation*