**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** *THIS DOCUMENT RELATES TO: ALL CASES* | MDL No. 2804 Case No. 1:17-md-2804 Hon. Dan Aaron Polster |

**CERTAIN DEFENDANTS'**
**MEMORANDUM IN SUPPORT OF MOTION FOR RELIEF**
**CONCERNING IMPROPER EXTRAJUDICIAL STATEMENTS**
<u>**AND VIOLATIONS OF COURT ORDERS**</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

FACTUAL BACKGROUND ..........................................................................................1

ARGUMENT ..................................................................................................................6

I.     PLAINTIFFS' COUNSEL VIOLATED THE OHIO RULES OF
       PROFESSIONAL CONDUCT. ...........................................................................6

II.    PLAINTIFFS' COUNSEL VIOLATED COURT ORDERS. ...............................9

III.   A GAG ORDER AND OTHER SANCTIONS ARE WARRANTED. ...............12

       A.     The Court Should Issue a Gag Order Mandating Strict Compliance with
              Ohio Rule of Professional Conduct 3.6. ................................................12

       B.     This Court Should Order Relief For Plaintiffs' Counsel's Violations of Its
              Previous Orders. ......................................................................................14

       C.     This Court Should Award Defendants Their Attorneys' Fees and Costs
              Incurred As A Result Of Plaintiffs' Counsel's Misconduct. .................16

       D.     This Court Must Refer Allegations of Professional Misconduct to the
              Court's Committee on Complaints and Policy Compliance. ..................16

CONCLUSION..............................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aaron v. Durrani*,
No. 1:13-cv-202, 2013 WL 12121516 (S.D. Ohio Oct. 1, 2013) ................................8, 12, 13

*Anthony J. Mantia, LLC v. Impact Sports, Inc.*,
No. 3:09-cv-362, 2011 WL 13232488 (S.D. Ohio Nov. 8, 2011) ...........................7

*Brown v. Tellermate Holdings Ltd.*,
No. 2:11-cv-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) ..................................15, 16

*Doe v. Rose*,
No. CV-15-07503, 2016 WL 9107137 (C.D. Cal. Sept. 30, 2016) ...............................7, 8, 14

*Dorsett v. County of Nassau*,
No. CV 10-01258 ADS, 2012 WL 2076911 (E.D.N.Y. June 7, 2012) ..................14

*Field Turf USA, Inc. v. Sports Const. Group, LLC*,
No. 1:06 CV 2624, 2007 WL 4412855 (N.D. Ohio Dec. 12, 2007)........................15

*Gentile v. State Bar of Nevada*,
501 U.S. 1030 (1991).....................................................................6, 7, 13

*Goodyear Tire & Rubber Co. v. Haeger*,
137 S. Ct. 1178 (2017).................................................................16

*Knox v. City of Fresno*,
No. 1:14-cv-00799, 2016 WL 10647198 (E.D. Cal. June 2, 2016).......................15

*Mann v. Univ. of Cincinnati*,
824 F. Supp. 1190 (S.D. Ohio 1993), *aff'd,* 152 F.R.D. 119 (S.D. Ohio 1993),
*aff'd*, 114 F.3d 1188 (6th Cir. 1997)......................................................15

*McDonald v. Cooper Tire & Rubber Co.*,
No. 8:01-cv-1306, 2005 WL 2810707 (M.D. Fla. Oct. 27, 2005)........................15

*Nat'l Hockey League v. Met. Hockey Club*,
427 U.S. 639 (1976)......................................................................12

*Pauley v. United Operating Co.*,
606 F. Supp. 520 (E.D. Mich. 1985)........................................................12

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
685 F.3d 486 (5th Cir. 2012) ........................................................16

*State of Colorado ex rel. v. Attorney General*,
    205 U.S. 454 (1907)........................................................................6

*United States v. Cutler*,
    58 F.3d 825 (2d Cir. 1995)..............................................................8

*United States v. Koubriti*,
    307 F. Supp. 2d 891 (E.D. Mich. 2004)........................................14

## RULES

Fed. R. Civ. P. 37(b)(2).....................................................................15

Fed. R. Civ. P. 37(b)(2)(A)(ii).........................................................15

Fed. R. Civ. P.37(b)(2)(C) ...............................................................16

Local Rule 3.7(d)(1)..........................................................................18

Local Rule 83.7...................................................................................7

Local Rule 83.7(b).............................................................................12

Local Rule 83.7(d).............................................................................16

Ohio R. Prof. Cond. 3.4.......................................................................8

Ohio R. Prof. Cond. 3.6...............................................12, 13, 14, 17

Ohio R. Prof. Cond. 3.6(a)..................................................................7

Ohio R. Prof. Cond. 4.1.......................................................................8

Ohio R. Prof. Cond. 8.4................................................................8, 17

## OTHER AUTHORITIES

Daniel Fisher, "Opioid Lawyers Say Settlement May Hinge on Forcing Plaintiffs
    Into Class Action," *Forbes* (Sept. 27, 2018),
    https://www.forbes.com/sites/legalnewsline/2018/09/27/opioid-lawyers-say-
    settlement-may-hinge-on-forcing-plaintiffs-into-class-action/#d4103dc1d1cf.......................6

Bill Whitaker, "Opioid Crisis: The Lawsuits That Could Bankrupt Manufacturers
    and Distributors," *60 Minutes* (Dec. 16, 2018),
    https://www.cbsnews.com/news/opioid-crisis-attorney-mike-moore-takes-on-
    manufacturers-and-distributors-at-the-center-of-the-epidemic-60-minutes/ ...........................1

Opioid Manufacturers Fraudulent Marketing Litigation First Renewal of
   Retention Agreement (July 1, 2017),
   https://www.ohioattorneygeneral.gov/Files/Legal/Outside-
   Counsel/Contingency-Fee-Information/Opioid-Manufacturers-Litigation.aspx ......................3

Jef Feeley, "Purdue's Oxycontin Targeted at Judge's Opioid Summit," *Bloomberg*
   (Feb. 2, 2018), https://www.bloomberg.com/news/articles/2018-02-02/purdue-
   s-oxycontin-said-to-be-targeted-at-judge-s-opioid-summit........................................................5

Jeff Overley and Emily Field, "Inside the Opioid MDL's Big Closed-Door
   Hearing," *Law360* (Feb. 1, 2018),
   https://www.law360.com/articles/1008010/inside-the-opioid-mdl-s-big-
   closed-door-hearing ...................................................................................................................5

## INTRODUCTION

Lawyers representing plaintiffs in this litigation are engaged in a concerted campaign to taint potential jury pools in this district—and across the country—through misleading, inflammatory, and improper public statements.  Their behavior, which reached a crescendo on national TV during a recent episode of *60 Minutes*, is a flagrant violation of their ethical obligations as attorneys practicing before this Court and threatens defendants' rights to a fair adjudication of the claims asserted against them.  Certain statements by plaintiffs' counsel also have violated this Court's express orders.  These lawyers' professional misconduct is so far outside the bounds of appropriate behavior as to warrant a gag order and other sanctions.  Such steps are necessary to help mitigate the unfair and prejudicial effects of the misconduct and to deter similar misconduct in the future.  The essential fairness of this proceeding and the rights of the parties are at stake.

## FACTUAL BACKGROUND

On December 16, 2018, CBS aired an episode of its nationally broadcast television show *60 Minutes* that included a segment entitled "Opioid Crisis: The lawsuits that could bankrupt manufacturers and distributors."[1]  During the 13-minute segment, three lawyers for plaintiffs— Mike Moore, Ohio Attorney General (and Governor-elect) Mike DeWine, and Burton LeBlanc— offered to the public the plaintiffs' one-sided views of the case.  While Mr. Moore, Mr. DeWine, and Mr. LeBlanc were the only lawyers who were featured on camera, the video showed at least two plaintiffs' counsel strategy sessions with several other plaintiffs' lawyers present, and also

---

[1]  A transcript and video recording of the segment is available on CBS's website at https://www.cbsnews.com/news/opioid-crisis-attorney-mike-moore-takes-on-manufacturers-and-distributors-at-the-center-of-the-epidemic-60-minutes/.  For convenience, the transcript is attached at Exhibit 1.  But to understand the full extent of the lawyers' misconduct, defendants encourage this Court to review the video.

made clear that numerous other lawyers for the plaintiffs were aware of and involved in the effort.  Ex. 1 at 3 (noting that when *60 Minutes* was at Mr. Moore's "command center" "about a dozen lawyers from all around the country" were there too).

The lawyers who appeared in the *60 Minutes* segment claimed to have reviewed data from the federal government's ARCOS database and arrived at the conclusion that this "evidence" establishes the defendants' liability.  They further suggested that any jury would reach the same conclusion and award astronomical damages approaching $100 billion.  And Mr. Moore went on to characterize the plaintiffs' case against certain defendants as particularly "easy" and "simple."  Ex. 1 at 5, 6.  The lawyers' statements included the following:

- "If we try the Ohio case, if we win a verdict against these manufacturers and distributors there, it could bankrupt them.  It'd put them outta business."  (Mr. Moore) (Ex. 1 at 2)

- "[W]hen a jury hears the evidence in this case, they're not gonna award just a couple hundred million dollars.  It may be $100 billion."  (Mr. Moore) (*id.*)

- "[T]he stories that you've heard from some of the DEA [Drug Enforcement Administration] investigative agents concerning the large volumes of pills going into certain parts of our country are absolutely true."  (Mr. LeBlanc, in response to a question about "the most important thing" he had learned from the ARCOS data) (*id.* at 7)

- "I'm not allowed to talk about the specifics.  But I will simply tell you it's shocking.  Anyone who was looking at those numbers, as those middlemen were, as these distributors were, clearly, clearly should've seen that something was dramatically wrong."  (Mr. DeWine) (*id.*)

- "I don't think they cared enough.  And if they cared enough, maybe we would not have lost 500,000 lives from this problem.  It's—it just—it appalls me."  (Mr. Moore) (*id.*)

- "I've seen all the models.  To be effective, we need at least $100 billion to start off with."  (Mr. Moore, in response to a question about amounts the plaintiffs estimate they would need to fund treatment, prevention, and education programs) (*id.*)

- "Nobody in the world's gonna believe [the defendants' arguments that they should not be blamed for opioid abuse]. And—and don't go try to tell that to 12 jurors in Mississippi or Ohio who've lost people from this. You know what—(LAUGH) you know what those jurors are gonna do? They're gonna go in the back room, they're gonna spend about 30 minutes thinking about it, gonna come back out and bam." (Mr. Moore) (*id.* at 8)

Mr. Moore misleadingly implied he had no personal stake in the litigation. *See* Ex. 1 at 7 ("I don't care one whit about any money in this case. Not one whit whatsoever about it."). In fact, his contingency fee agreement with just one of his numerous clients—the Ohio Attorney General—provides for him to earn millions of dollars depending on the outcome of the case. *See* https://www.ohioattorneygeneral.gov/Files/Legal/Outside-Counsel/Contingency-Fee-Information /Opioid-Manufacturers-Litigation.aspx. Presumably he has similar arrangements with his other clients.[2]

Mr. LeBlanc misleadingly suggested that the defendants had access to the ARCOS database in the ordinary course and that this data should have alerted them to suspicious patterns of distribution. *See id.* at 7 (Reporter: "Did the companies have access to this information [the ARCOS data]?" Mr. LeBlanc: "It was their data."); *see also id.* at 2 ("If they didn't know it the first couple years, they clearly would've seen it after that. You can't miss it. When one year we had close to a billion—a billion pain meds prescribed in the state of Ohio, you know, 69 per man, woman, and child in the state. And that lies at the feet of the drug companies. They're the ones who did that.") (Mr. DeWine).

But, as plaintiffs' counsel well know, while manufacturers and distributors separately submit information to the DEA for inclusion in the ARCOS database, they do not have access to the database itself or to the information submitted by other manufacturers and distributors. In

---

[2] Mr. Moore is counsel of record for at least three plaintiffs in this MDL (Hamilton County, Tennessee; Hillsborough County, Florida; and the City of Tampa, Florida), as well as the State of Ohio, the State of Arkansas, and Salt Lake County, Utah.

this very proceeding, the United States has emphasized that "the data contains law enforcement sensitive and Privacy Act protected information," including "confidential business records and trade secrets by the reporting companies," and thus "DEA does not release ARCOS data publicly and only produced it [in this action] under the safeguards of the Protective Order." *United States of America's Brief in Support of Objections to Disclosure of ARCOS Data*, ECF 717 at 2.

And as this Court previously recognized, "[e]xtensive federal laws and regulations limit the circumstances in which the DEA may disclose ARCOS data," including data submitted by reporting companies. Op. & Order, ECF 800 at 10. The ARCOS database is used by the federal government for law enforcement purposes and the full compilation of data provides a far more comprehensive view of prescription opioid distribution than any individual manufacturer or distributor would ever have. For this reason, the database could never be admissible to establish any defendant's knowledge of all of the information contained within it. Mr. LeBlanc's suggestion to the contrary was false, and he knew it at the time.

There can be no doubt that these lawyers' purpose in speaking to the press was to inflame public sentiment against the defendants and impair their ability to receive a fair hearing. Mr. Moore admitted as much: "A case in court is a case in court, and that's fine. But there's also the court of public opinion. And the court of public opinion is sometime [sic] the most powerful court." Ex. 1 at 3. According to the reporter, Mr. Moore attributed his success in prior litigation against tobacco companies "mostly" to "going public," and suggested that he was using the same "playbook" here to "build legal and public pressure until the companies see no choice but to settle, and fork over billions." *Id.* at 5.[3]

---

[3] Of course, there are numerous differences between Mr. Moore's previous litigation against tobacco companies and the current litigation against opioid manufacturers and distributors. For starters, opioid medications are FDA approved, available only through a prescription, and

4

When defendants first learned about CBS's planned broadcast—from a teaser CBS aired featuring some of the statements identified above—they promptly reached out to plaintiffs' counsel to voice their concerns and request appropriate preventive or remedial actions "before the segment airs and potentially causes significant and irreparable harm to one or more defendants."  Ex. 2 (Ltr. from M. Cheffo to Attorney General M. DeWine, Dec. 16, 2018). Plaintiffs' counsel never even responded.

Plaintiffs' counsel's participation in the *60 Minutes* segment was not an isolated incident. They have made other improper and inflammatory extrajudicial statements about the defendants. For example, in February 2018, the defendants provided this Court with numerous press reports quoting misleading statements made by plaintiffs' counsel during a settlement conference, as well as this Court's view of the information that was presented during the conference.  *See* Jeff Overley and Emily Field, "Inside the Opioid MDL's Big Closed-Door Hearing," *Law360* (Feb. 1, 2018), https://www.law360.com/articles/1008010/inside-the-opioid-mdl-s-big-closed-door-hearing; Jef Feeley, "Purdue's Oxycontin Targeted at Judge's Opioid Summit," *Bloomberg* (Feb. 2, 2018), https://www.bloomberg.com/news/articles/2018-02-02/purdue-s-oxycontin-said-to-be-targeted-at-judge-s-opioid-summit.  The very next day, this Court issued an order precluding counsel from disclosing the content of the settlement discussions or providing any commentary on them.  ECF 116.  Notwithstanding the Court's order, plaintiffs' counsel have continued to

_____

intended to be used under the careful supervision of a physician and only as prescribed. Moreover, manufacturers and distributors play distinct roles in the pharmaceutical supply chain. The plaintiffs' efforts to hold manufacturers and distributors of these important, FDA-approved medications liable for the consequences of others' misuse and abuse—as well as the activities of illegal drug cartels flooding the streets with heroin and fentanyl—bear no resemblance to the tobacco litigation, and plaintiffs' legal theories have never been applied in this context. Moreover, the risk of addiction to opioids has been common knowledge for centuries, and this risk was at all relevant times prominently disclosed in the FDA-approved labeling for the opioid medications manufactured or distributed by the various defendants.

make improper extrajudicial statements about the confidential settlement discussions, divulge and mischaracterize information presented during those discussions, and lodge inflammatory remarks and ad hominem attacks against the defendants.  *See, e.g.*, Daniel Fisher, "Opioid Lawyers Say Settlement May Hinge on Forcing Plaintiffs Into Class Action," *Forbes* (Sept. 27, 2018),  https://www.forbes.com/sites/legalnewsline/2018/09/27/opioid-lawyers-say-settlement-may-hinge-on-forcing-plaintiffs-into-class-action/#d4103dc1d1cf.

As is clear from their repeated misconduct—and Mr. Moore's own admission—it is plaintiffs' counsel's intent to rile up the public, taint the views of prospective jurors with mischaracterizations of "evidence" which (if admissible at all) could never be used in a court of law in the way plaintiffs' counsel suggested, and render it impossible for defendants to receive a fair adjudication of the claims asserted against them.  This is wholly inappropriate, unethical behavior, and unfortunately this Court's prior efforts to stop it have been ineffective.  It is now time for stronger sanctions.

## ARGUMENT

## I.      PLAINTIFFS' COUNSEL VIOLATED THE OHIO RULES OF PROFESSIONAL CONDUCT.

It is a bedrock principle of our judicial system that the law is to be decided by courts, and disputed facts are ordinarily to be decided by a jury, based on admissible evidence presented in a courtroom during trial.  *See State of Colorado ex rel. v. Attorney General*, 205 U.S. 454, 462 (1907) (Holmes, J.) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by outside influence, whether of private talk or public print.").  These fundamental aspects of due process are required to guarantee a fair adjudication of claims.

Extrajudicial statements by lawyers pose a particular "threat to the fairness of a pending proceeding." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074 (1991).  Because of their professional standing, and because "lawyers have special access to information through discovery and client communications," lawyers' public comments about a case "are likely to be received as especially authoritative."  *Id*.  To guard against this risk, the rules of professional responsibility expressly prohibit the lawyers involved in a matter from making extrajudicial statements likely to prejudice a party's ability to receive a fair adjudication.  For example, Rule 3.6(a) of the Ohio Rules of Professional Conduct provides:

> A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.[4]

Mr. Moore, Mr. DeWine, and Mr. LeBlanc have blatantly violated this rule.  Each of them made extrajudicial statements, knowing that they would be nationally televised on *60 Minutes*, for the express purpose of creating overwhelming public pressure on the defendants to settle.  They expressed opinions about the merits of the litigation, insinuating that they had reviewed "evidence" establishing the defendants' liability.  *See Doe v. Rose*, No. CV-15-07503, 2016 WL 9107137, at *5 (C.D. Cal. Sept. 30, 2016) (it is improper to comment on "the strengths or weaknesses of any party's case").  They mischaracterized this supposed "evidence"—the ARCOS data—implying, for instance, that it was within each defendant's possession when they knew it was not.  Ex 1. at 6.  They suggested that a jury should award sums designed to bankrupt defendants, even going so far as to identify particular amounts.  *Id.* at 1.  And they commented

---

[4] Attorneys practicing before this Court—whether they are members of the bar of this Court or admitted for purposes of a particular proceeding—are bound by the Ohio Rules of Professional Conduct.  *See, e.g.*, Local Rule 83.7; *see also Anthony J. Mantia, LLC v. Impact Sports, Inc.*, No. 3:09-cv-362, 2011 WL 13232488, at *1 (S.D. Ohio Nov. 8, 2011).

on "the character or reputation" of the defendants, accusing one of them of lying and others of lacking "walking around sense" and "not car[ing] enough." *See Aaron v. Durrani*, No. 1:13-cv-202, 2013 WL 12121516, at *1 (S.D. Ohio Oct. 1, 2013) (finding counsel's "derogatory comments" about defendants to be improper extrajudicial statements); *Doe*, 2016 WL 9107137, at *5 (it is improper to discuss "the character or reputation of the parties").

These sorts of statements would not be permissible in a courtroom during a trial. *See* Ohio R. Prof. Cond. 3.4 (at trial, a lawyer may not "assert personal knowledge of facts in issue . . . or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused"); Ohio R. Prof. Cond. 4.1 (a lawyer may not knowingly "make a false statement of material fact or law to a third person"). And there is no legitimate excuse for any of these lawyers to have made them outside the courtroom for any reason, much less with the stated intent to generate pretrial publicity detrimental to the defendants. Plaintiffs' counsel's statements "were dipped in venom and were deliberately couched to poison the well from which the jury would be selected. Such conduct goes beyond the pale, by any reasonable standard, and cannot be condoned under the rubric of 'effective advocacy.'" *United States v. Cutler*, 58 F.3d 825, 840 (2d Cir. 1995).

Other lawyers who participated in the planning or execution of this scheme have likewise violated their ethical obligations. Rule 8.4 of the Ohio Rules of Professional Conduct makes a lawyer who "knowingly assist[s] or induce[s] another to [violate the Ohio Rules of Professional Conduct], or do[es] so through the acts of another," just as responsible as the lawyer who commits the underlying violation.

Finally, Mr. Moore's suggestion that he would not receive "one whit" of money from this litigation was false. Mr. Moore is a private attorney working for several plaintiffs in and outside

of this MDL.  His contingency fee agreement with the State of Ohio alone provides for him and his co-counsel to receive up to $50 million depending on the outcome of the case.  He presumably has similar agreements with his other clients.

His statements as to the potential value of a jury award were similarly irresponsible.  In opining that the value of an award "may be $100 billion," Ex. 1 at 2, 7, Mr. Moore knew that his audience would include potential jurors and yet, in transparent self-interest, he nonetheless attempted to anchor in the minds of the public and future jury pools a dollar value based on his own representations about unspecified "models."  His attempt to bias public opinion and the jury toward a view about the value of the case is a stunning and inappropriate act rooted in self-interest.

## II.    PLAINTIFFS' COUNSEL VIOLATED COURT ORDERS.

When this Court permitted plaintiffs' counsel and state attorneys general such as Mr. DeWine access to ARCOS data, it stressed the extremely limited purposes for which the data could be used.  The Court repeatedly stated that the ARCOS data could be used for only two purposes—"this litigation" or "law enforcement"—and would not be made public.  ECF 156 at 13:6-9, 13-14; *id.* at 42:6-17, 46:22-25, 47:1-5, 70:20-23; *see also* ECF 167 at 3 (confidential ARCOS data "shall not be used by the parties, counsel for the parties, or any other authorized persons identified in ¶ 6 for any purpose whatsoever other than (1) to mediate, settle, prosecute, or defend the above-captioned litigation, or (2) for law enforcement purposes"); ECF 233 at 22 ("Use of ARCOS database shall be limited to this litigation and for State and local law enforcement purposes only.  No person shall disclose the data or allow use of the data except as necessary for a submission to the court or at trial."); ECF 397 at 3 (same).

As for potential disclosure to the press, this Court was unequivocal:  it ordered that confidential ARCOS data "shall not be communicated to the public or media ***in any way or form***

without prior approval of the Court." ECF 167 at 4 (emphasis added); *see also* ECF 800 at 11 ("Allowing the ARCOS data to be disclosed to the Media . . . would eviscerate the Court's Protective Order."). The parties, their lawyers, and state attorneys general such as Mr. DeWine are all bound by this order. ECF 167 at 4; ECF 640 at 1; *see also* 12/20/18 Minutes and Order, ECF 1206.

During their appearances on *60 Minutes*, Mr. Moore, Mr. DeWine, and Mr. LeBlanc flagrantly violated these court-ordered restrictions by repeatedly discussing and characterizing the confidential ARCOS data that had been produced to them. In fact, a significant portion of the *60 Minutes* segment focused on the "huge confidential DEA database called ARCOS," which Mr. Moore and "his allies" characterized as "powerful" and "devastating" evidence. Ex. 1 at 1, 6. In using the ARCOS data to make their case to the "court of public opinion," all three attorneys violated the protective order several times over.

Mr. LeBlanc evidently told the reporter that "his team" had taken "the lead in analyzing the ARCOS data." Ex. 1 at 6. He boasted to the audience that he could "actually tell you which distributor distributed to which particular pharmacy, by year, by volume, and where the pills came from," that he could "immediately look at volume and detect patterns with the data that we currently have," and that he has that data "for every transaction in the United States." *Id.* at 6. When asked "[w]hat's the most important thing that it has shown you," Mr. LeBlanc replied: "That the stories that you've heard from some of the DEA investigative agents concerning the large volumes of pills going into certain parts of our country area absolutely true." *Id.* at 7. The reporter then stated, "[o]ne of those stories concerned Kermit, West Virginia, a town of just 400 people, where nine million opioid pills were delivered in just two years to a single pharmacy," and asked whether "the companies [had] access to this information." *Id.* Mr. LeBlanc

responded:  "This was their data."  *Id.*  It is obvious that the ARCOS data formed the basis for Mr. LeBlanc's statements; that the statements were made for an unauthorized purpose (*i.e.*, not to "mediate, settle, prosecute or defend" the litigation, and not for "law enforcement purposes"); and that they were communicated to the media and the public without prior approval of this Court.

Mr. Moore and Mr. DeWine likewise used the ARCOS data for unauthorized purposes and made statements about it to the media and the public without prior Court approval. Mr. Moore opined that "the ARCOS data [gave] him the ammunition he needs to demolish the opioid industry's argument," and added that:  "If you've got walking around sense and you care, you're going to check before you send nine million pills to a little, bitty county in West Virginia or Mississippi or Louisiana or Ohio."  *Id.* at 7, 8.  Mr. DeWine proclaimed the ARCOS data "shocking," and asserted that "[a]nyone who was looking at those numbers, as those middlemen were, as these distributors were, clearly, clearly should've seen that something was dramatically wrong."  *Id.* at 7.  In making these statements, Mr. DeWine was well aware of this Court's restrictions on disclosure—going so far as to admit that he was "not allowed to talk about the specifics."  *Id.*  But this Court's protective order is by no means limited to "specifics" about the ARCOS data, as the plain text of the order makes clear.  *See generally* ECF 167.  It categorically prohibits covered parties from using confidential ARCOS data for any purpose other than those set forth in the order itself—namely litigation or law enforcement.  *Id.* at 3.  And it bars those persons from communicating the data to the public or the media "in any way or form" without this Court's prior approval.  *Id.* at 4.

Mr. Moore also violated another Court order by commenting on the status of settlement discussions.  After numerous press reports inaccurately reported on the settlement negotiations,

this Court ordered "all participants" in the negotiations, "and all other counsel and parties who are consulted" about those negotiations, to "maintain strict confidentiality as to the contents of those discussions."  ECF 116 at 1.  It also directed that "nobody is to disclose to the media or any outside party the contents of the discussions, or provide the media assessments or commentary regarding those discussions."  *Id.*  Mr. Moore's suggestion that plaintiffs' counsel are "a long way from convincing the drug industry" to pay them money, Ex. 1 at 5, is a clear violation of this order.  And this is not even the first time plaintiffs' counsel violated that order by disclosing information about the confidential settlement negotiations to the press.

## III.    A GAG ORDER AND OTHER SANCTIONS ARE WARRANTED.

When a lawyer violates a rule of professional conduct or court order, sanctions are appropriate, and indeed necessary, "not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Nat'l Hockey League v. Met. Hockey Club*, 427 U.S. 639, 643 (1976); *see also* Local Rule 83.7(b) (authorizing "such disciplinary action as the circumstances warrant").  "[T]he harm which would result were [attorneys] to go unpunished would be the unspoken endorsement of flagrant disregard for this Court's orders" and rules governing the legal profession.  *Pauley v. United Operating Co.*, 606 F. Supp. 520, 527 (E.D. Mich. 1985).

### A.    The Court Should Issue a Gag Order Mandating Strict Compliance with Ohio Rule of Professional Conduct 3.6.

"[T]he right to a fair trial . . . is one of our most cherished values, and a trial judge should have the authority to adopt reasonable measures to avoid injury," including by issuing a "gag order" prohibiting improper communications between plaintiffs' counsel and the press.  *Aaron*, 2013 WL 12121516, at *1 (entering gag order to address counsel's improper extrajudicial statements).  Such orders protect the integrity and fairness of the judicial system and are a

common and appropriate means of redressing violations of ethical rules against extrajudicial statements. *Id.* They "fall within the Court's prerogative to maintain appropriate decorum in the administration of justice and to protect the rights of the litigants from prejudice." *Id.*[5]

There can be no clearer circumstances justifying entry of a gag order than those presented here. The recent *60 Minutes* segment involved willful violations of the Ohio Rules of Professional Responsibility, on national television, by multiple officers of this Court—including a former Mississippi Attorney General (and self-proclaimed "unofficial commanding officer of the army that's attacking the opioid industry," Ex. 1 at 3), and the current Ohio Attorney General (and Governor-elect)—for the stated purpose of trying this case in the "court of public opinion" rather than in a court of law. The threat that the defendants will not be able to receive a fair trial in Ohio, or Mississippi, or anywhere else in the country is real, and multiplies exponentially with each improper statement to the press.

A gag order is essential to preserve whatever can be salvaged of defendants' rights to due process and a fair adjudication of the claims asserted against them.[6] No lesser, alternative remedy could protect these interests, especially in light of the plaintiffs' stated intent to use the media "to influence public perception of [d]efendants," *Aaron*, 2013 WL 12121516, at *2, and the fact that this was not the first time plaintiffs' counsel used the media to tell their one-sided story of the case. *See Gentile*, 501 U.S. at 1075 (even "[e]xtensive *voir dire* may not be able to filter out all of the effects of pretrial publicity"). Absent intervention by this Court, it surely will not be the last.

---

[5] "If there were no [limits on a lawyer's ability to make extrajudicial statements], the result would be the practical nullification of the protective effect of the rules of forensic decorum and the exclusionary rules of evidence." Official Comment to Ohio R. Prof. Cond. 3.6, at [1].

[6] To be clear, defendants' rights may well have been irretrievably harmed by the behavior of plaintiffs' counsel, and defendants reserve all rights in this regard.

The gag order should specifically bar plaintiffs' counsel from any and all conduct that would violate Ohio Rule of Professional Responsibility 3.6, including but not limited to making extrajudicial statements about "[t]he character, credibility, or reputation of a party," "[t]he strengths or weaknesses of any party's case," "[a]ny information the attorneys know or reasonably should know is likely to be inadmissible as evidence and would create a substantial risk of prejudice if disclosed," *Doe*, 2016 WL 9107137, at *6, or "confidential information" subject to protective orders. *United States v. Koubriti*, 307 F. Supp. 2d 891, 902 (E.D. Mich. 2004).

**B.      This Court Should Order Relief For Plaintiffs' Counsel's Violations of Its Previous Orders.**

As explained above, plaintiffs' counsel deliberately flouted this Court's orders that the ARCOS data be used only for purposes of "this litigation" and "law enforcement," *see, e.g.*, ECF 167 at 3; ECF 233 at 22; ECF 397 at 3, and "not be communicated to the public or media *in any way or form* without prior approval of the Court," ECF 167 at 4 (emphasis added); as well as this Court's order that the parties "maintain strict confidentiality as to the contents of [settlement] discussions" and not "disclose to the media or any outside party the contents of the discussions, or provide the media assessments or commentary regarding those discussions," ECF 116 at 1. While the disclosures plaintiffs' counsel made were at a high level of generality, they are nevertheless deserving of an appropriate remedy because they were part of a broader pattern of disrespect and deliberate disregard for the rights of the defendants and the integrity of the judicial process.

In similar circumstances, courts have imposed a variety of sanctions.  In *Dorsett v. County of Nassau*, for example, the court held a non-party in contempt and required him to pay a fine for violating a court order and disclosing information about a confidential report to a local

news program. Even though only a "few details" were disclosed, and even though the court did not think he acted willfully, the "very public manner" of the disclosure and the need to ensure "future compliance" by that non-party and other elected officials with access to the report and with an incentive to "satisfy their constituents," warranted a remedy. No. CV 10-01258 ADS, 2012 WL 2076911, at *10-11 (E.D.N.Y. June 7, 2012). A comparable sanction would be appropriate here and is well within this Court's authority. *See Brown v. Tellermate Holdings Ltd.*, No. 2:11-cv-1122, 2015 WL 4742686, at *6 (S.D. Ohio Aug. 11, 2015) (violation of protective order basis for imposing Rule 37(b)(2) sanctions); *Field Turf USA, Inc. v. Sports Const. Group, LLC*, No. 1:06 CV 2624, 2007 WL 4412855, at *4-6 (N.D. Ohio Dec. 12, 2007) (same); *Knox v. City of Fresno*, No. 1:14-cv-00799, 2016 WL 10647198, at *1-3 (E.D. Cal. June 2, 2016) (violation of protective order basis for holding attorneys in contempt and imposing sanctions under court's inherent authority); *McDonald v. Cooper Tire & Rubber Co.*, No. 8:01-cv-1306, 2005 WL 2810707, at *1-3 (M.D. Fla. Oct. 27, 2005) (same).

Defendants also reserve the right to argue that a party whose counsel improperly disclosed information in violation of court orders should not be permitted to rely on that information at trial. *Cf. Mann v. Univ. of Cincinnati*, 824 F. Supp. 1190 (S.D. Ohio 1993) (sanctioning a university and its attorneys who had improperly disclosed the plaintiff's private medical data by excluding that data from trial, even though it was relevant to the issue of damages and to the plaintiff's credibility), *aff'd*, 152 F.R.D. 119, 1205 (S.D. Ohio 1993), *aff'd*, 114 F.3d 1188 (6th Cir. 1997); *see also* Fed. R. Civ. P. 37(b)(2)(A)(ii) (authorizing order precluding party from "introducing designated matters into evidence").

15

**C.    This Court Should Award Defendants Their Attorneys' Fees and Costs Incurred As A Result Of Plaintiffs' Counsel's Misconduct.**

This Court also should award defendants the attorneys' fees and costs incurred as a result of plaintiffs' counsel's violations of the rules of professional conduct and this Court's orders.  As the Supreme Court recently reaffirmed, this Court has the inherent authority to fashion appropriate sanctions for litigation misconduct, including the "assessment of attorney's fees . . . to reimburse legal fees and costs incurred by the other side" as a result of the misconduct. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017) (internal citations and quotation marks omitted).    Courts have awarded fees and costs when a party discloses confidential information in violation of a court order, even when—unlike here—the disclosure was inadvertent.  *See, e.g.*, *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 490-91 (5th Cir. 2012) (affirming award of attorney's fees for inadvertent disclosure); *Brown*, 2015 WL 4742686, at *6 (awarding attorney's fees); *see also* Fed. R. Civ. P. 37(b)(2)(C) ("court must order . . . [the payment of] reasonable expenses, including attorney's fees, caused by the failure [to comply with a discovery order], unless the failure was substantially justified or other circumstances make an award of expenses unjust").  Here, plaintiffs' counsel's intentional efforts to taint the proceedings and deprive defendants of a fair adjudication through their improper extrajudicial statements and disclosures more than justifies an award of fees.[7]

**D.    This Court Must Refer Allegations of Professional Misconduct to the Court's Committee on Complaints and Policy Compliance.**

Except in circumstances not present here, Local Rule 83.7(d) requires that when this Court becomes aware of a violation or potential violation of the Ohio Rules of Professional

---

[7] In fact, the extrajudicial statements targeted at Ohio by Ohio's highest-ranking lawyer and incoming governor in this *60 Minutes* episode (and elsewhere) were highly prejudicial and threaten the very viability of Ohio as a suitable venue.  Defendants reserve the right to bring a change of venue motion, and/or ask the Court to adjust trial schedules, at an appropriate time.

Responsibility by a lawyer admitted to practice before this Court, the matter must be referred to the Court's Committee on Complaints and Policy Compliance, with notification to the Clerk of Court, "for investigation and the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as is appropriate." This procedure is mandatory, not discretionary. At a minimum, Mr. Moore, Mr. DeWine, and Mr. LeBlanc must be referred to this Committee in light of their clear violations of Ohio Rule of Professional Responsibility 3.6.

This Court also should determine whether additional referrals are appropriate. As noted above, the video of the *60 Minutes* segment confirms that numerous other lawyers for the plaintiffs were aware of and involved in the campaign to disseminate plaintiffs' one-sided view of the case to the press and the public. *See also* Ex. 1 at 3 (noting that "about a dozen lawyers from all around the country" were gathered at Mr. Moore's "command center" on the day *60 Minutes* visited). This Court should order Mr. Moore, Mr. DeWine and Mr. LeBlanc to identify all counsel who were present for the taping of the *60 Minutes* segment or otherwise knowingly assisted, induced, or participated in the effort in any way. *See* Ohio R. Prof. Cond. 8.4.

## CONCLUSION

For the foregoing reasons, this Court should grant this motion and order the relief set forth below and all other relief the Court deems necessary:

(1) Mr. Moore, Mr. DeWine, and Mr. LeBlanc, all counsel representing the plaintiffs in this MDL, and all those who have received information or documents pursuant to this Court's Orders, shall strictly comply with Rule 3.6 of the Ohio Rules of Professional Conduct and shall refrain from making any statements to the media or the public relating to any of the following subjects: (a) the character, credibility, or reputation of a party; (b) the strengths or weaknesses of any party's case; (c) any information the attorneys know or reasonably should know is likely to

be inadmissible evidence and would create a substantial risk of prejudice if disclosed; and (d) the ARCOS data or any information produced in discovery in this action.

(2)     Mr. Moore, Mr. DeWine, and Mr. LeBlanc shall be admonished for violating this Court's orders and the Court should impose appropriate sanctions to deter future violations.

(3)     Mr. Moore, Mr. DeWine, and Mr. LeBlanc shall pay the defendants' attorneys' fees and costs incurred as a result of their misconduct.

(4)     Pursuant to Local Rule 83.7(d)(1), this matter shall be referred to the Court's Committee on Complaints and Policy Compliance, with notification to the Clerk of Court, for investigation and the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as is appropriate.

(5)     Mr. Moore, Mr. DeWine, and Mr. LeBlanc shall identify all counsel who were present for the taping of the *60 Minutes* segment or otherwise knowingly assisted, induced, or participated in the effort in any way.

January 4, 2019                                             Respectfully submitted,


                                                           */s/ Carole S. Rendon*
                                                           Carole S. Rendon
                                                           BAKER & HOSTETLER LLP
                                                           Key Tower 127 Public Square, Suite 2000
                                                           Cleveland, OH 44114-1214
                                                           Tel: (216) 621- 0200
                                                           Fax: (216) 696-0740
                                                           crendon@bakerlaw.com

                                                           *Counsel for Defendants Endo Health
                                                           Solutions Inc., Endo Pharmaceuticals Inc.,
                                                           Par Pharmaceutical, Inc., and Par
                                                           Pharmaceutical Companies, Inc. (incorrectly
                                                           named as "Par Pharmaceutical Companies,
                                                           Inc. f/k/a Par Pharmaceutical Holdings,
                                                           Inc.")*

*/s/ Donna M. Welch*
Donna M. Welch, P.C.
(Illinois Bar No. 6226352)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Tel: (312) 862-2424
Fax: (312) 862-2200
dwelch@kirkland.com

*Counsel for Defendants Allergan Finance,*
*LLC f/k/a Actavis, Inc. f/k/a Watson*
*Pharmaceuticals, Inc. and Allergan PLC f/k/a*
*Actavis PLC*

*/s/ Shannon McClure Roberts*
Shannon McClure Roberts
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
smcclure@reedsmith.com

*Counsel for Distributor Defendant*
*AmerisourceBergen Drug Corporation*

*Counsel for H.D. Smith for the limited*
*purpose of this motion*

*/s/ Enu Mainigi*
Enu Mainigi
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com

*Counsel for Defendant Cardinal Health, Inc.*

/s/ Timothy D. Johnson
Timothy D. Johnson (0006686)
CAVITCH, FAMILO & DURKIN CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, Ohio 44114
Tel:  (216) 621-7860
Fax:  (216) 621-3415
tjohnson@cavitch.com

*Attorney for Discount Drug Mart, Inc.*

/s/ Charles C. Lifland
Charles C. Lifland (Cal. Bar No. 108950)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Tel: (213) 430-6000
Fax: (213) 430-6407
clifland@omm.com

*Counsel for Defendants Johnson & Johnson;
Janssen Pharmaceuticals, Inc.; Janssen
Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc.; and Ortho-
McNeil-Janssen Pharmaceuticals, Inc. n/k/a
Janssen Pharmaceuticals, Inc.*

/s/ Brien T. O'Connor
Brien T. O'Connor
Andrew J. O'Connor
ROPES & GRAY LLP
Prudential Tower
800 Boylston St.
Boston, MA 02199
Tel:  (617) 235-4650
Brien.O'Connor@ropesgray.com
Andrew.O'Connor@ropesgray.com

*Counsel for Defendant Mallinckrodt LLC*

/s/ Geoffrey Hobart
Geoffrey Hobart
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
Tel:  (202) 662-5281
ghobart@cov.com

*Counsel for Distributor Defendant McKesson Corporation*

/s/ Mark S. Cheffo
Mark S. Cheffo
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel:  (212) 698-3500
Mark.Cheffo@dechert.com

*Counsel for Defendants Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company*

21