# EXHIBIT 5

**To:** Landau, Dr. Craig (US)[Dr.Craig.Landau@pharma.com]; PPLP Executive Committee[PPLPExecutiveCommittee@purduepharma.com]
**From:** Martin, Josephine
**Sent:** Wed 7/25/2018 7:05:16 AM
**Subject:** Re: Bloomberg: Justice for Opioid Communities Means Massive Payday for Their Lawyers

This article is the result a background briefing by Bob and Mark Sheffo. Part of the comms team effort to broaden the story.

Josephine C. Martin
Senior Vice President, Corporate Affairs and Communications
Purdue Pharma LP
201 Tresser Blvd.
Stamford CT 06901
202.257.4063 cell
203.588.7303
Josephine.Martin@pharma.com

**From:** "Dr. Craig Landau" <Dr.Craig.Landau@pharma.com>
**Date:** Wednesday, July 25, 2018 at 8:01 AM
**To:** PPLP Executive Committee <PPLPExecutiveCommittee@purduepharma.com>
**Subject:** Fwd: Bloomberg: Justice for Opioid Communities Means Massive Payday for Their Lawyers

Good perspective.


Craig Landau, MD

President & CEO
Purdue Pharma
US mobile (203) 912-5576
CDN Mobile (416) 347-6284

Sent from my iPhone
Please excuse typos and auto-dictation errors...


Begin forwarded message:

> **From:** Shannon Humeniuk <shannon@rodacreative.com>
> **Date:** July 25, 2018 at 07:39:30 EDT
> **To:** "Robert.Josephson@pharma.com" <Robert.Josephson@pharma.com>,
> "Josephine.Martin@pharma.com" <Josephine.Martin@pharma.com>,
> "Jennifer.Jacob@pharma.com" <Jennifer.Jacob@pharma.com>,
> "Danielle.Lewis@pharma.com" <Danielle.Lewis@pharma.com>,
> "Burt.Rosen@pharma.com" <Burt.Rosen@pharma.com>, "Alan.Must@pharma.com"
> <Alan.Must@pharma.com>, "Dr.Craig.Landau@pharma.com"

CONFIDENTIAL

<Dr.Craig.Landau@pharma.com>, "William.Nordwind@pharma.com" <William.Nordwind@pharma.com>, "Marcelo.Bigal@pharma.com" <Marcelo.Bigal@pharma.com>, "Brianne.Weingarten@pharma.com" <Brianne.Weingarten@pharma.com>, "Sarah.Robertson@pharma.com" <Sarah.Robertson@pharma.com>, "Dr.Lisa.Miller@pharma.com" <Dr.Lisa.Miller@pharma.com>, "Marc.Kesselman@pharma.com" <Marc.Kesselman@pharma.com>
Cc: Management <management@rodacreative.com>
Subject: Bloomberg: Justice for Opioid Communities Means Massive Payday for Their Lawyers

**Justice for Opioid Communities Means Massive Payday for Their Lawyers**
Bloomberg
By Andrew Harris, Jared Hopkins and Hannah Recht
July 25, 2018
https://www.bloomberg.com/graphics/2018-opioid-lawsuits/

The opioid lawsuits keep coming—hundreds of them—filed by states, cities, counties, Native American tribes and labor unions. While the human tragedy of Americans addicted to these painkillers has been growing for years, the resulting legal drama is just starting.

But one thing is certain: If the lawsuits are successful, the winners will include the lawyers.

A Bloomberg review of almost 100 agreements between the municipalities and their lawyers puts the stakes into focus: If the plaintiffs collect anything close to the maximum $50 billion that a global settlement may yield, according to a Bloomberg Intelligence estimate, a handful of attorneys could pocket at least one-quarter of that.

The cities and counties that are suing are aware of this. And their elected officials don't generally care. They say they have nothing to lose by hiring skilled attorneys who are willing to work—with no money down—for a cut of a win. Any recovery is better than no money at all, they say.

Bloomberg's analysis offers the first real glimpse into the money at play in what may be one of the biggest legal challenges in U.S. history.

The Lawsuits

Opioids are the most-prescribed class of drugs—more than blood pressure, cholesterol or anxiety medications. In 2012, the peak of the prescription boom, doctors wrote 255 millionprescriptions for opioid painkillers.

While the drugs have legitimate use in relieving pain from acute injuries and chronic conditions, their potential for addiction and misuse is high. According to the Centers for Disease Control, more than 46 people died every day from overdoses involving prescription opioids in 2016.

Cities and counties say they've been devastated by the crisis. Collectively, they say they've spent billions of dollars for health care, law enforcement and social services. Now they want to hold opioid distributors and manufacturers responsible.

According to a Bloomberg analysis of court records and lawsuit filings, lawyers have brought more than 900 cases on behalf of states, local governments and tribes, as well as unions, medical practices and individuals. Those suing include some of the hardest-hit communities, stretching from Appalachia to northern California, but also some areas where the crisis has seen fewer prescriptions and lower overdose rates.

Most of the cases are in federal court, and those have been joined together for preliminary proceedings in what lawyers call a multidistrict litigation, or MDL. In an effort to make the litigation move quicker, U.S. District Judge Dan Polster in Cleveland is overseeing the MDL cases and making initial rulings that apply to them all. He has scheduled a trial for three of the cases next year while also pressing for a settlement.

Note: Non-governmental plaintiffs—including unions, individuals and private companies—in the multidistrict litigation are not shown, nor are lawsuits in state courts.

Separately, dozens of states and municipalities, including large cities like New York and smaller communities in Maine, Illinois and elsewhere, have filed suits in state courts, with some seeking a tactical advantage by bringing their case before a local judge. In several instances, state attorneys general are spearheading the litigation.

The state and federal lawsuits are similar, with plaintiffs targeting drug companies such as Oxycontin-making Purdue Pharma LP and drug distributors including McKesson Corp.

The allegations include fraud, negligence, unjust enrichment, false advertising and deceptive marketing. The legal arguments are complex and it's unclear whether all of them (or any of them) will survive the companies' motions to dismiss. But if some of the claims are allowed to proceed, the risk to the companies will grow significantly.

More than 60 percent of the communities in the federal cases have poverty rates above the national average, and two-thirds of the counties had above-average opioid prescription rates in 2016.

In Floyd County, Kentucky, for example, 226 opioid prescriptions were written for every 100 residents in 2016—three and a half times the national average—and the county has a poverty rate of 31 percent.
But affluent communities have sued as well. Montgomery County, Maryland, is among the wealthiest counties in the nation. Just 7 percent of its 1 million residents live in poverty—less than half the national average. And opioid prescriptions are rare, at only 35 per 100 residents.

Most Counties that Filed Suits Have Above Average Poverty and Opioid Prescriptions

The Lawyers
Three attorneys lead the litigation—Joe Rice, Paul Hanly and Paul Farrell. Beneath them

CONFIDENTIAL

PPLPC034001170871

is a 21-lawyer executive committee in charge of coordinating aspects of the cases and a three-lawyer liaison group handling administrative issues. Attorneys from numerous law firms are involved in the case.

Rice, 64, whose firm Motley Rice has more than 100 attorneys, is one of the most successful mass tort lawyers, having led the negotiations with Big Tobacco for a $246 billion settlement in 1998. Rice's suits against the opioid industry in 2014 were the first in the current wave of litigation.

Hanly, 67, has brought cases against asbestos and pharmaceutical companies. In 2003, his 80-attorney firm, Simmons Hanly Conroy, sued Purdue Pharma. Four years later, he won a $75 million settlement on behalf of 5,000 patients. He has kept thousands of documents from that case, which is likely to aid the plaintiffs in the current litigation wave.

Farrell, 46, a native of opioid-ravaged Huntington, West Virginia, had multimillion-dollar settlements under his belt when he began suing the industry, and he's viewed by his colleagues as having the best understanding of the distributors' cases. A partner in Greene Ketchum Farrell Bailey & Tweel, the five-person firm is involved in more than half of the lawsuits. Farrell's firm, like those of Rice and Hanly, are now allied with many others in pursuit of damages for their clients and the accompanying payday.

Related story: One Man's $50 Billion Vendetta Against Opioids

The Recruiting

To enlist clients, hundreds of attorneys fanned out to visit rural courthouses and city council chambers across the nation. Law firms formed alliances with one another and with politically connected local attorneys.

In a pitch to commissioners in Traverse County, Michigan, lawyer Paul Pennock of Weitz & Luxenberg said anyone working at a drug company who didn't notice the crisis building was an "imbecile."
"They were going around to all the Michigan counties," Kathy Dwan, a commissioner in Saginaw County, Michigan, said of the lawyers. "If the pharmaceutical companies didn't have deep pockets, nobody would be suing them."

Cities sometimes issued a formal request for proposal before signing up a law firm, but a referral from a local lawyer often got them a foot in the door. In Ohio, Dayton Mayor Nan Whaley said a local political consultant referred her to Cleveland attorney John Climaco, an alumnus of the Big Tobacco litigation. Other Ohio cities followed suit.

West Virginia's Kanawha County didn't look far for its lawyers. Commissioner Kent Carper is a partner at a firm that's aligned with Farrell in dozens of suits. Carper helped write the state law on public nuisance that Farrell is basing part of his cases on. Carper said there's no conflict because he isn't involved in the litigation.

A local touch sometimes made the difference. In Campbell County, Kentucky, Steve

Pendery, the top elected official, said he bridled at the idea of filing suit because he saw it as a payday for lawyers who "swoop in" to his community. But Pendery, a self-described "free market Republican sort," said he ultimately decided it was the right thing to do after out-of-state lawyers partnered with local attorneys he knew.

The Companies' Defenses

Drugmakers and companies that distribute opioids recognize there's a public health crisis. But they say they're not responsible and their lawyers have begun filing requests for dismissal.

The companies say the plaintiffs haven't identified any prescriber of opioids who was duped by supposed misleading advertising. They say the plaintiffs are ignoring "the many independent actions," such as illegal drug sales, which led to the opioid crisis.

They say they've extensively disclosed the risks of prescription opioids and that the Food and Drug Administration approved the drugs' marketing, and argue that only states have legal authority to sue—not counties or cities.

Matthew Maletta, Endo International Plc's chief legal officer, said the lawsuits, "fueled by contingency-fee counsel," will do more harm than good. "These lawsuits effectively hand the reins of law enforcement to private lawyers motivated by a potential bounty," he said. One worry: patients in need of pain relief may be denied it if the companies stop developing and selling the drugs.

Distributors, meanwhile, point out that they neither market nor prescribe opioids. They say their alleged misconduct—failing to adequately monitor and report suspicious orders—is "too indirect" to support suits against them.

Fiscal Year 2017 Revenue of Key Defendants
The lawyers hope to bring in hundreds more plaintiffs. At an April conference in Las Vegas, one lead attorney said they hope to file about 2,000 total cases. At the conference, the lawyers urged other attorneys to sign up municipalities.

In the fee arrangements reviewed by Bloomberg, the lead lawyers and the dozens of other firms joining them are generally slated to receive anywhere from 25 percent to 33 percent of the total payout, depending on when and how the litigation ends. Some of those firms initially getting at least 30 percent later reduced their fee to 25 percent because so many municipalities have signed onto the litigation. If there's a trial and appeal, for instance, some lawyers stand to recover 40 percent or more.
The paydays in some cases would be based on the gross value of any award—including money earmarked for crucial public programs like addiction treatment, according to Lester Brickman, a professor emeritus at Benjamin N. Cardozo School of Law who reviewed some of the retainer agreements. In other words, if a settlement includes a program worth $1 million, lawyers may collect a percentage of the value of that program as well.
Polster or some other judge may have the final word on the amount of legal fees because the litigation is subject to a court's supervision. Still, the numbers could be

CONFIDENTIAL

PPLPC034001170873

staggering. A settlement for $50 billion could lead to a $12.5 billion payday.

There's huge risk for the lawyers. A judge or an appeals court could toss out the claims, and years of work would go unpaid. Juries could reject the cases. Or a settlement could be for a fraction of the amount the sought. By contrast, attorneys representing the manufacturers and distributors are paid an hourly rate.

There may be investors funding the lawsuits who stand to benefit. Litigation-funding firms typically help pay the costs of litigation in return for a portion of the recovery, and Polster has asked for information about firms bankrolling the suits.

How the Opioid Settlement Could Work

Municipalities and others have brought lawsuits in state and federal courts. More than 900 have been filed so far.

Cases in federal court are before Polster and those in state courts are before local judges across the county.

As the parties negotiate, the drugmakers and distributors have filed dismissal requests.

Both sides will have a better sense of whether to settle—and for how much—after hearing a jury's verdict in the test trial Polster has scheduled for March. Legal rulings from him and other judges on whether the cases may proceed will also have a huge impact on a potential accord.

Polster has said he wants to reach a deal quickly, but that's looking increasingly unlikely. Talks will likely include lawyers for the municipalities, drugmakers, distributors, state attorneys general and the U.S. government.

From start to finish, the litigation could take about four years, one of the lawyers estimated. A settlement will almost surely include all the cases—in state and federal court.
In the end, a deal could be one of the most lucrative in history—or a huge disappointment to the communities battered by the crisis.

A larger question looms: whether litigation is really the best way to tackle the crisis. But little federal government action has left no other real options for cities and counties trying for handle the fallout and serve their constituents.

"The hundreds of communities that joined this litigation have done so because it's the only real way to meaningfully address the epidemic," lawyers Farrell, Hanly and Rice said in a statement.

Alexandra Lahav, who teaches at the University of Connecticut law school, said litigation may be the last, best hope.

"What people turn to is the courts," said Lahav, an expert in mass tort litigation. It's "an

CONFIDENTIAL

PPLPC034001170874

imperfect fit for solving the myriad problems raised in these situations, but you have to go to the institutions that exist."

Data Sources and Methodology

The list of lawsuit plaintiffs included in the multidistrict litigation was assembled from court transfer orders and court filings available as of July 23, 2018. Some cases have multiple plaintiffs. A small number of plaintiffs opposed their transfer orders and have been removed back to their original district courts, or may be at a later date. Those cases are included in this analysis.

Lawyer percentage fees were collected from retainer agreements, obtained by public records request, and from law firms and government officials. The fees reported are based on those available figures for settlement and/or judgment. Some agreements call for lesser or greater fees depending upon whether the case is resolved before the filing of a complaint, upon appeal and other contingencies.

Population and poverty rates for states, counties, cities and towns are from the 2012–2016 American Community Survey. Opioid prescription rates for states and counties are from the Centers for Disease Control 2016 prescribing rate dataset, which is based on QuintilesIMS Transactional Data Warehouse data.

CONFIDENTIAL

PPLPC034001170875