# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

# MEMORANDUM IN SUPPORT OF DISTRIBUTORS' MOTION TO CERTIFY ORDER UNDER 28 U.S.C. § 1292(b) FOR INTERLOCUTORY APPEAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

I.      AN IMMEDIATE APPEAL MAY MATERIALLY ADVANCE ULTIMATE
TERMINATION OF THE LITIGATION. ......................................................................... 3

II.     THE COURT'S ORDER PRESENTS CONTROLLING QUESTIONS OF LAW ........... 7

III.    THERE ARE SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION
WITH THE COURT'S ORDER ......................................................................................... 8

        A.     Reasonable Jurists Could Disagree Whether the County Adequately
Alleged That Distributors Proximately Caused Its Injuries. .................................. 9

        B.     Reasonable Jurists Could Disagree Whether the County Adequately
Alleged An Injury To Its "Business or Property." ................................................ 15

        C.     Reasonable Jurists Could Disagree Whether the OPLA Abrogates the
County's Common-Law Nuisance Claim. ............................................................ 19

CONCLUSION ......................................................................................................................... 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ahrenholz v. Bd. of Trs. of Univ. of Ill.*,
219 F.3d 674 (7th Cir. 2000) ................................................................... 7

*Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*,
741 F. Supp. 906 (S.D. Ga. 1990), *rev'd in part on other grounds*, 953 F.2d
587 (11th Cir. 1992) .............................................................................. 6

*Ashley County v. Pfizer, Inc.*,
552 F.3d 659 (8th Cir. 2009) ................................................................. 14

*Brown v. Ajax Paving Indus., Inc.*,
752 F.3d 656 (6th Cir. 2014) ............................................................ 16, 17

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ............................................................ 17, 18

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
863 F.3d 474 (6th Cir. 2017) ................................................................. 12

*City of Cleveland v. Ameriquest Mortg. Sec.*,
615 F.3d 496 (6th Cir. 2010) ...................................................... 5, 11, 13

*City of Philadelphia v. Beretta U.S.A. Corp.*,
277 F.3d 415 (3d Cir. 2002) ................................................................. 14

*Gucwa v. Lawley*,
731 F. App'x 408 (6th Cir. 2018) ..................................................... 16, 17

*Hemi Grp., LLC v. City of N.Y.*,
559 U.S. 1 (2010) ...................................................... 9, 10, 11, 15

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992) ................................................................ *passim*

*In re Baker & Getty Fin. Servs., Inc.*,
954 F.2d 1169 (6th Cir. 1992) ...................................................... 3, 5, 8

*In re Blue Cross Blue Shield Antitrust Litig.*,
2018 WL 3326850 (N.D. Ala. June 12, 2018) .................................... 3, 4

*In re City of Memphis*,
293 F.3d 345 (6th Cir. 2002) ................................................................... 7

*In re Fosamax Prods. Liab. Litig.*,
  2011 WL 2566074 (S.D.N.Y. June 29, 2011) .......................................................................5

*In re Lloyd's Am. Tr. Fund Litig.*,
  1997 WL 458739 (S.D.N.Y. Aug. 12, 1997) ..........................................................................5

*In re Miedzianowski*,
  735 F.3d 383 (6th Cir. 2013) ................................................................................................8

*In re Trump*,
  874 F.3d 948 (6th Cir. 2017) .......................................................................................7, 8, 19

*Jackson v. Sedgwick Claims Management Services, Inc.*,
  731 F.3d 556 (6th Cir. 2013) (en banc) .................................................................15, 16, 17

*James v. Meow Media, Inc.*,
  90 F. Supp. 2d 798 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002) ...........................11

*Johnson v. Jones*,
  515 U.S. 304 (1995).............................................................................................................3

*Katz v. Carte Blanche Corp.*,
  496 F.2d 747 (3d Cir. 1974) (en banc), *cert. denied*, 419 U.S. 885 (1974)..............................3

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999)................................................................................................14

*Malamud v. Sinclair Oil Corp.*,
  521 F.2d 1142 (6th Cir. 1975) ..............................................................................................7

*Newsome v. Young Supply Co.*,
  873 F. Supp. 2d 872 (E.D. Mich. 2012)................................................................................7

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
  694 F.3d 783 (6th Cir. 2012) ................................................................................................6

*Perry v. American Tobacco Co.*,
  324 F.3d 845 (6th Cir. 2003) .........................................................................................13, 14

*Sterk v. Redbox Automated Retail, LLC*,
  672 F.3d 535 (7th Cir. 2012) ............................................................................................3, 8

*Susan B. Anthony List v. Driehaus*,
  2011 WL 5299378 (S.D. Ohio Nov. 2, 2011)........................................................................3

*Trollinger v. Tyson Foods, Inc.*,
  370 F.3d 602 (6th Cir. 2004) .........................................................................................12, 13

*United States v. Harchar*,
331 B.R. 720 (N.D. Ohio 2005).........................................................................7

*W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis*,
138 F. Supp. 2d 1015 (W.D. Tenn. 2000).............................................5, 7

*Welborn v. Bank of N.Y. Mellon Corp.*,
557 F. App'x 383 (5th Cir. 2014) (per curiam) .............................................17, 18

*Winnett v. Caterpillar, Inc.*,
2007 WL 2123905 (M.D. Tenn. July 20, 2007) .......................................6

**STATE CASES**

*City of Toledo v. Sherwin-Williams Co.*,
2007 WL 4965044 (Ohio Ct. Com. Pl. Dec. 12, 2007) ...................................20, 21

*Carrel v. Allied Products Corp.*,
677 N.E.2d 795 (Ohio 1997)...........................................................................20

*Cincinnati v. Beretta U.S.A. Corp.*,
768 N.E.2d 1136 (Ohio 2002)..........................................................................20

*City of Cleveland v. JP Morgan Chase Bank, N.A.*,
2013 WL 1183332 (Ohio Ct. App. Mar. 21, 2013) ..................................5

*City of New Haven v. Purdue Pharma, L.P.*,
No. 17-6086134-S (Conn. Super. Ct. Jan. 8, 2019).......................................10, 11

*Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
1977 WL 1058 (S.D. Ohio Sept. 9, 1977) ......................................................3, 4

*Harter v. Beach Oil Co.*,
2011 WL 2358552 (M.D. Tenn. June 9, 2011)................................................3

*LaPuma v. Collinwood Concrete*,
661 N.E.2d 714 (Ohio 1996)............................................................................20, 22

**OTHER AUTHORITIES**

18 U.S.C. § 1962(c) ...........................................................................................6

28 U.S.C. § 1292(b) ...................................................................................... *passim*

2004 Ohio Laws File 144 (Am. Sub. S.B. 80) (codified at OHIO REV. CODE §
2307.71(B))...................................................................................................20

2006 Ohio Laws File 198 (Am. Sub. S.B. 117) (codified at OHIO REV. CODE §
2307.71(A)(13))..........................................................................................21

OHIO REV. CODE § 2307.71(A)(13) ............................................................................21

OHIO REV. CODE § 2307.71(B) ...................................................................................20

Stephen J. Werber, *An Overview of Ohio Product Liability Law*, 43 Clev. St. L.
    Rev. 379, 382 (1995) ............................................................................................20

16 Wright, Miller, & Cooper, Federal Practice & Procedure § 3930 (1995) ..................8

Defendants AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation ("Distributors") move this Court to enter the attached Proposed Order certifying the Court's December 19, 2018 Opinion and Order, ECF No. 1203 ("Order") for an immediate appeal pursuant to 28 U.S.C. § 1292(b).

## PRELIMINARY STATEMENT

The Court has acknowledged that the claims asserted by the City of Akron and Summit County (collectively, the "County") "do not fit neatly into the legal theories" advanced in the complaint, and its Order was based on a "broad[]" reading of Sixth Circuit precedent. Order at 20, 39. It nonetheless held that the County adequately alleged (i) an injury to its "business or property" that (ii) was proximately caused by Distributors' alleged conduct, and thus allowed the County to pursue a claim for mandatory treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The Court also overruled Magistrate Judge Ruiz's determination that the Ohio Product Liability Act ("OPLA") abrogates the County's common-law nuisance claim.

Certification of the Court's Order could "materially advance the ultimate termination of the litigation." *See* 28 U.S.C. § 1292(b). Most notably, an immediate appeal would advance the Court's stated goal of achieving a global resolution. No matter how the Sixth Circuit rules, its decision will remove uncertainty about the viability of the County's liability theories. Indeed, unless and until the Sixth Circuit has the opportunity to rule on the legal sufficiency of the RICO theories advanced by plaintiffs in these cases, the parties' expectations regarding the merits of these theories—and the accompanying prospect of mandatory treble damages—will remain different, which Distributors respectfully submit will make settlement substantially more difficult to achieve.

In a matter as large and complex as the national prescription opiate litigation, moreover, the early appellate resolution of threshold legal issues has the potential to save judicial resources and litigation expense. A decision by the Sixth Circuit that the County's RICO and common-law public nuisance claims fail as a matter of law would not only simplify the trial in this matter, but also would have precedential significance in many other cases. In addition, because the County's Ohio-law claims turn on the very same proximate causation standard as its federal RICO claim, appellate resolution of the proximate causation question has the potential to be case-dispositive. Thus, an immediate appeal would materially advance the termination of the litigation.

This Court's Order also meets § 1292(b)'s other criteria. It involves controlling questions of law as to which there are substantial grounds for difference of opinion. The rulings are plainly legal in nature. The proximate causation holding is, in our view, inconsistent with decisions of the Supreme Court and Sixth Circuit dismissing claims by local governments because they failed to allege a ***direct*** relationship between the government's injury and the defendants' alleged wrongdoing. The RICO "business or property" holding presents a question of first impression in the Sixth Circuit and, in our view, conflicts with decisions of two other courts of appeals. And the OPLA abrogation holding departs from the conclusions of Judge Ruiz, the only Ohio court to address the question, and the Ohio Attorney General in the lead-paint litigation. Accordingly, there are substantial grounds for difference of opinion with the Court's Order.

## ARGUMENT[1]

A district court may certify an order for interlocutory appeal if it finds (1) that the order involves a controlling question of law (2) regarding which there is substantial ground for

---

[1] Unless otherwise noted, all emphasis is added and all citations and internal quotation marks are omitted.

difference of opinion, and that (3) an immediate appeal may materially advance the end of the litigation. 28 U.S.C. § 1292(b). An immediate appeal may "simplify, or more appropriately direct, the future course of litigation," thereby "reduc[ing] the burdens of future proceedings." *Johnson v. Jones*, 515 U.S. 304, 309 (1995). Thus, "[a]n interlocutory appeal is *favored* where reversal would substantially alter the course of the district court proceedings or relieve the parties of significant burdens," as would plainly be the case here. *Harter v. Beach Oil Co.*, 2011 WL 2358552, at *2 (M.D. Tenn. June 9, 2011).

## I.  AN IMMEDIATE APPEAL MAY MATERIALLY ADVANCE ULTIMATE TERMINATION OF THE LITIGATION.

The overriding question presented at this time is whether an interlocutory appeal could "materially advance the ultimate termination of the litigation." A settlement is the objective in most MDL proceedings, and this Court has made clear from day one that it believes an early settlement that helps to ameliorate the scourge of opioid addiction should be the objective of all parties.[2] An immediate appeal is warranted because certification of this Court's Order will facilitate settlement.[3]

---

[2]  *See* Case Management Order No. 1, ECF No. 232, at 1; Transcript of Proceedings, Jan. 9, 2018, at 4–6, *In re Nat'l Prescription Opiate Litig.*, No. 17-cv-2804 (N.D. Ohio filed Dec. 8, 2017), ECF No. 71..

[3]  Courts specifically have cited increasing the prospects of settlement as a reason to conclude that an interlocutory appeal might materially advance the ultimate termination of the litigation. *See, e.g.*, *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d 535, 536 (7th Cir. 2012) (interlocutory appeal warranted where "uncertainty about the status of [one of plaintiffs'] claims may delay settlement … and by doing so further protract the litigation"); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974) (en banc), *cert. denied*, 419 U.S. 885 (1974) ("district court's opinion about settlement possibilities" should guide its exercise of discretion under § 1292(b)); *Susan B. Anthony List v. Driehaus*, 2011 WL 5299378, at *2 (S.D. Ohio Nov. 2, 2011) (interlocutory appeal may "materially advance the ultimate termination of the litigation" in part because "an affirmance may well spur the parties to settle"); *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 3326850, at *6 n.5 (N.D. Ala. June 12, 2018) (in a large, complex MDL, "it is … plain that [granting interlocutory review] will likely affect the parties' settlement prospects"); *Gutter v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1977 WL 1058,

- 3 -

This Court has recognized that a trial will make global settlement more difficult.[4]  But the Court's decision allowing the County to move forward with virtually all of its claims has made settlement much more difficult.  This is particularly true with regard to the RICO claim, which offers plaintiffs the prospect of mandatory treble damages and attorneys' fees and therefore substantially skews the settlement calculus.  The possibility of massive RICO liability gives plaintiffs every incentive to take their chances at trial.  And it gives defendants every incentive to fight that claim through summary judgment, trial, and, if necessary, an appeal.  Certification will advance the timing of that indispensable appellate review and vastly shorten the road to possible settlement, with the freeing of resources to address the public health problem and the potential for savings in litigation costs for all concerned.

Beyond its potential to facilitate settlement, an immediate appeal of this Court's Order will materially advance the ultimate termination of the litigation in other ways.  *First*, interlocutory review can be particularly helpful in MDL proceedings, where the appellate ruling may have precedential importance for many of the consolidated cases.  For example, immediate review of the sufficiency of the RICO allegations would provide important appellate guidance for each of the more than 1,200 cases currently consolidated before this Court asserting RICO claims.[5]  It thus

---

at *7 (S.D. Ohio Sept. 9, 1977) (noting the "virtual impossibility" of settlement before obtaining appellate review is a reason to certify).

[4]    *See* Case Management Order No. 1, ECF No. 232, at 1; Transcript of Proceedings, Jan. 9, 2018, at 4–6, *In re Nat'l Prescription Opiate Litig.*, No. 17-cv-2804 (N.D. Ohio filed Dec. 8, 2017), ECF No. 71; Transcript of Status Conference Proceedings, Aug. 2, 2018, at 22–24, *In re Nat'l Prescription Opiate Litig.*, No. 17-md-2804 (N.D. Ohio filed Dec. 8, 2017), ECF No. 854.

[5]    *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, 2018 WL 3326850, at *6 ("Given the nationwide scope and importance of this multidistrict litigation, the need for § 1292(b) review is particularly compelling."); *In re Fosamax Prods. Liab. Litig.*, 2011 WL 2566074, at *9–10 (S.D.N.Y. June 29, 2011) (interim review in "a bellwether case in a multidistrict litigation consisting of over 100 cases to be decided under Florida law" will "materially advance" the litigation); *In re Lloyd's Am. Tr. Fund Litig.*, 1997 WL 458739, at *4 (S.D.N.Y. Aug. 12, 1997) ("Because the district court's efficiency concerns are greatest in large, complex cases,

has the potential to streamline discovery and/or trial preparation not only in this case, but in the other Track One cases, the Track Two cases, and in the myriad other cases currently before the Court. Moreover, because the Ohio Supreme Court has adopted the federal RICO standard for pleading proximate causation, appellate resolution of that issue has the potential to affect other claims in this case.[6]

*Second*, immediate review of the RICO issues has the potential to "avoid protracted and expensive litigation." *In re Baker & Getty*, 954 F.2d at 1172; *accord W. Tenn. Chapter of Assoc. Builders & Contractors, Inc. v. City of Memphis*, 138 F. Supp. 2d 1015, 1026 (W.D. Tenn. 2000) ("an interlocutory decision could have a major impact on the time and expense involved at trial," particularly in a case where "the financial and legal stakes are high"). This Court intends to conduct a three-week trial involving more than 35 defendants in this case. Case Management Order One, ECF No. 232, at 8. An already complicated trial will be made inordinately more difficult practically, more complex legally, and almost surely longer by the need to present evidence regarding each element of a RICO claim, including (1) the existence (or non-existence) of a criminal enterprise, (2) whether each defendant played a role in directing the affairs of the alleged criminal enterprise, and (3) whether each defendant committed two or more RICO

---

certification may be more freely granted in so-called 'big' cases."); *see also In re Baker & Getty Fin. Servs., Inc.*, 954 F.2d 1169, 1172 n.8 (6th Cir. 1992) (issue is "controlling" if it has "precedential value for a number of pending cases").

[6]  *See, e.g.*, *City of Cleveland v. Ameriquest Mortg. Sec.*, 615 F.3d 496, 504 (6th Cir. 2010) ("[T]he Supreme Court's application of *Holmes* [*v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992)] in its subsequent decision *Anza* [*v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006)] is instructive and consistent with how we believe the Ohio Supreme Court would consider this matter because the Ohio Supreme Court has previously adopted the directness requirement precedent of the United States Supreme Court."); *City of Cleveland v. JP Morgan Chase Bank, N.A.*, 2013 WL 1183332, at *5 (Ohio Ct. App. Mar. 21, 2013) (holding that "[t]he same proximate cause requirements"—i.e., "the 'direct relation' test set forth in *Holmes*"— apply to both RICO and Ohio Corrupt Practices Act claims).

"predicate acts" in service of the purported enterprise.[7]  The potential to avoid the complications of a trial on the merits of the RICO claim amply justifies interim review.[8]

Appellate guidance regarding the RICO "business or property" question, in particular, has the potential to simplify the trial and avoid error.  Such threshold questions of standing are especially well-suited to interlocutory review.[9]  Appellate guidance regarding whether the novel measure of damages adopted by the Court—which turns on whether the County incurred costs that "go beyond the ordinary cost of providing [government] services," Order at 20—could reduce the risk that the parties' proof at any trial will be directed at the wrong legal standard.  Moreover, as this Court has acknowledged, at least some of the categories of damages sought by the County may not be recoverable because they arise out of the personal injury of County residents.  *See* Order at 16 (discussing "medical treatment and emergency response services").

*Third*, early appellate review of this Court's ruling on the County's nuisance claim likewise has the potential to simplify the trial and avoid error.  Nuisance is one of the County's central liability theories.  It would be more efficient to know now if the Sixth Circuit agrees with the Magistrate Judge or the Court about whether the OPLA abrogates the County's nuisance claims.  If no appeal is permitted, and a jury verdict in the County's favor on that claim is later appealed and reversed because the claim is abrogated, considerable public and private sources will have been expended with nothing to show for it.  *See City of Memphis*, 138 F. Supp. 2d at 1026

---

[7]  *See* 18 U.S.C. § 1962(c); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791–96 (6th Cir. 2012) (discussing requirements for RICO claim).

[8]  *See, e.g.*, *Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 741 F. Supp. 906, 913 (S.D. Ga. 1990) (interim review of RICO claim "will materially advance the ultimate termination of the litigation" because "a substantial portion of any trial will … be devoted to the RICO claim"), *rev'd in part on other grounds*, 953 F.2d 587 (11th Cir. 1992).

[9]  *See, e.g.*, *Winnett v. Caterpillar, Inc.*, 2007 WL 2123905, at *6 (M.D. Tenn. July 20, 2007) ("The interlocutory determination of threshold issues, such as standing, may be particularly helpful in 'advanc[ing] the ultimate termination of the litigation.'").

(interlocutory review warranted when it "will potentially save substantial judicial resources and litigant expense").

## II.    THE COURT'S ORDER PRESENTS CONTROLLING QUESTIONS OF LAW.

Whether the County stated a RICO claim and whether the OPLA abrogates the public nuisance claim are controlling questions of law.

As a threshold matter, the "sufficiency of a complaint is a question of law" for purposes of § 1292(b).  *See, e.g.*, *In re Trump*, 874 F.3d 948, 951 (6th Cir. 2017).  The issues on which Distributors seek certification turn on the proper interpretation of (1) *Holmes v. Securities Investor Protection Corp.* and its progeny, and (2) the RICO statute's "business or property" limitation, and (3) the OPLA's abrogation provisions—each of which involves purely legal questions.[10]  Because resolution of these issues will not require the Sixth Circuit to make factual determinations or delve into a detailed factual record, they present pure questions of law appropriate for interlocutory review.  *See In re City of Memphis*, 293 F.3d 345, 350–51 (6th Cir. 2002).

Nor can there be any doubt that resolution of these legal issues would be controlling.  "The Sixth Circuit has … set a low bar for a determination that a question of law is 'controlling' in the context of a motion for certification under § 1292(b)."  *Newsome v. Young Supply Co.*, 873 F. Supp. 2d 872, 875–76 (E.D. Mich. 2012).  It is not necessary that appellate review will result in dismissal of the entire action.[11]  "Rather, all that must be shown … is that resolution of the issue

---

[10]  *See, e.g.*, *In re Trump*, 874 F.3d at 951 ("[T]he application and import of *Brandenburg v. Ohio* … are also questions of law."); *Malamud v. Sinclair Oil Corp.*, 521 F.2d 1142, 1146 (6th Cir. 1975) (accepting immediate appeal to determine whether plaintiff alleged injury to "business or property" under Section 4 of the Clayton Act); *see also Ahrenholz v. Bd. of Trs. of Univ. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000) (questions of law include "the meaning of a statutory … provision"); *United States v. Harchar*, 331 B.R. 720, 724 (N.D. Ohio 2005) ("Statutory interpretation … involves pure questions of law.").

[11]  *See Sterk*, 672 F.3d at 536 (rejecting argument that immediate appeal was inappropriate because reversal would not result in dismissal of entire action and stating, "neither the statutory

on appeal *could materially affect* the outcome of litigation in the district court." *Baker & Getty*, 954 F.2d at 1172 n.8.[12]  For the reasons explained in Part I, *supra*, appellate guidance regarding the sufficiency of the County's claim for treble damages under RICO and its nuisance claim would have precedential value and could save the court and parties substantial time and resources, not only in this case but in many of the cases currently consolidated before this Court.

## III.  THERE ARE SUBSTANTIAL GROUNDS FOR DIFFERENCE OF OPINION WITH THE COURT'S ORDER.

There are substantial grounds for difference of opinion regarding the legal sufficiency of the County's RICO claims against Distributors and the OPLA's abrogation of the common-law nuisance claims.

"A substantial ground for difference of opinion exists where reasonable jurists might disagree on an issue's resolution …." *In re Trump*, 874 F.3d at 952.  The Sixth Circuit has spelled out the types of circumstances that signal the existence of a substantial ground for difference of opinion—namely, where "(1) the question is difficult, novel and either a question on which there is little precedent or one whose correct resolution is not substantially guided by previous decisions; (2) the question is difficult and of first impression; (3) a difference of opinion exists within the controlling circuit; or (4) the circuits are split on the question."  *In re Miedzianowski*, 735 F.3d 383, 384 (6th Cir. 2013).  The Court has acknowledged that the County's allegations "do not fit neatly into the legal theories" it has advanced, relied on "the broadest reading of Sixth Circuit precedent" in sustaining the RICO allegations, and disagreed with Magistrate Judge Ruiz's

___

language nor the case law requires that if the interlocutory appeal should be decided in favor of the appellant the litigation will end … with no further proceedings in the district court").

[12]  *See also* 16 Wright, Miller, & Cooper, Federal Practice & Procedure § 3930 ("The requirement that an appeal may materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law.").

conclusion that the OPLA abrogates the County's common law nuisance claim.  Order at 20, 28, 39.  Under these circumstances, reasonable jurists could disagree with this Court's decision to allow the claims to go forward.

### A. Reasonable Jurists Could Disagree Whether the County Adequately Alleged That Distributors Proximately Caused Its Injuries.

There is substantial ground for difference of opinion regarding the Court's conclusion that the County met its obligation to plead that Distributors' alleged misconduct was the proximate cause of its claimed injuries.  A RICO plaintiff must allege a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *see* Order at 7–8.  "A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 9 (2010) (alteration in original) (quoting *Holmes*, 503 U.S. at 271, 274).  Accordingly, theories of proximate causation under RICO cannot "***go beyond the first step***." *Hemi*, 559 U.S. at 10 (plurality opinion).

In *Hemi*, New York City sued an out-of-state tobacco seller for fraudulently failing to submit customer information, which resulted in "lost tax revenue" to the City by hindering its ability to track down customers who unlawfully failed to pay sales tax.  *Id.* at 10–11.  The Supreme Court held that the City's "causal theory" was too "attenuated" because "the conduct directly responsible for the City's harm was the customers' failure to pay their taxes," not the retailer's failure to report its cigarette sales.  *Id.* at 9, 11.  Under those circumstances, the Court had little trouble concluding that "the disconnect between the asserted injury and the alleged fraud" was too great to satisfy RICO's proximate causation requirement.  *Id.* at 11.

The disconnect between Distributors' alleged wrongful conduct and the County's asserted injury arguably is as great.  As in *Hemi*, "the conduct directly responsible for the [County's] harm" was the diversion and misuse of opioid medications by County residents, not Distributors' alleged

failures to report or halt "suspicious" orders placed by County pharmacies.  *Id.*  Distributors' alleged failures cannot be said to affect the County in the first instance, but only after many intervening actors and events—including (i) a prescribing doctor's decision regarding a patient's treatment, (ii) a pharmacist's decision whether to dispense a prescription, and (iii) a patient's or another's decision to misuse or divert a prescribed medication—that "move well beyond the first step."  *Id.* at 10.

Notably, a recent decision applying the *Holmes* direct injury test relied on precisely these intervening actors and events to dismiss opioid-related claims brought against Manufacturers and Distributors by various Connecticut municipalities.  *See City of New Haven v. Purdue Pharma, L.P.*, No. 17-6086134-S, at 6 (Conn. Super. Ct. Jan. 8, 2019) (Connecticut "adopts the approach of … *Holmes*" to "decide what's too indirect to sue over").  Noting the "many links" in the "causation chain" separating the defendants' alleged conduct from the cities' claimed injury, the court held that the cities' allegations were "too attenuated to support a claim."  *Id.* at 6, 8 (identifying no fewer than five links in the causal chain separating distributors' conduct from any "black market" for prescription opioids).  In doing so, the court applied the three *Holmes* policy factors and concluded that each supported dismissal.  *See, e.g.*, *id.* at 9 (noting the "dizzying complexity" of appropriately apportioning damages to and among the defendants); *id.* at 9–10 (noting that both addicts and government regulators have claims superior to the cities' claims). This recent decision by the court presiding over Connecticut's coordinated opioid litigation proceedings—which addressed virtually identical claims and reached a diametrically opposite conclusion from this Court—demonstrates that reasonable jurists could disagree with this Court's interpretation of *Holmes*.

This conclusion is bolstered by the fact that the superseding criminal misconduct of actors outside Distributors' control necessarily stands between Distributors and the County's alleged injury. In its Order, this Court embraced a causal theory premised on the diversion of opioid medications "into an illicit, black market"—conduct that occurs only after the medicines are delivered by Distributors to DEA-licensed pharmacies. *See* Order at 9–10. Thus, in every case, the criminal conduct of a third party—whether it be a doctor who knowingly prescribes the medications in the absence of a legitimate medical need, a pharmacist who dispenses in the absence of a valid prescription, or a third party who illicitly buys or steals the medicines—stands between Distributors and any harm to the County. Under these circumstances, reasonable jurists could disagree regarding whether Distributors were the ***direct*** cause of the County's alleged injuries. *See, e.g.*, *Hemi*, 559 U.S. at 11 (directness requirement not satisfied where alleged injury was contingent on intervening third-parties' decisions "not to pay taxes they were legally obligated to pay"); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798, 818 (W.D. Ky. 2000) (dismissing RICO claim where criminal's "intervening acts served as a superseding cause which broke the required causal connection needed … to establish civil RICO liability"), *aff'd*, 300 F.3d 683 (6th Cir. 2002).

The Sixth Circuit's decision in *City of Cleveland v. Ameriquest Mortgage Securities* underscores this conclusion. There, the City of Cleveland alleged that the defendants' financing of subprime loans led to a foreclosure crisis, which caused homes in the City to become "eyesores, fire hazards, and easy prey for looters and drug dealers," thereby leading to "increased expenditures for fire and police protection and maintenance and demolition costs" on the part of the City. 615 F.3d at 499. Faced with those allegations, the Sixth Circuit held that the City's allegations failed the *Holmes* direct injury test because numerous "independent actors" stood between the defendants' misconduct and the City's injury. *Id.* at 505.

- 11 -

Like the defendants in *Ameriquest*—who "did not directly make subprime loans to the homeowners of Cleveland" but rather securitized the loans for sale to investors, *id.*—Distributors do not directly make opioid medications available to County residents.  Distributors only ship to licensed retailers, who dispense to patients pursuant to a doctor's prescription.  Without both a doctor who prescribed the medications and a pharmacist who dispensed them, the medications supplied to pharmacies by Distributors would have remained on the shelf, reaching no one.  Moreover, like the City in *Ameriquest*—whose harm was directly caused not by the defendants but by the subsequent actions of homeowners, lenders and the "[d]rug dealers and looters [who] made independent decisions to engage in … criminal conduct," *id.*—the County's alleged harm, to the extent it can be traced to any party, was more directly caused by (i) manufacturers whose allegedly deceptive marketing changed the standard of care for prescribing opioids, (ii) those doctors, pharmacists or others who made the independent decision to divert lawfully obtained controlled substances to illegal use, and (ii) the County residents who used the medicines unlawfully.  Thus, even more so than in *Ameriquest*, "the connection between the [County's] alleged harm and [Distributors'] alleged misconduct is too indirect to warrant recovery."  *See id.* at 506; *see also City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (similar).

In the course of reaching a contrary conclusion, this Court opined that "Defendants' alleged conduct is less remote than prior Sixth Circuit precedent finding proximate cause," citing (only) *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 613 (6th Cir. 2004).  *See* Order at 10.  As an initial matter, the connection between the alleged wrongdoing and harm in this case is ***not*** "less remote" than in *Trollinger*.  There, the employee-plaintiffs alleged that their employer engaged in a scheme to deflate their wages by hiring illegal alien workers.  The Sixth Circuit declined to dismiss the complaint at the pleading stage, but only after noting that the defendant allegedly "***directly***

- 12 -

employed the four plaintiffs, … ***directly*** paid them and … ***directly*** injured [them] by paying them less than they otherwise would have paid" but for the illegal hiring scheme.  *Id.* at 615.  Moreover, as the Sixth Circuit recognized in *Ameriquest*, the relaxed pleading standard relied on in *Trollinger* was abrogated by two subsequent decisions of the Supreme Court.  *See* 615 F.3d at 503–04 (citing *Anza*, 547 U.S. at 453; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  Accordingly, reasonable jurists could disagree with this Court's decision to rely on *Trollinger* while overlooking the more recent and more analogous *Ameriquest* and *Deutsche Bank* decisions.

Reasonable jurists also could disagree with this Court's attempt to distinguish *Perry v. American Tobacco Co.*, 324 F.3d 845 (6th Cir. 2003).  In a long line of tobacco cases, the courts of appeals unanimously rejected RICO claims brought against the tobacco industry by third-party payors seeking to recover increased healthcare costs caused by smoking.  In *Perry*, the Sixth Circuit "agree[d] with the essential holdings of [those] circuits."  *Id.* at 849 (collecting cases).  As the court explained, because the claims of third-party payors were "inherently contingent on injury to third-party smokers," they were "too remote" to state a claim as a matter of law.  *Id.*[13]

This Court sought to distinguish the tobacco cases on the ground that the defendants' conduct in those cases did not allegedly create an "illicit market."  Order at 12.  But there is no suggestion in *Perry* that this purported distinction matters.  *Perry*'s holding did not turn on the precise nature of the defendants' alleged conduct but on the derivative and contingent nature of

---

[13]  The claims in *Perry* were even more remote than those brought by third-party payors in the other tobacco cases because they were brought by individual subscribers of a health insurance plan.  324 F.3d at 847.  The Sixth Circuit, however, unequivocally endorsed the holdings of eight other circuits barring claims brought directly by the third-party payors.  *Id.* at 849.  Because the plaintiffs in each of those eight cases were the parties that directly paid the increased costs allegedly caused by the tobacco companies' wrongdoing, reasonable jurists could disagree with the Court's attempt to distinguish *Perry* as hinging on the "passed-on" nature of the plaintiffs' alleged injury.  Order at 11–12.

the third-party payor's alleged injury.  *See* 324 F.3d at 849.  And, just like the third-party payors in the tobacco cases, the County's alleged injuries here are entirely derivative of, and contingent on, the use and abuse of opioids by County residents:  "Without injury to the individual [opioid users], the [County] would not have incurred any increased costs …."  *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999).

This Court's reliance on the "illicit market" allegations as determinative, moreover, conflicts with persuasive authority from other circuits.  *See, e.g.*, *Ashley County v. Pfizer, Inc.*, 552 F.3d 659, 662–63 (8th Cir. 2009); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 424 (3d Cir. 2002) (dismissing on remoteness grounds a claim by a municipality that the negligent distribution of firearms fueled an "illegal market" for handguns).  In *Ashley County*, numerous counties brought claims against the manufacturers and distributors of products containing ephedrine or pseudoephedrine, seeking "to recoup the costs expended by the counties in dealing with the societal effects of the methamphetamine epidemic."  552 F.3d at 662–63.  The counties alleged that the defendant manufacturers and distributors "knew that their products were being used illegally" to cook methamphetamine and that "they were selling far more than the legitimate market for their products."  *Id.* at 663–64.  Despite the defendants' alleged fueling of an illicit market for their products, the Eight Circuit concluded that the counties failed to plead proximate causation.  *Id.* at 666 (citing *Anza*, 547 U.S. at 456–57).  As the court explained, "it is inadvisable as a matter of public policy to deem the [distributor] defendants' actions a legal cause" where they do not "sell the medications directly to the public," but rather sell their products to "independent retailers" from whom illegal methamphetamine cooks obtain the products.  *Id.* at 663, 671–72 & n.5.  Likewise, Distributors should not be deemed a legal cause of the County's alleged injury because they sold opioids only to DEA-licensed retailers, and any diversion to an illicit market

- 14 -

that occurred was the result of the subsequent, criminal conduct of third parties over whom Distributors had no control.

In short, numerous actors and events—including, in every case, the intervening criminal conduct of a third party—stand between Distributors' alleged conduct and the alleged creation of an illicit market for opioids, and still more stand between Distributors' conduct and the County's purported injury. Under these circumstances, ample authority—including *Holmes*, *Hemi*, *Ameriquest*, and *Ashley County*—strongly suggests that the County's RICO claim against Distributors fails on proximate causation grounds as a matter of law. At a minimum, there is a substantial ground for difference of opinion on this question warranting interlocutory review.

### B. Reasonable Jurists Could Disagree Whether the County Adequately Alleged An Injury To Its "Business or Property."

There is substantial ground for difference of opinion regarding this Court's conclusion that the County properly asserts claims for cognizable "business or property" injuries under RICO. First, reasonable jurists could disagree with the Court's conclusion that the County's claim for medical treatment and other costs do not "flow from" the personal injury of County residents, and thus are not barred by the Sixth Circuit's decision in *Jackson v. Sedgwick Claims Management Services, Inc.*, 731 F.3d 556, 566 (6th Cir. 2013) (en banc). Second, reasonable jurists could disagree with this Court's conclusion—contrary to the decisions of two courts of appeals addressing the issue—that local governments may recover under RICO for expenses incurred to provide quintessential governmental services to their residents. Interlocutory review therefore is warranted.

#### 1. Personal Injuries

As this Court recognized, the Sixth Circuit has interpreted RICO to bar claims for both "personal injuries and pecuniary losses flowing from those personal injuries." Order at 13 (quoting

*Jackson*, 731 F.3d at 565–66).  Here, the County's alleged "losses" all arguably "flow[] from" personal injuries:  but for the opioid addiction and overdoses of County residents, there would be no "opioid epidemic" for the County to (allegedly) spend money combatting.  For example, the County seeks to recover the costs of providing "healthcare and medical care" to County residents.  Order at 15.  As the Court acknowledged, this alleged injury "[p]erhaps" can be said to "arise directly out of the personal injury of the [County's] citizens."  *Id.* at 16.  Plainly, it does, according to the Sixth Circuit.  *Gucwa v. Lawley*, 731 F. App'x 408, 412 (6th Cir. 2018) ("personal injuries and their associated pecuniary losses—***including medical expenses***—do not confer relief under [RICO]").  Accordingly, reasonable jurists could disagree regarding whether some or all of the expenses claimed by the County are not cognizable injuries under RICO.

Reasonable jurists also could disagree with the narrow reading of *Jackson* adopted by the Court.  In *Jackson*, an en banc panel of the Sixth Circuit held, without any further limitation, that all damages "flowing from" personal injuries are barred under RICO.  731 F.3d at 565–66.  Yet this Court read two restrictions into *Jackson* that do not appear in the Sixth Circuit's holding.  First, the Court read *Jackson* to preclude only losses that "arise[] ***directly*** out of a personal injury."  Order at 13.  This reading conflicts with *Jackson*'s holding that no damages "flowing from" personal injury may be recovered under RICO.  *See Brown v. Ajax Paving Indus., Inc.*, 752 F.3d 656, 658 (6th Cir. 2014) ("*Jackson* explained that expected workers' compensation benefits stand outside the Act's perimeter because they ***flow from personal injuries.***").

Second, the Court held that *Jackson* may be read to apply only "when the alleged RICO injury merely acts as an alternate theory for recovering damages otherwise available in a tort claim for personal injury and is asserted by the plaintiff him- or herself."  Order at 14.  This limitation, however, runs afoul of Sixth Circuit authority holding that it is the "nature of the ***injury***"—and not

the identity of the parties—that determines whether *Jackson* applies.  *Brown*, 752 F.3d at 658 (emphasis in original).  The Sixth Circuit itself has applied *Jackson* to bar a RICO claim where the plaintiff did not herself suffer personal injuries, but instead—like the County here—voluntarily provided care for a third-party tort victim.  *See Gucwa*, 731 F. App'x at 412–13.  Accordingly, reasonable jurists could disagree with the Court's narrow reading of *Jackson* and its resultant holding that the County's alleged injuries are cognizable under RICO.

## 2. Sovereign Capacity

No Sixth Circuit authority addresses whether a local government may recover under RICO for governmental expenses undertaken in its sovereign capacity, and the decisions of two other circuits strongly suggest that they may not.  Accordingly, there is substantial ground for disagreement with the Court's novel holding that the County may recover for the costs of providing healthcare, law enforcement, and other core government services to its residents "to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services."  Order at 20.

At least two circuits have held that local governments may recover under RICO only for injury to their commercial interests, not for the costs of government services provided in their sovereign or quasi-sovereign capacities.  *See Welborn v. Bank of N.Y. Mellon Corp.*, 557 F. App'x 383, 387 (5th Cir. 2014) (per curiam) (local governments may not recover under RICO for injuries to "the government's ability to carry out governmental functions"); *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 979 (9th Cir. 2008) (barring county's claims for "increased expenditures for law enforcement and health care services" under RICO).  In reaching a contrary conclusion, this Court did not address or attempt to distinguish *Welborn*.  As for *Canyon County*, the Court quoted the Ninth Circuit's statement that a local government may not recover "based **solely** on the fact that it has spent money in order to act governmentally" to suggest that use of the word "solely"

had restrictive significance.  Order at 19.  That interpretation, however, is undermined by the Ninth Circuit's later and unequivocal holding "that the government does not possess a property interest in the law enforcement or health care services that it provides to the public" and, therefore, "is not 'injured in its property' when greater demand causes it to provide additional public services of this type."  *Canyon County*, 519 F.3d at 977.  At a minimum, reasonable jurists could disagree with the Court's effort to distinguish *Canyon County*.

Reasonable jurists likewise could disagree with this Court's conclusion that the County has alleged damages associated with its "participation in the marketplace."  Order at 20.  Distributors take no issue with the proposition that "government entities that have been overcharged in commercial transactions and thus deprived of their money can claim injury to their property."  *Canyon County*, 519 F.3d at 976; *see also Welborn*, 557 F. App'x at 387 ("Recovery [by governmental entities] is only authorized for injuries suffered in its capacity as a consumer of goods and services.").  No authority, however, supports the Court's suggestion that the County may recover from Distributors for the costs of providing medical treatment—including the administration of naloxone—to County residents merely because the County (allegedly) had to first purchase the naloxone.  *See Canyon County*, 519 F.3d at 976 ("[a]ll government actions require the expenditure of money").  Just as the costs of providing law enforcement services are not recoverable under *Canyon County* despite the fact that a local government might have had to purchase the weapons and police cars used by the police department, the costs of providing medical services to residents are not recoverable despite the fact that a local government might have had to purchase the medicines provided to those residents.

In sum, Distributors are aware of no authority from any jurisdiction holding—as this Court did—that local governments "may recover [RICO] damages based on the provision of

governmental services in their capacity as a sovereign to the extent they can prove the asserted costs go beyond the ordinary cost of providing those services." Order at 20. By contrast, decisions of both the Fifth and Ninth Circuit are (at a minimum) plausibly read to hold that local governments may not bring RICO claims to recover the costs of government services that they provide to their residents. Especially in the absence of any Sixth Circuit guidance on this issue, interlocutory review is warranted.

### C. Reasonable Jurists Could Disagree Whether the OPLA Abrogates the County's Common-Law Nuisance Claim.

There is a substantial ground for difference of opinion regarding this Court's conclusion that the County's common-law nuisance claim was not abrogated by the OPLA. The issue is novel (only one Ohio trial court has addressed it) and is one on which fair-minded jurists might reach contradictory conclusions, as this Court and Magistrate Judge Ruiz have done. An immediate appeal of the abrogation question therefore is warranted. *E.g.*, *In re Trump*, 874 F.3d at 952 ("[W]hen novel legal issues are presented, on which fair-minded jurists might reach contradictory conclusions, a novel issue may be certified for interlocutory appeal without first awaiting development of contradictory precedent.'").

Resolution of the question whether the OPLA abrogates common-law nuisance claims requires the interpretation of two amendments to the OPLA that became effective in 2005 and 2007. Neither has been interpreted by the Ohio Supreme Court. The absence of guidance from the Ohio Supreme Court particularly is problematic because these legislative amendments were designed to overrule prior Ohio Supreme Court decisions that read the OPLA too narrowly. As a result, pre-amendment Ohio precedents—including the 1996 Supreme Court case on which the Court relied in its Order, *LaPuma v. Collinwood Concrete*, 661 N.E.2d 714, 716 (Ohio 1996)— are neither controlling nor useful precedent.

- 19 -

The OPLA was first enacted in 1988, creating "an exclusive statutory basis for all tort based product liability claims."  Stephen J. Werber, *An Overview of Ohio Product Liability Law*, 43 Clev. St. L. Rev. 379, 382 (1995).  In the ensuing years, the Ohio Supreme Court repeatedly divided on the scope of OPLA abrogation.  *See* ECF No. 1088-1.  In 1996, a decade before the legislative amendments to the OPLA, a divided Supreme Court held that a claim for damage to the product itself was not abrogated.  *La Puma*, 661 N.E.2d at 716.  In dicta, the *La Puma* majority noted that "although a cause of action may concern a product, it is not a product liability claim within the purview of Ohio's product liability statutes unless it alleges damages other than economic ones." *Id.*  A divided Supreme Court also construed the OPLA's abrogation narrowly in *Carrel v. Allied Products Corp.*, 677 N.E.2d 795, 800 (Ohio 1997), holding that "the common-law action of negligent design survives the enactment of the [OPLA]," and again in *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1143–45 (Ohio 2002), holding, over a dissent, that plaintiffs' products-based nuisance and negligence claims could proceed.

In 2005, the General Assembly responded to these decisions by adding language to the OPLA "intended to abrogate ***all*** common law product liability causes of action."  2004 Ohio Laws File 144 (Am. Sub. S.B. 80) (codified at OHIO REV. CODE § 2307.71(B)).  The General Assembly further clarified the OPLA's broad application after the City of Toledo in 2006 sued several manufacturers of lead paint on a common-law nuisance theory, relying on *Beretta*.  *City of Toledo v. Sherwin-Williams Co.*, 2007 WL 4965044 (Ohio Ct. Com. Pl. Dec. 12, 2007).  During the pendency of that litigation, the General Assembly passed another amendment, effective 2007, clarifying the definition of "product liability claim" under the OPLA to "also include[] any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product

- 20 -

unreasonably interferes with a right common to the general public." 2006 Ohio Laws File 198 (Am. Sub. S.B. 117) (codified at OHIO REV. CODE § 2307.71(A)(13)).

Upon passage of the amendment, the Court of Common Pleas dismissed the City of Toledo's claims, holding that the just-amended OPLA "expressly encompasses public nuisance claims within the product liability statute," and therefore "public nuisance actions such as Plaintiffs' subjudice, were intended to be abrogated by the OPLA." *Sherwin-Williams*, 2007 WL 4965044, at *5. The City and the State apparently agreed with the court's understanding of the amendment's effect, because the City did not appeal the dismissal, and the Ohio Attorney General voluntarily dismissed the State of Ohio's separate lead-paint lawsuit. Thus, since enactment of the 2005 and 2007 amendments to the OPLA, the Ohio Supreme Court has not had occasion to interpret their scope, and the only lower court to do so held that the OPLA ***does*** abrogate common-law nuisance claims—a conclusion with which the Ohio Attorney General apparently agreed. *Sherwin-Williams*, 2007 WL 4965044, at *5.

Magistrate Judge Ruiz, in his Report and Recommendation, ECF No. 1025 ("R&R"), agreed with this conclusion. The R&R recommended dismissal of the common-law nuisance claim because the County's "absolute public nuisance claim constitutes a common law public nuisance claim and, therefore, falls within the purview of OPLA." R&R at 64. The R&R rejected the County's argument that the amended OPLA abrogates "only those public nuisance actions that seek compensatory damages defined as harm elsewhere in the statute" as "contrary to the plain language of the statute." *Id.* The R&R interpreted the 2005 and 2007 amendments as creating "two types of product liability claims that fall under OPLA's abrogation provisions: (1) product-related causes of action seeking compensatory damages for physical injury or for physical property damage (other than the product in question); and (2) public nuisance-type actions alleging

- 21 -

unreasonable interference with a right common the general public." *Id.* at 58.  The R&R found that the language in *La Puma* suggesting that product liability claims are abrogated only when they allege "damages other than economic ones," 661 N.E.2d at 716, applied only to the first type of claim (which was the only type defined in the OPLA at the time of that decision).  According to the R&R, the distinction between economic loss and harm "was not maintained with respect to the Type 2 definition" that was introduced in 2007, and for this reason, the County's claim was abrogated.  R&R at 65–66.

This Court rejected the distinction between Type 1 and Type 2 claims, holding instead that "in light of the legislative history, the Court finds it ***at least plausible, if not likely***, that the 2005 and 2007 Amendments to the OPLA intended to clarify the definition of 'product liability claim' to mean 'a claim or cause of action [*including* any common law negligence or public nuisance theory of public liability …] that is asserted in a civil action … that seeks to recover compensatory damages … for [harm] …."  Order at 27 (second emphasis in original).

This background demonstrates that there is substantial ground for difference of opinion as to whether the OPLA abrogates common-law nuisance claims that seek only economic damages.[14] The Court's holding runs counter to (i) the R&R, (ii) the only Ohio lower court decision squarely to address the 2007 amendment, (iii) the Ohio Attorney General's decision to dismiss the State's lead-paint litigation in light of the amendment and the *City of Toledo* decision.  Even apart from this background, the Court's own language tacitly admits that there is ground for a difference of opinion when it says that the Court's construction of the amendments is "at least plausible, if not likely."  Order at 27.  Interlocutory review is therefore warranted.

---

[14]  In fact, the County's so-called economic losses all derive from the personal injuries (in the form of addiction or overdose) suffered by community members.  *See supra* Part III.B.1.

## CONCLUSION

For the foregoing reasons, the Court should enter the attached Proposed Order certifying its Order for an immediate appeal pursuant to 28 U.S.C. § 1292(b).

Dated: January 17, 2019                          Respectfully submitted,

*/s/ Robert A. Nicholas*                          */s/ Enu Mainigi*
Robert A. Nicholas                               Enu Mainigi
Shannon E. McClure                               F. Lane Heard III
REED SMITH LLP                                   Steven M. Pyser
Three Logan Square                               Ashley W. Hardin
1717 Arch Street, Suite 3100                     WILLIAMS & CONNOLLY LLP
Philadelphia, PA 19103                           725 Twelfth Street, NW
Tel: (215) 851-8100                              Washington, DC 20005
Fax: (215) 851-1420                              Tel: (202) 434-5000
rnicholas@reedsmith.com                          Fax: (202) 434-5029
smcclure@reedsmith.com                           EMainigi@wc.com
                                                 lheard@wc.com
                                                 spyser@wc.com
*Counsel for AmerisourceBergen Corporation*      ahardin@wc.com
*and AmerisourceBergen Drug Corporation*

                                                 *Counsel for Cardinal Health, Inc.*
*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Mark H. Lynch
Christian J. Pistilli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street N.W.
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
mlynch@cov.com
cpistilli@cov.com

*Counsel for McKesson Corporation*

## LOCAL RULE 7.1(F) CERTIFICATION

Pursuant to the Case Management Order No. 1, ECF No. 232, and Local Rule 7.1(f), Distributors are permitted to file memoranda relating to dispositive motions of up to 30 pages.  This memorandum adheres to that limit.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

## CERTIFICATE OF SERVICE

I, Geoffrey E. Hobart, hereby certify that the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart

- 24 -