**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | |
| **This document relates to:** | **MDL No. 2804** |
| **THE NAVAJO NATION,** | **Master Docket No.: 1:17-MD-02804-DAP** |
| **PLAINTIFF,** | **Hon. Judge Dan A. Polster** |
| **v.** | |
| **PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION; CVS PHARMACY, INC.; WALGREEN CO.; and WALMART INC., f/k/a/ WAL-MART STORES, INC.** | **Case No.: 1:18-op-45496-DAP** **JURY TRIAL DEMANDED** |
| **DEFENDANTS.** | |

**FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................. 9

I.      PLAINTIFF........................................................................................................... 9

II.     DEFENDANTS ................................................................................................... 10

        A.      Manufacturer Defendants.................................................................... 10

        B.      Distributor Defendants......................................................................... 11

        C.      Pharmacy Defendants .......................................................................... 12

JURISDICTION AND VENUE ......................................................................................... 13

FACTUAL BACKGROUND.............................................................................................. 13

I.      PRESCRIPTION OPIOIDS ARE HIGHLY DANGEROUS............................ 13

II.     MANUFACTURER DEFENDANTS HAVE LEGAL DUTIES TO DISCLOSE ACCURATELY THE RISKS OF OPIOIDS................................... 14

III.   MANUFACTURER DEFENDANTS VIOLATED THEIR DUTIES............................ 15

        A.      Manufacturer Defendants Made Misleading Statements About the Risks of Prescribing Opioids to Treat Chronic Pain and Failed to State Accurately the Magnitude of Those Risks ...................................................................... 15

               1.      Manufacturer Defendants Misrepresented the Risks of Addiction to Prescription Opioids................................................................................. 16

               2.      Manufacturer Defendants Misleadingly Claimed that Patients Who Were Showing Signs of Addiction Were Not Actually Addicted ..................... 21

               3.      Manufacturer Defendants Falsely Claimed There Was No Risk in Increasing Opioid Dosages to Treat Chronic Pain................................... 22

        B.      Manufacturer Defendants' Misleading Statements Were Designed for Maximum Effect and Targeted to Specific Audiences........................................... 24

        C.      Manufacturer Defendants Knew or Should Have Known That Their Statements Were Misleading............................................................................... 29

        D.      Manufacturer Defendants' Conduct Violated Their Duties................................. 33

IV.     DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS HAVE
        KNOWINGLY VIOLATED LEGAL DUTIES TO PREVENT OPIOID DIVERSION. 34

        A.      Federal Law Sets a Standard of Care That Distributor Defendants and Pharmacy
                Defendants Must Follow ........................................................................................ 35

                1.      Distributor Defendants' Standard Of Care Under Federal Law .............. 35

                2.      Pharmacy Defendants' Standard of Care Under Federal Law ................. 35

        B.      Distributor Defendants Understood Their Duties and Violated Them Anyway ... 38

                1.      Distributor Defendants Understood and Acknowledged Their Duties ..... 38

                2.      Distributor Defendants Have Been Subject to Prior Regulatory Actions for
                        Failing to Prevent Diversion .................................................................... 41

                        a.      Cardinal .......................................................................................... 41

                        b.      McKesson ........................................................................................ 42

                        c.      AmerisourceBergen ........................................................................ 43

                3.      Distributor Defendants Continued to Violate Their Duties ...................... 44

        C.      Pharmacy Defendants Understood Their Duties and Violated Them Anyway .... 46

                1.      Pharmacy Defendants Understood and Acknowledged Their Duties ....... 46

                2.      Prior Regulatory Actions Against Pharmacy Defendants for Failing to
                        Prevent Diversion ..................................................................................... 48

                        a.      CVS ................................................................................................. 49

                        b.      Walgreens ....................................................................................... 52

                        c.      Walmart ........................................................................................... 54

                3.      Despite Prior Regulatory Actions, Pharmacy Defendants Continue to
                        Violate Their Duties .................................................................................. 54

V.      DEFENDANTS' MISCONDUCT HAS INJURED AND CONTINUES TO INJURE
        THE NAVAJO NATION AND ITS CITIZENS ............................................................... 55

        A.      Manufacturer Defendants' Misconduct Has Injured and Continues to Injure the
                Navajo Nation and Its Citizens ............................................................................ 55

        B.      Distributor Defendants' Misconduct has Injured and Continues to Injure the
                Navajo Nation and Its Citizens ............................................................................ 58

C.     Pharmacy Defendants' Misconduct Has Injured and Continues to Injure the Navajo Nation and Its Citizens ............................................................................ 60

D.     Defendants' Misconduct Has Damaged the Navajo Nation and Its Citizens ....... 62

VI.     FACTS PERTAINING TO CLAIMS UNDER RICO ..................................................... 62

A.     The Opioid Marketing Enterprise .......................................................................... 62

       1.     The Common Purpose And Scheme of the Opioid Marketing Enterprise 62

       2.     The Conduct of the Opioid Marketing Enterprise .................................... 66

       3.     The Pattern of Racketeering Activity ....................................................... 71

B.     The Opioid Supply Chain Enterprise ..................................................................... 74

       1.     The Common Purpose and Scheme of the Opioid Supply Chain Enterprise ............................................................................................................. 74

       2.     The Conduct of the Opioid Supply Chain Enterprise ............................... 76

       3.     The Pattern of Racketeering Activity ....................................................... 77

C.     Effects of the Opioid Marketing Enterprise and the Opioid Supply Chain Enterprise .............................................................................................................. 81

COUNT I ....................................................................................................................... 82

COUNT II ...................................................................................................................... 89

COUNT III ..................................................................................................................... 95

COUNT IV – VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT (N.M.S.A. §§ 57-12-1 TO -26) (AGAINST MANUFACTURER DEFENDANTS).................................. 98

COUNT V – VIOLATION OF ARIZONA CONSUMER FRAUD ACT (A.R.S. §§ 44-1521 TO -1534) (AGAINST MANUFACTURER DEFENDANTS) ............................................. 99

COUNT VI – VIOLATION OF UTAH CONSUMER SALES PRACTICE ACT (U.C.A. §§ 13-1-1 TO -23) (AGAINST MANUFACTURER DEFENDANTS).................................... 100

COUNT VII – NUISANCE (AGAINST MANUFACTURER DEFENDANTS) ..................... 100

COUNT VIII – NEGLIGENCE AND NEGLIGENCE PER SE (AGAINST MANUFACTURER DEFENDANTS) ......................................................................................................... 103

COUNT IX – UNJUST ENRICHMENT (AGAINST MANUFACTURER DEFENDANTS). 106

COUNT X – VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT (N.M.S.A. §§ 57-12-1 TO -26) (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) ....................................................................................................... 107

COUNT XI – VIOLATION OF ARIZONA CONSUMER FRAUD ACT (A.R.S. §§ 44-1521 TO -1534) (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) ....................................................................................................... 108

COUNT XII – VIOLATION OF UTAH CONSUMER SALES PRACTICE ACT (U.C.A. §§ 13-11-1 TO -23) (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) ....................................................................................................... 109

COUNT XIII – NUISANCE (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) ....................................................................................................... 110

COUNT XIV – NEGLIGENCE AND NEGLIGENCE PER SE (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) ................................................. 113

COUNT XV – UNJUST ENRICHMENT (AGAINST DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS) .................................................................................. 115

COUNT XVI – CIVIL CONSPIRACY (AGAINST ALL DEFENDANTS) ........................... 117

PRAYER FOR RELIEF ......................................................................................................... 118

REQUEST FOR JURY TRIAL .............................................................................................. 127

Plaintiff, the Navajo Nation, brings this First Amended Complaint for compensatory, punitive, and other damages, and restitution, disgorgement, and civil penalties.  The Defendants are (A) Purdue Pharma L.P., Purdue Pharma Inc., The Purdue Frederick Company, Endo Health Solutions Inc., and Endo Pharmaceuticals Inc. (collectively, "Manufacturer Defendants"); (B) McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, Walgreen Co., and Walmart Inc., f/k/a Wal-Mart Stores, Inc. (collectively, "Distributor Defendants"); and (C) CVS Pharmacy, Inc., Walgreen Co., and Walmart Inc., f/k/a Wal-Mart Stores, Inc. (collectively, "Pharmacy Defendants").  Collectively, the Manufacturer Defendants, the Distributor Defendants, and the Pharmacy Defendants are referred to herein as the "Defendants."

## INTRODUCTION

1.     Prescription opioids are powerful pain-reducing medications.  When used properly, they can help manage pain for certain patients.  But, even then, these drugs can cause addiction, overdose, and death.  When used to treat chronic pain, or when used for non-medical purposes, those risks are amplified.

2.     In recent years, prescription opioid use for both chronic pain and non-medical purposes has grown dramatically, resulting in an epidemic of abuse.  Nationwide, millions of Americans are addicted to prescription opioids, and tens of thousands die annually from opioid overdoses.  According to the Centers for Disease Control and Prevention ("CDC"), in Arizona, New Mexico, and Utah, where parts of the Navajo Nation are located, 7,309 people died of drug overdoses between 2014 and 2016, and the "main driver" of these deaths was prescription and illicit opioids.[1]

---

[1] CDC, *Drug Overdose Death Data*, https://www.cdc.gov/drugoverdose/data/statedeaths.html (last updated December 19, 2017) (Arizona:  1,211 deaths in 2014, 1,274 deaths in 2015, 1,382 deaths in 2016; New Mexico: 547 deaths in 2014, 501 deaths in 2015, 500 deaths in 2016; Utah:  603 deaths in 2014, 646 deaths in 2015, 635 deaths in 2016).

3. Defendants' conduct caused this epidemic.

4. Manufacturer Defendants have engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating chronic pain with prescription opioids. Although manufacturers are prohibited from marketing prescription opioids through misstatements or omissions of material facts, Manufacturer Defendants did so through this campaign, which includes websites, promotional materials, conferences, guidelines for doctors, and other vehicles.

5. This aggressive marketing campaign enabled Manufacturer Defendants to overcome the longstanding medical consensus that opioids are unsafe for the treatment of chronic pain. Defendants' actions caused doctors to increasingly prescribe opioids. Between 1999 and 2016, the number of opioids prescribed nationwide quadrupled.[2] Not surprisingly, deaths from prescription opioids also quadrupled over the same period.[3]

6. The increase in opioid prescriptions to treat chronic pain in turn led to a massive increase in the number of people seeking prescription opioids for non-medical uses and becoming addicted. Nationally, the number of people who take prescription opioids for non-medical purposes is now greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.[4] In Arizona, New Mexico, and Utah, data from the

---

[2] Li Hui Chen et al., *Drug-Poisoning Deaths Involving Opioid Analgesics: United States, 1999–2011*, 166 Nat'l Ctr. for Health Statistics Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf; Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity and Mortality Weekly Report 1445 (Dec. 30, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.
[3] Anna Lembke, *Drug Dealer MD: How Doctors Were Duped, Patients Got Hooked, and Why It's Hard To Stop* 4 (2016).
[4] Substance Abuse and Mental Health Servs. Admin., *Results from the 2009 National Survey on Drug Use and Health: Volume I. Summary of National Findings*, NSDUH Series H-38A, HHS Publication No. SMA 10-4586 Findings (2010).

Substance Abuse and Mental Health Services Administration indicate that over 545,000 residents use prescription opioids for non-medical purposes each year.[5]

7.      This increase in non-medical demand and addiction has led to an increase in diversion, which occurs when the supply chain of prescription opioids is broken and drugs are transferred from a legitimate channel to an illegitimate one.

8.      The legitimate supply chain for prescription opioids begins with the manufacture and packaging of the pills.  Manufacturers (including Manufacturer Defendants) then transfer the pills to distributors—in particular Distributor Defendants, who, upon information and belief, together account for at least 85% of opioid shipments in the United States.  Distributors (including Distributor Defendants) then supply opioids to pharmacies (including Pharmacy Defendants) and others who dispense the drugs to consumers.

9.      At the manufacturer level, diversion occurs whenever opioid manufacturers fill suspicious orders from distributors.  As discussed below, suspicious orders include orders of an unusually large size, orders of a size that are disproportionately large in comparison to the population of a community, orders that deviate from a normal pattern, and orders of unusual frequency.  Diversion also occurs when manufacturers allow opioids to be lost or stolen from inventory or in transit.

10.     At the distributor level, diversion occurs whenever prescription opioid distributors fill suspicious orders from retailers such as pharmacies.  As discussed below, under Federal and applicable state law, suspicious orders include orders of an unusually large size, orders of a size that are disproportionately large in comparison to the population of a community served by a

---

[5] Substance Abuse and Mental Health Servs. Admin., *National Survey on Drug Use and Health: Comparison of 2002–2003 and 2013–2014 Population Percentages (50 States and the District of Columbia)* 16–17 (2015), http://www.samhsa.gov/data/sites/default/files/NSDUHsaeLongTermCHG2014/NSDUHsaeLongTermCHG2014.pd f (4.43% of people age 12 or older in New Mexico engage in the non-medical use of prescription pain relievers).

pharmacy, orders that deviate from a normal pattern, and orders of unusual frequency.  Diversion also occurs when distributors allow opioids to be lost or stolen from inventory or in transit.

11.     At the pharmacy level, diversion occurs whenever a pharmacist fills a prescription despite having reason to believe it was not being filled for a legitimate medical purpose.  A prescription may lack a legitimate medical purpose when a patient is either a drug dealer or opioid-dependent, seeks to fill multiple prescriptions from different pharmacies or obtain prescriptions from multiple providers, travels great distances between a doctor and a pharmacy to fill a prescription, presents multiple prescriptions for the largest dose of more than one controlled substance such as opioids and benzodiazepines, or when there are other red flags surrounding the transaction.  Opioids are also diverted from pharmacies when they are stolen by employees or others, obtained with stolen, forged, or invalid prescriptions, or sold without prescriptions.

12.     Of the opioid prescriptions issued in Arizona, New Mexico, and Utah each year, national studies suggest that as many as 12.8% of those prescriptions are diverted to non-medical uses.[6]  These conclusions about the extent of prescription opioid diversion are further supported by Drug Enforcement Administration ("DEA") data showing that in the past few years the states

---

[6] The studies estimate that the percentage of prescription opioids that are diverted to illegitimate purposes ranges from 1.9% to 12.8% of total prescriptions.  B.L. Wilsey et al., *Profiling Multiple Provider Prescribing of Opioids, Benzodiazepines, Stimulants, and Anorectics*, 112 Drug and Alcohol Dependence 99 (2010) (estimating that 12.8% of prescriptions are diverted); N. Katz et al., *Usefulness of Prescription Monitoring Programs for Surveillance– Analysis of Schedule II Opioid Prescription Data in Massachusetts, 1996–2006*, 19 Pharmacoepidemiology and Drug Safety 115 (2010) (estimating the diversion rate at 7.7% when defining likely diversion as patients that obtain opioids from at least three prescribers and at least three pharmacies in a year); D.C. McDonald & K.E. Carlson, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, 8 PLoS ONE (2013) (estimating the diversion rate at 1.9% of all prescriptions and 4% of total grams dispensed).

in which the Navajo Nation is located have seen annual distribution exceeding 504 milligrams per citizen,[7] and 4,580 milligrams per opioid user.[8]

13.     As detailed below, Distributor Defendants and Pharmacy Defendants have legal obligations to combat diversion.  Distributor Defendants and Pharmacy Defendants have routinely and continuously violated these obligations, and instead have taken advantage of the massively increased demand for prescription opioids for non-medical uses by profiting heavily from the sale of opioids that they knew, or should have known, were being diverted from the legitimate supply chain to illegitimate channels of distribution.  The failure of Distributor Defendants and Pharmacy Defendants to comply with their legal obligations to prevent diversion and to alert authorities to potential diversion continues today, despite (a) the well-known harm resulting from the prescription opioid crisis, and (b) substantial fines for diversion levied against multiple Distributor Defendants and Pharmacy Defendants.

14.     The misconduct of Defendants, including their consistent failure to comply with their legal obligations and their concealment thereof, has caused an epidemic of prescription opioid abuse.  American Indians, including the Navajo Nation, have been significantly impacted by this epidemic.  American Indians suffer the highest per capita rate of opioid overdoses.[9]

---

[7] Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*, (June 20, 2018) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2013/2013_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight* (Feb. 29, 2016) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2014/2014_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*, (Mar. 7, 2016) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2015/2015_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*,  (Feb. 3, 2017) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/report_yr_2016.pdf.
[8] Wenjun Zhong et al., *Age and Sex Patterns of Drug Prescribing in a Defined American Population*, 7 Mayo Clinic Proceedings 697, 700 (2013).
[9] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief.pdf.

15.    Hundreds of American Indians have died of opioid overdoses in recent years. And for every opioid overdose death, it is estimated that there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 non-medical users of opioids.[10]

16.    The impact on American Indian children is particularly devastating.  The CDC has reported that approximately one out of every ten American Indian youths aged 12 or older used prescription opioids for non-medical purposes in 2012.[11]  This is double the rate for white youths.[12]  Similarly, it has been reported that by twelfth grade, nearly 13% of American Indian teens have used OxyContin, an opioid manufactured by Defendant Purdue.[13]  The fact that American Indian teens are easily able to obtain OxyContin at these alarming rates indicates the degree to which drug diversion has created an illegal secondary market for prescription opioids.

17.    The opioid epidemic resulting from Defendants' conduct has injured even the youngest members of Indian tribes.  In 1992, in the United States, only 2% of pregnant women admitted for drug treatment services abused opioids.  By 2012, opioids accounted for 38% of all drug treatment admissions of pregnant women.[14]  Many American Indian women have become addicted to prescription opioids and have used these drugs during their pregnancies.  As a result,

---

[10] Jennifer DuPuis, Associate Dir. Human Servs. Div., Fond du Lac Band of Lake Superior Chippewa, *The Opioid Crisis in Indian Country*, at 37, https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last visited Mar. 27, 2018); Gery P. Guy, Jr. et al., *Emergency Department Visits Involving Opioid Overdoses, U.S., 2010–2014*, 54 Am. J. of Preventive Medicine e37 (Jan. 2018), http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext.

[11] National Congress of American Indians Policy Research Center, *Reflecting on a Crisis Curbing Opioid Abuse in Communities* (Oct. 2016), http://www.ncai.org/policy-research-center/research-data/prc-publications/Opioid_Brief.pdf.

[12] *Id*.

[13] Linda R. Stanley, *Rates of Substance Use of American Indian Students in 8th, 10th, and 12th Grades Living on or Near Reservations: Update, 2009–2012*, Pub. Health (Rep. Mar.–Apr. 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3904895/table/T1/.

[14] Naana Afua Jumah, *Rural, Pregnant, and Opioid Dependent: A Systematic Review*, 10 Substance Abuse 35 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/.

many American Indian infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome, which can have adverse short- and long-term developmental consequences.[15]

18.     Pregnant American Indian women are up to 8.7 times more likely than pregnant women from other groups to be diagnosed with opioid dependency or abuse, and in some communities more than 1 in 10 pregnant American Indian women have a diagnosis of opioid dependency or abuse.[16]  On information and belief, the same is true of women in the Navajo Nation.

19.     On information and belief, the prescription opioid use and abuse have resulted in prescription opioid-related deaths among Navajo Nation citizens.

20.     Defendants' prescription opioid diversion on and around the Navajo Nation contributes to and exacerbates a range of existing social problems.  Adverse impacts on the Navajo Nation's families include child abuse and neglect, and family dysfunction.  Navajo Nation children are regularly removed from their families as a result of prescription opioid dependency and abuse by both children and parents.  These removals harm Navajo Nation children and families, and they harm the Navajo Nation itself, particularly when children are placed with families outside the Navajo Nation.

21.     Other social problems caused by the opioid epidemic include criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, of these adverse social outcomes, more and more Navajo Nation resources are devoted to addiction-related problems, leaving a diminished pool of resources available for education, cultural preservation, and social programs.  Meanwhile, the prescription opioid crisis diminishes the Navajo Nation's

---

[15] Jean Y. Ko et al., *CDC Grand Rounds, Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, 66 Morbidity and Mortality Weekly Report 242 (Mar. 10, 2017), https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf.
[16] DuPuis, *supra* note 10, at 64.

available workforce, decreases productivity, increases poverty, and consequently requires greater expenditures for governmental assistance.

22.     The use of prescription opioids also often leads to the use of non-prescription opioids, such as heroin, a link that is now well-documented. Heroin use in the area in and around the Nation's Reservation has also caused devastating addiction, abuse, and death.

23.     Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in the Nation's communities.

24.     Damages suffered by the Navajo Nation include the costs of: (a) medical care, therapeutic and prescription drugs, and other treatments for patients suffering from opioid-related addiction, overdoses, or disease; (b) law enforcement and public safety measures necessitated by the opioid crisis; (c) opioid-related counseling and rehabilitation services; (d) welfare for children whose parents suffer from opioid-related disease or incapacitation; (e) increased crime, property damage, and public blight caused by opioids; and (f) lost productivity of its citizens and businesses.

25.     To remedy all Defendants' misconduct, the Navajo Nation brings this action for: (a) violations of the Racketeer-Influenced and Corrupt Organizations Act ("RICO"); (b) violations of the Lanham Act; (b) unfair trade practices; (c) common law nuisance; (d) negligence; (e) unjust enrichment; and (f) civil conspiracy.

26.     The Navajo Nation seeks: (a) injunctive relief; (b) compensatory damages; (c) statutory damages and penalties pursuant to Federal and applicable state law; (d) reimbursement of all payments fraudulently induced by all Defendants' conduct; (e) disgorgement of all amounts unjustly obtained by all Defendants; (f) restitution of all

expenditures by the Navajo Nation resulting from all Defendants' conduct; (g) punitive damages; (h) attorneys' fees and costs; and (i) such further relief as justice may require.

## PARTIES

### I.    PLAINTIFF

27.     The Navajo Nation is a federally recognized Indian tribe with a membership of over 300,000 citizens.  The Navajo Nation covers 27,000 square miles that extend into the states of Arizona, New Mexico, and Utah.  It exercises sovereign governmental authority within its territory and over its citizens.

28.     The Navajo Nation provides health care to its members directly and through entities on or near its territory to which the Navajo Nation delegates its authority for the purpose of entering into contracts under the Indian Self Determination Act to provide health care services to Navajo Nation citizens.  These entities include the Alamo School Board, Fort Defiance Indian Hospital Board, Navajo Health Foundation–Sage Memorial Hospital, Ramah Navajo School Board, Tuba City Regional Health Care Corporation, Utah Navajo Health System, and Winslow Indian Health Care Center.  As used herein, references to the Navajo Nation include the Navajo Nation itself and these duly authorized entities.

29.     The Navajo Nation brings this action on behalf of the Nation itself and under its *parens patriae* authority on behalf of its citizens in the public interest to protect the health, safety, and welfare of the citizens of the Navajo Nation to stop the prescription opioid crisis on and near the Navajo Nation and to recover damages and seek other redress from harm caused by Defendants' improper marketing, sales, distribution, dispensing, and reporting practices related to prescription opioids.

## II.      DEFENDANTS

### A.      Manufacturer Defendants

30.      Defendant Purdue Pharma L.P. (together with Purdue Pharma Inc. and The Purdue Frederick Company, "Purdue") is a Delaware limited partnership with its principal place of business in Connecticut.  At all relevant times, Purdue Pharma L.P. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold nationwide, including within New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

31.      Defendant Purdue Pharma Inc. (together with Purdue Pharma L.P. and The Purdue Frederick Company, "Purdue") is a New York corporation with its principal place of business in Connecticut.  At all relevant times, Purdue Pharma Inc. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold nationwide, including within New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

32.      Defendant The Purdue Frederick Company (together with Purdue Pharma L.P. and Purdue Pharma Inc., "Purdue") is a Delaware corporation with its principal place of business in Connecticut.  At all relevant times, The Purdue Frederick Company has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

33.      Defendant Endo Health Solutions Inc. (together with Endo Pharmaceuticals Inc., "Endo") is a Delaware corporation with its principal place of business in Pennsylvania.  At all relevant times, Endo Health Solutions Inc. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold within New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

34.     Defendant Endo Pharmaceuticals Inc. (together with Endo Health Solutions Inc., "Endo") is a Delaware corporation with its principal place of business in Pennsylvania.  At all relevant times, Endo Pharmaceuticals Inc. has manufactured and distributed substantial amounts of prescription opioids that have been and continue to be sold in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

35.     As discussed further below, in violation of their legal obligations, Manufacturer Defendants have made misstatements or omitted information regarding the risks of using prescription opioids to treat chronic pain.

**B.      Distributor Defendants**

36.     Defendant McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in California.  McKesson is authorized to conduct business in New Mexico.  At all relevant times, McKesson has distributed substantial amounts of prescription opioids in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

37.     Defendant Cardinal Health, Inc. ("Cardinal") is an Ohio corporation with its principal place of business in Ohio.  Cardinal is authorized to conduct business in New Mexico. At all relevant times, Cardinal has distributed substantial amounts of prescription opioids in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

38.     Defendant AmerisourceBergen Corporation ("AmerisourceBergen") is a Delaware corporation with its principal place of business in Pennsylvania.  AmerisourceBergen is authorized to conduct business in New Mexico.  During all relevant times, AmerisourceBergen has distributed substantial amounts of prescription opioids in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

39.     Defendant Walgreen Co. ("Walgreens") is an Illinois corporation with its principal place of business in Illinois.  Walgreens is authorized to conduct business in New

Mexico.  At all relevant times, Walgreens has distributed substantial amounts of prescription opioids in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

40.     Defendant Walmart Inc., f/k/a Wal-Mart Stores, Inc. ("Walmart") is a Delaware corporation with its principal place of business in Arkansas.  Walmart is authorized to conduct business in New Mexico.  At all relevant times, Walmart has distributed substantial amounts of prescription opioids in New Mexico, Arizona, and Utah, and within or near the Navajo Nation.

41.     As discussed below, Distributor Defendants have consistently failed to comply with their legal obligations concerning prescription opioid diversion, and have paid civil penalties to resolve government allegations regarding prescription opioid diversion.

### C.     Pharmacy Defendants

42.     Defendant CVS Pharmacy, Inc. ("CVS") is a Rhode Island corporation with its principal place of business in Rhode Island.  CVS is authorized to conduct business in New Mexico.  At all relevant times, CVS has sold and continues to sell prescription opioids at locations that service Navajo Nation citizens, including in New Mexico, Arizona, and Utah, and in close proximity to Navajo Nation hospitals, clinics, and other healthcare facilities serving Navajo Nation citizens.

43.     Defendant Walgreens is a Delaware corporation with its principal place of business in Illinois.  Walgreens is authorized to conduct business in New Mexico.  At all relevant times, Walgreens has sold and continues to sell prescription opioids at locations that service Navajo Nation citizens, including in New Mexico, Arizona, and Utah, and in close proximity to Navajo Nation hospitals, clinics, and other healthcare facilities serving Navajo Nation citizens.

44.     Defendant Walmart is a Delaware corporation with its principal place of business in Arkansas.  Walmart is authorized to conduct business in New Mexico.  At all relevant times, Walmart has sold and continues to sell prescription opioids at locations that service Navajo

Nation citizens, including in New Mexico, Arizona, and Utah, and in close proximity to Navajo Nation hospitals, clinics, and other healthcare facilities serving Navajo Nation citizens.

45.     As discussed below, each Pharmacy Defendant has consistently failed to comply with its legal obligations concerning prescription opioid diversion.  Additionally, each Pharmacy Defendant has paid civil penalties to resolve government allegations regarding prescription opioid diversion.

## JURISDICTION AND VENUE

46.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question, and under 28 U.S.C. § 1362 because this action is brought by an Indian tribe.  This Court has supplemental jurisdiction over the state-law causes of action under 28 U.S.C. § 1367 because the state-law claims are part of the same case or controversy.

47.     This Court has personal jurisdiction over all Defendants because each Defendant has substantial contacts and business relationships with New Mexico, including consenting to be sued in New Mexico by registering an agent for service of process and/or obtaining a distributor license, and has purposefully availed itself of business opportunities in New Mexico, including by marketing, distributing, or selling prescription opioids in New Mexico and on and near the Navajo Nation's communities.

48.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district and because all Defendants are subject to this Court's jurisdiction.

## FACTUAL BACKGROUND

## I.     PRESCRIPTION OPIOIDS ARE HIGHLY DANGEROUS

49.     Prescription opioids are powerful pain-reducing medications that include non-synthetic, partially-synthetic, and fully-synthetic derivatives of the opium poppy.  While these

drugs can have benefits when used properly, they also pose serious risks.  In particular, they present "substantially increase[d]" risk when used to treat chronic pain and "can cause serious harm, including addiction, overdose and death" when "misused or abused."[17]

50.     Given these risks, the marketing, distribution, and sale of prescription opioids are heavily regulated by Federal law, including the Federal Controlled Substances Act ("FCSA"), 21 U.S.C. §§ 801 *et seq.*, and the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S. §§ 321 *et seq.*  Similarly, numerous state regulations—including numerous professional regulations related to persons who handle, prescribe, and dispense controlled substances—impose strict controls and requirements throughout the prescription opioid distribution chain.

51.     As discussed below, despite the dangers of prescription opioids, Manufacturer Defendants wrongfully marketed them through misleading statements that minimized the risks of these drugs and failed to disclose accurately the true magnitude of those risks.  The actions of Manufacturer Defendants created a huge market for prescription opioids, which in turn led to massive diversion of these drugs from legitimate to illegitimate channels.  Distributor Defendants and Pharmacy Defendants, who have duties to implement effective measures to prevent diversion, wrongfully turned a blind eye to it.  Defendants as a group also concealed their wrongdoing from the public and the Nation.  As a result of all Defendants' wrongful acts, the Navajo Nation and its citizens have suffered injuries and damages.

## II.     MANUFACTURER DEFENDANTS HAVE LEGAL DUTIES TO DISCLOSE ACCURATELY THE RISKS OF OPIOIDS

52.     Each Manufacturer Defendant has a duty under Federal and Arizona, New Mexico, and Utah law to exercise reasonable care in marketing and selling prescription opioids.

---

[17] Food and Drug Admin., *Opioid Medications*,
https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm337066.htm (last updated Feb. 15, 2018).

53.     The FDCA prohibits "the introduction . . . into interstate commerce of any . . . drug . . . that is adulterated or misbranded."  21 U.S.C. § 331(a).  "Misbranding" includes misleading advertising.  21 U.S.C. § 352.  Misleading advertising, in turn, includes both "representations made or suggested by statement, word, design, device, or any combination thereof," and

> the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual.

21 U.S.C. § 331(n).

54.     Manufacturer Defendants have a duty not to contradict or minimize FDA-required warnings on their opioid product labels.

55.     Manufacturer Defendants also have a common law duty to make a full and fair disclosure as to the matters about which they choose to speak.

III.     MANUFACTURER DEFENDANTS VIOLATED THEIR DUTIES

A.     Manufacturer Defendants Made Misleading Statements About the Risks of Prescribing Opioids to Treat Chronic Pain and Failed to State Accurately the Magnitude of Those Risks

56.     Manufacturer Defendants have engaged in a multi-million dollar marketing campaign to minimize and misstate the risks of addiction and abuse when prescription opioids are used to treat chronic pain.

57.     Manufacturer Defendants made statements that contradicted or minimized FDA-required warnings about their opioid products.

58.     Manufacturer Defendants made statements through websites, promotional materials, conferences, guidelines for doctors, and other vehicles that suggested that the risk of addiction when opioids are used for chronic pain was low—statements directly contrary to

15

established scientific evidence. Manufacturer Defendants' marketing claims also differ from the safety warnings that Manufacturer Defendants must place on many of their opioid products. In fact, as discussed further below, Manufacturer Defendants have been repeatedly fined or otherwise sanctioned for their misleading statements in the marketing of prescription opioids.

### 1. Manufacturer Defendants Misrepresented the Risks of Addiction to Prescription Opioids

59. The Manufacturer Defendants utilized various channels to carry out their marketing scheme of targeting the medical community and patients with deceptive information about opioids, including (a) front groups that appeared to be independent from Manufacturer Defendants ("Front Groups"), and (b) so-called "Key Opinion Leaders" ("KOLs"), that is, doctors who were paid by the Manufacturer Defendants to promote their pro-opioid message. The Front Groups put out patient education materials and treatment guidelines that supported the use of opioids for chronic pain, overstated their benefits, and understated their risks.[18] Manufacturer Defendants funded these Front Groups in order to ensure supportive messages from these seemingly neutral and credible third parties, and their funding did, in fact, ensure such supportive messages—often at the expense of their own constituencies. The American Pain Foundation, the American Academy of Pain Medication, the American Pain Society, the Federation of State Medical Boards, the Alliance for Patient Access, the U.S. Pain Foundation, and the American Geriatrics Society all functioned as Front Groups.

60. Acting through Front Groups, which were nominally independent, neutral organizations, Manufacturer Defendants contributed content and funding to numerous "guidelines" on prescription opioid use. These guidelines misleadingly downplayed the risks of

---

[18] Staff of S. Comm. on Homeland Sec. & Governmental Affairs, 115th Cong., *Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups* (Comm. Print 2018), www.hsdl.org/?abstract&did=808171, at 3.

addiction when opioids are prescribed for chronic pain. For instance, an October 2011 pamphlet entitled, "A Policymaker's Guide to Understanding Pain & Its Management," put out by a Front Group called the American Pain Foundation and "made possible by support from Purdue Pharma LP," asserted that "[l]ess than 1 percent of children treated with opioids become addicted" and that pain was generally "undertreated" due to "misconceptions about opioid addiction."[19] Similarly, "Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain," a February 2009 article funded by the American Pain Society, another Front Group, and written by several authors with financial ties to Manufacturer Defendants, promoted opioids as "safe and effective" for chronic pain treatment and indicated that the risk of addiction was manageable for all patients regardless of past drug abuse history.[20] Likewise, "Treatment Options: A Guide for People Living with Pain," a 2006 American Pain Foundation pamphlet financially supported by Purdue, claimed that addiction is rare and limited to certain extreme cases.[21] Endo also sponsored the American Pain Foundation—in 2010 alone, the organization received more than $2,500,000 from Endo.[22] By asserting that the Front Groups were independent non-profit organizations with missions other than the increase of opioid use, the Manufacturer Defendants and Front Groups concealed that the Front Groups were acting under the practical control of, and/or for the benefit of, the Manufacturer Defendants and the creation of an increased market for opioids that would yield higher revenue and profits.

---

[19] Am. Pain Found., *A Policymaker's Guide to Understanding Pain & Its Management* (Oct. 2011), http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.
[20] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 The J. of Pain 113 (Feb. 2009), http://dx.doi.org/10.1016/j.jpain.2008.10.008.
[21] Am. Pain Found., *Treatment Options: A Guide for People Living with Pain* (2006), https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.
[22] Am. Pain Found., *2010 Annual Report* (Dec. 20, 2011), https://archive.org/details/277604-apf-2010-annual-report.

61.     Manufacturer Defendants produced and provided directly to doctors and patients marketing materials that made similar misstatements.  Purdue issued marketing materials, starting in 1996, stating that "addiction to opioids legitimately used in the management of pain is very rare."[23]  Endo distributed a pamphlet, "Living with Someone with Chronic Pain," which stated that most healthcare providers agree that most people do not develop an addiction.

62.     Manufacturer Defendants ran websites that promoted similar misleading claims. For example, Endo sponsored painknowledge.com and painaction.com, which claimed, as of 2009 and 2015, respectively, that "[p]eople who take opioids as prescribed usually do not become addicted" and that "[m]ost chronic pain patients do not become addicted to the opioid medications that are prescribed for them." [24]

63.     Endo also represented that "[t]aking opioids for pain relief is not addiction" and that "[a]ddiction to an opioid would mean that your pain has gone away but you still take the medicine regularly when you don't need it for pain, maybe just to escape from your problem."[25] In the same publication, Endo suggested that patients use the following test to determine whether they are addicted to opioids:  "Ask yourself: Would I want to take this medicine if my pain went away?  If you answer no, you are taking opioids for the right reasons—to relieve pain and improve your function. You are not addicted."[26]

---

[23] Drug Label for Oxycodone Hydrochloride 5mg Capsule,
https://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=41068.
[24] National Initiative on Pain Control, *Pain: Opioid Therapy* (2009),
https://web.archive.org/web/20101007083722/http://painknowledge.org/patiented/pdf/B697_%20Patient%20Handout_FINAL.pdf; Joanne Zeis, *Opioid Medication and Addiction,* PainAction (Aug. 17, 2017),
https://www.painaction.com/opioid-medication-addiction/, at 4.
[25] Endo Pharmaceuticals, *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004), https://perma.cc/QN86-62PK.
[26] *Id.*

64.     Manufacturer Defendants trained salesmen to downplay the risk of addiction.  For instance, Purdue salesmen were instructed to tell doctors that opioids' addiction risk was "less than one percent."[27]

65.     Manufacturer Defendants sponsored training sessions where doctors were given similar misleading information regarding the risks of opioid addiction.  For example, Purdue sponsored training sessions in the late 1990s and early 2000s where opioid addiction was described as "exquisitely rare."[28]

66.     All of these statements were false.  The CDC has stated that:  (1) there is "extensive evidence" of the possible harms of opioids, including addiction; (2) "[o]pioid pain medication use presents serious risks," including addiction; and (3) using opioids to treat chronic pain "substantially increases" the risk of addiction.[29]  Studies have found that up to 26% of long-term users of opioids experience problems with addiction or dependence.[30]

67.     Moreover, in August 2016, the U.S. Surgeon General expressed concern that "heavy marketing to doctors" had led many to be "taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain," and noted the "devastating" results that followed from this misinformation.[31]

68.     Findings by the Food and Drug Administration ("FDA") similarly belie Manufacturer Defendants' assertions that prescription opioids are safe for treating chronic pain. These findings show that:  (1) "most opioid drugs have 'high potential for abuse'"; (2) treatment

---

[27] U.S. Gov't Accountability Office, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (Dec. 2003), https://www.gpo.gov/fdsys/pkg/GAOREPORTS-GAO-04-110/content-detail.html.
[28] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death,* 190 (2003).
[29] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016,* 65 Morbidity and Mortality Weekly Report 1 (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[30] *Id.*
[31] Letter from U.S. Surgeon General Vivek H. Murthy (Aug. 2016), https://perma.cc/VW95-CUYC.

of chronic pain with opioids poses "known serious risks," including "addiction, abuse, and misuse . . . overdose and death" even when used "at recommended doses"; and (3) opioids should be used only "in patients for whom alternative treatment options" have failed.[32] And several studies finding double-digit rates of prescription drug abuse in chronic pain patients controvert Manufacturer Defendants' claims that addiction rates are less than one percent.[33]

69.     Similarly, a prominent neuropharmacologist at the Washington University School of Medicine in St. Louis, Dr. Theodore Cicero, remarked in 2016 that Purdue's OxyContin dosing is "the perfect recipe for addiction" due to its encouragement of psychological and physical withdrawal symptoms.[34]

70.     As recently as June 2017, the New England Journal of Medicine published an analysis finding that Purdue's introduction of OxyContin into the marketplace coincided with a significant increase in misleading dissemination of the claim that addiction to opioids is rare. Moreover, this analysis concluded that "[w]e believe that this citation pattern contributed to the North American opioid crisis by helping to shape a narrative that allayed prescribers' concerns about the risk of addiction associated with long-term opioid therapy."[35]

---

[32] Letter from Janet Woodcock, M.D., Dir. of Food and Drug Admin., Center for Drug Evaluation and Research, to Andrew Kolodny, M.D. Responding to Petition Submitted by Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), http://www.supportprop.org/wp-content/uploads/2014/12/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

[33] Caleb J. Banta-Green et al., *Opioid Use Behaviors, Mental Health and Pain—Development of a Typology of Chronic Pain Patients*, 104 Drug and Alcohol Dependence 34 (Sept. 2009), http://dx.doi.org/10.1016/j.drugalcdep.2009.03.021; Joseph A. Boscarino et al., *Risk Factors for Drug Dependence Among Out-Patients on Opioid Therapy in a Large US Health-Care System*, 105 Addiction 1776 (Oct. 2010), http://dx.doi.org/10.1111/j.1360-0443.2010.03052.x; Jette Højsted et al., *Classification and Identification of Opioid Addiction in Chronic Pain Patients*, 14 European J. of Pain 1014 (Nov. 2010), http://dx.doi.org/10.1016/j.ejpain.2010.04.006.

[34] Harriet Ryan et al., '*You Want a Description of Hell?' OxyContin's 12-Hour Problem*, L.A. Times, May 5, 2016, http://www.latimes.com/projects/oxycontin-part1/.

[35] Pamela T. M. Leung et al., *A 1980 Letter on the Risk of Opioid Addiction*, 376 New England J. of Med. 2194 (June 1, 2017), http://www.dx.doi.org/10.1056/NEJMc1700150.

## 2. Manufacturer Defendants Misleadingly Claimed that Patients Who Were Showing Signs of Addiction Were Not Actually Addicted

71.     Manufacturer Defendants also made false statements that individuals showing signs of prescription opioid addiction might instead have untreated pain requiring additional opioids—a baseless theory labeled "pseudoaddiction."

72.     Purdue published a physician education pamphlet in 2011 suggesting that drug-seeking behavior could be a sign of "pseudoaddiction," which was described as "[drug-seeking behaviors] in patients who have pain that has not been effectively treated."  Purdue used the term "pseudoaddiction" in numerous other marketing materials, including one entitled "Responsible Opioid Prescribing – A Physician's Guide."[36]  Endo also published materials promoting "pseudoaddiction."

73.     However, there is no scientific support for the concept of "pseudoaddiction," a term coined by Dr. J. David Haddox, the Vice President of Health Policy for Purdue.[37]  In fact, Endo's Vice President for Pharmacovigilance and Risk Management recently testified that he was not aware of any research validating the "'pseudoaddiction' concept."[38]

74.     The 2016 CDC Guideline rejects the notion of pseudoaddiction.  Instead of recommending that prescription opioid dosages be increased if patients do not obtain relief, the Guideline states that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer term use"[39] and that doctors

---

[36] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (2007).

[37] Marion S. Greene & R. Andrew Chambers, *Pseudoaddiction: Fact or fiction? An Investigation of the Medical Literature*, 2 Current Addiction Reports 310 (Oct. 1, 2015), http://dx.doi.org/10.1007/s40429-015-0074-7.

[38] Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 7, *In re Endo Health Solutions Inc.*, No. 15-228 (Attorney General of the State of N.Y. 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.

[39] Deborah Dowell, Tamara Haegerich, & Roger Chou, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity and Mortality Weekly Report 1, 13 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

should "reassess[] pain and function within 1 month" so as to "minimize risks of long-term opioid use . . . ."[40]

### 3. Manufacturer Defendants Falsely Claimed There Was No Risk in Increasing Opioid Dosages to Treat Chronic Pain

75.    Manufacturer Defendants also falsely claimed that doctors and patients could increase prescription opioid dosages indefinitely without added risk.

76.    Guidelines edited and sponsored by Purdue and Endo and put out by Front Groups[41]—namely "Treatment Options: A Guide for People Living with Pain" (2006) and "A Policymaker's Guide to Understanding Pain & Its Management" (2011)—claim that:  (a) some patients "need" a larger opioid dosage, regardless of the dose prescribed; (b) opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain; and (c) dosage escalations, even unlimited ones, are "sometimes necessary."[42]

77.    As recently as June 2015, Purdue's "In the Face of Pain" website was promoting the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of prescription opioids, the patient should find another doctor who will.  Also in 2015, Purdue presented a paper on the Problems of Drug Dependence, challenging the correlation between prescription opioid dosage and overdose.[43]  And in 2016, Purdue's Dr. Haddox falsely

---

[40] *Id.* at 25.

[41] Am. Pain Found., *2010 Annual Report* (Dec. 20, 2011), https://www.archive.org/details/277604-apf-2010-annual-report.

[42] Am. Pain Found., *Treatment Options: A Guide for People Living with Pain* (2006), https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf; Am. Pain Found., *A Policymaker's Guide to Understanding Pain & Its Management* (Oct. 2011), http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[43] A. DeVeaugh-Geiss et al., *Is Opioid Dose a Strong Predictor of the Risk of Opioid Overdose?: Important Confounding Factors That Change the Dose-Overdose Relationship*, CPDD 76th Annual Scientific Meeting Program (June 2014), http://cpdd.org/wp-content/uploads/2016/07/2014CPDDprogrambook.pdf.

claimed that evidence does not show that Purdue's opioids are being abused in large numbers.[44]

Dr. Haddox's false statements on behalf of Purdue are an example of active concealment of

Purdue's wrongdoing with respect to causing the opioid epidemic.

78.     Endo distributed a pamphlet in 2004, "Understanding Your Pain: Taking Oral

Opioid Analgesics," which stated that patients "won't 'run out' of pain relief" so long as they

increase dosages.[45]  Endo also sponsored a website from 2004 to 2007, painknowledge.com,

which claimed that prescription opioid dosages may be increased until "you are on the right dose

of medication for your pain."

79.     Manufacturer Defendants made these statements despite strong contrary scientific

evidence.  The FDA has stated that the available data "suggest a relationship between increasing

opioid dosages and risk of certain adverse events."[46]  The CDC has stated that there is "an

established body of scientific evidence showing that overdose risk is increased at higher opioid

dosages," and has specifically recommended that doctors "avoid increasing doses" above

90 morphine milligram equivalents ("MME") per day. [47]

80.     Nonetheless, Manufacturer Defendants misrepresented the effects of escalating

dosages to further their relentless pursuit of corporate profit.  The ability to escalate dosages was

critical to Manufacturer Defendants' efforts to market prescription opioids for chronic pain

---

[44] Harrison Jacobs, *There is a Big Problem with the Government's Plan to Stop the Drug-Overdose Epidemic*, Business Insider, Mar. 14, 2016, http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3.

[45] Endo Pharmaceuticals, *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004), https://perma.cc/QN86-62PK.

[46] Letter from Janet Woodcock, M.D., Dir. of Food and Drug Admin., Ctr. for Drug Evaluation and Research, to Andrew Kolodny, M.D. Responding to Petition Submitted by Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), http://www.supportprop.org/wp-content/uploads/2014/12/FDA_CDER_Response_to_Physicians_for_Responsible_Opioid_Prescribing_Partial_Petition_Approval_and_Denial.pdf.

[47] Deborah Dowell, Tamara Haegerich, & Roger Chou, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity and Mortality Weekly Report 1 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

treatment because doctors would otherwise abandon treatment when patients built up tolerance and no longer obtained pain relief.  And for at least some products, escalation of dosage was key: of the seven available OxyContin tablet strengths, the three strongest—40 milligrams (120 MME), 60 milligrams (180 MME), and 80 milligrams (240 MME)—all exceed the CDC limit when taken twice per day as directed.  The Manufacturer Defendants' misrepresentations were made not only to keep the wrongfully created opioid epidemic going, but also to conceal the Manufacturer Defendants' wrongdoing in causing it by affirmatively concealing that the observable adverse outcomes of the epidemic were caused by the Manufacturer Defendants' previous false and misleading marketing and representations, discussed above.  In other words, as they no doubt became aware of the overwhelming evidence that their marketing had irresponsibly caused the opioid epidemic, the Manufacturer Defendants denied the link, both concealing and worsening their wrongful conduct and its adverse effects.

**B.**     **Manufacturer Defendants' Misleading Statements Were Designed for Maximum Effect and Targeted to Specific Audiences**

81.     Manufacturer Defendants disseminated these misstatements to doctors through a wide array of sources, each designed to maximize impact and targeted to a specific receptive audience.

82.     Manufacturer Defendants often delivered their misstatements through KOLs— doctors in the field of pain management who were heavily funded by Manufacturer Defendants. Manufacturer Defendants frequently used KOLs to deliver their message because they knew that doctors often place great confidence in seemingly independent peers.  By asserting that the KOLs were independent physicians, the Manufacturer Defendants and KOLs concealed that the KOLs were acting under the practical control of, and/or for the benefit of, the Manufacturer Defendants and the creation of an increased market for opioids that would yield higher revenue

and profits.  Drs. Russell Portenoy, Lynn Webster, Perry Fine, and Scott Fishman all served as KOLs.

83.     The most prominent KOL was Dr. Russell Portenoy, who held himself out as an unbiased expert on opioids but received substantial funding from Manufacturer Defendants. Dr. Portenoy gave, in his words, "innumerable" lectures and media appearances promoting opioids.[48]  During these appearances, he routinely downplayed the dangers of opioids.  In 2010, he said on Good Morning America that "[a]ddiction, when treating pain, is distinctly uncommon" and that "most doctors can feel very assured that that person is not going to become addicted."  He also regularly repeated—including in a 1986 paper published in the journal of the American Pain Society, a 1996 paper written on behalf of the American Pain Society and the American Academy of Pain, and numerous lectures—the unsubstantiated claim that the addiction risk posed by opioids was lower than one percent.[49]  Dr. Portenoy later conceded that some of his statements were misleading.  In December 2012, he was quoted as saying, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did."[50]

84.     Between 2001 and 2010, Purdue's "In the Face of Pain" website similarly presented statements of Dr. Portenoy and other KOLs who were portrayed as independent experts.  The website did not disclose that Purdue had paid many of these KOLs for other work,

---

[48] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal, Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

[49] Russell Portenoy & K. Foley, *Chronic Use of Opioid Analgesics in Non-Malignant Pain: Report of 38 Cases*, 25 Pain 171 (May 1986), https://www.ncbi.nlm.nih.gov/pubmed/2873550; Russell Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain: A Review of the Critical Issues*, 11 J. of Pain and Symptom Mgmt. 203 (Apr. 1996), http://dx.doi.org/10.1016/0885-3924(95)00187-5; Russell Portenoy, *Opioid Therapy for Chronic Nonmalignant Pain*, 1 Pain Research and Mgmt. 17 (1996), http://downloads.hindawi.com/journals/prm/1996/409012.pdf.

[50] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, The Wall Street Journal, Dec. 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.

and did not identify Purdue's involvement beyond a small copyright notice at the bottom of the website.[51]  These activities were calculated not only to make the messages most effective, but also to conceal that the growing opioid epidemic was the Manufacturer Defendants' wrongful creation.

85.     Manufacturer Defendants also often disseminated their misstatements through Front Groups that presented themselves as independent patient advocacy organizations, but whose content and funding came largely from Manufacturer Defendants.  These Front Groups included the American Pain Foundation, the American Pain Society, and the American Academy of Pain Medicine.  Much like the KOLs, these Front Groups allowed Manufacturer Defendants to present their misstatements as if they came from unbiased experts.  The active concealment of the close relationship between the Manufacturer Defendants and the Front Groups and KOLs not only made their misleading messages more effective, but also served to conceal the wrongdoing of the Manufacturer Defendants.  The Front Groups, KOLs, and Manufacturer Defendants all affirmatively and falsely held out the Front Groups and KOLs as independent sources of objective information, concealing their practical control by and/or coordinated action for the benefit of the Manufacturer Defendants.

86.     These Front Groups published many of the misleading "guidelines" described above, based on content and funding provided by Manufacturer Defendants, including:  (1) "Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain"

---

[51] Advocacy Voices, In the Face of Pain (archived Nov. 7, 2010),
https://web.archive.org/web/20101107090355/http://www.inthefaceofpain.com:80/search.aspx?cat=4#7.

(2009);[52] (2) "A Policymaker's Guide to Understanding Pain & Its Management" (2011);[53] and (3) "Treatment Options: A Guide for People Living with Pain" (2006).[54] In 2007, the American Pain Society repeated Manufacturer Defendants' misstatements that addiction was a "rare problem" for patients using opioids for chronic pain and that there was "no causal effect . . . between the marketing of [a particular opioid] and the abuse and diversion of the drug."[55]

87.     Manufacturer Defendants also conducted conferences, training sessions, and educational programs for doctors, often with all expenses paid at resort destinations. These events were useful to Manufacturer Defendants because studies show that such events influence the attending practitioners' prescribing habits and views towards a drug.[56]

88.     From 1996 to 2001, Purdue conducted over 40 pain management and speaker training sessions at resorts to recruit and train physicians, nurses, and pharmacists as speakers on its behalf.[57] Purdue trained over 5,000 people at these all-expenses-paid events.[58] The DEA has

---

[52] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 The J. of Pain 113 (Feb. 2009), http://dx.doi.org/10.1016/j.jpain.2008.10.008.

[53] Am. Pain Found., *A Policymaker's Guide to Understanding Pain & Its Management* (Oct. 2011), http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf.

[54] Am. Pain Found., *Treatment Options: A Guide for People Living with Pain* (2006), https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf.

[55] *Evaluating the Propriety and Adequacy of the OxyContin Criminal Settlement: Hearing Before the S. Comm. on Judiciary*, 110th Cong. 1 (2007) (Statement of James Campbell, M.D.).

[56] Ray Moynihan, *Doctors' Education: The Invisible Influence of Drug Company Sponsorship*, 336 The BMJ 416 (Feb. 21, 2008), http://dx.doi.org/10.1136/bmj.39496.430336.DB; A.C. Anand, *Professional Conferences, Unprofessional Conduct*, 67 Medical J. Armed Forces India 2 (Jan. 2011), http://dx.doi.org/10.1016/S0377-1237(11)80002-X; David McFadden et al., *The Devil Is in the Details: The Pharmaceutical Industry's Use of Gifts to Physicians as Marketing Strategy*, 140 J. of Surgical Research 1 (2007), http://dx.doi.org/10.1016/j.jss.2006.10.010.

[57] U.S. Gov't Accountability Office, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (Dec. 2003), https://www.gpo.gov/fdsys/pkg/GAOREPORTS-GAO-04-110/content-detail.html.

[58] *Id.*

estimated that Purdue funded over 20,000 opioid pain-related programs between 1996 and July 2002 through direct sponsorship or financial grants.[59]

89.     Manufacturer Defendants also used direct salesmen to market opioids.  These salesmen often received the majority of their compensation based on individual sales figures, ensuring that they were strongly motivated to present their audiences with misleading information minimizing the risks of opioids.[60]

90.     In addition, Manufacturer Defendants targeted marketing to doctors who would be most receptive to the misstatements.

91.     Manufacturer Defendants specifically targeted their marketing to primary care physicians, who are generally less aware of the medical literature regarding the dangers of treating chronic pain with prescription opioids.  One longtime Purdue collaborator speaking to an FDA advisory panel on January 30, 2002 acknowledged that "[g]eneralists are adopting [opioid] therapy without adequate knowledge of pain management principles."[61]  Manufacturer Defendants also targeted susceptible patients like veterans and the elderly.

92.     Manufacturer Defendants developed methods to target doctors who were already prescribing higher-than-average numbers of opioids.  Purdue created a database to identify doctors with large numbers of chronic pain patients (which also showed which doctors most frequently prescribed opioids).  This database gave Purdue extensive knowledge of where and how its drugs were being used, including in Arizona, New Mexico, and Utah, and has allowed Purdue to target doctors already susceptible to its message.[62]

---

[59] *Id.*
[60] *Id.*
[61] Food and Drug Admin., Anesthetic and Life Support Drugs Advisory Comm., Tr. of Meeting (Jan. 30, 2002), https://www.fda.gov/ohrms/dockets/ac/02/transcripts/3820t1.pdf.
[62] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, 99 Am. J. of Public Health 221, 222 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

### C. Manufacturer Defendants Knew or Should Have Known That Their Statements Were Misleading

93.     The problems caused by the deceptive, unfair, and false marketing of prescription opioids were specifically known by Manufacturer Defendants.  Manufacturer Defendants knew their statements were misleading not only because they knew their statements were contrary to established fact, but also because they were fined and otherwise sanctioned by various government entities for misleading marketing.

94.     In 2007, Purdue settled federal allegations that it had introduced misbranded drugs into interstate commerce.  Purdue paid over $700 million and three of its former executive officers pleaded guilty to federal crimes.[63]  Purdue acknowledged that "some employees made, or told other employees to make, certain statements about OxyContin to some healthcare professionals that were inconsistent with the FDA-approved prescribing information for OxyContin and the express warning it contained about risks associated with the medicine."[64]

95.     In August 2015, New York State settled claims against Purdue related to its marketing and sales practices.  The settlement required Purdue to ensure that its sales representatives flag doctors and other professionals who were improperly prescribing and/or diverting opioids, stop calling and/or marketing to doctors on the company's "no-call list," and inform health care providers about FDA-approved training programs regarding the appropriate prescription of opioids.  The agreement also required Purdue to stop representing that its website

---

[63] Plea Agreement at 4, *United States v. The Purdue Frederick Co.*, No. 1:07-cr-00029-JPJ (W.D. Va. May 10, 2017).
[64] Shannon Henson, *Purdue, Employees to Pay $700M in OxyContin Case*, LAW360, (May 10, 2007, 12:00 AM), https://www.law360.com/illinois/articles/24509/purdue-employees-to-pay-700m-in-oxycontin-case.

"www.inthefaceofpain.com" was neutral or unbiased, and to disclose the financial relationship Purdue's purportedly neutral experts have with Purdue.[65]

96.     In August 2017, Purdue settled, for over $20 million, claims by numerous Canadian plaintiffs that the company failed to warn about the dangers of OxyContin, including its addictive properties.[66]

97.     In 2016, Endo settled claims with New York and agreed to halt misleading advertisements in New York about the safety of prescription opioids.  The State found that opioid use disorders "appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[67]  Endo had claimed on its website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but New York found that Endo had no evidence for that statement.[68]  Consistent with this finding, Endo agreed not to make statements in New York that opioids "generally are non-addictive" or "that most patients who take opioids do not become addicted."[69]

98.     Manufacturer Defendants have also represented to the public that they are taking steps to curb the opioid epidemic, rather than creating it.

---

[65] Press Release, N.Y. State Office of the Attorney General, A.G. Schneiderman Announces Settlement with Purdue Pharma That Ensures Responsible and Transparent Marketing of Prescription Opioid Drugs by the Manufacturer (August 20, 2015), https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent.
[66] *See* Will Davidson LLP, *Purdue Pharma Agrees to OxyContin Settlement, but Is it Fair?*, Lexology (Aug. 22, 2017), https://www.lexology.com/library/detail.aspx?g=d53ee1ee-44cb-4ef5-b916-e570a385b568.
[67] Assurance of Discontinuance Under Executive Law Section 63, Subdivision 15 at 7, *In re Endo Health Solutions Inc.*, No. 15-228 (Attorney General of the State of N.Y. 2016), https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf.
[68] *Id.*
[69] *Id.*

a.  As recently as November 2017, Purdue stated on its website that ". . . too often these medications [opioids] are diverted, misused, and abused.  Teenagers, in particular, are vulnerable to prescription drug abuse, which has become a national epidemic."[70]  In response to the misuse of prescription opioids, Purdue said that "Corporations have a responsibility to address this issue, and Purdue has dedicated vast resources for helping to prevent drug abuse . . . ."[71]

b.  Purdue also stated in November 2017 that it is "committed to being part of the solution to prescription drug abuse" and that it "offers an array of programs focused on education, prevention, and deterrence, and through partnerships with (1) healthcare professionals, (2) families and communities, and (3) law enforcement and government" to combat the "widespread abuse of opioid prescription pain medications [that] can lead to tragic consequences, including addiction, overdose, and death."[72]

c.  Also in November 2017, Purdue discussed the opioid epidemic and its response to it, stating that "The nation is experiencing a public health crisis involving licit and illicit opioids.  Purdue endorses the following policies that support a comprehensive approach to reducing addiction, abuse, diversion, and overdose related to opioids."[73]  Those policies include limiting the duration of one's first opioid prescription; use of prescription drug monitoring programs; requiring demonstrated competence for opioid prescribing; and expanding the use of naloxone, an opioid reversal agent.

99.  However, these representations are untrue.  For example, despite its public statements of corporate responsibility, and its "constructive role in the fight against opioid abuse" and "strong record of coordination with law enforcement, Purdue has failed to report to authorities illicit or suspicious prescribing of its opioids."[74]  This concealment while making representations to the contrary (and also under a duty to disclose), not only served as a cause of

---

[70] Purdue Pharma, *Combating Opioid Abuse*, http://www.purduepharma.com/healthcare-professionals/responsible-use-of-opioids/combating-opioid-abuse/ (last visited Mar. 27, 2018).

[71] *Id.*

[72] Purdue Pharma, *Responsible Use of Opioids*, http://www.purduepharma.com/patients-caregivers/responsible-use-of-opioids/ (last visited Mar. 27, 2018).

[73] Purdue Pharma, *Public Policies to Address the Opioid Crisis*, http://www.purduepharma.com/about/purdue-pharma-public-policy/ (last visited Mar. 27, 2018).

[74] *See* Press Release, Purdue Pharma L.P., Setting the Record Straight on OxyContin's FDA-Approved Label (May 5, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-oxycontins-fda-approved-label/; Press Release, Purdue Pharma L.P., Setting the Record Straight on Our Anti-Diversion Programs (July 11, 2016), http://www.purduepharma.com/news-media/get-the-facts/setting-the-record-straight-on-our-anti-diversion-programs/.

the continuation of the opioid epidemic, but also to affirmatively conceal the Manufacturer Defendants' wrongdoing in causing the epidemic in the first place.

100.    In 2012, Endo took the remarkable step of asserting that the FDA should block generic versions of Endo's Opana ER because the drug was dangerously susceptible to abuse and misuse.[75]  Endo made no such assertions before it faced financial competition regarding the drug.

101.    Additionally, since at least 2002, Purdue has maintained a database of healthcare providers suspected of inappropriately prescribing OxyContin or other opioids.  According to Purdue, physicians could be added to this database based on observed indicators of illicit prescribing, such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing volume.  Purdue has said publicly that "[o]ur procedures help ensure that whenever we observe potential abuse or diversion activity, we discontinue our company's interaction with the prescriber or pharmacist and initiate an investigation."[76]

102.    Yet, according to a 2016 investigation by the Los Angeles Times, Purdue failed to cut off these providers' prescription opioid supply at the pharmacy level and failed to report these providers to state medical boards or law enforcement—meaning Purdue continued to generate sales revenue from their prescriptions.[77]

103.    This investigation also found that for over a decade, Purdue "collected extensive evidence suggesting illegal trafficking of OxyContin" but consistently failed to report suspicious dispensing or stop supplies to pharmacies.[78]  Despite knowing of illicit prescribing, Purdue did

---

[75] *See* David Heath, *Drugmaker Set to Profit from an Opioid it Said Was Unsafe*, CNN, Oct. 30, 2017, http://www.cnn.com/2017/10/30/health/opana-endo-opioid-profit/index.html.
[76] *Id.*
[77] *See* Harriet Ryan et al., *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, L.A. Times, July 10, 2016, http://www.latimes.com/projects/la-me-oxycontin-part2/.
[78] *Id.*

not report its suspicions until years after law enforcement shut down a Los Angeles clinic that Purdue's district manager described internally as "an organized drug ring" and that had prescribed over 1.1 million OxyContin tablets.[79]  Again, this concealment of the truth, while making representations to the contrary (and also under a duty to disclose), not only served as a cause of the continuation of the opioid epidemic, but also to affirmatively conceal the Manufacturer Defendants' wrongdoing in causing the epidemic in the first place.

### D.    Manufacturer Defendants' Conduct Violated Their Duties

104.    Manufacturer Defendants have continued to promote, directly and indirectly, deceptive marketing messages that misrepresent, and fail to include material facts about, the dangers of prescription opioid usage, despite actual or constructive knowledge that the prescription opioids were ultimately being consumed for unsafe and non-medical purposes.

105.    Manufacturer Defendants have negligently or recklessly failed to control adequately the content and distribution of marketing materials and sales efforts regarding prescription opioids.  A reasonably prudent manufacturer of opioids would have anticipated the dangers of widely advertising and distributing dangerous opioid products, and protected against it.  A reasonably prudent manufacturer could have:  (a) ensured physicians were judicious in considering when to prescribe opioids; (b) used due care in wording its marketing materials to ensure the risks of opioids were clearly communicated; (c) conducted and publicized scientific studies testing the risks of opioid products; (d) taken greater care in hiring, training, and supervising employees responsible for marketing and selling opioid products; (e) investigated demographic or epidemiological data concerning the increasing demand for narcotic painkillers and the linkage of that demand with Manufacturer Defendants' marketing efforts; and

---

[79] *Id.*

(f) followed applicable statutes, regulations, professional standards, and guidance, as Manufacturer Defendants agreed to do when settling prior actions against them.

106.    Manufacturer Defendants failed to take any of these steps to prevent their misrepresentations and omissions from contributing to the opioid epidemic.

## IV. DISTRIBUTOR DEFENDANTS AND PHARMACY DEFENDANTS HAVE KNOWINGLY VIOLATED LEGAL DUTIES TO PREVENT OPIOID DIVERSION

107.    Each of the Distributor Defendants and Pharmacy Defendants has a common law duty to exercise reasonable care under the circumstances.  In addition, each of the Distributor Defendants and Pharmacy Defendants assumes a duty, when it speaks publicly about prescription opioids, to speak accurately.

108.    Moreover, applicable state and Federal laws and regulations impose duties on Distributor Defendants and Pharmacy Defendants, and create a standard of conduct to which they must adhere.

109.    These statutes and regulations were designed to prevent drug diversion (which, as discussed above, occurs whenever the supply chain of prescription opioids is broken and the drugs are transferred from a legitimate channel to an illegitimate one) by creating a legal framework for distributing and dispensing controlled substances and monitoring and controlling them from manufacture through delivery to the patient.  These statutes and regulations include the FCSA, 21 U.S.C. §§ 801 *et seq.*, state controlled substances acts, laws regarding branding of drugs, and regulations related to persons who handle, prescribe, and dispense controlled substances.  These statutes and regulations impose strict controls throughout the prescription opioid distribution chain.

110.    The Navajo Nation is not asserting a cause of action under these laws.  But just as a driver's violation of a speed limit can demonstrate that he acted negligently, so, too, Distributor

Defendants' and Pharmacy Defendants' violations of applicable Federal and state laws and regulations show that they failed to meet the relevant standard of care.

**A.     Federal Law Sets a Standard of Care That Distributor Defendants and Pharmacy Defendants Must Follow**

**1.     Distributor Defendants' Standard Of Care Under Federal Law**

111.    The FCSA sets the standard of conduct to which Distributor Defendants must adhere.  The FCSA requires all prescription opioid distributors to maintain effective controls against prescription opioid diversion and to employ a system to identify and report to law enforcement suspicious orders of controlled substances.

112.    Distributor Defendants must (a) send transaction data to the DEA on each acquisition or reduction of inventory, as well as any lost or stolen inventory, and (b) maintain a complete and accurate record of each substance manufactured, sold, delivered, or otherwise disposed of.  21 U.S.C. § 827.

113.    Distributor Defendants must employ a system to inform the DEA of suspicious orders.  21 C.F.R. § 1301.74(b).

114.    The DEA's Automation of Reports and Consolidated Orders System ("ARCOS") accumulates data on distributors' controlled substances transactions, which are then summarized into reports used by the DEA to identify any diversion of controlled substances into illicit channels of distribution.  21 C.F.R. § 1304.33.  This includes Distributor Defendants' transactions.

**2.     Pharmacy Defendants' Standard of Care Under Federal Law**

115.    The FCSA requires pharmacists to review each controlled substance prescription and, prior to dispensing medication, make a professional determination that the prescription is effective and valid.

116.    Under the FCSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances."  *See* 21 C.F.R. § 1301.71(a).  In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* rests with the pharmacist who fills the prescription."  (Emphasis added.)

117.    Therefore, pharmacists must ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by an individual practitioner who is approved and registered with the DEA to write prescriptions for opioids acting in the usual course of his professional practice.

118.    The DEA has informed pharmacists that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription."[80]  Filling such a prescription is illegal.  As the DEA states, "The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin.  To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be [criminally] prosecuted."[81]

119.    Questionable or suspicious prescriptions include:  (a) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances than other practitioners in the area; (b) prescriptions that should last for a month in legitimate use, but are refilled more frequently; (c) simultaneous prescriptions for antagonistic

---

[80] Michele Leonhart et al., *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.
[81] *Id.*

36

drugs, such as depressants and stimulants; (d) prescriptions that look "too good" or where the prescriber's handwriting is too legible; (e) prescriptions with atypical quantities or dosages; (f) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (g) photocopied prescriptions; or (h) prescriptions containing different handwritings.  Most of the time, these questionable or suspicious attributes are not difficult to detect or recognize; they should be apparent to an adequately trained pharmacist.

120.    Pharmacists are also instructed to be suspicious of signs that a customer is seeking to divert prescription opioids, including customers who:  (a) appear to be returning too frequently; (b) are seeking to fill a prescription written for a different person; (c) appear at the pharmacy counter simultaneously, or within a short time, all bearing similar prescriptions from the same physician; (d) are not regular patrons or residents of the community, and present prescriptions from the same physician; (e) drive long distances to have prescriptions filled; (f) seek large volumes of controlled substances in the highest strength in each prescription; (g) seek a combination of other drugs with prescription opioids such as tranquilizers and muscle relaxers that can be used to create an "opioid cocktail"; and (h) pay large amounts of cash for their prescriptions rather than using insurance.  Ignoring these suspicious signs violates industry standards and DEA guidelines and is illegal under multiple laws.

121.    Other "red flags" that should alert a pharmacist to potential diversion include: (a) prescriptions that lack the technical requirements of a valid prescription, such as a verifiable DEA number and signature; (b) prescriptions written in excess of the amount needed for proper therapeutic purposes; (c) prescriptions obtained through disreputable or illegal web-based pharmacies; and (d) patients receiving multiple types of narcotic painkillers on the same day.

122.     Each prescriber of controlled substances is issued a number identification by the DEA and must sign each prescription.  Industry standards require pharmacists to contact the prescriber for verification or clarification whenever there is a question about any aspect of a prescription.  If a pharmacist believes the prescription is forged or altered, he or she should not fill it, but instead should call the local police.  If a pharmacist believes there is a pattern of prescription abuse, the local Board of Pharmacy and the DEA must be contacted.

**B.     Distributor Defendants Understood Their Duties and Violated Them Anyway**

**1.     Distributor Defendants Understood and Acknowledged Their Duties**

123.     In addition to Federal and state laws and regulations regarding controlled substances, Distributor Defendants received detailed, specific instructions for identifying and minimizing the risk of prescription opioid diversion.

124.     To combat prescription opioid diversion, the DEA has provided readily-available guidance to distributors on the requirements of suspicious order reporting, including Distributor Defendants.

125.     Since 2006, the DEA has briefed distributors regarding legal, regulatory, and due diligence responsibilities.  During these briefings, the DEA pointed out the red flags distributors, including Distributor Defendants, should look for to identify potential diversion.

126.     Since 2007, the DEA has hosted at least five conferences to provide registrants with updated information about diversion trends and regulatory changes that affect the drug supply chain and suspicious order reporting.[82]  All of the major distributors, including Distributor Defendants, attended at least one of these conferences.

---

[82] Drug Enf't Admin., *Distributor Conferences*, https://www.deadiversion.usdoj.gov/mtgs/distributor/index.html (last visited Jan. 22, 2019); Drug Enf't Admin., *Manufacturer Conferences*,

127.    On September 27, 2006, and December 27, 2007, the DEA's Office of Diversion Control sent letters to all registered distributors, including Distributor Defendants, providing guidance on suspicious order monitoring and the distributors' obligations to conduct due diligence on controlled substance customers to help prevent diversion.[83]

128.    The September 27, 2006 letter reminded distributors, including Distributor Defendants, of their legal obligation to use due diligence to avoid filling orders that might be diverted into the illicit market.  The letter explained that each distributor must exercise due care in confirming the legitimacy of all orders.  It also described circumstances that could indicate diversion, including orders of (a) excessive quantities of a limited variety of controlled substances while ordering few, if any, other drugs, or (b) the same controlled substance from multiple distributors.

129.    The December 27, 2007 letter reminded distributors, including Distributor Defendants, that suspicious orders must be reported when discovered and that monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting.  The letter also advised distributors (a) that they must independently analyze a suspicious order before sale to determine if the controlled substances would likely be diverted and (b) that filling a suspicious order and then completing the sale does not absolve the distributor from legal responsibility.

---

https://www.deadiversion.usdoj.gov/mtgs/man_imp_exp/index.html (last visited Jan. 22, 2019); Drug Enf't Admin., *National Conference on Pharmaceutical and Chemical Diversion*, https://www.deadiversion.usdoj.gov/mtgs/drug_chemical/index.html (last visited Jan. 22, 2019); Drug Enf't Admin., Pharmacy *Diversion Awareness Conferences*, https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/index.html (last visited Jan. 22, 2019).
[83] Masters Pharmaceuticals, Inc.; Decision and Order, 80 Fed. Reg. 55,418, 55,421 (Drug Enf't Admin. Sept. 15, 2015) (No. 13–39), 2015 WL 5320504.

130.     Distributor Defendants were on notice that their own industry group, the Healthcare Distribution Management Association, now known as Healthcare Distribution Alliance ("HDA"), published Industry Compliance Guidelines for reporting suspicious orders and preventing diversion.[84]

131.     These industry guidelines further explained that, by being "[a]t the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."[85]

132.     Finally, the Distributor Defendants have themselves recognized the magnitude of the problem and have made statements assuring the public they recognize their duty to curb the opioid epidemic.

133.     A Cardinal executive recently claimed that Cardinal uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[86]

134.     McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and is "deeply passionate about curbing the opioid epidemic in our country."[87]

135.     At the very least, these assurances about eliminating criminal activity from the supply chain and curbing the opioid epidemic created a duty for Distributor Defendants to act reasonably by following through on their assurances.  Further, these false representations

---

[84] Healthcare Distrib. Mgmt. Ass'n (HDMA), *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances*, filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. Mar. 7, 2012), Doc. No. 1362415 (App. B at 1).
[85] *Id.*
[86] Lenny Bernstein et al., *How Drugs Intended for Patients Ended up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, Wash. Post, Oct. 22, 2016, http://wapo.st/2vCRGLt.
[87] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, Dec. 22, 2016, http://wapo.st/2uR2FDy.

concealed from the public and the Nation the Distributor Defendants' and the Pharmacy

Defendants' wrongdoing that caused the opioid epidemic.

### 2. Distributor Defendants Have Been Subject to Prior Regulatory Actions for Failing to Prevent Diversion

136.    Despite knowing the risks of diversion and their broad assurances to regulators,

states, and the public, Distributor Defendants have recklessly or negligently allowed diversion.

Their misconduct has resulted in numerous civil fines and other penalties recovered by

government agencies—including actions by the DEA related to violations of the FCSA.

### a. Cardinal

137.    Cardinal has paid millions of dollars in multiple DEA and state actions relating to

its improper management and distribution of prescription opioids.

138.    In 2008, Cardinal paid a $34 million penalty to settle allegations about

prescription opioid diversion taking place at seven warehouses around the United States.[88]  These

allegations included failing to report to the DEA thousands of suspicious orders of hydrocodone

that Cardinal then distributed to pharmacies that filled illegitimate prescriptions originating from

rogue Internet pharmacy websites.

139.    In 2012, Cardinal reached another settlement with the DEA relating to systemic

prescription opioid diversion in its Florida distribution center.[89]  Cardinal's Florida center

received a two-year license suspension for supplying more than 12 million dosage units to only

four area pharmacies, nearly 50 times as much oxycodone as it shipped to the rest of Florida and

an increase of 241% in only two years.  The DEA found that Cardinal's own investigator warned

---

[88] Press Release, U.S. Attorney's Office Dist. of Colo., Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims That it Failed to Report Suspicious Sales of Widely-Abused Controlled Substances (Oct. 2, 2008), https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

[89] Press Release, Drug Enf't Admin., DEA Suspends for Two Years Pharmaceutical Wholesale Distributor's Ability to Sell Controlled Substances from Lakeland, Florida Facility (May 15, 2012), https://www.dea.gov/pubs/pressrel/pr051512.html.

Cardinal against selling opioids to these pharmacies but that Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacies.  Instead, Cardinal's opioid shipments to the pharmacies increased.

140.    In December 2016, Cardinal paid $44 million to settle charges that it had violated the law by failing to report suspicious orders in four states.[90]  The same Florida distribution center at the heart of the 2012 settlement was again implicated in this case.  The settlement also covered a Cardinal subsidiary, Kinray LLC, which did not report a single suspicious order regarding its shipments of oxycodone and hydrocodone to more than 20 New York-area pharmacy locations that placed unusually high orders of controlled substances at an unusually frequent rate.  Cardinal Health d/b/a Kinray LLC is a licensed wholesale drug distributor in Arizona, New Mexico, and Utah, and, on information and belief, distributes opioids in those States, and within or near the Navajo Nation.

141.    In January 2017, Cardinal paid $20 million to settle allegations by West Virginia that Cardinal had shipped increasing amounts of opioids to numerous counties without utilizing proper controls, in essence benefitting from West Virginia's problem with prescription opioid abuse.[91]

### b.    McKesson

142.    McKesson has agreed to pay over $163 million to resolve government charges regarding diversion.

---

[90] Press Release, U.S. Attorney's Office Dist. of Md., Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act (Dec. 23, 2016), https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act.
[91] Eric Eyre, *2 Drug Distributors to Pay $36M to Settle WV Painkiller Lawsuits*, Charleston Gazette-Mail, Jan. 9, 2017, http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

143.    In May 2008, McKesson paid $13.25 million to settle claims by the DEA that it had failed to maintain effective controls against diversion.[92]  McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies, resulting in millions of doses of controlled substances being diverted.

144.    Following the 2008 settlement, McKesson was supposed to change its ways and fix its flawed processes to prevent prescription opioid diversion.  But it did not do so.  It was later revealed that McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that, in a five-year period, it filled more than 1.6 million orders but reported just 16 orders as suspicious (all from a single consumer).  In fact, in 2013, inspections of some of McKesson's distribution facilities found that the company did not even fully "implement or adhere to its own" compliance program.[93]  In early 2017, it was reported that McKesson had agreed to pay $150 million to the Federal Government to settle certain prescription opioid diversion claims that it allowed drug diversion at 12 distribution centers in 11 states.[94]

### c.    AmerisourceBergen

145.    AmerisourceBergen has paid $16 million in settlements and had certain licenses revoked as a result of allegations related to prescription opioid diversion.

---

[92] Press Release, U.S. Attorney's Office Dist. of Colo., McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims That it Failed to Report Suspicious Sales of Prescription Medications (May 2, 2008), https://www.justice.gov/archive/usao/co/news/2008/May08/5_2b_08.html.

[93] Anders Melin and Jef Feeley, *McKesson Records Show Failed Opioid Oversight, Lawsuit Says*, Bloomberg, Dec. 8, 2017 1:34 PM https://www.bloomberg.com/news/articles/2017-12-08/mckesson-investor-claims-board-failed-oversight-duty-on-opioids.

[94] Press Release, U.S. Dep't of Justice, McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

146.     In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies.[95]  Again in 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.[96]

147.     In January 2017, AmerisourceBergen paid the State of West Virginia $16 million to settle allegations that it knowingly shipped increasing amounts of prescription opioids without sufficient monitoring or control, facilitating six-fold increases in prescription opioid consumption in some counties.[97]  AmerisourceBergen was part of a drug supply chain that included doctors who wrote prescriptions for non-medical purposes and "pill mill" pharmacies that dispensed excessive numbers of painkillers.  In addition to the monetary settlement, AmerisourceBergen agreed to adhere to stricter reporting guidelines within West Virginia.

### 3.     Distributor Defendants Continued to Violate Their Duties

148.     Despite being penalized by law enforcement authorities, Distributor Defendants Cardinal, McKesson, and AmerisourceBergen have not changed their conduct.  Rather, they have treated fines as a cost of doing business in an industry that generates billions of dollars in revenue.

149.     All of the Distributor Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing prescription opioids.  That pattern and practice has also affected the Navajo Nation and its citizens.

---

[95] Press Release, AmerisourceBergen, AmerisourceBergen Signs Agreement with DEA Leading to Reinstatement of Its Orlando Distribution Center's Suspended License to Distribute Controlled Substances (June 22, 2007), http://investor.amerisourcebergen.com/news-releases/news-release-details/amerisourcebergen-signs-agreement-dea-leading-reinstatement-its.
[96] Jeff Overley, *AmerisourceBergen Subpoenaed by DEA over Drug Diversion*, LAW360 (Aug. 9, 2012, 4:28 PM), https://www.law360.com/articles/368498/amerisourcebergen-subpoenaed-by-dea-over-drug-diversion.
[97] Eric Eyre, *2 Drug Distributors to Pay $36M to Settle WV Painkiller Lawsuits*, Charleston Gazette-Mail, Jan. 9, 2017, http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.

150.     In fact, Distributor Defendants have supplied and continue to supply quantities of prescription opioids on and near the Navajo Nation with the actual or constructive knowledge that the opioids were ultimately being consumed by Navajo Nation citizens for non-medical purposes.  Many of these shipments should have been stopped or investigated as suspicious orders, but Distributor Defendants negligently or recklessly failed to do so.

151.     Each Distributor Defendant knew, or should have known, that the amount of prescription opioids that it allowed to flow into the Navajo Nation was far in excess of what could be consumed for medically necessary purposes in the relevant communities (especially given that each Distributor Defendant knew it was not the only prescription opioid distributor servicing those communities).

152.     Distributor Defendants negligently or recklessly failed to control their supply lines to prevent diversion.  A reasonably prudent distributor of controlled substances would have anticipated the danger of prescription opioid diversion and protected against it by, for example: (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly abused prescription opioids in amounts much greater than appropriate, given the size of the local populations; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers on and near the Navajo Nation; (e) informing pharmacies and retailers about prescription opioid diversion; and (f) in general, following applicable statutes, regulations, professional standards, and guidance from government agencies.  Distributor Defendants were under a duty to speak with respect to their fulfilling of suspicious orders, and yet concealed their wrongdoing from the DEA, the public, and the Nation.

153.    On information and belief, Distributor Defendants made little to no effort to visit the pharmacies servicing the Navajo Nation to perform due diligence inspections to ensure that the controlled substances Distributor Defendants had furnished were not being diverted to illegal uses.

154.    On information and belief, the compensation Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing Navajo Nation citizens, thus improperly creating incentives that contributed to and exacerbated prescription opioid diversion and the resulting opioid abuse.

**C.    Pharmacy Defendants Understood Their Duties and Violated Them Anyway**

**1.    Pharmacy Defendants Understood and Acknowledged Their Duties**

155.    Pharmacy Defendants similarly had industry-specific knowledge of the particular risks and harms from filling prescriptions for non-medical purposes and the resulting widespread opioid abuse.

156.    The DEA[98] has provided extensive guidance to pharmacists concerning their duties to the public, as have state pharmacy boards,[99] and national industry associations.[100] The guidance teaches pharmacists how to identify red flags, which indicate that there may be a

---

[98] Michele Leonhart et al., *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act*, Drug Enf't Admin., Diversion Control Div. (Revised 2010), https://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/.
[99] Tex. State Bd. of Pharmacy, *Abuse & Misuse of Prescription Drugs* (last visited Mar. 27, 2018), https://www.pharmacy.texas.gov/SB144.asp; Fla. Bd. of Pharmacy, *DEA Guidelines to Prescription Fraud* (June 12, 2013), http://floridaspharmacy.gov/latest-news/dea-guidelines-to-prescription-fraud/; Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red Flags for Pharmacists and Pharmacy Technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8.
[100] Philip Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-Sys. Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

problem with the legitimacy of a prescription presented by a patient.[101]  The guidance also tells pharmacists how to resolve the red flags and what to do if the red flags are unresolvable.

157.    For instance, the industry guidance tells pharmacists how to recognize:  (a) stolen prescription pads; (b) prescription pads printed using a legitimate doctor's name, but with a different call back number that is answered by an accomplice of the drug-seeker; (c) prescriptions written using fictitious patient names and addresses; and (d) other red flags.[102]

158.    Pharmacy Defendants, through their words or actions set forth in news reports and other public documents, have acknowledged these risks and assured the public that issues affecting public health and safety are their highest priority.

159.    CVS has publicly acknowledged the massive scope and devastating effects of the opioid epidemic; "Prescription drug abuse has become a national epidemic in recent years.  The use of controlled substances has increased dramatically, with prescriptions for opioids jumping more than 300 percent between 1999 and 2010.  Overdose deaths increased from 4,000 annually to 16,600 during the same period.  In fact, such overdoses are now the second leading cause of accidental death in the U.S., and more than 2.4 million people were considered to be opioid abusers in 2010.  Increases in substance abuse treatment hospital admissions, emergency department visits, and overdose deaths linked to prescription drug abuse place a huge burden on communities across the U.S."[103]

---

[101] Va. Bd. of Pharmacy, *Prescription Drug Abuse: Red Flags for Pharmacists and Pharmacy Technicians* (Aug. 6, 2014), https://youtu.be/j5CkhirlZk8; Philip W. Brummond et al., *American Society of Health-Systems Pharmacists Guidelines on Preventing Diversion of Controlled Substances*, 74 Am. J. of Health-System Pharmacy e10 (Jan. 2017), http://www.ajhp.org/content/early/2016/12/22/ajhp160919.

[102] Fla. Bd. of Pharmacy, *DEA Guidelines to Prescription Fraud* (June 12, 2013), http://floridaspharmacy.gov/latest-news/dea-guidelines-to-prescription-fraud/; Mass. Bd. of Registration in Med., Policy 15-05, *Prescribing Practices Policy and Guidelines* (Oct. 8, 2015), http://www.mass.gov/eohhs/docs/borim/policies-guidelines/policy-15-05.pdf.

160.    In 2015, CVS publicly stated that, "the abuse of controlled substance pain medication is a nationwide epidemic that is exacting a devastating toll upon individuals, families and communities.  Pharmacists have a legal obligation under State and Federal law to determine whether a controlled substance was issued for a legitimate purpose and to decline to fill prescriptions they have reason to believe were issued for a non-legitimate purpose."[104]

161.    Similarly, in 2016, Walgreens issued a press release captioned "Walgreens Leads Fight Against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Deaths."[105]

162.    In 2017, Walmart acknowledged the need for a "solution to the [opioid] epidemic" and noted the epidemic has "devastated so many families and communities across America."[106]

163.    The Pharmacy Defendants' misrepresentations about their activities constituted concealment of their wrongdoing that caused the opioid epidemic.  Their failure to report suspicious orders constituted additional concealment.

### 2.    Prior Regulatory Actions Against Pharmacy Defendants for Failing to Prevent Diversion

164.    Despite knowing and even warning of these risks, Pharmacy Defendants recklessly or negligently permitted diversion to occur.  In failing to take adequate measures to prevent substantial opioid-related injuries to the Navajo Nation, Pharmacy Defendants have breached their duties under the "reasonable care" standard of New Mexico common law

---

[104] *Patients Profiled at Pharmacy Counters*, KTNV, Feb. 23, 2015, http://contact1846.rssing.com/chan-30860085/all_p11.html#item217.
[105] Press Release, Walgreens, Walgreens Leads Fight Against Prescription Drug Abuse with New Programs to Help Curb Misuse of Medications and the Rise in Overdose Deaths (Feb. 9, 2016), http://news.walgreens.com/press-releases/general-news/walgreens-leads-fight-against-prescription-drug-abuse-with-new-programs-to-help-curb-misuse-of-medications-and-the-rise-in-overdose-deaths.htm.
[106] Press Release, Walmart, Walmart Supports State of Emergency Declaration on Opioids (Oct. 26, 2017), https://news.walmart.com/2017/10/26/walmart-supports-state-of-emergency-declaration-on-opioids.

(including violating a voluntarily-undertaken duty to the public which they have assumed by their own words and actions), professional duties under the relevant standards of professional practice, and requirements established by New Mexico and Federal laws and regulations.

165.    Pharmacy Defendants were on notice of their ongoing negligence or reckless misconduct towards the Navajo Nation in part because of their history of being penalized for violating their duties in other jurisdictions.

### a.    CVS

166.    CVS has paid fines totaling over $40 million as the result of a series of investigations by the DEA and the United States Department of Justice ("DOJ").  It nonetheless treated these fines as the cost of doing business and has allowed its pharmacies to continue (a) dispensing prescription opioids in quantities significantly higher than any plausible medical need would require, and (b) violating their recordkeeping and dispensing obligations under the FCSA.

167.    As recently as February 2016, CVS paid $8 million to settle allegations by the DEA and the DOJ that its stores and pharmacists had been violating their duties under the FCSA and filling prescriptions with no legitimate medical purpose.[107]  CVS has resolved similar

---

[107] Press Release, Drug Enf't Admin., DEA Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (Feb. 12, 2016), https://www.dea.gov/divisions/wdo/2016/wdo021216.shtml.

allegations by settling with Florida ($22 million),[108] Oklahoma ($11 million),[109] Massachusetts

and New Hampshire ($3.5 million),[110] Texas ($1.9 million),[111] and Rhode Island ($450,000).[112]

168.     These cases included evidence that CVS filled prescriptions that were clearly

forged.  For example, in 2016, CVS settled with the United States to resolve allegations

stemming from two DEA investigations that revealed that over 50 CVS stores in Massachusetts

and New Hampshire had filled patently forged prescriptions for addictive painkillers more than

500 times between 2011 and 2014.[113]  The DEA estimated the street value of the diverted drugs

to be over $1 million.  One forger successfully filled 131 prescriptions for hydrocodone at eight

CVS stores.  One of those stores filled 29 prescriptions for the forger over the course of just six

months, an inordinate amount under the circumstances.  At a different store, the same individual

filled 28 prescriptions that she forged for herself and three other alleged patients, even though the

prescriptions were identical in every respect other than the patient name.  Additionally, 107 of

the forged prescriptions bore the Massachusetts address of a dentist who had closed her

Massachusetts practice and moved to Maine, something that should have been easily discovered

---

[108] Press Release, U.S. Attorney's Office Middle Dist. of Fla., United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (May 13, 2015), https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution.

[109] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

[110] Press Release, U.S. Attorney's Office Dist. of Mass., CVS to Pay $3.5 Million to Resolve Allegations That Pharmacists Filled Fake Prescriptions (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

[111] Patrick Danner, *H-E-B, CVS Fined over Prescriptions*, San Antonio Express-News, Sept. 5, 2014, http://www.expressnews.com/business/local/article/H-E-B-CVS-fined-over-prescriptions-5736554.php.

[112] Press Release, U.S. Attorney's Office Dist. of R.I., Drug Diversion Claims Against CVS Health Corp. Resolved with $450,000 Civil Settlement (Aug. 10, 2015), https://www.justice.gov/usao-ri/pr/drug-diversion-claims-against-cvs-health-corp-resolved-450000-civil-settlement.

[113] Press Release, U.S. Attorney's Office Dist. of Mass., CVS to Pay $3.5 Million to Resolve Allegations That Pharmacists Filled Fake Prescriptions (June 30, 2016), https://www.justice.gov/usao-ma/pr/cvs-pay-35-million-resolve-allegations-pharmacists-filled-fake-prescriptions.

by CVS pharmacists by checking the DEA website or calling the phone number on the prescriptions.

169.    CVS also has settled allegations by the DEA and DOJ that its stores and pharmacists had been violating their duty under the FCSA and filling prescriptions with no legitimate medical purpose.[114]  As part of the settlement, CVS acknowledged that from 2008 to 2012, some of its stores in Maryland dispensed controlled substances, including prescription opioids, in a manner that was not fully consistent with the FCSA and relevant regulations, including failing to comply with a pharmacist's responsibility to ensure that these prescriptions were issued for a legitimate medical purpose.  CVS paid $8 million to settle these claims.

170.    CVS also has settled allegations by the DOJ that some of its stores in Connecticut failed to maintain records in accordance with the FCSA.[115]  On over 6,000 occasions, CVS stores in Connecticut failed to keep appropriate records of prescriptions and purchase invoices.  CVS settled these allegations for $600,000.

171.    Dating back to 2006, CVS retail pharmacies in Oklahoma and elsewhere intentionally violated the FCSA by filling prescriptions signed by prescribers with invalid DEA registration numbers.[116]  To fill otherwise illegitimate prescriptions, CVS pharmacists substituted valid DEA registration numbers of non-prescribing practitioners, or substituted false DEA registration numbers in company computer systems, on paper prescriptions, and even in the

---

[114] Press Release, U.S. Attorney's Office Dist. of Md., United States Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances (Feb. 12, 2016), https://www.justice.gov/usao-md/pr/united-states-reaches-8-million-settlement-agreement-cvs-unlawfuldistribution-controlled.
[115] Press Release, U.S. Attorney's Office Dist. of Conn., CVS Pharmacy Pays $600,000 to Settle Controlled Substances Act Allegations (Oct. 20, 2016), https://www.justice.gov/usao-ct/pr/cvs-pharmacy-pays-600000-settle-controlled-substances-act-allegations.
[116] Press Release, U.S. Attorney's Office W. Dist. of Okla., CVS to Pay $11 Million to Settle Civil Penalty Claims Involving Violations of Controlled Substances Act (Apr. 3, 2013), https://www.justice.gov/usao-wdok/pr/cvs-pay-11-million-settle-civil-penalty-claims-involving-violations-controlled.

information that the pharmacy reported to the State of Oklahoma's Prescription Drug Monitoring Program.[117]

### b.    Walgreens

172.    Walgreens agreed to the largest settlement in DEA history—$80 million—to resolve allegations that it committed an unprecedented number of recordkeeping and dispensing violations of the FCSA, including negligently allowing controlled substances such as oxycodone and other prescription pain killers to be diverted for abuse and illegal black market sales.[118]  As part of the settlement, Walgreens agreed to enhance its training and compliance programs, and to cease compensating its pharmacists based on the volume of prescriptions filled.  The settlement resolved investigations into and allegations of FCSA violations in Florida, New York, Michigan, and Colorado that resulted in the diversion of millions of prescription opioids into illicit channels.

173.    Walgreens' Florida operations at issue in this settlement highlight its egregious conduct regarding diversion of prescription opioids.  Walgreens' Florida pharmacies each allegedly ordered more than one million dosage units of oxycodone in 2011—more than ten times the average amount.[119]  They increased their orders over time, in some cases as much as 600% in the span of just two years, including, for example, supplying a town of 3,000 residents with 285,800 orders of oxycodone in a one-month period.  Yet Walgreens' corporate officers not only turned a blind eye, but also facilitated the opioid boom in Florida by providing Walgreens' pharmacists with incentives through a bonus program that compensated them based on the

---

[117] *See* Complaint, *United States v. CVS Pharmacies*, No. 5:11-cv-1124-HE (W.D. Okla. Oct. 5, 2011).
[118] Press Release, U.S. Attorney's Office S. Dist. of Fla., Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act (June 11, 2013), https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled.
[119] Order to Show Cause and Immediate Suspension of Registration, *In the Matter of Walgreen Co.* (Drug Enf't Admin. Sept. 13, 2012).

number of prescriptions filled at the pharmacy.  In fact, corporate attorneys at Walgreens suggested, in reviewing the legitimacy of prescriptions coming from pain clinics, that "if these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance," underscoring Walgreens' attitude that profit outweighed compliance with the FCSA or the health of communities.[120]

174.    Walgreens has also settled with a number of state attorneys general, including West Virginia ($575,000)[121] and Massachusetts ($200,000).[122]  The Massachusetts Attorney General's Medicaid Fraud Division found that, from 2010 through most of 2015, multiple Walgreens stores across the state failed to monitor the prescription opioid use of some Medicaid patients who were considered high-risk.  Such patients are supposed to obtain all prescriptions from only one pharmacy, and that pharmacy is required to track the patient's pattern of prescription use.  Some of the state's 160 Walgreens accepted cash for controlled substances from patients in MassHealth (the state's combined program for Medicaid and Children's Health Insurance Program), rather than seeking approval from the agency.  In some cases, MassHealth had rejected the prescription; other times, MassHealth was never billed.  In response, Walgreens simply agreed to update its policies and procedures and train its staff to ensure that pharmacists properly monitor and do not accept cash payments from patients deemed high-risk.

---

[120] *Id.*

[121] Caleb Stewart, *Kroger, CVS, and Walgreens Settle Lawsuit with West Virginia for $3 Million*, WHSV, Aug. 16, 2016, http://www.whsv.com/content/news/Kroger-CVS-and-Walgreens-settle-lawsuit-with-West-Virginia-for-3-million-390332992.html.

[122] Felice J. Freyer, *Walgreens to Pay $200,000 Settlement for Lapses with Opioids*, Bos. Globe, Jan. 19, 2017, https://www.bostonglobe.com/metro/2017/01/18/walgreens-agrees-better-monitor-opioid-dispensing/q0B3FbMo2k3wPt4hvmTQrM/story.html.

### c.    Walmart

175.    In 2009, Walmart paid $637,000 to resolve allegations of numerous record keeping violations at its pharmacies in Texas.  Those allegations included that Walmart had failed to timely file records indicating loss or theft of drugs to the DEA, in violation of the FCSA.[123]

### 3.    Despite Prior Regulatory Actions, Pharmacy Defendants Continue to Violate Their Duties

176.    Despite their extensive understanding of the risks and harms of prescription opioid diversion set forth above, Pharmacy Defendants continue to fail to fulfill their obligations to prevent prescription opioid diversion.

177.    Pharmacy Defendants have engaged in a consistent, nationwide pattern and practice of illegally distributing prescription opioids.  That pattern and practice has also affected the Navajo Nation and its citizens.

178.    Pharmacy Defendants regularly filled opioid prescriptions in circumstances where red flags were present, while failing to uphold their duty to report such suspicious orders (and their wrongful fulfillment of them).

179.    Pharmacy Defendants regularly filled opioid prescriptions that would have been deemed questionable or suspicious by a reasonably prudent pharmacy.

180.    Pharmacy Defendants have not adequately trained or supervised their employees at the point of sale to investigate or report suspicious or invalid opioid prescriptions, or protect against corruption or theft by employees or others.

---

[123] *See generally* Emma Perez-Trevino, *Wal-Mart Fined for Alleged Recording Keeping Violations*, Brownsville Herald, Jan. 7, 2009, http://www.brownsvilleherald.com/news/local/article_1a19f348-e9ad-534f-a1a1-8423736b0df9.html; *Walmart Fined for Pharmacy Record-Keeping Violations*, Ozarks First, Jan. 7, 2009, http://www.ozarksfirst.com/news/health-and-medical/walmart-fined-for-pharmacy-record-keeping-violations

181.    Pharmacy Defendants have utilized monetary compensation programs for certain employees that are based, in part, on the number of prescriptions filled and dispensed.  This type of compensation creates economic disincentives within the companies to change their practices to stem diversion.  For example, there have been reports of chain store supervisory personnel directing pharmacists to fill prescriptions regardless of the red flags presented.

## V.    DEFENDANTS' MISCONDUCT HAS INJURED AND CONTINUES TO INJURE THE NAVAJO NATION AND ITS CITIZENS

182.    Defendants had the ability and the duty to prevent misleading marketing and prescription opioid diversion, both of which presented known or foreseeable dangers of serious injury.  But they failed to do so, resulting in substantial injury to the Navajo Nation and its citizens.

### A.    Manufacturer Defendants' Misconduct Has Injured and Continues to Injure the Navajo Nation and Its Citizens

183.    Manufacturer Defendants' marketing campaign has resulted in a significant increase in prescription opioid usage:  between 1999 and 2016 the number of opioids prescribed nationwide quadrupled.[124]  Nationally, the number of people who take prescription opioids for non-medical purposes is now greater than the number of people who use cocaine, heroin, hallucinogens, and inhalants combined.[125]

184.    Every year, millions of Americans misuse and abuse prescription opioid pain relievers in ways that can lead to addiction, overdose, and death.  Data from the Substance Abuse

---

[124] Li Hui Chen et al., *Drug-Poisoning Deaths Involving Opioid Analgesics: United States, 1999–2011*, 166 Nat'l Ctr. for Health Statistics Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf; Rose A. Rudd *et al.*, *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity and Mortality Weekly Report 1445 (Dec. 30, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.
[125] Substance Abuse and Mental Health Servs. Admin., *Results from the 2009 National Survey on Drug Use and Health: Volume I. Summary of National Findings*, NSDUH Series H-38A, HHS Publication No. SMA 10-4586 Findings (2010).

and Mental Health Services Administration suggest that in 2016, among Americans over the age of 12, over 1.75 million were prescription opioid-dependent,[126] and over 11.5 million used opioids for non-medical purposes.[127]

185.    In Arizona, New Mexico, and Utah, data from the Substance Abuse and Mental Health Services Administration indicate that over 545,000 residents use prescription opioids for non-medical purposes each year.[128]  Similarly, DEA data show that in the past few years the states in which the Navajo Nation is located have seen annual distribution exceeding 504 milligrams per citizen,[129] and 4,580 milligrams per opioid user,[130] which is far more than is medically necessary.

186.    This growth in non-medical demand, addiction, and diversion has led to serious harm to the Navajo Nation and its citizens.  The increase in opioid usage has led to levels of addiction that, according to the U.S. Surgeon General, have "devastated" communities across America.[131]  Princeton University economist Alan Krueger found that opioids may be responsible for roughly 20% of the national decline in workforce participation by prime-age men

---

[126] Substance Abuse and Mental Health Servs. Admin., *Results from the 2016 National Survey on Drug Use and Health: Detailed Tables*, Table 5.2A at 1222 (Sept. 7, 2017), https://www.samhsa.gov/data/sites/default/files/NSDUH-DetTabs-2016/NSDUH-DetTabs-2016.pdf.

[127] *Id.* Table 1.54A at 273.

[128] Substance Abuse and Mental Health Servs. Admin., *National Survey on Drug Use and Health: Comparison of 2002–2003 and 2013–2014 Population Percentages (50 States and the District of Columbia)* 16–17 (2015), http://www.samhsa.gov/data/sites/default/files/NSDUHsaeLongTermCHG2014/NSDUHsaeLongTermCHG2014.pdf (4.43% of people age 12 or older in New Mexico engage in the non-medical use of prescription pain relievers).

[129] Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*, (June 20, 2018) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2013/2013_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight* (Feb. 29, 2016) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2014/2014_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight* (Mar. 7, 2016) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/2015/2015_rpt1.pdf; Drug Enf't Admin., ARCOS 3 – Report 1, *Retail Drug Distribution By Zip Code Within State by Grams Weight*,  (Feb. 3, 2017) https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/report_yr_2016.pdf.

[130] Wenjun Zhong et al., *Age and Sex Patterns of Drug Prescribing in a Defined American Population*, 7 Mayo Clinic Proceedings 697, 700 (2013).

[131] Letter from U.S. Surgeon General Vivek H. Murthy (Aug. 2016), https://perma.cc/VW95-CUYC.

and 25% of the drop by women.[132]  In 2011, the CDC reported that overdose deaths from prescription opioids had reached "epidemic levels."[133]  That year, 16,917 people in the United States died from a prescription opioid-related overdose—an increase of more than 20% over the previous three years.[134]  Since then, the national death toll has continued to rise.  In 2014, 18,893 people died from a prescription opioid-related overdose.[135]  In 2015, that number increased again to 22,598.[136]  As discussed above, overdose deaths in the United States involving prescription opioids have quadrupled since 1999.  CDC data show that over 123,000 people died from prescription opioid overdoses from 2011–2016.[137]

187.    It was reasonably foreseeable to Manufacturer Defendants that their deceptive, unfair, and false marketing of prescription opioids on and near the Navajo Nation would allow prescription opioids to fall into the hands of addicts and other inappropriate users.

188.    It was reasonably foreseeable to Manufacturer Defendants that their deceptive, unfair, and false marketing would cause injuries, including abuse, addiction, overdose, and death. It was also reasonably foreseeable that many of these injuries would be suffered by the Navajo Nation and its citizens, and that the costs of these injuries would be shouldered by the Navajo Nation.

189.    Manufacturer Defendants knew or should have known that their continuing efforts to employ deceptive, unfair, and false marketing, despite being previously sanctioned by

---

[132] *See* Alan B. Krueger, *Where Have All the Workers Gone? An Inquiry into the Decline of the U.S. Labor Force Participation Rate*, Brookings Papers on Econ. Activity Conference Draft (Aug. 26, 2017).
[133] Press Release, CDC, Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.
[134] Li Hui Chen et al., *Drug-poisoning Deaths Involving Opioid Analgesics: United States, 1999–2011*, 166 Nat'l Ctr. for Health Statistics Data Brief (Sept. 2014), https://www.cdc.gov/nchs/data/databriefs/db166.pdf.
[135] Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity and Mortality Weekly Report 1445 (Dec. 30, 2016), https://www.cdc.gov/mmwr/volumes/65/wr/mm655051e1.htm.
[136] *Id.*
[137] CDC, Wide-ranging Online Data for Epidemiologic Research (WONDER), http://wonder.cdc.gov.

government agencies for such actions, would contribute to the use and misuse of prescription opioids affecting the Navajo Nation.

190.    Manufacturer Defendants knew or should have known that a substantial amount of the prescription opioids dispensed on and near the Navajo Nation were being dispensed as a result of their deceptive, unfair, and false marketing.  It was foreseeable that the increased number of prescriptions for opioids resulting from Manufacturer Defendants' deceptive, unfair, and false marketing would cause harm to individual pharmacy customers, third parties, and the Navajo Nation.

191.    Manufacturer Defendants made substantial profits over the years based on the deceptive, unfair, and false marketing of prescription opioids on and near the Navajo Nation. Their participation and cooperation in a common enterprise has foreseeably caused injuries to the citizens of the Navajo Nation and financial damages to the Navajo Nation.  Manufacturer Defendants knew or should have known that the Navajo Nation would be unjustly forced to bear the costs of these injuries and damages.

192.    Manufacturer Defendants' deceptive, unfair, and false marketing of prescription opioids to the Navajo Nation showed a reckless disregard for the safety of the Navajo Nation and its citizens.  Their conduct poses a continuing threat to the health, safety, and welfare of the Navajo Nation and its citizens.

**B.    Distributor Defendants' Misconduct has Injured and Continues to Injure the Navajo Nation and Its Citizens**

193.    It was reasonably foreseeable to Distributor Defendants that their violations of their duties under New Mexico and Federal laws and regulations would allow prescription opioids to be diverted into illegitimate channels for non-medical uses.

194.    It was reasonably foreseeable to Distributor Defendants that their failure to prevent diversion would cause injuries, including addiction, overdose, and death.  It was also reasonably foreseeable that many of these injuries would be suffered by the Navajo Nation and its citizens, and that the costs of these injuries would be shouldered by the Navajo Nation.

195.    Distributor Defendants knew or should have known that the prescription opioids being diverted from their supply chains would contribute to the opioid abuse on or near the Navajo Nation and among the Navajo Nation's citizens, and would create access to prescription opioids by unauthorized users, which, in turn, would perpetuate the cycle of addiction, demand, and illegal transactions.

196.    Distributor Defendants knew or should have known that a substantial amount of the prescription opioids dispensed on and near the Navajo Nation were being dispensed based on invalid or suspicious prescriptions.  It was foreseeable that filling suspicious orders for prescription opioids would harm the Navajo Nation and its citizens.

197.    Distributor Defendants were aware of widespread prescription opioid abuse on and near the Navajo Nation, but they nevertheless persisted in a pattern of distributing commonly-abused and diverted opioids in geographic areas—and in such quantities, and with such frequency—that they knew or should have known these commonly-abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

198.    The use of prescription opioids by Navajo Nation citizens who were addicted or who did not have a medically necessary purpose for using opioids could not have occurred without the actions of Distributor Defendants.  If Distributor Defendants had guarded against diversion as required by New Mexico and Federal law, the Navajo Nation and its citizens would have avoided significant injury.

199.    Distributor Defendants made substantial profits based on the illegal diversion of prescription opioids on and near the Navajo Nation.  Distributor Defendants' participation and cooperation in a common enterprise has foreseeably caused injuries to Navajo Nation citizens and financial damages to the Navajo Nation.  Distributor Defendants knew or should have known that the Navajo Nation would be unjustly forced to bear the costs of these injuries.

200.    Distributor Defendants' distribution of excessive amounts of prescription opioids to the Navajo Nation showed a reckless disregard for the safety of the Navajo Nation and its citizens.  Their conduct poses a continuing threat to the health, safety, and welfare of the Navajo Nation and its citizens.

201.    At all relevant times, Distributor Defendants engaged in these activities, and continue to do so, knowing that the Navajo Nation in its role of providing protection and care for its citizens, would have to provide or pay for additional costs to the healthcare, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

202.    It was reasonably foreseeable to Distributor Defendants that the Navajo Nation would be forced to bear substantial expenses as a result of Distributor Defendants' acts.

203.    The conduct of Distributor Defendants, their agents, and their employees was, at the very least, negligent.

**C.    Pharmacy Defendants' Misconduct Has Injured and Continues to Injure the Navajo Nation and Its Citizens**

204.    It was reasonably foreseeable to Pharmacy Defendants that filling invalid or suspicious prescriptions for opioids would cause harm to the Navajo Nation and its citizens.

205.    It was reasonably foreseeable to Pharmacy Defendants that their failure to prevent diversion would cause injuries, including addiction, overdose, and death.  It was also reasonably foreseeable that many of these injuries would be suffered by the Navajo Nation and its citizens.

206.    Pharmacy Defendants were aware of widespread prescription opioid abuse on and near the Navajo Nation, but nevertheless persisted in filling invalid or suspicious prescriptions for opioids and failed to address this misconduct.

207.    The use of prescription opioids by Navajo Nation citizens who were addicted or who did not have a medically necessary purpose could not have occurred without the actions of Pharmacy Defendants.  If Pharmacy Defendants had guarded against diversion, the Navajo Nation and its citizens would have avoided significant injury.

208.    Pharmacy Defendants made substantial profits from the diversion of prescription opioids on and near the Navajo Nation.  Their participation and cooperation in a common enterprise has foreseeably caused injuries to Navajo Nation citizens and damages to the Navajo Nation.  Pharmacy Defendants knew or should have known that the Navajo Nation would be unjustly forced to bear the costs of these injuries.

209.    At all relevant times, Pharmacy Defendants have engaged in improper dispensing practices, and continue to do so, despite knowing they could take measures to eliminate them in substantial part.

210.    At all relevant times, Pharmacy Defendants engaged in these activities, and continue to do so, knowing that the Navajo Nation, in its role of providing protection and care for its citizens, would have to provide or pay for additional costs to the healthcare, social services, welfare, and education systems, and would also have to bear the loss of substantial economic productivity and tax revenue.

211.     It was reasonably foreseeable to Pharmacy Defendants that the Navajo Nation

would be forced to bear substantial expenses as a result of Pharmacy Defendants' acts.

212.     The conduct of Pharmacy Defendants, their agents, and their employees is, at the

very least, negligent.

**D.      Defendants' Misconduct Has Damaged the Navajo Nation and Its Citizens**

213.     Defendants' misleading marketing and failure to prevent prescription opioid

diversion on and near the Navajo Nation damaged the Navajo Nation.  Defendants' misconduct

has contributed to a range of social problems including child neglect, family dysfunction, babies

born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and

social despair.  As a result, more and more of the Navajo Nation's resources are devoted to

addiction-related problems.  Meanwhile, the prescription opioid crisis diminishes the Navajo

Nation's available workforce, decreases productivity, increases poverty, and consequently

requires greater expenditures by the Navajo Nation.

**VI.     FACTS PERTAINING TO CLAIMS UNDER RICO**

210.     Defendants did not simply scheme to market opioids through misrepresentations

and turning a blind eye to diversion.  Various groups of Defendants also formed informal

associations with others ("Enterprises") and used these Enterprises to perpetrate their schemes,

as described below.

**A.      The Opioid Marketing Enterprise**

**1.      The Common Purpose And Scheme of the Opioid Marketing
             Enterprise**

211.     Knowing that their prescription opioids were highly addictive, ineffective, and

unsafe for the treatment of long-term, chronic pain, non-acute, and non-cancer pain, the

Manufacturer Defendants formed an association-in-fact enterprise with the Front Groups and

KOLs described above (the "Opioid Marketing Enterprise").  The Manufacturer Defendants used the Opioid Marketing Enterprise to engage in a scheme to increase their profits and sales unlawfully, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term, chronic pain.

212.     Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.  The Manufacturer Defendants' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioid-friendly messaging, fueled the opioid epidemic in the United States.[138]

213.     The Manufacturer Defendants, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including the Nation, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use.  The misleading statements included the following:  (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Manufacturer Defendants named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.  The misleading statements not only caused and worsened the opioid

---

[138] *See Fueling an Epidemic*, *supra* note 125, https://www.hsdl.org/?abstract&did=808171.

epidemic, but as time went on, they concealed the Manufacturer Defendants' wrongdoing from the public and the Nation (including as a result of the Opioid Marketing Enterprise).

214.    The scheme devised, implemented, and conducted by the Manufacturer Defendants constituted a common course of conduct designed to ensure that the Manufacturer Defendants unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effectiveness of their drugs.  The Manufacturer Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetrated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

215.    There was regular communication among the Manufacturer Defendants, Front Groups, and KOLs, in which information was shared, misrepresentations were coordinated, and payments were exchanged.  Typically, the coordination, communication, and payment occurred, and continues to occur, through the repeated and continuing use of interstate wires and the U.S. Mail in which the Manufacturer Defendants, Front Groups, and KOLs shared information regarding overcoming objections and resistance to the use of opioids for chronic pain.  The Manufacturer Defendants, Front Groups, and KOLs functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.  These actions were effective to conceal the scheme and the Opioid Marketing Enterprise and its impact from the Nation until sufficient information came to light due to government and media investigation to allow the Nation to discover it, leading to the filing of the Complaint in this matter.

216.    At all relevant times, the Front Groups were aware of the Manufacturer Defendants' conduct and were knowing and willing participants in and beneficiaries of that

conduct.  Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and the Nation.  But for the Opioid Marketing Enterprise's scheme, the Front Groups would have had incentive to disclose the deceit by the Manufacturer Defendants and the Opioid Marketing Enterprise to their members and constituents.  By failing to disclose this information, the Front Groups perpetuated the Opioid Marketing Enterprise's scheme and common purpose, continued its wrongful concealment from the Nation, and reaped substantial benefits.

217.    At all relevant times, the KOLs were aware of the Manufacturer Defendants' conduct and were knowing and willing participants in and beneficiaries of that conduct.  The Manufacturer Defendants selected KOLs because they favored the aggressive treatment of chronic pain with opioids.  The Manufacturer Defendants' support helped the KOLs become respected industry experts.  And, as they rose to prominence, the KOLs falsely promoted the benefits of using opioids to treat chronic pain, repaying the Manufacturer Defendants by advancing their marketing goals.  The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were engaged in the same scheme, to the detriment of consumers, prescribers, and the Nation.  But for the Opioid Marketing Enterprise's scheme, the KOLs would have had incentive to disclose the deceit by the Manufacturer Defendants and the Opioid Marketing Enterprise, and to protect their patients and the patients of other physicians.  By failing to disclose this information, the KOLs furthered the Opioid Marketing Enterprise's scheme and common purpose, continued its wrongful concealment from the Nation, and reaped substantial benefits.

218.    As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the

Manufacturer Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and that the use of opioids for chronic pain was not supported by medically acceptable evidence.  The Manufacturer Defendants and their co-conspirators thus continued to conceal the Manufacturer Defendants' wrongdoing from the Nation.

## 2.  The Conduct of the Opioid Marketing Enterprise

219.  The Manufacturer Defendants, Front Groups, and KOLs engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise.  The conduct of the members of the Opioid Marketing Enterprise in furtherance of the Enterprise's common purpose involved: (a) misrepresentations regarding the risk of addiction and safe use of opioids for long-term, chronic pain (described in detail above); (b) efforts to criticize or undermine the CDC Guideline referenced above;[139] and (c) efforts to limit prescriber accountability.

220.  In addition to disseminating misrepresentations about the risks and benefits of opioids, members of the Opioid Marketing Enterprise also furthered its common purpose by criticizing or undermining the CDC Guideline, which represented "an important step—and perhaps the first major step from the federal government—toward limiting opioid prescriptions for chronic pain."[140]

---

[139] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity and Mortality Weekly Report 1 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[140] Staff of S. Comm. on Homeland Sec. & Governmental Affairs, 115th Cong., Fueling an Epidemic: Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups at 13(Comm. Print 2018), https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf (last checked on May 22, 2018).

221.    Several Front Groups, including the U.S. Pain Foundation and the American Academy of Pain Medicine ("AAPM"), criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."[141]

222.    The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."[142]

223.    The Manufacturer Defendants alone could not have accomplished the purpose of the Opioid Marketing Enterprise without the assistance of the Front Groups and KOLs, who were perceived as "neutral" and more "scientific" than the Manufacturer Defendants themselves. Without the work of the Front Groups and KOLs in spreading misrepresentations about opioids, the Opioid Marketing Enterprise could not have achieved its common purpose.

224.    The impact of the Opioid Marketing Enterprise's scheme is still impacting the Nation—i.e., opioids continue to be prescribed and used for chronic pain throughout the area of the Nation's territory, and the epidemic continues to injure the Nation and consume its resources, including the Nation's healthcare, criminal justice, social services, welfare, and education systems.

225.    In short, the Manufacturer Defendants, the Front Groups, and the KOLs were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest

---

[141] Pat Anson, *Chronic Pain Groups Blast CDC for Opioid Guidelines*, Pain News Network, Sept. 22, 2015, https://www.painnewsnetwork.org/stories/2015/9/22/chronic-pain-groups-blast-cdc-for-opioid-guidelines..
[142] Am. Acad. of Pain Medicine, *CDC Guideline for Prescribing Opioids for Chronic Pain* (Mar. 16, 2016), https://web.archive.org/web/20160615194041/http://www.painmed.org/files/aapm-statement-cdc-guideline-for-prescribing-opioids-for-chronic-pain.pdf.

in the object of the scheme, and functioned within a structure designed to effectuate the

Enterprise's purpose.

226.  From approximately the late 1990s to the present, each of the Manufacturer

Defendants exerted control over the Opioid Marketing Enterprise and participated in the

operation or management of its affairs, directly or indirectly, in the following ways:

a.  Creating and providing a body of deceptive, misleading, and unsupported medical and popular literature, electronic and print advertisements, sales and promotional training materials, and presentations about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) were thus more likely to be relied upon by physicians, patients, and payors;

b.  Selecting, cultivating, promoting, and paying Front Groups and KOLs based on their willingness to communicate and distribute the Manufacturer Defendants' messages about the use of opioids for chronic pain;

c.  Providing substantial opportunities for Front Groups and KOLs to participate in research studies on topics the Manufacturer Defendants suggested or chose, with the predictable effect of ensuring that many favorable studies appeared in the academic literature;

d.  Paying KOLs to serve as consultants or on the Manufacturer Defendants' advisory boards, or on the advisory boards and in leadership positions of Front Groups, and to give talks, typically over meals or at conferences;

e.  Paying significant amounts of money to the leaders and individuals associated with Front Groups;

f.  Donating to Front Groups to support talks that were typically presented over meals or at conferences;

g.  Disseminating false, misleading, imbalanced, and unsupported statements regarding opioids through unbranded materials that appeared to be independent publications from Front Groups;

h.  Sponsoring programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

     i.     Developing and disseminating pro-opioid treatment guidelines with the help of KOLs as authors and promoters, and Front Groups as publishers and supporters;

     j.     Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Manufacturer Defendants, such as veterans and the elderly, and then funding that distribution;

     k.     Concealing their relationship to and control of Front Groups and KOLs from the Nation and the public at large; and

     l.     Intending that Front Groups and KOLs would distribute, through the U.S. Mail and interstate wire facilities, promotional and other materials that claimed opioids could be safely used for chronic pain.

227.    The Manufacturer Defendants controlled representations made about their opioids, doled out payments to KOLs, and ensured that representations made by KOLs, Front Groups, and the Manufacturer Defendants' sales detailers were consistent with the Manufacturer Defendants' messaging throughout the United States.  The Front Groups and KOLs in the Opioid Marketing Enterprise were dependent on the Manufacturer Defendants for their financial structure and for career development and promotion opportunities.

228.    The Front Groups also conducted and participated in the conduct of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

     a.     The Front Groups promised to, and did, make representations regarding opioids and the Manufacturer Defendants' drugs that were consistent with the Manufacturer Defendants' messages;

     b.     The Front Groups distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials that claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain;

     c.     The Front Groups echoed and amplified messages favorable to increased opioid use and ultimately, the financial interests of the Manufacturer Defendants;

    d.    The Front Groups issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

    e.    The Front Groups strongly criticized the 2016 CDC Guideline, which had recommended limits on opioid prescriptions for chronic pain;[143] and

    f.    The Front Groups concealed their connections to the KOLs and the Manufacturer Defendants.

229.    The KOLs also participated in the conduct of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

    a.    The KOLs promised to, and did, make representations regarding opioids and the Manufacturer Defendants' drugs that were consistent with the Manufacturer Defendants' messages;

    b.    The KOLs distributed, through the U.S. Mail and interstate wire facilities, promotional and other materials that claimed that opioids could be safely used for chronic pain without addiction, and misrepresented the benefits of using opioids for chronic pain;

    c.    The KOLs echoed and amplified messages favorable to increased opioid use and ultimately, the financial interests of the Manufacturer Defendants;

    d.    The KOLs issued guidelines and policies minimizing the risk of opioid addiction and promoting opioids for chronic pain;

    e.    The KOLs strongly criticized the 2016 CDC Guideline, which had recommended limits on opioid prescriptions for chronic pain;[144] and

    f.    The KOLs concealed their connections to the Front Groups and the Manufacturer Defendants, and their sponsorship by the Manufacturer Defendants.

230.    The scheme devised and implemented by the Manufacturer Defendants and members of the Opioid Marketing Enterprise amounted to a common course of conduct intended to increase the Manufacturer Defendants' sales from prescription opioids by encouraging the

---

[143] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, 65 Morbidity and Mortality Weekly Report 1 (2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[144] *Id.*

prescribing and use of opioids for long-term, chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue to the present.

231.    As discussed above, the Manufacturer Defendants funded and controlled the various Front Groups.  The Front Groups, which appeared to be independent, but were not, transmitted the Manufacturer Defendants' misrepresentations.  The Manufacturer Defendants and the Front Groups thus worked together to promote the goals of the Opioid Marketing Enterprise.

232.    The Manufacturer Defendants worked together through the Front Groups that they jointly funded and through which they collaborated on the joint promotional materials described above.

233.    Similarly, as discussed above, the Manufacturer Defendants paid KOLs, including Dr. Portenoy, to spread their misrepresentations and promote their products.  The Manufacturer Defendants and the KOLs thus worked together to promote the goals of the Opioid Marketing Enterprise.

### 3.    The Pattern of Racketeering Activity

234.    The Manufacturer Defendants' scheme was perpetrated through multiple acts of mail fraud and wire fraud that constituted a pattern of racketeering activity.

235.    This pattern of racketeering activity involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities, including misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities of opioids for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from increased sales of the Manufacturer Defendants' opioids.

236.    Each of these fraudulent mailings and interstate wire transmissions constitutes a separate act of racketeering activity, and collectively, these violations constitute a pattern of racketeering activity.

237.    The Manufacturer Defendants devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for long-term, chronic, non-acute, and non-cancer pain.  The Manufacturer Defendants and members of the Opioid Marketing Enterprise knew that these representations violated the FDA-approved use of these drugs, and were not supported by actual evidence.  The Manufacturer Defendants intended that their common purpose and scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to defraud and to advance their illegal scheme.

238.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain to prescribers, regulators, the public, and the Nation, the Manufacturer Defendants, the Front Groups, and the KOLs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

239.    The Manufacturer Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the fraudulent marketing of opioids involved thousands of communications, publications, representations, statements, electronic transmissions, and payments, including, *inter alia*:

        a.    Marketing materials about opioids and their risks and benefits, which the Manufacturer Defendants, Front Groups, and KOLs published and transmitted to healthcare providers located across the country through the Internet and television;

b.      Written representations and telephone calls between the Manufacturer Defendants and Front Groups regarding the misrepresentations, marketing statements, and claims about prescription opioids, including the non-addictive, safe use of opioids for chronic long-term pain generally;

c.      Written representations and telephone calls between the Manufacturer Defendants and KOLs regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of prescription opioids for chronic long-term pain generally;

d.      E-mails, telephone calls, and written communications between the Manufacturer Defendants and the Front Groups agreeing to or implementing the scheme for the fraudulent marketing of opioids;

e.      E-mails, telephone calls, and written communications between the Manufacturer Defendants and the KOLs agreeing to or implementing the scheme for the fraudulent marketing of opioids;

f.      Communications between the Manufacturer Defendants, Front Groups, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

g.      Communications between the Manufacturer Defendants, KOLs, and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

h.      Written and oral communications directed to state agencies, Federal and state courts, and private insurers throughout the country that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

i.      Receipts of increased profits—the wrongful proceeds of the scheme sent through the U.S. Mail and interstate wire facilities.

240.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Manufacturer Defendants that the Front Groups and KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

241.    The Manufacturer Defendants, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Manufacturer

Defendants' fraudulent scheme and participated in the common course of conduct to commit acts of fraud in marketing prescription opioids.

242. Indeed, for the Manufacturer Defendants' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of opioids. This conclusion is supported by the fact that the Manufacturer Defendants each financed, supported, and worked through the same KOLs and Front Groups, and often collaborated on and mutually supported the same publications, presentations, and prescription guidelines.

243. The Manufacturer Defendants' predicate acts all had the purpose of creating the opioid epidemic that substantially injured the Nation's business and property, including, but not limited to, suffering increased law enforcement and public works expenditures, increased emergency and treatment services, damage to emergency equipment and vehicles, the processing and payment of fraudulent prescriptions, other increased medical costs, and lost productivity, economic opportunity, and tax revenue. It also has substantially injured the health and welfare of the Nation's citizens, all while simultaneously generating billion-dollar revenue and profits for the Manufacturer Defendants. The predicate acts were committed or caused to be committed by the Manufacturer Defendants through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

**B.     The Opioid Supply Chain Enterprise**

      **1.     The Common Purpose and Scheme of the Opioid Supply Chain Enterprise**

244. In addition to the Opioid Marketing Enterprise, there existed a second, separate enterprise. For more than a decade, Defendants worked together in an illicit enterprise, engaging in illegal conduct with the common purpose and achievement of vastly increasing their

respective profits and revenues by exponentially expanding a market that the law intended to restrict (the "Opioid Supply Chain Enterprise").

245.    Through the connections they made as a result of their participation in HDA, Defendants chose to flout the closed system designed to protect citizens.  Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines:  Reporting Suspicious Orders and Prevention of Diversion of Controlled Substances."  But, privately, Defendants refused to act.  Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied.  President and CEO of the HDA, John Gray, said to Congress in 2014, it is "difficult to find the balance between proactive and anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."[145]  Yet, Defendants apparently all found the same profit-maximizing balance—intentionally remaining silent to ensure the largest possible financial return.

246.    Defendants thereby breached their duties under the FCSA.  As "registrants" under the FCSA, Defendants are duty bound to identify and report "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[146]  Critically, Defendants' responsibilities do not end with the products they manufacture or distribute—there is no such limitation in the law because their duties cut across company lines.  Thus, when Defendants obtain information about the sales and distribution of other companies' prescription

---

[145] *Improving Predictability and Transparency in DEA and FDA Regulation: Hearing Before the Subcomm. on Health of the H. Comm. on Energy and Commerce*, 113th Cong. (2014) (statement of John M. Gray), https://www.gpo.gov/fdsys/pkg/CHRG-113hhrg90872/html/CHRG-113hhrg90872.htm.
[146] 21 C.F.R. § 1301.74(b).

opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity to the DEA.

247.    At all relevant times, Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues, and profits by fraudulently increasing the quotas set by the DEA that would allow them to benefit collectively from a greater pool of prescription opioids.  In support of this common purpose and fraudulent scheme, Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt, and report suspicious orders of opioids and diversion of their drugs into the illicit market.  Their collective silence in the face of their duties to speak constituted concealment of their wrongdoing that effectively kept it hidden from the public and the Nation until government and media investigation revealed sufficient information to bring their wrongful conduct causing the opioid epidemic to light, leading to the Complaint in this matter.

### 2.    The Conduct of the Opioid Supply Chain Enterprise

248.    At all relevant times, Defendants exerted control over, conducted, and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties to identify, investigate, and report suspicious orders of opioids.

249.    Defendants disseminated false and misleading statements to Federal and state regulators claiming that:

a.    the quotas for prescription opioids should be increased; and

b.    they were complying with their obligations to:  (i) maintain effective controls against diversion of their prescription opioids; (ii) design and operate a system to disclose suspicious orders of prescription opioids; and (iii) notify the DEA of any suspicious orders or diversion of their prescription opioids.

250. The FCSA and the Code of Federal Regulations require Defendants to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders. The failure to make reports as required by the FCSA and Code of Federal Regulations amounts to a criminal violation of the statute. It also constitutes concealment of Distributor Defendants' and Pharmacy Defendants' wrongful fulfillment of suspicious orders.

251. Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records, and other documents required to be filed with the DEA, including the Manufacturer Defendants' applications for production quotas. Specifically, Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

### 3. The Pattern of Racketeering Activity

252. Defendants used, directed the use of, and/or caused to be used, thousands of U.S. Mail and interstate wire transmissions in service of their scheme through virtually uniform misrepresentations, concealments, and material omissions regarding their compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

253. Defendants devised and knowingly carried out a scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts when there was a duty to disclose.

254.    For the purpose of executing the illegal scheme, Defendants used the U.S. Mail and interstate wires intentionally and knowingly with the specific intent to defraud and advance the illegal scheme.  These repeated acts of mail fraud and wire fraud constituted a pattern of racketeering activities.

255.    Defendants' use of the U.S. Mail and interstate wires included, but was not limited to, the transmission, delivery, or shipment of the following by Defendants, or third parties that foreseeably sent them as a result of Defendants' illegal scheme:

a.    The prescription opioids themselves;

b.    Documents and communications that supported and/or facilitated the Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

c.    Documents and communications that facilitated the manufacture, purchase, and sale of prescription opioids;

d.    Defendants' DEA registrations;

e.    Documents and communications that supported and/or facilitated Defendants' DEA registrations;

f.    Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g.    Documents and communications related to the Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h.    Documents intended to facilitate the manufacture and distribution of the Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports, and correspondence;

i.    Documents for processing and receiving payment for prescription opioids;

j.    Payments from the Distributor Defendants to the Manufacturer Defendants;

k.    Rebates and chargebacks from the Manufacturer Defendants to the Distributor Defendants;

l.      Payments to the Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

m.      Deposits of proceeds from the Defendants' manufacture, distribution, and sale of prescription opioids; and

n.      Other documents and things, including electronic communications.

256.    Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by U.S. Mail or by private or interstate carrier, shipments of prescription opioids and related documents by U.S Mail or by private carrier affecting interstate commerce.

257.    Defendants used the Internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities.  Specifically, the Defendants made misrepresentations about their compliance with Federal and state laws requiring them to identify, investigate, and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

258.    At the same time, Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids, and their compliance with all Federal and state regulations regarding the identification and reporting of suspicious orders of prescription opioids.

259.    The U.S. Mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators, the public, and the Nation into believing that Defendants were complying with their Federal and state obligations to identify and report suspicious orders of prescription opioids while Defendants were knowingly allowing millions of doses of prescription opioids to be diverted into the illicit drug market.

Defendants' scheme and common course of conduct was to increase or maintain high production quotas for their prescription opioids from which they could profit.

260.    Many of the precise dates of the uses of the U.S. Mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records.  However, the Nation has described the types of and, in some instances, occasions on which the predicate acts of U.S. Mail and/or wire fraud occurred.  They include thousands of communications to perpetrate and maintain the scheme, including the things and documents described in the preceding paragraphs.

261.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

262.    The predicate acts all had the purpose of creating the opioid epidemic that substantially injured the Nation in its business and property, including, but not limited to, suffering increased law enforcement and public works expenditures, increased emergency and treatment services, damage to emergency equipment and vehicles, the processing and payment of fraudulent prescriptions, other increased medical costs, and lost productivity, economic opportunity, and tax revenue.  It also has substantially injured the health and welfare of the Nation's citizens, all while simultaneously generating billion-dollar revenue and profits for Defendants.  The predicate acts were committed or caused to be committed by Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

263.    As described above, Defendants were repeatedly warned, fined, and found to be in violation of applicable laws and regulations, and yet they persisted.  The sheer volume of enforcement actions against Defendants supports this conclusion that Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.[147]

264.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

### C.    Effects of the Opioid Marketing Enterprise and the Opioid Supply Chain Enterprise

265.    The Nation's injuries were proximately caused by Defendants' racketeering activity, which directly caused the over-prescription, over-purchase, and over-consumption of prescription opioids.  But for Defendants' misstatements and omissions and the schemes employed by the Opioid Marketing Enterprise and the Opioid Supply Chain Enterprise, the Nation would not have paid for opioid prescriptions for chronic pain and would not be bearing the costs of its current opioid epidemic.

266.    By reason of, and as a result of the conduct of each of the Defendants, and in particular, their pattern of racketeering activity, the Nation has been injured in its business and property in multiple ways, including, but not limited to, suffering increased law enforcement and public works expenditures, increased emergency and treatment services, damage to emergency equipment and vehicles, the processing and payment of fraudulent prescriptions, other increased

---

[147] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions*, 6 (May 2014), https://oig.justice.gov/reports/2014/e1403.pdf.

medical costs, and lost productivity, economic opportunity, and tax revenue.  The health and welfare of the Nation's citizens also has been injured.

267.    Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to the Nation, and the Nation is entitled to bring this action for three times its actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## CLAIMS FOR RELIEF

## COUNT I

### OPIOID MARKETING ENTERPRISE
### VIOLATION OF RICO, 18 U.S.C. § 1961 *et seq.*

### (Against the Manufacturer Defendants)

268.    The Nation incorporates by reference the foregoing allegations as if fully set forth herein.

269.    At all relevant times, the Manufacturer Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

270.    The Opioid Marketing Enterprise was an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of the Manufacturer Defendants, the Front Groups, and the KOLs.  The activities of this Enterprise affected interstate commerce.

271.    At all relevant times, the Opioid Marketing Enterprise:  (a) had an existence separate and distinct from each member of the Opioid Marketing Enterprise; (b) was separate and distinct from the pattern of racketeering in which the Manufacturer Defendants engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Manufacturer Defendants; (d) was characterized by interpersonal

relationships between and among each member of the Opioid Marketing Enterprise, including between the Manufacturer Defendants and each of the Front Groups and KOLs; (e) had sufficient longevity for the Opioid Marketing Enterprise to pursue its purpose; and (f) functioned as a continuing unit.

272.    In particular, each of the Manufacturer Defendants, KOLs, and Front Groups that made up the Opioid Marketing Enterprise had systematic links to and personal relationships with each other through (a) joint participation in lobbying groups, (b) trade industry organizations, (c) contractual relationships, and (d) continuing coordination of activities.  These systematic links and personal relationships allowed members of the Opioid Marketing Enterprise to act with a common purpose and to conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of the Manufacturer Defendants coordinated their efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry-friendly and would work together with the Manufacturer Defendants to advance the common purpose of the Opioid Marketing Enterprise.

273.    Each of the Manufacturer Defendants and the other members of the Opioid Marketing Enterprise conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use.

274.    Specifically, the Manufacturer Defendants:  (1) through the use of Front Groups that appeared to be independent of the Manufacturer Defendants; (2) through the dissemination of publications that supported the Manufacturer Defendants' scheme; (3) through continuing medical education ("CME") programs controlled and/or funded by the Manufacturer Defendants;

(4) by the hiring and deployment of so-called KOLs who were paid by the Manufacturer Defendants to promote their message; and (5) through the "detailing" activities of the Manufacturer Defendants' sales forces, conducted an association-in-fact enterprise, and/or participated in the conduct of that enterprise through a pattern of illegal activities (the predicate racketeering acts of U.S. Mail and wire fraud) to carry out the common purpose of the Opioid Marketing Enterprise.  The Opioid Marketing Enterprise sought to further this common purpose through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Manufacturer Defendants conducted and participated in the conduct of the Opioid Marketing Enterprise by engaging in U.S. Mail and wire fraud in violation of 18 U.S.C. § 1962(c).

275.    Together with the Fronts Groups and KOLs, the Manufacturer Defendants formed an association-in-fact enterprise, the Opioid Marketing Enterprise, for the purpose of increasing unlawful profits and revenues from the continued prescription and use of opioids for long-term, chronic pain and through creating widespread dependency on and addiction to opioids.

276.    The Manufacturer Defendants each worked together to coordinate the Opioid Marketing Enterprise's goals and conceal their role, and the Opioid Marketing Enterprise's existence, from the public by, among other things:  (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to promote their false messages; (iii) funding, editing, and distributing CME programs to advance their false messages; and (iv) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians and, in particular, at physicians lacking the expertise of pain care specialists (that is, sales detailing).

277.    Each of the Front Groups helped disguise the role of the Manufacturer Defendants by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials—a body of biased and unsupported scientific "literature" and "treatment guidelines" that promoted the Manufacturer Defendants' false messages.

278.    Each of the KOLs was a physician chosen and paid by one or more of the Manufacturer Defendants to influence prescriber habits by promoting the Manufacturer Defendants' false message through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the Manufacturer Defendants' role in the Opioid Marketing Enterprise and the Opioid Marketing Enterprise's existence.

279.    The Manufacturer Defendants conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) that employed the use of U.S. Mail and interstate wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids.

280.    The Manufacturer Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud.

281.    Indeed, for the Manufacturer Defendants' fraudulent scheme to work, each of the Manufacturer Defendants had to agree to implement similar tactics.

282.   The Manufacturer Defendants' predicate acts of racketeering activity (18 U.S.C.

§ 1961(1)) consisted of:

a.   Mail Fraud:  The Manufacturer Defendants violated 18 U.S.C. § 1341 by
sending or receiving, or by causing to be sent and/or received, materials
via U.S. Mail or commercial interstate carriers for the purpose of
executing the unlawful scheme to design, manufacture, market, and sell
the prescription opioids by means of false pretenses, misrepresentations,
false promises, and omissions.

b.   Wire Fraud:  The Manufacturer Defendants violated 18 U.S.C. § 1343 by
transmitting and/or receiving, or by causing to be transmitted and/or
received, materials by interstate wires for the purpose of executing the
unlawful scheme to design, manufacture, market, and sell the prescription
opioids by means of false pretenses, misrepresentations, false promises,
and omissions.

283.   Each of the Manufacturer Defendants not only violated the above laws but also

aided and abetted others in the violations of the above laws, thereby rendering the Manufacturer

Defendants indictable as principals.

284.   As summarized herein, the Manufacturer Defendants used the U.S. Mail and

interstate wires to send or receive thousands of communications, publications, representations,

statements, electronic transmissions, and payments to carry out the Opioid Marketing

Enterprise's fraudulent scheme.

285.   Because the Manufacturer Defendants disguised their participation in the Opioid

Marketing Enterprise, and worked to keep even the Opioid Marketing Enterprise's existence

secret so as to give the false appearance that their false messages reflected the views of

independent third parties, many of the precise dates of the Opioid Marketing Enterprise's uses of

the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire

fraud) have been hidden and cannot be alleged without access to the books and records

maintained by the Manufacturer Defendants, Front Groups, and KOLs.  Indeed, an essential part

of the successful operation of the Opioid Marketing Enterprise depended upon secrecy. However, the Nation has described occasions on which the Manufacturer Defendants, Front Groups, and KOLs disseminated misrepresentations and false statements to consumers, prescribers, regulators, and the Nation, and how those acts were in furtherance of the scheme.

286.    The Manufacturer Defendants each committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that the Manufacturer Defendants committed, conspired to commit, and/or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity and/or constituted continuous racketeering activity, and therefore constituted a "pattern of racketeering activity."  The racketeering activity was made possible by the Manufacturer Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise.  The Manufacturer Defendants participated in the scheme to defraud by using U.S. Mail and interstate wires (including telephones and the Internet) in interstate or foreign commerce.

287.    As described herein, the Manufacturer Defendants engaged in a pattern of related and continuous acts for years.  Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and the Nation.

288.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.

289.     The Manufacturer Defendants, Front Groups, and KOLs intentionally crafted their fraudulent scheme in accordance with the common purpose of the Opioid Marketing Enterprise to ensure that their own profits—and the rewards of the scheme meted out to the Front Groups and KOLs—remained high.  In designing and implementing the scheme, the Manufacturer Defendants understood and intended that those in the distribution chain would rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Manufacturer Defendants' products.

290.     The racketeering activities conducted by the Manufacturer Defendants, Front Groups, and KOLs amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and the Nation.  The Manufacturer Defendants have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing affairs of the Opioid Marketing Enterprise.

291.     The pattern of racketeering activity alleged herein is continuing as of the date of this Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.  The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

292.     The Manufacturer Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the Nation injury in its business and property.  They also directly and proximately caused injury to the Nation's citizens.  The Manufacturer Defendants' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic.  The Nation's injuries were not unexpected, unforeseen, or independent.  Rather, as the Nation alleges, the Manufacturer Defendants knew that the opioids were unsuited to treatment of long-term, chronic, non-acute, and non-cancer pain, or for any other use not

approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Manufacturer Defendants engaged in a scheme that utilized the U.S. Mail and interstate wires in order to carry out the Opioid Marketing Enterprise's fraudulent scheme, thereby increasing sales of their opioid products.

293.    Specifically, the Manufacturer Defendants' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured the Nation in the form of substantial losses of business and property that logically, directly, and foreseeably arose from the opioid epidemic.  The health and welfare of the Nation's citizens also have been injured.  The Nation's injuries, as alleged throughout this Complaint, are hereby expressly incorporated herein by reference.

294.    The Nation is most directly harmed and there is no other plaintiff better suited to seek a remedy for the economic harms at issue here.

## COUNT II

### OPIOID SUPPLY CHAIN ENTERPRISE
### VIOLATION OF RICO, 18 U.S.C. § 1961 *et seq*.
### (Against All Defendants)

295.    The Nation incorporates by reference all other paragraphs of this First Amended Complaint as if fully set forth herein.

296.    At all relevant times, the Defendants were and are "persons" under 18 U.S.C. § 1961(3) because they are entities capable of holding, and do hold, "a legal or beneficial interest in property."

297.    The Defendants together formed an association-in-fact enterprise, the Opioid Supply Chain Enterprise, for the purpose of increasing the quota for and profiting from the increased volume of opioid sales in the United States, including but not limited to creating a market for non-medical use of opioids of epidemic proportions.  The Opioid Supply Chain

Enterprise was an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of the Defendants. The activities of the Opioid Supply Chain Enterprise affected interstate commerce.

298. At all relevant times, the Opioid Supply Chain Enterprise: (a) had an existence separate and distinct from each member of the Opioid Supply Chain Enterprise; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Defendants; (d) was characterized by interpersonal relationships between and among each member of the Opioid Supply Chain Enterprise, i.e., the Defendants; (e) had sufficient longevity for the Opioid Supply Chain Enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Supply Chain Enterprise participated in the conduct of the Enterprise through a pattern of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid quotas and the resulting sales.

299. Many of the Defendants are members, participants, and/or sponsors of the HDA, and have been since at least 2006, and utilized the HDA to form the systematic links and interpersonal relationships of the Opioid Supply Chain Enterprise and to assist the Defendants in engaging in the pattern of racketeering activity that gives rise to this Count.

300. The Defendants conducted and participated in the conduct of the Opioid Supply Chain Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

301. The pattern of racketeering activity of the Opioid Supply Chain Enterprise included the use of U.S. Mail and interstate wire facilities, in furtherance of a scheme to defraud

Federal and state regulators, the American public, and the Nation in violation of 18 U.S.C.

§ 1341 (mail fraud) and § 1343 (wire fraud).

302.    The pattern of racketeering activity of the Opioid Supply Chain Enterprise also

included the felonious manufacture, importation, receiving, concealment, buying, selling, or

otherwise dealing in a controlled substance or listed chemical (as defined in section 102 of the

Controlled Substance Act), punishable under the laws of the United States.

303.    Specifically, 21 U.S.C. § 843(a)(4) makes it unlawful for any person knowingly

or intentionally to furnish false or fraudulent information in, or omit any material information

from, any application, report, record, or other document required to be made, kept, or filed under

this subchapter.  A violation of 21 U.S.C. § 843(a)(4) is punishable by up to four years in jail,

making it a felony.  21 U.S.C. § 843(d)(1).  The Defendants violated 21 U.S.C. § 843(a)(4) by

knowingly and intentionally furnishing false information in, and omitting material information

from, reports, records, and other documents required to be made, kept, and filed under the

relevant subchapter of Title 21 of the United States Code.

304.    The pattern of racketeering activity of the Opioid Supply Chain Enterprise also

included violations of the Travel Act, 18 U.S.C. § 1952.  Defendants violated 18 U.S.C. § 1952

in that they used the mail and facilities in interstate commerce (i.e., interstate wires) with the

intent to carry on, or facilitate the carrying on of, an "unlawful activity" within the meaning of

18 U.S.C. § 1952(b), namely, a business enterprise involving controlled substances, and

thereafter carried on such unlawful activity, in violation of applicable state laws.

305.    The Defendants, with knowledge and intent, agreed to the overall objective of

their fraudulent scheme and participated in the common course of conduct to commit acts of

fraud.

306.     Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics.

307.     In sum, the Defendants' predicate acts of racketeering activity (18 U.S.C. § 1961(1)) consisted of:

    a.    Mail Fraud:  The Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. Mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, false promises, and omissions.

    b.    Wire Fraud:  The Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by interstate wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, false promises, and omissions.

    c.    Controlled Substance Violations:  The Defendants who are Distributor Defendants violated 21 U.S.C. § 843 by knowingly or intentionally furnishing false or fraudulent information in, and/or omitting material information from, documents filed with the DEA.

    d.    Travel Act Violations:  The Defendants violated 18 U.S.C. § 1952 by using the mail and facilities in interstate commerce with the intent to carry on, or facilitate the carrying on of, an unlawful activity, namely, a business enterprise involving controlled substances in violation of applicable state laws.

308.     Each of the Defendants not only violated the above laws but aided and abetted others in the violations of the above laws, thereby rendering Defendants indictable as principals.

309.     Many of the precise dates of the Defendants' criminal actions at issue here have been hidden by Defendants and cannot be alleged without access to Defendants' books and records.  Indeed, an essential part of the successful operation of the Opioid Supply Chain Enterprise alleged herein depended upon secrecy.

310.    The Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about the reality of the suspicious orders that the Defendants were filling on a daily basis—leading to the diversion of hundreds of millions of doses of name-brand and generic prescription opioids into the illicit market.

311.    The Defendants committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity within the past ten years.

312.    The multiple acts of racketeering activity that the Defendants committed, conspired to commit, and/or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity and/or constituted continuous racketeering activity, and therefore constituted a "pattern of racketeering activity."  The racketeering activity was made possible by the Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Supply Chain Enterprise.

313.    As described herein, the Defendants engaged in a pattern of related and continuous predicate acts for years.  Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and the Nation.  The predicate acts consisted of a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the distribution and sale of their highly addictive and dangerous drugs.  The predicate acts were not isolated or sporadic events.

314.    The predicate acts all had the purpose of creating the opioid epidemic that substantially injured the Nation's business and property, as well as the health and welfare of the

Nation's citizens, while simultaneously generating billion-dollar revenue and profits for the Defendants.  The predicate acts were committed or caused to be committed by the Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

315.    The pattern of racketeering activity alleged herein is continuing as of the filing date of this First Amended Complaint and, upon information and belief, will continue into the future unless enjoined by this Court.

316.    By intentionally refusing to report and halt suspicious orders of their prescription opioids, Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

317.    It was foreseeable to the Defendants that the Nation would be harmed when they refused to report and halt suspicious orders, because their violation of the duties imposed by the FCSA and Code of Federal Regulations allowed the widespread diversion of name-brand and generic prescription opioids out of appropriate medical channels and into the illicit drug market—causing the opioid epidemic that the FCSA intended to prevent.

318.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

319.    The Defendants' violations of law and their pattern of racketeering activity directly and proximately caused the Nation's injury in its business and property.  The Defendants' pattern of racketeering activity, including their refusal to identify, report, and halt suspicious orders of controlled substances, logically, substantially, and foreseeably caused an opioid epidemic.  The Nation was injured and continues to be injured by the Defendants' pattern of racketeering activity and the opioid epidemic that it created.

320.    Defendants knew that the opioids they manufactured and supplied were unsuited for treatment of long-term, chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, in order to increase sales of their opioid products, the Defendants engaged in a scheme of deception by refusing to identify or report suspicious orders of prescription opioids that they knew were highly addictive, subject to abuse, and were actually being diverted into the market of non-medical use.  They did so by utilizing the mail and interstate wires as part of their fraud.

321.    The Defendants' predicate acts and pattern of racketeering activity were a proximate cause of the opioid epidemic that has injured the Nation in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid epidemic brought on by the Defendants' acts.  The Defendants' predicate acts also injured the health and welfare of the Nation's citizens.

322.    Specifically, the predicate acts and pattern of racketeering activity proximately caused the Nation's injuries, as alleged throughout this First Amended Complaint, and such allegations are expressly incorporated herein by reference.

323.    The Nation is most directly harmed and there is no other plaintiff better suited to seek a remedy for the economic harms at issue here.

## COUNT III

### LANHAM ACT
### (15 U.S.C. § 1125)
### (Against All Defendants)

324.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

325.    The Lanham Act provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which –

(B) in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities . . . of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

326.    As alleged in Paragraphs 1–___ of this First Amended Complaint, Defendants, in connection with their manufacture, distribution, and/or sale of prescription opioids, made numerous false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids.

327.    These false or misleading descriptions and representations of fact misrepresented the nature, characteristics, or qualities of the prescription opioids.

328.    Specifically, as described herein, Manufacturer Defendants misrepresented the safety and efficacy of prescription opioids.

329.    Distributor and Pharmacy Defendants misleadingly represented that they were taking effective steps to prevent diversion.

330.    The Navajo Nation was damaged by Defendants' false or misleading descriptions and representations of fact.

331.    For instance, Manufacturer Defendants' false or misleading descriptions and representations of fact led patients to seek care from doctors and clinics who prescribed high doses of opioids, rather than from the duly authorized entities to which the Navajo Nation has delegated authority to provide healthcare.

332.    But for Manufacturer Defendants' false advertising as to the safety of opioid drugs, these patients would have sought alternative, safer forms of treatment offered by the Navajo Nation's hospitals and clinics.  But for Distributor Defendants' and Pharmacy

96

Defendants' false statements regarding their prevention of diversion, these patients would not have sought treatment from doctors and clinics who prescribed high dosages of opioids because they would not have been able to obtain excessive and unnecessary quantities of opioids as a result of their treatment.

333.     Similarly, Manufacturer Defendants' false or misleading descriptions and representations of fact led Navajo Nation citizens away from drug treatment services, including those provided by the Navajo Nation.  But for Manufacturer Defendants' false advertising as to the safety of prescription opioids and Manufacturer Defendants' claims of "pseudoaddiction," more of the Navajo Nation's citizens would have sought drug treatment services from the clinics and other treatment facilities authorized to operate within or near the Navajo Nation, and would have successfully recovered from opioid addiction.

334.     The Manufacturer Defendants engaged in a false and misleading advertising campaign designed to deceive doctors and the public into believing that prescription opioids were safe for the treatment of chronic pain.

335.     Distributor Defendants' and Pharmacy Defendants' similarly misrepresented that they actively and effectively were preventing the diversion of prescription opioids.

336.     As alleged herein, and incorporated into this count, the Defendants engaged in systemic false and misleading advertising, via print advertising, promotional materials, and other items designed to deceive doctors and the public into believing that opioids were safe for the treatment of chronic pain.  Defendants also designed their systemic false and misleading advertising to reach consumers.

337.     The Navajo Nation is entitled to legal and equitable relief, including injunctive relief, disgorgement, and damages in an amount to be determined.

## COUNT IV

### VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT
### (N.M.S.A. §§ 57-12-1 TO -26)
### (Against Manufacturer Defendants)

338.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

339.    Each of the Manufacturer Defendants violated the New Mexico Unfair Trade Practices Act, N.M.S.A. §§ 57-12-1 to -26, by committing unfair or deceptive trade practices.

340.    Each of the Manufacturer Defendants, in the regular course of their trade, has knowingly made false or misleading statements in connection with the sale of prescription opioids.  Such statements may have, tended to, and/or did deceive or mislead others.  N.M.S.A. § 57-12-2(D).

341.    Each of the Manufacturer Defendants falsely represented that prescription opioids have characteristics, uses, and/or benefits that they do not have.  N.M.S.A. § 57-12-2(D)(5).

342.    Each of the Manufacturer Defendants falsely represented that prescription opioids were safe and effective.  N.M.S.A. § 57-12-2(D)(7).

343.    Each of the Manufacturer Defendants marketed and/or sold prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts, or (b) failing to state material facts regarding the safety and efficacy of these drugs.

344.    Each of the Manufacturer Defendants also committed unconscionable trade practices in connection with the marketing and/or sale of prescription opioids by taking advantage of the Navajo Nation and its citizens to a grossly unfair degree and to their detriment. N.M.S.A. § 57-12-2(E)(1).

345.     By reason of these deceptive acts and/or practices, and these unconscionable acts, the Navajo Nation and its citizens were injured.

## COUNT V

### VIOLATION OF ARIZONA CONSUMER FRAUD ACT
### (A.R.S. §§ 44-1521 TO -1534)
### (Against Manufacturer Defendants)

346.     The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

347.     Each of the Manufacturer Defendants violated the Arizona Consumer Fraud Act by using deception, deceptive and unfair acts and practices, and fraud in connection with the marketing and/or sale of prescription opioids.  A.R.S. § 44-1522.

348.     Each of the Manufacturer Defendants violated the Arizona Consumer Fraud Act in connection with the marketing and/or sale of prescription opioids, by making misrepresentations, or by concealing, suppressing, or omitting material facts with the intent that others would rely on such misrepresentations, concealments, suppressions, or omissions.  A.R.S. § 44-1522.

349.     As a consequence and proximate result of such deception, deceptive or unfair acts or practices, fraud, misrepresentations, and concealment, suppression, or omission of material facts, the Navajo Nation has been injured and suffered damages.

350.     Each of the Manufacturer Defendants has acted wantonly or recklessly or has engaged in conduct that demonstrates a reckless indifference to the interests of others.

351.     By reason of these deceptive acts and/or practices, the Navajo Nation and its citizens were injured.

## COUNT VI

### VIOLATION OF UTAH CONSUMER SALES PRACTICE ACT
### (U.C.A. §§ 13-1-1 TO -23)
### (Against Manufacturer Defendants)

352.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

353.    Each of the Manufacturer Defendants violated the Utah Consumer Sales Practice Act, U.C.A. §§ 13-1-1 to -23, by engaging in deceptive acts and/or practices in connection with the marketing and/or sale of prescription opioids.

354.    Each of the Manufacturer Defendants engaged in these deceptive acts and/or practices by knowingly or intentionally representing that prescription opioids have characteristics, uses, or benefits that they do not have.  U.C.A. § 13-11-4(2)(a).

355.    Each of the Manufacturer Defendants falsely represented that prescription opioids were safe and effective.  U.C.A. § 13-11-4(2)(b).

356.    Each of the Manufacturer Defendants engaged in unconscionable acts in the marketing and/or sale of prescription opioids.  U.C.A. § 13-11-5.

357.    By reason of these deceptive acts and/or practices, and these unconscionable acts, the Navajo Nation and its citizens were injured.

## COUNT VII

### NUISANCE
### (Against Manufacturer Defendants)

358.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

359.    Manufacturer Defendants have caused, are causing, and will continue to cause a public nuisance, in that they have committed offenses against the public order and economy of

the Navajo Nation by unlawfully marketing prescription opioids through misleading statements in ways that facilitate the sale, distribution, and dispensing of such drugs from premises on or near the Navajo Nation to inappropriate users in the Navajo Nation—including children and people at risk of overdose or suicide.

360. Manufacturer Defendants' activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a) to be free from reasonable apprehension of danger to person and property;

b) to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal prescription opioid use;

c) to be free from the negative health and safety effects of widespread illegal drug sales on premises on and near the Navajo Nation;

d) to be free from blights on the community created by areas of illegal drug use and opioid sales;

e) to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f) to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

361. Manufacturer Defendants' interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

a) has harmed and will continue to harm the public health and public peace of the Navajo Nation;

b)      has harmed and will continue to harm the Navajo Nation by increasing

crime, and thereby interfering with the rights of the community at large;

c)      is proscribed by Federal statutes;

d)      is of a continuing nature, and has produced long-lasting effects; and

e)      is known to Manufacturer Defendants that their conduct has a significant

effect upon the public rights of the Navajo Nation and its citizens.

362.    In addition and independently, the Manufacturer Defendants' conduct invades a

legally protected interest.  Manufacturer Defendants' conduct constitutes an unreasonable,

intentional, and substantial interference because, *inter alia*, each Manufacturer Defendant has

conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of

prescription opioid drugs and to ensure their widespread use for chronic pain.

363.    Because Manufacturer Defendants have marketed and sold prescription opioids in

a manner contrary to law and because Manufacturer Defendants' conduct has unreasonably,

intentionally, and substantially interfered with a right common to the general public,

Manufacturer Defendants are liable for public nuisance.

364.    The nuisance has affected the Navajo Nation community in that it has

undermined, is undermining, and will continue to undermine the Navajo Nation citizens' public

health, quality of life, and safety.  It has resulted in severe problems including addiction,

overdoses, and dysfunction within the Navajo Nation, its citizens, families, and communities.

365.    Public resources have been, are being, and will be consumed in efforts to address

prescription opioid abuse, thereby eliminating available resources which could be used to benefit

the Navajo Nation.

366. The Manufacturer Defendants' actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of the Navajo Nation, offend decency, and render the Navajo Nation's citizens insecure in their lives and the use of property.

367. The Manufacturer Defendants' nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately-recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

368. At all times, Manufacturer Defendants possessed the right and ability to control the nuisance-causing flow of prescription opioids into and around the Navajo Nation.

369. As a direct and proximate result of the Manufacturer Defendants' nuisance, the Navajo Nation citizens have been injured in their ability to enjoy rights common to the public.

370. As a direct and proximate result of the nuisance, the Navajo Nation has sustained economic harm by spending substantial sums to address the societal harms caused by Manufacturer Defendants' nuisance-causing activity, including costs to the Navajo Nation's healthcare system, social services program, welfare program, and education system.

371. The Navajo Nation has also suffered unique harms of a kind that are different from its citizens at large, namely, that the Navajo Nation has been harmed in its proprietary interests.

## COUNT VIII

### NEGLIGENCE AND NEGLIGENCE PER SE
### (Against Manufacturer Defendants)

372. The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

373. The Manufacturer Defendants owe a duty to the Navajo Nation to act reasonably under the circumstances.

374. The Manufacturer Defendants also have duties under Federal and state law, including the FDCA, to exercise reasonable care in marketing and selling opioids. Those laws seek, among other things, to protect the Nation and its citizens.

375. The conduct of Manufacturer Defendants has fallen below the reasonable standard of care. Their negligent acts have included the following:

   a)     marketing prescription opioids with misleading statements resulting in oversupply on and near the Navajo Nation of highly addictive prescription opioids;

   b)     enhancing the risk of harm from prescription opioids by marketing those drugs with misleading statements and omissions;

   c)     inviting criminal activity into the Navajo Nation by marketing prescription opioids in violation of New Mexico and Federal laws;

   d)     failing to adhere to all applicable laws and regulations pertaining to the marketing of prescription opioids;

   e)     failing to train or investigate their employees properly; and

   f)     failing to provide adequate safeguards against misleading marketing.

376. Each Manufacturer Defendant had a responsibility to exercise reasonable care in marketing prescription opioids.

377. Each Manufacturer Defendant marketed prescription opioids using misleading statements and omissions knowing that (a) there was a substantial likelihood this marketing would lead to sales for illicit or non-medical purposes, and (b) opioids are inherently dangerous when used for chronic pain and non-medical purposes.

378.    The Manufacturer Defendants were negligent or reckless in not acquiring or not utilizing special knowledge and special skills that relate to the dangerous activity of selling prescription opioids in order to prevent or ameliorate such distinctive and significant dangers.

379.    Each Manufacturer Defendant breached their duty to exercise the degree of care commensurate with the dangers involved in marketing and introducing into commerce dangerous controlled substances.

380.    The Manufacturer Defendants were also negligent or reckless in voluntarily undertaking duties to the Navajo Nation that they breached.  Manufacturer Defendants, through their affirmative statements regarding protecting consumers, undertook duties to take all reasonable precautions to avoid misleading marketing statements.

381.    The Manufacturer Defendants were also negligent per se by virtue of having violated laws and regulations pertaining to the marketing of prescription opioids.

382.    The Manufacturer Defendants' conduct was the cause-in-fact and proximate cause of injuries and damages to the Navajo Nation, including but not limited to the following: increased costs for its healthcare system, social services program, welfare program, and education system, as well as the cost of lost productivity, and additional damages to be proven at trial.

383.    The Navajo Nation is without fault, and its injuries would not have happened had Manufacturer Defendants used due care.

384.    The reckless, wanton, and reprehensible nature of Manufacturer Defendants' conduct entitles the Navajo Nation to an award of punitive damages and attorneys' fees and costs.

## COUNT IX

### UNJUST ENRICHMENT
### (Against Manufacturer Defendants)

385.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

386.    The Navajo Nation has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Manufacturer Defendants' misleading statements.

387.    These expenditures by the Navajo Nation have added to Manufacturer Defendants' wealth and have helped sustain Manufacturer Defendants' businesses.

388.    The Navajo Nation has paid for what may be called Manufacturer Defendants' externalities—the costs of the harm caused by their misleading statements and omissions.

389.    In this way, the Navajo Nation has conferred a benefit upon Manufacturer Defendants.

390.    Manufacturer Defendants made substantial profits while fueling prescription opioid abuse on and near the Navajo Nation.  Manufacturer Defendants continue to receive considerable profits from the sale of controlled substances on and near the Navajo Nation. Manufacturer Defendants are aware of these obvious benefits, and retention of these benefits is unjust.  Manufacturer Defendants have been unjustly enriched by these benefits.  It would be inequitable to allow Manufacturer Defendants to retain these benefits.

## COUNT X

**VIOLATION OF NEW MEXICO UNFAIR PRACTICES ACT**
**(N.M.S.A. §§ 57-12-1 TO -26)**
**(Against Distributor Defendants and Pharmacy Defendants)**

391.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

392.    Each of the Distributor Defendants and Pharmacy Defendants violated the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26, by committing unfair or deceptive practices.

393.    Each of the Distributor Defendants and Pharmacy Defendants, in the regular course of their trade, have knowingly made false or misleading statements in connection with the distribution and sale of prescription opioids.  Such statements may have, tended to, and/or did deceive or mislead others.  N.M.S.A. § 57-12-2(D).

394.    Each of the Distributor Defendants and Pharmacy Defendants falsely represented that their prescription opioid distribution and dispensing services had characteristics, uses, and/or benefits related to diversion prevention and control that they do not have.  N.M.S.A. §§ 57-12-2(D)(5), (7).

395.    Distributor Defendants and Pharmacy Defendants offered diversion control services with the intent not to supply reasonable expectable public demand.  N.M.S.A. § 57-12-2(D)(10).

396.    Each of the Distributor Defendants and Pharmacy Defendants distributed, marketed, and/or sold prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts, or (b) failing to state material facts.  N.M.S.A. § 57-12-2(D)(14)

397.     Each of the Distributor Defendants and Pharmacy Defendants also committed unconscionable trade practices in connection with the distribution, marketing, and/or sale of prescription opioids by taking advantage of the Navajo Nation and its citizens to a grossly unfair degree and to their detriment.  N.M.S.A. §57-12-2(E)(1).

398.     By reason of these deceptive acts and/or practices, and these unconscionable acts, the Navajo Nation and its citizens were injured.

**COUNT XI**

**VIOLATION OF ARIZONA CONSUMER FRAUD ACT**
**(A.R.S. §§ 44-1521 TO -1534)**
**(Against Distributor Defendants and Pharmacy Defendants)**

399.     The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

400.     Each of the Distributor Defendants and Pharmacy Defendants violated the Arizona Consumer Fraud Act by using deception, deceptive and unfair acts and practices, and fraud in connection with the distribution and sale of prescription opioids.  A.R.S. § 44-1522.

401.     Each of the Distributor Defendants and Pharmacy Defendants violated the Arizona Consumer Fraud Act in connection with the distribution and sale of prescription opioids, by making misrepresentations or by concealing, suppressing, or omitting material facts with the intent that others would rely on such misrepresentations, concealments, suppressions, or omissions.  A.R.S. § 44-1522.

402.     As a consequence and proximate result of such deception, deceptive or unfair acts or practices, fraud, misrepresentations, and concealment, suppression, or omission of material facts, the Navajo Nation and its citizens have been injured and suffered damages.

403.    Each of the Distributor Defendants and Pharmacy Defendants has acted wantonly or recklessly or has engaged in conduct that demonstrates a reckless indifference to the interests of others.

404.    By reason of these deceptive acts and/or practices, the Navajo Nation and its citizens were injured.

## COUNT XII

### VIOLATION OF UTAH CONSUMER SALES PRACTICE ACT
### (U.C.A. §§ 13-11-1 TO -23)
### (Against Distributor Defendants and Pharmacy Defendants)

405.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

406.    Each of the Distributor Defendants and Pharmacy Defendants violated the Utah Consumer Sales Practice Act, U.C.A. §§ 13-11-1 to -23, by engaging in deceptive acts and/or practices in connection with the distribution and sale of prescription opioids.

407.    Each of the Distributor Defendants and Pharmacy Defendants engaged in these deceptive acts and/or practices by knowingly or intentionally representing that their prescription opioid distribution and dispensing services have characteristics, uses, or benefits related to diversion control that they do not have.  U.C.A. § 13-11-4(2)(a), (b).

408.    Each of the Distributor Defendants and Pharmacy Defendants engaged in unconscionable acts in the marketing and/or sale of prescription opioids.  U.C.A. § 13-11-5.

409.    By reason of these deceptive acts and/or practices, and these unconscionable acts, the Navajo Nation and its citizens were injured.

## COUNT XIII

### NUISANCE
### (Against Distributor Defendants and Pharmacy Defendants)

410.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

411.    Distributor Defendants and Pharmacy Defendants have caused, are causing, and will continue to cause a public nuisance, in that they have committed offenses against the public order and economy of the Navajo Nation by unlawfully:

g)    facilitating the diversion of prescription opioids by selling, distributing, or dispensing, or facilitating the sale, distribution, or dispensing of, such drugs from premises on and near the Navajo Nation to unauthorized users—including children and people at risk of overdose or suicide;

h)    failing to implement effective controls to guard against theft, diversion, and misuse of controlled substances from legal supply chains;

i)    failing to design and operate an adequate system to detect, halt, and report suspicious orders of controlled substances; and

j)    using property for repeated unlawful sales of controlled substances.

412.    Distributor Defendants' and Pharmacy Defendants' activities have unreasonably interfered, are interfering, and will interfere with the common rights of the public:

a)    to be free from reasonable apprehension of danger to person and property;

b)    to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal prescription opioid use;

        c)      to be free from the negative health and safety effects of widespread illegal drug sales on premises on and near the Navajo Nation;

        d)      to be free from blights on the community created by areas of illegal drug use and opioid sales;

        e)      to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

        f)      to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

413.    Distributor Defendants' and Pharmacy Defendants' interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

        a)      has harmed and will continue to harm the public health and public peace of the Navajo Nation;

        b)      has harmed and will continue to harm the Navajo Nation and its citizens, thereby interfering with the rights of the community at large;

        c)      is proscribed by Federal laws and regulations;

        d)      is of a continuing nature, and has produced long-lasting effects; and

        e)      is known to Distributor Defendants and Pharmacy Defendants that their conduct has a significant effect upon the public rights of the Navajo Nation and its citizens.

414.    In addition and independently, Distributor Defendants' and Pharmacy Defendants' conduct invades a legally protected interest.  Distributor Defendants' and Pharmacy Defendants' conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, Distributor Defendants and Pharmacy Defendants have permitted dangerous

drugs under their control to be diverted for illicit purposes such as to injure the Navajo Nation and its citizens.

415.　　Because Distributor Defendants and Pharmacy Defendants have marketed and sold prescription opioids in a manner contrary to law and because Distributor Defendants' and Pharmacy Defendants' conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, Distributor Defendants and Pharmacy Defendants are liable for public nuisance.

416.　　The nuisance has affected the Navajo community in that it has undermined, is undermining, and will continue to undermine the Navajo Nation's citizens' public health, quality of life, and safety.  It has resulted in severe problems including high rates of addiction, overdoses, and dysfunction within the Navajo Nation, and among the Navajo Nation's citizenry.

417.　　As detailed above, public resources have been, are, and will continue to be consumed in efforts to address prescription opioid use and abuse, thereby eliminating available resources which could be used to benefit the Navajo Nation public at large.

418.　　At all times, Distributor Defendants and Pharmacy Defendants had the obligation and the ability to control the sale, distribution, or dispensing of prescription opioids in or near the Navajo Nation.  Distributor Defendants had the power to shut off the illicit supply of prescription opioids into the Navajo Nation, and Pharmacy Defendants had the power to prevent the sale of prescription opioids for non-medical purposes on and near the Navajo Nation.

419.　　As a direct and proximate result of the nuisance, Navajo Nation citizens have been injured in their ability to enjoy rights common to the general public.

420.　　As a direct and proximate result of the nuisance, the Navajo Nation has sustained economic harm by spending substantial sums trying to fix the societal harms caused by

Distributor Defendants' and Pharmacy Defendants' nuisance-causing activity, including costs to the Navajo Nation's healthcare system, social services program, welfare program, and education system.

## COUNT XIV

**NEGLIGENCE AND NEGLIGENCE PER SE**
**(Against Distributor Defendants and Pharmacy Defendants)**

421.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

422.    Distributor Defendants and Pharmacy Defendants owe a duty to act reasonably under the circumstances.

423.    Distributor Defendants and Pharmacy Defendants also have duties under Federal and state law, including the FCSA, to exercise reasonable care in selling and distributing opioids. Those laws seek, among other things, to protect the Nation and its citizens.

424.    The conduct of Distributor Defendants and Pharmacy Defendants fell below the reasonable standard of care.  Their negligent acts include the following:

a)    oversupplying the market on and near the Navajo Nation with highly-addictive prescription opioids;

b)    using unsafe distribution and dispensing practices;

c)    enhancing the risk of harm from prescription opioids by failing to act as a last line of defense against diversion;

d)    inviting criminal activity into the Navajo Nation by disregarding precautionary measures built into Federal and New Mexico laws and regulations;

e)    failing to adhere to all applicable laws and regulations pertaining to the distribution and sale of prescription opioids;

       f)      failing to train or investigate their employees properly;

       g)      failing to review prescription orders for red flags;

       h)      failing to report suspicious orders or refuse to fill them;

       i)      failing to provide effective controls and procedures to guard against theft and diversion of controlled substances; and

       j)      failing to police the integrity of the supply chain for prescription opioids.

425.    Each Distributor Defendant and Pharmacy Defendant had a responsibility to control the sale, distribution, or dispensing of prescription opioids.

426.    Each Distributor Defendant and Pharmacy Defendant sold prescription opioids when they knew or should have known that (a) there was a substantial likelihood that many of the sales were for non-medical purposes, and (b) prescription opioids are inherently dangerous when used for non-medical purposes.

427.    Distributor Defendants and Pharmacy Defendants were negligent or reckless in not acquiring or not utilizing special knowledge and special skills that relate to the dangerous activity of selling prescription opioids in order to prevent or ameliorate such distinctive and significant dangers.

428.    Distributor Defendants and Pharmacy Defendants were also negligent or reckless in failing to guard against foreseeable third-party negligence or misconduct, including that of negligent or corrupt prescribers, pharmacists, and staff, and criminals who buy and sell prescription opioids for non-medical purposes.

429.    Each Distributor Defendant and Pharmacy Defendant breached their duty to exercise the degree of care commensurate with the dangers involved in selling dangerous controlled substances.

430.    Distributor Defendants and Pharmacy Defendants were also negligent or reckless in voluntarily undertaking duties to the Navajo Nation that they breached.  Distributor Defendants and Pharmacy Defendants, through their statements to the media, regulators, insurance companies, customers, and the public at large, undertook duties to take all reasonable precautions to prevent drug diversion.

431.    Distributor Defendants and Pharmacy Defendants were also negligent per se by virtue of having violated laws and regulations pertaining to the diversion of prescription opioids.

432.    Distributor Defendants' and Pharmacy Defendants' conduct was the cause-in-fact and proximate cause of injuries and damages to the Navajo Nation, including but not limited to increased costs for its healthcare system, social services program, welfare program, and education system, as well as the costs of lost productivity, lower tax revenue, and additional damages to be proven at trial.

433.    The Navajo Nation is without fault, and the injuries to it would not have happened in the ordinary course of events if Distributor Defendants and Pharmacy Defendants had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

434.    The reckless, wanton, and reprehensible nature of Distributor Defendants' and Pharmacy Defendants' conduct entitles the Navajo Nation to an award of punitive damages and attorneys' fees and costs.

## COUNT XV

**UNJUST ENRICHMENT**
**(Against Distributor Defendants and Pharmacy Defendants)**

435.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

436.    The Navajo Nation has expended substantial amounts of money in an effort to remedy or mitigate the harms caused by Distributor Defendants' and Pharmacy Defendants' conduct.

437.    The Navajo Nation's expenditures to support people who use prescription opioids have added to Distributor Defendants' and Pharmacy Defendants' wealth.  The expenditures by the Navajo Nation have helped sustain Distributor Defendants' and Pharmacy Defendants' businesses.

438.    In this way, the Navajo Nation has conferred a benefit upon Distributor Defendants and Pharmacy Defendants, by paying for what may be called Distributor Defendants' and Pharmacy Defendants' externalities—the costs of the harm caused by Distributor Defendants' and Pharmacy Defendants' improper sales, distribution, and dispensing practices.

439.    In this way, the Navajo Nation has conferred a benefit upon Distributor Defendants and Pharmacy Defendants.

440.    Distributor Defendants and Pharmacy Defendants made substantial profits while fueling the use and abuse of prescription opioids on and near the Navajo Nation.

441.    Distributor Defendants and Pharmacy Defendants continue to receive considerable profits from the sale, distribution, and dispensing of controlled substances on and near the Navajo Nation.  Distributor Defendants and Pharmacy Defendants are aware of these obvious benefits, which have unjustly enriched Distributor Defendants and Pharmacy Defendants, and thus retention of these benefits is not justified under these circumstances. Indeed, it would be inequitable to allow Distributor Defendants and Pharmacy Defendants to retain these benefits.

## COUNT XVI

**CIVIL CONSPIRACY**
**(Against All Defendants)**

442.    The Navajo Nation realleges and incorporates by reference the foregoing allegations as if set forth at length herein.

443.    Manufacturer Defendants have engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating chronic pain with prescription opioids.  Their aggressive marketing campaign enabled Manufacturer Defendants to overcome the longstanding medical consensus that prescription opioids are unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide.

444.    In response to and in conjunction with this increased demand, the Manufacturer Defendants continuously supplied prescription opioids to the Distributor Defendants, which the Distributor Defendants then continuously supplied to the Pharmacy Defendants, which then dispensed these prescription opioids to consumers, including the Navajo Nation citizens.  These transactions occurred despite Defendants having actual or constructive knowledge that they were habitually breaching their common law duties and violating the FCSA.

445.    Without Manufacturer Defendants' misrepresentations, which created demand, Distributor Defendants would not have been able to sell to Pharmacy Defendants the increasing number of orders of prescription opioids for non-medical purposes that have injured the Navajo Nation and its citizens.

446.    Without Distributor Defendants' supply of prescription opioids, Pharmacy Defendants would not have been able to fill the increasing number of orders of prescription opioids for non-medical purposes that have impacted the Navajo Nation and its citizens.

117

447.     Not one of the Defendants would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other Defendants.

448.     The Defendants agreed with each other to accomplish the unlawful purposes of marketing, selling, distributing, and retailing prescription opioids through violations of law and misrepresentations.  The Defendants performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, distributing, and retailing prescription opioids by means of misrepresentations and omissions, violating Federal and state laws, and turning a blind eye to diversion of prescription opioids.

449.     As a result of the concerted action between the Manufacturer Defendants, the Distributor Defendants, and the Pharmacy Defendants, the Navajo Nation and its citizens have suffered damages.

450.     Defendants are jointly and severally liable for the results of their concerted efforts.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, the Navajo Nation, prays that this Court enter judgment in its favor against Defendants and:

a.     On Count I (RICO Violation, Opioid Marketing Enterprise, Against Manufacturer Defendants):

i.     Enter an order awarding the Navajo Nation its actual and treble damages stemming from the Manufacturer Defendants' violations of RICO;

ii.     Enter an order for equitable and/or injunctive relief in the form of court-supervised corrective communication, actions, and programs;

iii.     Enter an order forfeiting any property acquired or maintained by the Manufacturer Defendants through their racketeering activity; and

118

      iv.     Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

    b.    On Count II (RICO Violation, Opioid Supply Chain Enterprise, Against All Defendants):

      i.     Enter an order awarding the Navajo Nation its actual and treble damages stemming from the Defendants' violations of RICO;

      ii.     Enter an order for equitable and/or injunctive relief in the form of court-supervised corrective communication, actions, and programs;

      iii.     Enter an order forfeiting any property acquired or maintained by the Defendants through their racketeering activity; and

      iv.     Award the Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

    c.    On Count III (Lanham Act Violation Against All Defendants):

      i.     Enter an order awarding the Navajo Nation its actual damages stemming from Defendants' violations of the Lanham Act; and

      ii.     Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other and additional relief as the Court may determine to be just and proper.

    d.    On Count IV (Violation of New Mexico Unfair Practices Act Against Manufacturer Defendants):

i.      Enter an order that directs Manufacturer Defendants to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26, in connection with the marketing, manufacture, and sale of prescription opioids;

ii.     Enter an order awarding the Navajo Nation its actual damages for each and every instance that Manufacturer Defendants, jointly and severally, are found to have breached the provisions of the New Mexico Unfair Practices Act, and an order awarding the Navajo Nation three times its actual damages for each and every instance that Manufacturer Defendants, jointly and severally, are found to have willfully breached the provisions of the New Mexico Unfair Practices Act, N.M.S.A. § 57-12-10(B);

iii.    Award the Navajo Nation such additional relief as may be necessary to remedy Manufacturer Defendants' violations of the New Mexico Unfair Practices Act; and

iv.     Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other additional relief as the Court may determine to be just and proper, in accordance with N.M.S.A. § 57-12-10(C).

e.      On Count V (Arizona Consumer Fraud Act Against Manufacturer Defendants):

i.      Enter an order that directs Manufacturer Defendants to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating Arizona Consumer Fraud Act, A.R.S. §§ 44-1521–1534, in connection with the marketing, manufacture, and sale of prescription opioids;

ii.     Enter an order awarding the Navajo Nation its actual damages for each and every instance that Manufacturer Defendants, jointly and severally, are found to have breached the provisions of the Arizona Consumer Fraud Act;

iii.     Award the Navajo Nation such additional relief as may be necessary to remedy Manufacturer Defendants' violations of the Arizona Consumer Fraud Act; and

iv.     Award the Navajo Nation punitive damages in light of the Manufacturer Defendants' conduct that is wanton, reckless, or demonstrates a reckless indifference to the interests of others, which reflects spite and ill-will.

f.     On Count VI (Utah Consumer Sales Practice Act Against Manufacturer Defendants):

i.     Enter an order that directs Manufacturer Defendants to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating the Utah Consumer Sales Practice Act, U.C.A. §§ 13-1-1 to -23, in connection with the marketing, manufacture, and sale of prescription opioids;

ii.     Enter an order awarding the Navajo Nation its actual damages for each and every instance that Manufacturer Defendants, jointly and severally, are found to have breached the provisions of the Utah Consumer Sales Practice Act;

iii.     Award the Navajo Nation such additional relief as may be necessary to remedy Manufacturer Defendants' violations of the Utah Consumer Sales Practice Act; and

iv.     Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other additional relief as the Court may determine to be just and proper, in accordance with U.C.A. § 13-1-17.5.

g.     On Count VII (Nuisance Against Manufacturer Defendants):

v.     Order Manufacturer Defendants to pay the expenses the Navajo Nation has incurred or will incur in the future to abate fully the nuisance they have caused;

vi.     Award the Navajo Nation punitive damages; and

vii.     Order such further relief as justice and equity may require.

h.     On Count VIII (Negligence and Negligence Per Se Against Manufacturer Defendants):

i.     Award the Navajo Nation compensatory damages for the substantial costs to the Navajo Nation's healthcare system, social services program, welfare program, and education system, as well as the cost of lost productivity due to Manufacturer Defendants' negligence;

ii.     Award the Navajo Nation punitive damages;

iii.     Award the Navajo Nation attorneys' fees and costs; and

iv.     Order such further relief as justice and equity may require.

i.     On Count IV (Unjust Enrichment Against Manufacturer Defendants):

i.     Award the Navajo Nation restitution of its costs caused by Manufacturer Defendants' actions, including the costs of addressing Defendants' externalities;

ii.     Disgorge Manufacturer Defendants of all amounts they have unjustly obtained; and

iii.     Order such further relief as justice and equity may require.

j.     On Count V (Violation of New Mexico Unfair Practices Act Against Distributor Defendants and Pharmacy Defendants):

i.     Enter an order that directs each Distributor Defendant and Pharmacy Defendant to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1 to -26, in connection with the marketing and sale of prescription opioids;

ii.     Enter an order awarding the Navajo Nation its actual damages for each and every instance that each Distributor Defendant and Pharmacy Defendant, jointly and severally, are found to have breached the provisions of the New Mexico Unfair Practices Act, and an order awarding the Navajo Nation three times its actual damages for each and every instance that each Distributor Defendant and Pharmacy Defendant, jointly and severally, are found to have willfully breached the provisions of the New Mexico Unfair Practices Act, N.M.S.A. § 57-12-10(B);

iii.     Award the Navajo Nation such additional relief as may be necessary to remedy Distributor Defendants' and Pharmacy Defendants' violations of the New Mexico Unfair Practices Act; and

iv.     Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other additional relief as the Court may determine to be just and proper, in accordance with N.M.S.A. § 57-12-10(C).

k.     On Count XI (Violation of Arizona Consumer Fraud Act Against Distributor Defendants and Pharmacy Defendants),

i.     Enter an order that directs each Distributor Defendant and Pharmacy Defendant to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521–1534, in connection with the marketing and sale of prescription opioids;

ii.     Enter an order awarding the Navajo Nation its actual damages for each and every instance that each Distributor Defendant and Pharmacy Defendant, jointly and severally, are found to have breached the provisions of the Arizona Consumer Fraud Act;

123

iii.　　Award the Navajo Nation such additional relief as may be necessary to remedy Distributor Defendants' and Pharmacy Defendants' violations of the Arizona Consumer Fraud Act; and

iv.　　Award the Navajo Nation punitive damages in light of the Distributor Defendants' and Pharmacy Defendants' wanton and reckless conduct, which reflects spite and ill-will.

l.　　On Count XII (Violation of Utah Consumer Sales Practice Act Against Distributor Defendants and Pharmacy Defendants):

i.　　Enter an order that directs each Distributor Defendant and Pharmacy Defendant to "cease and desist the[ir] unlawful conduct prospectively," i.e., cease and desist violating the Utah Consumer Sales Practice Act, U.C.A. §§ 13-1-1 to -23, in connection with the marketing and sale of prescription opioids;

ii.　　Enter an order awarding the Navajo Nation its actual damages for each and every instance that each Distributor Defendant and Pharmacy Defendant, jointly and severally, are found to have breached the provisions of the Utah Consumer Sales Practice Act;

iii.　　Award the Navajo Nation such additional relief as may be necessary to remedy Distributor Defendants' and Pharmacy Defendants' violations of the Utah Consumer Sales Practice; and

iv.　　Award the Navajo Nation the costs of bringing this action, investigative costs and fees, attorneys' fees, and such other additional relief as the Court may determine to be just and proper, in accordance with U.C.A. § 13-1-17.5.

m.　　On Count XIII (Nuisance Against Distributor Defendants and Pharmacy Defendants):

       i.     Order Distributor Defendants and Pharmacy Defendants to pay the expenses the Navajo Nation has incurred or will incur in the future to abate fully the nuisance they have caused;

       ii.     Award the Navajo Nation punitive damages; and

       iii.     Order such further relief as justice and equity may require.

n.     On Count XIV (Negligence and Negligence Per Se Against Distributor Defendants and Pharmacy Defendants):

       i.     Award the Navajo Nation compensatory damages for the substantial costs to the Navajo Nation's healthcare system, social services program, welfare program, and education system, as well as the cost of lost productivity due to Distributor Defendants' and Pharmacy Defendants' negligence;

       ii.     Award the Navajo Nation punitive damages;

       iii.     Award the Navajo Nation attorneys' fees and costs; and

       iv.     Order such further relief as justice and equity may require.

o.     On Count XV (Unjust Enrichment Against Distributor Defendants and Pharmacy Defendants):

       i.     Award the Navajo Nation restitution of its costs caused by Distributor Defendants' and Pharmacy Defendants' actions, including the costs of addressing Distributor Defendants' and Pharmacy Defendants' externalities and the costs of prescription opioids paid for by the Navajo Nation;

       ii.     Disgorge Distributor Defendants and Pharmacy Defendants of all amounts they have unjustly obtained; and

       iii.     Order such further relief as justice and equity may require.

p.      On Count XVI (Civil Conspiracy Against All Defendants):

       i.      Award the Navajo Nation compensatory and punitive damages for the conspiracy in which Manufacturer Defendants, Distributor Defendants, and Pharmacy Defendants engaged; and

      ii.      Order such further relief as justice and equity may require.

## REQUEST FOR JURY TRIAL

The Navajo Nation respectfully requests that all issues presented by its above First

Amended Complaint be tried by a jury, with the exception of those issues that, by law, must be

tried before the Court.


Date:  January 23, 2019

OF COUNSEL:

David C. Mielke, NM Bar # 9723
SONOSKY CHAMBERS SACHSE
MIELKE & BROWNELL, LLP
600 Marquette Avenue, NW,
Suite 660
Albuquerque, NM 87102
dmielke@abqsonosky.com

Richard W. Fields
FIELDS PLLC
1700 K Street, NW
Suite 810
Washington, DC 20006
fields@fieldslawpllc.com

Lloyd B. Miller
Donald J. Simon
Whitney A. Leonard
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP
1425 K. Street, NW
Suite 600
Washington, DC 20005
lloyd@sonosky.net
dsimon@sonosky.net
whitney@sonosky.net

*/s/ Jenna A. Hudson*
Scott D. Gilbert
Richard Leveridge
Michael B. Rush
Jenna A. Hudson
GILBERT LLP
1100 New York Avenue, NW
Suite 700
Washington, DC 20005
gilberts@gilbertlegal.com
leveridger@gilbertlegal.com
rushm@gilbertlegal.com
hudsonj@gilbertlegal.com

Assistant Attorney General Paul Spruhan
NAVAJO NATION
P.O. Box 2010
Window Rock, AZ 86515
(928) 871-6343
pspruhan@nndoj.org

*Attorney for the Navajo Nation*

127

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2019 I electronically filed the foregoing First

Amended Complaint with the Clerk of this Court by using the CM/ECF system, which will send

notice of electronic filing to all counsel of record.

*/s/ Jenna A. Hudson*             
Jenna A. Hudson, Esq.
