UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*All Cases* | MDL 2804<br><br>Hon. Dan Aaron Polster<br><br>Mag Judge David A. Ruiz |

## PLAINTIFF CITY OF CLEVELAND'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISQUALIFY CAROLE RENDON

### I.      INTRODUCTION

Plaintiff the City of Cleveland ("Cleveland") moves the Court for an Order disqualifying Carole S. Rendon[1] and her firm, BakerHostetler, from the case.  Cleveland recognizes the gravity of this request, but it is compelled to do so under the circumstances, all of which are discussed below.  By way of background, Rule 1.11(a) of the Ohio Rules of Professional Conduct bars a former government attorney from representing a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.  The Ohio Rules of Professional Conduct apply to all lawyers practicing before this Court.  *See* Local Rule 83.5(b) ("All attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct adopted by the Supreme Court of Ohio . . . ").  The purpose of this rule is to "prevent a lawyer from exploiting

---

[1] Ms. Rendon and BakerHostetler are counsel for opioid manufacturer defendants Endo Health Solutions Inc. and Endo Pharmaceuticals, Inc. (collectively, "Endo").  Endo is represented by Arnold & Porter LLP as well.  Ms. Rendon also serves as the Manufacturer Defendants' Co-Liaison Counsel.  Dkt. 24.

public office for the advantage of another client." Rule 1.11 Cmt. 3. Similarly, Rule 1.11(c) of the Ohio Rules of Professional Conduct forbids a former government attorney from representing a client adverse to another person when the lawyer possesses confidential government information about that person acquired when the lawyer was a public officer or employee.

While acting as United States Attorney for the Northern District of Ohio, Ms. Rendon personally received confidential government information relating to the City of Cleveland, the opioid crisis, and the internal workings of the law enforcement community within the Northern District of Ohio. According to Ms. Rendon's bio, as a member of the U.S. Attorney's Office, she served "as lead counsel on the Consent Decree providing comprehensive reform for the Cleveland Division of Police."[2] This work undoubtedly gave her direct insight into the inner workings of the Cleveland Police Department and it now serves to benefit her firm and its clients in this litigation **against** Cleveland. Similarly, while at the U.S. Attorney's Office, Ms. Rendon she was, as she herself said, part of a team who "created the Northeast Ohio Heroin and Opioid Task Force."[3] Again, this work undoubtedly gave Ms. Rendon direct knowledge about and insight into the impact of the opioid crisis on Plaintiffs in this litigation, as well as their response to the crisis -- all of which now puts her private clients at a significant advantage vis-à-vis Cleveland and the other Plaintiffs. In light of Ms. Rendon's personal involvement in issues that are central to this litigation, through her work at the U.S. Attorney's Office for the Northern District of Ohio, including her work on the Consent Decree regarding Cleveland's Division of Police and involvement with the Northeast Ohio Heroin and Opioid Task Force, Ms. Rendon and her firm should be disqualified. This is particularly so because Ms. Rendon, in her position as counsel for Endo and as manufacturers' liaison counsel, has used this information while actively

---

[2] "Response to Request for Proposal to serve as Independent Monitor for the Consent Decree regarding the Chicago Police Department," BakerHostetler Sept. 4, 2018, available at http://chicagopoliceconsentdecree.org/wp-content/uploads/2018/09/Baker-Hostetler-Proposal-redacted.pdf (last visited Jan. 4, 2019).

[3] *See*, *supra*, n.1.

participating in and taking depositions of Cleveland and Cuyahoga County witnesses with whom she interacted and communicated during her government employment.

If, however, the Court believes that the record is not yet adequate to disqualify Ms. Rendon, Cleveland asks that the Court order her to sit for deposition so that Cleveland and the other bellwethers can discover the full scope of her knowledge gained from her involvement with the bellwether's witnesses concerning the opioid crisis and law enforcement's responses to the crisis. And if the Court agrees that such a deposition in permissible, Cleveland asks that Ms. Rendon be directed to cease direct involvement in depositions of witnesses she interacted with as a result of her position as the United States Attorney for the Northern District of Ohio until that deposition is completed.

## II.    FACTUAL BACKGROUND

Ms. Rendon served in the U.S. Attorney's Office for the Northern District of Ohio from 2009-2017.[4]  From 2009-2016, Ms. Rendon served as the First Assistant United States Attorney. *Id.*  From July 15, 2016 until March 2017, Ms. Rendon was the United States Attorney for the Northern District of Ohio—and hence the chief law enforcement officer for the district.  *Id.*[5]

### A.    Ms. Rendon Obtained and Used Direct Knowledge Regarding the Impact of the Opioid Crisis on Plaintiffs, and their Responses thereto, through her Close Work and Constant Communication with Plaintiffs' Law Enforcement Personnel and Employees

During her tenure at the U.S. Attorney's Office, Ms. Rendon was involved in many matters involving the opioid crisis and the Track One jurisdictions (City of Cleveland, Summit County, and Cuyahoga County) ("CT1").  Notably, Ms. Rendon was a founding member and co-creator of the U.S. Attorney's Heroin and Opioid Task Force ("Opioid Task Force").[6]  The

---

[4] *See* https://www.justice.gov/usao-ndoh/pr/carole-s-rendon-sworn-us-attorney-northern-district-ohio

[5] https://www.cleveland.com/court-justice/index.ssf/2017/03/us_attorney_carole_rendon_says.html

[6] *See* https://www.justice.gov/usao-ndoh/pr/us-attorneys-heroin-and-opioid-task-force-recognized-attorney-generals-award.

3

Opioid Task Force members included high-ranking officials from Plaintiffs the City of Cleveland and the Cuyahoga County who, working together with Ms. Rendon in her capacity as the Task Force Chair, were responsible for "increasing access to Narcan, developing new protocols to how police handle drug overdose scenes, increased training for physicians about the potential side effects of prescription opioids, public awareness campaigns, and the formation of a consortium to coordinate the response from the various medical systems in Greater Cleveland, among others."[7]

The members of the Opioid Task Force included various stakeholders in northern Ohio. Of particular relevance here, the Opioid Task Force membership included the Cuyahoga County Sheriff's Department, Cuyahoga County Common Pleas Court, the Cuyahoga County Prosecutor's Office, the Cleveland Division of Police, the DEA, the FBI, the Ohio State Medical Board, the Ohio State Pharmacy Board, the Cuyahoga County Board of Health, the Cuyahoga County Medical Examiner, University Hospitals, and the ADAMHS Board.  In 2016, the Department of Justice recognized fifteen members of the Opioid Task Force with the Attorney General's Award, with the list of specially recognized individuals including Keith Martin (Drug Enforcement Administration), Philip Angelo (Cuyahoga County Sheriff's Department), Vincent Caraffi (Cuyahoga County Board of Health), Dr. Thomas Gilson (Cuyahoga County Medical Examiner), Gary Gingell (Commander, Cleveland Division of Police), Hugh Shannon (Cuyahoga County Medical Examiner's Office), and Dr. Joan Papp (MetroHealth Medical Center).  Critically, many of these people, with whom Ms. Rendon had constant interaction as Chair of the Task Force, are now key witnesses in this litigation.  For example, Caraffi, Gilson, Gingell, Shannon, and Papp have been, or will be, deposed in this case. (Gilson, Shannon, and Gingell are 30(b)(6) designees from Cuyahoga County and the City of Cleveland.)[8]

---

[7] *See* https://www.justice.gov/usao-ndoh/pr/us-attorneys-office-among-numerous-community-partners-host-daylong-conference-next (last visited Jan. 4, 2019).
[8] *See* https://www.justice.gov/usao-ndoh/pr/us-attorneys-heroin-and-opioid-task-force-recognized-attorney-generals-award (last visited Jan. 4, 2019).

Partly due to her work on the Opioid Task Force and given her substantial involvement in combating the opioid crisis in Ohio, Ms. Rendon testified before the Homeland Security Committee in April 2016.  *See* Pifko Declaration Ex. 5.  Ms. Rendon testified to "working closely with our Federal, our State, our local law enforcement officers to fight this growing epidemic" and was in "constant communication . . . on a regular basis by e-mail and phone" with representatives from the Plaintiff jurisdictions.  *Id.*  Multiple witnesses specifically testified that they met with Ms. Rendon in her capacity as Chair of the Opioid and Heroin Task Force. ████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████  ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████

Beyond the Opioid Task Force, further interactions Ms. Rendon had with witnesses regarding the subject matter of this case have been confirmed in deposition testimony.  In his deposition, Commander Gingell testified at various points to the breadth of Ms. Rendon's involvement with matters relating to the opioid crisis. ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████  ███████████████████████████████████████████████████

███████████████████████████████████  ███████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Ms. Rendon's use of her knowledge regarding Plaintiffs' employees did not end with her assistance during the deposition of Commander Gingell.  Rather, Ms. Rendon has examined witnesses about topics she would have personal knowledge about from her time as a member of the Task Force. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ ██

████████████████████████████████████████

████████ ████████████ ████████████████████

████████████████████████████ ████████████

Similarly, Ms. Rendon was not merely mentioned in depositions of Plaintiffs' witnesses; rather, Ms. Rendon has directly participated in depositions of witnesses who were already familiar with Ms. Rendon, and she used her unique position to elicit testimony regarding her participation in and involvement with Plaintiffs' response to the opioid crisis. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

6

**B.**     **Ms. Rendon Obtained and Used Knowledge Directly from Plaintiffs Witnesses Based on the Relationships she Developed with them during her Time in the U.S. Attorney's Office and as Part of her Personal and Professional Role in the Northeast Ohio Response to the Opioid Crisis**

During her time in the U.S. Attorney's Office, Ms. Rendon routinely received information from local law enforcement on the status of investigations and efforts to combat the opioid crisis.  In one email, ███████████ from the Cuyahoga County Medical Examiner's Office provided Carole Rendon ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████  In deposition, Ms. Rendon examined Chief Williams ██████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████ ███ ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████

Ms. Rendon also received updates directly from ██████████████ on meetings between Cuyahoga County officials and the Ohio Governor on efforts to address the opioid crisis. ████ ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████

7

Ms. Rendon was an active participant in working with Cuyahoga County to formulate its Emergency Action Plan.  The plan was put together with Opioid Task Force members like Dr. Gilson from Cuyahoga County and Vince Caraffi from the DEA.  ███████████████████ ████████████████████████████████████████████████████████████████ ██

Not only was Ms. Rendon the recipient of information from the Plaintiff jurisdictions, Ms. Rendon herself reached out to gather information on things like overdose deaths.  In one instance, Ms. Rendon personally emailed ████████████ of Cuyahoga County ████████ ████████████████████████████████████████████████████████████████ ████████████████████████

Ms. Rendon also was involved with many organizations that dealt specifically with the opioid crisis and included members from the CT1 jurisdictions.  Ms. Rendon was a member of the High Intensity Drug Trafficking Area (HIDTA) Program and even on HIDTA's Executive Board.  ██████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

█████████████████████ Ms. Rendon was also a member of Stand Together Against Neighborhood Crime Everyday (STANCE).  As part of STANCE, Ms. Rendon facilitated meetings where crime statistics, including information about opiate overdoes, were discussed. ████████████████████████████████████████████████████████████████

█████████████████████████████████████████ The U.S. Attorney's Office and Ms. Rendon were also involved with The Organized Crime Drug Enforcement Task Force (OCDETF), a Task Force that dealt with highly confidential law enforcement meetings, materials, and investigations—some of which were opiate-based investigations.

Ms. Rendon also was an active participant in conferences addressing the opioid crisis. See Pifko Declaration Exs. 13 and 14.  These conferences were attended by many members of

the CT1 jurisdictions such as Dr. Gilson from Cuyahoga County Medical Examiner's Office and Commander Gingell of Cleveland Division of Police.

In addition to her official duties, Ms. Rendon also wrote articles about the opioid crisis while employed at the U.S. Attorney's Office.  Ms. Rendon worked closely with Dr. Gilson of the Cuyahoga Medical Examiner's Office to co-author "Rules for Establishing Causation in Opiate/Opioid Overdose Prosecutions — The Burrage Decision," published March 1, 2017. Pifko Declaration Ex. 15. The article offers guidance on the types of evidence required for establishment of causation in overdose prosecutions.  During their collaboration, Dr. Gilson disclosed confidential information about the Medical Examiner's Office to Ms. Rendon ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Ms. Rendon also wrote an opinion article titled, "An opioid crisis where 'death specification' prosecutions are only one answer," which was published July 13, 2016.  In that article, Ms. Rendon acknowledges that "[d]octors and patients need more education about the dangers of prescribing too many pain pills and prescribing them too often" and that "[h]eroin and fentanyl use and prescription drug misuse are intertwined and both must be addressed."[9]

### C. Ms. Rendon Obtained and Used First-Hand Knowledge of the Cleveland Division of Police through her Work Overseeing the Consent Decree, which Involved a Comprehensive Assessment of the Policies, Procedures, Training, and Systems of Accountability for the Cleveland's Division of Police

Ms. Rendon also has in depth knowledge about the City of Cleveland Police Force because she investigated and negotiated a Consent Decree with the Cleveland Department while at the U.S. Attorney's Office.  She was the signatory on the eventual Consent Decree between

---

[9] Carole S. Rendon, "An opioid crisis where 'death specification' prosecutions are only one answer: Carole S. Rendon (Opinion)," The Plain Dealer, July 13, 2016, available at https://www.cleveland.com/opinion/index.ssf/2016/07/a_public_health_and_law_enforc.html (last visited Jan. 4, 2019).

the U.S. Attorney's Office for the Northern District of Ohio and Cleveland.  *See* Pifko Declaration Ex. 17.  Ms. Rendon now describes herself as having been the "lead counsel" for the Consent Decree negotiated directly with the Cleveland Division of Police.[10]  The Consent Decree touches on many aspects of the City of Cleveland Police Force that have been intensely subject to discovery in this litigation, including training, resource allocation, and other internal procedures.  As the Consent Decree outlines, the DOJ investigation included "a comprehensive assessment of CDP's [Cleveland Division of Police] policies, procedures, training, systems of accountability, and community engagement."  *Id.*  That comprehensive review also included "multi-day onsite tours of CDP's facilities, District command stations, and ride-alongs with officers in every police District; interviews with Cleveland officials, CDP's command staff, members of CDP's specialized units, supervisors, and police officers; an extensive review of documents; and numerous meetings with residents, community groups, members of religious communities, the Office of Professional Standards, the Civilian Police Review."  *Id.*

Ms. Rendon has used this knowledge for the benefit of her client and other Defendants in this litigation.  The Consent Decree was discussed extensively in the deposition of Cleveland's Chief Williams.  Defendants' counsel spent over thirty-eight pages of deposition transcript asking Chief Williams about topics related to the settlement agreement between the City of Cleveland and the Northern District of Ohio U.S. Attorney's Office.  ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████  Ms. Rendon's inside knowledge concerning Cleveland's Division of Police may be used to bolster those arguments.  Indeed, some of the extensive questioning concerning the Consent Decree included examination conducted by Ms. Rendon herself.  ████████████████████████████████████████████████████

---

[10] https://www.bakerlaw.com/CaroleSRendon#overview

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████

**D.  Documents Produced by Plaintiffs Confirm Ms. Rendon's Central Role in Plaintiffs' Response to the Opioid Crisis**

In addition to the specific examples above, documents produced in this case are replete with mention of and/or reference to Ms. Rendon.  In the document produced by Cleveland, Cuyahoga County, and Summit County, Ms. Rendon's name appears frequently, reflecting the extent of her direct involvement with the issues at stake in this litigation.  Specifically, Ms. Rendon's name appears 5,088 times in Cuyahoga County's document production, 653 times in Cleveland's document production, and 227 times in Summit County's document production.

**E.  Despite her Direct Involvement in Combatting the Opioid Crisis in Conjunction with and on Behalf of Plaintiffs, Ms. Rendon Accepted Representation Adverse to the Entities and Individuals she Worked with and on Behalf of, Yet she Refuses to Acknowledge any Potential Conflict**

In May 2017, roughly two months after her resignation as U.S. Attorney, Ms. Rendon joined the law firm of BakerHostetler in Cleveland, where she is currently employed.[11]  As a member of BakerHostetler Ms. Rendon represents Defendant Endo Pharmaceuticals directly in

---

[11] https://www.bakerlaw.com/press/bakerhostetler-adds-second-us-attorney-to-chambers-ranked-white-collar-team

this MDL and, indirectly represents all Manufacturer Defendants' as their liaison counsel.  Ms. Rendon has actively participated in this case, appearing at numerous status conferences and depositions.  In particular, Ms. Rendon has been heavily involved in depositions of Cleveland and Cuyahoga County witnesses and, in multiple instances described above, directly questioned those witnesses.

Ms. Rendon has refused to recognize even the potential for a conflict in her involvement on alternative sides of the issues being litigated in this case.  However, Ms. Rendon's predecessor as U.S. Attorney for the N.D. Ohio, Steve Dettlebach, also works at BakerHostetler. Yet, unlike Ms. Rendon, Ms. Dettlebach has recused himself from this case.[12]  Additionally, Ms. Rendon's successor as U.S. Attorney for the N.D. Ohio, Justin Herdman, has also recused himself from any involvement in this case because of his prior work at Jones Day, who represents Wal-Mart in this case.  In short, multiple attorneys who have had involvement on both sides of the issues being litigated in this case recognized the conflict that their work presents and recused themselves.  Ms. Rendon, unfortunately, has not.

## III.    ARGUMENT

"It is axiomatic that a district court has inherent authority to disqualify an attorney as a sanction for professionally unethical conduct."  *United States v. Villaspring Health Care Ctr., Inc.*, No. CIV.A. 3:11-43-DCR, 2011 WL 5330790, at *2 (E.D. Ky. Nov. 7, 2011).  "A motion to disqualify counsel is the proper method for a party to bring an alleged breach of ethical duties to the court's attention."  *See Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-CV-485, 2007 WL 2907323, at *2 (N.D. Ohio Oct. 4, 2007). Disqualification for an ethical violation is appropriate when there is a "'reasonable possibility [that] some specifically identifiable impropriety' actually occurred,

---

[12] Ms. Rendon contends that Mr. Dettlebach only recused himself from this case because of his ultimately unsuccessful run for Attorney General of Ohio.  *See* Pifko Declaration Ex. 18.  Yet, to the best of Plaintiff's knowledge, Mr. Dettlebach remains recused despite no longer being a candidate, casting doubt on Ms. Rendon's explanation for the recusal.

and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002) (*quoting Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 258 (S.D. Ohio 1991)).

Close calls regarding conflicts of interest and disqualification should be decided in favor of disqualification. *See Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978) ("Doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification."). As one court has said, "[i]n determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances 'with hair-splitting nicety' but, ... with the view of preventing 'the appearance of impropriety' [the Court should] resolve all doubts in favor of disqualification.") *Sanford v. Commonwealth of Virginia*, 687 F. Supp. 2d 591, 602 (E.D. Va. 2009) (quoting *United States v. Clarkson*, 567 F.2d 270, 273 n. 3 (4th Cir.1977)).

### A.    The Mere Appearance of Impropriety Should Disqualify Ms. Rendon

This is an unusual, unique situation. As outlined above, Rendon's involvement with the individuals, issues, and information at the heart of this case is more than just pro forma involvement by virtue of being the U.S. Attorney. Ms. Rendon was involved, at a personal and professional level, with the individuals, Plaintiffs, and issues that are at the very heart of this litigation. Plaintiffs' request for her disqualification, therefore, is undeniably based on the fundamental fairness and the integrity of the legal system.

The ethical rules and values at issue here, provided they are properly protected, protect the public's trust in the legal system and endeavor to avoid the appearance of impropriety. Ohio courts have indicated that the mere appearance of impropriety is a factor to consider when determining if an attorney should be disqualified. *See e.g. Kala v. Aluminum Smelting & Ref. Co.*, 1998-Ohio-439, 81 Ohio St. 3d 1, 5, 688 N.E.2d 258, 262; *see also Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 664 (N.D. Ill. 1986) (finding that several Circuit Courts of

Appeal have noted the concerns of former government attorneys side-switching, safeguarding confidential governmental information, encouragement of public service actions to secure future private employment, and the professional benefit derived from avoiding the "appearance of evil").  In large part, this consideration is to protect the integrity of and public confident in the legal system.  *See Kala v. Aluminum Smelting & Ref. Co.*, 1998-Ohio-439, 81 Ohio St. 3d 1, 5, 688 N.E.2d 258, 262 (finding that by avoiding appearance of impropriety, "a court helps to maintain public confidence in the legal profession and assists in protecting the integrity of the judicial proceeding."); *Kronberg v. LaRouche*, No. 1:09CV947 AJT/TRJ, 2010 WL 1443934, at *5 (E.D. Va. Apr. 9, 2010) (finding disqualification "necessary to protect the public perception of and the public trust in the judicial system").

These considerations are particularly acute when dealing with former government attorneys.  As one court stated: "the public must be protected against the possibility that government attorneys in a variety of ways will conduct 'their offices with an eye toward future private employment,' whether by law firms or prospective clients." *Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 44 (D.C. 1984); *Wagner v. Lehman Bros. Kuhn Loeb Inc.*, 646 F. Supp. 643, 665 (N.D. Ill. 1986) (finding that the case of a former government attorney switching sides posed a danger to the "perceived integrity" of the government agency and the court system).  In fact, the comments to the Ohio Rules of Professional Conduct explicitly recognize that one of the goals of Rule 1.11 is to "prevent a lawyer from exploiting public office for the advantage of another client."  *See* Rule 1.11 Cmt. 3.

Ms. Rendon's disqualification raises precisely these concerns.  In the span of mere months, Ms. Rendon went from being the chief federal law enforcement officer for Northern District of Ohio, where she was lauded for her work combating the opioid crisis, to defending the very companies she was fighting while in government service.  This side-switching erodes public confidence in the justice system.  Incredibly, Ms. Rendon touts her experience as a federal prosecutor, including her work on the Opioid Task Force, on her firm's website.

14

Notably, Ms. Rendon's predecessor and successor as U.S. Attorney for the N.D. of Ohio have recused themselves from involvement in this case.  Ms. Rendon's predecessor as U.S. Attorney for the N.D. Ohio, Steve Dettlebach, has recused himself from this case and works at the same firm as Ms. Rendon (BakerHostetler).  Ms. Rendon's successor as U.S. Attorney for the N.D. Ohio has also recused himself from any involvement in this case because of his prior work at Jones Day, which represents a Defendant in this case.  Ms. Rendon is not subject to a different set of rules.  This Court, in the same way Mr. Dettlebach and Mr. Herman have respected the pertinent ethical boundaries, should err on the side of caution and disqualify Ms. Rendon from further work on this case.

The reason for this is clear: "[A] lawyer should further the public's . . . confidence in the rule of law and the justice system because legal institutions in a constitutional democracy depend on popular participation and support to maintain their authority."  Preamble to Ohio Rules of Professional Conduct.  By working to combat the opioid crisis – one of the worst public health crises in U.S. history – while in the U.S. Attorney's office, then switching to represent the very companies accused of causing that crisis, Ms. Rendon's actions will severely undermine the public confidence in the legal system.  Even assuming it is a close call, this Court should not engage in "hair-splitting nicety" but rather should restore faith in the judicial system and reaffirm the public servants' duty to the public, the profession, and the legal system.

### B.    Ms. Rendon Violated Ohio Rules of Professional Conduct 1.11(c) and 1.11(a)

Ms. Rendon has violated at least two provisions of Ohio Rules of Professional Conduct: Rule 1.11(a) and 1.11(c).[13]  Both rules impose ethical limits on the work of former government employees who enter private practice, and a violation of either rules provides a sufficient basis to disqualify Ms. Rendon from this litigation.

---

[13] Ms. Rendon is subject to the Ohio Rules of Professional Conduct.  *See* Local Rule 83.5(b), 83.7(a).

15

     i.       **Rule 1.11(a) Disqualifies Ms. Rendon because she personally and substantially worked on opioid matters while at U.S. Attorney's Office**

Rule 1.11(a) prohibits former public employees from representing a client when the lawyer has worked on a substantially related matter as a government employee. Specifically, Rule 1.11(a) states:

> (a) A lawyer who has formerly served as a public officer or employee of the government shall comply with both of the following:
>
> > (1) all applicable laws and Rule 1.9(c) regarding conflicts of interest;
> >
> > (2) not otherwise represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation.

Rule 1.11(a) of the Ohio Rules of Professional Conduct.

It is undisputed that Ms. Rendon was a public employee during her time as an Assistant United States Attorney and as the United States Attorney for the Northern District of Ohio. Moreover, Ms. Rendon was neither a figurehead nor an understudy during that time.  Rather, she was personally and professionally involved in many meaningful efforts to combat the scourge of the opioid epidemic in northern Ohio.

The Ohio Rules of Professional Conduct define "Substantially related matter" as a matter "that involves the same transaction or legal dispute or one in which there is a substantial risk that confidential factual information that would normally have been obtained in the prior representation of a client would materially advance the position of another client in a subsequent matter."  In analyzing whether matters are "substantially related" for the purpose of ABA Model Rule 9-101(b), the D.C. Court of Appeals found that former government attorneys switching sides raises significant ethical concerns.  *Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 49–50 (D.C. 1984).  Therefore, the Court reasoned, "where the complainant's evidence shows that the factual contexts of the two (or more) transactions overlap in such a way that a reasonable

16

person could infer that the former government attorney may have had access to information legally relevant to, or otherwise useful in, the subsequent representation, we conclude that the complainant will have established a prima facie showing that the transactions are substantially related." *Id*.

As detailed above, Ms. Rendon had extensive involvement in matters involving the opioid crisis, including the impact of the crisis on Plaintiffs' jurisdictions, the work of Plaintiffs' employees in response to the crisis, and the resources that the Plaintiffs did or did not have in order to combat the crisis. Ms. Rendon gains all of this information while working in the U.S. Attorney's Office, and she has not indicated to Plaintiffs that she has gotten any approval from the government for her current representation.

Perhaps most significantly, Ms. Rendon was one of the lead architects of the Consent Decree between the Cleveland and the U.S. Attorney's Office. Defense counsel has directly put the Consent Decree at issue in this case and extensively questioned witnesses about it. *See generally* Pifko Declaration Ex. 3. In fact, Ms. Rendon – one of the signatories on the final Consent Decree – directly questioned Chief Williams about the Consent Decree. By virtue of their own questioning on the topic of the Consent Decree, Defendants demonstrate their own belief that the Consent Decree is connected to this litigation, yet neither Ms. Rendon nor any Defendant's counsel has explained how Ms. Rendon's involvement with the Consent Decree does not, by itself, disqualify her from further involvement in this case. This, combined with the fact that Ms. Rendon herself admits on her firm's website that she was substantially involved with the Consent Decree as DOJ's "lead counsel," makes is clear Ms. Rendon is in violation of Rule 1.11.

Ms. Rendon also worked on other matters in connection with the opioid crisis like the aforementioned Opioid Task Force. Tellingly, the vast majority of DOJ-recognized Opioid Task Force members from CT1 jurisdictions will be, or have been, deposed in this case. Ms. Rendon's access to the inner workings of the Plaintiffs' organizations in this action while she

was in the U.S. Attorney's office gave Ms. Rendon factual information that now can be, and has been used, used in connection with the current litigation. This is improper and in violation of 1.11(a). Returning to the concept of "substantially related," "[t]he 'substantially related' test . . . is meant to induce a former government lawyer considering a representation to err well on the side of caution." *In re Sofaer,* 728 A.2d 625, 628 (D.C.1999).

### ii. Rule 1.11(c) Disqualifies Ms. Rendon Because the Confidential Information Ms. Rendon Obtained while a Government Attorney Can Be and Has Been Used to Plaintiffs' Material Disadvantage

The Ohio Rules of Professional Conduct prohibit former government attorneys from using confidential information gained during their time in public service in representing a private client to the detriment of an opposing litigant. Specifically, Rule 1.11(c) states as follows:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Rule 1.11(c) of the Ohio Rules of Professional Conduct

Here, all of the elements of 1.11(c) are met such that Ms. Rendon is in violation of the rule. First, Ms. Rendon was a public employee from 2009-2017 while at the U.S. Attorney's office. During that time, Ms. Rendon gained confidential knowledge about the Plaintiffs in the CT1 jurisdictions. As defined in Rule 1.11(c), the term "confidential government information" means "information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public." Confidential information is not limited to just particular, discrete pieces of information. Confidential information can be in the form of "strategic insights." *See United States v. Villaspring Health Care Ctr., Inc.*, No. CIV.A. 3:11-43-DCR, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011)

18

(disqualifying a former government attorney under Kentucky's nearly identical version of Ohio Rule of Professional Conduct 1.11(c)).

Ms. Rendon's work in her official capacity as a member of the U.S. Attorney's Office on various task forces and her interaction with numerous local law enforcement and other municipal employees gave her unique access to information not otherwise known to the public. Given Ms. Rendon's admittedly "constant communication" with the representatives from Plaintiffs' jurisdictions, it was inevitable that Ms. Rendon would gather mental impressions and strategic insights from Plaintiffs, not only on matters related to law enforcement, but also subjects like public health. *See* Pifko Declaration Ex. 15. *See Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37, 44–45 (D.C. 1984) ("[G]overnment attorneys often have access to information that is generally not available to the private sector, even through discovery."). Information about law enforcement activities, including things like statistical information and mental impressions, are precisely the types of confidential information that the ethical rules seek to protect.

The record submitted with this motion contains many instances of Ms. Rendon working closely with the Plaintiffs and gaining confidential information about their efforts to combat and respond to the opioid crisis. Commander Gingell's emails with Ms. Rendon indicate that she gained information about Commander Gingell's strategic insights into how Cleveland Police viewed the opioid crisis and responded to it. *See* Exhibit 1, Gingell Declaration. Additionally, Ms. Rendon gained confidential information about the strain on Cleveland and Cuyahoga's resources ██████████████████████████████████████████████████████ ████████████████████ ██████████████████ Also, Ms. Rendon was also working with Cuyahoga County Medical Examiner's Office and the Cuyahoga County Drug Court to develop strategies regarding prosecution of overdose cases. *See* Pifko Declaration Ex. 15; Pifko Declaration Ex. 4 at 395:16-20. She also was part of the committee drafting Action Plans on how to address the crisis. Ms. Rendon has also questioned witnesses in deposition about meetings which she herself attended while at the U.S. Attorney's Office.

19

Ms. Rendon's access to confidential information extended to general knowledge about the inner workings of the Cleveland Police Department gained from her leadership of the investigation that led to the Consent Decree.  *See* Pifko Declaration Ex. 17.  The extensive investigation gave Ms. Rendon information about the depths of the workings of the police department, an organization that remains at the forefront of the Plaintiff's efforts regarding the opioid epidemic in the CT1 jurisdictions.

In her December 28th letter to the Court, Ms. Rendon claims to have no confidential information that is relevant to the case largely because "any communication" from the City of Cleveland to Ms. Rendon while she was with the federal government would be a public record and therefore not confidential communication.  That is simply untrue.  *See* Exhibit 1, Gingell Declaration; Exhibit 2, Gilson Declaration.  Additionally, if, as Ms. Rendon argues, that "any communications" from the City of Cleveland would not be confidential because they are public records, it would eviscerate Rule 1.11(c) and make it pointless.  *Cf In re Anonymous*, 932 N.E.2d 671, 674 (Ind. 2010) ("[T]he Rules contain no exception allowing revelation of information relating to a representation even if a diligent researcher could unearth it through public sources").

It is undoubtedly a material disadvantage for Plaintiffs to be deposed by someone with an intimate and detailed knowledge of the inner workings of many of the matters directly at issue in this case.  This dynamic is perhaps most evident when dealing with the law enforcement aspects of this case.  During a line of questioning about the connection between prescription opioids and illicit drug use, Ms. Rendon was passing notes to the questioning attorney. ███████████

████████████████████████████████████

████████████████████████████████

███████████████████████████  This is clearly a topic that Ms. Rendon would have information about from her time at the U.S. Attorney's Office. ███████████████████

████████████████████████████████████

Ms. Rendon also can use the confidential information gained from her public service when

evaluating the resources being expended by the Plaintiff jurisdictions.  But Ms. Rendon did more than just know how the decisions were being made – she weighed in herself about how funds for the HIDTA should be spent and how the Action Plan should be drafted.

Information about how state and local law enforcement are responding to the opioid crisis, including things such as resources expended and the connection between prescription opioids and illicit drug use, go directly to the issues of damages in this case.  By its own description, the Opioid Task Force dealt with issues central to this case: "increasing access to Narcan, developing new protocols to how police handle drug overdose scenes, increased training for physicians about the potential side effects of prescription opioids, public awareness campaigns, and the formation of a consortium to coordinate the response from the various medical systems in Greater Cleveland, among others."[14]  Issues of resource allocation deal directly with the causation and damages aspects of this case.  Ms. Rendon was not only privy to information about how these types of decisions were being made; she herself participated in the decision-making.

Furthermore, the work Ms. Rendon did with Dr. Gilson of the Medical Examiner's Office shows how the confidential information gained by Ms. Rendon while in the U.S. Attorney's Office prejudices the Plaintiffs.  Connecting drug overdose cases to opioids is an issue that is critical to proving damages in this case.  By knowing the strategies, thoughts, and methods about how the Medical Examiner's Office evaluates overdose cases, Ms. Rendon can advise her client how to poke holes in Plaintiffs theories of the case using information that is beyond what is in the public domain.  *See* Exhibit 2.

Even though it appears Ms. Rendon has actually used her special knowledge to the exclusive benefit of her private clients, Rule 1.11(c) only requires that the confidential

---

[14] *See* https://www.justice.gov/usao-ndoh/pr/us-attorneys-office-among-numerous-community-partners-host-daylong-conference-next (last visited Jan. 4, 2019).

21

information "**could be used** to the material disadvantage of that person."  Rule 1.11(c) of the Ohio Rules of Professional Conduct (emphasis added).  That is, the rule does not require a showing that the confidential information has in fact been used to the material disadvantage of the adverse party.  Thus, even if Ms. Rendon has arguably not yet used her confidential knowledge to disadvantage the Plaintiffs, given that discovery is ongoing the risk is still very real.  The Court should disqualify Ms. Rendon to avoid even the potential for her using confidential information.

### C.    Plaintiff's Request for Disqualification Is Timely

Plaintiffs make this motion for disqualification in a timely manner.  Production and review of documents has been ongoing simultaneously and on a nearly continuous rolling basis, and the full scope of Ms. Rendon's involvement in the issues in this case did not come into focus until recently.  The full extent of Ms. Rendon's involvement in the case only became known when she started participating in law enforcement depositions in late November.[15]  As Ms. Rendon notes, Plaintiff makes this request ten months before trial and with months left in discovery.  *See* Pifko Declaration Ex. 18.  The cases cited by Ms. Rendon in her letter do not counsel against the disqualification of Ms. Rendon because all involve motions for disqualification immediately before trial.  That is clearly not the situation here.

Furthermore, there will be no prejudice to Ms. Rendon's client if she is disqualified.  Endo Pharmaceuticals is not only represented by BakerHostetler, but also represented by Arnold & Porter – two large, national law firms.  In any event, Endo is a large corporation with over $3 billion in revenue.  It has the resources to find additional counsel if need be both in Cleveland and nationally.

In fact, insofar as timing is concerned, Ms. Rendon's quick switch from public employee (working with Plaintiffs) to private counsel (working against them) militates in favor of disqualification.  Ms. Rendon has served as defense liaison counsel since January 1, 2018 and as

---

[15] During deposition, Plaintiff's counsel contemporaneously objected to Rendon's questioning.

counsel to Endo defendants "well before" that date.  *See* Ex. Pifko Declaration Ex. 18.  Ms. Rendon only resigned as U.S. Attorney in March 2017.  The extremely short amount of time between her resignation as U.S. Attorney (March 2017) and when she joined BakerHostetler (May 2017) only worsens the appearance of impropriety.  In less than six months, Ms. Rendon, someone who was honored for her work on the opioid crisis, went from the chief federal law enforcement officer for northern Ohio to defending the very companies she was previously fighting.

> **D.** **In the Alternative, the Court Should Order Ms. Rendon to Sit for Deposition**

On December 5, 2018, before filing this motion, Cleveland served Ms. Rendon on with a subpoena for deposition testimony as a fact witness.  In connection with its request to depose Ms. Rendon, Cleveland submitted a corresponding *Touhy* request to the United States Department of Justice.  If the Court determines that the record presented by this motion is currently insufficient to disqualify Ms. Rendon from the case, Cleveland asks that Ms. Rendon be ordered to sit for deposition so that Cleveland can discover additional information concerning Ms. Rendon's extensive inside knowledge concerning the opioid crisis, the region's law enforcement coordination strategies, and the federal government's responses to the crisis in the Northern District of Ohio.  This will no doubt disclose additional information relevant to this motion.  Justice dictates that if Ms. Rendon is permitted to stay in the case, Plaintiffs be allowed to question Ms. Rendon so that they can have access to that same body of knowledge.

## IV.    CONCLUSION

It cannot be reasonably disputed that, as a result of her work at the U.S. Attorney's Office, Ms. Rendon has intimate knowledge about the opioid crisis in the Northern District of Ohio, the greater Cleveland area's law enforcement community, specifically including inner workings of Cleveland's Division of Police, and the area's responses to and strategies for addressing the crisis.  Given the great public importance of this litigation and given that ethical quandaries should be resolved by erring on the side of caution, Ms. Rendon should be

23

disqualified from further working on this litigation, and so too her law firm unless and until it complies with the screening requirements set forth in Rules 1.11(b) and 1.11(c).

Respectfully submitted,

s/Mark Pifko

Mark Pifko
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, California  91436
(818) 839-2325
(818)986-9698 (Fax)
mpifko@baronbudd.com

s/Peter H. Weinberger

Peter H. Weinberger (0022076)
**SPANGENBERG SHIBLEY & LIBER**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Counsel for Plaintiff the City of Cleveland*

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon defense counsel via email.

s/Mark Pifko

Mark Pifko
*Counsel for Plaintiff the City of Cleveland*

24

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*s/Mark Pifko*
Mark Pifko
*Counsel for Plaintiff the City of Cleveland*