IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


IN RE: NATIONAL            )
PRESCRIPTION              )
OPIATE LITIGATION,        )
                          )    Civil Action
                          )    Number 1:17MD02804
                          )
  APPLIES TO ALL CASES    )
                          )
                          )


                  - - - - -

        TRANSCRIPT OF PROCEEDINGS HAD BEFORE

               DAVID R. COHEN

               SPECIAL MASTER

         ON WEDNESDAY, JANUARY 9, 2019
                  - - - - -




Official Court Reporter:        Shirle M. Perkins, RDR, CRR
                                U.S. District Court
                                801 West Superior, #7-189
                                Cleveland, OH 44113-1829
                                (216) 357-7106




Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
 1    APPEARANCES:

 2       For the Plaintiffs:            PETER WEINBERGER, ESQ.,
                                        Spangenberg, Shibley &
 3                                      Liber
                                        Suite 1700
 4                                      1001 Lakeside Avenue, E
                                        Cleveland, OH 44114
 5                                      (216) 696-3232

 6       For Defendants                 DONNA M. WELCH, ESQ.,
         Purdue Pharma L.P.,            Kirkland & Ellis - Chicago
 7       Purdue Pharma Inc.,            300 North LaSalle Street
         And The Purdue                 Chicago, IL 60654
 8       Frederick Company, Inc.:       (312) 862-2425

 9    Also Present:

10    David Ackerman, Esq.,
      James Bennett, Esq.,
11    Sheila Birnbaum, Attorney-at-Law
      Paul Farrell, Esq.,
12    Michael Fuller, Esq.,
      Frank Gallucci, Esq.,
13    Paul Lafata,  Esq.,
      James Ledlie, Esq.,
14    Mark Lynch, Esq.,
      Amy Lucas, Attorney-at-Law
15    Andrew O'Connor, Esq.,
      Mark Pifko, Esq.,
16    Steve Pyser, Esq.,
      Steve Reed, Esq.,
17    Joseph Rice, Esq.,
      Sara Roitman, Attorney-at-Law
18    Hunter Shkolnik, Esq.,
      Laura Wu, Attorney-at-Law

19

20

21

22

23

24

25
```

<u>WEDNESDAY SESSION, JANUARY 9, 2019, AT 8:45 A.M.</u>

        SPECIAL MASTER COHEN:  Good morning, everybody.

        COUNSEL:  Good morning.

        SPECIAL MASTER COHEN:  Room full.  Thank you all for coming in.

    I apologize for Cleveland's weather.  It's actually not too bad for this time of year.  Okay.

    Our Court Reporter today is Shirle Perkins.  Please identify yourself -- oh, wait a minute.  I want to make sure that -- can folks on the phone hear me?

        A VOICE:  Yes, we can.

        SPECIAL MASTER COHEN:  Okay.  Thank you.

    I'm going to -- we're just beginning.  This is Special Master David Cohen.  If you could please mute yourself unless you are speaking, I think that will help.  I'm going to try to remind everybody here to speak into the microphones.  We're in the courtroom with roughly 50 folks, most of whom are not near a microphone.  So I'm going to ask people either to be in front of the mike or to go to the lectern to make sure everybody can hear what's going on.

    Today's Court Reporter is Shirle Perkins.  She knows some of you but not most of you.  So if every time you identify yourself before you begin speaking, I think that will help make things clear as we go forward today.

1      Normally when we're like this together on the phone,

2   during our conferences on the phone, I record that but don't

3   have an official court reporter.  The difference today being

4   that we have an Official Court Reporter means that, of

09:13:19 5   course, this is on the record and, therefore, if you look at

6   my appointment order, you'll see that there is no need to

7   request to formalize ruling.  This is the formal ruling on

8   the record.  So that takes care of the three-day period

9   within which you have to request a formalized ruling if you

09:13:36 10   don't like it.  You can begin the objection process

11   immediately.

12      I sent out an e-mail yesterday.  I sent out a number

13   of e-mail rulings and said if anybody wants them formalized,

14   they should let me know by this morning.  I haven't heard

09:13:54 15   anything via e-mail saying that someone wants me to

16   formalize a ruling that I e-mailed out yesterday.  Let me

17   ask now if that is the case.

18      Everybody is satisfied with the e-mailed rulings?

19   Okay.  Hearing nothing, I will assume that's the case.

09:14:10 20      So we have the usual agenda with many, many items.

21   I'm going to go through them more or less in order.  But, I

22   am going to start out of order with Agenda Item 83, per Mark

23   Lynch's request because counsel, I believe in California,

24   has -- who is going to address that, Ms. Henn, counsel for

09:14:36 25   Defendants, has other obligations and so I agreed to take

1    that first so that we don't mess up her day.

2                    MS. HENN:  Thank you, Special Master Cohen.

3    Emily Henn of Covington and Burling on behalf of McKesson.

4                    SPECIAL MASTER COHEN:  You're welcome.  Good

09:14:54 5    morning.

6                    MS. HENN:  Good morning.

7                    SPECIAL MASTER COHEN:  Are you in California?

8                    MS. HENN:  I am.

9                    SPECIAL MASTER COHEN:  Very early in the

09:15:01 10    morning.

11                    MS. HENN:  Thank you.

12                    SPECIAL MASTER COHEN:  And it was also

13    suggested that this might not be right but put it this way;

14    we're not going to get to it really on the merits today but

09:15:12 15    what I did want to talk about -- and I don't know, Paul

16    Farrell, if this is your issue on the Plaintiff's side, but

17    I want to figure out how to address this.

18         The issue that Plaintiffs raised is that there are

19    confidentiality designations made both for testimony in

09:15:31 20    deposition and also of documents, and Plaintiffs assert that

21    that's limiting them either with respect to upcoming motions

22    and/or the ability to communicate with their clients.  I

23    believe that's the issue.

24         And so Plaintiffs have asked me or the Court to review

09:15:54 25    the confidentiality designations to determine whether

1        they're appropriate.

2             Of course, there are thousands and thousands and

3        thousands of lines of deposition that have been marked

4        confidential, and probably thousands, maybe millions, of

09:16:11  5        documents that have been marked confidential, and the

6        question is how do we do this, how do I do that, when does

7        it need to be done.  Obviously I can't look at every

8        confidentiality designation.  It has to be that there will

9        be some method where we -- where I and other folks on the

09:16:34 10        Court who will help me make determinations and then apply

11        that.

12             So let me start with the Plaintiffs on this question

13        and ask what it is you need, what the quickest, easiest,

14        best way we can do that is, and when you need it?

09:16:50 15             ^ (**Portion to be sealed.**)

16                  MR. FARRELL:  Paul Farrell on behalf of the

17        Plaintiffs.

18             One of the very first depositions that was taken in

19        the case was Nate Hartle, H-A-R-T-L-E, for McKesson as their

09:17:09 20        30(b)(6) designee.  By virtue of the fact that this was one

21        of the first depositions in this litigation, it was the

22        first to ripen with the designation of confidentiality.

23             What we saw was that we felt as if there was an

24        overdesignation of confidentiality, and we tasked

09:17:31 25        Mr. Anthony Irpino, who's here, to begin spearheading this,

1    knowing that there would be hundreds and hundreds of

2    depositions to follow.

3         So we've used McKesson's Nate Hartle's deposition

4    transcript as sort of the first opportunity for you to call

09:17:54  5    balls and strikes.

6         Since that time, we have added to it the 30(b)(6)

7    deposition of Cardinal Health, as well as AmerisourceBergen.

8    The reason we've added those three together and presented it

9    to you is because we believe that there are categories of

09:18:16 10    designations that you could call balls and strikes on for

11    each of the Big 3 distributors.  That would then show us a

12    template moving forward, which would hopefully, if the

13    Plaintiffs are correct, result in the de-designation of a

14    tremendous amount of documents and testimony that have been

09:18:39 15    so designated.

16         For instance, in the Cardinal Health privilege log,

17    going through the process and selecting 100 documents has

18    resulted in 80 some of the designations for attorney/client

19    privilege being withdrawn.

09:18:54 20         The reason this is important to us is because we

21    represent public entities.  ███████████████████████████

22    ████████████████████████████████████████████████████████

23    ████████████████████████████████████████████████████████

24    ████████████████████████████████████████████████████████

09:19:24 25    That's something that I would like to share with the Cabell

1   County Commission in the City of Huntington when they make

2   decisions, especially about settlement or anything else.

3   Now showing this to the client is one thing, but

4   showing it to the Mayor of Huntington and the Cabell County

09:19:46 5   Commission, who are charged with making decisions on behalf

6   of the 100,000 people in my community, it seems to me at

7   some point in time, we need to be able to share it with our

8   clients and they need to be able to share it with the people

9   they represent.

09:20:02 10   SPECIAL MASTER COHEN:  Was that a particular

11   line of deposition marked confidential?

12   MR. FARRELL:  Yes.

13   SPECIAL MASTER COHEN:  Let me make clear.

14   This is a public hearing, we're on the record.  Everything

09:20:14 15   you say right now is public and so even that now has become

16   public.  I want to make sure everybody understands the

17   ground rules.  I'm sure that was inadvertent.

18   MR. FARRELL:  It was inadvertent.

19   So there's --

09:20:30 20   MS. HENN:  Special Master Cohen, this is Emily

21   Henn.

22   SPECIAL MASTER COHEN:  Go ahead.

23   MS. HENN:  We would request that you deny this

24   invitation to begin line by line review of confidentiality

09:20:44 25   designations.

1    As you know, our position is that there's no need to

2    undertake this process at this time, and that it's premature

3    before summary judgment motions are submitted, other types

4    of motions, and before the parties designate exhibits for

09:21:01  5    trial.

6    Unlike the privilege reviews Mr. Farrell just

7    referenced and many of which you've been asked to undertake,

8    confidentiality designations are not blocking Plaintiffs'

9    access to anything.  They have it all.  And in this respect,

09:21:18 10    these issues are very different and much less urgent in

11    privilege disputes which need to be resolved for the

12    opposing party to even have access to the information.

13    SPECIAL MASTER COHEN:  So, Emily, I think

14    I confused you about timing, which is the third subject, but

09:21:34 15    I'm more curious about what the best way to do it is when I

16    get to it.  For example, I think that there have been

17    requests of the Court to undertake privilege review for

18    certain critical documents that the parties want to use in

19    deposition, call back, things like that, that's more time

09:21:58 20    sensitive -- although you wouldn't know it by my response to

21    all of that stuff -- and probably less time sensitive are

22    the confidentiality designations.  I agree.

23    My first question and more important question is how

24    do I do it?  It sounds like Plaintiffs are saying, "Well, we

09:22:14 25    propose that you take a look at the three 30(b)(6)

1    depositions of the three distributors and go through those,"

2    and that's kind of a limited set of information and a

3    running start.  So I wonder whether you agree with that or

4    have another approach in mind?

09:22:29    5    MS. HENN:  Special Master Cohen, this is Emily

6    Henn, again.

7    We have an approach that we think would be even more

8    streamlined and more efficient.  When you ask the question

9    and when Mr. Farrell spoke this morning, he talks about the

09:22:46 10    need to discuss materials or answers or information with his

11    client, and the specific material that he discussed in open

12    court just now is designated or was designated confidential,

13    not highly confidential, and under Paragraph 33C and D of

14    the protective order, Mr. Farrell has always had the right

09:23:07 15    to discuss that with his client, with individual parties,

16    with present or former officers, directors, or employees of

17    that party.

18    It sounds like Plaintiffs' real animating concern here

19    is the ability to discuss information with their client, and

09:23:23 20    the only restriction on that under the protective order is

21    highly confidential information, which is quite limited.

22    It's quite a small subset of the -- of the designations

23    Plaintiffs have raised here.  And my suspicion is that any

24    highly confidential information that Plaintiffs feel a need

09:23:41 25    to discuss with their client, if they would raise that issue

1      with Defendants, which they have not done, it would be

2      readily resolved.  Highly confidential is typically

3      designated that way because it's competitively sensitive.

4      And so it should be relatively straight forward for the

09:24:00  5      parties to work out limited agreements for Mr. Farrell's

6      clients to review material like that on an as-needed basis

7      while otherwise maintaining protections over highly

8      confidential information.

9          So our suggestion would be that the parties, the

09:24:16 10      Defendants continue to work and meet and confer with Mr

11      Irpino, who is a consummate professional and very productive

12      in working through these issues.  That meet-and-confer

13      process has done its job in limiting and reducing the

14      disputes over confidentiality designations, but we could add

09:24:35 15      to that process a special process to get attention on this

16      highly confidential information that Plaintiffs need to

17      discuss with their clients or feel that they need to discuss

18      with their clients so that won't be an issue.

19          It will also dramatically reduce the issues that we

09:24:53 20      would ever have to bring to your attention, in my view.

21                 SPECIAL MASTER COHEN:  So, Mr. Farrell -- I

22      need to go back and forth between last and first names

23      because I call you all by first names.  Now in court, I'll

24      be more formal and forget.  So just get used to it -- that

09:25:10 25      seems reasonable, if that's really what you're after.  If

1    what you're after is being able to use this information more

2    publicly, it doesn't get you where you want.  And so I need

3    to hear what your response is to that.

4         Seems like a good starting point to take it that way.

09:25:26  5         MR. FARRELL:  The short answer and the honest

6    answer is I want the public record to be complete and

7    transparent because I represent, as the co-lead of this

8    litigation, 1400 communities that are asking for some

9    resolution to this epidemic.

09:25:52 10    And I guess my primary focus is that I don't believe

11   some of this information is confidential at all.  The

12   statement that I made earlier, how could that possibly be

13   confidential?  That's something that I feel the need and the

14   desire, as not only a lawyer, a co-lead in representing

09:26:20 15   clients, but living amongst the epidemic in Huntington, West

16   Virginia.  So when I see the overdesignation of things that

17   are not confidential as confidential, it's a problem for me.

18        Now, I understand that through the process of

19   discovery, that we don't try this case in the public realm.

09:26:41 20   But there's a difference with this litigation because we

21   represent the public interest.

22        So from day one, I have continued to communicate my

23   mission is one of transparency, and I believe that the

24   designations that exist are improper.  I'm willing to

09:27:02 25   concede that if there's something highly confidential, then

1       that's a whole different issue.  But, when you look at Nate

2       Hartle's deposition, there's very little, if anything at

3       all, that's in there that should be cloaked with

4       confidentiality.

09:27:21  5             SPECIAL MASTER COHEN:  So do you believe that

6       both -- that all of the confidentiality issues, that the

7       best way to address those, at least as a first step, would

8       be for the Court to take the three 30(b)(6) depositions you

9       mentioned on the three distributors in particular, go

09:27:36  10      through them, determine whether the Court agrees with the

11      confidentiality designations, and then, you know, give it

12      back to the parties and say run with it?

13             MR. FARRELL:  Yes.  And if you wanted to

14      narrow it down even further, you could start with just the

09:27:50  15      McKesson deposition and the exhibits that are attached to

16      it, and if you -- if you start with that, I think you'll see

17      that is where some clear balls and strikes are.

18             SPECIAL MASTER COHEN:  Did you want to say

19      something, Ms. Henn?

09:28:10  20             MS. HENN:  Yes.  This is Emily Henn again.

21         We would submit that there is really no legitimate

22      interest in doing what Mr. Farrell now admits that he wants

23      to do, which is to publicize pretrial discovery.

24             Judge Polster's order dealing with ARCOS data, makes

09:28:27  25      clear that the Judge views publicizing this kind of

information as eviscerating the protective order that the

parties agreed on and contradicting as a cloak the bedrock

principal that discovery is a private process, the sole

purpose of which to assist trial preparation, and in this

case, global settlement discussions.

We've detailed in our letter numerous specific and

ongoing examples of Plaintiff's efforts to seek pretrial

publicity in this case.  The public release of information

could influence potential jurors and result in a case being

tried outside the courtroom.

Now, the process that Mr. Farrell is suggesting needs

to happen of limit -- of limiting confidential information

naturally occurs when you get to court filings and summary

judgment because a different standard applies to things that

are designated to be in a public realm for purpose of

resolving the claims in this case.  But, that's not the case

with pretrial discovery.  And Defendants feel very strongly

that it's not appropriate, for example, for Plaintiffs to

have documentary film crews coming to depositions in this

case.

Indeed, Paragraph 10 of the protective order has a

broad standard for what constitutes confidential

information, and it includes things that are research,

technical, commercial, or financial information that the

designating party has maintained as confidential or other

1    information that's not publicly available.  It's a broad

2    standard, and we submit that orderly -- an orderly

3    completion of the discovery, much of which remains to be

4    done in an extremely compressed time period, would be best

09:30:22  5    served by maintaining confidentiality procedures in the

6    protective order, having the type of meet-and-confer process

7    that all Defendants have be willing to undertake in good

8    faith, and then allowing these issues to sort themselves out

9    at the time they need to be sorted out, which is when

09:30:39 10    summary judgment and other dispositive motions are filed

11    with the Court.

12                SPECIAL MASTER COHEN:  Okay.

13        So I think I understand the parties' positions.  I

14    will observe that I agree with you, and the reason I agree

09:30:50 15    with you, Ms. Henn, about one thing you said, is that Judge

16    Polster has made it very clear that the confidentiality

17    designations during discovery are very different from what

18    happens at summary judgment and a trial, and he said

19    numerous times that everything is public at a public trial,

09:31:07 20    including information that's been designated even as highly

21    confidential.  There are ways of dealing with that in a

22    public trial, but for the most part, the doors are wide open

23    on all of this coming into the public knowledge.

24        So I'm not going to decide immediately right now what

09:31:25 25    to do with this issue because I don't think I need to.  But,

1    I will tell you that my inclination is to have somebody,

2    maybe me, maybe somebody else, address the confidential

3    designations in the -- is it Hurtle?

4                   MR. FARRELL:  Hartle --

09:31:43  5              MS. HENN:  Hartle, H-A-R-T-L-E.

6                   SPECIAL MASTER COHEN:  The Hartle deposition

7    and let the parties know what the Court thinks about those.

8         If -- I also have no problem with Plaintiffs,

9    Mr. Irpino, and Defendants, Ms. Henn, or whomever else, go

09:32:01 10   through this and try and resolve some of those issues before

11   that.  But you should probably get do it because I may at

12   any point assign this to somebody and you'll just get

13   rulings back.  So if you can moot what the Court has to do

14   with that, that would be a good idea.

09:32:18 15        I see somebody at the lectern.  Did you want to say

16   something?

17                  MR. IRPINO:  Yes or no this is Anthony Irpino.

18                  SPECIAL MASTER COHEN:  Hello.

19                  MR. IRPINO:  Hello.

09:32:29 20        I will confirm that we've had very professional, very

21   good, and productive meet and confers regarding

22   confidentiality and privilege, but right now,

23   confidentiality.

24        One of the issues that we face is that through this

09:32:44 25   process, you get to some areas where it's -- it's difficult

1   for a side representing a Defendant saying, "Oh, I'll just

2   let this go.  There are some things that might not be as

3   easy, some things that may not be as easy to find in the

4   public record.  The bottom line in this case is that there's

09:33:02  5   an awful lot of information that's in the public, one way,

6   shape, form, or another through congressional testimony,

7   through reports.  The House Energy Committee recently in

8   December issued a report, a hundred pages long of it,

9   detailing different Defendants' threshold monitoring

09:33:21 10   systems, suspicious monitoring systems, different stuff.

11         It's difficult to go through and read that, compare

12   it, and then de-designate stuff.  We get that.  The point

13   here is that if we can have some stuff at the beginning from

14   the Court to give some guidance, I think that would greatly

09:33:42 15   assist the parties in the meet-and-confer process.

16         We have met and conferred on all the depositions that

17   Mr. Farrell referenced, all three of them, and there was a

18   lot of cooperation.  It's just that some guidance can go a

19   long way in helping the parties with the meet-and-confer

09:33:56 20   process.  And I'll just reference what we did in the BP Oil

21   Spill case.

22         We had that guidance in the beginning, and it was a

23   very efficient meet-and-confer process over hundreds of

24   depositions.  So once you have that initial standard set by

09:34:12 25   the Court calling balls and strikes, it greatly helps.

1      SPECIAL MASTER COHEN:  I understand.  So let

2  me ask you a question, given what you've said.

3      It sounds like you would challenge some of the

4  confidentiality designations based on, for example, the

5  recent Congressional report.  If I were to just ask somebody

6  here in the court, "Hey, take a look at the dep, go through

7  and see if you agree," how do they come up to speed with

8  what would presumably be your argument that no, this can't

9  be highly confidential or even confidential at all given

10  something that's out there when they don't know what it is

11  that's out there?

12      MR. IRPINO:  In our submissions, we included

13  charts that matched testimony with public information.

14      SPECIAL MASTER COHEN:  When you refer to

15  submissions, what are you referring to.

16      COUNSEL:  Oh, the submissions in connection

17  with this motion.

18      SPECIAL MASTER COHEN:  So you may have seen

19  the e-ail that I sent out last night saying I need some

20  specific pointing to e-mails.  Is that -- is it -- my

21  ultimate question is, is that in the chart?

22      MR. IRPINO:  Yes.  We will do some specific

23  pointing to e-mails to follow up on that.

24      SPECIAL MASTER COHEN:  And have Defendants

25  similar -- go ahead, Ms. Henn.

1          MS. HENN:  I wanted to note that the

2    protective order clearly states that anything that's public

3    would qualify for confidential treatment, and the Defendants

4    are well aware of that and wouldn't suggest otherwise.

09:35:38  5       We agree with you, Special Master Cohen.  If

6    Plaintiffs feel something is public, they should do more

7    than what they do in the charts that they submitted to you,

8    which is to just say this is public, it's been public

9    information.  There are -- the depositions go into great

09:35:57 10    detail about aspects of Suspicious Order Monitoring that are

11    not public.  And so it would greatly assist the

12    meet-and-confer process if Plaintiffs are more specific and

13    don't paint with that broad brush, just taking the position

14    that it's all public.

09:36:12 15         SPECIAL MASTER COHEN:  Okay.  We're getting to

16    the but --

17         MS. HENN:  I just had a quick request, Special

18    Master Cohen.  We would -- we would request that the portion

19    of today's transcript in which Mr. Farrell quoted our

09:36:25 20    witness be redacted from the public record just to allow the

21    regular order process to proceed.  I agree with you that it

22    was likely an inadvertence, but it's not the way to resolve

23    these disputes.  I don't think anyone would suggest.

24         SPECIAL MASTER COHEN:  Are there any reporters

09:36:41 25    in the room?  All right.

1          So the cat still seems to be in the bag.  Not that it

2     was on the line.  But, Shirle, can you do that?

3               COURT REPORTER:  I'd need to have counsel

4     review to make sure what --

5               MS. HENN:  We'd be happy to point out the

6     specific line if it would be helpful.

7               SPECIAL MASTER COHEN:  Okay.  We'll do that

8     for now.

9               MS. HENN:  Thank you very much.

10          ^ **(End of Sealed portion.)**

1      SPECIAL MASTER COHEN:  All right.

2          I think that's all we need for Agenda 83, Ms. Henn.

3      Thank you for waking up early and addressing that.

4                  MS. HENN:  Thank you, again, for accommodating

09:37:16  5    my schedule.  I very much appreciate it.

6                  SPECIAL MASTER COHEN:  You're welcome.  Okay.

7          We're turning next to the first Agenda Item on the

8      list, which is Agenda Item Number 123.  This has to do with

9      request by Plaintiffs to reopen a Cardinal Health

09:37:32 10    deposition.  As late as 11:21 I'm told last night, the

11     parties were still working on this.  And I think that

12     everybody is leaning the same direction, which is to say

13     that Mr. Fuller, Ms. Mainigi, and I seem to think the best

14     way to do this or the way that I think is the best way to do

09:37:53 15    this, and the parties are reading my mind, is not to reopen

16     the deposition but to require the opponent to answer

17     written -- a written question or written questions, and I

18     think that what was happening late last night was the

19     parties were negotiating what those written questions were,

09:38:12 20    and my understanding is Mr. Fuller, who is at the lectern,

21     is that the parties have not yet come to agreement.  And so

22     what I would like to hear is that there could be an

23     additional meeting and conferring, which I know is a swear

24     word now in this case, to try and identify what the

09:38:26 25    questions are that the deponent would answer, but I can tell

1    you that that is my inclination; that is to say not to

2    reopen the deposition but to allow written questions.

3               MR. FULLER:  May it please the Court.  Michael

4    Fuller on behalf of the Plaintiff.

09:38:39  5        The one sticking issue -- and so after we came to that

6    realization, I sent a proposed question to Ms. Mainigi.  I

7    sent it to Mr. Pyser this morning but my understanding is

8    that she forwarded it to him.  And it seems to be the

9    Defendant's position that you can get an answer to the

09:39:00  10   question that was asked.  My response was well, had she

11   answered that yes, they made changes to the SOM program

12   after September of '06, I would have asked further

13   questions.  But, she testified she had no idea what the

14   company did for approximately a year.

09:39:18  15              SPECIAL MASTER COHEN:  Yeah, I mean I can get

16   to that right now, that it's not going to be one question

17   yes or no answer; it's going to be with follow-ups, to the

18   extent that there are follow-ups that you would have asked.

19   That only makes sense to me.  It's not going to be so

09:39:32  20   constrained.

21              MR. PYSER:  Special Master Cohen, I can speak

22   to this a little bit --

23              SPECIAL MASTER COHEN:  One second.  Can you

24   first identify yourself?  And second, go -- and you can sit

09:39:40  25   down.  You don't need to stand, but I do need you to speak

1        into a microphone.

2                      MR. PYSER:  Sure.  Steven Pyser on behalf of

3        Cardinal Health.

4            And Mr. Fuller's representation is correct.  There was

09:39:48  5   a text with some proposed language around 11:30 last night.

6        I landed after that.

7            I had a chance to look at something that Mr. Fuller

8        sent this morning and we're happy to continue to meet and

9        confer.  I think the original throughout what's been

09:40:02 10   proposed is overbroad.  And I also point out that following

11       the 30(b)(6) deposition, Mr. Fuller took the deposition of

12       several witnesses from the relevant time period.  They spoke

13       to those issues.

14           The questions have been, at least in our mind in part,

09:40:20 15   addressed.  So we're kind of retreading ground that we don't

16       think we need to go into overly detailed changes of

17       questions that -- questions maybe they wish they would have

18       asked.  They had 30(b)(6) fact witnesses, and I think the

19       record is clear on the important issues.

09:40:43 20                  SPECIAL MASTER COHEN:  So I'm going to give

21       directions to both parties and then I'll have to -- I think

22       that's what we need to do today.  You need to continue to

23       discuss this.  My ruling is there will be written questions

24       to the deponent from Plaintiffs.  It's not going to be a

09:40:57 25   single yes or no question; it's going to have some

1    follow-up, assuming that the answer is, for example, yes,

2    then there would be follow-up questions normally asked.  At

3    that point, it's appropriate to ask that.

4         The direction of the Plaintiffs is you need to be

09:41:08  5    searchable.  If you already got the information from

6    somebody else, then you've got it.  You don't need to ask it

7    again.  So try and minimize, to the extent you can, what it

8    is you're asking.  If you've got information from other

9    deponents, then you've got it.

09:41:19 10         I understand there's a distinction between a fact

11    witness and a 30(b)(6) witness, but if you have information,

12    you have it.

13         And so I think with that direction, my hope is that

14    when we have our next meeting, you'll tell me this is

09:41:31 15    resolved.

16                   MR. FULLER:  Fair enough your Honor.

17                   MR. PYSER:  Thank you, your Honor.

18                   SPECIAL MASTER COHEN:  Okay.  Thank you.  All

19    right.

09:41:45 20         So the next agenda item is Agenda Item Number 124, and

21    this is an issue that is a natural byproduct of a litigation

22    that is so sprawling and with so many parties.

23         And both sides have complained that they're getting

24    e-mails or letters on the same topic from different counsel,

09:42:11 25    and it becomes impossible to respond.

1           I think as a general matter, you all have been

2      sensitive to this and tried hard to avoid it.  Some of it is

3      simply not to be avoided because of the nature of this

4      litigation.  I sent out an e-mail asking for suggestions.

09:42:26  5      So what I want to do is just have three or four minutes of

6      colloquy between the parties, suggestions on what you can do

7      yourself to ameliorate this problem, suggestions on what the

8      other side can do to ameliorate this problem.  I don't know

9      who it is really that needs to talk about it.  There are so

09:42:48 10     many attorneys that it can't just be lead counsel or the PEC

11     talking about this.

12           So again, I see someone at the lectern, and I'll let

13     you give me your best idea on how to address this.

14               MR. ACKERMAN:  Sure.  Special Master Cohen,

09:43:05 15     it's David Ackerman on behalf of the PEC.

16           I appreciate your comments.  I think the suggestion we

17     have from our side to ameliorate some of the issues we've

18     been experiencing on the Bellwether side is that Defendants

19     designate points of contact or people that we can reach out

09:43:25 20     to specific to the jurisdictions.  I believe that the way

21     the Defendants had organized is that they had

22     issues-specific people, or at least that's been my

23     perception, based on the last six months or so of meet and

24     confers.

09:43:40 25           And while that is fine, it ends up that for Summit, we

1    are dealing with seven or eight different Defense counsel

2    and having to have seven or eight different meet and confers

3    where it seems, especially at this stage of the litigation,

4    it makes more sense for everyone to have one phone

09:43:59  5    conversation where we can talk about things, get all the

6    issues out and have one person on the Defendants' side who

7    can coordinate that.

8         We have done that on the Plaintiff's side with respect

9    to Defendants.  We organized very early in this litigation,

09:44:14 10    you know what I think we've been calling them as handlers,

11    but essentially, Defendant teams.  So my friends who are

12    representing Purdue know when there are issues regarding

13    Purdue, they're going to hear from me or Ms. Singer, or Ms.

14    Conroy, or someone from our firm.

09:44:30 15         We don't have that same kind of assurance on the

16    Plaintiffs' side, and so we end up you know having to almost

17    look at almost every single e-mail that comes in to try to

18    figure out what applies to us and what doesn't.

19              SPECIAL MASTER COHEN:  How do you deal with

09:44:43 20    the issue that there are -- just as there are

21    Plaintiff-Specific issues, there are also Defendant-specific

22    issues?  In other words, I'm trying to -- I'm trying to

23    understand how that would work where the issue at hand,

24    issue that's being discussed, is different as to each

09:45:03 25    Defendant.

1          MS. REDMAN:  Special Master Cohen, this is

2     Sarah Redman.  I'm happy to jump in or allow Mr. Ackerman to

3     respond.

4          Certain -- this is -- I'm on behalf of Purdue.

09:45:13  5     Certainly the Defense group will have to speak about it.  I

6     think everyone is in agreement that we should come up with a

7     process, and everyone is in agreement that we can probably

8     work this out through a meet-and-confer, especially as we're

9     looking ahead towards Track Two.  I think we're trying to

09:45:28 10    figure out kind of overall how can we improve, how can we

11    learn on what we've been doing the last ten months.

12         I think some type of hybrid approach may work here.

13    So certainly there has to be efficiencies where we either

14    divide it up by party or Defendant, and so there's some

09:45:44 15    continuity in terms of relationships.  I think that's

16    valuable for both sides in terms of being able to kind of

17    negotiate and figure out who you're working with.

18         There are going to be issues I think that are best

19    handled by a particular person.  So -- or a particular group

09:45:59 20    of people.  I can use the example the claims data, for

21    example.  That has generally been something that Allergan

22    and Purdue have taken the lead on.  I think it's worked

23    quite well in the sense of there's institutional knowledge

24    there that transcends just one Plaintiff.  I see it on the

09:46:14 25    Plaintiff's side.  It seems like there's people who are

1   focused on privilege issues or focused on the SOM programs.

2   That seems to be something that we can work out, I think

3   organically, if we're an all focused on this issue idea we

4   do need some type of system.  And I think all of us want to

09:46:29 5   avoid having to respond to lots of different e-mails, and

6   certainly keep up with the tsunami of e-mails I think we're

7   all dealing with.

8            MR. ACKERMAN:  To address your question,

9   Special Master Cohen, personally I'm not aware of complaints

09:46:44 10   from Defendants regarding the process.  If there are

11   specific complaints, we can address them.  What we have run

12   into is, for instance, getting an e-mail or a letter from

13   one counsel regarding Interrogatories 6, 7 or, you know, I

14   don't want to use 6, 7 and 8 because those numbers have

09:47:00 15   actual meaning.

16            (Laughter.)

17            MR. ACKERMAN:  Getting a letter from one

18   counsel on Interrogatories 12, 18, and 19 and the letter on

19   --

09:47:09 20            SPECIAL MASTER COHEN:  All the numbers have

21   meaning.

22            MR. ACKERMAN:  Yeah.

23        And another letter from, you know, Interrogatories 32

24   and 33, which maybe we haven't gotten to yet.  I don't even

09:47:19 25   know.  But that's the problem that we run into.  And

1      frankly, what brought this to a head for Summit is that we

2      had a meet and confer on law enforcement privilege with

3      colleagues, with counsel from Ropes and Gray.

4          We had a discussion about law enforcement privilege on

09:47:35  5      the December 21st call, and then all of a sudden we started

6      getting letters about law enforcement privilege from another

7      Defense counsel.  And it's that type of issue that is an

8      inefficiency that I think some organization could render.

9              SPECIAL MASTER COHEN:  I just have to pause

09:47:52 10      and note that when you're sitting here on the bench, you

11      really see these chandeliers waving back and forth, which is

12      what happens because this building is, you know, built to

13      move with the wind.  And so they're really shaking today.

14              COUNSEL:  It's that tsunami of e-mails.

09:48:11 15          (Laughter.)

16              SPECIAL MASTER COHEN:  I was in this building

17      when the earthquake in Washington D.C., which damaged the

18      Washington Memorial occurred, and these were moving like

19      crazy all the way over here.  But, if you ever see a Judge

09:48:25 20      up here kind of looking around, you know what it is.

21      They're really shaking today.

22          Go ahead.

23              MS. WU:  Special Master Cohen, this is Laura

24      Wu for McKesson.

09:48:33 25          I wanted to address a couple points that Ackerman

1    raised and echo what everyone has said.  We all welcome

2    coordination.  We can all do better.  But I think the

3    parties are trying very hard on both sides, and what I want

4    to say specifically in response to law enforcement privilege

09:48:50  5    issues is as you've seen from our submissions, McKesson, for

6    the distributor Defendants, has taken the view on these

7    issues for months.  There are other members of the Defense

8    group for manufacturers and for the retail pharmacies who

9    are also involved.  So having some different voices in the

09:49:09 10    communications is necessity -- necessitated by the Defense

11    group.

12         I can put my hand up and say I'm happy to take all of

13    the initial e-mails on law enforcement privilege, but I want

14    to assure the Plaintiffs and Mr. Ackerman in particular that

09:49:26 15    we are coordinating.  And I'm well aware of the calls that

16    Mr. Ackerman has had with my friends at Ropes and Gray about

17    the law enforcement privilege.  Just because of scheduling,

18    I haven't been able to be on every single call, but answer

19    as to any Defendant is an answer as to all Defendants.  And

09:49:43 20    so if we get an answer to resolve an issue, we all take note

21    of that and don't follow up.  And the fact that I've put

22    letters into the Special Master on law enforcement privilege

23    simply indicates that a cross cutting legal issue remains

24    open as to all Plaintiffs.

09:50:00 25                   SPECIAL MASTER COHEN:  So -- look, we all

1   agree that there's room for improvement.  I also think that

2   it is some organic and sometimes the issue is going to have

3   to come up and then everybody says, "Wait a minute.  This

4   isn't working as well as it might.  Let's figure out a

09:50:15  5   better way to deal with it."

6          Again, I agree that you need to meet and confer.  What

7   I'd like to do is kind of having a showing of hands, who are

8   the people that are going to volunteer to sit down and

9   specifically address this issue of coordination to try to

09:50:30 10   figure out ways to improve it, both right now and going

11   forward in Track Two?  Because we're all going to try and

12   modify the Court's orders, the deposition protocol, the case

13   management order, and everything else to deal with issues

14   that come up over the last ten months that can be made

09:50:45 15   better.

16          So I want to know who it is that's going to be talking

17   on this?

18              MS. ROITMAN:  Hi, Special Master.

19          I'm happy to take the lead -- Sarah Roitman, along

09:50:56 20   with Donna Welch, on behalf of the manufacturers, and

21   welcome participation from anybody else.

22              MS. WU:  Laura Wu.  We all join for the

23   distributors.

24              SPECIAL MASTER COHEN:  Great.

09:51:01 25              MR. ACKERMAN:  Mr. Pifko and I will handle for

1        the Plaintiffs.  As Ms. Singer is well aware, we have a rule

2        that if you volunteer something, you have volunteered to do

3        it, so.

4                    SPECIAL MASTER COHEN:  Okay.

09:51:09  5        So thank you all for volunteering.  Everybody here,

6        and I, appreciate that might make things easier going

7        forward.  It's not going to cure all the problems but maybe

8        it will iron some things out in advance.  So thank you.

9        Okay.

09:51:29 10        Agenda Item 125 has to do with the Bio Immersion Trip.

11        I sent out e-mails directing Plaintiffs to produce

12        documents, and I believe that all of the Plaintiffs have

13        since responded, saying essentially that they have done so.

14        I have this as resolved for today's purposes.  It's

09:51:57 15        not the ultimate issue but the discovery aspect of it.  And

16        so I wasn't going to spend any more time on it.  Does want

17        to address that?

18                    MS. ROITMAN:  Special Master Cohen, this is

19        Sarah Roitman.  I'm happy to direct that's fine with us.  We

20        were the ones who put on the agenda --

21                    COURT REPORTER:  I'm sorry I'm having a hard

22        time knowing who is speaking.

23                    MS. ROITMAN:  Of course.  My apologies.

24        That's fine with us.  We appreciated your ruling in

09:52:26 25        terms of asking Plaintiffs to provide responsive information

1    that we can assess their claims.  Unless I missed it, I

2    don't think we've heard from Summit, but I certainly could

3    have missed a response.

4         In the meantime, we're reviewing the documents and

09:52:39  5    trying to find them in the productions and I'm -- there's

6    nothing further on this topic for us at this point.

7              MR. WEINBERGER:  Peter Weinberger on behalf of

8    Plaintiffs.

9         I agree that there are -- there's more work to be done

09:52:59 10   on this issue.  There's nothing ripe for today.  But I do

11   want to point out that we have received responses by January

12   7th, per your e-mail from Allergan, Purdue, and Mallinckrodt

13   but did not receive any responses from Teva or Janssen, and

14   I name these Defendants because they are the ones that

09:53:31 15   are -- that appear to be implicated by the Bio Immersion

16   documents, testimony, because they were board members of

17   Bio.

18         So I just want to point that out and hope that we will

19   be receiving something from those Defendants soon.

09:53:55 20             SPECIAL MASTER COHEN:  All right.

21         So I've heard Teva, Janssen and Akron mentioned as

22   parties that may not yet have responded, and I saw

23   Plaintiffs getting up when Akron's name was mentioned.  So

24   let me get that first.

09:54:06 25             MR. ACKERMAN:  This is David Ackerman.

1          Summit and Akron both responded on January 7th to

2     advise that they had no awareness of the trip.

3                MR. REED:  Special Master Cohen, Steve Reed

4     for the Teva Defendants.  Steve Reed for the Teva

09:54:22 5     Defendants.

6          So on December 17th, we submitted a letter to the

7     Court informing the Court that Teva is not a member.  The

8     assertion that it's a member of the Bio executive committee

9     is simply inaccurate.

09:54:35 10          We represent to the Court that we're not member of

11     Bio.  We're actually not alleged to have been a member of

12     Bio.  In the initial letter, there's reference to a former

13     CEO of Teva, who left the company years ago, who is

14     currently involved with Bio, but there's no connection

09:54:51 15     whatsoever to Teva.  So I think we've actually answered the

16     question.

17          I don't know what more we can say other than the

18     people we said aren't involved don't have knowledge.

19                SPECIAL MASTER COHEN:  Okay.

09:55:02 20                MS. LUCAS:  Amy Lucas for Janssen.  We

21     produced documents on the deadline and sent them a

22     production letter, and we don't have a privilege log.  We're

23     not withholding anything.  Our understanding is that the

24     order didn't require a written response beyond the

09:55:20 25     production, but if you'd like representation that we

1    received --

2                    MR. WEINBERGER:  I can address that.  I think

3    the order -- first of all, I haven't seen the Janssen

4    production and part of the problem is that as opposed to

09:55:36  5    responding directly to and putting a subject line on the Bio

6    Immersion issue, Allergan, perhaps Janssen also, simply

7    produces the documents as in the normal course as part of

8    document production and doesn't designate the subject line

9    that indicates that this is a response to this particular

09:55:59  10    issue.

11        So that was clarified by Donna Welch with respect to

12    Allergan yesterday, and I -- my sense is that probably

13    Janssen did not designate a subject line that indicated to

14    us that was a response.  That's Number 1.

09:56:17  15        Number 2, as I understand your order, they were to

16    identify the individuals who either participated in or

17    received information regarding the Bio Immersion trip.  That

18    may or may not be revealed in documents.  And so I sent a

19    letter or an e-mail I think yesterday, I think to the entire

09:56:44  20    group of potential Defendants here saying you have a

21    responsibility to give us the names of the individuals.

22    Mallinckrodt's named an in-house counsel under letter, and

23    in response to that e-mail, they've identified that person

24    for us, and I appreciate that.

09:57:00  25        So I think there is a written response required.

1          MS. ROITMAN:  Special Master Cohen, if I may

2     respond.

3          SPECIAL MASTER COHEN:  This is Sarah Roitman.

4          MS. ROITMAN:  A couple things on that point.

09:57:13  5     So first with respect to Summit, we appreciated

6     Summit's response.  If I recall, I think the response was

7     that their in-house counsel or external counsel weren't

8     aware of the trip beforehand.

9          Yesterday you issued a follow-up ruling, which we

09:57:27 10    understood to be asking any Plaintiffs whose employees or

11    representatives communicated with Bio or Leaders' Quest

12    about the trip, for those responsive communications to also

13    be produced.  And that was the piece that I don't think

14    we've heard yet on Summit, although I'm happy to be

09:57:45 15    corrected if I'm wrong about that.

16         With respect to Mr. Weinberger's point about

17    Defendant's responses, I think here your order was very

18    clear that Defendants were required for any employees that

19    communicated with Leaders' Quest or were on the working

09:58:03 20    group, that we had to produce responsive documents.

21         It sounds like all the Defendants have done that.  I

22    don't think that there was a requirement to specifically

23    identify either by name or Bates number those documents

24    because Plaintiffs already have them.

09:58:18 25         And the reason why I think both sides agree with that

1    was because when Plaintiffs provided us with their responses

2    yesterday, Cleveland and Cuyahoga, they did it the same way

3    that we did it of saying those documents have been produced

4    and they're now kind of in your hands and you can look for

09:58:34 5    them.

6        So we'd ask that if there's any ruling with respect to

7    any additional information that we have to provide, that it

8    just be reciprocal.

9        SPECIAL MASTER COHEN:  You know, y'all can

09:58:44 10   make it easy for each other or hard for each other.  And I

11   get there are tactical reasons why you might want to make it

12   hard for each other.  I don't really like it.  I would

13   prefer y'all make it easy for each other.  One way to do

14   that -- and by the way, it makes it easier for the Court --

09:59:00 15  is that when you're sending e-mails to each other about a

16   specific topic -- and we've said this before, but I'm

17   reminding everybody -- that the subject line should be

18   specific so that everybody knows that a response to, for

19   example, the Bio Immersion Trip, is in fact a response to

09:59:15 20  the Bio Immersion Trip and not just one of the, quote, MDL

21   documents.  That's Part 1.

22       Part 2, again, you can produce the documents and say,

23   "Oh, they're in there somewhere.  We've responded.  Go find

24   it," or in an e-mail or a letter, you can say, "We've

09:59:32 25  responded.  Here's how we've responded, and here's what the

1    response says."

2          The latter is easier for everybody and doesn't add

3    much time.  In fact, it will save everybody time because

4    even though it takes you five minutes to do it upfront, it's

09:59:46  5    going to save three hours of looking at stuff later on.

6          So I'm directing everybody going forward, as much as

7    possible, with every issue, that when these things come up,

8    you should identify for each other, as much as you can, the

9    response; the responsive documents, responsive people, the

10:00:03  10    response to the issue.  All right?

11          What I'm hearing, I think, is that everybody says,

12    "We've responded fully," except that people are still trying

13    to find it.  So I'm going to ask Plaintiffs to say, "We're

14    not sure that we have this information.  Please tell us and

10:00:20  15    show us where it is."  I'm going to ask Defendants to say,

16    "We're not sure we've got this particular information.  Show

17    us where it is."  Sounds like there's a very small increment

18    that I'm talking about right now.  I know this is a little

19    bit of a side show we're talking about, but what I'm saying

10:00:38  20    is a global issue that has -- that has to be put into place

21    with respect to everybody going forward.  Okay?

22                    MS. ROITMAN:  Thank you.

23                    MR. WEINBERGER:  Thank you.

24          But I do think we need some clarification.  Perhaps I

10:00:54  25    misread your January -- your December 24th order.  But, you

1      know there may be people on the Defense's side who received

2      information regarding the Bio Immersion Trip and its

3      planning who have not -- who did not create a document with

4      respect to that.

5          And what I'm hearing is that they don't believe that

6      it's within the ambit of your order to identify those

7      people.  I don't read your order that way.  It says --

8                  SPECIAL MASTER COHEN:  I don't either.

9                  MR. WEINBERGER:  Okay.  Thank you.

10                 SPECIAL MASTER COHEN:  So if there's

11     information along those lines that you don't think you've

12     received, you need to identify that.  Okay.

13         So far we've talked about easy agenda items.  I think

14     we're moving into not so easy.  The reason I say that is

15     because the status report that was submitted to Judge

16     Polster had a lengthy section that dealt with IQVIA

17     productions.  And, of course, I think it was December 27th,

18     we were all on the phone together, and I entered a very

19     specific, I thought, order having to do with IQVIA

20     production.

21         Having read the status reports submitted to Judge

22     Polster, I think there are two aspects to what comes under

23     the rubric of IQVIA production.  And I say rubric because

24     IQVIA production may not be only IQVIA as an entity.  And

25     we'll get to that.

1        But, nonetheless, the two aspects seem to be first,

2   data, and then the second aspect, documents that have to do

3   more with auditing rules that IQVIA might have played or

4   other entities might have played for the benefit of the

10:02:59  5   Defendants.  So I want to deal with them separately.

6        On December 27th, I think we were only dealing with

7   data.  And I made very clear what it was that I wanted the

8   Defendants to do.  Here's my understanding.  You can tell me

9   if it's incorrect and where we need to go from here.

10:03:20 10                MR. WEINBERGER:  Before you go there, I have

11   an update that may shortcut --

12                SPECIAL MASTER COHEN:  Happy to get shortened.

13                MR. WEINBERGER:  Okay.

14        Just before midnight last night, Evan Janush and I

10:03:34 15   received a letter from IQVIA's counsel, Patrick Oot of

16   Chicardi.

17                SPECIAL MASTER COHEN:  Sorry.  Who is it?

18                MR. WEINBERGER:  Patrick Oot, O-O-T.

19        This is a gentleman who we've been dealing with over

10:03:51 20   the last number of months in response to subpoenas that

21   we -- subpoena we issued to IQVIA, IMS, et cetera.  And

22   he did respond to two questions that I put in the status

23   report and were part of a letter that was sent to him and

24   that is whether or not the Nationwide Exponent data that was

10:04:15 25   produced by Allergan that appears to be applicable to all

1    opioids sold in the marketplace by all Defendants since

2    1997, whether or not that contains or could contain data

3    fields which would include the names of the pharmacies that

4    dispensed or distributed the drugs, and/or de-identified

10:04:45  5    patient level data or other patient identifiers.  And

6    according to a letter that he sent to us, exponent does not

7    identify those two fields.

8                  SPECIAL MASTER COHEN:  The moral of the story

9    being you've got everything there is to get?

10:05:04  10                 MR. WEINBERGER:  That appears to be the case.

11   We intend to communicate further with him to assure

12   ourselves that there isn't some other data source that

13   contains this information, but yes, with respect to what

14   Allergan has produced, that was ordered by -- from IQVIA,

10:05:25  15   which is exponent data, I think we have everything that

16   we've asked for.

17                 SPECIAL MASTER COHEN:  So more broadly, the

18   order that I issued on December 27th, is there anything

19   left?

10:05:38  20                 MR. WEINBERGER:  Well, there are other --

21   there are several other databases, IQVIA databases that we

22   are -- we continue to meet and confer about, and I don't

23   really think at this point we need your help in that regard.

24                 SPECIAL MASTER COHEN:  Okay.  That's fine.

10:05:56  25        Any other -- anybody else need to weigh in on that?

1    Sounds like this is either resolved or there's nothing to

2    resolve at this point.  Okay.

3         Then there's the second half, which I understand less

4    well.  Did you want to say something, Mr. Hanna.

10:06:18    5              MR. HANNA:  Your Honor, did you move off of

6    the data issue?

7              SPECIAL MASTER COHEN:  I did unless you -- we

8    need to go back to it.

9              MR. HANNA:  There is an issue with respect to

10:06:26   10    whether --

11              SPECIAL MASTER COHEN:  One second.  Can you

12    please identify yourself for the Reporter and also pull the

13    microphone a little closer.  Thank you.

14              MR. HANNA:  Is that on?  There is an issue

10:06:45   15    with respect to the authentication of that data,

16    specifically whether the other co-defendants will

17    essentially admit the authenticity of the Allergan produced

18    material.

19              SPECIAL MASTER COHEN:  Why don't you deal with

10:07:10   20    that by asking them -- we don't need to do it right now.  I

21    understand it's an issue, but it sounds like that's

22    something you can pursue outside of this meeting.  And if

23    there's a problem, you can come back to it.

24              MR. HANNA:  Sure.  I just wanted to put on the

10:07:23   25    record that that issue is absent.

1           SPECIAL MASTER COHEN:  Okay.  Thank you.  So

2   on December 27th, we only dealt with the data aspect.  I

3   think the other aspect kind of hearkens back maybe to

4   earlier rulings by the Court or me, which I will need to be

10:07:41   5   somewhat reminded of, and I guess I'm not quite sure where

6   to start.

7           I think that this ultimately is something that if I

8   understand what the issue is, it's going to have to be

9   decided by the Court.  When I said the Court, I mean Judge

10:07:58 10   Polster.

11           I guess, Plaintiffs, you want to start?

12           MR. WEINBERGER:  Sure.

13           This does hearken back to the hearing of November 20th

14   and the order that was issued by Judge Polster on the

10:08:11 15   November 21st, Document 1147.  And broadly speaking, it has

16   to do with the production by the Defendants of SOMS-related

17   information, which includes audits that were performed

18   either in-house or by third-party vendors.  And we have, as

19   part of the subpoena that we issued on IQVIA, we asked IQVIA

10:08:50 20   to independently produce any documents associated with their

21   divisions that provided SOMS-related consulting services to

22   any of the Defendants in this case.

23           Now, going back to the November 21st order, the Court

24   ordered in general that all SOMS-related information should

10:09:18 25   be produced forthwith and spoke to the issue of

1    attorney/client privilege in that order.  We have not

2    received any documents from IQVIA with respect to this

3    issue.  But, I think the issue has come to the forefront

4    with particularity with respect to a conversation that took

10:09:52    5    place at the last discovery conference.

6         And so I think that -- in some respect, this has to do

7    with, I think, Item 122 of the agenda, which I think covers

8    this.  And that is the disclosure by Cardinal's counsel last

9    Thursday that there's -- there was a document discovered in

10:10:22  10    the offices of, or files of their in-house counsel that they

11    claim to be privileged, which we believe, based upon the

12    description, may be an audit performed by one of the

13    divisions of IQVIA, Cegedim Dendrite on behalf of Cardinal.

14         And this -- this in part is within the scope of

10:10:57  15    documents that we are requesting that the Defendants either

16    produce, or if they don't have in their possession, that

17    they ask IQVIA to produce -- for them to produce to us.

18         This document that was disclosed last Thursday was not

19    on a privilege log and has now been placed on a privilege

10:11:27  20    log, and I believe the document has been produced to you for

21    in camera inspection.

22         We know, as a general matter, that with respect to

23    SOMS documents, which are in the possession of all the

24    Defendants and which we have requested in discovery, that

10:11:46  25    there is -- there has been privileges asserted with respect

1    to many of those documents.  And so it's our position that

2    this issue of privilege is now in the forefront, and that

3    the way to deal with this in the first instance is to deal

4    with this particular document that you are currently -- that

10:12:15  5    you currently have in your possession in camera.

6              SPECIAL MASTER COHEN:  With everything that

7    you said, the thing that concerns me most was that the

8    document was only recently produced.

9              MR. PYSER:  Special Master Cohen, I can speak

10:12:25 10    to that.  This is Steven Pyser for Cardinal Health.

11         I believe that the document that is being referred to,

12    although I would certainly want to confirm this, I believe

13    the document that's being referred to is actually Agenda

14    Item 84.  And the reason it was not obvious is because it

10:12:49 15    was from a file of an attorney who was not a custodian in

16    this litigation.

17         So until this issue arose as a specific request,

18    please go look for this information outside the scope of

19    anywhere you've ever looked before.  And we had narrowed the

10:13:07 20    scope as you do in every single occasion of what custodians

21    you're going to do, what searches you're going to do, that's

22    not outside the norm.  We had no idea this document existed

23    until we went to try to find it in particular.

24         So having done that, we've now presented it to the

10:13:24 25    Court in camera, and I think the distinction here is that

1    the Court's order of November 21, 2018, Document 1147,

2    states that the Defendant shall not interpose

3    attorney/client privileges as a reason for not producing

4    discovery of all details of their SOMS.

10:13:49  5          We have produced discovery of all details of our

6    Suspicious Order Monitoring System.  What we do not believe

7    that the Court's order does is say if that you're in a

8    litigation, or reasonable anticipation of litigation, and

9    lawyers in response to that litigation are working with

10:14:08  10   consultants to assist them in their legal work, that that is

11   somehow waived because it also concerns Suspicious Order

12   Monitoring.

13          SPECIAL MASTER COHEN:  Well, I agree with you

14   that it's not automatically waived because it's -- because

10:14:22  15   it has to do with SOMS.  The attorney/client privilege

16   isn't -- it isn't eviscerated because it has to do with

17   SOMS.

18          MR. PYSER:  Thank you, your Honor.

19          SPECIAL MASTER COHEN:  Having said that, I

10:14:32  20   want to be clear, it seems to me that there's a category of

21   documents, not just for Cardinal but for everybody, at least

22   every distributor, from what I am now beginning to gather

23   that has to do with audits, where distributors perhaps in

24   the 2006-to-2008 time frame dealing with what DEA was doing

10:15:00  25   at that time were obtaining assistance from outside

1    entities, from third parties.  Dendrite, I can't

2    pronounce -- Cegedim, whatever it is, others --

3          (Laughter.)

4                SPECIAL MASTER COHEN:  -- and it seems like

10:15:14  5    some of those documents weren't produced for the reasons

6    that you just explained; that is to say the agreed-upon

7    search terms and the agreed-upon custodians did yield hits.

8    It's clear to me, given what I've seen, that those documents

9    are extremely relevant.  They may be protected by

10:15:33 10    attorney/client privilege but they're extremely relevant and

11    at the very least, need to be made part of the privilege

12    log.  So I'm directing all parties, distributors and

13    manufacturers and everybody else, that you need to go

14    looking for -- and I'm not sure how to do it.  You all can

10:15:50 15    figure out the best way -- you need to go looking for

16    documents that were created by third parties or you, in

17    connection with working with third parties, having to do

18    with auditing or helping with, you know, as broadly as -- I

19    can come up with different phraseologies, but the point is

10:16:15 20    to construe it broadly -- addressing the SOMS, addressing

21    Suspicious Order Monitoring Systems and the related due

22    diligence, to the extent there are third parties that are

23    working with any party in this case, any Defendant in this

24    case, where they're saying here's what we suggest you do,

10:16:34 25    here's how you can improve it, whatever it is.  If y'all --

1    if the Defendants were getting help from an outside party

2    having to do with the running of the SOMS, due diligence,

3    anything like that, those documents need to be found and

4    either produced or put on a privilege log.  And if the

10:16:57  5    Defendants have a concern about or Plaintiffs have a concern

6    about making sure that the mechanics of the Defendants doing

7    that is appropriate, then you need to meet and confer.

8         I'm not going to suggest the best way because you're

9    way more expert in figuring how to do what I just said.  Any

10:17:17 10   questions?  Counsel?

11             MR. WEINBERGER:  A comment if I may.  Peter

12   Weinberger.

13        These documents are not only relevant.  They've been

14   in our request for production of documents since the very

10:17:27 15   beginning of this litigation.  So to suggest that they are

16   not a part of the search, they couldn't be found with search

17   terms, this document couldn't be found with search terms or

18   that it wasn't a custodian that had been designated is

19   simply not an answer to the question as to why this document

10:17:48 20   was produced so late in this litigation.

21        So I assume then with respect to this one document

22   that we're at some point going to proceed forward with

23   determination of privilege and will need guidance as to

24   what -- whether we need to file a motion to compel if you

10:18:20 25   rule it is privileged or exactly how we're going to get that

1     in front of you and/or the Court because I think -- again, I

2     think this has relevancy and ramifications across the board,

3     both as to all the Defendants in this case.

4                 SPECIAL MASTER COHEN:  Well, we're bouncing

10:18:40  5     around amongst topics, but what are you proposing that is

6     different than what is already in place with regard to the

7     review of the Cardinal document that was recently produced

8     in camera?

9                 MR. WEINBERGER:  You know, obviously, the next

10:18:59 10     step is for you to decide whether or not it should be

11     produced.  And then I guess we'll go from there.

12                 SPECIAL MASTER COHEN:  Okay.  Mr. Fuller.

13                 MR. FULLER:  Yes.  Special Master Cohen, Mike

14     Fuller on behalf of the Plaintiffs.

10:19:12 15         With the Defendants filing so many privilege logs

16     these days, can we have a separately designated privilege

17     log for these specific documents you're referring to?

18         As the Court is aware, we had an 80 -- excuse me,

19     48,000 document privilege log come in to Cardinal.  These

10:19:31 20     could be separated out into their own privilege log, that

21     would be helpful.

22                 SPECIAL MASTER COHEN:  Well, there's a way to

23     do it.  Just thinking off the top of my head, to identify

24     any such document just with the word audit.  I mean that

10:19:43 25     kind of flags it.  In other words, use a keyword somehow in

1       the privilege log so that you know those documents are the

2       ones that are being produced responsive to this directive.

3                   MR. FULLER:  That would solve part of the

4       issue.

5                   MR. REED:  Special Master Cohen, Steve Reed on

6       behalf of Teva Defendants.

7           Just one point of clarification, and Ms. Singer is in

8       the courtroom so she can correct me if I'm wrong, but in her

9       noting of this issue, on January 7th, her note to the Court,

10      she noted, asserted that the Defendants have failed to

11      comply with these requests, except for Teva.  My

12      understanding is that Teva has complied and that the

13      Plaintiffs are not expecting anything from us.  So I wanted

14      to make sure that was clear on the record.  And if Ms.

15      Singer disagrees, perhaps we can raise it now.

16                  MS. SINGER:  This is Linda Singer.  I am

17      without a microphone over there.  So I think you're asking

18      if I confirm for the record that Teva had complied with the

19      Suspicious Order Monitoring and charge back production?

20                  MR. REED:  I just want to make sure that I'm

21      reading your note to the Court correctly.  You carved out

22      Teva.  I'm happy to see that.  I just wanted to make sure --

23                  MS. SINGER:  I think Mr. Reed just wanted me

24      to say something nice about his client on the record, which

25      I am happy to confirm.

         1          (Laughter.)

         2                    MR. REED:  Thank you.

         3                    MR. WEINBERGER:  One other issue on behalf of

         4     Plaintiffs.

10:21:21 5          Within the ambit of the -- or the scope of these

         6     documents, it should be contracts between the third parties,

         7     third-party vendors and the Defendants because the contracts

         8     will define the scope of the work.

         9                    SPECIAL MASTER COHEN:  Right.

10:21:40 10                   MR. WEINBERGER:  And to my knowledge, there

        11     hasn't been a robust production of those contract documents,

        12     and that's one of the things that we had asked IQVIA's

        13     counsel to produce for us.

        14          And their response was well, why don't -- this was

10:22:03 15    communicated to all of us, including the Defendants because

        16     we had a joint call with counsel for IQVIA, and he suggested

        17     why don't you -- one of the Defendants have the people in

        18     their organization who dealt with the IQVIA companies to be

        19     identified, and they can contact our people at IQVIA, who --

10:22:31 20    with whom they had contact and get those documents produced

        21     to the extent that the Defendants have not produced them.

        22                    SPECIAL MASTER COHEN:  So is there a subpoena

        23     to IQVIA?

        24                    MR. WEINBERGER:  Yes.

10:22:41 25                   SPECIAL MASTER COHEN:  So the production of

1  these documents has to be from the Defendant if they have

2  them.  And to the extent the Defendants don't have them and

3  the subpoena covers it from IQVIA, the Defendants are

4  required to direct IQVIA to produce them, including

10:23:00 5  contracts.

6  MR. WEINBERGER:  Thank you.

7  SPECIAL MASTER COHEN:  Anything else on this?

8  MR. FULLER:  Yes.  Special Master Cohen,

9  again, Mike Fuller on behalf of the Plaintiff, PEC.

10:23:17 10  This belies a bigger issue, and you pointed out your

11  largest concern is that --

12  SPECIAL MASTER COHEN:  Go ahead.  I thought it

13  was pretty big already.

14  MR. FULLER:  Your biggest concern was that

10:23:31 15  this document was never identified previously.  This is not

16  the first time this has happened with Cardinal, and if I can

17  lay the record and the groundwork for the Court, sticking

18  with -- may I approach, your Honor?

19  SPECIAL MASTER COHEN:  Yes.  You don't need to

10:23:46 20  ask that.

21  MR. FULLER:  Sticking with the document from

22  Dendrite identified as early as Monday, this goes back to

23  discovery answers to binding discovery as well as written 30

24  (b) responses where the Defendants were asked to identify --

10:24:10 25  SPECIAL MASTER COHEN:  Before you proceed, I

1    note that you just gave me two documents for the record.

2    They're both marked highly confidential.  And so I just want

3    to remind you that we're on the record and you should be

4    careful about your references.

5    10:24:23          MR. FULLER:  Fair enough, your Honor.  The:

6    First document is a written response to a 30(b) from October

7    18, 2018.  The second document is a supplemental response to

8    the combined discovery from November of this -- or last

9    year, November 30th.  If you review the highlighted

10:24:44 10    sections, it indicates what the Defendants say that Dendrite

11    did, and I don't think it's highly confidential that what

12    they've claimed is that Dendrite, at least up until this

13    point, only provided investigations of on-site pharmacies.

14    They've never, until this document came to light, even

10:25:07 15    identified Dendrite as providing SOM services.

16         As the Court has already -- is already aware, they

17    filed a 48,000-document privilege log that never includes

18    this item.

19         A companion issue that's before you is Item 128, which

10:25:30 20    is I think next on the agenda.  And here's what causes the

21    Plaintiff's side the issue.  It's not that -- in 128, this

22    dealt with additional documents that were a retrospective

23    lookback analysis that Cardinal conducted based on its 2008

24    memorandum of understanding with the federal government.

10:25:57 25         We now discover that that was actually conducted and

1   you ordered it as production.  We have moved and what's

2   pending before the Court for your Honor to compel the

3   Defendants to respond to this discovery request that asks

4   about retrospective analysis.  It was never identified

10:26:18  5   previously.  Your Honor sent an e-mail that says look, you

6   have the information now; that should be sufficient.  The

7   Defendants respond and this is what's telling.  Defendant's

8   response says that, "Look.  You've ruled.  We're going to

9   produce it, coming this Friday, January 11th.  Although we

10:26:38 10   do not believe the 2009 analysis is actually responsive to

11   the specific request and the topic."

12       That's where the problem comes.  Same thing with

13   they're claiming with Dendrite.  They're not recognizing

14   these documents as being responsive to anything.  They're

10:26:59 15   literally talking about an 18-month analysis of their

16   Suspicious Orders going to 2008 until 2006 as agreed to do

17   by the MOA.

18       You're talking about a Dendrite document that if --

19   and I can provide the Court a copy.  That mimics what was in

10:27:21 20   Cardinal's file as the same review that Dendrite did for

21   Master Pharmaceutical.  Apparently that wasn't privileged.

22       It's highly relevant, has a huge impact on Plaintiff's

23   case.  And I apologize.  I should have brought the next

24   document up.

10:27:42 25           SPECIAL MASTER COHEN:  What is the document?

1    This is the pharmaceutical's -- excuse me -- Master

2    Pharmaceutical's Dendrite Report that is analogous, you

3    believe, to the Cardinal --

4            MR. FULLER:  Correct.

10:27:55  5            SPECIAL MASTER COHEN:  All right.

6        And you just said you don't believe that this was

7    designated as privileged in the Master's case.  Why do you

8    say that?

9            MR. FULLER:  I don't know if it was designated

10:28:05 10    in the Master's case.  I know it got produced at Cardinal

11    because Cardinal produced it to us.  If there was any

12    privilege --

13            SPECIAL MASTER COHEN:  Produced to Cardinal by

14    whom?

10:28:14 15            MR. FULLER:  I do not, your Honor.

16            MR. PYSER:  Special Master, Cohen, I note --

17    this is Steven Pyser for Cardinal --

18            SPECIAL MASTER COHEN:  Please identify

19    yourself for the record.

10:28:21 20            MR. PYSER:  Steven Pyser for Cardinal Health.

21        Sorry.  The placement of the microphone prohibits

22    standing up.

23        The document that I was just handed, at least which I

24    think is a Master Pharmaceutical document, does not have a

10:28:33 25    Bates number.  So the Plaintiffs reproduced it, and I,

1    sitting here today, can't speak to the multiple noting --

2                    MR. WEINBERGER:  I have a copy.

3                    COUNSEL:  Thank you.

4                    MR. FULLER:  Your Honor, the Bates Number for

10:29:04  5    that is CAHMDL2804, 02481524.

6           Your Honor, the next document --

7                    MR. PYSER:  I would also note, your Honor --

8    and this goes for the other documents that have been

9    provided just now to Special Master Cohen.  This document,

10:29:26 10    because it doesn't have a Bates number also doesn't have a

11    confidentiality stamp that likely went along with it.  So I

12    would ask that for all the documents that counsel is now

13    presenting to the Court, that whatever their confidentiality

14    marks were originally, that be respected by the Court and by

10:29:41 15    the parties.

16                    SPECIAL MASTER COHEN:  Agreed.

17           But still, I just want to get back to the question of

18    do we know whether this Master's document was --

19                    MR. FULLER:  We do not know how it got to

10:29:57 20    Cardinal, your Honor.

21                    SPECIAL MASTER COHEN:  Mr. Pyser, do you know.

22                    MR. PYSER:  Sitting here today, receiving this

23    document, I can't speak to that.

24                    SPECIAL MASTER COHEN:  You've seen this

10:30:07 25    before?

1          MR. PYSER:  This particular document?

2          SPECIAL MASTER COHEN:  Yes.  You know of this

3     document?  I know of this document.  I don't know how --

4          MR. PYSER:  We believe it was an attachment to

10:30:14 5     one of the Plaintiff's submissions.

6          MR. WEINBERGER:  And we refer to this document

7     at the November 20, 2018, hearing before Judge Polster.

8          SPECIAL MASTER COHEN:  Right.

9          MR. PYSER:  But I would note that I can't

10:30:26 10     speak whatsoever to what Master's Pharmaceutical might have

11     engaged this company to do.  I can only speak to what

12     Cardinal Health engaged them to do in context of that

13     engagement, who they were reporting to.  And those are the

14     issues originally put before the Court and were complying

10:30:43 15     with the Court's order to produce certain documents.

16          So I -- you know, again, the Plaintiffs are coming

17     around to an issue where they've asked questions, we've

18     provided answers, witnesses, fact witnesses have testified,

19     identified documents.  We are -- we are or have produced

10:31:03 20     those documents.  It's going around and around where

21     we've already complied.  And that's what we're getting at.

22     When Plaintiffs shift over now, I think we've shifted over

23     into Agenda Item 128, Topic 16.  I think the Court had it

24     right in its e-mail when you said, "Okay.  You've raised

10:31:20 25     this topic.  A witness has testified on this topic.  The

1     documents have been identified and will be produced on this

2     topic."

3                    SPECIAL MASTER COHEN:  Well, Plaintiffs'

4     concern, and it's legitimate and fair, is that it seems that

10:31:33  5     the document we're talking about is something that should

6     have been produced earlier, that it should have been

7     gathered by the net of previous discovery.  And so I'll tell

8     you, and I'm pointing at everybody here, not just Defendants

9     and not just Plaintiffs, that the Court has made it very

10:31:59 10     clear to me, Judge Polster has said, "If you need to

11     sanction anybody, go ahead.  You have the authority to do

12     that.  If somebody isn't doing what they're supposed to do

13     or behaving inappropriately, you, David Cohen, have the

14     authority to sanction them, and I will address it then if

10:32:15 15     they appeal it to me, you know, using the appropriate

16     standards."

17          The reason I say that is because I'm extremely

18     reticent to do that, but we're getting into an area where if

19     it later turns out that the Defendants have not produced

10:32:34 20     documents that are central to this litigation and we all

21     know what that means, like if you see it when you know it,

22     you know it when you see it, there is going to be a problem

23     coming from me and/or the Court.  And I want to make myself

24     very clear.  Don't monkey around -- I said this before --

10:32:58 25     don't monkey around with parsing words.  Critical discovery

1    needs to be produced from both sides, from both sides.  And

2    the kind of document we're talking about now, which

3    according to Mr. Fuller, Cardinal said we don't think this

4    was covered, it's just wrong.  It was.

10:33:29  5    MR. PYSER:  To be clear, your Honor, that was

6    because of that particularized discovery request.  Speaking

7    to the general production question, as to why certain

8    documents weren't picked up, I think the document that was

9    put before Special Master Cohen through our in camera

10:33:46 10    submission is a perfect example.

11    SPECIAL MASTER COHEN:  I'm not talking about

12    that one right now.

13    MR. PYSER:  And I can look into whether there

14    was a search term issue or a custodian issue, but I can

10:33:56 15    assure the Court there is no attempt, as you just said, to

16    monkey around.  Where we find responsive documents, we are

17    producing, millions of them.

18    So I understand the Court's directive.  We are

19    producing responsive nonprivileged documents, and we'll

10:34:12 20    continue to do so.  If anything else is located, we will do

21    so.

22    SPECIAL MASTER COHEN:  Right.  And documents

23    that are responsive that are privileged need to be put on a

24    log.

10:34:22 25    MR. PYSER:  Understood.

1          MR. FULLER:  And, your Honor, just to complete

2     the record, Mr. Pyser -- well, I shouldn't point out

3     Mr. Pyser.  Cardinal filed a response that said this

4     document isn't even responsive anyway.  The testimony has

10:34:35  5     been that these documents would have been responsive to that

6     request; particularly by Mr. Reardon, who is in charge of

7     the Suspicious Order Monitoring Program up until 2007.

8          Then when we argued this issue previously before your

9     Honor over the phone, your Honor asked about two documents

10:34:53  10     that they did identify.  This goes, again, to the 18-month

11     lookback; these reports that have to be produced on Friday.

12          They've produced the document by Mr. Rauch that

13     identifies the formulary he's going to use to run this

14     process.  They identify the document at the end that was

10:35:13  15     provided to the DEA that said yes, we did the 18-month

16     lookback.

17          So they're claiming that the search terms triggered

18     the documents, set up the formulary, and the document that

19     says hey we did it but didn't trigger anything in the

10:35:27  20     middle.  And Mr. Rauch testified he's the one that ran the

21     reports.  So he was a custodian.

22          We've heard this issue it's not triggered by search

23     terms or it wasn't labeled as custodian.  Your Honor heard

24     months of testimony and argument about how we had to rely on

10:35:44  25     the Defendants to identify who the likely custodians would

1    be.  We were going on what they said for a lot of that.

2         Here we have -- and what's so concerning to us on our

3    side is we have two probably most significant documents, the

4    most significant point in time of this litigation, 2000,

10:36:05  5    2007, 2008 time frame, one doing a retrospective review of

6    Suspicious Orders and doing an analysis, the other

7    evaluating Suspicious Order Monitoring Systems that were in

8    place that, lo and behold, never made it to privilege log,

9    never got identified, and the company that did the analysis,

10:36:28 10   we weren't even told in written responses that that was the

11   type of analysis that they were doing.  We had to discover

12   all of this on our own.

13        That's not the way this litigation should be ran.

14   It's just not, your Honor.  And Mr. Pyser's response is,

10:36:47 15   with all due respect, your e-mail, Special Master, to us

16   yesterday was, "Well, look.  You got the information now."

17   We had the information for 2007.  But, when they entered the

18   MOU in 2012, was there another analysis that they did

19   looking back?  We don't know because we haven't came across

10:37:08 20   that in discovery.  But they should have to tell us that.

21              SPECIAL MASTER COHEN:  All right.  So about --

22              MR. FARRELL:  Judge, Paul Farrell.  One quick

23   thing.

24        I just want to emphasize this retrospective lookback

10:37:19 25   audit was a component of Cardinal Health's Memorandum of

1    Understanding and Agreement with the DEA for failure to

2    conduct, design, and operate a Suspicious Order Monitoring

3    System.

4         So what we're seeing is -- is Mr. Rauch testified he

10:37:40   5    performed that very analysis and gave it to in-house

6    counsel, and then it disappears and doesn't even show up on

7    a privilege log.

8              SPECIAL MASTER COHEN:  All right.  So --

9              MR. PYSER:  Special Master Cohen, I would also

10:37:53  10    add just some of the issues, there are intersecting issues

11    here, many of them are covered, I believe, by Agenda Item

12    122, which Cardinal is preparing a written response, which

13    is Plaintiff's request for Cardinal Health to release

14    details of its Suspicious Order Monitoring System.

10:38:09  15         So some of this at least is issues that will be

16    addressed in writing, and Plaintiffs are raising now, which

17    is contrary to some of the agreement, but all of that said,

18    I'll repeat for the Court what I said before, which is look,

19    there's no monkeying.  There's no hiding the ball.  When

10:38:25  20    documents come up, we are producing those documents.  We

21    can't produce documents that are not located whether through

22    research terms or custodians, and that applies to every

23    Plaintiff and Defendant in this case that, for example, when

24    the General Counsel has agreed look, his work is legal and

10:38:44  25    that's why it's been submitted to you because certain of

1    these documents are prepared in preparation for litigation,

2    there's -- they're on the log and we prepared them or

3    they're not custodian so they're not there, and that's the

4    agreement for all parties.  So I don't think there's

10:39:00  5    anything you need here as we continue to search and continue

6    to produce whatever Plaintiffs ask so.

7           MR. FULLER:  Your Honor, and Mr. Pyser's

8    correct.  There is another issue that was put on the agenda

9    that was bumped to give them time to respond in writing.

10:39:17 10   That's not going to resolve this issue.

11          SPECIAL MASTER COHEN:  No.

12          MR. FULLER:  The issue is whether we can rely

13   on the discovery and the responses we're getting.

14       And I have to admit, I have not done a ton of

10:39:29 15   multi-district work, your Honor, but I hear repeatedly it

16   wasn't triggered by search terms or custodians.  If we asked

17   for it in a request for production and you know about it or

18   your client knows about it, you have to give it.  Why else

19   would we do the request for production?

10:39:44 20          SPECIAL MASTER COHEN:  Yeah, I --

21          MR. FULLER:  It's so contrary.

22          SPECIAL MASTER COHEN:  I agree with your

23   proposition.  Let me -- let me cut to this.

24       So first of all, with regard to Agenda Item 128, which

10:39:59 25   we've touched on, my original concern was I don't know why

1    we need to direct Cardinal to amend an interrogatory

2    response when you know the answer, but what has become clear

3    is that the request for the amendment to the interrogatory

4    is not simply to formalize something that you already know,

10:40:21  5    to include a document that you've already received, but to

6    ensure that there are other -- ensure you've received other

7    documents or know about other documents related to that that

8    haven't been produced.

9        So I'm going to grant the request Plaintiffs have made

10:40:38  10    for Cardinal Health to supplement its written responses to

11    Topics 16 and 18, and that will require Cardinal to ensure

12    it has produced the kind of documents that I was talking

13    about earlier having to do with audits and lookbacks and due

14    diligence and anything to do with the running or the

10:41:02  15    modification of Suspicious Order Monitoring Systems.

16        I again want to be clear the fire with which you are

17    playing right now is hot.  Defendants need to make sure that

18    they do what I've directed because I really don't want to

19    come back and see the Court and myself be put in a position

10:41:27  20    to say, "Look.  I told you and now you're in -- you're in a

21    troublesome spot."

22              MR. FARRELL:  Special Master Cohen, these are

23    30(b)(6) topics that we asked for a deponent.  They said

24    they would provide a written response.  So what we're asking

10:41:43  25    is instead of getting more lawyer responses, is it possible

1    for us to have -- reopen the 30(b)(6) testimony, have your

2    Honor sit, and that we can inquire on the variety of topics

3    that we believe are incomplete?

4        We've raised this issue before.  We're getting through

10:41:59  5    30(b)(6) testimony.  We're not getting clean, clear answers,

6    and we're running out of time.  So -- hold on.  I'm not

7    done.

8            MR. PYSER:  That was not the original

9    request --

10:42:09  10            MR. FARRELL:  I'm not done.

11            MR. PYSER:  -- written testimony.  We will

12    provide in accordance with the Court's order.  This has

13    already been ruled on once, and we now have a ruling to

14    provide the written answers to 30(b)(6) testimony.  We will

10:42:24  15    do so.  We shouldn't now go back and reopen other issues and

16    attack it from a different way that wasn't even part of the

17    briefing or the request from the Plaintiffs originally.

18            SPECIAL MASTER COHEN:  The answer, Paul, is

19    not yet.  If that happens, I want it to be after all the

10:43:12  20    documents are produced, responsive to what I just said.  It

21    may happen.

22        On this topic, let me ask you now that we've gotten as

23    far as we have -- I think we're done for the moment -- to

24    what extent have I mooted the need for the parties to bring

10:43:43  25    this up at the status report tomorrow with Judge Polster?

1      Not saying you shouldn't, just asking where are we on this

2      so I can let the Judge know a little bit what to expect.

3                   MR. WEINBERGER:  I think -- I think you have

4      covered that part of our status report.  There's still two

10:44:01  5      other sections.  One has to do with SOMS-related issues and

6      charge back data with respect to the manufacturers, which is

7      an Agenda Item 69.  But with respect to the first part of

8      the status report, I think we've covered that waterfront.

9                   SPECIAL MASTER COHEN:  Anybody else want to

10:44:23 10      weigh in on that specific question?

11                   MR. REED:  Special Master.  Steve Reed for the

12      Teva Defendants.

13          I think in general, the parties, up until recently,

14      have observed an approach with the status reports to the

10:44:36 15      Judge that make sense, which is to report on the status of

16      the proceedings, which includes a general reference to the

17      status of the discovery proceedings.

18          They're taking place, as the Court directed, before

19      you.  In recent reports, there's been a troubling trend

10:44:51 20      where the Plaintiffs seem to be trying to litigate the

21      issues that are still pending before you to Judge Polster

22      directly, in the hopes of getting a decision which preempts

23      the process and we think corrupts the process.  It doesn't

24      allow for a proper development of the record and an

10:45:09 25      opportunity to argue for you to consider to make a

1    recommendation for us to decide whether to ask you to

2    formalize it, and for one of us to take it to Judge Polster

3    if it's ripe.

4         And so there was a lot of discussion earlier this

5    morning about how we can improve the process, make it more

6    efficient.  I would say that's top of -- near the top of my

7    list, which is we should not be raising discovery disputes

8    that you haven't yet decided in a status report to Judge

9    Polster.

10                  SPECIAL MASTER COHEN:  Well, as a general

11   matter, I agree.

12        It was especially curious to me that lengthy

13   discussions in the status report actually didn't make

14   reference to some of the discovery -- Plaintiffs or

15   Defendants -- didn't make reference to the discovery rulings

16   I made on the topics.  So I thought that it was an odd

17   presentation to the Court.

18        On the other hand, I think it's fair to say that the

19   status reports to the Court as a general matter have been

20   pretty vanilla and sometimes it's curious to me that the

21   parties aren't trying to fill in the Court a little bit more

22   on what's happening.  Status reports sometimes last ten

23   minutes, and I'm left thinking I'm no not sure what the

24   Judge just learned.

25        The status report doesn't have to be an asking for

1    resolution of issues, but it should probably be a bit more

2    thorough of a recitation of what the issues that are being

3    dealt with are.

4        So somewhere in the middle is, you know, a good place

10:46:32  5    to be.  I also think that given where we are in the arc of

6    Track One, that it makes sense to me -- it didn't surprise

7    me that the parties are jumping up and down trying to get to

8    the end of things and bring things to the Court's attention

9    because there's a lot of tension, a lot of issues that are

10:46:49 10    needed.  So I understand your point.

11        But it sounds like, getting back to my original

12    question, the Defendants don't think -- and I'm not saying

13    you shouldn't.  I just want to make sure the Defendants

14    don't think that there's some issue that the court needs to

10:47:03 15    resolve tomorrow during the status call on this topic.

16                MR. REED:  From the Defense's perspective,

17    there is not anything at this time.

18                MR. RICE:  Your Honor, Joe Rice for the

19    Plaintiffs.

10:47:17 20        Everything that you've done this morning and

21    everything that's in our status report points to a problem

22    that I've raised with you with greatest of respect.  There's

23    no way you can get this done by yourself.  So we do think

24    that the concept of how we go forward should be part of our

10:47:41 25    discussion with the Judge tomorrow.  Part of our status

1    report was to point out the magnitude of the task that the

2    Judge has put on you in dealing with all of the discovery,

3    thousands and thousands of privilege claims, and deadlines

4    that just await your ruling, and you just can't do it all.

10:48:06   5    It's not humanly possible, no matter how hard you try.

6              SPECIAL MASTER COHEN:  I'm inhuman?

7         (Laughter.)

8              MR. RICE:  Well, show it.

9         So we do think that some discussion tomorrow with the

10:48:19  10    Court in the status report addressing these issues is

11    appropriate, and we do intend to raise them.

12              SPECIAL MASTER COHEN:  Yeah, that's fine.  I

13    mean to tell you the truth, it's occurred to me that --

14    look, I know that this process has been very expensive for

10:48:33  15    both sides to have three Special Masters, but there's no way

16    around it that I've seen, and it's occurred to me that I

17    wouldn't mind getting some help.  One way to do that is to

18    take some of the issues that I've had trouble getting to,

19    specifically the confidentiality and privilege log issues,

10:48:51  20    and giving them to other Special Masters or giving them to

21    Court Clerks.  And we've begun to do that.  It also occurs

22    to me maybe I need to hire somebody at a lower, at a lower

23    hourly rate, who can help me with that stuff.

24         And so maybe that's a -- I'm just throwing that out.

10:49:13  25    There may be other ideas to talk about.  It's fine with me

1    if you address that issue with the Court tomorrow.

2                   MR. RICE:  Thank you.

3                   MS. Birnbaum:  Sheila Birnbaum for Purdue.

4        Mr. Rice, when you say you want to raise this, you're

10:49:26  5    raising it as an issue, do you have solutions that you want

6    to discuss before that, or is this a gotcha that you're

7    going to provide solutions that you haven't shared with

8    anyone else?  And why don't we have a meet and confer about

9    whether there could be an agreement between the parties as

10:49:47 10    to what can be done instead of raising it in a vacuum

11    without solutions?

12                   SPECIAL MASTER COHEN:  So we're going to take

13    a 15-minute break, and during that time, I direct you and

14    Mr. Rice to meet and confer.

10:50:00 15        (Laughter.)

16                   MS. BIRNBAUM:  Maybe for ten minutes.  We'd

17    like to take a break, too.

18                   SPECIAL MASTER COHEN:  All right.  If -- it is

19    10 of.  Let's come back at 10 after and we'll resume.

10:50:12 20    Everybody can take a break.  Thank you.

21        (Thereupon, a recess was taken.)

22

23

24

25

1          MS. BIRNBAUM:  Special Master Cohen.

2          Sorry we've been late.  Mr. Rice and I had a

3     ten-minute confab which took a lot longer and was joined by

4     a lot of other folks.

11:13:41  5          I think from our perspective, the Defendant's

6     perspective, we are meeting after this hearing with the

7     Plaintiffs, and I think we would like to continue to discuss

8     coming up with a helpful solution to help you get through

9     these confidentiality issues.  And I think if you give us a

11:14:05 10     little more time, perhaps we can come up with a joint

11     solution or if not, then we may come up with two solutions

12     to try to assist you in getting maybe more help for you to

13     help get us through this review of the confidentiality

14     communications.

11:14:29 15          SPECIAL MASTER COHEN:  Okay.  Thank you.

16          MR. RICE:  I think it's fair to say that --

17     and correct me if I'm wrong, everybody who's in the room --

18     everybody recognizes that the efforts you're putting in

19     would still -- the task you've been given is going to

11:14:45 20     require some help.  So I think we're united in trying to

21     figure out how to get this done, and I think everybody

22     recognizes the ramifications getting this done has on

23     getting this case reasonably ready for trial with existing

24     trial dates.  So there will be other discussions we'll have

11:15:02 25     to have.

1          SPECIAL MASTER COHEN:  Yeah, that's fine.  I

2     appreciate your working together to find the solution to

3     help all of us together.

4          So I actually never needed reading glasses until I had

11:15:15  5     the agenda for this case --

6          (Laughter.)

7          SPECIAL MASTER COHEN:  -- put in front of me.

8          Just to let you know, so I was just told during the

9     break that the Judge has a criminal matter.  I think it's

11:15:28 10     probably a sentencing, but I'm not exactly sure what it is

11     -- at 1:00.  That will probably run from 1:00 to 1:30.  So

12     we will take a break then.  I want to run pretty solid until

13     then.  So we'll have our lunch break at 1:00.

14          This is taking a little longer than I anticipated so

11:15:44 15     far, but I also know that many of the topics we've addressed

16     so far are the bigger ones.  There's kind of one or two more

17     big ones we have to address.

18          I was asked during the break if perhaps we can address

19     Number -- next, Number 84.  Is that right, Jim?

11:16:07 20          MR. CECCHI:  102.

21          SPECIAL MASTER COHEN:  Because people need to

22     get on planes.  Somebody call off page what 102 is on.

23     There's a lot of rustling of papers.

24          MR. CECCHI:  I think it's 6 but I'm not sure.

11:16:44 25          SPECIAL MASTER COHEN:  Are you sure it's 102?

| | |
|---|---|
| 1 | MR. CECCHI:  103. |
| 2 | SPECIAL MASTER COHEN:  103, top of Page 6. |
| 3 | These are Wal-Mart specific issues, and this comes under |
| 4 | the -- I don't want to do this very much.  I don't want to |
| 11:17:10 5 | jump to previous agenda items because most of these are in |
| 6 | the nature of status reports, but my understanding as to |
| 7 | this one is that it kind of is moved back into the realm of |
| 8 | dispute and impasse, despite the fact that to this point, |
| 9 | everybody had been working together. |
| 11:17:34 10 | So, Jim, why don't you go ahead? |
| 11 | MR. CECCHI:  Thank you, your Honor.  James |
| 12 | Cecchi on behalf of the PSC. |
| 13 | We're addressing the Wal-Mart issues and the agenda |
| 14 | says to give a status report, and the report is that we are |
| 11:17:48 15 | at an impasse.  And we're prepared to go through the issues |
| 16 | today.  I have one of my partners on the phone. |
| 17 | The problem with the discovery from the Plaintiffs' |
| 18 | perspective is -- and it goes back to your Honor's comments |
| 19 | about parsing -- |
| 11:18:02 20 | MS. BONOVICH:  I'm sorry.  I hate to |
| 21 | interrupt.  This is Kelly Bonovich for Wal-Mart.  And |
| 22 | because we've jumped out of order on the agenda, I just want |
| 23 | to make sure my colleague, who is handling this topic, is |
| 24 | going to be -- is on the call presently. |
| 11:18:18 25 | SPECIAL MASTER COHEN:  And who is that? |

1          MS. FUMERTON:  Hi, Kelly.  This is Tara

2     Fumerton.  I apologize, Special Master Cohen, I was not able

3     to be there in person, but I am on the phone now and can be

4     prepared to address these issues.  Although I'm a little bit

11:18:33  5     confused but never had a conversation with the Plaintiffs'

6     representative that's now speaking.  So I'm not really sure

7     what's going to be discussed since we've just recently sent

8     them the letter to Plaintiff which we thought was a

9     continuation of our meet and confer process and --

11:18:54 10          SPECIAL MASTER COHEN:  Tara, Tara, we're

11     having trouble hearing you here.  We haven't had trouble

12     hearing the other folks on the phone.  I'm not sure if

13     that's because you're not speaking directly into the phone.

14     But, the Court Reporter hasn't been able to get some of what

11:19:07 15     you've been saying.

16          MS. FUMERTON:  Hi, Special Master Cohen.  This

17     is Tara Fumerton.  Is that better?

18          SPECIAL MASTER COHEN:  Yes, it is. And I heard

19     what you said.

11:19:15 20          The essence of it was that you don't believe you've

21     spoken directly with the Plaintiffs' attorney, who's

22     speaking now, and that you recently sent something to the

23     Plaintiffs on these topics.  And I'm not sure if you said

24     you don't agree that there -- that you're at an impasse.

11:19:30 25     Was that the last thing you said?  I didn't really hear it.

1          MS. FUMERTON:  Yes, that was the last thing I

2     had said that it was not my understanding that we had

3     reached an impasse.  So this is all a little bit of a

4     surprise to me.

11:19:45  5          MR. CECCHI:  Your Honor, I apologize for not

6     speaking personally to Tara.  My more learned colleagues who

7     are taking depositions in the Wal-Mart case today were

8     speaking directly to her.  We did receive a letter back

9     after the last hearing from your Honor where you told us to

11:19:57 10    continue meet and conferring.  And we got that at 1:59 two

11    nights ago.

12          Our judgment is that the meet-and-confer process has

13    reached a conclusion, that we're not making productive

14    process.  There's fundamental items.  There's fundamental

11:20:12 15    requests for documents that they are parsing and limiting in

16    a self-serving way that we believe we need responses to.

17    And your Honor discussed some of those items in the last

18    hearing, and they're in our December 19th letter.  Let me

19    just give you a few examples.

11:20:28 20         Altorex Software.  They used Altorex Software in

21    connection with Suspicious Order Monitoring.  It's a

22    program, as we understand it, that's even more powerful than

23    the Tableau Program, which your Honor, I'm sure, has heard

24    about.

11:20:40 25         They used it, for Suspicious Order Monitoring.  They

1    manipulated data that was fed into it.  We need the Altorex

2    native files so we can see what they were doing, when they

3    were doing it, how they were doing it, and what they were

4    doing it.

5        It's not controversial.  We've asked for it.  We don't

6    have it.

7        "Know your customer" documents.  They initially told

8    us we don't do know your customer.  We now found documents

9    in their limited production.  I do want to give a footnote

10   here, Judge.  Wal-Mart is one of the largest Defendants, if

11   if not the largest Defendant in this case, with the smallest

12   production of documents.  They originally told us, "We don't

13   have "know your customer" documents.  We now have documents

14   where -- of course, they had "know your customer" documents.

15   It's a requirement.  We need those documents.  We just don't

16   have a full production.

17       Same thing -- and this is all in our letter on

18   December 19th.  High risk prescriber data.  They used high

19   risk prescriber data to do Suspicious Order Monitoring.  We

20   know that because we've located some documents which tell us

21   that.

22       We haven't received a full and fulsome production

23   concerning high risk -- they call it their High Risk

24   Prescriber Program, which also -- well, this issue isn't

25   ripe.

1          So we still haven't received, Judge, the amended

2      answers to interrogatories, which I believe were promised to

3      us.  We haven't received amended responses or full responses

4      to a whole host of production of documents.  And I'm

5      prepared to go through them or, you know, my partner Jan

6      Brody can go or we can have a special hearing.  However you

7      want to proceed.

8              MS. FUMERTON:  This is Tara Fumerton.  May I

9      respond basically to the each of those points?

10             SPECIAL MASTER COHEN:  Go ahead.

11             MS. FUMERTON:  So this is a little bit

12     difficult because even with respect to Mr. Brody, who's on

13     the phone, he joined the meet-and-confer process fairly

14     late, and no disrespect to him, but maybe is not grounded in

15     the facts in the prior meet-and-confer process.  But as to

16     each of these issues briefly, I'll take Altorex first.

17         So we've identified that Bates number.  The Altorex

18     output that were used as part of the Order Monitoring

19     process, what Plaintiffs have said they continue to want, I

20     guess, is some sort of hypertechnical, but it's -- the

21     algorithm that was used to show how the data was polled, and

22     we have been investigating whether or not that's even

23     possible for these historical documents, but as far as the

24     outputs of that Altorex, they have been produced and

25     identified by Bates number.

1     With respect to the "know your customer" statement

2     that Plaintiffs' counsel just made, we have never said that

3     we didn't use "know your customer" information.  To the

4     contrary, our letters went back and forth, and the fact some

11:23:33  5     of this information is in our production shows that we have

6     used it.  And our position is slightly different.

7     They have requested information about "know your

8     customer" programs and policies that might be more

9     applicable to a distributor like McKesson or somebody who is

11:23:52 10     distributing to pharmacies that were, you know, it did not

11     have any affiliation with or didn't know.

12     Wal-Mart distributes only to its own pharmacy,

13     pharmacies, doesn't distribute anywhere else.  And so there

14     are discussions of "know your customer" requirement and how

11:24:07 15     Wal-Mart complied with those, and those are in our

16     production.  And we've given additional information to them

17     with respect to that to clarify it.

18     With respect to specific comments about how we're one

19     of the largest Defendants in this case, perhaps you know, by

11:24:25 20     sheer size we are, but with respect to actually distribution

21     of this case, we are one of the smallest.  It's only a

22     fraction, and I want to say 1 or 2 percent of the overall

23     distribution in this direction so --

24               SPECIAL MASTER COHEN:  I don't care about your

11:24:44 25     size.

1          MS. FUMERTON:  -- so purely perspective.

2          So then just going to the amended rogs as well, we are

3     sending amended rogs today.  We will have them today.

4          And then with respect to the request for production,

11:24:57  5     that's where we had sent an additional letter identifying

6     information by Bates number.  We produced some of the

7     information that the Special Master requested.  For example,

8     the McKesson example contract.  We did give that to them.

9          So again, I just -- these are blanket statements that

11:25:14  10    Plaintiffs' counsel are making who were not -- have not been

11    really involved in this issue.  It's sort of difficult to

12    address because I feel a lot of these issues are either not

13    fully being described accurately or are not fully describing

14    the responses that we've made.

11:25:32  15         MR. CECCHI:  Judge, I can address that and I

16    can address Altorex directly.

17         Wal-Mart's response, all it did was confirm that four

18    documents they've produced are output from Altorex.

19              SPECIAL MASTER COHEN:  Four you said?

11:25:45  20              MR. CECCHI:  Four, yes.

21         Quote, "We have confirmed that the four Buzio analyst

22    reports Wal-Mart produced are output from Altorex.  We are

23    still evaluating whether we can produce the "work flow that

24    you requested during our December 28th meet and confer."

11:26:01  25         That's parsing.  What we asked for is the native

1      files, Altorex native files, so we can see what they were

2      looking at.  It's not hard to produce this.  It's electronic

3      data.  And I'm no expert in it, but this is an example of

4      parsing.

5          I can read what they responded.  I can read our

6      request for productions of documents.  Let me give you

7      another one.

8          In their response to our -- the meet and confer,

9      Request For Production Number 11, quote, "Consistent with

10     our discussions, we will provide you with the Bates numbers

11     of the documents in Wal-Mart's production of the Wal-Mart's

12     documents concerning the safe use of opioids and risk of

13     opioid misuse."

14         We asked for all documents, whether they were Wal-Mart

15     given to you by manufacturers in connection with marketing

16     presentation, all documents.

17         So what they come back and do is parse our request and

18     say, "Well, we've given you some Wal-Mart documents."

19     That's parsing.  That's what they're doing.  That's why we

20     are not getting fulsome productions.

21         The same requires -- Request For Production Number 13,

22     Wal-Mart did not propose quote, "Quotas to any entity, and

23     thus, has no such documents to produce."  We didn't limit

24     the request to quotas we limited -- we asked for needs,

25     forecasting documents.  We don't have them.

1       Now Ms. Fumerton is right.  I wasn't at the meet and

2   confer, but that doesn't mean they have produced the

3   documents that they haven't -- that they have wholesomely

4   responded to our request.  The fact is that they have not.

11:27:29  5   And Altorex is a perfect example.

6       So I don't know how best to deal with this, your

7   Honor.  We're happy to have a special session and go through

8   though this in microscopic detail, but the fact of the

9   matter is we don't think the meet-and-confer process is

11:27:44 10   moving the ball forward with the rapidity and consistent

11   with your Honor's comments earlier this morning that this

12   should be done without parsing, that we need the facts.

13       SPECIAL MASTER COHEN:  All right.

14       So because this was -- because this was on the agenda

11:27:59 15   under previous agenda items with a note that I just wanted a

16   status report, the status report is now clear that we need

17   to move this back kind of into a different category.  And it

18   may be that you simply are going to give me back the letter

19   from December 19th saying these are all of the topics that

11:28:21 20   we need rulings on, but I need in writing --

21       MR. CECCHI:  Sure.

22       SPECIAL MASTER COHEN:  -- from both sides

23   their positions on the sub-issues that you just named, the

24   "know your customer," the Altorex Software, the native files

11:28:32 25   from Altorex, the high risk prescriber program and data, and

1    a list of what is left.

2         I assume that there's been some movement because over

3    the past couple of weeks, I've heard, "We're working

4    together."  So whatever is now left, if you believe that

11:28:49  5    you're at an impasse, I need a list of those things in

6    writing, and I'll either rule on them in writing or we'll

7    get back together.

8                   MR. CECCHI:  Good.  Thank you, your Honor..

9                   MS. FUMERTON:  Yes, your Honor we will do

11:29:03 10    that.

11                  SPECIAL MASTER COHEN:  Thank you, Tara.

12         Jumping back now, more or less, into the order, on the

13    agenda, the next one I see is Number 127.  This is something

14    I ruled on via e-mail in writing.  I think there's nothing

11:29:20 15    left to discuss there.  Anybody think that something more

16    needs to be said about that topic?

17                  MR. SHKOLNIK:  Hunter Shkolnik for Cuyahoga

18    County.

19         Your Honor, no, I think you've -- Special Master

11:29:34 20    Cohen, I think you resolved this issue.  I think you said

21    three and a half hours, and we're ready to go.

22                  SPECIAL MASTER COHEN:  Thank you.

23                  MR. SHKOLNIK:  Thank you.

24                  SPECIAL MASTER COHEN:  128 we've discussed at

11:29:44 25    length.

1          129 is a topic that I said Cardinal could submit a

2    response on Friday.  So we're not going to address that now.

3          I think 130, 131 and 132 are all related and have to

4    do with essentially the law enforcement privilege.

5                    MR. PIFKO:  Special Master Cohen, if I may.  I

6    want -- there are different issues -- sorry.  Mark Pifko

7    from Baron and Budd on behalf of Cleveland.

8          These -- these three issues are different, and I want

9    to address -- I understand there's overlap, but they should

10   be addressed, so -- in a separate way.

11                   MS. WU:  Special Master Cohen, Laura Wu for

12   McKesson and the Defendants.  And I'm happy to kind of give

13   an update as well.

14         Number Agenda Item 130 is the Defendant's motion to

15   compel production of thousands of documents, which

16   Plaintiffs are currently withholding on the basis of

17   unsubstantiated law enforcement privilege claims.

18                   SPECIAL MASTER COHEN:  I'm sorry, Laura.  You

19   said compel production of what?

20                   MS. WU:  Documents which are currently being

21   held by Plaintiffs on the basis of unsubstantiated law

22   enforcement privilege claims.

23                   SPECIAL MASTER COHEN:  When you say documents,

24   can you give me an idea within Agenda Item 130 what sort of

25   documents you're talking about?

1               MS. WU:  We are requesting an order compelling

2   production of all documents currently identified as being

3   withheld on the basis of a law enforcement privilege claim.

4   We bring this motion on the basis that the Plaintiffs have

11:31:35  5   failed to make out the very basic requirements for any law

6   enforcement privilege claim.

7       When we start with the legal analysis for that claim,

8   we have to start with a formal claim by head of the relevant

9   department.  Here that would be our local sheriffs or police

11:31:54 10   chief.  We have no claim by a sheriff or police chief.  When

11   we move on next, there needs to be a personal consideration

12   of each document.  Again, there's no personal consideration,

13   and there's no specification of the privilege.  And if I --

14           SPECIAL MASTER COHEN:  One second.  I see you

11:32:08 15   waving your finger.  Let me kind of lift up to like 50,000

16   feet.

17           MS. WU:  Certainly.

18           SPECIAL MASTER COHEN:  I understand we're

19   fighting over something that matters.

11:32:21 20         MS. WU:  I'm happy to address that.

21           SPECIAL MASTER COHEN:  So I've been given

22   documents to review.  I don't remember whether it was in

23   conjunction with Agenda Item 130, 131 or 132, but I think

24   they were duty reports.

11:32:35 25         MS. WU:  Yes.  And that's Agenda Item 92, the

1    Cleveland duty reports.

2                    SPECIAL MASTER COHEN:  And I think I've

3    gotten -- sorry, which Agenda Item?

4                    MS. WU:  92.

11:32:43  5                    SPECIAL MASTER COHEN:  So there's another

6    topic?

7                    WOMAN:  Carryover item from several weeks

8    prior, correct.

9                    SPECIAL MASTER COHEN:  And here's what I see.

11:32:50  10   I see redacted information that would be completely

11   irrelevant and unhelpful to you if you saw it.  And I see

12   redactions of information that doesn't look confidential.  I

13   don't understand why those redactions are made, like the

14   name of, you know, the super secret name for the project,

11:33:14  15   Project Innocence, and it's -- that's redacted.

16        How is that mattering to anybody in this litigation?

17   And so I'm not getting why we are fighting over some of this

18   stuff.

19                    MS. WU:  Well --

11:33:25  20                   SPECIAL MASTER COHEN:  Some I get, but now

21   again, let's say a 50,000-foot view.  Yes, since I think I

22   need this explained to me a little bit, the essence of what

23   Defendants are saying, why they're pounding the table about

24   this topic is that it goes to damages.

11:33:42  25                   MS. WU:  Well, Special Master Cohen, I

1    believe it's broader than that.  Presently there are more

2    than 20,000 documents which Plaintiffs have identified under

3    log, subject to law enforcement privilege claim.  I

4    understand from letters that Cleveland counsel has provided

11:33:58  5    just this week that there are additional documents of an

6    unknown quantum that are also being withheld on the very

7    same basis.  So we have a massive pile of documents that are

8    being withheld.  And what we understand from the privilege

9    claims that we see on the logs and also from the redacted

11:34:16 10    documents that we have, and then with the benefit of

11    significant deposition testimony from law enforcement

12    witnesses from the track jurisdictions is that at present,

13    Plaintiffs, across the board, are withholding significant

14    documents on the basis that any specific law enforcement

11:34:34 15    encounter records are subject to a law enforcement

16    privilege.

17         First off, that is contrary to the law.  In any case,

18    the law enforcement privilege is not an absolute privilege,

19    and whereas here --

11:34:47 20              SPECIAL MASTER COHEN:  I've read all this but

21    you're not answering my question.

22              MS. WU:  Sure.

23              SPECIAL MASTER COHEN:  Why do you need them?

24              MS. WU:  The substance of many of the

11:34:52 25    documents that have either been withheld or redacted, as

best we can tell from the information available to us, which

certainly is limited, but based on the deposition testimony

we've obtained, that the witnesses have told us that many of

the documents that have been redacted are withheld in their

entirety include information about specific law enforcement

encounters that would identify the drugs involved in those

encounters, for example, and that's information which we

haven't been able to benefit from elsewhere in the

production.

What we see by and large in the law enforcement

productions that we've received thus far is that we have

charge information, statutory information, or aggregate data

that is insufficient to tell the Defendants what type of

drug was involved, drug or drugs was involved in a law

enforcement encounter.  That means that Defendants aren't

able to test the claims that the law enforcement encounters

that form the bases for many of the allegations in the

Plaintiffs' complaints, whether those encounters involved

heroin, meth, cocaine --

SPECIAL MASTER COHEN:  Got it.  Got it.  Drugs

involved.  What else?

MS. WU:  Correct.

In addition, we need to understand the circumstances

in those specific law enforcement encounters and the

investigations into intervening alternate causes for opioids

1    present in our track jurisdictions.  The plaintiff law

2    enforcement witnesses over and over again have told us that

3    there are criminal acts involved.  And based on the

4    production thus far, we're not able to inquire into those

11:36:30  5    intervening and alternative criminal acts that Plaintiffs'

6    own witnesses have identified for us.

7        Gert Wilms, the Prosecutor from Akron, went so far as

8    to say yeah, those -- those criminals should be Defendants

9    in this lawsuit, but as we sit here today with the

11:36:44 10    productions we have, we aren't able to take discovery of

11    those intervening and alternative causes because that

12    relevant information has been obscured by redactions or

13    completely withheld in the Plaintiffs' productions.

14            SPECIAL MASTER COHEN:  Can you give me -- I

11:37:00 15    know it's -- I'm asking you to describe something you

16    haven't seen.  But, can you give me an example that you

17    think might have been in so of the documents you've -- that

18    were redacted or that you didn't receive that would give you

19    information about criminal acts that you want?

11:37:16 20            MS. WU:  Sure.

21        Again, I'd like to talk about deposition testimony

22    because that's the most specific factual information that we

23    have.

24        We deposed a former patrol officer who described his

11:37:30 25    first encounter with prescription opioids in law

1  enforcement.  He described a robbery of a pharmacy which

2  took place to the best of his recollection back in 2006 when

3  he was on a patrol.  He could not remember the name of the

4  pharmacy that was involved.  That's incredibly relevant

11:37:48  5  information.

6      We've looked back to the documents.  We've tried to

7  find something to tie to that testimony.  And we were unable

8  to locate any such information in the productions.  What we

9  see is specific people, places, and things are all redacted.

11:38:04  10  And so we're not able to test the claims.

11      SPECIAL MASTER COHEN:  Why do you need

12  specific places?  So there are duty reports -- and I don't

13  understand why.  Okay?  There are duty reports that said

14  that the event, whatever it was, happened at 185th and, you

11:38:17  15  know, Jones Street, I don't understand why it was redacted

16  nor do I understand why you need it.

17      MS. WU:  The specific location -- I don't know

18  what type of law enforcement event you're referencing.  It

19  would depend on the nature of the law enforcement event, but

11:38:33  20  for example, speaking from the Defendants' perspective, we

21  need to look into claims of diversion.  So if we are -- we

22  are specifically, but not exclusively, interested in looking

23  for law enforcement encounters where there are criminal

24  components to the diversion alleged in this case.  So, for

11:38:54  25  example, the example I highlighted earlier about a pharmacy

1    robbery, we would like to know what pharmacy that is so we

2    can tell if -- tell what events led us to that event, what

3    investigation happened after, and whether or not those

4    events are causes for the harms which are alleged in this

11:39:12  5    case.

6         So it's not just damages.  Damages are certainly a

7    component of this in terms of testing the quantum of what we

8    expect to receive in expert discovery from Plaintiffs'

9    experts.  I highlight that we don't have a lot of that

11:39:27  10   information now, but it also has to do with causation, both

11   intervening and alternative causes for the harms which

12   Plaintiffs alleged.

13             SPECIAL MASTER COHEN:  Let me hear from

14   Plaintiffs, please.

11:39:41  15             MR. PIFKO:  Thank you, your Honor.  Mark Pifko

16   from Baron and Budd on behalf of Cleveland.

17        As an initial matter, this is procedurally improper.

18   We can't do it this way.  We just had this whole discussion

19   about the Cardinal issue.  Plaintiffs come and said all SOMS

11:39:57  20   data, we request an order saying they immediately produce

21   all those documents immediately.  We were just arguing for

22   15 minutes about a document that wasn't even on the

23   privilege log.  We've identified these documents on the log.

24   We can't -- I understand a lot of things are being done in a

11:40:12  25   unique fashion in this litigation, but we cannot just have

1    some wholesale order that says all these documents are not

2    subject to --

3                SPECIAL MASTER COHEN:  Oh, yes, you can.  So

4    you'd better get to the merits.

11:40:22  5                MR. PIFKO:  Anyway you asked the fundamental

6    question here, and there's no basis for them to need any of

7    this information.

8        They have -- they have the data, and they have the

9    summary and we're fighting about the detail reports --

11:40:35 10                MS. WU:  We don't have the LERMS data.

11                MR. PIFKO:  They have -- you have -- they have

12    all the information about it.  If there is an arrest or

13    there is an incident involving some type of drug, they have

14    that in the data that's already been produced.  They're

11:40:48 15    asking for the narrative detailed reports, but they have the

16    specific information.  It's just simply not true that they

17    don't have the information about the drugs.

18        And as far as like other things we're talking about,

19    locations, identity of individuals, it's irrelevant.  It

11:41:02 20    has -- it has no bearing on anything here.  We will

21    stipulate that it's illegal to have heroin, but whether

22    there was an illegal activity concerning heroin is not a --

23    is not the issue here.  You know, we contend that they

24    caused the heroin to come into this community, but they're

11:41:17 25    not going to establish by showing some arrest that happened

1    on 34th Street that it was a heroin dealer.  That's

2    not going to be relevant --

3              SPECIAL MASTER COHEN:  Explain to me why

4    you've redacted.

11:41:27  5              MR. PIFKO:  Well --

6              SPECIAL MASTER COHEN:  The location of a

7    crime, the fact that it happened at a given intersection,

8    not -- location of a police officer's investigative report,

9    that it says that he reported to an intersection and that's

11:41:43 10    redacted.  Explain to me why when it says that it's not --

11    and I'm making this up obviously -- you know, Project

12    Snowball, why that's redacted.  Who cares what the name of

13    the project is?

14              MR. PIFKO:  Here's where that comes from, and

11:41:55 15    I can't speak to that -- that's why these issues can't all

16    be tied together.  I can't speak for the other Bellwethers,

17    but I can tell you -- I said this on the phone before --

18    that these law enforcement issues are of the utmost

19    sensitivity to the City of Cleveland.

11:42:07 20              SPECIAL MASTER COHEN:  They really care that

21    somebody knows it's called Snowball?

22              MR. PIFKO:  They contend that a lot of the

23    information that's redacted provides insight into the

24    techniques and the strategy of how they conduct their law

11:42:20 25    enforcement investigations, and they are deathly afraid if

1      it gets out in the hands of the Defendants -- I don't

2      believe anyone sitting here is going to purposefully release

3      the information, but we all know there's contract attorneys

4      here, there's inadvertent productions of privileged

11:42:34  5      information happening on both sides.  They are deathly

6      afraid if that information gets flipped over to the other

7      side, it's going to get into the wrong hands.  Who knows who

8      know somebody who, you know, some enterprising criminal

9      wants to find out some information, they can get that there

11:42:49 10      and that is --

11              SPECIAL MASTER COHEN:  I'm sympathetic.  I

12      truly am sympathetic to law enforcement's interests in

13      making sure that there is no breach of important information

14      that would in any way hamper or impede or hurt what they're

11:43:09 15      doing.  I'm totally sympathetic to that.  Right?  And I get

16      that when, for example, a lot of information is given to

17      some folks, that it may be that a paralegal who's working on

18      it is the boyfriend or girlfriend of somebody out there and

19      somehow, some information is there by divulge to that person

11:43:26 20      that has a bad effect.  I get it.  Okay?

21          Those interests haven't yet convinced me that what you

22      are redacting and what you are not giving to the Defendants

23      is consonant with that concern.  I'm just not seeing it.

24              MR. PIFKO:  That's why we need to deal with

11:43:45 25      this on a document-by-document basis.

1          SPECIAL MASTER COHEN:  No.  You can't do it

2     that way.

3          MR. PIFKO:  If you want to say some address in

4     the abstract is not privileged, I can't say -- I can say

11:43:55  5     that generally, it is sound privilege but I can't say the

6     context of a specific document or why that it might be

7     confidential in that situation.  We just -- we cannot deal

8     with this in a vacuum on a broad brush stroke.  We need to

9     look at document by document.  If it's not you, some other

11:44:11  10     Special Master needs to go through these documents.

11          MS. WU:  Special Master Cohen, these first

12     step --

13          A MAN:  Special Master Cohen --

14          MS. WU:  I'm sorry.

11:44:18  15          The first step in this inquiry is to determine whether

16     or not the Plaintiffs have made out any valid privilege

17     claim.

18          What counsel for the Plaintiffs now request is the

19     opportunity to put -- to make good on the burden that

11:44:32  20     they've had through this entire litigation and ignored up

21     until now.  But, we can move fast, move past the technical

22     aspects of the inquiry to where you started, which is that

23     this is responsive, relevant, and in fact, crucial

24     information to the claims and defenses in this case.

11:44:51  25          And courts regularly call for the production of even

1  law enforcement privileged information, which is subject to

2  a valid claim, which we don't have here, based on an

3  attorney's-eyes-only production basis.

4      We've offered that in this case, and we think that's

11:45:07  5  more than sufficient to protect the client -- the

6  Plaintiff's interests because we share concerns about law

7  enforcement.  It is not our client's interest to put

8  anything in jeopardy.

9           SPECIAL MASTER COHEN:  I want to ask you the

11:45:18  10  question.  And then I need to hear from Paul.

11           MS. WU:  Certainly.

12           SPECIAL MASTER COHEN:  So I've looked at a few

13  records now and think that the redactions are inappropriate,

14  don't make sense to me.  And I would say, I don't know,

11:45:35  15  let's say three out of three.  Okay?  I don't remember how

16  many I looked at.  Let's say three out of three of those

17  documents, I think that the redactions were excessive or

18  inappropriate and, therefore, Defendants should just get

19  them.  Let's say that's what I conclude.  Okay?

11:45:50  20      Applying that same logic, why wouldn't it be the case

21  that with 100 documents that were produced by -- and I don't

22  remember the Defendant honestly.  I think it was Cardinal --

23  I asked them to go back and look at them and they withdrew

24  84 of them, why wouldn't I say, "You know what?  You get

11:46:08  25  them all.  Plaintiffs you get them all"?  Same logic.

1            MS. WU:  I think here we're dealing with two

2      legal standards.  I believe that with regard to the Defense

3      claims discussed earlier, we are addressing the

4      attorney/client privilege, which, as you know, is an

11:46:22  5      absolute privilege.

6          Here we're dealing with a law enforcement privilege.

7      So even assuming a valid claim of law enforcement privilege,

8      production of privileged information is in many, if not all

9      circumstances, appropriate with proper confidentiality

11:46:39 10      protections.  So the legal analysis is very, very different

11      in those circumstances.

12            SPECIAL MASTER COHEN:  Paul, did you have

13      anything to say or --

14            MR. FARRELL:  Paul Farrell on behalf of the

11:46:49 15      Plaintiffs.

16          I think you picked up on the same hypocrisy I have

17      been frustrated with in this litigation.

18            SPECIAL MASTER COHEN:  Her answer was a good

19      one, though.

11:47:01 20            MR. FARRELL:  It wasn't bad.

21          (Laughter.)

22            MR. FARRELL:  And so moving past the issue of

23      the attorney/client being a different standard, I just want

24      to remind the Court that the law enforcement privilege was

11:47:11 25      relied upon heavily when we were debating ARCOS.  And my,

1       how quickly the Defendants have changed their position on

2       the effect of law enforcement privilege.

3                   SPECIAL MASTER COHEN:  But the ARCOS data was

4       produced subject to protective order.

11:47:24  5           MR. FARRELL:  So subject to all that, what I

6       really want to remind the Court is we're getting ready for

7       CT2.  And so what I want to do is I want us to get to some

8       ultimate conclusion.  When we challenged the Cardinal Health

9       privilege log, you had found that those documents are

11:47:40 10      extremely relevant.

11           If, on the other hand, this pursuit of police files is

12      not very relevant, not probative, then what we're doing is

13      we're burdening these communities with producing information

14      that has little to no relevance.

11:48:01 15          And so what I'll point out about the idea of bringing

16      in third parties, there hasn't been a third-party complaint

17      filed by any of the Defendants anywhere in the country.

18      There absolutely has not been any indication that the

19      robbery of a pharmacy of 5,000 pills has had a dramatic

11:48:20 20      impact upon the 25 million pills they sold into Cleveland.

21           And so for a relative standpoint, what I don't want is

22      I don't want Defense's discovery to be punitive.  And if

23      this is an exercise where we get to go through and allow

24      them to develop a record -- and as it turns out, there's

11:48:39 25      nothing in here, other than time consuming, I'd like to

1    reach that conclusion before we replicate these issues in

2    CT2, CT3 and CT4.

3              MS. WU:  Special Master Cohen --

4              SPECIAL MASTER COHEN:  Let me ask --

11:48:53  5              MR. LEDLIE:  Special Master Cohen, this is

6    James Ledlie from Motley Rice.  I'm with Summit County and I

7    wanted to address one item, which is you were requesting why

8    a location might be redacted or why an operation of a covert

9    operation might be redacted.

11:49:07 10              SPECIAL MASTER COHEN:  Yeah, go ahead.

11              MR. LEDLIE:  You need to consider, your Honor,

12    in deciding this issue that there are a number of open

13    investigations, open criminal matters, and there's a certain

14    amount of repetition within criminal enterprises.  And so

11:49:25 15    while the data might be -- that is one reason why certain

16    pieces of information may be redacted is to protect the

17    security of the officers in the field and of the sources and

18    methods of investigation, held tightly of all criminal

19    police investigations.

11:49:45 20              MS. WU:  Special Master Cohen --

21              SPECIAL MASTER COHEN:  Here's -- no, I

22    still -- I will get to you.  I still have some more

23    questions for the Plaintiffs.

24         I want to understand why the names of officers have

11:49:59 25    been redacted if -- if -- I get that if they're undercover,

1    I get it.  Is there any other reason that the names of an

2    officer would be redacted?

3                MR. ACKERMAN:  Special Master Cohen, this is

4    David Ackerman for Summit and Akron.  I want to answer your

11:50:13  5    question and also piggy back on what Mr. Ledlie just said.

6        My understanding is that officers' names have been

7    redacted where those officers are acting as undercover

8    informants or the officers are operating in an undercover

9    capacity.

11:50:29 10        The issue that we from Summit and Akron and I think

11    other Plaintiffs have is that Ms. Wu is seeking to operate

12    here on sort of a global basis saying there should be no law

13    enforcement privilege ever where I think there are

14    pockets -- you have looked at documents from Cleveland and

11:50:46 15    have concerns about redactions.  I don't know what those

16    documents say and I can't speak to those.  But, I do know

17    that for Summit and Akron, we have withheld documents

18    regarding ongoing investigations or redacted the names of

19    confidential informants, and we discussed this with you on

11:51:05 20    December 21st, and you told us to go back and do a re-review

21    and we're doing that re-review.  And I just want to make

22    sure that nothing that we had previously discussed or

23    determined is going to, all of a sudden, be reversed by this

24    notion that there should be some global disavowment of the

11:51:22 25    law enforcement privilege.

1          MS. WU:  Special Master Cohen, as everyone is

2     well aware, I know that Mr. Farrell is thinking about Track

3     Two, but I'm very concerned about the January 25th cut-off

4     date, and what I'm hearing from Plaintiffs is that they

11:51:35  5     essentially want to restart their analysis of law

6     enforcement privilege documents, and that's inappropriate at

7     this late stage in the game.

8          SPECIAL MASTER COHEN:  How many documents are

9     we talking about?

11:51:45  10          MS. WU:  We're talking about more than 20,000

11    documents which have been logged specifically for a law

12    enforcement privilege claim.  In addition, based upon

13    correspondence from Cleveland counsel, we understand that

14    there's a large -- what I believe to be a large number of

11:52:01  15    documents that are not logged, that for which we're being

16    told there is a law enforcement privilege claim.  And just

17    to highlight, I know we've been very focused on duty reports

18    because those are the documents which you have in front of

19    you for in camera review, but Plaintiff witnesses have

11:52:16  20    identified several other categories of documents, which are

21    currently being withheld, based on a law enforcement

22    privilege claim, which has been unlogged, such as

23    heroin-involved death investigation charts.

24         Scott -- Detective Scott Moran from Cleveland just sat

11:52:32  25    for deposition last week.  He identified a number of

1    categories of documents which are not on a privilege log,

2    and based on Cleveland counsel's letter of Monday night, we

3    understand are now being the subject of such a claim.

4         It's first of all too late in the day to do that.

11:52:51  5    There's no substantiated claim whatsoever.  All we have is a

6    letter from counsel.  That's not how one makes a privilege

7    claim.  And when we look at the substance of those documents

8    as described by Detective Moran, these are critically

9    important to the Defendants in this case.

11:53:09 10         So even assuming a valid law enforcement privilege

11   claim, which we don't have, the authority is clear that

12   production is appropriate.  And here we're happy to afford

13   Plaintiffs whatever additional confidentiality protections

14   they think are necessary.  We're very happy to do that.

11:53:26 15              SPECIAL MASTER COHEN:  Let me ask you about

16   that.

17         Let's say that I -- let's say that I order all of

18   those documents to be produced attorney's eyes only in some

19   extremely limited fashion, and what I'm thinking of is not

11:53:39 20   every Defendant, to like two or three people, and those two

21   or three people on behalf of all Defendants will go through

22   those documents and identify the information that is

23   relevant to superseding intervening cause, is relevant to

24   damages, is relevant to additional discovery, and that's it.

11:53:58 25   What then happens, I think, is that I've at least addressed,

1    if not completely cured, Plaintiffs' counsel's concern that

2    the production of that information somehow might lead to

3    something bad happening. Give me an idea.

4              MS. WU: I think that we're open to that. I

11:54:15  5    might have to negotiate the number of attorneys simply

6    because the number of documents for review is so large and

7    the time is so tight, especially before depositions which

8    are scheduled for as soon as next week. But, I think that

9    we would be amenable to a smaller group of Defendants who

11:54:32 10   would be able to receive the documents in the first instance

11   and then revisit in collaboration with Plaintiffs the

12   appropriate way to move forward in terms of making those

13   documents more broadly available and for use in depositions.

14             SPECIAL MASTER COHEN: I mean the alternative,

11:54:48 15   and I'll hear from Plaintiffs now, the alternative is for

16   Plaintiffs to spend a God-awful amount of time going through

17   documents and making sure that their redactions don't

18   include the three or four things Defense counsel just

19   identified as being important.

11:55:06 20        For example, the drugs involved, whether a criminal

21   act was involved, and the location. I mean I'm okay with

22   informants and undercover officers' identities being

23   redacted. It still makes no sense to me why you're

24   redacting Project Snowball, but it's also irrelevant to the

11:55:25 25   Defendant. So I don't care about that.

1          MS. WU:  Special Master --

2          SPECIAL MASTER COHEN:  -- so there's two

3    options.  One is to protect your interests, which as I said

4    I'm sympathetic to, by just letting the Defendants have the

5    documents but in an extremely limited way or give yourself a

6    lot of work and have to go through and redact.  And I want

7    to hear from Plaintiffs.

8          MS. WU:  I just wanted to underscore, Special

9    Master Cohen, that we had made that very same offer, saying

10   just redact the necessary information, we don't need it, and

11   we don't -- we don't care if you redact it.  But, instead

12   what we've been left with is the situation we have now,

13   which is crazy overbroad redactions and the withholding of

14   documents, some of which haven't even been placed on a

15   privilege log, which at this late date in discovery, with

16   January 25th staring us in the face, we really can't accept

17   that alternative at this point.

18         MR. ACKERMAN:  I just want to make one point

19   quickly is that some of these documents -- David Ackerman.

20   Sorry.

21       Some of these documents have information that is

22   subject to DEA or DOJ restrictions, and we have been advised

23   by the DOJ or the DEA not to release them.  And they have

24   been logged.  And at this point --

25         SPECIAL MASTER COHEN:  How many of the 20,000

1    are we talking about?

2                MR. ACKERMAN:  That I don't know.  I'd have to

3    go back and find that.

4                SPECIAL MASTER COHEN:  Take a semi-educated

11:56:54  5    case.

6                MR. ACKERMAN:  I would guess at least 10 if

7    not more.

8                SPECIAL MASTER COHEN:  Is DEA or DOJ here

9    today?  Did they know the hearing was going to occur?  I

11:57:03 10    understand we're under a furlough.

11                MALE COUNSEL:  I sent a letter about trying to

12    get together, and I got an automatic response he was on

13    furlough.

14                SPECIAL MASTER COHEN:  He's in Ohio.  Bennett.

11:57:16 15                MS. SINGER:  Special Master Cohen -- Linda

16    Singer.  Having talked to DOJ about these issues, it is Mr.

17    Bennett's team that handles any issue related to Touhy and

18    they are all furloughed.  So DOJ is unable to make any

19    decisions about Touhy until the shutdown is over.

11:57:31 20                MS. WU:  One point to answer your question.

21    DEA is aware of the conference today.  I received a call

22    yesterday from an attorney in the civil fraud division at

23    DOJ, who is not furloughed, who is calling on Mr. Bennett's

24    behalf to inquire as to the status of law enforcement

11:57:48 25    privilege issues.  I shared with that attorney that there

1        would be a conference today and that I would pass on her

2        communication to all parties in this case.  And I've done

3        so.  So to make sure we're sharing information

4        appropriately.

11:58:02    5                    SPECIAL MASTER COHEN:  Who is that?

6                    MS. WU:  The name escapes me, but I'll be

7        happy to forward you the e-mail as well.

8                    SPECIAL MASTER COHEN:  Okay.  So, Mr. Pifko.

9                    MR. PIFKO:  I was just going to add in

11:58:14   10       addition to the DOJ issues, there's also certain types of

11       informant issues that even our clients are not allowed to

12       know that are kept internal to the -- Cuyahoga County has

13       that.  And again, I just -- I want to reiterate that they

14       don't need this information, that all the charges that have

11:58:29   15       been brought, it's all been produced.  They have all the

16       details they need.  But at bottom, if you're going to order

17       something, I know my client is going to insist on reviewing

18       them.

19              So if you're going to order that, we need to look for

11:58:40   20       certain categories of information.  That's the approach that

21       we're going to take.  But I -- Defendants really do not need

22       this information.  It's a waste of everyone's time and

23       resources.

24                    SPECIAL MASTER COHEN:  All right.

11:58:49   25              So I just want to understand your assertion.  That

1      Defendants already have what they're asking for.  Explain

2      that to me.

3                     MR. PIFKO:  They have in the -- my local

4      counselor here maybe can explain some of the details of the

11:59:04  5   workings of LERMS a little bit better than I can but they

6      have in the LERMS data, they have detailed discussions about

7      the property that was seized.  If that's drugs, it's -- it's

8      discussed in the LERMS data, and I've said this before.

9      I -- when I hear their complaints, I feel like they don't

11:59:21 10  understand how to use the data that's been produced to them.

11     And you know we're getting all sorts of databases and weird

12     programs like Mr. Cecchi was discussing.  They're not

13     teaching us how to use it.  It's not our job to teach them,

14     but there are different spreadsheets on there that, all from

11:59:38 15  LERMS and it can tell you about an incident that occurred

16     and you can cross check that with property seized and see

17     what the drugs were.  So the contention that they don't know

18     what the drugs are is false.

19          And they have the charging data from the County that

11:59:51 20  was produced.  I just don't -- it's mind boggling to me they

21     would somehow need information about the identity of the

22     victim or some of this other --

23                     SPECIAL MASTER COHEN:  Is LERMS only

24     Cleveland?

12:00:05 25                     MS. LUCAS:  Special Master Cohen, may I be

1    heard on that?

2            SPECIAL MASTER COHEN:  One second.  Is LERMS

3    only Cleveland?

4            MS. WU:  LERMS is Cleveland-specific, and this

12:00:10  5    is Laura Wu.

6        Amy Lucas is standing up.  She's been handling the

7    LERMS issues for months now.  And I'd be happy to have her

8    address the LERMS deficiencies.

9            SPECIAL MASTER COHEN:  For the record, we're

12:00:22 10    touching on Agenda Item 51.  Go ahead.

11            MS. LUCAS:  Correct.  I take issue with

12    Mr. Pifko's representation that we have everything that we

13    need.  That is incorrect.

14        Last time, if you'll recall, the last hearing,

12:00:35 15    Mr. Pifko represented that the detailed reports, which

16    contain the actual details of what happened -- and I

17    understand that they have produced spreadsheets with the

18    other property information.  But, I think we all know how to

19    use a spreadsheet, but we had all agreed that the detailed

12:00:51 20    reports are to be produced.  And they still have not done

21    it.  And we were supposed to get an update today.  So for

22    him to represent that we have everything that we need is

23    just simply incorrect.

24            MR. PIFKO:  The detail reports aren't

12:01:04 25    relevant.  I still believe that.  I'm going to give it to

1    them anyway.  I've been the most transparent person in this

2    litigation.  I'm going to give them everything.  It's not

3    relevant.

4                      MS. WU:  This is Laura Wu.

12:01:16   5        I would just say that Mr. Pifko mentioned that what

6    the Defendant has is charge information, and that's true.

7    We have a lot of charge information.  We have bookings

8    information.  But that does not give us information about

9    intervening alternative criminal acts, and it also does not

12:01:29   10   give us drug-specific information for individual law

11   enforcement encounters.

12        And at this point, that information has not been

13   provided to Defendants because it's subject to law

14   enforcement privilege.

12:01:41   15                   SPECIAL MASTER COHEN:  All right.  Here's my

16   ruling.

17                      MR. ACKERMAN:  Special Master Cohen, before

18   you rule, I want to make sure I make the point for Summit

19   and Akron because there's been a lot of discussion about

12:01:49   20   what documents Cleveland has produced.  Summit and Akron

21   have produced court records.  They've made court records

22   available.  Where any person has been charged, we have

23   produced a list of all of the -- all of the offenses where

24   they -- a person was charged with a drug-related offense and

12:02:06   25   made the underlying court files available.  So what this is

1    is not issues where somebody was actually charged with a

2    crime.  It is actually police investigative files.

3         So it is a totally separate issue.  So the notion that

4    Defendants don't have any information on this topic is

12:02:22  5    incorrect.

6                   SPECIAL MASTER COHEN:  Yeah, I think -- look.

7    After all is said and done, after all of this argument, I

8    still think you guys are fighting over something that's not

9    worth fighting over.

12:02:34 10         So here's what's going to happen.  Two things:  First,

11   I want Defendants to identify 10 percent of the documents

12   that have been withheld in whatever categories you want,

13   ones you want to receive.  You don't need to receive every

14   single one to do what you said you need to do, which is to

12:03:02 15   identify intervening superseding causes, identify the extent

16   to which the damages claims aren't valid because it has to

17   do with heroin and so forth.  I'm not hearing arguments

18   anymore.  I'm ruling.  Okay?

19        You can identify those 2000 documents from a mix of

12:03:20 20   jurisdictions, however you want.  They can be all Cleveland,

21   they can be a mix of the four different jurisdictions.

22        Those documents will be produced.  You can produce

23   those documents with the following information redacted:

24   Informant's names, undercover officers, anything that would

12:03:46 25   reveal the existence of an ongoing investigation.  And that

1    has to be extremely narrow.  Okay?  I'm not even sure a

2    Project Snowball name really touches on that.

3         Defendants, for their part, have to identify a very

4    few number of attorneys who will be given access to those

12:04:13    5    records.  Your complaint or your -- your concern was to view

6    20,000 documents.  I need a bunch -- well, it's not 20,000.

7    It's 2000.  And so I'm thinking two or three should be

8    sufficient.

9         So the documents will be produced with those

12:04:32    10    redactions, and they'll be reviewed attorney's eyes only

11    pursuant to the orders that the parties have already agreed

12    to.  Attorney's eyes only designation by only those Defense

13    counsel.

14         Any questions?  Paul?

12:04:47    15                MR. FARRELL:  So creating precedent moving

16    forward -- I'm sorry.  Paul Farrell on behalf of the

17    Plaintiffs.  Creating precedent for moving forward in other

18    case tracks, what I'll ask the Court to do at some point in

19    time is to make a ruling as to whether or not this exercise

12:05:06    20    is relevant toward the issue at hand.

21                SPECIAL MASTER COHEN:  If prove unnecessary,

22    and we'll deal with that when we get to it.  I understand

23    your concern.

24                MS. WU:  Special Master Cohen, in follow-up to

12:05:18    25    an issue I raised during the argument portion of that issue,

1    which is that Cleveland has advised that there are

2    additional documents that have not currently been logged as

3    subject to a law enforcement privilege but are currently

4    being withheld, we're unable to select from those documents.

12:05:32  5    And for production, I understand that but we'd --

6              MR. PIFKO:  That's not true, by the way.

7              MS. WU:  -- ask for an entry of an order that

8    all of these documents be logged.

9              MR. PIFKO:  They are logged.

12:05:42 10        What she's talking about is I voluntarily agreed to

11    re-review all of our duty reports and put more narrow

12    redactions on them, which we've been doing.  And what she's

13    talking about is there were documents that were withheld in

14    their entirety, which then we were going to review and

12:06:01 15    produce them in a redacted form.  So that's all we're

16    talking about.

17        And to the extent there are documents that haven't

18    been produced, it seems there are new requests they're

19    asking for that we are continuing to provide to them.

12:06:10 20              MS. WU:  That's actually a point of

21    clarification.  I can use the Heidi investigation records,

22    which I've referenced in connection with Detective Moran's

23    deposition, as an example.  Those are documents which are

24    clearly responsive to our requests, and they're also within

12:06:26 25    the custody of -- an agreed-upon custodian, Detective Moran.

1    Those documents have neither been produced nor logged.  And,

2    therefore, we have a problem.

3                    MS. LUCAS:  This is Amy Lucas.

4        I would also like confirmation of the details reports

12:06:41  5    from LERMS are excluded from this order because Mr. Pifko

6    has already represented that those would be produced.

7                    MR. PIFKO:  I've always contended that there

8    could be potential redactions on those documents.  So that

9    could be covered by the privileges.

12:06:59 10                    SPECIAL MASTER COHEN:  We're not undoing

11    promises you've made.  Did you promise to produce those?

12                    MR. PIFKO:  I promised to produce the data but

13    never said I was going to produce it unredacted.  I've

14    always said, you can look at the letters and the discussions

12:07:10 15    we've had.  One of the things they were upset about was I

16    said it was going to take time and it was burdensome because

17    we're going to have to go through and review them for these

18    privileges.

19                    MS. LUCAS:  That was at the last hearing.

12:07:19 20    There's a transcript of it, and we can check, but my

21    recollection was that Mr. Pifko said the chief legal

22    officer, chief lawyer from Cleveland was out of town.

23                    MR. PIFKO:  Again, I'm producing the LERMS

24    data.  I'm just not producing it unredacted.  I never said I

12:07:36 25    was going to give it unredacted.

1          SPECIAL MASTER COHEN:  All right.

2               You can go back and examine that.  And as I said,

3     promises made are not undone by this.

4               As for the specific documents you're referring to of

12:07:46  5     that one deponent, you know they exist, choose one.

6                    MR. GALLUCCI:  Special Master Cohen, Frank

7     Gallucci for Cuyahoga County.

8               One point of clarification with regards to the

9     redactions.  You mentioned redaction of confidential

12:07:58 10     informants and undercover officers.  The difficulty is we as

11     counsel do not have the ability to know those names.  So

12     what I would request is that we can redact names of all law

13     enforcement.  So I don't know who the confidential

14     informants are, I don't know who the undercover officers

12:08:15 15     are, and frankly there's no reason for Defendants to need to

16     know an officer or informant's name in any instance.

17                    SPECIAL MASTER COHEN:  I don't see a problem

18     with that, given what you've asserted you need this

19     information for.

12:08:30 20                    MS. WU:  We certainly -- Defendants have no

21     desire to have informant information.  However, I've raised

22     the timing concern and also the over redaction issue to you

23     previously.  We made the offer to receive these documents

24     with appropriate redactions months ago, and instead,

12:08:47 25     Plaintiffs chose this course.  This is the situation of

1    their own making with just really about two weeks before the

2    close of discovery.  There's simply not time to redo this

3    process, especially with critical law enforcement

4    depositions, which are set forth to go forth next week and

12:09:05  5    the following week.

6                SPECIAL MASTER COHEN:  How timely can you

7    produce these 2000 records with the redactions you want to

8    undertake?

9                MR. PIFKO:  We've addressed this.  We've

12:09:10  10    mentioned this privilege from the beginning of the

11    litigation.  So that's not true.  They're the ones who

12    waited --

13                SPECIAL MASTER COHEN:  Answer my question.  I

14    don't need argument about stuff I've decided.

12:09:17  15                MR. PIFKO:  I would say two weeks, a week.

16                SPECIAL MASTER COHEN:  Got to be less than two

17    weeks.

18                MR. PIFKO:  I'll do it in a week.

19                MR. ACKERMAN:  Can I add one point of

12:09:28  20    clarification?  We talked earlier about information that may

21    have DOJ or DEA restrictions.  To the extent any of the 2000

22    documents have information from the DOJ or DEA, we will need

23    to be authorized to redact that info or seek the DOJ's or

24    DEA's input to the extent we can get it.

12:09:49  25                SPECIAL MASTER COHEN:  So I need you to try.

1          MR. ACKERMAN:  We certainly will try.  I want

2    to make sure we're not obligated to produce a document over

3    a DOJ or DEA objection even if there is no way to clarify

4    whether they are releasing the objections.

12:10:04  5          SPECIAL MASTER COHEN:  So I mean are we

6    talking -- is their interest because they were part of a

7    Task Force?  Why do they have an interest in this at all?

8          MR. ACKERMAN:  They work cooperatively with

9    law enforcement in --

12:10:17 10          SPECIAL MASTER COHEN:  What is it --

11          MR. ACKERMAN:  -- law enforcement officers.

12    They are -- there are specific officers in Summit and Akron

13    who are basically assigned to work with the DEA.

14          SPECIAL MASTER COHEN:  Right.  I'm asking what

12:10:28 15    is it the DEA, DOJ is concerned about divulging?

16          MR. ACKERMAN:  I can't speak for them.  I

17    don't know.  We've only received instructions from them to

18    claw back certain documents that have been produced that

19    maybe have been made marked law enforcement sensitive or DEA

12:10:46 20    sensitive and for other information from that they have

21    provided to the law enforcement agencies.  I just can't

22    speak for DEA on this point.

23          SPECIAL MASTER COHEN:  All right.  Let -- go

24    forward in this way.  You're going to identify 2000

12:11:00 25    documents.  If seven of them are DEA sensitive, then it's a

1  nonissue.  If half of them are, then it is an issue.  So

2  let's just go forward with this as it is now.

3          MS. WU:  I'll just note that we have some

4  separate privilege logs from Plaintiffs, which are based on

12:11:14  5  DEA privilege claims and we're happy to stay away from those

6  documents for purposes of this exercise to simplify.

7          SPECIAL MASTER COHEN:  Thank you.

8          MR. SHKOLNIK:  Special Master Cohen, Hunter

9  Shkolnik for Cuyahoga.

12:11:25 10      You've ordered that 2000 be identified.  If we want to

11  do this process fast, I would ask that the directive be that

12  it's all not dumped on one of the four, that it should be

13  somehow evenly dispersed.  Otherwise, we won't get them done

14  as quickly as you would like.  So if that type of

12:11:43 15  consideration would be made as part of the directive, we

16  would appreciate it.

17          MS. WU:  I will tell you that we may have a

18  larger sample for Cleveland because Cleveland has the

19  largest number of claims.  And also from what we've seen so

12:11:56 20  far, the most suspect.  So just in full disclosure, there

21  may be a larger sampling from Cleveland just based on what

22  we've seen in the documents and heard in deposition

23  testimony thus far.

24          SPECIAL MASTER COHEN:  All right.  That's --

12:12:06 25  to get --

1          MR. PIFKO:  Factually, her letter -- I'm --

2          SPECIAL MASTER COHEN:  One second.  One

3     second.

4          To get to where you need to be, you don't need them

12:12:17  5     from Cleveland or anybody else.  So I'm going to put a

6     restriction that no more than 60 percent as to any given

7     Plaintiff.

8          MR. ACKERMAN:  The process could go quicker if

9     it was only 1,000 documents.  Sorry.  David Ackerman.

12:12:30  10        (Laughter.)

11         SPECIAL MASTER COHEN:  My ruling stands.

12         MR. GALLUCCI:  Special Master, Cohen, Frank

13    Gallucci again.

14         What is the ultimate decision with regard to redaction

12:12:39  15    of law enforcement officers since we don't know who is

16    undercover versus confidential informant?  We discussed it,

17    but I don't believe we reached a conclusion.

18         SPECIAL MASTER COHEN:  Yeah, I'm -- if you

19    want to take the time to redact all the names of the

12:12:57  20    officers, you can do that.  I'm not seeing that it's as

21    vital as the other information, given the arguments I've

22    heard.

23         MR. GALLUCCI:  Thank you.

24         MS. ROITMAN:  Special Master, if an officer is

12:13:08  25    actually making an arrest, at that point, the report shows

1    that if an officer's making an arrest, he's not undercover

2    anymore.  Carol pointed that out.

3                MR. GALLUCCI:  The name is still an undercover

4    officer.  It's a particularly sensitive issue to Cuyahoga

12:13:26  5    County, in that a member of their law enforcement team was

6    recently identified, ended up in the hospital and almost

7    killed.

8                MS. ROITMAN:  I'm certainly not advocating for

9    that.

12:13:35 10                MR. GALLUCCI:  That's what happens when the

11    names get out.

12                SPECIAL MASTER COHEN:  The officers' names are

13    redacted.

14                MS. WU:  Special Master Cohen, this is Laura

12:13:44 15    Wu for McKesson.

16        I'm happy to share that we can strike or defer one of

17    the law enforcement-related agenda items.  That's Agenda

18    Item Number 132, which is a motion to compel production of

19    documents from Summit and Akron.  And David Ackerman and I

12:14:00 20    have spoken.  While these issues have been raised

21    previously, we're going to continue our conference on this

22    issue and would be happy to defer that issue until next

23    week.

24                SPECIAL MASTER COHEN:  Let me first ask you --

12:14:14 25    I was going to turn to that.

1      I assume that what I just said fully addresses 130 and

2  131.

3                MS. WU:  In fact, based on Mr. Pifko's letter

4  of Monday stating that Cleveland would not produce the

12:14:33  5  documents based on the law enforcement privilege claim, I

6  believe that those documents should be logged if that is the

7  case because they -- those documents have not been logged.

8  And that's with regard to the Cleveland motion to compel,

9  which is Number 131 on the agenda.

12:14:52 10                MR. PIFKO:  Of course, anything that we're

11  asserting a privilege over will be on the log.  To the

12  extent it hasn't been on the log, it's because it hasn't

13  been produced yet.

14                SPECIAL MASTER COHEN:  Okay.  I think that

12:15:01 15  we're done with 131, 130 and 132.

16                MR. WU:  Special Master Cohen, so while I'm up

17  here, there was an issue which was raised about DEA

18  discovery, Agenda Item Number 117.  The Defendant's motion

19  to take the depositions of Detectives Leonard and Prince.

12:15:23 20  This is a related issue.

21      As you will recall, Defendants moved in order to take

22  the depositions of Detectives Leonard and Prince, who are

23  two of the Track One law enforcement team members, who do

24  have ties to DEA through Task Force assignments, there is a

12:15:44 25  pending Touhy request for each of those depositions.

1    However, given the time left in discovery, we renew our

2    request to move forward with the portions of those

3    depositions, which are not subject to any Touhy -- Touhy

4    clearance issue so that we may complete those depositions

12:16:02  5    before January 25th.

6                    SPECIAL MASTER COHEN:  So you --

7                    MS. WU:  Recognizing we may need to reopen

8    them once Touhy issues are resolved.

9                    SPECIAL MASTER COHEN:  You're jumping to

12:16:11 10    Agenda Item Number 117.  What we did with that was to kick

11    the can down the road very purposely for a week, hoping that

12    Congress and the President would come to some agreement,

13    which has not occurred and, therefore, we don't have a Touhy

14    response from the Government.

12:16:23 15         And given deadlines, I don't see any other option,

16    unless somebody's got a good idea.  I'm happy to see to --

17    except to let the depositions go forward and for folks to

18    try to tap dance around the Touhy issues.

19                    MS. WU:  Special Master Cohen, we believe that

12:16:46 20    is the appropriate course.  Natalie Waites is the civil

21    fraud DOJ attorney who contacted me yesterday, and as I told

22    her and shared with the parties, I agreed that I would

23    report back to her following your ruling on this issue so

24    that DOJ and DEA won't be advised of the situation with

12:17:05 25    regard to these witnesses.

1          SPECIAL MASTER COHEN:  Anybody have a good

2     idea?

3          MR. ACKERMAN:  The only idea I would add --

4     this is David Ackerman.  The only idea I would add would be

12:17:17  5     to schedule these later in the -- or as close to January

6     25th as we can so that we can give the Government enough

7     time if we can.

8          SPECIAL MASTER COHEN:  That's actually a good

9     point.  And let me say this, which is a more broad

12:17:29 10     observation.

11          I've gotten, I think, two, maybe three different

12     requests by e-mail from parties saying we are in agreement.

13     Always great words to hear.  We are in agreement, we were in

14     disagreement as to what -- as to whose depositions would be

12:17:47 15     taken.  But, we are now in agreement and we -- the

16     Plaintiffs and Defendants agree that these six folks, we

17     will depose, but we'd like permission to take those

18     depositions after the January 25th cut off.

19          And I, in every instance, said that's fine with me.

12:18:03 20     If you guys agree that doesn't lead to a fight later on or

21     coming back to the Court and the Court saying wait a minute,

22     there was a deadline, why are you deposing folks after that

23     deadline, if you're in agreement, I don't have a problem

24     with that.  I should know about it.  You should pass it by

12:18:17 25     me, but I don't have a problem with that.

1          One way to deal with this might be to agree to, I

2    suggest, that you agree to proceed that way, which is to say

3    if, God forbid, a month from now, we still don't have Touhy

4    responses and the Government is still in furlough, then

12:18:34  5    you're going to have to do the tap dance.  But let's set

6    these depositions for some late date, even after the January

7    25th deadline so we can try to avoid the issue of having to

8    recall them after Touhy decisions get made.

9          MS. WU:  Special Master Cohen, we understand

12:18:49 10    those issues and certainly favor efficiency.  However, given

11    the importance of these witnesses and the late date and the

12    schedule, we feel we need to move forward, especially in

13    light of the expert deadlines which are right around the

14    corner.

12:19:01 15          SPECIAL MASTER COHEN:  Anybody have some issue

16    that isn't important and critical?  I'm just curious because

17    I haven't heard one yet.

18          (Laughter.)

19          COUNSEL:  Confidentiality designations, your

12:19:12 20    Honor.

21          (Laughter.)

22          MS. WU:  So I do want to be clear that we --

23    that we Defendants want to move to schedule these

24    depositions before the January 25th cut off, and that I'll

12:19:24 25    be happy to cooperate with Plaintiff's counsel in order to

1    do that.

2                    SPECIAL MASTER COHEN:  Remind me who these

3    fellows are, law enforcement?

4                    MS. WU:  It's Detectives Leonard from Akron

12:19:34 5    and Prince from Cleveland.

6                    SPECIAL MASTER COHEN:  And what do they do?

7                    MS. WU:  They are Narcotics Detectives.  And

8    as I understand it, they have had assignments to DEA Task

9    Forces in recent years and, therefore, the DEA has

12:19:48 10    identified that Touhy clearance is required for these

11    witnesses, and I'll note that these are witnesses that

12    Plaintiffs have put forth as people with the greatest

13    knowledge of diversion in the Track One jurisdiction.

14                    SPECIAL MASTER COHEN:  All right.

12:20:03 15        If you're not willing to agree to have them occur

16    after the 25th and thereby avoid -- and thereby increase the

17    likelihood that Touhy rulings are received, these will take

18    place the last week of discovery.

19            Anything else on 117?  Thank you.

12:20:33 20        I think we crossed off Agenda Item Numbers 130, 131

21    and 132 as well as 117.  That brings us to Agenda Item 133.

22            I believe I issued a written ruling on this one, and

23    so I don't think there's anything more to say today unless

24    someone waves their hand.

12:21:05 25            Seeing none, we'll move to Agenda Item 134.  I think I

1    received a -- I don't remember.  I think I received an

2    e-mail last night, early this morning, saying that we didn't

3    need to address this because there had been some agreement

4    on the topic or at least agreement to meet and confer and

12:21:27  5    kick it down the road.

6                    MS. McCLURE:  Your Honor, I would like to

7    provide some -- Shannon McClure, ABC, on behalf of

8    Defendants with respect to Item 134, the SACWIS issue.

9                I'd like to provide a little bit of background that

12:21:41 10    explains the e-mail you received last night and then get

11    some guidance on a moving-forward basis.

12                SACWIS is the State Wide Automatic Welfare Information

13    System, and there are two, essentially, issues that the

14    Defense wants from this.  One is the data set itself, to the

12:22:01 15    extent that the listed cases involved substance abuse; and

16    then for those cases, the case note files and activity logs

17    for the substance abuse-related SACWIS entries.

18                We took the deposition of Cabot on 11-2.

19                    SPECIAL MASTER COHEN:  Sorry.  Who?

12:22:18 20                    MS. McCLURE:  Cabot.  He's a child welfare

21    DCFS-related witness.

22                He indicated that they -- that this data is maintained

23    and that notes are made in the data set with respect to the

24    substance abuse, those child welfare removals that involved

12:22:36 25    substance abuse.

1       On the 13th of November, we took the deposition of

2   Weiskatel, who had indicated that a couple years -- of years

3   ago, it became the rule that the parent's or child's drug of

4   choice that led to a removal, or was involved in a removal,

12:22:50  5   had to be noted in the activity case note file and activity

6   log.

7       So this is an important issue because Plaintiffs Rog

8   18 notes that there's $219 million worth of alleged damages

9   that the Plaintiffs are contending relate to Child and

12:23:11 10   Family Services.

11       So our ability to get into these documents and

12   understand which of these involved substance abuse and which

13   of the ones that involved substance abuse, which involved

14   opioids, and of those which involve prescriptions is

12:23:26 15   important.

16       We issued a letter to the Plaintiffs following up on

17   the Cabot deposition on the 13th and on the Weiskatel

18   deposition on the 19th requesting this information.  We

19   received zero response.

12:23:35 20       Therefore, on the 7th, my colleague, Kelly Hibbert,

21   put this issue on the agenda to you with a letter itemizing

22   what it was we wanted.

23       Yesterday on the 8th was the Merriman deposition,

24   another deposition that my partner, Eric Alexander, took

12:23:52 25   that relates to child welfare issues.

1           That deposition concluded at 5:20 P.M.  At the

2      conclusion of that deposition, just a couple of, not even

3      two hours later, we received this letter that indicates

4      basically we produced the documents, there is no issue here.

12:24:10   5      They would have known about it had they met and conferred

6      with us.

7           So respectfully we did attempt to meet and confer.  We

8      sent several letters, which went completely unresponded to.

9      They're now contending that a document that was produced

12:24:23  10      months ago is in fact the data set -- data set and,

11      therefore, we have it.

12           However, so one, we could have avoided or at least

13      narrowed this topic had we received any response to our

14      numerous letters on this issue prior to last night.

12:24:40  15           And we could have, had we known about the fact that

16      they were contending that this document was the one we were

17      seeking or was at least one of the ones we were seeking,

18      could have asked David Merriman about it yesterday in his

19      deposition prior to its conclusion.

12:24:54  20           It also seems that the document they're pointing to,

21      which is an Excel spreadsheet that contains numerous tabs,

22      seems to have been a download of a data set.  It's not

23      entirely clear what the document is, whether it is, in fact,

24      a download of an entire data set, whether there were

12:25:13  25      parameters or coding selected by someone.  And so we have a

1    number of issues and questions about how this document was

2    created, what it is, why they think that this document

3    satisfies the Item Number 134 requests for the data set.

4         But I note that by definition, it's only a document

12:25:33  5    that's an Excel spreadsheet.  To my knowledge, it does not

6    even contend to contain all the case note or activity log

7    files.  Nevertheless, the point ultimately is, your Honor,

8    there is more to do.  There is more to -- more questions

9    that we have, more answers that are needed.  But I note that

12:25:50  10    it's unfortunate that it seems that the document was

11    produced just a couple of hours after a witness' testimony,

12    who, I believe, would have had the ability to answer some of

13    the questions if indeed they had responded to our numerous

14    letters on the topic of the SACWIS database and how we

12:26:11  15    needed it.

16         So, nevertheless, we do have a number of questions

17    about the documents that they identified that they say

18    satisfies our requests for the data set and the case note

19    and activity log.  And so we'll need to come back to your

12:26:27  20    Honor on this point but wanted to provide the background as

21    to why this issue was before you in the first place and how

22    we believe it could have been at least avoided or at least

23    narrowed prior to today's hearing.

24              MR. SHKOLNIK:  Good afternoon, Special Master

12:26:51  25    Cohen.  Hunter Shkolnik again for Cuyahoga County.

1        I think the gist of what I just heard was we gave them

2   the document that they're looking for, the spreadsheet, the

3   SACWIS spreadsheet.  We confirmed it in our letter.  They

4   did not ask for a single meet and confer.  They did not ever

12:27:05  5   put this on any type of request to us that they didn't have

6   the SACWIS database.  Had they done that, we would have told

7   them that.

8        Like most of the Defendants in this case and most of

9   the Plaintiffs, we send letters immediately after a

12:27:20 10   deposition.  We confirm that we are asking for things.  Then

11   we actually go about asking for meet and confer and

12   discussing it with the other side.  And before we ever bring

13   it to you, we try to have somewhat of a discussion.  That

14   was not done here.

12:27:34 15        We received the letter on the 7th for the first time

16   about the concern about this issue.  We responded within 24

17   hours.

18        We did produce SACWIS database.  Whether they'd like

19   it or not, that's what it is.  It was produced on August --

12:27:52 20   sorry -- it was produced on August 27, 2018.  They had it

21   for all of these depositions.  I don't know what more we

22   want -- or they wanted from us there.

23        With respect to the individual files, that's a

24   different issue.  This is the first time they're asking for

12:28:08 25   the individual children's files that support the SACWIS --

1    you know, that are from the SACWIS database. If that's an

2    issue now, it's kind of late, but we'll work with them, and

3    we said it in our letter yesterday. If they pick 25, we can

4    work with them and show them what's there. If they want a

12:28:29  5    few more than that, maybe that's an option. We'll take your

6    directive.

7        Thank you very much.

8            SPECIAL MASTER COHEN: All right. So I don't

9    need to hear more on this.

12:28:36 10    What I'm hearing is, first of all, there's been a

11    miscommunication. Ain't the first time that's happened.

12        And second of all, you're going to go forward and

13    confer and try to iron out what needs to get ironed out.

14        It does concern me that Defendants think that they,

12:28:51 15    from what I understand, asked twice about this, and quote,

16    unquote, there was no response. So something is wrong. I

17    don't want to figure out what it was, except that something

18    is wrong. And what I'm hearing is wrong is that there's a

19    communication failure between the Plaintiffs and Defendants

12:29:07 20    when something is asked to be identified.

21        As I said, if you make it easier for each other, it

22    will -- it will be easier for everyone and me. So I'm

23    urging you again to try to avoid that.

24        Some of it is unavoidable, I understand, in a

12:29:24 25    litigation of this size. So I think that -- I think

1    everyone's agreeing on this topic that you need to iron out

2    the remaining issues.

3              MS. McCLURE:  Yes, your Honor, we will do so.

4    And we did, in fact, write to them on the 19th and the 13th

12:29:38  5    of December and did not receive a response.

6         With respect to the offer to provide 25 files, a

7    sampling of the files for this purpose is wholly

8    insufficient, but we will discuss that with them in our

9    future meet and confers but wanted to pre-flag for the Court

12:29:53 10    that we do not anticipate accepting samples.

11              SPECIAL MASTER COHEN:  Okay.

12         We'll move on to Item Number 135, and I am -- I think

13    Plaintiffs assert that this is unripe.  I think you've only

14    heard from one side.

12:30:08 15              MR. PYSER:  Yes.  Your Honor, Steven Pyser,

16    Williams and Connolly for Cardinal Health.  I'll be

17    addressing this issue.

18         The claim that this issue wasn't ripe, we disagree

19    with.  I'm looking here in an e-mail from my partner, Paul

12:30:25 20    Boehm, re-transmitting the letter -- I believe this is about

21    the certain document production, and he was told that if it

22    isn't resolved on Monday, we intend to add a new agenda

23    item.

24         So I believe -- I don't have the original

12:30:41 25    communication, but I believe Plaintiffs were told, it's

1    certainly implicit as we're sending these letters back and

2    forth that these are important issues.  And as to why

3    they're important, this is a deposition that happened on

4    December 12th.  Documents were identified in the deposition.

12:30:58    5    Those documents included budget requests, autopsy tracking

6    reports on opioid-related autopsies, information and

7    tracking data for opioid-related expenditures for Child and

8    Family Services and County Jail.  And really, all we're

9    asking is a pretty simple request.

12:31:17   10        If these have been produced, say so.  But, based on

11    our review, these documents, specifically identified almost

12    a month ago by our witness, were not produced before the

13    deposition.  Still to this date, there's been no production

14    of them, and they should be produced immediately because

12:31:35   15    they're clearly relevant documents.

16        And we recently had a conversation about Cardinal

17    Health and the need to produce documents, and we understand

18    that, and we are doing so, and we're actively engaged in

19    that --

12:31:47   20            SPECIAL MASTER COHEN:  Yeah, I agree with you.

21    I'm with you.  Let's hear it.

22            MR. SHKOLNIK:  Special Master Cohen, Hunter

23    Shkolnik again.

24        Counsel references the e-mail from Mr. Boehm.  It was

12:31:56   25    actually a letter that said we were to respond by the end of

1    yesterday, January 8th.

2        Our letter back identifying each of the documents and

3    where they are in the database, that's been produced, went

4    out some time after midnight because we were working on

12:32:14  5    getting the actual Bates numbers.  So they gave us a

6    deadline of the 8th.  They put it on the agenda on the 7th.

7    We responded by either late in the 8th or early of the 9th,

8    and we've literally gone through and identified by Bates

9    numbers each of the documents they have requested and the

12:32:32 10    fact that they were produced.

11        If it's -- everyone was rushing to get on your agenda

12    because they had face time today.  It would have been easier

13    to say respond by the 8th, and if you don't do it, we'll put

14    it on next week's agenda, but they didn't want that.  So we

12:32:48 15    have a detailed letter --

16            SPECIAL MASTER COHEN:  Ignoring the "Hurry,

17    everybody, to try and get something on the agenda," what I'm

18    hearing is what they've asked for, you've provided.

19            MR. SHKOLNIK:  Yes.  And we gave them a letter

12:33:02 20    detailing with Bates numbers, quite a bit of them.

21            SPECIAL MASTER COHEN:  Okay.

22            MR. BOEHM:  I need to weigh in on this.  This

23    is Paul Boehm.  Let me correct a couple of things that just

24    aren't true.

12:33:09 25        One, that the e-mail correspondence that my partner,

1    Mr. Pyser, referenced is not the letter itself.  It was a

2    re-transmission of a letter.

3                   SPECIAL MASTER COHEN:  Paul, Paul, I'm going

4    to -- Paul, I'm going to interrupt you.  Paul, I don't care.

12:33:24  5    All I care about is whether the documents that you want have

6    been produced, which is what you care about.  And --

7                   MR. BOEHM:  That's the next thing.

8                   SPECIAL MASTER COHEN:  I'm told they

9    identified last night the documents that you wanted to be

12:33:37 10    produced, and I assume that you haven't had a chance to

11    determine whether that's true.  If you have, fine, but it

12    sounds like the way to move forward most quickly is for you

13    to have time to review their response to your request, and

14    then you can tell me next week if they're wrong.

12:33:56 15                   MR. BOEHM:  But I need to --

16                   SPECIAL MASTER COHEN:  I don't want to get

17    into the details.  I don't want to get into the details of

18    who wrote what, when, or whether it was an e-mail or a

19    letter.

12:34:05 20                   MR. BOEHM:  I understand.  I understand,

21    Special Master Cohen.  I just -- I need to correct

22    representations that were made with respect to the -- we

23    got -- we have a long conversation Mr. Pyser participated in

24    about the discovery and what we need to do and what our

12:34:18 25    obligations are, and it's a two-way street.  The letter we

1    got back doesn't do what Mr. Shkolnik has said.  It's says,

2    "Here are a couple documents, and then we're going to search

3    and produce different documents we have not already

4    produced," and it is January 9th.  And we have a discovery

12:34:32 5    cut-off of January 25th.  And there are some other issues I

6    guess coming up on the agenda that fit into this same

7    bucket.

8        Look, we can have a conversation.  We will.  We're

9    always eager to have conversations that will advance

12:34:46 10    Plaintiffs' productions, but there are some significant

11    gaps.  There are gaps in this bucket.  We will take

12    direction to meet and confer, but any suggestion that it's

13    resolved and they've given us all the information simply

14    isn't correct and we can revisit this again next week, but

12:35:00 15    time is short, and we are going to need an order if we can't

16    get Plaintiffs to agree to produce it right away because we

17    don't have very much time left.

18            SPECIAL MASTER COHEN:  I'll say this.  It

19    appears to me that the documents that you've asked for

12:35:16 20    should be produced.

21        It sounds like Mr. Shkolnik has said they have been

22    produced; to the extent they haven't, we're looking for them

23    and will produce them.

24        So I think that's all that needs to be said.  It

12:35:29 25    should be produced.  Plaintiffs say they have and will chase

1       after it, it should happen as quickly as possible.

2            Anything else?

3                 MR. PYSER:  Special Master, Cohen, we would

4       just add that the same principle -- and I understand you're

12:35:43  5   going to get written submissions on this.  The same

6       principle should apply to Agenda Item Number 136, which

7       follows the same process where we have been requesting

8       documents since November 30th that are extremely important.

9       And every time we hear, "We'll get them to you get, we'll

12:35:57 10   them to you in the future," and the documents just aren't

11      produced.  So I understand that's on the upcoming agenda

12      items, but we think that flows directly along with 135, and

13      we'd ask the same principle apply.

14                MR. SHKOLNIK:  With respect to 136, it was our

12:36:13 15   understanding that we had until Friday to respond.  And I

16      could be wrong on that.  Once again, this is another item

17      rushed to the agenda, and we spoke about it and we said we

18      needed until Friday to respond if there were any additional

19      items responsive.

12:36:31 20        By the way, we got their request on the 7th.

21                SPECIAL MASTER COHEN:  Yeah.  I'm not

22      addressing that now, but again to the extent that it appears

23      a party has made a legitimate request for a document,

24      especially one that's been referred to by a deponent, the

12:36:48 25   other side should try to get that document out as soon as

1          possible.

2                    MR. SHKOLNIK:  The one issue with the Adams

3          documents and what documents we have in our possession and

4          don't, it's been an issue we have discussed with counsel.

12:37:00  5          But we are on top of this.  We got the request less than two

6          days ago.  They'll have an answer Friday.

7                    MR. PYSER:  This letter came two days ago, but

8          the history laid out in the letter --

9                    SPECIAL MASTER COHEN:  I don't need a history.

12:37:12 10         We're moving on to document -- excuse me, Agenda Item Number

11         138.  All right.

12              Let's start with what I'm not going to do.  I'm not

13         going to strike the depo.  That would be excessive.  And

14         frankly, my interest there is more for the deponent than the

12:37:48 15         parties.

16              Something funny is going on, and I don't want anything

17         funny going on in the future.  I want there to be an

18         understanding and agreement as to how things go forward in

19         this sort of circumstance.  I get both sides' position.

12:38:14 20              My question is if there is a former employee, what's

21         going to happen every time, or what the rules are for

22         certain kinds of former employees?  Defendants say there's

23         an order and a rule and that's what has to be followed.

24         Plaintiff says that rule didn't apply in these

12:38:37 25         circumstances.

1          There needs to be a clarification on how that gets

2     dealt with, former employees.

3                    MS. SINGER:  Special Master Cohen -- oh.

4                    SPECIAL MASTER COHEN:  I get that the former

12:38:46  5     employee in this case had at some point made clear they

6     didn't want to work with the former employer and didn't want

7     counsel either provided by their former employer or private.

8     And that kind of takes it outside of the ambit, I think, at

9     least as to some extent, to an understandable extent, with

12:39:08 10     regard to what the CMO says.  And I don't feel like it would

11     be productive for me to preside over the negotiation of what

12     may have to be an amendment to the case management order or

13     an understanding between the parties.  I don't want to do

14     that now with you.  You can do that yourselves.  You'll be

12:39:26 15     better off doing it by yourselves.

16          So I don't need to hear a lot.  I've seen what's gone

17     on.  It needs to be addressed going forward.  I'll take a

18     minute or two of comment if you think it's necessary.

19                    MS. ROITMAN:  Thank you, Special Master Cohen.

12:39:42 20     This is Sara Roitman on behalf of Purdue.

21          We hear you about your ruling, and we're not going to

22     revisit that.  The one thing I would ask, however, is we

23     agree with you that something funny happened with this

24     deposition, that we would ask if you are not inclined to

12:39:58 25     strike the entire deposition, that you at least strike the

1    portion where Purdue was not on the line and was not able to

2    participate in the deposition.  I think it was about the

3    first 30 minutes of it.  And that thereupon, after we were

4    quickly made aware of the deposition, got someone on the

12:40:15  5    line or at least able to be logging objections; albeit, we

6    weren't able to see any of the documents, and then were

7    later able to participate in a limited fashion.

8         But I think that that might achieve the purpose here

9    of -- I understand you don't want to subject Mr. Horowitz to

12:40:34 10    a second deposition and perhaps are reluctant to strike the

11    entire transcript.  But, I think that that is a common kind

12    of middle ground for addressing what we think are really

13    serious concerns about what happened with this deposition,

14    both in terms of a failure to comply with the process that

12:40:53 15    is in place in the deposition protocol in terms of how to

16    reach out to make requests about party depositions,

17    including former witnesses, and the fact that the parties

18    were actively meeting and conferring about this issue.

19         We had even sent you an update the day we met and

12:41:08 20    conferred saying the issue is still open, both sides are

21    going to get back to each other, and then we proceeded in

22    good faith thinking that that was the status of things.

23    Unbeknownst to us, different communications were being made

24    to the witness, and then obviously, this deposition happened

12:41:25 25    on January 3rd.

1   With respect to the idea of how we address this going

2   forward, happy to kind of talk about that in relation to the

3   revisions we were doing to Track Two, and I think if it's

4   going to have broader ramifications, I think our position is

12:41:40  5   that the current deposition protocol already has a fairly

6   simple process in place that has been working, with the

7   exception of Mr. Horowitz, has actually been working with

8   all others that I'm aware of, former employees, that both

9   sides have been asking the parties.  Certainly I think both

12:41:59 10   Plaintiffs and Defendants have been deposing a lot of former

11   employees.  And the process that we have all been complying

12   with, and the process that Plaintiffs have used for the 14

13   other witnesses that they asked for for Purdue, was first

14   reach out to the party, have an informal exchange of whether

12:42:17 15   they want to depose the witness.  We talk about scheduling.

16   In the event we can't work it out, it obviously gets

17   presented to you.  That process I think has worked fairly

18   well.  I can't imagine, can't recall another instance like

19   this.

12:42:33 20   Mr. Horowitz is unique in the sense that Plaintiffs

21   didn't follow that process here.  But, there's nothing

22   unique about him as a witness that would mean they couldn't

23   have followed it here.

24   SPECIAL MASTER COHEN:  Okay.

12:42:45 25   I think we're getting a little bit into what I don't

1    want to get into.  Let me hear briefly from Plaintiffs.

2                    MS. SINGER:  So I hear your point that you

3    don't want this reargued, and I won't rise to the

4    point-counter-point conversation.  I want to speak to the

12:43:00    5    suggestion that there was something funny here.

6        Purdue was notified of this deposition from the very

7    get-go but Special Master Cohen.  I see you shaking your

8    head, but there has been a suggestion that something was

9    done here.

12:43:14   10        This witness was effectively a whistle blower.  He

11    indicated from the get-go that he was not working with

12    Purdue, even though he immediately called Purdue to let them

13    know about the subpoena and even talked to in-house counsel

14    the day before the deposition.  This was always on the

12:43:29   15    calendar, such that four other Defendants participated in

16    the deposition.

17        So I think the suggestion here that somehow something

18    was funny, to use your word, is just not fair or an accurate

19    reflection of what happened.  Purdue had lots of

12:43:47   20    opportunities to intercede if this deposition should -- if

21    they were going to move to quash or take some other action.

22        As to what should happen with the depo -- oh, and I'm

23    sorry.  In terms of the protocol itself, I don't think we've

24    had another instance where a witness was effectively a

12:44:04   25    whistle blower and said I want to come forward.  I don't

1    want to come forward through my former employer.  As he

2    testified at the hearing, we encouraged him to get counsel.

3    He didn't feel that was necessary.

4        The one fact he testified to was that we told him, we

12:44:18  5    encouraged him to do that, said we couldn't offer him legal

6    advice but instructed him to testify truthfully.

7        So the record here is very clear on that history.  If

8    there are specific questions that Purdue would have asked in

9    that first half hour, which by the way, four other

12:44:34 10    Defendants were present at, happy to have a meet-and-confer

11    with them about that or if there's specific testimony they

12    think was improper or could have been addressed in the first

13    half hour -- I don't think there was anything of

14    substance -- but they knew about the deposition, they didn't

12:44:48 15    stop it, and the fact that anything should be changed about

16    it I think is unwarranted.

17            SPECIAL MASTER COHEN:  Yeah.

18        So I'm going to give Purdue a standing objection to

19    the fact that they weren't there for that first half hour.

12:45:03 20            MS. ROITMAN:  We would ask, your Honor, that

21    that portion of it be struck.

22            SPECIAL MASTER COHEN:  No, I'm not striking

23    it.  I'm saying you have a standing objection to it.

24            MS. ROITMAN:  Oh.  I misunderstood.

12:45:09 25            SPECIAL MASTER COHEN:  And that can be the

1     basis for which you would move at some future time for that

2     portion of the deposition not to be used, and the Court will

3     rule on it at that time.

4         Going forward, even if somebody is considered to be a

12:45:26 5     whistle blower, of course, we only have two or three weeks

6     left in this case, the CMO needs to be adhered to strictly.

7     To the extent that that needs to get changed going forward

8     for Track Two, you all are going to chat about that.

9         Anything else?

12:45:44 10         MS. SINGER:  I do think, Special Master Cohen,

11     that we skipped over Item 137, which was the custodial file

12     of Robin Abrams.

13         SPECIAL MASTER COHEN:  I said 137 but was

14     looking at 138.  Hold on just a minute.  My computer just

12:46:12 15     freaked out.  Okay.

16         So we just addressed Agenda Item 138.  Moving back to

17     138, which has to do with an item we've addressed before,

18     which is the deposition of Robin Abrams.

19         Go ahead, Ms. Singer.

12:46:58 20         MS. SINGER:  So before I start with the

21     argument, and I think there are two pieces of it:  One, the

22     production of Ms. Abrams' custodial file; the other, the

23     deposition.  And I think they are separate questions for

24     you.

12:47:08 25         There are, I think in order to speak to the particular

1   circumstances here -- and we recognize that there is a

2   significant burden in requesting the custodial file of an

3   in-house counsel.  So I think to -- to explain to you why we

4   think it's both appropriate and necessary here, I'd like

12:47:25   5   permission to go off the record so we can share some

6   confidential information.

7              MR. LAFATA:  Special Master Cohen, this is

8   Paul Lafata.

9         With respect to the request, I don't know why we would

12:47:38   10   go off the record.  If we can -- we can -- what we can

11   agree, it should be subject to protective order so we

12   actually have a record of what's discussed in the

13   proceedings even if it's not a public record.

14              MS. SINGER:  That's fine.

12:47:49   15              SPECIAL MASTER COHEN:  Well, here's my

16   concern.  Like we did with Mr. Farrell's inadvertent comment

17   in the beginning, we can put this part of the record under

18   seal or something like that.  I don't know who's on the

19   phone.  I don't even know who's in the courtroom.  I don't

12:48:05   20   know everybody who's in the courtroom.

21         And so I'm concerned about, unless everybody here

22   agrees, I just want to make sure everyone's in agreement as

23   to how we're going to proceed right now if you want to talk

24   about some information that is confidential or privileged.

12:48:24   25              MR. LAFATA:  Well, I just don't understand the

1     request to go off the record.  There's one thing to have an

2     on-the-record discussion that is confidential for the Court,

3     but a separate request to stop transcribing the proceedings.

4     Maybe --

5          MS. SINGER:  That's fine.

6          SPECIAL MASTER COHEN:  No.

7     I'm saying it will be on the record.  It will be put

8     under seal and marked confidential, but I don't know who

9     else is listening, and it's conceivable that if there is

10    some confidential information discussed later that is going

11    to be marked confidential or under seal, that it won't

12    matter because someone else is going to hear it.  I don't

13    know how to deal with that, except to take the phone off and

14    close the door.

15         MR. LAFATA:  I believe you requested a list of

16    everyone who would have been on the telephone before the

17    proceeding today.  If the -- if you want to make an inquiry,

18    if there's someone on the phone who's not on that list or

19    hasn't announced themselves and is not subject to protective

20    order, we can make that inquiry.  You can certainly do that.

21    But -- or as long as we have an understanding of counsel

22    that the discussion today is not a waiver of the protective

23    order.

24         MS. SINGER:  Special Master Cohen, you can

25    also direct that this conversation is confidential.  That

1    anyone on the phone line or in the courtroom is directed not

2    to share this information.

3            MR. LAFATA:  We can always do it at side bar

4    with the Court Reporter without the telephone if --

12:49:46  5            SPECIAL MASTER COHEN:  Let's do that.  Let's

6    do a side bar.  I just want to be excessively careful.  It

7    probably is excessive, but I prefer to be excessively

8    careful than not careful enough.  So --

9            MR. WEINBERGER:  We're ten minutes from

12:50:02 10    breaking.  Why don't we just not continue the telephone

11    conference and then we can just deal with it in the

12    courtroom?

13            A VOICE:  Disconnect the phone now.

14            SPECIAL MASTER COHEN:  Yeah.  We're probably

12:50:19 15    five minutes from breaking.  All right.

16      Everybody, on the phone, I'm going to disconnect you.

17    If you want to find out what happened, you'll be able to if

18    you're allowed to see the transcript.  And thank you for

19    calling in.  We're going to try to resume at 1:45 if you

12:50:42 20    want to call back in.

21            MS. SINGER:  All right.

22            MR. LAFATA:  Special Master Cohen, I'm also

23    not sure, frankly, who everyone is in the gallery, in the

24    courtroom.  So I don't know if they are subject to

12:51:05 25    protective order.  I think a side bar would be a better

1    approach.

2              SPECIAL MASTER COHEN:  Side bar.

3        **(Proceedings were held at side bar under seal.)**

```
            1
            2
            3
            4
13:00:37    5
            6
            7
            8
            9
13:00:52   10
           11
           12
           13
           14
13:01:09   15
           16
           17
           18
           19
13:01:23   20
           21
           22
           23
           24
13:01:36   25
```

1

2

3

4

13:05:21    5

6              (Thereupon, a luncheon recess was had.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          <u>WEDNESDAY SESSION, JANUARY 9, 2019, AT 1:48 P.M.</u>

 2                    SPECIAL MASTER COHEN:  Welcome back,

 3     everybody.

 4                    MR. WEINBERGER:  David, can I just interrupt

 5     for just a second?  If possible --

 6                    SPECIAL MASTER COHEN:  Let me just -- are

 7     people on the phone?  Is anybody on the phone?  Were people

 8     going to call back in?  Does anybody know if folks were

 9     going to try to call back in?

10                    MR. WEINBERGER:  I can't speak for anyone in

11     particular, but I suspect yeah.

12                    COURT REPORTER:  Katie is the one who places

13     the call to the parties.

14                    MS. ROITMAN:  I have a colleague, not speaking

15     but listening in, and he says that he cannot hear us.

16                    SPECIAL MASTER COHEN:  Yeah.  I've got to call

17     somebody.

18          (Pause.)

19                    SPECIAL MASTER COHEN:  Anybody need to say

20     anything not on the record?

21                    MR. WEINBERGER:  Yes.  Peter Weinberger for

22     the Plaintiffs.

23          With hopefully everyone's consent, we'd like to

24     proceed with Item 69 because it's a matter of Linda Singer's

25     handling it, and she's got to catch a plane.

1        And I just have one other short issue that I want to

2   discuss right now.  And that --

3                    SPECIAL MASTER COHEN:  This is off the record?

4                    MR. WEINBERGER:  No, on the record.

13:58:05  5              SPECIAL MASTER COHEN:  We're off the record

6   until I get the call.

7                    MR. WEINBERGER:  Okay.  We can stay off the

8   record and then if necessary, put it on the record.

9        (Discussion held off the record.)

14:01:06 10             SPECIAL MASTER COHEN:  Okay.  Is anybody on

11  the phone.  Can anybody hear me on the phone?

12                   A VOICE:  Yes.

13                   SPECIAL MASTER COHEN:  All right.

14       Welcome back.  We're reconvening and back on the

14:01:22 15  record.  Again, I ask everybody on the phone to please mute

16  yourself unless you're speaking.

17                   MR. WEINBERGER:  Mr. Boggs has already been

18  deposed as a 30(b)(6) witness without any issues arising

19  that would impact on his deposition as a result of the lack

14:01:42 20  of a Touhy clearance.  His deposition has also been

21  scheduled, his fact deposition has been scheduled for next

22  week.  We want to proceed with it.  And our only concern is

23  that to the extent there's any objection interposed or any

24  decision by the witness to not testify on a particular

14:02:05 25  subject because of the lack of a Touhy letter, that we be

1    permitted to bring him back once -- once we can initiate

2    such a letter with the DOJ.

3             MR. LYNCH:  That's patently objectionable,

4    Special Master.  If they haven's sent a Touhy letter --

14:02:23    5             SPECIAL MASTER COHEN:  First of all, please

6    identify yourself.

7             MR. LYNCH:  Oh, sorry.

8             SPECIAL MASTER COHEN:  And please talk into

9    the mike.

14:02:27   10             MR. LYNCH:  Mark Lynch for McKesson.

11        If they haven't sent a Touhy letter, it's too late.

12             MR. FARRELL:  So Paul Farrell.  We have sent a

13    Touhy letter.  Mr. Bennett responded by stating that they

14    were on furlough.  But this belies a bigger point that we've

14:02:43   15    been raising for quite some time.  We're --

16             MR. LYNCH:  Can I break?  The biggest point is

17    we haven't gotten a Touhy letter.  They raised holy hell

18    about not getting our Touhy letters but they don't send us

19    their Touhy letters.

14:02:58   20             MR. FARRELL:  So the bigger issue is Gary

21    Boggs is a former DEA agent, who now works for McKesson.

22    And so when he has been deposed as a 30(b)(6) witness in the

23    West Virginia Attorney General litigation.  And in that

24    transcript, there are questions and answers that go towards

14:03:26   25    his time at the DEA.  In addition, I can like make reference

1    to a specific document, MCK MDL 00536449, which are minutes

2    from -- not minutes.  I'm sorry -- notes from a meeting

3    between the DEA and McKesson back in 2007, where Mr. Boggs

4    was participating in his role as the DEA.

14:03:58  5         So as you've noted, in our past telephone calls, there

6    has come a big issue as to whether or not he is allowed to

7    discuss his prior role with the DEA.  I understand there

8    might be a difference between Mr. Boggs being allowed on

9    behalf of the DEA to speak on behalf of the DEA versus

14:04:24 10  whether or not he's allowed to talk about his prior

11   prosecutions.

12         We were operating under the presumption, as you noted

13   during our last telephone conference, that there is no

14   prohibition to a former DEA agent talking about this.

14:04:40 15  Certainly, Mr. Boggs has on other occasions, and so we --

16   with the understanding that the DOJ may have recently

17   changed its position on whether or not prior employees can

18   talk about their role in the DEA, we recently sent a Touhy

19   request just to make sure that when we talk to Mr. Boggs,

14:05:04 20  we've crossed all of the I's -- crossed all of the T's and

21   dotted all of the I's.

22              SPECIAL MASTER COHEN:  All right.  How

23   recently?  How recently?  All right a few things.  First of

24   all --

14:05:20 25              MR. LYNCH:  Can we find just --

1          SPECIAL MASTER COHEN:  Just a minute.  Yes,

2     you can.  But, I want to make a couple comments.

3          Anybody who sends a Touhy letter copies everybody from

4     now on right away.

14:05:29  5          MR. WEINBERGER:  We have.

6          SPECIAL MASTER COHEN:  I'm not saying you

7     didn't.  I'm just setting down a rule.  From now on in this

8     litigation, anybody who sends a Touhy letter, copies

9     everybody else right away.  Okay?

14:05:38 10          MR. WEINBERGER:  We agree.

11          SPECIAL MASTER COHEN:  Go ahead.

12          MR. FARRELL:  Sorry, Special Master Cohen.

13     That was sent to Mr. Bennett on the 2nd, and you did tell us

14     to forward them.  And I just forwarded it to all Defense

14:05:49 15     counsel.  So they now have the Touhy request that was sent

16     for Mr. Boggs as well as Mr. Barber.

17          MR. LYNCH:  The second was well into the

18     shutdown.  This is a transparent ploy to delay things.

19          MR. WEINBERGER:  Oh, come -- well, actually,

14:05:59 20     the opposite.

21          MR. LYNCH:  They never sent a Touhy letter

22     until after the shutdown.

23          MR. FARRELL:  Hold on.  So --

24          SPECIAL MASTER COHEN:  Wait a minute.  I don't

14:06:11 25     need anything more on this.

1        First of all, I happen to be at lunch.  And when I saw

2   the long line down on the seventh floor, I walked to the

3   Terminal Tower to get some lunch there and happened to bump

4   into James Bennett, who is now in the courtroom.

5        And he did not know that this was taking place, which

6   is everybody's fault, including mine.  So just a note that

7   whenever there is a status conference in front of me, we

8   should remember to invite the Government to participate.

9        I asked Mr. Bennett if he wouldn't mind stopping by to

10  explain what's going to happen and how, and how we can all

11  work together through these processes, assuming that there

12  is something to work through.

13       And so, Mr. Bennett, if you could get up and explain,

14  first of all, what you are currently allowed and not allowed

15  to do with reference to Touhy; and second of all, let's

16  pretend that this furlough ends tomorrow, what the process

17  would be.

18            MR. BENNETT:  Sure.

19       As the Court knows, the parties were aware on December

20  21st appropriations to the federal government lapsed.  As a

21  result, a number of federal employees with the Department of

22  Justice and other federal executive agencies have been

23  furloughed.  That includes myself.

24       There are some very limited exceptions that allow

25  those employees to work without pay, generally involving

1    criminal or national security type matters.

2         In this particular case, I am not authorized to work

3    on any substantive matters regarding the MDL.  My sole

4    purpose for actually being in the office today, which I was

14:07:54  5    exempted only for today, was to request a stay, additional

6    stay of this Court's order of any discovery involving the

7    United States, which we anticipate to file some time this

8    afternoon or early evening.

9         As a result, employees at the DEA, the DOJ, and the

14:08:13 10    FBI are not able to respond to, process, or review, or

11    produce any discovery information at this point in the MDL.

12         Once the furlough ends and appropriations are

13    restored, we have discussed internally and plan to suggest

14    to the parties scrolling back up and responding to those

14:08:36 15    Touhy requests, discovery requests and document productions.

16         We believe the most appropriate way to do that is to

17    receive priority requests from the parties.  So, for

18    example, if there's a deposition that's scheduled for the

19    end of January that there needs to be a Touhy authorization,

14:08:51 20    assuming appropriations are restored by that point, we would

21    make that a priority.  We believe we can start getting

22    authorization letters out within five days after

23    appropriations being restored.  But, we certainly won't be

24    able to respond to the voluminous numerous requests that are

14:09:07 25    pending within a short five-day time period.

1        So it will take us some time to respond to everything,

2     but we would like to work with the Plaintiffs and the

3     Defendants in prioritizing those requests was based on the

4     discovery that is going on at the time.

14:09:22  5            SPECIAL MASTER COHEN:  Any questions for

6     Mr. Bennett?

7            MR. FARRELL:  Yes, Paul Farrell.

8        The question that is on our minds is when do we need

9     to get a Touhy request?  And we had been operating -- we had

14:09:39 10     in mind that we were going to depose Mr. Boggs, which

11     included discussions about Mr. Boggs' role with the DEA in

12     documents that are -- have been disclosed in the case.

13        And so if the Department of Justice is taking the

14     position that no former DEA agent can talk about anything

14:10:02 15     they did while they were with the DEA, then that puts us on

16     a different trajectory.

17        Same with Mr. Barber.  Lyndon Barber is now working

18     for Cardinal Health and we have asked for and received a

19     date for his deposition.  And so when we go and talk to

14:10:22 20     Mr. Barber, we presumed we were going to be asking him

21     questions about his prosecution among other Defendants,

22     Cardinal Health.  So it -- it's of vast importance for us to

23     figure out now whether or not if we proceed with Mr. Boggs

24     next week, and we are precluded from going into anything

14:10:44 25     about his former role with the DEA, we would like the

1      opportunity to come back once the furlough is up and then

2      consider the ramifications or consider the restrictions that

3      the DOJ puts on.

4          But as you noted on the telephone conference --

14:10:59  5              SPECIAL MASTER COHEN:  Well, I didn't note

6      exactly what you said I noted.  So just can you answer his

7      question?

8              MR. BENNETT:  I think I can.

9          So for Department of Justice employees, it's our

14:11:09 10     position that the regulations require them to get

11     authorization to disclose non-public official Department of

12     Justice information.

13         So if you are asking about investigations that are not

14     public, if you're asking about procedures that are not

14:11:24 15     public, if you're asking about policies that are not public,

16     then those things would require prior authorization, whether

17     they are a current employee or a former employee.

18         To the extent that you're asking general questions,

19     like the employment history or about publicly known and

14:11:40 20     available information, then there would not be a requirement

21     for former employees to get a Touhy authorization -- to be

22     authorized to do that.

23         Does that answer the question?

24              SPECIAL MASTER COHEN:  It comes as close as I

14:11:51 25     think you're going to be able to come.

1          Let me ask you a question of personal interest.  Is

2     there any penalty to a former or present employee if they're

3     asked a question for which Touhy authorization was required

4     and they answer it?

5              MR. BENNETT:  I don't know the answer to that

6     question.  I never faced the penalty question.

7              SPECIAL MASTER COHEN:  All right.  Thank you.

8     Anybody else have any other questions for Mr. Bennett?

9              MR. RICE:  I don't have a question but I want

10    to -- I sent yesterday a letter to you.

11             SPECIAL MASTER COHEN:  This is Joe rice.

12             MR. RICE:  I'm sorry.

13         I sent a letter to you and to the news yesterday and

14    to Alex, and yours kicked back when I sent it to you.  But

15    it was a request that there not be DOJ and Defendants with

16    Special Master or DOJ from the Plaintiff with the Special

17    Master when we're talking about other people's documents and

18    other people's Touhy requests.  So I just want to be sure

19    that that got received and we get some understanding of

20    that.

21         We understand there had been some meetings or

22    discussions between DOJ and the Defendants about depositions

23    and gratuity issues, that Defendants had issued Touhy

24    letters but we also issued Touhy letters on the same people,

25    and we weren't aware of agreements or discussions that were

1    being raised with you.

2                    SPECIAL MASTER COHEN:  Yeah, I think that when

3    the conversation you're referring to took place, the Touhy

4    submissions had only been made by the Defendants.  And so

14:13:23  5    that conversation -- now I may be incorrect, but that was --

6    that was what I believed when that conversation took place.

7    Nonetheless, I take your point.

8                    MR. RICE:  Fair enough.

9                    SPECIAL MASTER COHEN:  And you are correct

14:13:35 10    that's how it should go.

11                    MR. BENNETT:  And, Mr. Rice, we did receive

12    your e-mail.  I think you just got my out of office, but I

13    did receive the letter.

14                    MR. RICE:  Thank you, sir.

14:13:43 15                    MR. BENNETT:  Special Master Cohen, would you

16    like me to remain in case additional questions come up or do

17    you want me to leave?

18                    SPECIAL MASTER COHEN:  Sounds like you have

19    other work to do, and I don't think I have any other

14:13:50 20    questions for you.  And appears no one else does.  So thank

21    you for coming in on a -- on your single day of employment

22    this week.

23            (Laughter.)

24                    MR. BENNETT:  Thank you very much.

14:13:59 25                    SPECIAL MASTER COHEN:  Is that a three-week

1       old beard?

2                   MR. BENNETT:  It's a little longer than that,

3       but yeah, it's -- it's growing.  I was hoping it would keep

4       me incognito.  Apparently, it didn't work.

14:14:11  5                   SPECIAL MASTER COHEN:  No.  Sorry.

6            (Laughter.)

7                   SPECIAL MASTER COHEN:  All right.

8            So let's return to the question of when these

9       depositions are going to take place that implicate Touhy

14:14:26 10     concerns.

11           It's my preference that a deponent be deposed once.

12      That's why I suggested that we move a deposition toward the

13      end of January so that the Touhy process can go forward and

14      a deponent doesn't have to be recalled.  It sounds like, and

14:14:45 15     I didn't completely follow what you were saying, Pete.

16      Partly because I was being interrupted with this phone call

17      and I didn't hear everything you said.  That you believe

18      there's good reason to go forward with some depositions

19      immediately, even though they have Touhy issues, and then

14:15:01 20     come back and mop up Touhy issues later if necessary.

21           Is that what you were saying?

22                   MR. WEINBERGER:  Yes, that was until I just

23      heard Mr. Bennett's dissertation.

24                   SPECIAL MASTER COHEN:  Okay.

14:15:12 25                   MR. WEINBERGER:  And I really think we need to

1    -- it's actually my partner, Bill Howse, who's taking the

2    deposition.

3                SPECIAL MASTER COHEN:  I didn't hear you.

4                MR. WEINBERGER:  My partner, Bill Howse, is

14:15:23 5   taking that deposition.  And I think we need to confer with

6    him.  Paul Farrell and I need to confer with him to

7    determine whether or not we want to proceed next week.

8                SPECIAL MASTER COHEN:  All right.

9        I hear that as meaning there's nothing for me to do

14:15:38 10  right now.

11               MR. FARRELL:  This is Paul Farrell.  I think

12   what it comes to is -- let's just play it out.  "Mr. Boggs,

13   were you present for the 2007 meeting with Mr. McKesson?

14   Objection.  That was part of his role with the DEA."  He's

14:15:57 15  instructed not to answer.  So then we come back, the

16   furlough's lifted.

17               SPECIAL MASTER COHEN:  Is that McKesson's

18   objection to make?

19               MR. WEINBERGER:  Let's assume he, the witness,

14:16:09 20  decides.

21               SPECIAL MASTER COHEN:  If he, the witness,

22   decides, then you're going to have to deal with it.

23               MR. FARRELL:  So the way we would deal with it

24   is we would come back to you, and if you rule that it is

14:16:16 25  permissible to ask him that question, we would be --

1    SPECIAL MASTER COHEN:  I'll tell you right now

2    the way I'm going to deal with it is allow him to be

3    redeposed when the Touhy issue is resolved.  That's all I

4    can do.  I'm not going to rule on that.

14:16:28  5    MR. WEINBERGER:  Okay.  So --

6    SPECIAL MASTER COHEN:  I can tell you that I

7    think it seems to me it's not McKesson's objection to make.

8    It's his decision to make, and then instruction not to

9    answer is rarely appropriate, and that ain't one of them.

14:16:40 10    MR. WEINBERGER:  Understood.

11    So we'll keep the deposition on, but we will confer,

12    you know, meet with my partner and get back to McKesson's

13    counsel if there's any change.

14    SPECIAL MASTER COHEN:  Okay.

14:16:52 15    MR. WEINBERGER:  Thanks.

16    MR. LYNCH:  Special Master, I'd just like to

17    point out that the end of January -- is this on?

18    SPECIAL MASTER COHEN:  This is Mark Lynch.

19    MR. LYNCH:  The end of January is getting

14:17:04 20    very, very jammed up.  And it seems to be the answer for

21    every problem is, "Well, we'll do it at the end of January."

22    And the capacity of the end of January to handle all these

23    issues is, I think, perhaps past the breaking point.

24    And I think that -- they ought to go forward.  They

14:17:26 25    ought to ask the questions.  The test according to Mr.

1    Bennett is whether it's official information and nonpublic

2    information, and get the testimony, get it out of the way,

3    and then if they can come back with anything that they

4    really need that was official and nonpublic, that's

14:17:46  5    relevant, then you can decide that.

6                    SPECIAL MASTER COHEN:  I mean that seems like

7    a reasonable approach, but I'm not going to order it.  I

8    want you all to try to work this out.  And as I said, this

9    might be the kind of thing where I just say the deposition

14:18:05 10    either on the Touhy increment or the entirety will go

11    forward because of extenuating circumstances after January

12    25th, and that's not an impossibility.  All right.

13         Just so that I can keep track, that's an Agenda Item

14    we already addressed earlier, correct, that you came back

14:18:35 15    to?

16                    MR. WEINBERGER:  Yes, we were going to ask you

17    to deal with those.  Number 69.

18                    SPECIAL MASTER COHEN:  Okay.  We will jump to

19    Agenda Item 69, which is the top of Page 4.  And this is,

14:18:55 20    Mr. Weinberger, what you referred to earlier as the other

21    matter that was referenced in the status report to Judge

22    Polster?

23                    MR. WEINBERGER:  Yes.

24                    SPECIAL MASTER COHEN:  So let me begin with a

14:19:11 25    question for the Defendants.

1          Is the last -- I believe it's the last sentence in the

2     note section of this Agenda Item.  I'll read it.  The

3     Plaintiffs say, "We ask that this be placed on the agenda

4     for Wednesday's discovery conference, and that each

14:19:34  5     Defendant be required to certify that they have produced,

6     one, complete details regarding their SOM programs, and the

7     suspicious orders they identified, investigated, and

8     reported; and two, all records relating to charge back

9     requests submitted to or paid by Defendants."

14:19:52 10          Why shouldn't I do that?  I can't think of a good

11     reason not to do that.

12               MR. PYSER:  Special Master Cohen, just to

13     clarify, that was at the request of the manufacturers.

14     Correct?

14:20:10 15               SPECIAL MASTER COHEN:  I hadn't noticed that,

16     but that is correct.

17               MR. PYSER:  Thank you.  That was Steven Pyser

18     for Cardinal Health.

19               MR. REED:  Special Master Cohen, Steve Reed

14:20:13 20     for Teva.

21          Again, I'll point out that this does not apply to

22     Teva.  I think Plaintiffs would agree.

23          (Laughter.)

24               MR. REED:  So while all the distributors are

14:20:31 25     carving themselves out, I would like to point out the last

1    sentence of the matter of description, which notes Teva's

2    compliance.

3                MS. WELCH:  Special Master Cohen, Donna Welch

4    for Allergan.

14:20:45  5        As indicated in my January 7th letter to Plaintiffs,

6    Allergan has produced all of the relevant documents, all of

7    the relevant responsive documents.

8        But I'll -- I'll note that what we're being asked to

9    certify in Item 1, I'm not certain exactly what that means,

14:21:05 10   "produce complete details regarding their SOM programs and

11   the suspicious orders they identified," if that's just

12   simply asking for certification that --the responsive

13   documents that we have, have been produced, I guess we don't

14   have an issue with it, to the extent, you know, parties on

14:21:29 15   both sides are being asked to certify that responsive

16   documents have been produced.

17       If they're seeking something in addition to simply

18   production, we've not had a discussion about it, and I don't

19   know what that would be.  I know distributors, for example,

14:21:44 20   were asked to respond in writing on certain issues.  We have

21   not been asked to or ordered to or required to do that, but

22   for my client, I can say that the responsive documents have

23   all been produced.

24                MS. SINGER:  Special Master Cohen, just to

14:22:00 25   respond to that, you ordered, I think, on December 5th at a

1    hearing that at this stage, given the voluminous discovery

2    and where we are in discovery, that the Defendants produce

3    and identify those documents.

4          Ms. Welch is right that we haven't asked for any form

14:22:14 5    to be filled out.  But, this request reflects Judge

6    Polster's order that documents reflecting complete details

7    on Suspicious Order Monitoring Programs not be withheld on

8    claims of privilege and two discovery requests that

9    Plaintiffs served, Purdue Request 17, Purdue Request Number

14:22:34 10   31, which lay out the documents that have been requested,

11   all records of charge back requests demurred in the note on

12   the agenda.  So I don't think I need to restate them here.

13         But I can tell you that based on the reports back from

14   the various Plaintiff teams who have been interacting with

14:22:54 15   Defendants, with the exception of Teva -- Mr. Reed gives me

16   residuals on this -- that there are gaps, we believe, for

17   all Defendants.  They are different for each of the

18   manufactured Defendants.

19         So for Allergan, there was deposition testimony

14:23:13 20   recently that the person who ran Allergan's Suspicious

21   Ordering Monitor Program testified she made a record each

22   time an order triggered their Suspicious Order Monitoring

23   system.

24         We haven't found these records.  Perhaps Allergan

14:23:28 25   produced them.  But again, consistent with your order, those

1    records should be identified, and if they haven't been

2    produced, they should be produced.  And each Defendant

3    should be able to certify that those kinds of details at

4    this point have been produced.  We are weeks away from

14:23:42 5    expert deadlines.

6                SPECIAL MASTER COHEN:  Produced or logged.

7                MS. SINGER:  Yes, produced or logged, so that

8    we can challenge the privilege.  Yes, correct.

9        But, this is information that we must have for expert

14:23:54 10    reports.

11                COUNSEL:  Special Master Cohen --

12                SPECIAL MASTER COHEN:  What about the

13    suggestion that that obligation should apply equally to

14    Plaintiffs, certification obligation?

14:24:09 15                MS. SINGER:  So I'm -- you know, we're talking

16    about productions that were ordered by you and by this Court

17    that we have struggled to get from Defendants.

18                SPECIAL MASTER COHEN:  I guarantee you that if

19    I ask a Defendant to make a suggestion as to whether they've

14:24:25 20    struggled about getting some information from you, they

21    could give me a list.

22                MS. SINGER:  If there's a request or a

23    particular instance for critical information that we

24    certify, I'm certainly happy to entertain that request from

14:24:36 25    Defendants.  You know, they should represent that the

1    production is complete.  They have said that it is.  We

2    don't believe it is based on our review of the records.  So

3    there's only one way to put that to rest.  And we believe

4    pursue -- as you have said before, there's been lots of

14:24:51  5    parsing of the responses here that indicates to us that all

6    of the documents haven't actually been produced.

7                 MS. LUCAS:  Speaking for Janssen, this is Amy

8    Lucas.

9         I'm confused as to -- at least as to us why this is

14:25:07 10    even on the agenda and raised in some way applicable to all

11    Defendants.  We have ongoing meet-and-confer efforts with

12    our handlers, and I just -- I don't understand why something

13    is being discussed in a motion-to-compel setting when we

14    have been working our tails off to meet and confer with them

14:25:26 15    to give them everything they need.

16                 COUNSEL:  Special Master Cohen --

17                 WOMAN COUNSEL:  We as well have been working

18    with our assigned handler, and there was talk this morning

19    about the Plaintiffs' side and how they have representatives

14:25:44 20    attached and assigned to particular Defendants.  And our

21    handler for Endo and Carr is Jill Scalia, who has been in

22    ongoing conversations with Ms. Scalia and has produced, to

23    my knowledge, everything that's responsive with respect to

24    the SOMS-related documents, including SOMS documents

14:26:06 25    discussed earlier today, with one small exception, which

1    we're producing this week.  And we've been in ongoing

2    discussions with our handler as well.

3              SPECIAL MASTER COHEN:  If that's true, what's

4    the worry about certifying?  You just made the statement in

5    court as an officer of the court on the record.  Why are you

6    hesitant to certify it?

7              WOMAN COUNSEL:  I'm not hesitant to certify we

8    have completed our production.  We produced documents

9    responsive to the requests.  I just don't understand the

10   language of the certification.  It is extremely broad and

11   we've never been approached about this language outside of

12   this particular mechanism.  And it's removed from our

13   ongoing discovery discussions with our handler.

14             MS. SINGER:  So just to make sure the record

15   is clear, my understanding is that Endo has not produced the

16   Suspicious Order Monitoring program for its generic

17   subsidiary, Carr?  That is an issue that has been raised

18   with Endo.  Last production update indicated that, you know,

19   it will be produced TBD.  And at this point, as Defendants

20   have made clear in all of prior discussions, TBD is not an

21   acceptable response.

22             MS. LUCAS:  I think this is an issue that goes

23   both ways.  There's an Agenda Item for Cleveland's

24   productions that are woefully deficient and in our view

25   neglected.  So I just -- I don't think it's --

1        SPECIAL MASTER COHEN:  What are you talking

2   about, Juvi Court?

3        MS. LUCAS:  No.  It's not on the agenda

4   because Mr. Pifko updated you Monday, and we submitted a

5   response which we can talk about when we get to the agenda,

6   but I think everybody, I would hope that everybody's working

7   in good faith to get everybody what they need, but I just

8   don't think it's fair for the Plaintiffs to be waving their

9   arms up and down, jumping up and down, when this is an issue

10  that absolutely goes both ways.

11       MS. ACKERMAN:  Let me just jump in.  This is

12  David Ackerman.

13       Since there was a reference to one of Janssen's

14  handlers, as Ms. Lucas knows, I am one of Janssen's

15  handlers, and what I can address is that Janssen advised us

16  that they had identified SOMS documents.  And then when we

17  went back and were preparing for a deposition this week,

18  we identified a number of SOMS documents that were not --

19  that had not been produced, and Janssen produced those on, I

20  believe, over the weekend, and then identified that there

21  were additional documents forthcoming.

22       That's the reason for the certification.  We need to

23  know when these productions of key documents are complete.

24       MR. LAFATA:  Special Master Cohen, this is

25  Paul Lafata for Purdue.

1          I think what Mr. Ackerman said actually is maybe a

2     good idea for what may be helpful here.  It sounds like the

3     Plaintiffs for some Defendants have an idea of what they

4     expect to see that they're not seeing.

14:28:49  5          I think, rather than have a secret list, why don't the

6     Plaintiffs just tell what they expect to be seen in these

7     document categories that they're not seeing?

8          For Purdue, for example, I -- in early December, I

9     submitted these correspondences to the Court and then

14:29:04 10    listing things we've been producing on this, and I've not

11    heard, "But we're missing A.  We're missing B."

12         So that's the normal course.  If we say we believe

13    we've done what we have, and the other -- and the Responding

14    Party Plaintiff or Defendant believes there's something

14:29:17 15    missing, you just say, "Raise your hand, I think there's

16    something missing," and then we address that, rather than a

17    blanket certification when there's already a list of

18    questions about whether there's something missing.

19              MS. LUCAS:  And I will say to Mr. Ackerman's

14:29:29 20    credit, that is what they have done with us.  Albeit,

21    regardless of the timing and when they sent it to us, that

22    is what they did.  They gave us a long list, and we

23    immediately started investigating and have been working with

24    them, and we would welcome continuing to work with them and

14:29:45 25    it's been productive.

1        MR. O'CONNOR:  Special Master Cohen, this

2    Andrew O'Connor for Mallinckrodt.  I would echo Mr. Lafata's

3    comments.

4        We submitted to Endo, Ms. Singer, a list of what we

14:29:57  5    produced and addressed her questions on November 30th.  She

6    thanked us and said I'll be back in touch with any

7    questions.  The next we heard from her was this blanket

8    e-mail to everyone.  And we would respectfully suggest we

9    continue to do what we've done productively in the vast

14:30:14 10    majority of cases and just engage in a meet and confer with

11    our handlers who know what we've produced, what we haven't

12    produced.  And we can get to a good place on this.  This

13    blanket request out of left field, I don't think, is

14    productive.

14:30:29 15        SPECIAL MASTER COHEN:  I'm not going to -- I'm

16    not going to order a certification at this time.  I think

17    that it is appropriate at the end of discovery, whatever

18    that means, which may not be on January 25th, that some sort

19    of certification by both sides be offered.  I'm not sure

14:30:48 20    what it's going to look like.  I'll take suggestions.  The

21    key is for everybody to be confident they've gotten what

22    they asked for on both sides.

23        I know that the Plaintiffs are sometimes complaining

24    that we can't give you a list because we don't know what

14:31:05 25    we're asking for.  You should know what we've asked for,

1    given the broad categories that we've included in our

2    discovery requests.  I've tried to address that as best I

3    can.

4        Plaintiffs, you are going to have to come up with

14:31:20  5    lists as specifically as you can of what it is you think you

6    haven't received that you think you should or that needs to

7    be put on a privilege log.  And I know a lot of what you

8    think you should receive, you haven't received because it's

9    on a privilege log, but it's got to be on one or the other.

14:31:36  10        MS. SINGER:  So as you acknowledge, Special

11    Master Cohen, we don't know what we don't know.  And the

12    dynamic that happens is what Mr. Ackerman described or what

13    Ms. Conroy was talking about is that we go to a deposition

14    and a witness responds to say that would have been in this

14:31:50  15    record or that database.  And when the deposition has

16    happened, right, it is incredibly inefficient to find out

17    about documents the Defendants should have known about in

18    the summer when they were responding to discovery or

19    certainly when they were preparing a witness for deposition.

14:32:06  20    And to put the burden on us where we know we are happy to

21    identify to Defendants what we think is missing, but we

22    can't know what isn't there, and it is their obligation.

23        Frankly, from my perspective -- and other Plaintiffs

24    may disagree -- and they will if they do, the certification

14:32:24  25    is less important than getting the documents, and again, we

1    have a deposition tomorrow of a compliance official.  We

2    have expert report deadlines coming.  We can't get this

3    information in February or on January 25th.

4                   SPECIAL MASTER COHEN:  You know --

14:32:44  5          MR. WEINBERGER:  One other thing.

6         This particular -- we're not talking about the breadth

7    of all the discovery documents that we've been requesting.

8         This particular set of documents, the Suspicious Order

9    Monitoring documents and charge back data, which has

14:33:03  10  significant relevance to the data, is something that the

11   Court, on November 21st, that you I think later on clarified

12   was applicable to the manufacturers.

13                  SPECIAL MASTER COHEN:  Agreed.

14                  MR. WEINBERGER:  And so with respect to this

14:33:24  15  category of documents, which is critical to the case, I

16   don't think it's unreasonable for the Plaintiffs, under

17   these circumstances, to be asking the Defendants, "Certify

18   that you've given us everything."

19                  MR. REED:  Special Master Cohen, Steve Reed

14:33:44  20  for Teva.

21        Again, Teva is not in this particular issue, but I do

22   have a concern about the certification going down what I

23   view as a bit of a slippery slope with this certification.

24        Plaintiffs have categories that they think are

14:33:57  25  particularly important.  Certainly, the Defendants feel the

1      same way.  I think it becomes a distraction and then could

2      become an unproductive game of Gotcha if we we're talking

3      about and battling over certifications as opposed to

4      operating in good faith back and forth to make sure that

14:34:16  5      things aren't missed.  Things will always be missed.

6           If people discharge their obligations under the rules

7      and the code, they will search -- make reasonable efforts to

8      search the right places to produce responsive documents.  If

9      it turns out things were missed, then I think it's on both

14:34:35 10      parties to engage in order to make sure those are collected

11      in a timely way.

12           If we then just start to trade certifications and

13      start filing motions about whether a certification was

14      accurate or not, it's going to become a side show that will

14:34:49 15      become an unnecessary distraction in this case.

16                SPECIAL MASTER COHEN:  I'm not going to do the

17      certification now, and I've been very clear this morning,

18      you know, what could happen, what may happen if documents

19      that clearly should have been produced, that were clearly

14:35:06 20      critical, weren't, and are produced in Track Two, where did

21      this come from, why wasn't this produced before.

22           Plaintiff should make as clear as they can to

23      Defendants what it is they believe they have not received,

24      and the categories of documents that they want to make damn

14:35:22 25      sure they have right now on the lines of what you just said,

1    Pete, and try and avoid this issue.  That's all I'm in a

2    position to do at this time.

3        It's 2:35 and we have a hard stop at 3:00.  I just

4    want to note that.  All right.

14:35:44 5    We're moving on to -- or back to Agenda Item 139.

6                    MR. REED:  Sorry.  What number was that?

7                    SPECIAL MASTER COHEN:  139.

8        And my notes to myself is that I think that Purdue

9    thought this wasn't quite ripe, and I suggested the parties

14:36:10 10   should be able to resolve it on their own and I sent the

11   parties back to talk about that.

12                   MR. ACKERMAN:  This is David Ackerman.  I've

13   spoken with Mr. Lafata this morning.  I think we'll talk in

14   the morning about this.  The only thing I would ask is that

14:36:23 15  we be able to raise this with you if for some reason we

16   can't reach agreement on an expedited basis because we have

17   a 30(b)(6) witness scheduled, I believe, for Tuesday.

18       So I just wanted to alert you to the fact that if for

19   some reason Paul and I can't work it out, we might be asking

14:36:44 20  you for a quick decision.

21                   MR. LAFATA:  Special Master Cohen, Mr.

22   Ackerman is right that we are, pursuant to your request, I

23   think late last night, we're going to be conferring about

24   this.  We really think there ought to be a way for attorneys

14:36:57 25  to work this out.  It's a matter of just time.

1              SPECIAL MASTER COHEN:  I agree.

2              MR. ACKERMAN:  Deposition time.

3              SPECIAL MASTER COHEN:  All right.

4         So that's fine.  Do your best.  Come back to me if you

14:37:04  5    need to.  Remind me that this is something, if you do come

6    back to me, that I agreed to address quickly.  Okay.

7              MR. ACKERMAN:  Thank you.

8              SPECIAL MASTER COHEN:  Item 140 is another

9    issue that I just think there's some middle ground that the

14:37:32 10    parties should be able to meet there.  We can talk about it

11    briefly now if you want, and I can help you come to that

12    middle ground or you can agree to try to do that without me.

13    It really did seem like there's, you know, both sides were

14    making reasonable points.

14:37:49 15              MS. WELCH:  Donna Welch for the Defendants.

16         We are really seeking clarification from you, Special

17    Master Cohen, that Discovery Ruling 7 doesn't prohibit us

18    from talking to prescribers.

19         I am not aware that Plaintiffs have taken a contrary

14:38:10 20    position on your order.

21              SPECIAL MASTER COHEN:  No, but they wanted to

22    be careful about it and, you know, I could clarify it but

23    what I would rather do is, if you can come to an agreement

24    on exactly what that means -- you know what their concerns

14:38:22 25    are, they're valid, and at the same time you have concerns

1    about wanting to be able to get some information.

2         So if you can come to an agreement about what my

3    ruling meant and what that allows you to do, that's fine.

4              MS. WELCH:  We would like to do that.  I'll

14:38:39  5    raise two issues.  The first is what we need to do and would

6    like to do now, which is to talk to prescribers without

7    identifying specific prescriptions, without identifying or

8    talking about specific patients, but to talk to prescribers

9    in the Track One jurisdiction about opioids.

14:39:00 10       That's what we're looking to do right now.  We don't

11   believe that is in contravention of your order, but out of

12   an abundance of caution, we wanted to make sure that

13   Plaintiffs do not believe that would violate the order and

14   that you don't believe that would violate your order.

14:39:17 15       We firmly believe there will be a time where we will

16   need to talk to some prescribers about certain prescriptions

17   or about certain individuals.  We're not there yet, and we

18   are not there yet in part because we don't have what we

19   believe are full answers to the interrogatories and complete

14:39:42 20   production of claims data.  But, we absolutely represent to

21   the Court that it -- the Defendants do not intend now to do

22   that.  We will come back to you and to the Plaintiffs to

23   discuss a protocol by which we could engage in discussions

24   with, and potentially discovery of, prescribers, and to do

14:40:06 25   that pursuant to a protocol so that it's deidentified.

1          Again, our issue has never been to try to get names

2     out in the record.  So that -- that is a next step, but

3     right now, we believe we're entitled to talk to prescribers

4     generally.  Many of these prescribers, most of these

14:40:29  5     prescribers, we didn't learn about even because of the

6     claims data, but again, because of the order wording of your

7     order, out of an abundance of caution, we cross-referenced

8     them.  And many of the prescribers that we believe we have a

9     need to talk to are referenced in the claims data.  Again,

14:40:45 10     we don't intend to discuss the claims data with them.  Any

11     specific prescriptions, any specific individuals, we won't

12     reference the names of patients, but we believe that that

13     should be allowed right now.

14               MR. ACKERMAN:  Special Master Cohen, this is

14:41:00 15     David Ackerman.

16          And as you can see, many of the Bellwether Plaintiffs

17     representatives have gotten up to whisper in my ear because

18     this is an extremely sensitive issue for the Bellwether

19     Plaintiffs.  I understand she says they don't want to go to

14:41:14 20     prescribers and ask about specific individuals or

21     prescriptions, but the problem we have is that if you go to

22     a prescriber and say, "So if you had a patient who was about

23     40 years old and who came to you with a knee injury, and you

24     prescribed an 80 milligram oxy, why would you have done

14:41:33 25     that?"  And that may refresh something in a prescriber's

1     mind.  That's exactly why I put what I did in my letter,

2     which is we need to understand really more specifics from

3     the Defendants about what it is they want to ask prescribers

4     about.

5         If this is a question to a prescriber just to say,

6     "Did you get -- were you visited by a sales representative

7     and what did the sales representative tell you," well, that

8     doesn't implicate claims data and that might not be an

9     issue.  But, if this is questions about a particular

10    prescriber's prescribing habits and they have that

11    information because it was produced in the claims data, that

12    is an absolute issue for the Bellwether Plaintiffs and

13    something we think is prohibited by Discovery Ruling 7.  And

14    the Plaintiffs produced this information in full reliance on

15    those protections that were key to the -- that effort.

16                    SPECIAL MASTER COHEN:  Donna, is there a way

17    to do what you want to do by talking to prescribers who are

18    not in the claims data?

19                    MS. WELCH:  I think, unfortunately, given the

20    volume of claims data and the prescribers that we believe we

21    need to talk to, it would limit us significantly.

22        So, no, we don't -- we don't think that's -- we don't

23    think that's sufficient and, again, recognize that we

24    believe we will be back in front of you at some time soon

25    saying that we need to talk to certain of those prescribers

1    now about specific prescriptions and specific individuals.

2         We're representing we want do that; yet, we're

3    representing we won't do that until we've got an order in

4    place that allows us to do that under a protocol that

14:43:16  5    protects privilege or privacy or, you know, keeps things

6    confidential.  But to say that we can't talk to the

7    prescribers, you know, in the -- in the claims data, the

8    claims data that they're relying on is too limiting for

9    Defendants.

14:43:34 10         This -- they talk about the SOMS data as being what

11    goes to the heart of their case.  This is the information

12    that goes to the heart of our defenses.

13              MR. ACKERMAN:  Let's just be clear about a

14    couple things -- sorry.  I didn't realize you weren't done.

14:43:51 15              MS. WELCH:  And there's nothing to say.  I

16    mean we could be ordered that if a doctor starts to discuss,

17    wants to go to individual patient level information right

18    now, we can be instructed as officers of the court that

19    we're to tell that doctor we can't talk about that right

14:44:06 20    now.  And we're happy to do that, too.

21         But, again, to say that we can't talk to prescribers

22    and we can't ask about their prescribing habits, of course,

23    we need to ask about their prescribing habits.  But, again

24    we're officers of the Court.  We understand that until we

14:44:25 25    have an order allowing us to do it, we're not -- we're not

1    going to monkey around to, you know, quote things from

2    earlier, asking about things that come out of the claims

3    data and using the claims data.

4                MR. ACKERMAN:  To clarify a couple points.

14:44:45  5        The Plaintiffs are not relying on the claims data.

6    Plaintiffs have produced the claims data a because we were

7    ordered to on July 3rd and thereafter.  It was the

8    Defendants at all times who wanted the claims data and all

9    times aware that you had placed these restrictions on

14:45:03 10  discovery of individuals and prescribers identified in the

11   claims data.  And what we are saying now is if they want to

12   talk to prescribers about issues outside of the claims data,

13   then that probably is permissible under Discovery Ruling 7

14   and we can discuss it with them.  But, if they want to talk

14:45:22 15  to the prescribers about information they learned by virtue

16   of the claims data, that it, by its very nature, is using

17   the to claims data to conduct third-party discovery.  It is

18   exactly what you prohibited in Discovery Ruling Number 7.

19                MS. WELCH:  We are not seeking at this time to

14:45:39 20  ask the prescribers about information contained in the

21   claims data.  That's not what we're talking about.  But to

22   say we can't ask generally about prescribing habits because

23   it might --

24                SPECIAL MASTER COHEN:  That's enough.  You've

14:45:52 25  asked for clarification, I will try and give it to you.

1          Thank you.

2               MR. SHKOLNIK:  Special Master Cohen, if we

3    could just place on the record -- Hunter Shkolnik on behalf

4    of Cuyahoga.

14:46:03  5          Cuyahoga's position is we saw this as a slippery slope

6    when we were arguing this very issue back in July.  We were

7    given assurances that they were not going to be drilling

8    down on employees on doctors, and ever getting to this

9    level.

14:46:18 10          Now we're hearing, "Well, let's just do the next

11   step," which is we'll generically talk to doctors who just

12   happen to be in the claims database, which we were ordered

13   to produce under the guise they were never going to go drill

14   down that far.  And after they get through the generics

14:46:35 15   speaking to doctors that happen to be there, "Well, we're

16   going to ask for a new protocol so we can speak

17   specifically."

18          This is the reason why we took the position.  We were

19   never relying on this -- on these claims, making these

14:46:49 20   claims seeking recovery.  And we oppose this, and it is

21   clear that our worse fear that we had been suggesting in the

22   beginning is coming to fruition.  This is the next step

23   before they ask for their specific protocol to speak to

24   doctors about our employees, and our employees families,

14:47:07 25   which is something that was precluded and we would ask that

1    it be stopped and stopped now, so that we never get to the

2    next step.  Thank you.

3              MS. WELCH:  May I make one more point Special

4    Master Cohen.

14:47:18  5              SPECIAL MASTER COHEN:  In one minute or less.

6              MS. WELCH:  What has changed since then is

7    that Plaintiffs have now taken the rather extraordinary

8    position that every prescription for opioids, every single

9    one written in the Track One jurisdictions is improper.

14:47:35 10   They've made prescriptions for chronic pain, one of the

11   seminal issues in their case.  To say that we can't talk to

12   prescribers when they're saying that every prescription was

13   tainted guts our ability to defend in these cases.  It's and

14   fundamental issue to the defense.

14:47:58 15             SPECIAL MASTER COHEN:  Okay.  Thank you.  I

16   understand the issue.

17             MR. REED:  Special Master Cohen, Steve Reed

18   for Teva.

19        I know you've given a lot of time and you want to move

14:48:10 20   off this subject.  I would just put a plea in.  That we

21   could have your clarification promptly because time is

22   important, and I just want to respond to one thing that we

23   heard which was there was some kind of guise.

24        I want to be very clear our view is we've been accused

14:48:26 25   of defrauding doctors and our view is and has always been in

1    order to defend ourselves against these very ambitious

2    claims, we have to have the facts underlying the Plaintiff's

3    claims and we have to be able to take discovery in order to

4    re respond to those claims.

14:48:45  5    Even if the Plaintiffs decide they want to pursue an

6    aggregate model which we think is legally insufficient.  One

7    of the ways to respond to that kind of model is to speak to

8    the doctors under the model supposedly were misled to find

9    out if they were misled and by who, and what that caused

14:49:05 10    them to do.

11    And this is just from our perspective.  We've heard

12    from the Plaintiffs what they think are the critical pieces

13    of discovery for them -- Tim I'm telling you from my

14    perspective this is critical for the manufacturer he is

14:49:18 15    defense and we feel a bit frustrated in our efforts to get

16    it.

17    MR. PIFKO:  Special Master Cohen, I want to

18    note that also the HIPAA order -- Mark Pifko from Baron and

19    Budd for Plaintiffs -- the HIPAA order, which I don't have

14:49:30 20    the docket entry but I know I memorized it because we've

21    talked about it so much, it was entered on July 3rd, was

22    also, limits the use of this.  And we've had this issue in

23    other contexts where you say the parties agree to this and

24    you know you're tuck with it.  So that was the -- that was

14:49:45 25    an order that was entered I believe by mutual agreement of

1    the parties and that was the limitation on the use of the

2    claims data was a provision that's in the order.  So he if

3    that's what was agreed to, that's what was agreed to.

4    There's no reason for us to revisit that.

14:49:59  5             MR. REED:  Special Master Cohen, Steve Reed

6    for Teva.

7         We've masked the information.  We're actually asking

8    questions from treating physicians so I'm not sure I

9    understand at all the concern about protecting health care

14:50:10 10   information when these are the treating physicians who

11   presumably have that information.  We're certainly not

12   looking to provide those doctors with information that they

13   don't already have and are not entitled to.  But, to me this

14   is just a construct.

14:50:24 15            SPECIAL MASTER COHEN:  Agenda Item 141 is the

16   next one on the list.  And that one is Plaintiff's request

17   for additional deposition time from Chris Zimmerman and

18   Stephen Mays.

19        I've read the parties' submissions on this.  Frankly,

14:50:37 20   I think the Defendants make a very strong point, that they

21   did nothing wrong, and that they acted appropriately, given

22   the rules that were in place when these very early

23   depositions occurred.

24        And the rules that were in place at that time were

14:50:51 25   different than they are now.  Having said that, I also think

1    that it's appropriate -- it's I think that the best result

2    for this case, despite the fact that I don't think

3    Defendants did anything wrong, is nonetheless to reopen

4    these depositions to allow Plaintiffs to ask some additional

14:51:23    5    questions because the parties are so important, because the

6    rules did change after this occurred, and I'm going to --

7    allow a very limited amount of questioning.  Specifically,

8    I'm going to allow one and a half hours each for

9    Mr. Zimmerman and Mr. Mays.  I did get Defense counsel's

14:51:42    10    e-mail this morning explaining why they though Mays and

11    Zimmerman were different.  But, nonetheless I'm going to

12    allow that, and they're both in their roles as fact

13    witnesses, not 30(b)(6) witnesses.

14                Any questions about that ruling?

14:51:59    15                        MR. PIFKO:  We accept that ruling.

16           I want to clarify at no point was I trying to impute

17    they deposit anything wrong.  We thought under the fact we

18    were entitle to more testimony so I didn't want you to think

19    we were arcing they were acting in bad faith.

14:52:12    20                        SPECIAL MASTER COHEN:  Okay.  Thank you.

21                        MR. PIFKO:  And to the extent we have a time

22    limitation I did have the Rite-Aid issue that I raised.

23    It's at the bottom of the agenda because it's a new item but

24    a significant issue I wanted to make sure we would have the

14:52:26    25    opportunity to discuss.

1      SPECIAL MASTER COHEN:  All right.  What page

2 is that, what item number?

3      MR. PIFKO:  I'll have to look at it.

4      SPECIAL MASTER COHEN:  29.

14:52:51  5      MR. PIFKO:  Yeah, 29.

6      MR. MALLOY:  Special Master Cohen, this is

7 John Malloy on behalf of Rite-Aid.  I had filled in for

8 Alisa McElroy, who had to jump earlier this afternoon.

9      I believe this was an issue that Ms. Moore had raised

14:53:12 10 with you by e-mail, and it's our position on Rite-Aid.

11      SPECIAL MASTER COHEN:  Yeah, this is too

12 important an issue for me not to have a response in writing

13 from Rite-Aid.  I know what the issue is.  I know that among

14 other things Rite-Aid believes this has already been

14:53:30 15 decided, and I know that you believe that you've come to

16 additional information making this dispensing information,

17 you think, relevant and produceable because it -- it ties

18 back into the Suspicious Order Monitoring.  So I get the

19 issue.  It's a big issue, and I think that they need a

14:53:50 20 chance to respond in writing.

21      MR. PIFKO:  Okay.  Fair enough, but you know,

22 everybody, including me when I've been acting on behalf of

23 Cleveland, has been forced to respond in very limited time

24 frames.

14:54:00 25      They asked, I believe it was Monday, even Amerisource

1    asked for more time, and they responded last night.  I don't

2    understand what's taking them so long to respond.  We need

3    to get that resolved.

4              SPECIAL MASTER COHEN:  I agree.

14:54:12  5        Rite-Aid, when can you -- I will tell you when you're

6    going to, but for someone to ask you when you think you can.

7              MR. MALLOY:  I would ask that Ms. Moore, who's

8    in a deposition right now, and I have called her to join the

9    call so that she can respond.

14:54:29 10        I think some of the delay is because of the -- (phone

11   connection paused.) -- on this issue on January 7th, and we

12   had not heard anything before that, even though the

13   depositions were on December 18th, December 20th, but we

14   propose that we respond on Monday.

14:54:49 15              SPECIAL MASTER COHEN:  That's fine.

16              MR. MALLOY:  Thank you, Special Master.

17              MR. PIFKO:  I just wanted to clarify a

18   position.

19        I understand you're not going to rule, but they

14:54:58 20   testified that the dispensing data was the first line of

21   defense.  So if that's the case, I need to -- if they're

22   going to say every prescription that was ordered was valid,

23   I don't believe that's going to be true.  I need the

24   opportunity to prove that that's, in fact, not true if

14:55:12 25   that's going to be their position.

1          SPECIAL MASTER COHEN:  Agenda -- we're now

2     moving into what are categorized as previous agenda items.

3     These are agenda items where they're put in this bucket

4     because the parties were working together and making

5     progress.

6          The first one is Number 51, and Mr. Pifko was working

7     on some statistics and other issues with a January 7th

8     deadline of figuring that out.

9          Can I get a report on that?

10          MS. LUCAS:  Special Master, I have printed you

11     courtesy copies of the submissions because they came in

12     after the agenda was submitted.  Would you like me to submit

13     it to you?

14          SPECIAL MASTER COHEN:  Sure.

15          MR. PIFKO:  I can explain to you -- I can give

16     you the gist of it.

17          So obviously, the request, this all started with an

18     investigation asking that there was potential deficiencies

19     in the way the documents were collected.

20          It's -- I just -- I can't snap my fingers and make

21     people do things.  I'm not the one, obviously, who's -- I'm

22     not the IT person who's going to go and collect the data.

23     Believe me, we've been bugging everybody in the City and all

24     the vendors as regularly as we can to get them to get us the

25     information.  I have confirmed that several custodians do

1    not have issues, and I've confirmed some of the custodians

2    do have issues.

3         Ms. Lucas wrote back and said she was upset that we

4    haven't told them what -- why there are issues.  I've

14:56:46  5    learned from our IT staff that we may never be able to

6    figure that out.  And honestly, I don't know why we need

7    to know.  What does that tell us?

8         The bottom line is if there's a deficiency, I'm going

9    to correct it and I'm going to produce the additional

14:56:59  10    documents.  So I don't know why we're fighting about the

11    technical details about what sort of glitch may have

12    happened.  I can tell you it wasn't intentional.

13         And I also want to make clear I had some conversations

14    with Ms. Wu.  I know this isn't her issue, but we were

14:57:13  15    talking outside in the hall.  And if people need to be made

16    available for deposition, again because of additional

17    documents, I'm not going to object to that.  I think that's

18    fair.

19         So I wanted the Court to understand our view there.

14:57:25  20              SPECIAL MASTER COHEN:  All right.

21         So I -- as a general matter, I agree with you that I

22    don't really care so much as to what went wrong.  I'm more

23    concerned with getting it fixed.

24         The first paragraph of Ms. Lucas' January 7th e-mail

14:57:43  25    lists nine folks who you don't address.

1          MS. LUCAS:  And to correct that, it's actually

2    eight.  There was one person on there who was listed twice.

3          SPECIAL MASTER COHEN:  All right.  So how do

4    we get that finished?

14:57:55  5          MR. PIFKO:  I'm working -- literally sending

6    e-mails while we're sitting here about it, pushing it

7    through as fast as I can.  I can't squeeze water from a

8    rock.  That's all I can say.

9          MS. LUCAS:  We're concerned.  I don't know if

14:58:14 10   upset is fair.  We're concerned, and we do object to the

11   fact that this has now been going on since December --

12   November with you, and Cleveland has now repeatedly ignored

13   orders from you and continues to do so.  And in this

14   instance, Cleveland was the one who requested this order and

14:58:35 15   consented to it.

16        I do -- I am sympathetic that Mark is working hard and

17   he's pushing people, but at this point, we need an update on

18   what they are doing because they cannot keep ignoring orders

19   from you, and not even acknowledging that they're ignoring

14:58:54 20   them repeatedly, and give themselves extensions.

21        This is -- this is the same issue that we're having

22   with LERMS, the same issue we're having with the call back,

23   and we need them to finish.  And if it's a matter of

24   collecting and running a privilege screen and de-duplicating

14:59:12 25   and just sending us the documents, we don't have a problem

1    with that.  We do have a problem with this continuing to

2    drag out.

3         There are --

4              MR. PIFKO:  To be clear, we're not holding up

14:59:25 5    anything by reviewing the documents.  It's just an IT issue

6    right now.  I'm happy to expedite the production of any new

7    documents as soon as possible.

8              SPECIAL MASTER COHEN:  I don't know when our

9    meeting will be next week, but this needs to be finished by

14:59:48 10   then.  It really is true that you've asked for a bunch of

11   extensions at times.  I get that.  You're trying hard.  But,

12   this needs to be finished.  Okay?

13             MR. PIFKO:  Okay.

14             SPECIAL MASTER COHEN:  So whoever is in the

15:00:02 15   Cleveland IT Department, they need to understand that

16   vacation is over.

17             MR. PIFKO:  It would help if you -- if in a

18   one sentence e-mail, you say, "Here's my ruling.  I need

19   it," I can make sure everybody in the City is aware of the

15:00:15 20   order.

21             SPECIAL MASTER COHEN:  Ms. Lucas, why don't

22   you provide me with that one sentence, and I'll use it as my

23   sentence and forward it.

24             MS. LUCAS:  Can do, your Honor.  Thank you.

15:00:35 25             SPECIAL MASTER COHEN:  So might as well stay

1    up there.

2        What about Agenda Item 57, which is the LERMS data?

3            MR. PIFKO:  So that, I continue to say that

4    we're going to produce it.  Like I said the last time we

15:00:54 5    gave an update, I understand that people high up in the City

6    had to approve its release.  I understand that that process

7    is being completed.  We were just e-mailing about that as

8    well today.  I don't have any further details, but I mean I

9    obviously am going to produce it.  I -- that said, as I said

15:01:14 10   earlier, I don't think it's relevant.  So -- and I don't

11   think it provides any new information.  I think it's just

12   going to be superfluous information about not objecting to

13   producing it.  But, we're -- I hope to have it produced as

14   soon as possible.

15:01:29 15           SPECIAL MASTER COHEN:  Same story.

16           MS. LUCAS:  Thank you.  I just wanted to

17   clarify what we were talking about earlier with the LERMS

18   data when Ms. Wu was arguing.

19       Mr. Pifko represented that he had reserved the right

15:01:40 20   to redact the detail reports.  And I went back and looked at

21   our discussion about this, and on December 21st when we

22   reviewed our wonderful holiday present of our agreement, he

23   said at Page 98, Line 24, through 99, Line 4, "Tyler

24   Technologies was able to export the detailed reports they

15:02:01 25   want."

1    And so we are getting that.  And I think that we

2    should have it within a week or two, but the answer is they

3    were able to do it.  And we will be getting the data and we

4    will produce it.

15:02:11  5    And again, on January 3rd, because Mr. Pifko wasn't at

6    the December 27th hearing, again, on the 3rd at Page 81,

7    Line 16, to 82, Line 2, there's another colloquy where he

8    talks about, "It was voluminous, so it took some time.  But,

9    they got it to the City, and the City is working on getting

15:02:31 10    it so we can produce it."

11    And you asked a question and he responded, "One of the

12    issues is that the chief lawyer in the City needs to sign

13    off, and I believe she might be out this week.  But, we -- I

14    want to say some time next week."  So there was never any

15:02:46 15    discussion once they agreed to produce this material that

16    they would be reserving the right to make redactions or

17    withholdings.

18            MR. PIFKO:  I said that earlier in the

19    process.  Saying I'm going to produce it doesn't mean I'm

15:02:58 20    producing without redactions.  I'm producing the data.  I

21    stand by that.

22            SPECIAL MASTER COHEN:  It needs to happen by

23    the time we get together next week.  Same ruling.

24            MS. LUCAS:  Okay.

15:03:08 25            SPECIAL MASTER COHEN:  All right.  It's 3:00.

1   I know there are other things on this list, but I'm just not

2   going to get to them today.  I don't know what to do about

3   that, except that we need to finish.  All right.

4       There are a couple of things I want to touch on

15:03:45  5   quickly.  The Baldassano matter, have the Plaintiffs heard

6   about my ruling in that issue?  This is Agenda Item 112.  It

7   was an employee, Valli Baldassano, who was -- was it a Teva

8   employee?

9           MR. REED:  She was the chief compliance

15:04:47 10  officer at Seflon before the acquisition.

11          SPECIAL MASTER COHEN:  Right, who has multiple

12  sclerosis.

13      I had a conversation, a lengthy conversation with her

14  and with Defense counsel on the phone.  The short version is

15:04:59 15  the Plaintiffs are going to be allowed a very surgical

16  deposition, lasting two hours long at her house.

17      I'll tell Plaintiffs that the reason we came to two

18  hours is that she stated that she gets very, very foggy at

19  about one hour and 15 minutes.  And it may well be you'll

15:05:20 20  ask her a lot of questions that she simply cannot recall.

21      She's clearly in the later throws of her disease.  And

22  so that's where the meeting spot is.  Three hours at her

23  house.

24          Defense counsel was supposed to send me something.  He

15:05:40 25  didn't.  So we can ask why I haven't received that yet?

1           MR. REED:  Special Master Cohen, while I was

2      here, I received a draft, which I signed off on.  So you

3      should get that shortly.

4           And just to clarify, I believe you just said three

5      hours.  I think --

6           SPECIAL MASTER COHEN:  No, I said two.  If I

7      said three, I misspoke.

8           MR. REED:  Thank you.

9           SPECIAL MASTER COHEN:  Agenda Item 116 looks

10     like this is now agreed on.  That is an attorney's eyes only

11     designation.

12          Last sentence in the notes there says Plaintiffs'

13     proposed revisions are acceptable to Defendants.  So what I

14     would like the parties to do is please to file a joint

15     proposed order on that.

16          And then just to end with a bang, Agenda Item Number

17     109, the depositions of Richard Sackler and Kathy Sackler

18     will both go forward.

19          MS. LUCAS:  Special Master Cohen, just to

20     remind you, on Agenda 120 about Plaintiffs's interrogatory

21     responses, you had asked for submission of Mr. Pifko's

22     letter, which I know he did.  But, you were going to enter

23     an order after that.

24          SPECIAL MASTER COHEN:  Sorry, 120?

25          MS. LUCAS:  Yeah.

1      SPECIAL MASTER COHEN:  Ms. Lucas, tell me

2  again what I said I would do.

3      MS. LUCAS:  You had asked for Mr. Pifko to

4  submit to you his letter, in which the Plaintiffs had

15:07:35  5  objected to supplementing their interrogatories.  And at

6  Page 78 to 79 of the last January 3rd transcript, you had

7  said that -- you entered, I'm paraphrasing, you understood

8  the parties will have expert reports but you agreed to

9  supplement these, you need to supplement them, and I want to

15:07:59 10  look at the letter.

11      MR. PIFKO:  The issue wasn't quite ripe

12  because we -- they put it on the agenda and we said we would

13  get a response letter.  And then we -- with the deadline we

14  said we would get the response letter was the day after the

15:08:14 15  conference, I believe, or maybe the day of the conference.

16      And then so you said I want to see our response

17  letter, and then I sent it to you.  I think it was like

18  right after the conference, I sent you that letter.  And

19  then I guess you were going to look at it and make your

15:08:28 20  ruling after seeing our response.

21      SPECIAL MASTER COHEN:  Is that letter at one

22  of these exhibits here?

23      MR. PIFKO:  Probably not.  I wasn't in charge

24  of putting this item on the agenda, but I can resend the

15:08:39 25  letter to you if you want.

1              SPECIAL MASTER COHEN:  Yeah.  As I said, if

2    it's not listed on the agenda, then I don't know to look at

3    it.  There's just too much coming at me to remember to do

4    that.

15:08:50  5              MR. PIFKO:  Okay.

6              SPECIAL MASTER COHEN:  So I can't rule on that

7    right now.  And if you or opposing counsel send me that

8    letter, I'll look at it as soon as I can.

9        I've been waved at to go meet with the Judge.  So I

15:09:03 10    think we're done today.

11              MS. WELCH:  Special Master Cohen?

12              SPECIAL MASTER COHEN:  Who am I looking at?

13              MS. WELCH:  Sorry.  Donna Welch for

14    Defendants.

15:09:10 15        With respect to 89 and 90, on 89, which is the failure

16    to comply with Discovery Ruling 5 and 13, we received Ms.

17    Singer's letter last night.  We'll respond to that now since

18    we didn't get to that item today and tee it up for the call

19    with you next week.

15:09:28 20        And on 90, with respect to claims data, we continue to

21    meet and confer with Mr. Ackerman.  He has promised a

22    proposed order to allow reproduction of Rawlings data.  I'd

23    like a commitment from him that we'll get that order

24    resolved so that we can try to get that production made

15:09:47 25    before we're in front of you next week.

1          MR. ACKERMAN:  Yeah.  I will try to get it to

2     you before Friday.

3              MS. WELCH:  Thank you.

4              MR. ACKERMAN:  I think he wants to sign off on

15:09:57  5     it first, but I'll do my best.

6              MS. WELCH:  Thanks.

7              SPECIAL MASTER COHEN:  Okay.

8        We're off the record and done, everybody.  Thank you

9     for coming.  Couldn't finish it all, but that's the time I

15:10:10 10     got.

11        Thank you.

12        (Proceedings adjourned at 3:10 p.m.)

13                  C E R T I F I C A T E

14          I certify that the foregoing is a correct

15     transcript from the record of proceedings in the

16     above-entitled matter.

17

18

19

20     s/Shirle Perkins_____
       Shirle M. Perkins, RDR, CRR
21     U.S. District Court - Room 7-189
       801 West Superior Avenue
22     Cleveland, Ohio 44113
       (216) 357-7106
23

24

25