UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*All Cases* | MDL 2804<br><br>Hon. Dan Aaron Polster<br><br>Mag Judge David A. Ruiz |

**BELLWETHER PLAINTIFFS' REPLY TO ENDO DEFENDANTS' BRIEF IN OPPOSITION TO THE MOTION TO DISQUALIFY CAROLE RENDON**

## I. INTRODUCTION

In their Opposition to CT1 Plaintiffs' Motion to Disqualify, Carole Rendon, BakerHostetler, and the Endo Defendants (collectively, "Endo") improperly rely on overly narrow readings of the Ohio Rules of Professional Conduct ("Ohio RPC"). Their hyper-technical arguments ignore the inescapable reality that the circumstances at issue here demand disqualification. The following facts are not in dispute: Ms. Rendon was a public servant at the U.S. Attorney's Office for the Northern District of Ohio ("USAO") where she had extensive involvement with local governmental efforts to address the opioid epidemic in northern Ohio, including working closely with key Plaintiffs' witnesses; and yet, mere months after leaving public office, Ms. Rendon started representing the very opioid manufacturers accused of causing the opioid epidemic. In taking on that representation, Ms. Rendon violated the Ohio RPC. To find in Plaintiffs' favor, however, the Court need not reach that conclusion. Even if the violation were a close call, the law is clear the Court should exercise its discretion and find in favor of disqualification, thereby ensuring the integrity of, and trust in, the legal system.

## II.     ARGUMENT

### A.     The Appearance of Impropriety Supports Disqualification

In opposing Plaintiffs' motion, Endo erroneously suggests that an attorney's conduct that creates an appearance of impropriety does not provide any basis for disqualification under Ohio law.  But courts continue to consider the appearance of impropriety when evaluating motions to disqualify, even after the current version of Ohio RPC was adopted.  *See e.g. Bank of New York v. Aponte*, No. 12 MA 125, 2013 WL 5503160, at *4 (Ohio Ct. App. Sept. 24, 2013); *NexGen Energy Partners, LLC v. Reflecting Blue Techs., Inc.*, 94 N.E.3d 924, 931 (Ohio Ct. App. 2017); s*ee also United States v. Villaspring Health Care Ctr., Inc.*, No. CIV.A. 3:11-43-DCR, 2011 WL 5330790, at *3 (E.D. Ky. Nov. 7, 2011) ("Kentucky Rule of Professional Conduct 1.11 derives from ABA Model Rule of Professional Conduct 1. 11, which serves to avoid the appearance of impropriety on the part of current and former government employees.").

Remarkably, Endo never argues in its Opposition that there is no appearance of impropriety created in this case.  Rather, Endo implicitly acknowledges that an appearance of impropriety does exist and instead argues that such an appearance *alone* cannot disqualify Ms. Rendon.[1]  Ohio courts have made it clear that "even in a close case disqualification is favored to dispel any appearance of impropriety that an asserted conflict of interest presents."  *Bank of New York v. Aponte*, No. 12 MA 125, 2013 WL 5503160, at *4 (Ohio Ct. App. Sept. 24, 2013) (citing *Kala v. Aluminum Smelting & Refining Co., Inc.*, 81 Ohio St.3d 1, 11, 1998–Ohio–439, 688 N.E.2d 258 approvingly).  "The trial court has wide latitude when considering a motion to disqualify counsel." *Spivey v*. Bender, 77 Ohio App.3d 17, 22, 601 N.E.2d 56 (7th Dist. 1991).

Here, the appearance of impropriety is clear.  Ms. Rendon is a former public servant who had intimate access to information about the opioid crisis in Plaintiffs' jurisdictions, including Plaintiffs' response to the crisis.  Ms. Rendon was once honored for her work combating the opioid crisis, but now she is in a leadership role defending the opioid manufacturers' conduct

---

[1] Since the filing of Plaintiffs' motion, Ms. Rendon appears to have ceased her direct involvement in the case.

2

(which helped create and fuel the crisis) in those same jurisdictions. With Ms. Rendon's active assistance, Endo and the other manufacturer defendants for whom she serves as liaison, blame the Plaintiffs for the crisis and attack them for the alleged inadequacy of their response. Even if this conduct creating the appearance of impropriety existed in the absence of a technical ethical violation, the Court should use its "wide latitude" to consider the appearance of impropriety when evaluating whether Ms. Rendon should remain as counsel in this case. Indeed, close calls should be found in favor of disqualification (*see Sanford v. Commonwealth of Virginia*, 687 F. Supp. 2d 591, 602 (E.D. Va. 2009)) and here, the appearance of impropriety should further tip the balance towards disqualification, especially given Ms. Rendon's status as a former government attorney and high-ranking public official in this District.

### B. Ms. Rendon's Representation of Endo Violates the Ohio RPC

#### i. Ms. Rendon's Representation of Defendants Violates Rule 1.11(a)

Endo contends that Ms. Rendon is not in violation of Ohio RPC 1.11(a) because this case does not involve the same "matter" that Ms. Rendon worked on at the USAO. The plain language of Rule 1.11(a) prohibits a lawyer from "represent[ing] a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee," without informed, written consent. Ohio RPC Rule 1.11(a). The Official Comments explain that "[i]n determining whether two particular matters are the same, the lawyer should consider the extent to which the matters involve the same basic facts, the same or related parties, and the time elapsed." Ohio RPC Rule 1.11, Official Cmt. 10.

Endo urges an artificially narrow construction of the term "matter"; but the strictness of its interpretation is not supported by the law or the cases it cites. *See Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 29 (D.D.C. 1984) (disqualification concerns implicated when "the past government matter is essentially *like* the private litigation conducted in the present") (emphasis added). The Court need not resolve that dispute, however. Under *any* construction of what constitutes a "matter," there can be no doubt that Ms. Rendon's work at the

3

U.S. Attorney's Office involved the same "matter" as her work on behalf of Defendants.[2]

At the USAO, Ms. Rendon worked on, and was involved with, Plaintiffs' response to the opioid crisis within their jurisdictions. Through her work on this matter, Ms. Rendon worked with, and shared information with, officials representing the Plaintiff jurisdictions—and they in turn shared information with her. Plaintiffs' opening brief details how Ms. Rendon was involved through, among other things, the Opioid Task Force, specifically including Plaintiffs' response to the crisis in Northern Ohio throughout 2013-2017. *See* Plaintiffs' Opening Mem. at 1-11. This is much more specific than "the opioid crisis," or the "Opioid Task Force" and more accurately captures the profound nature of the Opioid Task Force's work and the matter on which the U.S. Attorney's Office was intensely focused. Nor is the Opioid Task Force or the work on Plaintiffs' response to the opioid crisis too vague or indistinct to constitute a "matter." Indeed, the definition of "matter" set forth in Rule 1.11 includes not only a proceeding or claim, but also a "controversy," an "investigation," or "any other particular matter involving a specific party or parties." The comments further instruct that "a 'matter' may continue in another form." Ohio RPC Rule 1.11, Official Cmt. 10; *see also Villaspring*, 2011 WL 5330790, at *4 ("Court[s] must analyze the matters' substance, rather than their forms."). The work of the Opioid Task Force for the Northern District of Ohio involved both an "investigation" and a "particular matter" – the response to the opioid epidemic "involving specific parties," including the City of Cleveland, Cuyahoga County, Summit County, and the City of Akron.

---

[2] With respect to Rule 1.11(a), Endo argues only that the "matter" at issue is not the same; it does not dispute that Ms. Rendon's involvement in the Opioid Task Force was substantial. Thus Endo's citation to *Arroyo v. City of Buffalo*, No. 15-CV-753A(F), 2017 WL 3085835 (W.D.N.Y. July 20, 2017), *report and recommendation adopted*, No. 15-CV-753, 2018 WL 488943 (W.D.N.Y. Jan. 20, 2018), is inapposite. There, the court declined to disqualify a former city attorney because although the court found that the "matter" at issue was the same, it concluded that "the record [was] barren of anything to support that [counsel at issue] substantially participated in the incident or its aftermath by any substantive involvement." 2017 WL 3085835, at *12.

4

As counsel for Endo, Ms. Rendon's representation involves the same basic facts, the same parties, and the same time period as her work on the Opioid Task Force. Endo's defenses focus on the response of the same parties – the City of Cleveland and Cuyahoga County and Summit County and the City of Akron – to the same opioid crisis during the same period. Ms. Rendon, as counsel of record for Endo, recently filed Endo's answer to the amended complaints and has asserted a list of affirmative defenses blaming the Plaintiffs for the Failure to Monitor or Mitigate, Comparative Fault, Unclean Hands, and asserting the Statute of Limitations and Laches. *See* Endo's Answer to Plaintiffs' Amended Complaint and Affirmative Defenses, Dkt. No. 1271. These affirmative defenses encompass the very substance of the work and communications that Ms. Rendon participated in with the Plaintiffs while working at the USAO. It cannot reasonably be argued that the work Ms. Rendon did with the Opioid Task Force is not the same matter involving the response of the same parties (the same city and county) to the same situation in the same time period. *See* Ohio RPC, Rule 1.11, Official Cmt. 10.

Ms. Rendon is not just currently involved as a consultant to the defense team. Rather, she has taken an active role in taking depositions during in which she and the defense team are eliciting deposition testimony from Plaintiffs' witnesses based upon information Ms. Rendon learned while at the USAO. The facts involved in the work of the Opioid Task Force and the facts involved in Defendants' defense of this action are the same facts. *See Gen. Motors Corp. v. City of New York*, 501 F.2d 639, 651 n.22 (2d Cir. 1974) ("In determining whether this case involves the same matter as the 1956 Bus case, the most important consideration is not whether the two actions rely for their foundation upon the same section of the law, but whether the facts necessary to support the two claims are sufficiently similar."). To further demonstrate that the facts are the same, Ms. Rendon's name appears **5,088 times** in Cuyahoga County's document production, **653 times** in Cleveland's document production, and **227 times** in Summit County's document production, which were all produced in response to Defendants' specific discovery requests. This document production alone demonstrates the substantial overlap between Ms. Rendon's work at the USAO and the matter at hand in this case. *See Gen. Motors Corp.*, 501

F.2d at 652 ("[w]here the overlap of issues is so plain, and the involvement while in Government employ so direct," disqualification is appropriate).

Additionally, as discussed in Plaintiffs' opening brief, Ms. Rendon was the "lead counsel" for the Consent Decree negotiated directly between the USAO and the Cleveland Division of Police. Endo never argues that Ms. Rendon's work as the "lead counsel" of the Consent Decree between DOJ and the City of Cleveland does not constitute a "matter," but instead argues that the Consent Decree "had nothing to do with the opioid abuse crisis." Opposition at p. 14. If this were so, one would ask why Ms. Rendon and her colleagues seek discovery regarding that very Consent Decree. In the deposition of Chief Williams, Defendants' counsel, including Ms. Rendon, questioned Chief Williams in great detail about the Consent Decree, eliciting responses specifically referencing Ms. Rendon. *See* Plaintiff Opening Mem. at 10-11; *see also* Exhibit 2. Endo cannot plausibly claim that the Consent Decree is a "wholly unrelated matter" when Defendants themselves put the Consent Decree directly at issue. *See also Villaspring,* 2011 WL 5330790, at *4 (finding matters to be the same when one was a criminal matter and the other a civil matter).

The cases Endo cites do not show otherwise. Endo relies in particular on two district court cases, neither of which is authoritative and neither of which arises under the Ohio Rules of Professional Responsibility. In *Laker Airways*, 103 F.R.D. 22, *supra*, the court found that a grand jury investigation into airline price fixing was not the same matter as an action alleging a conspiracy to eliminate Laker's "Skytrain" service, because the meeting that was the subject of the grand jury investigation occurred four years before the "Skytrain" service even came into existence. 103 F.R.D. at 30. Not surprisingly, price-fixing in the industry in 1972 was simply not the same matter as a conspiracy to eliminate a service that did not begin until 1976 at the earliest. Nor was Laker's application to the government to begin "Skytrain" service the same matter as a conspiracy by other private parties to end that service. *Id.* at 32. The remainder of the matters alleged to require disqualification in that case either involved rule-making or involved matters in which there was no credible showing that the lawyer in question participated

6

in them. *Id.* at 32-36. The facts of *Laker Airways* are a far cry from the facts here, where Ms. Rendon's extensive involvement cannot be disputed. In contrast to *Laker Airways*, Ms. Rendon's work at the USAO involved the same crisis and response, the same parties, the same time period, and critically, in defending against the allegations, Defendants raise the same issues Ms. Rendon clearly has specific knowledge about, as a result of her work at the USAO. *See Intellectual Ventures I LLC v. Checkpoint Software Technologies Ltd.*, 2011 WL 2692968, at *9 (D. Del. June 22, 2011) ("The defendants in Laker Airways. . . did not seriously argue that the information to which the lawyer previously had access was material or substantially related to the pending lawsuit.").

The other case on which Endo relies, *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 2006 WL 6846702 (E.D.N.Y. Aug. 7, 2006), is equally inapposite. As a threshold issue, *In re Payment Card* calls for a much broader construction of "matter" than Endo concedes. *See* 2006 WL 6846702, at *11 (litigation arising from a government investigation involves the same "matter"). Of greater significance, however, in *In re Payment Card*, the court looked to the documentary record to assess (1) which side more accurately described the scope of the previous governmental investigation; and (2) to determine the degree of similarity between that investigation and the matter then before the court. 2006 WL 6846702, at **11-14. There, the court found it "patent" that "[t]hat the government was in no meaningful sense 'investigating'" the matters at issue in the private lawsuit. *Id.* at *14. Here, the record shows that Ms. Rendon's work in the Opioid Task Force shaped the response of the Plaintiffs to epidemic. Through her work, Ms. Rendon gained confidential insight into the strategies adopted by Plaintiffs. Indeed, to confirm the similarity, one need only look to Defendants' affirmative defenses. *See* Endo's Answer to Plaintiffs' Amended Complaint and Affirmative Defenses, Dkt. No. 1271.

      **ii.**      **Ms. Rendon's Representation of Defendants Violates Rule 11.1(c)**

Ms. Rendon should be disqualified for the independent reason that her representation of Endo violates Ohio RPC Rule 11.1(c). *See Villaspring*, 2011 WL 5330790, at *6 ("1.11(c) also

provides grounds for disqualifying" attorney in addition to the violation of Rule 1.11(a)(2)).  As a former government lawyer, Ms. Rendon has confidential information related to how Plaintiffs responded to the opioid crisis that she "acquired when [she] was a public officer" and now she is "representing a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of" Plaintiffs.  *See* Ohio RPC Rule 1.11(c).

The defenses put forth thus far by Ms. Rendon's clients – both the Endo Defendants specifically and all Defendants for whom she serves as Defense Liaison counsel – focus on ***how*** Plaintiffs responded to the opioid crisis and ***when*** they knew it was an epidemic.  Ms. Rendon was not only aware of – she was ***involved*** in – many of these decisions through her role as USAO.  As a result, Ms. Rendon knows how choices were made with limited resources, if mistakes occurred and, if so, how they were addressed.  The Opioid Task Force, which Ms. Rendon formed and chaired, was the forum where all the knowledge about the opioid crisis was shared.  Because Ms. Rendon served as chair, and in fact was one of the people who convened the Task Force, she indisputably possesses confidential information about when the communities knew they had a problem, the type of information that led them to believe there was a crisis, and the different strategies Plaintiffs implemented to address the issue.  As Gary Gingell, a Commander for Cleveland's Division of Police, testified, the confidential information he shared with Ms. Rendon included Cleveland's efforts to combat the opioid crisis, including internal strategy with respect to law enforcement decisions and resources management, law enforcement activities and investigations, the resources spent, and his "strategic insights into Cleveland's multi-faceted efforts to combat the opioid crisis."  *See* Exhibit 1, Gingell Decl. at ¶¶ 4-5.  The Cuyahoga County medical examiner, Dr. Thomas Gilson, similarly testified that he shared with Ms. Rendon similar types of information related to the County's work to address the problems that opioids were causing.  *See* Exhibit 2, Gilson Decl. at ¶¶ 7-8.

It is inconceivable that the Defendants have not, and will not, continue to use all of this information to disadvantage Plaintiffs in this litigation.  The Comments to Rule 1.11 explain that

8

"where the successive clients are a government agency and another client, . . . unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service." Ohio RPC, Rule 1.11, Official Cmt. 4. This is exactly what is occurring here: Defendants are obtaining an unfair advantage due to their access to confidential information about Plaintiffs, obtainable only through Ms. Rendon's USAO work.

Courts have held that strategic insights and awareness of the strengths and weaknesses of a case can be the type of confidential information that can preclude a former government attorney from subsequent representation of an adverse client. *See Villaspring,* 2011 WL 5330790, at *6 (citing *United States v. Philip Morris, Inc.,* 312 F. Supp. 2d 27, 43 (D.D.C. 2004)). Plaintiffs' actions, discussions, and decisions in response to the opioid crisis, and how this may play into Defendants' defenses, is "exactly the kind of information" received while Ms. Rendon was in the U.S. Attorney's Office, "that might be useful to the second [representation]" of Defendants against Plaintiffs. *See id*.

Endo tries to distinguish *Villaspring* as involving "an attorney who participated twice on opposite sides *of the very same matter*" (Opposition at p. 12 (emphasis in original)), but that is incorrect and misses the point. Although the facts are not exactly the same as the present situation, the former government attorney in *Villaspring* investigated defendants as an assistant state attorney general but declined to prosecute and referred the case to the U.S. Attorney which brought a different kind of case. The parties and actions were *not* the same, but the court disqualified the attorney because he possessed "confidential information in the form of strategic insights." *Villaspring,* 2011 WL 5330790, at *6. In this case, those strategic insights are not, as Endo argues, just general knowledge into "how police departments and medical examiners offices conduct investigations" (Opposition at pp. 12-13), but *specific knowledge* about how Plaintiffs' police departments, medical examiners and others responded to the *opioid crisis.* Here, that is the heart of this case and this information goes directly to several of Defendants' defenses.

9

Similarly, in *Dugar v. Board of Educ. of City of Chicago, Dist. 299,* No. 92 C 1621, 1992 WL 142302 (N.D. Ill. June 18, 1992), the court disqualified an attorney who previously worked for the Board of Education from representing plaintiffs who were challenging the Board's practices pertaining to expulsions and suspensions. Even though "the matters involving the named plaintiffs had not arisen" when the attorney worked for the Board, she was disqualified because "she was privy to the discussions regarding the Board's position" and rationale on the issues involved in the case, and "confidential information concerning the Board's legal analyses and strategies relating to student suspensions and expulsions." *Id*. at *4.[3] The attorney, like Endo here, contended that any information she may have received was not confidential because it would be part of the public record. Notwithstanding that argument, the court found in favor of disqualification anyway: "It is the exchange of ideas and the analyses underlying any disciplinary action that comprises the confidential information to which [she] was exposed." *Id*. Similarly, in this case, Ms. Rendon was exposed to Plaintiffs' rationale on the issues involved in the case, including their discussions, ideas, and analyses on how to best respond to the opioid crisis. Ms. Rendon now uses this information to help Defendants oppose Plaintiffs in this litigation.

As it does with Rule 1.11(a), Endo relies on *Laker Airways*, 103 F.R.D. 22 to argue that Plaintiffs have not identified what confidential information was imparted. Opposition at pp. 11-13. But *Laker* is an old case about a different rule[4] and it concerned "various incidents in the past career"[5] of a lawyer who may have had "some relationship to the present suit."[6] This is in contrast to the specific information at issue here where Ms. Rendon worked with Plaintiffs to address their response to the opioid crisis and she is now defending a party accused of causing

---

[3] Although the court in *Dugar* applied a specific Seventh Circuit test, the analysis involved the same language related to Rule 11.1(c) that is at issue here.

[4] The challenge in *Laker* was based on Canon 9 of the D.C. Code of Professional Responsibility and the Code's Disciplinary Rule 9-101(B), and not Rule 1.11(c).

[5] *Laker Airways*, 103 F.R.D. at 26.

[6] *Id*. at 29.

that crisis.  The *Laker Airways* court found that the advice the lawyer provided was general, not related to the present case, and only shared "a common area of the law."  *Laker Airways*, 103 F.R.D. at 39-40.  On the other hand, the court acknowledged that "[d]isqualification would be appropriate if the moving party were able to demonstrate with some degree of persuasiveness that the material was indeed confidential and could not have been obtained by other means; that it is material to and has significance in the private litigation; and that under the circumstances the former government attorney would be able to use such information to the prejudice of the moving party."  *Id*. at 32 n.27.  Here, Plaintiffs have made such a showing.  Only someone in a position such as Ms. Rendon's could have had close access to the details of Plaintiffs' response to the opioid crisis.  Endo argues that Plaintiffs failed to mitigate their damages, but Ms. Rendon and her office were centrally involved in that response.  They also argue that Plaintiffs' damages were caused not by them, but by criminals.  To that end, Ms. Rendon and her office worked with Plaintiffs to devise a coordinated law enforcement response to the opioid epidemic with Ms. Rendon's input and assistance, which included criminal prosecutions.  Allowing Ms. Rendon and her firm to continue, in light of this inside information, is prejudicial to Plaintiffs.

The Court should not be persuaded by Endo's narrow reading of what constitutes confidential information.  "The question of whether confidential government information could be used to the Defendants' material []advantage is the most difficult because it is inherently predictive and requires the court to engage in informed conjecture as to what information will become relevant as the case progresses."  *Kronberg v. LaRouche*, No. 1:09CV947, 2010 WL 1443934, at *4 (E.D. Va. April 9, 2010) (disqualifying an attorney in part because he had a "mental roadmap" about the other party "that was shaped at least in part by his access to confidential government information.").  In this case, Ms. Rendon has a similar "roadmap" that was shaped at least in part by her access to confidential government information learned while she worked with Plaintiffs to combat the opioid crisis.  Ms. Rendon and her firm should be disqualified because they possess confidential information that goes to the heart of Plaintiffs' case and Defendants' defenses.

### C. Endo Fails to Show that the Motion Is Barred by Waiver or Bad Faith

Endo argues that a party may impliedly waive an "objection to opposing counsel" by delaying bringing the motion. Opposition at 19. While "*a former client* who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly" may be barred from raising the conflict on the ground of an implied waiver (*In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd*, 5 F. App'x 396 (6th Cir. 2001) (emphasis added) (quoting *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F.2d 85, 87 (9th Cir. 1983)), Plaintiffs are not former clients of Ms. Rendon and do not seek disqualification under the rules governing such a relationship. *Cf.* Prof. Cond. Rule 1.6, 1.9. The disqualification sought here is based on Rule 1.11, which governs "Special Conflicts of Interest for Former and Current Government Officers and Employees." The public policies underlying this Rule are simply not subject to an implied waiver analysis.

By enacting Rule 1.11, the Ohio Supreme Court recognized that conflicts involving current and former government officers like Ms. Rendon raise important public policy issues:

> [W]here the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government. Also, unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service.

Ohio RPC Rule 1.11, Official Cmt. 4; *see also id* at Official Cmt. 3 (Rule "designed not only to protect the former client, but also to prevent a lawyer from exploiting public office for the advantage of another client"); *Sec. Inv'r Prot. Corp. v. Vigman*, 587 F. Supp. 1358, 1364 (C.D. Cal. 1984) (Rule 1.11 rooted in protecting "public's trust"). Implied waiver is simply not applicable when public policy is implicated: "When, however, the reason for disqualification implicates the public interest rather than just the relationship between the moving party and the

12

firm to be disqualified, it should be held that waiver and laches defenses do not apply." *In re Raymond Prof'l Grp., Inc.,* 421 B.R. 891, 910 (Bankr. N.D. Ill. 2009).

Allowing an implied waiver from delay is particularly inappropriate here in the context of a Rule 1.11 violation.[7] In the case of an attorney adverse to a former client, where Rules 1.6 and 1.9 govern, courts find delay as a substitute for the express, knowing consent permitted under the rules. *Health Maint. Network v. Blue Cross of So. California*, 202 Cal. App. 3d 1043, 1064, 249 Cal. Rptr. 220, 234 (Ct. App. 1988); *see also Kelley v. Buckley,* 2011-Ohio-1362, ¶ 23, 193 Ohio App. 3d 11, 23–24, 950 N.E.2d 997, 1006. Here, however, Rule 1.11 does not give these Plaintiffs the power to consent to a waiver. Instead, the determination of whether public policy permits the waiver is vested in the attorney's former government employer. Prof. Cond. Rule 1.11(e) ("A disqualification required by this rule may be waived *by the affected client*" (emphasis added)); *Vigman,* 587 F. Supp. at 1363 ("The direct disqualification of a former government lawyer under Paragraph (A) may be waived by the former agency in proper circumstances. Waiver may be in the public interest." (quoting ABA, Notes, Proposed Alternative Model Rules at 306 (May 30, 1981))). Thus, because Plaintiffs have no authority to consent to a waiver, it is inappropriate to apply the implied waiver analysis.

Even if the test urged by Endo is applicable (it is not), the facts here do not support a finding of implied waiver. Importantly, as the party asserting waiver, Endo has the "burden of making a clear showing of the facts from which a finding of waiver may flow." *United States v. Washington*, 18 F. Supp. 3d 1123, 1138 (W.D. Wash. 1987). As noted above and in the Plaintiffs' initial motion, Plaintiffs and their counsel were not made aware of the breadth of Ms. Rendon's knowledge and her intention to take advantage of that knowledge until November 2018, when she began to actively participate in depositions of witnesses she knew. Thereafter, in the midst of an extremely busy discovery period and including the holiday season, Plaintiffs promptly raised the conflict with Ms. Rendon and filed their motion. *See In re Cabe & Cato,*

---

[7] Endo has not cited any case finding an implied waiver of Rule 1.11.

*Inc.*, 524 B.R. 870, 879 (Bankr. N.D. Ga. 2014) (excusing delay because moving party took time to ascertain facts and to make sure motion was "on solid ground"). This brief time from recognition of the conflict until the motion was filed is not excessive. *See Sickle v. State Farm Fire & Cas., Co.,* No. 3:12-CV-0672, 2013 WL 12043482, at *2–3 (E.D. Tenn. Apr. 26, 2013), *objections overruled,* No. 3:12-CV-672-TAV-HBG, 2013 WL 12043470 (E.D. Tenn. Dec. 11, 2013) ("ninety-days does not, in this Court's view, constitute waiver for a conflict"); *HealthNet, Inc. v. Health Net, Inc.*, 289 F. Supp. 2d 755, 763 (S.D.W. Va. 2003) (six month delay not excessive).

With respect to prejudice, many of the cases cited by Endo are distinguishable based on the proximity to trial. *See, e.g., In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 377 (6th Cir. 1999) (motion to disqualify brought six days prior to trial and made seven days after the bankruptcy court had refused to reconsider its order denying a motion for additional discovery); *Reeves v. Town of Cottageville*, No. 2:12-cv-02765, 2014 WL 4231235 (D.S.C. Aug. 26, 2014) (defendants waited until six days before the pretrial conference and thirteen days before the trial before moving to disqualify plaintiff's counsel); *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099 (D.N.J. 1993) (plaintiffs waited until three years after the commencement of litigation and only four months prior to trial). In this case, the trial is now scheduled for late October. *See* Dkt. No. 1303.

Finally, Endo fails to show that Plaintiffs' motion was made in bad faith or motivated by a desire to obtain a tactical advantage. The supposed delay is explained above. That Plaintiffs gave Ms. Rendon the benefit of the doubt and then tried to voluntarily work out a resolution of the conflict shows good faith, not a tactical move. Similarly, given that the conflict here is not the run of the mill situation where an attorney represented one client and now is representing another with adverse interests, the fact that Plaintiffs needed to refine their legal theories when faced with the wrongful conduct is not evidence of bad faith.[8] As the cases cited by Endo make

---

[8] Endo relies on *Alexander v. Primerica Holdings, Inc*., 822 F. Supp. 1099 (D.N.J. 1993) for the proposition that changing legal theories supporting disqualification is evidence of bad faith.

14

clear, more than a few months delay after the nature of the conflict became evident is required to support a finding of bad faith. *See Ike & Sam's Grp., LLC v. Brach*, 138 A.D.3d 690, 692, 29 N.Y.S.3d 53 (N.Y. App. Div. 2016) (two-year and eight-month delay in moving to disqualify when moving party was aware of the alleged conflict of interest prior to the time the action was commenced); *Alexander,* 822 F. Supp. at 1118–20 (three-year delay and motion made after deponents gave testimony inconsistent with affidavits by party which had previously exhibited bad faith in litigating case).

### D. A Deposition of Ms. Rendon Is Appropriate.

A deposition to determine more facts about the extent of Ms. Rendon's personal knowledge is wholly appropriate in these circumstances.[9] *Baker v. BP Am., Inc*., 768 F. Supp. 208, 211 (N.D. Ohio 1991) (finding that there were "compelling arguments" for an attorney's deposition in connection with his role as a fact witness in the case before the attorney was disqualified); *Salatin v. Trans Healthcare of Ohio, Inc.*, 208 F. Supp. 2d 862, 863 (N.D. Ohio 2002) (court ordering deposition of attorney to enable a fair assessment of the need of attorney as a fact witness). Endo contends that Plaintiffs' offers at settlement and good faith negotiations somehow evidence the lack of need for her deposition. It does not. Plaintiffs tried to resolve the issue of Ms. Rendon's improper representation in a way that was mutually agreeable to all parties and to avoid the time, effort, and expense of full briefing on the issue during one of the busiest times in the case. The Plaintiffs' offers of compromise should not be weaponized against them.

---

*Alexander* made no such holding. Instead, the conduct alleged as bad faith was the plaintiffs abandoning their prior position that substantive relief needed to be expedited following depositions that established perjury by their witnesses. *Id.* at 1119-20.

[9] This Court can order the deposition conditioned on the assent of the DOJ in response to the pending *Touhy* request for Ms. Rendon's testimony.

## III. CONCLUSION

Plaintiffs acknowledge that the disqualification of Ms. Rendon and her firm would be consequential. However, Defendants' continued access to and use of Ms. Rendon's unique knowledge and insights from her time in the United States Attorney's Office for the District where the CT1 Plaintiffs come from is greatly damaging, not only to the CT1 Plaintiffs, but to the integrity and public's perception of this important litigation and the legal process as a whole. Endo's Opposition ignores these important public policy considerations and instead focuses narrowly on artificial legal technicalities, which is wholly at odds with the spirit and letter of the ethical rules. This Court should not do the same.

Respectfully submitted,

*s/Mark Pifko*
Mark Pifko
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Los Angeles, California 91436
(818) 839-2325
(818) 986-9698 (Fax)
mpifko@baronbudd.com
*Counsel for City of Cleveland*


*s/Linda Singer*
Linda Singer
**MOTLEY RICE**
401 9th St. NW, Ste 1001
Washington, DC 20004
(202) 386-9626
lsinger@motleyrice.com
*Counsel for Summit County
  and City of Akron*

*s/Hunter Shkolnik*
Hunter Shkolnik
**NAPOLI SHKOLNIK**
360 Lexington Ave., 11th Flr
New York, NY 10017
(212) 397-1000
hunter@napolilaw.com
*Counsel for Cuyahoga County*


*s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
**SPANGENBERG SHIBLEY & LIBER**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com
*Plaintiffs' Liaison Counsel*


**CERTIFICATE OF SERVICE**

I hereby certify that on January 31, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*s/Mark Pifko*
Mark Pifko
*Counsel for Plaintiff the City of Cleveland*