# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | CASE NO. 1:17-MD-2804 |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: *"Track One Cases"* | ) ) ) | |
| | ) ) ) | DISCOVERY RULING NO. 14, PART 1, REGARDING PRIVILEGE AND CLAW-BACK |

During Track One discovery, the parties have: (1) withheld production of certain documents based on attorney-client privilege, the work product doctrine, or other assertions; and (2) clawed back allegedly privileged documents that were "inadvertently" produced.[1] In numerous instances, opposing counsel has then challenged these designations or claw-backs and asked the undersigned to perform in camera review.

This Ruling addresses some of the parties' challenges. The Special Master will address other privilege and confidentiality challenges in subsequent Rulings.[2]

Given the substantial letter briefing already submitted on the topics addressed below, if any party chooses to object to any aspect of this Ruling, it must do so on or before 5:00 p.m EST on February 4, 2019.

---

[1]  *See* Case Management Order No. 2 (docket no. 441) §IX at 25-28 (setting out "claw-back" provisions applicable to "Inadvertent Production of Documents").

[2]  The Special Master intends to issue additional Rulings on the topics of attorney-client privilege and work-product doctrine using the caption "Discovery Ruling No. 14, Part 2," and so on. Unless otherwise stated, the conclusions stated in this and any other such Ruling rely solely on the legal standards set out below and not on any statements made in Judge Polster's 11/21/18 ruling.

**I.      Legal Standards.**

    **A.      Attorney-Client Privilege.**

"The Sixth Circuit has set forth the essential elements of the attorney-client privilege: '(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser, (8) unless the protection is waived.'" *Ohio A. Philip Randolph Institute v. Smith*, 2018 WL 6591622 at *2 (S.D. Ohio Dec. 15, 2018) (quoting *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)). When asserting the attorney-client privilege, "[t]he burden of establishing the existence of the privilege rests with the person asserting it." *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 2000).

"The party claiming an attorney-client privilege not only bears the burden of proving that the privilege applies, but must also show that the privilege has not been waived." *Davis v. Drake*, 2014 WL 5795554 at *3-4 (N.D. Ohio Nov. 6, 2014).  The privilege is waived "by voluntary disclosure of private communications by an individual or corporation to third parties." *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996).  Production or disclosure of privileged documents to a government agency constitutes a waiver of attorney-client privilege. *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289 (6th Cir. 2002).

"A communication between non-lawyers is generally not protected under the attorney-client privilege unless the 'dominant intent is to prepare the information in order to get legal advice from the lawyer.'" *In re Behr Dayton Thermal Prod., LLC*, 298 F.R.D. 369, 375 (S.D. Ohio 2013). Moreover, a "communication is not privileged simply because it is made by or to a person who happens to be an attorney.  To be privileged, the communication must have the *primary* purpose of

2

soliciting legal, rather than business, advice." *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607 at *1 (N.D. Ohio Apr. 9, 2007) (internal quotation marks and citations omitted, emphasis in original). "A communication is not privileged simply because it is made by a person who happens to be an attorney." *Zigler v. Allstate Ins. Co*., 2007 WL 1087607 at *1 (N.D. Ohio Apr. 9, 2007); *see In re Vioxx*, 501 F.Supp.2d 789, 798 (E.D. La. 2007) ("Legal counsel does not always render, and is not always expected to render, exclusively legal assistance."). "It is now generally accepted that communications between an attorney and client of primarily a business nature are outside the scope of the privilege." *Glazer v. Chase Home Finance LLC*, 2015 WL 12733394 at *4 (N.D. Ohio Aug. 5, 2015). When "in-house counsel appears as one of many recipients of an otherwise business-related memo, the federal courts place a heavy burden on the proponent to make a clear showing that counsel is acting in a professional legal capacity and that the document reflects legal, as opposed to business, advice." *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514 at *3–6 (S.D. Ohio Nov. 13, 2012).

Ultimately, "[c]laims of attorney-client privilege are 'narrowly construed because [the privilege] reduces the amount of information discoverable during the course of a lawsuit.'" *In Re Columbia/HCA*, 293 F.3d at 294 (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)). The privilege "applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir.1986) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1975)).

**B.     The Work Product Doctrine.**

The work product doctrine "is distinct from and broader than the attorney-client privilege." *In re Antitrust Grand Jury*, 805 F.2d at 163 (quoting *United States v. Nobles,* 422 U.S. 225, 238 n.

11 (1975)). The doctrine is designed to allow an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 51 (1947). The doctrine is set out in Fed. R. Civ. P. 26(b)(3)(A): "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," but those materials may be discovered if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

So-called "fact" work product, which is the "written or oral information transmitted to the attorney and recorded as conveyed by the client," *In re Antitrust Grand Jury*, 805 F.2d at 163, may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship. *Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335, 339–40 (6th Cir.1988). Absent waiver, however, a party may not obtain the "opinion" work product of his adversary – that is, "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories." *In re Antitrust Grand Jury*, 805 F.2d at 163–64 (citations omitted). Documents "prepared by a corporation as part of efforts to ensure compliance with federal regulatory agencies . . . and not because of possible litigation, are not protected by work-product doctrine." *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514 at *6 (S.D. Ohio Nov. 13, 2012) (quoting *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2009 WL 4641707 at *3 (E.D. Pa. Dec.7, 2009)).

**II.    Analysis.**

    **A.    Documents Clawed Back by Cardinal Health (Agenda Item 82).**

Plaintiffs and Defendant Cardinal Health seek a ruling on a dispute that arose during the November 27, 2018 deposition of Cardinal's corporate representative, Eric Brantley. During deposition, Plaintiffs introduced documents produced by Cardinal. Cardinal immediately asserted the documents had been inadvertently produced and were protected under the attorney-client privilege and/or work-product doctrine. Accordingly, Cardinal formally clawed-back the three documents. The parties have been unable to reach an agreement on whether this claw-back is appropriate, so they ask the Special Master to rule.

The documents at issue include an email thread between Cardinal's in-house and outside counsel, as well as two attached charts.[3] The charts summarize factual information related to certain aspects of Cardinal's Suspicious Order Monitoring System ("SOMS"), such as its organizational structure, personnel changes, and types of training provided, during different time periods. The email conveys the charts from in-house to outside counsel; the only substantive aspect of the email thread occurs when outside counsel asks who created the charts. (Answer: an in-house paralegal.) In its submission to the undersigned, Cardinal explains that the two charts are updated versions of a chart provided years earlier to the DEA, and the earlier chart has been produced to Plaintiffs in this case. Cardinal asserts that, after the DEA served an administrative warrant on Cardinal's Lakeland, Florida distribution center, Cardinal updated the earlier chart for use by "internal and external counsel and senior leadership in the defense of an existing or anticipated DEA legal action."

The three documents at issue, however, are entirely devoid of legal advice. Identification

---

[3] The email is Bates-stamped CAH-MDL2804_02142793, while the charts are Bates-stamped CAH-MDL2804_02142794-2801 and CAH-MDL2804_01522227-2234.

of the author of the charts in the email itself is innocuous, and the charts simply set out factual information of a business nature regarding Cardinal's SOMS – the same business information summarized in the earlier version of the chart that Cardinal produced to the DEA and has been produced to Plaintiffs in this litigation. Cardinal has simply not met its burden of establishing that attorney-client privilege applies to the email thread or the charts.[4]

In addition, the parties' submissions leave it at best unclear how to categorize the DEA's "legal" action against Cardinal. Cardinal asserts, without further explanation, that it created the charts after receiving a DEA administrative warrant. But the relevant regulations (21 C.F.R. §§1316.01-13) address administrative inspections, which is not "litigation;" and inspections requiring an administrative warrant as set forth in 21 C.F.R. Part 1316, Subpart A, are not necessarily followed by litigation. Cardinal's assertion that it was anticipating litigation is entirely bare. (This despite the Special Master's request for additional submissions explaining the authorship and context of the charts.) Accordingly, the Special Master concludes Cardinal also has not carried its burden of showing the email thread or the two charts are protected by the work-product doctrine. They must be produced.

Moreover, even granting Cardinal the benefit of the doubt that the DEA administrative action was "litigation," the charts are still discoverable upon a showing by Plaintiffs of substantial need and an inability to otherwise obtain the information by other means without material hardship. *See* Fed. R. Civ. P. 26(b)(3)(A); *Toledo Edison Co.*, 847 F.3d at 339-40. The overwhelming nature of

---

[4] Even if the email chain itself is protected by the attorney-client privilege, it does not follow that the attached charts are automatically protected from discovery. *See Smith*, 2018 WL 6591622 at *3 (holding that attachments in an email were not protected by attorney-client privilege where the attachments themselves did not contain legal advice but instead contained preexisting factual records).

the two charts is that they summarize factual information related to a critical business matter – Cardinal's Suspicious Order Monitoring System. Plaintiffs assert, and the Special Master agrees, that they have a substantial need for this factual information. Cardinal's discovery responses do not provide the same information in as clear or specific a fashion. Further, Plaintiffs have no way to obtain this information absent undue hardship, other than from Cardinal itself.

In sum, the Special Master concludes the email thread and the two charts are not protected from production by attorney-client privilege or the work product doctrine. Further, even if the documents are attorney work product, they must be produced pursuant to the "substantial need" exception set forth in Fed. R. Civ. P. 26(b)(3)(A).

B. **Documents on Walgreens' First Privilege Log (Agenda Item 64).**[5]

In its First Privilege Log, Walgreens listed 27 documents. Plaintiffs challenge Walgreens' assertion of privilege, arguing any privilege has been waived. Specifically, Plaintiffs note that Walgreens previously produced all of these documents to the DEA in 2012; Plaintiffs assert this prior production to a third party worked to waive any current claim of privilege. *See In re Columbia/HCA*, 293 F.3d at 293 (affirming the district court's ruling that "voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege to all other adversaries").

Walgreens answers that, in 2012, it filed a motion to compel the return of the documents at issue. But that motion to compel sought the return of only two emails, and the motion was dismissed on procedural grounds. Put simply, Plaintiffs have made a prima facie showing of waiver,

---

[5] This ruling was originally issued via email on January 18, 2019, and Walgreens timely requested it be formalized.

and Walgreens has not carried its burden of showing otherwise.

Walgreens also asserts the documents are not even relevant, because they contain information about dispensing, not distribution. *See* Discovery Ruling No. 8 (docket no. 1055) (holding that pharmacies must produce only certain types of dispensing information). Some of the documents do appear to be related primarily to dispensing and not distribution; others appear to have at least some nexus to distribution. The Special Master and the Court do not have time, at this point in the litigation, to assess whether individual documents listed in a privilege log should be produced or withheld based on relevance; at least some of them are relevant. Having concluded none of them are privileged, Walgreens must now produce all of them.

C. **Cardinal Clawback of 2.8 Million Documents (Agenda Item 129).**

Plaintiffs and defendant Cardinal also seek a ruling on a dispute that arose during the August 7, 2018 deposition of Jennifer Norris, Cardinal's corporate representative. During the deposition, counsel for Cardinal clawed back an exhibit which was an email chain between Cardinal, outside counsel for Cardinal, and a third-party consultant. Upon review, Cardinal then realized the exhibit was one of about 2.8 million documents that Cardinal had: (a) originally produced to the DEA in 2008 during a regulatory action, and then (b) produced again in this MDL as a "prior production." *See* CMO-1 at 15 (docket no. 232) ("Defendants shall review documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities involving the marketing or distribution of opioids and shall produce to the PEC non-privileged documents relevant to the claims in this MDL proceeding."). Cardinal contends the Norris exhibit and all of the other 2.8 million documents: (1) were inadvertently produced to the DEA in 2008, (2) were inadvertently produced again in the

MDL, (3) contain privileged information or communications, and (4) are all appropriately clawed back.

More specifically, after the Norris deposition, Cardinal conducted a review of the entire DEA "prior production" and now seeks to claw back three categories of documents produced in this MDL:

1. Five discs produced to DEA in 2008 that contained privileged documents (the "Category One Documents"). These discs were clawed back from the DEA in 2008 and replacement discs excluding the privileged documents were produced to DEA. Cardinal produced both sets of discs – the ones originally produced to the DEA but then clawed back, and also the replacement discs given to the DEA in 2008 – in this MDL.

2. Additional documents produced to DEA in 2008 that Cardinal Health now contends are privileged, or contain privileged information (the "Category Two Documents"), but did not so contend in 2008.

3. Documents that contain Summation load files and related TIFF images (the "Category Three Documents"). While native files were produced to DEA in 2008, the Summation load files and TIFF images were not.

In the event of inadvertent disclosure of privileged materials, Fed. R. Evid. 502(b) states: "When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; *and* (3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B)." (Emphasis added). In addition, CMO-2 states: "If, nevertheless, a Producing Party discloses Privileged Information, such disclosure (as distinct from use) shall be deemed inadvertent without need of further showing under Federal Rule of Evidence 502(b) and shall not constitute or be deemed a waiver or forfeiture of the privilege or protection from discovery in this case or in any other federal or state proceeding by that party (the 'Disclosing Part'"). This Section shall be interpreted to provide the maximum protection allowed by Federal Rule of Evidence

9

502(d)." Docket no. 441 at 25.

Although Cardinal Health is correct that CMO-2 intends to permit the parties to claw back privileged information without necessarily meeting all the requirements of Fed. R. Evid. 502(b), this Rule was still wholly applicable to Cardinal's 2008 production to DEA. Cardinal has not shown that it complied with Rule 502(b) when it produced the **Category Two Documents** at issue in 2008. Had Cardinal "promptly" attempted to claw back privileged information from DEA in 2008, and otherwise demonstrated it met the requirements of of Rule 502(b), then it would be permitted to claw back the documents now. Cardinal acknowledges, however, that it produced privileged documents to the DEA in 2008 and never sought to claw them back from the DEA – it only now seeks to claw back those documents from MDL Plaintiffs, more than 10 years after they were first produced to DEA. Essentially, Cardinal waived privilege as to all Category One documents when it produced them unreservedly to the DEA in 2008, and that waiver remains. While the Special Master is sympathetic to Cardinal's assertion that the DEA action in 2008 concluded shortly after it produced these documents, so Cardinal never had a need to make any further determinations regarding privilege or claw-back, the Special Master concludes Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced in 2008.

The Special Master further concludes, however, that Cardinal did not waive privilege in connection with the **Category One Documents**, and may claw them all back now. In 2008, when Cardinal determined it had inadvertently produced to the DEA five discs that contained privileged materials, it timely clawed them back and, as stated in the Tucker Declaration, "replacement discs excluding the privileged documents were produced to DEA." Essentially, Cardinal has demonstrated the Category One Documents were not ultimately produced to the DEA. Cardinal's

production of those documents in this MDL meets the three-part test recited above, so Cardinal may now claw them back.

Finally, with respect to the **Category Three Documents**, Cardinal Health never produced the Summation load files and TIFF images to DEA in 2008; it only produced native files to DEA. Accordingly, there is no need to examine whether Cardinal complied with the requirements of Rule 502(b) in 2008 in connection with the Category Three Documents.  Because these documents were inadvertently disclosed for the first time in this MDL, the agreement related to inadvertent disclosures contained in CMO-2 applies.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**Dated: January 31, 2019**