**UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**CARDINAL HEALTH'S OBJECTION TO DISCOVERY RULING NO. 14, PART I**

**Introduction**

Discovery Ruling No. 14, Part I, includes three rulings.[1] Two concern Cardinal Health and are the subject of this objection. First, Cardinal Health's claw-back of privileged documents that it inadvertently produced to DEA in 2008 in connection with a DEA investigation and promptly sought to claw back when it learned about the inadvertent production during the course of this litigation. Second, an email chain between in-house and outside counsel for Cardinal Health concerning a chart, in the nature of a demonstrative exhibit, that was prepared at the direction of counsel for potential use in contesting a DEA action against the Company, as well as the chart itself.

The Special Master erred in concluding that: (1) Cardinal Health did not comply with Rule 502(b) in 2008 and (2) the email chain and charts were neither a privileged communication nor protected by the work product doctrine.

---

[1] Dkt. No. 1321 ("the Ruling").

# I.
# THE "CATEGORY TWO" DOCUMENTS

### A. The Relevant Procedural Background.

The following background is material to the first ruling identified above relating to Cardinal Health's claw-back of privileged documents inadvertently produced to DEA in 2008. CMO-1 required defendants to produce documents "previously produced" that are "relevant to the claims in this MDL proceeding"[2] and imposed a two-month deadline. Cardinal Health produced nearly three million pages of documents in accordance with CMO-1—far more than any other distributor. To comply with CMO-1, Cardinal Health worked quickly to identify, locate, call back from storage, and prepare those documents for production, including documents produced to DEA in 2007 and 2008.[3] The latter documents had been subjected to four levels of review by Cardinal Health's outside counsel when they were produced to DEA in 2007-2008.[4] In the very compressed timeframe set forth by CMO-1, it was not feasible for Cardinal Health's attorneys to re-review, before production in this litigation, the millions of pages of documents produced in earlier litigation.

Federal Rule of Evidence 502(b) provides: "When made in a federal proceeding …, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error …." Further, given the accelerated schedule imposed by CMO-1, CMO-2 relaxed the requirements of Rule 502(b), stating: "If, nevertheless, a Producing Party discloses Privileged Information, such

---

[2]  *See* CMO-1 ¶ 9(k)(ii).

[3]  *See* Declaration of Robert Tucker ¶¶ 3–4 (attached as Exhibit A).

[4]  *Id.* ¶¶ 17–18.

disclosure (as distinct from use) shall be deemed inadvertent without need of further showing under Federal Rule of Evidence 502(b) and shall not constitute or be deemed a wavier or forfeiture of the privilege or protection from discovery in this case or in any other federal or state proceeding by that Party …. This Section shall be interpreted to provide the maximum protection allowed by Federal Rules of Evidence 502(d)."[5]

At page 9 of the Ruling, the Special Master refers to three categories of documents that Cardinal Health seeks to claw-back from its 2008 production to DEA.[6] The Category One and Three documents are *not* at issue in this appeal:

- Category One documents were produced to DEA in 2008 and clawed back by Cardinal Health at that time. The Special Master ruled that Cardinal Health "may claw them all back now."

- Category Three documents were not produced to DEA and were inadvertently disclosed for the first time in this proceeding. The Special Master ruled that "CMO-2 applies," permitting claw-back.

The Category Two documents *are* in dispute:

- Category Two documents were produced to DEA in 2008. Cardinal Health recognized that they had been inadvertently produced and sought their return shortly after a document from that production was marked as a deposition exhibit on August 7, 2018.

    **B.    The Relevant Facts.**

The Robert Tucker Declaration explains in detail the circumstances of the 2007-2008 document production to DEA and why production of the Category Two documents was inadvertent.[7] In brief, Cardinal Health produced to DEA a tremendous volume of documents at

---

[5]  CMO-2 at ¶ 53.

[6]  The Special Master ruled separately as to one document (an email chain with attached charts). That ruling is the subject of Part II, *infra*. The Special Master refers to the three categories together as containing 2.8 million documents. Ruling at 8. The number of *pages* total approximately 2.8 million; the number of documents is approximately 402,000.

[7]  Tucker Decl. ¶¶ 17–19 (Exhibit A).

3

great speed under the immediate threat of suspension of its registration for four distribution centers. Outside counsel for the company conducted a privilege review of hard-copy documents, and a combination of outside counsel and contract lawyers conducted a four-level review of electronically-stored information. When it made the production, Cardinal Health expressly stated that it did not intend to waive privilege over produced documents and reserved the right to claw-back any inadvertently produced material. *Id.* ¶ 19. Cardinal Health acted on that intention when, before settlement with DEA, it clawed back privileged documents it discovered had been produced inadvertently.

Because the matter promptly settled, however, there was no hearing or other proceeding in which DEA might have made use of the documents. For that reason, Cardinal Health had no reason to revisit the 2008 production or reason to believe there were privileged documents in the documents to be re-produced. Cardinal Health remained unaware that it had produced privileged documents until August 2018—when its corporate representative was deposed in this litigation and a plainly privileged document was marked as an exhibit—that other privileged documents had apparently been produced to DEA years before. Cardinal Health asserted the privilege at the deposition, promptly carried out an inquiry to determine how the document came to be produced, and determined that the deposition exhibit was part of what are now labeled the Category Two documents.[8] Per CMO-2, Cardinal Health then sent a claw-back demand to Plaintiffs. Cardinal Health also sent DEA a claw-back demand.

### C. Cardinal Health Did Not Waive Privilege for Category Two Documents.

The Special Master did not fault Cardinal Health's compliance with CMO-2; rather, he

---

[8] The issue was briefed before the Special Master. *See* Exs. B, C, D, and E (submitted *in camera*).

held that CMO-2 did not apply to the Category Two documents because he found that Cardinal Health waived any privilege by not seeking to claw them back from DEA in 2008. Ruling at 10 ("Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced in 2008.").

The Ruling is mistaken as to a point of fact and also the applicable legal rule. First, the Special Master found that "Cardinal waived privilege as to all Category [Two] documents when it produced them ***unreservedly*** to the DEA in 2008." *Id*. (emphasis added).[9] Cardinal Health did not produce the documents unreservedly. It made two express reservations:

> Please be advised that by producing the above documents and all other documents previously provided to DEA, ***Cardinal Health does not intend to waive the protection of the attorney work- product doctrine, attorney-client privilege, or any other applicable privilege, protection or immunity***.
>
> Cardinal Health has screened … all documents produced for privilege … before they are produced to the Government. Because of the volume of records that have been produced and that will continue to be produced and the speed with which Cardinal Health is attempting to produce them, ***Cardinal Health requests and expects that DEA will return to Cardinal Health, upon request, any documents that we later discover to be privileged or otherwise protected and to have been inadvertently produced***.[10]

This reservation is important because it goes hand-in-hand with the legal rule that governs timely claw-back demands.

The Ruling does not cite any legal authority, but proceeds from the premise that Cardinal Health was obligated to discover the inadvertent disclosure and seek a claw-back of the

---

[9] The quoted sentence says "Category One documents," but that is surely a typographical error, as the paragraph expressly addresses "the **Category Two Documents**," and the next paragraph holds that "Cardinal did not waive privilege in connection with **Category One Documents**, and may claw them all back now." Ruling at 10 (emphases in original).

[10] Tucker Decl. ¶ 19 (Exhibit A) (emphasis added).

5

documents at the time of production ("Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced"), even though it made no sense for Cardinal to be re-reviewing its production then ("the Special Master is sympathetic to Cardinal's assertion that the DEA action in 2008 concluded shortly after it produced the documents, so Cardinal never had a need to make any further determinations regarding privilege or claw-back").[11]

Under the applicable legal authority, however, the fact that Cardinal "never had a need to make any further determinations regarding privilege," as recognized by the Special Master, establishes that Cardinal did *not* waive privilege.  The Advisory Committee note to Rule 502(b) makes this clear:  "The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake."  *See also Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 2011 WL 13076888, at *2 (N.D. Ohio Jan. 26, 2011) (same).  The relevant time period for purposes of waiver is not how much time lapses after the documents are inadvertently produced, but how much time lapses after the inadvertent production has been discovered.  *Id.* at *3 (producing party did not waive where they "took prompt steps to recall the documents *once they realized that they had been disclosed*." (emphasis added)).  A party's "duty to rectify *only arises when the opposing party can prove actual knowledge of the disclosure*," so "when the documents were first produced does not affect whether [producing parties'] response to their inadvertent disclosure was 'prompt.'"  *United States ex rel. Health v. Wis. Bell Inc.*, 272 F. Supp. 3d 1094, 1098 (E.D. Wis. 2017) (emphasis added).  It is the time of discovery that starts the clock running on the producing party's diligence in seeking to recover the documents.  *Absolute Activist Value Master Fund Ltd.*

---

[11]  Ruling at 10.

*v. Devine*, 262 F. Supp. 3d 1312, 1323 (M.D. Fla. 2017) (a party cannot "fail to take steps to rectify an inadvertent disclosure *once one has been discovered*") (emphasis added).

Thus, courts have recognized that, when a case settles, a party may have no reason to discover an inadvertent production.  *Cf. McDermott Will & Emery LLP v. Superior Court*, 217 Cal. Rptr. 3d 47, 67 (Ct. App. 2017) (explaining that a "motion to declare the e-mail privileged was not necessary because the Probate Action settled before anyone used" it).  And courts have also recognized that years can pass before the inadvertent production is discovered.  In *West Penn Allegheny Health System, Inc. v. UPMC*, the court held that a five-year gap between production and claw-back "should not count against" the producing party because "[t]here was no discovery during that time period" and the law firm later retained to represent the producing party in another suit "had no reason or need to review discovery already made …."  2013 WL 12141531 at *5 (W.D. Penn. Apr. 9, 2013).  The court measured delay from the time of discovery, not from the time of the disclosure itself.  *Id.*

The Special Master did not question Cardinal Health's representation that its new counsel in this litigation (Williams & Connolly LLP) discovered the inadvertent production of the Category Two documents only after discovery in this litigation was underway and then acted promptly, and in accordance with CMO-2, to seek their return.  The Ruling therefore is in error, and this Court should find that no waiver has occurred with respect to the Category Two documents.

## II.
## THE EMAIL & ATTACHED CHARTS

### A.  The Relevant Facts.

At depositions of two Cardinal Health former employees on November 27 and November 30, 2018, Plaintiffs marked as exhibits an email chain between in-house and outside counsel

7

(Milbank Tweed) and charts that compared features of Cardinal Health's Suspicious-Order Monitoring (SOM) system in November 2005–December 2007, post-December 1, 2007, and as of December 31, 2011.  Counsel for Cardinal asserted privilege at the depositions and requested return of the documents pursuant to CMO-2.[12]

The email exchange consists of four emails between February 5 and February 8, 2013. When these emails were exchanged, there was a pending DEA enforcement action involving Cardinal Health's Lakeland, Florida distribution center—an action that was not settled until 2016.  Also pending was a shareholder demand letter regarding the Board of Directors' oversight of the company's distribution of prescription opioids.  Cardinal Health had retained Milbank Tweed as counsel to the Special Demand Committee of the Board to investigate the shareholder allegations.

Milbank Tweed asked in-house counsel, Mr. Goldsand, when the chart had been prepared; Mr. Goldsand asked a paralegal in the Cardinal Health litigation department to provide him a Word version of the chart; and he then forwarded the document and question to Mr. Mone. The charts were created by a litigation paralegal at Cardinal Health at Mr. Goldsand's and outside counsel's direction after DEA had served an administrative warrant on Cardinal Health's Lakeland, Florida distribution center.

As is evident from the face of the documents, the charts reflect one possible strategy for responding to DEA—a comparative illustration to DEA that the system was state-of-the-art as of December 31, 2011.  Milbank Tweed expressed interest in the charts for similar reasons—

---

[12] The underlying privileged documents were provided to the Special Master as an attachment to Plaintiffs' submission.  *See* Ex. F (submitted *in camera*).  Cardinal Health submitted its Response to the Special Master.  *See* Ex. G (submitted *in camera*).

8

because they may have been relevant to its privileged investigation of shareholder allegations.[13] *See* Discovery Ruling Regarding the "Teamsters Materials," Dkt. No. 835, Aug. 1, 2018 (upholding privilege over documents reviewed by counsel as part of a shareholder investigation).

In the end, neither outside counsel in the DEA litigation, nor Milbank Tweed disclosed the charts to DEA or anyone else.

### B. The Charts Are Protected Work Product.

The Court need not reach the question of whether the email chain and charts are privileged communications (*see* section C), for the work product doctrine clearly applies. The Ruling is erroneous in two respects.

First, the Special Master questioned whether the charts were prepared "in anticipation of litigation." It was unclear, the Ruling said, "how to categorize the DEA's 'legal' action against Cardinal" in 2012. Was it litigation or just an inspection pursuant to administrative warrant?[14] The course of events makes clear that the DEA action was more than a mere administrative inspection. Inspections occur regularly, without use of an administrative inspection warrant. Counsel's reasonable anticipation of litigation proved accurate, for DEA's filing of the show-cause order was followed by four years of litigation (Cardinal Health filed a lawsuit in federal district court to enjoin the enforcement action), investigations by U.S. District Attorneys in

---

[13] The Ruling (at 6) states that Cardinal Health did not meet the "Special Master's request for additional submissions explaining the authorship and context of the charts." But, in response to the Special Master's inquiries, counsel for Cardinal Health did provide a proffer of additional information regarding the context and authorship of these documents *in camera* on December 17, 2018, along with an affirmative offer to provide declarations from the individuals who served as the basis for the information supplied by counsel, if the Special Master required. *See* Ex. H (submitted *in camera*). These declarations were prepared in December and were ready to be provided to the Special Master upon request. *See* Exs. I and J (submitted *in camera*).

[14] Ruling at 6.

9

Florida, Maryland, New York, and Washington State, and negotiations that resulted in settlements in 2016 obligating Cardinal Health to pay $44 million "[t]o avoid the delay, expense, inconvenience, and uncertainty of litigation of the [DOJ's] claims." It may be, as the Special Master said, that "inspections … are not necessarily followed by litigation," but this was no routine inspection and the related litigation and settlement make that clear. Plaintiffs, in the Track 1 complaints, refer to this and similar DEA actions as "administrative action[s] … to force compliance."[15] And while Cardinal Health does not agree with the hyperbole used, Plaintiffs themselves have claimed that the "administrative inspection warrant" that was issued was equivalent to a criminal search warrant.

Moreover, both the Northern District of Ohio and Sixth Circuit held explicitly that documents prepared during or before an administrative proceeding may be "in anticipation of litigation" and therefore protected. *See United States v. Roxworthy*, 457 F.3d 590, 600 (6th Cir. 2006) (documents prepared "in anticipation of dealing with the IRS" merit work-product protection); *United States v. Eaton Corp.*, 2012 WL 3486910 at *10 (N.D. Ohio Aug. 15, 2012) (documents prepared "in connection with the IRS's examination of [defendant's] 2005 and 2006 tax returns are aptly characterized as prepared 'in anticipation of litigation.'"). It may be said of a tax audit, as well as of an administrative inspection, that it is "not necessarily followed by litigation." But *Roxworthy* and *Eaton* stand for the proposition that litigation need not be inevitable for defense counsel's preparation to be "in anticipation of litigation."

To be sure, a party "must have had a subjective belief that litigation was a real possibility." *Roxworthy*, 457 F.3d at 594. But that case is instructive as to what circumstances

---

[15] *See, e.g.*, Complaint at ¶ 212, *City of Cleveland v. AmerisourceBergen Drug Corp., et al*,, No. 68 Civ. 394 (Mar. 6, 2018); Complaint at ¶ 739*, County of Cuyahoga v. Purdue Pharma L.P., et al,* CV 17 888099 (Oct. 27, 2017).

give rise to a reasonable belief that litigation is—not likely—but possible. In *Roxworthy*, the IRS had not yet undertaken *any* action against the defendant, but because the defendant's transactions implicated an unsettled area of law and the IRS had "demonstrated an inclination to litigate in that area," the court held that the documents were prepared "in anticipation of litigation." *Id.* at 597. The same is true here. Just how distributors were to monitor suspicious orders was unsettled, as the Government Accounting Office found in a 2015 report. It said that DEA had inexplicably failed to provide guidance to distributors (as it had for pharmacies and physicians).[16] And DEA certainly had demonstrated an inclination to litigate in the area, as the Track 1 Complaints all attest, citing "178 registrant actions [brought by DEA] between 2008 and 2012."[17]

Even apart from this history of active DEA enforcement in the years immediately preceding DEA's action against Cardinal Health in 2012, it is well-established that "investigation by a federal agency presents more than a remote prospect of future litigation, and provides reasonable grounds for anticipating litigation sufficient to trigger application of the work-product doctrine." *Martin v. Monfort, Inc.*, 150 F.R.D. 172, 173 (D. Colo. 1993); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F.Supp. 491, 513 (D.N.H. 1996); *In re Grand Jury Subpoena*, 220 F.R.D. 130, 147 (D. Mass 2004) ("Many courts have held … and this Court agrees, that once a

---

[16] United States Government Accountability Office, *Prescription Drugs: More DEA Information about Registrants' Controlled Substances Roles Could Improve Their Understanding and Help Ensure Access* (June 2015) ("while DEA has created guidance manuals for pharmacists and practitioners, the agency has not developed a guidance manual or comparable document for distributors;" "although DEA may not be able to provide guidance that will definitively answer the question what constitutes a suspicious order or offer advice about which customers to ship to, DEA could … provide guidance around best practices in developing suspicious orders monitoring systems").

[17] *See* Complaint at ¶ 534, *City of Cleveland v. AmerisourceBergen Drug Corp., et al,*, No. 68 Civ. 394 (Mar. 6, 2018).

11

governmental investigation has begun, litigation is sufficiently likely to satisfy the 'anticipation' requirement."). Here, the issuance of an administrative inspection warrant by the DEA created a reasonable anticipation of litigation. Therefore, documents like the two charts, prepared to dissuade the DEA from proceeding or to rebut its allegations that Cardinal Health's SOM system had not improved to address new challenges, are protected work product.

The second respect in which the Ruling is erroneous as to work product is that "even granting Cardinal the benefit of the doubt that the DEA administrative action was 'litigation,'"[18] the Special Master found that Plaintiffs had shown a substantial need for the charts and an inability to obtain the information otherwise. That finding is not explained, however; all that the Ruling says by way of explanation is that "Cardinal's discovery responses do not provide the same information in as clear or specific a fashion."[19] That is akin to a "best evidence" standard, however, and the case law is clear that a movant cannot demonstrate a "substantial need" and overcome work product protection by asserting that the documents in question are better evidence. A plaintiff must show that the documents are "sufficiently unique and important, as compared to other possible sources of the same information, to justify overriding work product protection." *Carr v. C.R. Bard, Inc.*, 297 F.R.D. 328, 333–34 (N.D. Ohio 2014). The "understandable desire for (possibly) more probative evidence … does not demonstrate substantial need …, much less that equivalent evidence could not be generated except with undue hardship." *Id.*; *Toledo Edison Co. v. G.A. Technologies,* 847 F.2d 335 (6th Cir. 1988) ("The plaintiffs must shoulder the burden of showing that they have substantial need of [the documents] and that they are essentially unable to obtain their equivalent.").

---

[18] Ruling at 6.

[19] *Id.* at 7.

The charts do not contain unique information about Cardinal Health's SOM system. What the features of the system were at various times and how they have changed over time is information contained in Cardinal Health's written discovery responses and in Cardinal Health's production to date of more than 4.3 million pages of documents. Importantly, information about this time period is also available from employees who have had direct responsibility for the SOM system since 2008—including employees who have been scheduled for depositions, ***but who have yet to be deposed***.[20]  *See In re Dayco Corp. Derivative Securities Litigation*, 102 F.R.D. 468, 470 (S.D. Ohio 1984) (plaintiffs did not demonstrate "substantial need" or "undue hardship" where they could depose individuals who could, "arguably at least, provide the information found" in the protected materials); *Stampley v. State Farm Fire & Cas. Co.*, 23 Fed. Appx. 467, 471 (6th Cir. 2001) (plaintiff did not show "substantial need and undue hardship" because she could have deposed the people who prepared the protected materials).

In *Laws v. Stevens Transport, Inc.*, 2013 WL 608046, at *3 (S.D. Ohio Feb. 19, 2013), the Southern District of Ohio held that plaintiffs failed to meet their burden of establishing substantial need where they did not show that "without the [materials], they are unable to present a case of either liability or damages."  The court observed that "nothing suggests that the withheld [materials] contain vital information which can be obtained only by viewing them, and not from [other sources].  And there is no allegation or proof that [a witness] has no recollection, or only a vague one, of the [incident]." *Id.* at *4.  The same is true here, and the Special Master did not find otherwise.  What distinguishes the two charts from the other information in

---

[20]  Michael Mone, who oversaw Cardinal Health's anti-diversion program from approximately 2008 to 2012, will be deposed on February 22.  The deposition of Todd Cameron, Mr. Mone's successor as of 2012, is also forthcoming.  Plaintiffs already have deposed several other individuals concerning the details of Cardinal Health's anti-diversion program from the early 2000s through the present.

13

Plaintiffs' possession about Cardinal Health's SOM system is that the charts contain attorneys' advocacy in a comparison of the features of the system at different times.  But it is that very aspect of the charts that reflects the thinking of counsel about how best to make Cardinal Health's defense to the DEA's enforcement action—an approach that counsel thought better of and did not employ.  The charts are not a mere summary of factual information;[21] they are potential demonstrative exhibits and, therefore, at the core of what the work product doctrine protects.

For these reasons, the charts were prepared in anticipation of litigation with DEA and provided to outside counsel retained in anticipation of litigation with shareholders.  Plaintiffs seek the charts, not because they contain factual information that is unavailable, but precisely because the charts are argumentative in nature.

### C. The Email and Charts Are Privileged.

The claim of privilege is straightforward.  Outside counsel for the company (Milbank Tweed), retained in connection with potential shareholder litigation, emailed in-house counsel to find out who prepared the charts.  The Ruling states that "the only substantive aspect of the email thread occurs when outside counsel asks who created the charts."[22]  But that is to ignore what is really happening:  in-house litigation counsel is communicating—first, with a paralegal, to obtain a Word version of the charts—then, with the former head of the SOM group, to secure an answer about who prepared the charts—so that Milbank Tweed could know with whom to discuss the charts.  The exchange is telegraphic, but when outside counsel seeks information from in-house counsel under such circumstances, and in-house turns to a knowledgeable employee for the

---

[21] Ruling at 7.

[22] Ruling at 5.

14

answer, that is a privileged communication.

The Ruling also states that "the charts simply set out factual information of a business nature regarding Cardinal's SOMS…."[23] But as set forth above in Section B, that is not true. Even if it were, however, that does not strip these charts of their privileged status. Although "[m]any cases note that facts are not protected by attorney-client privilege …. this carve-out to the attorney-client privilege for underlying facts does not erode the protection afforded to the communications relaying those facts. Thus, '[w]hile facts themselves are not protected by the privilege, the communications of facts between an attorney and client are protected if transmitted for the purpose of obtaining legal advice.'" *Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp.*, 2016 WL 31250004, at *2 (N.D. Ill. June 2, 2016) (quoting *National Association of Realtors*, 242 F.R.D. 491, 494 (N.D. Ill. 2007)). It is the ***communication*** that gives rise to the privilege, not whether the communication conveys facts or not. Indeed, it is hard to imagine a scenario in which the provision of legal advice does not require, in part, the obtaining and/or rendering of factual information.

## III.
## CONCLUSION

For the reasons stated, this Court should find no waiver has occurred and Cardinal Health's claw-back of privileged material was permissible under the terms of CMO-2.

---

[23] Ruling at 6.

15

Dated: February 6, 2019                               Respectfully submitted,

*/s/ Steven M. Pyser*
Enu Mainigi
F. Lane Heard III
Steven M. Pyser
Ashley W. Hardin
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
lheard@wc.com
spyser@wc.com
ahardin@wc.com

*Counsel for Defendant Cardinal Health, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this 6th day of February, 2019, the foregoing document was served via the Court's ECF system to all counsel of record.

>　　　　　　　　　　　　　　　　*/s/ Steven M. Pyser*
>　　　　　　　　　　　　　　　　Steven M. Pyser
>
>　　　　　　　　　　　　　　　　*Counsel for Defendant Cardinal Health, Inc.*