| | | |
|---|---|---|
| DOCKET NO. X07 HHD CV 17 6086134 S | : | SUPERIOR COURT |
| | : | |
| CITY OF NEW HAVEN | : | JUDICIAL DISTRICT |
| | : | OF HARTFORD |
| V. | : | |
| | : | COMPLEX LITIGATION DOCKET |
| | : | |
| PURDUE PHARMA, L.P., ET AL | : | JANUARY 8, 2019 |

### MEMORANDUM OF DECISION
### DISMISSING CASES FOR LACK OF JURISDICTION

**1. Cities suing drug companies bear the ordinary burdens of civil plaintiffs.**

Every year, opioid abuse kills more and more Americans. Annual deaths from opioid abuse are now in the tens of thousands. Many have attributed the rising death toll to drug company lies and the over-supply of these addictive pain killers. Federal prosecutors have been among those blaming the drug companies. They indicted the leaders of the Purdue Pharma organization, the maker of OxyContin. They accused the company of tricking doctors and the public into believing opioids were safe for long-term use. Ultimately, three company officials pled guilty to felonies and the company paid a $600 million fine.[1]

Law enforcement actions like the federal case against Purdue Pharma appear in all respects the righteous manifestations of government vindicating the public interest. Justly deserved fines and penalties in government enforcement cases are a public good: they punish the guilty and deter the tempted. And they are relatively easy to bring. The

---

[1] *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp. 2d 569 (2007).

1

**EXHIBIT A**

Mailed to Reporter of Judicial Decisions on 1/8/19. AH/co. 244.00

strict rules that govern who can sue in ordinary civil damages cases don't apply in enforcement cases. Specific statutes grant the state and federal government authority to bring these kind of suits without meeting the ordinary burdens of individual civil plaintiffs.

But the cities who have brought the lawsuits this court is considering, by contrast, have been granted no such authority. Yes, the cities are governments, and they are suing drug companies about opioid abuse. The defendants include Purdue Pharma and twenty-four other drug companies.[2] The trouble is that these matters are ordinary civil damages cases and face the ordinary civil rules about who can sue for what.

They are ordinary civil cases because without any special statutory authority, the thirty-seven cities in the cases on this court docket are seeking—not to vindicate the public interest as a whole—but to gain money solely for themselves. The cities want the money for the indirect harm they say the drug companies caused them. They say they have been forced to pay for addicts' social and medical needs and have suffered other indirect expenses the addicts themselves caused, including extra emergency-responder expenses, consequences from drug related crimes, etc.

But because they are suing in an ordinary civil lawsuit their lawsuits can't survive without proof that the people they are suing directly caused them the financial losses they seek to recoup. This puts the cities in the same position in claiming money as the brothers, sisters, friends, neighbors, and co-workers of addicts who say they have also

---

[2] The total calculations as to the number of plaintiffs and defendants includes all eight cases that are currently pending on this court's docket. Nevertheless, this decision only applies to the following matters: *New Haven v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 17 6086134; *New Britain v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 18 6087132; *Waterbury v. Purdue Pharma*, Docket No. X07 HHD CV 17 6088121; *Bridgeport v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 18 6088462. These are the only cases where the motions to dismiss were fully briefed and argued before the court on September 10, 2018 and November 7, 2018.

2

indirectly suffered losses caused by the opioid crisis. That is to say—under long-established law—they have no claims at all.

Why should this be so? Haven't they suffered? Haven't we all suffered? At least in some indirect way? All probably true. But can all of us line up in court and ask for our personal share of the extra taxes, declining property values, rising crime rates and personal anguish we suffer from the addictions surrounding us?

Not if we want a rational legal system. To keep order in law, government enforcement agencies must represent the indirect public interest in court, not a flurry of individual plaintiffs—even when they are local governments.

To permit otherwise would risk letting everyone sue almost everyone else about pretty much everything that harms us. Connecticut rightly rejects this approach. It judges that allowing these kinds of lawsuits would lead to a wildly complex and ultimately bogus system that pretends to measure the indirect cause of harm to each individual and fakes that it can mete out proportional money awards for it. In short, our courts have declined to get out of the business of reasoned judgment and into the business of irrational speculation.

These cases illustrate the problem. If they were allowed to proceed under ordinary civil rules, each of the twenty-five companies being sued here could be held responsible only for harms they themselves caused to each party suing. Even if they could, none of the complaints allege any form of civil conspiracy, so we don't have to worry about that issue.

This means proving the drug companies caused the specific extra expenses claimed would require a court or jury to calculate the impact on each of thirty-seven cities of the activities of each of the twenty-five defendants, as distinguished from each

other, and as distinguished from the impact of all the other strains on municipal budgets. The strains the court would have to measure would inevitably include the impact on cities of other drug abuse, alcohol abuse, guns, the economy, government waste, cuts in state and federal aid, mandatory employee raises and pension contributions, rising medical expenses, businesses moving out of state, etc.

In the end, any precise number the court might purport to "calculate" would lead to absurd results that would have a court or jury declaring that a given drug company in a given city in a given year caused 3.6 percent of the increased cost of Narcan, 2 percent of the increased emergency services budgets, and 1 percent of the increased social service budget. This would inevitably require determining causation by conjecture. It would be junk justice.

Remember, the cities aren't asking the court to stop misleading advertising or the oversupply of drugs. They aren't asking the court to fine the companies under some law or regulation. The cities are asking the court to order allegedly guilty parties to pay for the damage they each allegedly caused each city. So to collect money from the drug companies the cities would have to prove both the amount of the damage and the degree of the cause.

The drug companies ask the court to dismiss these cases because they claim indirect damages that would turn on conjectural analysis of causes and effects. Because the companies are right, the court must accede to their request.

### 2. *Ganim v. Smith & Wesson* mandates the rejection of the cities' indirect damages claims.

Our Supreme Court has long ruled claims like these impermissible. In legal parlance, it has held that the indirectly harmed have no "standing to sue" and that the courts may not hear, but instead must dismiss, these claims. The courts are said to have no "subject matter jurisdiction" over this kind of claim. And our Supreme Court has also said there must be no delay about identifying and dismissing cases that don't belong in court.

In 1996 in *Federal Deposit Ins. Co. v. Peabody, N.E., Inc.*, our Supreme Court held that when a challenge is made to the court's subject matter jurisdiction "it must be immediately acted upon" by the court "before it can move one further step."[3] As our High Court held in 2000 in *Ramos v. Vernon*, this includes claims like this about "standing" where the people suing have only a claim that those they sue harmed them in an immeasurably indirect way.[4] Indeed, our Court has considered these issues in a case remarkably like these cases and has emphatically held that these claims don't belong in court.

That case was the 2001 Supreme Court decision in *Ganim v. Smith & Wesson Corp.*, a lawsuit by a city about the indirect consequences of gun violence.[5] *Ganim* holds that courts can't credibly consider cases derived from harms allegedly connected to defendants by lengthy, multifaceted chains of causation that must weigh their conduct while trying to separate that conduct from the myriad of independent factors that make up most broadly defined social crises like gun and opioid abuse.[6]

---

[3] 239 Conn. 93, 99.
[4] 254 Conn. 799, 808.
[5] 258 Conn. 313.
[6] *Id.*, 345-65.

5

*Ganim* makes a policy judgment. The judgment is that the more direct the harm, the more justice there is in compensating for it. But it also assumes that the more theoretical the harm, the weaker the claim for compensation. The *Ganim* Court understood that our actions have indirect effects on others like the rock that ripples the pond or the butterfly that flaps its wings. But it is impossible to trace fairly every act to its utmost consequence.

So how does *Ganim* decide what's too indirect to sue over? *Ganim* adopts the approach of the 1992 United States Supreme Court's decision in *Holmes v. Securities Investor Protection Corp.*[7] *Holmes* said that to determine causes direct enough to sue over we must consider three factors:

- How indirect is the injury;
- How complicated is it to decide who gets what money;
- Whether directly injured parties could sue instead.

Let's consider these policies here. How indirect is the alleged injury? The *Ganim* Court said that the more links people have to make to prove the causation chain the less likely those people are to have a right to have standing to sue.[8]

The cities have many links to make here:

Link 1: The manufacturers make the opioids.

Link 2: The manufacturers sell the opioids to the distributors.

Link 3: The distributors sell the opioids to a pharmacy.

Link 4: Doctors prescribe the opioids.

Link 5: Patients take them.

---

[7] 503 U.S. 258.
[8] 258 Conn. at 365.

6

Link 6: Some patients become addicted.

Link 7: The city must give emergency and social services to some addicts while the city's quality of life, property values and crime rate worsen from the spread of addiction, further straining city resources.

Of course, the cities can't claim that every person harmed within their borders got the drugs from just one of the companies they are suing. There are further side sets of links they would have to rely on to explain some aspects of the problem:

Link 8: Pills get loose and are sold on the black market creating other costly addicts.

Link 9: Pills get too expensive or scarce for some addicts who turn to more accessible stocks of street fentanyl or heroin, creating costly addicts.

Unfortunately for the cities, these links look remarkably similar to the links rejected as too indirect in *Ganim*:

Link 1: Manufacturers make the guns.

Link 2: The manufacturers sell the guns to the distributors.

Link 3: The distributors sell the guns to retail outlets.

Link 4: The retailers sell consumers the guns.

Link 5: The consumers use the guns.

Link 6: Some consumers injure themselves or others with the guns.

Link 7: The city must give emergency and social services to some of the wounded while the city's quality of life, property values and crime rate worsen, further straining city resources.

The city in *Ganim* also couldn't claim that every person harmed within its borders got the guns from one of the companies they were suing. As it is here there were further side sets of links needed to explain some aspects of the problem:

Link 8: Guns get loose during the distribution chain and get sold on the black market, creating other costly incidents.

Link 9: Guns get stolen or otherwise get into the hands of third parties creating costly incidents.

Measured link by link, this case is just like *Ganim* and *Ganim* held these links too attenuated to support a claim.

As in *Ganim*, complicated rules would also be required here to sort out who caused what. Blindingly complex ones.

Measuring blame in this part of the *Holmes* test means measuring money. The question is the relative complexity of deciding how much to pay to each plaintiff if the defendants are found liable. Here, this would mean engaging in the kind of rank speculation the court has been talking about. How much of the extra police expense is caused by increases in violence stemming from other drugs, from the proliferation of guns in the city, from trends in domestic violence, from cuts in state aid, from successful collective bargaining by police unions for raises? Is the price of Narcan going up? Is the city's cost of medical care going up because of increased drug abuse or because of ever-increasing drug prices?

Assuming wrongs were found, it would be hard to look the defendants in the eye while pronouncing them each responsible for a specific percentage of blame for city expenses. We would have to suppose either that all cities are alike and potentially award the most money to the worst-managed city or analyze all of these factors for each city,

for each year, for each increased expenditure.

The dizzying complexity and the ultimate need here for rank-guess work means the second *Holmes* factor disfavors finding the cities have standing to sue. Any distribution of money among the cities would look more like the distribution of alms from the community chest than like the judgment of a court of competent jurisdiction. Nothing in the common law stops federal or state law enforcers from seeking to distribute fine money in any way they want, but that is not how the ordinary civil system works.

The third *Holmes* policy is equally unhelpful to the cities. There are directly hurt people who can and have sued the drug companies in civil court. Those people are, of course, the addicts who have suffered, died, and whose concerns often get buried in the stampede to the courthouse. These cases aren't about them. They are about money to municipalities, not money for the many whose lives were allegedly ruined by a false belief that opioids were safe for long-term use.

Many lawsuits have been brought in the names of these addicts. At first, some failed because self-righteous legal doctrines blamed the addicts and barred their claims for their own "wrongful conduct" in getting addicted. This thinking ignored the potential double decrease in free will the addicts claimed.[9] Those doped by fatally addictive opioids often claimed they were first duped by false assurances that the pills were safe for long-term use.

Fortunately, these restrictive cases began to be supplanted by better thinking in 2005. That year, the West Virginia Supreme Court in *Tug Valley Pharmacy, LLC v. All*

---

[9] See *Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo County*, 235 W.Va. 283; *Let the Plaintiffs Sue—Opioid Addiction, The Wrongful Conduct Rule, And The Culpability Exception* 34 W. Mich. U. T.M. Cooley L. Rev. 33, 52 (2017).

*Plaintiffs Below in Mungo County* adopted the approach our own Connecticut law mandates by state statute for most tort claims: comparative negligence.[10] This approach means that where drug users know the risks, disregard them, and choose to destroy their own lives they can't recover money from any drug company. But where the statute applies and someone could prove their troubles were caused by being deceived by a defendant about the safety of a drug, they could recover any dollar damages they prove reduced by any percentage of their losses a jury finds is their own fault. Certainly, drug users are the "directly injured parties" the *Ganim* Court talked about.

Naturally, the cities will complain that the drug users can't recover the cities' expenses for them. But it is inherent in the *Ganim* judgment that in ordinary civil court we prefer recoveries *only* by those mostly directed injured and not just to prevent double recoveries by the addicts and the cities for the same damage. Instead, we prefer to compensate just the directly injured because it is sound judicial policy to hold people responsible only to the degree we can reasonably connect a legally prohibited act to a directly resulting harm.[11] In this regard, the addicts' claims are clearly superior claims.

And the addicts' claims aren't the only superior claims. Government regulators have been bringing civil and criminal charges against the drug industry for years and more are being filed all the time.[12] Enforcement claims are superior to the cities' claims because individual damages aren't at issue in those cases. This means they don't require the same causation analysis as ordinary individual lawsuits for compensatory damages.

Unfair trade practices claims are a good example. Because of the absence of direct

---

[10] General Statutes § 52-572h (b).
[11] 258 Conn. at 351.
[12] See, e.g., *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp. 2d 569 (2007); *New Hampshire v. Purdue Pharma, L.P.*, New Hampshire Superior Court, Merrimack County, Docket No. 217-2017-CV-00402 (September 18, 2018, *Kissinger, J.*);

injury, *Ganim* explicitly bars unfair trade practices claims by the cities in this case.[13] But § 42-110m of the Connecticut Unfair Trade Practices Act authorizes the state (*not* cities) as a law enforcement agency to sue unscrupulous businesses. Most importantly, the statute directly declares that in these law enforcement cases "[p]roof of public interest or public injury shall not be required."

This means that from a causation standpoint government law enforcement agencies like the state are better situated than cities to sue allegedly corrupt drug companies.[14] And unlike privately suing addicts the state could potentially recover funds that might ease the burdens of cities. The state might share some of the money with cities or at least shore itself up and improve its chances of helping cities hurt by this epidemic.

So there are two parties better situated to sue than the cities suing here. And thus the third *Holmes* factor, and thus all the factors, require this court to dismiss the cities' claims.

### 3. *Ganim's* reasoning isn't undercut by recent rulings in other courts.

Some courts have refused to dismiss cases like these. Of course, this court has to follow *Ganim* and not them. But it's worth noting that nothing in those cases distinguishes *Ganim* in any way that might call for a different outcome here.

Courts in New Hampshire, New York, Ohio, and Washington have given some thought to the subject of whether the claims allege causation directly enough to merit being heard.[15]

---

[13] 258 Conn. at 374.
[14] And the state has now chosen to do so. *State v. Purdue Pharma, L.P.*, Superior Court, judicial district of Hartford, Docket No. CV 19 6105325.
[15] See, e.g., *New Hampshire v. Purdue Pharma, L.P.*, New Hampshire Superior Court, Merrimack County, Docket No. 217-2017-CV-00402 (September 18, 2018, *Kissinger, J.*); *In re Opioid Litigation*, Supreme

11

Some of them have discussed the notion of "proximate cause."[16] They appear sensibly to recognize that it might be proved that opioid companies should have known that misleading people into overuse of their products might lead to opioid addiction. And foreseeability is an element of proximate cause. But observing this doesn't solve the problem of *Ganim's* central point: the impossibility of rationally calculating what part of the actual harm alleged—municipal expenses—was legally caused by what defendant.

In an ordinary Connecticut civil case, a person can be liable for "causing" something if the cause at issue is indispensable, foreseeable, and substantial to the harm claimed.[17] Notions of both "legal cause" and "proximate cause" are included in this formula.

Where the harm would have happened anyway a cause isn't indispensable. Where the harm at issue isn't a foreseeable result of the wrong then the wrong isn't a proximate cause. And the requirement of substantiality means that causes that play very small roles when compared to other concurrent causes aren't proximate.

Critically, each of these factors assumes a court can rationally measure any given defendant's conduct against any given harm complained of to see whether what each defendant has done was indispensable, foreseeable, and substantial to the harm complained of in the lawsuit.

And this is where *Ganim* draws the line. It holds that there are circumstances

---

Court of New York, Suffolk County, Docket No. 400000/2017 (June 18, 2018, *Garguilo, J.*); *In re: National Prescription Opiate Litigation,* United States District Court, Docket No. 1:18-op-45090 (N.D. Ohio, October 5, 2018); *Everett v. Purdue Pharma, L.P.*, United States District Court, Docket No. C17-209RSM (W.D. Wash., September 25, 2017).
[16] *Id.*
[17] *Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 329 (2015).

12

where courts can't credibly make these measurements. Those circumstances include cases that pose questions like these cases do: Was the distributor who shipped extra pills to Bridgeport really responsible for Waterbury's increased police budget or the extra municipal medical expenses of Beacon Falls? If so, all of it? If not all of it, how much of it? If these ordinary civil cases are to stay in court, the other court decisions on opioid cases don't adequately consider that sooner or later someone has to make and measure these connections.

The cases favoring the cities sensibly enough observe that when you trick people into overusing opioids you get more addicts. Harm to the addicts is obvious. But the cities aren't complaining about harm to the addicts. They are claiming about harm to themselves from the social spin off of rising addiction rates: increases in their social services, their police expenses, and their fire and ambulance expenses, along with their medical bills.[18]

As the *Holmes* analysis shows, these expenses are a long radius and many concentric circles away from the simple observation that promoting more addiction creates more addicts. To fairly measure the number of rings and the length of the radius between drug makers pumping out too many pills and police officers piling up too much overtime requires the guesswork already described.

Our gut instincts may tell us that the rise in addiction did cost cities money, but *Ganim* has decided it is fanciful to pretend we can credibly quantify the actual harm to cities and attribute that harm by individual percentage to over two-dozen defendants.

---

[18] See Complaint, p. 63-67.

13

*Ganim* reflects that pretending we can do it would diminish courts as places of that reasoned, reliable, and replicable thing we call "justice."[19]

### 4. Voices at the back of a crowd.

The cities haven't even suggested to the court a way it could rationally make the required connections. They admit as they must that none of the defendants is 100 percent responsible for causing 100 percent of rising city expenses. But the best one plaintiff could do was to suggest the companies might be considered the cause of all wrongs in proportion to their share of the opioid market.

But that kind of measure would have nothing to do with measuring the harm an individual defendant directly caused to a specific city. It is the broader kind of analysis by which a court *might* fashion a penalty or a fine vindicating the entire public interest, but it isn't a way to fashion compensatory damages. In this context, it irrationally assumes that the cities have already accurately measured the impact of the actions of the individual defendants on the individual cities instead of identifying some rational way to do it.

Perhaps that's why most plaintiffs in this case didn't mention the market share idea during the multiple days this matter was argued. Instead, they did worse. They offered nothing.

It's certainly been a drag on the court's willingness to believe that there is a credible case for causation when, despite the court begging them for one, the plaintiffs couldn't suggest even a *possible* way to calculate the degree of individual causation in

---

[19] 258 Conn. at 352-53.

14

this case. A credible suggestion on measuring causation might have given the court some pause. But during the long hours spread over two days spaced amply apart during which this motion was argued in court and during which the plaintiffs knew what the court wanted, it became apparent that the plaintiffs filed these lawsuits without first thinking of a way to sort out the causation conundrum. Indeed, the best they could do was to say that in some other cases in some other place someone is said to be working on something about it.

And maybe that's why they didn't seem to think it was their responsibility to develop a theory before filing the lawsuits. These lawsuits are, after all, part of a mixed crowd of cases assembling on courthouse lawns across the country. Some of them are brought by individuals, some by cities, some by states, and some by the federal government. Some are civil actions like this. Some invoke regulatory powers. Some are criminal. But merely because these cases exist somewhere else doesn't relieve the cities of their burdens here.

The cities can't just join the swelling chorus calling for justice and shrug off the burdens of being what they are—ordinary civil plaintiffs that must prove direct causation to recover compensatory damages. *Ganim* will not permit it.

### 5. Conclusion: social problems are poor candidates for compensatory damage awards.

It might be tempting to wink at this whole thing and add to the pressure on parties who are presumed to have lots of money and possible moral responsibility. Maybe it would make them pay up and ease straining municipal fiscs across the state. But it's bad law. If the courts are to be governed by principles and not passion, *Ganim*

must apply just as much in hard cases as in easy ones.

Faced with lawsuits brought by parties without standing, this court can only declare that it has no subject matter jurisdiction to hear these claims.

Therefore, all of the cities' claims in all of the subject lawsuits are dismissed.[20]

BY THE COURT

_____
Moukawsher, J.

---

[20] As stated previously, this decision only applies to the following cases: *New Haven v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 17 6086134; *New Britain v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 18 6087132; *Waterbury v. Purdue Pharma*, Docket No. X07 HHD CV 17 6088121; *Bridgeport v. Purdue Pharma, L.P.*, Docket No. X07 HHD CV 18 6088462.