1    UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF OHIO
     EASTERN DIVISION

3    - - - - -

4

5    IN RE:                        )
                                   )
6    NATIONAL PRESCRIPTION         ) Case No. 1:17MD 2804
     OPIATE LITIGATION             )
7                                  )
     Motion to Disqualify          )
8

9

10   - - - - -

11

12   TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

13   JUDGE DAN A. POLSTER, JUDGE OF SAID COURT,

14   ON WEDNESDAY, FEBRUARY 6TH, 2019,

15   COMMENCING AT 2:30 O'CLOCK P.M.

16   - - - - -

17

18

19

20   Court Reporter:              GEORGE J. STAIDUHAR
                                  801 W. SUPERIOR AVE.,
21                                SUITE 7-184
                                  CLEVELAND, OHIO 44113
22                                (216) 357-7128

23

24

25

1    APPEARANCES:

2        On behalf of the Plaintiffs:

3            SPANGENBERG, SHIBLEY & LIBER, LLP
             BY:  PETER H. WEINBERGER, AUSA
4            1001 Lakeside Avenue, Suite 1700
             Cleveland, OH 44114
5

6        On behalf of the Defendants:

7            BAKER HOSTETLER
             BY:  JOHN PARKER, ESQ.
8                 JONATHAN STERN, ESQ.
             Key Tower
9            127 Public Square, Suite 2000
             Cleveland, OH 44114-1214
10

11                       - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    WITNESS:                                    EXAMINATION

3    Commander Gary Gingell

4        By the Court                                 9

5        By Mr. Stern                                16

6        By Mr. Weinberger                           29

7        By Mr. Stern                                31

8    Dr. Thomas Gilson

9        By the Court                                34

10                                                   52

11       By Mr. Weinberger                           36

12       By Mr. Parker                               40

13   Chief Calvin D. Williams

14       By Mr. Weinberger                           55

15                                                   67

16       By Mr. Parker                               60

17   Carole Rendon

18       By Mr. Parker                               69

19                                                  109

20       By Mr. Weinberger                           93

21       By the Court                               111

22

23

24

25

1        **P R O C E E D I N G S**

2           THE COURT:  All right.  Good afternoon.

3    Please be seated.

4           This is a hearing in MDL 2804, the opioid

5    MDL on the Plaintiffs' motion to disqualify.  The parties

6    are here, and the Court is ready to proceed.  I have a

7    few things I want to say at the outset.

8           This is a difficult hearing to conduct —

9    this is a very difficult for me to conduct and not one I

10   sought out, and in fact, I sought to avoid.  I know the

11   parties conducted extensive discussions before this

12   motion was filed in an effort to achieve some resolution,

13   and that those discussions continued under Special Master

14   Cohen's auspices after motion was filed.

15           Ms. Rendon is a good friend of mine.  I know

16   her to be an excellent attorney, both during her

17   distinguished government career and afterwards, and I

18   consider you to be a highly ethical and professional

19   attorney, and the same goes for the men and women at

20   Baker Hostetler whose partners include many friends ands

21   former colleagues.  It is a highly professional and

22   ethical law firm.

23           Everyone should recall I did not want to

24   create this litigation track.  I didn't think it was a

25   good idea, but after several months, I was convinced that

1    it was necessary to do so.  Trying to address a

2    nationwide social epidemic in a courtroom is a

3    problematic endeavor to say the least.  It doesn't fit.

4             In an adversarial proceeding, in a trial,

5    there are winners, and there are losers.  There are no

6    winners in this epidemic.  There are only casualties.

7    The only thing we all can agree upon is that we need to

8    reduce those casualties, both on the front end and the

9    back end.

10            I don't think anyone anticipated how this

11   litigation track was going to play out when we created it

12   last spring because I don't think there has ever been a

13   litigation like this in the history of our country.

14            We've got more than 1,500 cities and

15   counties seeking to recoup past and future public

16   expenditures under RICO and public nuisance theories of

17   liability.

18            The Plaintiffs' efforts to prove their

19   damages under these theories and the Defendants' effort

20   to counter those allegations have led to depositions and

21   document discovery that I don't think anyone could have

22   readily foreseen a year ago.

23            So it is nobody's fault that these issues

24   are surfacing now and not a year ago because I don't

25   think anyone could have anticipated them.  And I would

1    also say that the problem, the issue we are addressing is

2    specific to this track one trial involving the Northern

3    District of Ohio, two cities in this district Cleveland

4    and Akron, and the surrounding counties, Summit and

5    Cuyahoga County, that were in this Heroin and Opioid Task

6    Force supervised by the U.S. Attorney's Office.

7              I haven't read or seen anything that to me

8    creates any issue or problem with Ms. Rendon or her

9    firm's participation in any trial anywhere else in the

10   country or her work in the MDL generally, but the focus

11   is on her work, taking depositions and participating in

12   this track one trial that is now set for October the

13   21st.

14             So at this point, I have a couple of

15   questions for two witnesses, but I think it is best if

16   anyone who is going to be a witness wait outside, and we

17   have one witness at a time.  That's generally my

18   practice.  I want to make sure that each witness'

19   testimony is based on his or her knowledge and

20   recollection.

21             And the two witnesses I had just a couple

22   questions would be Commander Gingell and Dr. Gilson, but

23   anyone -- so I guess I will start with Commander Gingell,

24   but anyone else who is a potential witness, we have

25   opened up the witness rooms outside, and I would request

7

1    that those people wait outside.

2              I guess, Ms. Rendon, if you are a potential

3    witness, you can be here, but anyone else who is a

4    potential witness should be in one of the witness

5    rooms.

6              And Commander Gingell, I would like you to

7    come and take the witness stand.

8              MR. WEINBERGER:  Your Honor, do you mind if

9    I stay?

10             THE COURT:  No.  That's fine,

11   Mr. Weinberger.

12             MR. WEINBERGER:  So counsel for Ms. Rendon,

13   Mr. Parker and I, have discussed the fact that during

14   the course of testimony, some of these witnesses may

15   be reluctant and should be reluctant to discuss the

16   details —

17             THE COURT:  Oh, I am not going to ask them

18   any details, and I am not going to permit any questions

19   about it, that's it.  I mean, that's the one thing we are

20   not going to have.

21             MR. WEINBERGER:  If I could just further

22   explain, and I think this is may be what the Court has in

23   mind, so confidential information such that relates to

24   law enforcement tactics or strategy and the like are

25   things that we have concern about, and I am assuming

1    that's what you are directing your comments to.

2             THE COURT:  There will be no questions by me

3    or anyone else about those details.

4             MR. WEINBERGER:  Thank you, your Honor.

5             MR. PARKER:  John Parker, on behalf of

6    Ms. Rendon, and I will he remain seated.  There have been

7    certain documents produced in the case, which were

8    attached to the various declarations that have been

9    submitted here in Court, which under the terms of the

10   protective order that governs this case, which admittedly

11   I am not that familiar with because this is my only touch

12   point with this case happily that are confidential or

13   highly confidential.

14             In addition --

15             THE COURT:  We are not going to be

16   discussing those documents, Mr. Parker.

17             MR. PARKER:  All right.  In addition, your

18   Honor, the depositions, for example, Commander Gingell

19   because it was taken less than 30 days ago, under the

20   protective order, it is presumptively confidential, and

21   then the parties dedesignate it, if there is something

22   from that deposition that we believe to be important, I

23   assume you would let us approach to --

24             THE COURT:  Well, we are not going to have a

25   lot of questions.  I have two questions, and we are not

Commander Gingell – Examination

1    going to have any questions about the details or

2    substance of what was discussed during opioid Task Force

3    meetings.  That's the whole point of this.

4              It is problematic going into the details

5    because if there was sensitive or confidential law

6    enforcement information, it should be known only to the

7    individuals in that room.  It is, quite frankly, isn't

8    even any need for me to know let alone the lawyers.

9              So I don't plan to ask any witnesses, and if

10   anyone tries to ask such a question, I will immediately

11   stop it, so we are not going to have a lot of witness

12   testimony, I don't think.

13             All right.  And I may have mispronounced

14   your name, Commander.  How do you pronounce it, sir?

15             COMMANDER GINGELL:  Gingell, sir.

16             THE COURT:  Gingell, okay.  Commander, if

17   you could raise your right hand, please.

18                     **GARY GINGELL**

19   **called as a witness and being first duly sworn**, **was**

20   examined and testified as follows:

21                        EXAMINATION

22   BY THE COURT:  :

23   Q.   All right.  Commander, if you could just briefly

24   give your name and your position.

25   A.   Commander Gary Gingell, G-i-n-g-e-l-l, badge number

Commander Gingell – Examination

1    6103.
2    Q.   Okay.  And you are with the Cleveland Police Force,
3    sir?
4    A.   Cleveland Division of Police.  I am Commander
5    of Special Services, which includes narcotics, SWAT,
6    gang impact, and several folks on different task
7    forces.
8    Q.   All right.  And you, sir, gave — submitted a
9    declaration, a sworn declaration in connection with this
10   motion, correct?
11   A.   Correct.
12   Q.   And you were also deposed as a witness, you were
13   deposed as a witness in the course of this litigation,
14   this track-one case?
15   A.   Correct.  As a witness in my own job description in
16   November and then as a 30(b)(6) witness in January.
17   Q.   Okay.  November of 2018 and then a 30(b)(6) witness
18   for the City in January of 2019?
19   A.   Correct.
20   Q.   Okay.  Sir, how did it feel to you in November of
21   2018 and January of 2019 to have Ms. Rendon as an
22   attorney for one of the drug manufacturers question you
23   during your deposition?
24   A.   Sir, she was there in November, and personally, it
25   was very uncomfortable, extremely uncomfortable as we

Commander Gingell - Examination

1   worked on the same team for years on this effort, very

2   serious crises everybody knows.  I don't have to get into

3   that, but we worked together on it; she, being the top

4   law enforcement official in the district.

5          We worked with DEA and all the other

6   entities involved from law enforcement, and actually, she

7   spearheaded the effort for the opiate Task Force, United

8   States Attorneys Opiate Task Force, brought everybody

9   together, and we worked on this crisis then.  It was

10  something that we never experienced before.

11         We didn't have a playbook for it.  We just

12  kind of figured things out as we went along relative to

13  our response, and she was a part of all of that.

14         So to have her on the other side of the

15  table during my deposition and even initial phases before

16  she actually deposed me, the lady — I think her name was

17  Sonia — did most of the deposition from the start, and

18  Carole was down at the end of the table?

19         And there were notes being passed as

20  questions were being asked.  I don't know what was on the

21  notes, but there were notes being passed down to Sonia,

22  and then, she questioned me by herself, and the topics of

23  discussion were topics that we had went over in the Task

24  Force, and the Task Force, your Honor, was in the U.S.

25  Attorney's Office in a locked — you know, the inner

Commander Gingell – Examination

1    sanctum of the U.S. Attorney's Office, actually two doors

2    down from the U.S. Attorney's Office.

3            So these meetings weren't public, and I know

4    there were minutes in that created, but when I reviewed

5    minutes of what I would say, it was just generalized.  We

6    had discussions in those meetings that I didn't see in

7    the minutes relative to interactions, overlaps between

8    law enforcement or emergency room issues like HIPAA,

9    Narcan, whether we used Narcan or didn't, why we didn't.

10           And the three topics of discussion in the

11   deposition, one was Narcan; the other was fentanyl, which

12   we discussed in our Task Force, and the other was LEAD.

13   That's Law Enforcement Assisted Detox, which we created

14   with the Adams Board in about 2017 I think it was.

15           This was discussed heavily inside this

16   meeting with the U.S. Attorneys Opiate Task Force.  In

17   fact, it was a partnership with the Adams Board, and my

18   guys on the street, who answered over a thousand calls

19   for '16 and over a thousand for '17, combined with deaths

20   and non fatals, they would go to the scene and want to do

21   more for the non fatal victims rather than hand them a

22   pamphlet?

23           So we had looked at some of the other things

24   going around in the state where the police were offering

25   a service.  So we put together with Bill Bannihan what we

13

Commander Gingell — Examination

1   called our LEAD, Law Enforcement Assisted Detox, where my

2   guys would go into the ER, work with folks in the ER, and

3   again, we talked about this at the meetings and arranged

4   it with Metro, especially with Dr. Papp?

5             And my guys would then be able to take

6   somebody right from the ER to one of the three treatment

7   centers, Stella, Rosary Hall, and I forget the third one.

8   It is on 19th of Prospect, but in any event, those are

9   the three topics she grilled me on.

10            And it was like — she sat there while we

11  had these discussions.  She was part of it, and now she

12  is on the other side of the table grilling me about it.

13  And my take on it was, she felt — what she was trying to

14  elicit from me was we should have started something

15  earlier, we should have been more comprehensive with the

16  LEADs.

17            With fentanyl, she was going back to 2006,

18  and fentanyl wasn't a problem in Cleveland then, and she

19  had the medical reports that I had and fentanyl deaths

20  during that time frame from '06 to probably '14 or so

21  were barely single digit or just barely double digit.  It

22  wasn't an issue, but she took me back to 2006 with her

23  questioning for some reason?

24            And the Narcan, that was an issue that

25  Project DAWN got started with Dr. Papp to get this out to

Commander Gingell – Examination

1    the addicts.  Well, they also wanted to get out to the

2    law enforcement and some of the fire personnel that

3    didn't have –– the paramedics had it in Cleveland.  I

4    don't believe the EMTs did.  Our EMS had it.  Our

5    officers did not.

6              In those meetings, there would be questions,

7    "hey, when is Cleveland going to get Narcan?"  I said, I

8    know we are working on it.  We talked to the chief, but

9    there is the EMS, Fire, and our department, and the law

10   department and the unions were all involved in this thing

11   because it is a medical thing.

12             So I didn't know the whole process they were

13   going through, but I said we are working on it.  But that

14   was one of her topics at the meeting, and I don't know

15   what her reasons were, possibly that, hey, if we got it

16   earlier, maybe there wouldn't be as many deaths.  I don't

17   know where she was going on it, but she definitely

18   grilled me on it and the other two topics, sir.

19   Q.   All right.  Thank you, sir.

20             And my second and really only other question

21   is, do you feel that this experience will have any impact

22   upon your or your office's participation in task forces

23   chaired by the U.S. Attorney's Office going forward?

24   A.   Well, sir, I have been on quite a while.  I have

25   seen relationships sour, and I have seen them be very

Commander Gingell - Examination

1   good, and I think right now our relationships are better

2   than they have ever been with the federal agencies we

3   work with and the local agencies we work with.

4           That being said, I have worked narcotics for

5   a long time.  I have seen guys that worked a case with

6   DEA or whatever entity, and the case went off and took a

7   right turn because it got steered that way, not by the

8   detective who originated the case but by whatever entity

9   they were working with, and that was the end of that

10  relationship with that entity sometimes forever.  I am

11  not working with DEA or FBI.

12          I have heard it over and over again.

13  Personally, I like Mr. Herdman, and that will not be an

14  issue for me, but I know that has been an issue that has

15  been festering over the life of my career, and I think we

16  have done a lot through STANCE and the Opiate Task Force

17  to glue those relationships together, but I think

18  something like this, I think a lot of people feel

19  betrayed, myself included.

20          I had the utmost respect for Carole when she

21  in the office.  She was hands-on, knew a lot about what

22  was going on and participated in things, but this really

23  kind of flipped it over for me.

24          THE COURT:  All right.  Thank you, sir.

25  Does either side want to ask any follow-up questions on

Commander Gingell - Examination

1   my two?

2              MR. WEINBERGER:  Not on behalf of the

3   Plaintiffs.

4              MR. STERN:  Just a few if I may, your Honor.

5   Jonathan Stern.

6              THE COURT:  Yes, Mr. Stern.

7              Is it better for Mr. Stern -- I know the

8   habit, of course, is to always to stand, but I want to

9   make sure, because of the way our audio is working, if

10  counsel can stay seated because that way it will be

11  recorded better.

12             MR. STERN:  Thank you, your Honor.

13             THE COURT:  Or Mr. Stern, if you prefer to

14  be at the podium standing, that's fine, but if you are at

15  -- standing at the table, you should be seated.

16             MR. STERN:  I am okay here.

17                  EXAMINATION CONTINUED

18  BY MR. STERN:  :

19  Q.   Commander, I want to talk to you a little bit about

20  the Task Force.

21             MR. STERN:  And I understand the Court's

22  instruction, and I will not heed it.

23  Q.   This Task Force that you've described at the U.S.

24  Attorney's Office, it was --

25             MR. STERN:  You know what, your Honor?  I am

Commander Gingell – Examination

1    going to go to the podium if that's okay.

2              THE COURT:  That's fine, Mr. Stern.

3    BY MR. STERN::

4    Q.    Commander, the Task Force you are talking about grew

5    out of a conference that was held in November of 2013

6    here in Cleveland.  Is that correct?

7    A.    I am not sure when it started.  I don't know if it

8    was before that or after that.

9    Q.    But you do remember there was a conference that

10   involved law enforcement, treatment providers, and people

11   from a broad range of disciplines and occupations who got

12   together to talk about the opioid crisis, right?

13   A.    In the fall of '13 I believe it was.

14   Q.    Right.  And the principal action item coming out of

15   that conference was to create what became known as the

16   U.S. Attorney's Office Heroin and Opioid Task Force,

17   correct?

18   A.    As I said, I don't remember exactly when it started.

19   I know we were meeting before that.  Actually, the first

20   meeting was with the Medical Examiner in the fall of '12

21   when they first brought it to our attention about the

22   spike in heroin deaths, and then we met again several

23   times over the course of the beginning of '13, and we, in

24   fact, formed our HIDI team, Heroin Involved Death

25   Investigation team, and they were active by June or July

Commander Gingell – Examination

1    of '13.  I am not exactly sure then, but I know the

2    U.S. Attorney was involved in those discussions.

3    Q.   Ms. Rendon was not the U.S. Attorney at the time,

4    was she?

5    A.   No.  It was Craig Tame was there.  He is the law

6    enforcement liaison for the U.S. Attorney's Office.  I am

7    not sure who else.  It was a long time ago, but I know

8    the U.S. Attorney's Office was involved in our

9    discussions in early '13.

10             MR. STERN:  Your Honor, I have an exhibit.

11   May I approach the witness, your Honor?

12             THE COURT:  Mr. Stern, I am really not

13   interested in a long detailed history of the Opioid Task

14   Force going back to 2013.  I asked two pretty narrow and

15   specific questions, and I would like you to limit your

16   examination to those questions.

17             MR. STERN:  I will, your Honor.

18             MR. WEINBERGER:  And your Honor ––

19             MR. STERN:  Let me move ahead then.

20   BY MR. STERN::

21   Q.   Let me move ahead then, Commander.

22             The Opioid Task Force, when was the first

23   meeting of the U.S. Attorneys Opioid Task Force that you

24   attended?

25   A.   I don't recall.

Commander Gingell – Examination

1    Q.    The Opioid Task Force included law enforcement

2    agents, right?

3    A.    Correct.

4    Q.    Some were federal; some were state.  Is that

5    right?

6    A.    Correct.

7    Q.    And by the way, you say you've worked with

8    Ms. Rendon.  You have never been a federal law

9    enforcement officer.

10          Is that right?

11   A.    No.

12   Q.    You never operated under her authority, correct?

13   A.    No.  But I have the Northern Ohio Law Enforcement

14   Task Force which used to be the Caribbean Task Force.  I

15   have a lieutenant that works in there, and he co-leads it

16   with an FBI supervisor, three detectives.  They work

17   directly under the OCDETF chief, who works for the

18   U.S. Attorney, and it is housed in the U.S. Attorney's

19   Office.

20   Q.    Understood, Commander.  Let me ask a different

21   question.

22          You never had a day-to-day working

23   relationship with Ms. Rendon, correct?

24   A.    No.

25   Q.    You never worked on any case that she has

Commander Gingell - Examination

1    prosecuted, correct?

2    A.    Correct.

3    Q.    In fact, during her entire time at the U.S.

4    Attorney's Office, she prosecuted may be a handful of

5    criminal cases, correct?

6    A.    I —

7              THE COURT:  Mr. Stern, this is going to be a

8    fairly short hearing.  If you had some questions directly

9    related to the questions I asked or the answers to those

10   two questions that the Commander gave, that's fine.

11   Otherwise, we are not going to have more questions.

12   BY MR. STERN:  :

13   Q.    Commander, the Opioid Task Force included leaders

14   from the Cleveland Clinic, correct?

15   A.    Doctors.

16   Q.    That's not a government agency, correct?

17   A.    That's correct.

18   Q.    It is not a law enforcement agency, right?

19   A.    That's correct.

20   Q.    They are not from the U.S. Attorney's Office?

21             THE COURT:  Mr. Stern, everyone knows who

22   the Cleveland Clinic is.

23             MR. STERN:  Your Honor, we are making a

24   record, and I respectfully request to have a little

25   leeway.

Commander Gingell – Examination

1          THE COURT:  You are taking too much leeway.

2    BY MR. STERN:  :

3    Q.   The MetroHealth Medical Center, they were members of

4    the Opioid Task Force?

5    A.   Yes.

6    Q.   Robby's Voice, they were members of the Task

7    Force?

8    A.   I couldn't say no.  I don't know for sure.

9          MR. STERN:  Your Honor, may I approach now?

10   Unless the Plaintiffs will stipulate in which case I

11   won't —

12         THE COURT:  That there were other members of

13   the Task Force?  Sure.  Obviously, there were a lot of

14   other members of the Task Force besides the Cleveland

15   Police Department.

16   BY MR. STERN::

17   Q.   And Robby's Voice is not a government agency,

18   correct?

19   A.   Not to my knowledge.

20   Q.   Orca House, they were members of the Task Force?

21   A.   Pardon?

22   Q.   Orca House, they were members of the Task Force?

23   A.   I don't know who all is in the Task Force, sir.  I

24   can name federal law enforcement agencies, probably most

25   of them, and the locals.  The other treatment

Commander Gingell – Examination

1    professionals, I know Dr. Papp from Metro, I know

2    Dr. Jason Jerry from the Clinic, Aaron Marks from one of

3    the treatment areas, but I don't know a whole lot of the

4    others.

5    Q.    WKYC Channel 3, they were members of the Task

6    Force?

7    A.    I don't know that.

8    Q.    Do you dispute that?

9    A.    I am not disputing it, but if there was media going

10   to be present other than Mike Tobin or the communications

11   person there, we are usually advised of that, that there

12   will be media present.

13   Q.    I am not talking about a media presence.  Wasn't

14   WKYC a member of the Task Force?

15   A.    I don't know, sir.

16   Q.    How about St. Vincent Charity Hospital?

17   A.    Yes.

18   Q.    And how about the Adams Board?

19   A.    Yes.

20   Q.    And all the entities that — none of the entities

21   that I just named are law enforcement agencies,

22   correct?

23   A.    Correct.

24   Q.    And the information that was being shared at the

25   Task Force was shared in the presence of all of the

Commander Gingell – Examination

1  members of the Task Force who would have attended a

2  particular meeting, correct?

3  A.    That's correct.

4  Q.    So the information that you talked about on direct

5  examination and on his Honor's instructions, I won't get

6  into the particulars, but the kinds of information you

7  talked about, if WKYC 3 had a representative on the Task

8  Force and showed up at the meeting, that person you would

9  have shared the information with in a room where that

10  person was sitting, correct?

11  A.    If there was somebody from a TV station there, I

12  would not have got in depth with anything.

13  Q.    So you don't know whether WKYC was a member of the

14  Task Force?

15          MR. WEINBERGER:  Objection, your Honor.

16  Asked and answered.

17          THE COURT:  All right.  Overruled.  You can

18  answer that question.

19          Do you remember if they were a member?

20          THE WITNESS:  I do not remember, sir.

21  BY MR. STERN:  :

22  Q.    You would come to these meetings, sir, and there

23  would be anywhere from 20 to 40 people in the room.  Is

24  that right?

25  A.    That's correct.

Commander Gingell – Examination

1    Q.   Let me ask you, did you always know who everyone in

2    the room was?

3    A.   No, I did not.

4    Q.   Do you know who Monica Robins is?

5    A.   Reporter, I believe?

6    Q.   And she attended these meetings as a member of the

7    Task Force, correct?

8    A.   I don't know, sir.

9              MR. STERN:  Court's indulgence?

10             (Pause.)

11   BY MR. STERN:  :

12   Q.   And let me ask a general question again without

13   getting into the particulars:

14             The information you talked about having

15   shared in your declaration, that was information —

16   that's the same information you are talking about here

17   that was shared in the Task Force, correct?

18   A.   At those meetings?

19   Q.   Yes.

20   A.   Yes.

21   Q.   You never stood up at any of those meetings and said

22   "if there is anybody here who is not from law

23   enforcement, you need to leave the room"?

24   A.   No.

25   Q.   You freely shared that information with all of the

Commander Gingell – Examination

1   attendees at the meeting?

2   A.   Yes, and that was necessary with the crisis that was

3   going on.  The people were literally dying, and just like

4   relationships with law enforcement, that meeting actually

5   was a different task force that got us started down the

6   road of the partnerships, was called STANCE, and it was

7   about gun violence.  It started in '05.

8          Most of those people were transplanted right

9   into the Opioid Task Force.  When the Opioid Task Force

10  started, I'm sure everybody was a little reluctant to

11  talk, but as things moved forward, it became pretty

12  apparent that we needed to talk and be open with each

13  other to see how issues may have overlapped with each

14  other.  Like we would talk about HIPAA issues that were a

15  problem at Metro Hospital, and it was an overlap, and

16  Dr. Papp was there.

17         So people, you know, again, to go in that

18  meeting and sit there and say nothing would accomplish

19  nothing, so we talked, and I talked about stuff in that

20  meeting that I wouldn't talk about at a public community

21  meeting, and I never saw anybody put it on TV?

22         But the conversations were had in that

23  innerlocked room, and it was revolving around this crisis

24  and what each particular entity could do on their part to

25  help it.  And from the way we looked at overdose deaths

Commander Gingell – Examination

1    and overdose non fatals totally changed within our

2    division over this period of time?

3                    And it continued to evolve in these

4    meetings, what we learned in these meetings because we

5    were open, because we were talking.

6    Q.    Understood, because the whole point of the Task

7    Force was to share information between and among law

8    enforcement, treatment providers, community leaders, and

9    so forth, right?

10   A.    Right.  But it wasn't to take that information out

11   and give it to the first newspaper guy you saw on the

12   street or some committeeman.  There was a lot of

13   things in there discussed that I didn't hear in a public

14   forum.

15   Q.    Discussed openly in front of people that were from

16   organizations, that were not law enforcement

17   organizations, right?

18   A.    All professionals working towards the same common

19   goal to stop this crisis.

20   Q.    Discuss openly in front of people whose identity you

21   didn't even know?

22   A.    They were inside the U.S. Attorney's Office.  It is

23   an invitation only.  They couldn't just walk off the

24   street and walk into the meeting.

25   Q.    But every member was permitted to attend the

Commander Gingell – Examination

1   meetings?

2   A.   Pardon?

3   Q.   Every member was permitted to attend the

4   meetings?

5   A.   I don't know how they arranged that, sir.

6   Q.   Did you ever hear of any member of the Task Force

7   being excluded from a meeting?

8   A.   I wasn't the one sitting there saying who could come

9   and go.

10  Q.   So the answer to my question is no, you never heard

11  of anybody being excluded?

12  A.   I never did hear of anybody being excluded, no.

13              MR. STERN:  The Court's indulgence?

14              (Pause.)

15  BY MR. STERN::

16  Q.   And sir, without getting into particulars, you

17  talked about the questions you were asked at your

18  30(b)(6) deposition, correct?

19  A.   Pardon?

20  Q.   You were asked by his Honor and you testified just

21  now about what happened at your deposition?

22  A.   I said Carole Rendon was not there.

23  Q.   I am sorry.  Your first deposition you talked about

24  Ms. Rendon being there, right?

25  A.   That's right.

Commander Gingell – Examination

1  Q.   And without getting into particulars, you answered

2  all the questions you were asked?

3  A.   Yes.

4  Q.   You answered all those questions in front of people

5  that weren't Ms. Rendon?

6  A.   Pardon?

7  Q.   I withdraw that.

8           You did not decline to answer a single

9  question that Ms. Rendon asked, correct?

10  A.   There may have been some questions I couldn't

11  answer.

12  Q.   But not that you refused to?

13  A.   I did to the best of my ability, sir.

14           MR. STERN:  Court's indulgence?

15           (Pause.)

16           MR. STERN:  I have nothing further.

17  Actually, give me 30 seconds, your Honor, if I may.

18           THE COURT:  Okay.

19           (Pause.)

20           MR. STERN:  Nothing further, your Honor.

21  Thank you.

22           THE COURT:  Thank you, Mr. Stern.

23  Mr. Weinberger?

24              – – – – –

25           EXAMINATION CONTINUED

Commander Gingell — Examination

1  BY MR. WEINBERGER::

2  Q.    Sticking with the Opioid Task Force for a moment,

3  were there times when you would have occasion to meet

4  with Ms. Rendon outside of those meetings in smaller

5  groups?

6  A.    There were meetings –– I really don't remember

7  meeting specifically with her at the drug investigation

8  meeting, but we would meet, if we were going to have a

9  meeting, we would meet in Mr. Dettelbach's office with

10  all the folks involved and discuss what we didn't want to

11  put out public; what we did.

12              Occasionally, I would get a phone call from

13  either Joe Pinjuh, Craig Tame, once in a while Dave

14  Sierleja, who all worked in the U.S. Attorney's Office,

15  and would say, "hey, I am sitting here with Carole," and

16  it might have been a gun –– you know, a gun violence

17  issue or might have been an opiate issue –– but not many

18  of those and an e-mail every, you know, so often.

19  Q.    Okay.  And in a separate –– on a separate issue from

20  the Task Force –– and I think your declaration deals with

21  the STANCE meetings?

22  A.    Correct.

23  Q.    What does STANCE stand for?

24  A.    It is STANCE, is a gun violence program, and there

25  is different components to it.  Law enforcement is one.

Commander Gingell - Examination

1   The FBI is the lead in that.  That's where the

2   subcommittee meets over there, and then the main

3   committee, the executive committee meets at the U.S.

4   Attorney's Office in the same room as the Opiate Task

5   Force.

6   Q.   And did there come a time when the STANCE meetings

7   evolved into discussions about the opioid crisis?

8   A.   A lot, especially in '16 and '17.

9   Q.   And those meetings only involved law enforcement

10  personnel, correct?

11  A.   Well, there was probation there and reentry folks.

12  Q.   Okay.  And was Ms. Rendon present during the course

13  of those meetings?

14  A.   Somewhat, yes.

15  Q.   And with respect to those meetings, did you have an

16  expectation that they were confidential?

17  A.   Same thing, yes, sir.

18  Q.   And in general, with respect to the opioid meetings,

19  despite the people in the room, did you have an

20  expectation, Commander, that those meetings were

21  confidential and specific information, for example, law

22  enforcement tactics, et cetera, would not be disclosed to

23  the public?

24  A.   Yes, I did.

25  Q.   How did you arrive at that expectation?

Commander Gingell – Examination

1   A.   Well, I heard other conversations that I didn't

2   expect to hear from other entities, and our own

3   conversations about what we were trying to do.

4           As I said, after the comfort level kind of

5   rose up, we started to talk about things we wouldn't talk

6   about in public.  I wouldn't go to a community meeting

7   and talk about it, but amongst these folks, again, trying

8   to solve this horrendous problem that none of us had ever

9   faced before, we realized we had to, so to speak, put our

10  cards on the table to try to get help in areas that

11  overlapped or in the development of our strategies with

12  HIDI and such, with Narcan, and those kind of things.

13          MR. WEINBERGER:  That's all I have.

14          MR. STERN:  Your Honor, on STANCE, your

15  Honor, that's a new topic.

16          THE COURT:  Very briefly.

17              EXAMINATION CONTINUED

18  BY MR. STERN:

19  Q.   Commander, without getting into all the particulars,

20  you would agree with me that there were non law

21  enforcement members of STANCE, correct?

22  A.   Yes.

23  Q.   Including members, for example, the Chamber of

24  Commerce, right?

25  A.   I am not sure of all the members.

Commander Gingell - Examination

1    Q.    National Council of Jewish Women?

2    A.    Yes.

3    Q.    And sir, isn't it true that STANCE didn't ever get

4    involved in opioid-related issues because it is not

5    really their mission?

6    A.    The mission is gun violence, sir, but because of the

7    magnitude of the crisis and all the deaths going on in

8    our county that everybody was trying to get a handle on,

9    we talked about it because a lot of the same people that

10   were at the Opiate Task Force met every month.  The

11   STANCE meeting met every month, so there were

12   conversations fairly regularly on what was going on with

13   the opiate issue.

14   Q.    Sir, at your deposition in November, you were asked

15   this question and you gave this answer:

16          "Question:  What is STANCE?

17          "Answer:  It is a violent gun program.  It

18   has been in existence -- it is basically -- it is a

19   meeting, and it is held at the U.S. Attorney's Office.

20   Carole was part of that.  It is the FBI, ATF,

21   U.S. Attorney, County Prosecutor, parole, a bunch of law

22   enforcement factions along with reentry, and you know, it

23   is just a huge effort to kind of cut crime in a number of

24   different ways, but it is focused on gun crime.

25          "Question:  Does it ever get involved in

Commander Gingell – Examination

1   opioid related issues?

2           "Answer:  No.  That's really not their

3   mission.

4           That was your testimony in November,

5   correct?

6   A.   Right.  The members of that and except for DEA,

7   Cleveland Police, County Prosecutor, the members of that

8   Task Force, their mission is gun violence.  So the gun

9   violence is what we discussed.

10          It is what we work on just like we do at the

11  Opioid Task Force, but invariably, we would discuss

12  what's going on in the opiate issue, with the opiate

13  issue.

14  Q.   Everybody who is a member of STANCE participated or

15  was permitted to participate in those discussions?

16  A.   Again, I don't know how the invitations went, but

17  yes.

18  Q.   Well, you knew the representative for the National

19  Council of Jewish Women was there, correct?

20  A.   I do remember her.

21          MR. STERN:  All right. I have nothing

22  further.

23          THE COURT:  All right.  Thank you,

24  Commander.  You may step down.  You can stick around, but

25  I am sure you have got some important duties.

Dr. Gilson – Examination

1    THE WITNESS:  Thank you, sir.

2    THE COURT:  But from my standpoint, you are

3    excused.  Thank you, sir.

4    All right.  I would like to have a couple of

5    questions of Dr. Gilson.

6    (Pause.)

7    THE COURT:  Good afternoon, Doctor.  If you

8    could raise your right hand.

9    DR. THOMAS GILSON

10   **called as a witness and being first duly sworn, was**

11   examined and testified as follows:

12   EXAMINATION

13   BY THE COURT::

14   Q.   Doctor, thank you for coming in.

15   If you could give us your name and position

16   please?

17   A.   My name is Thomas Gilson.  Last name is G–i–l–s–o–n.

18   I am the Cuyahoga County Medical Examiner's and Crime

19   Laboratory Director.

20   Q.   And how long have you had that position?

21   A.   Seven and–a–half years.

22   Q.   Okay.  You submitted a sworn declaration in

23   connection with this motion.  Is that correct?

24   A.   Yes, I did.

25   Q.   And you were deposed, at least, once in connection

Dr. Gilson - Examination

1  with this litigation?

2  A.   I was actually deposed twice, your Honor.

3  Q.   Do you recall when you were deposed?

4  A.   January 11th was my 30(b)(6) deposition on behalf of

5  the County, and it was about a week and-a-half later -- I

6  don't remember the date -- but that was my fact

7  deposition.

8  Q.   All right.  Were you questioned by Ms. Rendon on

9  either or both of those occasions?

10  A.   She was not present for either one.

11  Q.   Okay.  Were you questioned by anyone -- I will go

12  back.  You are a member -- have been a member of the U.S.

13  Attorneys' Opioid and Heroin Task Force or Heroin and

14  Opioid Task Force?

15  A.   Yes, I have been.

16  Q.   Were you questioned by anyone at either of those

17  depositions about your participation in the Task Force

18  and what was discussed at meetings?

19  A.   Yes, I was.

20  Q.   How did you feel -- well, who questioned you about

21  that?

22  A.   I believe it was the counsel for Purdue Pharma.

23  They did the bulk of the questioning in both depositions,

24  and as I recall, the topics were just, you know, were

25  these public -- was this information out in the

Dr. Gilson – Examination

1   public?

2   Q.   But Ms. Rendon wasn't –– didn't participate in

3   either of those depositions ––

4   A.   No.

5   Q.   –– to your recollection?

6   A.   No, your Honor.  She was not present, and I know in

7   the 30(b)(6), we also had asked whether she was on the

8   phone.  She was not, so I believe she was not on the

9   phone for my fact deposition, either.

10            THE COURT:  Okay.  Thank you.  Then I don't

11  have any further questions of you.  I don't know if

12  either side wishes to question you further.

13            MR. WEINBERGER:  Yes, your Honor, if I

14  may?

15            THE COURT:  All right.  Mr. Weinberger?

16                 EXAMINATION CONTINUED

17  BY MR. WEINBERGER::

18  Q.   Do you know whether or not there were any

19  lawyers from Baker Hostetler, Ms. Rendon's law firm,

20  either present or on the phone for either of your

21  depositions?

22  A.   Yes, I do.

23  Q.   And what is your knowledge about that?

24  A.   There were attorneys, certainly at my fact

25  deposition, also I believe at my 30(b)(6) deposition.

Dr. Gilson – Examination

1   Q.   Were you asked questions, Dr. Gilson, related to

2   when it was that from your perspective as Medical

3   Examiner of Cuyahoga County you became aware of an opioid

4   epidemic or crisis?

5   A.   That was covered in my deposition, yes.

6   Q.   Was there extensive questions about that issue

7   raised with you?

8   A.   I mean, they were both very long days, yes.  I am

9   sure.

10  Q.   Okay.  And did your involvement as a member of the

11  Task Force of the U.S. Attorney's Task Force, were you

12  questioned about when you, as a member of that Task Force

13  or when the Task Force, in general, became aware of

14  whether there was an epidemic related to opioids within

15  the County?  Was that part of the questioning?

16  A.   I don't remember that as a specific question.  We

17  were talking about kind of how we came to understand the

18  epidemic, and that certainly would have –– had bearing on

19  that topic.

20  Q.   Okay.  As Medical Examiner for the County, did there

21  come to be an occasion where you and Ms. Rendon and other

22  members of the Medical Examiner's Office sat together in

23  an office, in a confidential matter to discuss strategies

24  for the prosecution of opioid–related deaths?

25  A.   Yes.  In 2016, we met at the Medical Examiner's

Dr. Gilson - Examination

1    Office, myself and administrator Hugh Shannon were

2    present on my side.  I know Ms. Rendon was also present,

3    and there were other people from the U.S. Attorney's

4    Office.

5         I am not exactly sure who was present there,

6    but she was not the only person from the office, and the

7    only other one I distinctly remember being there was

8    Joseph Pinjuh, an Assistant U.S. Attorney.

9    Q.   And your job, as a Medical Examiner, was ultimately

10   to provide expert testimony, if necessary, with respect

11   to prosecutions of drug dealers and the like associated

12   with opioid-related deaths, correct?

13   A.   There was an interest in prosecuting some of the

14   drug dealers under a death specification, and we were

15   talking about strategies and expert testimony that would

16   be provided on those deaths that occurred in our

17   jurisdiction, in Cuyahoga County.

18   Q.   And did you consider those conversations that you

19   had with Ms. Rendon -- by the way, Ms. Rendon was a

20   member of the U.S. Attorney's Office at the time,

21   correct?

22   A.   Yes, she was.

23   Q.   And did you consider those conversations to be of a

24   confidential or privileged nature between you and the

25   members of the U.S. Attorney's Office, including

Dr. Gilson – Examination

1    Ms. Rendon?

2    A.    Yes, I did.

3    Q.    At some point, did you become aware of the fact that

4    Ms. Rendon was representing one of the manufacturers of

5    opioid pills or products?

6    A.    Yes, I did.

7    Q.    And how did you feel about her representing an

8    opioid manufacturer in light of your involvement with her

9    and her involvement in the Opioid Task Force?

10   A.    On a personal level, I was very disappointed

11   because, you know, we had worked a lot on something that

12   was very damaging to our community.  Professionally, I

13   always felt free to speak at the U.S. Attorney's Task

14   Force, and I think it was a place where we could exchange

15   ideas.  I don't feel like anything that was said there

16   was untruthful.

17          I don't know how that would impact, you

18   know, any of these proceedings.  And yeah, I think some

19   of it was more my personal feelings; some of it was, you

20   know, professionally wondering what impact that would

21   have on it but my feeling personally that I had misled

22   anybody in what I had shared at that meeting.

23   Q.    I was not suggesting that.

24          You respect Ms. Rendon and had a good

25   relationship with her while she was with the U.S.

Dr. Gilson – Examination

1    Attorney's Office?

2    A.    I certainly did.  I think she was a wonderful

3    colleague and a great attorney, and we co-authored a

4    paper together that I thought her contributions were very

5    helpful and kind of getting a side across to my

6    professional colleagues that was important.

7    Q.    And during your interaction with her, you placed

8    your trust as the Medical Examiner of this County in her,

9    did you not?

10   A.    Sure.

11            MR. WEINBERGER:  Thank you.  That's all I

12   have.

13            MR. PARKER:  Your Honor, John Parker.  If I

14   can, I will go back.

15            THE COURT:  Okay.

16                EXAMINATION CONTINUED

17   BY MR. PARKER::

18   Q.    Good afternoon, Dr. Gilson.

19   A.    Good afternoon, sir.

20   Q.    I don't think we met.  I am John Parker from Baker

21   and Hostetler.

22            I want to ask you a few questions, if I can,

23   first, about the Opioid Task Force.  You were a member of

24   that Task Force?

25   A.    Yes, I was.

Dr. Gilson – Examination

1    Q.    And you came to some meetings.  Is that right?

2    A.    I —— there were really two task forces in the

3    County.  One was from the Board of Health, which I was

4    more actively participating in.  The U.S. Attorneys, I

5    certainly participated in a fair amount, but I would say

6    the more active participant from my office was my

7    administrator, Hugh Shannon.

8              Last name is S-h-a-n-n-o-n, and he, I think,

9    missed —— he missed one or two meetings.  That's as many

10   as he missed in the entire duration of the Task Force,

11   and we were both active in terms of planning up towards

12   the summit in 2013, which is what I see as the genesis of

13   the Task Force.

14   Q.    It is a great point, Dr. Gilson.

15             So the Court is the clear, there were two

16   task forces:  One, the Cuyahoga County Opioid Task Force,

17   correct?

18   A.    That's from the Board of Health, yeah.

19   Q.    Yes.  And you were an active participant in that,

20   correct?

21   A.    Yes.

22   Q.    And Ms. Rendon never went to any of those

23   meetings?

24   A.    I never remember her being there.

25   Q.    And the other Task Force was the U.S. Attorney

Dr. Gilson - Examination

1    Heroin and Opioid Task Force, correct?

2    A.    Yes.

3    Q.    And you went to some of those meetings, not all but

4    some?

5    A.    As many as my schedule would permit, but yeah, but I

6    had representation from the office at virtually all of

7    them.

8    Q.    But you were there enough to know there was lots of

9    members at those meetings, correct?

10   A.    That's correct.

11   Q.    There was the Cleveland Clinic, MetroHealth,

12   correct?

13   A.    There were physicians from there, yes.

14   Q.    Okay.  There were representatives of the Cuyahoga

15   County Common Pleas Court, Judge Synenberg, Judge Matia,

16   correct?

17   A.    I had seen them there, yes.

18   Q.    And Channel 3, Monica Robins?

19   A.    I don't remember seeing her there.  She was at the

20   summit I know.

21   Q.    Did you see Bill Shields there, also a local anchor

22   man.  Do you know who Bill Shields is?

23   A.    I have to confess, I don't know -- if he fell in

24   front of me if I'd recognize him.

25   Q.    He will be disappointed to learn that.

Dr. Gilson – Examination

1  A.   But don't tell him I said so.

2         (Laughter.)

3  Q.   Okay.  There were some of the members from the media

4  that attended some of the Task Force meetings, however,

5  correct?

6  A.   I can't say that.

7  Q.   Fair enough.  There were people from educators,

8  from various education facilities, or am I confusing the

9  other Task Force, Baldwin Wallace, and some of those

10  schools?

11  A.   There were representatives on the Board of Health

12  Task Force about education because one of the initiatives

13  we were trying to consider was whether or not it would be

14  advantageous to start school programs for instruction.

15         So I would associate, at least, the person I

16  worked with most closely there with the Board of Health

17  Task Force.  She may have been present.  You know, I

18  didn't really keep track of everybody present there.  She

19  may have been present at the U.S. Attorney's Task Force

20  as well.

21  Q.   At the U.S. Attorney's Task Force, there were

22  recovering addicts, correct?

23  A.   At least a couple.

24  Q.   So they were private citizens, weren't they?

25  A.   I mean, we are all private citizens.  They were

Dr. Gilson – Examination

1    there in their capacity as representatives of the

2    recovering community.

3    Q.   And never during one of the meetings that you

4    attended, Doctor, did anybody say what we're discussing

5    in these meetings is confidential, don't talk about it

6    outside the room, did they?

7    A.   That's not true.

8    Q.   That was said?

9    A.   I distinctly recall Commander Gingell saying at one

10   point we were talking about a specific topic, that he did

11   not want that disseminated.

12   Q.   And he was telling that to the recovering addict

13   community and to all these people, perhaps the media,

14   that was in the room?

15   A.   He just told everybody in the room that that wasn't

16   to be shared, yeah.

17   Q.   And he took it on their word that they would do

18   that.  Nobody had to sign a non disclosure agreement, did

19   they?

20   A.   I never did.

21   Q.   You made presentations at some of the U.S.

22   Attorney's Task Force meetings, didn't you?

23   A.   Yes.

24   Q.   Among the things you presented were the deaths going

25   on in the community, all sorts of statistics regarding

Dr. Gilson – Examination

1    the opioid crisis, correct?

2    A.    That's correct.

3    Q.    And you didn't mean for any of those to be

4    confidential, did you?

5    A.    They are on our website.  I mean, we shared a lot of

6    that information.  I may have shared interpretations of

7    it.  I really wasn't focusing on whether that was going

8    to be more widely disseminated.

9    Q.    No.  In fact, you are right, Doctor.  All of that

10   information is on the Cuyahoga County Medical Examiner's

11   website, isn't it, the number of fentanyl deaths, the

12   number of heroin deaths, the carfentanil deaths related

13   in the County.  All of those things just as an example

14   are publicly available on the website, aren't they?

15   A.    I am not sure if I follow exactly what you mean.

16   Everything that I discussed at that Task Force is on the

17   website?  That is not true.

18   Q.    Did you publish on the website the number of

19   fentynal and carfentanil–related deaths in Cuyahoga

20   County?

21   A.    Yes, I did.

22   Q.    And did you put things on the website about new

23   trends like fake prescription pills actually made out of

24   fentanyl, warnings like that on your website?

25   A.    Absolutely.

Dr. Gilson – Examination

1    Q.    And those are things you discussed openly in the

2    U.S. Attorneys and Opioid Task Force, correct?

3    A.    I would have discussed them there, yes.

4    Q.    And sir, you didn't intend for anything you said,

5    anything that the Medical Examiner's Office said to be

6    confidential at those meetings, did you?

7    A.    I don't remember to be honest because I shared, you

8    know, interpretations and analysis of some of that data,

9    and as I say, I thought it was a free-ranging forum.  I

10   was not really concerned about confidentiality that much

11   on my part because the people in the room were

12   stakeholders trying to address a really very damaging

13   crisis in our community.

14   Q.    And sir, wasn't one of the objectives of the Task

15   Force to disseminate to the community the information

16   that the organizations were sharing?

17   A.    Sure.  I think, you know, some of it.  I don't know

18   that all of that was intended.  It wasn't just -- you

19   know, we published minutes from all our meetings.

20   Q.    I want to switch gears for just a moment and

21   talk about the meeting you had with Ms. Rendon in the

22   Medical Examiner's Office.  I believe you said that was

23   in 2016?

24   A.    My recollection -- and I tried to go back and

25   look -- it's early 2016.

Dr. Gilson - Examination

1    Q.   All right.  And Mr. Pinjuh came along with her and

2    other representatives of the U.S. Attorney's Office.

3    A.   And Craig Tame, and I don't remember if there were

4    other folks there.

5    Q.   All right.  And the purpose of that meeting was for

6    the U.S. Attorney's Office to explain to you what the

7    Burrage versus United States Supreme Court opinion

8    required to support a possible sentencing enhancement in

9    federal court, right?

10              MR. WEINBERGER:  Objection, your Honor.  We

11   are getting very close to the concerns that I have?

12              THE COURT:  Well, I will allow the subject.

13   Was that one of the subjects you talked about?

14   A.   We certainly talked about that, yes.

15   Q.   In fact, to address Mr. Weinberger's objection, you,

16   Ms. Rendon, and Mr. Pinjuh published a four-page article

17   about that very subject that got published.  Isn't that

18   right?

19   A.   Yes, I did.

20   Q.   You didn't mean for that to be confidential, did

21   you, sir?

22   A.   No.

23   Q.   No.  In fact, that article was subsequently

24   published in the Academic Forensic Pathology, the

25   official publication of the National Association of

Dr. Gilson - Examination

1   Medical Examiners, right?

2   A.   That's correct.

3   Q.   And the purpose of that was to try to get enhanced

4   sentencing, and you wanted every coroner in the country

5   to know about that possibility, didn't you?

6   A.   My purpose in publishing that was to explain what

7   the burden was that federal prosecutors were facing, so

8   as an educational tool to understand what was implied

9   under Burrage when there were mixed intoxications.

10          The other purpose of it — and granted it is

11  probably not a legal journal that is read by a lot of

12  attorneys — was also to say this is kind of the medical

13  side of what I cannot, you know, honestly say in a

14  mixture as an interpretation.

15          So it wasn't that I was doing anything more

16  than trying to give a factual representation is how I

17  understood that in association with good attorneys to

18  fill in the legal side of it.

19  Q.   And Doctor, Ms. Rendon came to your office once, and

20  the Burrage decision was what she discussed, correct?

21  She only came once to the Medical Examiner's Office to

22  meet with you, correct?

23  A.   As far as I remember.  We were discussing strategies

24  about prosecutions, and that would have involved the

25  Burrage decision.

Dr. Gilson – Examination

1  Q.   And you published those strategies in an article

2  publicly disseminated, so every single prosecutor

3  and Medical Examiner in the country that read the

4  article would have benefit of that.  Isn't that correct,

5  Doctor?

6  A.   And every defense attorney I hoped, too.

7  Q.   That's right.  It wasn't meant to be confidential,

8  was it, sir?

9  A.   No.

10  Q.   You gave –– I think the Court asked you –– you gave

11  two depositions in this case?

12  A.   Yes, I did.

13  Q.   And one individually and one as a 30(b)(6)

14  representative of the County?

15  A.   That's correct.

16  Q.   And there were a lot of topics.  I won't go through

17  them, but you had a lot of topics you had to prepare for

18  in that 30(b)(6) deposition, correct?

19  A.   Yes, I did.

20  Q.   And you reviewed a lot of documents to prepare for

21  your deposition and ask whatever questions you thought

22  might come up, correct?

23  A.   I reviewed a lot of documents.  I did a lot of

24  preparation with counsel for the County and tried to

25  be as prepared as the County's representative as I

Dr. Gilson – Examination

1   could.

2   Q.   But isn't it true, Doctor, that every document you

3   prepared or you reviewed in connection with preparation

4   for your deposition so you could answer whatever

5   questions the defense might ask you you testified were

6   publicly available documents most on the County's

7   website.  Isn't that true, sir?

8            Do you remember testifying to that at your

9   deposition?

10  A.   I don't, but I mean, most of the documents I

11  reviewed are publicly available.

12  Q.   You don't recall at your deposition saying that to

13  the best of your knowledge everything that you reviewed

14  was publicly available?

15  A.   I don't remember, but it is certainly not untrue as

16  I sit here today.

17  Q.   You've also testified before Congress.  Is that

18  right?

19  A.   Yes, I did.

20  Q.   And the purpose of your testimony was to share

21  everything about what was happening in the opioid crisis

22  in Cuyahoga County.  Is that correct?

23  A.   It would be long testimony if it was everything.  I

24  gave an overview of what was going on in the crisis at

25  that time, and the specific matter the Senate would have

Dr. Gilson — Examination

1    under consideration was about regulating parcels through

2    the U.S. Postal Service, UPS and FedEx and how drugs were

3    entering the country.

4    Q.   And before Congress, you testified about the

5    resources of the Medical Examiner's Offices as they had

6    been affected by the opioid crisis, correct?

7    A.   I believe I did, yes.

8    Q.   You even submitted a budget to Congress entitled

9    "The Cost of Heroin-Fentynal Crisis, Fiscal Impacts to

10   the Cuyahoga County Medical Examiner's Office Operation

11   Update," didn't you?

12   A.   I don't remember if there is a document like that.

13   I don't remember if it was submitted to Congress.

14   Q.   You don't dispute that though.  You just don't

15   remember?

16   A.   I don't know.

17   Q.   You certainly didn't mean for your Congress

18   testimony to be confidential, did you?

19   A.   No.

20   Q.   And in fact -- well, I think I've asked that

21   question.

22           MR. PARKER:  Thank you very much, Doctor?

23           THE COURT:  All right.  Doctor, I just have

24   one final question.

25           EXAMINATION CONTINUED

1    BY THE COURT::

2    Q.    I think your words were, if I got it correctly, you

3    were personally very disappointed when you learned that

4    Ms. Rendon was representing a drug manufacturer in this

5    case.

6              My question is:  Will this —— do you believe

7    this will have any impact upon your participation in the

8    Heroin and Opioid Task Force or any future Task Force

9    coordinated by the U.S. Attorney's Office?

10   A.    No.  I remain very committed to helping the

11   community.

12             THE COURT:  Okay.  Thank you.  You may step

13   down.  You can stay for the rest of this, but I am sure

14   you have a lot of other duties.  But as far as I am

15   concerned, you are excused.

16             THE WITNESS:  Just a few.  Thank you very

17   much.

18             THE COURT:  All right.  I didn't have any

19   other questions of any witnesses, and I am not looking to

20   prolong this.  If either side has a brief witness that

21   they want to present, witness or witnesses, I will

22   consider it, but again, I am not —— I've asked the

23   questions of the witnesses that I wanted to ask.

24             MR. WEINBERGER:  Your Honor, on behalf of

25   the Plaintiffs, we would call to the stand Chief Calvin

1   Williams of the city of Cleveland.  That's what we are

2   considering doing.  If I may with all do respect, how do

3   you see the rest of this hearing playing out?  For

4   example —

5              THE COURT:  I don't — I don't need any —

6   the only argument I need is anything new that someone

7   wants to add based on the testimony today.  I've read

8   everyone's very thorough memoranda.  I certainly don't

9   need anyone to summarize the arguments or paraphrase the

10  arguments or say them again.

11             But if anyone has anything additional

12  to say based on the testimony today — obviously, no

13  one had heard that testimony — I would be interested in

14  that brief argument, but that's — I don't need much

15  more.

16             MR. WEINBERGER:  From the Plaintiffs'

17  perspective —

18             THE COURT:  And was the Chief — well, the

19  Chief was, of course, deposed.  I actually read the

20  deposition transcript.

21             MR. WEINBERGER:  Yes.  And I can tell you

22  that he was not involved in the Task Force but was, as

23  you might expect, intimately involved in the consent

24  decree.

25             THE COURT:  I understand that.  He was not

1    involved in the Task Force.  If you think you have a few

2    brief questions about, I guess, about the deposition or

3    about how he feels or has reacted, I would permit that,

4    but I don't need — I don't want a lot of long

5    questioning.  I don't know if the Defendants are going to

6    present any witnesses.  So you are proposing to have

7    brief questioning of Chief Williams?

8                    MR. WEINBERGER:  Right.

9                    THE COURT:  From the defense side, what

10   about you, Mr. Parker or Mr. Stern?

11                   MR. PARKER:  We would probably call

12   Ms. Rendon, your Honor.

13                   THE COURT:  Okay.  All right.  Well, I will

14   have some brief questions of Chief Williams

15   Mr. Weinberger if you wish to call him.

16                   MR. WEINBERGER:  I will.

17                   THE COURT:  But I want to keep them brief.

18                   MR. WEINBERGER:  And as far as argument,

19   your Honor, the concerns we have, there is no question,

20   the issues have been fully briefed, but since the filing

21   of our reply brief, which we expect would be the end of

22   the briefing, you have granted Endo the right to file a

23   sur—reply.  You've also allowed other co—Defendants and

24   the co—Defendant manufacturers to file a brief, and

25   you've also just a few minutes ago allowed into the

Chief Williams — Examination

1    record a letter ――

2           THE COURT:  I didn't invite any of these

3    filings, but it didn't make sense to just say you can't

4    file them.

5           MR. WEINBERGER:  No, nor am I suggesting

6    that, your Honor, but I think I would be remiss in not

7    being able to comment on these recent filings that we

8    didn't expect were going to occur.

9           THE COURT:  Well, I might allow brief

10   comment on something of the new filing.  So let's hear

11   from the Chief first.

12          (Pause.)

13          THE COURT:  Good afternoon.  If you could

14   raise your right hand.

15          **CHIEF CALVIN D. WILLIAMS**

16   **called as a witness and being first duly sworn, was**

17   examined and testified as follows:

18                    EXAMINATION

19          THE COURT:  Thank you.

20   BY MR. WEINBERGER::

21   Q.   Would you please state your full name and your

22   position with the city of Cleveland.

23   A.   Calvin Daniel Williams.  I am the Chief of Police

24   for the city of Cleveland.

25   Q.   And how long have you held that position?

Chief Williams – Examination

1    A.    I have been the chief since February 10th, 2014.

2    Q.    All right.  As a result of holding that position,

3    did you have involvement in the negotiations of a

4    settlement resulting in a consent decree with the

5    U.S. Attorney's Office involving the Cleveland Police

6    Force?

7    A.    Yes, I did.

8    Q.    Specifically — well, in general terms, what was

9    your involvement in that?

10   A.    In general terms, I represented to the Division of

11   Police in both the leadup with the investigation in

12   supplying documents for the Department of Justice as well

13   as the negotiation of the actual settlement agreement

14   itself and now currently the implementation of that

15   settlement agreement.

16   Q.    And in the course of negotiating the consent decree

17   and your involvement in that process, did you have

18   involvement with Carole Rendon?

19   A.    Yes.

20   Q.    And her position was with the U.S. Attorney's Office

21   at the time?

22   A.    That's correct.

23   Q.    And as part of the negotiations, were you required

24   to disclose information regarding the operation of the

25   Cleveland Police Department in a confidential setting?

Chief Williams - Examination

1    A.    Yes, we were.

2    Q.    Can you just give the Court a brief overview of

3    the kind of information that you were required to

4    provide to the U.S. Attorney's Office, including Carole

5    Rendon, to carry out the potential consent decree and

6    settlement?

7    A.    Yes.  The city of Cleveland as well as the Division

8    of Police was required to give any and all documentation

9    on our staffing.  The resources and deployment of

10   divisional assets as far as computers, cars, things like

11   that, how the division operates from top to bottom, all

12   that information was required in the consent decree

13   process for the U.S. Department of Justice.

14   Q.    And was Ms. Rendon a recipient of this information?

15   A.    Yes.

16   Q.    You gave your deposition in this case?

17   A.    Yes, I did.

18   Q.    And was Ms. Rendon present at the deposition?

19   A.    Yes, she was.

20   Q.    And did she question you about information

21   concerning the use of Cleveland Police Department

22   resources in reference to the opioid epidemic and crime

23   related to opioids?

24   A.    Yes, she did.

25   Q.    Specifically what areas did she ask about?

Chief Williams – Examination

1  A.   She asked a little bit about the Task Force

2  operations, the Opioid Task Force itself, but more

3  specifically, we talked or her questions concerned the

4  settlement agreement, the resources that were supplied or

5  that the city of Cleveland had to supply to be in

6  compliance with the settlement agreement and work through

7  that process.

8  Q.   And did that include questions about the

9  availability and use of Narcan?

10  A.   Yes.

11  Q.   And did it involve information about drug

12  prosecutions and the like?

13  A.   I believe we talked about the prosecutions that were

14  related to our HIDI unit within our division.

15  Q.   What is the HIDI unit?

16  A.   The Heroin Involved Death Investigation unit that is

17  a part of our narcotics unit.

18  Q.   From your perspective, as the witness being

19  questioned by Ms. Rendon, was she utilizing information

20  that was generated from the consent decree negotiations

21  in her questioning of you?

22  A.   Yes.  I thought that was her purpose there,

23  yes.

24  Q.   And can you explain a little bit more how —— what

25  occurred and what you experienced in that questioning?

Chief Williams – Examination

1    A.    Well, the questions were along the lines of exactly

2    things that were part of the settlement agreement, things

3    that were part of divisional operations, things that were

4    part of Task Force operations with the Cuyahoga County

5    and Opioid Task Force itself.

6    Q.    I am going to ask you a question the Court has asked

7    other witnesses, and that is, from your position as Chief

8    of Police, how did you feel about being asked these

9    questions by counsel, Ms. Rendon, when she was

10   representing the Defendant manufacturer in relation to

11   the fact that she had previously been involved in this

12   consent decree?

13   A.    Honestly, your Honor, I felt betrayed.  I felt that

14   this is a person that we worked side by side with, both

15   during the consent decree process and during this opioid

16   crisis that had intimate knowledge of everything we are

17   doing, everything that we are trying to accomplish, that

18   actually spearheaded a lot of this?  And now this person

19   is sitting a cross the table from me basically using

20   information against us.

21   Q.    Now, when she was negotiating the consent decree on

22   behalf of the U.S. Attorney's Office, she was in an

23   adverse position to the city of Cleveland at that time,

24   correct?

25   A.    Yes, she was, but that process, we also agreed

Chief Williams – Examination

1    once the settlement agreement was reached actually in

2    Judge Oliver's chamber that it would be a collaborative

3    approach to implementing the consent decree process.

4    Q.    So in spite of the fact that the issues that

5    confronted the city of Cleveland were brought forward by

6    the U.S. Attorney's Office and Ms. Rendon, the process of

7    proceeding towards the consent decree was a collaborative

8    process between you, members of the city of Cleveland,

9    and the U.S. Attorney's Office, correct?

10   A.    To the extent possible, yes.

11   Q.    Including Ms. Rendon, correct?

12   A.    Yes.

13              MR. WEINBERGER:  Thank you, your Honor.

14              MR. PARKER:  Few questions, your Honor?

15              THE COURT:  Yes, Mr. Parker.

16                   EXAMINATION CONTINUED

17   BY MR. PARKER::

18   Q.    Good afternoon, Chief Williams.

19   A.    Afternoon.

20   Q.    You are not a member of the U.S. Attorney's Heroin

21   and Opioid Task Force, are you?

22   A.    Yes, I am.  I defer my membership to Commander Gary

23   Gingell.

24   Q.    You don't go to their meetings.

25   A.    No.

Chief Williams – Examination

1    Q.    And you are not aware of who actually attends those

2    meetings?

3    A.    Through e-mail correspondence and reports from

4    Commander Gingell, yes.

5    Q.    And did you get the e-mail that had 108 recipients

6    for people who attended the U.S. Attorney's Opioid and

7    Heroin and Opioid Task Force?

8    A.    I can't recall that exact e-mail, but yes, I do get

9    e-mails with dozens and dozens of people listed on the

10   e-mails, yes.

11   Q.    For the —— who are attendees or members of the U.S.

12   Attorney's Heroin and Opioid Task Force?

13   A.    Both, yes.

14   Q.    I want to ask you a few questions about the consent

15   decree.

16              You said you felt betrayed when Ms. Rendon

17   went into private practice and decided to represent

18   companies when she had been on the other side of the

19   table representing the federal government against the

20   city of Cleveland negotiating the consent decree.  Did I

21   understand that testimony correctly?

22   A.    No.

23   Q.    What I did understand, the federal government and

24   the Justice Department, in particular, was looking into

25   the practices of the city of Cleveland that led to the

Chief Williams – Examination

1    consent decree, correct?

2    A.   I do understand that the mayor of the city of

3    Cleveland invited the Department of Justice to review the

4    Division of Police, yes.

5    Q.   Well, it was an investigation by the Department of

6    Justice into the alleged use of excessive force in

7    violation of constitutional rights by the Cleveland

8    Division of Police.  Isn't that correct?

9    A.   That's part of it, yes.

10   Q.   That's what you testified at your deposition it was

11   about, correct?

12   A.   I don't recall that exactly.

13   Q.   But it is right?

14   A.   I'm sorry?

15   Q.   That's a correct statement:  It was an investigation

16   by the Department of Justice into the alleged use of

17   excessive force and a violation of constitutional rights

18   by the Cleveland Division of Police, correct?

19   A.   That was part of the investigation, yes.

20   Q.   And the Department of Justice opened that

21   investigation in March of 2013, correct?

22   A.   As far as I remember, that's correct.

23   Q.   And findings were announced on December 4th, 2014,

24   correct?

25   A.   That seems like the timeline, yes.

Chief Williams - Examination

1    Q.   And the investigation had nothing to do with the

2    Cleveland Division of Police's response to the opioid

3    abuse crisis, correct?

4    A.   The investigation, no, it did not.

5    Q.   Okay.  It was about excessive force, correct, among

6    other things, but it was -- that was the primary issue

7    that was being investigated by the Justice Department,

8    correct?

9    A.   Correct.

10   Q.   And in your view, the opioid crisis, as tragic as it

11   is and the consent decree, are totally different matters,

12   aren't they?

13   A.   Yes and no.

14   Q.   Well, you are aware that there were findings issued

15   by the Department of Justice, aren't you?

16   A.   Yes, I am.

17   Q.   And those are a public document, aren't they?

18   A.   Yes.

19   Q.   And that was 59 pages I believe long, and it is

20   published on the city of Cleveland's website, isn't

21   it?

22   A.   Correct.

23   Q.   And nowhere in those 53 or 59 pages is the word

24   "opioid" even used, is it, Chief?

25   A.   To my knowledge, no.

Chief Williams – Examination

1    Q.    And in fact, subsequently, the consent decree became

2    a public document, did it not?

3    A.    Yes.

4    Q.    And that's filed, among other places, on the city of

5    Cleveland's website?

6    A.    Yes.

7    Q.    And in fact, the only time in the 105-page consent

8    decree that the word "opioid" appears is one time on page

9    100 in paragraph 431 where it defines an individual in

10   crisis and says "that is a person in a mental health

11   crisis who appears to be significantly under the

12   influence of opioids or PCP."

13              That's the only time it is in the consent

14   decree.  Isn't that true, Chief.

15   A.    If I remember correctly, you may be right.

16   Q.    And you've testified before City Council numerous

17   times about the consent decree, haven't you?

18   A.    A few times, yes.

19   Q.    And was it — have you testified before committees

20   of Council in addition to the Council as a whole?

21   A.    That's correct.

22   Q.    Has your testimony been recorded?

23   A.    On TV 20, yes.

24   Q.    And at those hearings, you presented information and

25   answered questions about the resources that would be

Chief Williams – Examination

1    required to comply with the consent decree, haven't

2    you?

3    A.    Yes.

4    Q.    And you've included the cost of compliance in the

5    consent decree in proposed budgets of the Division, have

6    you not?

7    A.    In some instances, yes.

8    Q.    And those budgets are public records, aren't they,

9    sir?

10   A.    Yes.

11   Q.    So there is really no secret, is there, Chief, about

12   what the city of Cleveland has to do to comply with the

13   consent decree and how much it will cost and all those

14   sorts of things?

15   A.    For compliance?

16   Q.    Yeah.

17   A.    No.  There isn't, no.

18   Q.    And in fact, the person who is in charge of

19   overseeing compliance with the consent decree is the

20   monitor.  Isn't that right?

21   A.    He is appointed by the Court, yes.

22   Q.    And the person, the individual assigned with

23   oversight of the Cleveland Division of Police compliance

24   internally is Greg White, correct?

25   A.    Greg White works for the mayor, yes.

Chief Williams – Examination

1    Q.    In overseeing compliance with the consent decree,

2    right?

3    A.    That's his duty, yes.

4    Q.    Yes.  He is a former U.S. Attorney, isn't he?

5    A.    Yes, he is.

6    Q.    He is a former Judge in this courthouse, isn't

7    he?

8    A.    Yes.

9             MR. PARKER:  No further questions.  Thank

10   you.  Oh, I'm sorry, your Honor.  I have one more

11   question.

12   BY MR. PARKER::

13   Q.    Is the fact that Ms. Rendon is no longer in the U.S.

14   Attorney's Office and now represents Defendants in the

15   opioid case going to change the efforts of the Cleveland

16   Division of Police in one small bit with the vigor and

17   the efforts they bring to attack the opioid crisis in

18   Cleveland?

19   A.    I don't think I quite understand your question.

20   Q.    You are going to still do your best job everyday

21   trying to fight the opioid crisis in Cleveland, and you

22   are going to ask your Division to do the best job they

23   can to fight the opioid crisis everyday in Cleveland,

24   regardless of where Ms. Rendon works, aren't you?

25   A.    Of course we are.

Chief Williams – Examination

1      MR. PARKER:  Thank you.

2           EXAMINATION CONTINUED

3  BY MR. WEINBERGER::

4  Q.   Chief Williams, if the consent decree has nothing to

5  do with the opioid crisis, do you have any idea why it

6  was you were asked all those questions by Ms. Rendon

7  about the consent decree in your deposition?

8  A.   I think they go to resources, expenditures, and

9  things like that.

10  Q.   Right.  So resources how you — prior to the decree

11  and since the decree, you were assigning resources to

12  various aspects of law enforcement, correct?

13  A.   That's correct.

14  Q.   And I know you are not a lawyer, are you?

15  A.   No, I am not.

16  Q.   Okay.  So if the defense of Endo Pharmaceuticals who

17  Carole Rendon represents and who — and if she is the

18  lawyer that signed an answer, that alleges the city of

19  Cleveland failed to mitigate their damages, in other

20  words, failed to assign resources to remedy the opioid

21  crisis, does that square with why perhaps you were being

22  asked that question —

23           MR. PARKER:  Objection, your Honor.

24  Q.   — about the consent decree?

25           THE COURT:  I think that — that calls for

Chief Williams – Examination

1  the witness to speculate why someone else asked a

2  question, Mr. Weinberger, so I will sustain that

3  objection.

4  BY MR. WEINBERGER::

5  Q.   Okay.  But from your understanding, the line of

6  questioning that you were subjected to had to do with

7  issues of whether or not you were assigning or the city

8  of Cleveland was assigning sufficient personnel and

9  resources to the opioid crisis, correct?

10  A.   That's correct.

11           MR. WEINBERGER:  Thank you, your Honor.

12           THE COURT:  All right.  Thank you, Chief.

13  You may step down.  You are welcome to stay.  But I know

14  you have got a lot more responsibilities, so you are

15  certainly free to go, but thank you.

16           THE WITNESS:  Thank you, your Honor.

17           THE COURT:  All right.  Mr. Parker, if you

18  want to call Ms. Rendon.  Ms. Rendon, if you can raise

19  your right hand?

20                  - - - - -

21

22

23

24

25           **CAROLE RENDON**

Ms. Rendon - Examination

1   called as a witness and being first duly sworn, was

2   examined and testified as follows:

3                              EXAMINATION

4   BY MR. PARKER:

5   Q.   Ms. Rendon, let's try to cut to the Chase a little

6   bit here.

7                   While you were employed in the U.S.

8   Attorney's Office, did you ever work on a matter that had

9   the same basic facts and the same related parties as the

10  there track one cases?

11  A.   No, I did not.

12  Q.   Do you possess any confidential government

13  information as that term is used — as you understand

14  that term to be in Rule 1.11 of the Ohio Rules of

15  Professional Conduct that you could use to the material

16  detriment of the track one Defendants?

17  A.   No, I do not.

18  Q.   Whether or not you could use it to the Plaintiffs'

19  material disadvantage, do you possess any confidential

20  government information that's relevant to this case?

21  A.   I do not.

22  Q.   How do you know that with such confidence?

23  A.   Because I am the one and only person sitting in this

24  room who knows what I know, and I know the rules, and I

25  know what they require.  I know what confidential

Ms. Rendon - Examination

1    government information is, and I don't possess any of it

2    relevant to this case.

3    Q.    Do you take your ethical obligations as a lawyer

4    seriously?

5    A.    I absolutely do.

6    Q.    Can you explain that?

7    A.    So in my life and in my career with my clients, I

8    have worked with and worked side by side with people who

9    are rule followers and people who are rule benders and

10   people who are rule breakers, and I am to a fault a rule

11   follower.

12   Q.    You submitted a declaration that the Court has in

13   this case?

14   A.    I did.

15   Q.    Who drafted that declaration?

16   A.    I drafted it.

17   Q.    Is it true and complete?

18   A.    It is.

19   Q.    I want to just get a little bit of your history in

20   the U.S. Attorney's Office so that we can put it in

21   context with when the cases that we are here about were

22   filed.

23              When did you first start in the Department

24   of Justice?

25   A.    My first job in the Department of Justice was

Ms. Rendon - Examination

1    actually in Boston, Massachusetts.  When I graduated from

2    law school, I clerked on the Seventh Circuit Court of

3    Appeals, and then I went into the Attorney General's

4    Honors Program in the Criminal Division of the Department

5    of Justice, and I was assigned to the Organized Crime

6    Strike Force in Boston, Massachusetts.  And subsequently,

7    the strike forces across the country were merged into

8    their local U.S. Attorney's Office, and my job stayed the

9    same, but my title went from Trial Attorney to Assistant

10   U.S. Attorney.

11   Q.   And how long were you in the U.S. Attorney's Office

12   in Boston?

13   A.   So all told just under a decade.

14              The second part of my time in the U.S.

15   Attorney's Office, I was the chief of the Organized Crime

16   Drug Enforcement Task Force.

17   Q.   And what did you do after you left the U.S.

18   Attorney's Office in Boston?

19   A.   I went into private practice, first briefly in

20   Boston, and then my husband Michael and I moved back home

21   to Cleveland.

22   Q.   And did you go back into the U.S. Attorney's Office

23   here in the Northern District of Ohio?

24   A.   Yes.  After spending about a dozen years in private

25   practice, I, in November of 2009, I returned to the

Ms. Rendon - Examination

1    Department of Justice.

2    Q.    In what position?

3    A.    Initially, as the Executive Assistant U.S. Attorney

4    and then as the First Assistant U.S. Attorney.

5    Q.    And how long did you serve in those roles?

6    A.    About six and-a-half years, November of 2009 until

7    February 6th of 2016.

8    Q.    And what happened on February 6th of 2016?

9    A.    I became the United States Attorney.

10   Q.    How long did you serve in that role?

11   A.    Until March 10th of 2017.

12   Q.    And why did you leave the U.S. Attorneys Office?

13   A.    Because I and all of my remaining colleagues who

14   were United States Attorneys across the country were

15   forced to resign on March 10th of 2017.

16   Q.    Now, while you were the assistant and the executive

17   assistant here in this office, did you personally

18   prosecute cases on a day-to-day basis?

19   A.    No.

20   Q.    How many criminal investigations did you directly

21   oversee?

22   A.    Myself personally, just one.

23   Q.    And how many criminal prosecutions did you handle

24   while you were the Executive and the First Assistant?

25   A.    I only handled two.

Ms. Rendon – Examination

1   Q.   Were either of them opioid cases?

2   A.   No.

3   Q.   What was the case you handled?

4   A.   So one was a single Defendant felon in possession of

5   a firearm case that I was going to try with a brand new

6   AUSA, but it ended up pleading, and the other was a

7   lengthy investigation and prosecution of campaign

8   finance, witness tampering, and obstruction of justice

9   charges.

10  Q.   Did you handle any civil litigation as the First

11  Assistant U.S. Attorney?

12  A.   I did.

13  Q.   What was that?

14  A.   So I handled two matters involving the Voting Rights

15  Act, one adverse to the Cuyahoga County Board of

16  Elections, and the other the Lorain County Board of

17  Elections, trying to bring those two counties into

18  compliance with the Voting Rights Act, which is why we

19  now have bilingual ballots in each of those counties, and

20  I worked on the consent decree with the Cleveland

21  Division of Police.

22  Q.   So at least in one matter, you were adverse to

23  Cuyahoga County Board of Elections while you were in the

24  U.S. Attorney's Office?

25  A.   Yes.

Ms. Rendon - Examination

1    Q.    During your tenure as Executive First Assistant, did

2    the U.S. Attorney's Office, to your knowledge, ever bring

3    an action against any of the Defendants in the track one

4    cases?

5    A.    No, we did not.

6    Q.    During your tenure as the Executive and First

7    Assistant, to your knowledge, was it ever discussed in

8    the U.S. Attorney's Office about bringing an

9    investigation or a case against the track one Defendants?

10   A.    No, it never was.

11   Q.    Now, when you became the U.S. Attorney, did you

12   conduct any trials?

13   A.    I did not.

14   Q.    Did you prosecute any criminal cases on a day-to-day

15   basis?

16   A.    No.

17   Q.    Did you handle any drug cases?

18   A.    No.

19   Q.    Did you handle any civil cases?

20   A.    Personally, no.  As the U.S. Attorney, no, I was not

21   able to be directly involved in any criminal or civil

22   cases.

23   Q.    Now, during your tenure as the U.S. Attorney, did

24   you or your office ever bring an action against any of

25   the track one Defendants?

Ms. Rendon - Examination

1    A.    We did not.

2    Q.    Did you ever investigate, to your knowledge, any of

3    the Defendants in the track one cases?

4    A.    No, we did not.

5    Q.    To your knowledge, was that ever even discussed?

6    A.    No, it was not.

7    Q.    And who was your client when you worked in the

8    U.S. Attorney's Office?

9    A.    United States of America.

10   Q.    In your entire legal career, have you ever

11   represented the city of Cleveland, Cuyahoga County, city

12   of Akron, or Summit County?

13   A.    No.

14   Q.    And so I don't forget, did the city of Akron or

15   Summit County ever participate in the U.S. Attorney's

16   Heroin and Opioid Task Force?

17   A.    They did not.

18   Q.    Did you ever have any contact with them in

19   connection with that?

20   A.    Not in connection with the task force, no.

21   Q.    And I assume you've never been employed by the city

22   of Cleveland, Cuyahoga County, the city of Akron or

23   Summit County, have you?

24   A.    I have not.

25   Q.    And were the track one lawsuits filed when you

Ms. Rendon – Examination

1    worked for the U.S. Attorney's Office?

2    A.    They were not, no.

3    Q.    Did you know the track one Plaintiffs planned to

4    file these lawsuits before they were filed?

5    A.    No.

6    Q.    Did anyone ever discuss the filing of the suits by

7    the track one Plaintiffs before they were filed?

8    A.    They did not.

9    Q.    Now, when did you begin representing Endo

10   Pharmaceuticals?

11   A.    In June of 2017.

12   Q.    Was that before or after the — well, where was that

13   case at by the way?

14   A.    So that case was filed by the Attorney General of

15   the state of Ohio.  At the time, it was Mike DeWine, and

16   that case is pending in the Southern District of Ohio in

17   Ross County.

18   Q.    And have the track one cases yet been filed?

19   A.    No.

20   Q.    Do you recall when Cuyahoga County filed its case?

21   A.    The first track one case that was filed was filed by

22   Cuyahoga County in October of 2017, and I apologize, I

23   don't remember the exact date.

24   Q.    Does the 27th sound right?

25   A.    Sounds right.

Ms. Rendon - Examination

1   Q.   And you had already been representing Endo by that

2   point?

3   A.   Correct, I was already representing Endo at that

4   point.

5   Q.   And do you recall when Akron and Summit filed their

6   cases?

7   A.   Akron and Summit filed in December of 2017.

8   Q.   All right.  Now, as the U.S. Attorney, it has been

9   mentioned that you were a member of the U.S. Attorneys

10  Heroin and Opioid Task Force?  Were you also involved in

11  various other community organizations and task forces?

12  A.   Yes, a lot of them.

13  Q.   Can you just tick them off for the Court?

14  A.   I will try.  I will tick off, at least, the ones

15  that I recall.

16          So I was very involved in the collaborative

17  and human trafficking work that was done with private

18  citizens and law enforcement to address that issue.  That

19  evolved with Cuyahoga County and others in establishing

20  the Northeast Ohio Business Ethics Coalition, which also

21  involved private citizens and business entities.

22          I helped to start up the Northeast Ohio

23  Cyber Security Consortium.  I also worked in a task

24  force-like setting to address issues involving

25  child pornography.

Ms. Rendon — Examination

1   Q.   There was some testimony earlier about an

2   organization called STANCE?

3   A.   Yes.  I was involved with STANCE.

4   Q.   Can you explain what STANCE is?

5   A.   STANCE stands for Standing Together Against

6   Neighborhood Crime Everyday, and the purpose of

7   STANCE, which existed long before I joined the U.S.

8   Attorney's Office here in the Northern District,

9   was to address the problem of youth violence in the

10  city of Cleveland.

11  Q.   And was that what was typically discussed at the

12  meetings that you attended for STANCE?

13  A.   That was, yes.

14  Q.   Now, I want to ask you some questions about the

15  U.S. Attorneys Heroin and Opioid Task Force, and if I

16  refer to it as the Task Force, you will understand what I

17  mean?

18  A.   Yes, I will.

19  Q.   Okay.  Can you tell us what it was?

20  A.   The U.S. Attorneys Heroin and Opioid Task Force was

21  an organization that was formed in the fall of 2013,

22  early winter actually, following a summit that we held at

23  the Cleveland Clinic, and it is an organization.  It is a

24  community organization that has, amongst its members, law

25  enforcement, federal, state, and local, elected judges,

Ms. Rendon - Examination

1    elected representatives outside of the judiciary, private

2    citizens, doctors, educators, treatment professionals,

3    pain management doctors, WKYC Channel 3, and others.

4    Q.    And did representatives of all of those

5    organizations attend these meetings?

6    A.    Yes, they did.

7    Q.    At any meeting you were ever at, do you recall

8    anybody ever saying the information being discussed at

9    this meeting is confidential?

10   A.    Absolutely not.

11   Q.    In fact, was the purpose of the meetings to keep

12   information confidential or to disseminate it?

13   A.    The purpose of the meeting was two fold:  One, to

14   share information amongst ourselves about what each was

15   seeing from their own perspective, try to help one

16   another come up with other ideas and ways we could

17   address the opioid abuse crisis in our community and

18   then, yes, to get that information out to the public,

19   because, otherwise, we weren't going to do any good just

20   sitting talking amongst ourselves in a room.

21            The purpose was to put that into action, and

22   the action plan itself was right on the U.S. Attorneys

23   website.

24   Q.    So at some point, you became the chair of the Opioid

25   Task Force?

Ms. Rendon − Examination

1    A.    I did the day I became the U.S. Attorney.

2    Q.    So prior to you becoming the U.S. Attorney, who was

3    the chair?

4    A.    Steve Dettelbach, my predecessor, was the U.S.

5    Attorney.

6    Q.    And after you have left the office who became the

7    chair?

8    A.    Justin Herdman who is the current United States

9    Attorney.

10   Q.    And how often did the Task Force have meetings?

11   A.    We met approximately every other month.

12   Q.    So six times a year?

13   A.    Correct.

14   Q.    And how many members just generally did the Task

15   Force have?

16   A.    Well, some of the documents I've looked at have

17   upwards of a hundred people on the e-mail inviting them

18   to the Task Force meetings.  On average at a meeting, we

19   would have somewhere between 40 and 50 people in

20   attendance.

21   Q.    And I think you testified that the task force was a

22   community−based organization.  It is not a governmental

23   or quasi governmental organization, is it?

24   A.    No.

25   Q.    Was there ever discussion at any of the Task Force

Ms. Rendon - Examination

1    meetings about the track one Defendants?

2    A.    Never.

3    Q.    Did the Task Force have subcommittees?

4    A.    It did.

5    Q.    What were the subcommittees?

6    A.    It had four subcommittees, law enforcement,

7    education and prevention, healthcare policy, and

8    treatment.

9    Q.    And were you a member of any of the subcommittees?

10   A.    I was not.

11   Q.    Did you ever attend a subcommittee meeting?

12   A.    I did not.

13   Q.    And what just generally were the goals of this Task

14   Force?

15   A.    So the goals of the Task Force, which are stated

16   right on the document that outlines the work of a task

17   force on the U.S. Attorney's website, was to address the

18   burgeoning problem of heroin and opioids in our community

19   and to try to work on that with a multifaceted approach

20   involving what we called an all-of-the-above type of an

21   effort.

22   Q.    Now, did non Task Force members sometimes attend

23   meetings?

24   A.    Often.

25   Q.    Who were those folks?

Ms. Rendon - Examination

1    A.    So we had representatives of elected officials who

2    attended the meetings.  I recall a representative from

3    David Joyce's office attending, a representative from

4    representative Sprague's office attending.  We had

5    members of the media that attended on occasion.

6             I actually know Bill Shields and have a

7    distinct memory of him being at a Task Force meeting.  We

8    had other people who came in and presented about various

9    treatment facilities.  I recall very specifically the

10   Berea Police Department presenting about a new program

11   that they had developed for the city of Berea, so a

12   whole wide range of different folks would come in, a lot

13   of whom were involved in either education or in

14   treatment.

15   Q.    And did the U.S. Attorney's Office make any effort

16   to share Task Force information with the public?

17   A.    Yes, we did.

18   Q.    What was that?

19   A.    So we did it in a number of different ways.  First

20   of all, the Task Force members, myself included, and

21   others attended hundreds of community forums where we

22   discussed what was happening in the community and what we

23   were doing to try to address it.

24             We issued press releases.  We held

25   press conferences, so we were — and we updated

Ms. Rendon - Examination

1    information that was available on our website on a

2    regular basis.

3    Q.    What type of information did the Task Force share

4    with the public, the Task Force, not the U.S. Attorney's

5    Office but the Task Force?

6    A.    Well, the Task Force primarily through the U.S.

7    Attorney's website shared with the public our community

8    action plan and the work that we were doing to try to

9    implement that action plan.

10   Q.    And that was the community action plan developed by

11   the Task Force?

12   A.    Correct.

13   Q.    Was information about HIDI — we heard that, Heroin

14   Involved Death Investigation team — shared on the

15   website?

16   A.    Yes.  All of the protocols associated with the HIDI

17   team and how it operates and what it was trying to

18   accomplish and how they responded to overdose scenes is

19   all right on the U.S. Attorney's website.

20   Q.    Was there any effort to keep that information

21   confidential?

22   A.    No.  The purpose was to share that information so

23   that other law enforcement agencies could read it, see

24   it, and perhaps adopt it as a model in their own

25   communities.

Ms. Rendon - Examination

1    Q.    Were the statistics from the Medical Examiner's

2    Office shared during these Task Force meetings?

3    A.    Yes, every meeting.

4    Q.    And were they subsequently published and made

5    available to the public?

6    A.    Yes.  They are right on the Medical Examiner's

7    website.

8    Q.    Did anyone ever — was anyone ever compelled by the

9    U.S. Attorney's Office to provide information to the Task

10   Force through a CID, a subpoena, an investigation,

11   anything of that nature?

12   A.    Absolutely not.

13   Q.    Now, you know Commander Gary Gingell.  Is that

14   correct?

15   A.    I do.

16   Q.    You heard him testify today?

17   A.    I did.

18   Q.    Can you characterize your interactions with him at

19   the time you were in the U.S. Attorney's Office?

20   A.    So virtually all of my interactions with Commander

21   Gingell were either at the Heroin and Opioid Task Force

22   or working the case of the STANCE Task Force, which is a

23   separate task force that also is actually chaired by or

24   run by a private citizen or at community forums.

25              I recall Commander Gingell and some of the

Ms. Rendon - Examination

1    doctors from the Cleveland Clinic and a Cuyahoga County

2    prosecutor appearing on a panel that I moderated at the

3    Ohio Attorney General's Law Enforcement Conference, but

4    those were my contacts with Commander Gingell.

5    Q.    Did you ever have a private one-on-one meeting with

6    Commander Gingell?

7    A.    No.

8    Q.    Did you ever speak with him on the phone?

9    A.    No.

10   Q.    Did he ever present information at a Task Force

11   meeting?

12   A.    He did.

13   Q.    And were these where all of the people you've

14   described, the hundred people or however many were

15   present?

16   A.    Well, there weren't a hundred in the room.

17   Q.    Okay.

18   A.    Because the room wouldn't hold a hundred.

19   Q.    How many were in the room?

20   A.    You know, on an average, we would have anywhere

21   between 40 and 50 people attend the Task Force

22   meetings.

23   Q.    And those included private citizens?

24   A.    It did, yes.

25   Q.    Whenever you were at one of these meetings and

1  Commander Gingell presented did he ever say "hey, keep

2  this information confidential"?

3  A.    Not at any meeting that I ever attended, no.

4  Q.    What was your understanding about whether the

5  information he was disseminating at these meetings was

6  intended to be confidential?

7  A.    It was my understanding that it was not intended to

8  be confidential.

9  Q.    Why do you have that understanding?

10  A.    Because the whole purpose of the Task Force was for

11  people from different perspectives to get together, share

12  with one another what they were doing and bring that back

13  to their communities and hopefully augment the work that

14  they were doing to try to address the heroin abuse

15  crisis.

16             So for example, if there were people,

17  representatives from David Joyce's office present at a

18  Task Force meeting and Commander Gingell was presenting,

19  you would hope that they would take that information back

20  to the Congressman himself and perhaps others and would

21  try to adopt some of the work that Commander Gingell had

22  presented at the Task Force meeting.

23  Q.    You are familiar with Rule 1.11 of the Ohio Rules of

24  Professional Conduct?

25  A.    Yes, I am.

Ms. Rendon - Examination

1    Q.    And using the definition of "confidential government
2    information" that appears in that rule, do you have any
3    confidential government information provided to you by
4    Commander Gingell?
5    A.    I do not.
6    Q.    Do you have any confidential government information
7    provided to you by the city of Cleveland as it relates to
8    the opioid abuse crisis?
9    A.    I do not.
10   Q.    Let's talk a little bit about Dr. Gilson.  You heard
11   him testify today, did you not?
12   A.    I did.
13   Q.    And how do you know him?
14   A.    I know him also from my time in the U.S. Attorney's
15   Office and primarily, if not exclusively, in connection
16   with the U.S. Attorney's Heroin and Opioid Task Force.
17   Q.    And he testified about meeting with you.  Do you
18   remember that testimony.
19   A.    I do.
20   Q.    How many times did you meet with him at the Medical
21   Examiner's Office?
22   A.    One time.
23   Q.    Do you recall who else attended that meeting?
24   A.    So Dr. Gilson was there, Hugh Shannon, the
25   administrator of his office, was there.  I attended, Joe

Ms. Rendon — Examination

1    Pinjuh, who is the Chief of the OCDETF unit in the U.S.

2    Attorney's Office, Craig Tame, our law enforcement

3    coordinator, and I am almost positive but closer to 95

4    percent than a hundred percent I am sure that Mike Tobin

5    was there as well.  He is the community outreach

6    specialist.

7    Q.    And what was the purpose of the meeting?

8    A.    The purpose of the meeting was to explain to

9    Dr. Gilson and Hugh Shannon the opinion that the

10   United States Supreme Court had issued in Burrage versus

11   United States.

12   Q.    And was the purpose of the meeting for you to

13   provide information about that to Dr. Gilson or

14   Dr. Gilson to provide information to you?

15   A.    The purpose of the meeting was for us to provide

16   information to Dr. Gilson and Hugh Shannon about the

17   Burrage opinion and what it required.

18   Q.    What were you trying to accomplish?

19   A.    So one of the things that we were trying to do was

20   bring what are called death specification cases when we

21   could against drug dealers, and the Burrage opinion

22   establishes what the government has to be able to prove

23   in order to seek that sentence enhancement.

24   Q.    And in fact, did the three of you publish an

25   article?

Ms. Rendon - Examination

1    A.    We did.

2    Q.    And what was that article about?

3    A.    So that article was about exactly what we talked

4    about in that meeting.  It was about the Burrage opinion,

5    what it requires, and then what medical examiners need to

6    be able to testify to in order to meet the but-for

7    causation requirement in that opinion.

8    Q.    As somebody who has never been published, I don't

9    mean to belittle the article, but how long was it?

10   A.    So it is actually two pages.  There is like a front

11   cover page and a back page that has some citations.

12   Q.    Now, other than the Burrage but-for causation issue

13   we just discussed and the article that came out of that,

14   did you ever discuss strategies for prosecuting cases

15   with Dr. Gilson?

16   A.    I did not.

17   Q.    Was the Medical Examiner's Office on the Task

18   Force?

19   A.    They were.

20   Q.    Did he attend meetings, Dr. Gilson?

21   A.    He did.

22   Q.    Were there others from the Medical Examiner's Office

23   who attended the meetings?

24   A.    Yes, Hugh Shannon.

25   Q.    And did the medical examiner regularly present

Ms. Rendon - Examination

1    information at the Task Force?

2    A.    They did.

3    Q.    Did they ever indicate that the information they

4    were presenting was confidential?

5    A.    No, they did not.

6    Q.    What type of information did they present at those

7    meetings, Ms. Rendon?

8    A.    So they would present also information about what

9    they were seeing in the Medical Examiner's Office,

10   trends, developments, how many people had died in the

11   last couple of months since the beginning of the year,

12   demographics, how old, how many men, how many women, how

13   many had died in the city of Cleveland, how many in the

14   suburbs, what they were dying from, fentanyl,

15   carfentanil, heroin, cocaine.

16                All of the information that they had

17   gathered would be presented usually at the beginning of

18   our Task Force meetings, and so anything new that they

19   were seeing, they would make sure that they alerted

20   everybody on the Task Force to that new trend that they

21   might be seeing.

22   Q.    Was that information also available on their

23   website?

24   A.    It is.

25   Q.    Now, I take it the U.S. Attorney's Office never

Ms. Rendon - Examination

1   issued a summons, a CID, any kind of subpoena to get any

2   of this information from Dr. Gilson, did they?

3   A.    We did not.

4   Q.    Again, using the definition of confidential

5   government information in Rule 1.11, do you have any

6   confidential government information provided to you by

7   Dr. Gilson?

8   A.    I do not.

9   Q.    Do you have any confidential government information

10  provided to you by Cuyahoga County related to the opioid

11  abuse crisis?

12  A.    I do not.

13  Q.    You were involved in the issuance of the consent

14  decree between the Department of Justice and the city of

15  Cleveland.   Is that correct?

16  A.    Yes, I was.

17  Q.    Can you tell us what that investigation was about?

18  A.    So the investigation was to determine whether or not

19  the Cleveland Division of Police engaged in a pattern or

20  practice of the excessive use of force, both lethal and

21  non lethal, in violation of the Constitution of the

22  United States.

23  Q.    I believe Chief Williams answered every one of my

24  questions forthrightly about this, so I won't go over

25  them with you, but does the consent decree have anything

Ms. Rendon — Examination

1    to do with the opioid crisis?

2    A.    It has nothing to do with the opioid crisis.

3    Q.    Now, you began working at Baker and Hostetler

4    when?

5    A.    May 1st of 2017.

6    Q.    And you began representing the Endo Defendants

7    when?

8    A.    In June of 2017.

9    Q.    And you were appointed co-liaison counsel for the

10   manufacturers when?

11   A.    December of 2017.

12   Q.    And at any time after the Plaintiffs filed a track

13   one case, did they object to your appointment as liaison

14   counsel?

15   A.    No.

16   Q.    And mindful of the remarks that the Judge made at

17   the beginning of all of this, when was the first time the

18   Plaintiffs actually raised an issue about your

19   participation in this litigation?

20   A.    The first time anybody raised an issue about my

21   participation was a letter I received from Hunter

22   Shkolnik in August of 2018.

23   Q.    And was the basis of that — did that letter mention

24   Rule 1.11?

25   A.    It did not.

Ms. Rendon – Examination

1   Q.   When was the first time the Plaintiffs raised the
2   issue of Rule 1.11?
3   A.   In December of 2018, in a letter that they submitted
4   to the Department of Justice seeking my deposition
5   pursuant to the Touhy regulations.
6   Q.   Ms. Rendon, you are familiar with the Ohio Rules of
7   Professional Conduct that govern all of us who are barred
8   here in the state of Ohio, are you not?
9   A.   I am very familiar with them, yes.
10  Q.   Have you violated any of the Rules of Professional
11  Conduct?
12  A.   I absolutely have not.
13              MR. PARKER:  Thank you.
14              THE COURT:  All right.  Mr. Weinberger?
15              EXAMINATION CONTINUED
16  BY MR. WEINBERGER:
17  Q.   Ms. Rendon, your tenure with the U.S. Attorney's
18  Office ended on what day?
19  A.   March 10th of 2017.
20  Q.   And you had been in the U.S. Attorney's Office for
21  how long as of that time?
22  A.   Since November of 2009.
23  Q.   And you were the acting U.S. Attorney for how
24  long?
25  A.   I was the acting U.S. Attorney from February 6th of

Ms. Rendon - Examination

1    2016 until I was confirmed by the Senate in July of 2016.

2    Q.    So — and you were an employee of the federal

3    government during that time frame, correct?

4    A.    Correct.  I was an employee of the Department of

5    Justice.

6    Q.    And as the U.S. Attorney and Assistant U.S. Attorney

7    for the Northern District of Ohio, do you understand that

8    you also represent the interests of the citizens of

9    Cuyahoga County, Cleveland, and other communities within

10   the Northern District of Ohio?

11   A.    My client when I worked for the United States

12   government was the United States of America.  We were

13   often adverse to the city of Cleveland and other

14   governmental agencies.

15            So I represented all of the citizens, all of

16   the taxpayers who live in the 40 counties that are within

17   the Northern District of Ohio, but I did not represent

18   any of the governmental agencies.

19   Q.    So in your whatever, however you want to couch your

20   relationship with the citizens of the Northern District

21   of Ohio and the counties and cities within that district,

22   would you agree that those citizens placed their trust in

23   you during the time frame that you were acting U.S.

24   Attorney and Assistant U.S. Attorney?

25            MR. PARKER:  Objection, your Honor.  I am

Ms. Rendon - Examination

1  not sure she can testify to what the citizens of the

2  Northern District of Ohio think about her.

3              THE COURT:  Well, Mr. Weinberger, I would

4  suggest you rephrase that.  Technically, Mr. Parker is

5  correct for the same reason I sustained an objection

6  before.

7              You can ask Ms. Rendon how she feels, but

8  you can't ask her to guess on how — what someone else

9  feels.

10             MR. WEINBERGER:  Right.

11  BY MR. WEINBERGER:

12  Q.   Do you feel that the citizens of our community have

13  the right to place their trust in you while you were in

14  this position?

15  A.   I think the citizens of the United States of

16  America have the right to place their trust in the

17  governmental officials that they elect to represent them

18  and in the government of the United States of America,

19  absolutely.

20  Q.   And so that would apply to the citizens of the

21  communities in the Northern District of Ohio?

22  A.   Yes.  I would expect that the citizens would expect

23  their government to do its level best to deal with the

24  issues under their jurisdiction.

25  Q.   Right.  And one of the issues that confronted our

Ms. Rendon - Examination

1    communities during your tenure was the horrific opioid

2    crisis that occurred, correct?

3    A.    Yes.  We have an opioid abuse crisis that developed

4    during my tenure — well, preceded my tenure in the U.S.

5    Attorney's Office — but there was an opioid abuse crisis

6    that we were addressing when I was in the U.S. Attorney's

7    Office.

8    Q.    Right.  And so how is it that you became then

9    chairman of the Task Force, the U.S. Attorney Task Force

10   to deal with the opioid crisis?

11   A.    So the chair of the Task Force is the person who

12   holds the position as the U.S. Attorney.

13   Q.    Right.  I just want to know how you became the

14   chair.

15   A.    By virtue of becoming United States Attorney.

16   Q.    All right.  And before you became U.S. Attorney, the

17   previous chair was the previous U.S. Attorney,

18   Mr. Dettelbach, correct?

19   A.    Yes.

20   Q.    All right.  So when you assumed the role as chair of

21   the Opioid — U.S. Attorney opioid crisis you took that

22   role very seriously, didn't you?

23   A.    The role as chair of the Opioid Task Force?  Is that

24   what you are asking?

25   Q.    Yes, yes.

Ms. Rendon - Examination

1   A.   Yes.  I took all of my roles very seriously as

2   U.S. Attorney.

3   Q.   And the way that the Task Force dealt with that

4   opioid crisis was a serious matter, correct?

5   A.   The way that the U.S. Attorney's Office dealt with

6   everything that we were responsible for —

7   Q.   — I asked you —

8   A.   — was a serious matter.  Yes, Mr. Weinberger, and

9   that includes the opioid abuse crisis.

10   Q.   Thank you.  You've answered my question.

11               Now, you resigned from the U.S. Attorney's

12   Office in April 2017?

13   A.   No.  I resigned on March 10th of 2017 as required by

14   the current Administration.

15   Q.   And then, you became employed by Baker and

16   Hostetler, correct?

17   A.   I did.

18   Q.   And that employment began on May 1, 2017?

19   A.   It did.

20   Q.   And then, you got hired by Endo Pharmaceuticals in

21   June of 2017?

22   A.   I did.

23   Q.   Now, you testified before the Senate committee —

24   let me see if I can come up with a name here, the

25   United States Senate Committee on Homeland Security and

Ms. Rendon - Examination

1   Governmental Affairs — you testified before that

2   committee on April 22, 2016, did you not?

3   A.   I don't have the date memorized, but that sounds

4   right.

5   Q.   Well, did you read the transcript of your

6   testimony before the committee that was an exhibit to our

7   motion?

8   A.   I did.

9   Q.   And is everything — you testified under oath when

10  you gave that testimony, didn't you?

11  A.   Um, I do not believe it was under oath.

12  Q.   All right.  Was everything that was in the

13  transcript attributed to you in your testimony before

14  that United States Senate Committee truthful?

15  A.   To the best of my ability, absolutely.

16  Q.   And in giving that testimony, that was a committee

17  of the Senate that was formed to, in part, deal with the

18  opioid crisis, correct?

19  A.   It was a field hearing of a committee of the Senate,

20  yes.

21  Q.   Right.  And the Task Force of the U.S. Attorney on

22  the opioid crisis here in Northeastern Ohio was presented

23  as one of the model task forces from around the country

24  to deal with this epidemic, correct?

25  A.   Presented as a model to whom, Mr. Weinberger?

Ms. Rendon - Examination

1    Q.    A model to our country.

2    A.    No, I mean, in what — in what location are you

3    asking if it was presented as a model?

4    Q.    At the U.S. Senate Committee hearing that you

5    testified in?

6    A.    So, yeah.  I testified about our Task Force, and I

7    testified about the fact that it had become a model

8    within the Department of Justice, and that U.S.

9    Attorney's Offices in other parts of the country were

10   trying to establish the same type of community based

11   organizations to address the opioid abuse crisis in a

12   multifaceted fashion.

13   Q.    Was one of the issues that was identified by the

14   Task Force the fact that doctors were — legitimate

15   doctors were overprescribing opioids?

16   A.    One of the issues that we addressed during Task

17   Force meetings was the concern about the overprescription

18   of opioids in our community, yes.

19   Q.    And did you come to learn that the reason for the

20   overprescription or the alleged reason was the way in

21   which the opioid medications were being marketed by the

22   manufacturers and the distributors of those drugs?

23   A.    No.  That was never discussed in any of our Task

24   Force meetings.

25   Q.    So did you develop a healthcare policy as part of

Ms. Rendon - Examination

1    the Task Force?

2    A.    Yeah.  It was a healthcare policy subcommittee that

3    worked on healthcare policy, and a lot of the work that

4    they were committed to doing is on the U.S. Attorney's

5    website in the Community Action Plan of the Task Force.

6    Q.    And was one of the purposes of the Task Force to try

7    to change the way in which doctors were prescribing

8    opioids?

9    A.    Yes.  There were members of the Task Force who were

10   working on issues associated with prescribing protocols

11   and trying to work on implementation on the new CDC

12   guidelines for prescribing protocols and making sure that

13   doctors in the community knew what the appropriate

14   protocols were.

15   Q.    Right.  And one of the things that needed to be

16   addressed as identified by the Task Force was to address

17   the underlying incentives that caused the

18   overprescription in the first place, correct?

19   A.    Yes, and the thing that we were focused on was the

20   HCAHPS scores, which I sound like I know what I am

21   talking about, but it is because other people explained

22   it to me.

23          In the hospitals, there is what is called a

24   patient satisfaction survey that is given to patients,

25   and one of the ways that hospitals are reimbursed for

Ms. Rendon - Examination

1    their medical care is based on those patient satisfaction

2    surveys.  And one of the questions on the survey is how

3    well was your pain managed.

4    Q.   And while you were a member of the Task Force or

5    leading the Task Force, did you come to learn how that

6    patient satisfaction survey in terms of level of pain

7    came to fruition?

8    A.   I did not.

9    Q.   You know how it did now, don't you?

10   A.   I have some sense, but I haven't — I have to say I

11   haven't studied that, so I wouldn't want to try to repeat

12   back.

13   Q.   Okay.  So you told us after being retained by Endo

14   Pharmaceuticals in defense of their case you then were

15   retained by the manufacturers as liaison counsel,

16   correct?

17   A.   Yes.  So I was first retained by Endo

18   Pharmaceuticals to represent them in connection with the

19   first case that was filed in Ross County, Ohio.

20   Q.   Right, and ultimately became involved in their

21   defense here in the MDL, correct?

22   A.   Correct.

23   Q.   After which you then became liaison counsel for all

24   the manufacturers, correct?

25   A.   Yes.  The manufacturers nominated myself and

Ms. Rendon - Examination

1    Mark Cheffo to be their two liaison counsel.

2    Q.   And is it fair to say that the allegations of the

3    complaints filed by my colleagues on this side of the

4    courtroom deal with the question of whether or not the

5    manufacturers illegally or improperly marketed the drugs

6    to doctors?

7    A.   Those were some of the allegations that are

8    contained in the complaints that were filed in the MDL,

9    correct.

10   Q.   And similarly, there are allegations against the

11   manufacturers and distributors concerning whether or not

12   they violated the Controlled Substances Act in the way in

13   which they failed to identify suspicious orders and ship

14   them nonetheless.  Are you aware of that?

15   A.   There are allegations with respect to the

16   suspicious orders that were filed and not filed in the

17   complaints.

18   Q.   Are you aware of the fact that the allegations of

19   these complaints detail the fact that this misconduct,

20   including the misconduct of Endo Pharmaceuticals who you

21   represent, led directly to the opioid epidemic in our

22   communities.  You are aware of that, right.

23   A.   I am aware that that is part of the contention that

24   the Plaintiffs have made in the complaints that have been

25   filed in this litigation, yes.

Ms. Rendon – Examination

1    Q.   Right.  And you were one of the lawyers that signed
2    the answer that Endo recently filed in January of 2019 to
3    the amended complaints in the MDL?
4    A.   Yes.
5    Q.   Did you help formulate that answer?
6    A.   I did not help formulate the answer, no.  I reviewed
7    the answer before it was filed, but I did not help
8    formulate the answer.
9    Q.   At the time that you signed the answer, you realized
10   that under Rule 1.11 your responsibility was to ensure
11   that the answer was accurate as far as you knew?
12   A.   Of course.
13   Q.   Including the affirmative defenses that your client
14   was alleging in the case, right?
15   A.   Of course.
16   Q.   So you became aware of the fact that the — some of
17   the affirmative defenses include whether or not the
18   complaints were filed within the statute of limitations,
19   right?
20   A.   Yes.
21   Q.   And isn't your knowledge about from the Task Force
22   from things that you learned while you were U.S. Attorney
23   regarding when County and City officials became aware of
24   the opioid epidemic relevant to that answer?
25   A.   I don't know that it actually is relevant to that

Ms. Rendon – Examination

1   answer because I can't say beyond what people shared in

2   our community forum about what they learned, when they

3   actually learned it.

4               I know that Dr. Gilson testified before

5   the United States Congress that he alerted the

6   County Executive in the fall of 2011 to what he viewed

7   as a burgeoning heroin and opioid epidemic in our

8   community.

9   Q.   So is that one of the reasons why at his deposition

10  you and other defense counsel participated in questioning

11  Dr. Gilson about when he became aware of the epidemic?

12              MR. PARKER:  Objection.  There is no

13  foundation.  Dr. Gilson testified he was not at —

14  Ms. Rendon wasn't at those depositions.

15              THE COURT:  Well, I guess you should

16  rephrase it.  There were attorneys from Baker at the

17  deposition.

18              So if Ms. Rendon knows, she can answer based

19  open her knowledge.  So I guess rephrase it,

20  Mr. Weinberger.

21  BY MR. WEINBERGER:

22  Q.   So were you aware of the fact there was questioning

23  by either you or other Baker Hostetler lawyers or your

24  co-counsel in this case of Dr. Gilson concerning learning

25  when he or other county officials knew about the

Ms. Rendon - Examination

1    epidemic?

2    A.    I have not read the entirety of Dr. Gilson's

3    deposition transcripts in this case.  I have read parts

4    of them, but I know that other witnesses whose

5    depositions I attended, both involving Summit and Akron,

6    were asked questions about when they first knew.  That

7    would be a really obvious set of questions that you would

8    ask if you were defending this litigation,

9    Mr. Weinberger.

10   Q.    And have you asked any questions of the bellwether

11   witnesses along those lines?

12   A.    Not that I recall, actually.

13   Q.    Okay.  Now, in the answer that you signed on behalf

14   of Endo Pharmaceuticals, did you allege a failure on

15   the part of the bellwether Plaintiffs to mitigate

16   damages?

17   A.    That is one of the affirmative defenses, yes.

18   Q.    And mitigation in this context means the failure to

19   take earlier action to avoid the damages that were

20   sustained, right?

21   A.    Not necessarily.  The defense can include a number

22   of ways in which the Plaintiffs in the track one cases

23   may have failed to completely and effectively mitigate

24   their damages.

25   Q.    Right.

Ms. Rendon - Examination

1    A.    But not limited to when they started.  It could

2    include a whole host of things, and that is one of the

3    affirmative defenses we have asserted and one of

4    the defenses we are engaged in discovery trying to

5    develop.

6    Q.    Right.  One of the issues that might arise is, was

7    there a failure to adequately prosecute criminals,

8    potential criminals who were involved in supplying

9    illicit drugs, right?

10   A.    I have a hard time foreseeing how that would be

11   particularly relevant to a failure to mitigate; I think a

12   failure to investigate, but I think the fact of who was

13   prosecuted and what they were prosecuted for is a matter

14   of public record.

15                    And there will be evidence as to how many

16   people were prosecuted or not prosecuted if that ends up

17   being relevant to the defenses that are presented

18   ultimately when the track one cases go to trial in some

19   fashion.

20   Q.    So the failure to investigate how drugs were

21   entering jurisdiction, that would come within the ambit

22   of the failure to mitigate?

23   A.    I would assume that the entirety of how the track

24   one Plaintiffs addressed the opioid crisis in their

25   community and whether they did everything they could have

Ms. Rendon - Examination

1   and should have to address that crisis will be part and

2   parcel of a potential defense based on failure to

3   mitigate.

4   Q.   And is it your testimony today that the many issues

5   that this Task Force, this U.S. Opioid Task Force dealt

6   with has absolutely nothing to do with any of the

7   defenses that Endo Pharmaceuticals and the other

8   manufacturers have alleged?

9   A.   I have not said that the Opioid Task Force is

10  unrelated in some fashion to this litigation.  It is not

11  confidential, and nothing that I learned in the context

12  of that Task Force constitutes confidential government

13  information within the meaning of Rule 1.11, and I don't

14  know anything from having worked on that Task Force that

15  is not also information that is available publicly and to

16  other members of the Task Force including private

17  citizens.

18  Q.   This morning a number of your colleagues or former

19  colleagues in the U.S. Attorney's Offices sent — signed

20  a letter that was attached to an Endo Pharmaceuticals

21  pleading supporting Endo's reply in opposition to our

22  motion to disqualify you.  Are you aware of that?

23  A.   Yes, I am.

24  Q.   How many of them, AUSAs or U.S. Attorney's, do you

25  know?

Ms. Rendon - Examination

1    A.    Personally, I would have to look at the list of

2    people who signed them, probably five or six.

3    Q.    And how many of those lawyers did you talk to about

4    executing such a letter that was going to be submitted to

5    the Court?

6    A.    I talked to three of them.

7    Q.    And when you talked to those — who are the three

8    that you talked to?

9    A.    So I talked — I talked by telephone with Barbara

10   McQuade, who was the former U.S. Attorney for the Eastern

11   District of Michigan.  I talked with Richard Rossman, who

12   is the current Executive Director of the National

13   Association of Former U.S. Attorney's, and I talked with

14   Carmen Ortiz, who was the U.S. Attorney for the District

15   of Massachusetts.

16   Q.    When did you talk to these three individuals?

17   A.    I talked to Carmen Ortiz today.  I talked to Barbara

18   McQuade last week, and I talked to Richard Rossman last

19   week.

20   Q.    And when you talked with them, any of them, did you

21   tell them in detail what your involvement had been with

22   the U.S. Attorney Opioid Task Force for — during your

23   tenure at the U.S. Attorney's Office?

24   A.    I did, and I also made available to anybody who

25   asked the publicly filed documents on the motion to

Ms. Rendon - Examination

1  disqualify in this case.

2  Q.   Did you talk with them about what the allegations

3  are in the lawsuits that have been filed against Endo

4  Pharmaceuticals?

5  A.   Generally, yes.  In specific detail, no.

6              MR. WEINBERGER:  Thank you, your Honor.

7  That's all I have.

8              MR. PARKER:  Few brief follow-ups, your

9  Honor.

10             THE COURT:  Very brief, Mr. Parker.

11                 EXAMINATION CONTINUED

12  BY MR. PARKER:

13  Q.   Ms. Rendon, Mr. Weinberger just asked you some

14  questions about some former U.S. Attorneys who submitted

15  a letter.  Do you know how many former U.S. Attorneys,

16  not AUSAs, U.S. Attorneys represent parties in one of

17  these opioid cases that have been filed?

18  A.   I know of at least a half dozen.

19  Q.   Are they on both sides of that V?

20  A.   Yes.

21  Q.   One other question about Task Force:  You were asked

22  by Mr. Weinberger about overprescription by doctors,

23  patient satisfaction scores, all of those things that

24  were discussed during the Task Force meetings.  Were

25  those confidential or public?

Ms. Rendon - Examination

1    A.    They were public.

2    Q.    And one last question:  If AUSAs and U.S. Attorneys

3    are not allowed to leave the Government and represent

4    private defendants in actions that just happen to be on

5    the same topic of something they dealt while they were in

6    government —

7              THE COURT:  No one — I mean —

8              MR. PARKER:  I will withdraw it, your

9    Honor.

10             THE COURT:  No one is suggesting that — you

11   can ask the question, but no one is suggesting that.

12             MR. PARKER:  Well, my question, your Honor,

13   was going to be what kind of chilling effect does she

14   believe, based upon her 20 years, almost 20 years working

15   in the government, would a decision that says a former

16   U.S. Attorney who touched on a topic that —

17             THE COURT:  Remember I said at the outset

18   the only thing I am considering is some limitation on

19   participation in this track one trial regardless of what

20   the initial motion was.  That's all I am considering.

21             I am not considering limiting or restricting

22   Ms. Rendon and the other 1499 some cases or being liaison

23   counsel or anything else.  The focus is on this, so I

24   think — you can ask the question, but I don't think it

25   is relevant.  That's all.

Ms. Rendon - Examination

1          MR. PARKER:  I think I can pick up the with

2    queue.  I will withdraw the question.  Thanks, Judge.

3                    EXAMINATION CONTINUED

4    BY THE COURT:

5    Q.   All right.  Ms. Rendon, I just have one question:

6    There have been a lot of questions on both sides.  We had

7    three witnesses, two from the City, two from the County.

8              How do you feel sitting here today when you

9    heard Commander Gingell and then Chief Williams say that

10   they felt betrayed when they were questioned in

11   depositions?  How did you feel?

12   A.   Personally, it made me feel badly.  I don't agree

13   with their perception.  You know, I have spent nearly 30

14   years practicing law, and I have been on both sides of

15   the V, your Honor, and I believe to my deepest core that

16   this system of justice that we have works only because

17   clients on both sides of the V are entitled to zealous

18   representation by counsel of their choice.

19              And so I have represented the United States

20   of America, and I have represented people who have been

21   alleged to have committed crimes.  I have represented

22   individuals and corporations, and I have done it all

23   proudly and zealously and ethically, and my client, Endo

24   Pharmaceuticals, is just as entitled to zealous

25   representation by counsel of their choice as is any other

Ms. Rendon - Examination

1    party in any other case pending in any federal court in

2    the United States of America.

3              And I believe that's my core, and if this

4    system of justice doesn't allow that, then this system of

5    justice cannot function.

6    Q.   All right.  I respect your opinion, but does

7    it trouble you at all that those two distinguished

8    public servants testified under oath that they felt

9    betrayed?

10   A.   It doesn't, your Honor, because they don't share

11   that same belief.  They are just as troubled when I

12   represent an individual who has been accused of a crime

13   because they see the world in very black and white terms.

14             There are good guys, and there are bad guys

15   and the people on one side of the V are the good guys,

16   and the people on the other side of the V are the bad

17   guys.  And I know this because I have talked to them and

18   to other law enforcement officers who have said to me

19   repeatedly how can you represent somebody who has been

20   charged with child pornography?  How can you do that?

21   Because that's how our system of justice functions.

22   That's how it works, and they shouldn't feel betrayed.

23             They have a job to do, and they are doing it

24   to the very best of their ability.  I have a job to do,

25   and I am doing it to the very best of my ability and

1    within the ethical rules every single day that I practice

2    law.

3              THE COURT:  All right.  Thank you.  All

4    right.  I want to give our court reporter a very short

5    break, and it is getting late.  So we will take a

6    ten-minute break, and then I will hear no more than

7    five-minute oral argument from each side, and I really

8    mean it.

9              I am going to limit it to five minutes, and

10    it has got to be focused on anything that has come up

11    today at this hearing that you feel is not adequately

12    addressed by your thorough briefs.  So we will take a

13    ten-minute recess and resume promptly and conclude the

14    hearing.

15              (Recess had.)

16              THE COURT:  Okay.  Everyone can be seated,

17    please.  All right.  So I said I would have five minutes

18    of oral the argument from each side based on what we have

19    today.  So I guess, Mr. Weinberger, since your side

20    brought the motion, I think you should speak first.

21              MR. WEINBERGER:  May it please the Court,

22    Judge Polster, I harken back to your initial comments,

23    and I must say it is with a heavy heart and even stronger

24    conviction that I ask the Court on behalf of the

25    bellwether Plaintiffs in this case to grant the motion to

1    disqualify Ms. Rendon and her family — not her family —

2    her firm from this case.

3            And speaking of family, I just want the

4    Court and Ms. Rendon to know that this is not personal,

5    and you know, you could call that statement rhetoric if

6    you want or disbelieve what I am saying when I say that,

7    but I truly mean it.

8            And the fact that the Court saw fit to hear

9    this motion in a public forum I think speaks volumes to

10   the importance of the issue in this case because at

11   issue, your Honor, is fundamentally what are the ethical

12   responsibilities of a member of the Justice Department in

13   whom our communities in the Northern District of Ohio and

14   in whose citizens like myself and the Court place our

15   trust.

16           This is not just a case of a government

17   lawyer going into private practice and attempting to make

18   a living as a private citizen in the private sector.  The

19   website of Baker and Hostetler that contains Ms. Rendon's

20   biography describes her role as chairman of the Task

21   Force as being one of her greatest accomplishments.

22           And when she did that, despite how she might

23   want to parse what her — who she was responsible to — I

24   mean, after all, the federal government is we, the

25   people, and the Northern District of Ohio, the

1   U.S. Attorney represents we, the people, of our

2   communities, communities who have been ravished by the

3   opioid crisis, and that, as Defendants would say, the

4   opioid abuse crisis.

5           It is an epidemic of huge proportions, and

6   it affects all of us, and what has struck me about the

7   response to our motion to disqualify, your Honor, is the

8   briefs of the Defendants and those that joined in as

9   amicus briefs, not one time ever addressed the question

10  of the appearance of impropriety.

11          And you know, we can get hypertechnical and

12  question whether or not that's a basis for a

13  disqualification or whether it is to be something to be

14  considered in relation to 1.11.  The fact of the matter

15  is that we brought this motion to disqualify because,

16  having heard from Chief Williams and having heard from

17  Dr. Gilson and from Commander Gingell, we were struck by

18  the fact that, as their lawyers, they reacted in the way

19  that they did to the way in which Ms. Rendon participated

20  in the discovery in this case.

21          And so we had the responsibility, not just

22  as officers of the Court, a responsibility that we all

23  take very seriously but in representing the citizens of

24  our communities who have brought these lawsuits to bring

25  this motion.  So you have — we have laid it all out in

1    our briefs.

2              Let me just say one final thing that I think

3    goes to the heart of this.  So the motion, the

4    affirmative defenses and the answers go directly to

5    information that Ms. Rendon has obtained during her

6    tenure as U.S. Attorney and AUSA working on the epidemic,

7    and whether or not this is the exact same matter or not

8    is really irrelevant.  What is relevant is that she did

9    switch sides.

10             She was pursuing remedies for our community,

11   and now she is defending a Defendant and acting as

12   liaison counsel for a number of Defendants that we say

13   caused this crisis.

14             Ms. Rendon knows the rules of the courtroom,

15   and you asked her specifically at the end a question

16   about how she reacted to the testimony of our witnesses

17   when they felt that they -- when they stated they felt

18   betrayed; that their trust had been betrayed.

19             I waited for a direct answer, but I don't

20   think you nor anyone else in this courtroom got a direct

21   answer.  What I heard a lot about was every client is

22   entitled to zealous advocacy.  That's true.  But that

23   doesn't mean that every client is entitled to zealous

24   advocacy by every lawyer no matter what the circumstances

25   are.

1        And I would suggest to you respectfully,

2   your Honor, that the circumstances in this case require

3   that the Court consider carefully, as I know you have,

4   the circumstances where, within a few short months, she

5   switched sides to represent the Defendant Endo and the

6   other co-defendants in this case and rule in favor of our

7   motion to disqualify.

8        Thank you, your Honor.

9        THE COURT:  All right.  Thank you,

10  Mr. Weinberger.

11       Mr. Parker?

12       MR. PARKER:  Thank you, your Honor, and

13  thank you for your attention today.

14       And despite my great respect for

15  Mr. Weinberger, I have to disagree with him.  This is

16  very personal.  Make no mistake about it.  The only way

17  that this Court under the law that applies to all of us

18  as lawyers in Ohio is to find that Ms. Rendon violated

19  an ethical rule.  The appearance of impropriety is no

20  longer a standard that you can apply in this or any other

21  case.

22       In February of 2007, the Ohio Supreme Court

23  adopted the new modeled rules, which replaced the old

24  Code of Professional Responsibility.  It did so after

25  appointing a committee, a committee by the way which

118

1    Deborah Coleman served on with distinction, and I am sure

2    she would report that the reason for that adoption of the

3    model rules was because they wanted to get rid of the

4    appearance of impropriety, because it is no longer a

5    standard -- and was a standard that they gave former

6    government lawyers and others no guidance under the

7    rules.

8           The fact that there is no ethical violation

9    by Ms. Rendon in this case is underscored by the fact

10   that the Plaintiffs keep wanting to go back to a legal

11   standard that is not the law here.  And in fact, in the

12   State versus the Cormack case out of the Eighth District,

13   Cuyahoga County, the Court -- and we have cited this in

14   our brief, so I won't repeat it all, your Honor -- but

15   they said the appearance of impropriety is a rule now

16   that only applies to judges.  It doesn't apply to lawyers

17   any more in Ohio.

18          And there the rule was applied improperly to

19   a former government lawyer based upon him -- a prosecutor

20   rather giving testimony before the Ohio Senate.  That

21   court in Cormack found that the application of the

22   judicial code and the appearance of impropriety in and of

23   itself was a basis for reversal, and they did, in fact,

24   reverse.

25          The testimony of Commander Gingell and

1   Chief Williams where they feel betrayed doesn't create

2   the appearance of impropriety because, as Ms. Rendon

3   explained, that's the way that law enforcement sees it

4   every time a prosecutor goes over to the defense side,

5   and that's exactly what happened in this case.  That's

6   not an appearance of impropriety.

7            That is our system, and when you go over to

8   the other side, if you don't like it because you are

9   committed to law enforcement, that's fine, but that's not

10  an appearance of impropriety, and it is certainly not a

11  violation of the rules.

12           They have to — and Mr. Weinberger didn't

13  really talk about the fact that there was any specific

14  ethical rule violation here, but their briefs point to

15  two.

16           Rule 1.11(a), where they say she switched

17  sides, it is the same matter, working on the Opioid Task

18  Force in the U.S. Attorney's Office, and this case is

19  somehow the same matter.  And secondly, under 1.11(c),

20  she has confidential information.

21           But the case law that we've cited for you in

22  our briefs, your Honor, point that those matters, the

23  Opioid Task Force in these track one cases have to be

24  identical.  They have to be essentially the same.  It is

25  not enough that they just touch on the same thing.

1          You heard no testimony today from any

2    witness that these are the same things.  The testimony

3    was more about trying to deal with the crisis in the

4    community.  That's one thing.  The track one Defendants

5    are accused of something totally different in a totally

6    different setting.

7          It is not the same matter under any of the

8    cases that have been cited.  The opioid epidemic is like

9    the cancer epidemic, like obesity epidemic, gun violence.

10   They are general things.  The case law says you can't

11   find an ethical violation or otherwise.  U.S. Attorney's,

12   Assistant U.S. Attorneys, Cuyahoga County Prosecutors

13   will never be able to leave their office and come into

14   this or any other courtroom and handle a matter that is

15   related to that.

16         Your Honor, there was testimony that

17   Judge Synenberg and Judge Matia are members of the Opioid

18   Task Force.  The appearance of impropriety standard

19   applies to them.  Yet, the two of them, as you know,

20   preside over our drug court in Common Pleas Court.

21         Certainly, their participation in what has

22   been the testimony was a very public forum, cannot create

23   even an appearance of impropriety, which is not the legal

24   standard in Ohio, because their participation there is

25   about dealing with the general problem affecting our

1    community.

2           And the only thing that relates, that

3    the Plaintiffs have tried to show is that Ms. Rendon's

4    participation in that committee, never in a subcommittee

5    meeting, but just in the committee somehow created

6    that.

7           Just to touch briefly, your Honor, on the

8    Rule 1.11(c) violation rule, the rule is very specific as

9    to what information constitutes confidential government

10   information.  It is defined, and there are a bunch of

11   hurdles the Plaintiffs have to get over, none of which

12   they presented you evidence on today.

13          They have to show that the information was

14   obtained under governmental authority.  That's why I kept

15   asking:  Was any of this information required to be given

16   because there was some CID, some subpoena, some

17   investigation?  Every witness said no.  They voluntarily

18   gave it.

19          If you don't find that, you can't find a

20   violation of Rule 1.11(c).  The Justice Department would

21   have to be presently prohibited under the rule from

22   disclosing it to the public.  There is no testimony today

23   you heard about that.  There is nothing in a single

24   declaration filed in this motion that would touch on

25   that.

1           Another requirement of Rule 1.11(c) is that
2    the information cannot otherwise be available to the
3    public.  Well, your Honor, you heard a lot of testimony
4    today about how public all of this was, and in fact, that
5    there were members of the media attending the Opioid Task
6    Force, and as Ms. Rendon testified, the purpose of the
7    Opioid Task Force was to disseminate it publicly.  So
8    there cannot be a Rule 1.11(c) violation here.
9           In conclusion, your Honor, the Court has to
10   find that Ms. Rendon violated a specific Ohio Rule of
11   Conduct.  The appearance of impropriety is old, outdated,
12   and no longer good law in the state of Ohio.
13          And I would submit to you that the
14   Plaintiffs have not offered you any evidence, any
15   evidence that she violated 1.11(a) where the two matters
16   would have to be the same.  The U.S. Attorney's Heroin
17   and Opioid Task Force simply isn't a matter, and they
18   can't establish a violation of Rule 1.11(c) either, your
19   Honor, because she doesn't possess confidential
20   government information as that term is defined and as has
21   been interpreted in the state of Ohio.
22          Your Honor, not only what I ask that you
23   deny the motion that the Plaintiffs have brought, but in
24   a day when the internet -- everything exists forever on
25   the internet, and people will be able to go back in time

1    and look at this motion that has been filed against

2    Ms. Rendon, that accuses her of violating an ethical

3    rule, I would not only ask that you deny the motion; I

4    would ask that you do it in the strongest terms possible.

5    Thank you.

6                    THE COURT:  All right.  Thank you,

7    Mr. Parker.  All right.

8                    MR. UNGER:  Your Honor ——

9                    THE COURT:  Yes.

10                   MR. UNGER:  —— Mike Unger.  We filed a brief

11   earlier this week on behalf of Distributor Defendants

12   AmerisourceBergen and McKesson.  I was wondering if

13   the Court would indulge me a couple minutes on the

14   motion.

15                   THE COURT:  Well, it is getting late,

16   Mr. Unger.  I will give you two minutes ——

17                   MR. UNGER:  I think I can.

18                   THE COURT:  —— but it has to be different

19   than what anyone else has said.

20                   MR. UNGER:  I think I can do it, your Honor.

21                   I join Mr. Parker in urging you to decline

22   the Platinfiffs' invitation to apply that appearance of

23   impropriety standard.  I respectfully disagree.  I have

24   got a lot of respect for Mr. Weinberger, but I

25   respectfully disagree that that topic wasn't addressed in

1    our brief or in any of the other briefs.

2            There is no appearance of impropriety

3    standard in Ohio any longer.

4            THE COURT:  I have already —— I have heard

5    that.  I need —— I only want something different than

6    what Mr. Parker said.

7            MR. UNGER:  Yeah.  There is no uncomf ——

8    makes the witness uncomfortable standard; there is no

9    how—did—it—make—you—feel standard.  That's just not the

10   law in Ohio that applies to those of us who practice here

11   in Cleveland or anywhere else.

12           And applying, I submit, your Honor, that

13   outdated standard and thereby creating new law, whether

14   it is by way of disqualification of Ms. Rendon or

15   restricting her in any way with respect to her

16   participation in this matter, will have broad and far

17   reaching implications for the legal profession that this

18   Court should avoid imposing.

19           Adopting the appearance of impropriety

20   standards would just throw the current system out the

21   window, again, as would the subjective views of witnesses

22   based on claims of discomfort, disloyalty, or personal

23   disappointment.  Plaintiffs are asking you to do

24   something in this case that is unprecedented.

25           It is noteworthy following on —— but

1  hopefully not repeating what Mr. Parker just said — it

2  is notable that they don't cite a single analogous case

3  that supports their position, not one single Ohio case

4  following what happened in 2007 when we changed here in

5  Ohio the Code of Professional Responsibility to the Ohio

6  Rules of Professional Conduct, whereby disqualification

7  of an attorney based on the appearance of propriety was

8  eliminated.

9          I respectfully submit, Judge, given what the

10  Court is being asked to do here in taking into account

11  what you have seen this afternoon, I submit that the

12  first two lines of the Rules of Professional Conduct

13  offer some helpful conduct, some helpful context and

14  guidance, and they read as follows:

15          The rule — and I quote "the Ohio Rules of

16  Professional Conduct are rules of reason.  They should be

17  interpreted with reference to the purposes of legal

18  representation and the law itself."

19          We join in the request that the motion be

20  denied.

21          Thank you, your Honor.

22          THE COURT:  All right.  Thank you,

23  Mr. Unger.

24          MR. SHKOLNIK:  Judge Polster, just one

25  procedural issue, and I am sorry to take the time, but

1  you had posed a question to Dr. Gilson –– I'm sorry,

2  Hunter Shkolnik on behalf of Cuyahoga County –– whether

3  or not Ms. Rendon questioned him at either of the

4  depositions.

5        I think it needs to be clear on the record

6  that the motion had been filed, and there was a

7  suggestion that Ms. Rendon not –– or there was a

8  discussion and Ms. Rendon withdrew, as I understand it,

9  from handling those depositions.  So I just think that

10 should be clarified.

11       THE COURT:  All right.  Thank you.

12       MR. PARKER:  Your Honor, I don't want to

13 call Ms. Rendon again, but the reason she didn't

14 participate was because her son was at the cardiologist.

15       THE COURT:  All right.  Well, it doesn't

16 matter.  I simply was –– you know, I was establishing who

17 questioned him.  It didn't matter why, and Ms. Rendon

18 didn't.  So all right.

19       I am just going to say a few things.  There

20 has never been a case or cases like this in the country.

21 These cases don't fit well in a courtroom, and candidly,

22 they don't fit very well –– this issue doesn't fit very

23 well within the cases that either side has cited or for

24 that matter the model rules.

25       So I have read the cases.  I have read the

1    rules, but guess what?  No one has had to deal with

2    a situation like this that I have ever seen.  I am

3    the first one.  So the rules provide some guidance.

4    The cases provide some guidance, but none of those

5    judges, courts have had to deal with something quite like

6    this.

7            The Plaintiffs' theories don't fit squarely

8    within the law.  Their theories of damages don't fit

9    squarely.  So the Defendants' defenses don't fit so

10   squarely, either.  And there is a very important issue

11   that, quite frankly, no one identified in the briefs, but

12   I am keenly aware of it because I go back aways.

13           And when I began as a federal prosecutor in

14   1976, there was active competition, mistrust, distrust

15   between local and state law enforcement officials and

16   prosecutors and federal law enforcement officials and

17   prosecutors, and I know that for a fact because I saw it,

18   and I saw the impact, the adverse impact it had on law

19   enforcement in this region and how it impacted our

20   citizens.

21           And that climate of mistrust—distrust

22   competition has changed over 40 some years, not by

23   accident but by the very, very hard work, in my opinion,

24   of federal officials who, one U.S. Attorney after another

25   and the Assistant U.S. Attorneys in those offices,

1    beginning when I was there and then continuing for years

2    after, have worked very, very hard to create a climate of

3    cooperation and trust.

4              And today there are multiple task forces.

5    As Ms. Rendon testified, it is not just the Heroin and

6    Opioid Task Force; there are multiple task forces.  I was

7    on a few of them, and there is very close cooperation.

8              And the beneficiaries are not the law

9    enforcement officials, the prosecutors or the agents, the

10   beneficiaries are all of us who live here.  And so we

11   have sophisticated, cooperating law enforcement to

12   address the very sophisticated law breakers.

13             And it has taken 40 some years to create

14   that climate of trust, and I, as well as everyone else,

15   should be very concerned about anything that erodes that,

16   and that's why I listened very carefully to the testimony

17   of the witnesses.

18             The key factual question in deciding this

19   motion is whether or not Ms. Rendon is in her

20   participation and is head of the Task — the Opioid and

21   Heroin Task Force received confidential information,

22   information that was not then publicly available, that

23   was shared in a confidential way, and which she is

24   somehow using now defending Endo in allegations brought

25   by the city of Cleveland and County.  All right.

1          The Plaintiffs insist that she received

2     confidential information; the Defendants insist and

3     Ms. Rendon testified that they — that she did not.  The

4     last thing I want is the deposition that the Plaintiffs

5     have sought of Ms. Rendon to go fishing around and trying

6     to ferret out exactly all the details of what were

7     discussed.

8          And for that, I am not going to allow a

9     deposition and for the same reason I didn't allow any

10    questions of the witnesses here as to the details of what

11    was discussed.

12         What I have done and I have this week asked

13    the Department of Justice to look into that question.

14    The Department of Justice had offered sometime in 2018 to

15    participate as a friend of the Court.  The Court needs a

16    friend.

17         The Department of Justice has no position

18    one way or another as to who represents Endo, whether it

19    is Ms. Rendon in Baker or anyone else, and I have asked

20    them, they are in a position to determine whether or not

21    there was any confidential information shared by the city

22    of Cleveland and/or County officials to Ms. Rendon during

23    the Task Force meetings, and they are going to report

24    that to me, and I will use that as a basis to make my

25    decision.  I think that's the best way to do it.

1        Until I receive that answer, I am going to

2   direct that Ms. Rendon and Baker Hostetler attorneys not

3   participate in any further depositions of city of

4   Cleveland and Cuyahoga County witnesses.  I don't know if

5   there are going to be any, but I am imposing that

6   limitation, and again, the only thing I am focusing on is

7   this track one case.

8        I have not heard or seen anything which

9   require any disqualification of Ms. Rendon or Baker as to

10  participation in any other of the 1,500 or so cases in

11  this MDL, any one of the 300 or so cases that are pending

12  in state court, or participation as a liaison counsel or

13  in any of the oversight of the MDL.  We are focusing on

14  this track one.

15       So the Department of Justice is looking into

16  that, and they will report to me, and as soon as they do,

17  I will make a decision.  But I appreciate everyone's hard

18  work at the hearing today and on the briefs that have

19  been submitted.

20       So with that, we are adjourned.  Thank you.

21       (Hearing concluded at 5:30 p.m.)

22                      - - - - -

23

24

25

1       C E R T I F I C A T E

2     I, George J. Staiduhar, Official Court

3 Reporter in and for the United States District Court,

4 for the Northern District of Ohio, Eastern Division,

5 do hereby certify that the foregoing is a true

6 and correct transcript of the proceedings herein.

7

8

9

10      s/George J. Staiduhar
       George J. Staiduhar,
11      Official Court Reporter

12      U.S. District Court
       801 W. Superior Ave., Suite 7-184
13      Cleveland, Ohio 44113
       (216) 357-7128

14

15

16

17

18

19

20

21

22

23

24

25