**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | ) ) ) | **CASE NO. 1:17-MD-2804** |
| | ) | **SPECIAL MASTER COHEN** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| "*Track One Cases*" | ) ) ) ) ) | **AMENDMENT TO DISCOVERY RULING NO. 14, PART 1, REGARDING PRIVILEGE AND CLAW-BACK** |

On January 31, 2019, the undersigned issued "*Discovery Ruling No. 14, Part 1*" (docket no. 1321) (hereinafter, "*Ruling*").  Among other conclusions, this *Ruling* reached the following: (1) Cardinal's claim of privilege related to three specific documents was not well-taken; (2) Walgreens waived privilege as to 27 specific documents; and (3) Cardinal waived privilege as to a group of documents (referred to as "Category Two Documents").

Walgreens and Cardinal each filed timely objections to this *Ruling* (docket nos. 1343, 1344).[1] The Court, however, concluded that in their objections Walgreens and Cardinal had both "submitted new evidence, case law, and arguments not first provided to Special Master Cohen for his consideration when making Discovery Ruling No. 14, Part 1;" accordingly, the Court resubmitted the issues to the undersigned "for further consideration," stating the "Special Master may adjust his ruling as he sees fit."  Order at 1, 2 (docket no. 1349); *see* Fed. R. Civ. P. 53(f)(1) ("In acting on a master's order, report, or recommendations, the court . . . may . . . resubmit to the master with instructions.").

---

[1] No party filed any objection to two other aspects of this Ruling, which were that Cardinal had not waived privilege to Category One and Category Two Documents.

The Special Master has reviewed Cardinal's and Walgreens' post-*Ruling* objections, and also allowed plaintiffs to respond via letter to defendants' "new evidence, case law, and arguments." In light of these additional submissions, the Special Master now amends his earlier *Ruling*. As set forth below, the final conclusions reached in the earlier *Ruling* are unchanged, but they are now supported with additional analysis. The original *Ruling* is incorporated herein by reference.

### A. Documents Clawed Back by Cardinal Health (Agenda Item 82).

As outlined in the original *Ruling*, the three documents at issue include an email thread between Cardinal's in-house and outside counsel, as well as two attached charts. The charts summarize factual information related to certain aspects of Cardinal's Suspicious Order Monitoring System ("SOMS"), such as its organizational structure, personnel changes, and types of training provided, during different time periods. The email conveys the charts from in-house to outside counsel; the only substantive aspect of the email thread occurs when outside counsel asks who created the charts. (Answer: an in-house paralegal.) In its submission to the undersigned, Cardinal explained that the two charts are updated versions of a chart provided years earlier to the DEA, and the earlier chart has been produced to Plaintiffs in this case.

In the original *Ruling*, the Special Master concluded the email and charts were not protected from disclosure by the work-product doctrine for two reasons: (1) it was at best unclear whether the documents were created "in anticipation of litigation;" and (2) even if they were, (a) the documents contain fact work-product, not opinion work-product, and (b) plaintiffs showed they have a substantial need for the information contained in the documents and could not, without undue hardship, obtain their substantial equivalent by other means.

In its objection, Cardinal responded to the first reason (whether the documents were created

"in anticipation of litigation") by submitting additional explanation regarding the extent to which it reasonably anticipated not only an enforcement action brought by the DEA, but also potential shareholder litigation. Having reviewed this material, the Special Master now agrees with Cardinal that it reasonably anticipated litigation, so the two charts are, in fact, work-product.

Cardinal responded to the second reason by arguing anew that: (1) the charts contain *opinion* work-product, not just *fact* work-product, and the former is not subject to disclosure absent waiver, which has not occurred; and (2) plaintiffs have not showed they have a substantial need for the information contained in the documents. Even after weighing Cardinal's new evidence and arguments, however, the Special Master disagrees.

The original *Ruling* characterized the documents as "entirely devoid of legal advice." *Ruling* at 5. The *Ruling* explained: "Identification of the author of the charts in the email itself is innocuous, and the charts simply set out factual information of a business nature regarding Cardinal's SOMS – the same business information summarized in the earlier version of the chart that Cardinal produced to the DEA and has been produced to Plaintiffs in this litigation. * * * The overwhelming nature of the two charts is that they summarize factual information related to a critical business matter – Cardinal's Suspicious Order Monitoring System." *Id.* at 5-7.

In its objection, Cardinal disagrees that the documents "simply set out factual information," asserting that "the charts contain attorneys' advocacy in a comparison of the features of the [SOMS] at different times. But it is that very aspect of the charts that reflects the thinking of counsel about how best to make Cardinal Health's defense to the DEA's enforcement action—an approach that counsel thought better of and did not employ. The charts are not a mere summary of factual information; they are potential demonstrative exhibits and, therefore, at the core of what the work product doctrine protects." Objection at 14.

3

This is a creative argument, but unavailing.  ***Any*** document that contains purely factual information could be a demonstrative exhibit, and counsel's "contemplation" that the facts contained in such a document could make a good exhibit does not turn the document into opinion work-product.  Even the "thought" that the chart should list certain facts – e.g., "aspects of Cardinal's Suspicious Order Monitoring System ("SOMS"), such as its organizational structure, personnel changes, and types of training provided, during different time periods," *Ruling* at 5 – does not transmute those facts into opinions.  It is too far a stretch to conclude the charts "reflect[] the attorney's [or, more accurately, paralegal's] mental impressions, opinions, conclusions, judgments, or legal theories."  *In re Antitrust Grand Jury*, 805 F.2d 155, 163–64 (6th Cir. 1986).² The Special Master reiterates that the overwhelming nature of the two charts is that they summarize factual information.

Cardinal also insists that, even if the documents are fact work-product, plaintiffs have not shown a substantial need for the charts and an inability to obtain the information otherwise. Cardinal sets out correctly the applicable standard:

> A plaintiff must show that the documents are "sufficiently unique and important, as compared to other possible sources of the same information, to justify overriding work product protection."  *Carr v. C.R. Bard, Inc.*, 297 F.R.D. 328, 333–34 (N.D. Ohio 2014).  The "understandable desire for (possibly) more probative evidence . . . does not demonstrate substantial need . . . , much less that equivalent evidence could

---

² Indeed, although Cardinal insists "the charts reflect one possible strategy for responding to DEA – a comparative illustration to DEA that the [SOMS] was state-of-the-art as of December 31, 2011" – it is easy to imagine the DEA using the same chart to point out how Cardinal's SOMS did not adhere to federal regulations.  Of course, this is the opposite of Cardinal's "opinions, conclusions, judgments, or legal theories."  The point is that the chart simply does not provide insight into counsel's thinking.  *See In re San Juan Dupont Plaza Hotel Fire Litig.*, 859 F.2d 1007, 1015 (1st Cir. 1988) ("opinion work product . . . protection is not triggered unless disclosure creates a real, nonspeculative danger of revealing the lawyer's thoughts").

>  not be generated except with undue hardship." *Id.*; *Toledo Edison Co. v. G.A. Technologies*, 847 F.2d 335 (6th Cir. 1988) ("The plaintiffs must shoulder the burden of showing that they have substantial need of [the documents] and that they are essentially unable to obtain their equivalent.").

Objection at 12.

Cardinal argues the "charts do not contain unique information about Cardinal Health's SOM system. What the features of the system were at various times and how they have changed over time is information contained in Cardinal Health's written discovery responses and in Cardinal Health's production to date of more than 4.3 million pages of documents." *Id.* at 13. Cardinal adds that "information about this time period is also available from employees who have had direct responsibility for the SOM system since 2008—including employees who have been scheduled for depositions, but who have yet to be deposed." *Id.* (emphasis deleted).

This argument does not characterize correctly the state of the parties' discovery, which the Special Master has overseen from the start. As plaintiffs note, on November 21, 2018, the Court "ordered all defendants (including Cardinal) to 'respond **fully** to all discovery seeking information regarding their Suspicious Order Monitoring Systems (SOMS)' and for defendants to produce 'discovery of **all details** of their SOMS.'" Letter to Special Master from Michael Fuller at 9 (Feb.

15, 2019) (quoting Order at 1 (docket no. 1147) (emphasis supplied by plaintiffs)).[3] Despite this Order, "Cardinal's 11/30/2018 discovery responses (which should have provided all details of their SOMS over the years) do not come close to providing the SOMS facts set-forth in the charts." *Id.* Nor did Cardinal's 30(b)(6) witness provide anywhere near a comprehensive summary of the information contained in the charts.

Cardinal's suggestion that plaintiffs can piece together the same information from the other 4.3 million pages of documents Cardinal has produced, or from future witness depositions, does not overcome plaintiffs' clear showing that (despite great effort) they have not and cannot obtain the equivalent of the information the charts disclose. This is especially true because the details of Cardinal's SOMS over time is ***the*** most central factual issue in plaintiffs' case against Cardinal. *See Stampley v. State Farm Fire & Cas. Co.*, 23 Fed. Appx. 467, 471 (6th Cir. 2001) ("Substantial need consists of the ***relative importance of the information in the documents*** to the party's case and the ability to obtain that information by other means.") (emphasis added).

In sum, the Special Master stands fast in the conclusion reached in the original *Ruling* – plaintiffs are entitled to production of the email and two charts pursuant to the "substantial need" exception set forth in Fed. R. Civ. P. 26(b)(3)(A).

---

[3] The Court also ordered that "Defendants shall not interpose attorney-client privilege as a reason for not producing discovery of all details of their SOMS." Order at 1 (docket no. 1147). The Special Master interprets this to mean that attorney-client privilege and the work-product doctrine must be construed with special care when assessing documents related to defendants' suspicious order reports, suspicious order monitoring efforts, or due diligence. *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc*., 152 F.R.D. 132, 135 (N.D. Ill. 1993) ("As the attorney-client and work product privileges obscure the search for the truth, they are both narrowly construed by courts to restrict their impact upon the discovery process."); *United States v. Skeddle*, 989 F. Supp. 890, 900 (N.D. Ohio 1997) ("The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose.").

The strong language used by the Court in its November 21, 2018 Order underscores the fact that plaintiffs have struggled to obtain full and complete discovery of defendants' SOMS.

Finally, the Special Master concludes that Cardinal's assertion that the documents are also protected by attorney-client privilege still fails. In the original *Ruling*, the Special Master observed that "[t]he three documents at issue, however, are entirely devoid of legal advice. * * * Cardinal has simply not met its burden of establishing that attorney-client privilege applies to the email thread or the charts." Ruling at 5-6. Cardinal's objection raises no new arguments or evidence that change this conclusion. The "attorney-client privilege is more narrow and distinct than the work product doctrine." *Nelson v. NAV-RENO-GS, LLC*, 2013 WL 2475862 at *3 (D. Nev. June 7, 2013) (citing *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975)). While it protects communications made in confidence between the client and attorney from discovery, it does not protect the underlying facts within those communications. *Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981); *see also Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514 at *50 (S.D. Ohio Nov. 13, 2012) ("Neither the attorney-client privilege nor the work product doctrine applies to prevent the disclosure of underlying facts, regardless of who obtained those facts."); *Clevenger v. Dillard's Dep't Stores, Inc.*, 2006 WL 2709764 at *3 (N.D. Ohio Sept. 20, 2006) (finding that attorney's notes taken during a meeting with a third party were not privileged, even where the attorney "may have then later communicated [to his client] about the notes and given a legal opinion thereon, [because doing so] does not convert the notes themselves into attorney-client communication").

In short, having reviewed the parties' additional submissions, the Special Master still concludes the email thread and the two charts are not protected from production by attorney-client privilege or the work product doctrine.

### B. Law applicable to Claw-Back Assertions.

The original *Ruling* rejected Walgreens' and Cardinal's claims that certain documents they

produced were subject to claw-back. In their objections, Walgreens and Cardinal submitted additional authority explaining the legal standards for assertions of inadvertent production and claw-back of documents. Because the original *Ruling* did not explicate these standards, and simply applied them, they are set out here.

Federal Rule of Evidence 502 imparts provisions that apply "to disclosure of a communication or information covered by the attorney-client privilege or work-product protection." The Rule states in relevant part that, when a document is disclosed "in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error." Fed. R. Civ. P. 502(b).

Regarding the first prong, the parties implicitly agree, and the facts support the conclusion, that Walgreens and Cardinal produced the documents at issue inadvertently.

Regarding the second prong – whether defendants took reasonable steps to prevent disclosure in the first place – "Courts have found that a party took reasonable steps to prevent inadvertent disclosure when it 'engaged in a multi-attorney review of [the relevant] documents.'" *West Penn Allegheny Health System, Inc. v. UPMC*, 2013 WL 12141531 at *3 (W.D. Penn. Apr. 9, 2013) (quoting *D'Onofrio v. Borough of Seaside Park*, 2012 WL 1949854 at *10-12 (D.N.J. May 30, 2012)). In contrast, "[p]recautionary measures were found to be inadequate when a party used keyword searches to conduct a privilege review, but failed to include the names of all attorneys in that search; when that privilege review was conducted by an attorney with no prior experience doing privilege reviews; and when the party produced documents that its limited search should have caught." *Id.* at *4 (citing *Rhoads Industries v. Building Materials Corp. of America*, 254 F.R.D. 216,

224 (E.D. Pa. 2008) (internal quotation marks omitted).

Regarding the third prong – whether defendants took reasonable steps to rectify the error – – "the rule does *not* require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake." *Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 2011 WL 13076888 at *2 (N.D. Ohio Jan. 26, 2011) (quoting Fed. R. Civ. P. 502(b) explanatory note Nov. 28 2007) (emphasis added). But the "rule *does* require the producing party to follow up on any obvious indications that a protected communication or information has been produced inadvertently." *Id.* Once a producing party is "on notice that something [i]s amiss with its document production and privilege review[,] then that party has an obligation to promptly re-assess its procedures and re-check its production." *D'Onofrio*, 2012 WL 1949854 at *12 (quoting *U.S. v. Sensient Colors, Inc.*, 2009 WL 2905474 at *5 (D.N.J. 2009)) (internal quotation marks omitted).

The relevant time period for purposes of waiver is not how much time lapses after the documents are inadvertently produced, but how much time lapses after the inadvertent production has been discovered. *See Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 2011 WL 13076888 at *3 (N.D. Ohio Jan. 26, 2011) (the producing party did not waive privilege because it "took prompt steps to recall the documents once [it] realized that they had been disclosed"). A party's "duty to rectify only arises when the opposing party can prove actual knowledge of the disclosure;" thus, "when the documents were first produced does not affect whether [the producing parties'] response to their inadvertent disclosure was 'prompt.'" *United States ex rel. Health v. Wis. Bell Inc.*, 272 F. Supp. 3rd 1094, 1098 (E.D. Wis. 2017). It is the time of discovery of disclosure that starts the clock running on the producing party's diligence in seeking to recover the documents. *Absolute Activist Value Master Fund Ltd. v. Devine*, 262 F. Supp. 3d 1312, 1323 (M.D. Fla. 2017) (a party cannot

9

"fail to take steps to rectify an inadvertent disclosure *once one has been discovered*") (emphasis added). Courts have recognized that years can pass before the inadvertent production is discovered. *See West Penn Allegheny Health System, Inc. v. UPMC*, 2013 WL 12141531 at *5 (W.D. Penn. Apr. 9, 2013) (holding that a five-year gap between production and claw-back "should not count against" the producing party because "[t]here was no discovery during that time period" and the law firm that was later retained to represent the producing party in another suit "had no reason or need to review discovery already made").

The above-cited legal authority addressing the second and third prongs can be summarized as follows: whether reasonable steps were taken "promptly" to rectify inadvertent disclosure is measured from the time the disclosure is or should have been discovered, not from the time of the disclosure itself.

### C. Documents on Walgreens' First Privilege Log (Agenda Item 64).

As outlined in the original *Ruling*, Walgreens listed 27 documents in its First Privilege Log. Plaintiffs argued Walgreens waived any claim of privilege over all of these documents because: (a) Walgreens produced the documents to the DEA in 2012; and (b) although Walgreens later filed a motion to compel the return of *two* of these documents in 2012, the motion was dismissed on procedural grounds and Walgreens did nothing more to seek claw-back. The Special Master concluded that plaintiffs "made a prima facie showing of waiver, and Walgreens has not carried its burden of showing otherwise." *Ruling* at 7-8.[4]

New, more detailed evidence submitted by the parties after the Special Master issued the

---

[4] The Special Master also rejected Walgreens' assertion that it should not have to produce the documents because they were not relevant. *Ruling* at 8.

original *Ruling* shows that: (1) in response to a DEA administrative subpoena, Walgreens produced to the DEA many thousands of documents in May and June of 2012; (2) included within this production were all 27 of the documents Walgreens now lists in its First Privilege Log; (3) before producing any of these documents, counsel for Walgreens conducted a privilege review;[5] (4) the DEA responded to Walgreens' production in August of 2012 by, *inter alia*, asking Walgreens if it intended to assert privilege over any of the documents it had produced; (4) Walgreens re-reviewed numerous documents, replied that two of the documents were privileged, and sought claw-back;[6] (5) after the DEA did not return the documents, Walgreens filed an action in Virginia federal court to obtain their return; (5) in the Virginia action, the DEA asserted Walgreens had waived any claim of privilege over the two documents when it separately, voluntarily supplied the same documents to another company, Cardinal Health;[7] (6) in December of 2012, the Virginia court denied Walgreens' motion to compel return of the documents, based on lack of subject matter jurisdiction;[8] (8) in June of 2013, Walgreens settled the DEA proceeding connected to the original administrative

---

[5] *See In re: Administrative Subpoena*, case no. 12-MC-43 (E.D. Va.), docket no. 2-2 at ¶¶6,7 (Oct. 3, 2012) (declaration of Walgreens' counsel explaining three attorneys reviewed each document for privilege before production).

[6] *Id.* at ¶¶19-23 (explaining that one attorney re-reviewed numerous critical documents for privilege).

[7] It is unclear whether the DEA asserted Walgreens provided the two documents *themselves* to Cardinal, or provided Cardinal with an unredacted version of the DEA's "Immediate Suspension Order" that quoted or referred to the two documents. *See id.* docket no. 22 at 1-2 and docket no. 22-1 at ¶¶8-9 (DEA stating that "Walgreens voluntarily disclosed to . . . Cardinal . . . the September 13, 2012 Immediate Suspension Order ("ISO")," and the "ISO contains the putatively privileged materials at issue"); *id.* docket no. 2-3 at (email from Walgreens' counsel to DEA stating the ISO "references and relies . . . on a document inadvertently produced to you that is subject to the attorney-client privilege").

[8] *See id.* docket no. 32 (Magistrate Judge's Report and Recommendation that Walgreens' motion to compel be denied) and docket no. 44 (Order adopting the R&R following oral argument).

11

subpoena, but the "DEA reserve[d] the right to seek to admit evidence of Covered Conduct for proper evidentiary purposes in any future administrative proceeding against Walgreens;"[9] and (9) there is no evidence the DEA ever returned the two documents that Walgreens sought to claw back.

In its objection, Walgreens addresses separately the two documents it tried to claw back in 2012, and the other 25 documents it did not then try to claw back. Regarding the 25 documents, Walgreens offers the conclusory assertion that the DEA proceedings concluded in 2013 "before counsel could identify the documents as privileged and seek their return." Objection at 1. But this ignores Walgreen's counsel's own declaration that he undertook a two-stage privilege review in 2012, after which he did *not* identify these 25 documents as privileged. And counsel undertook the second stage of privilege review only after the DEA specifically asked whether Walgreens intended to seek claw-back of any documents. This request by DEA (tantamount to a warning), together with counsel's discovery that, after first-stage privilege review, Walgreens had produced documents it later came to believe were privileged, certainly gave Walgreens reason to "re-assess its procedures and re-check its production." *D'Onofrio*, 2012 WL 1949854 at *12. Walgreens' failure to seek claw-back of the 25 documents until after they were produced again in this MDL represents a failure of both the second and third prongs of the Rule 502(b) test: Walgreens did not take reasonable steps to prevent disclosure of these 25 documents in 2012, and failed to take reasonable steps to rectify the error any time since.

Turning to the two documents that Walgreens did try to claw back in 2012, Walgreens asserts that: (1) it did undertake prompt action to obtain return of the documents in 2012; and (2) once it settled the DEA proceedings in 2013, it had no reason to continue to pursue its claw-back

---

[9] Settlement Agreement at 8, ¶7.

efforts. Even accepting the first assertion,[10] the second fails. Walgreens knew as of December 21, 2012 that its attempt through litigation in Virginia to obtain claw-back of the two documents had failed. Nothing prohibited the DEA from using or relying on the two documents over the next six months during ongoing proceedings with Walgreens, and there is good reason to think DEA actually did rely on the two documents during this period.[11] Nor was the DEA prohibited from using these documents thereafter. Walgreens and the DEA settled their dispute on June 11, 2013, and the settlement agreement reserved to the DEA the right to use, in any subsequent proceedings, the evidence it had obtained. Indeed, the settlement agreement noted that DEA had a continuing *obligation* to "assist and cooperate with any [other] agency that initiate[s] an investigation, action, or proceeding involving Covered Conduct;" this assistance would presumably include sharing with that other agency the two documents. In sum, Walgreens had ample reason to continue to pursue

---

[10] Plaintiffs argue that Walgreens did not, in fact, promptly seek return of the two documents in 2012. The DEA wrote Walgreens on August 9, 2012, stating: "Given the extent of [your] pre-disclosure review by at least three attorneys, I am assuming that Walgreens is not asserting any privilege over the materials you have provided." *In re: Administrative Subpoena*, case no. 12-MC-43 (E.D. Va.), docket no. 2.2 at 1. Walgreens did not respond to the DEA and seek claw-back until over a month later, on September 11, 2012. Plaintiffs argue that waiting a whole month was not "prompt." *Compare* MDL Protective Order (docket no. 441) at 25, ¶54 (if the Receiving Party notifies the Designating Party that it has received potentially Privileged Information, "the Designating Party **shall have seven (7) days to assert privilege** over the identified information") (emphasis added). By the time Walgreens sought claw-back in 2012, the DEA had already issued its Immediate Suspension Order, which divulged information contained in the two documents.

[11] *See In re: Administrative Subpoena*, case no. 12-MC-43 (E.D. Va.), docket no. 37 at 8 (in Walgreens' objection to the Magistrate Judge's R&R, which recommended denial of the motion to compel return of the two documents, Walgreens stated the DEA "read, relied upon, and is continuing to retain these communications even after Walgreens informed it of the inadvertent production of privileged material.").

It is also notable that, while the government argued successfully that the Virginia federal court did not have jurisdiction over the motion to compel, the government further argued that Walgreens should instead "seek return of its privileged material in the D.C. Circuit or before an administrative law judge." *Id.* at 13. Walgreens apparently did not pursue either of these alternative approaches to obtain claw-back.

claw-back efforts after the Virginia action was dismissed and after it settled with the DEA. That it did not seek claw-back of the two documents until 2018 represents waiver of any claim of privilege.[12]

For these reasons, the Special Master reaffirms the conclusion reached in the original *Ruling* – plaintiffs are entitled to production of the 27 documents listed in Walgreens' First Privilege Log.

### D.  Cardinal Clawback of 2.8 Million Documents (Agenda Item 129).

As outlined in the original *Ruling*, Cardinal produced about 2.8 million documents to the DEA in 2008 during a regulatory action, and then produced them again in this MDL as a "prior production." Cardinal contended all of these documents: (a) were inadvertently produced to the DEA in 2008, (b) were inadvertently produced again in the MDL, (c) contain privileged information or communications, and (d) are appropriately clawed back. The 2.8 million documents fall into three categories: (1) documents Cardinal produced to the DEA in 2008, but then clawed back in 2008; (2) documents Cardinal produced to DEA in 2008, did ***not*** attempt to claw back in 2008, but seeks to claw back now; and (3) "meta-documents" that are related to documents produced to DEA in 2008, but were not themselves produced to the DEA.

In the original *Ruling*, the Special Master concluded Cardinal did not waive privilege in connection with the Category One or Category Three Documents, and may claw them all back now. No party filed an objection to these conclusions.[13]

---

[12] Because it is not necessary to do so, and because the facts are not clear on the current record, the Special Master does not address on the merits plaintiffs' contention that Walgreens also, ***in addition,*** waived privilege by supplying the two documents to Cardinal.

[13] Cardinal is still obligated to produce a privilege log for all Category One and Category Three Documents.

The Special Master further concluded that Cardinal did waive privilege in connection with the Category Two Documents:

> Had Cardinal "promptly" attempted to claw back privileged information from DEA in 2008, and otherwise demonstrated it met the requirements of Rule 502(b), then it would be permitted to claw back the documents now.  Cardinal acknowledges, however, that it produced privileged documents to the DEA in 2008 and never sought to claw them back from the DEA – it only now seeks to claw back those documents from MDL Plaintiffs, more than 10 years after they were first produced to DEA.  Essentially, Cardinal waived privilege as to all Category [Two][14] documents when it produced them unreservedly to the DEA in 2008, and that waiver remains.  While the Special Master is sympathetic to Cardinal's assertion that the DEA action in 2008 concluded shortly after it produced these documents, so Cardinal never had a need to make any further determinations regarding privilege or claw-back, the Special Master concludes Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced in 2008.

*Ruling* at 10.

Cardinal objects to this conclusion, asserting that:

- it did not produce Category Two documents to the DEA in 2008 "unreservedly" – to the contrary, Cardinal produced those documents with the express reservations that it "did not intend to waive the protection of the attorney work-product doctrine, attorney-client privilege, or any other applicable privilege," and "requests and expects that DEA will return to Cardinal Health, upon request, any documents that we later discover to be privileged." and
- it did not discover, and had no reason to discover, until 2018 that the Category Two documents it had produced in 2008 were privileged.  Specifically, after Cardinal settled with the DEA in 2008, it had no reason or obligation to determine whether it had produced privileged documents that it needed to claw back; moreover, no such reason arose until Cardinal discovered it had re-produced those documents in this MDL in 2018, at which time Cardinal did promptly seek claw-back.

Plaintiffs respond by drawing parallels between (i) Cardinal's production of the Category

---

[14]  The original *Ruling* said "One," which was a typo.

Two documents to the DEA in 2008, and (ii) Walgreen's production of the 27 documents to the DEA in 2012, discussed above.  In both cases, the defendant now relies on its past settlement with the DEA as the reason it did not seek claw-back until 2018.  And in both cases, the settlement agreement itself provided that the DEA could use documents the defendant produced in subsequent proceedings.[15]  Plaintiffs also argue that, since Cardinal knew it had inadvertently produced *some* privileged documents in 2008 (the Category One Documents, which it clawed back promptly), it had ample reason to search for *other* such documents (like the Category Two Documents), and to claw them back in 2008 as well.

The Special Master admits he has struggled with the issue presented.  There is some appeal to the argument that, once a case resolves, all unsettled issues – for example, whether attorney-client privilege was waived – go into stasis.

Still, after lengthy and careful reconsideration, the Special Master concludes Cardinal's actions (or inactions) do amount to waiver of any claim of attorney-client privilege over the Category Two Documents.  Cardinal is correct that, after it produced discovery to the DEA in 2008, it was not required *absent some reason* "to engage in a post-production review to determine whether any protected communication or information has been produced by mistake."  *Automated Sols. Corp.*, 2011 WL 13076888 at *2.  But case law makes clear that reasons sometimes *do* arise that change a producing party's obligations: once a producing party is "on notice that something [i]s amiss with its document production and privilege review[,] then that party has an obligation to

---

[15]  *See* Cardinal Settlement Agreement ¶4 at 7-8 ("DEA reserves the right to seek to admit evidence of the Covered Conduct for proper evidentiary purposes in any other administrative proceeding against the Released parties for non-covered conduct," and "DEA shall . . . assist and cooperate with any [other] law enforcement agency that initiates an investigation, action, or proceeding involving the Covered Conduct."

promptly re-assess its procedures and re-check its production"). *D'Onofrio*, 2012 WL 1949854 at *12. *See also Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684, 700 (S.D. Fla. 2009) ("In light of the fact that Humana was aware that it inadvertently produced a number of documents which it believed to contain privileged information, Humana had an obligation to carefully . . . ensure that no additional privileged documents were divulged.").

Cardinal offers one non-binding and non-analogous citation for the proposition that, after a case settles, a party may have no reason to discover an inadvertent production. *See McDermott Will & Emery LLP v. Superior Court*, 217 Cal. Rptr. 3d 47, 67 (Ct. App. 2017) (explaining that a "motion to declare the e-mail privileged [in earlier litigation] was not necessary because the Probate Action settled before anyone used [the e-mail]"). The Special Master accepts that there may be circumstances where full and final settlement of a case, in which waiver was still being litigated, can suspend the need for any rectification of prior inadvertent disclosure. But in this case, Cardinal's settlement with the DEA specifically allowed the DEA to continue to use against Cardinal the documents Cardinal had produced. Furthermore, Cardinal knew that, despite having undertaken a methodical privilege review of its entire 2008 production, it was forced to claw back thousands of "Category One Documents."[16] Cardinal's simple statement to the DEA stating it did not intend to waive any privilege did not inoculate Cardinal from having to take steps to rectify production errors after having strong reason to believe errors had occurred.

Ultimately, Cardinal failed three times to prevent disclosure of the Category Two

---

[16] *See* Declaration of Robert J. Tucker ¶¶17-18 at 5 (Oct. 3, 2018) (describing Cardinal's four-level privilege review of electronically-stored information, and single-level privilege review of hard-copy documents).

*id.* ¶11 at 3 (Oct. 3, 2018) (counsel for Cardinal averring that "five discs containing privileged documents" were produced to DEA in 2008 and then clawed-back.

Documents: (1) when it first produced them to the DEA in 2008; (2) after it learned, in 2008, that it had inadvertently produced the Category One documents, but did not then re-check its production and seek additional claw-backs; and (3) when it produced all of the documents again in this MDL. The Special Master concludes Cardinal has failed to show it met all three prongs of Rule 502(b). Accordingly, Cardinal has waived privilege over all of the Category Two documents.[17]

    **RESPECTFULLY SUBMITTED,**

        /s/ David R. Cohen
        **David R. Cohen**
        **Special Master**

**Dated: February 20, 2019**

---

[17] Plaintiffs make a variety of other arguments regarding ways in which Cardinal failed to meet all three prongs of Rule 502(b), including that: (1) Cardinal's original privilege review to prevent inadvertent disclosure was inadequate, at least as to hard-copy documents; and (2) Cardinal inadequately described the methodology and timing of its privilege review as to all documents, so it did not carry its burden of persuasion. Because it is not necessary to do so, the Special Master does not address these arguments.