## UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

## CARDINAL HEALTH'S OBJECTION TO AMENDMENT TO DISCOVERY RULING NO. 14, PART I, REGARDING PRIVILEGE AND CLAW-BACK

### Introduction

The Amendment to Discovery Ruling No. 14, Part I ("Amended Ruling" or "AR"),[1] reaches the same conclusions as the initial Ruling ("Ruling" or "R") and includes three rulings.[2] Two concern Cardinal Health and are the subject of this objection.

The first ruling concerns privileged documents that Cardinal Health inadvertently produced to DEA in 2008 and promptly sought to claw back in this litigation when it learned about the inadvertent production during an early deposition in August 2018. The second ruling concerns an email chain between in-house and outside counsel for Cardinal Health concerning an attached chart—in the nature of a draft demonstrative exhibit—that was prepared at the direction of counsel for potential use in contesting imminent DEA action against the Company.

Regarding the documents inadvertently produced to DEA in 2008, then automatically produced in this litigation pursuant to CMO-1, the Special Master erred in concluding that

---

[1] Dkt. No. 1380.

[2] Dkt. No. 1321.

Cardinal Health waived the privilege by not discovering the inadvertent production earlier.  The Special Master acknowledged that the issue was a close one for him—that he "struggled" with it.[3]  His resolution of the issue, however, both undermines the privilege and imposes an unwarranted penalty for making an expedited production of documents in the 2008 DEA action, and again here pursuant to CMO-1.

Regarding the email chain between counsel and the attached chart reflecting counsel's view of how Cardinal Health might defend its Suspicious Order Monitoring system, the Special Master rightly determined that the documents constitute attorney work product, but erred in concluding that Plaintiffs met their burden of demonstrating a substantial need for the documents.  Plaintiffs could not demonstrate that they did not have alternative means to obtain the same information where (i) Cardinal Health had produced months ago the policies, procedures and guidelines that describe the workings of the system, including a special report prepared for the Board of Directors that described the system in detail, and when (ii) Plaintiffs declined to depose—noticing, then withdrawing the notices for—the two Cardinal Health officials with responsibility for directing the Suspicious Order Monitoring system from 2008 to date.  These facts are fatal to the finding that there was substantial need for the work-product material.  Secondarily, the Special Master erred in failing to treat the email chain-plus-chart as a privileged communication and, at the very least, opinion work product.

## I.
## THE 2008 DEA PRODUCTION

### A.    The Relevant Procedural Background.

The following background is material to Cardinal Health's claw-back of the privileged

---

[3]    *Id*. at 16.

documents inadvertently produced to DEA in 2008.  CMO-1 required defendants to produce documents "previously produced" that are "relevant to the claims in this MDL proceeding"[4] and imposed a two-month deadline.  Cardinal Health produced nearly three million pages of documents in accordance with CMO-1—far more than any other distributor.  To comply with CMO-1, Cardinal Health worked quickly to identify, locate, call back from storage, and prepare those documents for production. That collection included documents produced to DEA in 2007 and 2008.[5]  The DEA productions included both hard-copy and electronic documents. Before Cardinal produced them to DEA in 2008, the hard-copy documents were reviewed for privilege by Cardinal Health's then outside law firm; the electronic documents, by a combination of contract attorneys and the outside law firm, with four levels of review.[6]  In the very compressed timeframe set forth by CMO-1, it was not feasible for Cardinal Health's attorneys to *re*-review, before production in this litigation, the millions of pages of documents produced to DEA in 2007–2008.

Federal Rule of Evidence 502(b) provides:  "When made in a federal proceeding …, the disclosure does not operate as a waiver in a federal or state proceeding if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error …."  Given the expedited nature of discovery in Track 1 and the accelerated schedule imposed by CMO-1 for documents produced in earlier litigation, CMO-2 relaxed the requirements of Rule 502(b), stating:  "If, nevertheless, a Producing Party discloses Privileged Information, such disclosure (as

---

[4]  *See* CMO-1 ¶ 9(k)(ii).

[5]  *See* Declaration of Robert Tucker ¶¶ 3–4 (attached as Exhibit A).

[6]  *Id*. ¶¶ 17–18.

distinct from use) shall be deemed inadvertent without need of further showing under Federal

Rule of Evidence 502(b) and shall not constitute or be deemed a wavier or forfeiture of the

privilege or protection from discovery in this case or in any other federal or state proceeding by

that Party …. This Section shall be interpreted to provide the maximum protection allowed by

Federal Rules of Evidence 502(d)." [7]

At page 14 of the Amended Ruling, the Special Master refers to three categories of

documents that Cardinal Health seeks to claw-back from its 2008 production to DEA. [8]  The

Category One and Three documents are ***not*** at issue in this Objection:

- Category One documents were produced to DEA in 2008 and clawed back by Cardinal
  Health at that time.  The Special Master ruled that Cardinal Health "may claw them all
  back now."

- Category Three documents were not produced to DEA and were inadvertently disclosed
  for the first time in this proceeding.  The Special Master ruled that "CMO-2 applies,"
  permitting claw-back.

The Category Two documents ***are*** in dispute:

- Category Two documents were produced to DEA in 2008.  Cardinal Health recognized
  that they had been inadvertently produced and sought their return shortly after a
  document from that production was marked as a deposition exhibit on August 7, 2018.

### B.  The Relevant Facts about the 2008 Production to the DEA.

Robert Tucker, an attorney at Baker & Hostetler LLP, has submitted a declaration that

explains in detail the circumstances of the 2008 document production to DEA and why

---

[7]  CMO-2 at ¶ 53.

[8]  The Special Master ruled separately as to one document (an email chain with attached
charts).  That ruling is the subject of Part II, *infra*.

As in the initial Ruling, the Special Master again refers to the three categories together as
containing 2.8 million "documents."  AR at 14; R at 8. As explained in Cardinal Health's
initial Objection, Doc. No. 1344 at 3 n.6, the number of *pages* total approximately 2.8
million; the number of documents is approximately 402,000.

production of the Category Two documents was inadvertent.[9]  In brief, Cardinal Health produced to DEA a tremendous volume of documents at great speed under the immediate threat of suspension of its registration for four distribution centers.  Outside counsel for the company conducted a privilege review of hard-copy documents, and a combination of outside counsel and contract lawyers conducted a four-level review of electronically-stored information.  When it made the 2008 production to DEA, Cardinal Health expressly stated that it did not intend to waive privilege over produced documents and reserved the right to claw back any inadvertently produced material.  *Id.* ¶ 19.  Based on Cardinal Health's recent re-examination of the 2008 production to DEA, it appears that the company did claw back a small number of documents at the time—one for certain, 17 at most.[10]

Cardinal Health and the DEA promptly resolved the agency's concerns by agreement.  There were no depositions, hearings or other proceedings in which DEA might have made use of the documents and thereby alerted Cardinal Health to the fact that additional documents had been inadvertently produced.  Given the settlement, which brought the DEA's investigation to a quick conclusion, Cardinal Health had no reason to re-review the production it had just made.  Cardinal Health remained unaware that it had produced privileged documents to DEA in 2008 (other than the few clawed back) until August 2018, when, following the expedited production pursuant to

---

[9]  Tucker Decl. ¶¶ 17–19 (Exhibit A).

[10]  The Special Master said "Cardinal knew that, despite having undertaken a methodical privilege review of its entire 2008 production, it was forced to claw back *thousands* of 'Category One' documents."  AR 17 (emphasis added, as are all emphases in this brief unless otherwise indicated).  This reference to "thousands" of clawed-back documents reflects a misunderstanding of the Tucker Declaration, which explained that Cardinal Health retrieved the five discs produced to the DEA.  It did so, however, not to claw back all five disc's worth of documents as privileged, but a relative handful of privileged documents. Cardinal Health then re-produced the discs to DEA minus the privileged documents that had caught the attention of counsel.

CMO-1, a Cardinal Health corporate representative was deposed in this litigation and a plainly privileged document from that 2008 production was marked as an exhibit.  Cardinal Health asserted the privilege at the deposition, promptly carried out an inquiry to determine how the document came to be produced, and determined that the deposition exhibit was part of what are now labeled the Category Two documents.[11]  Per CMO-2, Cardinal Health then sent a claw-back demand to Plaintiffs.  Cardinal Health also sent DEA a claw-back demand.

### C.  Cardinal Health Did Not Waive Privilege for Category Two Documents.

#### 1.  The errors in the Ruling

The Special Master did not fault Cardinal Health's compliance with CMO-2; rather, he held that CMO-2 did not apply to the Category Two documents, concluding that Cardinal Health waived any privilege by not seeking to claw them back from DEA in 2008.  AR 17–18 ("Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced in 2008.").

The initial Ruling was mistaken both as to a point of fact and the applicable legal rule. The Special Master found that "Cardinal waived privilege as to all Category [Two] documents when it produced them ***unreservedly*** to the DEA in 2008," R 10,[12] when, in fact, Cardinal Health made two express reservations:

> Please be advised that by producing the above documents and all other documents previously provided to DEA, ***Cardinal Health does not intend to waive the protection of the attorney work- product doctrine, attorney-client privilege, or any other***

---

[11]  The issue was briefed before the Special Master.  *See* Exs. B, C, D, and E to Objection To Ruling No. 14, Part I (Doc. No. 1344) (incorporated by reference) (submitted *in camera*).

[12]  The quoted sentence said "Category One documents," but that was a typographical error, as the paragraph expressly addressed "the **Category Two Documents,**" and the next paragraph held that "Cardinal did not waive privilege in connection with **Category One Documents**, and may claw them all back now."  R 10 (emphases in original).

> *applicable privilege, protection or immunity*.
>
> Cardinal Health has screened … all documents produced for privilege … before they are produced to the Government. Because of the volume of records that have been produced and that will continue to be produced and the speed with which Cardinal Health is attempting to produce them, ***Cardinal Health requests and expects that DEA will return to Cardinal Health, upon request, any documents that we later discover to be privileged or otherwise protected and to have been inadvertently produced***.[13]

This reservation is important because it goes hand-in-hand with the legal rule that governs timely claw-back demands.

Also, the Ruling mistakenly proceeded from the legal premise that Cardinal Health was obligated to discover the inadvertent disclosure and claw back the documents at the time of production.  R 10 ("Cardinal permanently waived privilege when it did not seek to correct its inadvertent disclosure at the time the documents were initially produced").  The Ruling applied this "rule," although the Special Master acknowledged that it made no sense for Cardinal to have undertaken a re-review of its production then.  *Id.* ("the Special Master is sympathetic to Cardinal's assertion that the DEA action in 2008 concluded shortly after it produced the documents, so Cardinal never had a need to make any further determinations regarding privilege or claw-back").

The Amended Ruling corrects both errors.  It recognizes that in 2008 Cardinal Health reserved its right to claw back inadvertently produced documents.  AR 17.  And it further recognizes that the case law does not require the producing party to conduct a post-production re-review to ensure that no privileged document has been inadvertently produced, but instead examines whether the producing party has acted promptly to rectify any inadvertent disclosure

---

[13]   Tucker Decl. ¶ 19 (Exhibit A).

based, not on when the disclosure occurred, but on when the disclosure was discovered or should have been discovered. *Id*. at 9–10, 16.  The Special Master nevertheless concluded, albeit "struggl[ing] with the issue," that "Cardinal failed three times to prevent disclosure of the Category Two Documents: when it produced them to the DEA in 2008; when it did not re-check its production then; and when it produced the documents in the MDL. *Id*. at 17–18.

### 2.        The errors in the Amended Ruling

The Special Master's conclusion is mistaken in three respects. First, insofar as he cites these ***three*** alleged failures to prevent disclosure as the basis for his finding of waiver, he considered two factors that are irrelevant.  Rule 502(b), as explained above, calls for a three-part inquiry: (1) Was the initial disclosure inadvertent? (2) Did the holder of the privilege take reasonable steps to prevent disclosure? and (3) Did the holder promptly take reasonable steps to rectify the error?  The Special Master does not dispute that Cardinal Health took reasonable steps to prevent disclosure of privileged material to the DEA in the first place (as explained in the Tucker Declaration) and that the company's disclosure of the Category Two documents in 2008 was therefore inadvertent.[14]  And he does not dispute that CMO-1 required defendants to produce straightaway in this litigation all documents that they had produced in connection with earlier litigation and investigations, allowing time for nothing more than the identification, physical collection and re-production of those documents.  Thus, the sole issue should be whether Cardinal Health acted promptly to claw back the privileged documents when it learned,

---

[14]   AR 8 ("the parties implicitly agree, and the facts support the conclusion, that … Cardinal produced the documents at issue inadvertently").  As to whether Cardinal Health took reasonable steps to prevent the inadvertent disclosure in the first place, the Special Master determined that he did not have to address that question.  AR 18, n.17.  The facts set forth in the Tucker Declaration (i.e., multi-attorney, multi-step review) establish that Cardinal did take reasonable steps, and those facts are undisputed by contrary evidence.

or should have learned, of their inadvertent production. The fact of producing the documents in 2008, and of producing them again in 2018 on an expedited basis pursuant to CMO-1, are not factors (or failures) that count against Cardinal Health in deciding that issue; they are the pre-conditions to there even being an issue of inadvertent disclosure.

Second, in addressing that issue and in concluding that Cardinal Health should have discovered the inadvertent production of privileged documents in 2008, the Special Master misapplied *D'Onofrio v. Borough of Seaside Park*, 2012 WL 1949854 (D.N.J. May 30, 2012) (not for publication)—the primary decision upon which he relies. The Amended Ruling accepts that Rule 502(b) does not require a producing party to engage in a post-production review to determine whether any privileged documents were produced by mistake; that it is the time of discovery of the mistaken disclosure that starts the clock running on the producing party's due diligence in clawing back the documents; and that it is irrelevant how much time lapses after the inadvertent production and its discovery. AR 9. The Amended Ruling cites *D'Onofrio*, however, for the general proposition that the producing party must promptly re-check its production once it is "'on notice that something [i]s amiss.'" *Id*. (quoting *D'Onofrio*, 2012 WL 1949854 at *12). And, in applying that proposition to the facts, the Amended Ruling again cites *D'Onofrio*.

But the *D'Onofrio* court applied the proposition very differently than does the Special Master. The production in *D'Onofrio* involved just 14 boxes of documents (approximately 100,000 pages)—a far cry from the 2.8 million pages of documents produced to the DEA. And when the court in *D'Onofrio* found that "something was amiss with [the defendants'] document production long before Plaintiff relied on three privileged documents" in a reply brief, the court was confronted, not with a single instance (as here) of the defendants' having discovered that

some documents had been produced inadvertently, but with "seemingly unending problems"

with the document production.

- Counsel reviewed all the documents for privilege and left it to a clerical employee to separate the documents marked as privileged from those marked as not privileged. The clerical employee did so for only 2 boxes.

- Defendants clawed back the disc containing the production after discovering that some attorney comments about the non-privileged documents had been produced. But defendants did not re-review the entire production and discover the inadvertent production of the documents marked as privileged.

- When the plaintiff reported that the disc was unreadable, and defendants re-burned the disc, they did not discover the inadvertent production.

- When the plaintiff reported that the second disc was also unreadable, defendants burned it again and did a quality control audit to ensure that the same documents were being produced as before, but still did not discover the inadvertent production.

- When defendants created the privilege log, they did not recognize that "the bulk of the entries [were] missing"—i.e., "70% of the information that should have been included," but had been inadvertently produced.[15] Defendants again did not discover the inadvertent production.

- When the plaintiff reported that the documents on the third disc were out of order, defendants corrected the problem on a fourth disc and, in doing so, discovered some documents that had been flagged as privileged in the initial review but had not been withheld. But they did not re-review the production and discover the larger problem of inadvertent production.

- Only when the plaintiff filed a reply brief that attached three privileged documents (two and a half years after the initial production) did defendants re-review the entire production and recognize that 1000 pages of privileged documents had been produced.[16]

The court was willing to assume that discovery of the first glitch (mistaken disclosure of

counsel's electronic comments about the privileged documents) did not, "standing alone,

reasonably put [defendants] on notice that actual privileged documents may have been

---

[15]  *D'Onofrio*, 2012 WL 1949854 at *13.

[16]  *Id*. at *1–4 (detailing the "seemingly unending problems").

mistakenly produced to Plaintiff."[17]  Likewise, for the second oversight: the court found that, even though the privilege log was missing "70% of the material that should have been included" and "this disparity in number of pages logged would have been self-evident," it was willing to assume that "nothing in the creation or the content of the … privilege log, … would have put the [defendants] on notice that something was amiss with their document production and privilege review."[18]  It was only the third "discovery mishap" involving the disclosure of protected information—i.e., the combined notice that the documents on the third disc were disorganized and that 728 privileged documents had been inadvertently disclosed—that the court said should have put defendants on notice "that something had gone profoundly awry with their document production and privilege review."[19]

The Amended Ruling points to nothing like this in the way of notice—only that "Cardinal knew it had inadvertently produced **some** privileged documents in 2008 (likely one but at most 17 documents out of 402,000).  AR 16 ("the Category One Documents, which it clawed back promptly") (emphasis in original).  In *D'Onofrio*, there were "unending problems" over a period of two years, the cumulative effect of which was to create the requisite notice that "something had gone profoundly awry."  With Cardinal Health's 2008 production, however, the company spotted a small number of documents it had mistakenly disclosed to DEA and corrected that one error before the DEA matter settled approximately six months later.  *D'Onofrio*, in short, took a "three strikes and you're out" approach to Rule 502(b) before holding that the defendants had waived the privilege. [20]  The Special Master called one "strike" and held there had been a waiver.

---

[17]  *Id*. at *13.

[18]  *Id*. at *14.

[19]  *Id*.

[20]  The same is true of *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 258 F.R.D. 684

Third, the Amended Ruling mistakenly counts against Cardinal Health the fact that its settlement with DEA in 2008 allowed the agency to keep and use the documents produced by the company.[21] That fact is irrelevant. The test for waiver—acknowledged by the Special Master— is whether the producing party acts promptly to rectify the inadvertent production ***once the party has discovered it***. AR 9 ("A party's 'duty to rectify arises when the opposing party can prove actual knowledge of the disclosure'"; and "It is the time of discovery of disclosure that starts the clock running on the producing party's diligence in seeking to recover the documents") (quoting *United States ex rel. Health v. Wis. Bell Inc.*, 272 F. Supp.3d 1094, 1098 (E.D. Wis. 2017)). The Advisory Committee Notes to Rule 502(b) explain that "[t]he rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake." Such review may be required, the Notes go on to say, only if there are "any ***obvious indications*** that a protected communication or information had been produced inadvertently."[22]

A boilerplate clause in the DEA-Cardinal Health settlement agreement permitting the agency to use the company's documents is not such an "obvious indication." It is neither a signal that privileged documents have been disclosed nor a signal that they haven't. Moreover, because one common reason to settle is to put an end to litigation costs, and the law typically

---

(S.D. Fla. 2009), the other case cited by the Special Master. There, the court held that the defendant had taken reasonable steps to rectify the inadvertent disclosure of privileged documents on the first four occasions when it discovered such problems. It was only as to the fifth document—because it was the *fifth* time—that the court held that the defendant had waived the privilege by not acting sooner to discover the inadvertent disclosure. *Id.* at 700.

[21] AR at 17 ("[I]n this case, Cardinal's settlement with the DEA specifically allowed the DEA to continue to use against Cardinal the documents Cardinal had produced.").

[22] Advisory Committee Notes, subdivision (b) ("The rule applies to inadvertent disclosures made to a federal office or agency ….").

encourages settlement, it makes little sense to impose on a settling party the duty to re-review its document production.  *Cf. McDermott Will & Emery LLP v. Superior Court*, 217 Cal. Rptr. 3d 47, 67 (Ct. App. 2017) (explaining that a "motion to declare the e-mail privileged was not necessary because the Probate Action settled before anyone used" it).

The Amended Ruling does not dispute Cardinal Health's representation that its new counsel in this litigation (Williams & Connolly LLP) discovered the inadvertent production of the Category Two documents only after discovery in this litigation was underway and then acted promptly, and in accordance with CMO-2, to seek their return.  The Amended Ruling therefore is in error, and this Court should find that no waiver has occurred with respect to the Category Two documents.

## II.
## THE EMAIL & ATTACHED CHARTS

### A.    The Relevant Facts.

At depositions of two Cardinal Health former employees on November 27 and November 30, 2018, Plaintiffs marked as exhibits an email chain between in-house and outside counsel (Milbank Tweed) and two charts that compared, by way of three columns, features of Cardinal Health's Suspicious-Order Monitoring (SOM) system in November 2005–December 2007, post-December 1, 2007, and as of December 31, 2011 ("the 3-column charts").  Counsel for Cardinal asserted privilege at the depositions and requested return of the documents pursuant to CMO-2.[23]

---

[23]  Plaintiffs submitted the underlying privileged documents to the Special Master.  *See* Ex. F to Objection to Ruling No. 14, Part I (Doc. No. 1344) (incorporated by reference) (submitted *in camera*).  Cardinal Health submitted its Response to the Special Master *in camera*.  *See* Ex. G to Objection to Ruling No. 14, Part I (Doc. No. 1344) (incorporated by reference) (submitted *in camera*).  The Amended Ruling refers to the email chain and *two* charts.  The two charts that were marked as deposition exhibits are versions of the same chart, and the differences are minimal.

An earlier version of the chart ("the 2-column chart") compared only the November 2005–December 2007 period with the post-December 1, 2007–pre-2012 period.  Cardinal Health produced the earlier chart to the DEA (and, in turn, to Plaintiffs pursuant to CMO-1) and has not sought to claw it back.[24]

The email exchange consisted of four emails between February 5 and February 8, 2013.  When these emails were exchanged, there were pending DEA enforcement actions —actions that were not settled until 2016.  Also pending was a shareholder demand letter regarding the Board of Directors' oversight of the company's distribution of prescription opioids.  Cardinal Health had retained Milbank Tweed as counsel to the Special Demand Committee of the Board to investigate the shareholder allegations.

Milbank Tweed asked in-house counsel, Mr. Goldsand, when the chart had been prepared; Mr. Goldsand asked a paralegal in the Cardinal Health litigation department to provide him a Word version of the chart; and he then forwarded the document and question to Mr. Mone in Cardinal's Quality and Regulatory Affairs department.  The charts had been created by a litigation paralegal at Cardinal Health in late 2011 or early 2012 at the direction of outside counsel during the course of existing or anticipated DEA action.[25]

As is evident from the face of the documents, the charts reflect one possible strategy for defending against the DEA actions—a comparison demonstrating the evolution and improvement of the anti-diversion program.  Milbank Tweed expressed interest in the charts for similar reasons—because they were advising the Board of Directors in connection with possible

---

[24]  The 2-column chart is not privileged, because Cardinal Health made use of it in the company's discussions with the DEA.

[25]  *See* Exhibit J to Objection to Discovery Ruling No. 14, Part I (incorporated by reference) (submitted *in camera*).

shareholder litigation against the Company.[26]

In the end, neither outside counsel in the DEA litigation nor Milbank Tweed disclosed the charts to DEA or anyone else.

### B.     The Charts Are Protected Work Product.

The Court need not reach the question of whether the email chain and charts are privileged communications (*see* section C).  The Amended Ruling concluded correctly that the 3-column charts are work product, but decided erroneously that Plaintiffs had shown a substantial need for the charts, although Plaintiffs declined to take the first and most basic step to obtain the information in the charts—namely, depose the two Cardinal Health employees who directed the Suspicious Order Monitoring system and who were in the best position to describe and compare the system at different points in time.

#### 1.     No showing of substantial need

The initial Ruling held that the charts were not prepared in anticipation of litigation because the DEA's administrative warrant was not litigation.[27]  As Cardinal Health explained in its Objection, the course of events makes clear that the DEA action was more than a mere administrative inspection.  Inspections occur regularly, without use of an administrative

---

[26]  *See* Discovery Ruling Regarding the "Teamsters Materials," Dkt. No. 835, Aug. 1, 2018 (upholding privilege over documents reviewed by counsel as part of a shareholder investigation).  The Ruling (at 6) stated that Cardinal Health did not meet the "Special Master's request for additional submissions explaining the authorship and context of the charts."  But, in fact, counsel for Cardinal Health had made a proffer of additional information regarding the context and authorship of these documents *in camera* on December 17, 2018, along with an affirmative offer to provide declarations from the individuals who served as the basis for the information supplied by counsel, if the Special Master required. *See* Ex. H, I & J to Objection to Ruling No. 14, Part I (Doc. No. 1344) (incorporated by reference) (submitted *in camera*).

The Amended Ruling does not find Cardinal Health failed to make a submission explaining the authorship of the 3-column charts.

[27]  R 6.

inspection warrant.  Cardinal Health's reasonable anticipation of litigation proved accurate, for DEA's filing of the show-cause order in February 2012 was followed by four years of litigation (Cardinal Health filed a lawsuit in federal district court to enjoin the enforcement action), investigations by U.S. District Attorneys in Florida, Maryland, New York, and Washington State, and negotiations that resulted in settlements in 2016 obligating Cardinal Health to pay $44 million "[t]o avoid the delay, expense, inconvenience, and uncertainty of litigation of the [DOJ's] claims."  The Amended Ruling "now agrees with Cardinal that it reasonably anticipated litigation, so the two [3-column] charts are, in fact, work-product." AR 3.

Plaintiffs therefore have the burden of establishing a substantial need for the charts.  To do that, Plaintiffs had to show the Special Master that they could not obtain the same information in another way without undue hardship.  *Carr v. C.R. Bard, Inc.*, 297 F.R.D. 328, 333–34 (N.D. Ohio 2014) (requiring a showing that the sought-after documents were "sufficiently unique and important, as compared to other possible sources of the same information, to justify overriding work product protection"); *Toledo Edison Co. v. G.A. Technologies,* 847 F.2d 335 (6th Cir. 1988) (the requesting party bears the burden to demonstrate substantial need and that the party is unable to obtain the "substantial equivalent of the materials by other means").

Plaintiffs have not made that showing, and the Amended Ruling tilts with a straw man.  It is important to underscore at the outset that ***Plaintiffs have, and Cardinal Health does not seek to retrieve, the 2-column chart***.  Plaintiffs thus have Cardinal Health's description of the Suspicious-Order Monitoring system as it was from November 2005 to December 2007 and after December 1, 2007.  What specific showing, then, have Plaintiffs made of a substantial need for the information in the third column—the description of the Suspicious-Order Monitoring system as of December 31, 2011?

None. Nor does the Amended Ruling consider what specific showing Plaintiffs have made about the information contained in the third column.  Certainly, Plaintiffs questioned a number of Cardinal Health's employees about the Suspicious-Order Monitoring system as of year-end 2011 and going forward, and had the opportunity to question others, but elected to use the allowable deposition time to pursue other subjects.  Plaintiffs questioned Cardinal Health's 30(b)(6) witness about that period, asking only about 25 questions, but that was Plaintiffs' choice.[28]  Plaintiffs also questioned other Cardinal witnesses about that period: (1) Nick Rausch (Manger, Quality & Regulatory Affairs and Director of Analytics), about DEA actions against retail chain pharmacies from after he left the anti-diversion group, and the aggregate volume of distributions by Cardinal Health into the state of Ohio; (2) Rich Ryu (Director of Analytics) about setting and applying thresholds and about the "algorithm" for identifying orders of unusual size, pattern, and frequency; (3) Kimberly Anna-Soisson (Manager, Supply Chain Integrity), about the guidelines for setting and adjusting thresholds, customer due diligence processes, and procedures for detecting and reporting suspicious orders and responding to threshold events; (4) Kim Howenstein (Assistant to Director of Investigations; Analyst), about setting and reviewing thresholds and the structure and decision making process of the Large Volume Tactical & Analytic Committee; and (5) Chris Forst (Director, Supply Chain Integrity), about procedures for comparing customers; (6) Craig Baranski (Director of Operations, Wheeling, West Virginia Distribution Center), about procedures for flagging "orders of interest" for QRA review; and (7, 8, 9 & 10) Ray Carney, Steve Lawrence, Chris Lanctot, and Thomas Convery (Sales), about spotting "red flags" for customers.  Plaintiffs were obligated to show that the 3-column charts—

---

[28]  The Special Master remarks, without citation to the deposition, that "Cardinal's 30(b)(6) witness [did not] provide anywhere near the comprehensive summary of the information contained in the charts." AR 6. She did not, because she wasn't asked.

specifically, the third column—contain information that either these witnesses did not provide or were asked about and could not answer.  Plaintiffs did not do that.

This failure is all the more glaring because Plaintiffs withdrew the deposition notices for Michael Mone, who ran the Suspicious-Order Monitoring system from 2008 to 2012, and Todd Cameron, who has run it since 2012.  They, better than anyone or any set of documents, are in a position to describe the workings of the system in detail.  Even had the Cardinal witnesses listed above not been able to describe the elements of the system as of year-end 2011 and afterward in as much detail as the charts—and Plaintiffs have made no such showing—Mone and Cameron were the obvious witnesses to do just that, and more.  But Plaintiffs withdrew the deposition notices when the Special Master issued his Amended Ruling.

In summary, where Plaintiffs already have the 2-column chart, overcoming work-product protection for the 3-column charts required that Plaintiffs show that they had no alternative way to learn about Cardinal Health's Suspicious-Order Monitoring system at the end of 2011 and post-2012 other than by obtaining the 3-column chart. The Amended Ruling does not explain what showing Plaintiffs made to that effect, nor could it, because Plaintiffs (i) did not take the depositions of the two Cardinal Health employees (Michael Mone and Todd Cameron) who directed the system from 2008 to 2012 and 2012 to date, respectively, and (ii) did not ask questions about the post-2012 system of the Cardinal Health employees they did depose. Plaintiffs' track record in deposition discovery reflects an almost total disinterest in the post-2012 period.

The courts have consistently held that a party cannot establish substantial need where it has had the opportunity to depose witnesses with relevant information.  *See, e.g.*, *Stampley v. State Farm Fire & Cas. Co.*, 23 Fed. Appx. 467, 471 (6th Cir. 2001) (plaintiff did not show

"substantial need and undue hardship" because she could have deposed the people who prepared

the protected materials); *Randleman v. Fidelity Nat. Title Ins. Co.*, 251 F.R.D. 281, 286 (N.D.

Ohio 2008) (party failed to show substantial need for discovery of a document which was

protected by work product privilege, where party seeking disclosure would be able to depose

persons with knowledge of underlying facts); *Ross v. Abercrombie & Fitch Co.*, 2008 WL

821059 at *4 (S.D. Ohio March 24, 2008) (same); *In re Dayco Corp. Derivative Securities

Litigation*, 102 F.R.D. 468, 470 (S.D. Ohio 1984) (plaintiffs did not demonstrate "substantial

need" or "undue hardship" where they could depose individuals who could, "arguably at least,

provide the information found" in the protected materials).[29]  Here, Plaintiffs deposed 10

Cardinal employees who offered testimony about the post-2012 system, some of whom could

have offered more, if asked.  Even if there was information they could not provide, Plaintiffs did

not just fail to take advantage of the opportunity to depose Mone and Cameron; they

affirmatively declined to take their depositions.

      The Court need not go further.  But, seeking to excuse Plaintiffs' failure to meet their

burden, the Special Master said that Plaintiffs should not have to "piece together the same

information from the other 4.3 million pages of documents Cardinal has produced, or from future

witness depositions."  AR 6.  But this reasoning is misguided in three ways.

- First, Cardinal did not argue that some unidentified "future depositions" might supply the
  information about the post-2012 system, but rather that Plaintiffs had failed to follow
  through with the depositions they had already noticed of the two employees who,

---

[29]   *See also S.E.C. v. Treadway,* 229 F.R.D. 454, 456 (S.D.N.Y. 2005) (same); *Hohenwater v. Roberts Pharmaceutical Corp.*, 152 F.R.D. 513, 516–17 (D.S.C. 1994) (same); *Maloney v. Sisters of Charity Hosp. of Buffalo, N.Y.*, 165 F.R.D. 26, 30–31 (W.D.N.Y. 1995); (same); *Miles v. Bell Helicopter Co.*, 385 F. Supp. 1029, 1032 (N.D. Ga. 1974) (same).

between them, had (and have) direct responsibility for the Suspicious-Order Monitoring system.  Plaintiffs failed to show either that (i) Mone and Cameron cannot or will not answer Plaintiffs' questions about the post-2012 system or (ii) that there would have been undue hardship in taking their depositions, which were already on the calendar.

- Second, there is no question of "piec[ing] together" information from the deposition testimony that would be equivalent to the third column on the charts, as if that were some hardship.  The charts contain just seven criteria, and it would be a simple matter to ask Mone and Cameron (and to have asked Cardinal's 30(b)(6) witness) to describe the post-2012 system in terms of: (1) personnel resources; (2) "know-your-customer" procedures; (3) organizational structure; (4) training; (5) tone at the top; (6) retail business conference; and (7) customer/patient safety focus.[30]

- Third, Cardinal Health did not dump 4.3 million pages of documents, leaving Plaintiffs to find the "needle" of the post-2012 Suspicious-Order Monitoring system in that haystack.  The reason the Court required the parties to produce metadata was to enable them (Plaintiffs, in this instance) to search the document production by custodian's name, date range, and/or search term in order to zero-in on a category of documents.  Cardinal Health produced its standard operating procedures (1327 pages), anti-diversion working guidelines (124 pages), policies and procedures for order processing (252 pages), and cage & vault/transportation/state reporting procedures (1192 pages).  Plaintiffs did not claim they were unable to locate these documents or that reviewing them (2895 total pages) was too burdensome for them to undertake.[31]  Cardinal Health went beyond

---

[30]  *See* Ex. F to Objection to Ruling No. 14, Part I (Doc. No. 1344) (incorporated by reference) (submitted *in camera*).

[31]  The Bates ranges, respectively, are CAH_MDL_PRIORPROD_AG_0004444–0005771;

producing the policies, procedures and guidelines, however, also producing a report prepared by Milbank, Tweed, Hadley & McCloy LLP in 2012–2013 for a special committee of the Cardinal Health Board of Directors.  That report investigated and evaluated the Suspicious-Order Monitoring system for purposes of responding to a shareholder demand letter which alleged that the directors and officers had breached their fiduciary duties by failing to implement a system to detect and prevent the diversion of controlled substances.  The Amended Ruling accepts at face value (and quotes) Plaintiffs' assertion that Cardinal's discovery responses "'do not come close to providing the SOMS facts set forth in the charts,'"[32]—an assertion that altogether fails to take stock of these documents cited above.

For these reasons, the charts were prepared in anticipation of litigation with DEA and provided to outside counsel retained in anticipation of litigation with shareholders.  Plaintiffs seek the charts, not because they contain factual information that is unavailable, but precisely because the charts are argumentative in nature.

### 2.       The email and charts are privileged.

The Special Master also erred in concluding that the 3-column charts, which were prepared by a Cardinal Health paralegal in response to a request by outside counsel, is not protected by the attorney-client privilege because the privilege "does not protect the underlying facts within [attorney-client] communications."  AR 7.  The Special Master misapprehended the principle that the privilege protects communications, not facts.

The 3-column charts are as much entitled to the protection of the privilege as were the

---

CAH_MDL2804_00124800–00124924; CAH_MDL2804_00059048–00059300; and CAH_MDL2804_02879959–02881151.

[32]   AR 6.

questionnaires about foreign payments in *Upjohn Co. v. United States*, 449 U.S. 383, 386–87, 397 (1981), that corporate employees completed, as directed by the chairman of the company, and sent to the general counsel.  That the charts are "devoid of legal advice" is of no moment.[33] "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn*, 449 U.S. at 390; *Toyo Tire & Rubber Co., Ltd. v. Atturo Tire Corp*., 2016 WL 3125004, at *2 (N.D. Ill. June 2, 2016) ("'While facts themselves are not protected by the privilege, the communications of facts between an attorney and client are protected if transmitted for the purpose of obtaining legal advice.'") (quoting *National Association of Realtors*, 242 F.R.D. 491, 494 (N.D. Ill. 2007)).

The Special Master misapplied *Upjohn*.  The charts were prepared at outside counsel's direction and constitute a communication with counsel.  The principle that privilege does not protect the underlying facts from discovery means that Plaintiffs can question Cardinal Health employees comprehensively about the Suspicious-Order Monitoring system, just as in *Upjohn* "the Government was free to question the employees who communicated with [the general counsel] and outside counsel."  *Id.* at 396.  And Plaintiffs have already done so.  What they may not do is invade "the oldest of the privileges for confidential communications known to the common law" and ask about the content of the communication that was prepared at the request of outside regulatory counsel (Quarles & Brady), shared with other outside counsel (Milbank Tweed), and was the subject of a question to in-house counsel by Milbank, which was advising the Board in connection with the threat of shareholder litigation.  *Upjohn*, 449 U.S. at 389.[34]

---

[33]  AR 7.

[34]  *See* Section II(A).  That outside directed the creation of the 3-column chart for possible use in defending the DEA actions does not alter the privileged nature of the communication,

The charts are not at all like an attorney's notes of a meeting **with a third party**, as in *Clevenger v. Dillard's Department Stores, Inc.*, 2006 WL 2709764 (S.D. Ohio Sept. 20, 2006), on which the Special Master relied.  That decision turned on the fact that "[t]he notes taken by [the attorney] during his meeting with [the third party] reflect facts and disclosures made by others, not disclosures made by his client Dillard's." *Id.* at *3.  In contrast, the chart at issue here was a vehicle for Cardinal Health, **the client**, to communicate with its counsel.[35]

## CONCLUSION

For the reasons stated, this Court should find no waiver has occurred and Cardinal Health's claw-back of privileged material was permissible under the terms of CMO-2.

---

because, in the end, counsel did not use, nor otherwise disclose, the chart.  *See In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("although some of the documents appear to be drafts of communications the final version of which might eventually be sent to other persons, and as distributed would not be privileged, we see no basis in the record for inferring that AG did not intend that the drafts—which reflect its confidential requests for legal advice and were not distributed—to be confidential"); *In re Feldberg,* 862 F.2d 622, 629 (7th Cir. 1988) ("[r]are is the case in which attorney-client conversations do not lead to some public disclosure" and just because a trial is public or a lawyer writes a brief to be filed with the court, it does not follow that communications "antecedent" to the trial and "drafts of the brief" are unprivileged).

[35]  The Special Master's reliance on *Graff v. Haverhill North Coke Co.*, 2012 WL 5495514 (S.D. Ohio Nov. 13, 2012), is also misplaced.  There, the magistrate judge was explicit that she would "compel no further production or redaction of the withheld documents to unearth any potential underlying facts" because "[p]laintiffs may inquire about the relevant facts by deposing the appropriate witnesses or through other discovery vehicles." *Id.* at 51.  Here, Plaintiffs declined, apparently for tactical reasons, to depose the "appropriate" witnesses, Mone and Cameron.

Dated: February 28, 2019                    Respectfully submitted,

                                            */s/ Steven M. Pyser*
                                            Enu Mainigi
                                            F. Lane Heard III
                                            Steven M. Pyser
                                            Ashley W. Hardin
                                            **WILLIAMS & CONNOLLY LLP**
                                            725 Twelfth Street, N.W.
                                            Washington, DC 20005
                                            Tel: (202) 434-5000
                                            Fax: (202) 434-5029
                                            emainigi@wc.com
                                            lheard@wc.com
                                            spyser@wc.com
                                            ahardin@wc.com

                                            *Counsel for Defendant Cardinal Health, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this 28th day of February, 2019, the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Steven M. Pyser*
Steven M. Pyser

*Counsel for Defendant Cardinal Health, Inc.*