Nos. 18-84, 18-86

In The
# Supreme Court of the United States

————————————

ConAgra Grocery Products Company, et al.,
*Petitioners*,

v.

California,
*Respondent.*

————————————————————

The Sherwin-Williams Company,
*Petitioner*,

v.

California,
*Respondent.*

————————————

**On Petitions for Writ of Certiorari
to the Court of Appeal of California**

————————————

**BRIEF OF INDIANA, LOUISIANA, TEXAS,
UTAH, AND WYOMING AS *AMICI CURIAE* IN
SUPPORT OF PETITIONERS**

————————————

| | |
|---|---|
| Office of the Indiana | Curtis T. Hill, Jr. |
|   Attorney General | Attorney General of Indiana |
| IGC South, Fifth Floor | Thomas M. Fisher* |
| 302 W. Washington Street | Solicitor General |
| Indianapolis, Indiana 46204 | Kian Hudson |
| (317) 232-6255 | Julia C. Payne |
| Tom.Fisher@atg.in.gov | Deputy Attorneys General |
| *Counsel for* Amici *States* | *\*Counsel of Record* |
| *Additional counsel with signature block* | |

i

## QUESTION PRESENTED

Whether the Due Process Clause of the Fourteenth Amendment prohibits a State from arbitrarily imposing liability for lawful activity regardless of causation.

ii

## TABLE OF CONTENTS

QUESTION PRESENTED .......................................... i

TABLE OF AUTHORITIES ..................................... iii

INTEREST OF THE AMICI STATES ...................... 1

SUMMARY OF THE ARGUMENT ........................... 2

REASONS FOR GRANTING THE
    PETITIONS ........................................................... 3

I.    This Case Exemplifies a Recent Trend
       Where State and Local Governments
       Use Public Nuisance Lawsuits as
       Weapons for Wealth Transfers and
       Social Change ..................................................... 3

II.   California's Expansive Public
       Nuisance Law Tests the Limits of Due
       Process ............................................................... 15

CONCLUSION ........................................................ 23

ADDITIONAL COUNSEL ...................................... 24

iii

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*American Electric Power Co., Inc. v.*
   *Connecticut,*
   564 U.S. 410 (2011).............................................18

*Antolok v. United States,*
   873 F.2d 369 (D.C. Cir. 1989).............................17

*Baker v. Carr,*
   369 U.S. 186 (1962).............................................16

*BMW of North America, Inc. v. Gore,*
   517 U.S. 559 (1996).............................................19

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985).............................................20

*California v. Gen. Motors Corp.,*
   No. C06-05755, 2007 WL 2726871 (N.D.
   Cal. Sept. 17, 2007).......................................11, 17

*Camden Cnty. Bd. of Chosen Freeholders v.*
   *Beretta, U.S.A. Corp.,*
   273 F.3d 536 (3d Cir. 2001) ...............................8, 9

*Carmichael v. Kellogg, Brown & Root*
   *Servs., Inc.,*
   572 F.3d 1271 (11th Cir. 2009)............................17

iv

**FEDERAL CASES [CONT'D]**

*City of New York v. B.P. P.L.C.*,
    No. 18 Civ. 182 (JFK), 2018 WL 3475470
    (S.D.N.Y. July 19, 2018) ....................................12

*City of Oakland v. BP P.L.C.*,
    Nos. C 17-06011 WHA, C 17-06012
    WHA, 2018 WL 3609055 (N.D. Cal. July
    27, 2018).......................................................12, 20

*City of Philadelphia v. Beretta U.S.A. Corp.*,
    277 F.3d 415 (3d Cir. 2002) ..................................8

*Comer v. Murphy Oil*,
    No. 05-436, 2007 WL 6942285 (S.D.
    Miss. Aug. 30, 2007) (unpublished
    ruling), *appeal dismissed*, 607 F.3d 1049
    (5th Cir. 2010), *mandamus denied*, No.
    10-294 (U.S. Jan. 10, 2011) .................................17

*Honda Motor Co. v. Oberg*,
    512 U.S. 415 (1994).......................................18, 19

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ..............................16

*Native Vill. of Kivalina v. ExxonMobil
    Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009),
    *aff'd*, 696 F.3d 849 (9th Cir. 2012)..........11. 16, 17

v

**FEDERAL CASES [CONT'D]**

*Occidental of Umm al Qaywayn, Inc. v. A*
   *Certain Cargo of Petrol.,*
   577 F.2d 1196 (5th Cir. 1978)..............................17

*Philip Morris USA v. Williams,*
   549 U.S. 346 (2007)...............................................19

*State Farm Mutual Automobile Insurance*
   *Co. v. Campbell,*
   538 U.S. 408 (2003)...............................................19

*White v. Smith & Wesson,*
   97 F. Supp. 2d 816 (N.D. Ohio 2000) ...................8

**STATE CASES**

*Blomen v. N. Barstow Co.,*
   85 A. 924 (R.I. 1913) ............................................13

*Braun v. Ionotti,*
   175 A. 656 (1934) .................................................13

*City of Boston v. Smith & Wesson Corp.,*
   12 Mass. L. Rptr. 225 (Mass. Super. Ct.
   2000)........................................................................8

*City of Chicago v. American Cyanamid Co.,*
   823 N.E.2d 126 (Ill. App. Ct. 2005).......................9

*City of Chicago v. Beretta U.S.A. Corp.,*
   821 N.E.2d 1099 (Ill. 2004)....................................8

vi

STATE CASES [CONT'D]

*City of Cincinnati v. Beretta U.S.A. Corp.*,
    768 N.E.2d 1136 (Ohio 2002) ...............................8

*City of Milwaukee v. NL Industries, Inc.*,
    691 N.W.2d 888 (Wis. Ct. App. 2004) ................10

*City of St. Louis v. Benjamin Moore & Co.*,
    226 S.W.3d 110 (Mo. 2007) ...................................9

*Detroit Board of Education v. Celotex Corp.*,
    493 N.W.2d 513 (Mich. Ct. App. 1992) ................7

*Diamond v. General Motors Corp.*,
    97 Cal. Rptr. 639 (Cal. Ct. App. 1971) ................6

*Ganim v. Smith & Wesson Corp.*,
    780 A.2d 98 (Conn. 2001) .....................................9

*City of Gary ex rel. King v. Smith & Wesson
    Corp.*,
    801 N.E.2d 1222 (Ind. 2003)................................8

*Lapre v. Kane*,
    36 A.2d 92 (R.I. 1944) .........................................13

*In re Lead Paint Litigation*,
    924 A.2d 484 (N.J. 2007) .................................9, 10

*People v. ConAgra Grocery Products Co.*,
    227 Cal. Rptr. 3d 499 (Cal. Ct. App.
    2017)............................................................14, 15

vii

**STATE CASES [CONT'D]**

*People v. Miner*,
    2 Lans. 396 (N.Y. App. Div. 1868)........................1

*State v. Lead Industries Ass'n, Inc.*,
    951 A.2d 428 (R.I. 2008) ....................10, 12, 13, 14

*State v. Warren*,
    180 So. 2d 293 (Miss. 1965) ..................................1

*Wood v. Picillo*,
    443 A.2d 1244 (R.I. 1982) ....................................13

*Young v. Bryco Arms*,
    821 N.E.2d 1078 (Ill. 2004)...................................9

**RULES**

Supreme Court Rule 37.2(a) .......................................1

**OTHER AUTHORITIES**

3 William Blackstone, Commentaries ch. 4 .............21

14 N.Y.Prac., New York Law of Torts § 8:2 .............21

Christopher H. Schroeder, Corrective
    Justice and Liability for Increasing
    Risks, 37 UCLA L. Rev. 439 (1990)...............21, 22

viii

OTHER AUTHORITIES [CONT'D]

Donald G. Gifford, *Public Nuisance as a
Mass Products Liability Tort*, 71 U. Cin.
L. Rev. 741 (2003) .........................................5, 6, 7

EPA, Protect Your Family from Exposures
to Lead, https://www.epa.gov/lead/
protect-your-family-exposures-lead ...................13

H.L.A. Hart & T. Honore, Causation in the
Law lxvii (2d ed. 1985).........................................22

Jason M. Solomon, *What Is Civil Justice*, 44
Loyola of Los Angeles L. Rev. 317 (2010) ...........21

Matthew R. Watson, Comment, *Venturing
into the "Impenetrable Jungle": How
California's Expansive Public Nuisance
Doctrine May Result in an
Unprecedented Judgment Against the
Lead Paint Industry in the Case of*
County of Santa Clara v. Atlantic
Richfield Company, 15 Roger Williams
U.L. Rev. 612 (2010) .................................6, 7, 9, 10

National Association of Attorneys General,
*State Attorneys General Powers and
Responsibilities* (Emily Myers ed., 3d ed.
2013)................................................................7, 8

Paul Nolette, *Federalism on Trial* (2015) ...............18

ix

**OTHER AUTHORITIES [CONT'D]**

Restatement (Second) of Torts § 821B
(1979)......................................................................4

Victor E. Schwartz & Phil Goldberg, *The
Law of Public Nuisance: Maintaining
Rational Boundaries on a Rational Tort*,
45 Washburn L.J. 541 (2006) ......................*passim*

1

## INTEREST OF THE *AMICI* STATES[1]

The States of Indiana, Louisiana, Texas, Utah, and Wyoming respectfully submit this brief as *amici curiae* in support of Petitioners. At common law, the attorney general had the power to prevent and abate public nuisances. *See State v. Warren*, 180 So. 2d 293, 299 (Miss. 1965); *People v. Miner*, 2 Lans. 396 (N.Y. App. Div. 1868). Traditionally, that power included the ability to require a person having control over a public nuisance to abate it. More recently, however, some state and local governments have attempted to wield public nuisance lawsuits as a weapon against a variety of societal ills, regardless whether their chosen defendants caused the nuisance or have the ability to abate it in any meaningful way.

Amici are States that seek to police the boundaries of public nuisance lawsuits. Cases such as this that enable courts to impose liability arbitrarily with no proof that the defendants caused any harm or can abate it in any recognizable way denigrate the appropriate power of attorneys general to abate legitimate public nuisances and threaten to undermine the Anglo-American tradition of justice. For these reasons, Amici urge the Court to grant the petitions and reverse the judgment of the California Court of Appeal.

---

[1] Pursuant to Supreme Court Rule 37.2(a), counsel of record for all parties have received notice of the Amici States' intention to file this brief at least 10 days prior to the due date of this brief.

2

## SUMMARY OF THE ARGUMENT

This case concerns the Due Process limits on a State's ability to impose liability arbitrarily and retroactively as part of a broader scheme to remedy societal harms. California attempts to employ public nuisance law as a weapon for regulation of the paint industry—or, more precisely, to extract penalties for long-ago participation in a lead paint industry that no longer exists. In so doing, it has required Petitioners to pay damages for conditions that they neither caused nor have any control over. This theory of liability goes far beyond any traditional understanding of public nuisance law.

At common law and during the colonial years, public nuisance law was a method of tempering invasions on public rights, such as the use of public lands or the upholding of public morality. But during the Industrial Revolution, States began to experiment with using public nuisance law as a means of regulation. In more recent years, States have attempted to expand public nuisance law to deal with a variety of problems, from tobacco-related healthcare costs to global climate change. These theories of liability, exemplified by this case, dispose with traditional notions of causation in favor of requiring industry groups to abide by broad injunctions or pay large amounts of damages, theoretically to "abate" "nuisances," but really to substitute a deep-pocketed scapegoat for an actual responsible party.

In other contexts, this Court has imposed constitutional limitations on the ability of States and state

3

courts to arbitrarily assign liability. For instance, courts have rejected public nuisance claims that implicate political questions or have been displaced by statutory regulation. The Commerce Clause and the constitutional requirements of personal jurisdiction also impose limits on the ability of public nuisance lawsuits to regulate out-of-state conduct. And the Court has applied notions of "substantive" due process to limit the amount of punitive damages that courts may impose. This case presents an opportunity for the Court to consider another possible constitutional limitation on expansive and amorphous liability: whether due process prohibits the imposition of retroactive liability without proof of causation.

Amici urge this Court to grant certiorari in order to answer this important federal question.

## REASONS FOR GRANTING THE PETITIONS

### I.  This Case Exemplifies a Recent Trend Where State and Local Governments Use Public Nuisance Lawsuits as Weapons for Wealth Transfers and Social Change

Public nuisance law is derived from hundreds of years of common law tradition. But in recent years, state and local governments have sought to use public nuisance lawsuits for a new purpose: to regulate broad societal problems through litigation or failing that, to enable mass transfers of wealth from industry to preferred groups. These new regulatory nuisance lawsuits drift far afield of the original common law

4

understanding of public nuisance doctrine.  Yet previously-recognized constitutional restraints have proved insufficient to reign them in.

1.  At twelfth-century English common law, public nuisance was a criminal offense for infringing on the rights of the Crown.  Victor E. Schwartz & Phil Goldberg, *The Law of Public Nuisance: Maintaining Rational Boundaries on a Rational Tort*, 45 Washburn L.J. 541, 543 (2006).  The offenses most commonly took the form of purprestures, or encroachments upon royal lands.  Restatement (Second) of Torts § 821B (1979).  The attorney general could bring suit for injunctive relief to abate the nuisance by stopping infringement and repairing damage to the King's property.  Schwartz & Goldberg, *supra*, at 543.

Beginning in the fourteenth century, public nuisance law expanded to include not only the rights of the Crown itself, but also those of the general public, including "the right to safely walk along public highways, to breathe unpolluted air, to be undisturbed by large gatherings of disorderly people and to be free from the spreading of infectious diseases." *Id.* at 543–44 (internal citation omitted).  Courts weighed the value of the conduct against the harm it caused to determine whether it merited criminal punishment.  *Id.* at 544. And in 1535, nuisance law expanded to allow private damages for *individuals* who suffered an injury different in kind than that of the general public. *Id.*

The American colonies, and later the States, inherited the English common law tradition of public

5

nuisance. *Id.* at 545. Historically, American public nuisance lawsuits involved "non-trespassory invasions of the public use and enjoyment of land," "the obstruction of public highways and waterways," and "using property in ways that conflicted with public morals or social welfare," such as "gambling halls, taverns, or prostitution houses." *Id.*

During the Industrial Revolution, public nuisance evolved as a theory for seeking relief where legislatures could not keep up with changing technology. *Id.* at 545–46. Such lawsuits included claims against factories for water pollution and claims against railroads for noise and air pollution, the latter of which were largely unsuccessful as long as the railroad operated in accordance with the expectations of the legislature. *Id.* at 546.

In the early twentieth century, state legislatures began codifying nuisance law either by defining public nuisance broadly or by declaring specific activities to be nuisances, such as "engaging in the sale of intoxicating liquors," "conducting bawdy or assignation houses," or "maintaining gambling houses." Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 804 (2003) (internal citation omitted). These statutes made it easier for state attorneys general to bring criminal prosecutions for nuisance or suits for injunctive relief. *Id.* at 805. Private lawsuits for monetary damages were much less common. *Id.*

During the New Deal era, Congress and state legislatures began passing comprehensive statutory

6

schemes to regulate everything from railroads to alcohol sales. The new regulations lessened the need to use the common law of public nuisance as a means of addressing these problems. The use of public nuisance lawsuits for regulatory purposes tapered off. *Id.* at 805–06.

In the 1970s, fueled by the broad definition of public nuisance in the Second Restatement of Torts, courts experienced a resurgence of public nuisance lawsuits in the context of environmental regulation. Gifford, *supra*, at 806–09. In *Diamond v. General Motors Corp.*, 97 Cal. Rptr. 639, 641 (Cal. Ct. App. 1971), a class of property owners in Los Angeles County sued a group of automobile manufacturers, petroleum refiners, gasoline-filling stations, and owners of industrial plants seeking both damages and injunctive relief for air pollution. The case was the first of its kind seeking to hold product manufacturers, rather than the actual polluters, responsible for the amorphous problem of air pollution in Los Angeles County. *Id.* at 641–42; *see also* Gifford, *supra*, at 750; Schwartz & Goldberg, *supra*, at 548–49. The court rejected class certification, explaining that "[p]laintiff is simply asking the court to do what the elected representatives of the people have not done: adopt stricter standards over the discharge of air contaminants in this county, and enforce them with the contempt power of the court." *Diamond*, 97 Cal. Rptr. at 645.

In the 1980s, after courts refused to hold asbestos manufacturers strictly liable for the presence of asbestos in homes and schools, plaintiffs turned to public nuisance theory. Gifford, *supra*, at 751; Matthew

7

R. Watson, Comment, *Venturing into the "Impenetrable Jungle": How California's Expansive Public Nuisance Doctrine May Result in an Unprecedented Judgment Against the Lead Paint Industry in the Case of* County of Santa Clara v. Atlantic Richfield Company, 15 Roger Williams U.L. Rev. 612, 617–18 (2010). In *Detroit Board of Education v. Celotex Corp.*, 493 N.W.2d 513, 516 (Mich. Ct. App. 1992), a class of public and private schools sued manufacturers whose asbestos products were used in their buildings. As in *Diamond*, plaintiffs in *Detroit Board of Education* sought to hold manufacturers liable for damages to abate the nuisance even though they no longer retained control of their products. *Id.* at 517. The court held that public nuisance was not a viable theory because it would "significantly expand, with unpredictable consequences, the remedies already available to persons injured by products." *Id.* at 521. The court further explained that nuisance liability may not "be imposed on a party whose only act was to create the nuisance," *id.*, because "[d]efendants now lack the legal right to abate whatever hazards their products may pose," *id.* at 522.

But in the 1990s, States began turning to public nuisance theories to target manufacturers, and in particular to hold tobacco companies liable for state Medicaid expenditures on tobacco-related health problems. Gifford, *supra*, at 753; Schwartz & Goldberg, *supra*, at 554. Over forty States sued tobacco companies seeking Medicaid reimbursement under a variety of legal theories, including public nuisance. National Association of Attorneys General, *State Attorneys General Powers and Responsibilities* 387

8

(Emily Myers ed., 3d ed. 2013). However, these legal theories never faced a definitive test in court because the cases settled. *Id.* at 388.

Also during the late 1990s and early 2000s, States and municipalities sought to hold firearm manufacturers liable for gun violence by way of public nuisance law. Schwartz & Goldberg, *supra*, at 555–57. But unlike the environmental and asbestos lawsuits, some of the firearm cases were successful in court. For example, in *City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1234 (Ind. 2003), the Indiana Supreme Court held that a City's public nuisance claim did not violate due process because "a nuisance claim may be predicated on a lawful activity conducted in such a manner that it imposes costs on others." *See also White v. Smith & Wesson*, 97 F. Supp. 2d 816 (N.D. Ohio 2000); *City of Boston v. Smith & Wesson Corp.*, 12 Mass. L. Rptr. 225 (Mass. Super. Ct. 2000); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002).

But more courts rejected the same theories. In *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1116 (Ill. 2004), the court first held that the right to be free from gun violence was not a public, but an individual, right. It then held that "the alleged public nuisance is not so foreseeable to the dealer defendants that their conduct can be deemed a legal cause of a nuisance that is the result of the aggregate of the criminal acts of many individuals over whom they have no control." *Id.* at 1138; *see also City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415 (3d Cir. 2002); *Camden Cnty. Bd. of Chosen Freeholders v.*

9

*Beretta, U.S.A. Corp.*, 273 F.3d 536 (3d Cir. 2001); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98 (Conn. 2001); *Young v. Bryco Arms*, 821 N.E.2d 1078 (Ill. 2004).

2.  States next sought to remedy the societal ill of deteriorated lead paint through public nuisance lawsuits, but courts largely rejected such theories for the lack of a causal connection as traditionally required by public nuisance law. *See* Watson, *supra*, at 619.

In *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110, 113 (Mo. 2007), the City brought a nuisance suit against lead paint manufacturers seeking damages for the costs of abating lead paint in private residences. The court rejected the suit because the City could not show that "the particular defendant actually caused the problem." *Id.* at 116.

Similarly, in *City of Chicago v. American Cyanamid Co.*, 823 N.E.2d 126, 128 (Ill. App. Ct. 2005), the City alleged that the defendant paint manufacturers had created a public nuisance by promoting lead-based paint for residential use. The court "conclude[d] that plaintiff has failed to allege sufficient facts to show that defendants were the cause in fact of the alleged nuisance." *Id.* at 136.

Then, in *In re Lead Paint Litigation*, 924 A.2d 484, 501 (N.J. 2007), the court rejected the public-nuisance claim brought by twenty-six New Jersey municipalities against lead paint companies because, even assuming "that the continuing presence of lead paint in homes qualifies as an interference with a common

10

right sufficient to constitute a public nuisance for tort purposes," "plaintiffs' complaints aim wide of the limits of that theory" because they seek to hold liable a defendant that has no control over the premises where the lead paint is found and thus, no ability to abate the nuisance.  Moreover, the court also explained that an expansion of public nuisance law was not needed to address problems that the legislature had already addressed by a "careful and comprehensive scheme."  *Id.* at 440.

Next, in *State v. Lead Industries Ass'n, Inc.*, 951 A.2d 428, 455 (R.I. 2008), the Rhode Island Supreme Court rejected a the State's public nuisance action against lead paint manufacturers because "the state's complaint . . . fails to allege any facts that would support a conclusion that defendants were in control of the lead pigment *at the time* it harmed Rhode Island's children" (emphasis added).

Finally, in *City of Milwaukee v. NL Industries, Inc.*, 691 N.W.2d 888, 890 (Wis. Ct. App. 2004), the City brought suit against paint manufacturers to recover the cost of abatement of lead paint in homes. The court held that an issue of material fact existed as to whether the defendants caused the harm alleged.  *Id.* at 893.  On remand, a jury found that defendants' conduct did not cause the nuisance.  *Watson, supra*, at 627.

3.  Despite these decisions, state and local officials continue to push the boundaries of public nuisance law by using it as a means for regulation or large-scale wealth transfers.

11

For instance, district courts dismissed two cases seeking relief from greenhouse-gas-emitting industries for harms allegedly arising from global climate change. In one case, an Alaskan village brought suit against twenty-four oil, energy, and utility companies "seek[ing] damages under a federal common law claim of nuisance, based on their alleged contribution to the excessive emission of carbon dioxide and other greenhouse gases which they claim are causing global warming." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 868 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012).  The court dismissed the village's claims for "abatement" of climate-cased coastal erosion, observing that "the allocation of fault—and cost—of global warming is a matter appropriately left for determination by the executive or legislative branch." *Id.* at 877.

In another case, the same court dismissed public nuisance claims against automakers for damages, recognizing "the complexity of the initial global warming policy determinations that must be made by the elected branches prior to the proper adjudication of Plaintiff's federal common law nuisance claim[,]" *California v. Gen. Motors Corp.*, No. C06-05755, 2007 WL 2726871 at *6, *16 (N.D. Cal. Sept. 17, 2007), and the "lack of judicially discoverable or manageable standards by which to properly adjudicate Plaintiff's federal common law global warning nuisance claim," *id.* at *16.

12

Even more recently, a federal district court in New York dismissed a public nuisance lawsuit against several gas and oil companies for damages alleging that production and sale of fossil fuels contributed to climate change. *See City of New York v. B.P. P.L.C.*, No. 18 Civ. 182 (JFK), 2018 WL 3475470 (S.D.N.Y. July 19, 2018). And in California, a federal court dismissed a similar lawsuit for lack of personal jurisdiction. *See City of Oakland v. BP P.L.C.*, Nos. C 17-06011 WHA, C 17-06012 WHA, 2018 WL 3609055 (N.D. Cal. July 27, 2018).

4. The plaintiffs' overwhelming success in this case, however, departs from cases where courts have kept public nuisance claims within traditional bounds.

A common law public nuisance claim has three elements: (1) unreasonable interference; (2) with a right common to the general public; (3) by those with control over the instrumentality alleged to have created the nuisance when the damage occurred. *See, e.g., State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 446 (R.I. 2008). California's lawsuit does not meet these requirements.

First, California has not shown that any of Petitioners' actions were unreasonable. Sherwin-Williams ran a single advertisement promoting its paints, some of which (certain outdoor paints) contained lead, at a time when lead paint was legal and contributed money to a trade association that promoted lead paint. App. 392a–95a, 399a. There is no

13

evidence that any of the paint manufacturers continued to promote lead paint once its harmful effects to the general public became known or that it ever promoted lead paint for residential interior use in California.

Second, Petitioners have not interfered with a right common to the general public.  Lawful activity can occasionally be deemed unreasonable, but only if it "create[s] a substantial and continuing interference with a public right." *Lead Indus., Ass'n*, 951 A.2d at 447.  For example, courts have held that chemical dumps causing fires, *Wood v. Picillo*, 443 A.2d 1244, 1245–48 (R.I. 1982), swine operations emitting bad odors, *Lapre v. Kane*, 36 A.2d 92, 94–95 (R.I. 1944), greenhouses emitting smoke, *Braun v. Ionotti*, 175 A. 656, 657 (1934), and construction equipment causing noise and vibration, *Blomen v. N. Barstow Co.*, 85 A. 924, 924–28 (R.I. 1913), to be public nuisances. Here the alleged nuisance is the mere *presence* of lead paint in thousands of individual dwellings across the State of California. Lead paint creates no substantial and continuing interference when left undisturbed.  *See* EPA, Protect Your Family from Exposures to Lead, https://www.epa.gov/lead/protect-your-family-exposures-lead (explaining that undisturbed lead paint poses no hazard). California has not shown that these minor, decades-old actions have actually caused a public health crisis.

Regardless, even deteriorating lead paint inside a *private* residence is not a *public* nuisance.  *See Lead Industries, Ass'n*, 951 A.2d at 454. Relying on "the longstanding principle that a public right is a right of

14

the public shared resources such as air, water, or public rights of way," *id.* at 455, the court in *Lead Industries* held that "[t]he right of an individual child not to be poisoned by lead paint" "falls far short of alleging an interference with a public right." *Id.* at 453.  Because the nuisance that California alleges does not interfere with a public right, the damages that California seeks are merely a transfer of wealth, rather than a true abatement of a public nuisance.

Third, Petitioners do not have control over the instrumentality alleged to have created the nuisance. Petitioners do not own any of the residences where the lead paint was used, nor do Petitioners have the power to abate the nuisance by remediation.  Instead, Petitioners have been ordered to pay millions of dollars in damages to an "abatement fund."  App. 180a. In contrast, public nuisance suits were historically brought for injunctive relief to abate the nuisance by stopping infringement of the public right and repairing any damage to property.  Schwartz & Goldberg, *supra*, at 546.

Yet the California Court of Appeal held three out of many former lead paint manufacturers jointly and severally liable for the ongoing presence of lead paint in California homes and apartment buildings. *See generally People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017). The court specifically stated that the defendants' actions "were not too remote to be considered a legal cause of the current hazard even if the actions of others in response to those promotions and the passive neglect of owners also played a causal role."  *Id.* at 546.  The

15

court simultaneously found that the promotions were "a very minor force" in creating the nuisance, *id.* at 545, while holding that requiring manufacturers to "clean up the hazardous conditions that [it] assisted in creating . . . is not disproportional to its wrongdoing." *Id.* at 559.

In so holding, the California court departed dramatically from traditional public nuisance law, which required a material causal link between the defendants' conduct and the alleged harm, particularly where liability is divined post hoc.

## II. California's Expansive Public Nuisance Law Tests the Limits of Due Process

Recent developments in public nuisance law, especially theories like that of California in this case, distort the traditional purpose of civil lawsuits in the Anglo-American tradition. Instead of seeking to redress a particular injury caused by a particular defendant, they seek to enact societal change or massive wealth transfers through the court system by holding entire industries responsible for broad societal harms. In other words, such lawsuits seek to regulate (or at least punish) industry in the absence of legislative enactments. The question is whether those distortions transgress constitutional limits.

In the past, this and other courts have been willing to impose constitutional controls over distortions of the civil justice system in multiple contexts, including by way of the political question doctrine, displacement by statute, substantive rights under the Due

16

Process Clause, and extraterritoriality doctrine. This case presents an opportunity to consider whether the procedural safeguards of the Due Process Clause impose constitutional limitations on regulation or general wealth transfer through litigation.

1.  First, courts around the country have rejected public nuisance and other tort claims that are in substance political and therefore nonjusticiable.

Longstanding Supreme Court precedent has established that a claim presents non-justiciable political questions if its adjudication would not be governed by "judicially discoverable and manageable standards" or would require "an initial policy determination of a kind clearly for non-judicial discretion." *Baker v. Carr*, 369 U.S. 186, 217 (1962). The political question doctrine arises from the Constitution's core structural values of judicial modesty and restraint. As early as *Marbury v. Madison*, Chief Justice Marshall stated that "[q]uestions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." 5 U.S. (1 Cranch) 137, 170 (1803). These questions, Marshall wrote, "respect the nation, not individual rights . . . ." *Id.* at 166. There, in the very case that establishes the power of judicial review, the political question doctrine received its judicial imprimatur.

With respect to public nuisance claims in particular, attempts to litigate climate change with public nuisance lawsuits have run headlong into the political question doctrine. *See Native Vill. of Kivalina v. Exxon Mobil Corp.*, 663 F. Supp 2d 863, 871 (N.D. Cal.

17

2009), *aff'd*, 696 F.3d 849 (9th Cir. 2012); *California v. Gen. Motors Corp.*, No. C06-05755, 2007 WL 2726871 at *6–16 (N.D. Cal. Sept. 17, 2007).

Similarly, a district court in Mississippi dismissed on political question grounds a lawsuit by Gulf of Mexico residents against oil and gas companies for damages from Hurricane Katrina, which plaintiffs alleged was strengthened by climate change. *Comer v. Murphy Oil,* No. 05-436, 2007 WL 6942285 (S.D. Miss. Aug. 30, 2007) (unpublished ruling), *appeal dismissed*, 607 F.3d 1049 (5th Cir. 2010), *mandamus denied*, No. 10-294 (U.S. Jan. 10, 2011).

More broadly, several Circuits and other federal courts have recognized that political questions may arise in cases that are nominally tort claims. *See, e.g.*, *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1280–96 (11th Cir. 2009) (finding tort claims arising from automobile accident were barred by the political question doctrine); *Antolok v. United States*, 873 F.2d 369, 383–84 (D.C. Cir. 1989) (noting that "[i]t is the political nature of the [issue], not the tort nature of the individual claims, that bars our review and in which the Judiciary has no expertise."); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petrol.*, 577 F.2d 1196, 1203–05 (5th Cir. 1978) (concluding tortious conversion claims were barred by the political question doctrine).

Thus, in some circumstances, structural constitutional restrictions have effectively restrained adventurous theories for expanding judicial power via common law claims.

18

2. Second, courts have rejected public nuisance claims as displaced by statutory regulation.

Most notably, in *American Electric Power Co., Inc. v. Connecticut*, 564 U.S. 410 (2011), eight States sued several private utilities alleging that carbon dioxide emissions had contributed to the public nuisance of global warming. Paul Nolette, *Federalism on Trial* 144–45 (2015).  The district court dismissed the lawsuit on political question grounds, but the Second Circuit reversed, holding that the States had alleged a viable public nuisance claim under federal common law.  *Id.* at 146–48. This Court reversed, holding that "the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants." *Am. Elec. Power Co.*, 564 U.S. at 424.

Displacement of federal common law by statute represents the converse of the political question doctrine. In political question doctrine cases, courts choose not to define the parameters of liability, but to leave room for legislatures to do so; in displacement cases, courts recognize that the legislature has *already* done so. And in the state common law context, preemption by federal statute serves the same function.

3. Next, the Court has used constitutional doctrine to limit the use of punitive damages to regulate wholly extraterritorial conduct. In *Honda Motor Co. v. Oberg*, 512 U.S. 415, 430 (1994), the Court ex-

19

plained that "traditional practice provides a touch-
stone for constitutional analysis" under the Due Pro-
cess Clause. It relied on "the well-established common
law protection against arbitrary deprivations of prop-
erty" to hold that Oregon's constitutional amendment
prohibiting judicial review of punitive damages
awards violates substantive rights under the Due
Process Clause. *Id.* at 430.

Similarly, the Due Process Clause prevents States
from assessing punitive damages for harms caused to
the general public, rather than to the specific plaintiff
bringing the suit. *See Philip Morris USA v. Williams*,
549 U.S. 346 (2007); *State Farm Mutual Automobile
Insurance Co. v. Campbell*, 538 U.S. 408 (2003). The
problem in the punitive damages cases was to claim a
private remedy for a public harm. California here
seeks a converse, yet similarly misaligned, outcome:
a public remedy for a private harm (if that).

Both Due Process and Commerce Clause consider-
ations, moreover, prohibit States from using punitive
damages to punish out-of-state conduct.  In *BMW of
North America, Inc. v. Gore*, 517 U.S. 559, 572 (1996),
when an Alabama court attempted to alter BMW's na-
tionwide policies by imposing punitive damages for
wholly extraterritorial conduct, the Court decreed
that "a State may not impose economic sanctions on
violators of its laws with the intent of changing the
tortfeasors' lawful conduct in other States."

4.  Personal jurisdiction presents another consti-
tutional limit to regulation via civil liability in state

20

court. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985). State courts may exercise personal jurisdiction over only those defendants who have "purposefully established 'minimum contacts' in the forum State." *Id.* at 474. Moreover, "these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476.

In the public nuisance context, in *City of Oakland v. BP P.L.C.*, Nos. C 17-06011 WHA, C 17-06012 WHA, 2018 WL 3609055 (N.D. Cal. July 27, 2018), where the City brought public-nuisance lawsuits to remedy global climate change against three companies who produced and sold fossil fuels, the court held that it lacked personal jurisdiction over the defendants because "global warming would have continued in the absence of all California-related activities of the defendants." *Id.* at *3. Consequently, personal jurisdiction serves as another constitutional limit to regulation by litigation.

5. As this case demonstrates, however, even these restraints are not enough to prevent vague and expansive tort liability theories as a means of regulating industry. The question remains whether the Due Process Clause requires some adherence to traditional limits on common law liability, particularly where

21

courts are employing broad theories of equitable relief rather than legislatively decreed remedies.

Here, Petitioners have been held jointly and severally liable because it advertised lead paint for lawful use over seventy years ago and contributed to a trade association. California has not even proved that any of the remaining lead paint in houses and apartment buildings (1) is harming anyone; (2) was manufactured by Petitioners or (3) that anyone relied on Petitioners' advertisements in deciding to use lead paint. Based on this scant evidence, the court below required Petitioners to pay for inspection and remediation of tens of thousands of California homes. This liability-without-causation approach substantially departs from traditional public nuisance doctrine which required plaintiffs to show causation.

In the Anglo-American tradition, the purpose of the civil court system is "to bring justice home to every man's door" by ensuring that injuries are "redressed in an easy and expeditious manner." 3 William Blackstone, Commentaries ch. 4. Yet civil justice also requires that "the claim is brought against and addressed to the one who has allegedly caused the harm." Jason M. Solomon, *What Is Civil Justice*, 44 Loyola of Los Angeles L. Rev. 317, 329 (2010).  Thus, the justice system is designed to "vindicate[e] the right of the victim to hold the wrongdoer accountable."  *Id.  See also* 14 N.Y.Prac., New York Law of Torts § 8:2 ("[I]t would not seem fair to allocate losses onto those who have committed no wrongdoing."); Christopher H. Schroeder, Corrective Justice and Liability for Increasing Risks, 37 UCLA L. Rev. 439, 439

22

(1990) ("A fundamental feature of [corrective justice] is the causation requirement: an individual must have caused harm before he or she can be held liable in tort."); H.L.A. Hart & T. Honore, Causation in the Law lxvii (2d ed. 1985) ("The courts [have] further made it clear that in the civil law of negligence causal connection is a requisite of liability which is *additional* to the . . . [creation of foreseeable risks] of harm." (footnote omitted)).  A court system that pays no heed to causation fails to fulfill this purpose.

Accordingly, amici urge the Court to grant certiorari to resolve the important question whether the Due Process Clause imposes any limits on the use of public nuisance lawsuits to achieve broad wealth transfer and regulatory ends by imposing retroactive liability on selected out-of-state manufacturers without proof of causation.

23

## CONCLUSION

The Petitions should be granted.

Respectfully submitted,

Office of the Indiana
  Attorney General
IGC South, 5th Floor
302 W. Washington Street
Indianapolis, IN  46204
(317) 232-6255
Tom.Fisher@atg.in.gov

CURTIS T. HILL, JR.
Attorney General
THOMAS M. FISHER*
Solicitor General
KIAN HUDSON
JULIA C. PAYNE
Deputy Attorneys
General

*Counsel for* Amici *States*

*\*Counsel of Record*

Dated:  August 16, 2018

24

## ADDITIONAL COUNSEL

PETER K. MICHAEL
Attorney General
State of Wyoming

SEAN D. REYES
Attorney General
State of Utah

JEFF LANDRY
Attorney General
State of Louisiana

KEN PAXTON
Attorney General
State of Texas

*Counsel for* Amici *States*

Dated:  August 16, 2018