Exhibit 3



800.887.6989
direct 818.839.2325
fax 818.986.9698
email mpifko@baronbudd.com

Encino Plaza
15910 Ventura Blvd.
Suite 1600
Encino, CA  91436

December 28, 2018

**VIA E-MAIL**

Special Master David Cohen
U.S. District Court for the
Northern District of Ohio
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, Ohio 44113

      RE:    **In Re National Prescription Opiate Litigation**
                **U.S. District Court for the Northern District of Ohio**
                **Case No. 1:17-md-2804**

Dear Special Master Cohen:

      Plaintiffs the City of Cleveland, the County of Cuyahoga, the City of Akron, and the County of Summit ("Plaintiffs") move to compel compliance with a subpoena they served on the Healthcare Distribution Alliance (the "HDA")[1] on June 8, 2018.  The HDA's counsel consented to the jurisdiction of the MDL Court and the Special Master to resolve the parties' dispute.

      The HDA is not just any third party.  The HDA's core members are Defendants in this litigation and communications within the HDA provide important evidence of not only Defendants' conduct, but also of the conspiracy among those Defendants.  Indeed, the HDA's activities are central to Plaintiffs' RICO claims and the HDA is discussed in Magistrate Judge Ruiz's Report and Recommendation.

      Notwithstanding the above, the HDA is unwilling to make a thorough and complete production of documents.  Specifically, the HDA has taken an unreasonably narrow reading of the Complaint -- and the HDA's role in this litigation -- to reject a litany of highly relevant search terms, and to prop up meritless assertions of the associational privilege and common

---

[1] Prior to assuming its current name, the HDA existed as the Healthcare Distribution Management Association ("HDMA") and the National Wholesale Druggists Association ("NWDA").  For ease of reference, all prior iterations of the HDA are referred to as the HDA.



Special Master David Cohen
December 28, 2018
Page 2

interest privilege, all in an effort to withhold critically relevant documents from Plaintiffs. By this submission, Plaintiffs thus respectfully request the following orders[2]:

1. That the HDA be required to apply the document search terms proposed by Plaintiffs on November 20, 2018, to reflect the appropriate scope of Plaintiffs' subpoena mandated by Federal Rule 26; and

2. That the associational privilege and the common interest privilege, as asserted by the HDA in response to Plaintiffs' subpoena, are inapplicable and cannot be used to withhold documents from Plaintiffs in response to the subpoena.

**I.     Summary of Allegations and History of Meet and Confer with the HDA**

On June 8, 2018, Plaintiffs served the HDA with a subpoena for deposition testimony and the production of documents. As alleged in Plaintiffs' Complaints, the HDA served as one of the primary organizations through which the "Defendants worked together to achieve their common purpose." (*See* Summit SAC at ¶ 531.) Among other things, Plaintiffs alleged that the RICO Marketing and Supply Chain Defendants were able to form the Opioid Marketing and Supply Chain Enterprises through their membership and participation in the HDA.

Plaintiffs alleged that the HDA was a member and active participant in the Pain Care Forum -- a decades old lobbying and trade industry group that aggressively lobbied in favor of pro-opioid policies -- and that the HDA provided its Manufacturer and Distributor members with opportunities to "strengthen alliances"[3] and "network[] with HDA wholesale distributor members," "host and sponsor HDA Board of Directors events," "participate on HDA committees, task forces and working groups with peers and trading partners," and "mak[e] connections."[4] (Summit SAC at ¶¶ 534-36.)

Moreover, Plaintiffs alleged that the councils, committees, task forces, and working groups provided the opportunity for the RICO Defendants to work closely together, confidentially, to develop and further the common purpose and interests of the enterprise; in order words, to coordinate their activities. (Summit SAC at ¶ 539.) In short, the HDA provided a forum that facilitated a "deep level of interaction and cooperation between two groups in [a] tightly knit industry. The Marketing and Distributor Defendants were not two separate groups

---

[2] While Plaintiffs' subpoena issued from the District Court for the District of Columbia, the HDA has agreed to submit to the recommendation of the Special Master on the condition that the HDA be provided two weeks from the filing of Plaintiffs' moving papers to provide its response.

[3] *Manufacturer Membership*, Healthcare Distribution Alliance, https://www.healthcaredistribution.org/about/membership/manufacturer (last accessed Apr. 25, 2018).

[4] *Id*.



Special Master David Cohen
December 28, 2018
Page 3

operating in isolation or two groups forced to work together in a closed system. Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids." (Summit SAC at ¶ 543.)

Based on these allegations, there can be no question the HDA is one of the most relevant entities who is not named as a Defendant in this litigation. Rulings from the Court confirm and support this conclusion. On October 5, 2018, Magistrate Judge Ruiz issued a Report and Recommendation regarding all of the RICO Defendants' Motions to Dismiss Plaintiffs' RICO claims. In recommending that the motions be denied in their entirety as to Plaintiffs' RICO claims, the HDA played a critical role in Judge Ruiz's analysis. Judge Ruiz made the following findings about the nature of Plaintiffs' RICO claims and the role of the HDA:

- Defendants worked together through trade or other organizations, such as the Pain Care Forum (PCF) or the Healthcare Distribution Alliance (HDA) to increase opioid sales.

- [T]he HDA created a private network where representative of the Manufacturers and Distributors could form relationships, create alliances between them, and hold strategic business discussions between high-level executives.

- [T]he Manufacturers and Distributors used the HDA to jointly increase production quotas, to stymie efforts that would prevent the diversion of opioids, and to coordinate their refusal to report suspicious orders, including those made by direct competitors.

(Dkt. 1025 at 9, 37-38.)

Against this backdrop, the Court must understand the current dispute as an attempt by the HDA to delay a full and complete production of documents, and to delay Plaintiffs' discovery efforts into an area that the Court has already deemed centrally relevant to the pending RICO claims. Two examples of this conduct are noteworthy for this submission.

First, the HDA's approach to the production of documents has, from the beginning, been extremely miserly. The HDA originally took the position that it would not produce emails due to the then-pending discovery schedule. After it tried to prompt Plaintiffs to create their own search terms in the dark, the HDA proposed **eleven** (11) facially inadequate search terms, coupled with a list of drug names. (*See* July 19, 2018 correspondence from Brian S. Weinstein, at 1 and Appendix A.) These are not the actions of an entity that is trying to work cooperatively with Plaintiffs in order to comply with their obligations pursuant to a subpoena. Rather, these efforts indicate conscious tactics meant to delay and obfuscate the discovery process.

Second, all of the HDA's purported "negotiations" regarding search terms and custodians consist of an attempt to force Plaintiffs to unilaterally accept the HDA's position at the risk of losing all progress in the negotiations. On July 11, 2018, the HDA stated that it would only agree to move forward "subject to [Plaintiffs'] agreement to the terms described above." (*Id*. at



Special Master David Cohen
December 28, 2018
Page 4

2.)  This ultimatum has continued throughout Plaintiffs' attempt to obtain discovery from the HDA.  Additional examples are as follows:

- Consistent with the approach described below, HDA is willing to conduct further review and to make additional productions, above and beyond what is reasonably required, **on the condition that this resolves any disputes between HDA and Plaintiffs regarding the scope of production**.  (October 2, 2018 correspondence from Brian S. Weinstein at 2) (emphasis added.)

- Subject to your agreement to the terms described above, we will move forward as expeditiously as possible with our review consistent with this letter."  (October 2, 2018 correspondence from Brian S. Weinstein at 5.)

- Assuming, again, that the proposals made in this letter resolve the outstanding disputes concerning the scope of HDA's production, HDA will agree to produce emails from John Gray [and Ms. Gallenagh].  (December 7, 2018 correspondence from Brian S. Weinstein at 3.)

- Subject to your agreement to the terms described above, we will move forward as expeditiously as possible with our review consistent with this letter.  (*Id*. at 5.)

Based on the above, although the HDA made some initial products, the it has since **refused to produce any additional documents**, and has taken the position that it will not move forward with production, because on October 2, 2018, Plaintiffs responded to HDA's ultimatum to indicate "Plaintiffs do not agree to the HDA's terms," and advised Plaintiffs would provide the HDA with a responsive letter regarding the search terms in dispute.  (*See* October 2, 2018 correspondence from Sterling L. Cluff; December 7, 2018 correspondence from Brian S. Weinstein at 2 ("HDA notes that Plaintiffs have requested that HDA not begin a second round of review and production until after these negotiations have concluded, despite the inevitable delays this will cause in the eventual review and production process").)

The foregoing examples indicate that HDA has taken an untenably restrictive approach to its obligations pursuant to Plaintiffs' subpoena, and used routine negotiations as opportunities to force Plaintiffs to accept unreasonable positions to obtain basic, necessary discovery.  As discussed below, the HDA's primary objection to any production in this case has been, and continues to be, that it should not be subjected to the burden of production because it is a third party.  However, the HDA has never established any legitimate basis for its burden argument, or addressed the clear weight of the allegations concerning its central role in facilitating a RICO enterprise among its members.  *Indeed, the HDA's burden arguments fall flat because the HDA is funded by Defendants, including, as discussed below, payments of nearly $10 million dollars from one Defendant alone.*  Simply put, Defendants cannot hide behind the trade organization they created and funded.



Special Master David Cohen
December 28, 2018
Page 5

In addition to its burden argument, the HDA has also maintained two inapplicable privilege objections throughout the entirety of the parties' negotiations. All told, the HDA's objections have given rise to three disputes that require the intervention of the Special Master, each of which is individually addressed below.

**II.     The Search Terms Used by the HDA Must be Appropriately Wide in Scope to Reflect the Mandate of Federal Rule 26**

In the HDA's words, Plaintiffs' subpoena "fails to account for the burden [it] would impose, which are particularly extreme and inappropriate considering that HDA is a third party," and that further collection, review and production of documents "would be a burdensome undertaking in itself, particularly in light of HDA's role as a third party." (October 2, 2018 correspondence from Brian S. Weinstein at 1-3.) The HDA reiterated this message on December 7, 2018 as the basis for rejecting multiple search terms that Plaintiffs proposed (and then modified) to decrease the burden on the HDA. The HDA continues to maintain that Plaintiffs' efforts to obtain a full and complete production of documents from the HDA are unreasonable and not appropriately targeted because the HDA is a third party. However, the HDA's arguments fail in light of the considerations of Rule 26, which provides:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1); *see also Dunlap v. Presidential Advisory Commission on Election Integrity*, 319 F. Supp. 3d 70, 82-83 (D.C. Cir. 2018) (noting that in addition to Rule 45, Rule 26 "requires district courts . . . to consider a number of factors potentially relevant to the question of undue burden under Rule 45") (internal punctuation omitted).

Here, as the Court recognized in its Recommendation and Report, the HDA played a central role in the formation and conduct of the Opioid Marketing and Supply Chain enterprises. As such, it is perhaps the most relevant entity not already named as a defendant in this case. Moreover, documents to date show that the HDA was essentially a mouthpiece and puppet used by the RICO Defendants to further their unlawful activities, including, but not limited to:

> (1) rewriting the Marino/Blackburn bill that eventually removed some of the DEA's authority to enforce the CSA;

Case: 1:17-md-02804-DAP  Doc #: 1416-4  Filed: 03/05/19  7 of 14.  PageID #: 39243



(2) providing the Government Accountability Office information that was critical of the DEA while working with the RICO Defendants to undermine the DEA's efforts to enforce the CSA;

(3) coordinating meetings with members of the Pain Care Forum to educate them about the HDA's model distribution guidelines, and supporting their efforts to establish REMS for prescription opioids and increase/maintain high quotas;

(4) working at the behest of the HDA Executive Committee and Board of Directors (populated by high-level executives from McKesson, Cardinal Health, and AmerisourceBergen) to file *amicus curiae* briefs on behalf of Cardinal Health;

(5) scheduling DEA meetings wherein the HDA made recommendations on the kinds of questions to avoid asking, so that industry did not receive answers that increased their regulatory obligations;

(6) encouraging the HDA members to work together, due to aggressive DEA enforcement actions, to develop a joint DEA strategy;

(7) holding regular coordination meetings with the "Big Three" distributors; and

(8) submitting comments, on behalf and at the behest of its members, in support of increasing and/or not decreasing quotas.

With this evidence in mind, the proportionality factors described in Rule 26 all weigh in favor of compelling the HDA to provide a full and complete production on the issues relevant to Plaintiffs' claims. Further support concerning the Rule 26 proportionality factors is as follows:

1. There is no doubt that that an opioid epidemic that kills people on a daily basis presents a sufficiently important issue to compel a full and complete document production.

2. The amount in controversy, given the pendency of Plaintiffs' RICO claims and the national scope of the MDL, is large enough to compel a full and complete production.

3. The HDA informed Plaintiffs that with the exception of some back-up files, it has relatively easy access to the documents and information Plaintiffs seek.

4. Defendants' document productions in this action reveal that **HDA received approximately $9.1 million in contributions between 2010 and 2018 from a single**



Special Master David Cohen
December 28, 2018
Page 7

> *Defendant, and an additional $2.3 million in contributions from that same Defendant to the HDA Research Foundation.*  Contributions of this magnitude, from only **one** RICO Defendant, suggest that HDA has ample resources to handle the collection, review, and production of additional documents.[5]

5. Magistrate Judge Ruiz recognized that the HDA is at the center of both the RICO Marketing and Supply Chain Enterprises, and facilitated the formation of those enterprises, the racketeering activities related to marketing, suspicious orders, diversion and coordinated responses on behalf of its members in response to the DEA.  Discovery from the HDA is among the most important discovery related to Plaintiffs' RICO and OCPA claims from any entity that is not already a named RICO Defendant.

6. There is no question that the benefit of Plaintiffs' subpoena outweighs the potential burden or expense of a complete production.  The HDA has not offered sufficient facts to supports its purported claim of undue burden.  Indeed, the HDA's ample resources are underscored by its hiring of Davis Polk & Wardwell[6] to handle its response to the subpoena.

Simply put, the HDA's position regarding the scope of production and the burden imposed on it as a third party cannot stand.  This argument has principally been utilized by the HDA to outright reject and/or significantly revise search terms[7].  Specifically, the HDA continues to argue about the number of documents that it would be required to collect, review, and produce, relying on the argument that producing documents is a burden for a third party.  However, rather than negotiating in good faith, the HDA has flatly rejected many of Plaintiffs' search terms,[8] and refused to offer any good faith counterproposals.

---

[5] Publicly available documents indicate that at least one of the HDA's members paid approximately $1,700,000 in dues during 2017.  Surely an entity that commands dues in such staggering amounts has the resources to accomplish a full and complete document production to meet its discovery obligations.  http://investor.amerisourcebergen.com/political-engagement

[6] Davis Polk & Wardwell is an international law firm headquartered in New York City with 961 attorneys.  It is consistently ranked as one of the most prestigious law firms in the world.

[7] Additionally, the HDA has refused to produce certain categories of information while arguing that the words of Plaintiffs' subpoena are not broad enough to cover the subjects for which Plaintiffs seek discovery.  For instance, the HDA has thus far refused to produce all documents regarding the financial contributions made to the HDA by its members.  (*See* December 7, 2018 correspondence from Brian S. Weinstein at 4.)

[8] In addition to broadening the HDA's original eleven (11) search terms, Plaintiffs' proposed an additional thirty-four (34) terms and various search strings to match them with, all of which were based on search terms accepted by RICO Defendants.  (*See* September 10, 2018 correspondence from Mark Pifko.)  In response, the HDA rejected twenty-five (25) of Plaintiffs' search terms,



Notwithstanding the HDA's intransigence, the parties extensively met and conferred regarding approximately forty-five search terms and additional streams.  As of December 7, 2018, however, the HDA had still revised and/or flatly rejected a significant number of Plaintiffs' November 20, 2018 proposals, all of which were offered in good faith and in consideration of the scope of the claims at issue.  Based on the above discussions concerning the scope of those claims, and the central role the HDA played in the RICO Defendants' conduct, Plaintiffs request that the HDA be ordered to apply the search terms articulated in their November 20, 2018 letter to the HDA, as those terms represent a reasonable compromise given the initial positions of the parties.

### III.     The HDA' Associational Privilege and Common Interest Privilege Objections Are Without Merit and Cannot Stand

The asserted legal and factual basis of at least two claimed privileges are ripe for analysis and recommendation by the Special Master.  As discussed more fully below, the associational privilege and common interest privilege are neither legally, nor factually, applicable under the facts of this case.  Moreover, even if those privileges were applicable (they are not), the HDA's members -- RICO Defendants in this case -- are not adversaries, are subject to a robust protective order, and have already waived the privileges by producing certain documents.

#### A.    The Associational Privilege is Inapplicable and Cannot be Used to Withhold Documents from Plaintiffs

The HDA's assertion of the associational privilege has no merit.  While the First Amendment does establish a privilege for associational activities, that privilege is not absolute.  Rather, it is a qualified privilege against disclosure of certain kinds of associational information.  *NetJets Aviation, Inc. v. NetJets Association of Shared Aircraft Pilots*, 2017 WL 3484101 (S.D. Ohio Aug. 15, 2017).  In order to validly assert a qualified privilege, the HDA is required to demonstrate an objectively reasonable probability that disclosure of the documents sought by Plaintiffs "will chill associational rights, *i.e.* that disclosure will deter membership due to fears of threats, harassment, or reprisal from either government officials or private parties which may affect members' physical well-being, political activities, or economic interests."  *Id*.; *see also Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009) (relied on by *NetJets Aviation*); *Tree of Life Christian Schools v. City of Upper Arlington*, 2012 WL 831918, *2-3 (S.D. Ohio Mar. 12, 201).  Bare allegations of possible First Amendment violations are insufficient to justify

---

and the vast majority of Plaintiffs' revisions to HDA's eleven original search terms.  (*See* October 2, 2018 correspondence from Brian S. Weinstein; *see also* November 20, 2018 correspondence from Mark Pifko.)  Although Plaintiffs' attempted to further limit their revisions and proposed search terms pursuant to the Court's guidance regarding the Mallinckrodt search term dispute (dated October 8, 2018), the HDA has continued to take an unreasonable position in relation to Plaintiffs' revisions and proposed search terms, and has continued to reject eleven (11) of Plaintiffs' proposed terms without a counter-proposal.



Special Master David Cohen
December 28, 2018
Page 9

judicial intervention.  *SpeechNow.org v. Federal Election Commission*, 2009 WL 10675043, at *4 (C.D. Cal. Jan. 16, 2009).  The HDA must specifically provide "objective and articulable facts, which go beyond allegations or subjective fears."  *Id*.  Aside from the cases that Plaintiffs anticipate the HDA will cite (similar to those cited in its July 12, 2018 e-mail), the HDA has not provided Plaintiffs with a <u>single</u> fact to support its assertion of the associational privilege.

Moreover, the HDA's unsupported claim of associational privilege, *i.e.* that disclosure of associational activities will deter membership due to fear of threats, harassment, or reprisal, is undermined by the HDA's public statements about its members, their members' public participation in the HDA, and the HDA's public activities.  There are multiple examples of the HDA publicly disclosing the way it acts on behalf of its members, who they are, and how they participate in the HDA.  Thus, disclosure of associational information in litigation (where a significantly strict protective order is in place) cannot reasonably be argued to chill associational rights – especially when the Court considers that the majority of the Defendants named in this case are members of the HDA.  For example, in March 2016, the HDA released a statement that explicitly discussed the fact that the "HDMA-Championed Bill S.483 Passed Unanimously by the Senate."[9]  Bill S.483 eventually became the Ensuring Patient Access and Effective Drug Enforcement Act ("EPAEDEA"), which has been at the center of public debate about the opioid crisis for the past two years. After the passage of the EPAEDEA, the HDA disseminated public statements about its involvement in the passage of the EPAEDEA, interactions with the DEA, and interactions with the GAO as part of a "broad, system-wide effort to address abuse and misuse."[10]

The HDA's website is also replete with public disclosures about the kinds of associational activities in which the HDA members participate, including descriptions of the kind of work each council, committee task force, and working group engaged in, and in which the HDA members participated.  Moreover, the HDA members named as Defendants have produced documents reflecting their contributions to multiple associations, including tens of millions of dollars to the HDA, in addition to multi-million-dollar contributions to the HDA's Foundation.  And, although the HDA is now attempting to hide contributions by its members, the HDA's PAC website discloses the sources and amounts of contributions that the HDA PAC received from the HDA members, and the disbursements that the HDA PAC made on behalf of its members (broken down by Committee, party affiliation, chamber of Congress).  Again, the HDA does not have a plausible argument that disclosure of associational activities will in any way chill associational rights.

---

[9] https://www.hda.org/news/2016-03-17-s-483-passes-in-senate.

[10] https://www.hda.org/news/2017-10-13-the-reality-of-the-opioid-epidemic;
https://www.healthcaredistribution.org/news/2017-10-18-a-crisis-of-misinformation;
https://www.hda.org/news/2018-06-17-fact-check-where-60-minutes-got-it-wrong-on-the-opioid-crisis.



Special Master David Cohen
December 28, 2018
Page 10

Aside from having no basis for asserting the associational privilege, the HDA's attempt to assert it is improper for additional reasons. First, the HDA has not established any objective or articulable facts demonstrating that production of the requested information will chill associational rights by deterring membership. Rather, the HDA already publicly discloses its lobbying activities and the associational activities of its members without concern for chilling association rights or deterring membership. Second, the associational activities of the HDA, and its members' participation therein, are critical to prove that the RICO Defendants coordinated their activities through the HDA. Third, as discussed in *Marshall v. Bramer*, 828 F.2d 355, 360 (6th Cir. 1987), the existence of a protective order in this case is another factor that weighs in favor of disclosure, despite the potential assertion of the qualified associational privilege, if any such privilege actually exists here.[11] *See In re National Prescription Opiate Litig.*, 2018 WL 3616261, at *3-4 (N.D. Ohio July 26, 2018) (recognizing that the Sixth Circuit has approved the use of protective orders in cases involving matters of great public interest) (citing *Marshall* and *The Courier Journal v. Marshall*, 828 F.2d 361, 364 (6th Cir. 1987) (upholding a protective order against an attempt by the Courier Journal to obtain the list of KKK members disclosed in *Marshall* despite the court's holding that matter was "of intense public interest")). Here, the conclusion that a protective order will adequately protect First Amendment rights is even stronger because Plaintiffs do not seek to compel production of sensitive information to the HDA's political opponents. Rather, Plaintiffs seek documents that the HDA has already provided to the Defendants -- all of whom are members of the HDA.

An exhaustive description of the documents produced thus far would overwhelm this brief, but examples of documents already produced by HDA's members include: vendor payment histories to associations like the HDA; all documents produced from the HDA Regulatory Affairs Committee, Federal Government Affairs Committee, State Governmental Affairs Committee, etc.; e-mails regarding the coordination of DEA meetings through the HDA; emails containing legislative developments, priorities and recommendation charts; maps documenting HDA and Big 3 lobbying by state; emails regarding policy development, lobbyists and proposals for further action; and board of director and executive committee documents describing the HDA's lobbying activities, PAC activities, recommendations for further policy and legislation development to assist the HDA members' business strategies; and documents indicating that the HDA was the driving force behind passage of the EPAEDEA by, among other things, re-drafting the legislation with member input. Again, given that members of the HDA who were actually involved in the associational activities do not claim a privilege on any of these

---

[11] Here, the basis for the HDA's assertion of a qualified associational privilege is unlike the facts of *Ohio Organizing Collaborative v. Husted*, 2015 WL 7008530 (S.D. Ohio. Nov. 12, 2015). In *Ohio Organizing*, the court distinguished *Marshall* and found that the defendants were seeking disclosure of sensitive political information - irrelevant to the claims or defenses at issue - to parties that could reasonably be perceived as political adversaries. Here, unlike *Ohio Organizing*, the HDA has still not made any showing that the requested information is politically sensitive, Plaintiffs have explained how the requested information is highly relevant to the claims and defenses at issue, and, critically, every named Defendant is a member of the HDA and, therefore, not a political adversary.



Special Master David Cohen
December 28, 2018
Page 11

documents, the HDA's assertion of a privilege is patently unreasonable. Therefore, we request that the Special Master hold that the qualified associational privilege does not apply to the documents withheld by the HDA.

      B.    <u>The Common Interest Privilege is Inapplicable and Cannot be Used to Withhold Documents from Plaintiffs</u>

Another strategy of the HDA to conceal highly relevant documents is its purported assertion of the common interest privilege. The common interest privilege grew out of the "concept of a joint defense privilege . . . in the context of criminal co-defendants whose attorneys shared information in the course of devising a joint strategy for their clients' defenses." *In re Grand Jury Subpoena, 89-3 and John Doe 89-129*, 902 F.2d 244, 249 (4th Cir. 1990). The common interest privilege acts as an exception to waiver of the attorney-client relationship but as an exception, the common interest must rest on the existence of an otherwise valid privilege. *Id*. Courts have extended this type of joint privilege to: "civil codefendants . . . ; companies that have been individually summoned before a grand jury who shared information before any indictment was returned . . . ; potential co-parties to prospective litigation . . . ; plaintiffs who were pursuing separate actions in different states . . . ; and civil defendants who were sued in separate actions . . . ." *Id*. (citations omitted). The HDA, clearly, does not fall within any of these categories.

The common-interest doctrine applies "where the parties are represented by separate attorneys but share a common **legal** interest." *State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2010 WL 2287454, at *8 (E.D. Mich. June 04, 2010) (emphasis added). The common interest doctrine "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). "The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *SR Int'l Bus. Ins. Co. Ltd. V. World Trade Ctr. Props., LLC*, 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002). The common interest doctrine should only apply to communications made with respect to actual or reasonably likely litigation involving the parties participating in the communications. *See, e.g., In re Santa Fe Int'l Corp.*, 272 F.3d 705, 711 (5th Cir. 2001) ("there must be a palpable threat of litigation" not a mere possibility for the doctrine to apply); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 50 (S.D.N.Y. 1989) ("actual or potential litigation is a necessary prerequisite for application of the joint defense privilege").

In the Northern District of Ohio, the common interest privilege permits the disclosure of privileged communications to people outside of the direct attorney-client relationship without waiving the privilege, provided the parties have "an identical legal interest with respect to the subject matter of the communication." *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 439 (N.D. Ohio 1999) (citing *Duplan Corp. v. Deering Milliken*, 397 F. Supp. 1146, 1164 (D.S.C. 1974)). However, the common interest privilege "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Id*. (quoting *Bank*



*Brussels Lambert v. Credit Lynnaois*, 10 F.R.D. 437, 447 (S.D.N.Y. 1995)); *see also Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 19 (E.D.N.Y. 1996) (noting that a "concern about litigation . . . does not transform [the parties'] common interest and enterprise into a legal, as opposed to commercial matter"); *Oak Industries v. Zenith Industries*, 1988 WL 79614 at *4 (N.D. Ill. July 27, 1988) (declining "to expand the coverage of the attorney-client privilege to information which a party freely shares with other business persons"); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 512 (D.Conn. 1976) (finding no common interest where disclosures were part of adversary business negotiations rather than the advancement of a "joint interest vis-a-vis the rest of the world").

In light of the foregoing, it is clear the HDA does not have a valid common interest privilege with its members.  First, the HDA was not named in any case involving its members and, therefore, cannot have a common, let alone **identical**, legal interest with its members.  Second, as noted above, a joint business strategy implemented through the HDA by its members, which involves a concern about the outcome of litigation (for example *In re Master*s and/or *Cardinal Health, Inc. v. Holder*), cannot give rise to a common interest privilege.  Third, to the extent that the HDA shared copies of its legal strategies, memoranda, and briefs with employees of the HDA members who are not lawyers for their comment or consideration, that sharing destroys any attorney-client privilege that the HDA may have had with its own attorneys and, therefore, destroys any resulting common interest privilege.  Fourth, the relationship between the HDA and its members is more akin to a business relationship that, at best, involves a concern about litigation, rather than "an identical legal interest."

Thus, the HDA cannot plausibly argue that it had identical or even common interests with its members.  And, the HDA has not advanced a single fact tending to show that it anticipated litigation against a common adversary as that faced by its members.  Without these facts, the HDA's claim of the common interest privilege necessarily collapses.  Plaintiffs accordingly request that the Special Master determine either that the common interest privilege does not apply under the facts presented, or that any purported privilege has been waived.

## IV.   <u>CONCLUSION</u>

The HDA is doing everything in its power to stall Plaintiffs' legitimate right to discovery in this action, and to withhold critically relevant documents that reflect its role in conduct that has afflicted the country.  Such abusive tactics, however, cannot and should not be permitted by this Court.  As this Court has already recognized, the HDA plays a central role in Plaintiffs' RICO claims, and Plaintiffs' allegations of the formation and maintenance of a coordinated enterprise by and among the various RICO Defendants.  The HDA's attempt to sidestep its discovery obligations to provide highly relevant information by claiming it is a mere "third party" thus cannot be taken seriously.  Further, its attempts to withhold documents by asserting meritless privileges, particularly when viewed in light of clear case law and prior productions from Defendants in this action, has no basis in law or fact.  Plaintiffs accordingly respectfully request the Special Master issue the following orders:



Special Master David Cohen
December 28, 2018
Page 13

1. That the HDA be required to apply the document search terms proposed by Plaintiffs on November 20, 2018, to reflect the appropriate scope of Plaintiffs' subpoena mandated by Federal Rule 26; and

2. That the associational privilege and the common interest privilege, as asserted by the HDA in response to Plaintiffs' subpoena, are inapplicable and cannot be used to withhold documents from Plaintiffs in response to the subpoena.

>Best regards,
>
>/s/ Mark Pifko
>
>Mark Pifko

cc: HDA Counsel (Mr. Brian Weinstein and Ms. Cristina Rincon, Davis Polk & Wardwell)
Defendants' Counsel
Plaintiffs' Counsel