Exhibit 4

| | |
|---|---|
| New York | Paris |
| Northern California | Madrid |
| Washington DC | Tokyo |
| São Paulo | Beijing |
| London | Hong Kong |

## Davis Polk

**Brian S. Weinstein**

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

212 450 4972 tel
212 701 5972 fax
brian.weinstein@davispolk.com

January 11, 2019

Re: **In Re National Prescription Opiate Litigation U.S. District Court for the Northern District of Ohio**, 1:17-md-2804

Special Master David Cohen
U.S. District Court for the Northern District of Ohio
Carl B Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, Ohio 44113

Dear Special Master Cohen:

We write in response to Plaintiffs' December 28, 2018 motion to compel ("Motion") on behalf of our client Healthcare Distribution Alliance ("HDA"), a non-profit trade organization representing primary pharmaceutical distributors.

I.     Overview

As set forth in more detail in Section II below, since the time that HDA was served with Plaintiffs' third-party subpoena (the "Subpoena"), it has made clear to Plaintiffs that it had every intention to cooperate and to devote significant resources to reviewing and producing documents that were potentially relevant to Plaintiffs' lawsuit.  HDA has done just that, having spent thousands of hours reviewing over one million pages of documents from 20 custodians and having made extensive productions to Plaintiffs, which will be supplemented with additional productions in the next few days as HDA completes its most recent round of review.

To the extent that HDA's emails and files contain relevant communications with its members, who are Defendants in this litigation, those documents should also be contained in the files of the Defendants themselves, and should already have been produced in this litigation by the Defendants.  Plaintiffs have never suggested that this is not the case.  Nonetheless, HDA has never objected to Plaintiffs' third-party subpoena outright and indeed has never objected to undertaking a significant review and production process.  HDA has simply asked that appropriate search terms be used that reasonably relate to the issues that are actually in dispute in this litigation, so that HDA is not required to review hundreds of thousands of irrelevant emails.

In particular, since this litigation relates to opioids, the search terms should relate to opioids. Instead, Plaintiffs have demanded that HDA use numerous search terms and search strings that have no relationship to opioids, each of which on its own generates tens or hundreds of

thousands of hits.  For example, Plaintiffs would require HDA to review all documents containing the word "distribute" or "distribution" within 50 words of the names of HDA's members, HDA itself, or certain third parties.  (See Ex. K.3 [Plaintiffs' Nov. 20 and HDA's Dec. 7 Proposed Terms Search Term Hit Reports, Attached to Dec. 7, 2018 Letter from B. Weinstein to M. Pifko], Appendix B, Search 8, at 6.)  Given that the term "distribution" is literally contained within HDA's name, and that HDA's members are pharmaceutical distributors, it is unsurprising that this search string would generate hundreds of thousands of hits.  Likewise, Plaintiffs would require HDA to review any document containing generic words such as "approach," "comment," "request," "discuss," or "collaborate" within 25 words of the name of HDA or one of its members. (See Ex. K.3, Appendix B, Search 20, at 8.)  Again, it is not surprising that terms as generic as this would generate hundreds of thousands of hits.  These examples are unfortunately not outliers, but are representative of Plaintiffs' overall approach, as described further below.  The results of the searches demanded by Plaintiffs would be that HDA would be required to review over 550,000 *additional* documents (millions of pages) beyond what HDA has already reviewed, based on search terms that reflect no genuine effort to tailor them to the issues in this litigation. That is not a proper approach to litigation discovery.

Moreover, while HDA has tried to engage with Plaintiffs over a period of months to reach a consensual resolution on search terms, Plaintiffs have taken seven weeks, on each of two separate occasions, to respond to HDA.  As a result, Plaintiffs are now not only demanding that HDA review over 550,000 additional documents, but that it do so on the cusp of the January 25 fact discovery deadline.  Even if Plaintiffs' search terms were otherwise appropriate, which they are not, that would simply not be achievable.  Using HDA's proposed search terms, which we submit are entirely appropriate, HDA will be in a position to complete its production by early next week and HDA has proposed dates for its witnesses to sit for depositions by the fact discovery deadline.

The only other issues raised by Plaintiffs concern the common interest privilege and the associational privilege.  HDA has not actually invoked the associational privilege, and so there is no live controversy to adjudicate.  As to the common interest privilege, the case law supports its application to certain communications between counsel to a trade association and its members, but in all events, the applicability of the privilege has to be determined on a document-by-document basis.  HDA has asserted the privilege on a document-by-document basis through its privilege log, but Plaintiffs have not challenged any particular assertions in like fashion.  Plaintiffs' attempt to have this Court reject the applicability of this privilege in blanket fashion is inappropriate and incorrect.

II.      Procedural background and meet-and-confer process

The relevant background to this dispute is as follows:

- Plaintiffs served their third-party subpoena on HDA on June 8, 2018.  (Ex. A [June 8, 2018 Subpoena and RFPs].)

- As outside counsel to HDA, we reached out to Plaintiffs' counsel on June 26, 2018 and indicated that HDA would agree to produce documents subject to certain objections.  We agreed that responses and objections would be served by July 6, and that we would meet and confer on July 10.

- Contrary to Plaintiffs' assertion that HDA "tried to prompt Plaintiffs to create their own search terms in the dark" (Motion at 3), during the July 10 meet-and-confer Plaintiffs offered to propose an initial set of search terms for HDA's consideration.  (Ex. B [July 12, 2018 Email from B. Weinstein to M. Pifko].)  Plaintiffs later retracted this offer, at which point HDA promptly developed its own proposals, based on the language in Plaintiffs' RFPs, which HDA provided to Plaintiffs on July 19, 2018.  (Ex. C [July 19, 2018 Letter from B. Weinstein to M. Pifko].)

- At the time, Plaintiffs had emphasized the need for expediency in light of the then-existing August 31 discovery deadline.  HDA, therefore, moved forward quickly with the collection and review of documents from 16 custodians using HDA's proposed search terms.

- On August 7, Plaintiffs sent a perfunctory email that did not offer a counterproposal to HDA's proposed search terms, but simply stated that the prior discovery deadlines had been adjourned, that Plaintiffs "are not in agreement concerning your proposed search terms," that "we do not intend to unnecessarily rush through the process of obtaining the documents and testimony to which we are entitled," and that "we are going to provide you with a more detailed written response."  (Ex. D [Aug. 7, 2018 Email from M. Pifko to B. Weinstein].)

- On August 15, August 17, and September 8, HDA made productions to Plaintiffs totaling approximately 27,000 pages, based on the search terms in HDA's July 19 proposal.

- Plaintiffs' substantive responses to HDA's initial search term proposals were not provided until September 10, 2018, more than *seven weeks* after HDA made its search term proposals on July 19.  (Ex. E [Sept. 10, 2018 Letter from M. Pifko to B. Weinstein].)  Plaintiffs' proposed search terms were extraordinarily overbroad and went far beyond the issues in the litigation.  Plaintiffs' letter did not purport to explain why any of its search term strings were appropriate, or even which requests they supposedly related to in Plaintiffs' subpoena.

- On September 13, 2018, we informed Plaintiffs on behalf of HDA that we had received their proposal and were analyzing it.  Given their voluminous search term strings, it took some time to analyze them, determine how burdensome they would be to comply with, and develop counterproposals.  On September 26, approximately two weeks after they sent their proposals, Plaintiffs threatened to go to Court if they did not get a response by the end of the week, despite the fact that they had taken over seven weeks to respond to HDA's proposals.  We informed Plaintiffs that we would respond by the following week. (Ex. F [Sept. 13-26, 2018 Emails between B. Weinstein and M. Pifko].)

- On October 2, 2018, HDA responded to Plaintiffs, explaining why Plaintiffs' search term proposals were unreasonable and why HDA's initial proposals were reasonable, but nonetheless agreeing to accept certain of Plaintiffs' proposals and to accept others with revisions if, in the interest of compromise, it would resolve the dispute.  HDA's concessions amounted to an additional 24,500 documents that HDA agreed to review. (Ex. G [Oct. 2, 2018 Letter from B. Weinstein to M. Pifko].)[1]

- On that same day, Plaintiffs sent an email stating summarily that they did not agree with HDA's proposals and asking HDA to provide the hit counts associated with the competing

---

[1] Far from constituting an "ultimatum," as Plaintiffs erroneously suggest (Motion at 4), these were good-faith efforts to reach a negotiated compromise.

search term proposals, which HDA subsequently provided.  (Ex. H [Oct. 2, 2018 Email from S. Cluff to C. Rincon].)

- Seven weeks later, on November 20, having not heard from Plaintiffs and with the January 25, 2019 fact discovery deadline approaching, we reached out to Plaintiffs on behalf of HDA to ask for a response.  (Ex. I [Nov. 20, 2018 Email from B. Weinstein to M. Pifko].)  We stated: "We will need sufficient time to review a large volume of documents and prepare for a deposition, and do not want to be placed in a situation where we are expected to review an unmanageable volume of documents in an unreasonably short amount of time.  We reserve all rights in that regard."  (*Id.*)

- After being prompted by HDA, Plaintiffs finally responded to HDA's proposed search terms on November 20, seven weeks after HDA's October 2, 2018 proposal.  (Ex. J [Nov. 20, 2018 Letter from M. Pifko to B. Weinstein].)  Plaintiffs' counterproposal remained extraordinarily overbroad, as explained further below, and would have resulted in over 670,000 documents to review.

- On December 7, 2018, despite the extreme overbreadth of Plaintiffs' proposals, and HDA's belief that its original proposals were reasonable, HDA again offered to make additional search term concessions if it would resolve the dispute.  (Ex. K [Dec. 7, 2018 Letter from B. Weinstein to M. Pifko].)  These additional search terms resulted in an additional 78,800 documents to review.  HDA explained in detail why the search proposals with which it could not agree were facially unreasonable.  (Exs. K and K.1 [Appendix to Dec. 7, 2018 Letter from B. Weinstein to M. Pifko].)  HDA also provided Plaintiffs with hit reports showing the number of documents generated by Plaintiffs' proposals and HDA's proposals.  (Exs. K.2 [Plaintiffs' Sept. 10, 2018 and HDA's Oct. 2, 2018 Proposed Terms Search Term Hit Reports] and K.3 [Plaintiffs' Nov. 20, 2018 and HDA's Dec. 7, 2018 Proposed Terms Search Term Hit Reports].)

- Ten days later, on December 17, Plaintiffs declared an impasse without responding to the specific explanations and counterproposals in HDA's December 7 letter, just as they have failed to address the specific search term disputes in their December 28 motion.  (Ex. L [Dec. 17-19, 2018 Emails between B. Weinstein and M. Pifko].)

- Plaintiffs asked whether HDA would consent to the jurisdiction of the MDL Court for purposes of adjudicating Plaintiffs' motion, even though HDA is not subject to the jurisdiction of the MDL Court.  HDA agreed, so long as the two sides could agree on a schedule for submitting their respective letter briefs.  (Ex. L.)

- Despite the fact that Plaintiffs told HDA that it should wait to conduct its supplemental review until the dispute over the search term parameters was resolved (Ex. K at 2), given the impending January 25, 2019 fact discovery deadline, HDA no longer felt comfortable waiting, and so it proceeded ahead with its supplemental review pursuant to the search protocol it proposed on December 7.  HDA expects to be able to make its production resulting from such review—which HDA estimates approximately 6,500 additional documents, or 50,000 pages—within the next few days.  HDA has also agreed to make a 30(b)(6) witness and two individual fact witnesses available for depositions by the January 25 fact discovery deadline.[2]

---

[2] Far from "refus[ing] to produce any additional documents" (Motion at 4), HDA has undertaken to review enormous quantities of additional documents and to produce the responsive ones, consistent with HDA's proposed search protocol, even though Plaintiffs had taken the position that HDA should await the resolution of

III.     Plaintiffs have failed to meet their burden of showing that their search terms are
        appropriately designed to yield relevant documents without imposing undue burden.

It is Plaintiffs' burden to prove that the search terms in dispute are reasonably designed to lead to
the identification of relevant information.  *See, e.g.*, *Giunto v. Metro. Grp. Prop. & Cas. Ins. Co.*,
No. 1:11 CV 2774, 2013 WL 12131306, at *2 (N.D. Ohio Aug. 20, 2013) ("Evidence is
discoverable if it is non-privileged and relevant to the claims or defenses of either party . . . .
[T]he initial burden of showing that the information sought is discoverable, is on the proponent of
a motion to compel."); *Piks Corp. v. United States*, 97 F.R.D. 327, 330 (N.D. Ohio 1982) (denying
motion to compel based on plaintiffs' failure to establish relevance to the questions in dispute);
*English v. Wash. Metro. Area Transit Auth.*, 323 F.R.D. 1, 17 (D.D.C. 2017) ("[T]he moving
party . . . bears the burden of proving the relevance of the information whose production [it]
seeks to compel."); *Pederson v. Preston*, 250 F.R.D. 61, 66 (D.D.C. 2008) ("Discovery should be
tailored to the issues involved in a particular case.").

Plaintiffs have failed to meet that burden.  Indeed, their motion fails to discuss the specific search
term disputes at issue, instead relying on generalities about why robust discovery is appropriate.
*See, e.g.*, *Nat'l Credit Union Admin. Bd. for G.I.C. Fed. Credit Union v. Basconi*, No. 5:16CV455,
2017 WL 749187, at *3 (N.D. Ohio Feb. 27, 2017) (denying plaintiff's request for production of
certain documents as overly broad where plaintiff did not "assert[] how these documents relate to
this case" beyond a generalized assertion); *Breiterman v. U.S. Capitol Police*, 324 F.R.D. 24, 31
(D.D.C. 2018) (denying in part motion to compel and finding that "broad assertion . . . is
insufficient to establish the relevance and discoverability of these disputed categories").  Again,
HDA has not resisted providing robust discovery, even though its communications with
Defendants should already have been produced by the Defendants themselves, but such
discovery must be reasonably connected to the issues in the litigation.  Instead, Plaintiffs'
proposed search terms that are in dispute are untethered from the issues in the litigation—they
are not limited to opioids, and include such generic and commonplace terms as to be almost
useless as a tailoring device.

To provide some illustrative examples, Plaintiffs' search terms include:

1)  All documents containing any of the following words or phrases, *without any other
    limitation at all*: "public safety," "public health," "death*," "dead," "die*," "fatal*,"
    and "crisis," which unsurprisingly generate huge volumes of documents.  (Ex. K.3,
    Appendix B, Search 24, at 9.)  We understand that the Special Master has
    expressed a preference against single-word search terms.  (Discovery Ruling No.
    3, Doc. No. 762, at 9.)  These are just a few examples of Plaintiffs' single-word
    search strings. (*See, e.g.*, Ex. K.3, Appendix B, Searches 11-13, 30.)  Given that
    HDA's members are pharmaceutical distributors, it is not surprising that there
    would be hundreds of thousands of emails containing words like these, without
    having any meaningful relationship to this litigation.

2)  All documents in which words such as "collaborate," "approach," "contact,"
    "comment," "request," or "discuss" appear within 25 words of HDA's name or the
    name of one of its members.  It is hard to imagine search terms more generic
    than these.  These terms reflect no effort to connect the searches to the issues in
    the litigation in a reasonable way—they are a prototype of inappropriately broad

the dispute over search terms before conducting its review.  Given Plaintiffs' delays, as described above, HDA
did not have time to wait any longer in light of the January 25, 2019 deadline for fact discovery.

search terms.  Not surprisingly, they generate an exorbitant number of hits—
approximately 387,000 documents (445,000 including attachments).  (Ex. K.3,
Appendix B, Search 20, at 8.)

3)  All documents containing the words "distribute" or "distribution" within 50 words of
the names of HDA, HDA's members, or certain third parties, resulting in hits on
approximately 337,000 documents (394,000 including attachments).  (Ex. K.3,
Appendix B, Search 8, at 6.)  HDA's members are pharmaceutical distributors.
Indeed, the term "distribution" is literally contained within HDA's name.
Accordingly, using the words "distribute" or "distribution" as search limiters in no
way limits the documents to those that are likely to be relevant to this lawsuit.
Instead, it generates vast quantities of documents that could relate to any aspect
of pharmaceutical distribution that has nothing to do with opioids, much less to
the issues surrounding opioids that are the focus of the litigation.

4)  All documents containing the word "manufacture" within 50 words of the names of
HDA or HDA's members, which hits on over 80,000 documents (115,000
including attachments).  (Ex. K.3, Appendix B, Search 9, at 6.)  Plaintiffs' search
terms similarly include all documents containing the words "make" or "made"
within 50 words of the names of HDA or HDA's members, which hits on
approximately 119,000 documents (155,000 including attachments).  (Ex. K.3,
Appendix B, Search 10, at 6). Again, these search terms are inappropriately
broad and generic, and reflect no effort to limit the searches to opioids, much less
to the specific issues relating to opioids that are relevant to Plaintiffs' lawsuit.

5)  All documents containing generic words such as "research," "trend," "present,"
"presentation," or "marketshare," within 50 words of the names of HDA or HDA's
members.  These terms hit on approximately 103,000 documents (137,000
including attachments).  (Ex. K.3, Appendix B, Search 23, at 9.)  Again, no effort
is made to connect the searches to the opioid-related issues in dispute in this
litigation.

6)  All documents containing words like "committee" and "council" within 50 words of
the names of HDA, one of its members, or other industry groups, which hits on
approximately 220,000 documents (270,000 including attachments).  (Ex. K.3,
Appendix B, Search 7, at 6.)  Because HDA is an organization that operates
largely through committees, councils, and similar sub-groups, the vast majority of
its activities could be covered by such searches, regardless of whether such
documents have anything to do with opioids.

7)  All documents in which the word "business" or "sales" appears within five words
of "decision," which hits on over 4,000 documents (9,000 including attachments).
(Ex. K.3, Appendix B, Search 22, at 9.)  Requiring HDA to review every document
that contains the phrase "business decision" or "sales decision" is not reasonably
tied to the issues in the MDL.

Unfortunately, the above is not a complete list of Plaintiffs' overly broad search terms, but is
illustrative of the vast overbreadth of Plaintiffs' approach.  We respectfully refer the Special
Master to the appendix to our December 7, 2018 letter (Ex. K and the attachments thereto at
Exs. K.1-K.3), which comprehensively sets forth all of the specific terms in dispute, as well as the
explanations for those disputes.

Contrary to Plaintiffs' suggestion that HDA has not offered reasonable proposals, HDA has
reviewed enormous quantities of documents—over one million pages—based on its search

protocols and those portions of Plaintiffs' proposed protocol that HDA accepted in the interest of compromise. HDA did not reject Plaintiffs' search terms outright, but accepted some,[3] accepted others with revisions so that they related to opioids and this litigation,[4] and only rejected terms that were vastly and inappropriately overbroad. And the fact that this motion does not raise any disputes regarding custodians or particular requests for information is further evidence that HDA has not been taking a hard line opposing discovery, but rather has been willing to provide extensive discovery and to consensually resolve other disputed issues where the requests have been more reasonable.

Given Plaintiffs' failure to reasonably connect the disputed search terms to the issues in the litigation, the burden associated with reviewing millions of additional pages of documents resulting from those search terms is undue and inappropriate. *See, e.g.*, Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena."); *Battle v. Chi. Cycle, Inc.*, No. 1:11MC61, 2012 WL 5500507, at *5 (N.D. Ohio Nov. 13, 2012); *Recycled Paper Greetings, Inc. v. Davis*, No. 1:08-MC-13, 2008 WL 440458, at *1, *4 (N.D. Ohio Feb. 13, 2008) (granting motion to quash third-party subpoena on Fortune 500 company as unduly burdensome); *Millennium TGA, Inc. v. Comcast Cable Commc'ns LLC*, 286 F.R.D. 8, 13, 16 (D.D.C. 2012) (denying motion to compel production from Fortune 100 company as unduly burdensome).

Plaintiffs' argument that the Defendants in this case have reviewed and produced far larger quantities of documents does not change the analysis. To the contrary, to the extent that Plaintiffs are interested in HDA's documents because they may reflect communications with and between Defendants about issues concerning opioids, those documents should already have been produced by the Defendants. Plaintiffs have made no showing to the contrary. Requiring a third party to review hundreds of thousands of emails based on generic search terms that are not tied to the issues in this litigation is even more inappropriate given that, if a limited quantity of relevant documents happens to be found within this massively overbroad review set, there is a significant chance they have already been produced by the Defendants themselves.

IV.    Plaintiffs' privilege arguments are unsupported and unripe.

     *1.  HDA has a legitimate claim to the common interest privilege, which must be contested, if at all, on a document-by-document basis.*

As a threshold matter, Plaintiffs' arguments against application of the common interest privilege are not appropriately brought at this time. Despite the fact that HDA has provided Plaintiffs with a privilege log containing the requisite details on each of its privilege claims, including the common interest privilege, Plaintiffs have made no specific challenges to any of those claims. We are willing and able to defend those privilege assertions on a document-by-document basis. See *Hilton-Rorar v. State & Fed. Commc'ns Inc.*, No. 5:09-CV-01004, 2010 WL 1486916, at *7 (N.D. Ohio Apr. 13, 2010) ("[A] claim of privilege cannot be a blanket claim and, instead, must be made and sustained on a question-by-question or document-by-document basis."). However, Plaintiffs have not specifically challenged a single privilege designation, nor have they challenged the sufficiency of HDA's privilege log as a whole, instead making a

---

[3] *See* Ex. K.1: Appendix A, Searches 2, 5; Appendix B, Searches 19, 30.

[4] *See*, Ex. K.1: Appendix A, Searches 1, 3, 6-11; Appendix B, Searches 2-3, 4, 6, 11-13, 15-16, 18, 21, 24-29, 31-33.

generalized argument with no support for their assumptions.  *See, e.g., Pederson v. Preston*, 250 F.R.D. 61, 65 (D.D.C. 2008) (denying motion to compel based in part on fact that plaintiff failed to "specifically challenge[] any claim of privilege").  Plaintiffs inappropriately seek a categorical denial of the privilege based on hypothetical applications of the common interest privilege totally divorced from the facts of this case.  If Plaintiffs wish to challenge the application of the common interest privilege, they must do so using the details provided in the privilege log and based on the actual documents in question.

Nevertheless, contrary to Plaintiffs' assertions, HDA may appropriately claim the common interest privilege over certain communications between its attorneys and its members.  Various courts have so held in the context of communications between a trade association's lawyers and the trade association's members.  *See, e.g., A&R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. CIV. 3:07CV929 (WWE), 2013 WL 6044333, at *10-11 (D. Conn. Nov. 14, 2013) (applying the common interest rule to a trade association's attorney "advis[ing] the members and coordinat[ing] their legal efforts with respect to proposed legislation, regulation, and potential litigation"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-489 (PLF/JMF/AK), 2010 WL 11570865, at *2 (D.D.C. Sept. 28, 2010) (applying common interest privilege to communications between a lawyer employed by trade organization and members); *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 220 (W.D. Ky. 2006) (finding trade organization and members had common legal interest "that extends to legislative and regulatory matters, as well as in matters in litigation or which could lead to litigation").  The common interest privilege does not require that HDA be an actual party to the litigation.  *See, e.g., MPT, Inc. v. Marathon Labels, Inc.*, No. 1:04 CV 2357, 2006 WL 314435, at *7 (N.D. Ohio Feb. 9, 2006) ("[Pa]rties can have common legal interests outside of the litigation context altogether."); *Holland v. Island Creek Corp.*, 885 F. Supp. 4, 6-7 (D.D.C. 1995) (finding coal operators' association shared a common interest with plan trustees, "although there was no actual or immediately imminent litigation"); *In re United Mine Workers of Am. Emp. Benefit Plans Litig.*, 159 F.R.D. 307, 314 & n.5 (D.D.C. 1994) (determining common interest privilege may be triggered "even if the transferor and transferee do not later become co-parties in actual litigation").

Plaintiffs' arguments regarding the inapplicability of the common interest privilege to communications made with commercial, rather than legal, concerns in mind are plainly inapplicable.[5]  The parties claiming privilege in Plaintiffs' cited cases were typically counterparties in business arrangements, a fact pattern entirely distinct from a trade association like HDA's relationship with its members.[6]  Furthermore, *SCM Corp. v. Xerox Corp.*, on which Plaintiffs rely (Motion at 12), actually supports HDA's position that communications between HDA and its members are protected by the common interest privilege.  70 F.R.D. 508 (D. Conn. 1976).  To

---

[5] Likewise, insofar as Plaintiffs cite a case referring to "identical" legal interests, *Libbey Glass, Inc. v. Oneida, Ltd.,* 197 F.R.D. 342, 347 (N.D. Ohio 1999), this phrase is applied to differentiate those instances in which the parties share a primarily commercial interest with a potential ancillary legal interest from those in which the parties have an actual shared legal interest.  *See id.* at 348 ("[C]onfidential communications can be shared only if both parties have more than merely *concurrent* legal interests . . . the parties must have a *common legal* as opposed to commercial, interest.") (internal quotation marks and citations omitted).

[6] For example, in *Libbey*, the documents were shared between parties negotiating a contract to buy and distribute glassware.  197 F.R.D. at 349.  In *Oak Industries v. Zenith Industries*, the District Court for the Northern District of Illinois found that the common interest privilege did not apply to a defendant who had shared documents with potential buyers of its consumer electronics group.  No. 86 C 4302, 1988 WL 79614 at *4 (N.D. Ill. July 27, 1988).  In *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, the parties had shared documents as part of a revolving credit agreement.  160 F.R.D. 437, 440 (S.D.N.Y. 1995).

the extent that the court in *SCM Corp.* declined to apply the common interest privilege to Xerox's communications with its joint venture partner, Rank, it reasoned that Xerox had shared the information with Rank as an adverse party with whom it was "negotiating the price for relinquishing voting and managerial control in [a joint venture]." *Id.* at 513.  HDA and its members, as well as the members themselves, are not negotiating across from one another through the HDA.  The *SCM Corp.* court held the common interest privilege *did* apply to communications of a committee with representatives from both Xerox and another company, Battelle.  *Id.* at 514.  The court held that "[w]hile all the work of the committee is not necessarily privileged, the requisite common interest to satisfy the confidentiality aspect of the privilege appears to have been present on the subject of the [technology development] and related patent rights." *Id.*  The parallels between HDA and its members and between Xerox and Battelle are obvious.

Plaintiffs do not point to any facts suggesting that HDA and its members did not seek to maintain the confidentiality of communications held in connection with common legal interests.  Plaintiffs instead state—without any legal support whatsoever—that:

> to the extent that the HDA shared copies of its legal strategies, memoranda, and briefs with employees of the HDA members who are not lawyers for their comment or consideration, that sharing destroys any attorney-client privilege that the HDA may have had with its own attorney, and therefore, destroys any resulting common interest privilege.

(Motion at 12.)  Plaintiffs are incorrect as a matter of law.  Entities who share a common interest privilege need not share the information directly through attorneys for the common interest privilege to apply, and a waiver will not occur where relevant employees within each organization receive the advice.  *See, e.g.*, *Holland*, 885 F. Supp. at 6-7 (finding no waiver where law firm prepared a memorandum for coal miners' association, and association then shared that memorandum with plan trustees); *SCM Corp.*, 70 F.R.D. at 518 ("A privileged communication should not lose its protection if an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation.").

In short, Plaintiffs' request for a blanket ruling that the common interest privilege does not apply, divorced from the context of any particular document, is unsupportable.

> 2.  *There is no ripe dispute regarding the associational privilege, because HDA has not asserted such privilege over any document.*

As set forth in our October 2, 2018 letter to Plaintiffs, courts have held the associational privilege may apply to internal communications within trade organizations, particularly in the context of lobbying.  (Ex. G at 4 (citing *In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d 470, 490 (10th Cir. 2011); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1158 (9th Cir. 2010); *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164-MLW-DWB, 2007 WL 852521, at *3-5 (D. Kan. Mar. 16, 2007)).)  However, as HDA has informed Plaintiffs, it is not currently withholding or redacting any document on the basis of a claim of associational privilege, and has no intention of doing so in connection with this litigation.  Accordingly, there is no present dispute related to the associational privilege for the Special Master to resolve.

********

Special Master David Cohen                          10                          January 11, 2019

For the foregoing reasons, HDA respectfully requests that the Special Master:

1. Deny Plaintiffs' request to enter an order requiring HDA to produce additional documents beyond those it already has produced and will be producing in connection with its December 7, 2018 search terms; and

2. Deny Plaintiffs' request that the Special Master adopt a blanket rule prohibiting HDA from claiming the common interest or associational privileges.

Respectfully submitted,

Brian S. Weinstein

Attachments
cc w/ att.:      Mark Pifko and Sterling Cuff, Baron & Budd, P.C.
                 Plaintiffs' Counsel
                 Defendants' Counsel