<u>Exhibit 5</u>

**BARON BUDD®**  DALLAS | AUSTIN | BATON ROUGE | NEW ORLEANS | LOS ANGELES
SAN DIEGO | NEW JERSEY | NEW YORK | WASHINGTON, D.C.

800.887.6989  
direct 818.839.2325  
fax 818.986.9698  
email mpifko@baronbudd.com  

Encino Plaza  
15910 Ventura Blvd.  
Suite 1600  
Encino, CA 91436

January 15, 2019

**VIA E-MAIL**

Special Master David Cohen  
U.S. District Court for the  
Northern District of Ohio  
Carl B. Stokes U.S. Courthouse  
801 West Superior Avenue  
Cleveland, Ohio 44113

RE: **In Re National Prescription Opiate Litigation**
U.S. District Court for the Northern District of Ohio; Case No. 1:17-md-2804
*Plaintiffs' Reply in Support of Motion to Compel Document Production from the HDA*

Plaintiffs submit this reply to the January 11, 2019 opposition submitted by the Healthcare Distribution Alliance (the "HDA") concerning Plaintiffs' Motion to Compel the Production of Documents from the HDA. In opposing Plaintiffs' motion, HDA erroneously contends that it has been cooperative. In fact, the HDA employed a laundry list of delay tactics and gamesmanship efforts to withhold information and thwart the discovery process. HDA also takes issue with Plaintiffs' search terms. However, the terms proposed by Plaintiffs, which are consistent with the requirements of Rule 26, are not burdensome, and certainly not in the context of this litigation. Finally, the HDA's argument that the Court cannot now rule on its claim of the common interest privilege is unavailing, and ignores the HDA's untimely production of a voluminous privilege log. Based on the foregoing, Plaintiffs respectfully request the Court issue an order compelling HDA to apply the document search terms reflected in Plaintiffs' November 28, 2018 letter (or apply the compromises outlined in Appendix 1 below), and an order finding that the common interest privilege does not apply.[1]

### 1.    The HDA Has Been Uncooperative in Responding to Plaintiffs' Subpoena

The HDA claims it has been cooperative in response to Plaintiffs' subpoena. In so arguing, HDA ignores the central import of the subpoena in the context of this nationally unprecedented crisis, and turns a blind eye to the fact that HDA has been a key player in the crisis since at least as early-2000s.

---

[1] The HDA has apparently taken the position that it has not, and is not now, invoking the application of the associational privilege to withhold the production of documents.



After Plaintiffs served their subpoena on June 8, 2018, Plaintiffs met and conferred with HDA's outside regulatory counsel.  At that time, HDA requested an extension to retain outside counsel.  Plaintiffs obliged and received their first communication from HDA's outside counsel on June 26, 2018.  During the meet and confer referenced in the HDA's letter, the HDA took the position that they would not collect, review, or produce a single email in response to the subpoena.  Only after weeks of additional aggressive campaigning by Plaintiffs did the HDA finally relent.

With respect to search terms, the law is clear that it is the HDA's initial task to propose terms because it must confer with its custodians.  "Where counsel are using keyword searches for retrieval of ESI, they at a minimum must carefully craft the appropriate keywords, with input from the ESI's custodians as to the words and abbreviations they use." *William A. Gross Construction Associates, Inc. v. American Manufacturers Mutual Insurance Company*, 256 F.R.D. 134, 135-136 (S.D.N.Y. 2009) (cautioning against "lawyers designing keyword searches in the dark, by the seat of their pants, without adequate (indeed, here, without any) discussion with those who wrote the emails").  Ultimately, in response, HDA only suggested eleven search terms.  Moreover, despite its position that it has produced a sizeable and sufficient production of documents, the HDA's initial production included only 26,000 pages.  Only after months of meeting and conferring, and substantial revisions of the search terms (which remain unresolved), did HDA's document production eventually reach 76,000 pages.

The central theme of HDA's opposition letter, that it has repeatedly and consistently cooperated with Plaintiffs at every turn, cannot be taken seriously.

### 2. **Plaintiffs' Proposed Search Terms Are not Burdensome**

The HDA spends much of its opposition attempting to identify specific search terms and arguing that the number of documents they would yield would be burdensome for the HDA to review and produce.  This tactic, however, fails to address the operative law governing the analysis of a purportedly burdensome production, and instead relies on anecdotal discussions, which also fail to account for the context of this litigation.

Rule 26 permits the production of nonprivileged matter "that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discover outweighs its likely benefit."

In their December 28, 2018 letter, Plaintiffs provided an in-depth analysis of the considerations required under Rule 26.  In response, the HDA fails to rebut the fact that the scope and importance of the allegations at issue overshadow the alleged burden of searching and reviewing additional documents, particularly in light of the HDA's central role in Plaintiffs' RICO claims.  The HDA similarly fails to acknowledge the fact that it has ample resources to respond to a subpoena.  Defendants' document productions in this action reveal that the HDA received approximately $9.1 million in contributions between 2010 and 2018 from a single Defendant, and an additional $2.3 million in contributions from that same Defendant to the HDA Research Foundation.



Finally, in an effort to support its position that it should not be required to review and produce a high volume of documents, the HDA contends that other Defendants in this litigation should possess the documents sought. This argument fails. First, the HDA ignores the fact that other Defendants would not be in possession of critical internal discussions among HDA employees or executives, or their interactions with the DEA or other governmental agencies. Second, each Defendant in this case maintains and applies its own document retention policy and it is not true that the Defendants preserved all of the documents now sought from the HDA. No Defendant in this action has made a complete production of HDA document.

Despite these facts, and in the interest of exhausting all cooperation efforts, Plaintiffs are willing to compromise and make substantial concessions on the bulk of the currently disputed search terms. (*See* Appendix 1 below).

### 3. **This Court Can Rule on the HDA's Assertion of Common Interest Privilege**

The HDA argues that the Court cannot rule on the HDA's blanket assertion of the common interest privilege to withhold various documents because "[the] HDA has asserted the privilege on a document-by-document basis through its privilege log, but Plaintiffs have not challenged any particular assertions in like fashion." (*See* HDA's January 11, 2019 Opposition Letter). This position only underscores the HDA's consistent and repeated attempts to stall and delay Plaintiffs' legitimate right to discovery in this action.

Specifically, while the HDA's opposition letter appears to have no explanation as to why Plaintiffs did not brief a line-by-line challenge to the HDA's privilege log, it simultaneously conceals from the court that its privilege log was produced to Plaintiffs late at night on December 27, 2018, which is the night before Plaintiffs' briefing deadline on this issue, which Plaintiffs and the HDA previously agreed to.

Additionally, the cases relied upon by the HDA fail as a matter of law. Specifically, the cases confirm that the HDA does not have a sufficiently common interest with its members to withhold information that was communicated to them, or to their employees. For example, in *United States v. American Tel. and Tel. Co.*, 642 F.2d 1285 (1980), previously relied on by HDA, the court advised that a common interest should not be narrowly construed to co-parties. *Id*. at 1329. However, that court clarifies that "[s]o long as a transferor and transferee anticipate litigation against a common adversary, they have a strong common interest." *Id*. Ultimately, the court in *American Tel*. held that a common interest existed in that case because "MCI shares common interests with the United States, in the sense that they are proceeding in overlapping antitrust issues against a common adversary, AT&T." *Id.* at 1300. Here, the HDA has not advanced a single fact tending to show that the HDA itself anticipated litigation against a common adversary, as compared to its members. Without these facts, the HDA's claim of a common interest privilege evaporates. *In re United Mine Workers of America Employee Benefits Plan Litig.*, 159 F.R.D. 307 (D.D.C. 1994) is in accord because there, the court noted that a common interest privilege would only have arisen if the parties anticipated litigation against a common adversary and, further observed that in *American Tel*. there was a guarantee of confidentiality that strengthened the case against waiver of privilege. *Id*. at 304-15 at n.5-6.



Special Master David Cohen
January 15, 2019
Page 4

      HDA's citation to *A&R Body Specialty and Collision Works, Inc. v. Progressive Casualty Insurance Co.*, 2013 WL 6044333 (D. Conn. Nov. 14, 2013) and *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215 (W.D. Kent. Aug. 2, 2006) are similarly unpersuasive. Those cases do not create a blanket privilege for trade associations and their members. Rather, as the court noted in *A&R Body*, the common interest privilege that applied in that case was first premised on a valid attorney client relationship between the trade association and the litigants. Next, the court determined that the communications at issue were understood and expected to be kept confidential. *Broessel* is inapt because, as the court noted in that case, the common interest privilege applied because all members of a trade association anticipated that they would become co-defendants in the same civil action and signed a joint defense agreement as part of their joint litigation strategy and intent to use their trade association as part of that litigation strategy. The court further noted that disclosure of the trade association's documents "could very well reveal the mental impressions, opinions, and trial strategy of Defendant's counsel." *Broessel*, 238 F.R.D. at 221.

      Here, the HDA has not advanced any facts that would place its privilege assertion on par with the trade organizations in *A&R Body* or *Broessel*, by providing any facts demonstrating that it had an attorney client relationship with the RICO Defendants. Instead, what the HDA has never addressed is the fact that multiple RICO Defendants have produced copies of documents that the HDA has either withheld and/or heavily redacted based on the illusion of a common interest privilege. At bottom, the production of these documents by the HDA's members – named as Defendants in this lawsuit and prior lawsuits – undercuts the argument that any Defendant expected communications with the HDA to remain confidential and/or acts as a waiver of any purported privilege. Therefore, Plaintiffs request that the Special Master determine either that the common interest privilege does not apply under the facts presented, or that any purported privilege has been waived.

**4.**    <u>**Conclusion**</u>

      Plaintiffs request the Court issue an order compelling HDA to apply the document search terms in Plaintiffs' November 28, 2018 letter (or apply the compromises outlined in Appendix 1 to this letter) and an order finding that the common interest privilege does not apply

                                    Best regards,

                                      /s/ Mark Pifko

                                      Mark Pifko

cc:    Defendants' Counsel
        Plaintiffs' Counsel



## **APPENDIX 1**

As described below, Plaintiffs require the assistance of the Special Master to resolve HDA's position regarding at least twenty-six search terms, a significant majority of which include a final proposal for resolution from Plaintiffs below.[2]  Using the Appendix attached to Mr. Weinstein's December 7, 2018 correspondence, Plaintiffs are willing to make the following concessions:

<u>Inclusion of Terms related to Controlled Substances and Their Abbreviations</u>

HDA rejected the inclusion of certain terms related to controlled substances and their abbreviations based on its position that "Plaintiffs have not requested communications . . . unless they related to opioids," and, therefore, Plaintiffs are not entitled to any documents beyond those related to opioids.  HDA asserted this objection in relation to the following words in terms 3, 6, and 8-11 from Appendix A, and terms 15-16, 29, 31, and 32 of Appendix B: "(control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")".  HDA's position in relation to these words is untenable for two reasons.

First, HDA ignores the fact that these terms were taken from documents produced by its members as part of the words that they use to describe the manufacture and distribution of prescription opioids which are all controlled substances that fall into either schedule two or schedule threes and are often abbreviated by HDA and its members variously as CS, C2, CII, C-II, C3, CIII, or C-III, etc.  Against that factual backdrop, the inclusion of these terms is necessary to capture the Defendants' discussions with HDA about prescription opioids.  Second, HDA's position is internally inconsistent and therefore should be rejected.  Specifically, HDA included or accepted these words in relation to other terms that either it or Plaintiffs suggested.  Having accepted these terms as relevant to the claims at issue, HDA should not be able to pick and

---

[2] Plaintiffs accept HDA's revisions regarding Appendix A search terms 1-2, and 5 without alteration.  Plaintiffs also accept HDA's revisions regarding Appendix A search term 7 as long as the term "violation*" remains.

Plaintiffs accept HDA's revisions regarding Appendix B search terms 2-4, 6, 19, 21, 25, 29-31, and 33 without alternation.  Plaintiffs also accept HDA's revisions regarding Appendix B search term 11 (as long as the term "parameter*" is maintained), 18 (so long as the term "amicus" remains), 21 (so long as the terms "organiz*" and "convers* NEAR5 {with}" remain), and 32 (so long as the inclusion of the full list of terms related to opioids and controlled substances is accepted by HDA.

Plaintiffs also accept HDA's revisions to the Industry Trade Group String so long as the terms: "Research and Education Foundation," HDA Research Foundation," "Center for Healthcare Supply Chain Research," "NWDA Healthcare Foundation," and "NWDA NEAR2 healthcare" remain.



Special Master David Cohen
January 15, 2019
Page 6

choose the instances in which it wants to include the terms. They have been accepted and should be applied to all terms where appropriate.

### Restriction of Terms related to Interactions with the DEA

In relation to Plaintiffs' proposed terms 12 and 13, HDA included additional search terms that improperly limit HDA's production of documents based on its narrow reading of Plaintiffs' claims and subpoena. Contrary to HDA's position, the terms search terms in terms 1 and 2 do not fully capture the work that HDA did on behalf of its members in relation to the DEA regarding suspicious orders and diversion. Specifically, documents produced to date indicate that the HDA, as early as 2007, was working with its members to hold DEA Strategy meetings and develop a comprehensive DEA strategy in response to recent DEA actions regarding suspicious orders and diversion. These types of documents would not be captured by the search terms referenced by the HDA and should be included because they undoubtedly fall within Topics of Examination Nos. 7-8, and Requests for Production Nos. 15-17.

### Remaining Terms Rejected or Improperly Modified by HDA

The remaining terms discussed below were either rejected or improperly modified by HDA to an extent that prevents Plaintiffs' from obtaining necessary discovery. Given that HDA rejected and/or modified each of these terms in ways that are germane to each request, they are addressed individually.

Appendix B, Term 5 – HDA rejected this term based on its mistaken belief that "Plaintiffs have not requested general communications between and among HDA and its members regarding the marketing of pharmaceuticals. While this is mistaken – Plaintiffs included Topic of Examination and Request for Production No. 1 – Plaintiffs are willing to offer the final concession that will more narrowly tailor this request to prescription opioids and the ways in which Defendants referred to them as controlled substances.

> ((market* OR advertis* OR promot* OR ~~relief* OR~~ (pain NEAR5 relie~~f~~*)) OR (improve* NEAR5 function) OR effect* OR efficac* OR sales* OR (sales NEAR5 rep*) OR (sales NEAR5 team*) OR pamphlet* OR brochure* OR video* OR journal* OR article* OR publication* OR manual* OR unbrand* OR brand* OR offlabel OR (off NEAR5 label) OR "prior auth*" OR exhibition* OR (video NEAR5 conference*) OR poster* OR (trade NEAR5 show*) OR "visual aid*" OR handout* OR "hand out*" OR flyer* OR "fact sheet*" OR factsheet*) NEAR25 ((Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")) ~~AND~~ NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

Appendix B, Term 7 – HDA's sole reason for rejecting this term is that "HDA has not agreed to produce documents generally regarding the participation of HDA and its members in



Special Master David Cohen
January 15, 2019
Page 7

HDA's councils, committees, task forces, and working groups" because it "would be overbroad and unduly burdensome."  Here, HDA does not dispute that this information is called for by the subpoena.  Nevertheless, in an effort to resolve this dispute, Plaintiffs are willing to include search strings related to suspicious orders/diversion and prescription opioids.

> ((council OR committee OR "task force" OR taskforce OR "working group" OR conference* OR expo* OR seminar* OR GPPC OR RAC OR GAC OR PAC OR IRC OR LOC OR BTC OR "PA Council" OR PPC OR FGAC OR LOC OR ~~(Manufacturer NEAR5 "Government Affairs") OR~~ MGAAC OR SGAC ~~OR (Contract* NEAR5 Chargeback*)~~ OR ADIWG OR IWG OR "Board {of} Directors" OR PGRDRC ~~OR (Drug NEAR5 Diversion)~~ OR DDTF ~~OR ("controlled substance*" NEAR5 abuse)~~ OR CSATF OR "PCF REMS" OR ("Drug Diversion" NEAR5 "DEA Strategy") NEAR25 ((Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*") OR (suspicious NEAR5 order*) OR "SOM" ~~OR Protocol*~~ OR "order monitoring program" OR OMP OR SOP OR "SO hold" ~~OR (design NEAR5 operate) OR (above NEAR5 average) OR (unusual NEAR5 size) OR (deviat* NEAR5 "normal pattern") OR ("unusual NEAR5 frequency")~~ OR (order* NEAR5 irregular OR atypical OR abnormal OR aberrant OR anomalous OR deviat* OR (red NEAR5 flag*) OR "above average")) ~~AND~~ NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

Appendix B, Term 8 - HDA rejected this term based on its mistaken belief that "Plaintiffs have not requested general communications between and among HDA and its members regarding the distribution of pharmaceuticals."  While this is mistaken – Plaintiffs included Topic of Examination and Request for Production No. 2 – Plaintiffs are willing to offer the final concession that will more narrowly tailor this request to prescription opioids and the ways in which Defendants referred to them as controlled substances.

> (Distrib* NEAR25 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")) ~~AND~~ NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

Appendix B, Terms 9-10 – HDA rejected these terms based on its mistaken belief that "Plaintiffs have not requested general communications between and among HDA and its members regarding the manufacture of pharmaceuticals."  While this is incorrect – Plaintiffs included Topic of Examination and Request for Production No. 1 – Plaintiffs are willing to offer the final concession that will more narrowly tailor this request to prescription opioids and the ways in which Defendants referred to them as controlled substances.



Special Master David Cohen
January 15, 2019
Page 8

    9 – (Manufactur* NEAR25 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")) AND NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

    10 - ((Mak* OR Made) NEAR25 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")) AND NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

    Appendix B, Term 14 – HDA rejected this term based on its mistaken belief that "Plaintiffs have not requested general communications about DEA enforcement actions." Despite this mistaken believe, Plaintiffs subpoena contains multiple Topics of Examination and Requests for Production that call for production of documents that would be collected by this search term, including Topics of Examination 1-2, 5-7 and 12-13, and Requests for Production 1-6, 11-12, 14-16, 18-20. Each of these topics and requests call for production of the requested documents because, at a minimum, documents produced by Defendants to date indicate that HDA discussed DEA audits, investigations, enforcement actions, etc. with its members directly and through the councils, committees, task forces, and working groups. Plaintiffs believe that this term should be applied as currently written.

    Appendix B, Term 17 – HDA rejected this term based on its mistaken belief that "Plaintiffs have not requested general communications about HDA members' knowledge of sales data and have made no attempt to define the relevant subject of such communications." Plaintiffs' Complaint alleges that all of the RICO Defendants had knowledge of their competitors' sales and failed to report them, in addition to refusing to report their own suspicious orders. There is no doubt that knowledge of sales data is directly relevant to this aspect of Plaintiffs' claims. Moreover, since sales data is part of the chain of manufacturing and distributing controlled substances, the request for these documents falls easily within Topics for Examination 1-2, and Requests for Production Nos. 1-2. Plaintiffs believe that this term should be applied as currently written.

    Appendix B, Term 21 – HDA rejected this term based on the untenable position that "Plaintiffs have not requested general communications about coordination by HDA or its members and have made no attempt to define the relevant subject of such communications." The entirety of Plaintiffs' subpoena and the RICO allegations are directed at discovering and proving the level of coordination that the RICO Defendants used as part of their efforts to profit from the illegal marketing and distribution of prescription opioids. Plaintiffs' Complaint alleges that the RICO Defendants coordinated their efforts through multiple front and industry trade groups, including, the HDA. HDA's position is facially flawed and Plaintiffs argue that every single



Special Master David Cohen
January 15, 2019
Page 9

request in Plaintiffs' subpoena call for the production of documents related to the Defendants coordinated efforts. This term should be applied as written.

Appendix B, Term 22 – HDA rejected this term based on its belief that Plaintiffs have not adequately explained the purpose of this term. Plaintiffs further explain now that these terms – "business decision" and/or "sales decision" were terms used by multiple distributor defendants in relation to their duty to halt orders that they deemed suspicious. This term should be applied as written.

Appendix B, Term 23 – HDA rejected this term, like Appendix B, Term 17, based on the belief that "Plaintiffs have not requested general communications reflecting HDA members' knowledge of sales and distribution data." As explained above regarding Appendix B, Term 17, HDA's position is simply incorrect, and this term should be applied as written.

Appendix B, Term 24 – HDA rejected essentially all of Plaintiffs' proposed terms in Plaintiffs' 24 based on its belief that "Plaintiffs have not sufficiently explained the purpose of these terms and why other terms are not sufficiently tailored to identify documents responsive to Plaintiffs' RFPs." The relevance of these terms – during the pendency of national litigation to address the opioid crisis – is self evident. Plaintiffs are entitled to discover what the RICO Defendants knew, said, and/or did about the opioid crisis through the HDA. Furthermore, there is not another term that would collect the documents Plaintiffs' request with this search term. This term should be applied as written.

Appendix B, Term 26 – Plaintiffs are willing to accept all of HDA's revisions with three exceptions. Plaintiffs request that the terms sponsor*, collab* and *author* remain.

> ("continuing medical education" OR "medical education" OR CME* ~~OR fund* OR grant*~~ OR sponsor* OR collab* OR research* OR study OR studies OR trial* OR experiment* ~~OR analy* OR investig*~~ OR author* OR scientific* OR empirical* ~~OR statistic* OR~~ seminar* OR webinar* OR publication* OR publish* OR speaker* OR bureau* ~~OR advisor*~~ OR "key opinion leader" OR KOL OR "thought leader" OR ~~present* OR program* OR train*~~ OR campaign* OR ~~dinner* OR lunch*~~ OR honorrari* OR incent* OR gift* ~~OR grant* OR withdraw* OR chronic*~~) ~~NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])~~ NEAR25 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*"))

Appendix B, Term 27 – Plaintiffs understand are willing to accept HDA's revision subject to the modification below.

> ((chargeback* OR (charge NEAR5 back*) OR discount* OR rebate* ~~OR assistance*~~ OR coupon* OR "vault security" OR incentive* OR allowance* OR adjustment*) ~~NEAR50~~ NEAR25 (("suspicious order*" OR "SOM" OR "SOM



Protocol*" OR "order monitoring program" OR OMP OR SOP OR "SO hold" OR "unusual size" OR (unusual NEAR5 size) OR (deviat* NEAR5 "normal pattern") OR "unusual frequency" OR (order* NEAR5 (irregular OR abnormal OR excess* OR exceed* or high* OR deviat* OR "red flag*" OR (red NEAR5 flag*) OR "above average")) NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

Appendix B, Term 28 – Plaintiffs understand the methodology HDA utilized to revise this search term and propose the following additional revision.

("Controlled Substances Act" NEAR5 "section 843") OR ("Controlled Substances Act" NEAR5 "section 823") OR (CSA NEAR5 "section 843") OR (CSA NEAR5 "section 823") OR "21 USC 823" "OR 21 USC 843" OR 843 OR "21 CFR 1301.74") NEAR50 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* w/5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")

Appendix B, Term 32 – Plaintiffs understand the methodology that the HDA utilized in revising this search term. However, the revisions do not adequately target the information that is most relevant to Plaintiffs' claims. Plaintiffs propose the following revision.

((mislead* OR deceive* OR misled OR misrep* OR decept* OR omit* OR omission* OR myth* OR pseudoaddict* OR "pseudo-addict*" OR (pseudo NEAR5 addict*)) NEAR25 (Opioid* OR opiate* OR opoid* OR opiod* OR [DRUG NAMES LIST] OR (control* NEAR5 subst*) OR CS OR C2 OR C2s OR "C-II" OR "C-IIs" OR CII OR CIIs OR "schedule II*")) NEAR50 ([RICO Marketing Enterprise String] OR [Front Group String] OR [KOL String] OR [Data Vendor String] OR [Industry Trade Group String] OR [RICO Supply Chain String])

Appendix B, Term 33 – Plaintiffs understand the methodology that the HDA utilized in revising this search term. However, the revisions do not adequately target the information that is most relevant to HDAs involvement with the GAO. Specifically, the HDA submitted information to the GAO that was critical of DEA's management of quotas and enforcement of the CSA. Moreover, discovery to date indicates that HDA coordinated its response to the GAO with its members. This term should be applied as written.