# EXHIBIT 1



Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

January 21, 2019

**Confidential – Subject to Protective Order**

# EXHIBIT 1



**Driving progress**
**through partnership**

**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

January 16, 2019

**Confidential**

# EXHIBIT A



**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

January 7, 2019

**Confidential**

# EXHIBIT 1

```
                                              Page 1

 1              IN THE UNITED STATES COURT

 2               NORTHERN DISTRICT OF OHIO

 3                   EASTERN DIVISION

 4

 5            ~~~~~~~~~~~~~~~~~~~~

 6   IN RE:  NATIONAL PRESCRIPTION    MDL NO. 2804

 7   OPIATE LITIGATION

 8                             Case No.

 9                             17-mdl-284

10                             Judge Dan Polster

11

12

13   This document relates to:

14   The County of Summit, Ohio, et al., v.

15   Purdue Pharma L.P., et al.,

16   Case No. 1:18-OP-45090 (N.D. Ohio)

17

18            ~~~~~~~~~~~~~~~~~~~~

19            Videotaped deposition of

20             CHRISTOPHER CABOT

21              November 2, 2018

                  9:09 a.m.

22

                 Taken at:

23             Kelley & Ferraro

                950 Main Avenue

24             Cleveland, Ohio

25            Wendy L. Klauss, RPR
```

Page 2

1  APPEARANCES:
2
3  On behalf of Cuyahoga County and the
   Witness:
   Napoli Shkolnik PLLC
4  SALVATORE C BADALA, ESQ
   400 Broadhollow Road
5  Suite 305
   Melville, NY  11747
6  (631) 224-1133
   Sbadala@napolilaw com
7  -AND-
   Plevin & Gallucci
8  FRANK L  GALLUCCI, III, ESQ
   55 Public Square
9  Suite 2222
   Cleveland, OH  44113-1901
10 (216) 861-0804
   Fgallucci@pglawyer com
11
   On behalf of Distributor
12 AmerisourceBergen Drug Corporation,
   Co-Liaison Counsel for the Distributor
13 Defendants:
   Reed Smith LLP
14 KELLY H  HIBBERT, ESQ
   MOLLY Q  CAMPBELL, ESQ
15 1301 K Street N W
   Suite 1100 - East Tower
16 Washington, D C   20005
   (202) 414-9200
17 Khibbert@reedsmith com
   Mqcampbell@reedsmith com
18
   On behalf of Insys Therapeutics, Inc :
19 Holland & Knight LLP
   HEIDI A  NADEL, ESQ
20 2300 U S Bancorp Tower
   111 S W  Fifth Avenue
21 Portland, OR  97204
   (503) 243-2300
22 Heidi nadel@hklaw com
23
24
25

Page 3

1  APPEARANCES, Continued:
2  On behalf of Walmart Inc  F/K/A Wal-Mart
   Stores, Inc
3  Jones Day
   BRANDY H  RANJAN, ESQ
4  325 John H  McConnell Blvd
   Suite 600
5  Columbus, OH   43215-2673
   (614) 469-3939
6  Branjan@jonesday com
   -AND-
7  Jones Day
   MEREDITH KINCAID, ESQ
8  1420 Peachtree Street, N E
   Suite 800
9  Atlanta, GA  30309-3053
   (404) 581-3939
10 Mkincaid@jonesday com
11 On behalf of Cardinal Health, Inc ,
   Co-Liaison Counsel for the Distributor
12 Defendants:
   Williams & Connolly LLP
13 MATTHEW P  MOONEY, ESQ
   725 Twelfth Street, N W
14 Washington, DC  20005
   (202) 434-5000
15 Mmooney@wc com
16 On behalf of Prescription Supply, Inc :
   Pelini, Campbell & Williams, LLC
17 KRISTEN E  CAMPBELL TRAUB, ESQ
   Bretton Commons
18 8040 Cleveland Avenue NW, Suite 400
   North Canton, OH  44720
19 (330) 305-6400
   Kec@pelini-law com
20
   On behalf of Allergan Finance, LLC:
21 Kirkland & Ellis LLP
   TUCKER HUNTER, ESQ
22 300 North LaSalle
   Chicago, IL  60654
23 (312) 862-2000
   Tucker hunter@kirkland com
24
25

Page 4

1  APPEARANCES, Continued:
2  On behalf of Endo Health Solutions, Inc ,
   Endo Pharmaceuticals Inc , Par
3  Pharmaceutical, Inc , and Par
   Pharmaceutical Companies, Inc , (FKA Par
4  Pharmaceutical Holdings, Inc )
   Arnold & Porter
5  ALLISON GARDNER, ESQ
   601 Massachusetts Ave,  N W
6  Washington, D C   20001-3743
   (202) 942-5150
7  Allison gardner@arnoldporter com
8  On behalf of Distributor Defendant
   McKesson Corporation, Co-Liaison Counsel
9  for the Distributor Defendants:
   Covington & Burling LLP
10 JOHN ZIPP, ESQ
   One City Center
11 850 Tenth Street, NW
   Washington, DC   20001-4956
12 (202) 662-6000
   Jzipp@cov com
13
   On behalf of Teva Pharmaceutical
14 Industries Ltd :
   Morgan Lewis, LLP
15 VINEETA PRAKASH KAMATH, ESQ,
   1111 Pennsylvania Avenue N W
16 Washington, DC  20004
   (202) 739-3000
17 Vineeta Kamath@morganlewis com
18 ~ ~ ~ ~ ~
19 ALSO PRESENT:
   Kurt Henschel, Videographer
20 ~ ~ ~ ~ ~
21
22
23
24
25

Page 5

1         TRANSCRIPT INDEX
2  APPEARANCES:............................    2
3  INDEX OF EXHIBITS ....................    6
4  EXAMINATION OF CHRISTOPHER CABOT
   By Ms. Hibbert............................   21
5  By Ms. Nadel.............................  330
   By Ms. Ranjan............................  334
6  By Mr. Badala............................  340
   By Ms. Hibbert...........................  342
7

   REPORTER'S CERTIFICATE...................  346
8

   EXHIBIT CUSTODY
9  EXHIBITS RETAINED BY COURT REPORTER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

Page 90

1  there is, you know, drug testing, there is
2  interviewing, you know, the subjects of the
3  case, and often times they will just let us
4  know.
5         Sometimes toxicology reports from
6  fatalities or for children that have ingested
7  drugs, that happens frequently, you know, when
8  people leave the drugs laying out and things
9  like that, and we have had children die from
10  ingesting drugs that the parents leave out
11  so...
12     Q.   And I've seen toxicology screens
13  and drug-of-choice data tracked, in terms of
14  the START program.
15         Is that data tracked outside of the
16  START program as well?
17     A.   Yes, there are efforts to do that.
18     Q.   What do you mean, "There are
19  efforts to do that"?
20     A.   I mean, it is important for us to
21  try to get a handle of, you know, which drugs
22  can be considered most dangerous to the
23  families and children that we serve.  So we try
24  to track that as best we can.
25         Sometimes it's difficult.

Page 91

1  Sometimes there is more drugs than just one
2  drug, you know, so -- but there is -- but there
3  is a means of us, of the staff -- again, it is
4  only as good as the data that is input of them
5  entering, and I think it just really captures
6  that substance abuse was a factor, when we try
7  to enter it in the system so...
8     Q.   Can you tell me about that tracking
9  process more specifically?
10     A.   That process started -- I was kind
11  of a worker pre all this electronic data stuff
12  and, I mean, we used to handwrite our notes,
13  but, you know, so there is a -- there is
14  just -- I mean, a lot of things are kept for
15  data purposes.
16         So we just want to try to see what
17  percentage of cases really have substance abuse
18  as an involvement, and that's basically the
19  whole premise of that one tab in the system.
20     Q.   When you say, "One tab in the
21  system," what are you talking about?
22     A.   So basically you would click, is
23  substance abuse a factor, yes or no,
24  essentially.  The real meat of the substance
25  abuse use and what drugs would be actually

Page 92

1  found in the worker's dictation.
2     Q.   So the system that you are talking
3  about clicking on a tab, what is that called?
4     A.   It is called SACWIS, State
5  Automated Welfare Information System.
6     Q.   Can you spell out the acronym --
7     A.   Yes.
8     Q.   -- for the reporter?
9     A.   S-A-C-W-I-S.
10     Q.   If I refer to that as -- is it
11  SACWIS?
12     A.   Yes.
13     Q.   You will know what I'm referring
14  to?
15     A.   Yes.
16     Q.   So the SACWIS program, that's a
17  state automated program; is that right?
18     A.   Yes.
19     Q.   When did that first start being
20  used by your department?
21     A.   Approximately 2008, but I don't
22  know the specific date.  So the year, I think,
23  was 2008.
24     Q.   So thinking of it in terms of what
25  you were doing at the time, this is before you

Page 93

1  took over as senior manager of the START
2  program, correct?
3     A.   Right.  Yeah.
4     Q.   Prior to the electronic database
5  being adopted, how were -- how were you and
6  your department keeping track of records?
7     A.   Prior to any electronic system or
8  SACWIS?
9     Q.   Is there an electronic system that
10  predated SACWIS?
11     A.   Yeah.
12     Q.   What was that?
13     A.   That was called FACTS, F-A-C-T-S.
14  And I don't know what the initials -- I can't
15  remember what those initials stand for.
16     Q.   Do you know when the FACTS system
17  was used?
18     A.   I don't know when it -- what the
19  inception of it was, but I know that it
20  overlapped a little bit with SACWIS, obviously,
21  until we can get everything up and running.  So
22  there is still some archival data there, but it
23  is not in use anymore.
24     Q.   And you don't know when that first
25  began to be used?

24 (Pages 90 - 93)

1  intricacies of it.
2      Q.   Do you use the SACWIS system
3  currently in your role and responsibilities as
4  social program administrator 5?
5      A.   Yes.
6      Q.   And in your role as social program
7  administrator 5, to your knowledge, is there
8  any other tab or aspect of the system that you
9  use that involves substance abuse?
10      A.   No.
11      Q.   Is there any way in the SACWIS
12  system to track what type of substance is being
13  abused?
14      A.   Not as like a drop-down or
15  something like that.  That would have to be
16  mined out to the activity logs, or the case
17  notes, as you say.
18      Q.   So if you wanted to understand what
19  substance was at issue for any given case, you
20  would look to the activity logs or the case
21  notes for the particular case, correct?
22      A.   Amongst other, yeah.  That would be
23  the first place, yes.
24      Q.   When you say "amongst other"
25  things --

1      A.   Well, I mean, so we do have -- so
2  we have what's called the reading file, where
3  documents can be scanned into the system.
4          So if, on any case, if, you know,
5  if somebody got a DUI or arrested for DUI or
6  something, charges or something might be
7  scanned into the system.  So there is an
8  electronic place to store, you know, certain
9  documents.
10      Q.   Okay.  To your knowledge, is there
11  any -- are there any reports that you have run on
12  the SACWIS system that relate specifically to
13  substance abuse?
14      A.   I don't know.
15      Q.   Are there any reports that you have
16  run in your role as social program
17  administrator 5 and administrator of social
18  services that involve substance abuse?
19      A.   No.
20      Q.   Are there any particular programs
21  that you have supervised, in your role as
22  social program administrator, that specifically
23  relate to substance abuse?
24          MR. BADALA:  Objection to form.
25      A.   Again, any day I could be dealing

1  with a case that substance abuse is a
2  contributing factor to what's going on with the
3  family and the children so...
4      Q.   Other than the START program, there
5  is no other programs, under Children and Family
6  Services, that specifically address a family or
7  individual's substance abuse; is that fair?
8          MR. BADALA:  Objection to form.
9      A.   That's fair.
10      Q.   I assume in your various roles with
11  Children and Family Services, you have been
12  evaluated over time?
13      A.   Yes.
14      Q.   Have you ever had a poor
15  evaluation?
16      A.   No.
17      Q.   Do you evaluate others?
18      A.   Yes.
19      Q.   Who currently reports to you, as
20  administrator of social services?
21      A.   Specific names?
22      Q.   And titles, please.
23      A.   Joseph Jackson, senior manager;
24  Christopher Malcolm, M-A-L-C-O-L-M, senior
25  manager; Mary Mitchell, senior manager; Earvin

1  Thomas, E-A-R-V-I-N, senior manager; Lara
2  Parks, L-A-R-A, senior manager; and David Gray,
3  senior manager.
4          I also have a social program
5  administrator 2 that reports to me, Maureen
6  Draye, D-R-A-Y-E, and, of course, my assistant
7  reports to me, if want her name.  Do you want
8  her name?
9      Q.   That's okay.
10          So you said that there is a social
11  program administrator 2, as well?
12      A.   Yes.
13      Q.   Are there any other levels of
14  social program administrator that we haven't
15  already talked about?
16      A.   I don't know.
17      Q.   Is there a 1?
18      A.   I don't know.  Probably, but I
19  don't know for sure.
20      Q.   Do you know how many people are
21  employed with Children and Family Services?
22      A.   Not to the -- not to the single
23  digit, no.
24      Q.   Do you have an approximation?
25      A.   It's over 800.

26 (Pages 98 - 101)

Page 246

1 crisis has to do with opioids, opiate abuse,
2 heroin abuse.
3         What is important for me is I'm
4 here dealing with the devastation, putting out
5 the fires, making sure kids are safe.
6 Ancillary, if I have time to start tracking
7 things and stuff, I'll do that.  But my job is
8 to keep kids safe first and foremost.  If I
9 have the luxury of tracking every little thing
10 and dotting every I, I know that's important,
11 but that's not my focus.
12         My focus is asking people what got
13 you to the point you are at now and what can I
14 do to fix it to keep little Johnny safe so...
15     Q.    And not even getting into the
16 nitty-gritty or the specifics, as you put it,
17 but with regard to tracking substance use and
18 whether it was prescription opioids versus
19 heroin or any other type of drug, that wasn't
20 something that the department kept track of,
21 throughout the time that you have been in the
22 department, correct?
23         MR. BADALA:  Objection to form.
24     A.    I mean, all I can say is in the 25
25 years I have been working with families and

Page 247

1 with substance abusers, it's not common that
2 someone picks up heroin and says, "One day I'm
3 going to smoke or use heroin," however they use
4 it.  Usually it is a progressive thing, and it
5 starts out, and most of the time what we see it
6 start out with is prescription pills.
7     Q.    And again, I'm asking you what
8 information can I look to to verify that
9 account that you are giving me?  Is there any
10 information that I can look to to verify that
11 account?
12         MR. BADALA:  Objection to form.
13     A.    I don't know.
14         MS. HIBBERT:  Let's take a break.
15         THE VIDEOGRAPHER:  Off the record,
16 2:34.
17         (Recess taken.)
18         THE VIDEOGRAPHER:  On the record,
19 2:46.
20     Q.    Okay.  Mr. Cabot, we left off, we
21 were talking a little bit about Exhibit Number
22 8. Can you put that back in front of you.
23     A.    Sure.
24     Q.    I have a couple more questions
25 about that.

Page 248

1         We talked about the 2014
2 statistical reports, and then it also states
3 there in that paragraph under the Department
4 News, she, your secretary, will be tracking
5 this data for the past three calendar years.
6 Do you know what that means?
7     A.    What I was trying to, I think, say
8 there, assuming that this is exactly what I
9 wrote, is that I was going to have my secretary
10 go back three years to track the drug-of-choice
11 data.
12     Q.    Because it says there right under
13 Department News, "Since January 1, 2014, we
14 have been keeping data on specific types of
15 drugs involved with each of our cases,"
16 correct?
17     A.    Yes.
18     Q.    So that was a new process that
19 started the beginning of 2014, tracking the
20 drug-of-choice data; is that right?
21         MR. BADALA:  Objection to form.
22     A.    It wasn't new.  I mean, I don't
23 know, to be honest with you.  I just know that
24 in January of 2014, I started tracking it
25 specifically.

Page 249

1     Q.    That was new to your practice, as
2 manager of the START program, as of January
3 2014, to track the types of drugs involved with
4 each of your cases, correct?
5     A.    I don't know.  Because what I was
6 trying to get at here, like I said earlier, was
7 the increase in the heroin and opiates, not
8 just all drugs.
9         So I don't know.  I can't answer
10 that, I didn't track some type of drug use
11 previous to that.  All I know is that what I
12 was interested in showing is over the three
13 years, the increase in that specific drug use.
14     Q.    And were you able to track, over
15 the last three years, the increase in that
16 specific drug use?
17     A.    I don't know.  I can't recall.
18     Q.    If you had tracked the increase of
19 these -- the specific drug use over the last
20 three years from 2014, would you have kept that
21 information anywhere?
22         MR. BADALA:  Objection to form.
23     A.    I don't know.
24     Q.    You state next, in the next
25 sentence, "We will also be graphically

63 (Pages 246 - 249)

Page 346

```
1           REPORTER'S CERTIFICATE
2   The State of Ohio,  )
3                SS:
4   County of Cuyahoga.  )
5
6           I, Wendy L. Klauss, a Notary Public
7   within and for the State of Ohio, duly
8   commissioned and qualified, do hereby certify
9   that the within named witness, CHRISTOPHER
10  CABOT, was by me first duly sworn to testify
11  the truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25
```

Page 347

```
1           I do further certify that I am not
2   a relative, counsel or attorney for either
3   party, or otherwise interested in the event of
4   this action.
5           IN WITNESS WHEREOF, I have hereunto
6   set my hand and affixed my seal of office at
7   Cleveland, Ohio, on this 7th day of
8   October, 2018.
9
10
11
12
13      Wendy L. Klauss
14      Wendy L. Klauss, Notary Public
15      within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25
```

Page 348

```
1                   Veritext Legal Solutions
                        1100 Superior Ave
2                          Suite 1820
                        Cleveland, Ohio 44114
3                       Phone: 216-523-1313
4
    November 7, 2018
5
    To: SALVATORE C  BADALA
6
    Case Name: In Re: National Prescription Opiate Litigation v
7
    Veritext Reference Number: 3073631
8
    Witness:  Christopher Cabot      Deposition Date:  11/2/2018
9
10  Dear Sir/Madam:
11
    The deposition transcript taken in the above-referenced
12
    matter, with the reading and signing having not been
13
    expressly waived, has been completed and is available
14
    for review and signature   Please call our office to
15
    make arrangements for a convenient location to
16
    accomplish this or if you prefer a certified transcript
17
    can be purchased
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived
22
23  Sincerely,
24  Production Department
25
    NO NOTARY REQUIRED IN CA
```

Page 349

```
1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 3073631
3   CASE NAME: In Re: National Prescription Opiate Litigation v
    DATE OF DEPOSITION: 11/2/2018
4   WITNESS' NAME: Christopher Cabot
5       In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me
7       I have made no changes to the testimony
    as transcribed by the court reporter
8
9   Date              Christopher Cabot
10      Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____
17
18      Notary Public
19
        Commission Expiration Date
20
21
22
23
24
25
```

88 (Pages 346 - 349)

# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

                ~~~~~~~~~~~~~~~~~~~~

5

6      IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
       OPIATE LITIGATION

7                                   Case No. 17-md-2804

8                                   Judge Dan Aaron
       This document relates to:      Polster

9

       The County of Cuyahoga v. Purdue

10     Pharma L.P., et al.
       Case No. 18-OP-45090

11

12                ~~~~~~~~~~~~~~~~~~~~

13             Videotaped deposition of
                CYNTHIA G. WEISKITTEL

14

15               November 13, 2018

16                   8:59 a.m.

17

18

19                   Taken at:

20          Climaco, Wilcox, Peca & Garofoli

21           55 Public Square, Suite 1950

22                 Cleveland, Ohio

23

24

25          Renee L. Pellegrino, RPR, CLR

Page 2

```
1  APPEARANCES:
2  On behalf of Cuyahoga County:
      Napoli Shkolnik PLLC
3     JOSEPH L  CIACCIO, ESQ
      360 Lexington Avenue
4     New York, New York  10017
      (844) 230-7676
5     jciaccio@napolilaw com
        - and -
6     Napoli Shkolnik PLLC
      MARIA FLEMING, ESQ
7     55 Public Square, Suite 2100
      Cleveland, Ohio  44113
8     (844) 230-7676
      mfleming@@napolilaw com
9       - and -
      Plevin & Gallucci
10    FRANK GALLUCCI, ESQ
      55 Public Square
11    Suite 2222
      Cleveland, Ohio  44113-1901
12    (216) 861-0804
      fgallucci@pglawyer com
13
      On behalf of Walmart, Inc :
14    Jones Day
      SHIRLETHIA V  FRANKLIN, ESQ
15    51 Louisiana Avenue, N W
      Washington, D C  20001-2113
16    (202) 879-3939
      sfranklin@jonesday com
17
18              ~ ~ ~ ~ ~
19
20
21
22
23
24
25
```

Page 3

```
1  APPEARANCES, CONT'D:
2  On behalf of Prescription Supply, Inc :
      (Via Telephone)
3     Pelini, Campbell & Williams
      PAUL B  RICARD, ESQ
4     Bretton Commons, Suite 400
      8040 Cleveland Avenue NW
5     North Canton, Ohio  44720
      (330) 305-6400
6     pbricard@pelini-law com
7  On behalf of AmerisourceBergen Drug Corporation:
      Reed Smith LLP
8     ERIC L  ALEXANDER, ESQ
      LINDSAY A  DeFRANCESCO, ESQ
9     1301 K Street, N W
      Suite 1000 - East Tower
10    Washington, D C  20005
      (202) 414-9200
11    ealexander@reedsmith com
      ldefrancesco@reedsmith com
12
      On behalf of Cardinal Health:
13    Williams & Connolly
      WILL HAWKINS, ESQ
14    725 Twelfth Street, N W
      Washington, D C  20005
15    (202) 434-5421
      whawkins@wc com
16
      On behalf of McKesson Drug Corporation:
17    Covington & Burling LLP
      JOHN W  ZIPP, ESQ
18    One CityCenter
      850 Tenth Street, NW
19    Washington, D C  20001-4956
      (202) 662-2000
20    jzipp@cov com
21              ~ ~ ~ ~ ~
22
23
24
25
```

Page 4

```
1  APPEARANCES, CONT'D:
2  On behalf of Teva Pharmaceuticals:
      (Via Telephone)
3     Morgan, Lewis & Bockius LLP
      VINEETA PRAKASH KAMATH, ESQ.
4     1111 Pennsylvania Avenue NW
      Washington, D.C.  20004-2541
5     (202) 739-5320
      vineeta.kamath@morganlewis.com
6
      On behalf of Insys Therapeutics, Incorporated:
7     Holland & Knight
      NICHOLAS A.F. SAROKHANIAN, ESQ.
8     200 Crescent Court, Suite 1600
      Dallas, Texas  75201
9     (214) 964-9496
      nicholas.sarokhanian@hklaw.com
10
11  ALSO PRESENT:  Joe VanDetta, Videographer
12
              ~ ~ ~ ~ ~
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1              TRANSCRIPT INDEX
2
```

```
3  APPEARANCES ....................................2
4  INDEX OF EXHIBITS ..............................6
5  INDEX OF OBJECTIONS ...........................9
6
7  EXAMINATION OF CYNTHIA G. WEISKITTEL:
8  BY MR. ALEXANDER .............................14
9
10 AFTERNOON SESSION ...........................207
11
12 REPORTER'S CERTIFICATE ......................431
13
14 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 54

1 information that's specific to clients and their
2 drug use and the impact of drug use in that
3 particular situation would be recorded, correct?
4    A.    Yes.
5    Q.    And what you're testifying to is
6 that there's been no analysis or no
7 documentation beyond individual case files that
8 looks at this issue of people transitioning from
9 a prescription opioid that is taken pursuant to
10 a prescription written for them to people who
11 over time are taking heroin and other street
12 drugs obtained illegally, correct?
13        MR. GALLUCCI:  Object to form.
14    A.    There is work going on to enter
15 information into our SACWIS system so that we
16 could produce those reports, so there is work
17 being done to do that.
18    Q.    Did you give some direction to start
19 entering that into SACWIS or has that always
20 been going on?
21    A.    The entering of information into
22 SACWIS is -- some of it is mandatory and some of
23 it is optional.  Some of the drug screens in
24 previous years were optional.  They are now
25 required.

Page 55

1    Q.    And when did the drug screen
2 information become mandatory for SACWIS?
3    A.    I'm not completely sure.
4    Q.    And just for the record, what does
5 SACWIS stand for?
6    A.    State Automated Child Welfare
7 Information System.
8    Q.    That's one of the databases that
9 your DCFS -- your group uses as part of its
10 memorialization of information on individual
11 cases for various types of tracking purposes?
12    A.    We are required by the state to
13 enter the information about families into the
14 SACWIS system.
15    Q.    Are there other databases that you
16 use besides SACWIS?
17    A.    Yes.
18    Q.    What else?
19    A.    So we have a START database,
20 which -- and we also have other databases as far
21 as we use a team decision-making process, so
22 there is a database and reports associated with
23 that that could obtain information about drug
24 use.
25    Q.    Anything else?

Page 56

1    A.    Not that I can think of
2 specifically.
3    Q.    So within a case file are there
4 specific categories of documents or names of the
5 documents that should be within each case file?
6    A.    There are different sections of a
7 file.
8    Q.    So are there something like case
9 notes?  Is that a section of a file?
10    A.    Yes.
11    Q.    What about activity logs?
12    A.    Activity logs are case notes.
13    Q.    And are those always maintained
14 within a case file?
15    A.    The expectation is yes.
16    Q.    What about the case files; do you
17 have some sort of retention policy for how long
18 you keep case files?
19    A.    The historic society dictates the
20 collection of the information and how long it is
21 stored for.
22    Q.    Do you know how long that is?
23    A.    I am not completely sure, but I
24 believe all of our records back to -- go back
25 decades.

Page 57

1    Q.    Oh, okay.  So if we wanted to look
2 at case files from ten years ago to see, even if
3 it wasn't back then automatically tracked into
4 SACWIS or some other database, to look at like
5 opioid use versus meth use versus cocaine use
6 versus whatever use in individual cases from ten
7 years ago, those case files should still be
8 available?
9        MR. GALLUCCI:  Object to form.
10    A.    Yes.
11    Q.    And for, like, ten years ago, were
12 there reports being generated back then that
13 looked at the impact of the various types of
14 drug use?
15        MR. GALLUCCI:  Object to form.
16    A.    There are in our history much better
17 reports out of the START department that do talk
18 about drug use.  There are still reports that
19 are produced as far as babies born positive tox,
20 the percentage, the number of kids it's
21 happening for, number of families we remove due
22 to drugs.
23    Q.    So for START, that goes back to
24 1997; is that correct?
25    A.    Correct.

15 (Pages 54 - 57)

Page 178

1    A.   Um-hum.
2    Q.   And it's to a number of people,
3 including you, as the last person copied.
4        Do you see that?
5    A.   Yes.
6    Q.   And who is Ms. Piccola?
7    A.   Trista was hired as the person who
8 managed our data, and then she became a deputy
9 director and she left the agency in 2017.
10   Q.   And did you have something to do
11 with her leaving the agency in 2017?  Was that
12 after you took over?
13   A.   No.  That had nothing to do with me.
14   Q.   When you said she managed your data,
15 what do you mean?
16   A.   She was initially hired to run the
17 performance evaluation team, and then under Pat
18 Rideout, she became a deputy director, so we
19 were peers as deputies and then I became
20 director.
21   Q.   So was she responsible for
22 performing analyses that might be useful in
23 increasing the overall performance of the
24 division?
25   A.   Yes, her and her staff.

Page 179

1    Q.   And over time did some of that
2 relate to the impact of drug abuse and use
3 trends of different drugs within your client
4 population?
5    A.   I don't have a specific memory.
6    Q.   So what it says in this first --
7 well, let's just walk through it.
8        So this is sent April 17th, 2014,
9 correct?
10   A.   Yes.
11   Q.   And the subject is "Please read and
12 review with your staff."  So without running
13 through every name, it was sent to a variety of
14 people who have oversight over people who might
15 ultimately be doing some sort of data entry into
16 a database?
17   A.   The people listed are senior
18 managers, and yes.
19   Q.   And the subject is "Please read and
20 review with your staff," so that these people
21 are all -- all the recipients are people who had
22 staff, correct?
23   A.   Yes.
24   Q.   And it says, "Per our discussion,
25 attached is the memo and set of instructions

Page 180

1 requiring staff to enter drug of choice on all
2 open cases for parents, caregivers and youth
3 beginning next week.  We will send this to
4 supervisors as well.  You need to ensure all
5 your staff," which is underlined, "are aware of
6 this requirement.  Let us know if you have any
7 questions."
8        Did I read that right?
9    A.   Yes.
10   Q.   So it starts off by saying, "Per our
11 discussions."  Do you remember any discussion
12 before this about the issue of tracking drug of
13 choice?
14   A.   I don't remember a specific
15 discussion.
16   Q.   Do you know what "drug of choice"
17 refers to here, where this is being entered, why
18 this is being tracked?
19   A.   I believe it's being tracked so that
20 we can pull this data out of SACWIS.
21   Q.   So is this talking about entering
22 data into SACWIS?
23   A.   The actual memo is.
24   Q.   And why was it important to start
25 tracking drug of choice in 2014?

Page 181

1    A.   Well, as the memo says,
2 heroin-related deaths had increased.  In
3 response to the epidemic, Cuyahoga County had
4 created this community-wide effort, and it was
5 an attempt to provide our data to the effort.
6    Q.   That's where you are in the attached
7 memo, correct?  You've just been reading from
8 the attached memo?
9    A.   Yes.
10   Q.   Did you have anything to do with
11 this attached memo?
12   A.   As far as writing it?
13   Q.   Yes.
14   A.   It comes from all the deputy
15 administrators, so I would have been included in
16 that group.  I do not believe I wrote it.
17   Q.   Do you recall any discussions about
18 generating this memo or this issue of making
19 sure the drug of choice was going to be entered
20 from now on?
21   A.   I don't remember specific
22 conversations.
23   Q.   From your perspective, what is drug
24 of choice in the SACWIS database?  What does
25 that refer to?

46 (Pages 178 - 181)

Page 182

1    A.   The drug that the parents state that
2 they choose to use.
3    Q.   So can somebody have more than one
4 drug of choice?
5    A.   Sure.
6    Q.   And does it suggest any sort of
7 priority if a person takes, you know, ten
8 different drugs, they would all be a drug of
9 choice?
10    A.   I don't know the specifics of
11 SACWIS.
12    Q.   Do you know what the practice was
13 before April of 2014 in terms of entering drug
14 of choice into SACWIS by anybody at Cuyahoga
15 County?
16    A.   I don't remember.
17    Q.   Do you know what the practice was
18 elsewhere in the state?
19    A.   I do not.
20    Q.   And was kind of the issue here that
21 they needed to capture drug of choice better
22 going forward because there would be increased
23 scrutiny or analysis of any data about drug
24 usage?
25       MR. CIACCIO:  Object to form.

Page 183

1    A.   I think the memo was written so we
2 would have a better -- we would have better data
3 available about the drugs that our families were
4 using.
5       THE VIDEOGRAPHER:  Could we go off
6 the record for one second?
7       MR. ALEXANDER:  Yes.
8       THE VIDEOGRAPHER:  Off the record,
9 12:10.
10       (Short recess had.)
11       THE VIDEOGRAPHER:  On the record,
12 12:12.
13 BY MR. ALEXANDER:
14    Q.   Hopefully the listening recording
15 stuff is going to work now.  Let me go back to
16 where we were.
17       This memo that's on the second page
18 of Exhibit 2 is from deputy administrators,
19 which at that time would have included you,
20 correct?
21    A.   Yes.
22    Q.   The first sentence says, "Cuyahoga
23 County is in the midst of a public health
24 crisis."  The second one says, "Heroin-related
25 deaths have increased dramatically in the last

Page 184

1 five years, from 64 deaths in 2009 to 195 deaths
2 in 2013."
3       Did I read that right?
4    A.   Yes.
5    Q.   Was it your awareness at the time
6 that there was a public health crisis related to
7 heroin?
8    A.   I don't remember.
9    Q.   I mean, you're signing your name to
10 a document that said that, right?
11    A.   You're asking me about a document
12 that's four years old and what do I remember
13 from then.
14    Q.   Do you not remember much of what was
15 going on four years ago in terms of the
16 functioning of the department and its awareness
17 of and response to a heroin epidemic?
18       MR. CIACCIO:  Objection to form.
19    A.   No.  What I'm saying is a lot goes
20 on in the department, and for me to remember
21 every memo that's issued is pretty unlikely.
22    Q.   It was just not a big deal that you
23 were going to start having staff enter drug of
24 choice in SACWIS?
25    A.   No.  It was a big deal.  I just

Page 185

1 don't remember the specifics of the memo.
2    Q.   Do you remember an awareness that at
3 this time there was a heroin epidemic going on
4 in Cuyahoga County that was the subject of
5 discussion between you and other deputy
6 administrators?
7    A.   I don't remember specific
8 conversations.
9    Q.   Do you remember that in general,
10 that there was an awareness of a heroin epidemic
11 in April of 2014 in Cuyahoga County?
12    A.   I'm not sure.
13    Q.   The memo from you and the other
14 deputy administrators continues, "In response to
15 this epidemic, Cuyahoga County has created a
16 heroin initiative," both capitalized, "a
17 community-wide effort working to provide
18 education, prevention, treatment and
19 interdiction to the individuals and families
20 whose lives have been affected by heroin."
21       Do you remember a heroin initiative?
22    A.   Not the specifics.
23    Q.   "As child welfare professionals,
24 however, we know that heroin is only one of many
25 drugs that can cause devastation and hardships

47 (Pages 182 - 185)

Page 274

1  when you have behavioral needs that need to be
2  addressed.  It's a higher level of care.  It's a
3  kid with acting out behaviors.
4        Q.    So this number -- this estimate for
5  Ohio cost for caregivers' serious substance
6  abuse, have you ever seen an estimate like that
7  specific to Cuyahoga County?
8        A.    I have not.
9        Q.    And have you ever seen an estimate
10  specific to Cuyahoga County for prescription
11  opioids, whether used by somebody who had a
12  prescription or used illegally?
13        A.    I have not.
14        Q.    For any time period?
15        A.    I have not.
16              MR. ALEXANDER:  I don't know how
17  long we've been going, but are you okay to do at
18  least one more?
19              THE WITNESS:  I don't know.  How
20  many more of these documents you got?
21              MR. CIACCIO:  We're a little bit
22  over an hour.  If you want to do one more.
23              MR. ALEXANDER:  Yeah, I'll do one
24  more.
25              MR. CIACCIO:  Okay.  We'll do one

Page 275

1  more and then we'll take a break.
2              THE WITNESS:  Sure.
3              -  -  -  -  -
4              (Thereupon, Deposition Exhibit 11,
5              E-Mail from Cynthia Weiskittel to
6              Various Recipients, dated July 7,
7              2016, with Attachment, Beginning
8              ████████████████████████, was
9              marked for purposes of
10              identification.)
11              -  -  -  -  -
12        Q.    Exhibit 11 is an e-mail that
13  forwards another e-mail with some data in it,
14  and these have the ████████████████████████
15  ███████ and it looks like you're a recipient
16  on both the cover e-mail and the forwarded
17  e-mail.  I'm going to ask you about the one that
18  was forwarded from July 6, 2016, okay?
19        A.    Yes.
20        Q.    And this is an e-mail forwarded to
21  you by -- or sent to you by Mary Wachtel of the
22  Public Children Service Association of Ohio.
23              Do you see that?
24        A.    Yes.
25        Q.    And it says, "Updated based on

Page 276

1  reports now available for caseworker blitz."
2              Do you see that?
3        A.    Yes.
4        Q.    And I asked you before about
5  caseworker blitz.  You said the name didn't ring
6  any bells to you?
7        A.    Yes.
8        Q.    Does it ring any bells now?
9        A.    Yes.
10        Q.    What was the caseworker blitz?
11        A.    So it was an attempt by the -- the
12  state to have all of the information around
13  drugs updated in the system so we could get
14  better baselines.
15        Q.    And so what was PCSAO having to do
16  with this sort of data entry project?
17        A.    My suspect is they were trying to
18  use the data to make an argument to the state
19  for funding.
20        Q.    And the data -- this is SACWIS data?
21        A.    Yes.  It's data they're pulling out
22  of the system, yes.
23        Q.    When you say "system," you mean
24  SACWIS?
25        A.    Yes.

Page 277

1        Q.    So the categories here are called
2  "Baseline Report," "Mid-Blitz Report" and
3  "Second Mid-Blitz Report."  Do you know what
4  they're talking about in terms of these basic
5  data points?
6        A.    What I can remember is we were given
7  the baselines and then given opportunities,
8  dates by which updates should be made, and then
9  the reports were run again, so I believe that's
10  what the mid-blitz and the second mid-blitz
11  report refer to.
12        Q.    Was the purpose to try to increase
13  the information in SACWIS that tracked what drug
14  specifically was being used by patients where
15  there was drug data, kind of like we saw back in
16  2014, when there was a mandatory -- a shift to
17  making it mandatory to enter drug of choice?
18        A.    I think that the attempt here was to
19  do what it suggests, is for us to update the
20  information as it related to opiates and then
21  the exposure, whether it was prenatal or not.
22  And, again, it was an attempt to get a better
23  overall view of what was going on in the state.
24        Q.    So it was focused on increasing the
25  information in SACWIS specific to opiates?

70 (Pages 274 - 277)

Page 278

1    A.   Correct.
2    Q.   How could you add new data specific
3  to opiates if the data had already been entered
4  on a case?
5    A.   I think what it's suggesting is
6  people needed to go back to make sure all of
7  their data that was to be entered was being
8  entered.  There also could be children born
9  after '14, a new baby into a home who was drug
10  addicted and a mother had in -- prior had that
11  addiction, and so you would want to accurately
12  record that.
13    Q.   So why would there need to be a
14  blitz if there was a requirement to enter all
15  information entered accurately already?
16    A.   The requirement -- the blitz was for
17  the entire state.  The requirement was for DCFS
18  Cuyahoga County.
19    Q.   Okay.  So for Cuyahoga County did
20  this blitz change anything for you guys?
21    A.   Did the blitz change anything for
22  us?  Well, if you read my e-mail, I clearly feel
23  that the numbers given do not represent our
24  numbers and I have asked my staff to do some
25  oversight and monitoring and to ensure that the

Page 279

1  information requested is entered.
2    Q.   Do you know what the results were
3  once you guys entered your data?
4    A.   I don't.
5    Q.   Go back to page 2 then for a second,
6  just in terms of these estimates.  I want to
7  make sure we're reading this correctly.
8       So adults in the system with opiate
9  and heroin characteristics -- opiate or heroin
10  characteristics went from less than half a
11  percent to about 5 percent.
12       Am I reading that correct?
13    A.   Yes.
14    Q.   And the children under the age of 3
15  with exposure went from 3 percent to 5.8 percent
16  roughly?
17    A.   Yes.
18    Q.   And do you know why it was that
19  these numbers went up?
20    A.   Because I think staff weren't
21  entering all the information they were expected
22  to, and when they cleaned up their data, that's
23  why the numbers went up.
24    Q.   But why would it be that entering
25  more data would lead to the percentage of heroin

Page 280

1  or opioid, or for the second one it says opiates
2  would go up?
3    A.   I don't understand your question.
4    Q.   I mean, if a quarter of the data is
5  entered and then three-quarters of the data is
6  entered, it shouldn't change the percentage that
7  involved heroin unless there's something about
8  the data that wasn't entered before that makes
9  it be more likely to have heroin information in
10  it, correct?
11       MR. CIACCIO:  Objection to form.
12    Q.   That's how the math works.
13    A.   I understand that.  I can't explain
14  to you why it would change the percentages.
15    Q.   Was the expectation that the more
16  data that got entered, the percentages of heroin
17  or opiate involvement would rise?
18    A.   I don't think there was any
19  presumption at first, other than we wanted to
20  make sure the data was accurate.
21    Q.   Then what was the purpose of your
22  e-mail to your staff telling them that you
23  thought the data entered thus far didn't reflect
24  your numbers?
25    A.   Because that's what I thought.

Page 281

1    Q.   You thought that your percentages
2  would be higher, lower, different, what?
3    A.   I would believe -- I would believe
4  that -- my assumption is that the number in
5  percentages would have been higher.
6    Q.   Have you ever seen any data that
7  indicated the percentage of adult case
8  participants with opiate or heroin use was more
9  than 4.95 percent?
10    A.   Specific data, I don't know.
11    Q.   What about the percentage of
12  children with exposure to opiates; have you ever
13  seen anything indicating it was more than 5.79
14  percent?
15    A.   I don't know.
16    Q.   Did you have any ability to testify
17  with specificity and certainty that the
18  number -- the percentage of adults in your
19  system had more than 5 percent usage of opiates
20  or heroin?
21    A.   I don't know.
22    Q.   What about to say that it was more
23  than 5.79 percent for children?
24    A.   Again, I don't know.
25       MR. ALEXANDER:  Ready for a break or

71 (Pages 278 - 281)

Page 430

1  Whereupon, counsel was requested to give
2  instruction regarding the witness' review of
3  the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6  Transcript review was requested pursuant to
7  the applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10  Counsel was requested to give instruction
11  regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 431

1          REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3                     ) SS:
4  County of Cuyahoga.  )
5
6      I, Renee L. Pellegrino, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, CYNTHIA G.
10  WEISKITTEL, was by me first duly sworn to testify
11  the truth, the whole truth and nothing but the truth
12  in the cause aforesaid; that the testimony then
13  given by the above referenced witness was by me
14  reduced to stenotypy in the presence of said
15  witness; afterwards transcribed, and that the
16  foregoing is a true and correct transcription of the
17  testimony so given by the above referenced witness.
18      I do further certify that this
19  deposition was taken at the time and place in the
20  foregoing caption specified and was completed
21  without adjournment.
22
23
24
25

Page 432

1      I do further certify that I am not a
2  relative, counsel or attorney for either party,
3  or otherwise interested in the event of this
4  action.
5      IN WITNESS WHEREOF, I have hereunto set
6  my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 16th day of November, 2018.
8
9
10
11
12
13  Renee L. Pellegrino, Notary Public
14  within and for the State of Ohio
15
16  My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25

Page 433

1          Veritext Legal Solutions
                1100 Superior Ave
2                  Suite 1820
              Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
5  November 16, 2018
6  To: Napoli Shkolnik PLLC
7  Case Name: In Re: National Prescription Opiate Litigation v
8  Veritext Reference Number: 3112776
9  Witness:  Cynthia G  Weiskittel      Deposition Date:  11/13/2018
10  Dear Sir/Madam:
11  The deposition transcript taken in the above-referenced
12  matter, with the reading and signing having not been
13  expressly waived, has been completed and is available
14  for review and signature   Please call our office to
15  make arrangements for a convenient location to
16  accomplish this or if you prefer a certified transcript
17  can be purchased
18
19  If the errata is not returned within thirty days of your
20  receipt of this letter, the reading and signing will be
21  deemed waived
22
23  Sincerely,
24  Production Department
25      NO NOTARY REQUIRED IN CA

109 (Pages 430 - 433)

# EXHIBIT 3

CONFIDENTIAL

CUYAH_002453543



Cuyahoga County Department of Children and Family Services
3955 Euclid Avenue, Cleveland, Ohio 44115
(216) 431-4500
24-Hour Children's Hotline (216) 696-KIDS (696-5437)
Ohio Relay Service (TTY) 711

## MEMORANDUM

CUYAH_002453544

# Recording Drug of Choice

CONFIDENTIAL

CUYAH_002453545

CONFIDENTIAL

CUYAH_002453546

CONFIDENTIAL

CUYAH_002453547

# EXHIBIT 4

CONFIDENTIAL

CUYAH_002450606

CONFIDENTIAL

CUYAH_002450607

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**THE COUNTY OF CUYAHOGA,**

      **Plaintiff,**

**v.**

**PURDUE PHARMA L.P.; PURDUE PHARMA INC.; THE PURDUE FREDERICK COMPANY, INC.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; ENDO PHARMACEUTICALS INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC.; ENDO HEALTH SOLUTIONS INC.; INSYS THERAPEUTICS, INC.; MCKESSON CORPORATION; CARDINAL HEALTH, INC.; AMERISOURCEBERGEN CORPORATION; RUSSELL PORTENOY; PERRY FINE; SCOTT FISHMAN; and LYNN WEBSTER,**

      **Defendants.**

**Case No. 1:17-cv-2484**
**Judge Dan Aaron Polster**

**DISTRIBUTOR DEFENDANTS' FIRST SET OF**
**REQUESTS FOR PRODUCTION TO PLAINTIFF**

      Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure as well as the Case

Management Order in *In re National Prescription Opiate Litigation* (Dkt. No. 232 in No. 1:17-

cv-2804), Distributor Defendants[1] hereby request that Plaintiff respond to the following Requests

---

[1]  The  Distributor  Defendants  are  AmerisourceBergen  Drug  Corporation  (incorrectly  referred  to  as

for Production ("Requests") in accordance with its obligations under the Federal Rules of Civil Procedure.  Responses to the Requests shall be provided in the manner required by Rule 34(b)(2), the Local Rules of the Northern District of Ohio, this Court's Case Management Order One entered on April 11, 2018, Doc. No. 232, and any other applicable law or rules, within thirty (30) days of the service of these Requests.

If Plaintiff finds any term or other aspect of the Requests vague, ambiguous, or otherwise objectionable and intends to so object, counsel for the Distributor Defendants offer to promptly meet with counsel for Plaintiff to endeavor to resolve any issues.

## DEFINITIONS

1.     "Prescription Opioid(s)" refers to FDA-approved pain-reducing medications consisting of natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in a person's brain or body to produce an analgesic effect, including, but not limited to, the Prescription Opioids referenced in the Complaint for the wholesale distribution of which Plaintiff seeks to hold any Distributor Defendant liable.

2.     "Plaintiff" means the individual plaintiff named in this action, including its executive and legislative branches, agencies, offices, departments, divisions, commissions, agents, employees, boards, instrumentalities, vendors, administrators, and other persons or entities acting on its behalf or controlled by it.  When the pronouns "You" or "Your" are used, their antecedent is the Plaintiff.

3.     "Suspicious Order(s)" means any order of Prescription Opioids placed by any source that Plaintiff contends should have been reported to the DEA or Ohio authorities, including the Ohio Board of Pharmacy.  Suspicious Orders are not limited to those placed with

---

AmerisourceBergen Corporation or Amerisource Corporation in the Complaint), Cardinal Health, Inc., and McKesson Corporation.

the Distributor Defendants, but include those placed with any entity that has a regulatory reporting obligation.

## INSTRUCTIONS

1. Unless otherwise stated, the timeframe covered by these Requests is the time period including each year during which each individual Plaintiff claims any Distributor Defendant engaged in any allegedly wrongful or unlawful conduct that caused damage to the Plaintiff or such other time period as the parties may later agree or the Court determines should apply to each side's discovery in this action.

2. Unless otherwise set forth, the responsive documents and communications requested include all documents and communications that are related to the timeframe covered by these Requests, regardless of creation date.

3. Each Plaintiff must individually respond to each of these Requests.

## REQUESTS FOR PRODUCTION

1. All documents that refer or relate to the volume of Prescription Opioids prescribed, dispensed, sold, distributed, diverted, or used in Plaintiff's geographical boundaries.

2. All law enforcement documents that refer or relate to the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids or the possession, abuse, illegal sale, or addiction to other opioids in Plaintiff's geographical boundaries.

3. All law enforcement documents that refer or relate to allegedly Suspicious Orders or other improper or wrongful actions by distributors, prescribers, pharmacies, or other healthcare providers related to Prescription Opioids.

4.      All communications between the Plaintiff and any State or Federal agency (including but not limited to the United Stated Drug Enforcement Agency, a United States Attorney or representative thereof, Ohio Department of Medicaid and its constituent providers, Ohio Department of Public Safety, Ohio Automated Rx Reporting System, State of Ohio Board of Pharmacy, and State Medical Board of Ohio), or other law enforcement or government entity, that refer or relate to the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids or the possession, abuse, illegal sale, or addiction to other opioids.

5.      All documents relating to any alleged Prescription Opioid-related violation of state or federal law or regulation, including 21 CFR Section 1306.04, related to any pharmacy, medical doctor, physician assistant, pharmacist, pharmacy technician, healthcare provider, or other person or entity in Plaintiff's geographical boundaries.

6.      All documents relating to any Plaintiff communication or transaction with any Distributor Defendant or any other distributor of Prescription Opioids.

7.      All documents and data referring or relating to Plaintiff expenditures relating to the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids or the possession, abuse, illegal sale, or addiction to other opioids, including documents  relating to healthcare costs paid by Plaintiff or by fully or partially-funded medical insurance plans and workers' compensation programs. Include in this response any policies governing evaluation or approval of those expenditures' legitimacy.

8.      All documents constituting, relating to, or referring to autopsies or death certificates for any and all individuals residing in Plaintiff's geographical boundaries whose death was attributed in whole or in part to the abuse, use, misuse, prescribing, dispensing, sale,

distribution, addiction to, and/or diversion of Prescription Opioids or the possession, abuse, illegal sale, or addiction to other opioids or drugs.

9.      All documents relating to comments, complaints, or inquiries by members of the general public concerning the abuse, use, misuse, prescribing, dispensing, sale, distribution, addiction to, and/or diversion of Prescription Opioids or the possession, abuse, illegal sale, or addiction to other opioids.

10.     All documents referring or relating to Plaintiff's efforts to suspend, revoke, or seek the suspension or revocation of registrations or licenses of, or fine or otherwise sanction any distributors, doctors, pharmacies, pharmacists, healthcare providers, or other DEA registrants because of alleged diversion of Prescription Opioids in or into Plaintiff's geographical boundaries.

11.     All documents comprising or supporting Plaintiff's annual and periodic budgets (including but not limited to receipts and expenditures).

**AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH, INC., and MCKESSON CORPORATION,**

**By counsel**

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
**REED SMITH, LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
rnicholas@reedsmith.com
smcclure@reedsmith.com

Alvin L. Emch
aemch@jacksonkelly.com

5

JACKSON KELLY PLLC
500 Lee Street, East, Suite 1600
P.O. Box 553
Charleston, WV 25322
(304) 340-1000

*Counsel for AmerisourceBergen Drug
Corporation*

*/s/ Enu Mainigi*
Enu Mainigi
F. Lane Heard
Steven M. Pyser
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
emainigi@wc.com
lheard@wc.com
spyser@wc.com

*Counsel for Cardinal Health, Inc.*

*/s/ Mark Lynch*
Mark H. Lynch
mlynch@cov.com
Geoffrey E. Hobart
ghobart@cov.com
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C.  20001-4956
Phone:  (202) 662-6000

*/s/ Emily Johnson Henn*
Emily Johnson Henn
ehenn@cov.com
**COVINGTON & BURLING LLP**
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA  94065
Phone:  (650) 632-4700

*Counsel for McKesson Corporation*

6

## <u>CERTIFICATE OF SERVICE</u>

I, Robert A. Nicholas, among the Steering Committee members for the Distributor Defendants, certify that on April 20, 2018, I caused the foregoing to be served via electronic mail on the individuals on the attached service list.


*/s/ Robert A. Nicholas*

<u>**SERVICE LIST**</u>

<u>***Counsel for Plaintiff***</u>

David G. Lambert, Esq.
**OFFICE OF THE PROSECUTING ATTORNEY - CUYAHOGA COUNTY**
8th Floor
Courts Tower, Justice Center
1200 Ontario Street
Cleveland, OH 44113
216-443-5869
Fax: 216-443-7602
dlambert@prosecutor.cuyahogacounty.us

Frank L. Gallucci, III, Esq.
**PLEVIN & GALLUCCI**
2222 Illuminating Bldg.
55 Public Square
Cleveland, OH 44113
216-861-0804
Fax: 216-861-5322
fgallucci@pglawyer.com

Joseph L. Ciaccio, Esq.
**NAPOLI SHKOLNIK**
11th Floor
360 Lexington Avenue
New York, NY 10017
212-397-1000
Fax: 646-843-7603
jciaccio@napolilaw.com

Leo M. Spellacy , Jr., Esq.
**PORTER, WRIGHT, MORRIS & ARTHUR - CLEVELAND**
Ste. 500
950 Main Avenue
Cleveland, OH 44113
216-255-5431
Fax: 216-255-5450
lspellacy@tddlaw.com

Paul B. Maslo, Esq.
**NAPOLI SHKOLNIK**
11th Floor
360 Lexington Avenue
New York, NY 10017

212-397-1000
Fax: 646-843-7603
pmaslo@napolilaw.com

Paul J. Napoli, Esq.
**NAPOLI SHKOLNIK**
11th Floor
360 Lexington Avenue
New York, NY 10017
212-397-1000
Fax: 646-843-7603
PNapoli@napolilaw.com

Robin M. Wilson, Esq.
**OFFICE OF THE COUNTY EXECUTIVE - CUYAHOGA COUNTY**
Department of Law
2079 East Ninth Street
Cleveland, OH 44115
216-696-6464
Fax: 216-698-2744
RWilson@cuyahogacounty.us

Salvatore C. Badala, Esq.
**NAPOLI SHKOLNIK**
Ste. 305
400 Broadhollow Road
Melville, NY 11747
212-397-1000
Fax: 646-843-7603
sbadala@napolilaw.com

*Liaison Counsel for Plaintiffs*

Peter Henry Weinberger, Esq.
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East
Suite 1700
Cleveland, OH 44114-1149
(216) 696-3232
pweinberger@spanglaw.com

Steven J. Skikos, Esq.
**SKIKOS CRAWFORD SKIKOS & JOSEPH**
One Sansome Street, Suite 2830
San Francisco, CA 94104
(415) 546-7300

sskikos@skikoscrawford.com

Troy A. Rafferty, Esq.
**LEVIN PAPANTONIO THOMAS MITCHELL RAFFERTY & PROCTOR PA**
316 S. Baylen Street
Suite 600
Pensacola, FL 32502
(805) 435-7000
trafferty@levinlaw.com

## _**Counsel for Defendants**_

Steven A. Reed, Esq.
**MORGAN LEWIS & BOCKIUS**
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
Fax: (215) 963-5001
steven.reed@morganlewis.com

_Counsel for Defendants Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Actavis, LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; and Watson Laboratories, Inc._

Charles C. Lifland, Esq.
**OMELVENY & MYERS**
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000
clifland@omm.com

_Counsel for Defendants Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Johnson & Johnson_

Mark S. Cheffo, Esq.
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, NY 10010
markcheffo@quinnemanuel.com

_Counsel for Defendants Purdue Pharma L.P.; Purdue Pharma Inc.; and The Purdue Frederick Company Inc._

Jonathan L. Stern, Esq.
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001
jonathan.stern@apks.com

*Counsel for Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.*

Donna Welch, Esq.
**KIRKLAND & ELLIS**
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
Fax: (312) 862-2200
donna.welch@kirkland.com

*Counsel for Defendants Allergan PLC f/k/a Actavis plc; and Allergan Finance LLC f/k/a Watson Pharmaceuticals, Inc. f/k/a Actavis, Inc.*

J. Matthew Donohue, Esq.
**HOLLAND & KNIGHT LLP**
2300 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, OR 97204
matt.donohue@hklaw.com

*Counsel for Insys Therapeutics, Inc.*

Jordan D. Rauch, Esq.
O. Judson Scheaf, III**,** Esq.
**HAHN, LOESER & PARKS - COLUMBUS**
Ste. 1400
65 East State Street
Columbus, OH 43215
614-233-5169
Fax: 614-233-5159
jrauch@hahnlaw.com
JScheaf@hahnlaw.com

*Counsel for Defendant Russell Portenoy*

Tyler G. Tarney, Esq.
Daniel J. Hyzak, Esq.
**GORDON & REES**
Ste. 2495
41 South High Street
Columbus, OH 43215
614-340-5558
Fax: 614-360-2130
ttarney@grsm.com
dhyzak@grsm.com

*Counsel for Defendants Perry Fine, Scott Fishman, and Lynn Webster*

*__Liaison Counsel for Distributor Defendants__*

Enu Mainigi, Esq.
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street NW
Washington, DC 20005
emainigi@wc.com

Shannon McClure, Esq.
**REED SMITH, LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
smcclure@reedsmith.com

Geoffrey E. Hobart, Esq.
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956
ghobart@cov.com

*__Liaison Counsel for Manufacturer Defendants__*

Mark S. Cheffo, Esq.
**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22$^{nd}$ Floor
New York, NY 10010
markcheffo@quinnemanuel.com

Carole Rendon, Esq.
**BAKERHOSTETLER**
127 Public Square
Suite 2000
Cleveland, OH 44114
crendon@bakerlaw.com

*__Liaison Counsel for Chain Pharmacies__*

Kaspar J. Stoffelmayr, Esq.
**BARTLIT, BECK, HERMAN, PALENCHAR & SCOTT**
54 West Hubbard Street, Ste. 300
Chicago, IL 60654
312-494-4434
Fax: 312-494-4440

kaspar.stoffelmayr@bartlit-beck.com

***Liaison Counsel for Physician Defendants***

Tyler Tarney, Esq.
**GORDON & REES, LLP**
41 South High Street, Suite 240
Columbus, OH 43215
ttarney@grsm.com

# EXHIBIT 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit 1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit 2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

<u>**VERIFICATION**</u>

I, Joseph W. Boatwright, IV, declare:

I am Chief Corporate Counsel for the County of Cuyahoga, Ohio. I am authorized to make this verification on behalf of the Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley (together, "Plaintiff").

The foregoing Plaintiff's Second Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 represents a municipal corporate response, based on information, in part, assembled by Plaintiff's employees and/or representatives. Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual. Subject to these limitations, the information contained in the foregoing response is, to the best of Plaintiff's knowledge, true and correct. Plaintiff reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.


Executed at Cuyahoga, Ohio on this 30th day of November, 2018.



_____
Joseph W. Boatwright, IV

# EXHIBIT 7



**Driving progress**
through partnership

**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

**December 13, 2018**

**Confidential – Subject to Protective Order**

# EXHIBIT 8



**Eric L. Alexander**
Direct Phone:  +1 202 414 9403
Email:  ealexander@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

**December 19, 2018**

**Confidential – Subject to Protective Order**

# EXHIBIT B

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Exhibit 1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# Exhibit 2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## <u>VERIFICATION</u>

I, Joseph W. Boatwright, IV, declare:

I am Chief Corporate Counsel for the County of Cuyahoga, Ohio. I am authorized to make this verification on behalf of the Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley (together, "Plaintiff").

The foregoing Plaintiff's Second Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 represents a municipal corporate response, based on information, in part, assembled by Plaintiff's employees and/or representatives. Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual. Subject to these limitations, the information contained in the foregoing response is, to the best of Plaintiff's knowledge, true and correct. Plaintiff reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Cuyahoga, Ohio on this 30th day of November, 2018.

Joseph W. Boatwright, IV

# EXHIBIT C

1          IN THE UNITED STATES COURT

2         NORTHERN DISTRICT OF OHIO

3           EASTERN DIVISION

4

5       ~~~~~~~~~~~~~~~~~~~~

6  IN RE:  NATIONAL PRESCRIPTION   MDL NO. 2804

7  OPIATE LITIGATION

8                  Case No.

9                  17-mdl-284

10               Judge Dan Polster

11

12

13  This document relates to:

14  The County of Summit, Ohio, et al., v.

15  Purdue Pharma L.P., et al.,

16  Case No. 1:18-OP-45090 (N.D. Ohio)

17

18       ~~~~~~~~~~~~~~~~~~~~

19        Videotaped deposition of

20         CHRISTOPHER CABOT

21         November 2, 2018

            9:09 a.m.

22

           Taken at:

23        Kelley & Ferraro

         950 Main Avenue

24        Cleveland, Ohio

25      Wendy L. Klauss, RPR

Page 2

```
 1   APPEARANCES:
 2
     On behalf of Cuyahoga County and the
 3   Witness:
        Napoli Shkolnik PLLC
 4      SALVATORE C  BADALA, ESQ
        400 Broadhollow Road
 5      Suite 305
        Melville, NY  11747
 6      (631) 224-1133
        Sbadala@napolilaw com
 7      -AND-
        Plevin & Gallucci
 8      FRANK L  GALLUCCI, III, ESQ
        55 Public Square
 9      Suite 2222
        Cleveland, OH  44113-1901
10      (216) 861-0804
        Fgallucci@pglawyer com
11
     On behalf of Distributor
12   AmerisourceBergen Drug Corporation,
     Co-Liaison Counsel for the Distributor
13   Defendants:
        Reed Smith LLP
14      KELLY H  HIBBERT, ESQ
        MOLLY Q  CAMPBELL, ESQ
15      1301 K Street N W
        Suite 1100 - East Tower
16      Washington, D C  20005
        (202) 414-9200
17      Khibbert@reedsmith com
        Mqcampbell@reedsmith com
18
     On behalf of Insys Therapeutics, Inc :
19      Holland & Knight LLP
        HEIDI A  NADEL, ESQ
20      2300 U S Bancorp Tower
        111 S W  Fifth Avenue
21      Portland, OR  97204
        (503) 243-2300
22      Heidi nadel@hklaw com
23
24
25
```

Page 3

```
 1   APPEARANCES, Continued:
 2   On behalf of Walmart Inc  F/K/A Wal-Mart
     Stores, Inc
 3      Jones Day
        BRANDY H  RANJAN, ESQ
 4      325 John H  McConnell Blvd
        Suite 600
 5      Columbus, OH  43215-2673
        (614) 469-3939
 6      Branjan@jonesday com
        -AND-
 7      Jones Day
        MEREDITH KINCAID, ESQ
 8      1420 Peachtree Street, N E
        Suite 800
 9      Atlanta, GA  30309-3053
        (404) 581-3939
10      Mkincaid@jonesday com
11   On behalf of Cardinal Health, Inc ,
     Co-Liaison Counsel for the Distributor
12   Defendants:
        Williams & Connolly LLP
13      MATTHEW P  MOONEY, ESQ
        725 Twelfth Street, N W
14      Washington, DC  20005
        (202) 434-5000
15      Mmooney@wc com
16   On behalf of Prescription Supply, Inc :
        Pelini, Campbell & Williams, LLC
17      KRISTEN E  CAMPBELL TRAUB, ESQ
        Bretton Commons
18      8040 Cleveland Avenue NW, Suite 400
        North Canton, OH  44720
19      (330) 305-6400
        Kec@pelini-law com
20
     On behalf of Allergan Finance, LLC:
21      Kirkland & Ellis LLP
        TUCKER HUNTER, ESQ
22      300 North LaSalle
        Chicago, IL  60654
23      (312) 862-2000
        Tucker hunter@kirkland com
24
25
```

Page 4

```
 1   APPEARANCES, Continued:
 2      On behalf of Endo Health Solutions, Inc ,
        Endo Pharmaceuticals Inc , Par
 3      Pharmaceutical, Inc , and Par
        Pharmaceutical Companies, Inc , (FKA Par
 4      Pharmaceutical Holdings, Inc )
        Arnold & Porter
 5      ALLISON GARDNER, ESQ
        601 Massachusetts Ave,  N W
 6      Washington, D C  20001-3743
        (202) 942-5150
 7      Allison gardner@arnoldporter com
 8   On behalf of Distributor Defendant
     McKesson Corporation, Co-Liaison Counsel
 9   for the Distributor Defendants:
        Covington & Burling LLP
10      JOHN ZIPP, ESQ
        One City Center
11      850 Tenth Street, NW
        Washington, DC  20001-4956
12      (202) 662-6000
        Jzipp@cov com
13
     On behalf of Teva Pharmaceutical
14   Industries Ltd :
        Morgan Lewis, LLP
15      VINEETA PRAKASH KAMATH, ESQ,
        1111 Pennsylvania Avenue N W
16      Washington, DC  20004
        (202) 739-3000
17      Vineeta Kamath@morganlewis com
18      ~ ~ ~ ~ ~
19   ALSO PRESENT:
        Kurt Henschel, Videographer
20      ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 5

```
 1              TRANSCRIPT INDEX
 2   APPEARANCES:............................    2
 3   INDEX OF EXHIBITS ..................    6
 4   EXAMINATION OF CHRISTOPHER CABOT
     By Ms. Hibbert............................   21
 5   By Ms. Nadel............................  330
     By Ms. Ranjan...........................  334
 6   By Mr. Badala...........................  340
     By Ms. Hibbert..........................  342
 7
     REPORTER'S CERTIFICATE...................  346
 8
     EXHIBIT CUSTODY
 9   EXHIBITS RETAINED BY COURT REPORTER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 90

1  there is, you know, drug testing, there is
2  interviewing, you know, the subjects of the
3  case, and often times they will just let us
4  know.
5          Sometimes toxicology reports from
6  fatalities or for children that have ingested
7  drugs, that happens frequently, you know, when
8  people leave the drugs laying out and things
9  like that, and we have had children die from
10  ingesting drugs that the parents leave out
11  so...
12     Q.    And I've seen toxicology screens
13  and drug-of-choice data tracked, in terms of
14  the START program.
15          Is that data tracked outside of the
16  START program as well?
17     A.    Yes, there are efforts to do that.
18     Q.    What do you mean, "There are
19  efforts to do that"?
20     A.    I mean, it is important for us to
21  try to get a handle of, you know, which drugs
22  can be considered most dangerous to the
23  families and children that we serve.  So we try
24  to track that as best we can.
25          Sometimes it's difficult.

Page 91

1  Sometimes there is more drugs than just one
2  drug, you know, so -- but there is -- but there
3  is a means of us, of the staff -- again, it is
4  only as good as the data that is input of them
5  entering, and I think it just really captures
6  that substance abuse was a factor, when we try
7  to enter it in the system so...
8     Q.    Can you tell me about that tracking
9  process more specifically?
10     A.    That process started -- I was kind
11  of a worker pre all this electronic data stuff
12  and, I mean, we used to handwrite our notes,
13  but, you know, so there is a -- there is
14  just -- I mean, a lot of things are kept for
15  data purposes.
16          So we just want to try to see what
17  percentage of cases really have substance abuse
18  as an involvement, and that's basically the
19  whole premise of that one tab in the system.
20     Q.    When you say, "One tab in the
21  system," what are you talking about?
22     A.    So basically you would click, is
23  substance abuse a factor, yes or no,
24  essentially.  The real meat of the substance
25  abuse use and what drugs would be actually

Page 92

1  found in the worker's dictation.
2     Q.    So the system that you are talking
3  about clicking on a tab, what is that called?
4     A.    It is called SACWIS, State
5  Automated Welfare Information System.
6     Q.    Can you spell out the acronym --
7     A.    Yes.
8     Q.    -- for the reporter?
9     A.    S-A-C-W-I-S.
10     Q.    If I refer to that as -- is it
11  SACWIS?
12     A.    Yes.
13     Q.    You will know what I'm referring
14  to?
15     A.    Yes.
16     Q.    So the SACWIS program, that's a
17  state automated program; is that right?
18     A.    Yes.
19     Q.    When did that first start being
20  used by your department?
21     A.    Approximately 2008, but I don't
22  know the specific date.  So the year, I think,
23  was 2008.
24     Q.    So thinking of it in terms of what
25  you were doing at the time, this is before you

Page 93

1  took over as senior manager of the START
2  program, correct?
3     A.    Right.  Yeah.
4     Q.    Prior to the electronic database
5  being adopted, how were -- how were you and
6  your department keeping track of records?
7     A.    Prior to any electronic system or
8  SACWIS?
9     Q.    Is there an electronic system that
10  predated SACWIS?
11     A.    Yeah.
12     Q.    What was that?
13     A.    That was called FACTS, F-A-C-T-S.
14  And I don't know what the initials -- I can't
15  remember what those initials stand for.
16     Q.    Do you know when the FACTS system
17  was used?
18     A.    I don't know when it -- what the
19  inception of it was, but I know that it
20  overlapped a little bit with SACWIS, obviously,
21  until we can get everything up and running.  So
22  there is still some archival data there, but it
23  is not in use anymore.
24     Q.    And you don't know when that first
25  began to be used?

24 (Pages 90 - 93)

1 intricacies of it.
2     Q.    Do you use the SACWIS system
3 currently in your role and responsibilities as
4 social program administrator 5?
5     A.    Yes.
6     Q.    And in your role as social program
7 administrator 5, to your knowledge, is there
8 any other tab or aspect of the system that you
9 use that involves substance abuse?
10     A.    No.
11     Q.    Is there any way in the SACWIS
12 system to track what type of substance is being
13 abused?
14     A.    Not as like a drop-down or
15 something like that.  That would have to be
16 mined out to the activity logs, or the case
17 notes, as you say.
18     Q.    So if you wanted to understand what
19 substance was at issue for any given case, you
20 would look to the activity logs or the case
21 notes for the particular case, correct?
22     A.    Amongst other, yeah.  That would be
23 the first place, yes.
24     Q.    When you say "amongst other"
25 things --

1     A.    Well, I mean, so we do have -- so
2 we have what's called the reading file, where
3 documents can be scanned into the system.
4          So if, on any case, if, you know,
5 if somebody got a DUI or arrested for DUI or
6 something, charges or something might be
7 scanned into the system.  So there is an
8 electronic place to store, you know, certain
9 documents.
10     Q.    Okay.  To your knowledge, is there
11 any -- are there any reports that are run on
12 the SACWIS system that relate specifically to
13 substance abuse?
14     A.    I don't know.
15     Q.    Are there any reports that you have
16 run in your role as social program
17 administrator 5 and administrator of social
18 services that involve substance abuse?
19     A.    No.
20     Q.    Are there any particular programs
21 that you have supervised, in your role as
22 social program administrator, that specifically
23 relate to substance abuse?
24          MR. BADALA:  Objection to form.
25     A.    Again, any day I could be dealing

1 with a case that substance abuse is a
2 contributing factor to what's going on with the
3 family and the children so...
4     Q.    Other than the START program, there
5 is no other programs, under Children and Family
6 Services, that specifically address a family or
7 individual's substance abuse; is that fair?
8          MR. BADALA:  Objection to form.
9     A.    That's fair.
10     Q.    I assume in your various roles with
11 Children and Family Services, you have been
12 evaluated over time?
13     A.    Yes.
14     Q.    Have you ever had a poor
15 evaluation?
16     A.    No.
17     Q.    Do you evaluate others?
18     A.    Yes.
19     Q.    Who currently reports to you, as
20 administrator of social services?
21     A.    Specific names?
22     Q.    And titles, please.
23     A.    Joseph Jackson, senior manager;
24 Christopher Malcolm, M-A-L-C-O-L-M, senior
25 manager; Mary Mitchell, senior manager; Earvin

1 Thomas, E-A-R-V-I-N, senior manager; Lara
2 Parks, L-A-R-A, senior manager; and David Gray,
3 senior manager.
4          I also have a social program
5 administrator 2 that reports to me, Maureen
6 Draye, D-R-A-Y-E, and, of course, my assistant
7 reports to me, if want her name.  Do you want
8 her name?
9     Q.    That's okay.
10          So you said that there is a social
11 program administrator 2, as well?
12     A.    Yes.
13     Q.    Are there any other levels of
14 social program administrator that we haven't
15 already talked about?
16     A.    I don't know.
17     Q.    Is there a 1?
18     A.    I don't know.  Probably, but I
19 don't know for sure.
20     Q.    Do you know how many people are
21 employed with Children and Family Services?
22     A.    Not to the -- not to the single
23 digit, no.
24     Q.    Do you have an approximation?
25     A.    It's over 800.

26 (Pages 98 - 101)

Page 246

1  crisis has to do with opioids, opiate abuse,
2  heroin abuse.
3        What is important for me is I'm
4  here dealing with the devastation, putting out
5  the fires, making sure kids are safe.
6  Ancillary, if I have time to start tracking
7  things and stuff, I'll do that.  But my job is
8  to keep kids safe first and foremost.  If I
9  have the luxury of tracking every little thing
10  and dotting every I, I know that's important,
11  but that's not my focus.
12        My focus is asking people what got
13  you to the point you are at now and what can I
14  do to fix it to keep little Johnny safe so...
15    Q.   And not even getting into the
16  nitty-gritty or the specifics, as you put it,
17  but with regard to tracking substance use and
18  whether it was prescription opioids versus
19  heroin or any other type of drug, that wasn't
20  something that the department kept track of,
21  throughout the time that you have been in the
22  department, correct?
23        MR. BADALA:  Objection to form.
24    A.   I mean, all I can say is in the 25
25  years I have been working with families and

Page 247

1  with substance abusers, it's not common that
2  someone picks up heroin and says, "One day I'm
3  going to smoke or use heroin," however they use
4  it.  Usually it is a progressive thing, and it
5  starts out, and most of the time what we see it
6  start out with is prescription pills.
7    Q.   And again, I'm asking you what
8  information can I look to to verify that
9  account that you are giving me?  Is there any
10  information that I can look to to verify that
11  account?
12        MR. BADALA:  Objection to form.
13    A.   I don't know.
14        MS. HIBBERT:  Let's take a break.
15        THE VIDEOGRAPHER:  Off the record,
16  2:34.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  On the record,
19  2:46.
20    Q.   Okay.  Mr. Cabot, we left off, we
21  were talking a little bit about Exhibit Number
22  8. Can you put that back in front of you.
23    A.   Sure.
24    Q.   I have a couple more questions
25  about that.

Page 248

1        We talked about the 2014
2  statistical reports, and then it also states
3  there in that paragraph under the Department
4  News, she, your secretary, will be tracking
5  this data for the past three calendar years.
6  Do you know what that means?
7    A.   What I was trying to, I think, say
8  there, assuming that this is exactly what I
9  wrote, is that I was going to have my secretary
10  go back three years to track the drug-of-choice
11  data.
12    Q.   Because it says there right under
13  Department News, "Since January 1, 2014, we
14  have been keeping data on specific types of
15  drugs involved with each of our cases,"
16  correct?
17    A.   Yes.
18    Q.   So that was a new process that
19  started the beginning of 2014, tracking the
20  drug-of-choice data; is that right?
21        MR. BADALA:  Objection to form.
22    A.   It wasn't new.  I mean, I don't
23  know, to be honest with you.  I just know that
24  in January of 2014, I started tracking it
25  specifically.

Page 249

1    Q.   That was new to your practice, as
2  manager of the START program, as of January
3  2014, to track the types of drugs involved with
4  each of your cases, correct?
5    A.   I don't know.  Because what I was
6  trying to get at here, like I said earlier, was
7  the increase in the heroin and opiates, not
8  just all drugs.
9        So I don't know.  I can't answer
10  that, I didn't track some type of drug use
11  previous to that.  All I know is that what I
12  was interested in showing is over the three
13  years, the increase in that specific drug use.
14    Q.   And were you able to track, over
15  the last three years, the increase in that
16  specific drug use?
17    A.   I don't know.  I can't recall.
18    Q.   If you had tracked the increase of
19  these -- the specific drug use over the last
20  three years from 2014, would you have kept that
21  information anywhere?
22        MR. BADALA:  Objection to form.
23    A.   I don't know.
24    Q.   You state next, in the next
25  sentence, "We will also be graphically

Page 346

1          REPORTER'S CERTIFICATE
2  The State of Ohio,   )
3                SS:
4  County of Cuyahoga.  )
5
6          I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, CHRISTOPHER
10  CABOT, was by me first duly sworn to testify
11  the truth, the whole truth and nothing but the
12  truth in the cause aforesaid; that the
13  testimony then given by the above-referenced
14  witness was by me reduced to stenotypy in the
15  presence of said witness; afterwards
16  transcribed, and that the foregoing is a true
17  and correct transcription of the testimony so
18  given by the above-referenced witness.
19          I do further certify that this
20  deposition was taken at the time and place in
21  the foregoing caption specified and was
22  completed without adjournment.
23
24
25

Page 347

1          I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5          IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 7th day of
8  October, 2018.
9
10
11
12
13        _Wendy L. Klauss_
14      Wendy L. Klauss, Notary Public
15      within and for the State of Ohio
16
17  My commission expires July 13, 2019.
18
19
20
21
22
23
24
25

Page 348

1              Veritext Legal Solutions
                 1100 Superior Ave
2                    Suite 1820
               Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
   November 7, 2018
5
   To: SALVATORE C  BADALA
6
   Case Name: In Re: National Prescription Opiate Litigation v
7
   Veritext Reference Number: 3073631
8
   Witness:  Christopher Cabot      Deposition Date:  11/2/2018
9
10 Dear Sir/Madam:
11
   The deposition transcript taken in the above-referenced
12
   matter, with the reading and signing having not been
13
   expressly waived, has been completed and is available
14
   for review and signature   Please call our office to
15
   make arrangements for a convenient location to
16
   accomplish this or if you prefer a certified transcript
17
   can be purchased
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived
22
23 Sincerely,
24 Production Department
25
   NO NOTARY REQUIRED IN CA

Page 349

1            DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 3073631
3  CASE NAME: In Re: National Prescription Opiate Litigation v
   DATE OF DEPOSITION: 11/2/2018
4  WITNESS' NAME: Christopher Cabot
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7      I have made no changes to the testimony
   as transcribed by the court reporter
8
9  Date              Christopher Cabot
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
   They have read the transcript;
13 They signed the foregoing Sworn
   Statement; and
14 Their execution of this Statement is of
   their free act and deed
15
   I have affixed my name and official seal
16
   this _____ day of_____, 20____
17
18    Notary Public
19    _____
      Commission Expiration Date
20
21
22
23
24
25

88 (Pages 346 - 349)

# EXHIBIT D

**CONFIDENTIAL**

**CONFIDENTIAL**

**CONFIDENTIAL**

**CONFIDENTIAL**

**CONFIDENTIAL**

**CONFIDENTIAL**

**CONFIDENTIAL**

# EXHIBIT E



**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

**January 14, 2019**

**Confidential – Subject to Protective Order**

# EXHIBIT F

# POWELL & MAJESTRO PLLC

ATTORNEYS AT LAW

405 CAPITOL STREET
SUITE P-1200
P. O. BOX 3081
CHARLESTON, WV 25331

PHONE (304) 346-2889
FAX (304) 346-2895

WRITER'S E-MAIL
amajestro@powellmajestro.com

December 19, 2018

**Via Electronic Mail**

Special Master David Cohen
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue Cleveland, OH 44113-1837
david@specialmaster.law

> Re:     *In re: National Prescription Opiate Litigation,*
>         **MDL No. 2804**
>         **Plaintiffs' Response to Motion to Compel Answers**
>         **to Distributor Defendants' Interrogatory No. 18**

Dear Special Master Cohen:

I write on behalf of the PSC and Plaintiffs, City of Cleveland, Cuyahoga County, City of Akron, and Summit County (collectively "Plaintiffs"), in response to the December 11, 2018 Motion to Compel Answers to Distributor Defendants' Interrogatory No. 18 ("Motion").

The Motion is the latest chapter in the Distributor Defendants' attempt to force Plaintiffs into an early disclosure of expert opinions.   This latest attempt comes after the Distributor Defendants, unwilling to wait for a ruling from you on their November 11, 2018 Renewed Motion to Compel, were unsuccessful in convincing Judge Polster at the November 21, 2018 Status Conference that they were entitled to the same relief they seek here.   The Motion should be denied.

* * * * *

First, this issue was resolved by Judge Polster at the November 20, 2018 Status Conference.   Notwithstanding their filing of the Renewed Motion to Compel (which was then pending before you), Defendants chose to seek the same relief from Judge Polster at the November 20, 2018 Status Conference.   There, Defendants complained to Judge Polster that Plaintiffs only provided a lump sum number and did not provide the damage computations requested in their interrogatory.   Judge Polster recognized and accepted Plaintiffs' argument that the Plaintiffs needed

December 19, 2018
Page  2

expert testimony to provide the computations Defendants seek.   Rather than requiring the computations Defendants are seeking, Judge Polster ordered: "By 12:00 noon EST on Nov. 30, 2018, plaintiffs will supplement their damages computations by providing their current good-faith estimates of the elements of their alleged damages."   Doc. 1147 at ¶ 3.

Contrary to the Motion, p. 3, Judge Polster did not order Plaintiffs to provide damage computations, instead, he ordered Plaintiffs to "*supplement* their damages *computations*" by providing "current good faith *estimates of the elements* of their alleged damages."   *Id.* (emphasis added).   At the hearing Judge Polster accepted that expert reports were not due until next year and further explained that the estimates he was ordering Plaintiffs to provide were not binding on either the Plaintiffs or their experts.

On November 30, 2018, Plaintiffs served the required supplement to their damage computations.[1]  ("Responses") In Exhibit 2 to each of the Responses, Plaintiffs each detailed eight separate elements of their damages and provided Defendants with their current good faith estimates.   The Responses comply with Judge Polster's order, and Defendants should now be required to await Plaintiffs' expert reports.[2]

Defendants complain that the Responses do not explain how they correlate with previous responses or commit that they are complete.   The simple answer to this criticism is that the Responses are what Judge Polster ordered -- Plaintiffs' current good faith estimates of the elements of their damages.   No correlation with previous responses is necessary as this is the first such estimate of the elements provided by Plaintiffs.   Because Judge Polster recognized these numbers are merely a non-binding current estimate, the estimates and categories may change as Plaintiffs' experts further examine the data and complete their reports and are thus, by definition, not final.

The calculation of Plaintiffs' claimed damages is a complex exercise.   To do so Plaintiffs and their attorneys have retained experts.   Plaintiffs' experts are creating models to quantify the expenses incurred that are attributable to Defendants' misconduct.   The Plaintiffs do not have the capacity to provide these calculations absent expert testimony.   Defendants' supposed inability to receive

---

[1]Cleveland, Cuyahoga, Akron, and Summit's Second Supplemental Responses are attached to the Motion as Exhibits A, B, C, and D respectively.

[2]Defendants also complain that Plaintiffs' identification of lost tax revenue in their responses was a single lump sum amount.   Motion at pp. 2-3.   Plaintiffs have further reviewed the data and are willing to break this element of damages down on a yearly basis.

December 19, 2018
Page 3

complete answers from Plaintiffs' witnesses are illustrative of the need to rely on expert testimony rather than evidence of Plaintiffs' stonewalling on discovery.

Thus, the further detail and the "computations" demanded by Defendants are in reality a request for an early draft of Plaintiffs' expert reports.   Rule 26(a)(2) was amended in 2010 to make it clear that draft expert reports are work product and not discoverable:

> This amendment is intended to alter the outcome in cases that have relied on the 1993 formulation in requiring disclosure of all attorney-expert communications and draft reports. The amendments to Rule 26(b)(4) make this change explicit by providing work-product protection against discovery regarding draft reports and disclosures of attorney-expert communications.

Advisory Committee Notes to the 2010 Amendments; *see also Picken v. Louisville Ladder Inc.*, No. 11-13044, 2013 WL 12182395, at *3 (E.D. Mich. Sept. 26, 2013) (same).   The Plaintiffs cannot detail the calculations of what expenses are alleged to be caused by Defendants' conduct without providing Defendants with an early draft disclosure of their experts' conclusions.    Under Rule 26(a)(2), draft expert conclusions are not discoverable as part of expert disclosures.   There certainly is no authority supporting disclosure of draft conclusions before expert disclosures are even due.   Recognizing this, Judge Polster's order rejected Defendants' request for these computations now and instead required only good faith estimates for each category of damages.

While Rule 26(a)(1) may require some damage calculations in an ordinary case prior to the disclosure of expert reports, CMO 1 recognized that these types of disclosures were not appropriate in this case and relieved the parties of the obligation of complying with the rule.   Doc. 232 at ¶ 9(b).   Indeed, even Rule 26(a)(1) case law recognizes that the Rule 26(a)(1) disclosure obligation "is limited by the quantity and quality of information available to the party who makes the damages production under the Rule." *Hyland v. Home Services of America*, 2008 WL 11357996 (W.D. Ky March 26, 2008) (denying motion to compel with the understanding that the Plaintiff remains required by the Rules to timely supplement his damages calculation based on the information currently available to him).   As Judge Polster recognized, given the nature of the underlying dispute in this matter, it is not unreasonable for the Plaintiffs to rely on expert assistance in order to develop damage calculation. *See K&M International, Inc. v. NDY Toy, LLC*, 2015 WL 5749605 (N.D. Ohio September 30, 2015) (denying motion where Plaintiff reserved the right to provide an expert report on damages and when some documentation regarding damages was provided before the close of expert discovery because the Plaintiff's expert was timely identified, the documents relied on by the expert were promptly produced, and the categories of alleged damages were provided prior to the close of fact discovery).

December 19, 2018
Page 4

Defendants, citing inapplicable Rule 26(a)(1) caselaw, seek computations "of sufficient detail that Defendants may understand the contours of their potential exposure and make informed decisions as to . . . discovery." Motion at p. 4 (citation and internal quotation omitted). While such a request may be appropriate in an ordinary case, the request for computations here ignores the nature of the impending bellwether trials which discovery is being conducted for trial not settlement of individual cases. *See* CMO 1 at p.1 (noting purpose of the creation of a litigation track); *id.* at ¶ 6(e) (requiring leave of Court for voluntary dismissal of case against all defendants). Defendants certainly are not suggesting that they need the detail of the computations of non-binding estimates now to evaluate settlement of these cases.

Defendants claim they are prejudiced because of the impending deadline for fact discovery. Plaintiffs have provided and will continue to provide to Defendants the underlying data their experts are using to calculate damages. Defendants have been and can continue to inquire into these underlying facts during fact discovery. After expert disclosures are served, Defendants can conduct discovery of the Plaintiff's experts and test the underlying facts the experts rely on to support their opinions. Defendants will not be prejudiced if they await Plaintiffs' expert reports to conduct this discovery. Instead, it will be more efficient for them to conduct this discovery based on the actual theories and calculations Plaintiffs will offer to the jury rather than draft, non-binding estimates.

\* \* \* \*

Because Plaintiffs are not required to give Defendants early draft expert reports and because Plaintiffs have complied with Judge Polster's order that they "supplement their damages computations by providing their current good-faith estimates of the elements of their alleged damages," the Motion should be denied.

Sincerely,

/s/ Anthony J. Majestro

Anthony J. Majestro

Cc:     xALLDEFENDANTS-MDL2804-Service@arnoldporter.com
        mdl2804discovery@motleyrice.com

# EXHIBIT G

# EXHIBIT 2



**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

January 16, 2019

**Confidential**

# EXHIBIT 1



**Driving progress**
**through partnership**

**Eric L. Alexander**
Direct Phone: +1 202 414 9403
Email: ealexander@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

January 2, 2019

**Confidential – Subject to Protective Order**

# EXHIBIT 2

28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
**o.** 843.216.9000 **f.** 843.216.9450

**Jodi Westbrook Flowers**
*Licensed in SC*
direct: 843.216.9163
jflowers@motleyrice.com

**MotleyRice** ®
LLC
ATTORNEYS AT LAW
www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

January 11, 2019

**VIA ELECTRONIC MAIL**

Eric L. Alexander, Esq.
Reed Smith LLO
1301 K Street, N.W.
Suite 1000-East Tower
Washington, DC 20005-3373
ealexander@reedsmith.com

RE:     *In Re National Prescription Opioid Litigation;* Case No. 17-md-2804
        *The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.,* Case No. 18-op-45090
        **Summit County Children Services – Deposition of Julie Barnes**

Counsel:

I write in response to your letter of January 2, 2019, regarding Ms. Julie Barnes' deposition and "data and certain types of documents" that you maintain came up during her deposition on December 3, 2018.

Results of 2015 Analysis Performed by Sharon Geffken

Any documents regarding the 2015 "hand count" performed by Ms. Geffken and referenced by Ms. Barnes during her testimony have already been provided by Children Services and produced to Defendants.  Specifically, responsive information relating to this analysis is contained in the 2015, 2016, and 2017 PCSAO fact books (*see* ███████████████████████████).

We have confirmed with Summit County Children Services there is no further data or documents either in hard copy or electronically related to this "hand count" that were not previously produced.

Statewide Automated Child Welfare Information System (or "SACWIS")

Defendants also seek an "aggregate SACWIS dataset or the case files stored in SACWIS from the relevant time period."  The appropriate entity from which to seek that information the Ohio State PCSAO or SACWIS itself.  Plaintiff has produced certain responsive SACWIS documents in its possession (*see* the summary report produced at ███████████████████████).
As previously explained, the law prevents Summit County Children Services from providing the



Re: Response to Julie Barnes Deposition Letter
January 11, 2019
Page 2

case files of children and families that it serves.  SACWIS is simply a server maintained by the State of Ohio to house child welfare records.

More to the point, there are over 6.7 million records in SACWIS and the burden of production – even if it were possible – substantially outweigh the needs of the case.  That said, let's meet and confer regarding what compromises are possible.

On today's phone call with David Ackerman, you advised that the summary report was lacking detail.  We will confer with Cuyahoga and our client to determine whether we can provide (or have already provided) a similar report.

SCCS Board of Trustees Meeting Documents

In response to Defendants' requests for SCCS Board Meeting "data reports;" "executive director reports;" and "finance reports;" any such documents that exist for these categories have been previously produced to Defendants (*see* &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; (executive director reports); and &#9608;&#9608;&#9608;&#9608;&#9608;&#9608; (finance reports)).

With regard to Board Meeting agendas and minutes, Summit County Children Services will collect and produce any responsive documents.

If you have questions, let's discuss in a meet and confer.

Very truly yours,

*/s/ Jodi Westbrook Flowers*

Jodi Westbrook Flowers

cc.     All Plaintiffs' Counsel (mdl2804discovery@motleyrice.com)
        All Defense Counsel (xALLDEFENDANTS-MDL2804-SERVICE@arnoldporter.com)

# EXHIBIT 3



**Kelly H. Hibbert**
Direct Phone:  +1 202 414 9226
Email:  khibbert@reedsmith.com

Reed Smith LLP
1301 K Street, N.W.
Suite 1000 - East Tower
Washington, D.C. 20005-3373
+1 202 414 9200
Fax +1 202 414 9299
reedsmith.com

**January 14, 2019**

**Confidential – Subject to Protective Order**

# EXHIBIT 3

**This Document Produced Natively**

CONFIDENTIAL

# EXHIBIT 4

**TAB 1**

**TAB 4**

# EXHIBIT 5

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

**Salvatore C. Badala**

**Partner**

NAPOLI
SHKOLNIK PLLC
ATTORNEYS AT LAW

(212) 397-1000 Ext. 1045 | SBadala@NapoliLaw.com
360 Lexington Avenue, Eleventh Floor, New York, NY 10017 | vCard

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.

**Salvatore C. Badala**

**Partner**



(212) 397-1000 Ext. 1045 | SBadala@NapoliLaw.com

360 Lexington Avenue, Eleventh Floor, New York, NY 10017 | vCard

Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated.

# EXHIBIT 6

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies--electronic, paper or otherwise--which you may have of this communication.

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

Confidential & Privileged

Unless otherwise indicated or obvious from its nature, the information contained in this communication is attorney-client privileged and confidential information/work product. This communication is intended for the use of the individual or entity named above. If the reader of this communication is not the intended recipient, you are hereby notified that any dissemination, distr bution or copying of this communication is strictly prohibited. If you have received this communication in error or are not sure whether it is privileged, please immediately notify us by return e-mail and destroy any copies--electronic, paper or otherwise--which you may have of this communication.

**EXHIBIT 7**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 1







Bureau of Justice Statistics - Prisoner Statistics;
https://www.bjs.gov/index.cfm?ty=dcdetail&iid=269

US Department of Justice, National Drug Intelligence Center, "The Economic Impact of
Illicit Drug Use on American Society" (2011), Table 1.7;
https://www.justice.gov/archive/ndic/pubs44/44731/44731p.pdf

National Survey on Drug Use and Health (NSDUH); http://pdas.samhsa.gov/#/

FBI Uniform Crime Reporting Program, National Incident-Based Reporting System
(NIBRS), Summit Data; https://ucr.fbi.gov/nibrs-overview

National Survey on Drug Use and Health (NSDUH);
https://www.samhsa.gov/data/data-we-collect/nsduh-national-survey-drug-use-and-
health

U.S. Drug Enforcement Administration (Diversion Control Division), National Forensic
Laboratory Information System, Public Resource Library, Table 2;
https://www.nflis.deadiversion.usdoj.gov/Resources/NFLISPublicResourceLibrary.aspx

Bureau of Justice Statistics - Prisoner Statistics;
https://www.bjs.gov/index.cfm?ty=dcdetail&iid=269

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# EXHIBIT 8

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4                    - - -

5    In Re National          :
     Prescription Opiate     :
6    Litigation              :
                             :  MDL No. 2804
7                            :
     This document relates   :  Case No. 17-md-2804
8    to:                     :
                             :  Judge Dan Aaron
9    The County of Summit,   :  Polster
     Ohio, et al., v. Purdue :
10   Pharma L.P., et al.     :
     Case No. 1:18-OP-45090  :

11

12          Transcript of the video deposition of

13   Julie Barnes, a witness herein, called by the

14   Track One Defendants for examination under the

15   applicable rules of Federal Civil Court

16   Procedure, taken before me, Linda D. Riffle,

17   Registered Diplomate Reporter, Certified Realtime

18   Reporter, Certified Realtime Captioner, and

19   Notary Public in and for the State of Ohio,

20   pursuant to notice and agreement, at the Akron

21   Bar Association, 57 South Broadway Street, Akron,

22   Ohio, on Monday, December 3, 2018, beginning at

23   8:59 a.m. and concluding on the same day.

24

25

1 accurate.  So, you know, if we pulled a -- data
2 that said substance abuse was an issue for this
3 many families in their case plan, that's accurate
4 data.
5       Where the inaccuracy to the data comes
6 in is that someone might not have put it there.
7 They might have put it somewhere else.  So that
8 certainly could be a higher number.  I don't
9 think it would be a lower number.  So that's
10 where I think the -- the difference comes in.
11 BY MR. ALEXANDER:
12    Q.   And differentiating before 2016 in terms
13 of whether the drug of choice was marijuana or
14 alcohol or heroin or cocaine or something else,
15 that is also an issue in terms of whether the
16 data is robust enough to accurately capture what
17 was going on in the client population for that
18 time period, correct?
19       MS. FLOWERS:  Object to the form.  Asked
20 and answered.
21       THE WITNESS:  I believe the same
22 applies, yes.
23 BY MR. ALEXANDER:
24    Q.   Meaning if it's there, it's --
25    A.   It's accurate.

1    Q.   -- it's accurate for that record, but it
2 may not be captured for a percentage of the
3 files?
4    A.   Correct.  Uh-huh.
5    Q.   All right.  Are there other databases
6 that are utilized to track this sort of
7 information over the last five-and-a-half years
8 as you've been executive director other than
9 SACWIS?
10    A.   I don't believe so.
11    Q.   Okay.  And as we mentioned, there are
12 individual case files, correct?
13       MS. FLOWERS:  Object to the form.
14       THE WITNESS:  There are individual case
15 records in SACWIS, and then there is aggregate
16 data in SACWIS as well.
17 BY MR. ALEXANDER:
18    Q.   But Summit County has literally hard
19 copy or -- or case files that associate, here's
20 the record on a particular case, right?
21       MS. FLOWERS:  Object to the form.  Lack
22 of foundation.
23 BY MR. ALEXANDER:
24    Q.   Like, there's an activity log, there's
25 other various documents that make up what you

1 call somebody's case file?
2    A.   That's right.
3    Q.   And have you initiated any sort of data
4 projects where somebody went back to the actual
5 case files -- not the SACWIS, but back to the --
6 the case files to try to extract better or more
7 accurate information about drug use or the impact
8 of drug use or abuse on Children's Services?
9    A.   Yes.  We did do that in 2015.  The
10 former director of social services did a specific
11 hand count of cases where she went in to case
12 records for some time period in 2015 to identify
13 substance abuse issues consistently as well as
14 type of drug.
15    Q.   Did that project have a name?
16    A.   No.  It was just a research that she did
17 internally, so . . .
18    Q.   Who did the research?
19    A.   The former director of social services.
20 Her name was Sharon Geffken.
21    Q.   And was there a reason why this was
22 initiated, as far as you know?
23    A.   It was initiated because we knew that we
24 had a problem with opioids and were -- we were
25 really trying to get a better understanding of

1 the volume, and did not feel -- felt that our
2 data that we could pull out of SACWIS was
3 under-representing the issue.  So she was trying
4 to get a better and more accurate look at how
5 opioids were impacting our children and families.
6 So she spent some time doing a research project
7 where she looked at case-specific information.
8    Q.   Did anybody else work on it or just her?
9    A.   Just her to my knowledge.  I -- I don't
10 know if she had any help with that.
11    Q.   Did you get some sort of report or
12 summary of the project after it was completed?
13    A.   She just told me the outcome of it at
14 the time, and I had her -- only recall, really, a
15 rough estimate on that.  But she looked at
16 substance abuse specifically and type of drug.
17 And I -- I think the substance abuse was around
18 50 percent and opioid use was around 40 percent,
19 so . . .
20    Q.   40 percent of the 50 percent?  So 20
21 percent?
22    A.   No.  I believe that was of the total,
23 so -- of our total -- the total population she
24 looked at.
25    Q.   So 80 percent of all substance abuse in

35 (Pages 134 - 137)

Page 138

1 this analysis in 2015 was opioids or opiates
2 or -- I'm just trying to figure out --
3        MS. FLOWERS: Objection. Misstates --
4        MR. ALEXANDER: -- which drug you're
5 talking about.
6        MS. FLOWERS: Objection. Misstates the
7 testimony.
8        THE WITNESS: No. That's not right. I
9 really don't recall. I -- I shouldn't guess.
10 BY MR. ALEXANDER:
11    Q. Was there a formal report written up?
12    A. No, I don't believe there was a formal
13 report, so . . .
14    Q. Just relayed to you orally?
15    A. I know it was relayed to me orally. If
16 it was any other format, I don't recall it being
17 in another format, so . . .
18    Q. Did anything happen with this, as far as
19 you know, like get presented at a board meeting
20 or go to somebody else up higher in the county
21 government chain, to the state, to the AG,
22 anything like that?
23    A. I --
24        MS. FLOWERS: Object to the form.
25        THE WITNESS: I -- we may have used her

Page 139

1 data. We provided some data to PCSAO, the Public
2 Children's Services Association of Ohio, that
3 year. That may have been provided to them as --
4 when we were trying as a state -- I think '15 was
5 the first year that, as a state, we were trying
6 to gather some data around substance use and the
7 percentage of opioids.
8        And I believe that's what was provided
9 to PCSAO in '15, was what Sharon Geffken did
10 through the hand count that she did that year.
11 BY MR. ALEXANDER:
12    Q. Was there any other data collected by
13 Ms. Geffken other than the percentage that
14 involved opioids -- percentage of open cases that
15 involved opioids?
16    A. That was her specific project, so I
17 don't think so.
18    Q. Was -- do you know if this was part of
19 the PCSAO opioid survey?
20    A. Well, that's why I was saying that may
21 be what -- why she did it, is that she was
22 submitting it to PCSAO.
23    Q. Okay. If you wanted to lay your hands
24 on any of the data that she generated from 2015,
25 Ms. Geffken, could you do that?

Page 140

1    A. If we had any data or reports that she
2 generated, those would have already been
3 provided, so . . .
4    Q. So I'm -- I'm not trying to hide the
5 ball on -- on documents. In terms of, like,
6 things with your name on them, June 2016 is when
7 they start. We don't have anything from your
8 plus -- first three-plus years. We don't have
9 produced, as far as I know, and I try to know,
10 the stuff from 2015, stuff from 2014. We just
11 don't have those documents produced yet.
12        And I know that you said you're not the
13 one who gathered all the documents, certainly,
14 made decisions on -- on what to produce. So when
15 I ask you about whether documents exist or not
16 and what you did and how it would be
17 memorialized, I'm not -- I honestly haven't seen
18 all of your documents. That's why I'm asking.
19    A. Okay.
20    Q. Does that make sense?
21        MS. FLOWERS: Objection to the colloquy.
22 BY MR. ALEXANDER:
23    Q. Do you understand?
24    A. I -- I think what you're saying is if I
25 provided something to my attorneys, they haven't

Page 141

1 given it to you. Is that what you're saying?
2    Q. I don't know if you provided something
3 to your attorneys --
4    A. Yeah.
5    Q. -- relating to your work in 2006, 2007,
6 2013, '14, '15. I don't know what you provided
7 them. But I only know what we have. So I'm
8 trying to understand which documents you think
9 exist from this time period.
10        So the hand count that Ms. Geffken
11 did -- am I saying her name right?
12    A. Yes. Uh-huh.
13    Q. -- you're not sure if it resulted in
14 some sort of formal written submission --
15 spreadsheet, something -- that went on to
16 somebody other than you, correct?
17        MS. FLOWERS: Object to the form.
18        THE WITNESS: I don't believe that was
19 presented in any kind of a report or spreadsheet
20 format, no.
21 BY MR. ALEXANDER:
22    Q. Would it have gone up to PCSAO or to
23 somebody on a statewide basis, it would have had
24 to have gone to them by e-mail and attaching some
25 sort of data, correct?

36 (Pages 138 - 141)

```
 1              C E R T I F I C A T E

 2                     - - -

 3  State of Ohio,            :
                                 SS:
 4  County of Franklin,       :

 5                     - - -

 6          I, Linda D. Riffle, Registered Diplomate
    Reporter, Certified Realtime Reporter, Certified
 7  Realtime Captioner, and Notary Public in and for
    the State of Ohio, hereby certify that the
 8  foregoing is a true and accurate transcript of
    the deposition testimony, taken under oath on the
 9  date hereinbefore set forth, of Julie Barnes.
            I further certify that I am neither
10  attorney or counsel for, nor related to or
    employed by any of the parties to the action in
11  which the deposition was taken; and further that
    I am not a relative or employee of any attorney
12  or counsel employed in this case, nor am I
    financially interested in the action; and further
13  that I am not under a contract as defined in Ohio
    Civil Rule 28(D).

14

15
                         _____
16                       Linda D. Riffle,
17                       Registered Diplomate
                         Reporter, Certified
18                       Realtime Reporter,
                         Certified Realtime
19                       Captioner, and Notary
                         Public in and for the
20                       State of Ohio

21  My Commission Expires:  July 26, 2021

22                     - - -

23

24

25
```

# EXHIBIT 9

Page 1

1            IN THE UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF OHIO
3                     EASTERN DIVISION
4

                ~~~~~~~~~~~~~~~~~~~~
5

6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION
7                                  Case No. 17-md-2804
8                                  Judge Dan Aaron
      This document relates to:      Polster
9

      The County of Cuyahoga v. Purdue
10    Pharma L.P., et al.
      Case No. 18-OP-45090
11

12              ~~~~~~~~~~~~~~~~~~~~
13            Videotaped deposition of
               CYNTHIA G. WEISKITTEL
14

15              November 13, 2018
16                  8:59 a.m.
17

18

19                  Taken at:
20        Climaco, Wilcox, Peca & Garofoli
21         55 Public Square, Suite 1950
22               Cleveland, Ohio
23

24

25        Renee L. Pellegrino, RPR, CLR

Page 382

1    A.   I think every PCSA was asked to
2  complete the survey.
3    Q.   So you didn't see what Tammy filled
4  out, or Trista, whoever filled it out?
5    A.   I don't remember seeing it.
6    Q.   It says here -- under the survey it
7  says, "Potential data accuracy issues."  It
8  says, "I've attached a spreadsheet that compares
9  the number of kids that agencies reported
10  coming" --
11    A.   Did you go back to the first page?
12    Q.   I did.  I'm sorry.
13    A.   No problem.  Go ahead.
14    Q.   Sometimes I think I've said things
15  that I haven't.  I just thought it.  My
16  apologies.
17    A.   No problem.
18    Q.   The first page of Exhibit 24,
19  there's a section heading called "April Opiate
20  Survey," and under that the first bullet says,
21  "Potential Data Accuracy Issues."
22       Do you see that?
23    A.   Yes, I do.
24    Q.   It says, "I've attached a
25  spreadsheet that compares the number of kids

Page 383

1  that agencies reported coming into custody in
2  county year 2015 with custody numbers pulled
3  from SACWIS.  Our assumption was that the SACWIS
4  number of kids in temporary custody should
5  generally match the agency reported number of
6  kids that came into custody, but you will see
7  that there are some glaring differences in those
8  numbers for some counties.  Based on some county
9  outreach, some of this can be explained by the
10  inclusion of kids who came into agency custody
11  via Juvenile Rule 6 and emergency court order.
12  I would like your thoughts on this issue and how
13  much clean-up we should pursue.  I feel
14  confident in this data at the state level given
15  the small difference overall but have some
16  concerns re: county level data analysis."
17       Do you see that?
18    A.   Um-hum.
19    Q.   Any idea what they're talking about?
20    A.   Do you want to know what a Juvenile
21  Rule 6 is?  Is that what you're asking me?
22    Q.   No.  Are there actual differences in
23  data between the state numbers and the county
24  numbers for kids in custody that should be of
25  concern?

Page 384

1    A.   I don't know.
2    Q.   Did you ever get results of this
3  later?
4    A.   Did we get results of this?
5    Q.   Yes.
6    A.   I don't know.
7    Q.   Did you ever do anything with any
8  results of an April opiate survey, April 2016
9  opiate survey?
10    A.   Again, I don't know.
11    Q.   Are there other opiate surveys from
12  a statewide basis that you've gotten results
13  from?
14    A.   We've been asked to complete other
15  opiate surveys.  I'm not sure that we've gotten
16  results.
17    Q.   When were you most recently asked to
18  complete one?
19    A.   It was this year, and I believe
20  Tammy completed it.
21       - - - - -
22       (Thereupon, Deposition Exhibit 25,
23       E-Mail String Beginning ████████
24       ████████████████, was marked for
25       purposes of identification.)

Page 385

1       - - - - -
2    Q.   Exhibit 25 --
3       THE WITNESS:  I keep taking this.
4       MR. CIACCIO:  I know.  Sorry.
5       MR. ALEXANDER:  I think you figured
6  it out better than he has.
7       MR. CIACCIO:  Yeah.  This has been
8  really tough for me.  I'm sorry?
9    Q.   -- e-mail chain.  The ████████████
10  ████████████████████████████████.
11       If you go to the first e-mail in
12  time, this is from Mary Wachtel to Tamara
13  Chapman-Wagner July 27th, 2017, correct?
14    A.   Yes.
15    Q.   And this says, "PCSAO opioid
16  survey," so it suggests there was one in 2017,
17  correct?
18    A.   Yes.
19    Q.   It says, "Dear Tamara, I hope you're
20  well.  We are in the process of analyzing the
21  2017 opioid surveys and noticed that Cuyahoga
22  County's numbers from 2015-2016 are very
23  different, with significant drops in the number
24  of kids reported with parental drug use and with
25  parental opiate use from 2015 to 2016."

97 (Pages 382 - 385)

1      Do you see that?
2      A.   Yes.
3      Q.   So there should be documents
4  relating to filling out a survey in 2017 looking
5  at 2016, correct?
6      A.   Yes.
7      Q.   That would be on e-mails and it
8  would be some sort of spreadsheet or whatever
9  that Tamara Chapman-Wagner or somebody acting
10  under her direction filled out those forms,
11  correct?
12      A.   Again, Tammy filled out the survey.
13      Q.   Okay.  And were you aware of drop in
14  the number of kids reported with parental drug
15  use and with parental opiate use from 2015 to
16  2016 for Cuyahoga County?
17      A.   Well, Tammy goes on and gives an
18  explanation for that.
19      Q.   I'm asking about the drop.  Were you
20  aware that there was a drop, regardless of the
21  explanation?
22      A.   I was not.
23      Q.   I'm sorry?
24      A.   I was not.
25      Q.   So, again, for this first e-mail it

1  says, "This drop, combined with a similar drop
2  in another major metro county, has greatly
3  impacted the statewide data results, which are
4  currently showing fewer kids taken into custody
5  with parental drug and opiate use in 2016
6  compared to 2015.  This is counter to what we
7  expected and what PCSAs have been telling us."
8  In other words, the drop in Cuyahoga County and
9  one other large county, Franklin, Hamilton,
10  whatever, was so significant that overall
11  statewide, it showed a drop from 2015 to 2016."
12  That's what she's saying, right?
13      A.   That's what Mary is saying, correct.
14      Q.   And Tamara says she will review and
15  get back to you today, and then you have an
16  exchange with her and Angela Sausser -- I'm
17  sorry, then Tamara e-mails Angela Sausser, Mary
18  Wachtel, you and Jennifer Finkelstein.
19      Do you see that?
20      A.   Yes.
21      Q.   And who is Jennifer Finkelstein?
22      A.   I've never met her, but it says
23  she's an intern at PCSAO.
24      Q.   But we know Angela Sausser and Mary
25  Wachtel?  We've talked about them before?

1      A.   Right.  Angela is the director of
2  PCSAO.
3      Q.   And she says -- Tammy says, "I've
4  reviewed the data and the major differences in
5  the numbers for children removed due to parental
6  drug use in 2015 are estimated numbers, the
7  numbers from last year," meaning 2016, "are
8  actual numbers.
9      Okay.  Why would the numbers in '15
10  have been estimated and not actual?
11      A.   Well, as she goes on to say, that
12  there are times when we enter the reason to
13  remove in SACWIS, we enter neglect or abuse
14  category without being specific abuse of drugs.
15      Q.   So it may not have been a real drop,
16  but that's because the numbers for 2015 were
17  essentially inflated because they were
18  estimates?
19      A.   They were estimates and they could
20  have been inflated.
21      Q.   And it ends with, "Without doing a
22  complete review of every child removed, we
23  cannot determine if parental drug use was a
24  factor."
25      Do you see that?

1      A.   Yes, I do.
2      Q.   Do you agree with that?
3      A.   She's talking about a review of
4  every removal, what the journal entry -- so keep
5  in mind when we file a journal entry in court,
6  an allegation, a complaint, we may then reduce
7  or strike certain points to make an agreement
8  with the parents for a finding.  So if the
9  worker simply writes in "neglect," it may have
10  said in the journal industry mom's drug use
11  impacted, but they only put into the system that
12  it was a finding of neglect without adding the
13  additional information.  We would have to look
14  at every journal entry and complaint to figure
15  that out.
16      Q.   Right.  So if one wanted to make an
17  accurate kind of apples-to-apples comparison
18  over the years, there would need to be a review
19  of these files to look at why children were
20  actually being removed, correct?
21      A.   We would look at complaints filed,
22  legal complaints filed.
23      Q.   And has an analysis like that been
24  done to get the correct numbers?
25      A.   As Tammy goes on to say in here, we

98 (Pages 386 - 389)

Page 390

1 are always trying to fine-tune our
2 documentation, and so we've worked with staff to
3 be more specific, so the data is getting
4 cleaner.
5    Q.   So you think the 2016 numbers are
6 pretty accurate?
7    A.   They're cleaner, yeah.
8    Q.   And they're cleaner and more
9 accurate than '15?
10    A.   Correct.
11    Q.   And what about '17?  Is '17 cleaner
12 and more accurate?
13    A.   My hope would be that we continue to
14 improve those numbers, the accuracy of the
15 numbers.
16    Q.   And the trend seems to be that the
17 less accurate numbers inflated the number of
18 children removed due to parental drug use or
19 opiates, correct?
20    A.   That's what's being alleged here.
21    Q.   Would you agree with that?
22    A.   I think we would have to look at all
23 the data to figure that out.
24    Q.   Is it a plausible interpretation of
25 the data and the data collection?

Page 391

1        MR. CIACCIO:  Objection to form.
2    A.   Again, Tammy is giving her best
3 thinking about it.  She hasn't done the review
4 so we don't know that she's actually right.
5    Q.   Is she pretty good at analyzing data
6 and understanding the way data entry works?
7    A.   She's pretty good at using data.
8    Q.   And she knows the flaws of the
9 system and its limitations?
10    A.   Yes.
11    Q.   So you would defer to her on her
12 analysis here?
13    A.   As I said, it's her -- it is her
14 hypothesis, and we would have to do more digging
15 to see if she's correct.
16    Q.   My question is, do you defer to her
17 on her analysis?
18    A.   No.
19    Q.   It would need to be analyzed to get
20 full accurate numbers?
21    A.   Yes.
22    Q.   I'm not quite done with that one.
23 Sorry.
24    A.   I might have memorized it.  How do
25 you know?

Page 392

1    Q.   The third paragraph --
2    A.   Yes.
3    Q.   -- in her e-mail says, "I will tell
4 you, that while opiates have certainly risen in
5 our county, we are not seeing the impact on our
6 cases that many other counties are facing."
7        Do you see that statement?
8    A.   Yes.
9    Q.   Do you agree with that?
10    A.   Yes.  She's talking about southern
11 Ohio.  Southern Ohio has seen their custody
12 numbers double due to the opiate crisis.  That's
13 not true in Cuyahoga County.
14        - - - - -
15        (Thereupon, Deposition Exhibit 26,
16        E-Mail String with Attachment
17        Beginning ███████
18        ████████, was marked for
19        purposes of identification.)
20        - - - - -
21    Q.   Exhibit 26, this is a long e-mail
22 chain with an attachment, starts at ███████
23 ████████
24        I'm going to start at the back, if
25 you will.  The first e-mail in time is from Amy

Page 393

1 Eddings of something called Ideastream.org.  Can
2 you explain what that is?
3    A.   Again, Idea Stream is the program
4 that's on our public TV station.  They did an
5 adoption thing today.
6    Q.   I'm sorry.  They did what today?
7    A.   They did an adoption story.  So they
8 don't do just DCFS.  They do different stories
9 from around the county.
10    Q.   And it starts off with a series of
11 questions to Mary Louise Madigan, who we saw
12 earlier, correct?
13    A.   Yes.
14    Q.   It says, "They're doing a story on
15 opioids and child welfare foster care," and this
16 is a follow-up to a conversation they apparently
17 had, correct?
18    A.   I'm sorry.  I'm not sure what e-mail
19 you're on.  Are we at the back?
20    Q.   Yes.  ████████████
21 █.
22    A.   Okay.  So this is from Amy to Mary
23 Louise, and then Mary Louise responds, yes.
24    Q.   So looking at the e-mail from Amy
25 Eddings --

99 (Pages 390 - 393)

Page 430

1 Whereupon, counsel was requested to give
2 instruction regarding the witness' review of
3 the transcript pursuant to the Civil Rules.
4
5          SIGNATURE:
6 Transcript review was requested pursuant to
7 the applicable Rules of Civil Procedure.
8
9          TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 432

1          I do further certify that I am not a
2 relative, counsel or attorney for either party,
3 or otherwise interested in the event of this
4 action.
5          IN WITNESS WHEREOF, I have hereunto set
6 my hand and affixed my seal of office at
7 Cleveland, Ohio, on this 16th day of November, 2018.
8
9
10
11
12 _Renee L. Pellegrino_
13 Renee L. Pellegrino, Notary Public
14 within and for the State of Ohio
15
16 My commission expires October 12, 2020.
17
18
19
20
21
22
23
24
25

Page 431

1          REPORTER'S CERTIFICATE
2 The State of Ohio,   )
3                      ) SS:
4 County of Cuyahoga.  )
5
6          I, Renee L. Pellegrino, a Notary Public
7 within and for the State of Ohio, duly
8 commissioned and qualified, do hereby certify
9 that the within named witness, CYNTHIA G.
10 WEISKITTEL, was by me first duly sworn to testify
11 the truth, the whole truth and nothing but the truth
12 in the cause aforesaid; that the testimony then
13 given by the above referenced witness was by me
14 reduced to stenotypy in the presence of said
15 witness; afterwards transcribed, and that the
16 foregoing is a true and correct transcription of the
17 testimony so given by the above referenced witness.
18          I do further certify that this
19 deposition was taken at the time and place in the
20 foregoing caption specified and was completed
21 without adjournment.
22
23
24
25

Page 433

1          Veritext Legal Solutions
          1100 Superior Ave
2          Suite 1820
          Cleveland, Ohio 44114
3          Phone: 216-523-1313
4
November 16, 2018
5
To: Napoli Shkolnik PLLC
6
Case Name: In Re: National Prescription Opiate Litigation v
7
Veritext Reference Number: 3112776
8
Witness: Cynthia G Weiskittel      Deposition Date: 11/13/2018
9
10 Dear Sir/Madam:
11
The deposition transcript taken in the above-referenced
12
matter, with the reading and signing having not been
13
expressly waived, has been completed and is available
14
for review and signature   Please call our office to
15
make arrangements for a convenient location to
16
accomplish this or if you prefer a certified transcript
17
can be purchased
18
19 If the errata is not returned within thirty days of your
20 receipt of this letter, the reading and signing will be
21 deemed waived
22
23 Sincerely,
24 Production Department
25
          NO NOTARY REQUIRED IN CA

Veritext Legal Solutions
www.veritext.com                                                                 888-391-3376