# EXHIBIT A

## Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

~~~~~~~~~~~~~~~~~~~~

IN RE:  NATIONAL PRESCRIPTION    MDL NO. 2804
OPIATE LITIGATION
                Case No.
              17-mdl-284
            Judge Dan Polster

This document relates to:
The County of Summit, Ohio, et al., v.
Purdue Pharma L.P., et al.,
Case No. 1:18-OP-45090 (N.D. Ohio)

~~~~~~~~~~~~~~~~~~~~
Videotaped deposition of
PATRICIA RIDEOUT
January 11, 2019
9:05 a.m.

Taken at:
Sheraton Ann Arbor Hotel
3200 Boardwalk Street
Ann Arbor, Michigan
Wendy L. Klauss, RPR

## Page 2

```
 1    APPEARANCES:
 2
      On behalf of Cuyahoga County:
 3       McHugh & Fuller Law Group.
         AMY J. QUEZON, ESQ.
 4       108 1/2 Capitol Street
         Charleston, West Virginia   25304
 5       (304) 347-8383
         Amy@mchughfuller.com
 6          -AND-
         Napoli Shkolnik PLLC
 7       MARIA FLEMING, ESQ.
         55 Public Square, 21st Floor
 8       Cleveland, OH  44114
         (216) 397-1000
 9       Mfleming@napolilaw.com
10    On behalf of Distributor
      AmerisourceBergen Drug Corporation,
11    Co-Liaison Counsel for the Distributor
      Defendants:
12       Reed Smith LLP
         ERIC ALEXANDER, ESQ.
13       LINDSAY A. DeFRANCESCO, ESQ.
         1301 K Street N.W.
14       Suite 1000 - East Tower
         Washington, D.C.  20005
15       (202) 414-9200
         Ealexander@reedsmith.com
16       Ldefrancesco@reedsmith.com
17    On behalf of Insys Therapeutics, Inc.:
         Holland & Knight LLP
18       NICHOLAS A.F. SAROKHANIAN, ESQ.
         200 Crescent Court, Suite 1600
19       Dallas, TX  75201
         (214) 964-9500
20       Nicholas.sarokhanian@hklaw.com
21
22
23
24
25
```

## Page 3

```
 1    APPEARANCES, Continued:
 2    On behalf of Walmart Inc. F/K/A Wal-Mart
      Stores, Inc.
 3       Jones Day
         RICHARD M. BRODSKY, ESQ.
 4       150 West Jefferson
         Suite 2100
 5       Detroit, Michigan   48226-4438
         (313) 733-3939
 6       Rbrodsky@jonesday.com
 7    On behalf of CVS Rx Services, Inc. and
      CVS Indiana, LLC:
 8       Zuckerman Spaeder LLP
         ANTHONY RUIZ, ESQ.
 9       1800 M Street, NW
         Suite 1000
10       Washington, DC   20036-5807
         (202) 778-1823
11       Aruiz@zuckerman.com
12    On behalf of Endo Health Solutions, Inc.,
      Endo Pharmaceuticals Inc., Par
13    Pharmaceutical, Inc., and Par
      Pharmaceutical Companies, Inc., (FKA Par
14    Pharmaceutical Holdings, Inc.)
         Arnold & Porter
15       HEATHER A. HOSMER, ESQ.
         601 Massachusetts Ave,  N.W.
16       Washington, D.C.  20001-3743
         (202) 942-5150
17       Heather.hosmer@arnoldporter.com
18    On behalf of Distributor Defendant
      McKesson Corporation, Co-Liaison Counsel
19    for the Distributor Defendants:
         Covington & Burling LLP
20       MICHAEL LANOSA, ESQ.
         1999 Avenue of the Stars
21       Los Angeles, CA  90067
         (424) 332-4800
22       MLanosa@cov.com
23          ~ ~ ~ ~ ~
24    ALSO PRESENT:
         Neal Durkin, Videographer
25          ~ ~ ~ ~ ~
```

## Page 4

```
 1              TRANSCRIPT INDEX
 2    APPEARANCES:............................   2
 3    INDEX OF EXHIBITS ......................   5
 4    EXAMINATION OF PATRICIA RIDEOUT
      By Mr. Alexander........................  18
 5
      REPORTER'S CERTIFICATE.................. 355
 6
      EXHIBIT CUSTODY
 7    EXHIBITS RETAINED BY COURT REPORTER
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 37

1  of choice was; is that your understanding?
2       MS. QUEZON: Objection to form.
3       A.  Yes.
4       Q.  And what do you recall about the
5  data source issues relating to this issue of
6  what drug somebody was taking when they had
7  some issue with substance abuse and they came
8  in contact with Children and Family Services?
9       A.  As with all other data collection
10 in public child protection work, it's always a
11 bit problematic.  We are terribly
12 under-resourced in every way, staff-wise,
13 dollar-wise, technology-wise, and the state
14 data collection system is not the best, and so,
15 yeah, I had concerns about all kinds of
16 different data points that are important to our
17 work, including the question about drug and
18 alcohol use generally, and about drug of
19 choice, if you will.
20      Again, my concerns were almost
21 universally around underreporting.
22      Q.  So one of the issues, when you have
23 this uncertainty about data, is it's hard to
24 make comparisons from year to year to look at
25 whether there is some real change or whether

Page 38

1  there is just change in how data is entered,
2  right?
3       MS. QUEZON: Object to the form.
4       A.  No.  I think a broad question like
5  annual trending is something that we always
6  did.  I'm talking about troubles with far more
7  specific cause-and-effect questions and -- but,
8  no, we were able to tell quite a bit from big
9  trends.
10      Q.  Let me make it more direct.  When
11 the efforts were, kind of, launched in mid 2014
12 to improve the data in SACWIS, that's the state
13 system you were referring to?
14      A.  Uh-huh.
15      Q.  Yes?
16      A.  Yes.  I'm sorry.
17      Q.  We all do it sometimes.  Let me
18 just go back.
19      So the state system that you
20 referred to, that you said wasn't very good for
21 collecting data while you were working for
22 Cuyahoga County, was called SACWIS,
23 S-A-C-W-I-S, correct?
24      A.  Right.
25      Q.  And in 2014, there were efforts

Page 39

1  initiated to do what was ultimately called a
2  blitz to improve the data specifically focused
3  on the drug of choice and trying to get more
4  accurate information on the number of people
5  who were using opioids or opiates, including
6  heroin, who were in contact with the system --
7       MS. QUEZON: Object to form.
8       Q.  -- is that what you are talking
9  about?
10      MS. QUEZON: Same objection.
11      A.  Yeah.  That wasn't an effort to
12 complete SACWIS, which is completely owned by
13 the state, and the counties have no ability to
14 influence it, or very, very little.
15      That was entirely my own agency's
16 effort to try to put a spotlight on this
17 important issue, at a time when we saw what was
18 happening elsewhere in the state and wanted to
19 sharpen up our data to make sure we were
20 looking at accurate data.
21      Q.  You don't recall any statewide
22 pushes to try to improve the SACWIS data in
23 terms of drug of choice in particular?
24      A.  I don't recall, but it may have
25 also been part of their concern.  It was

Page 40

1  certainly a local one as well.
2       Q.  Focusing on the local one, the part
3  that you had, was there a time when you thought
4  that the entry of drug of choice, including
5  whether it was an opiate or opioid in general,
6  regardless of whether you could identify which
7  particular drug it was and how it was obtained,
8  got better?
9       MS. QUEZON: Object to the form.
10      A.  I don't know.
11      Q.  During your term, did that ever
12 happen, where you thought that the data was now
13 reliable about what drug somebody was actually
14 abusing?
15      A.  There were no resources for an
16 analysis of that type.  Even the so-called
17 blitz wasn't entirely homegrown,
18 pencil-and-paper sort of thing.  That is the
19 nature of the IT support we generally get for
20 SACWIS issues.
21      Q.  So for the time period where you
22 have personal knowledge about the data that was
23 generated relating to Cuyahoga County Children
24 and Family Services, including the drug that
25 somebody was abusing when they were abusing a

Page 41

1   drug, it was never up to the standards where
2   you thought it was reliable and accurate?
3           MS. QUEZON: Object to the form.
4       A.   SACWIS -- as I already said, data
5   collection in child protection, not just in
6   Cuyahoga County, but 88 counties in Ohio and 50
7   states is lousy. I will leave it at that.
8           So those of us who are responsible
9   do what we can with it, but it's not great
10  data. The private sector would be appalled.
11      Q.   So it was never to your standards
12  of being reliable and accurate?
13      A.   No, I wouldn't say that. I mean,
14  it was the best we had, and I'm a firm believer
15  that you work from the data available to you.
16  You don't discount it because you know there
17  are flaws in it.
18          And we -- I treated it as reliable,
19  but I always used any other mechanism available
20  to me to confirm what I was seeing.
21      Q.   So it's not a criticism of Cuyahoga
22  County in general. What I'm trying to get at
23  is whether the data that existed during your
24  time in charge was ever specific enough to
25  point to, like, what particular drug somebody

Page 42

1   was taking or how they ever got it. So why
2   don't we break that down.
3       A.   Yes.
4       Q.   Okay. So if you have somebody and
5   they go into some broad bucket of their drug of
6   choice is, you know, THC, or marijuana, right,
7   you know that for somebody like that, that they
8   are getting marijuana products that they are
9   either smoking or ingesting, and that those are
10  going to be, at that time period, illegal,
11  correct?
12      A.   Uh-huh.
13          MS. QUEZON: Object to the form.
14      Q.   Yes?
15      A.   Yes, that's correct.
16      Q.   If you get that their substance of
17  choice, because it's not always drugs, is
18  alcohol --
19      A.   Uh-huh.
20      Q.   -- you are not boiling down to
21  whether they are focusing on drinking a certain
22  type of alcohol as their alcohol that they tend
23  to abuse, right?
24          MS. QUEZON: Object to the form.
25      A.   Not in a data perspective.

Page 43

1   Certainly in a case management one, yes.
2       Q.   For an individual case, you might
3   pay attention to that?
4       A.   Yes.
5       Q.   And so for other drugs, if somebody
6   is taking -- is abusing cocaine, would you ever
7   boil -- you know, kind of get down to whether
8   they were smoking crack or they were snorting
9   powder or they were using some cocaine in some
10  other manner?
11          MS. QUEZON: Object to the form.
12      A.   Same answer. We would pay a great
13  deal of attention to that for each individual
14  family. There would be not a report out of
15  SACWIS, or anywhere else, to give me totals on
16  that sort of thing.
17      Q.   And during your first stint back in
18  the 90s as deputy director, was that during the
19  time when there was a big cocaine problem in
20  Cuyahoga County?
21      A.   The tail end, yes.
22      Q.   Back then, did you -- did the
23  county or your division within health and human
24  services, to your knowledge, do any kind of
25  analysis of the impact of the cocaine epidemic

Page 44

1   in Cuyahoga County on the provision of public
2   services, like Children and Family Services
3   did?
4           MS. QUEZON: Object to the form.
5       A.   I moved to Cleveland in 95 from a
6   different area of Ohio that was hit even harder
7   by crack cocaine. So there were many analyses,
8   but I could not remember who conducted them or
9   in what format, and I don't know specifically
10  as to whether the analysis was done in
11  Cuyahoga, because I didn't arrive there until,
12  as I said, pretty much the tail end of that,
13  the worst of that epidemic, which started in
14  the 80s.
15      Q.   Just focused on that period 95 to,
16  you said, 98 or 99, when you were deputy
17  director of Cuyahoga County Children and Family
18  Services, did the abuse that was going on then
19  of cocaine put a financial strain and a
20  staffing strain on Children and Family
21  Services?
22          MS. QUEZON: Object to the form.
23      A.   Yes, as does every aspect of
24  parental drug and alcohol use. It's one of the
25  major drivers of child maltreatment, so it

Page 69

1  heroin or other opiates, or whether they used
2  other stuff first?
3      Q.  Let me ask it more fully, because
4  that's not exactly it.
5      A.  Okay.
6      Q.  Do you know if the heroin users in
7  Cuyahoga County or the people who are
8  overdosing on fentanyl or fentanyl analogs were
9  generally starting with a legal prescription
10 for an opioid, written for them and used by
11 them in a legal fashion?
12     A.  I have no data on that.
13     Q.  You heard people say something
14 about this kind of gateway concept, and they
15 think that was what was driving the sometimes
16 called opioid epidemic or heroin epidemic in
17 Ohio in general; is that right?
18     A.  My last lengthy answer was
19 addressing that, in which I shared that I was
20 educated repeatedly, by people who researched
21 this that, in fact, this problem of legal
22 prescription drugs leading to opioid addiction,
23 overdoses, fentanyl problems, you know, was, in
24 fact, a more recent development and a much
25 bigger problem than in the past.

Page 70

1      Q.  Had you ever looked, if you recall,
2  at the data that your folks were pulling out
3  of, like, START or SACWIS during your time
4  there, to look at the rates of opioid pills
5  being used versus heroin usage to see
6  whether --
7      A.  I had no data on that.
8      Q.  -- there was some sort of trend
9  that was either consistent with or inconsistent
10 with a gateway effect?
11     A.  I never had data that was that fine
12 grained.
13     Q.  So let's go back to where we were
14 about, kind of, the burdens on the Division of
15 Children and Family Services.
16         You said there is obviously budget
17 constraints, there is staffing constraints,
18 there are issues of substance abuse in the
19 community.  Are those right so far?
20     A.  Yeah.
21     Q.  Is there also an economic overlay,
22 where when the national economy or the local
23 economy is not doing as well, you tend to have
24 more cases or a greater burden?
25         MS. QUEZON:  Object to the form.

Page 71

1      A.  Every societal issue that puts
2  stress on family causes a higher risk of child
3  welfare involved families.
4          So it is an endless risk.  Name
5  everything that we wish were better in our
6  society, it is helping to create threats to
7  children's safety, which brings those families
8  to the attention of agencies like CCDCFS -- I'm
9  sorry, Cuyahoga County DCFS, which is the child
10 welfare agency.
11         MS. QUEZON:  Abbreviations for
12 everything.
13     A.  Sorry.
14     Q.  Government.
15     A.  Yeah.
16     Q.  So I don't know that we can get to
17 an endless list, but maybe the top five or so
18 from your perspective.  Is substance abuse one
19 of maybe the top five drivers?
20     A.  Yes.
21     Q.  Is mental health --
22     A.  Yes.
23     Q.  -- another driver?
24         And are there also, in your
25 experience, trends in mental health where at

Page 72

1  certain times, like when the economy is bad or
2  when there is national turmoil or foreign wars
3  or that sort of thing, that there can be
4  changes in rates of mental health?
5      A.  You'd have to ask a mental health
6  expert that question.
7      Q.  What about, like, when there
8  is -- let me go on.
9          So what are the other things you
10 would list as the primary drivers of a burden
11 on --
12     A.  Poverty.
13     Q.  Okay.
14     A.  And once we talk about poverty,
15 then we have to unpack that to ask why people
16 are poor, and then we can get into all cases of
17 races and structural and individual, we can get
18 into unemployment, we can get into -- I mean,
19 the stuff is multi, multi, multilayered.
20         So, but, yeah, the presenting
21 problems for families, when they come to the
22 attention of an agency like this one, will,
23 more often than not, have mental health, drug
24 and alcohol issues prevalently represented,
25 yeah.

Page 273

1  Q. And then so these minutes, the
2  couple of pages of minutes are attached, who
3  prepared those?
4  A. I don't remember. My guess -- I'm
5  sorry.
6  Q. Go on.
7  A. My guess is that Jen drafted them,
8  and then I edited them, and we sent them out.
9  Q. So there was a meeting on April 15,
10 2014 attended by you, Trista Piccola, Tammy
11 Chapman-Wagner, Jackie McCray, Jen Croessmann,
12 and Cindy Weiskittel. We have identified a
13 couple of them. Who is Jackie McCray?
14 A. Another deputy director.
15 Q. For what area?
16 A. Resources and placements. So she
17 had all the foster care/adoption contracting,
18 that stuff.
19 Q. And Tammy Chapman-Wagner?
20 A. Tammy, along with Cindy, was
21 responsible for all the direct services, from
22 the hotline through the ongoing -- including
23 START, case review, all that stuff.
24 Q. So there is a bunch of stuff on the
25 first page. Does any of that relate to

Page 274

1  anything on the impact of drug abuse trends or
2  drug abuse?
3  A. I would have to read it all.
4  Q. I can probably speed things up.
5  A. Great.
6  Q. The first thing that I see that has
7  anything do with anything about drug or drug
8  abuse trends or whatever, any of that stuff,
9  frankly, we have been talking about, is at the
10 bottom of the second page --
11 A. Yes.
12 Q. -- carrying over to the top of the
13 third page.
14    Drug of Choice Issue; do you see
15 that?
16 A. Yes.
17 Q. And is that the part of this that
18 relates to anything about drug abuse or
19 substance abuse?
20 A. It basically reflects everything we
21 have just been talking about.
22 Q. So it says, "Problem: We have no
23 way to measure the extent/prevalence of drug
24 use or types of preferred drugs among our open
25 families because SACWIS entry point is so

Page 275

1  rarely used." What do you mean by the entry
2  point?
3  A. Data entry.
4  Q. The people just --
5  A. The data entry --
6  Q. Don't do it?
7  A. -- module isn't being filled in.
8  Q. "Roger Ward," we talked about him
9  from the state, "has been tasked with getting a
10 handle on the statewide child welfare
11 experience with opiates. He is creating a flag
12 in SACWIS for keywords to identify cases
13 involving drugs; he'll also compare a list to
14 services and eventual outcomes for families."
15    The next bullet says, "Our
16 week-long data entry blitz will occur next
17 week. We hope to get a baseline by requiring
18 every WOR to enter drug into SACWIS." Have I
19 read that right so far?
20 A. Uh-huh.
21 Q. What is WOR?
22 A. Worker of record.
23 Q. That's like the caseworker assigned
24 to a case?
25 A. Yeah.

Page 276

1  Q. "Next step. The directive memo on
2  drug of choice entry will go out tomorrow, with
3  a cleanup expectation for next week," and we
4  have gone over that memo. Okay.
5     So this is the way, kind of, it
6  works -- was working within your organization,
7  there was a meeting, launched a memo, it went
8  out, the minutes might come in later, but all
9  of this was, kind of, coming to a head in April
10 of 2014, correct?
11 A. It appears so.
12 Q. I'm going to just do, at the risk
13 of making somebody mad at me, I think, kind of
14 like where we were, it's kind of our baseline,
15 if you will.
16        - - - - -
17    (Thereupon, Deposition Exhibit 19,
18    Designated Confidential, April 28
19    2014 Email with Attachment,
20    Beginning with Bates Label CUYAH
21    002450002, was marked for purposes
22    of identification.)
23        - - - - -
24 Q. Exhibit 19 -- oh, oh, no. I don't
25 want this one. Give it back. Sorry about

Page 353

1  questions to the time of trial. Thank you very
2  much.
3            MR. RUIZ: No questions.
4            MR. BRODSKY: No questions.
5            MR. ALEXANDER: On the phone?
6            A VOICE: No questions.
7            A VOICE: No questions.
8            A VOICE: No questions.
9            MR. ALEXANDER: And for the
10 plaintiffs?
11           MS. QUEZON: No questions.
12           MR. ALEXANDER: I think you are
13 done, Ms. Rideout.
14           THE WITNESS: Thank you.
15           THE VIDEOGRAPHER: This concludes
16 the deposition. The time is 4:17, p.m.
17           MS. QUEZON: We would like read and
18 sign the deposition.
19       (Deposition concluded at 4:17 p.m.)
20                - - - - -
21
22
23
24
25

Page 354

1  Whereupon, counsel was requested to give
2  instruction regarding the witness's review of
3  the transcript pursuant to the Civil Rules.
4
5            SIGNATURE:
6  Transcript review was requested pursuant to the
7  applicable Rules of Civil Procedure.
8
9            TRANSCRIPT DELIVERY:
10 Counsel was requested to give instruction
11 regarding delivery date of transcript.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 355

1            REPORTER'S CERTIFICATE
2  The State of Ohio,  )
3                       SS:
4  County of Cuyahoga.  )
5
6            I, Wendy L. Klauss, a Notary Public
7  within and for the State of Ohio, duly
8  commissioned and qualified, do hereby certify
9  that the within named witness, PATRICIA
10 RIDEOUT, was by me first duly sworn to testify
11 the truth, the whole truth and nothing but the
12 truth in the cause aforesaid; that the
13 testimony then given by the above-referenced
14 witness was by me reduced to stenotypy in the
15 presence of said witness; afterwards
16 transcribed, and that the foregoing is a true
17 and correct transcription of the testimony so
18 given by the above-referenced witness.
19           I do further certify that this
20 deposition was taken at the time and place in
21 the foregoing caption specified and was
22 completed without adjournment.
23
24
25

Page 356

1            I do further certify that I am not
2  a relative, counsel or attorney for either
3  party, or otherwise interested in the event of
4  this action.
5            IN WITNESS WHEREOF, I have hereunto
6  set my hand and affixed my seal of office at
7  Cleveland, Ohio, on this 16th day of
8  January, 2019.
9
10
11
12
13           <%2222,Signature%>
14           Wendy L. Klauss, Notary Public
15           within and for the State of Ohio
16
17 My commission expires July 13, 2019.