# EXHIBIT C

## Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION
~~~~~~~~~~~~~~~~~~~~

IN RE: NATIONAL PRESCRIPTION  MDL No. 2804
OPIATE LITIGATION
        Case No.
        17-md-2804

        Judge Dan Aaron
        Polster

This document relates to:

The County of Cuyahoga, et al. v. Purdue Pharma L.P., et al., Case No. 1:17-OP-45004 (N.D. Ohio)

~~~~~~~~~~~~~~~~~~~~

Videotaped Deposition of
DEBORAH FORKAS

January 23, 2019
10:03 a.m.

Taken at:

Napoli Shkolnik PLLC
55 Public Square, Suite 2100
Cleveland, Ohio 44113

Stephen J. DeBacco, RPR

## Page 2

1  APPEARANCES:
2
    On behalf of the Plaintiffs:
3
      Kelley & Ferraro, by
4        MATT McMONAGLE, ESQ.
      950 Main Avenue, Suite 1300
5        Cleveland, Ohio
      (216) 367-1979
6        mmcmonagle@kelley-ferraro.com
7
    On behalf of Stark County, Ohio; and
8      Summit County, Ohio:
9        Motley Rice, LLC, by
      NATALIE DEYNEKA, ESQ.
10       28 Bridge Boulevard
      Mt. Pleasant, South Carolina 29464
11       (843) 216-9343
      ndeyneka@motleyrice.com
12
13     On behalf of AmerisourceBergen Drug
    Corporation:
14
      Reed Smith, LLP, by
15       ERIC L. ALEXANDER, ESQ.
      LINDSAY A. DEFRANCESCO, ESQ.
16       1301 K Street Northwest, Suite 1000
      East Tower
17       Washington, D.C., 20005
      (202) 414-9403
18       ealexander@reedsmith.com
      (202) 414-9286
19       ldefrancesco@reedsmith.com
20
    On behalf of McKesson Corporation, via
21     teleconference:
22       Covington & Burling, LLP, by
      DELBERT TRAN
23       One Front Street
      San Francisco, CA 94111-5356
24       (415) 591-6000
      dtran@cov.com
25       ~ ~ ~ ~ ~

## Page 3

1  APPEARANCES, Continued:
2
    On behalf of Walmart, Inc.:
3
      Jones Day, by
4        CHRISTOPHER LOVRIEN, ESQ.
      555 South Flower Street
5        Fiftieth Floor
      Los Angeles, California 90071
6        (213) 243-2316
      cjlovrien@jonesday.com
7
8      On behalf of Endo Pharmaceuticals, Inc.,
    Endo Health Solutions, Inc., Par
9      Pharmaceuticals, Inc. and Par
    Pharmaceutical Companies, Inc., via
10     teleconference:
11       Arnold & Porter Kaye Scholer, by
      NICOLE R. LEIBOW, ESQ.
12       250 West 55th Street
      New York, New York 10019-9710
13       (212) 836-7838
      nicole.leibow@arnoldporter.com
14
15     On behalf of Insys Therapeutics:
16       Holland & Knight, LLP, by
      JESSICA L. FARMER, ESQ.
17       800 17th Street Northwest
      Suite 1100
18       Washington, D.C. 20006
      (202) 469-5222
19       jessica.farmer@hklaw.com
20       ~ ~ ~ ~ ~
21
    ALSO PRESENT:
22
      Joe VanDetta, Legal Videographer
23
      ~ ~ ~ ~ ~
24
25

## Page 4

1            TRANSCRIPT INDEX
2
3      APPEARANCES............................. 2
4
5      INDEX OF EXHIBITS ...................... 5
6
7      EXAMINATION OF DEBORAH FORKAS
8      By Mr. Alexander......................... 9
9      By Ms. Deyneka........................... 249
10     By Mr. Alexander......................... 253
11     By Ms. Deyneka........................... 262
12     By Mr. Alexander......................... 263
13
14     REPORTER'S CERTIFICATE................... 266
15
16     EXHIBIT CUSTODY
17     EXHIBITS RETAINED BY THE COURT REPORTER

Page 145

1  or other health care, and that that affects the
2  burden on Children -- Children and Family
3  Services?
4       A.  I would say yes.
5       Q.  The next paragraph says, "Mental
6  illness and substance abuse are our biggest
7  challenges.  If a neglectful mother is a drug
8  user, her children are usually sent to another
9  family member or into foster care while she
10 gets help."
11          "When a mother can demonstrate that
12 she has completed a treatment program and has
13 her life together, you can then focus on
14 reunification, along with several months of
15 monitoring by our workers.  Only if she is
16 fully drug free and there are no instances of
17 abuse or neglect can the case be closed."
18          Did I read that right?
19      A.  Yes.
20      Q.  The statement in here about
21 substance abuse and mothers who were drug
22 users, was -- was that focused on any
23 particular substance or drug or all drugs and
24 substances?
25      A.  I think it was in general.

Page 146

1       Q.  And over this time, were you and
2  your department also tracking the --
3  essentially the burden in individual cases or
4  across your cases of the types of drugs that
5  people were abusing or the substance of abuse
6  that was most prevalent?
7       A.  I don't know if we at that time --
8  during this time when this was written.  I
9  don't know.  I don't recall.
10      Q.  What about overall when you were
11 director of Cuyahoga County Children and Family
12 Services?  Were you looking at, essentially
13 the -- which drugs of choice or substance of
14 abuse were most common?
15      A.  Well, we -- how we were tracking
16 that, you were saying?
17      Q.  Yes.
18      A.  Well, I don't know that we were --
19 were tracking it in a -- in a very good way.
20      Q.  Over your -- over your time in the
21 field, has there been better tracking of things
22 like which drug or substance is driving a case
23 or a participant, a client, is actually
24 abusing?
25      A.  Well, now, it's better.  I mean, we

Page 147

1  have places in SACWIS to document things.  We
2  can document things in different ways.  There's
3  been more roles that have been promulgated to
4  how we are supposed to document.  We didn't
5  have a lot of that at the time.
6       Q.  And that's changed over time?
7       A.  That's changed over time.
8       Q.  So there's better documentation in
9  general of which substances involved in a case,
10 were driving the need for Children and Family
11 Services now, than there was back in 2010?
12      A.  I would say yes.  I mean, it's not
13 a perfect system though.
14      Q.  So one of the things that you get
15 when you have a change in how often drug of
16 choice is or how well drug of choice is tracked
17 is you can make it look like there's a new
18 problem with a drug that is just because
19 they're tracking it better, right?
20      A.  Right, correct.
21      Q.  And so when we look back at any of
22 the historic data from SACWIS about drug trends
23 or, you know, drugs being involved in a
24 different Children and Family Services case, we
25 have to take into account that how they tracked

Page 148

1  the drug of choice or substance of choice, may
2  have changed over time, right?
3       A.  I don't know that as a fact, but it
4  may be true.  It may not be.  I don't know.
5       Q.  I mean, given your position as
6  director of or assistant director of three
7  different Ohio counties over the time period
8  when SACWIS has been in place, that's your
9  experience, right?
10      A.  I have some experience with that,
11 but I don't know if that's true on all these
12 cases.
13      Q.  If you could just look through to
14 the next page, it's page 4, first full
15 paragraph says, "But we face terrific odds.  In
16 2008, even before the recession hit, 42 percent
17 of Cleveland children lived in poverty and 65
18 percent were in single-parent families.  Among
19 50 American cities, only Detroit was worse.
20 Now, the recession, state budget cuts, high
21 unemployment, rising homelessness and poverty,
22 and a shortage of support services such as
23 mental health care mean it's harder every day
24 for our agency alone to protect children."
25          Did I read that right?

Page 229

1  A.  -- did this?
2  Q.  So somebody at the -- at Ohio ran
3  this report and generated this, and in response
4  to a request from Cuyahoga.  Okay?
5  A.  Really?
6  Q.  That's what we were told.  So I'm
7  not going to belabor it, because this is not,
8  obviously, a document that was generated back
9  when you were with Cuyahoga County.
10  A.  Thank you.
11  Q.  But if you look at the -- the dates
12  of the -- the cases in here, they start in 2006
13  and go forward.  Do you see that?
14  A.  I see that.
15  Q.  And do you know when SACWIS first
16  started to be used?
17  A.  Oh, I don't remember.
18  Q.  And have you ever seen reports that
19  are in -- generally of this format from SACWIS?
20  A.  Generally.
21  Q.  And -- and to run a report from
22  SACWIS, you have to pick which fields to
23  include and which parameters, and you have to
24  define a search using, you know, Boolean
25  operators or some sort of specifics of

Page 230

1  programming, right?
2  A.  Yes.
3  Q.  So whatever is in this report
4  doesn't necessarily mean that's all of what is
5  in SACWIS, let alone the underlying case files
6  for any individual case referenced here,
7  correct?
8  A.  I don't know that.  I assume.
9  Q.  It may or may not be all?
10  A.  Right, may or may not.  I don't
11  know.
12  Q.  But there are more fields than
13  these, what, eight fields or something, in
14  SACWIS, aren't there?
15  A.  Yeah, I believe there are.  I'm not
16  a SACWIS guru, to be honest with you.
17  Q.  And if you go forward, keeping in
18  mind that this goes back to 2006, and if you
19  were to flip through, you'd see that -- that
20  this includes cases from the time period when
21  you were the director, from '09 to early '11.
22   You -- do you see that, that this
23  involves cases from the time period when you
24  were director of Cuyahoga County --
25  A.  Yes.

Page 231

1  Q.  -- Children and Family Services?
2  A.  Yes.
3  Q.  Okay.  So if you could go to, then,
4  the -- the second tab, which is, luckily,
5  smaller paper, less fields, a little easier to
6  follow.  It's --
7  A.  The second blue tab or the
8  second -- just the second tab?
9  Q.  The second tab, so the first blue
10  tab on the --
11  A.  Okay.
12  Q.  -- smaller paper.
13  A.  Got it.
14  Q.  You got it?
15  A.  I got it.
16  Q.  So this report has year-by-year
17  data on abandonment, count, percentage, and
18  then it says, "Alcohol Abuse of child,"
19  "Alcohol Abuse of parent."
20   Do you see that?
21  A.  I see it.
22  Q.  And then, in later ones, it talks
23  about substance abuse, disability, desertion,
24  dependency.  There are a bunch of these
25  columns, according to what was run in an

Page 232

1  individual report.
2   Do you see that?
3  A.  Uh-huh.
4  Q.  Did you have reports run like this
5  when you were --
6  A.  No.
7  Q.  -- director?
8  A.  No.
9  Q.  Did you receive reports like this,
10  even if you didn't ask for them?
11  A.  No.
12  Q.  Did the reports you had available
13  to you back then have the level of information
14  where you could get down to which particular
15  drug it was that a parent might be abusing
16  or --
17  A.  I don't believe so.  I --
18  Q.  I mean, you -- you actually know
19  that, right?  That you generally didn't have --
20  A.  Yeah, we didn't have --
21  Q.  -- specificity?
22  A.  No.  We didn't have specificity out
23  of SACWIS originally.
24  Q.  Yeah.  It would say "drug abuse" or
25  "alcohol abuse."

Page 233

1 A. No.
2 Q. It wouldn't say this person's a
3 cocaine addict or a --
4 A. Uh-huh.
5 Q. -- you know, PCP addict or
6 whatever, right? Is that correct?
7 A. That's correct.
8 Q. So any kind of data that was added
9 later to allow specificity on drug of choice or
10 the specific drug somebody was abusing that
11 covers a period of time of 2009 or 2010 would
12 need to have been added later, correct?
13 A. It seems so. I'm not an expert,
14 but I would think so.
15 Q. From what you know, that
16 information, that level of information was not
17 in the database --
18 A. Correct.
19 Q. -- on a realtime basis back when
20 you were a director --
21 A. No.
22 Q. -- correct?
23 A. Cor- -- correct.
24 Q. So if you go through to Tab 3, you
25 see some of the things are highlighted in here,

Page 234

1 and I'll represent to you the highlighting was
2 in the original. We didn't add it. That's how
3 we got the document. And so it specifically
4 mentions, like, barbiturates, three different
5 categories of barbiturates. It has
6 buprenorphine. It has codeine, multiple
7 categories. It has methadone. It has opiate,
8 morphine. It has a bunch of different drugs
9 that have been highlighted.
10 Do you see that?
11 A. No, I don't see that. I'm sorry.
12 I'm having a hard time.
13 Q. In Tab 3.
14 A. One --
15 Q. The first page looks like this,
16 ma'am.
17 MR. McMONAGLE: That's it.
18 Q. There.
19 A. Thank you, sir.
20 Q. So if you just flip through the
21 highlighted parts that were in the original as
22 we got it, a numbers of -- a number of names of
23 specific drugs or facts related to drugs are
24 highlighted in here, including, like I said,
25 specific drugs like hydromorphone, morphine,

Page 235

1 and then there are categories related to drugs
2 like prenatal drug exposure, positive
3 toxicology screen at birth.
4 Do you see those?
5 A. I'm still working on it.
6 Q. Okay.
7 A. Yeah, I see it.
8 Q. These specific -- this level of
9 detail relating to drug abuse or the way in
10 which somebody was identifi- -- a case was
11 identified as involving drugs --
12 A. Uh-huh.
13 Q. -- that wasn't in SACWIS back in
14 2009, 2010, and early 2011, was it?
15 A. I don't think so.
16 Q. Because one of the things that
17 we've seen from a lot of the documents from
18 even a couple of years after you is people
19 saying, you know, we can't really drill down to
20 what drug is really driving this because SACWIS
21 just doesn't have that data.
22 A. Uh-huh.
23 Q. Does that sound right --
24 A. When was this --
25 Q. -- to you?

Page 236

1 A. It could be. When -- when -- may I
2 ask a question? When was this ra- -- ran?
3 When was --
4 Q. Aug- --
5 A. -- this run?
6 Q. August of 2018.
7 A. '18 it was run, okay.
8 Q. Late August of 2018.
9 So if you look, then, to the fourth
10 tab, there's a report where there's a case ID,
11 a person ID, an age, characteristic code,
12 characteristic description, and substance flag.
13 Do you see that? Those are the
14 column headings?
15 A. Yes.
16 Q. What's the difference between a
17 case ID and a person ID?
18 A. I don't know. I have no idea. I
19 didn't deal with their co- -- those codes --
20 Q. Okay.
21 A. -- in SACWIS. So I just -- I don't
22 know. I have no idea.
23 Q. But this --
24 A. I mean, all cases had person IDs.
25 That's -- I do know that, but I don't know what

```
                                                      Page 265
 1      Whereupon, counsel was requested to give
 2   instructions regarding the witness's review of
 3   the transcript pursuant to the Civil Rules.
 4
 5           SIGNATURE:
 6   Transcript review was requested pursuant to the
 7   applicable Rules of Civil Procedure.
 8
 9           TRANSCRIPT DELIVERY:
10   Counsel was requested to give instructions
11   regarding delivery date of transcript.
```

```
                                                      Page 266
 1           REPORTER'S CERTIFICATE
 2   The State of Ohio,   )
 3                          SS:
 4   County of Cuyahoga.  )
 5
 6        I, Stephen J. DeBacco, a Notary
 7   Public within and for the State of Ohio, duly
 8   commissioned and qualified, do hereby certify
 9   that the within named witness, DEBORAH FORKAS,
10   was by me first duly sworn to testify the
11   truth, the whole truth and nothing but the
12   truth in the cause aforesaid; that the
13   testimony then given by the above-referenced
14   witness was by me reduced to stenotypy in the
15   presence of said witness; afterwards
16   transcribed, and that the foregoing is a true
17   and correct transcription of the testimony so
18   given by the above-referenced witness.
19        I do further certify that this
20   deposition was taken at the time and place in
21   the foregoing caption specified and was
22   completed without adjournment.
```

```
                                                      Page 267
 1        I do further certify that I am not
 2   a relative, counsel or attorney for either
 3   party, or otherwise interested in the event of
 4   this action.
 5        IN WITNESS WHEREOF, I have hereunto
 6   set my hand and affixed my seal of office at
 7   Cleveland, Ohio, on this 28th day of
 8   January, 2019.
 9
10
11
12
13        <%11472,Signature%>
14        Stephen J. DeBacco, Notary Public
15        within and for the State of Ohio
16
17   My commission expires September 30, 2022.
```

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

January 28, 2019

To: Mr. McMonagle

Case Name: In Re: National Prescription Opiate Litigation v.

Veritext Reference Number: 3202803

Witness:  Deborah Forkas  Deposition Date:  1/23/2019

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of
this letter, the reading and signing will be deemed waived.

Sincerely,

Production Department

NO NOTARY REQUIRED IN CA