UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | CASE NO. 1:17-MD-2804 |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: "*Track One Cases*" | ) ) ) | |
| | ) ) ) | DISCOVERY RULING NO. 18 REGARDING PRESCRIPTIONS AND DISPENSING DATA |

This Discovery Ruling addresses two matters pending before the Special Master – one that derives from Discovery Ruling No. 5, and one that derives from Discovery Ruling No. 8.  In both matters, the parties ask the Special Master to order production of more detailed discovery.  In both matters, the Special Master declines.

**Agenda Item 89 – Compliance with Discovery Ruling No. 5**

This is at least the third time the Special Master has addressed complaints by defendants that plaintiffs have not sufficiently answered manufacturers' Interrogatory no. 6.

After plaintiffs objected to this interrogatory as initially drafted, the Special Master ruled in Discovery Ruling No. 5 that plaintiffs must respond to it as rewritten by the undersigned. Specifically, the Ruling directed plaintiffs to respond to the following Interrogatory:

> Identify and describe 500 prescriptions of opioids that were written in [Plaintiff's jurisdiction] in reliance on any alleged misrepresentations, omissions, or

>   other alleged wrongdoing by any Defendant. Include in the response the healthcare provider; the patient; the date of prescription; which opioid or opioids were prescribed; the specific misrepresentation, omission, or wrongdoing that allegedly caused the prescription to be written; the Defendant and the specific sales representative(s), employee(s), or agent(s) of the Defendant that made or committed the alleged misrepresentation, omission, or wrongdoing; the person or persons to whom the alleged misrepresentation or omission was made or to whom the alleged wrongdoing was directed; and whether, by whom, and for how much the prescription was approved for reimbursement. Your response must include at least 10 prescriptions for an opioid sold by each manufacturing defendant.

*See* DR No. 5 (docket no. 1027) at 2-3.  The Special Master also rewrote a few other Interrogatories and instructed the plaintiffs to answer them, too.

Plaintiffs objected to DR No. 5, asserting the rewritten Interrogatories were still too broad; the Court overruled this objection, with a caveat, as follows:

>   Instead of answering the disputed interrogatories as required by the Discovery Ruling [No. 5], Plaintiffs may instead elect not to answer them ***on the condition*** that Plaintiffs instead categorically and affirmatively respond to the disputed interrogatories by stating that: (1) they will not assert, either in expert opinions or factual presentations at trial, that any specific prescriptions "were unauthorized, medically unnecessary, ineffective, or harmful" or that "the filling of [any specific prescriptions] caused or led to harm for which [Plaintiffs] seek to recover," and (2) Plaintiffs instead will rely, at trial and in expert opinions, solely on a theory of aggregate proof.

Order at 1-2 (docket no. 1047) (footnote omitted; emphasis in original).

Plaintiffs decided to answer the Interrogatories, but defendants were dissatisfied and moved to compel a more thorough response.  As explained in Discovery Ruling No. 13, "With their most recent responses, Plaintiffs identified specific prescriptions and persons in response to Manufacturer ROGs 7 & 10 and Pharmacy ROGs 2 & 3, but did not identify specific prescriptions in response to Manufacturer ROG 6."  *See* DR No. 13 (docket no. 1215) at 6.  The Special Master ruled that

plaintiffs either had to answer *all five* of these interrogatories fully, or instead state they will rely, at trial and in expert opinions, solely on a theory of aggregate proof.  *Id.*

Plaintiffs then supplemented their answer to manufacturers' Interrogatory no. 6, but defendants now remain dissatisfied.  Defendants complain that plaintiffs' newest response "failed to provide the discrete and critical information requested in Interrogatory No. 6: the details about the specific misstatements that each specific doctor relied on in writing each specific prescription."  Letter to Special Master from D. Welch at 2 (Jan. 4, 2019) (agenda exhibit 89H).  Defendants insist that, for each of the 500 prescriptions, plaintiffs must respond with (i) "the *specific* misrepresentation, omission, or wrongdoing that allegedly caused the prescription to be written;" (ii) "the *specific* sales representative(s), employee(s), or agent(s) of the Defendant" that made the alleged misrepresentation; and (iii) "the *[specific]* person or persons to whom the alleged misrepresentation or omission was made."  *Id.* (some emphasis in original).

Plaintiffs assert that the level of detail defendants seek is unnecessary and excessive. Plaintiffs explain that: (1) their Interrogatory response "lists multiple false statements that were made by Defendants and the ways in which Defendants disseminated those statements – publicly; via sales representatives, CMEs and speakers; in articles and treatment guidelines; and in other ways;" (2) "*collectively*, Defendants' misrepresentations changed the standard of care for prescribing opioids;" (3) plaintiffs will not prove their case "by proving prescribers relied on a *specific* misrepresentation made by a *specific* representative of Defendants in writing *specific* prescriptions;" rather they will "prove their case with aggregate, and not individualized proof;" and (4) they "do not intend, and have never intended, to demonstrate specific reliance by these medical professionals on a prescription-by prescription basis."  Letter to Special Master from L. Singer at 3-4 (Jan. 8, 2019) (agenda exhibit 89R) (emphasis added).

In DR No. 13, the Special Master overruled defendants' argument that plaintiffs had not adequately answered manufacturer Interrogatories 7 and 10, finding that "Plaintiffs have sufficiently identified the connections between the prescriptions and misstatements at issue."  DR No. 13 (docket no. 1215) at 7.  The Special Master reaches the same conclusion regarding manufacturer Interrogatory no. 6.

The essence of plaintiffs' claim is that by "misrepresenting the risks and benefits of opioids, particularly for long-term use and at high doses, and for non-cancer chronic pain, Manufacturer Defendants deprived *all* prescribers and patients from having accurate information about the dangers and appropriateness of opioids, rendering *all* prescriptions improper." Letter to Special Master from L. Singer at 6 (Jan. 8, 2019) (agenda exhibit 89R) (emphasis added).  With their response to Interrogatory no. 6, Plaintiffs have produced data regarding 500 specific prescriptions (actually many more than that) written in reliance on defendants' alleged wrongdoings; this data includes the specific patient, prescriber, drug, pharmacy, diagnosis, and various other information.  Responses to other Interrogatories set out what the alleged wrongdoings are and make clear that plaintiffs claim these wrongdoings affected *every* prescription and *every* prescriber.

Ultimately, plaintiffs simply do not claim that a specific misrepresentation made by a specific defendant representative led to the writing of a specific prescription.  Therefore, it is not reasonable to require plaintiffs to provide this information in response to Interrogatory no. 6. Whether the evidence that *is* adduced can support plaintiffs' claims and legal theories remains an open question; but whether plaintiffs' responses provide defendants with sufficient information relevant to the claims and defenses actually at issue in the Track One cases is not.

In sum, the Special Master will not order plaintiffs to supplement their response to manufacturer's Interrogatory no. 6.

**Agenda Item 29 – Compliance with Discovery Ruling No. 8**

In Discovery Ruling No. 8, the undersigned addressed a dispute regarding the pharmacy defendants' "dispensing information." The Special Master ruled that plaintiffs were entitled to some, but not all, of the dispensing information they sought. *See* DR No. 8 (docket no. 1055) at 3-5 (setting out what types of information defendants did and did not have to produce). For example, this Ruling stated the pharmacy defendants had to produce "dispensing data [if the defendants used it] as a component of their suspicious order monitoring programs." *Id.* at 3; *see also id.* at 4 (directing pharmacy defendants to produce "Documents regarding evaluation of opioid orders from a particular retail pharmacy in Track One jurisdictions, whether before or after those orders are placed. ***To the extent such an evaluation includes dispensing data, that data must also be produced.***") (emphasis added). But the pharmacy defendants did not have to produce "*all* dispensing documents and data, and evidence of *all* dispensing violations." *Id.* at 2.

Plaintiffs now contend that deposition testimony by employees of defendant Rite-Aid shows that Rite-Aid actually used virtually *all* of its dispensing data as a component of its suspicious order monitoring program. Specifically, testimony establishes that Rite-Aid used an "auto-replenishment system," which generated automatic orders to Rite-Aid's distribution centers from individual pharmacies for a given opioid. The automatic order was based primarily on the pharmacy's past volume, rate of sale, and inventory on hand for that opioid. Ultimately, this means that <u>the amount of the specific opioid *dispensed* by the individual pharmacy</u> was an important factor used by the auto-replenishment system to order more of that opioid for that pharmacy. And Rite-Aid states that its auto-replenishment system also acted as the principal element of its Suspicious Order Monitoring

System.[1]

Plaintiffs present a good argument that the dispensing data is, therefore, a component of Rite-Aid's SOMS.  Nonetheless, the Special Master concludes plaintiffs are not entitled to Rite-Aid's dispensing data at this time.[2]  In light of what plaintiffs already know, and where the parties are in the Track One discovery process, the burden on Rite-Aid to produce all of its opioid dispensing data would be undue.  The Special Master agrees with this assessment by Rite-Aid:

> Plaintiffs have the facts concerning how the auto replenishment system worked from document production and deposition testimony – the specific dispensing data which was used in that system with other information is not necessary to enable Plaintiffs to address whether that system and other Rite Aid policies, procedures, and systems were together sufficient to satisfy the suspicious order monitoring requirements for the Controlled Substances Act.
> If Plaintiffs want to argue, as they suggested during meet and confer, that the system was not designed to identify and screen out fake or illegitimate prescriptions, they can do that based on the information they already have about how the algorithm worked.

Letter from J. Lavelle to Special Master at 6 (Jan. 14, 2019).

In sum, the information plaintiffs already have regarding Rite-Aid's auto-replenishment system, together with the ARCOS data they already have (which shows, with perhaps less granularity than would dispensing data, the opioids sold by each Rite-Aid pharmacy), is sufficient.

---

[1] At least some of the testimony in question suggests the auto-replenishment system acted primarily to ensure sufficient inventory in individual pharmacies to support ongoing rates of sale for opioids, and not to ascertain whether those sales involved possible diversion.  Other testimony, however, suggests Rite-Aid also intended the auto-replenishment system to identify suspicious orders.  Another element of Rite-Aid's SOMS apparently included examination by the distribution center of whether an order exceeded a threshold.

[2] As the Special Master noted in DR No. 8, "[a]t some future juncture (e.g. after the first trial), the balance the Court must weigh under Fed. R. Civ. P. Rule 26(b)(1) may well shift, making plaintiffs' additional requested discovery appropriate."  DR No. 8 (docket no. 1055) at 5.

Accordingly, the Special Master will not order Rite-Aid to supplement its production of dispensing data at this time.

      **RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**Dated: March 26, 2019**