## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | CASE NO. 1:17-MD-2804 |
| OPIATE LITIGATION | ) | |
| | ) | SPECIAL MASTER COHEN |
| THIS DOCUMENT RELATES TO: | ) | |
| *"Track One Cases"* | ) | |
| | ) | DISCOVERY RULING NO. 14, PART 5 |
| | ) | REGARDING PRIVILEGE CLAIM ON |
| | ) | CARDINAL'S DENDRITE AUDIT |

**AGENDA ITEM NO. 84**

During Track One discovery, defendant Cardinal Health withheld thousands of documents from discovery as privileged. This includes "documents drafted by and/or received by [Cardinal's] third-party consultants at Cegedim Dendrite (currently owned by IQVIA) [hereinafter, "Dendrite"] and Deloitte." Letter from M. Fuller to Special Master Cohen at 1 (Dec. 10, 2018) (agenda exhibit 84A). One of these documents is an "on-site audit of Cardinal's SOM system" performed by Dendrite in January of 2008. *Id.* Plaintiffs have obtained in discovery a similar audit performed by Dendrite for Masters Pharmaceuticals, so plaintiffs know what Cardinal's Dendrite Audit likely contains: a thorough analysis of Cardinal's Suspicious Order Monitoring System and recommendations on "corrective actions" that can make Cardinal more "compliant" with government requirements. *Id.* at 2. Plaintiffs insist Cardinal's Dendrite Audit document is not protected by attorney-client privilege.

The Special Master directed Cardinal to produce the Audit document for *in camera* review, and the parties have submitted numerous letters, with exhibits, arguing whether attorney-

privilege applies.  Having considered these submissions carefully, the Special Master concludes for the reasons stated below that the audit document is not privileged and Cardinal must produce it, along with other, related documents.[1]  Some of these other documents will be addressed separately in Discovery Ruling No. 14, Part 6.

## I.  Relevant Facts.

In 2007, Cardinal operated 27 distribution centers around the country, each of which had obtained a separate registration from the United States Drug Enforcement Agency ("DEA") to distribute opioids.  Beginning in late 2007, the DEA initiated a crack-down on problems it had identified with several of Cardinal's distribution centers.  Specifically, in November and December of 2007, and early January of 2008, the DEA issued Orders to Show Cause to revoke Cardinal's registration for four of its distribution centers in Washington, Florida, New Jersey, and Texas.  The DEA also issued Immediate Suspension Orders for the first three.  Subsequent investigation by the DEA revealed concerns with three other Cardinal distribution centers in Georgia, California, and Colorado.

Cardinal worked with its attorneys at Cadwalader, Wickersham & Taft LLP to respond

---

[1] Plaintiffs have identified numerous documents as representative of the types of documents withheld by defendants based on privilege, and have asked the undersigned to review these representative documents *in camera*.  The parties understand they should apply rulings on these representative documents to other, similar documents.

As used in this ruling, then, "other, related documents" generally include any document provided by Dendrite to Cadwalader or Cardinal to which the analysis below could apply – including, for example, Dendrite's reports of on-site pharmacy reviews.  Moreover, as the parties have recognized, the analysis below may also apply generally to documents provided by: (1) Dendrite to other defendants; and (2) other consultants to Cardinal and other defendants.  The parties are directed to apply this *Ruling* to these other documents as appropriate.

2

quickly to the DEA's 2007 Orders.  One of the first things Cadwalader did was to hire Dendrite on December 5, 2017, the same day Cardinal received its second Immediate Suspension Order.[2] Cadwalader's agreement with Dendrite stated it was "providing legal advice to its client Cardinal . . . in preparation  of its pending regulatory action," and Cadwalader was hiring Dendrite "to assist with regulatory compliance consulting to Cardinal Health."  Agreement at 3.   Dendrite's more-particularized "Statement of Work for Cadwalader/Cardinal" explained that:

> Dendrite's consultants will provide regulatory compliance consulting as it relates to the Controlled Substances Act, and implementing regulations.  Our regulatory compliance consulting services include supporting Cardinal's suspicious order monitoring program including but not limited to * * * Support Cardinal's ongoing discussions and negotiations with the DEA.

*Id.*[3]

Over the next few weeks, Dendrite and Cardinal fleshed out more precisely what services Dendrite would provide.  For example, on December 14, 2007, in response to Cardinal's request for "the proposed scope and specs of the Dendrite IT testing project," Dendrite stated its "primary objectives associated with the SOM [Suspicious Order Monitoring] review" were to "assist Cardinal

---

[2] As noted, Cardinal did not hire Dendrite directly; rather, Cardinal's law firm, Cadwalader, entered into the consulting agreement with Dendrite.  But documents show it was Cardinal that paid Dendrite, not Cadwalader.  Moreover, Cardinal designated these payments as regulatory expenses, not legal expenses.  *See* exhibit 10 to letter from Mike Fuller to Special Master (Mar. 13, 2019) (internal Cardinal email stating: "It has been decided that the Dendrite expenses and Litigation expenses related to the anti-diversion matter will be retained within the QRA [Quality & Regulatory Affairs] corporate function.  This was a decision by Jeff H based on a commitment he made to the DEA.")

[3] Cardinal provided the Cadwalader/Dendrite Agreement to the Special Master *in camera*, asserting that at least certain portions of it – including the blue-highlighted language quoted above and elsewhere in this *Ruling* – are privileged.  The Special Master asked Cardinal for permission to quote this language in this *Ruling* and Cardinal graciously agreed, on condition that doing so would not be considered a waiver of the privilege.

in an onsite review of its beta release of its suspicious order monitoring program/system and corresponding operating procedures.    Cegedim Dendrite will provide Cardinal with recommendation[s] on any corrective actions that may be required to have a more compliant SOM system (i.e., disclos[ur]e of suspicious orders of controlled substances before they are shipped)." *See* exhibit 1 to letter from Mike Fuller to Special Master (Feb. 15, 2019).  Dendrite's work to make Cardinal's SOM system "more compliant" would include "[r]eview of Cardinal's suspicious order monitoring SOPs that describe its SOM system," "[v]erification of appropriate computer systems validation approaches and/or testing documentation for the SOM system," and so on.  *Id.*  Dendrite added it would also undertake a second phase of SOM system review, involving "a full validation executed by our team (or jointly with Cardinal if that is preferred) once the [new, improved SOM] system is finalized for full release."  *Id.*

In addition to helping Cardinal redesign its SOM system, Dendrite also confirmed early on that it would investigate the client pharmacies to which Cardinal shipped opioids,[4] assess Cardinal's other distribution centers,[5] help to "roll out [the new SOM] system . . . internally,"[6] and "provide DEA with proof of the effectiveness of [Cardinal's] processes."[7]  Dendrite also later provided in-house training to Cardinal employees on suspicious order monitoring and detection/prevention of

---

[4]  *See* exhibit 2 to letter from Mike Fuller to Special Master (Feb. 15, 2019) (Dendrite confirming it will perform "pharmacy onsite reviews, calls to hospitals to verify supposed hospital pharmacies," and "assisting with determining continued pharmacy client decisions."); *id.* at exhibit 4 (noting Dendrite will be "gathering background information from [Cardinal's] customers who order controlled substances.").

[5]  *See id.* exhibit 2 (Dendrite confirming it would conduct distribution center reviews).

[6]  *Id.* exhibit 3.

[7]  *Id.*

4

diversion.  *Id.* exhibit 5.

Having retained Dendrite for this array of assignments, Cardinal proceeded to respond to the DEA's Orders by highlighting Cardinal's relationship with Dendrite and the work Cardinal had agreed Dendrite would do.  For example, on December 18, 2007, Cardinal's Chief Legal Officer told the DEA's Office of Chief Counsel that Cardinal was working voluntarily and proactively with Dendrite to investigate its own distribution centers:

> I wanted to inform you that last week we initiated an intensive onsite third-party review of 18 distribution centers that have not been the subject of your recent enforcement actions.  Starting yesterday, teams of attorneys from our outside law firms, accompanied by consultants from Dendrite, will be visiting the distribution centers and reporting their findings to us.  The purpose of the review is to provide a detailed and on-the-ground assessment of the current effectiveness of our anti-diversion controls.  We envision making a summary of this assessment available to you in the near future.

Letter from Ivan Fong to D. Linden Barber at 3 (Dec. 18, 2007).  The intention of this letter, of course, was to placate the DEA and avoid receipt of additional DEA Show Cause Orders for other distribution centers.  The letter was accompanied by a chart listing numerous other actions Cardinal was voluntarily undertaking to show its commitment to "anti-diverson" of opioids.  *Id.* at exhibit 1.  These actions included: (1) "[s]upplement[ing] both anti-diversion unit and field organization efforts with resources from Dendrite until new positions and gaps are closed;" (2) using Dendrite to "conduct independent third-party, on-site investigations of anti-diversion control processes at each distribution center to identify risks;" (3) using Dendrite to "[c]onduct [a] retrospective review of high-volume customers of hydrocodone [and] oxycodone;" and (4) using Dendrite to "[d]evelop [a] corrective action plan and implement improvements arising out of [its] independent third-party investigation."  *Id.*

5

On the same day that Cardinal's Chief Legal Officer wrote to the DEA, Cadwalader asked the DEA to modify the Immediate Suspension Order for Cardinal's New Jersey distribution center by allowing a "limited exception," or "carve-out," permitting Cardinal to ship opioids to hospitals and national chain pharmacies.  As a sweetener, Cadwalader offered as follows:

> To assuage any concerns the DEA might have with respect to granting the proposed modification, Cardinal Health would, upon the granting of the modification, place an employee from Cegedim Dendrite ("Dendrite") on-site at the [New Jersey] facility during the remainder of the suspension. The Dendrite employee will work with Cardinal Health's corporate Quality and Regulatory Affairs group to monitor the controlled substance orders placed by such customers and the procedures in place at the facility with respect to processing them.  In addition, Cardinal Health will provide to the DEA such reports on the controlled substance orders as the DEA deems appropriate.

Letter from Jodi Avergun to Larry Cote at 3 (Dec. 18, 2007).

After the DEA denied the requested "limited exception" for the New Jersey distribution center, Cadwalader asked for reconsideration, and suggested an even broader role for Dendrite:

> Cardinal Health has previously offered to engage employees of Dendrite, a leader in anti-diversion compliance in the private sector, at the Swedesboro[, New Jersey] facility to monitor and enforce a limited exception to the immediate suspension orders.  The Company extends that offer to include the Lakeland, Florida and Auburn, Washington facilities.

Letter from Jodi Avergun to Larry Cote at 3 (Jan. 14, 2008).[8]

Cadwalader also updated the DEA regarding Dendrite's "intensive onsite third-party review of [Cardinal's] distribution centers," which Cardinal's Chief Legal Officer had mentioned a month

---

[8]  The DEA did not grant Cardinal's requested "limited exceptions" to the three Immediate Suspension Orders.  Documents submitted to the Special Master leave unclear whether Cardinal embedded Dendrite employees in any of its distribution facilities.

6

earlier:

> [Cardinal] authorized its outside counsel and [Dendrite] to undertake a review of all
> of its distribution centers to determine if there was any immediate risk or incidences
> of blatant diversion that Cardinal Health had previously failed to detect, with the goal
> of reporting those results to the DEA at the completion of the investigation. * * *
> That review has included site visits to 21 of Cardinal Health's 23 [sic] distribution
> centers . . . and independent site visits and verifications of more than 170 of Cardinal
> Health's retail independent customers by a team of Dendrite investigators and
> consultants.  As you know, we have scheduled a meeting with you later this week to
> provide a preliminary report.

*Id.* at 3.

Cardinal's promise to the DEA that it would use Dendrite to "[d]evelop [a] corrective action plan and implement improvements arising out of [its] independent third-party investigation" began to come true when, on January 23, 2008, Dendrite delivered to Cadwalader the "Dendrite Audit." *In camera* review of this document shows the entire thrust of the Audit was to determine the extent to which Cardinal's Suspicious Order Monitoring System met existing DEA regulatory requirements, and to identify and execute modifications necessary to improve compliance.

Dendrite sent its Audit directly to Jodi Avergun of Cadwalader, and the Audit is marked "attorney client privileged/confidential."  Avergrun forwarded the Audit to only two Cardinal employees, both of whom were high-level in-house counsel.  Cardinal has found no other copies of the Audit in any of the files of litigation custodians in this case.  Cardinal has also treated other documents produced by Dendrite as privileged.  For example, Cardinal has listed on its privilege log, and not produced, reports created by Dendrite and provided to Cadwalader documenting Dendrite's pharmacy site visits.

Dendrite did go on to assist Cardinal with the design and implementation of a new and

improved Suspicious Order Monitoring System.  Ultimately, Cardinal resolved the DEA's 2007

Show Cause Orders and Immediate Suspension Orders in September of 2008 by paying a record fine

of $34 million and agreeing to maintain an improved compliance program designed to detect and

prevent diversion of controlled substances.  Despite this resolution, due to continuing problems with

suspicious order monitoring, due diligence, and diversion, the DEA pursued new investigations of

Cardinal's distribution centers in Maryland, Florida, New York and Washington beginning in 2012,

and Cardinal paid an additional $44 million fine in 2016.


**II.    Legal Standards.**

The Special Master has set out the legal standards applicable to attorney-client privilege and

the work-product doctrine in *Discovery Ruling No. 14, Part 1* and *Amended Discovery Ruling No.

14, Part 1*.  *See* docket nos. 1321 & 1380; *see also* Order at docket no. 1428 (affirming these

*Rulings*).  Those standards are repeated and amplified here.[9]


**A.    Attorney-Client Privilege.**

"The Sixth Circuit has set forth the essential elements of the attorney-client privilege: '(1)

Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as

such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6)

are at his insistence permanently protected (7) from disclosure by himself or by his legal adviser,

(8) unless the protection is waived.'" *Ohio A. Philip Randolph Institute v. Smith*, 2018 WL 6591622

---

[9] In addition to the analysis set out within this *Ruling*, the Special Master has applied and
incorporates herein the legal standards and authorities set out in all prior "Discovery Rulings No.
14, Part x."  This includes docket nos. 1321, 1353, 1359, 1380, 1387, & 1395.

at *2 (S.D. Ohio Dec. 15, 2018) (quoting *Fausek v. White*, 965 F.2d 126, 129 (6th Cir. 1992)).  When asserting attorney-client privilege, "[t]he burden of establishing the existence of the privilege rests with the person asserting it."  *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 2000).

"The party claiming an attorney-client privilege not only bears the burden of proving that the privilege applies, but must also show that the privilege has not been waived."  *Davis v. Drake*, 2014 WL 5795554 at *3-4 (N.D. Ohio Nov. 6, 2014).  The privilege is waived "by voluntary disclosure of private communications by an individual or corporation to third parties."  *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996).  Production or disclosure of privileged documents to a government agency constitutes a waiver of attorney-client privilege.  *See In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 293 (6th Cir. 2002) (affirming the district court's ruling that "voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege to all other adversaries").

"A communication between non-lawyers is generally not protected under the attorney-client privilege unless the 'dominant intent is to prepare the information in order to get legal advice from the lawyer.'"  *In re Behr Dayton Thermal Prod., LLC*, 298 F.R.D. 369, 375 (S.D. Ohio 2013).  Moreover, a "communication is not privileged simply because it is made by or to a person who happens to be an attorney.  To be privileged, the communication must have the *primary* purpose of soliciting legal, rather than business, advice."  *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607 at *1 (N.D. Ohio Apr. 9, 2007) (internal quotation marks and citations omitted, emphasis in original).  "A communication is not privileged simply because it is made by a person who happens to be an attorney."  *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607 at *1 (N.D. Ohio Apr. 9, 2007); *see In re Vioxx*, 501 F.Supp.2d 789, 798 (E.D. La. 2007) ("Legal counsel does not always render, and is not

always expected to render, exclusively legal assistance.").  "It is now generally accepted that communications between an attorney and client of primarily a business nature are outside the scope of the privilege." *Glazer v. Chase Home Finance LLC*, 2015 WL 12733394  at *4 (N.D. Ohio Aug. 5, 2015).   When "in-house counsel appears as one of many recipients of an otherwise business-related memo, the federal courts place a heavy burden on the proponent to make a clear showing that counsel is acting in a professional legal capacity and that the document reflects legal, as opposed to business, advice." *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514 at *3–6 (S.D. Ohio Nov. 13, 2012).

The attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it, but also the giving of information to the lawyer to enable him [or her] to give sound and informed advice."  *Upjohn Co. v. United States*, 449 U.S. 383, 390, (1981).  Thus, the "privilege applies to factual investigations conducted by counsel at a corporate client's request (to provide legal advice to that client), and also to agents of an attorney who are assisting in rendering legal advice to the client."  *In re Behr Dayton Thermal Prod*., 298 F.R.D. at 373.  The Second Circuit explained the application of privilege to an attorney's agents as follows:

> if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege; there can be no more virtue in requiring the lawyer to sit by while the client pursues these possibly tedious preliminary conversations with the accountant than in insisting on the lawyer's physical presence while the client dictates a statement to the lawyer's secretary or [is] interviewed by a clerk not yet admitted to practice.  ***What is vital to the privilege is that the communication be made in confidence for the purpose of obtaining legal advice from the lawyer.  If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.***

10

*United States v. Kovel*, 296 F.2d 918, 922 (2ⁿᵈ Cir. 1961) (citations omitted, emphasis added); *see Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1994 WL 58999 at *5 (6ᵗʰ Cir. 1994) (citing *Kovel* with approval).

Ultimately, "[c]laims of attorney-client privilege are 'narrowly construed because [the privilege] reduces the amount of information discoverable during the course of a lawsuit.'" *In Re Columbia/HCA*, 293 F.3d at 294 (quoting *United States v. Collis*, 128 F.3d 313, 320 (6ᵗʰ Cir. 1997)). The privilege "applies only where necessary to achieve its purpose and protects only those communications necessary to obtain legal advice." *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6ᵗʰ Cir.1986) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1975)).

## B.    The Work Product Doctrine.

The work product doctrine "is distinct from and broader than the attorney-client privilege." *In re Antitrust Grand Jury*, 805 F.2d at 163 (quoting *United States v. Nobles,* 422 U.S. 225, 238 n. 11 (1975)). The doctrine is designed to allow an attorney to "assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Hickman v. Taylor*, 329 U.S. 495, 51 (1947).  The doctrine is set out in Fed. R. Civ. P. 26(b)(3)(A): "Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)," but those materials may be discovered if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."

11

So-called "fact" work product, which is the "written or oral information transmitted to the attorney and recorded as conveyed by the client," *In re Antitrust Grand Jury*, 805 F.2d at 163, may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship.  *Toledo Edison Co. v. G.A. Technologies, Inc.*, 847 F.2d 335, 339–40 (6th Cir.1988).  To demonstrate substantial need, a plaintiff must show that the documents are "sufficiently unique and important, as compared to other possible sources of the same information, to justify overriding work product protection."  *Carr v. C.R. Bard, Inc.*, 297 F.R.D. 328, 334 (N.D. Ohio 2014).  The "understandable desire for (possibly) more probative evidence . . . does not demonstrate substantial need . . . , much less that equivalent evidence could not be generated except with undue hardship."  *Id.*

In contrast to "fact" work product, however, a party may not obtain the "opinion" work product of his adversary – that is, "any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories" –  absent waiver.  *In re Antitrust Grand Jury*, 805 F.2d at 163–64 (citations omitted).  Documents "prepared by a corporation as part of efforts to ensure compliance with federal regulatory agencies . . . and not because of possible litigation, are not protected by work-product doctrine." *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514 at *6 (S.D. Ohio Nov. 13, 2012) (quoting *In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 2009 WL 4641707  at *3 (E.D. Pa. Dec.7, 2009)); *see also Fed. Trade Comm'n v. Abbvie, Inc.*, 2015 WL 8623076 at *9 (E.D. Pa. Dec. 14, 2015) ("attorney-client privilege does not apply . . . if the client seeks regulatory advice for a business purpose").

### III.    Analysis.

Cardinal asserts that the Dendrite Audit "contains a privileged analysis prepared by Dendrite at the request and direction of outside counsel for Cardinal Health for the purpose of (a) assisting outside counsel in providing legal advice to Cardinal Health in connection with then-ongoing regulatory actions by DEA and (b) in anticipation of litigation related to those actions."  Letter from Jennifer Wicht to Special Master at 1 (Jan. 7, 2019) (provided *in camera*).  This assertion however, is simply not an accurate characterization of how Dendrite served Cardinal and Cadwalader.

The overwhelming nature of Dendrite's activities were to provide ***business*** analysis and advice to Cardinal so that it could meet its regulatory obligations – not to assist Cadwalader in providing ***legal*** analysis and advice to Cardinal.  The facts set out in Section I above show Dendrite understood from the start that it would "provide ***regulatory compliance consulting*** as it relates to the Controlled Substances Act, and implementing regulations."  Cadwalader/Dendrite Agreement at 3.  Cardinal, not Cadwalader, paid Dendrite directly for its services, and designated those payments as regulatory expenses.  Dendrite's "primary objective" was to "provide ***Cardinal***" – not Cadwalader – "with recommendation[s] on any corrective actions that may be required to have a more compliant SOM system," as required by DEA regulations.  Dendrite also visited Cardinal's client pharmacies to see if they were diverting opioids, assessed Cardinal's other distribution centers to see if they suffered the same problems as its centers in Washington, Florida, New Jersey, and Texas, administered in-house training to Cardinal employees, and even provided employee outsourcing to Cardinal for various functions.  The insertion of Cadwalader between Dendrite and Cardinal did not transform Dendrite from a business advisor to a legal advisor.

Moreover, Cardinal repeatedly offered to (and apparently did, to at least some extent) share

13

Dendrite's observations and conclusions with the DEA; Cardinal even offered to embed Dendrite employees at its distribution centers and have those employees help with DEA reporting.

These circumstances combine to create a clear picture that the work and advice Dendrite was providing was not "legal" and Dendrite's primary function was not to support the giving of legal advice by Cadwalader.  All of the activity Dendrite undertook involved investigation and support of Cardinal's business processes, followed by advice on modifications to those processes to ensure regulatory compliance.  Of special note is that Cardinal touted Dendrite to the DEA as a trusted, "independent third-party," Fong letter at exh. 1, that was assisting Cardinal in meeting its regulatory obligations – ostensibly proving to the DEA that Cardinal was responding quickly, substantively, and seriously to the three Immediate Suspension Orders by obtaining the best-available outside help. It is entirely inconsistent for Cardinal to have advertised Dendrite as an "independent third-party," offering to share Dendrite's observations and conclusions with the DEA, while at the same time insisting Dendrite was Cadwalader's agent,[10] gathering only privileged information to support counsel's provision of legal services.

Cardinal offers two main arguments to support its assertion that the Dendrite Audit is privileged.  First, Cardinal asserts Dendrite served in different capacities at the same time, performing both privileged and non-privileged work:

> The fact that Dendrite performed other, non-privileged work for Cardinal

---

[10] Another obstacle to Cardinal's assertion that Dendrite was acting as Cadwalader's agent is that the Cadwalader/Dendrite Agreement states explicitly that was not the case.  *See* Agreement at 4, ¶13 ("Relationship of the parties.  Dendrite and [Cadwalader] are independent contractors . . . and are not agents, representatives, partners, or joint venturers of each other.").  Cardinal argues that "privilege applies . . . also to agents of an attorney who are assisting in rendering legal advice to the client"), Wicht letter at 3 (Jan. 7, 2019) (quoting *In re Behr Dayton Thermal*, 298 F.R.D. at 373), but Cadwalader agreed that Dendrite is not its agent.

Health related to its controlled substance anti-diversion program has no bearing on the fact that it also conducted a separate, privileged analysis at the exclusive direction of outside counsel for Cardinal Health.  Plaintiffs' effort to conflate these two distinct categories of work is disingenuous and should be rejected.

Letter from Steve Pyser to Special Master at 2 (Mar. 29, 2019).

The line Cardinal seeks to draw, however, is fuzzy and contrived.  Cadwalader hired Dendrite on December 5, 2017 to perform *all* of the work it went on to do in the next several months.  This included in-house training (documents regarding which Cardinal has produced); about 170 on-site pharmacy-client investigations, the results of which Cardinal offered to and apparently did share with the DEA;[11] investigations of 18 Cardinal distribution centers, the results of which Cardinal offered to and apparently did share with the DEA; possible embedding of Dendrite personnel in Cardinal's distribution centers, to include direct-reporting to the DEA; providing other employee outsourcing for various functions where Cardinal had "gaps;" and the Audit of Cardinal's SOM system.  The contention that Dendrite simultaneously provided to Cadwalader and to Cardinal both privileged and non-privileged services suggests, if anything, subject matter waiver.[12]

---

[11]   One example of a withheld Dendrite pharmacy site-visit report is document CAH_MDL_PRIV_001316, which is the subject of a separate privilege challenge by plaintiffs.

[12]   *See In re Columbia/HCA*, 293 F.3d at 293 ("voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege to all other adversaries"); *In re Grand Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 255 (6th Cir. 1996) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter.") (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir.1982)); *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir.1982) ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter . . . ."); *Edwards v. Whitaker*, 868 F.Supp. 226, 229 (M.D. Tenn.1994) ("voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject").

15

Cardinal's second argument to support its assertion that the Dendrite Audit is privileged is to note how carefully the Audit was treated: Dendrite marked the Audit as attorney-client privileged and provided the Audit only to Cadwalader, which shared it only with Cardinal's in-house counsel. But "it is axiomatic that one cannot render privileged that which is otherwise not privileged merely by placing it in the hands of his attorney." *Humphries v. Pennsylvania R. Co.*, 144 F.R.D. 177, 178 (N.D. Ohio 1953).  *See United States v. Kovel*, 296 F.2d 918, 921 (2nd Cir. 1961) ("[n]othing in the policy of [attorney-client] privilege suggests that attorneys, simply by placing accountants, scientists or investigators on their payrolls and maintaining them in their offices, should be able to invest all communications by clients to such persons with a privilege the law has not seen fit to extend when the latter are operating under their own steam."); *Waters v. Drake*, 2015 WL 8281858 at *4 (S.D. Ohio Dec. 8, 2015) ("where the dominant purpose of such communications is not to secure legal advice or information requested by counsel, but to make some type of policy or business decision, the communication cannot be insulated from discovery just by sending a copy of it to a lawyer."). Put more simply, "when a client's ultimate goal is not legal advice, but is rather accounting, medical, or environmental advice [from the hired consultant], the privilege is inapplicable," regardless of how privately any communications between the lawyer and the consultant are treated.  *In re Grand Jury Matter*, 147 F.R.D. 82, 85 (E.D. Penn. 1992).  Neither Cardinal's, Cadwalader's, nor Dendrite's characterization of Dendrite's work and documents is controlling.

In sum, the following facts are antithetical to a finding that the Dendrite Audit is attorney-client privileged or work-product:

- the entire purpose of the Dendrite Audit (and all of Dendrite's work) was to improve Cardinal's ***regulatory compliance***, but documents "prepared by a corporation as part of efforts to ensure compliance with federal regulatory agencies . . . and not because of possible litigation, are not protected by work-product doctrine." *Graff*, 2012 WL 5495514 at *6.

16

- the entire purpose of the Dendrite Audit (and all of Dendrite's work) was to assess and improve Cardinal's **SOM system**, but "to be privileged, the communication must have the *primary* purpose of soliciting legal, rather than business, advice." *Zigler*, 2007 WL 1087607 at *1 (emphasis in original).[13]

- Cardinal and Cadwalader repeatedly offer to **share Dendrite's findings** with the DEA, but "voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege to all other adversaries." *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d at 293.

- the business advice contained in the Audit **is Dendrite's**, addressed primarily to Cardinal and designed to improve Cardinal's business processes – the Audit is not addressed primarily to Cadwalader, nor is it designed to improve Cadwalader's legal advice to Cardinal – but "if the advice sought is the accountant's [or regulatory consultant's] rather than the lawyer's, no privilege exists." *Kovel*, 296 F.2d at 922.

That Cardinal might have anticipated litigation in connection with the four Show Cause Orders it received from the DEA in late 2007 and early 2008 does not change the fundamental nature of what Dendrite did: **provide business consulting work to Cardinal**.

*     *     *     *     *

The Special Master closes this *Ruling* with two additional observations.  First, in *Amended Discovery Ruling Nos. 14, Part 1,* the Special Master concluded (and the Court later agreed) that: (1) two charts Cardinal sought to claw back were **fact** work-product; and (2) plaintiffs showed they

---

[13] *See also Occidental Chem. Corp. v. OHM Remediation Servs. Corp.*, 175 F.R.D. 431, 437 (W.D.N.Y. 1997) (holding attorney-client privilege did not apply where plaintiff's counsel hired an environmental consultant to formulate a remediation plan, and not "specifically to assist them in rendering legal advice;" and further noting that "courts that have considered whether to apply the attorney-client privilege to communications or other documents involving independent outside consultants 'have been cautious in extending its application'") (quoting *United States Postal Service v. Phelps Dodge Refining Corp.*, 852 F.Supp. 156, 159 (E.D.N.Y.1994)).

17

were entitled to production of these documents pursuant to the "substantial need" exception set forth in Fed. R. Civ. P. 26(b)(3)(A).  The analysis of the two Cardinal charts applies even more strongly to the Dendrite Audit, and the Special Master incorporates and applies it in its entirety.  *See* docket no. 1380 at 2-6.

Second, plaintiffs offer an entirely separate and additional argument why Cardinal should be ordered to produce the Dendrite Audit, to which Cardinal did not respond.  Plaintiffs note that a party "may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication."  *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996).  In this case, Cardinal has made numerous affirmative statements regarding the extent to which its SOM system complied with DEA regulatory requirements, including:

- "Cardinal Health's controlled substance monitoring program and scrutiny of its pharmacy customers meets or exceeds all DEA requirements."

- "Defendant complied at all relevant times with all applicable laws, including all legal and regulatory duties."

- "Cardinal Health has always intended and believed it was acting in compliance with the relevant statutes, regulations, and guidance that DEA provided about what it expected distributors to do in order to be in compliance with same."

*See* Letter from Mike Fuller to Special Master at 8-10 (Feb. 15, 2019) (quoting these and numerous other affirmative statements made by Cardinal in pleadings and discovery responses).

The Special Master's review of the Dendrite Audit reveals that the Audit reflects directly and clearly on the truth of the above-quoted factual assertions.  Plaintiffs' make a strong argument that "privilege may be implicitly waived when defendant asserts a claim that in fairness requires examination of the protected communications," and Cardinal offers no argument in response.  *In re*

*United Shore Fin. Servs., LLC*, 2018 WL 2283893 at *2 (6th Cir. Jan. 3, 2018) (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2nd Cir. 1991).  Accordingly, for this additional reason, the Special Master concludes Cardinal must produce the Dendrite Audit, along with other, related documents.

      If any party chooses to object to this ruling, it must do so on or before April 8, 2019.

      **RESPECTFULLY SUBMITTED,**

          /s/ David R. Cohen_____
          **David R. Cohen**
          **Special Master**

**Dated: March 31, 2019**