# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*This document relates to:*<br><br>*Saint Elizabeth Medical Center, Inc., et al., v. AmerisourceBergen Drug Corp., et al.*, 18-op-46046; *Baptist Healthcare System, Inc., et al., v. Amerisource Bergen, et al.*, 18-op-46058; *West Boca Medical Center, Inc., v. AmerisourceBergen Drug Corp, et al.*, 18-op-45530; *Southwest Mississippi Regional Medical Center, et al., v. AmerisouceBergen Drug Corp., et al.*, 17-op-45175; *St. Vincent Charity Medical Center v. AmerisourceBergen Drug Corp.*, 18-op-45610. | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**BRIEF OF HOSPITAL PLAINTIFFS IN RESPONSE TO
DEFENDANTS' BRIEFING ON VIABILITY OF PUBLIC NUISANCE CLAIMS
NATIONWIDE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................................. ii

INTRODUCTION ................................................................................................................................ 1

    I.     Hospital Plaintiffs May Bring a Public Nuisance Claim Because They Suffered a "Special Injury" That Was "Different In Kind" From That Suffered by the Public At Large. ....................................................................................................................... 1

    II.    Public Nuisance Laws Apply to Opioids. ............................................................... 4

    III.   Because of the Tight Causal Relationship Between the Public Nuisance and the Damages, the Hospitals' Public Nuisance Claims in This Case Are Distinguishable From the Hospitals' Nuisance Claims in the Tobacco Cases. ...... 8

CONCLUSION .................................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Cases**

*Akzo Coatings of Am., Inc. v. Am. Renovating*,
 842 F. Supp. 267 (E.D. Mich. 1993) ................................................................................... 4

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
 228 F.3d 429 (3rd Cir. 2000) ............................................................................................ 8, 9

*Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*,
 241 F.3d 696 (9th Cir. 2001) ................................................................................................ 8

*Bologna v. Kerr-McGee Corp.*,
 95 F. Supp. 2d 197 (S.D.N.Y. 2000) .................................................................................... 4

*Carson v. Hercules Powder Co.*,
 402 S.W.2d 640 (Ark. 1966) ................................................................................................ 3

*Chase Manhattan Bank, N.A. v. T & N PLC*,
 905 F. Supp. 107 (S.D.N.Y. 1995) ....................................................................................... 4

*Cincinnati v. Beretta U.S.A. Corp.*,
 768 N.E.2d 1136 (Ohio 2002) .............................................................................................. 8

*Eberhart v. Massell*,
 311 F. Supp. 654 (N.D. Ga. 1970) ....................................................................................... 5

*Freed v. State*,
 No. 1013, 2017 WL 3262234 (Md. Ct. Spec. App. Aug. 1, 2017) ...................................... 6

*Hampton v. North Carolina Pulp Co.*,
 27 S.E.2d 538 (N.C. 1943) ................................................................................................... 2

*Haynes v. Hamilton County*,
 883 S.W.2d 606 (Tenn. 1994) ............................................................................................ 11

*In re SIC*,
 14 P. 405 (Cal. 1887) ............................................................................................................ 6

*Ivester v. Johnson*,
 No. 1:14-cv-00681-JMS-TAB, 2016 WL 3570725 (S.D. Ind. July 1, 2016) ...................... 6

*Malden v. Breslin*,
 609 N.E.2d 498 (Mass. App. Ct. 1993) ................................................................................ 4

*Nashua Corp. v. Norton Co.*,
 No. 90-CV-1351 (RSP/RWS), 1997 WL 204904 (N.D.N.Y. Apr. 15, 1997) ...................... 4

*Nenny v Seu Si Lun*,
  112 N.W. 220 (Minn. 1907) .................................................................................................. 5

*Ohio Fair Plan Underwriting Assn. v. Arcara*,
  417 N.E.2d 115 (Oh. Ct. App. 1979) ................................................................................... 11

*Ontiveros v. Borak*,
  667 P.2d 200 (Ariz. 1983) .................................................................................................... 10

*People ex rel. O'Neill v. Bancroft*,
  29 P. 112 (Idaho 1892) ........................................................................................................... 5

*People v. ConAgra Grocery Products Co.*,
  227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) .......................................................................... 8

*Philadelphia Elec. Co. v. Hercules, Inc.*,
  762 F.2d 303 (3rd Cir. 1985) .................................................................................................. 8

*Scott v. MD Helicopters, Inc.*,
  834 F.Supp.2d 1334 (M.D. Fla. 2011) ................................................................................. 11

*Scruggs v. Beason*,
  20 So.2d 774 (Ala. 1945) ........................................................................................................ 1

*State ex rel. Jennings v. Purdue Pharma L.P.*,
  No. N18C-01-223 MMJ CCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) .................... 7

*State ex rel. Nagle v. Naughton*,
  63 P.2d 123 (Mont. 1936) ...................................................................................................... 5

*State v. Clancy*,
  168 P. 894 (Wash. 1917) ........................................................................................................ 5

*State v. Nemeth*,
  No. A-1382-11T4, 2012 WL 5845588 (N.J. Super. Ct. App. Div. Nov. 20, 2012) .................... 6

*State v. Ohman*,
  179 N.W. 143 (Iowa 1920) ..................................................................................................... 7

*State v. Purdue Pharma Inc.*,
  No. 217-2017-CV-00402, 2018 WL 4566129 (N.H. Super. Ct. Sept. 18, 2018) ....................... 8

*State v. Rabinowitz*,
  118 P. 1040 (Kan. 1911) ......................................................................................................... 6

*State v. Van Osdol*,
  417 P.3d 488 (Or. 2018) ......................................................................................................... 5

*State v. Zimmerman,*
 148 N.E. 5 (Ill. 1925) .................................................................................................. 6

*Strickland v. Lambert,*
 109 So.2d 664 (Ala. 1959) ......................................................................................... 1

*Town of Superior, Mont. v. Asarco, Inc.,*
 874 F.Supp.2d 937 (D. Mont. 2004) ....................................................................... 11

*Union Oil Co. v. Oppen*,
 501 F.2d 558 (9th Cir. 1974) ..................................................................................... 3

*United States. v. Sischo*,
 262 F. 1001 (W.D. Wash. 1919) ................................................................................ 5

*Villines v. North Arkansas Regional Medical Center,*
 385 S.W.3d 360 (Ark. Ct. App. 2011) .................................................................... 11

*Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*,
 737 F. Supp. 1272 (W.D.N.Y. 1990) .................................................................. 3, 4

**Statutes**

CAL. CIVIL CODE § 3493 .................................................................................................. 2

WASH. REV. CODE ANN. § 7.48.240 ................................................................................ 5

**Other Authorities**

O'Malley, et al., 3 Fed. Jury Prac. & Inst. § 120:62 (6th Ed.) ....................................... 12

Restatement (Second) of Torts § 821B (1979) .................................................................. 7

Restatement (Second) of Torts § 821B, cmt. h. ................................................................. 7

Restatement (Second) of Torts, §821C, cmt. h (1979) ..................................................... 2

Restatement (Second) of Torts: Normal Intervening Force § 443 (1979) .................... 11

Restatement (Second) of Torts: Who Can Recover for Public Nuisance § 821C (1979) ............... 1

# INTRODUCTION

The Court has directed the parties to "submit briefing addressing the viability of statutory and/or common law claims for public nuisance where any MDL plaintiff is located." Doc. No. 1218 at 2.  In response to issues raised by Defendants in their briefing (Doc. No. 1404), the Hospital Plaintiffs respectfully submit this brief addressing the viability of their nuisance claims. As discussed more fully below, the Hospitals' nuisance claims may proceed for three reasons: 1) the Hospitals have suffered an injury different from the public at large; 2) the manufacturing of opium has historically been found to be a public nuisance; and 3) the Hospitals' injuries are a direct result of Defendants' unlawful conduct.

**I.   Hospital Plaintiffs May Bring a Public Nuisance Claim Because They Suffered a "Special Injury" That Was "Different In Kind" From That Suffered by the Public At Large.**

A private party can recover for damages caused by a public nuisance where the plaintiff can demonstrate a "special injury," unique to the plaintiff, that is "different in kind" from the injury experienced by the public at large as a result of the nuisance.  This is the law of each of the 50 states.  *See* Exhibit 1 (50 state survey).

Numerous states (over 30) have adopted or cited with approval Restatement (Second) of Torts: Who Can Recover for Public Nuisance § 821C (1979), which provides, in pertinent part: "In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference."  Other states reach the same result in their common law without reference to the Restatement.  *See*, *e.g.*, *Strickland v. Lambert*, 109 So.2d 664, 665 (Ala. 1959) ("An individual complaining of a public nuisance must show some special injury to himself different from the common injury to the public." (quoting *Scruggs v. Beason*, 20 So.2d 774, 775 (Ala. 1945)). And other states have enacted

1

statutes that provide private plaintiffs the right to pursue public nuisance claims if they can prove a "special injury."  *See*, *e.g.*, CAL. CIVIL CODE § 3493 ("A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise").  Whatever the precise formulation and source of law – whether through the adoption of the Restatement § 821C, application of common law principles, or by statute – <u>every state</u> provides that a private party may sue under tort for public nuisance upon proof of a special, different in kind, injury from that incurred by the general public.

In this case, where the alleged nuisance consists of the creation of a massive public health hazard, the hospitals have suffered an injury that is "different in kind" from the injury to the community as a whole.  In short, the hospitals have incurred specific financial costs treating opioid-related conditions—costs they were obligated to incur as a matter of law—for which the law of nuisance provides them a remedy.

Actual pecuniary loss to a plaintiff's business has long been recognized as precisely the sort of particular damage that sets a plaintiff's injuries apart from those of the public at large and provides a basis for a plaintiff to recover from defendant for creating a public nuisance. Restatement (Second) of Torts, §821C, comment h (1979), notes:

> Pecuniary loss to the plaintiff resulting from the public nuisance is normally a different kind of harm from that suffered by the general public. A contractor who loses the benefits of a particular contract or is put to an additional expense in performing it because of the obstruction of a public highway preventing him from transporting materials to the place of performance, can recover for the public nuisance. The same is true when it can be shown with reasonable certainty that an established business has lost profits, as when the obstruction of the highway prevents a common carrier from operating buses over it or access to the plaintiff's place of business is made so inconvenient that customers do not come to it.

*See also, e.g., Hampton v. North Carolina Pulp Co.*, 27 S.E.2d 538, 545-546 (N.C. 1943) ("The personal right involved here is the security of an established business."); *Union Oil Co. v. Oppen*,

501 F.2d 558, 569 (9th Cir. 1974) ("The injury here asserted by the [commercial fisherman plaintiff from pollution] is a pecuniary loss of a particular and special nature, limited to the class of commercial fishermen which they represent."); *Carson v. Hercules Powder Co.*, 402 S.W.2d 640, 642 (Ark. 1966) (same).

The simplified examples in the comments to Section 821C regarding obstruction of a river or a highway are just that, simplified examples. However, the conclusion that a financial injury to a business is different in kind from the injury to the public at large is intuitive and makes sense. Where every member of the public at large may be generally inconvenienced by a nuisance, it is wrong for a private individual (in this case, hospitals) to be required to bear substantial pecuniary costs as a consequence. Though not every state court has been presented facts on this precise issue, plaintiffs have identified more than 20 states that have permitted nuisance, explicitly or implicitly recognizing financial injury to be "special" or "different in kind," thereby permitting plaintiffs to seek compensation. *See* Exhibit 1.

In the same vein, courts have recognized that burdening a private plaintiff to assume "cleanup costs" (especially where that cleanup duty is mandated by law) constitutes the sort of "special injury" that permits a private plaintiff to sue for damages under a public nuisance theory. In *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 737 F. Supp. 1272 (W.D.N.Y. 1990), a private land owner sued the predecessor owner for public nuisance (among other claims), arising from the defendant's negligent storage of hazardous waste which plaintiff was then required to clean up. Relying on Section 821C, the court concluded that the plaintiff's cleanup costs constituted a "special injury" that permitted plaintiff to sue for public nuisance:

> With regard to the issue of whether Westwood has suffered harm 'of a different kind from that suffered by other persons exercising the same public right,' the court

> finds that if Westwood can establish, as it claims, that it has incurred response costs consistent with the National Contingency Plan ("NCP"),…those costs will be sufficient to meet this criterion for bringing a public-nuisance action. *See* Restatement (Second) of Torts § 821C, comment h (1977).

*Westwood Pharmaceuticals, Inc.*, 737 F. Supp. at 1281 (internal citations omitted). *See also Nashua Corp. v. Norton Co.*, No. 90-CV-1351 (RSP/RWS), 1997 WL 204904, at *4 (N.D.N.Y. Apr. 15, 1997) (Plaintiff's "response costs constitute special harm giving [plaintiff] standing to assert a public nuisance claim."); *Chase Manhattan Bank, N.A. v. T & N PLC*, 905 F. Supp. 107, 111, 126 (S.D.N.Y. 1995) ("costs of abatement and removal…represent special damages different from the damages suffered by the general public."); *Akzo Coatings of Am., Inc. v. Am. Renovating*, 842 F. Supp. 267, 273 (E.D. Mich. 1993) (defendant liable to plaintiff under a nuisance for plaintiff's costs to abate nuisance); *Malden v. Breslin*, 609 N.E.2d 498, 501 (Mass. App. Ct. 1993) (plaintiff entitled to fair and reasonable value of clean-up costs it sustained as a result of public nuisance).[1] The analogy is obvious: the defendants have created the opioid nuisance, requiring the plaintiffs to expend their own monies to clean it up.

**II.    Public Nuisance Laws Apply to Opioids.**

Defendants spend the bulk of their argument claiming that nuisance laws do not apply to "products" generally. To the contrary, there is a long history of judicial and legislative recognition that *conduct* associated with the manufacture and distribution of opium constitutes a public health nuisance that can be appropriately addressed through nuisance laws. *See, e.g.,*

---

[1] *See also Bologna v. Kerr-McGee Corp.*, 95 F. Supp. 2d 197, 205 (S.D.N.Y. 2000) ("Plaintiffs adequately have alleged a public nuisance claim. The complaint states that as a result of the migration of hazardous substances into the land, air and groundwater around the site, 'Plaintiffs suffer damages different in kind and degree from the general public in that the creation and maintenance of the nuisance caused plaintiffs to incur and continue to incur substantial costs for controlling, sampling, investigating and remediating the contamination released on its site.'" (quoting Complaint)).

4

*United States. v. Sischo*, 262 F. 1001, 1007-08 (W.D. Wash. 1919) (smuggled opium for smoking is "nuisance per se"); *People v. Kingston*, 164 N.Y.S. 181, 182 (N.Y. App. Div. 1917) ("If the defendant maintains premises for the sale and distribution of dangerous drugs [including heroin], selling and distributing them to habitual users and others in violation of law… the defendant may properly be convicted of maintain and committing a public nuisance."); *Nenny v Seu Si Lun*, 112 N.W. 220, 221 (Minn. 1907) (landlord-tenant action reciting that tenant had sold opium on the premises and "maintained a nuisance thereon"); *State v. Clancy*, 168 P. 894, 895 (Wash. 1917) (quoting nuisance statute: "all opium dens or houses, or places of resort where opium smoking is permitted, are nuisances");[2] *State v. Van Osdol*, 417 P.3d 488, 495 (Or. 2018) (tracing Oregon's modern drug nuisance statute to 1885 law which made it illegal for "any person to frequent an opium den for the purpose of purchasing or smoking opium"). Indeed, the language used by the courts to support the application of public nuisance to opium use a century ago is hardly different than that used by plaintiffs in this case. In *Sischo*, 262 F. at 1008, the court noted: "[S]moking opium is fitted by nature to harm the community." Another case summarized a local opium den ordinance as declaring that "smoking opium, was injurious to public health, contrary to public morals, and against the peace and good order of the city…." *In*

---

[2] That same language is still on the books. *See* WASH. REV. CODE ANN. § 7.48.240. A Montana statute cited in a 1936 case provided that every building in which "any opium or coca leaves, their salts, derivatives, and preparations thereof are sold or given away or used contrary to the laws of the state of Montana, is a nuisance." *State ex rel. Nagle v. Naughton*, 63 P.2d 123, 125 (Mont. 1936). A statute from Idaho in 1892 provided trustees of towns and villages the power "[t]o pass by-laws and ordinances, to prevent and remove nuisances, to prevent and restrain and suppress bawdy-houses, gambling-houses, opium dens, and other disorderly houses within the limits of said town or village." *People ex rel. O'Neill v. Bancroft*, 29 P. 112, 115 (Idaho 1892). *See also, Eberhart v. Massell*, 311 F. Supp. 654, 656 n.1 (N.D. Ga. 1970)) (quoting Atlanta ordinance that makes operating opium den a nuisance).

5

*re SIC*, 14 P. 405, 406 (Cal. 1887).[3]

Indeed, throughout the 50 states, conduct involving the maintenance of locations for the manufacture and distribution of illegal drugs, or the illicit manufacture and distribution of lawful drugs, has been routinely treated by common law or statute as a "public nuisance."[4] These laws do not distinguish between "lawful" prescription opioids and the unlawful ones (such as heroin). *See, e.g., Freed v. State*, No. 1013, 2017 WL 3262234 (Md. Ct. Spec. App. Aug. 1, 2017) (defendant convicted of maintaining a common nuisance for selling oxycodone and other controlled substance pills from his house); *Ivester v. Johnson*, No. 1:14-cv-00681-JMS-TAB, 2016 WL 3570725, at *1 (S.D. Ind. July 1, 2016) (defendant convicted of maintaining a common nuisance for selling oxycodone and other controlled); *Pearson v. State*, No. 36A04-1211-CR-610, 2013 WL 5303747 (Ind. Ct. App. Sept. 19, 2013) (common nuisance based in part on numerous prescription drugs including hydromorphone); *State v. Nemeth*, No. A-1382-11T4, 2012 WL 5845588 (N.J. Super. Ct. App. Div. Nov. 20, 2012) (possession of oxycodone basis for public nuisance count). The notion that the law of public nuisance does not reach the "product" of drugs (and opioids) is simply wrong.[5] Though this case does not involve the allegation that

---

[3] *See also, State v. Ah Sam*, 13 P. 303, 304 (Or. 1887) ("The object of the enactment of the statute in question [making it illegal to frequent an opium den] was to repress a most dangerous and corrupting vice, -- one that strikes at the very foundations of both public health and public morals.").

[4] *See, e.g.,* CAL. HEALTH & SAFETY CODE § 11570. "Every building or place used for purpose of unlawfully selling…any controlled substance…is a nuisance[.]"

[5] And, in its day, conduct associated with the illegal manufacture and distribution of alcohol (a "product") was also routinely held to constitute the maintenance of a public nuisance. *See, e.g., State v. Rabinowitz*, 118 P. 1040 (Kan. 1911) (selling and delivering of intoxicating liquor on the streets of a municipality, publicly, repeatedly, and persistently, constitutes a common nuisance); *State v. Zimmerman,* 148 N.E. 5, 6 (Ill. 1925) ("The General Assembly has the power to declare that any place kept and maintained for the illegal manufacture and sale of

the defendants owned or operated "drug dens," the fact that the states have uniformly adopted drug nuisance (and related forfeiture) laws speaks loudly to the widespread recognition of the health hazards and harms to the community at large associated with drug use and addiction.  In short, there is a long history of judicial recognition of the public health vice of opioid use, and an equally long history of the application of public nuisance laws to attack this vice.

Defendants cite to *State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) for the court's statement that "[t]here is a clear national trend to limit public nuisance to land use."  First, Restatement § 821B(2) provides that the crux of an inquiry into public nuisance is the <u>conduct</u> of the defendants, that is: "(a) Whether the <u>conduct</u> involves a significant interference with the public health …; (b) whether the <u>conduct</u> is proscribed by a statute, ordinance or administrative regulation, or (c) whether the <u>conduct</u> is of a continuing nature….." (emphasis supplied).  The comments to § 821B leave no ambiguity:  "[A] public nuisance does not necessarily involve interference with use and enjoyment of land."  § 821B, cmt. h. Second, as described above, courts for more than a hundred years have used nuisance rationales and nuisance language in describing the public health consequences of opioids.  Third, this contention that public nuisance counts are tethered to the land was squarely rejected by the trial court in New Hampshire handling a similar opioid case, holding that the essence of a nuisance claim involves "behavior" and that the defendant's claim that "the origin of a public nuisance must arise from the use of real property, is a too narrow reading of the law."  *State v. Purdue Pharma Inc.*, No. 217-2017-CV-00402, 2018 WL

---

intoxicating liquors shall be deemed a common nuisance.…"); *State v. Ohman*, 179 N.W. 143 (Iowa 1920) (nuisance based upon manufacture of liquor).

7

4566129, at *13 (N.H. Super. Ct. Sept. 18, 2018).[6]

The defendants place extensive reliance on cases where courts have rejected nuisance suits involving lead paint or hand guns. Even if those cases reflect some states' limiting the reach of nuisance laws for certain products,[7] these cases say nothing about the application of nuisance laws to drugs (products) in general, and opioids in particular, that have historically been the subject of nuisance laws and which have historically been recognized as posing public health and public safety hazards.

### III. Because of the Tight Causal Relationship Between the Public Nuisance and the Damages, the Hospitals' Public Nuisance Claims in This Case Are Distinguishable From the Hospitals' Nuisance Claims in the Tobacco Cases.

Defendants generally allege that the conduct of the many actors involved in opioid distribution and use defeats proximate cause. Defendants cite to two tobacco cases as part of their proximate cause argument. Defs.' Br. at 4 n. 1. In *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris, Inc.*, 241 F.3d 696 (9th Cir. 2001), the Ninth Circuit affirmed the trial court's dismissal of the Hospital Districts' common law (including nuisance) claims on the grounds that the tobacco firms' unlawful conduct was not the proximate cause of the hospitals' injuries. *Id*. at 700. In *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429 (3rd Cir. 2000), the Third

---

[6] *See also, Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 315 (3rd Cir. 1985) ("An action for public nuisance may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights." (footnote omitted)).

[7] And they are not so one-sided as defendants suggest. *See People v. ConAgra Grocery Products Co.*, 227 Cal. Rptr. 3d 499, 532 (Cal. Ct. App. 2017) (affirming nuisance verdict against lead paint manufacturers); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002) (permitting nuisance case against gun manufacturer). Though nuisance cases against gun manufacturers were "overruled" by statute, the public nuisance principles of *Cincinnati v. Beretta* remain sound and would apply to opioids: "[W]e find that under the Restatement's broad definition, a public-nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public." 768 N.E.2d at 1142.

Circuit affirmed the trial court's dismissal of the hospitals' complaint against the cigarette companies. The court reasoned that the hospitals' injuries were "derivative" of the claims of the non-paying patients'.[8] These cases are easily distinguishable.

First and foremost, the difference between opioids and tobacco could not be more stark. Cigarette smokers do not show up at the hospital emergency rooms feigning symptoms to seek cigarettes. They do not transition from Camels to needle-based injections of nicotine to get their nicotine fix and get needle-related diseases. They are not taken to hospitals unconscious or in a coma from smoking too many Marlboros, and do not give birth to babies addicted to tobacco needing a million dollars of treatment in hospital NICUs.[9] Moreover, though there are a variety of long-term health consequences known to be associated with a lifetime of smoking (say cancer or lung disease), these are far different than opioid-related conditions, which are lethally dangerous and predictably send users to emergency rooms within time-frames that coincide with their addictive behavior – not many decades later.

---

[8] The entire discussion on this issue was two paragraphs. The first paragraph set forth general principles of nuisance law and the second stated, in full:

> The District Court found that the Hospitals did not sufficiently allege that they suffered a harm different from and of greater magnitude than the harm suffered by the general public. We agree. The Hospitals' injuries are derivative of the nonpaying patients' injuries, and the Hospitals are one of numerous parties in the public harmed by the alleged conspiracy. In these circumstances, remedying the source of the conspiracy is more properly a task for public officials. The District Court correctly dismissed the public nuisance claim.

*Id*. at 446.

[9] Although the record in the tobacco case is not clear from the opinions, it is reasonable to conclude that the false marketing scheme alleged by the plaintiff hospitals in the instant case is far more directly linked with the opioid epidemic that the false advertising of the tobacco companies. After all, tobacco had been a widely accepted product, available to any adult. Here, the defendants' advertising was directed at prescribers; the users by and large had no choice other than to take the drugs prescribed to them.

9

And, as to the contention that the hospitals' financial losses are simply "derivative" of the patients' – whatever that really means – we stress that persons addicted to prescription opioids, as a rule, are more likely to be found in rural or financially depressed areas, and are unlikely to have financial resources sufficient to pay hospital bills because of unemployment resulting from disabling pain, unemployment resulting from addiction behaviors, poverty resulting from spending cash on opioids, or a host of other reasons that are intertwined with their opioid use.  That is an entirely different financial and geographic demographic group than, say, "tobacco smokers," which can include countless working persons with health insurance or other financial resources, and who are unlikely to have been bankrupted (and unable to pay hospital bills) as a result of using tobacco.  Further, hospitals have some discretion on admitting some patients in some circumstances.  They have virtually no discretion to refuse to treat those showing up at the emergency room.  The requirement that hospitals treat opioid-related conditions imposes an unavoidable financial burden of a nature and degree different than having them absorb costs of treating patients who cannot pay for smoking-related health problems.

Though the court in *Ass'n of Wash. Pub. Hosp. Dist.* did not squarely address the issue of a superseding intervening cause, that issue lies just below the surface of its finding on causation and we address that here.  In this regard, "the policy of the law on questions of intervening and superseding cause has evolved to the rule that the original actor is relieved from liability for the final result when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor and when, looking backward, after the event, the intervening act appears extraordinary." *Ontiveros v. Borak*, 667 P.2d 200, 206 (Ariz. 1983) (dramshop liability for seller of intoxicating beverages).  Simply put, there are no "extraordinary" intervening acts in this case.  It is simply not possible to create a population of

opioid addicts without, at the same time, creating a population who will demand and be provided unreimbursed and under-reimbursed services from the hospitals. There is nothing about addicts seeking hospital treatment for opioid-related conditions care that, "when looking backward … appears extraordinary" or is not "normal consequence" of the Defendants' acts. In short, there are no legal superseding intervening causes that relieve Defendants from liability.[10]

In any event, the issues of proximate cause, intervening cause and superseding cause are classic jury issues for which there are standard federal pattern jury instructions.[11] Though drafted for a negligence case, the federal pattern instruction for "intervening cause" sets forth principles that apply in any case where issues of causation are to be decided. As modified for a nuisance claim, the instruction reads: "If you find defendants [created a nuisance] but plaintiffs' injuries were caused by the acts of third persons, defendants may be liable for such injuries, if you further find that a reasonably prudent person, situated as defendant was before the happening

---

[10] *See* Restatement (Second) of Torts: Normal Intervening Force § 443 (1979): "The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."

[11] *See, e.g., Town of Superior, Mont. v. Asarco, Inc.*, 874 F.Supp.2d 937, 950 (D. Mont. 2004) (denial of summary judgement in pollution nuisance case: "Whether [Defendant] knew Plaintiffs were using the tailings, whether it was reasonably foreseeable that Plaintiffs would use the tailings, and whether [Defendant] knew the tailings were contaminated and posed health threats to Plaintiffs' citizens are all genuine issues of material facts that are disputed by the parties."); *Ohio Fair Plan Underwriting Assn. v. Arcara*, 417 N.E.2d 115 (Oh. Ct. App. 1979) (issue of whether arson of dilapidated building constituted an intervening cause a fact question for the jury); *Haynes v. Hamilton County*, 883 S.W.2d 606, 612 (Tenn. 1994) ("Proximate cause, as well as superseding intervening cause, are ordinarily jury questions…."); *Villines v. North Arkansas Regional Medical Center*, 385 S.W.3d 360, 365 (Ark. Ct. App. 2011) ("Intervening cause is also a factual question for the jury." (citations omitted)); *Scott v. MD Helicopters, Inc.*, 834 F.Supp.2d 1334, 1339 (M.D. Fla. 2011) (suit against helicopter manufacturer: "The Court finds that whether the improper maintenance performed on N468WE constituted a foreseeable intervening cause that would cut off any potential liability is a question for the jury.").

11

of the incident, would have foreseen an act of the kind committed by the third person was a probable consequence of defendant's [nuisance]." O'Malley, et al., 3 Fed. Jury Prac. & Inst. § 120:62 (6th Ed.). When a series of dominos are closely arrayed, such that pushing over the first necessarily pushes over the last, it is no defense that there were intervening dominos in the middle. Through the false marketing scheme and the other conduct alleged in the Complaint, the defendant pushed over that first domino, and every domino fell, as the defendants foresaw and intended, sending opioid addicts to the hospitals' emergency room doors. The issue of causation is squarely a jury issue.

There is simply no basis to apply the Ninth Circuit's interpretation of Washington state law on proximate cause (in connection with tobacco advertising) to the facts of this case. Here, opioid manufacturers and distributors willfully created a public nuisance in the nature of widespread use of opioids, resulting in foreseeable and direct financial injuries to the plaintiff hospitals.

## CONCLUSION

WHEREFORE, we request the Court find that the Plaintiff Hospitals have properly alleged a public nuisance claim.

Dated: April 5, 2019                                  Respectfully submitted,

/s/ *Don Barrett*
John W. ("Don") Barrett
David McMullan, Jr.
Richard Barrett
Sterling Starns
BARRETT LAW GROUP, P.A.
P.O. Box 927
404 Court Square North
Lexington, Mississippi 39095
Ph: (662) 834-2488
Fax: (662) 834-2628
dbarrett@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

12

rrb@rrblawfirm.net  
sstarns@barrettlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2019, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's system.

/s/ *Don Barrett*  
John W. ("Don") Barrett  
BARRETT LAW GROUP, P.A.  
P.O. Box 927  
404 Court Square North  
Lexington, Mississippi 39095  
Ph: (662) 834-2488  
Fax: (662) 834-2628  
dbarrett@barrettlawgroup.com
