**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**CARDINAL HEALTH'S OBJECTION TO**
**AMENDMENT TO DISCOVERY RULING NO. 14, PART 5,**
**REGARDING PRIVILEGE AND CARDINAL'S DENDRITE AUDIT**

Discovery Ruling No. 14, Part 5 (Dkt. No. 1498) concerns a single document: a report[1] prepared (i) by the consulting group, Cegedim Dendrite, (ii) at the request and direction of outside counsel for Cardinal Health, Cadwalader, Wickersham, & Taft, LLP, which had been retained (iii) to defend Cardinal Health in connection with an imminent DEA enforcement action, and where (iv) Dendrite addressed the report to Cadwalader, which shared it (v) solely with Cardinal's Health's General Counsel and senior in-house counsel.  The Special Master erred in concluding that the Dendrite Report is not protected by either the attorney-client privilege or work product protection, and by applying his ruling to documents that were not the subject of the motion to compel.

The Special Master's fundamental error was to focus on the nature of Dendrite's work for Cardinal Health as a whole, not the primary purpose of the report prepared at Cadwalader's

---

[1]   Plaintiffs and the Special Master have referred to the report at issue as an "Audit."  The report is not labelled as such, and references a "review" of Cardinal Health's SOM System.  The cover letter refers to the document as a "report."

direction, which was a discrete assignment.  Prepared at the law firm's request, essential to its understanding of the allegations being made by the DEA, and ultimately shared only with a small number of lawyers at Cardinal Health, the report's primary purpose—indeed, its sole purpose—was to inform Cadwalader's strategy vis-à-vis the DEA threatened enforcement action.  The report is both a privileged communication and protected work product.

**Background**

In November and December 2007, and again in January 2008, the DEA issued Administrative Inspection Warrants, Orders to Show Cause, and Immediate Suspensions of Registrations ("ISOs") to Cardinal Health.  The Immediate Suspension of Registrations orders prohibited Cardinal Health from shipping controlled substances from three regional distribution centers.  Cardinal Health retained Cadwalader, Wickersham, & Taft, LLP ("Cadwalader") to defend it.[2]

One of Cadwalader's first actions was to retain the services of Cegedim Dendrite ("Dendrite"), a firm with expert regulatory consultants, to advise it about the compliance systems challenged by the DEA.  Ruling at 3 ("One of the first things Cadwalader did was to hire Dendrite on December 5, 2007, the same day Cardinal received its second Immediate Suspension Order.").  The Letter Agreement between Cadwalader and Dendrite provided that Dendrite would "assist with regulatory compliance consulting to Cardinal Health" in furtherance of Cadwalader's efforts to "'provide[] legal advice to its client Cardinal Health . . . in preparation of its pending regulatory action'" by DEA.[3]  Dendrite also agreed to provide consulting services to

---

[2]    The Special Master has held previously that Cardinal Health reasonably anticipated litigation with the DEA when it issued these ISOs, as well as potential shareholder litigation. Amendment to Discovery Ruling No. 14, Part 1 (Dkt. No. 1380).

[3]    Ruling at 3 (quoting 12/5/07 Letter Agreement between Cadwalader, Wickersham, and Taft, LLP, and Dendrite Interactive Marketing LLC).  Cardinal provided the Cadwalader/Dendrite

Cardinal Health.[4]

Dendrite went to work in December 2007, gathering information about Cardinal Health's Suspicious Order Monitoring ("SOM") system through on-site interviews and other communications with the company's employees. Dendrite submitted its report on January 23, 2008. It was marked as privileged and was addressed to Cadwalader alone. Cadwalader shared it only with Cardinal Health's then General Counsel, Steve Falk, and senior in-house counsel.[5] The report gave Dendrite's professional opinion regarding Cardinal Health's compliance with its suspicious-order reporting obligations in light of DEA's new guidance, as articulated in letters issued to registrants in September 2006, February 2007, and December 2007, and provided recommendations.[6]

Apart from the report, Dendrite performed several projects in connection with Cardinal Health's SOM system. Cardinal has produced non-privileged documents relating to that work (over 2,000 such documents).[7]

---

Agreement to the Special Master *in camera*, and maintains privilege on certain portions of it, including the language quoted above. The Special Master ruled that the quotation of the Letter Agreement would not constitute a waiver of the privilege. *Id.* at 3 n.3.

[4]  In Dendrite's "Statement of Work," Dendrite agreed to provide "regulatory compliance consulting as it relates to the Controlled Substances Act, and implementing regulations," including "supporting Cardinal [Health]'s suspicious order monitoring program." Ruling at 3 (quoting 12/5/07 Letter Agreement between Cadwalader, Wickersham, and Taft, LLP, and Dendrite Interactive Marketing LLC); *see also* 3 n.3 (ruling no waiver of privilege due to quoted language).

[5]  The only copy of the report that Cardinal Health has been able to locate was found in the closed files of Mr. Falk. No copies were found in the files of the custodians whose documents have been produced in the litigation.

[6]  Cardinal Health submitted the Dendrite Report *in camera* to the Special Master and understands that the Court has access to it, but Cardinal Health can provide another copy directly to the Court if desired.

[7]  The foregoing facts reiterate the evidence provided in Cardinal Health's January 7, 2019 and March 29, 2019 submissions.

## The Grounds for Objection

The Special Master's analysis is erroneous in five respects.

### 1.  The Special Master erred in applying *Upjohn* and *Kovel*.

The two seminal cases regarding whether privilege attaches to a consultant's work are *Upjohn Co. v. United States*, 449 U.S. 383 (1981), and *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961).  *Upjohn* recognized that the attorney-client privilege "exists to protect not only the giving of professional advice to those who can act on it, ***but also the giving of information to the lawyer*** to enable him to give sound and informed advice."  449 U.S. at 390.[8]  *Kovel*, which foreshadowed *Upjohn*, similarly recognized that there is a privilege "where the client in the first instance consults a lawyer who retains an accountant [or consultant]."  296 F.2d at 922.  As the court explained, with reference to an accounting consultant:

> Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . .  ***By the same token, if the lawyer has directed the client, either in the specific case or generally, to tell his story in the first instance to an accountant engaged by the lawyer, who is then to interpret it so that the lawyer may better give legal advice, communications by the client reasonably related to that purpose ought fall within the privilege*** . . . .  What is vital to the privilege is that the communication be ***made in confidence for the purpose of obtaining legal advice from the lawyer***.

*Id*.

Here, Cadwalader did just what *Upjohn* and *Kovel* sanctioned:  it retained Dendrite and had the client explain its SOM system "in the first instance" to Dendrite so that the law firm, in turn, could "interpret [the information] so that [Cadwalader] may better give legal advice."  The

---

[8]    All emphases are added unless otherwise stated.

Special Master does not dispute that Cadwalader, not Cardinal Health, engaged Dendrite; that Dendrite interrogated the client about its compliance with DEA's regulations (and DEA's letters regarding those regulations); and that the Report described Dendrite's investigation, and interpreted its significance, for Cadwalader's benefit.  And the Special Master does not dispute that apart from Cadwalader, only Cardinal Health's General Counsel and senior in-house counsel received a copy of the Report. These facts, standing alone, establish that the Report is a privileged communication.

### 2.  The Special Master erred in focusing on the primary purpose of Dendrite's overall work, not the Report.

When there is a question whether the communication between lawyer and client involves legal advice, the law looks to the "primary purpose" of the communication.  That test is not relevant here, where the communication is not one between lawyer and client, but between lawyer and consultant.  In the latter case, *Upjohn* and *Kovel* supply the legal test.

Even if the "primary purpose" test were relevant here, however, it would apply to the communication—*i.e.*, the Report.  "To be privileged, ***the communication*** must have the primary purpose of soliciting legal, rather than business, advice."  *Zigler v. Allstate Ins. Co.*, 2007 WL 1087607 at *1 (N.D. Ohio Apr. 9, 2007) (internal quotation marks omitted); *Alomari v. Ohio Dep't of Pub. Safety*, 626 F. App'x 558, 570 (6th Cir. 2015) (when a communication involves both legal and non-legal matters, "we 'consider whether the predominant purpose of the *communication* is to render or solicit legal advice'" (quoting *In re Cnty. of Erie*, 473 F.3d 413, 420 (2d Cir. 2007))).

The Special Master erred, because rather than evaluating the primary purpose of the Report, he evaluated the primary purpose of the overall ***relationship*** between Cardinal Health and Dendrite.  Ruling at 13-14 (finding that the "overwhelming nature of Dendrite's activities

5

were to provide *business* analysis so it could meet its regulatory obligations" and that "Dendrite's primary function was not to support the giving of legal advice by Cadwalader") (emphasis in original). Thus, when the Special Master concluded that "the entire purpose of the Dendrite Audit (and all of Dendrite's work) was to assess and improve Cardinal's SOM System," Ruling at 17, he disregarded the rationale of *Upjohn* and *Kovel*. Those decisions recognized that a lawyer may delegate to an expert consultant "in the first instance" the interrogation of the client in order to elicit the client's "story," where that story involves a specialized field, like accounting or regulatory compliance. A fair reading of the Report reflects that Dendrite described and interpreted what it had learned from the client. The Special Master appeared to conclude, however, that such reporting could never be legal in nature, because the subject of the reporting was an essential element of Cardinal Health's business, namely its regulatory compliance. The cases hold otherwise.

To begin with, "[t]he mere fact that business considerations are weighed in the rendering of legal advice does not vitiate the attorney-client privilege." *Id.* (quoting *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 951 F. Supp. 679, 685-686 (W.D. Mich. 1996)); *Zigler*, 2007 WL 1087607 at *1 (holding "'documents prepared for the purpose of obtaining or rendering legal advice are protected even though the documents also reflect or include business issues'" (quoting *In re OM Sec. Litig.*, 226 F.R.D. 579, 587 (N.D. Ohio 2005))). *U.S. ex rel. Robinson v. Northrop Grumman Corp.*, 2002 WL 31478259, at *1 (N.D. Ill. Nov. 5, 2002) is illustrative. In that case, Northrop's legal department, in anticipation of a wide-scale government audit, engaged an outside auditor consultant to assist it in evaluating Northrop's "regulatory compliance and potential liability." The consultant performed both privileged and non-privileged work. Each resulted in a corresponding final report to Northrop. The fact that the consultant did work for

6

Northrop apart from its direct assistance to the legal department, however, did not preclude the court from holding that the consultant's review was conducted to "provide [Northrop's counsel] with the ability to give legal advice to Northrop, and therefore is privileged." *Id*. at *5.  The court rejected the contention that Northrop "funneled" the review through legal "to mask what they believed was an unflattering analysis" of Northrop's system, and held that the final report and related documents from this review were in fact privileged. *Id.* at *4.

The Dendrite Report is of the same nature.  Confronted with ISOs that effectively shut down three of Cardinal Health's distribution centers, Cadwalader's first task was to gain an understanding of how the company's SOM system worked and determine whether it complied with DEA regulations—a task complicated by September 2006 and February 2007 letters from the DEA regarding the regulations, plus a third letter in December 2007, issued at the same time the DEA was issuing the ISOs to Cardinal Health.  That understanding and determination were essential predicates to Cadwalader's definition of a defense strategy—whether to deny and fight, explain and negotiate, or admit and seek leniency.  The Report provided just the information Cadwalader needed.  It evaluated Cardinal Health's compliance measures, did so separately as to the regulations and the statute, explained how DEA's December 2007 letter changed the industry's understanding of what had been approved, and made recommendations (taking into account changes already being implemented).

The Special Master is correct that "'one cannot render privileged what is otherwise not privileged merely by placing it in the hands of his attorney.'"  Ruling at 16 (quoting *Humphries v. Pennsylvania R. Co.*, 144 F.R.D. 177, 178 (N.D. Ohio 1953)).  But that has never been Cardinal Health's argument.  The report is privileged because the law gives its blessing to counsel's use of an expert to listen to the client's story in the first instance and "translate" it for

counsel, where the subject matter requires expertise, as it does regarding accounting and regulatory compliance issues.  As for the fact that Dendrite billed Cardinal Health rather than Cadwalader, the Special Master elevates form over substance in attaching significance to that; the client always pays in the end.

### 3.  The Special Master erred in finding that the Dendrite Report was not work product.

At page 16, the Special Master cites facts "antithetical to a finding" that the Dendrite Report is either privileged or work product.  At pages 17-18, he treats the Report as work product for which Plaintiffs have shown a substantial need.

Regarding the suggestion that the Report is not work product, there is no dispute Cadwalader commissioned the work from Dendrite, and Dendrite authored a report that was addressed solely to Cadwalader (and provided by Cadwalader solely to Cardinal Health's General Counsel and senior in-house counsel).  And there is no dispute that Cadwalader acted in anticipation of litigation.  Amendment to Discovery Ruling No. 14, Part 1 (Dkt. No. 1380).

The question, then, is whether Plaintiffs demonstrated a substantial need for the Report. Plaintiffs' substantial need argument is a series of conclusory statements devoid of any of the requisite analysis regarding why they have a substantial need for this particular document.  Even if they had made a sufficient showing (they did not), the Special Master made no analysis of that showing.  That was error.  It is not enough to incorporate his Discovery Ruling No. 14, which involved different documents.  The Special Master's conclusion here is that Dendrite's work was of a piece.  If that is true, then Plaintiffs were under an obligation to show why the more than 2,000 documents about Dendrite's work produced by Cardinal Health were insufficient, and to explain how they had exhausted alternative means of learning about Dendrite's work when they failed to depose Cardinal Health's witnesses about those documents.

8

### 4.   The Special Master erred in suggesting Cardinal Health waived the privilege.

To the extent the Special Master suggests that Cardinal Health may have waived privilege, that suggestion is incorrect.

First, the Special Master's finding that "Cardinal [Health] and Cadwalader repeatedly offer to *share Dendrite's findings* with the DEA," Ruling at 17, fundamentally mischaracterizes Cardinal Health's treatment of the Dendrite Report.  There is no evidence Cardinal Health shared the Report or the opinions expressed therein with the DEA or anyone.  Ruling at 7 ("Avergun forwarded the Audit to only two Cardinal employees, both of whom were high-level in-house counsel.")

The facts here are nothing like *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 293 (6th Cir. 2002), cited by the Special Master.  That case involved the *voluntary* disclosure of privileged internal audits to the Department of Justice as part of a negotiated settlement in a fraud investigation.  Columbia/HCA agreed to disclose the privileged audits and related documents to DOJ pursuant to a confidentiality agreement reserving claims of privilege and work product protection over the documents.  293 F.3d at 291–92.  When the plaintiffs in a later lawsuit sought to compel production of the audit material, Columbia/HCA refused to produce it on grounds that it had not waived the attorney-client privilege or protection under the work-product doctrine.  *Id*. at 293.  The Sixth Circuit rejected that selective waiver argument, holding that "the 'general principle that disclosure normally negates the privilege is worth maintaining.'"  *Id*. at 304 (quoting *United States v. MIT*, 129 F.3d 681, 685 (1st Cir. 1997)).  In contrast, Cardinal Health has at all times maintained its privilege claim over the Dendrite Report, and never disclosed it or its findings to DEA or to any other third party.

Second, as for the Special Master's musing that Dendrite's provision of "both privileged

and non-privileged services suggests, if anything, subject matter waiver," Ruling at 15, the cases he cites at footnote 12 involve voluntary disclosure of privileged communications *to a third party*.[9]  As a consultant to Cadwalader and its client, Cardinal Health, there can be no waiver of privilege—not even a breach of confidentiality—in communicating with client and counsel.  And there is no waiver simply because the consultant performs both privileged and non-privileged work.  *U.S. ex rel. Robinson v. Northrop Grumman Corp.*, *supra*.

Third, the Special Master erred in finding implied waiver.  His Ruling makes the "additional observation[]" that Cardinal Health waived privilege because it "ma[de] factual assertions the truth of which can only be assessed by examination of the privileged communication."  Ruling at 18 (citing *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 470 (S.D.N.Y. 1996)).[10]  The Special Master's reading of *Kidder* is overbroad, taking out of context a single passage from the court's extensive analysis in that case.  The court in *Kidder* found waiver on much narrower grounds than the Special Master's reference to that case suggests.  In *Kidder*, the court found the company had waived privilege for statements in documents

---

[9]   *See In re Columbia/HCA*, 293 F.3d at 293 ("voluntary disclosure of privileged materials to the government constitutes a waiver of the attorney-client privilege as to all other adversaries"); *In re Grant Jury Proceedings Oct. 12, 1995*, 78 F.3d 251, 255 (6th Cir. 1996) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication listed, but often as to all other communications relating to the same subject matter.") (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)); *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982) ("When a party reveals part of a privileged communication in order to gain an advantage in litigation, it waives the privilege as to all other communications relating to the same subject matter . . . ."); *Edwards v. Whitaker*, 868 F. Supp. 226, 229 (M.D. Tenn. 1994) ("voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject").

[10]   Plaintiffs made this argument for the first time in two "supplemental" submissions long after the briefing deadlines.  Cardinal Health objected to both submissions as untimely.  The Special Master should have either stricken these submissions or requested a response from Cardinal Health on each newly raised, untimely issue.  Because the Special Master considered these arguments, Cardinal Health addresses the argument here.

underlying a report where (i) the report was publicly released, (ii) the underlying statements were explicitly reflected in the report, and (iii) the company cited the report in multiple forums as an "authoritative source of detailed information," *id.* at 471, including proffering the report "as a reliable . . . source of data on which the court should rely in reaching whatever conclusion would favor the company," *id.* at 472.  "Having in effect made representations to the various courts and an arbitration panel as to the substance of those [underlying] statements," the Court held that Kidder could not then "invoke a privilege to bar disclosure of those documents or portions of documents that would reveal the substance of the statements."  *Id.*  These facts stand in stark contrast to the report at issue here: Cardinal Health has not publicly released the Dendrite Report, provided it to any government agency, or made representations about the report – let alone statements contained therein – in furtherance of its claims or defenses in any legal forum.

Moreover, *Kidder* relied on the standard articulated in *Hearn v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975), but that standard has since been rejected by the Second, Sixth, and Third Circuits, *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("[a] mere indication of a claim or defense certainly is insufficient to place legal advice at issue….  [A] party must rely on privileged advice from his counsel to make his claim or defense."); *Ross v. City of Memphis*, 423 F.3d 596, 604 n.4 (6th Cir. 2005) (criticizing *Hearn* as inconsistent with the certainty in application of privilege principle articulated by the Supreme Court in *Upjohn*); *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.*, 32 F.3d 851, 863-64 (3d Cir. 1994), as well as the Northern and Southern Districts of Ohio, *01 Communique Laboratory, Inc. v. Citrix Systems, Inc.*, 2015 WL 13649574, at *6-7 (N.D. Ohio April 17, 2015) (recognizing criticism Hearn and standard articulated in *Rhone-Poulenc*); *U.S. v. Ohio Edison Co.*, No. C2-99-1181, 2002 WL 1585597, at *5 (S.D. Ohio Jul. 11, 2002).

Under this authority, the fact that "Cardinal Health has made numerous affirmative statements regarding the extent to which the SOM System complied with DEA regulatory requirements," Ruling at 18, does not waive the privilege. If a defendant's assertion of innocence or denial of liability constituted a waiver of privilege, then the privilege would be waived in every case in which a criminal defendant pleads not guilty or a civil defendant comes into court without its checkbook in hand. There cannot be a waiver unless Cardinal Health put the contents of the **communication** itself – the Report – at issue. There is no evidence that it did. The representations cited by the Special Master are not anything Cardinal Health said at the time (in 2008) nor anything it said about the Report, but general assertions made by Cardinal Health **in the present MDL litigation** regarding its compliance. In any event, the Report is not necessary to evaluate Cardinal Health's compliance; that can be done based on the more than six million pages of documents produced by Cardinal Health.

### 5. The Special Master erred in ordering the production of documents other than the Report.

The Special Master directs Cardinal Health to produce the Dendrite Report, "along with other, related documents," and suggests that this ruling should be applied to "other, similar documents." Ruling at 2 n.1, 19. This is error. If a Court finds that a document is not privileged, over the objection of the producer,[11] it cannot conclude that other "like" documents over which the producer asserts privilege are no longer privileged and must be produced. Privilege is a document-by-document, fact-intensive and specific inquiry. *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("The inquiry into whether

---

[11] This stands in contrast to the situation where a document is challenged and, upon re-review, the party determines that the document is not in fact privileged. In that case, the parties have downgraded other similar documents that the producer agrees are not privileged.

12

documents are subject to a privilege is a highly fact-specific one. Only when the district court has been exposed to the contested documents and the specific facts which support a finding of privilege under the attorney-client relationship for each document can it make a principled determination as to whether the attorney-client privilege in fact applies.") (internal quotation marks omitted).  A court cannot order wholesale production of numerous unidentified privileged documents based on its conclusions about one.  *See Craig v. Rite Aid Corp.*, 2012 WL 426275, at *5 (M.D. Pa. Feb. 9, 2012) ("Federal courts are further required to assess the application of the privilege on an individualized case-by-case basis."), *on reconsideration in part*, 2012 WL 1079472 (M.D. Pa. Mar. 30, 2012); *see also Am. Nat. Bank & Tr. Co. of Chicago v. Equitable Life Assur. Soc. of U.S.*, 406 F.3d 867, 879-880 (7th Cir. 2005) (noting that "distinguishing . . . counsel's legal advice from their business advice" is an "especially difficult" area of privilege law") (emphasis in original).

## Conclusion

For the reasons stated, this Court should find that the Report is privileged.

Dated: April 8, 2019                                    Respectfully submitted,

                                                        */s/ Lane Heard*
                                                        Enu Mainigi
                                                        F. Lane Heard III
                                                        Steven M. Pyser
                                                        Ashley W. Hardin
                                                        **WILLIAMS & CONNOLLY LLP**
                                                        725 Twelfth Street, N.W. Washington, DC
                                                        20005
                                                        Tel: (202) 434-5000
                                                        Fax: (202) 434-5029
                                                        emainigi@wc.com
                                                        lheard@wc.com
                                                        spyser@wc.com
                                                        ahardin@wc.com
                                                        *Counsel for Defendant Cardinal Health, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that this 8th day of April, 2019, the foregoing document was served via the Court's ECF system to all counsel of record.

*/s/ Steve M. Pyser*
Steven M. Pyser

*Counsel for Defendant Cardinal Health, Inc.*