UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | CASE NO. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO: *"Track One Cases"* | ) ) ) ) | JUDGE DAN A. POLSTER |

### TRACK ONE PLAINTIFFS' OBJECTION TO DISCOVERY RULING NO. 19 REGARDING DR. PORTENOY

Plaintiffs in the Track One cases submit this objection to Special Master David R. Cohen's Discovery Ruling No. 19 regarding Dr. Russell Portenoy, entered on April 5, 2019. Doc. # 1524.¹ In that ruling, Special Master Cohen sanctioned Plaintiffs pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure for their failure to timely

---

¹ Dr. Portenoy was, in Special Master Cohen's words, "a 'Key Opinion Leader' who, essentially, acted as a paid shill for the manufacturer defendants by promoting the use of prescription opioids while downplaying their risks." *Id.*, at 1. Plaintiffs' Complaints prominently featured allegations concerning Dr. Portenoy and his work on behalf of Purdue and other marketing defendants, as well as his role in maintaining their control over Front Groups such as the APS and the APF. The Complaints describe Dr. Portenoy's subsequent change of heart, noting that he was among KOLs who "have conceded that many of their past claims in support of opioid use lacked evidence or support in the scientific literature" and citing three separate occasions when Dr. Portenoy acknowledged that his statements "weren't true" and did not rely on "real evidence," and directly quote Dr. Portenoy characterizing his past comments in support of opioid use to treat chronic pain as "'pseudoscience.'" Doc. # 514 (Summit County Second Amended Complaint), at ¶¶ 404-411. Thus, throughout this litigation, Defendants have been on notice and aware of Dr. Portenoy's current views concerning his past work on behalf of Defendants, views that remain unchanged in his most recent declaration.

disclose to Defendants Dr. Portenoy's Settlement and Consulting Agreement with Plaintiffs.[2] Specifically, Special Master Cohen ruled, in relevant part:

> Plaintiffs may not: (1) obtain deposition testimony from Dr. Portenoy in the Track One cases; nor (2) rely in Track One cases (at trial or in support of any motion) upon any prior written or oral testimony from Dr. Portenoy, including the Oklahoma deposition.

*Id.*, at 3.[3]

Special Master Cohen's ruling is excessive, and should be reversed or modified by this Court. First, Special Master Cohen erred in concluding that Plaintiffs' delay in disclosing Dr. Portenoy's Settlement and Consulting Agreement was intentional. Second, the Special Master erred in concluding that the delay in disclosure was harmful

---

[2] The MDL Plaintiffs entered into a "Settlement and Consulting Agreement" with Dr. Portenoy on March 5, 2018. The Plaintiffs first expressly informed Defendants of the existence of this agreement on January 9, 2019, more than two weeks prior to his scheduled deposition, when they produced Dr. Portenoy's declaration to Defendants. *See* Doc. # 1524-3, at 4-5 (Letter from Hunter Shkolnik to Special Master (Apr. 2, 2019) (quoting declaration)); Doc. # 1524-2, at 39 (copy of declaration, stating that "I have agreed to cooperate with certain plaintiffs in this multidistrict lawsuit . . . who have entered into settlement agreements with me dismissing me as a defendant in their cases"). Plaintiffs produced Dr. Portenoy's proffer letter and settlement agreement on January 21, 2019, several days prior to Dr. Portenoy's scheduled deposition, which was subsequently postponed. *See* Doc. # 1524-2 at 371 (email from Jayne Conroy transmitting agreements).

[3] The Special Master further ruled that:

> Plaintiffs are *not* precluded from: (1) obtaining or using testimony from Dr. Portenoy in any other MDL case that may be set for trial, or (2) relying in Track One cases, or any other MDL cases, on documents produced by Dr. Portenoy that were originally created before the date the MDL was assigned to the Court (December 12, 2017).

*Id.* Plaintiffs do not object to this second portion of the Special Master's ruling.

2

to Defendants, simply relying on Defense Counsel's assertion of prejudice without any factual finding regarding any actual harm. Any such prejudice suffered by Defendants was mitigated by (1) the production of correspondence between Plaintiffs' counsel and counsel for Dr. Portenoy and (2) Defendants' ability to take Dr. Portenoy's deposition in the six months that remain between now and the October trial.[4] In analogous and more egregious circumstances, a court refused to exclude late-produced evidence. *Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 171 (Cl. Ct. 2006). In this important bellwether litigation, the Court should adopt a similar approach and reverse the Special Master's ruling.

> I. **The Special Master Erred In Concluding That the Delay in Disclosure Was Intentional.**

In his ruling, Special Master Cohen recognized that sanctions under Rule 37(c)(1) are not mandated where the failure to provide information was "substantially justified or is harmless." Doc. # 1524, at 4. In their letter to the Special Master, Plaintiffs explained that their failure to produce Dr. Portenoy's Settlement and Consulting Agreement was substantially justified because it was "inadvertent, not intentional." Doc. # 1524-3, at 7. As Plaintiffs explained:

> In this massive and fast-paced litigation, Plaintiffs, like Defendants, have multiple teams working on different aspects of this litigation. Lawyers working on affirmative discovery were distinct from lawyers working on defensive discovery responses. Plaintiffs' settlement agreement with Dr. Portenoy was negotiated by MDL counsel, and the agreement was not

---

[4] Along with his ruling, the Special Master submitted for the record the letter motion filed by Defendants, the accompanying exhibits, and Plaintiffs' letter in response. *See* Docs. # 1524-1, # 1524-2, and # 1524-3. Given this extensive letter briefing already before the Court, Plaintiffs herein highlight only those materials most directly relevant to the present objection.

3

> contained in the files of any of the Plaintiff municipalities from which document productions were gathered.

*Id.*[5]

The Special Master rejected Plaintiff's claims of inadvertence based on two purported "facts" asserted by Defense Counsel: (1) that Summit County and Akron's discovery responses were "signed by the same counsel [Linda Singer] who principally drafted Dr. Portenoy's proffer agreement and corresponded with counsel for Dr. Portenoy regarding his proffer session," Doc. # 1524, at 4; and (2) that MDL Plaintiffs' counsel discussed "withholding Dr. Portenoy's signed declaration from Defendants" in an email exchange. Doc. # 1524-1, at 17. However, neither of these purported "facts" are true, nor do they carry the implication the Special Master ascribed to them.

While it is true that Summit County and Akron's discovery responses were electronically "signed" by Ms. Singer, as lead counsel for those clients, she was not the attorney who prepared them. As Defendants are well aware, counsel at Motley Rice (like many defense counsel) have divided responsibilities between affirmative and defensive discovery. Consistent with that division of responsibility, necessary for a litigation of this magnitude on this schedule, Ms. Singer did not prepare every discovery response even though, as a lead counsel, her electronic "signature" appears on the actual pleading. Ms. Singer simply was unaware of the document request that called for production of Dr. Portenoy's settlement agreement, which resided in the

---

[5] Plaintiffs' letter to the Special Master also detailed the myriad ways and occasions on which Plaintiffs had alerted Defendants to their "interest in and interactions with Dr. Portenoy." Doc. # 1524-3, at 2-5.

4

attorneys' files—not the client's files. The attorneys who prepared the responses were, in turn, unaware of the existence of the settlement agreement with Dr. Portenoy. Ms. Singer apologized for the oversight at the time, and Plaintiffs do not deny the settlement agreement should have been timely produced. However, Ms. Singer's electronic "signature" on the discovery responses, which appeared regularly on other routine correspondence, simply does not provide any evidence of intentional deception of either Defendants or the Court.[6]

The second piece of purported evidence of intentional misconduct cited by the Special Master is even less persuasive because it contains only the comments of non-MDL counsel. Defense counsel claimed in his letter to the Court that, in an email exchange on January 9, 2019, "Oklahoma Plaintiffs, MDL Plaintiffs, and Dr. Portenoy's counsel discuss the fact that *the MDL Plaintiffs have been withholding Dr. Portenoy's signed declaration from Defendants and contemplate their ability to continue withholding it*." Doc. # 1524-1, at 17 (emphasis added). This is a misrepresentation of the contents of this communication.

The referenced documents, found at Exhibit 9 to Defense counsel's letter, Doc. # 1524-2, at 76-88, consist of a series of emails among counsel for these three parties concerning Dr. Portenoy's upcoming deposition. But the only emails that discuss Dr.

---

[6] Plaintiffs are well aware that, pursuant to Rule 26(g)(1)(A), an attorney signing a discovery response is certifying that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry . . . [the disclosure] is complete and correct as of the time it is made." Ms. Singer believed at the time that her reliance on her colleagues to have prepared accurate responses was reasonable under the circumstances. Plaintiffs acknowledge, with 20/20 hindsight, that it was in fact insufficient.

5

Portenoy's declaration are from *counsel for the Oklahoma Attorney General in a parallel litigation* asking whether the other parties were "handing over a copy of the declaration" and noting that, since he did not possess a final copy he was not obliged to do so, and a response *from Dr. Portenoy's counsel* stating that she did not believe she was obligated to provide the declaration to defendants. *Id.*, at 84, 83. **There is no email whatsoever from MDL Plaintiff's counsel on this subject.** And, indeed, as Plaintiffs advised the Special Master, January 9 was the very day on which Plaintiffs produced Dr. Portenoy's declaration to the Defendants (which expressly disclosed his proffer and settlement agreements). Doc. # 1524-3, at 4-5 & n.6.[7] Thus, these emails provide no support for the Special Master's conclusion that Plaintiffs' delay in disclosing Dr. Portenoy's agreement was something other than an inadvertent mistake.

The evidence cited in the Special Master's ruling thus does not establish that Plaintiffs' delay in disclosing Dr. Portenoy's proffer and settlement agreements was intentional. In fact, it was inadvertent. It therefore does not provide a basis for sanctions under Rule 37(c)(1).

## II. The Special Master Erred In Concluding That the Delay in Disclosure Was Harmful to Defendants.

The Special Master also concluded that the delay in disclosing Dr. Portenoy's Settlement and Consulting Agreement "was not harmless." Doc. # 1524, at 5. Special Master Cohen reached this conclusion based on Defense counsel's assertion that they

---

[7] Indeed, Plaintiffs' counsel's records indicate that Dr. Portenoy's declaration was provided to their contractor, Ricoh, for production on January 8, the day before this exchange of emails even occurred.

6

were prevented from "'seeking even the most basic discovery from Dr. Portenoy and gave Plaintiffs unfettered access to him throughout the entirety of the fact discovery period.'" *Id.* (quoting Doc. # 1524-1, at 3).[8] Yet, Defendants utterly fail to support their assertion that they were in any way harmed by the belated disclosure of Dr. Portenoy's settlement agreement.

Defendants contend, generically, that the delayed disclosure prevented them from "question[ing] prior deponents about . . . whether any ever spoke with Dr. Portenoy or were otherwise advised of his new opinions in this case such that it influenced their own testimony" or "solicit[ing] the testimony of other witnesses who might have contradicted Dr. Portenoy's declaration." Doc. #1524-1, at 22. The problem with Defendants' position is twofold: first, Dr. Portenoy has not changed his positions in the least. The statements in his declaration are entirely consistent with public statements he had made prior to the start of this litigation and that are reflected in Plaintiffs' Complaint. *See* Doc. #1524-3, at 2 & n.2 (quoting Doc. # 514 (Summit County Second Amended Complaint), ¶¶ 404-411). There is no "change in [Dr. Portenoy's]

---

[8] To be precise, Defense counsel Cheffo claimed in his letter that it was this Court's stay on discovery against all physician defendants that prevented Defendants from obtaining discovery from Dr. Portenoy. Although Mr. Cheffo accuses the Plaintiffs of misleading this Court into entering that stay, *id.* at 10, 12, Master Cohen made no such finding, which is inconsistent with the facts. *See* Doc. # 1524-3, at 5.

Moreover, the Court should take note of the fact that, last September, Plaintiffs already produced to Defendants more than 100,000 pages of documents they had received from Dr. Portenoy in a zipfile labeled "PORTENOY001.zip." Doc. # 1524-3, at 3. Thus, it is simply not true that Defendants have been denied "even the most basic discovery from Dr. Portenoy."

opinion" for Defendants to explore. The only thing that changed was Dr. Portenoy's agreement to testify truthfully about those opinions as part of his settlement agreement.

Second, it is important to recall Dr. Portenoy's role in the opioid crisis. He was, as Special Master Cohen put it, "a paid shill for the manufacturer defendants . . . [who] promot[ed] the use of prescription opioids while downplaying their risks." Doc. # 1524, at 1. Given this role, it is exceedingly unlikely that any of Plaintiffs' fact deponents would have had any information about Dr. Portenoy that Defendants could have explored in deposition. The only persons with direct knowledge of Dr. Portenoy's role in the opioid crisis were Defendants' employees and agents; Defendants were in no way deterred in their ability to seek testimony from such witnesses to contradict Dr. Portenoy's testimony, especially given that the gist of his views had already been set forth in Plaintiffs' Complaint.

Plaintiffs agree that Defendants should have the opportunity to question Dr. Portenoy himself about the circumstances that led to his settlement agreement with Plaintiffs—and they would already have had that opportunity if Dr. Portenoy's deposition had not been postponed. Defendants can still take his deposition now, a full six months before the scheduled trial. In no other way, however, can it be said that Defendants have been harmed by the belated disclosure of Dr. Portenoy's settlement agreement.[9]

---

[9] Rather than repeat arguments that have already been set forth at length in the submissions to the Special Master, Plaintiffs direct the Court to the discussion in those submissions of each of the five factors identified by the Sixth Circuit in *Howe v. City of Akron*, 801 F.3d 718, 747 (6th Cir. 2015), for determining whether a failure to disclose

### III. The Special Master's Proposed Sanction Is Excessive.

Finally, Plaintiffs object to the Special Master's proposed sanction as excessive. Even if this Court were to accept the Special Master's conclusions that Plaintiffs' failure to timely disclose Dr. Portenoy's Settlement and Consulting Agreement was neither substantially justified nor harmless, exclusion of any testimony from Dr. Portenoy at the upcoming bellwether trial would be a punishment that does not fit the crime. It would unnecessarily exclude critical testimony of which Defendants have long been aware and would undermine the value of the upcoming trial as a bellwether for other cases in the MDL.

Notably, Special Master Cohen was clearly uncomfortable with and hesitant to impose a sanction excluding Dr. Portenoy's testimony from the upcoming bellwether trial. As the Special Master acknowledged: "'[e]xclusion of evidence is an extreme sanction and should be applied only when lesser sanctions are inadequate.'" Doc. # 1524, at 6 n.3 (quoting *Zoltek Corp. v. U.S.*, 71 Fed. Cl. 160, 171 (Cl. Ct. 2006; also citing *Trustee of Michigan Reg'l Council of Carpenters Employee Benefits Fund v. Carpentry Contractors, Inc.*, 203 F.R.D. 247, 253 (E.D. Mich. 2001)). He expressly recognized that his proposed remedy would both "keep[] evidence from the trier of fact" and "impose[] counsel's [purported] failures on the Track One plaintiffs." *Id.* Special Master Cohen conceded that it would be "within the realm of reasonableness to instead allow

---

was harmless or substantially justified. *See* Doc. # 1524-3, at 8-10. Plaintiffs therein explain how none of the five factors support a determination that Plaintiffs' conduct was neither substantially justified nor harmless and therefore in violation of Rule 37(c)(1).

9

defendants to depose Portenoy and require plaintiffs to pay for all costs associated with that deposition." *Id.*

The most closely analogous case strongly supports the conclusion that the Special Master's proposed remedy is excessive and that exclusion of Dr. Portenoy's testimony is not warranted. In *Zoltek*, a patent infringement action, the federal government improperly withheld a declaration and accompanying documents from a third party witness that were relevant to the government's affirmative defense of patent invalidity, despite the fact that disclosure was required in response to plaintiff's document requests. The government withheld the declaration and documents for over three years, and did not disclose the information until after it had relied on it in the deposition of the inventor of the patented invention.[10] Nevertheless, the court concluded that exclusion of the declarant's testimony was not warranted under Rule 37(c)(1). 71 Fed. Cl. at 171.[11]

The *Zoltek* court found that the withheld information was "of great importance to the litigation," *id.* at 168, that the government's failure to produce the declaration and documents was not substantially justified, *id.* at 170-71, and that, because plaintiff would have to "reevaluate its litigation strategy" in light of the withheld documents, plaintiff had been "prejudiced by Defendant's delay in producing the documents." *Id.* at

---

[10] By contrast, Plaintiffs here failed to disclose Dr. Portenoy's settlement for only ten months and produced both his declaration and settlement agreement prior to his scheduled deposition.

[11] *Zoltek* was decided under Rule 37 of the Rules of the U.S. Court of Federal Claims. As the Court noted, that rule "is almost identical to FRCP 37(c)(1), and interpretation of the federal rule informs the Court's analysis of" the Court of Claims rule. *Id.* at 167.

10

169. Nevertheless, because the information was revealed sufficiently before trial, there was no risk that the trial would be disrupted, and any prejudice from the delayed disclosure could be "cured" by allowing the plaintiff to re-depose the patent inventor during the remaining discovery period. *Id.* at 169-70. Therefore, the *Zoltek* court ruled that "the remedy of exclusion of the evidence is inappropriate and unduly harsh under the circumstances" and instead ordered that the plaintiff be permitted to take an additional deposition of the inventor at the government's expense. *Id.* at 171.

The same reasoning applies here. Plaintiffs' delay in disclosing Dr. Portenoy's settlement agreement was much shorter than the delay in *Zoltek* and, unlike that case, it was belatedly produced prior to the only deposition that would be directly affected by the information. Moreover, as in *Zoltek*, the information was disclosed well in advance of trial, so that there will be no "trial by ambush," and any prejudice to Defendants from the belated disclosure can be fully cured by now allowing them to take Dr. Portenoy's deposition. If exclusion of the declarant's testimony was inappropriate and excessive in *Zoltek*, it would also necessarily be, *a fortiori*, an excessive and inappropriate remedy here.

Defendants should be allowed to take Dr. Portenoy's deposition to explore any relationship between Dr. Portenoy's settlement agreement with Plaintiffs and the substance of his proposed testimony. No other sanction is warranted.

## CONCLUSION

As Plaintiffs explained in their submission to the Special Master, Dr. Portenoy was a central figure in the manufacturer defendants' unlawful and misleading

11

promotion of opioids to treat chronic pain, who was paid for years by a number of the Defendants to promote the use of opioids for that purpose. Dr. Portenoy's role in this litigation has been clear from the outset and Defendants are intimately familiar with his conduct, since he engaged in these activities at their behest and with their financial support.

Defendants are desperately afraid of Dr. Portenoy's testimony in this MDL and have gone to great lengths to seek its exclusion. But there is no reason why it should be excluded. Defendants have been fully aware of the substance of Dr. Portenoy's positions from the beginnings of this litigation, and any minimal harm resulting from the delayed disclosure of his settlement agreement with Plaintiffs can be fully addressed through his pre-trial deposition. The Court needs to hear from Dr. Portenoy, whether through his declaration, his deposition testimony, or in live testimony in open court.

For all of these reasons, the Special Master's ruling excluding Dr. Portenoy's testimony from the upcoming Case Track One trial should be reversed and Defendants' motion to exclude his testimony under either Rule 37(c)(1) of the Federal Rules of Civil Procedure or under Rule 3.04(b) of the Ohio Rules of Professional Conduct[12] should be denied.

Respectfully submitted,

*/s/ Hunter J. Shkolnik*

---

[12] Special Master Cohen did not reach Defendants' arguments for sanctions under Rule 3.04(b). For the reasons set forth in Plaintiffs' letter submission to the Special Master, Doc. # 1524-3, at 10-12, no sanction is warranted under that rule.

                Hunter J. Shkolnik (admitted pro hac vice)
                Napoli Shkolnik PLLC
                360 Lexington Avenue
                New York, New York 10017
                Phone: (212) 397-1000
                hunter@napolilaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2019, I caused a copy of the foregoing TRACK ONE PLAINTIFFS' OBJECTION TO DISCOVERY RULING NO. 19 REGARDING DR. PORTENOY to be served, by filing a true and correct copy with this Court's CM/ECF system, to all counsel of record.

*/s/ Salvatore C. Badala*