1                  UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF OHIO

2                    EASTERN DIVISION

3

4  IN RE:                       Case No. 1:17-md-2804
    NATIONAL PRESCRIPTION       Cleveland, Ohio

5  OPIATE LITIGATION
                        Wednesday, April 24, 2019

6                       11:05 a.m.

7

8

9

10                  TRANSCRIPT OF CONFERENCE
          BEFORE SPECIAL MASTER DAVID R. COHEN

11

12

13  APPEARANCES:           David Rosenblum Cohen,
                       Special Master

14                     Law Office of Dave R. Cohen
                     24400 Chagrin Blvd., Ste.300

15                     Cleveland, Ohio   44122
                     216-8331-0001

16

17

18  (Appearances continued to Page 2.)

19

20

21  Official Court Reporter:  Heidi Blueskye Geizer
                     Certified Realtime Reporter

22                     United States District Court
                     801 West Superior Avenue

23                     7-178 U.S. Court House
                     Cleveland, Ohio   44113

24                     216-357-7092

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.

```
 1      APPEARANCES:   (Continued)

 2      For the Plaintiffs:        Peter H. Weinberger
                                   Hunter J. Shkolnik
 3                                 Donald A. Migliori
                                   W. Mark Lanier
 4                                 Paul T. Farrell, Jr.
                                   Paul J. Hanly, Jr.
 5                                 Salvatore C. Badala
                                   Elizabeth J. Cabraser
 6                                 David I. Ackerman
                                   Jayne Conroy
 7                                 Evan M. Janush
                                   Sterling Cluff

 8

 9      For the Defendants:        Mark S. Cheffo
                                   Steven A. Reed
10                                 Donna M. Welch
                                   Charles C. Lifland
11                                 Carole M. Rendon
                                   Mark H. Lynch
12                                 Neelum J. Wadhwani
                                   Kaspar J. Stoffelmayr
13                                 Elisa P. McEnroe
                                   James B. Matthews III
14                                 Paul B. Hynes, Jr.

15

16      For Interested Party       James R. Bennett, II
        U.S. Department            Renee A. Bacchus
17      of Justice Drug            Assistant U.S. Attorneys
        Enforcement                801 Superior Avenue, W, Ste. 400
18      Administration:            Cleveland, OH 44113
                                   216-622-3988

19

20                           -  -  -  -  -

21

22

23

24

25
```

1    MORNING SESSION, WEDNESDAY, APRIL 24, 2019  11:05 A.M.

2                   THE COURT:  Okay.  Everybody, thank you for

3    being here.  Here is the plan.  I received Tuesday

4    mid-morning an agenda which was only 3,000 pages as opposed

5    to the 8,000-page agenda that I usually get, and I did

6    manage last night staying up until a little past midnight to

7    get through all of the items on the agenda that are listed

8    as new.  There are also a number of items on the agenda that

9    have been on prior agendas, and my goal today before we

10   separate is to at least get to every item that is new and

11   address it, and rule on it to the extent that I can.

12         As to the items that are not new, most of them are

13   items that have already become ripe and I just haven't

14   gotten to, as you know, and I continue to work on those.

15   And unfortunately, as I've said before, this is really kind

16   of a triage, and new things come up that need attention

17   which sometimes keep me from getting to things that are

18   older but ripe, and I know that, and continue to try to get

19   to that stuff; but I am going to try and get to today

20   everything that is listed as new and help you get past those

21   issues.

22         And as I said, the first one I want to address is

23   agenda item number 190, which has to do with task force

24   members and defendants for additional time with those task

25   force members in deposition, and also addressing the law

1    enforcement privilege and the *Touhy* objections that have

2    been raised by DOJ.

3         I'm going to start by simply asking the questions of

4    defendants, how much more -- assuming that I say yeah, you

5    can have what you want, how much more time do you need with

6    each of the three deponents who were task force members?

7    Also, how much time have you already had?

8              THE WITNESS:  Special Master Cohen, this is

9    Laura Wu from McKesson.  We expect we would be able to

10   complete the continued depositions of three depositions, the

11   depositions of Detectives Prince, Leonard, and Baker-Stella,

12   all within a period of about eight hours.  Each of these

13   depositions was started originally related to local law

14   enforcement exclusively, and then reopened once *Touhy*

15   clearance had issued.

16        In the depositions which focused on the task force

17   diversion activities, defendants were stymied at every turn

18   with hundreds of instructions not to answer --

19              SPECIAL MASTER COHEN:  Right, I read the

20   arguments.  I just need an answer to my question.  How much

21   time do you need?

22              MS. WU:  I think one day for all three

23   witnesses.

24              THE COURT:  One day total, so call it two and

25   a half hours each.

1              THE WITNESS:  That's my best estimate.

2              SPECIAL MASTER COHEN:  And how much time did

3     you have with each already?

4              MS. WU:  We have had a full deposition day

5     with each of them.  With Detective Prince we I believe have

6     had more than seven hours.  His deposition was reopened

7     based on the Cleveland document production failures in

8     addition to the *Touhy* clearance issues, so he stands in a

9     slightly different respect.

10             SPECIAL MASTER COHEN:  Okay.  Mr. Bennett,

11    here is what I'm thinking.  I've read the briefs that have

12    been submitted, the letter briefs that have been submitted

13    by the parties.  First of all, it seems pretty clear to me

14    there's both statutes and case law that say that *Touhy* regs

15    don't apply to law enforcement officers when they're

16    deputized to a federal task force, and also that they are

17    not deemed federal employees.  So I think that objections

18    based on *Touhy* are questionable at best.

19         I also think that the law enforcement privilege is

20    limited, and you've seen, I'm sure, the same language as I

21    have, there's a case *United States v. Quebe*, Q-U-E-B-E, that

22    talks about what information is privilege and what isn't.

23         What I'm seeing when I review the transcript is that

24    the invocations of law enforcement privilege are probably

25    more broad than are required.  I am completely sympathetic

6

1    to the law enforcement privilege, the last thing I want to

2    do is because of this litigation get in the way of any

3    ongoing enforcement actions or to divulge any law

4    enforcement techniques.

5        So what I think needs to happen is I think it's

6    appropriate to allow these depositions to continue over the

7    course of one day for the three of them.  I'm going to limit

8    them to two hours each.  I'm going to attend those

9    depositions, and I'm going to be sitting there, and I'm

10   going to rule on the law enforcement privilege scope.

11       As I say, I think that some of your objections were

12   appropriate, but I think that some of them might have gone

13   too far, and that there's information that could be elicited

14   that is fair for the defendants to obtain.

15       So the question really is a matter of scheduling.  And

16   I'll stop there and ask if you have any questions or

17   thoughts.

18                   MR BENNETT:  Thank you, Special Master Cohen.

19   This is James Bennett from the Department of Justice.

20       I want to make two points.  The first point is the

21   idea that the *Touhy* regulations do not govern federal task

22   force officers.  Respectfully, Special Master Cohen, that is

23   an issue that both myself and the department would strongly

24   disagree with.  We believe that it does in fact, and there

25   is a definition contained in the *Touhy* regulations, which is

1    that I think it's 28 C.F.R. 16.21(b), that would include the

2    task force officers.  The statute that is cited by the

3    defendants is the general enabling statute where the task

4    force officers are deputized, and it says they're not

5    federal employees.  That deals with the statute regulations

6    that deal with civil service and competitive exams, and

7    things like that.

8         So will be an issue that we would have to have the

9    special master write an official decision on and we would

10   have to object to it.  It's that vitally important, not just

11   for these three task force officers, but for all the other

12   task force officers that may be involved in the case going

13   forward, as well as implications that would have around the

14   country.  So that would be the first point I would make

15   regarding whether or not the *Touhy* regulations apply.

16        The second point I wanted to make was that the idea

17   that the United States -- and I'm not speaking for the

18   plaintiffs here, but that the United States for the vast

19   majority of the objections raised that based on law

20   enforcement privilege, would be incorrect.  This is a case

21   where the U.S. Attorney designee authorized these three task

22   force officers to disclose official Department of Justice

23   information.  That authorization specifically set out what

24   they were and were not allowed to testify about.

25        I think we now have a very good roadmap of what the

1    defendants want, and my suggestion is these officers are

2    prohibited by law from disclosing stuff that they haven't

3    been authorized to even if it might be discoverable, and I

4    believe that a number of the questions that were asked may

5    be authorized, or at least a substantial portion of the

6    information would be authorized if they submitted an amended

7    request and that got to be vetted, but some of the questions

8    that were asked that they complained we did not let the

9    officers answer was because those answers might have

10   implicated or definitely would have implicated privileged

11   information, including but not limited to information that

12   would be protected by 6(c) because it was Grand Jury

13   information, confidential law enforcement techniques, the

14   effectiveness of which would have been impaired, and so

15   forth.

16        So the U.S. Attorney designee should have the ability

17   in the first instance to determine whether or not that

18   information is privileged or not, and so we would

19   respectfully request that opportunity first.  And then if

20   the parties/defense disagrees then they could challenge

21   those specific limitations once they have more specific

22   questions to determine whether or not there was an

23   appropriate invocation of privilege or statutory

24   prohibition.

25                  SPECIAL MASTER COHEN:  Let me say a few

1      things, one of which I'm glad you brought up.

2           You said that you're going to need me to essentially

3      formalize my order and write it down so that you have an

4      opportunity to object.  If you look at my appointment order,

5      what it says is that a ruling needs to be either issued by

6      me on the docket or in front of a court reporter.

7           We're in front of a court reporter today, so the

8      rulings that I issue today on any matter are of record.

9      They are ready to be objected to.  There's nothing more that

10     I need to do.  If any of you want to object to any ruling,

11     you have the whatever period, three-day period I think it

12     is, or -- no, whatever it is.  You have the normal period to

13     object to those rulings.

14          And in most cases in sum I may issue something in

15     writing, in most cases I will not.  So to the extent you

16     want to object to a ruling, you should take my rulings today

17     as the rulings that you are going to object to.  That's the

18     first thing.

19          The second thing --

20               MR. BENNETT:  Thank you for that

21     clarification.  I didn't know the rule.  My apology.

22               SPECIAL MASTER COHEN:  No problem, no problem.

23     This is only the second time I think that we've done this.

24          So here is what I'm reading, Mr. Bennett, and I'm

25     making this a part of my ruling.  I'm reading 21 U.S.C. §

1    878(b).  And it says, quote, State and local law enforcement

2    officers performing functions under this section shall not

3    be deemed federal employees.  It's not talking about civil

4    servants, it's talking about law enforcement officers.

5         I'm also looking at a case called *Felix v. New York*

6    *City Police Department*, 1991 Westlaw 251660, out of the

7    Southern District of New York in 1991.  And it essentially

8    says that DOJ's *Touhy* regs do not apply to local law

9    enforcement officers when they're deputized to a federal

10   task force.

11        So those both seem to be directly on point.  And I

12   simply disagree with you as a matter of law that these law

13   enforcement officers are quote/unquote prohibited by *Touhy*

14   from answering these questions.  That's not how I understand

15   *Touhy* to work.

16        The other -- then I will jump to I'm not sure I

17   understood what you said about what procedure you would like

18   to take place to address the law enforcement privilege

19   concerns that you have.  My ruling is that the depos go

20   forward and the questioning goes forward, and if what you're

21   saying is that you want submission question by question

22   beforehand so that you know what to object to, that's just

23   not workable.

24             MS. WU:  Special Master Cohen, this is Laura

25   Wu.  I would also state that we have complied with the *Touhy*

1    process, and under the Sixth Circuit law as well as Judge

2    Polster's rulings in this case, *Touhy* itself does not weigh

3    on your ruling as to what is discoverable, and therefore we

4    can only address any privileges raised by the government on

5    a question-by-question basis live during a deposition.

6         And I would also note that both on the -- during the

7    hearing today and in its papers the government has disavowed

8    any law enforcement privilege claims.  That happened over

9    and over in the depositions as the lawyers taking the

10   depositions requested that the government state the basis

11   for its instructions not to answer.

12                   SPECIAL MASTER COHEN:  Yeah.  And let me just

13   add, look, this is going to go forward according to my

14   ruling unless you get it reversed by the Court through

15   objection.

16        And if it gives you any solace, Mr. Bennett, I'm not

17   going to open the floodgates to questions.  I just think

18   there are certain areas where you were super-extra-careful

19   where you didn't need to be.  I don't know what solace that

20   gives you, but I'm just giving you some insight into how I

21   anticipate this is going to go forward.

22                   MR. BENNETT:  This is James Bennett again.

23   Thank you for that, Special Master Cohen.  I guess the first

24   thing that causes me concern, and I just want to make sure I

25   understand, is that your ruling is that the *Touhy*

1    regulations do not apply to federal task force officers, and

2    as a result, the United States would not have any standing

3    to even object to the questions.  Am I misunderstanding

4    something?

5         And I will point out to the Court that in our

6    brief -- I'm sorry, to Special Master -- in our brief letter

7    that we sent you we did cite to the case of *Mayo v. City of*

8    *Scranton*, which specifically rejected the arguments that the

9    defendants make, and also to 28 C.F.R. 16.21(b), which

10   defines the term "employee" for purposes of the regulation

11   different than what 21 U.S.C. 878 defines the term "federal

12   employee" for purposes of those statutes.

13        So I do believe that there is law that supports the

14   government's position, and *Felix* does not even address the

15   statute -- I'm sorry -- the regulation at issue, which is 28

16   C.F.R. 16.21, *et seq.*  And so I guess that would be the

17   first point of clarification I would ask to make sure that I

18   understand the Court's ruling, the Special Master's ruling

19   that the TFOs are not employees for purposes of the statute

20   such that the United States would not have standing to even

21   object.

22        Regarding the second issue, which was the point that

23   we were making, the employees have to look to the statute

24   themselves and the regulations, and 28 C.F.R. 16.22(a) says

25   that no employee in response to the demand shall produce

1    information without prior approval.

2         So the offsets that I was envisioning was that the

3    prior approval would be obtained for these additional

4    questions or additional areas of information that were being

5    asked about in the depositions that were not originally

6    included in the authorization.

7              THE COURT:  All right.  Well, let me ask you a

8    question.  Were you making objections only based on *Touhy* or

9    were you making objections also based on law enforcement

10   privilege?

11             MR. BENNETT:  There were objections that were

12   based on more than just *Touhy*.  There were certainly law

13   enforcement-sensitive information that we objected to, but

14   most of the objections and all the ones that I know of that

15   were complained about by the defense were all as a result of

16   being outside the scope of the authorization and instructing

17   the witnesses that under 16.22(a) they were not currently

18   authorized to disclose that information.

19             SPECIAL MASTER COHEN:  All right.  So here is

20   what makes sense:  What I had thought we would do was that

21   we would get together and I would rule on the law

22   enforcement privilege objections that you made or were going

23   to make during the two hours each additional, and that there

24   would be no *Touhy* objections based on scope.  But it sounds

25   to me like what you just said is you think that you can go

1    back to DOJ, get additional authority, and maybe avoid some

2    of what I just said, and that makes sense to me.  I know

3    you've done that before in other instances, you've gone back

4    to DOJ and gotten additional scope under *Touhy*.

5         I think that you probably already know what it is, the

6    additional scope you would need to obtain, but it also only

7    makes sense for the defendants and you to clarify that

8    before you go back and make sure that everything they want

9    you to ask for is what you ask for.

10        So does it make sense?  Do you think it makes sense

11   for the defendants and you to get together, figure out what

12   additional scope you would seek, to do it quickly and to

13   receive that?  And I still think it makes sense for me to

14   sit in the depos and rule on law enforcement privilege

15   objections, but to get that done first, and then I don't

16   have to say that you're not -- that *Touhy* doesn't apply.

17             MR. BENNETT:  This is James Bennett from the

18   Department of Justice.

19        I would agree on both of those counts.  Number one, we

20   would be happy to meet and confer with the defendants and go

21   back and see what additional authorization for questions

22   that they asked in the deposition or anything else that

23   they've come up with could be authorized.

24        And second, I would also agree a hundred percent that

25   it makes a lot of sense to have you present at the

1    deposition if you're willing and available.  I think that

2    will eliminate a lot of the parties' concerns as we go

3    through that.  So the United States would support both of

4    those two things.

5                    MS. WU:  Special Master Cohen, this is Laura

6    Wu.  I'd like to highlight the fact that the questions that

7    we want to ask, we/the defendants want to pose to these

8    witnesses, are within the scope of *Touhy* clearance received.

9    It's only as applied in the depositions in a rather

10   aggressive and nonsensical way that the *Touhy* clearance has

11   been used to shield important discovery in this case.

12       And I realize that these technical discussions about

13   whether a statute or a DOJ's regs are highly interesting, I

14   agree, but we can move more quickly to the Sixth Circuit

15   authority *In re Bankers*, which makes clear that that

16   decision doesn't really hold water in this case.  In any

17   case it's the Federal Rules of discovery and privileges

18   which govern what discovery is permissible in this case.

19       We have gone through the *Touhy* process, and no further

20   process with *Touhy* is necessary.  Instead, a ruling would

21   allow us to move forward immediately to get these

22   depositions completed efficiently.  No further *Touhy* process

23   is required under Sixth Circuit law.  And Judge Polster has

24   ruled consistent with *In re Bankers* already in this case

25   when confronting ARCOS data issues.

1      SPECIAL MASTER COHEN:  All right.  So I'm

2   going to tell you to go back to work with DOJ to get this

3   done.  It just makes more sense to work together.  If I

4   don't have to rule, I'm not going to.  I'm going to sit in

5   the deposition.

6      Mr. Bennett, how long do you think it will take after

7   you meet with the defendants to get a response from DOJ?

8      MR. BENNETT:  Generally, just for this project

9   it wouldn't take long.  However, I'm sure you're keenly

10   aware there are a number of other requests and issues and

11   matters pending, and the DOJ has, you know, finite

12   resources.

13      THE COURT:  Give me a rough guess.

14      MR. BENNETT:  Let me ask this.  And I hate

15   answering a question with a question, and I apologize, but

16   what would the Special Master deem to be the outer extent of

17   the reasonable amount of time that you would let us have to

18   do it?

19      SPECIAL MASTER COHEN:  A week.  I mean, this

20   is an increment of what you already have.  You already know

21   exactly what it is the defendants have sought.  I think it

22   would be pretty quick for you by the end of this week for

23   sure to state what additional areas of inquiry you're

24   seeking.  And like I say, it's just an increment.  So

25   whoever you went to last time, just say remember what we

1    said before?  Now it's X plus A.

2                    MR. BENNETT:  I guess you're saying by the end

3    of this week, so in 48 hours?  That wouldn't be something

4    that I could --

5                    SPECIAL MASTER COHEN:  No; that you're going

6    to meet with the defendants.

7                    MR. BENNETT:  Okay.

8                    SPECIAL MASTER COHEN:  And then by this Friday

9    take the request back to DOJ, and within a week hear back.

10                    MR. BENNETT:  Yes.  I think the problem is we

11   have a 30(b)(6) deposition that I'm in all day tomorrow, and

12   Joe Rannazzisi's deposition that we're in all day Friday, so

13   I'm not sure of the availability to meet with the defendants

14   over the next 48 hours.

15                    MS WU:  Special Master Cohen, again, we could

16   schedule the depositions.  The *Touhy* clearance at this time

17   should not be a barrier.  Instead, the Federal Rules and any

18   law enforcement privilege claims under clear Sixth Circuit

19   law and the law of this case rule the day.  Let's just

20   reschedule these.  I'm happy --

21                    SPECIAL MASTER COHEN:  You're going to get the

22   depos, it's just a matter of when.  And I'm trying to get it

23   to happen as soon as possible, but I'm not going to pound

24   the table about it.

25        So Mr. Bennett --

1          MR. BENNETT:  I would be available Monday to

2    meet with the defendants, and then would hope to have by the

3    following Monday the authorization letter completed.  Would

4    that be a reasonable time?

5          SPECIAL MASTER COHEN:  The authorization

6    letter to or from DOJ?

7          MR. BENNETT:  The authorization letter from

8    DOJ that grants any additional --

9          SPECIAL MASTER COHEN:  That's fine.

10          MR. BENNETT:  -- by the following --

11          SPECIAL MASTER COHEN:  That's fine.

12          MR. BENNETT:  The authorization letter done by

13    the following Monday.

14          SPECIAL MASTER COHEN:  Okay, so that's what

15    we're going to shoot for.

16          MR. CLUFF:  Special Master Cohen, this is

17    Sterling Cluff from Baron & Budd, on behalf of Cleveland.  I

18    have just a scope question about your order.

19        From the discussion the parties have been having, it

20    sounds like the scope of your order relates to these

21    witnesses who work exclusively as task force officers on the

22    DEA's Tactical Diversion Squad.  Is that what you're

23    ordering them to be brought back to be deposed about in

24    these two hours?

25          SPECIAL MASTER COHEN:  Yes, but also I know

1     that there were questions asked about their work before they

2     were on the task force to which law enforcement privilege

3     objections were made, and if those questions are asked again

4     and I conclude that the law enforcement privilege argument

5     isn't well taken, then they'll have to answer it.  So I

6     think what you're asking is are you limited to asking

7     questions about the work they did only while they were on

8     the task force, and the answer is no.

9                     MR. CLUFF:  Understood.  Thank you.

10                    SPECIAL MASTER COHEN:  Okay.  Let's move on.

11    Thank you, everybody.

12                    MS. WU:  Special Master Cohen, there's a

13    related issue, documents that have been clawed back.

14    Perhaps we can confer with Mr. Bennett on that issue --

15                    SPECIAL MASTER COHEN:  Yeah.

16                    MS. WU:  -- and deal with it at the

17    rescheduled depositions.

18                    SPECIAL MASTER COHEN:  Right.  And I think the

19    clawbacks may be related to the *Touhy* scope, and so I agree

20    that that should be addressed.

21                    MS. WU:  Okay, thank you.

22                    SPECIAL MASTER COHEN:  All right.  Thank you

23    everybody on that one.  Mr. Bennett, I think that's it for

24    you, so if you guys want to sign off, that's fine.

25                    MR. BENNETT:  All right.  Thank you, Special

1     Master Cohen.  Renee and I are exiting the call now.

2                    THE COURT:  All right.  Let's dive into the

3     fun one.  Number 200 is the plaintiffs' -- excuse me -- the

4     defendants' motion to strike plaintiffs' experts.

5                    MS. WELCH:  Special Master Cohen, Donna Welch

6     on behalf of the defendants.  Given the breadth of the

7     issues involving specific experts, there may be others who

8     are here in person or on the phone who will need to join in.

9                    SPECIAL MASTER COHEN:  That's fine.

10                    MS. WELCH:  I want to start --

11                    MR. WEINBERG:  Before you get started -- Peter

12     Weinberger -- Ms. Rendon is in the room, and in view of the

13     disqualification of Ms. Rendon with respect to Cuyahoga

14     County, and in view of the fact that a number of the experts

15     address Cuyahoga County damages and those sorts of issues,

16     we have a concern.

17                    MS. WELCH:  I don't believe any specific

18     details about the reports themselves will be discussed on

19     the record today, Pete.

20                    THE COURT:  I hear your concern.  I think that

21     this is 99 percent procedural.  If as we go through this

22     your concern heightens then let me know, but I think we can

23     get through this without that concern.

24                    MR. WEINBERG:  Thank you.

25                    SPECIAL MASTER COHEN:  And Ms. Welch, let me

1      start.  Let me ask a few questions.  First of all, let's

2      figure out who we're talking about.  I believe from the

3      submissions to me that we're talking about Cutler and

4      Gruber, Rosenthal, Liebman, McCann, and Young.  Those are

5      the experts whose reliance materials defendants say came

6      late or who supplemented slash amended their reports after

7      the March 25th deadline.  So let's just --

8                      MS. WELCH:  There are others, Special Master

9      Cohen.

10                     SPECIAL MASTER COHEN:  Who are they?

11                     MS. WELCH:  So I believe you mentioned McCann.

12     We agree.  Schondelmeyer was not on your list.

13                     SPECIAL MASTER COHEN:  Right.

14                     MS. WELCH:  Liebman we agree.  Alexander,

15     Rosenthal, Gruber, Cutler, and Young.

16                     SPECIAL MASTER COHEN:  So the only ones that

17     you added to my list were Schondelmeyer and Alexander, and I

18     do remember Schondelmayer.  Remind me who Alexander is.

19                     MR. MIGLIORI:  You have Alexander on your

20     list, Your Honor, at least on the agenda.

21                     SPECIAL MASTER COHEN:  Is that a separate

22     agenda item?

23                     MR. MIGLIORI:  It's listed in the motion.

24     Alexander is the epidemiologist that has the 15 areas of

25     redress for nuance abatement.

1              MS. WELCH:  Yeah, national abatement costs.

2              SPECIAL MASTER COHEN:  One second.

3              MS. WELCH:  He's addressed at page 5 of the

4    defense --

5              SPECIAL MASTER COHEN:  Got it.

6              MS. WELCH:  -- emergency motion reply, and in

7    Exhibit A.

8              SPECIAL MASTER COHEN:  All right.  So here is

9    the first thing I want to know.  I want to take them one at

10   a time.  We've got Cutler and Gruber kind of taken together.

11   Rosenthal, Liebman, that's L-I-E-B-M-A-N, McCann, and Young.

12             MS. WELCH:  And to the extent it's helpful, we

13   think they fall into a few buckets that may make the

14   argument on the issues more efficient.

15             SPECIAL MASTER COHEN:  That probably would

16   help, but the first question I have is that it's clear that

17   there were some reliance materials that were produced after

18   the deadline.  It's clear that there was supplementations

19   and amendments that were produced after the deadline.

20        For example, there was the whole bit about the data

21   usage agreement that took forever to iron out, but I believe

22   is now ironed out, and that had to do with --

23             MR. MIGLIORI:  Cutler and Gruber.

24             SPECIAL MASTER COHEN:  Thank you -- Cutler and

25   Gruber.

1          What I want to know is with which experts was there --

2     are there any experts where all of that stuff wasn't ironed

3     out more than two weeks before their depo?

4               MS. WELCH:  Yes.

5               SPECIAL MASTER COHEN:  Which ones wasn't

6     ironed out more than -- within two weeks of their depo?

7               MS. WELCH:  Which were not you're asking?

8               SPECIAL MASTER COHEN:  Which were.  For

9     example, I think the Cutler and Gruber, it took a while to

10    get the data usage agreement, it's now ironed out.  Was it

11    ironed out, was everything kind of fixed and dealt with more

12    than two weeks or more than their depo?

13              MS. WELCH:  So I believe the data was produced

14    finally on April 17th.  We have dates for deposition that I

15    understand have been confirmed for Gruber on the 25th, which

16    is within the two-week period, not outside a two-week

17    period.  And for Cutler, on the 26th and 27th; again, not

18    within the two-week period.

19              SPECIAL MASTER COHEN:  Okay.  Can you go down

20    the rest of the list?

21              MR. MIGLIORI:  I have it handy, if it's easier

22    for us to do it in terms -- we've actually identified the

23    time between deposition.

24              SPECIAL MASTER COHEN:  Go ahead.

25              MR. MIGLIORI:  So for Cutler and Gruber, it is

1       in fact nine days for Cutler, pointing out that it's only a

2       very small amount of redacted information that was actually

3       in the report that couldn't be unredacted until this form

4       was filled out.  So it was it's not a new opinion, it's just

5       the redactions that we could not undo or --

6                   SPECIAL MASTER COHEN:  But it was also data on

7       which he relied.

8                   MR. MIGLIORI:  Correct.

9                   MS. WELCH:  Correct.

10                   MR. MIGLIORI:  So I want to make sure it's

11       specific to that one issue and the unwillingness of the

12       defendants to sign the original agreement.

13                   THE COURT:  Go ahead.

14                   MR. MIGLIORI:  On Gruber, right now the date

15       is the 25th, so that would be eight days.

16           For Rosenthal, we have 16 days before the May 4th and

17       May 5th depositions, so that's after two weeks.

18           For Liebman, it was all provided 26 days before

19       deposition.

20           For McCann --

21                   MS. WELCH:  And to be clear, we believe there

22       still remains significant deficiencies with respect to

23       Liebman --

24                   MR. MIGLIORI:  Okay.

25                   MS. WELCH:  -- as is laid out in the reply and

1      Exhibit A.

2                  MR. MIGLIORI:  We can debate that.  Our

3      position is that that's all been provided.  Everything

4      that's been requested has been provided.

5           On McCann, yesterday this came up before the Court,

6      this is that very fundamental base ARCOS data issue:  How

7      are we going to take the raw data and make it available.  It

8      was represented in Court yesterday by one of the defense

9      counsel that they hadn't received anything.  What they were

10     looking for was the actual coding that was used for the

11     platform that our expert McCann used, and that was a process

12     we told them would be available yesterday; and in fact I

13     confirmed that it was in fact produced yesterday.  There was

14     one small file I think produced this morning that was

15     inadvertently left out, but that's been produced.

16                 The defendants have not set a deposition for that --

17                 MS. WELCH:  If I could pause on McCann.

18          Just so you know, Special Master Cohen, from the

19     defense perspective, the issues with McCann's wholly new

20     report served on the 15th of April without permission, and

21     the April 3rd supplement, there are significant issues that

22     go well beyond the deficiencies in the reliance materials

23     produced.

24                 MR. MIGLIORI:  We're prepared to address that,

25     Your Honor.  As you know, there was SOMS and diversion

1      witnesses that were allowed to extend to April 15th.

2                    SPECIAL MASTER COHEN:  I know, go ahead.

3                    MR. MIGLIORI:  As it relates to -- and by the

4      way, the defendants on McCann have not chosen any of the

5      proposed dates, so as of yesterday we believe that the

6      coding and reliance material requested has been produced.

7      We offered May 1st to May 8th.  We're just waiting to hear

8      what date.  And I think yesterday the Court gave us

9      essentially through June 1st to try to figure out some

10     methodology of understanding what we did, meeting and

11     conferring on it, having a deposition, and coming up with

12     some kind of evidentiary agreement.

13          That is one of the most critical witnesses for all

14     of -- as a foundation for all of our experts.

15          For Young --

16                    MS. McENROE:  Hold on.  Before we move on, if

17     you guys can hear me, this is Elisa McEnroe from Morgan

18     Lewis.  I want to make sure we're clear on McCann.

19          Yesterday dates were provided by plaintiff for

20     McCann's deposition of May 9th to 10th and May 13th to 14th.

21     The data was produced very early this morning.  We are in

22     the process of reviewing it before we are going to accept

23     any deposition dates.

24          Defendants had asked for deposition dates between May

25     1 and May 8, which would be prior to the May 10th deadline

1      for defendants' experts, but the dates that were provided by

2      plaintiffs are not until the 9th and 10th or 13th or 14th.

3           I just wanted to make sure that part of the discussion

4      was clear.

5                     MR. MIGLIORI:  Okay.  And the last, for Young,

6      Your Honor, the raw data was again an issue that related to

7      very specific database materials, how to get in to actually

8      access it.  It's data that was available online.  There was

9      some instruction back and forth how to get it, Cornell

10     University housed it.

11          That apparently has been confirmed as being exchanged.

12                    MS. WELCH:  My understanding is there is still

13     data use restrictions that prevent our experts from

14     utilizing the data, the data that was provided for the first

15     time on April 16th.

16                    MR. MIGLIORI:  That the deposition in Young is

17     May 14th, and there are some user agreement issues that

18     still have not been agreed to by the defendants.  We

19     actually point out that instead of meeting and conferring on

20     it we got this motion instead, but we were trying to work

21     out the discrete user agreement issues on accessing this

22     public database, not a database that this witness actually

23     maintains or controls.

24          The Alexander issue is there are corrections to

25     Alexander that were made that were made on April 3rd.  A

1    subsequent spreadsheet producing certain information that

2    was specifically requested was provided on April 17th. That

3    deposition is set for the 25th and 26th, which is 22 days

4    after the April 3rd. And the spreadsheet, which again was

5    requested by the defendants, that was produced eight days

6    before this deposition.

7         Alexander's issues are very discrete. They're limited

8    to a very small part of the testimony, so it's not a

9    substantial production of spreadsheets. It relates to five

10   paragraphs of his 60-page report on valuation of abatement.

11        I'll point out for both Liebman and for Alexander that

12   valuation portion of an abatement case traditionally is even

13   done post-trial, that is it's a subsequent proceeding.

14   There's certainly no prejudice there.

15        Schondelmeyer is not really an issue in terms of

16   producing information. Schondelmeyer is that witness that

17   talks about the entire closed system. It's a

18   visibility-type witness. It's actually the kind of witness

19   the Judge was referring to yesterday, "Maybe we can start

20   with somebody that explains how all this works within the

21   system," which very much goes to both the SOMS and the

22   diversion issues, that is the visibility throughout the

23   closed system. And then he actually has some 50 opinions or

24   references to different defendants and how they fit within

25   that closed system and their obligations under both SOMS and

1    diversion.

2         So I think there are just a couple words less than 14

3    days where the data provided are not within two weeks.

4              MS. WELCH:  Special Master Cohen, it would be

5    helpful if we could have a little time to frame these issues

6    from our perspective.  Plaintiffs' argument goes to data

7    deficiency issues, but I think misses from our perspective

8    the larger point, the reason the emergency motion was

9    brought.  It is clear, and I don't think anybody would

10   dispute that this is an expert-driven case.  Plaintiffs came

11   forward with 19 experts.  There are novel expert theories,

12   untested theories.  And the Court in denying our emergency

13   motion made it clear that CMO8 is to be strictly adhered to.

14        And the problem here goes well beyond a failure to

15   timely provide all of the reliance materials.  The problem

16   here is that plaintiffs have flagrantly violated CMO8 and

17   your May -- excuse me -- your March 19th order.  The result

18   is that we are rocketing forward on expert discovery where

19   defendants are getting supplemental reports that provide not

20   a new spreadsheet or a new paragraph or two, but new models,

21   new regression theories, whole cloth new reports.

22        They did this without meeting the standard laid out in

23   CMO8, which was that they could request the ability to you,

24   make a request to you to supplement if there were new facts

25   and information that came out after the March 25th deadline,

1    and that with permission from you they could supplement.

2         They came one time to the Special Master and asked for

3    a supplement.  They came on the 13th of March, and you

4    granted in part and denied in part their request.  You gave

5    them leave not to file four SOMS reports but up to four SOMS

6    reports based on their claims that they needed the DEA

7    depositions to occur, and based on their claims that certain

8    distributors had allegedly belatedly produced documents.

9         They did not come back and seek permission for any of

10   the other supplements.  They didn't because they couldn't

11   meet the standard laid out in CMO8, which is supposed to be

12   the law of the land.

13                 SPECIAL MASTER COHEN:  Let me interrupt you.

14                 MS. WELCH:  And the problem here, Special

15   Master Cohen --

16                 SPECIAL MASTER COHEN:  Because you're just

17   repeating --

18                 MS. WELCH:  -- it is not being applied fairly.

19                 SPECIAL MASTER COHEN:  Let me interrupt you,

20   please.

21        So if there's a theme to this litigation, it is that

22   everybody ain't getting everything they want.  And that's

23   largely due to the speed with which we've all been directed

24   to proceed through this litigation, including trial, which

25   we even all talked about yesterday.  And I've said before

1      that, you know, that my goal is to make sure everybody gets

2      roughly 80 percent of what's out there, because that's

3      probably enough for everybody to win or lose the case.

4          And I could point to and everybody could think of

5      multiple instances where discovery is being produced after

6      deadlines that everybody wishes they could have gotten

7      earlier so they could have asked other deponents about it,

8      so they could have given it to their experts, and so on and

9      so forth.  And the last thing you mentioned was to make sure

10     that this is all being imposed fairly.  I totally get that,

11     and that's entirely what I'm after.

12         It seems to me that virtually all of what I'm looking

13     at here with all of these experts is caused by these time

14     limitations, and the same thing is going to happen with

15     defendants; probably even more large because the defendants

16     have roughly five times as many experts.  The same issues

17     are going to arise.

18         Now, I'm not suggesting that defendants should think,

19     ah-hah, well then I guess we are not going to provide our

20     reliance materials and make the plaintiffs fight for it,

21     because if I see any hint of that then I'm going to have to

22     address it firmly.  But there is no way to avoid that things

23     like this will happen on the plaintiffs' side, too.

24         And what I'm after is making sure that the defendants'

25     counsel and the defendants' experts get most of what they

1    need in time to understand what the opinions are, to be able

2    to ask questions at depositions, and, let's be frank, to

3    address it at trial.  In other words, even if some of what

4    you get comes after a deposition, which has happened in many

5    cases already, that discovery comes after a deposition, it's

6    not like you don't get to use it.  It's not like you're not

7    going to ask questions on those points.

8         So --

9              MS. WELCH:  We understand that, Special Master

10   Cohen.  We think there are a few easy ones here that aren't

11   just about a little bit of delay with respect to reliance

12   materials, where fundamental fairness really does require

13   serious consideration and, in our view, an order striking.

14             SPECIAL MASTER COHEN:  All right.  Give me

15   that third bucket then.

16             MS. WELCH:  McCann's whole cloth new report

17   was issued on April 15th.

18             SPECIAL MASTER COHEN:  I've got an idea how to

19   deal with that.  Go to the next one.

20             MS. WELCH:  Let me make the point on that

21   report, David, that you don't need to look beyond

22   paragraph -- the first full paragraph of Miss Singer's

23   nine-page response to our motion served on April 19th to

24   understand that there was no reason, nothing new that

25   required them to serve this weeks after CMO8 required it to

1    be served.

2                    THE COURT:  Go ahead.

3                    MS. WELCH:  She recognizes --

4                    SPECIAL MASTER COHEN:  No, go ahead to the

5    next one.  Go ahead to the next one.

6                    MS. WELCH:  Totally new.

7         The Schondelmeyer report is a purported SOMS report.

8    We do not believe it falls within the extension that you

9    granted.  Schondelmeyer is not a DEA expert or a SOMS

10   expert.  He doesn't cite to or discuss the DEA depositions

11   that prompted their request for an extension.  We think

12   fundamental fairness says let's do some culling of this case

13   now, and strike the April 15th McCann and Schondelmeyer.

14        With respect to the other supplements that were just

15   self-help extensions in disregard of CMO8, from our

16   perspective that's Liebman and Alexander, to paint these as

17   we've got an extra spreadsheet here, an extra paragraph

18   there, is crazy when you dig in.

19                   SPECIAL MASTER COHEN:  So in your third bucket

20   you're putting Schondelmeyer, Alexander, Liebman, and

21   McCann.  Anybody else?

22                   MS. WELCH:  No.

23                   SPECIAL MASTER COHEN:  All right.

24                   MS. WELCH:  Although be to clear, that's two

25   separate buckets, we believe.

1              SPECIAL MASTER COHEN:  Schondelmeyer and

2      McCann are in the first.

3              MS. WELCH:  We believe the 4-15 McCann and

4      Schondelmeyer, which were whole cloth new reports, not

5      supplements to anything else, provided on the 15th should be

6      stricken.

7              SPECIAL MASTER COHEN:  So --

8              MS. WELCH:  We believe the supplements for

9      Liebman and Alexander should either be stricken, or it's not

10     a matter of just now we have their information and even if

11     we get it too close to the deposition we can still use it.

12     The problem for defendants is we've got a May 10th deadline

13     for our experts.  And in a case like this, to jam

14     defendants' experts who are trying to analyze, understand,

15     and process supplements that are coming in as late as last

16     night, it makes the 5-10 deadline for our experts who are

17     trying to respond to those reports unworkable.

18              THE COURT:  So here is --

19              MS. WELCH:  And that applies to obviously the

20     significant deficiencies in productions for Rosenthal,

21     Gruber, Cutler, and Young, which we put in a separate

22     bucket.

23              SPECIAL MASTER COHEN:  You keep saying the

24     same thing or same things I've read, and it's frustrating to

25     me, because we have so much to get through.  I got your

1    point.

2         So with the SOMS reports, I said that plaintiffs could

3    produce their SOMS expert reports three weeks later.  And at

4    the time I said that -- and I don't remember where I said

5    it, but I'm sure I did -- that defendants would get a like

6    extension of time for responsive experts.

7         I know that at the time I was thinking, because this

8    was before I had any inkling of how many experts any side

9    was going to produce, that there would be X SOMS experts by

10   plaintiffs, three or four, and that there would be X the

11   same number of responsive experts from defendants; and in

12   fact, the ratio is more like five to one.

13        In fact, let me ask a question about that.  So I'm

14   kind of jumping over to agenda item 198.  In the defendants'

15   submissions it says the manufacturer defendants may serve 7

16   to 8 SOM expert reports, the non-manufacturer defendants may

17   serve approximately 16 to 20 SOM expert reports.

18        So a few questions there.  First of all, are those

19   numbers in addition to the 98 that y'all said?

20             MS. WELCH:  No, that's subsumed.

21             SPECIAL MASTER COHEN:  Okay.

22             MS. WELCH:  This was really the issue

23   addressed with the Court yesterday, that each defendant has

24   different issues with respect to SOMS.

25             SPECIAL MASTER COHEN:  The non-manufacturer

1    defendants it says may serve 16 to 20.  Does

2    non-manufacturer defendants mean distributors and pharmacies

3    both?

4              MS. WELCH:  That's my understanding.

5              SPECIAL MASTER COHEN:  And then it says

6    manufacturer defendants may serve 7 to 8 SOMS reports.  I

7    guess I don't understand why a manufacturer needs to file a

8    SOM expert report; I thought that was kind of an issue that

9    was peculiar to the distributors or the pharmacies.

10             MS. WELCH:  They've attempted to extend those

11   theories, we don't think appropriately, but they and their

12   experts have attempted to extend it to manufacturers.  We

13   need the ability to address them.

14             MR. MIGLIORI:  If I can respond to that.

15        The SOMS regulations are addressed to DEA registrants.

16   They apply to manufacturers as they apply to distributors,

17   as they apply to pharmacies.  So the analysis that our three

18   experts do are not -- are for each and every one of these

19   defendants.  While they say they have to have one for each

20   company, we have these four to actually address all of them.

21        So the idea of they need 28 is not appropriate; but it

22   applies to all DEA registrants, not just distributors.

23             SPECIAL MASTER COHEN:  So I look at McCann's

24   supplementation as one of the SOMS expert reports, and there

25   were four others.  So I'm seeing five expert reports that

1       were SOMS related, including Schondelmeyer.

2           The question is, what does that mean for my statement

3       earlier that plaintiffs got a three-week extension on the

4       SOMS expert reports and defendants get an equal number?

5           What I'm going to rule is that it's going to be two to

6       one, which is frankly roughly the ratio that I think is

7       appropriate at trial, but that's just an aside.

8           So I'm going to allow defendants to file with a

9       three-week extension of time ten SOM expert reports.  What I

10      think that does, among other things, is cure to a large

11      extent all of the issues -- and I don't think they're as

12      serious as defendants make them out to be -- all of the

13      issues that have been pointed out as to all of plaintiffs'

14      experts.  That include Cutler and Gruber, Schondelmeyer,

15      Alexander, Rosenthal, Liebman, McCann, and Young.

16          So the bottom line is, I am not striking any experts,

17      I'm not striking any portions of any experts.  I'm not

18      concluding that any of the opinions that the experts offer

19      can't be offered, or anything else.

20          I think that the cure comes, first of all, from the

21      ten SOMS experts that I'm allowing defendants to file three

22      weeks later; and second of all, that what goes around comes

23      around, and defendants are going to be faced with the same

24      thing, and aren't going to be allowed to complain about it

25      very loudly.  And that's what ends up being fair.

1            And I know, Donna, you don't like it, but that's the

2       ruling.

3                      MS. WELCH:  Well, respectfully, let me at

4       least make a note on the record that we think not only does

5       it not solve the issue, it exacerbates the issue.

6            This ruling essentially means that there are

7       individual defendants who are being precluded effectively

8       from having a SOMS defense and a SOMS expert.  To say that

9       20-plus individual defendant families need to now decide 10

10      SOMS experts across the 20 families --

11                     THE COURT:  You can put it in an objection.

12      We're moving on.

13                     MR. LYNCH:  Your Honor -- Special Master

14      Cohen --

15                     SPECIAL MASTER COHEN:  Go ahead, Mr. Lynch.

16                     MR. LYNCH:  Yesterday Judge Polster agreed

17      that every defendant is entitled to a SOMS expert.  Are you

18      reversing that ruling?

19                     SPECIAL MASTER COHEN:  If you want to argue

20      that what I just did reversed that ruling you're free to

21      make that objection to the Court, but what I'm doing is

22      coming down with what I think is the most fair way to deal

23      with what is a difficult circumstance.

24                     MR. LYNCH:  So ten SOMS experts don't cover

25      each defendant.

```
 1              SPECIAL MASTER COHEN:  You're going to have to

 2     figure out the extent to which --

 3              MR. WEINBERG:  Controlling the --

 4              MR. LYNCH:  Don't interrupt, Mr. Weinberger.

 5              MR. WEINBERG:  Excuse me.

 6              MR. LYNCH:  Don't interrupt.

 7              THE COURT:  But both of you need to talk to

 8     me, and not each other.

 9              MR. LYNCH:  Would you direct him not to

10     interrupt, please, Special Master?

11              SPECIAL MASTER COHEN:  The answer to your

12     question, Mr. Lynch, is that I have concluded that the SOMS

13     expert reports that come three weeks late, which I allowed

14     them to do, contain opinions that are generally global, and

15     that y'all have to figure out -- look.  Y'all have to figure

16     out how to choose ten of your experts who get -- you get to

17     file them all, you get to file every expert report that you

18     said you were going to, 98 of them; three of them you get

19     more time.

20         Which three you get more time to file you're going to

21     have to decide amongst yourselves, and my suspicion is that

22     the expert reports that plaintiffs filed late have some

23     general observations that apply generally to all of the

24     defendants, and that you will be able to find ten experts

25     that can respond in a general way.
```

1          I'll add one more thing:  Maybe he didn't say it

2     yesterday, I don't remember, honestly, but he certainly made

3     it clear, that he thinks that the number of experts that the

4     defendants have as a total is absurd, that there's no way it

5     can possibly happen at trial that you can introduce 98

6     experts, even if all of the defendants are at trial.

7          So you can make whatever argument you want.  If you

8     want to object to my ruling, you're free to do that, but I'm

9     telling you that I certainly don't think I'm overruling

10    anything that Judge Polster did.

11              MR. LYNCH:  Where did the three come from?

12    I'm having trouble following the numbers here.

13              SPECIAL MASTER COHEN:  Three what?

14              MR. LYNCH:  You said we could submit three

15    SOMS reports --

16              SPECIAL MASTER COHEN:  I said you have three

17    extra weeks.

18              MR. LYNCH:  Three extra weeks.

19              SPECIAL MASTER COHEN:  Yes, as they did, to

20    file ten of your SOM expert reports.

21              MR. LYNCH:  And they get to file

22    Schondelmeyer.  Even though all you authorized them to file

23    late was four, they filed five.  That's okay?

24              SPECIAL MASTER COHEN:  They filed four plus

25    McCann, which was a supplement, and I'm saying, yes, they

1     can do that.  They got five, you get ten.

2                   MR. LYNCH:  I think I've got it.  Thank you,

3     Your Honor.

4                   SPECIAL MASTER COHEN:  You're welcome.

5                   MR. STOFFELMAYR:  May I ask a clarification

6     question, not on those, related to that issue?

7                   SPECIAL MASTER COHEN:  Go ahead.

8                   MR. STOFFELMAYR:  What are we doing about the

9     non-SOMS experts, like the initial McCann report, where, you

10    know, we depose them two weeks after getting the data.  His

11    deposition won't take place until after May 10, and I

12    suspect there are others in the same category.

13         Our experts won't be able to do a report that explains

14    what's wrong with Dr. McCann's report until after we have a

15    chance to depose him.  It is more than like 48 hours.

16    That's not workable, obviously.

17                   SPECIAL MASTER COHEN:  So I apologize that I

18    didn't get what you just asked me.  Can you just ask it

19    again?

20                   MR. STOFFELMAYR:  Yes, I'll try again.

21         So there are some experts not in the SOMS category,

22    I'm thinking very specifically because it's important to us

23    of Dr. McCann.  His initial report, not the whole separate

24    discussion about the supplement.

25         So his initial report has lots and lots of charts, and

1    one of the back and forth, we don't need to revisit what

2    happened when, but I think as of this morning we believe we

3    hope we finally have the programs that would allow our

4    experts to recreate what he did with the ARCOS data and see

5    does it make sense, does it not make sense, whatever.

6         If we depose him two weeks from this morning -- it's

7    going to take time, our experts were working on it at 6:30

8    this morning.  If we depose him two weeks from today, and I

9    don't think he's available exactly two weeks from today, the

10   suggestion was middle of next month; assuming we can find

11   dates that work middle of next month that work for Dr.

12   McCann, his deposition will not take place until after our

13   expert reports are due on May 10.

14                THE COURT:  Guess what.  You get to

15   supplement, just like they did.

16                MR. STOFFELMAYR:  We will be able to

17   supplement after his deposition?

18                SPECIAL MASTER COHEN:  According to them, you

19   have an obligation to supplement.

20                MR. STOFFELMAYR:  All right.  Thank you,

21   David.

22                MR. HYNES:  Would that apply with respect to

23   SOM experts if their SOM experts that are not deposed until

24   a few days before our --

25                SPECIAL MASTER COHEN:  Can you say your name

1    for the record?

2                     MR. HYNES:  Paul Hynes for CVS.

3         If some other SOM experts are not deposed until a few

4    days before the original deadline of May 10th for all of the

5    experts and we have some SOM experts that have to serve a

6    report by that May 10th deadline, will we then have an

7    opportunity to supplement to the extent something occurs in

8    one of their SOM experts depositions.

9                     SPECIAL MASTER COHEN:  The simple answer is

10   yes.  The more fulsome answer is that you can't drive a

11   truck through that door.  You can't --

12                     MR. HYNES:  Understood.

13                     SPECIAL MASTER COHEN:  -- you can't use that

14   as an excuse for every single SOM expert to produce a

15   supplement three weeks later that they then can't depose on.

16   And you, know you're right, this can be exacerbated.

17        Everybody, and frankly y'all you should talk to each

18   other about how to figure this out.  I cannot solve every

19   bit of this issue.  It's a big issue.  I'm doing the thing

20   that I think is most fair.  Somebody could easily think I

21   got it wrong; I'm just doing what I think is fair.

22        The answer to your question is yes; the better answer

23   is you need to talk to each other and figure it out, and not

24   abuse it.

25                     MR. HYNES:  Understood.  I just think there

1    are going to be some SOM experts we have that are going to

2    have to go by May 10th under your ruling, and I wanted to

3    know how deal with the situation.

4                    THE COURT: And another way to solve it, if

5    it's possible, is to push depos later, if possible.

6                    MR. HYNES: Thank you.

7                    SPECIAL MASTER COHEN: And I should add, look,

8    I know that the Judge set a deadline as to when -- or rather

9    refused to move deadlines as to when things have to happen.

10   The reason he did that is because he needs the *Daubert*

11   motions made ripe in time to rule on them. So if there is a

12   way for you to agree that some depositions can be taken

13   later because you're not going to *Daubert* them or it's not

14   going to affect the *Daubert* briefing, if you can agree to

15   that, then I'm not going to say you can't do it.

16                   MR. MIGLIORI: We understand that. We're

17   willing to meet on that.

18                   SPECIAL MASTER COHEN: All right.

19        Well, that was probably enough excitement for a little

20   bit. Why don't we take a five-minute break, and we'll come

21   back and pick up. So we'll take five minutes, and it really

22   will be five minutes.

23                   (Recess had.)

24                   SPECIAL MASTER COHEN: The next agenda item we

25   are going to address is item number 201. This has to do

1     with defendants' motion to compel follow-ups.  I'm just

2     going at read off my ruling on this one.

3          On page 3339 of the agenda begins with the list of the

4     additional questions that defendants want plaintiffs to

5     answer, and I'm going to go through the list, and rule on

6     whether plaintiffs have to do that.

7          Number two, the answer is no.

8          Number five, the answer is yes, but to each

9     sub-question plaintiffs have to answer yes or no.  They

10    don't have to go into the reasoning or the why.

11         Number six is no.

12         Number eight is no.

13         Number nine is yes.

14         Number 12 is yes.

15         Number 13 is no.

16              MR. SHKOLNIK:  What was that, Special Master?

17              SPECIAL MASTER COHEN:  Nine was yes, 12 is

18    yes, 13 is no.

19              MR. SHKOLNIK:  Thank you.

20              SPECIAL MASTER COHEN:  15 is yes, but

21    collectively.  So the question reads "for each of the 500

22    prescriptions," but there doesn't need to be an explanation

23    for each one individually.  So that the question essentially

24    ends up being rephrased as "Explain how these 500

25    prescriptions support your claims for the harm for which you

1    seek to recover in this case."

2          Number 17 is no.

3          Number 18 is no.

4          Number 19 is no.

5          Number 21 is yes.

6          Number 22 is yes; but again, each sub-question has to

7    be answered yes or no.

8          And I think that fully addresses that agenda item.

9          The next one on the list is 188.  This is plaintiffs'

10   request to serve a limited number of document subpoenas.

11   The first thing I'm going to note is that, again, this comes

12   back to not enough time to do all the discovery everybody

13   wants to do.

14         The subpoenas that are listed I think are all fair

15   game.  I think all of the evidence that is being sought

16   there via those subpoena is fairly sought.  The trick is

17   that it's not all fairly sought in Track One because there

18   were discovery cutoffs, and I made clear before that at some

19   time discovery has to end.

20         At that juncture, which I think was January 25th, I

21   said that there would be reciprocal discovery allowed, and

22   the defendants had to choose how many subpoenas and how many

23   depositions they would take, pursue after that date, and the

24   plaintiffs would get an equal amount.

25         Then it's kind of fuzzy, frankly, as to what is

1    quote/unquote after that date.

2         What I conclude is that it is fair as a matter of

3    reciprocality to allow the plaintiffs to serve five

4    subpoenas.  I think they wanted to take 15.  And they are

5    only document subpoenas.  And I'm going to choose which ones

6    they are, to some extent because in some cases I think that

7    the discovery really could have been obtained or the

8    subpoenas should have been sent earlier.

9         And so the subpoena will be allowed to issue from

10   plaintiffs to FDI Consulting, to IntegriChain, to Taft

11   Consultancy Services, and to Impact.  And then plaintiffs

12   can choose the fifth one from these choices:  Capitol Hill

13   Consulting, Harris Analytics, or Discovery International.  I

14   think that that is what makes things fair; that as I've

15   said, that's my polestar.

16        All right.  The next one is 191, this has to do with

17   SOM audit reports.

18             MS. STRONG:  Mr. Cohen, Sabrina Strong.  I

19   don't believe we have had a response from any of the

20   defendants on these issues as to each particular subpoena,

21   and I think it would be appropriate for you to consider a

22   response from the defendants before making a ruling as to

23   which would be appropriate.

24        You referenced IntegriChain, for example, and that in

25   part pertains to my client Janssen.  There were documents

1     produced, at least 762 documents concerning Janssen's

2     relationship with IntegriChain that was produced back in

3     June, and certainly before October, so to allow that kind of

4     discovery now really doesn't seem to make sense.

5          But Your Honor, in fairness, you have not heard the

6     position from the defendants with respect to any of these

7     particular subpoenas, and so I would ask you give us an

8     opportunity to respond to those four that you just

9     identified at a minimum, and you could consider our response

10    before making this ruling.

11              SPECIAL MASTER COHEN:  I disagree with you.  I

12    think I did receive the response.  There was a list of the

13    15, and there were responses as to each of the 15 as to, for

14    example -- and some of the ones that I didn't choose I

15    didn't choose because the argument was plaintiffs knew about

16    this a long time ago, they should have subpoenaed it

17    earlier.  I took that into account.

18         Maybe you think that I didn't take it into account

19    enough with reference to IntegriChain, but I believe that

20    that subpoena is discovery that as of January 25th it was

21    legitimate for the plaintiffs to seek.

22              MS. STRONG:  My understanding, Your Honor, is

23    that we have not had an opportunity to brief these issues

24    for you.

25              SPECIAL MASTER COHEN:  Maybe not fully, but

1    they're -- I mean, what you just said, that kind of argument

2    at the very least was presented to me in the communications

3    that I got with respect to at least some of the other

4    subpoenas.  So I figure that I've received the defendants'

5    position, and I'm going to sit with what I've got.

6                    MS. STRONG:  Understood, Your Honor.

7                    SPECIAL MASTER COHEN:  Thank you.

8            191 has to do with SOMS audit reports.  I guess I need

9    to know what is at issue here.  I believe that there are two

10   things that I'm seeing from the communications.  One is that

11   McKesson agrees that it withheld four SOMS audit reports and

12   says that it agrees essentially with plaintiffs, that those

13   should be submitted to me for *in camera* review.

14           I haven't received them yet, and so I will receive

15   those and review them.  That's McKesson.

16           Separately under agenda item number 197, I think that

17   AmerisourceBergen is essentially in the midst of reviewing

18   their SOMS audits and determining the extent to which they

19   have been produced or are going to be put on a privilege

20   log, and there's essentially a meet and confer ongoing.  And

21   then a number of defendants have affirmatively responded and

22   said, yeah, we have produced all of our SOMS audit reports.

23           So the first question I have is, beyond the McKesson

24   four and beyond what AmerisourceBergen has said, are there

25   any other SOMS audit reports that are at issue under agenda

1     item number 191.

2                    MR. WEINBERGER:  This is Peter Weinberger on

3     behalf of plaintiffs.

4          Before we move beyond McKesson, we would like -- we

5     would ask Special Master Cohen that you make a ruling that

6     the docket 4 audit reports be turned over to you immediately

7     for review, for *in camera* review.

8                    SPECIAL MASTER COHEN:  I think that was

9     agreed, so I'll so rule.

10                   MR. WEINBERG:  Well, I think there was a date

11    of April 29th that was suggested because they wanted to make

12    arguments to give context to the documents.  And our

13    preference, we don't see why pursuant to discovery ruling

14    14-5 that they can't just turn over the documents forthwith

15    with some explanation to give them context, so that we can

16    begin to have you review those and to determine whether or

17    not they are privileged or not.

18                   SPECIAL MASTER COHEN:  Right.  So McKesson

19    should give those to me as soon as possible, meaning this

20    week.  They can follow that up with any explanation they

21    need.  It's going to take me, you know, more than a day or

22    two to review it, but I can at least start doing that.

23         Go ahead.

24                   MR. WEINBERG:  Okay.  So here is the list of

25    responses that I have, subject to the defendants' correcting

1    me if I misstated anything.

2        Prescription Supply has responded on April 18th that

3    they have no audit reports within the purview of our scope

4    of our request.

5        Allergan has done the same, but we have some issues

6    with respect to that.

7        CVS has indicated that they have reports, that we've

8    asked them to produce them immediately.  There was some

9    discussion that they wanted to do it without prejudice to a

10   waiver, or a waiver of the privilege.  If they produced

11   them, our request is that they simply produce them per your

12   order.

13       Cardinal, as you know, is an ongoing and separate

14   item, but your ruling specifically ordered them to produce

15   the dendrite document that was the subject of 14-5, and it

16   has not been produced as of yet.

17       And Janssen has responded, indicating that they have

18   no -- that they have reviewed their documents, they have no

19   additional audit reports.  We may have some issues with

20   respect to that.

21       And Purdue this morning sent a fairly lengthy e-mail

22   indicating that they do have an audit report that's on their

23   privileged log and that they are maintaining the privilege

24   argument, claiming that it does not come within the ambit of

25   disclosure as set forth in your discovery ruling 14, part 5.

1          I frankly haven't had a chance to look at it in

2     detail, but that is where we stand.

3          With respect to so that's one -- that's three --

4     that's seven defendants.  With respect to the other

5     defendants, we have not heard anything.

6               MR. REED:  Special Master Cohen, Steve Reed

7     for Teva.  We haven't sent an e-mail, but I'm happy to give

8     a report where we stand.

9          There are actually two categories of documents at

10    issue for us.  One is a group of documents related to a

11    privileged review that was done back in 2012.  Those were

12    actually inadvertently produced.  We have a clawback letter

13    out, and we have been meeting and conferring with ^ Art

14    Handler for a while now.

15         So it has not materialized into a dispute to take up

16    to you, but we're happy to tee it up for you and give you a

17    briefing, a very short letter brief on it, and let you see

18    the documents if you'd like to review them in camera.

19         We have a second set of, again, a privilege review at

20    the direction of counsel who is in charge of this litigation

21    late last year.  That will be added to our privilege log

22    shortly, but that's not something we discussed with the

23    plaintiffs.

24         In my view, both sets of documents are plainly

25    privileged, and we're happy to present our arguments to you

1    on those on why we take that position.

2              SPECIAL MASTER COHEN:  Well, so here is what

3    we need to do.  As I noted earlier, discovery ruling 14-5 is

4    what I call a bellwether evidentiary ruling, and I believe

5    it was understood to be that by the parties as it was being

6    addressed.  And of course there are other bellwether

7    evidentiary rulings that I have made before where the

8    parties agreed, let's give the Special Master a hundred

9    documents, he can rule on whether our invocation of

10   privilege is appropriate, and then we'll apply that analysis

11   to other documents.  So that's the way we've been working

12   things, and it's frankly the only way this can work in a

13   piece of litigation this size.

14       Which is a long way of saying the parties need to

15   continue to try and work this out and apply my ruling, and

16   meet and confer.  And when they truly get to impasse -- and

17   I'm not saying don't run and say, okay, we're at impasse,

18   and throw it in Cohen's lap -- you all need to try and work

19   this out as much as you can.

20       To the extent that you know that certain documents

21   you're sticking with it, then I need to see them so that I

22   can do a privilege review.

23       What we need to do though is get some deadlines put on

24   this.  And so what I'm ordering is, first of all, for every

25   defendant, and some of them have already done so, is every

1    defendant needs to respond with a statement to plaintiffs of

2    whether they are withholding any audit reports, and if they

3    have, whether they put them on privilege logs.

4         Some defendants have already said we haven't.  Unless

5    there's a reason for plaintiffs to question that, then that

6    ends that issue.  If plaintiffs do have to question that,

7    you need to meet and confer and try and come to some

8    resolution.

9         But every defendant needs to send a response on the

10   question of "Are you withholding any SOMS audit reports" to

11   the plaintiffs by -- I'll ask defendants, what's reasonable?

12   It needs to be fairly soon.  I'll pick it if you don't say

13   it.

14              MR. REED:  Special Master, the only reason I'm

15   sitting here silently is I think we've already done that,

16   that we've exchanged correspondence with Pearl Robertson.

17   We're not at an impasse.  I don't know that there's more --

18              SPECIAL MASTER COHEN:  Is a week fair?

19              MS. STRONG:  Can I say one other thing?  The

20   folks on the phone are on mute, that's why people didn't

21   speak up on the last issue.  I didn't know.

22              SPECIAL MASTER COHEN:  I didn't know folks

23   were on the phone, and I'm sorry.

24              MR. WEINBERG:  So I believe it was about two

25   weeks ago, it could have been a week ago, after your ruling

1    was affirmed by Judge Polster I sent an e-mail to all the

2    defendants indicating that in light of the ruling we were

3    again asking for the audit reports, and that it was our

4    position that they couldn't just stand on whatever it is

5    they had stated in a privilege log, or whatever their prior

6    correspondence may have been to us, that justified not

7    producing the documents; that they needed to go back, with

8    all due respect, and reanalyze their privilege arguments in

9    light of the ruling; and to the extent that they stood on

10    those privileged claims that they needed to explain to us

11    how it was that those privilege claims still existed despite

12    the ruling under DR 14-5.

13        And so with respect to Mr. Reed, the fact that there

14    has been prior correspondence prior to the ruling, from our

15    perspective, is not enough.  And in accordance with what

16    you've just said, because you have provided guidance on this

17    very important issue, from the plaintiffs' perspective we

18    want to make sure that the defendants have analyzed those

19    documents and the context within which those documents have

20    been produced or created, and reassess whether or not those

21    privileges still apply.

22            MR. REED:  David, just to shortcut this, I'm

23    happy to send an e-mail saying we have done in fact what

24    Mr. Weinberger asks.

25            SPECIAL MASTER COHEN:  Well, my question

1    remains, you know, plaintiffs sent out that request:  Some

2    defendants responded, some did not.  And I need to set a

3    deadline for a response from every defendant.

4         It seems like to the extent that many defendants

5    already did that, that doesn't need to be a lot longer.

6         So I'm just pulling up my calendar --

7              MR. WEINBERG:  We would ask by close of

8    business on Friday.

9              MR. LYNCH:  Special Master Cohen, we ask until

10   the 29th, and we got agreement on that from --

11             SPECIAL MASTER COHEN:  That's fine.  You have

12   until the 29th, the close of business on the 29th.  I need

13   every defendant to respond in as much detail as they can to

14   plaintiffs' request that a status report essentially be

15   provided with regard to SOMS audit reports.

16        And with regard to those SOMS audit reports, that any

17   defendant already knows that they're not going to be

18   producing, A, you can put it in a privilege log; B, submit

19   it to me within the next three or four days.  And if they

20   want to provide context and explanation I'm happy to receive

21   that, and it can even follow it.  It doesn't have to come at

22   the same time as the audit reports themselves.

23        Let me add something --

24             MR. REED:  I apologize, but I missed that.

25   What is it that you're looking for from us in the next three

1    or four days?

2                    SPECIAL MASTER COHEN:  If you already know

3    that you're withholding a SOMS audit report because you are

4    saying it's privileged, I need to receive it for *in camera*

5    review within the next three or four days.  And you're also

6    welcome to send a letter explaining, giving it context,

7    telling me why it's privileged; and that letter doesn't have

8    to come at the same time.  If you need three or four extra

9    days to supply the letter giving me context, you can do

10   that.

11                   MR. REED:  So if I could ask for modification,

12   I think your point, that you really don't want to be swamped

13   with material until there's an impasse.  I don't think we've

14   reached an impasse, and so I'm not sure it makes sense to

15   submit that to you before there's an impasse.

16                   SPECIAL MASTER COHEN:  No, no; but for

17   example, McKesson has already said we've already put these

18   on a privilege log, we know we're not going to produce them,

19   so those I need to receive.

20        If you're still working on meeting and conferring, I

21   agree, that should continue.

22                   MR. REED:  Okay, so we will meet and confer.

23                   SPECIAL MASTER COHEN:  You absolutely should

24   exhaust all possibility to not reach impasse.

25                   MR. REED:  Perfect.  Thank you.

1          MR. HYNES:  Paul Hynes for CVS.

2      Is it three to four days after we reach an impasse

3  they need to be submitted to you for *in camera* review?

4          MR. WEINBERG:  This is the problem, Special

5  Master Cohen.  You know, these reports are extremely

6  relevant to our SOMS expert opinions.

7          SPECIAL MASTER COHEN:  I agree.

8          MR. WEINBERG:  So every day that we put off --

9  to use a phrase that the defense used earlier, which was

10  it's simply nonsensical, you know, they know what they have;

11  they have had a chance to look at the opinion.  I don't know

12  why it's taking all this time.

13      And frankly, I mean, I will certainly meet and confer

14  with whoever wants to, but it's a simple question.  It's a

15  simple answer to some simple questions.

16          THE COURT:  Y'all have until May 3 to finish

17  your meets and confers on this.  Anything that you haven't

18  resolved, I receive the SOMS audit reports that you can't

19  agree on, and I need to receive contextual letters with

20  those on the 3rd by the latest.  Everything before then that

21  you can resolve, I urge you to do so.

22          MR. WEINBERG:  Well, are you changing your

23  ruling with respect to the deadline of April 29th?

24          SPECIAL MASTER COHEN:  I forgot what that was

25  already.

1            MR. WEINBERG:  It was that every defendant

2       must respond to the request --

3            THE COURT:  No, they still have to respond by

4       May 29th.

5            MR. WEINBERG:  April 29th.

6            SPECIAL MASTER COHEN:  Yes.

7            MR. WEINBERG:  And tell us whether or not it's

8       on a privilege log.

9            SPECIAL MASTER COHEN:  Correct.  And then that

10      will give you an opportunity, plaintiffs an opportunity to

11      meet with the defendants, and see if you can resolve any of

12      what is listed.

13           MR. SHKOLNIK:  Your Honor, I'm not arguing at

14      this point, but can it be made clear that they tell us which

15      log and exactly where, give us direction?

16           SPECIAL MASTER COHEN:  That's a good idea.

17           MR. SHKOLNIK:  They get a little milky.

18           SPECIAL MASTER COHEN:  Yes, that is a

19      requirement.

20         Is anybody from Cardinal here or on the phone?

21           MS. WADHWANI:  Yes.

22           SPECIAL MASTER COHEN:  Hi.

23           MS. WADHWANI:  Hi.

24           SPECIAL MASTER COHEN:  I know that Cardinal is

25      assessing discovery ruling 14-5, and more particularly the

1    Judge's affirmance or decision not to overrule the objection

2    to that.

3                    MS. WADHWANI:  Correct.

4                    SPECIAL MASTER COHEN:  But there needs to be a

5    time limit within which Cardinal decides to do something,

6    and I think that it has three choices, from what I can tell

7    from the case law.

8         It has the choice to produce the document; it has the

9    choice to put itself into contempt, and thereby take an

10   appeal; and I think -- although this part I'm not sure

11   about -- it has the choice to seek a writ of mandamus.

12        Right now there really isn't the contempt choice,

13   because there's no order that puts you into contempt.  I'm

14   going to make this ripe.  In other words, I'm giving

15   Cardinal a deadline.

16        The order that the Judge entered affirming my

17   discovery ruling 14, part 5, came out on --

18                    MS. WADHWANI:  April 16th.

19                    SPECIAL MASTER COHEN:  -- April 16th, so by

20   April 30th I need Cardinal to make a choice.

21        If it doesn't produce or file a petition by April

22   30th, then Cardinal will be in contempt.  And the contempt

23   penalty is something I have to decide, and I'll issue

24   something in writing.

25        I believe that -- I think my appointment order only

1   empowers me to recommend contempt and not to actually place

2   you in contempt, but you actually need the contempt to take

3   the appeal, if that's what you want to do.

4        I can tell you that it's going to go something like

5   this.  What I'm going to recommend is that if Cardinal

6   doesn't produce by April 30th that it will be in contempt,

7   and either affirmative defenses will not be -- may not be

8   invoked, or there will be a jury instruction telling the

9   jury that it has to accept, or that there's a rebuttable

10  presumption that Cardinal was out of compliance; something

11  like that.  It's going to be -- it's not going to be a money

12  sanction.  Okay?

13       And I just want you to know that that's -- I'm sure

14  the board of directors is trying to figure out what to do,

15  and that's their deadline for doing it.

16            MS. WADHWANI:  Okay.  So by April 30th we'll

17  alert you, Special Master Cohen, as to Cardinal Health's

18  decision about next steps.

19            SPECIAL MASTER COHEN:  Or earlier.

20            MS. WADHWANI:  Okay.  Thank you.

21            SPECIAL MASTER COHEN:  Yep.  And you can even

22  tell me, go ahead and place us in contempt, that's what we

23  want to do because we want to take the appeal.  The Supreme

24  Court suggests that a defendant can decide to do that in

25  order to take an appeal.  If you want to do that, let me

1  know.

2          MS. WADHWANI:  Thank you, Special Master.

3  We'll let you know our decision on April 30th.

4          SPECIAL MASTER COHEN:  Okay.  Thank you.

5          MS. STRONG:  Mr. Cohen, Sabrina Strong again.

6      Just going back to issue number 188, I did confirm

7  that we did not have an opportunity to respond.  This issue

8  came up on Monday.  I believe only Endo responded as to two

9  of the subpoena recipients.  There were 20-plus subpoenas

10  served, I believe.

11      As I noted before, I believe each subpoena should be

12  looked at separately to determine whether you think

13  discovery should be permitted in April, given the January

14  discovery cutoff.

15      We would ask that we have an opportunity to respond as

16  to the subpoenas that relate to our clients so that you can

17  properly consider the specific facts relevant to whether

18  it's appropriate to have the subpoenas issued this far after

19  the discovery cutoff.

20      And I would also ask if you were not inclined to

21  change your decision on that that we reserve our right to

22  preclude this evidence from ever being produced at this

23  trial.

24          MR. ACKERMAN:  Special Master Cohen, David

25  Ackerman.  If I may respond.

1          With respect to IntegriChain especially, we took a

2     30(b)(6) deposition of Janssen on November 15th, I believe

3     it was, specifically related to the data sources available

4     to Janssen.

5          Janssen's 30(b)(6) designee came prepared with a

6     document that was marked as Exhibit 3 to that deposition

7     listing all of the data sources.  IntegriChain wasn't on

8     there.

9          That's the problem that we had with IntegriChain, is

10    that say what you want about when Miss Strong claims

11    documents were produced; their own 30(b)(6) designee who was

12    supposed to testify about this didn't, couldn't identify

13    IntegriChain.

14              SPECIAL MASTER COHEN:  You're getting into the

15    details, but I want to go back to your -- the pages for

16    your -- let me just jump to it.

17         I'm looking at page 2712 of the agenda.  There's a

18    chart here, and the third column lists reason for service at

19    this time -- hold on one second -- and I think this was

20    produced by plaintiffs.  Am I right, this chart?

21              MR. ACKERMAN:  Yes.  I don't have the entire

22    agenda document in front of me, but I think that's the chart

23    we prepared.

24              SPECIAL MASTER COHEN:  And in it though are

25    statements about -- I'm trying to remember what I was

1    looking at, because there was something that essentially set

2    forth in many instances defendants' position, including

3    column 3 here.

4               MS. STRONG:  Your Honor -- I mean Mr. Cohen,

5    what might make most sense is to have this kicked to next

6    week so we can actually put positions in on it.

7         Mr. Ackerman was getting into some of the details

8    about the specifics of IntegriChain.  I would just like the

9    opportunity to brief that for you or put something down in

10   writing so you can understand what the issues are and hear

11   our position on the issues, which I don't believe you've

12   been exposed to.

13        I wasn't -- like I said, I believe other folks on the

14   phone were intending to speak to some of these issues.  I

15   don't know that we need to make -- the bottom line is I

16   don't think you've been properly briefed, we're talking

17   about discovery months after the cut-off that I think would

18   only be appropriate if the facts warranted it, and you don't

19   have the facts, from what I understand.

20              THE COURT:  Here is another way to do it,

21   Sabrina.

22        So as I said way back when, back in January, whatever

23   you get they get.  You took five, they get five.  Another

24   alternative is to say choose whatever five you want.  You

25   get five, they get five.

1            Instead I chose which five, because those are the ones

2       that actually I think for various reasons are either the

3       most relevant or aren't ones that really, really, really

4       should have been done earlier, which some of them should

5       have.

6            I agree with defendants' position, some of these just

7       came too late, but it's always been a matter of

8       reciprocality.

9                 MS. STRONG:  I don't know the specific

10      agreement you're referring to, but I would think any

11      discovery authorized in April would have to have some

12      justification for it, as opposed to just a free for all

13      picking up and deciding what willy-nilly discovery you'd

14      want to do at this point in time.

15           With respect to the depositions, for example, I'm

16      doing this off the fly based on what he just said, my

17      understanding is that this relationship didn't even start

18      until December of 2018.

19           So we need to get into the facts, Special Master

20      Cohen, to understand whether it's appropriate or not.  I

21      didn't think you were trying to arbitrarily allow discovery

22      after this far after the cut-off.

23                SPECIAL MASTER COHEN:  You can object.  I am

24      not changing my ruling.

25                MS. STRONG:  Okay, understood.

1            MR. FARRELL:  Special Master Cohen, Paul

2    Farrell.

3            Knowing that we are short on time, I'd like to raise

4    what I think to be is an extremely critical issue that is

5    the subject of my April 19th, 2019 e-mail to you that I

6    copied all of defense counsel.

7            There's a primary underlying issue that has tentacles

8    that reach out into three or four different subject matters.

9    And the primary issue is that some of the defendants are

10   still limiting Rule 34 and requests for production of

11   documents to the designation of custodial files.

12           As recently as January 25, 2019, you stated on the

13   record that the designation of a custodial file does not

14   limit the scope of Rule 34.  Yet very recently, we are still

15   seeing that as a defense, and I'll give you two examples.

16           Number one is that, as you know, I have been trying to

17   affirm whether or not certain distributors ratified or

18   approved the filing of an *amicus* brief in Masters

19   Pharmaceutical.  Very recently we subpoenaed HDA, the Court

20   affirmed it, and HDA in fact produced such communications.

21           There is an e-mail from HDA to a whole wide litany of

22   defendants.  That document has not shown up in a number of

23   their files, and when asked why it was this document was not

24   in their files or on a privilege log, the response was that

25   custodial file wasn't requested.

1          Number two is discovery request number 8 on my

2     combined discovery request that we served on July 1st,

3     specifically asked the distributors, Please produce and

4     identify the Bates stamp range for all communications to

5     and/or from the DEA since January 1, 2006 related to opioids

6     and/or opioid products.

7          We recently played go fish, where we said to a

8     particular distributor, we're looking for a certain time

9     frame of communications which should exist.  And since it's

10    not in your file, we're asking you to go look at your

11    lawyer's correspondence file with the DEA; and the response

12    was, we don't have an obligation to go and look at those

13    custodial files.

14         So those are two primary examples of active litigation

15    points that will be very relevant to the trial, documents

16    that are relevant, they are nonprivileged, and they appeared

17    to have escaped the net of Rule 34, and not been placed on a

18    privilege log only because of some argument that we didn't

19    play go fish with the right custodial file.

20         So what we are asking you to do is we are asking you

21    to definitively state on the record that Rule 34 applies and

22    is not supplanted by or replaced by the designation of

23    custodial files, and that when we the plaintiffs

24    specifically request some supplementation based upon that

25    that they must do so.

1              SPECIAL MASTER COHEN:  Well, this is a bit of

2      a Pandora's box, because the parties undertook a long

3      negotiation, and there was a pretty good fight during that

4      time as to who the custodians would be, and it went back and

5      forth, and I had to resolve those to some extent, and then

6      what the search terms would be.

7          And to come back now and say that net didn't work, we

8      didn't get everything -- no surprise, it never will -- and

9      therefore the defendants have to go back, and as to every

10     discovery request we made search everybody, and forget about

11     all of those negotiations we did with custodians, I can't

12     throw it open that wide.

13         On the other hand, if there's a basis like the one you

14     just said or the two of you just said, where it appears that

15     there's something that is clearly important and relevant,

16     then I don't think it's unfair for either party, whether

17     it's plaintiffs or defendants, to ask the other side to go

18     back and look for documents that that net didn't catch.

19         And when I said what I said about Rule 34 before, that

20     was in the context of that specific evidence.  So I'm just

21     kind of thinking out loud.

22         I think you're right, Paul, that Rule 34 isn't

23     limited, but I also think -- and I know defendants have said

24     it in some letters -- that you can't just ignore all of the

25     restrictions that everybody agreed to on who the custodians

1    are.

2         I'm not sure where that leads us except that to some

3    extent it may be that you need to send -- well, put it this

4    way:  Here is where it leaves us.  You're right, defendants

5    can't say we only agree to these custodians, and we're not

6    going to look for documents.  If you give them a specific

7    reason to look for a document, which I think you did in at

8    least one case, they can say that as a general rule we're

9    not going to take every discovery response and go and look

10   for everything everywhere, we fairly limited it to

11   custodians.  And it works the same with plaintiffs.

12        That's the general direction I can give right now.

13             MR. PADGETT:  Special Master Cohen, Bill

14   Padgett on behalf of H.D. Smith, one of the minor

15   distributors.

16        We were on the initial e-mail trail that Mr. Farrell

17   included in the e-mail to you in which we responded that our

18   CEO, who is the only H.D. Smith person copied on that

19   communication, was not included as our custodians because it

20   was an apex custodian request and an apex deposition, and

21   you recall going through all of that.

22        We viewed the custodian list that we had as covering

23   H.D. Smith's HDA communications.  We've produced a wealth of

24   HDA communications and documents, and that particular

25   document was -- and I think if I recall some of our

1    discovery conferences -- you noting that there will be one

2    or two documents that don't come through because of the way

3    we negotiated this custodian setup.

4         But what happened there was that they did request

5    this -- our CEO's Dale Smith, Junior's custodial file, and

6    we objected.  And this was all part of the apex deposition

7    project at issue.

8         And we specifically asked them, please provide which

9    areas are not covered with regard to depositions and

10   documents, what areas are not covered by our custodian list,

11   and we never got a response to that e-mail.

12        And so I think I'm not going through this as just to

13   our specific situation, but to broadly these are the types

14   of circumstances that you have with regard to this custodian

15   situation, and your ruling did not require us to produce Mr.

16   Smith, his custodial file or his deposition.

17        So I just wanted to lay out how that happened, and it

18   I think highlights exactly what you were talking about with

19   regard to the negotiations, what we worked through.

20             SPECIAL MASTER COHEN:  Yeah.  And there will

21   never be an endpoint to discovery that is relevant in this

22   case.  There will never be an endpoint to documents that

23   either side wants from the other except for deadlines and

24   except for these agreements.

25        And having said that, if there is a specific piece of

1      extremely important evidence that got missed and the other

2      side says, hey, we think you have this, will you look for

3      it, I think that probably that should happen; but it should

4      only happen when it is kind of an important,

5      extremely-relevant piece of evidence that was missed.

6              We've got to live with the 80/20 rule in this case,

7      it's the best we will ever do, and I'm talking everybody.

8                       MR. FARRELL:  Special Master Cohen, I'd like

9      to note that H.D. Smith at least responded to my e-mail and

10     made that explanation, Cardinal Health has not.

11             So Cardinal Health was also on that e-mail chain, and

12     there's no explanation for how the document wasn't produced,

13     when it was not only asked for in discovery, but David, I

14     asked this question in 30(b)(6), in the testimony itself.

15             More importantly, we know that Cardinal Health engaged

16     in direct communications with the DEA, and in some of those

17     communications we used those communications as the basis for

18     DR 14-5.

19             We've asked for the similar correspondence related to

20     the 2012 DEA investigation, and Cardinal Health says that's

21     with our lawyers, we don't have to produce that.

22                      MS. WADHWANI:  Special Master Cohen, this is

23     Nela Wadhwani on behalf of Cardinal Health.  May I please

24     respond to all these points?

25                      THE COURT:  Sure.

1          MS. WADHWANI:  As to Mr. Farrell's e-mail,

2     Mr. Fuller and I met this morning to discuss the HDA

3     document.  So while we did not respond to Mr. Farrell's

4     e-mail directly, I have had communications with plaintiffs'

5     counsel on the HDA document.

6          As to the DEA communications, that is actually agenda

7     item number 199 on the agenda today, so we can jump into

8     that.

9          The springboard for plaintiffs raising this issue was

10    a document that is not a Cardinal Health document, that was

11    produced by Cardinal Health by the end of October in this

12    year.  On that, plaintiffs suggest by production of this

13    document that has nothing to do with Cardinal Health that

14    somehow Cardinal Health has an obligation to go out to

15    outside counsel and get additional communications.

16         The letter that plaintiff cited proves no such thing.

17    It's unsurprising -- excuse me, my voice seems to be going

18    away -- it's unsurprising that Cardinal Health is not copied

19    on this letter by the outside law firm K&L Gates to the DEA,

20    because K&L Gates was representing as they made very clear

21    in the first paragraph of that letter Bates Pharmaceutical

22    Services and Bates Pharmacy in the state of Washington, and

23    it was sent to DEA on behalf of Bates.  There would be no

24    reason for K&L Gates to copy Cardinal Health on that letter,

25    it had nothing to do with them.

1          Instead, as the prior e-mail to that letter

2     demonstrates, which is in plaintiffs' possession but was not

3     provided to you, was that the way that Cardinal Health came

4     into possession of that document was because the CEO of

5     Bates, who did possess the letter, sent it to employees at

6     Cardinal Health.

7          In other words, this letter which is not about

8     Cardinal Health, proves nothing related to Cardinal Health,

9     and its productions of DEA communications.

10          And the reason this is important is because what

11     plaintiffs are asking us to do is to go on a fishing

12     expedition long of at the end of discovery, based on a

13     document that has nothing to do with Cardinal Health and

14     eviscerates the parties' agreed-to negotiations, and would

15     result, as you said, in the end -- or in no end to

16     discovery.

17          We see this as an attempting to go back to square one

18     on discovery.  As Mr. Farrell just said, he thinks that

19     custodians and search terms being negotiated among parties

20     with large volumes of ESI, which is typically the approach,

21     somehow is not meeting the obligations requirements of Rule

22     34.  To the contrary, it's been long recognized that this

23     approach to discovery meets a party's obligations, and it's

24     frankly the only feasible approach --

25                    SPECIAL MASTER COHEN:  Let me jump in.

1          MS. WADHWANI:  -- principles knowing it is not

2     reasonable or feasible for the parties to search --

3          SPECIAL MASTER COHEN:  Let me jump in.  You've

4     jumped to agenda item 199, and I agree with you.  I am not

5     going to order anything additional be done with regard to

6     199.  Plaintiffs have the document that they have.  This is

7     not what I would consider anything like a smoking gun

8     document.  And I think I've tried to lay out what the

9     general rules are, which is that I don't need to resay it, I

10    don't need to repeat myself.

11         As to agenda item 199, I'm not ordering anything

12    additional to be done.  If different circumstances arise

13    with regard to different types of documents where it's shown

14    that something that's kind of critical that's within the

15    heartland of what needs to be produced wasn't, and that

16    there should be return to looking for documents by a

17    defendant, then the defendant should do that, or I will be

18    asked to order it, and I'll order it.  I'm not going to do

19    anything with 199.  And we need to move on to something

20    else.

21         MR. ACKERMAN:  David, can I ask one thing?

22         The purpose of this is for us to ask for Cardinal

23    Health to turn over direct communications by their counsel

24    with the DEA related to the 2012 DEA immediate suspension

25    order and settlement agreement that resulted in $44 million,

1    not some collateral proceeding.  But when the DEA went and

2    charged them for the second time there were communications

3    back and forth between Cardinal and the DEA, and that's what

4    I'm looking for.

5              SPECIAL MASTER COHEN:  Well, if that's what

6    you're looking for, Paul, you're coming at this obliquely,

7    because the document that was shown to me from K&L Gates had

8    nothing to do with Cardinal, it had something to do with

9    some other defendant.

10        If what you're saying is that you think Cardinal is

11   obligated to go ask its outside counsel for documents that

12   it used as communications with DEA in connection with that,

13   then that's what you should ask them.  I didn't get that

14   from agenda item number 199.

15             MR. FULLER:  Special Master, Mike Fuller on

16   behalf of plaintiffs, the one dealing with Cardinal on this

17   issue.  We've been asking them since March, would you just

18   agree to go check with your outside counsel that handled

19   that 2012 investigation and let us know if you have

20   anything, before we have to fight about it.

21        Until this morning they had not given an answer as to

22   whether they would even go and check.

23        Your Honor knows because the communications directly

24   with the DEA related to the 2007 action were very integral

25   in getting 14.5 discovery ruling.

1           We're asking for the same thing, because the

2     communications aren't there.  As directly from Cardinal, we

3     suspect they were going through local counsel or their

4     retained counsel at that point acting as their agent.

5           This was just an exemplar of the type of

6     communications that go from retained counsel directly to the

7     DEA.

8                     SPECIAL MASTER COHEN:  Right.  And as I see

9     it, you came at it too obliquely.

10                    MR. FULLER:  I apologize for that.

11                    SPECIAL MASTER COHEN:  And it also sounds like

12    you're meeting and conferring as recently as this morning,

13    so I'm going to let that --

14                    MR. FULLER:  But again, we've been asking for

15    them to give us an answer on this issue since mid March.

16    We're at the end of April now, and they won't.  The problem

17    is we continue to meet and confer on multiple issues.

18                    SPECIAL MASTER COHEN:  Where is Cardinal on

19    the question of whether they will go back to outside counsel

20    and ask for communications that they had with the DEA?

21                    MS. WADHWANI:  Special Master Cohen,

22    plaintiffs have not demonstrated that we haven't produced

23    such documents that they are looking for, or even that such

24    documents exist.  We think they need to do something more

25    than cite a document from another law firm about a client

1    that is not Cardinal Health and suddenly say we have to call

2    up outside counsel and ask them to go search through all

3    their files for documents they may or may not have that may

4    or may not exist, that may already be what Cardinal has

5    produced.

6              SPECIAL MASTER COHEN:  There is a 99 percent

7    chance those documents exist, and I'm ordering you to go to

8    outside counsel and find out if they have them, and produce

9    them, unless they are privileged.

10             MS. WADHWANI:  Okay.

11             SPECIAL MASTER COHEN:  We are moving on to

12   agenda item number 198.  We've actually addressed that, and

13   that had to do with SOM expert reports.

14        You know, agenda item 197, which has to do with

15   AmerisourceBergen, it seems like a lot of this could be

16   avoided if AmerisourceBergen had actually responded instead

17   of ignoring us for two weeks.

18        There are three issues here:  AmerisourceBergen says

19   that it is gathering these documents and will soon produce

20   them.  That has to do with issue one, which is documents

21   concerning DEA enforcement actions related to regulatory

22   compliance at non-Track One distribution centers.

23   Essentially for all of these what we need is a date certain.

24        Well, I should say for issue one and two we need a

25   date certain.  I'm happy that AmerisourceBergen asserts that

1      it's gathering those documents and will produce them soon,

2      but I need a deadline.

3              MS. McCLURE:  So Your Honor, just for

4      background, this is the issue where we had previously

5      produced information about the Lockbourne distribution

6      center, and you had ordered that we collect from 25

7      additional distribution centers nationwide.

8          In briefing on that we had explained that that was

9      going to require a time-intensive and resource-intensive

10      effort to go to collect both documents that various

11      corporate individuals may have, as well as going

12      specifically out to distribution centers.

13          We are in the process and have been collecting

14      documents from those distribution centers.  We are beginning

15      to roll productions out this week.

16          As far as the fact that each of these distribution

17      centers has different managers in charge of it, I would

18      request that we have two weeks from today to complete.

19              SPECIAL MASTER COHEN:  That's fine.  You'll

20      roll them out in the meantime.

21              MS. McCLURE:  We are rolling productions out

22      this week on issue number one.

23              SPECIAL MASTER COHEN:  The same with issue

24      two, this has to do with SOM audits.  AmerisourceBergen

25      says, quote, We intend to de-designate the annual order of

1    monitoring program audits performed by outside consultants,

2    as well as the internal audits conducted by Amerisource's

3    corporate security and regulatory affairs, et cetera.  We

4    will produce -- begin production of the SOMS audits this

5    week.

6         Can you roll that out and be finished in two weeks?

7              MS. McCLURE:  Yes.  And I believe this issue

8    is also somewhat addressed by the other deadlines that you

9    set today.  So to the extent that there are any SOMS audits

10   that we believe fall within those other deadlines that you

11   set for 4-29 and 5-3, we will address those in that time

12   period, which is actually sooner than two weeks; but yes.

13             SPECIAL MASTER COHEN:  Okay, thank you.

14        And then issue 3, I'll read you what plaintiffs ask me

15   to rule, which seems reasonable.  Plaintiffs asked for an

16   order, quote, requiring AmerisourceBergen to produce the

17   entirety of what it received from FTI on a weekly and

18   monthly basis, including all of the Tableaux files and

19   supplemental monthly reports, and customer score cards, as

20   well as the procedures, algorithms, and queries that were

21   applied against Amerisource's transactional data, in order

22   to run Amerisource's national order monitoring program.

23             MS. McCLURE:  Okay.  So as to the entirety of

24   the documents that we received on a weekly and a monthly

25   basis from FTI, including things like score cards,

1    supplemental reports, we've already produced a number of

2    those documents in various categories:  7 of 24 of the COP

3    documents, 6 of 14 of the score cards, 5 of 13 of the

4    supplemental reports.  We are in the process of rolling out

5    additional materials.

6         And to the point that Mark Pifko's letter says, quote,

7    The entirety of what we received from FTI on a weekly and

8    monthly basis; we are already agreeing to do that portion of

9    it.

10              SPECIAL MASTER COHEN:  Okay.

11              MS. McCLURE:  As to the second point, which is

12   the procedures, algorithms, and queries by FTI, Special

13   Master, this also implicates the order that you gave about

14   half an hour ago indicating that FTI would be ordered to

15   respond to a document subpoena issued by the plaintiffs.

16              SPECIAL MASTER COHEN:  Right.

17              MS. McCLURE:  We do not possess some of the

18   information that the plaintiffs have requested, and so what

19   I would suggest is that the parties continue to discuss and

20   meet and confer on that piece, which is called in

21   Mr. Pifko's letter procedures, algorithms, and queries by

22   FTI.

23              SPECIAL MASTER COHEN:  All right, so I'm going

24   to order all of that.  Obviously you can obviously produce

25   what you have, you can't produce that which you do not have.

1          To the extent that you have procedures, algorithms,

2     and queries, you need to produce it.  You said you are

3     already producing everything else that was requested, so I'm

4     simply going to order that you do all of what you just said

5     you're doing, and the parties are going to have to work

6     together with FTI to get that which you do not have.  Okay?

7                    MS. McCLURE:  Thank you, Your Honor.

8                    SPECIAL MASTER COHEN:  Thank you.

9          194 and 195 both have to do with Cardinal, which has

10    to do with IQVIA documents and the Deloitte documents.  What

11    I'm seeing is that there is no impasse, that the parties are

12    continuing to work together.

13                   MR. FULLER:  Your Honor, this is Mike Fuller

14    on behalf of the plaintiffs.

15         We spoke this morning.  We're going to kick this to

16    next week, if we can't get it resolved.

17                   SPECIAL MASTER COHEN:  That's fine.  I'm going

18    to urge Cardinal to re-read discovering ruling 15 and do

19    everything it can as soon as it can to fully update its

20    responses to the -- I think there were five status points

21    listed at the end of DR 15.

22         It sounds like you're working on that, but I just

23    point you to that again as a continuing obligation.

24                   MR. FULLER:  And we talked about DR 15

25    specifically this morning, Judge.

1          SPECIAL MASTER COHEN:  Great.

2          MR. FULLER:  Your Honor, 196 you kicked to

3    Special Master Yanni.

4          SPECIAL MASTER COHEN:  Correct.  199 we

5    already dealt with.

6          MR. FULLER:  Yes, Your Honor.

7          THE COURT:  192 has to do with Janssen's

8    charge-back data.

9        This is information that I think plaintiffs should

10   have asked for a long time ago, frankly.  Candidly, it looks

11   to me like an expert started looking at stuff and said, hey,

12   I need this charge-back data, after the fact discovery

13   period had closed, and so I'm going to deny.

14         MR. JANUSH:  May I just reply?  Because I

15   didn't reply in writing to Janssen's position, and I have

16   information that may change the Court's perspective on this.

17         SPECIAL MASTER COHEN:  Go ahead.

18         MR. JANUSH:  Evan Janush, for the record, on

19   behalf of the plaintiffs.

20       So what Your Honor may not be aware of is you are

21   aware that I sent the e-mail on November 16th requesting

22   within the discovery period Janssen to identify all of their

23   charge-back data by Bates numbers.  That is an exhibit to my

24   submission to the Court.

25       I got a response on December 6th.  That response

1        included one Excel file that was an omnibus file for Ohio

2        data.  It also included references to other data that

3        discussed charge-back generally.

4             What I didn't get a chance to reply to because of the

5        deadline that I adhered to is the fact that in Janssen's

6        response Janssen included two omnibus Excel files from 2017.

7        I didn't explain the significance perhaps as best as I could

8        have in my initial motion because I didn't realize that

9        Janssen was going to take the incredulous position that it

10       was limiting its charge-back production to only

11       Ohio-specific data.

12            Unbeknownst to you as of this moment is the fact that

13       those two Excel files that were produced with the Ohio file

14       were omnibus 2017 national data from UCLA to Boston,

15       Massachusetts.

16            Why is that relevant?  It eviscerates, it entirely

17       undercuts Janssen's position that we should have known that

18       it limited its charge-back position to Ohio only.

19            Janssen produced some national data.  The national

20       data it produced was woefully irrelevant to the litigation

21       because it contained 2013 production for three months, 2017

22       production that it identified after two years after NUCYNTA

23       had already been divested.

24            Janssen is essentially speaking out of both corners of

25       its mouth before the Court and saying, well, we produced

1    long ago this Ohio file, and we adhered to DR 2.  Well, DR

2    2, Your Honor, as you know, contained two specific

3    categories.  Category one, discovery for centralized data,

4    and category two, discovery for decentralized data.

5          Janssen admitted in its response that this came from a

6    SAP alpha database that they specifically filtered to

7    produce the Ohio spreadsheet.  They filtered a national

8    centralized database to give us Ohio data, while separately

9    citing us to other tidbits of national data.

10         So I did ask for it long ago.  How was I to know that

11   their intent was to read DR 2 differently than every other

12   manufacturing defendant?

13         Every other manufacturing defendant produced national

14   charge-back data.  This isn't hard for them to do.  They

15   have a SAT database.  They should be able to dial it up and

16   produce an unfiltered national report.

17         I didn't know until we followed up and got a response

18   with 185 citations that -- and until we followed up after

19   that and responded with our letter motion to the Court --

20   that Janssen would come back and say, DR 2, what you also

21   need to know.

22         Buried within the 185 citations are a number of

23   PowerPoints, Word documents, snippets, all containing

24   references to national or regional data.

25                    SPECIAL MASTER COHEN:  All right.  So a couple

1      things.  First of all, I did get almost all of that --

2                    MR. JANUSH:  Sorry if you didn't.

3                    SPECIAL MASTER COHEN:  -- from what you

4      already submitted.  Second of all, I think you need to look

5      up the word incredulous.

6           Let me ask you, is it true that every defendant, other

7      defendant, produced national charge-back data?

8                    MS. STRONG:  I don't know the answer to that.

9      I just want to put a caveat here and answer your question.

10          This is an issue that Amy Lucas is really the expert

11     on, and she's on a plane to a deposition right now.  I don't

12     think the answer to that, it doesn't change anything.

13          I want to make something clear as to what Mr. Janush

14     is talking about.  Some of this national data produced was

15     actually coming from custodial files, which is distinct from

16     the other sources of information and how it's collected, is

17     my understanding.

18          This information was identified for him back in

19     December, the national information he's talking about.  If

20     he had any questions about the scope of our production he

21     should have addressed it back then.

22          I think you have clarity on the facts that it was

23     produced in November, reproduced in December, all of the

24     Ohio data, which we believe is more than what is required.

25          We think it's limited to just the counties, Special

1    Master Cohen, but we produced actually all of Ohio, and

2    there was never any issues until just recently.

3                    SPECIAL MASTER COHEN:  What is it about

4    national charge-back data that is important and you need it

5    for?

6                    MR. JANUSH:  So having proof that Janssen

7    tracked national charge-back data is relevant to demonstrate

8    that on a Suspicious Order Monitoring level what they could

9    have done to incorporate that data on a national basis to

10   build that data into their program, and know the downstream

11   distribution monitoring.  It goes directly to DR 2,

12   distribution monitoring.  It is part of DR 2 category 1.  It

13   goes directly to diversion in DR 2.

14       I am representing to you that I have spoken with Linda

15   Singer on this.  I have confirmed before oral argument,

16   every single manufacturing defendant produced national

17   charge-back data.  The fact that I wrote and asked for the

18   total extent of your Bates numbers for charge-back data and

19   got one Ohio-specific file, two 2017 national files two

20   years after NUCYNTA was sold, and a few 2013

21   national -- three months of 2013 national Excel files,

22   underscores that I was not in a position to read Janssen's

23   mind and know until after seeing the response to this motion

24   that they actually intended to carve out their SAP database

25   and produce only Ohio.

1    We didn't know that they even filtered the SAP

2    database until they responded to this motion.

3                SPECIAL MASTER COHEN:  Okay.  If --

4                MR. SHKOLNIK:  Special Master, can I add one

5    point to respond to your question?

6                SPECIAL MASTER COHEN:  Sure.

7                MR. SHKOLNIK:  Just to respond to your

8    question that you just posed.

9        National charge-back data is very important here

10   because it shows it will help us, and it helps and it shows

11   what the defendants could do in terms of tracking the

12   migration of pills, people buying in different regions of

13   the country; and they end up being our CT-1 counties, and

14   what information they had, what they could have done with

15   it; and seeing who is receiving the pills, who is buying the

16   pills, and where they're going; and they're the backbone of

17   our SOM reports that have been exchanged.

18               SPECIAL MASTER COHEN:  Is it true, Sabrina,

19   that, do you know, it sounds like the Ohio-only data was

20   actually culled from a larger dataset.

21               MS. STRONG:  No.  I'm getting some notes from

22   folks.  It looks like, no, what we produced in December was

23   actually identified as an Ohio file.  The entirety of that

24   noncustodial source was produced and clearly identified as

25   Ohio charge-back data.  So they had total clarity as to what

1    it was that we produced at the time, and this should have

2    been raised back in November, December.  There's plenty of

3    meet and confers about it.  This was never ever raised

4    before, Special Master Cohen.

5                    MR. JANUSH:  That's not an answer to your

6    question.

7        Miss Lucas's response, Special Master Cohen, I would

8    direct you to it, expressly states that the Ohio data was

9    culled from the SAP, I believe it's alpha, I don't have it

10   up on my computer right now, from a SAP database that they

11   filtered for Ohio for NUCYNTA and Duragesic from 1990 to the

12   present, and that is how they produced the Ohio data.

13       I don't know anything about custodial files because

14   Miss Lucas's response to the motion addresses how they

15   filtered a national database.

16                   MS. STRONG:  And again, to the extent it was

17   filtered, it was very clear that only Ohio was produced.

18   And you know, to the extent that there's more details on

19   this, like I said, Amy Lucas is on a plane right now.

20                   THE COURT:  I need to think about this one, I

21   am not going to rule today.  I need to go back and look at

22   it.

23                   MS. STRONG:  Okay, and she can be prepared to

24   argue next week.

25                   SPECIAL MASTER COHEN:  She can send me

1    something additional by e-mail if she wants to.

2              MR. JANUSH:  I would encourage, if you haven't

3    looked already, I did attach two large 2017 files that

4    provided national data that would appropriately serve to

5    confuse me that their intent was only Ohio specific.

6              MS. STRONG:  Again, I think it's pretty clear

7    that's custodial data, which is very different, Special

8    Master Cohen.

9              SPECIAL MASTER COHEN:  I think the last new

10   item on the agenda is item number 202.

11        And Donna, you and I had a conversation about this

12   before.  This has to do with, since you are with United

13   Health and I think with some others, with regard to claims

14   data, and I'm actually going to change my mind a little bit

15   as to where I had been once before.

16        I've always been very concerned about medical claims

17   data being released because of privacy issues, and I've

18   also, as you know, tried to take an approach where the

19   parties get some but not all data; so they get 500

20   prescriptions, not all prescriptions, and so on.

21        In this case, as defendants actually write in their

22   letter, we've only received 2 percent of the opioid

23   prescriptions written in Track One jurisdictions.

24        It seems to me that's a pretty reasonable portion, and

25   that from that they can draw inferences, and that they don't

1    need the other 98 percent of those opioid prescriptions.

2    There's no reason to think that the 2 percent is

3    substantially not representative.  And so I'm not going to

4    do what the defendants asked me to do when they say that

5    they want me to order United Health and others to produce

6    all of the other claims data.

7         On the other hand, the defendants also asked me to

8    order production of preferred drug lists, formulary plans,

9    and/or -- and I'm reading now -- opioid drug utilization

10   reports associated with health plans offered by insurers

11   through residents of the Track One jurisdictions.

12        That I think is appropriate, that I think the United

13   Health and the others should be ordered to do.  We probably

14   need a written order to do that.  I'm not sure that just

15   saying that on the record is going to get United Health and

16   the others to do what I just said.

17             MS. WELCH:  We're happy to submit today a

18   proposed written order on the issue.

19        With respect to the first issue, Special Master Cohen,

20   I would like to note for the record that in prior

21   discussions with the parties about whether some sort of

22   sampling or some smaller portion was sufficient, I think the

23   Special Master at least asked the other side whether or not

24   they would be prepared, for example, to stipulate that the

25   two percent of data that was provided on behalf of the Track

1      One counties' and cities' own employees and families is

2      representative, whether it's a valid sample.

3           I predict we would not have agreement from plaintiffs

4      on that issue.  If I'm wrong, I would certainly love to hear

5      that.  But absent some sort of stipulation from plaintiffs

6      on that, again, I think this fundamentally limits

7      defendants' and their experts' ability to defend these

8      claims, denying us 98 percent of what is clearly relevant

9      and discoverable information.

10          We know that based on prior orders, we know it's

11     relevant, we know it's discoverable, and multiple protective

12     orders have been entered, including de-identification where

13     appropriate to protect medical claims data.

14          So we would respectfully disagree with the Special

15     Master's ruling on item one.

16               MR. CHEFFO:  And David, can I add on that,

17     too, because I think this is relevant to what came up

18     yesterday.

19          We heard yesterday that the plaintiffs were concerned

20     about -- and Judge Polster addressed this about the ARCOS

21     data, like we're going to have one expert basically come in

22     and say here is the platform, and then at trial we're going

23     to say, oh, we can't rely on that; and the plaintiffs,

24     understandably I think, at least wanted to have the

25     situation where they could say, is there agreement on at

1    least not what the data may mean, but at least that it's all

2    going to be somewhat representative or accurate.  Right?

3    This is not the exact same situation.

4         But here, and this is something you know from day one,

5    you know, because we have been kind of asking for this and

6    then not been shy about making the point that prescription

7    data, we then got a few, you know, nothing in terms of the

8    breadth we asked for; we got some representative samples,

9    and over time it's gotten cut down, cut down, cut down.

10   There's really, as far as I understand this issue, there's

11   no discussion.

12        If we were to basically without that stipulation, you

13   know, what's going to happen at trial, we are going to say

14   here is two percent.  Well, how can we know that this

15   represents anything?  What is the point of that?  What about

16   the other 98 percent?

17        So no one could really argue, I don't think credibly,

18   that this is not relevant.  I mean, let's go back to what

19   this case is about.  The damages is for $7 billion.  Right?

20   $7 billion is what one of their experts is asking for, in

21   addition to the 200 million in actual damages.  And one of

22   our core defenses all along, you've heard there's no stone

23   unturned about any Suspicious Order Monitoring or any

24   charge-back data.

25        They need everything, every piece of detail,

1   nationwide.  They want to track everything.  And when we

2   basically are talking about the prescriptions here in this

3   jurisdiction, there seems to be two percent is enough.

4        And I just would respectfully say that's just

5   fundamentally unfair for us, because this is the kind of

6   information that our experts absolutely have been waiting

7   for for months and months and months to look at, because we

8   just fundamentally don't think that the characterizations

9   and the story about the prescription data is going to be

10  borne out by this.

11       And this is information that's not hypothetical; it's

12  not a model, it's not ethereal.  It's the actual information

13  and data.

14                 SPECIAL MASTER COHEN:  Two questions.  Two

15  questions.

16                 MR. CHEFFO:  Please.

17                 SPECIAL MASTER COHEN:  The first is, do

18  plaintiffs have any more data than that?

19       In other words, you have the two percent that you've

20  gotten.  Do plaintiffs have any other data?

21                 MR. CHEFFO:  Well, look.  This is the yin and

22  the yang, and that's the point.  They want to do a model.

23       You said all along, I think the Court has in some

24  regard, I don't know what they have or don't have, but the

25  point is that you have said in written order, the Court has,

1    it doesn't necessarily matter how they want to prove their

2    case.

3         I don't think what we're saying, and I think as kind

4    of Don said, there may be something less than a hundred

5    percent, but two percent of a statistically-significant

6    modeled-out random selection doesn't seem, respectfully, to

7    be the way to go.

8         Again, their whole point is they only want a teeny bit

9    of information, they don't want to look individually.  They

10   want to draw models.  We get that, we understand that from

11   the beginning.

12        Our whole point has always been that doesn't work.

13   And whether it's under *Daubert* issues -- and in order to

14   validate a model, as you know, Special Master Cohen, you

15   need actual information.  So if they have a whole model that

16   says, for example, Purdue is responsible for 15 percent or X

17   percent; if we say, well, that's interesting on your model,

18   but we have right in front of us prescription data, and we

19   know that that's not true --

20                  SPECIAL MASTER COHEN:  Let me ask my second

21   question.  So here is what the letter says from defendants:

22   Defendants and their experts need the prescription-level

23   data about these actual prescriptions and the accompanying

24   diagnosis information that shows why they were written.

25        I don't really care that that data would include the

1      opioid prescription I got when I had a hip replacement.

2      Okay?  I don't really care, but I think a lot of people out

3      there would really care that you have data that shows that

4      they got an opioid prescription and the diagnosis they got

5      it for.  There's a tremendous amount of private information.

6           I get that we have protective orders, I understand

7      that, but it's still a tremendous amount of private

8      information that is HIPAA protected.  It just raises all

9      kinds of concerns in my mind.

10               MR. CHEFFO:  And you've been very sensitive

11     about this.

12               THE COURT:  And I don't know that redaction is

13     a realistic possibility.

14               MR. CHEFFO:  Here is what I would offer.  You

15     have had this concern, and we have not jumped up and said,

16     oh, that's whacky.  You've been very concerned about

17     individual data.

18          We've told you a few things.  One is you know,

19     notwithstanding anything else, but we have clients in this

20     case, right, who are particularly sensitive, right, with

21     adverse event reporting data and information.  It is not

22     like an industry that doesn't understand HIPAA, first point.

23          Second point, you know, there are ways then to not

24     throw -- again, respectfully -- the baby out with the bath

25     water.  If you want us to propose heightened levels of

1      protection, whether they are, you know, limited access, we

2      already have they're de-identified.

3           We can do things that I think will satisfy you to put

4      it into some extent, at least initially for our experts to

5      look at this in some kind of black box, that you know that

6      it's -- look, the issue is if we get two percent, those two

7      percent are going to have the same information.  Right?  So

8      the argument --

9                     SPECIAL MASTER COHEN:  You've already got that

10     two percent.

11                    MR. CHEFFO:  I understand.  But as to the 98

12     percent, the same protections that we will employ, we have

13     no more interest, as I think I have said to you many times,

14     we do not want to embarrass anybody.  We do not want to have

15     personal information available.  We are not going to do

16     anything to disclose information that is protected from

17     HIPAA.

18          But the point here is that just like they need this

19     incredibly-detailed information, this is really of kind of

20     the one thing that I think we've been asking for from the

21     beginning.  This is the most critical, because I don't want

22     to repeat, but the idea that you can have a model and then

23     you actually have the actual data; and you can't look at the

24     actual data, but we can look at the model, that's just not a

25     fair way to do this.

1          THE COURT:  So because it's 1:30, let me just

2     ask, do plaintiffs have a dog in this fight, or is this all

3     United Health's fight?

4          MR. ACKERMAN:  So that was what I was going to

5     jump in here.  This is not plaintiffs' data.  We have

6     produced our claims data.

7          I don't know whether counsel for United Health is on

8     the line, I don't know whether he was given notice of this

9     hearing.

10          SPECIAL MASTER COHEN:  I don't think so.

11          Here is what I want you to do.  I want you to send me

12     a proposed order like you said you would, including both of

13     these, including both the data and the other, but include in

14     it something that will satisfy me about the privacy

15     concerns, because that's where I'm getting hung up.  All

16     right?

17          MR. ACKERMAN:  I may jump in on the privacy

18     concerns, however, because as you know, the plaintiffs have

19     expressed privacy concerns about the claims data that has

20     already been produced in this litigation.  And to the extent

21     that certain claims data would be subject to heightened

22     privacy concerns, I'm sure that our clients would want those

23     same privacy concerns to be applied to the claims data that

24     plaintiffs have already produced.

25          I'm just talking in the abstract, because I need to

1    see what gets produced or what gets proposed, but I just

2    wanted to put that point out there.

3                SPECIAL MASTER COHEN:  It may be things that

4    are already in place are sufficient, but I want it included

5    in the order.  It may be you can come up with something that

6    will make me happier that you're then willing to apply to

7    what's already been produced, but you can see where I'm

8    getting hung up.

9                MS. WELCH:  Understood.

10               MR. CHEFFO:  Thank you.

11               SPECIAL MASTER COHEN:  All right.  I think

12   that actually brings us to the end of all of the new items

13   on the agenda, and secondly, to the time within which we

14   have today.  And we're going to be getting back together

15   next Wednesday, actually in 16B instead of 16A, same call-in

16   number.

17          Any very-very-last-minute things before I jump in the

18   car and go to the airport?

19               MS. McCLURE:  Special Master Cohen, another

20   item was 189.  In light of the fact that there's now going

21   to be a delay between this hearing and that, that is a

22   renewed item about SACWIS data and the fact that there is

23   still redactions going on of case files, but there's no

24   documents that are being rolled out in the meantime, while

25   other redactions have been completed --

1       SPECIAL MASTER COHEN:  I don't know how I

2  skipped over that.  I had this written down.

3       That needs to be rolling.  Whatever the number there

4  was of ten case files or whatever the number is, as the

5  redactions are done that needs to be rolling, and it's not

6  wait until all ten are finished.

7       MS. McCLURE:  And our understanding is that

8  some have already been redacted that are being held, and so

9  we would just like the production of anything that's been

10  redacted to begin to go out the door today --

11       SPECIAL MASTER COHEN:  Correct.

12       MS. McCLURE:  -- because this is affecting

13  defendants' ability to prepare.

14       SPECIAL MASTER COHEN:  You just got what you

15  asked for.

16       MR. SHKOLNIK:  Just so it is clear, nothing

17  has been completed and not produced.  We were going to, when

18  we came up we said we were going to roll them out.

19            (Multiple speakers.)

20            (Court reporter interrupted.)

21       SPECIAL MASTER COHEN:  Everything you just

22  said was not on the record because the court reporter said

23  too many people were talking at the same time.

24       We need to stop.  I think we understand each other.

25       MS. WADHWANI:  One clarification, Special

1    Master Cohen.  You said in your reciting of the second part

2    of this hearing that it was set for the 29th, I think,

3    but April 30th, which is Tuesday, and today you said

4    Wednesday.  I just want to make sure whether we're meeting

5    Tuesday or Wednesday.

6                    SPECIAL MASTER COHEN:  Whatever I said in my

7    e-mail.  I think it's Tuesday at 9:30, right next door.

8         Thank you.

9                        -   -   -   -   -

10

11

12

13                    C E R T I F I C A T E

14

15        I certify that the foregoing is a correct transcript

16    from the record of proceedings in the above-entitled matter.

17

18          s/Heidi Blueskye Geizer_____ April 26, 2019

19          Heidi Blueskye Geizer                    Date
            Official Court Reporter
20

21

22

23

24

25