# Exhibit A

**EXHIBIT A TO OBJECTION TO SPECIAL MASTER'S APRIL 24 RULINGS REGARDING DEFENDANTS' SOMS/ANTI-DIVERSION EXPERT REPORTS AND PLAINTIFFS' UNTIMELY EXPERT REPORTS AND OPINIONS**

| Proffered Expert | Summary of Deficiencies |
|---|---|
| G. Caleb Alexander | • On March 25, Alexander submitted a 60-page report with "preliminary analyses" of 15 different categories of abatement remedies.<br>• **To Strike: April 3, 2019 Report.** Alexander's April 3 supplemental report[1] materially changed the estimates for 10 of the 15 categories. As a result, his abatement estimate for Cuyahoga and Summit counties increased by more than $450 million.<br>• The "supplement" also included a brand new 14-page "Technical Appendix" along with three separate Excel spreadsheets, which contain 30 separate sheets.<br>• **To Strike: April 17, 2019 Report.** Alexander served another substantial "update" on April 17. Specifically, he made a number of material changes to the models used to estimate his 15 categories, and also provided new ways of estimating the 15 categories. For the first time, this "update" sets out four different ways of estimating the abatement costs, three of which were not previously disclosed.<br>• Plaintiffs served Alexander's "update" a mere nine days before the agreed-upon date for his deposition (April 26)—well short of the two-week minimum guaranteed under CMO 8. |
| Stephen Schondelmeyer | • **To Strike: April 15, 2019 Report.** Plaintiffs do not offer any compelling reason to allow the untimely report of Stephen Schondelmeyer, other than their unfounded attempt to sneak him in under the guise of the SOMS/anti-diversion extension to April 15. Schondelmeyer does not fit into this category of expert.<br>• Schondelmeyer has ***no*** experience within the DEA, and therefore ***no*** direct experience as it relates to SOMS or anti-diversion. The bulk of Schondelmeyer's experience is in pharmaceutical economics, in the academic context. The nuances behind DEA regulations and enforcement actions as it relates to SOMS and anti-diversion are wholly distinct from Schondelmeyer's area of expertise. In fact, Schondelmeyer admits his lack of specific subject-matter expertise in his own report. He notes that he has "more than 45 years of experience ***related to pharmaceutical economics and public policy research***." Schondelmeyer, however, does not claim to have any knowledge of the regulatory framework underlying DEA enforcement action. |

[1] To be clear, Plaintiffs did not seek nor obtain leave to file any of the reports submitted after March 25 discussed here and in the body of the Objection.

<table>
<tr><th>Proffered Expert</th><th>Summary of Deficiencies</th></tr>
<tr><td></td><td><ul><li>While Schondelmeyer has testified numerous times as an expert, his testimony has primarily focused on prescription drug pricing, competition between brand name and generic prescription medications, and the reimbursement for prescription drugs under private and public insurance programs, not DEA regulations, SOMS, or anti-diversion compliance.</li><li>In his report, he does not consider DEA regulations or enforcement activities, does not discuss data or practices related to anti-diversion issues, and does not rely upon or cite any of the DEA depositions that have been taken to date (the timing of which was the purported reason for Plaintiffs' request that the SOMS expert deadline be extended). Schondelmeyer focuses primarily on macro-level market data that purportedly allows Defendants to make conclusions about the supply of opioid drugs, potentially suspicious orders, and a whole host of other compliance-related issues that have little to nothing to do with SOMS and anti-diversion compliance.</li><li>DEA enforcement of SOMS and anti-diversion practices is an incredibly complicated regulatory framework that touches both on constantly shifting DEA guidance as well as an intimate understanding of inventory control. This requires expertise from an operational angle of the pharmaceutical industry—of which Schondelmeyer has none.</li></ul></td></tr>
<tr><td>David Cutler / Jonathan Gruber</td><td><ul><li>To Strike: All opinions relying on county-level mortality data. On March 25, Plaintiffs only partially produced government mortality data on which Cutler and Gruber rely for their opinions. It was not until April 10 that Plaintiffs first informed Defendants of the existence of a Data Use Agreement with the National Center for Health Statistics (NCHS) required for access to a complete set of relied-upon data.</li><li>Upon finally learning about this NCHS agreement, Defendants worked diligently with Plaintiffs to craft a separate agreement through which Defendants could access this data—but it took nearly a week to finalize.</li><li>Only on April 17—23 days after CMO 8 ordered Plaintiffs to produce reliance materials in full—were Plaintiffs finally able to confirm that Defendants received all of the mortality data on which Cutler and Gruber relied.</li><li>This Plaintiff-caused significant delay has prejudiced Defendants' ability to develop defenses to these expert opinions, particularly in light of the fact that this data was received eight days before Gruber's deposition and nine days before Cutler's deposition.</li></ul></td></tr>
<tr><td>Jeffrey Liebman</td><td><ul><li>Liebman proposes a $7.2 billion "Abatement Plan" for Cuyahoga and Summit Counties alone. He breaks that plan into 19 separate categories.</li></ul></td></tr>
</table>

| Proffered Expert | Summary of Deficiencies |
| --- | --- |
| | • But his original report, served on the March 25 deadline, included figures for only 7 of those 19 categories in each county. The remainder—12 categories for each of Cuyahoga and Summit Counties—were left blank.<br>• Liebman's report includes Appendix C, titled "Interviews and Meetings with Members of the Communities," which lists 34 interview sessions (both calls and meetings) with various local government officials, law enforcement, medical practitioners, and social service providers. Liebman's report states that his abatement plan "takes into account the information [he] learned in these interviews." However, no further information such as notes, transcripts of conversations, or duration of conversations, was provided with the original report. In an April 8 letter, Defendants requested information related to these interviews, including but not limited to notes or transcripts of interviews or meetings, as well as a list of all attendees and the duration of each interview or meeting.<br>• **To Strike: April 3, 2019 Report.** On April 3, more than a week after the deadline, Liebman served a "supplemental" report filling in the numbers for the remaining categories. In addition, Liebman changed the figures for several of the seven categories that had been disclosed by the deadline. The result was a $1.0315 billion increase in the base abatement estimate for Summit, and a $475 million increase in the base abatement estimate for Cuyahoga.<br>• **To Strike: April 16, 2019 Report.** On April 16, Liebman served a "Summary of Errata" attached to a reply letter in response to identified deficiencies in his report. The letter noted that "Plaintiffs have identified and corrected an error in Tables C.5 and S.5 (Special Populations: Child Welfare) of the Liebman Supplemental Report, resulting in an adjustment to Liebman's estimated costs for that abatement category."<br>• The result was a $15.1 million increase in the base abatement estimate for Cuyahoga, and a $10.6 million increase in the base abatement estimate for Summit.<br>• Plaintiffs' April 16 reply letter also included a "sharefile site" link which contained four PDF documents of interview notes. After reviewing these files, it appears they include notes for 13 of the 34 interview sessions listed on Appendix C. In their letter, Plaintiffs acknowledged that not all notes had been turned over, stating, "[w]e are still gathering and scanning handwritten interview notes and will provide them to you as soon as possible." With respect to one set of notes in particular, D. Skoda's comments from a Round-table meeting with Representatives of the Summit County Community, Plaintiffs |

| Proffered Expert | Summary of Deficiencies |
|---|---|
| | stated, "we will produce Dr. Liebman's notes from that meeting, if any, as soon as possible this week." To date, Plaintiffs have not provided any additional interview notes to Defendants despite Defendants following up on this issue in an April 25, 2019 letter. |
| Craig McCann | • **To Strike: March 25, 2019 Report to the extent it relies on underlying data not produced with it.**<br>• On March 25, McCann provided his expert report without any of the underlying files and computer codes he used to analyze raw data and produce the tables, charts, figures, and graphs he relied upon in his reports. On April 5 and April 11, Defendants raised these deficiencies with Plaintiffs.<br>• Plaintiffs have conceded that programming codes are necessary to review and replicate expert analysis in response to deficiency letters regarding other experts. Plaintiffs assert, but have provided no basis why, such information would not be appropriately disclosed here; in any event, Plaintiffs finally agreed to provide McCann's reliance materials in a letter dated April 15, three weeks after the production deadline. But Plaintiffs would not commit to providing these underlying files and computer codes until April 23 (29 days after the deadline) because McCann was testifying in another case and has "other professional obligations."<br>• **To Strike: April 3 and April 15, 2019 Reports.**<br>• On April 3, McCann submitted a new report that included five previously excluded tables and an additional 95 pages of appendices. McCann's report remained focused on Distributor and Pharmacy Defendants—not any of the Manufacturer Defendants.<br>• On April 15—a full three weeks after the deadline—McCann served a new report focused on the Manufacturer Defendants. While styled a "Second Supplemental" report, this was an entirely new report—37 pages long, including 71 paragraphs, not counting appendices.<br>• All of the data and methodologies upon which McCann relied to support his "Second Supplemental" report were available to McCann when he submitted his original report on March 25. |
| Meredith Rosenthal | • **To Strike: March 25, 2019 Report to the extent it relies on underlying data not produced with it.**<br>• On April 4, Defendants identified missing reliance materials for Rosenthal. For example, the 39 computer programs Plaintiffs produced with Rosenthal's report on March 25, which supposedly replicated her regression models, did not actually do so.<br>• To fully assess and test the validity of conclusions such as those presented by Rosenthal, it is necessary to be able to first replicate how those conclusions were reached, because it is only after such |

| Proffered Expert | Summary of Deficiencies |
|---|---|
| | replication that one can examine whether the process and method used to reach the conclusions was proper. Without that fundamental information, Defendants are severely prejudiced in their ability to assess Rosenthal's opinions.<br>• On April 8, supplemental materials were produced. Along with these materials, Plaintiffs responded that they had "confirmed that some of the programs we produced with Rosenthal's report were not correct." At that time, Plaintiffs purported to provide corrected programs.<br>• On April 9, Defendants informed Plaintiffs that these corrected programs still did not produce Rosenthal's regression model due to missing data files.<br>• Plaintiffs did not provide these files until April 16-17. But that production lacked necessary programs to translate the source data into the final results for three files used by Rosenthal: cancer_deaths_by_county.xlsx; cancer_controls.dta; and mortality_counties.dta.<br>• In response to another deficiency email from Defendants, Plaintiffs on April 18 provided a program that allegedly could be used to translate the source data for cancer_deaths_by_county.xlsx. That production, however, still does not translate the source data into the final results, and reads in in two files that were not provided in the Shared Data folder or Rosenthal's back-up materials.<br>• Not until April 22 did Plaintiffs produce additional documents that purported to resolve the outstanding deficiencies with Rosenthal's reliance materials. Defendants continue to evaluate the Rosenthal productions. |
| Nancy K. Young | • **To Strike: All opinions relying on data from the Adoption and Foster Care Analysis and Reporting System ("AFCARS"), the National Child Abuse and Neglect Data System ("NCANDS"), and the Regional Partnership Grant ("RPG") Data System.** Plaintiffs failed to include any of this underlying data with their report served on March 25.<br>• Plaintiffs have contended that they were not required to produce the raw datasets upon which Young relied because they are "publicly available." But the data on which Young relies is not easily available to the public; to the contrary, access requires a multi-step application process. *See Request a Restricted Dataset*, NATIONAL DATA ARCHIVE ON CHILD ABUSE AND NEGLECT, https://www.ndacan.cornell.edu/datasets/request-restricted-data.cfm; *see also Order Dataset*, NATIONAL DATA ARCHIVE ON CHILD ABUSE AND NEGLECT, https://www.ndacan.cornell.edu/datasets/request-dataset.cfm. And two out of the three datasets cited by Young may take "2-3 |

| Proffered Expert | Summary of Deficiencies |
| --- | --- |
| | weeks for delivery" even after this cumbersome applicable process is completed. *See Request a Restricted Dataset*, NATIONAL DATA ARCHIVE ON CHILD ABUSE AND NEGLECT, https://www.ndacan.cornell.edu/datasets/request-restricted-data.cfm.<br>• On April 4, Defendants sent Plaintiffs a letter formally requesting the AFCARS, NCANDS, and RPG data at issue. On April 8, Plaintiffs produced 20 documents in response to this request. Contrary to Plaintiffs' representation, this production was incomplete and non-responsive. Plaintiffs produced one PowerPoint presentation, one PDF document, and 18 spreadsheets. The PowerPoint contained a selection of graphics already included in Young's report that relied on AFCARS and NCANDS data. The spreadsheets merely recreated the figures reflected in these same graphics in an excel format. In addition, although the PDF contained some data from AFCARS and NCANDS, it was not produced in a "usable format to allow evaluation" of Young's opinions. *See* ECF No. 941, § 10, ¶¶ 1-2.<br>• Defendants identified these issues for Plaintiffs in separate correspondence on April 12 and requested the ***raw data*** from ***all three*** data sets in a ***usable format***. On April 16, Plaintiffs informed Defendants that they could not provide the raw data because of certain data use restrictions. Plaintiffs gave Defendants two alternative (but equally untenable) options: (1) order the data directly (with attendant delay), or (2) identify Defendants' experts as Young's "research staff" to piggyback on her use agreement. As Defendants previously explained, neither option provided a reasonable solution because both required Defendants' experts to misrepresent that they are "researchers" seeking to obtain the data for "research purposes," either by signing the required data use agreements or applying to become a "research staff" member. Defendants would not agree to make such material misrepresentations to a government entity or third party that houses government data—nor should they have to.<br>• On April 24, at the direction of Special Master Cohen and a month after their deadline to produce expert reports and reliance materials, Plaintiffs finally transferred all of the datasets that Young relied on in her report to Defendants' experts who completed a data use agreement. |