# Exhibit B



401 9th St. NW, Suite 1001
Washington, DC 20004
**o.** 202.232.5504  **f.** 202.232.5513

**Linda Singer**
*Licensed in DC, NY*
direct: 202.386.9626
lsinger@motleyrice.com

www.motleyrice.com

"I will stand for my client's rights.
I am a trial lawyer."
–Ron Motley (1944–2013)

April 19, 2019

**VIA EMAIL**

Special Master David Cohen
Carl B. Stokes U.S. Courthouse
801 West Superior Avenue
Cleveland, OH 44-113-1837

      Re:    *In re National Prescription Opiate Litigation,* Case No. 17-md-2804;
              Response to Defendants' Emergency Motion to Strike Plaintiffs' Untimely and Non-Compliant Expert Reports and Opinions

Dear Special Master Cohen:

      Plaintiffs write in response to Defendants' Emergency Motion to Strike Plaintiffs' Untimely and Non-Compliant Expert Reports and Opinions, filed with the Court on the evening of April 17, Doc. # 1559, and referred by the Court to the Special Master pursuant to the Court's June 4, 2018 Order Reassigning Workload, Doc. # 549.

      It is difficult for Plaintiffs to meaningfully respond to Defendants' "motion" for, while it is long on carping about purported deficiencies in Plaintiffs' expert reports and production of supporting materials, it is woefully short on actual legal argument. Just to take the most obvious example, it is not at all clear precisely what relief Defendants seek from the Court. They style their motion as a "motion to strike," presumably under Rule 12—which is a motion that applies to pleadings, not expert reports—yet really seem to be seeking an order to exclude some or all of the testimony of certain of Plaintiffs' experts, which would normally be a motion pursuant to Rule 37(c), but Defendants have made no effort to make the showing required to exclude evidence under that Rule.[1] In particular, Defendants complain that Case Management Order ("CMO") 8 "guaranteed" them "a minimum of two weeks to evaluate an expert report and complete set of reliance materials before taking that expert's deposition." Doc. # 1559-1 at 1. Yet, with agreements among the parties to conduct depositions of Plaintiffs' experts through early May, Defendants will have at least that long to prepare in every, or virtually every, case.

      Based on the cases they cite at page 10 of their motion, especially the two First Circuit decisions, it appears that Defendants are really intending, without quite saying so, to bring a motion under Rule 16(f) for sanctions for non-compliance with a scheduling order imposed by the Court. *See Rosario-Diaz v. Gonzalez,* 140

---

[1] Ironically, Rule 37 provides for exclusion of evidence where a party fails to disclose or supplement information required by Rule 26(a) or (e), yet one of Defendants' primary complaints is that Plaintiffs have provided too many supplements to their expert reports.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 2

F.3d 312 (1st Cir. 1998); *Tower Ventures, Inc. v. City of Westfield,* 296 F.3d 43 (1st Cir. 2002). But those cases all involved blatant and prolonged violations by parties of the courts' scheduled deadlines,[2] not the sorts of technical disputes about the sufficiency of Plaintiffs' compliance with the expert disclosure deadline Defendants allege here. Defendants' sweeping motion to strike should be denied.[3]

### Plaintiffs' Expert Disclosure in General

A number of important propositions regarding Plaintiffs' expert disclosures cannot seriously be disputed:

1)  Plaintiffs substantially complied with their duties with regard to expert witness disclosures under both CMO 8 and Your Honor's Order on Discovery in Track 1 Cases, Doc. No. 941. On March 25, the deadline set by the Court, Plaintiffs disclosed the identities of 19 experts[4] and provided Defendants with expert reports totaling around 1,800 pages. Defendants have offered no complaints to date about the majority of these expert reports. Plaintiffs simultaneously provided defendants with copies of vast quantities of materials on which Plaintiffs' experts had relied, including virtually all such materials that were not publicly available.

    On April 15, pursuant to Your Honor's order granting Plaintiffs' request "for an extension of time to complete and serve expert reports related solely to the issues of SOMS and anti-diversion compliance" based on delays in the production of SOMS discovery and in completing the depositions of DEA employees, Plaintiffs timely identified four additional expert witnesses related to SOMS and anti-diversion compliance, and provided Defendants with their expert reports. Plaintiffs also provided a supplemental expert report for expert Craig McCann, who had been previously disclosed, extending the methodology of his earlier report to the issue of manufacturer defendants' compliance efforts, on which the newly named experts could rely. Once again, Plaintiffs also produced substantial quantities of supporting materials with these reports.

---

[2] In *Rosario-Diaz,* police officer defendants repeatedly ignored deadlines set by the court for filing dispositive motions, even though this deadline was extended several times. The court of appeals explained that defendants' "show of indifference" justified the district court's refusal to entertain their very belated motions for summary judgment based on qualified immunity. 140 F.3d at 314-15. Similarly, in *Tower Ventures*, the plaintiff simply ignored a court-imposed deadline for initial disclosures and then, a month later, requested an extension of the deadline for furnishing discovery materials—which was granted—and then again ignored that deadline, as well as a deadline for filing a motion for summary judgment, leading to sanctions under Rule 16(f). 296 F.3d at 44-45. Defendants do not even suggest that any comparable misconduct has occurred here.
[3] The current motion is, as even Defendants implicitly acknowledge, *see* Doc. #1559-1 at 1, n.1, part and parcel of Defendants' efforts to extend the expert discovery schedule and delay the Track 1 Case bellwether trial, including Defendants' Emergency Motion to Reconsider Orders Setting Expert Discovery Schedule, Doc. # 1552, which Judge Polster denied yesterday.
[4] Plaintiffs have subsequently withdrawn the designation of two of these experts, Jan Ballantyne and Ted Miller.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 3

2) Where Plaintiffs' expert reports were incomplete or incorrect in any respect, Plaintiffs have sought to timely correct those deficiencies by filing corrected or supplemental expert reports. In litigation this large and complex, operating on such an expedited time schedule, mistakes in expert reports (and in other areas of discovery) are bound to occur. Expert witnesses frequently supplement the content of and correct errors in their analyses throughout the litigation, often not disclosing these revisions to their opinions until they are deposed or even later. Here, where Plaintiffs or their experts recognized deficiencies or errors in their produced reports, Plaintiffs took it upon themselves to supplement or correct those reports as soon as possible, and well in advance of the experts' depositions.
Defendants would have this Court believe that there is something nefarious or underhanded about these efforts by Plaintiffs and their experts to correct such errors or omissions. There is not. Defendants falsely cite CMO 8 for the proposition that that order "permitted Plaintiffs to serve material after [the expert disclosure deadline] only if (i) 'new relevant information or facts [came] forward after the expert filing date that would support *a request* that a report be amended or supplement[ed],' and (ii) Plaintiffs sought and obtained '*approval of the Special Master or Court.*'" Doc. # 1559-1 at 2 (quoting Doc. # 1306 at 1, n.1) (emphasis added). But that is not what the footnote to CMO 8 says. Rather, it simply notes that "[t]he parties recognize that new relevant information or facts may come forward after the expert filing date that would support a request that a report be amended or supplement[ed] with the approval of the Special Master or Court." Doc. # 1306 at 1, n.1. CMO 8 says nothing about—and certainly does not negate—a party's duty to supplement an expert report produced pursuant to Rule 26(a)(2) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Rule 26(e)(1)(A); *see also* Rule 26(a)(2)(E) ("The parties must supplement these [expert] disclosures when required under Rule 26(e)."). That is precisely what Plaintiffs have done here.

3) Many of the initial deficiencies in Plaintiffs' expert reports were the direct result of Defendants' delays and intransigence in producing required discovery. Indeed, this was one of the bases on which Plaintiffs sought to postpone their deadline for disclosing their SOMS and compliance experts. *See* March 13 letter from Michael Fuller to Special Master Cohen, submitted in support of request for extension ("Plaintiffs simply seek a limited extension for a limited set of compliance reports that are certain to be impacted by highly relevant, ongoing, and/or recently ordered discovery . . . . Without the benefit of the DEA depositions, HDA's production, and Defendants' very recent, or forthcoming productions, it will be impossible for Plaintiffs' compliance experts to certify the finality and completeness of their proffered opinions. They will almost certainly have to amend, alter, or supplement their opinions . . . ."). While Mr. Fuller made these assertions with regard to discovery specifically related to the SOMS and compliance experts, they are equally true of Defendants' conduct in delaying discovery throughout this MDL.

4) Plaintiffs provided Defendants with a vast amount of materials on which their experts relied at the same time that they produced the expert reports. Plaintiffs believe that these productions fully, or at least substantially, complied with their obligations under Rule 26 and the orders in this case. Nevertheless, when Defendants contended that additional materials should have been

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 4

    produced—in most cases materials that Plaintiffs believe were not required under Rule 26—Plaintiffs chose to provide those materials to Defendants as quickly as possible, rather than getting caught up in prolonged debates about the precise scope of their disclosure obligations. To cite just two examples: in their initial productions, Plaintiffs were of the opinion that they needed to identify, but did not need to produce, materials on which the experts had relied that were publicly available without cost to persons with a digital subscription, where it was reasonable to assume that Defendants had such a subscription, such as articles in JAMA. Defendants, by contrast, took the position that such materials had to be produced pursuant to Your Honor's Order on Discovery in Track 1 Cases, Section 10, because they were not "publicly and easily available without cost, due to the cost of the subscription. Rather than argue the point, Plaintiffs have sought to supplement their initial disclosures of materials on which the experts relied to include such materials.

    Similarly, in a number of instances, Defendants have contended that Plaintiffs' disclosures are deficient because Plaintiffs have not fully provided them with complete access to the databases and programs on which Plaintiffs' experts relied to allow them to fully replicate those analyses. Plaintiffs are not aware of any legal authority requiring experts to produce such information with their reports. *See, e.g., Helmert v. Butterball LLC,* 2011 WL 3157180, *2 ("'Nor is there any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report.' To the extent that the plaintiffs question Mr. Dopp's calculations, they will have ample opportunity to ask about them during his deposition.") (quoting *Cook v. Rockwell Int'l Corp.,* 580 F. Supp. 2d 1071, 1121-22 (D.Colo. 2006)). And, Your Honor was very clear in your Order on Discovery in Track 1 Cases that nothing in the paragraphs of that order related to expert reports and materials "expands in any way the disclosure requirements of FRCP 26(a)-(b)." Doc. # 941, Section 10. Nevertheless, in light of your instruction that "[t]he parties shall cooperate in exchanging programs or other materials necessary to allow full review and evaluation of the disclosed expert analyses," *id.,* where Defendants have called issues to their attention, Plaintiffs have endeavored to provide Defendants with full access to the relevant databases and programs. (In some instances, however, those efforts have been delayed by Defendants' refusal to execute acceptable use agreements with the entities that control the underlying datasets.)

5) Many of Plaintiffs' experts have relied on publicly available information and employed methodologies in conducting their analyses that have been widely employed in the professional literature and by public entities assessing and addressing the opioid crisis. There is little in these reports that should have come as a shock to Defendants or for which they would need prolonged study to evaluate. Indeed, in many instances, Plaintiffs suspect that Defendants already had access to many of the materials on which Plaintiffs' experts relied even before they were produced. For this reason, many of their complaints about delayed production ring hollow, and are self-evidently part of their overall strategy to delay the Case Track 1 trial.

6) In virtually every case, Plaintiffs have completed their supplementation of their expert reports and supporting materials more than two weeks before the agreed-upon date for the expert's deposition. Thus Defendants will still have all of the time contemplated by CMO 8 to prepare.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 5

>   For example, Defendants complain about Expert Jeffrey Liebman's supplementation of his expert report on April 3, but his deposition is not scheduled to take place until April 29 and May 3, roughly four weeks after the supplemental report was filed. Similarly, Defendants express alarm that certain reliance materials for Dr. Meredith Rosenthal were not produced until April 16. Yet Dr. Rosenthal's deposition is not scheduled to take place until May 4-5, more than two and a half weeks after the date on which the last piece of missing data was provided.

7) While, like much in this case, Plaintiffs' production of expert reports has not been flawless, Plaintiffs have both substantially and timely complied with their disclosure obligations. Any deficiencies were necessitated by the ambitious pace and scope of this case, and were promptly corrected. Nor are Defendants blameless with regard to these issues. In many instances, Plaintiffs' experts' ability to complete their reports was significantly hampered by Defendants' persistent delays in producing discovery materials on which the experts relied.

   Contrary to Defendants' arguments, Plaintiffs can hardly be said to have been indifferent to, or taken casually, their obligations to produce expert reports and materials in accordance with the schedule established by the Court. Plaintiffs have devoted great time and expense to meeting their expert disclosure obligations, in order to keep the Track One cases on schedule for trial. Defendants have not demonstrated any inappropriate conduct by Plaintiffs, nor have they been able to show any harm associated with any purported shortcomings in Plaintiffs' expert disclosures. They should not be entitled to any relief on this motion to strike.

### Issues Raised Concerning Specific Experts

With the foregoing as background, Plaintiffs hereby respond to Defendants' complaints concerning particular expert witnesses.[5]  Before doing so, however, it is worth repeating what Rule 26 does and does not require a party to produce with respect to expert testimony.  "Rule 26(a)(2) does not require a party to disclose all of its expert's notes, calculations, and preliminary analysis." *Etherton v. Owners Ins. Co.*, Civil Action No. 10–cv–00892–MSK–KLM, 2011 WL 684592, at *2 (D. Colo. Feb.18, 2011). "Nor is there any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report." *Cook*, 580 F.Supp.2d at 1121–22.  Thus, although as described below, in many instances, Plaintiffs have

---

[5] Responding to Defendants' expert-specific concerns is something of a moving target. Plaintiffs continue to produce responsive materials in response to Defendants' complaints and Defendants continue to send the Plaintiffs new purported "deficiency" notices. Just this morning, Donna Welch wrote you to indicate that Defendants intend to update Appendix A to their motion later this afternoon, which will obviously preclude Plaintiffs from responding. Plaintiffs nevertheless herein respond to Defendants' allegations concerning purported deficiencies set forth in their motion.

Also, given the shortness of time, and to avoid burying the Special Master in (electronic) paper, Plaintiffs in this section cite to numerous documents and emails, but we have not had the time to fully collect and compile them for the Court. As should no doubt be obvious, Plaintiffs would be happy to provide the Court with copies of any of the referenced materials upon request.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 6

provided computer programs, back-up data sets and other information setting forth in detail how the experts made the calculations they made, much of this information was not required. Given that Defendants have received more than they were entitled to, they should not be heard to complain about *when* they received it.

**G. Caleb Alexander:** Defendants express concerns about changes in Alexander's report in an April 3 supplement and an April 17 update, along with the production of a "technical appendix" with his supplemental report. Both updated versions of Alexander's report reflect an expert tweaking his numbers to improve his results and/or apply the same analysis under differing assumptions. They should make it easier for Defendants to explore Dr. Alexander's opinions at deposition.

The Supplemental Expert Report is identical to the Expert Report except for the title and the following changes:

(1) Revised the national abatement cost estimates in the table in paragraph 176 of the report to reflect different dollar figures for each category.
(2) Revised the total dollar figures in paragraph 180 to reflect the revised cost estimates in the table in paragraph 176.

The Supplemental Report also included four supporting files for the first time: three spreadsheets and a Word document. Two of the spreadsheets are related "models" that calculate the costs of a national abatement plan, which are reported in paragraph 176 and 180 of the report. The third spreadsheet lists certain parameters, such as the cost per diem of methadone maintenance treatment, which feeds into one of the models (the redress model). The Word document is a "technical appendix" to the other model (the Markov model), which documents generally how the model works and lists certain parameters used in the model.

On April 17, 2019, Plaintiffs served an "update" to the Supplemental Report. The update consisted of (1) a three-page supplement describing certain changes to the supporting spreadsheets and a new table intended to replace the table that appears in paragraph 176 of the Supplemental Report; and (2) new copies of the three spreadsheets implementing the described changes. These are the same spreadsheets described above.

The changes to the spreadsheets range from minor (e.g., updating the "sources" spreadsheet to be consistent with the models) to more significant (e.g., revising the Criminal Justice Interventions to assume that only ¼ of released inmates will require transitional housing and social services, not all). The changes to the model are summarized in Table 1 of the three-page update.

In addition to these changes, the models included the results of three additional abatement cost scenarios. The original models included the results of just one scenario (referred to as the "baseline" scenario in the update). As documented in the three-page update, the purpose of the other scenarios is to demonstrate how future abatement costs could change depending on how the epidemic progresses. The cost estimates for all three additional scenarios are lower than the cost estimate for the baseline scenario. As documented in the three-page update, the Markov model spreadsheet also includes a new worksheet with graphical representations of one of the scenarios (Scenario D), which feeds the effects of the abatement plan over time back into the model, such that the cost of implementing the plan declines over time.

Nothing in the Alexander Report or the Alexander Supplemental Report is novel or unexpected to the Defendants. The elements of a sound abatement plan for the opioid crisis are well-documented,

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 7

including in widely published and cited academic literature and in numerous documents produced to Defendants in fact discovery many months ago and/or available publicly, including Summit County's Sequential Intercept Mapping and Action Planning for Opioid Epidemic Response Final Report (July 27, 2018), available publicly and produced as SUMMIT_001448247 on August 23, 2018, and the Ohio Governor's Cabinet Opiate Action Team's Action Guide To Address Opioid Abuse (May 2017), available publicly and produced as SUMMIT_000068846 on June 26, 2018.  Likewise, nothing in the cost estimate or Markov model Excel spreadsheets is novel or especially complex.  The cost estimate (or "redress models") spreadsheet uses simple arithmetic to calculate the 10-year cost of the abatement interventions proposed in Alexander's report.  The other spreadsheet uses a straightforward Markov model, which is a standard methodology used in predictive modeling to predict outcomes for future events—like the opioid epidemic—given a set of known data, such as the size of the U.S. population and the number of people currently suffering from opioid use disorder.  In fact, similar methodologies have been utilized to model the opioid epidemic in published literature that has been available to Defendants and which they almost certainly were aware of well before the submission of Dr. Alexander's reports.  *See* Pitt, Allison L., Keith Humphreys and Margaret L. Brandeau, "Modeling Health Benefits and Harms of Public Policy Responses to the US Opioid Epidemic," AJPH Open Themed Research Vol. 108 no. 10 (Oct 2018): 1394-1400.

Defendants have suffered no prejudice as a result of Dr. Alexander's revisions. If anything, the revisions provide them with additional information to inform their questioning at his upcoming deposition.

**David Cutler/Jeffrey Gruber:** With respect to the expert reports of Dr. Jonathan Gruber and Dr. David Cutler, Defendants' motion to strike boils down to one singular issue regarding restricted data that Plaintiffs could not turn over without Defendants' signatures to a data use agreement. As Plaintiffs made clear to Defendants immediately after Defendants requested this data, Plaintiffs had to de-identify mortality data from 2005-2016 for counties in which there were fewer than 10 deaths in those years pursuant to a restriction agreement with the National Center for Health Statistics (NCHS)—a federal agency that tracks the mortality data discussed in Plaintiffs' expert reports. In order for Defendants' consultants and experts to access this data, they had to sign the same data use agreement (DUA) with the NCHS that Plaintiffs' consultants had to sign.

But Defendants refused to sign the DUA, claiming ambiguities in the agreement precluded them from signing despite Plaintiffs' representations otherwise (and the fact that Plaintiffs' experts signed the same agreement). After numerous back and forth, Defendants ultimately agreed to a revised DUA on April 16 and Plaintiffs turned over the de-identified data that same day. Furthermore, Plaintiffs had no obligation to turn this data over before March 25. The de-identified data was effectively a redaction of certain death counts in excel files, and is no different than any filing or pleading containing sensitive information for which information *must* be redacted.

Contrary to Defendants' representations that Plaintiffs have still only produced a "portion" of the data, as Plaintiffs made clear to Defendants on April 17, there is nothing further for Plaintiffs to produce because there are no additional files or data beyond what plaintiffs provided to Defendants. Put simply, Defendants have *everything* Plaintiffs' consultants and ultimately Dr. Gruber and Dr. Cutler relied upon in their report, and *everything* to replicate the regression analyses contained in both reports. As such, there is certainly no basis for the court to strike either of these expert reports.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 8

**Jeffrey Liebman:** As Defendants recognize, and as Plaintiffs readily acknowledge, the initial expert report of Jeffrey Liebman produced on March 25 was incomplete in several respects. Dr. Liebman submitted his complete supplemental report on April 3. The supplemental report differed from the original report in the following respects:

(1) Revised cost calculation appendices to include calculations for several abatement programs that were not costed in the initial report.
(2) Added references in the report to abatement costs calculations in the appendices for several abatement programs that were not costed in the initial report. Revised the total dollar figures in the report to include the cost of the newly costed abatement programs.
(3) Submitted an expanded and revised Materials Considered list that included additional documents and additional information on some documents, such as a URL pointing to a location on the web where the document is available publicly.

The deposition of Dr. Liebman is scheduled for April 29 and May 3, giving Defendants approximately four weeks from the submission of his supplemental report to prepare for his deposition.

**Craig McCann:** Defendants contend that on April 3, McCann submitted a report including five new tables and an additional 95 pages of appendices that contained new information about shipments of opioid medications from at least five different Distributor Defendants across the United States. Contrary to Defendants' assertions, the report filed by Dr. McCann on April 3 did not contain new information, new opinions or in any way alter the conclusions reached by Dr. McCann in his March 25 Report. Instead, Dr. McCann's April 3 report merely included tables which presented data in a slightly different format as well as figures and tables that had previously been marked as exhibits in various depositions. The five tables appearing in the body of the April 3 McCann Report summarize electronic data produced with and included in the March 25 McCann report. Defendants have had the remaining Figures and Tables, which were attached as appendices A through E, as they were all exhibits to depositions of Defendants' witnesses. The flow of opioids figures attached as Appendix F were inadvertently excluded from the March 25 McCann Report but, like the tables included in the body of the report, merely summarize data contained within the Processed ARCOS provided to Defendants on March 25.

Defendants also assert that McCann provided his expert report without the underlying files and computer codes he used to analyze data. To the contrary, the "underlying files" are already in Defendants' possession. The "raw data files" used by Dr. McCann are simply the ARCOS data files, which the U.S. Department of Justice and the U.S. Drug Enforcement Administration produced to the Defendants at the same time those files were produced to the Plaintiffs. Further, on March 25, Plaintiffs produced processed ARCOS data, which included corrected and supplemented ARCOS data used by Dr. McCann in his analysis. On March 25 Plaintiffs also produced Excel files for distributor transactions and chain distributor transactions. Plaintiffs do not concede that programming codes are necessary to review and replicate Dr. McCann's analysis. Dr. McCann's March 25 report, as well as his April 15 report, explain in detail the criteria used to identify transactions in his report. Plaintiffs have produced or provided means to access the raw and processed data, Dr. McCann has explained the methodology used in the analysis, and Dr. McCann has provided the results of the analysis, which is all Defendants need in order to review or replicate the analysis. In short, all of Dr. McCann's materials required to be produced by the Case Management Order have been produced in full. In addition, in the interest of compromise, Plaintiffs have agreed to gather and

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 9

produce the materials that fall within the new categories Defendants have requested, but due to Dr. McCann's prior professional commitments, Plaintiffs need until April 23, 2019 in order to make such production.

Dr. McCann's April 15 analysis simply supports the liability expert reports. Dr. McCann's April 15th report incorporates the exact same methodology used in his initial report. It extends the analysis, however, further upstream to the manufacturers. This analysis was needed to support the SOMS experts due on April 15th. The only thing new in the April 15th report is identifying the manufacturers based on the previously produced March 25th Report. The flagged transactions in the April 15th Report are the same transactions identified in the March 25th Report. The data, methodologies, and analysis are all provided in the March 25th report: the April 15th report simply explains one more piece of information contained in the already produced data.

Dr. McCann's April 15th supplementation supports the opinions of the newly disclosed Manufacturer SOMS experts. Those experts, as noted in Special Master Cohen's March 19, 2019 Order, received additional time to complete their SOMS analysis due to Defendants' late production of significant SOMS related documents and information and the not-yet-completed DEA depositions. There is a domino effect created by the SOMS liability experts which impact the innate causal relationships between the conduct by the defendants, the volume of pills, the impact on the community and the resulting damage model.

The timing of Dr. McCann's supplementation to coincide with the Manufacturer SOMS reports is appropriate and non-prejudicial to Defendants. Moreover, Defendants have requested new dates for Dr. McCann's deposition between May 1 and May 8 which, consistent, with CMO 8, would provide Defendants with more than two weeks to analyze Dr. McCann's April 15 report prior to his deposition.

**Meredith Rosenthal:** As described in Defendant's "summary of deficiencies" attached to their motion, Plaintiffs have worked diligently to provide additional reliance materials Defendants claim should have been produced. These materials consist primarily of computer programs that Plaintiffs were not obliged under Rule 26 to produce, but agreed to do so in order to provide as full disclosure as possible. (Examples include programs used to convert publicly available raw data into data files that could then be used to input the data into Dr. Rosenthal's computations and analysis.) Defendants concede that the final missing materials were provided to them on April 16. Dr. Rosenthal's deposition is not scheduled to occur until May 4 and 5. Thus Defendants have nearly three weeks to work with all of her reliance materials to prepare for her deposition.

**Stephen Schondelmeyer:** The Defendants move to strike Dr. Schondelmeyer's report for a different reason from the others. They claim the report is untimely, because it is "beyond the scope of the Special Master's order granting an extension to Plaintiffs limited to four SOMS and anti-diversion expert reports." Doc. # 1559-1 at 2. Their motion mischaracterizes the nature and substance of Dr. Schondelmeyer's report and unilaterally narrows the Special Master's order. Plaintiffs were entitled to disclose additional expert reports related "to the issue of SOMS and anti-diversion compliance." Dr. Schondelmeyer's Report is so related.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 10

     As the Defendants themselves concede, Dr. Schondelmeyer's report "focuses on the types and sources of data generated as a byproduct of the interconnected marketing and distribution systems…and his opinion is that the Manufacturer Defendants and Distributor Defendants had *sufficient information to detect and assess suspicious orders*." Doc. # 1559-1 at 9. Defendants claim this falls outside the permitted scope, apparently arguing that only what Defendants ordain as anti-diversion or SOMS experts may opine on those issues. But underlying anti-diversion and SOMS systems is a complex network of data systems and that an understanding of those system is relevant to assessing compliance. Dr. Schondelmeyer's report sets out this important foundation and relates them to the specific SOMS and anti-diversion policies and practices of defendants at issue in this case. His report is directly on point and in compliance with Your Honor's order.

     The early portions of Dr. Schondelmeyer's report contain straightforward, uncontroversial explanations of the statutory and regulatory groundwork in place for manufacturer and distributor registrants to comply with the Controlled Substances Act ("CSA"). *See generally,* Schondelmeyer Report at 1-48. He explains the types of data available for implementation into SOM procedures, and how that data can be accessed and shared among registrants to detect diversion and suspicious orders. In doing so, he lays the groundwork for the latter portion of his report, which specifically addresses how the named defendants failed to adequately put in place and adhere to SOM policies as required by the CSA. *Id.* The Defendants' assertion that Dr. Schondelmeyer "does not discuss data or practices related to anti-diversion issues," is completely false. Doc. # 1559-1 at 9.

     Dr. Schondelmeyer's report expressly discusses data and practices related to anti-diversion. Section VI of his report is entitled "Regulation of Controlled Substances." Section VII of the report is entitled "VII – Record Keeping Requirements for Prescription Drugs." Section VIII is entitled "Data Sources in the Pharmaceutical Market." These sections unquestionably address "data and practices related to anti-diversion," and the Defendants' attempt to characterize them as something else is incorrect.

     It is telling that the Defendants' claim that the report makes "conclusions about the supply of drugs, potentially suspicious orders and *other compliance issues that have little to do with SOM anti-diversion compliance.*" Doc. # 1559-1 at 9. The Plaintiffs' assert that compliance issues have *everything* to do with potentially suspicious orders and the duty to maintain effective controls to prevent diversion, and that non-compliance is the heart of this litigation.

     Dr. Schondelmeyer's report then builds upon the data sources available to the manufacturer and distributor defendants to input and utilize in SOM procedures, and how they failed to do so. It contains 57 pages of discussion related to anti-diversion non-compliance by the named Defendants. The very essence of the report is anti-diversion and SOM procedures. Schondelmeyer Report at 83-140. The fact that it also mentions financial incentives for non-compliance in the supply chain is simply a factor related to non-compliance.

     **Nancy K. Young:** Defendants' claim that Plaintiffs have not produced the data that Nancy Young relies on from the Adoption and Foster Care Analysis and Reporting System ("AFCARS") is simply not accurate. Plaintiffs produced the data Dr. Young's report references by email to Defense counsel on April 8, 2019. As Defense counsel themselves have acknowledged: "Based on review of the PDF Plaintiffs provided (PLTF_2804_000013826), it appears that this document may contain certain of the underlying data Defendants' requested from the NCANDS database and AFCARS database . . ." Email from Eric Alexander, 4/12/19.

Special Master David Cohen
April 19, 2019
Re: Response to Defendants' Emergency Motion
Page 11

      Moreover, Dr. Young's report provided links to the data, and the links provides simple instructions on access. Cornell University houses the data sets all of which are available at no cost.  Dr. Young's user agreement with Cornell prevents her from releasing the full data set to anyone.  As a courtesy, after Defendants complained about lack of production of the full raw data sets, *id.*, Dr. Young contacted Cornell to facilitate access.  Contrary to what the Defendants represented to the Court about this process taking weeks, Cornell reported it could turn around access to data sets within three days, one set within 24 hours.  Email from Jodi Flowers to Eric Alexander and attachments, 4/16/19.  Dr. Young and Cornell provided defendants with two simple methods in which to access the full raw data sets—either through her office or through the University—but rather than take the simple steps required to access, *i.e.*, executing a user agreement and three other forms, Defendants chose to file this motion.

      It is worth noting this data involves children and child welfare so the paperwork Cornell requires for access is not unwarranted, and is quite standard. Defendants can and likely have accessed the raw data already by filling out the standard paperwork, publicly available forms linked to in the report and also provided by Plaintiffs to Defendants as a courtesy.  *Id.*  Rather than working cooperatively with Plaintiffs or Cornell University to complete the user paperwork necessary to access to the full data set, Defendants instead moved to strike Young's report in its entirety and delay these proceedings further.  *Id.*  The court should not reward the intransigence of the defense tactics.

## CONCLUSION

      For the foregoing reasons, both general and specific to particular experts, Defendants' Emergency Motion to Strike Plaintiffs' Untimely and Non-Compliant Expert Reports and Opinions should be denied.

      Respectfully submitted,

      */s/ Linda Singer*

      Linda Singer