**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>Case No. 1:18-op-45749-DAP<br><br>THE BLACKFEET TRIBE OF THE BLACKFEET INDIAN RESERVATION,<br><br>     Plaintiff,<br><br>v.<br><br>AMERISOURCEBERGEN DRUG CORPORATION, et al.<br><br>     Defendants. | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

**PLAINTIFF BLACKFEET'S OBJECTIONS TO REPORT AND RECOMMENDATIONS OF MAGISTRATE JUDGE DAVID A. RUIZ**

Plaintiff the Blackfeet Tribe of the Blackfeet Indian Reservation ("Blackfeet" or "Plaintiff") objects to one recommended ruling in Magistrate Judge Ruiz's April 1, 2019 Report and Recommendation ("R&R") on Defendants' Motions to Dismiss the Corrected First Amended Complaint ("FAC"). Specifically, Plaintiff objects to the Magistrate Judge's recommendation that Plaintiff's federal common law public nuisance claim in Count Three be dismissed. Respectfully, Judge Ruiz failed to consider that it is well accepted, and also logical, that tribes should avail themselves of the federal common law. Judge Ruiz incorrectly assumed that federal nuisance is restricted to the conflicting rights of states and that Blackfeet's claims did not present a sufficient federal interest to justify the doctrine's applicability. The doctrine

provides an ideal vehicle to address Blackfeet's claims, and the R&R's conclusion to the contrary should be rejected.

I.  **THE BLACKFEET TRIBE'S FEDERAL COMMON LAW PUBLIC NUISANCE CLAIM (COUNT THREE) SHOULD NOT BE DISMISSED**

### A. It Is Well-Accepted, and Also Fitting, That Tribes Can and Should Avail Themselves of the Federal Common Law

The R&R was mistaken in finding that Blackfeet's claims do not justify application of the federal common law. Indeed, it is well-accepted, and especially fitting, for federally recognized tribes to avail themselves of the federal common law. The Supreme Court has long held that federal common law is an appropriate vehicle for claims involving tribes, because "[w]ith the adoption of the Constitution, Indian relations became the exclusive province of federal law." *County of Oneida v. Oneida Indian Nation of New York State*, 105 S. Ct. 1245, 1251 (1985) ("*Oneida II*"); *see also United States v. Pend Oreille Pub. Util. Dist. No*. 1, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994) ("The Supreme Court has recognized a variety of federal common law causes of action to protect Indian lands from trespass, including actions for ejectment, accounting of profits, and damages."); *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 670 (1974) ("*Oneida I*") (tribe adequately asserted possessory rights under the federal common law).

The Second Circuit's decision in *United States v. Forness*, 125 F.2d 928 (2d Cir. 1942), illustrates how federally recognized tribes need not rely on state law to enforce their rights but may turn—as Blackfeet has done—to federal common law. In *Forness*, the Seneca Nation had leased a lot on their reservation to a non-Indian for a period of 99 years. *Id.* at 931. The renters, however, failed to pay the rent for several years. *Id.* After failing to recover the unpaid rent from the defendant despite repeated attempts to collect it, the Seneca Nation decided to cancel the lease, a remedy allowed under federal common law. *Id.* The defendant renters argued that the

2

Seneca did not have a cause of action under federal common law, and that only New York state law applied. *Id.* at 932. And, as New York state law prohibited the cancellation of a lease for failure to pay, the defendants argued the Seneca's claim had to be dismissed. *Id.* The Second Circuit disagreed, noting that "state law does not apply to the Indians except so far as the United States has given its consent." *Id.* As Congress had not enacted any statute that abrogated the Seneca Nation's ability to pursue claims under federal law or limit the Seneca to state law causes of action, it was free to vindicate its rights via federal common law. *Id.* at 937-943. Here, Congress has enacted no statute imposing the law of Montana on the Blackfeet Nation. Thus, the Blackfeet may turn to federal law to vindicate their tribal rights.

Application of the federal common law to fashion a "uniform rule of decision," *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6 (1972) ("*Milwaukee I*"), is especially appropriate for tribes, given their inherent interstate and transboundary nature. Many reservations themselves span multiple states. For example, the Navajo Nation spans the state borders of Arizona, New Mexico, and Utah; the Yankton Sioux Reservation spans the Nebraska and South Dakota borders; the Duck Valley Indian Reservation spans the borders of Idaho and Nevada; the Colorado River Indian Tribes Reservation spans the Arizona and California borders; the Fort Mojave Indian Reservation spans the Arizona, California, and Nevada borders; and the Washoe Tribe of Nevada and California spans the borders of those states. While an application of state common law standards is possible for some tribes, application of a patchwork of several states' standards may prove untenable, unfeasible, and impractical for many other tribes. The federal common law is well-suited to resolve some of these complexities.

3

### B.  Public Nuisance Based on the Federal Common Law Is Not Restricted to the Conflicting Rights of States

The R&R incorrectly concludes that federal common law public nuisance is limited to instances involving the conflicting rights of states. As the Supreme Court in *Milwaukee I* held, "it is not only the character of the parties that requires us to apply federal law" but rather "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism." 406 U.S. at 105 n.6. Relying on this key language, the Seventh Circuit held in *City of Evansville v. Kentucky Liquid Recycling, Inc.* that federal nuisance is not restricted to suits by states. 604 F.2d 1008, 1017-19 (7th Cir. 1979). The R&R's reliance on a cramped reading of the 1981 Supreme Court case of *Tex Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) for this proposition is unavailing. Indeed, more recently, the Supreme Court in *Am. Elec. Power Co. v. Connecticut*, observed that the Supreme Court had "not yet decided whether private citizens . . . may invoke the federal common law of nuisance . . ." 564 U.S. 410, 422, (2011).

Other federal courts have more squarely found that tribes and other political subdivisions may avail themselves to federal nuisance laws. *See, e.g.*, *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 771-772 (7th Cir. 2011) (tribal plaintiff in federal nuisance suit); *In re Ingram Barge Co.*, 2016 U.S. Dist. LEXIS 49319, at *141 (N.D. Ill. Apr. 13, 2016) (allowing federal common law public nuisance claims by U.S. government against private company for destruction of dam and related shoreline damage); *Township of Long Beach v. City of New York*, 445 F. Supp. 1203, 1214 (D.N.J. 1978) ("The extension of [*Milwaukee I*] to include governmental units does not appear to be a drastic or an unwarranted application."); *Anderson v. Teck Metals, Ltd.*, 2015 U.S. Dist. LEXIS 1035, at *29 (E.D. Wash. Jan. 5, 2015) ("assuming"

4

that private plaintiff had standing under federal common law public nuisance claims, but ultimately dismissing on other grounds).

### C. Blackfeet Has Demonstrated a Federal Interest Justifying the Need for Federal Common Law Public Nuisance

Blackfeet's claims also present an overriding federal interest here sufficient to justify application of federal common law public nuisance. First, Blackfeet is a sovereign native tribe, which significantly heightens the federal interests in this controversy. Indeed, it is widely understood that the United States has a "strong federal interests in promoting tribal economic development, tribal self-sufficiency, and strong tribal governments." *Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 128 (2005) (internal citations and quotations omitted); *see also Gila River Indian Cmty. v. Waddell*, 91 F.3d 1232, 1237 (9th Cir. 1996) ("The promotion of tribal economic development has long been recognized as an important federal interest."). As articulated in Plaintiff's First Amended Complaint, Defendants' actions have not only endangered the health, welfare, and safety of Blackfeet, but have also had catastrophic social, financial, and economic consequences, affecting the financial well-being and sovereignty of the Tribe and all tribal members. FAC ¶¶ 34, 734, 898, 900, 901, 904.

Second, Defendants' conduct was so pervasively interstate in nature that federal nuisance is warranted. *See Tex. Indus. v. Radcliff Materials*, 451 U.S. 630, 641 (1981) (federal nuisance law is applicable when "the interstate or international nature of the controversy makes it inappropriate for state law to control.") As detailed in Blackfeet's First Amended Complaint, Defendants polluted the Blackfeet community with deadly opioids through a nation-wide, fraudulent marketing and distribution scheme. Defendants' marketing and distribution of opioids were driven by national policies, coordination, plans, and procedures that were carefully crafted and implemented using national, regional, state, and local prescriber- and patient-level data.

Moreover, prescriptions for opioids manufactured and distributed in one jurisdiction were regularly transported for sale in another, including Blackfeet's. FAC ¶ 639 (detailing the investigation and arrest of a group transporting over 800-1,200 30 mg oxycodone pills every two weeks from California for distribution in Billings, Montana).

Third, it is undeniable that a dominant federal interest exists in the types of illegal, cross-boundary marketing and distribution drug schemes that are present here. *See, e.g.*, *United States v. One Parcel of Prop. Located at 31-33 York St., Hartford, Conn.*, 930 F.2d 139, 141 (2d Cir. 1991) (observing "the universally-recognized federal interest in eradicating the illegal drug trade . . . "); *United States v. Begay*, 2006 WL 8444146, at *7 n. 9 (D.N.M. June 2, 2006) ("Drug crimes implicate a unique federal interest."); *United States v. Heldon,* 479 F. Supp. 316, 321 (E.D. Pa. 1979) (observing "[t]he substantial federal interest in controlling wholesale distribution of illegal drugs . . ."). In sum, Blackfeet has clearly articulated several federal interests sufficient to justify application of federal nuisance law.

### D. Federal Common Public Nuisance Is Broad and Encompasses the Type of Conduct and Harm That Occurred Here

To the extent the Magistrate Judge Ruiz based his ruling on federal nuisance being limited only to instances of interstate pollution, that is also incorrect. The Supreme Court has observed that federal nuisance common law "adapts to changing scientific and factual circumstances." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423 (2011). Federal common law of nuisance reshapes "the old law of public nuisance . . . to fit the 'realities of modern technology.'" *United States v. Ira S. Bushey & Sons, Inc.*, 363 F. Supp. 110, 120 (D. Vt.), *aff'd,* 487 F.2d 1393 (2d Cir. 1973). Other circuit courts have observed that the Supreme Court's jurisprudence "reflects [a] broad understanding" of the public nuisance doctrine and that

6

"[p]ublic nuisance traditionally has been understood to cover a tremendous range of subjects." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 771-772 (7th Cir. 2011).

And, the Second Restatement, which "has been a common reference point for courts considering cases arising under federal common law," *Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892, 900 (7th Cir. 2014), broadly defines a public nuisance as "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1) (1979) (explaining that common rights include "public health, the public safety, the public peace, the public comfort or the public convenience"). Public nuisance based on the federal common law serves as an ideal vehicle for Blackfeet's claims.

### E. Plaintiff's Federal Common Law Public Nuisance Claim Is Not Displaced by CSA or DEA Regulations

Though the R&R did not explicitly rule on the displacement inquiry, Defendants have failed to demonstrate that displacement is justified. As articulated in Plaintiff's Opposition to Defendants' Motion to Dismiss, no relevant law or regulation, including the Controlled Substances Act ("CSA"), speaks directly to the conduct at issue. Rather, all the laws Defendants raise are, at most, *generally* applicable, which courts have held is insufficient to satisfy the displacement test. This is especially true in regard to the reckless national marketing schemes of the type Manufacturer Defendants engaged in, which are not discussed at all in any law or regulation cited by Defendants. And, because Congressional action, not executive action, is the touchstone of displacement analysis, the DEA regulations Defendants raise are irrelevant to the inquiry.

It is simply inconceivable that Congress intended the CSA to act as a complete occupation of federal drug standards to the exclusion of a national standard of liability. Defendants' arguments would essentially consign sovereign tribes to dependency upon the

whims of federal agents to protect them from incursions by reckless manufacturers, promotors and distributors of lethal painkillers. There is no evidence that Congress had that intention through its promulgation of the CSA. The R&R's dismissal of Blackfeet's federal nuisance cause of action should be rejected.

## CONCLUSION

For the foregoing reasons, and those set forth in Plaintiffs' Memorandum in Opposition to the Motions to Dismiss (Doc. #1130), Plaintiff respectfully urges the Court to reject the recommendation of the Magistrate Judge that Count Three of the First Amended Complaint should be dismissed.

Dated: <u>April 29, 2019</u>                     Respectfully submitted:


/s/ *Archie Lamb*


BLACKFEET TRIBE OF THE BLACKFEET
INDIAN RESERVATION, Plaintiff

Archie C. Lamb
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7000
Fax: 850-436-6068
alamb@levinlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 29, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

/s/ Archie Lamb
Archie C. Lamb
*Counsel for Plaintiff*