UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*Muscogee (Creek) Nation v. Purdue Pharma L.P., et al.*<br><br>Case No 1:18-op-45749 | MDL No. 1:17-md-02804<br><br>Case No. 1:18-op-45459<br><br>Judge Dan Aaron Polster<br><br>Magistrate Judge David A. Ruiz |

**MUSCOGEE (CREEK) NATION'S RESPONSE TO DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE DAVID A. RUIZ**

All of the Defendants (who group themselves as the "Generic Manufacturers," "Manufacturers," "Distributors," and "Pharmacies") have objected to Magistrate Judge Ruiz's Report and Recommendation (the "R&R") concerning the First Amended Complaint ("FAC") filed by the Muscogee (Creek) Nation ("the Nation"). Below, the Nation responds by subject. The Nation also incorporates and adopts by reference all arguments made by the Blackfeet Tribe in its corresponding opposition to Defendants' objections.

**I.     RICO Objections**

The Nation comprehensively briefed why its RICO claims are properly pled and how its injuries establish standing and proximate causation. *See* the Nation's Opposition to Motions to Dismiss at 111-136, R. 1008 ("Nation Opp."). Distributors' and Manufacturers' objections primarily rehash prior arguments about: (1) injury to "business or property"; (2) predicate acts; (3) RICO enterprise; and (4) *Holmes* causation. As noted in the R&R, this Court already "had occasion to address all these arguments when addressing the motions for dismissal in *Summit County*." R&R 20. There was "nothing materially new in these arguments," because the RICO claims asserted by the Nation and Blackfeet "track[ ] the allegations in Summit County." R&R 20-21. Defendants have not assigned any particular error to the R&R, and their objections should be summarily overruled.

Distributors also contend the Nation is not a "person" with RICO standing, because it is a sovereign Indian tribe. The Distributors cited no cases for this sweeping proposition. By contrast, the R&R cited several cases in which Indian tribes or other sovereigns were specifically found to be "persons" under the RICO statute. R&R 21-21. The R&R's conclusion is consistent with—if not compelled by—this Court's prior finding that RICO damages *can* be available to plaintiffs in their *sovereign* capacity. *Summit* Order 24. Separately, the Nation has also alleged damages to its

1

proprietary interests, i.e., losses associated with its own "participation in the marketplace." *See, e.g.*, FAC ¶ 432. For those kinds of losses, a sovereign plaintiff can "undoubtedly recover" under RICO, and therefore has standing. *Summit* Order 20.

The final RICO objection comes from the Pharmacies, who claim that none of the allegations in Count II relate to any "dispensing" activity of Pharmacies. This objection is baseless, for at least three reasons. ***First***, there are dozens of allegations throughout the FAC about federal and state laws governing Pharmacies in their role as opioid retailers, as well as allegations about how Pharmacies violated these laws, made misrepresentations, concealed their wrongdoing, and failed to make legally required reports. *See*, *e.g.*, FAC ¶¶ 179-199; 237-262; 329-408. ***Second***, when the Nation uses the word "Defendants" in Count II's allegations it plainly denotes the "Defendants" who are participants in the Opioid Supply Chain racket, which include retail Pharmacies. When properly and broadly construed, there are many RICO allegations that target Pharmacies' retailing and dispensing activities,[1] ***Third***, there is no talismanic requirement for the Nation to use the word "dispensing" to implicate Pharmacies' racketeering activity *as retailers*. Liability is premised on Pharmacies' predicate acts involving drug diversion, concealing information from regulators, mail and wire fraud, misleading the public, violating controlled substances law, and so forth. The FAC provides no basis to infer Pharmacies engaged in these predicate acts only as "distributors," and not as retailers, too.[2]

To the extent Pharmacies' true objection here is about Rule 9(b) or "group pleading," the R&R rightly rejected these arguments (and the identical arguments made by all Defendants). R&R

---

[1] *See, e.g.*, FAC ¶¶ 334, 389 ("*Defendants* [including retail Pharmacies] disseminated false and misleading statements to Federal and state regulators claiming that: . . . they were complying with their obligations to: (i) maintain effective controls against diversion of their prescription opioids…."; and that Pharmacies, as members of the Opioid Supply Chain Enterprise, violated laws "which makes it unlawful to distribute or *dispense* a controlled substance except as authorized by state law . . . .")
[2] Walgreens and Walmart's arguments that the Nation failed to state non-RICO claims against them in their capacity as Distributor Defendants (R. 1586 at 1, 3 n. 2) fail for the same reasons. *See also* R&R 25–27.

2

25–27. With respect to Rule 9(b), the R&R found the fraud and RICO allegations in the FAC against all defendants are "substantially similar to those in Summit County" and they "compl[y] with the level of specificity required by Rule 9(b)."[3] Defendants have not explained why this Court should depart from its previous conclusion.

## II.  Objections to Tribal Recovery of Damages under ISDEAA

The R&R correctly concluded that section 1621e of the Indian Health Care Improvement Act, 25 U.S.C. § 1621e, does not bar recovery of healthcare damages involving funds provided to Indian tribes under the Indian Self Determination and Education Assistance Act (ISDEAA). The Nation has previously addressed the arguments raised in the Manufacturers' objection. Nation Opp. at 38-45. Nevertheless, several points merit emphasis.

*First*, Manufacturers erroneously state that the Nation "did not dispute that IHC[I]A § 1621e governs the potential recovery" of ISDEAA funds. R. 1590 at 8. This is false. The Nation specifically explained that section 1621e is not the *exclusive* remedy to recover healthcare damages; rather, it is just one additional remedy that Congress chose to provide to Tribes, to supplement pre-existing state law tort remedies and other claims. Nation Opp. 39, 42.

*Second,* Manufacturers insist that Tribes had no remedy against tortfeasors prior to the 2010 amendment of the IHCIA, repeating their argument that *Standard Oil* governs this analysis because of the relationship between Tribes and the federal government, and because federal "grant money" implicates the federal purse. R. 1590 at 9-11 (citing *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 302 (1947)). But the R&R correctly recognized that ISDEAA compacts and contracts are *not* grants; they are a unique form of federal contracting under which the funds

---

[3] R&R 25; *see also id.* (rejecting the proposition that a plaintiff must "reiterate its allegations against each defendant individually" in cases like this one, i.e., where "multiple defendants are alleged to have engage in the same pattern of conduct or conspired in a fraudulent scheme"); *id.* 26 (holding that imposing such a requirement would add "no substantive value").

3

become *tribal* funds once they are contracted.[4] And while Tribes clearly have an important government-to-government relationship with the United States, this relationship between two sovereigns bears no resemblance to the employer-employee relationship between the federal government and the soldier in *Standard Oil*. The R&R thus properly concluded that *Standard Oil* does not preclude Tribes from availing themselves of state-law tort remedies. R&R 47. And contrary to Defendants' argument that the savings clause in section 1621e preserves only the "substantive bases" of state-law liability (and not actual causes of action under state law),[5] subsection 1621e(k) expressly preserves "any right of recovery"—that is, any cause of action—available to the Tribes under state, federal, or tribal law. Nation Opp. 40-42.

***Third,*** the Manufacturers argue that a Tribe's recovery of "specific healthcare costs incurred by [its] members" is not a sufficiently quasi-sovereign interest to give rise to *parens patriae* authority. R. 1590 at 10. But the Nation has made clear that it is not seeking to recover on behalf of individual patients; instead it is seeking damages for harm to the Nation as a tribal sovereign, including recovery of the Nation's funds it had to divert to opioid-related care that would otherwise have been available to provide services to the Nation's citizens. Nation Opp. 45.

Thus, the R&R correctly concluded that the Nation may recover for harms to its healthcare system regardless of whether its funding came from an ISDEAA contract or another source.

---

[4] R&R 46 & n.3; *see also* Nation Opp. Brief 37 & nn.99-100. The Manufacturer's mis-use a quote from *Cohen's Handbook on Federal Indian Law* § 22.02[5] (2017), for the proposition that "financial responsibility" for ISDEAA contracts and compacts "remains with the federal government." Manufacturers' Obj. 10. What this means, as the *Handbook* explains, is that an agency is responsible for providing Tribes with at least the funding that the agency would have spent for operation of the federal program, but that "[i]f a tribe operates the program more cheaply than the federal government did, it can keep the savings and put them back into the program," *id.,* thus reinforcing the statutory principle that Tribes control ISDEAA funds and, as the *Handbook* also notes, "tribes may redesign programs to meet the needs of their service population," and the Secretary "must accede" to such redesigns unless they would violate the law. *Id.* at § 22.02[2].

[5] R. 1590 at 11; *see also* Manufacturers' Reply 17-18. Neither of the cases cited by the Manufacturer defendants addresses the IHCIA, and they are therefore unhelpful on the meaning of the IHCIA's savings clause. *See* Manufacturers' Obj. 11 (citing *Huddleston v. United States*, 485 F. App'x 744, 745 (6th Cir. 2012); *Heusle v. Nat'l Mut. Ins. Co.*, 628 F.2d 833, 837 (3d Cir. 1980)).

4

**III.     Nuisance Objections**

Distributors and Manufacturers argue that the R&R misapplied the *Erie* doctrine by "failing to faithfully apply precedent" which allegedly limits nuisance to "harmful uses of property." R. 1585 at 7. But the R&R did not err, because there is no such Oklahoma precedent. Distributors' objection on this point is centered on a handful of Oklahoma nuisance opinions involving land-use disputes. *Id*. Not surprisingly, cases regarding land-use disputes tend to discuss nuisance doctrine from the vantage point of land use. But as the R&R observed, none of Defendants' cases present any *limitation* on the scope of nuisance law.

On the other hand, the R&R found strong support for its "*Erie* prediction" that Oklahoma law allows the Nation's nuisance claim. ***First***, a plain reading of the Oklahoma nuisance statute permits the nuisance claim, whereas "Defendants' theory would have the court ignore the literal language of the Oklahoma nuisance statute." R&R 53. ***Second***, at least two Oklahoma trial courts (in tobacco litigation, and in opioid litigation) permitted so-called "products-nuisance" claims.[6] ***Third***, looking at nationwide trends—as Defendants concede the Court must under *Erie*—nearly every jurisdiction to consider opioid-related nuisance claims has held they are viable. While the Defendants make reference to a nuisance ruling from Delaware's opioid litigation—which was based on Delaware-specific precedent—rulings from courts in Oklahoma, Alaska, Ohio, New York, New Hampshire, West Virginia, Washington, Tennessee, and elsewhere (not to mention this Court in *Summit County*) confirm the viability of the claim. Defendants' position about "products-nuisance" has been almost universally rejected, and they do not even attempt to say why the Oklahoma Supreme Court would follow the path of Delaware.

---

[6] R&R 54-55. Distributors' mistakenly contend the nuisance claim is a disguised products liability claim. It is not clear what they mean by this characterization. Defendants' nuisance-causing activity is their systematic failure to follow their legal obligations to prevent the unchecked overflow of opioids polluting communities in the Muscogee (Creek) Nation. No product is alleged to be defective, per se, which is the *sina qua non* of a products liability claim.

5

*Finally*, while the Oklahoma Supreme Court has not decided the precise issue presented in this case, it has decided at least one very analogous case (which the R&R cited) that strongly indicates that Oklahoma nuisance law extends to the kind corporate malfeasance alleged in the FAC.[7] Western Oklahoma was opened to non-Indian settlement for the first time in the 1890s. With the influx of settlers came opportunities for commercial exploitation. Several merchants and distributors conspired and formed associations-in-fact to manipulate the supply chains for essential products like grain, cattle feed, timber, and coal, and they "combined to suppress evidence which will enable the officers to enforce the anti–trust law." *Id*. 912. To end the price-gouging, government officials sued the monopolists under Oklahoma's public nuisance statute, which was substantially identical to what exists today. *Id*. at 917 (quoting the statute). Even though the unlawful monopolistic behavior was not specifically tied to any particular land-use or property, the Oklahoma Supreme Court held that the alleged anti-competitive behavior and its socioeconomic effects constituted a public nuisance because it invaded "public rights," including the peoples' right to have:

> their business affairs unobstructed and the atmosphere of their daily transactions unpolluted by monopolistic organizations destroying that free and open market to which all are entitled. The benefit of a free and open market, unhampered by secret combinations with the power by virtue of such to arbitrarily fix prices which those who enter it shall receive and shall be required to pay, is one of the most valuable rights which organized government offers a citizen.  (*Id*. 920)

Surely if the Oklahoma Supreme Court recognized the public nuisance in *Long Bell Lumber*, then it would recognize the public nuisance theory here.

Distributors separately contend the R&R failed to apply the "control of the instrumentality" test. R. 1585 at 3. Although this "test" is not referenced in any Oklahoma statute or nuisance case,

---

[7] *See Territory v. Long Bell Lumber Co*., 22 Okla. 890, 99 P. 911 (Okla. 1908). Examples of the corporate malfeasance alleged in the FAC are at ¶¶ 9-12.

6

Distributors claim it is the law of Oklahoma.[8] Their only support for this proposition is *Burlington Northern & Santa Fe Railway Co. v. Grant*, 505 F.3d 1013, 1026 (10th Cir. 2007), which mentions the concept of "control" in an inapplicable context, and frankly cuts against Distributors' position. *Grant* analyzed "control" in the context of BNSF's private nuisance claim against a corporate officer of a nuisance-causing corporation, using "control" as a proxy for whether an individual officer could be *personally* liable for corporate misdeeds. *Id*. at 1026. The court found there could be no liability without evidence the officer "was responsible for the maintenance of a nuisance that was under his possession or control."[9] The Tenth Circuit then equated the "control" inquiry with whether the officer "personally directed, *participated in* or controlled the commission of a tort." *Id*. This hardly expresses the kind of rigid "control of the instrumentality test" espoused by Distributors. It also does not aid in Distributors' defense to the Nation's nuisance claim, since the Nation alleges all Distributors participated in the commission of torts (and because *Grant* indicated the issue should be decided on an evidentiary record). To whatever extent a "test" applies, the R&R correctly found that each defendant possessed sufficient "control" over its nuisance-causing activity when it had the opportunity to cease its alleged misconduct. The question is whether Distributors are in a position to abate the alleged ongoing nuisance. Based on the plausible factual allegations here, they are.

---

[8] Distributors' *Erie* concerns seem to vanish with respect to the "control of the instrumentality" test. They primarily rely on a Rhode Island lead paint case, without explaining why it should apply. They also fail to mention why the case is distinguishable. The Rhode Island court was persuaded by the fact that the state legislature had enacted "statutory schemes" to address the lead paint nuisance, which "reflect[ed] the General Assembly's chosen means" of responding to the problem. *State v. Lead Indus., Ass'n, Inc*., 951 A.2d 428, 457-458 (R.I. 2008). The General Assembly "made clear policy decisions about how to reduce lead hazards . . . and who should be responsible. Importantly, the General Assembly has recognized that landlords, who are in control of the lead pigment at the time it becomes hazardous, are responsible for maintaining their premises and ensuring that the premises are lead-safe." *Id*. 449.

[9] *Id*. Further, the Tenth Circuit cited two Oklahoma cases for its statement about "control." Both undercut Distributors' position. They hold nuisance liability extends to any defendant who "*participated in the creation or maintenance of a nuisance* which caused injury to the Plaintiffs." *Branch v. Mobil Oil Corp*., 788 F. Supp. 531, 534–35 (W.D. Okla. 1991). The holding in *Duncan v. Flagler*, 192 Okla. 18 (1942) was similar, and the court also indicated nuisance liability might even extend further, i.e., to those who merely "aided and abetted in the maintenance of the nuisance."

7

## IV.  "Innocent Seller" Objections

Distributors contend the R&R misinterpreted Oklahoma's "Innocent Seller" statute. They take the extreme position that Section 57.2(G) uniformly applies to each and every common-law negligence cause of action that a plaintiff could possibly assert against a seller, regardless of whether the claim pertains to a defective product. They are wrong for at least three reasons. ***First***, the R&R correctly found there is no Oklahoma authority or legislative history "demonstrating that this statute displaces all common law negligence claims, or applying this statutory section outside a product liability action." R&R 65. In fact, the statute's legislative history indicates 57.2 was meant to govern products liability litigation, only.[10] ***Second***, Distributors' "textual" interpretation of 57.2(G) is illogical and would lead to patently absurd results. For example, if the statute applied to all manner of negligence allegations against sellers and distributors, McKesson could invoke 57.2(G) in defense of a negligence lawsuit concerning one of its delivery trucks, and plaintiff's case would presumably fail because he could not likely establish McKesson was negligent in "assembling, inspecting, or maintaining" its products. That outcome would make no sense—because the relevant negligence would *not* be a defective product, but negligent acts or omissions. ***Third***, Oklahoma courts tellingly have not applied the statute in another area of common-law negligence litigation against sellers relating *non*-defective products, i.e., cases against alcohol vendors.[11] Finally, even if the statute applies, the FAC meets the pleading requirements.[12]

---

[10] Section 57.2(G) was introduced as part of House Bill 3365, which was described as "An Act relating to ***product liability***; providing certain rebuttable presumptions in ***product liability actions***; providing grounds for rebutting presumptions; providing circumstances for which a ***product liability action may be asserted***; providing for liability under certain circumstances; providing for codification; and providing an effective date." Oklahoma House Journal, 2014 Reg. Sess. No. 1 (Feb. 3, 2014).

[11] In *Brigance v. Velvet Dove Rest., Inc.*, 725 P.2d 300, 304 (Okla. 1986), the Oklahoma Supreme Court found a common-law cause of action against liquor vendors who overserved drunk patrons. In 2017, several years after the enactment of the "Innocent Seller" statute, the Oklahoma Supreme Court reaffirmed *Brigance* and even extended its holding (to apply to convenience stores and other alcohol sellers). *See Boyle v. ASAP Energy, Inc.*, 408 P.3d 183, 195 (Okla. 2017), *reh'g denied* (Dec. 11, 2017).

[12] The FAC alleges Distributors must use reasonable care to safely maintain opioid products within their supply chains to prevent loss, diversion, or unauthorized access. FAC 166, 181-182. It further alleges Distributors breached that

8

## V. Unjust Enrichment Objections

Manufacturers and Distributors repeat their unjust enrichment arguments from their motions to dismiss, which are the same arguments Manufacturers previously asserted to the trial court in Oklahoma's opioid litigation, where they were also rejected.[13] Defendants contend that no Oklahoma authority supports the Nation's claim. However, the R&R cited several cases demonstrating that the Nation's unjust enrichment claim is consistent with common law principles in Oklahoma. R&R 65-66. This puts Oklahoma's law in line with numerous other states in which courts have sustained unjust enrichment claims in opioid litigation based on the same theories. *See* Nation Opp. 9-12. There is no basis to find the R&R erred in sustaining the unjust enrichment claim at this stage.

## VI. Pharmacies' Causation Objections

Pharmacies argue the Nation's claims fail as to causation because: (1) the learned intermediary doctrine insulates dispensers from liability unless prescriptions were "unreasonable on their face," and (2) the causal chain is broken under the "sole efficient legal cause doctrine" because of opioid abuse after Pharmacies filled prescriptions. Pharmacies are wrong for two reasons.

*First*, this R&R has carefully considered and rejected that the learned intermediary doctrine bars claims against the Defendants. R&R at 63. Even if that were not the case, the exception provided by *Carista v. Valuck*, 394 P.3d 253, 256 (Okla. Civ. App. 2016) does not apply. Under *Carista*, a pharmacy would be liable notwithstanding the learned intermediary doctrine if it filled

---

standard. FAC ¶¶ 224-229; 465-478. These allegations satisfy the statute. *See* 57.2(G)(2) (requiring allegation that product sellers failed to "exercise reasonable care [ ] in … maintaining such product"); *see also* R&R 64 (discussing *Loomis v. Specialized Desanders, Inc*., 2018 WL 4355205, at *3 (W.D. Okla. Sept. 12, 2018) (holding that plaintiff satisfied 57.2(G)(2) under similar allegations).

[13] *See* Exhibit A to Manufacturers' Obj. (R. 1590-1, p. 36); *State of Oklahoma ex rel. Hunter v. Purdue L.P*., No. CJ-2017-816 (Okla. Dist. Ct. Dec. 6, 2017).

9

prescriptions that were "unreasonable on [their] face" because, for example, they that included "facially bizarre quantities or dosages clearly outside of any acceptable range."[14] The Nation's allegations meet this test—such as when the Nation alleges that Pharmacies filled "prescriptions written in excess of the amount needed for proper therapeutic purposes" (*see, e.g.*, FAC ¶¶ 175, 176)—and whether Pharmacies acted as the Nation alleges and those actions were improper are an issue of fact not appropriate for resolution at this stage.[15]

*Second*, Oklahoma's "sole efficient legal cause" doctrine does not bar the Nation's claims. Intervening causes only break the causal chain if they are "neither anticipated nor reasonably foreseeable." *Minor v. Michael Ben Zidell Trust*, 618 P.2d 392, 394 (Okla. 1980). In *Prince v. B.F. Ascher Co., Inc.*, 90 P.3d 1020 (Okla. Civ. App. 2004), which Defendants call "on-point," the decedent was injured because he modified the product after purchase, which was not foreseeable. That is markedly distinct from end users taking prescription opioids in their intended form, which is what the Nation alleges resulted in harm here.[16]

## VII. Conclusion

For the foregoing reasons, as well as the additional points raised in the opposition of the Blackfeet Tribe, the Defendants' objections to the R&R should be overruled.

---

[14] In addition to the fact that *Carista* does not apply (as explained herein), the learned intermediary doctrine applies when a manufacturer "adequately warns prescribing physicians of the dangers associated with the drug," *Woulfe v. Eli Lilly & Co.*, 965 F. Supp. 1478, 1482 (E.D. Okla. 1997), which is not the case here because the Nation alleges that manufacturers mislead and misrepresented drug safety. *See* Nation Opp. at 32.

[15] In *Carista*, the Court found that plaintiff had not alleged sufficient facts to establish breach and granted leave to amend. Pharmacy Defendants inaccurately imply that the Complaint was dismissed because a higher standard than notice pleading applied. *See* Pharmacy Obj. at 6 (R. 1586).

[16] Moreover, the case that gave rise to the "sole efficient legal cause" doctrine presents a completely distinct fact pattern. *See McClelland v. Harvie Kothe-Ed Rieman, Post No. 1201, Veterans of the Foreign Wars of U.S., Inc.*, 770 P.2d 569, 572 (Okla. 1989); *see Brigance v. Velvet Dove Restaurant, Inc.*, 725 P.2d 300, 304 (Okla. 1986) (for claims after 1989, a commercial vendor "has a duty to exercise reasonable care not to sell liquor to a noticeably intoxicated person").

*s/ Tyler Ulrich*
Tyler E. Ulrich, Esq.
Florida Bar No. 094705
BOIES SCHILLER FLEXNER LLP
100 SE 2nd Street, Suite 2800
Miami, Florida 33131
Tel. 305-539-8400
Fax 305-539-1307
Email: tulrich@bsfllp.com

William S. Ohlemeyer
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
wohlemeyer@bsfllp.com

Attorney General Kevin Dellinger,
OBA #15612
First Assistant Attorney General Lindsay
Dowell, OBA #30062
MUSCOGEE (CREEK) NATION
P.O. Box 580
Okmulgee, OK 74447
kdellinger@mcnag.com
ldowell@mcnag.com

Scott D. Gilbert
Michael B. Rush
Jenna A. Hudson
GILBERT LLP
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
gilberts@gotofirm.com
rushm@gotofirm.com
hudsonj@gotofirm.com

Richard W. Fields
FIELDS PLLC
1700 K Street, NW, Suite 810
Washington, DC 20006
fields@fieldslawpllc.com

Lloyd B. Miller
Donald J. Simon
Whitney A. Leonard
SONOSKY CHAMBERS SACHSE
ENDRESON & PERRY, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
lloyd@sonosky.net
dsimon@sonosky.net
whitney@sonosky.net


Gregory M. Utter
Joseph M. Callow
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, OH 45202
gmutter@kmklaw.com
jcallow@kmklaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing was filed with the Clerk of the Court using the CM/ECF system on this 9th day of May, 2019, which will send notification of the same to all counsel of record.

*s/ Tyler Ulrich*
Tyler E. Ulrich, Esq.
