```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      - - -
 5
    IN RE:  NATIONAL         :  HON. DAN A.
 6  PRESCRIPTION OPIATE      :  POLSTER
    LITIGATION               :
 7                           :
    APPLIES TO ALL CASES     :  NO.
 8                           :  1:17-MD-2804
                             :
 9
             - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      - - -
12
                 February 22, 2019
13
                      - - -
14
15           Videotaped deposition of
    PATRICK FOURTEAU, taken pursuant to
16  notice, was held at the offices of
    Patterson Belknap, LLP, 1133 Avenue of
17  the Americas, New York, New York,
    beginning at 8:41 a.m., on the above
18  date, before Michelle L. Gray, a
    Registered Professional Reporter,
19  Certified Shorthand Reporter, Certified
    Realtime Reporter, and Notary Public.
20
                      - - -
21
22         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23              deps@golkow.com
24
```

```
 1   APPEARANCES:
 2
     NAPOLI SHKOLNIK, PLLC
 3   BY:  CHRISTOPHER L. SCHNIEDERS, ESQ.
     BY:  ADAM HAENEL, ESQ.
 4   6731 West 121st Street, Suite 201
     Overland Park, Kansas 66209
 5   (844) 230-7676
     cschnieders@napolilaw.com
 6   ahaenel@napolilaw.com
     Representing the Plaintiffs
 7
 8   PATTERSON BELKNAP WEBB & TYLER, LLP
     BY:  JONATHAN H. HATCH, ESQ.
 9   1133 Avenue of the Americas
     New York, New York 10036
10   (212) 336-7625
     jhatch@pbwt.com
11   Representing the Witness
12
     HOLLAND & KNIGHT, LLP
13   BY:  J. MATTHEW DONOHUE, ESQ.
     111 S.W. Fifth Avenue
14   2300 U.S. Bancorp tower
     Portland, Oregon 97204
15   (503) 517-2913
     matt.donohue@hklaw.com
16   Representing the Defendant, Insys
     Therapeutics, Inc.
17
18   FARRELL FRITZ, P.C.
     BY:  MATTHEW D. DONOVAN, ESQ.
19   622 Third Avenue
     New York, New York  10017
20   (646) 237-1803
     mdonovan@farrellfritz.com
21   Representing the Defendant, Cardinal
     Health
22
23
24
```

```
 1   APPEARANCES:  (Cont'd.)
 2
     ARNOLD & PORTER KAYE SCHOLER, LLP
 3   BY:  TIFFANY IKEDA, ESQ.
     777 Figueroa Street, 44th Floor
 4   Los Angeles, California  90017
     (213) 243-4000
 5   tiffany.ikeda@arnoldporter.com
     Representing the Defendants, Endo
 6   Health Solutions; Endo
     Pharmaceuticals, Inc.; Par
 7   Pharmaceutical Companies, Inc. f/k/a
     Par Pharmaceutical Holdings, Inc.
 8
 9   TELEPHONIC/STREAMING APPEARANCES:
10
     JACKSON KELLY, PLLC
11   BY:  SANDRA K. ZERRUSEN, ESQ.
     50 South Main Street, Suite 201
12   Akron, Ohio 44308
     (330) 252-9060
13   Skzerrusen@jacksonkelly.com
     Representing the Defendant,
14   AmerisourceBergen
15
     JONES DAY
16   BY:  CHRISTOPHER M. LOMAX, ESQ.
     600 Brickell Avenue
17   Brickell World Plaza
     Suite 3300
18   Miami, Florida 33131
     (305) 714-9719
19   Clomax@jonesday.com
     Representing the Defendant, Walmart
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

1   APPEARANCES:  (Cont'd.)
2
3   VIDEOTAPE TECHNICIAN:
    Henry Marte
4
5   LITIGATION TECHNICIAN:
    John Knowles
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    A.    No.

2    Q.    That had all been done
3  before you arrived at Insys?

4    A.    Yeah.

5    Q.    Do you have any knowledge as
6  to who would have been involved with
7  that, with Dr. Kapoor?

8    A.    There was a -- I understand
9  that there was a gentleman by the name of
10  Kottayil, George Kottayil that was --
11  Kottayil, K-O-T-T-A-Y-I-L.  I understand
12  that the gentleman worked at Insys and
13  was party to the development of the
14  product.

15    Q.    But it's your understanding
16  that Dr. Kapoor had the initial idea for
17  this product, correct?

18    A.    Correct.

19    Q.    And that was something that
20  he had developed based upon some
21  experience he had at Sciele?

22    A.    I think the genesis of the
23  product is the passing away of his wife.
24  That was the genesis behind it, where I

1  think he struggled mightily dealing with
2  her passing away.  And the notion of --
3  he put together the pain relief idea and
4  the fast relief of NSAID that is so that
5  he said why don't we put those two things
6  together.  That is my understanding of
7  how this product came to be.
8         Q.    But the sublingual delivery
9  system, that's something that he would
10 have had specific experience at Sciele
11 with, correct?
12        A.    Can you explain what you
13 mean by experience in that case?
14        Q.    He would have become aware
15 of that as a possible delivery mechanism
16 at Sciele, correct?
17        A.    Yes.
18        Q.    And I think you already
19 testified that while at Sciele, you
20 didn't discuss any -- any sort of opioid
21 medications that would have a rapid onset
22 of delivery, correct?
23        A.    Correct.
24        Q.    All right.  From the time

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | So commercial meetings would |
| 3 | obviously have to do only with the |
| 4 | commercially marketed products, like |
| 5 | Subsys, right? |
| 6 | A. | Exactly. |
| 7 | Q. | So, you were asked by |
| 8 | Dr. Kapoor in late 2012 to attend these |
| 9 | weekly meetings? |
| 10 | A. | To call in on to those |
| 11 | weekly meetings. |
| 12 | Q. | Okay.  On what day of the |
| 13 | week did they occur? |
| 14 | A. | On Fridays. |
| 15 | Q. | Were you provided with |
| 16 | information prior to those meetings? |
| 17 | A. | Yes. |
| 18 | Q. | What type of information? |
| 19 | A. | It was a sales op with |
| 20 | summary of the week. |
| 21 | Q. | So those weekly meetings |
| 22 | would occur, and the weekly numbers would |
| 23 | be gone over during those meetings? |
| 24 | A. | Yes. |

```
 1            Q.    And you said that you were
 2    asked, based upon your experience to join
 3    those meetings.  What did you mean by
 4    that?
 5            A.    John wanted another pair of
 6    ears on those meetings, if there was were
 7    things that I would pick up that did not
 8    seem right or if I would have a
 9    recommendation that I would make to him
10    after those calls.
11            Q.    Obviously it follows that a
12    commercial meeting has to do with
13    commercial issues, right?
14            A.    Right.
15            Q.    That involves marketing,
16    correct?
17            A.    Correct.
18            Q.    And you have a background in
19    marketing, correct?
20            A.    Correct.
21                  MR. HATCH:  Objection to
22            form.
23    BY MR. SCHNIEDERS:
24            Q.    And that's part of the
```

Highly Confidential - Subject to Further Confidentiality Review

1 limited in terms of the product that we
2 were promoting at Sciele because of the
3 competitiveness of the environment and
4 the small size of our company. But that
5 was the -- the rationale behind the
6 approach that we did.
7     Q. So in Sciele, the base
8 salary for sales representatives was
9 lower than what was typical within the
10 industry, correct?
11     A. Yeah, yeah.
12     Q. And the bonus structure was
13 potentially more lucrative than what
14 might have been capped at some of the
15 larger companies, correct?
16     A. Yes.
17     Q. And that model was employed
18 at Insys, correct?
19     A. That model was employed at
20 Insys, yes.
21     Q. Who decided to employ that
22 model at Insys?
23     A. It was decided by John
24 Kapoor.

```
 1   how the financing was arrived at?
 2        A.    Yes.
 3        Q.    Okay.  Did you know that
 4   when you spoke to Dr. Kapoor --
 5        A.    Yes.
 6        Q.    And you're -- let's make
 7   sure we are not talking -- let me get my
 8   question out.  Okay?
 9              Did you know that at the
10   time that you spoke with Dr. Kapoor when
11   he asked you to join the board?
12        A.    Yes.
13        Q.    Okay.  So he told you that
14   he had personally, through his assets,
15   financed the company up to that point?
16        A.    Yes.
17        Q.    Did that cause you any pause
18   in deciding to join?
19        A.    No.
20        Q.    It goes on to say, "These
21   trusts are controlled by or are
22   affiliated with our founder and executive
23   chairman and principal stockholder,
24   Dr. John N. Kapoor.  As of March 31,
```

```
 1            form.
 2                 THE WITNESS:  Right.
 3   BY MR. SCHNIEDERS:
 4        Q.    By products, we mean Subsys,
 5   correct?
 6        A.    Correct.
 7        Q.    Okay.  If you would go to
 8   Bates number that ends in 0997 on Page
 9   120.
10              At the top of this page
11   there is a list of the management,
12   executive officers and directors.
13              Do you see that?
14        A.    Yes.
15        Q.    We've talked about
16   Mr. Babich, who served as the president,
17   CEO, and director, correct?
18        A.    Correct.
19        Q.    Mr. Babich at that time was
20   only 36.  Is that your recollection?
21        A.    Yes.
22        Q.    Did that cause you any pause
23   having someone at the head of the company
24   that was so young?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    The choice was a choice of
 2   John Kapoor at the time.  He had
 3   worked -- Mike Babich had worked with
 4   John and was obviously very close to
 5   John.  I did not feel that there was any
 6   reason to discuss his choice at the time.
 7          Q.    Mr. Babich had worked for
 8   Dr. Kapoor in many positions, correct?
 9          A.    Correct.  And had worked at
10   Insys since 2002, so knew intimately the
11   product and the company.
12          Q.    Did, in your experience,
13   Mr. Babich take his orders from
14   Dr. Kapoor?
15                MR. DONOHUE:  Object to the
16          form.
17                THE WITNESS:  Obviously in
18          the past he was working directly
19          for Dr. Kapoor and they had direct
20          interaction.
21                As a CEO, the perception was
22          that indeed he still worked very
23          closely with Dr. Kapoor, as the
24          capital was based in Phoenix as
```

```
 1   it, yes.
 2        Q.   And was it your experience
 3   that even if an e-mail to -- from his
 4   e-mail account was written by his
 5   assistant, that it was based upon
 6   consultation his assistant had had with
 7   Dr. Kapoor, correct?
 8        A.   Correct.
 9        Q.   So this e-mail that we're
10   looking at in Exhibit 12, at the bottom
11   it says, "Patrick, I would like to
12   request if you could discuss with your
13   compensation consultant what my
14   compensation should be as executive
15   chairman.  I do spend a significant
16   amount of time on Insys.  Thanks, John."
17             Do you see where I've read
18   that from?
19        A.   Yes.
20        Q.   Who was your compensation
21   consultant?
22        A.   I could give you the name.
23   I don't have it at the tip of my finger.
24   But I -- I can give you the name.  We
```

1  used an outside firm.
2         Q.    Okay.  So there was a firm
3  that you consulted with?
4         A.    Yeah.  Yeah.  Consulted
5  with.  We were always doing it on the
6  basis, and it's attached to most of the
7  minutes of the board meetings.
8         Q.    So -- so that group would
9  have advised you on how executives should
10 be compensated?
11        A.    Exactly.  We were looking at
12 that all -- every year trying to do that
13 to make sure that we were always in the
14 band of what we wanted to be, high --
15 i.e., the plan was always low in base and
16 higher in incentive.  That was a model
17 that was applied throughout the whole
18 company.
19        Q.    Okay.  So it wasn't just the
20 sales force that had that model?
21        A.    No.  The model was for
22 everybody.
23        Q.    So going up from there.  You
24 write back and say, "John, I will talk to

```
 1   our consultant today and will hope to get
 2   something shortly.  Best."
 3              Do you see where I've read
 4   that from?
 5        A.    Yes.
 6        Q.    Do you recall this
 7   interaction at all?
 8        A.    Yeah.
 9        Q.    Okay.  Tell me what you can
10   recall about it.
11        A.    Nothing.  That John asked me
12   for a revision of his executive
13   compensation, as executive chairman,
14   which tended to make me chuckle knowing
15   the wealth that he had, why was he
16   looking at being compensated like that?
17        Q.    Do you recall how he was
18   compensated?
19        A.    I don't recall the amount.
20   I think there was a suggestion that it
21   would figure into -- in the minutes that
22   was provided by the comp committee.
23        Q.    Fair to say that Dr. Kapoor
24   did spend a large amount of time
```

```
 1    regarding Insys?
 2         A.    Yeah.
 3               MR. DONOHUE:  Object to the
 4         form.
 5    BY MR. SCHNIEDERS:
 6         Q.    Do you have any sense of how
 7    often he was on site at Insys?
 8         A.    No.
 9         Q.    He lived in Phoenix,
10    correct?
11         A.    He lived in Phoenix, but
12    worked mainly out of his home office.
13               (Document marked for
14          identification as Exhibit
15          Insys-Fourteau-13.)
16               THE WITNESS:  Thank you.
17    BY MR. SCHNIEDERS:
18         Q.    Handing you Exhibit 13.
19    Exhibit 13 is another e-mail about four
20    days later after Exhibit 12.  It's from
21    John Kapoor, again, through his
22    assistant's e-mail address.  It says,
23    "Patrick, I will call you to discuss."
24               And then he says two things
```

1    2014 he wants to establish that, right?
2        A.    Okay, okay.  That's what --
3        Q.    Is that fair?
4        A.    That's fair.  That's totally
5    fair.
6        Q.    So below, sales force
7    expansion.  It says, "First quarter,
8    Dr. Kapoor wants the sales force expanded
9    to 150," correct?
10             MR. DONOHUE:  Objection to
11        form.
12             THE WITNESS:  That, that was
13        his objective, yes.
14   BY MR. SCHNIEDERS:
15       Q.    And then to 175 in the
16   second quarter, correct?
17       A.    Exact.
18       Q.    And then to 200 in the third
19   quarter, right?
20       A.    Exact.
21       Q.    And also to go up to 20
22   total reps in oncology, correct?
23       A.    Exact.
24       Q.    Okay.  Do you recall the

```
 1              need not prevent him to talk to
 2              people at Sciele that he had known
 3              prior to me joining.  I had no
 4              problem with that.
 5                      So that indeed is the same
 6              thing at Insys.  It is very
 7              possible I never perceived it as a
 8              CEO, as, quote-unquote, you know,
 9              stepping in onto my bailiwick.
10                      I saw it as a team, our
11              team, we were trying -- at Sciele
12              I mean, we are a team trying to do
13              that.  That's the way I saw it at
14              Sciele.  And I assume it was the
15              same approach that was taken at
16              Insys.
17                      I did not know anything in
18              particular about his relationship
19              with Mike except that Mike and he
20              had been working together for now
21              12 years, 13 years.
22      BY MR. SCHNIEDERS:
23              Q.    You would agree that Mike
24      Babich was CEO of Insys because
```

```
 1   Dr. Kapoor wanted him to be CEO, correct?
 2              MR. DONOHUE:  Object to the
 3        form.
 4              THE WITNESS:  Yes.  Yes.
 5   BY MR. SCHNIEDERS:
 6        Q.   And you would agree that if
 7   Dr. Kapoor decided that he didn't want
 8   Mike Babich to be CEO anymore, he
 9   wouldn't be CEO, correct?
10              MR. HATCH:  Objection to
11        form.
12              MR. DONOHUE:  Same
13        objections.
14              THE WITNESS:  Correct.
15   BY MR. SCHNIEDERS:
16        Q.   He served at the whim of
17   Dr. Kapoor?
18              MR. HATCH:  Objection to
19        form.
20              MR. DONOHUE:  Same
21        objection.
22              THE WITNESS:  Served at the
23        whim of Dr. Kapoor, but he served
24        the board.  The whim of the board
```