UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION )<br>)<br>) | MDL 2804 |
| This document relates to: )<br>) | Case No. 1:17-md-2804-DAP |
| *All MDL Tribal Cases* )<br>) | Judge Dan Aaron Polster |

**PLAINTIFFS' TRIBAL LEADERSHIP COMMITTEE'S MOTION TO MODIFY THE COURT'S CONSOLIDATED ARCOS PROTECTIVE ORDER OF APRIL 12, 2019**

The undersigned counsel, in their capacity as members of the Tribal Leadership Committee appointed by Special Master Yanni, bring this motion on behalf of Plaintiffs in all MDL Tribal Cases ("Tribal Plaintiffs") and hereby move this Honorable Court for an order modifying the Court's Consolidated ARCOS Protective Order of April 12, 2019 (ECF Doc. 1545) to provide for the distribution to counsel for Native American Tribes of the SLCG Processed ARCOS data and county level reports, as enumerated in that Order, for all counties comprising the Purchased/Referred Care Delivery Area (PRCDA) of the Tribe.

In support of this Motion, Tribal Plaintiffs state as follows:

On April 12, 2019, this Court entered a Consolidated ARCOS Protective Order, consolidating and superseding the Court's prior ARCOS Protective Orders governing disclosure of information from the DEA ARCOS/DADS Database and Suspicious Order Reports produced by the Department of Justice ("DOJ") and/or DEA. ECF Doc. 1545.  With respect to Native American Tribes, that Order provided that certain county-level SLCG Processed ARCOS data and county-level reports, as identified in the Order, would be provided to counsel "for all counties included, in whole or in part, within [the Tribe's] territorial boundaries[.]" *Id*. at 4.  For the reasons stated below, Tribal Plaintiffs respectfully request that this Court modify the Order to

provide Tribes with expanded access to county-level data that more accurately reflects the actual service areas within which Tribes provide governmental services, including health care services, to their citizens and other beneficiaries.

Eligibility for and utilization of tribal governmental services is not limited to individuals residing on tribal lands or within reservation boundaries.  Rather, such services (especially health care services) are administered in each Tribe's PRCDA, encompassing not only tribal lands but lands within certain adjacent counties.  These PRCDA areas represent a fair and reasonable measure of the actual geographic area within which tribal governments provide governmental services to their beneficiaries.

PRCDAs are periodically designated by the U.S. Indian Health Service ("IHS") and published in the Federal Register pursuant to duly promulgated federal regulations.  *See*, *e.g.*, Exhibit A, Department of Health and Human Services, Indian Health Service, Notice to Propose the Re-Designation of the Delivery Area for the Havasupai Tribe, 84 Fed. Reg. 7910 (Mar. 5, 2019) (also listing current PRCDAs for each Tribe as recognized by the IHS) (implementing 42 C.F.R. part 136).  As the Federal Register notice states, a PRCDA is "the geographic area within which [purchased/referred care] will be made available by the IHS to members of an identified Indian community who resides within the area."  *Id.*  These are the counties for which ARCOS data is sought pursuant to this Motion, and represent a somewhat larger set of counties than those which only contain tribal lands.

By way of explanation, eligible American Indian and Alaska Native (AI/AN) beneficiaries receive health care services through tribal health care programs (or through IHS) in two different ways.  First, Tribes and IHS provide direct care in tribal- and IHS-facilities located on or near tribal lands.  Second, tribal and IHS programs pay for various services provided by

2

non-tribal and non-IHS providers through the Purchased/Referred Care ("PRC") program. This program is available when the direct care services a patient needs are unavailable in a tribal or IHS facility and it is therefore necessary to refer the patient to a private non-Tribal/IHS facility and purchase the required care from it. *See* 42 C.F.R. Part 136, Subpart C.[1]

Federal law does not impose any residency requirement for direct care from a tribal or IHS facility,[2] and both Tribes and IHS regularly provide direct care to AI/AN beneficiaries and other individuals who live outside tribal lands or reservation boundaries. As eligible beneficiaries, those individuals are entitled to receive culturally appropriate direct care services from tribal and IHS facilities, free of charge and regardless of residency.[3]

However, eligibility for PRC services is more restricted. Federal regulations provide that eligible AI/AN beneficiaries must reside within a designated Purchased/Referred Care Delivery Area ("PRCDA") in order to be eligible for coverage under the PRC program. 42 C.F.R. § 136.23. Unless otherwise defined by statute or regulation, a Tribe's PRCDA consists of those

---

[1] The PRC program was previously referred to as Contract Health Services. The Consolidated Appropriation Act of 2014, Pub. L. No. 113-76, changed the name of the Contract Health Services program to the Purchased/Referred Care program, but applicable regulations still refer to Contract Health Services.

[2] *See* 42 C.F.R. 136.12(a)(2) (prescribing eligibility for IHS services and providing that such services "will be made available to persons of Indian descent belonging to the Indian community served by the local facilities and program[,]" and that "Generally, an individual may be regarded as within the scope of the Indian health and medical service program if he/she is regarded as an Indian by the community in which he/she lives as evidenced by such factors as tribal membership, enrollment, residence on tax-exempt land, ownership of restricted property, active participation in tribal affairs, or other relevant factors in keeping with general Bureau of Indian Affairs practices in the jurisdiction."). In 1987, the IHS attempted to restrict eligibility for direct care to individuals residing in designated "Health Service Delivery Areas," *see* 42 C.F.R. § 136a.12, but Congress has imposed a moratorium on implementation of those restrictions in the IHS appropriations each year since. *See, e.g.*, Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, Div. E, Title III, Department of Health and Human Services, Indian Health Service (Feb. 15, 2019) (Administrative Provisions providing "That none of the funds made available to the Indian Health Service in this Act shall be used to implement the final rule published in the Federal Register on September 16, 1987, by the Department of Health and Human Services, relating to the eligibility for the health care services of the Indian Health Service until the Indian Health Service has submitted a budget request reflecting the increased costs associated with the proposed final rule, and such request has been included in an appropriations Act and enacted into law[.]")

[3] Tribes may also choose to provide health care services to non-beneficiaries under Section 813 of the Indian Health Care Improvement Act, 25 U.S.C. § 1680c.

counties that include all or part of a reservation, *plus* any county or counties that have a common boundary with the reservation.  42 C.F.R. § 136.22.  The Secretary may, and periodically does, re-designate counties for inclusion in or exclusion from a PRCDA, upon consideration of certain regulatory criteria.  *Id*.  The IHS maintains a list of PRCDAs by Tribe, and that list is periodically published in the Federal Register.  The most recent publication is attached as Exhibit A to this Motion.[4]

As noted above, the direct health care services provided by Tribes and the IHS are not limited to individuals residing within PRCDAs.  However, because of the way PRCDAs are defined, and due to the fact that purchased/referred care eligibility is more restricted than eligibility for direct care services, a Tribe's provision of direct care services extends *at a minimum* to AI/AN beneficiaries residing within its PRCDAs.  PRCDAs thus represent a clearly defined minimum geographic area within which a tribal government provides health care services to its beneficiaries.[5]

---

[4] The attached Federal Register publication lists only those PRCDAs that have been implemented by the IHS.  For example, while Congress has designated the entire State of Arizona and the States of North Dakota and South Dakota as PRCDAs, 25 U.S.C. §§ 1678, 1678a, the IHS has not yet implemented those PRCDAs and they are not reflected in the Federal Register publication.

[5] Tribes also provide many other governmental services to beneficiaries living outside the Reservation boundary but within its PRCDA, including child welfare services, housing assistance, disability assistance, economic development, and more.  *See, e.g.*, 25 C.F.R. Part 20 (governing the provision of certain financial assistance, social, and human services to eligible AI/ANs, and providing at 25 C.F.R. § 20.100 that "Service area means a geographic area designated by the Assistant Secretary where financial assistance and social services programs are provided.  Such a geographic area designation can include *a reservation, near reservation, or other geographic location*."); 45 C.F.R. § 98.83 (Department of Health and Human Services regulations providing that tribal programs administering grants from the Child Care and Development Fund shall carry out programs and activities "on or near an Indian reservation") (emphasis added); 45 C.F.R. §98.80 (including "Indian children living *on or near reservations*" in the calculation of the number of children in a tribe for purposes of Child Care and Development Funds) (emphasis added); 24 C.F.R. § 1000.1 (noting that regulations implementing the Native American Housing Assistance and Self-Determination Act support the development and operation of low-income housing in "Indian areas," defined in 24 C.F.R. § 1000.10 as the area within which a Tribe or designated tribal entity operates affordable housing programs, *not limited to reservations or trust lands*) (emphasis added); 24 C.F.R. § 1000.302 (defining "formula areas" for Indian Housing Block Grants to Tribes to include Department of the Interior Near-Reservation Service Areas and Congressionally Mandated Service Areas, among others, and providing that such areas may be expanded to include *any other off-reservation areas where the Tribe has provided substantial housing services*) (emphasis added); 25 U.S.C. § 1521 (establishing a grant-making program to allow to tribes to "establish and expand profit-making Indian-owned enterprises *on or near reservations*") (emphasis added); 25 U.S.C. § 741 (authorizing grants

Because a tribe's PRCDA, not its reservation, is the most accurate geographic description of the area within which a tribe provides health care and other governmental services to its members and beneficiaries, those tribal services are severely impacted by the flow of opioids into its PRCDA. Further, since most tribal lands are held in trust by the United States, a substantial share of opioids reaching even tribal citizens who live on reservation are secured from private pharmacies located immediately off reservation lands but within PRCDA areas. The ARCOS data regarding opioid distribution in PRCDA counties is thus directly relevant to the tribal claims and to the identification of proper defendants for purposes of amending tribal complaints.

To be clear, the Tribes are not seeking expanded access to ARCOS data on a theory that tribal members residing away from tribal lands frequently travel from their place of residence in order to take advantage of tribal governmental services, or that prescription opioids are known to migrate, legally or not, from one jurisdiction or another once dispensed.  While both propositions are true (and likely to a heightened extent for Tribes), the Tribes understand that these factors are common to all governmental plaintiffs in the MDL.  Rather, the basis for the Tribes' request is that, unlike other governments, *tribal service areas themselves* routinely—and by federal regulation—extend beyond a Tribe's reservation lands.  As a result, limiting the Tribes' access to

---

to tribes for "vocational rehabilitation services for American Indians who are individuals with disabilities residing *on or near . . . reservations*") (emphasis added); 25 U.S.C. § 1931(a) (authorizing grants to tribes and tribal organizations to administer "Indian child and family service programs *on or near reservations*") (emphasis added); 45 C.F.R. § 1355.20 (allowing a tribal authority to license child care institutions and foster family homes "*on or near an Indian reservation*") (emphasis added); 45 C.F.R. 98.61 (allocating Child Care and Development Block Grant funds to tribes based partially on "the number of all Indian children living *on or near tribal reservations* or other appropriate area served by the tribal grantee") (emphasis added); 25 U.S.C. § 1644(a) (instructing the Secretary of the Interior to make grants and/or compact with tribes and tribal organizations to support programs "*on or near reservations* and trust lands" that assist individual Indians with enrolling for health benefits and paying coverage costs) (emphasis added); 25 U.S.C. § 1680(h) (instructing the Secretary of the Interior to make grants to tribes for the development and testing of the assumption by the tribe of health care delivery systems for members of the tribe "living on or near the reservations") (emphasis added); *and* 7 C.F.R. § 250.2 (authorizing tribal organizations to distribute donated food "*on, or near, Indian reservations*") (emphasis added).

ARCOS data to only those counties that are "included, in whole or in part, within [the Tribe's] territorial boundaries," as the current Order does, provides Tribes with only partial ARCOS data relative to their actual geographic service areas, thus limiting the utility of that data and putting the Tribes at a unique disadvantage in this litigation.

The recognition in federal law of PRCDA's is a partial response to the fact that a large number of Tribal members and other beneficiaries of tribal governmental services live outside of reservation boundaries.  This has resulted from a number of historical factors including the illegal confiscation of tribal and treaty-protected lands and other nonconsensual diminishments of tribal reservation boundaries; periods of forced removal and assimilation; the failure of the United States to live up to treaty obligations to provide basic services and infrastructure on reservation lands; and the extreme remoteness and lack of economic opportunity on many reservation lands.  It is critically important to Tribes to continue to provide governmental services to members of their communities who live outside of reservation boundaries, and for those individuals to maintain their close ties to their Tribe and access to culturally appropriate services.

Tribes, as governments, are unique in the extent to which the operation of their governmental programs routinely extends beyond their territorial boundaries to those who live

"near" but not "on" reservations, as recognized in both statute[6] and regulation.[7]  This feature of tribal governments, of course, has implications for this litigation and for the use of ARCOS data in particular.  Although it is difficult to capture the full scope of tribal governmental services through defined geographic areas, PRCDAs provide a fair, reasonable, and objective basis on which to do so.  PRCDAs are tied directly to the provision of health care services to AI/AN beneficiaries through the Indian health care system, are defined by a federal agency through public rulemaking procedures and published in the Federal Register, and provide a reasonable sand reasonably *limited* estimation of the geographic area actually served by the tribal government.

For these reasons, the Tribal Plaintiffs respectfully submit that use of PRCDAs to define access to county-level ARCOS data for Tribes would be the best way to address the problem of incomplete and inaccurate data currently being encountered by the Tribes, and provide more

---

[6] *See, e.g.*, 26 U.S.C. § 45A(c)(1) (requiring that qualified employees—for purposes of the Indian Employment Credit—must live "on or near the reservation in which the services are performed"); 20 U.S.C. § 1411(h)(2) (protecting services for "Indian children with disabilities residing on or near reservations"); 25 U.S.C. § 1068(a) (allowing waiver of certain requirements for institutions located on or near an Indian reservation where waiver "will substantially increase higher education opportunities appropriate to the needs of American Indians"); 25 U.S.C. § 2007(f) (defining an "eligible Indian student" as one who "resides on or near a reservation or meets the criteria for attendance at a Bureau off-reservation home-living school," among other factors); *and* 25 U.S.C. § 309 (authorizing the Secretary of the Interior to establish a vocational training programs for Indians residing "on or near" a reservation).  *See also Morton v. Ruiz*, 415 U.S. 199, 230 (1982) (holding that Congress had not ratified the Bureau's interpretation that its service area excluded Indians living off reservations), *codified at* 25 U.S.C. § 13 note.

[7] *See, e.g.*, 34 C.F.R. § 371 (explaining that the American Indian Vocational Rehabilitation Services program serves only those "American Indians with disabilities who live on or near Federal or State reservations"); 25 C.F.R. § 23.109 (instructing state courts to consider "[l]ength of past domicile or residence on or near the reservation of each Tribe" when determining which Tribe an Indian child belongs to under ICWA); 25 C.F.R. §273.12 (prioritizing educational contracts serving "Indian students on or near reservations" under the Johnson-O'Malley Act); 20 C.F.R. § 668.400 (explaining that the supplemental youth services program serves "Native American youth on or near Indian reservations"); 25 C.F.R. § 26.5 (requiring that applicants for BIA job placement and training reside "on or near an Indian reservation or in a service area, or in the agreed contract area"); 25 C.F.R. § 87.9 (listing "the percentage of tribal members residing on or near the subject reservation" as a factor to consider when assessing a tribal programming proposal using Indian Judgment Funds); 25 C.F.R. § 635.117 (protecting preferential employment for "Indians living on or near a reservation"); *and* 41 C.F.R. §60-1.5 (defining "near" as "all that area where a person seeking employment could reasonably be expected to commute to and from in the course of a work day").

equivalent access for the Tribes as compared with other governmental plaintiffs.  Further, Tribal Plaintiffs believe that the additional ARCOS data can be provided to counsel for the Tribes promptly enough so that no extension of the Court's current deadline for amending tribal complaints will be necessary.[8]

WHEREFORE, Tribal Plaintiffs respectfully request that this Honorable Court grant their Motion to Modify the Court's Consolidated ARCOS Protective Order of April 12, 2019 (ECF Doc. 1545), to provide for the distribution to counsel for Native American Tribes the SLCG Processed ARCOS data and county level reports, as enumerated in that Order, for all counties comprising the Purchased/Referred Care Delivery Area of the Tribe as identified in Exhibit A to this Motion.  A form of proposed Order accompanies this Motion.

|  |  |
|---|---|
| Respectfully submitted, | **Plaintiffs' Tribal Leadership Committee** |
|  | **Robins Kaplan LLP** |
|  | By: *s/   Timothy Q. Purdon*<br>Timothy Q. Purdon<br>1207 West Divide Avenue, Ste. 200<br>Bismarck, ND 58503<br>T: (701) 255-3000<br>F: (612) 339-4181<br>TPurdon@RobinsKaplan.com |
|  | Tara D. Sutton<br>Holly H. Dolejsi<br>800 LaSalle Avenue, Ste. 2800<br>Minneapolis, MN 55402<br>T: (612) 349-8500<br>F: (612) 339-4181<br>TSutton@RobinsKaplan.com<br>HDolejsi@RobinsKaplan.com |

---

[8] Pursuant to this Court's Opinion and Order dated April 4, 2019, non-bellwether tribal plaintiffs must file their Short-Form Amended Complaints no later than 60 days after the Court's final ruling on the pending Motions to Dismiss the complaints of the two Bellwether Tribal Plaintiffs. (ECF Doc. 1515.)  The Court has not yet issued that final ruling.

Brendan V. Johnson
140 North Phillips Avenue, Ste. 307
Sioux Falls, SD 57104
T: (605) 335-1300
F: (612) 339-4181
BJohnson@RobinsKaplan.com

and

**Sonosky, Chambers, Sachse,
Miller & Monkman, LLP**
725 East Fireweed Lane, Suite 420
Anchorage, Alaska  99503
Telephone:  (907)258-6377
Facsimile:    (907)272-8332

And

**Keller Rohrback L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
P: 206.623.1900
F: 206.623.3384

And

**Hobbs Straus Dean & Walker**
516 SE Morrison Street
Suite 1200
Portland, OR 97214
Tel: 503.242.1745
Fax**:** 503.242.1072

And

**GILBERT LLP**
1100 New York Ave., NW
Suite 700
Washington, DC 20005
Tel: 202-772-2200

And

**Lieff Cabraser Heimann & Bernstein, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111

9

Phone: 415-956-1000
Fax: 415-956-1008

And

**Levin Papantonio**
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
And

**Domina Law Group**
2425 South 144th Street
Omaha, NE 68144
Telephone: (402) 493-4100
Facsimile: (402) 858-9212

And

**Skikos, Crawford, Skikos & Joseph, LLP**
One Sansome Street
Suite 2830
San Francisco, CA 94104
Telephone: (415) 546-7300
Facsimile: (415) 546-7301

And

**Frazer PLC**
1 Burton Hills Blvd.
Suite 215
Nashville TN 37215
Telephone: (615) 647-6464

**CERTIFICATE OF SERVICE**

I hereby certify that on 7th day of June, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtain through, the Court CM/ECF Systems.

<u>*s/ Timothy Q Purdon*</u>
Timothy Q. Purdon