# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) **MDL 2804**<br>)<br>) **Case No. 1:17-md-2804**<br>) |
| **THIS DOCUMENT RELATES TO:** | )<br>) **Judge Dan Aaron Polster**<br>) |
| *Muscogee (Creek) Nation v.*<br>*Purdue Pharma L.P., et al.*<br>Case No 1:18-op-45749 | )<br>) **OPINION AND ORDER**<br>)<br>) |
| *The Blackfeet Tribe of the Blackfeet Indian*<br>*Reservation v.*<br>*AmerisourceBergen Drug Corporation, et al.*<br>Case No. 1:18-op-45749 | )<br>)<br>)<br>)<br>) |

        This matter is before the Court upon the Reports and Recommendations ("R&Rs") of the

United States Magistrate Judge in the above captioned cases. **Doc. ##: 1499; 1500**. On April 29, 2019

Manufacturer, Generic Manufacturer, Distributor, and Pharmacy Defendants (collectively

"Defendants") filed objections to various portions of both R&Rs.[1] On May 9, 2019, Plaintiffs The

Blackfeet Tribe of the Blackfeet Indian Reservation ("Blackfeet Tribe" or "Tribe") and Muscogee

(Creek) Nation ("Muscogee Nation" or "Nation") (collectively "Plaintiffs") filed responses to the

---

[1] The Magistrate Judge does a comprehensive summary of the various defendants and claims in the R&Rs. *See* Doc. #: 1499 at 3-7; Doc. #: 1500 at 1-3. For this opinion, the referenced categories of defendants correspond to those defendants who filed, joined, or were included in each separately filed objection. *See* Doc. #: 1582 (Pharmacy Defendants' Objection to the R&R re Blackfeet); Doc. #: 1585 (Distributor Defendants' Objection to the R&R re Muscogee); Doc. #: 1586 (Pharmacy Defendants' Objection to the R&R re Muscogee); Doc. #: 1587 (Generic Manufacturer Defendants' Objection to the R&R re Blackfeet); Doc #: 1588 (Distributor Defendants' Objection to the R&R re Blackfeet); Doc #: 1589 (Associated Pharmacies, Inc.'s Joinder re Distributor Defendants' Objection to the R&R re Blackfeet); Doc. #: 1590 (Manufacturer Defendants' Objection to both R&Rs re both plaintiffs); Doc. #: 1592 (Generic Manufacturer Defendants' Objection to the R&R re Muscogee). Blackfeet also filed an Objection to the R&R, Doc. #: 1591, but subsequently withdrew its objections. Doc. #: 1602.

objections. Doc. ##: 1624; 1625. Upon a *de novo* review of the record, and for the reasons set forth below, the Court **ADOPTS** the Reports and Recommendations with respect to all recommendations except for those regarding Plaintiffs' negligence per se claims. The Court **OVERRULES** the R&R with respect to its findings and recommendations on Plaintiffs' negligence per se claims.

There are many similarities between the claims presented by Plaintiffs and the arguments brought by Defendants in the above captioned cases and the claims and arguments advanced in the *Track One* Cases. Collectively herein, the Magistrate Judge's *Summit County* R&R, Doc. #: 1025, and the Court's Opinion and Order adopting-in-part and rejecting-in-part that R&R, Doc. #: 1203, are referred to as the "*Track One* Orders." The Court understands and appreciates that in an effort to minimize duplicative briefing, Defendants rely upon each other's assertions and arguments to fully explain their positions. Therefore, for the sake of simplicity, this opinion refers to the Muscogee Nation and the Blackfeet Tribe collectively as "Plaintiffs," and refers to all Defendants collectively as "Defendants." In those instances where an argument or assertion necessarily pertains only to a specific party, that party is referred to individually. Additionally, The Blackfeet R&R, Doc. #: 1500, incorporates the Muscogee R&R, Doc. #: 1499, by reference. In many instances, Defendants present the same arguments in their objections to both R&Rs. Thus, to the extent that it can, the Court will address Defendants' arguments by referring generally to both R&Rs (even though it may cite only to one), and by referring only to the Objection that the Court believes best makes Defendants' argument.

## I.    SUFFICIENCY OF THE PLEADINGS

### A. Sufficiency of Pleadings, Pleading Fraud, and Group Pleading

#### 1. Federal Rules of Civil Procedure 8 and 9

Generic Manufacturers assert that Plaintiffs rely on improper group pleading and that the R&Rs failed to dismiss Plaintiffs' claims on this ground. Defendants' arguments meander confusingly through three distinct but interwoven areas of pleading jurisprudence: Rule 8's plausibility standard,

Rule 9's particularity standard, and the concept of group pleading, which is borrowed from securities litigation.

Federal Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As refined by the Supreme Court, this short and plain statement need only provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Federal Rule 9 requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "The sufficiency of a fraud pleading tends to vary with the complexity of the transaction in question in the litigation. When the issues are complicated or the transactions cover a long period of time, a number of federal courts have required less of the pleader." Charles Alan Wright *et al*, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.); *see also, cf., United States v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017) (describing that "'particular' allegations of fraud may demand different things in different contexts."). The Sixth Circuit has relaxed pleading standards in certain contexts to aid in judicial efficiency. *See, e.g., U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007) (describing how "pleading every instance of fraud would be extremely ungainly, if not impossible" in situations where allegations are "complex and far-reaching.").

"Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Saltire Indus., Inc. v. Waller, Lansden, Dortch & Davis, PLLC*, 491 F.3d 522, 526 (6th Cir. 2007) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006)). That is, when considering Rule 9's particularity requirement, "'a court

must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8.'" *Id.* Thus, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." *Williams v. Duke Energy Intern., Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

The Magistrate Judge's analysis with respect to the sufficiency of Plaintiffs' pleading strikes the appropriate balance between simplicity and particularity. Therefore, the Court **ADOPTS** the R&Rs analysis and recommendations regarding the sufficiency of Plaintiffs' pleadings. Plaintiffs have met the pleading standard for its diversion claims and for those sounding in fraud.

### 2. **Group Pleading**

Generic Manufacturers also assert that Plaintiffs' complaints rely on improper "group pleading," and for that reason lack the requisite particularity required under Rule 9. The group pleading doctrine (or sometimes "group-published" doctrine) acts as a recognized exception to Rule 9's particularity requirement within the context of securities litigation. It is not entirely clear why Defendants invoke the doctrine under these circumstances. "[The group pleading] exception is premised on the assumption that '[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers.'" *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 689 (6th Cir. 2005) (quoting *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987)). The doctrine is not recognized in all circuits, and the Sixth Circuit has expressly not decided the "viability of the group-published doctrine" within this circuit. *Id.*

Even assuming that the group pleading doctrine applies in the Sixth Circuit, and that it applies outside of the securities litigation context, the point would be purely academic. The Court determined above that Plaintiffs have met Rule 9's particularity requirement. There is no need to speculate whether the group pleading exception ought to apply in this case.

To the extent Defendants raise the issue of group pleading as a proxy for their assertion that Plaintiffs are required to separately reiterate their allegations against each defendant individually, the R&Rs appropriately analyze this issue within the overarching framework of the Federal Rules described above. *See* Doc. #: 1499 at 25-26 ("Those decisions [cited by Defendants] do not stand for the proposition that where [all of the] multiple defendants are alleged to have engaged in the same pattern of conduct or conspired in a fraudulent scheme, that a plaintiff must reiterate its allegations against each defendant individually. Such a finding would exponentially increase the length of pleadings while adding no substantive value."). Accordingly, the Court **ADOPTS** the R&Rs with respect to the sufficiency of Plaintiffs' pleadings.

### B. The Blackfeet Tribe's Dispensing-Related Claims

Pharmacies assert that the Blackfeet Tribe expressly disavowed its dispensing-related claims against Pharmacies as retailers, and that the R&R erred by not directly addressing this alleged disavowal. In its omnibus opposition brief to Defendants' motions to dismiss, the Tribe writes: "Plaintiff does not allege violations of statutes or regulations applicable specifically to retailers who sell opioids." Doc. #: 1017, Blackfeet Omnibus Opp. at 92. Out of context, this sentence does appear to indicate that the Tribe intends to abandon its claims against the pharmacies in their capacity as retailers. However, two sentences later, the Tribe writes: "In addition, the Pharmacy Defendants are liable for their role in the supply chain as retailers under the same theories as apply to their role as distributors." *Id.* at 93. The first sentence quoted above is ambiguous, but the second sentence clearly states the Tribe's intent. Whatever the first sentence means, it is clear within the context of the rest of

the section that the Tribe did not intend for it to be read as a disavowal of its claims against Pharmacies as retailers.

Pharmacies also assert that even if the Tribe has not disavowed its claims against them as retailers, the Tribe has not alleged sufficient facts to support their claims against the Pharmacies. Regarding the Pharmacies' additional assertions that the Tribe has not alleged sufficient facts to support claims against them in their capacity as retailers, the Court concurs with and **ADOPTS** the Magistrate Judge's analysis. *See* Doc. #: 1500 at 30-32.

## II. CAUSATION

### A. "Sole Efficient Legal Cause" Doctrine

Pharmacies assert that the Muscogee R&R did not address Oklahoma's "sole efficient legal cause" doctrine. They assert that the Muscogee R&R erred in its reliance on the Court's prior analysis in the *Track One* cases because Ohio does not have a doctrinal equivalent to Oklahoma's "sole efficient legal cause" doctrine. Pharmacies allege that under Oklahoma law, the "sole efficient legal cause" doctrine requires that there can be "no proximate causation—as a matter of law—for the intentional misuse of an intoxicating and addictive substance." Doc. #: 1586, Pharm. Obj. at 14 (citing *McClelland v. Harvie Kothe-Ed Rieman, Post No. 1201, Veterans of the Foreign Wars of U.S., Inc.*, 770 P.2d 569 (Okla. 1989); *Prince v. B.F. Ascher Co., Inc.*, 90 P.3d 1020 (Okla. Civ. App. 2004)).

First, Oklahoma's "sole efficient legal cause" doctrine is simply another name for the tort concept that there can be no liability if there are intervening or superseding events that break the causal chain. This concept was addressed in the *Track One* R&R. Defendants' arguments were considered and rejected by the Magistrate Judge and his recommendations were adopted by the Court.

Second, Pharmacies rely on *McClelland* and *Prince* for their assertion that the intentional misuse of an intoxicating substance insulates a seller from civil liability. Pharmacies' reliance is misplaced. Their assertion is drawn from a section of the *McClelland* opinion where the Oklahoma

Supreme Court describes the history of the court's jurisprudence prior to its holding in *Brigance v. Velvet Dove Rest., Inc.*, 725 P.2d 300 (Okla. 1986). In *Brigance*, the Oklahoma Supreme Court articulated the appropriate test to determine when an intervening event will cut off liability. "In Oklahoma, the test to determine whether a cause is supervening is whether it is: '(1) independent of the original act, (2) adequate of itself to bring about the result and (3) one whose occurrence was not reasonably foreseeable.'" *Brigance*, 725 P.2d at 305 (quoting *Thompson v. Presbyterian Hosp., Inc.*, 652 P.2d 260, 264 (Okla.1982)).

Under Oklahoma law, "the question of proximate cause is one for the jury." *Prince*, 90 P.3d at 1029 (citing *Thompson*, 652 P.2d at 263). Therefore, regarding the first prong of the *Brigance* test, the Court concludes that whether a Nation member's intentional misuse of opioids is independent of the Defendants' alleged failure to prevent diversion is a question of fact. Regarding the second prong, it is difficult to say that without an unreasonably large number of diverted opioid pills available, enough individual Nation members could have misused enough appropriately monitored and controlled pills to have created the opioid crisis by themselves. Even if every opioid user did, in fact, misuse their pills, had there been fewer available to misuse, perhaps this crisis could have nevertheless been averted. Finally, regarding the third prong, and as thoroughly discussed in the *Track One* Orders, the Muscogee Nation member's collective misuse of opioids is a reasonably foreseeable result of Defendants' alleged failure to prevent diversion. Thus, the misuse of opioids in this case does not insulate—as a matter of Oklahoma law—Pharmacies from civil liability under the "sole efficient legal cause" doctrine and fails at least the foreseeability prong (and possibly all three prongs) of the *Brigance* test to determine whether such misuse is a supervening cause.

### B. Oklahoma's Learned Intermediary Doctrine

In the *Track One* cases, claims were only brought against Pharmacies in their capacity as distributors. Here, Plaintiffs have brought claims against Pharmacies both in their capacity as

distributors and in their capacity as dispensaries or retailers. Pharmacies assert that the Muscogee R&R erred generally by not considering the sufficiency of the Nation's claims against Pharmacies as dispensaries, and specifically by not considering the applicability of the learned intermediary doctrine as it applies to pharmacies under Oklahoma law. The parties agree that the learned intermediary doctrine, as understood under Oklahoma law, is described in the Oklahoma appellate court's opinion in *Carista v. Valuck*, 394 P.3d 253 (Okla. Civ. App. 2016).[2] Pharmacies assert that, for the Nation to maintain its claims against them as dispensaries under Oklahoma law, the Nation "must allege facts sufficient to show that the prescription was 'unreasonable on its face.'" Doc. #: 1586, Pharm. Obj. at 6-7 (quoting *Carista*, 394 P.3d at 256-57). And, Pharmacies assert, absent such a showing, the learned intermediary doctrine serves to break the chain of causation with respect to them.

"As a general rule the question of proximate cause is a question of fact for the jury." *Lefthand v. City of Okmulgee*, 968 P.2d 1224, 1226 (Okla. 1998), *as corrected* (Oct. 29, 1998) (citing *Thompson*, 652 P.2d at 263). In *Carista*, an Oklahoma appellate court concluded that the learned intermediary doctrine can be applied to "shield pharmacists from being required to 'second guess' a physician's medical decisions embodied in an otherwise authorized and legally made prescription."[3] *Carista*, 394 P.3d at 256. The *Carista* court also recognized an exception to the doctrine's application to pharmacists when a pharmacist fills a prescription that is, "unreasonable on its face." *Id.*

Pharmacies cite *Carista* for the proposition that "a doctor's prescribing decision cuts off pharmacy liability *unless* the prescription was 'unreasonable on its face.'" Doc. #: 1586, Pharm. Obj.

---

[2] The Nation concedes that *Carista* governs the application of the learned intermediary doctrine and its exceptions to pharmacists in Oklahoma. *See* Doc. #: 1008, Muscogee Omnibus Opp. at 57 (citing *Carista* for its stated "unreasonable on its face" exception further described below).

[3] The *Carista* court notes that the learned intermediary doctrine has traditionally been applied in Oklahoma to shift the duty to warn end users of the hazards of pharmaceutical products from the manufacturer to the doctor (i.e., the "learned intermediary"). *See Carista*, 394 P.3d at 256. ("it is the duty of a drug manufacturer to inform a physician of known hazards, side effects, and interactions of prescription drugs, and the duty of the physician, not the manufacturer, to relay this information to the patient.").

at 8 (emphasis in original). Pharmacies' assertion presupposes that the learned intermediary doctrine automatically shields pharmacists from liability unless the exception applies. However, that was not the holding in *Carista*. The *Carista* court expressly recognized that the learned intermediary doctrine does not automatically apply. The court concluded that "as we have identified in this opinion, although the immunity granted by the 'learned intermediary' doctrine and other Oklahoma statutes is broad, it is not absolute." *Carista*, P.3d at 259. A more appropriate understanding of the *Carista* court's holding is: *When* a court concludes that the learned intermediary doctrine applies, *then* liability is cut off *unless* the pharmacy fills prescriptions that are facially unreasonable. Here, the Court is not convinced that the learned intermediary doctrine applies to the causal chain that has been alleged by the Muscogee Nation.

The Nation has alleged that Marketing Defendants falsely marketed opioids to sell more than the legitimate medical market could support; Diversion Defendants (including retail pharmacies) distributed (and dispensed) these opioids in a manner that failed to control their oversupply; and as a result, the Nation incurred significant costs. *See* Doc. #: 1008, Muscogee Omnibus Opp. at 51 (citing Doc. #: 731, Muscogee FAC). As the Muscogee R&R correctly identifies, the Court has already considered and rejected Defendants' arguments, generally, with respect to the learned intermediary doctrine in the *Track One* case. *See* Doc. #: 1499 at 63. The Court concluded in the *Track One* Orders that *Track One* Plaintiffs had alleged facts sufficient to support a causal chain similar to that alleged by the Nation here. *See* Doc. #: 1203 at 9-10. Pharmacies do not explain how the Nation's alleged causal chain differs from that of the *Track One* Plaintiffs' or what role, if any, the learned intermediary doctrine plays in this alleged causal chain.

Pharmacies' objection points out that the Court's conclusion regarding the learned intermediary doctrine in the *Track One* cases was premised, at least in part, on Manufacturers'

deceptive marketing practices specifically targeting doctors. *See* Doc. #: 1025 at 30 ("The court declines to find that the physicians' act of writing prescriptions breaks the causal chain, as a matter of law, when the very purpose of the Defendants' alleged scheme was to achieve exactly that result."). Pharmacies assert that because the Nation does not allege that Pharmacies played any role in the Manufacturers' alleged scheme to deceive doctors, that the learned intermediary doctrine ought to still insulate them from liability. However, the extent to which Pharmacies knew about and took advantage of Manufacturers' alleged scheme to deceive doctors is a question of fact which Plaintiffs will need to prove.

Even if the Court were to conclude that the learned intermediary doctrine applies to the Pharmacies in this case, then the Court would need to determine whether *Carista's* "unreasonable on its face" exception should apply. The Nation has alleged that "prescriptions [were] written in excess of the amount needed for proper therapeutic purposes." Doc. #: 731, Muscogee FAC at ¶176. This is sufficient to put Pharmacies on notice that at least some of the prescriptions they filled are alleged to have been facially unreasonable. The Court concludes that the Nation has alleged that at least some of the prescriptions filled by Pharmacies were unreasonable on their face. Whether those prescriptions were, in fact, unreasonable is also a question of fact that Plaintiffs will need to prove.

### C. Oklahoma's "Innocent Seller" Statute

Distributors object to the Muscogee R&R's conclusion that Distributors owe the Nation a duty, either created by statutory obligation or under the common law. In Oklahoma, as in the *Track One* jurisdiction, "foreseeability of harm" is the touchstone for determining whether a defendant owes a common law duty of care. *See Lowrey v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007); *see also* Okla. Stat. Ann. tit. 76 § 1 (2018). The Muscogee R&R correctly identifies that these arguments are not novel and have been considered and rejected in the *Track One* Orders. Therefore, the Court declines Distributors' invitation to consider them again now.

10

Distributors also assert that the R&R erred in its conclusion that Oklahoma's "innocent seller" statute does not displace the Nation's common law negligence claim. Oklahoma's "innocent seller" statute states:

A product seller other than a manufacturer is liable to a claimant on the basis of negligence if the claimant establishes that:
1. The product seller sold the product involved in such action;
2. The product seller did not exercise reasonable care:
   a. in assembling, inspecting, or maintaining such product, or
   b. in passing on warnings or instructions from such product's manufacturer about the dangers and proper use of such product; and
3. Such failure to exercise reasonable care was a proximate cause of the harm complained of by the claimant.

Okla. Stat. tit. 76, § 57.2(G).

The Muscogee R&R recognizes that in Oklahoma, a manufacturer or seller can be liable for an allegedly defective product under several different theories of liability. Thus, the Muscogee R&R, as the *Track One* Orders did, draws an appropriate distinction between a product liability claim alleging a negligence theory and claim alleging a non-product liability theory of negligence. The Muscogee R&R also correctly identifies that the Nation has sufficiently alleged a non-product liability negligence theory. Therefore, the Court agrees with the Magistrate that Distributors have not provided any reason for the Court to conclude that the "innocent seller" statute ought to displace the Nation's non-product liability negligence theory and bar the Nation's claim. The Court, thus, **ADOPTS** the Muscogee R&R with respect to these findings based on Oklahoma law.

## III. ERIE DOCTRINE PRINCIPLES

Defendants assert that the Magistrate Judge erred by incorrectly applying *Erie* principles to several different state law issues. Where a state's highest court has not addressed a specific issue, the Court "must predict how the court would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). To make this "*Erie* guess," the

Court may rely on, for example, "'the decisions (or dicta) of the [state] Supreme Court in analogous cases, [and] pronouncements from other [lower state] courts.'" *S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citing *In re Amazon.com, Inc., Fulfillment Ctr. Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 852 F.3d 601, 610 (6th Cir. 2017)). The Court may also "exercise [its own] judgment based upon applicable principles of state law, upon relevant decisions in other jurisdictions, and upon [its] own conceptions of sound and just rules." *Winston Corp.* v. *Cont'/ Cas. Co.,* 508 F.2d 1298, 1304 (6th Cir. 1975).

The Sixth Circuit has instructed that "[w]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path." *Combs v. Int'l Ins. Co.,* 354 F.3d 568, 575-577 (6th Cir. 2004) (internal quotation marks and citation omitted). However, the Court is also obliged to follow the states' laws governing the interpretation of their own respective statutes. Thus, the appropriate balance is one that avoids greatly expanding liability, restricts liability when such a restriction is reasonable, and in any event, uses the state's own rules of statutory interpretation.

In Oklahoma, "[i]t is a well established rule of statutory construction that statutes are to be construed according to the plain and ordinary meaning of their language." *Wallace v. State*, 935 P.2d 366, 369 (Okla. 1997) (citing Okla. Stat. Ann. tit. 25, § 1) "A statute must be held to mean what it plainly expresses and no room is left for construction and interpretation where the language employed is clear and unambiguous." *Id.* (quoting *Abshire v. State,* 551 P.2d 273, 274 (Okla. Crim. 1976)). Similarly, in Montana, "[w]hen interpreting a statute, [courts] look first to the plain meaning of its words. When the statute is plain, unambiguous, direct and certain, the statute speaks for itself and there is no need to resort to extrinsic means of interpretation." *In re Marriage of Christian*, 983 P.2d 966, 968 (Mont. 1999) (citing *State v. Asmundson*, 940 P.2d 104, 106–07 (Mont. 1997). "In the

construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Mont. Stat. Ann. 1-2-101.

Defendants have identified three areas of law where they assert neither the Oklahoma nor the Montana Supreme Courts have ruled: 1) whether Montana or Oklahoma law authorizes Plaintiffs to recover the costs of providing public services (the "free public services doctrine" or "municipal cost recovery rule"); 2) whether either state's law recognizes Plaintiffs' "negative externalities" theory of unjust enrichment; and 3) whether either state's law will find a products-based nuisance claim cognizable. For each of these areas, Defendants assert that the R&Rs incorrectly predicted how the Oklahoma and Montana Supreme Courts would rule.

### A. Municipal Cost Recovery Rule

Defendants contend that Oklahoma and Montana law regarding the municipal cost recovery rule differ from the Ohio law, and therefore, that both R&Rs erred by applying the reasoning and conclusion from the *Track One* Orders. They assert that "Ohio is one of the few states that has declined to adopt that common law doctrine," whereas "no Oklahoma or Montana case or statute [exists] abrogating those principles or creating any exception." Doc. #: 1590, Man. Obj. at 14. Defendants also suggest that the Court's conclusion in the *Track One* Orders was based only on the narrow issue of whether the rule prevented Plaintiffs' recovery under the Racketeer Influenced and Corrupt Organizations ("RICO") and did not analyze recovery under state tort law.

Plaintiffs respond by saying that, while there is no case that rejects the municipal cost recovery rule in either jurisdiction, there is also no case that expressly adopts the rule. Plaintiffs assert that, so long as the Court must look to jurisdictions outside Oklahoma and Montana for guidance, the Court should reasonably refer to cases that are directly on point, such as *City of Everett v. Purdue Pharma*

13

*L.P.*, No. C17-209RSM, 2017 WL 4236062, at *7 (W.D. Wash. Sept. 25, 2017) and *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018), and not to the factually non-analogous cases cited by Defendants.

Plaintiffs' suggestion seems more reasonable under the circumstances. In addition to the cases cited by Plaintiffs—although the Court notes none are binding precedent—the Court observes that other jurisdictions' lower courts have rejected the application of the municipal cost recovery rule. *See, e.g.*, *State ex rel. Jennings v. Purdue Pharma L.P.*, No. CV-N18C-01-223-MMJ-CCLD, 2019 WL 446382, at *6 (Del. Super. Ct. Feb. 4, 2019) ("The Court finds that the municipal cost recovery rule does not apply in this case. In five separate courts, and in the multi-district federal litigation based in Ohio, judges have rejected the notion that the municipal cost recovery rule bars recovery for public costs."). The current trend among state court judges ruling in opioid-related cases around the country is that the municipal cost recovery rule does not apply when, as alleged here, an ongoing and persistent course of intentional misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal, county, or in this case, tribal services. The Court concludes that the Oklahoma and Montana high courts would likely follow this trend and reject the municipal cost recovery rule's application to Plaintiffs' state law claims.

### B. Unjust Enrichment

As in the *Track One* cases, Plaintiffs here each assert, generally, that Defendants made substantial sums of money providing Plaintiffs' members with opioids, and in doing so, caused grievous societal harms ("negative externalities"). Plaintiffs assert that substantial costs were incurred by them in mitigating these "externalities," and that, as a result, it would be unjust for Defendants to retain these substantial profits while Plaintiffs' incur substantial costs from their efforts to mitigate and remediate the harm. The R&Rs correctly analyzed the elements of unjust enrichment law in

14

Montana and Oklahoma and concluded that Defendants presented no persuasive reason to depart from the Court's prior analysis and holding in the *Track One* Orders. Defendants do not object to the Magistrate Judge's statements of the law, but only to his conclusions that the Montana and Oklahoma Supreme Courts would ultimately recognize Plaintiffs' "negative externalities" theory of liability. Defendants' assert that 1) Oklahoma and Montana do not currently recognize a "negative externalities' theory of liability, and 2) by concluding that the state supreme courts would recognize such a theory, the R&Rs greatly expanded liability beyond what Oklahoma or Montana law currently recognizes. Defendants assert that Plaintiffs have not identified any Oklahoma or Montana state law corollary to *White v. Smith & Wesson*, 97 F. Supp. 2d 816 (N.D. Ohio 2000), which according to Defendants uniquely established a broad theory of unjust enrichment liability in Ohio.

Unjust enrichment is an equitable doctrine. Montana and Oklahoma have an expansive view of the types of equitable circumstances that permit the use of unjust enrichment for recovery. *See, e.g.*, *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Dioceses of Great Falls/Billings*, 296 P.3d 450, 457 (Mont. 2013) ("[U]njust enrichment serves as a unifying principle for a wide variety of equitable claims."); *N.C. Corff P'ship, Ltd. v. OXY USA, Inc.*, 929 P.2d 288, 295 (Okla. Civ. App. 1996) (cert. denied) ("A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." (quoting 66 Am. Jur. 2d *Restitution and Implied Contracts* § 3 (1973)).

As described above, the Court may "exercise [its] judgment based upon applicable principles of state law, upon relevant decisions in other jurisdictions, and upon [its] own conceptions of sound and just rules." *Winston,* 508 F.2d at 1304. Here, applicable principles of Oklahoma and Montana state law permit a broad view of unjust enrichment liability to vindicate a wide variety of equitable

principles, and the Court's prior decisions in both the *Track One* cases and in *Winston* are relevant to making its decision. Thus, the Court concludes, as the R&Rs did, that Oklahoma and Montana would permit Plaintiffs' "negative externalities" theory of unjust enrichment and that doing so would not greatly expand liability under the current view of the law in those states.

Distributors also object to the R&Rs' alleged failure to consider its argument that the unjust enrichment claim is "entirely derivative of its other, legally deficient claims, and so should be dismissed as duplicative." Doc. #: 1588, Dist. Obj. at 9-10 (citing Doc. #: 924, Dist. Mot. to Dismiss at 27). Distributors' assertion, however, is conclusory, was provided with no rationale for such a finding, and need not have been addressed. It is not error for the R&Rs not to have done so.

### C. Nuisance

#### 1. **Product-Based Nuisance Claims Under Oklahoma and Montana Law**

The R&Rs rightly concluded, and it is uncontested by the parties, that the plain language of both the Oklahoma and the Montana nuisance statutes allows for nuisance claims other than strictly property-based claims. Defendants contend, however, that neither Montana nor Oklahoma has ever used its respective public nuisance statutes for anything beyond property-based nuisance claims, and that allowing Plaintiffs' nuisance claims to go forward will impermissibly expand liability under the states' nuisance laws. Plaintiffs assert, on the other hand, that foreclosing their nuisance claims will require the Court to ignore the plain language of both states' nuisance statutes.

Defendants assert that absent an authoritative signal that Oklahoma's and Montana's Supreme Courts would permit Plaintiffs' public nuisance claims, *Erie* principles prevent the Court from allowing Plaintiffs' claims. Sixth Circuit precedent, however, is not so uncompromising. The actual language from the Sixth Circuit is: "Without some authoritative signal from the state's legislature or judiciary, . . . federal courts in diversity cases 'should be extremely cautious about adopting "substantive innovation" in state law.' *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 195

16

(6th Cir. 2015) (quoting *Combs,* 354 F.3d at 575-577). Being "extremely cautious" about expanding liability under state law does not preclude the court from doing so; it just compels a high degree of careful consideration before doing so. Here, without express guidance from Montana or Oklahoma's high courts, the Court must look at "all the available data." *Allstate*, 249 F.3d at 454, and "exercise [its] judgment based upon applicable principles of state law." *Winston,* 508 F.2d at 1304. It is true that when the Court is given a choice between an interpretation that *reasonably* restricts liability and one which greatly expands liability, the choice is obvious under *Combs*. Here, however, Defendants' interpretation is not a reasonable restriction. Defendants' interpretation would entirely cut off liability for all non-property-based public nuisance claims despite the plain and ordinary meaning of the statutory text. Such an interpretation would be in direct conflict with Montana's and Oklahoma's statutory interpretation jurisprudence described above in Section III.

In the absence of controlling guidance from the Montana or Oklahoma Supreme Courts, the Magistrate Judge was squarely within his purview to review and consult the statutory text, the rules of statutory interpretation, decisions from other jurisdictions, and decisions from lower appellate and trial courts to get an overall picture of how decisions are made by the high courts of Montana and Oklahoma. The Court concurs with the Magistrate Judge's careful analysis of the available data and his conclusion comports with the applicable principles of the respective states' laws.

### 2. **Immunity from Authorized Activity**

Distributors assert that, under Montana law, "an activity or condition can be an absolute nuisance only if it is a nuisance even when performed or maintained without fault." Doc. #: 1588, Dist. Obj. at 6-7 (citing *Barnes v. City of Thompson Falls,* 979 P.2d 1275, 1278 (Mont. 1999)). Thus, they conclude, "the Tribe's nuisance claim is viable only if Distributors are at fault," and since they were authorized by statute to distribute opioids, they are not at fault and the Tribe's nuisance claim is not viable. *Id.* Defendants have distilled the thorough analysis of the Montana Supreme Court in

17

*Barnes* down to something unintelligible, which was unnecessary because the *Barnes* Court summarized its own analysis. The Montana Supreme Court concluded that "a statutorily authorized activity or facility cannot be a nuisance unless the plaintiff can show: (1) that the defendant completely exceeded its statutory authority, resulting in a nuisance; or (2) that the defendant was negligent in carrying out its statutory authority, resulting in a qualified nuisance." *Barnes*, 979 P.2d at 1280. Thus, to allege an absolute public nuisance, the Tribe needed only to allege that Distributors exceeded their statutory authority. The Tribe alleged that Distributors, among other things, caused the diversion of opioids by over-distributing, which goes beyond Distributors' statutory grant. Using Distributors' term, the Tribe has sufficiently alleged that Distributors are "at fault" due to their alleged distribution behavior that exceeded their statutory authority. It is this "fault' that makes the Tribe's nuisance claim viable. The Blackfeet R&R conducts a thorough and accurate analysis of Montana's immunity for statutorily authorized activities, and the Court concurs with that analysis. *See* Doc. #: 1500 at 26-28.

### 3. **Public Right**

Defendants object to the R&Rs conclusion that Plaintiffs sufficiently alleged interference with a public right. Defendants assert that the urgent public health crisis they allegedly created is a collection of individual rights and that "public health" and "public right" are not synonymous. Defendants assert that the R&Rs should have relied on *State v. Lead Industries Association, Inc.*, 951 A.2d 428 (R.I. 2008), a Rhode Island Supreme Court case, to influence its decision, but provide no reasoning as to why Oklahoma or Montana Supreme Courts might look to Rhode Island for guidance under the *Erie* principles described above. Defendants also assert that the R&Rs erred by not analyzing what a "public right" is as described by the Restatement (Second) of Torts § 821B.

Defendants conveniently overlook large portions of the Restatement. For example, the Restatement states that, at common law, "public nuisances included interference with the public

18

health." Restatement (Second) of Torts § 821B, cmt. (1979). Thus, "public health" has traditionally been considered a "public right." Further, "[i]t should be noted that in some states there are statutes defining a public nuisance to include interference with 'any considerable number of persons;' and under these statutes no public right as such need be involved." *Id.* As it happens, Montana and Oklahoma have such statutes. *See* Mont. Code Ann. § 27-30-102(1) (2017) ("A public nuisance is one which affects, at the same time, an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."); Okla. Stat. tit. 50, § 50-2 (2018) ("A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal."). The Court finds Defendants' objections to the R&Rs unpersuasive and concurs with the R&Rs' thoughtful analysis on the issue of public rights.

### 4. **Control Over The "Instrumentality of The Nuisance"**

The R&Rs found that the "creation and fueling of the illicit [opioid] market," and/or, "Defendants' conduct in carrying out their business activities" constitutes Plaintiffs' alleged instrumentality of the nuisance. Doc. #: 1499 at 57; Doc. #: 1500 at 31. As such, the R&Rs conclude, Defendants had control over the instrumentality of the nuisance by virtue of their control over their own opioid marketing, distribution, or dispensing practices.

The R&Rs description of the nuisance and the instrumentality of the nuisance are a little unclear. The Court takes the language quoted above from the R&Rs to mean that the nuisance is the condition of having more opioids free in circulation than are medically necessary (e.g. an illicit, secondary, or "black" market), and that defendants' conduct in carrying out their business activities is the instrumentality by which the nuisance was created and fueled. Distributors assert that, contrary to this conclusion, addiction and death is the nuisance and the physical opioid drugs causing the

19

addition and death are the instrumentality. Thus, Distributors conclude that, at the time of the addiction and death of Plaintiffs' members, Defendants no longer had control over the physical opioid pills themselves, and thus cannot be liable for nuisance. Distributors assert that the R&Rs' conclusion is "at odds with what the Complaint alleges." Doc. #: 1585, Dist. Obj. at 34. However, the R&Rs cite several passages from Plaintiffs' Complaints that specifically support their conclusion. *See, e.g.*, Doc. #: 1499 at 57-58. The Court does not agree with Distributors' proposed conception of Plaintiffs' alleged nuisance.

Distributors' essentially argue that the R&Rs did not, as Distributors attempt to do, place blame on the victims of opioid addiction. *See* Doc. #: 1585, Dist. Obj. at 8-9 (arguing "these FDA-approved medications . . . only [injure those who come in contact with, sell, or purchases them] when they are mis-prescribed and/or misused."). This assertion is especially alarming because it echoes one of the misrepresentations alleged to have been made by Defendants in causing this crisis. *See, e.g.*, Doc. #: 731, Muscogee FAC at 34-35. Thus, the Court concurs with and **ADOPTS** the analysis of the R&Rs.

## IV. RICO

### A. Whether Plaintiffs Are A "Person" Under RICO

The R&Rs concluded that Plaintiffs are "persons" within the meaning of RICO and therefore have standing to assert RICO claims. Doc. #: 1499 at 21-23. The Distributors disagree. Doc. #: 1585; Dist. Obj. at 2-3. They argue that Plaintiffs fail "to point to any 'affirmative showing of statutory intent' that overcomes the 'longstanding interpretive presumption that "person" does not include [a] sovereign.'" *Id.* (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780-81 (2000)). RICO establishes a civil cause of action to "[a]ny person injured in his business or property" by conduct proscribed by the Act. *See* 18 U.S.C. § 1964(c). "[A RICO] plaintiff only has standing if, and

can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 105 S.Ct. 3275, 3285 (1985).

The Distributors assert that the R&Rs' finding that the word "person" should be read broadly "to effectuate [RICO's] remedial purposes" cannot be reconciled with *Vermont Agency*. *See* Doc. #: 1499 at 22. But the Distributors reliance on *Vermont Agency* is inapposite. In *Vermont Agency*, Relator Stevens brought a *qui tam* action pursuant to the False Claims Act ("FCA") against his employer, the Vermont Agency of National Resources ("VANR"). *Vt. Agency*, 529 U.S. at 770. The Supreme Court granted certiorari to decide whether a State (or state agency) is a "person" that is subject to liability under the FCA. *Id.* The Supreme Court was hesitant to subject the States to the FCA's penalties without an affirmative showing of statutory intent and therefore construed "person" to exclude a State. *See id.* at 780-81. Although the Supreme Court did not reach the issue of whether subjecting States to FCA liability violated the Eleventh Amendment, the potential Eleventh Amendment implications in *Vermont Agency* distinguish it from this case.

Although generally the term "person" does not include a sovereign, "[t]he purpose, the subject matter, the context, the legislative history, and the executive interpretation of the statute are aids in construction which may indicate an intent, by the use of the term, to bring state or nation within the scope of the law." *United States v. Cooper Corp.*, 312 U.S. 600, 605 (1941). Congress provided a specific definition of the word "person" when used in RICO. Section 1961(3) defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." The Merriam-Webster dictionary defines an "entity" as "an organization (such as a business or governmental unit) that has an identity separate from those of its members."[4] Undoubtedly, an Indian Tribe is an "entity." Thus, applying the plain language of the statute and the common understanding

---

[4] https://www.merriam-webster.com/dictionary/entity

of the words therein, the definition of a "person" includes Plaintiffs. *See also Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1358 (9th Cir. 1988) (finding that a foreign sovereign is a "person" pursuant to RICO). Accordingly, the Court agrees with the R&Rs that Plaintiffs have standing to make a RICO civil claim.

### B. Sufficiency of Plaintiffs' RICO Allegations

The Pharmacies assert that the Muscogee Nation has not pled sufficient facts to put them on notice that they are liable as retailers under RICO. The Muscogee R&R concluded that "the entities identified in the FAC as both Pharmacies and Distributors are alleged to have engaged in both distribution and dispensing of prescription opioids." Doc. #: 1499 at 27. Pharmacies assert that the R&R misunderstood—and in doing so did not address—their argument that the Nation's RICO claim is based entirely on allegations related to distribution. Pharmacies' assertion is not well-taken.

The Muscogee R&R identified several paragraphs where the Muscogee FAC discusses Pharmacies' dispensing practices generally. Although these paragraphs are not found within Count II of the FAC alleging a violation of RICO by an Opioid Supply Chain Enterprise, the FAC expressly incorporates by reference "all other paragraphs in this Complaint as if fully set forth herein." Doc. #: 731, Muscogee FAC at ¶380. Furthermore, the FAC expressly alleges that the pattern of racketeering activity in the Opioid Supply Chain Enterprise includes violations of 63 Okla. State. tit. § 2-401(A)(1) due to Defendants' dispensing activity. *See id.* at ¶389 ("By turning a blind eye to diversion, Defendants aided and abetted the unlawful distribution *and dispensing* of prescription opioids." (emphasis added)). The Court **ADOPTS** the Muscogee R&R's conclusion regarding the Nation's allegations against Pharmacies as retailers.

Additionally, Distributors cursorily rehash several arguments as objections to the R&Rs' RICO findings that have already been addressed previously by the Court in the *Track One* Orders and

are adequately and correctly addressed in the R&Rs here.[5] The Court has addressed each of these arguments at length and declines to do so again. The Court adopts the R&Rs' conclusions as they pertain to Plaintiffs allegations of their RICO claims.

## V.    NEGLIGENCE PER SE

Both the Muscogee R&R and the Blackfeet R&R declined to address Defendants' arguments regarding negligence per se because the R&Rs found that Plaintiffs sufficiently pled a common law duty. *See* Doc. #: 1499 at 63, n.43; Doc. #: 1500 at 35, n.30. However, a claim for negligence per se requires that a defendant violated a particular statute and has distinct elements from a common law negligence claim. In Montana, "[n]egligence per se requires that: (1) the defendant violated a particular statute; (2) the statute was enacted to protect a specific class of persons; (3) the plaintiff is a member of that class; (4) the plaintiff's injury is of the sort which the statute was enacted to prevent; and (5) the statute was intended to regulate members of the defendant's class. *Harwood v. Glacier Elec. Co-op., Inc.*, 949 P.2d 651, 656 (Mont. 1997) (citation omitted). Under Oklahoma law, a statutory violation is a prerequisite to a negligence per se claim. *Hampton By & Through Hampton v. Hammons*, 743 P.2d 1053, 1056 (Okla. 1987). "When a city ordinance is violated, the elements of actionable negligence are: (1) the injury must have been caused by the violation; (2) the injury must be of a type intended to be prevented by the ordinance; and (3) the injured party must be one of the class meant to be protected by the ordinance." *Id.* Thus, the R&Rs' findings that Defendants owed a common law duty to Plaintiffs has no bearing on whether Plaintiffs have viable negligence per se claims.

---

[5] Distributors assert that Plaintiffs failed to allege 1) a direct causal connection between claimed injuries and alleged predicate acts; 2) an injury to its business or property as required by RICO; 3) that Defendants committed predicate acts; that Defendants participated in a valid RICO enterprise.

The key element of a negligence per se claim that Plaintiffs cannot overcome is showing that they are intended beneficiaries of the statutes that Defendants' allegedly violated. Plaintiffs' Complaints specifically allege that Defendants have violated the Oklahoma Uniform Controlled Dangerous Substances Act ("Oklahoma CSA"), the federal Food, Drug, and Cosmetic Act ("FDCA"), the federal Controlled Substances Act ("CSA"), and Mont. Code Ann. § 37-7-604. *See* Case: 18-op-45749, Doc. #: 9, Blackfeet FAC at ¶ 1021; Doc. #: 731, Muscogee FAC at ¶¶ 97, 435. But Plaintiffs are not intended beneficiaries of the CSA or FDCA, the Blackfeet Tribe is not an intended beneficiary of the Montana statute, and the Muscogee Nation is not an intended beneficiary of the Oklahoma CSA. The Court will address each of these statutes and their intended beneficiaries in turn.

In drafting the CSA, "Congress intended to protect the public from the deleterious effects of the illegitimate use and distribution of controlled substances." *Bonds v. Tandy*, 457 F.3d 409, 415 (5th Cir. 2006); *see also Gonzales v. Oregon*, 546 U.S. 243, 250 (2006) (the CSA was "[e]nacted in 1970 with the main objectives of combating drug abuse and controlling the legitimate and illegitimate traffic in controlled substances"). "[T]he CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules." *Gonzales*, 546 U.S. at 250. The CSA was intended to protect individual members of the public from falling victim to drug misuse and abuse. The CSA was not intended to protect sovereigns like the Tribes from spending more on addiction-related public services when rates of addiction increase. Thus, the Tribes cannot use the CSA as a statutory basis for their negligence per se claims. The same applies to the Oklahoma CSA which is also designed to protect individuals from being harmed by illicit drug use. *See* Okla. Stat. Ann. tit. 63, § 2-101, *et seq*.

Montana Code Ann. § 37-7-604 is a statute that sets forth the requirements for a manufacturer to be licensed in Montana. Nothing in the statute can be construed to protect the Blackfeet Tribe from

the injuries it alleges. Lastly, the purpose of the FDCA is to "ensur[e] that when a citizen takes a prescription drug, that individual has absolute assurance that the product is safe and effective." *Beaty v. Food & Drug Admin.*, 853 F. Supp. 2d 30, 42 (D.D.C. 2012). The FDCA promotes public health and safety, it was not intended to protect Plaintiffs from the costs of public services to address the opioid epidemic. Thus, none of the statutes cited by Plaintiffs are intended to protect Plaintiffs from the harms they allege. Plaintiffs cannot state claims for negligence per se pursuant to these statutes. Accordingly, the Court finds Defendants' Objections regarding the Tribes' negligence per se claims well-taken. The R&R is **OVERRULED** as to the negligence per se claims and those claims are hereby **DISMISSED**.

## VI. CIVIL CONSPIRACY

Distributors assert that the Muscogee Nation "failed to adequately allege that Distributors performed underlying unlawful acts under Oklahoma law," Doc. #: 1585, Dist. Obj. at 17, and that the Blackfeet Tribe similarly "failed adequately to allege that Distributors performed any underlying unlawful acts under Montana law." Doc. #: 1588, Dist. Obj. at 14. The implication in Distributors' assertions is that Oklahoma and Montana law is materially or substantively different than Ohio law as analyzed in the *Track One* Orders, and as such the Magistrate Judge erred by relying on the Court's prior analysis. Distributors undercut their own position, however, by themselves relying on the objections they previously made to the *Track One* R&R in support of their objections here. The R&Rs expressly and correctly compared the Oklahoma, Montana, and Ohio civil conspiracy laws and concluded that "[t]he requirements for civil conspiracy in Oklahoma are similar to those in Ohio," Doc. #: 1499 at 69, and "[t]he requirements for civil conspiracy in Montana are [also] similar to those in Ohio." Doc. #: 1500 at 42. Thus, Distributors' objections regarding Plaintiffs' civil conspiracy claims are **OVERRULED**.

Pharmacies object to the Blackfeet R&Rs' conclusion that the Tribe has adequately pled the "meeting of the minds" element of civil conspiracy.[6] Pharmacies' argument is different from the Distributors in that Pharmacies assert that the Tribe failed to allege that any Pharmacy defendant participated in industry organizations such as the Healthcare Distribution Alliance (HDA) and the Pain Care Forum (PCF). Pharmacies assert that absent allegations of participation in these groups, the Tribe has made "no plausible allegations of a 'meeting of the minds' required to plead a conspiracy." Doc. #: 1582, Pharm. Obj. at 14. This is incorrect. The Tribes have defined "Distributor Defendants" as including "National Retail Pharmacies." *See* Doc. #: 1500 at 2, n.3; *see also* Case: 18-op-45749, Doc. #: 9, Blackfeet FAC at ¶96. Thus, when the Tribe alleges that "Distributor Defendants" have participated in these organizations, it by definition alleges participation in these industry groups by "National Retail Pharmacies." *See, e.g.,* Case: 18-op-45749, Doc. #: 9, Blackfeet FAC at ¶¶473, 520 ("Documents produced by the Marketing Defendants further indicate that opioid manufacturers coordinated their opioid marketing messaging with the *Distributor Defendants*." (emphasis added)) ("The *Distributor Defendants* actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA. The *Distributor Defendants* participated directly in the PCF as well." (emphasis added)). The Court, therefore, **ADOPTS** the Blackfeet R&R's recommendation with respect to civil conspiracy.

## VII. RECOVERY UNDER THE INDIAN SELF-DETERMINATION AND EDUCATION ASSISTANCE ACT

The R&Rs concluded that the Medical Cost Recovery Act ("MCRA") does not provide the exclusive remedy for Plaintiffs to recover damages for medical care furnished with funds procured

---

[6] "Under Montana law, a civil conspiracy claim requires a plaintiff to establish the following elements: (1) two or more [conspiring] persons . . . . ; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." Doc. #: 1500 at 42 (quoting *Sullivan v. Cherewick*, 391 P.3d 62, 67 (Mont. 2017) (internal quotations omitted).

pursuant to an Indian Self Determination and Education Assistance Act ("ISDEAA") compact. Doc. #: 1499 at 44-47. The Manufacturers object, stating that the Indian Health Care Improvement Act ("IHCIA") and MCRA *are* the only vehicles through which Plaintiffs can recover these medical costs. Doc. #: 1590; Man. Obj. at 6. Further, to recover these costs, Plaintiffs must have identified specific injured persons in their Complaints, which they did not. *Id.* at 7. After careful review of these objections, the Court finds them without merit.

Plaintiffs receive federally-funded healthcare directly through Indian Health Service ("IHS") or indirectly through services provided by tribes under ISDEAA compacts. *See* 25 U.S.C. § 5301, *et seq*. IHCIA's § 1621e(a) provides a vehicle through which Plaintiffs can recover the costs of ISDEAA-funded healthcare from a third-party tortfeasor. 25 U.S.C. § 1621e(a). Section 1621e limits recovery in two ways: (1) a Tribe may only recover costs incurred on or after March 23, 2010; and (2) a Tribe can recover only "to the same extent and under the same circumstances as the United States may recover under [the MCRA]." 25 U.S.C. § 1621e(e)(3)(A). But Plaintiffs are not attempting to recover for expenses incurred by IHS, they seek recovery of healthcare costs pursuant to state tort law. Doc. #: 1008; Muscogee Omnibus Opp. at 36.

The Manufacturers argue that the Muscogee R&R erred because § 1621e is the only vehicle through which Plaintiffs can recover ISDEAA-funded healthcare costs. Doc. #: 1590; Man. Obj. at 8. They cite *United States v. Standard Oil Co. of California* in support. 332 U.S. 301 (1947). The Supreme Court in *Standard Oil* held that no cause of action existed for the Government to recover the cost of an injured soldier's healthcare unless or until Congress created one. *Id.* at 314. Congress responded to *Standard Oil* by enacting the MCRA in 1962, which created such a cause of action. *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 140 (D.D.C. 2000). What is missing from

the Manufacturers' analysis of *Standard Oil* is the Supreme Court's heavy reliance on Congress to provide the framework for causes of action involving federally-funded healthcare costs.

Congress enacted § 1621e to provide a right of recovery for healthcare costs Tribes expend in response to a third-party tortfeasor. *See* 25 U.S.C. § 1621e(a). But Congress, by the plain language of the statute, did not intend for § 1621e to act as a limit on a Tribe's right of recovery. Conversely, Congress was explicit that "[n]othing in [§ 1621e] shall be construed to limit any right of recovery available to . . . an Indian Tribe . . . under the provisions of any applicable Federal, State, or tribal law[.]" 25 U.S.C. § 1621e(k). If this Court were to construe § 1621e as creating the only cause of action to recover a Tribe's healthcare costs—as the Manufacturers suggest—that interpretation would contradict the plain language of § 1621e(k). Accordingly, the Court finds that § 1621e is not the exclusive remedy for Plaintiffs to recover for injuries alleged. Consequently, whether Plaintiffs identified specific injured persons to sufficiently plead a claim pursuant to MCRA is irrelevant.

### VIII. CONCLUSION

Accordingly, the Court **OVERRULES** the Reports and Recommendations of the Magistrate Judge, Doc. ##: 1499; 1500, with respect to Plaintiffs' negligence per se claims as discussed above in section V. and **ADOPTS** the Reports and Recommendations with respect to all other sections.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster** *June 13, 2019*
 **DAN AARON POLSTER**
 **UNITED STATES DISTRICT JUDGE**