UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES: | Judge Dan Aaron Polster |
| *ALL CASES* | Hearing Date: June 25, 2019 |
| | Time:   12:00 p.m. |

**PLAINTIFFS' CORRECTED MEMORANDUM IN SUPPORT OF CERTIFICATION OF RULE 23(b)(3) CITIES/COUNTIES NEGOTIATION CLASS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................... 1

II. WHAT THIS MOTION IS AND IS NOT ................................................................ 8

    A. What This Motion Is Not .............................................................................. 8

    B. What This Motion Is ..................................................................................... 9

III. THE NEGOTIATION CLASS DEFINITION AND BASIC FUNCTION ............... 10

IV. THE NEGOTIATION CLASS REPRESENTATIVES .......................................... 14

V. SEQUENCE AND PROCESS: ............................................................................... 36

VI. SUMMARY OF NEGOTIATION CLASS PROCESS, ALLOCATION FORMULAE, SUPERMAJORITY VOTING MECHANISM, AND FEES ................. 37

VII. HOW THE SUPERMAJORITY VOTING PROCESS WORKS ........................... 43

VIII. HOW THE ALLOCATION MODEL WORKS ....................................................... 44

    A. Factor One: Opioid Use Disorder ............................................................. 45

    B. Factor Two: Overdose Deaths .................................................................. 46

    C. Factor Three: Amount of Opioids ............................................................. 47

    D. Final Calculation ....................................................................................... 49

    E. Distribution Within Counties .................................................................... 49

IX. THE NEGOTIATION CLASS MEETS ALL APPLICABLE REQUIREMENTS OF RULE 23 ............................................................................ 51

    A. The Negotiation Cities/Counties Class Is Too Numerous For Individual Joinder, Meeting Rule 23(a)(1)'s "Numerosity" Requirement ............................ 51

    B. There Are Questions Of Law And Fact With Common Answers, Fulfilling Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance Criteria ............. 52

    C. The Claims Of The Class Representatives Are Typical Of The Claims Of The Class Under Rule 23(a)(3) .......................................................... 54

    D. The *Sine Qua Non* Of The Negotiation Class Is The Achievement Of Adequate Representation Meeting Rule 23(a)(4) Requirements ......................... 55

X. THE NEGOTIATION CLASS MEETS THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(b)(3) ............................................. 59

    A. Predominance .............................................................................................. 59

    B. Superiority ................................................................................................... 61

    C. The Negotiation Class Also Merits Certification Under Rule 23(c)(4) .............. 64

1725838.15

## TABLE OF CONTENTS
### (continued)

Page

XI.    THE CLASS NOTICE AND DIRECT NOTICE PROGRAM FULFILL THE
       "BEST PRACTICABLE NOTICE" STANDARDS OF RULE 23(c) ........................... 66

XII.   CONCLUSION ............................................................................................. 68

1725838.15

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)...................................................................................... passim

*Carroll v. Compucred Collections, Inc.*,
399 F.3d 620 (6th Cir. 2005) ................................................................................ 61

*Daffin v. Ford Motor. Co.*,
458 F.3d 549 (6th Cir. 2006) .............................................................. 51, 55, 56

*In re Combustion Engineering*,
391 F.3d 190 (3d Cir. 2004) .................................................................................. 7

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
722 F.3d 838 (6th Cir. 2013) .......................................................................... 51, 53

*Martine v. Behr Dayton Thermal Prods. LLC*,
896 F.3d 405 (6th Cir. 2018) ................................................................................ 64

*Nat'l League of Cities v. Brennan*,
419 U.S. 1321 (1974)............................................................................................. 11

*Nat'l League of Cities v. Usery*,
426 U.S. 833 (1976)................................................................................................ 11

*Rikos v. Proctor & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ................................................................................ 53

*Stern v. Marshall*,
564 U.S. 462 (2011).............................................................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011), 131 S. Ct. 2541 (2011) ......................................................... 53

*Whitlock v. FSL Mgmt., LLC*,
843 F.3d 1084 (6th Cir. 2016) ............................................................................... 51

<u>**Statutes**</u>

11 U.S.C. § 524(g) ....................................................................................................... 6

<u>**Other Authorities**</u>

Fed. R. Civ. P. 23........................................................................................... passim

Fed. R. Evid. 408 ............................................................................................................ 3

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**Treatises**

7AA Charles Alan Wright et al., *Federal Practice and Procedure*
§ 1790 (3d ed. 2018) ................................................................................................ 64

D. Theodore Rave, *Closure Provisions in MDL Settlements*,
85 Fordham L. Rev. 2175 (2017) ............................................................................... 8

Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action,*
92 N.Y.U. L. Rev. 846 (2017) ................................................................................... 57

Francis E. McGovern & William B. Rubenstein,
*The Negotiation Class:  A Cooperative Approach to Large Claim Class Actions* (June 2019) . 4

John C. Coffee, Jr., *Class Action Accountability:  Reconciling Exit, Voice, and Loyalty in
Representative Litigation*, 100 Colum. L. Rev. 370 (2000) ...................................................... 3

Morgan A. McCollum, *Local Government Plaintiffs and the Opioid Multi-District Litigation* .... 8

*Principles of the Law of Aggregate Litigation* § 3.17 (Am. Law Inst. 2010) .......................... 7, 65

Robert H. Klonoff, Mark Herrmann & Bradley W. Harrison,
*Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. Pitt. L. Rev. 727
(2008) ....................................................................................................................... 57

Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*,
1999 Sup. Ct. Rev. 337 (1999) ................................................................................... 3

- iv -

I.    **INTRODUCTION**

Over 1,200 cities and counties have filed civil actions now centralized before this Court as part of the MDL No. 2804 proceedings.  Many other cities and counties are proceeding with related cases in state courts.  Additional thousands of cities and counties are watching the progress of the Opioids litigation with great interest.  This Court has, on several occasions, advised that they would be included as part of any comprehensive class action settlement, without filing their own suits.  According to the U.S. Census Bureau, there are a total of approximately 5,000 counties and 19,500 "incorporated places" (cities, towns, villages, and municipalities) in the United States.  All of them face, to some degree, the nationwide epidemic and national public health crises brought on by the manufacture, marketing, sale and use of the prescription opiates that are the subject of this case.  This case requires a truly comprehensive, forward-looking, national and voluntary resolution to enable state and local governments to face and to fight this epidemic, through settlements that would 1) fund prevention, treatment and recovery programs; and 2) transform the practices of the manufacturers, distributors, pharmacists and prescribers who are alleged to have played roles in the opioids epidemic.

It is self-evident that each city and county has a vital interest in, and a real need for, financial relief from, and better practices by, the defendants.  In the customary sequence of settlement class certification, there would be no presentation to this Court and to the thousands of class members until some settlement had been worked out and was ready for potential approval.  Necessarily, this means that the class members would be presented with a class settlement that had already been formed and as to which they could only object or opt out.  What is being proposed here is a certification of a class *to aid* in the settlement process, rather than *to evaluate* an already concluded process.

It is no secret that there have been settlement discussions right from the onset of this

- 1 -

MDL process. The Court directed that this was a desired aim in its earliest conference, and a special committee of the Plaintiffs' Executive Committee has been charged with leading the negotiation efforts on behalf of all potentially affected entities, even as other special committees have directed themselves to discovery, preparation for trial, and the numerous other requirements for pushing ahead with litigation of this import and daunting magnitude. While no comprehensive settlement has yet been reached, serious discussions were initiated in early 2018 under the auspices of the MDL Court, have been actively supervised by Court-appointed Special Masters, and are ongoing. The best resolutions will be comprehensive ones, with a nationwide reach to match the nationwide crisis, and the aim of the present motion is to create a procedural mechanism that can aid in that effort.

It is not the size of the affected class that presents novel issues; the Rule 23 class mechanism is often used to review, approve, and effectuate settlements that concern large numbers of plaintiffs. Rather, Rule 23 here offers the perfect mechanism for allowing the affected cities and counties to negotiate credibly and effectively, as a group seeking a common resolution, with any national defendant who chooses to do so. All involved recognize that these consolidated cases present one of, if not the most complex MDLs ever prosecuted, with 1,500 governmental entities pursuing claims relating to immediate health crises against dozens of Defendants. If the MDL is not resolved globally, it will consume thousands of hours of judicial time and millions of dollars of party resources over years of continued litigation.

Were this Court to be presented with a settlement class under Rule 23(e) involving such a resolution, it would be required by Rule 23 and established case law to scrutinize searchingly the negotiations that led up to it. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the Supreme Court held that such scrutiny is required in certifying a settlement class, to guarantee

that all groups within the class have been fairly treated, vis-à-vis each other, and to ensure that one group has not taken advantage to the detriment of another on matters unrelated to the valuation of their respective claims.  *Amchem* requires "structural assurance[s]" of loyalty on the part of the class representatives to the class members as a means to avoid fatal intra-class conflicts, especially in situations where the harm suffered by the class is ongoing.  *Id.* at 627.

Courts (and class members) are usually presented with a class action settlement as a *fait accompli*, which means they must thus review class settlement negotiations retrospectively. Class members, or their counsel, must look back and rely on the accounts of those involved, since settlement discussions are, as a matter of policy, confidential under Fed. R. Evid. 408.  The larger class—the class members "absent" from the negotiations—is then given voice in the approval process via three reactive choices:  stay in the class and accept, stay in the class and object, or exit the class by opting out.[1]  This typical sequence could be followed here, but months of experience with the intensive Opioids settlement negotiations to date, and due respect for the cities and counties as self-governing political subdivisions with day-to-day decision-making power and responsibilities to their own constituencies, suggest a mechanism better suited to the unique circumstances of this case:  giving the class an earlier and more active voice in the process.

Accordingly, this motion requests the certification of a "Negotiation Class," comprised of all cities and counties in the United States (more formally defined below), represented by a

---

[1] *See* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 377 (2000) (proposing the need to balance the requirements of exit, voice, and loyalty to protect class member interests); Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 341-42 (1999) (identifying that most class action reforms are focused on an exit, voice, and loyalty structure).

diverse array of city and county plaintiffs who have been active in the litigation of these proceedings.  The Negotiation Class will be certified for the specific purpose of creating a unified body to enter into further negotiations with defendants.  It is not aimed at being the vehicle for litigation or settlement.  While this is not a customary usage of the class mechanism, it must be recalled that Rule 23 does not speak of a "litigation class" or a "settlement class."  The Rule addresses only the use of the class action when certain conditions are met under Rule 23(a), and then specifies the reasons for common class treatment under Rule 23(b)(3).  Only recently has Rule 23(e) been amended from a terse requirement for judicial approval of settlements in class cases to a detailed set of procedures that recognize that some cases may settles as class claims, though they have not yet, and might never have been, certified for trial.   Although the procedure suggested in this motion is novel, as will be addressed, Movants seek no special quarter from the strictures of the Rule.[2]  The fact that the aim is the special purpose of negotiation rather than litigation should not detain this Court.  The aim of every settlement class is similarly limited, even if that procedure has by now become quite standard.[3]

There is one simple purpose for the Negotiation Class: to allow coordinated action by all the cities and counties in the settlement process.  The goal is to fashion settlements that extract

---

[2] The settlement class itself started life as a judicial innovation, decades before the ultimate enshrinement of a robust body of jurisprudence and emerging best practices in the Ressler 2018 Amendments to Fed. R. Civ. P. 23(e) and its accompanying Advisory Committee Notes. The evolution of this procedural common law is traceable through the presumption of suggested "best practices" in the class action settlement sections of the Second, Third, and Fourth iterations of the *Manual for Complex Litigation*, *see, e.g. Manual for Complex Litigation* (Fourth) §§ 21.6-21.635 (2004), long before these procedures were borrowed for and distilled in Rule 23 itself.

[3] For a sustained analysis of the permissibility of the negotiation class approach under traditional Rule 23 principles and case law, *see* Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Large Claim Class Actions* (June 13, 2019) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3403834.

- 4 -

the maximum amounts possible—in dollars and in changed practices—from the defendants, and that accomplish the fair allocation of the settlement funds among the Class.

The cities and counties demand, and deserve, true agency in settlement discussions.  The certification of a Negotiation Class will provide notice and information to all of them on the essential structure and format of ongoing discussions, the decisions to be made, and activate their participation, through a supermajority voting procedure, to determine approval or rejection of any resulting classwide deal up front.  In other words, rather than having settlement negotiations and reaching a deal first, and then certifying a Rule 23(e) settlement class to approve it, the cities and counties in this case propose to certify a self-governing Negotiation Class first, and then to proceed with negotiations through this pre-existing class mechanism.

1.      The sequence of events proposed by this motion is as follows:

a)      Give preliminary approval and approve notice to the proposed Negotiation Class under Rule 23(a) and 23(b)(3);

b)      Notify the members of the Class of i) their right to participate in, or opt out of, the proposed Negotiation Class; ii) the proposed metrics for allocation between states and cities/counties, and among cities/counties; and iii) the supermajority voting procedure by which participating Class members will vote on any and all proposed settlements reached with defendants;

c)      Enter an order certifying and confirming the membership of the Negotiation Class at the close of the notice and opt-out period;

d)      Negotiate any Class settlements with interested national Opioids defendants.[4]

e)      Approve or reject any subsequently resulting class settlements under Rule 23(e).

This sequence enables cities and counties make the decision to stay in or to opt out of the Negotiation Class up front, knowing 1) the allocation metrics and formula that will be used to calculate their share of each settlement; and 2) the way the supermajority voting process will work and how their votes will be weighed.

Those who stay in will therefore know that they will have voting rights with respect to any resulting settlement, and they will know how the votes are to be counted and weighted. They also know how any lump sum settlement reached under this class structure with defendants would be allocated as among the class members.  They thus have the essential information to make  their own decisions regarding their participation in the Negotiation Class, and they may begin the process of determining the intra-county level share between each county and its constituent incorporated places.  The subsequent class negotiations enable all cities and counties to have a more active role in the settlement negotiation process than they could ever have separately.  In this Class, they are neither passive beneficiaries nor absent members.  They are active, voting participants.

The voting process and supermajority requirement proposed as the mechanism through which the Negotiation Class decides to accept or reject settlement offers is adopted from the

---

[4] National Opioids defendants include the defendants named in underlying actions conducting nationwide opioids manufacturing, sales or distribution.  None of them are required to utilize this process.

aggregate settlement mechanism proposed by the American Law Institute's *Principles of the Law of Aggregate Litigation* § 3.17 (Am. Law Inst. 2010) [hereinafter "*ALI Principles*"] and the 75% voting approval requirement utilized in asbestos bankruptcy plans, codified as 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); *see also In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005).  This supermajority voting mechanism has thus been proposed in the general aggregate litigation context, and enacted to provide statutory protection in the specific bankruptcy context, to add direct participation and choice features to solve mass claims problems like the one faced in the Opioids litigation: how to resolve thousands of claims and potential claims in a single, inclusive, fair, and effective process that gives the claimants the optimal settlement amount and the Selling Defendants global peace.  It is especially applicable to sophisticated parties, such as the cities and counties whose actions are joined in this MDL.  As the *ALI Principles* note, approval of group settlements by voting rules are well-designed and have been approved for sophisticated clients.  *Id.*

The Negotiation Class has important benefits for the defendants as well.  Once the Negotiation Class is confirmed after the close of the opt-out period, in August 2019, it will be a known entity with a known scope and participation level.  Defendants will thus be able to predict, with certainty, that any settlement reached with the Class will bind a known percentage of cities and counties across the nation.  Defendants will not need to renegotiate innumerable settlements *seriatim*, and they will not be negotiating with uncertainty as to the size of the group to be bound, or the power of the binding mechanism.  Negotiations will thus more closely resemble negotiations between two sophisticated and independent decision makers, rather than a) the more usual class scenario in which class representatives labor to create the largest possible settlement without the parties knowing to what degree the class will actually participate; or b) an

- 7 -

unworkable, impractical scenario with large number of cities and counties, or competing groups vying for attention.  The Negotiation Class is pre-existing, pre-organized, and self-governing.

At the end of the day, there is one additional feature that compels class treatment.  Any mechanism that offers certainty of resolution gives any settling defendant the prospect of "global peace," to which attaches a well understood "peace premium."  *See* D. Theodore Rave, *Closure Provisions in MDL Settlements,* 85 Fordham L. Rev. 2175, 2175 (2017) ("Closure has value in mass litigation.  Defendants often insist on it as a condition of settlement, and plaintiffs who can deliver it may be able to command a premium.").[5]  It is difficult to imagine any other feasible mechanism that could coordinate the needs of a class of more than 20,000 city and county entities.  These are, by definition, incorporated self-governing jurisdictions who cannot lightly yield their authority to handle problems on behalf of their citizens.  What the Negotiation Class offers is both coordination for the defendants and active participation for the Class, an outcome that merges the legitimate needs of all parties to this litigation with the specific nature of the class that is proposed.

## II.     WHAT THIS MOTION IS AND IS NOT

### A.     What This Motion Is Not

This is **not** a Rule 23(e) motion for settlement class certification.  No proposed settlements are before the Court.  This is also **not** a Rule 23(b)(3) motion to certify a class for

---

[5] See Morgan A. McCollum, *Local Government Plaintiffs and the Opioid Multi-District Litigation*, N.Y.U. L. Rev., 6 (forthcoming Mar. 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3378794 (commenting that in the context of opioids litigation, "[g]lobal peace means that a settlement legally forecloses all, or close to all, current and future litigation against the defendant through claim preclusion…. Any settlement arising out of an MDL must therefore use creative measures to get parties that have *not* already sued, or have sued in state courts, into the settlement in order to prevent them from litigating in the future.").

trial.  Such a motion may, or may not, ever be made by any plaintiff in this case should litigation, rather than resolution, prevail.  But this is not it.  Plaintiffs understand and assert that the certification of this Negotiation Class would ***not*** be precedent or support of any kind for the certification of any litigation-purposes class, or for the certification of any claim or issue for trial or adjudication, and ask the Court to so order.  Its certification would not impair the right of any party to seek or to oppose any other class certification for any other purpose.  Membership in the Class would not limit the ability of cities and counties to sue or settle on their own, nor limit the Defendants to settle with individual Class members or through other procedures.  It would not preclude other categories of plaintiffs in this MDL from organizing on a class, group, or other basis to prosecute or settle their claims.  In other words, this is a procedural option for potential settlements, without issue or claim preclusive impact on any other procedures that may be utilized.  Only if a class settlement is reached through the Negotiation Class vehicle, that is, only if a there is classwide settlement offer that gets supermajority approval from the Class itself, would the normal Rule 23(e) mechanism for claims resolution and bar orders be activated.

### B. <u>What This Motion Is</u>

This is a motion to recognize and organize a class of similarly-situated cities and counties with a common interest in the best possible settlements, as soon as practicable, with one or more willing defendants.  Such settlements would serve as an alternative to litigation, in these proceedings or elsewhere, by thousands of cities and counties to obtain redress for the opioids crisis they all face.  The certification of a class now, whose membership will be known to Defendants, and whose rights and options will be known to the Class members themselves, should enable the more efficient and more certain negotiation of the best practicable settlements of cities' and counties' claims.  The Negotiation Class will unite the cities and counties vis-à-vis each other; acknowledge and formalize the community of interest that already exists among them;

- 9 -

empower them as a formal group, to negotiate the best deal on total settlement amount; engage them sooner rather than later in the necessary local allocation process; and facilitate the subsequent court approval process of any settlement the Negotiation Class reaches with defendants.

Time is, and has always been, of the essence in this litigation. Opioids casualties continue to rise, and the national life expectancy continues to fall. Cities and counties across the country continue to devote outsized portions of their budgets to their daily efforts to stem this tide and to protect their citizens. Declaring a state of emergency, however, does not fund emergency services, and does not trigger the actions necessary to make a difference. Extraordinary measures are called for. This Court has devoted extraordinary effort to fostering and enabling serious settlement discussions, including the appointment of Special Masters, the use of special sessions, and expedited trial scheduling. But this case is more complicated, on every level, than any litigation its participants can recall. The Negotiation Class takes the mechanism authorized by the Federal Rules of Civil Procedure and applies it to the unique needs and circumstances of this litigation. The procedure proposed here is governed by Rule 23. Movants seek no special treatment or consideration. This is a motion for class certification under Rule 23, nothing more, nothing less.

The Negotiation Class meets all applicable requirements of Rule 23, as this motion demonstrates, and plaintiffs and class representatives respectfully urge its certification without delay.

## III. THE NEGOTIATION CLASS DEFINITION AND BASIC FUNCTION

The Negotiation Class is proposed as a voluntary opt-out class under Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(3), and 23(c), and will be comprised of:

**all counties, parishes, and boroughs (collectively, "counties"); and all incorporated places, including without limitation cities, towns, villages, and municipalities, as defined by the United States Census Bureau (collectively, "cities") as listed on the Opioids Negotiation Class website, www.Opioidsnegotiationclass.com.**

This is not a litigation class.  Certification of the Negotiation Class will not be utilized to prosecute, litigate or try any claim, in this or any court, against any of the defendants named in the national opioid litigation.  It does not affect the prosecution of existing actions filed against opioids manufacturers, opioids distributors, or pharmacies by Class members.  It will not stop any individual cases brought by cities and counties from proceeding or settling.  It does not obligate any defendants to make a settlement offer to the Class.  All Class members will have the right to opt out of the proposed "Negotiation Class" after receiving a Court-approved Class Notice if and when the proposed class structure receives preliminary approval from this Court.

The purpose of certifying a Negotiation Class is to establish and maintain an identified, unified and durable nationwide body of cities and counties that can credibly claim to negotiate in the best interest of all the class governmental parties.  Although the proposed procedure is novel, the use of a coordinated litigation device to represent the common interests of cities and counties is not new.  For example, the National League of Cities has frequently represented the collective interests of its members in litigation, including in the Supreme Court.  *See Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985); *Nat'l League of Cities v. Brennan*, 419 U.S. 1321 (1974).[6]

---

[6] In *National League of Cities*, a group of cities, states and intergovernmental organizations successfully challenged the validity of certain 1974 amendments to the Fair Labor Standards Act, which had expanded the act to include state and local governments, as well as private employers. The National League of Cities, on behalf of its constituent members, was the lead plaintiff/appellant.  It was not necessary to reach organizational standing in that case.  426 U.S.

*Footnote continued on next page*

- 11 -

The proposed Negotiation Class seeks to achieve the same benefits of collective representation of common interests in negotiating the best practicable resolution of the cities and counties' claims.

Under the proposed Negotiation Class, there will be a supermajority voting process that can approve a proposed settlement if more than 75% of voting class members approve the proposed settlement, based on 75% supermajorities of litigating and non-litigating counties and municipal bodies by number, by population, and by allocation.  See Section VII for a detailed description of how the six-way, supermajority voting process works to insure active participation and voice for all class members regardless of size, situation, litigation status and perspective.  It has long been recognized that a coordinated group is best able to secure better returns by offering the prospect of complete resolution of a dispute.  The aim here is to form a body vested with the power to negotiate on behalf of all class members, subject to concurrent supermajority voting requirements for any settlement subsequently proposed to it.

The proposal presented here is premised on the distribution of voting power under Section 524(g) of the Bankruptcy Code.  11 U.S.C.A. § 524(g).  That provision allows, in the bankruptcy context, for the organization of asbestos claimants into a voting collective that enables a 75% supermajority to approve a bankruptcy workout of asbestos claims, subject to approval by a Bankruptcy Court.  Whereas bankruptcy courts have only limited powers on the core disputes before them, *Stern v. Marshall*, 564 U.S. 462, 468-69 (2011), district courts hold

---

*Footnote continued from previous page*

at 866, n.7.  Here, the class representatives are cities and counties, and hence members of the defined class they represent; they have direct standing to take the actions that the National League takes on a less formal basis, and to do so for monetary settlements as well as injunctive relief.

the full power of Article III.  It would be bizarre to leave the powers to prepackage a voting resolution of a complicated dispute in the hands of an Article I tribunal, but not the Article III tribunal necessary for expanded bankruptcy workouts beyond the core dispute.  Were the first resolution of the opioids crisis to come through a bankruptcy process, such a voting process would be second nature.  The proposal uses this well-established mechanism under the supervision of this Court directly.

There have been settlement discussions, under the auspices of the Court, between various defendants and representatives of the States and other public entities from the onset of this MDL. The aim of these negotiations has been to generate funds and establish programs to help abate the Opioids epidemic.  To date, there have been no settlements with any of the defendants, although negotiations are ongoing.

Any successful settlement resolution could generate funds that would be utilized at both the State level and the level of city and county political subdivisions.  Inevitably, any settlement fund will present issues as to the appropriate allocation of the funds available for remediation and prevention.  Because not only States, but also cities and counties, have filed suits and are active litigants, defendants need a comprehensive release from all litigants and potential litigants. Given the sheer number of municipal and county entities in the United States, one-by-one approval of a comprehensive resolution including allocation among the settling parties is likely impossible as a logistical matter.  A cohesive negotiating group of cities and counties is essential because only a collective negotiating front is able to offer the prospect of global peace which typically results in what is termed a "peace premium" in mass harm litigation.  A collective negotiation front may also be helpful to negotiate effectively an allocation system with the States to determine, from any comprehensive settlement, the States' and cities and counties' relative

- 13 -

aggregate shares, in the absence of prior agreement entered by any States and their subdivisions.

Through the proposed Negotiation Class Notice, including the Settlement Allocation Lookup Tool posted on www.Opioidsnegotiationclass.com, the Class members identified and listed on that website will be able to elect to participate in the Class (and to vote on future proposed settlements), or to opt out. In deciding whether to participate, all Class members will have knowledge of the portion of the cities and counties' aggregate share of each proposed settlement that would be allocated to each county (for subsequent local allocation among that county and its constituent cities) by utilizing the Settlement Allocation Lookup Tool on the settlement website.

## IV.    THE NEGOTIATION CLASS REPRESENTATIVES

The following proposed Negotiation Class Representatives are U.S. cities and counties who are plaintiffs in actions now part of the MDL No. 2804 proceedings. The complaints in the underlying actions allege predominately common facts about the conduct of defendants in creating and sustaining the opioid epidemic and public health crisis nationwide, as well as the local impact of the tragedy, and the resulting harm to each plaintiff in battling it. Their complaints assert similar claims that raise common legal questions—the issues that have been, and continue to be, the focus of discovery and pretrial proceedings in the MDL.

**The County of Albany, New York**. Albany County is home to New York's capital city, Albany, which is its population center and the sixth most populous city in the state. The county includes 39 legislators and is led by County Executive Daniel P. McCoy. In 2017, McCoy convened a 19-member county-wide Opioid Taskforce to address skyrocketing overdose death. He created the nationally recognized Project Orange, a partnership with local pharmacies to take back unused prescription drugs. With the Capital in such close proximity, McCoy has been able to lobby for important reforms on the state level to address the opioid epidemic as well as secure

- 14 -

state grants for things like the expansion of Medication Assisted Treatment. McCoy hosts a

NARCAN training each month with free kits to take home and ensured the County Department

of Probation staff is trained on using the antidote for emergency situations with clients. Albany

County was one of the first counties of New York to join the federal lawsuit against national

opioid manufacturers, having filed in January 2018. As the President of the County Executives

of America and Co-Chair of its Opioid Task Force, McCoy has played a unique role not only in

the lawsuit itself, but also working with other county executives to get involved and pursue their

own policy initiatives in their home states. Albany County has retained the outside counsel of

Motley Rice for the ongoing litigation.

**City of Atlanta, Georgia**. It is the most populous City in Georgia and is the home to

over 490,000 people. In Atlanta in 2015, there were 141 heroin-related emergency department

admissions. Due to its location, Atlanta has been referred to a "heroin distribution hub", placing

an enormous burden on the government, law enforcement, and the community. Atlanta spends

millions of dollars each year to provide and pay for health care, services, pharmaceutical care

and other necessary services and programs on behalf of residents of its City whom are indigent

or otherwise eligible for services, including payments through services such as Medicaid for

prescription opium painkillers ("opioids") which are manufactured, marketed, promoted, sold,

and/or distributed by the Defendants. Residents of Atlanta continue to die from the use of opioid

pain medications at an alarming rate. The rate of overdose deaths in Fulton County has

continued to climb since 2004. Over the past ten years, the City has also seen a dramatic rise in

the distribution of naloxone and buprenorphine, drugs used to treat opioid overdoses and

addiction. The largest hospital in the State of Georgia is Grady Hospital, a public hospital

located in Atlanta. Grady Hospital has seen a significant rise in opioid related emergency room

- 15 -

visits and admissions.  Grady Hospital has also seen a dramatic uptick in the administration of Narcan, as well as babies born with Neonatal Abstinence Syndrome.  Opioids have become the most serious drug problem for the Atlanta Law Enforcement.  The commission of criminal acts to obtain opioids is an inevitable consequence of opioid addiction.  In sum, Atlanta has experienced economic costs directly related to the opioid epidemic, including Medicaid costs, law enforcement, judicial, foster care, Narcan costs, loss of productivity, and various other costs directly caused by the actions of the defendants.

**Bergen County, New Jersey** is the most populous county in New Jersey with nearly one million residents.  The County has been hard-hit by the opioid epidemic and has expended substantial time and resources to combat its effects—from emergency services to the courts, to care facilities and clinics, to prisons, and to the police department.  The County, a leader in the State of New Jersey in terms of treatment and prevention programs, including:  detox and short term rehabilitation beds at New Hope Detox, the Bergen County Addiction Recovery Program, half-way housing at the Spring House Halfway House for Women and the Ladder Project, Office of Alcohol and Drug Dependency Services, the Bergen Equestrian Center, the Thrive Programs at Bergen New Bridge Medical Center, Epic Programs at Children's Aid and Facility Services, regular Narcan training, and the ARCH Program which provides intravenous drug use risk reduction counseling, overdose prevention counseling, and drug treatment assessment.  The County filed suit against opioid manufacturers and distributors in May 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of Chosen Freeholders, which consists of seven elected members. James J. Tedesco serves as the County Executive.

**Broward County, Florida** serves as a bellwether for purposes of motions to dismiss

- 16 -

briefing in the MDL.  Broward's population is over 1.9 million; the opioid epidemic claimed 582 lives in Broward County (the 9th highest opioid overdose death rate in the country) in 2016. The number of Broward County lives lost due to drug overdoses in 2016 was more than double the amount in 2014, and up to 260 deaths from 2015.  The County Attorney is Andrew Meyers, and Assistant County Attorney Danielle French has been actively engaged in the litigation.

**Camden County, New Jersey** has been hard-hit by the opioid epidemic, and has expended substantial time and resources to combat its effects – from emergency services, to the courts, to care facilities and clinics, to prisons, and to the police department.  In 2014, the Freeholder Board created the Camden County Addiction Awareness Task Force comprised of educational leaders, law enforcement, public health professionals, healthcare institutions, religious affiliates and non-profit entities.  The Camden County Addiction Awareness Task Force has received both regional and national attention for its work in addressing this on-going public health crisis.  Focused on prevention and treatment, Camden County has placed a licensed drug and alcohol counselor in every municipal courtroom.  The County filed suit against opioid manufacturers and distributors in February 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of Chosen Freeholders, which consists of seven elected members.  Louis Cappelli, Jr. serves as Freeholder Director.

**Cass County, North Dakota** has a population of less than 180,000, yet had 31 deaths related to opioid overdose in 2016.  All Cass County high schools and middle schools are now carrying Narcan as a result of the problem.  The County has been proactive in seeking to abate the epidemic.  Since 2017, the City of Grand Forks (which lies within Cass County) has distributed more than 275 Naloxone kits, trained more than 520 community members on

- 17 -

overdose recognition and distributed 2000 treatment and prevention guides.  Birch Burdick serves as Cass County's State's Attorney and Tracy Peters, as Cass County Assistant State's Attorney. Both have been actively involved in the litigation.

**City of Chicago, Illinois** was incorporated in 1837, and hosts a population of approximately 2.7 million residents, the third-largest city in the United States.  Chicago's government is comprised of an elected mayor, Lori Lightfoot, a 50-member City Council composed of aldermen and alderwomen from the City's 50 wards, and numerous other elected officials and more than 30 other departments and agencies, including Chicago's Department of Public Health.  Chicago is the most populous city in Illinois, and is located within Cook County, the most populous county in Illinois and home of the largest consolidated court system in the United States.  Chicago has been ravaged by the opioid crisis, and experienced increased overdose deaths from prescription opioids, heroin, fentanyl, and other synthetic opioids, with overdose deaths approaching 750-1000 per year on Chicago's streets at the height of the opioids crisis.  In 2014, Chicago initiated the first opioid lawsuit filed by a city in the United States, which is now among the many subsequent lawsuits moving forward today in the MDL against opioid manufacturers and distributors.  In 2016, in light of the growing heroin epidemic nationwide, Chicago helped launch the Chicago-Cook County Task Force on Heroin, and in 2017 Chicago's Department of Public Health participated in the launch of Illinois's Opioid Crisis Response Council, a statewide effort to staunch the flow of opioids throughout Illinois communities.  Beginning in 2014-15, Chicago launched its prescription disposal program for the disposal of unused opioids and other prescription drugs, and advocated for changes in its health care and prescription drug benefits programs to encourage adoption of new CDC guidelines for opioids treatment and abuse that were issued in 2016.  Chicago operates numerous substance

- 18 -

use/addiction treatment programs related to prescription opioids throughout the city, and ensures treatment is available in Chicago for all types of opioid addiction, including treatment modalities such as Medication for Addiction Treatment (MAT) and other treatments in various outpatient, inpatient, residential, recovery homes, and detoxification settings.  Chicago initiated and supports naloxone training and distribution for the City's emergency personnel and first-responders, with naloxone overdose treatment now available in all Chicago Police and Fire Department emergency vehicles.  Chicago's opioids litigation is managed by lawyers in its internal Law Department, headed by newly appointed Corporation Counsel Mark Flessner, and is represented in the MDL litigation by its outside counsel Motley Rice and Wexler Wallace.

**Cobb County, Georgia** is Georgia's third most-populous county, with a population of approximately 700,000.  Few areas have been hit as hard by the opioid epidemic as Cobb County.  Indeed, Cobb County had some of the highest opioid overdose deaths in Georgia with 121 deaths in 2017 and is one of three Georgia counties dubbed the "Heroin Triangle."  The opioid problem is so severe in Cobb County that it was featured in the A&E Network docuseries "Intervention."  The Epidemic has hit every aspect of the community and County government including law enforcement, drug courts, family services, emergency services.  To help fight this crisis, Cobb County has partnered with "The Zone," a non-profit corporation and Recovery Community Organization that mobilizes resources within and outside of the community to help recovery and rehabilitation efforts.  The opioid epidemic is also of the utmost importance to Cobb County's leadership.  One of the County Commissioners, who is at the forefront of the community in addressing this epidemic, was recently recognized by an invitation to the White House conference on "Best Practices in Combatting the Opioid Epidemic: A Conference with State and Local Leaders" hosted by the Office of Intergovernmental Affairs.  The County filed suit against

- 19 -

opioid manufacturers and distributors in June of 2018.  The County is managed by the Board of Commissioners, and Mike Boyce is the Chairperson.  Commissioner Bob Ott has taken an active role in combatting the epidemic in the County and in the litigation.

**Cumberland County, Maine**.  Cumberland County has a population of over 280,000 residents.  In 2016, Cumberland County accounted for 78 of the 376 overdose deaths, a total of 21% of all overdose deaths.  In 2014, Cumberland County had the highest rate of drug overdose responses per 10,000 residents.

**Cuyahoga County, Ohio**.  Cuyahoga County is one of the trial bellwethers in the multi-district litigation, set for trial on October 21, 2019.  With an estimated population of more than 1.2 million, it is the second most populous county in Ohio.  Its county seat is Cleveland. Cuyahoga County has been dramatically impacted by the opioid epidemic, and drug overdose is now the leading cause of accidental death.  In 2015, one person died every day in Cuyahoga County from a drug overdose.  During January and February of 2016, one person died every day in Cuyahoga County from a heroin or fentanyl overdose.  Specifically, January was a record for fentanyl deaths, broken again in February.  Thereafter, in March of 2016, two people died every day in Cuyahoga County from a heroin or fentanyl overdose.  From 2006 until 2016, over 1,000 people died in Cuyahoga County from opioid overdoses.  In the year 2016, there were 666 drug overdose deaths reported by the Cuyahoga County Medical Examiner's Office.  There were 727 drug overdoses in 2017.  In 2017, the emergency rooms treated an estimated 9,191 patients presenting with drug related injuries, a 21% increase compared to 2016.  The number of deaths linked to prescription drug abuse increased almost 500% from 1999 to 2013.  Moreover, heroin mortality rose significantly from 40 deaths associated with heroin in 2007 to 161 in 2012, and approximately 75% of the people who were dying of heroin overdoses had a previous

- 20 -

prescription for opiates.  In other words, within two years of death almost 3 to 4 heroin fatalities received a legal prescription for a controlled substance.  The crippling effect of this public health emergency is felt proportionally across all facets of Cuyahoga County's government.

The City of Delray Beach, Florida. Delray Beach in southern Florida, has a population of approximately 69,000 people.  Of the 33,000 people who died nationwide of opioid overdoses in 2015, approximately 12% were Floridians.  Delray Beach has been at the center of the opioid epidemic for many years.  It lies within Palm Beach County and has been dubbed the "pill mill capital of the U.S.", with South Florida having reportedly lost an estimated 900 lives in 2016 alone.  Delray Beach spends millions of dollars each year providing a wide range of opioid- and addiction-related services for its residents and visitors.  The City has seen an unprecedented growth in the drug addiction treatment industry, i.e., sober homes, contributing to an influx of addicted populations into the city from across the country.  The City Attorney, Lynn Gelin, has been actively involved in the litigation.

Denver, Colorado is a consolidated City-County.  Denver's government represents over 700,000 residents and is comprised of an elected mayor, thirteen-member city council, auditor and numerous other departments and agencies.  Denver County has the largest population in the state.  It has taken an active role in the Opioid Litigation, helping initiate a litigation effort among approximately 20 cities and counties in Colorado that have likewise filed suit in the MDL.  Denver strives to meet the needs the opioid crisis imposes on its community through substance treatment programs like Denver Health's Comprehensive Addictions Rehabilitation and Evaluation Services (CARES) and through the Mayor's Office's $3.1 million Opioid and Substance Misuse Strategic Action Plan.  The Plan is the result of a collaborative effort among more than 100 government agencies and community organizations to address the opioid crisis in

- 21 -

Denver.  Denver has helped form the Collective Impact Group to coordinate the cross-disciplinary efforts underway to address the opioid epidemic.  The Collective Impact group is a collaborative of law enforcement agencies, behavioral health, public health, and community organizations to help guide Denver's approach to tackling this crisis.  Denver regularly works with other Coloradan jurisdictions to address opioid-related issues.  The City and County of Denver's case is managed by Renee' A. Goble, Assistant City Attorney for the City and County of Denver, Municipal Operations Section.

**East Baton Rouge Parish / City of Baton Rouge, Louisiana** - East Baton Rouge Parish is the most populous parish in Louisiana with over 440,000 residents and the City of Baton Rouge is the state's capital and its second-largest city.  East Baton Rouge Parish and the City of Baton Rouge share a consolidated government.  The City-Parish has been devastated by the impact of the opioid crisis.  Drug overdose deaths increased 218 percent from 28 in 2012 to 89 deaths in 2016, with opioids present in the vast majority.  According to the East Baton Rouge coroner, overdoses killed more people than homicides in 2016.  In 2017, there were 111 drug-related deaths in the Parish and paramedics administered over 800 doses of naloxone, a 40 percent increase from 2016.  Deaths due to heroin also spiked in the last several years.  Based on data from the Centers for Disease Control and Prevention, for nine consecutive years, from 2006-2014, opioid prescriptions ranged from over 103 to almost 131 prescriptions per 100 persons in Baton Rouge.  That is more than one opioid prescription for every man, woman and child.  In the past 3 years those numbers still hovered at over 9 opioid prescriptions for every 10 residents of East Baton Rouge Parish in 2015 and 2016 and over 8 prescriptions for every 10 residents in 2017.  The City-Parish has a needle exchange program and has provided funding for addiction treatment programs and drug abuse prevention and education programs.  The City-Parish filed its

- 22 -

complaint on January 23, 2018 and is committed to holding the companies responsible for the epidemic accountable.  The City-Parish is governed by its Metropolitan Council and Mayor-President Sharon Weston Broome.

**Escambia County, Florida** is a county in the Florida Panhandle that is home to the city of Pensacola and a population of approximately 300,000.  Escambia County has been especially hard hit by the Opioid Crisis.  In 2014 over 670 patients were hospitalized as a result of opioid poisoning and in just the first six months of 2018 emergency medical services administered 286 doses of naloxone to 176 opioid-related overdose victims.  These statistics are not surprising seeing as opioid prescriptions poured into Escambia County at an alarming rate of 149.2 prescriptions per 100 people in 2010, and continue to be over 110 per 100 people through 2016. Escambia County has incurred substantial costs by responding to the Opioid Crisis and has expended significant resources on emergency response personnel, law enforcement, court services, and addiction related treatment.  Escambia County filed their complaint in May of 2018 and has been active in the litigation since that date.

**Essex County, NJ** – Essex County, with a population of approximately 800,000 people, is, in fact, the most diverse county in the United States in terms of household income (i.e. has the highest Household Income Diversity Index score of any US county).  Newark, the poorest city in the county, has a median household income of $33,025 and a per capita income of $17,198, whereas Essex Fells, the fourth wealthiest municipality in the State of New Jersey, has a median household income of $174,432 and a per capita income of $89,316.  The County has been hard-hit by the Opioid Epidemic with opioid-related deaths dramatically climbing year-over-year -- from 59 in 2012 to 213 in 2017.  In January 2018, DEA New Jersey Division Special Agent in Charge Valerie A. Nickerson announced that "New Jersey is facing a heroin and prescription

- 23 -

opioid abuse epidemic like we have never seen before, and Essex County has been leading the state in overdose deaths for the past two years." The County has expended substantial time and resources to combat the Opioid Epidemic – from emergency services, to the courts, to care facilities and clinics, to prisons, and to the police department. The County filed suit against opioid manufacturers and distributors in August 2018 and is committed to holding the companies' responsible for the epidemic accountable. The County is managed by the Board of Chosen Freeholders. Joseph N. DiVincenzo, Jr. serves as County Executive.

**Franklin County, Ohio** is Ohio's most populous county with approximately 1.2 million citizens. The Franklin County seat is Columbus, which is the state capital and the most populous city in Ohio. The County has been hard-hit by the opioid epidemic. The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and has identified Franklin County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average. Franklin County has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, and placing thousands of children in foster care placements, among others. Franklin County filed its initial Complaint on January 20, 2018 and is committed to holding the companies responsible for the epidemic accountable. The County is managed by the Franklin County Commission which consists of three elected Commissioners. Marilyn Brown serves as the President of the County Commission.

**County of Gooding, Idaho**. Gooding County has a population of over 15,000. In 2017, Idaho providers wrote 70.3 opioid prescriptions for every 100 persons, which is higher than the

- 24 -

national average of 58.7 opioid prescriptions. In 2016, an Idahoan died every 34 hours from drug overdose, and Gooding was not immune.

**The City of Grand Forks**, North Dakota, is North Dakota's third largest city, with a population of more than 55,000 people. Grand Forks has experienced a recent spike in costs associated with addressing the opioid epidemic. For example, the Grand Forks Fire Department and the local Altru EMS administered more than three times as much Naloxone in 2017 than they did in 2010, reaching a new high. From August 2017 through March 2019, the City of Grand Forks distributed more than 275 Naloxone kits, trained more than 520 community members on overdose recognition, and distributed almost 2,000 prevention and treatment guides throughout the city. The city through its City Attorney, Howard Swanson, has been actively involved in the litigation.

**County of Jefferson, Alabama**. Jefferson is the most populous County in Alabama at approximately 659,300. The County also suffered the largest number of opioid related deaths in Alabama at 162. In 2017, there were 98 fatal heroin overdoses and 100 in 2016. Additionally, in 2017, there were 105 fatal fentanyl overdoses and 104 in 2016. Jefferson has the highest drug overdose rate of any county in Alabama. Between 2010 and 2016, the number of drug overdose deaths increased by 173% in Jefferson County. Between October of 2016 and September of 2017, 185 Jefferson County children were admitted into the foster care system due to parental drug abuse.

**Jefferson County / City of Louisville, Kentucky** share a consolidated government and is the most populous county in the state with over 770,000 citizens. Like all areas of Kentucky, Jefferson County has been heavily impacted by the Opioid Epidemic. The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and

- 25 -

has identified Jefferson County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average.  Illustrative of Louisville's struggles with dealing with the opiate crisis was the 32 hour period in February of 2017 where emergency crews responded to over 50 overdose calls.  In 2017, over 350 individuals from Jefferson County died from a drug related overdose, a rate of 45.6 people per 100,000 residents. Jefferson County has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, and placing thousands of children in foster care placements, among others.

**Jersey City, New Jersey** is the second most populous city in New Jersey with more than 260,000 residents.  The City has been hard-hit by the opioid epidemic.  In response to the opioid crisis, Jersey City has been compelled to spend increasing amounts of money and resources to combat its effects for several years, impacting virtually every branch of the city.  These efforts impose substantial costs on Jersey City, including substantial expenditures annually on overdose-reversing naloxone, Suboxone and buprenorphine support, mental health services related to addiction, drug court, treatment, recovery programs, therapy and counseling, and medical costs. Jersey City has also integrated overdose prevention education into schools, youth programs, and other public settings.  Despite these efforts, Jersey City's number of fatal overdoses continues its climb.  The County filed suit against opioid manufacturers and distributors in June 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The City Council in Jersey City consists of nine elected members.  Steven M. Fulop is the Mayor of Jersey City.

1725838.15

**Kanawha County, West Virginia** is West Virginia's most populous county with over 183,000 citizens.  The Kanawha County seat is Charleston, which is the state capital.  The County has been hard-hit by the opioid epidemic.  According to the National Center for Health Statistics, the drug poisoning rate in Kanawha County has consistently exceeded the national average.  The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and has identified Kanawha County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average.  The DEA has disclosed to the West Virginia Attorney General certain data from the ARCOS database relating to the sale of hydrocodone doses to retailers in West Virginia between 2007 and 2012.  This data became public knowledge in an article published by the Charleston Gazette-Mail which revealed that distributors sold some 66 million doses of prescription opioids to retailers in Kanawha County during that time period.  Kanawha County has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.  Kanawha County filed its initial Complaint on March 9, 2017 and is committed to holding the companies responsible for the epidemic accountable.  The County is managed by the Kanawha County Commission which consists of three elected Commissioners.  Kent Carper serves as the Commission President.

**King County, Washington** is the largest county in Washington State, with an estimated population of over 2.2 million residents.  The County has been hard hit by the opioid epidemic, with heroin and opioid use at crisis levels, and a large, addicted homeless population.  The

- 27 -

County has been a national leader in efforts to address and combat the epidemic, and has devoted substantial resources administering opioid-related programs and efforts since the mid 2000's.  In 2016, King County convened the Heroin and Prescription Opiate Addiction Task Force that includes experts from multiple disciplines who came together to develop both short and long-term strategies to prevent abuse and addiction, prevent overdose, and improve access to different types of treatment for opioid addiction.  The County filed suit against opioid manufacturers and distributors in January 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Metropolitan King County Council, which consists of nine members elected by district.  Dow Constantine is the elected County Executive.

**The City of Los Angeles, California** is the most populous city in California and the second most populous city in the United States, with a population of approximately 4 million people.  Los Angeles experienced a significant increase in prescription opioid overdose-related hospitalizations and drug treatment and emergency room visits between 2005 and 2015, including neonatal abstinence syndrome-related hospitalizations.  Los Angeles also experienced a steady increase in overdose deaths from 2010 to 2014.  Los Angeles, through its City Attorney Mike Feuer and Managing Assistant City Attorney Michael Bostrom has played an active role in the litigation.

**City of Lowell, Massachusetts**.  The injuries of Lowell reached a point where EMS services reported 2,240 opioid-related incidents from the first quarter of 2016 through the first quarter of 2018.  Additionally, there have been 282 opioid-related deaths in Lowell in 2016 and 2017. Indeed, the rate of opioid overdose deaths in Lowell in 2015 was 43.3 per 100,000 (the national average in 2016 was 13.3 deaths per 100,000).  This in a county, Middlesex, where nearly 5,000,000 solid dosage units of Schedule II opioids were prescribed in the second quarter

of 2018 alone and opioid-related overdose deaths climbed sharply from 118 opioid-related deaths in 2006 to 414 such deaths in 2016.  In fact, in a 12-hour span from March 21-March 22, 2018, first responders reported four fatal overdoses in Lowell.

**City of Manchester, New Hampshire**.  The City of Manchester is the largest city in the State of New Hampshire with approximately 112,000 residents.  It is one of the largest employers in New Hampshire, employing around 1,220 people.  In 2015, there were 726 total suspected overdose calls for services made by the Manchester Fire Department.  This included 589 patients treated with Narcan.  In the second half of 2015 alone, public services collection services collected 264 discarded needles.

**Maricopa County, Arizona's** governing body is its Board of Supervisors, which consists of five members chosen by popular vote within their own districts.  With approximately 4.4 million residents, Maricopa County is the most populous of the 15 counties in Arizona, and the fourth most populous county in the entire country, larger than approximately half the U.S. states.  Over 61% of Arizona's population resides in Maricopa County.  Given the size and breath of the County, it regularly works with the State of Arizona and other jurisdictions to address opioid issues.  Maricopa County's efforts to address the opioid crisis are wide-ranging, including but not limited to implementing 18 drug take-back sites, expanding overdose treatment, training related to fentanyl and carfentanil handling, and responding to health and law enforcement burdens associated with addressing black tar heroin.  Maricopa County's case is managed by Thomas P. Liddy, Chief, Civil Services Division, Maricopa County Attorney's Office.

**Mecklenburg County, North Carolina** is the most populous county in North Carolina, with a population of over 1 million.  As a practical and financial matter, the County has been

- 29 -

saddled with an enormous economic burden.  Nearly every department in the County is affected

by the opioid crisis caused by Defendants in some manner, including the County's Emergency

Management Services, and Criminal Justice Services.  In 2017 alone, Mecklenburg County had

173 opioid overdose deaths.  Between 2012 and 2017, there was a 127% increase in ER visits

due to opioids.  The County has held summits for several years, where former drug addicts,

doctors, and counselors come together to discover and develop solutions and has participated in

efforts to find a solution to the Epidemic on a state and national level.  The County filed suit

against opioid manufacturers and distributors in February of 2018 and is committed to holding

the companies' responsible for the epidemic accountable.  The County is managed by the Board

of County Commissioners, Dena Diorio is the County Manager and County Counsel, Tyrone

Wade has been managing the litigation.

**The Metropolitan Government of Nashville and Davidson County, Tennessee**

("**Nashville**") is a consolidated city-county government and it is the state capital.  Its population

is 700,000 (MSA 1.9 million) and its annual budget is $2.3 billion.  Nashville is governed by

Mayor David Briley and a forty-member Council.  Nashville is a statewide leader in various

efforts to combat the opioids catastrophe, including organizing regional opioid-related

educational events bringing together government officials and public health communities,

hosting public outreach and education events, hiring a dedicated Opioids Response Coordinator,

implementing a syringe exchange program, and designing a real-time opioids overdose tracking

program and Mass Overdose Event Emergency Response Plan.  Nashville's opioids litigation is

managed by Director of Law Jon Cooper, in consultation with Mayor Briley.

**Milwaukee County, Wisconsin** is the most populous county in Wisconsin with almost

600,000 residents and has more deaths due to opioids than anywhere else in the State.  Opioid-

- 30 -

related deaths more than doubled from 144 in 2012 to 336 in 2017.  These deaths illustrate just a small part of the devastating effect the opioid crisis has had in Milwaukee: in 2017 it was estimated for every death there were approximately five more people who overdosed, were treated with naloxone and survived.  In 2016, the rate of opioid overdose deaths in Milwaukee County was 30.1 per 100,000 residents, which was more than double the rate in the State (14.3), which itself has risen from 5.9 deaths per 100,000 since 2006.  Milwaukee County has also led the State with the highest rate of inpatient hospitalizations and emergency department visits involving opioids.  Milwaukee County has responded to the opioid epidemic in its community by equipping EMS paramedics, firefighters and law enforcement with naloxone.  The Milwaukee Community Opioid Prevent Effort has collaborated with academic and community partners on prevention, intervention, overdose treatment protocols, and tools to reduce opioid deaths.  The Milwaukee County Office of Emergency Management, the Milwaukee County Behavioral Health Division, the Milwaukee County Substance Abuse Prevention Coalition, and the Milwaukee County Department of Health & Human Services have all implemented opioid-specific programs to combat the crisis.  Milwaukee County filed suit against the opioid manufacturers and distributors in March of 2018 and is committed to holding the companies responsible for the epidemic accountable.  Margaret Daun serves as Corporation Counsel for Milwaukee County and has been actively involved in the litigation.

**Monterey County, California** is home to over 437,000 residents of all socioeconomic backgrounds.  Monterey County owns a public hospital, the Natividad Medical Center, located in Salinas, California. Natividad is a 172-bed hospital owned and operated by the County of Monterey, and offers inpatient, outpatient, emergency, diagnostic, and specialty health care.  Natividad has provided health care services to Monterey County's diverse population for more

than 132 years.  Natividad is a Level II Trauma Center with more than 52,000 Emergency

Department visits each year.  According to the California Department of Public Health (CDPH),

between 2011 and 2014, Monterey County had an average death rate due to opioids of 5.32

deaths per 100,000 residents.  CURES reports an average Opioid Prescription Rate of 594.69 per

1,000 residents between 2011 and 2015 and an average morphine milligram equivalent per

resident of 670 mg between 2010 and 2015.  The CDPH states that Monterey County

experienced an average rate of non-fatal opioid-related emergency department visits of 10.37

visits per 100,000 residents between 2010 and 2014.  Monterey County and its Natividad

Hospital have been on the front lines of the opioid crisis and have spent significant taxpayer

resources to combat the crisis, from emergency response to preventative education and other

County sponsored studies and programs.  Charles McKee is Monterey County Counsel and

William Litt serves as Deputy County Counsel and has been actively involved in the opioid

litigation.

      **County of Palm Beach, Florida**.  Palm Beach County is at the epicenter of the "opioid

epidemic" in Florida.  Palm Beach County has approximately 1.48 million residents.  The

County is ranked fourth in the nation for the number of overdose deaths per 100,000 residents

(41.5 deaths per 100,000).  Over 140 deaths were attributed to prescription drugs in Palm Beach

County in 2012.  There were 189 deaths in 2014, and 307 in 2015.  Palm Beach County suffered

569 deaths in 2016.  In 2017, Palm Beach recorded nearly 600 opioid overdose deaths.  Palm

Beach County has unleashed a stampede of lawyers, health officials, police and rehab specialists

to tackle the epidemic.  As a result of the opioid epidemic, foster care costs have dramatically

increased in Palm Beach County.  For example, as of August of 2017, 45 percent of the children

who entered into the Palm Beach County foster care system were from parents with substance

abuse problems, the majority of which were abusing opioids.  Palm Beach County is in desperate need of additional services for its opioid addicted residents.  Further, a report prepared for the County Commission in 2017 found that 24,000 uninsured people in Palm Beach County could use detoxification and residential-treatment services, but only 7 percent have received any.  In 2017, Palm Beach County Fire-Rescue spent $205,000 just on Narcan to treat opioid overdoses.  Fire-Rescue also estimates it costs about $1,500 to respond to an overdose call, and more than 4,000 were recorded in 2016, totaling $6 million in added costs.

**Phoenix, Arizona** is a city of 1.6 million people.  On June 5, 2017, Arizona Governor Doug Ducey signed an emergency declaration to address the increasing number of opioid deaths in the state, most of which occurred in Maricopa County, where Phoenix sits.  Phoenix had the highest concentration of opioid deaths in Arizona that year.  Over the past five years, Phoenix alone has spent more than $750,000 on the acquisition of Narcan.  The new City Attorney is Cris Meyer and the Assistant City Attorney Anoop Bhatheja is actively involved in the litigation.

**Prince George's County, Maryland**.  Prince George's County has approximately 909,308 residents.  It is the second largest County in the state of Maryland, and employs thousands of people.  Prescription opioid-related intoxication deaths in Prince George's County increased from 13 in 2015 to 16 in 2016.  Oxycodone-related intoxication deaths within Prince George's County also increased from 8 in 2015 to 9 in 2016.  Fentanyl-related intoxication deaths in Prince George's County increased from 15 in 2015 to 58 in 2016.

**Riverside County, California** is the fourth most populous county in California, and the eleventh-most populous county in the United States, with approximately 2.35 million residents.  Riverside County has been severely affected by the opioid epidemic.  In 2017 alone, over 1.5 million opioid prescriptions were written within Riverside County, and 140 people died from

- 33 -

opiate overdoses.  In 2017, Riverside County also reported 309 opioid overdose ED Visits and 216 Opioid Overdose Hospitalizations.  The County operates its own health system, which like many others has been severely impacted by the opioid epidemic.  The County filed suit against opioid manufacturers and distributors in June of 2018 and is committed to holding the companies' responsible for the epidemic accountable.  Litigation on behalf of the County has been managed by Greg Priamos, County Counsel.  The County is managed by a Board of Supervisors.  Kevin Jeffries is the Chairperson of the Board and George Johnson serves as the County Executive Officer.

**City of Saint Paul, Minnesota**.  The City of Saint Paul has approximately 309,180 residents and employs thousands of people.  In 2018, 76 people died from suspected opioid overdoses in Saint Paul, according to preliminary information released by the Minnesota Department of Health.  Saint Paul police officers have administered at least 65 doses of Narcan to combat opioid overdoses since December 2017.  Saint Paul is the county seat and largest city in Ramsey County, which is the smallest yet most densely populated county in the state of Minnesota (approximate population of 508,640).  Between 2000 and 2016, Ramsey County has seen 1395 total opioid overdose cases, with 371 opioid overdose fatalities.

**San Francisco, California** is a consolidated City-County.  Its government is composed of the Mayor, Board of supervisors, several elected officers and other departments and agencies. It is one of thirteen Charter Counties in California.  The City and County of San Francisco, California has struggled with a significant prescription opioid, and related heroin problem, for two decades.  It was proactive early on, implementing the Drug Overdose Prevention & Education (DOPE) project, the largest single city naloxone distribution program in the country. While DOPE effectively slowed overdose death rates, San Francisco continues to have a sizable

- 34 -

opioid addicted homeless population.  The general population is approximately 884,363 and the

case is being managed by Chief of Special Litigation Owen Clements, who has strong

relationships with city and county counsel offices throughout the state.  Louise Renne serves as

one of San Francisco's outside counsel in this litigation.  She is a nationally recognized leader in

municipal law and was intimately involved in representing San Francisco (as City Attorney) in

the tobacco industry litigation.

**Summit County, Ohio** has more than 541,000 residents, all of whom have been

impacted in some way by the crushing opioid epidemic.  Home to the State of Ohio's leading

Opioid Task Force, Summit County took an aggressive approach to both identifying the cause of

the opioid tsunami, as well as treating and educating its 31 different communities.  As the driving

force of the litigation on behalf of the communities and social service agencies that make up

Summit County, the Executive's office has seen a dramatic increase in the need for funding to

support its existing County initiatives like naloxone kits, needle exchanges, medication assisted

treatment, intensive outpatient treatment and inpatient bed availability.  That cumulative work

and cost is all in addition to the increased demands on first responders, the judicial system and

indigent defense—all of which have seen skyrocketing costs due to the increase in numbers of an

addicted population.  With award winning drug courts, innovative Health Department initiatives,

and a dedicated and progressive law enforcement community, Summit County has committed to

the role of life saving prevention and treatment and seeks to hold responsible those companies

who caused this man-made plague.  Summit County, together with Cuyahoga County, is the first

MDL bellwether trial, scheduled to begin Oct. 21, 2019, against opioid defendants.

**County of Tulsa, Oklahoma**.  The County of Tulsa's population is approximately

648,360.  Substance dependency levels are troublesome in Tulsa.  Every year, since 2013, the

- 35 -

Oklahoma Department of Mental Health and Substance Abuse Services has financed Substance Abuse programs for an increasing number of citizens in Tulsa; even though the state number of serviced citizens has decreased since 2016. Seven out of ten unintentional poisoning deaths in Tulsa County involved a prescription painkiller. From 2007 to 2012, Tulsa County had the eleventh highest prescription opioid rate in the state of Oklahoma.

**Wayne County**, **Michigan.** With a population of approximately 1.75 million people, Wayne County is the most populous county in the State of Michigan. Michigan healthcare providers wrote 11 million prescriptions for opioids in 2015 and another 11 million in 2016 – more annual opioid prescriptions than Michigan has people. Between 2013 and 2015, opioid-related deaths in Wayne County increased from 478 to 506, then soared to 817 in 2016 – more than 32 overdose deaths for every 100,000 residents. Through the County's Corporation Counsel, James Heath, Wayne County has been actively involved in the litigation.

## V.  SEQUENCE AND PROCESS:

All members of this proposed Negotiation Class may comment upon this motion by emailing or mailing their comments to the attention of the undersigned proposed Class Counsel, the Special Masters and the Court to info@opioidsnegotiationclass.info or NPO Litigation, P.O. Box 6727, Portland, OR 97228-6727 before the scheduled June 25, 2019 preliminary hearing.

At the June 25, 2019 preliminary hearing of this motion, and as described more fully in the attached Memorandum in Support hereof, proposed Class Representatives and Class Counsel will ask the Court to take the following actions:

a)  Give preliminary approval of and approve notice to the proposed Negotiation Class of 75% supermajority (both by class member and by population) voting procedure described herein, the proposed Class Action Notice, and the FAQs.

1725838.15

    b)  Approve the dissemination of the proposed Class Notice by posting it on the Settlement Website and by mailing and emailing it directly to all proposed Class members.

    c)  Set and include in the Class Notice a deadline (at least 60 days from mailing/emailing) and a procedure by which proposed Class members may exclude themselves from ("opt out" of) the Negotiation Class.

    d)  Set a final hearing for early September 2019 to certify and confirm the membership of the Negotiation Class, and to enter an order that defines the included entities, appoints their Class Representatives and confirms their Class Counsel, and attaches the list of excluded entities, under Fed. R. Civ. P. 23(c).

## VI. SUMMARY OF NEGOTIATION CLASS PROCESS, ALLOCATION FORMULAE, SUPERMAJORITY VOTING MECHANISM, AND FEES

    All counties, parishes, and boroughs ("Counties"); and all cities, towns, villages, municipalities and other "incorporated places," ("Cities") as defined by the United State Census Bureau and as listed on the Negotiation Class website, have an opportunity to participate, as voluntary members of the Negotiation Class, in considering and voting upon any proposed settlement by Defendants in this Opioids litigation, without the necessity of filing or maintaining an individual lawsuit.  The listed Cities and Counties also have the right to exclude themselves from the Negotiation Class, in which case they will not be entitled to participate in any Negotiation Class settlement, will not be eligible to vote on any proposed settlement, or be bound by it.  Those who elect to remain within the Class will have vested voting rights with respect to any proposed Class settlement.  To achieve Class approval, a proposed settlement must receive a supermajority vote, by population, by number and by allocation, of the voting members.  Population numbers are taken directly from currently available 2010 United States Census data, posted on the website, to be replaced by 2020 United States Census data, when such

data become available.  Proposed settlements that achieve Class approval by supermajority vote as described above will then be subject to Court approval as fair, adequate and reasonable under Fed. R. Civ. P. 23(c).

Each potential Class member may determine what its allocation of any potential settlement will be (at the County level) by utilizing the Settlement Allocation Lookup Tool posted on the Negotiation Class Website.  This is not a guarantee of any particular amount, as there have been no settlements to date.  Rather, it is a way for each governmental subunit to know what portion of any national settlement will be available to all the governmental entities within each county in the United States.  The Allocation Tool shows county-by-county divisions of any settlement proceeds that come to the entire class of municipal and county entities.  It sets the allocation formula, not the amount that may be obtained in any given settlement.

This Allocation Tool shows in dollars the pro rata share for each county, utilizing a three-part formula that reflects the level of opioids-related harm by using the three metrics for which existing, reliable, detailed and objective data are available for each county:  1) morphine milligram equivalent ("MME") data [volume of opioid pills], 2) overdose deaths, and 3) opioid use disorder cases, described in detail in Section VII below.  They are weighted equally:  1/3 – 1/3 – 1/3.  This formula is the product of prolonged and intensive research, analysis and discussion by and among members of the court-appointed Plaintiffs' Executive Committee and Settlement Committee and their retained public health and health economics experts.  Seventy-five percent (75%) of the Class' share of any settlement would be allocated, at the county level, to each County and its constituent Cities utilizing the formula based on these three metrics.

**Special Needs Fund**.  Fifteen percent (15%) of the allocation will be set aside in a fund (the "Special Needs Fund") that is available to all Class members, by application.  Distributions

from the Special Needs Fund to Class Members are allowed for:  (1) a Class Member to recover its own costs of litigating its lawsuit; (2) to obtain additional relief for any local impact of the opioids crisis that is not captured by the Class Member's automatic allocation; or (3) to recognize a unique role that a county or municipality may have played, or may play, in addressing the opioid epidemic at not only a local but regional level.

Application to the Special Needs Fund is made on a claim-by-claim basis, and is voluntary.  Awards will be made, on an individual basis, by a Court-appointed Special Master. Any unawarded portion of the Special Needs Fund would revert to the Class.

**<u>Private Attorneys Fee Fund</u>**.  Ten percent (10%) of the allocation will be set aside in a fund to address private counsels' attorneys' fees and costs (the "Private Attorneys' Fees Fund"), with individual awards to be recommended by a Private Attorneys' Fees Committee.  Any disputes would be resolved by a Court-appointed Special Master and awards are subject to entry of a final Order by the Court.  While existence of a contingency fee contract would be a relevant factor, the Private Attorneys' Fees Committee shall consider all relevant factors in determining the appropriate fee for each counsel and each client class member.  No fee shall be awarded that exceeds the contractual fee agreement.

The Private Attorneys' Fees Fund would be distributed after receipt and determination of all applications from qualified private counsel (counsel with representation agreements with one or more Class members executed as of June 14, 2019).  Applications to the Private Attorneys' Fees Fund would be made on a client-by-client basis, and would be in lieu of enforcement of private contracts with those clients.  Application to the Private Attorneys Fund is voluntary and optional.  The choice to apply to the Fund or to enforce contingency fee contracts can be made on a client-by-client basis.  The Court-appointed Private Attorneys' Fees Committee and Special

- 39 -

Master will consult with the Class Action/Common Benefit Fees Committee to avoid duplicate awards. If all or part of the Private Attorneys' Fees Fund is unawarded, for any reason, it would revert to the benefit of the Class.

**Internal Allocations**. Each County class member and its constituent City class members will decide the internal allocation of the county level award among themselves. They may elect to use a pre-existing mechanism. One such mechanism is the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and the cities within them split the task of funding various government functions. Relying on this data, funds would be divided among the county government and city governments in proportion to their shares of total spending in the county on certain government functions that relate to recommended abatement efforts. Another possible mechanism would be to use the system in place for allocating sales taxes or other revenues between the County and its Cities. All the entities within any given county are free to utilize whichever mechanism works best. In the event they cannot agree, a court-appointed neutral will resolve or adjudicate the allocation. The allocation system is described in detail in Section VIII of this Memorandum.

**Voting Process**. Under the supermajority voting system to be used to approve or reject any proposed settlement presented to the Class, each Class member, whether it is a county, parish, borough, city, town, or other "incorporated place," has one vote in either the litigating or non-litigating[7] per-member pool. This means that each municipal entity has one vote and each county has one vote, even if their jurisdictional reach overlaps.

_____

[7] A "litigating" class member is one who has an existing lawsuit, in any federal or state court, on file as of June 14, 2019.

Each Class member also has the same number of votes as its 2010 United States Census population in the litigating or non-litigating population voting pool.[8] This means that each municipal entity will be given a weighted vote for each person within that entity. At the same time, each county will be given a weighted vote for each person within the county, even though the same people may be counted in the municipal votes as well. In effect, there will be over 500 million potential votes total, reflecting that many people will be counted at both the county and municipal levels.

A voting supermajority of all six pools is required for a settlement offer to be approved. That supermajority is defined as 75% of the votes cast. Any settlement offer approved by the Negotiation Class by supermajority vote would then be subject to Court approval under the class action settlement approval process and criteria set forth in Rule 23(e). The supermajority voting process is described in Section VII of this Memorandum.

**Allocation**. On February 7, 2018, the Court appointed a Plaintiffs' Settlement Committee and authorized a support committee [Dkt # 118] who will continue to negotiate with defendants on behalf of plaintiffs as a whole, including the proposed Class. The proposed Class Counsel and Class Representatives would also, upon confirmation, participate in negotiations on behalf of the Class. The parties recognize it is probable that one or more defendants will seek to resolve the Opioid litigation by a joint settlement offer to one or more States and the cities and counties within that State. If a defendant offers a settlement of this nature, it would lead to

---

[8] Population data changes, and populations fluctuate. It is essential, however, as a matter of fairness and transparency, to have a known and official source for population that is compiled by an official source independent of the litigation. For settlements after 2020 United States Census data becomes available, that data will be used for population-related calculations. Population data is posted on the Class website.

discussion regarding allocation between the State and the cities and counties within the State. The first preferred result of that discussion is for each State to reach agreement with the cities and counties within the State on the allocation and use of the money within the State.  In the absence of an agreement, there would be a negotiation of an appropriate allocation.  If an allocation negotiation arises, initially three representatives from the Class -- Louise Renne (former City Attorney for the City and County of San Francisco), Mark Flessner (City of Chicago Corporate Counsel), and Zachary Carter (Corporation Counsel of the City of New York), and potentially several others to be designated as appropriate after Class membership is known, will join the Negotiating Team.  Their sole focus would be the allocation of monies between the States and the cities and counties.  Any agreed-to allocation would be treated as a settlement and submitted to the Negotiation Class for its consideration.  Again, the preferred alternative would be for a State and the cities and counties within the State to reach agreement.

**Class Counsel Fees**.  At the Classwide level, Class Counsel will apply to the Court for any Class Counsel fees and costs (including work done by any counsel for the common benefit under the Court's Orders prescribing same) under Fed. R. Civ. P. 23(h).  The structure and amount of such fees cannot be determined until settlements are negotiated, and could vary from settlement to settlement.  In every case, under class action rules (e.g., Fed. R. Civ. P. 23(h)), Class members would have notice and an opportunity to be heard on any application for Class Counsel fees and costs.  Class Counsel fees and costs as awarded by the Court would be allocated by the Class Action/ Common Benefit Fees Committee among individual applicants seeking compensation and reimbursement for Class-related, common benefit fees and costs, with recommended awards subject to resolution by the Special Master and subject to entry of a final Order by the Court.

- 42 -

VII.    **HOW THE SUPERMAJORITY VOTING PROCESS WORKS**

The agreement to be bound by a supermajority vote means that no settlement can be reached that would bind the Negotiation Class without the approval of a supermajority of the class, defined in several ways.  Each Class member votes once.  The votes cast are assigned to each of their applicable "pools" or categories.  To be binding, 75% of each of the following six categories must approve a proposed settlement:

1.   75% of the total number of cities and counties that had filed suit as of June 14, 2019.  This number is based on all individual class members who had suits on file regardless of size, so that each voting entity has one vote;

2.   75% of the total number of cities and counties that had not filed suit as of June 14, 2019.  This number is based on all individual class members who had no suits on file regardless of size, so that each voting entity has one vote;

3.   75% of the total voting population of all cities and counties that had filed suit as of June 14, 2019.  For this computation, each person in a voting city and each person in a voting county is the equivalent of one vote.  The population for each jurisdiction is drawn from the 2010 Census data, and is presented on the litigation website, opioidsnegotiationclass.com.  The data will be updated once the 2020 Census figures become available.  Many individual residents in this category may be counted twice, once as a resident of a municipality, and once as a resident of a county;

4.   75% of the total voting population of all cities and counties that had not filed suit as of June 14, 2019.  For this computation, each person in a voting city and each person in a voting county is the equivalent of one vote.  The population for each jurisdiction is drawn from the 2010 Census data, and is presented on the litigation website, opioidsnegotiationclass.com.  The data will be updated once the 2020 Census figures become available.  Many individual residents in this category may be counted twice, once as a resident of a municipality, and once as a resident of a county;

5.      75% of the litigating entities, weighted by their allocations as shown on the Settlement Allocation Lookup Tool to be posted at opioidsnegotiationclass.com;[9] and

6.      75% of the non-litigating entities, weighted by their allocations as shown on the Settlement Allocation Lookup Tool to be posted at opioidsnegotiationclass.com.[10]

In order for a proposed settlement to be binding on the Negotiation Class, a 75% supermajority of those voting must vote in favor.  No settlement may be approved as binding unless all categories are in favor at the requisite 75% level.  The 75% figure is calculated on the basis of the votes actually cast.  Consistent with the voting rules in Section 524(g) of the bankruptcy code, which also requires special qualified majorities for different categories, non-votes are not considered as part of the denominator.

## VIII.   HOW THE ALLOCATION MODEL WORKS

This allocation model addresses how settlement funds intended for local governments would be distributed among them.  It is designed to be as simple as possible, while still treating all cities, counties, and other municipal entities fairly – regardless of whether they brought suit.

The allocation model uses three factors to determine the share of a global settlement that each county will receive.  These three factors address the most critical causes and effects of the

---

[9] For purposes of determining a supermajority vote in this category, the allocation mechanism shall be based on the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and cities within them share the task of funding various government functions.

[10] For purposes of determining a supermajority vote in this category, the allocation mechanism shall be based on the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and cities within them share the task of funding various government functions.

- 44 -

opioid crisis:  (1) the number of persons suffering opioid use disorder in the county;[11] (2) the number of opioid overdose deaths that occurred in the county; and (3) the amount of opioids distributed within the county.

The allocation model gives each of these factors a straightforward, one-third weighting. The model is designed not to favor small, medium, or large counties based only on their population.  Although population is taken into account indirectly because the three factors above each tends to increase with population, the model allocates global settlement funds proportionally to where the opioid crisis has caused actual harm.

There are no perfect mechanisms to measure the three factors.  To ensure the model is as unbiased and transparent as possible, the model uses only data collected and reported by the federal government.  This is critical as the model follows the reporting mechanisms deemed most relevant by federal public health authorities.  The calculation process is explained below.

Note that the allocation model determines the percentage share of a settlement that each county will obtain, but does not itself determine how a county and the cities or other municipalities that are fully or partially within the county will divide this share.  *See* Section VIII E. below.

### A.    Factor One: Opioid Use Disorder

"Opioid use disorder" refers to dependence upon or abuse of prescription pain relievers and/or heroin, including addiction.[12]  Statistics on opioid use disorder are collected by the U.S.

---

[11] The term *county* as used in this document includes Louisiana parishes and New England townships.

[12] *See* Substance Abuse & Mental Health Serv. Admin., Ctr. for Behavioral Health Statistics and Quality, *2017 National Survey on Drug Use and Health: Methodological Summary and Definitions* (Sept. 2018), at 53, 128, 147, available at https://bit.ly/2LGmrLB [hereinafter "2017

*Footnote continued on next page*

Department of Health and Human Services (DHHS), and reported in the National Survey on Drug Use and Health (NSDUH).[13]

The allocation model uses NSDUH data to count the number of persons with opioid use disorder, both by county and nationally.[14]  Each county is then assigned a percentage representing its share of the total number of people with OUD in the nation.  For example, during the operative time period, there was an annual average of 9,444 persons with opioid use disorder in Cuyahoga County, Ohio, and 2,111,800 persons nationally; so Cuyahoga County is assigned a score of approximately 0.45% for this factor.

### B.      Factor Two: Overdose Deaths

The Multiple Causes of Death (MCOD) data are county-level, national mortality data reported by the National Center for Health Statistics (NCHS), the Centers for Disease Control and Prevention (CDC), and DHHS. The CDC makes summarized MCOD data, including counts of deaths caused by opioid drug poisonings, accessible online through a reporting system known

---

*Footnote continued from previous page*

NSDUH: Methodological Summary and Definitions"] (defining "Opioid Use Disorder" and "Heroin Use Disorder" for purposes of the survey).

[13] NSDUH data are accessible publicly at https://bit.ly/2HqF554.

[14] NSDUH survey respondents were classified as having an Opioid Use Disorder if they met criteria in the Diagnostic and Statistical Manual of Mental Disorders, 4th edition (DSM-IV, American Psychiatric Association, 1994), for either dependence upon or abuse of heroin, prescription pain relievers, or both in the past year.  *See* 2017 NSDUH: Methodological Summary and Definitions, at 146. Around 0.8% of the U.S. population is estimated to meet this definition.  NSDUH survey respondents were classified as having Opioid Misuse if they used prescription pain relievers for a non-medical purpose or used heroin any time during the past year.  *See id.* at 146, 215.  Opioid misuse is a broader measure than opioid use disorder, capturing around 4.7% of the U.S. population on average in the recent past. Because opioid use disorder data are available by state but not by county, the model imputes the number of people with OUD in each county of a state by distributing the number of people with OUD in that state across counties in proportion to opioid misuse rates, which are available at a more granular level. Specifically, NSDUH makes available opioid misuse rates at a substate (multi-county) level by grouping together nearby counties.  The model uses NSDUH data for the period 2007-2016.

as WONDER (Wide-ranging ONline Data for Epidemiologic Research).[15]  Because it is well-established that deaths caused by opioid overdose are under-reported, and that under-reporting varies geographically in predictable ways, the model applies a standard, accepted method (the "Ruhm adjustment") to unsummarized MCOD data to estimate opioid overdose deaths in each county.[16]

The allocation model uses adjusted MCOD data to count the number of deaths caused by opioid overdose, both by county and nationally.  Each county is then assigned a percentage share.  For example, during the operative time period, there were 2,139 opioid overdose deaths in Cuyahoga County, Ohio, and 347,641 deaths nationally; so Cuyahoga County is assigned a score of 0.62% for this factor.

### C.    Factor Three: Amount of Opioids

The United States Drug Enforcement Agency collects statistics on the amount of opioids shipped to a given location, and reports them in a database known as ARCOS (Automation of Reports and Consolidated Orders System).  The model uses ARCOS data to measure opioid amounts by counting "morphine milligram equivalents," or MMEs.[17]  The model counts MMEs instead of pills because different opioid drugs have different strengths – for example, a 10-mg hydrocodone pill has 10 MMEs, a 10-mg oxycodone pill has 15 MMEs, and a 10-mg

---

[15] *See* CDC WONDER, *About Multiple Cause of Death Data, 1999-2017,* https://bit.ly/2p8hDkp (last visited June 13, 2019). The model uses MCOD death data for the period 2006-2016.

[16] *See* Christopher J. Ruhm, *Geographic Variation in Opioid and Heroin Involved Drug Poisoning Mortality Rates*, 53 Am. J. Preventive Med. 745 (2017); Christopher J. Ruhm, *Corrected US Opioid-Involved Drug Poisoning Deaths and Mortality Rates, 1999-2015*, 113 Addiction 1339 (2018).

[17] Specifically, the model uses non-public ARCOS data for the period 2006-2014 produced by the DEA in *In re: National Prescription Opiate Litigation*, MDL No. 2804, which is subject to a confidentiality order.

hydromorphone pill has 30 MMEs.

The model measures the amount of MMEs that were shipped to a given location, both by county and nationally.  Unlike with Factor One and Factor Two, however, the model does not simply examine, for each county, the percentage of all MMEs shipped nationally.  Instead, the model first adjusts the number of MMEs in each county based on the extent to which those MMEs produced a negative outcome.  (*See* footnote 14 for details.)  The model makes this adjustment because the oversupply of opioids had more deleterious effects in some counties than in others.[18]

As with the other factors, each county is assigned a percentage representing its share of the national total for this factor.  For example, and for illustrative purposes only, Cuyahoga County, Ohio's adjusted MMEs from 2014-2016 are 8,450,486,702, and the sum of all counties'

---

[18] Mechanically, the MME adjustment works as follows.  First, the model calculates for each county two separate ratios:  (1) an opioid use disorder (OUD) ratio, and (2) an opioid overdose death ratio. The OUD ratio is calculated by dividing the percentage of people in a county with OUD by the percentage of people nationally with OUD.  So, if OUD is 10% more common in a county than nationally, that county's OUD ratio is 1.1.  Next, the model calculates an opioid overdose death ratio in the same way.  The county's MMEs are then multiplied by the higher of the two ratios.  To take Cuyahoga County, Ohio as an example: In Cuyahoga County, 0.89% of people have OUD; while nationally 0.82% of people have OUD.  So Cuyahoga County has an OUD ratio of approximately 1.09 (i.e., 0.89% ÷ 0.82%), reflecting that residents of the county are 9% more likely to have OUD than the average American.  Likewise, on average, 15.2 out of every 100,000 people in Cuyahoga County died of an opioid overdose annually between 2006 and 2016; while nationally 10.2 out of every 100,000 people died of an opioid overdose annually during the same period.  So Cuyahoga County has a death ratio of approximately 1.49 (i.e., 15.2 ÷ 10.2), reflecting that residents of the county were 49% more likely to die of an opioid overdose during that period than was the average American.  Because 1.49 is the higher of Cuyahoga's two ratios, its MMEs are scaled upwards by 49%.  This does not mean that Cuyahoga will receive 49% more than it otherwise would receive.  On the contrary, because all counties' MMEs are being scaled, this adjustment within Factor Three results in a 3.9% increase to Cuyahoga's total allocation, from 0.46% of the national allocation to 0.48%.  Ultimately, Factor Three takes into account not only the number of MMEs that were shipped to each county, but also the degree of harm those MMEs caused.

- 48 -

adjusted MMEs is 2,212,761,307,410, so Cuyahoga County is assigned a score of 0.38% for this factor.

### D.  Final Calculation

As mentioned above, each of the three factors is given an equal, one-third weight. For example, and for illustrative purposes only, Cuyahoga County, Ohio would receive the following three scores: (1) 0.45% for Opioid Use Disorder; (2) 0.62% for Overdose Deaths; and (3) 0.38% for MMEs.  The average of the County's three scores is around 0.48%.  Accordingly, Cuyahoga County would receive 0.48% of any global settlement amount.  Put differently, if a defendant reaches a national, global settlement with all cities and counties of $1 billion, Cuyahoga County would receive $4.8 million from that defendant.

### E.  Distribution Within Counties

The allocation model described above determines how funds will be allocated among *counties*.[19]  The next step is for each county and the cities *within* that county to reach agreement on how allocated funds will be directed within the county to abate the crisis.  The county and the cities within it may share the funds however they choose.

If a county and the cities within it cannot reach agreement on how to share the county's allocation, then the Special Master will divide the funds.  Unless one of the local governments provides an alternative approach for the Special Master's consideration, he or she will divide the funds by applying a formula that relies on federal data showing how counties and the cities within them historically have split funding for government functions potentially relevant to

---

[19] The term *county* as used in this section and throughout this document includes Louisiana parishes and New England townships.

opioid abatement.[20]  For example, and for illustrative purposes only, Cuyahoga County, Ohio contains 59 cities, including Cleveland and Parma.  The federal data show that Cuyahoga County is responsible for 64.5% of local government spending in the county on functions potentially relevant to opioid abatement, while Cleveland is responsible for 17.4% of spending, Parma is responsible for 1.5% of spending, and the other cities in Cuyahoga County together are responsible for 16.6% of spending.  Accordingly, if a defendant reaches a national, global settlement with all cities and counties of $1 billion, and Cuyahoga County receives $4.8 million, then Cuyahoga County would ultimately receive $3,096,000 (64.5%) of the settlement funds allocated to the County, Cleveland would receive $835,200 (17.4%), Parma would receive $72,000 (1.5%), and the remaining cities in Cuyahoga County would receive smaller amounts, totaling $796,800 (16.6%).  As noted above, the County government and city governments may agree to share the funds however they choose; the formula applies only if they cannot agree and no party to such a dispute presents an acceptable alternative formula to the Special Master.

---

[20] Specifically, the formula draws on US Census Bureau data on local government spending by function.  The Census of Governments Survey of State and Local Government Finances polls all state, county, township, city, and special district governments every five years, with 2012 being the most recent data available.  This data covers cities and counties for 98% of the U.S. population.  Data for some additional jurisdictions was backfilled from a survey of a sample of jurisdictions performed in 2016.  Finally, state-specific regression analyses were employed to create estimates for the very small number of remaining jurisdictions.  The functions or expenditure categories examined for each jurisdiction were: elementary and secondary education net of capital outlay, public welfare (including child protective services), hospitals net of capital outlay, health, police protection, fire protection, corrections net of capital outlay, housing and community development, and judicial and legal.  In this context, "net of capital outlay" means that capital costs—for constructing new facilities and renovating existing ones—are excluded for those expenditure categories.  If data from the 2017 Survey become available before the Special Master decides on the division of funds, it is anticipated that the Master would take those data into consideration in making a decision.

## IX.    THE NEGOTIATION CLASS MEETS ALL APPLICABLE REQUIREMENTS OF RULE 23

"*Amchem* makes clear that the certification provisions of Rule 23 are designed to 'focus court attention on whether a proposed class has sufficient unity so that *absent members* can fairly be bound by decisions of class representatives.'"  *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1091 (6th Cir. 2016) (citing *Amchem*, 521 U.S. at 621).  Here, the function of the Negotiation Class is to give all class members the opportunity to be present and active, rather than absent and passive, and to participate directly in their own settlement decisions, and the Negotiation Class has a super power:  it votes.

### A.    The Negotiation Cities/Counties Class Is Too Numerous For Individual Joinder, Meeting Rule 23(a)(1)'s "Numerosity" Requirement

Rule 23 is a joinder mechanism, an alternative to individual joinder when those with an interest in the issue or procedure are so numerous that joinder under Rule 18, 19, or 20 could be unwieldy.  No strict numerical tests exist to define Rule 23 (a)(1) numerosity; "substantial" numbers of class members "are sufficient to satisfy this requirement."  *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013) (quoting *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)).

Each of the over 1,200 cities and counties that is a named plaintiff in these MDL proceedings, and each of the nearly 1,000 additional cities and counties that have initiated their own actions in state court, has a vital interest in the effective resolution of their public nuisance and other claims.  This group by itself is too large to be involved, individually, in the settlement negotiations in which each has a vital interest.  Serial negotiations are unlikely to add up to as large a sum as could be obtained in a classwide settlement with a defined group of all cities and counties.  Moreover, it is highly unlikely that as fair and sensible an allocation among each could be reached in individualized settlements, as can be reached if the group works together and

- 51 -

speaks with one voice.  Accordingly, the "numerosity" requirement of Rule 23 (a)(1) is more than met in this case even if only actively litigating counties and cities were counted.

The need for a comprehensive settlement mechanism is of even greater scope.  In terms of sheer numbers there are approximately 25,000 cities and counties across the country, each of which understands, based on statements by the court that it would be able to participate in any global or class resolution in this MDL.  Moreover, by definition, the cities and counties are spread across the United States, located in every state and territory.

The class members (approximately 5,000 counties and 19,500 "incorporated places") are presently identified by an independent and authoritative agency, the United States Census Bureau.  While, through the use of technology, it is more than possible to communicate with them, to keep them advised of the proceedings in this litigation, and to enable them to participate and vote in any comprehensive settlement, the presence of scores, hundreds, or thousands of cities or counties in an actual negotiation room remains impracticable.  It is this very problem that the Negotiation Class solves:  It enables every one of them to be active, every one of them to participate, and every one of them to vote on any resulting settlement, without making the negotiation process unwieldy.

### B. There Are Questions Of Law And Fact With Common Answers, Fulfilling Rule 23(a)(2) Commonality and Rule 23(b)(3) Predominance Criteria

A question is common if its answer does not depend on who is asking.  This motion is not for trial, and does not raise issues of trial structure, sequencing, manageability or subclasses.  It does acknowledge the inescapable:  that there is no local immunity from the national opioids public health crisis, that it reaches every county and town, and that the fact of impact is a common one, varying only in degree.

Answers to the important factual questions about the nature and extent of each

- 52 -

defendant's conduct and role in creating or sustaining the epidemic, and whether these answers drive liability under the federal statutory law of Civil RICO and the bedrock common law of public nuisance, also have common answers.  The opioids crisis has cast a common pall over this nation.  Whether it is better to resolve the government entities' claims by resolution rather than trial also raises profound common questions of public policy, governance, and equity:  a unitary settlement with a national treatment, prevention, and enforcement plan is far greater in effectiveness than any sum of piecemeal settlements, and the single procedural question before the proposed Negotiation Class is whether the Class members prefer to organize themselves into a pre-existing voting trust with known allocations and procedures to decide on offers to settle.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation marks omitted); *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015). Commonality may arise from one question, whose answer will resolve an issue that is central to a shared claim "in one stroke." *Dukes*, 564 U.S. at 350.  The *Dukes* standard, derived from a now-classic article on the related Rule 23 (b)(3) predominance inquiry, "focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit." *Id.* (citing Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)); *Whirlpool*, 722 F.3d at 852.

Here, a course of conduct by multiple defendants that spanned decades is alleged in common terms by hundreds of cities' and counties' complaints, including the instant action. Across the many complaints before the Court is a common core of factual allegations concerning the conduct of the defendants, the result in terms of promoting and facilitating opioid addiction, and the devastating result of opioid addiction on communities across the country.  The common

1725838.15

core of factual issues in this case is what gave rise to coordination in the MDL and serves as a reason for the use of scheduled bellwether trials:  to assess the strength and potential value of the common core of factual claims by all affected local jurisdictions.  There is no need to repeat verbatim in this pleading the factual allegations that are the centerpiece of complaint after complaint in the actions before this Court.  These common factual allegations will ultimately have answers that are, or should be, common, and they correspond to elements of liability under legal claims and theories that are, literally, common.  This motion does <u>not</u> contemplate a classwide trial of any of these myriad common questions, even though a case can be made, viewing the opioids crisis panoramically, that the common questions of law and tort arising from this common series of events far outweigh—dramatically predominate over—the questions that affect any of the individual members of the class, in satisfaction of Rule 23 (b)(3).

The difficulty that arises from testing such an assertion at any classwide cities/counties trial at this stage of the litigation, is one of manageability.  A series of bellwether trials appears to be the most practicable mechanism to obtain sample answers at this stage.  But trial manageability does <u>not</u> impair a class certified to promote settlement.  As *Amchem* observed, manageability issues can preclude a trial-purposes class without disabling one certified for purposes of avoiding trial, by promoting resolution as the common answer.  *See Amchem*, 521 U.S. at 620.

### C.   The Claims Of The Class Representatives Are Typical Of The Claims Of The Class Under Rule 23(a)(3)

As this Court is aware, this MDL litigation is characterized by two recurring claims, made by virtually every city and county plaintiff in this case, deriving from the same factual allegations about the defendants' products and defendants' conduct:  public nuisance and Civil RICO.  While complaints also include more localized or statewide claims, public nuisance and

- 54 -

Civil RICO are the recurring common themes and legal theories.  They are the typical claims in the case under Rule 23 (a)(3), and those shared by the class representatives with the members of the cities/counties Negotiation Class.  Representatives' claims that arise from the same conduct and are based on the same legal theories fulfill Rule 23 (a)(3) typicality. *Daffin*, 458 F.3d at 553. The opioids crisis is nationwide.  While it has numerous epicenters that are particularly hard-hit, it also shares a nationwide character.  Meaningful resolution may require nationwide settlements that are also custom-tailored, as appropriate to meet the needs of the respective communities.  A comprehensive settlement program with both nationwide and localized components is best suited to accomplish this relief, and is best negotiated by taking account of the typical claims that unite the members of the class, are shared by the class representatives, and would be addressed through settlement.

### D.    The *Sine Qua Non* Of The Negotiation Class Is The Achievement Of Adequate Representation Meeting Rule 23(a)(4) Requirements

The problem perceived by the Supreme Court in *Amchem*, which scuttled an ambitious settlement of nationwide asbestos claims—a settlement that never was rebuilt—was the absence of active, participating class representatives on behalf of every identifiable category of claimants. Here, the negotiations class is comprised solely of cities and counties, which share common problems, and have asserted common claims.  Other categories of MDL plaintiffs, such as Tribes or third party payors, may form their own litigating or negotiating groups or classes.  This motion does not stop them, it may encourage them, but it does not include them. While there are many differences among the smallest of towns and the largest of urban centers, and between underfunded rural entities and large counties with pre-existing infrastructures, such that the allocation of settlement funds must be addressed with care and participation, there is an overarching recognition that the opioids problem cannot effectively be addressed unless *all* cities

- 55 -

and counties participate.  This Court perceived an inescapable fact early on, which the cities and

counties know all too well:  opioids do not respect city and county boundaries, and one city's

problem can easily become another's.  Government entities must work together.  They won't be

able to work together effectively, unless they can share information, power, and agency with

each other in an appropriate way.  The structural assurance of adequate representation of all

interests is ideally found in the literal structure of the negotiations class itself:  here, the

certification process creates a preexisting class which will come to the table with its constituents'

interests and identities known and articulated and with the right to vote any resulting settlement

up or down.  *See Amchem*, 521 U.S. at 628.

Rule 23 (a)(4) requires that "the representatives will fairly and adequately protect the

interests of the class."  Adequacy is financially assured where the responsibilities and class

members have the same claim functionally with the same basic factual predicates:  they are

facing and trying to solve the same problems.  *See Daffin*, 458 F.3d at 553-54.  Assurances of

adequate representation are found structurally, in the representation or negotiation process, or

substantively, in the terms of the resulting settlement.  *Amchem*, 521 U.S. at 627-28.  Both

structural and functional assurances are built into, indeed, are the essential purpose, of the

Negotiation Class.

The proposed Negotiation Class Representatives comprise a wide array of counties and

cities of every size, urban and rural, from across the country.  They have been active in Opioids

litigation at the federal and state level.  They have invested their time and resources in

conducting litigation and exploring resolution.  They are represented by members of the Court-

appointed Plaintiffs' Executive Committee, who have been charged with the prosecution of the

Opioids MDL litigation for the common benefit of plaintiffs.  They have been actively engaged

in settlement negotiations, including assessment of the financial resources of Defendants, through the Court-appointed Settlement Committee.  They are well-armed to represent the Negotiation Class in obtaining the best settlement offers—for the Class itself to accept or reject.

The adequacy factor demands heightened attention in the settlement context, because a court presented with a settlement and settlement class simultaneously will lack the opportunity "to adjust the class, informed by the proceedings as they unfold."  *Amchem*, 521 U.S. at 620.  Here, the Negotiation Class itself will pre-exist any settlement proposal, will itself give heightened attention to the merits of any proposal itself, indirectly through its negotiating representatives <u>and</u> directly, by voting; all of which proceedings unfold after the Court has confirmed the Negotiation Class and before the Court considers or approves any actual classwide settlement under Rule 23(c).  Both Class and Court will be informed on an ongoing basis and can make informed decisions as these proceedings unfold.  Here, adequacy is no afterthought; it is designed into the mechanism.  Full use is also made of current technology in facilitating information to, and communications with, Class members through the Internet, to enable and optimize active participation by Class members.[21]

What is most critical here is that there is no risk of class representatives failing to represent the interests of passive, absent class members.  This is the ultimate "participatory class action."[22]  The only purpose of this Negotiation Class is to give all class members a direct voice in approving or rejecting any proposed settlement, and to do so on the basis of previously

---

[21] See Robert H. Klonoff, Mark Herrmann & Bradley W. Harrison, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. Pitt. L. Rev. 727 (2008) (anticipating how advanced electronic communication can facilitate class member participation).

[22] *See* Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action,* 92 N.Y.U. L. Rev. 846 (2017).

- 57 -

established, clear voting rules.

This proposal gives class members significantly more protection and information than is given to class members in the normal contested litigation class that ultimately settles.  In the latter situation, class members have to decide whether to opt out at the time of class certification, before they have any idea whether there will be a settlement – or what the terms of a settlement will be.  If a case later settles, class members who didn't opt out earlier cannot opt out if they don't like the settlement.  (While Rule 23 does allow courts to grant an optional second opt out, in practice they rarely do so.)

The structure here, by contrast, would not cram down any settlement without a supermajority approval.  Instead, cities and counties will know up front the allocation metrics and formula when making their opt out decisions.  A direct comparison between this proposal and the well accepted approach used for a contested class certification highlights that what is being proposed here is really quite modest.  The more extreme circumstance is the accepted one of forcing someone to opt out before the class member has any idea what a settlement might include.[23]  While this is a "novel" proposal, it does not push the application of Rule 23 beyond its terms, its spirit, or its functional goals.  Compared to the universally accepted contested litigation scenario, class members here are well protected.

In short, this is not an aggressive new use of the class action device, but a new

---

[23] The ALI noted this very concern in *ALI Principles*, and proposes that, ordinarily, a second opt-out be provided when "the terms of the settlement are not revealed" until after the opt out.  *ALI Principles*, § 3.11.  As it acknowledges, under Rule 23 itself this "applies only as a matter of discretion, and few courts have ordered a second opt-out."  *Id.* at Comment a.  Here, of course, any settlement would not merely be "revealed" to a passive or disinterested Class as a done deal; the very purpose and function of the Class, known by Class members going in, is to negotiate and vote on its own deal.

- 58 -

application that is faithful to the animating principles of Rule 23 and enhances its protections for the benefit of the Class.

## X.  THE NEGOTIATION CLASS MEETS THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(b)(3)

The Negotiation Class is proposed for certification under Rule 23(b)(3), to enable class members to elect membership through an opt-out provision.  No class member will be bound unless it finds the proposed negotiation and voting mechanism to be suitable.  Rule 23(b)(3) classes are appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.  Predominance

For anyone with familiarity with the events giving rise to opioids litigation, to ask the Rule 23(b)(3) predominance and superiority questions is to answer them in the affirmative.  The opioid crisis is a national crisis with local impact.  It affects each and every class member individually, but not only individually:  to be effective, any remedial measures applied to address and combat the crisis must be coordinated above the local or individual level, but must reach those levels as well.

The crisis requires nationwide remedies.  The class members are well aware of this.  At the state level, virtually all Attorneys General have now taken action, in courts or through administrative prosecutions, against one, some, or all of the major opioids defendants.  Over 1,200 cities and counties have filed suits against these defendants, which are now coordinated and centralized before this court.  The Attorneys General have been diligently discussing settlement proposals and alternatives for over a year, as has the PEC, on behalf of the states, the

- 59 -

litigating (and non-litigating) cities and counties.  What arise inevitably in the course of these discussions are predominantly common issues arising from predominantly common questions, not only of law and fact with respect to the underlying controversy (see above commonality section) but as to what are the best practicable solutions.

What has emerged is a consensus that the best solutions are programmatic, centralized, or at least administered in a coordinated fashion, to obtain the most cost-effective remedies soonest, and to get the most benefit from the substantial, yet finite, resources of the defendants who are being called upon to account, with cash and with behavioral reforms, for the underlying common conduct that created this crisis.  The application of these remedies will undoubtedly vary locally, to address specific local needs, but must, in some fashion, be administered and controlled on a common level.  As this court is aware, over a year has been spent in intensive settlement negotiations, with one of the first concepts to emerge, and gain consensus, being the need for programmatic equitable remedies to provide prevention, treatment, rehabilitation, and enforcement mechanisms: mechanisms that will be required to be sustained over many years to address and reduce the epidemic.  Dollars are necessary, but not sufficient.  Behavioral modification, at all levels and by all parties, is essential.

Instinctively, some class mechanism seems best suited to accomplish these goals.  As the court is well aware, various Rule 23 proposals have been considered and developed.  Class action experts have been consulted.  Plaintiffs and defendants alike have given serious consideration to Rule 23(b)(1) and Rule 23(b)(2) mechanisms.  There are advantages and disadvantages to each, and it may well be that some parties turn to them again for some settlements in this litigation.  At this time, however, the comparative analysis between these and the more familiar form of class organization that Rule 23(b)(3) represents weigh in its favor.

- 60 -

B.    **Superiority**

Rule 23 (b)(3) asks the relative, rather than absolute, question of whether a class action is "superior to other available methods," not whether it is a perfect solution.  Rule 23 (b)(3) superiority is most obvious when the vindication of small claims would be precluded by the cost of pursuing them individually.  *See Amchem*, 521 U.S. at 617; *Carroll v. Compucred Collections, Inc.*, 399 F.3d 620, 625 (6th Cir. 2005).  The superior feasibility of a class mechanism is as self-evident here, where the sheer scale of damage done by the opioids epidemic is staggering, discovery and trial is complex and costly for all parties, and the claims of each of the thousands of cities and counties facing the ongoing economic burden is substantial.  Some method must be found to conserve finite funds otherwise exhausted in replicative litigation, and to allocate them fairly among all who need them.

The Negotiation Class voting process is the superior mechanism to maximize the prospect of comprehensive rather than piecemeal settlement.  Comprehensive settlements are inherently superior ways of delivering programmatic, sustained, enforceable, cost-effective and equitably allocated remedies-precisely the outcome all cities and counties have a legitimate interest in obtaining here.

Rule 23(b)(3) includes a non-exhaustive list of factors pertinent to the court's 'close look' at the predominance and superiority criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem*, 521 U.S. at 616.

Each of these (A)-(D) superiority factors strongly favors certification of the Negotiation

- 61 -

Class to effectuate optimal classwide settlements for cities and counties.

(A) <u>Individual control</u>.  The Class itself reflects these entities' interests in autonomy and self-determination through voting, while giving them a collective voice.  It gives class members the capacity to offer a credible settling partner without the risk of holdouts or strategic objections from a minority.  If class members choose to stay in the class, they are knowingly making the decision to trade their right to exit for a right to participate in a comprehensive settlement mechanism.  This class includes an innovation that further enhances superiority while honoring individual control:  the added feature of voting rights, to augment the traditional option of class members – to object to or opt out of pre-negotiated settlements, by giving them voice, and votes, at the outset of each settlement cycle.

(B) <u>Extent of Existing Litigation</u>.  So many cases raising common questions of fact have been filed that an MDL has already been established, centralizing over 1200 cases, most brought by cities and counties, based on the same general facts or fact issues, and asserting similar claims.  Hundreds of additional analogous suits have been brought by cities and counties in state courts.  This motion would not remove them to federal court, make them part of MDL 2804, or disturb their progress.  It would, however, provide a central mechanism to effectuate a voluntary classwide solution for all of them.

(C) <u>Limited-Purpose Centralization</u>.  The proposed Negotiation Class recognizes the need to organize a fair and efficient mechanism to facilitate the resolution of hundreds of existing suits, while enabling many thousands of additional cities and counties to participate in resolutions that benefit all, while avoiding the ever-greater proliferation of individual suits.  It coordinates the resolution mechanism in a centralized and logical forum, the MDL Court, without interfering with the prosecution of state court actions by those who desire to pursue them.  It transcends the

palpable management difficulties of both the individualized multi-jurisdictional piecemeal litigation of cities' and counties' claims as it now exists, *and* the management challenges of a litigation class, by *creating* a classwide resolution mechanism. This class includes an innovation that further enhances superiority: the added feature of voting rights, to augment the traditional option of class members – to object to or opt out of pre-negotiated settlements, by giving them voice, and votes, at the outset of each settlement cycle.

Moreover, the class members vote globally, and act to implement settlements locally, balancing common interests and individual needs. Each county and its constituent cities must determine how to allocate the county-level settlement amount, to account for the variance, from place to place, of the services provided and the burdens undertaken by each.

(D) <u>Manageability</u>. Neither Rule 23 itself nor its interpretive case law divides class actions into litigation and settlement subspecies, though recently-amended Rule 23(e) borrows and builds on class action settlement approval case law by codifying a specific court approval process (including a process to resolve previously uncertified cases, including uncertifiable-for-trial cases) and articulates the criteria to inform it. Moreover, Rule 23(b)(3)'s own factors are functionally inflected. As the Supreme Court has noted, "Settlement is relevant to a class certification" and in the "Settlement-only" class certification context, "a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.

Here, the Negotiation Class fulfills the Rule 23(b)(3)(D) manageability factor not merely in the negative sense—by avoiding intractable trial management concerns—but in a positive way, by creating a more manageable (and fairer) vehicle for negotiating and considering potential settlements than would either piecemeal, serial negotiations with thousands of entities, or a

traditional settlement class in which the class and the court are simultaneously presented with a done deal. Here, the class manages the process of ready agreement.

## C. The Negotiation Class Also Merits Certification Under Rule 23(c)(4)

The Sixth Circuit, as have all others, has endorsed the utilization of Rule 23(c)(4) to provide class treatment for single issues or aspects of a case, leaving others to individualized adjudication or later consideration.

As approved by the Sixth Circuit, "Rule 23(c)(4) contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution."[24] It "is particularly helpful in enabling courts to restructure complex cases to meet the other requirements for maintaining a class action."[25] "'A district court has broad discretion to decide whether to certify'" a Rule 23 (c)(4) class.[26]

The certification of a class of governmental decision-makers—cities and counties—to create a voting trust to consider, in turn, prospective comprehensive settlement of claims against specific defendants in this litigation is an innovative and appropriate application of Rule 23(c)(4). Here, the issue is not one of a common question of conduct or liability, nor the actual adjudication, on the merits, of any claim or issue (although Rule 23(c)(4) could be available for these purposes on the litigation track of this MDL). Rather, it is a common issue of process: how to establish a procedural mechanism that provides integrity and inclusiveness to the process

---

[24] *Martine v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018), *cert. denied,* 139 S. Ct. 1319 (2019).

[25] 7AA Charles Alan Wright *et al.*, *Federal Practice and Procedure* § 1790 (3d ed. 2018) [hereinafter "Wright & Miller § 1790"]. Wright & Miller § 1790 provides a valuable summary of case law and concerns that can arise with issue-based class actions under Rule 23(c)(4).

[26] *Behr Dayton*, 896 F.3d at 411.

of settlement consideration and approval.

In the usual class action, a relatively passive class awaits a settlement proposal that is pre-negotiated, and pre-approved.  After the court has made a preliminary finding that the proposed settlement is likely to be approved, notice is sent to potential "settlement class" members who then have three choices:  stay in the class and await final approval, and a subsequent claims or distribution process; "opt out" of the class and go their own way; and stay in the class and object to the settlement.  These alternatives, as a matter of well-established law, provide sufficient due process to class members, in conjunction with active scrutiny by the court.

In this case, the Class is unique:  comprised of governmental decision makers who themselves have constituencies, and are used to more active decision-making.[27]  They are in the business of governing, of making contacts, and of figuring out how to maximize their resources in pursuit of their needs.  Authorization by voting, through boards of supervisors, city councils, or analogous bodies, is what they do.  It is thus appropriate to assure their optimal participation at every practicable stage of the settlement negotiation and approval process.  Accordingly, here the class comes <u>first</u>, before any proposed settlement, to decide for itself whether the allocation system described in this motion and on the Negotiation Class website, is one in which each wishes to participate.  Moreover, this participation is informed:  class members know they will

---

[27] As the *ALI Principles* observes, it is precisely because of the class members' sophistication that the proposal here is so reasonable.  *See, e.g.*, § 3.17 comment d.(2) ("Sophisticated clients, such as businesspersons or investors, are more likely than others to appreciate the benefits and risks of subjecting themselves to some form of substantial-majority rule.  Consequently, it is easier to justify the use of [substantial-majority] voting rules when sophisticated clients are involved").  *See also* Reporters' Notes to § 3.17, at 271-75 (citing extensive authority on the ethical propriety of appropriate voting procedures for businesses and other sophisticated clients).  Here, the Class is comprised entirely of a specific category of sophisticated clients:  local governmental entities, for whom voting is existential and familiar.

- 65 -

have a vote, and that a supermajority of both large and small entities will be required before any

settlement proposed by the defendants is approved by them.  Thereafter, the additional, and

traditional, class protection of the Rule 23(e) settlement approval process will apply.

Accordingly, it is appropriate both under Rule 23(b)(3), and, independently, under

Rule 23(c)(4) for the Negotiation Class to be certified so that this active participation, decision-

making, voting trust process can be put in place, creating a pre-existing and cohesive class of

cities and counties whose interests are aligned in obtaining the optimal settlement to address and

battle the opioid crisis that affects them all.

## XI.    THE CLASS NOTICE AND DIRECT NOTICE PROGRAM FULFILL THE "BEST PRACTICABLE NOTICE" STANDARDS OF RULE 23(c)

All members of the proposed class are known governmental entities, identified by the

United States Census Bureau, and listed on the Negotiation Class website,

www.Opioidsnegotiationclass.com.  Each is an official and self-conscious entity, each is

reachable by mail and/or email, and each will so be notified here.  Such direct and individualized

notice is the gold standard under Rule 23(c), fulfills all due process requirements, and, most

importantly, will reach and provide all class members with the information they will need to

make class membership decisions.

Rule 23 (c)(2)(B) describes the notice to be given to a Rule 23(b)(3) Class:

For any class certified under Rule 23(b)(3), the court must direct to class members
the best notice that is practicable under the circumstances, including individual
notice to all members who can be identified through reasonable effort.  The notice
must clearly and concisely state in plain, easily understood language:

(i)      the nature of the action;
(ii)     the definition of the class certified;
(iii)    the class claims, issues, or defenses;
(iv)     that a class member may enter an appearance through an attorney if the
         member so desires;
(v)      that the court will exclude from the class any member who requests
         exclusion;

- 66 -

(vi)  the time and manner for requesting exclusion; and

(vii)  the binding effect of a class judgment on members under Rule 23(c)(3).[28]

The form of the proposed Class Notice and the FAQs attached to the [Proposed] Order filed with this Motion include the information specified in Rule 23(c)(2)(B).  They will be mailed and emailed to all Class members by a retained and Court-approved notice provider. They will also be posted, together with the Class lists, Settlement Allocation Lookup Tool, the Motion, this Memorandum, and further motions and orders of the Court, as well as additional pertinent information as it becomes available, on the Class website.  The Class website, opioidsnegotiationclass.com, will serve as a central information clearinghouse for the Class, enabling informed and active ongoing participation by providing Class members with the following:

### Opioid Negotiation Class Official Website Content Checklist

1. U.S. Census Bureau list of counties and "incorporated places," with 2010 Census population figures

2. Allocation Lookup Tool

3. Notice of Motion, Motion and Memorandum in Support of Negotiation Class Certification

4. Order Granting Class Certification and Approving Class Notice Action

5. Class Action Notice

6. Allocation Formula (explain MME/overdose deaths/OUD one-third/one-third/one -third and describe supporting metrics

7. Voting Procedure Summary and Supermajority formula

8. Frequently Asked Questions ("FAQs")

---

[28] Courts have flexibility to allow those who opt out in error or precipitously to opt back in, to share in the Class benefits, if to do so will be fair to the Class and to interested defendants' ability to determine the scope of the Class in approaching the negotiation.  Here plaintiffs support such a "right of return" if it is requested by an entity within 30 days of the Court's confirmation order.

- 67 -

**Opioid Negotiation Class Official Website Content Checklist**

9.      Link to the Court's MDL 2804 website, www.ohnd.uscourts.gov/mdl-2804, and a general Opioids litigation information website nationaprescriptionopiatemdl.com

10.     List of Class Representatives

11.     List of Class Counsel

12.     Exclusion Request description and procedure

13.     Schedule of deadlines and hearing dates

## XII.     <u>CONCLUSION</u>

WHEREFORE, the above-listed Plaintiffs/Proposed Class Representatives, by and through the undersigned Court-appointed counsel, respectfully urge preliminary approval of the Negotiation Class, an order directing dissemination of the notice to the proposed Class, and the scheduling of a final certification hearing after the completion of the notice program and opt-out period.

Dated:  June 17, 2019          *Co-Lead Counsel*

By:      /s/ Paul J. Hanly, Jr.
             Paul J. Hanly, Jr.

SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
Tel:     212-784-6401
Fax:     212-213-5949

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd. 17th Floor
Mount Pleasant, SC 29464
Tel:     843-216-9000
Fax:     843-216-9450
Email: jrice@motleyrice.com

Paul T. Farrell Jr.
GREENE KETCHUM, FARRELL, BAILEY & TWEEL, LLP
419 Eleventh Street
Huntington, WV 25701
Tel:    304-525-9115
Fax:    304-529-3284
Email: paul@greeneketchum.com

*Plaintiffs' Liaison Counsel*


By:     /s/ Peter Weinberger
        Peter Weinberger

SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue, E, Ste. 1700
Cleveland, OH 44114
Tel:    216-696-3232
Fax:    216-696-3924
Email: pweinberger@spanglaw.com

Steve Skikos
SKIKOS, CRAWFORD, SKIKOS AND JOSEPH
1 Sansome Street Ste. 2830
San Francisco, CA 94104
Tel:    415-546-7300
Fax:    415-546-7301
Email: sskikos@skikos.com

Troy Rafferty
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
  RAFFERTY AND PROCTOR
316 South Baylen Street Ste. 600
Pensacola, FL 32502
Tel:    850-435-7163
Fax:    850-436-6163
Email: trafferty@levinlaw.com

Dated:  June 17, 2019          *Plaintiffs' Executive Committee*

By:     /s/ Elizabeth J. Cabraser
             Elizabeth J. Cabraser

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Flr.
San Francisco, CA 94111
Tel:     415-956-1000
Fax:     415-956-1008
Email: ecabraser@lchb.com

Don Barrett
BARRETT LAW GROUP,
404 Court Square, P.O Box 927
Lexington, MS 39095
Tel:     662-834-2488
Fax:     662-834-2628
Email: DonBarrettPA@gmail.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
  AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel:     973-994-1700
Fax:     973-994-1744
Email: jcecchi@carellabyrne.com

Erin K. Dickinson
CRUEGER DICKINSON LLC
4532 North Oakland Avenue
Whitefish Bay, WI 53202
Tel:     414-210-3767
Email: ekd@cruegerdickinson.com

James R. Dugan, II
THE DUGAN LAW FIRM, APLC
365 Canal Street Ste. 1000
New Orleans, LA 70130
Tel:     504-648-0180
Fax:     504-648-0181
Email: jdugan@dugan-lawfirm.com

- 70 -

1725838.15

Paul J. Geller
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road Ste. 500
Boca Raton, FL 33432
Tel:     561-750-3000
Fax:     561-750-3364
Email: pgeller@rgrdlaw.com

Michael J. Fuller
MCHUGH FULLER LAW GROUP
97 Elias Whiddon Road
Hattiesburg, MS 39402
Tel:     601-261-2220
Fax:     601-261-2481
Email: mike@mchughfuller.com

R. Eric Kennedy
WEISMAN KENNEDY & BERRIS CO., LPA
1600 Midland Bldg.
101 Prospect Avenue, W
Cleveland, OH 44115
Tel:     216-781-1111
Fax:     216-781-6747
Email: ekennedy@weismanlaw.com

W. Mark Lanier
LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
Tel:     713-659-5200

Peter J. Mougey
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY &
  PROCTOR, PA
316 South Baylen Street Ste. 600
Pensacola, FL 32502
Tel:     850-435-7068
Fax:     850-436-6068
Email: pmougey@levinlaw.com

- 71 -

Ellen Relkin
WEITZ & LUXENBERG, P.C.
700 Broadway 5th Floor
New York, NY 10003
Tel:     212-558-5715
Fax:     212-344-5461
Email: erelkin@weitzlux.com

Lynn Sarko
KELLER ROHRBACK
1201 Third Avenue Ste. 3200
Seattle, WA 98101
Tel:     206-623-1900
Fax:     206-623-3384
Email: lsarko@kellerrohrback.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road Ste. 305
Melville, NY 11747
Tel:     212-397-1000
Fax:     646-843-7603
Email: hunter@napolilaw.com

Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel:     973-639-9100
Fax:     973-639-9393
Email: cseeger@seegerweiss.com

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd. Ste. 1600
Los Angeles, CA 91436
Tel:     818-839-2333
Fax:     818-986-9698
Email: rtellis@baronbudd.com

- 72 -

James D. Young
MORGAN & MORGAN
76 South Laura Street Ste. 1100
Jacksonville, FL 32202
Tel:     904-361-0012
Fax:     904-366-7677
Email: jyoung@forthepeople.com

*On the Brief*:
Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Tel:     (212) 998-6580
Email: samuel.issacharoff@nyu.edu

1725838.15