1               IN THE DISTRICT COURT OF THE UNITED STATES
                 FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION

3

          IN RE:                      Case No. 1:17MD2804
4         NATIONAL PRESCRIPTION        Cleveland, Ohio
          OPIATE LITIGATION
5                                      June 25, 2019
                                       1:03 p.m.
6

7

8                         - - - - -

9

10          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE DAN A. POLSTER,

12            UNITED STATES DISTRICT JUDGE, AND

13       DAVID A. RUIZ, UNITED STATES MAGISTRATE JUDGE.

14

15                        - - - - -

16

17

18

19

20   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
21                            801 West Superior Avenue
                              Cleveland, Ohio  44113
22                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
23

24

25

1    APPEARANCES:

2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                  Hunter J. Shkolnik, Esq.
3                                 Donald A. Migliori, Esq.
                                  W. Mark Lanier, Esq.
4                                 Paul J. Hanly, Jr., Esq.
                                  Paul J. Geller, Esq.
5                                 Elizabeth Cabraser, Esq.
                                  Paul Farrell, Esq.
6                                 Salvatore C. Badala, Esq.
                                  Joseph Rice, Esq.
7                                 Jayne Conroy, Esq.
                                  Frank L. Gallucci, III, Esq.
8                                 Linda Singer, Esq.
                                  Paulina do Amaral, Esq.
9                                 Andrea Bierstein, Esq.
                                  John A. Baden, IV, Esq.
10                                Robert Leone, Esq.
                                  Mark Dearman, Esq.
11                                James W. Ledlie, Esq.
                                  James Cecchi, Esq.
12
     For the Defendants:          Mark S. Cheffo, Esq.
13                                Steven A. Reed, Esq.
                                  Donna M. Welch, Esq.
14                                Carole S. Rendon, Esq.
                                  Mark H. Lynch, Esq.
15                                Kaspar J. Stoffelmayr, Esq.
                                  Lane Heard, Esq.
16                                Robert Nicholas, Esq.
                                  Sean O. Morris, Esq.
17

18   ALSO PRESENT:                Special Master David Cohen
                                  Special Master Francis McGovern
19                                Special Master Cathy Yanni

20

21   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
22

23

24

25

<u>TUESDAY, JUNE 25, 2019, 1:03 P.M.</u>

THE COURT:  All right.  Everyone can be seated.

THE CLERK:  If anyone has a phone or an iPad or anything really close to the mic, if you would pull that back.  That causes the static.

THE COURT:  All right.  We're reconvening in the opioid MDL.

This is sort of what we call the roadmap presentation.  I've invited each side or each group to discuss for the Court the summary judgment motions they have filed or plan to file by Friday's deadline to suggest to the Court how they interrelate and, most significantly, to prioritize them because I've told both sides if we get inundated with dispositive and *Daubert* motions, that, of course, the Court will review them all, but most would be denied without opinion.

So I need some guidance, so I appreciate the presentations that we're about to receive.

So I don't know if the format was the plaintiffs first or defendants first or how do we do it.  It really doesn't -- yes, Mr. Lanier.

MR. LANIER:  Yes, Your Honor.  I believe plaintiffs are to go first.

THE COURT:  All right, fine.  We'll go to

1    the plaintiffs' side.

2              MR. LANIER:  Thank you.  May it please the

3    Court, Your Honor.

4              Our desire is to follow assiduously your

5    directions, and so we are here to roadmap and give you

6    information on three points.  We are not here to argue

7    substance or try to poison the well, if it were, on any

8    of these.

9              THE COURT:  I don't think you'd poison it,

10   but I appreciate that, that the purpose is not for

11   argument.

12             MR. LANIER:  Yes.

13             THE COURT:  If I need that, I'll get it way

14   down the road.

15             MR. LANIER:  With that admonition in mind,

16   Your Honor, the first item that I want to inform the

17   Court about is we have pleaded fraud.

18             Fraud, we believe the activities of fraud

19   that we would try to prove are activities that are

20   subsumed within other actions, including RICO and the

21   Ohio statutory RICO equivalent.  And so we will be

22   dropping the fraud claims.

23             That will remove one of the summary

24   judgments of the defendants, and it's something that I'm

25   delighted to be able to tell the Court is the beginning

1    of us continuing to trim down what we've got.

2            With that announcement, Your Honor, that

3    leaves us with two other things on the agenda that you've

4    given us.  One is roadmapping the summary judgments, and

13:06:33  5    the other is the *Daubert* motions.

6            On the summary judgment motions, Your

7    Honor, we anticipate filing three.  We would prioritize

8    them in the following manner.

9            The first in priority is a partial

13:06:50 10    adjudication of duties under the Controlled Substances

11    Act.  This is basically our motion to counter the

12    argument of "I'm just a truck driver," that a number of

13    the distributors especially seem to make.

14            We anticipate filing that because we

13:07:09 15    believe that it will help direct not only settlement

16    issues, but it will help direct the trial itself and

17    streamline the trial if we all have a common

18    understanding of the duties under the Controlled

19    Substances Act that are relevant for our case.

13:07:25 20            The second motion that we anticipate filing

21    on summary judgment is a partial summary judgment

22    abatement of public nuisance that will have two aspects

23    to it.

24            The first aspect is the finding of an

13:07:42 25    ongoing nuisance.  The second aspect -- and the nuisance,

1       of course, being a significant interference with public

2       health.  The second being the joint and several liability

3       to abate for any defendant who is a substantial

4       contributor.

13:08:00  5       We do not believe that the apportionment

6       statute will be applicable under those equitable claims

7       to abate, and we believe that when the Court rules on

8       this summary judgment, it will strike a number of the

9       affirmative defenses and streamline the trial as well.

13:08:16 10       Our third motion for summary judgment is

11      actually related in part to the first motion for summary

12      judgment that I described to you, but in priority terms

13      we put it third because we think that it would be the

14      third one that we believe should be looked at, and that

13:08:35 15      is if the Court rules on our partial adjudication of

16      duties under the Controlled Substances Act motion, which

17      we hope the Court will, then we will also be seeking a

18      factual or an undisputed factual summary judgment of each

19      of the defendant violations.

13:08:54 20       And if the Court will rule on these, each

21      defendant that we're able to deal with on that basis will

22      take a chunk out of the trial.

23      Those are the only three motions for

24      summary judgment we anticipate filing, Your Honor.

13:09:07 25      On the *Daubert* motions, which is the third

1    thing to cover with you here, we will not be filing any

2    *Daubert* motions.

3                    We believe that the motions that we would

4    file in front of you all concern matters that will be

13:09:24  5    best dealt with through cross-examination of the various

6    experts, so you will not get *Daubert* motions from the

7    plaintiffs' side.

8                    That concludes our roadmap, Your Honor.

9                    THE COURT:  Thank you, Mr. Lanier.

13:09:37 10                    That's very succinct.

11                    Let me just -- so are you saying if -- you

12    believe there's undisputed evidence that various

13    defendants violated their duties under the Controlled

14    Substances Act?

13:10:07 15                    Is that -- is that the thrust of one and

16    three together?

17                    MR. LANIER:  Yes, Your Honor.  That is the

18    thrust.

19                    THE COURT:  Okay.  All right.  Well, I

13:10:29 20    think that's very clear, and I appreciate that summary.

21                    Okay.  I guess we'll start with the

22    manufacturers.

23                    MR. HEARD:  Your Honor, actually the

24    distributors will go next.

13:10:44 25                    THE COURT:  Okay.  Distributors,

1    distributors can be next.

2              Very good.

3              MR. HEARD:  Your Honor, Lane Heard.  I'm

4    speaking for the distributors this afternoon, and we'll

13:10:57 5    try to provide a succinct roadmap to three dispositive

6    motions and three *Daubert* motions.

7              And Your Honor has a hard copy of the

8    slides that we submitted yesterday electronically.

9              The three dispositive motions, the first,

13:11:16 10    and not to your surprise, statute of limitations; the

11    second, civil conspiracy; and the third, proximate

12    causation.

13              The first two of these, statute of

14    limitations and civil conspiracy, were filed last week on

13:11:31 15    June the 18th.  The third, causation, will be filed by

16    the end of the day today.  And the sequence we would

17    suggest to Your Honor is in that very order.

18              If I may, as to each of these motions, let

19    me just highlight what it is that may be distinctive or a

13:11:56 20    wrinkle about these.

21              Where the statute of limitations is

22    concerned, this is a motion on behalf of the

23    manufacturers and the distributors together.  The

24    pharmacies, as you will hear, have a separate motion

13:12:10 25    based on the statute of limitations.

1          It's a motion as to all counts in the

2     complaint, but it is styled a partial summary judgment

3     because this does not seek the complete dismissal of any

4     count.  It seeks a dismissal of each claim insofar as the

13:12:31  5     claim accrued before October, 2012.  And it does not

6     challenge conduct that accrued after October, 2012.

7          Now, Your Honor, you're going to find in

8     the motion as it was written that there's a slight

9     difference as between the manufacturers and the

13:12:53 10     distributors because a fraud count was asserted up until

11     today, and so the accrual rules are slightly different

12     for the fraud count, which applied only to the

13     manufacturers.

14          With the fraud count being dropped, there's

13:13:09 15     now a one hundred percent overlap in the arguments for

16     the distributors and the manufacturers as to the accrual

17     of these claims.

18          And I guess the only word of explanation is

19     this obviously is not a motion that turns on missing the

13:13:27 20     statute by days or weeks or even months.

21          The fundamental argument is that the claims

22     accrued years before these lawsuits were filed in 2017,

23     so the shorthand that's used in the motion, this breaking

24     point of October, 2012, arises from the fact that the

13:13:49 25     longest statute of limitations is five years under Ohio

1    RICO.

2                     And if you count back five years from the

3    first filed complaint, which was the Cuyahoga complaint,

4    October 27th, 2017, you get to this October, 2012.

13:14:08   5                     So that's, for discussion purposes in the

6    motion, the date that we keep talking about before and

7    after.

8                     And that motion would obviously streamline

9    the trial because it would focus on a much more limited

13:14:24  10    period of time, the period fundamentally after October,

11    2012.

12                     The second dispositive motion that's quite

13    important to the distributors is the civil conspiracy.

14    This is a motion filed just by the distributors.  It's

13:14:38  15    just as to the civil conspiracy count, which is Count 11

16    in both the Cuyahoga and Summit complaints.

17                     It addresses the specific elements of the

18    conspiracy alleged in each complaint.  There were three

19    such elements:  A conspiracy to try to jack up the

13:15:00  20    production quotas, a conspiracy to market the nine

21    misrepresentations that are set forth in the complaints,

22    and an agreement not to report suspicious orders.  This

23    motion addresses the lack of evidence as to each of those

24    three alleged agreements.

13:15:16  25                     This is a no-evidence motion.  We waited

1    for discovery.  This motion will make the argument that

2    there's no evidence to support those claims.

3              And so granting this motion obviously would

4    eliminate one count, but more particularly it would give

13:15:33  5    us a trial in which the evidence is distinct as between

6    the distributors, the manufacturers, the pharmacies.

7              The third motion on causation which will be

8    filed today is a motion filed on behalf of the

9    distributors.  I think you're also going to receive such

13:15:54 10    motions separately from the manufacturers and the

11    pharmacies.

12              This, too, is a no-evidence motion.  We've

13    waited to see the accumulated discovery, but you'll see

14    on the slide, Your Honor, that there's a slight break

13:16:10 15    between the first bullet point and the other three bullet

16    points, and that reflects a difference in character

17    between two sets of arguments.

18              The first bullet points to an argument that

19    Your Honor -- has not been presented to Your Honor before

13:16:30 20    on causation, and points to a particular gap in the

21    evidence that we could not have known about until

22    plaintiffs identified their experts and all discovery was

23    complete.

24              And that first bullet point goes just to a

13:16:46 25    missing component in the proof of causation.  The

1    plaintiffs have obviously come forward with experts that

2    say the distributors had inadequate compliance systems.

3    What we don't have is any proof, expert or otherwise,

4    that had we done the compliance plaintiffs said we should

13:17:06  5    have done, that it would have resulted in any fewer

6    shipments of opioids into the two counties.

7              So that first bullet point, there is a

8    combination of no evidence, no expert proof that even

9    addresses that component, coupled with, you will see in

13:17:24 10    the brief, rather substantial evidence from the

11    plaintiffs' own experts that would indicate that the

12    volume of orders shipped would not have changed even with

13    adequate due diligence.

14              The second three points are addressed in

13:17:43 15    argument Your Honor has encountered in the motions to

16    dismiss; that is, the chain of causation, but now we're

17    able to couple that argument with the actual evidence or

18    lack of evidence in discovery to show why that chain is

19    too attenuated and causes too remote.  And this

13:18:02 20    obviously, this motion, if granted, is dispositive and it

21    applies to all claims.

22              Where the *Daubert* motions are concerned,

23    Your Honor, there are going to be quite a number filed by

24    the defendants collectively, but I would point Your Honor

13:18:18 25    to three that are of particular concern to the

1    distributors and that concern them uniquely.

2                The three experts are James Rafalski, Seth

3    Whitelaw and Craig McCann.  The first two are compliance

4    experts, and they address compliance in slightly

13:18:40  5    different ways.

6                And I want to point Your Honor to arguments

7    about each of them that are singular that you will meet

8    where they are concerned but will not meet with any other

9    experts who are being challenged.  And then I want to

13:18:55 10    direct Your Honor to the ways in which Mr. Rafalski and

11    Mr. McCann are tied together.  They are sort of

12    co-dependent or twin experts.

13                So where Mr. Rafalski is concerned, he

14    worked at the DEA.  There are challenges to the

13:19:13 15    reliability of his opinion based on the bases, but what

16    is unique about this particular *Daubert* motion is that

17    Mr. Rafalski felt he could not disclose certain bases for

18    his opinion.

19                They involve legal guidance he had gotten

13:19:32 20    while he was an employee of the DEA.  He said, rightly or

21    wrongly, that he could not disclose that.

22                So while that failure to completely

23    disclose the bases for his opinions could be construed

24    exclusively as a *Daubert* question, it's also a question

13:19:48 25    of violating Rule 26.

1          So the threshold argument Your Honor will

2     see in that motion is a Rule 26 argument that says he

3     must be disqualified because of his failure to disclose

4     fully the bases for opinion.

13:20:02  5          Let me --

6          THE COURT:  What did he -- what did he say?

7     I mean, did he -- did he assert law enforcement privilege

8     or, I mean, he couldn't have just refused to answer the

9     question.

13:20:18  10          MR. HEARD:  Well, I believe he felt like he

11     was constrained in part by the *Touhy* authorization that

12     he had to testify at all.

13          Also, the advice he had gotten was from

14     lawyers at the DEA.  It was legal guidance which informed

13:20:32  15     his view about what the compliance regimen should be for

16     reporting suspicious orders.

17          So whichever it is, he said, "I can't

18     answer those questions."

19          And so we think there's a Rule 26 problem,

13:20:47  20     although it has a *Daubert* aspect to it as well.

21          Now, let me come back to Mr. Rafalski when

22     we talk about Mr. McCann, explain how they are twinned,

23     but let me also take Seth Whitelaw because he's the other

24     compliance expert.

13:21:06  25          What is distinctive about the *Daubert*

1    challenge here is that while there are arguments made

2    about the reliability of his opinion, which you'll see in

3    the body of the motion, this is, I think, the only

4    *Daubert* challenge to the qualifications of the expert.

13:21:25  5          It's a claim he simply doesn't have the

6    expert he would need --

7                    THE COURT:  That's Mr. Whitelaw?

8                    MR. HEARD:  That's Mr. Whitelaw.

9                    THE COURT:  Okay.

13:21:33 10                    MR. HEARD:  Now, I should say as to

11   Mr. Rafalski and Mr. Whitelaw, their opinions are

12   directed at each of the distributors and also to CVS and

13   Walgreen's, so these motions are on behalf of those

14   particular defendants.

13:21:47 15          Now, the way in which Mr. Rafalski and

16   Mr. McCann are related -- and the Court will want to be

17   reading them in conjunction, although the motions

18   certainly cross-reference one another -- is that

19   Mr. Rafalski identified five methodologies for how you

13:22:11 20   could flag suspicious orders.  And through counsel,

21   Mr. McCann was provided with those five methodologies.

22          Mr. McCann is admittedly not a subject

23   matter expert.  He doesn't claim any expertise with

24   regard to the DEA or suspicious orders or compliance.  He

13:22:35 25   describes himself as a computer, and he did calculations.

1          So Mr. McCann's opinion in one respect sits

2    on top of Mr. Rafalski because Mr. Rafalski provided him

3    the assumptions that he used in order to count the number

4    of suspicious orders that would follow if you used

13:22:56  5    methodology one, two, three, four or five.

6          So part of our challenge to Mr. McCann is

7    those methodologies, we say, are unreliable and

8    unsupported, and if Your Honor were to find that,

9    Mr. McCann's opinion would necessarily fall.

13:23:11 10          But that relationship also operates in the

11   opposite direction as well, because after Mr. McCann had

12   done his calculations and said, "These are the number of

13   suspicious orders that you get if you do the calculation

14   using methodology one, two, three, four or five,"

13:23:32 15   Mr. Rafalski then takes that number and says, "That's the

16   number of suspicious orders that were then diverted into

17   the two counties."

18          We make arguments as to how Mr. McCann's

19   calculations are unreliable and how they did not follow

13:23:54 20   the methodology as Mr. Rafalski set it forth.

21          And so we say not only does Mr. McCann's

22   opinion fall because of faulty assumptions he received

23   from Mr. Rafalski, in the opposite direction we say

24   Mr. McCann engaged in unreliable methodologies, and that

13:24:17 25   when Mr. Rafalski took the end product, his opinion is,

1    therefore, faulty and he then failed to take an

2    additional step that would have been necessary to reach

3    his ultimate conclusion.

4                So Rafalski and McCann are intertwined,

5    interrelated in that way.

6                So those are the three *Daubert* motions,

7    Rafalski, Whitelaw, and McCann, that peculiarly concern

8    the distributors, but I would say in closing, Your Honor,

9    you're going to hear from my colleagues at the pharmacies

10   and the manufacturers, there are a series of other

11   motions that are joint so they concern us as well.

12               And of that number, I would just highlight

13   that of concern to the distributors is Mr. David Cutler,

14   who renders an opinion as to the percentage of

15   opioid-related harms that were caused by distributors'

16   conduct as well as manufacturers' conduct; and then there

17   is Thomas McGuire who is a damages expert.

18               Now, the damages expert, there are

19   challenges on behalf of all defendants.  Mr. McGuire, I

20   think, will be of particular interest to the Court

21   because you'll see that the challenge is based on the

22   fact that his argument is not that there are damages, but

23   that there are opportunity costs.

24               I think that's where I would leave it, Your

25   Honor, except to say there are tranche two motions and

1    just so there are no surprises we expect on behalf of the

2    distributors to file a tranche two summary judgment

3    motion about negligence per se.  Makes much the same

4    argument that Your Honor granted as in the tribal cases

13:26:09  5    in the last week.

6                And there will be a motion under RICO about

7    the enterprise element that in some sense is a companion

8    to the civil conspiracy claim.

9                But we would invite Your Honor to consider

13:26:26  10    the three dispositive motions we've highlighted and the

11    three *Daubert* motions.

12                Thank you.

13                THE COURT:  All right.  Thank you,

14    Mr. Heard.

13:26:40  15                MR. STOFFELMAYR:  All right.  Good

16    afternoon, Your Honor.  Kaspar Stoffelmayr, and I'm

17    liaison counsel for the chain pharmacy defendants.

18                We do have our slides on the screen, but I

19    have hard copies for anyone who doesn't have one or who

13:27:10  20    needs one.

21                Your Honor, do you have a hard copy of our

22    presentation?

23                THE COURT:  Yes.  Thank you,

24    Mr. Stoffelmayr.

13:27:33  25                MR. STOFFELMAYR:  So what I'd like to do is

1      just spend a couple minutes -- I'll try to be brief and

2      obviously nonargumentative -- just going through what are

3      the key motions from our perspective, the pharmacy

4      defendants, and how do they relate to arguments being

5      made by other defendants.

6              There are some related motions that will be

7      filed by other parties.  I want to just highlight how

8      they're different from our motions so that's clear to the

9      Court.

10             You've also asked us, I think a number of

11     times, which motions are most important to us, and which

12     ones would we prefer you to focus on, at least initially.

13             It's worth pointing out there are six

14     pharmacy defendants.  We are not all identically

15     situated.  And that means you couldn't say here is the

16     one and only one motion that matters the most to all six

17     of us, but I think I can say that for all of us the most

18     important motions would be the limitations motion -- and

19     ours is different -- and the party-specific motions that

20     each of the six defendants will file.

21             And those actually dovetail in a way that I

22     think is helpful, and I'll get to why that is.  Those are

23     not completely independent points.

24             So I'll start with our limitations motion.

25     This was filed on June 19th so it's already on the

1    docket, and we filed a separate motion.  We didn't join

2    the motion filed by the distributors and manufacturers

3    and I want to make sure it's clear why.  The underlying

4    law is the same and we don't obviously want to, you know,

13:29:12  5    replow all that ground, but the relief we're asking for

6    is quite different.

7              And the reason the relief the pharmacies

8    are asking for is so different is because there are

9    different applicable limitations periods and different

13:29:27 10    facts that are unique to us that don't apply to other

11    defendants.

12              So, first, the different limitations

13    periods, there's two reasons for that.  One is different

14    claims are asserted against the pharmacy defendants.  Not

13:29:41 15    all of the same claims are asserted against the pharmacy

16    defendants that are asserted against the distributors.

17    So we're only talking about an, at most, you know, two to

18    four years.  You know, that's an issue to brief, but

19    we're talking about a shorter time period.

13:29:56 20              And the other reason is that the claims

21    against us were filed later.  They came with an amended

22    complaint, so the relevant period with respect to us, is

23    what our motion says anyway, is looking at April, 2014

24    and forward; not 2012.  And in the case of HBC and

13:30:15 25    Discount Drug Mart, it's actually even a bit later.

1          The second reason the relief we ask for is

2     so different is that all of the pharmacy defendants

3     stopped distributing controlled substances.  This is not

4     an ongoing activity as plaintiffs would say it is, you

13:30:32  5     know, with respect to the distributors.

6          The pharmacies all stopped doing

7     distribution, but they stopped it at different points in

8     time.  It's not as if there was one cut-off date that

9     applies to everybody.  So for that reason, the exact

13:30:48  10    relief we ask for is going to vary with respect to each

11    pharmacy.

12          In some cases, we say distribution stopped

13    entirely outside of the limitations period, and we ask

14    for summary judgment in its -- you know, on those claims

13:31:03  15    in their entirety.

16          In other cases, we say that there was some

17    distribution in a brief period inside the limitations

18    period.  It might be a period of only a few months, so we

19    say that as to that entity, the limitations argument

13:31:21  20    doesn't dispose of the claim entirely.  But it does limit

21    the claim to a very, very brief period.

22          And that's how the party-specific motions

23    dovetail with the limitations motion.  The limitations

24    motion, you know, tells you what's left to look at, what

13:31:35  25    is the relevant period you need to look at, and then the

```
 1    party-specific motion might say -- and this will vary

 2    party-by-party -- "In that brief period that's still

 3    relevant no one has criticized our conduct.  They've

 4    criticized our conduct for things that happened in

 5    earlier time periods, but not in that window that's still

 6    relevant.

 7                   THE COURT:  All right.  Could you

 8    just -- do you have those dates --

 9                   MR. STOFFELMAYR:  I can certainly provide

10    them.

11                   THE COURT:  -- for the different

12    pharmacies?

13                   I've read that.  I've read the motion.

14                   Was this triggered by when these drugs were

15    changed in classification from Schedule III to Schedule

16    II?

17                   I know that promised a lot of companies to

18    change their business plans.

19                   MR. STOFFELMAYR:  Again it's not

20    consistent.

21                   There's certainly some of the pharmacy

22    defendants that only ever distributed C-III or

23    Category -- Schedule III controlled substances and so

24    when hydrocodone was rescheduled from Schedule III to

25    Schedule II, that's when they stopped distributing the
```

1    last opioid.

2               So the relevant dates would be in the case

3    of Walgreen's, their last distribution into Ohio was

4    April of 2014.  Early April.  So that's outside the

5    limitations period.

6               There are two different relevant CVS

7    entities.  One of them also last shipped a

8    hydro -- excuse me -- Hydrocodone combination product in

9    April of 2014 outside of the limitations period.  The

10   other CVS entity shipped Hydrocodone-containing products

11   until later in the year, April or September, 2014.

12              So that would be a case where there's just

13   a sliver of months inside the limitations period.

14              Giant Eagle, HBC, is in a similar

15   situation.  It was with the rescheduling of Hydrocodone

16   that their distribution ended.

17              I believe the same is true for Rite Aid.

18   Their last shipments were in September of 2014.

19              And then Discount --

20              THE COURT:  Giant Eagle was September of

21   2014?

22              MR. STOFFELMAYR:  Yes, Giant Eagle was also

23   September of 2014.

24              THE COURT:  Okay.

25              MR. STOFFELMAYR:  Same with Rite Aid and

1    same with Discount Drug Mart.  Each of them -- sorry, in

2    the case of Discount Drug Mart, it's -- well, each of

3    them stopped distributing when Hydrocodone was

4    rescheduled from Schedule III to Schedule II.

5                    THE COURT:  So that's September, 2014.

6                    MR. STOFFELMAYR:  October, 2014.

7                    Many of them had a last shipment in

8    September in advance of when the rescheduling became

9    effective in October.

10                   THE COURT:  All right.

11                   And what about Walmart, did you mention

12   them?

13                   MR. STOFFELMAYR:  Walmart goes later.

14                   Walmart shipments continued until April of

15   2018, so for them it's not -- again it's not continuing,

16   but the conduct of distribution anyway continues for

17   several years.

18                   It's not just a matter of months in that

19   case.

20                   So then I think each of those entities that

21   has at least a sliver of distribution inside the

22   limitations period or more than a sliver is going to

23   argue in their defendant-specific motion -- and this is

24   an argument they can only make individually about

25   themselves -- "Hey, nobody criticized our conduct in that

1    time period.  They might have criticized us for things we

2    did earlier, but in that time period, not."

3                   THE COURT:  Well, they're only sued as

4    distributors in these -- in this case.

5                   MR. STOFFELMAYR:  In this case that's

6    correct.  These are all arguments that relate

7    specifically to the Track 1 trial.

8                   THE COURT:  All right.

9                   MR. STOFFELMAYR:  These don't necessarily

10   have broader consequences.

11                  There are arguments about the limitations

12   period under Ohio law in this particular -- in this

13   particular trial, but the effect they would have if the

14   motions were granted would be to remove this group of

15   defendants from the Track 1 trial; not from

16   the -- wouldn't have necessarily broad consequences

17   beyond that in the litigation.

18                  Obviously we might or might not have

19   limitations arguments that relate to other trials or

20   other cases.

21                  The other sort of overreaching motions we

22   have filed are -- or will file will be a causation

23   motion.  The arguments will be similar as far as the law

24   goes, but specific to our facts.

25                  And this will be a no-evidence motion as it

1   was described, simply no evidence connecting the

2   shipments, the pharmacy distributors -- sorry -- pharmacy

3   defendants acting as distributors to their own stores.

4   No evidence that would connect those shipments, we would

13:36:42  5   say, to the harm that plaintiffs are claiming.

6         And the harm we're talking about here that

7   this motion will be focused on is harm that is allegedly

8   connected to diversion.

9         You know, when it comes to the pharmacy

13:36:56  10  defendants, like the other distributors, the claim here

11  isn't that we shipped too much to our own stores in order

12  to fill legitimate prescriptions, even if there is a

13  claim that those legitimate prescriptions were a result

14  of improper demand.  The claim is that the shipments to

13:37:15  15  our stores are somehow connected to the diversion of

16  opioids, the improper diversion; not the filling of

17  legitimate prescriptions.

18         THE COURT:  I mean, they would have to show

19  that one or more of the stores of the specific pharmacy

13:37:27  20  defendant was a pill mill.

21         MR. STOFFELMAYR:  Essentially, yes.

22         And there is -- our motion will argue that

23  there is no evidence that would allow a trier of fact to

24  draw that conclusion.

13:37:38  25         THE COURT:  Okay.

1        MR. STOFFELMAYR:  We also have a conspiracy

2   motion.  This was filed on June 21st, and I just to want

3   make sure it's clear to the Court how this is different

4   from the RICO arguments the Court has already seen in the

13:37:50   5   motion to dismiss context, and will probably see again in

6   the summary judgment context.

7        There is no RICO claim pled against the

8   pharmacy defendants, so this motion goes only to the Ohio

9   common law conspiracy claim.  And it's a no-evidence

13:38:08  10   motion.  We say there is no evidence to allow a trier of

11   fact to conclude that the pharmacy defendants entered

12   into a, quote, unquote, malicious combination, which

13   would be required for a civil conspiracy claim.

14        The third and last common motion, which has

13:38:25  15   not been filed yet but will, is a preemption motion, and

16   this is a preemption argument the Court has not seen yet.

17   I do want to, at the outset, again make clear what it's

18   not.

19        This is not the sort of preemption argument

13:38:38  20   the Court has seen made by the manufacturer defendants

21   that has to do with how the FDA regulates the labeling

22   for prescription drugs.  That's an important preemption

23   argument, but a very different one.

24        Our preemption argument goes to how the

13:38:54  25   legal scheme governing the distribution of controlled

1    substances works.  And the issue presented is whether the

2    balance that this Controlled Substances Act strikes

3    between permitting distribution and restricting

4    distribution, I mean one way to think of it is the

13:39:14   5    statute is clear on this, it has two goals, to get drugs

6    into the hands of people -- I'm paraphrasing obviously --

7    but to get drugs into the hands of people who need them

8    and to keep drugs out of the hands of people who

9    shouldn't have them.

13:39:26   10    That's a balance that the statute tries to

11    strike by making some things legal and some things

12    illegal, and the issue presented is whether it's

13    permissible under preemption law for state tort law

14    obligations to rest on top of that federal scheme and

13:39:42   15    alter the balance.  And our argument obviously is that

16    it's not permissible.

17    And then, finally, on the summary judgment

18    motions I alluded to, each pharmacy defendant will file

19    an individual motion.  They will be -- you know, they are

13:39:57   20    certainly not complete.  They will be variations of

21    no-evidence motions and, as I said, in many cases they

22    will dovetail with the limitations motion.

23    Last point I want to address, and don't

24    want to spend unnecessary time on it, are the *Daubert* or

13:40:13   25    expert motions.  I would only just reiterate what

1    Mr. Heard said from our perspective as well the Rafalski,

2    McCann and Whitelaw motions are the ones of the greatest

3    unique concern to us.

4              And I completely agree as to Rafalski and

13:40:33  5    McCann, it's not a qualifications challenge, it is a

6    challenge to assumptions that they both make, and it's a

7    consequence of the way their reports work together or

8    their opinions work together that if one falls, the other

9    falls as well.

13:40:49 10              So if Rafalski is inadmissible,

11    Mr. McCann's opinions don't come in and, likewise, if

12    Mr. McCann's opinions are improper, there would be no

13    basis for at least most of, I don't want to say

14    everything, but much of what Mr. Rafalski says.  That's

13:41:05 15    our argument in any event.

16              The other motions, we list the ones on our

17    slide which you would say we have a particular interest,

18    but again those three, if you were asking us to

19    prioritize, those three are certainly the most important

13:41:21 20    from our perspective.  Followed by, I think, by the

21    Cutler and Gruber motions where the experts try to say as

22    a matter of economics, "Here's how I connect a volume of

23    shipments to damages actually suffered by the

24    plaintiffs."

13:41:36 25              You know, it's one thing to say, "Here's a

1    lot of shipments and here's a lot of expenses," but how

2    do you say what would have been different, you know, the

3    but-for world if those shipments had not happened or had

4    been smaller, would expenditures have been any different.

5    And the Cutler and Gruber opinions go to

6    that, and so our motions on those experts are obviously

7    important to us as well.

8    THE COURT:  Okay.  Thank you very much,

9    Mr. Stoffelmayr.

10   MR. CHEFFO:  Thank you, Your Honor.  Mark

11   Cheffo.

12   Do you have a copy of our slides?

13   THE COURT:  Yes, I have them, Mr. Cheffo.

14   You have more slides, you have the most

15   number of slides.

16   MR. CHEFFO:  That's what it looks like.

17   Yeah, I think we win the prize for the most slides.

18   Your Honor, so let me first just thank you

19   and Magistrate Judge Ruiz and the Special Masters and the

20   clerk -- your clerks and your staff for giving us this

21   opportunity -- we really do appreciate -- to really

22   preview and contextualize what you're going to be seeing

23   on Friday, some of which you've seen already and I think

24   anticipate.

25   The way we're going to do it, if you don't

1    mind, we're going to stay seated because I'm going to do

2    part of this and Donna Welch and Steve Reed, we're going

3    to somewhat tag team here.

4              What we, I think, want to do is just set

5    the backdrop here.

6              So you've made some comments about the

7    number of motions, and we are very sensitive to that

8    fact, but I think to some extent the next slide or two

9    just really tells the story here.

10             And we hear Mr. Lanier's comments and they

11   dropped the fraud claim and he indicates that he's going

12   to continue to trim, and obviously to the extent that

13   some of these 80 different defendants and some of these

14   multiple causes of actions are trimmed, that will be

15   helpful to us.  It will be helpful to the Court and

16   obviously the staff.  So we welcome that kind of

17   expeditiously.

18             But the point being that there are, as you

19   can see, many different causes of action.  Some of them,

20   as you can see here, are against all the defendants, but

21   then there's a host of other RICO and Ohio claims that

22   are as to certain defendants but still a substantial

23   portion.

24             Some of them are overlapping.  Some of them

25   are not.  But obviously they are all going to require an

1    incredible amount of proof and experts, and to the extent

2    that we can trim those, obviously that will -- that will

3    help everyone.

4              What I'm going to, with my colleagues'

13:44:22  5    help, try to do today is identify those motions and

6    *Daubert* challenges that we think should be read together

7    respectfully, hopefully give the Court a little bit of

8    guidance at least as to our thinking, how we would

9    approach it.

13:44:37 10              What you'll also hear is that certain of

11    the *Daubert* motions and others might not be needed and

12    probably would not be needed if you were to grant some in

13    whole or in part.  Some dispose of all claims, others

14    just certain of the claims, and then there's, frankly, a

13:44:50 15    grouping of particularly *Daubert* motions and perhaps even

16    some of the summary judgment issues that would

17    substantially streamline the evidence and the time

18    required at trial, which we think is also a very

19    important objective.

13:45:01 20              And the last thing I think I'll say as a

21    preview is that, you know, we don't really prioritize

22    these in terms of order of importance because, frankly,

23    you know, we think that they're all important.  But what

24    we've tried to do is, again, give the Court some type of

13:45:17 25    visibility as to how it might consider approaching these

1    motions.

2              So this is kind of an overall slide.  As

3    you can see on the left, there's the statute of

4    limitations issue, then there's the causation motions.

13:45:29  5    And we would suggest, you know, obviously to the extent

6    even if you were to divide *Daubert* with causation, as

7    you'll hear from Ms. Welch, that this is one that we

8    think are, to a large extent, inextricably intertwined.

9    And it would make sense to read both the *Daubert* along

13:45:45 10    with the causation briefs because, as you'll hear, we

11    think that really they are a predicate for one another.

12              Obviously then there will be the RICO

13    summary judgment motions, and then there are the joint

14    summary motions that are listed here, including

13:46:00 15    preemption, public nuisance, and then Steve will talk

16    about -- Mr. Reed will talk about the generics and no

17    evidence issues.

18              This again, you know, in the spirit of

19    roadmap, the marketing *Daubert*s, Dr. Egilman, Dr. Kessler

13:46:17 20    and Perri, those are folks who we've made *Daubert*

21    challenges to.

22              We've combined, as you'll see, the

23    Kessler/Perri motions.

24              There's the diversion *Daubert*s.  You've

13:46:28 25    heard a little bit about those, and those are the three

1    experts that we intend to challenge.

2            There's the damages experts, McGuire, and

3    the abatement, and then obviously there's the other

4    separate *Daubert* challenges that you will see and you

5    will receive on Friday.

6            So with that, I will be back in a minute or

7    two, but I'm going to ask Ms. Welch to kind of address

8    the causation issues.

9            MS. WELCH:  Good afternoon, Your Honor, and

10   Special Masters and staff.

11           I would like to provide a brief framework

12   for the manufacturer defendants' specific briefing

13   relating to plaintiffs' burden to prove proximate cause

14   which we believe cuts across all claims.

15           And the principal brief that we would point

16   the Court to is, in the first instance, the manufacturing

17   defendants' summary judgment motion which will be filed

18   on Friday regarding a failure to prove proximate cause.

19           And as a threshold issue, we would note for

20   the Court that plaintiffs' sole proof of proximate cause

21   with respect to the manufacturing defendants relies on

22   interrelated aggregate proof models of their experts.

23           And with respect to the manufacturing

24   defendants' marketing-based claims, the claims that

25   essentially allege that misrepresentations made by the

1    manufacturers in the promotion and marketing of

2    prescription opioids caused the harm, relies solely on

3    two aggregate proof models:  One offered by Professor

4    Meredith Rosenthal and one by Professor David Cutler.

13:48:24  5         We would respectfully suggest that the

6    Court may want to first review the manufacturing

7    defendants' causation motion, and then the related

8    *Daubert* motions directed at Professor Rosenthal and

9    separately at Professor Cutler.

13:48:45 10         And the principal basis of the summary

11   judgment motion, which comes out in the *Daubert* motions

12   as well, is that these models simply don't separate out

13   harm, on the one hand, from prescription opioids and

14   harm, on the other hand, from illegal drugs.

13:49:13 15         Second, that neither of the models separate

16   out in any way lawful marketing by the manufacturers from

17   marketing that is alleged to be unlawful.

18         MR. WEINBERGER:  Your Honor, Peter

19   Weinberger.

13:49:33 20         We followed your directive, and I don't

21   believe Ms. Welch is following the directive that we're

22   not going to argue these motions today.

23         And this seems --

24         THE COURT:  Well, I don't -- I mean, she

13:49:47 25   just said, "This is what our motion's going to say," all

1    right.

2              I mean, I think she's explaining how the

3    proximate cause model motion relates to the *Daubert*

4    challenges for Rosenthal and Cutler, so that's how I took

13:50:02  5    it.

6              I mean, so the -- the attack basically

7    is -- what she's saying is -- and, Peter, I don't know if

8    it's true -- she's saying that your -- your proof relies

9    almost exclusively on these two experts, and if they

13:50:19 10    knock out these experts, then they knock out your proof.

11              And she's just said this is what they're

12    saying so, I mean, so far I don't think it's a problem.

13    I don't want -- need any more argument, but just saying

14    what the challenge is so.

13:50:36 15              MS. WELCH:  Thank you, Your Honor.  And

16    that was certainly the intent this afternoon, just to

17    isolate and help the Court understand the bases for the

18    causation motion and the overlap with the bases in many

19    respects for the separate *Daubert* motions.

13:50:51 20              The third point with respect to the models

21    that we would point out is that they don't separate out

22    the conduct of any individual defendant manufacturer

23    versus nondefendants or all manufacturers together.

24              The impact with respect to granting the

13:51:14 25    causation motion for the manufacturing defendants would

1    be resolution of all of the claims against the

2    manufacturing defendants brought by the Track 1

3    plaintiffs, and we believe would provide meaningful

4    guidance regarding the proof that needs to be offered by

13:51:30  5    other MDL plaintiffs, including in Track 2.

6                And if you turn to the next slide, this

7    attempts visually to identify again the aggregate proof

8    models that are relied on here, first for the bucket of

9    marketing-related claims against the manufacturers, and,

13:51:54  10   second, for the distribution or diversion-related claims.

11               And I'll talk briefly about the motion

12   being brought with respect to Professor Rosenthal's model

13   and with respect to Professor Cutler's model.

14               I believe the Court has now heard a little

13:52:17  15   bit about the McGuire damages *Daubert* motion which is

16   being brought on behalf of all the defendants, but

17   suffice it to say -- and I think, Your Honor, you've got

18   it exactly right -- that it is our position that if the

19   causation motion for the manufacturers were to be

13:52:32  20   granted, it would obviate the need to address the

21   Rosenthal motion or the Cutler motion as it relates to

22   the manufacturers.

23               On the flip side --

24               THE COURT:  It was actually the opposite.

13:52:46  25               So you're saying that the -- you're saying

1    that the only -- the only evidence that the plaintiffs

2    have on proximate cause comes from these two experts and

3    if I knock out these experts, they don't survive *Daubert*

4    challenge, then there isn't anything there.

13:53:05 5                So you're suggesting they are interrelated;

6    not that they are somehow some separate -- that's how I

7    took it.

8                MS. WELCH:  You're exactly right, Your

9    Honor.  It's really two sides of the same coin in our

13:53:20 10   view.

11               If the Rosenthal and Cutler models were to

12   be admitted into evidence, we believe -- and we don't

13   believe they should be -- but we believe that the same

14   result applies because even taking those models at face

13:53:37 15   value, they simply don't connect the proximate cause

16   dots.

17               So whether it's grant of the causation

18   motion for summary judgment leading to no need to further

19   separately address the two *Daubert* motions, or

13:53:53 20   addressing, first, the Rosenthal motion and next in line

21   the Cutler motion, we believe if those two models were

22   excluded, then the claims against the manufacturing

23   defendants would fail.

24               Briefly, with respect to the separate

13:54:13 25   bucket of theories against the manufacturing defendants,

1    which is the distribution or the diversion claims, again

2    we think there is an interrelated component with respect

3    to the aggregate proof, which is the only proof

4    plaintiffs offer of causation for the diversion or

13:54:33  5    distribution claims.

6              I won't go into the bases for the motions

7    to exclude McCann and Rafalski.  They were addressed both

8    by Mr. Heard and Mr. Stoffelmayr.

9              Suffice it to say that from the

13:54:53  10    manufacturers' perspective, none of the experts --

11    McCann, Rafalski, or Lacey Keller -- identify any

12    suspicious orders that were shipped by manufacturers into

13    the Track 1 counties.

14              So as a threshold matter, we believe

13:55:14  15    proximate cause, the story of proximate cause begins and

16    ends on the diversion claims with the exclusion of

17    McCann, Rafalski and Keller.

18              I would note further -- and it's the red

19    zeroes on this chart -- that you will see in our

13:55:36  20    causation summary judgment motion that plaintiffs offer

21    no proof, expert or otherwise, that purports to link any

22    alleged diversion by manufacturers to either third party

23    harms or further down the chain to damages or abatement.

24              So we believe there is a failure of

13:56:01  25    proximate cause both with respect to the marketing claims

1   and the distribution claims.

2                   Specific with respect to the marketing

3   claims, again after a review of the manufacturers'

4   causation motion, we would respectfully suggest that the

13:56:26  5   Court would want to review the *Daubert* motion regarding

6   Professor Rosenthal's aggregate proof model.

7                   We don't seek to exclude Professor

8   Rosenthal on the basis of qualifications, but as the

9   Court knows, expert opinions that don't fail -- or that

13:56:46  10  don't connect the alleged conduct of a defendant to

11  injury are commonly excluded for lack of fit.

12                  And lack of fit is the principal basis for

13  the *Daubert* motion regarding Professor Rosenthal.

14                  Rosenthal assumes that all marketing was

13:57:09  15  unlawful.

16                  MR. WEINBERGER:  Objection, Your Honor.

17                  THE COURT:  Well, yeah, that, that's more

18  of an argument, so I agree.

19                  So you're just saying her expert -- her

13:57:21  20  expert opinion doesn't fit the issues in this case.

21                  MS. WELCH:  That's exactly right, Your

22  Honor.

23                  And beyond that, as identified in the

24  briefing, we believe there are other methodologic flaws

13:57:34  25  that would separately require exclusion of Professor

1    Rosenthal.

2                 Next, we would urge the Court to look at

3    the *Daubert* motion as it relates to Professor David

4    Cutler.  Because Professor Cutler relies, as one of his

13:57:58  5    principal inputs in his model, on Professor Rosenthal,

6    it's our belief that if the Rosenthal model is excluded,

7    the Cutler model fails as well.

8                 So again, with respect to the claims

9    against the manufacturers, if the Rosenthal *Daubert*

13:58:19 10    motion is granted, it would obviate separate

11    consideration of the Cutler *Daubert* motion with respect

12    to manufacturers.

13                 But I would note that the Cutler *Daubert*

14    motion is brought on behalf of all defendants, and so in

13:58:36 15    addition to inappropriate reliance on the Rosenthal

16    inputs, we have separate fit issues with Professor

17    Rosenthal's aggregate proof models, which really look at

18    average national opioid shipments by anyone and a

19    correlation with opioid mortality, both related to

13:59:02 20    prescription drugs and illegal drugs.

21                 The final set of *Daubert* motions that we

22    would suggest the Court would want to look at -- but

23    again after the causation brief, the Rosenthal *Daubert*

24    motion and the Cutler *Daubert* motion -- would be related

13:59:24 25    *Daubert* motions that go to three noneconomic experts who

1    attempt to link the marketing of the manufacturer

2    defendants to illegal drugs.  Those are David Schumacher,

3    an anesthesiologist; Anna Lembke, a psychiatrist; and

4    Katherine Keyes, an epidemiologist.

13:59:52  5          These would not be dispositive with respect

6    to the causation motion for summary judgment, but they do

7    inform that motion in certain respects.

8          And the principal basis on which we move to

9    exclude all three of those experts are qualifications and

14:00:10 10   the reliability of their underlying methodologies,

11   including a failure to analyze conduct specifically in

12   the Track 1 counties.

13         And with that, I'll turn it back over to

14   mark.

14:00:23 15          MR. CHEFFO:  Great.  Thanks, Donna.

16   Thanks, Your Honor.

17         So as you just heard, those were, you know,

18   essentially what we would, you know, respectfully request

19   of the place to start to the extent that the Court has to

14:00:35 20   start somewhere.

21         And what I'm going to cover now are some of

22   the, you know, again important claims, but many of them

23   may not need to be addressed to the extent that the Court

24   were to grant in part some or all of the causation

14:00:48 25   issues.

1          So with respect to the RICO and conspiracy

2     claims, this would obviously resolve less than all of the

3     claims.  We believe we've tried to track some of the

4     guidance and learning from the Report & Recommendation,

14:01:02 5     Your Honor's previous rulings, and obviously to the

6     extent a RICO claim was dismissed, conspiracy claims, it

7     would substantially narrow the case and, we think, make

8     it much, much more manageable from a trial perspective by

9     a lot.

14:01:18 10          I won't spend a lot of time; just

11     highlighting what you might expect are the bases of our

12     motion which would go to the two RICO claims is

13     challenging the enterprise and conspiracy allegations,

14     and basically that there's no evidence of cause -- of

14:01:35 15     injury or damages that is caused by the RICO violations.

16          And as you can see there, it would resolve

17     six of the claims and, as I indicated, really

18     substantially narrow this case for trial.

19          With respect to nuisance, again relatively

14:01:52 20     straightforward in the sense of what our arguments are.

21     This is on behalf of the manufacturers.  It is two, two

22     of the counts, the common law and statutory nuisance

23     claims.

24          You know, the three primary bases, no

14:02:07 25     evidence that manufacturers significantly interfered with

1    a public right.  Implicit in that is that we don't

2    believe that the plaintiffs have actually defined what a

3    nuisance is or, you know, appropriately characterized

4    that, other than kind of claims about an opioid crisis or

14:02:26  5    epidemic, which we don't think are enough.

6                And to the extent that they are going to

7    rely on what Your Honor offered in the *Blackfeet*

8    decision, I guess that will remain to be seen, but that's

9    going to be a core element of our motion with respect to

14:02:39 10    nuisance.

11                You can also see that we don't believe that

12    the manufacturers violated any predicate law, nor is

13    there any evidence of that; and again the causation

14    argument, that there's no evidence that the conduct

14:02:52 15    proximately caused any harms in the counties at issue,

16    and obviously would substantially narrow the claims in

17    terms of the nuisance issues.

18                I'm going to briefly now turn to a few of

19    the *Daubert* motions.

14:03:08 20                So this is a motion that is brought on

21    behalf of all defendants.  We believe that this is one

22    that can, you know, wait until after Your Honor addresses

23    the causation issues.

24                Our kind of main issue, as you'll read, is

14:03:23 25    that Dr. Egilman is a kind of a catch-all.  He, in our

1    view, purports to do what a jury should be doing.  He

2    offers opinions about the defendants' motives.  He

3    basically --

4                    MR. WEINBERGER:  Objection, Your Honor.

14:03:37  5          MR. CHEFFO:  I'm just explaining what they

6    are going to read on Friday.

7                    THE COURT:  All right.  I think basically

8    you're saying -- you're alleging that he's taking the

9    role of a jury and it's not a proper subject for an

14:03:50 10   expert.

11                   MR. CHEFFO:  That's correct, Your Honor.

12                   THE COURT:  So I can see the slides so.

13                   MR. CHEFFO:  Okay.  And I think that's

14   right.

14:03:57 15          And I think the one, the one point we would

16   make throughout all of these is that there are clearly

17   some of the *Daubert* motions, and I think you've heard,

18   that are focused on qualifications, but it is important I

19   think to focus that many of them are not focused on

14:04:11 20  qualifications, and there are fit and reliability issues

21   that I think are important to focus on.

22                   Matthew Perri is, as I indicated, he and

23   Dr. Kessler are addressed in the same motion.  Unlike

24   Dr. Kessler where our motion is focused on certain

14:04:29 25  aspects of Dr. Kessler's testimony, with respect to

1    Matthew Perri it's focused on his entire testimony, and

2    similar to what, you know, we heard and what you can read

3    is that he basically, you know, in our view does not

4    serve an appropriate role as an expert.  And telling the

14:04:46    5    jury, you know, what documents say and people think and

6    what conclusions are is not appropriate.

7                    Then with respect to Dr. Kessler, again,

8    all defendants have moved with respect to him, same

9    motion because it's similar -- excuse me.  Thank you.  I

14:05:08   10    have to keep up here.

11                    He -- what we have not moved with respect

12    to, you know, regulatory framework testimony are issues

13    or more about offering legal opinions, kind of reading

14    documents and try to articulate what companies think or

14:05:25   15    why they did.  We think that's a basis for exclusion, as

16    he has been excluded before on similar grounds.

17                    And Lacey Keller, we seek to exclude her

18    entire testimony; reliability and fit, foundation issues.

19    I mean, just as a quick preview, the main kind of thrust

14:05:49   20    is that she only does kind of one step of what we think

21    is a two-step analysis for suspicious orders.  We lay

22    that out, I think, pretty clearly in the brief.

23                    And as a result, we think that her opinions

24    don't fit and there's not an appropriate foundation.

14:06:05   25                    And then, finally, before I turn it over to

1    Mr. Reed, there's a preemption issue you've heard about.

2    The distributors' preemption issue.

3                    Ours is, we think, well-taken for a number

4    of reasons.  And also, obviously, to the extent that the

14:06:26  5    Court were to grant this in whole or part would again

6    substantially limit the amount of evidence and the

7    documents and the testimony that would be required.

8                    So the main thrust is that there's a

9    preemption argument that we think is well-founded with

14:06:43 10   respect to the plaintiffs' state law claims for

11   inadequate marketing and labeling based on, you know,

12   lawful and approved products, and their state law fraud

13   on the DEA claims are also preempted.

14                    And this is -- this is a particularly

14:06:57 15   important one for streamlining, you know, what we think

16   will be a very challenging, you know, trial period, to

17   the extent that the Court allows the cases to proceed.

18                    So I am, in the spirit of time, unless Your

19   Honor has any questions, I'm going to turn it over to

14:07:14 20   Mr. Reed to kind of close it out.

21                    THE COURT:  Okay.

22                    MR. REED:  Thank you, Your Honor.  So I

23   have the good fortune of batting cleanup.

24                    A few slides that I would like to go

14:07:28 25   through.

1          I focus on some specific motions for

2    summary judgment.

3          The first one is a targeted motion for

4    summary judgment filed on behalf of -- well, filed with

5    respect to generics.  There are two types of defendants

6    who will be joining this motion.  There are defendants

7    who have only sell and have only ever sold generic

8    medications, and then there are defendants who sell both

9    branded and generics, but the motion itself will be

10   focused on claims with respect to generics.

11         The claims at issue in this motion will be

12   claims based on the alleged false marketing or failure to

13   warn with respect to generics.

14         So it's a fairly targeted motion.  You'll

15   see that that targeted motion addresses a number of

16   claims in the complaint, so it will have the effect, if

17   granted, of significantly narrowing the case and the

18   issues at trial.  And it will also have the effect, or

19   should, of limiting the number of defendants who will

20   have to participate in the trial.

21         I don't intend to get into argument, but we

22   do identify for Your Honor's convenience the bases on

23   which this group will intend to move.

24         We'll explain some differences about the

25   industry and why generics don't promote their products.

1          We'll explain that there was no record

2     evidence of promotion in the record.

3          We'll explain the law that was briefed in

4     the tribal cases, and I think is familiar with Your

14:08:57  5     Honor, that explains why any state law claim that would

6     impose a duty to warn is preempted by federal law.

7          And then, finally, it will address a

8     concern that Your Honor has expressed at one point or

9     another about whether there's liability when

14:09:11 10     one-third -- one entity sells into a market that it has

11     reason to believe is inflated by fraud.  And we'll

12     explain how the Supreme Court and the Sixth Circuit have

13     addressed that particular issue.

14          So that, that is -- that motion, and as I

14:09:25 15     say, that could have a significant impact in narrowing

16     the case.

17          If we go to Slide 20, these are

18     defendant-specific motions, so much of what you've heard

19     to this point, Your Honor, are descriptions of motions

14:09:41 20     that are jointly filed either by all defendants or by

21     groups of defendants, but as Your Honor recognized at the

22     May hearing and I think has recognized throughout this

23     case, there are multiple defendants in this case, and

24     each of them has the right to defend itself.

14:09:59 25          We're still left with -- I don't know what

1    the final count is, but we've got many dozens of

2    defendants, and each of them has an interest in

3    addressing the claims against them.

4              So the goal here is to have short, focused

14:10:12  5    motions filed on behalf of those manufacturer defendants

6    who wish to file them.  It's not clear yet whether all of

7    them will want to or not.  But to the extent they do, the

8    intent here is to focus on unique factors applicable to

9    that defendant, the moving defendant, again with a goal

14:10:30 10    to avoid overlap.

11              But some of the themes that you'll see will

12    cut across motions -- absence of wrongdoing, absence of

13    causation, settlement/release, et cetera -- but again the

14    intent here will be to focus on defendant-specific

14:10:46 15    issues, the record as to those defendants.

16              And again the implications, if those

17    motions are granted, obviously it will help to cull the

18    case.

19              We've heard from Mr. Lanier that the

14:10:58 20    plaintiffs intend to cull the case, to drop defendants.

21    Certainly this is one way we can encourage the Court to

22    do that for the plaintiffs.

23              And, finally, if we go to the last slide,

24    Slide 21, these are the so-called no-evidence defendants.

14:11:18 25    Maybe we will improve upon the title when we finally get

1  to filing, but the whole point here is again we have

2  dozens of defendants in this case.  Some of the

3  defendants in the Track 1 case were added -- added to

4  this case even after the close of discovery.

14:11:33  5         And for many of them, they were never

6  served with discovery.  There's no evidentiary record

7  with respect to defendants.

8         We've listed a number of those entities on

9  this slide.  It's not meant to be exhaustive.  But again,

14:11:47 10  the point here is that to the extent there's no evidence

11  in the record with respect to these defendants, there's

12  no legitimate issue of fact that would justify having

13  them appear at trial.

14         It obviously serves the broader goal of

14:12:03 15  streamlining the case, culling the defendants, and

16  focusing on those entities, in the short period of time

17  that we have, where plaintiffs have some basis to assert

18  a claim.

19         THE COURT:  Okay.  Thank you, Mr. Reed.

14:12:17 20         Do you have any questions?

21         All right.  Well, I want to thank all

22  counsel.  There was a lot of -- obviously the ones who

23  spoke, but there were a whole lot of other folks behind

24  the scenes who helped put this together.

14:12:32 25         I think this is very helpful to me and my

1    team to get a preview.  Obviously I've read the ones that

2    have been filed so I had a good sense of those, but all

3    the others and how they relate, and we'll figure out the

4    best way that we can to address them.

14:12:49  5            So unless anyone else has anything to say,

6    anything?

7            We're adjourned, and I want to thank

8    everyone.

9            THE CLERK:  All rise.

14:13:00 10            (Proceedings concluded at 2:13 p.m.)

11                   -  -  - -

12              C E R T I F I C A T E

13            I certify that the foregoing is a correct

14    transcript from the record of proceedings in the

15    above-entitled matter.

16

17

18

19    **/s/Susan Trischan**

20    /S/ Susan Trischan, Official Court Reporter

21    Certified Realtime Reporter

22

23    7-189 U.S. Court House
      801 West Superior Avenue
      Cleveland, Ohio 44113
24    (216) 357-7087

25