# EXHIBIT 5

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                    -  -  -
 5
        IN RE:  NATIONAL      :   HON. DAN A.
 6      PRESCRIPTION OPIATE    :   POLSTER
        LITIGATION             :
 7                             :
        APPLIES TO ALL CASES   :   NO.
 8                             :   1:17-MD-2804
                               :
 9
              - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    -  -  -
12
                March 13, 2019
13
                    -  -  -
14
15           Videotaped deposition of
     HUGH M. O'NEILL, taken pursuant to
16   notice, was held at the offices of
     Courtyard by Marriott Basking Ridge, 595
17   Martinsville Road, Basking Ridge, New
     Jersey, beginning at 10:59 a.m., on the
18   above date, before Michelle L. Gray, a
     Registered Professional Reporter,
19   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
20
                    -  -  -
21
22        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 2

1  APPEARANCES:
2
3  LIEFF CABRASER HEIMANN & BERNSTEIN
   BY: MARK P. CHALOS, ESQ.
4  222 2nd Avenue South, Suite 1640
   Nashville, Tennessee 37201
5  (615) 313-9000
   Mchalos@lchb.com
6
7     - and -
8  LIEFF CABRASER HEIMANN & BERNSTEIN
   BY: PETER ROOS, ESQ.
8  275 Battery Street, 29th Floor
9  San Francisco, California 94111
   (415) 956-1000
10 proos@lchb.com
11    - and -
12 KELLER ROHRBACK, LLP
   BY: GARY GOTTO, ESQ.
13 3101 North Central Avenue, Suite 1400
   Phoenix, Arizona 85012
14 (602) 248-0088
   Ggotto@kellerrohrback.com
15 Representing the Plaintiffs
16
   BRANSTETTER, STRANCH & JENNINGS, PLLC
17 BY: TRICIA HERZFELD, ESQ.
   223 Rosa L. Parks Avenue
18 Suite 200
   Nashville, Tennessee 37203
19 (615) 254-8801
   Therzfeld@bsjfirm.com
20 Representing the Tennessee Plaintiffs
21
22
23
24

Page 3

1  APPEARANCES: (Cont'd.)
2
   ROPES & GRAY, LLP
3  BY: BRIEN T. O'CONNOR, ESQ.
   BY: WILLIAM DAVISON, ESQ.
4  Prudential Tower
   800 Boylston Street
5  Boston, Massachusetts 02199
   (617) 951-7000
6  Brien.o'connor@ropesgray.com
   william.davison@ropesgray.com
7  Representing the Defendant,
   Mallinckrodt
8
9  JONES DAY
   BY: BRANDY H. RANJAN, ESQ.
10 325 John H. McConnell Boulevard
   Suite 600
11 Columbus, Ohio 43215
   (614) 469-3939
12 Branjan@jonesday.com
   Representing the Defendant, Walmart
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1  TELEPHONIC/STREAMING APPEARANCES:
2
3  REED SMITH, LLP
   BY: M. PATRICK YINGLING, ESQ.
4  10 South Wacker Drive, 40th Floor
   Chicago, Illinois 60606
5  (312) 207-2934
   mpyingling@reedsmith.com
6  Representing the Defendant,
   AmerisourceBergen
7
8  COVINGTON & BURLING, LLP
   BY: SARA SUNDERLAND, ESQ.
9  One Front Street
   San Francisco, California 94111
10 (415) 591-7063
   Ssunderland@cov.com
11 Representing the Defendant, McKesson
   Corporation
12
13 BAILEY WYANT PLLC
   BY: HARRISON M. CYRUS, ESQ.
14 500 Virginia Street East
   Suite 600
15 Charleston, West Virginia 25301
   (304) 345-4222
16 hcyrus@baileywyant.com
   Representing the Defendant, West
17 Virginia Board of Pharmacy
18
19
   ALSO PRESENT:
20
   Mark Casey, Esq.
21 (Mallinckrodt)
22
   VIDEO TECHNICIAN:
23 Henry Marte
24

Page 5

1      - - -
2    I N D E X
3      - - -
4
5  Testimony of:      HUGH M. O'NEILL
6    By Mr. Chalos          11
7    By Mr. Gotto          148
8    By Ms. Herzfeld        181
9
10     E X H I B I T S
11     - - -
12
13 NO.       DESCRIPTION         PAGE
14 Mallinckrodt
   O'Neill-1   Executive Profile   13
15     Of Hugh M. O'Neill
16 Mallinckrodt
   O'Neill-2   E-mail, 12/13/13    47
17     Subject, Xartemis
       Messaging
18     MNK-T1_0000947867-68
19 Mallinckrodt
   O'Neill-3   E-mail Thread       58
20     2/17/14
       Subject, A Few
21     Items
       MNK-T1_000953264
22
23
24

Highly Confidential - Subject to Further Confidentiality Review

Page 6

```
1        - - -
2     E X H I B I T S  (Cont'd.)
3        - - -
4
5  NO.        DESCRIPTION       PAGE
6  Mallinckrodt
   O'Neill-4   E-mail Thread    72
7             11/5/13
             Subject, Xartemis
8             XR ADT Impact
             MNK-T1_0000944036
9
   Mallinckrodt
10 O'Neill-5   E-mail Thread    80
             4/11/14
11            Subject, Pharmacy
             Tele-Calls
12            MNK-T1_0002806634-35
13 Mallinckrodt
   O'Neill-6   E-mail Thread    89
14            5/20/14
             Subject, Critical
15            Immediate Attention
             MNK-T1_0002235394-96
16
   Mallinckrodt
17 O'Neill-7   E-mail Thread    111
             8/31/15
18            Subject, August
             Daily Sales by
19            Customer
             MNK-T1_0002081432-34
20
   Mallinckrodt
21 O'Neill-8   E-mail Thread    117
             10/7/14
22            Subject, Xartemis
             XR Updated Districts
23            MNK-T1_0005150446-47
24
```

Page 7

```
1        - - -
2     E X H I B I T S  (Cont'd.)
3        - - -
4
5  NO.        DESCRIPTION       PAGE
6  Mallinckrodt
   O'Neill-9   2016 Election    132
7             Cycle Report
             MNK-T1_0002402270-87
8
9  Mallinckrodt
   O'Neill-10  E-mail Thread    154
10            5/20/08
             Subject, Sunrise
11            Wholesale
             MNK-T1_0003028219-20
12 Mallinckrodt
   O'Neill-11  E-mail Thread    160
13            1/27/09
             Subject, Oxy 30
14            MNK-T1_0000559532-33,
15 Mallinckrodt
   O'Neill-12  E-mail, 1/13/12  169
16            Subject, Meeting
             Materials
17            MNK-T1_0002734988-13
18 Mallinckrodt
   O'Neill-13  E-mail Thread    198
19            10/9/17
             Subject, Today show
20            Clip and Related
             News Article
21            MNK-T1_0007257169-72
22
23
24
```

Page 8

```
1        - - -
2     E X H I B I T S  (Cont'd.)
3        - - -
4
5  NO.        DESCRIPTION       PAGE
6  Mallinckrodt
   O'Neill-14  E-mail Thread    205
7             10/29/13
             Subject, Xartemis
8             XR EC Update
             MNK-T1_0008396589-90
9
   Mallinckrodt
10 O'Neill-15  E-mail Thread    210
             11/8/13
11            Subject, MNK-795
             Launch Plan
12            MNK-TNSTA01956641-42
13 Mallinckrodt
   O'Neill-16  E-mail Thread    218
14            4/28/14
             Subject, Return of
15            XXR
             MNK-TNSTA01496957-58
16
17
18
19
20
21
22
23
24
```

Page 9

```
1        - - -
2     DEPOSITION SUPPORT INDEX
3        - - -
4
5  Direction to Witness Not to Answer
6  PAGE   LINE
   None.
7
8  Request for Production of Documents
9  PAGE   LINE
   None.
10
11 Stipulations
12 PAGE   LINE
   None.
13
14 Questions Marked
15 PAGE   LINE
   None.
16
17
18
19
20
21
22
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1          - - -
2          THE VIDEOGRAPHER: We are
3   now on the record. My name is
4   Henry Marte. I'm a videographer
5   with Golkow Litigation Services.
6          Today's date is March 13,
7   2019. And the time is 10:59 a.m.
8          This videotaped deposition
9   is being held at the Marriott,
10  Basking Ridge, New Jersey, in the
11  matter of National Prescription
12  Opiate Litigation.
13         The deponent is Hugh
14  O'Neill.
15         All appearances are noted on
16  the stenographic record.
17         Will the court reporter
18  please administer the oath to the
19  witness.
20         - - -
21         ... HUGH M. O'NEILL, having
22  been first duly sworn, was
23  examined and testified as follows:
24         - - -

Page 11

1          EXAMINATION
2          - - -
3   BY MR. CHALOS:
4       Q.   Mr. O'Neill, thank you for
5   being here today. You must be a very
6   important guy; is that right?
7       A.   I don't believe that. But I
8   appreciate that.
9       Q.   Well, in the room today
10  we've got two lawyers from Ropes & Gray.
11      A.   That's true, yes.
12      Q.   There was a man here earlier
13  who I think who is going to come back
14  named Mark Casey.
15      A.   Yes, that's correct.
16      Q.   Who is that?
17      A.   General counsel of the
18  company.
19      Q.   Is he your boss?
20      A.   No.
21      Q.   What is his relationship to
22  you in the hierarchy?
23      A.   Colleagues.
24      Q.   Are you at the same level

Page 12

1   that he is?
2       A.   I am.
3       Q.   What is your job with
4   Mallinckrodt today?
5       A.   I'm brand executive vice
6   president chief commercial marketer for
7   the branded business.
8       Q.   For what organization?
9       A.   Mallinckrodt
10  Pharmaceuticals.
11      Q.   And what is Mallinckrodt
12  PLC?
13      A.   Mallinckrodt PLC is the, if
14  I understand correctly, I believe it's
15  the holding company for the other
16  subsidiaries of the organization.
17      Q.   And what organization
18  actually pays your salary?
19      A.   Mallinckrodt
20  Pharmaceuticals. Mallinckrodt.
21      Q.   Is that Mallinckrodt PLC or
22  do you know?
23      A.   I do not know.
24      Q.   And do you receive a

Page 13

1   paycheck or is it direct deposited?
2       A.   It's direct deposited.
3          (Document marked for
4          identification as Exhibit
5          Mallinckrodt-O'Neill-1.)
6   BY MR. CHALOS:
7       Q.   Let me hand you what we're
8   going to mark as Exhibit Number 1.
9          It is a document
10  Bates-numbered MNK-T1_0008592808 through
11  2810.
12         This is -- there you go.
13         MR. CHALOS: Could you pass
14     that to the witness.
15         MR. O'CONNOR: Take your
16     time.
17  BY MR. CHALOS:
18      Q.   What we've handed to you as
19  Exhibit 1 I'll represent to you was
20  produced to us through Mallinckrodt's
21  lawyers. And it appears to be your CV.
22  But if you take a minute to look that
23  over and confirm that for me, if you
24  would.

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1    A.   It is my CV.
2    Q.   Did you prepare this
3  document?
4    A.   I did.
5    Q.   When did you last update
6  this?
7    A.   I don't know the exact date.
8  Sometime in 2018.
9    Q.   And for what reason did you
10  update this document?
11    A.   My title was changed in May
12  of 2018.
13    Q.   Was that a promotion?
14    A.   It was.
15    Q.   Were you looking for a job
16  at that time?
17    A.   I was not.
18    Q.   Are you looking for a job
19  currently?
20    A.   I am not.
21    Q.   When was the last time that
22  you were actively looking for a job?
23    A.   Five years ago when I joined
24  the company.  Five and a half years ago.

Page 15

1    Q.   Okay.  So it has you listed
2  here as the executive vice president
3  chief commercial officer based in
4  Bedminster, New Jersey.  That's your
5  current role?
6    A.   That's my current role.
7    Q.   Okay.  What do you do?  You
8  list some bullet points here, six bullet
9  points of a description of your job.  Are
10  those all accurate?
11      MR. O'CONNOR:  Objection.
12  BY MR. CHALOS:
13    Q.   Let me ask that again.  You
14  list six bullet points here under your
15  title as executive vice president, chief
16  commercial officer.  Are those
17  descriptions accurate?
18      MR. O'CONNOR:  Objection.
19      THE WITNESS:  What I do in
20    the job, I have responsibility for
21    the entire branded business
22    currently, which is made up of
23    two -- two groups, one is a
24    hospital business and one is in

Page 16

1  autoimmune rare disease.
2  BY MR. CHALOS:
3    Q.   Autoimmune?
4    A.   Rare disease.
5    Q.   Okay.  Looking at Exhibit 1,
6  is everything that's set forth in
7  Exhibit 1 accurate to the best of your
8  knowledge?
9      MR. O'CONNOR:  Objection.
10      THE WITNESS:  It is my CV,
11    yes.
12  BY MR. CHALOS:
13    Q.   Is the information contained
14  within Exhibit 1 accurate to the best of
15  your knowledge?
16      MR. O'CONNOR:  Objection.
17      THE WITNESS:  It is.
18  BY MR. CHALOS:
19    Q.   Let's go back to the time
20  when you started at Mallinckrodt.  That
21  was in 2013; is that right?
22    A.   That is correct.
23    Q.   Okay.  How did you come to
24  work for Mallinckrodt?

Page 17

1    A.   Through an executive
2  recruiter.
3    Q.   At the time that you --
4  immediately prior to moving to
5  Mallinckrodt, you worked for a company
6  called Sanofi; is that correct?
7    A.   That is correct.
8    Q.   Who did you interview with
9  at Mallinckrodt when you first joined the
10  company?
11    A.   I interviewed with a panel
12  of individuals including members of the
13  board of directors, as well as members of
14  the executive committee at the time.
15    Q.   Do you remember any names?
16    A.   Ian Watkins, who is the head
17  of HR for us.  At the time Matt Harbaugh
18  was the chief financial officer.  Melvin,
19  who's the chairman of the board, couple
20  members of the board, and also Mark
21  Trudeau.
22    Q.   Okay.  When you said board,
23  what do you mean by that?
24    A.   It's the board of directors

Highly Confidential - Subject to Further Confidentiality Review

---

Page 18

1  of the company.
2      Q.   Do you know of what company?
3      A.   Mallinckrodt.
4      Q.   Is that Mallinckrodt PLC?
5      A.   I don't know whether it's
6  Mallinckrodt -- it's -- the way I think
7  about it, it's Mallinckrodt.
8      Q.   You think of it all as one
9  company?
10     A.   Well, I think about it as
11 Mallinckrodt Pharmaceuticals, and then
12 the way I think about it there's
13 subsidiaries attached to it.  But the
14 board is the board that help steer the
15 company, Mallinckrodt.  Whether that's
16 PLC or not, I don't know.
17     Q.   Okay.  Does the board make
18 all of the material decisions for the
19 pharmaceuticals business?
20         MR. O'CONNOR:  Objection.
21         THE WITNESS:  The board is
22     there to help us strategically set
23     the direction of the company and
24     challenge our strategy and to

Page 19

1      think about how we're actually
2      building the business.  But the
3      operational piece of the business
4      is actually run by myself and an
5      operating committee which consists
6      of finance and some of the
7      manufacturing folks.
8  BY MR. CHALOS:
9      Q.   Okay.  And that's -- are you
10 talking about at the present time or
11 during the entire time?
12     A.   During that time.  During
13 that time and the present time.
14     Q.   Okay.  So during the entire
15 time that you've been working for
16 Mallinckrodt, what you just described was
17 the role of the board of directors?
18         MR. O'CONNOR:  Objection.
19         THE WITNESS:  As I
20     understand it, yes.
21 BY MR. CHALOS:
22     Q.   Okay.  Were you directly
23 answerable to the board of directors in
24 all of your positions at Mallinckrodt?

Page 20

1          MR. O'CONNOR:  Objection.
2          THE WITNESS:  I reported
3      directly to the CEO of the company
4      at the time, and I still do.  Mark
5      Trudeau was the CEO.  I'm a member
6      of the executive committee.  The
7      executive committee has
8      responsibility directly through
9      Mark and to the board.
10 BY MR. CHALOS:
11     Q.   Okay.  So let's go back and
12 talk about the time 2013 to 2015 when you
13 were the senior vice president and
14 president of specialty pharmaceuticals.
15 Okay?
16     A.   Yes.
17     Q.   Okay.  What were you senior
18 vice president of?
19     A.   I had responsibility for all
20 of the business -- businesses that the
21 company had at that point in time, which
22 included a small branded piece of the
23 business, as well as the generic business
24 and the active pharmaceutical ingredients

Page 21

1  or API business.
2          The only businesses that I
3  did not have responsibility for were the
4  imaging business, which was the contrast
5  media and the nuclear imaging business.
6      Q.   And that has since been
7  sold?
8      A.   That is correct, yes.
9      Q.   And in your role as senior
10 vice president and president of specialty
11 pharmaceuticals, you were answerable to
12 Mr. Trudeau?
13     A.   I was -- reported directly
14 to Mark.  And I was responsible for the
15 management of the business on a daily
16 operations, on a daily basis, yes.
17     Q.   What was the line between a
18 decision that you could make and a
19 decision that you would need Mr. Trudeau
20 to make for you at the time when you were
21 senior vice president and president of
22 specialty pharmaceuticals?
23         MR. O'CONNOR:  Objection.
24         THE WITNESS:  So the daily

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1 operation of the business was my
2 responsibility. That includes the
3 management of the budget, that
4 includes the delivery of the --
5 the sales targets, the operation
6 plan, the manufacturing plan. And
7 we did that through an operating
8 committee, also known as an OC.
9 The operating committee was
10 chaired by myself, as well as the
11 gentleman who was responsible for
12 manufacturing and the financial
13 head. And we ran the business and
14 made those daily operational
15 decisions.
16 Mark's role was not a member
17 of the OC. He was not a part of
18 that. Mark's role was more around
19 the overall strategic direction of
20 the company, policy issues, those
21 type of things.
22 But the running of the
23 business on a daily basis was run
24 by the OC.

Page 23

1 BY MR. CHALOS:
2 Q. And for what decisions would
3 you need input from the board of
4 directors?
5 A. It was the normal, probably
6 once or twice a year. It was strategic
7 plan. So we would review the strategic
8 plan of the company, where we're going,
9 where we're going, what are the choices
10 that we think we should make. The
11 overall budget of the company and any
12 specific updates as it relates to mergers
13 and acquisitions and business development
14 targets.
15 Q. There was a time when the
16 company decided to no longer promote
17 Xartemis; is that true?
18 A. That is correct, yes.
19 Q. Who made that decision?
20 A. The operating committee.
21 Q. Did you need to get approval
22 from Mr. Trudeau for that?
23 MR. O'CONNOR: Objection.
24 THE WITNESS: I informed

Page 24

1 him, but the decision was the
2 operating committee's decision.
3 BY MR. CHALOS:
4 Q. Was the decision already
5 made by the time you informed
6 Mr. Trudeau?
7 A. I don't recall the timing of
8 when we had the conversation, whether it
9 was before or after.
10 Q. Okay. Did Mr. Trudeau have
11 input into the decision as to whether to
12 continue promoting Xartemis?
13 MR. O'CONNOR: Objection.
14 THE WITNESS: Mark has
15 always had an opinion, but the
16 decision ultimately was the
17 operating committee's.
18 BY MR. CHALOS:
19 Q. Okay. Was the -- were the
20 people on the operating committee, did
21 they change during -- at any point during
22 the time 2013 to 2015?
23 A. I don't think so. I think
24 it was myself, the head of manufacturing

Page 25

1 which was Dr. Frank Scholz, and the CFO
2 at the time, which was Matt Harbaugh.
3 There were meetings where Matt wouldn't
4 attend and he'd send a surrogate, which
5 was usually the head of his financial
6 group. But those were the three core.
7 Q. Who was the head of
8 Mr. Harbaugh's financial group?
9 A. Actually at the time it --
10 it changed. Trying to remember. George
11 Kegler was one. And then also Barbara
12 Bowden who came in later.
13 MR. CHALOS: Is he talking
14 too fast for you?
15 THE REPORTER: No, it's
16 fine.
17 MR. CHALOS: Okay. Okay.
18 Just wanted to --
19 THE WITNESS: Tell me if I'm
20 speaking too fast. Just let me
21 know.
22 MR. CHALOS: That's fine --
23 it's fine for me, but she's trying
24 to take it all down. So just

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1 wanted to make sure we're not
2 getting ahead of her.
3 BY MR. CHALOS:
4 Q. Have you ever given a
5 deposition before?
6 A. I have.
7 Q. On how many occasions?
8 A. I'm sorry?
9 Q. On how many occasions?
10 A. Two, three. I can't
11 remember the exact number. But I've done
12 it before.
13 Q. Okay. And what context did
14 you give those depositions?
15 A. Previous professional issues
16 related to litigation. My previous
17 organization, as well as personally on --
18 on an item as well.
19 Q. Okay. Let's talk about the
20 professional ones. Have you given a
21 deposition since you started working at
22 Mallinckrodt?
23 A. I have not.
24 Q. Who were you working for at

Page 27

1 the time you gave a deposition?
2 A. Sanofi.
3 Q. Okay. And what was the
4 nature of that lawsuit?
5 A. At the time I was the head
6 of the Canadian business for -- for
7 Sanofi, and we had a partnership with a
8 company that did not end the way that the
9 partner that -- wanted it to end, and we
10 terminated that agreement and it ended up
11 resulting in a lawsuit and there were
12 depositions attached to it.
13 Q. Okay. Where was that
14 lawsuit filed, do you know?
15 A. I don't remember.
16 Q. In the U.S.?
17 A. I don't recall. I believe
18 so. I believe so, but I'm not sure.
19 Q. What was the name of that
20 partner?
21 A. I don't remember to be
22 honest with you. I don't recall.
23 Q. What -- what type of
24 business were -- was Sanofi in

Page 28

1 partnership with in that -- with that
2 business?
3 A. It was a -- if I remember
4 correctly, it was a -- it was a pain
5 cream ointment that was to be used for
6 osteoarthritis patients. And we ended
7 the partnership because of the lack of
8 successful development of the product.
9 Q. Do you have a ballpark on
10 the time that you gave that deposition?
11 MR. O'CONNOR: Objection.
12 THE WITNESS: I don't
13 recall.
14 BY MR. CHALOS:
15 Q. You were with Sanofi from
16 2003 through 2013?
17 A. That is correct.
18 Q. Do you remember if it was
19 towards the beginning or towards the end
20 of your time there?
21 A. It was towards the end.
22 Q. Were you -- was the
23 deposition during the time that you were
24 general manager/president of Sanofi

Page 29

1 Canada?
2 A. It was actually after that.
3 Q. Okay. So sometime 2012 or
4 2013?
5 A. Yeah. It might even be
6 after I left the organization. I don't
7 recall exactly the dates, but...
8 Q. Okay. And you mentioned a
9 personal deposition involving a personal
10 matter. Without giving me too much
11 detail, what was the nature of that?
12 A. It was divorce proceedings.
13 Q. Was that here in New Jersey?
14 A. It was.
15 Q. What time frame was that?
16 A. '06, '07.
17 Q. In what county?
18 A. God bless you.
19 Q. What county?
20 A. Morris County.
21 Q. Do you live in New Jersey
22 now?
23 A. I split my time between
24 Missouri and New Jersey.

Page 30

1  Q.  Is that an arrangement that
2  you have plans to change at some point?
3  A.  It's a temporary
4  arrangement.  Ultimately we'll move back
5  to New Jersey.  But we have not done that
6  yet.
7  Q.  Do you have a time frame for
8  when you plan to move here full-time?
9  A.  Not -- not particularly.
10 Sometime within the next probably six to
11 12 months.
12 Q.  Okay.  So let's go back to
13 the time when you were senior vice
14 president and president of specialty
15 pharmaceuticals at Mallinckrodt.
16       During that time, you were
17 responsible for the company's opioids
18 business; is that right?
19 A.  That is correct, yes.
20 Q.  And that includes both the
21 branded opioids and the generic opioids?
22 A.  That is correct, yes.
23 Q.  Did that also include the
24 active pharmaceutical ingredients

Page 31

1  business?
2  A.  It did.
3  Q.  With respect to the active
4  pharmaceutical ingredients business,
5  where did those raw materials come from?
6       MR. O'CONNOR:  Objection.
7       THE WITNESS:  I don't really
8  recall the exact location.  I know
9  that there were raw materials that
10 came in for processing API.  I
11 believe some of them came from
12 outside the country.  I don't
13 remember exactly where.
14 BY MR. CHALOS:
15 Q.  Okay.  How did those
16 materials get into the United States?
17      MR. O'CONNOR:  Objection.
18      THE WITNESS:  They got
19 through normal clearance through
20 the DEA and through shipping into
21 the company and into the country
22 and we were authorized to receive
23 the product and then manufacture.
24 BY MR. CHALOS:

Page 32

1  Q.  At the time, did
2  Mallinckrodt have any businesses at the
3  shipping end of those products?  In other
4  words, did Mallinckrodt have businesses
5  overseas that imported the materials into
6  the United States?
7  A.  I don't recall.  I don't
8  recall that.
9  Q.  And when I'm talking about
10 raw materials, what are the raw materials
11 that went into the API business during
12 the time that you were the president and
13 specialty pharmaceuticals division?
14      MR. O'CONNOR:  Objection.
15      THE WITNESS:  So the API
16 business consisted of a couple of
17 different major forms.  One was
18 acetaminophen, which as you know
19 is a rough form of Tylenol, which
20 we manufacture, as well as
21 controlled substances such as
22 hydrocodone, oxycodone, and
23 others, that were used in our
24 finished products as well supplied

Page 33

1  to other potential manufacturers.
2  BY MR. CHALOS:
3  Q.  And so the raw materials,
4  let's talk about for hydrocodone,
5  oxycodone, what were the raw materials
6  that went into those products?
7       MR. O'CONNOR:  Objection.
8       THE WITNESS:  I don't really
9  recall.  I had responsibility for
10 the front-end of the business.
11 There were manufacturing people
12 that did all those pieces.
13 BY MR. CHALOS:
14 Q.  Is that something that
15 Dr. Scholz would know about?
16      MR. O'CONNOR:  Objection.
17      THE WITNESS:  I can't speak
18 on what Frank would know or not.
19 I don't know.
20 BY MR. CHALOS:
21 Q.  Is Dr. Scholz, he was in
22 charge of manufacturing operation at that
23 time?
24 A.  He was.

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.  What role did you have
2 during the time that you were president
3 of specialty pharmaceuticals division in
4 terms of the marketing messaging for the
5 branded products?
6    A.  So I had a group of people
7 that had responsibility for marketing and
8 sales on the branded side, just as I had
9 a group of people that were responsible
10 for the management of the generic
11 business. They had responsibility for
12 developing the strategies, the messaging,
13 the launch, the overall approach to the
14 marketplace.
15      And then my role was to be
16 involved and make sure there was
17 communication about what that looked like
18 and how we wanted to approach the market,
19 and then also to ensure that we were
20 successfully prepared for launch.
21    Q.  Did you have final approval
22 over any of the marketing messaging for
23 the branded products?
24    A.  The way the approval process

Page 35

1 works for the branded business, is it
2 goes through what was referred to as
3 promotional review committee, which is
4 legal, compliance, regulatory, and
5 medical. And they approve all of the
6 PRC, all of the promotional materials. I
7 don't approve those materials.
8    Q.  Did you have any role with
9 respect to approving the marketing
10 materials?
11      MR. O'CONNOR: Objection.
12      THE WITNESS: No.
13 BY MR. CHALOS:
14    Q.  I'm sorry. Your answer was
15 no?
16    A.  No.
17    Q.  What role do you currently
18 play in the company with respect to the
19 opioids litigation?
20    A.  I'm not sure I understand
21 the question, I'm sorry.
22    Q.  Sure.
23      Do you have any role in the
24 company with respect to the opioids

Page 36

1 litigation that's ongoing?
2      MR. O'CONNOR: Objection.
3      THE WITNESS: No.
4 BY MR. CHALOS:
5    Q.  Are you aware of any
6 litigation that was filed during the time
7 that you were the president of the
8 specialty pharmaceuticals group?
9    A.  I don't -- I am not, not
10 aware, no.
11    Q.  What do you call it, do you
12 call it a group or business or division?
13    A.  Subsidiary of the broader
14 company.
15    Q.  What was -- what were the
16 reasons that you decided to stop
17 promoting Xartemis?
18      MR. O'CONNOR: Objection.
19      THE WITNESS: So the product
20    in development was focused on
21    potentially an abuse deterrence
22    formulation. And through the
23    clinical development of the
24    product, the goal was to

Page 37

1    eventually get an abuse deterrence
2    claim on the product to add into
3    the market as a potential part of
4    the solution to kind of address
5    the -- the appropriate use of the
6    product.
7      That did not happen, number
8    one. So we didn't end up -- we're
9    not getting an abuse deterrent
10    claim. The other issues were that
11    we did decide to launch because we
12    had an approval. And we tried to
13    make sure that it was positioned
14    appropriately as it relates to a
15    potential opportunity for patients
16    who had a hard time dealing with
17    other forms of the product.
18      And we stopped promoting it
19    because the product was not able
20    to penetrate the market and be
21    successful.
22 BY MR. CHALOS:
23    Q.  How did you monitor the --
24    as you call it, market penetration of

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1 Xartemis?

2     MR. O'CONNOR: Objection.

3     THE WITNESS: So it was --

4 we looked at performance metrics

5 like you would normally. So

6 things such as ideas of who the

7 segmented physicians are that

8 potentially were appropriate to

9 write the product for patients who

10 could benefit from it.

11     We also looked at

12 prescription uptake based on those

13 appropriate patient populations.

14 BY MR. CHALOS:

15     Q. And where did you get that

16 data from?

17     A. Third-party sources. I

18 can't remember if it was IMS or some

19 others, but it was third-party sources.

20     Q. So the data that you got

21 regarding the Xartemis prescriptions was

22 prescription-level data?

23     MR. O'CONNOR: Objection.

24     THE WITNESS: Normally, you

Page 39

1 look at prescription level data,

2 both new prescriptions as well as

3 total prescriptions. And you look

4 at those across segmented

5 physicians that you believe are

6 appropriate to write the product

7 based on where the patients are

8 actually treated.

9 BY MR. CHALOS:

10     Q. Okay. So you can determine

11 from the data which doctors are writing

12 prescriptions for Mallinckrodt products?

13     MR. O'CONNOR: Objection.

14     THE WITNESS: Yes, we can.

15 BY MR. CHALOS:

16     Q. And you can also determine

17 which doctors are writing for products

18 manufactured by other companies?

19     MR. O'CONNOR: Objection.

20     THE WITNESS: So the

21 challenge with this market is,

22 because it's so genericized, you

23 don't really see who manufactures.

24 It just usually you see the

Page 40

1 chemical, the -- the amount of the

2 chemical that they are writing, so

3 hydrocodone with acetaminophen or

4 oxycodone or so forth. But we

5 don't usually see the

6 manufacturer, per se, unless it's

7 another brand.

8 BY MR. CHALOS:

9     Q. Okay. So for the branded

10 products, you would see for each

11 prescription that was written for the

12 specific product, right?

13     A. For our -- for our data,

14 yes.

15     Q. Yes.

16     A. You can see their overall

17 prescribing activity. But usually we

18 just looked at what our prescribing

19 activity was.

20     Q. Okay. And could you see, if

21 somebody wrote a prescription for a

22 generic, let's talk about -- let's talk

23 about Xartemis in particular.

24     So Xartemis was a

Page 41

1 combination drug?

2     A. Yes.

3     Q. Okay. So what was in that?

4     A. It was a combination of

5 oxycodone and acetaminophen.

6     Q. Okay. So could you also see

7 what physicians were writing

8 prescriptions for generic oxycodone and

9 acetaminophen combinations?

10     A. We saw the -- we could see

11 the full market potential, and we could

12 see -- I can't -- I can't recall exactly,

13 but the -- there was a history of what

14 they wrote, but we couldn't see

15 specifically how that breakout went. But

16 we saw the history of how the physicians

17 wrote, yes.

18     Q. Okay. And you can see which

19 prescriptions -- which -- excuse me. Let

20 me start that again.

21     A. Sure.

22     Q. During the time that you

23 were the president of the specialty

24 pharmaceuticals group, you could see

Page 42

1 which physicians were writing
2 prescriptions for Mallinckrodt's branded
3 product including Xartemis at that time?
4     A.   Yes.
5     Q.   Okay.  Was Exalgo still on
6 the market at that time?
7     A.   I don't recall the exact
8 timing.  When I joined the company,
9 Exalgo was at the back end of its
10 lifecycle.  It was going to go off
11 patent.  One strength maintained
12 exclusivity post the other ones losing
13 patent protection.  But we were
14 separating ourselves from promoting that
15 product, I want to say it was probably
16 like 2000 -- I can't remember the exact
17 date, but within the 2014 time frame.
18     Q.   Okay.  So when you first
19 joined Mallinckrodt, Mallinckrodt was
20 still promoting Exalgo?
21     A.   Yes, that's correct.
22     Q.   And was that under -- were
23 you in charge of that as well?
24     A.   It was under the branded

Page 43

1 business, yes.  It would have been my
2 responsibility.
3     Q.   Was it the 32-milligram dose
4 that they continued to promote for some
5 period of time?
6     A.   I believe that's correct,
7 yes.
8     Q.   Was the company at that time
9 monitoring the prescription level data
10 for Exalgo?
11     A.   I'm sure we had prescription
12 level data of how the product was
13 actually being written by physicians.
14 That would be normal course of business.
15     Q.   Okay.  You also were at one
16 time receiving daily sales reports for
17 both the branded opioids and the generic
18 opioids; is that right?
19          MR. O'CONNOR:  Objection.
20          THE WITNESS:  That is
21     correct.  We do say -- see daily
22     sales reports, yes.
23 BY MR. CHALOS:
24     Q.   Is -- is that something that

Page 44

1 came to you during the entire time that
2 you were the president of the specialty
3 pharmaceuticals business?
4          MR. O'CONNOR:  Objection.
5          THE WITNESS:  It came -- it
6     came to the operating committee.
7     It came to my -- myself included,
8     yes.
9 BY MR. CHALOS:
10     Q.   Okay.  You -- are you aware
11 that in 2017 Mallinckrodt entered into a
12 settlement agreement with the Drug
13 Enforcement Administration?
14     A.   I'm aware of the settlement.
15 Not of the details, because I was not
16 running the business at the time.  But I
17 was aware of the settlement, yes.
18     Q.   Okay.  Did you -- you may
19 have just answered my next question then.
20          What role, if any, did you
21 have in conjunction with the discussions
22 with the Drug Enforcement Administration
23 that ultimately led to that settlement
24 agreement?

Page 45

1     A.   None.
2     Q.   Do you know who
3 Michael-Bryant Hicks is?
4     A.   I do.
5     Q.   Who is he?
6     A.   He's our former general
7 counsel.
8     Q.   So Mr. Casey's predecessor?
9     A.   That is correct, yes.
10     Q.   And he was the general
11 counsel for Mallinckrodt LLC, as well as
12 Mallinckrodt PLC?
13     A.   I don't know.
14          MR. O'CONNOR:  Objection,
15     objection.
16          THE WITNESS:  I don't really
17     know.  I mean I know he was the
18     general counsel for the company.
19     I don't know whether it was LLC,
20     PLC or how it was set up.
21 BY MR. CHALOS:
22     Q.   Okay.  What role, if any,
23 did Mark Trudeau have in formulating the
24 messaging for Mallinckrodt's branded

Page 46

1 opioid Xartemis?
2 　　　　MR. O'CONNOR: Objection.
3 　　　　THE WITNESS: As I mentioned
4 earlier, Mark -- Mark's role as
5 chief executive officer was not
6 involved in the daily operations.
7 He was more setting the strategy
8 direction of the company.
9 Investor relations, board
10 relations, those type of things.
11 　　　　The operating committee
12 which I chaired like I mentioned
13 earlier really had responsibility
14 for the management of the business
15 on a daily basis.
16 　　　　And the PRC, or the
17 promotional review committee,
18 approved the messaging for the
19 products that were used in front
20 of customers.
21 BY MR. CHALOS:
22 　　Q.　Okay. Would you from time
23 to time present to Mr. Trudeau proposed
24 messaging for Xartemis?

Page 47

1 　　　　MR. O'CONNOR: Objection.
2 　　　　THE WITNESS: I don't recall
3 whether we had conversations about
4 it or not.
5 BY MR. CHALOS:
6 　　Q.　Are you from New Jersey?
7 　　A.　I am. Is it that evident?
8 　　Q.　Well, I'm from New York
9 originally, so yeah.
10 　　A.　Born in Brooklyn, but raised
11 in Jersey.
12 　　Q.　Which part of Brooklyn?
13 　　A.　Flatbush.
14 　　Q.　I was born in Queens.
15 　　　　(Document marked for
16 　　　　identification as Exhibit
17 　　　　Mallinckrodt-O'Neill-2.)
18 BY MR. CHALOS:
19 　　Q.　I'm going to hand you what
20 we'll mark as collective Exhibit
21 Number 2. I believe it to be an e-mail
22 and its attachment. The Bates numbers
23 are MNK-T1_0000947867, and
24 MNK-T1_000947868.

Page 48

1 　　　　We'll mark that, both of
2 those as collective Exhibit Number 2.
3 　　　　(Discussion off the record.)
4 BY MR. CHALOS:
5 　　Q.　Okay. And you can take as
6 much time as you need to review this,
7 Mr. O'Neill. I'm going to ask you a few
8 questions when you're ready.
9 　　A.　Okay.
10 　　Q.　So, Exhibit Number 2 is,
11 first page, is an e-mail from you to Mark
12 Trudeau dated December the 13th of 2013,
13 7:52 p.m. The subject line is Xartemis
14 messaging.
15 　　　　And you said in that e-mail,
16 "I've attached one slide that represents
17 our messaging for Xartemis XR."
18 　　　　And does this appear, the
19 second page of Exhibit 2, to be that
20 slide?
21 　　A.　I don't really recall the
22 e-mail, but clearly I mean I'm looking at
23 it, so it came from me.
24 　　　　The message -- the -- the

Page 49

1 outline of the slide certainly seems to
2 fit the e-mail, yes.
3 　　Q.　Okay. You -- you said here,
4 "For purposes of the next week, I would
5 recommend that the focus be on the onset
6 you expect, the duration they deserve."
7 　　　　Do you see that?
8 　　A.　I do.
9 　　Q.　Okay. Do you have any idea
10 what you were referring to there when you
11 said "for the purposes of next week"?
12 　　A.　I don't recall.
13 　　Q.　If you go further down, you
14 said, "As we spoke about at the EC, we
15 will be testing this messaging with
16 physicians and payors."
17 　　　　Do you see that?
18 　　A.　I do.
19 　　Q.　Okay. What is the EC?
20 　　A.　It's the executive committee
21 of the organization. It's Mark's direct
22 reports.
23 　　Q.　Okay. So at the time in
24 2013, who was on the executive committee?

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1    A.   It would be better off
2  probably going by roles.  But Mark --
3  Mark obviously was on it, the CFO, the
4  general counsel, myself as the head of
5  the branded business, the generic
6  business.  I'm sure Dr. Scholz who was
7  the head of manufacturing, as well as
8  head of science and technology.  I
9  probably missed a couple people, but
10  those were the major pieces.
11    Q.   And during this time period,
12  the time period where you were the
13  president of specialty pharmaceuticals,
14  how often did the executive committee
15  meet?
16    A.   I don't recall the exact
17  timing.  But probably once a month at
18  least.  There were different topics on
19  the agenda.
20    Q.   During the time when you
21  were president of the specialty
22  pharmaceuticals business, did you attend
23  board of directors meetings?
24    A.   I'd be in certain sections

Page 51

1  of those board of directors meetings.  I
2  wasn't in there the whole time.  It was
3  usually those things that were relevant
4  to my presence.
5    Q.   Would you attend every board
6  of director meeting?
7    A.   I don't recall if I attended
8  every one.  But if I was on the agenda,
9  I'd be there.
10    Q.   Where did those occur?
11    A.   At this time I believe they
12  were occurring in Dublin.
13    Q.   How often did those occur?
14    MR. O'CONNOR:  Objection.
15    THE WITNESS:  I don't recall
16    the exact timing.  Probably once a
17    quarter, four times a year maybe.
18  BY MR. CHALOS:
19    Q.   Do you still attend those
20  board of directors meetings?
21    A.   I do.
22    Q.   Have you attended those
23  meetings during the entire time that
24  you've worked at Mallinckrodt?

Page 52

1    A.   I have.  Not all of them,
2  but, you know, like I said, when I'm --
3  when it's relevant for me to be there.
4    Q.   Okay.  Have they always
5  taken place in Dublin, since you've been
6  involved?
7    A.   Initially Dublin.  Now they
8  take place in London.
9    Q.   Does the entire executive
10  committee attend the board meetings?
11    A.   Now, yes.  We are -- we are
12  always there, because there's usually a
13  chance to interact with the board, answer
14  specific questions, but, yes, most of the
15  EC is there.
16    Q.   Was there a time where that
17  wasn't true?
18    A.   In the beginning, we would
19  go based on whether the topic required us
20  to be there.  Now we tend to go to every
21  one.  It doesn't mean that we're in the
22  meeting the whole time, but we were
23  there.
24    Q.   When did that change?

Page 53

1    A.   I don't recall the exact
2  timing.
3    Q.   Was it recent?
4    A.   I'd have to speculate.  I
5  don't -- it wasn't that long ago.
6    Q.   Okay.  So let's go back to
7  Exhibit Number 2.  This phrase or
8  phrases, "The onset you expect, the
9  duration they deserve."
10    Did you come up with that?
11    A.   No.  My expectation would --
12  that would have come from my marketing
13  team.
14    Q.   Do you have a marketing
15  background?
16    A.   I do.
17    Q.   What was your undergraduate
18  degree in?
19    A.   Finance.
20    Q.   And did you get a graduate
21  degree?
22    A.   I did.
23    Q.   From Seton Hall as well?
24    A.   I did.

Highly Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.    What was -- what was your
2  graduate degree in?
3    A.    Marketing.
4    Q.    When was that?
5    A.    My graduate degree was in
6  '97, I believe.
7    Q.    And how about your
8  undergrad?
9    A.    '92.
10    Q.    That's PJ days?
11    A.    Yeah, yeah.  I got -- my
12  undergrad was from Montclair State.  And
13  graduate was from Seton Hall.
14    Q.    Got it.  Those were heavy
15  times for their basketball program.
16    A.    It was.
17    Q.    Was this slide that's
18  attached to Exhibit Number 2, was that
19  something that the marketing department
20  prepared, do you think?
21    A.    I can't remember who
22  prepared it.  But it would have
23  definitely come from the brand team, yes.
24    Q.    From the brand team?

Page 55

1    A.    Yeah, from the marketing
2  group, yeah.
3    Q.    What was the brand team?
4    A.    So every -- the way we
5  manage our products, is there is usually
6  a team of individuals that require --
7  that manage the business.  And those that
8  we refer to as brand teams, they usually
9  have people from marketing, people from
10  finance, from medical, other people that
11  help drive the strategy for the business
12  at a brand level.
13    Q.    Do you have any medical
14  training?
15    A.    I do not.
16    Q.    This -- on Exhibit 2, the
17  messaging recap is, "Xartemis XR is the
18  first and only oxycodone HCl/APAP
19  combination for acute pain with immediate
20  and extended-release analgesia, providing
21  fast-acting and long-lasting continuous
22  pain relief with the benefit of 12-hour
23  dosing for patients."
24        Is that something that the

Page 56

1  brand team came up with?
2    A.    They would have tested that.
3  They would have developed it, and it
4  would have had to have been cleared by
5  the promotional review committee that I
6  spoke of earlier, which included medical,
7  regulatory, and legal.
8    Q.    Got it.
9        Do you know why you were
10  sending this information to Mark Trudeau
11  in December of 2013?
12    A.    I don't recall exactly why,
13  but you could go back to where the
14  company was.  We had just spun.  We had
15  just become public from our spin-out from
16  Covidien.  And this was our first --
17  could be our first launch.  And so there
18  was a lot of interest in where we were
19  going.  It was more informational than
20  anything else.
21    Q.    What was your role with
22  respect to the spin from Covidien?
23    A.    I joined after that was
24  completed.  That was completed in July of

Page 57

1  '13.  I joined in September.
2    Q.    Do you have any legal
3  training?
4    A.    I do not.
5    Q.    What role with respect to --
6  talking about Xartemis here.  What role
7  with respect to the discussions with FDA
8  over labeling did you play?
9    A.    I was not involved in the
10  active discussions with the FDA.  That
11  would have been our regulatory team.  I
12  was aware of the discussions and the
13  dialogue, but I was not actively
14  involved.
15    Q.    Was there a point person for
16  the company to deal with the FDA on that
17  issue?
18    A.    It would have been our head
19  of regulatory at the time, which I
20  believe was Mark Mannebach.  I think his
21  last name was.  I can't remember.  He's
22  not with the company anymore.
23    Q.    Since you've been with the
24  company, has Mallinckrodt promoted

Page 58

1 Roxicodone?
2     A.   Not that I'm aware, no.  I
3 don't know.  But I don't think so.
4     Q.   Have you heard of
5 Roxicodone?
6     A.   I have, yes.
7     Q.   Is that a product that the
8 company still sells?
9     A.   I believe it's part of the
10 generic business.  I'm not aware of how
11 it's handled.  It's not part of my
12 responsibility.
13     Q.   Was that part of your
14 responsibility when you were president of
15 the specialty pharmaceuticals business?
16     A.   I don't remember if it was
17 in the portfolio at this point in time.
18 It was a relatively small product.  If it
19 was, I don't really recall.
20         (Document marked for
21         identification as Exhibit
22         Mallinckrodt-O'Neill-3.)
23 BY MR. CHALOS:
24     Q.   We'll mark as Exhibit

Page 59

1 3MNK-T1_0000953264.
2         If you need a break at any
3 time.
4     A.   No, that's okay.  I just
5 need a little water.
6     Q.   You can take as much time as
7 you need to review that.
8     A.   Okay.
9     Q.   So let's talk about the
10 e-mail on the bottom first.  This is from
11 you to someone named Todd Killian and
12 Stacy Chick.  Do you see that?
13     A.   I do.
14     Q.   Okay.  Who was Todd Killian?
15     A.   Todd Killian at the time was
16 the head of my market access team.
17     Q.   What was the function of the
18 market access team?
19     A.   So their primary
20 responsibility was interacting directly
21 with payors, both private and public
22 payors.
23     Q.   Okay.  And Stacy Chick.  Who
24 is she?

Page 60

1     A.   At the time she was the head
2 of the sales organization.
3     Q.   You -- you said in this
4 e-mail, "I hope you guys had a good
5 weekend.  As I've had the chance to think
6 through the various topics from the last
7 cabinet meeting," do you see that?
8     A.   I do.
9     Q.   What -- what was the
10 cabinet?
11     A.   So the cabinet was myself,
12 members of my direct reports, commercial
13 leadership, as well as medical and some
14 other people that were monitoring the
15 launch of the product and determining how
16 it was going and what, if anything, we
17 should be thinking differently about.
18     Q.   Okay.  And that was
19 different from these other groups that
20 we've talked about?
21     A.   Yeah.  This was -- this was
22 a very -- this was a group that was
23 meeting more -- more frequently than the
24 OC.  The OC probably monthly.  This was

Page 61

1 probably weekly.
2     Q.   During the time period that
3 you were president of the specialty
4 pharmaceuticals group, was the company
5 monitoring pharmacy level data as well on
6 its products?
7     A.   I don't recall whether we
8 were or not.  I don't -- I don't
9 remember.
10     Q.   Do you know what I mean when
11 I say pharmacy level data?
12     A.   You're -- I'm assuming you
13 mean dispense data at the pharmacy.
14     Q.   Yes, I am.
15     A.   No, I don't remember if we
16 did or not.
17     Q.   Is that something the
18 company does today?
19     A.   It's different today.  So
20 the business that we have now is a
21 specialty pharmaceutical business.  And
22 it's handled through SPs, specialty
23 pharmacies, not retail pharmacies.  And
24 we get to see that data as part of our

Page 62

1 network. But, yes, we do see it. But I
2 don't know if we were monitoring pharmacy
3 data here or not.
4     Q. Did you have access -- did
5 the company have access to pharmacy level
6 data back when you were the president of
7 the specialty pharmaceuticals group?
8     A. There were third-party
9 providers that had that. IMS was one. I
10 can't remember who the other one was.
11 But, yes, there were third-party data
12 providers. And I'm sure like anything
13 else, it was probably there, but I don't
14 remember.
15     Q. Okay. Going back to Exhibit
16 Number 3. The first bullet point there,
17 you said, "Our overall approach to the
18 VA/DOD."
19     That's Veterans
20 Administration, Department of Defense?
21     A. That's correct.
22     Q. "This is a market that would
23 seem to be in need of a solution like
24 Xartemis XR. The policy team under

Page 63

1 leadership of Derek Naten is currently
2 digging into the messaging for policy
3 makers in DC."
4     Do you see that?
5     A. I do.
6     Q. Okay. What were you talking
7 about there?
8     A. So when you think about vets
9 and you think about some of the
10 challenges that they have with pain
11 management, both -- both active as well
12 as nonactive, there was a real
13 opportunity, potentially, to place the
14 product in that provided more sustainable
15 pain relief, without changing the dosing.
16 And it was more aligned with potentially
17 helping these patients reach a better
18 outcome.
19     Q. Okay. What was the policy
20 team?
21     A. So at the time we have a --
22 we had a, and we still do have a team
23 down in Washington DC that works on
24 public policy, as well as government

Page 64

1 affairs. And Derek is a part of that
2 team.
3     Q. Okay. And at some point you
4 were in charge of the political action
5 committee for Mallinckrodt; is that
6 right?
7     A. The PAC, yes.
8     Q. Are you still in charge of
9 that?
10     A. I chair the board for the
11 PAC, yes, I do.
12     Q. Is there any connection
13 between the PAC and the policy team?
14     A. No.
15     Q. Still under bullet point
16 Number 1 of Exhibit 3, you said, "Todd,
17 how do we handle the message into Hines
18 or at the VISN level."
19     Do you see that?
20     A. Yeah.
21     Q. What does that mean?
22     A. So Hines is the center of
23 the VA. It's where most clinical
24 decisions are made. And these are people

Page 65

1 who usually drive formulary decisions.
2     The VISNs, or the V-I-Z --
3 V-I-S-Ns, they are the regional structure
4 underneath Hines that makes local
5 decisions for the VAs.
6     Q. And why was it important to
7 get a message to those groups?
8     A. Because they are ultimately
9 going to make the decision of whether
10 they make the product available to the
11 patients that could potentially benefit
12 from it. So you want to share with them
13 the clinical messaging and the -- the
14 opportunity and understanding of the
15 product and potentially who -- who the
16 appropriate patients are that could
17 benefit from it.
18     Q. Okay. You went on to say in
19 Exhibit 3, "We obviously will need to go
20 out and recruit a topnotch AD to handle
21 this segment."
22     What is an AD?
23     A. Account director.
24     Q. Oh, okay. Did that ever

Page 66

1 happen?
2    A.  I don't recall whether we
3 hired somebody or not.  That's a --
4 that's a specific -- that's a specific
5 skill set that you go out to try to find,
6 but I don't know if we did or not.  I'm
7 assuming we did, but I don't remember.
8    Q.  Did the market access team
9 report to you at this time?
10    A.  It did.
11    Q.  The next bullet point in
12 Exhibit 3, "Differentiation in front of
13 the prescriber."
14      Do you see that?
15    A.  I do.
16    Q.  Okay.  What is
17 differentiation in front of the
18 prescriber?
19    A.  So one of the challenges
20 in -- in the branded business is getting
21 time in front of potential physicians,
22 because they see patients.  Their days
23 are very busy.  You want to make that as
24 productive as possible.  And they get a

Page 67

1 lot of people that are trying to get
2 their time.
3      So the question is how do
4 you actually stand out from that and how
5 do you potentially offer them a solution
6 that they don't see.  So it's really
7 making yourself stand out versus your
8 competition.
9    Q.  I see.  So one of the
10 challenges for a branded product like
11 Xartemis XR would be to explain to
12 prescribers why that product is new or
13 different from existing products?
14    A.  That's correct, yes.  But
15 also getting the time in front of them,
16 right.
17    Q.  With respect to a drug like
18 Xartemis, it also had generic
19 competition; is that right?
20    A.  Yeah, there were generic
21 versions of the product.  Not of
22 specifically that formulation.  But of
23 oxycodone and acetaminophen, yes.
24    Q.  And what was the messaging,

Page 68

1 if you remember, that was intended to
2 differentiate Xartemis from either the
3 generics or other branded products that
4 are similar to it?
5    A.  I don't recall the exact
6 messaging.  But I think the -- what you
7 shared with me earlier about the duration
8 and the dose, dosing, was probably part
9 of that.
10    Q.  That 12-hour dose that you
11 talked about earlier?
12    A.  Mm-hmm.  Yes.
13    Q.  Okay.  What, if any, was the
14 Mallinckrodt messaging about the risk of
15 addiction with respect to Xartemis?
16      MR. O'CONNOR:  Objection.
17      THE WITNESS:  I don't recall
18    the specific messaging as it
19    relates to -- to -- to the
20    addiction piece of the messaging.
21    I don't recall what it was.
22 BY MR. CHALOS:
23    Q.  Was there a discussion in
24 the Xartemis messaging about the risk of

Page 69

1 addiction?
2      MR. O'CONNOR:  Objection.
3      THE WITNESS:  I'm sure as I
4    mentioned earlier, through the --
5    through the -- through the PRC or
6    promotional review committee, that
7    it had to be a balanced message
8    based on the data.  We would not
9    put something out that didn't have
10    some sort of balance in it, I just
11    don't recall what the specifics
12    were.
13 BY MR. CHALOS:
14    Q.  Okay.  What is your
15 understanding today about the risk of
16 addiction with prescription opioids?
17      MR. O'CONNOR:  Objection.
18      THE WITNESS:  So, based on
19    what I know, there is clearly an
20    opioid crisis in place.  And the
21    opportunity for appropriate
22    utilization of this product is
23    really the most important piece.
24    There are patients that live with

Page 70

1 pain, and opioids represent a
2 significant opportunity for them
3 to manage their pain. But like
4 anything else, it has to be used
5 appropriately with the right
6 patient.
7 BY MR. CHALOS:
8    Q.   Is there a risk of addiction
9 for patients taking prescription opioids?
10       MR. O'CONNOR: Objection.
11       THE WITNESS: I am not a
12 scientist. It's hard for me to
13 say. I know that there's an
14 opioid issue.
15 BY MR. CHALOS:
16    Q.   Have you ever heard that
17 there's a risk of addiction with
18 prescription opioids?
19    A.   Like I said, I know there's
20 an opioid crisis as specifically in the
21 inappropriate use of the product, yes.
22    Q.   Have you ever read the
23 labels for any of the Mallinckrodt opioid
24 products?

Page 71

1    A.   Not since I've been in the
2 business, which was five years ago, four
3 years ago.
4    Q.   Back when you were the
5 president of the specialty
6 pharmaceuticals business, did you read
7 product labels for the opioid products?
8    A.   I'm sure I did.
9    Q.   Do you recall anything about
10 the risk of addiction in there?
11    A.   I'm sure there was risk
12 associated in the label. I don't
13 remember the exact language.
14    Q.   What do you know about the
15 opioid crisis?
16       MR. O'CONNOR: Objection.
17 BY MR. CHALOS:
18    Q.   You mentioned you know
19 there's a crisis.
20       MR. O'CONNOR: Objection.
21       THE WITNESS: I know that
22 there is a significant concern
23 related to the inappropriate use
24 of the products.

Page 72

1 BY MR. CHALOS:
2    Q.   Is there any risk of
3 addiction with prescription opioids even
4 when they are used appropriately?
5       MR. O'CONNOR: Objection.
6       THE WITNESS: Again, it's
7 hard for me to speculate on that.
8 I don't know that answer.
9 BY MR. CHALOS:
10    Q.   Have you ever known anyone
11 addicted to opioids?
12    A.   I have not.
13    Q.   Have you ever met anyone
14 addicted to opioids?
15    A.   I have not.
16    Q.   Let's mark as Exhibit Number
17 4.
18       (Document marked for
19 identification as Exhibit
20 Mallinckrodt-O'Neill-4.)
21       MR. CHALOS:
22 MNK-T1_0000944036.
23       THE WITNESS: Okay.
24 BY MR. CHALOS:

Page 73

1    Q.   Okay. So this is -- Exhibit
2 Number 4 is an e-mail from you to a group
3 of people dated November 5th of 2013.
4 It's to somebody named Sanjeev Luther.
5       Do you see that?
6    A.   I do.
7    Q.   Who is Mr. Luther?
8    A.   So at the time, Sanjeev was
9 the head of business analytics,
10 forecasting and such.
11    Q.   Okay. And what is that?
12    A.   He has responsibility for
13 the team that does all the business
14 analytics, on the KPIs, forecasting, all
15 those issues.
16    Q.   What's KPI?
17    A.   I'm sorry. Key performance
18 indicators. Score cards, those types of
19 things.
20    Q.   So would Mr. Luther be
21 reviewing information such as
22 prescription-level data?
23    A.   In his role, he would
24 understand it, yes. And he would

Page 74

1 probably see it.
2 Q. Okay. Is he still with the
3 company?
4 A. He is not.
5 Q. Do you know where he is now?
6 A. I do not.
7 Q. Okay. This is also sent to
8 someone named Joe Duarte.
9 Do you see that?
10 A. Yes.
11 Q. Who was he?
12 A. At the time, Joe was the
13 head of market access prior to Todd.
14 Q. Okay. And Melissa Falcone?
15 A. I do see that, yes. Melissa
16 at the time was the brand director.
17 Q. She's a marketing person
18 then?
19 A. She is.
20 Q. Is she still with the
21 company?
22 A. She is.
23 Q. Does she still -- does she
24 still report to you?

Page 75

1 A. No. And she is in a
2 different role now. She reports to the
3 current head of market access for the
4 organization.
5 Q. Who is that?
6 A. Sandy Loreaux.
7 Q. Is that a man or a woman?
8 A. Woman.
9 Q. Okay. So the subject line
10 here is "Xartemis XR ADT impact."
11 Do you see that?
12 A. I do.
13 Q. Okay. And this is sent --
14 you sent it with high importance, company
15 confidential. Why was that?
16 A. Because it referenced
17 specifically issues relating to our
18 ongoing negotiations with the FDA. And
19 that was a confidential negotiations that
20 potentially could lead to a different
21 thinking about the product.
22 Q. Okay. You said here, "We
23 are looking at various scenarios
24 concerning the ongoing label negotiations

Page 76

1 with the FDA. One of the scenarios is
2 that we do not receive any mention of ADT
3 within the label."
4 Do you see that?
5 A. I do.
6 Q. What is ADT?
7 A. Abuse deterrence. Abuse
8 deterrence technology. ADT is abuse
9 deterrence technology.
10 Q. Okay. And you were being
11 kept apprised at this time of the
12 negotiations with FDA?
13 A. Progress in our discussions
14 with the FDA regarding that, yes.
15 Q. Okay. But you weren't
16 involved?
17 A. No, I was not actively
18 involved in the negotiations.
19 Q. Okay. A couple sentences
20 down, you said, "I believe the major
21 point of differentiation will be our
22 ability to gain access in a
23 non-prior-authorized third-tier
24 position."

Page 77

1 Do you see that?
2 A. I do.
3 Q. Okay. What did you mean by
4 that?
5 A. So it's a formulary position
6 with the payors. So if you -- if you
7 think about, at this time -- it's changed
8 a little bit. At this time, copays, or
9 what the patient pays, is more defined by
10 tiers. So tier 1 was generic. Tier 2
11 usually was preferred brand. Tier 3 was
12 a nonpreferred brand.
13 And prior authorization was
14 the amount of management that the payor
15 would place on top of a specific
16 utilization of a brand. And what we
17 were -- what we were communicating based
18 on the language here -- and I can only
19 speculate, because I don't really
20 remember this, just based on what I'm
21 reading, is that it was important for the
22 product not to have prior authorization
23 on it. And allow it to sit in a
24 third-tier position, which would have

Page 78

1 been a little more expensive to the
2 patient but not prior authorized.
3     Q.   Okay.  Why was it being
4 prior authorized an issue?
5     A.   Because if you think about
6 the way payors manage formularies, they
7 step at it or they force patients to fail
8 on other products.  And more than
9 likely -- again, this is speculation
10 based on what I'm reading, is that the
11 challenge would be that if the product
12 was prior authorized, the patient would
13 have to fail on multiple other forms of
14 the generic before they get access to the
15 product.
16     Q.   Okay.  And if a product
17 required prior authorization, that would
18 mean that a physician would have to call
19 to the payor and say, "I need
20 authorization to make this prescription
21 for this patient"?
22     A.   That's one way.  Or
23 documentation, or call, yeah.  Some sort
24 of documentation.

Page 79

1     Q.   And that would likely have
2 the effect of reducing the number of
3 prescriptions?
4         MR. O'CONNOR:  Objection.
5         THE WITNESS:  Again, it
6     would -- it would potentially
7     impact how many patients get
8     access to the product because they
9     may not actually get -- ever get
10     access to it, because the
11     physician may not be willing to
12     write it.
13 BY MR. CHALOS:
14     Q.   Prior authorization is
15 something that the physician's office
16 would have to get; is that right?
17     A.   Yes.
18         MR. CHALOS:  All right.
19     Let's mark as the next numbered
20     exhibit MNK-T1_0002806634.
21         Be exhibit Number 5.  It's
22     actually a two-page exhibit.  Let
23     me review that.  So Exhibit
24     Number 5 is MNK-T1_0002806634 and

Page 80

1 6635.
2         (Document marked for
3     identification as Exhibit
4     Mallinckrodt-O'Neill-5.)
5         MR. CHALOS:  I'm told lunch
6     is here.  So after we finish
7     talking about this document, we
8     can take a break and eat.
9         THE WITNESS:  Okay.
10 BY MR. CHALOS:
11     Q.   Okay.  The top e-mail here
12 is from you to Stacy Chick with a copy to
13 someone named Mike Paterson.  Do you see
14 that?
15     A.   I do.
16     Q.   Who was Mr. Patterson?
17     A.   At the time Mike Paterson
18 was my -- my chief of staff.
19     Q.   What is that role?
20     A.   Responsibility for
21 execution, project management, making
22 sure things were moving the way they need
23 to move.
24     Q.   Is he still with the

Page 81

1 company?
2     A.   He is not.
3     Q.   Where is he now?
4     A.   I do not know.
5     Q.   When did he leave the
6 company?
7     A.   Couple years ago.
8     Q.   Do you know if he's still in
9 the pharmaceutical business?
10     A.   I do not know.
11     Q.   Okay.  Dated -- this e-mail
12 is dated April 11th of 2014.  And your
13 e-mail here on the top is to Stacy.
14         It says, "Stacy, thanks.  I
15 would ask you to follow up with Todd on
16 this issue.  There is no reason to have
17 our demand generation minimized by
18 dropping the ball at the retailer level."
19         Do you see that?
20     A.   I do.
21     Q.   Okay.  What does -- what did
22 you mean by that?
23     A.   So if you think about how
24 many retail pharmacies there are in the

Page 82

1 country, getting a new product stocked at
2 the retailer, when it's launched, is very
3 difficult, because they have limited
4 shelf space. They're -- they're only
5 willing to take certain things.
6        And what the concern was, if
7 we were able to generate interest in the
8 product, that when the prescription was
9 filled, the pharmacy wouldn't have the
10 product to fill the prescription. That
11 was the concern.
12    Q.   Okay. And what did you mean
13 when you used the term "demand
14 generation"?
15    A.   Again, going specifically to
16 the physicians with the right messaging,
17 to identify the appropriate patient and
18 generating prescriptions activity.
19    Q.   Okay. And that was one of
20 the goals of the sales staff?
21    A.   Sure, yes.
22    Q.   Okay. Was this issue ever
23 rectified?
24    A.   I don't recall whether it

Page 83

1 was or not, but clearly there was effort
2 to make sure the product was available,
3 based -- just based on the language in
4 the e-mail.
5    Q.   Okay. And at some point,
6 and we'll -- we'll look at this e-mail
7 later. But at some point you were
8 suggesting that Mallinckrodt should
9 guarantee sales to the pharmacies. So in
10 other words, if they stocked the Xartemis
11 and it didn't sell, then they wouldn't be
12 charged for it; is that right?
13    A.   I don't recall the detail on
14 that.
15    Q.   Okay. All right. We'll
16 look at some e-mails later on that.
17       MR. CHALOS: Okay. Well,
18    let's put this aside and eat
19    lunch, and we'll come back and
20    talk some more.
21       THE VIDEOGRAPHER: Remove
22    your microphones, please. The
23    time is 12:00 p.m. Off the
24    record.

Page 84

1        - - -
2       (Lunch break.)
3        - - -
4       THE VIDEOGRAPHER: We are
5    back on the record. The time is
6    12:46 p.m.
7 BY MR. CHALOS:
8    Q.   Mr. O'Neill, when you were
9 in charge of the specialty pharmaceutical
10 business, were you responsible for
11 generic opioids as well?
12    A.   I was.
13    Q.   Okay. Were you aware of a
14 suspicious order monitoring program in
15 place at the time?
16    A.   I was.
17    Q.   Okay. And what was your
18 role with respect to that?
19    A.   So as the head of the
20 business, I have responsibility for
21 managing the team that had responsible --
22 had -- ran the business on a daily basis.
23 So the order monitoring actually was
24 handled by a separate group that worked

Page 85

1 closely with the commercial team. I was
2 not actively involved in the order
3 monitoring, but I knew it existed.
4    Q.   Okay. Did they report to
5 you?
6    A.   No.
7    Q.   Who did they report to?
8    A.   I don't know where they
9 reported, but they were not part of the
10 commercial organization.
11    Q.   Okay. Did you have any
12 responsibility ultimately for suspicious
13 order monitoring in your role with the
14 specialty pharmaceuticals business?
15    A.   I did not.
16    Q.   Do you know a person named
17 Victor Borelli?
18    A.   I do not recall the name,
19 no.
20    Q.   What did you do to prepare
21 for your deposition today?
22    A.   I met with my attorneys.
23    Q.   Who is that?
24    A.   The gentlemen to my right.

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  Q.  Mr. O'Connor?
2  A.  Yes.
3  Q.  Okay.  Anyone else?
4  A.  His team right here.
5  Q.  Okay.  Mr. Davison as well?
6  A.  Mm-hmm.
7  Q.  And anybody else?
8  A.  That's it.
9  Q.  When did you do that?
10  A.  First was a couple weeks
11 ago, and then I think we had a touch-base
12 recently in the last couple of days.
13  Q.  Did you meet in person with
14 them?
15  A.  First time, yes.
16  Q.  Where was that?
17  A.  In Bedminster.  At our
18 offices in Bedminster.
19  Q.  Mallinckrodt has offices in
20 Bedminster?
21  A.  Yes, we do.
22  Q.  Who was in -- who was
23 present for that first meeting?
24  A.  Mr. Davison, Mr. O'Connor,

Page 87

1 and myself.
2  Q.  Anybody else?
3  A.  I don't think so.  I think
4 that was it.
5  Q.  Okay.  How long did that
6 meeting last?
7  A.  A few hours.
8  Q.  And then you had a -- you
9 said I think a touch-base discussion more
10 recently?
11  A.  I think within the next --
12 last 24, 48 hours, yes.  It was a phone
13 call.
14  Q.  That's what I was going to
15 ask you.  On the phone?
16  A.  Mm-hmm.
17  Q.  Same group of people?
18  A.  Yes.
19  Q.  How long did that last?
20  A.  Not very.  I can't remember
21 exactly, but it wasn't very long.
22  Q.  Did you do anything else to
23 prepare for your deposition today?
24  A.  I did not.

Page 88

1  Q.  Have you talked with anybody
2 other than the two lawyers you mentioned?
3  A.  I have not.
4  Q.  Have you talked with the
5 general counsel for Mallinckrodt in
6 preparation for your deposition today?
7  A.  I have.
8  Q.  About the deposition today,
9 I mean.
10       I'm sorry, in preparation
11 for the deposition today?
12  A.  In preparation, no.  But
13 about the awareness of the deposition,
14 yes.  But not in preparation.
15  Q.  Okay.  Did you look at any
16 documents to prepare for today?
17  A.  I did see documents, yes.
18  Q.  When was that?
19  A.  During the initial meeting.
20  Q.  Since that meeting have you
21 looked at any documents to prepare for
22 the deposition today?
23  A.  I have not.
24  Q.  Have you talked with anyone

Page 89

1 else who has had their deposition taken
2 in this litigation about your deposition?
3  A.  I have not.
4  Q.  Have you talked with anyone
5 who has had their deposition taken in
6 this litigation about their deposition?
7  A.  I have not.
8       (Document marked for
9       identification as Exhibit
10       Mallinckrodt-O'Neill-6.)
11 BY MR. CHALOS:
12  Q.  We've marked as Exhibit
13 Number 6 to your deposition a series of
14 e-mails.  MNK-T1_000223534 through 5397.
15 Exhibit 6.
16       MR. CHALOS:  I could have
17       handed those to both of you at the
18       same time.
19       MR. O'CONNOR:  That's all
20       right.
21 BY MR. CHALOS:
22  Q.  Let me know when you've had
23 a chance to review those.
24  A.  Okay.

Page 90

1  Q.   You've had a chance to
2  review Exhibit Number 6?
3  A.   I have, yes.
4  Q.   I want to focus you on the
5  e-mail Monday, May 19th, 2004 -- I'm
6  sorry, 2014, at 8:52 p.m. from you to
7  Stacy Chick, Ellen McCune and Todd
8  Killian.
9  Do you see that e-mail?
10 A.   I do.
11 Q.   Who is Ellen McCune?
12 A.   She was my head of
13 commercial operations at that point.
14 Q.   Okay.  And Todd Killian who
15 was he, again?
16 A.   He was head of market access
17 at that point.
18 Q.   Okay.  Okay.  So at this
19 point in May of 2014, you had not yet
20 decided to stop the promotion of
21 Xartemis; is that right?
22 A.   That is correct, yes.
23 Q.   And when did you decide to
24 stop promoting Xartemis?

Page 91

1  A.   I don't recall the exact
2  date, but it was later in 2014.
3  Q.   Who decided to terminate a
4  significant number of sales
5  representatives that had previously
6  promoted Xartemis?
7  MR. O'CONNOR:  Object.
8  BY MR. CHALOS:
9  Q.   Was that your decision?
10 MR. O'CONNOR:  Objection.
11 THE WITNESS:  That was a
12 decision that was taken at the
13 operating committee, based on
14 the -- based on the launch curve
15 and the lack of productivity.
16 BY MR. CHALOS:
17 Q.   Was that ultimately your
18 decision to approve or was that something
19 that the committee itself could decide
20 with -- regardless of your position?
21 A.   It was my recommendation,
22 and then ultimately the OC would make the
23 final approval on it.
24 Q.   Okay.  The operating

Page 92

1  committee, the OC, the operating
2  committee, that consisted of four people?
3  A.   I don't know the exact
4  numbers.  But there were -- there were
5  myself, I think I said earlier Dr. Frank
6  Scholz, George -- I mean Matt Harbaugh,
7  and those were the primaries, yes.  There
8  were others that came in and out.  But
9  they were the primaries.
10 Q.   Okay.  That is separate from
11 the executive committee, right?
12 A.   That is correct, yes.
13 Q.   And the executive committee,
14 I just want to make sure I have these
15 clear.  The executive committee, that was
16 a committee with Mark Trudeau, right, the
17 CFO?
18 A.   Yeah.  The executive
19 committee is the team of Mark's direct
20 reports, which include the CFO, myself at
21 that point in time, the head of HR, the
22 general counsel, head of communications,
23 head of production or manufacturing, and
24 the chief science officer.  I may have

Page 93

1  missed somebody.  But that was the main
2  core.
3  Q.   Are all of those people on
4  the executive committee based in the
5  United States?
6  MR. O'CONNOR:  Objection.
7  THE WITNESS:  There was also
8  the chief strategy officer, who
9  was based in London at the time.
10 And I think everybody else was
11 United States-based, if I'm not
12 mistaken.
13 BY MR. CHALOS:
14 Q.   Who was the chief strategy
15 officer?
16 A.   Gary Phillips.  Dr. Gary
17 Phillips.
18 Q.   Okay.  And then the
19 operations committee was all people based
20 in the U.S.?
21 A.   Yes.
22 Q.   All righty.  Did you decide
23 to terminate Stacy Chick?
24 A.   Stacy left the organization.

Page 94

1 I believe we moved on from it. I don't
2 remember exactly the details of it. But
3 yeah, she did leave the organization.
4     Q.   Was that -- did you have any
5 role in the decision that led to her
6 leaving the organization?
7          MR. O'CONNOR: Objection.
8          THE WITNESS: I don't
9     remember the exact -- since she
10     worked for me, I'm sure I had
11     input on what the ultimate
12     decision was.
13 BY MR. CHALOS:
14     Q.   Okay. So going back to
15 Exhibit Number 6. The e-mail
16 specifically from you dated 8:52 p.m. to
17 Ms. Chick, Ms. McCune, and Mr. Killian,
18 your subject line was "Critical.
19 Immediate attention required."
20          Do you see that?
21     A.   I do.
22     Q.   Fair to say that -- is it
23 fair to say that were you frustrated at
24 this point?

Page 95

1     A.   Concerned. I think
2 concerned is a better -- better
3 description.
4     Q.   Okay. I'm looking now at
5 the second paragraph, the one that starts
6 with, "After writing these down."
7          Do you see that?
8     A.   I do.
9     Q.   It says, "After writing
10 these down, I find it hard to believe
11 that we are at this point. Our job as
12 leaders is not to see the world the way
13 we want to see it, but see it for what it
14 is. At this point we have no choice but
15 to see the XXR" -- that's Xartemis XR?
16     A.   Correct.
17     Q.   -- "the XXR launch for what
18 it is, a failure," underlined and bolded,
19 right?
20          Do you see that?
21     A.   I do.
22     Q.   Did you believe that XXR
23 launch to be a failure at that point?
24     A.   At this point, based on the

Page 96

1 e-mail, I would say yes.
2     Q.   You go on to say,
3 "Therefore, I'm requesting immediate
4 focus and plan of action that is shared
5 with the entire commercial leadership."
6 And there's a series of it looks like
7 initials; is that right?
8     A.   That is correct.
9     Q.   Who are those people listed
10 there?
11     A.   SC would be Stacy Chick. MF
12 would be Melissa Falcone. TK would be
13 Todd Killian. EM would be Ellen McCune.
14 GK would be George Kegler. And HO is
15 myself.
16     Q.   Okay. This POA, is that a
17 plan of action?
18     A.   It is.
19     Q.   Okay. "This POA includes a
20 back to basics approach to generate Rx's
21 immediately."
22          What are Rx's?
23     A.   Prescriptions.
24     Q.   "This means increasing our

Page 97

1 reach to the 20K-plus targets that we
2 have not seen with a simple and powerful
3 concept. XXR is the right choice for
4 their acute pain patients (efficacy, PK
5 profile, dosing, et cetera) and that
6 specific patient profiles currently
7 utilizing older opioid-based pain
8 products would benefit from utilizing XXR
9 with little or no out-of-pocket cost."
10          Do you see that?
11     A.   I do.
12     Q.   Okay. In that sentence you
13 mentioned something, PK profile.
14          Do you see that?
15     A.   I do.
16     Q.   What is that?
17     A.   Pharmacokinetic profile,
18 which is how the drug actually behaves in
19 the drug as the active. And this
20 formulation of oxycodone and
21 acetaminophen actually stayed in the
22 blood for a longer period of time, which
23 means it provided better pain relief over
24 that period of time as opposed to spiking

Highly Confidential - Subject to Further Confidentiality Review

Page 98

1 and leaving. That's the pharmacokinetic
2 profile.
3    Q.   Okay. And what did you mean
4 by dosing?
5    A.   Smaller dosing less
6 frequently than the other competitor
7 products. This was a two-time-a-day drug
8 versus the competitors, which were four
9 to six.
10    Q.   Got it. Okay. And how is
11 that an advantage for this drug?
12    A.   So if you think about the
13 patients that are on the older
14 opioid-based products, they have to take
15 more, because the drug doesn't stay in
16 their system longer. This requires them
17 to take less. And it's easier to dose.
18 And it's easier for them to manage as
19 opposed to the other products.
20    Q.   You go on to say, "I would
21 also encourage the brand team to put
22 forth a guarantee program around the
23 product that states, if the physician and
24 the patient are not satisfied with XXR,

Page 99

1 we will reimburse the cost of the co-pay
2 for not only the patient in question, but
3 for the next patient that the physician
4 puts on the drug.
5        Do you see that?
6    A.   I do.
7    Q.   Was that program ever
8 implemented?
9    A.   I don't believe so.
10    Q.   Do you know why?
11    A.   I don't recall.
12    Q.   "I would also like to take
13 our highest performing 10 percent of reps
14 and bring them together on a weekend to
15 turn them loose on the organization and
16 the nonprescribing physicians."
17        What does that mean?
18    A.   So we had a group, a
19 subgroup of specialists who were actually
20 were doing well with the launch. And we
21 had a vast majority that were not. So
22 what we wanted to do was bring the reps
23 that were doing well to help us
24 understand what was working for them,

Page 100

1 what was not, and help educate the rest
2 of the organization in how we could
3 improve the -- the performance of the
4 brand.
5    Q.   Okay. Did that meeting
6 happen?
7    A.   I believe it did, yeah.
8    Q.   Do you recall where it
9 happened?
10    A.   I don't.
11    Q.   What was your role with
12 respect to sales compensation incentive
13 plans when you were the president of the
14 specialty pharmacy business --
15 pharmaceuticals business, sorry.
16        MR. O'CONNOR: Objection.
17        THE WITNESS: So the -- the
18    sales incentive plans were
19    developed by the business and then
20    approved by the commercial
21    operations group as well as HR and
22    others. And I was shown them, but
23    I was not involved in the
24    generation or the creation of

Page 101

1    them.
2 BY MR. CHALOS:
3    Q.   Did you have to approve them
4 before they were implemented?
5    A.   I'm sure I looked at them,
6 I'm sure I -- I approved them, yeah, I'm
7 sure I had input on it.
8    Q.   And you -- we talked earlier
9 about the messaging and I believe you
10 said that that was something that was
11 formulated by a committee?
12    A.   It's a brand team.
13    Q.   Brand team. Okay.
14        Did you have final approval
15 over the messaging for the branded opioid
16 products?
17    A.   I provided input on it. And
18 I did have final approval with the team
19 to say whether we were comfortable with
20 it or not.
21        Obviously, as we spoke about
22 before, going through PRC or promotional
23 review committee so it wasn't up to me
24 entirely. It had to be based on legal,

Page 102

1 regulatory compliance review, and
2 medical.
3     Q.   Did you have final signoff
4 on the messaging?
5     A.   I didn't sign off on it, but
6 I knew of -- I -- I was involved in it.
7 Yeah, I saw it.
8     Q.   Did you have any role with
9 respect to any marketing messaging for
10 the generic opioid products?
11     A.   I did not.
12     Q.   Who was responsible for
13 that?
14     A.   I had a gentleman who worked
15 for me who ran that business, gentleman
16 by the name of Walt Kaczmarek. And
17 again, on -- on the opioid side, on the
18 generic side, remember, there's no
19 promotion going on there.
20     Q.   Mm-hmm.
21     A.   Those products are actually
22 sold through distributors and then the
23 prescriptions are written for just the
24 chemical and then they are filled at the

Page 103

1 pharmacy. But there's no promotion to
2 doctors on that side.
3     Q.   What responsibility did you
4 have for the generic opioids business in
5 your role as the president of the
6 specialty pharmaceuticals business?
7     A.   I had business reported
8 directly to me. So Walt was part of my
9 leadership team. He had responsibility
10 for the daily operations of it, and I
11 oversaw how the business performed versus
12 expectations and helped them set budgets
13 and those type of things. But the daily
14 operation was really Walt's -- Walt's
15 responsibility.
16     Q.   Were -- were you more
17 hands-on on the brand side of the opioids
18 business at that point?
19     A.   I was, yes.
20     Q.   Why was that?
21     A.   Because it was our first
22 launch as a brand-new company and we were
23 focusing more on that. Because that was
24 the opportunity for us to show that we

Page 104

1 could launch our product.
2     And I came in specifically
3 with the idea of building out a branded
4 company. Even though I had generic
5 experience, the idea was to help build
6 the branded company as well.
7     Q.   Who was in charge of
8 building the generics opioid business at
9 that point?
10     A.   Walt Kaczmarek was the head
11 of the -- the generic business at that
12 point.
13     Q.   Okay. Was he the head of it
14 during the entire time that you were
15 president of the specialty
16 pharmaceuticals business?
17     A.   He was.
18     Q.   Is he still?
19     A.   No.
20     Q.   Who -- who runs that
21 business now?
22     A.   Matt Harbaugh is our -- is
23 the head of the generics business.
24     Q.   Okay. Going back here to

Page 105

1 Exhibit Number 6. Next paragraph. It
2 says, "The bottom line is one have
3 one" -- I assume you mean we have one
4 common goal?
5     A.   Yeah.
6     Q.   In all caps, "Generate
7 prescriptions."
8     Do you see that?
9     A.   I do.
10     Q.   You meant generating
11 prescriptions of Xartemis?
12     A.   I did.
13     Q.   "Everything else that is not
14 generating prescriptions should become
15 secondary priority."
16     Do you see that?
17     A.   I do.
18     Q.   What did you mean by that?
19     A.   So the focus of the
20 organization needed to be make sure that
21 we were able to communicate to the target
22 physicians about those patients that
23 could benefit from it. Educate the
24 physicians, allow them to make a choice

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1  on how they wanted to prescribe the
2  product.
3          And anything that we weren't
4  doing around that, or anything that
5  wasn't focused there should be considered
6  a secondary priority.
7      Q.   What other types of tasks
8  were you thinking of -- thinking of that
9  should become secondary priorities?
10     A.   I can't recall.  But, you
11 know, there -- there's other spends
12 involved in the business.  But -- but I
13 can't recall exactly what was there.
14     Q.   Okay.  Were you interviewed
15 by anyone from the Drug Enforcement
16 Administration at any time?
17     A.   I was not.
18     Q.   How about the Federal Bureau
19 of Investigation?
20     A.   I was not.
21     Q.   When you were president of
22 the specialty pharmaceuticals business at
23 Mallinckrodt, you were aware that
24 physicians in Ohio were prescribing

Page 107

1  Mallinckrodt opioid products, right?
2      A.   I was aware that products
3  were prescribed across the country, yeah.
4      Q.   And that would include Ohio?
5      A.   That would include Ohio,
6  sure.
7      Q.   Actually, let me grab this
8  one.
9          Were you familiar with the
10 Mallinckrodt chargeback program regarding
11 generic opioids while you were president
12 of the specialty pharmaceuticals
13 business?
14     A.   I was familiar with the
15 chargeback program, yes.
16     Q.   Okay.  What -- what was the
17 chargeback program in general terms, what
18 was your understanding of it?
19     A.   So the chargeback program is
20 designed to give back to the wholesalers
21 or the distributors, the -- the cost
22 difference between what they sold the
23 product for, versus what they bought it
24 from us for.  And that's usually done via

Page 108

1  a contractual vehicle.
2      Q.   And what was the purpose of
3  that program?
4      A.   To ensure that the
5  wholesalers were not out of -- out of the
6  cost of the drug, that they actually sold
7  to their clients at a lower price than
8  what they bought it for.  It's industry
9  practice.
10     Q.   Who was in charge of
11 negotiating those contracts with
12 distributors?
13     A.   It would have been Walt and
14 his team.  Walt Kaczmarek and his team.
15     Q.   Did you have a periodic
16 meeting with Walt to discuss the generics
17 business?
18     A.   I'm sure we did performance
19 reviews and discussions of how the -- the
20 products were performing.  I don't know
21 how often it was, but I'm sure we met.
22 Yes.
23     Q.   Okay.  Did you have any
24 committee related to the generic opioids

Page 109

1  business like some of these other
2  committees we talked about?
3      A.   No, no, not a specific one
4  directly related to that business.  But
5  that business would have been part of the
6  OC dialogue.  Because it was part of my
7  responsibility.
8      Q.   Was this a representative
9  from the generic opioids business on the
10 operating committee?
11     A.   If we talked about that
12 business, Walt would come in and have a
13 dialogue about it, yes.
14     Q.   Was there -- was he part of
15 the committee or would he be sort of
16 called in as needed?
17     A.   Called in as needed.
18     Q.   You mentioned earlier that
19 you had some experience with generics.
20 What did you mean by that?
21     A.   I've worked in generic
22 businesses elsewhere in my career.  I
23 started the generic business for Sanofi
24 in the U.S., what was at the time called

Page 110

1 Winthrop Pharmaceuticals. And earlier in
2 my career when I worked for Sandoz, we
3 developed a company that was called
4 Kratom that then became Geneva, and then
5 ultimately became Sandoz or Novartis.
6     Q.   Did you have any experience
7 with generic opioids prior to coming to
8 Mallinckrodt?
9     A.   I did not.
10     Q.   Had you any experience with
11 branded opioids before coming to
12 Mallinckrodt?
13     A.   I did not.
14     Q.   When you were president of
15 specialty pharmaceuticals business, did
16 you know that Mallinckrodt
17 pharmaceutical -- I'm sorry, that
18 Mallinckrodt generic opioids were being
19 sold in Ohio?
20     A.   I knew they were being sold
21 nationally. So I can only assume that
22 they were also sold in Ohio. I did not
23 know the details behind it.
24     Q.   Did you --

Page 111

1         MR. CHALOS:  Let's mark this
2 as an exhibit.
3         (Document marked for
4 identification as Exhibit
5 Mallinckrodt-O'Neill-7.)
6         MR. CHALOS:  I've marked as
7 Exhibit Number 7 MNK-T1_0002081432
8 through 1434. 1434 is an Excel
9 spreadsheet of a number of pages.
10 We've improved the process right
11 there.
12         MR. O'CONNOR:  Good job.
13 BY MR. CHALOS:
14     Q.   It's Exhibit Number 7.
15     A.   Okay.
16     Q.   Before we get to Exhibit
17 Number 7, I just want to make sure we got
18 this clear in the record.
19         When you were president of
20 the specialty pharmaceuticals business at
21 Mallinckrodt, did you know that
22 Mallinckrodt's generic opioids were being
23 sold in Ohio?
24     A.   I knew they were sold

Page 112

1 nationally. So, yes, I think they were
2 sold in Ohio, yes.
3     Q.   Okay. Exhibit Number 7 is
4 from a person named Erich Singer. Who is
5 that?
6     A.   He was a member of the
7 financial planning group.
8     Q.   His title is listed here as
9 manager, FP&A multi-source
10 pharmaceuticals.
11         Do you see that?
12     A.   I do.
13     Q.   What does all that mean?
14     A.   Manager of financial
15 planning and analysis for the
16 multi-source pharmaceuticals, which is
17 the generic business.
18     Q.   Okay. And you are listed in
19 this long list of recipients here as
20 being one of the persons to whom this
21 e-mail was sent in August of 2015.
22         Do you see that?
23     A.   I do.
24     Q.   Is this -- and the

Page 113

1 attachment -- well, let me back up. The
2 subject is "August daily sales by
3 customer." And the attachment is "August
4 MTD dosage daily sales," dated
5 August 31st of '15. And it's a
6 spreadsheet.
7         Did you receive a dosage
8 daily sales report on a periodic basis?
9     A.   I don't recall receiving
10 this. But based on the e-mail, my name
11 is on the distribution list. So that
12 means I did.
13     Q.   Okay. Do you recall during
14 this time frame in 2015 receiving daily
15 sales reports?
16     A.   Like I said, I'm on the
17 distribution list, so I'm assuming I
18 received these, yes.
19     Q.   Okay. When you were
20 president of the specialty
21 pharmaceuticals business, did you put
22 these daily sales reports to any use?
23     A.   Mostly for tracking against
24 the budget and where we were versus the

Page 114

1 expectation of the business.
2     Q.   So these pages aren't
3 numbered.  But which of -- in terms of
4 that operation, tracking against the
5 budget, which of the charts would be most
6 meaningful to you as an example in
7 Exhibit 7?
8     A.   So you have different
9 exhibits here.  One is a month to date,
10 one is a quarter to date, and one is a
11 year to date.  So we would look at all of
12 those to see where the business was
13 trending.  Mostly at the net sales level.
14     Q.   Okay.  What is the
15 difference between net sales and gross?
16     A.   The chargebacks mostly.
17     Q.   Was there anything else that
18 was subtracted from the gross sales to
19 yield the net sales number?
20     A.   It includes other
21 deductions, returns and other things.
22 But the chargebacks are the majority of
23 that difference.
24     Q.   So for example, the net

Page 115

1 sales analysis -- let me see here.
2     A.   Is that the second-to-last
3 page?
4     Q.   Yeah, that would be a good
5 place to start.  Yeah, so second-to-last
6 page, which is, actually, four pages from
7 the back, they are two-sided pages, where
8 it says net sales analysis.
9         Is that one of the charts
10 that you would typically review in
11 connection with measuring the sales --
12 actual sales to budget sales?
13     A.   Yes.
14     Q.   And this example in Exhibit
15 Number 7 shows that, at least in August
16 of 2015, the actual sales were about
17 9.8 percent short of the budgeted sales
18 year to date.
19     A.   That's correct, yes.
20     Q.   Okay.  So the -- at this
21 time in 2015, was Mallinckrodt counting
22 on a calendar year or on some other
23 basis?
24     A.   I don't remember when we

Page 116

1 switched.  We were on a fiscal year for a
2 period of time, and we switched to a
3 calendar year.  I can't remember whether
4 that happened, if it was in '15, or '16.
5 I can't recall.
6     Q.   The fiscal year ended in the
7 end of September?
8     A.   That's correct, yes.
9     Q.   At some point, Mallinckrodt
10 changed to a calendar year accounting?
11     A.   We did.
12     Q.   Do you know why that change
13 was made?
14     A.   I think it was driven by
15 normal behavior, what you saw in the
16 market.  Most people were on calendar
17 years versus -- versus fiscal years.
18     Q.   You can put that to the side
19 for now.  Did I take the other one?  This
20 is always a struggle to stay organized in
21 these things.
22         We've marked as Exhibit
23 Number 8 MNK-T1_0005150446 and 447.  447
24 is a PowerPoint that was produced in

Page 117

1 native format.
2         (Document marked for
3         identification as Exhibit
4         Mallinckrodt-O'Neill-8.)
5 BY MR. CHALOS:
6     Q.   The PowerPoint says "Top
7 prescribers network analysis LTD:
8 09/12," and it's dated October 6th of
9 2014.
10         You can take as much time as
11 you need to.  I'm going to direct you to
12 specific pages that we have questions
13 about.  But you can certainly review the
14 whole thing.
15     A.   Okay.
16     Q.   Did you have any role in
17 deciding whether the company would
18 purchase any additional businesses at any
19 time while you were at Mallinckrodt?
20     A.   I did, yes.
21     Q.   Okay.  What was your role in
22 that respect?
23     A.   So as part of the executive
24 team, working closely with the head of

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1 strategy, I provided input on where we
2 thought there might be opportunities and
3 reviewed those opportunities accordingly.
4 　　Q.　Did you -- did the company
5 in fact purchase any additional
6 businesses at -- while you were -- let me
7 try that again.
8 　　　　Did the company actually
9 purchase any businesses that you
10 recommended the company to purchase?
11 　　A.　As part of the team, yes we
12 did.
13 　　Q.　Okay.　Which were those?
14 　　A.　In 2014 we acquired a
15 company called Cadence Pharmaceuticals,
16 and then shortly thereafter we acquired a
17 company called Questcor Pharmaceuticals.
18 And both of those were opportunities that
19 I supported.
20 　　Q.　Did either of those relate
21 to opioids in any way?
22 　　A.　Cadence was a pain --
23 hospital-based pain company which had an
24 IV formulation of acetaminophen, also

Page 119

1 known as Ofirmev, which is a
2 non-opioid-based pain product used in
3 pre- and peri-postoperative pain
4 management.　But Questcor, no.
5 　　Q.　Did Cadence have any
6 opioid-related products?
7 　　A.　No.
8 　　Q.　Did Mallinckrodt ever
9 purchase a company called Orexo?
10 　　A.　No.
11 　　Q.　Is there -- do you recall a
12 discussion about potentially exploring an
13 opportunity related to Orexo?
14 　　A.　I don't recall the
15 conversation.　It wouldn't surprise me if
16 we did.　We looked at a lot of different
17 opportunities.
18 　　Q.　When you recommended the
19 purchase of an additional business, who
20 would ultimately have to approve that
21 purchase?
22 　　A.　Ultimately it would be the
23 board of directors would have to approve
24 the -- the move to acquire another

Page 120

1 company.
2 　　Q.　Do you recall any of the
3 persons actually on the board of
4 directors?
5 　　A.　I do.
6 　　Q.　Okay.　Who do you remember?
7 　　A.　At that time Mel Booth was
8 the chair of the board.　Marty Carroll
9 was one of the directors.　Joe Zaccagnino
10 another director.　JoAnn Reed, another
11 director.　Kneeland Youngblood, another
12 director.　Those are the major ones I
13 remember.　I don't remember all of them.
14 　　Q.　Was somebody named Diane
15 Golias on a board?
16 　　A.　Yes.　Diane was on the
17 board.
18 　　Q.　Okay.　David Carlucci?
19 　　A.　That's correct.
20 　　Q.　Paul Carter?
21 　　A.　Back then no.　Paul was not
22 on the board.　He's a relatively new
23 addition.
24 　　Q.　I was going to say, he is on

Page 121

1 the board now?
2 　　A.　Yes.
3 　　Q.　Okay.　What about David
4 Norton?
5 　　A.　He's a relatively new
6 addition.　He was not on the board at
7 that time.
8 　　Q.　Angus Russell?
9 　　A.　Not on the -- he came on the
10 board after we purchased Questcor.
11 　　Q.　Mark Trudeau?
12 　　A.　Yes.
13 　　Q.　He has been on the board the
14 whole time you've been there?
15 　　A.　As the CEO yes he has.
16 　　Q.　Anne Whitaker?
17 　　A.　At that point she was not on
18 the board.　She's a recent addition.
19 　　Q.　Virgil Thompson?
20 　　A.　He came on the board after
21 the acquisition of Questcor.
22 　　Q.　Do you have any say in who
23 gets onto the board?
24 　　A.　I do not.

Highly Confidential – Subject to Further Confidentiality Review

Page 122

1 Q. How do the board members get
2 chosen, do you know?
3 A. By the board itself and by
4 recommendation from external search
5 firms, and they make the final decision.
6 Q. Okay. So let's get back to
7 Exhibit 8.
8 Believe me, that's
9 shortening the deposition when I go off
10 on these tangents, so...
11 Anyway, let's get back to
12 Exhibit 8 here. This is an e-mail from a
13 person named Antoine Uwimana?
14 A. That's correct.
15 Q. Who is Mr. Uwimana --
16 Uwimana?
17 A. Antoine was the individual
18 who replaced Sanjeev who I mentioned
19 earlier. So he became the head of
20 business analytics after Sanjeev left.
21 Q. Okay. And the head of
22 business analytics reported to you?
23 A. No. Actually the head of
24 business analytics reported to Gary

Page 123

1 Phillips who was the head of strategy
2 and -- and -- strategy and business
3 development.
4 Q. And Mr. Phillips is based in
5 London?
6 A. Doc Phillips, yes, he was
7 based in London. He is no longer with
8 the company.
9 Q. Was Mr. Uwimana located in
10 the U.S.?
11 A. Yes.
12 Q. Where?
13 A. At this point in time I
14 think St. Louis.
15 Q. Okay. So he sent this
16 e-mail to you and Mr. Paterson on
17 October 7th of 2014, 7/57 p.m., and there
18 is some attachments here. But the
19 subject line is Xartemis XR updated
20 districts and network analysis. Do you
21 see that?
22 A. I do.
23 Q. Okay. Do you -- as you sit
24 here today, do you recall ever receiving

Page 124

1 this or ever reviewing this in the past?
2 A. I don't recall receiving it.
3 Q. Okay. Well, the -- the
4 first page of the attachment, which is
5 the -- it's the third page of this
6 exhibit. It says, "Top prescribers
7 network analysis, LTD: 09/12."
8 Do you see that?
9 A. I do.
10 Q. Do you have any idea what
11 LTD: 09/12 is?
12 A. I don't. I don't recall,
13 no.
14 Q. In reviewing this now, do
15 you have any idea what this PowerPoint
16 is?
17 A. I do. It's a -- it's an
18 analysis by region of target physicians
19 and their productivity, and looking at
20 their specialty and their ranking versus
21 the deciling of the -- the targets?
22 Q. I'm sorry, what was the very
23 last part of that?
24 A. Against the deciling of the

Page 125

1 targets. So the way the physicians are
2 segmented is the deciling of how
3 important they are. If they are
4 affiliated with hospitals, if they have a
5 strong network, those type of things. So
6 that's what this is.
7 Q. Okay. And that deciling was
8 an attempt to determine which physicians
9 were most likely to be candidates who
10 prescribe Mallinckrodt products for the
11 appropriate patients?
12 A. This is specific to Xartemis
13 XR. But yes, it was identified to give
14 direction to the field so that they would
15 spend time where there was the highest
16 probability of success.
17 Q. And how did -- well, who
18 within Mallinckrodt made the
19 determination as to where a particular
20 physician would fit within the deciling
21 framework?
22 A. So that would be a
23 combination of the brand team as well as
24 the business analytics group that would

Highly Confidential – Subject to Further Confidentiality Review

Page 126

1 make that final decision.
2      Q.   And is that based -- I'm
3 sorry?
4      A.   Or recommendation.
5      Q.   Okay.  Was that based on
6 their prior prescribing habits?
7      A.   That was one variable.  It
8 could also be the variable of how many
9 patients they saw that had this
10 indication or potential issue.  What --
11 what organizations they were affiliated
12 with.  In other words, did -- were they
13 part of a group practice, an individual
14 practice.  There's lots of variables that
15 lead into it.
16      Q.   If you look at the -- it's
17 labeled Page 2 of the PowerPoint.  It
18 says on the top, "National level summary
19 for top 25 prescribers."
20      Do you see that?
21      A.   I do.
22      Q.   Okay.  Were these top 25
23 prescribers, was that designation based
24 on potential or is that based on past

Page 127

1 prescriptions?
2      A.   Based on the -- the title,
3 it would be based on their prescriptions
4 of the product.  That's the way I would
5 interpret it.
6      Q.   Okay.  And if you look at
7 the chart to the right, now I'm afraid
8 I -- I think I've handed you a black and
9 white version of this.
10      A.   Mm-hmm.
11      Q.   Okay.  All right.  Well,
12 then that's not going to be terribly
13 helpful.
14      If you look at the second
15 bullet point there in the shaded section.
16 It says, "Top 25 prescribers were mostly
17 concentrated in the South Central."
18      Do you see that?
19      A.   I do.
20      Q.   "Followed by the East
21 region."
22      Was Tennessee in the South
23 Central?
24      A.   I don't recall where

Page 128

1 Tennessee was as far as region.
2      Q.   It looks like the South
3 Central, as far as I can tell, is
4 responsible for, among the top 25
5 prescribers, 50 percent of them, if you
6 look at the chart on the right.
7      Can you tell that?  Maybe
8 you can't tell that from yours.
9      A.   I can tell that.  Yes,
10 that's correct.
11      Q.   Okay.  All righty.  How
12 would the Mallinckrodt crew determine how
13 many patients a particular physician
14 would see with a certain potential
15 indication?
16      A.   So when we looked across
17 the -- the targets, we'd look at past
18 prescribing behavior.  We'd also look at
19 treatment codes.  In other words, as you
20 know, there's different treatment codes.
21 They are also referred to as ICD-9s,
22 ICD-10s, which tells you how they are
23 treating certain patients and that would
24 be driving a lot of the segmentation.

Page 129

1      Q.   And from where did
2 Mallinckrodt get the data about the
3 diagnosis codes that different physicians
4 would use for their patients?
5      MR. O'CONNOR:  Objection.
6      THE WITNESS:  Third --
7      third-party providers.  I don't
8      remember who exactly.
9 BY MR. CHALOS:
10      Q.   So in other words, you --
11 you could -- you, Mallinckrodt, could get
12 data to say, Dr. Jones has diagnosed X
13 number of patients with a certain
14 affliction over the past year?
15      A.   Yes.  That's exactly the
16 idea.
17      Q.   And you also could get the
18 data that says Dr. Jones prescribed X
19 number of prescriptions for, for example,
20 Xartemis over the past year?
21      A.   Yes.
22      Q.   Was that true that that
23 information was available to Mallinckrodt
24 during the entire time that you were

Page 130

1 president of the pharmaceutical --
2 specialty pharmaceuticals business?
3     A.   I don't recall the timing of
4 when we put certain pieces in or not.
5 The third-party data is available, yes.
6     Q.   Is it still available today?
7     A.   I believe so.
8     Q.   Was that available during
9 the time that you were working at Sanofi
10 as well?
11     A.   Yes.  You have to buy it.
12 You have to buy it from a third-party
13 provider.
14     Q.   Right.  But it's been
15 available on the market for at least a
16 couple of decades now?
17     A.   Yes.
18     Q.   Okay.  What is -- what is
19 your role presently with respect to the
20 political action committee or the PAC?
21     A.   So I serve as the chair of
22 the PAC which oversees the political
23 decisions and the overall fundraising for
24 the political action committee.  And the

Page 131

1 recommendations are brought to the board
2 as far as who we should support and why
3 we should support them, those types of
4 things.
5     Q.   To which board?
6     A.   The PAC board.
7     Q.   How did you end up being the
8 chair of the Mallinckrodt PAC?
9         MR. O'CONNOR:  Objection.
10         THE WITNESS:  I was asked to
11     serve as the chair of the PAC,
12     because of my -- my history in the
13     industry and my passion for what
14     we do.
15 BY MR. CHALOS:
16     Q.   Who asked you to serve in
17 that role?
18     A.   The head of the government
19 affairs group down in DC, Mark Tyndall.
20     Q.   When did Mr. Tyndall ask you
21 to serve in that role?
22     A.   I don't remember the exact
23 date.  But I've been doing it for a
24 couple of years now.

Page 132

1         (Document marked for
2     identification as Exhibit
3     Mallinckrodt-O'Neill-9.)
4 BY MR. CHALOS:
5     Q.   I'll hand you what we've
6 marked as Exhibit Number 9.  It's
7 MNK-T1_0002402270 through 2287.
8     A.   Okay.
9     Q.   So if you look at the second
10 page of Exhibit Number 9, a letter from
11 the chairman.
12         You say here -- and it's
13 your name here at the bottom of the
14 signature.  That's you, right, the
15 chairman?
16     A.   That is me, yes.
17     Q.   Okay.  Just in case you
18 weren't sure, they put your picture on
19 here too.
20     A.   Yes.
21     Q.   "The Mallinckrodt political
22 action committee, MNKPAC, just celebrated
23 its second anniversary."  So I guess that
24 puts its start sometime in 2014?

Page 133

1     A.   That's correct, yes.
2     Q.   Were you the original chair?
3     A.   I don't recall whether I was
4 the original or not.  I know I came on
5 around that time, so...
6     Q.   So the numbers that are set
7 forth here on the second page of
8 Exhibit 9, those numbers are correct in
9 terms of contributions and --
10     A.   Based on what it says here
11 in the report, I would say yes.
12     Q.   Okay.  If you go to the very
13 last sentence.  It says, "On behalf of
14 the executive committee and our
15 government affairs team, thank you for
16 your leadership and continued commitment
17 to MNKPAC."
18         Do you see that?
19     A.   Yes, I do.
20     Q.   Is that -- is that how it's
21 said MNKPAC?
22     A.   Yes.
23     Q.   It's not "MNKPAC"?
24     A.   No, it's MNKPAC.

Page 134

1  Q.  Okay.  What is the executive
2  committee that you're talking about
3  there?
4      A.  It's the executive committee
5  of the company.
6      Q.  Okay.  So those are --
7  that's the one with Mr. Trudeau and you
8  and CFO and those other folks?
9      A.  That's correct.
10     Q.  Okay.  The contributors to
11 MNKPAC are primarily Mallinckrodt
12 employees; is that right?
13     A.  They are all Mallinckrodt
14 employees, yes.
15     Q.  Okay.  So if you flip over
16 to Page 6 of Exhibit 9, the Bates number
17 ends in 2276.  It shows the bottom chart
18 there, annual MNKPAC receipts, $203,157.
19     Do you see that?
20     A.  I do.
21     Q.  Was that -- was that an
22 actual number of contributions or is that
23 a projected number?
24     A.  So based on the chart I'm

Page 135

1  reading, it says projected.  So I'm
2  assuming it's a projected number.
3      Q.  Do you know whether that
4  goal was reached?
5      A.  I don't recall.
6      Q.  Okay.  If you flip over to
7  the next page, Page 8, which is Bates
8  number ending in 2278.  There's a section
9  here, "Opioid epidemic congressional
10 action."  It refers to the Comprehensive
11 Addiction and Recovery Act, CARA.
12     Do you see that?
13     A.  I do.
14     Q.  Third sentence there says,
15 "The Mallinckrodt federal government
16 affairs team actively engaged with
17 Congress and the administration to
18 convert a potentially treacherous
19 political situation to one in which
20 includes policies that are favorable to
21 Mallinckrodt."
22     Do you see that?
23     A.  I do.
24     Q.  What policies were you

Page 136

1  referring to there?
2      A.  I don't recall what the
3  specific policies were.
4      Q.  Okay.  What was the role of
5  the Mallinckrodt executive team with
6  respect to the PAC?
7      A.  So if you go back to what
8  the executive committee is responsible
9  for, it's for the direction and the
10 policies of the organization, strategy.
11 And the environment that we compete in is
12 a very -- is very -- actually can
13 sometimes be difficult, and it's
14 influenced by many different things,
15 including government policies.
16     So the executive committee
17 was, and is, very concerned about the
18 environment we compete in.  And so
19 that's -- their role is to understand it
20 and to potentially work with members of
21 the team to figure out what's the best
22 way to manage them.
23     Q.  And the executive committee
24 reports to the board of directors of

Page 137

1  Mallinckrodt?
2      A.  Yes.  They report to Mark,
3  who then in turn is part of the board of
4  directors and so forth.
5      Q.  Mr. Trudeau has actually a
6  seat on the board of directors for
7  Mallinckrodt?
8      A.  He does.
9      Q.  So if you -- okay.  That's
10 all with this document.  You are aware in
11 2017 there were some discussions of
12 selling the specialty pharmacy -- sorry,
13 specialty pharmaceuticals business to
14 some third-party buyers.  Do you recall
15 that?
16     A.  The specialty pharmaceutical
17 business or the --
18     Q.  Is it broader than that?
19     A.  No, I'm asking for
20 clarification.  I'm not sure exactly what
21 you're asking.
22     Q.  Okay.  There's something
23 called Project Georgetown.  Do you recall
24 that?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.    Yes.

2    Q.    What was that?

3    A.    That is potential sale of

4  the generic business, the generic and API

5  business.

6    Q.    Okay.  And that included the

7  opioids business?

8    A.    The generic opioid business.

9  We were out of the branded at that time,

10 so yes.

11    Q.    And what role, if any, did

12 you have in connection with the potential

13 sale of that business?

14    A.    None.  I was aware of the

15 project, but I wasn't actively involved

16 in it at all.

17    Q.    Who was involved in it, if

18 you know?

19        MR. O'CONNOR:  Objection.

20        THE WITNESS:  At the time,

21     Frank Scholz, who was the head of

22     manufacturing, actually became the

23     head of the generic business at

24     that point in time.  He was

Page 139

1     running point on the project with

2     Matt Harbaugh, who was the CFO at

3     the time.

4  BY MR. CHALOS:

5    Q.    Whose decision was it to

6  explore the potential sale of the

7  specialty generics business?

8        MR. O'CONNOR:  Objection.

9        THE WITNESS:  So we had

10     always said that our goal was to

11     become a standalone specialty

12     branded company.  And that's why

13     we sold the imaging business.

14     That's why we were getting -- we

15     were diversifying ourself away

16     from the older legacy brands.  So

17     it was always our -- our strategy

18     to be a standalone branded

19     company.

20        So the decision to look at

21     options for this was part of our

22     strategy.

23 BY MR. CHALOS:

24    Q.    When you say our, who do you

Page 140

1  mean?

2    A.    The companies, the executive

3  committee, the board.

4    Q.    Okay.  Selling the specialty

5  generics business was something that

6  would have to be approved by the board of

7  directors?

8    A.    That is correct, yes.

9    Q.    You are aware that the

10 specialty pharmaceuticals business is

11 being spun off sometime later this year?

12    A.    I am.

13    Q.    What is your role in

14 connection with that spinoff?

15    A.    I'm aware of it.  But I'm

16 not actively involved in the project.  My

17 role is more focused on the branded

18 business that will be left and the

19 repositioning of that business post the

20 separation of the generics.

21    Q.    Whose decision was it to

22 spin off the specialty pharmaceuticals

23 business?

24        MR. O'CONNOR:  Objection.

Page 141

1        THE WITNESS:  The proposal

2     was made to the board of directors

3     from the strategy team and the

4     executive committee.  And the

5     board of directors supported

6     looking at the potential spin of

7     the business as an option.

8  BY MR. CHALOS:

9    Q.    And it's ultimately the

10 board of directors' decision whether to

11 spin off the specialty pharmaceuticals

12 business?

13        MR. O'CONNOR:  Objection.

14        THE WITNESS:  It is, yeah,

15     their decision is key to the

16     opinion to do that, yes.

17        MR. O'CONNOR:  All right.

18     We've been going a little over an

19     hour.  Just want to -- do you want

20     to take a break?

21        MR. CHALOS:  Yeah, we can

22     take a break if you want to take a

23     break.

24        THE VIDEOGRAPHER:  Remove

Highly Confidential – Subject to Further Confidentiality Review

Page 142

1 your microphones. The time is
2 1:48 p.m. We are off the record.
3 (Short break.)
4 THE VIDEOGRAPHER: We are
5 back on the record. The time is
6 2:07 p.m.
7 BY MR. CHALOS:
8 Q. Was Steven Romano on the
9 executive committee?
10 A. Yes.
11 Q. What is his position?
12 A. He's the chief science
13 officer for the company.
14 Q. Who was in charge of the
15 proposed spinoff of the specialty
16 pharmaceuticals business?
17 A. I'm not actively involved in
18 that. It's actually being run by -- as
19 part of the board's responsibility. I
20 don't even know who is actually running
21 point on it.
22 Q. Okay. Do -- do you know who
23 would know about that, the specifics of
24 that proposed spinoff within the company?

Page 143

1 MR. O'CONNOR: Objection.
2 THE WITNESS: Like I said,
3 it was a decision made at the
4 board level back a couple years
5 ago. My guess is it would be
6 members of the management team
7 that are actively involved. And
8 I'm not.
9 BY MR. CHALOS:
10 Q. Okay.
11 MR. CHALOS: Do you have
12 something to say?
13 MR. O'CONNOR: No, no, no.
14 I'm just -- nothing. Go ahead.
15 BY MR. CHALOS:
16 Q. Do you agree that
17 pharmaceutical marketing should support
18 and promote the safe use of medications?
19 MR. O'CONNOR: Objection.
20 THE WITNESS: Pharmaceutical
21 marketing should always focus in
22 on the best use of the product for
23 the patients that could benefit
24 from it.

Page 144

1 BY MR. CHALOS:
2 Q. Do you agree that companies
3 marketing pharmaceuticals should always
4 put patient safety before profits?
5 MR. O'CONNOR: Objection.
6 THE WITNESS: Pharmaceutical
7 companies should always put
8 patient safety in front of the
9 business results.
10 BY MR. CHALOS:
11 Q. Do you agree that companies
12 marketing pharmaceuticals must always be
13 truthful?
14 MR. O'CONNOR: Objection.
15 THE WITNESS:
16 Pharmaceuticals are the most
17 regulated industry, and everything
18 that we do actually is dictated by
19 the FDA in our claims. So
20 absolutely, we should be in full
21 compliance of that.
22 BY MR. CHALOS:
23 Q. And when pharmaceutical
24 sales reps are in the field speaking with

Page 145

1 physicians, everything they tell the
2 physician should be truthful?
3 MR. O'CONNOR: Objection.
4 THE WITNESS: Everything
5 they should tell a physician
6 should be online with what they
7 are approved to say.
8 BY MR. CHALOS:
9 Q. Do you agree that a company
10 marketing pharmaceuticals must never make
11 a false or misleading statement to the
12 medical community?
13 MR. O'CONNOR: Objection.
14 THE WITNESS: Again, as a
15 highly regulated industry, what we
16 say is controlled. And that's
17 what the -- that's what the rep
18 should be able to say. It should
19 be on -- on label, on point and
20 approved.
21 BY MR. CHALOS:
22 Q. And truthful?
23 A. Mm-hmm, yes.
24 MR. O'CONNOR: Objection.

Page 146

BY MR. CHALOS:

Q. Do you agree that pharmaceutical companies marketing pharmaceuticals must always accurately disclose information about the risks of their products in addition to the benefits of the product?

MR. O'CONNOR: Objection.

THE WITNESS: There should always be fair balance in every communication regarding the benefits and the risk of the product.

BY MR. CHALOS:

Q. Do you agree that pharmaceutical companies should be transparent about who or what they financially support?

MR. O'CONNOR: Objection.

THE WITNESS: Again, we're under specific regulatory requirements to report where we spend our money and how we support it, so yes.

Page 147

BY MR. CHALOS:

Q. Okay. Do you agree that companies marketing pharmaceuticals should never disguise marketing as scientific or educational efforts?

MR. O'CONNOR: Objection.

THE WITNESS: We should always be upfront about how we're spending our dollars and promoting the product and how they -- those are being positioned in the marketplace.

BY MR. CHALOS:

Q. And you agree that companies marketing pharmaceuticals should be upfront about when they are marketing a product as opposed to when they are conveying scientific or educational information?

MR. O'CONNOR: Objection.

THE WITNESS: Again, as a regulatory requirement, we are always upfront about how we -- we actually are spending and

Page 148

promoting our product, yes.

MR. CHALOS: Okay. I believe those are all the questions I have for now. Mr. Gotto is going to have some questions as well.

- - -

EXAMINATION

- - -

BY MR. GOTTO:

Q. Good afternoon, Mr. O'Neill.

A. Good afternoon.

Q. My name is Gary Gotto. I'm with the law firm Keller Rohrback. And we're -- are among the lawyers representing the plaintiffs in the multi-district litigation involving the opioids.

I have a few questions for you.

First, during your time when you -- when you had responsibility with respect to Mallinckrodt's generics business, would you have viewed it as

Page 149

suspicious if you had learned that physicians and pain clinics were purchasing Mallinckrodt oxycodone from a Mallinckrodt distributor who did business as a veterinary supply company?

MR. O'CONNOR: Objection.

THE WITNESS: Again, I was not actively involved in the details. We had order monitoring, people that managed that. That was their responsibility. So I would not have seen that.

BY MR. GOTTO:

Q. I take it from that answer that you were not aware of such a circumstance then; is that correct?

A. Yes. That's correct. I don't recall that at all.

Q. Okay. Understanding that, if you had become aware of that circumstance when you had responsibility for the generics business, would you have viewed that as a suspicious circumstance?

MR. O'CONNOR: Objection.

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1    THE WITNESS: Again, we have
2  suspicious ordering in place. My
3  expectation is they would have
4  caught that and they would have
5  managed it appropriately.
6  BY MR. GOTTO:
7    Q.   Okay. And if you had
8  learned of the existence of such ordering
9  and had learned -- would you have taken
10 steps to evaluate what, if any, actions
11 the personnel under you with
12 responsibility for suspicious order
13 monitoring had taken with regard to those
14 orders?
15    MR. O'CONNOR: Objection.
16    THE WITNESS: Just as I
17   mentioned before, the suspicious
18   ordering was separate from the
19   commercial organization. So my
20   expectation is that they would
21   have taken the appropriate
22   actions. It would not have been
23   my scope of responsibility.
24 BY MR. GOTTO:

Page 151

1    Q.   Okay. Would you have been
2  surprised to learn that such orders had
3  occurred over a thousand times?
4    MR. O'CONNOR: Objection.
5    THE WITNESS: Again, I have
6    no -- no recollection of that. I
7    don't even know the details of it.
8  BY MR. GOTTO:
9    Q.   Understanding that you don't
10 have any understanding of whether it did
11 or didn't happen. If you had learned
12 that there had been such orders filled
13 over a thousand times by a Mallinckrodt
14 distributor who was doing business as a
15 veterinary supply, would that have
16 surprised you?
17    MR. O'CONNOR: Objection.
18    THE WITNESS: Again, it
19   would not have been something that
20   I would have known or been
21   knowledgeable about at that point.
22 BY MR. GOTTO:
23    Q.   Understood. And that's the
24 reason my question is posed in a

Page 152

1  hypothetical, if you will.
2    A.   Right.
3    Q.   If you had learned of that
4  circumstance, would that have surprised
5  you?
6    MR. O'CONNOR: Objection.
7    THE WITNESS: It would --
8    again, having not been involved in
9    it, it's hard for me to speculate
10   about how I would react to it. I
11   don't know the details of it. It
12   would be hard for me to respond to
13   that.
14 BY MR. GOTTO:
15    Q.   Okay. What if you had learn
16 such sales had occurred 12,000 times?
17    MR. O'CONNOR: Objection.
18    THE WITNESS: Same
19   situation.
20 BY MR. GOTTO:
21    Q.   Okay. So as you sit here
22 today, you can't -- you can't answer one
23 way or the other whether you would have
24 been surprised to learn that over 12,000

Page 153

1  times physicians and pain clinics had
2  purchased Mallinckrodt oxycodone from a
3  Mallinckrodt distributor who was doing
4  business as a veterinary supply company?
5    MR. O'CONNOR: Objection.
6    THE WITNESS: That is
7    correct. I cannot respond to
8    that.
9  BY MR. GOTTO:
10   Q.   Do you recall any time
11 having an understanding as to who Cathy
12 Stewart was?
13   A.   I do not.
14   Q.   Okay. How about Bill
15 Ratcliff?
16   A.   I do not.
17   Q.   How about Karen Harper?
18   A.   I do. I remember Karen
19 Harper.
20   Q.   Who do you remember Karen
21 Harper to be?
22   A.   Karen was part of the
23 financial organization, and she had
24 responsibility for chargebacks and

Page 154

1 working with that team.
2      Q.   Okay.  Do you know if she
3 had any responsibility for DEA
4 compliance?
5      A.   I do not recall.
6      Q.   Do you know if she had any
7 responsibility with respect to suspicious
8 order monitoring?
9      A.   I do not recall.
10      (Document marked for
11      identification as Exhibit
12      Mallinckrodt-O'Neill-10.)
13 BY MR. GOTTO:
14      Q.   I'll hand you what we've
15 marked as Exhibit 10, which is an e-mail
16 thread from back in 2008.  I realize this
17 predates your time at Mallinckrodt.  And
18 feel free to take a look at Exhibit 10.
19 And you can tell me if you are familiar
20 with those e-mails.
21      A.   I have never seen this
22 document before.
23      Q.   Okay.  If you look on the
24 second page of Exhibit 10 you'll see an

Page 155

1 e-mail from a Victor Borelli.  I think
2 you testified earlier today that you were
3 not familiar with who Mr. Borelli is,
4 correct?
5      A.   That is correct.
6      Q.   Okay.  And you'll see that
7 the e-mail indicates that Mr. Borelli was
8 a national account manager.  Does seeing
9 that refresh your recollection in any
10 regard with respect to who Mr. Borelli
11 is?
12      A.   Not at all.
13      Q.   Okay.  If you turn back to
14 the first page of Exhibit 10, the last
15 e-mail, the one at the top of the first
16 page from Cathy Stewart -- and I will
17 tell you, Ms. Stewart has given a
18 deposition in this litigation.  I believe
19 at this time she's testified that she was
20 the customer service director.
21      MR. O'CONNOR:  Objection.
22 BY MR. GOTTO:
23      Q.   And Mr. -- Mr. Ratliff and
24 Ms. Harper have also given depositions in

Page 156

1 this litigation.  They were both
2 Mallinckrodt employees at this time, and
3 Mr. Ratliff had responsibility for
4 security.  Ms. Harper, you've already
5 told -- said that you're familiar with
6 Ms. Harper.  So I won't characterize her
7 role for you.
8      The -- just to give you some
9 context, just to at least my
10 understanding of who these folks are.
11      The e-mail from Ms. Stewart,
12 the May 20, 2008, e-mail says, "FYI, the
13 customer service reps all state that
14 Victor will tell them anything they want
15 to hear just so he can get the sale."
16 And I will tell you Ms. Stewart has
17 confirmed, the Victor she's referring to
18 in that e-mail is Mr. Borelli.
19      And again understanding this
20 e-mail predates your time at
21 Mallinckrodt.
22      But if during your tenure
23 when you had responsibility of overseeing
24 the opioids or the generics business for

Page 157

1 Mallinckrodt, if you had learned that the
2 customer service director had reported
3 that one of the -- that her service reps
4 stated that one of the national account
5 managers would tell them anything they
6 want to hear just so he can get a sale,
7 would that have concerned you?
8      MR. O'CONNOR:  Objection.
9      THE WITNESS:  So again, this
10      document predates me by five and a
11      half years, so it's hard for me to
12      say anything on it as far as
13      speculation, because I was not
14      even in the organization.  So it's
15      really hard for me to react to.
16 BY MR. GOTTO:
17      Q.   Sure.  I understand this
18 predates you.  And I'm asking you a
19 hypothetical and just kind of putting
20 this e-mail in front of you as sort of
21 the predicate for the hypothetical.  And
22 that is, if -- during your time when --
23 on your watch at Mallinckrodt for the
24 generics business, if this e-mail was

Highly Confidential – Subject to Further Confidentiality Review

Page 158

1  dated 2013 or 2014, rather than 2008, and
2  it had come to your attention that the
3  customer service director had so --
4  made -- passed along this information
5  with respect to a national account
6  manager, would that have caused you
7  concern?
8          MR. O'CONNOR:  Objection.
9          THE WITNESS:  Again, you're
10         asking me to speculate on
11         something that I did not -- that I
12         have no recollection of anything
13         like this happening when I was
14         there.  So I can't even make a
15         comment on that.
16 BY MR. GOTTO:
17     Q.   Okay.  So as we sit here
18 today, you're unable to give me an answer
19 as to whether you had received an e-mail
20 similar to Ms. Stewart's e-mail from 2008
21 in 2014, say, reporting what she reports
22 with respect to Mr. Borelli, as you sit
23 here today, you can't answer my question
24 as to whether that would have caused you

Page 159

1  concern?
2          MR. O'CONNOR:  Objection.
3          THE WITNESS:  Again, it's
4          speculation of what might have
5          happened, not what did happen.  So
6          it's hard for me to answer that
7          question.
8  BY MR. GOTTO:
9      Q.   Okay.  So this sort of
10 thing, assuming that the customer service
11 director's reports had told her that a
12 national account manager would tell them
13 anything they want to hear -- they want
14 to hear just to get a sale, that's not
15 the sort of thing that's so out of bounds
16 for you that you can -- you can answer
17 that hypothetically, and if you don't
18 want to do it, you would have been
19 concerned about it?
20         MR. O'CONNOR:  Objection.
21         THE WITNESS:  Again, the
22         issue -- the issue comes down to
23         speculating on something that
24         might or might not have occurred.

Page 160

1      This is something that it's hard
2      for me to react to based on where
3      we are today.
4      Q.   Okay.  Let's look at another
5  document.
6          (Document marked for
7          identification as Exhibit
8          Mallinckrodt-O'Neill-11.)
9  BY MR. GOTTO:
10     Q.   Hand you what we've marked
11 as -- oh, here's the other one.
12         I'll hand you what we've
13 marked as Exhibit 11.  And this is
14 another e-mail thread that predates your
15 time at Mallinckrodt.  But please take a
16 look at those e-mails and tell me if
17 you're familiar with them.
18         And for the record, this is
19 Bates MNK-T1_0000559532, and Exhibit 10
20 was -- began at Bates MNK-T1_0003028219.
21     A.   I've never seen this before.
22     Q.   Okay, fair enough.
23         We've discussed in the
24 context of the last exhibit Mr. --

Page 161

1  Mr. Borelli and his position as national
2  account manager.
3          The -- 1/27/09 e-mail
4  that's the latest e-mail that's in
5  Exhibit 11 is from Mr. Borelli to a
6  Steven Cochran at keysourcemedical.com.
7  Do you know who Mr. Cochrane is?
8      A.   I do not.
9      Q.   Do you know who KeySource
10 Medical is?
11     A.   I do not.
12     Q.   Did -- do you know if that
13 was a Mallinckrodt customer at any point?
14     A.   I do not.
15     Q.   Okay.  Assume if you --
16 assume with me if you will that KeySource
17 was a Mallinckrodt customer at the time
18 of this -- of this e-mail.
19         And you'll see in the --
20 Mr. Cochran's January 27th, '09 e-mail to
21 Mr. Borelli referring to oxy 30s, it
22 says, "Keep them coming.  Flying out of
23 here.  It's like people are addicted to
24 these things or something.  Oh wait,

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 people are."
2 And Mr. Borelli's response,
3 "Just like Doritos, keep eating. We'll
4 make more."
5 Again, if -- if these
6 e-mails were dated during your tenure as,
7 when you had responsibility for the
8 generics business, and it had come to
9 your attention that a national account
10 manager had this e-mail exchange with a
11 customer of Mallinckrodt's, would --
12 would that have caused you concern?
13 MR. O'CONNOR: Objection.
14 THE WITNESS: Again, we're
15 dealing with hypotheticals, right.
16 So this -- this -- this is
17 something that happened long
18 before I was here. I'm not even
19 familiar with who these people
20 are.
21 The company always had a
22 very direct conversation about how
23 to manage our customers
24 appropriately with order

Page 163

1 monitoring, the other things like
2 we spoke about earlier.
3 It's hard for me to react,
4 whether I would -- how I would say
5 to this, because I'd never saw
6 anything like this.
7 BY MR. GOTTO:
8 Q. Sure. Appreciate that
9 you -- that you never saw any -- anything
10 like this. And again I'm asking the
11 question in a hypothetical because of
12 that. And -- and sort of trying to
13 put -- put this e-mail exchange in the
14 time frame that would be pertinent to
15 your responsibilities at Mallinckrodt.
16 Fair to say that you would
17 have viewed equating oxycodone 30s to
18 Doritos as being something that was
19 inappropriate for a Mallinckrodt national
20 account manager to be doing?
21 MR. O'CONNOR: Objection.
22 THE WITNESS: Again, I -- we
23 treat our -- our drugs as
24 important options for patients,

Page 164

1 and they should be treated like
2 that across the board.
3 It's hard for me to -- to
4 react to this. Again, it's not --
5 not anything I'm even familiar
6 with.
7 BY MR. GOTTO:
8 Q. I mean, you'd agree with me
9 that selling -- manufacturing and selling
10 oxycodone is a serious business, right?
11 MR. O'CONNOR: Objection.
12 THE WITNESS: What we do on
13 our business is always serious
14 business.
15 BY MR. GOTTO:
16 Q. Okay. And -- and it needs
17 to be treated that way by Mallinckrodt
18 personnel, correct?
19 MR. O'CONNOR: Objection.
20 THE WITNESS: Again, this
21 is -- predates me. It's hard for
22 me to say whether -- what -- what
23 context this is even in.
24 BY MR. GOTTO:

Page 165

1 Q. Sure. Wholly apart from
2 yourself, you can put Exhibit 11 aside
3 for a moment, just as a -- as a -- in the
4 abstract.
5 You'd agree with me that
6 it's important for Mallinckrodt personnel
7 to be treating the business of
8 manufacturing and selling narcotics as a
9 serious business, right?
10 MR. O'CONNOR: Objection.
11 THE WITNESS: And again we
12 have, based on everything we put
13 in place, we talked about earlier
14 the order monitoring, the way the
15 company monitors things. Yes,
16 these are always treated as
17 serious.
18 BY MR. GOTTO:
19 Q. And it's important for a
20 company that's like Mallinckrodt that's
21 engaged in manufacturing and selling
22 prescription narcotics to -- to foster a
23 corporate culture that accords that
24 business the appropriate degree of

Page 166

1 seriousness and gravity, right?
2          MR. O'CONNOR: Objection.
3          THE WITNESS: Our corporate
4    culture takes everything we do
5    extremely serious, and full
6    compliance with all regulatory and
7    legal situations that we deal
8    with.
9 BY MR. GOTTO:
10   Q.   Okay. I'd like to show you
11 a -- a video that's been produced in the
12 litigation. I had written somewhere the
13 Bates range. I misplaced that.
14        MR. GOTTO:
15 MNK-T1_007033463.
16        If we can show the video,
17   please.
18        (Video playback.)
19   "She is the life of parties
20   she has never attended. She has
21   13 medical degrees and a masters
22   in the culinary arts. She has
23   lunch catered for rep leaders and
24   she buys. Every time she writes a

Page 167

1    prescription, an angel gets its
2    wings. She is the most
3    interesting physician in the
4    world.
5    "I don't always write
6    Exalgo, but when I do I make sure
7    the patients on the right dose.
8    "Stay focused, my friends."
9 BY MR. GOTTO:
10   Q.   Have you ever seen that
11 video before?
12   A.   I have not.
13   Q.   Okay. Do you know when it
14 was produced?
15   A.   I do not.
16   Q.   And I think you testified
17 earlier today that when you joined
18 Mallinckrodt, Exalgo was sort of in -- in
19 the last stages of -- of being a
20 Mallinckrodt product; is that correct?
21   A.   That's correct.
22   Q.   Okay. Do you know if that
23 video was -- was in use at Mallinckrodt
24 in any way during the time you were at

Page 168

1 Mallinckrodt?
2    A.   I do not know.
3    Q.   If during the time you were
4 at Mallinckrodt you had been aware that
5 that video had been produced by
6 Mallinckrodt for any purpose, would that
7 have caused you any concern?
8          MR. O'CONNOR: Objection.
9          THE WITNESS: Again, I
10   don't -- I don't know anything
11   about the -- the video. It's hard
12   for me to speculate on it.
13        But I'm not aware of it at
14   all.
15 BY MR. GOTTO:
16   Q.   Do you think that that video
17 fosters the kind of serious corporate
18 culture that takes into account the --
19 the gravity of the nature of the business
20 of -- of manufacture and sale of
21 prescription narcotics that would be
22 appropriate for a company like
23 Mallinckrodt?
24        MR. O'CONNOR: Objection.

Page 169

1          THE WITNESS: Again, not
2    seeing it in its context, not
3    having seen it before, it's hard
4    for me to make any judgment calls
5    on that.
6 BY MR. GOTTO:
7    Q.   Okay. So just based on what
8 we just saw on the screen, you feel like
9 you can't make a judgment on that?
10        MR. O'CONNOR: Objection.
11 BY MR. GOTTO:
12   Q.   Is that fair?
13        MR. O'CONNOR: Objection.
14        THE WITNESS: That's
15   correct, yes.
16        MR. GOTTO: Okay. One
17   moment. We're getting a document
18   here.
19        (Document marked for
20   identification as Exhibit
21   Mallinckrodt-O'Neill-12.)
22 BY MR. GOTTO:
23   Q.   I'll hand you what we marked
24 as Exhibit 12, another document that's

Page 170

1 been produced in the litigation.
2        MR. CHALOS:  If you need an
3    extra copy.
4        MR. GOTTO:  Just for the
5    table.
6 BY MR. GOTTO:
7    Q.   It begins at
8 MNK-T1_0002734988, skips a few pages,
9 which I believe were withheld in
10 production, and resumes at
11 MNK-T1_0002734994 and concludes on Bates
12 ending in 5013.
13        Take a look through that, if
14 you would, please, Mr. O'Neill, and tell
15 me if you're familiar with that document.
16    A.   So I've never seen the
17 document before.  I just need to take the
18 time to go through it.
19    Q.   Sure.
20    A.   And it predates my time at
21 the company.  So...
22        Okay.
23    Q.   Now, that you've looked at
24 it, any familiarity with that document?

Page 171

1    A.   None at all.
2    Q.   Okay.  I'd like to play for
3 you a recording that has been produced in
4 the litigation of one of the songs that's
5 contained in Exhibit 12.  And the lyrics,
6 if you want to follow them along, are on
7 the page ending in Bates 35001.
8        The song was produced at
9 MNK-T1_0007029131.
10        MR. GOTTO:  Please play the
11    song for us.
12        (Song played.)
13        SINGER:  You got to have the
14    proper dose, mon.  Titrate.  The
15    proper dose.
16        You can start at the middle.
17    You can start at the top.  You can
18    start with very little, but that's
19    not where you should stop.
20        Cause your patient needs
21    relief, mon.
22        So please do what you should
23    do.  When you convert and titrate.
24    Make sure it's EXAAAALGOOD.

Page 172

1        It's all good, man.
2        Every day your patient come
3    by and say they feel fine.  But
4    you see them wincing, so you know
5    it's a lie.  So you try something
6    new cause you know that it work.
7        But if you don't follow up,
8    the pain it will lurk.  The pain
9    it would lurk, mon.  The pain it
10    would lurk, mon.
11        The pain, it will lurk.
12        When you start at the middle
13    or you start at the top, or you
14    start with a little, make sure you
15    just don't stop.  'Cause your
16    patient needs relief, mon.  So do
17    what you should.
18        When you convert and
19    titrate, make sure EXAAAALGOOD.
20        EXAAAALGOOD.  EXAAAALGOOD.
21    EXAAAALGOOD.  EXAAAALGOOD.
22        You got to have the proper
23    dose, mon.  Titrate to proper
24    dose.  EXAAAALGOOD.  EXAAAALGOOD.

Page 173

1    It's EXAAAALGOOD.
2        You've got to have the
3    proper dose, mon, the mighty
4    converters.  Shout out.  You've
5    got to have the proper dose, mon.
6    Titrate to proper dose.  Shout out
7    to all the mighty converters.
8    Shout out.  You got to have to
9    have a proper dose, mon.  Proper
10    dose.  With EXAAAALGOOD.  With
11    EXAAAALGOOD.
12        Shout out.  The mighty
13    converters.
14        So make you are you are
15    taking the proper dose.  Shout
16    out.  EXAAAALGOOD.  EXAAAALGOOD.
17    EXAAAALGOOD.
18        (End of song playback.)
19 BY MR. GOTTO:
20    Q.   I take it you've never heard
21 that song before?
22    A.   Never.
23    Q.   Okay.  Have any idea of how
24 it was used at Mallinckrodt at any point?

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    A.   Not at all.
2    Q.   Okay.  Any idea who was
3  responsible for producing it?
4    A.   Not at all.
5    Q.   Understanding that
6  Exhibit 12, the e-mail predates your
7  tenure at Mallinckrodt, if during your
8  time of responsibility for the branded
9  business you had become aware of the song
10 we just listened to being used by
11 Mallinckrodt for any purpose, would that
12 have caused you concern?
13         MR. O'CONNOR:  Objection.
14         THE WITNESS:  It's a similar
15     situation.  It predates me.  I
16     don't know anything about this.
17     And it's hard for me to make any
18     comments on it.
19 BY MR. GOTTO:
20   Q.   Okay.  You'd agree with me
21 it's pretty clever, wouldn't you?
22         MR. O'CONNOR:  Objection.
23         THE WITNESS:  Again, it's
24     something that I know nothing of.

Page 175

1  BY MR. GOTTO:
2    Q.   It's certainly a stab at
3  being clever, isn't it?
4          MR. O'CONNOR:  Objection.
5          THE WITNESS:  Again, same
6     situation.
7  BY MR. GOTTO:
8    Q.   The -- so as you sit here
9  today, just reading these lyrics,
10 listening to the song, you can't
11 formulate a view as to how you would have
12 reacted to it if you had learned that
13 this was being used for any purpose at
14 Mallinckrodt during your tenure?
15         MR. O'CONNOR:  Objection.
16     Objection.
17         THE WITNESS:  Again, I know
18     nothing of this.  It's hard for me
19     to react to it.
20 BY MR. GOTTO:
21   Q.   Okay.  Now, if you turn to
22 the first page of Exhibit 12, it's the
23 there's an e-mail from a Mike Paterson.
24         Do you know who that was?

Page 176

1    A.   I do know who Mike was, yes.
2    Q.   And who was Mike?
3    A.   I don't know what his role
4  was at this point in time.  When Mike
5  worked for me, which was years later, he
6  was my -- my chief of staff.
7    Q.   Okay.  And when did he work
8  for you as chief of staff?
9    A.   2014, '13 through '15,
10 something like that.
11   Q.   Okay.  And it's also
12 addressed to a Michael Wessler.  Do you
13 know who that is?
14   A.   I do know of Michael
15 Wessler, yes.
16   Q.   Who is Michael Wessler?
17   A.   He was on the marketing team
18 at Mallinckrodt.
19   Q.   Okay.  And the e-mail is
20 from a CJ Sloan.  Do you know who that
21 is?
22   A.   I do not.
23   Q.   Okay.  You had a chance to
24 look through Exhibit 12.  And it's in the

Page 177

1  form -- the attachments to the e-mail are
2  in the form of a sort of script for sort
3  of a faux radio show with an announcer
4  leading into various songs.  Were you
5  able to gather that from the time that
6  you had to look through the exhibit?
7          MR. O'CONNOR:  Objection.
8          THE WITNESS:  Again, I'm not
9     familiar with the document at all.
10     All I can take it is from what
11     I've read.
12 BY MR. GOTTO:
13   Q.   Okay.  And I will tell you
14 that there's been produced in the
15 litigation recordings of certain of the
16 other songs that are -- the lyrics for
17 which are included in Exhibit 12.  I
18 don't want to take the time today to play
19 any of the others.
20         The -- I do have a couple of
21 questions for you, though.  If you turn
22 to the page ending in 4997.  I'll give
23 you a moment to get there.
24         I'm sorry.  I cited the

Page 178

1 wrong page. The page ending in 5003, if
2 you would, please. There's a -- the
3 heading says "Sweet Relief Double-Blind."
4 And in the first paragraph under "ANNCR
5 Intro," there is a sentence that says,
6 "In fact, the famous Dr. Hale proved that
7 we could cut a pain score in half."
8        Do you see that sentence?
9    A.   I do.
10    Q.   Any understanding of what
11 that's referring to?
12    A.   I do not --
13    Q.   Are you familiar with any
14 double-blind studies with respect to
15 Exalgo indicating its ability to cut a
16 pain score in half?
17    A.   I am not.
18    Q.   Do you know if Exalgo
19 cutting a pain score in half was a claim
20 that the FDA authorized Mallinckrodt to
21 assert?
22    A.   I do not.
23    Q.   You don't have any
24 recollection of that, correct?

Page 179

1    A.   Not at all.
2    Q.   Looking at Exhibit 12
3 overall. And the -- the various song
4 lyrics that are in here along with the
5 scripted intros and outros for the
6 announcers.
7        Again, if you had learned
8 during your tenure at Mallinckrodt
9 that -- that these materials were being
10 used for any purpose at Mallinckrodt,
11 would that have caused you concern?
12        MR. O'CONNOR: Objection.
13        THE WITNESS: Again, it's
14    speculation and I don't -- I'm not
15    aware of the document. I'm not
16    aware how these were used. And
17    it's hard for me to speculate on
18    what my response would be.
19 BY MR. GOTTO:
20    Q.   Assume for me that these --
21 that what Exhibit 12 reflects is a script
22 of a -- a recording that was made to --
23 to -- to portray, if you will, a radio
24 program that -- which an announcer would

Page 180

1 read the intro, a song would be played
2 where you'd see the lyrics of the song,
3 and then the announcer would read the
4 outro, and then -- and then that
5 recording was made available to
6 Mallinckrodt's sales personnel.
7        Would it have caused you any
8 concern if that recording was being made
9 available by anyone at Mallinckrodt to
10 the Mallinckrodt sales personnel?
11        MR. O'CONNOR: Objection.
12        THE WITNESS: So I'm -- it's
13    the same issue for me. This --
14    I've never seen this before. I'm
15    not aware how it was used, what it
16    was used for, or the issue as to
17    it, so it's hard for me to
18    speculate on any of that.
19 BY MR. GOTTO:
20    Q.   Okay. And based on the
21 assumptions that I gave you just a moment
22 ago, as you sit here today, you're not --
23 you're not able to reach a view as to
24 whether that would have caused you

Page 181

1 concern?
2        MR. O'CONNOR: Objection.
3 BY MR. GOTTO:
4    Q.   Is that fair?
5    A.   Yes.
6    Q.   That's fair?
7    A.   Yes.
8        MR. GOTTO: Okay. All
9    right. I don't have any further
10    questions. Thank you very much.
11        MR. DAVISON: Shall we go
12    off the record?
13        THE VIDEOGRAPHER: The time
14    is 2:43 p.m. Off the record.
15        (Short break.)
16        THE VIDEOGRAPHER: We are
17    back on the record. The time is
18    2:53 p.m.
19        - - -
20        EXAMINATION
21        - - -
22 BY MS. HERZFELD:
23    Q.   Good afternoon, Mr. O'Neill.
24 My name is Tricia Herzfeld, and I'm an

Page 182

1 attorney representing the Tennessee
2 plaintiffs in the Tennessee state --
3 state court litigation.
4         How are you doing?
5     A.   Good.  Good afternoon.
6     Q.   Good.  Very good.
7         Before we get started today,
8 I just wanted to put our objection on the
9 record to the incomplete document
10 production we've received thus far from
11 Mallinckrodt, the limited time available
12 for our deposition, and reserving our
13 rights to redepose this witness as we do
14 with every deposition in this case.
15     MR. DAVISON:  And
16     Mallinckrodt disagrees with your
17     statement of the facts.  We've
18     complied with the deposition
19     protocol and consider this to be
20     the final deposition to the
21     Tennessee claims.
22     MS. HERZFELD:  Okay.
23     Objection's noted.
24 BY MS. HERZFELD:

Page 183

1     Q.   Mr. O'Neill, do you know
2 anything specifically about the Tennessee
3 state court litigation?
4     A.   I do not.
5     Q.   Okay.  Have you heard of the
6 Tennessee state court litigation?
7     A.   I have not.
8     Q.   Okay.  And earlier we talked
9 about your position as president of
10 specialty pharmaceuticals.  Do you recall
11 that testimony?
12     A.   I do.
13     Q.   When you were president of
14 specialty pharmaceuticals for
15 Mallinckrodt, did you ever request
16 reports about suspicious order monitoring
17 or other anti-diversion programs?
18     A.   I did not.
19     Q.   Okay.  Since you've been at
20 Mallinckrodt, which person, if any, on
21 the executive committee is responsible
22 for overseeing Mallinckrodt's suspicious
23 order monitoring anti-diversion programs?
24     MR. O'CONNOR:  Objection.

Page 184

1     THE WITNESS:  There is a
2     separate order monitoring group
3     that is part of a different piece
4     of the organization.  I don't
5     remember where it sits, but it's
6     not in the commercial
7     organization.
8 BY MS. HERZFELD:
9     Q.   Okay.  And do you know if
10 there was someone on the executive
11 committee that was overseeing
12 responsibility for suspicious order
13 monitoring?
14     A.   I do not.
15     Q.   Okay.  Do you recall during
16 any executive committee meetings ever
17 being given any reports that had to do
18 with suspicious order monitoring at
19 Mallinckrodt?
20     A.   I do not.
21     Q.   Okay.  What about during
22 executive committee meetings, any reports
23 on anti-diversion efforts by
24 Mallinckrodt?

Page 185

1     A.   I do not.
2     Q.   Okay.  What about on any of
3 the other committees for which you sit,
4 did you ever recall any anti-diversion
5 efforts being discussed at those
6 committee meetings?
7     A.   I do not.
8     Q.   Okay.  Okay.  During your
9 time as a member on the executive
10 committee, do you recall ever engaging in
11 a conversation where the topic of
12 discussion was whether Mallinckrodt's
13 suspicious order monitoring program was
14 effective?
15     A.   I do not.
16     Q.   Do you know what metrics
17 were used to make a determination of
18 whether Mallinckrodt's suspicious order
19 monitoring program was effective?
20     A.   I do not.
21     Q.   Do you know anything about
22 attempts to obtain a patent on
23 Mallinckrodt's suspicious order
24 monitoring program?

Page 186

1    A.   I do not.
2    Q.   Okay.  Have you ever been
3  involved in a discussion of the costs of
4  Mallinckrodt's suspicious order
5  monitoring programs?
6    A.   I have not.
7    Q.   Okay.  What about any
8  anti-diversion programs in general by
9  Mallinckrodt?
10   A.   I have not.
11   Q.   Okay.  During your time on
12  the executive committee, has the
13  executive committee ever made a
14  recommendation regarding suspicious order
15  monitoring programs at Mallinckrodt?
16   A.   I do not know.
17   Q.   Okay.  And what about
18  anti-diversion programs?
19   A.   I do not know.
20   Q.   Okay.  We talked a little
21  bit earlier about your knowledge of the
22  opioid abuse epidemic in this country.
23  Do you recall that testimony?
24   A.   I do.

Page 187

1    Q.   Okay.  Would you agree that
2  the opioid epidemic is more severe in
3  some areas of the country than in others?
4        MR. O'CONNOR:  Objection.
5        THE WITNESS:  I don't know
6    the details of the -- of the
7    epidemic, per se.
8  BY MS. HERZFELD:
9    Q.   Okay.  Have you ever heard
10  that the opioid epidemic has hit the
11  Appalachian area of the country harder
12  than other areas of the country?
13   A.   I'm aware of the -- of the
14  challenge.  And I know that the
15  Appalachian has been part of it.  But I
16  don't know all the details behind it.
17   Q.   Okay.  And do you consider
18  Tennessee to be part of Appalachia?
19   A.   I don't know.
20   Q.   Why don't you tell me what
21  you consider to be part of Appalachia.
22   A.   Based on the Appalachian
23  Mountains, West Virginia, that area.
24  That's as much as I know.

Page 188

1    Q.   Okay.  So you'd say West
2  Virginia?
3    A.   Again, it's -- I always tied
4  it to the west -- to the Appalachian
5  Mountains, that -- that area.  So West
6  Virginia, that whole area of the central
7  part of the state -- of the country.
8    Q.   Okay.  And if those
9  mountains go into East Tennessee, would
10  you consider East Tennessee part of
11  Appalachia?
12       MR. O'CONNOR:  Objection.
13       THE WITNESS:  Yeah, I
14   don't -- I don't really define
15   what it is.  But, yeah, if it
16   does, I would guess so.
17  BY MS. HERZFELD:
18   Q.   Okay.  You are aware that
19  some areas of the country have higher
20  addiction rates than others; is that
21  correct?
22   A.   I am aware of the -- of the
23  higher addiction rates in certain areas
24  than others, yes.

Page 189

1    Q.   Okay.  And is one of those
2  areas the Appalachian region of the
3  country?
4    A.   I don't know all the details
5  behind it.  But it's my understanding
6  that it's a big problem there.  It's a
7  challenge there, yes.
8    Q.   Okay.  And what about
9  overdose rates?  Is your understanding
10  that overdose rates to opioids are a
11  particular problem in Appalachia?
12   A.   I don't know.
13   Q.   Okay.  What about crime
14  rates related to opioids?  Do you know
15  about that in Appalachia?
16   A.   I do not.
17   Q.   Okay.  What about neonatal
18  abstinence syndrome?  Have you heard of
19  that?
20   A.   I have not.
21   Q.   Have you heard of babies
22  being dependent on opioids?
23   A.   I have not.
24   Q.   In all your time at

Page 190

1 Mallinckrodt, you've never heard of
2 babies being born dependent on opioids?
3     A.  I have not.
4     Q.  Okay.  So that wasn't
5 discussed at any time in your position?
6     A.  It was not.
7       MR. O'CONNOR:  Objection.
8 BY MS. HERZFELD:
9     Q.  Have you ever heard anyone
10 at Mallinckrodt express a concern about
11 the opioid epidemic in Appalachia?
12       MR. O'CONNOR:  Objection.
13       THE WITNESS:  I have not.
14 BY MS. HERZFELD:
15     Q.  Would you agree that there
16 are certain characteristics that can
17 place a geographic area at a greater risk
18 of abuse and diversion of opioids?
19       MR. O'CONNOR:  Objection.
20       THE WITNESS:  I don't know.
21 BY MS. HERZFELD:
22     Q.  Have you had any training
23 regarding the diversion of opioids?
24     A.  I have not.

Page 191

1     Q.  Do you know if economic
2 factors can be an indicator of potential
3 abuse of opioids?
4       MR. O'CONNOR:  Objection.
5       THE WITNESS:  I do not.
6 BY MS. HERZFELD:
7     Q.  Okay.  What about economic
8 factors being a particular characteristic
9 of diversion of opioids?
10       MR. O'CONNOR:  Objection.
11       THE WITNESS:  I do not.
12 BY MS. HERZFELD:
13     Q.  Okay.  Do you know if there
14 is a linkage between the poverty rate of
15 a particular area and the use of opioids?
16       MR. O'CONNOR:  Objection.
17       THE WITNESS:  I do not.
18 BY MS. HERZFELD:
19     Q.  Okay.  What about education
20 rate?  Are you aware that there's a
21 link -- if there is a link between
22 education rates and the abuse and
23 diversion of opioids?
24     A.  I do not.

Page 192

1     Q.  Okay.  When you became
2 president of specialty sales at
3 Mallinckrodt in 2013, was Mallinckrodt
4 involved in attempting to expand the size
5 of the opioid market?
6     A.  I don't recall.
7     Q.  Okay.  So when you took over
8 that job, you don't know if you were
9 supposed to be expanding the market
10 there?
11     A.  Again, I don't recall that
12 the point in time what the -- what the
13 group was.  I had -- remember I had two
14 pieces of the business.  The branded
15 piece and the generic piece.  Walt ran
16 the generic piece.  My role was to really
17 focus on the branded piece of the
18 business.
19     Q.  Okay.  And so for either
20 side that you just -- you just talked
21 about, having the both sides, do you know
22 if the goal on either of those sides was
23 to expand the market for opioids?
24     A.  I do not.

Page 193

1     Q.  Okay.  Do you know if at any
2 point during your tenure at Mallinckrodt
3 you've been involved in the performance
4 of any sort of assessment to determine
5 whether the opioid market is too large?
6     A.  I have not.
7     Q.  During your tenure at
8 Mallinckrodt, have you ever been involved
9 in any discussions to determine whether
10 there were too many opioids being
11 prescribed as a whole?
12     A.  I have not.
13     Q.  What about too many opioids
14 being prescribed to a particular region?
15     A.  I have not.
16     Q.  Okay.  Have you ever heard
17 of Mallinckrodt evaluating whether abuse
18 deterrent technologies would stop the
19 opioid market from shrinking?
20     A.  I have not -- no, I'm
21 familiar with abuse deterrence
22 technologies with the conversation that
23 we had on Xartemis.  But no, not in that
24 context.

Page 194

1    Q.   Okay.  Would you agree that
2  per capita, opioid prescribing rates are
3  linked to certain outcomes?
4    A.   I don't know the answer to
5  that.
6        MR. O'CONNOR:  Objection.
7  Objection.
8  BY MS. HERZFELD:
9    Q.   Okay.  And what about opioid
10 per capita prescribing rates being linked
11 to overdoses.
12       MR. O'CONNOR:  Objection.
13 BY MS. HERZFELD:
14   Q.   Are you aware of that
15 information?
16       MR. O'CONNOR:  Objection.
17       THE WITNESS:  I am not.
18 BY MS. HERZFELD:
19   Q.   Okay.  What about per capita
20 opioid prescribing rates being linked to
21 substance abuse treatment admissions?
22 Are you aware of that linkage?
23       MR. O'CONNOR:  Objection.
24       THE WITNESS:  I am not.

Page 195

1  BY MS. HERZFELD:
2    Q.   Would you agree that the
3  availability of opioids is linked to the
4  abuse and diversion of opioids?
5        MR. O'CONNOR:  Objection.
6        THE WITNESS:  I can't -- I
7    don't know the answer to that.
8  BY MS. HERZFELD:
9    Q.   Do you know anything about
10 the abuse or diversion of opioids?
11   A.   I do not.
12   Q.   Since you've been at
13 Mallinckrodt, has anyone at Mallinckrodt
14 to your knowledge ever considered
15 altering sales practices based on the
16 severity of the opioid epidemic in a
17 specific area?
18   A.   I don't know.
19   Q.   Have you ever been made
20 aware of or involved in any conversations
21 about detailing physicians in a specific
22 area less, given the opioid epidemic
23 affecting that area?
24   A.   I do not.

Page 196

1    Q.   Have you ever been involved
2  in discussions about targeting fewer
3  physicians in a certain area where the
4  opioid epidemic may be particularly
5  severe?
6    A.   I have not.
7    Q.   Okay.  Have you ever been
8  involved in any conversations about
9  restricting the number of opioids
10 distributors can ship to a particular
11 geographic area?
12   A.   I have not.
13   Q.   What information do you know
14 about providing sales force training on
15 recognizing the signs of abuse and
16 diversion by prescribers and at
17 pharmacies?
18   A.   I don't know.
19   Q.   You weren't aware of any --
20   A.   I was not.
21   Q.   Okay.  Do you know if anyone
22 has ever suggested any of those measures,
23 training the sales force to recognize
24 signs of abuse and diversion?

Page 197

1    A.   I do not.
2    Q.   Do you know if anyone ever
3  talked at Mallinckrodt to your knowledge
4  about restricting sales techniques or
5  sales practices in the State of
6  Tennessee?
7    A.   I do not.
8    Q.   Okay.  What about in
9  Appalachia generally?
10   A.   I do not.
11   Q.   Okay.  Do you know that
12 Mallinckrodt previously restricted sales
13 in the State of Florida?
14   A.   I do not.
15   Q.   When you were a member of
16 the executive committee, was there ever
17 any discussion about the opioid epidemic
18 in Appalachia?
19   A.   No.
20   Q.   Okay.  What about Tennessee?
21   A.   Not that I recall.
22   Q.   Okay.  What about any of the
23 other committees on which you served?
24   A.   Not that I recall.

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1    (Document marked for
2    identification as Exhibit
3    Mallinckrodt-O'Neill-13.)
4  BY MS. HERZFELD:
5    Q.   I'm going to hand you what
6  we're going to mark as Plaintiffs'
7  Exhibit 13.  For those on the phone, it's
8  MNK-T1_0007257169 through 7172.
9         MR. O'CONNOR:  Do you have
10    another copy?  Do you have a copy?
11         MS. HERZFELD:  I have all
12    sorts.  There you go.
13         MR. O'CONNOR:  Thank you.
14  BY MS. HERZFELD:
15    Q.   Let me know when you've had
16  an opportunity to read through.
17    A.   Okay.
18    Q.   Are you finished reading it?
19    A.   I am.
20    Q.   Okay.  And do you recognize
21  this document?
22    A.   I don't recall seeing it
23  before.
24    Q.   Okay.  Is it an e-mail that

Page 199

1  was sent from Nancy Stauder to you?
2  Nancy Stauder, I guess.  I see your name
3  on the third line of the "to."
4    A.   Yes, I'm on the list.
5    Q.   Okay.  And who is Nancy
6  Stauder?
7    A.   Nancy Stauder, she is a
8  member of our communications team.
9    Q.   Okay.  And do you know -- do
10  you know her personally?
11    A.   I do.
12    Q.   Okay.  And it was sent on
13  October 9, 2017; is that correct?
14    A.   That's what the document
15  says.
16    Q.   Okay.  And it was sent to
17  your e-mail address.  Do you believe that
18  you received this document in the
19  ordinary course of business at
20  Mallinckrodt?
21         MR. O'CONNOR:  Objection.
22         THE WITNESS:  It's hard for
23    me -- I -- I know this is an
24    e-mail that came to me.  That's

Page 200

1  the most I can say.
2  BY MS. HERZFELD:
3    Q.   Okay.  Very good.
4         In looking at this e-mail,
5  it's forwarding a link and an article
6  from a Today show segment; is that
7  correct?
8    A.   Based on the e-mail that I
9  just read, yes, that's correct.
10    Q.   Okay.  And did you view the
11  video of the Today show -- Today show
12  clip?
13    A.   I don't recall.
14    Q.   Okay.  And did you -- before
15  now, did you read the article that was
16  associated with this e-mail?
17    A.   I don't recall.
18    Q.   Okay.  And the e-mail
19  article here seems to talk about what was
20  shown in the Today show clip; is that
21  right?
22    A.   Based on my reading of the
23  e-mail right now, that's what it seems,
24  yes.

Page 201

1    Q.   Okay.  And it's talking a
2  bit about babies that are born dependent
3  on opioids; is that right?
4    A.   Based on my reading of the
5  document right now, yes.
6    Q.   Okay.  And before when we
7  talked, you said you didn't know about
8  babies being born dependent on opioids.
9         So can I take from that that
10  you hadn't read this article before we
11  sat here today?
12         MR. O'CONNOR:  Objection.
13         THE WITNESS:  I can't
14    speculate.  It's hard for me to
15    say.  I -- I may have read it, but
16    time goes by.  There's lots of
17    things that I read, so it's hard
18    for me to remember.
19  BY MS. HERZFELD:
20    Q.   Okay.  Well, I'll submit to
21  you the video that went along with this,
22  this piece on NBC News for the Today show
23  has a bit of video with a baby screaming
24  on -- and wincing from detoxing from

Highly Confidential – Subject to Further Confidentiality Review

Page 202

1 opioids.
2         Do you recall seeing that at
3 all?
4         MR. O'CONNOR:  Objection.
5         THE WITNESS:  I do not.
6 BY MS. HERZFELD:
7     Q.   Okay.  Okay.  And after you
8 received this e-mail, were you aware of
9 any discussions about the neonatal
10 abstinence issue in Tennessee that's
11 referenced in this article?
12     A.   I don't recall.
13     Q.   And Mallinckrodt, to your
14 knowledge, continued selling drugs that
15 were being shipped into Tennessee; is
16 that correct?
17         MR. O'CONNOR:  Objection.
18         THE WITNESS:  We continued
19     to sell products at a national
20     level.  What went into Tennessee,
21     it's hard for me to say.
22 BY MS. HERZFELD:
23     Q.   Okay.  And so when you say
24 you shipped products at a national level,

Page 203

1 that would include opioid products; is
2 that right?
3     A.   Our products were shipped
4 through distributors nationally,
5 including those products, yes.
6     Q.   Okay.  Including opioid
7 products.  And so when they were shipped
8 nationally, there was no restriction to
9 keep them from Tennessee; is that
10 correct?
11     A.   I don't know.
12     Q.   Okay.  And if there were
13 documents within Mallinckrodt's
14 possession that talks about the number of
15 Mallinckrodt opioids that made it into
16 Tennessee after October 9, 2017, do you
17 have any reason to think that they are
18 incorrect?
19         MR. O'CONNOR:  Objection.
20         THE WITNESS:  Again, I don't
21     know anything about any of those
22     documents.
23 BY MS. HERZFELD:
24     Q.   Okay.  So you're -- as you

Page 204

1 sit here today, you're telling me you
2 don't know if Mallinckrodt opioids were
3 sent to Tennessee after October 9, 2017,
4 is that your testimony?
5         MR. O'CONNOR:  Objection.
6         THE WITNESS:  Again, I was
7     not involved in the business.  I
8     don't know how the products were
9     shipped at that point in time.  I
10     don't -- I don't know the details.
11 BY MS. HERZFELD:
12     Q.   Okay.  You weren't involved
13 in which business?
14     A.   The generic business at this
15 point.
16     Q.   Okay.  And what about the
17 branded business?
18     A.   We were not -- we didn't
19 have any opioids in the portfolio that --
20     Q.   I see.  I see the
21 distinction that you're making.  Okay.
22 Very good.
23         Okay.  And after you
24 received this e-mail, do you know if

Page 205

1 Mallinckrodt did anything in response to
2 the neonatal abstinence syndrome issue in
3 Tennessee?
4         MR. O'CONNOR:  Objection.
5         THE WITNESS:  I do not.
6 BY MS. HERZFELD:
7     Q.   Okay.  Is it concerning to
8 you that there are babies born dependent
9 on opioids?
10         MR. O'CONNOR:  Objection.
11         THE WITNESS:  I feel
12     terrible reading it.  And I think
13     it's -- it's a terrible thing.
14         MS. HERZFELD:  Okay.  Okay.
15     (Document marked for
16     identification as Exhibit
17     O'Neill-14.)
18 BY MS. HERZFELD:
19     Q.   Let me hand you what we'll
20 mark as Exhibit 14.  MNK-T1_0008396589
21 through -- through 6590 with an
22 attachment that is not Bates stamped.
23         Okay.  I've just handed you
24 a document, Mr. O'Neill.  If you'll look

Highly Confidential - Subject to Further Confidentiality Review

Page 206

1  with me on the first page please of this
2  exhibit, 14.
3      It's an e-mail sent from you
4  to Sue Eshbaugh dated October 29, 2013;
5  is that correct?
6      A.  That is.
7      Q.  Okay.  And in this e-mail
8  you ask if she can bring you a hardcopy
9  of an attached presentation for an update
10 of that date at 2:00 p.m.; is that right?
11     A.  That's what the e-mail says.
12     Q.  Okay.  And who is Sue
13 Eshbaugh?
14     A.  At that point she was my
15 assistant.
16     Q.  Okay.  And this was an
17 e-mail you had originally received from
18 Terry Terifay; is that correct?
19     A.  That's what the document
20 says, yes.
21     Q.  Okay.  Do you have any
22 reason to think this document isn't
23 authentic?
24     A.  The document is what it is,

Page 207

1  so...
2      Q.  Okay.  And it was sent from
3  your e-mail address at Mallinckrodt; is
4  that right?
5      MR. O'CONNOR:  Objection.
6      THE WITNESS:  That's what
7      the document says, yes.
8  BY MS. HERZFELD:
9      Q.  Okay.  Okay.  And do you
10 recall this e-mail at all?
11     A.  I do not.
12     Q.  Okay.  So switching through
13 to me here to the attached PowerPoint
14 presentation.
15     Okay.  The PowerPoint is
16 titled here, Xartemis XR Executive
17 Committee Update, dated 10/29/13.  Do you
18 see that?
19     A.  I do.
20     Q.  Okay.  And if you can switch
21 with me to Page 11.  There's this slide
22 titled Group Practice, Managed Care
23 Access.  It's got a little map on it.
24     Do you see where I'm at?

Page 208

1      A.  I do.
2      Q.  Okay.  Okay.  And so the
3  title of this document is, "Group
4  Practice, managed care access and
5  business rules were utilized to define
6  and place reps in territories.  Review
7  and input from field sales creates buy-in
8  and ownership."
9      Did I read that correctly?
10     A.  You did.
11     Q.  Okay.  And then down here on
12 the left-hand area it contains what it
13 calls a heat map scenario.  Do you see
14 that?
15     A.  I do.
16     Q.  Okay.  And it says that it
17 "depicts the total market" and then it
18 has little asterisk there, "for products
19 including hydro APAP, oxy APAP, Oxy ER,
20 Oxy IR, Opana IR, Nucynta" -- I'm not
21 sure how to say that -- "Nucynta and
22 Nucynta ER."
23     Do you see that?
24     A.  I do.

Page 209

1      Q.  Okay.  And then when you
2  look at -- when you look at this map, do
3  you recognize the state of Tennessee
4  there in the middle?
5      A.  I do.
6      Q.  Okay.  And what color is the
7  state of Tennessee primarily?
8      A.  It's red and pink.
9      Q.  Okay.  And red and pink
10 would be the most attractive areas
11 according to this heat map; is that
12 correct?
13     A.  Based on my reading of the
14 document.  Again, seeing it for the first
15 time and not recalling it, yes.
16 That's -- that's -- that's how I read
17 that.
18     Q.  Okay.  And do you recall
19 presenting this, this PowerPoint to the
20 board of directors?
21     A.  I do not.
22     Q.  Okay.  Would you have done
23 that?
24     A.  I would not have.

Highly Confidential – Subject to Further Confidentiality Review

Page 210

1  Q.  Okay.  Would it have been
2  somebody from your team?
3  A.  Again, it's hard for me to
4  remember -- or concern, but based on just
5  the names that are on the documents,
6  Terry who was the VP of marketing at the
7  time, would have been the one presenting
8  this to the executive committee.
9  Q.  Okay.  And do you know what
10 made such large portions of Tennessee the
11 most attractive area according to this
12 heat map?
13 A.  I do not.
14 Q.  Okay.  You can set that
15 aside for me, please.
16 A.  Sure.
17 (Document marked for
18 identification as Exhibit
19 Mallinckrodt-O'Neill-15.)
20 MS. HERZFELD:  I'm going to
21 hand you what we'll mark as
22 Plaintiffs' Exhibit 15.  For the
23 record, it's MNK_TNSTA_01956641
24 through 42 with an attached

Page 211

1  PowerPoint.
2  BY MS. HERZFELD:
3  Q.  I've handed you an e-mail
4  sent from you to Lori Hamilton dated
5  November 8, 2013.  Is that -- do you see
6  where I'm at?
7  A.  I do.
8  Q.  Okay.  And who is Lori
9  Hamilton?
10 A.  Lori is Mark's assistant.
11 Q.  And Mark is who?
12 A.  Mark Trudeau.
13 Q.  Okay.  So if you look for me
14 at Slide 1.  Do you know who gave this
15 presentation?
16 A.  I don't recall, because --
17 but my name is on the presentation, so...
18 Q.  Okay.  So is it possible
19 that you gave this presentation?
20 A.  Again, I don't remember.
21 But again, my name is on it, so it's
22 possible.
23 Q.  Okay.  And so looking at the
24 first slide here, under the key takeaway

Page 212

1  section, it says, "Targeting top 5
2  percent of prescribers responsible for
3  20 percent of acute prescriptions."
4  Do you see where I am now?
5  A.  I do.
6  Q.  Okay.  And then it says
7  underneath, "Most productive prescribers
8  are driven by orthopedics, pain
9  specialists, surgeons, and general
10 practitioners."
11 Is that correct?
12 A.  That is what the document
13 says, yes.
14 Q.  Okay.  And what factors
15 determine a productive prescriber?
16 A.  I don't recall the
17 interpretation of that.  It would be --
18 again, it would be how many patients they
19 see, how they think about the treatment
20 of pain.  The issues that we discussed
21 earlier around target.
22 Q.  Okay.  And then if you look
23 down at the next sentence, it says,
24 "Launch critical success factors.  Sales

Page 213

1  force expansion to 350 on track."
2  Do you know what that means?
3  A.  That would mean that we were
4  looking at potentially expanding our
5  sales force footprint to 350 specialty
6  reps.
7  Q.  Okay.  And do you know if
8  that occurred?
9  A.  I do not -- I do not recall.
10 Q.  Okay.  If you'll switch with
11 me to the second slide.  It says,
12 "Targeting 50K high value prescribers
13 across multiple specialties."
14 Did I read that correctly?
15 A.  You did.
16 Q.  Okay.  And then this slide
17 also contains a heat map scenario
18 depicting the total market which we
19 discussed earlier.
20 Do you see where I'm at?
21 A.  I do.
22 Q.  Okay.  And then here it also
23 has Tennessee as the red or most
24 attractive designation.

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1 Do you see that?
2 A. I do.
3 Q. Okay. Do you know when
4 coming up with the targeting information
5 about these particular areas, if
6 Mallinckrodt considered overdose rates?
7 A. I don't know.
8 Q. Okay. What about addiction
9 rates? Do you know when developing
10 targeting lists or areas, if Mallinckrodt
11 considered addiction rates for opioids in
12 those areas?
13 A. I do not know.
14 Q. Okay. When coming up with
15 those targeting rates for sales of
16 Mallinckrodt opioids, do you know if
17 Mallinckrodt considered the rate of
18 neonatal abstinence births?
19 A. I do not know.
20 Q. Okay. When coming up with
21 the targeting list for Mallinckrodt
22 opioids, do you know if Mallinckrodt
23 considered the crime rates of a
24 particular area?

Page 215

1 A. I do not know.
2 Q. Okay. And when developing
3 targeting areas for Mallinckrodt opioids,
4 do you know if Mallinckrodt considered
5 the prescribing rates per capita for
6 opioids in those areas?
7 A. I do not know.
8 Q. Okay. If you'll look with
9 me to the right section, in the right
10 bottom-right-hand corner of that slide. It
11 says, "Highest days on therapy."
12 Do you see where I'm at?
13 A. I do.
14 Q. Okay. Do you know what
15 highest days on therapy means?
16 A. It means the specialist who
17 writes for a certain period of time as it
18 relates to the prescription.
19 Q. Okay. So that would mean
20 for people who write -- for physicians
21 who write prescriptions for opioids for
22 longer periods of time?
23 A. It would mean that, yeah, it
24 would mean the physicians who write the

Page 216

1 drug for a certain period of time, as an
2 example, orthopedics on average, based on
3 this chart, ten days.
4 Q. Okay. Thank you. Okay.
5 You can set that aside for me, please.
6 Do you know if Mallinckrodt
7 has a program to examine high volume
8 prescribers for potential abuse and
9 diversion?
10 A. I do not.
11 Q. Okay. When you were
12 president of specialty sales, did
13 Mallinckrodt have a program that required
14 sales representatives to report signs of
15 abuse and diversion they may encounter
16 when detailing physicians or pharmacies?
17 A. I don't know.
18 Q. Okay. Has Mallinckrodt ever
19 had a program that required sales
20 representatives to report potential signs
21 of abuse and diversion they might come
22 across while detailing physicians or
23 pharmacies?
24 A. I don't know.

Page 217

1 Q. Okay. Does Mallinckrodt
2 have any kind of a program designed to
3 identify prescribers that are
4 overprescribing opioids?
5 A. I do not know.
6 Q. Okay. Do you know if
7 Mallinckrodt has ever considered creating
8 a program like that?
9 A. I do not know.
10 Q. Who would have been in
11 charge of determining whether
12 Mallinckrodt should have a program like
13 that?
14 A. It would --
15 MR. O'CONNOR: Objection.
16 Objection.
17 THE WITNESS: Again, it
18 would be based on the business,
19 and it's hard for me to speculate.
20 I don't know where that would sit.
21 BY MS. HERZFELD:
22 Q. Okay. So I think you talked
23 before, and I want to make sure I
24 understand this, about there being a

Highly Confidential - Subject to Further Confidentiality Review

Page 218

1 generic side and a branded side.
2   A.   Yes.
3   Q.   And you dealt more with the
4 branded side than the generic side?
5   A.   That is correct.
6   Q.   Okay.  But you were
7 technically over both for a period of
8 time?
9   A.   I was.
10   Q.   Okay.  And so I think we
11 talked a little about the generic stuff.
12 But on the branded side, who would be the
13 person who could answer my questions
14 about training of the sales force to
15 report signs of abuse and diversion?
16   A.   I don't know who that would
17 be.
18       (Document marked for
19 identification as Exhibit
20 Mallinckrodt-O'Neill-16.)
21       MS. HERZFELD:  Okay.  I'm
22 going to hand you what we're going
23 to mark as Plaintiffs' Exhibit 16.
24       For the record, it's

Page 219

1       MNK_TNSTA_01496957 through 58.
2 BY MS. HERZFELD:
3   Q.   Take a look at this e-mail.
4 And let me know when you're finished
5 reading it, please.
6   A.   Okay.
7   Q.   Okay.  Could you tell me
8 what this document is?
9   A.   That's an e-mail.
10   Q.   Sent from who?
11   A.   Top -- based on -- again I
12 don't recall it.  But based on just my
13 reading from the e-mail, from Todd
14 Killian to me.  Or from me to Todd
15 Killian I should say.
16   Q.   Okay.  And who is Todd
17 Killian?
18   A.   At that point in time, Todd
19 was responsible for market access.
20   Q.   Okay.  And what do you mean
21 by market access?
22   A.   So he had responsibility for
23 relationships with payors, but also
24 pharmacies and distribution.

Page 220

1   Q.   Okay.  And the date of this
2 e-mail is?
3   A.   April 28, 2014.
4   Q.   Okay.  And in this e-mail
5 that you send to Todd, you say, "It
6 concerns me greatly that we have returns
7 on the product already."
8       Did I read that correctly?
9   A.   You did.
10   Q.   Okay.  And could you read
11 the rest of -- of your e-mail there to
12 him?
13   A.   I can.
14       "How can that be?  It was my
15 impression that target pharmacies were
16 linked to high decile docs.  If a bottle
17 is sitting there how did it not get
18 pulled through.  We cannot afford to have
19 product coming back."
20   Q.   Okay.  And what is a target
21 pharmacy that you're referring to here?
22   A.   So these were pharmacies
23 where there was specific product movement
24 of existing pain medications that we felt

Page 221

1 it was right to at least try to get a
2 bottle into the pharmacy so if a
3 physician wrote the prescription, it was
4 available for the patient to get filled.
5   Q.   Okay.  And so you would have
6 salespeople detail those pharmacies in
7 order to make sure that your product was
8 available in case a physician wrote a
9 prescription?
10   A.   An issue at launch, yes.
11   Q.   Okay.  You had already
12 spoken to Mr. Chalos earlier about high
13 decile doctors.  Do you recall that
14 testimony?
15   A.   I do.
16   Q.   Okay.  And so here you're
17 talking about the linkage between high
18 decile doctors and target pharmacies; is
19 that correct?
20   A.   That's what the e-mail says,
21 based on my reading of it.
22   Q.   Okay.  And so I want to make
23 sure that I understand what you meant
24 there.

Page 222

1    So is what you're saying
2 there that you could tell which
3 pharmacies were filling -- filling
4 prescriptions for a high opioid
5 prescribing doctors?
6    A.   What we're saying here,
7 based on my reading of the document, is
8 that there were target docs, target
9 physicians that were -- that were more
10 likely to prescribe the product.  And
11 what we tried to do was make sure the
12 product was available at pharmacies so
13 that if they wrote it, the patient can
14 fulfill it, yes.
15    Q.   Okay.  So you could tell
16 which pharmacies those high prescribing
17 doctors used most often?
18    A.   It's usually by zip code, by
19 geographic location.
20    Q.   Okay.  And how would you get
21 that information?
22    A.   Third party.
23    Q.   Okay.  And a third party
24 like whom?

Page 223

1    A.   I don't recall where it came
2 from --
3    Q.   Like -- somebody like --
4    A.   -- somebody like IMS.  Could
5 be something like that.
6    Q.   Okay.
7    MS. HERZFELD:  Okay.  If
8 you'll give me just one minute,
9 I'll see if I have any other
10 questions for you.
11    Off the record for a minute.
12    THE VIDEOGRAPHER:  The time
13 is 3:30 p.m.  Off the record.
14    (Short break.)
15    THE VIDEOGRAPHER:  The time
16 is 3:36 p.m.  Back on the record.
17    MS. HERZFELD:  Okay.
18 Mr. O'Neill, we are back from a
19 short break.  I don't have any
20 further questions for you today.
21    THE WITNESS:  Thank you.
22    MS. HERZFELD:  Thanks.
23    MR. DAVISON:  We don't have
24 any questions.

Page 224

1    THE VIDEOGRAPHER:  This
2 marks the end of today's
3 deposition.  The time is 3:37 p.m.
4    (Excused.)
5    (Deposition concluded at
6 3:37 p.m.)

Page 225

1
2    CERTIFICATE
3
4
5    I HEREBY CERTIFY that the
witness was duly sworn by me and that the
6 deposition is a true record of the
testimony given by the witness.
7
   It was requested before
8 completion of the deposition that the
witness, HUGH M. O'NEILL , have the
9 opportunity to read and sign the
deposition transcript.
10
11
12
_____
13 MICHELLE L. GRAY,
A Registered Professional
Reporter, Certified Shorthand
14 Reporter, Certified Realtime
Reporter and Notary Public
15 Dated:  March 18, 2019
16
17
18    (The foregoing certification
19 of this transcript does not apply to any
20 reproduction of the same by any means,
21 unless under the direct control and/or
22 supervision of the certifying reporter.)
23
24

Page 226

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition
4  over carefully and make any necessary
5  corrections.  You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8        After doing so, please sign
9  the errata sheet and date it.
10        You are signing same subject
11  to the changes you have noted on the
12  errata sheet, which will be attached to
13  your deposition.
14        It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

Page 227

1        - - - - - -
          E R R A T A
2        - - - - - -
3
4  PAGE  LINE  CHANGE
5  ____  ____  _____
6        REASON: _____
7  ____  ____  _____
8        REASON: _____
9  ____  ____  _____
10        REASON: _____
11  ____  ____  _____
12        REASON: _____
13  ____  ____  _____
14        REASON: _____
15  ____  ____  _____
16        REASON: _____
17  ____  ____  _____
18        REASON: _____
19  ____  ____  _____
20        REASON: _____
21  ____  ____  _____
22        REASON: _____
23  ____  ____  _____
24        REASON: _____

Page 228

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I,_____, do
5  hereby certify that I have read the
6  foregoing pages, 1 - 229, and that the
7  same is a correct transcription of the
8  answers given by me to the questions
9  therein propounded, except for the
10  corrections or changes in form or
11  substance, if any, noted in the attached
12  Errata Sheet.
13
14
15  _____
16  HUGH M. O'NEILL              DATE
17
18
19  Subscribed and sworn
    to before me this
20  _____ day of _____, 20____.
21  My commission expires:_____
22
    _____
23  Notary Public
24

Page 229

1        LAWYER'S NOTES
2  PAGE  LINE
3  ____  ____  _____
4  ____  ____  _____
5  ____  ____  _____
6  ____  ____  _____
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____