# EXHIBIT 8

Q. So you would travel to other territories around the country to do these ride-alongs or field trips?
A. Yes. They were usually not locally, but I think there may have been at least one that was local.
Q. Did you ever do a ride-along in Ohio?
A. I think I actually did one in Columbus, Ohio.
Q. Any in northern Ohio?
A. None that I recall.
Q. How did you determine where you did the ride-alongs?
A. Sometimes it was just trying to provide some diversity of areas that I had gone. I tried to make sure that I didn't just go to warm climates. So I think I did go to Omaha, Nebraska once, and probably --
Q. In the winter?
A. I don't recall whether it was winter or summer.
But, yes, I tried to get some good geographic distribution. I tried to, you know, go with representatives that I thought could introduce me to, you know, customers that they had good



relationships with and that they were well thought of.
It usually wasn't somebody that was, you know, new to the company or that I would put more stress on them that wasn't necessary.
Q. Did you ever do a ride-along in Tennessee?
A. I think I did.
Q. Do you remember which part of the state?
A. I think it was in Memphis.
Q. Was it just once or was it --
A. Just once.
Q. Was the sales messaging the same for the entire country?
A. Yes.
Q. So the messaging that a sales representative in Ohio would be given is the same as the sales representative in Alaska?
A. Yeah. When you say "sales message," as it relates to the product --
Q. Yes, sir.
A. -- the message would have been the same. As it relates to payor information, it certainly probably was different.
Q. In terms of the risks and benefits of a particular product, the sales messaging is the same



regardless of the physical location?
A. That would have been the same. And, you know, once again, all the sales materials were provided to representatives nationally that had all of the standard, you know, legal approvals that I described earlier.
Q. Okay. So the sales messaging for a product in Tennessee or Ohio or California or Alaska, they were all the same?
A. Correct. I mean, to the best of our ability to monitor that.
Q. What do you mean by that?
A. Well, in one place somebody may have put more emphasis on some aspects of the message that they were more comfortable with or thought it was, you know, more important to that customer. Our customers might have been slightly different, so --
Q. That was in the discretion of the salesperson?
A. That would have been at the discretion of the salesperson but still using the approved promotional materials.
Q. And the approved promotional materials were the same throughout the country?
A. Correct.



Q. Were sales representatives given, while you were at Mallinckrodt, any training for identifying prescribers who may have been overprescribing opioids?
A. There was some training. We had a pharmacist from our scientific affairs group who, you know, spent time as part of the training describing kind of what that might look like and understanding other aspects of just the pharmacy.
Q. Okay. When was that training done?
A. It would have been done for new hires, so somewhere during the first months of their employment.
Q. Who was the person from scientific affairs who did that training?
A. I can't remember her name.
Q. It was a woman?
A. It was a woman.
Q. Was it the same person during the four years you were at Mallinckrodt?
A. I think it was.
Q. Part of that training was helping sales representatives identify prescribers who may have been overprescribing opioids?
A. It was, as I recall, it was training that

Page 90

the year-end of 2012, was the central region sales director looking exclusively at Exalgo performance when it came to the year-end evaluations of his district managers?
A. Sorry, I don't recall that far back.
Q. Okay. Mr. Meyer goes on to say: "Make sure you are driving Exalgo every day and every single sales call that you are on with your representatives."
Do you see that?
A. Yes.
Q. Do you recall in 2012, that the central region district managers were instructed that they should be driving Exalgo every day and every single sales call they are on with their representatives?
A. You know, once again, these are Jay's words, not mine. It was probably the number one weighted product for incentive compensation that year, I'm guessing. I don't remember specifically. We'd have to go back and look at the incentive plan to see how it was weighted.
But I think at that time we also had three other products we were promoting as well, so -- but this could have been the most heavily weighted of the products. But it would have been the same

Page 91

nationally, not just for Ohio or anywhere else.
Q. And what do you mean when you say it's the "number one weighted product"?
A. Well, the incentive compensation.
Q. Those are the bonuses?
A. The bonuses would have been weighted by product. So once again, we had other products that we were promoting. Some were -- every year they were weighted a little differently.
But Exalgo probably was the number one weighted, which meant it might have been a higher percentage of the incentive compensation went to this product's performance versus others.
Q. Okay. So the -- if it's the number one weighted, it means that if there is an increase in market share caused by an increase in prescriptions for Exalgo, that would mean more money and bonuses to the sales representative and the district managers?
A. Depending on what the compensation metrics were.
Q. Uh-huh.
A. Once again, remembering that Exalgo prescriptions were always coming from another opioid product.

Page 92

Q. So it was always about market share for Exalgo?
A. Yes. Yes.
Q. So when you say something is the "number one weighted product," it means that when calculating the bonuses for the sales representatives, the number of prescriptions for that product weighed more heavily in assessing the number -- the amount of the bonus?
A. Correct.
Q. Okay. You, if you scroll up here, there is another e-mail. This is from you to Mr. Terifay on August 22nd of 2012, at 2:01:59 p.m., and you say there: "Good opportunity to see the trickle-down communications, or in this case trickle-up, in follow-up to our NLM."
Do you see that?
A. Yeah.
Q. Okay. What is "NLM"?
A. I don't remember. I really don't remember.
Q. Could that mean -- could that be "NSM," like national sales meeting?
A. No.
Q. You think it's something else?
A. No. It might have been national leadership

Page 93

meeting. I'm not sure.
Q. And what do you mean by "trickle-up communications"?
A. Just the sequence of e-mails was coming from a territory to a district to a region to the national level.
Q. I see. Okay.
You didn't express any disagreement with the message conveyed by either Mr. McDaniel or Mr. Meyer in this e-mail, did you?
A. My comments were very brief. You're correct.
Q. Did you have a disagreement with the messages from either Mr. Meyer or Mr. McDaniel?
A. That being a hypothetical that I don't remember.
Q. And as you sit here today, looking at these messages from Mr. McDaniel or Mr. Meyer, is there anything in there that stands out to you as being something you disagree with?
A. I haven't read the whole, all the bullets, so I'm not sure; but in general, it represents typical communication, maybe, within the sales organization.
Q. Okay. Do you have any beef with it --

Page 342

I don't -- wouldn't recall.
Q. Okay. And do you know if any pictures or videos were ever taken of the Run Through the Warehouse?
A. I do not recall.
Q. Okay. Have you ever seen any pictures or videos of the Run Through the Warehouse?
A. Maybe just something used in follow-up, short segments of it.
Q. Okay. And where would you have seen those?
A. Maybe at a national sales meeting.
Q. Okay. Do you recall what year?
A. No, I don't.
Q. Do you recall what national sales meetings?
A. No, I don't.
Q. Okay. You don't have any copies or photographs of any videos or photographs?
A. I do not.
MS. HERZFELD: Okay. I don't think I have any further questions.
MR. DAVIS: If we may have just two minutes to confer briefly.
THE VIDEOGRAPHER: The time is 6:18 p.m. We're going off the record.
(Recess from 6:18 p.m. until 6:21 p.m.)

Page 343

THE VIDEOGRAPHER: The time is 6:21 p.m. We're back on the record.
MR. DAVIS: We're going back on the record just so we can go off the record and reserve Mr. Wickline's rights to read and sign. Thank you.
THE VIDEOGRAPHER: Any other statements for the record? Okay.
The time is 6:21 p.m., November 13, 2018, going off the record, completing today's videotaped session.
(Whereupon, the deposition concluded at 6:21 p.m.)

Page 344

C E R T I F I C A T E

I, SUSAN D. WASILEWSKI, Registered Professional Reporter, Certified Realtime Reporter, and Certified Realtime Captioner, do hereby certify that, pursuant to notice, the deposition of RONALD P. WICKLINE was duly taken on Tuesday, November 13, 2018, at 9:06 a.m. before me.

The said RONALD P. WICKLINE was duly sworn by me according to law to tell the truth, the whole truth and nothing but the truth and thereupon did testify as set forth in the above transcript of testimony. The testimony was taken down stenographically by me. I do further certify that the above deposition is full, complete, and a true record of all the testimony given by the said witness, and that a review of the transcript was requested.

________________________________________

Susan D. Wasilewski, RPR, CRR, CCP, CMRS, FPR, CCR

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

Page 345

INSTRUCTIONS TO WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it. It will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.