**EXHIBIT 17**

to reporting companies could be impaired. Any failure to meet our reporting requirements or achieve and maintain effective internal controls could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

*We may have received more favorable or less favorable terms from unaffiliated third parties than the terms we received in our agreements with Covidien.*

We entered into agreements with Covidien in connection with the Separation, including a separation and distribution agreement, a transition services agreement, a tax matters agreement and an employee matters agreement. Since such agreements were negotiated in the context of the Separation, the terms of such agreements may be more favorable or less favorable than the terms that would have resulted from arm's-length negotiations between unaffiliated third parties.

*Covidien may fail to perform under various transaction agreements that were executed as part of the Separation, or we may fail to have necessary systems and services in place when certain of the transaction agreements expire.*

In connection with the Separation, we entered into various agreements with Covidien, including a separation and distribution agreement, a tax matters agreement, an employee matters agreement and a transition services agreement. For further information on these agreements, refer to Exhibits 2.1, 10.1, 10.2 and 10.3, respectively, of our Current Report on Form 8-K filed with the SEC on July 1, 2013. Certain of these agreements provide for the performance of services by each company for the benefit of the other for a period of time after the Separation. We will rely on Covidien to satisfy its performance and payment obligations under these agreements. If Covidien is unable to satisfy its obligations under these agreements, including its indemnification obligations, we could incur operational difficulties or losses. If we do not have in place our own systems and services, or if we do not have agreements with other providers of these services when the transaction or long-term agreements terminate, we may not be able to operate our business effectively and our profitability may decline. We continue the process of creating our own, or engaging third parties to provide, systems and services to replace many of the systems and services Covidien provided to us prior to the Separation, and is continuing to provide us pursuant to these agreements. These systems and services may be more expensive or less efficient than the systems and services Covidien is providing during the transition period.

*Potential indemnification liabilities to Covidien pursuant to the separation and distribution agreement could materially adversely affect us.*

The separation and distribution agreement with Covidien provided for, among other things, the principal corporate transactions required to effect the Separation, certain conditions to the distribution and provisions governing the relationship between us and Covidien following the Separation. The separation and distribution agreement was filed with the SEC as Exhibit 2.1 to our Current Report on Form 8-K on July 1, 2013. Among other things, the separation and distribution agreement will provide for indemnification obligations principally designed to place financial responsibility for the obligations and liabilities of our business with us and financial responsibility for the obligations and liabilities of Covidien's remaining business with Covidien, among other indemnities. If we are required to indemnify Covidien under the circumstances set forth in the separation and distribution agreement, we may be subject to substantial liabilities. These potential indemnification obligations could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

*We may not achieve some or all of the expected benefits of the Separation, and the Separation may materially adversely affect our business.*

We may not be able to achieve the full strategic and financial benefits expected to result from the Separation, or such benefits may be delayed or not occur at all. The Separation was expected to provide the following benefits, among others: (i) our ability to focus on our own strategic and operational plans and capital structure; (ii) an appropriate capital structure for Mallinckrodt; (iii) a distinct investment identity allowing investors to evaluate the merits, performance and future prospects of us separately from Covidien; and (iv) more effective share-based compensation and currency for acquisitions.

We may not achieve these and other anticipated benefits for a variety of reasons, including, among others: (a) the Separation required significant amounts of management's time and effort, which may have diverted management's attention from operating and growing our business; (b) as an independent, publicly-traded company, we may be more susceptible to market fluctuations and other adverse events than if it were still a part of Covidien; (c) our business is less diversified than Covidien's business prior to the Separation; and (d) the continuing actions required to separate Covidien's and our respective businesses could disrupt our operations. If we fail to achieve some or all of the benefits expected to result from the Separation, or if such benefits are delayed, it could have a material adverse effect on our competitive position, business, financial condition, results of operations and cash flows.

The preceding table does not include other liabilities of $472.4 million, primarily consisting of obligations under our pension and postretirement benefit plans, unrecognized tax benefits for uncertain tax positions and related accrued interest and penalties, environmental liabilities and asset retirement obligations, because the timing of their future cash outflow is uncertain. The most significant of these liabilities are discussed below.

Income taxes payable is included within other income tax liabilities on the consolidated and combined balances sheets and, as of September 27, 2013, was $153.1 million. Payment of these liabilities is uncertain and, even if payments are determined to be necessary, they are subject to the timing of rulings by the Internal Revenue Service of tax positions we take. For further information on income tax related matters, refer to Note 7 of Notes to Consolidated and Combined Financial Statements included within Item 8. Financial Statements and Supplementary Data of this Annual Report on Form 10-K.

As of September 27, 2013, we had net unfunded pension and postretirement benefit obligations of $45.7 million and $53.2 million, respectively. While the timing and amounts of long-term funding requirements for pension and postretirement obligations are uncertain, we do not anticipate making material contributions to our pension and postretirement benefit plans during fiscal 2014.

We are involved in various stages of investigation and cleanup related to environmental remediation matters at a number of sites. These projects relate to a variety of activities, including decontamination and decommissioning of radioactive materials and removal of solvents, metals and other hazardous substances from soil and groundwater. The ultimate cost of cleanup and timing of future cash outlays is difficult to predict given uncertainties regarding the extent of the required cleanup, the interpretation of applicable laws and regulations and alternative cleanup methods. As of September 27, 2013, we believe that it is probable that we will incur investigation and remedial costs of approximately $46.4 million, of which $6.9 million is included in accrued and other current liabilities on our consolidated balance sheet at September 27, 2013. Note 18 of Notes to Consolidated and Combined Financial Statements included within Item 8. Financial Statements and Supplementary Data of this Annual Report on Form 10-K provides additional information regarding environmental matters, including asset retirement obligations.

*Legal Proceedings*

We are subject to various legal proceedings and claims, including patent infringement claims, product liability matters, environmental matters, employment disputes, contractual disputes and other commercial disputes, including those described in Item 3. Legal Proceedings of this Annual Report on Form 10-K. We believe that these legal proceedings and claims likely will be resolved over an extended period of time. Although it is not feasible to predict the outcome of these matters, management believes that their ultimate resolution will not have a material adverse effect on our financial condition, results of operations and cash flows.

*Guarantees*

In disposing of assets or businesses, we have historically provided representations, warranties and indemnities to cover various risks and liabilities, including unknown damage to the assets, environmental risks involved in the sale of real estate, liability to investigate and remediate environmental contamination at waste disposal sites and manufacturing facilities, and unidentified tax liabilities related to periods prior to disposition. The Company assesses the probability of potential liabilities related to such representations, warranties and indemnities and adjusts potential liabilities as a result of changes in facts and circumstances. The Company has no reason to believe that these uncertainties would have a material adverse effect on its financial condition, results of operations and cash flows.

In connection with the sale of the Specialty Chemicals business (formerly known as Mallinckrodt Baker) in fiscal 2010, we agreed to indemnify the purchaser with respect to various matters, including certain environmental, health, safety, tax and other matters. The indemnification obligations relating to certain environmental, health and safety matters have a term of 17 years from the sale, while some of the other indemnification obligations have an indefinite term. The amount of the liability relating to all of these indemnification obligations included in other liabilities on our consolidated balance sheet at September 27, 2013 was $20.1 million, of which $17.2 million related to environmental, health and safety matters. The value of the environmental, health and safety indemnity was measured based on the probability-weighted present value of the costs expected to be incurred to address environmental, health and safety claims made under the indemnity. The aggregate fair value of these indemnification obligations did not differ significantly from their aggregate carrying value at September 27, 2013. As of September 27, 2013, the maximum future payments we could be required to make under these indemnification obligations was $75.5 million. We were required to pay $30.0 million into an escrow account as collateral to the purchaser, of which $23.5 million remained in other assets on the consolidated balance sheet at September 27, 2013.

We have recorded liabilities for known indemnification obligations included as part of environmental liabilities, which are discussed in Note 18 of Notes to Consolidated and Combined Financial Statements included within Item 8. Financial Statements and Supplementary Data of this Annual Report on Form 10-K. In addition, we are liable for product performance; however, in the opinion of management, such obligations will not have a material adverse effect on our financial condition, results of operations and cash flows.

62

The following summarizes reclassifications from accumulated other comprehensive income:

| | Amount Reclassified From Accumulated Other Comprehensive Income | | | Line Item in the Consolidated Statement of Income |
|---|---|---|---|---|
| | December 29, 2017 | September 30, 2016 | December 30, 2016 | |
| Amortization of unrealized loss on derivatives | $ 1.3 | $ 0.7 | $ 0.2 | Interest expense |
| Income tax provision | (0.3) | (0.2) | — | Provision for income taxes |
| Net of income taxes | 1.0 | 0.5 | 0.2 | |
| Amortization of pension and post-retirement benefit plans: | | | | |
| Net actuarial loss | 2.7 | 11.4 | 1.0 [1] | |
| Prior service credit | (1.9) | (2.7) | (0.6) [1] | |
| Disposal of discontinued operations | (3.1) | 0.8 | — | |
| Plan settlements | 70.2 | 8.1 | 45.0 [1] | |
| Total before tax | 67.9 | 17.6 | 45.4 | |
| Income tax provision | (27.3) | (6.5) | (16.7) | Provision for income taxes |
| Net of income taxes | 40.6 | 11.1 | 28.7 | |
| Currency translation | (4.7) | (59.4) | — | |
| Total reclassifications for the period | $ 36.9 | $ (47.8) | $ 28.9 | |

(1) These accumulated other comprehensive income components are included in the computation of net periodic benefit cost. See Note 14 for additional details.

## 18. Guarantees

In disposing of assets or businesses, the Company has historically provided representations, warranties and indemnities to cover various risks and liabilities, including unknown damage to the assets, environmental risks involved in the sale of real estate, liability to investigate and remediate environmental contamination at waste disposal sites and manufacturing facilities, and unidentified tax liabilities related to periods prior to disposition. The Company assesses the probability of potential liabilities related to such representations, warranties and indemnities and adjusts potential liabilities as a result of changes in facts and circumstances. The Company believes, given the information currently available, that their ultimate resolution will not have a material adverse effect on its financial condition, results of operations and cash flows.

In connection with the sale of the Specialty Chemical business (formerly known as Mallinckrodt Baker) in fiscal 2010, the Company agreed to indemnify the purchaser with respect to various matters, including certain environmental, health, safety, tax and other matters. The indemnification obligations relating to certain environmental, health and safety matters have a term of 17 years from the sale, while some of the other indemnification obligations have an indefinite term. The amount of the liability relating to all of these indemnification obligations included in other liabilities on the Company's consolidated balance sheets at December 29, 2017 and December 30, 2016 was $14.9 million and $15.1 million, of which $12.1 million and $12.4 million, respectively, related to environmental, health and safety matters. The value of the environmental, health and safety indemnity was measured based on the probability-weighted present value of the costs expected to be incurred to address environmental, health and safety claims made under the indemnity. The aggregate fair value of these indemnification obligations did not differ significantly from their aggregate carrying value at December 29, 2017 and December 30, 2016. As of December 29, 2017, the maximum future payments the Company could be required to make under these indemnification obligations was $70.2 million. The Company was required to pay $30.0 million into an escrow account as collateral to the purchaser, of which $18.3 million and $19.0 million remained in other assets on the consolidated balance sheets at December 29, 2017 and December 30, 2016, respectively.

The Company has recorded liabilities for known indemnification obligations included as part of environmental liabilities, which are discussed in Note 19. In addition, the Company is liable for product performance; however the Company believes, given the information currently available, that their ultimate resolution will not have a material adverse effect on its financial condition, results of operations and cash flows.

The Company was required to provide the U.S. Nuclear Regulatory Commission financial assurance demonstrating its ability to fund the decommissioning of its Maryland Heights, Missouri radiopharmaceuticals production facility upon closure. Following the sale of the Nuclear Imaging business, the surety bond was canceled in April 2017 and the Company is no longer required to provide

*Patent/Antitrust Litigation*

   *Tyco Healthcare Group LP, et al. v. Mutual Pharmaceutical Company, Inc.* We filed a patent infringement suit in the U.S. District Court for the District of New Jersey against Mutual Pharmaceutical Co., Inc., et al. (collectively, "Mutual") on March 20, 2007 pursuant to procedures set out in the Drug Price Competition and Patent Term Restoration Act of 1984, after Mutual submitted an Abbreviated New Drug Application to the U.S. Food and Drug Administration ("FDA") seeking to sell a generic version of our 7.5 mg Restoril sleep aid product. Mutual also filed antitrust and unfair competition counterclaims. The patents at issue have since expired or been found invalid. On January 18, 2013, the trial court issued an opinion and order granting our motion for summary judgment regarding Mutual's antitrust and unfair competition counterclaims. On May 1, 2013, Mutual appealed this decision to the U.S. Court of Appeals for the Federal Circuit. While it is not possible at this time to determine with certainty the ultimate outcome of the counterclaims, we believe that the final resolution of the claims will not have a material adverse effect on our financial condition, results of operations and cash flows.

*Pricing Litigation*

   From time to time, states attorneys general have brought cases against us that allege generally that we and numerous other pharmaceuticals companies reported false pricing information in connection with certain drugs that are reimbursable under Medicaid, resulting in overpayment by state Medicaid programs for those drugs, and generally seek monetary damages and attorneys' fees. For example, we are named as a defendant in *State of Utah v. Actavis US, Inc., et al.* filed May 8, 2008, which is pending in the Third Judicial Circuit of Salt Lake County, Utah. We intend to contest this case and to explore other options as appropriate. While it is not possible at this time to determine with certainty the outcome of the case, we believe that the ultimate resolution will not have a material adverse effect on our financial condition, results of operations and cash flows.

*Environmental Remediation and Litigation Proceedings*

   We are involved in various stages of investigation and cleanup related to environmental remediation matters at a number of sites, including those described below. The ultimate cost of site cleanup and timing of future cash outlays is difficult to predict, given the uncertainties regarding the extent of the required cleanup, the interpretation of applicable laws and regulations and alternative cleanup methods. We concluded that, as of September 27, 2013, it was probable that we would incur remedial costs in the range of $46.4 million to $81.5 million. We also concluded that, as of September 27, 2013, the best estimate within this range was $46.4 million, of which $6.9 million was included in accrued and other current liabilities and the remainder was included in environmental liabilities on the consolidated balance sheet at September 27, 2013.

   *Crab Orchard National Wildlife Refuge Superfund Site, near Marion, Illinois.* We are a successor in interest to International Minerals and Chemicals Corporation ("IMC"). Between 1967 and 1982, IMC leased portions of the Additional and Uncharacterized Sites ("AUS") Operable Unit at the Crab Orchard Superfund Site ("the Site") from the government and manufactured various explosives for use in mining and other operations. In March 2002, the Department of Justice, the U.S. Department of the Interior and the EPA (together, "the Government Agencies") issued a special notice letter to General Dynamics Ordnance and Tactical Systems, Inc. ("General Dynamics"), one of the other potentially responsible parties ("PRPs") at the Site, to compel General Dynamics to perform the remedial investigation and feasibility study ("RI/FS") for the AUS Operable Unit. General Dynamics negotiated an Administrative Order on Consent with the Government Agencies to conduct an extensive RI/FS at the Site under the direction of the U.S. Fish and Wildlife Service. General Dynamics asserted in August 2004 that we are jointly and severally liable, along with approximately eight other lessees and operators at the AUS Operable Unit, for alleged contamination of soils and groundwater resulting from historic operations, and has threatened to file a contribution claim against us and other parties for recovery of its costs incurred in connection with the RI/FS activities being conducted at the AUS Operable Unit. We and other PRPs who received demand letters from General Dynamics have explored settlement alternatives, but have not reached settlement to date. We and other PRPs are awaiting completion of the RI/FS by General Dynamics before the initiation of formal PRP negotiations to address resolution of these alleged claims. While it is not possible at this time to determine with certainty the ultimate outcome of this case, we believe that the final resolution of all known claims, after taking into account amounts already accrued, will not have a material adverse effect on our financial condition, results of operations and cash flows.

   *Mallinckrodt Veterinary, Inc., Millsboro, Delaware.* We previously operated a plant in Millsboro, Delaware ("the Millsboro Site") that manufactured various animal healthcare products. In 2005, the Delaware Department of Natural Resources and Environmental Control found trichloroethylene ("TCE") in the Millsboro public water supply at levels that exceeded the federal drinking water standards. Further investigation to identify the TCE plume in the ground water indicated that the plume has extended to property owned by a third party near the Millsboro Site. ==We, and other former owners, assumed responsibility for the Millsboro Site cleanup under the Alternative Superfund Program administered by the EPA.== We and other PRPs entered into an Administrative Order on Consent with the EPA on May 10, 2010, which was subsequently amended in November 2010 and January 2011, to investigate the potential source of TCE contamination and to evaluate options to abate, mitigate or eliminate the release or threat of release of hazardous substances at the Millsboro Site. We, along with the other parties, continue to conduct the studies and prepare remediation

42