UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES: | Judge Dan Aaron Polster |
| *ALL CASES* | Hearing Date:  August 6, 2019 |
| | Time:   10:00 a.m. |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
RENEWED AND AMENDED MOTION FOR CERTIFICATION
OF RULE 23(b)(3) CITIES/COUNTIES NEGOTIATION CLASS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................. 1

II. WHAT THIS MOTION IS AND IS NOT.......................................................... 11

    A. What This Motion Is Not....................................................................... 11

    B. What This Motion Is ............................................................................. 13

    C. This Motion Does Not Seek a Change in Existing Law ....................... 14

    D. The Relationship of the Negotiation Class to the Attorneys General ................. 15

III. THE NEGOTIATION CLASS DEFINITION AND BASIC FUNCTION.................... 15

IV. THE NEGOTIATION CLASS REPRESENTATIVES ................................. 19

V. SUMMARY OF NEGOTIATION CLASS SEQUENCE, PROCESS,
ALLOCATION FORMULAE, SUPERMAJORITY VOTING MECHANISM,
CLASS MEMBERS' SPECIAL NEEDS FUND, AND FEES ........................ 46

VI. HOW THE SUPERMAJORITY VOTING PROCESS WORKS ................. 53

VII. HOW THE ALLOCATION MODEL WORKS ............................................ 55

    A. Factor One: Opioid Use Disorder ........................................................ 56

    B. Factor Two: Overdose Deaths ............................................................. 57

    C. Factor Three: Amount of Opioids........................................................ 58

    D. Final Calculation................................................................................... 60

    E. Distribution Within Counties ............................................................... 60

VIII. THE NEGOTIATION CLASS MEETS ALL REQUIREMENTS OF RULE 23(a) ...... 62

    A. The Negotiation Cities/Counties Class Is Too Numerous For Individual
Joinder, Meeting Rule 23(a)(1)'s "Numerosity" Requirement........................... 62

    B. There Are Questions Of Law And Fact With Common Answers, Fulfilling
the Rule 23(a)(2) Commonality Requirement .................................... 64

    C. The Claims Of The Class Representatives Are Typical Of The Claims Of
The Class Under Rule 23(a)(3)............................................................. 66

    D. The *Sine Qua Non* Of The Negotiation Class Is The Achievement Of
Adequate Representation Meeting Rule 23(a)(4) Requirements........................ 67

IX. THE NEGOTIATION CLASS MEETS THE PREDOMINANCE AND
SUPERIORITY REQUIREMENTS OF RULE 23(b)(3)................................ 73

    A. Predominance........................................................................................ 73

        1. The Plaintiffs Have Sued Common Defendants ..................................... 81

**TABLE OF CONTENTS**
**(continued)**

Page

2.   Core Issues Underlying Claims against Manufacturer Defendants for Their Marketing Practices Turn on Common Evidence .................... 82

3.   Core Issues Underlying Claims against Distributor Defendants, Manufacturer Defendants, and Retail Pharmacy Defendants for Their Failures under the CSA Turn on Common Evidence .................... 84

4.   Common Questions of Law and Fact Outweigh Individual Questions in Importance and Significance to the Disposition of Opioids Litigation .................................................................................. 86

B.   Rule 23(b)(3)'s Superiority Requirement Is Met ................................................. 87

X.   ATTORNEYS' FEES AND COSTS ............................................................................ 92

A.   Class Counsel/Common Benefit Fees ................................................................ 93

B.   The Private Attorneys' Fees Fund ...................................................................... 95

XI.   THE CLASS MEMBERS' SPECIAL NEEDS FUND ................................................... 96

XII.   THE CLASS NOTICE AND DIRECT NOTICE PROGRAM FULFILL THE "BEST PRACTICABLE NOTICE" STANDARDS OF RULE 23(c) .......................... 97

XIII.   CONCLUSION ............................................................................................................. 99

1780116.13

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997).................................................................... passim

*Amgen v. Connecticut Retirement Plans of Trust*,
  568 U.S. 455 (2013)................................................................. 14, 86

*Beattie v. CenturyTel, Inc.*,
  511 F.3d 554 (6th Cir. 2007) ................................................... 87

*Carroll v. Compucred Collections, Inc.*,
  399 F.3d 620 (6th Cir. 2005) ................................................... 88

*Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*,
  803 F.2d 878 (6th Cir. 1986) ................................................... 71

*Daffin v. Ford Motor. Co.*,
  458 F.3d 549 (6th Cir. 2006) ....................................... 62, 66, 68

*Gasperoni v. Metabolife, International, Inc.*,
  No. 00-71255, 2000 WL 33365948 (E.D. Mich. Sept. 27, 2000) ......................................... 83

*Hanlon v. Chrysler Corp.*
  150 F.3d 1011 (9th Circuit 1999) ........................................... 76

*In re Combustion Engineering*,
  391 F.3d 190 (3d Cir. 2004) ..................................................... 9

*In re Deepwater Horizon*,
  910 F. Supp. 2d 891 (E.D. La. 2012),
  *aff'd*, 739 F.3d 790 (5th Cir. 2014)........................................ 71

*In re Hyundai and Kia Fuel Economy Litigation*,
  926 F.3d 539 (9th Circuit 2019) ................................... 75, 76, 77

*In re Insurance Brokerage Antitrust Litigation*,
  579 F.3d 241 (3d Cir. 2009) ..................................................... 71

*In re Mego Financial Corp.*,
  213 F.3d 454 (9th Cir. 2000) ................................................... 71

*In re National Football League Players Concussion Injury Litigation*,
  821 F.3d 410 (3d Cir. 2016) ..................................................... 71

*In re Sulzer Orthopedics Inc.*,
  398 F.3d 778 (6th Cir. 2005) ................................................... 93

*In re Volkswagen 'Clean Diesel' Marketing Sales Practices and Prods. Liab. Litig.*,
  895 F.3d 597 (9th Cir. 2018) ................................................... 71

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
  722 F.3d 838 (6th Cir. 2013) *cert. denied sub nom*
  *Whirlpool Corp. v. Glazer*, 134 S.Ct. 1277 (2014)...................... passim

# TABLE OF AUTHORITIES
## (continued)

Page

*Juris v. Inamed Corp.*,
  685 F. 3d 1294 (11th Cir. 2012) .................................................................. 71

*Lonardo v. Travelers Indem. Co.*,
  706 F. Supp. 2d 766 (N.D. Ohio 2010) ........................................................ 93

*Martin v. Behr, Dayton Thermal Products LLC*,
  896 F.3d 405 (6th Cir. 2018) .................................................. 73, 80, 83, 91

*Messner v. Northshore Univ. HealthSys.*,
  669 F.3d 802 (7th Cir. 2012) ...................................................................... 14

*Moulton v. U.S. Steel Corp.*,
  581 F.3d 344 (6th Cir. 2009) ...................................................................... 93

*Nat'l League of Cities v. Brennan*,
  419 U.S. 1321 (1974) .................................................................................. 17

*Nat'l League of Cities v. Usery*,
  426 U.S. 833 (1976) .................................................................................... 17

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) .................................................................... 74

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) .................................................................... 71

*Rawlings v. Prudential-Bache Props., Inc.*,
  9 F.3d 513 (6th Cir. 1993) .......................................................................... 93

*Rikos v. Proctor & Gamble Co.*,
  799 F.3d 497 (6th Cir. 2015) ................................................................ 65, 83

*Sprague v. General Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ...................................................................... 66

*Sterling v. Velsicol Chem. Corp.*
  855 F.2d 1188 (6th Cir. 1988) ............................................................... 73, 87

*Stern v. Marshall*,
  564 U.S. 462 (2011) .................................................................................... 18

*Tyson Foods, Inc. v. Bouaphakeo*,
  136 S. Ct. 1036 (2016) .......................................................................... 80, 86

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ............................................................................. 14, 65

*Waste Management Holdings, Inc. v. Mowbray*,
  208 F.3d 288 (1st Cir. 2000) ...................................................................... 74

*Whitlock v. FSL Mgmt., LLC*,
  843 F.3d 1084 (6th Cir. 2016) .................................................................... 62

*Williams v. Duke Energy Corp.*,
  No. 1:08-CV-46, 2014 WL 12652315 (S.D. Ohio Mar. 13, 2014) ................ 85

1780116.13

**TABLE OF AUTHORITIES**
(continued)

Page

**Statutes**

11 U.S.C. § 524(g) ................................................................ 10, 19, 56

18 U.S.C. §1961 ................................................................................ 88

**Rules**

Federal Rule of Evidence
   Rule 408 ......................................................................................... 5

Federal Rules of Civil Procedure
   Rule 23 .................................................................................... passim

Rule 18 ............................................................................................ 62

Rule 19 ............................................................................................ 62

Rule 20 ............................................................................................ 62

Rule 23(a) ................................................................................ 6, 8, 62

Rule 23(a)(1) ............................................................................. 62, 63

Rule 23(a)(1)-(4) ...................................................................... 15, 47

Rule 23(a)(2) ............................................................................. 64, 65

Rule 23(a)(3) ................................................................................... 66

Rule 23(a)(4) ...................................................................... 1, 67, 71, 72

Rule 23(b)(3) .......................................................................... passim

Rule 23(b)(3)(A)-(D) ..................................................................... 91

Rule 23(b)(3)(D) ....................................................................... 74, 90

Rule 23(c) .............................................................................. passim

Rule 23(c)(5) ................................................................................... 72

Rule 23(e) .............................................................................. passim

Rule 23(e)(1)(A)-(B) ...................................................................... 19

Rule 23(e)(2)(A)-(D) ...................................................................... 19

Rule 23(g) ................................................................................ 52, 69

Rule 23(g)(1)(A)(i)-(iv) ................................................................. 69

Rule 23(g)(3) ..................................................................................... 1

Rule 23(h) .............................................................................. passim

**Treatises**

1 *Newberg on Class Actions* § 3:12 (5th ed. 2011) .......................... 63

2 *Newberg on Class Actions* § 4:45 (5th ed. 2012) .......................... 80

2 *Newberg on Class Actions* § 4:49 (5th ed. 2012) .......................... 79

2 *Newberg on Class Actions* § 4:50 (5th ed. 2011) .......................... 86

2 *Newberg on Class Actions* § 4:50 (5th ed. 2012) ..................... 79, 80

**TABLE OF AUTHORITIES**
**(continued)**

Page

2 *Newberg on Class Actions* § 4:51 (5th ed. 2011 and Winter 2018 Supp.) ......................... 73, 74

2 *Newberg on Class Actions* § 4:63 (5th ed. 2018)..................................................... 77

*Manual for Complex Litigation*,
  *see, e.g. Manual for Complex Litigation* (Fourth)
  §§ 21.6-21.635 (2004) ........................................................................... 7

*Principles of the Law of Aggregate Litigation* § 3.11 (Am. Law Inst. 2010)............................. 72

*Principles of the Law of Aggregate Litigation* § 3.17 (Am. Law Inst. 2010)............................... 9

*Principles of the Law of Aggregate Litigation* § 3.18 (Am. Law Inst. 2010)............................... 8

## **Other Authorities**

Christopher J. Ruhm, *Corrected US Opioid-Involved Drug Poisoning Deaths and Mortality
  Rates, 1999-2015*, 113 Addiction 1339 (2018) ......................................................... 58

Christopher J. Ruhm, *Geographic Variation in Opioid and Heroin Involved Drug Poisoning
  Mortality Rates*,
   53 Am. J. Preventive Med. 745 (2017).............................................................. 58

D. Theodore Rave, *Closure Provisions in MDL Settlements*,
  85 Fordham L. Rev. 2175 (2017) ................................................................... 10

Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action,*
  92 N.Y.U. L. Rev. 846 (2017) ...................................................................... 70

Francis E. McGovern & William B. Rubenstein, *The Negotiation Class:
  A Cooperative Approach to Large Claim Class Actions* (June 2019) ...................................... 7

John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in
  Representative Litigation*, 100 Colum. L. Rev. 370 (2000) ............................................... 5

Morgan A. McCollum, *Local Government Plaintiffs and the Opioid Multi-District Litigation*,
  N.Y.U. L. Rev., 6 (forthcoming Mar. 2019)........................................................... 11

Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97,
  131-32 (2009) .................................................................................... 65

Robert H. Klonoff, Mark Herrmann & Bradley W. Harrison,
  *Making Class Actions Work: The Untapped Potential of the Internet*,
  69 U. Pitt. L. Rev. 727 (2008) ..................................................................... 70

Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*,
  1999 Sup. Ct. Rev. 337 (1999) ...................................................................... 5

I. **INTRODUCTION**

This renewed and amended motion reflects and incorporates input from members of the proposed Class, addresses the concerns of Attorneys General and defendants, clarifies the scope and intent of the Negotiation Class, and names additional cities and counties as proposed Class Representatives. It also streamlines the procedure for certification and notice, consistent with Fed. R. Civ. P. 3 and due process, to enable class certification to be accomplished before the commencement of the initial MDL No. 2804 bellwether trial. This motion proposes the appointment of a diverse array of 51 cities and counties to serve as Class Representatives, and a group of experienced counsel to serve as Class Counsel for the Negotiation Class under Rule 23(a)(4) and 23(g)(3).[1] This motion is brought by the County of Albany, New York and the additional City and County plaintiffs described in this Memorandum, in their own names and as proposed Class Representatives, on behalf of the proposed Negotiation Class with the full support of the undersigned proposed Class Counsel, joined by the undersigned Court-appointed Plaintiffs Co-Lead Counsel, Liaison Counsel, Settlement Committee members, and Plaintiffs' Executive Committee, in observance of their duty to promote the legitimate interests and common benefit of all plaintiffs in MDL No. 2084, and to provide an optional and voluntary mechanism intended to advance the overall resolution of Opioids litigation.

Approximately 1,200 cities and counties have filed civil actions now centralized before this Court as part of the MDL No. 2804 proceedings. Many other cities and counties are proceeding with related cases in state courts. Additional thousands of cities and counties are

---

[1] The proposed Class Representatives are identified and described in Section IV of this Memorandum. The Rule 23(g)(3) submissions of the proposed Class Counsel accompany this Memorandum.

- 1 -

watching the progress of the Opioids litigation with great interest.  This Court has, on several occasions, advised that these entities would be included as part of any comprehensive class action settlement, without the necessity of filing their own suits.[2]  According to the U.S. Census Bureau, there are a total of over 3,000 counties or their functional equivalents, (collectively, "counties") and over 30,000 cities, towns, villages, townships and municipalities in the United States that have government structures and provide services to their residents (collectively, "cities").[3]  These counties and cities are the members of the proposed Negotiation Class.  All of them face, to some degree, the nationwide epidemic and national public health crises brought on by the manufacture, marketing, sale and use of the prescription opiates that are the subject of this case.  The cities and counties whose actions comprise the MDL have asserted a vital interest in, and a real need for, financial relief from, and better practices by, the defendants.

This case requires a truly comprehensive, forward-looking, national and voluntary resolution that enables state and local governments to face and to fight this epidemic, together,

---

[2] As set forth in its July 13, 2018 Order Regarding Plaintiffs' Motion For Modification of CMO-1 (Doc. #739), "Finally, the Court reiterates its view that participation by a City or County in any eventual class or aggregate settlement is not contingent on having filed a complaint."  *Id.*, p. 4, n. 3.

[3] The Cities and Counties Class Lists posted on the Negotiation Class website have been revised to coincide with this amended motion.  The revised lists were generated from the US Census Bureau's 2012 Census of Governments:  Finance.  To ensure inclusion of cities that did not respond to the 2012 Census of Governments:  Finance, the Cities List was supplemented with cities from the 2010 Decennial Census.  The Cities and Counties Class Lists were then further refined by:  1) removing from the Counties List counties in Alaska, Connecticut, Massachusetts, and Rhode Island that do not have county governments; 2) adding to the Counties List the 78 municipios in Puerto Rico included in the 2010 Decennial Census; 3) removing from the Cities List two "cities" that have no permanent residents; and 4) removing from the Cities List any townships that did not report expenditures in the 2012 Census of Governments:  Finance database for corrections, elementary and secondary education (net of capital expenditures), fire, health, hospitals (net of capital expenditures), housing, judicial, police, and welfare.  The Cities and Counties Class Lists now include 11,841 townships that did not appear on the lists that accompanied the initial motion for certification.

through settlements that would 1) fund prevention, treatment and recovery programs at, as appropriate, the state, regional and local levels; and 2) transform the practices of the manufacturers, distributors, pharmacists and prescribers who are alleged to have played roles in the opioids epidemic.

It is no secret that there have been settlement discussions right from the onset of MDL No. 2804.  These have largely focused on the claims of the States, although none are presently parties in the MDL, for the obvious reason that any settlement that does not account for the States' claims cannot work.  The governmental entities that do comprise the majority of actions in MDL No. 2804 are cities and counties, and a fair and efficient way to resolve their claims must also be found.  The Court directed that a truly inclusive settlement was a desired aim in its earliest conference, and a special committee of the Plaintiffs' Executive Committee, the Settlement Committee, was appointed in April 2018, charged with leading the negotiation efforts on behalf of all potentially affected plaintiff entities.  Other special committees have directed themselves to discovery, preparation for trial, and the numerous other requirements for pushing ahead with litigation of this import and daunting magnitude.  While no comprehensive settlement has yet been reached, serious discussions were initiated in early 2018 under the auspices of the MDL Court, have been actively supervised by Court-appointed Special Masters, and are ongoing on an intensive schedule.

The cities and counties have, in a series of conferences with the Settlement Committee and Special Masters, discussed the impact of the opioids epidemic on their communities, including the costs and challenges of battling the epidemic, and the financial and human strain on their law enforcement, health and welfare, and social services resources to provide emergency services, treatment, prevention, and family support.

- 3 -

In the customary sequence of settlement class certification, there would be no presentation to this Court and to the thousands of class members until some settlement had been worked out and was ready for potential approval.  Necessarily, this means that the class members would be presented with a class settlement that had already been formed and as to which they could only object or opt out.  What is being proposed here is a certification of a class *to aid* in the settlement process, rather than *to evaluate* an already concluded process.

It is not the size of the affected class that presents novel issues; the Rule 23 class mechanism is often used to review, approve, and effectuate settlements that concern large numbers of plaintiffs.[4]  Rather, the innovation is in the sequencing of Rule 23, one that is neither prohibited nor discouraged by any fair reading of the Rule itself.  It offers in this case an advantageous mechanism for allowing the affected cities and counties to negotiate credibly and effectively, as a group seeking a common resolution, with any national defendant who chooses to do so.  All involved recognize that these consolidated cases present one of, if not the, most complex MDLs ever prosecuted, with thousands of governmental entities pursuing claims relating to the daily and immediate health crises they face, against the dozens of Defendants they claim are responsible.  If the MDL is not resolved globally, it will consume thousands of hours of judicial time and millions of dollars of party resources over years of continued litigation.

Were this Court to be presented first with a settlement class under Rule 23(e) involving a pre-negotiated resolution, it would be required by Rule 23 and established case law to scrutinize searchingly the negotiations that led up to it.  In *Amchem Products, Inc. v. Windsor*, 521 U.S.

---

[4] The proposed Class itself is unusual, and possibly unique:  we are unaware of any other scenario implicating allegedly tortious activity at the national level that has impacted the resources of local governments so severely or given rise to so many federal or state claims by such governments for relief.

- 4 -

591 (1997), the Supreme Court held that such scrutiny is required in certifying a settlement class, to guarantee that all groups within the class have been fairly treated, vis-à-vis each other, and to ensure that one group has not taken advantage to the detriment of another on matters unrelated to the valuation of their respective claims.  *Amchem* requires "structural assurance[s]" of loyalty on the part of the class representatives to the class members as a means to avoid fatal intra-class conflicts, especially in situations where the harm suffered by the class is ongoing.  *Id.* at 627.

The *Amchem* requirements were articulated in response to the conventional scenario, in which courts (and class members) are presented with a class action settlement as a *fait accompli*. This means they must thus review class settlement negotiations retrospectively.  Class members, or their counsel, rely on the accounts of those involved, since settlement discussions are, as a matter of policy, confidential under Federal Rule of Evidence 408.  The larger class—the vast majority of class members who were completely "absent" from the negotiations—is only then given voice in the approval process, via three reactive choices:  1) stay in the class and accept, 2) stay in the class and object, or 3) exit the class by opting out.[5]  This typical sequence could be followed here.  However, months of experience with the intensive Opioids settlement negotiations to date, and due respect for the cities and counties as self-governing political subdivisions with day-to-day decision-making power and responsibilities to their own constituencies, suggest a mechanism better suited to the unique circumstances of this case: giving a class comprised of entities that are, in the daily course, decision-makers and services-

---

[5] *See* John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 377 (2000) (proposing the need to balance the requirements of exit, voice, and loyalty to protect class member interests); Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 341-42 (1999) (identifying that most class action reforms are focused on an exit, voice, and loyalty structure).

providers, an earlier and more active voice in the settlement process.

Accordingly, this motion requests the certification of a "Negotiation Class," comprised of all cities and counties in the United States (more formally defined below), represented by a diverse array of city and county plaintiffs who have been active in the litigation of these proceedings.  The Negotiation Class will be certified for the specific purpose of creating a unified body to enter into further negotiations with defendants.  It is not aimed at being the vehicle either for litigation, or simply for approval of a pre-done deal or settlement.  While the formation of a cohesive group that has already agreed on the internal allocation of its share of any comprehensive settlement, and has already agreed on the voting mechanism it will use to accept or reject its aggregate, is not a customary usage of the class mechanism, it must be recalled that Rule 23 does not speak of a "litigation class" or a "settlement class."  That distinction evolved gradually in practice.  The Rule addresses only the use of the class action when certain conditions are met under Rule 23(a), and then specifies the reasons for class treatment under Fed. R. Civ. P. Rule 23(b)(3).

Only recently has Rule 23(e) been amended from a terse requirement for judicial approval of settlements in class cases to a detailed set of procedures that recognize that some cases may settle as class actions, though they have not yet, and might never have been, certified as class actions for trial.  Although the procedure suggested in this motion is novel, as will be addressed, Movants seek no special quarter from the strictures of the Rule.[6]  The fact that the aim

---

[6] The settlement class itself started life as a judicial innovation, decades before the ultimate enshrinement of a robust body of jurisprudence and emerging best practices in the recent 2018 Amendments to Fed. R. Civ. P. 23(e) and its accompanying Advisory Committee Notes.  The evolution of this procedural common law is traceable through the presumption of suggested "best practices" in the class action settlement sections of the Second, Third, and Fourth iterations of

*Footnote continued on next page*

is the special purpose of negotiation rather than litigation should not detain this Court.  The aim of every settlement class is similarly limited, even if that procedure has by now become quite standard.[7]

There is one simple purpose for the Negotiation Class: to allow coordinated action by all the cities and counties in the settlement process.  The goal is to fashion settlements that extract the maximum amounts possible—in dollars and in changed practices—from the defendants, and that accomplish the fair allocation of settlement funds among the Class.

The cities and counties demand, and deserve, true agency in settlement discussions.  The certification of a Negotiation Class will provide notice and information to all of them on the essential structure and format of ongoing discussions, the decisions to be made, and activate their participation, through a supermajority voting procedure, to determine approval or rejection of any resulting classwide deal up front.  In other words, rather than having settlement negotiations and reaching a deal first, and then certifying a Rule 23(e) settlement class to approve it, the cities and counties in this case propose to certify a self-governing Negotiation Class first, and then to proceed with negotiations through this pre-existing class mechanism.

1.     The sequence of events proposed by this motion is as follows:

---

*Footnote continued from previous page*

the *Manual for Complex Litigation*, *see, e.g. Manual for Complex Litigation* (Fourth) §§ 21.6-21.635 (2004), long before these procedures were borrowed for and distilled in Rule 23 itself.

[7] For a sustained analysis of the permissibility of the negotiation class approach under traditional Rule 23 principles and case law, *see* Francis E. McGovern & William B. Rubenstein, *The Negotiation Class: A Cooperative Approach to Large Claim Class Actions* (June 13, 2019) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3403834.  This article likewise traces the history of the "settlement class" from judicial novelty in the early 1970s through acceptance at the Circuit level nationwide in the ensuing decades.  *Id.* at n. 120.  Innovation paved the way for widespread acceptance, as judicially-created criteria and standards evolved to define the process and safeguard its integrity.

a)     Certify and approve notice to the proposed Negotiation Class under Rule 23(a) and 23(b)(3);

b)     Notify the members of the Class of i) their right to participate in, or opt out of, the proposed Negotiation Class; ii) the proposed metrics for allocation between states and cities/counties, and among cities/counties; and iii) the supermajority voting procedure by which participating Class members will vote on any and all proposed settlements reached with defendants through direct notice (mail and email) with the Class lists, Allocation Lookup Tool and other pertinent and updated information posted on the Class website;

c)     Enter an order confirming the membership of the Negotiation Class under Rule 23(c) at the close of the notice and opt-out period;

d)     Negotiate any Class settlements with interested national Opioids defendants.[8]

e)     Approve or reject any resulting class settlements by supermajority vote.

f)     Bring settlements approved by a supermajority vote of the Class to the Court for formal approval under Rule 23(e).[9]

This sequence enables cities and counties to make the decision to stay in or to opt out of

---

[8] National Opioids defendants include the defendants named in underlying actions conducting nationwide opioids manufacturing, sales, or distribution.  These are the defendants, as demonstrated by the charts in the Predominance section below, who have with greatest frequency been repeatedly named in the cities' and counties' MDL 2084 complaints, including those filed by the proposed Class Representatives.  None of them are required to utilize this process.

[9] Outvoted Class members retain their Rule 23(e) rights to object during the formal approval process.  This right to object is likewise a feature of the voting mechanism prescribed in Section 3.18 of the *Principles of the Law of Aggregate Litigation* as a "safety valve" for plaintiffs who agreed in advance to a voting process but were unhappy with a resulting settlement.  The combination of the supermajority process upfront with the Rule 23(e) formal approval process builds in the same safety valve here.

- 8 -

the Negotiation Class up front, knowing 1) the allocation metrics and formula that will be used to calculate their share of each settlement; and 2) the way the supermajority voting process will work and how their votes will be weighed.

Those who stay in will therefore know that they will have voting rights with respect to any resulting settlement, and they will know how the votes are to be counted and weighted. They also know how any lump sum settlement reached under this class structure with defendants would be allocated as among the class members. They thus have the essential information to make their own decisions regarding their participation in the Negotiation Class, and they may begin the process of determining the intra-county level share between each county and its constituent incorporated places. The subsequent class negotiations enable all cities and counties to have a more active role in the settlement negotiation process than they could ever have separately. In this Class, they are neither passive beneficiaries nor absent members. They are active, voting participants.

The voting process and supermajority requirement proposed as the mechanism through which the Negotiation Class decides to accept or reject settlement offers is adopted from the aggregate settlement mechanism proposed by the American Law Institute's *Principles of the Law of Aggregate Litigation* § 3.17 (Am. Law Inst. 2010) [hereinafter "*ALI Principles*"] and the 75% voting approval requirement utilized in asbestos bankruptcy plans, codified as 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb); *see also In re Combustion Eng'g*, 391 F.3d 190 (3d Cir. 2004), *as amended* (Feb. 23, 2005). This supermajority voting mechanism has thus been proposed in the general aggregate litigation context, and enacted to provide statutory protection in the specific bankruptcy context, to add direct participation and choice features to solve mass claims problems like the one faced in the Opioids litigation: how to resolve thousands of claims and potential

claims in a single, inclusive, fair, and effective process that gives the claimants the optimal settlement amount and the Selling Defendants global peace.  It is especially applicable to sophisticated parties, such as the cities and counties whose actions are joined in this MDL.  As the *ALI Principles* note, approval of group settlements by voting rules are well-designed and have been approved for sophisticated clients.  *Id.*

The Negotiation Class has important benefits for the defendants as well.  Once the membership of the Negotiation Class is confirmed after the close of the opt-out period, it will be a known entity with a known scope and participation level.  Defendants will thus be able to predict, with certainty, that any settlement reached with the Class will bind a known percentage of cities and counties across the nation to those processes of any settlement that definitively releases the cities'/counties' claims.  Defendants will not need to renegotiate innumerable settlements *seriatim*, and they will not be negotiating with uncertainty as to the size of the group to be bound, or the power of the binding mechanism.  Negotiations will thus more closely resemble negotiations among sophisticated and independent decision makers, rather than a) the more usual class scenario in which class representatives labor to create the largest possible settlement without the parties knowing to what degree the class will actually participate; or b) an unworkable, impractical scenario with large numbers of cities and counties left out, and/or factionalized as competing groups vying for attention.  The Negotiation Class is pre-existing, pre-organized, and self-governing.

There is one additional feature that compels class treatment.  Any mechanism that offers certainty of resolution gives any settling defendant the prospect of "global peace," to which attaches a well understood "peace premium."  *See* D. Theodore Rave, *Closure Provisions in MDL Settlements,* 85 Fordham L. Rev. 2175, 2175 (2017) ("Closure has value in mass litigation.

Defendants often insist on it as a condition of settlement, and plaintiffs who can deliver it may be able to command a premium.").[10]  It is difficult to imagine any other feasible mechanism that could coordinate the needs of a class of more than 20,000 city and county entities.  These are, by definition, incorporated self-governing jurisdictions who cannot lightly yield their authority to handle problems on behalf of their citizens.  While it is true that the Negotiation Class alone cannot deliver true "global peace"—it does not seek to interfere with the rights and claims of the States, nor those of hospitals, tribes, third party payors and others who may have claims against the national opioid defendants, it does offer a way to get closer to such peace.  The Negotiation Class offers both coordination for the defendants and active participation for the Class, an outcome that merges the legitimate needs of all parties to this litigation with the specific nature of the class that is proposed.

## II.    WHAT THIS MOTION IS AND IS NOT

### A.    What This Motion Is Not

This is **not** a Rule 23(e) motion for settlement class certification.  No proposed settlements are before the Court.  This is **not** a Rule 23(b)(3) motion to certify a class for trial.  Such a motion may, or may not, ever be made by any plaintiff in this case should litigation, rather than resolution, prevail.  But this is not it.  Plaintiffs understand and assert that the certification of this Negotiation Class would not be precedent or support of any kind for the

---

[10] See Morgan A. McCollum, *Local Government Plaintiffs and the Opioid Multi-District Litigation*, N.Y.U. L. Rev., 6 (forthcoming Mar. 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3378794 (commenting that in the context of opioids litigation, "[g]lobal peace means that a settlement legally forecloses all, or close to all, current and future litigation against the defendant through claim preclusion…. Any settlement arising out of an MDL must therefore use creative measures to get parties that have *not* already sued, or have sued in state courts, into the settlement in order to prevent them from litigating in the future.").

certification of any litigation-purposes class, or for the certification of any claim or issue for trial or adjudication, and ask the Court to order that it be so limited.  Its certification would not impair the right of any party to seek or to oppose any other class certification for any other purpose in this or any other court.  Membership in the Class would not limit the ability of cities and counties to sue or settle on their own, nor limit the Defendants to settle with individual Class members or through other procedures, nor change, as set forth in Section C below, the existing relationships between the States and their political subdivisions.  It does not stop cities and counties from staying in the Class while proceeding with trials and keeping and collecting on their verdicts and settlements.  It would not preclude other categories of plaintiffs in this MDL such as tribes, third party payors, or hospitals, from organizing themselves on a class, group, or other basis to prosecute or settle their claims.[11]

In other words, this is a procedural option for potential settlements, without issue or claim preclusive impact on any other procedures that may be utilized, or upon substantive law.  Only if a class settlement is reached through the Negotiation Class vehicle, that is, only if a there is classwide settlement offer that gets supermajority approval from the Class itself, would the

---

[11] As reflected in the language of the accompanying (proposed) Order, the Motion does not seek to stay or impair any action or proceeding in any court, and Class members may retain their Class membership while proceeding with their own actions, including discovery, pretrial proceedings, and trials.  In the event a Class member reaches a settlement or trial verdict, it may proceed with its settlement/verdict in the usual course without hindrance by virtue of the existence of the Negotiation Class. Such Class Member may not, however, collect on its individual settlement/judgment and also participate in any settlement fund.  Specifically, the Certification of the Negotiation Class would not be cited as precedent or in support of the certification of any class for any other purpose in any Opioids-related or other litigation by or against any party thereto.  This order is without prejudice to any party's ability to oppose the certification of this or any other class for the prosecution of any Opioids-related or other claim, defense, issue or question.  This Order is without prejudice to the ability of any Class member to proceed with the prosecution, trial and settlement, in this or any court, of an individual claim, nor does it affect the ability of any defendant to assert any defense thereto.

normal Rule 23(e) mechanism for settlement approval and final orders by the Court be activated.

**B.** **What This Motion Is**

This is a motion to recognize and organize a class of similarly-situated cities and counties with a common interest in the best possible settlements, as soon as practicable, with one or more willing defendants.  Such settlements would serve as an alternative to the present reality of litigation, in these proceedings and elsewhere, by thousands of cities and counties to obtain redress for the opioids crisis they face.  The certification of a class now, whose membership will be known to Defendants, and whose rights and options will be known to the Class members themselves, should enable the more efficient and more certain negotiation of the best practicable settlements of cities' and counties' claims.  The Negotiation Class will unite the cities and counties vis-à-vis each other; acknowledge and formalize the community of interest that already exists among them; empower them as a formal group, to negotiate their best deal on a Class settlement amount; engage them sooner rather than later in the necessary local allocation process between counties and cities; and facilitate the subsequent court approval process of the Class portion of any settlement to which the Negotiation Class is a party.

Time is, and has always been, of the essence in this litigation.  Opioids casualties continue to rise, and the national life expectancy continues to fall.  A national emergency has been declared, and the emergency is felt in the rawest terms at every level.  Cities and counties across the country, as well as the States themselves, continue to devote outsized portions of their budgets to their daily efforts to stem this tide and to protect their citizens.  Declaring a state of emergency does not itself fund emergency services, and does not trigger the actions necessary to make a difference.  Extraordinary measures are called for.  This Court has devoted extraordinary effort to fostering and enabling serious settlement discussions, including the appointment of Special Masters, the use of special sessions, and expedited trial scheduling.  But this case is more

- 13 -

complicated, on every level, than any litigation its participants can recall.  The Negotiation Class

takes the mechanism authorized by the Federal Rules of Civil Procedure and applies it to the

unique needs and circumstances that exist in this litigation, to benefit the cities/counties plaintiffs

that are the most numerous litigants in MDL 2804.  The procedure proposed here is governed by

Rule 23.  Movants seek no special treatment or consideration.  This is a motion for class

certification under Rule 23, nothing more, nothing less.  The Negotiation Class meets all

applicable requirements of Rule 23, as this motion demonstrates, and plaintiffs and class

representatives respectfully urge its certification without delay.

C.    **This Motion Does Not Seek a Change in Existing Law**

It is axiomatic that a class certification motion is procedural.  Although the class

certification inquiry is informed by the underlying claims to determine, for example, if the class

members' claims raise significant common questions of fact or law, the motion does not decide

the merits of these claims, nor determine substantive law, nor does class treatment affect the

substantive rights of those interested in the action.  "Rule 23 grants Courts no license to engage

in free-ranging merits inquiries at the certification stage."  *Amgen v. Connecticut Retirement*

*Plans of Trust*, 568 US 455, 466 (2013); *accord*, *Wal-Mart Stores, Inc. v. Dukes*, 564 US 338,

351 n.6 (2011); Advisory Committee's 2003 Note Rule 23(c)(1), U.S.C. App., p. 144: "an

evaluation of the merits is not properly part of the certification decision."  District courts may not

"turn the class certification proceedings into a dress rehearsal for a trial on the merits."  *In re*

*Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013)

*cert. denied sub nom Whirlpool Corp. v. Glazer*, 134 S.Ct. 1277 (2014) citing *Messner v.*

*Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012).

Accordingly, while this motion seeks to organize the thousands of existing and potential

litigants who are political subdivisions of States into a negotiating entity with a predetermined

- 14 -

intra-class allocation system to decide whether any settlement offer made to it on a class wide basis is sufficient, this motion does not seek to alter the law in any State regarding the relationships and powers of the States and their subdivisions.  Nor does it seek to dictate, to any defendant or to any State, a mandatory settlement process or settlement structure.

### D.    The Relationship of the Negotiation Class to the Attorneys General

The Negotiation Class motion is not intended to challenge the sovereignty of the States, the prosecution of actions on behalf of the States by their Attorneys General (AGs), or to disrupt the political order within any States.  The Negotiation Class could participate in discussions, have the benefit of a pre-set and pre-known allocation of any fund going directly to the county level, and provide a voting mechanism that provides defendants a definitive, inclusive and binding release from the cities/ counties class.  The class representatives may also participate in any necessary negotiations to allocate portions of any overall settlement between states and political subdivisions.  It is highly likely that, given legitimately representative negotiators for all cities/counties, agreements of allocation can be more efficiently reached than would be achieved through a piecemeal or arbitrary approach.  This is a real epidemic that really threatens fiscal health of every level of government, and needs to be solved at every level, most fairly and efficiently with active and legitimate negotiators representing all levels in the context of seeking overall, inclusive and preclusive resolution.

### III.    THE NEGOTIATION CLASS DEFINITION AND BASIC FUNCTION

The Negotiation Class is proposed as a voluntary opt-out class under Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(3), and 23(c), to be comprised of:

> **all counties, parishes, and boroughs (collectively, "counties"); and all incorporated places, including without limitation cities, towns, villages, townships, and municipalities, as recognized by the United States Census Bureau (collectively, "cities") and as listed on the Opioids Negotiation Class website, www.opioidsnegotiationclass.com.**

Through the proposed Negotiation Class Notice, including the Settlement Allocation Lookup Tool posted on www.opioidsnegotiationclass.com, the Class members identified and listed on that website will be able to elect to participate in the Class (and to vote on future Class settlements), or to opt out.  In deciding whether to participate, all Class members will have knowledge of the portion of the cities and counties' aggregate share of each proposed settlement that would be allocated to each county (for subsequent local allocation among that county and its constituent cities) by utilizing the Settlement Allocation Lookup Tool on the settlement website.[12]

It is worth repeating:  this is not a litigation class.  Certification of the Negotiation Class will not be utilized to prosecute, litigate or try any claim, in this or any court, against any of the defendants named in the national opioid litigation.  It does not affect the prosecution of existing actions filed against opioids manufacturers, opioids distributors, or pharmacies by Class members.  It will not stop any individual cases brought by cities and counties from proceeding or settling.  It does not obligate any defendants to make a settlement offer to the Class.  It does not ask this Court to adjudicate or alter any relationships between or among cities, counties, and States.  All Class members will have the right to opt out of the proposed "Negotiation Class" after receiving a Court-approved Class Notice if and when the proposed class structure receives preliminary approval from this Court.

The purpose of certifying a Negotiation Class is to establish and maintain an identified, unified and durable nationwide body of cities and counties that can credibly claim to negotiate in

---

[12] The Lookup Tool utilizes a hypothetical $1 billion settlement amount and calculates allocation at the county level based on 100% participation.  The allocation could change depending on the number of opt-outs, and the Lookup Tool will be adjusted, as necessary, to reflect opt-outs and/or to utilize an actual settlement offer, rather than the current hypothetical amount.

the best interest of all the class governmental parties.  Although the proposed procedure is novel, the use of a coordinated litigation device to represent the common interests of cities and counties is not new.  For example, the National League of Cities has frequently represented the collective interests of its members in litigation, including in the Supreme Court.  *See Nat'l League of Cities v. Usery*, 426 U.S. 833 (1976), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985); *Nat'l League of Cities v. Brennan*, 419 U.S. 1321 (1974).[13]  The proposed Negotiation Class seeks to achieve the same benefits of collective representation of common interests in negotiating the best practicable resolution of the cities and counties' claims.

Under the proposed Negotiation Class, there will be a supermajority voting process that can approve a proposed settlement if more than 75% of voting class members approve the proposed settlement, based on 75% supermajorities of litigating and non-litigating counties and municipal bodies by number, by population, and by allocation.  See Section VII for a detailed description of how the six-way, supermajority voting process works to insure active participation and voice for all class members regardless of size, situation, litigation status and perspective.  It has long been recognized that a coordinated group is best able to secure better returns by offering the prospect of complete resolution of a dispute.  The aim here is to form a body vested with the

---

[13] In *National League of Cities*, a group of cities, states and intergovernmental organizations successfully challenged the validity of certain 1974 amendments to the Fair Labor Standards Act, which had expanded the act to include state and local governments, as well as private employers. The National League of Cities, on behalf of its constituent members, was the lead plaintiff/appellant.  It was not necessary to reach organizational standing in that case.  426 U.S. at 866, n.7.  Here, the class representatives are cities and counties, and hence members of the defined class they represent; they have direct standing to take the actions that the National League takes on a less formal basis, and to do so for monetary settlements as well as injunctive relief.

power to negotiate on behalf of all class members, subject to concurrent supermajority voting requirements for any settlement subsequently proposed to it.

The proposal presented here is premised on the distribution of voting power under Section 524(g) of the Bankruptcy Code.  11 U.S.C.A. § 524(g).  That provision allows, in the bankruptcy context, for the organization of asbestos claimants into a voting collective that enables a 75% supermajority to approve a bankruptcy workout of asbestos claims, subject to approval by a Bankruptcy Court.  Whereas bankruptcy courts have only limited powers on the core disputes before them, *Stern v. Marshall*, 564 U.S. 462, 468-69 (2011), district courts hold the full power of Article III.  It would be bizarre to leave the powers to prepackage a voting resolution of a complicated dispute in the hands of an Article I tribunal, but not the Article III tribunal necessary for expanded bankruptcy workouts beyond the core dispute.  Were the first resolution of the opioids crisis to come through a bankruptcy process, such a voting process would be second nature.  The proposal uses this well-established mechanism under the supervision of this Court directly.

Any successful settlement resolution could generate funds that would be utilized at both the State level and the level of city and county political subdivisions.  Inevitably, any settlement fund will present issues as to the appropriate allocation of the funds available for remediation and prevention.  Because not only States, but also cities and counties, have filed suits and are active litigants, defendants need a comprehensive release from all litigants and potential litigants.  Given the sheer number of municipal and county entities in the United States, one-by-one approval of a comprehensive resolution including allocation among the settling parties is likely impossible as a logistical matter.  A cohesive negotiating group of cities and counties can facilitate overall resolution because it is able to offer the prospect of global peace which typically

- 18 -

results in what is termed a "peace premium" in mass harm litigation.  A collective negotiation

may also be helpful in designing an allocation system to determine the States' and cities and

counties' relative aggregate shares, in the absence of the preferred alternative of prior agreement.

The critique of class actions is that they engage the class remotely, late in the process,

and after the fact.  A passive class is presented with a take-it-or-leave deal.  To fill the

participation gap, courts have increasingly subjected class settlements to lengthened scrutiny,

functioning, in perceived necessity, as fiduciaries and guardians of passive beneficiaries.  The

2018 amendment to Rule 23(e) frontloads this protective process, requiring more, and more

specific, information from settlement proponents than ever before, to better evaluate a proposed

settlement for flaws or deficiencies before notice is sent to the Class.  Fed. R. Civ.

P. 23(e)(1)(A)-(B); Rule 23(e)(2)(A)-(D).  This motion frontloads that information to the Class

itself, before any deal is done in its name.  The Negotiation Class process, expressly designed for

the unique circumstances of this Class in this case, assures the Court—and settling defendants—

that a class settlement submitted for Rule 23(e) approval will be exited by a class consigned to

vote with its feet.  This selection assures preapproval by the Class itself.

## IV.      THE NEGOTIATION CLASS REPRESENTATIVES

The following proposed Negotiation Class Representatives are U.S. cities and counties

who are plaintiffs in actions now part of the MDL No. 2804 proceedings.  The complaints in

their underlying actions allege predominately common facts about the conduct of defendants in

creating and sustaining the opioid epidemic and public health crisis nationwide, as well as the

local impact of the tragedy, and the resulting harm to each plaintiff in battling it.  Their

complaints likewise assert similar claims that raise common legal questions—the issues that have

been, and continue to be, the focus of discovery and pretrial proceedings in the MDL.

**The County of Albany, New York**.  Albany County is home to New York's capital city,

Albany, which is its population center and the sixth most populous city in the state.  The county

includes 39 legislators and is led by County Executive Daniel P. McCoy.  In 2017, McCoy

convened a 19-member county-wide Opioid Taskforce to address skyrocketing overdose death.

He created the nationally recognized Project Orange, a partnership with local pharmacies to take

back unused prescription drugs.  With the Capital in such close proximity, McCoy has been able

to lobby for important reforms on the state level to address the opioid epidemic as well as secure

state grants for things like the expansion of Medication Assisted Treatment.  McCoy hosts a

NARCAN training each month with free kits to take home and ensured the County Department

of Probation staff is trained on using the antidote for emergency situations with clients.  Albany

County was one of the first counties of New York to join the federal lawsuit against national

opioid manufacturers, having filed in January 2018.  As the President of the County Executives

of America and Co-Chair of its Opioid Task Force, McCoy has played an important role not only

in the lawsuit itself, but also working with other county executives to get involved and pursue

their own policy initiatives in their home states.

      **City of Atlanta, Georgia**.  It is the most populous City in Georgia and is the home to

over 490,000 people.  In Atlanta in 2015, there were 141 heroin-related emergency department

admissions.  Due to its location, Atlanta has been referred to a "heroin distribution hub", placing

an enormous burden on the government, law enforcement, and the community.  Atlanta spends

millions of dollars each year to provide and pay for health care, services, pharmaceutical care

and other necessary services and programs on behalf of residents of its City whom are indigent

or otherwise eligible for services, including payments through services such as Medicaid for

prescription opium painkillers ("opioids") which are manufactured, marketed, promoted, sold,

and/or distributed by the Defendants.  Residents of Atlanta continue to die from the use of opioid

pain medications at an alarming rate.  The rate of overdose deaths in Fulton County has continued to climb since 2004.  Over the past ten years, the City has also seen a dramatic rise in the distribution of naloxone and buprenorphine, drugs used to treat opioid overdoses and addiction.  The largest hospital in the State of Georgia is Grady Hospital, a public hospital located in Atlanta.  Grady Hospital has seen a significant rise in opioid related emergency room visits and admissions.  Grady Hospital has also seen a dramatic uptick in the administration of Narcan, as well as babies born with Neonatal Abstinence Syndrome.  Opioids have become the most serious drug problem for the Atlanta Law Enforcement.  The commission of criminal acts to obtain opioids is an inevitable consequence of opioid addiction.  In sum, Atlanta has experienced economic costs directly related to the opioid epidemic, including Medicaid costs, law enforcement, judicial, foster care, Narcan costs, loss of productivity, and various other costs directly caused by the actions of the defendants.

**Bergen County, New Jersey** is the most populous county in New Jersey with nearly one million residents.  The County has been hard-hit by the opioid epidemic and has expended substantial time and resources to combat its effects—from emergency services to the courts, to care facilities and clinics, to prisons, and to the police department.  The County, a leader in the State of New Jersey in terms of treatment and prevention programs, including:  detox and short term rehabilitation beds at New Hope Detox, the Bergen County Addiction Recovery Program, half-way housing at the Spring House Halfway House for Women and the Ladder Project, Office of Alcohol and Drug Dependency Services, the Bergen Equestrian Center, the Thrive Programs at Bergen New Bridge Medical Center, Epic Programs at Children's Aid and Facility Services, regular Narcan training, and the ARCH Program which provides intravenous drug use risk reduction counseling, overdose prevention counseling, and drug treatment assessment.  The

County filed suit against opioid manufacturers and distributors in May 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of Chosen Freeholders, which consists of seven elected members. James J. Tedesco serves as the County Executive.

**Broward County, Florida** serves as a bellwether for purposes of motions to dismiss briefing in the MDL.  Broward's population is over 1.9 million; the opioid epidemic claimed 582 lives in Broward County (the 9th highest opioid overdose death rate in the country) in 2016.  The number of Broward County lives lost due to drug overdoses in 2016 was more than double the amount in 2014, and up to 260 deaths from 2015.  The County Attorney is Andrew Meyers, and Assistant County Attorney Danielle French has been actively engaged in the litigation.

**Camden County, New Jersey** has been hard-hit by the opioid epidemic, and has expended substantial time and resources to combat its effects—from emergency services, to the courts, to care facilities and clinics, to prisons, and to the police department.  In 2014, the Freeholder Board created the Camden County Addiction Awareness Task Force comprised of educational leaders, law enforcement, public health professionals, healthcare institutions, religious affiliates and non-profit entities.  The Camden County Addiction Awareness Task Force has received both regional and national attention for its work in addressing this on-going public health crisis.  Focused on prevention and treatment, Camden County has placed a licensed drug and alcohol counselor in every municipal courtroom.  The County filed suit against opioid manufacturers and distributors in February 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of Chosen Freeholders, which consists of seven elected members.  Louis Cappelli, Jr. serves as Freeholder Director.

**Cass County, North Dakota** has a population of less than 180,000, yet had 31 deaths related to opioid overdose in 2016.  All Cass County high schools and middle schools are now carrying Narcan as a result of the problem.  The County has been proactive in seeking to abate the epidemic.  Since 2017, the City of Grand Forks (which lies within Cass County) has distributed more than 275 Naloxone kits, trained more than 520 community members on overdose recognition and distributed 2000 treatment and prevention guides.  Birch Burdick serves as Cass County's State's Attorney and Tracy Peters, as Cass County Assistant State's Attorney.  Both have been actively involved in the litigation.

**City of Chicago, Illinois** was incorporated in 1837, and hosts a population of approximately 2.7 million residents, the third-largest city in the United States.  Chicago's government is comprised of an elected mayor, Lori Lightfoot, a 50-member City Council composed of aldermen and alderwomen from the City's 50 wards, and numerous other elected officials and more than 30 other departments and agencies, including Chicago's Department of Public Health.  Chicago is the most populous city in Illinois, and is located within Cook County, the most populous county in Illinois and home of the largest consolidated court system in the United States.  Chicago has been ravaged by the opioid crisis, and experienced increased overdose deaths from prescription opioids, heroin, fentanyl, and other synthetic opioids, with overdose deaths approaching 750-1000 per year on Chicago's streets at the height of the opioids crisis.  Chicago is a leader in Opioids litigation.  In 2014, Chicago initiated the first opioid lawsuit filed by a city in the United States, which is now among the many subsequent lawsuits moving forward today in the MDL against opioid manufacturers and distributors.  In 2016, in light of the growing heroin epidemic nationwide, Chicago helped launch the Chicago-Cook County Task Force on Heroin, and in 2017 Chicago's Department of Public Health participated

in the launch of Illinois's Opioid Crisis Response Council, a statewide effort to staunch the flow of opioids throughout Illinois communities.  Beginning in 2014-15, Chicago launched its prescription disposal program for the disposal of unused opioids and other prescription drugs, and advocated for changes in its health care and prescription drug benefits programs to encourage adoption of new CDC guidelines for opioids treatment and abuse that were issued in 2016.  Chicago operates numerous substance use/addiction treatment programs related to prescription opioids throughout the city, and ensures treatment is available in Chicago for all types of opioid addiction, including treatment modalities such as Medication for Addiction Treatment (MAT) and other treatments in various outpatient, inpatient, residential, recovery homes, and detoxification settings.  Chicago initiated and supports naloxone training and distribution for the City's emergency personnel and first-responders, with naloxone overdose treatment now available in all Chicago Police and Fire Department emergency vehicles. Chicago's opioids litigation is managed by lawyers in its internal Law Department, headed by newly appointed Corporation Counsel Mark Flessner.

**Cobb County, Georgia** is Georgia's third most-populous county, with a population of approximately 700,000.  Few areas have been hit as hard by the opioid epidemic as Cobb County. Indeed, Cobb County had some of the highest opioid overdose deaths in Georgia with 121 deaths in 2017 and is one of three Georgia counties dubbed the "Heroin Triangle."  The opioid problem is so severe in Cobb County that it was featured in the A&E Network docuseries "Intervention." The Epidemic has hit every aspect of the community and County government including law enforcement, drug courts, family services, emergency services.  To help fight this crisis, Cobb County has partnered with "The Zone," a non-profit corporation and Recovery Community Organization that mobilizes resources within and outside of the community to help recovery and

rehabilitation efforts. The opioid epidemic is also of the utmost importance to Cobb County's leadership. One of the County Commissioners, who is at the forefront of the community in addressing this epidemic, was recently recognized by an invitation to the White House conference on "Best Practices in Combatting the Opioid Epidemic: A Conference with State and Local Leaders" hosted by the Office of Intergovernmental Affairs. The County filed suit against opioid manufacturers and distributors in June of 2018. The County is managed by the Board of Commissioners, and Mike Boyce is the Chairperson. Commissioner Bob Ott has taken an active role in combatting the epidemic in the County and in the litigation.

**City of Concord, New Hampshire**. Concord is a city of approximately 43,000 people. It is among the hardest-hit cities in New Hampshire with respect to its drug overdose death rate which is estimated at between 11 and 25 deaths in 2018. An estimated one-third of Concord Police Department's Drug Enforcement Unit's investigations involve opioids. Merrimack County, where Concord sits, is among the counties in NH with the highest number of emergency room admissions due to opioid use. In 2017, emergency room visits due to opioid use by Merrimack County residents were 65.55 visits per 10,000 people, an increase of more than 73% over 2016. Concord, through its City Attorney, James Kennedy, has played an active role in the litigation.

**Cumberland County, Maine**. Cumberland County has a population of over 280,000 residents. In 2016, Cumberland County accounted for 78 of the 376 overdose deaths, a total of 21% of all overdose deaths. In 2014, Cumberland County had the highest rate of drug overdose responses per 10,000 residents.

**Cuyahoga County, Ohio**. Cuyahoga County is one of the trial bellwethers in the multi-district litigation, set for trial on October 21, 2019. With an estimated population of more than

- 25 -

1.2 million, it is the second most populous county in Ohio.  Its county seat is Cleveland.

Cuyahoga County has been dramatically impacted by the opioid epidemic, and drug overdose is

now the leading cause of accidental death.  In 2015, one person died every day in Cuyahoga

County from a drug overdose.  During January and February of 2016, one person died every day

in Cuyahoga County from a heroin or fentanyl overdose.  Specifically, January was a record for

fentanyl deaths, broken again in February.  Thereafter, in March of 2016, two people died every

day in Cuyahoga County from a heroin or fentanyl overdose.  From 2006 until 2016, over 1,000

people died in Cuyahoga County from opioid overdoses.  In the year 2016, there were 666 drug

overdose deaths reported by the Cuyahoga County Medical Examiner's Office.  There were 727

drug overdoses in 2017.  In 2017, the emergency rooms treated an estimated 9,191 patients

presenting with drug related injuries, a 21% increase compared to 2016.  The number of deaths

linked to prescription drug abuse increased almost 500% from 1999 to 2013.  Moreover, heroin

mortality rose significantly from 40 deaths associated with heroin in 2007 to 161 in 2012, and

approximately 75% of the people who were dying of heroin overdoses had a previous

prescription for opiates.  In other words, within two years of death almost 3 to 4 heroin fatalities

received a legal prescription for a controlled substance.  The crippling effect of this public health

emergency is felt proportionally across all facets of Cuyahoga County's government.

**The City of Delray Beach, Florida**.  Delray Beach in southern Florida, has a population

of approximately 69,000 people.  Of the 33,000 people who died nationwide of opioid overdoses

in 2015, approximately 12% were Floridians.  Delray Beach has been at the center of the opioid

epidemic for many years.  It lies within Palm Beach County and has been dubbed the "pill mill

capital of the U.S.", with South Florida having reportedly lost an estimated 900 lives in 2016

alone.  Delray Beach spends millions of dollars each year providing a wide range of opioid- and

addiction-related services for its residents and visitors.  The City has seen an unprecedented growth in the drug addiction treatment industry, i.e., sober homes, contributing to an influx of addicted populations into the city from across the country.  The City Attorney, Lynn Gelin, has been actively involved in the litigation.

**Denver, Colorado** is a consolidated City-County.  Denver's government represents over 700,000 residents and is comprised of an elected mayor, thirteen-member city council, auditor and numerous other departments and agencies.  Denver County has the largest population in the state.  It has taken an active role in the Opioid Litigation, helping initiate a litigation effort among approximately 20 cities and counties in Colorado that have likewise filed suit in the MDL.  Denver strives to meet the needs the opioid crisis imposes on its community through substance treatment programs like Denver Health's Comprehensive Addictions Rehabilitation and Evaluation Services (CARES) and through the Mayor's Office's $3.1 million Opioid and Substance Misuse Strategic Action Plan.  The Plan is the result of a collaborative effort among more than 100 government agencies and community organizations to address the opioid crisis in Denver.  Denver has helped form the Collective Impact Group to coordinate the cross-disciplinary efforts underway to address the opioid epidemic.  The Collective Impact group is a collaborative of law enforcement agencies, behavioral health, public health, and community organizations to help guide Denver's approach to tackling this crisis.  Denver regularly works with other Coloradan jurisdictions to address opioid-related issues.  The City and County of Denver's case is managed by Renee' A. Goble, Assistant City Attorney for the City and County of Denver, Municipal Operations Section.

**East Baton Rouge Parish / City of Baton Rouge, Louisiana** - East Baton Rouge Parish is the most populous parish in Louisiana with over 440,000 residents and the City of Baton

- 27 -

Rouge is the state's capital and its second-largest city.  East Baton Rouge Parish and the City of Baton Rouge share a consolidated government.  The City-Parish has been devastated by the impact of the opioid crisis.  Drug overdose deaths increased 218 percent from 28 in 2012 to 89 deaths in 2016, with opioids present in the vast majority.  According to the East Baton Rouge coroner, overdoses killed more people than homicides in 2016.  In 2017, there were 111 drug-related deaths in the Parish and paramedics administered over 800 doses of naloxone, a 40 percent increase from 2016.  Deaths due to heroin also spiked in the last several years.  Based on data from the Centers for Disease Control and Prevention, for nine consecutive years, from 2006-2014, opioid prescriptions ranged from over 103 to almost 131 prescriptions per 100 persons in Baton Rouge.  That is more than one opioid prescription for every man, woman and child.  In the past 3 years those numbers still hovered at over 9 opioid prescriptions for every 10 residents of East Baton Rouge Parish in 2015 and 2016 and over 8 prescriptions for every 10 residents in 2017.  The City-Parish has a needle exchange program and has provided funding for addiction treatment programs and drug abuse prevention and education programs.  The City-Parish filed its complaint on January 23, 2018 and is committed to holding the companies responsible for the epidemic accountable.  The City-Parish is governed by its Metropolitan Council and Mayor-President Sharon Weston Broome.

**Escambia County, Florida** is a county in the Florida Panhandle that is home to the city of Pensacola and a population of approximately 300,000.  Escambia County has been especially hard hit by the Opioid Crisis.  In 2014 over 670 patients were hospitalized as a result of opioid poisoning and in just the first six months of 2018 emergency medical services administered 286 doses of naloxone to 176 opioid-related overdose victims.  These statistics are not surprising seeing as opioid prescriptions poured into Escambia County at an alarming rate of 149.2

prescriptions per 100 people in 2010, and continue to be over 110 per 100 people through 2016. Escambia County has incurred substantial costs by responding to the Opioid Crisis and has expended significant resources on emergency response personnel, law enforcement, court services, and addiction related treatment.  Escambia County filed their complaint in May of 2018 and has been active in the litigation since that date.

**Essex County, NJ** — Essex County, with a population of approximately 800,000 people, is, in fact, the most diverse county in the United States in terms of household income (i.e. has the highest Household Income Diversity Index score of any US county).  Newark, the poorest city in the county, has a median household income of $33,025 and a per capita income of $17,198, whereas Essex Fells, the fourth wealthiest municipality in the State of New Jersey, has a median household income of $174,432 and a per capita income of $89,316.  The County has been hard-hit by the Opioid Epidemic with opioid-related deaths dramatically climbing year-over-year— from 59 in 2012 to 213 in 2017.  In January 2018, DEA New Jersey Division Special Agent in Charge Valerie A. Nickerson announced that "New Jersey is facing a heroin and prescription opioid abuse epidemic like we have never seen before, and Essex County has been leading the state in overdose deaths for the past two years."  The County has expended substantial time and resources to combat the Opioid Epidemic—from emergency services, to the courts, to care facilities and clinics, to prisons, and to the police department.  The County filed suit against opioid manufacturers and distributors in August 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of Chosen Freeholders.  Joseph N. DiVincenzo, Jr. serves as County Executive.

**County of Fannin, Georgia.**  Fannin County, with a population of approximately 25,000 people, is a rural county in the north central of Georgia, bordering North Carolina and

Tennessee, which has been particularly hard hit by the opioid epidemic.  Fannin County's 2017 prescribing rate was 128.5 prescriptions per 100 persons, it had 1721.67 MME per capita in 2015, there were 5 opioid-related deaths in 2016, and 11 people sought medical treatment related to opioids in 2016.  There were also 28 overdose reversals in 2016, with an overdose reversal rate 130.8.

**Franklin County, Ohio** is Ohio's most populous county with approximately 1.2 million citizens.  The Franklin County seat is Columbus, which is the state capital and the most populous city in Ohio.  The County has been hard-hit by the opioid epidemic.  The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and has identified Franklin County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average.  Franklin County has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, and placing thousands of children in foster care placements, among others.  Franklin County filed its initial Complaint on January 20, 2018 and is committed to holding the companies responsible for the epidemic accountable.  The County is managed by the Franklin County Commission which consists of three elected Commissioners.  Marilyn Brown serves as the President of the County Commission.

**Galveston County Texas**.  Galveston County has a population of 335,036 and is located along the Texas Gulf coast.  The county lives largely below the poverty line with per capita annual income at $21,568.  The county, though coastal, has large rural segments and is heavily impacted by the epidemic.  In 2016, the county suffered 125 overdose deaths, with a drug

overdose mortality rate of 14.  Galveston County, along with its Brazos Valley partners, formed an Opioid Task Force to study and combat the epidemic.  The Opioid Task Force offers training to police, medical professionals, and members of the treatment/recovery community.  The Brazos Valley Council of Governments, of which Galveston County is a leading member, has determined that opioid abuse and fatality is a top priority for the law enforcement and treatment communities. Galveston county is home to the University of Texas Medical Branch—Galveston, a leading researcher of opioid abuse in Texas.  The combination of coastal and rural makes Galveston County an ideal representative for the enormous swath of territory along the Texas Gulf Coast.

**County of Gooding, Idaho**.  Gooding County has a population of over 15,000.  In 2017, Idaho providers wrote 70.3 opioid prescriptions for every 100 persons, which is higher than the national average of 58.7 opioid prescriptions.  In 2016, an Idahoan died every 34 hours from drug overdose, and Gooding was not immune.

**The City of Grand Forks**, North Dakota, is North Dakota's third largest city, with a population of more than 55,000 people.  Grand Forks has experienced a recent spike in costs associated with addressing the opioid epidemic.  For example, the Grand Forks Fire Department and the local Altru EMS administered more than three times as much Naloxone in 2017 than they did in 2010, reaching a new high.  From August 2017 through March 2019, the City of Grand Forks distributed more than 275 Naloxone kits, trained more than 520 community members on overdose recognition, and distributed almost 2,000 prevention and treatment guides throughout the city.  The city through its City Attorney, Howard Swanson, has been actively involved in the litigation.

**County of Hennepin, Minnesota.**  Hennepin County is Minnesota's most populous

county with over 1.2 million residents—comprising approximately 20 percent of the state population.  Hennepin County includes the City of Minneapolis and its suburbs, at the center of the Twin Cities metropolitan area.  The County provides a wide range of services to its residents, ranging from social services to law enforcement to healthcare services and more.  Hennepin County has incurred substantial expenses as part of its response to the opioid crisis, including toxicology costs for the medical examiner; out-of-home placement for children as a result of parental drug use; opioid addiction treatment services provided to residents, clients, and inmates; naloxone distribution to law enforcement, public health staff, and the public; increased staffing to serve probation clients with opioid use disorder, to perform autopsies on opioid-related fatalities, and to prosecute opioid-related homicides.  In particular, the County's communities of color have experienced a disproportionate number of opioid-involved deaths.  The Hennepin County Board includes seven elected commissioners, and the County is managed by a county administrator.  Hennepin County filed its initial complaint in January 2018, through its elected County Attorney, Michael Freeman, and its outside counsel.

**City of Indianapolis, Indiana**.  Indianapolis is Indiana's capital city, with a population of approximately 820,445, making it the 12th largest city in the United States.  By an act of the Indiana General Assembly, Indianapolis consolidated with the government of Marion County in 1970.  Indianapolis and Marion County have been seriously impacted by the opioid crisis with 101 opioid prescriptions for every 100 persons in the county.  The Indianapolis area led the State of Indiana with the highest numbers of deaths due to drug overdose and non-fatal emergency department visits.  Marion County leads the country in pharmacy robberies.  Indiana has the fifth highest rate of diversion in the country.

**County of Jefferson, Alabama**.  Jefferson is the most populous County in Alabama at

approximately 659,300.  The County also suffered the largest number of opioid related deaths in Alabama at 162.  In 2017, there were 98 fatal heroin overdoses and 100 in 2016.  Additionally, in 2017, there were 105 fatal fentanyl overdoses and 104 in 2016.  Jefferson has the highest drug overdose rate of any county in Alabama.  Between 2010 and 2016, the number of drug overdose deaths increased by 173% in Jefferson County.  Between October of 2016 and September of 2017, 185 Jefferson County children were admitted into the foster care system due to parental drug abuse.

**Jefferson County / City of Louisville, Kentucky** share a consolidated government and is the most populous county in the state with over 770,000 citizens.  Like all areas of Kentucky, Jefferson County has been heavily impacted by the Opioid Epidemic.  The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and has identified Jefferson County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average.  Illustrative of Louisville's struggles with dealing with the opiate crisis was the 32 hour period in February of 2017 where emergency crews responded to over 50 overdose calls.  In 2017, over 350 individuals from Jefferson County died from a drug related overdose, a rate of 45.6 people per 100,000 residents. Jefferson County has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, and placing thousands of children in foster care placements, among others.

**Jersey City, New Jersey** is the second most populous city in New Jersey with more than 260,000 residents.  The City has been hard-hit by the opioid epidemic.  In response to the opioid

crisis, Jersey City has been compelled to spend increasing amounts of money and resources to combat its effects for several years, impacting virtually every branch of the city.  These efforts impose substantial costs on Jersey City, including substantial expenditures annually on overdose-reversing naloxone, Suboxone and buprenorphine support, mental health services related to addiction, drug court, treatment, recovery programs, therapy and counseling, and medical costs. Jersey City has also integrated overdose prevention education into schools, youth programs, and other public settings.  Despite these efforts, Jersey City's number of fatal overdoses continues its climb.  The County filed suit against opioid manufacturers and distributors in June 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The City Council in Jersey City consists of nine elected members.  Steven M. Fulop is the Mayor of Jersey City.

**Kanawha County, West Virginia** is West Virginia's most populous county with over 183,000 citizens.  The Kanawha County seat is Charleston, which is the state capital.  The County has been hard-hit by the opioid epidemic.  According to the National Center for Health Statistics, the drug poisoning rate in Kanawha County has consistently exceeded the national average.  The Centers for Disease Control and Prevention has tracked opioid prescription rates per county in the United States, and has identified Kanawha County as a consistent hotspot for levels of opioid prescriptions for over the past decade with prescribing rates exceeding the national average.  The DEA has disclosed to the West Virginia Attorney General certain data from the ARCOS database relating to the sale of hydrocodone doses to retailers in West Virginia between 2007 and 2012.  This data became public knowledge in an article published by the Charleston Gazette-Mail which revealed that distributors sold some 66 million doses of prescription opioids to retailers in Kanawha County during that time period.  Kanawha County

has incurred significant costs responding to the opioid crisis, including the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarcerations, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.  Kanawha County filed its initial Complaint on March 9, 2017 and is committed to holding the companies responsible for the epidemic accountable.  The County is managed by the Kanawha County Commission which consists of three elected Commissioners. Kent Carper serves as the Commission President.

**King County, Washington** is the largest county in Washington State, with an estimated population of over 2.2 million residents.  The County has been hard hit by the opioid epidemic, with heroin and opioid use at crisis levels, and a large, addicted homeless population.  The County has been a national leader in efforts to address and combat the epidemic, and has devoted substantial resources administering opioid-related programs and efforts since the mid 2000's.  In 2016, King County convened the Heroin and Prescription Opiate Addiction Task Force that includes experts from multiple disciplines who came together to develop both short and long-term strategies to prevent abuse and addiction, prevent overdose, and improve access to different types of treatment for opioid addiction.  The County filed suit against opioid manufacturers and distributors in January 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Metropolitan King County Council, which consists of nine members elected by district.  Dow Constantine is the elected County Executive.

**The City of Lakewood, Ohio**.  Lakewood is an inner-ring suburb of Cleveland, Ohio and the Third largest city in Cuyahoga County, Ohio.  Lakewood has the highest incidence of opioid overdose in the State of Ohio.  The population of Lakewood is over 50,000, but its

population density is the highest in the State of Ohio, and is roughly comparable to that of Washington, D.C. Lakewood police responses to fentanyl use increased from 198 in 2013 to 517 in 2016.  The City of Lakewood is representative of small suburban municipalities throughout the country.

**The City of Los Angeles, California** is the most populous city in California and the second most populous city in the United States, with a population of approximately 4 million people.  Los Angeles experienced a significant increase in prescription opioid overdose-related hospitalizations and drug treatment and emergency room visits between 2005 and 2015, including neonatal abstinence syndrome-related hospitalizations.  Los Angeles also experienced a steady increase in overdose deaths from 2010 to 2014.  Los Angeles, through its City Attorney Mike Feuer and Managing Assistant City Attorney Michael Bostrom has played an active role in the litigation.

**City of Lowell, Massachusetts**.  The injuries of Lowell reached a point where EMS services reported 2,240 opioid-related incidents from the first quarter of 2016 through the first quarter of 2018.  Additionally, there have been 282 opioid-related deaths in Lowell in 2016 and 2017. Indeed, the rate of opioid overdose deaths in Lowell in 2015 was 43.3 per 100,000 (the national average in 2016 was 13.3 deaths per 100,000).  This in a county, Middlesex, where nearly 5,000,000 solid dosage units of Schedule II opioids were prescribed in the second quarter of 2018 alone and opioid-related overdose deaths climbed sharply from 118 opioid-related deaths in 2006 to 414 such deaths in 2016.  In fact, in a 12-hour span from March 21-March 22, 2018, first responders reported four fatal overdoses in Lowell.

**City of Manchester, New Hampshire**.  The City of Manchester is the largest city in the State of New Hampshire with approximately 112,000 residents.  It is one of the largest

employers in New Hampshire, employing around 1,220 people.  In 2015, there were 726 total suspected overdose calls for services made by the Manchester Fire Department.  This included 589 patients treated with Narcan.  In the second half of 2015 alone, public services collection services collected 264 discarded needles.

**Maricopa County, Arizona's** governing body is its Board of Supervisors, which consists of five members chosen by popular vote within their own districts.  With approximately 4.4 million residents, Maricopa County is the most populous of the 15 counties in Arizona, and the fourth most populous county in the entire country, larger than approximately half the U.S. states.  Over 61% of Arizona's population resides in Maricopa County.  Given the size and breath of the County, it regularly works with the State of Arizona and other jurisdictions to address opioid issues.  Maricopa County's efforts to address the opioid crisis are wide-ranging, including but not limited to implementing 18 drug take-back sites, expanding overdose treatment, training related to fentanyl and carfentanil handling, and responding to health and law enforcement burdens associated with addressing black tar heroin.  Maricopa County's case is managed by Thomas P. Liddy, Chief, Civil Services Division, Maricopa County Attorney's Office.

**Mecklenburg County, North Carolina** is the most populous county in North Carolina, with a population of over 1 million.  As a practical and financial matter, the County has been saddled with an enormous economic burden.  Nearly every department in the County is affected by the opioid crisis caused by Defendants in some manner, including the County's Emergency Management Services, and Criminal Justice Services.  In 2017 alone, Mecklenburg County had 173 opioid overdose deaths.  Between 2012 and 2017, there was a 127% increase in ER visits due to opioids.  The County has held summits for several years, where former drug addicts,

doctors, and counselors come together to discover and develop solutions and has participated in efforts to find a solution to the Epidemic on a state and national level.  The County filed suit against opioid manufacturers and distributors in February of 2018 and is committed to holding the companies' responsible for the epidemic accountable.  The County is managed by the Board of County Commissioners, Dena Diorio is the County Manager and County Counsel, Tyrone Wade has been managing the litigation.

**The Metropolitan Government of Nashville and Davidson County, Tennessee** ("**Nashville**") is a consolidated city-county government and it is the state capital.  Its population is 700,000 (MSA 1.9 million) and its annual budget is $2.3 billion.  Nashville is governed by Mayor David Briley and a forty-member Council.  Nashville is a statewide leader in various efforts to combat the opioids catastrophe, including organizing regional opioid-related educational events bringing together government officials and public health communities, hosting public outreach and education events, hiring a dedicated Opioids Response Coordinator, implementing a syringe exchange program, and designing a real-time opioids overdose tracking program and Mass Overdose Event Emergency Response Plan.  Nashville's opioids litigation is managed by Director of Law Jon Cooper, in consultation with Mayor Briley.

**Milwaukee County, Wisconsin** is the most populous county in Wisconsin with almost 600,000 residents and has more deaths due to opioids than anywhere else in the State.  Opioid-related deaths more than doubled from 144 in 2012 to 336 in 2017.  These deaths illustrate just a small part of the devastating effect the opioid crisis has had in Milwaukee:  in 2017 it was estimated for every death there were approximately five more people who overdosed, were treated with naloxone and survived.  In 2016, the rate of opioid overdose deaths in Milwaukee County was 30.1 per 100,000 residents, which was more than double the rate in the State (14.3),

which itself has risen from 5.9 deaths per 100,000 since 2006.  Milwaukee County has also led the State with the highest rate of inpatient hospitalizations and emergency department visits involving opioids.  Milwaukee County has responded to the opioid epidemic in its community by equipping EMS paramedics, firefighters and law enforcement with naloxone.  The Milwaukee Community Opioid Prevent Effort has collaborated with academic and community partners on prevention, intervention, overdose treatment protocols, and tools to reduce opioid deaths.  The Milwaukee County Office of Emergency Management, the Milwaukee County Behavioral Health Division, the Milwaukee County Substance Abuse Prevention Coalition, and the Milwaukee County Department of Health & Human Services have all implemented opioid-specific programs to combat the crisis.  Milwaukee County filed suit against the opioid manufacturers and distributors in March of 2018 and is committed to holding the companies responsible for the epidemic accountable.  Margaret Daun serves as Corporation Counsel for Milwaukee County and has been actively involved in the litigation.

**Monterey County, California** is home to over 437,000 residents of all socioeconomic backgrounds.  Monterey County owns a public hospital, the Natividad Medical Center, located in Salinas, California. Natividad is a 172-bed hospital owned and operated by the County of Monterey, and offers inpatient, outpatient, emergency, diagnostic, and specialty health care. Natividad has provided health care services to Monterey County's diverse population for more than 132 years.  Natividad is a Level II Trauma Center with more than 52,000 Emergency Department visits each year.  According to the California Department of Public Health (CDPH), between 2011 and 2014, Monterey County had an average death rate due to opioids of 5.32 deaths per 100,000 residents.  CURES reports an average Opioid Prescription Rate of 594.69 per 1,000 residents between 2011 and 2015 and an average morphine milligram equivalent per

resident of 670 mg between 2010 and 2015.  The CDPH states that Monterey County experienced an average rate of non-fatal opioid-related emergency department visits of 10.37 visits per 100,000 residents between 2010 and 2014.  Monterey County and its Natividad Hospital have been on the front lines of the opioid crisis and have spent significant taxpayor resources to combat the crisis, from emergency response to preventative education and other County sponsored studies and programs.  Charles McKee is Monterey County Counsel and William Litt serves as Deputy County Counsel and has been actively involved in the opioid litigation.

**County of Norwalk, Connecticut**.  Norwalk is a city of approximately 89,000 people located in Southwest, Connecticut, within the metropolitan areas of New York City and Bridgeport.  The City experienced a more than threefold increase in overdose deaths from 2012 to 2017.  Despite the City's small size, the City's police department had to investigate opioid-related overdose deaths at a rate of nearly once per month in late 2015, and in 2016 the City's police and fire departments responded to approximately 300 calls in which Naloxone was administered in the context of a non-fatal opioid overdoses.  This is consistent with a rapid escalation of the opioid epidemic statewide, including a statewide rise to 12th in the nation in overdose deaths in 2017 (up from 50th in 2012), a rise of 35% in opioid-related emergency department visits from 2009 to 2014, a steady rise in the rate of NAS births from 2002 to 2014 (now ranking among the highest rates in the country), and more than 1,000 accidental opioid overdose deaths in 2017.

**County of Palm Beach, Florida**.  Palm Beach County is at the epicenter of the "opioid epidemic" in Florida.  Palm Beach County has approximately 1.48 million residents.  The County is ranked fourth in the nation for the number of overdose deaths per 100,000 residents

(41.5 deaths per 100,000).  Over 140 deaths were attributed to prescription drugs in Palm Beach County in 2012.  There were 189 deaths in 2014, and 307 in 2015.  Palm Beach County suffered 569 deaths in 2016.  In 2017, Palm Beach recorded nearly 600 opioid overdose deaths.  Palm Beach County has unleashed a stampede of lawyers, health officials, police and rehab specialists to tackle the epidemic.  As a result of the opioid epidemic, foster care costs have dramatically increased in Palm Beach County.  For example, as of August of 2017, 45 percent of the children who entered into the Palm Beach County foster care system were from parents with substance abuse problems, the majority of which were abusing opioids.  Palm Beach County is in desperate need of additional services for its opioid addicted residents.  Further, a report prepared for the County Commission in 2017 found that 24,000 uninsured people in Palm Beach County could use detoxification and residential-treatment services, but only 7 percent have received any.  In 2017, Palm Beach County Fire-Rescue spent $205,000 just on Narcan to treat opioid overdoses.  Fire-Rescue also estimates it costs about $1,500 to respond to an overdose call, and more than 4,000 were recorded in 2016, totaling $6 million in added costs.

Paterson City, New Jersey.  Paterson is the largest city and the county seat in Passaic County, New Jersey with a population of 148,678 people in 2017.  The City of Paterson has a storied past, as the home of Alexander Hamilton and the first planned industrial city in 1792 built around the historic Paterson Waterfalls over the Passaic River.  It is now an extremely poor (and very densely populated) city that is at least 50% Latin; 35% black, and less than 13% white, and has been hit very hard by the opioid epidemic.  Due to its proximity to NYC and other wealthy New Jersey suburban counties, it is the mecca of drug seekers, and has had to staff up its police force due to the increasing crime and arrests, while the City is on a shoestring budget.  Due to its city-run services for addiction, it has also drawn addicted people seeking inexpensive de-tox and

rehabs.  There are currently four representatives of New Jersey political subdivisions as class plaintiffs:  three counties and Jersey City.  Paterson is the third most populous city in New Jersey, has the highest percentage of non-white residents of any New Jersey city and would be an excellent representative of a poor inner city area that is struggling to provide services for its residents given the crush of the opioid epidemic.

**Phoenix, Arizona** is a city of 1.6 million people.  On June 5, 2017, Arizona Governor Doug Ducey signed an emergency declaration to address the increasing number of opioid deaths in the state, most of which occurred in Maricopa County, where Phoenix sits.  Phoenix had the highest concentration of opioid deaths in Arizona that year.  Over the past five years, Phoenix alone has spent more than $750,000 on the acquisition of Narcan.  The new City Attorney is Cris Meyer and the Assistant City Attorney Anoop Bhatheja is actively involved in the litigation.

**Prince George's County, Maryland**.  Prince George's County has approximately 909,308 residents.  It is the second largest County in the state of Maryland, and employs thousands of people.  Prescription opioid-related intoxication deaths in Prince George's County increased from 13 in 2015 to 16 in 2016.  Oxycodone-related intoxication deaths within Prince George's County also increased from 8 in 2015 to 9 in 2016.  Fentanyl-related intoxication deaths in Prince George's County increased from 15 in 2015 to 58 in 2016.

**Riverside County, California** is the fourth most populous county in California, and the eleventh-most populous county in the United States, with approximately 2.35 million residents. Riverside County has been severely affected by the opioid epidemic.  In 2017 alone, over 1.5 million opioid prescriptions were written within Riverside County, and 140 people died from opiate overdoses.  In 2017, Riverside County also reported 309 opioid overdose ED Visits and 216 Opioid Overdose Hospitalizations.  The County operates its own health system, which like

many others has been severely impacted by the opioid epidemic.  The County filed suit against opioid manufacturers and distributors in June of 2018 and is committed to holding the companies' responsible for the epidemic accountable.  Litigation on behalf of the County has been managed by Greg Priamos, County Counsel.  The County is managed by a Board of Supervisors.  Kevin Jeffries is the Chairperson of the Board and George Johnson serves as the County Executive Officer.

**City of Roanoke, Virginia**.  The City of Roanoke is located Western Virginia, one of the most afflicted areas in the United States (as depicted in Beth Macy's "Dopesick").  It serves as de facto capital of its region and is believed to be a gateway/distribution hub for opiates.  Its opioid prescription rate, the opioid overdose death rate, the opioid overdose emergency department visit rate, the neonatal abstinence syndrome rate, and the Hepatitis C infection rate are all significantly higher than the corresponding national rates, and are in line with the rates of the communities in the country that have been hardest hit by the opioid epidemic.

**County of Rockland, New York**.  Rockland County has a County has a population of approx. 328,868 people.  The opioid epidemic is so prevalent in Rockland County that Senate Maj. Leader Chuck Schumer released a press release on 2/19/19 which highlights that the opioid epidemic continues to plague Rockland County, with opioid related deaths jumping 61% between 2013 and 2016.  Rockland County holds a HIDTA designation and routinely has some of the highest rates of opioid related deaths in New York State.

**City of Saint Paul, Minnesota**.  The City of Saint Paul has approximately 309,180 residents and employs thousands of people.  In 2018, 76 people died from suspected opioid overdoses in Saint Paul, according to preliminary information released by the Minnesota Department of Health.  Saint Paul police officers have administered at least 65 doses of Narcan

to combat opioid overdoses since December 2017.  Saint Paul is the county seat and largest city in Ramsey County, which is the smallest yet most densely populated county in the state of Minnesota (approximate population of 508,640).  Between 2000 and 2016, Ramsey County has seen 1395 total opioid overdose cases, with 371 opioid overdose fatalities.

**San Francisco, California** is a consolidated City-County.  Its government is composed of the Mayor, Board of supervisors, several elected officers and other departments and agencies. It is one of thirteen Charter Counties in California.  The City and County of San Francisco, California has struggled with a significant prescription opioid, and related heroin problem, for two decades.  It was proactive early on, implementing the Drug Overdose Prevention & Education (DOPE) project, the largest single city naloxone distribution program in the country. While DOPE effectively slowed overdose death rates, San Francisco continues to have a sizable opioid addicted homeless population.  The general population is approximately 884,363 and the case is being managed by Chief of Special Litigation Owen Clements, who has strong relationships with city and county counsel offices throughout the state.  Louise Renne serves as one of San Francisco's outside counsel in this litigation.  She is a nationally recognized leader in municipal law and was intimately involved in representing San Francisco (as City Attorney) in the tobacco industry litigation.

**County of Smith, Texas**.  Smith County is a largely rural, but still populous, East Texas county, with a population of 227,727 (2017).  CDC data shows that accidental opioid-related overdose deaths are more prevalent in East Texas than in most other parts of Texas, a fact which was confirmed by the Texas Legislature in a Special Commission appointed to assess the opioid epidemic statewide.  Similar data reflects that Smith County has a higher rate of opioid prescriptions per 100 people than most other parts of Texas.  Even with its rural features, Smith

County is home to a sizable city, Tyler, Texas, which is a major hub for medical care in East Texas.  Smith county is home to several hospitals [and other healthcare units].  There are three Private Hospital systems and one State Hospital system that operate in the county:  Christus Trinity Mother Frances, UT Health East Texas (Ardent), Texas Spine and Joint, University of Texas Health Science Center. Smith County is an ideal representative as it combines the high-quality medical information that can be expected from a large city with the blight of rural communities that bear much of the devastation of the opioid epidemic in Texas.

**Summit County, Ohio** has more than 541,000 residents, all of whom have been impacted in some way by the crushing opioid epidemic.  Home to the State of Ohio's leading Opioid Task Force, Summit County took an aggressive approach to both identifying the cause of the opioid tsunami, as well as treating and educating its 31 different communities.  As the driving force of the litigation on behalf of the communities and social service agencies that make up Summit County, the Executive's office has seen a dramatic increase in the need for funding to support its existing County initiatives like naloxone kits, needle exchanges, medication assisted treatment, intensive outpatient treatment and inpatient bed availability.  That cumulative work and cost is all in addition to the increased demands on first responders, the judicial system and indigent defense—all of which have seen skyrocketing costs due to the increase in numbers of an addicted population.  With award winning drug courts, innovative Health Department initiatives, and a dedicated and progressive law enforcement community, Summit County has committed to the role of life saving prevention and treatment and seeks to hold responsible those companies who caused this man-made plague.  Summit County, together with Cuyahoga County, is the first MDL bellwether trial, scheduled to begin Oct. 21, 2019, against opioid defendants.

**County of Tulsa, Oklahoma**.  The County of Tulsa's population is approximately

648,360.  Substance dependency levels are troublesome in Tulsa.  Every year, since 2013, the Oklahoma Department of Mental Health and Substance Abuse Services has financed Substance Abuse programs for an increasing number of citizens in Tulsa; even though the state number of serviced citizens has decreased since 2016.  Seven out of ten unintentional poisoning deaths in Tulsa County involved a prescription painkiller.  From 2007 to 2012, Tulsa County had the eleventh highest prescription opioid rate in the state of Oklahoma.

**Wayne County**, **Michigan.**  With a population of approximately 1.75 million people, Wayne County is the most populous county in the State of Michigan.  Michigan healthcare providers wrote 11 million prescriptions for opioids in 2015 and another 11 million in 2016— more annual opioid prescriptions than Michigan has people.  Between 2013 and 2015, opioid-related deaths in Wayne County increased from 478 to 506, then soared to 817 in 2016—more than 32 overdose deaths for every 100,000 residents.  Through the County's Corporation Counsel, James Heath, Wayne County has been actively involved in the litigation.

## V.     SUMMARY OF NEGOTIATION CLASS SEQUENCE, PROCESS, ALLOCATION FORMULAE, SUPERMAJORITY VOTING MECHANISM, CLASS MEMBERS' SPECIAL NEEDS FUND, AND FEES

All members of this proposed Negotiation Class may comment upon this motion by emailing or mailing their comments to the attention of the undersigned proposed Class Counsel, the Special Masters and the Court to info@opioidsnegotiationclass.info or NPO Litigation, P.O. Box 6727, Portland, OR 97228-6727 before the scheduled August 6, 2019 class certification hearing.

At the August 6, 2019 hearing of this motion, proposed Class Representatives and Class Counsel will ask the Court to take the following actions:

a)     Certify the Negotiation Class, under Fed. R. Civ. P. Rule 23(a)(1)-(4) and 23(b)(3); and appoint Class Representatives and Class Counsel.

- 46 -

b) Approve and direct the dissemination of the proposed Class Notice by posting it on the Settlement Website and by ordering the Class notice providers, Epiq Global, to mail and email it directly to all proposed Class members and to report back to the Court on the completion of notice;

c) Include in the Class Notice a deadline (approximately 60 days from mailing/emailing) and a procedure by which proposed Class members may exclude themselves from ("opt out" of) the Negotiation Class.

d) Confirm the membership of the Negotiation Class, at the close of the opt-out period by entering an order that defines the included entities, identifies their Class Representatives and Class Counsel, and attaches the list of entities excluded from the Class, under Fed. R. Civ. P. 23(c).

All counties, parishes, and boroughs ("Counties"); and all cities, towns, villages, municipalities and townships that have governmental structures and provide services to their residents ("Cities") as identified by the United State Census Bureau and as listed on the Negotiation Class website, have an opportunity to participate, as voluntary members of the Negotiation Class, in considering and voting upon any proposed settlement by Defendants who choose to negotiate with the Class in this Opioids litigation, without the necessity of filing or maintaining an individual lawsuit.

The listed Cities and Counties also have the right to exclude themselves from the Negotiation Class, in which case they will not be entitled to participate in any Negotiation Class settlement, will not be eligible to vote on any proposed settlement, or be bound by it.  Those who elect to remain within the Class will have vested voting rights with respect to any proposed Class settlement.

To achieve Class approval, a proposed settlement must receive a supermajority vote, by population, by number and by allocation, of the voting litigating and non-litigating members. Population numbers are taken directly from currently available 2010 United States Census data, posted on the website, to be replaced by 2020 United States Census data, when such data become available.  Proposed settlements that achieve Class approval by supermajority vote as described above will then be subject to Court approval as fair, adequate and reasonable under Fed. R. Civ. P. 23(c).

Each potential Class member may determine what its allocation of any potential settlement will be (at the County level) by utilizing the Settlement Allocation Lookup Tool posted on the Negotiation Class Website.[14]  This is not a guarantee of any particular amount, as there have been no settlements to date.  Rather, it is a way for each governmental subunit to know what portion of any national settlement will be available to all the governmental entities within each county in the United States.  The Allocation Tool shows county-by-county divisions of any settlement proceeds that come to the entire class of municipal and county entities.  It sets the allocation formula, not the amount that may be obtained in any given settlement.

This Allocation Tool shows in dollars the pro rata share for each county, utilizing a three-part formula that reflects the level of opioids-related harm by using the three metrics for which existing, reliable, detailed and objective data are available for each county:  1) morphine milligram equivalent ("MME") data [volume of opioid pills], 2) overdose deaths, and 3) opioid

---

[14] A jurisdiction's allocated share may be slightly higher at the end of the opt out period, given a smaller class size, but the jurisdiction's actual recovery will likely not be altered significantly and the allocated share will not change again after that date.

use disorder cases, described in detail in Section VII below. They are weighted equally: 1/3 — 1/3 — 1/3.

This formula is the product of prolonged and intensive research, analysis and discussion by and among members of the court-appointed Plaintiffs' Executive Committee and Settlement Committee and their retained public health and health economics experts, as well as a series of meetings with scores of the cities, counties and subdivisions that comprise the Negotiation Class. These cities and counties were invited to, and did, provide comments and suggestions that were considered and implemented in deriving the formula for allocation. Important information, insight and perspective was provided to further inform the allocation analysis and formula by many cities and counties themselves, at conferences with the Special Master, and in consultation with their counsel. A number of these entities have now stepped forward to serve as proposed Class Representatives. At least seventy-five percent (75%) of the Class' net share of any settlement would be allocated, at the county level, to each County and its constituent Cities utilizing the formula based on these three metrics.

**Class Members' Special Needs Fund**. Fifteen percent (15%) of the Class' share of any allocation will be set aside in a fund (the "Class Members' Special Needs Fund") that is available to all Class members, whether litigating or not, by application on a claim-by-claim, voluntary basis. Awards will be made, on an individual basis, by a Court-appointed Special Master. Any unawarded portion of the Class Members' Special Needs Fund would revert to the Class. The Class Members' Special Needs Fund is more fully described in Section XI of this Memorandum.

**Private Attorneys Fee Fund**. Up to, but no more than, ten percent (10%) of any Class settlement will be set aside in a fund to address private counsels' attorneys' fees and costs (the "Private Attorneys' Fees Fund"), with the size of the Fund adjusted to ensure the proportionality

of fees if there are multiple settlements.  In this context, "Private attorneys" are any counsel with representation agreements with one or more Class members executed as of June 14, 2019. Private Attorneys may seek fees from the Private Attorneys' Fees Fund in lieu of enforcement of private contingency fee contracts with their clients.  Application to the Private Attorneys Fund is voluntary and optional.  The choice to apply to the Fund or to enforce contingency fee contracts can be made on a client-by-client basis.

A court-appointed Private Attorneys' Fees Committee will make initial recommendations concerning awards after receipt and determination of all applications from qualified private counsel.  Any disputes would be reviewed by a Court-appointed Special Master, who will make recommendations to the Court.  In allocating the fund, the Private Attorneys' Fees Committee will consider the contribution counsel has made to the common benefit of the class through the representation of its client(s).  Counsel's contingency fee contract will be a relevant factor, but the level of the contractual fee is not controlling, except that no fee shall exceed the contractual fee agreement.  The Court-appointed Private Attorneys' Fees Committee and Special Master will consult with the Court-appointed Class Action/Common Benefit Fees Committee to avoid duplicate awards (no "double-dipping").  If all or part of the Private Attorneys' Fees Fund is unawarded, for any reason, it would revert to the benefit of the Class.  The final distribution of the Private Attorneys' Fee Fund will be subject to Court approval under the notice and objection procedures of Rule 23(h).  The Private Attorneys Fees Fund is more fully described in Section X.B. of this Memorandum.

**Intra-County Allocations**.  As noted above, monetary awards will be distributed on a county level.  Each County class member and its constituent City class members will decide the internal allocation of the county level award among themselves.  They may elect to use a pre-

existing mechanism.  One such mechanism is the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and the cities within them split the task of funding various government functions.  Relying on this data, funds would be divided among the county government and city governments in proportion to their shares of total spending in the county on certain government functions that relate to recommended abatement efforts.  Another possible mechanism would be to use the system in place for allocating sales taxes or other revenues between the County and its Cities.  All the entities within any given county are free to utilize whichever mechanism works best.  In the event they cannot agree, a court-appointed neutral will resolve or adjudicate the allocation.  The allocation system is described in detail in Section VIII of this Memorandum.

**Class/Common Benefit Fees**.  At the Classwide level, Class Counsel will apply to the Court for any Class Counsel fees and costs (including work done by any counsel for the common benefit under the Court's Orders prescribing same) under Fed. R. Civ. P. 23(h).  The structure and amount of such fees cannot be determined until settlements are negotiated, and could vary from settlement to settlement in order to assure reasonableness and proportionality under prevailing law.  In every case, under class action rules (e.g., Fed. R. Civ. P. 23(h)), Class members would have notice and an opportunity to be heard on any application for Class Counsel fees and costs.  Class Counsel fees and costs as awarded by the Court would be allocated by the Class Action/ Common Benefit Fees Committee among individual applicants seeking compensation and reimbursement for Class-related, common benefit fees and costs, with recommended awards subject to resolution by the Special Master and subject to entry of a final Order by the Court.  This process is specifically designed to guard against "double-dipping" (i.e., to guard against counsel seeking fees under both the Private Attorneys' Fees Fund and the

common benefit award for the same time incurred.  Class/Common benefit fees are further addressed in Section X.A. of this Memorandum.

**Voting Process**.  Any proposed settlement with one or more defendants will be put to a vote of the class.  The voting mechanism was designed to be simple and straightforward:  Each class member will be asked to vote *one* time on *one* question:  "Do you approve the total amount of the settlement?"  Once the votes are cast, they will be counted in three different ways for both litigating entities (i.e. those that had filed suit by June 14, 2019) and non-litigating entities, and a settlement will only be deemed accepted by the class if a supermajority of 75% is achieved in each of the vote counts.  Any settlement offer approved by the Negotiation Class by supermajority vote would then be subject to Court approval under the class action settlement approval process and criteria set forth in Rule 23(e).  The supermajority voting process is more fully described in Section VI of this Memorandum.

**Negotiation**.  By the present motion, movants seek appointment of the following six lawyers to serve as Class Counsel:  Jayne Conroy; Christopher Seeger; Gerard Stranch; Louise Renne (former City Attorney for the City and County of San Francisco); Mark Flessner (City of Chicago Corporate Counsel); and Zachary Carter (Corporation Counsel of the City of New York).  All proposed Class Counsel represent city and/or counties litigating as plaintiffs in MDL No. 2804, and none of them represent any State or Tribe in Opioids-related litigation.  Their Rule 23(g) submissions are attached hereto as Exhibit A.

On February 7, 2018, the Court appointed a Plaintiffs' Settlement Committee [Dkt # 118] whose members will continue to negotiate with defendants on behalf of MDL plaintiffs as a whole.  The proposed Class Counsel and Class Representatives would, upon confirmation, represent the Class in any settlement negotiations.  Class Counsel will of course be authorized to

1780116.13

reach settlements with one or more defendants solely on behalf of the Class members, as they deem appropriate.

The parties recognize it is possible that one or more defendants will seek to resolve the Opioid litigation by a joint settlement offer to one or more States and the cities and counties within that State. If a defendant offers a settlement of this nature, it could lead to discussion regarding allocation between the State and the cities and counties within the State. The preferred result of that discussion is for each State to reach agreement with the cities and counties within the State on the allocation and use of the money within the State. In the absence of such an agreement, there would be a negotiation of an appropriate allocation. In such a negotiation, Class Counsel would represent the cities and counties within the State. The lump sum amount of the counties' and cities' allocation would be treated as a settlement and submitted to the Negotiation Class members in that state for a vote, as set forth above. Of course, the preferred alternative would be for a State and the cities and counties within the State to reach agreement.

## VI. HOW THE SUPERMAJORITY VOTING PROCESS WORKS

The agreement to be bound by a supermajority vote means that no settlement can be reached that would bind the Negotiation Class without the approval of a supermajority of the class, defined in several ways. Each Class member votes once. The votes cast are assigned to each Class member's applicable "pools" or categories. To be binding, 75% of the votes assigned to each of the following six categories must approve a proposed settlement:

1. 75% of the total number of cities and counties that had filed suit as of June 14, 2019. This number is based on all individual class members who had suits on file regardless of size, so that each voting entity has one vote;

2. 75% of the total number of cities and counties that had not filed suit as of June 14, 2019. This number is based on all individual class members who had no suits on file regardless of size, so that each voting entity has one vote;

3.    75% of the total voting population of all cities and counties that had filed suit as of June 14, 2019.  For this computation, each person in a voting city and each person in a voting county is the equivalent of one vote.  The population for each jurisdiction is drawn from the 2010 Census data, and is presented on the litigation website, opioidsnegotiationclass.com.  The data will be updated once the 2020 Census figures become available.  Many individual residents in this category may be counted twice, once as a resident of a municipality, and once as a resident of a county;

4.    75% of the total voting population of all cities and counties that had not filed suit as of June 14, 2019.  For this computation, each person in a voting city and each person in a voting county is the equivalent of one vote.  The population for each jurisdiction is drawn from the 2010 Census data, and is presented on the litigation website, opioidsnegotiationclass.com.  The data will be updated once the 2020 Census figures become available.  Many individual residents in this category may be counted twice, once as a resident of a municipality, and once as a resident of a county;

5.    75% of the litigating entities, weighted by their allocations as shown on the Settlement Allocation Lookup Tool to be posted at opioidsnegotiationclass.com;[15] and

6.    75% of the non-litigating entities, weighted by their allocations as shown on the Settlement Allocation Lookup Tool to be posted at opioidsnegotiationclass.com.[16]

In order for a proposed settlement to be binding on the Negotiation Class, a 75% supermajority of those voting must vote in favor.  No settlement may be approved as binding unless all categories are in favor at the requisite 75% level.  The 75% figure is calculated on the basis of the votes actually cast.  Consistent with the voting rules in Section 524(g) of the

---

[15] For purposes of determining a supermajority vote in this category, the allocation mechanism shall be based on the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and cities within them share the task of funding various government functions.

[16] For purposes of determining a supermajority vote in this category, the allocation mechanism shall be based on the U.S. Census Bureau's Annual Survey of State and Local Government Finances showing how counties and cities within them share the task of funding various government functions.

bankruptcy code, which also requires special qualified majorities for different categories, non-votes are not considered as part of the denominator.

## VII.    HOW THE ALLOCATION MODEL WORKS

This allocation model addresses how settlement funds intended for local governments would be distributed among them.  It is designed to be as simple as possible, while still treating all cities, counties, and other municipal entities fairly.  A number of cities and counties have been litigating actively and have been actively involved in developing the allocation mechanism. Some of them have stepped forward as proposed Class Representatives.  The allocation mechanism does not use litigation as a factor and in no way favors these entities.  The voting pools address litigating status, and Class members' own litigation costs may be recovered, upon application, from the Class Members' Special Needs Fund described in Section XI of this memorandum; the allocation model itself treats all Class members, regardless of litigating status, in precisely the same manner.

The allocation model uses three factors to determine the share of a global settlement that each county will receive.  These three factors address the most critical causes and effects of the opioid crisis:  (1) the number of persons suffering opioid use disorder in the county;[17] (2) the number of opioid overdose deaths that occurred in the county; and (3) the amount of opioids distributed within the county.

The allocation model gives each of these factors a straightforward, one-third weighting. The model is designed not to favor small, medium, or large counties based only on their population.  Although population is taken into account indirectly because the three factors above

---

[17] The term *county* as used in this document includes Louisiana parishes and New England townships.

each tends to increase with population, the model allocates global settlement funds proportionally to where the opioid crisis has caused actual harm.

There are no perfect mechanisms to measure the three factors.  To ensure the model is as unbiased and transparent as possible, the model uses only data collected and reported by the federal government.  This is critical as the model follows the reporting mechanisms deemed most relevant by federal public health authorities.  The calculation process is explained below.

Note that the allocation model determines the percentage share of a settlement that each county will obtain, but does not itself determine how a county and the cities or other municipalities that are fully or partially within the county will divide this share.  *See* Section VII E. below.

A. **Factor One: Opioid Use Disorder**

"Opioid use disorder" refers to dependence upon or abuse of prescription pain relievers and/or heroin, including addiction.[18]  Statistics on opioid use disorder are collected by the U.S. Department of Health and Human Services (DHHS), and reported in the National Survey on Drug Use and Health (NSDUH).[19]

The allocation model uses NSDUH data to count the number of persons with opioid use disorder, both by county and nationally.[20]  Each county is then assigned a percentage

---

[18] *See* Substance Abuse & Mental Health Serv. Admin., Ctr. for Behavioral Health Statistics and Quality, *2017 National Survey on Drug Use and Health: Methodological Summary and Definitions* (Sept. 2018), at 53, 128, 147, available at https://bit.ly/2LGmrLB [hereinafter "2017 NSDUH:  Methodological Summary and Definitions"] (defining "Opioid Use Disorder" and "Heroin Use Disorder" for purposes of the survey).

[19] NSDUH data are accessible publicly at https://bit.ly/2HqF554.

[20] NSDUH survey respondents were classified as having an Opioid Use Disorder if they met criteria in the Diagnostic and Statistical Manual of Mental Disorders, 4th edition (DSM-IV, American Psychiatric Association, 1994), for either dependence upon or abuse of heroin,

*Footnote continued on next page*

representing its share of the total number of people with OUD in the nation.  For example, during the operative time period, there was an annual average of 9,444 persons with opioid use disorder in Cuyahoga County, Ohio, and 2,111,800 persons nationally; so Cuyahoga County is assigned a score of approximately 0.45% for this factor.

### B. Factor Two: Overdose Deaths

The Multiple Causes of Death (MCOD) data are county-level, national mortality data reported by the National Center for Health Statistics (NCHS), the Centers for Disease Control and Prevention (CDC), and DHHS.  The CDC makes summarized MCOD data, including counts of deaths caused by opioid drug poisonings, accessible online through a reporting system known as WONDER (Wide-ranging ONline Data for Epidemiologic Research).[21]  Because it is well-established that deaths caused by opioid overdose are under-reported, and that under-reporting varies geographically in predictable ways, the model applies a standard, accepted method (the "Ruhm adjustment") to unsummarized MCOD data to estimate opioid overdose deaths in each

---

*Footnote continued from previous page*

prescription pain relievers, or both in the past year.  *See* 2017 NSDUH: Methodological Summary and Definitions, at 146.  Around 0.8% of the U.S. population is estimated to meet this definition.  NSDUH survey respondents were classified as having Opioid Misuse if they used prescription pain relievers for a non-medical purpose or used heroin any time during the past year.  *See id.* at 146, 215.  Opioid misuse is a broader measure than opioid use disorder, capturing around 4.7% of the U.S. population on average in the recent past.  Because opioid use disorder data are available by state but not by county, the model imputes the number of people with OUD in each county of a state by distributing the number of people with OUD in that state across counties in proportion to opioid misuse rates, which are available at a more granular level.  Specifically, NSDUH makes available opioid misuse rates at a substate (multi-county) level by grouping together nearby counties.  The model uses NSDUH data for the period 2007-2016.

[21] *See* CDC WONDER, *About Multiple Cause of Death Data, 1999-2017*, https://bit.ly/2p8hDkp (last visited June 13, 2019).  The model uses MCOD death data for the period 2006-2016.

county.[22]

The allocation model uses adjusted MCOD data to count the number of deaths caused by opioid overdose, both by county and nationally.  Each county is then assigned a percentage share.  For example, during the operative time period, there were 2,139 opioid overdose deaths in Cuyahoga County, Ohio, and 347,641 deaths nationally; so Cuyahoga County is assigned a score of 0.62% for this factor.[23]

### C.    Factor Three: Amount of Opioids

The United States Drug Enforcement Agency collects statistics on the amount of opioids shipped to a given location, and reports them in a database known as ARCOS (Automation of Reports and Consolidated Orders System).  The model uses ARCOS data to measure opioid amounts by counting "morphine milligram equivalents," or MMEs.[24]  The model counts MMEs instead of pills because different opioid drugs have different strengths—example, a 10-mg hydrocodone pill has 10 MMEs, a 10-mg oxycodone pill has 15 MMEs, and a 10-mg hydromorphone pill has 30 MMEs.

---

[22] *See* Christopher J. Ruhm, *Geographic Variation in Opioid and Heroin Involved Drug Poisoning Mortality Rates*, 53 Am. J. Preventive Med. 745 (2017); Christopher J. Ruhm, *Corrected US Opioid-Involved Drug Poisoning Deaths and Mortality Rates, 1999-2015*, 113 Addiction 1339 (2018).

[23] The allocation model is based on the best available overdose data, which depends upon reporting.  Opioid overdose deaths may have been systematically under- reported in Puerto Rico for a number of reasons.  In addition, following Hurricane Marta in 2017, Puerto Rico has faced heightened challenges in gathering death data and its medical and social services infrastructure (and thus its ability to address the opioid crisis) has been severely affected.  This is an example of one function of the Class Members' Special Needs Fund:  to address and equalize special circumstances, affecting specific Class members, that cannot be captured in an overall allocation system.

[24] Specifically, the model uses non-public ARCOS data for the period 2006-2014 produced by the DEA in *In re: National Prescription Opiate Litigation*, MDL No. 2804, which is subject to a confidentiality order.

The model measures the amount of MMEs that were shipped to a given location, both by county and nationally.  Unlike with Factor One and Factor Two, however, the model does not simply examine, for each county, the percentage of all MMEs shipped nationally.  Instead, the model first adjusts the number of MMEs in each county based on the extent to which those MMEs produced a negative outcome.  The model makes this adjustment because the oversupply of opioids had more deleterious effects in some counties than in others.[25]

As with the other factors, each county is assigned a percentage representing its share of the national total for this factor.  For example, and for illustrative purposes only, Cuyahoga County, Ohio's adjusted MMEs from 2014-2016 are 8,450,486,702, and the sum of all counties' adjusted MMEs is 2,212,761,307,410, so Cuyahoga County is assigned a score of 0.38% for this factor.

---

[25] Mechanically, the MME adjustment works as follows.  First, the model calculates for each county two separate ratios:  (1) an opioid use disorder (OUD) ratio, and (2) an opioid overdose death ratio.  The OUD ratio is calculated by dividing the percentage of people in a county with OUD by the percentage of people nationally with OUD.  So, if OUD is 10% more common in a county than nationally, that county's OUD ratio is 1.1.  Next, the model calculates an opioid overdose death ratio in the same way.  The county's MMEs are then multiplied by the higher of the two ratios.  To take Cuyahoga County, Ohio as an example: In Cuyahoga County, 0.89% of people have OUD; while nationally 0.82% of people have OUD.  So Cuyahoga County has an OUD ratio of approximately 1.09 (i.e., 0.89% ÷ 0.82%), reflecting that residents of the county are 9% more likely to have OUD than the average American.  Likewise, on average, 15.2 out of every 100,000 people in Cuyahoga County died of an opioid overdose annually between 2006 and 2016; while nationally 10.2 out of every 100,000 people died of an opioid overdose annually during the same period.  So Cuyahoga County has a death ratio of approximately 1.49 (i.e., 15.2 ÷ 10.2), reflecting that residents of the county were 49% more likely to die of an opioid overdose during that period than was the average American.  Because 1.49 is the higher of Cuyahoga's two ratios, its MMEs are scaled upwards by 49%.  This does not mean that Cuyahoga will receive 49% more than it otherwise would receive.  On the contrary, because all counties' MMEs are being scaled, this adjustment within Factor Three results in a 3.9% increase to Cuyahoga's total allocation, from 0.46% of the national allocation to 0.48%.  Ultimately, Factor Three takes into account not only the number of MMEs that were shipped to each county, but also the degree of harm those MMEs caused.

### D.     Final Calculation

As mentioned above, each of the three factors is given an equal, one-third weight. For example, and for illustrative purposes only, Cuyahoga County, Ohio would receive the following three scores:  (1) 0.45% for Opioid Use Disorder; (2) 0.62% for Overdose Deaths; and (3) 0.38% for MMEs.  The average of the County's three scores is around 0.48%.  Accordingly, Cuyahoga County would receive 0.48% of any global settlement amount.  Put differently, if a defendant reaches a national, global settlement with all cities and counties of $1 billion, Cuyahoga County would receive $4.8 million from that defendant.

### E.     Distribution Within Counties

The allocation model described above determines how funds will be allocated among *counties*.[26]  The next step is for each county and the cities *within* that county to reach agreement on how allocated funds will be directed within the county to abate the crisis.  The county and the cities within it may share the funds however they choose.

If a county and the cities within it cannot reach agreement on how to share the county's allocation, then the Special Master will divide the funds.  Unless one of the local governments provides an alternative approach for the Special Master's consideration, he or she will divide the funds by applying a formula that relies on federal data showing how counties and the cities within them historically have split funding for government functions potentially relevant to opioid abatement.[27]  For example, and for illustrative purposes only, Cuyahoga County, Ohio

---

[26] The term *county* as used in this section and throughout this document includes Louisiana parishes and New England townships.

[27] Specifically, the formula draws on US Census Bureau data on local government spending by function.  The Census of Governments Survey of State and Local Government Finances polls all state, county, township, city, and special district governments every five years, with 2012 being

*Footnote continued on next page*

contains 59 cities, including Cleveland and Parma.  The federal data show that Cuyahoga County

is responsible for 64.5% of local government spending in the county on functions potentially

relevant to opioid abatement, while Cleveland is responsible for 17.4% of spending, Parma is

responsible for 1.5% of spending, and the other cities in Cuyahoga County together are

responsible for 16.6% of spending.  Accordingly, if a defendant reaches a national, global

settlement with all cities and counties of $1 billion, and Cuyahoga County receives $4.8 million,

then Cuyahoga County would ultimately receive $3,096,000 (64.5%) of the settlement funds

allocated to the County, Cleveland would receive $835,200 (17.4%), Parma would receive

$72,000 (1.5%), and the remaining cities in Cuyahoga County would receive smaller amounts,

totaling $796,800 (16.6%).  As noted above, the County government and city governments may

agree to share the funds however they choose; the formula applies only if they cannot agree and

---

*Footnote continued from previous page*

the most recent data available.  This data covers cities and counties for 98% of the U.S.
population.  Data for some additional jurisdictions was backfilled from a survey of a sample of
jurisdictions performed in 2016.  Finally, state-specific regression analyses were employed to
create estimates for the very small number of remaining jurisdictions.  The functions or
expenditure categories examined for each jurisdiction were:  <u>elementary and secondary
education</u> net of capital outlay, <u>public welfare</u> (including <u>child protective services</u>), <u>hospitals</u> net
of capital outlay, <u>health</u>, <u>police protection</u>, fire protection, <u>corrections net</u> of capital outlay,
housing and community development, and <u>judicial</u> and legal.  In this context, "net of capital
outlay" means that capital costs—for constructing new facilities and renovating existing ones—
are excluded for those expenditure categories.  If data from the 2017 Survey become available
before the Special Master decides on the division of funds, it is anticipated that the Master would
take those data into consideration in making a decision.  Under the default intra-county
allocation formula, when a city's share would be less than $500, that amount will instead be
distributed to the county in which the city lies to promote practical application of the abatement
remedy.  In the vast majority of such cases, the county government supplies the majority of the
relevant government services in the county.  Affected cities could seek recovery through a
negotiated intra-county allocation,  or from the Class Members' Special Needs Fund. In the rare
circumstance that the city in question lies in a county that does not have a county government,
the amount would instead go to the Class Members' Special Needs Fund, and Class members
could seek recovery therefrom.  See Section XI of this Memorandum..

no party to such a dispute presents an acceptable alternative formula to the Special Master.

## VIII.    THE NEGOTIATION CLASS MEETS ALL REQUIREMENTS OF RULE 23(a)

"*Amchem* makes clear that the certification provisions of Rule 23 are designed to 'focus court attention on whether a proposed class has sufficient unity so that *absent members* can fairly be bound by decisions of class representatives.'"  *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1091 (6th Cir. 2016) (citing *Amchem*, 521 U.S. at 621).  Here, the function of the Negotiation Class is to give all class members the opportunity to be present and active, rather than absent and passive, and to participate directly in their own settlement decisions.  The Negotiation Class has a "super-power" that exemplifies *Amchem* "unity" while preserving individual choice:  it votes.

### A.    The Negotiation Cities/Counties Class Is Too Numerous For Individual Joinder, Meeting Rule 23(a)(1)'s "Numerosity" Requirement

Rule 23 is a joinder mechanism, an alternative to individual joinder when those with an interest in the issue or procedure are so numerous that joinder under Rule 18, 19, or 20 could be unwieldy.  No strict numerical tests exist to define Rule 23(a)(1) numerosity; "substantial" numbers of class members "are sufficient to satisfy this requirement."  *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013) *cert. denied sub nom Whirlpool Corp. v. Glazer*, 134 S.Ct. 1277 (2014) (quoting *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)).

Each of the over 1,200 cities and counties that is a named plaintiff in these MDL proceedings, and each of the nearly 1,000 additional cities and counties that have initiated their own actions in state court, has a vital interest in the effective resolution of the public nuisance and other claims that they have asserted in our courts.  This group by itself is too large to be involved, individually, in settlement negotiations.  Serial negotiations are unlikely to add up to as large a sum as could be obtained in a classwide settlement with a defined group of all cities and

counties.  Moreover, it is highly unlikely that as fair and sensible an allocation among each could be reached in individualized settlements, as can be reached if the group works together and speaks with one voice.  Accordingly, the "numerosity" requirement of Rule 23(a)(1) is more than met in this case even if only actively litigating counties and cities were counted.

The need for a comprehensive settlement mechanism is of even greater scope.  In terms of sheer numbers, there are over 30,000 cities and counties across the country, many of which are aware of the assurances of this Court that they would be able to participate in any global or class resolution in this MDL.  Moreover, by definition, the cities and counties are spread across the United States, located in every state and territory; thus geographical dispersion, which plays a large role in the impracticability of individual joinder analysis**,** demonstrates satisfaction of the requirement.[28]

The class members are identified by an independent and authoritative agency, the United States Census Bureau, whose lists and surveys of government entities are the source of the Class list.  While, through the use of technology, it is possible to communicate with Class members, to keep them advised of the proceedings in this litigation, and to enable them to participate and vote in any comprehensive settlement, the presence of scores, hundreds, or thousands of cities or counties in an actual negotiation room remains impracticable.  It is this very problem that the Negotiation Class solves:  It enables every one of them to be active, every one of them to participate, and every one of them to vote on any resulting settlement, without making the negotiation process unwieldy.

---

[28] *See* William B. Rubenstein, 1 *Newberg on Class Actions* § 3:12 (5th ed. 2011) ("[G]eographic dispersion of class members cuts in favor of certification as joinder of all members of a dispersed class is likely less practicable than joinder of all members of a similarly sized class residing in one neighborhood or working in one workplace").

**B.    There Are Questions Of Law And Fact With Common Answers, Fulfilling the Rule 23(a)(2) Commonality Requirement**

A question is common if its answer is the same for all members of the Class.  Answers to the important factual questions about the nature and extent of each defendant's conduct and role in creating or sustaining the epidemic, and whether these answers drive liability under the federal statutory law of Civil RICO and the bedrock common law of public nuisance, have answers that are common to the Class.[29]

In initiating this MDL, the Judicial Panel on Multidistrict Litigation stated (ECF #1 at 3) :

> All actions involve common factual questions about, *inter alia,* the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs. Both manufacturers and distributors are under an obligation under the Controlled Substances Act and similar state laws to prevent diversion of opiates and other controlled substances into illicit channels. Plaintiffs assert that defendants have failed to adhere to those standards, which caused the diversion of opiates into their communities. Plaintiffs variously bring claims for violation of RICO statutes, consumer protection laws, state analogues to the Controlled Substances Act, as well as common law claims such as public nuisance, negligence, negligent misrepresentation, fraud and unjust enrichment.

> The parties opposing transfer stress the uniqueness of the claims they bring (or the claims that are brought against them), and they argue that centralization of so many diverse claims against manufacturers and distributors will lead to inefficiencies that could slow the progress of all cases. While we appreciate these arguments, we are not persuaded by them. All of the actions can be expected to implicate common fact questions as to the allegedly improper marketing and widespread diversion of prescription opiates into states, counties and cities across the nation, and discovery likely will be voluminous.

The Supreme Court has held that "for purposes of Rule 23(a)(2), even a single common question will do."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citations omitted)

---

[29] In this unique situation, it is worth noting, while not essential to Rule 23(a)(2) analysis, that members of the proposed Negotiation Class themselves also have a single, common procedural question to answer:  whether they prefer to organize themselves into a pre-existing voting trust with known allocations and procedures to decide on offers to settle.

(internal quotation marks omitted).  As is clear from the JPML's order, adjudication of every class member's claim against any defendant in this case would require that class member to demonstrate the defendant's liability.  The defendant's liability would turn on the defendant's conduct and role in creating or sustaining the epidemic, and whether these answers drive liability under the federal statutory law of Civil RICO and the bedrock common law of public nuisance.

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation marks omitted); *Rikos v. Proctor & Gamble Co.*, 799 F.3d 497, 505 (6th Cir. 2015).  As noted above, commonality may be satisfied by even one question, whose answer will resolve an issue that is central to a shared claim "in one stroke."  *Dukes*, 564 U.S. at 350.  The *Dukes* standard, derived from a now-classic article on the related Rule 23(b)(3) predominance inquiry, "focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit."  *Id.* (citing Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)); *In re Whirlpool*, 722 F.3d at 852.

Here, a course of conduct by multiple defendants that spanned decades is alleged in common terms by hundreds of cities' and counties' complaints.  Across the many complaints before the Court is a common core of factual allegations concerning the conduct of the defendants in promoting and facilitating opioid addiction, and the devastating result of opioid addiction on communities across the country.  The common core of factual issues in this case is what gave rise to coordination in the MDL and serves as a reason for the use of scheduled bellwether trials:  to assess the strength and potential value of the common core of factual claims by all affected local jurisdictions.  The fact that the common *questions* of law and fact, which this Class seeks to settle, not to try, are more significant than the questions (e.g. of damages) that

involve only individual class members—that is, that these common questions predominate for

purposes of this motion—is demonstrated in the Predominance Section below.

      C.    **The Claims Of The Class Representatives Are Typical Of The Claims Of The Class Under Rule 23(a)(3)**

As this Court is aware, this MDL litigation is characterized by recurring claims deriving

from the same factual allegations about the defendants' products and defendants' conduct.

While complaints also include more localized or statewide claims, the claims of public nuisance,

conspiracy, fraud, and Civil RICO are the recurring common themes and legal theories.  They

are the typical claims in the case under Rule 23(a)(3), and they are shared by the class

representatives with the members of the cities/counties Negotiation Class.  Representatives'

claims that arise from the same conduct and are based on the same legal theories fulfill

Rule 23(a)(3) typicality.  *Daffin*, 458 F.3d at 553.

As shown by the surveys of actions set forth in the Predominance section below, the

claims of the Class Representatives are typical of the claims of the Class because they are

demonstrably based upon the same underlying events and the same legal theories.  The

"typicality" requirement is met because the Class members' claims are "fairly encompassed by

the named plaintiffs' claims."  *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir.

1998); *In re Whirlpool Corp. Front-Loading Washer Products*, 722 F.3d 838, 852 (6th Cir.

2013).  In pursuing their own interests in negotiating a fair settlement for cities and counties, "the

Class representatives also advocate the interests of Class members."  *In re Whirlpool*, 722 F.3d at

852-853.

The opioids crisis is nationwide.  While it has numerous epicenters that are particularly

hard-hit, it also shares a nationwide character.  Meaningful resolution may require nationwide

settlements that are also custom-tailored, as appropriate to meet the needs of the respective

communities.  A comprehensive settlement program with both nationwide and localized components is best suited to accomplish this relief, and is best negotiated by taking account of the typical claims that unite the members of the class, are shared by the class representatives, and would be resolved through settlement.

**D.**  **The _Sine Qua Non_ Of The Negotiation Class Is The Achievement Of Adequate Representation Meeting Rule 23(a)(4) Requirements**

The problem perceived by the Supreme Court in _Amchem_, which scuttled an ambitious settlement of nationwide asbestos claims—a settlement that never was rebuilt—was the absence of active, participating class representatives on behalf of each identifiable category of claimants.

Here, the negotiations class is comprised solely of cities and counties, which share common problems, and have asserted common claims.  Other categories of MDL plaintiffs, such as Tribes or third party payors, may form their own litigating or negotiating groups or classes. This motion does not stop them, and it may encourage them, but it does not include them.  While there are many differences among the smallest of towns and the largest of urban centers, and between underfunded rural entities and large counties with pre-existing infrastructures, such that the allocation of settlement funds must be addressed with care and participation, there is an overarching recognition that the opioids problem can most equitably be addressed if _all_ cities and counties are invited to participate.

This Court perceived an inescapable fact early on, which the cities and counties know all too well:  opioids do not respect city and county boundaries, and one city's problem can easily become another's.  Government entities must work together.  They won't be able to work together most effectively, unless they can share information, power, and agency with each other in an appropriate way.  The structural assurance of adequate representation of all interests is ideally found in the literal structure of the negotiations class itself:  here, the certification process

- 67 -

creates a preexisting class which will come to the table with its constituents' interests and identities known and articulated and with the right to vote any resulting settlement up or down. *See Amchem*, 521 U.S. at 628.

Rule 23(a)(4) requires that "the representatives will fairly and adequately protect the interests of the class."  Adequacy is functionally assured where the responsibilities and class members have the same claim functionally with the same basic factual predicates:  they are facing and trying to solve the same problems.  *See Daffin*, 458 F.3d at 553-54.  Assurances of adequate representation are found structurally, in the representation or negotiation process, or substantively, in the terms of the resulting settlement.  *Amchem*, 521 U.S. at 627-28.  Both structural and functional assurances are built into, indeed, are the essential purpose, of the Negotiation Class.

As this Memorandum demonstrates in the Class Representatives Section above, the proposed Negotiation Class Representatives comprise a wide array of counties and cities of every size, both urban and rural, from across the country.  They have been demonstrably active in Opioids litigation at the federal and state levels.  They have invested their own time and resources in conducting litigation and exploring resolution.  They are individually represented by members of the Court-appointed Plaintiffs' Executive Committee, who have been charged with the prosecution of the Opioids MDL litigation for the common benefit of plaintiffs, and by other counsel also actively engaged in litigation city and county claims in the MDL and in State courts. Many have been actively engaged in settlement negotiations, including assessment of the financial resources of Defendants, through the Court-appointed Settlement Committee, and have provided input on designing allocation and fashioning relief.  The Class Representatives are well-armed to represent the Negotiation Class in obtaining the best settlement offers—for the

Class itself to accept or reject.  This last point is critical:  unlike the traditional class action, the class representatives do not stand as gatekeepers who have the ability to fashion legal claims or settlements on behalf of the largely absent class members.  Here, by contrast, the class representatives are tasked with ensuring that the class can exercise its proper voting rights with regard to any potential settlement.

The proposed Negotiation Class Counsel, whose Rule 23(g) submissions accompany this Memorandum, have demonstrated, in satisfaction of the requirements of Rule 23(g)(1)(A)(i)-(iv), the work they have done in investigating and pursing claims for cities/counties in this litigation; their experience in class and complex litigation, and in the types of claims featured in this litigation; their knowledge of the applicable law; and the resources and dedication they have committed and will continue to commit to representing the Negotiation Class.  Of note, these Negotiation Class Counsel do not represent States or other potentially competing plaintiffs in any Opioids-related litigation.

The reason the adequacy factor demands "heightened attention" in the settlement context is because a court presented with a settlement and settlement class simultaneously will lack the opportunity "to adjust the class, informed by the proceedings as they unfold."  *Amchem*, 521 U.S. at 620.  Here, the Negotiation Class itself will pre-exist any settlement proposal, will itself give heightened attention to the merits of any proposal itself, indirectly through its negotiating representatives and directly, by voting; all of which proceedings unfold after the Court has confirmed the Negotiation Class and before the Court considers or approves any actual classwide settlement under Rule 23(c).  Both Class and Court will be informed on an ongoing basis and can make informed decisions as these proceedings unfold.  Here, adequacy is no afterthought; it is designed into the mechanism.  Full use is also made of current technology in facilitating

information to, and communications with, Class members through the Internet, to enable and optimize active participation by Class members.[30]

What is critical here is that there is no risk of class representatives failing to represent the interests of passive, absent class members.  This is the ultimate "participatory class action."[31] The sole purpose of this Negotiation Class is to give all class members a direct voice in approving or rejecting any proposed settlement, and to do so on the basis of previously established, clear voting rules.

As has occurred in response to this motion, subclasses are routinely suggested as a solution to a problem, intra-class conflict, that does not exist here.  Each type of Class member has direct voice and choice in the process because each has a vote, and that vote is placed in multiple pools that objectively correspond with its legitimate interests.  The problem with built in subclasses is that, from an objector standpoint, there are never enough, and Balkanization can result.

It is possible to devise a near infinite array of theoretical subclasses in almost every class action.  Once a court goes down that road, however, drawing rational lines becomes increasingly difficult, posing an ever-growing risk that the myriad resulting factions will prevent the occurrence of any settlement.[32]  That is why, in current practice, large settlement classes

---

[30] See Robert H. Klonoff, Mark Herrmann & Bradley W. Harrison, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. Pitt. L. Rev. 727 (2008) (anticipating how advanced electronic communication can facilitate class member participation).

[31] *See* Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action,* 92 N.Y.U. L. Rev. 846 (2017).

[32] Courts have frequently made these points.  The Sixth Circuit has stated that subclassing is appropriate "only when it will materially improve the litigation.  *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986).  The Third Circuit expressly notes the dysfunctional drawback of subclasses; the potential to "create a 'Balkanization' of the

*Footnote continued on next page*

comprising many different types and levels of economic claims have successfully been certified in MDL proceedings, affirmed on appeal, and implemented utilizing no subclasses at all, instead relying on a diverse array of representative plaintiffs and a compensation system tailored to the measurable realities of impact on class members.  *See, e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d 891 (E.D. La. 2012), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re National Football League Players Concussion Injury Litigation*, 821 F.3d 410 (3d Cir. 2016); *In re Volkswagen 'Clean Diesel' Marketing Sales Practices and Prods. Liab. Litig*., 895 F.3d 597 (9th Cir. 2018). The Negotiation Class adopts this contemporary functional model, and adds the participatory and protective mechanisms of supermajority voting and the voting pools to assure all interests and perspectives are actively represented within the Class.

As the Eleventh Circuit has observed, fidelity to *Amchem* and *Ortiz* does not exalt form over function:  those seminal cases "appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses."  *Juris v. Inamed Corp.*, 685 F. 3d 1294, 1323 (11th Cir. 2012) (emphasis in original; citations omitted).  Here, the voting process and pools are built into the Negotiation Class' structure.  We desire to empower, not immobilize, the class.  While we acknowledge that the Court may always designate subclasses, if and when appropriate, under Rule 23(c)(5), at any time before final judgment, we respectfully submit no need or function has yet been

---

*Footnote continued from previous page*

class action and present a huge obstacle to settlement if each subclass has an incentive to hold out for more money."  *In re Insurance Brokerage Antitrust Litigation*, 579 F.3d 241, 271 (3d Cir. 2009).  Disagreements over proposed divisions of class funds, and the inevitable fact that some class members get more than others in a settlement distribution, likewise do not require subclasses.  *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999); *In re Mego Financial Corp.*, 213 F.3d 454, 463 (9th Cir. 2000).

demonstrated.

This proposal gives class members significantly more protection and information than is given to class members in the normal contested litigation class that ultimately settles.  In the latter situation, class members have to decide whether to opt out at the time of class certification, before they have any idea whether there will be a settlement—or what the terms of a settlement will be.  If a case later settles, class members who didn't opt out earlier cannot opt out if they don't like the settlement.  (While Rule 23 does allow courts to grant an optional second opt out, in practice they rarely do so.)

The structure here, by contrast, doubles down on Rule 23(a)(4) adequacy of representation through loyalty to the Class; it would not cram down any settlement without a supermajority approval.  Instead, cities and counties will know up front the allocation metrics and formula when making their opt out decisions.  A direct comparison between this proposal and the well-accepted approach used for a contested class certification highlights that what is being proposed here is really quite modest.  The more extreme circumstance is the accepted one of forcing someone to opt out before the class member has any idea what a settlement might include.[33]  The Negotiation Class does not push the application of Rule 23 beyond its terms, its spirit, or its functional goals, and it fulfills them in a particularly functional and realistic way.  Compared to the universally accepted contested litigation scenario, class members here are extra-

---

[33] The ALI noted this very concern in *ALI Principles*, and proposes that, ordinarily, a second opt-out be provided when "the terms of the settlement are not revealed" until after the opt out.  *ALI Priciples* § 3.11.  As it acknowledges, under Rule 23 itself this "applies only as a matter of discretion, and few courts have ordered a second opt-out."  *Id.* at Comment a.  Here, of course, any settlement would not merely be "revealed" to a passive or disinterested Class as a done deal; the very purpose and function of the Class, known by Class members going in, is to negotiate and vote on its own deal.

- 72 -

protected.  The adequacy requirement is met.

## IX.  THE NEGOTIATION CLASS MEETS THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF RULE 23(b)(3)

The Negotiation Class is proposed for certification under Rule 23(b)(3), to enable class members to elect membership through an opt-out provision.  No class member will be bound unless it finds the proposed negotiation and voting mechanism, and its allocation prospects, to be suitable for its continued participation.  Rule 23(b)(3) classes are appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### A.  Predominance

While Rule 23(b)(3) itself does not define "predominace," several principles for determining predominance have emerged jurisprudentially.[34]  First, predominance builds on commonality.  Once common issues exist, predominance asks whether these are more prevalent than individualized ones.  Second, not every question of law or fact must be common.  While common questions must predominate, they need not be the only questions of law and fact.  For example, courts generally except that questions relating to individual causation and damages do not preclude Rule 23(b)(3) certification.[35]  Third, common issues need not be dispositive or contested.  For example, the fact that an issue has been conceded or otherwise resolved does not

---

[34] For a thorough exposition and analysis of these predominance "rules of thumb," *see* 2 *Newberg on Class Actions* § 4:51 (5th ed. 2011 and Winter 2018 Supp.)

[35] *See*, *e.g.*, *Martin v. Behr, Dayton Thermal Products LLC*, 896 F.3d 405 (6th Cir. 2018); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988).

"remove it from the predominance calculus."[36]  <u>Fourth</u>, the predominance tests does not turn

simply on a time comparison, such as a comparison of court time needed to adjudicate common

issues weighed against time needed to dispose of individual issues (and, in the settlement context,

such trial management issues are removed from predominance analysis entirely") [37]  <u>Fifth</u>, "The

predominance analyses is a pragmatic one"  *Newberg* at § 4:51.  It is not a numerical test, a

matter of simply "counting noses".[38]  The test is qualitative, it considers what questions matter

most to the advancement of the case.  A single common issue may be the overriding ones in the

litigation, despite the fact that it also involves numerous remaining individual questions.[39]

This Court is well-equipped, having presided over eighteen months of intense litigation,

to evaluate whether the common questions of law and fact (which are the subject of the empirical

surveys of the Class' own complaints described below), do predominate, as a pragmatic and

qualitative matter, and in the context of the quest for resolution, over individualized issues.  We

respectfully submit that they do.

The Opioids litigation raises questions of law and fact with common answers, and it is the

answers to these common questions that predominate in importance—that matter most—to the

advancement and disposition of the Opioids litigation.  These are the questions that have

consumed most of the Courts', the Special Masters', and the parties' attention in discovery,

---

[36] *Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288, 299 (1st Cir. 2000)

[37] *Amchem*, 521 U.S. at 620 ("confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for the proposal is that there be no trial.")

[38] *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (predominance "is not determined singly by counting noses:  that is, determining whether there are more common issues or more individual issues, regardless of relative importance.")

[39] *Newberg*, § 4:51.

(including hundreds of depositions), and have taken up the bulk of the briefing on motions to dismiss, and, most recently, summary judgment and Daubert motions addressed particularly to the initial bellwether trial, but reaching from beyond it in potential impact.  Of necessity in complex proceedings, particularly in MDLs, where the task is to conduct common fact discovery, and determine common potential issues, Courts and litigants prioritize:  they focus on the questions on which the litigation turns.  These are the questions, more fully addressed below, that also feature most heavily in the underlying complaints.  They are the predominating issues of defendants' conduct, knowledge, and duties, and on the existence and origins of the opioids epidemic, on which the liability of each to thousands of cities and counties, will turn.

"[P]redominance looks at the cohesiveness of 'the legal or factual questions that qualify each class member's case as a genuine controversy, questions that pre-exist any settlement.'"  *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539 (9th Circuit 2019), quoting *Amchem*, 521 at 623.  To determine the cohesiveness of the legal and factual questions that each class member raised in their own cases, we conducted a survey of all 51 proposed class representatives' complaints, together with a survey of a random sample of the non-class representative cities/counties' MDL cases.  As shown below, these surveys reveal a high degree of cohesiveness with respect to the issues raised by the class members themselves in their own cases, pre-existing any settlement, and pre-existing this motion itself.  Predominance is readily met where mass marketing conduct and representations and/or uniformly concealed fraud are at the heart of the case.  *Hyundai*, at 559-560.  As the underlying complaints reveal, such conduct is at the heart of the Opioids litigation.

In evaluating the qualitative predominance of common vs. individual questions, courts most often must rely on the allegations of a single class complaint and the agreements of the

class proponents.  Here, by contrast, the judicial evaluation of predominance can be informed not only by this Court's own experience in presiding over intensive discovery and pretrial activity in the CTO 1 cases of MDL No. 2804, but by an empirical assessment of what mattered most to the Class members themselves in filing their own cases, which now comprise the MDL.  In this unique litigation scenario, with a proposed Negotiation Class composed of government entities that make decisions and provide public services daily, a significant percentage of whom are active litigants in opioids litigation, the Courts' independent predominance analysis may appropriately be informed by considering the predominating questions from the Class' perspective also.  Predominance is not a matter of "counting noses," but these noses can properly taken into account.

Predominance is satisfied "where the class claims turn on the [defendants'] common course of conduct."  *Hyundai*, at 563.  This is so even where there is no unifying federal cause of action to provide a uniform legal framework.  Courts certify and affirm nationwide settlement classes consisting largely, or entirely, of state law claims, holding that "common questions as to the defendant's knowledge and existence of the problem predominate, notwithstanding 'variations in state law.'"  *Hyundai*, at 563, citing *Hanlon v. Chrysler Corp*. 150 F.3d 1011, 1022-23 (9th Circuit 1999).  Here, the prevalence of the federal statutory Civil RICO claim in the overwhelming majority of suits in the MDL provides an additional, albeit not essential, basis for the finding of predominance.

Of course, whether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether its purpose is litigation or settlement.  A class that is certifiable for settlement need not be certifiable for litigation if the settlement obviates the need to litigate individualized issues that would make a trial unmanageable.  *Hyundai*, citing William B.

- 76 -

1780116.13

Rubenstein, 2 *Newberg on Class Actions* § 4:63 (5th ed. 2018) "Courts . . . regularly certify settlement classes that might not have been certifiable for trial purposes because of manageability concerns."  Variations in state law do not defeat predominance.  "State law variations [are treated] as a subspecies of trial manageability concerns" that are not pertinent in the settlement context.  *Hyundai*, at 563.

Satisfying predominance, as we do through the lens of settlement, as *Amchem* acknowledges and permits, 521 U.S. at 620, is easily accomplished, because in the Opioids litigation, predominance can be demonstrated, not merely alleged.  The fact is that the underlying complaints make predominantly common factual allegations and assert predominately common legal theories against essentially the same set of national defendants.  Our original motion described three categories of nationally active defendants for whom a nationwide negotiating class of cities and counties could be useful:  "defendants conducting nationwide opioids manufacturing, sales or distribution."  These are the defendants that have been named on a recurring basis in the hundreds of cities/counties complaints in the MDL and state courts.  They are also the national manufacturing defendants and national distributing defendants that are the most frequently named (non-bankrupt) entities in the predominance charts described below.

The analysis of the complaints that were filed by the proposed Class Representatives, before they knew they would be class representatives, was conducted to determine whether these complaints alleged the same course of conduct by the nationwide defendants, described in the same basic terms, and raising the same questions of law.  Moreover, in addition to reviewing the complaints filed by proposed Class representatives, we also undertook a review of a randomized sample of Class member complaints.  Specifically, each of the over 1300 city or county complaints in the MDL (all complaints excluding those of the proposed Class representatives,

hospitals, third party payors and Tribes) was assigned a number.  The numbered complaints were then run through a google random number generator, and those complaints that were randomly assigned the numbers one through 50 were then analyzed.  The results are similar to the analysis of the Class representatives, supporting both commonality and predominance.

The charts below show graphically that the same questions about defendants' knowledge, conduct, duty, and the resulting harm, are constants throughout the complaints, and that the legal theories invoked as vehicles for relief—public nuisance and Civil RICO—recur in virtually all complaints.  These overwhelmingly common claims raise common legal questions.  This is an empirical demonstration of predominance (as well as the Rule 23(a) requirements of commonality and typicality) that is more authentic and authoritative than could be accomplished by the conventional approach of filing a consolidated class complaint, alleging a laundry list of common questions, and arguing that they predominate.  This empirical approach reveals identical, recurring questions of fact and law contained in scores of complaints filed independently by different plaintiffs through different counsel.  As a matter of fact, these are the questions that all plaintiffs considered essential and pivotal in their own cases when they filed them.[40]

_____

[40] There is an existing complaint that serves as an exemplar complaint, names the national defendants most likely to utilize the Negotiation Class mechanism, makes the common fact allegations, and asserts the common legal claims that are reflected in the surveys below:  the Cuyahoga County Third Amended Complaint, which is on file in MDL No. 2804 (Doc. #1631), and will be posted on the Class website for ease of reference.  It was filed to serve as the initial bellwether trial vehicle; it was filed by a plaintiff that has conducted extensive discovery in the case, is now preparing for trial, and proposes to serve as a class representative; it is the product of multiple motions to dismiss; it presents the national facts in fulsome manner; it includes the most frequently alleged federal and state claims; and it names all the national manufacturing, sales, and distribution defendants.  A list of all the Defendants name in the operative CT1 & 2 complaints is attached as Exhibit B.

Again this point bears emphasis.  In most class actions, the class claims are framed in the single complaint seeking class certification.  These class claims are presented as a model of what class members would seek.  Here, by contrast, the evidence of commonality and predominance is what class members—by the hundreds—have already claimed as the basis for recompense by the defendants.

Of course, predominance addresses not merely frequency, but importance:  What are the questions whose answers matter most?  Do the questions and claims that demonstrably matter most to the litigants themselves actually predominate in qualitative Rule 23(b)(3) terms?

This unique setting underscores that the fundamental principles underlying predominance are efficiency, fairness, and uniformity of treatment for similarly situated plaintiffs.  William B. Rubenstein, Alba Conte, & Herbert B. Newberg, 2 *Newberg on Class Actions* § 4:49 (5th ed. 2011).  The "predominance test is meant to help courts identify cases in which aggregate treatment would be efficient," so "it focuses on the extent to which the issues in the cases are common as opposed to individual—the more common the issues, the more likely it is that the case will be processed efficiently in the aggregate[.]"  *Id.*  Common issues — those susceptible to generalized, class-wide proof—will predominate "when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced."  2 *Newberg on Class Actions* § 4:50 (5th ed. 2011).  *See also In re Whirlpool*, 722 F.3d at 858 (predominance focuses on "common questions that can be proved through evidence common to the class.")  Functionally, courts first "characterize" the questions of the case as common or individual, and then "weigh" which predominate.  *See Newberg*, § 4:50 for a detailed description of this two-step analysis.

The Sixth Circuit 23(b)(3) jurisprudence reflects this two-step approach, and recognizes

the existence of predominance in situations like this, where a uniform and pervasive pattern of

conduct is alleged, even if the common conduct caused varying harm to individual class

members.  *See, e.g.*, *Martin v. Behr Dayton Thermal Products LLC*, 896 F.3d 405, 408 (6th Cir.

2018) (characterizing issues as either common or individual and finding that 'the common,

aggregation-enabling, issues . . . [were] more prevalent or important than the non-common,

aggregation-defeating, individual issues.').  *Id.* at 415 (citing *Tyson Foods, Inc. v. Bouaphakeo*,

136 S. Ct. 1036, 1045 (2016) (quoting *Newberg*, § 4:45).[41]

Although unique in structure and purpose, the Negotiation Class vehicle proposed here

aligns with *Martin*'s and *Whirlpool*'s common-sense, "characterize and weigh" approach to

predominance.  Here, the entire class makes the same core factual allegations and the same core

legal claims against the defendants who operated nationwide.  And most of the evidence to prove

those claims is exactly the same for every plaintiff.  To be sure, while in most traditional class

actions, the predominance of common questions of law and fact must be alleged, here,

predominance emerges from a review of the complaints of the Class Representatives:

---

[41] The Sixth Circuit similarly found that common issues predominated in *Whirlpool*.  There, the
class comprised Ohio residents who had purchased certain models of Whirlpool washing
machines, which were alleged to have permitted the growth of mold and mildew.  *In re
Whirlpool*, 722 F.3d at 844.  The court found that "liability questions common to the Ohio class
— whether the alleged design defects in the [washing machines] proximately caused mold to
grow in the machines and whether Whirlpool adequately warned consumers about the propensity
for mold growth — predominate[d] over any individual questions" and would "'prevail or fail in
unison.'"  *Id.* at 859.  That issues related to damages were reserved for individual adjudication
did not defeat predominance.



Moreover, a review of a randomized sample of class plaintiffs yields a similar showing:



### 1.   The Plaintiffs Have Sued Common Defendants

The vast majority of the Plaintiffs who have brought cases that are pending in this MDL,

have sued the defendants identified in the operative bellwether complaints.  Using the Class

representatives' complaints, we have ascertained that the vast majority have sued the following

key Defendant groups:

**Manufacturers:** Allergan (90.2%), Endo (98%), Insys (66.7%), Janssen (100%),

Mallinckrodt (94.1%), Purdue (100%), and Teva (98%).

**Distributors:**  AmerisourceBergen (100%), Cardinal Health (100%) and McKesson

(100%).

**Pharmacies:**  CVS (82.4%), Walgreens (86.3%), Walmart (56.9%), and Rite-Aid

(60.8%).[42]

### 2. Core Issues Underlying Claims against Manufacturer Defendants for Their Marketing Practices Turn on Common Evidence

Of the more than 1300 political subdivisions whose cases are pending in this MDL, the

vast majority have brought identical common law and statutory claims against the same

nationwide  Manufacturer Defendants for false or misleading marketing of their prescription

opioids.  By way of example, of the 51 proposed Class Representatives, 100 percent have alleged

false marketing against the Manufacturer Defendants' (which marketing was national in scope).

Moreover, they bring identical claims based on those facts: 100 percent have sued the

Manufacturer Defendants for public nuisance; 86.3 percent have sued the Manufacturer

Defendants under RICO, 18 U.S.C. § 1961, *et seq.*[43]

If any of their cases were to go to trial, the plaintiff would utilize the exact same evidence

---

[42] The fact that there are additional defendants, that are named less frequently by the class
representatives, should not preclude such defendants from using the class settlement vehicle to
negotiate a global settlement if circumstances so warrant.

[43] Given that some plaintiffs sued in state court, such as City of Norwalk, Connecticut, for
example, they likely did not include a RICO claim in an effort to prevent being removed.

to prove their claims and answer the same central questions, for example:

- Whether the Manufacturer Defendant engaged in false or misleading marketing practices concerning prescription opioids;

- Whether the Manufacturer Defendant knew or should have known that its marketing was false or misleading;

- Whether the Manufacturer Defendant's false or misleading marketing contributed to the creation, maintenance, or worsening of conditions inimical, harmful, or adverse to the public health and welfare; and

- Whether the Manufacturer Defendant violated RICO, 18 U.S.C. § 1961 *et seq.*, by forming an association-in-fact enterprise or participating in the conduct of an enterprise through a pattern of racketeering activities to carry out a common purpose of the enterprise: to increase profits through false or misleading marketing.

Fact and expert evidence relating to these issues will bear on all Class members in the same way. *See Martin*, 896 F.3d at 414. Evidence produced in the CTO 1 actions show that Manufacturer Defendants' marketing materials and practices were consistent nationwide. Whether a representation is made, or not, and whether it is true, or not, are quintessential questions susceptible of common proof. *Rikos v. Procter & Gamble Co*., No. 1:11-CV-226, 2014 WL 11370455, at *11 (S.D. Ohio June 19, 2014), *aff'd* 799 F.3d 497, 524 (6th Cir. 2015); *see Gasperoni v. Metabolife, International, Inc.*, No. 00-71255, 2000 WL 33365948, at *6 (E.D. Mich. Sept. 27, 2000) (Predominance is readily satisfied where "all the plaintiffs allege a common method of misrepresentation, and all allege the same legal claim.").

It is telling that the majority of discovery undertaken against the Manufacturer Defendants in the CTO 1 actions could be, and has been, seamlessly adopted by plaintiffs across the country (*e.g.*, the cross-noticing of depositions). And the purpose of their bellwether trial is to determine how these salient legal and factual questions—common to most Class members— would be decided by a jury.

3.    **Core Issues Underlying Claims against Distributor Defendants, Manufacturer Defendants, and Retail Pharmacy Defendants for Their Failures under the CSA Turn on Common Evidence**

The majority of Class members have also brought common law and statutory claims against the nationwide Distributor Defendants, Manufacturer Defendants, and Retail Pharmacy Defendants based on their violations of duties under the Controlled Substances Act.  Of the 51 proposed Class Representatives:  64.70 percent have explicitly adopted the Summit County factual allegations; 100 percent have sued the major Distributor Defendants for public nuisance related to their CSA failures and 96.1% have sued the Manufacturer Defendants for public nuisance related to their CSA failures; and 86.3 percent have sued manufacturer and distributor defendants under RICO, 18 U.S.C. §1961, *et seq.*

Again, if any one of those cases were to proceed to individual trial, the evidence utilized by the plaintiff would be the same, as would the central questions at trial, including:

- Whether the Distributor Defendant, Manufacturer Defendant, or Retail Pharmacy Defendant had duties under the Controlled Substances Act with respect to opioids;

- What was the scope of such duties;

- Whether the  Distributor Defendant, Manufacturer Defendant, or Retail Pharmacy Defendant violated those duties;

- Whether such violations contributed to the creation, maintenance, or worsening of conditions inimical, harmful, or adverse to the public health and welfare; and

- Whether the particular Distributor Defendant or Manufacturer Defendant violated RICO, 18 U.S.C. §1961 *et seq.*, by forming an association-in-fact enterprise or participating in the conduct of an enterprise through a pattern of racketeering activities to carry out a common purpose of the enterprise: to increase profits by increasing quotas, concealing each other's failures, and failure to maintain and report suspicious orders, in violation of the requirements of the Controlled Substances Act with respect to opioids.

These core issues all turn on common evidence.  Evidence in the CTO 1 actions confirm that Defendants' suspicious order monitoring policies were uniform nationwide, and the

coordination and implementation were centralized within each Defendant's operations. Defendants' conduct either violated the CSA or it did not.  Whether those violations contributed to the creation or worsening of detrimental public health conditions depends on expert evidence that will not vary from plaintiff-to-plaintiff, nor does evidence tending to prove or disprove Defendants' conspiratorial conduct.  No plaintiff's claim can proceed without resolving these issues, and so predominance is satisfied.  *See Williams v. Duke Energy Corp.*, No. 1:08-CV-46, 2014 WL 12652315, at *14 (S.D. Ohio Mar. 13, 2014)  ("because [p]laintiffs allege that the conduct of [defendant] and the other alleged conspirators was part of the same illegal pattern and scheme, the common issues of fact and law arising from that conduct predominate[.]")

As demonstrated by a review of the Class Representatives' complaints, the factual allegations related to false marketing and suspicious order monitoring are common to each and every one of those complaints, and the suspicious order monitoring allegations are included in every complaint that included pharmacies as defendants.



**4.    Common Questions of Law and Fact Outweigh Individual Questions in Importance and Significance to the Disposition of Opioids Litigation**

"Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that these questions will be answered, on the merits, in favor of the Class."  *Amgen*, 568 U.S. 455, 133 S. Ct. 1184, 1191 (emphasis in original).  As noted above, to evaluate predominance without deciding the merits, a court must "first *characterize* the issues in the case as common or individual, and then *weigh* which predominate."  2 *Newberg on Class Actions* § 4:50 (5th ed. 2010).  In *Tyson Foods, Inc. v. Bouaphakaeo*, 136 S. Ct. at 1045, the Supreme Court explained how the process works:

> An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, classwide proof.  The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.  When one or more of the central issues in the action are common to the class, and can be said to predominate the action may be proper under Rule 23(b)(3) even though other important matters may have to be tried separately, such as damages or some affirmative defense peculiar to some individual class members." (Alteration, citations and internal quotation marks omitted).

Here, as to the national defendants for whom a Negotiation Class could be most useful, common questions regarding liability—as to each defendant's knowledge, conduct and duty at any given time, cannot be said to vary among individual class members.  And even damages, an individual issue requiring individual adjudication in most Rule 23(b)(3) Class Actions, would be resolved here at one stroke; because the allocation system among Class members is already in place.

To be sure, every complaint alleges, of necessity, some individual facts.  These are the narratives of how the crisis affected each particular community, and the specific damages that

- 86 -

1780116.13

resulted.  The question of "how much?" is of necessity individual, and of necessity would be answered at trial, but has already been addressed in this systematic settlement mechanism that allocates damages fairly.

The common liability-related issues raised by the allegations regarding defendants' conduct, products, knowledge, and duties predominate in importance in the practical ways relating to judicial economy, efficiency, and cost-effectiveness.  In the litigation context, these questions are the ones that must be answered before each plaintiff's damages could even be addressed.  Of necessity, they comprise the bulk of each of the underlying complaints.[44]

It is well-established that individualized damages do not defeat class certification, even for litigation purposes *See Whirlpool*, 722 F.3d at 861; *Sterling v. Veliscol Chem. Corp.*, 855 F.2d at 1197[45]; and that the state law claims additionally asserted in many complaints raise questions of law that involve groups of plaintiffs, rather than any one individually.  Those would be addressed by subclassing or severance, in a litigation class context.  *Whirlpool*, 722 F.3d at 860.  They are certainly not a barrier to certification for resolution purposes.  *Amchem*, 521 U.S. at 620.

### B.    Rule 23(b)(3)'s Superiority Requirement Is Met

Rule 23(b)(3) asks the relative, rather than absolute, question of whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy," not

---

[44] In the <u>Cuyahoga County Third Amended Complaint</u>, for example, 242 pages are devoted to common issues while 48 are Ohio/Cuyahoga specific.

[45] As *Whirlpool* noted, no matter how individualized the issue of damages may be, determination of damages may be reserved for individual treatment, with the question of liability tried as a class action, and "recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.," 722 F.3d at 861, *citing Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564-68 (6th Cir. 2007).

whether it is a perfect solution.  Rule 23(b)(3) superiority is most obvious when the vindication of small claims would be precluded by the cost of pursuing them individually.  *See Amchem*, 521 U.S. at 617; *Carroll v. Compucred Collections, Inc.*, 399 F.3d 620, 625 (6th Cir. 2005).  The superior feasibility of a class mechanism, particularly to facilitate settlement, is as self-evident here, where the sheer scale of damage done by the opioids epidemic is staggering, discovery and trial is complex and costly for all parties, and the claims of each of the thousands of cities and counties facing the ongoing economic burden is substantial.  Some method must be found to conserve finite funds otherwise exhausted in replicative litigation, and to allocate them fairly among all who need them.

The Negotiation Class voting process is the superior mechanism to maximize the prospect of comprehensive rather than piecemeal settlement.  Comprehensive settlements are inherently superior ways of delivering programmatic, sustained, enforceable, cost-effective and equitably allocated remedies-precisely the outcome all cities and counties have a legitimate interest in obtaining here.

Rule 23(b)(3) includes a non-exhaustive list of factors pertinent to the court's 'close look' at the predominance and superiority criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem*, 521 U.S. at 616.

Each of these (A)-(D) superiority factors strongly favors certification of the Negotiation Class to effectuate optimal classwide settlements for cities and counties.

(A) <u>Individual control</u>.  The JPML's centralization of all opioid litigation in this forum

necessarily curtailed class members' capacity to individually control their own litigation, yet the Negotiation Class aims at giving some of that control and autonomy back to class members within an aggregate framework.  The Class itself reflects these entities' interests in autonomy and self-determination through voting, while giving them a collective voice.  It gives class members the capacity to offer a credible settling partner without the risk of holdouts or strategic objections from a minority.  If class members choose to stay in the class, they are knowingly making the decision to trade their right to exit for a right to participate in a comprehensive settlement mechanism.  This class includes an innovation that further enhances superiority while honoring individual control:  the added feature of voting rights, to augment the traditional option of class members—to object to or opt out of pre-negotiated settlements, by giving them voice, and votes, at the outset of each settlement cycle.

(B) Extent of Existing Litigation.  So many cases raising common questions of fact have been filed that an MDL has already been established, centralizing over 1200 cases, most brought by cities and counties, based on the same general facts or fact issues, and asserting similar claims.  Hundreds of additional analogous suits have been brought by cities and counties in state courts.  This motion would not remove them to federal court, make them part of MDL 2804, or disturb their progress.  It would, however, provide a central mechanism to effectuate a voluntary classwide solution for all of them.

(C) Limited-Purpose Centralization.  Again, the JPML's centralization of federal litigation in this forum already addresses this prong.  The proposed Negotiation Class recognizes the need to organize a fair and efficient mechanism to facilitate the resolution of hundreds of existing suits, while enabling many thousands of additional cities and counties to participate in resolutions that benefit all, while avoiding the ever-greater proliferation of individual suits.  It

coordinates the resolution mechanism in a centralized and logical forum, the MDL Court, without interfering with the prosecution of state court actions by those who desire to pursue them. It transcends the palpable management difficulties of both the individualized multi-jurisdictional piecemeal litigation of cities' and counties' claims as it now exists, *and* the management challenges of a litigation class, by *creating* a classwide resolution mechanism.  This class includes an innovation that further enhances superiority:  the added feature of voting rights, to augment the traditional option of class members—to object to or opt out of pre-negotiated settlements, by giving them voice, and votes, at the outset of each settlement cycle.

Moreover, the class members vote globally, and act to implement settlements locally, balancing common interests and individual needs.  Each county and its constituent cities must determine how to allocate the county-level settlement amount, to account for the variance, from place to place, of the services provided and the burdens undertaken by each.

(D) <u>Manageability</u>.  Neither Rule 23 itself nor its interpretive case law divides class actions into litigation and settlement subspecies, though recently-amended Rule 23(e) borrows and builds on class action settlement approval case law by codifying a specific court approval process (including a process to resolve previously uncertified cases, including uncertifiable-for-trial cases) and articulates the criteria to inform it.  Moreover, Rule 23(b)(3)'s own factors are functionally inflected.  As the Supreme Court has noted, "Settlement is relevant to a class certification" and in the "Settlement-only" class certification context, "a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.

Here, the Negotiation Class fulfills the Rule 23(b)(3)(D) manageability factor not merely in the negative sense—by avoiding intractable trial management concerns—but in a positive way,

by creating a more manageable (and fairer) vehicle for negotiating and considering potential

settlements than would either piecemeal, serial negotiations with thousands of entities, or a

traditional settlement class in which the class and the court are simultaneously presented with a

done deal.  Here, the class manages the process of ready agreement. [46]

The certification of a class of governmental decision-makers—cities and counties—to

create a voting trust to consider, in turn, prospective comprehensive settlement of claims against

specific defendants in this litigation is an innovative application—and satisfaction of,

Rule 23(b)(3)(A)-(D) requirements.  Here, the issue is not one of a common question of conduct

or liability, nor the actual adjudication, on the merits, of any claim or issue.  Rather, it is a

common issue of process:  how to establish a procedural mechanism that provides integrity and

inclusiveness to the process of settlement consideration and approval.

In the usual class action, a relatively passive class awaits a settlement proposal that is pre-

negotiated, and pre-approved.  After the court has made a preliminary finding that the proposed

settlement is likely to be approved, notice is sent to potential "settlement class" members who

then have three choices:  stay in the class and await final approval, and a subsequent claims or

distribution process; "opt out" of the class and go their own way; and stay in the class and object

to the settlement.  These alternatives, as a matter of well-established law, provide sufficient due

process to class members, in conjunction with active scrutiny by the court.

In this case, the Class is unique:  comprised of governmental decision makers who

---

[46] We note in passing another path to certification of the Negotiation Class.  As approved by the Sixth Circuit, "Rule 23(c)(4) contemplates using issue certification to retain a case's class character where common questions predominate within certain issues and where class treatment of those issues is the superior method of resolution."  *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018), *cert. denied,* 139 S. Ct. 1319 (2019).

themselves have constituencies, and are used to active decision-making.[47]  They are in the business of governing, of making contacts, and of figuring out how to maximize their resources in pursuit of their needs.  Authorization by voting, through boards of supervisors, city councils, or analogous bodies, is what they do.  It is thus appropriate to assure their optimal participation at every practicable stage of the settlement negotiation and approval process.  Accordingly, here the class comes <u>first</u>, before any proposed settlement, to decide for itself whether the allocation system described in this motion and on the Negotiation Class website, is one in which each wishes to participate.  Moreover, this participation is informed:  class members know they will have a vote, and that a supermajority of both large and small entities will be required before any settlement proposed by the defendants is approved by them.  Thereafter, the additional, and traditional, class protection of the Rule 23(e) settlement approval process will apply.

Accordingly, it is appropriate both under Rule 23(b)(3) for the Negotiation Class to be certified so that this active participation, decision-making, voting trust process can be put in place, creating a pre-existing and cohesive class of cities and counties whose interests are aligned in obtaining the optimal settlement to address and battle the opioid crisis that affects them all.

## X.  <u>ATTORNEYS' FEES AND COSTS</u>

This litigation centralizes over two thousand suits, predominantly brought as individual

---

[47] As the *ALI Principles* observes, it is precisely because of the class members' sophistication that the proposal here is so reasonable.  *See, e.g.*, § 3.17 comment d.(2) ("Sophisticated clients, such as businesspersons or investors, are more likely than others to appreciate the benefits and risks of subjecting themselves to some form of substantial-majority rule.  Consequently, it is easier to justify the use of [substantial-majority] voting rules when sophisticated clients are involved").  *See also* Reporters' Notes to § 3.17, at 271-75 (citing extensive authority on the ethical propriety of appropriate voting procedures for businesses and other sophisticated clients).  Here, the Class is comprised entirely of a specific category of sophisticated clients:  local governmental entities, for whom voting is existential and familiar.

cases by cities and counties who are represented by private counsel.  This Court has reiterated

that the filing of an individual suit is not a prerequisite for participation in a global settlement

(Doc #739).  Judicial economy would be ill-served by the necessity of additional filings of suits

asserting the same claims against the same defendants.  At the same time, it is the active

prosecution of individual suits in this litigation, and in related state court litigation, that has

served to advance both the individual cases themselves, and the litigation as a whole.  It is

accordingly essential, from the standpoint of public policy and equity, that a proportional system

for reimbursement of costs and award of fees to those who have served the common benefit of

plaintiffs as a whole, and individual clients, be established in conjunction with the Negotiation

Class mechanism.

### A.  Class Counsel/Common Benefit Fees

If the Negotiation Class reaches a settlement with one or more national defendants, any

application for the award of class counsel/common benefit fees in connection with such

settlement will be made pursuant to the procedures and requirements of Rule 23(h), under the

Sixth Circuit's prevailing standards for class counsel awards.[48]  This means that members of the

Negotiation Class will receive notice, and be provided an opportunity to comment on or object to

any class counsel/common benefit fees application.  The fee sought, whether as a percentage of a

common fund, as an award negotiated separately and subsequently for additional payment by

settling defendant, or as a combination thereof, would be for all counsel who have performed

work for the common benefit of the Class, with reference to this Court's common benefit orders

---

[48] *See, e.g.*, *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009); *In re Sulzer Orthopedics Inc.*, 398 F.3d 778, 780 (6th Cir. 2005); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010).

and protocol (e.g., Case Management Order No. 5 filed June 19, 2018, Doc. #636; Order

Regarding Plaintiff Attorneys' Fees and Expenses, May 1, 2018, Doc. #358).

As noted above, this Court has already put in place orders and protocols to govern the

keeping and reporting of common benefit time and costs.  These protocols will be utilized in

conjunction with such application to the court, whether, in the case of a particular settlement, the

fee is sought as a percentage of the Class fund, or whether a fee has been negotiated separately

with a defendant, subsequent to and separate from the negotiation of class benefits.  Either way,

the application will be public, will be subject to Class member comment, and must be approved

by the court under the legal standards of Rule 23(h) jurisprudence that guide courts in

determining fair and reasonable fees.

It is anticipated that, consistent with contemporary MDL practice, the court will be asked

to appoint a Fees Committee to recommend an allocation among common benefit applicants, that

a Special Master will be involved in the process to resolve any disputes, and that, of course, the

resulting recommendations will be subject to the approval of the court.  MDL Transferee Courts

have utilized Court-appointed fees committees, in both the class actions and mass actions

contexts, to review, evaluate, and make recommendations on awards to the many attorneys,

whether or not previously formally appointed by the court to leadership positions, who have

nonetheless devoted their time, efforts, and expenditures to activities, including discovery,

pretrial motions and briefing, and factual investigation, that have advanced the litigation for the

benefit of plaintiffs generally.  The goal is to assure that any and all class counsel/common

benefit fees applications, including compensation of time, recognition of excellence and effort,

and reimbursement of costs incurred, will be proportional to the particular settlement as to which

it is sought, and will be analyzed and awarded in accord with best practices of contemporary

attorneys' fees jurisprudence.  In no case will any counsel be allowed to "double dip"—that is, to seek or receive payment of the same time, services, or costs more than once, from any source or combination of sources.

### B. The Private Attorneys' Fees Fund

As noted above, this MDL is comprised predominantly of individual actions, brought by counsel on behalf of cities' and counties' clients who entered into private contingency fee contracts.  A private fees fund ensures that private counsel are adequately compensated, while also delivering the economies of scale that class actions provide, and assuring that litigating entities and none litigating entities are treated equitably, vis-à-vis each other, with respect to their net recoveries under any settlement.  The Private Attorneys' Fees Fund, comprised of up to but no more than 10% of any Negotiation Class Settlement Fund, provides a source of recovery on contingency fee contracts, upon application and subject to court approval, in lieu of the enforcement of such contracts against clients, while at the same time equalizing both the burdens and benefits of the litigation itself.  Like the Class Counsel/Common Benefit Fees, fees applications to the Private Attorneys' Fees Fund would be made to a Special Master, subject to the Special Master's recommendation, and ultimately subject to the approval of the court.  It is anticipated that a Private Fees Committee will be appointed by the Court and that this Committee will interact with the Common Benefit Fees Committee to assure against "double-dipping:"  that is, to make sure that the same time, work, and costs are not reimbursed or compensated more than once, whether from the same or different sources.

Like the Class Members' Special Needs Fund, the Private Attorneys' Fees Fund will be subject to reversion to the Class:  that is, any unawarded and unapproved funds will be returned to the Class.  Similarly, funds remaining from one settlement would be utilized in awards of the fees and costs in subsequent settlements, to lessen the amount sought in connection with such

- 95 -

subsequent settlements for fees and costs.  This "waterfall" provision, which applies to class fees

also, assures that fees and costs applications, whether made by class counsel/common benefit

counsel under Rule 23(h), or by private counsel in lieu of contingency fees to the Private Fees

Fund, are never excessive, are always based upon the recognized and established factors utilized

by the courts in awarding fees, and are always proportional to the results obtained for the

Negotiation Class and its members.

## XI.    THE CLASS MEMBERS' SPECIAL NEEDS FUND

The Class Members' Special Needs is not part of the award of Attorneys' Fees or costs.

It is monetary relief and/or reimbursement that will flow to members of the Negotiation Class,

litigating or not, through an application process (i.e., outside of the classwide allocation

formula).  The Class Members' Special Needs Fund recognizes that, while the allocation formula

utilizes objective data and reflects the input of public health economists and Class members,

there may nevertheless be special circumstances in which equity requires that the particular

needs of Class members on a local or regional basis need to be addressed in order to promote the

purposes of the settlement, to fight and abate the opioids epidemic.  Thus, the Class Members'

Special Needs Fund creates flexibility by serving two functions:  (1) it provides a source of

recovery for the special needs and expenditures of any Class member that may fall outside of, or

are otherwise not addressed by, the classwide allocation formula, which is designed based upon

objective nationwide statistical information and models to serve the majority of class members.

(2) it recognizes the reality that the litigating entities that have advanced the litigation not only

for themselves, but to the benefit of all others, may have incurred out-of-pocket costs in

prosecuting the litigation.  These costs, incurred by the entities themselves (as distinct from costs

of litigation borne by outside attorneys) such as the time and costs of their law departments or

legal staffs, would be subject to reimbursement out of this fund, upon application and approval

1780116.13

by a Court appointed Special Master.

The Class Members' Special Needs Fund best promotes the equitable allocation of the settlement among all class members by paying costs, incurred by the Class members themselves, that redounded to the common benefit, and by providing flexibility to fill in any gaps in the overall allocation system.  To the extent the segregated Class Members' Special Needs Fund is not fully utilized, any remaining amount will revert to the overall Class settlement fund.

## XII.   THE CLASS NOTICE AND DIRECT NOTICE PROGRAM FULFILL THE "BEST PRACTICABLE NOTICE" STANDARDS OF RULE 23(c)

All members of the proposed class are known governmental entities, identified by the United States Census Bureau, and listed on the Negotiation Class website, www.opioidsnegotiationclass.com.  Each is an official and self-conscious entity, each is reachable by mail and/or email, and each will so be notified here.  Such direct and individualized notice is the gold standard under Rule 23(c), fulfills all due process requirements, and, most importantly, will reach and provide all class members with the information they will need to make class membership decisions.

Fed. R. Civ. P. 23(c)(2)(B) describes the notice to be given to a Rule 23(b)(3) Class:

For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:

(i)      the nature of the action;
(ii)     the definition of the class certified;
(iii)    the class claims, issues, or defenses;
(iv)     that a class member may enter an appearance through an attorney if the member so desires;
(v)      that the court will exclude from the class any member who requests exclusion;

(vi)     the time and manner for requesting exclusion; and

(vii)    the binding effect of a class judgment on members under Rule 23(c)(3).[49]

The form of the proposed Class Notice and the FAQs attached to the [Proposed] Order filed with this Motion include the information specified in Rule 23(c)(2)(B).  They will be mailed and emailed to all Class members by a retained and Court-approved notice provider. They will also be posted, together with the Class lists, Settlement Allocation Lookup Tool, the Motion, this Memorandum, and further motions and orders of the Court, as well as additional pertinent information as it becomes available, on the Class website.  The Class website, opioidsnegotiationclass.com, will serve as a central information clearinghouse for the Class, enabling informed and active ongoing participation by providing Class members with the following:

### Opioid Negotiation Class Official Website Content Checklist

1.   Class Member Lists Compiled from U.S. Census Bureau Data.

2.   Allocation Lookup Tool

3.   Notices of Motions, Motions and Memoranda in Support of Negotiation Class Certification

4.   Order Granting Class Certification and Approving Class Action Notice

5.   Class Action Notice

6.   Allocation Formula (explain MME/overdose deaths/OUD one-third/one-third/one -third and describe supporting metrics

7.   Voting Procedure Summary and Supermajority formula

8.   Frequently Asked Questions ("FAQs")

9.   Link to the Court's MDL 2804 website, www.ohnd.uscourts.gov/mdl-2804, and a general Opioids litigation information website nationaprescriptionopiatemdl.com

---

[49] Courts have flexibility to allow those who opt out in error or precipitously to opt back in, to share in the Class benefits, if to do so will be fair to the Class and to interested defendants' ability to determine the scope of the Class in approaching the negotiation.  Here plaintiffs support such a "right of return" if it is requested by an entity within 30 days of the Court's confirmation order.

**Opioid Negotiation Class Official Website Content Checklist**

10.  List of Class Representatives

11.  List of Class Counsel

12.  Exclusion Request description and procedure

13.  Schedule of deadlines and hearing dates

## XIII.  <u>CONCLUSION</u>

WHEREFORE, Plaintiffs respectfully urge that the Court certify the Negotiation Class under 23(a) and (b)(3), appoint Class Representatives and Class Counsel, issue an Order directing notice to the proposed Class, and enter an order confirming Class membership after the completion of the notice program and opt-out period.

Dated:  July 9, 2019            *Proposed Co-Lead Class Counsel*


By:     /s/ Jayne Conroy
        Jayne Conroy

SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
Tel:    212-784-6401
Fax:    212-213-5949


By:      /s/ Christopher A. Seeger
        Christopher A. Seeger

SEEGER WEISS LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
Tel:    973-639-9100
Fax:    973-639-9393
Email:  cseeger@seegerweiss.com

1780116.13

*Proposed Class Counsel*

J. Gerard Stranch, IV
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Tel:    615-254-8801
Fax:    615-255-5419
Email: gerards@bsjfirm.com

Zachary Carter
NEW YORK CITY LAW DEPARTMENT
CORPORATION COUNSEL OF THE CITY OF NEW YORK
100 Church Street
New York, NY 1000
Tel:    (212) 345-1000
Email  zcarter@law.nyc.gov

Louise Renne
RENNE PUBLIC LAW GROUP
350 Sansome Street, Suite 300
San Francisco, CA  94104
Tel:    415-848-7200
Fax:    415-848-7230
Email: lrenne@publiclawgroup.com

Mark A. Flessner
CORPORATION COUNSEL
CITY OF CHICAGO
121 North LaSalle Street, Suite 600
Chicago, IL  60602
Tel:    (312) 744-0200
Email:

1780116.13

*Plaintiffs Co-Lead Counsel*

By:     /s/ Joseph F. Rice
        Joseph F. Rice

MOTLEY RICE LLC
28 Bridgeside Blvd. 17th Floor
Mount Pleasant, SC  29464
Tel:    843-216-9000
Fax:    843-216-9450
Email: jrice@motleyrice.com

Paul T. Farrell, Jr.
GREENE KETCHUM, FARRELL, BAILEY & TWEEL, LLP
419 Eleventh Street
Huntington, WV  25701
Tel:    304-525-9115
Fax:    304-529-3284
Email: paul@greeneketchum.com

Paul J. Hanley, Jr.
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
Tel:    212-784-6401
Fax:    212-213-5949

*Plaintiffs' Liaison Counsel*

By:     /s/ Peter Weinberger
        Peter Weinberger

SPANGENBERG SHIBLEY & LIBER, LLP
1001 Lakeside Avenue, E, Suite 1700
Cleveland, OH 44114
Tel:    216-696-3232
Fax:    216-696-3924
Email: pweinberger@spanglaw.com

1780116.13

Steve Skikos
SKIKOS, CRAWFORD, SKIKOS AND JOSEPH
1 Sansome Street, Suite  2830
San Francisco, CA 94104
Tel:     415-546-7300
Fax:     415-546-7301
Email: sskikos@skikos.com

Troy Rafferty
LEVIN, PAPANTONIO, THOMAS, MITCHELL,
  RAFFERTY AND PROCTOR
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel:     850-435-7163
Fax:     850-436-6163
Email: trafferty@levinlaw.com

*Plaintiffs' Executive Committee*


By:      /s/ Elizabeth J. Cabraser
            Elizabeth J. Cabraser

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel:     415-956-1000
Fax:     415-956-1008
Email: ecabraser@lchb.com

Don Barrett
BARRETT LAW GROUP,
404 Court Square, P.O Box 927
Lexington, MS 39095
Tel:    662-834-2488
Fax:    662-834-2628
Email: DonBarrettPA@gmail.com

James E. Cecchi
CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY &
  AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Tel:    973-994-1700
Fax:    973-994-1744
Email: jcecchi@carellabyrne.com

Erin K. Dickinson
CRUEGER DICKINSON LLC
4532 North Oakland Avenue
Whitefish Bay, WI 53202
Tel:    414-210-3767
Email: ekd@cruegerdickinson.com

James R. Dugan, II
THE DUGAN LAW FIRM, APLC
365 Canal Street, Suite 1000
New Orleans, LA 70130
Tel:    504-648-0180
Fax:    504-648-0181
Email: jdugan@dugan-lawfirm.com

By:    /s/ Paul J. Geller
        Paul J. Geller

ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Tel:    561-750-3000
Fax:    561-750-3364
Email: pgeller@rgrdlaw.com

1780116.13

Michael J. Fuller
MCHUGH FULLER LAW GROUP
97 Elias Whiddon Road
Hattiesburg, MS 39402
Tel:     601-261-2220
Fax:     601-261-2481
Email:  mike@mchughfuller.com

R. Eric Kennedy
WEISMAN KENNEDY & BERRIS CO., LPA
1600 Midland Bldg.
101 Prospect Avenue, W
Cleveland, OH 44115
Tel:     216-781-1111
Fax:     216-781-6747
Email:  ekennedy@weismanlaw.com

W. Mark Lanier
LANIER LAW FIRM
6810 FM 1960 West
Houston, TX 77069
Tel:     713-659-5200

Peter J. Mougey
LEVIN, PAPANTONIO, THOMAS, MITCHELL, RAFFERTY &
  PROCTOR, PA
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Tel:     850-435-7068
Fax:     850-436-6068
Email:  pmougey@levinlaw.com

Ellen Relkin
WEITZ & LUXENBERG, P.C.
700 Broadway 5th Floor
New York, NY 10003
Tel:     212-558-5715
Fax:     212-344-5461
Email:  erelkin@weitzlux.com

Lynn Sarko
KELLER ROHRBACK
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel:     206-623-1900
Fax:     206-623-3384
Email: lsarko@kellerrohrback.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel:     212-397-1000
Fax:     646-843-7603
Email: hunter@napolilaw.com

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd. Suite 1600
Los Angeles, CA 91436
Tel:     818-839-2333
Fax:     818-986-9698
Email: rtellis@baronbudd.com

James D. Young
MORGAN & MORGAN
76 South Laura Street, Suite 1100
Jacksonville, FL 32202
Tel:     904-361-0012
Fax:     904-366-7677
Email: jyoung@forthepeople.com

*On the Brief*:
Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Tel:     (212) 998-6580
Email: si13@nyu.edu

# EXHIBIT A



SIMMONS HANLY CONROY
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL DOCKET NO.: 2804 |
| | Hon. Judge Dan A. Polster |
| *This document relates to: ALL CASES* | |

**DECLARATION OF JAYNE CONROY IN SUPPORT OF HER APPOINTMENT AS CLASS COUNSEL FOR THE CITIES/COUNTIES NEGOTIATION CLASS**

I, Jayne Conroy of the law firm of Simmons Hanly Conroy LLC ("SHC") submit this declaration in support of my appointment as Rule 23(b)(3) Cities/Counties Negotiation Class Counsel.

**My Professional Experience and Leadership in Class Actions and MDL Litigation**

1. I am a name and managing partner of Simmons Hanly Conroy LLC, based in Alton, IL, which also has offices in New York, NY, Chicago, IL, San Francisco, CA, Los Angeles, CA and St. Louis, MO. I also have the privilege of serving in the firm's complex and mass tort litigation group. My office is in New York City and I am a long-standing member in good standing of the bars of the states of New York and Massachusetts, as well as the District of Columbia. I am also admitted to practice in the Federal District Courts of New York, Massachusetts and the District of Columbia.

2. I have been personally appointed to serve as co-lead counsel, steering committee member, and executive committee member and in other leadership roles in

*We stand for our clients.*

| HEADQUARTERS | NEW YORK | CHICAGO | SAN FRANCISCO | LOS ANGELES | ST. LOUIS |
|---|---|---|---|---|---|
| One Court Street | 112 Madison Avenue | 230 W. Monroe | 455 Market | 100 N. Sepulveda Blvd. | 231 S. Bemiston |
| Alton, IL 62002 | New York, NY 10016 | Suite 2221 | Suite 1150 | Suite 1350 | Suite 525 |
| TEL: (618) 259-2222 | TEL: (212) 784-6400 | Chicago, IL 60606 | San Francisco, CA 94105 | El Segundo, CA 90245 | St. Louis, MO 63105 |
| FAX: (618) 259-2251 | FAX: (212) 213-5949 | TEL: (312) 759-7500 | TEL: (415) 536-3986 | TEL: (310) 322-3555 | TEL: (800) 479-9533 |
| | | FAX: (312) 759-7516 | FAX: (415) 537-4120 | FAX: (310) 322-3655 | |

July 8, 2019                                                                          Page 2

numerous complex multi-district litigations and class actions. I focus my practice in the
areas of mass tort, sexual abuse, products liability and consumer fraud and I have an
established track record of helping lead some of the most complex and important MDLs
and class actions on behalf of injured plaintiffs and consumers. For the purposes of this
declaration, I will list a few of the most relevant cases where I have served in a court-
appointed leadership position:

- Court-appointed member of the Plaintiffs' Steering Committee in *In re:
  Volkswagen "Clean Diesel" Marketing, Sales Practices, And Products
  Liability Litigation*, MDL No. 2672 (N.D. Cal.)

- Court-appointed member of Plaintiffs' Steering Committee in *In re:
  Syngenta AG MIR162 Corn Litigation*, MDL 2591 (D. Kan. Jan. 21, 2015)

- Court-appointed member of Plaintiffs' Steering Committee in *In re:
  Actos Products Liability Litigation*, MDL 2299 (W.D. La. 2012)

- Court-appointed member of Plaintiffs' Steering Committee in *In re:
  Pelvic Repair System Products Liability Litigation*, MDL 2325, 2326 & 2327
  (S.D. W. Va. 2012)

- Court-appointed member of Plaintiff's Executive Committee in *In re:
  DePuy Pinnacle Hip Implant Products Liability Litigation*, MDL 2244 (N.D.
  Tex. Jan. 9, 2012)

- Co-chair of Environmental Testing Committee in *In re: Oil Spill by the Oil
  Rig "Deepwater Horizon" in the Gulf Of Mexico*, on April 20, 2010
  Litigation, MDL 2179 (E.D. La.)

- Court-appointed member of Lead Counsel Committee for Economic
  Loss Claims in *In re: Toyota Motor Corp. Unintended Acceleration
  Marketing, Sales Practices and Product Liability Litigation*, MDL 2151 (C.D.
  Cal.)

- Court-appointed co-chair of Plaintiffs' Law and Briefing Committee in
  *In re: Yazmin and Yaz (Drospirenone) Marketing, Sales Practices and
  Products Liability Litigation*, MDL 2100 (S.D. Ill.)

July 8, 2019                                                                                      Page 3

- Court-appointed member of Discovery and Science Committees, Trial Team and Common Benefit Allocation Committee in *In re: Bextra and Celebrex Products Liability Litigation*, MDL 1699 (N.D. Cal.) and New York State Coordinated Proceedings

- Court-appointed member of Plaintiffs' Executive Committee in *In re: Zyprexa Litigation*, MDL 1596 (E.D.N.Y.)

3.      My 30 plus years of experience in mass torts has included the initiation, discovery, trial and appeal of thousands of cases, including bellwethers, class actions and individual cases.   I have been intricately involved in the negotiation, settlement discussions and ultimate resolution of mass tort MDLs, major class action MDLs and numerous other class actions and individual cases.

4.      Other lawyers at SHC have also served in leadership roles in significant mass tort actions. My partner, Paul J. Hanly, Jr., is currently Co-Lead Counsel in this case. Lawyers at the firm currently have served on the Plaintiffs' Executive and/or Steering Committees in *In Re: Testosterone Replacement Therapy Products Liability Litigation*, MDL 2545 (N.D. Ill.); *In Re: Chantix (Varenicline) Products Liability Litigation*, MDL 2092 (N.D. Ala.); *In re Propecia (Finasteride) Products Liability Litigation*, MDL No. 2331 (S.D.N.Y); *In re Ephedra Products Liability Litigation*, MDL 1598 (S.D.N.Y); and *In re: Medtronic, Inc. Implantable Defibrillators Product Liability Litigation*, MDL 1726 (D. Minn.).

5.      In addition, shareholders of the firm have previously served on the Plaintiffs' Executive Committee in *In re Terrorist Attacks on September 11, 2001*, MDL 1570 (S.D.N.Y), which includes class actions, individual personal injury, death and property damage claims as well as serving as and co-lead counsel in the New Jersey state-court coordination *In re Zelnorm Litigation*, Case 28 (N.J. Superior Ct.).

6.      SHC also has extensive experience in class action litigation. Class actions in

July 8, 2019                                                                                     Page 4

which SHC members have served as class counsel or co-counsel include *St. Louis v. Perlitz*, Case No.: 3:13-cv-01132 (D. Conn.); *Parko v. Shell Oil Company*, 3:12-cv-00336-NJR-RJD (S.D. Ill.); *Keltner v. SunCoke Energy, Inc.*, Case No.: 2014-L-1540 (Ill. Cir. Ct. Madison Co.); *Buck et. al v. Republic Services, Inc.*, 4:13-cv-801-TCM (E.D.Mo.); *Chambers v. Merrill Lynch & Co., Inc.*, et al., 10-cv-07109 (S.D.N.Y.); *Madanat v. First Data Corporation*, 11-cv-364 (E.D.N.Y); *Closson v. Bank of America*, 04- 436877 (Cal. Superior Ct., S.F. Co.); *Remson v. Verizon*, 07-cv-5296 (E.D.N.Y); *Jones v. Honeywell International, Inc.*, 04-009174 (Fla. Cir. Ct., Hillsborough Co.); *Thomas v. ConocoPhillips, Inc.*, 2008 CA 001381 (Fla. Cir. Ct., Escambia Co.).  We are thus fully familiar with the responsibilities of class counsel.

**Opioid Litigation**

7.      My firm and I have extensive experience with opioid litigation and played a significant role in identifying and investigating the claims at issue here.

8.      In 2003, I, along with several members of my firm, commenced truly ground-breaking opioid litigation against Purdue Pharma LLP and Abbott Laboratories, Inc., for damages suffered by more than 5,000 clients prescribed the prescription opioid OxyContin. At the time, SHC[1] was the only major plaintiffs' firm in the country to prosecute such claims. We were not dissuaded from waging expensive and time-consuming litigation, even though other plaintiffs' firms derisively suggested that the firm was wasting its time pursuing such "problematic" claims against two major drug companies.  Following a three-plus-year battle that included extensive documentary

---

[1] At the time we commenced the OxyContin litigation against Purdue, SHC did not exist in its current form.  The cases were brought and litigated jointly by the New York law firm Hanly & Conroy, of which I was a founding partner, and the Illinois-based Simmons Firm.  The two firms later merged to form SHC.

July 8, 2019                                                                                    Page 5

discovery, numerous depositions and dispositive motions, including the separate filing by SHC of more than 1,200 cases in various courts across the nation, Purdue Pharma settled all 5,000+ of the clients' claims for $75 million.

9.      On August 31, 2016, my firm, representing Suffolk County New York, commenced one of the first lawsuits in the country brought by a governmental entity against the manufacturers of opioids to recover the costs of the opioid epidemic.  SHC filed scores of opioid claims on behalf of cities and counties around the country in 2016 and 2017, well before the creation of this MDL. Our knowledge from the prior OxyContin litigation was a crucial foundation in formulating these claims.

10.     In July, 2017, the New York State Litigation Coordinating Panel created coordinated proceedings for governmental-entity opioid cases in New York state courts. SHC was one of the law firms named as co-lead counsel.

11.     In these MDL proceedings, one of my partners serves as co-lead of the Law & Briefing Committee.  Our firm has also taken a leading role in legal briefing in the New York state-court coordinated proceedings.  We are as familiar as any law firm in the country with the applicable law in these cases.

12.     As noted above, SHC represents cities and counties all over the United States in connection with governmental opioid litigation. SHC does not represent any States or State Attorneys General.

**The Resources of SHC**

13.     SHC consists of 70 lawyers and approximately 175 technical and paralegal support members. Simmons Hanly Conroy is one of the largest plaintiffs' law firms in the nation involved in asbestos, complex, multiparty litigation on a national level.  My law firm and I stand ready to devote all necessary resources to this litigation. SHC's



July 8, 2019                                                                 Page 6

history with similar litigation further demonstrates our ability and willingness to devote the resources necessary to financially support this litigation.

I, Jayne Conroy, declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

EXECUTED this 8th day of July, 2019 in New York, NY.

Jayne Conroy (NY 2796134)
SIMMONS HANLY CONROY LLC
112 Madison Avenue
New York, NY 10016
(212)-784-6400
jconroy@simmonsfirm.com

6



**RPLG** Renne Public Law Group®

350 Sansome Street | Suite 300
San Francisco, CA 94104

July 8, 2019

*Via E-mail & U.S. Mail*

Honorable Judge Dan A. Polster
Carl B. Stokes United States Court House
801 West Superior Avenue, Courtroom 18B
Cleveland, Ohio 44113-1837

      **Re:   Opiate Litigation**

Dear Judge Polster,

      I write in support of the renewed and amended motion for certification of Rule 23(b)(3) Cities/Counties Negotiation Class.

      I am the former City Attorney for the City and County of San Francisco (1986-2001). As City Attorney, I represented all officials, departments, agencies and commissions that constitute the City and County of San Francisco, including all those concerning health, social welfare and law enforcement matters, in providing advice and/ or handling litigation. I also served as counsel for the local courts. A recent article I prepared for the Golden Gate University Law Review provides a full description of the role and duties of the San Francisco City Attorney. (The Office of the City Attorney of San Francisco by Louise Renne, Golden Gate University Law Review, Vol. 47, Number 2. May 2017.

      As City Attorney, I was among the first in the country to devote significant public resources to the prosecution of public interest cases and class actions. These included litigation against gun manufacturers and a variety of actions against banks and insurance companies. Of particular relevance to this proceeding are the cases I filed as City Attorney against R. J. Reynolds and other tobacco companies to: (1) stop the Joe Camel ads and others like it that targeted young people to get them smoking early and in into adulthood; and (2) on general health and welfare grounds in what later became known as the "Tobacco Cases". Because of the leadership role that San Francisco played, San Francisco was joined by other California cities and counties. Our efforts resulted in the unique terms of the California part of the Master

216322.1

**RPLG**  Renne Public Law Group®

Page 2

Tobacco Settlement providing 50 percent of all monies received in the Settlement to local government.  San Francisco alone received over $500 million from this lawsuit.  I worked with the Mayor and other local officials to ensure that the monies we received were used for public health purposes, including the rebuilding of one of the largest publicly owned skilled nursing facilities in the country.  The facility had been slated for demolition because it was not earthquake safe.

Since leaving the San Francisco City Attorney's Office, I have been in private practice representing government agencies, non-profits and plaintiffs in public interest class actions. These cases have included a national class action challenging the inappropriate marketing of annuity products to the elderly, and actions against WorldCom, Qualcomm, and lithium battery manufacturers, among others.  I am currently involved in a major shareholder action against Alphabet (Google).  I have also served as City Attorney for Richmond, California; General Counsel for the San Francisco Unified School District; and served as President of the San Francisco Police Commission.  A biography from our law firm website is attached as Exhibit A.

I am a founding partner of the Renne Public Law Group.  As the papers filed in this proceeding indicate, our firm is part of a coalition of law firms representing a number of California local governments.  I have the resources available to be able to fully and effectively serve as a class counsel in this matter.  I am particularly interested in helping to find a way to end the opioid epidemic, both for personal and professional reasons.  To that end, I have consulted with a number of health and public policy experts on ways to help end the crisis.  On June 25, 2019, I attended a national conference on the subject sponsored by the Public Health Institute at which both public health and law enforcement personnel were represented.  Interestingly, the U.S. Surgeon General spoke at the conference emphasizing how both public officials and law enforcement personnel must work together to solve this crisis and I had an opportunity to speak briefly with him on the subject.  Over the years, I have often worked with federal and state

216322.1

 Renne Public Law Group®

Page 3

officials as well as private entities on behalf of local governments in order to solve problems and am committed to doing my best in this case to help stop the opioid epidemic.

On March 27, 2019, I was awarded the Bill Edlund Award by the Ninth Judicial Circuit and U.S. District Court for the Northern District of California for excellence in the law.

Very Truly Yours,

Louise H. Renne

Louise H. Renne

216322.1



**RPLG** Renne Public Law Group®

350 Sansome Street | Suite 300
San Francisco, CA 94104

## EXHIBIT A

**ABOUT LOUISE RENNE**

Louise Renne is a founding partner of Renne Public Law Group, and was previously a founding partner of Renne Sloan Holtzman Sakai Public Law Group. She leads the firm's public interest litigation. Ms. Renne pioneered the model of public interest plaintiff coalitions comprised of government agencies, individuals, and non-profit organizations during her 16-year tenure as San Francisco City Attorney. She is known for transforming the traditionally defense-oriented practice of municipal law by creating an affirmative litigation program that won significant victories for cities and counties in California. As a nationally recognized and respected leader in municipal law, she often testifies before federal, state, and other governmental bodies. She is also frequently requested to conduct impartial investigations for local public agencies in high-profile cases.

Some of the public interest cases Ms. Renne has directed include:

- A certified national class action involving 250,000 victims, national and state putative class actions, and individual lawsuits involving elder financial abuse. These suits were brought on behalf of senior citizens against insurance companies, banks, and other entities for the sale of inappropriate annuity products to seniors.
- A lawsuit on behalf of African American employees in private industry for race discrimination, retaliation, and harassment.
- Numerous class-action suits brought on behalf of local public agencies against energy producers, tobacco companies, national banks, gun manufacturers, auto insurers and escrow companies.

**RELATED EXPERIENCE**

Ms. Renne previously served for 16 years as the elected City Attorney for the City and County of San Francisco. As City Attorney she was responsible for providing legal expertise and services to more than 60 operating departments and commissions, each tasked with providing essential government services. She modernized the City Attorney's office, establishing it as a national leader in the practice of public law by creating a vigorous and enterprising 200-lawyer legal department of highly-skilled litigators, negotiators, and advisory attorneys. She energized and streamlined the Office's advice function, building widely respected legal expertise in every area of municipal operations, ranging from traditional fields such as land use and public safety to the cutting-edge areas of energy regulation and telecommunications.

Ms. Renne also served as General Counsel for the San Francisco Unified School District where she led the effort to combat corruption existing at the time and established an in-house legal department, and as the City Attorney for the City of Richmond.

216322.1

**RPLG** Renne Public Law Group®

Page 2

Her prior experience includes:

- Member of the San Francisco Board of Supervisors for 8 years, where she was chair of the Finance Committee.
- California Deputy Attorney General for 11 years. She served in the environmental and criminal divisions and argued on behalf of the state before the California Supreme Court and the United States Supreme Court.
- Worked in private practice for 2 years.
- Staff attorney in the General Counsel's Office at the Federal Communications Commission for 3 years.

**COMMUNITY ACTIVITIES**

- Allies United for Children, Chair, Board of Directors
- San Francisco Fine Arts Museums, former member, Board of Directors
- San Francisco Police Commission, former President
- Volunteers of Laguna Honda Hospital, former member, Board of Directors
- American Cancer Society, San Francisco Chapter, former member, Board of Directors
- Friends of the Children, San Francisco Chapter, former Chair, Board of Directors
- PGA's First Tee program, former member, Board of Directors
- California Regional Water Quality Control Board, former member
- Golden Gate Bridge District, former member, Board of Directors
- California Women Lawyers, former President

**EDUCATION**

- Columbia University School of Law, JD
- Michigan State University, BA

**ADMISSIONS AND COURTS**

- California
- District of Columbia

216322.1



**TENNESSEE:**
CECIL D. BRANSTETTER, SR., 1920-2014
KARLA M. CAMPBELL*
BEN GASTEL*
TRICIA HERZFELD*
R. JAN JENNINGS*
JOE P. LENISKI, JR.
MIKE STEWART
JAMES G. STRANCH, III
J. GERARD STRANCH, IV
MICHAEL J. WALL

**KENTUCKY:**
DAVID SUETHOLZ*

THE FREEDOM CENTER
223 ROSA L. PARKS AVENUE, SUITE 200
NASHVILLE, TENNESSEE 37203
TELEPHONE (615) 254-8801
FACSIMILE (615) 255-5419
BSJFIRM.COM

515 PARK AVENUE
LOUISVILLE, KY 40208
TELEPHONE (502) 636.4333
FACSIMILE (502) 636.4342

3142 LOSANTIVILLE AVENUE, SUITE A
CINCINNATI, OH 45213
TELEPHONE (513) 381.2224
FACSIMILE (513) 381.2225

**ASSOCIATES:**
**TENNESSEE:**
CALLIE K. JENNINGS
SEAMUS T. KELLY
ANTHONY A. ORLANDI*
K. GRACE STRANCH

**KENTUCKY:**
DEVON N. R. OSER*

**OHIO:**
ALYSON STEELE BERIDON*
ERIC "RICK" GILL
PAMELA M. NEWPORT
CLEMENT L. TSAO*

## <u>DECLARATION OF J. GERARD STRANCH, IV IN SUPPORT OF HIS APPOINTMENT AS CLASS COUNSEL FOR THE NEGOTIATION CLASS</u>

1.      I, J. Gerard Stranch, IV of the law firm of Branstetter, Stranch, and Jennings PLLC ("Branstetter") submit this declaration in support of my appointment as Negotiation Class Counsel.

**My Professional Experience and Leadership in Class Actions and MDL Litigation Prior To Opioid Litigation, Including Leading Settlement Efforts in Complex Litigation**

2.      I am the managing partner of Branstetter, Stranch, & Jennings PLLC, based in Nashville, TN, which also has offices in Louisville, KY and Cincinnati, OH.  I also have the privilege of serving as head of Branstetter's complex and mass tort litigation group.

3.      I have been personally appointed to serve as lead counsel, co-lead counsel, steering committee member, executive committee member and in other leadership roles in numerous complex class actions.  I focus my practice in the areas of consumer fraud, antitrust, and mass torts and have an established track record of helping lead some of the most complex and important MDLs and class actions on behalf of consumers, employees, and injured plaintiffs. For the purposes of this declaration, I will highlight a few of the most relevant cases where I have served as class counsel or in a court-appointed leadership position.

4.      I have served as a member of the Plaintiff's Steering Committee in *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, 3:15-md-02672 (N.D. Cal.) (C. Breyer).  I represented a class of consumers that purchased Volkswagen vehicles fraudulently marketed as containing "clean" diesel technology but in fact contained a defeat device purposefully installed to evade emissions testing. The case eventually resolved for over $15 billion resulting in over 335,000 car owners receiving significant compensation for the



harm caused by Volkswagen and other actors. I personally performed significant work in moving this case to a successful conclusion on behalf of consumers. Specifically, I traveled to Germany on two separate occasions to cultivate relationships with experts and key fact witnesses. I also lead a group of attorneys that identified and developed the case against Bosch for its role in helping Volkswagen create and implement the defeat device that was central to its ability to evade government emissions testing.

5.    I also recently served on the Plaintiffs' Steering Committee in *In re New England Compounding Pharmacy Inc. Product Liability Action*, Case No. 1:13-md-02419 (D. Mass) (J. Zobel).  This MDL stemmed from the 2012 nationwide outbreak of fungal meningitis caused by patients' exposure to tainted pharmaceuticals manufactured by the New England Compounding Clinic.  The events of this tragedy lead to several congressional investigations, significant changes to federal law related to compounding pharmacies and the authority of the Food and Drug Administration ("FDA"), a criminal indictment of the principles of NECC, and thousands of lawsuits filed by injured patients throughout the country.  After the JPML consolidated this action in Boston, the Court selected me as part of the seven-person Plaintiffs' Steering Committee ("PSC").  The PSC oversaw one of the more complex MDLs in the United States with over 50 defendants including the doctors and hospitals responsible for selecting NECC as a vendor and many of NECC's own vendors that contributed to the fungal contamination at the center of this litigation. I was instrumental in securing over $210 million in settlement funds from the NECC Bankruptcy Estate and a group of other defendants that resolved claims in the Chapter 11 proceeding.  Additionally, hundreds of personal injury and wrongful death actions continued against the doctors and clinics that exposed patients to tainted drugs from NECC and I lead the litigation team pursing cases against clinics and doctors in Tennessee, which the Court selected as the group of cases to proceed to the first bellwether trials. I successfully oversaw all discovery and coordinated the efforts of numerous lawyers in the MDL and in Tennessee to quickly prepare the cases for trial.  Just prior to the first bellwether trials, the cases against the clinics in Tennessee resolved for an undisclosed amount and I was a key member of the leadership team working with the special master to secure these clinic settlements.

6.    Additionally, I served as Co-Lead Counsel in *In re Prograf*, Case No. 1:2011-md-02242 (D. Mass) (J. Zobel).  I represented a certified class of indirect purchaser plaintiffs in a nationwide antitrust action against Astellas Pharma, Inc., alleging that the defendant illegally delayed entry of generic Prograf into the marketplace by filing a sham Citizen Petition with the FDA. I actively litigated this case, including appearing for numerous arguments and other hearings before the Court.  The case survived summary judgment and we worked diligently to obtain class certification and prepare the case for trial. Prior to trial the parties reached a multi-million-dollar settlement. My work in this case lead the American Antitrust Institute to award me one of its prestigious Outstanding Antitrust Litigation Achievement by a Young Lawyer awards.

2

7.      Further, the Eastern District of Tennessee appointed my firm as Co-Lead counsel in *In re: Skelaxin (Metaxalone) Antitrust Litigation*, No. 1:12-cv-194 (E.D. Tenn.) (J. Collier). This MDL was an antitrust class action on behalf of end-payors regarding monopoly practices which prevented the sale of generic Skelaxin, a widely sold muscle relaxant. Judge Collier, seeing the need for an early resolution of this case, set this case on both a litigation track and settlement track that proceeded in tandem. The Court appointed me as lead mediation counsel on behalf of the Plaintiffs and the Class. Through these mediation efforts and working with a court-appointed mediator, the case settled on a class-wide basis for over $9 million.

8.      The Firm served on the Plaintiffs' Executive Committee in *Dahl v. Bain Capital Partners, LLC*, a federal antitrust case challenging bid rigging and market allocation in the private equity/leveraged-buyout industry filed in the District of Massachusetts in December 2007, which reached a $590.5 million settlement with seven defendants just months before trial in 2014 and was finally approved in 2015.

9.      Apart from my current work in the aforementioned complex litigations, I have a long history of bringing complex, multiparty claims to successful resolution on behalf of plaintiffs throughout the country as more fully detailed in the attached resume (Exhibit 1).

10.      I also have robust and unique settlement experience across a variety of mass tort, class action, and individual cases which make me uniquely qualified to pioneer this Negotiation Class. I have settled over 100 cases and have been intricately involved in the settlement of major class action MDLs and numerous other class actions, mass tort MDLs and individual cases. I have negotiated numerous settlements including the largest per capita recovery in a W-2 phishing scam, the largest per person recovery in a Telephone Consumer Protection Act (TCPA) texting case, and what is believed to be the highest percentage of damages recovered in a bank overdraft settlement.

### My Experience and Leadership in Opioid-Related Litigation

11.      In the *In re National Prescription Opiate Litigation,* 1:17-md-2804 (N.D. Ohio), I currently serve as one of the state court designees to the national settlement negotiation group. In this role I am involved in active negotiations on behalf of the state-based litigants in the national opioid MDL and I am involved in monthly meetings with the court-appointed settlement master in the MDL along with regular meetings of the State Court based litigants' group.

12.      I am currently lead counsel in the Tennessee state court actions *Barry Staubus, et al. v. Purdue Pharma L.P., et al.* C-41916, *Bryant C. Dunaway, et al. v. Purdue Pharma L.P., et al.,* CCI-2018-CV-6347, and *Jared Effler, et al. v. Purdue Pharma L.P., et al.*, Case No. 16596, which bring claims against opioid manufacturers, distributors, and pharmacies for their role in creating and sustaining the national prescription opioid epidemic which has ravaged the State of Tennessee. These cases stem from the national prescription opioid epidemic but are currently being

litigated outside of the federal MDL. These actions are being prosecuted under the Tennessee Drug Dealer Liability act through the District Attorney Generals as our clients, who have authority to bring the claims on behalf of all political subdivisions within their judicial districts, meaning we are proceeding on behalf of hundreds of counties and cities throughout Tennessee.  This litigation started before the MDL was formed and is proceeding quickly to trial.

13.     These Tennessee cases are fully litigating claims against the opioid industry. My firm has personally taken or defended over 70 depositions in this litigation, and the Tennessee state court litigation is the closest state court litigation to trial other than the case currently being litigated in Oklahoma.

14.     Given that the Tennessee state court cases are related to, but being litigated outside of the federal MDL, this has necessitated cooperation between our efforts and Lead Counsel and the Plaintiffs' Steering Committee in the MDL including coordinating depositions, document productions, and settlement negotiations. Due to our significant work in litigating this state court litigation and our willingness to engage with MDL plaintiffs, I was invited to serve as a State Court designee in the *In re: National Opiate Litigation* negotiation committee working with a settlement special master in trying to resolve the thousands of lawsuits pending in the federal MDL and state courts throughout the country related to the opioid crisis.

15.     With the exception of perhaps Oklahoma, no other state-based opioid litigations have been pursued as vigorously as those currently proceeding in Tennessee.  In total I lead a team of over 20 lawyers actively litigating these state actions. I appear at state court hearings where I have argued various Rule 12 motions, discovery motions, and scheduling motions. Our team has reviewed over 7 terabytes of documents, taken over 70 depositions, and are currently on pace to bring our first case to trial in early 2020 where I plan to be lead or co-lead trial counsel.

16.     In addition to my work on the Tennessee cases, I also represent cities and/or counties pursuing claims against opioid manufactures, distributors, and sellers in Connecticut and New York.

**I Am Willing and Able to Immediately Commit to this Time-Consuming Effort, Have A Track Record of Working with Plaintiffs' Counsel and Defense Counsel, And Can Draw On Significant Firm Resources To Aid in Settlement Negotiations**

17.     I am willing and able to immediately commit personally to the time commitment of actively managing this large-scale effort. Despite my prior active involvement in several MDLs across the country, I will be able to dedicate sufficient attention to this litigation.  In fact, two of the MDLs (*NECC* and *Volkswagen*) in which I served as leadership have recently concluded or are winding down.  Moreover, I am already dedicating significant time to this matter in my role as special state liaison to the *In re: National Opiate Litigation* MDL, which has required my attendance at regular monthly meetings both with plaintiffs and the special master, as well as

participation in frequent teleconferences.  My previous commitments in leading the *Prograf, Skelaxin, NECC, and Volkswagen* MDLs demonstrate that I personally fulfill my obligations once appointed to a leadership position, and my schedule would certainly allow me to fulfill my obligations here.

18.     I lead the complex litigation and mass tort practice group of my firm.  In this internal leadership position, I help my own law partners in the growth and success of their own practices in this field.  Moreover, in virtually every complex litigation I serve in, I am joined by co-counsel or serve alongside a committee of lawyers. In the recent *In re New England Compounding Pharmacy Inc. Product Liability Action*, I appeared almost monthly in Boston for regularly scheduled court hearings for over two and a half years and worked throughout with a committee of lawyers (both in the MDL and throughout Tennessee) to coordinate and manage the litigation on a state and national level.  I also served as lead Tennessee Plaintiffs' Counsel in this case. Over 100 Tennesseans were injured as a result of the catastrophe and 17 Tennesseans lost their lives. As lead Tennessee Plaintiffs' Counsel, I coordinated an effort across at least a dozen law firms in Tennessee pursing relief for their clients from the harms suffered as a result of this national health crisis. These efforts including taking over 45 depositions and reviewing millions of pages of documents.

19.     Through litigating these kinds of cases, I have become well known as a lawyer of professional integrity and affability.  As a result, several years ago the Vanderbilt University Law School asked me to develop a course on the practice of civil litigation aimed at teaching young lawyers how to build a law practice and most importantly how to develop cooperative, productive, and successful relationships with attorneys on both sides of the litigation bar.  I have taught that course as an Adjunct Professor of Law at Vanderbilt for the last several years.

20.     Branstetter consists of 27 lawyers and additional technical and paralegal support members to staff complex litigation of this nature.  Branstetter has three offices, including in Cincinnati, Ohio, and is one of the largest law firms in our home state of Tennessee doing complex, multiparty litigation on a national level.  My law firm stands ready to devote all necessary resources to this litigation. The Firm's history with similar litigation further demonstrates our ability and willingness to devote the resources necessary to financially support this litigation.

I, J. Gerard Stranch, IV, declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

EXECUTED this 7th day of July, 2019 in Nashville, Tennessee.

/s/J. Gerard Stranch, IV_____

J. Gerard Stranch, IV (TN BPR #23045)
BRANSTETTER, STRANCH &
  JENNINGS, PLLC
223 Rosa L. Parks Ave., Suite 200
Nashville, Tennessee 37203
(615) 254-8801
gerards@bsjfirm.com

6



ZACHARY W. CARTER
*Corporation Counsel*

THE CITY OF NEW YORK
LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL DOCKET NO.: 2804 |
| | Hon. Judge Dan A. Polster |
| This document relates to: ALL CASES | |

## DECLARATION OF ZACHARY CARTER IN SUPPORT OF HIS APPOINTMENT AS CLASS COUNSEL FOR CITIES/COUNTIES NEGOTIATION CLASS

1.     I, Zachary Carter of New York City Law Department submit this declaration in support of my appointment as Cities/Counties Negotiation Class Counsel.

2.     I am the 78th Corporation Counsel of the City of New York. As the chief legal officer of the City, I oversee the Law Department with over 900 attorneys, who represent the City's interest in thousands of legal matters facing the City.

3.     As a key legal advisor to the Mayor and his City agencies, I am primarily focused on advancing the City's interests, with a commitment to justice and fair outcomes for individuals. Throughout my career, I have used the law to level the playing field for those seeking equal access to justice and opportunity, free from the burden of discrimination based on race, national origin, gender, sexual preference or economic class.

4.     In 1993 I was appointed by President Bill Clinton as the United States Attorney for the Eastern District, the first African-American to hold that office. My office prosecuted the

full range of federal criminal cases, including major narcotics, securities fraud and human trafficking. Most notably, I oversaw civil rights prosecutions against police officers in the Abner Louima torture case and against rioters who killed Yankel Rosenbaum during the City's Crown Heights riots in 1991.

5. Prior to becoming the Corporation Counsel, I was a partner in the firm Dorsey & Whitney. I oversaw the Trial Group at the firm's New York office and was co-chair of the firm's White Collar Crime and Civil Fraud practice.

6. I have served as a magistrate judge of the United States District Court for the Eastern District of New York and as a judge of the New York City Criminal Court. I have served as chairman of the New York City Mayor's Committee on the Judiciary from 2002 through 2013. I received the Public Interest Law & Society Award from the New York Lawyers for the Public Interest and the Emory Buckner Medal from the Federal Bar Council.

7. I graduated from Cornell University in 1972 and New York University School of Law in 1975.

8. I am currently litigating outside of the federal MDL in the state court consolidated action *In re: Opioid Litigation* pending in the Supreme Court of the State of New York, County of Suffolk, Index No. 400000/2017, which bring claims against opioid manufacturers, distributors, and pharmacies for their role in creating and sustaining the prescription opioid epidemic.

I, Zachary Carter, declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

EXECUTED this 8th day of July, 2019 in New York, NY.

/s/Zachary Carter
New York City Law Department
Corporation Counsel of the City of New York
100 Church Street
New York, NY 1000
(212) 345-1000
zcarter@law.nyc.gov

**Rule 23(g) submission of (proposed) Class
Counsel Mark Flessner,
City of Chicago Corporation
Counsel, to be supplied**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL DOCKET NO.: 2804 |
| | Hon. Judge Dan A. Polster |
| This document relates to: ALL CASES | |

**DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF**
**APPOINTMENT AS CO-LEAD COUNSEL FOR THE NEGOTIATION CLASS**

1.      CHRISTOPHER A. SEEGER submits this declaration pursuant to 28 U.S.C. § 1746 in support of his appointment as Co-Lead Counsel for the proposed Negotiation Class ("Negotiation Class Counsel").  The statements in this declaration are based on my personal knowledge.

**My Professional Experience and Leadership in Class Actions and MDL Litigation Prior to the Opioid Litigation, Including Leading Settlement Efforts in Complex Litigation**

2.      I am a founding partner of Seeger Weiss LLP ("Seeger Weiss"), which is based in Ridgefield Park, New Jersey and also has offices in New York City and Philadelphia.    I have been admitted to the Bar of the States of New York and New Jersey for some 28 years, and to numerous federal courts.

3.      My practice primarily centers on the areas of pharmaceutical and medical device mass tort litigation, other mass tort litigation, and consumer fraud, antitrust, and other class action litigation.  I have been appointed to serve as Co-Lead Counsel, Co-Lead Class Counsel, Class Counsel, Settlement Class Counsel, Plaintiffs' Executive Committee ("PEC") member, Plaintiffs' Steering Committee ("PSC") member, or in other leadership roles in numerous class action and mass tort litigations.  I have an established track record of helping lead some of the most complex and important multidistrict litigations ("MDLs") on behalf of injured plaintiffs.   For the purposes

of this declaration, I highlight a few of the most relevant cases where I have served in a court-appointed leadership position.

4.      For example, I served as Co-Lead Counsel (and later as Co-Lead Class Counsel, and more recently was designated as sole Class Counsel) and chief negotiator for the plaintiffs in *In re NFL Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.) (Brody, J.) ("*NFL Players' Concussion*"). The claims asserted in that MDL on behalf of thousands of retired NFL players drew extensive media coverage. I spearheaded the negotiations that produced a groundbreaking settlement that provides an uncapped Monetary Award Fund that awards, under a carefully calibrated matrix (factoring in the class member's diagnosis, age at time of diagnosis, and eligible seasons played), substantial monetary compensation of as much as $5 million to those class members who manifest a neurocognitive or neuromuscular ailment that satisfies certain defined Qualifying Diagnoses (such as Alzheimer's Disease, Amyotrophic Lateral Sclerosis, and Parkinson's Disease). The settlement also provides a Baseline Assessment Program to determine the existence and extent of cognitive impairment in living retired NFL players and to provide medical treatment, evaluation, or both for those found to suffer from moderate cognitive impairment. Notably, the settlement was structured so that class counsel fees and expenses were separately paid by the NFL rather than out of class members' recoveries. Based on expert actuarial analysis, the settlement's benefits have a net present value of approximately $1 billion. I am extremely proud of the results obtained for the class members in that MDL – results made possible by focusing on the medical care class members needed, not just on numbers.

5.      In *In re Syngenta AG MIR162 Corn Litigation*, No. 2:14-md-02591 (D. Kan.) (Lungstrum, J.) ("*Syngenta*"), I was appointed to the Plaintiffs' Settlement Negotiation Committee ("PSNC"). In that capacity, I led the negotiations that produced a $1.51 billion global settlement. Those negotiations were particularly complex and multidimensional given the multijurisdictional nature of the litigation, which covered both class claims as well as those of tens of thousands of individual plaintiff and "mass action" suits in several federal and state courts. In its final order and judgment approving the nationwide settlement, the district court appointed me as one of three Settlement Class Counsel.

6.      I also served on the PSC, Discovery Committee, Trial Committee, and Settlement Committee in *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2672 (N.D. Cal.) (Breyer, J.) ("*Volkswagen 'Clean Diesel'*"). The classes in that MDL – consumers who had purchased Volkswagen vehicles fraudulently marketed as containing "clean" diesel technology but, in fact, equipped with emissions software (a "defeat device") installed to make it appear that the vehicles satisfied government emissions standards by detecting the different inputs between testing and ordinary driving modes – sought injunctive as well as monetary relief. My colleagues and I worked intensively for the better part of a year to work out comprehensive settlements in that matter. To date, we have obtained settlements with

Volkswagen worth more than $20 billion for class members, including an optional "buyback" program for car owners, plus billions more in environmental relief.  Like the *NFL Players' Concussion* settlement, the settlements were structured so that Volkswagen, not class members, will pay class counsel's fees and costs.

7.     Similarly, in *In re Zyprexa Products Liability Litigation*, MDL No. 1596 (E.D.N.Y.) (Weinstein, J.), in which I was appointed as Liaison Counsel, I was one of the chief negotiators of a $700 million settlement, followed by a $500 million second-round settlement that benefitted tens of thousands of individuals alleging that they had developed diabetes from taking the psychotropic medication at issue in that MDL.

8.     My success at the negotiating table has been built on my success in the courtroom. Counsel know I am fully willing and capable of taking large and complex cases to trial.  My successes in bellwether trials have led to global settlements.  For example, *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.) (Fallon, J.), in which I was appointed as Co-Lead Counsel, settled for $4.85 billion just months after my colleagues and I obtained a $47.5 million bellwether jury verdict.  Similarly, in *In re Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La.) (Fallon, J.), I was appointed Chair of the Plaintiffs' Trial Committee and lead trial counsel in a string of bellwether trials.  The successful verdicts in those cases paved the way for a national settlement valued at approximately $1 billion.

9.     I have earned the trust of my peers, adversaries, and the judges before whom I have appeared, by virtue of my disciplined, earnest, and honest approach to litigation and conflict resolution.  The Hon. Anita B. Brody wrote that the "successful implementation of the [*NFL*] settlement agreement to date is a credit to the work done by the attorneys at Seeger Weiss." Regarding my work in the *Syngenta* litigation, Special Master Ellen Reisman wrote, "Mr. Seeger served ably as the chair of the PSNC, keeping discussions going even when they (frequently) seemed in danger of breaking down.  It is the judgment of Special Master Reisman and Special Master Stack that without Mr. Seeger's involvement in the process, a resolution would not have been reached."  In adopting Special Master Reisman's report in *Syngenta*, the Hon. John W. Lungstrum wrote that I "contributed more than any other attorney in accomplishing the settlement of the litigation."

10.     Most recently, I was appointed Co-Lead Counsel in *In re 3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.) (Rodgers, J.), and *In re Intel Corp. CPU Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2828 (D. Or.) (Simon, J.).

11.     I believe deeply that, when carried out with skill, mutual respect, and common sense, litigation serves a critical role in our democracy.  Therefore, I am committed to sharing the experience, knowledge, and insight I have gained with my current and future colleagues by

teaching, speaking, and writing on mass torts, MDLs, and class actions, as outlined in my annexed resumé.  Equally important, I am focused on ways to improve how the bar and the bench work together to best achieve the goal – ensuring that wronged parties receive fair and effective representation and relief.  Toward that end, I serve on the Board of Advisers for the Center on Civil Justice at New York University School of Law and the Advisory Council for the Duke Conferences (part of the Duke Law School Center for Judicial Studies), through which my colleagues and I contribute to the development of best practices for MDLs.

## My Firm's Experience in the Opioid-Related Litigation

12.     In *In re National Prescription Opiate Litigation*, No. 1:17-md-2804 (N.D. Ohio), I have been appointed to the PEC and the Settlement Committee.  In the opioids-related litigation nationwide, Seeger Weiss represents only cities and counties.   Specifically, Seeger Weiss represents Jersey City, New Jersey and the New Jersey counties of Bergen, Camden, Essex, and Sussex in constituent actions against a number of the defendants in this MDL.  These constituent actions are, in alphabetical order:  *Bergen County, New Jersey v. Purdue Pharma L.P.*, No. 1:18-op-45616-DAP (N.D. Ohio); *Camden County, New Jersey v. Purdue Pharma L.P.*, No. 1:18-op-46306-DAP (N.D. Ohio); *City of Jersey City v. Purdue Pharma L.P.*, No. 1:18-op-45948-DAP (N.D. Ohio); *Essex County, New Jersey v. Purdue Pharma L.P.*, No. 1:18-op-45989-DAP (N.D. Ohio); *Sussex County, New Jersey v. Purdue Pharma L.P.*, No. 2:19-cv-13747-JMV-MF (D.N.J.) (case transferred pursuant to CTO-99; N.D. Ohio docket number not yet assigned).

13.     Seeger Weiss has undertaken significant work in this MDL.  It has led the development of the liability case against Endo Pharmaceuticals, which involved at least 15 depositions of corporate designees and current and former Endo-related employees, including the current CEO.  In addition, Seeger Weiss has handled the development of experts concerning manufacturer liability and distributor liability witnesses; taken depositions of defense experts related to liability, FDA, causation, and damages issues; and has been assisting with the defense of Fed. R. Evid. 702/*Daubert* motions.

14.     In addition, Seeger Weiss has been involved in the coordination of manufacturer-related discovery; the conciliation of disputes or, failing that, the presentation of disputes before the Special Masters; and general trial theme development.

## I Am Willing and Able to Immediately Commit to This Time-Consuming Effort, Have a Proven Track Record of Working with Plaintiffs' Counsel and Defense Counsel, and Can Draw on Significant Firm Resources to Aid in Settlement Negotiations

15.     With each appointment, a court entrusts me with the responsibility to shepherd the litigation to an efficient and effective outcome.  I maintain the highest standards of decorum, cooperation, and collegiality among fellow plaintiffs' counsel and defense counsel alike.  I will not tolerate any lesser standard from plaintiffs' counsel with whom I work.  The depth of my

commitment to honest, practical cooperation is shown, in significant part, by the settlements I have helped broker in even the most high-pressure, publicly-scrutinized cases, such as the *Volkswagen "Clean Diesel"* and *NFL Players' Concussion* MDLs.

16.     I am willing and able to immediately commit personally to the time commitment of actively managing this large-scale effort.  Despite my prior active involvement in several MDLs across the country, I will be able to dedicate sufficient attention to this litigation.  Three of the MDLs in which I served in leadership roles in the last several years (*Syngenta*, *In re NFL Players' Concussion*, and *Volkswagen "Clean Diesel"*) are now at a stage (with settlements being implemented or under appellate review) that demand less of my time and attention than they had previously.   My previous commitments in leading the *NFL Players' Concussion*, *Volkswagen "Clean Diesel,"* and other MDLs demonstrate that I have always fulfilled my obligations once appointed to a leadership position, and my schedule would certainly allow me to fulfill my obligations here.

17.     Seeger Weiss consists of nearly 30 lawyers and additional paralegal and technical support members to staff complex litigation of this nature.  My law firm stands ready to devote all necessary resources to this litigation.  My firm's history with similar litigation further demonstrates its ability and willingness to devote the resources necessary to financially support this litigation.

18.     I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

EXECUTED this 9th day of July, 2019 at Ridgefield Park, New Jersey

_/s/ Christopher A. Seeger_____
Christopher A. Seeger
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
(973) 639-9100
cseeger@seegerweiss.com

# EXHIBIT B

*In Re: Prescription Opiate Litigation* – MDL 2804
**List of Defendants[1]**

| # | Defendant Entity |
|---|---|
| 1 | Actavis Elizabeth LLC |
| 2 | Actavis Kadian LLC |
| 3 | Actavis Laboratories FL Inc. |
| 4 | Actavis Laboratories UT Inc. |
| 5 | Actavis LLC |
| 6 | Actavis Mid Atlantic LLC |
| 7 | Actavis Pharma Inc.  F/K/A Watson Pharma Inc. |
| 8 | Actavis South Atlantic LLC |
| 9 | Actavis Totowa LLC |
| 10 | Allergan Finance LLC F/K/A Actavis Inc. F/K/A Watson Pharmaceuticals, Inc. |
| 11 | Allergan Plc F/K/A Actavis Plc |
| 12 | Allergan Sales LLC |
| 13 | Allergan USA Inc. |
| 14 | AmerisourceBergen Drug Corporation |
| 15 | Anda, Inc. |
| 16 | Amneal Pharmaceuticals Inc. |
| 17 | Amneal Pharmaceuticals LLC |
| 18 | Amneal Pharmaceuticals Of New York LLC |
| 19 | Cardinal Health Inc. |
| 20 | Caremark Rx LLC |
| 21 | Cephalon Inc. |
| 22 | CVS Health Corporation |
| 23 | CVS Indiana L.L.C. |
| 24 | CVS Pharmacy Inc. |
| 25 | CVS Rx Services Inc. |
| 26 | CVS Tennessee Distribution LLC |
| 27 | Discount Drug Mart, Inc. |
| 28 | Endo Health Solutions Inc. |
| 29 | Endo Pharmaceuticals Inc. |
| 30 | Express Scripts Holding Company |
| 31 | Express Scripts Inc. |
| 32 | HBC Service Company |
| 33 | Henry Schein Medical Systems, Inc. |
| 34 | Henry Schein, Inc. |
| 35 | H. D. Smith Wholesale Drug Co. |
| 36 | HD Smith f/k/a HD Smith Wholesale Drug Co. |
| 37 | HD Smith Holdings, LLC |
| 38 | HD Smith Holding Company |

---

[1] These entities were listed as defendants in the cases brought by the some or all of the following Plaintiffs in the MDL litigation: City of Cleveland, Cuyahoga County, Summit County, OH, Cabell County, WV, Broward County, FL, and/or Monroe County, MI.

| # | Defendant Entity |
|---|---|
| 39 | Impax Laboratories LLC |
| 40 | Insys Therapeutics, Inc. |
| 41 | Janssen Pharmaceutica Inc. N/K/A Janssen Pharmaceuticals Inc. |
| 42 | Janssen Pharmaceuticals Inc. |
| 43 | Johnson & Johnson |
| 44 | Kroger Limited Partnership I |
| 45 | Kroger Limited Partnership II |
| 46 | KVK-Tech  Inc. |
| 47 | Mallinckrodt LLC |
| 48 | Mallinckrodt Plc |
| 49 | McKesson Corporation |
| 50 | Miami-Luken, Inc. |
| 51 | Noramco Inc. |
| 52 | Optum Inc. |
| 53 | Optum Rx Inc. |
| 54 | Ortho-Mcneil-Janssen Pharmaceuticals Inc. N/K/A Jannssen Pharmaceuticals Inc. |
| 55 | Par Pharmaceutical Companies Inc. |
| 56 | Par Pharmaceutical Inc. |
| 57 | Prescription Supply, Inc. |
| 58 | Purdue Pharma Inc. |
| 59 | Purdue Pharma L.P. |
| 60 | Rhodes Pharmaceuticals L.P. |
| 61 | Rhodes Technologies, Inc. |
| 62 | Rite Aid Corporation |
| 63 | Rite Aid Of Maryland Inc. D/B/A Rite Aid Mid-Atlantic Customer Support Center Inc. |
| 64 | Rite Aid Of West Virginia  Inc. |
| 65 | Beverly Sackler |
| 66 | David A. Sackler |
| 67 | Kathe A. Sackler |
| 68 | Ilene Sackler Lefcourt |
| 69 | Jonathan D. Sackler |
| 70 | Mortimer D.A. Sackler |
| 71 | Richard S. Sackler, M.D. |
| 72 | Theresa Sackler |
| 73 | SpecGX LLC |
| 74 | Tasmanian Alkaloids Pty Ltd |
| 75 | Teva Pharmaceutical Industries Ltd. |
| 76 | Teva Pharmaceuticals USA Inc. |
| 77 | The Purdue Frederick Company, Inc. |
| 78 | Walgreen Co. |
| 79 | Walgreen Eastern Co. Inc. |
| 80 | Walgreens Boots Alliance Inc. |
| 81 | Walmart Inc. F/K/A Wal-Mart Stores, Inc., |

| # | Defendant Entity |
|---|---|
| 82 | Walmart Inc |
| 83 | Wal-Mart Pharmacy Warehouse |
| 84 | Wal-Mart Pharmacy Warehouse #45 |
| 85 | Wal-Mart Stores East D/B/A Wal-Mart Pharmacy Warehouse #46 |
| 86 | Warner Chilcott Company LLC |
| 87 | Watson Laboratories Inc. |
| 88 | West Virginia CVS Pharmacy LLC |

1803585.1