# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2018

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from         to

| Commission File Number | Exact name of registrant as specified in its charter, principal office and address and telephone number | State of incorporation or organization | I.R.S. Employer Identification No. |
|---|---|---|---|
| 001-36867 | **Allergan plc**<br>Clonshaugh Business and Technology Park<br>Coolock, Dublin, D17 E400, Ireland<br>(862) 261-7000 | Ireland | 98-1114402 |
| 001-36887 | **Warner Chilcott Limited**<br>Canon's Court<br>22 Victoria Street<br>Hamilton HM 12<br>Bermuda<br>(441) 295-2244 | Bermuda | 98-0496358 |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Allergan plc Ordinary Shares, $0.0001 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

| | | | |
|---|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

| | | | |
|---|---|---|---|
| Allergan plc | Yes ☐ | No ☒ |
| Warner Chilcott Limited | Yes ☐ | No ☒ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

| | | | |
|---|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

| | | | |
|---|---|---|---|
| Allergan plc | Yes ☒ | No ☐ |
| Warner Chilcott Limited | Yes ☒ | No ☐ |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| Allergan plc | ☐ |
| Warner Chilcott Limited | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | |
|---|---|---|---|---|
| Allergan plc | Large accelerated filer | ☒ | Accelerated filer | ☐ |
| | Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | Emerging growth company | ☐ | | |
| Warner Chilcott Limited | Large accelerated filer | ☐ | Accelerated filer | ☐ |
| | Non-accelerated filer | ☒ | Smaller reporting company | ☐ |
| | Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).

| | | | |
|---|---|---|---|
| Allergan plc | Yes ☐ | No ☒ |
| Warner Chilcott Limited | Yes ☐ | No ☒ |

The aggregate market value of the voting and non-voting stock held by non-affiliates of Allergan plc as of June 30, 2018, based upon the last sale price reported for such date on the New York Stock Exchange, was $56.5 billion. The calculation of the aggregate market value of voting and non-voting stock excludes Class A ordinary shares of Allergan plc held by executive officers, directors, and stockholders that the registrant concluded were affiliates of Allergan plc on that date.

Number of shares of Allergan plc's Ordinary Shares outstanding on February 8, 2019: 332,614,474

This Annual Report on Form 10-K is a combined report being filed separately by two different registrants: Allergan plc and Warner Chilcott Limited. Warner Chilcott Limited is an indirect wholly owned subsidiary of Allergan plc. The information in this Annual Report on Form 10-K is equally applicable to Allergan plc and Warner Chilcott Limited, except where otherwise indicated. Warner Chilcott Limited meets the conditions set forth in General Instruction H(1)(a) and (b) of Form 10-K and, to the extent applicable, is therefore filing this form with a reduced disclosure format.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III of this Annual Report on Form 10-K ("Annual Report") is incorporated by reference from the Allergan plc proxy statement to be filed pursuant to Regulation 14A with respect to the Registrant's Annual General Meeting of Shareholders to be held on May 1, 2019.

**ALLERGAN PLC**

**WARNER CHILCOTT LIMITED**

**TABLE OF CONTENTS**

**FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2018**

| | | PAGE |
|---|---|---|
| **PART I** | | |
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 22 |
| ITEM 1B. | Unresolved Staff Comments | 43 |
| ITEM 2. | Properties | 43 |
| ITEM 3. | Legal Proceedings | 44 |
| ITEM 4. | Mine Safety Disclosures | 44 |
| **PART II** | | |
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 45 |
| ITEM 6. | Selected Financial Data | 48 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| ITEM 7A. | Quantitative and Qualitative Disclosures About Market Risk | 81 |
| ITEM 8. | Financial Statements and Supplementary Data | 83 |
| ITEM 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 83 |
| ITEM 9A. | Controls and Procedures | 83 |
| ITEM 9B. | Other Information | 84 |
| **PART III** | | |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 85 |
| ITEM 11. | Executive Compensation | 87 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 87 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 87 |
| ITEM 14. | Principal Accounting Fees and Services | 87 |
| **PART IV** | | |
| ITEM 15. | Exhibits, Financial Statement Schedules | 88 |
| ITEM 16. | Form 10-K Summary | 94 |
| | SIGNATURES | 95 |

## Business Overview

Allergan plc is a global pharmaceutical leader. Allergan is focused on developing, manufacturing and commercializing branded pharmaceutical, device, biologic, surgical and regenerative medicine products for patients around the world.  Allergan markets a portfolio of leading brands and best-in-class products primarily focused on four key therapeutic areas including medical aesthetics, eye care, central nervous system and gastroenterology.  Allergan is an industry leader in Open Science, a model of research and development, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care.  The Company has operations in more than 100 countries.  Warner Chilcott Limited is an indirect wholly-owned subsidiary of Allergan plc and has the same principal business activities.

Allergan plc's principal executive offices are located at Clonshaugh Business and Technology Park, Coolock, Dublin, Ireland and our administrative headquarters are located at 5 Giralda Farms, Madison, NJ 07940. Our Internet website address is www.allergan.com. We do not intend this website address to be an active link or to otherwise incorporate by reference the contents of the website into this report. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto, are available free of charge on our Internet website. These reports are posted on our website as soon as reasonably practicable after such reports are electronically filed with the SEC. The public may read and copy any materials that we file with the SEC electronically through the SEC website (www.sec.gov). The information contained on the SEC's website is not incorporated by reference into this Form 10-K and should not be considered to be part of this Form 10-K. Within the Investors section of our website, we provide information concerning corporate governance, including our Corporate Governance Guidelines, Board Committee Charters and Composition, Code of Conduct and other information. Refer to "ITEM 1A. RISK FACTORS-CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS" in this document.

## Business Development

### 2018 Significant Business Developments

The following are the significant transactions that were completed or announced in the year ended December 31, 2018.

## Licenses and Asset Acquisitions

### Bonti, Inc.

On October 24, 2018, the Company acquired Bonti, Inc. ("Bonti"), a privately held clinical-stage biotechnology company focused on the development and commercialization of novel, fast-acting neurotoxin programs for aesthetic and therapeutic applications, for $195.0 million upfront plus contingent consideration of up to $90.0 million which may be recorded if the corresponding events become probable.  The transaction was accounted for as an asset acquisition as the purchase primarily related to one asset.  The aggregate upfront expense of $196.6 million was recorded as a component of R&D expense in the year ended December 31, 2018.

### Elastagen Pty Ltd

On April 6, 2018, the Company completed the acquisition of Elastagen Pty Ltd, a clinical stage medical company developing medical and cosmetic treatments including recombinant human tropoelastin, the precursor of elastin, which will be combined with Allergan's existing fillers product lines.  The transaction was accounted for as an asset acquisition as the purchase primarily related to one asset.  The aggregate upfront expense of $96.1 million was recorded as a component of R&D expense during the year ended December 31, 2018.  Under the terms of the agreement, Elastagen Pty Ltd is eligible to receive additional contingent consideration of up to $165.0 million which may be recorded if the corresponding events become probable.

### Repros Therapeutics, Inc.

On January 31, 2018, the Company completed the acquisition of Repros Therapeutics, Inc., which was accounted for as an asset acquisition as the purchase primarily related to one asset.  The aggregate upfront expense of $33.2 million was recorded as a component of R&D expense during the year ended December 31, 2018.

4

As of December 31, 2018, our portfolio of products within the US Specialized Therapeutics, US General Medicine and International segments include the following products with sales in excess of $200.0 million:

| Product | Therapeutic Area | Active Ingredient | Therapeutic Classification |
|---|---|---|---|
| Alloderm® | Medical Aesthetics | Tissue | Skin graft |
| Alphagan®/Combigan® | Eye Care | Brimonidine tartrate | Selective alpha2 agonist |
| Botox® Cosmetics | Facial Aesthetics | Onabotulinumtoxin A | Acetylcholine release inhibitor |
| Botox® Therapeutics | Neuroscience and Urology | Botulinum toxin | Musculoskeletal agent |
| Breast Implants | Plastic Surgery | Silicone | Reconstructive plastic surgery |
| Bystolic®/Byvalson® | Diversified Brands | Nebivolol | Hypertension |
| Carafate®/Sulcrate® | Gastrointestinal | Sucralfate | Ulcerative colitis |
| Coolsculpting® | Medical Aesthetics | Medical device | Body contouring |
| Juvederm® Collection | Facial Aesthetics | Hyaluronic acid | Fillers |
| Linzess®/Constella® | Gastrointestinal | Linaclotide | Irritable bowel syndrome |
| Lo Loestrin® | Women's Health | Ethinyl estradiol and norethindrone | Oral contraceptive |
| Lumigan®/Ganfort® | Eye Care | Bimatoprost | Prostaglandin analogue |
| Ozurdex® | Eye Care | Dexamethasone | Intravitreal eye implant |
| Restasis® | Eye Care | Cyclosporine | Topical immunomodulator |
| Viibryd®/Fetzima® | Central Nervous System | Vilazodone HCl/Levomilnacipran | Major depressive disorders |
| Vraylar® | Central Nervous System | Cariprazine HCl | Schizophrenia, bipolar mania |
| Zenpep® | Gastrointestinal | Pancrelipase | Exocrine pancreatic insufficiency |

Our portfolio of products also includes eye drops including Optive and Refresh with net sales in excess of $200.0 million in 2018.

*Businesses*

Our US Specialized Therapeutics business offers certain of our branded products within the U.S., including Medical Aesthetics, Medical Dermatology through September 20, 2018, Eye Care and Neuroscience and Urology therapeutic products.

Our US General Medicine business is focused on newly developed pharmaceutical products, which are normally patented or have market exclusivity. These patented and off-patent trademarked products are branded pharmaceutical products, and as a result of patents or other market exclusivity are generally offered by a single provider when first introduced to the market. We market a number of branded products to physicians, hospitals, and other customers that we serve as the end patient.

Our International segment offers a wide array of branded products, including aesthetics products, outside of the United States.

Net revenues in our segments, including % of total net revenues, consisted of the following for the years ended December 31, 2018, 2017 and 2016 ($ in millions):

| | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | | Year Ended December 31, 2016 | |
|---|---|---|---|---|---|---|
| | Net Revenue | % of Total Net Revenue | Net Revenue | % of Total Net Revenue | Net Revenue | % of Total Net Revenue |
| US Specialized Therapeutics | $ 6,920.3 | 43.8% | $ 6,803.6 | 42.7% | $ 5,811.7 | 39.9% |
| US General Medicine | 5,322.9 | 33.7% | 5,796.2 | 36.4% | 5,923.9 | 40.6% |
| International | 3,504.7 | 22.2% | 3,319.5 | 20.8% | 2,881.3 | 19.8% |
| Other | 39.5 | 0.3% | 21.4 | 0.1% | (46.3) | (0.3)% |
| **Total** | $ 15,787.4 | 100.0% | $ 15,940.7 | 100.0% | $ 14,570.6 | 100.0% |

Included in segment revenues are product sales that were sold through the Anda Distribution business once the Anda Distribution business had sold the product to a third-party customer. These sales are included in segment results and are reclassified into revenues from discontinued operations through a reduction of Corporate revenues which eliminates the sales made by the Anda Distribution business through October 3, 2016 from results of continuing operations.

As of December 31, 2018, we conducted the majority of our branded drug delivery R&D activities in Irvine, California. We are presently developing a number of products through a combination of internal and collaborative programs.

**Financial Information About Segments and Geographic Areas**

The Company evaluates segment performance for its three operating segments based on segment contribution. Segment contribution for our segments represents net revenues less cost of sales (defined below), selling and marketing expenses, and select general and administrative expenses. Included in segment revenues for 2016 are product sales that were sold through our former Anda Distribution business once the Anda Distribution business had sold the product to a third-party customer. These sales are included in segment results and are reclassified into revenues from discontinued operations through a reduction of Corporate revenues which eliminates the sales made by our former Anda Distribution business through October 3, 2016 from results of continuing operations.  Cost of sales for these products in discontinued operations is equal to our average third-party cost of sales for third party branded products distributed by our former Anda Distribution business. The Company does not evaluate the following items at the segment level:

- Revenues and operating expenses within cost of sales, selling and marketing expenses, and general and administrative expenses that result from the impact of corporate initiatives. Corporate initiatives primarily include integration, restructuring, divestitures, acquisitions, certain milestones and other shared costs.

- General and administrative expenses that result from shared infrastructure, including certain expenses located within the United States.

- Other select revenues and operating expenses including R&D expenses, amortization, IPR&D impairments, goodwill impairments and asset sales and impairments, net as not all such information has been accounted for at the segment level, or such information has not been used by all segments.

- Total assets including capital expenditures.

The Company defines segment net revenues as product sales and other revenue derived from our products or licensing agreements.

Cost of sales within segment contribution includes standard production and packaging costs for the products we manufacture, third-party acquisition costs for products manufactured by others, profit-sharing or royalty payments for products sold pursuant to licensing agreements and finished goods inventory reserve charges.  Cost of sales within segment contribution excludes non-standard production costs, such as non-finished goods inventory obsolescence charges, manufacturing variances and excess capacity utilization charges, where applicable. Cost of sales does not include amortization or impairment costs for acquired product rights or other acquired intangibles.

Selling and marketing expenses consist mainly of personnel-related costs, product promotion costs, distribution costs, professional service costs, insurance, depreciation and travel costs.

General and administrative expenses consist mainly of personnel-related costs, facilities costs, transaction costs, insurance, depreciation, litigation costs and professional services costs which are general in nature and attributable to the segment.

**Customers**

In US Specialized Therapeutics, US General Medicine and International operations, we sell our brand and aesthetic products primarily to drug wholesalers, retailers and distributors, including national retail drug and food store chains, hospitals, clinics, mail order retailers, government agencies and managed healthcare providers such as health maintenance organizations and other institutions.  Certain medical aesthetic products and devices are also sold directly to physicians.

Sales to certain of our customers within the U.S. and Canada accounted for 10% or more of our annual revenues during the past three years. The following table illustrates customers and the respective percentage of revenues which they comprised in each of the last three years:

| Customer | 2018 | 2017 | 2016 |
|---|---|---|---|
| McKesson Corporation | 25% | 23% | 23% |
| Cardinal Health, Inc. | 23% | 19% | 18% |
| AmerisourceBergen Corporation | 22% | 19% | 18% |

12

**Manufacturing, Suppliers and Materials**

As of December 31, 2018, we manufactured certain of our own finished products at our plants. We also have development and manufacturing capabilities for raw material and active pharmaceutical ingredients ("API") and intermediate ingredients to support our R&D internal product development efforts in our Campbell, California, Irvine, California and Liverpool, United Kingdom locations.

We have major manufacturing sites in:

| Location | State / Country |
| --- | --- |
| Branchburg | New Jersey / USA |
| Campbell | California / USA |
| Cincinnati | Ohio / USA |
| Clonshaugh | Ireland |
| Dublin | California / USA |
| Galway | Ireland |
| Guarulhos | Brazil |
| Heredia | Costa Rica |
| Houston | Texas / USA |
| Liege | Belgium |
| Pringy | France |
| Waco | Texas / USA |
| Westport | Ireland |

Our manufacturing operations are subject to extensive regulatory oversight and could be interrupted at any time. Refer to *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

While we manufacture certain of our own finished products at our plants, we are dependent on third parties for the supply of many of our finished products. In addition, we are dependent on third parties for the supply of the raw materials necessary to develop and manufacture our commercialized products, including the API and inactive pharmaceutical ingredients used in many of these products. We are required to identify the supplier(s) of all the raw materials for our products in the drug applications that we file with the FDA in the U.S. and other regulatory authorities outside the U.S. If raw materials for a particular product become unavailable from an approved supplier specified in a drug application, we would be required to qualify a substitute supplier with the FDA and with other regulatory authorities outside the U.S., which could interrupt manufacturing of the affected product. To the extent practicable, we attempt to identify more than one supplier in each drug application. However, some raw materials are available only from a single source and, in many of our drug applications, only one supplier of raw materials has been identified, even in instances where multiple sources exist.

Furthermore, we obtain a significant portion of our raw materials from foreign suppliers. Arrangements with international raw material suppliers are subject to, among other things, FDA regulation, customs clearance, various import duties, foreign currency risk and other government clearances. Acts of governments outside the U.S. may affect the price or availability of raw materials needed for the development or manufacture of our products. In addition, any changes in patent laws in jurisdictions outside the U.S. may make it increasingly difficult to obtain raw materials for R&D prior to the expiration of the applicable U.S. or foreign patents. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to obtain sufficient supplies of raw materials, our ability to deliver our products to the market may be impeded." and — "The supply of APIs into Europe may be negatively affected by regulations promulgated by the European Union." in this document.

**Patents and Proprietary Rights**

We believe patent protection of our proprietary products is important to our products. Our success with our branded products will depend, in part, on our ability to obtain, and successfully defend if challenged, patent or other proprietary protection for such products. We currently have a number of U.S. and foreign patents issued or pending. However, the issuance of a patent is not conclusive as to its validity or as to the enforceable scope of the claims of the patent. Accordingly, our patents may not prevent other companies from developing similar or functionally equivalent products or from successfully challenging the validity of our patents. If our patent applications are not allowed or, even if allowed, if such patents are circumvented or not upheld in a court of law or in administrative proceedings, including oppositions, re-examinations or inter partes review ("IPR"), our ability to competitively market our patented products and technologies may be significantly reduced. Also, such patents may or may not provide competitive advantages for their respective products or they may be challenged or circumvented by competitors, in which case our ability to

14

commercially market these products may be diminished. For example, in October 2017, the U.S. District Court for the Eastern District of Texas issued an adverse trial decision finding that the four asserted patents covering our Restasis® (Cyclosporine Ophthalmic Emulsion) 0.05% product are invalid, and on November 13, 2018, the United States Court of Appeals for the Federal Circuit affirmed that ruling.  From time to time, we may need to obtain licenses to patents and other proprietary rights held by third parties to develop, manufacture and market our products. If we are unable to timely obtain these licenses on commercially reasonable terms, our ability to commercially market such products may be inhibited or prevented. In addition, patents covering, for example, Actonel® (certain indications), Androderm®, Carafate®, Minastrin®, Estrace® Cream, Namenda XR®, Femhrt®, INFeD®, Namenda® (IR), Pylera® and Rapaflo® products have expired and we have no further patent protection on these products.  Generic versions of our Minastrin® product entered the market during 2017 pursuant to settlement agreements previously entered into.  Generic versions of our Estrace® product entered the market in January 2018, generic versions of our Namenda XR® product entered the market in March 2018, and generic versions of our Rapaflo® product entered the market in December 2018.

We also rely on trade secrets and proprietary know-how that we seek to protect, in part, through confidentiality agreements with our partners, customers, employees and consultants. It is possible that these agreements will be breached or will not be enforceable in every instance, and we will not have adequate remedies for any such breach. It is also possible that our trade secrets will otherwise become known or independently developed by competitors.

We may find it necessary to initiate litigation to enforce our patent and trademark rights, to protect our trade secrets or know-how or to determine the scope and validity of the proprietary rights of others. Litigation concerning patents, trademarks, copyrights and proprietary technologies can often be protracted and expensive and, as with litigation generally, the outcome is inherently uncertain.

Litigation alleging infringement of patents, trademarks, copyrights or other intellectual property rights may be costly and time consuming. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — Third parties may claim that we infringe their proprietary rights and may prevent us from manufacturing and selling some of our products." and *Legal Matters* in "NOTE 25 — Commitments and Contingencies" in the accompanying "Notes to the Consolidated Financial Statements" in this document.

## Government Regulation and Regulatory Matters

The following discussion focuses on key markets to the Company's overall business.

### United States

All U.S. pharmaceutical manufacturers, including Allergan, are subject to extensive, complex and evolving regulation by the federal government, principally the FDA, and to a lesser extent, by the U.S. Drug Enforcement Administration ("DEA"), Occupational Safety and Health Administration and state government agencies, as well as by various regulatory agencies in foreign countries where our products or product candidates are being manufactured and/or marketed. The Federal Food, Drug, and Cosmetic Act ("FFDCA"), the Controlled Substances Act and other federal statutes and regulations govern or influence the testing, manufacturing, packing, labeling, storing, record keeping, safety, approval, advertising, promotion, sale and distribution of our products. In our international markets, the approval, manufacture and sale of pharmaceutical products is similar to that of the United States with some variations dependent upon local market dynamics.

### Specialty Pharmaceuticals

In the United States, FDA approval is required before any dosage form of any new drug, including an off-patent equivalent of a previously approved drug, can be marketed. The process for obtaining governmental approval to manufacture and market pharmaceutical products is rigorous, time-consuming and costly, and the extent to which it may be affected by legislative and regulatory developments cannot be predicted. We are dependent on receiving FDA and other governmental approvals prior to manufacturing, marketing and shipping new products. Refer to "ITEM 1A. RISK FACTORS — Risks Related to Our Business — If we are unable to successfully develop or commercialize new products, our operating results will suffer." and "— Extensive industry regulation has had, and will continue to have, a significant impact on our business, especially our product development, manufacturing and distribution capabilities." in this document.

All applications for FDA approval must contain information relating to product formulation, raw material suppliers, stability, manufacturing processes, packaging, labeling and quality control. We file a New Drug Application ("NDA") when we seek approval for drugs with active ingredients and/or with dosage strengths, dosage forms, delivery systems or pharmacokinetic profiles that have not been previously approved by the FDA. Generally, NDAs are filed for new chemical entities or for a new dosage form of previously approved drugs.

**Operating Results for the Years Ended December 31, 2018, 2017 and 2016**

Results of operations, including segment net revenues, segment operating expenses and segment contribution consisted of the following for the years ended December 31, 2018, 2017 and 2016 ($ in millions):

| | Year Ended December 31, 2018 | | | |
| --- | --- | --- | --- | --- |
| | US Specialized Therapeutics | US General Medicine | International | Total |
| Net revenues | $ 6,920.3 | $ 5,322.9 | $ 3,504.7 | $ 15,747.9 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 565.2 | 799.1 | 537.1 | 1,901.4 |
| Selling and marketing | 1,348.3 | 924.6 | 928.7 | 3,201.6 |
| General and administrative | 205.3 | 156.4 | 141.7 | 503.4 |
| Segment contribution | $ 4,801.5 | $ 3,442.8 | $ 1,897.2 | $ 10,141.5 |
| Contribution margin | 69.4% | 64.7% | 54.1% | 64.4% |
| Corporate(2) | | | | 1,067.3 |
| Research and development | | | | 2,266.2 |
| Amortization | | | | 6,552.3 |
| Goodwill impairments | | | | 2,841.1 |
| In-process research and development impairments | | | | 804.6 |
| Asset sales and impairments, net | | | | 2,857.6 |
| Operating (loss) | | | | $ (6,247.6) |
| Operating margin | | | | (39.7)% |

(1) Excludes amortization and impairment of acquired intangibles including products rights, as well as indirect cost of sales not attributable to segment results.
(2) Corporate includes net revenues of $39.5 million.

| | Year Ended December 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | US Specialized Therapeutics | US General Medicine | International | Total |
| Net revenues | $ 6,803.6 | $ 5,796.2 | $ 3,319.5 | $ 15,919.3 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales(1) | 495.4 | 843.9 | 478.7 | 1,818.0 |
| Selling and marketing | 1,369.5 | 1,084.1 | 913.8 | 3,367.4 |
| General and administrative | 208.2 | 177.3 | 120.6 | 506.1 |
| Segment contribution | $ 4,730.5 | $ 3,690.9 | $ 1,806.4 | $ 10,227.8 |
| Contribution margin | 69.5% | 63.7% | 54.4% | 64.2% |
| Corporate(2) | | | | 1,471.8 |
| Research and development | | | | 2,100.1 |
| Amortization | | | | 7,197.1 |
| In-process research and development impairments | | | | 1,452.3 |
| Asset sales and impairments, net | | | | 3,927.7 |
| Operating (loss) | | | | $ (5,921.2) |
| Operating margin | | | | (37.2)% |

(1) Excludes amortization and impairment of acquired intangibles including products rights, as well as indirect cost of sales not attributable to segment results.
(2) Corporate includes net revenues of $21.4 million.

The following are contractual commitments relating to the R&D and approval related milestones and sales based milestones ($ in millions):

| Transaction | Product | Maximum Milestones | | R&D / Approval Milestones | | Sales Based and Other Milestones | |
|---|---|---|---|---|---|---|---|
| Heptares Therapeutics, Ltd. | Neurological disorders | $ | 3,224.5 | $ | 649.5 | $ | 2,575.0 |
| Assembly Biosciences, Inc. | Gastrointestinal products | | 2,459.0 | | 1,069.0 | | 1,390.0 |
| AstraZeneca plc License | Brazikumab | | 1,250.0 | | 210.0 | | 1,040.0 |
| Akarna Therapeutics, Ltd. | Inflammatory and fibrotic diseases | | 975.0 | | 600.0 | | 375.0 |
| Tobira Therapeutics, Inc. | Cenicriviroc | | 800.1 | | 400.1 | | 400.0 |
| Chase Pharmaceuticals Corporation | Neurodegenerative disorders | | 800.0 | | 250.0 | | 550.0 |
| Merck & Co. | Ubrogepant & Atogepant | | 780.0 | | 350.0 | | 430.0 |
| Retrosense Therapeutics, LLC | RST-001 | | 495.4 | | 245.4 | | 250.0 |
| Naurex, Inc. | GLYX-13 | | 475.0 | | 75.0 | | 400.0 |
| AqueSys, Inc. | Xen Gel Stent | | 300.0 | | - | | 300.0 |
| Topokine Therapeutics, Inc. | XAF5 | | 260.0 | | 110.0 | | 150.0 |
| Oculeve, Inc. | True Tear® | | 150.0 | | 50.0 | | 100.0 |
| ForSight VISION5, Inc. | Bimatoprost Ring | | 125.0 | | 125.0 | | - |
| All Other | | | 4,225.1 | | 1,971.7 | | 2,253.4 |
| **Total** | | $ | **16,319.1** | $ | **6,105.7** | $ | **10,213.4** |

Such milestone payments will only be payable in the event that the Company achieves contractually defined, success-based milestones, such as:

- the advancement of the specified research and development programs;
- the receipt of regulatory approval for the specified compounds or products; and/or
- reaching a sales threshold of the specified compounds or products.

***Off-Balance Sheet Arrangements***

We do not have any material off-balance sheet arrangements that have, or are reasonably likely to have, a current or future effect on our financial condition, changes in financial condition, net revenues or expenses, results of operations, liquidity, capital expenditures or capital resources.

## CRITICAL ACCOUNTING ESTIMATES

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States ("GAAP"). These accounting principles require us to make certain estimates, judgments and assumptions. We believe that the estimates, judgments and assumptions are reasonable based upon information available to us at the time that these estimates, judgments and assumptions are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities as of the date of the financial statements, as well as the reported amounts of revenues and expenses during the periods presented. To the extent there are material differences between these estimates, judgments or assumptions and actual results, our financial statements will be affected. The significant accounting estimates that we believe are important to aid in fully understanding and evaluating our reported financial results include the following:

- Revenue Recognition
- Product Rights and Other Definite Lived Intangible Assets
- Goodwill and Intangible Assets with Indefinite Lives
- Allocation of Acquisition Fair Values to Assets Acquired and Liabilities Assumed
- Income Taxes
- Contingent Consideration and Other Commitments

## PART III

**ITEM 10.**    *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

**Directors**

The information concerning directors of Allergan required under this Item is incorporated herein by reference to the "Director Nominees For Election at the Annual Meeting" section of our definitive proxy statement, to be filed pursuant to Regulation 14A, related to our 2019 Annual General Meeting of Shareholders to be held on May 1, 2019 (our "2019 Proxy Statement").

The information concerning our Audit Committee and the independence of its members required by this Item, along with information about the financial expert(s) serving on the Audit Committee, is incorporated by reference to "Audit and Compliance Committee" section of our 2019 Proxy Statement.

**Executive Officers of the Registrant**

Below are our executive officers as of February 15, 2019:

| Name | Age | Principal Position with Registrant |
| --- | --- | --- |
| Brenton L. Saunders | 49 | Chairman, President and Chief Executive Officer |
| William Meury | 51 | Executive Vice President and Chief Commercial Officer |
| Matthew M. Walsh | 52 | Executive Vice President and Chief Financial Officer |
| A. Robert D. Bailey | 55 | Executive Vice President and Chief Legal Officer and Corporate Secretary |
| Karen L. Ling | 55 | Executive Vice President and Chief Human Resources Officer |
| Dr. C. David Nicholson | 64 | Executive Vice President and Chief R&D Officer |
| Wayne R. Swanton | 51 | Executive Vice President, Global Operations |
| James C. D'Arecca | 48 | Chief Accounting Officer |

**Brenton L. Saunders**

Mr. Saunders is Chairman, President and Chief Executive Officer of Allergan and has served in the role of President and Chief Executive Officer since July 2014 and of Chairman since October 2016, having previously served as Chief Executive Officer and President, and as director, of Forest Laboratories, Inc. , prior to its acquisition by Allergan. Prior to that, he served as Chief Executive Officer of Bausch + Lomb Incorporated, a leading global eye health company, serving in this capacity from March 2010 until August 2013. Mr. Saunders also held a number of leadership positions at Schering-Plough, including the position of President of Global Consumer Health Care and was named head of integration for the company's merger with Merck & Co. and for Schering-Plough's acquisition of Organon BioSciences. Before joining Schering-Plough, Mr. Saunders was a Partner and Head of Compliance Business Advisory at PricewaterhouseCoopers LLP. Prior to that, he was Chief Risk Officer at Coventry Health Care and Senior Vice President, Compliance, Legal and Regulatory at Home Care Corporation of America. Mr. Saunders began his career as Chief Compliance Officer for the Thomas Jefferson University Health System. Mr. Saunders serves on the Board of Directors of Cisco Systems, Inc., RWJBarnabas Health and The Allergan Foundation, and is a member of the Business Council, the Business Roundtable and PhRMA.

**William Meury**

Mr. Meury is Executive Vice President and Chief Commercial Officer of Allergan and has served in this role since May 2016, having previously served as President, Branded Pharma from March 2015 and Executive Vice President, Commercial, North American Brands from July 2014. Mr. Meury served as Executive Vice President, Sales and Marketing at Forest prior to its acquisition by Allergan (then known as Actavis). He joined Forest in 1993 and held multiple roles of increasing responsibility in Marketing, New Products, Business Development, and Sales. Before joining Forest, Mr. Meury worked in public accounting for Reznick Fedder & Silverman and in financial reporting for MCI Communications. He received a B.S. in Economics from the University of Maryland. Mr. Meury serves on the Board of Directors of Syndax Pharmaceuticals, The Jed Foundation and the International Council of Ophthalmology Foundation.

**Matthew M. Walsh**

Mr. Walsh is Executive Vice President and Chief Financial Officer of Allergan and has served in this role since February 2018.  Prior to joining Allergan, Mr. Walsh served as EVP, CFO at Catalent for 10 years. Before Catalent, Mr. Walsh was President, CFO and Acting CEO at Escala Group, Inc. He previously held a variety of finance leadership roles at GenTek, Inc., including Vice

**ALLERGAN PLC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In millions, except per share amounts)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Net revenues | $ 15,787.4 | $ 15,940.7 | $ 14,570.6 |
| Operating expenses: | | | |
| Cost of sales (excludes amortization and impairment of acquired intangibles including product rights) | 2,191.4 | 2,168.0 | 1,860.8 |
| Research and development | 2,266.2 | 2,100.1 | 2,575.7 |
| Selling and marketing | 3,250.6 | 3,514.8 | 3,266.4 |
| General and administrative | 1,271.2 | 1,501.9 | 1,473.9 |
| Amortization | 6,552.3 | 7,197.1 | 6,470.4 |
| Goodwill impairments | 2,841.1 | - | - |
| In-process research and development impairments | 804.6 | 1,452.3 | 743.9 |
| Asset sales and impairments, net | 2,857.6 | 3,927.7 | 5.0 |
| Total operating expenses | 22,035.0 | 21,861.9 | 16,396.1 |
| Operating (loss) | (6,247.6) | (5,921.2) | (1,825.5) |
| | | | |
| Interest income | 45.2 | 67.7 | 69.9 |
| Interest (expense) | (911.2) | (1,095.6) | (1,295.6) |
| Other income / (expense), net | 256.7 | (3,437.3) | 219.2 |
| Total other (expense), net | (609.3) | (4,465.2) | (1,006.5) |
| (Loss) before income taxes and noncontrolling interest | (6,856.9) | (10,386.4) | (2,832.0) |
| (Benefit) for income taxes | (1,770.7) | (6,670.4) | (1,897.0) |
| Net (loss) from continuing operations, net of tax | (5,086.2) | (3,716.0) | (935.0) |
| (Loss) / income from discontinued operations, net of tax | - | (402.9) | 15,914.5 |
| Net (loss) / income | (5,086.2) | (4,118.9) | 14,979.5 |
| (Income) attributable to noncontrolling interest | (10.2) | (6.6) | (6.1) |
| Net (loss) / income attributable to shareholders | (5,096.4) | (4,125.5) | 14,973.4 |
| Dividends on preferred shares | 46.4 | 278.4 | 278.4 |
| Net (loss) / income attributable to ordinary shareholders | $ (5,142.8) | $ (4,403.9) | $ 14,695.0 |
| | | | |
| (Loss) / income per share attributable to ordinary shareholders - basic: | | | |
| Continuing operations | $ (15.26) | $ (11.99) | $ (3.17) |
| Discontinued operations | - | (1.20) | 41.35 |
| Net (loss) / income per share - basic | $ (15.26) | $ (13.19) | $ 38.18 |
| (Loss) / income per share attributable to ordinary shareholders - diluted: | | | |
| Continuing operations | $ (15.26) | $ (11.99) | $ (3.17) |
| Discontinued operations | - | (1.20) | 41.35 |
| Net (loss) / income per share - diluted | $ (15.26) | $ (13.19) | $ 38.18 |
| | | | |
| Dividends per ordinary share | $ 2.88 | $ 2.80 | $ - |
| | | | |
| Weighted average ordinary shares outstanding: | | | |
| Basic | 337.0 | 333.8 | 384.9 |
| Diluted | 337.0 | 333.8 | 384.9 |

See accompanying Notes to the Consolidated Financial Statements.

F-6

**NOTE 17 — Long-Term Debt and Capital Leases**

Debt consisted of the following ($ in millions):

| | Guarantor | Issuance Date / Acquisition Date | Interest Payments | Balance As of December 31, 2018 | Balance As of December 31, 2017 | Fair Market Value As of December 31, 2018 | Fair Market Value As of December 31, 2017 |
|---|---|---|---|---|---|---|---|
| **Senior Notes:** | | | | | | | |
| Floating Rate Notes | | | | | | | |
| $500.0 million floating rate notes due March 12, 2018 (1) | (5) | March 4, 2015 | Quarterly | $ - | $ 500.0 | $ - | $ 500.6 |
| $500.0 million floating rate notes due March 12, 2020 (2) | (5) | March 4, 2015 | Quarterly | 500.0 | 500.0 | 501.9 | 508.1 |
| | | | | 500.0 | 1,000.0 | 501.9 | 1,008.7 |
| Fixed Rate Notes | | | | | | | |
| $3,000.0 million 2.350% notes due March 12, 2018 | (5) | March 4, 2015 | Semi-annually | - | 3,000.0 | - | 3,001.9 |
| $250.0 million 1.350% notes due March 15, 2018 | (6) | March 17, 2015 | Semi-annually | - | 250.0 | - | 249.7 |
| $500.0 million 2.450% notes due June 15, 2019 | (5) | June 10, 2014 | Semi-annually | - | 500.0 | - | 499.7 |
| $3,500.0 million 3.000% notes due March 12, 2020 | (5) | March 4, 2015 | Semi-annually | 2,706.7 | 3,500.0 | 2,694.8 | 3,528.4 |
| $650.0 million 3.375% notes due September 15, 2020 | (6) | March 17, 2015 | Semi-annually | 650.0 | 650.0 | 648.7 | 661.3 |
| $750.0 million 4.875% notes due February 15, 2021 | (7) | July 1, 2014 | Semi-annually | 450.0 | 450.0 | 459.4 | 474.3 |
| $1,200.0 million 5.000% notes due December 15, 2021 | (7) | July 1, 2014 | Semi-annually | 1,200.0 | 1,200.0 | 1,234.8 | 1,282.6 |
| $3,000.0 million 3.450% notes due March 15, 2022 | (5) | March 4, 2015 | Semi-annually | 2,940.5 | 3,000.0 | 2,891.0 | 3,044.5 |
| $1,700.0 million 3.250% notes due October 1, 2022 | (6) | October 2, 2012 | Semi-annually | 1,700.0 | 1,700.0 | 1,652.2 | 1,703.0 |
| $350.0 million 2.800% notes due March 15, 2023 | (6) | March 17, 2015 | Semi-annually | 350.0 | 350.0 | 332.8 | 341.6 |
| $1,200.0 million 3.850% notes due June 15, 2024 | (5) | June 10, 2014 | Semi-annually | 1,036.7 | 1,200.0 | 1,021.0 | 1,232.3 |
| $4,000.0 million 3.800% notes due March 15, 2025 | (5) | March 4, 2015 | Semi-annually | 3,027.5 | 4,000.0 | 2,956.0 | 4,067.1 |
| $2,500.0 million 4.550% notes due March 15, 2035 | (5) | March 4, 2015 | Semi-annually | 1,789.0 | 2,500.0 | 1,690.7 | 2,631.9 |
| $1,000.0 million 4.625% notes due October 1, 2042 | (6) | October 2, 2012 | Semi-annually | 456.7 | 456.7 | 412.4 | 471.2 |
| $1,500.0 million 4.850% notes due June 15, 2044 | (5) | June 10, 2014 | Semi-annually | 1,079.4 | 1,500.0 | 1,019.1 | 1,606.2 |
| $2,500.0 million 4.750% notes due March 15, 2045 | (5) | March 4, 2015 | Semi-annually | 881.0 | 1,200.0 | 836.6 | 1,277.3 |
| | | | | 18,267.5 | 25,456.7 | 17,849.5 | 26,073.0 |
| Euro Denominated Notes | | | | | | | |
| €700.0 million floating rate notes due June 1, 2019 (3) | (5) | May 26, 2017 | Quarterly | 802.7 | 840.4 | 794.9 | 837.2 |
| €700.0 million floating rate notes due November 15, 2020 (4) | (5) | November 15, 2018 | Quarterly | 802.7 | - | 791.3 | - |
| €750.0 million 0.500% notes due June 1, 2021 | (5) | May 26, 2017 | Annually | 860.0 | 900.4 | 849.7 | 895.8 |
| €500.0 million 1.500% notes due November 15, 2023 | (5) | November 15, 2018 | Annually | 573.4 | - | 572.4 | - |
| €700.0 million 1.250% notes due June 1, 2024 | (5) | May 26, 2017 | Annually | 802.7 | 840.4 | 775.5 | 831.1 |
| €500.0 million 2.625% notes due November 15, 2028 | (5) | November 15, 2018 | Annually | 573.4 | - | 573.4 | - |
| €550.0 million 2.125% notes due June 1, 2029 | (5) | May 26, 2017 | Annually | 630.7 | 660.3 | 594.7 | 657.8 |
| | | | | 5,045.6 | 3,241.5 | 4,951.9 | 3,221.9 |
| **Total Senior Notes Gross** | | | | 23,813.1 | 29,698.2 | 23,303.3 | 30,303.6 |
| Unamortized premium | | | | 64.3 | 88.9 | | - |
| Unamortized discount | | | | (64.5) | (81.7) | | - |
| **Total Senior Notes Net** | | | | **23,812.9** | **29,705.4** | **23,303.3** | **30,303.6** |
| **Other Indebtedness** | | | | | | | |
| Debt Issuance Costs | | | | (92.1) | (121.5) | | |
| Margin Loan | | | | - | 459.0 | | |
| Other | | | | 69.3 | 29.7 | | |
| **Total Other Borrowings** | | | | **(22.8)** | **367.2** | | |
| **Capital Leases** | | | | 7.6 | 2.7 | | |
| **Total Indebtedness** | | | | $ **23,797.7** | $ **30,075.3** | | |

(1) Interest on the 2018 floating rate note was three month USD LIBOR plus 1.080% per annum

(2) Interest on the 2020 floating rate note is three month USD LIBOR plus 1.255% per annum

(3) Interest on the 2019 floating rate note is the three month EURIBOR plus 0.350% per annum

(4) Interest on the 2020 floating rate notes is the three month EURIBOR plus 0.350% per annum

(5) Guaranteed by Warner Chilcott Limited, Allergan Capital S.à r.l. and Allergan Finance, LLC

(6) Guaranteed by Allergan plc and Warner Chilcott Limited

(7) Guaranteed by Allergan plc

Fair market value in the table above is determined in accordance with Fair Value Leveling under Level 2 based upon quoted prices for similar items in active markets.

The following represents the significant activity during the year ended December 31, 2018 to the Company's total indebtedness:

- The Company borrowed $700.0 million, and subsequently repaid $700.0 million, under its revolving credit facility to fund, in part, the repurchase of the Company's ordinary shares;

- The Company repurchased and retired $3,939.1 million of senior notes at face value for a total of $3,893.5 million from open market redemptions.  As a result of the debt extinguishment, the Company recognized a net gain of $15.6 million

within "other income / (expense), net" for the discount received upon repurchase of $45.6 million, offset by the non-cash write-off of premiums and debt fees related to the repaid notes of $30.0 million;

- The Company borrowed €1,700.0 million of senior notes;

- The Company repaid scheduled maturities on senior notes of $3,750.0 million; and

- The Company prepaid $459.0 million of indebtedness under the Company's margin loan.

The following represents the significant activity during the year ended December 31, 2017 to the Company's total indebtedness:

- The Company repurchased and retired $2,843.3 million of senior notes at face value for a total of $3,013.8 million as a result of a tender offer. As a result of the tender offer, the Company recognized a net loss of $161.6 million within "other income / (expense), net" for the premium paid upon repurchase of $170.5 million, offset by the non-cash write-off of premiums and debt fees related to the repaid notes of $8.9 million;

- The Company borrowed €2,700.0 million of senior notes;

- The Company repaid scheduled maturities on senior notes of $2,700.0 million;

- The Company repurchased and retired $750.0 million of senior notes at face value for a total of $785.1 million as a result of an early tender payment.  As a result of the early tender payment, the Company recognized a net loss of $27.6 million within "other income / expense, net" for the premium paid upon repurchase of $35.1 million, offset by the non-cash write-off of premiums and debt fees related to the repaid notes of $7.5 million; and

- The Company borrowed $525.0 million of indebtedness under the Company's margin loan and subsequently repaid $66.0 million.

### *Revolving Credit Facility*

On June 14, 2017, Allergan plc and certain of its subsidiaries entered into a revolving credit and guaranty agreement (the "Revolver Agreement") among Allergan Capital, as borrower, Allergan plc, as Ultimate Parent; Warner Chilcott Limited, Allergan Finance LLC, and Allergan Funding SCS, as guarantors; the lenders from time to time party thereto (the "Revolving Lenders"); J.P. Morgan Chase Bank as Administrative Agent; J.P. Morgan Europe Limited, as London Agent; and the other financial institutions party thereto. Under the Revolver Agreement, the Revolving Lenders have committed to provide an unsecured four-year revolving credit facility in an aggregate principal amount of up to $1.5 billion, with the ability to increase the revolving credit facility by $500.0 million to an aggregate principal amount of up to $2.0 billion.

The Revolver Agreement provides that loans thereunder would bear interest, at our choice, of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 1.00% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 2.00% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, the Company pays an unused commitment fee varying from 0.070% to 0.250% per annum, depending on the Debt Rating, of the unused portion of the revolver.

The obligations under the Revolver Agreement are guaranteed by Warner Chilcott Limited, Allergan Finance, LLC and Allergan Funding SCS.

The Revolver Agreement contains customary affirmative covenants for facilities of this type, including, among others, covenants pertaining to the delivery of financial statements, notices of default, maintenance of corporate existence and compliance with laws, as well as customary negative covenants for facilities of this type, including, among others, limitations on secured indebtedness, non-guarantor subsidiary indebtedness, mergers and certain other fundamental changes and passive holding company status.  The Revolver Agreement also contains a financial covenant requiring maintenance of a maximum consolidated leverage ratio.

In addition, the Revolver Agreement also contains customary events of default (with customary grace periods and materiality thresholds).

The Company was subject to, and as of December 31, 2018, was in compliance with all financial covenants under the terms of the Revolver Agreement. At December 31, 2018, there were $32.0 million of outstanding borrowings or letters of credit outstanding under the Revolver Agreement.

*Accumulated Other Comprehensive Income / (Loss)*

For most of the Company's international operations, the local currency has been determined to be the functional currency. The results of its non-U.S. dollar based operations are translated to U.S. dollars at the average exchange rates during the period. Assets and liabilities are translated at the rate of exchange prevailing on the balance sheet date. Equity is translated at the prevailing rate of exchange at the date of the equity transaction. Translation adjustments are reflected in shareholders' equity and are included as a component of other comprehensive income / (loss). The effects of converting non-functional currency assets and liabilities into the functional currency are recorded as transaction gains / (losses) in general and administrative expenses in the consolidated statements of operations.

Unrealized gain / (losses) net of tax primarily represent experience differentials and other actuarial charges related to the Company's defined benefit plans. The movements in accumulated other comprehensive income / (loss) for the years ended December 31, 2018 and 2017 were as follows ($ in millions):

| | Foreign Currency Translation Items | Unrealized gain / (loss) net of tax | Total Accumulated Other Comprehensive Income / (Loss) |
|---|---|---|---|
| Balance as of December 31, 2016 | $ 534.7 | $ (1,573.1) | $ (1,038.4) |
| Other comprehensive gain / (loss) before reclassifications into general and administrative | 1,248.0 | 111.7 | 1,359.7 |
| Net impact of other-than-temporary loss on investment in Teva securities | - | 1,599.4 | 1,599.4 |
| Total other comprehensive income / (loss) | 1,248.0 | 1,711.1 | 2,959.1 |
| Balance as of December 31, 2017 | $ 1,782.7 | $ 138.0 | $ 1,920.7 |
| Amounts reclassed, net of tax, upon adoption of ASU 2016-01 | - | (63.0) | (63.0) |
| Balance as of January 1, 2018 | $ 1,782.7 | $ 75.0 | $ 1,857.7 |
| Other comprehensive gain / (loss) before reclassifications into general and administrative | (474.4) | (38.1) | (512.5) |
| Total other comprehensive income / (loss) | (474.4) | (38.1) | (512.5) |
| Balance as of December 31, 2018 | $ 1,308.3 | $ 36.9 | $ 1,345.2 |

As of December 31, 2018 and 2017, unrealized gain / (loss) net of tax included $36.9 million and $75.0 million, respectively, related to the Company's pension and other post retirement plans.  The $63.0 million as of December 31, 2017 which was subject to the implementation of ASU No. 2016-01 was reclassified into Retained Earnings as a result of the implementation.

## NOTE 21 — Segments

The Company's businesses are organized into the following segments: US Specialized Therapeutics, US General Medicine and International. In addition, certain revenues and shared costs, and the results of corporate initiatives, are managed outside of the three segments.

The operating segments are organized as follows:

- The US Specialized Therapeutics segment includes sales and expenses relating to branded products within the U.S., including Medical Aesthetics, Medical Dermatology through September 20, 2018, Eye Care and Neuroscience and Urology therapeutic products.

- The US General Medicine segment includes sales and expenses relating to branded products within the U.S. that do not fall into the US Specialized Therapeutics business units, including Central Nervous System, Gastrointestinal, Women's Health, Anti-Infectives and Diversified Brands.

- The International segment includes sales and expenses relating to products sold outside the U.S.

| | Year Ended December 31, 2016 | | | |
| | US Specialized Therapeutics | US General Medicine | International | Total |
|---|---|---|---|---|
| Net revenues | $ 5,811.7 | $ 5,923.9 | $ 2,881.3 | $ 14,616.9 |
| | | | | |
| Operating expenses: | | | | |
| Cost of sales[1] | 290.9 | 879.8 | 418.2 | 1,588.9 |
| Selling and marketing | 1,137.0 | 1,185.7 | 788.2 | 3,110.9 |
| General and administrative | 174.2 | 174.9 | 117.2 | 466.3 |
| Segment contribution | $ 4,209.6 | $ 3,683.5 | $ 1,557.7 | $ 9,450.8 |
| Contribution margin | 72.4% | 62.2% | 54.1% | 64.7% |
| Corporate[2] | | | | 1,481.3 |
| Research and development | | | | 2,575.7 |
| Amortization | | | | 6,470.4 |
| In-process research and development impairments | | | | 743.9 |
| Asset sales and impairments, net | | | | 5.0 |
| Operating (loss) | | | | $ (1,825.5) |
| Operating margin | | | | (12.5)% |

[1] Excludes amortization and impairment of acquired intangibles including products rights, as well as indirect cost of sales not attributable to segment results.

[2] Corporate includes net revenues of $(46.3) million, which includes a reduction of $(80.0) million for revenues that were included in the segment results and reclassified into revenues from discontinued operations as a reduction of Corporate revenues for sales through our former Anda Distribution business.

No country outside of the United States represents ten percent or more of net revenues. The US Specialized Therapeutics and US General Medicine segments are comprised solely of sales within the United States.

The following table presents our net revenue disaggregated by geography for our international segment for the years ended December 31, 2018, 2017 and 2016 ($ in millions):

| | Years Ended December 31, | | |
| | 2018 | 2017 | 2016 |
|---|---|---|---|
| Europe | $ 1,482.6 | $ 1,439.2 | $ 1,322.8 |
| Asia Pacific, Middle East and Africa | 1,089.9 | 929.9 | 776.1 |
| Latin America and Canada | 862.4 | 863.3 | 722.3 |
| Other* | 69.8 | 87.1 | 60.1 |
| Total International | $ 3,504.7 | $ 3,319.5 | $ 2,881.3 |

*Includes royalty and other revenue

F-71

# EXHIBIT 2

# FORTUNE

## Actavis: The latest Fortune 500 company to "leave" the U.S. for tax reasons

By **BRIAN O'KEEFE**  May 21, 2013

By Brian O'Keefe, assistant managing editor

Fortune — Drugmaker Actavis (ACT, +0.00%) announced yesterday that it will buy rival Warner Chilcott PLC for $5 billion in stock and that, as part of the deal, it plans to reincorporate itself in tax-friendly Ireland, where Warner Chilcott (WCRX, +0.00%) is based. This despite the fact that the company's top executives, including CEO Paul Bisaro, will continue to live and work in New Jersey.

"Everybody loves New Jersey too much, so nobody is willing to go," he said on a conference call yesterday.

The move makes Actavis the latest Fortune 500 company to "leave" the U.S. in search of a lower tax rate and thrusts the generic drug giant into the ongoing debate about corporate tax rates in the U.S. alongside tech giant Apple (AAPL, +0.55%).

By basing much of its international operations in Ireland, Apple has been able to save billions of dollars in taxes in recent years, according to the report of a U.S. Senate inquiry that was released yesterday. In testimony before a Senate hearing this morning, Apple CEO Tim Cook said that his company pays an "extraordinary amount" of U.S. taxes and doesn't take advantage of tax "gimmicks" to avoid them, even though the Senate investigation found that Apple had set up structures that allowed it to pay little or no taxes in any country on much of its income.

PAID CONTENT

### The Moment That Made Me

Olympians and business leaders describe the moment that launched their careers.

From KPMG



**MORE:** Apple vs. Subcommittee: Tim Cook has some explaining to do

For Actavis, the acquisition and reincorporation



Earlier this month, the maker of generic and specialty drugs, formerly known as Watson Pharmaceuticals, made its debut on the Fortune 500 at No. 432 with $5.9 billion in revenue. On the day the list was officially released, I visited the company's headquarters and interviewed CEO Bisaro for a story on what it's like to join the Fortune 500. "Our intention is to be on the Fortune 500 for a long time," he told me.

But if Bisaro's merger and reincorporation plan goes forward as planned, Actavis will turn out to be a one-year wonder on the 500. Only companies domiciled in the U.S. are eligible for inclusion.

The acquisition of Warner Chilcott will give Actavis more brand-name drugs to balance against its generic portfolio and will bolster its already strong franchise of drugs for women's health. By bulking up, Actavis also may have a better chance to fend off potential suitors. In recent weeks, generic rivals Valeant Pharmaceuticals International (VRX, +0.00%) and Mylan (MYL, -0.71%) have both been rumored to be considering takeover bids for Actavis.

**RELATED:** The biggest merger you didn't hear about today

However, in a conference call with analysts to discuss the deal, Bisaro also extolled the added benefit of lowering his company's effective tax rate, which he forecast would drop from 28% to 17%. Based on Bisaro's strongly-held opinions about U.S. corporate tax policy, that must have been a major selling point for the deal.

Near the end of my interview with Bisaro earlier this month, I asked him a broad question about the stock market and he responded by bringing up the subject of corporate tax rates. "My own personal soapbox is that we've got to fix the disadvantage that American companies have — America-based companies — vs. other countries around the world," he said. "I know it's not a popular political issue but you've got to find a way to solve the tax problem."

It was clear that the disparity in corporate tax rates was a burning topic for him. "We're competing against companies that have much, much lower tax rates than we do," he went on, with growing excitement. "And we compete for the same investor base. So you can't put us at a disadvantage. We have to find ways around that, and often times it means moving jobs out of the United States. That can't be the policy that the government wants to follow. I think we have to step away from the rhetoric that 'we all need to pay our fair share' and all that other nonsense, and start thinking about, practically-speaking, how do we put more people to work?"

Actavis is hardly the first large, publicly traded company to reincorporate overseas for tax reasons. Two members of last year's Fortune 500, electronics maker Eaton (ETN, -0.94%) and insurance broker Aon (AON, +0.26%), dropped off the list this year after reincorporating to Ireland and the United Kingdom respectively. A 2011 study by Ernst & Young found that the U.S. had lost a total of 46 headquarters of Fortune Global 500 companies over the previous 11 years. Currently, a total of 21 companies currently included in the S&P 500 are technically headquartered overseas.

According to research published by the Cato Institute in September, the U.S. had an effective tax rate of 35.6% on new corporate investment, the fourth highest out of 90 countries studied and almost twice the average rate of the 90 countries.

It is clearly an issue that resonates with Bisaro, who joined Actavis as CEO in 2007 after a long run first as chief counsel and then president and COO of Barr Pharmaceuticals. He has has made significant changes at Actavis in his tenure. A few years ago, he moved the headquarters of the company, still known at the time as Watson Pharmaceuticals, from Corona, Calif., to Parsippany, N.J., in part to be nearer to talent in the pharma-heavy area but also, not incidentally, because Bisaro happens to live in the Garden State.

Last year, Bisaro engineered the acquisition of Swiss drug manufacturer Actavis and the board ultimately decided to adopt the Actavis name (and change its ticker symbol to ACT) because the Watson name is too common around the world and the company ran into copyright issues. The merger with Warner Chilcott is expected to close by the end of this year.

Actavis currently has 17,000 employees globally, about 5,400 of whom are employed in the U.S. Roughly 60% of the company's sales will be generated in the U.S. in 2013. That figure probably won't decrease in the near future. Even though Warner Chilcott is headquartered in Dublin, most of its sales are in North America.

Before my interview with Bisaro concluded, he decided to make his point about the deleterious effect of U.S. corporate tax rates one more time. "It can't be a good policy to say, 'We're going to tax you every time you do something, and therefore you're never going to do anything in the U.S.,'" he said. "How is that good for Americans?"

Now he has found a way around that policy, even though he will still be living and driving to work in New Jersey.

# EXHIBIT 3



# THE ECONOMIC AND COMMUNITY IMPACT OF ALLERGAN TO OHIO

APRIL 2019







# CONTENTS

**Executive Summary** — 1

**Background** — 2

**Methodology** — 2–3

**Economic Impact** — 4–6

    Operations Impact — 4

    Capital Investment Impact — 5

    Total Economic Impact — 6

**Fiscal Impact** — 6–8

    Earnings Tax Revenue — 6

    Sales Tax Revenue — 7

    Total Fiscal Impact — 8

**Community Outreach Initiatives** — 8–9

**Conclusion** — 9

# EXECUTIVE SUMMARY

Allergan plc, a global pharmaceutical company, maintains a production and packaging facility in the City of Cincinnati that employs nearly 200 individuals and contributes significantly to the local and Ohio economies through its operating and capital expenditures. Allergan's economic impact in Ohio is much larger than its own direct employment and spending, however. Allergan's Cincinnati operations generate hundreds of more jobs and millions of dollars in additional spending within the State economy, as well as hundreds of thousands of dollars in income and sales tax revenues to local government entities and the State of Ohio.

Through daily operations spending and capital investments, Allergan's Cincinnati manufacturing facility's estimated annual economic impact to the State of Ohio includes:

- $46.3 million in total economic output;
- $28.8 million in total earnings; and
- 686 total jobs, both directly and indirectly supported by this spending.

Allergan's Cincinnati capital expenditures and operations generate significant tax revenues for local governments and the State of Ohio. Allergan's estimated total fiscal impact of nearly $1.5 million in 2017 consisted of:

- Income tax revenue totaling approximately $286,000 for the City of Cincinnati and approximately $675,000 to the State of Ohio – for a total of nearly $1 million; and
- Sales tax revenue of approximately $30,000 for Hamilton County and approximately $336,000 for the State of Ohio.

Allergan contributes substantially to charitable organizations in the State of Ohio through financial contributions by the Allergan Foundation and volunteer efforts of Allergan associates. From 2017 to 2018, the Allergan Foundation contributed $145,000 to four organizations in Ohio, three of which are located in the City of Cincinnati. The Allergan Foundation's lifetime giving to the four organizations totals $555,000, including $485,000 to the Cincinnati Eye Institute Foundation. Allergan also promotes educational and financial outreach initiatives in Cincinnati through the significant volunteer efforts of its associates. Each year, Allergan associates volunteer hundreds of hours to causes such as fundraisers for a local STEM high school, the sorting of items for victims of natural disasters, as well as to organizations such as Habitat for Humanity and the Alzheimer's Society.



# BACKGROUND

Allergan plc, a global pharmaceutical company headquartered in Dublin, Ireland, develops, manufactures, and commercializes branded pharmaceutical, device, biologic, surgical, and regenerative medicine products  for patients around the world. Allergan's manufacturing operation in Cincinnati produces and packages a variety of pharmaceutical products used to treat diseases such as heart disease and Alzheimer's. The facility enjoys strong employee retention, with average employee tenure of eight years, as well as recognition within the company as Allergan Plant of the Year in 2017 and 2018.

Companies generate economic impacts that are greater than their own direct employment and spending, with additional job creation and spending rippling through the economy. Allergan requested that the Economics Center conduct an analysis to determine the Company's total economic and fiscal impact to the State of Ohio. This report provides results of this analysis and documents Allergan's charitable contributions within the State and, in particular, in the City of Cincinnati. The remainder of the report is divided into the following sections:

> **The Methodology Section** documents the analytical approach taken by the Economics Center to calculate the direct, indirect, and total economic impacts of Allergan's Cincinnati plant to the State of Ohio, as well as the theory behind the input-output model used to calculate the various economic impacts. This section also discusses the approach taken to determine the fiscal impact to both local government entities and Ohio.

> **The Economic Impact Section** details the direct and indirect economic impacts associated with operational spending and capital investment by Allergan's Cincinnati plant. Types of impacts include output (expenditures), jobs, and employee earnings.

> **The Fiscal Impact Section** details the data and methodology behind the Economics Center's calculation of local and State earnings/income and sales tax revenues.

> **The Community Outreach Initiatives Section** discusses how Allergan's contributions to the State of Ohio and, specifically, the City of Cincinnati extend well beyond economic and fiscal impacts. This section notes the Allergan Foundation's philanthropic activities in the State, as well as the many volunteer initiatives of Allergan associates in Cincinnati.

> **The Conclusion** summarizes Allergan's varied and significant contributions to the Ohio economy and to the betterment of communities in Cincinnati.

# METHODOLOGY

The Economics Center calculated the economic impact to the economy of the State of Ohio of Allergan's Cincinnati manufacturing operations based on capital and operating expenditure data provided by Allergan. Operating expenditures included both employee wages and benefits and recurring, non-employee operating expenses on goods and services such as manufacturing materials, utilities, insurance, and professional services. Allergan provided anonymized salary and benefit data, as well as zip code of residence, for employees working at the Cincinnati facility.

The Economics Center calculated the total economic impact of Allergan's Cincinnati operations using the Regional Input-Output Modeling System (RIMS II), an input-output model maintained by the U.S. Bureau of Economic Analysis (BEA). Input-output models capture the interdependencies of an economy's various industries, quantifying how direct expenditures on goods or services by a particular industry (or to individuals in the form of wages and benefits) yield additional expenditures within that economy.

2



Businesses, organizations, and governments contribute more to an economy than just the direct employment supported by operations and capital expenditures. The direct wages and expenditures fuel the economy as portions of the direct wages and expenditures are spent on goods and services sourced from other businesses in the economy. The businesses within the economy (and their employees) that benefit from these direct expenditures repeat the process until all the original money has leaked from the economy into outside economies and savings. The sum of Allergan's direct jobs and expenditures in Ohio and the indirect and induced jobs and expenditures created by the money flowing through the Ohio economy constitute Allergan's total economic impacts to the Ohio economy. Indirect jobs and wages are created when a firm purchases goods and services from other firms in the economy and when those firms, in turn, purchase goods and services from other firms in the economy, and so on, until all the original firm's expenditures have leaked out of the economy. Induced jobs and wages are those generated by purchases within the economy by employees with earnings flowing from direct expenditures and their resulting indirect expenditures. Except where induced effects are noted separately, indirect effects refer to both indirect and induced effects in this report.

Multipliers are figures expressed in input-output models that represent economic relationships between industries and between households and industries. For every dollar spent by a given organization in a particular industry, multipliers reflect how many more dollars will be spent in a local economy by other businesses and households, thereby determining the total economic impact of a project or investment. Multipliers also measure how many jobs and the amount of earnings that will be generated in an economy for a given level of expenditure. The BEA's RIMS multipliers reflect two sets of economic impacts, direct effects and final effects. The latter represent the sum of the direct and indirect effects. In this analysis, direct effects are capital and operating expenditures by Allergan's Cincinnati operations, as well as the jobs directly supported by Allergan in Ohio through both its operations and capital expenditures. The indirect impacts are the expenditures and employment that are created in the Ohio economy to the extent that households and industries are supported by and respond to the new demands of the directly impacted industries.

Industries' multipliers vary by geography, reflecting regions' unique inter-industry economic relationships. In this report, multipliers reflect these relationships specifically within the Ohio economy. Applying the relevant Ohio and Hamilton County multipliers for each industry allowed the Economics Center to assemble a realistic picture of the total economic impact of the Allergan's Cincinnati operations to the state.

For the fiscal impact calculations, the Economics Center gathered earnings/income and sales tax rate data from the Ohio Department of Taxation, Hamilton County Government, the City of Cincinnati, and other local municipalities in which Allergan employees reside. Tax rates were applied to employee earnings and taxable purchases to calculate tax revenues accruing to local entities and the State of Ohio.

3

# ECONOMIC IMPACT

The Economics Center determined the economic impact of Allergan's Cincinnati manufacturing facilities to the Ohio economy using capital and operating expenditure data provided by Allergan. Capital expenditure data included actual expenditures for calendar years 2016-2017, as well as budgeted expenditures for 2018-2021. Operating expenditures, including both employee wages and benefits and non-employee operating costs, reflected actual 2017 data. This report presents all monetary values in 2017 dollars, with 2016 capital expenditures adjusted for inflation using the national Consumer Price Index (CPI).

The Economics Center adjusted direct capital and non-wage operating expenditure data for leakage prior to applying output, earnings, and employment multipliers. Leakage refers to the portion of spending by a particular industry in an economy that is met by imports from companies and organizations outside the economy. Presented as percentages, leakage figures for the industries comprising capital and operating expenditures by Allergan's Cincinnati manufacturing operations were obtained from Economic Modeling Specialists International (EMSI).[1]  The post-leakage direct expenditure figures represent estimated expenditures by Allergan on goods and services sourced from firms located in the State of Ohio.

## Operations Impact

Direct operating expenditures of Allergan's Cincinnati facility include spending on employees' wages, as well as utilities, maintenance and repair, administrative services, and other recurring expenses associated with the upkeep and continued operations of the manufacturing facilities. These direct operating expenditures, in turn, support indirect output, employment, and earnings within associated industries. Indirect impacts include the hiring of additional workers by businesses benefitting from Allergan's direct expenditures and the increases in output and earnings by these businesses.

Direct output attributable to ongoing operations of Allergan's Cincinnati facilities totaled $18.3 million in 2017 and led to an additional $16.4 million in indirect economic output, as shown in Table 1. Meanwhile, Allergan's operating expenditures supported 196 direct jobs and an additional 424 indirect jobs in 2017. Total earnings attributable to ongoing operations were $25.4 million in 2017, including $12.0 million in direct earnings[2] and $13.4 million in indirect earnings.

**Table 1. Total Economic Impact of Operations of Allergan's Cincinnati Manufacturing Facilities, 2017**

| Type | Expenditures ($M) | Employment | Earnings ($M) |
|------|-------------------|------------|---------------|
| Direct | $18.3 | 196 | $12.0 |
| Indirect | $16.4 | 424 | $13.4 |
| **Total** | **$34.7** | **620** | **$25.4** |

*Source: Economics Center calculations using RIMS II multipliers from data provided by Allergan.*

---

[1] *EMSI utilizes labor market data and other publicly available sources in a proprietary methodology to allow for tailored economic analyses in a specified geographic area.*

[2] *Direct earnings include only wages and bonuses of direct employees and exclude benefits and all other non-wage employee expenditures.*

4



## Capital Investment Impact

Allergan's capital investment expenditures associated with its Cincinnati manufacturing facility vary somewhat year-to-year, ranging from $6.6 million in 2018 (projected) to $16.4 million in 2016. These figures include expenditures outside the Ohio economy and are substantially lower when accounting for leakage. Average capital expenditures over the six years 2016-2021 are $10.6 million overall and $5.5 million within the Ohio economy, as shown in Table 2.

The industries directly impacted by Allergan's capital investments in its Cincinnati facility reflect their manufacturing operations. Among the industries that benefit most from these capital expenditures are packaging machinery manufacturing, industrial machinery manufacturing, and pharmaceutical preparation manufacturing. The Economics Center also apportioned 50 percent of manufacturing-related capital expenditures to the Wholesale trade sector based on the assumption that Allergan sources half of its manufacturing machinery and other equipment from wholesalers, as opposed to directly from manufacturers.

Average annual total output accruing to the Ohio economy from Allergan's capital investments in its Cincinnati facility is $14.9 million, including $5.5 million in direct expenditures, $6.1 million in indirect expenditures, and $3.3 million in total earnings. Capital investments also supported 66 total jobs, of which just under two-thirds (43) are indirect jobs.

**Table 2. Total Economic Impact of Capital Investments of Allergan's Cincinnati Manufacturing Facilities, 2017**

| Type | Expenditures ($M) | Employment | Earnings ($M) |
|------|-------------------|------------|---------------|
| Direct | $5.5 | 23 | $1.5 |
| Indirect | $6.1 | 43 | $1.8 |
| **Total** | **$11.6** | **66** | **$3.3** |

*Source: Economics Center calculations using RIMS II multipliers from data provided by Allergan.*

5

## Total Economic Impact

The overall annual economic impact to the State of Ohio of Allergan's Cincinnati operations includes $46.3 million in total output, $28.8 in total earnings, and 686 jobs, as shown in Table 3. The overall output and employment multipliers of Allergan's Cincinnati operations for the Ohio economy are 1.90 and 3.16. Put differently, each dollar of direct expenditure by Allergan's Cincinnati operations generates an additional $0.90 in spending by other firms throughout the Ohio economy, and more than two jobs are created for every job directly supported by Allergan in Cincinnati. In addition, the total-to-direct earnings ratio of 1.89 indicates that every dollar in direct earnings generates an additional $0.89 in indirect earnings throughout the State of Ohio economy.

**Table 3 – Total Economic Impact of Allergan's Cincinnati Manufacturing Facilities within the State of Ohio, 2017**

| Type | Expenditures ($M) | Employment | Earnings ($M) |
|------|-------------------|------------|---------------|
| Direct | $23.8 | 219 | $13.6 |
| Indirect | $22.5 | 467 | $15.2 |
| **Total** | **$46.3** | **686** | **$28.8** |

*Source: Economics Center calculations using RIMS II multipliers and data provided by Allergan.*

# FISCAL IMPACT

## Earnings Tax Revenue

Employee earnings and their subsequent spending of a portion of those earnings generates considerable earnings tax and sales tax revenue to both local jurisdictions and the State of Ohio. The Economics Center calculated City of Cincinnati and State of Ohio earnings tax revenues generated by Allergan's Cincinnati employees based on wage data provided by Allergan. Local earnings tax revenue from Allergan's employees accrues to the City of Cincinnati, which assesses a 2.1 percent earnings tax. The Economics Center also calculated local earnings tax revenues from earnings supported by direct capital expenditures by applying to them the City of Cincinnati's 2.1 percent earnings tax rate. In total, the City of Cincinnati collected more than $286,000 in tax revenue in 2017 from direct earnings, as shown in Table 4. Importantly, Hamilton County multipliers were used to calculate local direct earnings from capital expenditures, as well as local indirect earnings, as the estimation of local earnings tax revenues was based on local earnings alone. Hamilton County multipliers were also used to calculate local indirect earnings and, in turn, tax revenues from these earnings.

Earnings tax revenues accruing to the State of Ohio from Allergan employees' wages and the wages of the indirect jobs supported by Allergan's Cincinnati facility were calculated by applying the appropriate State income tax rate to each employee's wages.[3,4] The State's 2017 income tax rates were also applied to average earnings of the direct and indirect jobs supported by Allergan's capital expenditures. Total estimated income tax revenues, from direct earnings, accruing to the State in 2017 were approximately $371,000.

---

[3] *The State of Ohio assesses income tax based on a taxpayer's earnings bracket. Taxpayers in higher-earning brackets pay a higher rate. Individual income tax rates are provided by the Ohio Department of Taxation: https://www.tax.ohio.gov/ohio_ individual/individual/annual_tax_rates.aspx.*

[4] *This approach likely understates by a small margin total income tax paid by Allergan employees to Ohio because it does not account for scenarios in which employees have other taxable income that pushes them into higher tax brackets.*

Finally, the appropriate Ohio income tax rate was applied to average earnings per indirect employee, indicating that these employees' indirect earnings contributed an estimated $259,000 of income tax revenue to the State of Ohio in 2017. In total, Allergan's Cincinnati operations generated more than $286,000 in local earnings tax revenue to the City of Cincinnati and approximately $675,000 in income tax revenue for the State of Ohio in 2017.

**Table 4. Local and State Earnings Tax Revenue from Total Earnings Due to Allergan's Cincinnati Operations, 2017**

| Jurisdiction | Income Tax Revenue ($) |
|---|---|
| Local | 286,395 |
| State | 674,737 |
| **Total** | **961,132** |

*Source: Economics Center calculations using RIMS II multipliers and data provided by Allergan.*

## Sales Tax Revenue

Portions of earnings, including both direct and induced,[5] contribute to Hamilton County and State of Ohio sales tax revenues as employees spend their earnings on taxable goods and services representing a range of industries. The Economics Center estimated sales tax revenues under the assumptions that employees applied 80 percent of their pre-tax income toward expenditures and that taxable items constituted 35 percent of these expenditures.[6] The Economics Center further adjusted County and State sales (and, by extension, sales tax) calculations downward to account for the portions of expenditures on taxable items that residents make outside the respective county of residence and the State of Ohio.[7] As with the earnings tax analysis, Hamilton County multipliers were used to estimate local direct earnings from capital expenditures and indirect and induced earnings, while State of Ohio multipliers were used to estimate statewide earnings from capital expenditures and statewide indirect and induced earnings.

As shown in Table 5, Allergan's Cincinnati operations generated an estimated $30,000 in Hamilton County sales tax revenue and approximately $336,000 in Ohio sales tax revenue in 2017. Direct sales tax revenues accounted for approximately 64 percent of the Hamilton County revenues generated by Allergan's Cincinnati manufacturing operation and approximately 58 percent of the Ohio revenues in 2017.

**Table 5. Sales Tax Revenues Accruing to Hamilton County and the State of Ohio Due to Allergan's Cincinnati Facility, 2017**

| Jurisdiction | Sales Tax Revenue ($) |
|---|---|
| Hamilton County | 30,037 |
| Ohio | 336,244 |
| **Total** | **366,281** |

*Source: Economics Center calculations using RIMS II multipliers and data provided by Allergan.*

---

[5] *The spending of induced earnings (rather than indirect) refers to the spending of households only. In this report, "indirect" refers to spending of both households and business-to-business transactions. For the purposes of sales tax estimation, the tax rates are only applied to household, or induced, spending.*

[6] *Midwest Consumer Expenditure Survey. U.S. Bureau of Labor Statistics. September 2017.*

[7] *From EMSI's Regional Requirements tables for Hamilton County and the State of Ohio.*

## Total Fiscal Impact

Total tax revenue generated by Allergan's Cincinnati operations to the State of Ohio and local tax-imposing municipalities were approximately $863,000 and $464,000, respectively, in 2017, as shown in Table 6. The total fiscal impact of Allergan's Cincinnati operations was more than $1.3 million in 2017.

**Table 6. State and Local Tax Revenues from Allergan's Cincinnati Facility, 2017**

|  | State Tax Revenue ($) | Local Tax Revenue ($) | Total Tax Revenue($) |
|---|---|---|---|
| Direct | 546,771 | 316,432 | 863,203 |
| Indirect | 464,210 |  | 464,210 |
| **Total** | **1,010,981** | **316,432** | **1,327,413** |

*Source: Economics Center calculations using RIMS II multipliers and data provided by Allergan.*

# COMMUNITY OUTREACH INITIATIVES

Allergan's influence in Ohio extends well beyond its role as an employer and economic driver. Allergan makes charitable contributions to organizations in Cincinnati and throughout Ohio through the Allergan Foundation, and employees of the company's Cincinnati manufacturing facility participate in numerous fundraisers for local and national organizations throughout the year.

Through the Allergan Foundation, the company contributed financially to four organizations in Ohio over the two years, 2017-2018. As shown in Table 7, the Allergan Foundation contributed $75,000 to the Cincinnati Eye Institute Foundation from 2017 to 2018 and has given a total of $485,000 to the Cincinnati Eye Institute Foundation. The Allergan Foundation's contributions to three other organizations – the Cleveland Clinic, St. Vincent de Paul Community Pharmacy of Cincinnati, and the Cincinnati Association for the Blind – totaled $145,000 from 2017 to 2018. The Allergan Foundation's lifetime giving to the four organizations was $555,000 through 2018.

**Table 7. Allergan Foundation Contributions to Organizations in Ohio ($), 2017-2018**

| Organization | 2017 | 2018 | 2-Year Total | Lifetime Giving |
|---|---|---|---|---|
| Cincinnati Eye Institute Foundation (Roselawn Clinic) | 50,000 | 25,000 | 75,000 | 485,000 |
| Cleveland Clinic (Fellowship) | 35,000 |  | 35,000 | 35,000 |
| St. Vincent de Paul Community Pharmacy of Cincinnati |  | 15,000 | 15,000 | 15,000 |
| Cincinnati Association for the Blind | 10,000 | 10,000 | 20,000 | 20,000 |
| **Total** | **95,000** | **50,000** | **145,000** | **555,000** |

*Source: Charitable contribution data provided by Allergan.*

In addition to charitable giving, employees of Allergan's Cincinnati manufacturing facility donate hundreds of hours each year to various fundraising and outreach initiatives. In many cases, the organizations to which the employees donate their time and efforts support causes that align with conditions or diseases that Allergan products address. For example, Allergan sponsored a team for the Mini Heart Marathon, the Cincinnati area's 10th-largest fundraiser, in March 2018. Allergan's Cincinnati facilities package Bystolic, a drug that is used to treat hypertension.

Allergan employees also participated in two walking fundraisers for Alzheimer's research in 2018, The Longest Day in June and the Alzheimer's Walk in October. Allergan packages Namenda, which helps treat the symptoms of Alzheimer's. Allergan assembled teams to walk in both events and hosted a visit from representatives of the Alzheimer's Society during The Longest Day. Employees of Allergan's Cincinnati facilities participated in several other local outreach initiatives and programs in 2018, as highlighted below:

**STEM Initiatives (Educational Outreach).** An annually recurring outreach initiative, Allergan hosted students from three schools – Shroder High School, Mt. Notre Dame High School, and Phoenix International High School – for career exploration days. Students toured the Allergan facility and learned about potential STEM careers within the pharmaceutical industry.

**Pi Day (Financial Outreach).** On Pi Day (March 14), Allergan organized a fundraiser for the Hughes High School STEM program. The event raised $800 for the Hughes STEM School for the purchase of basic supply needs for the school's students.

**Autism Speaks Walk.** In May 2018, more than 30 Allergan associates participated in the walk in support of colleagues personally impacted by autism.

**Habitat for Humanity.** Through this volunteer initiative in May, an Allergan team repaired and performed various tasks to several houses to prepare them for their new residents.

**Matthew 25 Ministries.** In July, a large team of Allergan associates spent time at Matthew 25 Ministries sorting items for the victims of hurricanes and other natural disasters.

**St. Vincent de Paul.** Allergan maintains an ongoing relationship with St. Vincent de Paul-Cincinnati, an organization offering social and health services in the community.   At an October event, Allergan brought a team of associates to St. Vincent de Paul to present a check to the agency. Allergan associates also participated in a St. Vincent de Paul coat drive.

# CONCLUSION

Allergan's Cincinnati manufacturing plant is a significant employer and driver of economic activity for the State of Ohio. In 2017, the plant was responsible for the direct employment in Ohio of 219 individuals, of whom 196 were Allergan employees and 23 were employees directly supported by the Facility's capital expenditures, and an additional 467 indirect jobs. Direct expenditures of $23.8 million by Allergan's Cincinnati facility resulted in additional indirect output of $22.5 million for total economic output of $46.3 million in the State's economy in 2017. The $13.6 million of direct earnings resulted in additional earnings of $15.2 million for total earnings of $28.8 million throughout the State. Further, total tax revenues accruing to the State of Ohio and to local government entities were more than $1.0 million and $316,000.

Allergan also emphasizes workplace culture and community involvement. The average tenure of Allergan's Cincinnati associates is eight years, and the plant won the award for Plant of the Year in 2017 and 2018. In addition, Allergan contributes significantly to local and national organizations and initiatives through financial contributions to and involvement in local charitable and community outreach initiatives. Lifetime giving by the Allergan Foundation to the Cincinnati Eye Institute Foundation and to three other organizations stood at $485,000 and $70,000 combined, respectively, through 2018. Moreover, Allergan's Cincinnati associates donate hundreds of hours of their time each year to a range of charitable causes and organizations. Altogether, Allergan contributes significantly to the betterment of the Ohio economy and to the communities in which the company's Cincinnati associates reside.



EXHIBIT 4

# New Study Showcases Economic and Community Impact of Allergan's Operations in Ohio

- Cincinnati facility generates annual economic output of $46.3 million and total earnings of $28.8 million -

- Supports 686 jobs directly and indirectly through investments and operations -

- Fiscal impact totaled more than $1.3 million in 2017 -

- Allergan employees and Foundation contribute significantly to charitable organizations in Ohio -



---

NEWS PROVIDED BY

**Allergan plc →**

Apr 15, 2019, 11:00 ET

---

CINCINNATI, April 15, 2019 /PRNewswire/ -- A new study by the University of Cincinnati Economics Center finds that the Ohio operations of biopharmaceutical company Allergan have a significant impact on the state's economy and communities. The study finds that the annual economic impact of Allergan's manufacturing and packaging facility in Cincinnati includes total output of $46.3 million and total earnings of $28.8 million. Allergan's economic impact is primarily a result of its daily operations and capital investments in Cincinnati, as well as its strong influence on employment in the community. The manufacturing facility, which employs nearly 200 highly skilled workers, supports 686 total jobs directly and indirectly through local investment and daily operations, according to the study. Additionally, Allergan's capital expenditures and operations in Cincinnati generate significant local and state tax revenues with a total fiscal impact of more than $1.3 million in 2017.

The Economics Center study finds that Allergan and its employees contribute substantially to the Ohio community through volunteering and financial donations. Allergan's Cincinnati employees donate hundreds of hours of their time each year to a range of local charitable and community initiatives. In addition, The Allergan Foundation has contributed a total of $555,000 to organizations in Cincinnati and in Ohio since it was established in 1998.

"Allergan's contribution to Ohio's community and economy is substantial. The company's Cincinnati manufacturing and packaging plant is a driver of economic activity for the state, including through employment, earnings, capital expenditures, and tax revenues. In addition, Allergan and its employees contribute to the communities in which they live and work through philanthropy and volunteerism. Allergan employees have spent hundreds of hours volunteering for local charities and community outreach programs while The Allergan Foundation has contributed more than half-a-million dollars to charitable groups in the Cincinnati area," said Brad Evans, Director of Research at the University of Cincinnati Economics Center.

"Allergan is extremely proud of our strong partnerships in the Cincinnati community and the economic impact of our operations as detailed in the University of Cincinnati study. Our positive impact would not be possible without the tremendous support of local and state leaders who make Cincinnati an excellent place for companies like Allergan to do business. Another key contributor is our Cincinnati team which plays an important role in supporting Allergan's commitment to delivering innovative treatments for patients. We also applaud our Cincinnati colleagues for earning Allergan's "Plant of the Year" distinction in 2017 and 2018. Allergan looks forward to making significant contributions to the economy and community of Cincinnati and the Buckeye state for many years to come," said Brent Saunders, Chairman and CEO of Allergan.

Additional findings of the Economics Center study included:

- Allergan's total annual economic output of $46.3 million includes $34.9 million in output from operations and $11.6 million in output from capital investments.

- Allergan's total employment impact of 686 jobs includes nearly 200 direct positions and 467 jobs supported indirectly by the economic contribution of the Cincinnati facility.

- Allergan's Cincinnati facility enjoys strong employee retention with the average employee tenure of eight years.

- Allergan's more than $1.3 million in total fiscal impact in 2017 included more than $316,000 in local tax revenue and more than $1.0 million in tax revenue paid to Ohio.

- The Allergan Foundation's 2017 contributions in Cincinnati and Ohio included donations for the Cincinnati Eye Institute Foundation, the Cincinnati Association for the Blind, St. Vincent de Paul Charity Pharmacy of Cincinnati and the Cleveland Clinic.

The study, titled "The Economic and Community Impact of Allergan in Ohio" was commissioned by Allergan. Full-text of the original report and the supplement are available via the following links:

*Economic Impact Study: https://allergan-web-cdn-prod.azureedge.net/actavis/actavis/media/allergan-pdf-documents/responsibility/economic-impact-ohio-full.pdf*

*Economic Impact Study Supplement: https://allergan-web-cdn-prod.azureedge.net/actavis/actavis/media/allergan-pdf-documents/responsibility/economic-impact-ohio-infographic.pdf*

**About Allergan's Ohio Operations**

Allergan employs nearly 200 highly skilled workers at its 150,000 square-foot manufacturing and packaging facility in Cincinnati. The facility currently produces a number of products supporting the Central Nervous System and Gastroenterology therapeutic areas, including VRAYLAR® (Cariprazine) for the treatment of schizophrenia and for the acute treatment of manic or mixed episodes of bipolar I disorder and LINZESS® (linaclotide) for the treatment of irritable bowel syndrome with constipation and chronic idiopathic constipation. Opened in 1984, Allergan's Cincinnati facility now produces more than one billion doses annually. Cincinnati received Allergan's "Plant of the Year" distinction in 2017 and 2018.

**About The Allergan Foundation**

The Allergan Foundation is a U.S.-based, private charitable foundation committed to providing a lasting and positive impact in the communities in which Allergan employees live and work. The Allergan Foundation focuses its support on charitable efforts dedicated to promoting access to quality healthcare and improving patient diagnosis, treatment, care and quality of life. Established in 1998, The Allergan Foundation has donated more than $92 million to a wide variety of philanthropic pursuits globally. For more information, visit The Allergan Foundation website at www.AllerganFoundation.org.

**About Allergan plc**

Allergan plc (NYSE: AGN), headquartered in Dublin, Ireland, is a bold, global pharmaceutical leader. Allergan is focused on developing, manufacturing and commercializing branded pharmaceutical, device, biologic, surgical and regenerative medicine products for patients around the world.

Allergan markets a portfolio of leading brands and best-in-class products primarily focused on four key therapeutic areas including medical aesthetics, eye care, central nervous system and gastroenterology.

Allergan is an industry leader in Open Science, a model of research and development, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care. With this approach, Allergan has built one of the broadest development pipelines in the pharmaceutical industry.

Allergan's success is powered by our global colleagues' commitment to being Bold for Life. Together, we build bridges, power ideas, act fast and drive results for our customers and patients around the world by always doing what is right.

With commercial operations in approximately 100 countries, Allergan is committed to working with physicians, healthcare providers and patients to deliver innovative and meaningful treatments that help people around the world live longer, healthier lives every day.

For more information, visit Allergan's website at www.Allergan.com.

**Forward-Looking Statement**

Statements contained in this press release that refer to future events or other non-historical facts are forward-looking statements that reflect Allergan's current perspective on existing trends and information as of the date of this release. Actual results may differ materially from Allergan's current expectations depending upon a number of factors affecting Allergan's business. These factors include, among others, the difficulty of predicting the timing or outcome of FDA approvals or actions, if any; the impact of competitive products and pricing; market acceptance of and continued demand for Allergan's products; the impact of uncertainty around timing of generic entry related to key products, including RESTASIS®, on our financial results; risks associated with divestitures, acquisitions, mergers and joint ventures; risks related to impairments; uncertainty associated with financial projections, projected cost reductions, projected debt reduction, projected synergies, restructurings, increased costs, and adverse tax consequences; difficulties or delays in manufacturing; and other risks and uncertainties detailed in Allergan's periodic public filings with the Securities and Exchange Commission, including but not limited to Allergan's Annual Report on Form 10-K for the year ended December 31, 2018. Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements.

**CONTACTS: Allergan:**
**Investors:**
Manisha Narasimhan, PhD
(862) 261-7162

Christine Chiou
(862) 261-7396

**Media:**
Amy Rose
(862) 289-3072

Lisa Brown

(862) 261-7320

SOURCE Allergan plc

Related Links

www.allergan.com

# EXHIBITS 5-6
# [sealed]

EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: Case No. 18-op-45090 | Judge Dan Aaron Polster |
| THE COUNTY OF SUMMIT, OHIO; SUMMIT COUNTY PUBLIC HEALTH; THE CITY OF AKRON; STATE OF OHIO EX REL., PROSECUTING ATTORNEY FOR SUMMIT COUNTY, SHERRI BEVAN WALSH AND THE DIRECTOR OF LAW FOR THE CITY OF AKRON, EVE BELFANCE, | **THIRD AMENDED COMPLAINT AND JURY DEMAND** |
| Plaintiffs, | |
| vs. | |
| PURDUE PHARMA, L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.; PAR PHARMACEUTICAL COMPANIES, INC. F/K/A PAR PHARMACEUTICAL HOLDINGS, INC.; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. N/K/A JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; NORAMCO, INC.; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC F/K/A ALLERGAN, INC.; ALLERGAN FINANCE, LLC, F/K/A/ ACTAVIS, INC., F/K/A WATSON PHARMACEUTICALS, INC.; ALLERGAN | |

SALES, LLC; ALLERGAN USA, INC.;
WATSON LABORATORIES, INC.;
WARNER CHILCOTT COMPANY, LLC;
ACTAVIS PHARMA, INC. F/K/A WATSON
PHARMA, INC.; ACTAVIS SOUTH
ATLANTIC LLC; ACTAVIS ELIZABETH
LLC; ACTAVIS MID ATLANTIC LLC;
ACTAVIS TOTOWA LLC; ACTAVIS LLC;
ACTAVIS KADIAN LLC; ACTAVIS
LABORATORIES UT, INC., F/K/A
WATSON LABORATORIES, INC.-SALT
LAKE CITY; ACTAVIS LABORATORIES
FL, INC., F/K/A WATSON
LABORATORIES, INC.-FLORIDA; INSYS
THERAPEUTICS, INC.; MALLINCKRODT
PLC; MALLINCKRODT LLC; SPECGX
LLC, AMERISOURCEBERGEN DRUG
CORPORATION; ANDA, INC.; CARDINAL
HEALTH, INC.; CVS INDIANA, LLC; CVS
RX SERVICES, INC.; DISCOUNT DRUG
MART, INC.; HBC SERVICE COMPANY;
HENRY SCHEIN, INC.; HENRY SCHEIN
MEDICAL SYSTEMS, INC.; MCKESSON
CORPORATION; MIAMI-LUKEN, INC.;
PRESCRIPTION SUPPLY, INC.; RITE AID
OF MARYLAND, INC.; D/B/A RITE-AID
MID-ATLANTIC CUSTOMER SUPPORT
CENTER, INC; WALGREEN CO.;
WALGREEN EASTERN CO.; AND
WALMART INC. F/K/A WAL-MART
STORES, INC.,

Defendants.

| Product Name | Chemical Name | Schedule[5] |
|---|---|---|
| OxyContin | Oxycodone hydrochloride, extended release | Schedule II |
| MS Contin | Morphine sulfate, extended release | Schedule II |
| Dilaudid | Hydromorphone hydrochloride | Schedule II |
| Dilaudid-HP | Hydromorphone hydrochloride | Schedule II |
| Butrans | Buprenorphine | Schedule III |
| Hysingla ER | Hydrocodone bitrate | Schedule II |
| Targiniq ER | Oxycodone hydrochloride and naloxone hydrochloride | Schedule II |

46.     Purdue made thousands of payments to physicians nationwide, including in Ohio, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

47.     OxyContin is Purdue's largest-selling opioid. Since 2009, Purdue's national annual sales of OxyContin have fluctuated between $2.47 billion and $3.1 billion, up four-fold from 2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs (*i.e.*, painkillers). Sales of OxyContin (launched in 1996) went from a mere $49 million in its first full year on the market to $1.6 billion in 2002.

48.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay the United States $635 million—at the time, one of the largest

---

[5] Since passage of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* ("CSA" or "Controlled Substances Act"), opioids have been regulated as controlled substances. As controlled substances, they are categorized in five schedules, ranked in order of their potential for abuse, with Schedule I being the most dangerous. The CSA imposes a hierarchy of restrictions on prescribing and dispensing drugs based on their medicinal value, likelihood of addiction or abuse, and safety. Opioids generally had been categorized as Schedule II or Schedule III drugs; hydrocodone and tapentadol were recently reclassified from Schedule III to Schedule II. Schedule II drugs have a high potential for abuse, and may lead to severe psychological or physical dependence. Schedule III drugs are deemed to have a lower potential for abuse, but their abuse still may lead to moderate or low physical dependence or high psychological dependence.

settlements with a drug company for marketing misconduct. None of this stopped Purdue. In fact, Purdue continued to create the false perception that opioids were safe and effective for long term use, even after being caught, by using unbranded marketing methods to circumvent the system. In short, Purdue paid the fine when caught and then continued business as usual, deceptively marketing and selling billions of dollars of opioids each year.

### 2.    Actavis Entities

49.    Defendant Allergan plc (f/k/a Actavis plc, f/k/a Allergan, Inc.) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland, and its administrative headquarters and all executive officers located in Madison, New Jersey. In October 2012, the Actavis Group was acquired by Watson Pharmaceuticals, Inc., and the combined company changed its name to Actavis, Inc. as of January 2013, and then to Actavis plc in October 2013. In October 2013, Actavis plc (n/k/a Allergan plc) acquired Warner Chilcott plc pursuant to a transaction agreement dated May 19, 2013. Actavis plc (n/k/a Allergan plc) was established to facilitate the business combination between Actavis, Inc. (n/k/a Allergan Finance, LLC) and Warner Chilcott plc. Following the consummation of the October 1, 2013 acquisition, Actavis, Inc. (n/k/a Allergan Finance, LLC Inc.) and Warner Chilcott plc became wholly-owned subsidiaries of Actavis plc (n/k/a Allergan plc). Pursuant to the transaction, each of Actavis, Inc.'s common shares was converted into one Actavis plc share. Further, Actavis plc (n/k/a Allergan plc) was the "successor issuer" to Actavis, Inc. and Warner Chilcott. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company thereafter changed its name to Allergan plc.

50.    The transaction that created Actavis plc converted each share of Actavis Inc.'s Class A common shares into one Actavis plc Ordinary Share. *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7. Actavis Inc. and

Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis Inc.; and, Actavis plc maintained all of Actavis Inc.'s officers in the same positions.  *See id.*  Actavis plc's SEC filings explained that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date."  *See City of Chicago v. Purdue Pharma L.P.*, et al. (N.D. Ill. 2015), No. 14-4361, 2015 WL 2208423, at *7.

51.     Defendant Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company incorporated in Nevada and headquartered in Madison, New Jersey.  Allergan Finance, LLC is a wholly-owned subsidiary of defendant Allergan plc.  In 2008, Actavis, Inc. (n/k/a Allergan Finance, LLC), acquired the opioid Kadian through its subsidiary, Actavis Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005.  Since 2008, Kadian's label has identified the following entities as the manufacturer or distributor of Kadian: Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc.  Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its behalf.

52.     Defendant Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California.  Allergan Sales, LLC is the current New Drug Application ("NDA") holder for Kadian, and in 2016, Allergan Sales, LLC held the Abbreviated New Drug Applications ("ANDAs") for Norco.[6]  Allergan Sales, LLC is the wholly-owned subsidiary of Allergan plc.

---

[6]   The Norco ANDAs are currently held by Allergan Pharmaceuticals International Limited, which is incorporated in Ireland.

53.     Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey.  Allergan USA, Inc. is currently responsible for Norco and Kadian sales. Allergan USA, Inc. is a wholly-owned subsidiary of Allergan plc.

54.     Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California.  Watson Laboratories, Inc. was sold to  Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva. . Prior to the sale, Watson Laboratories, Inc. was a direct subsidiary of Actavis, Inc., (n/k/a Allergan Finance, LLC). Between 2000 and 2015, Watson Laboratories, Inc. held the ANDAs for Norco and was the manufacturer of the drug.  Watson Laboratories, Inc. was also the ANDA holder of various generic opioids.

55.     Defendant Warner Chilcott Company, LLC is a limited liability company incorporated in Puerto Rico.  Since 2015, Warner Chilcott Company, LLC has been the manufacturer of Norco.  Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013.  Warner Chilcott Company LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

56.     Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is registered to do business with the Ohio Secretary of State as a Delaware corporation with its principal place of business in New Jersey.   Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) was previously responsible for sales of Kadian and Norco.  Actavis Pharma, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

57.     Defendant Actavis South Atlantic LLC is a Delaware limited liability company with its principal place of business in Sunrise, Florida.  Actavis South Atlantic LLC was listed as

the ANDA holder for oxymorphone and fentanyl transdermal.  Actavis South Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

58.     Defendant Actavis Elizabeth LLC is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey.  From December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth LLC served as the contract manufacturer of Kadian for Alpharma.  Actavis Elizabeth LLC held the NDA for Kadian from 2008 to 2013. Actavis Elizabeth LLC was also the holder of ANDAs for the following Schedule II opioid products:  oxycodone/acetaminophen;  homatropine  methylbromide/hydrocodone  bitartrate; morphine  sulfate  capsule;  morphine  sulfate  tablet;  oxycodone/hydrochloride  tablet; oxycodone/ibuprofen;  and  oxymorphone  tablet.   Actavis  Elizabeth  LLC  was  sold  to  Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

59.     Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Actavis Mid Atlantic LLC has held the ANDA for homatropine methylbromide/hydrocodone bitartrate.  Actavis Mid Atlantic LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

60.     Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Actavis Totowa LLC has held the ANDAs for  the  following  Schedule  II  opioid  products:  oxycodone/acetaminophen;  homatropine methylbromide; oxycodone/hydrochloride.

61.     Defendant Actavis LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.  Defendants Actavis South Atlantic LLC, Actavis

Elizabeth LLC, Actavis Mid Atlantic LLC, and Actavis Totowa LLC were all direct subsidiaries of Actavis LLC, which was an indirect subsidiary of defendant Watson Laboratories, Inc.  Watson Laboratories, Inc., in turn, was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC). Actavis LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

62.     Defendant Actavis Kadian LLC is a Delaware limited liability company with its principal place of business in Morristown, New Jersey.  Actavis Kadian LLC has been identified on Kadian's label as a manufacturer or distributor of Kadian.  Actavis Kadian LLC was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

63.     Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah.  Actavis Laboratories UT, Inc. was the Kadian NDA holder from 2013 to 2016 and was listed as the NDA holder for morphine sulfate capsule.  Actavis Laboratories UT, Inc. was sold to Teva Pharmaceutical Industries Limited as part of Allergan plc's 2016 sale of its generic businesses to Teva.  Prior to the sale, Actavis Laboratories UT, Inc. was a direct subsidiary of Actavis, Inc. (n/k/a Allergan Finance, LLC).

64.     Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida limited liability company with its principal place of business in Davie, Florida.  Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and was the ANDA holder of the following Schedule II opioid products: hydrocodone/acetaminophen; hydrocodone/ibuprofen; oxycodone/aspirin; and hydromorphone tablet. Actavis Laboratories FL, Inc. was sold to Teva Pharmaceutical Industries Ltd. as part of Allergan plc's 2016 sale of its generic businesses to Teva.

Prior to the sale, Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which was a direct subsidiary of Actavis, Inc.. (n/k/a Allergan Finance, LLC).  Andrx Corporation was transferred to Teva as part of the 2016 sale.

65.     Each of these defendants and entities currently is or was previously owned by Defendant Allergan plc, which uses them to market and sell its drugs in the United States. Collectively, these defendants and entities, and their DEA registrant subsidiaries and affiliates that manufacture, promote, distribute, and sell prescription opioids, are referred to as "Actavis."

66.     Actavis manufactures or has manufactured the following drugs as well as generic[7] versions of Kadian, Duragesic, and Opana in the United States:

| Product Name | Chemical Name | Schedule |
|---|---|---|
| Kadian | Morphine sulfate, extended release | Schedule II |
| Norco | Hydrocodone bitartate and acetaminophen | Schedule II |

67.     Actavis made thousands of payments to physicians nationwide, ostensibly for activities including participating on speakers' bureaus, providing consulting services, assisting in post-marketing safety surveillance and other services, but in fact to deceptively promote and maximize the use of opioids.

### 3.     Cephalon Entities

68.     Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.  Teva USA was in the business of selling generic opioids, including a generic form of OxyContin from 2005 to 2009.

---

[7]  In August 2016 Actavis' global generics business was acquired by Teva Pharmaceutical Industries Ltd.    Allergan plc, Annual Report (Form 10-K), 3 (Feb. 16, 2018) https://www.sec.gov/Archives/edgar/data/1578845/000156459018002345/agn-10k_20171231.htm.

849.    The RICO Marketing Defendants' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the RICO Marketing Defendants. The predicate acts were committed or caused to be committed by the RICO Marketing Defendants through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

### B.    The Opioid Supply Chain Enterprise

850.    Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort to "a categorical denial of any criminal behavior or intent."[213]  Defendants' actions went far beyond what could be considered ordinary business conduct. For more than a decade, certain Defendants, the "RICO Supply Chain Defendants" (Purdue, Cephalon, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, and AmerisourceBergen) worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

851.    Knowing that dangerous drugs have a limited place in our society, and that their dissemination and use must be vigilantly monitored and policed to prevent the harm that drug abuse and addiction causes to individuals, society and governments, Congress enacted the Controlled Substances Act ("CSA"). Specifically, through the CSA, which created a closed system of distribution for controlled substances, Congress established an enterprise for good. CSA imposes a reporting duty that cuts across company lines. Regulations adopted under the CSA

---

[213] McKesson Responds to Recent 60 Minutes Story About January 2017 Settlement With the Federal Government, McKesson, http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response (last visited Apr. 21, 2018).

require that companies who are entrusted with permission to operate within this system cannot simply operate as competitive in an "anything goes" profit-maximizing market. Instead, the statute tasks them to watch over each other with a careful eye for suspicious activity. Driven by greed, Defendants betrayed that trust and subverted the constraints of the CSA's closed system to conduct their own enterprise for evil.

852.    As "registrants" under the CSA, the RICO Supply Chain Defendants are duty bound to identify and report "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[214]  Critically, these Defendants' responsibilities do not end with the products they manufacture or distribute—there is no such limitation in the law because their duties cut across company lines. Thus, when these Defendants obtain information about the sales and distribution of other companies' opioid products, as they did through data mining companies like IMS Health, they were legally obligated to report that activity to the DEA.

853.    If morality and the law did not suffice, competition dictates that the RICO Supply Chain Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so. Under the CSA this whistleblower or watchdog function is not only a protected choice, but a statutory mandate. Unfortunately, however, that is not what happened. Instead, knowing that investigations into potential diversion would only lead to shrinking markets, the Rico Supply Chain Defendants elected to operate in a conspiracy of silence, in violation of both the CSA and RICO.

---

[214] 21 C.F.R. § 1301.74(b).

854.    The RICO Supply Chain Defendants' scheme required the participation of all.  If any one member broke rank, its compliance activities would highlight deficiencies of the others, and the artificially high quotas they maintained through their scheme would crumble.  But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for the DEA to go after any one of them.  Accordingly, through the connections they made as a result of their participation in the Healthcare Distribution Alliance ("HDA"), the RICO Supply Chain Defendants chose to flout the closed system designed to protect the citizens .  Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines:  Reporting Suspicious Orders and Prevention Diversion of Controlled Substances."  But, privately, the RICO Supply Chain Defendants refused to act and through their lobbying efforts, they collectively sought to undermine the impact of the CSA.  Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied. John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications."  Yet, the RICO Supply Chain Defendants apparently all found the same profit-maximizing balance -- intentionally remaining silent to ensure the largest possible financial return.

855.    As described above, at all relevant times, the RICO Supply Chain Defendants operated as an association-in-fact enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by fraudulently increasing the quotas set by the DEA that would allow them to collectively benefit from a greater pool of prescription opioids to manufacture and distribute. In support of this common purpose and fraudulent scheme, the RICO Supply Chain Defendants

jointly agreed to disregard their statutory duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market so that those orders would not result in a decrease, or prevent an increase in, the necessary quotas.

856.    At all relevant times, as described above, the RICO Supply Chain Defendants exerted control over, conducted and/or participated in the Opioid Supply Chain Enterprise by fraudulently claiming that they were complying with their duties under the CSA to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, and to halt such unlawful sales, so as to increase production quotas and generate unlawful profits, as follows:

857.    The RICO Supply Chain Defendants disseminated false and misleading statements to state and federal regulators claiming that:

    a.   the quotas for prescription opioids should be increased;

    b.   they were complying with their obligations to maintain effective controls against diversion of their prescription opioids;

    c.   they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

    d.   they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids; and

    e.   they did not have the capability to identify suspicious orders of controlled substances.

858.    The Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress

to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[215]

859.    The CSA and the Code of Federal Regulations, require the RICO Supply Chain Defendants to make reports to the DEA of any suspicious orders identified through the design and operation of their system to disclose suspicious orders.  The failure to make reports as required by the CSA and Code of Federal Regulations amounts to a criminal violation of the statute.

860.    The RICO Supply Chain Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the DEA including the Marketing Defendants' applications for production quotas.  Specifically, the RICO Supply Chain Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the DEA in their mandatory reports and their applications for production quotas.

861.    The RICO Supply Chain Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their scheme through virtually uniform misrepresentations, concealments and material omissions regarding their

---

[215] *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/ (last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html; Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html; Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills-.

compliance with their mandatory reporting requirements and the actions necessary to carry out their unlawful goal of selling prescription opioids without reporting suspicious orders or the diversion of opioids into the illicit market.

862.    In devising and executing the illegal scheme, the RICO Supply Chain Defendants devised and knowingly carried out a material scheme and/or artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

863.    For the purpose of executing the illegal scheme, the RICO Supply Chain Defendants committed racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme. These racketeering acts, which included repeated acts of mail fraud and wire fraud, constituted a pattern of racketeering.

864.    The RICO Supply Chain Defendants' use of the mail and wires includes, but is not limited to, the transmission, delivery, or shipment of the following by the Marketing Defendants, the Distributor Defendants, or third parties that were foreseeably caused to be sent as a result of the RICO Supply Chain Defendants' illegal scheme, including but not limited to:

    a.   The prescription opioids themselves;

    b.   Documents and communications that supported and/or facilitated the RICO Supply Chain Defendants' request for higher aggregate production quotas, individual production quotas, and procurement quotas;

    c.   Documents and communications that facilitated the manufacture, purchase and sale of prescription opioids;

    d.   RICO Supply Chain Defendants' DEA registrations;

    e.   Documents and communications that supported and/or facilitated RICO Supply Chain Defendants' DEA registrations;

    f.   RICO Supply Chain Defendants' records and reports that were required to be submitted to the DEA pursuant to 21 U.S.C. § 827;

g. Documents and communications related to the RICO Supply Chain Defendants' mandatory DEA reports pursuant to 21 U.S.C. § 823 and 21 C.F.R. § 1301.74;

h. Documents intended to facilitate the manufacture and distribution of the RICO Supply Chain Defendants' prescription opioids, including bills of lading, invoices, shipping records, reports and correspondence;

i. Documents for processing and receiving payment for prescription opioids;

j. Payments from the Distributors to the Marketing Defendants;

k. Rebates and chargebacks from the Marketing Defendants to the Distributors Defendants;

l. Payments to the RICO Supply Chain Defendants' lobbyists through the PCF;

m. Payments to the RICO Supply Chain Defendants' trade organizations, like the HDA, for memberships and/or sponsorships;

n. Deposits of proceeds from the RICO Supply Chain Defendants' manufacture and distribution of prescription opioids; and

o. Other documents and things, including electronic communications.

865. The RICO Supply Chain Defendants (and/or their agents), for the purpose of executing the illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of prescription opioids and related documents by mail or by private carrier affecting interstate commerce, including the following:

| Defendant Group Name | Company Names | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| **Purdue** | (1) Purdue Pharma, LP, (2) Purdue Pharma, Inc., (3) The Purdue Frederick Company | OxyContin | Oxycodone hydrochloride extended release | Schedule II |
| | | MS Contin | Morphine sulfate extended release | Schedule II |
| | | Dilaudid | Hydromorphone hydrochloride | Schedule II |
| | | Dilaudid-HP | Hydromorphone hydrochloride | Schedule II |

| Defendant Group Name | Company Names | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| | | Butrans | Buprenorphine | Schedule II |
| | | Hysinga ER | Hydrocodone bitrate | Schedule II |
| | | Targiniq ER | Oxycodone hydrochloride | Schedule II |
| Cephalon | (1) Cephalon, Inc., (2) Teva Pharmaceutical Industries, Ltd., (3) Teva Pharmaceuticals USA, Inc. | Actiq | Fentanyl citrate | Schedule II |
| | | Fentora | Fentanyl citrate | Schedule II |
| | | Generic oxycodone | Oxycodone hydrochloride | Schedule II |
| Endo | (1) Endo Health Solutions, Inc., (2) Endo Pharmaceuticals Inc., (3) Qualitest Pharmaceuticals, Inc. (*wholly-owned subsidiary of Endo*) | Opana ER | Oxymorphone hydrochloride extended release | Schedule II |
| | | Opana | Oxymorphone hydrochloride | Schedule II |
| | | Percodan | Oxymorphone hydrochloride and aspirin | Schedule II |
| | | Percocet | Oxymorphone hydrochloride and acetaminophen | Schedule II |
| | | Generic oxycodone | | Schedule II |
| | | Generic oxymorphone | | Schedule II |
| | | Generic hydromorphone | | Schedule II |
| | | Generic hydrocodone | | Schedule II |
| Mallinckrodt | (1) Mallinckrodt plc, (2) Mallinckrodt LLC (*wholly-owned subsidiary of Mallinckrodt plc*) | Exalgo | Hydromorphone hydrochloride | Schedule II |
| | | Roxicodone | Oxycodone hydrochloride | Schedule II |
| Allergan | (1) Allergan Plc, (2) Actavis LLC, (3) Actavis Pharma, Inc., (4) Actavis Plc, | Kadian | Morphine Sulfate | Schedule II |
| | | Norco (Generic of Kadian) | Hydrocodone and acetaminophen | Schedule II |

| Defendant Group Name | Company Names | Drugs | | |
|---|---|---|---|---|
| | | Drug Name | Chemical Name | CSA Schedule |
| | (5) Actavis, Inc., (6) Watson Pharmaceuticals, Inc., Watson Pharma, Inc. | Generic Duragesic | Fentanyl | Schedule II |
| | | Generic Opana | Oxymorphone hydrochloride | Schedule II |

866.     Each of the RICO Supply Chain Defendants identified manufactured, shipped, paid for and received payment for the drugs identified above, throughout the United States.

867.     The RICO Supply Chain Defendants used the internet and other electronic facilities to carry out their scheme and conceal the ongoing fraudulent activities.  Specifically, the RICO Supply Chain Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market.

868.     At the same time, the RICO Supply Chain Defendants misrepresented the superior safety features of their order monitoring programs, ability to detect suspicious orders, commitment to preventing diversion of prescription opioids, and their compliance with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

869.     The RICO Supply Chain Defendants utilized the internet and other electronic resources to exchange communications, to exchange information regarding prescription opioid sales, and to transmit payments and rebates/chargebacks.

870.     The RICO Supply Chain Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with each other and with various other affiliates, regional offices, regulators, distributors, and other third-party entities in furtherance of the scheme.

871.     The mail and wire transmissions described herein were made in furtherance of the RICO Supply Chain Defendants' scheme and common course of conduct to deceive regulators,

the public and the Plaintiffs that these Defendants were complying with their state and federal obligations to identify and report suspicious orders of prescription opioids all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The RICO Supply Chain Defendants' scheme and common course of conduct was to increase or maintain high production quotas for their prescription opioids from which they could profit.

872. Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden by Defendants and cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

873. The RICO Supply Chain Defendants did not undertake the practices described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Complaint, may have contributed to and/or participated in the scheme with these Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the RICO Supply Chain Defendants.

874. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

875. The predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the RICO Supply Chain Defendants. The predicate acts were committed or caused to be committed by the Defendants through their participation in the Opioid Supply Chain Enterprise and in furtherance of its fraudulent scheme.

876. As described above, the RICO Supply Chain Defendants were repeatedly warned, fined, and found to be in violation of applicable law and regulations, and yet they persisted. The sheer volume of enforcement actions against the RICO Supply Chain Defendants supports this conclusion that the RICO Supply Chain Defendants operated through a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA as required by 21 C.F.R. § 1301.74.

877. Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, Plaintiffs' communities and the Plaintiffs. The RICO Supply Chain Defendants calculated and intentionally crafted the diversion scheme to increase and maintain profits from unlawful sales of opioids, without regard to the effect such behavior would have on this jurisdiction, its citizens or the Plaintiffs. The RICO Supply Chain Defendants were aware that Plaintiffs and the citizens of these jurisdictions rely on these Defendants to maintain a closed system of manufacturing and distribution to protect against the non-medical diversion and use of their dangerously addictive opioid drugs.

878. By intentionally refusing to report and halt suspicious orders of their prescription opioids, the RICO Supply Chain Defendants engaged in a fraudulent scheme and unlawful course of conduct constituting a pattern of racketeering activity.

EXHIBIT 8

**Robbins Geller**
**Rudman & Dowd LLP**

| | | | | |
|---|---|---|---|---|
| Atlanta | Chicago | Melville | Philadelphia | San Francisco |
| Boca Raton | Manhattan | Nashville | San Diego | Washington, DC |

Thomas E. Egler
tome@rgrdlaw.com

June 20, 2019

<u>VIA EMAIL</u>

Timothy W. Knapp
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
timothy.knapp@kirkland.com

Re: *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)
Jurisdictional Discovery

Tim:

Thanks for talking yesterday regarding the jurisdictional discovery issues plaintiffs have raised with Allergan PLC.  My understanding is that Allergan will agree to extend the due date for plaintiffs' response to its motion to dismiss for at least two weeks.  We are still analyzing our time needs and will circle back with the Special Master as directed.

With regard to the information Allergan provided on the documents, our understanding is as follows:

For the Allergan PLC general ledger as a whole, the document Allergan_MDL_04451817 contains all of the entries for early 2016 through 2019, and the document Allergan_MDL_04452226 contains all of the entries in early 2016 (the latest one listed is January 8, 2016) and earlier.  The total number of transactions between the two documents is 1,744.

As I raised on the phone, upon examination, we believe the PLC general ledger data alone does not provide the full picture of the transactions between Allergan/Actavis's domestic subsidiaries and the Irish PLC, as it does not detail the intermediate transactions between the various offshore routes that Allergan/Actavis used to take funds between the U.S. entities and the PLC.

For example, the PLC general ledger contains numerous direct transactions between the PLC and various U.S. entities, such as Allergan Inc. (T0010).  However, there are also numerous transactions listed between the PLC and Allergan WC Ireland Holdings Ltd. (T1327) and other intermediate non-domestic entities.  The 2018 Tax Department entity flow chart (Allergan_MDL_04450023), as well as earlier iterations of that chart, show that these intermediate

Robbins Geller
Rudman & Dowd LLP

Timothy Knapp
June 20, 2019
Page 2

entities would have been the typical conduit for funds to and from the PLC and the U.S. entities. The PLC general ledger, therefore, standing alone, does not detail the flow of any funds that would have flowed through the intermediate entities to or from the PLC or the U.S. entities.  Instead, it merely shows direct transactions from the domestic entities with the PLC, and direct transactions from the intermediate entities with the PLC.

You stated that Allergan objects to providing further detail from these intermediate entities, as Allergan believes the documents and information produced to date are sufficient for the purposes of jurisdictional discovery.  Rather than spend more time on this issue, with regard to the information produced, we will proceed as it stands for the purposes of this jurisdictional discovery process.

Separately, we had sought information about a number of the codes contained in the various columns of document '1817.

**Column M**

On Wednesday, June 19, you sent an excel spreadsheet entitled "doc type," which you wrote contained the key to the "type" column (column M) in the '1817 spreadsheet.  We are examining the data and if we have questions we will get back to you.

**Column C**

With regard to Column C ("Cost Ctr"), you stated that while the system allowed entries to be categorized as "General and Administrative," "Sales & Marketing," "Research and Development," and "Cost of Goods Sold," all of the various entries in that column in the '1817 spreadsheet were under the category "General and Administrative."  You stated that the final four digits (the range of the entries in that column is -0001 through 0004) all also denoted a "General and Administrative" entry.

**Columns G, I, and R and T**

We ultimately determined that the "T____" codes in column G ("Tr.Prt"), I ("Entity"), R ("Text") and T ("Name of offsetting account") corresponded to the codes listed in the Tax Department entity flow chart produced at Allergan_MDL_04450023.  We are in the process of decoding these entity names, and if we have questions we will get back to you.  If your client has a list of code names, we would appreciate its production so we do not have to search the graphic document for them.

**Robbins Geller**
**Rudman & Dowd** LLP

Timothy Knapp
June 20, 2019
Page 3

**Column T**

You stated that with regard to column T ("Text") your understanding is that the PLC did not control the text that was typed into this column. Instead, the person representing the entity transferring funds to or from the PLC had the responsibility to provide this text, and the PLC could not decode any particular entry beyond its plain English meaning.

**Accounting Policies**

Plaintiffs asked again that Allergan PLC produce its accounting policies, as it appears that the production to date is incomplete. When you asked for detail on our position, I noted that each Allergan/Actavis Report on Form 10-K contains a list of "Critical Accounting Estimates" the company is required to disclose. I said plaintiffs had not seen in the production the policies that back up these estimates, and that the disclosures themselves summarize an accounting policy, but do not represent the policy itself. I stated that these were just an example of some of the policies a corporation would maintain in order to interpret and implement the applicable accounting rules.

You stated that Allergan PLC declines to provide further documents in this jurisdictional discovery process.

Please let me know if your understanding is different than what appears above on any of these issues.

Very truly yours,

THOMAS E. EGLER

TEE:krj

EXHIBIT 9

# Actavis plc is now Allergan plc

-- Company Begins Trading as "AGN" on New York Stock Exchange Today --

-- Redesigned Logo Celebrates Rich Heritage and Emergence as Growth Pharma Leader --

-- Unites Global Brand Portfolio under Allergan Name --

-- U.S. and Canada Generics Business to Retain Actavis Name --



---

NEWS PROVIDED BY

**Allergan plc →**
Jun 15, 2015, 07:00 ET

---

DUBLIN, June 15, 2015 /PRNewswire/ -- Actavis plc announced that the company has adopted Allergan plc (NYSE: AGN) as its new global name and will begin trading today under a new symbol — AGN — after ringing The Opening Bell at the New York Stock Exchange.  The company name change follows the acquisition of Allergan in March 2015 and the approval of the name change by Actavis shareholders on June 5.  The combination of Allergan and Actavis created one of the world's top 10 pharmaceutical companies by revenue and a leader in a new industry model – Growth Pharma.

Logo - http://photos.prnewswire.com/prnh/20150612/222796LOGO

"Today is an exciting day for Allergan and our 30,000 employees around the world who have helped us reach this special moment," said Brent Saunders, CEO and President of Allergan.  "By adopting the Allergan name, we are ensuring that our corporate identity reflects the transformation of our company within the pharmaceutical industry and our position as a dynamic new breed of company – a leader in Growth Pharma.  Today, under one company

name and identity, we set out on a new path forward, encouraging our employees across the globe to be bold in how we think and act, to engage and to move quickly to meet the needs of physicians, patients and customers.

"Allergan is home to world-renowned brands, the best-in-class global generics business, a premier pharmaceutical pipeline of medicines including brands, generics, biosimilars, OTC products and devices, as well as the fourth largest distributor in the U.S., which will retain the name Anda. Allergan's fully integrated business provides unique opportunities to respond quickly to customer and patient needs, and change the lives of those who depend on us."

Allergan has initiated a rebranding campaign that will guide the transition of its facilities, operations and commercial presence around the world to the new company name. The company has launched a new global web site at www.Allergan.com. Based on feedback received from customers, the company's U.S. and Canadian generics business will continue to operate under the Actavis name, capitalizing on its exceptional brand equity among customers.

Allergan has also today adopted a distinctive redesign of the company identity and logo. The new icon in the logo speaks to the strength of the Company's unique capabilities, the energy and passion of its people and its forward momentum. The circular shapes personify movement; purposeful paths of change and growth; growing spheres of influence and ideas; and achievement across brands and generics.

The result is a new, momentum-building and accessible visualization that celebrates Allergan's emergence as a Growth Pharma leader. Together, all united, all moving, resulting in an evolving, growing Company focused on a singular purpose – to power bold ideas in healthcare for people around the world.

**About Allergan**

Allergan plc (NYSE: AGN), headquartered in Dublin, Ireland, is a unique, global pharmaceutical company and a leader in a new industry model – Growth Pharma. Allergan is focused on developing, manufacturing and commercializing innovative branded pharmaceuticals, high-

quality generic and over-the-counter medicines and biologic products for patients around the world.

Allergan markets a portfolio of best-in-class products that provide valuable treatments for the central nervous system, eye care, medical aesthetics, gastroenterology, women's health, urology, cardiovascular and anti-infective therapeutic categories, and operates the world's third-largest global generics business, providing patients around the globe with increased access to affordable, high-quality medicines. Allergan is an industry leader in research and development, with one of the broadest development pipelines in the pharmaceutical industry and a leading position in the submission of generic product applications globally.

With commercial operations in approximately 100 countries, Allergan is committed to working with physicians, healthcare providers and patients to deliver innovative and meaningful treatments that help people around the world live longer, healthier lives.

For more information, visit Allergan's website at www.allergan.com.

**Forward-Looking Statement**

Statements contained in this press release that refer to future events or other non-historical facts are forward-looking statements that reflect Actavis' current perspective of existing trends and information as of the date of this release. Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements. Actual results may differ materially from Allergan's current expectations depending upon a number of factors affecting Allergan's business. These factors include, among others, the difficulty of predicting the timing or outcome of FDA approvals or actions, if any; the impact of competitive products and pricing; market acceptance of and continued demand for Allergan's products; difficulties or delays in manufacturing; and other risks and uncertainties detailed in Allergan's periodic public filings with the Securities and Exchange Commission, including but not limited to Allergan's Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 (such periodic public filings having been filed under the "Actavis plc" name). Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements.

**CONTACTS:**

**Investors:**

Lisa DeFrancesco

(862) 261-7152


**Media:**

David Belian

(862) 261-8141


SOURCE Allergan plc


Related Links

http://www.allergan.com

EXHIBIT 10

# Actavis Completes Warner Chilcott Acquisition

## - Creates Leading Global Specialty Pharmaceutical Company -

## - $11.0 Billion Anticipated Pro Forma Combined 2013 Revenue -

## - Top 3 U.S. ~$3.0 Billion Revenue Specialty Brand Business -

## - Current Leverage Ratio 3.1x Debt to Adjusted EBITDA -

Actavis plc logo.
(PRNewsFoto/Actavis plc)
(PRNewsFoto/Actavis plc)

---

NEWS PROVIDED BY

**Actavis plc** ➞

Oct 01, 2013, 07:05 ET

---

DUBLIN, Oct. 1, 2013 /PRNewswire/ -- Actavis plc (NYSE: ACT) ("Actavis") today announced that it has completed the acquisition of Warner Chilcott plc (NASDAQ: WCRX) ("Warner Chilcott") in a stock-for-stock transaction valued at approximately $8.5 billion.  The combination creates a leading global specialty pharmaceutical company with approximately $11 billion in anticipated pro forma combined annual 2013 revenue, and the third-largest specialty pharmaceutical business in the U.S. with approximately $3 billion in annual revenue focused on the core therapeutic categories of Women's Health, Urology, Gastroenterology and Dermatology.

In connection with the acquisition, Actavis and Warner Chilcott have been combined under a new company incorporated in Ireland, and have adopted the global name Actavis plc.  Shares of Actavis plc will trade on the New York Stock Exchange under the ticker symbol ACT. The scheme of arrangement to effect Actavis' acquisition of Warner Chilcott plc has taken effect today, and Warner Chilcott shareholders will receive the consideration to which they are entitled under the scheme of arrangement within 14 days.

"The combination of Actavis and Warner Chilcott creates a premier specialty pharmaceutical leader under the Actavis Specialty Brands umbrella.  This enhanced business segment is uniquely positioned to meet the healthcare needs of patients around the world — particularly as a leader in Women's Health," said Paul Bisaro, President and CEO of Actavis.  "The acquisition more than doubles Actavis' Specialty Brands portfolio and delivers an industry leading pipeline with more than 25 products in various stages of development.

"Within our Women's Health segment, we are now a strong leader with over 90 percent share of voice in oral contraceptives based on IMS Audits and have an expanded pipeline including seven new development programs encompassing three near-term launches and more than 10 products in late-stage development.  Additionally, the combination bolsters our Urology business, establishes a platform for continued expansion into the Gastroenterology and Dermatology therapeutic categories and provides the opportunity to introduce a broader portfolio of new products in Actavis' expanded global footprint.

"We are pleased with the performance of this business to date, including a record number of launches and the successful introductions of Minastrin™ 24, Delzicol™ and Doryx[®] 200 mg. When combined with the global commercial presence of Actavis Pharma and supported by our industry-leading Actavis Global Operations team, we now operate a formidable specialty pharmaceutical company.  We have immediately implemented a comprehensive integration process, and will focus our efforts on maximizing our broader portfolio of marketed products, our enhanced research and development capabilities and pipeline and our expanded manufacturing footprint to capture synergies and drive continued growth and value for our shareholders, customers and employees.  With the acquisition now closed, we renew our goal of long-term, double-digit organic earnings growth from this newly expanded base."

**Financially Compelling Transaction**

Actavis continues to expect the transaction to be more than 30 percent accretive to Actavis non-GAAP earnings per share in 2014, including anticipated after-tax operational synergies, related cost reductions and tax savings in excess of $400 million.  Concurrent with the closing, Actavis will refinance the legacy Warner Chilcott term loan with the new term loan previously announced on August 2, 2013, resulting in interest rate savings of approximately $12 million per

quarter assuming contractual amortization.[3] With a combined debt to EBITDA ratio of 3.1x, the Company has the ability to continue to invest in the growth of its businesses, while strong anticipated cash flows will allow for further ongoing deleveraging.

Additional details on the strengths of the combined companies, including revenue and earnings forecasts and updated synergy targets, will be discussed in more detail during Actavis' third quarter earnings conference call scheduled for Oct. 29, 2013.

**Review of the Benefits of the Acquisition**

The combination represents a significant achievement against Actavis' long-term strategic objective of building a leading global specialty pharmaceutical company. The combined Company begins operations with a defined global management structure, led by Actavis senior executives, and aggressive integration strategies are being executed to drive continued organic growth and rapid realization of synergies.

*Transforms Actavis Specialty Brands into a Global Competitor*

The close of the transaction accelerates Actavis Specialty Brands' evolution into a global competitor and a key growth driver for the new company. The combination provides a 125 percent increase in the number of marketed Specialty Brands products, a 600 percent increase in Specialty Brands pro forma net revenue and more than doubles Women's Health Specialty Brands products with the addition of Actonel®, Lo Loestrin®, Minastrin™ 24, Estrace® and Atelvia® and the recent approval of Lo Minastrin™. It also bolsters Actavis Specialty Brands' Urology business with the addition of the Enablex franchise and establishes a platform for continued expansion into the fast-growing areas of Gastroenterology and Dermatology.

*Expands Specialty Brands Industry Leading Pipeline*

Actavis Specialty Brands now possess an industry-leading pipeline with more than 25 products in various stages of development, including the combination of strong life cycle management strategies and new exclusive product opportunities for long-term sustainable growth in each therapeutic category. The combination significantly expands Actavis' Specialty Brands Women's Health pipeline with the addition of seven new pipeline programs, three near-term

launches (Levosert™, Minastrin™ 24 Fe, WC 3042) and 12 products in Phase III or the marketing application phase of development.  The combination also adds three mid-to-late phase Urology products in development and additional Dermatology and Gastroenterology products in various stages development.

### *Completes Actavis' Evolution into a Global Specialty Pharmaceutical Leader*

The dramatically strengthened Actavis Specialty Brands, combined with Actavis Pharma and Actavis Global Operations, forms the foundation of Actavis plc.  The combined organization has a diversified geographic footprint, with commercial operations in more than 60 countries around the world, and is an industry leader in research and development, focused on building the strongest pipeline in the industry in order to bring the right products to the right markets across the globe — generic, brand, branded generic, OTC products and biosimilars.

Actavis' global operations network continues to deliver timely product launches and exceptional levels of customer service, and is structured to fully support the Company's evolving product portfolio.  It encompasses a leading global supply chain, providing the capability to develop and manufacture products in multiple dosage forms and presentations that provide a competitive advantage in Actavis' commercial markets. The transaction is expected to further strengthen the global operations network with the addition of extended release and hormone manufacturing capabilities at a state-of-the-art facility in Puerto Rico, as well as additional manufacturing, packaging and R&D operations in Germany and Northern Ireland.

### October 29th Conference Call and Webcast Information

Actavis plans to discuss the close of the acquisition on its third quarter earnings conference call scheduled for October 29, 2013 at 8:30 a.m. Eastern Time.  The dial-in number to access the call is U.S./Canada (877) 251-7980, or from international locations, (706) 643-1573.  The Conference ID is 70901052.

A taped replay of the conference call will also be available beginning approximately two hours after the call's conclusion and will remain available through 12:00 midnight Eastern Time on November 12, 2013.  The replay may be accessed by dialing (855) 859-2056 and entering

Conference ID# 70901052.  From international locations, the replay may be accessed by dialing (404) 537-3406 and entering the same pass code.  To access the webcast, go to Actavis' Investor Relations Web site at http://ir.actavis.com.  A replay of the webcast will also be available.

**About Actavis**

Actavis plc (NYSE: ACT) is a global, integrated specialty pharmaceutical company focused on developing, manufacturing and distributing generic, brand and biosimilar products.  Actavis has global headquarters in Dublin, Ireland and administrative headquarters in Parsippany, New Jersey, USA.

Operating as Actavis Pharma, Actavis markets generic, branded generic, legacy brands and Over-the-Counter (OTC) products in more than 60 countries.  Actavis Specialty Brands is Actavis' global branded specialty pharmaceutical business focused in the Women's Health, Urology, Gastroenterology and Dermatology therapeutic categories.  Actavis Specialty Brands also has a portfolio of five biosimilar products in development in Women's Health and Oncology.  Actavis Global Operations has more than 30 manufacturing and distribution facilities around the world, and includes Anda, Inc., a U.S. pharmaceutical product distributor.

For press release and other company information, visit Actavis' Web site at http://www.actavis.com.

**Statement Required by the Irish Takeover Rules**

The directors of Actavis accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Actavis (who have taken all reasonable care to ensure that such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

**Forward-Looking Statement**

Statements contained in this press release that refer to Actavis' estimated or anticipated future results or other non-historical facts are forward-looking statements that reflect Actavis' current perspective of existing trends and information as of the date of this release. For instance, any statements in this press release concerning prospects related to Actavis' strategic initiatives, product introductions and anticipated financial performance are forward-looking statements. It is important to note that Actavis' goals and expectations are not predictions of actual performance. Actavis' performance, at times, will differ from its goals and expectations. Actual results may differ materially from Actavis' current expectations depending upon a number of factors affecting Actavis' business. These factors include, among others, the inherent uncertainty associated with financial projections; successful integration of the Warner Chilcott acquisition and the ability to recognize the anticipated synergies and benefits of the Warner Chilcott acquisition; the difficulty of predicting the timing and outcome of pending or future litigation and government investigations and risks that an adverse outcome in such litigation or investigations could render Actavis liable for substantial damages or penalties; risks that resolution of patent infringement litigation through settlement could result in investigations or actions by private parties or government authorities or agencies; the impact of competitive products and pricing; risks related to fluctuations in foreign currency exchange rates; periodic dependence on a small number of products for a material source of net revenue or income; variability of trade buying patterns; changes in generally accepted accounting principles; risks that the carrying values of assets may be negatively impacted by future events and circumstances; the timing and success of product launches; the difficulty of predicting the timing or outcome of product development efforts and regulatory agency approvals or actions, if any; risks and uncertainties normally incident to the pharmaceutical industry, including product liability claims and the availability of product liability insurance on reasonable terms; market acceptance of and continued demand for Actavis' products; difficulties or delays in manufacturing; the availability and pricing of third party sourced products and materials; successful compliance with governmental regulations applicable to Actavis' facilities, products and/or businesses; changes in the laws and regulations, including Medicare, Medicaid, and similar laws in foreign countries affecting, among other things, pricing and reimbursement of pharmaceutical products and the settlement of patent litigation; and such other risks and uncertainties detailed in Actavis, Inc.'s periodic public filings with the Securities and Exchange Commission, including but not limited to Actavis, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2012 (as revised pursuant to Actavis, Inc.'s Current Report on Form 8-K dated as of June 17, 2013, which was filed with the SEC on June 18, 2013) and Quarterly Reports on Form 10-Q for the periods ended March 31, 2013 and June 30, 2013, and Warner Chilcott's periodic public filings with the Securities and Exchange Commission, including but not limited

to Warner Chilcott's Annual Report on Form 10-K for the year ended December 31, 2012 and its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2013 and June 30, 2013. Except as expressly required by law, Actavis disclaims any intent or obligation to update these forward-looking statements.

**CONTACTS:**    **Investors:**

Lisa DeFrancesco

(862) 261-7152

**Media:**

Charlie Mayr

(862) 261-8030

David Belian

(862) 261-8141

(Logo: http://photos.prnewswire.com/prnh/20130124/NY47381LOGO )

SOURCE Actavis plc

# EXHIBIT 11

**Table of Contents**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2012**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission file number 001-13305**

# ACTAVIS, INC.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Nevada** | **95-3872914** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054**
*(Address of principal executive offices, including ZIP code)*

**(862) 261-7000** *(Registrant's telephone number, including area code)*

None

*(Former name, former address, and former fiscal year if changed since last report)*

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.0033 par value | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well known seasoned issuer (as defined in Rule 405 of the Securities Act).  Yes ☑  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐  No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:  Yes ☑  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑          Accelerated filer ☐          Non-accelerated filer ☐          Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐  No ☑

Aggregate market value of Common Stock held by non-affiliates of the Registrant, as of June 30, 2012:

**$9,442,846,857 based on the last reported sales price on the New York Stock Exchange**

Number of shares of Registrant's Common Stock outstanding on February 15, 2013: 127,832,241

## DOCUMENTS INCORPORATED BY REFERENCE

Part III incorporates certain information by reference from the registrant's proxy statement for the 2013 Annual Meeting of Stockholders, to be held on May 10, 2013. Such proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2012.

Table of Contents

**ACTAVIS, INC.**

**TABLE OF CONTENTS**

**FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2012**

PAGE

**PART I**

| | | |
|---|---|---|
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 22 |
| ITEM 1B. | Unresolved Staff Comments | 42 |
| ITEM 2. | Properties | 43 |
| ITEM 3. | Legal Proceedings | 44 |
| ITEM 4. | Not Applicable | 44 |

**PART II**

| | | |
|---|---|---|
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 45 |
| ITEM 6. | Selected Financial Data | 47 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 48 |
| ITEM 7A. | Quantative and Qualitative Disclosures About Market Risk | 73 |
| ITEM 8. | Financial Statements and Supplementary Data | 75 |
| ITEM 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 75 |
| ITEM 9A. | Controls and Procedures | 75 |
| ITEM 9B. | Other Information | 76 |

**PART III**

| | | |
|---|---|---|
| ITEM 10. | Directors and Executive Officers of the Registrant | 77 |
| ITEM 11. | Executive Compensation | 79 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management | 79 |
| ITEM 13. | Certain Relationships and Related Transactions | 79 |
| ITEM 14. | Principal Accounting Fees and Services | 80 |

**PART IV**

| | | |
|---|---|---|
| ITEM 15. | Exhibits, Financial Statement Schedules | 81 |
| SIGNATURES | | 82 |

2

Table of Contents

PART I

## ITEM 1.    *BUSINESS*

### Business Overview

On October 31, 2012, Watson Pharmaceuticals, Inc. completed the acquisition of Actavis Group. Watson Pharmaceuticals, Inc. common stock was traded on the New York Stock Exchange under the symbol "WPI" until close of trading on January 23, 2013, at which time Watson Pharmaceuticals, Inc. changed its corporate name to "Actavis, Inc." and changed its ticker symbol to "ACT." Actavis, Inc. ("Actavis," the "Company," "we," "us," or "our") is a leading integrated global specialty pharmaceutical company engaged in the development, manufacturing, marketing, sale and distribution of generic, branded generic, brand, biosimilar and over-the-counter ("OTC") pharmaceutical products. We also develop and out-license generic pharmaceutical products primarily in Europe through our Medis third-party business. Following the renaming, the Company also changed the name of its three reporting segments. The Global Generics segment has become "Actavis Pharma," Global Brands has become "Actavis Specialty Brands," and Distribution has become "Anda Distribution."

Following the acquisition of Actavis Group, the Company now has operations in more than 60 countries throughout the Americas (U.S., Canada, and Latin America), Europe (Europe, Russia, Commonwealth of Independent States ("CIS"), and Turkey), and MEAAP (Middle East, Africa, Australia, and Asia Pacific). The United States of America ("U.S.") remains our largest commercial market and represented approximately 81% of total net revenues for 2012. As of December 31, 2012, we marketed approximately 250 generic pharmaceutical product families and over 40 brand pharmaceutical products in the U.S. and distributed approximately 11,450 stock-keeping units ("SKUs") through our Anda Distribution Division.

Our principal executive offices are located at our global and U.S. headquarters at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054. Our international headquarters are located at Turmstrasse 24, 6300 Zug, Switzerland. Our Internet website address is www.actavis.com. We do not intend this website address to be an active link or to otherwise incorporate by reference the contents of the website into this report. Our annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and all amendments thereto are available free of charge on our Internet website. These reports are posted on our website as soon as reasonably practicable after such reports are electronically filed with the U.S. Securities and Exchange Commission ("SEC"). The public may read and copy any materials that we file with the SEC at the SEC's Public Reference Room or electronically through the SEC website (www.sec.gov). Within the Investors section of our website, we provide information concerning corporate governance, including our Corporate Governance Guidelines, Board Committee Charters and Composition, Code of Conduct and other information. See "ITEM 1A. RISK FACTORS-CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS" in this Annual Report on Form 10-K ("Annual Report").

### Acquisitions

#### *Acquisition of Uteron Pharma SA*

On January 23, 2013, the Company completed the acquisition of Belgium-based Uteron Pharma SA for $150.0 million in cash up front, and up to $155.0 million in potential future milestone payments. The acquisition of Uteron expands our Actavis Specialty Brands pipeline of Women's Health products including two potential near term commercial opportunities in contraception and infertility, and one novel oral contraceptive. Several additional products in earlier stages of development are also included in the acquisition. This transaction is consistent with Actavis Specialty Brands' growth strategy, which is focused on expanding our branded product portfolio globally.

#### *Acquisition of Actavis Group*

On October 31, 2012, Watson Pharmaceuticals, Inc. completed the acquisition of the Actavis Group. On January 24, 2013, the Company was renamed Actavis, Inc. The acquisition was consummated for a cash payment of €4.2 billion, or approximately $5.5 billion, and potential contingent consideration payable in the form of up to

3

Table of Contents

# PART III

**ITEM 10.**   *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

**Directors**

The information concerning directors of Actavis required under this Item is incorporated herein by reference from our definitive proxy statement, to be filed pursuant to Regulation 14A, related to our 2013 Annual Meeting of Stockholders to be held on May 10, 2013 (our "2013 Proxy Statement").

Information concerning our Audit Committee and the independence of its members, along with information about the financial expert(s) serving on the Audit Committee, is set forth in the Audit Committee section of our 2013 Proxy Statement and is incorporated herein by reference.

**Executive Officers of the Registrant**

Below are our executive officers as of February 21, 2013:

| Name | Age | Principal Position with Registrant |
|------|-----|-----------------------------------|
| Paul M. Bisaro | 52 | President and Chief Executive Officer |
| Sigurdur O. Olafsson | 44 | President, Global Generics |
| G. Frederick Wilkinson | 56 | President, Global Brands |
| Robert A. Stewart | 45 | President, Global Operations |
| R. Todd Joyce | 55 | Chief Financial Officer — Global |
| David A. Buchen | 48 | Chief Legal Officer — Global |
| Charles M. Mayr | 56 | Chief Communications Officer — Global |
| Patrick J. Eagan | 55 | Chief Human Resources Officer — Global |

**Paul M. Bisaro**

Paul M. Bisaro, age 52, has served as President and Chief Executive Officer since September 2007. Prior to joining Watson, Mr. Bisaro was President and Chief Operating Officer of Barr Pharmaceuticals, Inc. ("Barr") from 1999 to 2007. Between 1992 and 1999, Mr. Bisaro served as General Counsel and from 1997 to 1999 served in various additional capacities including Senior Vice President — Strategic Business Development. Prior to joining Barr, he was associated with the law firm Winston & Strawn and a predecessor firm, Bishop, Cook, Purcell and Reynolds from 1989 to 1992. Mr. Bisaro also served as a Senior Consultant with Arthur Andersen & Co. Mr. Bisaro received his undergraduate degree in General Studies from the University of Michigan in 1983 and a Juris Doctor from Catholic University of America in Washington, D.C. in 1989.

**Sigurdur O. Olafsson**

Sigurdur O. Olafsson, age 44, was appointed President, Actavis Pharma on April 27, 2012. He joined Watson as Executive Vice President, Global Generics in September 2010. Prior to joining Watson, Mr. Olafsson served as Chief Executive Officer of the Actavis Group from 2008 to 2010. From 2006 until 2008 Mr. Olafsson served as Deputy CEO of the Actavis Group and was CEO, Actavis Inc. U.S. and Chief Executive Corporate Development from 2003 to 2006, where he led Actavis' sales and marketing organization. Prior to joining Actavis, he held a number of positions with Pfizer's Global Research and Development organization in both the U.S. and the U.K. from 1998 to 2003. Prior to joining Pfizer, he served as Head of Drug Development for Omega Farma in Iceland for four years. Mr. Olafsson has a M.S. in Pharmacy (Cand Pharm) from the University of Iceland.

**G. Frederick Wilkinson**

G. Frederick Wilkinson, age 56, was appointed President Actavis Specialty Brands on April 27, 2012. He joined Watson as Executive Vice President, Actavis Specialty Brands in September 2009. Prior to joining Watson, Mr. Wilkinson was President and Chief Operating Officer of Duramed Pharmaceuticals, Inc. the proprietary products subsidiary of Barr from 2006 to 2009. Prior to joining Duramed Pharmaceuticals, Inc., he was President and Chief Executive Officer of Columbia Laboratories, Inc. from 2001 to 2006. From 1996 to

77

EXHIBIT 12

Table of Contents

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

# Form 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2013

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission file number 000-55075

# ACTAVIS plc

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Ireland** | **98-1114402** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification Number)* |

**1 Grand Canal Square, Docklands Dublin 2, Ireland**

*(Address of principal executive offices)*

**(862) 261-7000**

*(Registrant's telephone number, including area code)*

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Ordinary Shares, $0.0001 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer ☑ | Accelerated filer ☐ | Non-accelerated filer ☐ | Smaller reporting company ☐ |
| | | (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☑

This Annual Report on Form 10-K is being filed by the registrant on behalf of and as successor registrant to Actavis, Inc. and Warner Chilcott plc. The aggregate market value of the voting and non-voting stock held by non-affiliates of Actavis, Inc. as of June 28, 2013, based upon the last sale price reported for such date on the New York Stock Exchange, was $16,671.7 million. The calculation of the aggregate market value of voting and non-voting stock excludes Class A common shares of Actavis, Inc. held by executive officers, directors, and stockholders that the registrant concluded were affiliates of Actavis, Inc. on that date.

On October 1, 2013, Actavis plc became the successor registrant to Actavis, Inc. and Warner Chilcott plc, and each of Actavis, Inc.'s Class A common shares was converted into one Actavis plc Ordinary Share.

Number of shares of Registrant's Ordinary Shares outstanding on February 7, 2014: 174,199,744

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III of this Annual Report on Form 10-K ("Annual Report") is incorporated by reference from the Registrant's proxy statement to be filed pursuant to Regulation 14A with respect to the Registrant's Annual Meeting of Shareholders to be held on May 9, 2014.

Table of Contents

ACTAVIS plc

TABLE OF CONTENTS

FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2013

PAGE

**PART I**

| | | |
|---|---|---|
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 25 |
| ITEM 1B. | Unresolved Staff Comments | 52 |
| ITEM 2. | Properties | 52 |
| ITEM 3. | Legal Proceedings | 54 |
| ITEM 4. | Mine Safety Disclosures | 54 |

**PART II**

| | | |
|---|---|---|
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 55 |
| ITEM 6. | Selected Financial Data | 57 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 59 |
| ITEM 7A. | Quantative and Qualitative Disclosures About Market Risk | 94 |
| ITEM 8. | Financial Statements and Supplementary Data | 95 |
| ITEM 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 95 |
| ITEM 9A. | Controls and Procedures | 96 |
| ITEM 9B. | Other Information | 97 |

**PART III**

| | | |
|---|---|---|
| ITEM 10. | Directors and Executive Officers of the Registrant | 98 |
| ITEM 11. | Executive Compensation | 101 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management | 101 |
| ITEM 13. | Certain Relationships and Related Transactions | 101 |
| ITEM 14. | Principal Accounting Fees and Services | 101 |

**PART IV**

| | | |
|---|---|---|
| ITEM 15. | Exhibits, Financial Statement Schedules | 101 |
| SIGNATURES | | 102 |

2

Table of Contents

**ITEM 1.**    *BUSINESS*

**Company History**

Actavis plc (formerly known as Actavis Limited) was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 18, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott plc ("Warner Chilcott"). On October 1, 2013, pursuant to the transaction agreement dated May 19, 2013 among Actavis, Inc., Warner Chilcott, Actavis plc, Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) ("MergerSub"), (i) Actavis plc acquired Warner Chilcott (the "Warner Chilcott Acquisition") pursuant to a scheme of arrangement under Section 201, and a capital reduction under Sections 72 and 74, of the Irish Companies Act of 1963 where each Warner Chilcott ordinary share was converted into 0.160 of an Actavis plc ordinary share (the "Company Ordinary Shares"), or $5,833.9 million in equity consideration, and (ii) MergerSub merged with and into Actavis, Inc., with Actavis, Inc. as the surviving corporation in the merger (the "Merger" and, together with the Warner Chilcott Acquisition, the "Transactions"). Following the consummation of the Transactions, Actavis, Inc. and Warner Chilcott became wholly-owned subsidiaries of Actavis plc. Each of Actavis, Inc.'s common shares was converted into one Company Ordinary Share.

The issuance of the Company Ordinary Shares in connection with the Transactions was registered under the Securities Act of 1933, as amended, pursuant to Actavis plc's registration statement on Form S-4 (File No. 333-189402) filed with the Securities and Exchange Commission and declared effective on July 31, 2013.

Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Actavis plc is the successor issuer to Actavis, Inc. and to Warner Chilcott. The Company's Ordinary Shares are deemed to be registered under Section 12(b) of the Exchange Act, and Actavis plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder. The Company's Ordinary Shares were approved for listing on the New York Stock Exchange ("NYSE") and trade under the symbol "ACT".

On October 31, 2012, Watson Pharmaceuticals, Inc. completed the acquisition of the Actavis Group for a cash payment of €4.2 billion, or approximately $5.5 billion, and contingent consideration of 5.5 million newly issued shares of Actavis, Inc., which have since been issued (the "Actavis Group Acquisition"). Watson Pharmaceuticals, Inc.'s Common Stock was traded on the NYSE under the symbol "WPI" until close of trading on January 23, 2013, at which time Watson Pharmaceuticals, Inc. changed its corporate name to "Actavis, Inc." and changed its ticker symbol to "ACT."

On February 17, 2014, Actavis plc entered into a merger agreement with Forest Laboratories, Inc. ("Forest"). Forest is a leading, fully integrated, specialty pharmaceutical company largely focused on the United States market. Forest markets a portfolio of branded drug products and develops new medicines to treat patients suffering from diseases principally in the following therapeutic areas: central nervous system, cardiovascular, gastrointestinal, respiratory, anti-infective, and cystic fibrosis. Refer to "NOTE 23 – Subsequent Events" in the accompanying "Notes to Consolidated Financial Statements" in this Annual Report for a description of the merger agreement.

References throughout to "we," "our," "us," the "Company" or "Actavis" refer to financial information and transactions of Watson Pharmaceuticals, Inc. prior to January 23, 2013, Actavis, Inc. from January 23, 2013 until October 1, 2013 and Actavis plc subsequent to October 1, 2013.

**Business Overview**

Actavis is a leading integrated global specialty pharmaceutical company engaged in the development, manufacturing, marketing, sale and distribution of generic, branded generic, brand name ("brand" or "branded"), biosimilar and over-the-counter ("OTC") pharmaceutical products. We also develop and out-license generic pharmaceutical products primarily in Europe through our Medis third-party business. Following our renaming in January of 2013, we also changed the name of our three reporting segments, which remained in effect as of

3

Table of Contents

**Performance Graph**

*The information in this section of the Annual Report pertaining to our performance relative to our peers is being furnished but not filed with the SEC, and as such, the information is neither subject to Regulation 14A or 14C or to the liabilities of Section 18 of the Securities Exchange Act of 1934.*

The following graph compares the cumulative 5-year total return of holders of Actavis' Ordinary Shares (formerly Class A common shares of Actavis, Inc.) with the cumulative total returns of the S&P 500 index and the Dow Jones US Pharmaceuticals index. The graph tracks the performance of a $100 investment in our Ordinary Shares and in each of the indexes (with reinvestment of all dividends, if any) on December 31, 2008 with relative performance tracked through December 31, 2013.

Notwithstanding anything to the contrary set forth in our previous filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, which might incorporate future filings made by us under those statutes, the following graph will not be deemed incorporated by reference into any future filings made by us under those statutes.

**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***

Among Actavis plc, the S&P 500 Index, and the Dow Jones US Pharmaceuticals Index



\*$100 invested on 12/31/08 in stock or index, including reinvestment of dividends. Fiscal year ending December 31.

Copyright© 2014 S&P, a division of The McGraw-Hill Companies Inc. All rights reserved.

Copyright© 2014 Dow Jones & Co. All rights reserved.

| | 12/08 | 12/09 | 12/10 | 12/11 | 12/12 | 12/13 |
|---|---|---|---|---|---|---|
| **Actavis plc** | 100.00 | 149.08 | 194.39 | 227.10 | 323.67 | 632.29 |
| **S&P 500** | 100.00 | 126.46 | 145.51 | 148.59 | 172.37 | 228.19 |
| **Dow Jones US Pharmaceuticals** | 100.00 | 119.09 | 121.62 | 144.30 | 164.36 | 220.11 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

56

**Table of Contents**

**ITEM 7.**   *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

*Except for the historical information contained herein, the following discussion contains forward-looking statements that are subject to known and unknown risks, uncertainties and other factors that may cause actual results to differ materially from those expressed or implied by such forward-looking statements. We discuss such risks, uncertainties and other factors throughout this report and specifically under the caption "Cautionary Note Regarding Forward-Looking Statements" under "ITEM 1A. RISK FACTORS" in this Annual Report. In addition, the following discussion of financial condition and results of operations should be read in conjunction with the Consolidated Financial Statements and Notes thereto included elsewhere in this Annual Report.*

*In prior periods, our consolidated financial statements present the accounts of Actavis, Inc., and all of its wholly-owned subsidiaries. On May 16, 2013, Actavis plc (formally known as Actavis Limited) was incorporated in Ireland as a private limited company and re-registered effective September 18, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott. On October 1, 2013, we became the successor registrant of Actavis, Inc. and Warner Chilcott in connection with the consummation of certain transactions further described elsewhere in this Annual Report. In addition, on October 1, 2013, the shares of Actavis Public Limited Company began trading on the NYSE under the symbol "ACT," the same symbol under which Actavis, Inc.'s shares previously traded. References throughout to "ordinary shares" refer to Actavis Inc.'s Class A common shares, par value $0.0033 per share, prior to the consummation of the transactions and to our ordinary shares, par value $0.0001 per share, since the consummation of the transactions.*

**EXECUTIVE SUMMARY**

**Overview**

We are a leading integrated global specialty pharmaceutical company engaged in the development, manufacturing, marketing, sale and distribution of generic, branded generic, brand name, biosimilar and OTC pharmaceutical products. Through our third-party business within the Actavis Pharma segment, we out-license generic pharmaceutical products rights that we develop or acquire, primarily in Europe. We are also developing biosimilar products within our Actavis Specialty Brands segment. Additionally, we distribute generic and branded pharmaceutical products manufactured by third parties through our Anda Distribution segment. Our largest market is the United States of America, followed by our key international markets including Europe, Canada, Australia, Southeast Asia.

We have supported our Actavis Pharma and Actavis Specialty Brands businesses with a significant commitment of R&D expenditures of approximately 7% of net revenues for the years ended December 31, 2013, 2012 and 2011. Our global growth strategy is focused on: (i) internal development of differentiated high-demand products; (ii) establishment of strategic alliances and collaborations that bring new products, technologies and markets to our existing portfolio; and (iii) acquisition of products and/or companies that complement our existing portfolio in generics, brands and biosimilars.

As of December 31, 2013, we marketed over 250 generic pharmaceutical product families and approximately 45 branded pharmaceutical product families in the U.S. and a significant number of product families internationally. Generic pharmaceutical products are bioequivalents of their respective branded products and provide a cost-efficient alternative to branded products. Branded pharmaceutical products are marketed under brand names through programs that are designed to generate physician and consumer loyalty. Through our Anda Distribution segment, we distribute approximately 12,725 SKUs in the U.S. primarily to independent pharmacies, alternate care providers (hospitals, nursing homes and mail order pharmacies) and pharmacy chains, as well as generic products and certain selective branded products to physicians' offices.

*2013 Transactions*

During 2013, we completed the following transactions that impacted our results of operations and will continue to have an impact on our future operations.

59

Table of Contents

Restated Actavis Revolving Credit and Guaranty Agreement (the "ACT Revolving Credit Agreement" and, together with the ACT Term Loan Agreement, the "Amended and Restated Credit Agreements"), dated as of October 1, 2013. The ACT Revolving Credit Agreement amended and restated Actavis, Inc.'s $750.0 million senior unsecured revolving credit facility dated as of September 16, 2011, as amended by that certain Amendment No. 1 to the credit agreement and joinder agreement, dated as of May 21, 2012. At closing, $9.4 million of letters of credit were outstanding under the ACT Revolving Credit Agreement and no loans were outstanding.

The ACT Revolving Credit Agreement provides that loans thereunder will bear interest, at our choice of a per annum rate equal to either (a) a base rate, plus an applicable margin per annum varying from 0.00% per annum to 0.75% per annum depending on the Debt Rating or (b) a Eurodollar rate, plus an applicable margin varying from 0.875% per annum to 1.75% per annum depending on the Debt Rating. Additionally, to maintain availability of funds, we pay an unused commitment fee, which according to the pricing grid is set at 0.15% of the unused portion of the revolver.

Subject to certain limitations, borrowings under the ACT Revolving Credit Agreement may be made in alternative currencies, including Euros, British Pounds Sterling and other currencies. The ACT Revolving Credit Agreement contains sublimits on letters of credit and swingline loans in the amount of $100.0 million and $50.0 million, respectively. The issuance of letters of credit and borrowings of swingline loans reduces the amount available to be borrowed under the ACT Revolving Credit Agreement on a dollar-for-dollar basis. Amounts borrowed under the ACT Revolving Credit Agreement may be used to finance working capital and other general corporate purposes.

The ACT Revolving Credit Agreement imposes certain customary restrictions including, but not limited to, limits on the incurrence of debt or liens upon the assets of us or our subsidiaries, investments and restricted payments. The ACT Revolving Credit Agreement includes a consolidated leverage ratio covenant, as defined, whereby we are permitted to have a maximum consolidated leverage ratio as of the last day of any period of four consecutive fiscal quarters of the Company of up to (i) with respect to the four consecutive fiscal quarters from the Acquisition Date through December 31, 2013, 4.25 to 1.00; (ii) with respect to the four consecutive fiscal quarters from January 1, 2014 through December 31, 2014, 4.00 to 1.00; and (iii) with respect to the period of four consecutive fiscal quarters ending from January 1, 2015 and thereafter, 3.50 to 1.00.

We are subject to, and, as of December 31, 2013, were in compliance with, all financial and operational covenants under the terms of the Revolving Credit Facility. At December 31, 2013, loans and letters of credit outstanding were $265.0 million and $9.4 million, respectively. The net availability under the Revolving Credit Facility was $475.6 million. As of the date of this report, we repaid the full amount of our indebtedness under the Revolving Credit Facility.

**Senior Notes Indebtedness**

### *Actavis, Inc. Supplemental Indenture*

On October 1, 2013, the Company, Actavis, Inc., a wholly owned subsidiary of the Company, and Wells Fargo Bank, National Association, as trustee, entered into a fourth supplemental indenture (the "Fourth Supplemental Indenture") to the indenture, dated as of August 24, 2009 (the "Base Indenture" and, together with the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture (each as defined below), the "Indenture"), as supplemented by the first supplemental indenture, dated as of August 24, 2009 (the "First Supplemental Indenture"), the second supplemental indenture, dated as of May 7, 2010 (the "Second Supplemental Indenture"), and the third supplemental indenture, dated as of October 2, 2012 (the "Third Supplemental Indenture"). Pursuant to the Fourth Supplemental Indenture, we have provided a full and unconditional guarantee of Actavis, Inc.'s obligations under its $450.0 million 5.000% senior notes due August 15, 2014, (the "2014 Notes"), its $400.0 million 6.125% senior notes due August 15, 2019 (the "2019 Notes"), its $1,200.0 million 1.875% senior notes due October 1, 2017 (the "2017 Notes"), its $1,700.0 million 3.250% senior notes due October 1, 2022 (the "2022 Notes") and its $1,000.0 million 4.625% Senior Notes due 2042 (the "2042 Notes", and together with the 2014 Notes, the 2019 Notes, the 2017 Notes and the 2022 Notes, the "Notes").

Table of Contents

# PART III

ITEM 10.    *DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE*

## Directors

The information concerning directors of Actavis required under this Item is incorporated herein by reference to the "Board of Directors and Committees" section of our definitive proxy statement, to be filed pursuant to Regulation 14A, related to our 2014 Annual Meeting of Shareholders to be held on May 9, 2014 (our "2014 Proxy Statement").

The information concerning our Audit Committee and the independence of its members required by this Item, along with information about the financial expert(s) serving on the Audit Committee, is incorporated by reference to "The Audit Committee" section of our 2014 Proxy Statement.

## Executive Officers of the Registrant

Below are our executive officers as of February 25, 2014:

| Name | Age | Principal Position with Registrant |
|------|-----|-----------------------------------|
| Paul M. Bisaro | 53 | Chairman of the Board of Directors and Chief Executive Officer |
| Sigurdur O. Olafsson | 45 | President, Actavis Pharma |
| G. Frederick Wilkinson | 57 | President, Actavis Global Research and Development |
| Robert A. Stewart | 46 | President, Global Operations |
| R. Todd Joyce | 56 | Chief Financial Officer — Global |
| David A. Buchen | 49 | Chief Legal Officer — Global & Secretary |
| Charles M. Mayr | 57 | Chief Communications Officer — Global |
| Patrick J. Eagan | 56 | Chief Human Resources Officer — Global |
| James C. D'Arecca | 43 | Chief Accounting Officer — Global |

### Paul M. Bisaro

Paul M. Bisaro, age 53, has served as our President and Chief Executive Officer and as our chairman of our Board of Directors since October 2013, prior to which he served on the Board of Directors of Actavis, Inc. since September 2007. Prior to joining Actavis, Mr. Bisaro was President, Chief Operating Officer and a member of the Board of Directors of Barr Pharmaceuticals, Inc. ("Barr") from 1999 to 2007. Between 1992 and 1999, Mr. Bisaro served as General Counsel of Barr and from 1997 to 1999 served in various additional capacities including Senior Vice President — Strategic Business Development. Prior to joining Barr, he was associated with the law firm Winston & Strawn and a predecessor firm, Bishop, Cook, Purcell and Reynolds from 1989 to 1992. Mr. Bisaro also currently serves on the Boards of Visitors of the Catholic University of America's Columbus School of Law and Zimmer Holdings, Inc. Mr. Bisaro received his undergraduate degree in General Studies from the University of Michigan in 1983 and a Juris Doctor from Catholic University of America in Washington, D.C. in 1989.

### Sigurdur O. Olafsson

Sigurdur O. Olafsson, age 45, is the President, Actavis Pharma and joined Actavis as Executive Vice President, Global Generics in September 2010, and was appointed President of the Global Generics business in April 2012. Mr. Olafsson was also appointed as a member of our Board of Directors since October 2013. Prior to joining Actavis, Mr. Olafsson served as Chief Executive Officer of the Actavis Group from 2008 to 2010, where he was responsible for overseeing its global pharmaceuticals business with operations in more than 40 countries. From 2006 until 2008 Mr. Olafsson served as Deputy CEO of the Actavis Group and was CEO, Actavis Inc. U.S. and Chief Executive Corporate Development from 2003 to 2006, where he led Actavis' sales and marketing organization. Prior to joining the Actavis Group, he held increasingly responsible positions with Pfizer's Global

98

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**NOTE 21 — Commitments and Contingencies**

*Legal Matters*

The Company and its affiliates are involved in various disputes, governmental and/or regulatory inspections, inquires, investigations and proceedings, and litigation matters that arise from time to time in the ordinary course of business. The process of resolving matters through litigation or other means is inherently uncertain and it is possible that an unfavorable resolution of these matters will adversely affect the Company, its results of operations, financial condition and cash flows. The Company's general practice is to expense legal fees as services are rendered in connection with legal matters, and to accrue for liabilities when losses are probable and reasonably estimable.

The Company evaluates, on a quarterly basis, developments in legal proceedings and other matters that could cause an increase or decrease in the amount of the liability that is accrued. As of December 31, 2013, the Company's consolidated balance sheet includes accrued loss contingencies of approximately $260.0 million.

The Company's legal proceedings range from cases brought by a single plaintiff to mass tort actions and class actions with thousands of putative class members. These legal proceedings, as well as other matters, involve various aspects of the Company's business and a variety of claims (including, but not limited to, *qui tam* actions, antitrust, product liability, breach of contract, securities, patent infringement and trade practices), some of which present novel factual allegations and/or unique legal theories. In addition, a number of the matters pending against the Company are at very early stages of the legal process (which in complex proceedings of the sort faced by us often extend for several years). As a result, some matters have not yet progressed sufficiently through discovery and/or development of important factual information and legal issues to enable the Company to estimate a range of possible loss. In those proceedings in which plaintiffs do request publicly quantified amounts of relief, the Company does not believe that the quantified amounts are meaningful because they are merely stated jurisdictional limits, exaggerated and/or unsupported by the evidence or applicable burdens of proof.

*Antitrust Litigation*

*Actos® Litigation.* On December 31, 2013 two putative class actions were filed in the federal district court ( *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Takeda Pharmaceutical Co. Ltc. Et al.,* S.D.N.Y. Civ. No. 13-9244 and *Crosby Tugs LLC v. Takeda Pharmaceuticals Co. Ltd., et al.*, S.D.N.Y. Civ. No. 13-9250) against Actavis plc and certain of its affiliates alleging that Watson's 2010 patent lawsuit settlement with Takeda Pharmaceutical, Co. Ltd. related to Actos® (pioglitazone hydrochloride and metformin "Actos®") is unlawful. One additional complaint has been filed ( *Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Takeda Pharmaceutical Co. Ltd., et al.*, S.D.N.Y. Civ. No. 14-0116). The complaints, each asserted on behalf of putative classes of direct purchaser plaintiffs, generally allege an overall scheme that included Watson improperly delaying the launch of its generic version of Actos® in exchange for substantial payments from Takeda in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and unspecified damages.

The Company believes that it has substantial meritorious defenses to the claims alleged. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Androgel® Litigation.* On January 29, 2009, the U.S. Federal Trade Commission and the State of California filed a lawsuit in the United States District Court for the Central District of California *(Federal Trade Commission, et. al. v. Watson Pharmaceuticals, Inc., et. al., USDC Case No. CV 09-00598)* alleging that the September 2006 patent lawsuit settlement between Watson Pharmaceuticals, Inc. ("Watson" now known as Actavis, Inc.) and Solvay Pharmaceuticals, Inc. ("Solvay"), related to AndroGel® 1% (testosterone gel) CIII is unlawful. The complaint generally alleged that Watson improperly delayed its launch of a generic version of

F-72

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Androgel ® in exchange for Solvay's agreement to permit Watson to co-promote Androgel ® for consideration in excess of the fair value of the services provided by Watson, in violation of federal and state antitrust and consumer protection laws. The complaint sought equitable relief and civil penalties. On February 2 and 3, 2009, three separate lawsuits alleging similar claims were filed in the United States District Court for the Central District of California by various private plaintiffs purporting to represent certain classes of similarly situated claimants *(Meijer, Inc., et. al., v. Unimed Pharmaceuticals, Inc., et. al.,* USDC Case No. EDCV 09-0215); *(Rochester Drug Co-Operative, Inc. v. Unimed Pharmaceuticals Inc., et. al.,* Case No. EDCV 09-0226); *(Louisiana Wholesale Drug Co. Inc. v. Unimed Pharmaceuticals Inc., et. al,* Case No. EDCV 09-0228). On April 8, 2009, the Court transferred the government and private cases to the United States District Court for the Northern District of Georgia. On April 21, 2009 the State of California voluntarily dismissed its lawsuit against Watson without prejudice. The Federal Trade Commission and the private plaintiffs in the Northern District of Georgia filed amended complaints on May 28, 2009. The private plaintiffs amended their complaints to include allegations concerning conduct before the U.S. Patent and Trademark Office, conduct in connection with the listing of Solvay's patent in the FDA "Orange Book," and sham litigation. Additional actions alleging similar claims have been filed in various courts by other private plaintiffs purporting to represent certain classes of similarly situated direct or indirect purchasers of Androgel ® (*Stephen L. LaFrance Pharm., Inc. d/b/a SAJ Dist.  v. Unimed Pharms., Inc., et al.,* D. NJ Civ. No. 09-1507); (*Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Unimed Pharms. Inc., et al.,* D. NJ Civ. No. 09-1856); (*Scurto v. Unimed Pharms., Inc., et al.,* D. NJ Civ. No. 09-1900); (*United Food and Commercial Workers Unions and Employers Midwest Health Benefits Fund v. Unimed Pharms., Inc., et al.,* D. MN Civ. No. 09-1168); (*Rite Aid Corp. et al. v. Unimed Pharms., Inc. et al.,* M.D. PA Civ. No. 09-1153*); (Walgreen Co., et al. v. Unimed Pharms., LLC, et al.,* MD. PA Civ. No. 09-1240); (*Supervalu, Inc. v. Unimed Pharms., LLC, et al,* ND. GA Civ. No. 10-1024); (*LeGrand v. Unimed Pharms., Inc., et al*., ND. GA Civ. No. 10-2883); (*Jabo's Pharmacy Inc. v. Solvay Pharmaceuticals, Inc., et al*., Cocke County, TN Circuit Court Case No. 31,837). On April 20, 2009, Watson was dismissed without prejudice from the *Stephen L. LaFrance* action pending in the District of New Jersey. On October 5, 2009, the Judicial Panel on Multidistrict Litigation transferred all actions then pending outside of the United States District Court for the Northern District of Georgia to that district for consolidated pre-trial proceedings (*In re: AndroGel® Antitrust Litigation (No. II),* MDL Docket No. 2084), and all currently-pending related actions are presently before that court. On February 22, 2010, the judge presiding over all the consolidated litigations related to Androgel® then pending in the United States District Court for the Northern District of Georgia granted Watson's motions to dismiss the complaints, except the portion of the private plaintiffs' complaints that include allegations concerning sham litigation. Final judgment in favor of the defendants was entered in the Federal Trade Commission's action on April 21, 2010. On April 25, 2012, the Court of Appeals affirmed the dismissal. On June 17, 2013, the Supreme Court issued a decision, holding that the settlements between brand and generic drug companies which include a payment from the brand company to the generic competitor must be evaluated under a "rule of reason" standard of review and ordered the case remanded (the "Supreme Court Androgel Decision"). On July 20, 2010, the plaintiff in the *Fraternal Order of Police* action filed an amended complaint adding allegations concerning conduct before the U.S. Patent and Trademark Office, conduct in connection with the listing of Solvay's patent in the FDA's "Orange Book," and sham litigation similar to the claims raised in the direct purchaser actions. On October 28, 2010, the judge presiding over MDL 2084 entered an order pursuant to which the  *LeGrand* action, filed on September 10, 2010, was consolidated for pretrial purposes with the other indirect purchaser class action as part of MDL 2084 and made subject to the Court's February 22, 2010 order on the motion to dismiss. In February 2012, the direct and indirect purchaser plaintiffs and the defendants filed cross-motions for summary judgment, and on June 22, 2012, the indirect purchaser plaintiffs, including Fraternal Order of Police, LeGrand and HealthNet, filed a motion for leave to amend and consolidate their complaints. On September 28, 2012, the district court granted summary judgment in favor of the defendants on all outstanding claims. The plaintiffs then appealed. On September 12 and 13, 2013, respectively, the indirect purchaser plaintiffs and direct purchaser plaintiffs filed motions with the district court, asking the court for an indicative ruling that it would vacate its final order on the parties' summary judgment motions and conduct further

F-73

Table of Contents

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Following the filing of Mylan's complaint, three putative class actions were filed against Warner Chilcott and Mayne by purported direct purchasers, and one putative class action was filed against Warner Chilcott and Mayne by purported indirect purchasers, each in the same court. On December 5, 2013 an additional complaint was filed by the International Union of Operating Engineers Local 132 Health and Welfare Fund on behalf of another group of purported indirect purchasers. Warner has moved to dismiss this new complaint. In each case the plaintiffs allege that they paid higher prices for Warner Chilcott's Doryx® products as a result of Warner Chilcott's and Mayne's alleged actions preventing or delaying generic competition in violation of U.S. federal antitrust laws and/or state laws. Plaintiffs seek unspecified injunctive relief, treble damages and/or attorneys' fees. The court consolidated the purported class actions and the action filed by Mylan and ordered that all the pending cases proceed on the same schedule.

On February 5, 2013, four retailers, including HEB Grocery, Safeway, Inc., Supervalu, Inc. and Walgreen Co., filed in the same court a civil antitrust complaint in their individual capacities against Warner Chilcott and Mayne regarding Doryx®. (*Walgreen Co., Safeway, Inc., Supervalu, Inc. and HEB Grocery Co, LP. v. Warner Chilcott Public Limited Co., et al*, E.D.Pa. No. 13-cv-00658). On March 28, 2013, another retailer, Rite Aid, filed a similar complaint in the same court. (*Rite Aid Corp. v. Warner Chilcott Public Limited Co., et al.*, E.D.Pa. No. 13-cv-01644). Both retailer complaints recite similar facts and assert similar legal claims for relief to those asserted in the related cases described above. Both retailer complaints have been consolidated with the cases described above.

Warner Chilcott and Mayne moved to dismiss the claims of Mylan, the direct purchasers, the indirect purchasers and the retailers. On November 21, 2012, the Federal Trade Commission filed with the court an amicus curiae brief supporting the plaintiffs' theory of relief. On June 12, 2013, the court entered a denial, without prejudice, of Warner Chilcott and Mayne's motions to dismiss. Discovery is ongoing in the consolidated cases. On November 13, 2013, Warner Chilcott and Mayne reached an agreement in principle to settle the claims of the Direct Purchaser Plaintiff class representatives for $15 million. On February 18, 2014 the court preliminarily approved the settlement and set a hearing for final approval on June 9, 2014. Indirect Purchasers Plaintiffs' motion for class certification remains pending before the court, with no class having yet been certified.

The Company intends to vigorously defend its rights in the litigations. However, it is impossible to predict with certainty the outcome of any litigation, and the Company can offer no assurance as to when the lawsuits will be decided, whether the Company will be successful in its defense and whether any additional similar suits will be filed. The plaintiffs collectively seek approximately $1.2 billion in compensatory damages, which includes approximately $650 million in purported damages of the Direct Purchaser Plaintiffs with whom the company has a settlement in principle. The Company believes these amounts are unfounded and without merit. However, any award of compensatory damages could be subject to trebling. If these claims are successful such claims could adversely affect the Company and could have a material adverse effect on the Company's business, financial condition, results of operation and cash flows.

*Lidoderm® Litigation.* On November 8, 2013, a putative class action was filed in the federal district court ( *Drogueria Betances, Inc. v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 13-06542) against Actavis, Inc. and certain of its affiliates alleging that Watson's 2012 patent lawsuit settlement with Endo Pharmaceuticals, Inc. related to Lidoderm ® (lidocaine transdermal patches, "Lidoderm ®") is unlawful. The complaint, asserted on behalf of putative classes of direct purchaser plaintiffs, generally alleges that Watson improperly delayed launching generic versions of Lidoderm ® in exchange for substantial payments from Endo Pharmaceuticals in violation of federal and state antitrust and consumer protection laws. The complaint seeks declaratory and injunctive relief and damages. Additional lawsuits contain similar allegations have followed on behalf of putative classes of direct purchasers ( *Rochester Drug Cooperative, Inc. v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 13-7217; *American Sales Co. LLC, v. Endo Pharmaceuticals, Inc., et al.,* M.D.Tenn. Civ. No. 14-0022) and suits filed on behalf of a putative class of end-payer plaintiffs ( *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v.Teikoku Pharma USA, Inc., et al.,* N.D.Cal. Civ.

F-75

**Table of Contents**

## ACTAVIS PLC

### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

No. 13-5257; *Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Teikoku Pharma USA, Inc., et al.*, N.D.Cal. Civ. No. 13-5280; *City of Providence v. Teikoku Pharma USA, Inc., et al.*, D.R.I. Civ. No. 13-771; *Greater Metropolitan Hotel Employers — Employees Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, D.Minn. Civ. No. 13-3399; *Pirelli Armstrong Retiree Medical Benefits Trust v. Teikoku Pharma USA, Inc., et al.*, M.D.Tenn. Civ. No. 13-1378; *Plumbers and Pipefitters Local 178 Health and Welfare Trust Fund v. Teikoku Pharma USA, Inc., et al.*, N.D.Cal. Civ. No. 13-5938; *Philadelphia Federation of Teachers Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0057; *International Association of Fire Fighters Local 22 Health & Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0092; *Painters District Council No. 30 Health and Welfare Fund v. Teikoku Pharma USA, Inc., et al.*, C.D.Cal. Civ. No. 14-0289; *Local 17 Hospitality Benefit Fund v. Endo Pharmaceuticals, Inc., et al.*, N.D.Cal. Civ. No. 14-0503; *Teamsters Local Union 115 Health and Welfare Fund v. Endo Pharmaceuticals, Inc., et al.*, E.D.Pa. Civ. No. 14-0772). On December 23, 2013, plaintiffs in the United Food and Commercial Workers action filed a motion with the JPML to have all the Lidoderm® antitrust cases consolidated in the Northern District of California. Plaintiffs in several of the other actions filed objections and argued for consolidation in districts where their suits were filed. A hearing with the JPML has not yet been scheduled.

The Company believes it has substantial meritorious defenses and intends to defend itself vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Loestrin® 24 Litigation*.  On April 5, 2013, two putative class actions were filed in the federal district court (*New York Hotel Trades Council & Hotel Assoc. of New York City, Inc. Health Benefits Fund v. Warner Chilcott Pub. Ltd. Co., et al.*, D.N.J., Civ. No. 13-02178, and *United Food and Commercial Workers Local 1776 & Participating Employers Health and Welfare Fund v. Warner Chilcott (US), LLC, et al.*, E.D.Pa., Civ. No. 13-01807) against Actavis, Inc. and certain affiliates alleging that Watson's 2009 patent lawsuit settlement with Warner Chilcott related to Loestrin® 24 Fe (norethindrone acetate/ethinyl estradiol tablets and ferrous fumarate tablets, "Loestrin ® 24") is unlawful. The complaints, both asserted on behalf of putative classes of end-payors, generally allege that Watson and another generic manufacturer improperly delayed launching generic versions of Loestrin ® 24 in exchange for substantial payments from Warner Chilcott, which at the time was an unrelated company, in violation of federal and state antitrust and consumer protection laws. The complaints each seek declaratory and injunctive relief and damages. On April 15, 2013, the plaintiff in  *New York Hotel Trades* withdrew its complaint and, on April 16, 2013, refiled it in the federal court for the Eastern District of Pennsylvania (*New York Hotel Trades Council & Hotel Assoc. of New York City, Inc. Health Benefits Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa., Civ. No. 13-02000). Additional complaints have been filed by different plaintiffs seeking to represent the same putative class of end-payors  *(A.F. of L. — A.G.C. Building Trades Welfare Plan v. Warner Chilcott, et al., D.N.J. 13-02456, Fraternal Order of Police, Fort Lauderdale Lodge 31, Insurance Trust Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa. Civ. No. 13-02014). *Electrical Workers 242 and 294 Health & Welfare Fund v. Warner Chilcott Public Ltd. Co., et al.*, E.D.Pa. Civ. No. 13-2862 and *City of Providence v. Warner Chilcott Public Ltd. Co., et al.*, D.R.I. Civ. No. 13-307*)*. In addition to the end-payor suits, two lawsuits have been filed on behalf of a class of direct payors (*American Sales Company, LLC v. Warner Chilcott Public Ltd., Co. et al.*, D.R.I. Civ. No. 12-347 and *Rochester Drug Co-Operative Inc., v. Warner Chilcott (US), LLC, et al.*, E.D.Pa. Civ. No. 13-133476). On June 18, 2013, defendants filed a motion with the Judicial Panel on Multidistrict Litigation ("JPML") to consolidate these cases in one federal district court. After a hearing on September 26, 2013, the JPML issued an order conditionally transferring all related Loestrin ® 24 cases to the federal court for the District of Rhode Island. A preliminary hearing was held on November 4, 2013 after which an amended, consolidated complaint was filed on December 6, 2013. On February 6, 2014, the Company filed a motion to dismiss plaintiffs' complaints. The consolidated case is still in its early stages and discovery has not yet begun on either the class allegations or merits. The Company anticipates additional claims or lawsuits based on the same or similar allegations.

The Company believes it has substantial meritorious defenses and intends to defend both its brand and generic defendant entities vigorously. However, these actions, if successful, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

F-76

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

To the extent that any ANDA filer also submitted a Paragraph IV certification with respect to U.S. Patent No. 6,165,513 covering Actonel ® OaM, Warner Chilcott has determined not to pursue an infringement action with respect to this patent. While Warner Chilcott and Roche intend to vigorously defend the '938 Patent and the '634 Patent and protect their legal rights, the Company can offer no assurance as to when the lawsuits will be decided, whether the lawsuits will be successful or that a generic equivalent of Actonel® OaM will not be approved and enter the market prior to the expiration of the '938 Patent and the '634 Patent in 2023 (including, in each case, a 6-month pediatric extension of regulatory exclusivity).

*Asacol HD.*    In September 2011, Warner Chilcott received a Paragraph IV certification notice letter from Zydus Pharmaceuticals USA, Inc. (together with its affiliates, "Zydus") indicating that Zydus had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Warner Chilcott's Asacol® 800 mg product ("ASACOL HD). Zydus contends that Warner Chilcott's U.S. Patent No. 6,893,662, expiring in November 2021 (the "'662 Patent"), is invalid and/or not infringed. In addition, Zydus indicated that it had submitted a Paragraph III certification with respect to Medeva Pharma Suisse AG's ("Medeva") U.S. Patent No. 5,541,170 (the "'170 Patent") and U.S. Patent No. 5,541,171 (the "'171 Patent"), formulation and method patents which the Company exclusively licenses from Medeva covering Warner Chilcott's ASACOL products, consenting to the delay of FDA approval of the ANDA product until the '170 Patent and the '171 Patent expire in July 2013. In November 2011, Warner Chilcott filed a lawsuit against Zydus in the U.S. District Court for the District of Delaware charging Zydus with infringement of the '662 Patent ( *Warner Chilcott Co., LLC v. Zydus Pharms. (USA) Inc. et al.*, Case No. 1:2011cv01105). The lawsuit results in a stay of FDA approval of Zydus' ANDA for 30 months from the date of Warner Chilcott's receipt of the Zydus notice letter, subject to prior resolution of the matter before the court. While the Company intends to vigorously defend the '662 Patent and pursue its legal rights, the Company can offer no assurance as to when the pending litigation will be decided, whether the lawsuit will be successful or that a generic equivalent of ASACOL HD will not be approved and enter the market prior to the expiration of the '662 Patent in 2021. In January 2014 the parties reached an agreement in principle to settle the case. Under the terms of the settlement, Zydus can launch its ANDA product in November 2015, or can launch an authorized generic version of Asacol HD in July 2016 if it fails to obtain FDA approval of its ANDA by such time. The settlement is subject to execution of definitive documentation.

*Atelvia.*    In August and October 2011 and March 2012, Warner Chilcott received Paragraph IV certification notice letters from Watson Laboratories, Inc. — Florida (together with Actavis, Inc. (formerly Watson Pharmaceuticals, Inc.) and its subsidiaries, "Actavis"), Teva and Ranbaxy Laboratories Ltd. (together with its affiliates, "Ranbaxy") indicating that each had submitted to the FDA an ANDA seeking approval to manufacture and sell a generic version of Atelvia® 35 mg tablets ("Atelvia®"). The notice letters contend that Warner Chilcott's U.S. Patent Nos. 7,645,459 (the "'459 Patent") and 7,645,460 (the "'460 Patent"), two formulation and method patents expiring in January 2028, are invalid, unenforceable and/or not infringed. Warner Chilcott filed a lawsuit against Actavis in October 2011 (*Warner Chilcott Co., LLC et al. v. Watson Pharms., Inc. et al.*, Case No. 11-cv-5989), against Teva in November 2011 (*Warner Chilcott Co., LLC et al. v. Teva Pharms. USA, Inc. et al.*, Case No. 11-cv-6936) and against Ranbaxy in April 2012 ( *Warner Chilcott Co., LLC et al. v.Ranbaxy, Inc. et al.*, Case No. 12-cv-2474) in the U.S. District Court for the District of New Jersey charging each with infringement of the '459 Patent and '460 Patent. On August 21, 2012, the United States Patent and Trademark Office issued to the Company U.S. Patent No. 8,246,989 (the "'989 Patent"), a formulation patent expiring in January 2026. The Company listed the '989 Patent in the FDA's Orange Book, each of Actavis, Teva and Ranbaxy amended its Paragraph IV certification notice letter to contend that the '989 Patent is invalid and/or not infringed, and Warner Chilcott amended its complaints against Actavis, Teva and Ranbaxy to assert the '989 Patent. The lawsuits result in a stay of FDA approval of each defendant's ANDA for 30 months from the date of Warner Chilcott's receipt of such defendant's original notice letter, subject to prior resolution of the matter before the court. The Company does not believe that the amendment of its complaints against Actavis, Teva and Ranbaxy to assert the '989 Patent will result in any additional 30-month stay. In addition, none of the ANDA filers certified against the '122 Patent, which covers all of the Actonel® and

F-81

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

Chilcott filed a lawsuit against Lupin in September 2011 (*Warner Chilcott Co., LLC v. Lupin Ltd. et al.*, Case No. 11-cv-5048) and against Actavis in May 2012 (*Warner Chilcott Co., LLC v. Watson Labs., Inc. et al.*, Case No. 12-cv-2928) in the U.S. District Court for the District of New Jersey charging each with infringement of the '394 Patent and the '984 Patent. Warner Chilcott granted Lupin and Actavis covenants not to sue on the '394 Patent with regard to their ANDAs seeking approval for a generic version of Lo Loestrin® Fe, and the court dismissed all claims concerning the '394 Patent in the Lupin and the Actavis litigations in December 2012 and February 2013, respectively. The lawsuits result in a stay of FDA approval of each defendant's ANDA for 30 months from the date of Warner Chilcott's receipt of such defendant's notice letter, subject to the prior resolution of the matter before the court. On October 2, 2013, Actavis divested its ANDA to Amneal Pharmaceuticals. On October 4, 2013, Amneal Pharmaceuticals was substituted for Actavis as a defendant. A joint trial began on October 7, 2013 and concluded on October 17, 2013. On January 17, 2014, the district court issued its decision that the '984 Patent is valid and infringed by Lupin's and Amneal's respective ANDAs. On January 21, 2014, Lupin filed a notice of appeal to the United States Court of Appeals for the Federal Circuit (Appeal No. CAFC 14-1262). The appeal is currently pending.

While the Company intends to vigorously defend the '984 Patent and pursue its legal rights, it can offer no assurance as to when the lawsuits will be decided, whether such lawsuits will be successful or that a generic equivalent of Lo Loestrin ® Fe will not be approved and enter the market prior to the expiration of the '984 Patent in 2029.

*Rapaflo®.*     On June 17, 2013, Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Hetero USA Inc., Hetero Labs Limited, and Hetero Labs Limited, Unit 3 (collectively, "Hetero") in the United States District Court for the District of Delaware, alleging that sales of silodosin tablets, a generic version of Actavis' Rapaflo® tablets, would infringe U.S. Patent No. 5,387,603 (the '603 patent) (*Kissei Pharm. Co., Ltd. et al v. Hetero USA Inc. et al., Case No. 13cv01091).* The complaint seeks injunctive relief. On June 17, 2013 Actavis, Inc., Watson Laboratories, Inc., and Kissei Pharmaceutical Co., Ltd. sued Sandoz Inc. in the United States District Court for the District of Delaware, alleging that sales of Sandoz's generic version of Rapaflo® would infringe the '603 patent. (*Kissei Pharm. Co., Ltd. et al v. Sandoz, Inc., Case No. 13cv01092).* The complaint seeks injunctive relief. Actavis and Kissei's lawsuits against Hetero and Sandoz have been consolidated and remain pending. Pursuant to the provisions of the Hatch-Waxman Act, the FDA is precluded from granting final approval to the generic applicants prior to April 8, 2016. The Company believes it has meritorious claims to prevent the generic applicants from launching a generic version of Rapaflo. However, if a generic applicant prevails in the pending litigation or launches a generic version of Rapaflo before the pending litigation is finally resolved, it could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Patent Defense Matters*

*Bayer Patent Litigation.*     In August 2012, Bayer Pharma AG (together with its affiliates, "Bayer") filed a complaint against Warner Chilcott in the U.S. District Court for the District of Delaware alleging that Warner Chilcott's manufacture, use, offer for sale, and/or sale of its Lo Loestrin ® Fe oral contraceptive product infringes Bayer's U.S. Patent No. 5,980,940 (*Bayer Intellectual Property GMBH et al. v. Warner Chilcott Co., LLC et al.*, Case No. 12-cv-1032). In the complaint, Bayer seeks injunctive relief and unspecified monetary damages for the alleged infringement. In December 2012, Bayer amended the complaint to add a patent interference claim seeking to invalidate the Company's '984 Patent, which covers the Lo Loestrin ® Fe product.

Although it is impossible to predict with certainty the outcome of any litigation, the Company believes that it has a number of strong defenses to the allegations in the complaints and intends to vigorously defend the litigations. These cases are in the early stages of litigation, and an estimate of the potential loss, or range of loss, if any, to the Company relating to these proceedings is not possible at this time.

F-83

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

*Ibandronate Tablets (Generic version of Boniva®).*    On September 21, 2007, Hoffmann-La Roche Inc. sued Cobalt Laboratories, Inc. and Cobalt Pharmaceuticals Inc. (both of which were subsequently acquired by Watson in 2009) in the United States District Court for the District of New Jersey, alleging that sales of Ibandronate Tablets, a generic version of Hoffmann-La Roche's Boniva ® tablets, would infringe U.S. Patent Nos. 4,927,814 (the '814 Patent); 6,294,196 (the '196 Patent); and 7,192,938 (the '938 Patent) ( *Hoffmann-La Roche Inc. v. Cobalt Pharmaceuticals Inc., et. al., Case No. 07cv4540*). The complaint sought damages and injunctive relief. Thereafter, Hoffmann-La Roche asserted additional claims, alleging infringement of U.S. Patent Nos. 7,410,957 (the '957 Patent) and 7,718,634 (the '634 patent) against Cobalt, and the parties entered into stipulations to dismiss Hoffmann-La Roche's claims related to the '196 and the '938 Patent. On August 24, 2010, the District Court granted Hoffmann-La Roche's motion for summary judgment that Cobalt would infringe at least one claim of the '814 patent. On March 17, 2012, the '814 patent expired, leaving the '957 and '634 patents as the only patents in suit. On May 7, 2012, the District Court granted the Company's motion for summary judgment that certain claims of the '634 patent are invalid. On October 1, 2012, the District Court granted Cobalt's motion for summary judgment that certain claims of the '957 patent are invalid. On January 25, 2013 the District Court denied Plaintiffs' motion for reconsideration of the summary judgment decisions finding the '634 patent and '957 patent claims invalid. The plaintiff has appealed. The Court of Appeals heard oral arguments on the appeal on December 6, 2013. In June 2012, the Company began selling its generic version of Boniva ®. The Company believes it has substantial meritorious defenses to the case. However, the Company has sold and is continuing to sell its generic version of Boniva ®. Therefore, an adverse final appellate determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Oxymorphone Extended-Release Tablets (Generic version of Opana ® ER).*    On December 11, 2012, Endo Pharmaceuticals Inc. ("Endo") sued Actavis and certain of its affiliates in the United States District Court for the Southern District of New York, alleging that sales of the Company's 7.5 mg and 15 mg oxymorphone extended-release tablets, generic versions of Endo's Opana ® ER, would infringe U.S. Patent Nos. 7,851,482; 8,309,122; and 8,329,216, which the USPTO recently issued or Endo recently acquired ( *Endo Pharms. Inc. v. Actavis Inc. et al.*, Case No. 12-cv-8985). On July 11, 2013, the FDA approved Actavis' 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg oxymorphone extended-release tablets. On August 6, 2013, Endo filed a motion for a preliminary injunction seeking to prevent Actavis from selling its 5 mg, 10 mg, 20 mg, 30 mg, and 40 mg oxymorphone extended-release tablets. On September 12, 2013, the Court denied Endo's motion for a preliminary injunction and Actavis began selling its generic versions of Opana ® ER. On September 17, 2013, Endo filed a motion for an injunction pending appeal, which the Federal Court of Appeals for the Federal Circuit denied on November 21, 2013. On January 9, 2014, the Federal Circuit heard oral arguments on Endo's appeal of the district court's denial of the motion for a preliminary injunction. No decision on the appeal has been issued. The Company believes it has substantial meritorious defenses to the case. However, Actavis has sold and is continuing to sell its generic versions of Opana® ER, 5mg, 7.5 mg, 10 mg, 15 mg, 20 mg, 30 mg and 40 mg. Therefore, an adverse final determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Tranexamic Acid Tablets (Generic version of Lysteda®).*    On July 7, 2011, Ferring B.V. sued Watson in the United States District Court for the District of Nevada, alleging that sales of the Company's tranexamic acid tablets, a generic version of Ferring's Lysteda ® tablets, would infringe U.S. Patent No. 7,947,739 ("the '739 patent") ( *Ferring B.V. v. Watson Pharmaceuticals, Inc., et. al., Case No. 3:11-cv-00481*). On November 25, 2011, Ferring filed a second complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,022,106 ("the '106 patent"). (*Ferring B.V. v. Watson Pharmaceuticals,Inc., et. al., Case No. 3:11-cv-00853*). On November 9, 2012, Ferring filed a third complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,273,795 ("the '795 patent") ( *Ferring B.V. v. Watson Pharmaceuticals, Inc., et. al., Case No. 2:12-cv-01935* ). The cases are still pending. The District Court has consolidated all three cases. On January 3, 2013, Actavis began selling its

F-84

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

generic version of Lysteda®. On September 6, 2013, Ferring filed a fourth complaint in the District of Nevada alleging that sales of Actavis' tranexamic acid tablets would infringe U.S. Patent No. 8,487,055 ("the '795 patent") ( *Ferring B.V. v. Actavis, Inc., et. al., Case No. 3:13-cv-00477*). The fourth complaint also seeks damages for the alleged infringement of the '739, '106, '759, and '055 patents by Actavis' sales of its generic version of Lysteda ®. The fourth case has not been consolidated with the first three cases. Trial regarding the '739, '106 and '759 patents began on January 21, 2014, and on January 30, 2014, the Judge tentatively ruled that the '739, '106 and '759 patents are valid and infringed by Watson's ANDA product. As of February 12, 2014, the court had not issued a final order or ruling. The Company believes it has substantial meritorious defenses to the case. However, Actavis has sold and is continuing to sell its generic version of Lysteda ®. Therefore, an adverse final determination that one of the patents in suit is valid and infringed could have an adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Product Liability Litigation*

*Actonel Litigation.*    Warner Chilcott is a defendant in approximately 275 cases and a potential defendant with respect to approximately 382 unfiled claims involving a total of approximately 665 plaintiffs and potential plaintiffs relating to the Warner Chilcott's bisphosphonate prescription drug Actonel ®. The claimants allege, among other things, that Actonel® caused them to suffer osteonecrosis of the jaw ("ONJ"), a rare but serious condition that involves severe loss or destruction of the jawbone, and/or atypical fractures of the femur ("AFF"). All of the cases have been filed in either federal or state courts in the United States. Warner Chilcott is in the initial stages of discovery in these litigations. The 382 unfiled claims involve potential plaintiffs that have agreed, pursuant to a tolling agreement, to postpone the filing of their claims against Warner Chilcott in exchange for Warner Chilcott's agreement to suspend the statutes of limitations relating to their potential claims. In addition, Warner Chilcott is aware of four purported product liability class actions that were brought against Warner Chilcott in provincial courts in Canada alleging, among other things, that Actonel ® caused the plaintiffs and the proposed class members who ingested Actonel® to suffer atypical fractures or other side effects. It is expected that these plaintiffs will seek class certification. Of the approximately 669 total Actonel®-related claims, approximately 137 include ONJ-related claims, approximately 514 include AFF-related claims and approximately four include both ONJ and AFF-related claims. Warner Chilcott is reviewing these lawsuits and potential claims and intends to defend these claims vigorously.

Sanofi-Aventis U.S. LLC ("Sanofi"), which co-promoted Actonel ® with Warner Chilcott in the United States through the end of 2013 pursuant to a collaboration agreement, is a defendant in many of Warner Chilcott's Actonel® product liability cases. Sanofi and Warner Chilcott continue to co-promote Actonel® in other countries pursuant to the collaboration agreement. In some of the cases, manufacturers of other bisphosphonate products are also named as defendants. Plaintiffs have typically asked for unspecified monetary and injunctive relief, as well as attorneys' fees. Under the collaboration agreement, Sanofi has agreed to indemnify Warner Chilcott, subject to certain limitations, for 50% of the losses from any product liability claims in Canada relating to Actonel® and for 50% of the losses from any product liability claims in the United States and Puerto Rico relating to Actonel ® brought prior to April 1, 2010, which would include approximately 90 claims relating to ONJ and other alleged injuries that were pending as of March 31, 2010 and not subsequently dismissed. Pursuant to the April 2010 amendment to the collaboration agreement, Warner Chilcott will be fully responsible for any product liability claims in the United States and Puerto Rico relating to Actonel® brought on or after April 1, 2010. Warner Chilcott may be liable for product liability, warranty or similar claims in relation to products acquired from The Procter & Gamble Company ("P&G") in October 2009 in connection with Warner Chilcott's acquisition (the "PGP Acquisition") of P&G's global branded pharmaceutical's business ("PGP"), including ONJ-related claims that were pending as of the closing of the PGP Acquisition. Warner Chilcott's agreement with P&G provides that P&G will indemnify Warner Chilcott, subject to certain limits, for 50% of Warner Chilcott's losses from any such claims, including approximately 88 claims relating to ONJ and other alleged injuries, pending as of October 30, 2009 and not subsequently dismissed.

F-85

**Table of Contents**

**ACTAVIS PLC**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if insurance does not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Qui Tam and Related Litigation*

*Governmental Investigation and False Claims Act Litigation.*   Beginning in February 2012, Warner Chilcott, along with several of its current and former employees in its sales organization and certain third parties, received subpoenas from the United States Attorney for the District of Massachusetts. The subpoena received by Warner Chilcott seeks information and documentation relating to a wide range of matters, including sales and marketing activities, payments to people who are in a position to recommend drugs, medical education, consultancies, prior authorization processes, clinical trials, off-label use and employee training (including with respect to laws and regulations concerning off-label information and physician remuneration), in each case relating to all of Warner Chilcott's current key products. The Company is cooperating in responding to the subpoena but cannot predict or determine the impact of this inquiry on its future financial condition or results of operations.

The Company is aware of two *qui tam* complaints filed by former Warner Chilcott sales representatives and unsealed in February and March 2013 (*United States ex rel. Lisa A. Alexander and James P. Goan. v. Warner Chilcott PLC, et al.*, D. Mass. No. 11-10545 and *United States et al. ex rel. Chris Wible, v. Warner Chilcott PLC, et al.*, D. Mass. No. 11-11143). The unsealed *qui tam* complaints allege that Warner Chilcott violated Federal and state false claims acts through the promotion of all of Warner Chilcott's current key products by, among other things, making improper claims concerning the products, providing kickbacks to physicians and engaging in improper conduct concerning prior authorizations. The complaints seek, among other things, treble damages, civil penalties of up to eleven thousand dollars for each alleged false claim and attorneys' fees and costs. Other similar complaints may exist under seal. The United States of America has elected not to intervene at this time in each of the unsealed  *qui tam* actions, stating at the times of the relevant seal expirations that its investigation of the allegations raised in the relevant complaint was continuing and, as such, it was not able to decide at such time whether to intervene in the action. The United States of America may later seek to intervene, and its election does not prevent the plaintiffs/relators from litigating the actions. The government has, however, successfully moved the court in the  *Alexander and Goan* litigation to stay that proceeding until March 5, 2014. On December 2, 2013, plaintiff in the *Wible* action filed a notice of voluntary dismissal with respect to all of its claims except his for retaliation and claims under CA and IL state law. Warner Chilcott moved to dismiss the remaining cause of action in this Wible complaint on December 20, 2013 and that motion is still pending. Warner Chilcott intends to vigorously defend itself in the litigations. However, these cases are in the early stages of litigation, it is impossible to predict with certainty the outcome of any litigation, and the Company can offer no assurance as to when the lawsuits will be decided, whether Warner Chilcott will be successful in its defense and whether any additional similar suits will be filed. If these claims are successful such claims could adversely affect the Company and could have a material adverse effect on the Company's business, financial condition, results of operation and cash flows.

*Governmental Reimbursement Investigations and Drug Pricing Litigation.*   In November 1999, Schein Pharmaceutical, Inc., now known as Actavis Pharma, Inc. was informed by the U.S. Department of Justice that it, along with numerous other pharmaceutical companies, is a defendant in a  *qui tam* action brought in 1995 under the U.S. False Claims Act currently pending in the U.S. District Court for the Southern District of Florida (the "Florida Qui Tam Action"). The Company has not been served in the *qui tam* action. A *qui tam* action is a civil lawsuit brought by an individual or a company (the "qui tam relator") for an alleged violation of a federal statute, in which the U.S. Department of Justice has the right to intervene and take over the prosecution of the lawsuit at its option. Pursuant to applicable federal law, the *qui tam* action is under seal as to Actavis, Inc. The Company

F-88

EXHIBIT 13

**Companies Act 2014**

---

**A PUBLIC LIMITED COMPANY**

---

**CONSTITUTION**

**of**

**ALLERGAN PUBLIC LIMITED COMPANY**

**MEMORANDUM OF ASSOCIATION**

**(as amended by all resolutions passed up to and including 5 May 2016)**

1 The name of the Company is Allergan public limited company.

2 The Company is a public limited company deemed to be a PLC to which Part 17 of the Companies Act 2014 applies.

3 The objects for which the Company is established are

3.1

    (a) To carry on the business of a pharmaceuticals company, and to research, develop, design, manufacture, produce, supply, buy, sell, distribute, import, export, provide, promote and otherwise deal in pharmaceuticals, active pharmaceutical ingredients and dosage pharmaceuticals and other devices or products of a pharmaceutical or healthcare character and to hold intellectual property rights and to do all things usually dealt in by persons carrying on the above mentioned businesses or any of them or likely to be required in connection with any of the said businesses.

    (b) To carry on the business of a holding company and to co-ordinate the administration, finances and all other activities of any subsidiary companies or associated companies, to do all lawful acts and things whatever that are necessary or convenient in carrying on the business of such a holding company including the incorporation of any one or more subsidiaries and in particular to carry on the business of a management services company, to act as managers and to direct or coordinate the management of other companies or of the business, property and estates of any company or person and to undertake and carry out all such services in connection therewith as may be deemed expedient by the Company's board of directors and to exercise its powers as a shareholder of other companies.

    (c) To acquire the whole of the issued share capital of Warner Chilcott public limited company, a company incorporated under the laws of Ireland (registered number 471506).

3.2 To acquire shares, stocks, debentures, debenture stock, bonds, obligations and securities by original subscription, tender, purchase, exchange or otherwise and to subscribe for the same either conditionally or otherwise, and to guarantee the subscription thereof and to

exercise and enforce all rights and powers conferred by or incidental to the ownership thereof.

3.3     To facilitate and encourage the creation, issue or conversion of and to offer for public subscription debentures, debenture stocks, bonds, obligations, shares, stocks, and securities and to act as trustees in connection with any such securities and to take part in the conversion of business concerns and undertakings into companies.

3.4     To purchase or by any other means acquire any freehold, leasehold or other property and in particular lands, tenements and hereditaments of any tenure, whether subject or not to any charges or incumbrances, for any estate or interest whatever, and any rights, privileges or easements over or in respect of any property, and any buildings, factories, mills, works, wharves, roads, machinery, engines, plant, live and dead stock, barges, vessels or things, and any real or personal property or rights whatsoever which may be necessary for, or may conveniently be used with, or may enhance the value or property of the Company, and to hold or to sell, let, alienate, mortgage, charge or otherwise deal with all or any such freehold, leasehold, or other property, lands, tenements or hereditaments, rights, privileges or easements.

3.5     To establish and contribute to any scheme for the purchase of shares in the Company to be held for the benefit of the Company's employees and to lend or otherwise provide money to such schemes or the Company's employees or the employees of any of its subsidiary or associated companies to enable them to purchase shares of the Company.

3.6     To sell, lease, exchange, grant, convey, transfer or otherwise dispose of any or all of the property, investment or assets of the Company of whatever nature or tenure for such price, consideration, sum or other return whether equal to or less than the market value thereof and whether by way of gift or otherwise as the Directors shall deem fit and to grant any fee, farm grant or lease or to enter into any agreement for letting or hire of any such property or asset for a rent or return equal to or less than the market or rack rent therefor or at no rent and subject to or free from covenants and restrictions as the Directors shall deem appropriate.

3.7     To acquire and undertake the whole or any part of the business, good-will and assets of any person, firm or company carrying on or proposing to carry on any of the businesses which this Company is authorised to carry on, and as part of the consideration for such acquisition to undertake all or any of the liabilities of such person, firm or company, or to acquire an interest in, amalgamate with, or enter into any arrangement for sharing profits, or for co-operation, or for limiting competition or for mutual assistance with any such person, firm or company and to give or accept by way of consideration for any of the acts or things aforesaid or property acquired, any shares, debentures, debenture stock or securities that may be agreed upon, and to hold and retain or sell, mortgage or deal with any shares, debentures, debenture stock or securities so received.

3.8     To apply for, register, purchase, lease, hold, use, control, license or otherwise acquire any patents, brevets d'invention, copyrights, trademarks, licences, concessions and the like conferring any exclusive or non-exclusive or limited rights to use or any secret or other inventing information as to any invention which may seem capable of being used for any of the purposes of the Company or the acquisition of which may seem calculated directly or indirectly to benefit the Company, and to use, exercise, develop or grant licences in respect of or otherwise turn to account the property, rights or information so acquired.

2

3.9    To enter into partnership or into any arrangement for sharing profits, union of interests, co-operation, joint venture, reciprocal concession or otherwise with any person or company carrying on or engaged in or about to carry on or engage in any business or transaction which the Company is authorised to carry on or engage in or any business or transaction capable of being conducted so as directly to benefit this Company.

3.10   To invest and deal with the moneys of the Company not immediately required upon such securities and in such manner as may from time to time be determined.

3.11   To lend money to and guarantee the performance of the contracts or obligations of any company, firm or person, and the repayment of the capital and principal of, and dividends, interest or premiums payable on, any stock, shares and securities of any company, whether having objects similar to those of this Company or not, and to give all kinds of indemnities.

3.12   To engage in currency exchange and interest rate transactions including, but not limited to, dealings in foreign currency, spot and forward rate exchange contracts, futures, options, forward rate agreements, swaps, caps, floors, collars and any other foreign exchange or interest rate hedging arrangements and such other instruments as are similar to, or derived from, any of the foregoing whether for the purpose of making a profit or avoiding a loss or managing a currency or interest rate exposure or any other exposure or for any other purpose.

3.13   To guarantee, support or secure, whether by personal covenant or by mortgaging or charging all or any part of the undertaking, property and assets (both present and future) and uncalled capital of the Company, or by both such methods, the performance of the obligations of, and the repayment or payment of the principal amounts of and premiums, interest and dividends on any securities of, any person, firm or company including (without prejudice to the generality of the foregoing) any company which is for the time being the Company's holding company as defined in the Companies Act 2014 or a subsidiary as therein defined of any such holding company or otherwise associated with the Company in business.

3.14   To borrow or secure the payment of money in such manner as the Company shall think fit, and in particular by the provision of a guarantee or by the issue of debentures, debenture stocks, bonds, obligations and securities of all kinds, either perpetual or terminable and either redeemable or otherwise and to secure the repayment of any money borrowed, raised or owing by trust deed, mortgage, charge, or lien upon the whole or any part of the Company's property or assets (whether present or future) including its uncalled capital, and also by a similar trust deed, mortgage, charge or lien to secure and guarantee the performance by the Company of any obligation or liability it may undertake.

3.15   To draw, make, accept, endorse, discount, execute, negotiate and issue promissory notes, bills of exchange, bills of lading, warrants, debentures and other negotiable or transferable instruments.

3.16   To subscribe for, take, purchase or otherwise acquire and hold shares or other interests in, or securities of any other company having objects altogether or in part similar to those of this Company, or carrying on any business capable of being conducted so as directly or indirectly to benefit this Company.

3

3.17    To hold in trust as trustees or as nominees and to deal with, manage and turn to account, any real or personal property of any kind, and in particular shares, stocks, debentures, securities, policies, book debts, claims and choses in actions, lands, buildings, hereditaments, business concerns and undertakings, mortgages, charges, annuities, patents, licences, and any interest in real or personal property, and any claims against such property or against any person or company.

3.18    To constitute any trusts with a view to the issue of preferred and, deferred or other special stocks 'or securities based on or representing any shares, stocks and other assets specifically appropriated for the purpose of any such trust and to settle and regulate and if thought fit to undertake and execute any such trusts and to issue dispose of or hold any such preferred, deferred or other special stocks or securities.,

3.19    To give any guarantee in relation to the payment of any debentures, debenture stock, bonds, obligations or securities and to guarantee the payment of interest thereon or of dividends on any stocks or shares of any company.

3.20    To construct, erect and maintain buildings, houses, flats, shops and all other works, erections, and things of any description whatsoever either upon the lands acquired by the Company or upon other lands and to hold, retain as investments or to sell, let, alienate, mortgage, charge or deal with all or any of the same and generally to alter, develop and improve the lands and other property of the Company.

3.21    To provide for the welfare of persons in the employment of or holding office under or formerly in the employment of or holding office under the Company including Directors and ex-Directors of the Company or any of its subsidiary or associated companies and the wives, widows and families, dependants or connections of such persons by grants of money, pensions or other payments and by forming and contributing to pension, provident or benefit funds or profit sharing or co-partnership schemes for the benefit of such persons and to form, subscribe to or otherwise aid charitable, benevolent, religious, scientific, national or other institutions, exhibitions or objects which shall have any moral or other claims to support or aid by the Company by reason of the locality of its operation or otherwise.

3.22    To remunerate by cash payments or allotment of shares or securities of the Company credited as fully paid up or otherwise any person or company for services rendered or to be rendered to the Company whether in the conduct or management of its business, or in placing or assisting to place or guaranteeing the placing of any of the shares of the Company's capital, or any debentures or other securities of the Company or in or about the formation or promotion of the Company.

3.23    To enter into and carry into effect any arrangement for joint working in business or for sharing of profits or for amalgamation with any other company or association or any partnership or person carrying on any business within the objects of the Company.

3.24    To distribute in specie or otherwise as may be resolved, any assets of the Company among its members and in particular the shares, debentures or other securities of any other company belonging to this Company or of which this Company may have the power of disposing.

4

3.25    To vest any real or personal property, rights or interest acquired or belonging to the Company in any person or company on behalf of or for the benefit of the Company, and with or without any declared trust in favour of the Company.

3.26    To transact or carry on any business which may seem to be capable of being conveniently carried on in connection with any of these objects or calculated directly or indirectly to enhance the value of or facilitate the realisation of or render profitable any of the Company's property or rights.

3.27    To accept stock or shares in or debentures, mortgages or securities of any other company in payment or part payment for any services rendered or for any sale made to or debt owing from any such company, whether such shares shall be wholly or partly paid up.

3.28    To pay all costs, charges and expenses incurred or sustained in or about the promotion and establishment of the Company or which the Company shall consider to be preliminary thereto and to issue shares as fully or in part paid up, and to pay out of the funds of the Company all brokerage and charges incidental thereto.

3.29    To procure the Company to be registered or recognised in any foreign country or in any colony or dependency of any such foreign country or that the central management and control of the Company be located in any country.

3.30    To do all or any of the matters hereby authorised in any part of the world or in conjunction with or as trustee or agent for any other company or person or by or through any factors, trustees or agents.

3.31    To make gifts or grant bonuses to the Directors or any other persons who are or have been in the employment of the Company including substitute and alternate directors.

3.32    To do all such other things that the Company may consider incidental or conducive to the attainment of the above objects or as are capable of being conveniently carried on in connection therewith.

3.33    To carry on any business which the Company may lawfully engage in and to do all such things incidental or conducive to the business of the Company.

3.34    To make or receive gifts by way of capital contribution or otherwise.

3.35    To the extent permitted by law, to give whether directly or indirectly, any kind of financial assistance for the purchase of shares in or debentures of the Company or any corporation which is at any given time the Company's holding company.

The objects set forth in any sub-clause of this clause shall be regarded as independent objects and shall not, except, where the context expressly so requires, be in any way limited or restricted by reference to or inference from the terms of any other sub-clause, or by the name of the Company. None of such sub-clauses or the objects therein specified or the powers thereby conferred shall be deemed subsidiary or auxiliary merely to the objects mentioned in the first sub-clause of this clause, but the Company shall have full power to exercise all or any of the powers conferred by any part of this clause in any part of the world notwithstanding that the business, property or acts proposed to be transacted, acquired or performed do not fall within the objects of the first sub-clause of this clause.

5

NOTE:    It is hereby declared that the word "company" in this clause, except where used in reference to this Company shall be deemed to include any partnership or other body of persons whether incorporated or not incorporated and whether domiciled in Ireland or elsewhere and the intention is that the objects specified in each paragraph of this clause shall except where otherwise expressed in such paragraph be in no way limited or restricted by reference to or inference from the terms of any other paragraph.

4      The liability of the members is limited.

5      The share capital of the Company is €40,000 and US$101,000 divided into 40,000 deferred ordinary shares of €1.00 each, 1,000,000,000 ordinary shares of US$0.0001 each and 10,000,000 serial preferred shares of US$0.0001 each.

6      The shares forming the capital, increased or reduced, may be increased or reduced and be divided into such classes and issued with any special rights, privileges and conditions or with such qualifications as regards preference, dividend, capital, voting or other special incidents, and be held upon such terms as may be attached thereto or as may from time to time be provided by the original or any substituted or amended articles of association and regulations of the Company for the time being, but so that where shares are issued with any preferential or special rights attached thereto such rights shall not be alterable otherwise than pursuant to the provisions of the Company's articles of association for the time being.

28805560.1

**Companies Act 2014**

_____

**A PUBLIC LIMITED COMPANY**

_____

**ARTICLES OF ASSOCIATION**

**of**

**ALLERGAN PUBLIC LIMITED COMPANY**

**(as amended by Special Resolution passed on 5 May 2016)**

## Preliminary

1    The provisions set out in these articles shall constitute the whole of the regulations applicable to the Company and no other "optional provisions" as defined by section 1007(2) of the Act (with the exception of sections 83 and 84 of the Companies Act) shall apply to the Company.

2

2.1    In these articles:

| | |
|---|---|
| "Act" | means the Companies Act 2014 and every statutory modification and re-enactment thereof for the time being in force. |
| "Actavis Certificates" | has the meaning set out in article 157. |
| "Actavis Exchange Fund" | has the meaning set out in article 157. |
| "Actavis Share(s)" | means the common share(s) of Actavis, Inc., par value US$0.0033. |
| "Acts" | means the Act and all statutory instruments which are to be read as one with, or construed or read together as one with, the Act. |
| "Actual Board Size" | has the meaning set out in Article 95. |
| "address" | includes any number or address used for the purposes of communication, including by way of electronic mail or other |

7

electronic communication.

| | |
|---|---|
| **"Adoption Date"** | has the meaning set out in article 3.3. |
| **"Applicable Escheatment Laws"** | has the meaning set out in article 169.2. |
| **"Approved Nominee"** | means a person holding shares or rights or interests in shares in the Company on a nominee basis who has been determined by the Company to be an "Approved Nominee". |
| **"Assistant Secretary"** | means any person appointed by the Secretary or the Board from time to time to assist the Secretary. |
| **"Auditor" or "Auditors"** | means the statutory auditor or statutory auditors at any given time of the Company. |
| **"Clear Days"** | in relation to the period of notice to be given under these articles, that period excluding the day when the notice is given or deemed to be given and the day of the event for which it is given or on which it is to take effect. |
| **"Company Shares"** | has the meaning set out in article 157. |
| **"Company Subscriber Shares"** | has the meaning set out in article 157. |
| **"Covered Person"** | has the meaning set out in article 168.3. |
| **"Disclosure Notice"** | means a notice given to a person in accordance with section 1062 of the Act. |
| **"electronic communication"** | has the meaning given to those words in the Electronic Commerce Act 2000. |
| **"electronic signature"** | has the meaning given to those words in the Electronic Commerce Act 2000. |
| **"Euro Deferred Shares" or "deferred ordinary shares"** | means euro deferred shares of nominal value €1.00 per share (or such other nominal value as may result from any reorganisation of capital) in the capital of the Company, having the rights and being subject to the limitations set out in these articles. |
| **"Exchange Act"** | means the United States Securities Exchange Act of 1934, as amended from time to time. |
| **"Exchange Agent"** | has the meaning set out in article 157. |
| **"IAS Regulation"** | means Regulation (EC) No. 1606/2002 of the European Parliament and of the Council of 19 July 2002 on the |

8

application of international accounting standards.

| | |
|---|---|
| **"Member Associated Person"** | of any member means (A) any person controlling, directly or indirectly, or acting as a "group" (as such term is used in Rule 13d-5(b) under the Exchange Act) with, such member, (B) any beneficial owner of shares of the Company owned of record or beneficially by such member and (C) any person controlling, controlled by or under common control with such Member Associated Person. |
| **"Merger"** | means the merger of MergerSub with and into Actavis, Inc., with Actavis, Inc. surviving the merger as a wholly owned subsidiary of the Company. |
| **"Merger Consideration"** | has the meaning set out in article 157. |
| **"Merger Effective Time"** | has the meaning set out in article 157. |
| **"MergerSub"** | means Actavis W.C. Holding 2 LLC, a company organized in Nevada. |
| **"Ordinary Resolution"** | means an ordinary resolution of the Company's members within the meaning of section 191 of the Act. |
| **"Ordinary Shares" or "ordinary shares"** | means ordinary shares of nominal value US$0.0001 per share (or such other nominal value as may result from any reorganisation of capital) in the capital of the Company, having the rights and being subject to the limitations set out in these articles. |
| **"Redeemable Shares"** | means redeemable shares as defined by section 64 of the Act. |
| **"Register"** | means the register of members to be kept as required in accordance with section 216 of the Act. |
| **"Share"** | "Share" and "share" mean, unless specified otherwise or the context otherwise requires, any share in the capital of the Company. |
| **"Shareholder" or "the Holder"** | means in relation to any share, the person whose name is entered in the Register as the holder of the share or, where the context permits, the persons whose names are entered in the Register as the joint holders of shares. |
| **"Special Resolution"** | means a special resolution of the Company's members within the meaning of section 191 of the Act. |
| **"the Company"** | means the company whose name appears in the heading to these articles. |

| | |
|---|---|
| "the Directors" or "the Board" | means the directors from time to time and for the time being of the Company or the directors present at a meeting of the board of directors and includes any person occupying the position of director by whatever name called. |
| "the Office" | means the registered office from time to time and for the time being of the Company. |
| "the seal" | means the common seal of the Company and includes any duplicate seal. |
| "the Secretary" | means any person appointed to perform the duties of the secretary of the Company. |
| "these articles" | means the articles of association of which this article forms part, as the same may be amended from time to time and for the time being in force. |
| "US Holdco" | means Actavis W.C. Holding LLC, a limited liability company organized in Nevada. |

2.2    Expressions in these articles referring to writing shall be construed, unless the contrary intention appears, as including references to printing, lithography, photography and any other modes of representing or reproducing words in a visible form except as provided in these articles and / or where it constitutes writing in electronic form sent to the Company, and the Company has agreed to its receipt in such form. Expressions in these articles referring to execution of any document shall include any mode of execution whether under seal or under hand or any mode of electronic signature as shall be approved by the Directors.  Expressions in these articles referring to receipt or issuance of any electronic communications shall, be limited to receipt  or issuance in such manner as the Company has approved or as set out  in these articles. ,Notwithstanding the foregoing, all written communication by the Company and the Directors may for the purposes of these articles, to the extent permitted by law, be in electronic form.

2.3    Unless the contrary intention appears, words or expressions contained in these articles shall bear the same meaning as in the Acts or in any statutory modification thereof in force at the date at which these articles become binding on the Company.

2.4    References herein to any enactment shall mean such enactment as the same may be amended and may be from time to time and for the time being in force.

2.5    The masculine gender shall include the feminine and neuter, and vice versa, and the singular number shall include the plural, and vice versa, and words importing persons shall include firms or companies.

2.6    Reference to US$, USD, or dollars shall mean the currency of the United States of America and to €, euro, EUR or cent shall mean the currency of Ireland.

## Share capital and variation of rights

3

3.1     The share capital of the Company is €40,000 and US$101,000 divided into 40,000 deferred ordinary shares of €1.00 each, 1,000,000,000 ordinary shares of US$0.0001 each and 10,000,000 serial preferred shares of US$0.0001 each.

3.2     The rights and restrictions attaching to the ordinary shares shall be as follows:

(a)     subject to the right of the Company to set record dates for the purposes of determining the identity of members entitled to notice of and / or to vote at a general meeting, the right to attend and speak at any general meeting of the Company and to exercise one vote per ordinary share held at any general meeting of the Company;

(b)     the right to participate pro rata in all dividends declared by the Company; and

(c)     the right, in the event of the Company's winding up, to participate pro rata in the total assets of the Company.

The rights attaching to the ordinary shares may be subject to the terms of issue of any series or class of preferred shares allotted by the Directors from time to time in accordance with article 3.4.

3.3     The rights and restrictions attaching to the Euro Deferred Shares shall be as follows:

(a)     The Holders of the Euro Deferred Shares shall not be entitled to receive any dividend or distribution and shall not be entitled to receive notice of, nor to attend, speak or vote at any meeting of some or all of the Shareholders of the Company. On a return of assets, whether on liquidation or otherwise, the Euro Deferred Shares shall entitle the Holder thereof only to the repayment of the amounts paid up on such shares after repayment of the capital paid up on the ordinary shares plus the payment of $5,000,000 on each of the ordinary shares and the Holders of the Euro Deferred Shares (as such) shall not be entitled to any further participation in the assets or profits of the Company.

(b)     The special resolution passed on the date of adoption of these articles (the "**Adoption Date**") shall be deemed to confer irrevocable authority on the Company at any time after the Adoption Date:

(i)     to acquire all or any of the fully paid Euro Deferred Shares otherwise than for valuable consideration in accordance with section 102(1)(a) of the Act and without obtaining the sanction of the Holders thereof;

(ii)     to appoint any person to execute on behalf of the Holders of the Euro Deferred Shares remaining in issue (if any) a transfer thereof and/or an agreement to transfer the same otherwise than for valuable consideration to the Company or to such other person as the Company may nominate;

(iii)     to cancel any acquired Euro Deferred Shares; and

11

(iv) pending such acquisition and/or transfer and/or cancellation to retain the certificate (if any) for such Euro Deferred Shares.

(c) The Company shall, not later than three years after any acquisition by it of any Euro Deferred Shares as aforesaid, cancel such Shares (except those which, or any interest of the Company in which, it shall have previously disposed of) and reduce the amount of the issued share capital by the nominal value of the shares so cancelled and the Directors may take such steps as are requisite to enable the Company to carry out its obligations in this respect.

(d) Neither the acquisition by the Company otherwise than for valuable consideration of all or any of the Euro Deferred Shares nor the redemption thereof nor the cancellation thereof by the Company in accordance with this article shall constitute a variation or abrogation of the rights or privileges attached to the Euro Deferred Shares, and accordingly the Euro Deferred Shares or any of them may be so acquired, redeemed and cancelled without any such consent or sanction on the part of the Holders thereof. The rights conferred upon the Holders of the Euro Deferred Shares shall not be deemed to be varied or abrogated by the creation of further shares ranking in priority thereto or pari passu therewith.

3.4 The Board is authorised to issue all or any of the authorised but unissued preferred shares from time to time in one or more classes or series, and to fix for each such class or series such voting power, full or limited, or no voting power, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board providing for the issuance of such class or series, including, without limitation, the authority to provide that any such class or series may be:

(a) redeemable at the option of the Company, or the Holders, or both, with the manner of the redemption to be set by the Board, and redeemable at such time or times, including upon a fixed date, and at such price or prices;

(b) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes of shares or any other series;

(c) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Company;

(d) convertible into, or exchangeable for, shares of any other class or classes of shares, or of any other series of the same or any other class or classes of shares, of the Company at such price or prices or at such rates of exchange and with such adjustments as the Directors determine; or

(e) entitled to the right, voting separately as a class or with other Holders, to elect or appoint Directors generally or in certain circumstances,

12

which rights and restrictions may be as stated in such resolution or resolutions of the Directors as determined by them in accordance with this article.  The Board may at any time before the allotment of any preferred share by further resolution in any way amend the designations, preferences, rights, qualifications, limitations or restrictions, or vary or revoke the designations of such preferred shares.

3.5     Unless the Board specifically elects to treat such acquisition as a purchase for the purposes of the Acts, an ordinary share shall be deemed to be a Redeemable Share on, and from the time of, the existence or creation of an agreement, transaction or trade between the Company and any third party pursuant to which the Company acquires or will acquire ordinary shares, or an interest in ordinary shares, from such third party.  In these circumstances, the acquisition of such shares or interest in shares by the Company shall constitute the redemption of a Redeemable Share in accordance with the Act.

4       Subject to and in accordance with the provisions of the Act and the other provisions of this article, the Company may:

4.1     pursuant to section 66 of the Act, issue any shares of the Company which are to be redeemed or are liable to be redeemed at the option of the Company or the member on such terms and in such manner as may be determined by the Company in a general meeting (by Special Resolution) on the recommendation of the Directors;

4.2     without prejudice to any relevant special rights attached to any class of shares, purchase any of its own shares of any class (including any Redeemable Shares and without any obligation to purchase on any pro rata basis as between members or members of the same class) at any price and may cancel any shares so purchased or hold them as treasury shares (as defined in section 106 of the Act) and may reissue any such shares as shares of any class or classes; or

4.3     pursuant to section 83(3) of the Act, convert any of its shares into Redeemable Shares.

5       Without prejudice to any special rights previously conferred on the Holders of any existing shares or class of shares, any share in the Company may be issued with such preferred or deferred or other special rights or such restrictions, whether in regard to dividend, voting, return of capital or otherwise, as the Company may from time to time by Ordinary Resolution determine.

6

6.1     Without prejudice to the authority conferred on the Directors pursuant to article 3 to issue preferred shares in the capital of the Company, if at any time the share capital is divided into different classes of shares the rights attached to any class may, whether or not the Company is being wound up, be varied or abrogated with the consent in writing of the Holders of three-fourths of the issued shares in that class, or with the sanction of a Special Resolution passed at a separate general meeting of the Holders of the shares of that class, provided that, if the relevant class of Holders has only one Holder, that person present in person or by proxy, shall constitute the necessary quorum. To every such meeting the provisions of article 52 shall apply.

6.2     The redemption or purchase of preferred shares or any class of preferred shares shall not constitute a variation of rights of the preferred Holders where the redemption or

13

purchase of the preferred shares has been authorised solely by a resolution of the ordinary Holders.

6.3     The issue, redemption or purchase of any of the 10,000,000 serial preferred shares of US$0.0001 each shall not constitute a variation of the rights of the Holders of ordinary shares.

6.4     The issue of preferred shares or any class of preferred shares which rank junior to any existing preferred shares or class of preferred shares shall not constitute a variation of the existing preferred shares or class of preferred shares.

7     The rights conferred upon the Holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

8

8.1     Subject to the provisions of these articles relating to new shares, the unissued shares of the Company shall be at the disposal of the Directors, and they may (subject to the provisions of the Acts) allot, grant options over or otherwise dispose of them to such persons, on such terms and conditions and at such times as they may consider to be in the best interests of the Company and its members, but so that no share shall be issued at a discount save in accordance with the Act, and so that, in the case of shares offered to the public for subscription, the amount payable on application on each share shall not be less than one-quarter of the nominal amount of the share and the whole of any premium thereon.

8.2     Subject to any requirement to obtain the approval of members under any laws, regulations or the rules of any stock exchange to which the Company is subject, the Board is authorised, from time to time, in its discretion, to grant such persons, for such periods and upon such terms as the Board deems advisable, options to purchase or subscribe for such number of shares of any class or classes or of any series of any class as the Board may deem advisable, and to cause warrants or other appropriate instruments evidencing such options to be issued.

8.3     The Directors are, for the purposes of the Act, generally and unconditionally authorised to exercise all powers of the Company to allot and issue relevant securities (as defined by section 1021 of the Act) up to the amount of Company's authorised share capital and to allot and issue any shares purchased by the Company pursuant to the provisions of the Act and held as treasury shares and this authority shall expire five years from 1 October 2013.

8.4     The Directors are hereby empowered pursuant to section 1023 of the Act to allot equity securities within the meaning of the said section 1023 for cash pursuant to the authority conferred by article 8.3 as if section 1022(1) of the Act did not apply to any such allotment.  The Company may before the expiry of such authority make an offer or agreement which would or might require equity securities to be allotted after such expiry and the Directors may allot equity securities in pursuance of such an offer or agreement as if the power conferred by this article had not expired.

14

8.5     Nothing in these articles shall preclude the Directors from recognising a renunciation of the allotment of any shares by any allottee in favour of some other person.

9     The Company may pay commission to any person in consideration of a person subscribing or agreeing to subscribe, whether absolutely or conditionally, for any shares in the Company or procuring or agreeing to procure subscriptions, whether absolute or conditional, for any shares in the Company on such terms and subject to such conditions as the Directors may determine, including, without limitation, by paying cash or allotting and issuing fully or partly paid shares or any combination of the two. The Company may also, on any issue of shares, pay such brokerage as may be lawful.

10     Except as required by law, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any share or any interest in any fractional part of a share or (except only as by these articles or by law otherwise provided) any other rights in respect of any share except an absolute right to the entirety thereof in the Holder. This shall not preclude the Company from requiring the members or a transferee of shares to furnish the Company with information as to the beneficial ownership of any share when such information is reasonably required by the Company.

11     The shares of the Company may be either represented by certificates or, if the conditions of issue of the relevant shares so provide, by uncertificated shares. Except as required by law, the rights and obligations of the Holders of uncertificated shares and the rights and obligations of the Holders of shares represented by certificates of the same class shall be identical.

12     Any person claiming a share certificate to have been lost, destroyed or stolen, shall make an affidavit or affirmation of that fact, and if required by the Board shall advertise the same in such manner as the Board may require, and shall give the Company, its transfer agents and its registrars a bond of indemnity, in form and with one or more sureties satisfactory to the Board or anyone designated by the Board with authority to act thereon, whereupon a new certificate may be executed and delivered of the same tenor and for the same number of shares as the one alleged to have been lost, destroyed or stolen.

**Disclosure of beneficial ownership**

13

13.1     If at any time the Directors are satisfied that any member, or any other person appearing to be interested in shares held by such member: (x) has been duly served with a Disclosure Notice and is in default for the prescribed period (as defined in article 13.6(b)) in supplying to the Company the information thereby required; or (y) in purported compliance with such a notice, has made a statement which is false or inadequate in a material particular, then the Directors may, in their absolute discretion at any time thereafter by notice (a "**direction notice**") to such member direct that:

(a)     in respect of the shares in relation to which the default occurred (the "**default shares**") the member shall not be entitled to attend or to vote at a general meeting either personally or by proxy or to exercise any other right conferred by membership in relation to meetings of the Company; and

28805560.1

(b)     where the nominal value of the default shares represents at least 0.25 per cent. of the nominal value of the issued shares of the class concerned, then the direction notice may additionally direct that:

> (i)     except in a liquidation of the Company, no payment shall be made of any sums due from the Company on the default shares, whether in respect of capital or dividend or otherwise, and the Company shall not have any liability to pay interest on any such payment when it is finally paid to the member;
>
> (ii)    no other distribution shall be made on the default shares; and / or
>
> (iii)   no transfer of any of the default shares held by such member shall be registered unless:
>
> > (1)     the member is not himself in default as regards supplying the information requested and the transfer when presented for registration is accompanied by a certificate by the member in such form as the Directors may in their absolute discretion require to the effect that after due and careful enquiry the member is satisfied that no person in default as regards supplying such information is interested in any of the shares the subject of the transfer; or
> >
> > (2)     the transfer is an approved transfer (as defined in article 13.6(c)),

the Company shall send to each other person appearing to be interested in the shares the subject of any direction notice a copy of the notice, but the failure or omission by the Company to do so shall not invalidate such notice.

13.2    Where any person appearing to be interested in the default shares has been duly served with a direction notice or copy thereof and the default shares which are the subject of such direction notice are held by an Approved Nominee, the provisions of this article shall be treated as applying only to such default shares held by the Approved Nominee and not (insofar as such person's apparent interest is concerned) to any other shares held by the Approved Nominee.

13.3    Where the member upon whom a Disclosure Notice is served is an Approved Nominee acting in its capacity as such, the obligations of the Approved Nominee as a member of the Company shall be limited to disclosing to the Company such information as has been recorded by it relating to any person appearing to be interested in the shares held by it.

13.4    Any direction notice shall cease to have effect:

(a)     in relation to any shares which are transferred by such member by means of an approved transfer; or

16

(b)    when the Directors are satisfied that such member, and any other person appearing to be interested in shares held by such member, has given to the Company the information required by the relevant Disclosure Notice.

13.5    The Directors may at any time give notice cancelling a direction notice.

13.6    For the purposes of this article:

(a)    a person shall be treated as appearing to be interested in any shares if the member holding such shares has given to the Company a response to a Disclosure Notice which either (a) names such person as being so interested or (b) fails to establish the identities of all those interested in the shares and (after taking into account the said response and any other relevant information provided pursuant to a Disclosure Notice) the Company knows or has reasonable cause to believe that the person in question is or may be interested in the shares;

(b)    the prescribed period is 28 days from the date of service of the said Disclosure Notice unless the nominal value of the default shares represents at least 0.25 per cent of the nominal value of the issued shares of that class, when the prescribed period is 14 days from that date;

(c)    a transfer of shares is an approved transfer if but only if:

(i)    it is a transfer of shares to an offeror by way or in pursuance of acceptance of an offer made to all the Holders (or all the Holders other than the person making the offer and his nominees) of the shares in the Company to acquire those shares or a specified proportion of them; or

(ii)    the Directors are satisfied that the transfer is made pursuant to a sale of the whole of the beneficial ownership of the shares the subject of the transfer to a party unconnected with the member and with other persons appearing to be interested in such shares; or

(iii)    the transfer results from a sale made through a stock exchange on which the Company's shares are normally traded.

13.7    Nothing contained in this article shall limit the power of the Company under section 1066 of the Act.

13.8    For the purpose of establishing whether or not the terms of any notice served under this article shall have been complied with the decision of the Directors in this regard shall be final and conclusive and shall bind all persons interested.

## Lien

14    The Company shall have a first and paramount lien on every share (not being a fully paid share) for all moneys (whether immediately payable or not) called or payable at a fixed

17

28805560.1

time or in accordance with the terms of issue of such share in respect of such share. The Directors may at any time declare any share to be wholly or in part exempt from the provisions of this article. The Company's lien on a share shall extend to all dividends payable thereon.

15      The Company may sell, in such manner as the Directors think fit, any shares on which the Company has a lien, but no sale shall be made unless a sum in respect of which the lien exists is immediately payable, nor until the expiration of 14 days after a notice in writing, stating and demanding payment of such part of the amount in respect of which the lien exists as is immediately payable, has been given to the Holder for the time being of the share or the person entitled thereto by reason of his death or bankruptcy.

16      To give effect to any such sale, the Directors may authorise some person to transfer the shares sold to the purchaser thereof. The purchaser shall be registered as the Holder of the shares comprised in any such transfer, and he shall not be bound to see to the application of the purchase money nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings in reference to the sale. Where a share, which is to be sold as provided for in article 26, is held in uncertificated form, the Directors may authorise some person to do all that is necessary under the Companies Act 1990 (Uncertificated Securities) Regulations 1996 (S.I. No. 68 of 1996) and / or under any regulations made under section 1086 of the Act to change such share into certificated form prior to its sale.

17      The proceeds of the sale shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is immediately payable, and the residue, if any, shall (subject to a like lien for sums not immediately payable as existed upon the shares before the sale) be paid to the person entitled to the shares at the date of the sale.

18      Whenever any law for the time being of any country, state or place imposes or purports to impose any immediate or future or possible liability upon the Company to make any payment or empowers any government or taxing authority or government official to require the Company to make any payment in respect of any shares registered in the Register as held either jointly or solely by any Holder or in respect of any dividends, bonuses or other moneys due or payable or accruing due or which may become due or payable to such Holder by the Company on or in respect of any shares registered as aforesaid or for or on account or in respect of any Holder and whether in consequence of:

(a)      the death of such Holder;

(b)      the non-payment of any income tax or other tax by such Holder;

(c)      the non-payment of any estate, probate, succession, death, stamp, or other duty by the executor or administrator of such Holder or by or out of his estate; or

(d)      any other act or thing,

in every such case (except to the extent that the rights conferred upon Holders of any class of shares render the Company liable to make additional payments in respect of sums withheld on account of the foregoing):

(A)      the Company shall be fully indemnified by such Holder or his executor or administrator from all liability;

(B)      the Company shall have a lien upon all dividends and other moneys payable in respect of the shares registered in the Register as held either jointly or solely by such Holder for all moneys paid or payable by the Company in respect of such shares or in respect of any dividends or other moneys as aforesaid thereon or for or on account or in respect of such Holder under or in consequence of any such law together with interest at the rate of fifteen percent per annum thereon from the date of payment to date of repayment and may deduct or set off against such dividends or other moneys payable as aforesaid any moneys paid or payable by the Company as aforesaid together with interest as aforesaid;

(C)      the Company may recover as a debt due from such Holder or his executor or administrator wherever constituted any moneys paid by the Company under or in consequence of any such law and interest thereon at the rate and for the period aforesaid in excess of any dividends or other moneys as aforesaid then due or payable by the Company;

(D)      the Company may, if any such money is paid or payable by it under any such law as aforesaid, refuse to register a transfer of any shares by any such Holder or his executor or administrator until such money and interest as aforesaid is set off or deducted as aforesaid, or in case the same exceeds the amount of any such dividends or other moneys as aforesaid then due or payable by the Company, until such excess is paid to the Company; and

(E)      subject to the rights conferred upon the Holders of any class of shares, nothing herein contained shall prejudice or affect any right or remedy which any law may confer or purport to confer on the Company and as between the Company and every such Holder as aforesaid, his estate representative, executor, administrator and estate wheresoever constituted or situate, any right or remedy which such law shall confer or purport to confer on the Company shall be enforceable by the Company.

### Calls on shares

19      The Directors may from time to time make calls upon the members in respect of any moneys unpaid on their shares (whether on account of the nominal value of the shares or by way of premium) and not by the conditions of allotment thereof made payable at fixed times or in accordance with such terms of allotment, and each member shall (subject to receiving at least 14 days notice specifying the time or times and place of payment) pay to the Company at the time or times and place so specified the amount called on his shares. A call may be revoked or postponed as the Directors may determine.

20      A call shall be deemed to have been made at the time when the resolution of the Directors authorising the call was passed and may be required to be paid by instalments.

21      The joint Holders of a share shall be jointly and severally liable to pay all calls in respect thereof.

28805560.1

22      If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest on the sum from the day appointed for payment thereof to the time of actual payment at such rate as the Directors may determine, but the Directors shall be at liberty to waive payment of such interest wholly or in part.

23      Any sum which by the terms of issue of a share becomes payable on allotment or at any fixed date, whether on account of the nominal value of the share or by way of premium, shall for the purpose of these articles be deemed to be a call duly made and payable on the date on which, by the terms of issue, the same becomes payable, and in case of non-payment all the relevant provisions of these articles as to payment of interest and expenses, forfeiture or otherwise, shall apply as if such sum had become payable by virtue of a call duly made and notified.

24      The Directors may, on the issue of shares, differentiate between the Holders as to the amount of calls to be paid and the time of payment.

25      The Directors may, if they think fit, receive from any member willing to advance the same all or any part of the moneys uncalled and unpaid upon any shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become payable) pay interest at such rate not exceeding (unless the Company in general meeting otherwise directs) fifteen per cent per annum, as may be agreed upon between the Directors and the member paying such sum in advance.

**Transfer of Shares**

26

26.1    Subject to compliance with the Acts and to any applicable restrictions contained in these articles, applicable law, including U.S. securities laws, and any agreement binding on such Holder as to which the Company is aware, any Holder may transfer all or any of its shares by an instrument of transfer in the usual common form or in any other form or by any other method permissible under applicable law, as may be approved by the Directors. The instrument of transfer of any share may be executed for and on behalf of the transferor by the Secretary, Assistant Secretary or any duly authorised delegate or attorney of the Secretary or Assistant Secretary (whether an individual, a corporation or other body of persons, whether corporate or not, and whether in respect of specific transfers or pursuant to a general standing authorisation) and the Secretary or Assistant Secretary or a relevant authorised delegate shall be deemed to have been irrevocably appointed agent for the transferor of such share or shares with full power to execute, complete and deliver in the name of and on behalf of the transferor of such share or shares all such transfers of shares held by the members in the share capital of the Company. Any document which records the name of the transferor, the name of the transferee, the class and number of shares agreed to be transferred and the date of the agreement to transfer shares, shall, once executed by the transferor or the Secretary or Assistant Secretary or relevant authorised delegate as agent for the transferor, be deemed to be a proper instrument of transfer for the purposes of section 94 of the Act. The transferor shall be deemed to remain the Holder of the share until the name of the transferee is entered on the Register in respect thereof, and neither the title of the transferee nor the title of the transferor shall be affected by any irregularity or invalidity in the proceedings in reference to the sale should the Directors so determine.

28805560.1

26.2    The Company, at its absolute discretion, may, or may procure that a subsidiary of the Company shall, pay Irish stamp duty arising on a transfer of shares on behalf of the transferee of such shares of the Company. If stamp duty resulting from the transfer of shares in the Company which would otherwise be payable by the transferee is paid by the Company or any subsidiary of the Company on behalf of the transferee, then in those circumstances, the Company shall, on its behalf or on behalf of its subsidiary (as the case may be), be entitled to (i) seek reimbursement of the stamp duty from either the transferee or, at the Company's sole discretion, the transferor; (ii) set-off the stamp duty against any dividends payable to the transferee of those shares; and (iii) claim a first and permanent lien on the shares on which stamp duty has been paid by the Company or its subsidiary for the amount of stamp duty paid. The Company's lien shall extend to all dividends paid on those shares.

26.3    Notwithstanding the provisions of these articles and subject to any regulations made under section 239 of the Companies Act 1990 or section 1086 of the Act, title to any shares in the Company may also be evidenced and transferred without a written instrument in accordance with regulations made under section 239 of the Companies Act 1990 or under section 1086 of the Act.  The Directors shall have power to permit any class of shares to be held in uncertificated form and to implement any arrangements they think fit for such evidencing and transfer which accord with such regulations and in particular shall, where appropriate, be entitled to disapply or modify all or part of the provisions in these articles with respect to the requirement for written instruments of transfer and share certificates (if any), in order to give effect to such regulations.

27    Subject to such of the restrictions of these articles and to such of the conditions of issue of any share warrants as may be applicable, any share warrant may be transferred by instrument in writing in any usual or common form or any other form which the Directors may approve.

28    The Directors in their absolute discretion and without assigning any reason therefor may decline to register any transfer of a share which is not fully paid. The Directors may also decline to recognise any instrument of transfer unless:

28.1    the instrument of transfer is duly stamped (if required by law) and lodged with the Company, at such place as the Directors shall appoint for the purpose, accompanied by the certificate for the shares (if any has been issued) to which it relates, and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer;

28.2    the instrument of transfer is in respect of only one class of share; and

28.3    they are satisfied that all applicable consents, authorisations, permissions or approvals required to be obtained pursuant to any applicable law or agreement prior to such transfer have been obtained or that no such consents, authorisations, permissions or approvals are required.

29    If the Directors refuse to register a transfer they shall, within two months after the date on which the transfer was lodged with the Company, send to the transferee notice of the refusal.

30      In order that the Directors may determine the members entitled to receive payment of any dividend or other distribution or allotment of any rights or the members entitled to exercise any rights in respect of any change, conversion or exchange of shares, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted. If no record date is fixed, the record date for determining members for such purpose shall be at the close of business on the day on which the Directors adopt the resolution relating thereto.

31      Registration of transfers may be suspended at such times and for such period, not exceeding in the whole 30 days in each year, as the Directors may from time to time determine subject to the requirements of section 174 of the Act.

32      All instruments of transfer shall upon their being lodged with the Company remain the property of the Company and the Company shall be entitled to retain them.

### Transmission of Shares

33      In the case of the death of a member, the survivor or survivors, where the deceased was a joint Holder, and the personal representatives of the deceased where he was a sole Holder, shall be the only persons recognised by the Company as having any title to his interest in the shares; but nothing herein contained shall release the estate of a deceased joint Holder from any liability in respect of any share which had been jointly held by him with other persons. For greater certainty, where two or more persons are registered as joint Holders of a share or shares, then in the event of the death of any joint Holder or Holders the remaining joint Holder or Holders shall be absolutely entitled to the said share or shares and the Company shall recognise no claim in respect of the estate of any joint Holder except in the case of the last survivor of such joint Holders.

34      Any person becoming entitled to a share in consequence of the death or bankruptcy of a member may, upon such evidence being produced as may from time to time properly be required by the Directors and subject as herein provided, elect either to be registered himself as Holder of the share or to have some person nominated by him registered as the transferee thereof, but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the shares by that member before his death or bankruptcy, as the case may be. If the person so becoming entitled elects to be registered himself, he shall deliver or send to the Company a notice in writing signed by him stating that he so elects.  If he elects to have another person registered, he shall testify his election by executing to that person a transfer of the share. All the limitations, restrictions and provisions of these articles relating to the right to transfer and the registration of transfers of shares shall be applicable to any such notice or transfer as aforesaid as if the death or bankruptcy of the member had not occurred and the notice of transfer were a transfer signed by that member.

35      A person becoming entitled to a share by reason of the death or bankruptcy of the Holder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Holder of the share, except that he shall not, before being registered as a member in respect of the share, be entitled in respect of it to exercise any right conferred by membership in relation to the meetings of the Company, so, however, that the Directors may at any time give notice requiring such person to elect either to be registered himself or to transfer the share, and if the notice is not complied with within 60 days, the Directors may thereupon withhold payment of all dividends, bonuses or other

22

moneys payable in respect of the share until the requirements of the notice have been complied with.

### Forfeiture of Shares

36    If a member fails to pay any call or instalment of a call on the day appointed for payment thereof, the Directors may, at any time thereafter during such time as any part of the call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid together with any interest which may have accrued.

37    The notice shall name a further day (not earlier than the expiration of 14 days from the date of service of the notice) on or before which the payment required by the notice is to be made, and shall state that, in the event of non-payment at or before the time appointed, the shares in respect of which the call was made will be liable to be forfeited.

38    If the requirements of any such notice as aforesaid are not complied with any shares in respect of which the notice has been given may at any time thereafter, before the payment required by the notice has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited shares and not actually paid before the forfeiture.

39    A forfeited share shall be deemed to be the property of the Company and may be sold, re-offered or otherwise disposed of either to the person who was, before the forfeiture, the Holder thereof or entitled thereto or to any other person on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

40    When any share has been forfeited, notice of the forfeiture shall be served upon the person who was before forfeiture the Holder of the share, but no forfeiture shall be in any manner invalidated by any omission or neglect to give such notice.

41    A person whose shares have been forfeited shall cease to be a member in respect of the forfeited shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which, at the date of forfeiture, were payable by him to the Company in respect of the shares, but his liability shall cease if and when the Company shall have received payment in full of all such moneys in respect of the shares.

42    A statutory declaration that the declarant is a Director or the Secretary, and that a share in the Company has been duly forfeited on the date stated in the declaration, shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share. The Company may receive the consideration, if any, given for the share on any sale or disposition thereof and may execute a transfer of the share in favour of the person to whom the share is sold or disposed of and he shall thereupon be registered as the Holder of the share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the share.

43    The provisions of these articles as to forfeiture shall apply in the case of non-payment of any sum which, by the terms of issue of a share, becomes payable at a fixed time, whether on account of the nominal value of the share or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

23

44    The Directors may accept the surrender of any share which the Directors have resolved to have been forfeited upon such terms and conditions as may be agreed and, subject to any such terms and conditions, a surrendered share shall be treated as if it has been forfeited.

**Financial assistance**

45    The Company may give any form of financial assistance which is permitted by the Acts for the purpose of or in connection with an acquisition by subscription, purchase, exchange or otherwise, made or to be made by any person of or for any shares in the Company or in the Company's holding company.

**Alteration of Capital**

46    The Company may from time to time by Ordinary Resolution increase its authorised share capital by such sum, to be divided into shares of such amount, as the resolution shall prescribe.

47    In addition, and without prejudice, to the Company's rights under section 83 of the Act, the Company may by Ordinary Resolution:

47.1   reduce its authorised share capital;

47.2   consolidate and divide all or any of its share capital into shares of larger amount than its existing shares;

47.3   subdivide its existing shares, or any of them, into shares of smaller amount than is fixed by this constitution;

47.4   make provision for the issue and allotment of shares which do not carry any voting rights;

47.5   cancel any shares which, at the date of the passing of the resolution, have not been taken or agreed to be taken by any person and reduce the amount of its authorised share capital by the amount of the shares so cancelled; and

47.6   subject to applicable law, change the currency denomination of its share capital.

Where any difficulty arises in regard to any division, consolidation or sub-division under this article 47, the Directors may settle the same as they think expedient and in particular, may arrange for the sale of the shares representing fractions and the distribution of the net proceeds of sale in due proportion amongst the Holders who would have been entitled to the fractions, and for this purpose the Directors may authorise some person to transfer the shares representing fractions to the purchaser thereof, who shall not be bound to see to the application of purchase money nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings related to the sale.

48    In accordance with section 84 of the Act, the Company may by Special Resolution reduce its issued share capital, any capital redemption reserve fund, any share premium account or any undenominated capital in any manner and with and subject to any incident authorised, and consent required, by law. Nothing in this Article 48 shall, however, prejudice or limit the Company's ability to perform or engage in any of the actions described in section 83(1) of the Act by way of Ordinary Resolution only.

24

## General meetings

49    The Company shall in each year hold a general meeting as its annual general meeting in addition to any other meeting in that year, and shall specify the meeting as such in the notices calling it.  Not more than 15 months shall elapse between the date of one annual general meeting of the Company and that of the next.  Subject to section 176 of the Act, all general meetings of the Company may be held outside of Ireland.

50    All general meetings other than annual general meetings shall be called extraordinary general meetings.

51    The Directors may, whenever they think fit, convene an extraordinary general meeting, and extraordinary general meetings shall also be convened on such requisition, or in default may be convened by such requisitionists, as provided in section 178(3) of the Act.

52    All provisions of these articles relating to general meetings of the Company shall, mutatis mutandis, apply to every separate general meeting of the Holders of any class of shares in the capital of the Company, except that:

52.1    the necessary quorum shall be two or more persons holding or representing by proxy (whether or not such Holder actually exercises his voting rights in whole, in part or at all at the relevant general meeting) more than 50% of the total issued voting rights of the Company's shares, provided, however, that if the class of shares shall have only one Holder, one Holder present in person or by proxy shall constitute the necessary quorum;

52.2    any Holder of shares of the class present in person or by proxy may demand a poll; and

52.3    on a poll, each Holder of shares of the class shall have one vote in respect of every share of the class held by him.

53    A Director shall be entitled, notwithstanding that he is not a member, to attend and speak at any general meeting and at any separate meeting of the Holders of any class of shares in the Company.

### Notice of General Meetings

54

54.1    Subject to the provisions of the Acts allowing a general meeting to be called by shorter notice, an annual general meeting, and an extraordinary general meeting called for the passing of a Special Resolution, shall be called by not less than 21 Clear Days' notice and all other extraordinary general meetings shall be called by not less than 14 Clear Days' notice.

54.2    Notice of every general meeting shall be given in any manner permitted by these articles to all Shareholders (other than those who, under the provisions of these articles or the terms of issue of the shares which they hold, are not entitled to receive such notice from the Company) and to each Director and to the Auditors.

54.3    Any notice convening a general meeting shall specify the time and place of the meeting and, in the case of special business, the general nature of that business and, in reasonable prominence, that a member entitled to attend and vote is entitled to appoint

25

a proxy to attend, speak and vote in his place and that a proxy need not be a member of the Company. It shall also give particulars of any Directors who are to retire at the meeting and of any persons who are recommended by the Directors for election or re-election as Directors at the meeting or in respect of whom notice has been duly given to the Company of the intention to propose them for election or re-election as Directors at the meeting. Provided that the latter requirement shall only apply where the intention to propose the person has been received by the Company in accordance with the provisions of these articles. Subject to any restrictions imposed on any shares, the notice of the meeting shall be given to all the Holders of any class of shares of the Company as of the record date set by the Directors other than shares which, under the terms of these articles or the terms of allotment of such shares, are not entitled to receive such notice from the Company, and to the Directors and the Auditors.

54.4    The Board may fix a future time not exceeding 60 days preceding any meeting of Shareholders as a record date for the determination of the Shareholders entitled to attend and vote at any such meeting or any adjournments thereof, and, in such case, only Shareholders of record at the time so fixed shall be entitled to notice of and to vote at such meetings or any adjournment thereof. Subject to section 174 of the Act, the Board may close the Register against transfers of Shares during the whole or part of the period between the record date so fixed and the date of such meeting or the date to which such meeting is adjourned. If no record date is fixed, the record date for determining the Shareholders who are entitled to vote at a meeting of Shareholders shall be close of business on the date preceding the day on which notice is given.

54.5    The accidental omission to give notice of a meeting to, or, in cases where instruments of proxy are sent out without the notice, the accidental omission to send such instrument of proxy to, or the non-receipt of notice of a meeting or instrument of proxy by, any person entitled to receive notice shall not invalidate the proceedings at the meeting.

54.6    A Holder of shares present, either in person or by proxy, at any meeting of the Company or of the Holders of any class of shares in the Company shall be deemed to have received notice of the meeting and, where required, of the purposes for which it was called.

54.7    Upon request in writing of Shareholders holding such number of shares as is prescribed by section 178(3) of the Act, delivered to the Office, it shall be the duty of the Directors to convene a general meeting to be held within two months from the date of the deposit of the requisition in accordance with the section 178(3) of the Act. If such notice is not given within two months after the delivery of such request, the requisitionists, or any one of them representing more than one half of the total voting rights of all of them, may themselves convene a meeting, but any meeting so convened shall not be held after the expiration of three months from the said date and any notice of such meeting shall be in compliance with these articles.

55

55.1    The Directors may postpone a general meeting of the members (other than a meeting requisitioned by a member in accordance with section 178(3) of the Act or where the postponement of which would be contrary to the Acts or a court order pursuant to the Acts) after it has been convened, and notice of such postponement shall be served in

accordance with article 54 upon all members entitled to notice of the meeting so postponed setting out, where the meeting is postponed to a specific date, notice of the new meeting in accordance with article 54.

55.2    The Directors may cancel a general meeting of the members (other than a meeting requisitioned by a member in accordance with section 178(3) of the Act or where the cancellation of which would be contrary to the Acts or a court order pursuant to the Acts) after it has been convened, and notice of such cancellation shall be served in accordance with article 54 upon all members entitled to notice of the meeting so cancelled.

### Proceedings at General Meetings

56    No business shall be transacted at any general meeting unless a quorum is present at the time when the meeting proceeds to business.  Except as otherwise provided in these articles, a quorum shall be two or more persons holding or representing by proxy (whether or not such Holder actually exercises his voting rights in whole, in part or at all at the relevant general meeting) more than 50% of the total issued voting rights of the Company's shares, provided that if the Company has only one member, one member present in person or by proxy shall constitute a quorum.  Abstentions and broker non-votes will be counted as present for purposes of determining whether there is a quorum.

57    If within five minutes from the time appointed for a general meeting (or such longer interval as the chairman of the meeting may think fit to allow) a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved. In any other case it shall stand adjourned to such other day and such other time and place as the chairman of the meeting shall determine.  The Company shall give not less than five days' notice of any meeting adjourned through want of a quorum.

58    All business shall be deemed special that is transacted at an extraordinary general meeting.  All business that is transacted at an annual general meeting shall also be deemed special, with the exception of:

(a)    the consideration of the Company's statutory financial statements and the report of the Directors and the report of the Auditors on those statements and that report;

(b)    the review by the members of the Company's affairs;

(c)    the declaration of a dividend (if any) of an amount not exceeding the amount recommended by the Directors;

(d)    the authorisation of the Directors to approve the remuneration of the Auditors;

(e)    the election of Directors in place of those retiring (whether by rotation or otherwise); and

(f)    (subject to sections 380 and 382 to 385 of the Act) the appointment or re-appointment of Auditors.

59    A meeting of the members or any class thereof may be held by means of such telephone, electronic or other communication facilities (including, without limitation of the foregoing, by telephone or video conferencing) as permit all persons participating in the meeting to communicate with each other simultaneously and instantaneously, and participation in such a meeting shall constitute presence at such meeting.

27

60      No business may be transacted at a meeting of members, other than business that is either proposed by or at the direction of the Directors; proposed at the direction of the High Court of Ireland; proposed on the requisition in writing of such number of members as is prescribed by, and is made in accordance with, the relevant provisions of the Acts and, in respect of an annual general meeting only, these articles; or the chairman of the meeting determines in his absolute and sole discretion that the business may properly be regarded as within the scope of the meeting.  For business or nominations to be properly brought by a member at any general meeting, the member proposing such business must be a Holder of record at the time of giving of the notice provided for in articles 54 and 55 and must be entitled to vote at such meeting and any proposed business must be a proper matter for member action.

61

61.1    Subject to the Acts, a resolution may only be put to a vote at a general meeting of the Company if:

(a)     it is specified in the notice of the meeting; or

(b)     it is otherwise properly brought before the meeting by the chairman of the meeting or by or at the direction of the Board; or

(c)     it is proposed at the direction of a court of competent jurisdiction; or

(d)     it is proposed with respect to an extraordinary general meeting in the requisition in writing for such meeting made by such number of Shareholders as is prescribed by (and such requisition in writing is made in accordance with) section 178(3) of the Act; or

(e)     in the case of an annual general meeting, it is proposed in accordance with article 70; or

(f)     it is proposed in accordance with article 118; or

(g)     the chairman of the meeting in his discretion decides that the resolution may properly be regarded as within the scope of the meeting.

62      No amendment may be made to a resolution at or before the time when it is put to a vote unless the chairman of the meeting in his absolute discretion decides that the amendment or the amended resolution may properly be put to a vote at that meeting.

63      If the chairman of the meeting rules a resolution or an amendment to a resolution admissible or out of order, as the case may be, the proceedings of the meeting or on the resolution in question shall not be invalidated by any error in his ruling.  Any ruling by the chairman of the meeting in relation to a resolution or an amendment to a resolution shall be final and conclusive, subject to any subsequent order by a court of competent jurisdiction.

64      The Chairman, if any, of the Board, shall preside as chairman at every meeting of the Company, or if there is no such Chairman, or if he is not present within fifteen minutes after the time appointed for the holding of the meeting or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

65      If at any meeting no Director is willing to act as chairman of the meeting or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the members present shall choose one of their number to be chairman of the meeting.

66      The chairman of the meeting may, with the consent of any meeting at which a quorum is present, and shall if so directed by the meeting, adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting is adjourned for three months or more, notice of the adjourned meeting shall be given as in the case of the original meeting.  Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

67      The Board may, and at any general meeting or meeting of a class of members, the chairman of such meeting may, make any arrangement and impose any requirement or restriction it or he considers appropriate to ensure the security of the meeting including, without limitation, requirements for evidence of identity to be produced by those attending the meeting, the searching of their personal property and the restriction of items that may be taken into the meeting place.  The Board and, at any general meeting or meeting of a class of members, the chairman of such meeting, is entitled to refuse entry to a person who refuses to comply with any such arrangements, requirements or restrictions.

68

68.1    The Board may make such arrangements as it considers appropriate to enable the members to participate in any general meeting by means of two-way, audio-visual electronic facilities, so as to permit all persons participating in the meeting to communicate with each other simultaneously and instantaneously, and participation in such a meeting shall constitute presence in person at such meeting.

68.2    The Board may, and at any general meeting or meeting of a class of members, the chairman of such meeting may make any arrangement and impose any requirement as may be reasonable for the purpose of verifying the identity of members participating by way of electronic facilities, as described in article 68.1.

69      Subject to section 193 of the Act and the requirements of the Acts, anything which may be done by resolution in general meeting may, without a meeting and without any previous notice being required, be done by resolution in writing, signed by all of the Shareholders entitled generally to vote at general meetings who at the date of the resolution in writing would be entitled to attend a meeting and vote on the resolution and if described as a Special Resolution shall be deemed to be a Special Resolution or a Special Resolution of the class, as applicable.  Such resolution in writing may be signed in as many counterparts as may be necessary.  This article 69 shall not apply to those matters required by the Acts to be carried out in a meeting.

69.1    For the purposes of any written resolution under this article 69, the date of the resolution in writing is the date when the resolution is signed by, or on behalf of, the last Shareholder to sign and any reference in any enactment to the date of passing of a resolution is, in relation to a resolution in writing made in accordance with this article 69, a reference to such date.

69.2     A resolution in writing made in accordance with this article 69 is as valid as if it had been passed by the Company in general meeting.

**Advance notice of member business and nominations for Annual General Meetings**

70     In addition to any other applicable requirements, for business or nominations to be properly brought before an annual general meeting by a member, such member must have given timely notice thereof in proper written form to the Secretary of the Company.

71     To be timely for an annual general meeting, a member's notice to the Secretary as to the business or nominations to be brought before the meeting must be delivered to or mailed and received at the Office not less than 120 calendar days nor more than 150 calendar days before the first anniversary of the notice convening the Company's annual general meeting for the prior year; provided, however, that in the event that less than 70 days' notice or prior public disclosure of the date of the meeting is given or made to Shareholders, notice by the Shareholder must be so delivered not later than the close of business on the 15th calendar day following the day on which public announcement of the date of such meeting is first made.  In no event shall the public announcement of an adjournment or postponement of an annual general meeting commence a new time period (or extend any time period) for the giving of a member's notice as described in articles 72 and 73.

72     A member's notice to the Secretary must set forth as to each matter such member proposes to bring before the meeting:

72.1     a brief description of the business desired to be brought before the meeting, the text of the proposal or business (including the text of any resolutions proposed for consideration and if such business includes a proposal to amend the articles of the Company, the text of the proposed amendment) and the reasons for conducting such business at the meeting;

72.2     as to the member giving the notice:

      (a)     the name and address, as they appear in the Register, of such member and any Member Associated Person covered by clauses (b) and (c) below;

      (b)     (A) the class and number of shares of the Company which are held of record or are beneficially owned by the member and by any Member Associated Person with respect to the Company's securities; (B) a description of any agreement, arrangement or understanding in connection with the proposal of such business between or among such member and any Member Associated Person, any of their respective affiliates or associates, and any others (including their names) acting as a "group" (as such term is used in Rule 13d-5(b) under the Exchange Act) with any of the foregoing; (C) a description of any agreement, arrangement or understanding (including, regardless of the form of settlement, any derivative, long or short positions, profit interests, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions, and borrowed or loaned securities) that has been entered into, the effect or intent of which is to mitigate loss to, manage risk or benefit from share price changes for, or increase or decrease the voting power of, such member or such Member Associated Person, with respect to shares of the Company; (D) a representation that the member is a Holder of shares of the Company (either of record or

beneficially) entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to propose such business; (E) a representation whether the member or the Member Associated Person, if any, intends or is part of a group which intends (x) to deliver a proxy statement and / or form of proxy to Holders of at least the percentage of the Company's outstanding shares required to adopt the proposal and / or (y) otherwise to solicit proxies from members in support of such proposal. If requested by the Company, the information required under clauses (A), (B) and (C) of the preceding sentence shall be supplemented by such member and any Member Associated Person not later than ten days after the later of the record date for the meeting or the date notice of the record date is first publicly disclosed to disclose such information as of the record date; and

(c)     any material interest of the member or any Member Associated Person in such business.

The chairman of the meeting shall have the power and duty to determine whether any business proposed to be brought before the meeting was made or proposed in accordance with the procedures set forth in this article, and if any proposed business is not in compliance with this article, to declare that such defective proposal shall be disregarded. The chairman of such meeting shall, if the facts reasonably warrant, refuse to acknowledge that a proposal that is not made in compliance with the procedure specified in this article, and any such proposal not properly brought before the meeting, be considered.

73

73.1     A member's notice to the Secretary must set forth as to each person whom the member proposes to nominate for election as a Director all information relating to such person that is required to be disclosed in solicitations of proxies for election of Directors in an election contest, or as otherwise required, in each case pursuant to Regulation 14A under the Exchange Act (including such person's written consent to being named in the proxy statement as nominee and to serving as Director if elected); and

(a)     the name and address, as they appear in the Register, of such member and any Member Associated Person covered by clause (b) below; and

(b)     (A) the class and number of shares of the Company which are held of record or are beneficially owned by the member and by any Member Associated Person with respect to the Company's securities; (B) a description of any agreement, arrangement or understanding in connection with the nomination between or among such member and any Member Associated Person, any of their respective affiliates or associates, and any others (including their names) acting as a "group" (as such term is used in Rule 13d-5(b) under the Exchange Act) with any of the foregoing; (C) a description of any agreement, arrangement or understanding (including, regardless of the form of settlement, any derivative, long or short positions, profit interests, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions, and borrowed or loaned securities) that has been entered into as of the date of the member's notice by, or on behalf of, such member and any Member Associated Person, the effect or intent of which is to mitigate loss to, manage risk or benefit from share price changes for, or increase or decrease the voting power of, such

31

member or such Member Associated Person, with respect to shares of the Company; (D) a representation that the member is a Holder of shares of the Company (either of record or beneficially) entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to propose such nomination; (E) a representation whether the member or the Member Associated Person, if any, intends or is part of a group which intends (x) to deliver a proxy statement and / or form of proxy to Holders of at least the percentage of the Company's outstanding shares required to adopt the proposal and / or (y) otherwise to solicit proxies from members in support of such proposal. If requested by the Company, the information required under clauses (A), (B) and (C) of the preceding sentence shall be supplemented by such member and any Member Associated Person not later than ten days after the later of the record date for the meeting or the date notice of the record date is first publicly disclosed to disclose such information as of the record date.

73.2    The Company may require any proposed nominee to furnish such other information as it may reasonably require, including the completion of any questionnaires to determine the eligibility of such proposed nominee to serve as a Director of the Company and the impact that such service would have on the ability of the Company to satisfy the requirements of laws, rules, regulations and listing standards applicable to the Company or its Directors.

73.3    The chairman of the meeting shall have the power and duty to determine whether a nomination to be brought before the meeting was made or proposed in accordance with the procedures set forth in this article, and if any proposed nomination is not in compliance with this article, to declare that such defective nomination shall be disregarded.  The chairman of such meeting shall, if the facts reasonably warrant, refuse to acknowledge a nomination that is not made in compliance with the procedure specified in this article, and any such nomination not properly brought before the meeting shall not be considered.

74    Notwithstanding the foregoing provisions of articles 72 and 73, unless otherwise required by law, if the member (or a qualified representative of the member) does not appear at the annual general meeting to present a nomination or proposed business, such nomination shall be disregarded and such proposed business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Company.  For purposes of articles 72 and 73, to be considered a qualified representative of the member, a person must be a duly authorized officer, manager or partner of such member or must be authorized by a writing executed by such member or an electronic transmission delivered by such member to act for such member as proxy at the meeting of member and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the general meeting of members.

75 ·    In addition, if the member intends to solicit proxies from the members of the Company, such member shall notify the Company of this intent in accordance with Rule 14a-4 and / or Rule 14a-8 under the Exchange Act. Any references in these articles to the Exchange Act or the rules promulgated thereunder are not intended to and shall not limit any requirements applicable to member nominations or proposals as to any other business to be considered pursuant to these articles and compliance with these articles shall be the exclusive means for a member to make nominations or submit proposals for any other business to be considered at an annual general meeting (other than matters brought

properly under and in compliance with Rule 14a-8 of the Exchange Act, or any successor rule).  Nothing in these articles shall be deemed to affect any rights of members to request inclusion of proposals in the Company's proxy statement pursuant to applicable rules and regulations under the Exchange Act.

**Voting, proxies and corporate representatives**

76      Except where (i) a greater majority is required by the Acts or these articles; or (ii) where plurality voting is required pursuant to article 121.2, any question, business or resolution proposed at any general meeting shall be decided by a simple majority of the votes cast.

77      Subject to any rights or restrictions attached to any class of shares, at any meeting of the Company each member present in person shall be entitled to one vote on any question to be decided on a show of hands and each member in person or by proxy shall be entitled on a poll to one vote for each share held by him.

78      At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands unless a poll is (before or on the declaration of the result of the show of hands) demanded by:

78.1    the chairman of the meeting; or

78.2    by at least three members present in person or represented by proxy; or

78.3    by any member or members present in person or represented by proxy and representing not less than one-tenth of the total voting rights of all the members having the right to vote at the meeting; or

78.4    by a member or members holding shares in the Company conferring the right to vote at the meeting being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total sum paid up on all the shares conferring that right.

        Unless a poll is so demanded, a declaration by the chairman of the meeting that a resolution has, on a show of hands, been carried or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book containing the minutes of the proceedings of the Company, shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

        The demand for a poll may be withdrawn.

79      Except as provided in article 80, if a poll is duly demanded it shall be taken in such manner as the Chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

80      A poll demanded on the election of the Chairman or on a question of adjournment shall be taken forthwith.  A poll demanded on any other question shall be taken at such time as the Chairman of the meeting directs, and any business other than that on which a poll has been demanded may be proceeded with pending the taking of the poll.

81      When there are joint Holders, the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint Holders; and

for this purpose, seniority shall be determined by the order in which the names stand in the Register.

82      A member of unsound mind, or in respect of whom an order has been made by any court having jurisdiction (whether in Ireland or elsewhere) in matters concerning mental disorder, may vote, whether on a show of hands or on a poll, by his committee, receiver, guardian or other person appointed by that court and any such committee, receiver, guardian or other person may vote by proxy on a show of hands or on a poll.  Evidence to the satisfaction of the Directors of the authority of the person claiming to exercise the right to vote shall be received at the Office or at such other address as is specified in accordance with these articles for the receipt of appointments of proxy, not less than 48 hours before the time appointed for holding the meeting or adjourned meeting at which the right to vote is to be exercised and in default the right to vote shall not be exercisable.

83      No member shall be entitled to vote at any general meeting unless any calls or other sums immediately payable by him in respect of shares in the Company have been paid.

84      No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered, and every vote not disallowed at such meeting shall be valid for all purposes.  Any such objection made in due time shall be referred to the Chairman of the meeting, whose decision shall be final and conclusive.

85      A Holder entitled to more than one vote on a poll need not use all his votes or cast all the votes he uses in the same way.

86      If:

86.1    any objection shall be raised as to the qualification of any voter; or

86.2    any votes have been counted which ought not to have been counted or which might have been rejected; or

86.3    any votes are not counted which ought to have been counted,

the objection or error shall not vitiate the decision of the meeting or adjourned meeting on any resolution unless the same is raised or pointed out at the meeting or, as the case may be, the adjourned meeting at which the vote objected to is given or tendered or at which the error occurs.  Any objection or error shall be referred to the chairman of the meeting and shall only vitiate the decision of the meeting on any resolution if the chairman decides that the same may have affected the decision of the meeting.  The decision of the chairman on such matters shall be final and conclusive.

87      Votes may be given either personally or by proxy.

88

88.1    Every member entitled to attend and vote at a general meeting may appoint a proxy to attend, speak and vote on his behalf and may appoint more than one proxy to attend, speak and vote at the same meeting.  The appointment of a proxy shall be in any form consistent with the Acts which the Directors may approve and, if required by the Company, shall be signed by or on behalf of the appointor.  In relation to written proxies,

34

a body corporate may sign a form of proxy under its common seal or under the hand of a duly authorised officer thereof or in such other manner as the Directors may approve. A proxy need not be a member of the Company. The appointment of a proxy in electronic or other form shall only be effective in such manner as the Directors may approve. An instrument or other form of communication appointing or evidencing the appointment of a proxy or a corporate representative (other than a standing proxy or representative) together with such evidence as to its due execution as the board may from time to time require, may be returned to the address or addresses stated in the notice of meeting or adjourned meeting or any other information or communication by such time or times as may be specified in the notice of meeting or adjourned meeting or in any other such information or communication (which times may differ when more than one place is so specified) or, if no such time is specified, at any time prior to the holding of the relevant meeting or adjourned meeting at which the appointee proposes to vote, and, subject to the Acts, if not so delivered the appointment shall not be treated as valid.

88.2　　Without limiting the foregoing, the Directors may from time to time permit appointments of a proxy to be made by means of an electronic or internet communication or facility and may in a similar manner permit supplements to, or amendments or revocations of, any such electronic or internet communication or facility to be made. The Directors may in addition prescribe the method of determining the time at which any such electronic or internet communication or facility is to be treated as received by the Company. The Directors may treat any such electronic or Internet communication or facility which purports to be or is expressed to be sent on behalf of a Holder of a share as sufficient evidence of the authority of the person sending that instruction to send it on behalf of that Holder.

89　　Any body corporate which is a member of the Company may authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company and the person so authorised shall be entitled to exercise the same powers on behalf of the body corporate which he represents as that body corporate could exercise if it were an individual member of the Company. The Company may require evidence from the body corporate of the due authorisation of such person to act as the representative of the relevant body corporate.

90　　An appointment of proxy relating to more than one meeting (including any adjournment thereof) having once been received by the Company for the purposes of any meeting shall not require to be delivered, deposited or received again by the Company for the purposes of any subsequent meeting to which it relates.

91　　Receipt by the Company of an appointment of proxy in respect of a meeting shall not preclude a member from attending and voting at the meeting or at any adjournment thereof. An appointment proxy shall be valid, unless the contrary is stated therein, as well for any adjournment of the meeting as for the meeting to which it relates. A standing proxy shall be valid for all meetings and adjournments thereof or resolutions in writing, as the case may be, until notice of revocation is received by the Company. Where a standing proxy exists, its operation shall be deemed to have been suspended at any meeting or adjournment thereof at which the Holder is present or in respect to which the Holder has specially appointed a proxy. The Directors may from time to time require such evidence as it shall deem necessary as to the due execution and continuing validity of any standing proxy and the operation of any such standing proxy shall be deemed to be suspended until

such time as the Directors determine that they have received the requested evidence or other evidence satisfactory to it.

92      A vote given or poll demanded in accordance with the terms of an appointment of proxy or a resolution authorising a representative to act on behalf of a body corporate shall be valid notwithstanding the death or insanity of the principal, or the revocation of the appointment of proxy or of the authority under which the proxy was appointed or of the resolution authorising the representative to act or transfer of the share in respect of which the proxy was appointed or the authorisation of the representative to act was given, provided that no intimation in writing (whether in electronic form or otherwise) of such death, insanity, revocation or transfer shall have been received by the Company at the Office before the commencement of the meeting or adjourned meeting at which the appointment of proxy is used or at which the representative acts PROVIDED HOWEVER, that where such intimation is given in electronic form it shall have been received by the Company before the commencement of the meeting.

93      The Directors may send, at the expense of the Company, by post, electronic mail or otherwise, to the members forms for the appointment of a proxy (with or without stamped envelopes for their return) for use at any general meeting or at any class meeting, either in blank or nominating any one or more of the Directors or any other persons in the alternative.

94      The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

**Directors**

95      The number of Directors shall (subject to: (a) automatic increases to accommodate the exercise of the rights of Holders of any class or series of shares then in issue having special rights to nominate or appoint Directors in accordance with the terms of issue of such class or series of shares; and / or (b) any resolution passed in accordance with article 121.1) not be less than five nor more than fourteen, with the exact number of Directors (the "**Actual Board Size**") determined from time to time solely by the Board. The continuing Directors may act notwithstanding any vacancy in their body, provided that if the number of the Directors is reduced below the prescribed minimum the remaining Director or Directors shall appoint forthwith an additional Director or additional Directors to make up such minimum or shall convene a general meeting of the Company for the purpose of making such appointment.

96

96.1    Each Director shall be entitled to receive such fees for his services as a Director, if any, as the Board may from time to time determine.  Each Director shall be paid all expenses properly and reasonably incurred by him in the conduct of the Company's business or in the discharge of his duties as a Director, including his reasonable travelling, hotel and incidental expenses in attending and returning from meetings of the Board or any committee of the Board or general meetings.

96.2    Each Director is expressly permitted (for the purposes of section 228(1)(d) of the Act) to use the Company's property subject to such conditions as may be approved by the Board or such conditions as may have been approved pursuant to such authority as

may be delegated by the Board in accordance with these articles and including in each case for a Director's own benefit or for the benefit of another person.

97    The Board may from time to time determine that, subject to the requirements of the Acts, all or part of any fees or other remuneration payable to any Director of the Company shall be provided in the form of shares or other securities of the Company or any subsidiary of the Company, or options or rights to acquire such shares or other securities, on such terms as the Board may decide.

98    If any Director shall be called upon to perform extra services which in the opinion of the Directors are outside the scope of the ordinary duties of a Director, the Company may remunerate such Director either by a fixed sum or by a percentage of profits or otherwise as may be determined by a resolution passed at a meeting of the Directors and such remuneration may be either in addition to or in substitution for any other remuneration to which he may be entitled as a Director.

99    No shareholding qualification for Directors shall be required.  A Director who is not a member of the Company shall nevertheless be entitled to attend and speak at general meetings.

100    Unless the Company otherwise directs, a Director of the Company may be or become a Director or other officer of, or otherwise interested in, any company promoted by the Company or in which the Company may be interested as Holder or otherwise, and no such Director shall be accountable to the Company for any remuneration or other benefits received by him as a Director or officer of, or from his interest in, such other company.

**Borrowing powers**

101    Subject to the Act, the Directors may exercise all the powers of the Company to borrow or raise money, and to mortgage or charge its undertaking, property, assets and uncalled capital or any part thereof and to issue debentures, debenture stock, guarantees and other securities whether outright or as collateral security for any debt, liability or obligation of the Company or of any third party, without any limitation as to amount.

**Powers and duties of the Directors**

102    Subject to the provisions of the Acts and these articles, the Board shall manage the business and affairs of the Company and may exercise all of the powers of the Company as are not required by the Acts or by these articles to be exercised by the Company in general meeting.  No alteration of these articles shall invalidate any prior act of the Board which would have been valid if that alteration had not been made.  The powers given by this article shall not be limited by any special power given to the Board by these articles and, except as otherwise expressly provided in these articles, a meeting of the Board at which a quorum is present shall be competent to exercise all of the powers, authorities and discretions vested in or exercisable by the Board.

103    The Directors may from time to time and at any time by power of attorney appoint any company, firm or person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the

protection of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to delegate all or any of the powers, authorities and discretions vested in him.

104   The Company may exercise the powers conferred by the Act with regard to having an official seal for use abroad and such powers shall be vested in the Directors.

105   A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors in accordance with section 231 of the Act.

106

106.1   A Director who to his knowledge is in any way, whether directly or indirectly, interested in a contract or proposed contract, transaction or arrangement with the Company and has complied with the Acts and these articles with regard to disclosure of his interest shall be entitled to vote in respect of any contract, transaction or arrangement in which he is so interested and if he shall do so his vote shall be counted, and he shall be taken into account in ascertaining whether a quorum is present, but the resolution with respect to the contract, transaction or arrangement will fail unless it is approved by a majority of the disinterested Directors voting on the resolution.

106.2   Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employments with the Company or any company in which the Company is interested, such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

106.3   For the purposes of this article, an interest of a person who is the spouse or a minor child of a Director shall be treated as an interest of the Director.

106.4   Nothing in section 228(1)(e) of the Act shall restrict a director from entering into any commitment which has been approved by the Board or has been approved pursuant to such authority as may be delegated by the Board in accordance with these Articles. It shall be the duty of each Director to obtain the prior approval of the Board, before entering into any commitment permitted by section 228(1)(e)(ii) and 228(2) of the Act.

106.5   The Company by Ordinary Resolution may suspend or relax the provisions of this article to any extent or ratify any transaction not duly authorised by reason of a contravention of this article.

107   A Director may hold and be remunerated in respect of any other office or place of profit under the Company or any other company in which the Company may be interested (other than the office of auditor of the Company or any subsidiary thereof) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine, and no Director or intending Director shall be disqualified by his office from contracting or being interested, directly or indirectly, in any contract or arrangement with the Company or any such other company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise nor shall any Director so contracting or being so interested be liable to account to the Company for any

38

profits and advantages accruing to him from any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

108    So long as, where it is necessary, a Director declares the nature of his interest at the first opportunity at a meeting of the Board or by writing to the Directors, a Director shall not by reason of his office be accountable to the Company for any benefit which he derives from any office or employment to which these articles allow him to be appointed or from any transaction or arrangement in which these articles allow him to be interested, and no such transaction or arrangement shall be liable to be avoided on the ground of any interest or benefit.

109    To the maximum extent permitted from time to time under the laws of Ireland, the Company renounces any interest or expectancy of the Company in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its Directors, officers or members or the affiliates of the foregoing, other than those Directors, officers or members or affiliates who are employees of the Company. No amendment or repeal of this article shall apply to or have any effect on the liability or alleged liability of any such Director, officer or member or affiliate of the Company for or with respect to any opportunities of which such Director, officer or member or affiliate becomes aware prior to such amendment or repeal.

110    The Directors may exercise the voting powers conferred by shares of any other company held or owned by the Company in such manner in all respects as they think fit and in particular they may exercise their voting powers in favour of any resolution appointing the Directors or any of them as Directors or officers of such other company or providing for the payment of remuneration or pensions to the Directors or officers of such other company.

111    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director, but nothing herein contained shall authorise a Director or his firm to act as auditor for the Company.

112    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for money paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed, as the case may be, by such person or persons and in such manner as the Directors shall from time to time by resolution determine.

113    The Directors shall cause minutes to be made in books provided for the purpose:

113.1    of all appointments of officers made by the Directors;

113.2    of the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

113.3    of all resolutions and proceedings at all meetings of the Company and of the Directors and of committees of Directors.

114    The Directors, on behalf of the Company, may procure the establishment and maintenance of or participate in, or contribute to any non-contributory or contributory pension or superannuation fund, scheme or arrangement or life assurance scheme or arrangement for the benefit of, and pay, provide for or procure the grant of donations, gratuities, pensions, allowances, benefits or emoluments to any persons (including Directors or other officers)

28805560.1

who are or shall have been at any time in the employment or service of the Company or of any company which is or was a subsidiary of the Company or of the predecessor in business of the Company or any such subsidiary or holding Company and the wives, widows, families, relatives or dependants of any such persons. The Directors may also procure the establishment and subsidy of or subscription to and support of any institutions, associations, clubs, funds or trusts calculated to be for the benefit of any such persons as aforesaid or otherwise to advance the interests and well being of the Company or of any such other Company as aforesaid, or its members, and payments for or towards the insurance of any such persons as aforesaid and subscriptions or guarantees of money for charitable or benevolent objects or for any exhibition or for any public, general or useful object. Any Director shall be entitled to retain any benefit received by him under this article, subject only, where the Acts require, to disclosure to the members and the approval of the Company in general meeting.

### Disqualification of Directors

115     The office of a Director shall be vacated ipso facto if the Director:

115.1   is restricted or disqualified to act as a Director under the provisions of Part 14 of the Act; or

115.2   is prohibited by law from being a director; or

115.3   resigns his office by notice in writing to the Company or in writing offers to resign and the Directors resolve to accept such offer; or

115.4   is removed from office under article 122.

### Appointment, rotation and removal of Directors

116     At each annual general meeting of the Company, all the Directors shall retire from office and be re-eligible for re-election.

117     Upon the resignation or termination of office of any Director, if a new Director shall be appointed to the Board he will be designated to fill the vacancy arising.

118

118.1   No person shall be appointed a Director, unless nominated in accordance with the provisions of this article 118. Nominations of persons for appointment as Directors may be made:

(a)     by the affirmative vote of two-thirds of the Board; or

(b)     with respect to election at an annual general meeting, by any Shareholder who holds Ordinary Shares or other shares carrying the general right to vote at general meetings of the Company, who is a Shareholder at the time of the giving of the notice provided for in article 70 and at the time of the relevant annual general meeting, and who timely complies with the notice procedures set forth in articles 71 - 73; or

(c)     with respect to election at an extraordinary general meeting requisitioned in accordance with section 178(3) of the Act, by a Shareholder or Shareholders

who hold Ordinary Shares or other shares carrying the general right to vote at general meetings of the Company and who make such nomination in the written requisition of the extraordinary general meeting and in compliance with the other provisions of these articles and the Acts relating to nominations of Directors and the proper bringing of special business before an extraordinary general meeting; or

(d) by Holders of any class or series of shares in the Company then in issue having special rights to nominate or appoint Directors in accordance with the terms of issue of such class or series, but only to the extent provided in such terms of issue,

(sub-clauses (b), (c) and (d) being the exclusive means for a Shareholder to make nominations of persons for election to the Board).

118.2 For nominations of persons for election as Directors at an extraordinary general meeting to be in proper written form, a Shareholder's notice must comply with the requirements outlined in articles 72 and 73.

118.3 The determination of whether a nomination of a candidate for election as a Director of the Company has been timely and properly brought before such meeting in accordance with this article 118 will be made by the presiding officer of such meeting. If the presiding officer determines that any nomination has not been timely and properly brought before such meeting, he or she will so declare to the meeting and such defective nomination will be disregarded.

119 A retiring Director shall be eligible to be nominated for re-election at an annual general meeting.

120 If a Director stands for re-election in circumstances other than a contested election (as such term is defined in article 121.2 below), he shall be deemed to have been re-elected, unless at such meeting the Ordinary Resolution for the re-election of such Director has been defeated.

121

121.1 The Company may from time to time by Ordinary Resolution increase the maximum number of Directors.

121.2 Each Director shall be elected by an Ordinary Resolution at an annual general meeting (or an extraordinary general meeting called for that purpose), provided that if, at any general meeting, the election of all Director nominees in this manner would cause the Actual Board Size to be exceeded (a "**contested election**"), each of those nominees shall be voted upon as a separate resolution and the Directors shall be elected by a plurality of the votes of the Shareholders present in person or represented by proxy at any such meeting and entitled to vote on the election of Directors.

For the purposes of this article 121.2, "elected by a plurality of the votes" means the election of those Director nominees, equalling in number to the number of positions available to be filled at the relevant general meeting (i.e. such that the Actual Board Size is not exceeded), that received the highest number of votes cast in their favour.

41

122    The Company may, by Ordinary Resolution, remove any Director before the expiration of his period of office notwithstanding anything in these articles or in any agreement between the Company and such Director.  Such removal shall be without prejudice to any claim such Director may have for damages for breach of any contract of service between him and the Company.

123    The Directors may appoint a person who is willing to act to be a Director, either to fill a vacancy or as an additional Director, provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these articles as the maximum number of Directors.

124    Subject to the requirements and restrictions contained in these articles (in particular, article 95), the Company may by Ordinary Resolution elect another person in place of a Director removed from office under article 122; and without prejudice to the powers of the Directors under article 123 the Company in general meeting may elect any person to be a Director either to fill a vacancy or (subject to not exceeding the Actual Board Size) an additional Director.

### Officers

125    The Board may elect a chairman of the Board and determine the period for which he is to hold office and may appoint any person (whether or not a Director) to fill the position of chief executive officer (who may be the same person as the chairman of the Board).  The chairman of the Board shall vacate that office if he vacates his office as a Director (otherwise than by the expiration of his term of office at a general meeting of the Company at which he is re-appointed).

126    The Board may from time to time appoint one or more of its body to hold any office or position with the Company for such period and on such terms as the Board may determine and may revoke or terminate any such appointment.  Any such revocation or termination shall be without prejudice to any claim for damages that such Director may have against the Company or the Company may have against such Director for any breach of any contract of service between him and the Company that may be involved in such revocation or termination or otherwise.  Any person so appointed shall receive such remuneration, if any (whether by way of salary, commission, participation in profits or otherwise), as the Board may determine.

127    In addition, the Board may appoint any person, whether or not he is a Director, to hold such executive or official position (except that of Auditor) as the Board may from time to time determine. The same person may hold more than one office or executive or official position.

128    Any person elected or appointed pursuant to articles 125 to 127 (inclusive) shall hold his office or other position for such period and on such terms as the Board may determine and the Board may revoke or vary any such election or appointment at any time by resolution of the Board.  Any such revocation or variation shall be without prejudice to any claim for damages that such person may have against the Company or the Company may have against such person for any breach of any contract of service between him and the Company which may be involved in such revocation or variation.  If any such office or other position becomes vacant for any reason, the vacancy may be filled by the Board.

28805560.1

129　　　Except as provided in the Act or these articles, the powers and duties of any person elected or appointed to any office or executive or official position pursuant to articles 125 to 127 (inclusive) shall be such as are determined from time to time by the Board.

130　　　The use or inclusion of the word "officer" (or similar words) in the title of any executive or other position shall not be deemed to imply that the person holding such executive or other position is an "officer" of the Company within the meaning of the Acts.

131　　　The Secretary (including one or more deputy or Assistant Secretaries) shall be appointed by the Directors at such remuneration (if any) and upon such terms as it may think fit and any Secretary so appointed may be removed by the Directors.

131.1　It shall be the duty of the Secretary to make and keep records of the votes, doings and proceedings of all meetings of the members and Board of the Company, and of its committees, and to authenticate records of the Company.

131.2　A provision of the Acts or these articles requiring or authorising a thing to be done by or to a Director and the Secretary shall not be satisfied by its being done by or to the same person acting both as Director and as, or in place of, the Secretary.

**Proceedings of Directors**

132

132.1　The Directors may meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they may think fit. The quorum necessary for the transaction of the business of the Directors shall be a majority of the Directors in office at the time when the meeting is convened. Questions arising at any meeting shall be decided by a majority of votes. Each Director present and voting shall have one vote.

132.2　Any Director may participate in a meeting of the Directors by means of telephonic or other similar communication whereby all persons participating in the meeting can hear each other speak, and participation in a meeting in this manner shall be deemed to constitute presence in person at such meeting and any Director may be situated in any part of the world for any such meeting.

132.3　A meeting of the Directors or any committee appointed by the Directors may be held by means of such telephone, electronic or other communication facilities (including, without limiting the foregoing, by telephone or by video conferencing) as permit all persons participating in the meeting to communicate with each other simultaneously and instantaneously and participation in such a meeting shall constitute presence in person at such meeting. Such a meeting shall be deemed to take place where the largest group of those Directors participating in the meeting is physically assembled, or, if there is no such group, where the chairman of the meeting then is.

133　　　The President or Chairman, as the case may be, or any four Directors, may, and the Secretary on the requisition of the President or Chairman, as the case may be, or any four Directors shall, at any time summon a meeting of the Directors.

134　　　The continuing Directors may act notwithstanding any vacancy in their number but, if and so long as their number is reduced below the number fixed by or pursuant to these articles as the necessary quorum of Directors, the continuing Directors or Director may act for the

43

purpose of increasing the number of Directors to that number or of summoning a general meeting of the Company but for no other purpose.

135    The Board may from time to time designate committees of the Board, with such powers and duties as the Board may decide to confer on such committees, and shall, for those committees and any others provided for herein, elect a Director or Directors to serve as the member or members, designating, if it desires, other Directors as alternate members who may replace any absent or disqualified member at any meeting of the committee. Adequate provision shall be made for notice to members of all meetings of committees; a majority of the members shall constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present. Action may be taken by any committee without a meeting if all members thereof consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of such committees.

136    A committee may elect a chairman of its meeting. If no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the members present may choose one of their number to be chairman of the meeting.

137    All acts done by any meeting of the Directors or of a committee of Directors or by any person acting as a Director shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a Director.

138    Notwithstanding anything in these articles or in the Acts which might be construed as providing to the contrary, notice of every meeting of the Directors shall be given to all Directors either by mail not less than 48 hours before the date of the meeting, by telephone, email, or any other electronic means on not less than 24 hours' notice, or on such shorter notice as person or persons calling such meeting may deem necessary or appropriate and which is reasonable in the circumstances. Any Director may waive any notice required to be given under these articles, and the attendance of a Director at a meeting shall be deemed to be a waiver by such Director.

139    A resolution or other document in writing (in electronic form or otherwise) signed (whether by electronic signature, advanced electronic signature or otherwise as approved by the Directors) by all the Directors entitled to receive notice of a meeting of Directors or of a committee of Directors shall be as valid as if it had been passed at a meeting of Directors or (as the case may be) a committee of Directors duly convened and held and may consist of several documents in the like form each signed by one or more Directors, and such resolution or other document or documents when duly signed may be delivered or transmitted (unless the Directors shall otherwise determine either generally or in any specific case) by facsimile transmission, electronic mail or some other similar means of transmitting the contents of documents.

## Rights plan

140    Subject to applicable law, the Board is hereby expressly authorised to adopt any shareholder rights plan or similar plan, agreement or arrangement pursuant to which, under circumstances provided therein, some or all Shareholders will have rights to acquire

44

Shares or interests in Shares at a discounted price, upon such terms and conditions as the Board deems expedient and in the best interests of the Company.

### The seal

141   The Company, in accordance with article 104, may have for use in any territory outside Ireland one or more additional Seals, each of which shall be a duplicate of the Seal with or without the addition on its face of the name of one or more territories, districts or places where it is to be used and a securities seal as provided for in the Act.

142   Any Authorised Person may affix the Seal of the Company over his signature alone to any document of the Company required to be authenticated or executed under Seal.  Subject to the Acts, any instrument to which a Seal is affixed shall be signed by one or more Authorised Persons.   As used in this article 142, "Authorised Person" means (i) any Director, the Secretary or any Assistant Secretary, and (ii) any other person authorised for such purpose by the Board from time to time (whether, in the case of this clause (ii), identified individually or collectively and whether identified by name, title, function or such other criteria as the Board may determine).

### Dividends and reserves

143   The Company in general meeting may declare dividends, but no dividends shall exceed the amount recommended by the Directors.

144   The Directors may from time to time pay to the members such interim dividends as appear to the Directors to be justified by the profits of the Company.

145   No dividend or interim dividend shall be paid otherwise than in accordance with the provisions of the Act.

146   The Directors may, before recommending any dividend, set aside out of the profits of the Company such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for any purpose to which the profits of the Company may be properly applied and pending such application may at the like discretion either be employed in the business of the Company or be invested in such investments as the Directors may lawfully determine.  The Directors may also, without placing the same to reserve, carry forward any profits which they may think it prudent not to divide.

147   Subject to the rights of persons, if any, entitled to shares with special rights as to dividends, all dividends shall be declared and paid according to the amounts paid or credited as paid on the shares in respect whereof the dividend is paid, but no amount paid or credited as paid on a share in advance of calls shall be treated for the purposes of this article as paid on the share.  All dividends shall be apportioned and paid proportionately to the amounts paid or credited as paid on the shares during any portion or portions of the period in respect of which the dividend is paid; but if any share is issued on terms providing that it shall rank for dividend as from a particular date, such share shall rank for dividend accordingly.

148   The Directors may deduct from any dividend payable to any member all sums of money (if any) immediately payable by him to the Company on account of calls or otherwise in relation to the shares of the Company.

28805560.1

149     Any general meeting declaring a dividend or bonus and any resolution of the Directors declaring an interim dividend may direct payment of such dividend, bonus or interim dividend wholly or partly by the distribution of specific assets and in particular of paid up shares, debentures or debenture stocks of any other company or in any one or more of such ways, and the Directors shall give effect to such resolution, and where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient, and in particular may fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any members upon the footing of the value so fixed, in order to adjust the rights of all the parties, and may vest any such specific assets in trustees as may seem expedient to the Directors.

150     Any dividend or other moneys payable in respect of any share may be paid by cheque or warrant sent by post, at the risk of the person or persons entitled thereto, to the registered address of the Holder or, where there are joint Holders, to the registered address of that one of the joint Holders who is first named on the members Register or to such person and to such address as the Holder or joint Holders may in writing direct. Every such cheque or warrant shall be made payable to the order of the person to whom it is sent and payment of the cheque or warrant shall be a good discharge to the Company. Any joint Holder or other person jointly entitled to a share as aforesaid may give receipts for any dividend or other moneys payable in respect of the share. Any such dividend or other distribution may also be paid by any other method (including payment in a currency other than US$, electronic funds transfer, direct debit, bank transfer or by means of a relevant system) which the Directors consider appropriate and any member who elects for such method of payment shall be deemed to have accepted all of the risks inherent therein. The debiting of the Company's account in respect of the relevant amount shall be evidence of good discharge of the Company's obligations in respect of any payment made by any such methods.

151     No dividend shall bear interest against the Company.

152     If the Directors so resolve, any dividend which has remained unclaimed for six years from the date of its declaration shall be forfeited and cease to remain owing by the Company. The payment by the Directors of any unclaimed dividend or other moneys payable in respect of a share into a separate account shall not constitute the Company a trustee in respect thereof.

**Accounting Records and Financial Statements**

153

153.1   The Directors shall, in accordance with Chapter 2 Part 6 of the Act, cause to be kept adequate accounting records, whether in the form of documents, electronic form or otherwise, that are sufficient to:

(a)     correctly record and explain the transactions of the Company;

(b)     enable, at any time, the assets, liabilities, financial position and profit or loss of the Company to be determined with reasonable accuracy;

(c)     enable the Directors to ensure that any financial statements of the Company, required to be prepared under section 290 or 293 of the Act, and any directors' report required to be prepared under section 325 of the Act, comply with the

requirements of the Act and, where applicable, Article 4 of the IAS Regulation; and

(d)      enable those financial statements of the Company so prepared to be audited.

153.2    The accounting records shall be kept on a continuous and consistent basis, which is to say, the entries in them shall be made in a timely manner and be consistent from one period to the next. Adequate accounting records shall be deemed to have been maintained if they comply with the provisions of Chapter 2 of Part 6 of the Act and explain the Company's transactions and facilitate the preparation of financial statements that give a true and fair view of the assets, liabilities, financial position and profit or loss of the Company, and, if relevant, the group and include any information and returns referred to in Section 282(3) of the Act.

153.3    The accounting records shall be kept at the Office or, subject to the provisions of the Act, at such other place as the Directors think fit and shall be open at all reasonable times to the inspection of the Directors.

153.4    In accordance with the provisions of the Acts, the Directors shall cause to be prepared and to be laid before the annual general meeting of the Company from time to time such statutory financial statements of the Company and reports as are required by the Acts to be prepared and laid before such meeting.

153.5    A copy of the statutory financial statements of the Company (including every document required by law to be annexed thereto) which is to be laid before the annual general meeting of the Company together with a copy of the Directors' report and Auditors' report, or, summary financial statements prepared in accordance with section 1119 of the Act, shall be sent by post, electronic mail or any other means of communication (electronic or otherwise), not less than 21 Clear Days before the date of the annual general meeting, to every person entitled under the provisions of the Acts to receive them; provided that in the case of those documents sent by electronic mail or any other means of electronic communication, such documents shall be sent with the consent of the recipient, to the address of the recipient notified to the Company by the recipient for such purposes; and provided, where the Directors elect to send summary financial statements to the members, any member may request that he be sent a copy of the statutory financial statements of the Company.

### Capitalisation of profits

154    The Directors may resolve to capitalise any part of the amount for the time being standing to the credit of any of the Company's reserve accounts or to the credit of the profit and loss account which is not available for distribution by applying such sum in paying up in full unissued shares to be allotted as fully paid bonus shares to those members of the Company who would have been entitled to that sum if it were distributable and had been distributed by way of dividend (and in the same proportions). In pursuance of any such resolution under this article 154, the Directors shall make all appropriations and applications of the undivided profits resolved to be capitalised thereby and all allotments and issues of fully paid shares or debentures, if any, and generally shall do all acts and things required to give effect thereto with full power to the Directors to make such provisions as they shall think fit for the case of shares or debentures becoming distributable in fractions (and, in particular, without prejudice to the generality of the

47

foregoing, either to disregard such fractions or to sell the shares or debentures represented by such fractions and distribute the net proceeds of such sale to and for the benefit of the Company or to and for the benefit of the members otherwise entitled to such fractions in due proportions) and to authorise any person to enter on behalf of all the members concerned into an agreement with the Company providing for the allotment to them respectively, credited as fully paid up, of any further shares or debentures to which they may become entitled on such capitalisation or, as the case may require, for the payment up by the application thereto of their respective proportions of the profits resolved to be capitalised of the amounts remaining unpaid on their existing shares and any agreement made under such authority shall be binding on all such members.

### Amendment of articles

155     Subject to the provisions of the Acts, the Company may by Special Resolution alter or add to its articles.

### Audit

156     The Auditors shall be appointed and their duties regulated in accordance with the Act.

### Merger mechanism

157     Pursuant to the terms of the Merger, at the time the Merger became effective (the "**Merger Effective Time**"), US Holdco deposited with the exchange agent (the "**Exchange Agent**") certificates or, at the Company's option, evidence of shares in book entry form, representing all of the ordinary shares of US$0.0001 each in the capital of the Company (the "**Company Shares**") in issue immediately prior to the Merger Effective Time (other than the seven Company Shares in issue at the date of adoption of these articles (the "**Company Subscriber Shares**"). All certificates or evidence of shares in book entry form representing the Company Shares deposited with the Exchange Agent pursuant to the preceding sentence shall hereinafter be referred to as the "**Actavis Exchange Fund**". After the Merger Effective Time, the Company caused the Exchange Agent to mail to each Holder of record of a certificate or certificates, which immediately prior to the Merger Effective Time represented outstanding Actavis Shares (the "**Actavis Certificates**"); and to each Holder of record of non-certificated outstanding Actavis Shares represented by book entry (the "**Actavis Book Entry Shares**"), which at the Merger Effective Time were converted into the right to receive, for each such Actavis Share, one Company Share (the "**Merger Consideration**"):

(a)     a letter of transmittal which specified that delivery would be effected, and that risk of loss and title to the Actavis Certificates would pass, only upon delivery of the Actavis Certificates to the Exchange Agent or, in the case of the Actavis Book Entry Shares, upon adherence to the procedures set forth in the letter of transmittal, and

(b)     instructions for use in effecting the surrender of the Actavis Certificates and the Actavis Book Entry Shares (as applicable), in exchange for payment of the Merger Consideration therefor.

158     Upon surrender of Actavis Certificates and / or Actavis Book Entry Shares (as applicable) for cancellation to the Exchange Agent, together with such letter of transmittal, duly

completed and validly executed in accordance with the instructions thereto, and such other documents as were reasonably required by the Exchange Agent, the Holder of such Actavis Certificates or Actavis Book Entry Shares (as applicable) was entitled to receive in exchange therefore (i) that number of Company Shares into which such Holder's Actavis shares represented by such Holder's properly surrendered Actavis Certificates or Actavis Book Entry Shares (as applicable) were converted pursuant to the Merger, and (ii) a cheque in an amount of US dollars equal to any cash dividends or other distributions that such Holder had a right to receive and the amount of any cash payable in lieu of any fractions of shares in the Company that such Holder had the right to receive pursuant to the Merger.  In the event of transfers of ownership of shares of Actavis common stock which were not registered in the transfer records of Actavis, the proper number of Company Shares were capable of being transferred to a person other than the person in whose name the Actavis Certificate or the Actavis Book Entry Shares (as applicable) so surrendered were registered, if such Actavis Certificate or the Actavis Book Entry Shares (as applicable) were properly endorsed or otherwise were in proper form for transfer and the person requesting such transfer paid any transfer or other taxes required by reason of the transfer of Company Shares to a person other than the registered Holder of such Actavis Certificate or Actavis Book Entry Shares (as applicable) or established to the reasonable satisfaction of the Exchange Agent that such tax was paid or was not applicable.  Any portion of the Actavis Exchange Fund which was not transferred to the Holders of the Actavis Certificates or the Actavis Book Entry Shares (as applicable) as of the one year anniversary of the Merger Effective Time, was delivered to the Company or its designee, upon demand, and the Company Shares included therein were sold at the best price reasonably obtainable at that time. Any Holder of Actavis Certificates or Actavis Book Entry Shares (as applicable) who has not complied with the applicable exchange procedures or duly completed and validly executed the applicable documents necessary to receive the Merger Consideration, prior to the one year anniversary of the Merger Effective Time shall now look only to the Company for payment of such Holder's claim for the Merger Consideration (subject to abandoned property, escheat or other similar applicable laws), such claim only being a claim for cash equal to the amount of monies received by the Company for sale of the Company Shares to which such Holder had been entitled pursuant to the Merger.

### Notices

159     Any notice to be given, served, sent or delivered pursuant to these articles shall be in writing (whether in electronic form or otherwise).

160

160.1     A notice or document to be given, served, sent or delivered in pursuance of these articles may be given to, served on or delivered to any member by the Company:

(a)     by handing same to him or his authorised agent;

(b)     by leaving the same at his registered address;

(c)     by sending the same by the post in a pre-paid cover addressed to him at his registered address;

(d)      by sending the same by courier in a pre-paid cover addressed to him at his registered address; or

(e)      by sending, with the consent of the member, the same by means of electronic mail or facsimile or other means of electronic communication approved by the Directors, with the consent of the member, to the address of the member notified to the Company by the member for such purpose (or if not so notified, then to the address of the member last known to the Company).

160.2      For the purposes of these articles and the Act, a document shall be deemed to have been sent to a member if a notice is given, served, sent or delivered to the member and the notice specifies the website or hotlink or other electronic link at or through which the member may obtain a copy of the relevant document.

160.3      Where a notice or document is given, served or delivered pursuant to article 160.1(b) of this article, the giving, service or delivery thereof shall be deemed to have been effected at the time the same was handed to the member or his authorised agent, or left at his registered address (as the case may be).

160.4      Where a notice or document is given, served or delivered pursuant to article160.1(c) of this article, the giving, service or delivery thereof shall be deemed to have been effected at the expiration of 48 hours after the cover containing it was posted.

160.5      Where a notice or document is given, served or delivered pursuant to article 160.1(d) of this article the giving, service or delivery thereof shall be deemed to have been effected at the expiration of 24 hours after the cover containing it was posted. In proving service or delivery it shall be sufficient to prove that such cover was properly addressed, stamped and posted.

160.6      Where a notice or document is given, served or delivered pursuant to article 160.1(e) of this article, the giving, service or delivery thereof shall be deemed to have been effected at the expiration of 12 hours after dispatch.

160.7      Every legal personal representative, committee, receiver, curator bonis or other legal curator, assignee in bankruptcy, examiner or liquidator of a member shall be bound by a notice given as aforesaid if sent to the last registered address of such member, or, in the event of notice given or delivered pursuant to article 160.1(e) of this article, if sent to the address notified by the Company by the member for such purpose notwithstanding that the Company may have notice of the death, lunacy, bankruptcy, liquidation or disability of such member.

160.8      Notwithstanding anything contained in this article the Company shall not be obliged to take account of or make any investigations as to the existence of any suspension or curtailment of postal services within or in relation to all or any part of any jurisdiction or other area other than Ireland.

160.9      Any requirement in these articles for the consent of a member in regard to the receipt by such member of electronic mail or other means of electronic communications approved by the Directors, including the receipt of the Company's audited accounts and the Directors' and Auditor's reports thereon, shall be deemed to have been satisfied where the Company has written to the member informing him/her of its intention to use electronic communications for such purposes and the member has not, within four

weeks of the issue of such notice, served an objection in writing on the Company to such proposal. Where a member has given, or is deemed to have given, his/her consent to the receipt by such member of electronic mail or other means of electronic communications approved by the Directors, he/she may revoke such consent at any time by requesting the Company to communicate with him/her in documented form PROVIDED HOWEVER that such revocation shall not take effect until five days after written notice of the revocation is received by the Company.

160.10     Without prejudice to the provisions of articles 160.1(a) and 160.1(b), if at any time by reason of the suspension or curtailment of postal services in any territory, the Company is unable effectively to convene a general meeting by notices sent through the post, a general meeting may be convened by a public announcement and such notice shall be deemed to have been duly served on all members entitled thereto at noon on the day on which the said public announcement is made. In any such case the Company shall put a full copy of the notice of the general meeting on its website.

161     A notice may be given by the Company to the joint Holders of a share by giving the notice to the joint Holder whose name stands first in the Register in respect of the share and notice so given shall be sufficient notice to all the joint Holders.

162

162.1     Every person who becomes entitled to a share shall before his name is entered in the Register in respect of the share, be bound by any notice in respect of that share which has been duly given to a person from whom he derives his title.

162.2     A notice may be given by the Company to the persons entitled to a share in consequence of the death or bankruptcy of a member by sending or delivering it, in any manner authorised by these articles for the giving of notice to a member, addressed to them at the address, if any, supplied by them for that purpose. Until such an address has been supplied, a notice may be given in any manner in which it might have been given if the death or bankruptcy had not occurred.

163     The signature (whether electronic signature, an advanced electronic signature or otherwise) to any notice to be given by the Company may be written (in electronic form or otherwise) or printed.

## Winding up

·164     If the Company shall be wound up and the assets available for distribution among the members as such shall be insufficient to repay the whole of the paid up or credited as paid up share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the members in proportion to the capital paid up or credited as paid up at the commencement of the winding up on the shares held by them respectively. And if in a winding up the assets available for distribution among the members shall be more than sufficient to repay the whole of the share capital paid up or credited as paid up at the commencement of the winding up, the excess shall be distributed among the members in proportion to the capital at the commencement of the winding up paid up or credited as

paid up on the said shares held by them respectively.  Provided that this article shall not affect the rights of the Holders of shares issued upon special terms and conditions.

165

165.1   In case of a sale by the liquidator under the Act, the liquidator may by the contract of sale agree so as to bind all the members for the allotment to the members directly of the proceeds of sale in proportion to their respective interests in the Company and may further by the contract limit a time at the expiration of which obligations or shares not accepted or required to be sold shall be deemed to have been irrevocably refused and be at the disposal of the Company, but so that nothing herein contained shall be taken to diminish, prejudice or affect the rights of dissenting members conferred by the said section.

165.2   The power of sale of the liquidator shall include a power to sell wholly or partially for debentures, debenture stock, or other obligations of another company, either then already constituted or about to be constituted for the purpose of carrying out the sale.

166   If the Company is wound up, the liquidator, with the sanction of a Special Resolution and any other sanction required by the Acts, may divide among the members in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not), and, for such purpose, may value any assets and determine how the division shall be carried out as between the members or different classes of members. The liquidator, with the like sanction, may vest the whole or any part of such assets in trustees upon such trusts for the benefit of the contributories as, with the like sanction, he determines, but so that no member shall be compelled to accept any assets upon which there is a liability.

## Limitation on liability

167   To the maximum extent permitted by law, no Director or officer of the Company shall be personally liable to the Company or its Shareholders for monetary damages for his or her acts or omissions save where such acts or omissions involve negligence, default, breach of duty or breach of trust.

## Indemnity

168

168.1   Subject to the provisions of and so far as may be admitted by the Acts, every Director and the Secretary of the Company shall be entitled to be indemnified by the Company against all costs, charges, losses, expenses and liabilities incurred by him in the execution and discharge of his duties or in relation thereto including any liability incurred by him in defending any proceedings, civil or criminal, which relate to anything done or omitted or alleged to have been done or omitted by him as an officer or employee of the Company and in which judgment is given in his favour (or the proceedings are otherwise disposed of without any finding or admission of any material breach of duty on his part) or in which he is acquitted or in connection with any application under any statute for relief from liability in respect of any such act or omission in which relief is granted to him by the Court.

28805560.1

168.2    The Directors shall have power to purchase and maintain for any Director, the Secretary or other employees of the Company insurance against any such liability as referred to in section 235 of the Act.

168.3    As far as is permissible under the Acts, the Company shall indemnify any current or former executive officer of the Company (excluding any present or former Directors of the Company or Secretary of the Company), or any person who is serving or has served at the request of the Company as a Director or executive officer of another company, joint venture, trust or other enterprise, including any Company subsidiary (each individually, a "**Covered Person**"), against any expenses, including attorney's fees, judgments, fines, and amounts paid in settlement actually and reasonably incurred by him or her in connection with any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, to which he or she was, is, or is threatened to be made a party, or is otherwise involved (a "**proceeding**"), by reason of the fact that he or she is or was a Covered Person; provided, however, that this provision shall not indemnify any Covered Person against any liability arising out of (a) any fraud or dishonesty in the performance of such Covered Person's duty to the Company, or (b) such Covered Party's conscious, intentional or wilful breach of the obligation to act honestly and in good faith with a view to the best interests of the Company.  Notwithstanding the preceding sentence, this section shall not extend to any matter which would render it void pursuant to the Acts or to any person holding the office of auditor in relation to the Company.

168.4    In the case of any threatened, pending or completed action, suit or proceeding by or in the name of the Company, the Company shall indemnify each Covered Person against expenses, including attorneys' fees, actually and reasonably incurred in connection with the defence or the settlement thereof, except no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable for fraud or dishonesty in the performance of his or her duty to the Company, or for conscious, intentional or wilful breach of his or her obligation to act honestly and in good faith with a view to the best interests of the Company, unless and only to the extent that the High Court of Ireland or the court in which such action or suit was brought shall determine upon application that despite the adjudication of liability, but in view of all the circumstances of the case, such Covered Person is fairly and reasonably entitled to indemnity for such expenses as the court shall deem proper. Notwithstanding the preceding sentence, this section shall not extend to any matter which would render it void pursuant to the Acts or to any person holding the office of Auditor in relation to the Company.

168.5    Any indemnification under this article (unless ordered by a court) shall be made by the Company only as authorised in the specific case upon a determination that indemnification of the Covered Person is proper in the circumstances because such person has met the applicable standard of conduct set forth in this article.  Such determination shall be made by any person or persons having the authority to act on the matter on behalf of the Company.  To the extent, however, that any Covered Person has been successful on the merits or otherwise in defence of any proceeding, or in defence of any claim, issue or matter therein, such Covered Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith, without necessity of authorisation in the specific case.

168.6     As far as permissible under the Acts, expenses, including attorneys' fees, incurred in defending any proceeding for which indemnification is permitted pursuant to this article shall be paid by the Company in advance of the final disposition of such proceeding upon receipt by the Board of an undertaking by the particular indemnitee to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company pursuant to these articles.

168.7     It being the policy of the Company that indemnification of the persons specified in this article shall be made to the fullest extent permitted by law, the indemnification provided by this article shall not be deemed exclusive (i) of any other rights to which those seeking indemnification or advancement of expenses may be entitled under these articles, any agreement, any insurance purchased by the Company, vote of members or disinterested Directors, or pursuant to the direction (however embodied) of any court of competent jurisdiction, or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, or (ii) of the power of the Company to indemnify any person who is or was an employee or agent of the Company or of another company, joint venture, trust or other enterprise which he or she is serving or has served at the request of the Company, to the same extent and in the same situations and subject to the same determinations as are hereinabove set forth. As used in this article, references to the "Company" include all constituent companies in a consolidation or merger in which the Company or a predecessor to the Company by consolidation or merger was involved. The indemnification provided by this article shall continue as to a person who has ceased to be a Covered Person and shall inure to the benefit of their heirs, executors, and administrators.

## Untraced Holders

169

169.1     The Company shall be entitled to sell at the best price reasonably obtainable any share of a member or any share to which a person is entitled by transmission if and provided that:

      (a)     for a period of six years (not less than three dividends having been declared and paid) no cheque or warrant sent by the Company through the post in a prepaid letter addressed to the member or to the person entitled by transmission to the share or stock at his address on the Register or other the last known address given by the member or the person entitled by transmission to which cheques and warrants are to be sent has been cashed and no communication has been received by the Company from the member or the person entitled by transmission;

      (b)     at the expiration of the said period of six years the Company has given notice by advertisement in a leading Dublin newspaper and a newspaper circulating in the area in which the address referred to in article 169.1(a) is located of its intention to sell such share or stock;

      (c)     the Company has not during the further period of three months after the date of the advertisement and prior to the exercise of the power of sale received any communication from the member or person entitled by transmission; and

28805560.1

(d)     if so required by the rules of any securities exchange upon which the shares in question are listed, notice has been given to that exchange of the Company's intention to make such sale.

169.2   To the extent necessary in order to comply with any laws or regulations to which the Company is subject in relation to escheatment, abandonment of property or other similar or analogous laws or regulations ("**Applicable Escheatment Laws**"), the Company may deal with any share of any member and any unclaimed cash payments relating to such share in any manner which it sees fit, including (but not limited to) transferring or selling such share and transferring to third parties any unclaimed cash payments relating to such share.

169.3   The Company may only exercise the powers granted to it in this article 169 in circumstances where it has complied with, or procured compliance with, the required procedures (as set out in Applicable Escheatment Laws) with respect to attempting to identify and locate the relevant member of the Company.

169.4   If during any six year period referred to in article 169.1, further shares have been issued in right of those held at the beginning of such period or of any previously issued during such period and all the other requirements of this article (other than the requirement that they be in issue for six years) have been satisfied in regard to the further shares, the Company may also sell the further shares.

169.5   To give effect to any such sale the Company may appoint any person to execute as transferor an instrument of transfer of such share and such instrument of transfer shall be as effective as if it had been executed by the registered Holder of or person entitled by transmission to such share.

169.6   The Company shall account to the member or other person entitled to such share for the net proceeds of such sale by carrying all moneys in respect thereof to a separate account which shall be a permanent debt of the Company and the Company shall be deemed to be a debtor and not a trustee in respect thereof for such member or other person. Monies carried to such separate account may either be employed in the business of the Company or invested in such investments (other than shares of the Company or its holding company if any) as the Directors may from time to time think fit.

## Destruction of documents

170     The Company may destroy:

170.1   any dividend mandate or any variation or cancellation thereof or any notification of change of name or address, at any time after the expiry of two years from the date such mandate variation, cancellation or notification was recorded by the Company;

170.2   any instrument of transfer of shares which has been registered, at any time after the expiry of six years from the date of registration;

170.3   all share certificates which have been cancelled at any time after the expiration of one year from the date of cancellation thereof;

170.4   all paid dividend warrants and cheques at any time after the expiration of one year from the date of actual payment thereof;

28805560.1

170.5    all instruments of proxy which have been used for the purpose of a poll at any time after the expiration of one year from the date of such use;

170.6    all instruments of proxy which have not been used for the purpose of a poll at any time after one month from the end of the meeting to which the instrument of proxy relates and at which no poll was demanded; and

170.7    any other document on the basis of which any entry in the Register was made, at any time after the expiry of six years from the date an entry in the Register was first made in respect of it,

and it shall be presumed conclusively in favour of the Company that every share certificate (if any) so destroyed was a valid certificate duly and properly sealed and that every instrument of transfer so destroyed was a valid and effective instrument duly and properly registered and that every other document destroyed hereunder was a valid and effective document in accordance with the recorded particulars thereof in the books or records of the Company provided always that:

(a)    the foregoing provisions of this article shall apply only to the destruction of a document in good faith and without express notice to the Company that the preservation of such document was relevant to a claim;

(b)    nothing contained in this article shall be construed as imposing upon the Company any liability in respect of the destruction of any such document earlier than as aforesaid or in any case where the conditions of proviso (a) are not fulfilled; and

(c)    references in this article to the destruction of any document include references to its disposal in any manner.

56

We, the several persons whose names, addresses and descriptions are subscribed, wish to be formed into a company in pursuance of this constitution, and we agree to take the number of shares in the capital of the Company set opposite our respective names.

| Name, address and description of subscriber | Number of shares taken by the subscriber |
|---|---|
| Signed:<br><br><br>Patrick Spicer<br>For and on behalf of<br>Matsack Nominees Limited<br>70 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland<br><br>Body Corporate | 1<br><br>(One) |
| Total shares taken | 1 (One) |
| Dated 16 day of May 2013 | |
| Witness to the above signature:<br><br>Name: Amelia Drumm<br>Address:  70 Sir John Rogerson's Quay, Dublin 2<br>Occupation:  Company Secretary | |

57

# EXHIBITS 14-16
# [sealed]

# EXHIBIT 17

# Allergan plc Completes Divestiture of Global Generics Business to Teva Pharmaceuticals

-- Sale Advances Company's Evolution into a Focused Branded Growth Pharma Leader --

-- Provides Pre-Tax Proceeds for Use in Company's Capital Deployment Strategy --

-- Allergan Intends to Commence Previously Announced Share Repurchase Program --

-- Company to Provide Updated Guidance as Part of Second Quarter 2016 Earnings --



---

NEWS PROVIDED BY

**Allergan plc** →

Aug 02, 2016, 12:41 ET

---

DUBLIN, Aug. 2, 2016 /PRNewswire/ -- Allergan plc (NYSE: AGN) today announced that it has completed the divestiture of its global generic pharmaceuticals business to Teva Pharmaceutical Industries Ltd. Allergan has received $33.4 billion in cash and 100.3 million shares of Teva stock valued at $5.4 billion based on the opening price of $53.39 for Teva Pharmaceutical Industries Ltd. shares on August 2, 2016. These shares are subject to a twelve month holding period post-close of the transaction.

Logo - http://photos.prnewswire.com/prnh/20150612/222796LOGO

"With the divestiture of our Global Generics business, Allergan completes the most crucial step in its strategic evolution into a focused Branded Growth Pharma leader. Allergan is the most dynamic and exciting company in our industry and is well-positioned to expand our leadership

across our seven key therapeutic areas; enhance our world-class R&D pipeline through Open Science and build on our strong track record of value creation," said Brent Saunders, Chief Executive Officer and President, Allergan.

Teva has acquired Allergan's legacy Actavis Global Generics business, including the U.S. and international generic commercial units, third-party supplier Medis, global generic manufacturing operations, and the global generic R&D unit, as well as Allergan's international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and certain established international brands.

Allergan retains its dynamic global branded pharmaceutical business powered by best-in-class products for the central nervous system, eye care, medical aesthetics and dermatology, gastroenterology, women's health, urology and anti-infective therapeutic categories.

"We thank our Global Generics colleagues for their extraordinary efforts in building a leading Generics business. We look forward to seeing their continued success, now combined with Teva's world-class Generics business," added Saunders.

With the completion of the Generics divestiture, Allergan plans to commence its previously announced share repurchase program under board authorization of up to $10 billion of the Company's common stock in the coming days.

"We believe there is no greater investment than Allergan stock, given our high-growth, durable product portfolios, pipeline of 65-plus mid-to-late stage development programs and a balance sheet with significant capital for additional stepping stone acquisition opportunities," said Saunders.

The Company expects to execute an initial $5 billion in open market repurchases over the remainder of 2016. If favorable market conditions persist, the Company will plan to repurchase the remaining $5 billion under the authorization. The program may be discontinued at any time.

"Our capital deployment strategy is focused on creating significant value for shareholders and enhances our growth profile. In addition to the stock repurchase program, the proceeds from the Teva transaction will be used to pay down a significant portion of our debt to maintain our investment grade credit ratings and preserve significant firepower to invest for growth," added Saunders.

Following the close of the divestiture, Allergan also announced that it plans to provide updated full year 2016 guidance during its second quarter 2016 earnings call on August 8th.

**About Allergan plc**

Allergan plc (NYSE: AGN), headquartered in Dublin, Ireland, is a bold, global pharmaceutical company and a leader in a new industry model – Growth Pharma. Allergan is focused on developing, manufacturing and commercializing branded pharmaceuticals, devices and biologic products for patients around the world.

Allergan markets a portfolio of leading brands and best-in-class products for the central nervous system, eye care, medical aesthetics and dermatology, gastroenterology, women's health, urology and anti-infective therapeutic categories.

Allergan is an industry leader in Open Science, the Company's R&D model, which defines our approach to identifying and developing game-changing ideas and innovation for better patient care. This approach has led to Allergan building one of the broadest development pipelines in the pharmaceutical industry with 65+ mid-to-late stage pipeline programs in development.

Our Company's success is powered by our more than 16,000 global colleagues' commitment to being Bold for Life. Together, we build bridges, power ideas, act fast and drive results for our customers and patients around the world by always doing what is right.

With commercial operations in approximately 100 countries, Allergan is committed to working with physicians, healthcare providers and patients to deliver innovative and meaningful treatments that help people around the world live longer, healthier lives.

For more information, visit Allergan's website at www.Allergan.com.

**Forward-Looking Statement**

Statements contained in this press release that refer to future events or other non-historical facts are forward-looking statements that reflect Allergan's current perspective of existing trends and information as of the date of this release. Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements. Actual results may differ materially from Allergan's current expectations depending upon a number of factors affecting Allergan's business. These factors include, among others, the difficulty of predicting the timing or outcome of FDA approvals or actions, if any; the impact of competitive products and pricing; market acceptance of and continued demand for Allergan's products; difficulties or delays in manufacturing; and other risks and uncertainties detailed in Allergan's periodic public filings with the Securities and Exchange Commission, including but not limited to Allergan's Annual Report on Form 10-K for the year ended December 31, 2015 and Quarterly Report on Form 10-Q for the quarter ended March 31, 2016 (certain of such periodic public filings having been filed under the "Actavis plc" name). Except as expressly required by law, Allergan disclaims any intent or obligation to update these forward-looking statements.

**CONTACTS:**

**ALLERGAN**

**INVESTORS:**

Lisa DeFrancesco

(862) 261-7152

**MEDIA:**

Mark Marmur

(862) 261-7558

SOURCE Allergan plc

Related Links

http://www.allergan.com

# EXHIBITS 18-19
# **[sealed]**

EXHIBIT 20

EX-10.66 51 d529462dex1066.htm EX-10.66

**Exhibit 10.66**

**EXECUTION VERSION**

### <u>SETTLEMENT AGREEMENT AND MUTUAL RELEASES</u>

This Settlement Agreement and Mutual Releases (the "Agreement") is entered into as of January 31, 2018 (the "Effective Date") by and between Teva Pharmaceutical Industries Ltd. ("Teva") and Allergan plc ("Allergan"). Teva and Allergan shall be referred to collectively as the "Parties" and individually as a "Party."

#### <u>RECITALS</u>

WHEREAS, on July 26, 2015, the Parties entered into a Master Purchase Agreement which was amended by the First Amendment to the Master Purchase Agreement dated as of June 9, 2016, the Second Amendment to the Master Purchase Agreement dated as of July 5, 2016 and the Third Amendment to the Master Purchase Agreement dated as of July 11, 2016 (the "MPA") through which Teva acquired the Business (the "Transaction") (capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the MPA);

WHEREAS, on August 2, 2016 (the "Closing Date"), the Transaction closed and Teva became the owner of the Business;

WHEREAS, after the Closing Date, the Parties initiated arbitration under Section 3.3 of the MPA in response to Teva's claim for a purchase price adjustment of nearly $1.5 billion (inclusive of all Claims by either Party under Section 3.3 of the MPA, the "Working Capital Dispute");

WHEREAS, Teva and Allergan have made submissions to the Reporting Accountants in connection with the Working Capital Dispute (the "Submissions");

WHEREAS, on October 30, 2017, Teva asserted several claims for indemnification under Section 12.2 of the MPA ("October 2017 Notice"), including reiterating, restating, and updating claims for indemnification made on November 30, 2016 (such claims for indemnification, together with the claims for indemnification in the October 2017 Notice, the "Teva Asserted Claims") (the Teva Asserted Claims, collectively with any indemnification claims that Teva potentially could assert now or in the future under Section 12.2(a)(i) or Section 12.2(a)(iv) of the MPA, are referred to as the "Teva Indemnification Claims");

WHEREAS, on November 2, 2017, Allergan asserted several claims for indemnification under Section 12.3 of the MPA (the "November 2017 Notice"), including reiterating, restating and updating claims for indemnification made on November 18, 2016 and July 13, 2017 (such claims for indemnification in the November 2017 Notice, the "Allergan Asserted Claims") (the Allergan Asserted Claims, collectively with any indemnification claims that Allergan potentially could assert now or in the future under Section 12.3(a)(i) of the MPA, are referred to as the "Allergan Indemnification Claims");

WHEREAS, by this Agreement, the Parties desire to resolve any and all disputes arising out of, relating to, or in any way connected to the MPA, including but not limited to the Working Capital Dispute, the Teva Indemnification Claims and the Allergan Indemnification Claims, and to avoid future disputes under the MPA; it is the Parties' intention that, on and after the date hereof, (i) the only remedies available to Teva under the MPA are (A) indemnification under

Section 12.2(a)(ii) of the MPA for unknown breaches by Allergan of covenants that were intended to be performed by Allergan after the Closing, (B) indemnification under Section 12.2(a)(iii) of the MPA (Excluded Liability), and (C) specific enforcement of Allergan's ongoing covenants; and (ii) the only remedies available to Allergan under the MPA are (A) indemnification under Section 12.3(a)(ii) of the MPA for unknown breaches by Teva of covenants that were intended to be performed by Teva after the Closing, (B) indemnification under Section 12.3(a)(iii) (Assumed Liability) or Section 12.3(a)(iv) of the MPA (Liabilities and Claims relating to the operation of the Acquired Assets), and (C) specific enforcement of Teva's ongoing covenants;

**WHEREAS**, this Agreement is entered into for purposes of compromise and settlement only;

**NOW, THEREFORE**, in consideration of the foregoing, and the mutual promises and representations contained in this Agreement, and in exchange for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

### AGREEMENT AND MUTUAL RELEASES

1. **No Admissions**. This Agreement is being entered into solely to avoid lengthy, costly and time-consuming disputes. By entering into this Agreement, no Party is admitting any liability or wrongdoing whatsoever, and each Party continues to deny any and all liability and wrongdoing. This Agreement shall not be construed as an admission by either Party as to the merits of any position adopted by the other Party.

2. **Dismissal of the Working Capital Dispute**. Within two (2) Business Days of the Effective Date, the Parties shall jointly notify the Reporting Accountants that the Parties have reached an agreement in principle for the resolution of the Working Capital Dispute and that the Reporting Accountants should cease any and all activities relating to the Working Capital Dispute pending further instructions from the Parties. Within one (1) Business Day of the payment contemplated in Section 3 hereof, the Parties shall jointly notify the Reporting Accountants that the Working Capital Dispute has been finally and fully resolved and that the arbitration is terminated. The Parties shall split evenly any external costs or expenses associated with the Working Capital Dispute, including the fees and disbursements of the Reporting Accountants, but excluding the fees and expenses of the Parties' respective advisors. Upon payment of the Settlement Amount, Allergan's obligations under Section 3.3(g) and Section 3.3(h) of the MPA shall be fully satisfied.

3. **Payment**. Within thirty (30) days following the Effective Date, Allergan shall pay Teva the sum of US $700,000,000 (the "Settlement Amount"). The Settlement Amount shall be paid by wire transfer to the following Teva account:

    MIZRAHI TEFAHOT BANK LTD IL92 0204 6100 0000 0198 781
    Main Branch, Tel Aviv
    Branch No: 461
    Account No: 198781
    Swift: MIZBILIT
    Beneficiary: Teva Pharmaceutical Industries Ltd.

2

4.   **Agreed Liabilities and Indemnification; Third Party Claim Indemnification Procedures**. Teva agrees, on behalf of itself and each of its successors-in-interest and assigns, that it shall assume, and shall be or become responsible for (i) any Liabilities or Losses arising from the Third Party Claims listed on Exhibit A hereto, (ii) any Liabilities or Losses arising from the Third Party Claims listed on Exhibit B hereto or arising from any other Third Party Claim, in each case to the extent such Liabilities or Losses are based upon generic opioid drugs that are Products, and (iii) any Liabilities, Losses or Claims that are, directly or indirectly, jointly or severally, asserted against or imposed on Allergan, its respective Affiliates and their respective officers, directors, employees, agents, successors and permitted assigns (the "Allergan Parties") to the extent such Liabilities, Losses or Claims are based on parent or control liability or a substantially similar theory in connection with any Proceeding involving (1) a member of the Transferred Group and (2) a Product or the Business (collectively, (i), (ii) and (iii), the "Teva Agreed Liabilities"). For the avoidance of doubt, any Liabilities or Losses arising from the Third Party Claims listed on Exhibit B hereto or arising from any other Third Party Claim, in each case to the extent such Liabilities or Losses are based upon branded opioid drugs of the Retained Business that are not Products, are Excluded Liabilities under the MPA for which Teva is entitled to indemnification under Section 12.2(a)(iii) of the MPA. Teva further agrees that it will indemnify, defend and hold harmless the Allergan Parties, from, against and in respect of any and all Losses imposed on, sustained, incurred or suffered by, or asserted against, any of the Allergan Parties, whether in respect of third party claims, claims between the Parties, or otherwise, directly or indirectly relating to, arising out of, resulting from, based upon the underlying facts of, with respect to or by reason of the Teva Agreed Liabilities. Teva shall have 90 days from the Effective Date to notify Allergan that it desires to defend Allergan against any of the matters listed on Exhibit A hereto in accordance with the terms of Section 12.4 of the MPA. Unless otherwise agreed by the Parties, (i) Allergan shall be responsible for the defense of Third Party Claims involving opioid drugs to the extent such Third Party Claims are based upon branded opioid drugs of the Retained Business that are not Products and (ii) Teva shall be responsible for the defense of Third Party Claims involving opioid drugs to the extent such Third Party Claims are based upon generic opioid drugs that are Products. In the case of Third Party Claims that involve both (i) branded opioid drugs of the Retained Business that are not Products and (ii) generic opioid drugs that are Products, the Parties shall (x) each be responsible for the defense of such Third Party Claims in accordance with the immediately prior sentence and (y) cooperate with each other to enable the proper and adequate defense of such Third Party Claim. Each Party further agrees to provide the other Party by no later than February 28, 2018 a supplemental list which includes all additional known Third Party Claims based upon opioid drugs received by such Party on or before February 25, 2018 ("Supplemental Opioid Case List"), which shall be in substantially the same format as Exhibit B; any Third Party Claims appearing on Exhibit B (or the Supplemental Opioid Case List) shall be deemed to have been notified by each Party in compliance with Section 12.4 of the MPA. On or before the first Business Day of each month beginning after March 31, 2018, each Party shall provide the other Party with a list of additional Third Party Claims based upon opioid drugs that have been filed and served upon the Party on or prior to the third to last Business Day of the prior month ("Monthly Opioid

3

Case List"). The Monthly Opioid Case List shall be in substantially the same format as Exhibit B and the Supplemental Opioid Case List, and each Party may request a copy of a complaint listed thereon. The Parties' respective rights and obligations pursuant to Section 12.4 of the MPA shall otherwise remain unchanged, including but not limited to the Parties' obligations to cooperate following the date hereof to ensure the proper and adequate defense of a Third Party Claim.

5. **Mutual Releases**.

    (a)     Teva, for itself and its past and present parents, subsidiaries, affiliates, directors, managers, officers, shareholders, employees, attorneys, agents, representatives, predecessors, successors and assigns, hereby fully and forever releases and discharges Allergan and its past and present parents, subsidiaries, affiliates, directors, managers, officers, shareholders, employees, attorneys, agents, representatives, predecessors, successors and assigns, from any and all claims, counterclaims, demands, damages, debts, liabilities, attorneys' fees, actions, causes of action, obligations and demands whatsoever, whether fixed or contingent, at law or in equity, and now known or unknown (each, a "Claim"), (i) arising from or in any way relating to (A) the Working Capital Dispute, (B) the Teva Indemnification Claims (except for any Liabilities or Losses arising from the Third Party Claims listed on Exhibit B hereto or arising from any other Third Party Claim, in each case to the extent such Liabilities or Losses are based upon branded opioid drugs of the Retained Business that are not Products), (C) the Teva Agreed Liabilities, (D) any breach or alleged breach by Allergan of any representation or warranty contained in the MPA, (E) any breach or alleged breach by Allergan of any covenant in the MPA that was intended to be performed by Allergan or its Affiliates on or prior to the Closing, (F) any breach or alleged breach by Allergan prior to the date hereof of any covenant in the MPA that was intended to be performed by Allergan or its Affiliates after the Closing (an "Allergan Post-Closing, Pre-Settlement Covenant Breach") other than any Allergan Post-Closing, Pre-Settlement Covenant Breach the material underlying facts of which are unknown to Teva as of the date hereof or (G) the historical financial statements of the Business or the Transferred Group, including any Claim that such financial statements do not comply with U.S. GAAP or any other applicable accounting standards or Laws, or (ii) for any Losses resulting from any potential Claims that are referenced in the Submissions (collectively, the "Teva Released Claims").

    (b)     Allergan, for itself and its past and present parents, subsidiaries, affiliates, directors, managers, officers, shareholders, members, employees, attorneys, agents, representatives, predecessors, successors and assigns, hereby fully and forever releases and discharges Teva and its past and present parents, subsidiaries, affiliates, directors, managers, officers, shareholders, employees, attorneys, agents, representatives, predecessors, successors and assigns, from any and all Claims (i) arising from or in any way relating to (A) the Working Capital Dispute, (B) the Direct Claims specified in the November 2017 Notice, (C) the Third Party Claims for indemnification listed on Exhibit C hereto, (D) any breach or alleged

4

breach by Teva of any representation or warranty contained in the MPA, (E) any breach or alleged breach by Teva of any covenant in the MPA that was intended to be performed by Teva or its Affiliates on or prior to the Closing or (F) any breach or alleged breach by Teva prior to the date hereof of any covenant in the MPA that was intended to be performed by Teva or its Affiliates after the Closing (a "Teva Post-Closing, Pre-Settlement Covenant Breach") other than any Teva Post-Closing, Pre-Settlement Covenant Breach the material underlying facts of which are unknown to Allergan as of the date hereof, or (ii) for any Losses resulting from any potential Claims that are referenced in the Submissions (collectively, the "Allergan Released Claims").

(c)     Except as provided herein, (i) Teva shall continue to have rights to indemnification under Section 12.2(a)(ii) and Section 12.2(a)(iii) of the MPA; and (ii) Allergan shall continue to have rights to indemnification under Section 12.3(a)(ii), Section 12.3(a)(iii) and Section 12.3(a)(iv) of the MPA. For the avoidance of doubt, (i) Teva shall be prohibited from asserting any of the Teva Released Claims as Claims under Section 12.2(a)(iii) of the MPA, (ii) Allergan shall be prohibited from asserting any of the Allergan Released Claims as Claims under Section 12.3(a)(iii) or Section 12.3(a)(iv) of the MPA and (iii) the rights and obligations of the Parties under Section 9.1 of the MPA shall remain in effect.

(d)     The Parties acknowledge that the releases in this Agreement may include a release of claims, counterclaims, demands, damages, debts, liabilities, attorneys' fees, actions, causes of action, obligations and demands whatsoever, whether fixed or contingent, at law or in equity that are unknown or unsuspected. The Parties hereby waive any common law or statutory doctrine or provision that limits the effect of a release of unknown or unsuspected claims, counterclaims, demands, damages, debts, liabilities, attorneys' fees, actions, causes of action, obligations and demands whatsoever, whether fixed or contingent, at law or in equity. The releases in this Agreement are to be interpreted as broadly as the law allows.

(e)     Teva represents and warrants to Allergan that no Buyer Indemnified Party has received any Third Party Claim against a Buyer Indemnified Party other than (i) the Teva Indemnification Claims and (ii) any Third Party Claims based upon any branded or generic opioid drugs.

(f)     Allergan represents and warrants to Teva that no Seller Indemnified Party has received any Third Party Claim against a Seller Indemnified Party other than (i) the Allergan Indemnification Claims and (ii) the Third Party Claims listed on Exhibit A or Exhibit B hereto and any Third Party Claims based upon any branded or generic opioid drugs.

6.     **Covenant Not to Sue and Agreement to Indemnify**.

(a)     Teva agrees, on behalf of itself and each of its current and former directors, officers, employees, representatives, agents, controlling entities or persons, predecessors or successors-in-interest and assigns, (i) that it will neither initiate

5

nor continue any claims, suits, actions, arbitrations or proceedings that seek any relief based upon the Teva Released Claims or the Teva Agreed Liabilities and (ii) that it will not assign or otherwise transfer the Teva Released Claims to any party. Teva further agrees that it will indemnify Allergan for any and all costs, charges or expenses, including but not limited to reasonable attorneys' fees, incurred in connection with any breach of this Section 6(a).

(b)     Allergan agrees, on behalf of itself and each of its current and former directors, officers, employees, representatives, agents, controlling entities or persons, predecessors or successors-in-interest and assigns, (i) that it will neither initiate nor continue any claims, suits, actions, arbitrations or proceedings that seek any relief based upon the Allergan Released Claims and (ii) that it will not assign or otherwise transfer the Allergan Released Claims to any party. Allergan further agrees that it will indemnify Teva for any and all costs, charges or expenses, including but not limited to reasonable attorneys' fees, incurred in connection with any breach of this Section 6(b).

7.    **Representations and Warranties of the Parties**. The Parties represent and warrant to one another that:

(a)     Such Party has the legal right, capacity and authority to enter into this Agreement;

(b)     Such Party has taken all necessary corporate and legal actions, as applicable, to duly approve the making and performance of this Agreement;

(c)     This Agreement has been validly executed and delivered by such Party and constitutes its valid and binding obligation, enforceable against the Party in accordance with the terms hereof;

(d)     Neither the execution nor performance of this Agreement by such Party constitutes or will constitute a violation or breach of such Party's charter or bylaws (or comparable documents, as applicable);

(e)     Neither the execution nor the performance of this Agreement will constitute a violation or breach of any law, order, injunction, judgment, statute or regulation applicable to such Party or constitutes or will constitute a material default (or would, with the passage of time or the giving of notice, or both, constitute such a default) under any material contract, agreement or other instrument to which such Party is a party or by which it is bound;

(f)     Such Party has not relied upon any document, statement, representation, promise, inducement, understanding or information made or provided by any other Party or its representatives except as expressly set forth in this Agreement, and such Party has relied solely upon its own due diligence and independent judgment concerning this Agreement and the Party's decision to enter into this Agreement;

(g)     Such Party has read this Agreement and fully understands all of its terms, covenants, conditions, provisions and obligations and such Party believes that this

6

Agreement is a fair, just and reasonable resolution of the Working Capital Dispute, the Teva Indemnification Claims and the Allergan Indemnification Claims;

(h)    Such Party specifically acknowledges that this Agreement shall not be subject to any claim of mistake of fact, that it expresses a full and complete settlement between the Parties, and that regardless of the adequacy or inadequacy of the consideration described herein, this Agreement is intended to be a final and complete settlement of claims and obligations between the Parties described herein as covered by this Agreement; and

(i)    Such Party has not assigned or transferred any Claim or interest in any claim that is the subject of the releases in this Agreement.

8.   **Multiple Counterparts**. This Agreement: (i) may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument and shall be binding upon the person or entity executing the same; and (ii) may be executed by a signature page delivered by facsimile or email, in which case the person or entity so executing this Agreement shall promptly thereafter deliver its originally executed signature page (but the failure to deliver an original shall not affect the binding nature of such person's or entity's signature).

9.   **Governing Law**. This Agreement shall be governed by the laws of the State of New York without regard to its conflict of laws provisions.

10.   **Dispute Resolution**. Any dispute, controversy or claim relating to the interpretation or construction of Sections 4 or 5 of this Agreement, or to the determination of whether a claim for indemnification made by a Party under Sections 12.2 or 12.3 of the MPA is, in fact, subject to indemnification under the MPA, shall be finally resolved by arbitration in accordance with the International Institute for Conflict Prevention and Resolution ("CPR") Rules for Non-Administered Arbitration ("Rules") as in effect on the date of the Agreement, or such other rules and procedures as the Parties may agree. The arbitration will be conducted before a panel of three arbitrators, to be selected in accordance with the screened selection process provided in the Rules. The place of arbitration shall be New York, New York. The language of the arbitration shall be English. Except as otherwise agreed by the Parties, the arbitrators shall issue an award within ninety (90) days of the filing of the notice of intention to arbitrate, and the arbitrators shall agree to comply with this schedule before accepting appointment. Any claims for indemnification sought by Allergan involving allegations against the Transferred Group that relate to Claims based upon (i) contracts for services related to generic drugs that are Products or (ii) alleged or actual violations of competition or antitrust Laws in the generic drug market involving Products (other than any such violation of competition or antitrust Laws relating to any litigation settlement agreement between Allergan and Teva (or between their respective Affiliates)), shall be subject to a rebuttable presumption by the arbitrators that such claims are subject to indemnification by Teva under the MPA. Any claims for indemnification sought by Teva involving allegations against the Transferred Group that relate to Claims based upon (i) contracts for services related to branded drugs of the Retained Business that are not Products or (ii) alleged or

7

actual violations of competition or antitrust Laws in the branded drug market involving products of the Retained Business that are not Products (other than any such violation of competition or antitrust Laws relating to any litigation settlement agreement between Allergan and Teva (or between their respective Affiliates)), shall be subject to a rebuttable presumption by the arbitrators that such claims are subject to indemnification by Allergan under the MPA. In the event the arbitrators determine that the rebuttable presumption is inapplicable, the arbitrators will then proceed to determine whether the claim for indemnification is subject to indemnification under the MPA. Any award issued by the arbitrators shall be final, binding and conclusive on the Parties hereto and shall constitute an arbitral award upon which a judgment may be entered in any court having jurisdiction thereof. The prevailing party in any arbitration conducted under this provision will be entitled to an award of all fees, costs and expenses of the arbitrators and the arbitration (including, for the avoidance of doubt, reasonable attorneys' fees).

11. **No Effect on Manufacturing Agreements**. Nothing in this Agreement shall modify or in any way affect the parties' rights and obligations under any manufacturing or supply agreements between Allergan and Teva (or between their respective Affiliates).

12. **Kadian Agreement**. Teva shall, and shall cause its Controlled Affiliates to, (i) cooperate with Allergan to assign the Asset Purchase Agreement, dated December 17, 2008, by and between Actavis Elizabeth, LLC and King Pharmaceuticals, Inc. (the "Kadian Agreement") to Allergan or its Affiliate, such assignment to be effectuated by an agreement mutually satisfactory to Teva and Allergan, and (ii) prior to the assignment of the Kadian Agreement to Allergan or its Affiliate, cooperate with Allergan to provide Allergan with the benefits of the Kadian Agreement, including cooperation in asserting any indemnification rights of Actavis Elizabeth, LLC (or its successors and assigns) under the Kadian Agreement. Following the assignment of the Kadian Agreement to Allergan or its Affiliate, Allergan shall, and shall cause its Controlled Affiliates to, cooperate with Teva to provide Teva with the benefits of the Kadian Agreement that relate to the authorized generic of Kadian®, including cooperation in asserting any indemnification rights of Teva or its Controlled Affiliates under the Kadian Agreement with respect to any Liabilities or Losses to the extent such Liabilities or Losses are based upon or related to the authorized generic of Kadian®.

13. **No Modification**. This Agreement may only be modified or amended by a writing dated after the date hereof and signed by each of the Parties.

14. **Construction**.

    (a)   This Agreement shall be construed so that the word "including" means "including without limitation;" and the singular shall include the plural and vice versa.

    (b)   For the avoidance of doubt, "Products" as used in this Agreement shall exclude any products that are Excluded Assets.

    (c)   Titles or headings contained in this Agreement are included only for ease of reference and will have no substantive effect.

    (d)   None of the Parties will be entitled to have any language contained in this Agreement construed against another because of the identity of the drafter.

8

15. **Confidentiality**. Neither of the Parties hereto shall issue, make or cause to be made any disclosures regarding the terms of this Agreement without the written consent of the other Party, except that the Parties (i) may disclose the terms of this Agreement to attorneys, accountants and other advisors retained by the Party; (ii) may make such disclosures as may be required by applicable laws or regulations, provided that the disclosing Party notifies the other Party in writing of any such requirement and the intended disclosure at least two (2) Business Days in advance of any such disclosure; and (iii) may disclose that they entered into a "Settlement Agreement" without disclosing its terms. Either of the Parties may disclose the terms and conditions of this Agreement if such Party receives a subpoena or other process or order to produce this Agreement, provided that such Party shall, prior to any disclosure to any third party, promptly notify the other Parties to this Agreement so that each Party has a reasonable opportunity to respond to such subpoena, process or order. The Party receiving a subpoena, process or order shall (in the first instance) take no action contrary to the confidentiality provisions set forth above, and shall make reasonable efforts to respond only subject to the confidentiality designation available under a protective order in litigation. The Party objecting shall have the burden of defending against such subpoena, process or order. The Party receiving the subpoena, process or order shall be entitled to comply with it, except to the extent that any other Party is successful in obtaining an order modifying or quashing it.

16. **Entire Agreement**. This Agreement constitutes the full and entire understanding and agreement among the Parties with regard to the subject hereof and supersedes any prior negotiations, representations or agreements, written or oral, with respect to such subject matter; provided, however, that nothing herein shall amend, modify, or supersede the Tax Settlement and Resolution Agreement dated October 15, 2017, which the Parties intend to remain in full force and effect.

17. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or contrary to public policy, such term or provision shall be modified to the extent necessary to be valid and enforceable and shall be enforced as modified; provided, however, that if no modification is possible such provision shall be deemed stricken from this Agreement. In any case, the remaining provisions of this Agreement shall not be affected thereby.

18. **No Waiver**. Any waiver of any Party's rights under this Agreement is only effective if in writing signed by the Party to be charged or its duly authorized representative, and any such waiver shall only be effective for the specific matter waived and shall not be deemed to apply to any other conduct, provision or other matter.

19. **No Assignment**. The Parties agree that they have not, and will not, sell, transfer or assign, or purport to sell, transfer or assign, any Claim or interest in any claim that is the subject of the releases in this Agreement.

20. **Allocation of Global Purchase Price**. Within thirty (30) days following the Effective Date, Allergan shall deliver to Teva the final allocation of the Global Purchase Price (which, for the avoidance of doubt, shall be reduced by the entire amount of the Settlement Payment) among the Acquired Assets (the "Final PPA"). Teva agrees to treat the Final PPA as the Global Purchase Price Allocation in accordance with the MPA.

9

21. **Notices**. All notices and other communications hereunder shall be in writing, shall be sent by Federal Express or other expedited courier service, and shall be deemed effective and duly given upon delivery to the other Party at the following addresses or to such other addresses as the Parties may notify one another of in accordance with the provision of this Section:

If to Teva:

> Teva Pharmaceutical Industries Ltd.
> 5 Basel Street
> Petach Tikva 4951033
> Israel
> Attention: Chief Legal Officer
> Facsimile: +11 972 3 926-7896

With a copy (which does not constitute notice) to:

> Vinson & Elkins LLP
> 666 Fifth Avenue
> New York, NY 10103
> Attention: Ari Berman
> Facsimile: +1 (917) 849-5368

If to Allergan:

> Allergan PLC
> Clonshaugh Business and Technology Park
> Coolock
> Dublin, D17 E400
> Ireland
> Attention: Chief Legal Officer and Secretary
> Facsimile: +1 (862) 261-8223

With copies to (which shall not constitute notice):

> Allergan plc
> 5 Giralda Farms
> Madison, New Jersey 07940
> Attention: Chief Legal Officer and Secretary
> Facsimile: +1 (862) 261-8223

and:

> Latham & Watkins LLP
> 885 Third Avenue
> New York, NY 10022-4834
> Attention: Charles K. Ruck
>              R. Scott Shean
> Facsimile: +1 (212) 751-4864

10

22.  **Independent Legal Advice**. This Agreement was negotiated between the Parties at arm's length. Teva and Allergan acknowledge that they have been advised by their own independently selected counsel and other advisors in connection with this Agreement. Teva and Allergan further acknowledge that they enter into this Agreement solely on the basis of advice from independently selected counsel and on the basis of their own independent investigation of all of the facts, laws and circumstances material to this Agreement or any provision hereof, and not in any manner or to any degree based upon any statement or omission by any other party hereto or its counsel. As such, Teva and Allergan agree that they shall have no basis to challenge, set aside or void this Agreement on grounds of fraud, fraudulent inducement or related legal theories.

[SIGNATURE PAGES FOLLOW]

11

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed in their respective names by their duly authorized representatives as of the date and year written below.

TEVA PHARMACEUTICAL INDUSTRIES, LTD.

/s/ Michael McClellan
Name: Michael McClellan

Date: January 31, 2018

TEVA PHARMACEUTICAL INDUSTRIES, LTD.

/s/ Doron Herman
Name: Doron Herman

Date: January 31, 2018

ALLERGAN PLC

/s/ A. Robert D. Bailey
Name: A. Robert D. Bailey

Date: January 31, 2018

EXHIBIT 21

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended **December 31, 2015**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

| Commission File Number | Exact name of registrant as specified in its charter, principal office and address and telephone number | State of incorporation or organization | I.R.S. Employer Identification No. |
|---|---|---|---|
| 001-36867 | **Allergan plc** <br> Clonshaugh Business and Technology Park <br> Coolock, Dublin, D17 E400, Ireland <br> (862) 261-7000 | Ireland | 98-1114402 |
| 001-36887 | **Warner Chilcott Limited** <br> Cannon's Court 22 <br> Victoria Street <br> Hamilton HM 12 <br> Bermuda <br> (441) 295-2244 | Bermuda | 98-0496358 |

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Allergan plc Ordinary Shares, $0.0001 par value | New York Stock Exchange |
| Allergan plc 5.500% Mandatory Convertible Preferred Shares, Series A, par value of $0.0001 | New York Stock Exchange |
| Actavis Funding SCS $500,000,000 Floating Rate Notes due 2016* | New York Stock Exchange |
| *Notes issued by Actavis Funding SCS and guaranteed by Warner Chilcott Limited | |

**Securities registered pursuant to Section 12(g) of the Act:**

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

| | | | | |
|---|---|---|---|---|
| Allergan plc | Yes ☒ | | No ☐ |
| Warner Chilcott Limited | Yes ☒ | | No ☐ |

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.

| | | | | |
|---|---|---|---|---|
| Allergan plc | Yes ☐ | | No ☒ |
| Warner Chilcott Limited | Yes ☐ | | No ☒ |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days:

| | | | | |
|---|---|---|---|---|
| Allergan plc | Yes ☒ | | No ☐ |
| Warner Chilcott Limited | Yes ☒ | | No ☐ |

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).

| | | | | |
|---|---|---|---|---|
| Allergan plc | Yes ☒ | | No ☐ |
| Warner Chilcott Limited | Yes ☒ | | No ☐ |

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

| | |
|---|---|
| Allergan plc | ☐ |
| Warner Chilcott Limited | ☒ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Allergan plc | Large accelerated filer ☒ | Accelerated filer ☐ |
| | Non-accelerated filer (Do not check if a smaller reporting company) ☐ | Smaller reporting company ☐ |
| Warner Chilcott Limited | Large accelerated filer ☐ | Accelerated filer ☐ |
| | Non-accelerated filer (Do not check if a smaller reporting company) ☒ | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

| | | | | |
|---|---|---|---|---|
| Allergan plc | Yes ☐ | | No ☒ |
| Warner Chilcott Limited | Yes ☐ | | No ☒ |

The aggregate market value of the voting and non-voting stock held by non-affiliates of Allergan plc as of June 30, 2015, based upon the last sale price reported for such date on the New York Stock Exchange, was $119.0 billion. The calculation of the aggregate market value of voting and non-voting stock excludes Class A ordinary shares of Allergan plc held by executive officers, directors, and stockholders that the registrant concluded were affiliates of Allergan plc on that date.

Number of shares of Allergan plc's Ordinary Shares outstanding on February 15, 2016: 394,687,384

This Annual Report on Form 10-K is a combined report being filed separately by two different registrants: Allergan plc and Warner Chilcott Limited. Warner Chilcott Limited is an indirect wholly owned subsidiary of Allergan plc. The information in this Annual Report on Form 10-K is equally applicable to Allergan plc and Warner Chilcott Limited, except where otherwise indicated. Warner Chilcott Limited meets the conditions set forth in General Instruction H(1)(a) and (b) of Form 10-K and, to the extent applicable, is therefore filing this form with a reduced disclosure format.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain information required by Part III of this Annual Report on Form 10-K ("Annual Report") is incorporated by reference from the Allergan plc proxy statement to be filed pursuant to Regulation 14A with respect to the Registrant's Annual Meeting of Shareholders to be held on or about May 5, 2016.

**ALLERGAN PLC**

**WARNER CHILCOTT LIMITED**

**TABLE OF CONTENTS**

**FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2015**

PAGE

**PART I**

| | | |
|---|---|---|
| ITEM 1. | Business | 3 |
| ITEM 1A. | Risk Factors | 23 |
| ITEM 1B. | Unresolved Staff Comments | 52 |
| ITEM 2. | Properties | 52 |
| ITEM 3. | Legal Proceedings | 54 |
| ITEM 4. | Mine Safety Disclosures | 54 |

**PART II**

| | | |
|---|---|---|
| ITEM 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 55 |
| ITEM 6. | Selected Financial Data | 57 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 59 |
| ITEM 7A. | Quantitative and Qualitative Disclosures About Market Risk | 100 |
| ITEM 8. | Financial Statements and Supplementary Data | 102 |
| ITEM 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 102 |
| ITEM 9A. | Controls and Procedures | 102 |
| ITEM 9B. | Other Information | 103 |

**PART III**

| | | |
|---|---|---|
| ITEM 10. | Directors and Executive Officers of the Registrant | 104 |
| ITEM 11. | Executive Compensation | 104 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management | 104 |
| ITEM 13. | Certain Relationships and Related Transactions | 104 |
| ITEM 14. | Principal Accounting Fees and Services | 104 |

**PART IV**

| | | |
|---|---|---|
| ITEM 15. | Exhibits, Financial Statement Schedules | 105 |
| | SIGNATURES | 106 |

ITEM 1.      *BUSINESS*

**Explanatory Note**

This Annual Report on Form 10-K is a combined annual report being filed separately by two registrants: Allergan plc and its indirect wholly-owned subsidiary, Warner Chilcott Limited. Each registrant hereto is filing on its own behalf all the information contained in this annual report that relates to such registrant. Each registrant hereto is not filing any information that does not relate to such registrant, and therefore makes no representations as to any such information.

**Company History**

Allergan plc (formerly known as Actavis plc) was incorporated in Ireland on May 16, 2013 as a private limited company and re-registered effective September 20, 2013 as a public limited company. It was established for the purpose of facilitating the business combination between Actavis, Inc. and Warner Chilcott plc ("Warner Chilcott"). On October 1, 2013, pursuant to the transaction agreement dated May 19, 2013 among Actavis, Inc., Warner Chilcott, Allergan plc, Actavis Ireland Holding Limited, Actavis W.C. Holding LLC (now known as Actavis W.C. Holding Inc.) and Actavis W.C. Holding 2 LLC (now known as Actavis W.C. Holding 2 Inc.) ("MergerSub"), (i) the Company acquired Warner Chilcott (the "Warner Chilcott Acquisition") pursuant to a scheme of arrangement under Section 201, and a capital reduction under Sections 72 and 74, of the Irish Companies Act of 1963 where each Warner Chilcott ordinary share was converted into 0.160 of an Allergan plc ordinary share (the "Company Ordinary Shares"), or $5,833.9 million in equity consideration, and (ii) MergerSub merged with and into Actavis, Inc., with Actavis, Inc. as the surviving corporation in the merger (the "Merger" and, together with the Warner Chilcott Acquisition, the "Transactions"). Following the consummation of the Transactions, Actavis, Inc. and Warner Chilcott became wholly-owned subsidiaries of Allergan plc. Each of Actavis, Inc.'s common shares was converted into one Company Ordinary Share. Effective October 1, 2013, through a series of related-party transactions, Allergan plc contributed its indirect subsidiaries, including Actavis, Inc., to Warner Chilcott Limited.

On March 17, 2015, the Company acquired Allergan, Inc. ("Legacy Allergan") for approximately $77.0 billion including outstanding indebtedness assumed of $2.2 billion, cash consideration of $40.1 billion and equity consideration of $34.7 billion, which includes outstanding equity awards (the "Allergan Acquisition"). Under the terms of the agreement, Legacy Allergan shareholders received 111.2 million of the Company's ordinary shares, 7.0 million of the Company's non-qualified stock options and 0.5 million of the Company's share units. The addition of Legacy Allergan's therapeutic franchises in ophthalmology, neurosciences and medical aesthetics/dermatology/plastic surgery complements the Company's existing central nervous system, gastroenterology, women's health and urology franchises. The combined company benefits from Legacy Allergan's global brand equity and consumer awareness of key products, including Botox® and Restasis®. The transaction expanded our presence and market and product reach across many international markets, with strengthened commercial positions across Canada, Europe, Southeast Asia and other high-value growth markets, including China, India, the Middle East and Latin America.

In connection with the Allergan Acquisition, the Company changed its name from Actavis plc to Allergan plc.  Actavis plc's ordinary shares were traded on the NYSE under the symbol "ACT" until the opening of trading on June 15, 2015, at which time Actavis plc changed its corporate name to "Allergan plc" and changed its ticker symbol to "AGN."  Pursuant to Rule 12g-3(c) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), Allergan plc is the successor issuer to Actavis plc's ordinary shares and Actavis plc's mandatory convertible preferred shares, both of which are deemed to be registered under Section 12(b) of the Exchange Act, and Allergan plc is subject to the informational requirements of the Exchange Act, and the rules and regulations promulgated thereunder.

References throughout to "we," "our," "us," the "Company" or "Allergan" refer to financial information and transactions of Watson Pharmaceuticals, Inc. prior to January 23, 2013, Actavis, Inc. from January 23, 2013 until October 1, 2013 and Allergan plc and Warner Chilcott Limited subsequent to October 1, 2013.

References throughout to "Ordinary Shares" refer to Actavis, Inc.'s Class A common shares, par value $0.0033 per share, prior to the consummation of the Transactions and to Allergan plc's ordinary shares, par value $0.0001 per share, since the consummation of the Transactions.

On July 26, 2015, Allergan plc entered into a master purchase agreement (the "Teva Agreement"), under which Teva Pharmaceutical Industries Ltd. ("Teva") agreed to acquire the Company's global generic pharmaceuticals business and certain other assets (the "Teva Transaction").  Under the Teva Agreement, upon the closing of the Teva Transaction, we will receive $33.75 billion in cash and 100.3 million Teva ordinary shares (or American Depository Shares with respect thereto), which approximates $6.75 billion in Teva stock using the then-current stock price at the time the Teva Transaction was announced, in exchange for which Teva will acquire our global generics business, including the United States ("U.S.") and international generic commercial units, our third-party supplier Medis, our global generic manufacturing operations, our global generic R&D unit, our international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and some established international brands. We continue to work toward

3

**Performance Graph**

*The information in this section of the Annual Report pertaining to Allergan plc's performance relative to our peers is being furnished but not filed with the SEC, and as such, the information is neither subject to Regulation 14A or 14C or to the liabilities of Section 18 of the Securities Exchange Act of 1934, as amended.*

The following graph compares the cumulative 5-year total return of holders of Allergan plc's Ordinary Shares (formerly Class A common shares of Actavis plc.) with the cumulative total returns of the S&P 500 index and the Dow Jones US Pharmaceuticals index. The graph tracks the performance of a $100 investment in our Ordinary Shares and in each of the indexes (with reinvestment of all dividends, if any) on December 31, 2010 with relative performance tracked through December 31, 2015.

Notwithstanding anything to the contrary set forth in our previous filings under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, which might incorporate future filings made by us under those statutes, the following graph will not be deemed incorporated by reference into any future filings made by us under those statutes.



| | 12/10 | 12/11 | 12/12 | 12/13 | 12/14 | 12/15 |
|---|---|---|---|---|---|---|
| Allergan plc | 100.00 | 116.82 | 166.51 | 325.27 | 498.37 | 605.03 |
| S&P 500 | 100.00 | 102.11 | 118.45 | 156.82 | 178.29 | 180.75 |
| Dow Jones US Pharmaceuticals | 100.00 | 118.64 | 135.14 | 180.98 | 219.72 | 233.36 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

56

EXHIBIT 22

**Allergan Public Limited Company**

**2016 Irish Annual Report**

**Allergan Public Limited Company**

**CONTENTS**

| | Page |
|---|---|
| DIRECTORS AND OTHER INFORMATION | 2 |
| DIRECTORS' REPORT | 3 |
| INDEPENDENT AUDITORS' REPORT | 82 |
| CONSOLIDATED PROFIT AND LOSS ACCOUNT | 85 |
| CONSOLIDATED STATEMENT OF COMPREHENSIVE INCOME | 86 |
| CONSOLIDATED BALANCE SHEET | 87 |
| CONSOLIDATED STATEMENT OF SHAREHOLDERS' EQUITY | 89 |
| CONSOLIDATED STATEMENT OF CASH FLOWS | 90 |
| NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS | 91 |
| PARENT COMPANY BALANCE SHEET | 238 |
| PARENT COMPANY STATEMENT OF CHANGES IN EQUITY | 239 |
| NOTES TO THE PARENT COMPANY FINANCIAL STATEMENTS | 240 |

1

**Allergan Public Limited Company**

---

**DIRECTORS AND OTHER INFORMATION**

**Board of Directors (as of December 31, 2016)**

Brenton L. Saunders
Nesli Basgoz, M.D.
Paul M. Bisaro
James H. Bloem
Christopher W. Bodine
Christopher J. Coughlin
Michael R. Gallagher
Catherine M. Klema
Peter J. McDonnell, M.D.
Patrick J. O'Sullivan
Ronald R. Taylor
Fred G. Weiss

**Secretary and Registered Office**

A. Robert D. Bailey
Clonshaugh Business and Technology Park
Coolock
Dublin, D17, E400
Ireland

**Registered Number:** 527629

**Auditors**

PricewaterhouseCoopers
Chartered Accountants and Statutory Auditor
One Spencer Dock
North Wall Quay
Dublin 1
Ireland

2

**Allergan Public Limited Company**

**DIRECTORS' REPORT - continued**

**Financial condition, liquidity and capital resources - continued**

*Debt and Borrowing Capacity – continued*

| | Balance As of | | Fair Market Value As of | |
| --- | --- | --- | --- | --- |
| | December 31, 2016 | December 31, 2015 | December 31, 2016 | December 31, 2015 |
| | $ | $ | $ | $ |
| **Term Loan Indebtedness:** | | | | |
| WC Term Loan | | | | |
| WC Three Year Tranche variable rate debt maturing October 1, 2016 | - | 191.5 | | |
| WC Five Year Tranche variable rate debt maturing October 1, 2018 | - | 498.8 | | |
| | - | 690.3 | | |
| ACT Term Loan | | | | |
| 2017 Term Loan variable rate debt maturing October 31, 2017 | - | 572.1 | | |
| 2019 Term Loan variable rate debt maturing July 1, 2019 | - | 1,700.0 | | |
| | - | 2,272.1 | | |
| AGN Term Loan | | | | |
| AGN Three Year Tranche variable rate debt maturing March 17, 2018 | - | 2,750.0 | | |
| AGN Five Year Tranche variable rate debt maturing March 17, 2020 | - | 2,543.8 | | |
| | - | 5,293.8 | | |
| **Total Term Loan Indebtedness** | **-** | **8,256.2** | | |
| **Other Indebtedness** | | | | |
| Revolver Borrowings | - | 200.0 | | |
| Debt Issuance Costs | (144.6) | (195.8) | | |
| Other | 85.5 | 97.4 | | |
| **Total Other Borrowings** | **(59.1)** | **101.6** | | |
| **Capital Leases** | **2.4** | **4.1** | | |
| **Total Indebtedness** | **32,768.7** | **42,530.4** | | |

Fair market value in the table above is determined in accordance with ASC Topic 820 "Fair Value Measurement" ("ASC 820") under Level 2 based upon quoted prices for similar items in active markets.

**Floating Rate Notes**

On March 4, 2015, Actavis Funding SCS, a limited partnership (société en commandite simple) organized under the laws of the Grand Duchy of Luxembourg and an indirect wholly-owned subsidiary of Allergan plc, issued floating rate notes due 2016 (the "2016 Floating Rate Notes"), floating rate notes due 2018 (the "2018 Floating Rate Notes"), floating rate notes due 2020 (the "2020 Floating Rate Notes"), 1.850% notes due 2017 (the "1.850% 2017 Notes"), 2.350% notes due 2018 (the "2.350% 2018 Notes"), 3.000% notes due 2020 (the "3.000% 2020 Notes"), 3.450% notes due 2022 (the "3.450% 2022 Notes"), 3.800% notes due 2025 (the "3.800% 2025 Notes"), 4.550% notes due 2035 (the "4.550% 2035 Notes") and 4.750% notes due 2045 (the "4.750% 2045 Notes"). The notes are fully and unconditionally guaranteed by Actavis Funding SCS's indirect

**Allergan Public Limited Company**

### DIRECTORS' REPORT - continued

#### Floating Rate Notes - continued

parents, Warner Chilcott Limited and Actavis Capital S.a.r.l. ("Actavis Capital"), and by Allergan Finance LLC (formerly known as Actavis, Inc.), a subsidiary of Actavis Capital, on an unsecured and unsubordinated basis. Allergan plc has not guaranteed the notes.

The 2016 Floating Rate Notes were paid in full at maturity on September 1, 2016 and bore interest at the three-month LIBOR plus 0.875%. The 2018 Floating Rate Notes and the 2020 Floating Rate Notes bear interest at a floating rate equal to three-month LIBOR plus 1.080% and 1.255% per annum, respectively. Interest on the 2018 Floating Rate Notes and the 2020 Floating Rate Notes is payable quarterly on March 12, June 12, September 12 and December 12 of each year, and began on June 12, 2015.

#### Fixed Rate Notes

*Acquired Allergan Notes*

On March 17, 2015 in connection with the Allergan Acquisition, the Company acquired, and subsequently guaranteed the indebtedness of Allergan, Inc. comprised of the $350.0 million 2.800% senior notes due 2023, the $650.0 million 3.375% senior notes due 2020, the $250.0 million 1.350% senior notes due 2018 and the $800.0 million 5.750% senior notes due 2016. Interest payments are due on the $350.0 million senior notes semi-annually on the principal amount of the notes at a rate of 2.80% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption, if the redemption occurs prior to December 15, 2022 (three months prior to the maturity of the 2023 senior notes). If the redemption occurs on or after December 15, 2022, then such redemption is not subject to the make-whole provision. Interest payments are due on the $650.0 million senior notes semi-annually on the principal amount of the notes at a rate of 3.375% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments are due on the $250.0 million senior notes semi-annually on the principal amount of the notes at a rate of 1.350% per annum, and are redeemable at any time at the Company's option, subject to a make-whole provision based on the present value of remaining interest payments at the time of the redemption. Interest payments were due on the $800.0 million senior notes semi-annually on the principal amount of the notes at a rate of 5.750% per annum. The fair value of the acquired senior notes was determined to be $2,087.5 million as of March 17, 2015. As such, as part of acquisition accounting, the company recorded a premium of $37.5 million to be amortized as contra interest over the life of the notes.

The $800.0 million 5.750% senior notes were paid in full on April 1, 2016 with proceeds from the first quarter of 2016 borrowings under the revolving credit facility of $900.0 million at maturity.

*Acquired Forest Notes*

On July 1, 2014 in connection with the Forest Acquisition, the Company acquired the indebtedness of Forest comprised of the $1,050.0 million 4.375% senior notes due 2019, the $750.0 million 4.875% senior notes due 2021 and the $1,200.0 million 5.000% senior notes due 2021 (together the "Acquired Forest Notes"). Interest payments are due on the $1,050.0 million senior notes semi-annually in arrears on February 1 and August 1 beginning August 1, 2014. Interest payments are due on the $750.0 million senior notes due 2021 semi-annually in arrears on February 15 and August 15 beginning August 15, 2014. Interest payments are due on the $1,200.0 million senior note due 2021 semi-annually in arrears on June 15 and December 15, beginning

Allergan Public Limited Company

**DIRECTORS' REPORT - continued**

**Fixed Rate Notes - continued**

*Acquired Forest Notes – continued*

December 15, 2014. As a result of acquisition accounting, the notes were fair valued with a premium of $260.3 million as of July 1, 2014, which will be amortized as contra-interest over the life of the notes. The guarantor of the debt is Allergan plc.

*Allergan Acquisition Notes*

In connection with the Allergan Acquisition, Actavis Funding SCS issued the $1,000.0 million 1.850% notes due March 1, 2017, the $3,000.0 million 2.350% notes due March 12, 2018, the $3,500.0 million 3.000% notes due March 12, 2020, the $3,000.0 million 3.450% notes due March 15, 2022, the $4,000.0 million 3.800% notes due March 15, 2025, the $2,500.0 million 4.550% notes due March 15, 2035 and the $2,500.0 million 4.750% notes due March 15, 2045. These fixed rate securities were issued, in part, to finance the Allergan Acquisition.

*2014 Notes Issuance*

On June 10, 2014, Actavis Funding SCS issued the $500.0 million 1.300% notes due 2017, $500.0 million 2.450% notes due 2019, $1,200.0 million 3.850% notes due 2024 and $1,500.0 million 4.850% notes due 2044 (the "2014 New Notes"). Interest payments are due on the 2014 New Notes on June 15 and December 15 semi-annually, beginning on December 15, 2014. The guarantors of the debt are Warner Chilcott Limited, Actavis Capital S.a.r.l., and Allergan Finance, LLC.

*Allergan Finance LLC Supplemental Indenture*

On October 1, 2013, the Company, Allergan Finance LLC, a wholly owned subsidiary of the Company, and Wells Fargo Bank, National Association, as trustee, entered into a fourth supplemental indenture (the "Fourth Supplemental Indenture") to the indenture, dated as of August 24, 2009 (the "Base Indenture" and, together with the First Supplemental Indenture, the Second Supplemental Indenture and the Third Supplemental Indenture (each as defined below), the "Indenture"), as supplemented by the first supplemental indenture, dated as of August 24, 2009 (the "First Supplemental Indenture"), the second supplemental indenture, dated as of May 7, 2010 (the "Second Supplemental Indenture"), and the third supplemental indenture, dated as of October 2, 2012 (the "Third Supplemental Indenture"). Pursuant to the Fourth Supplemental Indenture, the Company has provided a full and unconditional guarantee of Allergan Finance LLC's obligations under its then outstanding $450.0 million 5.000% senior notes due August 15, 2014, (the "2014 Notes"), its $1,200.0 million 1.875% senior notes due October 1, 2017 (the "2017 Notes"), its $400.0 million 6.125% senior notes due August 15, 2019 (the "2019 Notes"), its $1,700.0 million 3.250% senior notes due October 1, 2022 (the "2022 Notes") and its $1,000.0 million 4.625% Senior Notes due October 1, 2042 (the "2042 Notes.").

*WC Supplemental Indenture*

On October 1, 2013, the Company, WCCL (defined below), Warner Chilcott Finance LLC (the "Co-Issuer" and together with WC Company, the "Issuers") and Wells Fargo Bank, National Association, as trustee (the "WC Trustee"), entered into a third supplemental indenture (the "Supplemental Indenture") to the indenture, dated as of August 20, 2010 (the "WC Indenture"), among the Issuers, the guarantors party thereto and the WC Trustee, with respect to the Issuers' WC Notes. Pursuant to the Supplemental Indenture, the Company had provided a full and unconditional guarantee of the Issuers' obligations under the WC Notes and the WC Indenture.

Allergan Public Limited Company

## DIRECTORS' REPORT - continued

### Fixed Rate Notes - continued

*WC Supplemental Indenture – continued*

On July 21, 2014, the Company redeemed the WC Notes for $1,311.8 million, which includes a make-whole premium of $61.8 million and the principal amount of the WC Notes of $1,250.0 million. As a result of the transaction, the Company recognized a gain in July of 2014 of $29.9 million, which includes the write-off of the then outstanding unamortized premium.

*2012 Notes Issuance*

On October 2, 2012, Allergan Finance, LLC issued the 2017 Notes, the 2022 Notes, and the 2042 Notes (collectively the "2012 Senior Notes"). Interest payments are due on the 2012 Senior Notes semi-annually in arrears on April 1 and October 1 beginning April 1, 2013. Net proceeds from the offering of the 2012 Senior Notes were used for the acquisition of the Actavis Group. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

*2009 Notes Issuance*

On August 24, 2009, Allergan Finance, LLC issued the 2014 Notes and the 2019 Notes (collectively the "2009 Senior Notes"). Interest payments are due on the 2009 Senior Notes semi-annually in arrears on February 15 and August 15, respectively, beginning February 15, 2010. Net proceeds from the offering of 2009 Senior Notes were used to repay certain debt with the remaining net proceeds being used to fund a portion of the cash consideration for the acquisition of the Arrow Group. The guarantors of the debt are Warner Chilcott Limited and Allergan plc.

### Credit Facility Indebtedness

On August 2, 2016, the Company repaid the remaining balances of all outstanding term-loan indebtedness and terminated its then existing revolving credit facility with proceeds from the Teva Transaction.

*WC Term Loan Agreement*

On December 17, 2014, Allergan plc and certain of its subsidiaries entered into a second amendment agreement (the "WC Term Loan Amendment") among Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, Actavis WC 2 S.à r.l. ("Actavis WC 2"), WCCL, Warner Chilcott Corporation ("WC Corporation" and together with Actavis WC 2 and WCCL, the "WC Borrowers"), Bank of America, N.A. ("BofA"), as administrative agent, and the lenders party thereto. The WC Term Loan Amendment amended and restated Allergan plc's existing amended and restated WC term loan credit and guaranty agreement, dated as of June 9, 2014 (such agreement, prior to its amendment and restatement pursuant to the WC Term Loan Amendment, the "2014 WC Term Loan"), among the WC Borrowers, Allergan plc, Warner Chilcott Limited, Warner Chilcott Finance, LLC, the lenders from time to time party thereto and BofA, as administrative agent, which amended and restated Allergan plc's existing WC term loan credit and guaranty agreement, dated as of August 1, 2013 (such agreement, prior to its amendment and restatement pursuant to the 2014 WC Term Loan Amendment, the "Existing WC Term Loan") among the WC Borrowers, Warner Chilcott Finance, LLC, Actavis Limited, BofA, as administrative agent and a syndicate of banks participating as lenders.

Pursuant to the Existing WC Term Loan, on October 1, 2013 (the "WC Closing Date"), the lenders party thereto provided term loans in a total aggregate principal amount of $2.0 billion, comprised of (i) a $1.0 billion tranche that would have matured on October 1, 2016 (the "WC Three Year Tranche") and (ii) a $1.0 billion tranche that

70

# EXHIBITS 23-37
# **[sealed]**