Highly Confidential - Subject to Further Confidentiality Review

 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3

      IN RE: NATIONAL            )
 4    PRESCRIPTION               )   MDL No. 2804
      OPIATE LITIGATION          )
 5    _____     )   Case No.
                                 )   1:17-MD-2804
 6                               )
      THIS DOCUMENT RELATES      )   Hon. Dan A.
 7    TO ALL CASES               )   Polster
 8
                   WEDNESDAY, APRIL 24, 2019
 9
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                         - - -
12           Videotaped deposition of Anna
13    Lembke, M.D., held at the offices of Lieff
14    Cabraser Heimann & Bernstein, LLP, 275
15    Battery Street, 29th floor, San Francisco,
16    California, commencing at 8:07 a.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                         - - -
23
               GOLKOW LITIGATION SERVICES
24       877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25

```
 1          A.    Yes.
 2          Q.    Okay.  Does the Dependence
 3   Effect include within its scope individuals
 4   who deliberately misused an opioid medication
 5   knowing that they were not using it for its
 6   intended indication; for example, crushing
 7   it, snorting it for a high, for euphoria,
 8   instead of to treat an indicated pain
 9   condition?
10          A.    Yes.
11          Q.    So the third of your triagrid
12   {phonetic} is the Gateway Effect, capital G,
13   capital E.
14                So in -- on page 86 of your
15   report, Exhibit 1, you describe the Gateway
16   Effect as -- you say, "The trajectory to
17   addiction begins with exposure."  Is that
18   right?
19          A.    That's right.
20          Q.    Okay.  So have you ever
21   tested -- well -- actually, strike that.
22                I wanted to ask one more
23   question about the Dependence Effect.
24                Have you ever published the
25   theory of the Dependence Effect in any
```

```
 1            if I've personally done that
 2            quantitative research?
 3    QUESTIONS BY MR. TSAI:
 4            Q.    Yes.
 5            A.    I have not.
 6            Q.    Have you ever used the specific
 7    terminology of the Gateway Effect and
 8    published that observation in any
 9    peer-reviewed scientific journal?
10            A.    No.
11            Q.    Have you ever tested the
12    Gateway Effect phenomenon to rule out the
13    inclusion of individuals who deliberately
14    committed a crime in obtaining and using
15    opioids?
16            A.    I wouldn't rule out those
17    individuals.
18            Q.    Okay.  So the Gateway Effect,
19    as you envision it, as you define it, does
20    include within its scope persons, including
21    persons in Cuyahoga and Summit County, who
22    deliberately committed a crime in obtaining
23    and using opioids?
24            A.    Yes.
25            Q.    Does the Gateway Effect include
```

```
 1    within its scope individuals who deliberately

 2    misused a prescription opioid medication

 3    knowing that medication was not prescribed to

 4    them?

 5          A.    Yes.

 6          Q.    Does the Gateway Effect include

 7    within its scope individuals who deliberately

 8    misused a prescription opioid medication

 9    knowing it -- knowing that they were using it

10    contrary to its intended indication and

11    approved indication, for example, to get a

12    high instead of treating pain?

13          A.    So I would like to go back and

14    amend what I said previously about the

15    Gateway Effect and refer to my report, which

16    on page 86, specifically says that the

17    Gateway Effect describes those individuals

18    who became exposed and addicted, including

19    individuals who turned from prescription

20    opioids to illicit sources of opioids such as

21    heroin.

22                So what I'm -- the group I'm

23    referring to in the Gateway Effect is, in

24    fact, those individuals who started with a

25    medical prescription and then became addicted
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    through that medical prescription, as
 2    distinct from the Tsunami Effect, which is
 3    those individuals who -- which includes those
 4    individuals who used an opioid not
 5    necessarily prescribed to them.
 6         Q.    Okay.  So the -- you know, the
 7    beginning bound of the set of individuals
 8    that you define as within the Gateway Effect
 9    are those individuals who received a
10    prescription directly from a doctor?
11         A.    Yes, and thank you for allowing
12    me the opportunity to clarify that.
13         Q.    So the Gateway theory posits a
14    particular direction of events:  First,
15    prescription opioids prescribed by a doctor,
16    and then later illegal heroin or street
17    fentanyl addiction; is that right?
18         A.    Not necessarily.
19               So that individual -- so you're
20    right in the sense that it posits an
21    individual who began with a prescription of
22    an opioid from a doctor, but it -- and it
23    could include those individuals who then turn
24    to illicit sources of heroin, but it also
25    includes those individuals who become
```

```
 1      addicted in an ongoing matter -- manner using
 2      the opioids prescribed by that doctor.
 3             Q.     Have you ever tested whether
 4      the Gateway Effect is confounded by
 5      individuals who had already used heroin
 6      before prescription opioid medications?
 7                    MR. ARBITBLIT:  Object to form.
 8                    THE WITNESS:  Well, that's
 9             something that the McCabe article
10             looked at, and I think one of the
11             salient findings there is it's really
12             the combined effect of access to
13             nonmedical opioids, plus medical use,
14             that confers risk.  It's not one or
15             the other in isolation, and both of
16             those individual groups can become
17             addicted.
18                    So people can get addicted
19             entirely through a medical
20             prescription and not engage in
21             nonmedical use.  They can engage in
22             nonmedical use and then also be
23             exposed medically; thus compounding
24             their risk.
25
```

Highly Confidential - Subject to Further Confidentiality Review

1         inform that problem.
2                 Furthermore, we know that many
3         people without a past history of
4         addiction can get addicted to opioids
5         through a doctor's prescription.
6    QUESTIONS BY MR. TSAI:
7         Q.    Okay.  And since your opinion
8    isn't -- individual's personal history of
9    substance use disorder is not information
10   that you would need to know, you did not
11   review any such information for any actual
12   individual with opioid use disorder in
13   Cuyahoga and Summit County; am I right?
14                MR. ARBITBLIT:  Object to form.
15        Object to the preface.
16                THE WITNESS:  I did not review
17        any individual patient's history.
18   QUESTIONS BY MR. TSAI:
19        Q.    So based upon your clinical
20   experience, can you walk us through the steps
21   between a person receiving a prescription
22   from a doctor for an opioid medication and
23   the ultimate outcome of going out to a street
24   dealer and seeking illegal, nonprescribed,
25   nonregulated heroin or fentanyl?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                How does that -- how does the
 2      Gateway Effect play out in your mind from
 3      prescription to going out into a street
 4      dealer?
 5                MR. ARBITBLIT:  Object to form.
 6           Vague.  Compound.
 7                THE WITNESS:  An individual
 8           presents in a medical clinic with pain
 9           and is prescribed opioids by that
10           doctor.
11                The doctor has been misled by
12           false promotional statements on the
13           part of defendants to believe that
14           there are benefits to the use of
15           opioids used long term in the
16           treatment of pain, despite the absence
17           of evidence for that.  And that doctor
18           has also been told that the risks are
19           very small for addiction as long as
20           that individual is being prescribed
21           opioids for a pain condition.
22                So that well-intentioned and
23           compassionate doctor, who is trying to
24           do the right thing, will continue that
25           opioid prescription and even increase
```

Highly Confidential - Subject to Further Confidentiality Review

1  the dose over time as that patient
2  inevitably develops tolerance.
3  That doctor, furthermore,
4  having been misled by the defendants
5  to believe that no dose is too high,
6  will continue to escalate that dose
7  over months to years until that
8  patient is at dangerously high doses
9  of opioids and at risk for all kinds
10 of morbidity and mortality, including
11 the risk of addiction.
12 And eventually that individual,
13 who is on very high doses of opioids,
14 has neurologic changes in their brain
15 such that if they -- they begin to
16 experience withdrawal often between
17 doses, so intradose withdrawal.
18 They have the sensation that
19 was validated by their doctor, but
20 which is probably not the case, that
21 the -- they need the opioids to treat
22 their pain when, in fact, taking the
23 opioids is most likely just treating
24 withdrawal from the last dose, but the
25 physiology and the pain of withdrawal

```
 1      drives that individual to then become
 2      very preoccupied with their pain, very
 3      preoccupied with the opioids, spending
 4      more and more time at the doctor's
 5      office with pain complaints, reporting
 6      that the opioids are no longer
 7      working, because they don't work in
 8      most cases for chronic pain.
 9              And again, the compassionate
10      doctor, being told that no dose is too
11      high, continues to escalate until that
12      individual is at a very, very high
13      dose, and that individual spends
14      almost all of their time possibly
15      going to the emergency room to try to
16      get more opioids to help with their
17      worsened pain and their withdrawal and
18      their tolerance, to the point that
19      that individual has developed a
20      full-blown opioid addiction within the
21      context of medical care.
22              Now, should it happen that at
23      some point that doctor retires or that
24      doctor gets ill and can't treat that
25      person anymore or that individual
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          moves to another region or the doctor
 2          moves to another region and then that
 3          individual can no longer obtain the
 4          opioids through the prescription of
 5          that -- of that doctor, then sometimes
 6          individuals will look to alternative
 7          and illicit sources of opioids.  And
 8          to their mind -- in their mind, they
 9          are treating their pain when they have
10          also developed an opioid use disorder.
11   QUESTIONS BY MR. TSAI:
12          Q.    Do you agree with -- let me
13   know if you agree or disagree with this.
14                When individuals become
15   addicted to an opioid, they remain human
16   beings?
17          A.    Of course I agree with that.
18          Q.    And true or false, an
19   opioid-addicted person is just a mindless
20   zombie?
21                MR. ARBITBLIT:  Object to form.
22                THE WITNESS:  I don't even know
23          how -- that's really offensive, and I
24          don't even know how to respond to
25          that.
```

1  prescription opioid users that then turn to

2  heroin use.

3           Do you see that?

4       A.  Uh-huh.

5       Q.  And they also cite the Jones

6  study, which has a similarly low number,

7  4.2 percent, of persons who had used

8  prescription opioids nonmedically then turn

9  to heroin use.

10          Do you see that?

11      A.  (No response.)

12      Q.  And do you have any basis to

13  disagree with those data?

14      A.  I'm not disagreeing with those

15  data, but I think it would be important to

16  look at actual numbers, not just percentages,

17  because when looking at actual numbers of

18  people who are using opioids nonmedically who

19  progress to heroin use, it gets to be very

20  high numbers.

21      Q.  Okay.  And Compton talks about

22  the aggregate big picture.  So at the very

23  bottom of that same paragraph, the NEJM

24  article states, "Yet taken in total, the

25  available data suggests that nonmedical

Highly Confidential - Subject to Further Confidentiality Review

```
 1      prescription opioid use is neither necessary
 2      nor sufficient for the initiation of heroin
 3      use and that other factors are contributing
 4      to the increase in the rate of heroin use and
 5      related mortality."
 6                Do you agree with that
 7      statement?
 8                MR. ARBITBLIT:  Object to form.
 9                THE WITNESS:  I would say that
10           I agree that it's neither necessary
11           nor sufficient, but it has been a huge
12           factor in the last two decades, three
13           decades, among individuals who use
14           heroin as evidenced by survey studies
15           showing that 80 percent of people who
16           use heroin began with a prescription
17           opioid.
18      QUESTIONS BY MR. TSAI:
19           Q.    And they use that nonmedically,
20      that figure?
21                MR. ARBITBLIT:  Object to form.
22      QUESTIONS BY MR. TSAI:
23           Q.    Correct?
24           A.    Let me look at that.
25                My reading of that article is
```