# Exhibit 9

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                      -  -  -
 5    IN RE:  NATIONAL              : HON. DAN A.
      PRESCRIPTION OPIATE           : POLSTER
 6    LITIGATION                    :
                                    : NO.
 7    APPLIES TO ALL CASES          : 1:17-MD-2804
 8
 9            - HIGHLY CONFIDENTIAL -
10     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
12                      -  -  -
13               JANUARY 15, 2019
14                      -  -  -
15              Videotaped deposition of
      ANDREW BOYER, held at the offices of
16    BRESSLER AMERY & ROSS, 325 Columbia
      Turnpike, Florham Park, New Jersey, on
17    Tuesday, January 15, 2019, beginning at
      approximately 9:50 a.m., the proceedings
18    being recorded stenographically by Gail
      Inghram Verbano, Registered Diplomate
19    Reporter, Certified Realtime Reporter,
      Certified Shorthand Reporter (No. 8635),
20    and transcribed under her direction.
21
22
23
24    Videotape technician:  Eric Davidson
```

```
 1            A.   Since February of last year,
 2    so February of 2018.
 3            Q.   So Teva -- I believe the
 4    record reflects that Actavis was acquired
 5    by Teva in 2016, perhaps around August of
 6    2016.
 7                 Does that sound correct to
 8    you?
 9            A.   That's correct.
10                 MR. ERCOLE:  Object --
11        objection to form.
12                 THE WITNESS:  Whatever entity I
13        was working for, I became a part of
14        Teva in 2016.
15    BY MR. KIEFFER:
16            Q.   Okay.  And when you became
17    part of Teva in 2016, you just referred to
18    it as "Teva" right?
19            A.   I believe it was Teva USA, but
20    I don't want to guess.  But I was part of
21    the US organization.  I also had control of
22    Canada, so I don't know the exact entity.
23            Q.   Okay.  We'll call it Teva for
24    purposes of today's deposition.
```

```
 1              So you were employed by Teva
 2   beginning with the acquisition in roughly
 3   August of 2016 until you assumed your
 4   current position in approximately February
 5   of 2018?
 6              MR. ERCOLE:  I'm going to
 7       object, because I think the witness has
 8       specified that it was Teva USA.  If we
 9       can have an agreement that when you're
10       referring to "Teva," it's Teva USA,
11       then that's fine.
12   BY MR. KIEFFER:
13       Q.   That's fine, if that's your
14   understanding of who your employer was.
15       A.   Perfectly fine.
16       Q.   Okay.  All right.  So you
17   worked for Teva from that period of time,
18   August of 2016 until about February of
19   2018?
20       A.   That is correct.
21       Q.   Okay.  What was your title at
22   the time you worked for Teva?
23       A.   President and CEO of North
24   America.
```

```
 1          Q.   And as president and CEO of
 2   Teva North America, were you -- did your
 3   job entail only the generic side of Teva's
 4   bills or branded products as well?
 5          A.   Generics only.
 6          Q.   From the period of time
 7   beginning with your employment with Watson,
 8   starting in 1998, did you work exclusively
 9   on the generics side of the business?
10          A.   Generics only.
11          Q.   Has -- your pharma career,
12   since at least 1998, has been generics
13   only?
14          A.   That is correct.
15               MR. KIEFFER:  Pull up document
16       1720.
17                       -  -  -
18          (Teva-Boyer No. 001 was marked for
19          identification.)
20                       -  -  -
21   BY MR. KIEFFER:
22          Q.   Sir, I've just handed you what
23   we have marked as Exhibit 1.  This is a
24   document that was provided to us in this
```

 1   litigation by counsel for Teva, actually

 2   from your electronic custodial files.

 3              Having done this process

 4   before, you're probably familiar with the

 5   fact that parties exchange documents in

 6   litigation?

 7        A.   Yes.

 8        Q.   Okay.  This particular one has

 9   a number in the lower right-hand corner.

10   For the record, I'm going to have to state

11   them today.  I apologize.  They're a little

12   cumbersome, but we want our record to be

13   complete.

14              This one is

15   TEVA_MDL_A_09643590, and this a -- appears

16   to be a PowerPoint presentation dated --

17   "Welcome to Teva Pharmaceutical Industries,

18   Ltd," dated 2017.  And, again, for the

19   record, this came from Mr. Boyer's

20   custodial files.

21              As a prefatory question, sir,

22   I'm assuming in the time that you were at

23   Watson and then Actavis and then Teva, from

24   time to time, you would receive PowerPoint

```
 1   presentations in various forms that
 2   pertained in some form or fashion to your
 3   job.
 4          A.   Yeah, I'm sure of that.
 5          Q.   Companies use PowerPoints a
 6   lot, and Actavis and Watson and Teva are no
 7   different; right?
 8          A.   I guess.
 9          Q.   Okay.  This particular one --
10   let me ask you some questions about some of
11   the statements in here and see if you're
12   familiar with them.
13               Teva is -- it's one of the
14   world's largest pharmaceutical companies;
15   correct?
16          A.   I don't know how --
17               MR. ERCOLE:  Object to the
18       form.
19               THE WITNESS:  I don't know how
20       you're qualifying "largest
21       pharmaceutical companies," but -- I
22       don't know.
23   BY MR. KIEFFER:
24          Q.   How about in generics?  Is it
```

 1   it did undertake certain promotional

 2   activities with respect to its generic

 3   products, they just may have been different

 4   promotional activities than the kind that

 5   happened on the branded side of the

 6   organization; true?

 7               MR. ERCOLE:  Objection to form.

 8               THE WITNESS:  Almost zero, when

 9        I was in charge of -- of the

10        Watson/Actavis organization.  I didn't

11        believe in spending dollars on product

12        and/or company promotion, because I

13        didn't believe that we could influence

14        the procurement of buyers that way.

15               If we did company promotion, it

16        was to let them know that we were

17        investing in R&D or that we had a great

18        supply chain or something along those

19        lines.  But very little beyond that,

20        unlike the brand side of the business.

21        It was very different.

22   BY MR. KIEFFER:

23        Q.   So no promotion at all when

24   you were in charge?

```
 1          A.   Almost zero.
 2               You'd have to show me my
 3   budgets, but I will show -- I will go
 4   through them and show you how little
 5   promotion we did of the company or the
 6   products --
 7          Q.   And -- I'm sorry.
 8          A.   -- if any.
 9          Q.   Okay.  And when you say you
10   did little, if any, promotion of the
11   company or the products, you're meaning the
12   products across the whole product line, all
13   the generics, not just opioids?
14          A.   Across everything, all
15   generics.
16          Q.   Okay.  So, for example, things
17   like print advertising, internet
18   advertising, recruitment of key opinion
19   leaders, those were not things that were
20   done when you were at Actavis and then
21   later Teva, in charge of the marketing
22   function?
23          A.   Not on the generic side of the
24   business.
```

```
 1          Q.   Okay.  Not at all?
 2          A.   Not at all.
 3          Q.   Didn't engage in any kind of
 4   cross-company -- meaning joint marketing
 5   and promotion efforts of generic
 6   products -- with other manufacturers of
 7   generics --
 8               MR. ERCOLE:  Objection to form.
 9               THE WITNESS:  No.
10   BY MR. KIEFFER:
11          Q.   -- to increase overall market
12   demand?
13          A.   No.
14          Q.   The notion -- or the old
15   phrase, a rising tide lifts all boats;
16   right?
17          A.   No.
18          Q.   Never did that?
19          A.   No.
20          Q.   Okay.  So if you turn to Page
21   16 of Exhibit 7, there is a little slide
22   that says, "Marketing Communications:
23   Electronic."
24               Do you see that?
```

```
 1          A.   Yes.
 2          Q.   Okay.  Up top in the "From"
 3   line, it says it's from "Drug Store News."
 4               Do you see that?
 5          A.   Yes.
 6          Q.   You know who Drug Store News
 7   is?
 8          A.   Yes.
 9          Q.   It's a big trade publication?
10          A.   One of the trade publications.
11          Q.   All right.  I'll just
12   represent to you, Mr. Myers testified that
13   this was some electronic advertising that
14   would have appeared in Drug Store News.
15          A.   Okay.
16          Q.   The particular ad to the right
17   is captioned "Demand, meet supply."  And
18   it's for oxycodone hydrochloride tablets in
19   15 -- blow that up -- in 15- and
20   30-milligram strengths.
21               My question to you is:  Is it
22   your testimony that, in the time you were
23   at Actavis, you never approved advertising
24   of this kind whatsoever?
```

```
 1              MR. ERCOLE:  Objection to form.
 2              THE WITNESS:  If we did
 3      anything -- and you'd have to go back
 4      and ask either Napoleon or the
 5      marketing team -- it was either "now
 6      available" products or "coming soon"
 7      products, but really nothing that would
 8      say anything more than that.
 9   BY MR. KIEFFER:
10         Q.   Okay.  You did mention, I
11   think in a prior answer, that insofar as
12   marketing or promotion during your time --
13         A.   Yeah.
14         Q.   -- running that side of the
15   organization, that you might have
16   undertaken some marketing or promotional
17   activities that would focus on the nature
18   of the company's supply chain?
19              MR. ERCOLE:  Objection to form;
20      mischaracterizes testimony.
21   BY MR. KIEFFER:
22         Q.   I don't want to
23   mischaracterize your testimony.
24         A.   So what I would say is, is
```

 1   that if we were doing corporate ads, there
 2   were ads that we did saying that we have
 3   one of the best service levels in the
 4   industry.  There were ads saying that we
 5   had a very strong R&D pipeline.  So things
 6   of that nature.
 7              I could have -- you know, we
 8   did do some of those -- I just don't
 9   remember what points in time, whether it
10   was Watson, it was Actavis, but we did do
11   some of that.  I just don't recall anything
12   product-specific.
13         Q.   Okay.  Any sort of email
14   blasts that you recall?
15         A.   So email blasts that we would
16   send out were "now available."  In other
17   words, we would send it out to wholesalers,
18   distributors, chains, saying that this
19   product is now approved and we are now
20   shipping.  So those type of initiatives we
21   would do.
22              We had a brand-to-generic
23   guide, which gave the brand name and the
24   generic name, so the pharmacist would know

 1   the equivalents of certain products.

 2        Q.   Okay.

 3        A.   We also did a brochure that
 4   showed all the names of our products, and
 5   the color, shape and size of the tablet or
 6   capsule, as well the publicly listed
 7   prices -- wholesale acquisition cost or
 8   suggested wholesale price.

 9             But beyond that, I'm -- off
10   the top of my head, I do not recall any
11   real advertising or promotion, per se.

12        Q.   Okay.  Let me ask you about a
13   couple more things, and then I'm going to
14   move on from this exhibit.

15             If you turn to Page 12.  Page
16   12 is entitled "Marketing Communications:
17   Corporate Ads."

18             Do you see that?

19        A.   Yes.

20        Q.   And there are some specific
21   products listed by name on the left-hand
22   side.

23             My only question is:  Based on
24   what you just told us, during your time

```
 1        15 products.  But if you look at the
 2        top 3 or 4 or 5, they were 8, 9, 10
 3        times the size of the other ones that
 4        you're looking at.
 5   BY MR. CRAWFORD:
 6        Q.   So, I mean, you were
 7   pushing -- pushing the generic Suboxone,
 8   the buprenorphine/naloxone pretty hard;
 9   right?  I mean, you did do -- you made
10   efforts to try to get this -- get the word
11   out about it being available; right?
12             MR. ERCOLE:  Hold on.
13        Objection to form, compound,
14        mischaracterizes or -- you know,
15        improper use of the word "push."
16             THE WITNESS:  Yeah, it's a nice
17        sound bite that you're trying to take
18        and push across, but that's not the
19        reality.
20             We sell 300 products in our
21        portfolio, and all of these products,
22        we spent time with our customers trying
23        to drive our market share and our --
24        maximizing the value of our assets.
```

1    BY MR. CRAWFORD:

2         Q.   So you're doing it for both
3    your Class II, Schedule II opioids and your
4    opioid treatment drugs; right?  They made
5    the top 15, three of them?

6              MR. ERCOLE:  Objection to form;
7         vague.  I'm not sure what you mean by
8         "it," but objection to form.

9              THE WITNESS:  We don't detail
10        products, as I've said before.  These
11        are not brands, these are generics.  We
12        offer up a price and we offer up a
13        consistent supply in our supply chain
14        and hopefully quality products, as said
15        by the FDA.  That's what we do.
16             There's no pushing, there's no
17        detailing, there's nothing else there.

18   BY MR. CRAWFORD:

19        Q.   Okay.  Did Actavis, or Watson
20   at the time, whatever they were called --
21   Watson became Actavis; correct?

22        A.   Watson changed its name to
23   Actavis.

24        Q.   Right.  After it bought

```
 1   Actavis?
 2        A.   That is correct.
 3        Q.   Okay.  So at one point in
 4   time, had you heard of Actavis trying to
 5   get approval for a generic form of
 6   fentanyl -- or of Fentora?
 7        A.   I don't recall.
 8        Q.   You mentioned before RiskMAPs
 9   or REMS.  Have you ever heard of those
10   terms?
11        A.   Yes.
12        Q.   And you're aware that a number
13   of Actavis products were subject to an
14   FDA-mandated RiskMAP or REMS; correct?
15        A.   Actavis when?
16        Q.   Actavis while you were there,
17   any time.
18        A.   Well, can't be any time.
19   Remember, we bought them at a certain point
20   in time.  So I don't know if, prior to the
21   transaction of Watson buying Actavis, what
22   they were working on, from a Fentora or any
23   other risk management product.
24             So if you've got a point in
```