# Exhibit 17

CONFIDENTIAL

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>*The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

# EXPERT REPORT OF MELANIE H. ROSENBLATT, M.D.
# MAY 10, 2019

## I. INTRODUCTION AND QUALIFICATIONS

### A. Background and Qualifications

1. I am the Medical Director of Pain Management at Pain Management Strategies, Inc., the Medical Director of Acute Pain Management at Holy Cross Hospital, and a founding partner of Melrose Pain Strategies. Until 2017, I was the Medical Director of Pain Management for Broward Health North, a level II trauma center, where I was also the chairperson of the Credentials and Qualifications Committee and a member of the Medical Executive Board.

2. I completed my undergraduate education at the State University of New York at Stony Brook. I obtained my M.D. from the State University of New York at Stony Brook School of Medicine in 1991.

3. I completed my Anesthesiology residency and pain training at St. Joseph's Hospital Health Center in Syracuse, New York. I am board certified in Anesthesiology, Pain Management, and Addiction Medicine.

4. I have been active in several local, regional and national professional societies, including the American Society of Anesthesiologists, the Society for Pain Practice Management, the American Academy of Pain Management, and the American Society of Addiction Medicine.

5. I lecture nationally about safety and risk assessment in the treatment of chronic pain. My academic research and opinions on opioid use disorder and opioid tapering/withdrawing

have been published in Pain Medicine News and Future Medicine's Pain Management journal.[1]

6. I am an affiliate faculty member at the University of Miami as an educator in Pain Management. I was also a clinical instructor at Nova Southeastern University College of Osteopathic Medicine in the Department of Surgery.

7. I have extensive experience with the prescribing of Actiq and Fentora. This includes clinical experience gained in both the inpatient and outpatient setting. I have prescribed oral transmucosal fentanyl citrate medicines, including Actiq and Fentora, for indications listed and unlisted on the FDA-approved package insert.

8. I currently bill for my services at $600 per hour. My compensation for the work on this matter is not contingent upon the outcome of this litigation or on the content of the opinions that I offer in this case. Appendix A provides my Curriculum Vitae, which includes a list of my expert testimony within the past four years.

B. Assignment

9. I have been retained by counsel for Cephalon, Inc. ("Cephalon"), Teva Pharmaceuticals USA, Inc. ("Teva USA"), Actavis Pharma, Inc. ("Actavis Pharma"), Actavis LLC ("Actavis LLC"), Watson Laboratories, Inc. ("Watson"), and other affiliates[2] to serve as an expert witness in this case.

---

[1] Pergolizzi, J. V., Jr. et al., "Tapering opioid therapy: clinical strategies," *Pain Management* Vol. 8, No. 6 (2018): 409-13.

[2] Teva USA and Cephalon are referred to as the "Teva Defendants." Actavis Pharma, Actavis LLC, Watson, Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida are referred to as the "Actavis Generic Defendants." In addition, I understand that Teva

2

## IX. OPINION #6: MARKETING MATERIALS AND SPONSORED RESEARCH CAN BE USEFUL SOURCES OF INFORMATION FOR PHYSICIANS, AND THE ACTIQ AND FENTORA MARKETING MATERIALS I REVIEWED ARE CONSISTENT WITH THEIR RESPECTIVE LABELS AND ARE NOT FALSE OR MISLEADING.

66. Pharmaceutical companies' marketing materials can be a useful source of information about new treatments, new uses for existing treatments, and corresponding risks and benefits. I have seen many marketing materials from pharmaceutical companies in my practice. In my experience, physicians approach such materials with skepticism, paying special attention to safety information, knowing that representatives of pharmaceutical companies have an incentive to sell their product.[79] With this critical perspective, some marketing materials, including detailing to physicians, can be informative and valuable for physicians. It is certainly not true that all marketing (or detailing) is inherently misleading or deceptive, as Plaintiffs' experts assume.[80]

### A. Generic Medicines Are Generally Not Promoted To Physicians.

67. It is my understanding that pharmaceutical companies typically do not promote generic products.[81] Indeed, I have never been detailed by a sales representative with respect to a generic medicine. This is also consistent with the testimony of Plaintiffs' experts, who

---

[79] Kesselheim, Aaron S. et al., "A Randomized Study of How Physicians Interpret Research Funding Disclosures," *New England Journal of Medicine* Vol. 367, No. 12 (2012): 1119-27; Lacasse, Jeffrey R and Jonathan Leo, "Knowledge of ghostwriting and financial conflicts-of-interest reduces the perceived credibility of biomedical research," *BMC Research Notes* Vol. 4, No. 27 (2011): 1-6

[80] Rosenthal Report, p. 50 ("I have been instructed by counsel to assume in my but-for scenarios that the fact finder (judge or jury) finds that all or virtually all promotion by the manufacturer Defendants from 1995 to the present was unlawful.").

[81] On the differences between generic and branded pharmaceutical products, see FDA, "Generic Drugs: Questions & Answer," available at https://www.fda.gov/Drugs/ResourcesForYou/Consumers/QuestionsAnswers/ucm100100.htm, accessed March 18, 2019.

29

have confirmed that the business model for generic medicines is different than the business model for brand-name medications, in that generic manufacturers generally do not promote their generic medicines to physicians.[82] Dr. Rosenthal, for instance, made this point clear: "Generally, manufacturers will not detail physicians for generics. They may have other sales force activities that they do that relate to price, but individual physicians are not generally making a decision about one generic versus the other. That decision happens at the pharmacy."[83]

68. As I understand it, that principle applies to the generic opioid medications of Teva USA and the Actavis Generic Defendants. For instance, Christine Baeder, the head of Teva USA's generic segment, testified that Teva USA does not promote generic medications to physicians because "[t]he decision-maker in generic procurement is not the physician. It's the officer at a corporate retail chain."[84] Likewise, Michael Perfetto, former Vice President of Actavis Sales and Marketing, testified that "we use quality, product supply, and pricing primarily to sell our [generic] products."[85] Andy Boyer, former Senior Vice President of Actavis Sales and Marketing and a former executive for Teva USA, added

---

[82] Deposition of Matthew Perri III, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, April 24, 2019 ("Deposition of Matthew Perri III"), p. 554 ("It's just simply that when we look at the overall balance for generics, we generally aren't going to see a lot of personal selling and we're not going to see a lot of personal selling related to the risks or possible harms of opioids. It's just an artifact of the market. Again, it's not judgmental, it's just this is the state of where we are, this is what's typically done in that marketing.").

[83] Deposition of Meredith Rosenthal, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, May 4, 2019 ("Deposition of Meredith Rosenthal"), pp. 197-198.

[84] Deposition of Christine Baeder, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, January 24, 2019 ("Deposition of Christine Baeder"), p. 416:5–15.

[85] Deposition of Michael Perfetto, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, December 18, 2018 ("Deposition of Michael Perfetto"), p. 315:24–316:2.

that "[i]t is physically impossible for a generic[s] company to hire enough sales representatives to go in and speak to physicians about all of [their] generic[s] products."[86] Mr. Boyer also noted that, "We don't detail products . . . [t]hese are not brands, these are generics. We offer up a price and we offer up a consistent supply in our supply chain and hopefully quality products . . . There's no pushing, there's no detailing, there's nothing else there."[87]

### B. The Actiq and Fentora Marketing Materials I Reviewed are Consistent with their Respective Labels and Would Not Have Caused a Provider to Write a Prescription That Was Medically Inappropriate or Unnecessary.

69.  I have reviewed hundreds of Actiq and Fentora marketing documents and I find these documents to be consistent with the label. All of the documents I reviewed contain clear descriptions of the approved indications, safety information, and risk of abuse.[88] In fact, many of the marketing materials I reviewed include the FDA-approved label for Actiq and Fentora and discuss the requirements of the TIRF REMS Program.[89] For example, one journal ad for Actiq includes a black box warning, and prescribing information with

---

[86] Deposition of Andrew Boyer, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, January 15, 2019 ("Deposition of Andrew Boyer"), p. 317:3–7.

[87] Deposition of Andrew Boyer, p. 346:9–17.

[88] "Actiq Marketing Materials," TEVA_MDL_A_00695218-6810; "Fentora Marketing Materials," TEVA_MDL_A_00025238-33471.

[89] See, e.g. TEVA_MDL_A_00695218-6810, at 00695600; TEVA_MDL_A_00025238-33471, at 00028116–00028124.

31