**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

*County of Summit, Ohio, et al. v. Purdue*
*Pharma L.P., et al.,*
Case No. 18-op-45090 (N.D. Ohio)

*The County of Cuyahoga, Ohio, et al. v.*
*Purdue Pharma L.P., et al.,*
Case No. 17-op-45004 (N.D. Ohio)

**MDL No. 2804**
**Case No. 17-md-2804**
**Judge Dan Aaron Polster**

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**OF WALMART INC.**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ............................................................ 2

LEGAL STANDARD ........................................................................................... 7

ARGUMENT ........................................................................................................ 7

I.      Plaintiffs Cannot Prove That Walmart Proximately Caused Their Injuries .................... 9

II.     Plaintiffs Cannot Fit Their Allegations Of Regulatory Violations Within Any
        Viable Cause Of Action .............................................................................. 11

        A.      Plaintiffs' Statutory Nuisance Claim Is Moot, As Walmart No Longer
                Engages In Any Conduct That Could Be Enjoined  (Count 5) ........................... 12

        B.      Walmart Did Not Create A Common Law Public Nuisance By
                Distributing An FDA-Approved Medication (Count 6) ..................................... 12

        C.      Walmart's Distribution Of Lawful Medications To Its Own Pharmacies
                Was Not Negligent (Count 7) ........................................................ 14

        D.      Plaintiffs Have Presented No Evidence That Walmart Committed Any
                Criminal Acts By Distributing Opioids (Count 9) ......................................... 15

        E.      Walmart Was Not Unjustly Enriched By Its Distribution Of A Lawful
                Medication (Count 10) ................................................................ 17

III.    Walmart Is Entitled To Summary Judgment On Plaintiffs' Claim For Punitive
        Damages .................................................................................... 18

CONCLUSION ..................................................................................................... 18

## TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Ailor v. City of Maynardville,*
   368 F.3d 587 (6th Cir. 2004) ...................................................................12

*Barnett v. Carr,*
   No. CA2000-11-219, 2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)............................12

*Brown v. Scioto Cty. Bd. of Commrs.,*
   87 Ohio App. 3d 704 (1993) ...................................................................13

*Calmes v. Goodyear Tire & Rubber Co.,*
   575 N.E.2d 416 (1991).........................................................................18

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986)...........................................................................7

*Chesnut v. Progressive Cas. Ins. Co.,*
   2006-Ohio-2080 (Ohio Ct. App. 2006)...........................................................18

*City of Cincinnati v. Beretta U.S.A. Corp.,*
   No. C-990729, 2000 WL 1133078 (Ohio Ct. App. Aug. 11, 2000) ...............................15, 17

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.,*
   863 F.3d 474 (6th Cir. 2017) ...................................................................13

*City of Miami v. Bank of Am. Corp.,*
   800 F.3d 1262 (11th Cir. 2015) .................................................................17

*Durr v. Strickland,*
   No. 2:10-CV-288, 2010 WL 1610592 (S.D. Ohio Apr. 15, 2010) .........................................11

*Haskins v. 3M Co.,*
   No. 15-cv-2086, 2017 WL 3118017 (D.S.C. July 21, 2017).............................................9

*In re Firearm Cases,*
   126 Cal. App. 4th 959 (Cal. Ct. App. 2005) .......................................................15

*Jewell v. City of Columbus,*
   485 N.E.2d 266 (Ohio Ct. App. 1984)...........................................................15

*Malone v. Courtyard by Marriott L.P.*,
    659 N.E.2d 1242 (Ohio 1996) ...............................................................................18

*Martin v. Cincinnati Gas & Elec. Co.*,
    561 F.3d 439 (6th Cir. 2009) ...................................................................................9

*Masters Pharm., Inc. v. DEA*,
    861 F.3d 206 (D.C. Cir. 2017)........................................................................6, 8, 9, 11

*Natale v. Everflow E., Inc.*,
    2011-Ohio-4304 (Ohio Ct. App. 2011)....................................................................13

*Pang v. Minch*,
    559 N.E.2d 1313 (Ohio 1990) ..................................................................................9

*Preston v. Murty*,
    512 N.E.2d 1174 (Ohio 1987) ................................................................................18

*Ramsey v. Del Monte Corp.*,
    9 Ohio App. 3d 103 (Ohio Ct. App. 1983) ..............................................................15

*Schwartz v. Honeywell Int'l, Inc.*,
    2018-Ohio-474 (Ohio 2018) .....................................................................................9

*State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.*,
    619 N.E.2d 2 (Ohio Ct. App. 1992).........................................................................13

*State v. McCarthy*,
    605 N.E.2d 911 (Ohio 1992) ..................................................................................16

*Sutowski v. Eli Lilly & Co.*,
    696 N.E.2d 187 (Ohio 1998) ....................................................................................9

## STATUTES

21 U.S.C. § 801(1) ...........................................................................................................12

21 U.S.C. § 823(b)(1), (e)(1) ........................................................................................4, 6

Ohio Code § 2307.60 .................................................................................................15, 16

Ohio Code § 2315.21(C)(1) ............................................................................................18

Ohio Code § 2925.02(A)...........................................................................................16, 17

**ADMINISTRATIVE AUTHORITIES**

21 C.F.R. § 1301.74(b) .................................................................................................................4

*Southwood Pharmaceuticals, Inc.; Revocation of Registration*,
    72 Fed. Reg. 36487, 36503 (Drug Enf't Admin. July 3, 2007) ..................................................8

## INTRODUCTION

Extensive discovery has confirmed that Defendant Walmart Inc. ("Walmart") does not belong in this litigation.  Walmart neither manufactured nor marketed opioids.  Plaintiffs do not allege that Walmart was part of any kind of RICO enterprise or otherwise engaged in fraudulent activity.  Instead, Plaintiffs' claims against Walmart rest entirely on Walmart's distribution of opioids to its own pharmacies—not one of which is claimed to be a "rogue" internet pharmacy, pill mill, or pain clinic.  Plaintiffs have made clear they do not base their case on any claim that any particular prescription was unauthorized or medically unnecessary, and they have forsworn any argument that Walmart's pharmacists did anything wrong when they filled prescriptions written by licensed medical professionals.  For the Walmart pharmacies in the relevant jurisdictions, controlled substances (including, but by no means limited to, opioids) averaged around 9% of prescriptions dispensed—a percentage significantly below the 20% benchmark that the DEA has declared appropriate.  Above all, Walmart's distribution accounts for a vanishingly small part of the relevant market:  Plaintiffs' own expert concluded that Walmart distributed *less than 1.3%* of the opioids distributed to Cuyahoga and Summit Counties.

To the extent Plaintiffs have any theory of wrongdoing, it seems to be that, in some unspecified manner, Walmart did not fully comply with DEA regulations requiring that distributors maintain controls against diversion.  But the record shows that Walmart's anti-diversion policies complied with the law at all times.  Most notably, while Plaintiffs' expert witnesses offered many opinions about *other* Defendants' suspicious order monitoring ("SOM") programs, they do not offer *a single opinion* criticizing Walmart's SOM program.

But even if Plaintiffs could show that Walmart committed some regulatory violation (and they cannot), Plaintiffs cannot meet their burden to prove that Walmart's conduct caused their harm.  There is *no evidence* of actual diversion of opioids from Walmart's supply chain to the

1

illicit market.  Because causation must be shown individually for each defendant, this alone requires summary judgment in Walmart's favor.

Nor can Plaintiffs fit their claims within any viable cause of action.  The Controlled Substances Act ("CSA") does not confer a private right of action, and Plaintiffs' claims of technical regulatory violations provide no basis to impose liability in tort:  Walmart's distribution of FDA-approved medications to its own pharmacies did not create an absolute public nuisance; Walmart did not act negligently when it distributed lawful medications to its pharmacies; Walmart did not commit "criminal acts" by engaging in conduct licensed by both state and federal governments; and Walmart was not unjustly enriched by its legitimate business activities.[1]

In discovery and through their experts, Plaintiffs have focused on their claims that Manufacturer Defendants engaged in false and misleading marketing and that Distributor Defendants turned a blind eye to the misconduct of "rogue" independent pharmacies, pill mills, and pain clinics.  But Walmart did none of those things.  It distributed only to itself, and there is not a shred of record evidence that the opioids it distributed were actually diverted. Walmart has no place in this case and should be awarded summary judgment on all claims.

## STATEMENT OF UNDISPUTED FACTS

### A.    Defendant Walmart Inc.

Walmart owns and operates retail stores throughout the United States, some of which contain pharmacies.  Ex. C at 4.  Walmart previously self-distributed controlled substances to its

---

[1] Pharmacy Defendants are submitting separate briefs addressing (1) the statute of limitations, (2) Plaintiffs' civil conspiracy claim (Count 11), (3) causation, and (4) preemption.  Walmart has joined all these briefs, and also incorporates the briefs of the Distributor Defendants addressing the statute of limitations and conspiracy.  *See* Docs. 1691, 1692.  In addition, Walmart incorporates by reference its prior arguments that Plaintiffs lack standing and that the Ohio Products Liability Act abrogates Plaintiffs' claims.  *See* Doc. 497-1 at 4-7, 8.

pharmacies but no longer does so; most relevant here, it stopped self-distributing Schedule II opioids in April 2018.  Ex. C at 4-5; Ex. J at 22:22-24.  Walmart never distributed controlled substances to any pill mills, independent pharmacies, internet pharmacies, or pain clinics.  Ex. A at 37; *see also* Ex. L at 449:1-18, 481:17-482:2, 1175:7-1176:4; Ex. N at 229:4-11.

Walmart operated no more than 17 pharmacies in the relevant jurisdictions.  *See* Ex. V 1935-43, 3185-89.  Plaintiffs' expert Craig McCann analyzed data from the DEA's ARCOS database for the period from 2006 to 2014 and found that Walmart's distribution accounted for **1.28% and 1.12%** of the opioids that were legally distributed to Cuyahoga and Summit Counties respectively.  *Id.* at 3779, 3849.  This compares to a combined market share of 72.52% in Cuyahoga County and 80.36% in Summit County for the three largest independent distributors.  *Id.*[2] Plaintiffs' expert further testified that, in the context of distribution to these two counties, 1% would qualify as a "*de minimis*" amount.  Ex. U at 510.

Walmart does not market controlled substances.  *See* Ex. A at 31-32; Ex. D at 459:2-4; Ex. I at 51:10-22.  Walmart's pharmacies cannot dispense controlled substances without a valid prescription, and, as a distributor, Walmart has no capacity to influence the prescribing decisions of medical professionals.  *See* Ex. W at 42 (statement by Plaintiffs' expert that "[o]pioid manufacturers . . . *unlike distributors* . . . make routine sales calls on prescribers' offices" (emphasis added)).  As one Walmart employee explained, Walmart "never did anything that would promote an opioid to the customer, to the end customer user, the patient that would pick up the prescription."  Ex. H at 57:10-16.

---

[2] Although Plaintiffs' expert did not calculate market shares after 2014, he found that overall shipments into Cuyahoga and Summit Counties peaked around 2011.  Ex. V at 9, 11.

B.    **Walmart's Controls Against Diversion.**

Distributors are required to maintain "effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels," 21 U.S.C. § 823(b)(1), (e)(1), including to "design and operate a system" to monitor for suspicious orders, 21 C.F.R. § 1301.74(b).  DEA witnesses testified that "there's more than one way to design and operate" such a system, and "DEA expects that each registrant will review its own business model and design a [SOM] system that fits its designed method of distribution."  Ex. L at 179:22-180:15, 1177:15-19; *see also* Ex. M at 466:17-22.

Walmart implemented robust controls to prevent theft or loss of controlled substances. These included extensive physical security at its distribution centers, including alarms and 24/7 alarm monitoring, security cameras, limited and monitored access, and daily inventory checks. Ex. C at 12; *see also* Exs. DD, II, JJ, KK.  Deliveries of controlled substances were made directly from Walmart's distribution centers to its pharmacies, which strictly limited access by non-pharmacist personnel.  Ex. C at 13; *see also* Exs. AA, BB, FF.

Walmart also leveraged its status as a self-distributor to develop an effective SOM program.  Walmart knew its customer because it was itself.  *See* Ex. C at 5; Ex. D at 233:11-235:21.  Employees at Walmart's distribution centers monitored orders, and, when orders were identified for review, managers would follow up "by reviewing prior order history, speaking with pharmacists, and escalating issues to field leadership."  Ex. C at 6-7; *see also* Ex. B; Ex. D at 45:10-46:24, 52:8-13, 169:17-170:16.  In addition, Walmart implemented systems to automatically flag orders for review in 2011 and—in keeping with its culture of continuous improvement, as

well as evolving DEA recommendations—updated its automatic systems in 2015 and 2017.  *See* Ex. B; *see also* Ex. D at 407:23-408:12.[3]

Walmart also reported significant information to DEA and state authorities.  If on review an order was deemed "suspicious," Walmart's procedures required reporting the order to the DEA.  Ex. C at 10; Ex. D at 134:3-137:2; *see also* Ex. F at 83:5-85:1.[4]  Walmart had procedures in place to report *every* movement of controlled substances in or out of its distribution centers for inclusion in DEA's ARCOS database and Ohio's OARRS database.  Ex. G at 177:2-21; *see also* Ex. M at 23:18-24:11.  And, from 2004 to 2010, Walmart faxed monthly reports to DEA identifying any outlier pharmacy orders of Schedule II controlled substances (including opioids).  Ex. C at 8.

At the close of discovery, there is no evidence of any diversion from Walmart's supply chain to the illicit market in Cuyahoga and Summit Counties.  DEA witnesses testified that a "red flag" for diversion would be if "40 or 50 percent" of orders filled by a pharmacy were "limited to oxycodone, hydrocodone" or other controlled substances, Ex. M at 455:1-6, and that for a "legitimate" pharmacy controlled substances would be expected to make up less than 20% of orders, Ex. N at 260:4-261:1.  Walmart's pharmacies in the jurisdiction fell well within this

---

[3] Beginning in 2011, Walmart automatically flagged any order for 50 or more bottles of a controlled substance, as well as any order 30% above the rolling 4-week average for the store/item combination.  *See* Ex. B; Ex. D at 257:5-17, 262:17-21; Ex. EE.  In 2015, Walmart implemented a system to automatically flag orders based on enhanced thresholds tailored to the particular item and store.  *See* Ex. B; Ex. D at 312:7-313:13, 326:12-327:10, 415:5-12.  And in 2017, Walmart began using an algorithmic SOM system developed by an independent industry expert to flag orders for review.  *See* Ex. B; Ex. D at 413:10-21; Ex. MM.

[4] In 2017, out of an abundance of caution, Walmart began reporting *all* orders flagged for internal review by Buzzeo's algorithmic system.  Ex. C at 11.  The DEA responded by asking that Walmart stop making those reports.  *Id.*; *see also* Ex. D at 456:10-24; Ex. ZZ.

legitimate range, as their percentage of controlled substances (of which opioids are only one type) averaged just over 9%.  Ex. C at 5-6; Ex. NN.[5]

C.      **State And Federal Oversight Of Walmart's Distribution.**

During the time it self-distributed, Walmart was registered with the DEA to distribute controlled substances.  *See, e.g.*, Ex. X; *see also* Ex. D at 147:10-21.  The DEA renewed Walmart's registration each time it applied, and, by law, was required to consider Walmart's anti-diversion procedures as part of that process.  *See* 21 U.S.C. § 823(b)(1), (e)(1); *cf. Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017) (approving revocation of distributor's registration based on inadequate order monitoring).

Walmart conferred with the DEA to ensure that its procedures met or exceeded DEA expectations.  *See* Ex. D at 47:12-19; 49:11–50:5; 79:6–83:23; 125:9–127:12; 138:7–139:11; 145:13–146:14.  And the DEA audited Walmart's pharmacy distribution centers to ensure regulatory compliance.  Ex. C at 14; *see also, e.g.*, Exs. OO, PP, RR, SS, TT, VV, XX.  Among other things, these audits included reviews of Walmart's SOM program.  *See* Ex. VV.  DEA witnesses have testified that, if such audits turned up a deficiency, the DEA would have notified Walmart.  *See* Ex. L at 130:2-131:23; *see also id.* at 461:13-21 (agreeing that "registrants who are visited by DEA field office personnel can rely on the information that they receive").  Yet the DEA has never issued any Orders to Show Cause or Immediate Suspension Orders against any Walmart pharmacy distribution center.  Ex. C at 14; *see also id*. at 17.

In addition, Walmart was licensed by the State of Ohio to distribute controlled substances, and each distribution center was licensed by the State in which it was located.  *See, e.g.*, Exs. Y,

---

[5] Exhibit NN lists the controlled substance percentage for each Walmart pharmacy in Summit and Cuyahoga county by quarter.  The sum of the percentages divided by the total number of entries yields 9.12%.  Overall, the percentages range from 4.12% to 15.20%.

Z.  Walmart's pharmacy distribution centers were also inspected and accredited by the Verified-Accredited Wholesale Distributors ("VAWD") program.  Ex. E at 118:15-24, 119:2-5; *see also* Ex. E at 123:20-24; 126:8-18; Exs. QQ, WW, YY.  VAWD is operated by the National Association of Boards of Pharmacy—of which the Ohio Board of Pharmacy is a member—and is designed to ensure that distribution facilities are operating legitimately, are validly licensed in good standing, and are employing best practices for safely distributing prescription medication.  Ex. AAA. Walmart submitted its policies for VAWD's review during the accreditation process, and on-site inspectors verified that actual practices conformed to those policies.  *See* Ex. E at 126:19–127:20; Ex. K at 68:12-24; Ex. UU.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In response to a properly supported motion for summary judgment, the non-movant must offer "specific facts showing that there is a genuine issue [of material fact] for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## ARGUMENT

After extensive discovery, there is no evidence of any wrongdoing by Walmart—much less wrongdoing that caused Plaintiffs' injuries.  Walmart did not market prescription opioids.  *See* Ex. A at 31-32; Ex. H at 57:8-23; Ex. I at 51:10-22.  If anything, Plaintiffs' experts describe Walmart and other pharmacies as among the *targets* of Manufacturer Defendants' alleged misinformation campaign.  *See* Doc. 1716-1 at 9-10.  Walmart did not distribute to the "rogue" independent pharmacies, internet pharmacies, pill mills, or pain clinics that are alleged to have caused the opioid crisis; it only distributed to its own pharmacies, and Plaintiffs have forsworn any claim based on

the conduct of those pharmacies.  *See* Ex. L at 449:1-18, 481:17-482:1; Ex. N at 225:24-226:4; *see also* Ex. L at 480:24-481:16.  And Walmart in no sense "flooded" the market:  The opioids it distributed accounted for less than 1.3% of the market in the relevant jurisdictions.  Ex. V at 3779, 3849.  Plaintiffs' own witnesses have repeatedly said that they are unaware of anything Walmart did to contribute to the opioid crisis in Cuyahoga and Summit Counties.  *See, e.g.*, Ex. Q 416:17-23; Ex. P at 206:17-208:9; Ex. O at 184:17-188:15, 191:2-193:14, 198:14-199:9, 202:13-24, 206:11-25.

Plaintiffs' theory of wrongdoing appears to rest entirely on the claim that Walmart did not comply with the CSA's requirement to maintain effective controls against diversion.  But that theory finds no support in the undisputed evidence.  The DEA performed audits of Walmart's distribution centers, which included review of Walmart's anti-diversion procedures, and issued no Orders to Show Cause or Immediate Suspension Orders against any Walmart distribution center.  *See supra* p. 6.  Even if Plaintiffs could second-guess the DEA in this regard—and they cannot— the record also confirms that Walmart's procedures were appropriately designed to fit its business.  Walmart employed robust physical security to address the risks of theft and loss that are inherent in pharmacy distribution.  *See id.* at 4.  And Walmart's SOM program leveraged the fact that Walmart only distributed to its own pharmacies.  *See id.* at 4-5.  DEA witnesses have suggested that the key goal of SOM is to "know who your customers are," *see, e.g.*, Ex. L at 211:24, and Walmart knew its only customer intimately, since it was itself.[6]  It is no wonder, then, that Plaintiffs' experts offer *no opinions* about Walmart's conduct as a distributor.

---

[6] Cases where the DEA has sanctioned distributors for inadequate SOM procedures are notably distinct.  For instance, *Southwood* involved a distributor to internet pharmacies that "supplied these drug pushers with large quantities of hydrocodone" and "showed little interest in determining whether they were engaged in lawful activity."  *Southwood Pharmaceuticals, Inc.; Revocation of Registration*, 72 Fed. Reg. 36487, 36503 (Drug Enf't Admin. July 3, 2007).  Similarly, *Masters*

Ultimately, however, Walmart would be entitled to summary judgment even if Plaintiffs could raise a triable question of fact on the issue of regulatory compliance.  First, even assuming Walmart fell out of regulatory compliance in some way (and it did not), Plaintiffs still would not be able to show that Walmart proximately caused their injuries.  Second, Plaintiffs cannot fit their theory of regulatory violations within any viable cause of action, as no record evidence supports any of Plaintiffs' claims.

## I.      Plaintiffs Cannot Prove That Walmart Proximately Caused Their Injuries.

Plaintiffs must establish causation separately for each defendant, *see Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 190 (Ohio 1998); *Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990), and there is a particular dearth of evidence that *Walmart* caused any harm to Plaintiffs.

The starting point of the proximate cause analysis is the undisputed fact that, according to Plaintiffs' own expert, Walmart distributed ***less than 1.3%*** of the opioids in the relevant market— an amount the expert characterized as *de minimis*.  *See* Ex. U at 510; Ex. V at 3779, 3849.  And all of those opioids were distributed to Walmart's own pharmacies, to be dispensed to patients presenting a valid prescription. Ex. A at 37. Where "causation is premised on the total cumulative" effect of numerous actors, a defendant cannot be held liable unless its conduct taken individually "'had a *substantial* impact on the total.'"  *Schwartz v. Honeywell Int'l, Inc.*, 2018-Ohio-474 ¶ 20 (Ohio 2018) (quoting *Haskins v. 3M Co.*, No. 15-cv-2086, 2017 WL 3118017, at *7 (D.S.C. July 21, 2017)); *see also id.* ¶ 22 (citing *Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009)).  Given Walmart's market share, Plaintiffs bear a heavy burden to show that Walmart's conduct had any, much less a substantial, impact on the opioid crisis in Cuyahoga and Summit Counties.

---

involved a distributor that ignored (and even helped cover up) the activities of "illegitimate pharmacies."  861 F.3d at 214; *see also id.* at 219.

Plaintiffs cannot come close to bearing that burden, as there is no evidence of actual diversion from Walmart's supply chain to the illicit market.  DEA witnesses testified that the "vast majority" of licensed medical professionals "are prescribing responsibly," Ex. M at 188:20-21, and that anti-diversion controls are essential to ensure that controlled substances are not distributed to "rogue" pharmacies or pain clinics.  *See* Ex. M at 213:17–216:10, 222:11–223:25.  Walmart distributed only to itself, and Walmart's pharmacies decidedly were not "rogue."  DEA witnesses testified that for a "legitimate" pharmacy, controlled substances would make up less than 20% of prescriptions, Ex. N at 260:4–261:1, and the evidence shows that controlled substances averaged 9% of medications dispensed (and never exceeded 15%) for Walmart's pharmacies in Cuyahoga and Summit Counties.  Ex. C at 5-6; Ex. NN; *see also* Ex. L at 449:10-18, 479:19–480:5; Ex. R at 314:9-17.  Even if Walmart's anti-diversion procedures somehow fell short—and the record shows they did not—there is no evidence that any such shortfall was the proximate cause of Plaintiffs' asserted harms.

Similarly, while Plaintiffs may believe that Walmart should have filed more SOM reports, nothing in the record suggests that Walmart's reporting practices caused Plaintiffs' asserted harm.  Unlike major distributors, whose SOM reports might have alerted the DEA to "rogue" internet pharmacies or pain clinics, Walmart did not distribute to such entities, and there is no evidence that Walmart's own pharmacies were ordering "excessive quantities of a limited variety of controlled substances while ordering few, if any, other drugs," or engaging in any other conduct indicative of diversion.  Ex. M at 453:16-18.  And even if Walmart had filed more reports about its own self-distribution, as Plaintiffs suggest, there is no evidence that such reports would have led the DEA to take any kind of enforcement action.  *See* Ex. L at 308:19–309:6 (testimony by DOJ representative agreeing that "not every suspicious order leads to diversion"); *see also* Ex. M

10

at 544:7-23.  To the extent that Plaintiffs' theory is simply that reports would have alerted the DEA to the volume of opioids distributed to Cuyahoga and Summit Counties, Walmart's miniscule market share means it had nothing to share in that regard, and, in any event, the DEA already had access to that information through its ARCOS database.  Ex. L at 56:8-24, 326:24–329:16, 333:11-15, 496:6-24.  It is fanciful to suggest that additional reports about Walmart's distribution to its own pharmacies would have done anything to prevent Plaintiffs' asserted injuries, much less that the absence of such reports was the proximate cause of Plaintiffs' harms.[7]

## II.  Plaintiffs Cannot Fit Their Allegations Of Regulatory Violations Within Any Viable Cause Of Action.

Even setting aside the requirement of proximate cause, discovery has confirmed that Plaintiffs' allegations of regulatory violations do not fit within any viable cause of action. Plaintiffs have focused their discovery efforts against Walmart on Walmart's compliance with the CSA, but Plaintiffs have no right of action to enforce that law.  *See, e.g.*, *Durr v. Strickland*, No. 2:10-CV-288, 2010 WL 1610592, at *2 (S.D. Ohio Apr. 15, 2010).  Plaintiffs have attempted to sidestep that problem by shoehorning their claims into various common law theories, but as this Court observed at the motion to dismiss stage, Plaintiffs' allegations "do not fit neatly into the legal theories chosen."  Doc. 1203 at 39.  Discovery has now shown that the actual facts do not fit those theories *at all* with respect to Walmart.

---

[7] Nor can Plaintiffs bridge this gap by claiming—as they do in a recent filing—that distributors have an obligation not to ship orders flagged as potentially "suspicious."  *See* Doc. 1733.  Even in Plaintiffs' telling, the obligation not to ship lasts only as long as it takes to investigate and determine that an order is not in fact "likely to be diverted into illegal channels." *Id.* at 5 (quoting *Masters*, 861 F.3d at 212).  The undisputed evidence shows that Walmart did investigate and clear flagged orders prior to shipment.  *See* Ex. C at 9; Ex. D at 198:2-7, 377:22-378:4.  And, even more fundamentally, there is no evidence of actual diversion of Walmart's shipments to the illicit market, and thus no evidence that any order was improperly shipped.

**A.      Plaintiffs' Statutory Nuisance Claim Is Moot, As Walmart No Longer Engages In Any Conduct That Could Be Enjoined  (Count 5).**

First, Plaintiffs' statutory nuisance claim must be dismissed as moot.  This Court has held that this claim is limited to forward-looking injunctive relief.  *See* Doc. 1203 at 30.  Because Walmart stopped distributing Schedule II opioids in April 2018, there is nothing to enjoin (even assuming Walmart committed legal violations, which it did not).  *See* Ex. J at 22:22-24.  This claim is accordingly moot.  *See, e.g.*, *Ailor v. City of Maynardville*, 368 F.3d 587, 600 (6th Cir. 2004).

**B.      Walmart Did Not Create A Common Law Public Nuisance By Distributing An FDA-Approved Medication (Count 6).**

Plaintiffs' common law nuisance claim also fails, because Walmart did not create a public nuisance by distributing a lawful medication to its own pharmacies.  Plaintiffs have framed their claim as one for an "absolute" public nuisance.  Unlike "qualified" public nuisance, which requires proof of negligence, the doctrine of absolute public nuisance imposes strict liability under limited circumstances.  For the doctrine to apply, Plaintiffs must show interference with a public right either by (1) an inherently dangerous activity, (2) intentional culpable conduct, or (3) unlawful conduct.  *See, e.g.*, *Barnett v. Carr*, No. CA2000-11-219, 2001 WL 1078980, at *10–11 (Ohio Ct. App. Sept. 17, 2001).  Plaintiffs can show none of those things.

First, Walmart's conduct was not inherently dangerous.  Opioids are lawful medications that are approved by the FDA, and Walmart dispensed opioids only when prescribed by licensed medical professionals, the "vast majority" of whom "are prescribing responsibly."  Ex. M at 188:20-21 (Rannazzisi); *see also* Ex. L at 393:10-18, 401:5-9.  The DEA has said that the public has an interest—recognized by federal law—in ensuring that opioids are distributed and available for legitimate medical uses.  *See* Ex. L at 392:4–395:4; *see also* 21 U.S.C. § 801(1).  In these circumstances, where a defendant "has met certain licensing parameters and is subject to many regulations," an absolute public nuisance claim is "not appropriate," absent intentional or unlawful

12

misconduct, as "part of the *quid pro quo* for the submission to such exacting regulatory oversight is the operator's insulation from liability under a theory of strict liability."  *State ex rel. Schoener v. Hamilton Cty. Bd. of Commrs.*, 619 N.E.2d 2, 5–6 (Ohio Ct. App. 1992); *see also Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App. 3d 704, 713 (1993) (similar).

Second, there is no evidence that Walmart engaged in intentional misconduct.  *See Natale v. Everflow E., Inc.*, 2011-Ohio-4304, ¶ 27 (Ohio Ct. App. 2011) (claim of intentional public nuisance cannot be based on "speculation and conjecture").  Walmart did not distribute to internet pharmacies, pill mills, or pain clinics; instead, Walmart distributed to its *own* pharmacies— pharmacies that Plaintiffs do not allege did anything wrong.  *See* Doc. 1203 at 2.  And Walmart did not "flood" the market; the opioids that it distributed accounted for less than 1.3% of the relevant market, and its pharmacies dispensed controlled substances at a rate well within the range the DEA has declared appropriate.  *See supra* pp. 3, 5-6.  There is no evidence of *any* intentional misconduct by Walmart, much less intentional misconduct that interfered with a public right.

Finally, Walmart did not engage in unlawful conduct that interfered with a public right. Walmart complied with state and federal regulations at all times.  *See supra* pp. 4-6, 7-8.  But even assuming that Walmart violated some regulation, "not every failure to comply with [a regulation] amounts to a public nuisance."  *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 479 (6th Cir. 2017).  Rather, to proceed on an absolute public nuisance theory, a plaintiff must show *both* that the defendant violated the law *and* that the violation substantially interfered with public health and safety.  *Id.*  To the extent that Walmart violated any regulation (and it did not), there is no evidence that any such violation had *any* effect on public health or safety in Cuyahoga and Summit Counties—much less that it created the opioid crisis or otherwise substantially interfered with public health and safety.

### C.  Walmart's Distribution Of Lawful Medications To Its Own Pharmacies Was Not Negligent (Count 7).

Walmart also is entitled to summary judgment on Plaintiffs' negligence claim.  At the motion to dismiss stage, the Court did not address Defendants' argument that the governing laws and regulations create no duty to Plaintiffs—an argument that Walmart reiterates by reference—but allowed the case to proceed on the theory that Defendants owe a common law duty not to expose Plaintiffs to harm by "creat[ing] an illegal, secondary opioid market."  Doc. 1203 at 35. Following discovery, however, there is no evidence that Walmart negligently created or contributed to such a black market for opioids—much less that a black market was a foreseeable result of Walmart's conduct of distributing lawful medications to its own pharmacies.

Walmart did not engage in any of the conduct that Plaintiffs have claimed contributed to diversion or otherwise caused a black market for opioids, *i.e.* marketing, distributing to "rogue" pharmacies, or "flooding" the local opioid market.  *See supra* pp. 7-8; *see also* Ex. L at 480:24-481:4 ("DEA has acknowledged . . . that no chain pharmacies were rogue pharmacies").  The only thing that Walmart did was distribute opioids to its own pharmacies, and Plaintiffs have forsworn any claim based on the conduct of those pharmacies.  *See* Doc. 1203 at 2.  Plaintiffs have identified no way in which Walmart acted negligently or contributed to the opioid crisis.

Plaintiffs' witnesses agree there is no evidence that Walmart's conduct contributed to diversion.  Christopher Kippes, Director of Epidemiology, Surveillance, and Informatics at the Cuyahoga County Board of Health, testified that he was unaware of anything Walmart did that contributed to the opioid crisis in Cuyahoga County.  Ex. P at 206:17-208:9.  Gerald Craig, Executive Director of the County of Summit Alcohol, Drug Addiction, and Mental Health Services, testified that he was unaware of any wrongdoing by Walmart with respect to prescription opioids in Summit County.  Ex. Q at 416:6-23.  And Derek Siegle, Executive Director of the Ohio

High Intensity Drug Trafficking Area (including Cuyahoga and Summit Counties), testified that in all his time working with the law enforcement agencies that participated in the HIDTA, no agency ever reported conduct by Walmart that contributed to the opioid crisis in Ohio or caused harm in Cuyahoga and Summit Counties.  Ex. O at 184:17-188:15, 191:2-193:14, 198:14-199:9, 202:13-24, 206:11-25; *see also* Ex. T at 337:16-19; Ex. S at 341:12-16.

In this regard, this case is akin to *In re Firearm Cases*, 126 Cal. App. 4th 959 (Cal. Ct. App. 2005).  That case, like this one, was allowed to progress past the pleadings under the theory that the defendants' conduct had created a black market.  *See id.* at 973.  At the close of discovery, though, the court granted summary judgment for defendants, explaining that "[n]o evidence in this case hints that" the defendants "did any of the . . . acts that plaintiffs characterize as high-risk." *Id.* at 984-85.  The court distinguished the Ohio Supreme Court's decision in *Beretta*—which Plaintiffs relied on here—on the ground that it was decided "on a motion[ ] to dismiss and [was] not based on a party's inability to present evidence."  *Id.* at 989; *see also Ramsey v. Del Monte Corp.*, 9 Ohio App. 3d 103, 106 (Ohio Ct. App. 1983) ("[M]ere possession and sale of a product . . . are alone insufficient to permit even an inference of negligence.").  The same reasoning applies here and entitles Walmart to summary judgment.[8]

### D. Plaintiffs Have Presented No Evidence That Walmart Committed Any Criminal Acts By Distributing Opioids (Count 9).

Plaintiffs' claim for injury through criminal acts, Ohio Code § 2307.60, also fails.  Walmart maintains that a defendant must be convicted of a crime to be held liable under this provision, but

---

[8] Plaintiffs cannot fill this gap by claiming that Walmart violated DEA regulations.  For one thing, no evidence supports that claim, but even if it did, Plaintiffs cannot proceed on a theory of negligence *per se* without establishing that the specific regulations at issue create a duty to the Plaintiffs.  *See, e.g., Jewell v. City of Columbus*, 485 N.E.2d 266, 268 (Ohio Ct. App. 1984) (rejecting claim that police officer acted negligently when filling out an accident report, as the "benefiting party as to uniform accident reports is the Department of Highway Safety" and the "law enforcement officer owes no duty and is not liable to the injured parties").

regardless of how the Ohio Supreme Court answers that question on certification, *see* Doc. 1203 at 36, Walmart is entitled to summary judgment because there is no evidence that Walmart violated any criminal provision.[9]

Plaintiffs' Complaint alleged that Walmart violated Ohio Code § 2925.02(A), which makes it a crime to "knowingly" "by force, threat, or deception" "caus[e] another to use a controlled substance" or "furnish[ ] to another or induc[e] or caus[e] another to use a controlled substance, and thereby caus[e] serious physical harm to the other person, or caus[e] the other person to become drug dependent."  *See* Second Am. Compl. ¶ 1092.  The evidence does not bear out that allegation with respect to Walmart.

First, Section 2925.02(B) includes an exception for "wholesalers, . . . pharmacists, owners of pharmacies, and other persons whose conduct is in accordance with" state laws governing controlled substances.  Even if Plaintiffs could establish some kind of regulatory violation, the Ohio Supreme Court has held that such a showing cannot overcome this exception for pharmacies, which applies so long as the defendant's conduct occurred "in the course of the *bona fide* treatment of a patient."  *State v. McCarthy*, 605 N.E.2d 911, 913-14 (Ohio 1992).  To show that Walmart's conduct was less than "*bona fide*," Plaintiffs would have to establish "[c]riminal intent."  *Id.* at 914.  Plaintiffs have no evidence with which they could make such a showing.

Second, even putting aside the statutory shield of Section 2925.02(B), Plaintiffs cannot meet the requirements for liability set by Section 2925.02(A).  To prevail, Plaintiffs would have to show either that Walmart (1) used "force, threat, or deception" to cause another to use a controlled substance or (2) that Walmart furnished an individual with a controlled substance and

---

[9] Walmart also reiterates its earlier argument that Plaintiffs' claims for purely economic losses do not involve an "injury to person or property," as required by the plain text of Section 2307.60. *See* Doc. 497-1 at 24.

thereby caused that person to suffer physical harm or become drug dependent.  *See* Ohio Code Ann § 2925.02(A).  But there is no record evidence from which Plaintiffs could conceivably make such a showing.

### E.   Walmart Was Not Unjustly Enriched By Its Distribution Of A Lawful Medication (Count 10).

Plaintiffs' unjust enrichment claim finds no support in the facts (let alone the law).  At the motion to dismiss stage, the Court held that Plaintiffs stated a claim because they alleged that "Plaintiffs have conferred a benefit upon Defendants by paying for Defendants' externalities." Doc. 1203 at 38.  But, at least with respect to Walmart, the evidence does not support this claim.

There is no evidence that Plaintiffs have conferred any benefit of any kind *on Walmart*. Plaintiffs claim to have provided additional services as a result of the opioid crisis, but none of those services can be tied to the tiny proportion of opioids distributed by Walmart.  *See* Ex. V at 3779, 3849.  Moreover, there is no basis to conclude that Walmart would have been forced to bear these costs if Plaintiffs had not.  Rather, "[t]he beneficiaries of the city's expenditures are its own residents."  *City of Cincinnati v. Beretta U.S.A. Corp.*, No. C-990729, 2000 WL 1133078, at *7 (Ohio Ct. App. Aug. 11, 2000).[10]

In addition, even if Plaintiffs conferred some unspecified benefit on Walmart, there is no evidence that it would "be inequitable for [Walmart] to retain such benefits."  *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1289 (11th Cir. 2015); *see also* 2019 WL 1966943, at *2 n.1 (11th Cir. May 3, 2019).  There is no evidence in this case that Walmart did anything other than distribute a lawful product to its licensed pharmacies, and that lawful conduct cannot support an

---

[10] While the Ohio Supreme Court later reversed the Ohio Court of Appeals' dismissal of the public nuisance and negligence claims, it did not review (and therefore let stand) the decision dismissing the unjust enrichment claim.  *See* 2002-Ohio-2480 ¶ 1 n.1 (Ohio 2002).

unjust enrichment claim. *See Chesnut v. Progressive Cas. Ins. Co.*, 2006-Ohio-2080, ¶ 30-31 (Ohio Ct. App. 2006).[11]

### III. Walmart Is Entitled To Summary Judgment On Plaintiffs' Claim For Punitive Damages.

Finally, Walmart is entitled to summary judgment on Plaintiffs' claim for punitive damages, as there is no evidence to support such an award. In Ohio, a plaintiff seeking punitive damages must prove actual malice, Ohio Code Ann. § 2315.21(C)(1), meaning "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987).

There is no evidence that Walmart acted with conscious disregard for a risk of harm when it distributed a lawful medication to its own pharmacies. *See Malone v. Courtyard by Marriott L.P.*, 659 N.E.2d 1242, 1247 (Ohio 1996). And there certainly was not a "great probability" that such harm would arise from Walmart's distribution of a lawful medication to its own pharmacies— distribution that, again, made up less than 1.3% of the relevant market. *See Calmes v. Goodyear Tire & Rubber Co.*, 575 N.E.2d 416, 419 (1991).

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Walmart on all of Plaintiffs' claims.

---

[11] At the motion to dismiss stage, Defendants explained that a claim for unjust enrichment requires evidence of some form of economic transaction between the parties. While the Court held otherwise, Walmart reiterates that argument for preservation purposes.

Dated:  June 28, 2019              Respectfully submitted,

/s/   Tara A. Fumerton

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com

*Attorneys for Walmart Inc.*

<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)</u>

Pursuant to Local Rule 7.1(f), I hereby certify that this Court has ordered that individual defendants' summary judgment briefs are limited to 18 pages, *see* Doc. 1653 at 3-4, and that the foregoing Memorandum of Law is 18 pages in length.

/s/   Tara A. Fumerton

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com