# EXHIBIT D

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3  IN RE: NATIONAL          )    MDL No. 2804
    PRESCRIPTION OPIATE      )
 4  LITIGATION,              )    Case No.
                             )    1:17-MD-2804
 5                           )
    THIS DOCUMENT RELATES TO )    Hon. Dan A.
 6  ALL CASES                )    Polster
                             )
 7
 8                   __ __ __
 9           Tuesday, January 22, 2019

                     __ __ __
10
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11             CONFIDENTIALITY REVIEW

                     __ __ __
12
13
14
15       Videotaped 30(b)(6) Deposition of
    Walmart, through the testimony of Susanne
16  Hiland, held at 4206 South J.B. Hunt Drive,
    Rogers, Arkansas, commencing at 8:22 a.m., on
17  the above date, before Debra A. Dibble,
    Certified Court Reporter, Registered
18  Diplomate Reporter, Certified Realtime
    Captioner, Certified Realtime Reporter and
19  Notary Public.
20
                     __ __ __
21
22
23          GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
25
```

1    reporter today is Debbie Dibble.  And

2    she will please now swear in the

3    witness.

4              SUSANNE HILAND,

5    having first been duly sworn, was examined

6    and testified as follows:

7              DIRECT EXAMINATION

8    BY MR. BOWER:

9        Q.    Good morning, Ms. Hiland.  How

10    are you today?

11        A.    I'm fine, thank you.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      Yes.

 2              Q.      Okay.

 3                      And so just to make sure we're

 4      all on the same page, I just want to go over

 5      a couple of those rules, just so there's no

 6      issues moving forward.  I think probably the

 7      most important one is to make sure that you

 8      understand my question.  So if at any point

 9      you don't understand the question, please

10      just let me know and I'll try to rephrase it.

11      Okay?

12              A.      Okay.

13              Q.      If you don't ask me to rephrase

14      it, I'll assume that you understand the

15      question as I asked it.  Okay?

16              A.      Okay.

17              Q.      And you understand that your

18      answers today are on behalf of Walmart;

19      correct?

20              A.      Yes.

21              Q.      And that tomorrow you will be

22      providing your own fact testimony; is that

23      correct?

24              A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And do you understand,

2  therefore, that the testimony you will give

3  today can be binding on the corporation?

4    A.    Yes.

5    Q.    Okay.  How long have you been

6  working at Walmart?

7    A.    29 years.

8    Q.    And I don't want to spend too

9  much time on your employment history, but can

10  you just -- let's start maybe in 2005, give

11  or take.  Going forward.  Okay?

12    A.    Yes.

13    Q.    What was your position in 2005?

14    A.    At the start of 2005, I was a

15  regional director for operations.  And then I

16  transitioned to a director of professional

17  services.

18    Q.    And when would that transition

19  occur?

20    A.    March of 2005.

21    Q.    Okay.

22          During that time period, did

23  you have oversight over Walmart pharmacies?

24          MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  In the regional

3          role I had oversight, yes.

4          Q.     (BY MR. BOWER) And what about

5    in the director role?

6          A.     In the director role, I had

7    responsibilities for Board of Pharmacy

8    issues.

9          Q.     What was your next position at

10   Walmart?

11         A.     The next position was a

12   promotion to senior director.  It was the

13   same department, but we -- the name of the

14   department changed to regulatory affairs.

15         Q.     And when did that occur?

16         A.     2009.

17         Q.     And just generally what were

18   your duties and responsibilities as the

19   senior director in regulatory affairs?  Is

20   that an accurate description of your title at

21   that time?

22         A.     That was my title.

23         Q.     Okay.

24                And what were your -- just a

Highly Confidential - Subject to Further Confidentiality Review

1    general description of your duties and

2    responsibilities in connection with that

3    title.

4         A.    I began to supervise the

5    directors that had responsibility for Board

6    of Pharmacy regulation.

7              I also had responsibility for

8    our licensing and registration function for

9    our facilities.  And I had federal regulatory

10   responsibility as it related to our licensed

11   pharmacies.

12             MS. TABACCHI:  Zach, of course,

13        you're welcome to inquire about the

14        witness's personal background, but

15        this is all beyond the scope of the

16        notice.

17             MR. BOWER:  I'm just trying to

18        get, like I said, a very high level.

19             MS. TABACCHI:  I just want to

20        make sure we're on the same page.  I'm

21        not going to object to every question

22        during this portion.

23             MR. BOWER:  No, I understand.

24        I'm just going to move quickly through

Highly Confidential - Subject to Further Confidentiality Review

```
 1         this.

 2         Q.     (BY MR. BOWER)  And what was

 3    your next role at Walmart after senior

 4    director of regulatory affairs?

 5         A.     For a short period of time in

 6    July 2011, I was senior director of

 7    compliance and quality assurance.

 8         Q.     So that was in 2011; is that

 9    correct?

10         A.     Yes.

11         Q.     And then your next role after

12    that was?

13         A.     February 2012 of -- I'll likely

14    not get the title correct, but it was senior

15    director of clinical quality assurance.

16         Q.     Okay.

17         A.     And that was the general title.

18    I'd have to look back to get the title

19    exactly correct.

20         Q.     Approximately how many titles

21    would you say you've had at Walmart in your

22    29 years?

23         A.     One -- a different one every

24    three years approximately.
```

1          Q.     What's your current title?

2          A.     My current title -- on paper my

3     title is Senior Director II, business

4     strategy.  That's an HR title.

5               In function, my title is senior

6     director of professional relations,

7     professional practice standards and clinical

8     services.

9          Q.     Do you believe you are the

10    person at Walmart with the most knowledge of

11    Walmart's maintenance and effective controls

12    against diversion?

13               MS. TABACCHI:  Object to the

14          form.

15               THE WITNESS:  I believe that

16          I'm prepared to speak to that topic on

17          behalf of Walmart.

18               MR. BOWER:  I move to strike

19          that answer.

20          Q.     (BY MR. BOWER)  I just would

21    ask you to please carefully listen to my

22    questions and answer the questions that I

23    ask.  Okay?

24          A.     Yes.

Highly Confidential - Subject to Further Confidentiality Review

10        A.     Much of it was

11    experience-based.  There were very tenured

12    associates, and their jobs were

13    specifically -- they were specifically

14    assigned to the controlled substance

15    processing areas.  And so they were very

16    familiar with practices and what might be out

17    of the ordinary.

18        Q.     What specifically would they

19    look for?

20        A.     They would be looking for

21    orders that were of an unusual size.  They

22    would be monitoring for any type of an order

23    that was requested outside of a normal

24    ordering schedule that Walmart had

Highly Confidential - Subject to Further Confidentiality Review

1    established.  And those were the -- those

2    were the things that they were looking for.

3         Q.    What do you mean by "normal

4    ordering schedule that Walmart had

5    established"?

6         A.    So for Walmart, the way that

7    our distribution was set up, every pharmacy

8    only received an order once a week.  And so

9    that was the schedule.  It was -- it was a

10   certain set of stores that would order four

11   days out -- one day of the week, but we only

12   distributed four days out of the week.  And

13   so they could see also if there were manual

14   orders coming in or requests for some

15   different order schedule.

16        Q.    So they were, for example,

17   looking at as to whether a store ordered more

18   than once a week?  Is that correct?

19        A.    What they would look for is --

20   there was a process for a store to order

21   outside of their normal pattern, so they

22   would be looking for those.  And then

23   understanding why they needed it outside of

24   that normal day.



```
12        A.      My understanding was that there
13   were -- there were processes in place before
14   we distributed C-IIs, and that started in
15   2002.  So that when the DC was opened in
16   2002, there had been a lot of conversations
17   with the DEA prior to that, around current
18   processes, what needed to carry over and how
19   to open that building.
```

Highly Confidential - Subject to Further Confidentiality Review

11          Q.      Did Mr. Culver convey to you

12    that he relied on those interactions with the

13    DEA in determining what policy would be used

14    to monitor for orders of controlled

15    substances?

16                  MS. TABACCHI:  Object to the

17          form.  Beyond the scope.

18                  You may answer.

19                  THE WITNESS:  What he conveyed

20          to me was that he worked interactively

21          with the DEA around requirements and

22          understanding what their expectations

23          were that ranged from physical

24          security of the buildings, the



1          shipping mechanisms to ensure safe
2          transport, as well as any reporting or
3          processes that the associates were
4          conducting as they were order
5          monitoring.

1    for unusual orders of unusual size as the

2    orders were being processed.

3         Q.    And how would they determine

4    whether an order was of unusual size?

5         A.    These were --

6              MS. TABACCHI:  Beyond the

7         scope.

8              THE WITNESS:  These were

9         long-tenured associates that

10        understood the business and the fact

11        that we were self-distributing.  So

12        they saw the -- they saw the patterns.

13        They worked with it every single day.

███ ███████     █████████
███ ████████████████████████
███ ████████████████████████
███ ████████████████████████
███ ███████████████

6      Q.      (BY MR. BOWER)  Did Walmart

7    rely on guidance from the DEA in implementing

8    or designing its suspicious order monitoring

9    programs?

10     A.      We didn't solely rely on

11   guidance, but we certainly had conversations

12   with the DEA regarding our plans, and took

13   into consideration any recommendations,

14   thoughts, suggestions that they had for how

15   we established our policies and practices.

16     Q.      And what conversations are you

17   referring to specifically?

18     A.      We have -- so in speaking with

19   Scott Culver, Scott relayed the conversations

20   that he had with the DEA in establishing the

21   C-II facility, our distribution facility,

22   even before any plans were built.  Blueprints

23   were reviewed.  Contractors were -- or at

24   least DEA-approved contractors to build the

Highly Confidential - Subject to Further Confidentiality Review

1    facility.  Over multiple interactions with

2    the DEA, they've seen our processes.  They've

3    reviewed our reports.  They've asked for

4    additional information which we've provided.

5    And so we have a -- we have a long history of

6    interaction, positive interaction, and

7    collaborative interaction with the DEA.

8          Q.    (BY MR. BOWER)  Okay.  And now

9    I want to ask probably a better question than

10    the last one.  So my question is more focused

11    than that.  I want to ask specifically what

12    conversations has Walmart had with the DEA

13    regarding designing or implementing its

14    suspicious order monitoring program for

15    controlled substances?

16          MS. TABACCHI:  Object to the

17          form.

18          THE WITNESS:  The conversations

19          have occurred over time, again, as the

20          distribution center was established

21          and reporting was pulled and reviewed.

22          As a part, one part of our order

23          monitoring, the DEA reviewed those

24          reports, and at one point asked us to

Highly Confidential - Subject to Further Confidentiality Review

1    begin sending those to them on a

2    regular basis.  I learned that through

3    a conversation with Scott Culver.

4         And then through the years, as

5    we've made certain changes, those

6    changes have been discussed through

7    audits that the DEA has conducted at

8    various of our facilities, where

9    they've -- they've actually asked to

10   review our order monitoring process.

11   It's a part of their audit on their

12   audit checklist, and we've -- we've

13   never had a reported deficiency in the

14   way that they've reviewed those

15   programs.

16   Q.    (BY MR. BOWER)  When was the

17   first time a conversation occurred between

18   someone at Walmart and someone at the DEA

19   regarding Walmart's design or implementation

20   of a suspicious order monitoring program?

21        MS. TABACCHI:  Object to the

22   form.

23        THE WITNESS:  So from an

24   overall perspective?

1           MS. TABACCHI:  Beyond the scope

2       of the notice from a time period

3       perspective.  I'm sorry.

4           THE WITNESS:  Before we

5       started -- before we stood up the

6       distribution center to distribute

7       opioids, C-IIs, Scott Culver reached

8       out to the DEA to understand, make

9       sure that all of the plans that we had

10      that are inclusive of our obligations

11      around preventing diversion were

12      discussed with the DEA, and then,

13      again, ongoing conversations have

14      occurred as our program has evolved.

15      Q.    (BY MR. BOWER)  Were those

16  initial discussions that Scott Culver had

17  with the DEA specific to order monitoring?

18      A.     There were -- there were

19  conversations around reporting and what

20  was -- what was expected.  And how they --

21  how the operation would -- would be

22  established.

23      Q.     And what did Walmart understand

24  that the DEA expected at that time?

Highly Confidential - Subject to Further Confidentiality Review

1            MS. TABACCHI:  Beyond the

2       scope.

3            THE WITNESS:  That our --

4            MS. TABACCHI:  You may answer.

5            THE WITNESS:  So the way that

6       our policies and procedures were set

7       up reflected our understanding of what

8       our obligations were at that time.

9       Q.    (BY MR. BOWER)  Well, I'm just

10   trying to get a little bit more information

11   as to what Walmart understood the DEA

12   expected.

13            So from those conversations,

14   what did Mr. Culver take away as to what the

15   DEA would require from a monitoring program?

16            MS. TABACCHI:  Object to the

17       form.  Beyond the scope.

18            THE WITNESS:  We didn't discuss

19       in very specific detail any specific

20       ask.

21            What I do know is that the

22       programming that was implemented was

23       the result of those conversations.

Highly Confidential - Subject to Further Confidentiality Review

9          THE WITNESS:  So we continued

10         our collaborative work with the DEA.

11         But we didn't rely on a yes-or-no

12         opinion from the DEA.  We would put

13         policies, practices in place, and then

14         communicate with the DEA over time and

15         make changes if there were changes

16         that were suggested, and we

17         implemented changes to our policies

18         independently ahead of DEA approval or

19         blessing.

20         Q.    (BY MR. BOWER)  Is it Walmart's

21    testimony today that the DEA has ever

22    approved or blessed Walmart's policies for

23    monitoring orders of controlled substances?

24         MS. TABACCHI:  Object to the

Highly Confidential - Subject to Further Confidentiality Review

1          form.

2                    THE WITNESS:  We've had

3          conversations with the DEA where they

4          agreed with the process that we

5          were -- that we had implemented versus

6          an outright approval.

7          Q.     (BY MR. BOWER)  And when did

8     those conversations occur, where the DEA

9     occurred with the process that was

10    implemented?

11         A.     So Scott Culver relayed to me

12    the conversations that I testified to

13    earlier, with the DEA, around our early

14    programs.  And then we have, through audits

15    that were conducted, different -- at the

16    different distribution centers we have

17    associates relaying information from the DEA,

18    with no audit finding any deficiency.  And I

19    spoke to Mike Mullins, and he relayed to me

20    that on the DEA audit form, order monitoring

21    was one of the areas that they checked.  So

22    from that, we found -- we have not been aware

23    that we've had a deficiency in our program.

24         Q.     Well, my question is a little

1    bit different, though.  As you sit here

2    today, can you provide to us any specific

3    conversations where the DEA blessed or

4    otherwise endorsed Walmart's suspicious order

5    monitoring program?

6              MS. TABACCHI:  Object to the

7         form.  Asked and answered.

8              THE WITNESS:  No, I testified

9         that there was no specific deeming of

10        appropriateness.  There were reviews

11        of our processes over time and never a

12        deficiency noted.

Highly Confidential - Subject to Further Confidentiality Review

███    █████████████████████████████

███    ██████████

3          Q.      (BY MR. BOWER)   Okay.   And

4     Walmart doesn't dispute that it had that

5     obligation in 2007; correct?

6                  MS. TABACCHI:   Object to the

7              form.   What obligation?

8          Q.      (BY MR. BOWER) The obligation

9     that we've been talking about.   To --

10                 MS. TABACCHI:   You're

11             paraphrasing.

12         Q.      (BY MR. BOWER)  -- report as

13    suspicious an order that deviates

14    substantially from a normal pattern.

15                 MS. TABACCHI:   Object to the

16             form.

17                 THE WITNESS:   Our programs were

18             in place to meet those obligations.

19         Q.      (BY MR. BOWER)  Did Walmart --

20    in 2000 -- let me strike that.

21                 In January 2008, was Walmart

22    reporting as suspicious orders that deviated

23    substantially from a normal pattern, "yes" or

24    "no"?

Highly Confidential - Subject to Further Confidentiality Review

1              MS. TABACCHI:  Object to the

2         form.

3              THE WITNESS:  If they were

4         determined to deviate from a pattern,

5         our program would have been to notify

6         the DEA.

7         Q.    (BY MR. BOWER)  And that's true

8    in January of 2008; correct?

9         A.    Yes.

10        Q.    Okay.  And in January 2008,

11   would Walmart have reported to the DEA an

12   order that deviated substantially from a

13   normal size?

14             MS. TABACCHI:  Object to the

15        form.

16             MR. BOWER:  I'll strike that.

17        Q.    (BY MR. BOWER)  Does Walmart

18   agree that in January of 2008, it was

19   obligated to report to the DEA orders that

20   deviated from a normal size?

21             MS. TABACCHI:  Object to the

22        form.  Calls for a legal conclusion.

23             THE WITNESS:  Yes.  Orders

24        deviating from -- I'm sorry.  I --

Highly Confidential - Subject to Further Confidentiality Review

1           "orders deviating from a normal size,"

2           are you reading that from the ...

3           Q.    (BY MR. BOWER)  I'm not reading

4    that from anywhere.  It's just a question.

5                MS. TABACCHI:  That's the

6           problem.

7                MR. BOWER:  I don't think I

8           have to read my questions from

9           somewhere unless I'm familiar with

10          some --

11               MS. TABACCHI:  If you're going

12          to try to represent what the law is --

13               MR. BOWER:  I'm asking the

14          question.

15          Q.    (BY MR. BOWER)  Does Walmart

16   agree that in January of 2008, it had an

17   obligation to report orders that deviated

18   substantially from a normal size?

19               MS. TABACCHI:  Object to the

20          form.  Calls for a legal conclusion.

21               THE WITNESS:  If we detected an

22          order that deviated from size and

23          could not -- and could not explain the

24          reason for that, therefore deeming

1    that order suspicious, we would have

2    contacted the DEA, notified the DEA.



Highly Confidential - Subject to Further Confidentiality Review

7    Q.    Did Walmart's policies and

8    procedures as of January 2008 take into

9    account this criteria as defined here by

10   Mr. Rannazzisi that I just read?

11              MS. TABACCHI:  Object to the

12         form.

13              THE WITNESS:  So our policies

14         and procedures were developed with our

15         understanding of what we were required

16         to -- our -- the obligations that we

17         had under the Controlled Substances

18         Act, in conversation with DEA agents

19         throughout the entirety of our

20         distribution of controlled substances.

21    Q.    (BY MR. BOWER)  Now, is it

22   Walmart's position that those conversations

23   somehow superseded this communication from

24   Mr. Rannazzisi?

1          MS. TABACCHI:  Object to the

2      form.

3          THE WITNESS:  We were working

4      collaboratively with the DEA agents

5      that we had on the ground that were in

6      our buildings and saw our operations.

7      And so as time went on, and our

8      business evolved, our practices

9      evolved, we remained in communication

10     with those DEA agents that were

11     actually in our buildings.



Highly Confidential - Subject to Further Confidentiality Review

1    helpful.  It starts with "This regulation."

2    And it states, "This regulation clearly

3    places the responsibility on the registrant

4    to design and operate such a system.

5    Accordingly, DEA does not approve or

6    otherwise endorse any specific system for

7    reporting suspicious orders."

8              Do you see that?

9              MS. TABACCHI:  Object to the

10        form.  Lack of foundation.  Beyond the

11        scope of the notice.

12             THE WITNESS:  Yes, I see that.

13        Q.    (BY MR. BOWER)  So if, in fact,

14   Walmart did receive this letter in 2012, then

15   it was again put on notice that it shouldn't

16   rely on its communications with the DEA for

17   approving its program for monitoring orders

18   of controlled substances.  Correct?

19             MS. TABACCHI:  Object to the

20        form.  Calls for a legal conclusion.

21        Improper hypothetical.  Beyond the

22        scope of the notice.

23             THE WITNESS:  So -- so, again,

24        we weren't relying on them to endorse

Highly Confidential - Subject to Further Confidentiality Review

```
1        a specific system.  I mean, I can't --

2        I can't read into what is intended by

3        this.  We knew that our responsibility

4        was our own responsibility.  And that

5        if there was a program in place, it

6        was ours to develop.

7            We did not rely on the DEA to

8        say, "This system is blessed, move

9        forward."

10           We implemented programs over

11       time, that we had communications with

12       the DEA, and had -- and did not have

13       an indication from them that there

14       were gaps.
```



10        Q.      (BY MR. BOWER) Was Walmart

11   registered to distribute controlled

12   substances with the DEA?

13                MS. TABACCHI:  Object to the

14          form.  Time period.

15                MR. BOWER:  Ever.

16                THE WITNESS:  Yes.

17        Q.      (BY MR. BOWER)  During what

18   time period was Walmart registered?

19        A.      From the time period at least

20   from 2006 through the time that we ceased

21   distribution in 2018.

Highly Confidential - Subject to Further Confidentiality Review



17          We were running -- and so -- so

18    as to those orders, if an order was

19    identified, they would alert a manager, and a

20    manager would work with the operations

21    leadership to determine the reason for that.

22          Q.    Now, if you look at Walmart's

23    responses to the combined discovery requests,

24    on page 4, the first bullet point, is that

1    the policy you're referring to?  Where it

2    says "From as early as 1994 until 2010,

3    employees in Walmart's pharmacy distribution

4    centers reviewed controlled drug stock

5    exception reports, followed up on orders by

6    speaking with pharmacists, and escalated

7    issues to market and/or regional leadership

8    as needed to investigate orders and to

9    resolve concerns."

10           Is that the policy you're

11   referring to?

12       A.    Yes.  As well as the bullet

13   that's at the very bottom of the page.  So

14   I'm on my document that, for the entire

15   relevant time period, our distribution

16   associates monitored orders.

17       Q.    Okay.  Now, let's go in 2006,

18   what specifically were the associates doing

19   to monitor orders?

20           MS. TABACCHI:  Object to the

21       form.

22           THE WITNESS:  They were

23       monitoring orders as they came into

24       the distribution center, and again



2          A.      They would hold that order,

3    conduct outreach to understand the nature of

4    the order, and then at the -- at the point at

5    which they were able to clear that order,

6    they -- that's the point at which it would be

7    shipped.

Highly Confidential - Subject to Further Confidentiality Review

11      A.      Well, I had supervision -- I

12  had responsibility for the pharmacies that

13  they were distributing to.

14              So could you -- I could go

15  physically stand in the pharmacy and

16  understand what the need for the order was

17  that was -- that they were questioning.

18      Q.      Wait, your answer to my

19  previous question was, "If it was escalated

20  to me, they would want to know if I had

21  information about a specific order that they

22  might be asking about."

23              What specific information would

24  they be seeking from folks that were in your

Highly Confidential - Subject to Further Confidentiality Review

1    position?

2              MS. TABACCHI:  Object to the

3         form.

4              THE WITNESS:  The purpose of

5         the order from the pharmacy that I

6         supervised.

7         Q.    (BY MR. BOWER)  And how would

8    the folks in your position determine what the

9    purpose of that order was?

10        A.    I would --

11             MS. TABACCHI:  Object to the

12        form.

13             THE WITNESS:  -- do one of

14        several things that might include

15        talking to a pharmacist, talking to a

16        pharmacy manager.  I could go on-site.

17        I could look at their -- the specifics

18        around that drug.

19             There were -- there was a lot

20        of information that I had access to,

21        because I supervised those pharmacies.

22        Q.    (BY MR. BOWER)  Well, let's

23   break that down.  You give us some things you

24   would do.  Right?  So what would you talk to

Highly Confidential - Subject to Further Confidentiality Review

1    a pharmacist about?

2         A.    I would ask them why they

3    needed the order.

4         Q.    And would you rely on what they

5    told you?

6         A.    It would depend on the

7    circumstance --

8         Q.    Okay.

9         A.    -- of the response.

10        Q.    Can you recall any specific

11   time where you asked a pharmacist a question

12   and you needed more follow-up?

13             MS. TABACCHI:  Object to the

14        form.  Beyond the scope.

15             THE WITNESS:  I don't recall a

16        specific situation.

17        Q.    (BY MR. BOWER)  Not a single

18   time that you can recall specifically?

19             MS. TABACCHI:  Same objections.

20             THE WITNESS:  No, I --

21        Q.    (BY MR. BOWER)  Okay.  And the

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     And this is when Walmart first
 2     implemented order alerts in Reddwerks;
 3     correct?
 4            A.     Yes.
 5            Q.     Do you know when in 2011
 6     Walmart first implemented order alerts in
 7     Reddwerks?
 8            A.     I don't know the exact date.
 9            Q.     Is that something you prepared
10     to testify on today?
11                   MS. TABACCHI:  Object to the
12            form.
13                   THE WITNESS:  I don't have an
14            exact date.
15            Q.     (BY MR. BOWER)  Do you know
16     whether it was -- could it have been 2012?
17            A.     No.  It was 2011.
```



17          Do you know whether during this

18    time period reflected in bullet point 4

19    there, whether Reddwerks was flagging orders

20    for non-controlleds of 50 bottles or more?

21          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

7        A.      The enhanced thresholds were

8    calculated using a year's worth of shipment

9    data, and then applying a formula, which was

10   the average weekly order, plus three standard

11   deviations over that 52-week shipment date.

12       Q.      And when that formula was used,

13   would that provide the enhancements for a

14   particular store?

15               MS. TABACCHI:  Object to the

16        form.

17               THE WITNESS:  It was store and

18        item specific.  And there were

19        additional defaults that were applied

20        to those thresholds as they were

21        calculated.

22       Q.      (BY MR. BOWER) And can you

23   describe for us how those defaults -- let me

24   break that down a little bit.

Highly Confidential - Subject to Further Confidentiality Review

1    How did Walmart go about

2    determining what the defaults would be?

3         A.    So again, based on enhancing

4    what we had in place, we continued to use

5    that 50-unit limit.  It was applied a little

6    bit differently in this context because we

7    took -- we took the dosage units and dropped

8    those down to item units to not exceed

9    5,000 units.

10         There was a default minimum

11   alert of 2,000 units applied, and then for

12   non-traited items for that location, there

13   was a limit set for a thousand dosage units.



12      A.      The process began to move --

13  still the process at the distribution center

14  was in place.  But those alerts were then

15  reviewed by the logistics compliance team.

16  And then the tiering was that practice

17  compliance also was involved.  So there were

18  additional teams that were involved in the

19  review.

Highly Confidential - Subject to Further Confidentiality Review



24          Q.      Now, how did the Reddwerks

1          A.      I see that.



22              THE WITNESS:  I think there

23      were a couple of negatives in there.

24      So what -- our policies were designed

1        to detect orders of interest.  We

2        conducted due diligence.  And if an

3        order was determined to be suspicious,

4        we did not ship and notified DEA.



Highly Confidential - Subject to Further Confidentiality Review



    23          THE WITNESS:  I think you have

    24      to look at the circumstances.  Our

Highly Confidential - Subject to Further Confidentiality Review

1       intent was never to ship a suspicious

2       order.  However, I think that if

3       there's too many false positives, it

4       could lead to missing --

5              I think one could lead to the

6       other from an unintended consequence

7       perspective.  That's why we were

8       working to get it right knowing that

9       neither situation was the ideal.  And

10      that's why we continued to adjust and

11      improve and make modifications to our

12      program over a continuum of time.

13             MS. TABACCHI:  Can we just take

14      a break when you come to a right

15      moment?

16             MR. BOWER:  Sure.  Go ahead.

17             THE VIDEOGRAPHER:  4:20.  We

18      are off the video record.

19             (Recess taken, 4:20 p.m. to

20      4:43 p.m.)

21             THE VIDEOGRAPHER:  4:43.  We

22      are on the video record.

23      Q.     (BY MR. BOWER)  All right.

24   We're back on the record.  I just would ask



10        Q.      (BY MR. BOWER)    After

11   September 21st, 2015, when was the next time

12   Walmart improved its suspicious order

13   monitoring program?

14              MS. TABACCHI:  Object to the

15        form.

16              THE WITNESS:  So there were

17        ongoing processes that were being

18        worked on, the most significant of

19        which was the switch from the

20        Reddwerks program to the Buzzeo

21        program that occurred in 2017.

Highly Confidential - Subject to Further Confidentiality Review



 5      Q.    So is it accurate, then, to say

 6   that Walmart began documenting its review of

 7   orders of interest in Archer on or about

 8   August of 2015?

 9      A.    We were documenting those

10   reviews with that Reddwerks enhancement.

11   That was part of the enhancement that was

12   implemented.

Highly Confidential - Subject to Further Confidentiality Review

1    Okay?

2          A.    Okay.

3          Q.    Unless it's -- is it something

4    that your memory has been refreshed over the

5    break?

6          A.    It is information specific to

7    one of the exhibits.

8          Q.    Okay.  Well, I guess it's a

9    little bit unusual, but let's hear it.

10         A.    So in -- as we were talking

11    about the exhibit that -- I'll have to find

12    it -- that showed our reporting post

13    Masters --

14         Q.    Mm-hmm.

15         A.    -- of orders of interest, where

16    we reported orders of interest prior to due

17    diligence to determine whether or not they

18    were suspicious?

19         Q.    Okay.

20         A.    We did report those to DEA.

21    And after that reporting, we had two

22    different DEA offices contact us and ask us

23    why we were reporting those and asked us to

24    stop reporting.

Highly Confidential - Subject to Further Confidentiality Review

2                     THE WITNESS:  My preparation

3             indicates that we did not participate

4             in marketing of opioids.

5             Q.    (BY MR. BOWER)  But my question

6     is a little bit different.  Did Walmart

7     consider that, marketing plans that were

8     going to be implemented by manufacturers in

9     deciding whether to purchase opioid products?

10                    MS. TABACCHI:  Objection.

11            Object to the form, beyond the scope.

12                    THE WITNESS:  I don't have that

13            detail.

14                    MR. BOWER:  Okay.

15            Q.    (BY MR. BOWER)  Would you agree

16    with me that Walmart -- sorry, just give me a

17    second.

18                    Would you agree with me that

19    Walmart was involved in NACDS going back to

20    the early 2000s?

21            A.    Yes.

22                    MS. TABACCHI:  Object to the

23            form.

24                    (Whereupon, Deposition Exhibit