# EXHIBIT L

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                      -  -  -
 5
           IN RE:  NATIONAL      :   HON. DAN A.
 6         PRESCRIPTION OPIATE    :   POLSTER
           LITIGATION             :
 7                                :
           APPLIES TO ALL CASES   :   NO.
 8                                :   1:17-MD-2804
                                  :
 9
                 - HIGHLY CONFIDENTIAL -
10
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      VOLUME I
12
                       -  -  -
13
                  April 17, 2019
14
                       -  -  -
15
16              Videotaped deposition of
      THOMAS PREVOZNIK, taken pursuant to
17    notice, was held at the law offices of
      Williams & Connolly, 725 12th Street,
18    Washington, D.C., beginning at 9:11 a.m.,
      on the above date, before Michelle L.
19    Gray, a Registered Professional Reporter,
      Certified Shorthand Reporter, Certified
20    Realtime Reporter, and Notary Public.
21                      -  -  -
22
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1          Michelle Gray, and she will now

2          please swear in the witness.

3                    -   -   -

4               ... THOMAS PREVOZNIK, having

5          been first duly sworn, was

6          examined and testified as follows:

7                    -   -   -

8               EXAMINATION

9                    -   -   -

10   BY MS. MAINIGI:

11          Q.    Good morning, Mr. Prevoznik.

12          A.    Good morning.

13          Q.    I will begin the

14   questioning.  My name is Enu Mainigi, and

15   I'm going to begin the questioning on

16   behalf of the defendants, and then there

17   are other defendants that may question

18   you after I'm done, and then the

19   plaintiffs will question you thereafter.

20               Mr. Prevoznik, I have put in

21   front of you Exhibit 1.  And Exhibit 1 is

22   the notice of deposition.

23               (Document marked for

24          identification as Exhibit

1        DEA-Prevoznik-1.)

2            (Document marked for

3        identification as Exhibit

4        DEA-Prevoznik-2.)

5    BY MS. MAINIGI:

6        Q.    The notice of videotaped

7    30(b)(6) deposition for your testimony

8    today.

9            Do you see that?

10       A.    Yes, I do.

11       Q.    And do you see that attached

12   to the notice is a letter dated March 22,

13   2019, from the Department of Justice

14   addressed to myself, and Ms. Singer of

15   Motley Rice?

16       A.    Yes.

17       Q.    Have you had a chance to

18   review, either alone or with your

19   counsel, the substance of this March 22nd

20   letter as well as the notice of

21   deposition?

22       A.    Yes, I have.

23       Q.    And do you understand that

24   you are here today testifying in a

Highly Confidential - Subject to Further Confidentiality Review

1    30(b)(6) capacity on behalf of the Drug

2    Enforcement Administration?

3         A.    Yes, I do.

4         Q.    And as I understand it, you

5    will be testifying as to certain topics

6    designated consistent with the letter

7    dated March 22, 2019, correct?

8         A.    Correct.

9         Q.    Okay.  Now, if you could

10   turn to the letter itself, Mr. Prevoznik.

11   And I'm looking specifically at Page 2 of

12   the letter.

13        A.    Okay.

14        Q.    You have been designated to

15   provide testimony on Topic 2, DEA's

16   interpretation and enforcement of and

17   practices related to 21 U.S.C. Section

18   823 and 21 C.F.R. Section 1301.74,

19   subject to the limitations set forth by

20   DOJ in this letter, correct?

21        A.    Correct.

22        Q.    How -- I notice,

23   Mr. Prevoznik, that Exhibit 3 that is in

24   front of you, is a deposition prep chart,

1    programmers that provided the details of

2    like what we could look at, whereas once

3    it went off the mainframe, then it become

4    more client service, so that the field

5    could actually do more things with it.

6    So that was roughly the fall -- fall of

7    2009 when it went off the mainframe.

8         Q.    To your understanding, what

9    are the uses of the ARCOS data?

10         A.    Well, it was originally for

11    UN reporting, so it was -- it's used for

12    UN reporting.  It's used for quotas.

13    It's used to show trends.  It's used in

14    our investigations, you know,

15    administrative, civil, criminal.  It

16    supports investigations.  We share it

17    with other federal agencies or state

18    agency, law enforcement, regulatory

19    agencies as well that are all, you know,

20    working to combat the diversion of

21    controlled substances.  So it's working

22    with them in corroboration on

23    investigations.  So it's used in various

24    means.

Highly Confidential - Subject to Further Confidentiality Review

1    it, it doesn't mean anything.

2              So that's part of our

3    review, when we go out and do schedule

4    investigations, is to review, are they

5    factually, in fact -- did -- is -- are

6    they operating a system that can detect a

7    suspicious order.

8    BY MS. MAINIGI:

9         Q.    And that's something that

10   the DEA reviews periodically as part of

11   its auditing process, correct?

12        A.    Correct.

13        Q.    So as part of the audit

14   process, operating systems that are

15   designed to review suspicious orders are

16   reviewed by the DEA?

17        A.    Well, it's not just the

18   schedule.  I mean it could be a

19   pre-registration, somebody is coming on

20   and they have -- we have to go through

21   the whole public interest of, you know,

22   what do you have in place to operate and

23   detect a system.  So it's not just a

24   schedule investigation.  There are

1    schedule investigations that we follow

2    up, and we do that as well.  So it comes

3    in -- it comes in various times that

4    we're going to review somebody's

5    operating system, whether we're on

6    schedule investigation, or whether we're

7    doing an investigation on a pharmacy or

8    something like that, where we're going to

9    look at how many SORs were submitted or

10   not submitted, or we're going to look at

11   the ARCOS data, how much did they buy.

12           We're going to look at

13   various things to make the determination

14   on what is going on.

15       Q.    And if either in the

16   pre-registration process or in the audit

17   process the DEA determines that a

18   registrant's system is not adequately

19   detecting suspicious orders, is that

20   something that is conveyed to the

21   registrant?

22       A.    Yeah, we -- we would tell

23   them, you need to add something.

24       Q.    It's clear in the Rannazzisi

Highly Confidential - Subject to Further Confidentiality Review

1      the characterization.

2           THE WITNESS:  Nationwide,

3      correct.

4  BY MS. MAINIGI:

5      Q.    Instead, one-off guidance

6  was perhaps provided in the context of

7  individual distributor meetings, correct?

8      A.    Yes.  Along with the MOAs

9  and the settlements that were done.

10     Q.    And is there documentation

11 of what was said at the individual

12 distributor meetings?

13     A.    It would be the PowerPoints

14 and the report -- after report.

15     Q.    And this is an internal DEA

16 report?

17     A.    Yes.

18     Q.    And have you reviewed those

19 internal DEA reports for the purpose of

20 preparing for your testimony today?

21     A.    Some of them.

22     Q.    Now, does the DEA agree that

23 there's more than one way to design and

24 operate a system that can identify and

Highly Confidential - Subject to Further Confidentiality Review

1    report suspicious orders?

2          A.     Yes.

3          Q.     And there's no single

4    feature that makes a suspicious order

5    monitoring system compliant, correct?

6          A.     Correct.

7          Q.     And the DEA leaves it up to

8    the registrant to design a system that

9    works with its own business model and

10   customer base, correct?

11         A.     Correct.

12         Q.     Does it matter to the DEA

13   whether a registrant reviews orders

14   manually or uses an automated system?

15         A.     No, it doesn't matter.

16         Q.     Other than requiring that

17   the report, suspicious order report

18   clearly indicate that the order is

19   suspicious, does DEA require suspicious

20   order reports to follow a particular

21   format?

22         A.     That's correct.

23         Q.     Let me ask the question

24   again.  The DEA does not require

Highly Confidential - Subject to Further Confidentiality Review

1      answer.

2           THE WITNESS:  Yeah, I

3      apologize.

4  BY MS. MAINIGI:

5           Q.    No, no, no, my fault too.

6           A.    Where was I?

7           Q.    Is the know your customer --

8  I think you've answered my question.

9           The -- the know your

10 customer concept is not explicitly stated

11 in the regulation, correct?

12          A.    Correct.

13          Q.    And that's true even today,

14 correct?

15          A.    Well, I mean it -- it still

16 goes back to maintaining control.

17          I mean, the whole structure

18 of the Controlled Substance Act, the

19 regulations, this is how you do business.

20 If you're going to do it -- be authorized

21 to handle controlled substances, this is

22 the way you're going to do it.  So if

23 you're going to be selling to customers,

24 you need to know who your customers are.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  It may or

2      may -- it may or may not.

3  BY MR. O'CONNOR:

4      Q.    Would the same be true of an

5  unusually frequent order?

6          MR. FINKELSTEIN:  Same

7      objection.  You can answer.

8          THE WITNESS:  Correct.  It

9      may or may not.

10  BY MR. O'CONNOR:

11      Q.    And the same would be true

12  of an order that deviates substantially

13  from the normal pattern?

14          MR. FINKELSTEIN:  Same

15      objection.  You can answer.

16          THE WITNESS:  Correct.  It

17      may or may not.

18  BY MR. O'CONNOR:

19      Q.    Okay.  And putting that

20  together, that means that not every

21  suspicious order leads to diversion,

22  correct?

23          MR. FINKELSTEIN:  Objection.

24      Scope.  You can answer.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  Could you

2       please repeat that?

3  BY MR. O'CONNOR:

4       Q.    Not every suspicious order

5  leads to diversion, correct?

6       A.    Correct.

7       Q.    I want to talk a little bit

8  about how suspicious order reports are --

9  are used within DEA.

10            Is it fair to say that most

11  suspicious order reports are submitted to

12  field offices?

13       A.    I would say based on the

14  fact that the big three are filing

15  electronically, I would say the majority

16  electronically.

17       Q.    When an order or when

18  suspicious order reports are filed

19  electronically, does that mean they are

20  filed with headquarters?

21       A.    Yes.  On the Legacy and the

22  vetted system.

23       Q.    Okay.  And do registrants

24  that are not reporting electronically to

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But to my question, has the

2    DEA ever provided any kind of guidance to

3    manufacturers informing them that they

4    were to know their customers' customer?

5    A.    No, not to my knowledge.

6    Q.    Okay.  Let's talk for a

7    minute about ARCOS.

8         Generally speaking, what

9    sorts of information does ARCOS contain?

10   A.    ARCOS contains the

11   manufacturers and distributors that are

12   to report all transactions for

13   Schedule I, Schedule II, Schedule III

14   narcotics, and GHB, and manufacturers

15   also have reported -- additional

16   reporting requirements for some

17   psychotropics.

18   Q.    Okay.  Would ARCOS contain

19   all of the distributions of prescription

20   opioids by manufacturers to distributors?

21   A.    So the transactions for

22   manufacture -- yes, manufacturer to a

23   distributor?  Yes.

24   Q.    Would ARCOS contain all the

Highly Confidential - Subject to Further Confidentiality Review

1    distributions of prescription opioids

2    from distributors to pharmacies or other

3    retail outlets?

4         A.    For those items, yes.

5         Q.    Does ARCOS data provide any

6    details about those transactions, like

7    the amount, the recipients --

8         A.    Yes, it tracks the quantity.

9    It has the DEA number of the registrant

10   that -- whether it's a sale.  It could be

11   a sale, it could be a purchase.  It could

12   be a disposition of, you know, getting

13   wasted.  Any transaction that -- that

14   could fall within the system that --

15   that's trackable, that would be in there,

16   for those items.

17        Q.    Okay.  Through ARCOS, can

18   DEA see the type of medication that's

19   being purchased?

20        A.    Well, it's in there by NDC

21   number.

22        Q.    Okay.  And the NDC number

23   would -- would allow the DEA to determine

24   which product we are talking about?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Correct.

2          Q.     So whether that was a -- the

3     DEA would know whether it was a oxycodone

4     5-milligram tablet, for example?

5          A.     Correct.

6          Q.     That level of detail?

7          A.     Yes.

8          Q.     Okay.  And the DEA receives

9     that information for each tablet that the

10    manufacturers sell to distributors,

11    correct?

12         A.     Each tablet?

13         Q.     Yes.

14         A.     It's by bottle size, because

15    NDC code also has the bottle size within

16    it.

17         Q.     Got it.  So -- so the DEA

18    can see each and every bottle that's

19    shipped between a manufacturer and a

20    distributor?

21         A.     As long as that's what they

22    are reporting, yes.

23         Q.     Okay.  And through ARCOS,

24    DEA can also see each and every bottle of

Highly Confidential - Subject to Further Confidentiality Review

1    opioids that's transmitted from a

2    manufacturer -- I'm sorry.  Strike that.

3              And through ARCOS, DEA can

4    see each and every bottle of opioids

5    that's transferred from a distributor to

6    a pharmacy for example, correct?

7         A.    Correct.

8         Q.    And they'll know the

9    location of that pharmacy?

10        A.    Correct.

11        Q.    Do they have the address for

12   the pharmacy?

13        A.    Yes.  It's linked to the DEA

14   registration.

15        Q.    Okay.  So through ARCOS, the

16   DEA has precise information about how

17   much of certain products is being shipped

18   to which geographic areas, correct?

19        A.    Correct.

20              Could I get a clarification

21   on what time frame you're talking about?

22        Q.    Sure.  So I would say 1996

23   to the present.  Does the answer change

24   at all during that time period?

Highly Confidential - Subject to Further Confidentiality Review

1    used for law enforcement.  It's used for

2    regulatory -- when you work with state

3    regulatory boards, you share information

4    with them.  If we're working on cases

5    regarding the diversion of controlled

6    substances.  We use it for trending.

7                It's used for -- researchers

8    often use a lot of the data.  They use

9    the reports that are -- the summary

10   reports that we post online.

11               We use it to corroborate

12   investigations.  We use it to -- for

13   targeting, like oh here is -- here is a

14   potential target.  We use it in a variety

15   of different ways.

16       Q.    Did the delays you spoke of

17   give the DEA any concern about its

18   ability to use that data effectively to

19   discharge its obligations?

20               MR. FINKELSTEIN:  Objection.

21        Vague.

22               THE WITNESS:  Well, you're

23        saying excessive purchases so that

24        was even -- that was more

Highly Confidential - Subject to Further Confidentiality Review

1    to in that provision we just covered,

2    right?

3         A.    Yes.

4         Q.    All right.  DEA agrees that

5    chronic pain is a serious problem for

6    many Americans, true?

7               MS. SINGER:  Objection.

8         Scope.

9               THE WITNESS:  Yeah, people

10         have back pain.

11   BY MR. STEPHENS:

12        Q.    And DEA also agrees that

13   it's crucial for physicians who are

14   engaged in legitimate pain treatment not

15   to be discouraged from providing proper

16   medication to patients as medically

17   justified?

18              MR. FINKELSTEIN:  Scope.

19              MS. SINGER:  Objection.

20         Scope.

21              THE WITNESS:  Yes.

22   BY MR. STEPHENS:

23        Q.    Okay.  And DEA agrees that

24   opioids, properly prescribed by DEA

Highly Confidential - Subject to Further Confidentiality Review

1   registered medical doctors, are an

2   appropriate medication for many

3   Americans?

4                   MS. SINGER:  Objection.

5           Scope.

6                   MR. FINKELSTEIN:  Scope.

7           Incomplete hypothetical.

8                   THE WITNESS:  Yes.

9   BY MR. STEPHENS:

10          Q.    DEA also agrees that there's

11  a legitimate medical need under Title 21

12  U.S.C. 801 for prescription opioids to

13  treat pain in patients in the United

14  States?

15                  MS. SINGER:  Objection.

16          Scope.

17                  THE WITNESS:  For a

18          legitimate medical purpose, yes.

19  BY MR. STEPHENS:

20          Q.    DEA also agrees that

21  prescription opioids are necessary to

22  maintain the health of the American

23  people?

24                  MS. SINGER:  Objection.

1          MR. FINKELSTEIN:  Scope.

2          THE WITNESS:  For all the

3     American people or those that need

4     it?

5  BY MR. STEPHENS:

6     Q.    Those that need it.

7     A.    Those that need it, yes.

8     Q.    Okay.  And DEA also agrees

9  that prescription opioids are necessary

10  to maintain the general welfare of

11  American people who need them?

12     A.    Correct.

13     Q.    Patients who are properly

14  prescribed opioid medications should be

15  able to obtain their medications from a

16  pharmacy?

17          MS. SINGER:  Objection.

18     Scope.

19          I think this has been a long

20     line of questions outside of the

21     scope.  And at some point I'd

22     request that DOJ instruct the

23     witness.

24          MR. FINKELSTEIN:  I agree

Highly Confidential - Subject to Further Confidentiality Review

1          that this is outside the scope.

2          I'll let the witness answer for

3          now if you have understanding.

4                THE WITNESS:  Yes.

5     BY MR. STEPHENS:

6          Q.    Is it also true under -- you

7     testified earlier today about the C.F.R.

8     regulations, correct?

9          A.    Correct.

10         Q.    And under Title 21 -- or I'm

11    sorry, under 21 C.F.R. 1301.71(b), it's

12    true that the regulation regarding

13    suspicious order monitoring does not

14    require strict compliance, it requires

15    substantial compliance?

16               MR. FINKELSTEIN:  Did you

17         mean 74?

18               MR. STEPHENS:  It might be

19         74.

20               MR. FARRELL:  1301.74(b)?

21               MR. STEPHENS:  Yes.  No,

22         actually -- here.  Let me just

23         mark it.

24               (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

1              MR. FINKELSTEIN:  Scope.

2              THE WITNESS:  Can you please

3        repeat it.

4    BY MR. STEPHENS:

5        Q.    Sure.  As to prescription

6    opioids, DEA believes that the

7    overwhelming majority of prescribing in

8    America is conducted responsibly?

9        A.    Yes, correct.

10        Q.    And DEA has stated that

11    99.5 percent of prescribers do not

12    overprescribe opioids?

13              MR. FINKELSTEIN:  Scope.

14              You can answer if you know.

15              THE WITNESS:  I don't know

16        that we said 99.5 percent.  I've

17        heard the figure 1 to 2 percent.

18    BY MR. STEPHENS:

19        Q.    Okay.  Well, let me show you

20    the transcript.

21              MR. FARRELL:  Can you

22        reference the transcript, please.

23              MR. STEPHENS:  Yes, sir.

24              (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -  -  -
 5
          IN RE:  NATIONAL      :   HON. DAN A.
 6        PRESCRIPTION OPIATE    :   POLSTER
          LITIGATION             :
 7                               :
          APPLIES TO ALL CASES   :   NO.
 8                               :   1:17-MD-2804
                                 :
 9
               - HIGHLY CONFIDENTIAL -
10
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                      VOLUME II
12
                     -  -  -
13
                  April 18, 2019
14
                     -  -  -
15
16              Continued videotaped
        deposition of THOMAS PREVOZNIK, taken
17      pursuant to notice, was held at the law
        offices of Williams & Connolly, 725 12th
18      Street, Washington, D.C., beginning at
        8:16 a.m., on the above date, before
19      Michelle L. Gray, a Registered
        Professional Reporter, Certified
20      Shorthand Reporter, Certified Realtime
        Reporter, and Notary Public.
21
                     -  -  -
22
              GOLKOW LITIGATION SERVICES
23        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
```

1      Retail chain pharmacies

2  commonly use a self-distributing model

3  where they distribute to chain pharmacy

4  locations that they own.

5          MR. FINKELSTEIN:  Objection.

6      Scope.  Answer if you know.

7          THE WITNESS:  Some do, and

8      some have changed.

9  BY MR. STEPHENS:

10      Q.   Okay.  For example,

11  Walmart's distribution centers only

12  distributed to Walmart pharmacies at

13  Walmart store locations?

14          MS. SINGER:  Objection.

15          MR. FINKELSTEIN:  Objection.

16      Scope.  Calls for speculation.

17          THE WITNESS:  That was

18      correct, yes.

19  BY MR. STEPHENS:

20      Q.   All right.  I'd like to ask

21  you some questions about Topic 3 related

22  to the guidance that DEA provides

23  regarding the adequacy of SOM systems.

24          Okay?

Highly Confidential - Subject to Further Confidentiality Review

1    registrants about a registrant's SOMs

2    system, true?

3         A.    Yes.  True.

4         Q.    DEA headquarters expects a

5    registrant to listen to the information

6    it receives from DEA field office

7    personnel, true?

8              MR. FINKELSTEIN:  Vague.

9              THE WITNESS:  Yeah.  It

10         depends what they are asking,

11         sure.

12    BY MR. STEPHENS:

13         Q.    Okay.  And the registrants

14    who are visited by DEA field office

15    personnel can rely on the information

16    that they receive from DEA field division

17    personnel regarding SOMs systems, true?

18              MR. FINKELSTEIN:  Vague.

19         Incomplete hypothetical.

20              THE WITNESS:  Yeah, they get

21         guidance.

22    BY MR. STEPHENS:

23         Q.    Would you agree that it's

24    important for DEA's diversion control

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And DEA viewed a ratio of

2  95 percent controlled substances versus 5

3  percent non-controlled substances as a

4  possible indication that the internet

5  pharmacy was diverting the controlled

6  substances true?

7    A.    I don't -- I don't think we

8  locked in on those specific numbers.  I

9  mean, that was an example he gave of 95

10  and five.  But we were -- we were

11  comparing against a brick-and-mortar

12  store of what typically happens there.

13    Q.    Yeah.  Okay.  So -- and a

14  brick-and-mortar store would be like a

15  Walmart or CVS, a Rite Aid, HBC Giant

16  Eagle, CVS, right?

17    A.    As well as independent

18  pharmacies as well, yes.

19    Q.    Okay.  And Walmart

20  pharmacies never had a ratio of

21  controlled to noncontrolled substances

22  that approached anything like the 95

23  percent to 5 percent ratio that the DEA

24  saw at some rogue internet pharmacies,

1    right?

2              MR. FINKELSTEIN:  Wait.

3         Scope, calls for speculation.

4              THE WITNESS:  Not to my

5         knowledge.

6    BY MR. STEPHENS:

7         Q.    Okay.  CVS, Walgreens, Rite

8    Aid, HBC Giant Eagle, they never had a

9    ratio of controlled to noncontrolled

10   substances that was 95 percent controlled

11   to 5 percent non-controlled, right?

12             MR. FINKELSTEIN:  Scope.

13        Calls for speculation.

14             THE WITNESS:  Not to my

15        knowledge.

16             MR. FINKELSTEIN:

17        Mr. Videographer, what's our

18        on-the-record time?

19             THE VIDEOGRAPHER:

20        42 minutes.

21             MR. FINKELSTEIN:  We're past

22        seven hours.  So everybody knows.

23   BY MR. STEPHENS:

24        Q.    DEA has acknowledged and has

1    acknowledged in presentations that it

2    gave that no chain pharmacies were rogue

3    pharmacies, right?

4          A.    Correct.

5                MR. FINKELSTEIN:  Hang on

6          one second.  I am just reading the

7          question.

8                Okay.

9    BY MR. STEPHENS:

10         Q.    Your answer was "correct,"

11   right?

12         A.    Yes.

13         Q.    Walmart, CVS, Rite Aid,

14   Walgreens, HBC Giant Eagle are all chain

15   pharmacies, true?

16         A.    True.

17         Q.    DEA is generally aware that

18   Walmart only distributes controlled

19   substances to its own Walmart store

20   pharmacies, right?

21               MR. FINKELSTEIN:  Objection.

22         Scope.  Calls for speculation.

23               THE WITNESS:  Well, that

24         just changed.  But prior to the

1    change, yes.

2    BY MR. STEPHENS:

3        Q.    Okay.  And the change now is

4    that they don't distribute at all, right?

5        A.    Correct.

6        Q.    Okay.  Walmart did not

7    distribute controlled substances to

8    internet pharmacies, right?

9            MR. FINKELSTEIN:  Scope.

10       Calls for speculation.

11           THE WITNESS:  I don't know.

12       I can't answer that, because I

13       don't know if there were any sales

14       store -- from the store to one of

15       those -- one of those potentially

16       rogue pharmacies.

17   BY MR. STEPHENS:

18       Q.    I'm only talking about --

19           MR. FINKELSTEIN:  Let him

20       finish his answer.

21           MR. STEPHENS:  I've let him

22       finish his answer.

23           MR. FINKELSTEIN:  No, you

24       haven't let him finish his answer.

Highly Confidential - Subject to Further Confidentiality Review

1    responsible for diverting opioids, true?

2                    MR. FINKELSTEIN:  Letting

3            this go for now.  You can answer.

4                    THE WITNESS:  Yes.

5    BY MR. STEPHENS:

6            Q.    And those ARCOS leads could

7    be helpful to DEA's efforts in the field,

8    right?

9            A.    Yes.

10           Q.    And that would support DEA's

11   mission to prevent diversion where it's

12   occurring, right?

13           A.    It points to it.  It might

14   not just be that source.  There's going

15   to be other issues as well, so...

16           Q.    Would you agree with a

17   general principle that more investigative

18   leads generated by ARCOS would equate to

19   more proactive investigations of

20   potential diverters?

21                   MR. FINKELSTEIN:  Incomplete

22           hypothetical.

23                   THE WITNESS:  Yeah.  It's a

24           point.

Highly Confidential - Subject to Further Confidentiality Review

```
1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION
3

     IN RE: NATIONAL        )
4    PRESCRIPTION           )   MDL No. 2804
     OPIATE LITIGATION      )
5    _____ )   Case No.
                            )   1:17-MD-2804
6                           )
     THIS DOCUMENT RELATES  )   Hon. Dan A.
7    TO ALL CASES           )   Polster
8
                  FRIDAY, MAY 17, 2019
9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                      - - -
12          Videotaped deposition of Thomas
13   Prevoznik, Volume III, held at the offices of
14   WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15   NW, Washington, DC, commencing at 8:10 a.m.,
16   on the above date, before Carrie A. Campbell,
17   Registered Diplomate Reporter and Certified
18   Realtime Reporter.
19

20

21                      - - -
22
             GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24

25
```

```
 1          to Walmart stores.

 2    QUESTIONS BY MS. FUMERTON:

 3          Q.     And your other commentary after

 4    you said "yes" was simply pure speculation on

 5    your part, correct?

 6          A.     Correct.

 7          Q.     Walmart was not a wholesale

 8    distributor of controlled substances,

 9    correct?

10                 MR. FINKELSTEIN:  Scope.

11                 THE WITNESS:  What do you mean

12          by that?

13    QUESTIONS BY MS. FUMERTON:

14          Q.     Well, various terms have been

15    used by plaintiffs when asking questions, and

16    what I'm distinguishing between are

17    distributors who distribute the wholesale to

18    many different pharmacies, independent and

19    the like, and a distributor like Walmart that

20    only self-distributes controlled substances.

21                 Do you understand that

22    distinction?

23          A.     Yes, correct.

24          Q.     Okay.  So under that

25    distinction, Walmart is not a wholesale
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor of controlled substances,

 2    correct?

 3                   MR. FINKELSTEIN:  Scope.

 4                   THE WITNESS:  Correct.

 5    QUESTIONS BY MS. FUMERTON:

 6         Q.    And that's true for Rite Aid as

 7    well, correct?

 8                   MR. FINKELSTEIN:  Scope.

 9                   THE WITNESS:  Yes.

10    QUESTIONS BY MS. FUMERTON:

11         Q.    And Walgreens, CVS and HBC

12    Giant Eagle, correct?

13                   MR. FINKELSTEIN:  Scope.

14                   THE WITNESS:  Yes.

15    QUESTIONS BY MS. FUMERTON:

16         Q.    And would you agree that

17    nonmembers -- well, let me strike that.

18                   You would agree that there may

19    be reasons why nonmembers of HDMA do not need

20    to follow HDMA guidelines, correct?

21                   MR. FINKELSTEIN:  Scope.

22         Vague.

23                   THE WITNESS:  I don't even know

24         that the HDMA members have to follow

25         the guidelines either.  I mean, the
```

1           registrants have to make their

2           decisions based on the registration.

3                HDMA is not a registrant.

4    QUESTIONS BY MS. FUMERTON:

5           Q.    You would agree that nonmembers

6    of HDMA might have different business models

7    than HDMA members, correct?

8           A.    Yes.  Yes.

9                MR. FINKELSTEIN:  Wait a

10          minute.

11               THE WITNESS:  Oh, sorry.

12               MR. FINKELSTEIN:  Scope.  Calls

13          for speculation.

14   QUESTIONS BY MS. FUMERTON:

15          Q.    And the DEA expects that each

16   registrant will review its own business model

17   and design a SOM system that fits its

18   designed method of distribution, correct?

19          A.    Yes.

20          Q.    Mr. Prevoznik, you're familiar

21   with immediate suspension orders, correct?

22          A.    Yes.

23          Q.    Are immediate suspension orders

24   also sometimes referred to as ISOs?

25          A.    Yes.