# EXHIBIT M

Page 1

1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION
3
     _____
4
        IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
5       OPIATE LITIGATION                  Case No. 17-md-2804
6
        This document relates to:          Judge Dan
7                                          Aaron Polster
8       The County of Cuyahoga v. Purdue
        Pharma, L.P., et al.
9       Case No. 17-OP-45005
10      City of Cleveland, Ohio vs. Purdue
        Pharma, L.P., et al.
11      Case No. 18-OP-45132
12      The County of Summit, Ohio,
        et al. v. Purdue Pharma, L.P.,
13      et al.
        Case No. 18-OP-45090
14   _____
15
16
17
18       Videotaped Deposition of Joseph Rannazzisi
19                   Washington, D.C.
20                   April 26, 2019
21                     8:37 a.m.
22
23
24   Reported by:  Bonnie L. Russo
25   Job No. 3301876

Page 14

1  MR. DAVISON: William Davison from
2  Ropes & Gray for Mallinckrodt and Specgx LLC.
3  MR. O'CONNOR: Andrew O'Connor from
4  Ropes & Gray for Mallinckrodt.
5  MS. O'GORMAN: Debra O'Gorman from
6  Dechert for Purdue.
7  MS. CONROY: Mildred Conroy from The
8  Lanier Law Firm for plaintiffs.
9  MR. FULLER: Mike Fuller for the
10 plaintiffs.
11 MR. FARRELL: Paul Farrell, Jr., for
12 the plaintiffs.
13 MS. SINGER: Linda Singer, Motley
14 Rice, for the plaintiffs.
15 MR. FINKELSTEIN: David Finkelstein,
16 Department of Justice for the DEA.
17 MR. BENNETT: James Bennett from the
18 U.S. Attorney's Office for the Northern
19 District of Ohio for the United States, the DEA
20 and the witness in his official capacity.
21 MR. UTTER: Greg Utter here on
22 behalf of Mr. Rannazzisi as his personal
23 counsel.
24 SPECIAL MASTER COHEN: David Cohen,
25 Special Master.

Page 15

1  MR. FORREST: Patrick Forrest, Drug
2  Enforcement Administration.
3  MS. BACCHUS: Renee Bacchus, U.S.
4  Attorney's Office, Northern District of Ohio on
5  behalf of DOJ, DEA and the witness.
6  MS. AGUINIGA: Sara Aguiniga, Motley
7  Rice on behalf of plaintiffs.
8  MR. FELDMAN: Larry Feldman on
9  behalf of the plaintiffs.
10 MS. MOORE: Kelly Moore on behalf of
11 Rite Aid.
12 MR. STOFFELMAYR: Kaspar
13 Stoffelmayr, Walgreens.
14 MR. HOBART: Geoffrey Hobart from
15 Covington for McKesson.
16 MS. WICHT: Jennifer Wicht from
17 Williams & Connolly for Cardinal Health.
18 MR. MATTHEWS: James Matthews for
19 Anda.
20 MR. RUIZ: Anthony Ruiz, Zuckerman
21 Spaeder for CVS Indiana, LLC and CVS Rx
22 Services.
23 THE VIDEOGRAPHER: Anyone on the
24 call that wants to identify themselves, please
25 speak up.

Page 16

1  MR. LADD: Matthew Ladd from Morgan
2  Lewis on behalf of Rite Aid.
3  MR. PADGETT: Bill Padgett on behalf
4  of H.D. Smith.
5  MR. BEISELL: Patrick Beisell from
6  Jones Day on behalf of Walmart.
7  MS. BARBER: Maureen Barber from
8  Morgan Lewis on behalf of the Teva defendants.
9  THE VIDEOGRAPHER: Will the court
10 reporter please swear in the witness.
11
12         JOSEPH RANNAZZISI,
13 being first duly sworn to tell the truth, the
14    whole truth and nothing but the truth,
15         testified as follows:
16 THE VIDEOGRAPHER: You may proceed,
17 Counsel.
18    EXAMINATION BY COUNSEL FOR McKESSON
19    BY MR. EPPICH:
20 Q.  Good morning, Mr. Rannazzisi.  My
21 name is Chris Eppich, I represent McKesson in
22 this litigation and I will be asking you some
23 questions this morning.
24 Please state your full name for the
25 record.

Page 17

1  A.  Joseph Thomas Rannazzisi.
2  Q.  Have you been deposed before, Mr.
3  Rannazzisi?
4  A.  I have been through a lot of
5  different types of testimony.  I just don't
6  recall if I have ever been deposed.
7  Q.  That's fair.  Let me -- let me just
8  review some of the ground rules for depositions
9  before we get in.
10 You have probably noticed the court
11 reporter is taking down everything that we say
12 and so to make her record clear and her life a
13 little easier, we will need to talk one at a
14 time.  I will ask my questions and then just
15 ask that you wait before I finish before you
16 start with your answers.
17 Does that make sense?
18 A.  Yes, sir.
19 Q.  Rather than shaking your head or
20 nodding, if you could give a verbal response to
21 my questions.
22 A.  Yes, sir.
23 Q.  If I ask a question and I am not
24 clear, you don't understand, just let me know
25 and if you don't let me know, I will assume you

Page 18

1  understand the scope of my question.
2      Does that make sense?
3   A.  Yes, sir.
4   Q.  Now is there anything that would
5  prevent you from testifying completely and
6  truthfully today?
7   A.  No, sir.
8      MR. EPPICH:  Let me mark as Exhibit
9  1.
10     (Deposition Exhibit 1 was marked for
11 identification.)
12     MR. EPPICH:  Exhibit 1 is the second
13 amended notice of videotaped deposition of
14 Joseph Rannazzisi.
15     MS. SINGER:  Excuse me one second,
16 Counsel.  Do you have copies for the plaintiffs
17 too?
18     BY MR. EPPICH:
19  Q.  Sir, have you seen Exhibit No. 1
20 before?
21  A.  No, sir.
22  Q.  You haven't seen it?
23     You didn't review it in preparation
24 for today's deposition?
25  A.  No.

Page 19

1   Q.  If I you could turn with me to the
2  letter that is Exhibit A, four or five pages
3  in.  Now, this letter is prepared by the U.S.
4  Department of Justice.
5      Have you seen this letter before?
6   A.  Yes, I have.
7   Q.  And you understand Exhibit A to be
8  a -- a letter from the DEA authorizing your
9  testimony on certain subjects today?
10  A.  Yes.
11  Q.  You were the head of DEA's Office of
12 Diversion Control from 2005 to 2015; is that
13 right?
14  A.  Approximately July of 2005 to '15,
15 yes.
16  Q.  July of 2005 to what month in 2015?
17  A.  October.  October 31st, 2015.
18  Q.  Halloween.  One of my favorite days.
19  A.  Uh-huh.
20  Q.  Now, between 2005 and 2015, you were
21 the senior-most law enforcement official at the
22 DEA responsible for pharmaceutical diversion?
23  A.  Yes, sir.
24  Q.  Was -- was there an opioid crisis
25 the entire time you were the head of the Office

Page 20

1  of Diversion Control?
2      MR. BENNETT:  Objection.  Calls for
3  speculation.
4      You can answer.
5      MS. SINGER:  Excuse me one second.
6      Can we ask the people on the phone
7  to mute, please.
8      MR. UTTER:  Go ahead.  You can
9  answer.
10     THE WITNESS:  Yes.  Yes.  There was
11 an opioid crisis during that time period.
12     BY MR. EPPICH:
13  Q.  And was the opioid crisis getting
14 worse every year you were the head of the
15 Office of Diversion Control?
16     MR. BENNETT:  Same objection.
17     THE WITNESS:  Overdoses -- overdose
18 deaths increased, yes.
19     BY MR. EPPICH:
20  Q.  As head of the Office of Diversion
21 Control, you were responsible for oversight and
22 control of all regulatory compliance,
23 inspections, and civil and criminal
24 investigations of approximately 1.6 million DEA
25 registrants; isn't that correct?

Page 21

1   A.  Yes.
2   Q.  And you provided leadership to a
3  team of 300 personnel?
4   A.  Direct -- direct report,
5  approximately -- you know, in headquarters,
6  approximately 300, yes.
7   Q.  And you controlled and operating
8  budget of approximately $350 million, correct?
9   A.  Yes.
10  Q.  Now, Mr. Rannazzisi, every entity
11 that is involved with getting opioids to
12 patients has to be registered with the DEA,
13 correct?
14  A.  Could you repeat that question.
15  Q.  Every entity that is involved with
16 getting opioids to patients has to be
17 registered with the DEA.
18  A.  No.  That's not correct.
19  Q.  Which entities do not have to be
20 registered?
21  A.  Nurses, pharmacists.  They have
22 no -- they're not registered.
23  Q.  But manufacturers have to be
24 registered?
25  A.  Yes.

Page 22

1  Q. Distributors have to be registered?
2  A. Yes.
3  Q. Pharmacies have to be registered?
4  A. Yes.
5  Q. And doctors have to be registered?
6  A. Yes.
7  Q. Now, none of those individuals or
8  entities can lawfully handle opioids without
9  DEA registration.
10 A. Yes.
11 Q. Now, DEA can, when it determines it
12 is legally appropriate, suspend or revoke a DEA
13 registration.
14 A. Yes.
15 Q. For example, that's a way the DEA
16 has to cut off a diverting registrant?
17 A. Repeat that question again, please.
18 Q. DEA's authority to suspend or revoke
19 a DEA registration is a way for DEA to cut off
20 a diverting registrant; isn't that correct?
21 A. That authority, we could stop a
22 registrant from conducting transactions with
23 controlled substances, yes.
24 Q. Yes.
25    You could cut them off, correct?

Page 23

1  A. Yeah. Stopping transactions, yes.
2  Cutting them off.
3  Q. In fact, it's -- it's DEA's
4  responsibility to do its best to ensure that
5  anyone who is registered to DEA or by DEA is
6  acting appropriately.
7     MS. SINGER: Objection. Vague.
8     MR. BENNETT: Join that objection.
9     THE WITNESS: It's DEA's
10 responsibility to ensure that the registrant
11 population is complying with the code of
12 federal regulations 21 C.F.R. and also 21 USC,
13 United States code.
14    BY MR. EPPICH:
15 Q. You're familiar with the ARCOS
16 database?
17 A. Yes, I am.
18 Q. Manufacturers and distributors are
19 required to report data to ARCOS on every
20 single controlled substance transaction?
21 A. Yes.
22 Q. DEA can then make use of that data,
23 can't it?
24    MR. BENNETT: Objection. Vague.
25    THE WITNESS: DEA does use that

Page 24

1  data.
2     BY MR. EPPICH:
3  Q. And using ARCOS, DEA monitors the
4  flow of DEA-controlled substances from their
5  point of manufacture through commercial
6  distribution channels to point of sale or
7  distribution to the dispensing retail level?
8     MS. SINGER: Objection. Foundation.
9     MR. BENNETT: Objection. Vague.
10    THE WITNESS: DEA can use that
11 system to monitor transactions downstream.
12    BY MR. EPPICH:
13 Q. And that's downstream from the
14 manufacturers all the way to the retail level,
15 correct?
16 A. Yes. I believe so.
17    SPECIAL MASTER COHEN: Just a
18 minute, please.
19    We're still hearing folks on the
20 phone. If you are on the phone, please mute
21 yourself.
22    BY MR. EPPICH:
23 Q. So, Mr. Rannazzisi, using ARCOS, DEA
24 can see the number of opioids sold by
25 manufacturers to distributors?

Page 25

1  A. Yes.
2  Q. And using ARCOS, DEA can see the
3  number of opioids distributed by distributors
4  to pharmacies, hospitals and doctors?
5  A. Yes.
6  Q. Registrants did not have access to
7  ARCOS data during your -- the time you led the
8  Office of Diversion Control, correct?
9  A. They had access to their own data
10 that they submitted to ARCOS. But no, not
11 other.
12 Q. So registered --
13 A. From the ARCOS.
14 Q. Pardon me.
15    Registrants had no access to the
16 ARCOS database, correct?
17 A. Except for their own entries, yes.
18 Q. Their own entries that's they
19 submitted?
20 A. Yes, that they submitted.
21 Q. But they couldn't access those
22 entries through the ARCOS database, could they?
23 A. I'm not sure about that.
24 Q. There was no portal that you were
25 aware of that a registrant could log into to

Page 186

1  question.
2      BY MR. STEPHENS:
3      Q.  Sir, did I read that question
4  accurately?
5      MS. SINGER:  Objection.  Vague and
6  compound.
7      THE WITNESS:  Yes.
8      BY MR. STEPHENS:
9      Q.  Okay.  And then, sir, your
10 response -- and I'm quoting from the second
11 sentence under response -- says, quote:  The
12 overwhelming majority of prescribing done by
13 physicians in America is conducted responsibly.
14 Often it is these doctors and pharmacists who
15 dispense the medication who are the first to
16 alert law enforce to potential prescription
17 problems.
18     Do you see that?
19     A.  Yes.
20     Q.  Did I read that accurately?
21     A.  Yes.
22     Q.  Is that your submission back to the
23 committee on the judiciary of the House of
24 Representatives for this hearing on July 12,
25 2007?

Page 187

1      MR. BENNETT:  Objection.  Form.
2  Objection.  It's incomplete reading of his
3  response to the question.  And so I would
4  object under Rule 106.
5      THE WITNESS:  First of all, this is
6  not my response.  It's the Department of
7  Justice and the administration's response.  And
8  everything must be vetted through them.
9      So regardless of what my feelings
10 were at the time, if the department or the --
11 the administration, through the vetting
12 process, felt that that's what they wanted to
13 put in, that's what was put in.
14     BY MR. STEPHENS:
15     Q.  So then, sir, let me ask you this
16 question:  As of July 12, 2007, did you agree
17 with the statement that the overwhelming
18 majority of prescribing done by physicians in
19 America is conducted responsibly?
20     Did you agree with that?
21     MR. BENNETT:  Objection.  Scope.
22     You're not authorized to give
23 personal opinions regarding nonpublic facts or
24 information you acquired in the performance of
25 your duties.  You are not -- not -- you are

Page 188

1  also not authorized to disclose any information
2  regarding internal deliberative process or
3  recommendations that you made.
4      To the extent that you have a
5  personal opinion that it does not rely on
6  internal deliberative process or nonpublic
7  factual information, you may give it on behalf
8  of yourself personally but are not speaking on
9  behalf of DEA.
10     THE WITNESS:  Could -- could you
11 repeat the question one more time.
12     BY MR. STEPHENS:
13     Q.  Yes.
14     As of July 12, 2007, did you agree
15 with the statement that the overwhelming
16 majority of prescribing done by physicians in
17 America is conducted responsibly?
18     MR. BENNETT:  Same instruction.
19     THE WITNESS:  I believe that the
20 vast majority of physicians are prescribing
21 responsibly, yes.
22     BY MR. STEPHENS:
23     Q.  Do you also agree with the statement
24 in the next sentence, Mr. Rannazzisi, that
25 often is it these doctors and pharmacists who

Page 189

1  dispense the medication who are the first to
2  alert law enforcement to potential prescription
3  problems?
4      MR. BENNETT:  Objection.  Same
5  instruction.
6      THE WITNESS:  If you're talking
7  about prescription fraud, fraudulent
8  prescriptions, for instance, if a -- a
9  pharmacist receives a prescription and he calls
10 the doctor and the doctor says, "I did not
11 write that prescription," and they make a call
12 to the police, yes.  That -- I would agree.
13 And I think that's what they were getting at at
14 the time.
15     BY MR. STEPHENS:
16     Q.  So you don't disagree with the
17 statement -- with the context you just
18 provided; is that fair, Mr. Rannazzisi?
19     A.  If the context is --
20     MS. SINGER:  Objection.
21     THE WITNESS:  Oh.
22     MS. SINGER:  Mischaracterizes the
23 witness's testimony.
24     THE WITNESS:  If we're talking about
25 a prescription fraud case where someone is

48 (Pages 186 - 189)

Page 210

1  can answer with a yes or no, again, regarding
2  your understanding.
3      Let me just add one other thing.  If
4  there is a way that you can ask a question
5  without reference to the statute, maybe you
6  can't, then that might help.
7      BY MR. STEPHENS:
8      Q.  Mr. Rannazzisi, was it your
9  understanding that when you testified in front
10 of Congress, you were testifying under oath and
11 needed to tell the truth?
12     A.  Yes.
13     Q.  So I would like to go back to the
14 start of your tenure, Mr. Rannazzisi, in 2005
15 and 2006.  Okay?
16     A.  Yes.
17     Q.  Now we had talked about rogue
18 Internet pharmacies a few minutes ago, correct?
19     A.  Yes.
20     Q.  Would you agree that not all
21 Internet pharmacies were rogue Internet
22 pharmacies who were diverting opioids?
23     A.  No.  In fact, I can't think of an
24 Internet pharmacy that was operating at that
25 point in time that wasn't rogue.

Page 211

1      MR. STEPHENS:  If I could ask, if
2  you could mark this as next in order, Bonnie.
3  Thank you.
4      (Deposition Exhibit 9 was marked for
5  identification.)
6      BY MR. STEPHENS:
7      Q.  So this has been marked as Exhibit
8  9.  It is a current transcript from May 16,
9  2007, entitled: "Rogue Online Pharmacies, the
10 growing problem with Internet drug trafficking,
11 a hearing before the Committee of the Judiciary
12 of the United States Senate."
13     And, sir, I would direct your
14 attention to Page 52.
15     So, Mr. Rannazzisi, on Page 52, it's
16 entitled: "Questions for the hearing record
17 for Joseph Rannazzisi deputy assistant
18 administrator, office of diversion and
19 control."
20     And then the first question states:
21 "At the hearing, witnesses provided testimony
22 about how easy it is for youth and others to
23 obtain prescription drugs illegally on the
24 Internet."
25     And it's then 1 Sub A:

Page 212

1  "Approximately how many websites currently
2  offer to sell controlled substances illegally
3  over the Internet?"
4      Do you see that, sir?
5      A.  Yes.
6      Q.  Okay.  Now I'm going to direct your
7  attention to the -- in the very middle of the
8  response, and there is a sentence there that
9  states: "It should be noted that there are
10 legitimate pharmacies that provide controlled
11 substances via the Internet and operate daily
12 within the boundaries of the law."
13     Do you see that?
14     MR. UTTER:  Take your time to read
15 the document so you are familiar with it.
16     THE WITNESS:  Okay.
17     BY MR. STEPHENS:
18     Q.  So my question, sir, is:  Did you
19 inform the United States Senate on May 16,
20 2007, that it was the administration's position
21 that it should be noted that there are
22 legitimate pharmacies that provide controlled
23 substances via the Internet and operate daily
24 within the boundaries of the law?
25     A.  Yes, but there is a difference

Page 213

1  between the pharmacies we were talking about
2  here and what we consider a rogue Internet
3  pharmacy.
4      Q.  Right.  My point is simply this, Mr.
5  Rannazzisi.
6      There are Internet pharmacies and
7  then, among those Internet pharmacies, there is
8  a subset, however large it may be, that are
9  rogue Internet pharmacies; is that fair?
10     MR. BENNETT:  Objection.  Vague.
11     THE WITNESS:  No.  Because in -- the
12 Internet pharmacies that are legal that you're
13 talking about are generally pharmacies where
14 you could go online and ask the pharmacist via
15 the Internet for a refill on your prescription.
16 That is an Internet pharmacy.
17     The pharmacies that I am dealing
18 with in the rogue context are pharmacies that
19 had a physician that was sitting in New Jersey,
20 a pharmacist that was sitting in Iowa and in
21 that facilitation center that was -- the
22 transaction was being conducted through a
23 survey or a patient questionnaire for cash with
24 no bona fide doctor-patient relationship, no
25 corresponding responsibility review by the

Page 214

1 pharmacist, the doctor never saw the patient
2 and that's rogue.
3     That's -- I think the legal term is
4 a conspiracy, and that's what we were talking
5 about. We were not talking about the pharmacy
6 that would be accessed by a patient who had
7 already turned in their prescription and
8 they're just looking for a refill.
9     BY MR. STEPHENS:
10     Q.  Okay.  So then let's focus on these
11 rogue Internet pharmacies that you just
12 described.  Okay?
13     The rogue Internet pharmacies that
14 were diverting controlled substances often had
15 a ratio where they distributed 95 percent
16 controlled substances against 4 percent
17 noncontrolled.  Fair?
18     MS. SINGER:  Objection.  Foundation.
19     MR. BENNETT:  Objection.  Vague.
20     MR. UTTER:  Same objections.
21     Go ahead.
22     THE WITNESS:  I -- 95 percent in
23 some aspects, they were generally high.  I
24 think we have seen rogue Internet pharmacies go
25 60, 70 percent up to 90, 95 percent depending

Page 215

1 on the pharmacy and what their business was.
2     BY MR. STEPHENS:
3     Q.  Did you view a ratio of 95 percent
4 controlled substances versus 5 percent
5 noncontrolled substances as a possible
6 indication that the Internet pharmacy was
7 diverting?
8     MS. SINGER:  Objection.  Calls for
9 speculation.  Incomplete hypothetical.
10     MR. BENNETT:  Objection.  Vague as
11 to time.
12     BY MR. STEPHENS:
13     Q.  During your tenure as deputy
14 assistant administrator, sir.
15     A.  High volume, high ratio, controlled
16 substance to noncontrolled substance is an
17 indicator of a potential problem, yes.
18     Q.  And these rogue Internet pharmacies
19 that you dealt with, they were not full range
20 pharmacies, like a retail chain pharmacy, like
21 a Walmart or a CVS or Walgreens or Rite Aid or
22 an HBC Giant Eagle, true?
23     MS. SINGER:  Objection.  Compound
24 question.
25     MR. BENNETT:  Objection.  Compound

Page 216

1 and vague.
2     THE WITNESS:  I don't remember -- I
3 know the vast majority of the pharmacies, the
4 brick and mortar pharmacies that we took action
5 against, were not independent -- they were
6 independent.  They were not chain drug stores.
7     However, I can't say that every --
8 every case we had was an independent.  I just
9 don't remember but I am pretty sure that the
10 vast majority were independent pharmacies.
11     BY MR. STEPHENS:
12     Q.  Sir, during your career as deputy
13 assistant administrator, you gave presentations
14 where you used slide decks that described rogue
15 Internet pharmacies; is that fair?
16     A.  Yes.
17     Q.  I would like to show you one of
18 those.
19     (Deposition Exhibit 10 was marked
20 for identification.)
21     BY MR. STEPHENS:
22     Q.  Sir, I would direct your attention
23 to Slide 50.
24     MR. BENNETT:  Counsel, may I ask,
25 where this was produced from?  It doesn't look

Page 217

1 like a DEA document so I am just curious.
2 There is no Bates number.  There's no document
3 number on it.
4     MR. STEPHENS:  Let me suggest this,
5 James, I will move on.  I will come back to
6 this and answer that question for you.  How's
7 that?
8     MR. BENNETT:  That's fine.  Thank
9 you.
10     BY MR. STEPHENS:
11     Q.  Mr. Rannazzisi, let me ask you this:
12 Do you recall giving presentations where, in
13 your description of what a rogue pharmacy was,
14 you told people that they were not chain
15 pharmacies?
16     MR. UTTER:  Don't look -- he is not
17 making a reference to the exhibit, so you are
18 not confused.  He is asking a question
19 independent of the exhibit.
20     THE WITNESS:  If I was reporting
21 what the majority of the pharmacies were, I
22 would say yes, a vast majority of the
23 pharmacies involved in rogue Internet sales are
24 independent pharmacies.
25     BY MR. STEPHENS:

55 (Pages 214 - 217)

Page 222

1  Internet pharmacy or pain clinic that you think
2  is diverting; is that fair?
3      A.   They are operating illegally.
4      Q.   Now, the rogue pain clinics or some
5  of the rogue pain clinics in the 2008, 2009
6  era, both prescribe and supply oxycodone to
7  their patients at the rogue pain clinic?
8          MR. BENNETT:  Objection.  Vague.
9          THE WITNESS:  Some of them did, yes.
10         BY MR. STEPHENS:
11     Q.   And as to those, they were not
12 sending patients to a pharmacy to fill a
13 prescription.  They were doing the supplying
14 right there at the pain clinic, correct?
15         MS. SINGER:  Objection.  Vague.
16         MR. BENNETT:  Same.
17         THE WITNESS:  In some cases, the
18 clinics were dispensing medication, yes.
19         BY MR. STEPHENS:
20     Q.   All right.  And in response to that,
21 some states passed legislation to require that
22 the prescriptions of controlled substances be
23 filled at a pharmacy, not at a pain clinic?
24         MS. SINGER:  Objection.  Foundation.
25 Beyond the scope of this witness's expertise.

Page 223

1          MR. BENNETT:  I will join both as
2  objection to foundation and scope.
3          MR. UTTER:  Same objections.
4          Go ahead.
5          THE WITNESS:  I don't know about all
6  states, but for instance, Florida did pass two
7  pieces of legislation.  First, the 72 hour rule
8  and then they completely eliminated the
9  dispensing of any controlled substance.
10         BY MR. STEPHENS:
11     Q.   Okay.  And then in response to that
12 legislation, some of the operators of these
13 rogue pain clinics opened up straw pharmacies
14 that were actually controlled by the rogue pain
15 clinic?
16         MS. SINGER:  Objection.  Compound
17 question again.  Beyond the scope of this
18 witness's expertise as a response.
19         MR. BENNETT:  Objection.  Scope.
20 Objection.  Vague.
21         THE WITNESS:  We -- there were
22 instances where rogue clinics purchased
23 pharmacies and started dispensing
24 prescriptions, and then having the pharmacists
25 dispense the medication.

Page 224

1          BY MR. STEPHENS:
2      Q.   Mr. Rannazzisi, have you ever used
3  the term or are you familiar with the term, "a
4  straw purchase?"
5      A.   Yes.
6      Q.   Okay.  Can you please describe what
7  a straw purchase of a pharmacy would be in this
8  scenario?
9      A.   The owner of the clinic would
10 basically pay money for an individual to act as
11 the purchaser of the pharmacy so it doesn't
12 draw attention to the clinic, so you would have
13 -- we got to see all different types of people
14 in Florida that were trying to apply for
15 pharmacy licenses at that point in time, that
16 were not medical -- didn't have a background in
17 medicine.
18     Q.   Okay.  And some of these straw
19 pharmacies did get licensed and registered for
20 a period of time by DEA, correct?
21     A.   We started a program where we
22 actually interviewed and reviewed all the
23 applicants and the vast majority of the
24 applicants, once they realized -- once we
25 started asking questions, they withdrew their

Page 225

1  application.
2      Q.   Okay.  To your recollection,
3  Mr. Rannazzisi, did any straw pharmacy actually
4  get opened and -- such that it was able to
5  dispense prescription controlled substances for
6  a period of time?
7          MS. SINGER:  Objection.  Compound
8  question.
9          MR. BENNETT:  Objection.  Scope.
10         You are not authorized to disclose
11 any information regarding any specific
12 nonpublic DEA investigations or activities.  To
13 the extent that you can answer this question
14 with publicly available information, you may.
15         THE WITNESS:  I -- I don't recall
16 any that got through the system.
17         MR. STEPHENS:  Are you okay if we
18 take a break right now?
19         MR. BENNETT:  That would be fine.
20         MR. STEPHENS:  Yes.
21         MR. BENNETT:  10 minutes?
22         MR. STEPHENS:  Yeah.  10.
23         THE VIDEOGRAPHER:  We are going off
24 the record.
25         This is the end of Media Unit No. 4.

57 (Pages 222 - 225)

```
                                                          Page 364

 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION
 3
       _____
 4
       IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
 5     OPIATE LITIGATION                  Case No. 17-md-2804
 6
       This document relates to:          Judge Dan
 7                                        Aaron Polster
 8     The County of Cuyahoga v. Purdue
       Pharma, L.P., et al.
 9     Case No. 17-OP-45005
10     City of Cleveland, Ohio vs. Purdue
       Pharma, L.P., et al.
11     Case No. 18-OP-45132
12     The County of Summit, Ohio,
       et al. v. Purdue Pharma, L.P.,
13     et al.
       Case No. 18-OP-45090
14     _____
15
16
17                         VOLUME II
18        Videotaped Deposition of Joseph Rannazzisi
19                     Washington, D.C.
20                       May 15, 2019
21                         8:43 a.m.
22
23
24     Reported by:  Bonnie L. Russo
25     Job No. 3301884
```

1     law.
2              BY MR. LANIER:
3       Q.    All right.  In the third page, you
4     go on to say, here are some circumstances that
5     might indicate there is diversion going on; is
6     that right?
7       A.    Yes, sir.
8       Q.    And these -- you gave four examples,
9     much like you have told us in here before, were
10    concerns that you had or that people could look
11    at -- strike that.  Let me start that question
12    again.
13             You give four circumstances that
14    might indicate diversion; is that fair to say?
15      A.    Yes, sir.
16      Q.    Ordering excessive quantities of a
17    limited variety of controlled substance while
18    ordering few, if any, other drugs.
19             Why would that perhaps be indicative
20    or perhaps indicate diversion?
21      A.    Well, for the most part, pharmacies
22    generally follow a pattern of ordering for
23    controlled substances and depending on what we
24    have read, it could be anywhere as low as 9
25    percent to up to 12 or 13 percent as the

1  average.  So it is a red flag when a pharmacy
2  is ordering, you know, 40, 50 percent of their
3  drugs has controlled substances, you know, and
4  looking at the legend or the noncontrolled
5  drugs, you've got to ask questions.
6           Why are you not ordering?  If you
7  are a full service pharmacy, why are you not
8  ordering noncontrolled legend drugs?
9      Q.   All right.  So we've got a red flag
10 on that.
11          The second one you gave is ordering
12 a limited variety of controlled substances in
13 quantities that are disproportionate, not in
14 proportion, to the quantity of noncontrolled
15 medications ordered.
16          Is that also a red flag?
17     A.   Again, same concept.  No. 1 handles,
18 you know, where we are only ordering large
19 quantities of oxycodone, hydrocodone, nothing
20 else or oxycodone, hydrocodone, alprazolam.
21          The second one is again, you are
22 taking the hydrocodone and the oxycodone and it
23 is far exceeding what you are ordering normal
24 noncontrolled drugs.  So it's disproportional.
25          If the normal pharmacy is ordering

Page 455

1   between 9 and 12 percent of the drugs of
2   controlled substances and this pharmacy is
3   ordering 40 or 50 percent and it is limited, it
4   is limited to oxycodone, hydrocodone --
5   oxycodone, hydrocodone and hydromorphone, that
6   should set up red flags.  It even goes deeper
7   if they were ordering a high dose of those
8   drugs.
9        Q.   All right.  Order excessive
10  quantities of limited varieties in combination
11  with excessive quantities of lifestyle drugs.
12  Another red flag?
13       A.   Yes.  That was tapping into the
14  three drug combination, the panel that we were
15  seeing, things like alprazolam, hydrocodone and
16  carisoprodol or hydrocodone -- or oxycodone,
17  carisoprodol and alprazolam, diazepam,
18  clonazepam, any of those different combinations
19  of drugs that is unusual.
20       Q.   You are throwing out a bunch of
21  words that most of us have never heard of in
22  our life because we just get told, go buy Advil
23  or something like that.
24            You're -- are these those -- these
25  are the chemical names that you are using for

Page 466

1    hey, don't blame us, the DEA didn't -- it's the
2    DEA responsibility to design and operate the
3    system. Would that be true?
4              MR. EPPICH: Objection.
5              MS. MAINIGI: Form.
6              THE WITNESS: No, that is just
7    incorrect. It is very specific. The
8    regulation is specific.
9              BY MR. LANIER:
10       Q.    Well, what if they say, oh, but the
11   DEA told us it is okay to do it this way?
12             MR. EPPICH: Objection. Form.
13             THE WITNESS: No. The DEA would not
14   tell them to do something outside of the
15   regulation.
16             BY MR. LANIER:
17       Q.    And did you specifically warn them
18   of this, that the DEA does not approve or
19   otherwise endorse any specific system for
20   reporting suspicious orders?
21             MS. MAINIGI: Objection.
22             THE WITNESS: Yes.
23             BY MR. LANIER:
24       Q.    All right. So much of this is the
25   same as the 2006 letter. I am just going to

Page 544

1  the suspicious order.
2             But I -- I don't understand what --
3  what would the company -- I'm just not -- I
4  guess I'm not catching what -- what the
5  question is.
6             BY MS. MAINIGI:
7       Q.    Would the DEA follow up on all
8  suspicious orders reported?
9       A.    The --
10            MR. BENNETT:  Objection.  Form.
11 Objection.  Scope.
12            THE WITNESS:  The DEA position is
13 that they would follow up on suspicious orders,
14 yes.
15            BY MS. MAINIGI:
16      Q.    My question was slightly more
17 nuanced.
18            Did the DEA follow up on all
19 suspicious orders that were reported to it?
20            MR. BENNETT:  Objection.
21            THE WITNESS:  I -- I couldn't tell
22 you if every suspicious order was followed up
23 on.
24            BY MS. MAINIGI:
25      Q.    Was it your intent that all