# EXHIBIT N

Page 1

```
 1
            IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
 3
 4       _____
 5       IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
         OPIATE LITIGATION                  Case No. 17-md-2804
 6
 7       This document relates to:         Judge Dan
                                           Aaron Polster
 8
         The County of Cuyahoga v. Purdue
 9       Pharma, L.P., et al.
         Case No. 17-OP-45005
10
         City of Cleveland, Ohio vs. Purdue
11       Pharma, L.P., et al.
         Case No. 18-OP-45132
12
         The County of Summit, Ohio,
13       et al. v. Purdue Pharma, L.P.,
         et al.
14       Case No. 18-OP-45090

15       _____
16
17                       VOLUME I
18        Videotaped Deposition of Kyle J. Wright
19                  Washington, D.C.
20                  February 28, 2019
21                     9:33 a.m.
22
23
24       Reported by:  Bonnie L. Russo
25       Job No. 3244302
```

Veritext Legal Solutions

www.veritext.com                                                888-391-3376

Page 24

1           Okay.
2                MS. MAINIGI:  I see none.
3                SPECIAL MASTER COHEN:  I'll be
4      putting myself on mute.  So if you do need me,
5      it may take me a second to come back online.
6      But I will be listening in.  And I'll let you
7      go to it.
8                THE VIDEOGRAPHER:  Will the court
9      reporter please swear in the witness.
10
11                   KYLE J. WRIGHT,
12     being first duly sworn, to tell the truth, the
13         whole truth and nothing but the truth,
14                   testified as follows:
15        EXAMINATION BY COUNSEL FOR DEFENDANT
16                  CARDINAL HEALTH, INC.
17              BY MS. MAINIGI:
18     Q.    Good morning, Mr. Wright.
19           If you could put your full name on
20     the record, please.
21     A.    Kyle James Wright.
22     Q.    Are you currently employed?
23     A.    No.
24     Q.    Are you retired?
25     A.    Yes.

Page 25

1    Q.    Who is your prior employer?
2    A.    Department of Justice Drug
3    Enforcement Administration.
4    Q.    And how long approximately did you
5    work for the Drug Enforcement Administration?
6    A.    22 years.
7    Q.    Do you understand, Mr. Wright, that
8    the Drug Enforcement Administration or DEA, as
9    I will call it, has authorized you to testify
10   on certain topics related to your employment at
11   the agency?
12   A.    Shame on them.  Yes.
13         MS. MAINIGI:  I'll go ahead and mark
14   for the record as Exhibit 1, Wright Exhibit 1.
15         And we've prepared a binder for you
16   that has some of these, Mr. Wright.
17         Exhibit 1 is your notice of
18   deposition.
19         (Deposition Exhibit 1 was marked for
20   identification.)
21         BY MS. MAINIGI:
22   Q.    Have you seen that document before?
23   A.    I -- I -- I don't recall.
24         (Deposition Exhibit 2 was marked for
25   identification.)

Page 225

1         BY MR. STEPHENS:
2     Q.   And that business model of
3 self-dispensing at the pain clinic increased
4 the risk of diversion, true?
5     A.   Increased the risk of diversion?  If
6 it wasn't out of medical necessity, it was
7 diversion.
8     Q.   Okay.  My point is more their --
9 their model of delivering the method case
10 through to the customer.
11         So in a situation where a pain
12 clinic is both writing the prescription and
13 dispensing the medication and not sending the
14 patient to a different pharmacist, in your
15 view, based on your experience, does that
16 increase the risk of diversion?
17         MR. BENNETT:  Objection to the form.
18         THE WITNESS:  It puts a -- all the
19 responsibility on the prescriber.
20         BY MR. STEPHENS:
21     Q.   At -- and in -- in my sample, the
22 prescriber's at the pain clinic, correct?
23     A.   Correct.
24     Q.   Okay.  Now, Walmart did not
25 distribute controlled substances to Internet

Veritext Legal Solutions
www.veritext.com        888-391-3376

Page 226

1  pharmacies, true?
2           MR. BENNETT:  Objection.
3           THE WITNESS:  Not to my direct
4  knowledge.
5           BY MR. STEPHENS:
6       Q.  And CVS, Rite Aid and Walgreens also
7  did not distribute controlled substances to
8  Internet pharmacies, true?
9           MR. BENNETT:  Objection.
10          MR. MIGLIORI:  Objection.
11          THE WITNESS:  I don't have any
12  direct knowledge, no.
13          BY MR. STEPHENS:
14      Q.  Okay.  In -- in response to some of
15  the questions from my colleague who was
16  representing the manufacturers, you answered a
17  series of questions as to whether or not the
18  manufacturer had an obligation to check on
19  someone who they were not supplying to.
20          Do you recall that line of
21  testimony?
22      A.  Yes.
23      Q.  Okay.  Would you agree that Walmart
24  and CVS and Rite Aid and Walgreens would have
25  no obligation to check on Internet pharmacies

Page 229

1  THE WITNESS: In the context of your
2  question, no.
3  BY MR. STEPHENS:
4  Q. Do you also agree that, to your
5  knowledge, Walmart did not distribute
6  controlled substances to any pharmacy other
7  than a Walmart pharmacy?
8  MR. MIGLIORI: Objection to form.
9  Foundation.
10  THE WITNESS: That was my
11  understanding of their operation, yes.
12  BY MR. STEPHENS:
13  Q. Okay. Would you also agree that
14  CVS, Rite Aid and Walgreens also only
15  distributed -- well, let me restate that.
16  I'm going to take it one at a time.
17  Okay?
18  A. Yes, sir.
19  Q. Would you also agree that CVS did
20  not distribute controlled substances to any
21  pharmacy other than a CVS pharmacy?
22  MR. MIGLIORI: Objection. Form.
23  Foundation.
24  MR. BENNETT: Objection.
25  THE WITNESS: I -- I do not have any

Page 260

1      Q.    Okay.  All right.
2            So just a couple more topics, and
3   then we're done.
4            I want to go back to conversations
5   that you would have had with distributors and
6   relating to ratios of controlled versus
7   noncontrolled substances.
8      A.    Okay.
9      Q.    Okay?
10           Do you remember having those
11  conversations with distributors?
12     A.    Yes.
13     Q.    Okay.  And is it -- is it accurate
14  to say that you knew that it was common for
15  legitimate pharmacies to have a ratio of
16  approximately 20 percent of controlled to 80
17  percent noncontrolled?
18     A.    In that area, yes.
19     Q.    Okay.  And higher percentages of
20  controlled drugs could be reasonable at times,
21  right?
22     A.    Yes.
23     Q.    For example, pharmacies located
24  right next to a cancer clinic or something like
25  that.

Page 261

1      A.     Correct.
2      Q.     Okay.  You had also testify earlier
3  about manual systems to identify suspicious
4  orders.
5             Do you remember that?
6      A.     A manual system.
7      Q.     As opposed to automated.
8             MR. MIGLIORI:  Objection to form.
9             THE WITNESS:  Okay.
10            BY MR. STEPHENS:
11     Q.     Do you recall testimony earlier
12 today about manual versus automated systems?
13     A.     Well, that would be in the early
14 days.
15     Q.     Right.
16            So we can go back to that, right?
17     A.     Okay.
18     Q.     Okay.  So back when people were
19 reporting --
20     A.     Paper.
21     Q.     -- excess reports in -- into DEA,
22 right?
23     A.     All right, sir.
24     Q.     Okay.  And manual would -- would --
25 a manual system would include people on the