# EXHIBIT P

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4            ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~
 5   IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
     OPIATE LITIGATION
 6                                   Case No.
                                     17-md-2804
 7
                                     Judge Dan Aaron
 8                                   Polster
 9
     This document relates to:
10
11   The County of Summit, Ohio, et al. v. Purdue
     Pharma L.P., et al., Case No. 18-OP-45090
12
     The County of Cuyahoga v. Purdue Pharma
13   L.P., et al., Case No. 18-OP-45090
14   City of Cleveland, Ohio v. Purdue Pharma
     L.P., et al., Case No. 18-OP-45132
15
             ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~ ~
16
17            Videotaped Deposition of
18             CHRISTOPHER M. KIPPES
19
                 January 18, 2019
20                   1:06 p.m.
21
                    Taken at:
22
              Napoli Shkolnik PLLC
23         55 Public Square, Suite 2100
              Cleveland, Ohio 44113
24
          Stephen J. DeBacco, RPR
25
```

1           MR. MASON:  Marty Mason on behalf
2   of the Plaintiff, also on behalf of Napoli
3   Shkolnik.
4           THE WITNESS:  Chris Kippes with the
5   Cuyahoga County Board of Health.
6           MS. JASIEWICZ:  And who do we have
7   on the phone?
8           MS. HOLLY:  Pam Holly, Morgan
9   Lewis, on behalf of the Teva Defendants.
10          MR. LANOSA:  This is Michael Lanosa
11  from Covington & Burling on behalf of McKesson.
12          MR. SALIMBENE:  Hey, Mike
13  Salimbene -- Michael Salimbene on behalf of
14  AmerisourceBergen, and I am with Reed Smith.
15          MS. RIGBERG:  Hi.  Karen Rigberg
16  with Arnold & Porter on behalf of the Endo and
17  Par Defendants.
18          THE VIDEOGRAPHER:  Would the court
19  reporter please swear in the witness.
20          CHRISTOPHER M. KIPPES, of lawful
21  age, called for examination as provided by the
22  Federal Rules of Civil Procedure, being by me
23  first duly sworn, as hereinafter certified,
24  deposed and said as follows:
25      EXAMINATION OF CHRISTOPHER M. KIPPES

```
                                        Page 13

 1   BY MS. JASIEWICZ:

 2         Q.    Good afternoon, Mr. Kippes.

 3               Would you please state your name

 4   for the record?

 5         A.    Sure.  Christopher M. Kippes.

 6         Q.    And how is your last name spelled?

 7         A.    K-i-p-p-e-s.

 8         Q.    Where do you live?

 9         A.    I live at 9548 Taberna Lane in

10   Olmsted Township, Ohio.

11         Q.    And how long have you lived there?

12         A.    I have lived there 14 1/2 years.

13         Q.    Have you ever been deposed before?

14         A.    No.  This is my first time.

15         Q.    So we'll go over a couple of ground

16   rules for deposition just so that you're aware.

17               So the first is to please make sure

18   that you respond audibly so that the court

19   reporter, who's taking everything down, gets

20   everything that you say.

21               So in particular, if I ask you a

22   yes-or-no question, please respond "yes" or

23   "no" rather than just nodding or shaking your

24   head, or even saying "uh-huh."

25               Is that okay?
```

Page 14

1          A.     Yes, it is.

2          Q.     Do you understand that you are

3     under oath?

4          A.     Yes, I do.

5          Q.     You understand that means you

6     should tell the truth, the whole truth, nothing

7     but the truth?

8          A.     Yes, I do.

9          Q.     One other thing on responding, the

10     tone might get conversational as we go on.  We

11     just need to be careful not to talk over each

12     other, since the court reporter is taking down

13     everything we say.  So I'll do my best not to

14     talk over you if you do your best not to talk

15     over me, and just wait until my question is

16     over before you answer.

17               Is that okay?

18          A.     Yes, it is.

19          Q.     Thanks.

20               I understand that you are the

21     director of epidemiology, surveillance, and

22     informatics at the Cuyahoga County Board of

23     Health; did I get that right?

24          A.     Yes, you did.

25          Q.     And is it okay if I abbreviate

1  epidemiology, surveillance, and informatics as

2  ESI?

3          A.      That is fine.

4          Q.      How long have you been the director

5  of ESI at the Cuyahoga County Board of Health?

6          A.      Since approximately 2004.

7          Q.      And what position did you

8  previously hold?

9          A.      I previously held the position of

10  what -- our position structure at that time was

11  called researcher II/program manager, and that

12  was -- I joined the health department in April,

13  2000.

14          Q.      And when you were a researcher, was

15  that also in the ESI division?

16          A.      At that time, the structure was

17  different from what it is right now.  I worked

18  inside of what we called the community health

19  department.

20          Q.      Aside from your work at the

21  Cuyahoga County Board of Health, do you

22  currently have any other employment?

23          A.      Yes, I do.

24          Q.      What is that employment?

25          A.      I am a part-time instructor.  I am

1    County has sued several retail pharmacy chains

2    in this lawsuit?

3         A.    No.

4         Q.    So then I take it that you don't

5    have any information about why the retail

6    pharmacy chains were sued?

7         A.    No.

8         Q.    You haven't formed any opinions

9    about anything that any retail pharmacy chain

10   has done wrong?

11        A.    This --

12             MR. MASON:  Objection.

13        A.    This is the first I'm hearing about

14   it, so I don't know.  I can't form an opinion.

15   I haven't -- it's the first I'm hearing about

16   it.

17        Q.    Let me try asking the question this

18   way.  Do you have any personal knowledge of

19   anything that Walmart has done that you believe

20   has contributed to the opioid crisis in

21   Cuyahoga County?

22        A.    No.

23        Q.    And would the answer be the same

24   for all the other retail pharmacy chains?  In

25   other words, you don't have any personal

Page 207

1    knowledge of anything any retail pharmacy chain

2    has done that you believe has contributed to

3    the opioid crisis in Cuyahoga County?

4         A.    No.

5         Q.    In your work at the Board of

6    Health, have you ever relied on any public

7    statements that Walmart has made about opioids?

8         A.    I'm -- I'm not aware of statements

9    they've made.

10        Q.    So the answer to my question would

11   be no?

12        A.    Could you repeat your question for

13   me?  Sorry.  It's getting late.

14        Q.    Sure.

15        A.    I'm -- I'm trying to stay with us

16   here.

17        Q.    Yeah.  That's okay.  Fine.  It's

18   absolutely.  If -- if there's anything at all

19   that you need me to rephrase or that you don't

20   understand, I appreciate you telling me.  I'm

21   trying -- you know, trying to be as fair and

22   straightforward as I can, so I want you to tell

23   me that.

24             What I was asking was, in your work

25   at the Board of Health, have you ever relied on

Page 208

1  any public statement that Walmart has made

2  about opioids?

3       A.    No.

4       Q.    Have you ever relied on any public

5  statements from any other retail pharmacy

6  chain?

7       A.    Related to the opioid?

8       Q.    Uh-huh.

9       A.    No.

10      Q.    Have you ever done any business on

11 behalf of the County with Walmart?

12      A.    Yes.

13      Q.    Can you tell me about that?

14      A.    Sure.  It's emergency

15 preparedness-related, so now and again Walmart

16 would do emergency preparedness days, and they

17 asked us to show up and kind of stay at a table

18 and answer any questions on personal

19 preparedness.  That's my recollection of any

20 involvement in -- in Walmart.

21      Q.    Is that sort of like disaster

22 planning?

23      A.    Yeah, the disaster planning.

24      Q.    And so Walmart was helping the

25 County with disaster planning?