# EXHIBIT C

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO  )  Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8

 9                    __ __ __
10            Friday, April 26, 2019

                      __ __ __
11
          HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12             CONFIDENTIALITY REVIEW

                      __ __ __
13

14

15

16        Videotaped Deposition of G. CALEB
      ALEXANDER, M.D., M.S., held at the Law
17    Offices of Peter Angelos, 100 North Charles
      Street, Suite 2200, Baltimore, Maryland,
18    commencing at 9:03 a.m., on the above date,
      before Michael E. Miller, Fellow of the
19    Academy of Professional Reporters, Registered
      Diplomate Reporter, Certified Realtime
20    Reporter and Notary Public.
21

22

23                    __ __ __
24         GOLKOW LITIGATION SERVICES
         877.370.3377 ph | fax 917.591.5672
25              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 10

1          PROCEEDINGS
2      (April 26, 2019 at 9:03 a.m.)
3      THE VIDEOGRAPHER:  We're now on
4  the record.  My name is David Lane,
5  videographer for Golkow Litigation
6  Services.  Today's date is April 26th,
7  2019.  Our time is 9:03 a.m.
8      This deposition is taking place
9  in Baltimore, Maryland in the matter
10 of National Prescription Opiate
11 Litigation.  Our deponent today is
12 Dr. George Caleb Alexander, M.D., M.S.
13 Counsel will be noted on the
14 stenographic record.  The court
15 reporter today is Mike Miller, who
16 will now swear in the witness.
17
18   G. CALEB ALEXANDER, M.D., M.S.,
19      having been duly sworn,
20      testified as follows:
21         EXAMINATION
22 BY MR. SNAPP:
23   Q.   Good morning, Dr. Alexander.
24 I'm Erik Snapp, I represent the Purdue
25 defendants.  I'll be asking you the initial

Page 11

1  set of questions today.
2      First of all, have you been
3  deposed before?
4   A.   No, I have not.
5   Q.   So let me just give you a few
6  ground rules.  First of all, it's really
7  important that we not speak over each other,
8  so if you'd wait until I finish my question
9  before you start your answer, Mike here will
10 be able to get down a better record.
11     Second of all, if you have any
12 questions or if my questions are unclear,
13 please let me know and I'll try to clarify my
14 questions.  Otherwise, I'll assume that you
15 understand my questions; is that fair?
16   A.   Yes, it is.
17   Q.   Okay.  Very good.
18     You understand that you're here
19 testifying in a case that's set to go to
20 trial in Ohio in October?  Do you understand
21 that?
22   A.   I do.
23   Q.   And have you been asked to
24 testify at trial in this case?  Have you been
25 asked to set aside any time to testify at

Page 12

1  trial?
2   A.   No, I have not.
3   Q.   Do you anticipate that you will
4  be testifying at trial?
5   A.   I don't know.
6   Q.   One other thing.  At any time,
7  if you need a break, just let me know and
8  we'll take a break, a short break, as long as
9  there's not a question pending.
10     Fair enough?
11  A.   Yes.
12  Q.   Okay.  Good.
13     So, Doctor, I want to start by
14 trying to define some terms that were used in
15 your expert reports.
16     First of all, can you tell me,
17 when you use the term "opioids," what do you
18 mean?
19  A.   It would depend upon the
20 context.
21  Q.   Okay.  Can you explain?
22  A.   In -- you know, without looking
23 at the report, you know, it's hard to provide
24 a specific instance or example, but in
25 general, I'm probably referring to both

Page 13

1  prescription and nonprescription opioids.
2   Q.   And when you're talking about
3  nonprescription opioids, what are you
4  referring to?
5   A.   Once again, it would be helpful
6  to know the specific context within the
7  report, but generally, heroin and illicit
8  fentanyl and fentanyl derivatives.
9   Q.   How do you define opioid use
10 disorder?  And if you want to know what I'm
11 referring to, in paragraph 40 of your report,
12 which I'll show you in a little bit -- you'll
13 just have to take my word for it now unless
14 you want to see it -- you referred to the
15 formal criteria for an opioid use disorder.
16 But I didn't see those formal criteria listed
17 anywhere in your report, so what are those?
18     MS. RITTER:  Objection, form.
19     It's compound.
20     MR. SNAPP:  Let me just ask a
21 new question.
22 BY MR. SNAPP:
23   Q.   What are the formal criteria
24 for an opioid use disorder?
25   A.   Well, having referred to my

Page 50

1 Q. Did you meet with any
2 representatives of Cuyahoga County?
3 A. Once again, there may have been
4 representatives at the meeting. I do not
5 know.
6 Q. Did you meet with anyone from
7 Summit County?
8 A. Yes.
9 Q. And who did you meet with from
10 Summit County?
11 A. I do not know.
12 (Whereupon, Deposition Exhibit
13 Alexander-4, Questions Re: Treatment
14 and Recovery/Notes from Akron, was
15 marked for identification.)
16 BY MR. SNAPP:
17 Q. I'm just going to mark for the
18 record the notes of that meeting just so
19 we're clear. This is Deposition Exhibit 4.
20 I just want to be clear what we're speaking
21 about. I'll come back to those and ask some
22 questions about them later, but for now I
23 just want to mark them for the record so
24 we're all on the same page.
25 A. Okay.

Page 51

1 Q. So you're saying it's possible
2 that you did meet with someone from Cuyahoga
3 and Cleveland, but you don't know?
4 A. Correct.
5 Q. Other than the meeting in
6 Akron, did you conduct any research in
7 Cuyahoga County or Summit County related to
8 this case?
9 A. Do you mean primary research
10 where I would interview patients, or what do
11 you mean by research?
12 Q. What do you mean by research?
13 A. Can you ask the question again,
14 please?
15 Q. I'm just trying to understand:
16 Other than the meeting in Akron --
17 A. Yeah.
18 Q. -- in July of 2018, did you do
19 anything else to -- do any research in the
20 counties that we're talking about, Cuyahoga
21 and Summit Counties?
22 A. I did. I did.
23 Q. What did you do?
24 A. I reviewed a variety of
25 materials that have been produced or provided

Page 52

1 for this case that reflect the conditions on
2 the ground in these counties.
3 Q. And are those the materials
4 that we received with your expert report? We
5 received a list of materials that included
6 some task force reports and other things.
7 Are those the materials you're talking about?
8 A. Yes.
9 Q. And did you receive those
10 materials from counsel, plaintiffs' counsel?
11 A. Yes.
12 Q. So other than reviewing some
13 documents provided to you by plaintiffs'
14 counsel, you didn't do anything else to do
15 any research, conduct any research in
16 Cuyahoga and Summit Counties; is that fair?
17 A. Yes.
18 Q. Now, there were some changes to
19 your reports, and I want to start with
20 Deposition Exhibit 1 and Deposition
21 Exhibit 2, and I want to make sure I
22 understand the changes that you made between
23 Exhibit 1 and Exhibit 2.
24 MS. RITTER: Objection to the
25 form. And I think that they're

Page 53

1 numbered the other way.
2 MR. SNAPP: I think you're
3 right.
4 MS. RITTER: Exhibit 2 is --
5 okay. Yeah.
6 MR. SNAPP: I think you're
7 right. Thank you for clarifying.
8 MS. RITTER: Okay.
9 BY MR. SNAPP:
10 Q. So Exhibit 2 is your original
11 report from March 25th. I want to understand
12 the differences between Exhibit 2 and the
13 April 3rd report that's marked as Exhibit 1.
14 Can you tell me, first of all,
15 why did you make changes?
16 A. I thought I could provide
17 better estimates.
18 Q. Okay. And why did you think
19 that?
20 A. In reviewing the components of
21 the -- in reviewing the estimates that we
22 provided, I identified areas where I thought
23 that we could make more conservative and
24 better estimates either of the population
25 within a given category or the costs

Highly Confidential - Subject to Further Confidentiality Review

Page 58

1    Q.    -- with the corrections that
2    are listed on Table 1 --
3    A.    Correct.
4    Q.    -- of Deposition Exhibit 3,
5    correct?
6    A.    Yes.
7    Q.    So is it fair to say that those
8    corrections essentially remove from your
9    analysis Scenario A?
10   A.    Yes.
11   Q.    And I noticed that in this
12   exhibit that we've marked as
13   Deposition Exhibit 3, which is your updated
14   April 17th supplemental report, you did not
15   do a Cuyahoga- and Summit-specific mapping
16   calculation that you had done previously in
17   the other exhibits.
18   A.    Uh-huh.
19   Q.    Will you be restricting your
20   testimony -- I guess I'm just trying to
21   understand.
22         Is Deposition Exhibit 3 -- it
23   seems to show that your testimony will only
24   focus on national abatement costs at this
25   point; is that correct?

Page 59

1    A.    Well, I don't -- as I said, I
2    don't know if I'm testifying.
3    Q.    Understood.  But do you have --
4    I didn't see any attempt in Deposition
5    Exhibit 3 to allocate Scenario B, C and D to
6    Cuyahoga and Summit Counties.
7    A.    Is that a question or can you
8    ask a question about --
9    Q.    Well, is there some attempt?
10   Did I just miss it I guess is the question?
11   A.    No, you did not.
12   Q.    Okay.  So you have not done
13   that next step to try to take these abatement
14   costs that are listed in Deposition Exhibit 3
15   and figure out which portion of the national
16   abatement costs are apportioned to Cuyahoga
17   and Summit Counties; is that fair?
18         MS. RITTER:  Objection to the
19   form.
20   A.    Yes, that's fair.
21   BY MR. SNAPP:
22   Q.    Do you intend to do so?
23   A.    Not at this time.
24         THE WITNESS:  Can we do a
25   five-minute break at your convenience?

Page 60

1         MR. SNAPP:  Absolutely.  This
2    is a good time.
3         THE WITNESS:  Okay.  Very good.
4         THE VIDEOGRAPHER:  Going off
5    the record at 10:05 a.m.
6         (Recess taken, 10:05 a.m. to
7    10:15 a.m.)
8         THE VIDEOGRAPHER:  We're back
9    on the record at 10:15 a.m.
10        (Whereupon, Deposition Exhibit
11   Alexander-5, Alexander Curriculum
12   Vitae, was marked for identification.)
13   BY MR. SNAPP:
14   Q.    Dr. Alexander, I've handed you
15   what's been marked as Deposition Exhibit 5,
16   which is your CV that was provided to us.
17   I'm not going to spend a lot of time on it.
18   I just want to understand:  Is this your
19   current CV?
20   A.    Well, I may have an update, you
21   know, on my desktop from April, but it
22   reflects a recent CV.
23   Q.    Okay.  Do you have any
24   additions you'd like to make to it at this
25   time?  I guess a better question would be:

Page 61

1    The one on your desktop, have you made
2    additions to that in the last couple of
3    months?  Because this one is marked -- it's
4    dated February 2019.
5    A.    I was promoted to full
6    professor.
7    Q.    Congratulations.
8    A.    Thank you.
9    Q.    Other than being promoted to
10   full professor, are there any other changes
11   you can think of?
12   A.    There are -- I mean, the most
13   relevant would be additional publications.
14   Q.    Okay.  Can you think of any in
15   particular that you've published since
16   February of 2019?  Looks like the last one is
17   on page 25.  There's a publication
18   number 243.
19   A.    No, I cannot.
20   Q.    Okay.  Are you board certified?
21   A.    Yes, I am.
22   Q.    In what?
23   A.    Internal medicine.
24   Q.    Okay.  I see that right down at
25   the bottom of page 1; is that right?  Am I

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1  been asked to do that in preparation of my
2  expert report.
3      Q.    Have you been asked to provide
4  any opinions with respect to any defendant's
5  conduct historically, its historic conduct?
6      A.    No, I have not.
7      Q.    Have you been asked to provide
8  any opinions with respect to the cause of the
9  opioid crisis or opioid epidemic, as you put
10 it?
11     A.    Yes, I have.
12     Q.    And what opinions do you intend
13 to offer if you testify at trial with respect
14 to the cause of the opioid crisis?
15     A.    May I look briefly at my
16 report?
17     Q.    Certainly.
18     A.    So paragraphs -- there are
19 paragraphs in my report that address what I
20 referred to as the genesis of the epidemic,
21 so I don't know if that answers your
22 question, but I guess my -- maybe you could
23 repeat your question for me.
24     Q.    Which paragraphs are you
25 referring to, Doctor?

Page 67

1      A.    Could you repeat your question,
2  please, just so I'm sure I refer to the right
3  paragraphs.
4      Q.    Well, I'm just trying to
5  understand if you have been asked to provide
6  opinions in this case with respect to the
7  cause of the opioid crisis or opioid
8  epidemic.
9      A.    I mean, I'd say only in the
10 highest -- only at the highest level of
11 abstraction.  I was asked to provide my best
12 judgments about what interventions should be
13 employed to abate the epidemic.
14         So in sort of laying the
15 groundwork for that in my report, I do
16 discuss, for example, in paragraph 16, the
17 modern opioid epidemic can be traced to the
18 1980s; paragraph -- paragraphs 31 through 34,
19 where I discuss misconceptions that I believe
20 must be addressed.  So, for example, there's
21 a conflict between reducing opioid oversupply
22 and improving quality of care for people with
23 pain.
24         So those are the only places in
25 my report where I discuss -- that I think are

Page 68

1  relevant to your question.
2      Q.    So I'm just trying to
3  understand.
4         So will you be -- if you
5  testify at trial, do you expect to provide
6  testimony related to any defendant's
7  responsibility for the opioid crisis?
8         MS. RITTER:  Objection, asked
9      and answered.
10     A.    I will do my best to speak to
11 whatever I'm asked to speak to, but my report
12 that I submitted contains what I've focused
13 on and what I would anticipate would be the
14 focus of any testimony.
15 BY MR. SNAPP:
16     Q.    Okay.  I'm just trying to
17 understand if you're going to be providing
18 testimony that any of the defendants caused
19 the opioid crisis or opioid epidemic, and if
20 so, I'm going to ask you questions about what
21 they did, so...
22     A.    Of course.  Of course.
23         I don't anticipate doing so.
24     Q.    Thank you.
25         So I noticed that in your CV --

Page 69

1  well, strike that.
2         Just to be clear, there's one
3  statement in paragraph 16, and I just want to
4  ask about --
5         MS. RITTER:  Excuse me, do you
6      mean Exhibit --
7         MR. SNAPP:  Paragraph 16 in
8      Deposition Exhibit 1.
9         MS. RITTER:  Okay.
10        MR. SNAPP:  I'm sorry.  I might
11     be looking at the wrong paragraph.
12     Forgive me.
13 BY MR. SNAPP:
14     Q.    Now, in the spillover sentence
15 from page 4 to page 5, you refer to the
16 activities of a number of intermediary
17 organizations supported by manufacturers.
18         Do you see that?
19     A.    I do.
20     Q.    What organizations are you
21 referring to in that sentence?
22     A.    Well, I believe they're cited
23 and discussed in the references that I
24 provide to support that assertion, and I also
25 see in footnote 3 that I provided some

Highly Confidential - Subject to Further Confidentiality Review

Page 102

1  identify methods that have evidence behind
2  them that can be implemented, and to reduce
3  opioid-related injuries and addiction and
4  death.
5      Q.   Is the goal to completely
6  eliminate opioid-related injuries and
7  addiction and death?
8      A.   Well, you know, I -- no, it is
9  not.
10     Q.   So you said it's to reduce
11 opioid-related injuries and addiction and
12 death.  How much are you seeking to reduce?
13     A.   A lot.  I mean we have an
14 enormous way to go, so -- and I think, you
15 know, there's an enormous need in Summit and
16 Cuyahoga Counties, and, you know, it's clear
17 that there's an epidemic in those counties.
18 And so there's an enormous way to go.
19     Q.   You used something called the
20 Markov model in your work in this case; is
21 that correct?
22     A.   Yes, it is.
23     Q.   Can you describe for me, what
24 is the Markov model?
25     A.   A Markov model is a

Page 103

1  mathematical model that allows for one to
2  examine dynamic processes within a
3  population.
4      Q.   Now, I've looked at a lot of
5  the papers that you've written, and I didn't
6  see any that included the Markov model.  Have
7  you -- correct me if I'm wrong.  Have you
8  ever published with respect to the Markov
9  model?
10         MS. RITTER:  Objection, form.
11         MR. SNAPP:  Let me ask a
12     clearer question.
13         THE WITNESS:  Please.
14 BY MR. SNAPP:
15     Q.   Sure.  I'm just trying to
16 understand.  Have you used the Markov model
17 in academic research before your
18 participation in this case?
19         MS. RITTER:  Objection, form.
20     A.   I believe -- can you ask one
21 more time, please?
22 BY MR. SNAPP:
23     Q.   Sure.
24         I'm just trying to understand
25 if you've used the Markov model in a

Page 104

1  non-litigation context --
2          MS. RITTER:  Did you say a --
3  BY MR. SNAPP:
4      Q.   -- prior to this?
5          MS. RITTER:  -- a Markov model?
6      Is that what you said?  I couldn't
7      hear you.  I'm sorry.
8          MR. SNAPP:  I might have said
9      the Markov, but we can use a Markov
10     model.
11 BY MR. SNAPP:
12     Q.   Have you used a Markov model
13 prior to your work in this case?
14     A.   I have not.
15     Q.   Do you know if the Markov model
16 that you used in this case has been subject
17 to any peer review?
18     A.   It has, but -- it has.
19     Q.   In what context?
20     A.   It's based on the inputs of a
21 number of renowned modeling experts.
22     Q.   Who are those experts?
23     A.   Harold Pollack, P-O-L-L-A-C-K,
24 David Dowdy, D-O-W-D-Y [sic], are the main two,
25 but it also reflects the contributions of

Page 105

1  Jeromie Ballreich, J-E-R-O-M-I-E,
2  B-A-L-L-R-E-I-C-H.
3      Q.   And did you consult with
4  Mr. Pollack and Mr. Dowdy and Mr. Ballreich
5  in preparing your report in this case?
6      A.   Regarding the component of the
7  report that's focused on the Markov model, I
8  did.
9      Q.   You did?
10     A.   I did.
11     Q.   Okay.  And where are these
12 three -- is -- Mr. Ballreich is one of your
13 employees, right?
14     A.   He's a consultant, yes.
15     Q.   As is Mr. Dowdy and
16 Mr. Pollack, correct?
17     A.   Yes.
18     Q.   They're on the list of people
19 you told me before were paid by your company;
20 is that correct?
21     A.   Yes.  Yes.
22     Q.   And so when I asked you if it
23 has been subject to any peer-review process,
24 let me ask it sightly differently.
25         Has the Markov model that you

1  used in this case been subject to any peer
2  review through the publication process?
3      A.    It has not.
4      Q.    Do you consider this an
5  economic model?
6      A.    Well, it's useful for both
7  epidemiology and economics.
8      Q.    Have you ever used it -- I
9  think you said you -- well, strike that.
10         What training have you received
11 yourself on using a Markov model?
12     A.    I have -- can you ask again,
13 please?
14     Q.    Sure.
15         I'm just trying to understand
16 what training you've received with respect to
17 using a Markov model.
18     A.    Right.  My learning about this
19 methodology has occurred through working with
20 the people that I identified as well as
21 working previously with health economists,
22 primarily at the University of Chicago during
23 my training there, and during my subsequent
24 faculty life there.
25     Q.    And so that was in the early

1  2000s?
2      A.    Yes.
3      Q.    And since then, have you used a
4  Markov model in any context for any analysis
5  that you have performed?
6      A.    I have not.
7      Q.    How did you choose the Markov
8  model for this case?  How did you choose to
9  use a Markov model as opposed to some other
10 model?
11     A.    It's a useful tool in this
12 instance because of its ability to allow for
13 one to follow populations over time and
14 through different transition states.  And I
15 think this is the reason that two or three
16 prior models of the opioid epidemic that have
17 been published have also used Markov models
18 and upon which our model was based.
19     Q.    And are you referring to the
20 Chen and Pitt articles that you cited in your
21 report?
22     A.    Among others, yes.
23     Q.    Do you consider yourself an
24 expert in the application of a Markov model?
25     A.    I think in this instance I

1  consider myself an expert in helping to
2  advise the courts regarding the remedies that
3  should be instituted in any abatement plan as
4  well as understanding the costs of those
5  remedies.  And as part of that, I believe the
6  Markov model provides value.
7      Q.    Did you consider using anything
8  other than a Markov model to estimate
9  abatement costs in this case?
10     A.    Yes.
11     Q.    What other models did you
12 consider?
13     A.    So we considered just a flat
14 spreadsheet, you know, just a flat Excel
15 file, rows and columns.  We considered a
16 decision tree, we considered a systems
17 dynamics model, and we considered a Markov
18 model.
19     Q.    And why did you choose a Markov
20 model over the three other methodologies you
21 just mentioned?  Why did you decide on a
22 Markov model as opposed to a flat
23 spreadsheet, a decision tree or a systems
24 dynamics model?
25     A.    We felt it would give us the

1  best answers to the questions that we posed.
2      Q.    Are there any limitations to
3  the Markov model that you used?
4      A.    Yes.
5      Q.    What are those limitations?
6      A.    One limitation is that it's
7  dependent upon assumptions about the
8  populations and transitions -- the
9  populations within different compartments of
10 the model, if you will, and the transitions
11 that individual -- the probabilities of
12 transitioning from one compartment to
13 another.
14     Q.    Okay.  There are also
15 assumptions with respect to certain costs
16 that you've used as well, right?
17     A.    Yes.
18     Q.    So there are assumptions
19 related to the populations, the transitions
20 and the costs.
21         Any other assumptions that you
22 can think of?  I should say any other
23 categories of assumptions?
24     A.    Assumptions or limitations?
25     Q.    Well, you identified the fact

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1 that it's dependent -- that the model is
2 dependent on assumptions --
3     A.    Right.
4     Q.    -- as a limitation of the
5 model.
6     A.    Right.
7     Q.    And I'm asking if there are
8 other assumptions other than population,
9 transition and costs.
10     A.    I mean, those are the big ones.
11     Q.    Okay.  So other than the fact
12 that the model is dependent on assumptions,
13 are there other limitations to your model?
14     A.    Well, the epidemic is dynamic,
15 and so I think that the answer is no -- I
16 mean, I think that assumptions are the major
17 matter here.  The epidemic is dynamic and
18 will continue to change and evolve, and so --
19 so what we've done and what I've tried to do
20 in my report is to provide a framework for
21 the courts and parties to use going forward.
22     Q.    Okay.
23         (Whereupon, Deposition Exhibit
24     Alexander-7, 2018 Pitt et al
25     Publication, was marked for

Page 111

1     identification.)
2 BY MR. SNAPP:
3     Q.    I'm handing you, Doctor, what's
4 been marked as Deposition Exhibit 7.  Do you
5 recognize this as the Pitt article that you
6 cited in your report?
7     A.    I do.
8     Q.    And the Pitt article, if you
9 turn to -- I'm sorry, give me one moment,
10 please.
11         The Pitt article lists a number
12 of limitations on page 1399.
13     A.    Uh-huh.
14     Q.    You see those?
15     A.    Yes.
16     Q.    So the first one is:  The
17 drivers behind the opioid epidemic are
18 dynamic, nonlinear and uncertain.
19         Do you agree with that as a
20 limitation to your model as well?
21     A.    I do.
22     Q.    And the authors here go on to
23 say:  Although we tested the impact of each
24 policy on multiple potential models of the
25 current state, the epidemic continues to

Page 112

1 change and may be substantially different in
2 just five years.  For example, the increasing
3 prevalence of fentanyl makes heroin use more
4 deadly.
5         Did I read that correctly?  As
6 a --
7     A.    Yes.
8     Q.    And do you agree that the
9 same -- that limitation that the authors of
10 the Pitt article identified is also a
11 limitation of your use of the Markov model?
12     A.    It is.  And -- it is, and that
13 falls under the category of the assumptions
14 that are made regarding the populations and
15 the transition probabilities.  But, yes, I do
16 certainly agree with that.
17     Q.    The second limitation that the
18 authors of the Pitt article identify was, the
19 next paragraph says:  Substance use disorder
20 is a complex disease with varying degrees of
21 severity and high relapse and recurrence
22 rates.  Our model is a simplification of the
23 phenomenon intended to capture only enough
24 detail to inform key high-level policy
25 questions.

Page 113

1         Does that paragraph that I just
2 read also apply as a limitation to your use
3 of the Markov model in this case?
4     A.    Well, our model, we believe --
5 I believe improves upon prior models in
6 several ways.  So, for example, we allow for
7 many different subgroups of patients with
8 opioid use disorder that take into account
9 the varied complexity that Pitt is referring
10 to.
11         We account for the large
12 population of individuals that have prior
13 opioid use disorder, but not past-year opioid
14 use disorder, and there's several other
15 differences as well between our model and the
16 Pitt model that we believe address this
17 concern.
18         But nevertheless, I would still
19 agree, substance use disorder is a complex
20 disease and with varying degrees of severity
21 and high relapse and recurrence rates.  And
22 our model nevertheless still represents a
23 simplification.  I believe it is -- improves
24 upon the Pitt one in several ways, but it is
25 a simplification, yes.

Highly Confidential - Subject to Further Confidentiality Review

---

Page 114

1    Q.    And then if we skip down to the
2  final limitation that's articulated in the
3  Pitt article, the authors say:  Though we
4  model the U.S. population on average to gain
5  high-level policy insights, different
6  geographical regions, age groups, races and
7  genders will experience different severities
8  and drivers of opioid-related problems.
9         As an initial matter, do you
10 agree with that statement?
11   A.    Yes, I do.
12   Q.    And do you agree that that is a
13 limitation of your model?
14   A.    I think for the purposes that
15 we designed our model, I'm not sure that this
16 is inherent limitation.  Our effort wasn't to
17 provide inputs to provide specific estimates
18 for Cuyahoga and Summit Counties, although
19 our model could potentially be used for that
20 purpose.
21        But it's certainly the case
22 that there's geographic variation in the ways
23 that the epidemic has manifest, if that's
24 what you're asking.
25   Q.    Well, I'm just trying to

---

Page 115

1  understand if your model has the same
2  limitation that this model does in terms of
3  if you wanted to localize your national
4  estimates to a particular geographic
5  location, you'd have to deal with these
6  limitations identified in this paragraph that
7  I just read from the Pitt article; is that
8  fair?
9    A.    One would have to consider
10 those matters, yes.
11   Q.    And that's not something that
12 you've done in your work for this case with
13 respect to Cuyahoga and Summit Counties,
14 correct?
15   A.    No, that's not fully correct.
16   Q.    How is that incorrect?
17   A.    We -- I have attempted to use
18 limited data from the counties that was
19 available to try to -- I've considered and
20 looked at some limited county data to see
21 whether, you know, in an effort to consider
22 applying the model locally, but I did not
23 pursue that exercise.
24   Q.    Okay.  So just so we're clear,
25 you have not applied your model locally based

---

Page 116

1  on the criteria that we just read from the
2  Pitt article or any other criteria.  Fair
3  enough?
4         MS. RITTER:  Objection, form,
5    compound.
6         THE WITNESS:  Can you ask that
7    again, please?
8         MR. SNAPP:  Let me just be very
9    simple.
10 BY MR. SNAPP:
11   Q.    You have not attempted to apply
12 your model locally in Cuyahoga and Summit
13 Counties, correct?
14   A.    No, that's correct.  And in my
15 report I speak to -- I speak to this matter
16 in the way that I believe that our national
17 estimates can be useful, as well as the
18 limits of their utility for developing
19 precise estimates for the Cuyahoga and Summit
20 County.
21   Q.    Fair enough.
22        So, sir, you refer in your
23 report to something called the APOLLO model.
24 What is the APOLLO model?
25   A.    The APOLLO model refers to the

---

Page 117

1  Markov model that we used to estimate changes
2  in populations affected by the opioid
3  epidemic over time.
4    Q.    And APOLLO is in all caps.  Is
5  it an acronym for something?
6    A.    It is not an acronym.
7    Q.    So is this a model -- the
8  APOLLO model, is this something that your
9  company, Monument Analytics, came up with?
10   A.    Yes, it is.
11   Q.    So it's not a model that's
12 published anywhere; is that fair?
13   A.    Yes, that's true.
14   Q.    In terms of -- is the APOLLO
15 model -- I just want to make sure I'm using
16 the right terminology for the rest of the
17 day.
18   A.    Of course, of course.
19   Q.    Is the APOLLO model the same as
20 the Markov model for purposes of your report?
21   A.    Yes, it is.
22   Q.    So the APOLLO model is your
23 application of the Markov model to this case;
24 is that fair?
25   A.    Yes, it is.

---

Page 118

1     Q.    Okay.  Thank you for clarifying
2  that.  Okay.
3         So why don't we take a short
4  break before I move any deeper into the
5  model.
6         MS. RITTER:  Good idea.
7  Everybody get some coffee.
8         THE VIDEOGRAPHER:  Going off
9  the record, 11:31 a.m.
10         (Recess taken, 11:31 a.m. to
11  11:43 a.m.)
12         THE VIDEOGRAPHER:  We're back
13  on the record at 11:43 a.m.
14  BY MR. SNAPP:
15     Q.    So, Doctor, we were talking
16  about the APOLLO model, the APOLLO Markov
17  model that you used in this case, and I want
18  to ask you some questions in particular about
19  how you determined the sequencing in the
20  APOLLO model.
21         MR. SNAPP:  David, could I get
22  my computer screen, please.
23  BY MR. SNAPP:
24     Q.    So I've put on the screen one
25  of the pages from one of your supporting

Page 119

1  spreadsheets.  Do you recognize this
2  document?
3     A.    I do.
4     Q.    It's very difficult to print it
5  out because of the format, so I thought it
6  would be easier just to show it on the
7  screen.
8         MR. SNAPP:  And we'll mark a
9  thumb drive with these on so that
10  we'll all be on the same page in terms
11  of what's in the record, okay?  Is
12  that okay with you?
13         MS. RITTER:  Okay.
14  BY MR. SNAPP:
15     Q.    So I want to understand the
16  sequencing.  So your model assumes that from
17  the general population, which is shown in the
18  top left box number 1 or bubble number 1,
19  people can only transition directly into
20  medical use of opioids or to heroin use,
21  correct?
22     A.    Yes.
23     Q.    In other words, a person cannot
24  transition directly from the general
25  population to nonmedical use of opioids under

Page 120

1  your model.
2         Am I correct about that?
3     A.    Yes.
4     Q.    What's your basis for not
5  including a transition directly from the
6  general population to the nonmedical use of
7  opioids?
8     A.    Can you go to the Inputs tab,
9  please?
10     Q.    Certainly.  What do you need --
11  before we go there, what do you need to look
12  at to answer my question?
13     A.    Yeah.  So I'm interested in
14  reviewing the inputs that go -- that lead
15  from Box 1, the transition probabilities from
16  Box 1.
17     Q.    Okay.
18     A.    So I just would like to confirm
19  the transitions that are depicted.
20     Q.    And just so we're clear, just
21  so the record is clear, what I'm talking
22  about is that you can go from the general
23  population down to -- which is Box 1, down to
24  Box 3H, or you can go from the general
25  population to Box 2, which is the medical use

Page 121

1  of opioids.
2         But under your model, you can't
3  go from the general population, Box 1, down
4  to Box 3, which is the nonmedical use of
5  opioids.  Correct?
6     A.    Yes.
7     Q.    Okay.  And you'd like to look
8  at the inputs, which I've put on the screen
9  now.
10     A.    Correct.  So if you scroll down
11  further, please.
12     Q.    Yes, sir.
13     A.    And further still.  Okay.
14         MS. RITTER:  Can we make it
15  clear for the record which table --
16  it's going to be hard for people --
17         MR. SNAPP:  Yes, we're looking
18  at the table that's -- the filename is
19  MAT Model 2.0 version 51.xlsm.
20         My understanding is that this
21  table, including the filename at the
22  very top, will be reflected on the
23  video record.
24     A.    So thank you for this.  That
25  was helpful.

Page 122

1    So in some cases we may not
2 have had a transition -- so I think -- so you
3 had asked why there's not a direct transition
4 from general population to nonmedical use.
5 BY MR. SNAPP:
6    Q.    Correct.
7    A.    And the model represents a
8 schematic or a simplification of all of
9 the -- necessarily represents a
10 simplification of all of the potential
11 transitions and populations, just as we
12 discussed a few minutes ago with the Pitt's
13 approach.  And it may also have been that we
14 didn't feel that we had as reliable inputs to
15 provide a transition probability for this
16 number.
17    Q.    Okay.  Well, I'd like you to
18 keep this -- we're going to keep this on the
19 screen, but I'd like you to take a look at
20 Deposition Exhibit 1, which is your report.
21 It's right on the top there.  It's your
22 April 3rd report.  And I'd like you to flip
23 to page 25, paragraph 73, please.
24    I'm directing you in
25 particular -- feel free to read the whole

Page 123

1 thing, if you'd like, but I'm particularly
2 interested in the last sentence of that
3 paragraph 73 of your report.
4    And just for the record, it
5 reads:  For example, of the 11.4 million
6 individuals in the United States reporting
7 opioid misuse in 2017, more than four-fifths,
8 83%, reported that they bought, were given,
9 or stole opioids from individuals who were in
10 turn prescribed these drugs by a licensed
11 prescriber.
12    Did I read that correctly?
13    A.    Yes.
14    Q.    And so my question is:  Your
15 model does not account for that 83% of people
16 in 2017 who reported opioid misuse and
17 bought, were given, or stole opioids from
18 individuals who were, in turn, prescribed
19 those drugs by a licensed prescriber,
20 correct?
21    A.    I do not believe that's
22 correct.
23    Q.    Well, some of these 83% would
24 have gone directly from the general
25 population, which is Box 1 on the chart,

Page 124

1 directly to Box 3, nonmedical use of opioids,
2 by either being given, buying or stealing
3 opioids from individuals who were, in turn,
4 prescribed the drugs by a licensed
5 prescriber, correct?
6    A.    There -- each box has a
7 population associated with it.  So if you go
8 to the Inputs tab again, Tab 3.
9    Q.    Okay.  Can you answer my
10 question first?
11    A.    Can you please ask the question
12 again?
13    MR. SNAPP:  Mr. Court Reporter,
14 could you please read the question
15 back.
16    (The following portion of the
17 record was read.)
18    "QUESTION:  Well, some of these
19 83% would have gone directly from the
20 general population, which is Box 1 on
21 the chart, directly to Box 3,
22 nonmedical use of opioids, by either
23 being given, buying or stealing
24 opioids from individuals who were, in
25 turn, prescribed the drugs by a

Page 125

1 licensed prescriber, correct?"
2    (End of readback.)
3    A.    It's hard for me to
4 understand -- I mean, it's hard for me to
5 understand the question.  I mean, I agree
6 with this question in the report -- or this
7 statement in the report, and I can explain
8 the way that we addressed the significant
9 population of people that use opioids
10 nonmedically.
11    But we do not have a direct
12 transition probability over time from the
13 general population to nonmedical use of
14 opioids.
15    We do consider the significant
16 number of people that use opioids
17 nonmedically and our model does allow for
18 these individuals to use opioids nonmedically
19 without having received a prescription first.
20    So I think if, you know -- but
21 as to the -- you know, as to the specific
22 reason for the absence of a transition
23 probability from Box 1 to Box 3, I would want
24 to spend more time looking at the model and
25 consulting with the others that developed it

Page 126

1 with me.
2 BY MR. SNAPP:
3    Q.    But just to be clear, this
4 concept page that we're looking on -- at
5 right now is intended to show the different
6 transitions that are accounted for in your
7 model, correct?
8    A.    Yes.
9    Q.    The transitions from one
10 population to another population?
11    A.    Yes.  Although there are some
12 transitions that are not depicted in this
13 schematic.
14    Q.    When we looked at the inputs,
15 Tab 3, there was no transition probability
16 for going from the general population to the
17 nonmedical use of opioids, correct?  If we go
18 down to the -- maybe I went past it.
19    A.    If you go up here -- so can you
20 go up further, please?  And up further still,
21 please.  Up further still, please.
22       So Box 3 has 5 million
23 individuals in it in --
24    Q.    That is misuse of opioid
25 population that I've highlighted?

Page 127

1    A.    Correct, the box that we were
2 looking at has 5 million individuals in it at
3 the start of the model.
4    Q.    Understood.  But you do not
5 take into account anywhere here a transition
6 from the general population to nonmedical use
7 of opioids, correct?
8    A.    I think that the model allows
9 for a growth in this population over time,
10 but it is a pathway that's mediated through
11 prescription opioid use, yes.
12    Q.    So in other words, in your
13 model, the only way someone gets to
14 nonmedical use of opioids is to first get a
15 prescription for prescription opioids,
16 correct?
17    A.    No.  At the start of the model,
18 the model runs through 10 or 15 years, and at
19 the starting population of the model, there's
20 5 million individuals that have nonmedical
21 use.
22    Q.    Fair enough.  Let me rephrase
23 my question.
24       So your model does not permit
25 any additional population -- additions to the

Page 128

1 population of those who have nonmedical use
2 of opioids, unless they first get a
3 prescription.  Fair enough?
4    A.    Yes, I believe that's -- that's
5 the case.
6    Q.    And does that fact impact the
7 ability of your model to predict what really
8 happens in the real world based on the fact
9 that there are 83%, according to your report,
10 who reported that they bought, were given or
11 stole opioids from individuals, who were, in
12 turn, prescribed these drugs by a licensed
13 prescriber?
14    A.    I'm not sure that it does.
15    Q.    It could though, right?
16    A.    Theoretically, it could, yes.
17    Q.    Because if you don't account
18 for those people, your numbers are not going
19 to be reliable.
20    A.    I'm sorry, say that again,
21 please.
22    Q.    If you don't account for the
23 people who went from the general population
24 at the beginning of your model, they were in
25 that general population number, which you

Page 129

1 have as over 240 million people, if they then
2 buy, are given or steal opioids from
3 individuals who were in turn prescribed these
4 drugs by a licensed prescriber, they will not
5 be reflected accurately in your model,
6 correct?
7    A.    Well, once again, my guess
8 would be that either -- there are dozens or a
9 hundred or more different inputs and
10 populations in the model.
11    Q.    Correct.  We'll be looking at
12 some of those.
13    A.    And we assess its performance
14 relative to other models as well as to data
15 that we have in hand.  We calibrate the
16 model, and it both is calibrated -- you know,
17 it's both calibrated to data that exists and
18 we also assess its performance relative to
19 others.
20       But the model represents a
21 simplification, and so the absence of a
22 specific transition probability from Box 1 to
23 Box 3 I believe represents either a decision
24 regarding a simplification or a data point
25 that wasn't readily available to us, so we

Page 134

1  A.  Uh-huh.
2  Q.  You note that the exact -- in
3 the second sentence, the exact costs of
4 abatement are difficult to estimate.
5      Do you agree with that?
6  A.  Yes.
7  Q.  And you agree that those exact
8 costs of abatement will depend upon the
9 population requiring services and the
10 programs in existence in each jurisdiction?
11  A.  Yes.  If you're asking about
12 jurisdiction-level costs, yes, those costs I
13 believe will depend upon the specifics of
14 individual jurisdictions.
15  Q.  Including the populations
16 requiring services and the existing programs,
17 correct?
18  A.  Yes.
19  Q.  Okay.  And in paragraph 176,
20 you described your analysis as a preliminary
21 analysis of the national costs of 15 types of
22 remedies, correct?
23  A.  Yes.
24  Q.  And if we look at Deposition
25 Exhibit 3, which is the April 17th update to

Page 135

1 your supplemental expert report, do the
2 estimates -- if you turn to the third page --
3 there it is -- the table also refers to your
4 estimates as preliminary estimates, correct?
5  A.  Yes.
6  Q.  Can you explain what you meant
7 in this context by preliminary estimates?
8  A.  I meant that, you know, as I
9 state, my goal wasn't to identify the precise
10 costs in a given category, but to provide an
11 initial estimate and initial framework upon
12 which more precise estimates could be
13 derived.  So by preliminary, I meant a
14 reasonable starting point.
15  Q.  And then as you explained in
16 your report, in paragraph 180, detailed
17 assessments of the specific costs in Cuyahoga
18 and Summit Counties will be required, and
19 there are a number of limitations in
20 extrapolating from national estimates to
21 specific localities.
22      That's what you said in your
23 report, correct?
24  A.  Yes.
25  Q.  And you have not conducted any

Page 136

1 detailed assessments of the specific costs
2 within Cuyahoga and Summit Counties that will
3 be required in this case -- strike that.
4      Is it fair to say, sir, that
5 you have not conducted any detailed
6 assessments of the specific costs within
7 Cuyahoga and Summit Counties?
8  A.  Yes, sir.
9  Q.  Now, you have -- going back --
10 we touched on this earlier.  In Deposition
11 Exhibit 3, you have four different scenarios,
12 and correct me if I'm wrong, but I believe
13 you testified earlier that Scenario A is no
14 longer in play, for lack of a better term; is
15 that fair?
16  A.  Yes.
17  Q.  So the focus would be on
18 Scenarios B, C and D; is that correct?
19  A.  Yes.
20  Q.  Okay.  And so we talked earlier
21 that Scenario C is simply Scenario A with the
22 corrections included on the first page of
23 Exhibit 3, correct?
24  A.  Yes.
25  Q.  And can you describe for me

Page 137

1 what Scenario B is?
2  A.  Scenario B provides an estimate
3 that assumes that -- the status quo with
4 respect to the provision of treatment for
5 opioid addiction and other services for
6 opioid use disorder over time.
7      So Scenario B assumes that
8 there's no increased treatment provided for
9 opioid use disorder; that there is no
10 reduction in the churning of patients that
11 have opioid use disorder; and that the
12 population in year one of these estimates, in
13 other words, the 2019 population, is fixed
14 for the remaining nine years of observation.
15      So essentially -- and that
16 there's no infrastructure expansion for the
17 treatment of opioid use disorder.
18      So Scenario B essentially
19 assumes the status quo, takes the costs of
20 treatment in year one, assumes the
21 populations remain fixed as they are in year
22 one, in other words, doesn't account for any
23 changes in dynamic population flow, and
24 multiplies by ten and accounts for the price
25 of inflation.

Page 158

1    A.    Yes, sir.
2    Q.    And that's in line 21.
3          And in every year from 2011 to
4    2016 your model overestimated the total OUD
5    population based on actual experience,
6    correct?
7    A.    Well, I think in the first
8    year, isn't our model lower than the actual?
9    Q.    I'm sorry, I said 2011 to 2016.
10   A.    Oh, I see, yes, yes.
11   Q.    So 2011, '12, '13, '14, '15 and
12   '16, your model overestimated the total
13   over -- I'm sorry, opium -- tell me what OUD
14   is.
15   A.    OUD, opioid use disorder.
16   Q.    Thank you, opioid use disorder.
17   Your model overestimated opioid use disorder
18   population in every one of those years from
19   2011 to 2016, correct?
20   A.    Yes, sir.
21   Q.    In fact, it was 15% higher in
22   2016.  If you look at 2016, this column,
23   column O, this is the 2016 predicted versus
24   actual.
25         And in 2016, you were 15%

Page 159

1    higher than the actual data, correct?
2    A.    Yes, sir.
3    Q.    Now, did your model -- did you
4    do anything to address in your model the fact
5    that your model was overpredicting the
6    population for opioid use disorder?
7    A.    Well, I mean, this model has
8    dozens of moving parts, and overall, I was
9    pleased with the -- and felt satisfied for
10   the purposes of this report in the
11   calibration that we were able to achieve.
12         Opioid use disorder is -- you
13   know, there are a number of shortcomings in
14   the ways that opioid use disorder is captured
15   and defined in the NSDUH, and so we -- so I
16   feel that this is -- you know, so we focused
17   on calibrating the model most tightly to more
18   recent years and to outcomes and populations
19   such as the population with the total
20   population and the population with overdose
21   that we had the greatest confidence in.
22   Q.    So is the answer to my question
23   that you did not do anything to try to
24   recalibrate your model based on the 15%
25   difference in 2016 between your model's

Page 160

1    predictions and the actual-world data?
2    A.    That's not -- not the case.
3    Q.    What did you do to try to
4    change your model so that it was -- it more
5    closely tracked real-world experience as
6    demonstrated by the NSDUH data?
7    A.    Right.  So in the course of
8    building a model, one is continuously
9    examining and evaluating the inputs and
10   parameters and evaluating their impact on any
11   number of outcomes.
12         And the calibration of the
13   model is one set of outcomes that one is
14   continually using as the model is being built
15   and refined.
16   Q.    So does your final --
17   A.    It's like --
18   Q.    I'm sorry, go ahead.
19   A.    It's like a control panel, I
20   mean, that one is looking at this as one of
21   many measures of -- in the process of
22   building and developing a model.
23   Q.    But does your model in its
24   final form include an estimate for 2016 of
25   total OUD that's 15% higher than the NSDUH

Page 161

1    data?
2          MS. RITTER:  Objection, asked
3       and answered.
4    A.    Yes, it does.
5    BY MR. SNAPP:
6    Q.    Let me look at another line,
7    which -- and then we can take a lunch break
8    after this, but let me look at another line,
9    lines 42 and 43, which I've highlighted on
10   the screen.
11         And these are data related to
12   overdose death Rx.  What does that mean?
13   A.    Overdose deaths attributed to
14   prescription opioids.
15   Q.    And that data came from -- the
16   real-world data, actual data came from the
17   CDC, correct?
18   A.    Yes, sir.
19   Q.    And is that CDC WONDER data?
20   A.    Yes, sir.
21   Q.    Now, does the CDC WONDER data
22   have any shortcomings?
23   A.    Yes, it does.
24   Q.    You mentioned earlier that
25   there were certain shortcomings with

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1 calculation of OUD in the NSDUH data. Can
2 you describe those shortcomings first, and
3 then I'll ask you about the CDC shortcomings?
4     A.    The NSDUH data, the data from
5 the National Survey on Drug Use and Health,
6 does not capture well individuals who may be
7 institutionalized, individuals who may be in
8 jail or in long-term care facilities,
9 individuals who are homeless, nor does it
10 capture individuals that may have a lifetime
11 history of opioid use disorder but not active
12 or past-year opioid use disorder.
13         And this is a difference and an
14 improvement of our model compared with many
15 others, because our model does account for
16 the 2.5 to 3 million people that may have
17 lifetime use of -- opioid use disorder but
18 not past-year opioid use disorder.
19     Q.    So is your expectation based on
20 the fact that they're not -- they don't have
21 past-year opioid use disorder, is your
22 expectation that they'll enter the opioid use
23 disorder population actively at some time in
24 the future?
25     A.    Some, absolutely.

Page 163

1     Q.    How did you -- what are you
2 relying on to calculate how many of those
3 nonactive lifetime opioid use disorder
4 population are going to actually reenter the
5 active OUD population?
6     A.    Here again, our model included
7 dozens, if not more, sources and populations,
8 and I would want to refer to that
9 documentation in order to, you know, provide
10 that for you.
11     Q.    Let's take a look at what we
12 have on the screen right here.  Before we do
13 that, you mentioned there were some
14 shortcomings with respect to the CDC WONDER
15 data that you used in line 42.  Can you
16 describe those shortcomings for us?
17     A.    Well, I think one concern is
18 the adequacy of attribution of death within
19 the data and variation across -- you know, so
20 I think that's one of the main shortcomings.
21     Q.    Explain that, please.
22     A.    Well, it's not always obvious
23 or clear to determine how someone died.
24     Q.    Do you know how it's determined
25 in Cuyahoga or Summit County how someone

Page 164

1 dies?
2         MS. RITTER:  Objection, form.
3     A.    It's -- you know, it's not what
4 I was asked to assist the courts with.  My
5 belief is that they have medical examiners.
6 BY MR. SNAPP:
7     Q.    And so what are some of the
8 issues that arise in terms of medical
9 examiners or others determining the cause of
10 death when there are drugs involved?
11     A.    I mean, that's beyond the scope
12 of what I was asked to assist with in this
13 setting.
14     Q.    But you acknowledge that there
15 are certain challenges with identifying
16 opioid-related deaths like the ones you
17 talked about before?
18     A.    My sense is identifying cause
19 of death can be tricky for a number of
20 reasons.  I mean, if you have just a body
21 that shows up at the morgue, trying to walk
22 through the cause of death I think can be a
23 complicated task.
24     Q.    For example, there might be
25 polysubstance use?

Page 165

1     A.    Yes.
2     Q.    And then do you know how a
3 medical examiner or other might decide of the
4 various substances that show up in the
5 toxicology screen, which one of those they
6 might attribute as the cause of death?  Do
7 you know how that's done?
8     A.    I do not.
9     Q.    But that's one of the
10 limitations of using the CDC WONDER data,
11 correct?
12     A.    Well, I think the wonder
13 data -- I'm sorry, can you please repeat the
14 question?
15     Q.    So one of the limitations of
16 using CDC WONDER data is the fact that
17 different jurisdictions, different medical
18 examiners, different people evaluating the
19 cause of death might reach different
20 conclusions based on the same toxicology
21 screen?
22     A.    I believe that's true.
23         MR. SNAPP:  Okay.  Why don't we
24 take our lunch break now.
25         MS. RITTER:  Okay.

Page 174

1    A.    I'm with you.
2    Q.    Two pages, you have to lay them
3  down next to each other.  Exactly.  Thank
4  you.  But I can show them on the screen for
5  purposes of what we're going to be looking at
6  here.
7         Now, I want to talk to you
8  about, in developing your model to predict
9  national abatement costs, you had to make
10 certain assumptions; is that correct?
11   A.    Yes.
12   Q.    And I want to talk to you about
13 the assumptions that you made.  Let's take a
14 look at them.
15        So in -- I'm going to highlight
16 on the screen Exhibit 8, lines 6, 7 and 8.
17 You see I've highlighted them?  Those values
18 are assumed for purposes of the model,
19 correct?
20   A.    Yes.
21   Q.    And if we go down to -- sorry.
22 If we go down to line 20, the mass media
23 target population is also assumed, correct?
24   A.    Yes.
25   Q.    How did you -- how did you come

Page 175

1  up with the number of 150 million for the
2  mass media target population?
3    A.    Well, this is an epidemic
4  that's national in scope and affects, you
5  know, tens of millions or hundreds of
6  millions of people.  So we felt that this was
7  a reasonable starting point as an assumption
8  for the number of people that might be
9  reached.
10   Q.    So were you trying to target a
11 certain percentage of the overall U.S.
12 population?
13   A.    No.
14   Q.    How did you come up with the
15 number of 150 million?
16   A.    Once again, it was based on
17 what we believed would be a reasonable
18 starting point for estimates and discussion
19 around abatement costs for a media campaign.
20   Q.    So in order to figure out how
21 much -- what the target population in
22 Cuyahoga and Summit Counties were, you'd need
23 to actually understand the actual population
24 of those counties; is that correct?
25   A.    Can you ask that again, please?

Page 176

1    Q.    If you wanted to localize the
2  mass media target population to Cuyahoga and
3  Summit Counties, how would you do so?
4    A.    Well, one would want to know
5  the size of the population and the nature of
6  the media markets in those counties.
7    Q.    Okay.  But you haven't done
8  that?
9    A.    No.
10   Q.    If we go down to line 28, this
11 is the length of first responder training.
12 That's another assumed number, correct?
13   A.    Yes, sir.
14   Q.    And if we look at line 30, is
15 that another assumed number of the cost per
16 first responder training?
17   A.    Yes, sir.
18   Q.    And then if we go down to
19 line 47, which is the residential program
20 population for pregnant women, is that
21 another assumed number, sir?
22   A.    Yes, sir.
23   Q.    And if we go down to line 52,
24 the cost per detailer per year, is that an
25 assumed number also, sir?

Page 177

1    A.    Well, there are -- I think we
2  provide some information there as you've
3  highlighted.
4    Q.    Right.  In fact, it's based on
5  four separate assumptions within that
6  particular parameter, correct?  It says:
7  These costs are based on several assumptions.
8  Number one, detailers would work
9  approximately 2,000 hours per year or 250
10 eight-hour days.
11        Number two, approximately one
12 fifth of the detailer time would be
13 administrative.
14        Number three, detailers would
15 see approximately three prescribers per day
16 and visit each prescriber once per calendar
17 quarter, thus seeing approximately 150 unique
18 prescribers per year.
19        Number four, the salary for a
20 detailer, typically a trained pharmacist,
21 would be approximately $125,000 per year.
22 With travel, fringe and administrative
23 support, the cost per detailer would be
24 approximately $176,000 per year.
25        So is it fair to say that

Page 178

1  line 53, the cost per detailer per year, is
2  itself an assumed number based on four
3  separate assumptions?
4      A.    Yes.  Although we -- yes, it
5  is, although I consulted with -- I mean, I
6  reviewed some source information about
7  academic detailing in order to derive that
8  estimate.
9      Q.    But it's an assumed number for
10  purposes of your analysis, correct, the
11  276,000?
12      A.    Yes.  Yes.
13      Q.    And if we look at line 56,
14  number of physicians visited by a detailer
15  per day, that's also an assumed number,
16  correct?  It says right here, assumed in --
17      A.    Yeah, I don't know why --
18      Q.    -- D.
19      A.    Yes, I think it's an assumed
20  number, although I don't fully understand the
21  300.  There must have been -- I don't think
22  that the value in the cell B56 is accurate,
23  but I would guess that that was an assumed
24  number, the number that would be visited a
25  day.

Page 179

1      Q.    Okay.  I'm not sure where the
2  300% either came from, because in the
3  printout it shows as 3.
4      A.    Yeah, I would expect 3 sounds
5  like the right number.
6      Q.    Is it all right with you if I
7  change that to 3 just so we're clear?
8  Because I'm not sure why that came up that
9  way.
10      A.    Well, I'd want to consult the
11  materials --
12      Q.    Fine, absolutely.
13      A.    -- but if you want to for the
14  purposes of this discussion, that's fine.
15      Q.    We'll leave it.  We'll leave it
16  as it is.
17      A.    Okay.
18      Q.    Line 57, number of unique
19  physician visits by a detailer, it says 150,
20  correct?
21      A.    Yes, sir.
22      Q.    And that's assumed.  That's
23  assuming that each physician will be visited
24  each calendar quarter by a detailer, correct?
25      A.    Yes, sir.

Page 180

1      Q.    And then line 58 and 59 are
2  also assumed numbers, correct?
3      A.    Yes, sir.  Although once again,
4  as with other estimates that I've provided
5  for academic detailing, I reviewed a number
6  of source documents that I include in my
7  expert report, and I believe that I may have
8  used some of these in order to provide the --
9  in order to -- as a basis for the assumptions
10  that are contained herein.
11      Q.    But in many of these other
12  lines, you've provided a source for the
13  numbers, right?
14      A.    Right.
15      Q.    And for these that you just
16  said "Assumed," you're just coming up with a
17  number and plugging it in based on, I guess,
18  your general knowledge based on the
19  experience you've had, or what's it based on?
20      A.    I don't recall precisely how I
21  derived these estimates, but I have reviewed
22  many scientific papers about academic
23  detailing, and I've also reviewed proposals
24  that have been written for the conduct of
25  academic detailing.  So that is to support

Page 181

1  academic detailing programs.
2      Q.    Well, are these assumptions --
3  some of these assumptions -- and we're going
4  to go through more -- some of these
5  assumptions, assumptions that were made by
6  the seven people that worked on your team to
7  put together this report?
8      A.    Well, I mean, ultimately, I
9  supervised the entire time and I take full
10  responsibility for all of the information
11  that's presented within the materials that
12  have been provided for the court.
13      Q.    But I'm just trying to
14  understand.  Is the reason you don't know
15  what they based a particular assumption on
16  because it was something that was done by one
17  of your team members and not by you directly?
18          MS. RITTER:  Objection to form.
19  That's not --
20          THE WITNESS:  Can you ask that
21  again, please?
22          MS. RITTER:  Foundation.
23  BY MR. SNAPP:
24      Q.    Sure.
25          Is the fact that you don't know

Page 182

what the source was for some of these
assumptions that we've highlighted, is that
fact because those assumptions were actually
plugged in by one of your team members
instead of you?

A.    I don't believe so.  I -- you
know, there are dozens of sources here.

Q.    Yes.

A.    But if anything, I would -- but
I was closely involved with the development
of all of these materials, and I think if
anything, if there's an -- if there was a
source for which there was unclear value,
that would significantly increase rather than
decrease the likelihood of my participation
in its -- in its estimation.

In other words, if there was --
the less clear the value, the greater the
likelihood that I would have been even more
integrally involved.

Q.    But do you remember
specifically any discussions with your team
with respect to the assumed values that we've
included so far, that we've highlighted so
far, I should say, on this sheet?

Page 183

A.    I do.

Q.    Okay.  Which ones?

A.    Well, if we can start from the
top.

Q.    Sure.

A.    So I recall discussions about
the split of different MAT treatments.

Q.    Okay.  But those are still
assumed numbers, right?

A.    They are.  And as I note, the
current distribution is less evenly weighted
across these three treatments.

Q.    What about the mass media
target population and the others highlighted
here?

A.    So I do -- I recall, you know,
at the vaguest level, a discussion about the
size of the mass media target population.

Q.    Now, I asked you some questions
about trying to localize the mass media
target population.

In your April 3rd report, you
localized one abatement number to Cuyahoga
and Summit County by multiplying it by 1.5%,
correct?

Page 184

A.    Yes, as a -- I think the
language that I included in the report about
that process captures well my confidence and
belief about that calculation.

Q.    And what is your confidence and
belief about that calculation?

A.    Well, I'd like to refer to my
report, if that's okay.

Q.    It's right in front of you.  Go
ahead.

A.    Okay.  So in paragraph 175, I
note that while the exact costs of abatement
are difficult to estimate, and will depend
upon the population requiring services -- so
we've reviewed that sentence, so I think
that's important.

Q.    Right.  You go on to say:  It's
possible to estimate the cost, nationally, of
the efforts required to reduce further harms,
in that sentence, correct?

A.    The costs nationally, correct.

Q.    Okay.

A.    And then I note, in 176:  I
performed preliminary analyses of the
national costs.  My goal was not to identify

Page 185

the precise costs of any category, but rather
to develop an initial estimate from which
costs could be based -- and then I discuss
my --

Q.    Could be based, I'm sorry, just
to finish.  Could be based -- could be
developed based on this Court's findings with
regard to the nuisance in these
jurisdictions.  That's what you wrote,
correct?

A.    Correct.  Correct.

Q.    Okay.  Go ahead.

A.    And then I discussed the steps,
and then I note in 179:  For some categories,
specific costs will depend upon decisions
made by the Court or its designees, local
policymakers and service providers.

And I give an example just of
one -- one product, naloxone, and the very
factors that could influence that.

And then I identify potential
limitations of extrapolating from the
national to a local level.

Q.    Which paragraph is that?

A.    180.

Highly Confidential - Subject to Further Confidentiality Review

Page 186

1    And then I -- and then I -- and
2  then I say but nevertheless, and then, you
3  know, I -- and I use just one proxy for the
4  fraction of the global abatement needs that
5  are represented by the counties of interest,
6  Summit and Cuyahoga County.  And that's the
7  basis for that calculation.
8    Q.    Okay.  And you said global
9  abatement.  I think you meant national?
10   A.    Correct.  Correct.  Yes.
11   Q.    Okay.  Very good.
12         So we'll come back to that, but
13 I just want to -- let's continue going
14 through the spreadsheet.
15   A.    Yeah.
16   Q.    This line 76, percentage of
17 foster and adoption population younger than
18 eight, that's another assumed number,
19 correct?
20   A.    Yes, sir.
21   Q.    And line 78, rate of IVDU that
22 is opioid use.  That's an assumed number,
23 correct?
24   A.    Yes, sir.
25   Q.    If we go down to line 98 where

Page 187

1  we're talking about drug disposal programs,
2  lines 98 and 99 are both assumed numbers,
3  correct?
4    A.    Yes, sir.  Here and in all
5  instances, I should say assumed for the
6  purposes of the estimates that I've provided.
7    Q.    And assumed for purposes of
8  running your model to calculate national
9  abatement costs, correct?
10   A.    Yes, sir, for these preliminary
11 estimates, yes.
12   Q.    If we look at line 119, this is
13 the proportion of individuals served by each
14 SSP.  What's an SSP?
15   A.    Syringe exchange program.
16   Q.    And that's an assumed number
17 also, correct?
18   A.    Yes, sir.
19   Q.    Now, lines 120 through 128
20 refer to, quote, unpublished federal data as
21 your source.
22         Do you see that?
23   A.    I do.
24   Q.    What unpublished federal data
25 are you referring to there?

Page 188

1    A.    These were derived from a -- I
2  don't know the specific source for these data
3  points.
4    Q.    Who would know?
5    A.    One of the team members that
6  assisted me in producing these estimates.
7    Q.    And do you know if you provided
8  that unpublished federal data to plaintiffs'
9  counsel so that we could receive it as part
10 of our review of this case?
11   A.    I do not know.
12   Q.    To my knowledge, we haven't
13 received it, so I'm not sure what it is
14 either.
15         If we look at the next line --
16   A.    I mean, I can -- let me just
17 say, I think there was a slide presentation,
18 a PowerPoint deck that contained these
19 estimates, and I think the deck was -- was
20 delivered or built by someone working within
21 a federal agency, but I don't have the
22 specific source in my head, and I don't know,
23 as I said, whether it was provided as part of
24 the materials that were produced.
25         MR. SNAPP:  I'm not typically

Page 189

1  one to request materials during a
2  deposition, but we would like to
3  receive those.
4         MS. RITTER:  We made a note of
5  that.  I don't remember if you have it
6  or not.  I'll have to look.
7         MR. SNAPP:  Thank you.
8  BY MR. SNAPP:
9    Q.    Now, 132 and 133, lines 132 and
10 133, these are some more assumed values,
11 assumed parameters in your model, correct?
12   A.    Yes, sir.
13   Q.    And those are the proportion of
14 SCFs in cities similar to Baltimore and
15 proportion of SCFs in cities similar to
16 San Francisco, correct?
17   A.    Yes, sir.
18   Q.    Now, did you do any analysis of
19 the proportion of SCFs in the cities of Akron
20 or Cleveland or cities similar to Akron and
21 Cleveland?
22   A.    No, did not.
23   Q.    So why did you choose Baltimore
24 and San Francisco?
25   A.    These -- I think that these

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1  cities were selected based on population and
2  the -- I don't have a good answer for you. I
3  didn't select these cities.
4      Q.    Someone on your team did?
5      A.    Yes, sir. And I --
6      Q.    And line -- I'm sorry.
7      A.    I should mention as well, you
8  had asked for the individuals that worked on,
9  you know, these materials, and so in
10 reviewing this, it occurs to me that two
11 additional people, I should mention. So one
12 is Susan Sherman, S-H-E-R-M-A-N, and the
13 other is Cassandra Crifasi. I believe her
14 last name is C-R-I-F-A-S-I.
15          And so they -- they worked a
16 long time ago -- which is why I wasn't
17 thinking of them actively -- with me on
18 individual abatement categories.
19     Q.    How long ago?
20     A.    I don't know.
21     Q.    Before you started putting
22 together your report?
23     A.    Yes.
24     Q.    Before your visit to Akron in
25 July of 2018?

Page 191

1      A.    I don't know.
2      Q.    Just so we're clear, I
3  highlighted line 129. That's another
4  assumption. I don't think I asked you about
5  that one, but that's another assumed number,
6  correct, the number of new supervised
7  consumption facilities to open in the U.S.?
8      A.    Yes, it is.
9      Q.    Is that an annual number?
10     A.    Yes, it is.
11     Q.    And do you have an
12 understanding of whether certain laws would
13 need to be changed to open a supervised
14 consumption facility in some jurisdictions?
15     A.    Can you ask the question again,
16 please?
17     Q.    Do you know one way or another
18 if supervised consumption facilities are
19 allowed in every jurisdiction in the United
20 States?
21     A.    My understanding is that
22 currently they are not.
23     Q.    And so in some jurisdictions,
24 there would be a need -- there would need to
25 be a change in law for a new supervised

Page 192

1  consumption facility to open, correct?
2      A.    Yes, sir, I believe that's the
3  case.
4      Q.    Do you know if that's the case
5  in Cuyahoga or Summit Counties?
6      A.    I believe it's the case.
7      Q.    And so the abatement remedy
8  with respect to -- that you're proposing with
9  respect to supervised consumption facilities
10 would require a change in the law in Summit
11 and Cuyahoga counties; is that fair?
12     A.    No. I was not asked to design
13 an abatement program for these counties. I
14 was asked to identify evidence-based
15 approaches to abate the opioid epidemic at a
16 national level.
17          And in my report, I both
18 qualify with respect to this particular
19 instance and also note in many places that it
20 really falls upon the communities themselves
21 to review what I've proposed and to decide
22 what they're already doing, what they need to
23 do more of, what they should be doing less of
24 and how it all fits together.
25     Q.    Do you know if the judge in

Page 193

1  this case would be able to order a
2  change in law to require the opening of
3  additional supervised consumption facilities?
4          MS. RITTER: Objection,
5  foundation.
6      A.    You said additional -- can you
7  you that --
8  BY MR. SNAPP:
9      Q.    Supervised consumption
10 facilities.
11          Do you know if the judge in
12 this case has the power to change the law so
13 that additional supervised consumption
14 facilities can be opened in the U.S.?
15          MS. RITTER: Same objection.
16     A.    I do not.
17 BY MR. SNAPP:
18     Q.    The next one that I highlighted
19 here is line 137, number of fentanyl testing
20 strips needed per injection, and that's an
21 assumed number, correct, for purposes of your
22 calculations?
23     A.    Yes, sir.
24     Q.    And line 140, extra costs for
25 program management, administrative personnel,

Page 194

shipping. If you look up at the top,
machines set up and maintenance for harm
reduction total cost.

Do you see that up here?

A. Yes, sir.

Q. So is that an assumed number
also, sir?

A. Yes, it is.

Q. Please scroll down on the
spreadsheet to lines 152 through 156. Are
these all numbers that were assumed for
purposes of your model?

A. Yes, they were. Although here
again, these were developed with -- as with
many other estimates, with either or both a
review of literature and scientific findings
as well as a consultation with experts in the
field.

Q. But for each of these numbers,
the midsized police departments, law
enforcement-assisted diversion cost and the
same cost from small police departments as
well as the size of specialized overdose
units for large police departments, for
midsized police departments and for small

Page 195

police departments, you don't have a source
other than to say that you're assuming these
numbers, correct?

A. For the purposes of the
materials that have been produced, we've --
I've identified these as assumed values.
They are based, once again -- all of these
parameters and estimates are based on a
combination of our best judgment, my
expertise, review of scientific information,
and the experience of others that provided
input as I developed these estimates.

And this really was, once
again, intended as a framework for
considering the cost of abatement.

Q. Understood.

And so one last assumed number
here is in line 160, which I'm highlighting
on the screen, number of hours required for
stigma reduction training.

That's also an assumed number
for purposes of your model; is that correct,
sir?

A. Yes, sir.

Q. So we have gone through, and we

Page 196

counted them up and we can count them up
again if you want, but I've highlighted 28
separate lines of assumed values within the
parameters that you have plugged into your
model.

Does that sound about right? I
mean, you can count them if you'd like.

A. I would have to if I --

Q. Okay. Well, would you like to,
because I'm --

A. No, I don't feel the need to.

Q. Okay.

A. But I just can't -- I'm not
positive there are 28, but I take your word
for it.

Q. There are 28.

A. Okay.

Q. I'm told there are 28.

A. Okay. Fair enough.

Q. And that's 28 out of -- you
have a total of 164 parameters, correct?

I'm sorry, it's actually less
than 164 parameters because you've got titles
in here.

A. Line headers, right.

Page 197

Q. So it's somewhere less than
that.

A. Okay.

Q. So give or take --

A. 15.

Q. -- roughly 15-20% of your
parameters are assumed; is that right, sir?

A. I think there are about 150
total, and how many did you say were assumed?

Q. 28.

A. Okay. So it would be about one
sixth.

Q. So 15 to 20% is accurate?

A. Yes.

Q. Now, I want to make sure I
understand your testimony. You said the
assumed parameters, the assumptions were
based on judgment, your experience, review of
scientific information and the experience of
others who provided input as you developed
these estimates; is that right?

A. Can you please read the list
again?

Q. Judgment?

A. Yes.

Page 202

1  correct?
2      A.    Yes, sir.
3      Q.    And so the number of
4  assumptions that are included -- incorporated
5  into your model are actually more than just
6  the 28 I pointed out to you, correct?
7      A.    Yes, sir.  I mean -- yes, sir.
8      Q.    So what I'm talking about is
9  the assumed parameters that you plugged into
10  the model, there are more than just the 28
11  that I highlighted on the screen.  There are
12  others that are derived from those
13  highlighted assumed numbers, correct?
14      A.    Yes, sir.
15      Q.    Okay.  If we count those up --
16  I think we counted 52, but we're not going to
17  go through those today.
18      A.    Okay.
19      Q.    It's 52, the 28 plus 24 would
20  get you to 52, so...
21          So we were looking before we
22  started --
23          MR. SNAPP:  We can turn that
24      off.  Thank you.
25          ///

Page 203

1  BY MR. SNAPP:
2      Q.    Before we started looking at
3  the spreadsheet we were looking at
4  paragraph 180 and 181 of your report.  I
5  think you were reading some language from
6  180.
7          In paragraph 181, you state
8  that your abatement estimate does not address
9  how abatement costs should be shared across
10  different parties; is that correct?
11      A.    Yes, sir.
12      Q.    And so just to be clear, you
13  haven't attempted to identify and quantify
14  the impact of any alleged wrongdoing by any
15  defendants on opioid-related outcomes and
16  subsequent costs, correct?
17      A.    Correct.
18      Q.    Does your model assume that the
19  defendants are responsible for all of the
20  abatement costs --
21      A.    No, sir.
22      Q.    -- that it predicts?
23          Does your model have anything
24  to do with who should pay for what?
25      A.    No, sir.

Page 204

1      Q.    Now, if we look at -- staying
2  on the same spreadsheet, if we go up to
3  line 145, this is your research line?
4      A.    Can you power up my screen,
5  please?
6      Q.    Oh, I'm sorry, yes.  Can we
7  have that?  Thank you.
8      A.    Thank you.
9      Q.    If we're looking at the
10  research line, which is 145, I'm going to
11  highlight it in green.  It's -- that makes it
12  difficult to read.  Sorry.  Let's change it
13  to a different color.
14          It's -- your source for your
15  $1.1 billion research budget is the NIH 2018
16  HEAL Initiative budget.  What is that?
17      A.    It's a -- I'm sorry, can you
18  please ask the question again.
19      Q.    Sure.  What is NIH 2018 HEAL
20  Initiative budget?
21      A.    Well, I provide a source that
22  describes in further detail the HEAL
23  Initiative.
24      Q.    Okay.
25      A.    This is a broad-reaching, you

Page 205

1  know, multi-institute initiative of the
2  National Institutes of Health to reduce
3  morbidity and mortality from the opioid
4  epidemic and to improve pain care through
5  scholarship and discovery, through scientific
6  investigation.
7      Q.    Are you aware from the source
8  that you cite there that the $1.1 billion of
9  funding for the HEAL program already exists
10  through congressional funding?
11          MS. RITTER:  Objection,
12      foundation.
13          THE WITNESS:  Can you ask that
14      question again, please?
15          MR. SNAPP:  Sure.
16  BY MR. SNAPP:
17      Q.    Have you -- in the source...
18          (Whereupon, Deposition Exhibit
19      Alexander-10, Press Release, NIH
20      launches HEAL Initiative, was marked
21      for identification.)
22  BY MR. SNAPP:
23      Q.    Sir, I'm handing you what's
24  been marked as Exhibit 10 to your deposition.
25  Thank you.  And this is a press release from

Page 206

1  April 4th, 2018 talking about -- the title is
2  NIH launches HEAL Initiative, doubles funding
3  to accelerate scientific solutions to stem
4  national opioid epidemic.
5        Do you see that?
6     A.  Uh-huh.
7     Q.  You have to answer verbally.
8  Sorry.
9     A.  Yes.  Yes.  I'm sorry.
10    Q.  Thank you.
11       And in the first paragraph
12 below the picture, there's a sentence that
13 says:  NIH is nearly doubling funding for
14 research on opioid misuse/addiction and pain
15 from approximately 600 million in fiscal year
16 2016 to 1.1 billion in fiscal year 2018, made
17 possible from a funding boost by Congress.
18       Do you see that?
19    A.  Yes, sir.
20    Q.  So do you have an understanding
21 that the $1.1 billion that you included as
22 part of your abatement remedy for the NIH
23 2018 HEAL Initiative is actually already
24 fully funded by Congress?
25    A.  Yes, sir.

Page 207

1     Q.  And are you going to be giving
2  any testimony if you testify at trial with
3  respect to whether the defendants should pay
4  for that $1.1 billion in funding?
5     A.  Well, I -- once again, I don't
6  know whether I would be testifying in trial,
7  and if so, I would speak to anything that I
8  was asked to speak to.
9     Q.  Were you suggesting, sir, by
10 including that number in your analysis, that
11 the defendants should pay for the entirety of
12 this program that's already federally funded?
13    A.  I -- my goal was to identify
14 remedies and then to try to provide national
15 estimates for what I thought these would
16 cost.
17       And in some cases, considerable
18 investments may already be being made by any
19 number of parties in some of these
20 categories, and so I wasn't asked nor did I
21 attempt to identify either how responsibility
22 should be shared across parties or how monies
23 should be -- how claims should be made
24 against various parties as a function of how
25 much has already been invested.

Page 208

1        So I don't know if that answers
2  the question, but I really didn't consider
3  the amount already being invested as I made
4  estimates of what I thought investments would
5  ultimately take.
6     Q.  So it's fair to say that you
7  don't think -- you don't have an opinion one
8  way or another whether the defendants should
9  pay for a program that's already been
10 federally funded; is that fair?
11    A.  No.
12    Q.  That's not fair?
13    A.  No.  I mean, I have not thought
14 a lot about it, but I don't have a
15 formulated -- at this point, I would want to
16 think more about it.  It's a complex
17 question, and I would want to think more
18 about it.  It's not something that I was
19 asked to prepare for in this report.
20    Q.  Fair enough.  And you don't
21 have an opinion on that issue today, correct?
22    A.  Correct.
23    Q.  Thank you.
24       So I assume, sir, that the same
25 analysis that you just went through in your

Page 209

1  answer to me would apply with respect to the
2  existence of Ohio's prescription drug
3  monitoring program, correct?
4     A.  When you say the same analysis,
5  can you ask the question again?
6     Q.  Sure, I'm sorry.  I was just
7  trying to shortcut things.
8     A.  Of course.
9     Q.  Trying to get you out of here.
10    A.  Well, I'm not complaining about
11 that, but...
12    Q.  So my point is simply that you
13 have not taken into account the costs that
14 the state of Ohio has already incurred in
15 establishing its PDMP or prescription drug
16 monitoring program, as part of your model; is
17 that correct?
18    A.  Correct.  Correct.  My -- in no
19 case did I look at how much is actually being
20 expended and use that to decide how much I
21 thought future abatement costs would be.
22    Q.  Fair enough.
23       And in terms of the PDMP that
24 exists in Ohio, is it your understanding that
25 that's a state program or a county program?

Page 214

1  national abatement costs within any of these
2  categories, did you calculate a confidence
3  interval for your estimates?
4       A.    We -- are you asking about a
5  specific one of these or for any of them?
6       Q.    Any of them.
7       A.    Okay.  In developing these
8  estimates, I examined a number of different
9  assumptions around -- assumptions regarding
10  the components of a given category.
11       So, for example, if we consider
12  the effects of -- if we consider the costs of
13  care required for pregnant women and
14  neonates, so these are women that have opioid
15  use disorder or children born, for example,
16  with opioid use disorder, I examined how the
17  estimates that I provided would vary based on
18  differences in the inputs.
19       So essentially, I did examine
20  how sensitive the final dollar amount was to
21  the assumptions we were making.
22       Q.    That's not a true confidence
23  interval, is it?
24       A.    No, it is not.
25       Q.    And so you did not calculate a

Page 215

1  confidence interval around your calculations,
2  your abatement cost calculations; is that
3  correct?
4       A.    I did not.
5       Q.    Now, with respect to these
6  abatement cost interventions that are listed
7  on the sheet that we have on the screen, you
8  would certainly expect the need for a mass
9  media campaign to go down over time, right?
10       A.    I am not sure about that.
11       Q.    Why not?
12       A.    Because as I outline in my
13  report, there are profound misconceptions
14  that have allowed for the epidemic to
15  flourish, and substantial gaps in quality of
16  care for those in pain as well as gaps in
17  care with respect to the use of opioids.
18       So I think this is an epidemic
19  that's been -- depending upon when you define
20  the start, that's been, you know, decades in
21  the making, and I believe that constant
22  investment in a media campaign over the next
23  decade is a reasonable approach.
24       Q.    Just focusing on this mass
25  media campaign for a moment -- well, strike

Page 216

1  that.
2       There's a paragraph in your
3  report that I want to ask you about.  I just
4  didn't understand it, so paragraph 181,
5  Deposition Exhibit 1.  Second sentence says:
6  In addition, some (e.g., "Medication Assisted
7  Treatment"), but not all, of my estimates
8  exclude costs arising from individuals with
9  heroin use disorders without prior
10  prescription opioid use.
11       Can you explain what you mean
12  by that?
13       A.    One of the improvements that I
14  believe is reflected in our model that has
15  not been reflected in prior Markov models of
16  the opioid epidemic is that we separately
17  account for a population, the minority of
18  individuals that have heroin use that have
19  not had prior prescription opioid use
20  preceding the heroin use.
21       And in our estimates of the
22  costs of treatment that we reviewed in
23  Scenarios B, C and D, we exclude the costs of
24  treatment for individuals using heroin whose
25  heroin use did not start with prescription

Page 217

1  opioids.  In other words, we provide
2  conservative estimates that exclude the
3  population of users of heroin that didn't
4  start with prescription opioids.
5       Q.    Did you do anything to exclude
6  heroin users who started with nonmedical use
7  of opioids?
8       A.    I would have to review the
9  source documentation for the specific
10  questions that we used from the data sources
11  that we used, such as NSDUH, in order to
12  understand -- in order to be able to answer
13  that question accurately.
14       Q.    Because when we started out
15  today looking at one of your -- we were
16  actually looking at this cover sheet --
17  actually, I'm sorry, wrong model.  We were
18  looking at the concept sheet of your
19  MAT Model 2.0 version 51.  We talked about
20  the fact that you can't go from the general
21  population to nonmedical use of opioids.
22       But did you exclude from your
23  model heroin users who went directly from the
24  general population to the nonmedical use of
25  opioids without the interim step of a medical

Page 226

1 also -- the sampling method makes a big
2 difference in terms of the ways that
3 individuals were sampled. And lastly, this
4 may be examining current participants rather
5 than the opportunities for future use. And
6 my abatement plan is forward-looking. It's
7 not looking back. It's looking forward.
8      So I don't -- so while this
9 information is helpful, it would only be one
10 of many pieces of information that I would
11 rely on to derive an estimate regarding the
12 number of people that would be appropriate
13 for drug court.
14      Q.   Well, wouldn't it be more
15 reliable if your model looked at just those
16 in drug courts, the drug court population
17 that was there because of prescription opioid
18 use?
19      MS. RITTER: Objection, form.
20      THE WITNESS: Can you ask that
21 again, please?
22 BY MR. SNAPP:
23      Q.   Sure.
24      I'm just trying to understand
25 if your model would be more reliable if it

Page 227

1 included, rather than the entire drug court
2 population that includes all these other
3 drugs, it only included those who were there
4 for prescription opioid use.
5      MS. RITTER: Objection, form,
6 foundation. That's not what he said.
7      MR. SNAPP: Let's broaden it.
8 BY MR. SNAPP:
9      Q.   Let me just broaden it.
10      Wouldn't your model be more
11 reliable, sir, if it focused only on the drug
12 court population that was in drug court
13 because of opioid use?
14      MS. RITTER: Objection, form.
15      A.   My goal is in identifying
16 national needs, and specifically with respect
17 to drug courts, I think that these should be
18 forward looking and based not just on the
19 number of current utilizers that have
20 opioid-related encounters with the criminal
21 justice system, but also the number that --
22 the unmet need and the unfulfilled need.
23      So I think that's very
24 important, and I do note here this -- on
25 page 27, it appears to me that these data

Page 228

1 were derived from 2008, and, of course,
2 there's been enormous changes since 2008 in
3 terms of morbidity and mortality from the
4 epidemic.
5      But --
6      MR. SNAPP: Can we get the
7 screen again, please.
8 BY MR. SNAPP:
9      Q.   So is it your testimony, sir,
10 that this number, this 120,000 drug court
11 population, is exclusively people who are in
12 drug court because they used opioids?
13      A.   No, it is not.
14      Q.   And your model would be more
15 reliable in addressing the opioid issues that
16 arise from the opioid epidemic if it were
17 focused solely on a drug court population of
18 opioid users, correct?
19      MS. RITTER: Objection to form,
20 foundation.
21      THE WITNESS: Can you ask that
22 again, please?
23      MR. SNAPP: Certainly.
24 BY MR. SNAPP:
25      Q.   Your model, in terms of its

Page 229

1 criminal justice intervention abatement cost
2 calculations, would be more reliable if the
3 drug court population that you were focused
4 on was only the drug court population that
5 was in drug court because of the use of
6 opioids?
7      MS. RITTER: Same objection,
8 form, foundation.
9      A.   Yeah. What I would say is that
10 the population that I think abatement
11 estimates should be built on for this
12 category is the population that are either
13 currently in drug courts because of
14 opioid-related crimes or encounters with the
15 criminal justice system, or the population
16 where there's unmet need and where drug court
17 should be expanded.
18      And it may be that that latter
19 group is an enormous population. I think
20 that I would want to look at this and other
21 documentation in order to be able to provide
22 the courts with additional information about
23 that.
24 BY MR. SNAPP:
25      Q.   Understood.

Highly Confidential - Subject to Further Confidentiality Review

Page 234

1    A.    Correct.  Correct.
2    Q.    So that's not -- I'm sorry.  Go
3  ahead.  I don't mean to talk over you, sir.
4    A.    So I think that would
5  represent -- if we think that that represents
6  half of the counties, that's the current
7  volume of participants in drug courts in half
8  of the counties in the United States.
9        So even without assuming
10  something about unmet need, of which I think
11  in many communities there's large amounts of
12  unmet need, it would suggest that if there
13  were drug courts in the entire United States,
14  assuming that these 50% where the drug courts
15  are currently present are representative of
16  the counties where they're not, that the drug
17  court population could be currently as high
18  as 240 without any scaling of that 240,000.
19    Q.    Assuming that's correct, only
20  some subset of that population, even your
21  assumed population --
22    A.    Yeah.
23    Q.    -- would actually be in drug
24  court due to opioid use, correct?
25    A.    That's correct.

Page 235

1    Q.    And so you have done no
2  calculations to determine what percentage of
3  your 120,000 drug court population is
4  actually in drug court as a result of using
5  opioids; is that correct?
6        MS. RITTER:  Objection, form.
7    A.    Well, if we use the numbers
8  from this report and we assume that if there
9  are 120,000 in drug courts in half of the
10  counties because half of the counties don't
11  have them, and so we double that to assume
12  that if every county had them and they were
13  operating at the same capacity, we'd have
14  about 240,000, then our estimate of 120 would
15  represent that -- an assumption that about
16  half of current -- current drug court
17  participants are utilizing the drug courts
18  because of opioid-related offenses.
19  BY MR. SNAPP:
20    Q.    But that's not what you did in
21  your model, right?
22    A.    Well, we have in our model an
23  estimate, and the estimate was derived from
24  this source documentation.
25    Q.    But you have no -- no source

Page 236

1  for an estimate that half of the participants
2  in drug court are there because of the use of
3  opioids.
4    A.    I don't have a precise source
5  to provide you to support that assumption.
6    Q.    You don't have any source to
7  support that assumption, do you?
8    A.    Well, as I noted before, there
9  were four categories of -- there were four
10  sources, ultimately, of information, at
11  least, that I used to derive the estimates
12  that I've provided, these preliminary
13  estimates and this framework, and so -- but I
14  can't identify specific -- you know, there
15  are no further written sources that I
16  provided of peer-reviewed publications or
17  other publications.
18    Q.    Those four sources were
19  judgment, your experience, your review of
20  scientific literature, and the experience of
21  your team members, correct?
22    A.    Yes.
23    Q.    And you can't point to any one
24  of those that tell me that -- what percentage
25  of this 120,000 drug court population can be

Page 237

1  attributed to those in drug court because of
2  opioids?
3    A.    The 120,000 is our -- the
4  120,000 is my estimation of the population
5  that could be served because of
6  opioid-related crimes in a national abatement
7  model.
8    Q.    With drug courts in every
9  county in the United States, correct?
10    A.    Well, I mean...
11    Q.    Maybe I'm misunderstanding your
12  testimony.  Is that what you testified to a
13  few minutes ago?
14    A.    The estimates that I provide
15  for -- the 120,000 is my best current
16  estimate of the number of individuals that
17  could be served for -- through drug courts
18  for opioid-related morbidity in the United
19  States.
20    Q.    Existing drug courts or drug
21  courts in every county?
22        MS. RITTER:  Objection, form.
23    A.    I don't address that in my --
24  you know, in my report.
25        ///

Highly Confidential – Subject to Further Confidentiality Review

Page 250

1    Q.    And so do you agree, sir, that
2  the medical care CPI calculation includes a
3  number of services that would not be part of
4  your abatement remedies?
5    A.    Well, the -- may I look at this
6  document for a few more minutes?
7    Q.    We can go off the record and
8  you can look at it, sure.
9        MS. RITTER:  Okay.
10   A.    Well, I don't -- what do you
11 mean by off the record?  Just take a break?
12 BY MR. SNAPP:
13   Q.    So it's not counting against my
14 time.
15   A.    Oh, no, no, that's fine then,
16 we don't have to do that.  Can you ask the
17 question again, please?
18   Q.    Do you agree, sir, that the
19 medical care CPI calculation includes a
20 number of services that would not be part of
21 your abatement remedies?
22   A.    I do.
23   Q.    Did you consider using any
24 other measure of CPI from the Bureau of Labor
25 Statistics?

Page 251

1    A.    Once again, the decision about
2  which inflation rate to use and how it should
3  be applied I believe was made based on the
4  expertise and the input of members of my team
5  as well as conversations with counsel and
6  perhaps others involved in the litigation.
7    Q.    Did you consider using any
8  other CPI measures?
9    A.    I believe that several may have
10 been considered, and it's a -- so I believe
11 that several may have been considered.
12   Q.    Did you consider, sir, using
13 the U.S. City All Urban Consumers CPI.
14   A.    I don't know -- I don't know
15 which indices were evaluated and so -- I
16 don't know which indices were evaluated.
17   Q.    So you don't know if you
18 considered the  All Items CPI for all U.S.
19 cities?
20   A.    When you say "you," are you
21 referring to the team that I supervised as
22 well as the others that were involved in this
23 process?
24   Q.    Sir, you've said a number of
25 times that this is your report and you're

Page 252

1  responsible for the report, so I'm talking
2  about you.
3    A.    Okay.
4    Q.    And you supervised the team, so
5  I'm asking:  Did you consider using any other
6  alternative measures of the inflation rate
7  using other CPI indices?
8    A.    I believe we did.
9    Q.    And did you include -- in your
10 analysis, did you consider using the All
11 Items U.S. CPI from the Bureau of Labor
12 Statistics?
13   A.    I don't recall.
14   Q.    Are you aware that there are
15 CPI statistics for the Midwest, which include
16 Ohio, available?  You're aware that those
17 statistics are available, right?
18   A.    I'm sorry, can you ask the
19 question again?
20   Q.    Let me back up, sir.
21       Have you used Bureau of Labor
22 Statistics inflation rates in any of your
23 other work?
24   A.    I do not believe so.
25   Q.    And is it fair to say that you

Page 253

1  relied on your team to decide which CPI
2  number to use in this context, and the
3  lawyers involved?
4    A.    Yes, it is.
5    Q.    Do you know if they considered
6  using -- if your team and the lawyers
7  considered using the Cleveland/Akron all item
8  CPI data from the Bureau of Labor Statistics?
9    A.    I don't know, but I'm not sure
10 that I would have suggested such, because my
11 report focuses on developing a national
12 abatement plan, and I've left it to other
13 experts to develop plans specific to Cuyahoga
14 and Summit Counties.
15       So in developing my national
16 estimates, I don't know that I would be
17 comfortable using or advise using one
18 jurisdiction's inflation factor over
19 another's.
20   Q.    Okay.  But even in your -- in
21 your 15 categories, many of these categories
22 that are on the screen right now do not
23 relate to medical care, correct?
24   A.    That's correct.
25   Q.    And yet, your team and the

Page 262

1 as best I can with my scientific knowledge.
2 I did not multiply 0.015 times
3 the bottom-line numbers in any of those
4 scenarios in order to identify a value that
5 would be the analogous value to the
6 $6.7 billion that's in paragraph 180 of
7 Exhibit 1, but that would be the nature of
8 such a calculation.
9 Q. Sir, are you saying that you
10 intend to do so in the future, if asked?
11 A. Are you asking whether I intend
12 to multiply one number by 1.5%?
13 Q. Yes.
14 A. Because that's -- that's what
15 we would be talking about.
16 Q. Okay.
17 A. I don't know.
18 Q. Okay. Do you think that 1.5%
19 calculation that you did in paragraph 180, is
20 that a reliable method of determining what
21 portion of abatement costs should be
22 attributed to Cuyahoga and Summit Counties?
23 A. I believe there's other -- I
24 believe there are other experts who are
25 focused squarely on doing just that.

Page 263

1 Q. And so is the answer to my
2 question you don't know?
3 A. I'm sorry. Let me clarify.
4 I believe there are other
5 experts whose work is focused on estimating
6 the specific costs in Cuyahoga and Summit
7 Counties.
8 Q. Do you see any limitations in
9 doing the calculation that you did to get to
10 1.5%?
11 A. Yes, I do.
12 Q. And what are those limitations,
13 sir?
14 A. I looked at one measure of
15 morbidity or mortality in one year as the
16 method of allocation, and I believe that
17 that's a limited -- a limited way to appraise
18 attributable share or allocation share.
19 It's not what I was asked to
20 do. I was not asked -- I mean, I provided
21 paragraph 180 as a high-level qualified
22 caveated approach of thinking about the
23 potential costs in two counties in the United
24 States.
25 Q. And so that 1.5%, if you

Page 264

1 applied it to each of your individual
2 abatement remedies, would that be a way to
3 figure out, with all the caveats that you
4 included, how much each of those abatement
5 remedies should cost within Cuyahoga and
6 Summit Counties?
7 A. There are other experts whose
8 work has focused squarely on identifying the
9 needs and costs of those counties.
10 Q. For example, if I wanted to
11 determine -- I understand what you're saying,
12 but if I wanted to determine for your mass
13 media campaign the population that you were
14 focused on with your mass media campaign in
15 Cuyahoga and Summit Counties, would I take
16 the 150 million multiplied by 1?%?
17 A. I'm sorry, where is the
18 150 million coming from?
19 Q. Well, that's the population
20 that you used in mass -- for mass media, the
21 mass media target population that's on the
22 screen right now. And you -- that remained
23 constant year after year.
24 So if I wanted to figure out
25 the mass media target population within

Page 265

1 Cuyahoga and Summit Counties, would I
2 multiply that by 1%? if I were using your
3 methodology?
4 A. No.
5 Q. What would I do?
6 A. Well, I'm not sure -- I mean,
7 if you multiply 150 million by 1.5%, there's
8 no dollar signs in there, so I don't know
9 that that -- that's a population times a
10 percent.
11 Q. Well, there's no dollar signs
12 in opioid overdose deaths either, sir, but
13 you used that as a percentage -- that's how
14 you got your percentage, right?
15 A. Yeah, I think I may have
16 misunderstood your question. Can you please
17 ask again the question about mass media?
18 Q. Sure.
19 So using your methodology of
20 attributing a certain portion of national
21 abatement costs to Cuyahoga and Summit County
22 by multiplying the numbers by 1.5%, if I
23 wanted to figure out the mass media target
24 population in Cuyahoga and Summit Counties,
25 would I multiply the 150 million by 1.5%?

Page 266

1    MS. RITTER: Objection,
2  foundation.
3    A.    No.  I mean, I didn't design
4  these estimates to be multiplied by 1.5% to
5  derive individual abatement estimates for
6  each category for the counties.  But even if
7  you -- so that was not my intent, but even --
8  so that was not my intent.
9  BY MR. SNAPP:
10    Q.   But isn't that essentially what
11  you did by taking the -- all the different
12  numbers, all of the different calculations
13  that are here in Exhibit 3 for each of the
14  abatement categories and adding them up and
15  then multiplying them by 1.5%?  Isn't that
16  exactly what you did?
17    A.   Well, so I guess I'm not fully
18  understanding the intention of your question.
19  So let me clarify one thing first.
20        I think if you were to want to
21  know if you -- assuming that the abatement
22  estimate that I made for mass media is
23  correct, let's just take year one, it was,
24  based on what you're showing here, about
25  $568 million.  So the 1.5% would be

Page 267

1  multiplied by 568 --
2    MS. RITTER:  5.6 billion.
3    THE WITNESS:  That's the
4  ten-year cost.  I was just doing
5  year-one costs.
6    MS. RITTER:  Okay.  I'm sorry.
7    A.   Okay.  We can take the ten-year
8  costs.  If one were to multiply out, one
9  would be multiplying 1.5% to the 5.7 billion,
10  not by 150 million.  In other words, you
11  would be multiplying the fractional morbidity
12  that we believe has accrued in the counties
13  by the total estimated cost for the media
14  abatement campaign in the counties.
15        So that's to clarify a prior
16  question that I believe you asked when you
17  asked would you multiply 150 million by
18  something.
19  BY MR. SNAPP:
20    Q.   So --
21    A.   But with all of that said, this
22  was just -- as I write in my report, this
23  was, you know, ultimately detailed
24  assessments of the specific costs will be
25  required and there are a number of

Page 268

1  limitations in extrapolating from national
2  estimates to specific localities.
3  Nevertheless -- and then I used this example.
4        And I've provided -- I've given
5  you some examples of why I think that 2017
6  overdoses has limits in terms of
7  understanding the share of the total
8  abatement costs that would be reasonable to
9  allocate to these specific counties.
10    Q.   Okay.  So just as another
11  example, if you were to take your 1.5% and
12  multiply it by the mass media target
13  population, you'd get 2.25 million.  That's
14  the math, okay?
15    A.   Okay.  Okay.
16    Q.   And just for your information,
17  in Cuyahoga and Summit Counties -- and I can
18  show you the Census Bureau information --
19    A.   Right.
20    Q.   -- there are only 1.78 million
21  people in both counties combined, so you'd be
22  overestimating the mass media target
23  population costs by using the simple 1.5%,
24  correct?
25    A.   Yes.

Page 269

1    Q.   And that's a limitation of
2  using any sort of calculation to allocate --
3  any sort of simple calculation to allocate
4  national abatement costs to any particular
5  jurisdiction, correct?
6    A.   Yes.  Yes.
7    Q.   Sir, if you could turn to your
8  Exhibit 1 again, which is your April 3rd
9  report, I think you've already explained
10  this, but I just want to make sure I
11  understand.
12        In paragraphs 35 through 39 of
13  the report, you discuss the fact that
14  opioid -- the opioid epidemic has impacted
15  communities differently, correct?
16    A.   Yes, sir.
17    Q.   And you say, because of that --
18  because of this, there's not a
19  one-size-fits-all approach with respect to
20  the abatement remedies, correct?
21    A.   Yes, sir.
22    Q.   And then further down in the
23  paragraph -- well, you discussed in that same
24  paragraph the fact that some communities have
25  had different investments in abatement

Page 302

1    A.    Yes, I do.
2    Q.    Do you have any a priori
3 precision requirements for your model?
4    A.    Well, the model -- I mean,
5 there's a Markov model and then there are
6 redress estimates, and so are you referring
7 to the Markov model or the redress estimates?
8    Q.    The one you called the APOLLO
9 model, I suppose.
10    A.    Okay.  And your question is do
11 I have a priori requirements for certain
12 levels of precision?
13    Q.    That's exactly what I asked,
14 yes.
15    A.    Yeah.  We -- you know, I think
16 as I spoke before, ultimately the model is
17 calibrated, and those calibrations are one of
18 the principal methods that we use to examine
19 and that one uses to exam the adequacy of the
20 model.
21          And in this instance, I
22 calibrated the model in order to fit it as
23 best I could to a variety of parameters that
24 I had the greatest confidence in.  And then
25 we assessed the -- you know, we assessed the

Page 303

1 quality of the model in many ways.
2    Q.    So let me go back to my
3 question.
4    A.    Yeah.  Yeah.
5    Q.    Sitting here today, are there
6 current precision requirements for your
7 model, that it has to be within plus or minus
8 5%, 10%, some other measure that one might
9 have for precision according to the standards
10 of pharmacoepidemiology?
11    A.    No, the overall fit and quality
12 of the model is based on many different
13 factors.
14    Q.    Okay.
15    A.    And so there's not one single
16 parameter that we say we need to be able to
17 estimate overdose deaths plus or minus 5% or
18 this model is no good.  The answer is no,
19 there's no single factor -- there's no single
20 a priori requirement for a given component
21 because there are, you know, dozens of
22 parameters and a dozen or more boxes.
23    Q.    So you're not even saying I
24 know that whatever comes out of my model will
25 be plus or minus 5%, correct?

Page 304

1    A.    Well, there are a number of
2 ways that -- there are a number of steps that
3 I took and that one takes in order to assess
4 and ensure the quality of a model such as the
5 model that we've built.
6    Q.    Sitting here today in terms of
7 the requirements of your model, it wasn't
8 built in a way that it can guarantee the
9 results will be even within 5%.  You'll give
10 a point estimate, but you won't have any
11 degree of precision as to the reliability of
12 that, correct?
13          MS. RITTER:  Objection to form.
14          THE WITNESS:  Can you ask that
15 again, please?
16          MR. ALEXANDER:  Sure.
17 BY MR. ALEXANDER:
18    Q.    The way your model is set up,
19 it gives a variety of point estimates,
20 correct?
21    A.    Yes.
22    Q.    And there will be no level of
23 certainty that any of those point estimates
24 will be accurate within any certain percent,
25 even 5% or 10%, correct?

Page 305

1    A.    Well, we -- you know, we did
2 not have an opportunity to discuss this, but
3 we include sensitivity analyses, and these
4 have been provided as part of the model.  And
5 what these analyses do is they assess the
6 robustness of the model.  They assess whether
7 or not, when you change one parameter, an
8 outcome that one cares about changes plus or
9 minus 5% or not.
10    Q.    So sensitivity is different
11 than what I'm talking about, which is that
12 you have a degree of confidence, like --
13 let's take a step back.
14          When you publish papers, you
15 typically have something where you say --
16 before you ever start the research project,
17 you'll have a requirement that whatever you
18 will present will have to be statistically
19 significant within certain parameters based
20 upon like a .05 p value or other fairly
21 standard statistical measures, correct?
22    A.    When conducting hypothesis
23 testing, yes.
24    Q.    And when conducting something
25 that's going to put out any kind of point

Page 318

1  Q. And you don't know what any of
2  those reasons would be for Cuyahoga or Summit
3  Counties in terms of why they did what they
4  did or why they failed to do what they might
5  have done better?
6  A. That's not true.
7  Q. Do you know like what the
8  budget restrictions have been or impact of
9  budget cuts since 2008 have been in those
10 counties?
11 A. Well, it wasn't the focus of my
12 report, but in the -- in the materials that
13 I've read, it's clear that resource
14 constraints are a major issue for both
15 counties.
16 Q. Okay. And did you look at why
17 there have been resource constraints?
18 A. Can you say more about what you
19 mean by look?
20 Q. For purposes of forming an
21 expert opinion in this case that you would
22 offer at trial if called at trial, have you
23 evaluated why there have been resource
24 constraints in Cuyahoga and Summit County
25 that affected their ability to institute

Page 319

1  timely and effective measures to combat the
2  opioid epidemic?
3  A. I've not done so
4  comprehensively, no.
5  Q. Does any aspect of your model
6  take into account how things would be
7  different if either or both of these counties
8  had acted reasonably in terms of combatting
9  the crisis from the first time that they
10 should have started acting to combat it?
11 MS. RITTER: Objection to the
12 form.
13 THE WITNESS: Can you ask that
14 again, please?
15 MR. ALEXANDER: I can have it
16 read back. Could you please do that.
17 (The following portion of the
18 record was read.)
19 "QUESTION: Does any aspect of
20 your model take into account how
21 things would be different if either or
22 both of these counties had acted
23 reasonably in terms of combatting the
24 crisis from the first time that they
25 should have started acting to combat

Page 320

1  it? "
2  (End of readback.)
3  MS. RITTER: Then there's my
4  objection to the form, foundation. I
5  guess it shows up again.
6  A. So I developed a national
7  model. I didn't develop a county model.
8  BY MR. ALEXANDER:
9  Q. Okay. So the answer is no, no,
10 my model doesn't do that and I didn't account
11 for that?
12 MS. RITTER: Objection to the
13 form, foundation again.
14 A. Yeah, my model is not -- you
15 know, the redress estimates that I provide do
16 not factor in the ways that different
17 jurisdictions may or may not have acted most
18 efficiently in combatting the opioid
19 epidemic.
20 BY MR. ALEXANDER:
21 Q. Let me ask it this way.
22 A. Yeah.
23 Q. So you've recognized in some of
24 your questioning and in the report that some
25 of what you propose requires actions at the

Page 321

1  local level, the county level, the state
2  level, the federal level, and by various
3  stakeholders, including healthcare
4  professionals and other kind of private
5  citizens and companies.
6  Is that a fair statement?
7  A. Yes.
8  Q. And so your model isn't
9  directed towards saying here are the costs
10 that would only be incurred by a certain
11 level of government, the county-level costs
12 or the federal costs or the state costs.
13 All of your costs are across
14 all of those governmental levels and include
15 private costs as well, correct?
16 MS. RITTER: Objection to the
17 form.
18 A. Yeah, my model wasn't focused
19 on figuring out who should shoulder the
20 costs; it was merely to estimate the costs.
21 So it wasn't to figure out who should
22 shoulder them or how much they're already
23 being paid for by others. It was just to
24 figure out what the costs -- it was to
25 provide a preliminary framework for thinking