# EXHIBIT E

Highly Confidential - Subject to Further Confidentiality Review

1              UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF OHIO

2                   EASTERN DIVISION

3      *************************

   IN RE:  NATIONAL

4  PRESCRIPTION OPIATE        MDL No. 2804
   LITIGATION

5                              Case No.
   This document relates      17-MD-2804

6  to:

7  The County of Cuyahoga,    Hon. Dan A. Polster
   et al. v. Purdue

8  Pharma L.P., et al.
   Case No. 17-OP-45004

9  (N.D. Ohio)

10     *************************

11     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

12              CONFIDENTIALITY REVIEW

13

14          Videotaped Deposition of JEFFREY

15  B. LIEBMAN, Ph.D. held at the offices of Ropes

16  & Gray LLP, 800 Boylston Street, Boston,

17  Massachusetts, commencing at 9:03, on the 3rd

18  of May, 2019, before Maureen O'Connor

19  Pollard, Registered Diplomate Reporter,

20  Realtime Systems Administrator, Certified

21  Shorthand Reporter.

22

           GOLKOW LITIGATION SERVICES

23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com

24

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.    Are you an expert in the -- or
2    let me ask this first.
3          Have you heard of the
4    suspicious order monitoring program and
5    requirements that are under the Controlled
6    Substances Act, the federal --
7    A.    I'm broadly aware of it.
8    Q.    But you're not an expert in
9    those requirements?
10   A.    No.
11   Q.    You're not an expert in FDA
12   regulatory issues?
13   A.    It's not a specialty.  I've
14   worked on them when I've been in the
15   government.
16   Q.    So you're familiar with FDA
17   issues, but you wouldn't consider yourself to
18   be an expert in the FDA requirements, for
19   example?
20   A.    That's correct.
21   Q.    Prior to this case, you've
22   never studied programs or policies that might
23   best reduce the impact of opioid abuse, true?
24   A.    No, that's not true.

Page 27

1    Q.    Okay.  In what context have you
2    studied programs or policies that might best
3    reduce the impact of opioid abuse?
4    A.    I helped teach a course at the
5    Harvard Kennedy school that was addressing
6    these issues.
7    Q.    And which course was that?
8    A.    So our master's in public
9    policy students in their first year take
10   courses in economics and statistics and
11   management and politics, and then at the end
12   of their first year we stop the whole core
13   curriculum for two weeks and we do a
14   simulation where they are given a real world
15   policy problem to address.
16         And last year and the year
17   before -- I can't remember if it was the
18   three years before, but at least last year
19   and the year before the simulation we gave
20   them was to come up with a solution.  One of
21   the years was to -- I think the simulation
22   was to advise the governor of Kentucky -- I
23   forget what the other framing was -- around
24   what that state's solution to the opioid

Page 28

1    crisis should be.
2    Q.    Was this -- and I'm sorry, this
3    was a part of the course?  I'm just trying to
4    figure out how to describe what it is
5    you're --
6    A.    It's -- why don't we call it --
7    we will call it the spring exercise.
8    Q.    The exercise, okay.  The spring
9    exercise.  The spring exercise, was this
10   before or after you were retained as an
11   expert in this case?
12   A.    Before.
13   Q.    And this was a two-week
14   exercise, is that true?
15   A.    The intense part of it.
16   There's obviously planning and curriculum
17   design and arranging for all the experts to
18   come visit campus as part of this.  But the
19   sort of intense part is two weeks for the
20   students.
21   Q.    Okay.  And this is an exercise
22   to help students learn how to do these sorts
23   of analyses?
24   A.    How to pull all the parts of

Page 29

1    the curriculum together and perform in a
2    professional setting with a realistic policy
3    scenario.
4    Q.    Okay.  And were the results of
5    this exercise presented to -- for example,
6    you said one of them was based on assuming
7    you were the advising the governor of
8    Kentucky.  Were the results presented to the
9    governor of Kentucky?
10   A.    I actually don't remember how
11   we did it that year.  What we generally do is
12   on the very last day we bring in outside
13   officials to receive the briefings, and then
14   sometimes we take the winning team of all the
15   teams and get them in front of the real
16   person.  I don't remember if we ended up
17   doing -- I wasn't -- that part of logistics
18   wasn't my responsibility.
19   Q.    And as part of this exercise,
20   who is -- who were the people doing the work
21   on it, the students that are --
22   A.    The students.
23   Q.    So this isn't something that
24   you are doing as an analyst to review,

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1  correct, to review the policies that best
2  might address the impact of opioid use,
3  correct?
4      A.    I wasn't generating a solution.
5  I was thinking about what materials would be
6  relevant for the students to read and which
7  outside experts did we want to hear from as
8  part of that period.
9      Q.    Okay.  Other than the spring
10 exercise that we've been talking about, have
11 you studied any programs or policies that
12 might best reduce the impact of opioid abuse,
13 other than in the context of this litigation?
14     A.    In some of our Government
15 Performance Lab work we have been involved
16 with jurisdictions that were thinking about
17 addiction issues.
18     Q.    Any that were specific to
19 opioid addiction?
20     A.    So all of them were broader,
21 included other addictions, but opioid
22 addictions were part of -- were at the
23 forefront of several of them.
24     Q.    And which jurisdictions are you

Page 31

1  thinking of?
2      A.    I'm thinking of Florida,
3  Connecticut, Louisville.
4          If you don't mind, I'll look at
5  my report and see if I forgot one.  I think
6  those are the three that --
7      Q.    And you're looking at now
8  Exhibit 4?
9      A.    Exhibit 4.  I would say
10 Bernalillo County, Albuquerque belongs in
11 that category, too.
12     Q.    Have you ever done any, outside
13 the context of this litigation, calculations
14 about how much it might cost to provide
15 services to reduce the impact of opioid
16 abuse?
17     A.    Specifically opioid abuse?
18     Q.    Yes.
19     A.    No.
20     Q.    And again specific to opioid
21 abuse, have you ever done any calculations as
22 to where money might best be spent to reduce
23 the impact of opioid abuse, outside the
24 context of this litigation?

Page 32

1      A.    Outside of the specific GPL
2  projects I mentioned, no.
3      Q.    And those GPL projects didn't
4  address just opioid abuse, correct?
5      A.    Right, they included other
6  addictions.
7      Q.    And as part of those GPL
8  projects, were opioid issues culled out as a
9  separate category?  For example, just where
10 I'm going, right, you know, were you looking
11 at the ways in which governments might
12 address abuse, but were there, like, separate
13 spreadsheets or line items with respect to
14 opioids?
15         MR. KO:  Object to the form.
16     A.    Can you simplify that question
17 for me?
18 BY MR. MORRIS:
19     Q.    I'll try.  I'll grant you that
20 was not a very good question.  I'll come back
21 to that concept.
22     A.    Okay.
23     Q.    Did you bring anything with you
24 today to prepare for your deposition?

Page 33

1      A.    No.
2      Q.    What did you do to prepare for
3  your deposition today?
4      A.    I reviewed my report.  I
5  reviewed some of the sources that I cite in
6  the report.  I met with counsel.
7      Q.    Okay.  Let's start with the
8  review of the report.
9          When you say the review of the
10 report, which report did you review?
11     A.    Primarily the supplemental
12 report.
13         (Whereupon, Liebman Exhibit
14     Number 6 was marked for
15     identification.)
16 MR. MR. MORRIS:
17     Q.    Okay.  And is that -- if you
18 take a look at what has been marked as
19 Exhibit 6 --
20     A.    Yes.
21     Q.    -- that's one that's marked --
22 is dated April 3, 2019?
23     A.    Correct.
24     Q.    That's what you're referring to

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1    Q.   And do those two things
2  describe the opinions you were asked to
3  render in this case?
4    A.   Yes.
5        MR. KO:  Object to the form.
6  BY MR. MORRIS:
7    Q.   And are those two things -- do
8  those describe the opinions that you intend
9  to offer in this case?
10   A.   Yes.
11   Q.   Any other opinions that you
12 intend to offer in this case?
13       MS. RITTER:  Objection to the
14 form.  Asked and answered.
15   A.   I think the report stands for
16 itself.  I'm trying to design a program that
17 would abate the crisis and figure out how
18 much that would cost.
19 BY MR. MORRIS:
20   Q.   Understood.
21       And so in terms of what you
22 were asked to do in this case, these two
23 categories describe them?
24   A.   Yes.

Page 63

1    Q.   And there's nothing else I'm
2  missing, in other words, that there's
3  something -- some other set of opinions that
4  you intend to provide in this case?
5        MS. RITTER:  Objection to the
6  form.  Foundation.
7    A.   My full work on this case
8  involves constructing an abatement plan and
9  figuring out the cost of it.
10 BY MR. MORRIS:
11   Q.   Am I correct you're not
12 offering an opinion regarding the cause of
13 what you refer to as the crisis?
14   A.   That's correct.
15   Q.   And you're not offering an
16 opinion in this case regarding the conduct of
17 any particular defendant?
18   A.   That's correct.
19   Q.   Or the conduct of any
20 particular group of defendants?
21   A.   That's correct.
22   Q.   And so no opinion regarding the
23 role or responsibility of any defendant in
24 injuring any person?

Page 64

1    A.   I'm not providing any opinion
2  on that.
3    Q.   And you're not offering any
4  opinion regarding the role or responsibility
5  of any defendant in causing what you refer to
6  as the opioid crisis?
7    A.   I missed the difference between
8  that question and the previous one.
9    Q.   There may not have been.
10   A.   Okay.  Ask it again.
11   Q.   You're not rendering an opinion
12 regarding the role or responsibility of any
13 defendant in causing what you refer to as the
14 opioid crisis?
15   A.   Correct.
16   Q.   Now, this one is slightly
17 different.  No opinion regarding the role or
18 responsibility of any defendant in causing a
19 public nuisance?
20   A.   That's correct.
21   Q.   And you're not offering any
22 opinion that assigns any percentage of fault
23 to any defendant, is that correct?
24   A.   That's correct.

Page 65

1    Q.   And you have no opinion
2  regarding the specific -- any specific
3  defendant's products?
4    A.   Well, I suppose some of the
5  products that are -- for example, the
6  medication-assisted treatment might be
7  produced by one of the defendants, although
8  I'm not sure about that.
9    Q.   Fair enough.
10       You're not rendering an opinion
11 regarding the efficacy, for example, of any
12 defendant's prescription opioid medication?
13   A.   That's correct.
14   Q.   And you're not rendering an
15 opinion regarding the marketing or
16 distribution activities of any defendant,
17 correct?
18   A.   I mean, but there are places
19 where the abatement needed responds to the
20 need, and so in some way some of these things
21 may be linked together.
22   Q.   You haven't studied the
23 marketing practices, for example, of any
24 particular defendant?

Page 78

1   Q.   And when did you notify counsel
2   that you had changes?
3   A.   Sometime in the last couple
4   days.
5   Q.   If you can go back to
6   Exhibit 6, which is your April 3rd report.
7   And turning -- going back to Paragraph 2 that
8   we were talking about before which has the
9   description of the two opinions, in the end
10  of the first opinion that you were asked to
11  provide it refers to "efforts to ameliorate
12  and abate the crisis."
13       Do you see that?
14  A.   Mm-hmm.
15  Q.   What do you mean by "the
16  crisis"?
17  A.   The conditions such that people
18  in the two communities are suffering, dying.
19  The communities are having resources
20  stretched, all of the impacts of the opioid
21  epidemic.
22  Q.   Okay.  And that was my next --
23  one of my next questions.  You also in the
24  paragraph above refer to a public health

Page 79

1   emergency.
2        Do you see that?
3   A.   Yeah.
4   Q.   Is that the same thing as the
5   crisis?
6   A.   I would say the people I've
7   interacted with in the bellwether communities
8   seem to use crisis, emergency, epidemic
9   pretty interchangeably, and I think there has
10  been a, if I recall right, a technical
11  emergency declared by the State of Ohio, so
12  there is -- I think there's maybe a little
13  bit more term of art to that one.
14       But the point here is that
15  there is a big problem that needs to be
16  addressed, and my report is about how to
17  abate that problem.
18  Q.   Okay.  And so in your report
19  sometimes you refer to crisis, sometimes you
20  refer to epidemic.  Is there a difference in
21  the way you're using those terms?
22  A.   No.  I'm treating those as
23  synonyms.
24  Q.   And let me go back to that.

Page 80

1        An epidemic or crisis of what
2   exactly?
3   A.   That there are lots of harms
4   happening in these communities because of the
5   effects of people being addicted to opioids,
6   and people are having lives ruined.  People
7   are dying.  The communities are having
8   difficulty delivering standard public
9   services because so much is being allocated
10  to deal with this crisis.
11  Q.   Let me talk about a couple more
12  terms that you use in the report.
13       You obviously refer to opioids.
14  What do you use that term to mean in your
15  report?
16  A.   It encompasses heroin,
17  synthetics like fentanyl, prescriptions,
18  OxyContin, the whole range of the related
19  compounds.
20  Q.   So not just prescription
21  medication?
22  A.   No.  Opioids means the full
23  range in the way I'm using it.
24  Q.   And so there's also -- I see

Page 81

1   you reference sometimes to illicit or illegal
2   opioids.  What does that refer to?
3   A.   That would refer to things like
4   heroin that are not legal, not for legal use.
5   Q.   Are you familiar with different
6   types of illicit opioids?
7   A.   I mean, there's illicit ones
8   that are always illicit.  There are ones that
9   can be illicit only if used in a way that
10  they were not intended to be used.  So
11  there's a range --
12  Q.   You're getting -- yeah, so
13  you're getting to one of the questions I
14  have.
15       So when you're use the term
16  illicit opioid, for example, are you
17  including in that prescription medication
18  that is in the hands of somebody who
19  shouldn't have it?
20  A.   So just to be clear, there's
21  nothing in my plan that is distinguishing
22  between illicit and not illicit.  My
23  assignment was to come up with an abatement
24  plan to adjust the whole opioid crisis, and

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1 not to distinguish.
2       So, you know, I think the only
3 place that I remember that the language comes
4 up is in a couple of the footnotes that --
5 pointing out that I'm dealing with the whole
6 crisis and not distinguishing.
7     Q.   Okay.  And we'll get there when
8 we're going through some of the specifics,
9 but some of the costs that you are examining
10 differ, depending on whether it's a
11 prescription opioid medication versus an
12 illicit opioid?
13       MS. RITTER:  Objection to the
14 form.
15     A.   So my plan attempts to abate
16 the harm, the harms that come from people
17 misusing prescription opioids and from people
18 who are misusing illicit opioids.
19 BY MR. MORRIS:
20     Q.   Okay.  We talked about this
21 term before, opioid use disorder, or OUD.
22 What do you use that term to mean?
23     A.   I use that to encompass the
24 disorder associated with the full range again

Page 83

1 of opioids.
2     Q.   There's also, though, heroin
3 use disorder, or HUD, which sometimes is
4 referred to.  How do you use that term?
5     A.   That would be the subset.  So I
6 use opioid use disorder to be the overall,
7 and heroin use disorder is a subset of that.
8     Q.   Going back to Paragraph 2 in
9 Exhibit 6, and we were talking about the
10 phrase efforts to ameliorate or -- sorry, "to
11 ameliorate and abate the crisis," then we
12 started talking about crisis.
13       What does ameliorate mean?
14     A.   To reduce the harms.
15     Q.   And does that mean to lessen
16 the harms in any way?  Is there a metric that
17 you're using for that?
18       MR. KO:  Object to the form.
19     A.   The plan I put together is
20 meant to make a deep and rapid -- to have a
21 deep and rapid effect in reducing harms.
22 BY MR. MORRIS:
23     Q.   It also says "and abate."  How
24 are you using the term abate?

Page 84

1     A.   Similarly to reduce the harms
2 associated with this crisis.
3     Q.   Okay.  For purposes of your
4 report, is there any difference between
5 ameliorate and abate?
6     A.   I think of the whole plan as an
7 abatement plan that is trying to move as fast
8 as we can to stop people from dying and stop
9 the other harms associated with the opioid
10 crisis.
11     Q.   Is there a specific goal that
12 would define what has abated the crisis?
13     A.   I don't have a specific goal.
14 I'm trying to make as much progress as we can
15 make as fast as we can.
16     Q.   And not to make light of it,
17 I'm just trying to figure out what the bounds
18 are.  So if the plan were to probably impact
19 ten people, that would in your terminology
20 abate the public nuisance?
21       MS. RITTER:  Objection to the
22 form.
23     A.   I'm really not trying to -- I
24 don't have any -- I'm trying to put forth a

Page 85

1 plan that will do much more than that, and I
2 don't have a -- the parsing of these words
3 isn't something that I have thought hard
4 about.
5 BY MR. MORRIS:
6     Q.   I understand.  Like I said, I'm
7 not trying to be pejorative or make light of
8 this at all.  I'm just trying to figure out
9 whether there's some trigger at which
10 something becomes, ah, we've reached, quote,
11 abatement that you've measured as part of
12 your activity, your opinions.
13       MS. RITTER:  Objection to the
14 form.  I'm not even sure there was a
15 question.
16     A.   I've forgotten the question.
17 If you wouldn't mind answering -- asking it
18 again.
19 BY MR. MORRIS:
20     Q.   Sure.  I'll come back to it.
21 When we get to some specifics --
22     A.   Okay.
23     Q.   -- I'll turn back to it.
24       If you could turn now to

Highly Confidential - Subject to Further Confidentiality Review

Page 86

1  Paragraph 14. We were looking at Paragraph 2
2  before which was raised in terms of the
3  opinions you were asked to provide, and 14
4  refers to things that you have concluded, and
5  then identifies an A and a B, in the first
6  sentence at least.
7       Do you see that?
8  A.   Mm-hmm.
9  Q.   Is there -- let me do it this
10 way. Can you read the first sentence?
11 A.   Of Paragraph 14?
12 Q.   Of Paragraph 14.
13 A.   "I conclude that there is a
14 framework within the area of applied
15 economics by which an economist can
16 reasonably evaluate the level of abatement
17 resources needed for the next 15 years in the
18 communities of Cuyahoga County and Summit
19 County, Ohio, to abate the opioid crisis and
20 the cost of those resources."
21 Q.   Okay. You use the term
22 "framework" here in discussing the
23 conclusions that you've reached. What does
24 framework mean?

Page 87

1  A.   I'm saying that there is a
2  methodology that one can use to do what I did
3  in this report.
4  Q.   And as an economist, are you
5  offering an opinion about what specific
6  programs should be implementing to abate the
7  crisis?
8  A.   I am doing what I always do
9  when I am asked by a committee to help them
10 make progress on a social problem, which is I
11 consult with national -- with the national --
12 I read literature that's been written about
13 the problem, often nationally, I consult with
14 national experts. I then learn enough about
15 the local situation to craft a solution that
16 matches the local conditions.
17      So that's a framework that I
18 have applied over and over again both when I
19 have served in government and in my work at
20 the Government Performance Lab.
21 Q.   Okay. And if you look in
22 Figure 1, there's a listing of the 19
23 specific elements of the abatement plan. Who
24 came up with those 19 elements?

Page 88

1  A.   I did.
2  Q.   And you came up with those 19
3  elements to -- in your opinion would be the
4  things that would abate the crisis?
5  A.   Exactly.
6  Q.   And you came up with these 19
7  elements of the plan even though you're not
8  an expert in the treatment of people in
9  communities with opioid use disorder?
10      MR. KO: Object to the form.
11 A.   I did exactly what I do every
12 time I'm asked to solve a policy problem; I
13 consult with experts, I study the literature,
14 I talk to people in the community, and then I
15 put together the policy proposal that I
16 believe can best help that community.
17 BY MR. MORRIS:
18 Q.   This is the first time you've
19 done such a thing for the opioid crisis, as
20 you've termed it, correct?
21      MR. KO: Object to the form.
22 A.   This is the first time that I
23 have assembled an abatement plan for a
24 community on the opioid crisis, that is

Page 89

1  correct.
2  BY MR. MORRIS:
3  Q.   Are you relying on other people
4  to say what should be part of the 19
5  elements?
6  A.   So I am relying on the sources
7  I cite in my report. So, for example, the
8  CDC has recommendations, the Surgeon General
9  has recommendations. I'm relying on advice I
10 got from a variety of experts, including
11 Dr. Lembke, Dr. Alexander and other, and I'm
12 relying on what I learned from talking to
13 local medical experts, local people working
14 on these policy issues in the community.
15 Q.   Okay. Let me ask it this way.
16      When did you start developing
17 your abatement plan?
18 A.   About a year ago.
19 Q.   And was that in the summer of
20 2018?
21 A.   Yes.
22 Q.   And you then submitted the
23 first report in March of 2019?
24 A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1  Q.    So that's approximately nine
2  months?
3  A.    Mm-hmm.
4  Q.    You've got to say yes or no.
5  A.    Yes, approximately.
6  Q.    Did you have a full-time job
7  during that period that wasn't working on
8  this opinion?
9  A.    Yes.
10  Q.    I may have asked you this
11  before.  Do you know how many hours the
12  individuals at Compass Lexecon spent working
13  on --
14  A.    I do not.
15  Q.    -- your opinion?
16  A.    I do not.
17  Q.    Who did the drafting of your
18  opinion?
19  A.    The writing?
20  Q.    Yes.
21  A.    I wrote nearly all of the first
22  draft.  There were a few paragraphs where I
23  asked someone under my direction to draft
24  them, and then I reviewed them and edited

Page 91

1  them.
2  Q.    And who did you ask under your
3  direction to make edits, or do additional
4  drafting?
5  A.    The three people at Compass
6  Lexecon that I mention before.
7  Q.    And what direction did you give
8  them?
9  MR. KO:  I'd advise the witness
10  not to disclose -- to the extent these
11  communications have been with or were
12  involving counsel, I'd instruct the
13  witness not to answer.
14  A.    So an example would be I would
15  say to them that I would like them to find
16  out if there's any literature, further
17  literature on the topic that I found a couple
18  papers on, and find that literature for me in
19  case I wanted to cite additional sources.
20  BY MR. MORRIS:
21  Q.    Anything else you can think of
22  for direction you gave them?
23  MR. KO:  Same instruction.
24  A.    Not specifically.

Page 92

1  BY MR. MORRIS:
2  Q.    How long did you spend doing
3  interviews of people?
4  A.    Can we turn to the exhibit that
5  has the interviews on it?
6  Q.    Sure.
7  A.    That would help me give you an
8  answer to that question.
9  Q.    Sure.  We're still on
10  Exhibit 6?
11  A.    Yes.  In Exhibit 6 and we're
12  going to go to Appendix -- one of the
13  appendices, Appendix C, please.  So this is
14  the list of interviews we did.  I guess we
15  could try to count them up to give you an
16  answer to your question of how long.
17  Q.    Let me ask this.  How many --
18  were all these interviews done in person?
19  A.    No.
20  Q.    How many interviews did you
21  conduct that weren't in person?
22  A.    So you can see on the list the
23  ones that say "call" were done on the phone,
24  and the ones that say "meeting" were done in

Page 93

1  person.
2  Q.    And when you met with people,
3  aside from the interviewees, were there other
4  people present?
5  A.    Yes.
6  Q.    And who would that be?
7  A.    It varied by meeting.
8  Typically there would be counsel there.
9  Q.    How did you determine what
10  documents to review in creating your
11  abatement plan?
12  MR. KO:  Same instruction as
13  before.  To the extent that these
14  conversations involved or were with
15  counsel, I'd instruct the witness not
16  to answer.
17  A.    I did what I always do when I
18  am studying a topic.  I do literature
19  searches, I direct people working for me to
20  do additional literature searches, I ask
21  experts if there are other sources that would
22  be relevant, and then I go find those
23  sources.  I -- you know, if there's anything
24  in one paper that cites another that looks

Page 94

1 relevant, I'll go find that. I'll ask the
2 experts, you know, if it's a particular
3 question I'll say, I've seen these three
4 papers, is there anything important that I'm
5 missing? Other people involved, like
6 counsel, will sometimes send me things that
7 they run into that they thought might be
8 relevant to what I'm working on.
9 BY MR. MORRIS:
10    Q.    And you said you spent
11 approximately 300 hours in total in working
12 on creating your report for March, 2019?
13         MR. KO: Asked and answered.
14    A.    That's correct.
15 BY MR. MORRIS:
16    Q.    How much of that time was spent
17 reviewing literature?
18    A.    I have not pressed that --
19 separated out the different activities like
20 that in my head.
21    Q.    I saw reference to depositions
22 that you've reviewed.
23    A.    Mm-hmm.
24    Q.    How did you determine which

Page 95

1 depositions to review?
2    A.    Counsel would suggest to me
3 ones that were relevant to the things I was
4 working with, and sometimes would share the
5 whole deposition with me and sometimes a
6 portion.
7    Q.    Let's go back to Figure 1 of
8 your April report on Page 7, which is
9 Exhibit 6.
10         You divided the abatement plan,
11 your abatement plan into four main
12 categories, correct?
13    A.    That's right.
14    Q.    We'll go into details about
15 some of those later, but did you consider any
16 other categories to include?
17    A.    They're categories that -- I
18 guess the answer is yes.
19    Q.    And which categories did you
20 consider including but not include?
21    A.    Well, as I reviewed the
22 literature, some of the recommendations are
23 not relevant for these communities, such as
24 that there should be new research on

Page 96

1 developing safer pharmaceuticals. That's
2 clearly not something that's going to happen
3 in Cuyahoga or in Summit. It's going to
4 happen at the national level. So things like
5 that I didn't include in my proposal for the
6 bellwethers.
7    Q.    Okay. So potential new
8 research for safer pharmaceuticals. Anything
9 else that you considered but did not include
10 in your abatement plan?
11    A.    I guess a similar thing would
12 be, you know, Customs department
13 interventions, to inspect more packages
14 coming in from China for fentanyl. Again,
15 that would -- that's not in the scope of
16 what -- is not relevant to the --- for these
17 -- for a plan that could be given in these
18 communities.
19         So there are probably other
20 things in that category, but basically I
21 was -- I tried to incorporate as many of the
22 practices that people were recommending and
23 that had -- I mean, there's a pretty strong
24 consensus in the literature about -- these

Page 97

1 are not particularly original categories,
2 just about every one of these reports is
3 recommending a similar set of things.
4    Q.    So the category that you just
5 mentioned that is not included -- as not
6 being, in your view, relevant to something
7 implemented by the counties is -- you refer
8 to it as Customs control. That would include
9 things like law enforcement efforts to stop
10 illegal or illicit drugs from crossing into
11 the United States from other countries?
12         MR. KO: Object to the form.
13    A.    Sorry. Customs does not
14 include -- you're talking -- you're saying
15 what would the Customs department activities?
16 BY MR. MORRIS:
17    Q.    Let's do it this way. Yes. So
18 let me re-ask the question. I clearly got
19 off track a little bit.
20         You're not including in this
21 abatement plan things like federal law
22 enforcement designed to try and prevent
23 illegal drugs from coming into the country,
24 correct?

Page 102

1 waves. You know, there was sort of our
2 initial figuring out what our policy position
3 was and estimating the cost of that. Then
4 there was the legislation that Senator Baucus
5 was moving and trying to figuring out that,
6 and there was sort of the house -- I mean,
7 there was -- I was working on this issue,
8 though, from the beginning of the
9 administration until the day the Affordable
10 Care Act passed, and then beyond. But any
11 particular estimate, you know, it depended on
12 how much time we had to produce it.
13     Q.    In footnote 7 of your report
14 you state that -- if you could go to there --
15 that "My estimates of the plan costs are not
16 reduced to reflect costs arising in
17 connection with heroin use in the community
18 where the individual had never used
19 prescription opioids."
20         Do you see that?
21     A.    Yes.
22     Q.    What does that mean?
23     A.    It means the same thing I told
24 you a little earlier, that my plan is to

Page 103

1 abate. What I was asked to do was figure out
2 an abatement plan for the whole opioid
3 crisis, and I was not asked to parse out
4 anything having to do with different reasons
5 for components of where that crisis came
6 from.
7     Q.    Okay. So in other words, your
8 cost estimates include the cost of treatment,
9 for example, of people who never used
10 prescription opioids?
11     A.    Yes.
12     Q.    If you were to try and account
13 for individuals in your plan who never used
14 prescription opioids, do you have an estimate
15 as to how much lower the abatement plan would
16 be?
17     A.    I have not thought about that.
18     Q.    You're noting that the
19 abatement plan is not reduced based on an
20 individual who has never used prescription
21 opioids. Are there other reductions that are
22 included?
23         MS. RITTER:  Objection to the
24     form.

Page 104

1     A.    Unless this is a -- nothing is
2 occurring to me, but I may be -- that was a
3 broad question. As we get to individual
4 elements maybe I will see some other place
5 where I --
6 BY MR. MORRIS:
7     Q.    Okay. Fair enough. I ask
8 because you cull out specifically in footnote
9 7 that it's not being reduced for that
10 purpose, and I was wondering if there was
11 some category or thing that you have in mind
12 that the plan is being reduced for.
13     A.    I think I was just trying to be
14 clear that this was -- that I was addressing
15 the whole crisis.
16     Q.    Okay. Let's go to
17 Paragraph 18, please.
18     A.    Yes.
19     Q.    And there in the first sentence
20 you say that you estimate that the
21 "implementation of the programs of Abatement
22 Plan evaluated to date will cost $5 billion
23 in Cuyahoga County and $2.2 billion in Summit
24 County over the next 15 years."

Page 105

1         Do you see that?
2     A.    I do.
3     Q.    What do you mean by "to date"?
4     A.    I mean, that it is possible
5 that more categories could pop up that
6 experts start recommending as part of the
7 solution to this crisis, and in that case I
8 could amend them in my report in that way.
9     Q.    As you sit here today, though,
10 do you have in mind any other categories?
11     A.    No.
12     Q.    Going on in Paragraph 18, at
13 the bottom of Page 7, the sentence that runs
14 on the next page, it says "In addition, I am
15 informed that the costs of certain services
16 contemplated in the Plan have been or will be
17 provided in documents or testimony from the
18 Counties."
19         Do you see that?
20     A.    Yes.
21     Q.    What did you mean by that?
22     A.    I meant that as this report was
23 being written and lots of other depositions
24 and other things were coming in, it was

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Q.    When you say "budgeting model,"
2    that's what you did, right?
3    A.    The budget model figures out
4    the quantity of resources needed to address
5    the epidemic, and then the associated price
6    with each of those quantities that you
7    multiply to get a cost.
8    Q.    Now, it's true that you haven't
9    tried to measure any impact that implementing
10   any one or more of the categories that you've
11   included in your abatement plan might have,
12   correct?
13        MR. KO:  Object to the form.
14   A.    That's correct.
15   BY MR. MORRIS:
16   Q.    Now, the authors of the Pitt
17   article -- I refer to as the Pitt article.
18   A.    That's fine.
19   Q.    The Pitt team noted a number of
20   limitations even under their modeling,
21   correct?
22   A.    I think they had a standard
23   section at the end of the paper that
24   discusses this.

Page 111

1    Q.    If you go then -- let's turn to
2    that.  If you go to Page e6.
3    A.    Okay.
4    Q.    And there's a helpful heading
5    that says "Limitations."
6         Do you see that?
7    A.    I do.
8    Q.    Okay.  In that first paragraph
9    the authors write after the first sentence,
10   "First, the drivers behind the opioid
11   epidemic are dynamic, non-linear, and
12   uncertain."
13        Do you agree with that?
14   A.    I think it depends.  I think
15   it's a complicated, compound sentence.  I
16   think we might want to talk about different
17   parts of it.
18   Q.    Okay.  Let's talk about
19   different parts of it.
20        Do you agree that the drivers
21   behind the opioid epidemic are dynamic?
22   A.    So what do "drivers" mean?
23   Q.    Do you have an understanding
24   about what the driver -- what drivers mean?

Page 112

1    A.    It is certainly the case that
2    things are going to change over time, that's
3    what dynamic means, but I'm not -- this seems
4    like a pretty vague sentence, so I'm not sure
5    how to agree or disagree with it.
6    Q.    Okay.  Let's go on to something
7    else.
8         The next sentence, can you read
9    the next sentence, the one that begins
10   "Although"?
11   A.    "Although we tested the impact
12   of each policy on multiple potential models
13   of the current state, the epidemic continues
14   to change and may be substantially different
15   in just five years."
16   Q.    Do you agree that the epidemic
17   continues to change and may be substantially
18   different in just five years?
19   A.    I don't know what
20   "substantially" means in terms of magnitude,
21   but I certainly think the epidemic changes
22   when you -- you know, fentanyl comes into
23   Cuyahoga in a much greater extent and we see
24   a lot more deaths or, you know, lots of

Page 113

1    things change over time, and it's one of the
2    reasons in my plan that I say one needs to
3    build into the plan a way to modify the plan
4    over time as information comes in.
5         And that's why I put resources
6    in to measure how things are coming in over
7    time, because any time you implement
8    something that is complex like this you want
9    to be able to respond to conditions on the
10   ground promptly.
11   Q.    Your abatement plan estimates
12   costs going out 15 years, correct?
13   A.    Correct.
14   Q.    Why did you choose 15 years to
15   cost out the abatement plan?
16   A.    It seemed clear that it was
17   going to take, well, the resources and
18   attention for at least that long to be able
19   to make the progress that needs to be made
20   against the crisis.
21   Q.    When you say "the progress that
22   needs to be made," what's your measurement of
23   that progress?
24   A.    I don't have a quantitative

Highly Confidential - Subject to Further Confidentiality Review

Page 114

1  sense, but it's -- you know, if you look at
2  the opinions of the medical experts like
3  Dr. Lembke, she states quite clearly that we
4  need these kind of resources and this isn't
5  going to be something where two or
6  three years of additional resources is going
7  to make this crisis go away.
8      Q.   Understood.  I was just -- you
9  had said that you needed 15 years to make the
10  kind of progress, and I was trying to figure
11  out, well, what's the progress then that --
12  measurement that you're using, if any?
13     A.   You know, my -- as you
14  mentioned in your question, I was not given
15  the assignment of measuring the impact, and I
16  think one would want to answer your more
17  recent question in that context.
18     Q.   You'd agree with me that trying
19  to predict the costs of even a slightly
20  complex problem out over a period of 15 years
21  is difficult?
22         MR. KO:  Object to the form.
23     A.   Well, projecting 10, 15 years
24  costs of complicated government proposals is

Page 115

1  done all the time.  Congressional budget
2  office does it, we did it at OMB, so it's a
3  pretty standard practice that one does
4  because you have to make decisions based on
5  the information we have today.
6  BY MR. MORRIS:
7      Q.   Is it difficult to do that?
8      A.   I spent a lot of time getting
9  trained and getting experience to be able to
10  do it well.  I guess -- I don't know if I
11  would say about --
12     Q.   Let me -- we talked about the
13  fact that the -- what you're referring to as
14  the opioid crisis is a complex, multi-faceted
15  problem.  Agree?
16     A.   Agreed.
17     Q.   And a complex, multi-faceted
18  problem, trying to budget over 15 years for a
19  plan to address it, is a difficult thing to
20  do, correct?
21         MR. KO:  Object to the form.
22     A.   I don't know what "difficulty"
23  means in this context.  It is something I
24  have been trained to do and have done many

Page 116

1  times in these kind of proposals.
2  BY MR. MORRIS:
3      Q.   Difficult to predict
4  accurately?
5         MS. RITTER:  Objection.
6  BY MR. MORRIS:
7      Q.   Let me be clear.  It's not
8  difficult to engage in the process perhaps.
9  Difficult to predict accurately what the
10  projected costs, what the costs will be for a
11  complex problem like the opioid crisis?
12         MS. RITTER:  Objection to the
13     form.
14  BY MR. MORRIS:
15     Q.   Agreed?
16     A.   No, I don't agree.  I think
17  it's quite clear from the sources I've
18  discussed that led me to choose the
19  components of these plans, what level of
20  treatment capacity, for example, is needed,
21  and we have a good methodology, solid
22  methodologies to figure out and project that
23  into the future.  And so, you know, I think
24  it is possible to generate good forecasts

Page 117

1  into the future.
2      Q.   If you go to Paragraph 20 of
3  your report.  And again, we're still on
4  Exhibit 6, which is the April 3rd version of
5  your report.
6      A.   Yeah.
7      Q.   I believe you mentioned this
8  before in one of your earlier questions --
9  answers -- well, let me do it this way.
10         Can you just read the first
11  sentence?
12     A.   "Because it is possible that
13  the epidemic will evolve in ways that either
14  reduce or increase the need for resources
15  relative to my primary estimates, it is
16  appropriate for me as an economist to provide
17  a range of estimates for lower cost and
18  higher cost scenarios."
19     Q.   So there you're recognizing
20  that given future events, that actual costs
21  of the plan you're proposing might be higher
22  and they might be lower?
23     A.   Yes.
24     Q.   Okay.  If you can go on to read

Page 122

1  identification.)
2  BY MR. MORRIS:
3      Q.   Okay.  I've handed you
4  Exhibit 12.  Do you recognize what Exhibit 12
5  is?
6      A.   Yes.
7      Q.   What is Exhibit 12?
8      A.   It's a guide that the US
9  Government Accountability Office has put out.
10     Q.   And this is one of the
11 documents that you cited in your report,
12 correct?
13     A.   Yes.
14     Q.   If you go to Page 11 of your
15 report.
16     A.   Of my report?
17     Q.   Yes.  And that's where it says
18 in Paragraph 28, the last sentence, "My
19 framework follows the standard approaches
20 used by the Congressional Budget Office, the
21 President's Office of Management and Budget,
22 and the Government Accountability Office in
23 estimating costs and projecting budgets."
24          Do you see that?

Page 123

1      A.   I do.
2      Q.   And footnote 23 is a citation
3  to the GAO Cost Estimating and Assessment
4  Guide?
5      A.   It is.
6      Q.   And is the Exhibit 12 that
7  guide?
8      A.   It is.
9      Q.   If you could turn to Page 9 of
10 the guide, there's a chart that starts
11 there -- actually, there's a table that
12 starts there and runs for a few pages, and
13 it's labeled "Table 2:  The Twelve Steps of a
14 High-Quality Cost Estimating Process."
15     A.   Yep.
16     Q.   Do you see that?
17     A.   Yep.
18     Q.   Did your creation of the
19 abatement plan follow these steps for
20 creating a cost estimate?
21     A.   I did not review these steps in
22 any detail.  I was familiar with this guide
23 from my time in government.
24     Q.   Okay.  Well, let me direct you

Page 124

1  to, for example, number 9, step 9.
2      Q.   Do you see that?
3      A.   I do.
4      Q.   In step 9, for example, is --
5  the description of it is "Conduct risk and
6  uncertainty analysis."
7      Q.   Do you see that?
8      A.   Yes.
9      Q.   Did you do that as part of your
10 abatement plan budgeting?
11     A.   What I did is for the main
12 component that I think we don't know exactly
13 how the world is going to play out, I gave
14 you high and low estimates that vary
15 according to that, and that's a form of
16 sensitivity analysis.
17     Q.   Okay.  So if you go to step 8
18 above that, that's "Conduct sensitivity
19 analysis"?
20     A.   Right.
21     Q.   Do you see that?  So that would
22 fall -- what you just described would fall
23 under step 8, correct?
24     A.   Yeah, they're both techniques

Page 125

1  for trying to communicate both what is
2  unknown and how estimates would vary -- can
3  vary in alternative states of the world.
4      Q.   Okay.  But a sensitivity
5  analysis, you'd agree with me, doesn't give a
6  prediction of accuracy, correct?
7          MR. KO:  Object to the form.
8      A.   A sensitivity analysis
9  sometimes is informed by one's assessment of
10 what the likely range of an outcome is, and
11 so sometimes it does incorporate some, I
12 think, information about accuracy, but it's
13 not the same as -- you know, for example, in
14 here, if you have data on the probability
15 distributions doing a Monte Carlo simulation,
16 which is what they're talking about in number
17 9.
18 BY MR. MORRIS:
19     Q.   So the sensitivity analysis is
20 something that measures how much of a change
21 there might be to the output, such as the
22 estimated cost if the inputs change.  Have I
23 got that right?
24     A.   Yes.

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1  Q.   But the sensitivity analysis
2  isn't something that measures how accurate
3  the assumed inputs are?
4       MR. KO:  Object to the form.
5  BY MR. MORRIS:
6  Q.   Correct?
7       MR. KO:  Object to the form.
8  A.   The sensitivity analysis does
9  exactly what you said.  It takes different
10 inputs and tells you how the results would
11 change.
12 BY MR. MORRIS:
13 Q.   Okay.  You mentioned, or you
14 referred to one of the bullet points in
15 number 9 that reads "Use an acceptable
16 statistical analysis method (e.g., Monte
17 Carlo simulation) to develop a confidence
18 interval around the point estimate."
19      And that's something you didn't
20 do here, correct?
21 A.   I did not do that here.
22 Q.   The next bullet point is
23 "Identify the confidence level of the point
24 estimate."

Page 127

1       That's also something that you
2  didn't do here, correct?
3  A.   That's correct.
4  Q.   Would you agree that that's a
5  key step in a high quality budget?
6       MS. RITTER:  Objection to the
7  form.
8  A.   One can only do Monte Carlo
9  estimates when you have a probability
10 distribution to use as the basis for them.
11 And there are lots of problems where we don't
12 have a data set to draw a probability
13 distribution from, and that's why it's pretty
14 uncommon to publish and do those kind of
15 uncertainty analysis.  You know, for example,
16 when we were estimating the cost of the
17 Affordable Care Act, we didn't do anything
18 like this.
19      And so you will occasionally
20 see this done in budgeting, but it's not --
21 you know, as I said in the very beginning of
22 this discussion, it's the exception rather
23 than the rule.
24 BY MR. MORRIS:

Page 128

1  Q.   If you could turn to Page 153
2  of Exhibit 12.
3  A.   That's the same exhibit we're
4  in, right?
5  Q.   Yes.  The GAO document.
6  A.   I lost track.  Okay.  You said
7  153?
8  Q.   153.
9  A.   Okay.
10 Q.   And this chapter is entitled
11 "Cost Risk and Uncertainty."
12      Do you see that?
13 A.   Mm-hmm.
14 Q.   Now if you could turn to the
15 next page, 154, there's a section entitled
16 "Point Estimates Alone Are Insufficient For
17 Good Decisions."
18      Do you see that?
19 A.   I do.
20 Q.   First, do you agree with that
21 statement?
22 A.   I don't think I agree with that
23 in general.  I think most of the times that
24 we were making decisions in government, the

Page 129

1  best that we have is a point estimate, and
2  so -- and we make decisions, important
3  decisions based on that all the time, so I
4  would not describe point estimates as
5  insufficient.
6  Q.   If you could read the first
7  sentence -- actually why don't you -- if you
8  could read aloud the first sentence of right
9  underneath that heading.
10 A.   "Since cost estimates are
11 uncertain, making good predictions about how
12 much funding a program needs to be successful
13 is difficult."
14 Q.   Do you agree with that?
15 A.   I think it depends on what it
16 is you're guesstimating.  Some things are
17 difficult to estimate and some aren't.
18 Q.   And the more complex the thing
19 you're trying to estimate, the harder it is
20 to predict, or to estimate?
21 A.   The more -- maybe the more
22 unknown things are.
23 Q.   You'd agree with me that there
24 are a significant number of unknowns in the

Page 130

1 cost estimate that you created for the
2 abatement plan, correct?
3          MR. KO:  Object to the form.
4      A.    I think we need to talk about
5 particular components to get into that
6 question.
7 BY MR. MORRIS:
8      Q.    Okay.  We'll come back to that
9 then.
10         If you could go to the third
11 paragraph underneath "Point Estimates Alone
12 Are Insufficient For Good Decisions," it
13 starts with the sentence "Point estimates are
14 more uncertain."
15         Do you see that?
16     A.    Yes.
17     Q.    Can you read that sentence?
18     A.    "Point estimates are more
19 uncertain at the beginning of a program,
20 because less is known about its detailed
21 requirements and opportunity for change is
22 greater."
23     Q.    Do you agree with that?
24     A.    Yes.

Page 131

1      Q.    And then the next sentence,
2 could you read that one, please?
3      A.    "In addition, early in a
4 program's lifecycle, only general statements
5 can be made."
6      Q.    Do you agree with that?
7      A.    I think it depends.  That is
8 too blanket a statement.
9      Q.    If you go to the next page on
10 155, in the first full paragraph there, the
11 last sentence begins, and I'll read this one,
12 "Thus, a point estimate, by itself, provides
13 no information about the underlying
14 uncertainty other than that it is the value
15 chosen as most likely."
16         Do you see that?
17     A.    Yes.
18     Q.    Can you read the next sentence?
19     A.    "A confidence interval, in
20 contrast, provides a range of possible costs,
21 based on a specified probability level."
22     Q.    Okay.  We've gone over that.
23 That's something that is not part of your
24 cost estimate for your abatement plan,

Page 132

1 correct?
2      A.    I do not provide confidence
3 intervals.
4      Q.    But that's another way of
5 stating in the sentence here what a
6 confidence interval does, right, gives a
7 range and then states, based on a percentage,
8 how confident the person doing the budget is
9 in the ultimate -- what the ultimate costs
10 will fall within that range?
11     A.    It gives you the probability
12 distribution of the estimates.
13     Q.    Okay.  If you go then to two
14 more pages in, 157, the paragraph that
15 begins, the first full paragraph there, "One
16 way to determine."
17         Do you see that?
18     A.    Yes.
19     Q.    Can you read that sentence?
20     A.    "One way to determine whether a
21 program is realistically budgeted is to
22 perform an uncertainty analysis, so that the
23 probability associated with achieving its
24 point estimate can be determined."

Page 133

1      Q.    Did you perform an uncertainty
2 analysis being described here in this
3 sentence for your abatement plan?
4      A.    I just want to make sure I
5 understand what they're using uncertainty
6 analysis to mean here.
7          (Witness reviewing document.)
8      A.    So I think -- I'm just reading
9 this section of this report so I'm not sure
10 if they defined uncertainty analysis
11 previously, but if what they are saying here
12 is that they did a Monte Carlo and out of the
13 Monte Carlo they created a cumulative
14 probability distribution, I did not do that
15 in my report.
16     Q.    Okay.  And the next sentence
17 there says, "A cumulative probability
18 distribution, more commonly known as an S
19 curve - usually derived from a simulation
20 such as Monte Carlo - can be particularly
21 useful in portraying the uncertainty
22 implications of various cost estimates."
23         And that -- you didn't run an S
24 curve?

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.    You have to -- the S curve is
2  just a way of plotting the outcomes of a
3  Monte Carlo distribution.  And as I said, I
4  did not do a Monte Carlo distribution.
5    Q.    So is it fair that you're not
6  offering -- to say that you're not offering
7  an opinion as to how accurate your cost
8  estimates are?
9          MR. KO:  Object to the form.
10   A.    I think that I've produced
11  reasonable estimates, so I do think they are
12  accurate, and I am offering opinion that they
13  are accurate.
14  BY MR. MORRIS:
15   Q.    And to what degree of certainty
16  are you opining that they're accurate?
17   A.    I don't have a quantitative
18  measure of the degree of certainty.
19   Q.    And you built into the plan a
20  continued re-evaluation of the plan over time
21  to try and track to see whether the costs go
22  up or down?
23   A.    Yes, because whenever one
24  develops a complicated multi-year plan, you

Page 135

1  want to -- this is what one does all the
2  time, and I do this at the GPL.  When I've
3  done this in government, you want to devise
4  the best plan that you can devise today, and
5  you want to be in a world to improve it over
6  time as we learn more and as the world
7  unfolds.
8    Q.    Do you know what a cost-benefit
9  analysis is?
10   A.    Yes.
11   Q.    And what is a cost-benefit
12  analysis?
13   A.    It's an analysis where one
14  compares the costs of a program and the
15  benefits of a program.
16   Q.    It's all in the name, right?
17         You didn't perform a
18  cost-benefit analysis as part of your work on
19  your opinion, did you?
20   A.    No, I was not asked to do that.
21   Q.    I want to talk a little more,
22  then, about what the $5 billion estimate for
23  Cuyahoga and $2.2 billion estimate for Summit
24  County represents.

Page 136

1          First, am I correct, those are
2  the total estimated amounts for all of your
3  abatement plan costs for the two counties
4  added up over the 15-year period, correct?
5    A.    Correct.
6    Q.    And you estimated how much
7  money might have been spent in year 1 or
8  might be spent in year 2, 3, and down the
9  line, and that's what you've added up,
10  correct?
11   A.    Yes.
12   Q.    You're familiar with the
13  concept of the present value or net present
14  value of money?
15   A.    Certainly.
16   Q.    Can you explain it to me?
17   A.    Sure.  That if I offered you
18  $100 a year from now, you would likely not be
19  willing to give me $100 today because a
20  dollar today is -- most people prefer to a
21  dollar in the future.
22   Q.    And that's because the concept
23  is to take into account that if you have a
24  dollar today it will grow into something more

Page 137

1  in the future?
2    A.    Yeah, I would say that people
3  have time preference.  They prefer
4  consumption today to time in the future, and
5  because of that, the market has to pay one
6  rate of return to get you to give up money
7  today.
8    Q.    And there's a calculation in
9  economics to -- that you can do to try and
10  determine the present value of a stream of
11  payments that go out into the future, is that
12  true?
13   A.    Yes, absolutely.
14   Q.    And did you do such a
15  calculation for your 15-year plan estimate?
16   A.    I don't provide one, but it's
17  trivial.  You can take the numbers in my
18  report and calculate one in three seconds if
19  you feel like it.
20   Q.    Understood.
21         But the -- what I'm trying to
22  get at is the roughly $7 billion of your
23  estimated abatement plan for the two counties
24  is not $7 million of today money?

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1    A.    Right, they're in nominal
2   dollars, but I provide all the information.
3   If you would prefer to see that other
4   information, I followed the practice that,
5   for example, the Congressional Budget Office
6   does in doing annual calculations, and then
7   giving you the nominal sum.  And I thought
8   that was the more standard way to present
9   that, but one can convert back and forth, I
10  mean, literally in seconds.
11   Q.    Okay.  But you didn't -- and I
12  get that, but that's not something you've
13  done?
14   A.    No.  But again, I've given all
15  the information you need if you wanted to
16  know that number.
17   Q.    Understood.  Because my next
18  question would be, do you know what that
19  number would be?
20   A.    No, but one could -- again, one
21  could calculate that very fast.
22   Q.    And that's a standard
23  calculation.  It is readily applied by
24  economists and accountants?

Page 139

1    A.    It's -- you know, it's more
2   common, I would say, in benefit-cost analysis
3   than in budget documents, but sometimes
4   you'll see it in the budget documents.  Like
5   the Social Security Administration when doing
6   its 75-year forecast will do it in a thing
7   that's more like in a budget document.
8    Q.    Does your estimated cost for
9   the abatement plan take into account the fact
10  that counties may get some money from, for
11  example, the federal government specifically
12  earmarked for the type of activities within
13  your abatement plan?
14   A.    So the scope of my assignment
15  was not to parse out who would be paying for
16  it.  It was just to figure out what the needs
17  were in the community, what services needed
18  to be offered to address those needs, and
19  then what the costs of all of that was.
20   Q.    Got it.
21         So just so I'm clear, so again
22  taking the total amount, estimated amount of
23  $7 billion, that's the total amount of your
24  estimated cost, and if there's money that's

Page 140

1   provided by the federal government, that
2   would go to that, but you haven't reduced
3   your $7 billion estimate taking into account
4   money that the federal government may have
5   already given Cuyahoga County, for example?
6         MS. RITTER:  Objection to form.
7    A.    I give you the total costs, and
8   I'm not -- it was beyond the scope of what I
9   was asked to do to figure out who would pay
10  and what that would do.
11  BY MR. MORRIS:
12   Q.    Fair enough.  I'm really just
13  trying to figure out what's embedded or not
14  in the $7 million.
15         So, for example, some of the
16  costs that you identified, and we'll go
17  through the details in a little bit, are
18  medical costs, and insurance companies
19  sometimes pay for those medical costs.  You
20  didn't subtract out the amount that insurance
21  companies may be paying for those costs in
22  the future, correct?
23   A.    Correct.
24   Q.    What was the purpose in

Page 141

1   providing an estimated cost for your
2   abatement plan?
3    A.    I guess my understanding is
4   that in some of the theories of this case, an
5   estimated cost would be useful in figuring
6   out what the defendants would end up paying
7   in a way that would allow this problem to
8   actually get abated.
9    Q.    Are you saying that there
10  should be a pot of money created that has 5
11  billion for Cuyahoga and roughly 2 billion
12  for -- 2.2 billion for Summit County,
13  respectively, now for them to draw upon?
14   A.    I'm not giving an opinion on
15  that.  I was asked to figure out what an
16  abatement plan would be and what it would
17  cost, and that's what I give you.
18   Q.    As a matter of economics, it
19  wouldn't make sense to have a giant pot of
20  money with $7.2 billion in it now for the
21  counties to draw down upon over the course of
22  15 years.  You agree with me on that, right?
23         MR. KO:  Object to the form.
24   A.    I think there may be two

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1 the report. Okay. The report -- okay. Yes,
2 the report -- well, if we're going -- it
3 depends -- if we're going to get into the
4 details and the numbers, we will pretty
5 quickly end up in exhibits, you know, in
6 Exhibit 5, 7 and 8.
7     Q.    So why don't we do this. We'll
8 start -- why don't you put in front of you
9 Exhibit 6 and 7, which I think gets us most
10 of the way there, except for the errata which
11 we'll deal with when we get there.
12     A.    6 and 7. Okay. We're good.
13     Q.    Okay. So now I'm going to --
14 if you go to Table -- I'm going to start
15 talking about Table 1, which also refers back
16 to Table 0, but let me just ask some general
17 questions about what is in Table 1 first.
18 That's the first category of costs for
19 treatment, excluding medication-assisted
20 treatment, correct?
21     A.    We're talking about the first
22 row in Table 1?
23     Q.    Yes.
24     A.    Yes.

Page 147

1     Q.    And that's the largest cost
2 that you include in your abatement plan,
3 correct?
4     A.    That's true, yes.
5     Q.    Okay. And by far that's the
6 largest cost, correct?
7     A.    It's my -- or four or five
8 times the next biggest one, so I guess, yes.
9     Q.    And roughly that combined is
10 about $4.3 billion, if I've done my math
11 correctly?
12     A.    You just combined the two
13 jurisdictions --
14     Q.    The two jurisdictions.
15     A.    I never do that in my head, but
16 you said 3 plus 1.3 is 4.3. Good job.
17     Q.    And we've talked about this
18 before, but these estimates you have, going
19 forward in time, these are estimates for
20 treatment of actual people, that actual
21 people will receive --
22     A.    Yes.
23     Q.    -- in the future?
24     And some of those people who

Page 148

1 are treated will not have any connection to
2 the defendants in this case, correct?
3     MR. KO: Object to the form.
4     A.    I don't have an opinion on
5 that.
6 BY MR. MORRIS:
7     Q.    Now, the starting point for the
8 number of people who you estimate might
9 receive treatment, if I understand it
10 correctly, is calculations that you've done
11 on Table 0?
12     A.    That's right.
13     Q.    So let's go there.
14     And just so I'm tracking, which
15 exhibit are you looking at right now? Are
16 you looking at 6 or 7?
17     A.    I am looking at 7.
18     Q.    Got it.
19     A.    I hope that I've done it up to
20 this point.
21     Q.    Sorry. I'm going to organize
22 myself here, just a second, for the
23 questions.
24     Okay. In -- let me know if

Page 149

1 I've got this right. You have -- for each of
2 the cost categories, you have a table, and
3 you have a table that's labeled C, and a
4 table that's labeled S that correspond to the
5 two counties?
6     A.    Exactly.
7     Q.    Looking off of Table C.O, so
8 Table 0 for Cuyahoga County, you start at the
9 top with line item 1 of OUD rate.
10     Do you see that?
11     A.    Yes.
12     Q.    Okay. Can you explain to me
13 what that means?
14     A.    It is the percentage of the
15 population in that county, age 12 or above,
16 with opioid use disorder.
17     Q.    Okay. And for -- and the total
18 estimate you have there is 1.4 percent?
19     A.    Yes.
20     Q.    And that then ties to the
21 source notes below?
22     A.    Correct.
23     Q.    You get to the 1.4 by adding
24 .77 percent for OUD prevalence and .63 HUD

Page 150

1  prevalence?
2      A.   Correct.
3      Q.   So this is a situation where
4  you are separating out the heroin use
5  disorder?
6      A.   I wouldn't say I'm separating
7  out.  I'm combining the two numbers to get
8  the totals of what I'm modeling.
9      Q.   Okay.  But from your
10 calculation, though, within footnote 1, OUD
11 prevalence does not include HUD prevalence.
12     A.   So there's two different
13 terminologies going on in the literature
14 here.  I'm taking these numbers from the
15 Pitt, et al. study, and they use OUD to mean
16 the non-HUD -- OUD, and so when I am adding
17 their number, their two numbers, I refer to
18 them the way they do, but in my study I use
19 OUD to be the combined amount.
20     Q.   Let's take a look at the Pitt
21 study.  Let's pull that out as well.  And
22 that's Exhibit 12.
23         MR. KO:  The Pitt study is
24 Exhibit 11.

Page 151

1          MR. MORRIS:  Oh, I'm sorry.
2  Thank you.  Exhibit 11.
3  BY MR. MORRIS:
4      Q.   And you reference the -- well,
5  let me ask you this way.
6          Where does the .77 OUD
7  prevalence come from?
8      A.   So there's a table of
9  parameters at the end on, I guess it's
10 page -- let's see where this is -- so this is
11 in the appendix.  I guess it's on page S.88.
12 And if you look -- one, two, three -- four
13 rows down you see the .77 number.
14     Q.   Okay.  And the source for that,
15 there's a column next to the value of .77,
16 and the source column says "Assumed."
17         Do you see that?
18     A.   Yes.
19     Q.   And then they -- the authors of
20 this study cite to additional studies.  Did
21 you review those studies?
22     A.   Can I just remember which ones
23 they cited to?
24     Q.   Sure.

Page 152

1      A.   But I assume this is the
2  National Survey of Drug Use and Health, but I
3  just want to double-check that I'm
4  remembering that right.  Do you know where
5  their citations go to?
6          MS. RITTER:  For the .77, is
7  that what you all are talking about?
8          MR. MORRIS:  Yes.
9  BY MR. MORRIS:
10     Q.   I have the listing of the
11 references starting, or including on S.106.
12     A.   Yeah, so I think they go under
13 the CDC.  I'm pretty sure that CDC number is
14 -- originates in the National Survey of Drug
15 Use and Health.
16     Q.   Did you review those citations
17 that they cite to?
18     A.   Yes.
19     Q.   And is that .77 based on Ohio
20 data?
21     A.   No, that's national data.
22     Q.   And when it says "Assumed,"
23 what does that mean?
24     A.   I do not remember exactly what

Page 153

1  that wording meant.
2      Q.   Do you know what the ultimate
3  underlying source for the .77 percent was?  I
4  know that it cites to -- the Pitt authors
5  cite to other articles.  Do you know how they
6  calculated .77?
7      A.   Again, I think the base input
8  here is the National Survey of Drug Use and
9  Health, which is a national representative
10 survey that is the most commonly used source
11 for figuring out what the prevalence of
12 opioid use disorder is.
13         But that study has some
14 limitations.  In particular, it leaves out
15 homeless populations, incarcerated
16 populations, other institutionalized
17 populations, and it's also a survey.  And
18 people often underreport substance abuse to
19 surveys, so for that reason they're making
20 adjustments, and I followed them in making
21 adjustments to that underlying data.
22     Q.   The authors of the Pitt
23 article, they didn't do original research to
24 try and determine the severe opioid use

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1  Cuyahoga -- sorry, the population receiving
2  treatment is 3,033, and by year 4 it's 6,067,
3  so that's doubling. That is a statement
4  about treatment capacity. It's not -- I'm
5  not making any forecasts about prevalence
6  going forward.
7      Q.    So I'm understanding this,
8  let's just go to year 4, which is where
9  you've actually gotten to the point of the
10  estimate doubling. You're not -- that 6,067,
11  and I'm looking at Page 7 now, 6,067 is not
12  your estimate of how many people will receive
13  treatment in year 4?
14      A.    Oh, it is an estimate of how
15  many people will receive treatment, but it's
16  not based on an estimate in that year of
17  prevalence. It's based on taking the initial
18  year treatment capacity and getting to double
19  of that.
20      Q.    Okay. But the initial year is
21  based on the prevalence rate, correct?
22      A.    Yes.
23      Q.    And then what you've done to
24  get to year 4 is double that, correct?

Page 163

1      A.    I doubled the capacity, but I
2  don't have some underlying projection, for
3  example, of how the population in the county
4  is changing or anything like that. I'm
5  doubling capacity for treatment.
6      Q.    Okay. I'm really not trying to
7  be obtuse here. Doubling capacity to me
8  means that that's what the system could
9  tolerate, not this is how many people I'm
10  predicting will be receiving treatment, at
11  least within the base case. Am I missing
12  something?
13          MS. RITTER: Objection to form.
14      A.    Is the -- I guess --
15  BY MR. MORRIS:
16      Q.    We're talking --
17      A.    Why don't you ask again.
18      Q.    Let me ask again. Let me ask
19  again, although I'm enjoying the
20  conversation.
21          Your first year estimate is
22  based on a prevalence rate?
23      A.    Yes.
24      Q.    And the only thing you've done

Page 164

1  to try and predict how many people will
2  receive treatment in year 4 is to double
3  that?
4      A.    So I'm not trying to predict
5  treatment. I'm trying to devise an abatement
6  plan. So the question is if we're trying to
7  be as aggressive as we can in treating this
8  crisis, what additional capacity do we need.
9  And based on my being -- the literature and
10  the expert opinion of Dr. Lembke, I have come
11  to the conclusion that we can double
12  treatment, and that we should double
13  treatment capacity, and then maintain that
14  doubled capacity through the end of the
15  15-year period.
16      Q.    Okay. This is where I'm
17  getting to now. Are you saying -- because
18  what you're ultimately doing for each one of
19  these line items is giving an estimate as to
20  how much it will cost, correct?
21      A.    Mm-hmm.
22      Q.    Is that a prediction of how
23  much you think it is going to cost, or how
24  much it could cost?

Page 165

1          MS. RITTER: Objection to the
2      form.
3      A.    I am saying that if we're going
4  to make as much progress as we can on the
5  opioid crisis in Cuyahoga, we should double
6  the treatment capacity, and I am then telling
7  you how much it will cost to double that
8  capacity and maintain that doubled capacity.
9  BY MR. MORRIS:
10      Q.    Are you offering an opinion
11  that in your estimation the number of people
12  who will receive treatment in year 4 will be
13  6,067 individuals in the Cuyahoga chart?
14      A.    We will create the capacity to
15  treat that many people, and I certainly hope
16  all the slots would be filled. You know,
17  maybe we only keep 98 percent of slots
18  filled. But I'm not trying to parse that
19  issue.
20      Q.    Are you rendering an opinion
21  about how many people actually will receive
22  treatment in, for example, year 4?
23      A.    I am rendering an opinion that
24  the abatement plan that is needed in these

Page 174

1 treatment needs for the people who are
2 relapsing or who are getting longer term
3 treatment, so I assume the same distribution.
4     Q.    Is there a measurement of
5 success of the abatement program that is
6 reflected in the estimates for the number of
7 people who are going to be treated?
8     A.    I have not made any projections
9 about outcomes here.  All I've simply done is
10 followed the guidance of the literature, I've
11 consulted the experts I've consulted that we
12 need to ramp up capacity and maintain that
13 capacity for at least 15 years.
14     Q.    So who are you relying on for
15 the concept or the idea that the number of
16 people potentially receiving treatment in
17 year 12 should be the same as those in year
18 5, and that the cost applied to that
19 treatment should be the same?
20     MR. KO:  Object to the form.
21     A.    Can you break that question up?
22 You had two different --
23 BY MR. MORRIS:
24     Q.    Sure.

Page 175

1     A.    -- and in the middle there.
2     Q.    Who are you relying on for the
3 proposition that the number of people in year
4 12 as receiving treatment would be the same
5 as the number of people in year 5?
6     A.    So Dr. Lembke's report
7 specifically says that we need to ramp up
8 treatment and maintain it for the extended
9 period of time.
10     Q.    Okay.  Are you referring to
11 Dr. Lembke's assertion about percentage of
12 individual people could go from 20 percent to
13 40 percent?  Is that what you're referring
14 to?
15     MR. KO:  Object to the form.
16 BY MR. MORRIS:
17     Q.    I'll bring out the report.  I
18 just want to know -- I want to get you to the
19 right portion of the report.
20     A.    So that --
21     MR. KO:  Hold on.  Is there a
22 question?
23     MR. MORRIS:  It was a
24 follow-up.  But let me ask it this

Page 176

1 way.  That's a good point.
2 BY MR. MORRIS:
3     Q.    Let me first do this.
4     Can you go to your report at
5 Paragraph 42, Exhibit 6?  If you could read
6 the second and third sentences of
7 Paragraph 42, please.
8     A.    "The cost estimates anticipate
9 that the number of individuals that receive
10 treatment will ramp up over four years such
11 that the number of individuals receiving
12 treatment for OUD will double between 2020
13 and 2023."
14     Q.    Okay.  And then the next
15 sentence?
16     A.    "I understand that the Expert
17 Report of Anna Lembke explains then an
18 effective Abatement Plan could expand its
19 reach in this way by 2024."
20     Q.    Okay.  And you say there that
21 you understand that her report says that.
22 Have you read her report?
23     A.    I have.
24

Page 177

1     (Whereupon, Liebman Exhibit
2 Number 13 was marked for
3 identification.)
4     MR. KO:  Sean, up to you, but
5 maybe after this round of questioning
6 we can have lunch?
7     MR. MORRIS:  Yeah, that was my
8 plan.  I'm going to tie this off and
9 then we can go to lunch.
10 BY MR. MORRIS:
11     Q.    If you go to Page 96, please.
12 If you look at Paragraph 17.
13     A.    Yes.
14     Q.    And she writes in 17, "With an
15 aggressive infusion of resources and efforts
16 in Summit and Cuyahoga Counties, it would be
17 reasonable that within four years the number
18 of bellwether individuals with OUD who
19 receive substance abuse treatment services
20 within a year could double, assuming that
21 only 20 percent of individuals with OUD
22 currently receive treatment."
23     Do you see that?
24     A.    I do.

Page 178

1  Q.  Okay.  Is that what you were
2  referring to as what you're relying on for
3  the doubling of the potential treatment of
4  individuals?
5  A.  That's one place.  There may be
6  a couple other places where this comes up in
7  this report, but yes.  Yes, I think that's
8  the right place.
9  Q.  And there she does not cite to
10  any sources, correct?
11  A.  That's right.  I want to
12  emphasize, though, that the specific numbers
13  I take from Lembke, but there are other
14  sources that I've drawn upon in forming my
15  opinion that we can achieve, and that this is
16  the right level of treatment to be targeting
17  in this abatement plan.
18  Q.  There are other sources that
19  talk about doubling the people who will
20  receive treatment within Summit and Cuyahoga?
21  A.  That it would be possible that
22  one can achieve -- that increases in the
23  number of people who receive treatment if one
24  implements an effective plan.

Page 179

1  Q.  Okay.  Do you have any
2  empirical reason to believe that?
3  A.  Well, if you look, for example,
4  in Vermont which has, I think, one of the
5  most aggressive efforts, they were able to
6  achieve when they undertook that plan
7  increases in the percentage of people who
8  were receiving treatment that I think were
9  higher than doubling.
10  Q.  And where is that located?
11  Where is that information located?
12  A.  Can we go to the -- actually we
13  can get it out of -- if we go to my report
14  and go to -- this is going to be like 24 or
15  25.  Let's see if I can find it.
16  I think that may be in the
17  Brooklyn and Sigmon article cited in footnote
18  24, although there were other Vermont papers
19  that I read, so, I'm not 100 percent sure
20  that that was the one I'm thinking of.
21  Q.  Did you put a numerical
22  estimate as to how confident you are in the
23  number of people who will receive treatment
24  in year 11, let's say?

Page 180

1  A.  So that's the area where I did
2  do sensitivity analysis because I wanted to
3  show how the results can change depending on
4  if the world turned out in different ways.
5  Q.  Right.  So we talked about
6  that, though.
7  The sensitivity analysis is if
8  the inputs change, how much will they change
9  for any given line item, right?
10  A.  That's correct.
11  Q.  That's not an estimate of how
12  competent one is in the prediction of the
13  output number, correct?
14  MR. KO:  Object to the form.
15  A.  That's correct.
16  MR. MORRIS:  Okay.  Why don't
17  we take a break for lunch.
18  THE VIDEOGRAPHER:  The time is
19  12:52 p.m., and we're off the record.
20  (Whereupon, a luncheon recess
21  was taken.)
22
23
24

Page 181

1  AFTERNOON SESSION
2
3  THE VIDEOGRAPHER:  The time is
4  1:48 p.m., and we're on the record.
5  BY MR. MORRIS:
6  Q.  Okay.  Dr. Liebman, you realize
7  you're still under oath?
8  A.  Yes.
9  Q.  Has anything that we've talked
10  about during the morning session caused you
11  to change any of the opinions in your report?
12  A.  No.
13  Q.  Before we went on break we were
14  talking about the estimated increase in the
15  number of people receiving services over
16  time, and we talked about Anna Lembke's
17  expert report that you cite in your report.
18  And then when I asked you
19  whether there's any other bases for that
20  assumption in your opinion, you mentioned a
21  Vermont article.
22  Do you remember anything more
23  about the Vermont article?  Do you remember
24  what it was entitled?

Page 182

1    A.    I can look up the title.  I
2  think we read it before.
3    Q.    Okay.  I'm sorry, you're right,
4  you pointed that out to me.  Let me ask it
5  this way.
6        Is there anything other than
7  the Lembke report and the Vermont article
8  that you're basing the increase from 20 to
9  40 percent?
10        MR. KO:  Object to the form.
11    A.    I'd say the general view that
12  it is possible to greatly increase the
13  percentage of people in treatment comes from
14  a much broader set of sources, including the
15  federal government's strategies around --
16  recommended strategies around combatting the
17  opioid crisis, the SAMSA reports, the CD
18  reports that are recommending strategies, all
19  those contemplated a much higher level of
20  treatment than we're currently doing.
21        And my other conversations with
22  medical experts like Dr. Alexander and with
23  local physicians on the ground in the two
24  bellwethers all contributed to me believing

Page 183

1  that this was a reasonable assumption.
2        THE VIDEOGRAPHER:  Can we go
3    off for a second?
4        The time is 1:50 p.m., and
5    we're off the record.
6        (Pause.)
7        THE VIDEOGRAPHER:  The time is
8    1:52 p.m., and we're on the record.
9  BY MR. MORRIS:
10    Q.    These other sources that you're
11  referring to, do they predict a doubling of
12  the number of people who could receive
13  treatment?
14        MR. KO:  Object to the form.
15    A.    Some of the conversations with
16  other medical experts, in some of those
17  conversations I was able to confirm that they
18  thought that was a reasonable assumption for
19  me to be making.
20  BY MR. MORRIS:
21    Q.    And which of the medical
22  experts are you referring to?
23    A.    I'm thinking particularly
24  Dr. Parran in Cuyahoga.

Page 184

1    Q.    And do you know what he was
2  basing his agreement with you about doubling
3  the number of people who could receive
4  treatment, what he was basing that on?
5    A.    My impression, based on his
6  expertise in treating people and designing
7  the systems and treating people in the
8  community.
9    Q.    You don't know whether he had
10  any empirical analysis to back up his
11  agreement with you?
12    A.    I don't know.
13    Q.    So keeping on Table 1 and using
14  Cuyahoga as the example while we're looking
15  at year 1 where there's 3,033 people listed
16  in the population receiving treatment on the
17  base case, and then increasing to 6,067 in
18  your report moving forward, you mentioned in
19  one of your answers before people moving in,
20  people moving out of that number.  Is it the
21  same cohort of people year-over-year that are
22  in that category?
23        MR. KO:  Object to the form.
24    A.    What category?

Page 185

1  BY MR. MORRIS:
2    Q.    So when you're listing the
3  people who -- in the population receiving
4  treatment, and in year 5 it's 6,067 and in
5  year 6 it's 6,067, it's not the same
6  6,067 people between year 5 and year 6, is
7  that right?
8        MS. RITTER:  Objection to form.
9    A.    Some of the individuals
10  overlap, but some will be different.
11  BY MR. MORRIS:
12    Q.    And have you done any
13  calculation as to how many will overlap and
14  how many will be different?
15    A.    I don't specifically model that
16  because I'm not fundamentally modeling the
17  people.  I'm modeling that needed treatment
18  capacity.
19    Q.    Okay.  Again, I really don't
20  want to beat a dead horse on this one, but
21  you say modeling the treatment capacity.  But
22  the line item is titled "Population Receiving
23  Treatment," it's not capacity to receive
24  treatment, correct?

Page 210

1 could. And that's treatment services for the
2 medication assisted treatment, correct?
3 A. That's the medication treatment
4 itself, not -- the same people might also be
5 getting some of the appropriate treatment,
6 but this is the medical, the medication
7 component.
8 Q. Okay. And for this one you
9 also calculated, or you estimated that the
10 number of people, percent of the population
11 receiving MAT treatment would double by year
12 4?
13 A. Not quite. The population
14 receiving MAT quadruples by year 4. So you
15 see 4,045 is twice 1,011.
16 Q. I'm sorry. Caught my on my bad
17 reading skills there.
18 And what is that based on?
19 A. It's very similar to the
20 conversation we already had about the
21 doubling of treatment. There is both a
22 general consensus in the literature, in the
23 literature that is recommending abatement
24 strategies that one can significantly

Page 211

1 increase the percentage of people receiving
2 MAT and that that would be a good thing to do
3 to reduce deaths and improve well-being, but
4 then the specific number I use relies on
5 Dr. Lembke's report.
6 Q. The same reference that we
7 looked at before?
8 A. It's roughly, it's maybe a
9 paragraph later than where we were looking.
10 Q. Okay. We were on Page 96
11 before of the Lembke report, and I'm sorry, I
12 already lost track of which exhibit that is.
13 MR. KO: I don't think you ever
14 marked it as an exhibit.
15 MR. MORRIS: I did. I probably
16 didn't say it.
17 A. On mine it's Exhibit 13.
18 BY MR. MORRIS:
19 Q. Exhibit 13. Thank you. Before
20 we were in -- on Page 96, Page 17, is there a
21 different reference to the increase for MAT
22 services?
23 A. We were in Paragraph 17 before,
24 and I think you want to look at Paragraph 18

Page 212

1 now.
2 Q. Okay. And there does she cite
3 to any support for her estimate of
4 quadrupling the number of people who receive
5 MAT treatment?
6 A. I think she cites to a study
7 down here which I'm not familiar with, but
8 then she also notes, I think, in Paragraph B
9 that she's relying partially on evidence from
10 Massachusetts and Vermont.
11 Q. Okay. You said that you, for
12 the assumption of moving the MAT treatment,
13 quadrupling the number of people who receive
14 the treatment, you referred to Lembke,
15 discussions that you've had. What else
16 beside Lembke did you rely on for that? I've
17 forgotten what your earlier answers, I'm not
18 trying to trick you. You mentioned Lembke.
19 What else did you rely on for your assumption
20 of your estimation of quadrupling people who
21 receive MAT treatment?
22 MR. KO: Object to the form.
23 A. So in, for the -- for my
24 conclusion, my general conclusion, that it is

Page 213

1 possible to greatly increase the percentage
2 of people receiving MAT, that comes from, if
3 we turn to -- I've lost my report. Right
4 here. If we turn to my report, Page 12,
5 footnote 24, you can see the CDC report
6 "Evidence-Based Strategies For Preventing
7 Opioid Overdose, What's Working in the US."
8 You can also see the Surgeon General's report
9 "Facing Addiction in America, the Surgeon
10 General's Spotlight on Opioids." So both of
11 those recommend that the nation take efforts
12 to greatly increase the amount of MAT and
13 think that it can happen and think that it
14 will have a major impact on deaths and other
15 harms. I spoke with the national experts
16 like Alexander and Lembke and discussed this
17 with them and with local physicians like
18 Dr. Parran, Dr. Smith, so all of those
19 approaches to gathering information which is
20 what I do whenever I'm trying to design a
21 solution to a policy problem, read the
22 literature, gather information from national
23 experts, talk to local people, they all
24 informed my judgment that it was reasonable

Page 214

1  to rely on the numbers that were in
2  Dr. Lembke's report.
3       Q.    You mentioned speaking to
4  Dr. Alexander.  How often did you speak --
5  how many times did you speak to
6  Dr. Alexander?
7       A.    I don't know the exact number.
8  I would have to go look at my calendar to
9  figure out exactly how many.
10      Q.    Did you talk to Dr. Alexander
11 following his deposition?
12      A.    No.
13      Q.    Did you talk to Dr. Alexander
14 in preparation for your deposition today?
15      A.    No.
16      Q.    Did you talk -- did you talk to
17 Dr. Lembke?
18      A.    Yes.
19      Q.    How often did you -- how many
20 times did you talk to Dr. Lembke?
21      A.    Either once or twice.  I
22 remember specifically once, but there might
23 be one other.
24      Q.    How long ago was that?

Page 215

1       A.    I think it was -- I'm pretty
2  sure it was in 2018, and I could guess what
3  month, but it would be plus or minus two
4  months, so that's probably not a good thing
5  for me to do.
6       Q.    What did you talk to Dr. Lembke
7  about?
8            MR. KO:  To the extent that
9       these communications and conversations
10      happened in the presence of counsel,
11      I'd instruct the witness not to
12      answer.
13      A.    I would say the main -- well,
14 there were a lot of people, so it was a long
15 -- the call I'm remembering was a long call,
16 but it was two and a half hours or something
17 like that.  And so there were a lot of topics
18 discussed.  One thing I remember spending a
19 lot of time on in that call was the question
20 of whether someone is ever cured of OUD or
21 whether people need persistent treatment for
22 a long period of time, and Dr. Lembke's view
23 was that one needs to think about addiction
24 as a chronic condition that lasts for

Page 216

1  someone's lifetime after they've experienced
2  addiction, and that we have to have treatment
3  capacity capable of serving the whole stock
4  of people who have ever experienced OUD for
5  quite some time.  So that was like -- that
6  was one of the things we talked about.
7  BY MR. MORRIS:
8       Q.    Do you remember anything else?
9       A.    We definitely talked about the
10 question of if one put a lot more resources
11 into this problem what percent of people
12 could one get into treatment and get to take
13 up MAT, you know, because you could imagine
14 doing an abatement plan that says that
15 15,000 people with OUD, let's assume costs
16 associated with giving 100 percent of them
17 MAT, and I needed to decide whether that was
18 a reasonable thing to do or whether I should
19 assume that we were going to treat a number
20 smaller than 100 percent, so there was
21 discussion of what the evidence suggested
22 was, could be achieved with an injection of
23 additional resources.
24      Q.    You mentioned you also talked

Page 217

1  to Dr. Alexander, and I forgot if I asked you
2  this so I apologize.  How many times did you
3  talk to Dr. Alexander in connection with this
4  case?
5            MR. KO:  Asked and answered,
6       but you can answer again.
7       A.    I don't remember the exact
8  number.
9  BY MR. MORRIS:
10      Q.    You don't remember how many
11 times you talked to him?  I don't remember
12 that you said you don't remember how many
13 times you talked to him.  All right.  Do you
14 remember what you talked to him about,
15 though?
16      A.    So there were a variety of
17 conversations, so --
18           MR. KO:  I provide the same
19      instruction as before to the extent
20      that his communications were with or
21      involving counsel, I instruct the
22      witness not to answer.
23      A.    I would say there were two
24 broad categories of conversations.  One was

Highly Confidential - Subject to Further Confidentiality Review

Page 238

1 I've encountered, although maybe someone in
2 the private sector does that.
3     Q.    There are differences, though,
4 depending on the kind of thing you're trying
5 to measure, in inflation rates based on
6 geography?
7         MR. KO:  Object to the form.
8     A.    I think the more relevant issue
9 is that there are difference in levels of
10 prices based on geography that what you would
11 pay someone to do a job in Cuyahoga might be
12 different than what you'd pay them to do the
13 job in Los Angeles, and those kind of level
14 differences are reflected in my report.  So
15 for example when we are putting in a social
16 worker salary, we're taking them from the
17 data from existing social worker salaries in
18 the specific bellwethers, so I think I
19 incorporated what is the most important
20 regional variation to incorporate.
21 BY MR. MORRIS:
22     Q.    Okay.  Let me, before we get
23 back into the other tables let me just finish
24 this off.  Did you have e-mails with McGuire?

Page 239

1     A.    Yes.
2     Q.    And what were the --
3 substantive e-mails regarding your opinions
4 in this case, you had those kind of e-mails?
5         MR. KO:  Object to the form.
6 BY MR. MORRIS:
7     Q.    The reason I asked it that way
8 is before I got chastised for potentially
9 asking you about e-mails that wanted to know
10 about the weather, so I'm only asking you
11 about e-mails, substantive e-mails related to
12 the opinions that you're giving in this case.
13 Did you have such e-mail exchanges with
14 McGuire?
15     A.    Yes.
16     Q.    And what was the nature, the
17 subject of those e-mails?
18     A.    The main one I recall was a
19 discussion of the rate of opioid use disorder
20 in the bellwethers.
21     Q.    And is that one where he gave
22 you a reference to look at, or is he just
23 giving you his opinion about it?
24         MR. KO:  Object to the form.

Page 240

1     A.    We were discussing different
2 ways of extrapolating from national rates to
3 local rates, and one possibility was to use
4 the relative mortality rates in the
5 bellwethers relative to the nation, which
6 would have resulted in a higher rate of
7 opioid use disorder than I use in my report
8 and higher expenditures on treatment.  And we
9 were discussing the relative merits of that
10 versus doing what I did, which was assume
11 that the national numbers applied to the
12 bellwethers.
13 BY MR. MORRIS:
14     Q.    Did you have e-mail,
15 substantive e-mail exchanges about your
16 opinion with Gruber?
17     A.    Any e-mails I had with
18 Dr. Gruber were in the first month or so of
19 the case, and I'm pretty sure they weren't
20 any things that were substantive having to do
21 with my opinion.
22     Q.    Okay.  Let's go to Table 4
23 which I have starting at Page 13 of 144.
24     A.    All right.

Page 241

1         MR. KO:  Just to be clear, it's
2 C.4, right?
3         MR. MORRIS:  C.4, correct.  I
4 know that there's two Table 4s, but
5 we'll start with C.4.  And this is
6 your estimate for the cost of
7 connecting individuals to services, is
8 that right.
9     A.    Yes.
10 BY MR. MORRIS:
11     Q.    Okay.  Now, in this category
12 you have staffing of a 24-hour, 7-day-a-week
13 referral line.  You have staffing for
14 emergency departments, transportation
15 assistance and web-based referral systems?
16     A.    Yes.
17     Q.    What's your basis for those
18 items as effective for connecting individuals
19 to services?
20     A.    So first as a general point,
21 that I think there's a very strong consensus
22 in both the national literature and in my
23 conversations with individuals in the
24 communities that one of the biggest

Page 266

1 social workers to be employed for this
2 purpose.
3     A.    Yes.
4     Q.    Do you see that?
5     A.    It sounds right, but I'm not
6 seeing it exactly.
7     Q.    Yeah, I'm sorry.  It's line
8 item 1 actually.  This is for the Cuyahoga
9 version of it.
10     A.    Yeah, I've got Summit.  That's
11 why I'm having trouble here.  Yes.
12     Q.    Okay.  What is that -- do you
13 know what that means with respect to the
14 terms of ratio of social workers to students?
15     A.    Yes, so that's all sort of
16 explained in this long footnote 1.  Would you
17 like to go into the details?
18     Q.    Well, let me ask it this way.
19 Would there be -- what would the metric be to
20 determine success or not with this program?
21     A.    I would measure whether -- I
22 would measure the rate at which teenagers and
23 people in their early twenties were becoming
24 addicted to opioids over time and whether

Page 267

1 that was coming down.
2     Q.    And the goal would be to, what
3 you just said --
4     A.    Exactly, yeah.
5     Q.    -- reduce the number of people
6 in the future, kids in the future who become
7 addicted, correct?
8     A.    Yes.
9     Q.    And have you calculated a
10 potential estimate of how many -- the level
11 of reduction that would result as a result of
12 implementing the school-based prevention
13 programs?
14     A.    My analysis doesn't involve
15 creating projections of the future opioid
16 population.
17     Q.    If you go to Table 14, and this
18 is the Cuyahoga version of it.  It starts at
19 Page 46 of 144, and this is for the cost of
20 medical provider education and outreach
21 category.  You have here three full-time
22 equivalent medical outreach providers for
23 Cuyahoga.  Do you see that?
24     A.    I do.

Page 268

1     Q.    What would these three people
2 be doing?
3     A.    They would be doing a variety
4 of activities to try to coach providers in
5 appropriate prescribing practices of opioids,
6 and they would probably also, if we could get
7 the data sharing working right, would be
8 identifying the 5 to 10 percent of
9 prescribers who seem to have the highest
10 rates of prescribing and focusing efforts
11 particularly on them.
12     Q.    If you look in the note number
13 1, there's -- it's based on an assumption
14 that approximately 10 percent of physicians
15 will be targeted for education.  Do you see
16 that?
17     A.    Yes.
18     Q.    Why did you assume that
19 percentage of physicians being targeted for
20 education?
21     A.    When I've talked to medical
22 experts who have been involved in this kind
23 of medical detailing, that's what they've
24 described as the kind of strategies you

Page 269

1 employ to focus your attention on the people
2 who seem to -- who might be the ones who are
3 overprescribing.
4     Q.    And do you know how many visits
5 per year that would mean for physicians by
6 the outreach individuals?
7     A.    I have a number in my head, but
8 I just want to make sure it's the same one
9 that I'm using here.
10     Q.    If you go to Page 134, which is
11 the further backup material for the tables.
12     A.    Okay.  It has the two.  That
13 was the number I was going to say, but I
14 wanted to make sure I was right.  Okay.
15     Q.    Okay.  So two, this would be a
16 target for two physician visits per year by
17 the employees in this category, the
18 practitioners?
19     A.    And that's an average.  In
20 fact, you wouldn't literally go to everyone
21 for two.  Some may need more visits.  Some
22 may need less.
23     Q.    The goal of this also would be
24 to reduce the number of people who eventually

Page 270

1  become in the category of opioid -- having
2  opioid use disorders?
3      A.    All of the components of the
4  prevention plans that we're talking about
5  that you try to prevent people from becoming
6  misusers or addicted to opioids.
7      Q.    Okay.  And like the other
8  preventative categories, you don't have a
9  metric to determine or a number in mind to
10 determine success of those programs?
11         MR. KO: Object to the form.
12     A.    I think in this one it's quite
13 clear what metric one would use to tell if
14 you're making progress, which is whether
15 prescriptions here are coming down.  In
16 particular I hope one would be able to do a
17 more nuanced version and be able to measure
18 the amount of appropriate and inappropriate
19 prescriptions.  So I think one could track
20 progress on this one.
21 BY MR. MORRIS:
22     Q.    You don't have a goal set,
23 though, as part of your -- this portion of
24 your abatement plan?

Page 271

1      A.    The goal is to make as much
2  progress as one can make.
3      Q.    Let's go to Table 16.  And
4  that's at Page 58 of 144 for the Cuyahoga
5  version and 51 for Summit County.
6      A.    Yes.
7      Q.    And it's cost of law
8  enforcement investigations.
9      A.    Mm-hmm.
10     Q.    And have you an estimate for 25
11 detectives investigating overdoses.  Do you
12 see that?
13     A.    Yes.
14     Q.    And for support for that, you
15 have a citation to the deposition of Gary
16 Gingell?
17     A.    Yes.
18     Q.    Okay.  Is that the basis for
19 your number of detectives for Cuyahoga
20 County?
21     A.    Yes.
22     Q.    And you cite to two pages from
23 his deposition.  Do you see that?
24     A.    Yes.

Page 272

1         (Whereupon, Liebman Exhibit
2      Number 15 was marked for
3      identification.)
4  BY MR. MORRIS:
5      Q.    Giving you what's been marked
6  as Exhibit 15, okay.  If you can go to the
7  pages that you cited there of the Exhibit 15
8  which is the deposition transcript for Gary
9  Gingell, if you can go to the pages in that
10 deposition transcript 243, 244.
11         (Witness reviewing document.)
12     Q.    You see his testimony there at
13 the bottom of Page 243 where he talks about,
14 he says "I could use, yeah, with the volume
15 of -- with the numbers here, 243 deaths.
16 I'll give you an example.  The homicide unit
17 had, I don't know, 110 or 115, whatever it
18 was, homicides last year with, I think, 14
19 detectives, so my guys had 243 death cases
20 with 5 detectives and another 1300 something
21 nonfatal cases.  So yeah, I could keep that
22 many people busy easy, and then you would
23 need the bosses.  Each squad would need a
24 sergeant.  You would need a lieutenant.

Page 273

1         "Question, so if you could say
2  you needed 20 to 25 more, it would be for the
3  HIDI?
4         "Answer, for the HIDI."
5      Is that what you based your
6  estimate of 25 detectives in Table C.16?
7      A.    Yes, that and a similar
8  conversation with him in person.
9      Q.    Okay.  So you had a
10 conversation with him where he told you he
11 thought that he could use 25 additional
12 detectives?
13     A.    Yes.
14     Q.    Did you talk to anybody else
15 about the number of detectives that might be
16 needed?
17     A.    So I looked at the death
18 statistics and the caseloads to verify that
19 his view of this was reasonable.
20     Q.    And in Summit County, you have
21 four additional?
22     A.    Yep.
23     Q.    What was that based on?
24     A.    It was again based on the view

Page 286

1  inflation rate for any of the categories in
2  your estimate, your cost estimate here, those
3  numbers could have been lower, correct?
4      A.    Mechanically if I used a lower
5  inflation rate, the number would be lower.
6      Q.    I want to go back to the
7  discussion that you had earlier about your
8  conversations with Dr. Alexander who has been
9  identified as an expert in this case.  Do you
10  recall generally that testimony from earlier?
11      A.    Yes.
12      Q.    I believe you said that one
13  conversation that you had with Dr. Alexander
14  pertained to certain components of the
15  abatement -- your abatement plan, correct?
16      A.    Yes.
17      Q.    Were there any components of
18  your abatement plan that Dr. Alexander
19  specifically recommended?
20          MR. KO:  Objection.  Asked and
21  answered.
22      A.    I don't remember.  I mean, as
23  I've said a few times today these components
24  are common across just about every proposal

Page 287

1  for abating this crisis, so the fact that
2  there's a lot of overlap between what I was
3  reading, what he was saying, what other
4  experts is saying is not a surprise here.
5  BY MS. HIBBERT:
6      Q.    Let me ask it a different way.
7  Were there any components of your abatement
8  plan that you didn't already have included in
9  the plan that Dr. Alexander then recommended
10  to be included?
11      A.    I'm just looking at my
12  components to see if there's anything that I
13  think we didn't already know about from five
14  other sources.
15          There's nothing that pops out
16  that I didn't already know would likely be a
17  component.
18      Q.    Were there any components of
19  your abatement plan that Dr. Alexander
20  recommended not be included?
21      A.    No.
22      Q.    Same question for any
23  components of Dr. Alexander's abatement plan,
24  did you offer any recommendations as to his

Page 288

1  abatement plan?
2      A.    No.
3      Q.    Have you reviewed
4  Dr. Alexander's expert report in this case?
5      A.    Yes.
6      Q.    So then you're aware of some
7  differences in the total cost estimates for
8  some of your overlapping programs, is that
9  right?
10      A.    He's doing national estimates
11  and I'm doing bellwether ones, so it's not a
12  direct comparison there.
13      Q.    There's no direct comparisons
14  for any of the overlapping components of
15  either of your abatement plans, is that your
16  understanding?
17          MR. KO:  Object to the form.
18          MS. RITTER:  Object to the
19  form.
20      A.    Can you ask that again, please?
21  BY MS. HIBBERT:
22      Q.    There's no direct comparisons
23  for any of the overlapping components for
24  either of your abatement plans, is that your

Page 289

1  understanding?
2          MR. KO:  Same objection.
3      A.    His estimates are national and
4  mine are local, so one would have to figure
5  out some way to convert the national ones to
6  the local estimates, for example, dividing by
7  the ratios of opioid deaths or population or
8  something like that before you could compare
9  the magnitudes.
10  BY MS. HIBBERT:
11      Q.    You're aware then, if you
12  reviewed his report, that his abatement plan
13  is for a 10-year time period.  Is that -- are
14  you aware of that?
15      A.    I don't specifically remember
16  that, but I take your word for it.
17      Q.    Did you have any conversations
18  with Dr. Alexander as to why he had a 10-year
19  abatement plan versus your 15-year abatement
20  plan?
21      A.    No.
22      Q.    Do you have an understanding of
23  why there would be a difference in the length
24  of the abatement plans?

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1    MS. RITTER: Objection. And I
2 would instruct him not to answer. In
3 case he would have to rely on a
4 conversation with counsel in order to
5 answer the question, I would instruct
6 him not to answer only that portion of
7 an answer that he would be tempted to
8 provide.
9 BY MS. HIBBERT:
10   Q.   With that instruction, can you
11 answer?
12   A.   I do not know why he decided to
13 use 10 years.
14   Q.   Why did you decide to use
15 15 years for your abatement plan?
16    MR. KO: Objection. Asked and
17 answered. Go ahead.
18   A.   Because from reading the
19 literature on abatement plans and from
20 talking to both national and local experts, I
21 came to the conclusion that it was going to
22 take sustained effort over a 15-year period
23 to abate this crisis.
24 BY MS. HIBBERT:

Page 291

1    Q.   What specific national and
2 local experts did you speak to and rely upon
3 in making that determination?
4    A.   I think I can't point to the
5 specific ones, but there were a lot of
6 different conversations and things I read.
7    Q.   Can you point to any specific
8 literature that you relied upon for that
9 determination?
10   A.   Not off the top of my head.
11   Q.   Is there any way that I can,
12 you know, know sitting here today what the
13 basis is for your determination that a
14 15-year abatement plan is most appropriate in
15 this case?
16   A.   I think you can see in the
17 medical expert reports of Dr. Lembke, for
18 example, that medical experts think that we
19 need a sustained effort at least that long.
20 Dr. Lembke talks extensively about how people
21 who are addicted today, many of them are
22 going to need lifetime treatment, and so I
23 think that's one of several places where you
24 can see quite clearly the medical consensus

Page 292

1 that this is not a short-term -- it's not --
2 there's not a short-term solution to this
3 problem, that it's going to take sustained
4 effort over a long period of time to abate
5 the opioid epidemic.
6    Q.   Lifetime is certainly more than
7 15 years, right?
8    MR. KO: Object to the form.
9    A.   Sorry, you're saying that
10 people live longer than 15 years?
11 BY MS. HIBBERT:
12   Q.   Your lifetime, your 15-year
13 abatement plan isn't to take into account the
14 lifetime of any particular person that might
15 be serviced by this plan, is it?
16    MR. KO: Object to the form.
17   A.   Sorry, I give a 15-year plan.
18 I would expect that we need to continue to
19 spend resources on this beyond 15 years.
20 BY MS. HIBBERT:
21   Q.   Does Dr. Lembke discuss why a
22 15-year abatement plan would be better than,
23 say, a 10-year abatement plan?
24   A.   I don't recall specifically.

Page 293

1    Q.   Have you spoken to anybody
2 aside from counsel in this case about the
3 appropriate length of time for an abatement
4 plan?
5    MS. RITTER: Objection to the
6 form. Foundation.
7    A.   Yes.
8 BY MS. HIBBERT:
9    Q.   Who?
10   A.   I did a phone call that was a
11 group call with several of the medical
12 experts where we explicitly discussed this
13 topic.
14   Q.   What medical experts did that
15 include?
16   A.   Dr. Ryan from Cincinnati,
17 Dr. Parran from Cuyahoga, and Dr. Lembke.
18   Q.   And what was the substance of
19 that conversation?
20   A.   Among the topics we discussed
21 was whether the level of services in an
22 abatement plan needed to extend beyond 10
23 years, and the consensus out of my discussion
24 with those doctors was that it did.

Page 298

1    A.    Are you asking about costs in
2  the past?
3  BY MS. HIBBERT:
4    Q.    Correct.
5    A.    I am not.
6    Q.    And you're not offering any
7  opinions regarding any costs incurred or to
8  be incurred by plaintiffs outside of what is
9  detailed in your abatement plan and estimate
10 of costs, correct?
11      MR. KO:  Object to the form.
12   A.    The opinion I am offering is
13 that there is -- that one can construct an
14 abatement plan and that one can have costs on
15 it. That's what my opinion is.
16 BY MS. HIBBERT:
17   Q.    And all of your opinions
18 regarding your abatement plan and your
19 estimation of the costs are included in your
20 report, the supplemental report and the
21 supplemental appendices that you have -- that
22 have been submitted to us in this case that
23 we've looked at here today, is that right?
24   A.    Yes.

Page 299

1    Q.    You don't have anything else
2  aside from what you've told us about today, I
3  think there were two circumstances, that you
4  intend to supplement or change in any way
5  with regard to your opinions, is that right?
6       MR. KO:  Object to the form.
7       Asked and answered.
8    A.    That's correct.
9  BY MS. HIBBERT:
10   Q.    There were a number of the
11 components to your abatement plan where you
12 seem to assume a population that stayed
13 constant over time. I think you said it
14 included child welfare population, the
15 maternal program, inmates with opioid use
16 disorder, and the homeless population. Would
17 you agree with that?
18      MR. KO:  Object to the form.
19   A.    In most cases I am assuming
20 that the capacity needs stayed constant over
21 time, is the specific thing I'm assuming.
22 BY MS. HIBBERT:
23   Q.    I'm sorry, the capacity for
24 what?

Page 300

1    A.    For example, with the jails, in
2  Cuyahoga I recommend that there be two
3  specialty facilities available to treat
4  people with addictions and that those
5  facilities that would be -- well, there's one
6  already, but the additional facilities would
7  be open for the full 15-year duration.
8    Q.    And with regard to the child
9  welfare, we can take a look at the table if
10 you'd like, you're also assuming that the
11 children placed in foster or institutional
12 care, the number of children placed in foster
13 or institutional care stays constant over the
14 15-year time period for your plan, correct?
15      MS. RITTER:  Objection to the
16      form.
17   A.    I assume that there is a number
18 of social workers and caseworkers and other
19 clinical staff in that department that we
20 need to get to and that we would then keep
21 that level constant.
22 BY MS. HIBBERT:
23   Q.    Based on the fact that the
24 number of children in those programs would

Page 301

1  stay the same, is that fair?
2    A.    Well, I'm basing the number
3  based on the needs today, and then I'm
4  assuming that we are going to need that
5  higher capacity going forward.
6    Q.    You're assuming that the needs
7  stay constant for the next 15 years, is that
8  fair?
9    A.    I'm assuming that the service,
10 yeah, the same level of services would be
11 provided, yes.
12   Q.    Because the need would be
13 there, the need would stay constant?
14      MS. RITTER:  Objection to form.
15 BY MS. HIBBERT:
16   Q.    I'm not trying to beat around
17 the bush. I just -- I'm asking a question.
18 You're answering a little bit of a different
19 question.
20   A.    Well, because I didn't -- the
21 way I thought about what I did isn't the way
22 you're phrasing it. The way I thought about
23 it was I figured out the level of services
24 that are needed now and I assumed that that

Page 302

1  level of services would continue to be
2  available into the future.
3      Q.    Are you offering an opinion in
4  this case as to the level of services that
5  will continue to be needed in the next
6  15 years for any of the components of your
7  plan?
8          MR. KO:  Object to the form.
9      A.    I think implicit in making a
10  15-year projection of an abatement plan, I am
11  doing my best job to project what those
12  service needs will be.
13  BY MS. HIBBERT:
14      Q.    Earlier you testified, I
15  believe, and correct me if I'm wrong, that
16  the abatement plan and cost estimates don't
17  identify or take into account who should be
18  paying for any of these estimated costs, is
19  that correct?
20          MS. RITTER:  Objection.  Asked
21  and answered.
22      A.    That is correct.
23  BY MS. HIBBERT:
24      Q.    And that includes the

Page 303

1  individual defendants in this case, right?
2      A.    That's correct.
3      Q.    And it may also include the
4  plaintiffs themselves, is that fair?
5      A.    I'm sorry, the question about
6  the plaintiffs?  Say the question again,
7  please?
8      Q.    Sure.  Is it fair to assume
9  that your -- strike that.
10          Is it fair that the plaintiffs
11  themselves may actually contribute to the
12  estimated costs, paying for the estimated
13  costs in your abatement plan?
14          MR. KO:  Object to the form.
15      A.    I don't have any -- I don't
16  have any opinions about that.  I'm just
17  explaining what the resource needs are, and I
18  don't have a -- I have not formed an opinion
19  about who would pay.
20  BY MS. HIBBERT:
21      Q.    And your plan doesn't take into
22  account any third-party payers like the
23  federal government or the State of Ohio or
24  any insurance companies or anybody like that,

Page 304

1  correct?
2      A.    I wasn't asked to figure out
3  who would pay for this.  I was asked to
4  figure out what the needs were to abate the
5  opioid crisis.
6      Q.    Would there be a way for
7  somebody who would want to make that
8  determination to look at your abatement plan
9  and estimation of costs and break out what,
10  if any, portion would be attributable to,
11  say, the individual defendants in this case?
12          MR. KO:  Object to the form.
13      A.    I think in order to do that,
14  one would have to incorporate some additional
15  information beyond what's in my report.
16  BY MS. HIBBERT:
17      Q.    What additional information
18  would we need to do that?
19      A.    I think we're about to get into
20  a discussion of legal theories of blame that
21  I am not qualified to discuss.
22      Q.    You're not qualified to discuss
23  that and you haven't done that in your
24  report, or your plan, correct?

Page 305

1      A.    That's correct.
2          MR. KO:  Object to the form.
3  BY MS. HIBBERT:
4      Q.    Is there any way to determine,
5  based on your abatement plan and the cost
6  estimates, what's already being paid for or a
7  type of program or component that's already
8  being paid for by, like, the federal
9  government, for instance?
10      A.    In constructing this plan and
11  thinking about what should go in it, I
12  thought about both how do we continue the
13  things that are already being done and how do
14  we do enough additional so that we make as
15  much progress as possible on the opioid
16  crisis.  So in thinking about that and
17  understanding what's currently being done,
18  some of the information I gathered would
19  allow one to figure out who was paying for
20  things now.
21      Q.    And do you have that -- have
22  you made a determination and offered an
23  opinion here in this case as to who is
24  ultimately -- strike that.

Highly Confidential - Subject to Further Confidentiality Review

Page 322

1  split up the remaining amount of time.
2  He wanted a break in between like at
3  the halfway point of the hour 25, so I
4  think we're around there, so if
5  there's a good point for your to
6  break.
7      MS. HIBBERT:  Let me just
8  finish this line.
9      MR. KO:  Yeah, of course, I
10  just wanted to make sure you're aware.
11 BY MS. HIBBERT:
12     Q.    Does your model also take into
13 account the efforts of the -- Summit County's
14 opiate task force?  I know -- I don't think
15 that's mentioned in your report.
16     A.    I'm certainly aware of their --
17 of the efforts going on in the Summit
18 communities.
19     Q.    Now, the cost estimates that
20 you have put into place here -- let's take
21 for example the naloxone distribution.
22 That's something that both the Cuyahoga
23 County and the Summit County opiate task
24 force have already begun implementing that

Page 323

1  program, is that correct?  Is that your
2  understanding?
3      MR. KO:  Object to the form.
4      A.    Both communities have expanded
5  the distribution of naloxone in recent years.
6  BY MS. HIBBERT:
7      Q.    So the cost estimates in your
8  program pertaining to the naloxone
9  distribution, those are not taking into
10 account the money that's already being spent
11 by the counties for those programs, is that
12 right?
13     A.    No, it's not right.  It takes
14 into account both that money and the
15 additional money.  It is the sum of that
16 money and additional money that is needed.
17     Q.    Okay.  So that money -- the
18 money that's already being spent is built
19 into the cost estimates, is that fair?
20     MR. KO:  Objection to the form.
21     A.    Continuing a similar amount of
22 money in the future is built into the cost
23 estimates.
24 BY MS. HIBBERT:

Page 324

1      Q.    The cost estimates aren't just
2  for the additional money that it would take
3  to continue with those programs?
4      A.    Sorry, the cost estimates,
5  repeat that question, please.
6      Q.    Sure.  The cost estimates
7  aren't just for the additional money that it
8  would take to continue implementing those
9  programs.
10     A.    Additional and continue seem to
11 conflict in that sense.  I both have the
12 costs that would be necessary to continue,
13 and I have the additional.  It is the sum of
14 the two.
15     MS. HIBBERT:  Let's take that
16 quick break.
17     MR. KO:  Thanks.
18     THE VIDEOGRAPHER:  The time is
19 5:15 p.m., and we're off the record.
20     (Whereupon, a recess was
21 taken.)
22     THE VIDEOGRAPHER:  The time is
23 5:25 p.m., and we're on the record.
24 BY MS. HIBBERT:

Page 325

1      Q.    Dr. Liebman, we talked earlier
2  about how your abatement plan and cost
3  estimates, do they include the estimates for
4  individuals who were addicted or are addicted
5  to illicit opioids like heroin and fentanyl
6  and car fentanyl and various analogs, do you
7  recall that testimony?
8      A.    Yes.
9      Q.    Would it have been possible for
10 you to separate out that population of people
11 in performing your analysis and calculations
12 in this case?
13     A.    I wasn't asked to do that so I
14 haven't thought heard about that question,
15 but I think it would be complicated.
16     Q.    Have you ever done a
17 calculation like this before where you would
18 have to separate out a certain population
19 like this?
20     A.    So, sorry, explain what like
21 this means.
22     Q.    Well, when you say that it
23 would be complicated, what do you mean by
24 that?

Highly Confidential - Subject to Further Confidentiality Review

Page 326

1    A.    I guess I was -- were you
2  simply -- was your question simply could I
3  make -- could we separate out MAT into people
4  who are currently using heroin and people who
5  are currently using prescription opioids?
6    Q.    Let me put it this way.  Would
7  it be possible to separate out all of your
8  cost components for every component any cost
9  associated with individuals that use or abuse
10 illicit opioids that have never used a
11 prescription opioid in their life?
12   A.    The reason it could be
13 complicated is that there are market factors
14 in the illegal drug market that determine how
15 much heroin is supplied to a community that
16 probably is dependent on, overall on -- I
17 really haven't thought about this issue so I
18 don't think I want to offer an opinion.
19   Q.    Okay.  If someone wanted to do
20 that, take your abatement plan and estimation
21 of cost and take out of it all of the
22 estimates for costs associated with
23 individuals that have never taken a
24 prescription opioid in their life, would that

Page 327

1  be possible?
2    A.    Someone could make an
3  assumption of, I guess, on the treatment side
4  of what fraction of people were in that
5  category and simply break out that number
6  into 80 percent and 20 percent or whatever it
7  was.
8    Q.    You didn't do that here in your
9  report?
10   A.    I was not asked to do that.
11   Q.    If someone asked you or if
12 someone wanted to down the line to take out
13 any of the estimated costs that were specific
14 to the cities of Cleveland and Akron, would
15 that be possible?
16   A.    Do you mean expenditures of
17 city government or people living in those
18 communities being served?
19   Q.    The expenditures associated
20 with those cities specifically?
21   A.    I'm sorry, I don't think you
22 answered that.  I'm not supposed to be asking
23 questions, but I don't think you answered.
24 You didn't make me understand your question.

Page 328

1  So are you asking me which part of this
2  program would be -- would I propose to be
3  administered by the city governments and,
4  therefore, dollars would have to flow through
5  them to administer those programs?
6    Q.    Let me try to make it more
7  clear since you don't understand, and that's
8  reasonable.
9          Would it be possible to
10 separate out any of the estimated costs that
11 are associated with residents that are in the
12 City of Cleveland or the City of Akron?
13 Start there.
14   A.    One could do that, for example,
15 by taking the fraction of the total county
16 population that lives in those communities.
17 Some of the rates might differ in the cities
18 and the outlying areas, and one would have to
19 think hard about whether one would make
20 different assumptions in the different parts
21 of the county.
22   Q.    What rates are you thinking of?
23   A.    Maybe the number of the
24 percentage of families involved in the child

Page 329

1  welfare system where opioid abuse is an issue
2  in that family, it could be that that rate
3  was different in the city than in the rest of
4  the county.
5    Q.    Was there any data or any
6  information that you looked for or wanted to
7  see in forming your opinions and performing
8  your calculations that you couldn't find or
9  wasn't provided to you?
10   A.    I think when everyone does
11 analysis like this, one has something you're
12 trying to estimate and you try to go find the
13 best source of data and you -- in lots of
14 categories, I look for one thing and I look
15 for another and I find what the best source
16 is that I can find out there.  So I think the
17 answer is definitely yes, but I'm not -- it's
18 not going to be easy for me to give you a
19 detailed list.
20   Q.    Have you asked anyone,
21 including the folks that you're working with
22 from Compass, any other experts or counsel in
23 this case, have you asked for any materials
24 that haven't been provided to you?