# **EXHIBIT G**

```
         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
                   EASTERN DIVISION
                       - - -


   IN RE:  NATIONAL           :    HON. DAN A.
   PRESCRIPTION OPIATE        :    POLSTER
   LITIGATION                 :
                              :
   APPLIES TO ALL CASES       :    NO.
                              :    1:17-MD-2804
                              :

            - HIGHLY CONFIDENTIAL -

   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                       - - -
                  April 29, 2019
                       - - -

            Videotaped deposition of
   KATHERINE KEYES, Ph.D., taken pursuant to
   notice, was held at the law offices of
   Lieff Cabraser, LLP, 250 Hudson Street,
   New York, New York beginning at 9:08
   a.m., on the above date, before Michelle
   L. Gray, a Registered Professional
   Reporter, Certified Shorthand Reporter,
   Certified Realtime Reporter, and Notary
   Public.

                       - - -

            GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1  in your report?
2     A.   So as I mentioned in the
3  report, there are other programs and
4  policies that counties have -- have
5  developed, have considered.  I think
6  there's different levels of evidence for
7  them.  I felt that these three in
8  particular had a solid evidence base
9  for -- again, not exhaustive.  But these
10 three are three really solid ways to
11 reduce opioid use disorder and morbidity
12 and mortality that have evidence
13 associated with them.
14    Q.   Did you think that these
15 three were the ones that had the best
16 evidence bases that you were aware of?
17    A.   I would --
18         MS. RELKIN:  Objection to
19 form.
20         You can answer.
21         THE WITNESS:  I -- I was not
22 asked to evaluate the best
23 policies and programs.  I was
24 asked to -- my approach to this

Page 367

1       report was to outline the evidence
2       for three solid programs that had
3       a strong evidence base.
4  BY MS. WINNER:
5     Q.   My question is --
6     A.   I'm not sure what the best
7  means.  Can you --
8     Q.   Well, the best evidence I
9  think, is actually, what I asked you.
10 Were those the ones that you thought had
11 the best evidence?
12    A.   Not necessarily.  I think
13 there's a combination of factors that one
14 needs to use and that we use in public
15 health when choosing what programs and
16 policies to highlight in these types of
17 contexts.  One is the level of evidence.
18 Another is the anticipated impact.
19        So I think, you know, among
20 other reasons that one would focus on
21 particular policies, I thought these
22 three had both a solid evidence base and,
23 specific to the counties, there was
24 enough information to suggest that there

Page 368

1  would be an impact on the epidemic.
2     Q.   Were there any other reasons
3  other than the ones you just described
4  why you selected these three?
5     A.   I would say that evidence
6  and impact were the -- the main reasons.
7     Q.   Okay.  Now, I'm pretty sure
8  I know the answer to this question, but
9  I'm going to ask it anyway.
10        In evaluating these measures
11 did you -- did your analysis
12 differentiate in any way between
13 abatement measures that are needed for
14 harms that can be traced back to
15 prescription opioids versus those that
16 are attributable solely to people whose
17 abuse of heroin or other illicit opioids
18 has nothing to do with prescription
19 opioids?
20         MS. RELKIN:  Objection to
21 form.
22         You can answer if you can.
23         THE WITNESS:  The case that
24 I make in this report is that the

Page 369

1       increase in the supply of
2       prescription opioids under -- was
3       an underlying factor for the
4       development of additional opioid
5       epidemics, including the heroin
6       epidemic creating a market,
7       increasing the risk among users.
8       And so, I would attribute -- in
9       terms of the overall opioid
10      epidemic, I don't see how one in a
11      public health sense would
12      differentiate between those two.
13 BY MS. WINNER:
14    Q.   So you don't think that
15 that's something that would be practical
16 to do, to try to differentiate between
17 those two categories?
18    A.   That's not what I said.  I
19 don't think one -- I think that these
20 epidemics are so intertwined in terms of
21 their underlying causation, that it's not
22 only -- the practicality of it is not the
23 key aspect.  It's the level of evidence
24 for causation.

Page 370

1    Q.   Now, remedial measures that
2 are taken to address the kinds of
3 problems that you've identified in your
4 report are today taken by a variety of
5 different actors, correct?
6         MS. RELKIN:  Objection to
7    form.
8         THE WITNESS:  I don't know
9    what you mean.  Can you define
10   remedial measures?
11 BY MS. WINNER:
12   Q.   Well, you identify three,
13 MAT --
14   A.   So but -- I'm sorry.  Can
15 you define remediation, what you mean by
16 that word.
17   Q.   Well, let me change the word
18 if that's giving you a problem.
19 Abatement measures, does that make you
20 feel more comfortable?
21   A.   Sure.  The three policies
22 and programs that I talk about.
23   Q.   Yes.  The kinds of programs
24 that you talk about are undertaken in the

Page 371

1 world by a variety of different actors,
2 correct?
3    A.   Can you describe what you
4 mean by actors.
5         MS. RELKIN:  Objection to
6    form.  Overbroad.
7 BY MS. WINNER:
8    Q.   Well, for example there are
9 some things that the federal government
10 implements and pays for, correct?
11   A.   Can you give me an example?
12 I can't --
13   Q.   You're not aware of any?
14 Are you aware of anything in these
15 categories that the federal government
16 pays for?
17   A.   I need -- I need some
18 specifics in terms of what exactly you're
19 referring to in order to answer that
20 question.
21   Q.   Are you aware of federal
22 funding for MAT, for example?
23   A.   There are reimbursement
24 programs for different levels of

Page 372

1 treatment that vary across a wide variety
2 of contexts.
3    Q.   And that would include MAT,
4 correct?
5    A.   So as I've said, I am not
6 sure what you mean by federal funding.
7 There is federal funding for health
8 insurance that is included in what I've
9 outlined here.
10   Q.   So federally funded health
11 insurance pays for some of these
12 measures, correct?
13   A.   It depends on the -- on the
14 context.
15   Q.   Have you ever heard of
16 grants that are made available to local
17 governments to pay for MAT?
18   A.   Again, I would need to see
19 some specifics on a particular type of
20 grant.  Certainly there are a number of
21 programs that are available to help
22 individuals who are unfortunately
23 addicted to opioids.
24   Q.   And there's some things that

Page 373

1 are -- some abatement measures that are
2 undertaken at the state level, correct?
3    A.   I think that there are a
4 broad range of institutions that can
5 participate in reversing the opioid
6 epidemic.  What currently occurs in terms
7 of the participation of institutions to
8 reduce the impact of the opioid epidemic
9 and what could possibly occur, -- what
10 I'm addressing here is the evidence for
11 these programs for their ability to
12 reduce the opioid epidemic, and that's
13 what's in the report.
14   Q.   Okay.  So would it -- based
15 on what you just said, would it be fair
16 to say that what you've done in your
17 analysis, is try to identify needs
18 without necessarily evaluating who would
19 actually satisfy those needs?
20   A.   I think what I was asked to
21 do --
22        MS. RELKIN:  Objection to
23   form.
24        THE WITNESS:  As an

Page 378

1 All right. So in Section F,
2 this is one of the -- section -- the
3 prior -- prior section you talk about --
4 generally about the efficacy of naloxone
5 distribution. And then in Section F.5.1
6 you go on to talk about the need
7 specifically in Cuyahoga County and
8 Summit County, correct?
9     A.  So the first part of
10 Section F.5 provides an evidence base for
11 the efficacy of naloxone in reversing
12 potential failed consequences of an
13 overdose. And also, in addition to that,
14 the evidence base that -- that providing
15 expanded access to naloxone also reduces
16 overdose events. So it's really two
17 different statements.
18     Q.  But -- but that said, where
19 you talk specifically about the -- trying
20 to quantify needs in Cuyahoga County and
21 Summit County for naloxone, that's
22 Section F.5.1, correct?
23     A.  That's correct.
24     Q.  Okay. So -- and then you

Page 379

1 talk about, in that section, you give --
2 you make a number of different
3 observations about -- about the numbers
4 and the needs for naloxone.
5     But I want to focus just on
6 the first instance, in the last
7 paragraph, which is about naloxone
8 administration kits in Cuyahoga County,
9 correct?
10     A.  Okay.
11     Q.  And in there you say, a
12 couple sentences down -- third sentence I
13 think. This is in -- "This is in
14 addition to medical first responders such
15 as EMS who are trained to administer
16 naloxone, available data indicate that in
17 2018 Cuyahoga County EMS administered
18 naloxone at least 4,353 times."
19     And then you go on with the
20 parenthetical about that. I'm -- I'm
21 focused on this 4,353 number.
22     Does Cuyahoga County
23 actually have EMS services at the county
24 level?

Page 380

1     A.  This statement was based on
2 data that was provided to me.
3     Q.  By whom?
4     A.  By the counsel.
5     Q.  Okay. So -- by counsel, you
6 mean plaintiffs' counsel, not your
7 counsel. We know that.
8     A.  That's right.
9     Q.  Yes. Okay.
10     So this came from
11 plaintiffs' counsel, correct?
12     A.  Yes.
13     Q.  Okay. So am I correct that
14 you don't actually know yourself whether
15 Cuyahoga County provides EMS services?
16     A.  I evaluated the -- the
17 statement based on what was sent to me.
18     Q.  Were you assuming, based
19 on -- on the information that was
20 provided to you by counsel, that Cuyahoga
21 County itself was, in fact, providing EMS
22 services?
23     A.  Again, I think what I have
24 in the report is pretty clear. You know,

Page 381

1 I was sent information -- I asked for
2 information about, you know, providing an
3 estimate of the potential impact in the
4 county and that's the information that
5 was provided to me. And that's what's in
6 the report.
7     Q.  So are you purporting
8 here -- I don't want to use the word
9 purporting. That isn't --
10     MS. RELKIN: Objection to
11 form.
12 BY MS. WINNER:
13     Q.  I don't -- that -- are you
14 intending here to provide an opinion
15 about the naloxone needs that exist for
16 EMS in the city of Cleveland?
17     A.  What I provided was the
18 information that was given to me about
19 the number of administered naloxone
20 distribution based on the information
21 that I was sent.
22     Q.  My question though, are you
23 offering any opinions through this report
24 about abatement needs in the city of

Page 382

1  Cleveland, to be provided for by the city
2  of Cleveland?
3      A.  My understanding is the city
4  of Cleveland is in Cuyahoga County; is
5  that correct?
6      Q.  That -- last I knew, yes.
7      A.  So I would say that that is
8  covered under the estimates that I have
9  provided.
10     Q.  If it were demonstrated to
11 you that Cuyahoga County, in fact, does
12 not provide EMS services, would that have
13 any impact on the opinions that you
14 provide in this paragraph?
15     A.  I mean, you know, let's --
16 I'm -- I'm -- I keep an open mind to all
17 available evidence.  I think the point
18 that I was making in this paragraph is
19 that naloxone is a really important
20 program to reduce overdose.  And however
21 it is distributed is how it should be
22 distributed.  So if there is new
23 information that I could use, my opinion
24 would not change.  Just that distributing

Page 383

1  naloxone is an important thing to do in
2  Cuyahoga County.
3      Q.  Well, you have basically two
4  sets of opinions about naloxone in -- in
5  this report.
6          One set of opinions is about
7  whether naloxone is a good and important
8  thing to have out there.  The other set
9  of opinions is about specific numbers,
10 and so I'm trying to focus on your
11 opinions about specific numbers.
12         And so my question is:
13 If -- if -- leaving aside the question of
14 whether, you know it is important for
15 naloxone to be available in the
16 community, would your opinion about the
17 specific needs of Cuyahoga County be
18 affected if you knew that Cuyahoga County
19 does not provide EMS services?
20         MS. RELKIN:  Objection to
21     form.  Compound.
22         THE WITNESS:  Again, I think
23     I would -- I would respond to that
24     by saying what I intended to

Page 384

1  convey in that paragraph was some
2  assessment of the overall amount
3  of distribution of naloxone that
4  should occur.
5          If there are -- if new
6  information comes to light about
7  specific EMS services, you know,
8  that estimate could be revised.
9  But it doesn't change the overall.
10         That's one sentence in the
11 overall paragraph about the
12 estimated number of naloxone
13 administration kits that I would
14 estimate would be necessary.
15         So, sure, of course, I keep
16 an open mind.  If new information
17 is available, I obviously want to
18 present the most accurate picture
19 that I can.  But I think the
20 opinion that I have doesn't
21 change.
22 BY MS. WINNER:
23     Q.  Do you distinguish in your
24 opinion -- is there a difference in

Page 385

1  your -- let me start that again.
2          Is there a difference in
3  your view between the amount of naloxone
4  that is needed within Cuyahoga County as
5  opposed to the amount that is needed by
6  Cuyahoga County as a government entity?
7          MS. RELKIN:  Objection to
8      form.
9          THE WITNESS:  I need more
10     information on your
11     differentiation.
12 BY MS. WINNER:
13     Q.  So you can't answer my
14 question without more information?
15     A.  I don't understand your
16 question.
17     Q.  Okay.  Let me ask you about
18 your section about Summit County.
19         You have a similar
20 paragraph, discussing naloxone
21 administration kits in Summit County on
22 the next page, correct?
23     A.  Mm-hmm.
24     Q.  And do you know -- and that

Page 386

1  includes, among other things -- there are
2  other things in here.  But one of the
3  things that's in there is you have an
4  estimate of the amount of naloxone that
5  is needed for EMS in Summit County,
6  correct?
7       A.   So what I have in here is,
8  "Data are not currently available to me
9  regarding the total number of first
10 responders in Summit County; however, the
11 Akron Fire Department has a current work
12 force of approximately 354 individuals,
13 and there are 14 EMS/paramedics," and I
14 have a citation that was provided to me.
15          "Available data indicate
16 that in 2018 Summit County EMS
17 administered naloxone at least 1,562
18 times.  This is likely an underestimate
19 because 81.8 percent of EMS agencies
20 reported."
21      Q.   Is there such a thing as
22 Summit County EMS?
23      A.   Again, I don't -- this is
24 the information that was provided to me.

Page 387

1  If new information comes to light, it
2  doesn't change my opinion that naloxone
3  is very much needed in communities that
4  have a high burden of opioid overdose.
5       Q.   You say this was information
6  that was provided to you.  Again, was it
7  provided to you by plaintiffs' counsel?
8       A.   That's correct.
9       Q.   You -- in what you just
10 read, there's a reference to the Akron
11 Fire Department.
12      A.   Yes.  The Akron Fire
13 Department has a current --
14      Q.   I don't need you to read it
15 again.  Is the Akron Fire Department an
16 agency of the Summit County government?
17      A.   This is the information that
18 was provided to me.  I can -- we can go
19 to Reference 195 and look at the
20 information.
21          I asked plaintiffs' counsel
22 for information on these different
23 workforce numbers.  And these are the
24 numbers that I relied on.  Should new

Page 388

1  information come to light, again, the
2  opinion is the opinion.  I think
3  providing an estimate for these specific
4  counties is -- is what I was endeavoring
5  to do in these paragraphs.
6       Q.   Do you know whether the
7  Akron Fire Department carries naloxone
8  today?
9       A.   That information was not
10 provided to me.
11      Q.   If -- well, I assume the
12 answer is going to be the same.  But let
13 me just ask it.
14          Assuming that the Akron Fire
15 Department does carry naloxone, do you
16 know who pays for it?
17      A.   In the -- I'm sorry, this
18 pen is really leaking.
19          In the information that was
20 provided to me, the source of funding for
21 each individual naloxone kit was not
22 included.
23      Q.   Now, in Section C.3 of your
24 report -- let's go back.  It starts on

Page 389

1  Page 32.  You provide estimates of the
2  numbers of persons in each of these two
3  counties who were currently living with
4  opioid use disorder, correct?  I'll
5  direct you to the last paragraph on Page
6  32, the first sentence.
7       A.   Yes.  "While the number of
8  individuals currently living with opioid
9  use disorder in Cuyahoga and Summit
10 Counties is unknown, I can provide an
11 estimate of the number, given number the
12 overdose deaths."
13      Q.   And you -- is the estimate
14 that you then -- and we'll walk through
15 this.  But is the estimate that you then
16 go on to provide intended to be
17 specifically an estimate of the number of
18 individuals in each county who is
19 currently living with opioid use
20 disorder?
21      A.   Depend -- so the paper that
22 I relied onto make that assessment looked
23 at individuals who were dependent or
24 regular users of opioids.

Page 390

1     Q. Is that the same thing as
2 people who have opioid use disorder?
3     A. So this is the information
4 that I thought was important to gather an
5 estimate of the number of individuals who
6 would be in need of these services.
7     Q. But my question is --
8     A. It would be inclusive of
9 opioid use disorder.
10     Q. But is opioid use disorder
11 the same thing as being a dependent or
12 regular user of opioid?
13     A. So the Degenhardt, et al.,
14 2011 paper did not is assess opioid use
15 disorder. The Degenhardt paper assessed
16 dependent or regular users of opioids.
17 And I used that paper to provide an
18 estimate of the number of individuals in
19 those counties who would be in need of
20 these services, and would include
21 individuals living with opioid use
22 disorder.
23     Q. Is it limited to people who
24 have opioid use disorder or is it

Page 391

1 broader?
2     A. The estimate is individuals
3 who are dependent or regular users of
4 opioids.
5     Q. Is that likely to be
6 broader, narrower, or the same as the
7 population of people with opioid use
8 disorder?
9     A. Let's see. Individuals who
10 are dependent, so -- and regular users of
11 opioids. I would estimate that it's
12 largely similar.
13     Q. How similar? Do you have a
14 confidence interval or anything like that
15 for that?
16     A. I would need to do a
17 statistical analysis for that.
18     Q. Okay. I'd like to show you
19 what's been previously marked as
20 Exhibit 13 to your deposition, which I'm
21 hoping is the article that you're talking
22 about.
23     (Document marked for
24     identification as Exhibit

Page 392

1 Keyes-13.)
2 BY MS. WINNER:
3     Q. And is Exhibit 13 in fact
4 the article that you referred to a second
5 ago as the one that you relied upon for
6 this calculation?
7     A. So this article, just to be
8 clear, is a random effect meta-analysis
9 for the mortality, the crude and
10 standardized mortality rates for
11 individuals who are dependent or regular
12 users of opioids.
13     Q. Okay.
14     A. And I relied on it for this
15 assessment.
16     Q. Okay. And this is -- this
17 is the article that you cite in this
18 section of your report? I think it's --
19     A. I cite this article in this
20 section of the report.
21     Q. And it is, I think, just for
22 the record, this is Reference 151.
23     A. Let me just double-check
24 that.

Page 393

1     Q. Sure.
2     A. Yes, it is Reference 151.
3     Q. What you pulled out of this
4 report, am I correct -- well, first of
5 all, let's just talk about what this is.
6     This is a -- and I don't
7 want to go into every detail of it. But
8 generally this is a review of multiple
9 studies that evaluates their results on
10 the subject of mortality, correct?
11     A. So the outcomes reported
12 here are two outcomes. One is the crude
13 mortality rate. And one is the
14 standardized mortality rate for specific
15 causes of death across studies that used
16 inclusion criteria -- I'm sorry, that
17 used exclusion criteria that included not
18 reporting heroin or opioid users,
19 opioid-related mortality, or not reported
20 research data or case studies.
21     So that is what the design
22 was, was a multiple search strategy to
23 find studies that assessed mortality
24 among regular and dependent users of

Page 398

1  that any one particular study, you might
2  be over or slightly under due to random
3  error or, you know, any number of
4  different reasons. And so in a
5  meta-analysis, what you do is take all
6  the studies on a particular topic and
7  then provide a summary estimate of them.
8  That is the intention of the analysis.
9      Q.  And -- and you would
10 consider this an epidemiological -- I can
11 never pronounce that word. You are
12 obviously used to it.
13     For your field, this is an
14 epidemiological study, or analysis, or
15 review, or whatever the word would be?
16 This is in your -- this comes from your
17 field, this particular paper here?
18     A.  I guess my question is, what
19 do you mean by my field?
20     Q.  Well, you are an
21 epidemiologist, correct?
22     A.  I am an epidemiologist, yes.
23     Q.  And -- and is this a paper
24 from epidemiology?

Page 399

1      A.  I would say that this paper
2  uses epidemiological studies in order
3  to -- you know, meta-analysis is used --
4  a lot -- I wouldn't claim it for
5  epidemiology. But this particular paper
6  uses epidemiological data.
7      Q.  So this -- am I correct
8  that, that what this paper is finding is
9  that there were .65 deaths per 100 person
10 years during which the subjects of the
11 studies were observed?
12     A.  I'm sorry, I'm just going to
13 go to the place where that is written.
14     Can you point again to the
15 page number?
16     Q.  Sure. Page -- it's -- we're
17 on Page 45.
18     A.  Sorry.
19     Okay. So what this study
20 said in the results section is that
21 "pooled estimates suggested that overdose
22 related mortality was the most common
23 specific cause at .65 deaths per 100,000
24 person years."

Page 400

1      So your question is?
2      Q.  I'm just trying to translate
3  that into more everyday English. Does
4  that mean that --
5      A.  If 100 people were observed
6  for one year, you would expect there to
7  be .65 overdose deaths.
8      Q.  Thank you. That's helpful.
9      And that is the -- that .65
10 figure is the number that you then went
11 on to use to apply to overdose statistics
12 to estimate the populations in each of
13 those -- these who had counties overdose
14 related --
15     A.  I used that as a -- and its
16 related confidence interval, to provide
17 an estimate of the number of dependent or
18 regular users of heroin -- I mean of
19 opioids.
20     Q.  Now, the -- who are the --
21 the subjects of these studies? Is -- and
22 I'm not asking you to list them all. Am
23 I correct that they are described in the
24 tables that -- the table that starts, I

Page 401

1  guess it's on Page 35, Table 1?
2      A.  Okay. So Table 1 is
3  included... studies investigating all
4  cause mortality.
5      And so table 2 then is
6  cohorts purporting proportion of deaths
7  due to AIDS, overdose, suicide, and
8  traumatic causes of death.
9      Q.  I'm -- I'm more focused on
10 the nature of the -- I think it's the
11 nature of the sample column.
12     No, who -- who were the
13 people who were in these studies?
14     MS. RELKIN: Objection.
15 Form. Overbroad.
16     There's multiple studies.
17 Do you want her to go through each
18 one?
19 BY MS. WINNER:
20     Q.  Do you see on Table 1
21 there's a column that says nature of
22 sample?
23     A.  So -- yeah, you know, again,
24 I -- you really should look at Table 2,

Page 406

1 the report the way the methodology
2 is used. The methodology that I
3 used is standard practice in the
4 epidemiological literature.
5      As far as any one particular
6 study that has used this estimate
7 in and of itself, I don't have a
8 specific citation in the report.
9 But it is a standard way to
10 evaluate population sizes in the
11 epidemiological literature.
12 BY MS. WINNER:
13    Q.   Okay. But I want to follow
14 up on what you just said. You don't have
15 a specific -- I don't have a specific
16 citation in the report, but it is a
17 standard way to evaluate population sizes
18 in the epidemiological literature.
19      I just want to focus -- when
20 you say it is a standard way, are you
21 talking about --
22    A.   I'm talking about the method
23 and not this particular number.
24    Q.   Got it.

Page 407

1      MS. DO AMARAL: Counsel, is
2 it a good time for us to take a
3 break?
4      MS. WINNER: Sure, no
5 problem.
6      THE VIDEOGRAPHER: The time
7 is 4:18 p.m. Going off the
8 record.
9      (Short break.)
10      THE VIDEOGRAPHER: The time
11 is 4:32 p.m. Back on the record.
12 BY MS. WINNER:
13    Q.   Okay. Before the break, we
14 were discussing the calculations you did
15 in Section C.3 of your report.
16    A.   Yes.
17    Q.   Correct?
18      And am I correct that you
19 took this .65 per 100 person-year number,
20 and you then applied that to the overdose
21 deaths in 2013 in each of the two
22 counties to estimate the opioid dependent
23 or regular user population in each
24 county?

Page 408

1    A.   That's correct.
2    Q.   And the overdose death
3 statistics from those counties that you
4 used included all drug overdoses, not
5 just opioid overdoses, correct?
6    A.   So just to be clear, that
7 is -- the reason for that is because the
8 Degenhardt meta-analysis looked at all
9 drug overdose deaths among regular or
10 dependent users. And so to provide a
11 comparable analysis, I needed to use all
12 drug overdose deaths in the counties.
13    Q.   But those were all drug
14 overdose -- okay. Strike that.
15      Let me try to streamline
16 this a little bit. Let's go back to
17 Degenhardt. Is that an appropriate way
18 to refer to Exhibit 13. If you would
19 turn back to the abstract. Near the
20 bottom there is a sentence that reads, "A
21 multi-variable regressions found the
22 following predictors of mortality rates:
23 Country of origin, the proportion of
24 sample injecting, the extent to which

Page 409

1 populations were recruited from an entire
2 country versus sub-national, and year of
3 publication."
4      Did I read that correctly?
5    A.   You read that statement
6 correctly. I'd like to go just to the
7 methods section to make sure that --
8 because sometimes in abstracts it's an
9 oversimplification of what was done.
10    Q.   Okay. Is there something
11 inconsistent? I assume you studied this
12 study fairly carefully before you used
13 it.
14    A.   I did study -- I did study
15 it carefully, but with over 200
16 citations, I just want to be sure that we
17 don't abstract something from an abstract
18 that is defined more carefully in the
19 paper itself.
20      Okay. So on page 43, I
21 think they provide more information on
22 study covariates. So the proportion of
23 the sample injecting was included in the
24 covariate as a continuous variable at a

Page 410

1 bivariable level.  Study is conducted in
2 countries low and middle income.  Low
3 case ascertainment.  High percentage of
4 sample injecting.
5         So yes.
6     Q.  All right.  Then there's a
7 section called "Limitations" on Page --
8 starting on Page 46.  I've seen a section
9 entitled "Limitations" in a number of the
10 studies that you've cited.  Is that a
11 common section to include in an article
12 like this?
13    A.  Yes.
14    Q.  And what is the author
15 generally -- what is the purpose of a
16 Limitations section in a paper like this?
17    A.  Generally, in
18 epidemiological studies, the purpose of a
19 limitations section is to provide the
20 reader with any additional information
21 that would aid in their interpretation of
22 the paper and to provide an opportunity
23 for the author to provide additional
24 information on the robustness of their

Page 411

1 results to any particular limitation of
2 the methods, data source, et cetera.
3    Q.  Well, the first paragraph
4 under limitations here says that, "The
5 studies reviewed here differed
6 considerably.  The length of follow-up of
7 the cohorts ranged from one to 36 years.
8 This is problematic, because drug use can
9 change over time period, and this can
10 affect mortality rates."
11         I'll stop there.
12         Do you think that that is an
13 accurate statement of a limitation of
14 this review?
15    A.  I would say that -- I would
16 say that that is an accurate limitation
17 of the review.  But again, applying it in
18 the way that I did in the report, I think
19 you provide a confidence interval around
20 the estimate.  You know, that's the best
21 available estimate for the rate of the
22 standardized mortality ratio for a
23 dependent user.
24         So I think that even though

Page 412

1 there is heterogeneity, to use that word
2 again, there are differences in the
3 length of follow-up of the cohorts from
4 one to 36 years.
5         When you meta-analyze
6 something, you're aggregating across all
7 of that.
8     Q.  Sometimes when you aggregate
9 over a heterogenous set of data, you can
10 gloss over variations, meaningful
11 variations within the data, correct?
12         MS. RELKIN:  Objection to
13     form.
14         THE WITNESS:  So anytime we
15     provide, you know, this is what
16     epidemiology does.  We provide
17     aggregate estimates of risk.  We
18     don't provide estimates at the
19     individual level.  So we're always
20     aggregating to provide an
21     assessment of risk factors.
22         You know, the overdose
23     deaths in the counties are also an
24     aggregate of a lot of individuals.

Page 413

1 BY MS. WINNER:
2    Q.  But aggregation can be --
3 the reason heterogeneity is identified as
4 a limitation here, is because, or at
5 least in part because aggregate -- it
6 means that aggregation can yield results
7 that are less meaningful?
8    A.  I don't necessarily think
9 that that is -- it really depends on what
10 the research question you're asking is
11 and what you're using those data for, in
12 terms of the meaningfulness of
13 aggregation.  Sometimes we want an
14 aggregate estimate of the average risk of
15 a certain outcome across the heterogenous
16 subgroups that make up that average risk.
17    Q.  Have mortality rates from
18 overdose deaths in the drug using
19 population changed over time?
20    A.  Over what time period
21 specifically?
22    Q.  Over any time period over
23 the last 20 years?
24    A.  So specifically in the last,

Page 414

1  you know, three years since 2013,
2  mortality rates have increased.
3      Q.   And did mortality rates
4  change in the time period before the last
5  three years?
6      A.   The mortality rates, the
7  overall population mortality rate due to
8  overdose has changed.  Is your question
9  about changes over -- can you be specific
10 about the population with which you're
11 asking the question.
12     Q.   Okay.  That's a fair
13 question.  Let's start with the overall
14 population mortality rate has changed
15 over time, has it not?
16     A.   The overall population
17 mortality rate of --
18     Q.   For overdose?
19     A.   For overdose has increased.
20     Q.   Has the overall mortality
21 rate varied over time before the past
22 three years among opioid users?
23     A.   You know, I would have to go
24 to meta-analysis in order to answer that

Page 415

1  question.
2          You're asking about the
3  United States?
4      Q.   Yes.
5      A.   So let's see if there are
6  U.S. studies --
7      Q.   Well, let me just ask, is
8  that something you've looked at before I
9  asked you that question just now?
10     A.   What the variation over
11 time -- so what I used as a meta-analysis
12 that pooled data across a number of
13 different studies.  To the extent that
14 there are U.S. studies involved in that
15 particular estimate, I don't believe that
16 there are, but I would like to just
17 confirm.
18         So the meta-analysis used
19 three different studies from North
20 America, from the United -- no, I'm
21 sorry, four different studies -- I
22 apologize again.  No, that's from Canada.
23         So there are a number of
24 studies cited in here.  One is based in

Page 416

1  California.  One is based in Albuquerque.
2  One is among Vietnam veterans.  And
3  overall it does not provide data on
4  whether the overdose rate among those
5  different populations have changed over
6  time.
7          So as far as I know, you
8  know, the -- the overdose rate among
9  regular or dependent users of opioids in
10 the United States has not been
11 systematically investigated.
12     Q.   Now, you do however have an
13 opinion that the mortality rate has
14 changed in the past three years because
15 of the fentanyl problem?
16     A.   The population mortality
17 rate has.
18     Q.   The population mortality.
19         Is that also true of the --
20 the opioid using population mortality
21 rate?
22         MS. RELKIN:  Objection to
23     form.
24         THE WITNESS:  So I'm sorry,

Page 417

1      your question is whether there is
2      available data on the overdose
3      rate from fentanyl among opioid
4      users?
5  BY MS. WINNER:
6      Q.   Let me -- let me -- let me
7  take a step back and ask a different
8  question.
9          If the -- some opioids, if
10 abused, are more lethal than others,
11 correct?
12     A.   It depends on the amount,
13 the dose, and the duration of use.
14     Q.   But -- but in terms of --
15     A.   I wouldn't make -- I just --
16 I wouldn't make a blanket statement about
17 products and their overdose potential.
18     Q.   Well, do you believe, based
19 on the data you've seen that illicitly
20 manufactured and sold fentanyl that's
21 used to adulterate heroin and cocaine and
22 other drugs, is -- contributes to more
23 overdose deaths than abuse of Vicodin for
24 example?