# EXHIBIT I

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF OHIO

 2                   EASTERN DIVISION

 3

 4

 5

     ***********************************

 6

     In re:  NATIONAL PRESCRIPTION        MDL NO. 2804

 7   OPIATE LITIGATION

 8

     This document relates to:        Case No.

 9                                     17-MD-2804

10

     All Cases                         Hon. Dan A. Polster

11   ***********************************

12                       * * *

                 WEDNESDAY, APRIL 24, 2019

13                       * * *

                    HIGHLY CONFIDENTIAL

14       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                         * * *

15

16            Videotaped deposition of SCOTT

17        WEXELBLATT, M.D., held at the offices of

18        Vorys, Sater, Seymour and Pease, Suite 3500,

19        301 East Fourth Street, Great American Tower,

20        Cincinnati, Ohio, commencing at 9:23 a.m.,

21        on the above date, before Kimberley Keene,

22        Registered Professional Reporter.

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    A. No.
2    Q. Have you ever, outside of your early medical
3  experience, participated -- well, let me ask it this
4  way: So in some of these treatment of the
5  mother-child dyads, there's other healthcare
6  professionals who are focused on the mother,
7  correct?
8    A. We have specialists in our OPQC team that are
9  maternal-fetal medicine, addiction medicine
10  specialists, obstetrics, social workers, yes. We have
11  every field covered.
12    Q. Okay. And even though you're talking about
13  all of those fields here, your part where you're
14  actually an expert is on the pediatrics side?
15    MS. KEARSE: Object to form.
16    A. I do take care of pediatric patients,
17  correct.
18    Q. Do you hold yourself out as an expert in
19  anything relating to the social services or
20  educational support that might be required because of
21  any kind of deficit in a newborn or a child?
22    A. So when we take care of the patient, it's the
23  family that we are addressing. So if a -- the whole
24  social service umbrella incorporates everything of the
25  family.

Page 91

1    Q. So let me break it down because I can give
2  some examples.
3    You've already talked about occupational
4  therapy and physical therapy and when those might be
5  required and how those might correct some of the sorts
6  of issues that you've identified, correct?
7    A. That is correct.
8    Q. So you're not an expert in occupational
9  therapy or physical therapy, correct?
10    MS. KEARSE: Object to form.
11    A. So to get into that field of OT or PT, they
12  need a referral from us. So we determine if they need
13  those services.
14    Q. Is that the extent of where you claim
15  expertise?
16    A. Yes.
17    Q. Okay. What about anything relating to social
18  work or the sorts of social services that are
19  typically provided on a county basis in Ohio?
20    A. Once again, it's knowing that they have a
21  need is our -- and then referral, and then
22  letting them take over.
23    Q. What about, like, the specifics of the social
24  work or the social services part of that, how you
25  would form a specific plan and what kind of staffing

Page 92

1  you would need to implement additional care for a
2  mother-child dyad affected by drug abuse?
3    Those specifics would be beyond your
4  expertise as well, correct?
5    MS. KEARSE: Object to form.
6    A. That is correct.
7    Q. And, therefore, that's -- and that's part of
8  why in your report you didn't outline any specifics of
9  what you think -- actually think social services would
10  need to provide, correct?
11    A. Exactly.
12    Q. And the same thing goes for any of these
13  areas in terms of obstetrical care or any of the
14  general topics that you've identified, that there
15  would be need for some sort of plan or some sort of
16  services to be provided to improve or -- I'm sorry --
17  as you say, optimize maternal-fetal outcomes.
18    Those sorts of specifics would need to be
19  provided by experts in the specific fields, not you?
20    MS. KEARSE: Object to form.
21    A. I agree with that.
22    Q. And there's nowhere where, for this case,
23  you've gone forward and set out that level of detail
24  about what a specific program would need to include at
25  the level of detail that you would really need to

Page 93

1  implement a program, correct?
2    MS. KEARSE: Object to form.
3    A. Depends on what you mean by "detail," yes.
4    Q. Well, I mean, we know that when it comes to,
5  like, the actual treatment of NAS children in the
6  hospital, when you initiate medication, how you might
7  do nonpharmacologic therapy, the -- what you might do
8  to provide different types of nutrition through breast
9  milk or formula, those sorts of things.
10    There are extensive plans that have been
11  published by you and by some of the entities that we
12  talked about, right?
13    A. Yes.
14    Q. Okay. But in terms of the level of detail to
15  say actually how you would implement a plan and what
16  staffing you would need for a plan, what money you
17  would need for a plan, on any of the other aspects of
18  your report, that's not anywhere that you've adopted
19  or referenced, correct?
20    MS. KEARSE: Object to form.
21    A. That's accurate.
22    Q. And as we said, the recommendations that you
23  have across the board aren't specific to the needs of
24  Cuyahoga or Summit County.
25    They're recommendations, I asked you before:

Highly Confidential - Subject to Further Confidentiality Review

Page 138

1 of stay, you're going to decrease the cost.

2     Q. Okay. So basically you have things you want

3 to do to save money, save healthcare dollars?

4     A. All we're proposing -- yes, that's one of the

5 goals, is to improve the outcomes.

6     Q. Okay. But you're not going to offer any

7 opinions about how much any of your plan would cost if

8 it were implemented in Cuyahoga County, Summit County,

9 or both, correct?

10     A. That is correct.

11     Q. Okay. And you're certainly not offering some

12 sort of opinion about how much it would cost to just

13 address the portion of this that relates to people

14 taking legal prescription -- legal prescriptions of

15 prescription opioids?

16     MS. KEARSE: Object to form.

17     A. Correct.

18     Q. Okay. Do you have an understanding as to how

19 much of the NAS you see is related to legal use versus

20 illicit use?

21     A. I would have to go back to our data to look

22 at that. I don't know off the top of my head.

23     Q. Okay. Do you have a -- like a majority is

24 illicit? Do you have an understanding at that level?

25     A. I think a third is illicit.

Page 139

1     Q. A third is illicit?

2     A. I think that's what we published in our first

3 paper.

4     Q. Okay. So you think two-thirds, then, are

5 people who are only taking while pregnant under the

6 direction of a -- of a doctor and they're not using

7 polypharmacy or some other illegal drugs at the same

8 time?

9     A. So illicit opioid. So the nonillicit would

10 include MAT and prescribed opioids.

11     Q. Okay. So --

12     A. So any prescribed opioid.

13     Q. What about the --

14     A. I just --

15     Q. I'm sorry. I didn't mean to cut you off.

16     A. I think that's what we published in our very

17 first paper, was our illicit use back then.

18     Q. Do you have any opinions that would look at

19 impacts or what to do to fix any of the impacts that's

20 focused at all just on the prescription part of it?

21 Like patients who got a legal prescription for an

22 opioid and then took it pursuant to directions with no

23 other illegal drugs at the same time?

24     MS. KEARSE: Object to form.

25     A. What would be my recommendation? Is that

Page 140

1 what you're asking?

2     Q. Do you intend to offer any opinions that's

3 limited to just those issues?

4     A. Yeah.

5     Q. You do?

6     A. That if you never get a prescription, you're

7 never going to have NAS.

8     Q. Okay. So what about the percentage of people

9 in Ohio who use heroin and heroin was the first drug

10 they ever used?

11     MS. KEARSE: Object to form.

12     Q. That happens, right?

13     A. I'm sure it has.

14     Q. I mean, NAS has been described in the medical

15 literature since, what, the 1970s?

16     A. 1975 was the first paper, correct.

17     Q. I think I have it and have read it. It was a

18 page-turner.

19     But the NAS that's described in the earliest

20 stuff was, what, related to methadone use in pregnant

21 women, or is it related to heroin?

22     A. Heroin.

23     Q. So there have been withdrawal and specific

24 clinical entity described from heroin use in pregnant

25 women for more than four decades now, correct?

Page 141

1     MS. KEARSE: Object to form.

2     A. That is correct.

3     Q. And do you know what percentage of the NAS

4 babies that the drug use they have has only ever been

5 legal?

6     Let me withdraw that. Let me -- let me fix

7 it, I think, because we're including MAT, right?

8     Nobody's -- the people aren't starting with

9 MAT unless they already have an addiction or a

10 diagnosed disorder, correct?

11     A. That is correct.

12     Q. So, there's some portion of pregnant women

13 who are getting a legal prescription for an opioid for

14 chronic pain, for instance, right?

15     A. That is correct.

16     Q. And you have that in your hospitals,

17 correct?

18     A. Yes.

19     Q. Sometimes prescribed by your colleagues,

20 correct?

21     A. Yes.

22     Q. And you're not here to opine that

23 prescription use of opioids in pregnant women for an

24 indication like chronic pain is always wrong, are

25 you?

Page 150

1 to either of them, what they did or didn't do, or
2 should or shouldn't have done?
3     A. No.
4     Q. And so the other, like, 15 defendants, you
5 certainly aren't offering any opinions specific to
6 their conduct, correct?
7     A. I didn't know there was 17.
8     Q. So let's go back to the allegations of the
9 Plaintiffs and what their information is.
10     We talked about conversations you may have
11 had through OPQC with people who work in those
12 counties, correct?  Remember that?
13     A. Uh-huh.
14     Q. And we talked about --
15     A. Yes.
16     Q. -- how you've seen some county-specific data
17 along the way, correct?
18     MS. KEARSE:  Object to form.
19     A. It's regional data for OPQC.
20     Q. I know --
21     A. You're talking about OPQC now.
22     Q. I'm not.
23     You've also seen some Cuyahoga and
24 Summit-specific date from some of the sources that
25 you've cited, correct?

Page 151

1     A. That is also correct.
2     Q. So in connection with your role in this
3 litigation, have you read any testimony given by
4 anybody who is a representative of or ever worked for
5 Cuyahoga or Summit County?
6     A. No.
7     Q. Have you looked at any of the documents
8 they've produced in the litigation?
9     A. No.
10     Q. Have you looked at any of their discovery
11 responses explaining what they think their harms were
12 or what their particular allegations are, or any of
13 those other things?
14     A. No.
15     Q. What about anything from the Defendants?
16 Have you looked at any documents produced by any
17 Defendant?
18     A. No.
19     Q. Do you have the ability to offer any opinions
20 about whether any portion of any harm that's claimed
21 by Cuyahoga or Summit County was caused by any action
22 or inaction of any specific Defendant?
23     A. I would have no idea at this point without
24 looking at anything.
25     Q. And the same thing goes for groups of

Page 152

1 Defendants?  You couldn't offer that testimony?
2     A. Wouldn't know who you were talking about, so,
3 no.
4     Q. I didn't think so, but I'll spot you
5 something:  There are manufacturers, and there are
6 distributors, and there are retail pharmacy
7 defendants.  Those are three ways that you might group
8 this.
9     You're not going to talk at trial about
10 anything the manufacturers as a whole did or didn't do
11 and how that caused any harm, correct?
12     MS. KEARSE:  Object to form.
13     A. Not my area of expertise.
14     Q. So you're not going to do it, right?
15     A. Yeah, I would assume not.
16     Q. Okay.  I mean, that's kind of the way this
17 works, is you disclose opinions, you claim expertise,
18 and as I understand you, Dr. Wexelblatt, you're going
19 to only try to offer opinions at trial that are
20 disclosed within your area of expertise and where
21 you've done enough research and evaluation that you
22 can offer an opinion.
23     Am I right so far?
24     A. That is a hundred -- correct.
25     Q. Okay.  So you're not going to offer any

Page 153

1 opinions about what any group of distributors did or
2 didn't do, or how that caused any harms, or what --
3 anything would need to be done to try to fix any of
4 that?
5     MS. KEARSE:  Object to form.
6     A. That's correct.
7     Q. Same thing for the other group of the
8 Defendants, the retail pharmacies, correct?
9     A. If they're mentioned, yes.
10     Q. And so this brings us back to where we were
11 about the issue of licit versus illicit drugs.  I am
12 not sure you used the word "licit."  I just did.
13     But do you know what that means?
14     A. Prescribed?
15     Q. Well legal, yeah.
16     A. Okay.
17     Q. So -- because you could have a prescribed
18 drug that's used illegally, right?  Like you could --
19     A. Right.
20     Q. -- steel somebody's prescription or you could
21 give it to somebody else and then the use ultimately
22 is illegal or illicit, correct?
23     A. You could -- yes, that is correct.  You could
24 illicitly use a prescribed substance.
25     Q. In various ways, including buying and on the

Highly Confidential - Subject to Further Confidentiality Review

Page 158

1  your recommendations for what they should have been
2  doing in the past?
3      A.  For all of those recommendations, you are
4  correct.
5      Q.  So you don't intend to offer an opinion at
6  trial as to anything that Cuyahoga County should be
7  doing extra in 2019 compared to what they're doing
8  already?
9      MS. KEARSE:  Objection.  That misstates his
10  testimony.
11      A.  Can you repeat that one more time?  I --
12      Q.  Sure.  That was like the shortest one I've
13  asked all day.
14      A.  Yeah, I was just --
15      Q.  I will.
16      You don't intend to offer an opinion at trial
17  that Cuyahoga County should be doing anything extra in
18  2019 compared to what they're already doing?
19      MS. KEARSE:  Objection.
20      A.  Not a hundred percent sure if they're doing
21  all of that, but if they are not doing the
22  recommendations, then I would recommend it.
23      Q.  Okay.  So sitting here today, are you in a
24  position to offer any opinions that there are specific
25  additional things that Cuyahoga or Summit County need

Page 159

1  to be doing going forward compared to what they're
2  already doing right now?
3      MS. KEARSE:  Object to form.
4      A.  It would be the recommendations in the report
5  is what we would recommend them be doing.
6      Q.  But you don't know how that relates to what
7  they're already doing?
8      A.  Countywide in each -- in the whole --
9  throughout the whole county, correct.
10      Q.  Or at any particular hospital in the county,
11  can you provide the level of detail of saying at, you
12  know, the Rainbow Health facility that's part of your
13  consortium in Cuyahoga County, how their current
14  practices relate to this and what they would need to
15  change as much as this relates to hospitals as to
16  other actors?
17      Can you do that?
18      A.  Not at the -- every hospital-specific level
19  in the county.
20      Q.  Okay.  And as we said, I mean, prevention,
21  education and training, supportive services, and
22  interventions, these are not just things you're asking
23  that hospitals should do; these are things that you're
24  asking various medical providers around the county
25  should do, various public servants, you know, social

Page 160

1  services, other employees of the county should do,
2  what you want patients to do, what you would want to
3  be in a public education campaign.
4      You're requiring a lot of actions not just by
5  specific hospitals, but you're suggesting actions
6  should be taken by a number of different actors in the
7  communities, correct?
8      A.  Correct.
9      Q.  So going back to my question before:  Sitting
10  here today, you're not in a position to say any
11  additional things that any actor in Cuyahoga or Summit
12  County should be doing compared to what they're
13  already doing now?
14      MS. KEARSE:  Object to form.
15      A.  If they're not doing it, then I would
16  recommend them doing it.
17      Q.  And sitting here today, you're not in a
18  position to know what anybody is doing in these
19  counties with regard to any of these
20  recommendations?
21      A.  I know in the general terms, certain parts
22  are doing certain recommendations, but not every
23  hospital in every county and every social worker in
24  the whole county.
25      Q.  And to do any of these things -- kind of the

Page 161

1  Section 4 of your report -- there would need to be
2  detailed plans put forward, and various people would
3  need to sign on, correct?
4      MS. KEARSE:  Objection.
5      A.  It would be a regional approach, correct.
6      Q.  And as far as you know, that hasn't happened,
7  and you can't say if it ever would work?
8      MS. KEARSE:  Object to form.
9      A.  I can't say it has happened, and I think it
10  would work if we implemented it.
11      Q.  No.  I mean, you can't say that all of the
12  people who would need to participate would ever sign
13  on and agree with your plan?
14      MS. KEARSE:  Object to form.
15      A.  I would hope they would.
16      Q.  Okay.  So do you know the difference between
17  hope and being able to opine under oath that something
18  is going to happen?
19      MS. KEARSE:  Object to form.
20      A.  Never used the word "opine" before, so I
21  don't know.
22      Q.  Let me see if I can ask this:  Sitting here
23  today, can you -- because it's in your report -- can
24  you offer an opinion to a reasonable degree of medical
25  certainty in the field of pediatrics and

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1 we are seeing the exact increase of the heroin and the
2 fentanyl.
3     Q. Do you know any other changes in terms of
4 like what is going on or what has gone on with cartel
5 activity or importation of illegal drugs from China
6 that involve, you know, designer drugs, to get around
7 like DA limits on drugs?
8     Do you know anything about any of that?
9     A. Not outside of what I read on CNN.
10     Q. So is that expert opinion or is that just
11 educated consumer?
12     A. I don't know -- I would not be an expert on
13 cartel or Chinese manufacturing of fentanyl.
14     Q. So other than saying in general you know
15 there was a time when the prescription -- the levels
16 of prescriptions in Ohio and the country went up, do
17 you have anything else to say about the cause of the
18 opioid or opiate crisis?
19     MS. KEARSE: Object to form.
20     A. No.
21     Q. Do you know -- well, do you intend to offer
22 -- let me ask this way: As I understand it, you don't
23 intend to offer any opinions as to the percentage of
24 harms in terms of NAS or any maternal-fetal issues
25 that relate solely to medically unnecessary

Page 183

1 prescriptions of opioids?
2     MS. KEARSE: Object to form.
3     A. Did you mean to ask it as a double negative,
4 or no? Because I think you did.
5     Q. I think I did.
6     A. Okay. So I --
7     Q. You don't intend to offer any opinions as to
8 the harm that was attributed to the medically
9 unnecessary prescription of opioids?
10     MS. KEARSE: Object to form.
11     A. Medically unnecessary?
12     Q. Yeah. Like -- so, every prescription that
13 got written and filled, there were healthcare
14 providers writing a script and them some pharmacy
15 filling it or some other way that it got dispensed.
16     Is that fair so far?
17     A. That is correct.
18     Q. Are you offering any opinions about the
19 conduct of any doctors or pharmacists or other people
20 in the healthcare chain that led to any particular
21 prescriptions being written and filled?
22     A. So I think one of the problems was there were
23 some many prescriptions filled that people had extra,
24 and then there was misuse based on the extra unused
25 pills. So I don't know if that would fall into this

Page 184

1 category or not.
2     Q. Are you critical of other doctors or other
3 healthcare providers for writing prescriptions and
4 filling prescriptions that you think weren't
5 appropriate?
6     A. I think that was done.
7     Q. Do you have some expert opinions and a basis
8 to offer an opinion about how often that was done or
9 how much a part of the problem it was here?
10     A. I couldn't give you the numbers or
11 percentages, but I can just tell you -- I just know
12 the data that shows the unintentional overdose from
13 prescription opioids increased. So that would be the
14 only then I would feel comfortable talking about.
15     Q. So your belief is that doctors bear some of
16 the responsibility for writing medically unnecessary
17 prescriptions?
18     MS. KEARSE: Object to form.
19     A. I think the education wasn't there to inform
20 people or it was just not known at that time.
21     Q. So is that a yes: You think doctors bear
22 some of the responsibility?
23     MS. KEARSE: Object to form.
24     A. Yes.
25     Q. And do you intend to offer any opinions about

Page 185

1 the percentage of responsibility that goes on doctors
2 across Ohio for writing medically unnecessary
3 prescriptions?
4     MS. KEARSE: Object to form.
5     A. I would have no idea to -- how to quantify
6 that.
7     Q. And you can't do that for Cuyahoga County or
8 Summit County either, can you?
9     A. There would be no difference.
10     Q. And what about any like individual, you know,
11 small nondefendant pharmacies or any particular
12 pharmacists who maybe have lost their license or gone
13 to jail over the years for conduct in relation to
14 dispensing controlled substances? Are you aware of
15 anything about that?
16     A. I am aware of that.
17     Q. Do you think those folks bear some fault?
18     MS. KEARSE: Object to form.
19     A. Yes.
20     Q. And you haven't formed any opinion as to
21 percentage of fault attributable to that sort of
22 conduct in terms of the opioid crisis in Cuyahoga
23 County or Summit County, correct?
24     A. Correct.
25     Q. You don't intend to offer any opinions as to

## Page 186

1  any expenses that have actually been incurred by
2  Cuyahoga or Summit County that are attributed to
3  anything about the opioid crisis, correct?
4      A. I think in our report we put the attributed
5  accounts due to NAS in there -- or is that Ohio -- I
6  would have to look back at my report if it was
7  generalized to Ohio rates or if it was county-specific
8  rates.
9      Q. So there is a general thing about the --
10  basically hospital costs paid by somebody relating to
11  NAS stays over a period of time.
12      Is that what you're talking about?
13      A. Yes.
14      Q. Okay. And so as we have talked about, most
15  of these are paid by Medicaid, correct?
16      A. Yes.
17      Q. So that's not paid by Cuyahoga or Summit
18  County, correct?
19      A. From their insurance? It is paid by
20  Medicaid, statewide.
21      Q. Right. Okay. So, is there any opinion that
22  you intend to offer about any expenses that Cuyahoga
23  County or Summit Count have actually already incurred
24  because of anything related to opioids?
25      A. It would just be NAS-related.

## Page 187

1      Q. And as we said, that is not actually a
2  Cuyahoga or Summit expense, correct?
3      MS. KEARSE: Object to form.
4      A. Just the hospitals in those counties.
5      Q. And they get paid by?
6      A. Medicaid.
7      Q. Medicaid almost 90 percent and private
8  insurers most of the rest, correct?
9      A. Correct.
10      MS. KEARSE: Object to form.
11      Q. So putting it together: You're not opining
12  that Cuyahoga or Summit have actually incurred any
13  specific additional expenses or costs because of
14  anything relating to the opioid crisis, correct?
15      MS. KEARSE: Object to form.
16      A. I think the whole opioid epidemic has had a
17  large impact with loss of jobs, increased
18  incarceration. So I think the impact, even though
19  outside of my expertise, that there has been an
20  impact.
21      Q. So that whole thing you just said was outside
22  of your expertise, correct?
23      A. Most -- the financial aspect, yes. But the
24  other aspect, I think would fall.
25      Q. Okay. I mean, at trial, do you intend to

## Page 188

1  offer any opinions within your area of expertise about
2  anything relating to expenses incurred or that will be
3  incurred by Cuyahoga or Summit County?
4      MS. KEARSE: Object to form.
5      A. No.
6      Q. Okay. Your opinion is that the increase of
7  NAS in Ohio is multifactorial, correct?
8      MS. KEARSE: Object to form.
9      A. Correct.
10      Q. Can you list all of the factors that you
11  think should be accounted for in connection with
12  that?
13      A. I think it is in the report. So I might miss
14  one or two. But it is multi-factorial. It's based on
15  there is mom factors, there is genetic factors, there
16  is infant factors, there is exposure factors.
17      So, it is like I -- like you said, it's
18  multi-factorial.
19      Q. Yeah. I think actually you didn't list them,
20  you just use the word multi-factorial in paragraph 42
21  of your report.
22      A. Okay.
23      Q. But I want to make sure that we just don't
24  have shorthand for what all of those are.
25      I'm going to guess -- let me talk about a

## Page 189

1  specific section of the report. I've marked as
2  deposition Exhibit 1 a copy of a report.
3      It says, In Re: National Prescription Opiate
4  Litigation, MDL No. 2804. Scott L. Wexelblatt, MD
5  Expert Report, March 25, 2019.
6      (AmerisourceBergen-Wexelblatt-001 was marked
7  for identification.)
8      Q. So I didn't attach -- and this will be
9  separate, your CV and whatever -- there were some
10  attachments, and those will be separate.
11      So paragraph 42 is where we are. And just to
12  orient, Exhibit 1 is what we have been referring to
13  as your report, correct?
14      A. Yes.
15      Q. And if you look on the last numbered page,
16  page 25, is that your signature from March 25, 2019?
17      A. That is a computer generated, yes.
18      Q. Okay. How long before had you started
19  your work on this report?
20      A. I first met with plaintiffs' attorneys in
21  December, I think.
22      Q. Do you know how many total hours you spent
23  preparing the report and other work that you did prior
24  to signing it?
25      A. It was 15 hours.