# EXHIBIT J

CONFIDENTIAL

### Data Sources and Methodology

Except where noted, all analyses conducted and graphs presented in this report were conducted by staff at Children and Family Futures. They are drawn from three data sets that are maintained by the National Data Archive on Child Abuse and Neglect ("NDACAN") at Cornell University (https://www.ndacan.cornell.edu/):

1) The 2017 file of the Adoption and Foster Care Analysis and Reporting System (AFCARS) which is a federally mandated data collection system that provides information on children covered by the protections of Title IV-B/E of the Social Security Act (Section 427). States are required to collect data on all children in foster care for whom the state child welfare agency has responsibility for placement, care, or supervision. These data are then de-identified and made public and available to researchers through the NDACAN. The current file released in January 2019, include data through Federal Fiscal Year ending September 30, 2017.
   https://www.ndacan.cornell.edu/datasets/dataset-details.cfm?ID=225

2) The National Child Abuse and Neglect Data System (NCANDS) Child File dataset consists of child-specific data of all investigated reports of maltreatment to State child protective service agencies. The NCANDS is a federally-sponsored national data collection effort created for the purpose of tracking the volume and nature of child maltreatment reporting each year within the United States. The Child File is the case-level component of the NCANDS. Child File data are collected annually through the voluntary participation of States. Submitted data consist of all investigations or assessments of alleged child maltreatment that received a disposition in the reporting year.
   https://www.ndacan.cornell.edu/datasets/dataset-details.cfm?ID=220

3) The Regional Partnership Grant – During the first year of the RPG Program, HHS, with Office of Management and Budget approval, developed a web-based RPG Data Collection and Reporting System to compile the performance measure data across all 53 grantees. Grantees began submitting case-level child and adult data to the RPG Data System in December 2008 and then uploaded their latest cumulative data files in December and June of each program year. Grantees' final data upload was in December 2012. The RPG Data System links data for children and adults together as a family unit and follows clients served over the course of the grant project, making it the most extensive quantitative dataset currently available on outcomes for children, adults, and families affected by substance abuse and child maltreatment. https://www.ndacan.cornell.edu/datasets/dataset-details.cfm?ID=191

Where other data or literature sources are referenced, it is so noted, what follows are Dr. Young's opinions.

For the last 25 years, I have stayed current on all scientific literature related to substance use and families in child welfare. Staff who I supervise maintain a quarterly update to a bibliography and summary of the literature. Twice I have co-authored special topic issues on substance abuse and

CONFIDENTIAL

child welfare of the journal *Child Welfare,* a scholarly peer-reviewed journal which has been published by the Child Welfare League of America (CWLA) since 1921.

In my role as Project Director for two separate national training and technical assistance initiatives for the Department of Health and Human Services beginning in 2002, and the Office of Juvenile Justice and Delinquency Prevention beginning in 2010, I have traveled to every state to provide technical assistance, facilitate workgroups, and/or deliver keynote speeches or training sessions. This has provided me opportunities to consult with professionals from across the country and gain a deep understanding of the complex challenges of families affected by parental opioid and other substance use disorders in child welfare agencies. I have also tracked the solutions that states and communities have implemented.

In these Project Director roles, I have had the experience on several occasions to convene expert multidisciplinary working groups to forge consensus on best practices on emerging practice and policy challenges in the field. Examples of these consultative and professional consensus efforts include: 1) *A Collaborative Approach to the Treatment of Pregnant Women with Opioid Use Disorders* (SAMHSA, 2016a); 2) *Guidance to States: Recommendations for Developing Family Drug Court Guidelines* (Children and Family Futures, 2013); and, 3) *Screening and Assessment for Family Engagement Retention and Recovery* (SAFERR) (Young et al., 2006).

Finally, I developed the evaluation strategy for the County of Sacramento's substance use and child welfare initiatives beginning in 1996. This depth and longevity of the work has provided me a unique understanding of county-level challenges, barriers, and solutions to opioid and other substance use disorders in child welfare and the courts. Since 2001, I have served as the evaluator of the County's Family Treatment Court programs. I originated the County's approach to using administrative data sets to monitor client outcomes from the California information systems for child welfare and substance use treatment data. This administrative data system approach became the foundation of the national Regional Partnership Grant performance measurement system. Similar methods have now also been tested in a proof of concept for the State System Improvement Program (SSIP) for the Ohio Supreme Court at the School of Medicine at Ohio State University. This was to assess the Ohio Family Treatment Courts. Thus, I have spearheaded the country's efforts in using administrative data to monitor performance measures for families with substance use disorders in child welfare.

Each of these experiences and depth of my knowledge deepened and informed my understanding of the national and county-level data presented in the report. The recommendations in this report are consistent with my 25-year career and knowledge of improving practice and policy on behalf of these children and families.

<u>**Summary of Opinions**</u>

1)  In the past four decades, our country has experienced at least three major shifts in substance use that dramatically affected children and families. The increase of opioid use, however, and specifically overdose deaths and hospitalizations have been shown to have a statistical relationship with increased foster care rates and has been described

CONFIDENTIAL

by long-time child welfare professionals as having the most burdensome effects on the child welfare systems of this country.

2) The current environment exhibits at least two major differences from our prior experiences. First, young people are dying at astonishing rates, and second, most states have infants being placed into protective custody at increasingly high rates.

3) We must continue to evaluate solutions to improve outcomes for families affected by parental opioid and other substance use disorders in child welfare services. However, federal, state, local efforts and private foundation grant programs over the past decade have specifically tested strategies to implement evidence-based programs. These programs have generated a knowledge base that allow us to recommend practice changes and system reforms to remediate the current opioid crisis.

## Brief Summary of the Data

In the three most recent changes in drug use patterns in our country, cocaine, methamphetamine, and opioids, adolescents and younger people at prime child-bearing ages, 18 to 26 year-olds, tend to be those who are most at risk to experiment and develop severe substance use disorders. This age group is also more likely to be unprepared to become parents. When these young parents also have a substance use disorder, they too often expose their child to substances during pregnancy, place their children in risky situations, or neglect their children so that child protective services are called upon to step in and protect the child.

As shown in 2017 survey data, the age group most likely to misuse opioids were also persons in prime childbearing ages. Approximately 7.3% or roughly 2.5 million 18 to 25 year-olds reported opioid misuse (Substance Abuse and Mental Health Services Administration [SAMHSA], 2018).

Graphic 1: Number and Rates of Past Year Opioid Misuse by Age



CONFIDENTIAL

Among all age groups, there are two aspects of parental opioid use that affect the child welfare system: (1) prenatal opioid and other substance use exposure when it is determined that there are immediate safety factors resulting in the newborn being placed in protective custody; and, (2) post-natal use that affects parents' or the legal caregivers' ability to safely care for their children, including parents' incarceration.

Congress has specified that hospital notification of cases of prenatal substance exposure is not substantiated child abuse or neglect.[1] Rather, when infants are identified by hospital staff, CPS is notified and the child welfare staff conducts an assessment of the family's risk and safety factors. Safety refers to immediate threats of danger (a parent actively using opioids and not pursuing treatment could be a safety threat) and risk refers to the likelihood of maltreatment occurring in the future (a family with parental opioid use, not fully compliant in treatment, and no other adult in the home to care for the child could be a risk factor). A plan of safe care to ensure the newborn's safety and well-being is developed before hospital discharge.

Estimates have found that between 2000 and 2009, the incidence of Neonatal Abstinence Syndrome ("NAS")[2] increased 3-fold from 1.2 to 3.4 per 1,000 hospital births (Patrick et al., 2012) and on to 5.8 per 1,000 hospital births in 2012. This represents an increase in incidence of 383% (Patrick et al., 2015). The Center for Disease Control ("CDC") examined publicly available data from 1999 through 2013 and found similar results, with NAS incidence increasing from 1.5 to 6.0 per 1,000 births, representing a 300% increase (Ko et al., 2016).

In response to these higher rates of infants experiencing NAS, in 2016, Congress amended the Child Abuse Prevention and Treatment Act ("CAPTA") to ensure that notifications are made to child protective services when medical personnel identify infants who are "affected by substance abuse, withdrawal symptoms or fetal alcohol spectrum disorders" and leaves operational definition of these terms to the states. Specifically, Congress removed "illegal" substance abuse from the statute to include infants who experience withdrawal from "legal" prescription drugs and specified that the plan of safe care must include the treatment needs of the family or caregiver.

After amendments to CAPTA in 2016, Ohio's Children's Services defined "affected by substance abuse" in their state child welfare policy as infants who test positive for a substance at birth or the hospital personnel makes a determination that the infant experiences withdrawal or is diagnosed with a fetal alcohol spectrum disorder (ODJFS, 2018). This means that when a notification comes from a hospital that an infant has been identified as affected by substance use, withdrawal symptoms or a fetal alcohol spectrum disorder, the county's children's services opens an investigation of child abuse or neglect. Thus the increase of infants affected by prenatal substance exposure also impacts the cases accepted by child welfare services.

Appropriate intervention is critical for the care of a child impacted by parental substance use. Intervention is both to provide immediate safety but also to treat the trauma of the separation from

---

[1] The exact language is that "…such notification shall not be construed to – (I) established a definition under Federal law of what constitutes child abuse or neglect; or (II) require prosecution for any illegal action."

[2] The correct term and diagnostic category for infants who experience withdrawal from opioids is Neonatal Opioid Withdrawal (NOWs) and Neonatal Abstinence Syndrome (NAS) is used to refer to all types of substances or when the specific substance is unknown. In practice however, few practitioners distinguish between the two and generally classify all infants with NAS rather than correctly identifying NOWs when appropriate.

CONFIDENTIAL

the parent as well as the social emotional challenges the child has developed. This treatment is very likely the difference between achieving a positive developmental trajectory and fulfilling his/her potential or perhaps repeating familial patterns and becoming a costly burden to society.

The Adoption and Safe Families Act ("ASFA") in 1997 increased the nation's focus on reducing the number of children in out-of-home care by providing incentives for states to increase the number of adoptions and to allow funding waivers to try innovative programming to prevent child removals. Soon after ASFA was enacted, the highest number of children in out-of-home care ever recorded was in 1999, with approximately 567,000 children (U.S. DHHS, 2006). That began the trend of more than a decade of decreasing the number of children in out-of-home care. The ASFA changes were having significant effects on the overall system despite the methamphetamine era of the late 1990s and early 2000s. Overall caseloads continued to decrease reducing the numbers of children in care to a low point in 2012 of just over 396,000 children. That trend began to reverse in 2011-2012 (shown as federal fiscal year 2012 in graph 2). In 2011-2012, the number began to rise and has continued a steady increase for the past five years. The increasing number of children in care since 2012 are both new intakes as well as children who are remaining longer in care because they cannot return to their home and alternative homes have not been found.

Graphic 2: Number of Children in Out-of-Home Care at End of Fiscal Year in the U.S., 2000 to 2017



Note: Estimates based on *children in foster care* as of September 30

Source: AFCARS Data, 2000-2017

Beginning in 2007, just prior and as the trend line began to reverse, our organization was providing technical assistance and performance monitoring to a large group of Administration on Children, Youth, and Families, Children's Bureau, grantees under the Regional Partnership Grant (RPG) program. There were 53 sites across the country (including Ohio), over 25,000 children and 14,000 parents in the program across its first five years. Child welfare professionals in that cohort of grantees reported in their qualitative semi-annual reports that the cases were becoming more difficult to treat and to manage. They attributed that in part to their prior efforts at diversion programs that child welfare had been instituting to keep children out of care. Grantee staff reported that the families who were coming into care were actually more difficult cases to work with. The

CONFIDENTIAL

partnerships needed to expand as the family's problems were more complex in terms of more severe substance use disorders and co-occurring health, mental health and socio-economic factors for the families to resolve to retain or regain custody of their children. Grantee staff reported that drug use patterns were shifting to prescription opioids and that it was more difficult to meet the medication-assisted treatment needs of parents (Children and Family Futures, 2013).

The trend of younger children in care and particularly the number of infants described above is staggering, especially in light of the loss of progress due to opioids. Part of the change in the makeup of the child welfare caseload includes this trend to a larger number of infants. Of the nearly 270,000 children who entered care in 2017, the largest group were infants (see Graphic 3). The data are not available on the percentage of those infants who experienced prenatal substance exposure, since until 2019, they are not required to be reported at the federal level[3] nor are they required data in the majority of states.

Infants in out-of-home care differ from older children in care. Infants tend to be in care longer, are adopted at higher rates (and thus eligible for adoption assistance payments until the age of majority), are more vulnerable for delays in social, emotional and cognitive development, they are more likely to be categorized as physical neglect cases meaning failure to provide care, unsanitary conditions, and prenatal substance exposure (Wulczyn, Ernst & Fisher, 2011).

Graphic 3: Number of Children who Entered Out-of-Home Care, by Age at Removal in the U.S., 2017



Note: Estimates based on **children who entered out of home care** during Fiscal Year        Source: AFCARS Data, 2017

Infants placed in out-of-home care are an increasing rate of all children in care as shown in Graphic 4. In 2017, infants were nearly 1 out of every 5 children placed in care.

---

[3] Beginning in 2019, states are to report in the annual update regarding CAPTA, to the extent practicable, the number of infants that hospitals notify child welfare have been identified as affected by substance abuse, withdrawal symptoms or fetal alcohol spectrum disorder and the number of such infant for whom a plan of safe care was developed.

**CONFIDENTIAL**



Graphic 4: Percent of Children under Age 1 who Entered Out-of-Home Care in the U.S., 2000 to 2017

These trends are resulting in an increasing shift toward younger children making up a larger percentage of children in out-of-home care with children under six now representing 42% of children in care.

Graphic 5: Number of Children in Foster Care at End of Fiscal Year by Age in the U.S., 2017



This rate of young children coming into care is especially troubling, as children ages birth to 3 years old are at their most vulnerable. Infancy and toddlerhood is a time of rapid development across all domains of functioning. The brain of a newborn is about one-quarter the size of an adult's and by the age of three, the brain has developed to about 80 percent of its adult size (Nowakowski, 2006). Thus, these data indicate a short window of time for intervention with these children and families. It is imperative that the development of that child take place in a stable environment with a caregiver who fosters mutual attachment with the child.

CONFIDENTIAL

Staff at Children and Family Futures have been monitoring the AFCARS data for nearly 20 years and we understand the challenges of using the data to precisely measure the impact of parental substance use disorders on child welfare. However in some states, there have been specific policy changes to improve the accuracy of data collection. In recent years, Ohio has implemented some of these changes. Research studies have also been conducted to better understand the prevalence of parental substance use disorders. Seay (2015) published a review of all of the studies in the literature and found that across research methods and populations studied, the average estimate among children placed in out-of-home care was that 59.1% were from families with a parent that substance use was associated with the child's placement.

There are several variables that are optional items for states to collect and report to the federal government that are factors associated with the child's placement in out-of-home care. Four of those optional data collection items are related to substance use: Alcohol use by parent; drug use by parent; alcohol use by child; and, drug use by child. Graphic 6 shows that between 2000 and 2009 were fairly steady rates of increase in parental alcohol and drug use associated with child removal.

Since 2009, however, states report a more rapid 14-percentage point increase. The numbers rose from 25% of cases in 2009 to 39% in 2017, in parental alcohol or drug use as factors in the child's removal. In this analysis, the percent is based on either drug or alcohol being reported.

Graphic 6: Incidence of Parental Alcohol or Drug Use as a Reason for Removal in the United States Factor in Out-of-Home Placement, 2000 to 2017



Note: Estimates based on *children who entered out of home care* during Fiscal Year

Source: AFCARS Data, 2000-2017

Children and Family Futures staff have been to every state in the country and asked child welfare professionals if what they observe coincides with these data representing the incidence of parental substance use. Not a single state's staff, including those I have asked in Ohio, believe these data accurately reflect their experience and tell us that these numbers are significant undercounts and vary across counties. They report the vast majority of cases in which a child is placed in protective custody are related to parental substance use disorders. Judges who oversee cases of child abuse and neglect most often state that parental substance use disorders are in virtually all but a very small number of the cases they adjudicate.

CONFIDENTIAL

My professional experience is that there are at least four reasons that AFCARS data significantly undercount the prevalence of parental opioid and other substance use disorders in child welfare:

1) The collection of the variable regarding parental substance use is not required to be submitted to the federal government;
2) Most states do not have a standardized screening tool to assess if parental substance use or type of substance is a factor associated in the child's placement in care;
3) The child welfare worker may not become aware that substance use is a factor in the family until they have been working with the family for an extended period and the "place in the data system" to record that factor is only in the initial intake screen, not in on-going services; and,
4) The state's data system AFCARS draws from does not have an easy, consistent way for the data regarding factors associated with the child's placement at intake to be entered into the data system.

Thus, there is wide variation across states in the prevalence reported as shown in the map in Graphic 7. The data range from states reports less than 5% to 70% of parents with substance use as a factor in the child's placement in out-of-home care. States with the highest prevalence rates, Alaska, Texas and Maine for example, are states that have implemented standardized substance use screening tools and instructions to record the results. This child welfare practice is exemplified in Maine and New Hampshire, contiguous states that have nearly opposite prevalence rates. We know that Maine and New Hampshire have experienced the impact of opioids in child welfare in similar ways; yet their child welfare data on this is dramatically different.

The reason that Maine reports nearly a 70% prevalence rate of parental substance use among children placed in care is that more than a decade ago, Maine's child welfare agency implemented a standardized screening tool into its practice. In the past few years, Ohio counties who have participated in a Supreme Court initiative and other efforts to improve these data, including Summit County, have implemented a similar short screening tool in child welfare practice. This is important because in future data analyses, the prevalence of opioid and other substance use disorders in child welfare in these counties will be more clearly obtainable and it is a vital gap in Ohio child welfare that needs to be addressed.

Graphic 7: Prevalence of Parental Alcohol or Other Drug Use as a Contributing Factor for Reason for Removal by State, 2017

**CONFIDENTIAL**



Efforts in Data Collection have improved in recent years, but significant undercount remains in some states.

Note: Estimates based on *children in out of home care at some point* during Fiscal Year 2017

Source: AFCARS, 2012-2017

Despite the undercount of parental alcohol or drug use as factors associated with child placement, among all reasons for child removal, drug abuse by parents was the cause of the largest percentage change driving removals over the past decade. Child welfare professionals report that neglect is the category that is checked in the data system, but that neglect is almost always associated with parents' substance use disorder. As shown in Graph 8, drug abuse by the parent increased by 13.5 percent over the past decade.

Graphic 8: Percent Change from 2007 to 2017 in Factors Associated with Child Placement



This discrepancy in data led the Office of the Assistant Secretary for Planning and Evaluation (ASPE) in the Department of Health and Human Services to conduct a mixed methods study of quantitative indicators of the opioid impact on foster care and a series of qualitative interviews. Their study was to determine the strength of the relationship at the county level of government and they conducted interviews with 188 professionals to understand the impact of opioids on child welfare systems. Specifically they evaluated the impact rates of drug overdose deaths, drug-related

CONFIDENTIAL

hospital stays, and emergency room visits on foster care reports of maltreatment, substantiated reports in which child protection investigators have confirmed that maltreatment occurred, and foster care entries. They found:

- **Higher rates of overdose deaths and drug hospitalizations correspond with higher child welfare caseload rates.** They estimate that in the average county across the country, a 10 percent increase in the overdose death rate corresponded to a 4.4 percent increase in the foster care entry rate. Similarly, a 10 percent increase in the average county's drug-related hospitalization rate corresponded to a 2.9 percent increase in its foster care entry rate.

- **Higher indicators of substance use (e.g., overdose deaths) correspond to more complex and severe child welfare cases (e.g. placement in care versus in-home services).** As cases became more severe—from report to substantiation to foster care placement—the relationship with substance use increased (i.e., the strength of the statistical model increased).

- **Hospitalization rates varied by substance, but different substances had similar relationships with foster care entry rates.** Use of any substance can put children at risk, and statistical analysis found that hospitalization due to different categories of substances have comparable relationships with foster care entry rates. Opioids, stimulants (including cocaine and methamphetamine), and hallucinogens had dramatically different hospitalization rates, with the rate of opioid-related stays being the largest (Radel et al., 2018).

This map shows by county the areas of the U.S. where the rate of both overdose death and foster care entries are above the national median. In Ohio, the concentration of these factors are in Southern Ohio and in Cuyahoga and Summit Counties in the North.

**Graphic 9: Counties with Rates of Drug Overdose Deaths and Foster Care Entries Both above the National Median in 2016**



CONFIDENTIAL

Sources: CDC/NCHS, National Vital Statistics System, Mortality; HHS/ACF, Adoption and Foster Care Analysis and Reporting System.

Again from the Radel et al., (2018) study, Graphic 10 summarizes the ASPE findings. As a county experiences a ten percent increase above the rate of the national median of overdose deaths, it also experiences a 2.3% increase in reports of child maltreatment, a 2.6% increase in substantiated child maltreatment, and a 4.4% increase in foster care placement. These increases place an additional burden on child welfare and related systems to manage the increased caseloads.

Graphic 10: Summary of the Relationship between Rates of Overdose Deaths and Child Welfare Indicators



Sources:  ASPE (2018) CDC/NCHS, National Vital Statistics System, Mortality; HHS/ACF,
Adoption and Foster Care Analysis and Reporting System.

ASPE also conducted interviews with 188 child welfare professionals from across the country. They found that the problems related to parents with opioid and other substance use disorders in child welfare had intensified over the prior few years and that families were more complex in terms of their services needs and the experiences of children requiring intervention. For example, they reported that for reunification to succeed child welfare workers needed to assess for and then obtain multiple services such as family therapy, parenting skills, child development, and domestic violence interventions. They also found gaps in access to treatment resources, particularly medication-assisted treatment (MAT), substance use disorder assessment protocols using current methods of evidence-based practice, and availability of family-centered treatment for child-welfare involved families. Workers reported that child welfare agencies had to arrange and pay for substance use disorder treatment as the publicly-supported treatment systems in their communities were not accessible due to the number of people accessing the limited resources available. As to the scope of the current caseload, the Assistant Secretary's report stated,

"Caseworkers are overwhelmed by the volume of cases, the lack of treatment resources, and the sheer magnitude of the problem. These factors all lead to high stress, burnout, and turnover. While this consequence is not a new phenomenon in child welfare practice, community leaders see it as worse now than in the past."

In particular, caseworkers and professionals in areas of the country with higher indicators of substance use contrasted factors they perceived as contributing to caseloads and difficulty in family

CONFIDENTIAL

reunifications compared to prior eras such as crack and cocaine in the 1980s and methamphetamine in the 1990s. In particular, they noted the impact on the entire family system with opioid use disorder. They reported that previously, family members and community institutions "shielded" children from the effects of their parents' use. These respondents reported that multiple generations of family members were frequently using substances so that finding substitute caregivers was more difficult and child welfare agencies were more likely to remove children and retain custody of the child (Radel et al, 2018).

In addition to this national picture, there is one study in the literature on medication-assisted treatment for opioid-using families in the child welfare system that is instructive here (Hall et al., 2016). The study is specific to the Sobriety Treatment and Recovery Team ("START") program operating in Kentucky and those results are discussed below. Dr. Hall reports on the 596 adult opioid users in the START sample and their experience with MAT. The Kentucky evaluation of the START program has been underway since 2007 (Huebner et al., 2017). It was originally funded by a Regional Partnership Grant[4] and subsequently by the state of Kentucky, which received permission from the federal government to use federal funds under a waiver program to continue the START program and the evaluation.[5] The evaluation is on-going and data are collected by program staff and submitted to Dr. Hall, who periodically reports to the state and publishes findings in the scientific literature (Hall, 2019; Hall et al., 2016).

For this purpose, I was interested in knowing what the data showed on the overall percentage of START participants with opioid use disorders. The question posed to my colleague was what percent of the overall START population were opioid users compared to START participants who were not using opioids. Dr. Hall ran analyses on the drug use at intake variable and shared his data on that variable by program years with me. He gave me permission to present the data in a bar graph in this report and he approved the accuracy of the graph. These START data show that in Ohio's neighboring state of Kentucky, in a child welfare program that did collect information on opioid use among the participants, the range of opioid use among women across the years was 46% to 80%.

Graphic 11: Percentage of Women START Participants in Kentucky Using Opioids by Year 2008-2018; Population served across Program Years = 1,103

---

[4] See RPG profile at: https://ncsacw.samhsa.gov/technical/rpg-ii.aspx?id=111)
[5] See explanation of waiver programs at:
https://www.acf.hhs.gov/sites/default/files/cb/waiver_summary_table_active.pdf)

**CONFIDENTIAL**



Source: Hall, M.T. (2019) Unpublished program participant data, KY START Program

These START data represent one of the grantees that participated in the Regional Partnership Grant (RPG-1) program in the first cohort funded from 2007 to 2012 (some grants operated for 3 years including Lucas County, Ohio). These were grants authorized by Congress to target communities affected by methamphetamine. However, many communities that were funded experienced higher rates of opioid use among parents than methamphetamine. There were 53 RPG-1 grantees located across the country. Each grantee had an individual program focus, goals and target population. The state of Tennessee program model was an in-home prevention program and not as directly comparable to the other programs in the region as evidenced by the number of adults served as shown in the table below.[6]

Each of the grantees uploaded child and parent demographic and outcome variables to a database that Children and Family Futures operated and analyzed during the grant period. Research staff who report to me have access to these RPG data as part of our role in overseeing the grants. Our staff have transferred the RPG performance measurement data files to the federal data warehouse at Cornell University for public use as was required by our federal contract. The following table shows the parent demographic data on opioid use for adults in the data set from grantees located in Ohio, Kentucky and Tennessee.

Overall across all 53 grantees and 14,066 adults in the program, 21% were using an opioid or heroin at intake to the program. Among grantees during 2007 to 2012, in Ohio, Kentucky and Tennessee, of the 2,244 parents in the programs, 1,145 used opioids or 51.0% of parents.

| Grantee ID | Grantee Name | State | Opioid or Heroin at Intake | Percent | Total Number Adults |
|---|---|---|---|---|---|
| 90CU0006 | KRCC | Kentucky | 320 | 37% | 860 |

[6] A map showing the RPG specific program information is available at this link: https://ncsacw.samhsa.gov/technical/rpg-i.aspx.

CONFIDENTIAL

| 90CU0045 | KY DCBS | Kentucky | 461 | 65% | 710 |
|---|---|---|---|---|---|
| 90CU0010 | Child and Family TN | Tennessee | 148 | 59% | 250 |
| 90CU0051 | State of TN | Tennessee | 10 | 20% | 51 |
| 90CU0015 | County of Lucas | Ohio | 55 | 37% | 148 |
| 90CU0028 | Butler County | Ohio | 151 | 67% | 225 |
| **Subtotal Ohio, Kentucky and Tennessee** | | | **1,145** | **51%** | **2,224** |
| **All RPG Grantees** | | | **2,972** | **21%** | **14,066** |

RPG data analyzed by Dr. Yueqi Yan, Children and Family Futures, from the RPG-1 Data Set, data collected under contract to the Administration on Children, Youth and Families, Children's Bureau, 2007-2013.

To summarize

- Infants are the largest age group of children entering foster care, they are at least twice the number of children of other ages
- Children removed due to parental substance use has increased dramatically as reported by the states but it is significantly undercounted in state data bases
- There is a relationship between increased overdose death rates and increases in child welfare indicators including reports of maltreatment, substantiated reports or maltreatment, and entries into foster care
- Child welfare professionals across the country, report that parental opioid use disorders are having a major impact on increasing child removals and preventing reunification
- In Kentucky, since 2009, the majority of program participants were using opioids in the START program
- Across six grantees in the Regional Partnership Grant program in Ohio, Kentucky and Tennessee, from 2007 to 2012, of 2,224 parents in child welfare, 51% were using an opioid or heroin

**Cuyahoga and Summit Counties Ohio Data**

Information on child maltreatment such as numbers and characteristics of children who are victims of maltreatment are submitted by state agencies to the federal government in the National Child Abuse and Neglect Data System (NCANDS) (U.S. DHHS, ACF, ACYF, 2016). Researchers can have permission to access this data set and receive de-identified data for specific studies from the data repository at Cornell University. As noted earlier, Children and Family Futures staff have

16

access to the NCANDS data and conducted analyses on the data submitted by the state of Ohio from 2004 to 2016. Graphics 13 and 14 show the number of substantiated reports and child victims in Cuyahoga and Summit Counties by year. Cuyahoga County has a pronounced influx and increasing trend of substantiated maltreatment reports and maltreatment victims in the late 2000s and 2010s. Summit County has a more recent increase of 300 child victims in 2016 over 2014.

Graphic 12: Number of Substantiated Maltreatment Reports and Child Victims in Cuyahoga County, 2004 to 2016



Note: Estimates based on *children who were the victims of substantiated maltreatment reports* during Fiscal Year

Graphic 13: Number of Substantiated Maltreatment Reports and Child Victims in Summit County, 2004 to 2016



Note: Estimates based on *children who were the victims of substantiated maltreatment reports* during Fiscal Year

17

CONFIDENTIAL

The data submitted by the Ohio Department of Job and Family Services (ODJFS) to the federal government in the Adoption and Foster Care Analysis and Reporting System (AFCARS) are made available to researchers each year. The following data analyses were conducted by Children and Family Futures staff and are from the publicly-available de-identified data set released in January 2019, which includes information submitted by the State of Ohio through federal fiscal year ending September 30, 2017. The counties of Cuyahoga and Summit share several similar trends with the nation as a whole, their overall child population of children in out-of-home care was declining after the Adoption and Safe Families Act of 1997, through the late 2010's, and then began to see an increase in numbers 2013 in Summit and 2014 in Cuyahoga. Children in out-of-home care in Cuyahoga in 2017, continues an upward trend to levels not seen since the early 2000s. In Cuyahoga, children in out-of-home placements reached 2,166 as of February 26, 2018. This is a drastic increase in comparison to the 1,681 children in out-of-home placements as of July 27, 2014. In Summit County in 2017, the 646 children in care may be a data outlier or data correction as there were 675 children in care in 2016 which continued an upward trend. The average over the two years of 2016 and 2017 is 660 children, which continues the upward trend and places the numbers similar to the numbers of 2010/2011.

Graphic 14: Number of Children in Out of Home Care at End of Fiscal Year in Cuyahoga and Summit, 2004 to 2017



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuyahoga | 3,687 | 3,055 | 2,490 | 2,186 | 2,009 | 1,699 | 1,732 | 1,926 | 1,693 | 1,558 | 1,666 | 1,749 | 1,755 | 1,918 |
| Summit | 1,325 | 1,239 | 998 | 961 | 893 | 847 | 680 | 589 | 517 | 551 | 569 | 588 | 675 | 646 |

Note: Estimates based on children in foster care as of September 30

Source: AFCARS Data, 2004-2017

The number of children placed in out-of-home care each year are also increasing at rates similar to the early 2000s. Cuyahoga placed 1,333 children in out-of-home care in 2017, more than 400 additional children than in 2012. Again in Summit, the 2017 data may be a correction as the 2016 and 2017 average is 775 per year.

Graphic 15: Number of Children Entering Out of Home Care in Cuyahoga and Summit Counties, 2004 to 2017

**CONFIDENTIAL**



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuyahoga | 1,487 | 1,232 | 1,211 | 988 | 1,028 | 784 | 944 | 1,161 | 926 | 854 | 979 | 1,115 | 1,158 | 1,333 |
| Summit | 1,201 | 1,121 | 1,083 | 1,086 | 1,075 | 874 | 760 | 746 | 704 | 672 | 682 | 710 | 877 | 672 |

Note: Estimates based on **children who entered out of home care** during Fiscal Year                Source: AFCARS Data, 2004-2017

As stated, the collection of the AFCARS data indicating that the placement of the child in out-of-home care is related to the parents' alcohol or drug use are optional data items. Therefore, prevalence of parental substance use as factors in child removal is seriously undercounted in child welfare cases (Young et al, 2007; Seay, 2016). Despite the undercount, in Cuyahoga and Summit Counties, as indicated in Graphic 16, over the past 13 years and particularly from 2012 to 2017 parental substance use in the data set was increasingly more likely to be included as a factor as to why the child was being placed in out-of-home care. These data are from the AFCARS 2017 dataset, however, we excluded cases with the variable, "alcohol use by parent." Therefore, these county-level data are only cases in which *parental drug use* was included as a factor in the case. Parental alcohol use has been excluded in all of the analyses for Cuyahoga and Summit County data.

Graphic 16 Prevalence of *Parental **Drug** Use* as a Factor for Reason for Removal in Cuyahoga and Summit Counties, 2004 to 2017



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cuyahoga | 12.8% | 11.9% | 11.5% | 11.0% | 9.4% | 11.1% | 15.9% | 17.9% | 19.4% | 21.7% | 21.6% | 21.1% | 19.9% | 24.0% |
| Summit | 6.2% | 5.7% | 10.2% | 13.4% | 11.6% | 14.0% | 16.2% | 16.0% | 19.8% | 25.4% | 29.0% | 27.8% | 30.6% | 31.9% |

Note: Estimates based on **all children in out of home care at some point** during Fiscal Year                Source: AFCARS Data, 2004-2017

**CONFIDENTIAL**

Again, from the AFCARS data set, in 2017, Cuyahoga County had 237 babies placed in care which is the highest number since 2007.  In 2017, Summit County had 97 babies (an unusually low number and may be an outlier after 152 babies in 2016). The average of the 2016 and 2017 data is 124 per year.

Graphic 17: Percent and Number of Children who Entered Out-of-Home Care in Cuyahoga and Summit Counties who were Under Age 1, 2004 to 2017



|          | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
|----------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|
| Cuyahoga | 304  | 288  | 271  | 231  | 222  | 151  | 189  | 195  | 169  | 144  | 172  | 188  | 195  | 237  |
| Summit   | 164  | 148  | 170  | 170  | 194  | 141  | 130  | 126  | 129  | 124  | 115  | 119  | 152  | 97   |

*Note: Estimates based on children who entered out of home care during Fiscal Year*     Source: AFCARS Data, 2004-2017

Cuyahoga and Summit Counties also have a young population of children in out-of-home care requiring early intervention and ensuring that services are provided so that the children do not fall behind in meeting their developmental milestones. In Cuyahoga 40% of children in out-of-home care are under the age of 6.

Graphic 18: Number of Children in Out-of-Home Care at End of Fiscal Year by Age in Cuyahoga County, Ohio, 2017



*Note: Estimates based on children in foster care as of September 30, 2017*     Source: AFCARS Data, 2017

In Summit County, the percent of children under age six is nearly half of its out-of-home population.

Graphic 19: Number of Children in Out-of-Home Care at End of Fiscal Year by Age in Summit County, Ohio, 2017



Note: Estimates based on *children in foster care* as of September 30, 2017                    Source: AFCARS Data, 2017

Again, mirroring the nation as a whole, Cuyahoga and Summit Counties have a higher rate of parental drug use reported among infants who are placed in out-of-home care as shown in Graphic 20. At least 40% of infants who are placed in out-of-home care are reported to have a parent with drug use that is a factor in their being placed in care.

Graphic 20: Percent of Children under Age 1 with Parental ***Drug Use*** as a Reason for Removal in the United States, Ohio, Cuyahoga, and Summit, 2004 to 2017



Note: Estimates based on *children under age 1 who entered out of home care* during Fiscal Year          Source: AFCARS Data, 2004-2017

CONFIDENTIAL

To summarize

- Summit and Cuyahoga Counties saw spikes in reports of child maltreatment in the mid- 2000s and increases in children coming into care
- Infants are the largest age group of children entering foster care, they are at least twice the number of children of other ages and they present specific challenges due to the critical time period for them to establish a permanent bond with their caregiver for their brain development
- Removals of children due to parental drug use has increased significantly as reported by the states and in Cuyahoga and Summit Counties, it is reported at highest rates for infants who are placed in out-of-home care

**County Initiatives on Parental Opioid and other Substance Use Disorders in Child Welfare**

As a component of the technical assistance that Children and Family Futures ("CFF") is providing to the Court Services Division of the Ohio Supreme Court under the State System Improvement Program ("SSIP") (funding for this initiative will be completed in September 2019), CFF staff developed summaries of initiatives each county in Ohio has implemented on collaborative efforts among the substance use disorder treatment, children's services and juvenile courts. The following are the summaries of programs in Cuyahoga and Summit counties. Each of these initiatives require significant county investments for activities such as: program conceptualization and planning; proposal writing; cross-agency coordination; fiscal and program oversight and management; program implementation including staff recruitment, training, and human resources functions; and, programmatic and fiscal reporting to state, private foundation and/or federal funders.

*Cuyahoga*

1. **Certified FDC** - The Ohio Supreme Court has adopted rule amendments that outline the procedures to receive Supreme Court certification for a specialized docket program. Under the certification amendments, courts operating specialized dockets are required to submit an application, undergo a site visit, and submit specific program materials to the Specialized Docket Section as part of the certification process. Cuyahoga County has received Ohio Supreme Court certification for its Family Drug Court.

2. **MOMS** - The goal of this collaborative, called Maternal Opiate Medical Supports (MOMS), is to improve maternal and fetal health outcomes, improve family stability, and reduce costs of Neonatal Abstinence Syndrome (NAS) to Ohio's Medicaid program by providing treatment to pregnant mothers with opiate issues during and after pregnancy through a Maternity Care Home (MCH) model of care.  The MCH model is a team-based healthcare delivery model that emphasizes care coordination and wrap-around services engaging expecting mothers in a combination of counseling, MAT, and case management.

CONFIDENTIAL

3. **MOMS+ (2 Sites)** - The goal of MOMS+ is to improve care and outcomes for the mother-infant dyad by supporting maternity care providers in the care of pregnant women with opioid use disorder (OUD), working closely with those who provide medication assisted treatment (MAT) and behavioral health (BH) therapy. The Ohio Perinatal Quality Collaborative (OPQC) built on previous efforts to test and spread a "Mentor-Partner" model to improve care and outcomes for pregnant women with OUD and their infants in the MOMS+ initiative.

4. **STR CURES Act** - The 21st Century Cures Act was passed by Congress and signed into law in late 2016. Ohio is eligible for up to $26 million dollars in FY 2017. Ohio MHAS applied on behalf of the state focusing on medication-assisted treatment, workforce development, immediate access, primary prevention, Screening, Brief Intervention and Referral to Treatment (SBIRT), recovery supports, including peer services, and addressing secondary trauma among first responders.  The counties selected to participate were those with the highest rates of opioid-related overdose deaths.

5. **ATP Sites** - OhioMHAS is conducting a program in select counties providing substance use disorder treatment to individuals who are criminal offenders within the criminal justice system, eligible to participate in MAT drug court, and with dependence on opioids, alcohol or both.  ATP funds can be used to provide recovery support services that are not Medicaid billable.  Eligible counties must have a certified adult drug court program. Treatment of eligible adult offenders are provided by a community addiction services provider certified by OhioMHAS.

6. **ODJFS Universal Screening Funding (non-SSRP/START)** -  The PPOFSUD funds were awarded to institute a Substance Use Disorder (SUD) Universal Screening program, and to aid in the development of a MOU to address the requirements of the Comprehensive Addiction and Recovery Act (CARA) CAPTA. The goal of the SUD Universal Screening program is to engage parents in a dialogue about their use of alcohol and/or drugs; how their alcohol/drug use may be affecting the safety of their children: and to determine if a family member requires further evaluation for SUDs.

7. **HOPE (Helping Ohio Parent Effectively) Parent Partner** - A program funded through ODJFS and Casey Family Programs that uses parent partners who have life experience in the child welfare system to advocate for parents and families.

*Summit*

1. **Children and Family Futures Training and Technical Assistance Site** - CFF operates the National Family Drug Court (FDC) Training and Technical Assistance (TTA) Program that provides TTA to FDCs across the country.  TTA can range from provision of resources to virtual or onsite visits. Summit County has actively engaged

CONFIDENTIAL

in TTA with CFF staff including monthly TA phone calls and on-site visits to improve the FDC operations.

2. **Certified FDC** - The Ohio Supreme Court has adopted rule amendments that outline the procedures to receive Supreme Court certification for a specialized docket program. Under the certification amendments, courts operating specialized dockets are required to submit an application, undergo a site visit, and submit specific program materials to the Specialized Docket Section as part of the certification process. Summit County is a certified FDC.

3. **SSIP (Statewide System Improvement Program) Expansion Demo Site -** The Ohio Supreme Court, ODJFS, Ohio MHAS, and Medicaid are collaborating at the State level to improve outcomes for families in the child welfare agency affected by substance use disorders.  Eleven counties were selected as demonstration sites to expand the capacity of their Family Drug Court or infuse effective FDC ingredients into all cases affected by substance use disorders.

4. **MOMS+ (2 Sites)** - The goal of MOMS+ is to improve care and outcomes for the mother-infant dyad by supporting maternity care providers in the care of pregnant women with OUD, working closely with those who provide medication assisted treatment (MAT) and behavioral health (BH) therapy. The Ohio Perinatal Quality Collaborative (OPQC) built on previous efforts to test and spread a "Mentor-Partner" model to improve care and outcomes for pregnant women with OUD and their infants in the MOMS+ initiative.

5. **STR CURES Act** - The 21st Century Cures Act was passed by Congress and signed into law in late 2016. Ohio is eligible for up to $26 million dollars in FY 2017. Ohio MHAS applied on behalf of the state focusing on medication-assisted treatment, workforce development, immediate access, primary prevention, Screening, Brief Intervention and Referral to Treatment (SBIRT), recovery supports, including peer services, and addressing secondary trauma among first responders.  The counties selected to participate were those with the highest rates of opioid-related overdose deaths.

6. **START** - The Ohio START program is primarily funded through a Victims of Crime Act (VOCA) grant from the Ohio Attorney General's Office, which will be shared among the counties over two and a half years. Ohio START emphasizes a wraparound approach for at-risk parents that includes frequent home visits and mentorship from people who have lived experience with recovery and the child protection system.

7. **ATP Sites** - OhioMHAS is conducting a program in select counties providing substance use disorder treatment to individuals who are criminal offenders within the criminal justice system, eligible to participate in MAT drug court, and with

CONFIDENTIAL

dependence on opioids, alcohol or both. ATP funds can be used to provide recovery support services that are not Medicaid billable.  Eligible counties must have a certified drug court program. Treatment of eligible adult offenders will be provided by a community addiction services provider certified by OhioMHAS.

8. **OTP Provider (2 sites) -** Opioid treatment program (OTPs) provide MAT for patients diagnosed with opioid use disorder. Typically, these facilities have an array of MAT options including methadone, buprenorphine products, and naltrexone (e.g., Vivitrol). OTPs are different than more common office-based opioid treatment programs because they are licensed by various federal and state authorities and must adhere to a strict set of guidelines that cover patient care.

9. **OhioMAS Subsidy** - In response to Ohio's heroin and opioid epidemic, the Ohio Department of Mental Health and Addiction Services (OhioMHAS) was given the opportunity to create the Specialized Dockets Subsidy Project to assist drug courts and other specialized dockets with funding to effectively manage persons with substance use disorders and criminal offenses in the community to reduce commitments to the state prison system. Specialized dockets that target parents charged with abuse/neglect/ dependency of their minor children were also eligible for funding. These programs reduce the number of children who are permanently removed from their homes and, instead, increase the number of children who can remain in their homes with protective supervision provided by child protective services agencies.

In addition, Children and Family Futures staff are the technical assistance contractor to the Administration on Children's Youth and Families, Children's Bureau, to provide technical assistance to the Regional Partnership Grant (RPG) program. Summit County was a grantee in cohort 2 (RPG-2) and received federal grant funds from 2012 through 2017. Summit referred to this grant as "STARS." One of our tasks was to write a final report to the federal government about the activities of all of the grantees. In the final summary report, a quote written by Children and Family Futures staff in 2017 about Summit County's experience is informative:

> "Summit County's child welfare system saw a dramatic rise in the number of children in custody in the same timeframe of increased opioid overdoses. During a one-week period in October 2016, the emergency room was treating 61 people for overdoses. The number of children in custody rose from 597 in August 2015 to 690 in August 2016. In response, the grantee accommodated as many families as possible in RPG services; raised the concern with other community stakeholders; and requested a site visit from the RPG TA team to strategize solutions with providers and executive leadership" (Children and Family Futures, 2017 p.58).

CFF staff also write a profile of each grantee. The lead agency of the Summit County RPG was the Children's Services agency. They anticipated serving 420 families who were children's services over the 5 years of the grant. The county had a local match requirement of approximately $90,000 per year to receive the annual $500,000 in federal funds. The **S**ummit County Collaborative on **T**rauma, **A**lcohol & Other Drug, & **R**esiliency building **S**ervices for Children &

CONFIDENTIAL

Families (STARS) provided rapid in-home substance abuse assessments for all court involved caregivers (and youth as appropriate) with reports for child abuse or neglect (NCSACW, 2017).

A STARS service coordinator (a specialized children's services worker) partnered with the child welfare caseworker and a Recovery Coach to provide a coordinated system of care for the entire family including: entry into substance use disorder treatment for parents and youth with identified needs; trauma assessment and evidence-based trauma services for children provided by Northeast Ohio Behavioral Health; evidence-based family strengthening services for the family; public health outreach; and, the Nurturing Parenting Program (NCSACW, 2017).

**Solutions:**

**What Works for Families Affected by Opioid Use Disorders**

Children, families, and child welfare agencies have been affected by changes in drug use patterns in child welfare programs over the past several decades. As a result of these prior drug use patterns affecting family service agencies, a set of common strategies have been developed leading to positive outcomes for families affected by substance use disorders. For the population of infants and their families who are affected by prenatal substance exposure, a five-point framework is recommended to organize the points of intervention and the strategies recommend here to be put into place, to further mitigate the impact of infants' exposure to opioids (SAMHSA, 2016). This framework is well accepted and has been included in national publications and included in the National Drug Control Policy of 2012 (Office of National Drug Control Policy, 2012).

Graphic 21:



**1) Pre-pregnancy:** Actions recommended to prevent the use of opioids and other substances during the pre-pregnancy and pre-natal phases are similar to the warning labels on alcohol bottles and at alcohol outlets as well as mass communication strategies so there is widespread awareness about the impact on the fetus and mother of opioids during pregnancy (SAMHSA, 2018).

CONFIDENTIAL

**2) Pre-Natal:** During prenatal care, there are specific guidelines that have been established, a committee opinion, and a bundle of services developed by the American College of Obstetricians and Gynecologists (2018) to be implemented. In addition to the prenatal screening, it is critical that enhanced substance use disorder treatment services be available to ensure the best birth outcome for the infant and the mother. This often also requires ensuring that the birth father and partner of the mother has access to medication assisted treatment and other support services.

Many jurisdictions have used home visiting and care coordination to ensure that women with opioid use disorders are engaged in treatment and prenatal care. One successful model for this in Ohio has been the Maternal Opiate Medical Support ("MOMS") program, training and team-based healthcare delivery model in recovery to ensure that pregnant women are getting access to medication assisted treatment, counseling, and prenatal care with the goal of improving birth outcomes for the infant and mother. (http://momsohio.org/)

When prenatal care for a woman with an opioid use disorder begins to impact on child welfare services is the requirement that a plan of safe care must be developed. In several states, child welfare services are proactively engaging with opioid treatment programs, other treatment programs, and public health programs to assist in the prevention of child placement when the baby is born if appropriate. The National Center on Substance Abuse and Child Welfare has developed guidance to states on implementing plans of safe care (NCSACW, 2018). The Children and Recovering Mothers ("CHARM") program from Burlington, Vermont ensures that pregnant women with opioid use disorders receive comprehensive care and supportive services from child welfare to eliminate the need to conduct emergency response investigations at the time of the child's birth. This greatly reduces the expense for child welfare, hospital staff and the trauma for the family (SAMHSA, 2016b).

There are three counties in Ohio (Coshocton, Fairfield, and Trumbull), along with the Ohio Supreme Court staff who are testing strategies to implement plans of safe care under a Quality Improvement Center (QIC) grant for Community Collaborative Court Teams from Children's Bureau (Children and Family Futures, 2017b). The lessons from these counties and the Supreme Court should be explored to understand implementation of plans of safe care in other counties in Ohio and other hard-hit areas. Information about the QIC can be found at: https://www.cffutures.org/qic-ccct/.

**3) At Birth:** For infants and their families who have not previously been identified as needing a plan of safe care, hospital medical staff are required to notify children's services if they have determined that the infant is affected by substance abuse, withdrawal symptoms or fetal alcohol spectrum disorder. Ohio's Department of Children's Services has taken a broad interpretation of "affected by" and states that a plan of safe care is required for all infants who had a positive substance toxicology result; demonstrated symptoms of substance withdrawal; and/or was diagnosed with Fetal Alcohol Spectrum Disorder (ODJFS, 2018).

Ohio Children's Services policy is that the hospital make a "referral" to Children's Services, which requires a determination on whether an investigation is to be conducted. Even if the infant and family are not accepted for a child welfare investigation, infants identified in the above three categories specified in CAPTA require resources of the hospital and of Children's Services to

CONFIDENTIAL

develop the plan of safe care and make a determination on who is to monitor the implementation of the plan (ODJFS, 2018).

The plan of safe care is also to identify and meet the substance use and other treatment needs of the family/caregiver. This may require access to comprehensive family-centered treatment, safe housing, mental health care, medication-assisted treatment. Family-centered treatment has been defined and the components must be individualized based on the needs of each member of the family (Werner, Young & Amatetti, 2007).

**4) Post-Partum:** Infants and their families who have been referred to Children's Services are facing a particularly important time as the infant's brain development is tied to establishing a bond with a caregiving adult. When possible, Children's Services strives to ensure this can safely be with the birth mother and family. There are several models to enhance parent engagement in treatment. Only one has documented outcomes with opioid using parents using medication-assisted treatment (Hall et al., 2016).

In the 1990s, Cuyahoga County led efforts to test family mentor strategies in the Sobriety Treatment and Recovery Team ("START") model. Subsequently the model was implemented in Kentucky where research has been conducted and is now on the California Clearinghouse of Evidence-Based Practices as a promising strategy to improve outcomes for children birth to age three in child welfare services. The START program pairs a person with lived experience with a child welfare worker from the very first referral to child protective services. To operate with fidelity to the model, there are timelines that must be met to ensure services are provided and families are engaged at each step of the child welfare process. A review of the development of the model and its first decade was published by (Huebner et al., 2017). The essential timeline of the first 30 days of the case is shown below and counties require technical assistance and treatment access to implement this recommended model.

Graphic 22: START Timeline



CONFIDENTIAL

Another component of services that are required by the Child Abuse Prevention and Treatment Act for all children who are placed in out-of-home care and are under the age of three is an assessment by Early Intervention Services. This assessment determines if children who are in child welfare services have developmental delays that require early intervention services and support. Many advocates believe that all young children who were identified as affected by prenatal substance exposure, should automatically meet criteria for early intervention services and that the assessments need to be conducted by staff who are trained specifically for children with prenatal substance exposure. In Ohio, Early Intervention (EI) is a statewide system that provides coordinated services to parents of eligible children under the age of three with developmental delays or disabilities. Each family receives an Individualized Family Service Plan (IFSP) that specifies services and supports to enhance the child's learning and development. For child welfare, the increased number of babies and young children who have been placed in care have placed additional strains on the budgets of Early Intervention services in conducting assessments and providing the services needed by this cohort of young children.

**5) Infancy and Beyond:** A comprehensive review of 40 years of outcome studies conducted by the American Academy of Pediatrics found that prenatal exposure to opioids is related to behavior problems in children as they age (Behnke & Smith, 2013). When children who have developmental delays or behavioral problems reach the age of 3 years-old (children begin to transition services at 2 years and 9 months), the delivery and cost of their services becomes the responsibility of their school districts under special education services in the Individuals with Disabilities Education Act ("IDEA"). Unfortunately, many of the services that children with prenatal exposure require as they mature fall through the gaps between education services (e.g., an aide in a classroom) and health care (e.g., Medicaid) and still end up the responsibility of the child welfare agency or to foster, kin, or adoptive parents to absorb through adoption assistance reimbursements or personal funds as they seek sufficient mental health, residential treatment, behavioral therapies or occupational therapy for these children as they age. For example, children who are adopted through the public child welfare agency are eligible for adoption assistance payments and Medicaid coverage until they are 21. Adoption assistance payments and Medicaid for adoptees are not "means tested" i.e., they are not given based on the income level of the adopted parents. Rather, if the child met criteria for Title IV-E reimbursements, the child is entitled to Adoption Assistance regardless of the income of their new parents. If they have special needs, for example, mental health conditions related to their adoption status (very common in adoptees) or developmental delays, children receive a higher adoption assistance monthly stipend so their adopted parents can obtain the services they require such as residential mental health care when they are adolescents.

**Comprehensive Systems Approach**

Other children affected by their parents' substance use disorder may not be diagnosed with prenatal substance exposure but come to the attention of child protective services as a victim of child abuse or neglect or are the sibling of a victim and are placed in protective custody. In the mid-1990s, we began to observe that many jurisdictions were reporting similar challenges in serving these families such as not having a way to identify which families had a substance use problem and were implementing similar strategies, such as family treatment courts or peer mentor models to improve outcomes for these children and families (Young, Gardner & Dennis, 1998; Young & Gardner, 2002). Various reports and publications also detailed these experiences as the federal government

CONFIDENTIAL

established national goals in 1999 in their Report to Congress, which was required in the ASFA legislation (U.S. DHHS, 1999).

In the ensuing years, the federal government, some states, counties, and some philanthropic foundations have funded programs to develop knowledge about what works to improve outcomes in this population.[7] Over time, we developed a framework to categorize the way that child welfare, substance use disorder treatment, the courts that oversee cases of child abuse and neglect, and community agencies must come together to work collaboratively to solve the complexity of challenges these families face such as those identified in the ASPE report discussed previously.

We refer to this framework as the "Elements of System Linkages." The framework has been adapted for different program models such as START and family treatment courts and we have used short hand over the years to help people remember the core ideas such as "The 7 Key Ingredients" and achieving, "The 5 Rs" to shorthand the outcomes to be achieved. These are shown in Graphic 23 and the practice strategies and system reforms that are recommended to support these changes in communities are described in the following pages.

While complex, what is understood is that child welfare cannot solve these problems by themselves, nor can treatment programs, nor can the courts. Families with opioid and other substance use disorders cross over each of these systems in a way that require a comprehensive and collaborative approach. The agencies and the officers of the court must work together in new relationships that put the best interests of the children and families at the center of their work. When trust is built between the agencies and communication is streamlined, when common outcomes are agreed to, families get the support they need from the critical partners. Each of the partners are vital players and no one professional or system—child welfare, treatment, judicial officer, parent attorney, child attorney, county counsel, housing authority, health care provider, etc.— can address this opioid crisis alone, a collaborative approach is recommended.  Otherwise, families fall through the gaps in the system.

The practice of child welfare is exemplified in the center of Graphic 24, that is the prevention approach that is needed and the case processing of child welfare practice. Across the top are the 6 practice changes that have been demonstrated through various grant programs and evaluations to produce better outcomes. Consistently improved outcomes have been demonstrated in various evaluations and summarized in publications including:

---

[7] See for example, Regional Partnership Grants: https://ncsacw.samhsa.gov/technical/rpg-i.aspx; Children Affected by Methamphetamine Grants (although program was in mid 2000s, 8.2% of parents served were with primary opioid problems): https://ncsacw.samhsa.gov/technical/cam.aspx; Prevention and Family Recovery (in one program site, Milwaukee, WI, they have only 35 new parent admissions to their family treatment court in 2018, but 20 parents (57.1%) have primary heroin use, 1 (2.9) has primary other opiate use; 4 parents (13.8%) have secondary heroin use; and 7 parents (24.1%) have other opiate use. These are unpublished data in the CFF database that have been reported to the Doris Duke Charitable Foundation in the annual report as of March 1, 2019): https://www.cffutures.org/pfr/; Family treatment court programs funded by the Department of Justice, OJJDP: https://www.cffutures.org/national-fdc-tta-program/; Additional information about child welfare grant programs is available at: https://ncsacw.samhsa.gov/default.aspx

CONFIDENTIAL

- Regional Partnership Grant (RPG) Program: Interim Safety, Permanency, Well-Being, and Recovery Outcomes: RPG Program Brief #4 (Children and Family Futures (2014). https://ncsacw.samhsa.gov/files/RPG_Program_Brief_4_Outcomes_508_reduced.pdf

- Children Affected by Methamphetamine Program: Implementation Progress and Performance Measurement Report (National Center on Substance Abuse and Child Welfare, 2016) https://ncsacw.samhsa.gov/files/CAM_Final_Report_508.pdf.

- Research Update on Family Treatment Courts: Need to Know by the National Association of Drug Court Professionals. May 2012. Marlow, D. & Carey, S. http://www.nadcp.org/wp-content/uploads/Reseach%20Update%20on%20Family%20Drug%20Courts%20-%20NADCP.pdf

- The impacts of family treatment drug court on child welfare core outcomes: A meta-analysis by Zhang, S., Huang, H., Wu, Q., Li, Y., & Liu, M. (2019). Child Abuse & Neglect, 88, 1–14. doi:10.1016/j.chiabu.2018.10.014.

The practice changes are sustained by system reforms that are shown in the gray bar. Across the bottom are the 5 key outcomes that cross substance use disorder treatment and child welfare systems, they are the focal outcomes to be measured and have been demonstrated to improve when these practice and policy changes are implemented in communities.

Graphic 24: Elements of System Linkages to Improve Practice and Policy and Family Outcomes



**Early Identification System for Families in Need of Substance Use Disorder Treatment:** As discussed in relation to the START program and the need for universal screening and information systems, it is critical that systems are developed to quickly identify parents with opioid use disorders. Clinically this is necessary because when parents are in crisis, failure to act timely can

CONFIDENTIAL

mean the difference between their engagement in treatment and their recovery or their continued use, relapse, or death. The failure of the system to provide the services needed to ensure families can engage lessens positive outcomes. Implementing universal screening tools requires a county to match their caseworkers' needs with available tools, train to implement the tools, make changes needed in intake and data collection, provide supervisors training, and ensure that on-going staff development is provided for newly hired staff. Coordination with local substance use disorder treatment agencies is important to ensure that screening tools and methods work in concert between their programs. Some jurisdictions utilize substance use disorder counselors at the child welfare offices and/or at the juvenile/family court to provide screening and assessments. Steps to implement screening and assessment are detailed in the SAFERR monograph:
https://ncsacw.samhsa.gov/files/SAFERR.pdf

**Timely Access to Assessment and Treatment Services:** Following the identification of parents who need assessment to determine if they have an opioid or other substance use disorder, timely assessment means that the appropriate levels of care are available to ensure safety for the parent in regard to relapse and overdose prevention, as well as safety for the child(ren). A meaningful response to the opioid epidemic requires a coordinated system between child welfare, treatment agencies, recovery supports, juvenile/family court, specialized family treatment court dockets, recovery coaches or mentors, and family advocates that will play a critical function in addressing this challenge. The parent may not have the ability to navigate between complex systems of child welfare, treatment, court, testing, visits with children, housing, medication management while they are in the early days of abstinence or induction to methadone or medications. Beyond the cognitive function and organizational skills needed, simple transportation is often a barrier in rural communities.[8]

**Increased Management of Recovery Services and Compliance with Treatment:** One of the strongest predictors of treatment outcomes is engagement in services for a minimum of 90 days. Each of the collaborating agencies has the opportunity to encourage the parent to stay in the recovery process and meet the requirements imposed on them. Many obstacles confront parents who want to keep their families together while they recover from opioid use disorders. Having recovery support staff to help ensure compliance with treatment is critical. In many jurisdictions, peer support has become a certified position with state agencies. However, they often are not specifically trained to work with child welfare-involved families. This requires a different approach, a family centered approach that includes the safety of the child as well as the parent in the approach to the mentoring relationship. Models of peer and family support specialists have recently been detailed by NCSACW staff and can be found at:
https://ncsacw.samhsa.gov/files/peer19_brief.pdf.

---

[8] Most states have implemented patient placement criteria to determine an appropriate level of care, or this is in place under Medicaid. However, these are generally medical criteria and do not account for the specific needs of families in child welfare. For example, child safety or parent domestic violence would not appear on a Medicaid patient placement criteria. Yet, child welfare agencies understand that children may do best when placed with a parent in treatment but Medical criteria alone may be a barrier to that level of care. Therefore, decisions such as needed residential placement for families involved in child welfare and timely access to treatment often need to look beyond Medical criteria for patient placement to these other socio-economic factors that may require a higher level of care than the health placement alone.

CONFIDENTIAL

**Family-Centered Treatment Services and Parent-Child Relationships:** In addition to women and children, a family systems approach is necessary when opioid use disorder treatment is provided to parents with children in the child welfare system. A parent's substance use disorder has a tremendous impact on the children, who need continuing skilled support. When residential care is warranted, it must be a priority to keep parents and their children together, if appropriate. Without effective intervention, the children of parents with opioid and other substance use disorders may repeat the parent's pattern. The special needs of these children must be addressed in prevention and intervention programs—ideally with their parents in a two-generation program.

Recent findings and lessons from the Prevention and Family Recovery Program ("PFR") have highlighted the importance of working with the whole family in a way that supports parenting. As described in findings from PFR's program, to effectively move to a family-centered approach and optimally support family well-being, the court, child welfare and treatment providers have to strengthen their relationships, increase communication, and enhance information sharing. The court needs to better understand what treatment services are provided and, importantly, the effectiveness of that treatment for families. Treatment providers need to understand how parents' success in treatment is directly linked to their parenting capacity and their relationships with their children and other family members. More information about providing family-centered services can be found at: http://www.cffutures.org/files/PFR_Brief2_Final%20Print%205-3-17.pdf.

In addition, many programs now understand that standard parenting programs are not effective with parents in early recovery. Many times the parents have significant trauma histories or have not been nurtured in a way that they understand how to nurture their child. Two generation programs and parenting curricula specific for parents in recovery that include weekly sessions and adjuncts to standard treatment curricula so that the parent(s) can retain or regain custody of their children and improve outcomes include Strengthening Families and Celebrating Families (https://www.strengtheningfamiliesprogram.org/) and (http://celebratingfamilies.net/).

**Increased Monitoring:** Increased monitoring in this context means more frequent contact with the treatment provider, recovery mentor, court officer, child welfare worker or all of the staff working with the family. In routine child welfare court cases, after adjudication, there is generally not another court hearing scheduled for six months and then a permanency hearing at 12 months. We have learned that this does not work for parents in early recovery. Much more frequent contact is needed. This may mean that a family treatment court is developed, or if the family is not in court services, that there are more frequent administrative case reviews, or family team meetings. The goal is to not let things go too far astray before child welfare, the treatment provider and court are aware that the parents are struggling and may need an adjustment to their treatment plan. A recent meta-analysis of family treatment courts concluded that: "Family Treatment Drug Courts should be considered as a critical model of choice for serving foster care involved families with substance use problems because of their sizeable and robust effect on promoting family reunification outcomes" (Zhang et al., 2019). More information about family treatment courts is available at: https://www.cffutures.org/national-fdc-tta-program/. The Office of Juvenile Justice and Delinquency Prevention has issued guidelines to develop family treatment courts, standards for family treatment courts are expected to be issued by June of 2019. The guidelines are available at: http://www.cffutures.org/files/publications/FDC-Guidelines.pdf. Ohio currently has 32 state certified

CONFIDENTIAL

family treatment courts. However, they do not operate at a scale to meet the needs of parents who could benefit from the service in any of the counties where they are located.

**Systematic responses for participants:** Responses to participant behavior should be designed to be therapeutic and motivational. Communicating clear concrete expectations for parents will enhance the likelihood of reunification within required timelines. Contingency contracting is an evidence-based therapeutic approach in substance use disorder treatment. Using that theoretical approach with families in child welfare is recommended. Often there are many demands placed on parents in case plans by child welfare, treatment agencies, and perhaps other service providers. Having a recovery coach who can clearly specify expectations, daily goals, and responses to achieving those goals (or not achieving them) is critical. Again, in the context of a family treatment court, those expectations and responses to behavior can be reinforced by the judicial officer and by the parent's attorney in effective ways (Edwards, 2010).

Underpinning these six practice changes are four system changes that are required to support improved approaches and results.

**Mission and Values:** The partners in the cross-system collaboration must create effective relationships with one another. The values held at the organizational level and by individual participants affect the likelihood of agreement on critical issues such as establishing a non-adversarial approach with families. The discussion of values is the cornerstone of a collaborative relationship and agreements on the mission of the work across agencies to solve the county's opioid use challenges in child welfare. Agreements on outcomes that the county decides to measure takes time. Practical matters such as how information will be shared when a parent has a relapse and what action will be taken are hard discussions that are based on an individual's beliefs and values. These are decisions that cannot be imposed from outside sources; guidance can be given but ultimately for the county to solve its opioid problem in child welfare, the community needs to own its solutions through this joint process focused on a common mission and outcomes to be achieved.

**Efficient Cross System Communication:** A second system that must be developed is grounded in the way agencies and professionals communicate. Effective communication and information sharing provide the guideposts to gauge the effectiveness of the collaborative's programs. In the child welfare agency, the communication with the opioid use disorder treatment agency is needed so that timely access to information is efficient and ensures safety for children and parents. This requires agreements among attorneys and implementation of efficient communication protocols. At the macro practice level, it requires information systems that are able to identify parents in treatment and children in child welfare and court systems so that monitoring of outcomes can take place in an efficient way. A model of this effort has been tested in Ohio using the family treatment courts as a pilot. However, wider scale implementation to ensure monitoring of system outcomes is needed.

**Cross Training and Staff Development:** Cross-training at all levels – administrative, management, and line-level staff – is essential to ensuring cooperation between key players in the systems. The NCSACW has free on-line training available to all three disciplines: child welfare, substance abuse and court personnel. Some states have made this training a required component

CONFIDENTIAL

of working in child welfare and a few states have provided a certification for substance use disorder treatment agencies whose staff have completed the on-line training. The training is available at: https://ncsacw.samhsa.gov/training/default.aspx

**Budget and Sustainability:** Sustainability of these efforts overtime is not just a funding issue. Rather it is the institutionalizing of new ways of practice into the very fabric of the process. It is ensuring that staff have the training they need to recognize opioid use in parents and those that need help; they need to know how to obtain the resources and interventions that infants and children need to overcome their challenges. Partnering with treatment professionals and working collaboratively with community partners so that opioids cannot take hold in communities has to be institutionalized in their paperwork, in their approach to families and in their culture. They need to have a new way of doing business that ameliorates these challenges in a way that crosses systems and supports families and their communities.

**Evaluation and Outcomes:** The system that supports the entire new way of doing business is grounded in effective information systems that can measure outcomes. The collaborative partners need to establish joint accountability and agreed-upon goals. The outcomes developed together will guide the work of the collaborative and demonstrate that the collaborative has achieved interagency agreement on desired results. Without agreement on shared outcomes, each of the partners is likely to measure its own progress as it did prior to collaboration, focused on its own perspective. The challenges in the information systems have been detailed throughout this paper—gaps in information, slow uploads delaying real time profiles of drug use trends, the inability to cross data systems—these challenges can be overcome but take resources and dedication of information technology expertise in the state and county agencies achieve.  Simply stated, agencies must come together to achieve better outcomes for families. As mentioned and by way of example, a resource in Ohio has been the effort to use administrative data to test the cross-agency monitoring of family participants in family treatment courts at the Government Resource Center of the School of Medicine at Ohio State University: https://grc.osu.edu/About

Based upon my education, experience, training and scholarship, I offer the following recommendations to improve child welfare services and the agencies with which they interact.

**Summary of Recommendations for Infants and their Families with Prenatal Opioid Exposure in Child Welfare and Related County Systems:**

- ✓ Ensure that both expectant mothers and fathers have comprehensive treatment including medications and pregnant women have access and follow up case management with their prenatal care
- ✓ Expand access to Ohio MOMS program
- ✓ Explore and implement the CHARM collaborative program from Burlington, Vermont to have plans of safe care implemented for all pregnant women in treatment in advance of babies' due date
- ✓ Implement Lessons from the Quality Improvement Center in Trumbull, Coshocton and Fairfield Counties such as efficient data logs for plans of safe care

CONFIDENTIAL

- ✓ Ensure hospital staff are trained and have sufficient resources to identify babies who meet criteria for plans of safe care and to make notifications to child welfare and to follow up so that babies and their family/caregiver do not go home without follow up plans
- ✓ Ensure the plan of safe care includes the comprehensive treatment needs of the family/caregiver as required by the Child Abuse Prevention and Treatment Act
- ✓ Implement START teams in counties where appropriate or assess other models of family support that ensure timely service delivery
- ✓ Provide sufficient training and resources for all infants and children under the age of three who are in the child welfare system to receive developmental services as required by the Child Abuse Prevention and Treatment Act
- ✓ Ensure that children who are older than three, have received developmental, behavioral, socio-emotional and educational assessments and interventions if they are a child of a parent with an opioid use disorder in the child welfare system
- ✓ Ensure that child welfare agencies and related county health and social services have sufficient resources to meet the caseload demands across the all the functions of child protective services including identify infants and children affected by parental opioid use, receive, prioritize and respond to maltreatment reports, conduct child abuse and neglect investigations, recruit and place children in safe alternative homes, conduct and participate in court processes, monitor child and family well-being, ensure treatment for children and families, provide adoption services including recruitment, home studies, placement and subsidies, and support transitional youth with services to adulthood when appropriate

**Summary of Recommendations for the Impact of Families with Opioid Use Disorders in Child Welfare and the Related County Systems:**

- ✓ Remedies for child welfare services require a comprehensive approach that include the support of other county agencies including substance use disorder treatment; the juvenile/family court and attorneys; public health; alcohol, drug, and mental health; and related health and social services to form a collaborative structure of on-going effort to solve the cross-agency barriers that can hinder a parent's recovery and a child's wellbeing. Resources and staffing are needed to support this effort.
- ✓ A system of early identification including implementation of standardized screening tools, training, and information system changes to support the data entry
- ✓ Timely access to substance use disorder assessment, motivational engagement, counseling, and treatment resources including the range of medications, psychiatry, health care and other services needed for comprehensive care
- ✓ Availability of MAT treatment in jails for incarcerated parents
- ✓ Recovery coaches including specialized training on child safety and family-centered care
- ✓ Availability of peer supports or family mentor services to enhance compliance with treatment and focus on ensuring sufficient lengths of stay
- ✓ Expansion of training programs to ensure peer mentors work effectively with child welfare-involved families
- ✓ Implement evidence-based parenting programs that are manual-based with evidence that it is effective with parents who have substance use disorders and incorporates teaching and skill-based curricula and practice sessions with children

CONFIDENTIAL

- ✓ Increased monitoring including more frequent court hearings, drug testing in coordination with treatment programs, peer mentors
- ✓ Expansion of family treatment court models and integrating family treatment court effective components across child welfare dockets
- ✓ Implementation of a system of effective contingency management for parents
- ✓ Facilitation services to coordinate the collaborative effort called for to keep the focus on improving the county's outcomes for children and families
- ✓ Increased access to legal advice, improving communication protocols and confidentiality releases
- ✓ Cross system training to work effectively with families affected by parental opioid use disorders
- ✓ Information system changes to track outcomes and evaluation resources to monitor effects of practice and policy improvements
- ✓ Increased public education efforts on the dangers of opioid drug use
- ✓ Sufficient funding for all programs

**In Conclusion:**

As demonstrated throughout this report, opioids have created an additional strain on child welfare staff and agencies to effectively prevent and treat child abuse and neglect. After more than a decade of decreasing cases of children in out-of-home care, significant areas of the country saw rapid increases in opioid use among parents leading to the rapid increase of child victims and out-of-home care placements. Among grant programs that my agency was contracted to provide technical assistance to, in some states, more than half of the parents had opioid use disorders and while the child welfare agencies had successfully sought competitive federal funding and created state and local initiatives for their community, they struggled to find solutions.

Proven strategies are available. Yet, to implement these programs and strategies at the scale needed to address the harms to children and their families, and for the staff, agencies, and communities who have been harmed will require a significant community effort with on-going leadership and resources.

Nancy K. Young, Ph.D

_ March 25, 2019 _____
Date

37