# EXHIBIT K

Highly Confidential - Subject to Further Confidentiality Review

```
                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
                       EASTERN DIVISION

 IN RE: NATIONAL              )    MDL No. 2804
 PRESCRIPTION OPIATE          )
 LITIGATION                   )    Case No.
                              )    1:17-MD-2804
                              )
 THIS DOCUMENT RELATES TO     )    Hon. Dan A.
 ALL CASES                    )    Polster
                              )
```

— — —

Tuesday, May 14, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

Videotaped Deposition of NANCY K. YOUNG, Ph.D., held at Robinson Calcagnie, Inc., 19 Corporate Plaza Drive, Newport Beach, California, commencing at 9:10 a.m., on the above date, before Debra A. Dibble, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Page 90

1 you understand that your role is not to
2 advocate for the party that represented -- or
3 retained you, but to provide an accurate and
4 fair representation of your own expertise as
5 it pertains to the issues in the case?
6         MS. FLOWERS:  Object to the
7     form.
8         THE WITNESS:  I understand that
9     as my -- a researcher in the field,
10    that is what I understand, yes.  And
11    as an expert in this case, yes.
12 Q.    (BY MR. ALEXANDER) So like
13 when you did your expert report, you would
14 want to include statements that were helpful
15 to plaintiffs' case and statements that were
16 not helpful to plaintiffs' case if you
17 thought that they were accurate; correct?
18        MS. FLOWERS:  Object to the
19    form.  Lack of foundation.
20        THE WITNESS:  I -- yes.  I can
21    say yes, I would want to include
22    statements both ways.  I don't believe
23    I found any statements that were
24    endorsing the proliferation of drugs

Page 91

1     in communities.
2 Q.    (BY MR. ALEXANDER) When you
3 say endorsing the proliferation of
4 prescription drugs in communities?
5 A.    Yes.
6 Q.    Do you intend to offer any
7 opinions at trial as to why there have been
8 increases in any metric of abuse at any point
9 in time in Cuyahoga and Summit County?
10        MS. FLOWERS:  Object to the
11    form.
12        THE WITNESS:  That's outside of
13    the scope of my report.  And I think
14    that's my experience and knowledge
15    about what has gone on in many
16    communities around our country.
17 Q.    (BY MR. ALEXANDER) So no, you
18 don't intend to offer any opinions at trial
19 about the reasons for the increase in any
20 type of substance abuse in Cuyahoga or Summit
21 County to any point of time; correct?
22        MS. FLOWERS:  Object to the
23    form.
24        THE WITNESS:  That's outside of

Page 92

1 the scope of what I was asked to do.
2 Q.    (BY MR. ALEXANDER) So you're
3 not going to do it?
4         MS. FLOWERS:  Object to the
5     form.
6         THE WITNESS:  That's correct.
7 Q.    (BY MR. ALEXANDER) And you're
8 not offering any opinions about the conduct
9 of any of the defendants in the case;
10 correct?
11 A.    No.  That wouldn't be my area
12 of expertise.
13 Q.    So correct, you're not going to
14 do it?
15        MS. FLOWERS:  Object to the
16    form.
17        THE WITNESS:  So correct.
18 Q.    (BY MR. ALEXANDER) Do you know
19 the names of any of the defendants?
20 A.    I know some of the names of the
21 defendants, yes.
22 Q.    I saw that one of the things
23 that you reviewed was one of the versions of
24 one of the complaints for either Cuyahoga or

Page 93

1 Summit County.  In connection with reviewing
2 the complaint, did you see various
3 allegations in there about what specific
4 defendants were alleged to have done wrong to
5 have -- what they did or what they failed to
6 do that the plaintiffs had some issue with?
7 A.    Yes, did I see that.
8 Q.    And you're not the person who
9 will testify at trial about whether any of
10 those allegations are correct or incorrect as
11 they relate to the conduct of any defendant?
12 A.    That is correct.
13 Q.    And in terms of what standards
14 apply to the conduct of any of the
15 defendants, whether they be FDA standards,
16 DEA standards, or any other standard that
17 might govern their conduct, you're not the
18 one to say what the standards of conduct are;
19 correct?
20 A.    That is correct.
21 Q.    And in terms of whether
22 anything the defendants did or didn't do
23 caused or contributed to anything about the
24 opioid epidemic or opiate crisis, however you

Page 94

1  may term it, that's also not anything you're
2  going to address; correct?
3       A.   That is correct.
4       Q.   In terms of whether anything
5  the defendants did or didn't do essentially
6  increased the cost of Cuyahoga or Summit
7  County in regards to anything relating to
8  substance abuse, that is also not an area
9  where you'll be offering expert opinions;
10 correct?
11      A.   I am not an expert on the cost
12 to the County broadly.  I do understand the
13 cost in children's services, although I
14 haven't been asked, nor would I offer
15 expertise on the cost of specific cases or
16 increased cases in children's services
17 related to the -- to opioids in the
18 community.
19      Q.   Your expert report doesn't
20 address costs at all.
21      A.   That is correct.
22      Q.   Therefore you're not going to
23 be offering any opinions that talk about past
24 costs or future costs associated with any

Page 95

1  social services or aspect of remediating any
2  problem with substance abuse; correct?
3           MS. FLOWERS:  Object to the
4      form.  Asked and answered.
5           THE WITNESS:  That is correct.
6      Q.   (BY MR. ALEXANDER)  And you're
7  not offering any kind of opinions about how
8  costs or damages should be allocated among
9  the defendants or any group of defendants
10 based upon any analysis or opinions you hold.
11          MS. FLOWERS:  Same objection.
12          THE WITNESS:  That is correct.
13      Q.   (BY MR. ALEXANDER)  You're not
14 actually -- do you call it the opioid crisis?
15 The opiate epidemic?  What words do you use
16 to describe the issue of the problems in
17 society that have been related to increasing
18 abuse of drugs like heroin and fentanyl?
19          MS. FLOWERS:  Object to the
20     form.  Lack of foundation.
21          THE WITNESS:  The opioid
22     epidemic.
23      Q.   (BY MR. ALEXANDER)  Okay.  So
24 using that term as you use it, do you intend

Page 96

1  to offer any testimony about the causes of
2  the opioid epidemic?
3       A.   No, I wouldn't be testifying to
4  the causes of the opioid epidemic.
5       Q.   Are you going to testify to the
6  causes of what drives substance abuse of any
7  substance in the United States or
8  specifically Cuyahoga and Summit County?
9           MS. FLOWERS:  Object to the
10     form.
11          THE WITNESS:  No.  That is
12     outside of the scope of what I was
13     asked to report on.
14      Q.   (BY MR. ALEXANDER)  Is that
15 also beyond your expertise, ma'am?
16      A.   I have a great deal of
17 knowledge about that, but that is not what I
18 was asked to report on, nor do I believe I
19 would be the expert that would be asked to
20 testify about that.  There are other experts,
21 I believe, that the plaintiffs would call for
22 that.
23      Q.   So we've talked about neonatal
24 abstinence syndrome.  You've also used the

Page 97

1  term neonatal opiate withdrawal, NOW?  That's
2  in one of your footnotes.  You say a lot of
3  clinicians get those wrong, but you really
4  think NOW is the right word?  Or acronym?  Is
5  that right?
6           MS. FLOWERS:  Object to the
7      form.  Misstates the report.
8           THE WITNESS:  Would you like me
9      to explain that?
10      Q.   (BY MR. ALEXANDER)  I want to
11 make sure I'm using the right acronyms when I
12 ask you substantive questions.  Do you prefer
13 NAS or NOW?
14      A.   We can use the term NAS.
15 That's sort of the generic term.  I do a fair
16 amount of writing for the federal government,
17 and when I'm writing for the federal
18 government, the federal government would like
19 me to be precise when I'm speaking or
20 writing, rather, specific to opioid
21 withdrawal, versus the broader category of
22 any abstinence syndrome, which would include
23 any kind of substance that the infant was
24 exposed to.  But it is generally referred to

Page 162

1    I detail the kinds of programs that
2    they put in place in order to try and
3    ameliorate the problems that were in
4    their caseloads.
5    Q.   (BY MR. ALEXANDER) And in
6  general, you think that it is reasonable and
7  appropriate to initiate programs as soon as
8  possible to try to ameliorate these problems;
9  correct?
10   A.   I understand the restrictions
11 on being able to do that, when the caseloads
12 are such that the resources are not available
13 to you to be able to do that.
14        When you are having babies
15 dropped off at your door and you have to find
16 a place for them, and children that you don't
17 have a place to put them, then that's your
18 immediate need.  So I understand the reasons
19 why some of these things can't be immediately
20 dealt with, because the child safety has to
21 come first.
22   Q.   Do you think that it's
23 reasonable and appropriate to try to initiate
24 programs as soon as possible to try to

Page 163

1  ameliorate these problems; correct?
2    A.   I do think it is appropriate
3  and reasonable when you can to put these
4  programs in place in order to help families
5  recover and care for their children.
6    Q.   And based upon the analysis
7  that you've done thus far in the case, the
8  information available to you that we've gone
9  over what you've seen and haven't seen, you
10 are not in a position to talk about whether
11 all of the measures that have been initiated
12 in Cuyahoga County were both reasonable and
13 appropriate in terms of their scope and their
14 timeliness; correct?
15        MR. PENDELL:  Objection to
16   form.
17        MS. FLOWERS:  Lack of
18   foundation.
19        THE WITNESS:  I disagree with
20   you.
21   Q.   (BY MR. ALEXANDER) Have you
22 disclosed in your expert report somewhere
23 where you say all of what Cuyahoga County has
24 done has been reasonable and timely to

Page 164

1  address the social services burden created by
2  the opioid epidemic?
3        MR. PENDELL:  Objection.
4        THE WITNESS:  I do not say that
5   in my report, and I know that what is
6   on the ground is not yet sufficient.
7   It has not yet remediated the problem
8   that they have.
9    Q.   (BY MR. ALEXANDER) So let me
10 use your words, then.  The issue of whether
11 everything Cuyahoga County has done has been
12 timely and appropriate was beyond the scope
13 of your work in this case; correct?
14        MR. PENDELL:  Objection, form.
15        THE WITNESS:  Could you repeat
16   that?
17   Q.   (BY MR. ALEXANDER) Sure.
18        The issue of whether everything
19 Cuyahoga County has done has been -- let me
20 start over.  The issue of whether everything
21 Cuyahoga County has done has been timely and
22 appropriate was beyond the scope of your work
23 in this case?
24        MS. FLOWERS:  Object to the

Page 165

1   form.  Lack of foundation.
2        THE WITNESS:  Yes, that was not
3   what I was asked to do.
4    Q.   (BY MR. ALEXANDER) Same thing
5  for Summit County.  The issue of whether what
6  Summit County has done in terms of changes in
7  family services, children's services, was
8  reasonable and timely, that was beyond the
9  scope of your work in this case?
10        MS. FLOWERS:  Same objection.
11        THE WITNESS:  Yes, that is
12   beyond what I was asked to do.
13   Q.   (BY MR. ALEXANDER) In other
14 words, you're not coming into court and
15 vouching for Cuyahoga County Children and
16 Family Services or Summit County Children's
17 Services, if you say that everything that
18 they did was reasonable and appropriate as a
19 response to the opioid epidemic after it
20 became known to them or should have become
21 known to them that there was a problem that
22 required additional efforts; correct?
23        MS. FLOWERS:  Object to the
24   form.  Asked and answered.

Page 166

1 THE WITNESS: That is correct.
2 I've listed in my report what I know
3 of the efforts that were put forward.
4 Q. (BY MR. ALEXANDER) And
5 therefore, your recommendations in your
6 report, the latter part of your report where
7 you go over some general recommendations of
8 what should be done and some general
9 description of what has been done or maybe is
10 going to be done in the future in the
11 counties, none of that is intended to take
12 account for how things would be if the
13 counties had behaved reasonably and
14 appropriately in terms of what they did and
15 when they did it; correct?
16 MS. FLOWERS: Object to the
17 form. Calls for speculation.
18 THE WITNESS: That is correct.
19 It was not intended for those purposes
20 that you state.
21 Q. (BY MR. ALEXANDER) And I want
22 to make sure we're on the same page, and I'm
23 pretty sure we are. But essentially -- I
24 mean, some of what you describe are like best

Page 167

1 practices and those may emerge over time.
2 But you have things that you think are
3 appropriate to be done to address the impact
4 of increasing substance abuse and the
5 specifics relating to the opioid epidemic as
6 you understand it. Correct, in general
7 terms?
8 A. Yes. Things that we have --
9 that have been demonstrated in other
10 communities that have helped remedy the
11 crisis, if you will.
12 Q. Right. So like you wouldn't
13 suggest something as a recommendation if you
14 thought that it wasn't likely to help;
15 correct?
16 A. That's correct.
17 Q. I mean, we know that you didn't
18 do any kind of legal feasibility analysis or
19 consider budget or cost in any of this;
20 correct?
21 A. That is correct.
22 Q. But in general, when you
23 recommend something, you recommend the things
24 you think will help; correct?

Page 168

1 A. That is correct.
2 Q. And the things that you think
3 should be done now, if they'd been done
4 before, they may have improved things so that
5 things would be better now than they are;
6 correct?
7 MS. FLOWERS: Object to the
8 form and lack of foundation.
9 THE WITNESS: Yes. That is
10 correct.
11 Q. (BY MR. ALEXANDER) I mean,
12 that's the way it works, is if you had, for
13 instance, think that MAT -- do you know what
14 MAT means in this context?
15 A. Yes, I do.
16 Q. What does it mean?
17 A. Medication-assisted treatment.
18 Q. And you think that there are
19 some barriers, kind of in terms of local law
20 and coordination between various
21 stakeholders, that can affect or impair the
22 efficacy of MAT in treating opioid use
23 disorder; correct?
24 MS. FLOWERS: Object to the

Page 169

1 form and the characterization of the
2 report.
3 THE WITNESS: I disagree with
4 your statement. You said that the
5 barriers of access would interfere
6 with the efficacy of MAT. And that's
7 not true.
8 Q. (BY MR. ALEXANDER) So I
9 actually didn't say access. That maybe was
10 an add-on.
11 A. No, you -- you said something
12 about the barriers of local control.
13 Q. So --
14 A. Would interfere with efficacy.
15 Q. Let me put it this way.
16 A. Okay.
17 Q. When it comes to something like
18 MAT, this is just an example. You have
19 general best practices recommendations for
20 the ways that essentially MAT being available
21 and being implemented can be at its maximal
22 efficacy; correct?
23 A. Let me look. I don't actually
24 remember what I said about availability of

Page 362

1  increased levels of substance use, including
2  but not limited to opioids, have devastated
3  many American families and the child welfare
4  system has felt the effects?
5      A.   Yes.
6      Q.   And in none of your testimony
7  in this case do you intend to offer an
8  opinion with some sort of differentiation or
9  breakdown between the effects of substance
10 use that involves opioids versus substance
11 use that does not involve opioids?
12          MS. FLOWERS:  Object to the
13     form, and lack of foundation.
14          THE WITNESS:  No, I do not.
15     Q.   (BY MR. ALEXANDER)  The
16 statement in the middle, "The situation is
17 not uniform.  While many states saw
18 considerable increases, in some states the
19 number of children in foster care actually
20 decreased during this period."
21     You think that's accurate data;
22 correct?
23          MS. FLOWERS:  Object to the
24     form.

Page 363

1          THE WITNESS:  Yes, I believe it
2     is.
3      Q.   (BY MR. ALEXANDER)  Given your
4  general discussion about what's been going on
5  nationally, do you have an explanation for
6  why it is that there are some states that had
7  a decrease in the number of children in
8  foster care during this time period when
9  there was, nationally, an increase in opioid
10 prescriptions according to your testimony and
11 understanding?
12     A.   I believe you've misstated my
13 report and my testimony about nationally the
14 increase of opioids.
15     Q.   Let me ask it this way:  Do you
16 have an explanation for why there would be
17 some states where during this same time
18 period the number of cases in foster care
19 continue to go down as they had been for the
20 prior ten-plus years nationally?
21     A.   There are some discussions
22 about some of the states that made those
23 policy changes and practice changes that we
24 spoke about earlier.  That they were -- that

Page 364

1  they didn't put those practice changes in
2  place until later.  There are also some
3  states that had some specific policy changes
4  particularly related to adolescents and
5  moving kids out of group homes.  So more
6  recently another law change has happened that
7  sort of mimics those changes in moving kids
8  out of residential placements.  So there are
9  some states that had already moved into some
10 of that practice.  So there's some variation
11 by states that had already either lagged in
12 some of those policy changes or had moved
13 forward with some of those changes for
14 adolescents in group homes --
15     Q.   Dr. Young --
16     A.   -- so it varies from state to
17 state.
18     Q.   I'm sorry, I thought you were
19 done.
20          Dr. Young, have you analyzed
21 what it is about anything relating to drug
22 usage or distribution patterns in the states
23 that continue to have a decrease in foster
24 care numbers that might explain that?

Page 365

1          MS. FLOWERS:  Object to the
2     form.  Asked and answered.
3          THE WITNESS:  I have begun to
4     look at some of that and some of the
5     states that have high numbers of
6     babies going into out-of-home care,
7     but I'm not ready to make any
8     statements related to that.
9      Q.   (BY MR. ALEXANDER)  You're not
10 going to rely on pending analyses that you're
11 trying to publish or present in connection
12 with anything you're doing in this case?
13     A.   No, I'm not.
14          (Whereupon, Deposition Exhibit
15     Young-5 was marked for
16     identification.)
17     Q.   (BY MR. ALEXANDER)  Handing you
18 what I've marked as Deposition Exhibit 5.
19          There's a copy for counsel.
20          This is identified as being a
21 docket from Children and Family Futures,
22 which is your written testimony before the
23 United States Senate Committee on Finance,
24 examining the opioid epidemic challenges and

Page 422

1  MS. FLOWERS: Lack of
2  foundation, objection.
3  THE WITNESS: The counties are
4  very much involved with what these
5  need to happen, but they -- can't do
6  it by themselves. It takes all of
7  these entities pulling together.
8  Q. (BY MR. ALEXANDER) Do you
9  understand that this lawsuit involves certain
10 parties that the court may be able to order
11 to do something, but only the ones who are
12 parties, like not the state, not third-party
13 hospital chains, not individual doctors out
14 in the community, not people running
15 treatment centers. Do you understand that?
16 MS. FLOWERS: Objection, calls
17 for a legal conclusion.
18 THE WITNESS: I understand
19 that. I also understand that that is
20 much of what this work entails is
21 bringing together community groups and
22 other interested parties. It's in the
23 hospital's best interest to also
24 participate to reduce the number of

Page 423

1  babies born with NAS, and that is the
2  way in which that comes together to
3  ensure that they're getting something
4  from this collaborative as well as the
5  county is getting something from this
6  collaborative.
7  Q. (BY MR. ALEXANDER) When you
8  say this work entails, are you talking about
9  the litigation? Or are you talking about the
10 general practice in the field?
11 A. I'm talking about the solutions
12 of putting together the collaborative work
13 that needs to happen to create these
14 solutions.
15 Q. Okay. So going back to my
16 question, did you include, or can you
17 identify the specific recommendations you
18 have that would just be things that would
19 need to be done by the counties themselves,
20 as opposed to involving the state or various
21 third parties?
22 MS. FLOWERS: Object to the
23 form.
24 THE WITNESS: I didn't do that.

Page 424

1  I could take a look at that, but I
2  think that most of these
3  recommendations would take the County
4  and other entities working together.
5  Q. (BY MR. ALEXANDER) So sitting
6  here today, having gone through your first
7  deposition, do you have anything that you've
8  testified to thus far you need to change or
9  supplement that we haven't already gone over?
10 A. Not that I know of right now.
11 Q. Do you have any additional
12 analysis or review or preparation that you
13 need to do before you testify at trial in
14 this matter?
15 A. Not that I know of right now.
16 Q. And obviously there can be
17 additional medical literature that comes out
18 or additional dataset or additional requests
19 from plaintiffs for you to look at stuff. If
20 you get that sort of information and it
21 changes your opinions or your bases therefor,
22 you will let us know through plaintiffs'
23 counsel; right?
24 A. Yes.

Page 425

1  MR. ALEXANDER: So subject to
2  our reservations that we went over
3  before on the record, I won't repeat
4  all of that, and I think there may be
5  some need for some additional
6  follow-ups on specific data and issues
7  identified relating to data during the
8  course of the deposition. Subject to
9  those reservations, those are the
10 questions that I have on behalf of
11 the -- my client and the distributor
12 defendants, and I would pass the
13 witness to anybody else who may ask
14 questions.
15 MS. FLOWERS: We have 7 minutes
16 and 38 seconds.
17 MR. ALEXANDER: Does anybody
18 else on the defense side have any
19 questions?
20 MS. FLOWERS: No questions.
21 Let's go off the record for just a
22 minute.
23 MR. ALEXANDER: Okay.