# Exhibit 7

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | : : : : | HON. DAN A. POLSTER |
| APPLIES TO ALL CASES | : : : | NO. 1:17-MD-2804 |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

April 29, 2019

- - -

Videotaped deposition of KATHERINE KEYES, Ph.D., taken pursuant to notice, was held at the law offices of Lieff Cabraser, LLP, 250 Hudson Street, New York, New York beginning at 9:08 a.m., on the above date, before Michelle L. Gray, a Registered Professional Reporter, Certified Shorthand Reporter, Certified Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 46

1    THE WITNESS: I have not.
2    No, I have -- I'm sure there's
3    many, many depositions. I have
4    not asked for all the depositions.
5  BY MR. HERMAN:
6    Q. These are ones that were
7  selected to you by plaintiffs' counsel?
8    A. These were materials that
9  were provided to me because they were
10 germane to the -- to the topic.
11   Q. They were provided to you by
12 plaintiff's counsel?
13   A. Yes.
14   Q. And did you have any input
15 into what depositions the plaintiff's
16 counsel decided to provide you?
17       MS. RELKIN: Objection to
18   form.
19       THE WITNESS: There was no
20   discussion of the broader range of
21   the universe of depositions. So
22   these were particular depositions
23   that they thought would be useful
24   in allowing me to understand what

Page 47

1    was going on at the county level.
2  BY MR. HERMAN:
3    Q. Did you read each of these
4  five depositions in its entirety?
5    A. I reviewed them. You know,
6  to say I read them, you know, I reviewed
7  them to the extent that they were useful
8  in formulating an understanding of what
9  was going on in the counties.
10   Q. Did you -- did you read them
11 in their entirety?
12       MS. RELKIN: Objection to
13   form.
14       THE WITNESS: For the
15   most -- I read them. I don't --
16   yeah. The majority of them I
17   looked at, I saw whether they were
18   useful in formulating my
19   understanding of what was
20   happening in the counties. Some
21   were more useful than others. I
22   wouldn't say that I read every
23   single one cover to cover in its
24   entirety because some I think were

Page 48

1    more useful than others.
2  BY MR. HERMAN:
3    Q. Did anyone point you to
4  specific portions of the depositions?
5    A. No.
6    Q. Okay. And then you've got,
7  on the next page, a list of 20 documents
8  produced in the litigation.
9    A. Mm-hmm.
10   Q. Do you know how many
11 documents have been produced in the
12 litigation?
13   A. No.
14   Q. How did you figure out what
15 documents to look at?
16       MS. RELKIN: Objection to
17   form.
18       THE WITNESS: These were the
19   list of documents that were made
20   available to me.
21 BY MR. HERMAN:
22   Q. And when you say made
23 available to you, do you mean provided to
24 you by plaintiffs' counsel?

Page 49

1    A. Yes.
2    Q. Are you aware that none of
3  the documents on this list were
4  provided -- were produced by defendants
5  in this case?
6    A. Am I -- sorry say that
7  again.
8    Q. Are you aware none of the
9  documents on this list were produced by
10 defendants in this case?
11   A. I was not privy to the
12 source, the -- which documents were
13 produced by whom.
14   Q. Did you conduct any
15 interviews before preparing your report?
16   A. Interviews?
17   Q. Interviews of, for example,
18 individuals who work for Cuyahoga County?
19   A. No.
20   Q. Did you -- you didn't
21 conduct any interviews?
22   A. I did not conduct
23 interviews.
24   Q. Okay. Did you ask to?

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  A.  You know, I'm an
2  epidemiologist.  I study population
3  aggregate data.  I don't -- that's not
4  within the scope of what this report
5  entails.
6      Q.  So the answer is that you
7  didn't ask to speak to anyone?
8      A.  The answer is that, as an
9  epidemiologist, you know, I don't do
10 interviews with individuals.  I study
11 population level trends.
12         MR. HERMAN:  Can I have the
13     supplemental list.
14         (Document marked for
15     identification as Exhibit
16     Keyes-2.)
17 BY MR. HERMAN:
18     Q.  I'm handing you what's been
19 marked as Exhibit 2, which is a
20 supplemental list of materials that was
21 provided to us by plaintiffs' counsel.  I
22 believe on April 23rd, 2019.
23         And, Professor Keyes, a few
24 times you've referenced additional

Page 51

1  materials that you reviewed after
2  preparing your report.  Is this a
3  complete list of the materials?
4      A.  To my knowledge, yes.
5      Q.  And I think you said that
6  the transcripts that were reviewed on --
7  that are listed here were provided to you
8  by plaintiffs' counsel?
9      A.  I'm sorry.  Say that -- the
10 transcripts that were --
11     Q.  The five deposition
12 transcripts that are listed on the
13 supplemental materials considered list.
14     A.  The four?  I think it's
15 four.
16     Q.  I apologize.  Four.  The
17 four deposition transcripts were provided
18 to you by plaintiffs' counsel?
19     A.  Yes.
20     Q.  When did you prepare your
21 report?
22     A.  I began preparing it around
23 January of 2019.  And worked on it
24 through around March when it was

Page 52

1  submitted.
2      Q.  Is there any reason that you
3  didn't review these depositions before
4  submitting your report?
5      A.  Is there -- what do you mean
6  by reason?
7      Q.  Well, they're all -- they're
8  all dated prior to the submission of your
9  report, correct?
10     A.  Yes.
11     Q.  And so they were available
12 to you at the time that you submitted
13 your report?
14         MS. RELKIN:  Objection to
15     form.
16         THE WITNESS:  Yes.  You
17     know, my report is on the
18     epidemiological evidence.  I
19     mostly relied on the peer-reviewed
20     literature and the grey literature
21     that I cite in the report.  I
22     didn't rely on transcripts.
23 BY MR. HERMAN:
24     Q.  And then there are two New

Page 53

1  England Journal medical -- of Medicine
2  articles?
3      A.  Mm-hmm.
4      Q.  And how did you locate those
5  articles?
6      A.  I'm an avid reader of the
7  scientific literature.  And so as a
8  scientist, I regularly read the journals.
9      Q.  And so you just found them
10 after you submitted your report while you
11 were reading The New England Journal of
12 Medicine?
13         MS. RELKIN:  Objection.
14         THE WITNESS:  I regularly
15     read The New England Journal of
16     Medicine.  I think these came up
17     in my -- in my -- the regular
18     course of my scientific practice.
19 BY MR. HERMAN:
20     Q.  Okay.  What role, if any,
21 did the materials listed on your
22 supplemental list play in formulating
23 your opinions in this case?
24     A.  These materials didn't

Page 450

1   just before you move on,
2   Exhibit 15 has some highlighting
3   in it. Is there any significance
4   to that?
5        MS. WINNER: I have no idea.
6        MS. DO AMARAL: Okay. Just
7   checking. It's just not something
8   that we discussed.
9        MS. WINNER: No, we did not.
10  And it --
11       MS. DO AMARAL: No problem.
12       MS. WINNER: Thank you.
13  BY MS. WINNER:
14       Q.  First sentence of C.4.3 in
15  your report says that an estimated
16  442,995 children were in the foster care
17  system in the U.S. as of 2017. And of
18  the 269,690 who entered the system in
19  2017, 39.3 percent of those cases were
20  due to parental substance abuse disorder.
21  And then you cite Reference 171.
22       A.  Yes.
23       Q.  And is that --
24       MS. WINNER: What exhibit

Page 451

1   number is this?
2   BY MS. WINNER:
3        Q.  Is that Exhibit 16? Is that
4   the reference --
5        A.  Exhibit 16 is Reference 171.
6        Q.  Okay. And can you tell me
7   where that 39.3 percent figure is to be
8   found in this exhibit?
9        A.  So if you look at the second
10  page -- oh, wait. So this is entering
11  the Foster care system as of 2017. So in
12  2017, drug abuse of the parent was
13  36 percent of the circumstances for the
14  child's removal. 2 percent was the drug
15  abuse of the child. Oh, but I have here
16  parental.
17       Q.  Yes.
18       A.  My apologies. And is 2016
19  here as well? I can provide you with an
20  updated citation that would include 2016.
21  I'm assuming that I averaged the two.
22  But --
23       Q.  All right. If you would --
24       A.  -- 36 is, you know, close.

Page 452

1        Q.  Turn to Page 36 where you
2   provide specific discussion of Cuyahoga
3   and Summit Counties in Section F.4.4.
4        Do you see that?
5        A.  Yes.
6        Q.  And you provide a statistics
7   in the first sentence for Cuyahoga
8   County. You then again -- you again
9   refer to Reference 171.
10       Do you see that?
11       A.  I do see that.
12       Q.  And can you tell me where
13  the Cuyahoga County numbers are in
14  Exhibit 171 -- in Reference 171,
15  Exhibit 16?
16       A.  That might be a typo. And
17  we can provide you with an updated
18  reference. I would have to go back and
19  look at the footnotes. I mean, it's not
20  in what you provided to me here.
21       Q.  And if you look at the first
22  sentence on the paragraph, next paragraph
23  on Summit County. It again -- it
24  provides a number for Summit County, and

Page 453

1   again cites the same reference, correct?
2        A.  We can provide you with an
3   updated citation, because I agree with
4   you it's not here.
5        Q.  Okay.
6        A.  We were able to provide
7   those numbers, so we can update that.
8        Q.  On your opinions -- again,
9   I'm running out of time. Let me just ask
10  this real fast, about -- you also provide
11  some numbers about naloxone needs and
12  fentanyl test strips.
13       My single question about
14  both of those is, am I correct that,
15  again, you're only attempting to identify
16  needs and not evaluating what is
17  currently available in the counties for
18  these things?
19       A.  So in neither section do
20  I -- I don't think I spoke to the current
21  availabilities in the counties. It was
22  really an assessment of the public health
23  need in the counties.
24       MS. WINNER: Let's go off

Highly Confidential - Subject to Further Confidentiality Review

Page 454

1  the record.
2          THE VIDEOGRAPHER:  All
3  right.  The time is 5:18 p.m.  Off
4  the record.
5          (Short break.)
6          THE VIDEOGRAPHER:  The time
7  is 5:22 p.m.  Back on the record.
8               - - -
9            EXAMINATION
10              - - -
11 BY MR. O'CONNOR:
12    Q.  Professor Keyes, I'm Andrew
13 O'Connor, I represent one of the
14 manufacturers in the case.  I'm going to
15 be asking you some questions on their
16 behalf.
17         In connection with preparing
18 your report, did you review any marketing
19 material used by opioid manufacturers?
20    A.  So, I reviewed what is cited
21 in my report.  This includes a number of
22 different papers in the peer-reviewed
23 literature that go over the marketing
24 materials from --

Page 455

1     Q.  Other than what you've cited
2  in the report, did you review any
3  marketing materials or studies --
4     A.  Everything that I reviewed
5  has been provided.  I'm familiar, as part
6  of my expertise in opioid use disorders,
7  more broadly with marketing materials
8  that were used.
9     Q.  And what marketing materials
10 are you familiar with through that
11 experience?
12    A.  The only market -- the only
13 materials that I cite in the report that
14 I rely on for the opinions that I made,
15 are the materials that are evaluated in
16 the peer-reviewed literature, that
17 overview the -- the evidence that was
18 used to market prescription --
19    Q.  Are you relying on any other
20 peer-reviewed materials other than what
21 you've cited in the report?
22         MS. RELKIN:  For that
23    opinion?
24 BY MR. O'CONNOR:

Page 456

1     Q.  For that point?
2     A.  I'm -- I'm not -- I just --
3  I'm sorry, I just want to understand the
4  question.  Am I relying on any other
5  peer-reviewed materials for which --
6  which point specifically?
7     Q.  For -- for any opinion on
8  marketing use -- marketing materials used
9  by opioid manufacturers.
10    A.  I'm relying on the material
11 the -- to form the opinions, the material
12 that I relied on is the material that is
13 cited in this report.
14    Q.  Okay.  So just to be clear,
15 did you review any of the actual primary
16 source material, which is to say, the
17 material -- the marketing materials
18 themselves in writing your report?
19    A.  So the --
20         MS. RELKIN:  Objection to
21    form.
22         THE WITNESS:  -- material
23    that I relied on to write my
24    report included a broad range of

Page 457

1     peer-reviewed literature, articles
2     that evaluate evidence that was
3     used in marketing materials.
4         More broadly, given 15 years
5     of studying opioid use disorders,
6     I'm familiar with marketing
7     materials that were used.  There
8     was no marketing material that I
9     relied on to form the opinion that
10    is in this report.
11 BY MR. O'CONNOR:
12    Q.  In 15 years what marketing
13 materials related to pharmaceutical
14 opioids did you review?
15    A.  There has been voluminous
16 evidence, as I cite here, regarding
17 distribution, sales and marketing of
18 opioids.
19    Q.  Does any of the evidence
20 you're referring to relate to any
21 manufacturing defendants in this case?
22         MS. RELKIN:  Objection to
23    form.
24         You mean specific?  Is that

Page 458

1  what you said?
2       THE WITNESS:  Does any of
3  the evidence that I'm referring to
4  relate to any manufacturing -- I
5  think the evidence that I've
6  provided in this report relates to
7  manufacturers of opioids.
8  BY MR. O'CONNOR:
9       Q.   Professor Keyes, who are the
10 manufacturing defendants in this case?
11      A.   There's a broad range of
12 manufacturing defendants in the case.
13 You know, I'm not -- I know that Purdue,
14 Janssen, Teva, a number of other
15 manufacturers are involved.
16      Q.   Can you name any other
17 manufacturers as you sit here today?
18      A.   I would have to go back to
19 my materials.  You know, I think it's all
20 cited in the complaint.  The -- the
21 opinions that I derived at for this
22 report are not specific to any particular
23 manufacturer unless I cite a specific
24 product in the report.  So all of the

Page 459

1  opinions that I've arrived at are about
2  the overall emergence of an opioid
3  epidemic in the United States.
4       Q.   In connection with Purdue,
5  did you review any Purdue marketing
6  materials yourself?
7       A.   In connection with Purdue?
8  So what I've cited -- I -- I think I've
9  answered the question.  What I've cited
10 in the -- in the report is the
11 peer-reviewed literature that evaluates
12 the evidence that was used for marketing
13 materials.
14      Q.   I'm going to mark an exhibit
15 that you cite in your report.
16          (Document marked for
17           identification as Exhibit
18           Keyes-17.)
19 BY MR. O'CONNOR:
20      Q.   It's a study by Art Van Zee.
21 It's marked Exhibit 17.
22      A.   Can you tell me which
23 citation number it is in the report?
24      Q.   I believe it's 15.

Page 460

1       Do you know who Art Van Zee
2  is?
3       A.   Sorry, I'm just trying to
4  find the specific place I reference that.
5  Do you know what page it's on?
6       So I -- the use of that
7  article is for the statement, "From 1997
8  to 2002, prescriptions for OxyContin for
9  noncancer pain increased from
10 approximately 670,000 in 1997 to" -- "to
11 about 6.2 million in 2002.  Prescriptions
12 for cancer pain also increased about
13 fourfold across the same period."
14      Q.   Back to my question.  Do you
15 know who Art Van Zee is?
16      A.   Do I know him personally?
17      Q.   Do you know who -- who he is
18 generally?
19      A.   According to the article, he
20 is an M.D., and he is affiliated with
21 Stone Mountain Health Services.
22      Q.   Other than what you're
23 reading right now, are you familiar with
24 his credentials?

Page 461

1       A.   I'm not aware of other
2  articles by Art Van Zee that I relied on
3  for the opinions in this report.
4       Q.   To your knowledge, is he an
5  epidemiologist?
6       A.   I have not evaluated his
7  training.
8       Q.   Does he have any expertise
9  related to the marketing of prescription
10 opioids?
11          MS. RELKIN:  Objection.
12          THE WITNESS:  That's not
13 information that was -- I think
14 the statement in the -- where I
15 cite his work is based on what is
16 written here.  I don't think it --
17      I'm sorry, your question
18 was:  Do I have any knowledge of
19 his expertise related to the
20 marketing of prescription opioids?
21 I'm not sure how that relates to
22 the statement that "OxyContin for
23 noncancer pain increased from
24 approximately 670,000 to

Page 470

1  statements.
2       MS. RELKIN: Objection to
3  form.
4  BY MR. O'CONNOR:
5       Q.  What I'm asking is simply,
6  direct me to the part of the report that
7  provides support for the statement that
8  opioid marketing materials understated
9  the risks of opioids.
10      A.  So I would say that there's
11 two different sections that evaluate that
12 statement. One is Section B.2. And in
13 section B.2, I provide an overview of a
14 number of different studies that have
15 estimated opioid use disorder and related
16 consequences among medical users of
17 opioids.
18      And then in several other
19 sections of the report, I also cite the
20 peer-reviewed literature on the
21 association between the marketing of
22 opioid products with risk.
23      Q.  Okay. I'd like to direct
24 your attention to Page 11 of your report,

Page 471

1  which we were just looking at a moment
2  ago.
3       You state that evidence
4  shows that pharmaceutical marketing of
5  prescription drugs increases prescribers'
6  likelihood of prescribing the marketed
7  drug in the future.
8       A.  I just need to find that
9  section.
10      Q.  It's near the top. The last
11 sentence --
12      A.  "Evidence shows that
13 pharmaceutical marketing of prescription
14 drugs increases the prescribers
15 likelihood of prescribing."
16      Q.  And you cite Sources 16 and
17 17.
18      And 16 is a study by
19 Dr. Fickweiler. Did I get that right?
20      A.  Yes.
21      Q.  Did you read the study by
22 Dr. Fickweiler before you cited it?
23      A.  I'm just going to pull the
24 study out.

Page 472

1       (Document marked for
2  identification as Exhibit
3  Keyes-19.)
4  BY MR. O'CONNOR:
5       Q.  Here. I've marked it as
6  Exhibit 19.
7       A.  Okay. So this is a study --
8  this is a review study. It looks at the
9  interaction between physicians and
10 pharmaceutical industry, including sales
11 representatives, on their impact on
12 physicians attitudes and prescribing
13 habits.
14      Q.  Okay. And you cited this
15 study in connection with your statement
16 on Page 11?
17      A.  Yes.
18      Q.  I'll direct your attention
19 to the second line of the second column.
20 It says, "However, the evidence
21 determining whether pharmaceutical
22 industry and PSRs'," which here means
23 pharmaceutical sales representatives,
24 "interaction influence physicians is

Page 473

1  divided and contradictory."
2       Do you agree that the
3  evidence determining whether
4  pharmaceutical industry interactions
5  influence physicians, is, quote, "divided
6  and contradictory"?
7       MS. RELKIN: Objection to
8  form.
9       THE WITNESS: Again, this is
10 an introduction of a scientific
11 paper. The purpose of an
12 introduction is to set up what's
13 known, not known, and the gaps in
14 the literature.
15      So that's not the conclusion
16 or the results of this analysis.
17 So I cited it in the paper, in my
18 report, based on its results, and
19 not for a statement in the
20 introduction that's setting up why
21 the study was conducted.
22 BY MR. O'CONNOR:
23      Q.  So would you agree that as
24 of the writing of this introduction that

Page 474

1  the evidence determining whether
2  pharmaceutical industry interactions
3  influence physicians was divided and
4  contradictory?
5      A.  I would need to look at the
6  specific citation, 17, 18, 19 through 22
7  and 23 through 26 to make a designation
8  about whether or not I agree with that
9  particular characterization.  It's
10 typically -- it's typical in the
11 scientific literature that we set up what
12 the gaps in the literature are.  And so
13 these studies would need to be looked at
14 one by one.
15     Q.  Did this -- did this study
16 by Dr. Fickweiler resolve any divided and
17 contradictory evidence on this question?
18     MS. RELKIN:  Objection to
19    form.
20     THE WITNESS:  So I believe
21    it's cited both this study and
22    another study with respect to that
23    statement.  I'm sorry.  I can't
24    find it.

Page 475

1      What this paper evaluated is
2    an entire review of the
3    literature.  So it provides a
4    synthesis of those gaps and
5    limitations.
6  BY MR. O'CONNOR:
7      Q.  Okay.  And this study was
8  in -- was published in 2017, correct?
9      A.  Yes, it was published in
10 2017.
11     Q.  If you go back to
12 Exhibit 18, which is the Hadland article.
13     A.  Oh sorry.  This is the
14 Hadland.
15     MS. RELKIN:  One of the
16    Hadland.
17 BY MR. O'CONNOR:
18     Q.  One of the Hadland articles.
19 The one that we looked at earlier.  This
20 was published in June of 2018, the next
21 year, correct?
22     A.  Both of these, yes.  It was
23 published in 2018.
24     Q.  And at this point, at least

Page 476

1  according to the introduction, it was
2  still unclear whether marketing of
3  opioids influenced prescribing, correct?
4      MS. RELKIN:  Objection to
5    form.
6      THE WITNESS:  I -- I feel
7    that I've answered the question.
8    This is a -- what's standardly
9    done in introduction to scientific
10   papers is a setup of the actual
11   results that were going to be
12   presented in the papers.  In order
13   to determine what the actual
14   strength of the evidence is for
15   pharmaceutical marketing of
16   opioids and whether it influenced
17   prescribing, we would need to go
18   into each one of these studies.  I
19   wouldn't -- I don't think you can
20   make a generalization about what's
21   known in the world or to whom,
22   based on one sentence in an
23   introduction section.
24 BY MR. O'CONNOR:

Page 477

1      Q.  In connection with preparing
2  your report, did you examine what factors
3  influence physicians' prescribing
4  decisions?
5      MS. RELKIN:  Objection.
6      THE WITNESS:  Did I examine
7    what factors influence physicians'
8    prescribing decisions?  I believe
9    I've cited a number of studies
10   with respect to that question in
11   this report.
12 BY MR. O'CONNOR:
13     Q.  Which studies are those?
14     A.  The studies that are in
15 front of you are among them.
16     Q.  Any others come to mind that
17 go to that point?
18     A.  Yeah, there are a number of
19 studies that are in Section B.2 that also
20 evaluate different aspects of -- again, I
21 look at aggregate level data.  And so
22 there are a number of studies in B.2 that
23 look at different risk metrics for how
24 physicians prescribe.

Highly Confidential - Subject to Further Confidentiality Review

Page 478

1  Q. Fair to say you didn't
2  consider any studies outside of the ones
3  cited in your report, correct?
4  A. I believe you've been
5  provided with all the material that I
6  evaluated to make my opinions.
7  Q. Okay. In considering -- or
8  in writing your report, did you consider
9  whether -- what physicians learn in
10 medical school impacts their prescribing
11 decision with respect to opioids?
12 A. Where physicians were in
13 medical school or what --
14 Q. Did you consider whether
15 what physicians learned in medical school
16 impacted their decisions to write
17 opioids?
18 A. So I do epidemiological
19 literature review and data analysis. It
20 is at a population level. And the
21 population level data indicates that
22 often what physicians were told, they
23 were misinformed about the risks and
24 benefits of opioids.

Page 479

1  Q. And were they -- who were
2  they told by?
3  A. The available literature
4  that I have cited in this report points
5  to materials that were received by the
6  manufacturers.
7  Q. Okay. And so in forming
8  your opinion, you didn't consider what
9  physicians learned in medical school, did
10 you?
11 A. People that teach in medical
12 school are also physicians. So they
13 are -- they are not developing their --
14 what they teach de novo.
15 Q. And in forming your opinion,
16 you didn't consider whether formularies
17 or third-party payor guidelines could
18 affect physicians' prescribing decisions,
19 did you?
20    MS. RELKIN: Objection to
21    form.
22    THE WITNESS: Can you give
23    me an example of formularies and
24    third-party payor guidelines?

Page 480

1  BY MR. O'CONNOR:
2  Q. Well, did you consider the
3  extent to which whether a prescription is
4  covered by an insurance company would
5  affect a physician's prescribing
6  decisions?
7  A. Again, I'm looking at
8  aggregate data with respect to individual
9  level and population level factors that
10 influence variation and risk. So whether
11 or not a prescription is covered by an
12 insurance company, whether that affects
13 the physician's decision is going to be
14 dependent on a lot of factors. And
15 doesn't change what's in the published
16 literature regarding the misinformation
17 on the risks of opioids.
18 Q. And that literature you're
19 referring to doesn't take into account
20 the question of formulary coverage, does
21 it?
22 A. Your question is whether
23 every single one of these papers takes
24 into account the question of formulary

Page 481

1  coverage?
2  Q. Does any of them?
3  A. That's a question about
4  confounding. And so in order to evaluate
5  whether formulary coverage is
6  confounding, the estimates that are in
7  this study, we would need to look at the
8  definition of confounding, which I've
9  provided in the report.
10 Q. And none of those studies
11 that are sitting in front of you address
12 this question of whether something like
13 formulary coverage influences prescribing
14 decisions, correct?
15 A. I would need to look at the
16 studies.
17    MR. O'CONNOR: Let's go
18    ahead and take a break.
19    THE VIDEOGRAPHER: The time
20    is 5:47 p.m. Off the record.
21    (Short break.)
22    THE VIDEOGRAPHER: We are
23    back on the record. The time is
24    5:53 p.m.

121 (Pages 478 to 481)

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review

Page 482

BY MR. O'CONNOR:
Q. Professor Keyes, I'm going to direct you to Page 20 of your report. In the first sentence of the last paragraph, it says, "There have been rapid increases in opioid overdose death due to heroin and synthetic opioids."
When you say synthetic opioids, does that include fentanyl?
A. Yes.
Q. And when you talk about fentanyl in your report, does that mean legally manufactured fentanyl or illegally manufactured fentanyl?
MS. RELKIN: Objection to form.
THE WITNESS: So the specific data that I cite is regarding the overdose deaths based on the T codes. And I don't think there's a separation between illegal and legal.
BY MR. O'CONNOR:
Q. So when we see fentanyl in

Page 483

the report, it's not distinguishing between legally manufactured fentanyl and illegally manufactured fentanyl?
A. It depends on the statement. I don't want to make a blanket statement about the report.
Q. With respect to opioid overdose deaths, as you sit here today, do you know which proportion of those that involve fentanyl involved illicitly made fentanyl versus legally manufactured fentanyl?
A. So you're asking a question about Reference 64 I believe. And Reference 64 -- let me check my source -- is, yes, the Hedegaard -- the CDC report on drug overdose deaths in the United States from 1999 to 2017. Those data report the -- the T codes that are designated on the death certificate for each death. And those do not separate out illegal from legal.
Q. And with respect to opioid overdose deaths generally, outside the

Page 484

context of that one article, are you familiar with the proportion of deaths that are attributable to illegally manufactured fentanyl?
A. The available data on opioid overdose deaths in the United States are largely drawn from the National Vital Statistics Service, which provides the most reliable information on death certificates and does not designate between those two.
Q. And so there is no way from that information to distinguish between legally made and illegally made fentanyl, correct?
A. Not based on the death records, no.
MR. O'CONNOR: All right. That's all I have.
But for the reasons my colleague stated earlier, we're reserving our right to keep this deposition open and to continue it or move to strike the witness

Page 485

because of our inability to ask other questions we wanted to, given the answers the witness provided today.
MS. DO AMARAL: You have two minutes. If you've got any questions, ask them now.
MR. CIACCIO: If you have any questions, ask it, you have two minutes.
MR. O'CONNOR: I'll ask two minutes of questions.
BY MR. O'CONNOR:
Q. So are you familiar with generic opioids?
A. What do you mean by familiar?
Q. Do you know the difference between branded opioids and generic opioids?
A. The -- the literature that I assessed in this report is on the overall opioid epidemic. When there was a specific opioid that was mentioned in

Highly Confidential - Subject to Further Confidentiality Review

Page 486

1   that literature, I -- I've cited it in
2   this report.
3       Q.  Do you know that generic
4   opioids aren't promoted to doctors in the
5   same way that branded opioids are?
6       A.  I would need to see the
7   documentation.  That's not something that
8   was covered in my report.  So I would not
9   agree with the statement that I had not
10  evaluated the literature on.
11      Q.  Well, if that statement were
12  true, would it change your opinions about
13  whether manufacturers of those products
14  contributed to opioid prescribing?
15          MS. RELKIN:  Objection to
16      form.
17          THE WITNESS:  I -- what I
18      did in this report is an overview
19      of the literature on what is known
20      about the emergence of the opioid
21      epidemic.  I would always keep an
22      open mind to new information.  But
23      you have not given me any
24      information with which to evaluate

Page 487

1       whether my mind would be changed
2       or not based on that information.
3   BY MR. O'CONNOR:
4       Q.  Well, I'm asking you to
5   assume that a particular product was not
6   promoted to physicians.
7       A.  That's -- the -- that
8   assumption is not what happened.  So I
9   evaluated what happened.
10      Q.  Well, I think you said a
11  moment ago you were open to learning new
12  information.  And I -- I'm saying, if you
13  learned that a particular product was not
14  promoted to doctors, would that change
15  your opinion?
16          MS. RELKIN:  Objection.
17          THE WITNESS:  I -- I am not
18      agreeing with that assumption,
19      based on the literature that I
20      reviewed, and the literature that
21      is cited in this report.  I don't
22      have any evidence with which to
23      agree with that assumption and the
24      premise of the question.

Page 488

1   BY MR. O'CONNOR:
2       Q.  And I understand you don't
3   agree with the assumption.  But I'm
4   saying, if you learned that new
5   information you say you're open to and
6   what I said was correct, does that change
7   your opinion?
8           MS. RELKIN:  Objection to
9       form.
10          THE WITNESS:  I haven't
11      learned any new information.
12          MR. CIACCIO:  That's two
13      minutes.
14          MR. O'CONNOR:  Okay.  For
15      all the reasons we already talked
16      about, we reserve our rights.
17      Thank you.  Thank you for your
18      time.
19          MS. RELKIN:  No questions.
20          THE VIDEOGRAPHER:  Off the
21      record.  Okay.  The time is
22      5:58 p.m.  Going off the record.
23          MR. REATEGUE:  Bruno
24      Reategue, for the Teva defendants,

Page 489

1   I'd like to put a due process
2   violation on the record for not
3   being able to ask questions in a
4   meaningful way.  Thank you.
5       (Excused.)
6       (Deposition concluded at
7   approximately 5:58 p.m.)

123 (Pages 486 to 489)

Golkow Litigation Services - 877.370.DEPS