Exhibit 8

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: NATIONAL        )
PRESCRIPTION           )  MDL No. 2804
OPIATE LITIGATION      )
_____ )  Case No.
                       )  1:17-MD-2804
                       )
THIS DOCUMENT RELATES  )  Hon. Dan A.
TO ALL CASES           )  Polster


WEDNESDAY, APRIL 24, 2019

HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

– – –

Videotaped deposition of Anna
Lembke, M.D., held at the offices of Lieff
Cabraser Heimann & Bernstein, LLP, 275
Battery Street, 29th floor, San Francisco,
California, commencing at 8:07 a.m., on the
above date, before Carrie A. Campbell,
Registered Diplomate Reporter and Certified
Realtime Reporter.



– – –


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1  would hold yourself out as a psychiatrist as
2  opposed to a pain management physician or an
3  anesthesiologist?
4          MR. ARBITBLIT:  Object to form.
5          THE WITNESS:  I would disagree
6      with that statement because I do hold
7      myself out as having expertise in the
8      field of pain management, but not
9      anesthesiology, per se.
10  QUESTIONS BY MR. TSAI:
11      Q.   How many hours have you spent
12  treating patients in palliative care, for
13  example, for their individual pain needs?
14      A.   I have not worked in a
15  palliative care setting.
16      Q.   How many patients have you
17  diagnosed with chronic pain as another
18  example?
19      A.   I have diagnosed many patients
20  with chronic pain over the years.  I've been
21  in practice for more than 20 years, seen
22  approximately 40,000 patients over my career.
23  I couldn't tell the exact number that I've
24  diagnosed with chronic pain, but if I had to
25  put a ballpark estimate, I would say

Page 15

1  something on the order of 50 percent of my
2  patients have some kind of chronic pain
3  diagnosis.
4      Q.   What is the total number of
5  patients you've treated for their individual
6  pain needs as opposed to addiction associated
7  with surgeries or cancer?
8          MR. ARBITBLIT:  Object to form.
9          THE WITNESS:  It's difficulty
10      for me to put an exact number on that.
11      The majority of patients that I treat
12      for their pain needs also have some
13      sort of co-occurring mental health
14      disorder, but pain is a priority in
15      the overall treatment plan of those
16      patients.
17  QUESTIONS BY MR. TSAI:
18      Q.   So just to be clear, in your
19  practice, you engage in primary diagnoses of
20  patients who are complaining of pain and
21  deciding how to treat their pain needs?
22          MR. ARBITBLIT:  Objection.
23          THE WITNESS:  Yes.
24  QUESTIONS BY MR. TSAI:
25      Q.   What is the total number of

Page 16

1  peer-reviewed research studies or articles
2  you've authored in the field of
3  anesthesiology, pain medicine or hospice and
4  palliative medicine?
5      A.   I've authored two peer-reviewed
6  articles in pain medicine journals, but I
7  have written more broadly on the issue of
8  pain vis-à-vis the opioid epidemic, and so
9  that more broad area would include more of my
10  publications.
11      Q.   And focusing on the two
12  articles in Pain Medicine journals, what were
13  the subject matters of those two articles?
14      A.   The subject matter of those two
15  articles in Pain Medicine journals had to do
16  with perioperative management of opioid
17  agonist treatments such as buprenorphine and
18  methadone.
19      Q.   Who retained you as a
20  testifying witness in this case?
21      A.   Lieff Cabraser Heimann &
22  Bernstein.
23      Q.   And do you know who they
24  represent?
25      A.   They represent the MDL.

Page 17

1      Q.   Can you be more specific?
2      A.   They represent the plaintiffs
3  in this case.
4      Q.   And who are the plaintiffs in
5  this case?
6      A.   The plaintiffs are the counties
7  and other entities who have been harmed as a
8  result of the opioid epidemic.
9      Q.   Which counties?
10      A.   There are too many counties
11  to -- I guess the bellwether counties would
12  be Cuyahoga and Summit Counties in Ohio.
13      Q.   Have you ever prescribed opioid
14  medications?
15      A.   Yes.
16      Q.   Since when?
17      A.   I prescribe opioid medications
18  on a weekly basis.
19      Q.   So when did you start
20  prescribing opioid medications?
21      A.   Since I obtained a DEA license.
22      Q.   And when was that?
23      A.   That was in 2000, 2001.
24      Q.   Approximately how many patients
25  do you believe you've prescribed opioid

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    medications to?
2        A.   It's difficult for me to put a
3    number on that.  I've been prescribing opioid
4    medications since I became a practicing
5    physician, and in recent years, I prescribed
6    more opioid medication in the treatment of
7    opioid use disorder.
8        Q.   Other than opioid use disorder,
9    have you prescribed opioid medications for
10   any other condition or indication?
11       A.   Yes, I have.  In the general
12   practice of medicine through my career, I
13   have prescribed other opioid medications.
14       Q.   What conditions or indications?
15       A.   Typically pain conditions.
16       Q.   When you prescribe opioid
17   medications to your patients, do you weigh
18   the risks and benefits based on your
19   individual patients' medical histories and
20   conditions?
21       A.   Yes, of course.
22       Q.   Do you have any degrees in
23   epidemiology?
24       A.   No.
25       Q.   Can you explain to the jury

Page 19

1    what epidemiology means?
2        A.   Epidemiology is the study of
3    the progression of disease through a
4    population.
5        Q.   Did you yourself actually
6    conduct any of the epidemiological research
7    cited in your report regarding factors
8    associated with the opioid crisis?
9        A.   Yes, I did.
10       Q.   And can you explain what
11   research you conducted?
12       A.   I conducted research regarding
13   who was prescribing opioids in this country
14   as well as who is prescribing buprenorphine
15   for the treatment of opioid use disorder,
16   which is relevant to the opioid epidemic more
17   broadly.
18       Q.   And what was the information
19   upon which you conducted your research?
20       A.   It was based on Medicare -- a
21   Medicare database from 2013.
22       Q.   Did you calculate or formulate
23   any of your own regression models or
24   statistical analyses in this case?
25       A.   No, I did not.

Page 20

1        Q.   Okay.  Other than the Medicare
2    database, did you conduct any of your own
3    epidemiological analysis of any data in this
4    case specific to the -- strike that.
5             Other than the Medicare
6    database, did you conduct any original
7    epidemiological analysis of any data in this
8    case?
9        A.   Yes, I did.
10       Q.   What data?
11       A.   Qualitative data that I
12   collected in preparation for writing my book,
13   "Drug Dealer, MD:  How Doctors Were Duped,
14   Patients Got Hooked, and Why It's So Hard to
15   Stop."
16       Q.   And what do you mean by
17   qualitative data in connection with writing
18   your book?
19       A.   Interviews that I conducted
20   with patients and health care providers in an
21   attempt to understand the progression of the
22   opioid epidemic in our population.
23       Q.   Okay.  And other than
24   conducting interviews in connection with
25   writing your book, did you conduct any

Page 21

1    quantitative analysis in connection with
2    that?
3        A.   No.
4        Q.   If you were asked to design an
5    epidemiological study and statistically
6    analyze the data results for submission to a
7    peer-reviewed journal, would you ask for
8    help, or would you do that all by yourself?
9             MR. ARBITBLIT:  Objection.
10   Compound.
11   QUESTIONS BY MR. TSAI:
12       Q.   You can answer.
13       A.   So I don't hold myself out as a
14   biostatistician.  I work with others who have
15   expertise in that area and together we
16   collaboratively think about the important
17   questions and interpret the data, so I would
18   be intimately involved in that process, but I
19   would not be conducting the statistical
20   analysis by myself.
21       Q.   What is the total amount of
22   peer-reviewed research studies or articles
23   you've authored in the field of epidemiology?
24       A.   I feel like I answered that
25   question before.

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1    working on the submission of any ANDA to the
2    FDA?
3        A.    No.
4        Q.    What is an NDA?
5        A.    I don't know.
6        Q.    What is an ANDA?
7        A.    I don't know.
8        Q.    Have you ever worked on the
9    submission -- do you have any experience
10   working on the submission of any prescription
11   medication marketing materials to the FDA for
12   government approval?
13       A.    I served on the research
14   advisory panel of California where we
15   reviewed studies that were being conducted in
16   the state of California on using various
17   investigative pharmaceuticals and my role was
18   to assess the safety of those studies.  And
19   so in that sense I have reviewed numerous
20   studies in the process of companies seeking
21   FDA approval for their drug.
22       Q.    And what was the connection in
23   that panel to any company's marketing
24   material?
25       A.    Well, it wasn't marketing

Page 27

1    material, per se.
2        Q.    Do you have any experience
3    regarding FDA regulations that govern
4    pharmaceutical marketing?
5        A.    No.
6        Q.    Have you ever treated any
7    person in Cuyahoga or Summit Counties for
8    opioid addiction?
9        A.    No.
10       Q.    Have you ever treated any
11   patients in Cuyahoga or Summit Counties for
12   any medical condition related to opioids?
13       A.    No.
14       Q.    Have you ever been to Summit
15   County?
16       A.    No, but I have been to Cuyahoga
17   County.
18       Q.    Are you able to identify any
19   particular individuals whose opioid addiction
20   or overdose led to costs incurred by Cuyahoga
21   or Summit Counties?
22       MR. ARBITBLIT:  Object to form.
23       THE WITNESS:  I am able to -- I
24   have analyzed the CDC data from Ohio,
25   including Summit and Cuyahoga

Page 28

1    Counties, and so I can speak to the
2    issue of the opioid epidemic in those
3    counties.
4    QUESTIONS BY MR. TSAI:
5        Q.    Is the CDC data that you are
6    referring to specific to any particular
7    individuals residing in those counties that
8    allows you to identify their medical
9    condition or the circumstances of their
10   opioid use?
11       MR. ARBITBLIT:  Object to form.
12       THE WITNESS:  The CDC data is
13   looking at individuals in aggregate,
14   not any one individual that I could
15   identify.
16   QUESTIONS BY MR. TSAI:
17       Q.    Have you ever asked for or been
18   provided any information specific to Cuyahoga
19   or Summit Counties regarding individual
20   persons whose addiction the counties contend
21   led to costs in this case?
22       MR. ARBITBLIT:  I'll instruct
23       you not to answer as to that question
24       because it involves the
25       attorney-expert privilege.

Page 29

1        Don't answer.
2    QUESTIONS BY MR. TSAI:
3        Q.    Let me rephrase it.
4        Have you ever reviewed any
5    information specific to Cuyahoga or Summit
6    Counties regarding any actual individuals
7    whose opioid addiction the counties contend
8    led to the costs that they're seeking in this
9    case?
10       A.    Well, I have reviewed
11   information specific to Cuyahoga and Summit
12   Counties regarding individuals living in
13   those counties broadly speaking as an
14   aggregate, not any one individual.  I haven't
15   personally treated any one individual living
16   in those counties.
17       Q.    Well, let me ask it this way:
18   Do you have any basis to tell us whether for
19   any individual in Cuyahoga and Summit
20   Counties whose opioid addiction or overdose
21   allegedly led the counties to incur expenses,
22   the clinical context of their opioid use?
23       MR. ARBITBLIT:  Object to form.
24       THE WITNESS:  Yes, I believe
25       that I do.

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 46

1    trying to capture the very real
2    phenomenon of flooding in our society
3    of opioid medication as a result of
4    misleading messaging by the defendants
5    that led to the use of those opioids
6    in minor and chronic pain conditions
7    and then made them readily accessible,
8    not just to people who were prescribed
9    opioids, but even those not being
10   prescribed opioids.
11   QUESTIONS BY MR. TSAI:
12       Q.    And to be clear about the scope
13   of this phenomenon, as you call it, does the
14   Tsunami Effect include within its scope
15   individuals who deliberately committed a
16   crime in obtaining and using opioids?
17       MR. ARBITBLIT:  Object to form.
18       THE WITNESS:  Yes.
19   QUESTIONS BY MR. TSAI:
20       Q.    And just in going back to our
21   discussion about your practice of prescribing
22   opioid medications to your patients, can you
23   name the opioid medications that you have
24   prescribed over the course of your career?
25       A.    I have prescribed opioids,

Page 47

1    Schedule II opioids, over the course of my
2    career, probably every one that you could
3    imagine in the course of inpatient treatment.
4           And I can't specifically name
5    them because I can't recollect the specific
6    instances.
7           In recent years, especially
8    practicing as an outpatient provider, I
9    primarily prescribe buprenorphine-naloxone in
10   the use of opioid use disorder.
11       Q.    Have you prescribed oxycodone?
12       A.    Not to my recollection in
13   certain years.  There may have been instances
14   when I temporarily took over that
15   prescription in the case of a patient that I
16   inherited in an effort to help them taper off
17   of that medication, but normally I would not
18   do that.
19           Normally I would collaborate
20   with my pain colleague and advise them how to
21   help that patient taper down to a safer dose
22   or come off the medication, oxycodone, all
23   together.
24       Q.    And when you refer to a pain
25   colleague that you would collaborate with,

Page 48

1    what are you referring to?
2       A.    Well, I have a courtesy
3    appointment at Stanford University School of
4    Medicine in the department of pain.  Those
5    courtesy appointments are given out in
6    recognition of my expertise in the treatment
7    of pain.  I see patients within the Stanford
8    University School of Medicine Pain Clinic.
9    In that context, I regularly collaborate with
10   my pain colleagues around complex patients.
11   We have interdisciplinary team treatment
12   meetings where we will discuss those patients
13   in collaboration to try to come together to
14   find the best treatment plan.
15          I also frequently communicate
16   with my pain colleagues using the electronic
17   medical records system and by telephone as we
18   collaborate together to come up with the best
19   treatment plan for our patients with pain.
20       Q.    Are there any particular
21   branded opioid medications that you can
22   recall prescribing?
23       A.    No.
24       Q.    Do you recall prescribing
25   hydromorphone?

Page 49

1       A.    I think I already answered that
2    question.
3       Q.    What was your answer?  I don't
4    recall.
5       A.    I don't recall any specific
6    pain medications that I prescribed outside of
7    the buprenorphine-naloxone that I now
8    prescribe regularly in my outpatient
9    practice.
10       Q.    Do you have any experience or
11   expertise in regard to the prescription drug
12   supply chain?
13       MR. ARBITBLIT:  Object to form.
14       THE WITNESS:  I am aware of the
15   role of the distributors in this case.
16   I have read the complaint.  I do
17   acknowledge their contribution to the
18   opioid epidemic, in particular the
19   flooding of pills in small towns that
20   should have alerted them to a problem,
21   which they did not take action on.
22       MR. TSAI:  Respectfully move to
23   strike that answer.
24   QUESTIONS BY MR. TSAI:
25       Q.    Have you ever worked for a

13 (Pages 46 to 49)

Highly Confidential - Subject to Further Confidentiality Review

Page 50

1  pharmaceutical company or consulted for one?
2      A.   No.
3      Q.   Do you have any experience or
4  expertise regarding the setting of DEA quotas
5  for prescription opioid medications?
6      A.   I'm aware of DEA quotas. I'm
7  aware of the discussion around them vis-à-vis
8  the opioid epidemic.
9      Q.   Do you agree that the
10  defendants in this case are part of the legal
11  prescription medicine manufacturing and
12  supply business?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I guess I'm
15      not -- I don't really understand the
16      question.
17  QUESTIONS BY MR. TSAI:
18      Q.   The defendants in this case are
19  making and selling legally approved,
20  government-regulated medicines?
21          MR. ARBITBLIT:  Is that a
22      question or a statement?
23  QUESTIONS BY MR. TSAI:
24      Q.   Do you agree?
25      A.   Is that a question or a

Page 51

1  statement?
2      Q.   I said, do you agree with that?
3      A.   Could you rephrase the
4  question?
5      Q.   The defendants in the case are
6  making and selling legally approved,
7  government-regulated medicines; is that
8  correct?
9      A.   Well, I guess I would object to
10  the form of the question, especially the
11  government-regulated medicine part.  I think
12  that the defendants in this case have also
13  had a major responsibility in that process of
14  regulation.
15      Q.   Do you have any basis to say
16  that defendants are selling medicines that
17  are not legally approved?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  Yes, the
20      medicines are legally approved.
21  QUESTIONS BY MR. TSAI:
22      Q.   Do you agree that there are
23  multiple steps between a prescription opioid
24  medication being approved by the government
25  on the one hand and the effects, the

Page 52

1  phenomenon that you call the Tsunami Effect?
2          MR. ARBITBLIT:  Object to form.
3          THE WITNESS:  I guess I would
4      want to know what multiple steps
5      you're referring to.
6  QUESTIONS BY MR. TSAI:
7      Q.   Well, as you envisioned the
8  Tsunami Effect, do you agree that for any of
9  the prescription opioid medications that you
10  refer to in your report -- first, it has to
11  be submitted for FDA approval?
12      A.   Yes.
13      Q.   And are you familiar with what
14  requirements must be met in order for the
15  government to approve a prescription opioid
16  medication as safe and effective?
17      A.   I am familiar, but I have not
18  been asked to opine on that aspect of the
19  case.
20      Q.   And in addition to approval by
21  the Food and Drug Administration as safe and
22  effective, do you agree that opioid
23  medications must be approved by the DEA for
24  manufacturing and sale?
25      A.   Yes.

Page 53

1      Q.   Okay.  And then once an opioid
2  medication pill is made, what is your
3  understanding of how it makes its way to an
4  actual individual in Cuyahoga and Summit
5  Counties for use?
6          MR. ARBITBLIT:  Object to form.
7          THE WITNESS:  Well, there's the
8      production part, and then there's the
9      distribution part where it's then
10      transported to a pharmacy, and then
11      the pharmacy is the dispensing agent
12      for that pill.
13  QUESTIONS BY MR. TSAI:
14      Q.   And before any individual in
15  Cuyahoga and Summit Counties can obtain an
16  opioid, they need to get a prescription from
17  a doctor, correct?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  Yes.
20  QUESTIONS BY MR. TSAI:
21      Q.   Okay.  So if we could discuss
22  one of the articles that you cite in your
23  study.
24          MR. TSAI:  Can we have Tab 3,
25      the McCabe study?

14  (Pages 50 to 53)

Highly Confidential - Subject to Further Confidentiality Review

Page 62

1   dentist, approximately 6 percent of
2   them were later diagnosed with an
3   opioid use disorder within a year.
4        My point being that there is a
5   risk with exposure to medical use of
6   opioids, not just to nonmedical use of
7   opioids.
8        MR. ARBITBLIT:  And Federal
9   Rule 106, Rule of Completeness,
10  Counsel, page 378 of the article
11  you're reading from states exactly
12  this, "Medical use of prescription
13  opioids during adolescence is
14  associated with greater odds of
15  subsequent prescription opioid
16  misuse," citing Harbaugh 2018, McCabe,
17  2013, and '16, and Mlech, 2015.
18       MR. TSAI:  I object to
19  counsel's testimony.
20       MR. ARBITBLIT:  It's not
21  testimony.  It's the Rule of
22  Completeness, Counsel.  You should be
23  familiar with it.
24       MR. TSAI:  The --
25

Page 63

1   QUESTIONS BY MR. TSAI:
2        Q.    So putting aside absolute risk,
3   and we'll talk about risk later on, but what
4   is your -- this is a finding comparing
5   likelihood of addictive substance use
6   disorder in two groups, correct, adolescents
7   who had medical use of prescription opioids,
8   no history of nonmedical use or abuse, and
9   adolescents who never took prescription
10  opioids, correct?
11       Am I reading that correct?
12       MR. ARBITBLIT:  Object to form.
13       THE WITNESS:  So to me, this --
14  that statement that you just read is
15  good evidence for the Tsunami Effect.
16  That basically because there has been
17  increased access to opioids, including
18  for teenagers, that has subsequently
19  increased their risk of going on to
20  develop some kind of substance use
21  problem.
22       MR. TSAI:  I move to strike.
23  QUESTIONS BY MR. TSAI:
24       Q.    What is your -- what is the --
25  the meaning of the finding that adolescents

Page 64

1   who indicated medical use without a history
2   of NMUPO did not differ from adolescents when
3   no history of medical use of prescription
4   opioids or NMUPO in the odds of substance use
5   disorders?
6        Can you tell the jury what that
7   means, in your opinion?
8        A.    That means comparing the risk
9   in those two populations, they had similar
10  risk.
11       Q.    So I wanted to ask you --
12  turning back to Exhibit 1, which is your
13  report, on page 89, you talk about
14  hepatitis C, HIV and other infectious
15  diseases.
16       Have you reviewed any data to
17  reliably rule out the likelihood that cases
18  of hepatitis C, HIV or other infectious
19  diseases were caused by actions independent
20  from opioid use?
21       A.    No.
22       Q.    And actions independent of
23  opioid use that are associated or that cause
24  infectious diseases like HIV and hepatitis C
25  include risky sexual conduct, for example; do

Page 65

1   you agree?
2        A.    Yes.
3        Q.    Have you reviewed any data to
4   reliably rule out the likelihood that cases
5   of hepatitis C, HIV or other infectious
6   diseases you refer to existed prior to any
7   opioid addiction or opioid abuse?
8        A.    No.
9        Q.    Do you have any -- did you
10  conduct any analysis, or do you have any
11  basis to quantify what percentage of cases of
12  hepatitis C, HIV and other infectious
13  diseases that you refer to were caused by
14  reasons that had nothing to do with opioid
15  use?
16       A.    No.
17       Q.    And just to be clear, opioid
18  use disorder and addiction are not
19  contagious, infectious diseases, correct?
20       A.    I would sort of disagree with
21  that.
22       Q.    Is there a pathogen?  Is there
23  an opioid use pathogen?
24       MR. ARBITBLIT:  Let her finish
25  her answer.

17 (Pages 62 to 65)

Highly Confidential - Subject to Further Confidentiality Review

Page 66

1       THE WITNESS:  There is not a
2   pathogen, per se, but the way that
3   opioid use disorder has spread through
4   the population is quite similar in
5   pattern to the way that infectious
6   diseases spread through close
7   contacts.
8   QUESTIONS BY MR. TSAI:
9       Q.    If I touch someone who has
10  opioid use disorder, do I get opioid use
11  disorder?
12      A.    No, but you also don't get HIV.
13      Q.    If I receive a blood
14  transfusion from someone with opioid use
15  disorder, do I get opioid use disorder?
16      A.    No.
17      MR. ARBITBLIT:  Counsel, we've
18  been going just a over an hour.
19      Is it time for a little break?
20      MR. TSAI:  Sure.  Off the
21  record, please.
22      VIDEOGRAPHER:  We're going off
23  the record, and the time is 9:11 a.m.
24      (Off the record at 9:11 a.m.)
25      VIDEOGRAPHER:  We are now going

Page 67

1   back on the record, and the time is
2   9:23 a.m.
3   QUESTIONS BY MR. TSAI:
4       Q.    And just one quick note:  In
5   most depositions, we don't have this handy
6   LiveNote screen, and I've noticed that you've
7   been hearing my questions but also reading.
8       If I could ask you just to
9   listen to my questions.  If you need
10  clarification, you can certainly look, but
11  this does -- if you kind of double up, it
12  does take up more time.
13      MR. ARBITBLIT:  I'll instruct
14  you to pay no attention to that.  You
15  look at the screen.  The questions are
16  complex.  It's serious litigation.
17      Do what you need to do to
18  understand the question.
19  QUESTIONS BY MR. TSAI:
20      Q.    So --
21      MR. ARBITBLIT:  That's why the
22  screen's here.
23  QUESTIONS BY MR. TSAI:
24      Q.    -- let me turn to the second
25  capitalized term in your report, "Dependence

Page 68

1   Effect," capital D, capital E, and there you
2   refer to individuals who become dependent on
3   opioids independent of addiction.
4       That's how you defined
5   Dependence Effect.
6       What is opioid dependence, in
7   your words, independent of addiction?  What
8   does that mean?
9       A.    So that distinction has become
10  important with the new criteria for
11  diagnosing a substance use disorder with the
12  DSM-V, which -- the DSM-V was a departure
13  from the DSM-IV in the sense that prior to
14  the DSM-V, the criteria of physiologic
15  tolerance and withdrawal counted toward a
16  diagnosis of addiction.
17      But with the evolution to the
18  DSM-V, that no longer counted under the
19  specific circumstances of a patient receiving
20  an opioid from a medical doctor and
21  developing tolerance and withdrawal as a
22  result of taking that medication, that
23  opioid, under a prescription as prescribed,
24  which de facto made it more difficult,
25  created a higher threshold, essentially, for

Page 69

1   diagnosing addiction with the DSM-V, but was
2   a way of recognizing that the physiologic
3   adaptation to opioids occurs to patients
4   taking opioids with a medical -- with a
5   medical prescription.
6       And so the DSM-V was an attempt
7   to distinguish between those individuals who
8   developed physiologic dependence under the
9   care of a doctor versus those individuals who
10  developed physiologic dependence, probably
11  also in many instances under the care of a
12  doctor, but also had these other behavioral
13  components that we use to signify the problem
14  of addiction.
15      Does that answer your question?
16      Q.    So do you agree with the
17  changes that were implemented in DSM-V's
18  diagnostic criteria for opioid use disorder?
19      A.    I accept those changes.  I
20  think that those -- that the physiologic
21  dependence, so the neurobiological changes
22  that occur in the brain as a result of
23  physical dependence on the opioid, can't be
24  distinguished necessarily from the
25  neurobiological changes that happen in the

18  (Pages 66 to 69)

Highly Confidential - Subject to Further Confidentiality Review

Page 74

1    QUESTIONS BY MR. TSAI:
2         Q.    And discontinuation phenomenon,
3    that is, when a person using an
4    antidepressant is going off of it, is
5    tapering off or down?
6         A.    That's right.
7         Q.    And they experience withdrawal?
8              MR. ARBITBLIT:  Object to form.
9              THE WITNESS:  They experience
10   some physical symptoms associated with
11   that taper process.
12   QUESTIONS BY MR. TSAI:
13        Q.    So am I right that
14   individuals -- some individuals classified as
15   having an opioid use disorder under the prior
16   DSM-IV framework would not be deemed to have
17   an opioid use disorder under the current
18   updated definition?
19        A.    That's correct.
20        Q.    Okay.  And so in tieing your
21   Dependence Effect phenomenon to dependence as
22   opposed to addiction, that's a broader net;
23   am I right?
24        A.    Yes.
25        Q.    It's more permissive?

Page 75

1              MR. ARBITBLIT:  Object to form.
2              THE WITNESS:  What do you mean
3    by "permissive"?
4    QUESTIONS BY MR. TSAI:
5         Q.    Well, you said lower bar, upper
6    bar.
7              So let me get -- it's a lower
8    bar to be considered dependent in your view
9    as opposed to addicted?
10        A.    I would say the criteria are
11   different.  I don't think I would use lower
12   bar versus higher bar.  They're now
13   categorized as distinct and separate
14   phenomenon.
15             The point of describing the
16   Dependence Effect is to communicate that
17   there are more than 10 million people in this
18   country who have taken opioids as prescribed
19   and become physically dependent and that
20   that's a very serious and morbid physical
21   condition, that being dependent on opioids is
22   not some kind of benign or easily reversible
23   phenomenon.
24        Q.    Does prescribing or dispensing
25   of opioid medications always lead to

Page 76

1    dependence?
2              MR. ARBITBLIT:  Object to form.
3              THE WITNESS:  Almost always,
4    yes.
5    QUESTIONS BY MR. TSAI:
6         Q.    Does it inevitably lead to
7    dependence?
8         A.    In the vast majority of cases,
9    yes.
10        Q.    Does it immediately and
11   automatically lead to dependence?
12             MR. ARBITBLIT:  Object to form.
13             THE WITNESS:  Not immediately.
14   It takes people varying degrees of
15   time.  Some people become dependent
16   within a matter of days to weeks.
17             Other people can go much
18   longer, but in the vast majority of
19   cases, people who take opioids daily
20   for an extended period of time become
21   physically dependent on those opioids,
22   such that they need more and more to
23   get the same effect.  And when they
24   reduce their dose or stop taking them
25   for some reason, they experience

Page 77

1    withdrawal.
2              And in many cases the
3    withdrawal is excruciating and very
4    debilitating.
5    QUESTIONS BY MR. TSAI:
6         Q.    Have you reviewed any
7    information or conducted any analysis to
8    quantify what individuals in the counties,
9    Cuyahoga and Summit Counties, became opioid
10   dependent?
11             MR. ARBITBLIT:  Object to form.
12             THE WITNESS:  Is this getting
13   back to what we talked about before,
14   this question?
15   QUESTIONS BY MR. TSAI:
16        Q.    I don't think I asked about
17   opioid dependence.
18        A.    Okay.  Can you say the question
19   again?
20        Q.    Have you reviewed any
21   information or conducted any analysis to
22   quantify what individuals in the counties,
23   Cuyahoga and Summit Counties, became opioid
24   dependent?
25             MR. ARBITBLIT:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

Page 78

1      THE WITNESS: No. No.
2  QUESTIONS BY MR. TSAI:
3      Q.   Can the Dependence Effect
4  phenomenon predict what individuals in what
5  particular cities or counties will become
6  addicted to or overdose from opioids?
7      A.   Yes.
8      Q.   How so?
9      A.   People who are dependent on
10 opioids are at increased risk to suffer from
11 overdose from those opioids, even separate
12 from being diagnosed from opioids, and I can
13 explain that physiology, if you would like.
14      It's also true that people who
15 are opioid dependent are at very high risk to
16 go on to meet DSM-V criteria for opioid
17 addiction.
18      Q.   Well, let me ask it from this
19 angle.
20      Have you ever tested the
21 Dependence Effect phenomenon to, for example,
22 rule out the inclusion of individuals who
23 deliberately committed a crime in obtaining
24 and using opioids?
25      MR. ARBITBLIT: Object to form.

Page 79

1      THE WITNESS: I don't
2  understand your question.
3  QUESTIONS BY MR. TSAI:
4      Q.   Have you ever tested the
5  Dependence Effect phenomenon -- well, let me
6  ask it this way.
7      Does the Dependence Effect
8  include within its scope individuals who
9  deliberately committed a crime in obtaining
10 and using opioids?
11      MR. ARBITBLIT: Object to form.
12      THE WITNESS: Yes.
13 QUESTIONS BY MR. TSAI:
14      Q.   Does the Dependence Effect
15 include within its scope individuals who
16 deliberately misused a prescription opioid
17 medication knowing that medication was not
18 prescribed to him or her?
19      A.   The Dependence Effect would
20 include anybody who has become
21 physiologically dependent on opioids.
22      Q.   And that would include
23 individuals residing in Cuyahoga and Summit
24 Counties whose exposure to opioids was via
25 opioids that were not prescribed to them?

Page 80

1      A.   Yes.
2      Q.   Okay. Does the Dependence
3  Effect include within its scope individuals
4  who deliberately misused an opioid medication
5  knowing that they were not using it for its
6  intended indication; for example, crushing
7  it, snorting it for a high, for euphoria,
8  instead of to treat an indicated pain
9  condition?
10      A.   Yes.
11      Q.   So the third of your triagrid
12 {phonetic} is the Gateway Effect, capital G,
13 capital E.
14      So in -- on page 86 of your
15 report, Exhibit 1, you describe the Gateway
16 Effect as -- you say, "The trajectory to
17 addiction begins with exposure." Is that
18 right?
19      A.   That's right.
20      Q.   Okay. So have you ever
21 tested -- well -- actually, strike that.
22      I wanted to ask one more
23 question about the Dependence Effect.
24      Have you ever published the
25 theory of the Dependence Effect in any

Page 81

1  peer-reviewed, scientific journal?
2      A.   I haven't -- I haven't -- I
3  haven't specifically used that terminology,
4  but in the JAMA article that we published on
5  buprenorphine prescribing, we do talk about
6  the exposure and the millions of people
7  exposed to opioids through a medical
8  prescription, the vast majority of whom
9  probably are opioid dependent.
10      Q.   And have you specifically used
11 the terminology of the Tsunami Effect,
12 capital T, capital E, in any peer-reviewed
13 scientific journal?
14      A.   No.
15      Q.   Have you ever tested the
16 Gateway Effect, going to the third leg, to
17 quantify what percentage of persons
18 ultimately addicted to illegal heroin, or
19 fentanyl, were individuals who started out
20 purely with no substance abuse history and
21 whose initial exposure was via a medically
22 appropriate prescription of an opioid
23 medication?
24      MR. ARBITBLIT: Object to form.
25      THE WITNESS: Are you asking me

21 (Pages 78 to 81)

Highly Confidential - Subject to Further Confidentiality Review

Page 82

1  if I've personally done that
2  quantitative research?
3  QUESTIONS BY MR. TSAI:
4      Q.   Yes.
5      A.   I have not.
6      Q.   Have you ever used the specific
7  terminology of the Gateway Effect and
8  published that observation in any
9  peer-reviewed scientific journal?
10     A.   No.
11     Q.   Have you ever tested the
12 Gateway Effect phenomenon to rule out the
13 inclusion of individuals who deliberately
14 committed a crime in obtaining and using
15 opioids?
16     A.   I wouldn't rule out those
17 individuals.
18     Q.   Okay.  So the Gateway Effect,
19 as you envision it, as you define it, does
20 include within its scope persons, including
21 persons in Cuyahoga and Summit County, who
22 deliberately committed a crime in obtaining
23 and using opioids?
24     A.   Yes.
25     Q.   Does the Gateway Effect include

Page 83

1  within its scope individuals who deliberately
2  misused a prescription opioid medication
3  knowing that medication was not prescribed to
4  them?
5      A.   Yes.
6      Q.   Does the Gateway Effect include
7  within its scope individuals who deliberately
8  misused a prescription opioid medication
9  knowing it -- knowing that they were using it
10 contrary to its intended indication and
11 approved indication, for example, to get a
12 high instead of treating pain?
13     A.   So I would like to go back and
14 amend what I said previously about the
15 Gateway Effect and refer to my report, which
16 on page 86, specifically says that the
17 Gateway Effect describes those individuals
18 who became exposed and addicted, including
19 individuals who turned from prescription
20 opioids to illicit sources of opioids such as
21 heroin.
22          So what I'm -- the group I'm
23 referring to in the Gateway Effect is, in
24 fact, those individuals who started with a
25 medical prescription and then became addicted

Page 84

1  through that medical prescription, as
2  distinct from the Tsunami Effect, which is
3  those individuals who -- which includes those
4  individuals who used an opioid not
5  necessarily prescribed to them.
6      Q.   Okay.  So the -- you know, the
7  beginning bound of the set of individuals
8  that you define as within the Gateway Effect
9  are those individuals who received a
10 prescription directly from a doctor?
11     A.   Yes, and thank you for allowing
12 me the opportunity to clarify that.
13     Q.   So the Gateway theory posits a
14 particular direction of events:  First,
15 prescription opioids prescribed by a doctor,
16 and then later illegal heroin or street
17 fentanyl addiction; is that right?
18     A.   Not necessarily.
19          So that individual -- so you're
20 right in the sense that it posits an
21 individual who began with a prescription of
22 an opioid from a doctor, but it -- and it
23 could include those individuals who then turn
24 to illicit sources of heroin, but it also
25 includes those individuals who become

Page 85

1  addicted in an ongoing matter -- manner using
2  the opioids prescribed by that doctor.
3      Q.   Have you ever tested whether
4  the Gateway Effect is confounded by
5  individuals who had already used heroin
6  before prescription opioid medications?
7          MR. ARBITBLIT:  Object to form.
8          THE WITNESS:  Well, that's
9  something that the McCabe article
10 looked at, and I think one of the
11 salient findings there is it's really
12 the combined effect of access to
13 nonmedical opioids, plus medical use,
14 that confers risk.  It's not one or
15 the other in isolation, and both of
16 those individual groups can become
17 addicted.
18          So people can get addicted
19 entirely through a medical
20 prescription and not engage in
21 nonmedical use.  They can engage in
22 nonmedical use and then also be
23 exposed medically; thus compounding
24 their risk.
25

Page 86

1    QUESTIONS BY MR. TSAI:
2        Q.    So you would rely on the McCabe
3    study's findings in regard to those groups
4    that you mentioned?
5            MR. ARBITBLIT:  Object to form.
6            THE WITNESS:  No, I'm not
7    relying on the McCabe study findings.
8    As I said before, I've done my own
9    qualitative research, and I've also --
10   I have vast experiential knowledge of
11   this problem from the many patients
12   I've treated in almost, you know, two
13   decades.
14           So I have seen the pattern of
15   opioid addiction as it has occurred in
16   those individuals.
17   QUESTIONS BY MR. TSAI:
18       Q.    Does the Gateway Effect include
19   within its scope individuals who had first
20   used heroin before they used prescription
21   opioids?
22       A.    No.
23       Q.    And how would you know for a
24   particular person in Cuyahoga or Summit
25   County with opioid use disorder that medical

Page 87

1    history, that sequence?
2            MR. ARBITBLIT:  Object to form.
3            THE WITNESS:  There are good
4    national data that have surveyed
5    individuals asking them about which --
6    individuals who have become addicted
7    to opioids, asking them which opioid
8    they started with, and over 80 percent
9    of individuals report that they
10   started with a prescription opioid.
11   QUESTIONS BY MR. TSAI:
12       Q.    And those -- that statistic
13   includes nonmedical use of prescription
14   opioids?
15       A.    Yes, it does, but it also
16   includes medical use of prescription opioids.
17       Q.    Have you ever tested whether
18   the Gateway Effect is confounded by
19   individuals who had already deliberately
20   misused or abused other drugs before any
21   medical opioid prescription?
22       A.    There are those cases, and I
23   have treated those individuals, and to me
24   that doesn't mitigate the problem of
25   addiction through an opioid prescription.

Page 88

1            So, for example, I've had many
2    patients who were in recovery from an
3    addiction to something else, who then got
4    exposed to an opioid through a medical
5    prescription and became addicted to that
6    opioid or relapsed to their other substance
7    who otherwise, I believe, would not have done
8    so were it not for the unnecessary exposure
9    to that opioid through a medical
10   prescription.
11       Q.    And individuals with a history
12   of substance abuse, and certainly a history
13   of diagnosed substance use disorder, are at a
14   higher risk of substance abuse disorder; do
15   you agree?
16           MR. ARBITBLIT:  Object to form.
17           THE WITNESS:  We do know based
18   on retrospective, epidemiologic
19   studies that patients with a personal
20   history of substance use disorder are
21   at increased risk to develop an opioid
22   addiction through a medical
23   prescription of opioids, yes.
24   QUESTIONS BY MR. TSAI:
25       Q.    So you would agree that for

Page 89

1    individuals who reside in Cuyahoga and Summit
2    County with opioid use disorder, an important
3    piece of information to know is their history
4    of substance abuse disorder and substance use
5    history?
6            MR. ARBITBLIT:  Object to form.
7            THE WITNESS:  I don't really
8    consider that that important a piece
9    of history.
10   QUESTIONS BY MR. TSAI:
11       Q.    So despite testifying that
12   epidemiology shows that patients with a
13   personal history of substance use disorder
14   are at an increased risk to develop an opioid
15   addiction through a medical prescription of
16   opioids, you wouldn't want to know whether
17   any particular individual in Cuyahoga and
18   Summit Counties had such a personal history
19   of substance abuse disorder?
20           MR. ARBITBLIT:  Object to form.
21   Argumentative.
22           THE WITNESS:  To me what's much
23   more relevant is that they're
24   currently addicted to opioids.  I
25   don't consider their past history to

23  (Pages 86 to 89)

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    inform that problem.
2         Furthermore, we know that many
3    people without a past history of
4    addiction can get addicted to opioids
5    through a doctor's prescription.
6    QUESTIONS BY MR. TSAI:
7         Q.    Okay.  And since your opinion
8    isn't -- individual's personal history of
9    substance use disorder is not information
10   that you would need to know, you did not
11   review any such information for any actual
12   individual with opioid use disorder in
13   Cuyahoga and Summit County; am I right?
14        MR. ARBITBLIT:  Object to form.
15   Object to the preface.
16        THE WITNESS:  I did not review
17   any individual patient's history.
18   QUESTIONS BY MR. TSAI:
19        Q.    So based upon your clinical
20   experience, can you walk us through the steps
21   between a person receiving a prescription
22   from a doctor for an opioid medication and
23   the ultimate outcome of going out to a street
24   dealer and seeking illegal, nonprescribed,
25   nonregulated heroin or fentanyl?

Page 91

1         How does that -- how does the
2    Gateway Effect play out in your mind from
3    prescription to going out into a street
4    dealer?
5         MR. ARBITBLIT:  Object to form.
6    Vague.  Compound.
7         THE WITNESS:  An individual
8    presents in a medical clinic with pain
9    and is prescribed opioids by that
10   doctor.
11        The doctor has been misled by
12   false promotional statements on the
13   part of defendants to believe that
14   there are benefits to the use of
15   opioids used long term in the
16   treatment of pain, despite the absence
17   of evidence for that.  And that doctor
18   has also been told that the risks are
19   very small for addiction as long as
20   that individual is being prescribed
21   opioids for a pain condition.
22        So that well-intentioned and
23   compassionate doctor, who is trying to
24   do the right thing, will continue that
25   opioid prescription and even increase

Page 92

1    the dose over time as that patient
2    inevitably develops tolerance.
3         That doctor, furthermore,
4    having been misled by the defendants
5    to believe that no dose is too high,
6    will continue to escalate that dose
7    over months to years until that
8    patient is at dangerously high doses
9    of opioids and at risk for all kinds
10   of morbidity and mortality, including
11   the risk of addiction.
12        And eventually that individual,
13   who is on very high doses of opioids,
14   has neurologic changes in their brain
15   such that if they -- they begin to
16   experience withdrawal often between
17   doses, so intradose withdrawal.
18        They have the sensation that
19   was validated by their doctor, but
20   which is probably not the case, that
21   the -- they need the opioids to treat
22   their pain when, in fact, taking the
23   opioids is most likely just treating
24   withdrawal from the last dose, but the
25   physiology and the pain of withdrawal

Page 93

1    drives that individual to then become
2    very preoccupied with their pain, very
3    preoccupied with the opioids, spending
4    more and more time at the doctor's
5    office with pain complaints, reporting
6    that the opioids are no longer
7    working, because they don't work in
8    most cases for chronic pain.
9         And again, the compassionate
10   doctor, being told that no dose is too
11   high, continues to escalate until that
12   individual is at a very, very high
13   dose, and that individual spends
14   almost all of their time possibly
15   going to the emergency room to try to
16   get more opioids to help with their
17   worsened pain and their withdrawal and
18   their tolerance, to the point that
19   that individual has developed a
20   full-blown opioid addiction within the
21   context of medical care.
22        Now, should it happen that at
23   some point that doctor retires or that
24   doctor gets ill and can't treat that
25   person anymore or that individual

24 (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 118

1  do not walk through the gateway to illegal
2  heroin?
3         MR. ARBITBLIT: Object to form.
4  QUESTIONS BY MR. TSAI:
5     Q.    They turn away or otherwise
6  take another path?
7     A.    That is what it says here, yes.
8     Q.    Okay. So then going back to
9  page 1, the first page of the Muhuri article,
10  in the introduction section, if you look down
11  to the second paragraph, the authors observe
12  that this progression from opioid --
13  prescription opioid medications to illegal
14  heroin may result simply because heroin may
15  be cheaper or easier for them to get in some
16  locations.
17         Do you see that?
18     A.    Is that here on this first
19  page?
20     Q.    Yeah. It's the first page --
21  I'm sorry, I have a different -- right.
22  Sorry.
23         It is the second page of your
24  exhibit. The Bates number ends in 6028, and
25  it's the first full paragraph on that page.

Page 119

1  It says, "This progression may result simply
2  because heroin may be cheaper or easier for
3  them to get in some locations."
4         Do you see that?
5     A.    Yes.
6     Q.    Okay. Do you have any -- did
7  you review any information or do any analysis
8  to determine whether this reason for switched
9  to illegal heroin, that it's cheaper or
10  easier to get, whether that applied --
11  applies in Cuyahoga or in Summit Counties?
12     A.    No.
13     Q.    Okay.
14         MR. TSAI: Could we get Tab 8,
15  please?
16         MR. ARBITBLIT: Okay. Counsel,
17  I don't want to have a disagreement
18  with you about this, but I don't see
19  in our summary of the protocol
20  anything that would overrule Federal
21  Rule 106.
22         If you have something that you
23  think prevents from me reading for the
24  Rule of Completeness, I would like to
25  know specifically what it is.

Page 120

1         I don't want to do this to
2  cause animosity. I do think, based on
3  my own experience and the rule itself,
4  that anything that in fairness should
5  be read with the same document as
6  you've brought in to evidence should
7  be read, and that's what the Rule of
8  Completeness, Federal Rule 106 says.
9         If you have something that you
10  think specifically overrules that rule
11  in our deposition protocol, please let
12  me know what it is. Otherwise, I'm
13  going to do it again, and I don't want
14  to do it again and have a fight with
15  you. That's not my purpose.
16         MR. TSAI: We have a limited
17  time on the record. Suffice it to
18  say, I disagree.
19         MR. ARBITBLIT: You can
20  disagree, and you can reserve your
21  rights, but I'm just going to read one
22  sentence from the same Muhuri article
23  that says, "There are many plausible
24  explanations for this finding,
25  including the Gateway theory of drug

Page 121

1  use, that posits that the use of some
2  drugs may expose individuals to a
3  repertoire of biological and
4  behavioral factors that could
5  influence their future use of other
6  drugs."
7         And that's at MDL_EXP_0006043,
8  and you can reserve whatever rights
9  you feel you have. But I'm trying to
10  do this expeditiously. I think I've
11  taken up a total of about two minutes
12  of your time.
13         MR. TSAI: And not only do I
14  reserve rights, I very much object to
15  counsel's eating up the time on the
16  record with his testimony and
17  colloquy, which is prohibited under
18  the deposition protocol expressly, so
19  I want to move on.
20         Can we get Tab 8, please?
21         (Lembke Exhibit 6 marked for
22  identification.)
23  QUESTIONS BY MR. TSAI:
24     Q.    So I want to talk about the
25  Compton article that you cite in your report.

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1         MR. ARBITBLIT:  Object to form.
2  QUESTIONS BY MR. TSAI:
3     Q.    That relationship?
4     A.    I think that now I would say
5  that my opinion has changed vis-à-vis this
6  particular statement in the sense that this
7  is a very general statement, that "the
8  relationship between doctors' prescribing
9  patterns and the initiation of heroin use
10  remains unclear" because there's not a wealth
11  of evidence I've reviewed showing there's a
12  clear link between receiving an opioid
13  prescription with a doctor and being at
14  higher risk for progressing to heroin use.
15     Q.    And does that evidence include
16  the studies that we went over just now, the
17  NASEM, the Muhuri, the Compton?
18     A.    Yes.
19     Q.    Okay.  So going back to
20  Compton -- do you have that article, the
21  Compton article?
22     A.    Yeah.
23     Q.    If you could turn to page 156
24  of that article.
25         So in the left-hand column it's

Page 135

1  above that heading "Break."  The heading
2  says, "Heroin use among people who use
3  prescription opioids nonmedically."
4         The sentence right before that,
5  I'll read it, it says, "Finally, these
6  differential properties and effects are
7  likely to interact with interindividual
8  variability in powerful complex and in
9  completely predictable ways so that some
10  persons who abuse prescription opioids could
11  find heroin less rewarding than prescription
12  opioids similarly rewarding or even more
13  rewarding."
14         Do you see that?
15     A.    Yes, I do.
16     Q.    And do you agree with that
17  statement?
18     A.    I do.
19     Q.    All right.  For any individuals
20  in Cuyahoga and Summit Counties with opioid
21  use disorder, did you review any information
22  or have any other basis to say whether their,
23  as the New England Journal of Medicine put
24  it, individual variability was such that they
25  found heroin less similarly or more rewarding

Page 136

1  than prescription opioids?
2     A.    I did not review individual
3  cases.
4     Q.    Okay.  And if we could turn to
5  the next page, 157, of the Compton article,
6  and the right-hand column, there they give
7  statistics that compare heroin use to use of
8  other substances.
9         So am I reading this correctly,
10  that heroin use over the period that was
11  studied in the -- in this NEJM article also
12  increased upon nonmedical users of
13  stimulants?
14     A.    Yes, you're reading it
15  correctly.
16     Q.    And what are examples of
17  stimulants?
18     A.    Stimulants -- nicotine is a
19  stimulant.  Methamphetamine is a stimulant.
20  Cocaine is a stimulant.
21     Q.    And during the same time
22  period, heroin use also increased among users
23  of tranquilizers, sedatives, cocaine,
24  marijuana and alcohol, correct?
25     A.    Yes.

Page 137

1     Q.    Okay.  And the next page, 158,
2  if you look at this first full paragraph, the
3  first sentence, the authors conclude that, "A
4  key factor underlying the recent increases in
5  rates of heroin use and overdose may be the
6  low cost and high purity of heroin."
7         Do you see that?
8     A.    I do.
9     Q.    And so am I reading that
10  correctly that the finding is that for --
11  when some persons who abuse prescription
12  opioids then subsequently initiate heroin
13  use, the cost and availability of heroin on
14  the street are primary factors in that
15  process?
16     A.    To me that statement needs to
17  be put in the larger context of increased
18  exposure to heroin through a medical
19  prescription and subsequent development of
20  opioid addiction to medical heroin --
21  medical opioids, that then put all of those
22  individuals at increased risk to progress to
23  heroin use.
24         So I think that that statement,
25  as I read their intention, is that in the

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1      mood.
2    QUESTIONS BY MR. TSAI:
3      Q.    And we're talking about
4    co-occurring mental illness.  Let's talk
5    about past history of substance use disorder.
6          Do you agree that past history
7    of substance use disorder is a
8    well-established risk factor for opioid use
9    disorder?
10     A.    Yes.
11     Q.    And let me just give an
12   example.
13          Edlund found that about half of
14   opioid overdose deaths involved another drug,
15   most commonly benzodiazepines.
16          Do you agree with that
17   observation?
18          MR. ARBITBLIT:  Object to form.
19          THE WITNESS:  I agree that a
20   large percentage of opioid overdose
21   deaths involve another drug, commonly
22   a sedative like a benzodiazepine.
23   QUESTIONS BY MR. TSAI:
24     Q.    And can you give some examples
25   of benzodiazepines?

Page 167

1      A.    Sure:  Valium, Klonopin, Xanax,
2    Ativan, Librium.
3      Q.    And you talk about a large
4    percentage of opioid-related overdoses
5    involve an individual that, to put it
6    bluntly, has another addictive substance in
7    their system.
8          What do you mean by a large
9    percentage?  Can you be more specific?
10     A.    Two-thirds of deaths involving
11   a benzodiazepine also involve an opioid
12   prescription.
13     Q.    And if you could turn to your
14   book, "Drug Dealer, MD," and page 146, the
15   internal page number of your book, and the
16   Bates number for that ends in 5680.
17     A.    Uh-huh.
18     Q.    It's the first full paragraph.
19   It says, "Today, doctors' prescription for
20   benzodiazepines continue to rise and are a
21   major culprit in the epidemic of prescription
22   overdose deaths plaguing this country.
23   Nonetheless, benzodiazepines are relatively
24   ignored in the national discussion on rising
25   rates of addiction."

Page 168

1          Is that still your belief?
2      A.    Yes.
3      Q.    And have you done any work or
4    analysis to quantify to what extent
5    benzodiazepines are, as you say, a major
6    culprit in the epidemic of prescription
7    overdose deaths plaguing this country?
8      A.    So I published an article in
9    the New England Journal of Medicine talking
10   about the benzodiazepine problem.  The
11   article was not based on my own analysis, but
12   was a review of published literature and some
13   summative interpretations of how to
14   intervene.
15          And based on other
16   publications, we found a seven-time increased
17   mortality involved benzodiazepines between
18   late 1990s and 2016, two-thirds of which also
19   involved an opioid.
20     Q.    And did you, in connection with
21   this article, dig into or quantify whether
22   the benzodiazepine use occurred before or
23   after the prescription opioid use?
24     A.    No.
25     Q.    So in your report on page 89,

Page 169

1    you say, "Economic downturn and the E-flux of
2    manufacturing jobs in towns across America in
3    the last 30 years have contributed to
4    so-called deaths of despair, early mortality
5    in middle-aged, non-Hispanic whites due
6    primarily to drug overdose."
7          Do you remember that passage?
8      A.    What page?
9      Q.    I believe it's page 89 of your
10   report, Exhibit 1, subsection B, and you cite
11   to the Case, Deaton study.
12          Do you recall that?
13     A.    Yes.
14          MR. TSAI:  So can we get
15   Tab 18?
16     A.    Oh, yeah.  I found it.
17          (Lembke Exhibit 8 marked for
18   identification.)
19   QUESTIONS BY MR. TSAI:
20     Q.    Okay.  So if you could turn
21   to -- the first page of the Case, Deaton
22   article, this has a broad conclusion that
23   "from 1999 to 2013, there was an increase in
24   mortality among middle-aged, white,
25   non-Hispanic Americans from all causes."

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1    Is that right?
2    A.    That's correct.
3    Q.    And in the introduction, the
4  bold introductory section, this Case, Deaton
5  study concluded that "these increased
6  mortality was due to various factors,
7  including drug and alcohol poisonings,
8  suicide, chronic liver disease and
9  cirrhosis."
10   Is that right?
11   A.    Yes.
12   Q.    And second to the last -- just
13 to be clear, do opioids cause deterioration
14 or chronic liver disease or cirrhosis?
15   A.    Not typically.
16   Q.    Okay.  And is it fair to say
17 that those drivers of the increased mortality
18 noted in the study were likely due to alcohol
19 use disorder or alcoholism colloquially?
20   A.    Yes.
21   Q.    Okay.  And in your report, you
22 acknowledge and agree that, quote/unquote,
23 "economic disadvantage is a contributing
24 factor to opioid-related mortality risk."
25   Is that correct?

Page 171

1    A.    I would agree that it is one
2  factor, but I also cited the Ruhm study,
3  arguing that economic disadvantage
4  contributes only 10 to 20 percent of
5  mortality risk attributable to opioids,
6  whereas the larger share of risk is due to
7  the supply of opioids in a given geographic
8  region.
9    Q.    Okay.  And have you conducted
10 any quantitative analysis of your own to
11 quantify the specific contribution of
12 economic disadvantage to opioid-related
13 mortality risk?
14   A.    No.
15   Q.    Do you have a model or an
16 analytical framework to untangle any costs
17 related to any such preexisting social and
18 economic problems versus any conduct by any
19 defendant with respect to Cuyahoga and Summit
20 Counties?
21   MR. ARBITBLIT:  Object to form.
22   THE WITNESS:  I think that the
23 Ruhm study could be used to inform a
24 model with respect to the risk
25 incurred by the supply of opioids

Page 172

1    versus economic disadvantage.
2  QUESTIONS BY MR. TSAI:
3    Q.    Have you in this case yourself
4  done any work to rule out the likelihood that
5  social and economic problems preexisting in
6  the counties were an important contributing
7  factor to observe opioid use disorder and
8  mortality?
9    MR. ARBITBLIT:  Object to form.
10   THE WITNESS:  I have stated in
11 my report that economic factors were a
12 factor, but not the most important
13 factor.
14   The most important factor is
15 the supply of opioids in that county.
16 That is my opinion.
17 QUESTIONS BY MR. TSAI:
18   Q.    And your opinion regarding the
19 relative degree of contribution of social and
20 economic problems, economic disadvantage,
21 versus any conduct by the defendants, is that
22 based on grappling with any county-specific
23 data, or is it only based on the Ruhm study
24 that you cited?
25   MR. ARBITBLIT:  Object to form.

Page 173

1    THE WITNESS:  It's based on my
2  reading of the literature, not just
3  this particular study, but also other
4  studies showing that the amount of
5  opioid prescribing in a given
6  geographic region is the biggest
7  predictor of opioid use disorder and
8  opioid overdose in that region.
9    MR. TSAI:  Okay.  Can we do tab
10 27?
11   (Lembke Exhibit 9 marked for
12 identification.)
13 QUESTIONS BY MR. TSAI:
14   Q.    So I would like to dig down
15 into the actual ground floor circumstances of
16 how folks get prescribed opioid medications.
17   So do you recall that last year
18 you gave a live interview on KQED with
19 Michael Krasny for a program entitled
20 "Medical Community Divided on Medicare's
21 Policy to Shorten High-Dose Opioid
22 Prescriptions"?
23   A.    Yes, I do.
24   Q.    Okay.  And the exhibit that
25 we've just put in front of you, does this

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1   appear to be a true and correct transcript of
2   that interview that you participated in?
3       A.   Yes, it does.
4       Q.   Okay.  And if you turn to
5   page 8, they may have misspelled your name,
6   but the Anna Lembke referred to, that's you?
7       A.   Which page?
8       Q.   It's page 8 of this exhibit.
9       A.   Yes.
10      Q.   Okay.  So if you could turn to
11  page 22 of the exhibit, and I'll start with
12  line 2 of that page.  I'll just read it.
13           You stated --
14      A.   I'm sorry.
15      Q.   Oh, sure.
16      A.   I have two sets of page numbers
17  here.  Is this page 7, parentheses 22 to 25?
18      Q.   That's correct.
19      A.   Okay.
20      Q.   And it's split up into
21  quadrants.  So it's the left-hand quadrant,
22  page 22.
23      A.   Yeah.
24      Q.   And you stated, "While it's a
25  very complicated connection that I do address

Page 175

1   in my book, it's hard to kind of put it into
2   a sound bite, but in general, you know,
3   people who are suffering from poverty,
4   unemployment, low education, are also people
5   who are known to be at higher risk for
6   addiction.
7           "It's also true that this is a
8   population that has turn towards disability
9   payments as a way to make ends meet, and in
10  order to, you know, justify the sick role and
11  get disability payments.  Many of these
12  individuals have been forced to take certain
13  type of medications because taking a
14  medication can legitimize the sick role.  So
15  it's a complex web."
16           Do you see that?
17      A.   Yes, I do.
18      Q.   What is "justifying the sick
19  role"?  What does that mean?
20      A.   Well, that's a term that goes
21  back to Talcott Parsons, who identified
22  social roles that people adopt, and anybody
23  who participates in the health care system
24  and views themselves as a, quote/unquote,
25  patient is someone who has adopted the sick

Page 176

1   role.
2       Q.   Okay.  In your opinion -- is it
3   still your opinion that certain individuals
4   who have turned to disability payments are
5   being forced to take certain types of
6   medications to justify the sick role?
7       A.   So this is part of -- this is
8   an excerpt from, as I state here, a much more
9   complicated issue that I address more
10  thoroughly in my book regarding how
11  disability can sometimes consciously or
12  otherwise encourage people living in poverty
13  to adopt the sick role as a way to get
14  disability payments.
15           And in order to legitimize the
16  sick role, they have to participate in that
17  health care system, and in the '90s and early
18  aughts and through today, it turns out
19  participating in the health care system as a
20  pain patient was actually dangerous because
21  that -- the risk of being exposed
22  unnecessarily to opioids was and continues to
23  be very high, and exposure to opioids is one
24  of the major risk factors for addiction.
25      Q.   So you use the term "forced to

Page 177

1   take certain types of medications."  Who in
2   your opinion is forcing these individuals to
3   take opioid medications to justify what
4   you've called the sick role?
5           MR. ARBITBLIT:  Object to form.
6   QUESTIONS BY MR. TSAI:
7       Q.   How does that mechanism work?
8       A.   The individuals are being
9   forced by economic circumstance.
10      Q.   And this phenomenon of being
11  forced by their individual economic
12  circumstance to take certain medications to
13  justify the sick role, have you reviewed any
14  data specific to Cuyahoga or Summit Counties
15  to determine whether that phenomenon occurred
16  in the counties?
17      A.   Nationally we've seen a huge
18  increase in the number of people going on to
19  disability for chronic pain conditions.  For
20  example, Social Security Disability insurance
21  today, there are more than 8 million people
22  enrolled in Social Security Disability
23  insurance, primarily for chronic pain
24  conditions.
25           So I believe that I can

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  extrapolate that to include Cuyahoga and
2  Summit Counties, that there are individuals
3  there who -- with chronic conditions who have
4  gone on disability.
5      Q.   Have you done the exercise of
6  extrapolating specifically to Cuyahoga and
7  Summit Counties?
8      A.   Do you mean a quantitative
9  analysis?
10     Q.   Yes.
11     A.   No.
12     Q.   Is it your opinion that
13 defendants have any role in structuring or
14 implementing the Social Security Disability
15 network?
16         MR. ARBITBLIT:  Object to form.
17         THE WITNESS:  I think
18     defendants have had a major role in
19     the narrative around how chronic pain
20     should be treated for patients who are
21     participating in the health care
22     system.  And as a result, patients
23     have been endangered because of being
24     exposed to dangerous -- the dangerous
25     substance that is opioids.

Page 179

1  QUESTIONS BY MR. TSAI:
2      Q.   Though, that's kind of
3  confusing to me.  The narrative is -- it's a
4  very broad term.
5      A.   Uh-huh.
6      Q.   Can you point to any specific
7  instance where any conduct by a defendant
8  caused an individual within the disability
9  payment network, for example, Social Security
10 Disability, to have been forced to take their
11 particular opioid medication?
12         MR. ARBITBLIT:  Object to form.
13         THE WITNESS:  So I think
14     defendants have been involved in the
15     change, the cultural change, in our
16     conceptualization of pain and have
17     created a climate in which doctors
18     have been forced to treat pain with
19     opioids, such that individuals who are
20     on disability and get care for their
21     chronic pain are at increased risk to
22     be exposed to opioids.
23 QUESTIONS BY MR. TSAI:
24     Q.   So you talked about climate,
25 the culture and narrative.

Page 180

1      These are all pretty
2  qualitative, would you agree?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Yes.
5  QUESTIONS BY MR. TSAI:
6      Q.   Can you point to a specific
7  instance, act, that fits the scenario that
8  you've outlined?
9          MR. ARBITBLIT:  Object to form.
10         THE WITNESS:  Yeah.
11     So in my report, I talk about
12     the Wisconsin Pain and Policy Study
13     Group, and I provide evidence that
14     the -- that industry funded the Pain &
15     Policy Study Group, defendants funded
16     the Pain & Policy Study Group, over a
17     period of many years.
18     And the Pain & Policy Study
19     Group, in turn, carried out programs
20     that benefitted the industry, not only
21     by increasing access to opioids and
22     limiting regulatory scrutinary {sic},
23     but also changing the culture around
24     pain treatment and identifying a model
25     in which doctors feared retribution if

Page 181

1      they didn't use opioids to treat pain.
2  QUESTIONS BY MR. TSAI:
3      Q.   Can you point to any instance
4  where anyone providing funds had a role in
5  the design and conduct of the specific study
6  or program that you're referring to?
7          MR. ARBITBLIT:  Object to form.
8          THE WITNESS:  On October 9,
9      2002, Joranson wrote to Mr. Kaiko, a
10     Purdue representative, quote, "For the
11     past several years, without your
12     support, some of the progress reported
13     below would not have been possible,"
14     end quote.
15 QUESTIONS BY MR. TSAI:
16     Q.   And in your view is that
17 designing and conducting the study?
18         MR. ARBITBLIT:  Object to form.
19         THE WITNESS:  It's not a study
20     they're referring to.  It's the model
21     policy rolled out by the Pain & Policy
22     Study Group, which had enormous
23     influence in the way that pain was
24     treated and is still treated today --
25

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1      So those are the types of
2  things I'm talking about.
3  QUESTIONS BY MR. TSAI:
4      Q.   What about hospital
5  administrators, do they have an important
6  role in ordaining and mandating protocols and
7  algorithms as you've referred to?
8      A.   Hospital administrators have an
9  important role in that, but, again, any role
10  that they played, I believe, was as unwitting
11  accomplices in the deliberate
12  misrepresentation of the benefits of opioids
13  and their risks by the defendants.
14      Q.   Third-party payers, health
15  insurance companies, they have an important
16  role in ordaining the mandates and the
17  protocols and the algorithms within the
18  industrialized medicine system that you
19  referred to?
20      A.   Yes, they do.
21      Q.   Okay.  And when you say that,
22  you know, there's a doctor, he or she feels
23  enormous pressure to make -- satisfy his or
24  her patients, get them quickly out, having
25  industrial line, like an assembly line, who

Page 195

1  is that pressure coming from?
2      MR. ARBITBLIT:  Object to form.
3      THE WITNESS:  That pressure
4  comes from the patients themselves and
5  the desire of the doctor to do a good
6  job, and usually people who go into
7  medicine are people who want to have
8  quality relationships with their
9  patients and feel like they help their
10  patients.  But there are also
11  institutional pressures on doctors to
12  have good doctor/patient satisfaction
13  surveys.
14      And there's also importantly
15  patients' expectations around what
16  they expect the doctor will provide to
17  them when they see that doctor.
18      And because of the defendants'
19  actions, patients came to expect that
20  when they had pain, they should get an
21  opioid from their doctor.  And we do
22  know that there are data showing that
23  when patients' expectations are not
24  met, they're more likely to rate that
25  doctor poorly.

Page 196

1      So there was overall enormous
2  pressure on doctors and on the system
3  to prescribe opioids even for minor
4  and chronic pain conditions in the
5  absence of evidence because that
6  evidence was misrepresented to all of
7  these various parties by the
8  defendants.
9  QUESTIONS BY MR. TSAI:
10      Q.   Have you done any analysis --
11  do you have any other basis to reliably rule
12  out the likelihood that there are these
13  pressures on prescribing doctors following
14  protocols and algorithms that came from
15  sources that had nothing to do with
16  defendants?
17      MR. ARBITBLIT:  Object to form.
18      THE WITNESS:  I have the lived
19  experience.  I got my degree in
20  medicine in the early 1990s, and I
21  lived through these, you know, past
22  two and a half decades, and I
23  personally felt the pressures from
24  entities like the Joint Commission in
25  order to practice in a certain way.

Page 197

1  QUESTIONS BY MR. TSAI:
2      Q.   And have you done any
3  quantitative analysis to tease out, let's
4  say, the role of hospital administrators, or
5  the role of third-party payers, in any
6  specific opioid prescribing decision of any
7  doctor in Cuyahoga and Summit County?
8      MR. ARBITBLIT:  Object to form.
9      THE WITNESS:  No.
10  QUESTIONS BY MR. TSAI:
11      Q.   So moving on, just briefly, you
12  talked about the CME that you attended.  It
13  was back in 2001.
14      A.   Yes.
15      Q.   So after attending that CME,
16  you didn't suddenly lose your independent
17  medical judgment, right?
18      You still had your own
19  independent medical judgment, you agree?
20      A.   CME courses have an enormous
21  influence on the information that doctors
22  acquire on which to base their medical
23  judgment.
24      So I didn't lose my medical
25  judgment, but I can only make judgment based

50 (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  on the information that I have and the
2  misrepresentation at that CME and others like
3  it across the country.
4      Q.   And you invoke your personal
5  experience?
6      A.   Yes.
7      Q.   So you didn't forget all of
8  your prior medical education and training
9  after leaving that -- how long was that
10  session?  One hour?  Day long?
11      A.   (Witness nods head.)
12          MR. ARBITBLIT:  Objection.
13  QUESTIONS BY MR. TSAI:
14      Q.   Did you forget your medical
15  education and training?
16          MR. ARBITBLIT:  Object to form.
17          THE WITNESS:  Could you specify
18      what medical education and training
19      you're referring to?
20  QUESTIONS BY MR. TSAI:
21      Q.   Yeah.  Your medical school,
22  your residency, your fellowship, all of your
23  experience in the clinical setting, did the
24  CME make you forget all of that?
25          MR. ARBITBLIT:  Object to form.

Page 199

1          THE WITNESS:  I didn't forget
2      it, but medicine is a discipline in
3      which we must keep up with the science
4      as it evolves, and a very busy
5      clinician, including myself, does not
6      have the time to read every single
7      peer-reviewed article and dig into who
8      funded it or whether or not they
9      accurately represented their
10      information.
11          So we rely on continuing
12      medical education courses in order to
13      acquire that knowledge.  So when I
14      went to that continuing medical
15      education course, I acquired a body of
16      knowledge that was not, in fact, based
17      in the evidence, that then influenced
18      my practice going forward and that of
19      my colleagues.
20  QUESTIONS BY MR. TSAI:
21      Q.   And to pick up on what you
22  said, you have to keep up -- science evolves,
23  medicine evolves.
24          So that's how medicine works,
25  right?  You have to make the best decisions

Page 200

1  that you can based on the scientific evidence
2  that's available --
3          MR. ARBITBLIT:  Object to form.
4  QUESTIONS BY MR. TSAI:
5      Q.   -- at the time of prescription;
6  do you agree with that?
7          MR. ARBITBLIT:  Object to form.
8          THE WITNESS:  As long as the
9      science is being accurately
10      represented.
11  QUESTIONS BY MR. TSAI:
12      Q.   All right.  So going back to
13  your TED Talk, if you could turn to page 5 of
14  that transcript?
15      A.   Yeah.
16      Q.   So starting on page 11, you
17  say --
18      A.   Page 5 or page 11?
19      Q.   Sorry, starting on page --
20  line 11 of page 5, you say, "The second big
21  invisible force driving this opioid epidemic
22  is the medicalization of poverty."
23          Do you see that?
24      A.   Yes.
25      Q.   Is it your opinion now that a

Page 201

1  big driver of the opioid epidemic is the
2  medicalization of poverty as you stated here
3  in 2017?
4      A.   It's my opinion that the
5  medicalization of poverty is a factor in the
6  opioid epidemic, but not as big a factor as
7  supply.
8      Q.   Okay.  And have you done any
9  analysis to quantify the relative
10  significance of the contributions of the
11  factor of medicalization of poverty, to use
12  your words, and prescription opioid supply?
13          MR. ARBITBLIT:  Object to form.
14          THE WITNESS:  I have not
15      personally done that analysis, but
16      there are others who I cite in my
17      report who talk about, again, as I've
18      answered in a previous question,
19      economic factors not being the primary
20      driver, and that supply of opioids in
21      a given region being the primary
22      driver of opioid use disorder and
23      opioid overdose in that region.
24  QUESTIONS BY MR. TSAI:
25      Q.   So at this time what percentage

51 (Pages 198 to 201)

Page 242

1  the record. I would like to take a
2  quick break. Thanks.
3      VIDEOGRAPHER: We're going off
4  the record, and the time is 1:37 p.m.
5      (Off the record at 1:37 p.m.)
6      VIDEOGRAPHER: We are now going
7  back on the record, and the time is
8  1:56 p.m.
9      (Lembke Exhibit 13 marked for
10  identification.)
11  QUESTIONS BY MR. TSAI:
12     Q.   So the next exhibit is
13  Appendix I to your report, and it has five
14  sections. Section B relates to Mallinckrodt.
15  Can you turn to that?
16     A.   Sure.
17     Q.   So, first of all, have you
18  reviewed any information that you can point
19  to or have any other basis to say that any of
20  the statements that you attribute to
21  Mallinckrodt in Appendix I.B of your report
22  were actually seen by any specific doctor or
23  other person in Cuyahoga and Summit Counties?
24     A.   I don't have specific examples,
25  but I do believe these misrepresentations

Page 243

1  were widely disseminated, including in Summit
2  and Cuyahoga Counties.
3      Q.   So are you speculating that
4  they would be seen by doctors in Cuyahoga and
5  Summit Counties but cannot point to any
6  specific basis to back that up? Is that fair
7  to say?
8      MR. ARBITBLIT: Object to form.
9      THE WITNESS: Because these
10  misrepresentations were so deeply
11  interwoven into medical education, it
12  would be hard for me to believe that
13  physicians in Summit and Cuyahoga
14  Counties hadn't seen these
15  misrepresentations, but I cannot point
16  to any specific examples.
17  QUESTIONS BY MR. TSAI:
18     Q.   And when you talked to doctors
19  after your pair of talks last year in Ohio,
20  did any of those doctors who practice in
21  Cuyahoga and Summit Counties tell you that
22  they relied on any of the statements that you
23  attribute to Mallinckrodt specifically?
24      MR. ARBITBLIT: Object to form.
25      THE WITNESS: The doctors that

Page 244

1  I spoke with validated that the
2  misrepresentations laid out here in
3  this section under Mallinckrodt were
4  misrepresentations that they had been
5  the recipients of in their medical
6  training and that had led them to
7  prescribe opioids in a way that they
8  now realize was not evidence based.
9  QUESTIONS BY MR. TSAI:
10     Q.   Did anyone use the word
11  "Mallinckrodt"?
12     A.   No, not that I recall.
13     Q.   Did anyone use the word -- any
14  of the products that are -- that Mallinckrodt
15  made specifically?
16     A.   Not that I recall.
17     Q.   Okay. Have you done any
18  analysis to determine whether or to what
19  extent Mallinckrodt's marketing of opioid
20  products, specifically Mallinckrodt,
21  influenced prescribing decisions or rates in
22  Cuyahoga and Summit Counties?
23      MR. ARBITBLIT: Object to form.
24      THE WITNESS: Mallinckrodt held
25  the Train-the-Trainer events which

Page 245

1  communicated these misrepresentations
2  to individuals who then went
3  throughout the country disseminating
4  these misrepresentations, and I don't
5  have any specific examples, but I
6  wouldn't be surprised if they
7  disseminated these misrepresentations
8  also in Summit and Cuyahoga Counties.
9      Also Mallinckrodt promoted a
10  book through the CARES Alliance called
11  Defeat Chronic Pain Now!, and I
12  wouldn't be surprised if that book was
13  read by providers in Cuyahoga and
14  Summit County and that book contained
15  these misrepresentations.
16  QUESTIONS BY MR. TSAI:
17     Q.   So you say you wouldn't be
18  surprised, but can you point to anything in
19  your materials that you've provided to us
20  that specifically isolates the contribution
21  of Mallinckrodt's conduct to promotional
22  activity with respect to opioid prescribing
23  or any adverse event in Cuyahoga and Summit
24  County?
25      MR. ARBITBLIT: Object to form.

62 (Pages 242 to 245)