Exhibit 9

Highly Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: NATIONAL | ) | |
| PRESCRIPTION | ) | MDL No. 2804 |
| OPIATE LITIGATION | ) | |
| _____ | ) | Case No. |
|  | ) | 1:17-MD-2804 |
|  | ) | |
| THIS DOCUMENT RELATES | ) | Hon. Dan A. |
| TO ALL CASES | ) | Polster |

TUESDAY, APRIL 23, 2019

HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

– – –

Videotaped deposition of Mark A.
Schumacher, M.D., Ph.D., held at the offices of
Morgan, Lewis & Bockius LLP, One Market,
Spear Street Tower, San Francisco,
California, commencing at 9:35 a.m., on the
above date, before Carrie A. Campbell,
Registered Diplomate Reporter and Certified
Realtime Reporter.

– – –

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 14

1       And is that a binder of
2 materials that you brought into this
3 deposition?
4     A.   That's correct.
5     MR. ERCOLE: I'd actually like
6 to mark that as Exhibit 1 if we can,
7 and then I'd like to make a copy of
8 that over the break.
9     THE WITNESS: That's fine.
10     (Schumacher Exhibit 1 marked
11     for identification.)
12 QUESTIONS BY MR. ERCOLE:
13     Q.   And, sir, I know your counsel
14 just articulated, but I need to ask you:
15 What is Exhibit 1, to the best of your
16 recollection?
17     A.   Sure. It contains my draft
18 report -- or the expert report. It also
19 includes exhibits provided by counsel as well
20 as materials considered, and finally a copy
21 of my curriculum vitae.
22     Q.   Okay.
23     A.   I believe -- yeah.
24     Q.   And you referred to a draft
25 report.

Page 15

1     What did you mean by that?
2     A.   I misspoke. It is my expert
3 report.
4     Q.   I believe from the initial set
5 of questions you have never been deposed as
6 an expert before; is that correct?
7     A.   That is correct.
8     Q.   Have you ever been proffered as
9 an expert in any case before?
10     A.   What do you mean by that?
11     Q.   Sure.
12     Have you ever attempted to
13 serve as an expert before in any type of
14 litigation?
15     A.   No. No.
16     Q.   So it stands to reason you've
17 never given, in any type of litigation, case
18 or proceeding, any type of expert opinion
19 before; is that correct?
20     A.   That is correct.
21     It's unusual in that -- in that
22 regards, but this is a very important area of
23 concern of mine.
24     Q.   So just to check off the box,
25 you've never given any expert opinion with

Page 16

1 respect to pharmaceutical marketing before,
2 correct?
3     A.   That's correct.
4     Q.   Never given any expert opinion
5 with respect to pain management before,
6 correct?
7     MR. LOESER: Objection to form.
8 QUESTIONS BY MR. ERCOLE:
9     Q.   You can answer the question.
10     A.   I've been asked for my expert
11 opinion about pain management multiple times
12 as part of my role as medical director of
13 pain management at UCSF Medical Center, as
14 well as chief of the division of pain
15 medicine since 2010.
16     Q.   You've never given any type of
17 expert opinion in any type of litigation case
18 with respect to pain management, correct?
19     A.   That is correct.
20     Q.   And you've never given any type
21 of expert opinion in any litigation case
22 concerning addiction, correct?
23     A.   That is correct.
24     (Schumacher Exhibit 2 marked
25     for identification.)

Page 17

1 QUESTIONS BY MR. ERCOLE:
2     Q.   Okay. Let's mark this as
3 Exhibit 2.
4     Dr. Schumacher, is that -- make
5 sure I'm pronouncing it right.
6     A.   Yes, thank you. Yes, that is
7 correct, Schumacher, yes.
8     Q.   I have -- my last name is
9 Italian, so people frequently mispronounce
10 it, so I just wanted to make sure I was not
11 doing that with you.
12     Sir, is this a copy of your
13 curriculum vitae, or CV?
14     A.   Yes, it is.
15     Q.   Okay. And for your
16 undergraduate education, you attended the
17 University of California; is that correct?
18     A.   Yeah, at San Diego. University
19 of California at San Diego, that's correct.
20     Q.   Let me ask this: With respect
21 to that CV, is there anything in there that
22 is inaccurate or that at this point in time
23 you need to change?
24     And I'll represent that's the
25 CV that was produced in connection with your

5 (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

1    expert report in this case.
2        A.    As far as my own personal
3    knowledge, there's potentially a
4    typographical error, but content-wise, as far
5    as I'm aware.
6        Q.    And for -- and what was your
7    major as an undergraduate?
8        A.    Biology with a concentration in
9    physiology.
10       Q.    You did not major in marketing,
11   correct?
12       A.    That is correct.
13       Q.    And for graduate education,
14   where did you -- where did you go for your
15   graduate education?
16       A.    I first completed a Ph.D. in
17   physiology and pharmacology at the University
18   of California-San Diego.
19       Q.    And you say you first did that.
20             What did you do afterward?
21       A.    Well, I continued and became
22   sort of a combined -- I joined the school of
23   medicine at UC-San Diego and completed my
24   doctorate in medicine after that.
25       Q.    Do you recall when that was?

Page 19

1        A.    I believe it's 1990.
2        Q.    You did not -- you do not have
3    a Ph.D. in marketing, correct?
4        A.    That's correct.
5        Q.    And you do not have a Ph.D. in
6    economics, correct?
7        A.    That is correct.
8        Q.    With respect to -- after you
9    graduated from medical school, where did you
10   do your residency and postgraduate training?
11       A.    Sure.
12             And I'm getting over a cold, so
13   sometimes I have to clear my throat here.
14   Excuse me.
15             I did a one-tier -- pardon me,
16   a one-year internship at Cedar Sinai Medical
17   Center in internal medicine, and that was
18   followed by a residency in anesthesia at
19   University of California-San Francisco.
20       Q.    Any other residency or
21   postgraduate training that you did?
22       A.    I did some additional sort of
23   combined postgraduate fellowship work in
24   mainly research areas in pain throughout, and
25   became a clinical instructor and then

Page 20

1    assistant professor soon after completing my
2    residency.
3        Q.    And where did you become a
4    assistant professor?
5        A.    That was at the same
6    institution, the University of California at
7    San Francisco.
8        Q.    Do you recall when that was?
9        A.    Excuse me, just to make sure I
10   don't fumble the numbers.
11             I was -- I became a clinical
12   instructor from 1994 to 1995 and became on
13   faculty as an assistant professor in
14   residence in 1995 forward.
15       Q.    And the residency that you did
16   was in anesthesia; is that correct?
17       A.    Anesthesiology, that's correct.
18       Q.    What did you do -- well, are
19   you still an assistant professor at this
20   point in time?
21       A.    I'm a professor, full
22   professor, and chief of the division of pain
23   medicine at the University of California-San
24   Francisco in the department of anesthesia and
25   perioperative care.

Page 21

1        Q.    And what does perioperative
2    care mean?
3        A.    It entails a range of subareas
4    for anesthesiology that includes pain
5    medicine, critical care, perioperative
6    evaluations that encompass the sort of total
7    care around a patient.
8        Q.    Does perioperative care involve
9    care associated with surgical procedures?
10       A.    That is correct.
11       Q.    And so when you say "total care
12   around a patient," is it fair to say you're
13   talking about total care around a patient
14   immediately before and immediately after a
15   surgery?
16       A.    So the mission of
17   anesthesiology encompasses the management of
18   pain.  Certain departments of anesthesia have
19   descriptions that include and pain
20   management.
21             Our particular department is --
22   was originally just called the department of
23   anesthesia, and then it broadened its title
24   to anesthesia and perioperative care to
25   project a broader term to include the

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review

Page 22

1  responsibilities of anesthesiologists before,
2  during and after their operation.
3      Q.    And with respect to the duties
4  of anesthesiologists after an operation, do
5  anesthesiologists continue to see patients
6  over long term after a particular surgery
7  takes place?
8      A.    Typically an anesthesiologist
9  would have a follow-up visit after their
10  operation while they're still in the
11  hospital.
12      Q.    You said "typically."
13          Is that one -- there's
14  typically a follow-up visit; is that correct?
15      A.    That's the standard of care,
16  that there's a follow-up visit, that's
17  correct.
18      Q.    And do you treat -- strike
19  that.
20          Do you treat chronic pain
21  patients in an outpatient setting?
22      A.    No, I do not; however, I have
23  managed and taken care of patients with
24  chronic pain, or what we call acute on
25  chronic pain, for 20 years on the inpatient

Page 23

1  side within the hospital.
2      Q.    You said -- was it acute
3  chronic pain?  Is that what you --
4      A.    I said chronic pain, and what
5  we term acute on chronic.  That is a patient
6  who has a chronic painful condition who has
7  come into the hospital for some other acute
8  problem.  For example, they may have had --
9  require an operation on their colon or their
10  gallbladder, but they have a chronic painful
11  condition like back pain, for example.
12      Q.    And so just so my notes are
13  clear, you do not treat those patients in an
14  outpatient setting; is that correct?
15      A.    As chief of the division of
16  pain medicine, I oversee all aspects of our
17  division, and I have recruited and have a
18  medical director for outpatient pain
19  management center.
20      Q.    Okay.  So let me -- maybe my
21  question wasn't clear.
22      A.    Sure.
23      Q.    With respect to you, do you
24  treat -- just my notes are clear --
25      A.    Sure.

Page 24

1      Q.    -- you do not treat patients in
2  an outpatient setting; is that correct?
3      A.    That's correct.  That's
4  correct.
5      Q.    Okay.  Are you board certified
6  in pain medicine?
7      A.    No, I am not.
8      Q.    Are you board certified in
9  addiction?
10      A.    No, I'm not.
11      Q.    What are you board certified
12  in?
13      A.    In anesthesiology.
14      Q.    With respect to -- you talked
15  about how, for anesthesiologists, the
16  standard of care is after a surgery, there is
17  typically a follow-up visit.
18          Do you recall that?
19      A.    That's correct.
20      Q.    Okay.  Typically are there
21  multiple follow-up visits?
22      A.    Well, I guess I would want to
23  know what the context of that is; that is,
24  under what circumstance are you describing.
25      Q.    Sure.  I'm just getting a sense

Page 25

1  of with respect to anesthesiologists.
2      A.    Uh-huh.
3      Q.    After a surgery takes place,
4  how long -- and that patient is discharged
5  from the hospital, how long will an
6  anesthesiologist typically follow up with or
7  treat a patient?
8          MR. LOESER:  Objection.  Form.
9          THE WITNESS:  Again, the
10      standard for follow-up is that an
11      anesthesiologist, or anesthesia part
12      of the team, sees that patient
13      postoperatively at least once and --
14      yeah.
15  QUESTIONS BY MR. ERCOLE:
16      Q.    So the standard of care then is
17  for the anesthesiology team or doctors to
18  then see a patient at least once after a
19  surgery takes place.
20          Is that what your testimony is?
21      A.    All right.  Based on the
22  context.  If there are other factors
23  involved, the complexity of the case that
24  requires additional follow-up, there could be
25  additional visits by the anesthesiologist.

7 (Pages 22 to 25)

Highly Confidential - Subject to Further Confidentiality Review

Page 26

1      Q.    And would you agree that
2   anesthesiologists see patients once in the
3   hospital before discharge?
4           MR. LOESER: Objection. Form.
5           THE WITNESS:  Physicians that
6      have been trained as anesthesiologists
7      have a variety of roles.  If they have
8      a role that's just assigned to the
9      operating room, then what we just
10     described is a good depiction.
11          There are other
12     anesthesiologists like myself that
13     participate in pain management care on
14     a consult service, and as
15     anesthesiologists and pain medicine
16     physicians, we see patients daily and
17     follow-up visits as well.
18  QUESTIONS BY MR. ERCOLE:
19     Q.    And that's in a hospital
20  setting, correct?
21     A.    Yeah, in my case it is.
22     Q.    Okay.
23     A.    In other cases, those
24  anesthesiologists that will see patients in
25  the outpatient setting.

Page 27

1      Q.    Okay.  And with respect to you,
2   have you -- strike that.
3           Do anesthesiologists see
4   patients on monthly bases over periods of
5   years?
6           Is that their responsibility?
7           MR. LOESER: Objection. Form.
8           THE WITNESS:  Anesthesiologists
9      that are pain management physicians
10     working in the outpatient clinic do
11     see patients on a regular basis,
12     potentially monthly.
13  QUESTIONS BY MR. ERCOLE:
14     Q.    You do not, correct?
15     A.    That is correct.
16     Q.    Okay.  Do you have any formal
17  education in marketing?
18     A.    My education in marketing
19  represents reading and review of literature
20  that was included in review of the literature
21  for the National Academy of Sciences, the
22  consensus report from that, as well as some
23  materials that were also included and
24  reviewed for this report I prepared.
25     Q.    Anything else?

Page 28

1      A.    No.
2      Q.    So you have no formal training
3   in marketing, correct?
4      A.    That's correct.
5      Q.    Have you ever -- and is it fair
6   to say you don't have any specialized
7   knowledge with respect to sales or marketing
8   analyses generally, correct?
9           MR. LOESER: Objection. Form.
10          THE WITNESS:  Is there another
11     way to ask that question?  I'm not
12     quite sure what the question is.
13  QUESTIONS BY MR. ERCOLE:
14     Q.    Sure.
15          I'm just asking in terms of
16  your -- in terms of your background and
17  specialization here, let me ask this:  When
18  was the national -- what is the National
19  Academy of Sciences consensus report that you
20  referenced?
21     A.    Right.
22          So I was invited to serve as a
23  committee member on an analysis to
24  characterize and provide recommendations to
25  the national opiate epidemic, to serve on the

Page 29

1   National Academy of Sciences Engineering and
2   Medicine.  And this was requested in order to
3   understand -- not so much appoint blame, but
4   to understand, characterize and to provide
5   recommendations.
6           Within that body of work, there
7   was, by the committee, the realization that
8   opiate manufacturing, marketing, was a key
9   cause and driver for increased prescribing
10  opioids and also a key driving force for the
11  opioid epidemic.
12     Q.    And we'll get into those
13  issues, but when was that consensus report
14  published?
15     A.    It was published in, I
16  believe -- let me just double-check, but I
17  believe it's -- just one minute.
18          In 2017.
19     Q.    Okay.  And so before 2017, you
20  had no education or specialized experience
21  with respect to marketing; is that fair to
22  say?
23          MR. LOESER: Objection. Form.
24     Mischaracterizes his testimony.
25          THE WITNESS:  I think that --

8 (Pages 26 to 29)

Highly Confidential - Subject to Further Confidentiality Review

Page 30

1    maybe could you say your question one
2    more time, please --
3    QUESTIONS BY MR. ERCOLE:
4    Q.    Sure.
5    A.    -- because I got a little bit
6    mixed up with what you're asking.
7    Q.    No problem.  Let's do it this
8    way.
9         You don't teach courses in
10   marketing, correct?
11   A.    That is correct.
12   Q.    You don't -- you haven't
13   published articles regarding marketing,
14   correct?
15        MR. LOESER:  Objection.
16   Mischaracterizes his testimony.
17        THE WITNESS:  Within my
18   publication list, I have no
19   publications in marketing.
20   QUESTIONS BY MR. ERCOLE:
21   Q.    And you have no background --
22   strike that.
23        You have no degree in anything
24   concerning marketing, correct?
25   A.    That is correct.

Page 31

1    Q.    And you don't hold yourself out
2    as an expert in marketing, do you?
3         MR. LOESER:  Objection.  Form.
4         THE WITNESS:  I have not stated
5    I've ever been an expert in marketing.
6    QUESTIONS BY MR. ERCOLE:
7    Q.    Have you ever consulted for a
8    pharmaceutical company?
9    A.    I have, as part of my academic
10   career, had a collaboration with, I
11   believe -- and I'll just double-check
12   possibly two companies.
13   Q.    And so you're double-checking,
14   can you let me know what you're referring to
15   there in your CV?
16   A.    Sure.  Sure.  Just a minute.
17        And again, I'm not sure it
18   follows the definition that you provided.
19        I was invited to give a talk at
20   one company called Anesiva some years ago,
21   and on another I gave a talk in Italy, Zambon
22   Pharmaceuticals.
23   Q.    Were you paid to give those
24   talks?
25   A.    No.  No.

Page 32

1    I was -- my travel expenses
2    were reimbursed, as I recall.
3    Q.    So just so I understand -- let
4    me ask this:  Other than those talks that
5    you've given at -- are they -- how would you
6    define it?
7         Were they talks given for the
8    pharmaceutical companies?
9    A.    I don't quite understand the
10   meaning of that question.
11   Q.    Yeah.
12        So what were the talks about?
13   A.    Sure.  Okay.
14        Well, one had to do with
15   Anesiva.  It related to my research on the
16   capsaicin receptor, which has been a
17   direction of my research.  It's a hot chili
18   pepper receptor that is a potential target
19   for analgesic therapy, for chronic pain
20   therapy.  And it discussed the structure and
21   function of that receptor in the peripheral
22   nervous system.
23        The other talk, the Zambon
24   talk, was -- followed in a similar light.  It
25   talked about the structure and what we call

Page 33

1    splice variants, sort of cousins of this
2    receptor and how there may be some potential
3    for therapeutic development in targeting that
4    receptor.
5    Q.    Any other speeches that you've
6    done or given for pharmaceutical companies?
7    A.    If you take -- just let me just
8    go through them --
9    Q.    Sure.
10   A.    -- to be as accurate as
11   possible.
12        One other thing I came across
13   that may be relevant, in 2010 I was invited
14   to give a talk about unmet needs of analgesia
15   for a venture innovation program as part of
16   UCSF, and that's where a number of, I think,
17   representatives from pharmaceutical companies
18   or startups were present.  That's where I was
19   introduced to a representative from the
20   Zambon, for example.
21        Let me just continue.  I think
22   that's right, yeah.
23   Q.    Have you ever served as a
24   speaker regarding opioids for any
25   pharmaceutical company?

9  (Pages 30 to 33)

Highly Confidential - Subject to Further Confidentiality Review

Page 34

1      A.    No, not that I recall.
2      Q.    Have you ever received any
3  grants from pharmaceutical -- strike that.
4           Have you ever received a grant
5  from a pharmaceutical company for a study
6  that you've done?
7      A.    Not that I'm aware of, no.
8      Q.    Best of your recollection, have
9  you ever received any payments, whether in
10 the form of consulting fees or honorariums or
11 anything, from pharmaceutical companies?
12     A.    Not that I recall.
13     Q.    We talked a little bit about
14 your clinical practice currently.
15           Well, let me ask this:
16 Currently, what is the name of the hospital
17 where you will see patients?
18     A.    The Moffitt Hospitals at
19 UCSF Medical Center.  I also --
20     Q.    Sorry.  I apologize.  And just
21 tell me to shut up if I'm talking over you,
22 or your counsel can tell me to shut up,
23 that's fine.  I apologize.
24           MR. LOESER:  Really?  We can do
25 that?

Page 35

1           THE WITNESS:  I also see
2  patients at the Mission Bay Hospital
3  campus.
4  QUESTIONS BY MR. ERCOLE:
5      Q.    So with respect to the
6  Moffitt-Long Hospital, how often do you see
7  patients there?
8      A.    I see chronic pain patients as
9  well as acute on chronic patients
10 approximately two days every week.
11     Q.    And how about with respect to
12 the Mission Long {sic}?
13     A.    It varies based on need.  There
14 I would fill in for patients -- for
15 attendings that may be unable, so that's much
16 less often.  I don't know how to describe
17 that, but that's less common.
18     Q.    Okay.  I mean, would you say
19 once a month maybe?
20     A.    I think that's fair.
21           I also co-round with a
22 pediatric pain team as well, so on average,
23 maybe once a month there.
24     Q.    Have you ever treated chronic
25 pain patients in a outpatient setting?

Page 36

1           MR. LOESER:  Objection.  Form.
2           THE WITNESS:  So -- although
3  that's a question you asked before, I
4  would just amend that in my training
5  and rotations in the residency program
6  in anesthesiology, I was a trainee
7  evaluating and providing treatment
8  plans in the outpatient setting during
9  that time.
10 QUESTIONS BY MR. ERCOLE:
11     Q.    And when was that?
12     A.    During my anesthesia residency,
13 which was -- just a minute.
14           Essentially 1991 through 1994.
15     Q.    And since then, you have not
16 treated any chronic pain patients in an
17 outpatient setting, correct?
18           MR. LOESER:  Objection.  Form.
19           THE WITNESS:  Well, I
20 participate at the pain management
21 center on occasion with our
22 multidisciplinary panel reviews of
23 patients, and so I will participate in
24 that regards.  I will sit in with a
25 review of patient cases and provide

Page 37

1  recommendations when appropriate.
2  QUESTIONS BY MR. ERCOLE:
3      Q.    Do you meet with the patients
4  there?
5      A.    That is -- is the question do
6  we meet with the patients while we're
7  discussing?
8      Q.    Well, I mean --
9      A.    Sorry.
10     Q.    Yeah, sure.
11           My question is a little bit
12 different.
13           Do you meet with -- strike
14 that.  Let me go back.
15           How often do you do that?
16           MR. LOESER:  Objection.  Form.
17           THE WITNESS:  Right.
18           On average, probably once a
19 month.  Yeah, that's about right.
20           And I -- as part of that --
21 sorry, just to -- I'll discuss cases
22 with the chronic pain faculty there or
23 medical director at least once a
24 month, that's correct.
25

10 (Pages 34 to 37)

Highly Confidential - Subject to Further Confidentiality Review

Page 38

1    QUESTIONS BY MR. ERCOLE:
2        Q.    And when you say you will --
3    you "review patient cases and discuss with
4    faculty there," do you actually meet with --
5    you, individually, meet with patients in that
6    circumstance?
7        A.    I typically do not meet with
8    the patients myself.
9        Q.    Okay. Dr. Schumacher, I just
10   want to ask you a couple of questions
11   about -- to understand your expertise here.
12       You are not an expert in
13   economics, correct?
14           MR. LOESER:  Objection.  Form.
15           THE WITNESS:  I have not gained
16       an expertise in economics.
17   QUESTIONS BY MR. ERCOLE:
18       Q.    And you're not a legal expert,
19   correct?
20           MR. LOESER:  Objection.  Form.
21           THE WITNESS:  I have not
22       described myself as a legal expert.
23   QUESTIONS BY MR. ERCOLE:
24       Q.    And you are not an expert in
25   epidemiology; is that fair to say?

Page 39

1            MR. LOESER:  Objection.  Form.
2            THE WITNESS:  As part of my
3        role, I've become more familiar with
4        the results of epidemiologic studies,
5        especially in preparation for the
6        National Academy of Sciences' report
7        as well as preparing reports --
8        preparing this particular report.
9    QUESTIONS BY MR. ERCOLE:
10       Q.    Other than --
11       A.    Other than that, I have no
12   additional expertise.
13       Q.    And you're not an expert in
14   mathematics; is that fair to say?
15           MR. LOESER:  Objection.  Form.
16           THE WITNESS:  I do not have an
17       advanced degree in mathematics.
18   QUESTIONS BY MR. ERCOLE:
19       Q.    And you wouldn't call yourself
20   an expert in mathematics, correct?
21           MR. LOESER:  Objection.  Form.
22           THE WITNESS:  I wouldn't
23       describe myself having expertise in
24       mathematics.
25

Page 40

1    QUESTIONS BY MR. ERCOLE:
2        Q.    And you wouldn't describe
3    yourself as having expertise in statistics;
4    is that fair to say?
5            MR. LOESER:  Objection.  Form.
6            THE WITNESS:  I would describe
7        myself as having a functional
8        knowledge of statistics as it relates
9        to outcomes data, my research
10       programs.
11   QUESTIONS BY MR. ERCOLE:
12       Q.    Do you have any specialized
13   training with respect to regression analyses?
14           MR. LOESER:  Objection.  Form.
15           THE WITNESS:  Upon my graduate
16       work and my -- from medicine to my
17       Ph.D. work to my research, I've
18       been -- it's been necessary to review
19       papers that have used regression
20       analysis in different ways, and so
21       I've done some independent reading in
22       those areas.
23   QUESTIONS BY MR. ERCOLE:
24       Q.    Other than some independent
25   reading, have any expertise with respect to

Page 41

1    regression analyses?
2            MR. LOESER:  Objection.  Form.
3            THE WITNESS:  I think that
4        describes my experience.
5    QUESTIONS BY MR. ERCOLE:
6        Q.    Have you ever conducted a
7    regression analysis?
8        A.    Ever?
9        Q.    Yeah.
10       A.    I have conducted a regression
11   analysis as part of my educational process
12   and statistical coursework in the past.
13       Q.    And what is a regression
14   analysis?
15       A.    It's an attempt to make a
16   correlation.
17           So, for example, if you want to
18   make a relationship between like how much you
19   eat and how much you weigh, there's a formula
20   to try to calculate how tightly that
21   relationship is.
22       Q.    Have you conducted any
23   regression analysis with respect to the
24   opinions that you are giving in this case?
25           MR. LOESER:  Object to the

11 (Pages 38 to 41)

Page 42

```
1      form, and also note that the topic of
2   regression analysis is far outside the
3   scope of the opinions that
4   Dr. Schumacher is providing.
5          MR. ERCOLE:  Well, fair enough.
6   We may disagree on that, but --
7          THE WITNESS:  I didn't
8   understand your question.
9   QUESTIONS BY MR. ERCOLE:
10     Q.   Sure.  I'll repeat it for you.
11         In connection with the -- I'll
12  repeat it exactly.
13         Have you conducted any
14  regression analyses with respect to the
15  opinions that you're giving in this case?
16         MR. LOESER:  Same objection.
17         THE WITNESS:  I'm aware that
18     there are certain reviews that contain
19     regression analysis, but I have no
20     opinion on the particular details of
21     those regression analyses.
22  QUESTIONS BY MR. ERCOLE:
23     Q.   Fair enough.
24         And let me -- and my question
25  may be even just a little bit easier than
```

Page 43

```
1   that, too, which is:  Have you, in connection
2   with any opinions you're giving here today,
3   run a regression analysis?
4          MR. LOESER:  Objection.  Form.
5          THE WITNESS:  I have not
6      personally run a regression analysis
7      on the information provided as part of
8      the report.
9   QUESTIONS BY MR. ERCOLE:
10     Q.   You've referenced the work you
11  did in connection with the committee on pain
12  management and regulatory strategies.
13         Do you recall that?
14     A.   I am -- I was a member of that
15  committee and also was a coauthor of that
16  report.
17     Q.   What can we come up -- what
18  acronym can we come up so that --
19     A.   How about NASEM?
20     Q.   NASEM?
21     A.   Do you mind?
22     Q.   Okay.
23     A.   N-A-S-E-M, NASEM.
24     Q.   N-A-S-E-M, okay.
25         So when I refer to the NASEM
```

Page 44

```
1   report, I'm going to be referring to that
2   document, or the NASEM committee, I'll be
3   referring to that committee.
4      A.   Perfect.
5      Q.   Does that work?
6      A.   That works for me.  Thank you.
7      Q.   In connection with your work
8   there, did you run any regression analyses?
9          MR. LOESER:  Objection.  Form.
10         THE WITNESS:  That -- although
11     I did not myself, I know that other
12     committee members had that expertise
13     and focused on that area.
14  QUESTIONS BY MR. ERCOLE:
15     Q.   You are not giving an opinion
16  one way or the other on the validity of any
17  regression analyses that were run with
18  respect to the NASEM report, are you?
19         MR. LOESER:  Objection to form.
20         THE WITNESS:  My role as a
21     member of that committee included
22     reviewing the results and conclusions
23     of that report and -- yeah.
24         Maybe you should repeat the
25     question again.
```

Page 45

```
1   QUESTIONS BY MR. ERCOLE:
2      Q.   Yeah, sure.
3      A.   Sorry.  I didn't answer it,
4   apparently.
5      Q.   Yeah, no problem.
6          So my question is:  Sitting
7   here today, you're not giving an opinion one
8   way or the other on the validity of any
9   regression analyses that were run with
10  respect to the NASEM report, correct?
11         MR. LOESER:  Objection.  Form.
12         THE WITNESS:  I'm here to give
13     validity to the conclusions of the
14     NASEM report.
15  QUESTIONS BY MR. ERCOLE:
16     Q.   Right.
17     A.   And if they're based on
18  regression analysis that were provided in
19  reference material in that report, then I
20  would support that conclusion.
21     Q.   Did you independently review
22  any regression analyses that were done in the
23  NASEM report?
24     A.   No, I did not.
25     Q.   And you didn't conduct any of
```

Highly Confidential - Subject to Further Confidentiality Review

Page 90

1    right?
2         MR. LOESER: Objection. Form.
3         THE WITNESS: I don't recall
4    reviewing any declarations.
5    QUESTIONS BY MR. ERCOLE:
6         Q.   Okay. Have you received any
7    summaries of any analyses or information from
8    counsel that you've relied upon in
9    formulating your reports?
10        MR. LOESER: Objection. Form.
11        And again, we're -- answer to
12   the extent you can without divulging
13   any actual communications between
14   yourself and counsel.
15        THE WITNESS: I drafted the
16   report. I shared it with counsel, who
17   provided organizational assistance.
18   QUESTIONS BY MR. ERCOLE:
19        Q.   Okay. So my question is a
20   little bit different, which is: In terms of
21   formulating your opinions in this case, did
22   you receive any summaries of facts or
23   information from counsel that formed the
24   basis for your opinions in this case?
25        MR. LOESER: Objection. Form.

Page 91

1         And again, I think we have a --
2    so everyone understands the protocol,
3    the witness will not be answering any
4    questions that require him to divulge
5    communications with counsel.
6         MR. ERCOLE: Okay. Well --
7         MR. LOESER: If you're asking
8    him for facts and opinions he relied
9    on, those are identified in his
10   report.
11        MR. ERCOLE: Well, I'm asking
12   whether he's been provided any
13   summaries that he's -- he's been
14   relied upon by counsel.
15        MR. LOESER: And the witness is
16   not going to answer any question about
17   communications with counsel except for
18   those on which he relied in forming
19   his opinions.
20        MR. LEVINE: For the record,
21   it's "considered," not "relied upon."
22   QUESTIONS BY MR. ERCOLE:
23        Q.   Yeah. I mean, that's my
24   question.
25        Did you receive any summaries

Page 92

1    from counsel that you considered or relied
2    upon in formulating your opinions?
3         A.   My report is based on my
4    research built from my career in the area of
5    pain medicine. It was built from my
6    knowledge of chronic pain and the difficult
7    treatment of chronic pain.
8         It relies on review of
9    literature that form the foundation of the
10   NASEM report, and it is built on the review
11   of the literature that came from establishing
12   this report.
13        Counsel's provided
14   organizational support in this report.
15        Q.   So, sir, do you remember my
16   question?
17        A.   So, no.
18        Q.   Okay. Dr. Schumacher, you do
19   not practice medicine in Ohio, correct?
20        A.   That is correct.
21        Q.   You're not licensed to practice
22   medicine in Ohio?
23        A.   That's correct.
24        Q.   You don't treat patients in
25   Ohio?

Page 93

1         A.   Treat patients physically in
2    Ohio?
3         Q.   Sure.
4         A.   I've certainly treated patients
5    from Ohio.
6         Q.   How many patients have you
7    treated from Ohio?
8         A.   It's hard to recall.
9         Q.   Okay. Have you ever spoken
10   with any -- strike that.
11        Did you speak with any Ohio
12   doctors in any field of medicine for purposes
13   of forming the opinions that you're giving in
14   this case?
15        A.   Not that I'm aware.
16        Q.   Did you ever conduct any survey
17   or study of Ohio doctors for purposes of
18   formulating your opinions in this case?
19        MR. LOESER: Objection. Form.
20        THE WITNESS: I have not
21   personally prepared surveys of -- I'm
22   sorry, I lost the last part of that
23   question.
24   QUESTIONS BY MR. ERCOLE:
25        Q.   Sure, I'll repeat it.

24  (Pages 90 to 93)

Highly Confidential - Subject to Further Confidentiality Review

Page 94

1      Did you ever conduct any survey
2  or study of Ohio doctors for purposes of
3  formulating your opinions in this case?
4      A.   No, I did not.
5          MR. LOESER:  Objection.
6  QUESTIONS BY MR. ERCOLE:
7      Q.   And so you've never spoken with
8  any Ohio doctors to ask them, for instance,
9  why they may have written an opioid
10 prescription for patients; fair to say?
11         MR. LOESER:  Objection.  Form.
12         THE WITNESS:  My exposure to
13    Ohio doctors would be represented by
14    statements they made in the call notes
15    that were part of the report as
16    examples of misstatements from the
17    pharmaceutical sales reps to such
18    doctors.
19 QUESTIONS BY MR. ERCOLE:
20     Q.   And that's the extent of your
21 exposure to Ohio doctors?
22         MR. LOESER:  Objection.  Form.
23         THE WITNESS:  Relative to this
24    report.
25

Page 95

1  QUESTIONS BY MR. ERCOLE:
2      Q.   Sure.
3      Relative to the opinions --
4      A.   Yeah.
5      Q.   -- you're giving in this case,
6  right?
7      A.   That's correct.
8      Q.   Have you conducted any survey
9  or study of Ohio patients to understand
10 whether they've benefitted from opioids that
11 they've been prescribed?
12         MR. LOESER:  Objection.  Form.
13         THE WITNESS:  Relative to
14    developing my own survey or analysis
15    of opioid use for people in -- taking
16    opioids in Ohio, there may be overlap
17    in some of the reference material that
18    I used that if there were surveys done
19    in those papers, but I've not done
20    myself.
21 QUESTIONS BY MR. ERCOLE:
22     Q.   Are you familiar with any
23 survey that you can -- that you can recall
24 today that evaluates whether patients in Ohio
25 have benefitted from opioids that they've

Page 96

1  been prescribed?
2          MR. LOESER:  Objection.  Form.
3          THE WITNESS:  I can't recall.
4  QUESTIONS BY MR. ERCOLE:
5      Q.   How about this:  Did you ever
6  speak with any patient in Ohio who received
7  an opioid prescription in formulating any of
8  your opinions in this case?
9      A.   Not that I'm aware of.
10     Q.   Sitting here today, can you
11 identify any Ohio prescriber who wrote an
12 opioid prescription because of a statement
13 that you contend was false that an opioid
14 manufacturer made?
15     A.   Well, I would refer to some of
16 the exhibits that I put in the report as
17 potential examples where following a
18 misstating -- a misleading statement made by
19 a pharmaceutical representative, that the
20 sales representative then states that they
21 have gotten assurance from that doctor that
22 they would now write for a higher-dose,
23 long-acting opioid, for example.
24         Those are some of the examples
25 that I included in the report.

Page 97

1      Q.   So what exhibit are you
2  referring to?
3      A.   If you give me a moment,
4  please.
5      Q.   Actually, for clarity of the
6  record, you are looking in Exhibit 1,
7  correct?
8      A.   Yes, that's correct.
9      Q.   Okay.  And what exhibit in
10 Exhibit 1 are you referring to?
11         Not in the sense of the Bates
12 number, in the sense of the -- if you look at
13 the first page, there should be an exhibit.
14         MR. LOESER:  It's his report.
15         THE WITNESS:  It's within my
16    report, yeah, sorry.
17         So, for example, on page 36 of
18    my report there's a note, July 6, 2000
19    note, from Ohio, quote:  "Spoke with
20    MD who expressed concern re: one
21    patient receiving 120 milligrams every
22    12 hours for back pain.  Discussed
23    with the provider that there was no
24    ceiling dose with oxy like
25    short-acting.  He seemed to think that

25  (Pages 94 to 97)

Highly Confidential - Subject to Further Confidentiality Review

Page 162

1    A.   I see that.  You've read it
2 correctly.
3    Q.   You wrote that, right?
4    A.   It was -- again, this was a
5 collaborative effort with Dr. Ramana Naidu
6 and myself.
7    Q.   The next bullet is lack of
8 formal research on the risks and benefits of
9 chronic opioid use.
10    Do you see that?
11    A.   That's read correctly.
12    Q.   That's another factor that you
13 identified as causing or contributing to the
14 opioid epidemic in this article?
15    MR. LOESER:  Objection.  Form.
16    THE WITNESS:  Again, I wouldn't
17    phrase it in the way you've said it,
18    that if we go back to the start of
19    this, it was meant to be a provocative
20    statement as where did opioid epidemic
21    come from.
22    And as you see as we work our
23    way down, we land on pharmaceutical
24    direct-to-consumer marketing,
25    direct-to-prescriber marketing.

Page 163

1    Again, it's my opinion that
2    that represents the driving force for
3    the opioid epidemic.
4 QUESTIONS BY MR. ERCOLE:
5    Q.   So the -- I believe you -- the
6 pain management and regulatory strategies
7 report that you've mentioned --
8    A.   Yes.
9    Q.   -- that was published in 2017,
10 correct?
11    A.   That's correct, yes.
12    Q.   And so this document was
13 published in -- or authored in September
14 of 2016, correct?  If you look at the first
15 page.
16    MR. LOESER:  Objection.  Form.
17    THE WITNESS:  September, yes.
18 QUESTIONS BY MR. ERCOLE:
19    Q.   Right.
20    A.   That's correct, yes.
21    Q.   So fair to say that you were
22 including -- well, had you reviewed any
23 marketing materials by any company when you
24 authored this document, Exhibit 5?
25    MR. LOESER:  Objection.  Form.

Page 164

1 QUESTIONS BY MR. ERCOLE:
2    Q.   I'll rephrase the question.
3    When you authored this
4 document, Exhibit 5, in September of 20 --
5 2016, had you reviewed any marketing
6 materials from any pharmaceutical company?
7    MR. LOESER:  Objection.  Form.
8    THE WITNESS:  I can't recall.
9 QUESTIONS BY MR. ERCOLE:
10    Q.   So sitting here today, you
11 can't identify a single marketing material or
12 document that you would have reviewed in
13 publishing an article on the Internet in
14 September of 2016 saying that pharmaceutical
15 marketing is a cause of the opioid epidemic?
16    MR. LOESER:  Objection.  Form.
17    THE WITNESS:  Again, my
18    statement in this article poses the
19    question and lists potential factors.
20    It -- that's what I have to say.
21 QUESTIONS BY MR. ERCOLE:
22    Q.   And have you done any -- well,
23 let me ask this:  How about the FDA -- strike
24 that.
25    How about FDA policy?  Was that

Page 165

1 a factor in causing or contributing to the
2 opioid epidemic in Ohio?
3    MR. LOESER:  Objection.  Form,
4    and outside the scope of his report.
5    THE WITNESS:  My report was --
6    and scope does not involve making
7    opinion about the FDA's process for
8    drug approval.
9 QUESTIONS BY MR. ERCOLE:
10    Q.   Did you consider that?
11    MR. LOESER:  Objection.  Form.
12    THE WITNESS:  In what way?
13 QUESTIONS BY MR. ERCOLE:
14    Q.   Did you consider that in
15 authoring the opinions that you're giving,
16 that -- you just said it was outside the
17 scope of your opinion.  So is it fair to say
18 that you're not giving an opinion on that
19 issue?
20    A.   My opinion is based on the lack
21 of scientific integrity that underpinned the
22 claims made by the pharmaceutical industry
23 that opioids, chronic opioids, were safe and
24 effective for the treatment of chronic pain.
25    I'm not making an opinion on

42 (Pages 162 to 165)

Highly Confidential - Subject to Further Confidentiality Review

Page 166

1    the process of the FDA.
2         Q.    Are you giving -- did you
3    consider whether DEA policy caused or
4    contributed to the opioid epidemic in Ohio?
5              MR. LOESER: Objection. Form.
6    Outside the scope of his report.
7    QUESTIONS BY MR. ERCOLE:
8         Q.    Let me ask this: Is it outside
9    the scope of your report as to whether or not
10   you considered whether DEA policy caused or
11   contributed to the opioid epidemic in Ohio?
12             MR. LOESER: Objection. Form.
13             THE WITNESS: That was outside
14   the scope of my report.
15   QUESTIONS BY MR. ERCOLE:
16        Q.    Fair enough.
17             And is it outside the scope of
18   your report as to whether or not you
19   considered whether FDA policy caused or
20   contributed to the opioid epidemic in Ohio?
21             MR. LOESER: Objection. Form.
22             THE WITNESS: Again, it was
23   outside the --
24             MR. LOESER: Compound.
25             THE WITNESS: -- scope of my

Page 167

1    report.
2    QUESTIONS BY MR. ERCOLE:
3         Q.    And is it fair to say -- is it
4    outside the scope of your report as to
5    whether or not you considered whether managed
6    care or reimbursement policies by managed
7    care entities caused or contributed to the
8    opioid epidemic in Ohio?
9              MR. LOESER: Objection. Form.
10   It's outside the scope of his report.
11             THE WITNESS: Yeah, I -- that
12   was outside the scope of my report.
13   QUESTIONS BY MR. ERCOLE:
14        Q.    Is it outside the scope of your
15   report as to whether or not you considered
16   whether pill mills caused or contributed to
17   the opioid epidemic in Ohio?
18             MR. LOESER: Objection. Form.
19   Outside the scope of his report.
20             THE WITNESS: Yeah. I do not
21   consider that. That was outside the
22   scope of my report.
23   QUESTIONS BY MR. ERCOLE:
24        Q.    Was it outside the scope of
25   your report as to whether or not actions or

Page 168

1    inactions taken by local government caused or
2    contributed to the opioid epidemic in Ohio?
3              MR. LOESER: Objection. Form.
4              THE WITNESS: Within my
5    opinion, there was evidence within the
6    literature of the influence of
7    pharmaceutical industries to try to
8    change certain rules at the state
9    level having to do with the approval
10   and prescribing practices of opioids.
11             But otherwise, the rest is --
12   otherwise, your question is outside
13   the scope of my report.
14   QUESTIONS BY MR. ERCOLE:
15        Q.    Did you consider whether Summit
16   or Cuyahoga -- excuse me.
17             Did you consider whether Summit
18   or Cuyahoga Counties -- strike that.
19             Did you consider whether Ohio's
20   decision when or when not to implement a PDMP
21   caused or contributed to the opioid epidemic
22   in Ohio?
23             MR. LOESER: Objection. Form.
24   Outside the scope of his report.
25   Assumes facts not in evidence.

Page 169

1              THE WITNESS: As part of the
2    NASEM report, there was a section in
3    which we examined the pattern of the
4    institution of these prescription
5    medication reporting systems, and so
6    broadly we examined different states'
7    record of that and whether there was a
8    relationship between the institution
9    of those tools for physicians and
10   potential rates of opioid abuse or
11   harm.
12             I do reference the NASEM report
13   in my core opinion, but that is as far
14   as I have. I don't have anything
15   specific for Ohio.
16   QUESTIONS BY MR. ERCOLE:
17        Q.    So you don't know one way or
18   the other --
19        A.    I can't recall.
20        Q.    Let me just -- let me just
21   finish.
22             You don't know sitting here
23   today, one way or another, whether Ohio
24   implemented a PDMP or not?
25             MR. LOESER: Objection.

43 (Pages 166 to 169)

Highly Confidential - Subject to Further Confidentiality Review

Page 170

1  Outside the scope of his report.
2       THE WITNESS:  It's outside the
3  scope for the -- your question.
4  QUESTIONS BY MR. ERCOLE:
5       Q.  And fair to say you didn't
6  consider the timing of -- strike that.
7       Fair to say you didn't consider
8  whether Ohio implemented a PDMP and, if so,
9  the timing of it in determining whether that
10 contributed or caused the opioid epidemic in
11 Ohio?
12      MR. LOESER:  Same objection.
13      THE WITNESS:  The context of
14 the prescription medication reporting
15 system has been, in my practice, a
16 tool to try to identify warning signs
17 of patients if they're prescribed
18 something and taking something else.
19      Again, the overall impact of
20 the record is a tool, but I can't
21 recall the details at this time that
22 relate the starting of the -- of that
23 recording program in the state of
24 Ohio.
25

Page 171

1  QUESTIONS BY MR. ERCOLE:
2       Q.  Did you consider whether the
3  misuse by -- strike that.
4       Did you consider whether the
5  misuse of opioids by patients in Ohio caused
6  or contributed to the opioid epidemic there?
7       MR. LOESER:  Objection.  Form.
8  Outside the scope of his report.
9       THE WITNESS:  Again, the core
10 of the opinion was based on a review
11 of the literature that -- pulled from
12 various studies that had been done
13 across the country.  I can't recall
14 which of those studies specifically
15 included cohorts from the state of
16 Ohio.
17 QUESTIONS BY MR. ERCOLE:
18      Q.  Sir, I'm just trying to
19 understand what you considered and didn't
20 consider --
21      A.  Sure.
22      Q.  -- in forming the opinions that
23 you're purporting to give in this case.
24      A.  Uh-huh.
25      Q.  And you agree this case is a

Page 172

1  serious case, right?
2       A.  That's why I'm here.
3       Q.  Right.
4       So did you consider, in giving
5  your opinions as to what caused or didn't
6  cause the opioid epidemic, the misuse of
7  opioids by patients in Ohio?
8       MR. LOESER:  Objection.
9  Assumes facts not in evidence.  It's
10 outside the scope of his report.
11      THE WITNESS:  My consideration
12 weighed on the effect of opioids on
13 the entire population of the United
14 States, at least that represented by
15 different study groups as represented
16 in the literature.
17 QUESTIONS BY MR. ERCOLE:
18      Q.  Did you consider the factor of
19 misuse of opioids by patients in determining
20 what caused or didn't cause the opioid
21 epidemic in Ohio?
22      And with all due respect, I
23 don't think you've answered that question.
24      MR. LOESER:  Objection.  Form.
25 Asked and answered several times.

Page 173

1       THE WITNESS:  Again, my opinion
2  is that the factors that are driving
3  the opioid epidemic, as we've
4  discussed, and the powerful force
5  behind the epidemic was driven by the
6  pharmaceutical industry, and those
7  factors and conditions existed across
8  the country and would not be
9  necessarily unique to Ohio.
10      That's my opinion.
11      MR. ERCOLE:  Okay.  I'll move
12 to strike that response as
13 nonresponsive.
14      MR. LOESER:  I object.  I
15 believe that answer was responsive and
16 shouldn't be stricken.
17 QUESTIONS BY MR. ERCOLE:
18      Q.  Okay.  Sir, have you done any
19 quantitative analysis to try to apportion
20 responsibility -- strike that.
21      We talked about -- well, you
22 identify in your September 20, 2016 article a
23 number of factors that, according to this
24 article, you say the opioid epidemic came
25 from, right?

44 (Pages 170 to 173)

Highly Confidential - Subject to Further Confidentiality Review

Page 174

1    A.   Actually, the phrasing is
2  "Where did the opioid epidemic come from?"
3    Q.   Right.
4    A.   "Did it come from the
5  following?"
6         And so it was posed as a
7  question.  "To put it succinctly, from the
8  following."
9         Yeah.  "So finally, where did
10 the opioid epidemic come from," question
11 mark?
12        "To put it succinctly, from the
13 following."
14        Right.
15   Q.   Right.
16   A.   So it is intended to engage the
17 reader to consider these conditions, that's
18 correct.
19   Q.   Okay.  Did you do anything to
20 try to apportion responsibility for the
21 opioid crisis in Ohio according to any of
22 these conditions or factors?
23        MR. LOESER:  Objection.
24 Mischaracterizes his prior testimony,
25 and form.

Page 175

1         THE WITNESS:  I have not
2  personally conducted an analysis to
3  apportion responsibility amongst these
4  various factors.
5         (Schumacher Exhibit 6 marked
6  for identification.)
7  QUESTIONS BY MR. ERCOLE:
8    Q.   Sir, last document I'm going to
9  show you.  Let's mark this as Exhibit 6.
10        MR. LOESER:  Take your time.
11 QUESTIONS BY MR. ERCOLE:
12   Q.   Sir, we talked before.  You
13 have not conducted any survey of
14 physicians -- strike that.
15        You haven't -- sorry.
16        I talked to you before.  You
17 have not conducted any survey of prescribers
18 in Ohio to figure out whether they received
19 any misleading marketing by defendants and,
20 if so, whether they relied upon that
21 marketing, correct?
22        MR. LOESER:  Objection.  Form.
23 Mischaracterizes his testimony.
24        THE WITNESS:  What I have
25 testified at this deposition is the

Page 176

1  evidence provided by counsel that
2  there were call note reports that were
3  describing efforts by the
4  pharmaceutical industry to influence
5  physician prescribing behavior
6  specifically about the use of higher
7  doses of chronic opioids.
8         Given that, I have not
9  conducted any other survey or
10 analysis.
11 QUESTIONS BY MR. ERCOLE:
12   Q.   Right.
13        You didn't survey Ohio -- you
14 didn't actually survey -- conduct and
15 initiate and oversee a survey of Ohio
16 prescribers to figure out whether they
17 received any misleading marketing and, if so,
18 whether that influenced their
19 decision-making, right?
20        MR. LOESER:  Objection.  Form,
21 and asked and answered.
22        THE WITNESS:  As best of my
23 knowledge, I have not conducted a
24 survey for -- in the Ohio area to
25 survey physicians in that regards.

Page 177

1  QUESTIONS BY MR. ERCOLE:
2    Q.   So the title of this document
3  is "Surveying Ohio Physicians on Opioid
4  Prescribing Behaviors."
5         Do you see that?
6    A.   I do.
7    Q.   Have you ever seen this
8  document before?
9    A.   I don't recall seeing this
10 document.
11        When was this -- I can't answer
12 the question, sorry.
13        Can I ask a question:  When was
14 this published?
15   Q.   Yeah.
16        So, unfortunately, we're here
17 to -- for me to ask questions.
18   A.   No, that's okay.
19   Q.   And I'm just asking whether
20 you've seen it.
21   A.   Okay.  I can't recall seeing
22 this.
23   Q.   You don't recall your counsel
24 ever giving you this document?
25        MR. LOESER:  Objection.

45 (Pages 174 to 177)

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1      We're not going to talk about
2  anything that may or may not have been
3  provided to him that's not considered
4  or relied on in his report.
5      THE WITNESS:  I don't --
6      MR. LOESER:  You can ask him
7  all you want about the document.
8  You're just not going to ask him
9  about --
10     MR. ERCOLE:  You can -- just
11 make your objection, and then we'll go
12 from there.
13     MR. LOESER:  Well, it's more
14 than making an objection.  It's an
15 instruction not to answer questions
16 about communications with counsel.
17     MR. ERCOLE:  Then just instruct
18 him not to answer.  If that's your --
19 if that's your -- what you're going to
20 argue.
21     MR. LOESER:  I'm instructing
22 the witness not to answer.  However,
23 you can ask whatever question you want
24 about the document; just don't ask
25 anything that I or my colleagues may

Page 179

1  have said to the witness about the
2  document.
3  QUESTIONS BY MR. ERCOLE:
4      Q.   So you just don't recall seeing
5  this document before?
6      A.   That's correct, yeah.
7      Q.   Okay.  And it's not something
8  you relied on or considered in your report,
9  right?
10     A.   I don't recall relying on this
11 document.
12     Q.   Can you turn to the -- I just
13 have one or two questions, and then we'll
14 take a break.
15     Can you turn to the page marked
16 SUMMIT_000839799?
17     A.   Okay.
18     Q.   And -- one second.
19     Do you see where in the summary
20 section on the second sentence it says,
21 "Certain factors such as employer
22 reimbursement policies and pharmaceutical
23 marketing did not overtly change opiate
24 prescribing habits"?
25     Do you see that?

Page 180

1      A.   I see that you've --
2      Q.   I read that right.
3      A.   -- correctly read that.
4      Q.   Yeah.  Okay.
5      And if this was a survey
6  conducted by the State of Ohio regarding
7  opioid prescribing behavior and what
8  prescriptions rely upon when prescribing
9  opioids in Ohio, would you have want to have
10 seen this document before issuing your
11 opinions here today?
12     MR. LOESER:  Objection.  Form.
13 The exhibit lacks foundation, and this
14 is outside the scope of his report.
15     THE WITNESS:  Well, before
16 rendering an opinion about two
17 sentences from the summary, I would
18 need to understand the sponsor of this
19 survey.  I would need an opportunity
20 to review the survey's methodologies
21 and look at their results prior to
22 stating an opinion.
23 QUESTIONS BY MR. ERCOLE:
24     Q.   Fair enough.
25     And at least -- and I'm not

Page 181

1  asking you to do that now.  I'm just saying
2  fair enough.
3      But you have not -- in
4  connection with your opinions in this case
5  that are contained in Exhibit 1, you did not
6  do that, right?
7      MR. LOESER:  Objection.  Form.
8      THE WITNESS:  I don't recall
9  ever reviewing this document before.
10     MR. ERCOLE:  Thank you.  So can
11 we take a three-minute break?
12     MR. LOESER:  Three?
13     MR. ERCOLE:  We can take a very
14 short break, if that's okay.
15     THE WITNESS:  Yeah, sure.
16     VIDEOGRAPHER:  We are now going
17 off the record, and the time is
18 2:13 p.m.
19     (Off the record at 2:13 p.m.)
20     VIDEOGRAPHER:  We are now going
21 back on the record, and the time is
22 2:25 p.m.
23     MR. ERCOLE:  Dr. Schumacher,
24 thank you for your time with me, at
25 least.

46  (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    That being said, I'm going to
2  pass the witness to one of the
3  codefendants here and reserve the
4  right to ask additional questions as
5  appropriate based upon further
6  developments in the deposition.
7  Thanks.
8         CROSS-EXAMINATION
9  QUESTIONS BY MR. MOONEY:
10    Q.   Good afternoon, Dr. Schumacher.
11    A.   Good afternoon.
12    Q.   My name is Matt Mooney.  I'm an
13  attorney with the law firm of Williams &
14  Connolly, and I represent Cardinal Health,
15  one of the defendants in this case.
16         Excuse me.  I have a couple of
17  questions just right off the bat.
18         On page 6 of your report, in
19  footnote 1 -- are you there?
20    A.   Yes.
21    Q.   You write, "'Defendants' as
22  used herein refers to the defendant
23  manufacturers of branded and generic opioid
24  products in the actions brought by plaintiffs
25  Cuyahoga County and Summit County, Purdue

Page 183

1  Pharma, Endo, Janssen, Teva, Cephalon,
2  Mallinckrodt, Actavis and Allergan."
3         Did I read that correctly?
4    A.   You read that correctly.
5    Q.   Okay.  Are the opinions in your
6  report and that you will offer in this
7  litigation limited to the defendant
8  manufacturers that you list in footnote 1 of
9  your report?
10    A.   My opinions that are listed in
11  the report are intended to be a broad-based
12  opinion to the effect of pharmaceutical
13  industry and industry in general that's it's
14  promoted the use of opioids for chronic
15  noncancer pain without scientific evidence.
16    Q.   Okay.  So is the answer to my
17  question, "no," the opinions in your report
18  and that you intend to offer in this
19  litigation extend to defendants beyond the
20  ones that you list in footnote 1 of your
21  report?
22    A.   I have no opinion about that.
23    Q.   You don't have an opinion about
24  whether or not your opinion applies to
25  defendants beyond the ones you've listed in

Page 184

1  your report as defendants; is that true?
2    A.   I have not included -- is it
3  Cardinal?
4    Q.   It is Cardinal, but I'm asking
5  more -- I'm asking more specifically.
6    A.   Uh-huh.
7    Q.   Do you have an opinion about
8  any of the other defendants that have been
9  named in this litigation that you intend to
10  offer at trial beyond the ones that you have
11  listed as defendants in footnote 1?
12    A.   My opinion is -- for this
13  report is listed here as the defendants in
14  footnote 1.
15    Q.   Okay.  You don't have a
16  specific opinion about the actions of
17  Cardinal Health as it relates to this
18  litigation, correct?
19    A.   I have not -- in my report, I
20  have not provided a focused opinion about
21  Cardinal Health.
22    Q.   And you're not going to offer
23  an opinion at trial about Cardinal Health
24  specifically, correct?
25    A.   It's my understanding that my

Page 185

1  testimony is -- within scope relates to this
2  report.
3    Q.   Okay.  And --
4         MR. LOESER:  Counsel, just so
5  the record's clear on these defendants
6  listed here, there's been no effort to
7  identify the affiliates and
8  subsidiaries.
9         So provided you're talking
10  about, you know, within that family
11  the companies, that's what that is
12  intended --
13  QUESTIONS BY MR. MOONEY:
14    Q.   When you used the word "Purdue
15  Pharma" in this report, are you referring to
16  Purdue Pharmaceuticals and its affiliates?
17    A.   That's correct.
18    Q.   Okay.  I'm working with that
19  same definition then.
20    A.   Okay.
21    Q.   To the extent that any of these
22  seven -- eight entities listed have
23  affiliates or subsidiaries that have been
24  listed as defendants, you may offer opinions
25  about them, but not outside of those

47 (Pages 182 to 185)

Page 202

1 Walmart was a defendant in this litigation?
2 A. I was not aware.
3 Q. Were you aware on March 25,
4 2019, when you completed your report that
5 Giant Eagle stores was a defendant in this
6 litigation?
7 A. I was not aware.
8 MR. LOESER: Were you aware
9 that there was such a thing as Giant
10 Eagle stores?
11 QUESTIONS BY MR. LAVELLE:
12 Q. Yes. Well, counsel asked a
13 good question; I'm going to ask the same one.
14 You never heard of Giant Eagle
15 stores?
16 A. That was the top of my mind,
17 actually. I'd never heard of that before.
18 Fair enough, yeah.
19 Q. All right. Fair enough.
20 A. Yeah.
21 Q. So you looked earlier in the
22 deposition at your report, which you have in
23 front of you, right?
24 A. Yes, I do.
25 Q. And you've got on page 6 a

Page 203

1 footnote, footnote 1, that refers to
2 defendants and defines defendants; is that
3 right?
4 A. That is correct.
5 Q. And your definition of
6 defendants excludes all of the pharmacies
7 that we just mentioned; is that right?
8 MR. LOESER: Objection. Form.
9 THE WITNESS: Those pharmacies
10 do not appear as this footnote.
11 QUESTIONS BY MR. LAVELLE:
12 Q. So throughout your report, when
13 you referred to defendants, you are not
14 referring to any of the chain pharmacies; is
15 that right?
16 A. Within the report I have used
17 wording that is broad and refers to the
18 pharmaceutical industry. In that regards,
19 that's the breadth of that.
20 However, the defendants as
21 listed do not include the companies you just
22 mentioned.
23 Q. So just to be clear, Doctor,
24 when you refer in your March 25, 2019 expert
25 report to defendants --

Page 204

1 A. Uh-huh.
2 Q. -- you are not referring to any
3 of the retail chain pharmacies; is that
4 right?
5 A. The retail chain pharmacies
6 were outside the scope of preparation of my
7 report.
8 Q. So the answer to my question
9 is, yes, you are not referring to them; is
10 that right?
11 A. I have not referred to those
12 companies in my report. They're outside the
13 scope of my report preparation.
14 Q. Are you aware of the basis on
15 which plaintiffs have asserted claims against
16 any of the retail chain pharmacies?
17 A. Only relative to my own reading
18 in the media. But I have not discussed
19 such -- well, I can't reveal discussions with
20 counsel, but, again -- I'm sorry, could you
21 repeat your question?
22 Q. Sure.
23 And I understand you may be
24 getting confused here. I'm not asking for
25 communications you had with your counsel.

Page 205

1 I'm just asking what your understanding is.
2 As you sit here today on
3 April 23, 2019, do you have an understanding
4 of why plaintiffs have asserted claims or
5 what the claims are that the plaintiffs have
6 asserted against the retail chain pharmacies?
7 A. That's outside the scope of my
8 report. I have no opinion in that matter.
9 Q. But do you have an
10 understanding of what the claims are against
11 them?
12 A. No, I do not.
13 Q. Do you have an understanding
14 today as to whether they have been sued for
15 dispensing as opposed to distribution?
16 A. I don't know.
17 Q. Do you know whether any of the
18 pharmacies I've mentioned earlier, Rite Aid,
19 CVS, Walmart, Walgreens, Giant Eagle, whether
20 they, in fact, distribute opioids or have
21 distributed opioids?
22 A. Within the -- preparing for
23 this report, I have no evidence other than
24 just from personal knowledge of being a
25 physician and knowing that certain pharmacies

Highly Confidential - Subject to Further Confidentiality Review

Page 338

1    opioids in the treatment of chronic
2    noncancer pain where there's no strong
3    literature that supports its use in
4    things like back pain, centralized
5    pain syndromes or headache, in my
6    opinion, underpin the driving force of
7    the opioid epidemic.
8    QUESTIONS BY MR. LEVINE:
9    Q.    So let me be more specific.
10        Can you say that any patient
11   who was prescribed an Endo product would not
12   have otherwise been prescribed a different
13   opioid had Endo not marketed and sold their
14   products?
15            MR. LOESER: Objection. Form.
16   Calls for speculation.
17            THE WITNESS: I don't know.
18   QUESTIONS BY MR. LEVINE:
19   Q.    Have you ever been detailed by
20   any Endo sales representative or marketing
21   person?
22   A.    I can't recall.
23   Q.    Do you recall ever telling any
24   Endo sales representative or marketing person
25   whether their marketing was too aggressive,

Page 339

1    improper or misleading?
2    A.    I don't recall ever doing that.
3    Q.    You never told anyone at Endo
4    that their promotion of opioids was improper,
5    did you?
6            MR. LOESER: Objection. Form.
7            THE WITNESS: I don't recall
8    doing that.
9    QUESTIONS BY MR. LEVINE:
10   Q.    Did you ever tell your
11   colleagues at UCSF that Endo's marketing was
12   improper?
13            MR. LOESER: Objection. Form.
14   Outside the scope of his report.
15            THE WITNESS: I don't recall.
16   QUESTIONS BY MR. LEVINE:
17   Q.    Did you ever present at a
18   medical conference to tell your colleagues
19   that they were being misled by Endo's
20   marketing?
21            MR. LOESER: Objection. Form.
22            THE WITNESS: No, I don't
23   recall ever doing that.
24   QUESTIONS BY MR. LEVINE:
25   Q.    Ever present at a medical

Page 340

1    conference to tell your colleagues that they
2    were being misled by other people's
3    marketing?
4    A.    I have made presentations that
5    have been based on the work of the NASEM
6    report that -- which the key thesis or the
7    key cause, conclusion, was the aggressive
8    promotion of opiates for noncancer chronic
9    pain. And within presentations, I have made
10   that reference to our study's conclusion.
11   Q.    Have you ever prescribed Opana
12   or Opana ER?
13   A.    No, I have not. It's not
14   within our formulary at UCSF.
15   Q.    Have you ever prescribed
16   Percocet?
17   A.    As part of our consult service,
18   we have prescribed Percocet to patients,
19   that's correct.
20   Q.    Do you continue to prescribe
21   Percocet?
22   A.    Based on the patient's history.
23   Often patients may come in with a history of
24   already taking Percocets, and depending on
25   the clinical situation, we -- and discussions

Page 341

1    with them, we may continue that medication.
2    So we would either give a recommendation or
3    if the prescribing pattern is under our
4    control, we would write for that
5    prescription.
6    Q.    Have you ever prescribed
7    Percocet based on marketing?
8            MR. LOESER: Objection. Form.
9            THE WITNESS: The decision to
10   prescribe Percocet has been -- within
11   the inpatient services has typically
12   been driven by a patient's particular
13   history of analgesic use and in
14   certain circumstances their ability to
15   tolerate different opioids, including
16   Percocet.
17   QUESTIONS BY MR. LEVINE:
18   Q.    Sorry, I don't believe you
19   answered my question.
20   A.    I'm sorry, could you repeat
21   that?
22   Q.    Have you ever prescribed
23   Percocet based on marketing?
24            MR. LOESER: Objection. Asked
25   and answered.

86 (Pages 338 to 341)

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1          THE WITNESS:  I have not based
2     a decision to use Percocet based on
3     marketing materials that I'm aware of.
4  QUESTIONS BY MR. LEVINE:
5          Q.    What methodology did you use to
6  determine that Endo's marketing influenced
7  the way opioids were prescribed?
8          MR. LOESER:  Objection.  Form.
9          THE WITNESS:  Well, principally
10     I was given the records as described
11     throughout this testimony of either
12     training materials or call notes or
13     internal documents, and upon those --
14     with review, I have included some
15     examples within my report.  And it is
16     on that basis that I've included those
17     in my opinion.
18  QUESTIONS BY MR. LEVINE:
19          Q.    So you've reviewed a document
20  and concluded that it influenced the way that
21  opioids were prescribed.
22          Is there any method in between
23  your review of the document and your
24  conclusion that I'm unaware of?
25          MR. LOESER:  Objection.  Form.

Page 343

1          THE WITNESS:  My opinion was
2     formed by the review of the documents
3     provided and -- yeah.
4  QUESTIONS BY MR. LEVINE:
5          Q.    No other method?
6          A.    Relative to the review of the
7  literature, there's been a relationship of
8  how, again, the influence of -- strike that.
9          I'll just stop there.  No other
10  influence.
11          Q.    No other influence -- you mean
12  no other method, right?
13          A.    No other method beyond the
14  review of the literature that is -- went into
15  the report development and also the materials
16  that were provided for review.
17          That said, I am understanding
18  that this is largely providing examples, and
19  there will be other expert testimony that
20  will focus on -- specifically around
21  marketing.
22          Q.    Do you know if any of the
23  marketing materials you reviewed were used in
24  Summit or Cuyahoga Counties?
25          A.    Specifically, I do not have

Page 344

1  documents that would tie those materials to
2  those counties.
3          Q.    Do you know if any of the
4  physicians -- if any physicians were
5  influenced to prescribe -- strike that.
6          Do you know if any physicians
7  were influenced to prescribe Endo's opioids
8  based on their marketing?
9          MR. LOESER:  Objection.  Form.
10          THE WITNESS:  Sorry, did you
11     say any physicians?  Where?  Could you
12     repeat that?
13  QUESTIONS BY MR. LEVINE:
14          Q.    Do you know if any physicians
15  were influenced to prescribed Endo's opioids
16  based on their marketing?
17          MR. LOESER:  Objection.  Form.
18          THE WITNESS:  My review of the
19     materials grew from the idea that
20     aggressive marketing in a number of
21     aspects of detailing and -- could be
22     generalized to influence physician
23     decision-making, and to that extent, I
24     do not have a specific link of a
25     particular physician to a particular

Page 345

1     Endo marketing.
2  QUESTIONS BY MR. LEVINE:
3          Q.    So the answer to my question
4  is, no, you do not know if any physicians
5  were influenced to prescribe Endo's opioids
6  based on their marketing?
7          MR. LOESER:  Objection.
8  QUESTIONS BY MR. LEVINE:
9          Q.    Correct?
10          MR. LOESER:  Asked and
11     answered.
12          THE WITNESS:  Beyond the
13     example I gave in terms of a general
14     effect of marketing of opioids for
15     chronic noncancer pain when there's
16     limited or no scientific evidence.
17  QUESTIONS BY MR. LEVINE:
18          Q.    You don't have any data
19  indicating what percentage of patients taking
20  opioids were exposed to marketing, do you?
21          MR. LOESER:  Objection.  Form.
22     Outside the scope of the report.
23          THE WITNESS:  Within the
24     preparation of the report, I did not
25     focus on evaluating that -- any

87 (Pages 342 to 345)

Highly Confidential - Subject to Further Confidentiality Review

Page 346

1    specific relationship or, I should
2    say, percentage of marketing materials
3    to patients. I don't know.
4    QUESTIONS BY MR. LEVINE:
5        Q.   So I'm going to -- I'm trying
6    to move through this as quickly as I can to
7    allow my colleague to have time.
8        A.   Sure. Sure.
9        Q.   You cite on -- in Exhibit B of
10   your report, you cite two sales training
11   reports in paragraphs 16 and 17.
12       A.   Okay.
13       Q.   Now, this section of your
14   report refers to efforts to trivialize
15   addiction.
16           At the beginning of Exhibit B,
17   you say these are examples of efforts to
18   trivialize addiction, correct?
19       A.   That's correct, yes.
20       Q.   Okay. You don't cite any
21   statements in these -- from these documents
22   that trivialize addiction, do you?
23           MR. LOESER: Objection. Form.
24           THE WITNESS: If you can just
25   give me a moment, I'll review these

Page 347

1    two quick statements. Thank you.
2            Well, again, going back to the
3    beginning of Exhibit B, examples,
4    notes reflecting efforts to trivialize
5    the risk of addiction and exaggerate
6    the benefits of chronic opioid use.
7    QUESTIONS BY MR. LEVINE:
8        Q.   Do you cite any examples of
9    exaggerating the benefits there either?
10           MR. LOESER: And I'll note for
11   the record there are other examples
12   that cover those topics.
13           MR. LEVINE: Right, but
14   these --
15           MR. LOESER: Not in this
16   section. I'm not saying in general.
17           MR. LEVINE: First of all, you
18   don't need to note anything for the
19   record. I'm asking about these two
20   examples.
21           MR. LOESER: Right. But to the
22   extent you're suggesting these are the
23   only --
24           MR. LEVINE: Please don't abuse
25   my time.

Page 348

1            MR. LOESER: -- Endo examples.
2    There are other --
3            MR. LEVINE: I'm not suggesting
4    anything of the sort.
5            MR. LOESER: Okay. Well, then
6    we've clarified that.
7            THE WITNESS: Well, again,
8    reading number 17, "I'd like you to
9    turn up the passion some with Opana,"
10   "staying ahead of the pain," "being
11   released from the grip of pain," are
12   tag lines that stand out and should be
13   used along -- these type of
14   statements, again, trying to
15   understand, again, the context in
16   which these were made is limiting.
17           So I would agree that there's
18   no specific inference that these
19   agents -- I would say this, that the
20   focus is on the success of pain
21   control with Opana, without any
22   mention of potential harms or risks to
23   addiction. I think that's --
24   QUESTIONS BY MR. LEVINE:
25       Q.   Sorry, just to be clear --

Page 349

1        A.   Yes.
2        Q.   -- you think these documents
3    don't mention potential harms or risks?
4        A.   I'm talking about these two
5    points, 16 and 17.
6        Q.   Right.
7            You think those documents don't
8    mention -- the documents you're referencing
9    there don't mention potential harms or risks?
10           MR. LOESER: Objection. And
11   asked and answered.
12   QUESTIONS BY MR. LEVINE:
13       Q.   Or is it just the statement you
14   pull out of the document that doesn't mention
15   it?
16       A.   It's just the statement I'm
17   referring to.
18       Q.   Okay. Do you agree that the
19   majority of opioid analgesics are thought to
20   drive -- strike that.
21           Do you agree that the majority
22   of opioid analgesics that are thought to
23   drive the catastrophic figures regarding
24   increased deaths and opioid-induced side
25   effects overwhelmingly comes from

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    submitted?
2        A.    Two.
3        Q.    When did you start working on
4    your report?
5        A.    Somewhere mid or late February.
6        Q.    And when did you finish your
7    report?
8        A.    March 25th.
9        Q.    And when you say you started in
10   mid-February, you're talking about
11   February 2019?
12       A.    That's correct.
13       Q.    Doctor, for the Purdue call
14   notes that you cite, some of these are from
15   outside of Ohio; is that fair?
16       A.    There's -- I see one.
17   Number 10 is Kentucky.  Number 11's Kentucky.
18   It looks like the bulk of them are from Ohio.
19       Q.    Number 8 is from West Virginia?
20       A.    You're right, yes, that's
21   correct.
22       Q.    And for the Ohio call notes,
23   you didn't determine whether any of these
24   call notes are from either Cuyahoga County or
25   Summit County?

Page 367

1        A.    That's correct.
2        Q.    Would you be surprised to learn
3    that only one of the call notes is from
4    Cuyahoga County?
5            MR. LOESER:  Objection.  Form.
6        Assumes facts not in evidence.
7            THE WITNESS:  That's new
8        information at this setting.
9    QUESTIONS BY MR. TAM:
10       Q.    Are you aware that the call
11   notes provide the city for the doctor?
12       A.    I'm sorry, could you repeat
13   that?
14           MR. LOESER:  Objection.  Form.
15           THE WITNESS:  I wasn't quite
16       sure I understood that.  Sorry.
17   QUESTIONS BY MR. TAM:
18       Q.    Are you aware that the call
19   notes identify the city for where the doctor
20   is located?
21           MR. LOESER:  Objection.  Form.
22           THE WITNESS:  I remember
23       reviewing aspects of it, but I was
24       unaware that the call notes had that
25       level of detail.

Page 368

1    QUESTIONS BY MR. TAM:
2        Q.    Did you do any research into
3    the prescribing practices of any of the
4    doctors corresponding to the call notes you
5    cite in your report?
6        A.    No, I have not.
7        Q.    So it's fair to say you don't
8    know what the patient outcomes are for any of
9    the patients that were prescribed an opioid
10   medication by any of the doctors called upon
11   in the call notes you cited, correct?
12           MR. LOESER:  Objection.  Form.
13           THE WITNESS:  As I mentioned
14       before, I did not have any of the data
15       that linked any of these particular
16       patients to their -- sorry, any of
17       these comments to particular
18       physicians, nor their patient or
19       patient outcome, that's correct.
20   QUESTIONS BY MR. TAM:
21       Q.    So you can't identify any
22   specific prescription for a Purdue opioid
23   medication that a doctor in Cuyahoga County
24   or Summit County wrote because of anything
25   Purdue said or did, can you?

Page 369

1            MR. LOESER:  Objection.  Form.
2            THE WITNESS:  My opinion was,
3        again, built on a broader view that
4        misleading statements by Purdue sales
5        representatives to influence
6        prescribing practices of physicians
7        throughout the United States,
8        including Ohio, was a driving force in
9        the overprescription of opioids,
10       leading to harm.
11   QUESTIONS BY MR. TAM:
12       Q.    Doctor, if you could please
13   focus on my question.
14           You can't identify any specific
15   prescription for a Purdue opioid medication
16   that a doctor in Cuyahoga or Summit County
17   wrote because of anything Purdue said or did,
18   an you?
19           MR. LOESER:  Objection.  Asked
20       and answered.
21           THE WITNESS:  Again, I do not
22       have the data that linked a specific
23       comment, a physician, to a particular
24       prescription or outcome.
25           Was that your question?

93 (Pages 366 to 369)

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    QUESTIONS BY MR. TAM:
2        Q.   So the answer to my question
3    is, no, you can't identify any specific
4    prescription for a Purdue opioid medication
5    that a doctor in Cuyahoga or Summit County
6    wrote because of anything Purdue said or did?
7            MR. LOESER:  Objection.  Asked
8        and answered.
9    QUESTIONS BY MR. TAM:
10       Q.   Right?
11           MR. LOESER:  Same objection.
12           THE WITNESS:  It's the same
13       answer.  No, I do not have the data
14       that links those circumstances.
15   QUESTIONS BY MR. TAM:
16       Q.   And you can't identify a doctor
17   in Cuyahoga or Summit County who relied on
18   any of Purdue's marketing materials when
19   prescribing a Purdue opioid medication to his
20   or her patients, can you?
21           MR. LOESER:  Objection.  It's
22       outside the scope of his report.
23           THE WITNESS:  Yeah, I have no
24       such data to link those events.
25

Page 371

1    QUESTIONS BY MR. TAM:
2        Q.   So you can't identify any such
3    doctor, correct?
4            MR. LOESER:  Same objection.
5            THE WITNESS:  I cannot identify
6        a particular doctor beyond the concern
7        that they're being influenced based on
8        a lack of scientific evidence.
9    QUESTIONS BY MR. TAM:
10       Q.   But again, you can't identify
11   any specific doctor in Cuyahoga or Summit
12   County?
13       A.   That's correct.
14           MR. LOESER:  Same objection.
15   QUESTIONS BY MR. TAM:
16       Q.   Are you aware that Purdue has
17   never done direct-to-consumer advertising for
18   OxyContin?
19       A.   My understanding of product
20   information that I reviewed for the report
21   included medications for the treatment of
22   chronic noncancer pain that appeared to me to
23   be directed at patients -- directly at
24   patients.
25       Q.   Can you cite to a specific

Page 372

1    OxyContin promotional material that you think
2    was directed to consumers?
3        A.   As I recall -- if you can just
4    give me a moment -- that there was a number
5    of marketing materials, but one stands out is
6    the so-called Spanos video, Spanos video.
7    And I believe, as I recall, that that video
8    was targeted to -- directly to patients, as I
9    recall.
10       Q.   Do you know whether any doctor
11   in Cuya -- let me strike that.
12           Do you know whether anyone in
13   Cuyahoga County or Summit County ever saw
14   those videos that you're referring to?
15       A.   Again, that was not within the
16   scope or the depth of marketing review.  I'm
17   not aware of -- I cannot confirm that any
18   people viewed that video in Cuyahoga County.
19       Q.   Do you have any evidence that
20   the use of those videos led to any instances
21   of abuse of opioids in Cuyahoga or Summit
22   County?
23           MR. LOESER:  Objection.
24       Outside the scope of his report.
25           THE WITNESS:  I have no

Page 373

1        evidence that directly links that
2        county to that particular marketing
3        material.
4    QUESTIONS BY MR. TAM:
5        Q.   And you don't know whether any
6    doctor in Cuyahoga or Summit County relied on
7    those videos when prescribing a Purdue opioid
8    medication to his or her patients, do you?
9            MR. LOESER:  Objection.
10       Outside the scope of his report.
11           THE WITNESS:  Again, I have no
12       evidence that would support that.
13           I'm sorry, I lost track of your
14       statement or question.
15   QUESTIONS BY MR. TAM:
16       Q.   You don't know whether any
17   doctor in Cuyahoga or Summit County relied on
18   anything in those videos when prescribing a
19   Purdue opioid medication to his or her
20   patients, do you?
21           MR. LOESER:  Same objection.
22           THE WITNESS:  I do not.
23   QUESTIONS BY MR. TAM:
24       Q.   And are you aware that those
25   videos were no longer distributed as of July

94 (Pages 370 to 373)

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    2001?
2            MR. LOESER: Objection. Calls
3    for speculation.
4            THE WITNESS: I did not know.
5    QUESTIONS BY MR. TAM:
6        Q.    You cite to the 2003 GAO report
7    in your report, right?
8        A.    That has been referenced in
9    various ways in the report.
10       Q.    If you turn to page -- sorry,
11   paragraph 76 of your report?
12       A.    76?
13       Q.    Yes.
14       A.    Okay.
15       Q.    So in paragraph 76, one of the
16   advertisements you single out for Purdue is
17   this ad that says in part, "There Can Be Life
18   with Relief."
19            Do you see that?
20            You'll have to turn the page,
21   actually. Paragraph --
22       A.    Oh, okay.
23       Q.    Do you see that?
24       A.    Yes, I do.
25       Q.    If you turn back to the prior

Page 375

1    page, you say that this is a 2006 ad?
2        A.    That is what's written here in
3    the document.
4        Q.    What is your basis for that
5    assertion?
6        A.    As I recall, review of the many
7    documents included brochures, and there was,
8    again, an attempt to pull out examples that
9    linked -- pardon me -- particular phrases
10   with an image. That's my recollection.
11       Q.    What's your basis for saying
12   that this is an ad from 2006?
13            MR. LOESER: Objection. Asked
14       and answered.
15            THE WITNESS: I don't recall
16       the details, other than I, at the
17       time -- well, I can only speculate
18       that somewhere in this review there
19       was a link of that date with that
20       image in some of the reviewed
21       materials.
22   QUESTIONS BY MR. TAM:
23       Q.    Are you aware that this ad was
24   withdrawn in December 2002?
25            MR. LOESER: Objection. Form.

Page 376

1            THE WITNESS: I was not aware
2       of that.
3    QUESTIONS BY MR. TAM:
4        Q.    Were you aware that the FDA
5    sent Purdue a warning letter about this
6    advertisement in 2002?
7            MR. LOESER: Objection. Form.
8            THE WITNESS: I was aware that
9       the FDA sent warning letters to Purdue
10      about misstatements in their marketing
11      materials. The chronology of that, I
12      can't recall.
13   QUESTIONS BY MR. TAM:
14       Q.    Are you aware that in response
15   to that warning letter Purdue took corrective
16   actions?
17            MR. LOESER: Objection. Form.
18            THE WITNESS: I understand that
19      in response to the letter that Purdue
20      made certain changes in their
21      marketing and withdrew certain
22      materials.
23   QUESTIONS BY MR. TAM:
24       Q.    Are you aware that Purdue
25   issued a corrective promotional piece in

Page 377

1    response to the FDA's warning letter?
2        A.    I'm aware that Purdue responded
3    to the request to withdraw certain marketing
4    materials and claims.
5        Q.    But you're not aware of any
6    corrective advertisements?
7        A.    I'm not aware of that.
8        Q.    Since 2002 are you aware of any
9    warning letter that Purdue -- let me ask that
10   again. Strike that.
11            Since 2002, are you aware of
12   any other warning letter that the FDA sent to
13   Purdue about its marketing of OxyContin?
14            MR. LOESER: Objection. It's
15       outside the scope of his report.
16            THE WITNESS: Yeah, that's
17       beyond the scope of my report. I have
18       no recollection of review of a
19       document that would support that.
20   QUESTIONS BY MR. TAM:
21       Q.    But you said you're aware of
22   letters from the FDA to Purdue, right?
23       A.    Broadly. The principal -- I'm
24   aware of a letter that requested Purdue to
25   make -- or defend certain marketing claims.

95 (Pages 374 to 377)