## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br>*The County of Summit, Ohio*, et al. *v. Purdue Pharma L.P.*, et al.,<br>Case No. 18-op-45090<br><br>*The County of Cuyahoga, Ohio*, et al. *v. Purdue Pharma L.P.*, et al.,<br>Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

## DECLARATION OF ANTHONY M. RUIZ

Pursuant to 28 U.S.C. § 1746, I, Anthony M. Ruiz, hereby declare as follows:

1.    I am an associate in the Washington, D.C. office of Zuckerman Spaeder LLP, counsel for CVS Indiana, L.L.C. and CVS Rx Services, Inc. (together, "CVS") in the above-captioned cases.

2.    I submit this declaration on behalf of CVS in support of the Pharmacy Defendants' Motion for Summary Judgment Based on the Statutes of Limitations and for the purpose of transmitting to the Court true and correct copies of the documents attached hereto.

3.    Attached as Exhibit 1 is a copy of excerpts (most relevant portions highlighted) from the expert report of Sonya Kwon submitted on behalf of CVS on May 10, 2019 in the above-captioned cases.

4.    Attached as Exhibit 2 is a copy of Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *ex rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley's Second Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 Pursuant to the Court's November 21, 2018 Order served on November 30, 2018.

5.      Attached as Exhibit 3 is a copy of Summit County, Ohio Plaintiff's Second Supplemental Response and Objections to Distributor Defendants' Interrogatory No. 18 Pursuant to the Court's November 21, 2018 Order served on November 30, 2018, including the revised Exhibit 2 to the Second Supplemental Response served on December 1, 2018.

6.      Attached as Exhibit 4 is a copy of the Ohio Board of Pharmacy license for CVS Indiana, L.L.C. obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

7.      Attached as Exhibit 5 is a copy of the Ohio Board of Pharmacy license for CVS Rx Services, Inc. obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

8.      Attached as Exhibit 6 is a copy of excerpts (most relevant portions highlighted) from the transcript of the deposition of Eric A. Griffin, 30(b)(6) representative for the Ohio Board of Pharmacy, which was held on January 23, 2019, in the above-captioned cases.

9.      Attached as Exhibit 7 is a copy of excerpts (most relevant portions highlighted) from CVS Corporation's 10-K for Fiscal Year ended December 30, 2000.

10.      Attached as Exhibit 8 is a copy of excerpts (most relevant portions highlighted) from CVS Caremark Corporation's 10-K for Fiscal Year ended December 31, 2010.

11.      Attached as Exhibit 9 is a copy of excerpts (most relevant portions highlighted) from CVS Corporation's 10-K for Fiscal Year ended December 31, 1997.

12.      Attached as Exhibit 10 is a copy of excerpts (most relevant portions highlighted) from CVS Corporation's 10-K for Fiscal Year ended December 31, 2005.

13.      Attached as Exhibit 11 is a copy of excerpts (most relevant portions highlighted) from CVS Caremark Corporation's 10-K for Fiscal Year ended December 31, 2011.

14.     Attached as Exhibit 12 is a copy of excerpts (most relevant portions highlighted) from the expert report of Craig J. McCann, Ph.D., CFA submitted on behalf of plaintiffs on March 25, 2019, in the above-captioned cases.

15.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 19th day of June, 2019.

Anthony M. Ruiz
**ZUCKERMAN SPAEDER LLP**
1800 M Street, N.W., Suite 1000
Washington, DC 20036
(202) 778-1800

# EXHIBIT 1



UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

---

IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION

MDL NO. 2804

Track One

---

PRELIMINARY EXPERT REPORT AND DISCLOSURE OF

SONYA KWON

ANKURA CONSULTING

MAY 10, 2019

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



    d.   The ARCOS data shows that CVS distributed less than ▮▮ of relevant opioids into Cuyahoga and Summit counties between 2006 and 2014 and distributed an estimated ▮▮ of total relevant opioids into Cuyahoga and Summit counties between 2006 and 2018.

    e.   Between 2006 and 2013, CVS shipments of HCPs increased at a slower rate than the annual DEA quota for hydrocodone.

    f.   Between 2006 and 2014, non-controlled substances represent approximately ▮▮ of dosage units shipped to CVS pharmacies in Cuyahoga and Summit counties by CVS distribution centers.

    g.   Between 2006 and 2014, HCPs represented less than ▮▮ of total dosage units shipped to CVS pharmacies in Cuyahoga and Summit counties by CVS distribution centers.

    h.   Between 2006 and 2014, controlled substances represent less than ▮▮ of total dosage units shipped to CVS pharmacies in Cuyahoga and Summit counties by CVS and Cardinal Health.

    i.   Between 2006 and 2014, HCPs represent less than ▮▮ of total dosage units shipped to CVS pharmacies in Cuyahoga and Summit counties by CVS and Cardinal Health.

    j.   Between 2006 and 2014, CVS pharmacies in Cuyahoga and Summit counties ordered a small percentage of HCPs from Cardinal Health.

## VII.   CVS DISTRIBUTED ONLY TO CVS PHARMACIES

18. The CVS distribution centers at issue in this case distributed prescription drugs only to CVS pharmacies. CVS's corporate representative testified that these CVS distribution centers "have only distributed controlled substances to CVS pharmacies."[21] CVS discovery responses likewise indicate that CVS's distribution centers "did not distribute hydrocodone combination products [the only relevant prescription opioid shipped by CVS] to any pharmacies in Cuyahoga and Summit Counties other than the CVS CT1 pharmacies."[22]

19. To confirm this testimony, I analyzed the CVS distribution data to evaluate the recipients of shipments from CVS in Cuyahoga and Summit Counties. I reviewed the store numbers receiving shipments from CVS Distributors and found that all shipments from CVS were shipped to CVS pharmacies. A listing of these 85 stores is included in Exhibit 2A.[23] The total number of shipments to these stores is shown in Table 1, below.

---

[21] Deposition of Mark Vernazza, November 20, 2018, p. 56, line 10.
[22] CVS Indiana, L.L.C.'s and CVS RX Services, Inc.'s Amended Objections and Responses to Interrogatories No. 1-6, 8-10, 13, 15-18, 20-21 and 30 of Plaintiffs' First Set of Interrogatories, September 10, 2018, p .8.
[23] There are 69 CVS stores in the distribution data with shipments between 1/1/2006 and 9/30/2014.



| | | |
|---|---|---|
| 2012 | 17,142 | 0 |
| 2013 | | |
| 2014 | | |
| **Total** | | |



## VIII.  CVS NEVER DISTRIBUTED SCHEDULE II OPIOIDS, SUCH AS OXYCODONE, INTO CUYAHOGA AND SUMMIT COUNTIES

21. The DEA categorizes "drugs, substances, and certain chemical used to make drugs" into various schedules based, in part, on the potential for abusing the drug.[24] The Court has limited discovery in this case to "opioid products that are or ever were classified as Schedule II under the Controlled Substances Act."[25] The DEA defines Schedule II drugs as "drugs with a high potential for abuse, with use potentially leading to severe psychological or physical dependence."[26] Prescription opioids such as oxycodone and fentanyl are, and always have been, Schedule II controlled substances.

22. CVS's corporate representative testified that the CVS distribution centers at issue "are now, and have always been, only distributors of Schedule III through V controlled substances, and have never been distributors of Schedule II controlled substances."[27] Thomas Moffatt, Vice President, Assistant Secretary and Assistant General Counsel of CVS Health, who has worked at CVS for over 20 years, also testified that to his knowledge, CVS has never distributed a Schedule II drug.[28] Additionally, Mark Nicastro, Director of the Indianapolis CVS Distribution Center, testified in his deposition that CVS distribution centers "do not carry C-II's."[29]

23. Thomas Moffatt also testified that CVS's DEA registrations "are for Schedules III through V;"[30] and Ronald Link, former Senior VP of Logistics for CVS Pharmacy, and John Mortelliti, Director of Asset Protection Supply Chain for CVS Health, confirmed that Schedule II drugs shipped to CVS pharmacies were supplied from outside vendors.[31]

24. I confirmed this testimony by reviewing the shipments reported in the ARCOS data. As part of my analysis, I used the ARCOS data to evaluate the distributor information for prescription medication classified as Schedule II controlled substances by the DEA. ARCOS Data shows that after filtering the

---

[24] "Drugs, substances, and certain chemicals used to make drugs are classified into (5) distinct categories or schedules depending upon the drug's acceptable medical use and the drug's abuse or dependency potential. The abuse rate is a determinate factor in the scheduling of the drug." https://www.dea.gov/drug-scheduling.
[25] Discovery Ruling No. 2, Doc. No. 693 (June 30, 2018), p. 3.
[26] https://www.dea.gov/drug-scheduling.
[27] Deposition of Mark Vernazza, November 20, 2018, p. 56, line 5.
[28] Deposition of Thomas Moffatt, January 15, 2019, p. 37, line 24 - p. 38, line 2.
[29] Deposition of Mark Nicastro, December 6, 2018, p. 37, line 5.
[30] Deposition of Thomas Moffat, January 15, 2019, p. 39, line 4.
[31] Deposition of Ronald Link, December 11, 2018, p. 26, line 9 and p. 35, line 18; Deposition of John Mortelliti, January 23, 2019, p. 209, line 23.



transactions to shipments of Schedule II medication to Cuyahoga and Summit Counties, out of the 14 opioids[32] relevant to this matter there are no shipments of any Schedule II opioids by CVS distribution centers.

## IX. CVS DISTRIBUTED HYDROCODONE COMBINATION PRODUCTS ONLY WHEN THEY WERE CLASSIFIED AS SCHEDULE III AND CEASED DISTRIBUTING THEM WHEN THEY WERE RE-CLASSIFIED AS SCHEDULE II

25.  CVS shipment data and ARCOS data shows CVS shipped HCPs through September 2014. During this time, HCPs were classified as Schedule III controlled substances. According to the DEA, Schedule III drugs are "drugs with a moderate to low potential for physical and psychological dependence. Schedule III drugs abuse potential is less than Schedule I and Schedule II drugs."[33]

26. Effective October 6th, 2014,[34] the DEA rescheduled HCPs from Schedule III to Schedule II.[35] Because these products became Schedule II controlled substances on this date, they fall within the universe of prescription opioids subject to discovery in this case even though they were not classified as Schedule II controlled substances before then. "Hydrocodone Combination Products are the only products ever distributed by the CVS Distributors into Cuyahoga and Summit Counties that meet this definition."[36]

27. Notably, once the DEA rescheduled HCPs to Schedule II, CVS stopped distributing HCPs to its stores. CVS's corporate representative testified that "CVS ceased the distribution of hydrocodone combination products upon those products being upscheduled to Schedule II in October of 2014."[37] Additionally, CVS discovery responses reflect that "the CVS Distributors have not distributed hydrocodone combination products since they were reclassified as Schedule II on October 6, 2014."[38]

28. In addition to reviewing deposition testimony and discovery responses, I analyzed the CVS distribution data for shipments of HCPs to Cuyahoga and Summit Counties.[39] I found that CVS distribution centers did not ship HCPs after September 2014. This finding is consistent with the testimony referenced above. Chart 1, below, shows the percentage of all shipments of HCP packages

---

[32] Buprenorphine, Codeine, Dihydrocodeine, Fentanyl, Hydrocodone, Hydromorphone, Levorphanol, Meperidine, Methadone, Morphine, Opium (Powdered), Oxycodone, Oxymorphone, and Tapentadol.
[33] https://www.dea.gov/drug-scheduling.
[34] DEA Drug Scheduling Actions, https://www.deadiversion.usdoj.gov/schedules/.
[35] https://www.govinfo.gov/app/details/FR-2014-08-22/2014-19922.
[36] CVS Indiana, L.L.C.'s and CVS RX Services, Inc.'s Amended Objections and Responses to Interrogatories No. 1-6, 8-10, 13, 15-18, 20-21 and 30 of Plaintiffs' First Set of Interrogatories, September 10, 2018, p. 5.
[37] Deposition of Mark Vernazza, November 20, 2018, p. 20, line 2-5.
[38] CVS Indiana, L.L.C.'s and CVS RX Services, Inc.'s Amended Objections and Responses to Interrogatories No. 1-6, 8-10, 13, 15-18, 20-21 and 30 of Plaintiffs' First Set of Interrogatories, September 10, 2018, p. 5.
[39] The NDC number and drug name are redacted in the CVS Shipment Data for all drugs other than the prescription opioids at issue in this case, which for CVS is only HCPs.



from CVS distribution centers to pharmacies in Cuyahoga and Summit counties by year. As noted above, the only pharmacies to which CVS distribution centers shipped HCPs were CVS pharmacies.

**Chart 1: CVS Distribution Center Shipments of HCPs to CVS Pharmacies
in Cuyahoga and Summit Counties (CVS Distribution Data)**



29. I also evaluated CVS shipments reported in the ARCOS data[40] and found shipments of HCPs from CVS through September 2014, but no shipments after the DEA rescheduled HCPs to Schedule II in October 2014. Specifically, the ARCOS data reflects that CVS Indiana, L.L.C. last shipped an HCP on April 9, 2014 and CVS Rx Services, Inc. last shipped an HCP on September 24, 2014 into Cuyahoga and Summit counties.[41]

## X.   CVS DISTRIBUTED ███ OF PRESCRIPTION OPIOIDS INTO CUYAHOGA AND SUMMIT COUNTIES

30.  To determine CVS's share of prescription opioid distributions in Cuyahoga and Summit Counties, I compared the volume of prescription opioids distributed by CVS to the volume of prescription opioids shipped by all distributors. I focused my analysis to Discovery Ruling No. 2, which limited discovery to "opioid products that are or ever were classified as Schedule II under the Controlled Substances Act,"

---

[40] This analysis uses the filtered ARCOS data, as described in Section IV of this report.
[41] This is consistent with the last date in the CVS distribution data of September 24, 2014.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 17-md-2804 |
| This document relates to: | Judge Dan Aaron Polster |
| Case No. 17-OP-45004 (N.D. Ohio) | |
| THE COUNTY OF CUYAHOGA, OHIO, and STATE OF OHIO EX REL., PROSECUTING ATTORNEY OF CUYAHOGA COUNTY, MICHAEL C. O'MALLEY, | PLAINTIFFS THE COUNTY OF CUYAHOGA, OHIO AND THE STATE OF OHIO *EX REL.* PROSECUTING ATTORNEY OF CUYAHOGA COUNTY, MICHAEL C. O'MALLEY'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DISTRIBUTOR DEFENDANTS' INTERROGATORY NO. 18 PURSUANT TO THE COURT'S NOVEMBER 21, 2018 ORDER |
| Plaintiffs, | |
| vs. | |
| PURDUE PHARMA L.P., PURDUE PHARMA INC., THE PURDUE FREDERICK COMPANY, INC., ENDO HEALTH SOLUTIONS INC., ENDO PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC., NORAMCO, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, TEVA PHARMACEUTICAL INDUSTRIES LTD., TEVA PHARMACEUTICALS USA, INC., CEPHALON, INC., ALLERGAN PLC f/k/a ACTAVIS PLC, ALLERGAN FINANCE LLC, f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC., WATSON LABORATORIES, INC., ACTAVIS LLC, ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., INSYS THERAPEUTICS, INC., MALLINCKRODT PLC, MALLINCKRODT LLC, CARDINAL HEALTH, INC., McKESSON | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CORPORATION, AMERISOURCEBERGEN
CORPORATION, HEALTH MART
SYSTEMS, INC., H. D. SMITH, LLC d/b/a
HD SMITH, f/k/a H.D. SMITH
WHOLESALE DRUG CO., H. D. SMITH
HOLDINGS, LLC, H. D. SMITH HOLDING
COMPANY, CVS HEALTH
CORPORATION, WALGREENS BOOTS
ALLIANCE, INC. a/k/a WALGREEN CO.,
and WAL-MART INC. f/k/a WAL-MART
STORES, INC.,

                              Defendants.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case

Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232),

and the Court's November 21, 2018 Order, The County of Cuyahoga, Ohio and the State of Ohio

*Ex Rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley, ("Plaintiff") hereby

provides its second supplemental response and objections to Distributor Defendants' Interrogatory

No. 18 (the "Interrogatories" and, each individually, a "Interrogatory"), as follows:

## OBJECTIONS

The following objections apply to each Interrogatory. To the extent that certain specific

objections are cited in response to an individual Interrogatory, those specific objections are provided

because they are applicable to that specific Interrogatory and are not a waiver of the objections

applicable to information falling within the scope of such Interrogatory.

1.       Plaintiff objects to each Interrogatory to the extent they are overly broad, vague,

unduly burdensome, seeks information that is not relevant to any party's claim or defense, or seeks

to impose obligations or require actions beyond those required by the Rules of Civil Procedure, the

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ESI Protocol entered in this matter or the Local Rules of the United States District Court of the Northern District of Ohio.

2.      Plaintiff objects to each Interrogatory to the extent it seeks information restricted from dissemination pursuant to court order, statute, or regulation. Further, Plaintiff's responses to the Interrogatories are not intended to waive, and does not constitute any waiver of, any objection to the admissibility, authenticity, competency or relevance of the information identified.

3.      These responses are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained provided herein. All such objections and the grounds therefore are hereby reserved.

4.      The fact that any of the Interrogatories herein may have been answered should not be taken as an admission or a concession of the existence of any facts set forth or assumed by the Interrogatories, or that such answer constitutes evidence of any fact thus set forth or assumed.

5.      Plaintiff objects to each Request to the extent Plaintiff has not yet completed its investigation of the facts relating to this action and has not yet completed its preparation for trial. Accordingly, these responses are necessarily limited in nature, and reflect only that information known to Plaintiff at this time.

6.      Plaintiff objects to each Interrogatory to the extent they purport to require Plaintiff to provide information that is in the public domain or otherwise available to Defendants as easily from other sources as from Plaintiff.

7.      Plaintiff objects to each Interrogatory to the extent they purport to state facts, assumptions, or characterizations that are disputed.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

8.      Plaintiff objects to each Interrogatory to the extent they seek information more appropriately obtained through other methods of discovery.

9.      Plaintiff objects to each Interrogatory to the extent that they seek information that is proprietary or confidential or that is protected from discovery as attorney work product and attorney-client communication, information gathered or prepared in anticipation of litigation, the public interest privilege, law enforcement privilege, public official privilege, and/or by any other privilege or immunity from disclosure (collectively, "Privileged Information").

10.      Plaintiff objects to each Interrogatory to the extent they seek confidential investigative, personal, or health information in Plaintiff's possession, custody, or control (collectively, "Confidential Information").

11.      Whenever in the responses Plaintiff employs the phrase "subject to and without waiving all objections," Plaintiff is responding to the Interrogatory as it may be narrowed by its objections and without waiver of any objection.

12.      Any response stating that Plaintiff will produce information shall be deemed followed by the phrase "as are within Plaintiff's possession, custody, or control."

13.      Plaintiff objects to each Interrogatory to the extent that they imply the existence of facts or circumstances that do not or did not exist, and to the extent that it states or assumes legal conclusions.  In providing these objections and responses, Plaintiff does not admit the factual or legal premise of any Interrogatory.

14.      Plaintiff objects to each Interrogatory to the extent they seek information that is not within Plaintiff's possession, custody, or control, seek documents that do not already exist, or which purport to require a response by Plaintiff on behalf of an entity or individual other than Plaintiff.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

15.     Plaintiff reserves the right to supplement, revise, correct, or clarify its responses and objections in the event that additional information becomes available.

16.     Plaintiff intends to complete its production by the time agreed upon by the parties for the completion of discovery, or by the date ordered by the Court. Upon request by the requesting party, Plaintiff is willing to meet and confer regarding its responses to the Interrogatories. All final decisions regarding whether any information will be withheld pursuant to any objection shall be made, and notice thereof provided, before the completion of written discovery.

## NON-WAIVER

1.     Plaintiff's responses are made without waiving its right to object (on the grounds of relevancy, hearsay, materiality, competency or any other ground) to the use of its responses in any subsequent stage or proceeding in this Action or any other action.

2.     If Plaintiff, in response to any Interrogatory, inadvertently produces information that is or could be the subject of objections stated herein, such information is not intended to be, nor is it deemed to be, a waiver of the objections with respect to such information produced or withheld.

3.     Plaintiff's failure to object to a specific Interrogatory on a particular ground or grounds shall not be construed as a waiver of its rights to object on any additional grounds.

4.     Plaintiff responds herein based upon information it has been reasonably able to gather at the time of making these responses.  Plaintiff reserves its right to amend and/or to supplement its objections and responses to the Interrogatories, consistent with further investigation and discovery.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## SPECIFIC RESPONSES AND OBJECTIONS

### Interrogatory No. 18:

Specify each category of injury (e.g. increased cost of law enforcement, fire, emergency services, etc.) for which You claim damages in the Litigation and provide a computation of damages for each category of injury alleged. For each category of injury, identify all Persons with knowledge about such damages.

### Response to Interrogatory No. 18:

Plaintiff renews its objections to responding to this interrogatory for the reasons laid out its previous responses and objections. Defendants also demand Plaintiff to respond to this interrogatory without an adequate record and/or the benefit of expert witness testimony. In addition, Pursuant to Federal Rule of Civil Procedure 33(d), this question can be answered, to the extent practicable, from business records already produced to Defendants or within Defendants' custody and control. *See* attached list as Exhibit 1.

Nonetheless, Plaintiff will comply with the Court's November 21, 2018 Order (*see* Dkt. No. 1147) in good faith and with the limitations laid out above and below.

The relevant interrogatory constitutes contention interrogatories. "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims. *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, fn. 2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999).  To be clear, it is the position of the Plaintiff that the answer to this contention interrogatory does not, consistent with Discovery Ruling 7, limit Plaintiff's experts from using different criteria or a different methodology to compute damages.

Plaintiff also objects to this interrogatory as vague, overly broad, and unduly burdensome to the extent it requests "each category of injury alleged" and also incorporates herein the objections stated

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in the briefing on the subject motion to compel. Plaintiff also objects to this interrogatory to the extent that it calls for disclosure of Privileged and Confidential Information. Plaintiff further objects that this interrogatory seeks information beyond its possession, custody, and control.

Plaintiff also objects to this interrogatory as calling for an expert opinion that will be the subject of a fully-supported and detailed expert opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Subject to and without waiving all objections, for purposes of responding to this contention interrogatory, Plaintiff incorporates the factual allegations in the Corrected Second Amended Complaint and its prior response to this interrogatory.

Plaintiff seeks, *inter alia*, damages in the amounts as set forth below, which reflect both past damages from at least 2006 to present, and ongoing damages for at least 10 years.[1] Plaintiff's investigation of both its past and ongoing costs, expenditures, damages, losses or harms caused by Defendants is ongoing and Plaintiff reserves the right to revise, supplement, and amend these amounts by the expert disclosure deadline. As the Court noted at the status hearing of November 20, 2018, this response represents the Plaintiff's estimate *at this point in time*.

Plaintiff's computation, based on Plaintiff's preliminary review of its records and is an estimate as of Plaintiff's damages as of the date of this response, is provided in Exhibit 2.[2] In addition to the damages identified in Exhibit 2, Plaintiff also seeks the following:

- Past and ongoing loss tax revenue in the amount of approximately $850 million.

---

[1] Plaintiff's computation does not include any financial expenditures related to injunctive relief sought in Plaintiff's Complaint.

[2] Exhibit 2 may not reflect grant money or other third-party revenue sources that Plaintiff could potentially recover from Defendants.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Treble damages pursuant to Plaintiff's federal Racketeer Influenced and Corrupt Organizations ("RICO") Act claim.

- Reasonable attorneys' fees and costs as permitted by law.

- The maximum amount of punitive damages that is constitutionally permissible in this case as determined by the trier of fact.

- Recovery of costs imposed on it by Defendants' conduct, along with disgorgement of profits, under unjust enrichment theories. The costs borne by Plaintiff are past damages described above. Plaintiff, however, does not include in this Answer an estimate for disgorgement of profits, which is not "damages."  Moreover, estimating Defendants' profits to be disgorged would require financial information not yet produced, or fully produced, by Defendants, and upon expert analysis, and therefore cannot be provided at this time.

- All applicable statutory pre and post-judgment interest to the fullest extent permissible by state and federal law.

- In addition to, and distinct from, "damages," Plaintiff continues to investigate and determine the scope of equitable relief they are entitled to under applicable causes of action, including abatement. That is not the subject of this Interrogatory but it is anticipated to include at a minimum the following categories of programs and services:

  o Increased availability of Medication Assisted Treatment (MAT)

  o Expansion and improvement of treatment facilities to address Opioid Use Disorder (OUD)

  o Expansion and improvement of access to treatment for individuals with OUD

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- o Expansion and improvement of opioid-related treatment in jails

- o Expansion and improvement of opioid-related treatment for adolescents

- o Expansion and improvement of opioid-related treatment for pregnant mothers

- o Expansion and improvement of opioid-related support for employment

- o Expansion and improvement of access to housing for individuals with OUD

- o Increased availability for naloxone/narcan

- o Increased availability for Needle Exchanges

- o Expansion and improvement of Hep C/HIV interventions

- o Expansion and improvement of opioid-related media campaigns

- o Expansion and improvement of opioid-related school-based prevention programs

- o Expansion and improvement of opioid-related law enforcement interventions

- o Expansion and improvement of opioid-related drug disposal programs

- o Expansion and improvement of opioid-related medical provider education

- o Expansion and improvement of surveillance of opioid use

- o Expansion and improvement of opioid-related data-informed systems

- o Expansion and improvement of opioid-related court-system resources

- Restrictions on the marketing and promotion of opioids.

To the extent Plaintiff is seeking future damages as set forth above, various components and subparts may either overlap, be a component part of, or be incidental to the equitable remedy sought as part of a comprehensive abatement plan should the Court enter such a plan, including the provision of funds necessary to implement the abatement plan.

Additionally, Plaintiff identifies the following persons with knowledge of such damages:

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Walter Parfejewiec

- Dr. Thomas Gilson

- Melinda Burt

- Captain Donald Gerome

- Vince Caraffi

- Maggie Keenan

- David Merriman

- Hugh Shannon

- Cynthia Weiskittel

- Holly Woods

- Matt Carroll

- Rebekah Dorman

- Ruth Gillette

- Brandy Carney

- Wendy Feinn

- Christopher Cabot

- Patricia Cooney

- Molly Leckler

- Martin Murphy

- Brian Ely

- Shannon Gray

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- Ken Mills

- Deborah Watkins

- Scott Osiecki

- Terry Allan

Plaintiff also refers Defendants to persons identified in its response to Distributor Defendants' Interrogatory No. 12.

Discovery into these topics is ongoing and will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Plaintiff reserves the right to supplement and amend this response upon further investigation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated: November 30, 2018

Respectfully submitted,
Plevin & Gallucci

*/s Frank Gallucci*
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804

Napoli Shkolnik PLLC

*/s Hunter J. Shkolnik*
Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

Scott Elliot Smith L.P.A.

*/s Scott Elliot Smith*
Scott Elliot Smith (0003749)
5003 Horizons Dr., Suite 200
Columbus, Ohio 43220
Phone: (614) 846-1700
ses@sestriallaw.com
Thrasher Dinsmore & Dolan L.P.A.

*/s Leo M. Spellacy, Jr.*
Leo M. Spellacy, Jr. (0067304)
1111 Superior Avenue
Suite 412
Cleveland, Ohio 44114
Phone: (216) 255-5450

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

<u>**CERTIFICATE OF SERVICE**</u>

I, Salvatore C. Badala, certify that on this 30th day of November 2018, I caused the foregoing to be served via electronic mail on Defendant's Liaison Counsel pursuant to the Case Management Order. *See* Dkt. No. 232.

<u>*s/ Salvatore C. Badala*</u>

13

# Exhibit 1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000000001- CUYAH_000000064

CUYAH_000000065 - CUYAH_000000132

CUYAH_000000133 - CUYAH_000000199

CUYAH_000000200 - CUYAH_000000718

CUYAH_000000719 - CUYAH_000000747

CUYAH_000000748 - CUYAH_000000819

CUYAH_000000820 - CUYAH_000001135

CUYAH_000001136 - CUYAH_000001646

CUYAH_000001647 - CUYAH_000001730

CUYAH_000001731 - CUYAH_000001811

CUYAH_012341077 - CUYAH_012341077

CUYAH_000001812 - CUYAH_000001874

CUYAH_000001875 - CUYAH_000001931

CUYAH_000001932 - CUYAH_000002439

CUYAH_000002440 - CUYAH_000002502

CUYAH_000002503 - CUYAH_000002563

CUYAH_000002564 - CUYAH_000003072

CUYAH_000003073 - CUYAH_000003099

CUYAH_000003100 - CUYAH_000003172

CUYAH_000000200 - CUYAH_000000718

CUYAH_000001136 - CUYAH_000001646

CUYAH_000018178 - CUYAH_000018178

CUYAH_001714366 - CUYAH_001714366

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_001714459 - CUYAH_001714459

CUYAH_000001932 - CUYAH_000002439

CUYAH_000002564 - CUYAH_000003072

CUYAH_000003509 - CUYAH_000004006

CUYAH_000005740 - CUYAH_000006329

CUYAH_000008003 - CUYAH_000008640

CUYAH_000009614 - CUYAH_000009831

CUYAH_000003173 - CUYAH_000003436

CUYAH_012341077 - CUYAH_012341077

CUYAH_000003437 - CUYAH_000003508

CUYAH_000003509 - CUYAH_000004006

CUYAH_000004007 - CUYAH_000004036

CUYAH_000004037 - CUYAH_000004294

CUYAH_000004295 - CUYAH_000004374

CUYAH_000004375 - CUYAH_000004523

CUYAH_000004524 - CUYAH_000004552

CUYAH_000004553 - CUYAH_000004798

CUYAH_000004799 - CUYAH_000004968

CUYAH_000004969 - CUYAH_000005145

CUYAH_000005146 - CUYAH_000005327

CUYAH_000005328 - CUYAH_000005496

CUYAH_000005497 - CUYAH_000005739

CUYAH_000005740 - CUYAH_000006329

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000006330 - CUYAH_000006573

CUYAH_000006574 - CUYAH_000006844

CUYAH_000006845 - CUYAH_000006986

CUYAH_000006987 - CUYAH_000007216

CUYAH_000007217 - CUYAH_000007427

CUYAH_000007428 - CUYAH_000007466

CUYAH_000007467 - CUYAH_000007687

CUYAH_000007688 - CUYAH_000007711

CUYAH_000007712 - CUYAH_000007929

CUYAH_000007930 - CUYAH_000008002

CUYAH_000013813 - CUYAH_000013817

CUYAH_000012445 - CUYAH_000012456

CUYAH_000012457 - CUYAH_000012480

CUYAH_000012409 - CUYAH_000012420

CUYAH_000012445 - CUYAH_000012456

CUYAH_000012457 - CUYAH_000012480

CUYAH_000012529 - CUYAH_000012544

CUYAH_000012545 - CUYAH_000012560

CUYAH_000012561 - CUYAH_000012576

CUYAH_000012577 - CUYAH_000012592

CUYAH_000012481 - CUYAH_000012496

CUYAH_000012497 - CUYAH_000012512

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000012513 - CUYAH_000012528

CUYAH_000008003 - CUYAH_000008640

CUYAH_000008641 - CUYAH_000008680

CUYAH_000008681 - CUYAH_000008907

CUYAH_000008908 - CUYAH_000009206

CUYAH_000009207 - CUYAH_000009269

CUYAH_000009270 - CUYAH_000009290

CUYAH_000009291 - CUYAH_000009316

CUYAH_000009317 - CUYAH_000009326

CUYAH_000009327 - CUYAH_000009345

CUYAH_000009346 - CUYAH_000009367

CUYAH_000009368 - CUYAH_000009613

CUYAH_000009614 - CUYAH_000009831

CUYAH_000010261 - CUYAH_000010288

CUYAH_000012351 - CUYAH_000014730

CUYAH_000010320 - CUYAH_000010329

CUYAH_000010330 - CUYAH_000010367

CUYAH_000010368 - CUYAH_000010423

CUYAH_000010424 - CUYAH_000010826

CUYAH_000010827 - CUYAH_000010845

CUYAH_000010846 - CUYAH_000010896

CUYAH_000010897 - CUYAH_000010909

CUYAH_000010910 - CUYAH_000011080

CUYAH_000011081 - CUYAH_000011251

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000011252 - CUYAH_000011262

CUYAH_000011263 - CUYAH_000011318

CUYAH_000011319 - CUYAH_000011347

CUYAH_000017939 - CUYAH_000018600

CUYAH_000011403 - CUYAH_000011443

CUYAH_000011444 - CUYAH_000011492

CUYAH_000011493 - CUYAH_000011525

CUYAH_000011526 - CUYAH_000011570

CUYAH_000011596 - CUYAH_000011615

CUYAH_000011616 - CUYAH_000011623

CUYAH_000011642 - CUYAH_000011797

CUYAH_000011799 - CUYAH_000011884

CUYAH_000011885 - CUYAH_000011982

CUYAH_000011997 - CUYAH_000012044

CUYAH_000012351 - CUYAH_000012362

CUYAH_000012363 - CUYAH_000012370

CUYAH_000012371 - CUYAH_000012382

CUYAH_000012383 - CUYAH_000012396

CUYAH_000012397 - CUYAH_000012408

CUYAH_000012409 - CUYAH_000012420

CUYAH_000012421 - CUYAH_000012432

CUYAH_000012433 - CUYAH_000012444

CUYAH_000012445 - CUYAH_000012456

CUYAH_000012457 - CUYAH_000012480

CUYAH_000012481 - CUYAH_000012496

CUYAH_000012497 - CUYAH_000012512

CUYAH_000012513 - CUYAH_000012528

CUYAH_000012529 - CUYAH_000012544

CUYAH_000012545 - CUYAH_000012560

CUYAH_000012561 - CUYAH_000012576

CUYAH_000012577 - CUYAH_000012592

CUYAH_000012593 - CUYAH_000012594

CUYAH_000012595 - CUYAH_000012943

CUYAH_000013464 - CUYAH_000013479

CUYAH_000013806 - CUYAH_000013812

CUYAH_000013813 - CUYAH_000013817

CUYAH_000013818 - CUYAH_000013820

CUYAH_000018030 - CUYAH_000018037

CUYAH_000018038 - CUYAH_000018066

CUYAH_000018067 - CUYAH_000018072

CUYAH_000018073 - CUYAH_000018075

CUYAH_000018076 - CUYAH_000018078

CUYAH_000018079 - CUYAH_000018115

CUYAH_000018116 - CUYAH_000018118

CUYAH_000018119 - CUYAH_000018141

CUYAH_000018142 - CUYAH_000018154

CUYAH_000018155 - CUYAH_000018161

CUYAH_000018162 - CUYAH_000018174

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000018175 - CUYAH_000018177

CUYAH_000018178 - CUYAH_000018178

CUYAH_000018179 - CUYAH_000018179

CUYAH_000018180 - CUYAH_000018199

CUYAH_000018200 - CUYAH_000018219

CUYAH_000018220 - CUYAH_000018232

CUYAH_000018233 - CUYAH_000018248

CUYAH_000018249 - CUYAH_000018264

CUYAH_000018265 - CUYAH_000018277

CUYAH_000018278 - CUYAH_000018281

CUYAH_000018282 - CUYAH_000018294

CUYAH_000018295 - CUYAH_000018322

CUYAH_000018323 - CUYAH_000018327

CUYAH_000018328 - CUYAH_000018355

CUYAH_000018356 - CUYAH_000018360

CUYAH_000018361 - CUYAH_000018488

CUYAH_000018489 - CUYAH_000018509

CUYAH_000018510 - CUYAH_000018533

CUYAH_012341075 - CUYAH_012341076

CUYAH_000018534 - CUYAH_000018549

CUYAH_000018550 - CUYAH_000018577

CUYAH_000018578 - CUYAH_000018582

CUYAH_000097414 - CUYAH_000097414

CUYAH_000018613 - CUYAH_000018627

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CUYAH_000018676 - CUYAH_000018726

CUYAH_000020380 - CUYAH_000020439

Exhibit 2

## Cuyahoga ($ Millions)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Divisions | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ADAMHS Board | $16.0 | $12.0 | $10.0 | $10.0 | $8.0 | $8.0 | $6.0 | $6.0 | $6.0 | $6.0 | $6.0 | $6.0 | $100.0 |
| Children and Family Services | $23.0 | $23.0 | $23.0 | $23.0 | $23.0 | $18.0 | $16.0 | $15.0 | $15.0 | $15.0 | $14.0 | $11.0 | $219.0 |
| Prosecutor | $5.0 | $5.0 | $5.0 | $5.0 | $4.0 | $4.0 | $4.0 | $4.0 | $4.0 | $4.0 | $3.0 | $3.0 | $50.0 |
| Public Defender | $4.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $37.0 |
| Court of Common Pleas | $4.0 | $3.0 | $3.0 | $3.0 | $3.0 | $3.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $32.0 |
| Juvenile Court | $2.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $13.0 |
| Sheriff (Sheriff Only) | $3.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $2.0 | $1.0 | $1.0 | $1.0 | $1.0 | $21.0 |
| Sheriff (Jail Only) | $8.0 | $7.0 | $7.0 | $7.0 | $7.0 | $7.0 | $7.0 | $6.0 | $6.0 | $5.0 | $5.0 | $5.0 | $77.0 |
| Medical Examiner | $4.0 | $4.0 | $2.0 | $2.0 | $2.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $1.0 | $21.0 |
| Department Related Costs (Past) | $69.0 | $60.0 | $56.0 | $56.0 | $53.0 | $47.0 | $42.0 | $41.0 | $39.0 | $38.0 | $36.0 | $33.0 | $570.0 |

| | 2027 | 2026 | 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Department Related Costs (Ongoing) | $100.0 | $99.0 | $98.0 | $97.0 | $96.0 | $95.0 | $94.0 | $93.0 | $92.0 | $91.0 | $955.0 |

**Total Department Related Costs (Past & Ongoing)**   **$1,525.0**

## <u>VERIFICATION</u>

I, Joseph W. Boatwright, IV, declare:

I am Chief Corporate Counsel for the County of Cuyahoga, Ohio. I am authorized to make this verification on behalf of the Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley (together, "Plaintiff").

The foregoing Plaintiff's Second Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 represents a municipal corporate response, based on information, in part, assembled by Plaintiff's employees and/or representatives. Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual. Subject to these limitations, the information contained in the foregoing response is, to the best of Plaintiff's knowledge, true and correct. Plaintiff reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Cuyahoga, Ohio on this 30th day of November, 2018.

_____
Joseph W. Boatwright, IV

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**SUMMIT COUNTY, OHIO PLAINTIFF'S
SECOND SUPPLEMENTAL RESPONSE AND OBJECTIONS TO
DISTRIBUTOR DEFENDANTS' INTERROGATORY NO. 18
<u>PURSUANT TO THE COURT'S NOVEMBER 21, 2018 ORDER</u>**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232), and the Court's November 21, 2018 Order, the County of Summit, Ohio ("Plaintiff") hereby provides its second supplemental response and objections to Distributor Defendants' Interrogatory No. 18 (the "Interrogatories" and, each individually, a "Interrogatory"), as follows:

## <u>OBJECTIONS</u>

The following objections apply to each Interrogatory. To the extent that certain specific objections are cited in response to an individual Interrogatory, those specific objections are provided because they are applicable to that specific Interrogatory and are not a waiver of the objections applicable to information falling within the scope of such Interrogatory.

1.      Plaintiff objects to each Interrogatory to the extent they are overly broad, vague, unduly burdensome, seeks information that is not relevant to any party's claim or defense, or seeks to impose obligations or require actions beyond those required by the Rules of Civil Procedure, the ESI

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Protocol entered in this matter or the Local Rules of the United States District Court of the Northern District of Ohio.

2.      Plaintiff objects to each Interrogatory to the extent it seeks information restricted from dissemination pursuant to court order, statute, or regulation. Further, Plaintiff's responses to the Interrogatories are not intended to waive, and does not constitute any waiver of, any objection to the admissibility, authenticity, competency or relevance of the information identified.

3.      These responses are made solely for the purpose of and in relation to this action. Each answer is given subject to all appropriate objections, which would require the exclusion at trial of any statement contained provided herein. All such objections and the grounds therefore are hereby reserved.

4.      The fact that any of the Interrogatories herein may have been answered should not be taken as an admission or a concession of the existence of any facts set forth or assumed by the Interrogatories, or that such answer constitutes evidence of any fact thus set forth or assumed.

5.      Plaintiff objects to each Request to the extent Plaintiff has not yet completed its investigation of the facts relating to this action and has not yet completed its preparation for trial. Accordingly, these responses are necessarily limited in nature, and reflect only that information known to Plaintiff at this time.

6.      Plaintiff objects to each Interrogatory to the extent they purport to require Plaintiff to provide information that is in the public domain or otherwise available to Defendants as easily from other sources as from Plaintiff.

7.      Plaintiff objects to each Interrogatory to the extent they purport to state facts, assumptions, or characterizations that are disputed.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

8.      Plaintiff objects to each Interrogatory to the extent they seek information more appropriately obtained through other methods of discovery.

9.      Plaintiff objects to each Interrogatory to the extent that they seek information that is proprietary or confidential or that is protected from discovery as attorney work product and attorney-client communication, information gathered or prepared in anticipation of litigation, the public interest privilege, law enforcement privilege, public official privilege, and/or by any other privilege or immunity from disclosure (collectively, "Privileged Information").

10.     Plaintiff objects to each Interrogatory to the extent they seek confidential investigative, personal, or health information in Plaintiff's possession, custody, or control (collectively, "Confidential Information").

11.     Whenever in the responses Plaintiff employs the phrase "subject to and without waiving all objections," Plaintiff is responding to the Interrogatory as it may be narrowed by its objections and without waiver of any objection.

12.     Any response stating that Plaintiff will produce information shall be deemed followed by the phrase "as are within Plaintiff's possession, custody, or control."

13.     Plaintiff objects to each Interrogatory to the extent that they imply the existence of facts or circumstances that do not or did not exist, and to the extent that it states or assumes legal conclusions.  In providing these objections and responses, Plaintiff does not admit the factual or legal premise of any Interrogatory.

14.     Plaintiff objects to each Interrogatory to the extent they seek information that is not within Plaintiff's possession, custody, or control, seek documents that do not already exist, or which purport to require a response by Plaintiff on behalf of an entity or individual other than Plaintiff.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

15.     Plaintiff reserves the right to supplement, revise, correct, or clarify its responses and objections in the event that additional information becomes available.

16.     Plaintiff intends to complete its production by the time agreed upon by the parties for the completion of discovery, or by the date ordered by the Court. Upon request by the requesting party, Plaintiff is willing to meet and confer regarding its responses to the Interrogatories. All final decisions regarding whether any information will be withheld pursuant to any objection shall be made, and notice thereof provided, before the completion of written discovery.

## NON-WAIVER

1.     Plaintiff's responses are made without waiving its right to object (on the grounds of relevancy, hearsay, materiality, competency or any other ground) to the use of its responses in any subsequent stage or proceeding in this Action or any other action.

2.     If Plaintiff, in response to any Interrogatory, inadvertently produces information that is or could be the subject of objections stated herein, such information is not intended to be, nor is it deemed to be, a waiver of the objections with respect to such information produced or withheld.

3.     Plaintiff's failure to object to a specific Interrogatory on a particular ground or grounds shall not be construed as a waiver of its rights to object on any additional grounds.

4.     Plaintiff responds herein based upon information it has been reasonably able to gather at the time of making these responses.  Plaintiff reserves its right to amend and/or to supplement its objections and responses to the Interrogatories, consistent with further investigation and discovery.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## SPECIFIC RESPONSES AND OBJECTIONS

**Interrogatory No. 18:**

Specify each category of injury (e.g. increased cost of law enforcement, fire, emergency services, etc.) for which You claim damages in the Litigation and provide a computation of damages for each category of injury alleged.  For each category of injury, identify all Persons with knowledge about such damages.

**Response to Interrogatory No. 18:**

Plaintiff renews its objections to responding to this interrogatory for the reasons laid out its previous responses and objections. Defendants also demand Plaintiff to respond to this interrogatory without an adequate record and/or the benefit of expert witness testimony.  In addition, Pursuant to Federal Rule of Civil Procedure 33(d), this question can be answered, to the extent practicable, from business records already produced to Defendants or within Defendants' custody and control.  See attached list as Exhibit 1.

Nonetheless, Plaintiff will comply with the Court's November 21, 2018 (*see* Dkt. No. 1147) in good faith and with the limitations laid out above and below.

The relevant interrogatory constitutes contention interrogatories.  "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims.  *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, fn. 2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999).  To be clear, it is the position of the Plaintiff that the answer to this contention interrogatory does not, consistent with Discovery Ruling 7, limit Plaintiff's experts from using different criteria or a different methodology to compute damages.

Plaintiff also objects to this interrogatory as vague, overly broad, and unduly burdensome to the extent it requests "each category of injury alleged" and also incorporates herein the objections

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

stated in the briefing on the subject motion to compel.  Plaintiff also objects to this interrogatory to the extent that it calls for disclosure of Privileged and Confidential Information.  Plaintiff further objects that this interrogatory seeks information beyond its possession, custody, and control.

Plaintiff also objects to this interrogatory as calling for an expert opinion that will be the subject of a fully-supported and detailed expert opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Subject to and without waiving all objections, for purposes of responding to this contention interrogatory, Plaintiff incorporates the factual allegations in the Corrected Second Amended Complaint and its prior responses to this interrogatory.

Plaintiff seeks, *inter alia*, damages in the amounts as set forth below, which reflect both past damages from at least 2006 to present, and future damages for at least 10 years.[1]  Plaintiff's investigation of both its past and future costs, expenditures, damages, losses or harms caused by Defendants is ongoing and Plaintiff reserves the right to revise, supplement, and amend these amounts by the expert disclosure deadline.  As the Court noted at the status hearing of November 20, 2018, this response represents the Plaintiff's estimate *at this point in time*.

Plaintiff's computation, based on Plaintiff's preliminary review of its records and an estimate of Plaintiff's damages as of the date of this response, is provided in Exhibit 2.[2]  In addition to the damages identified in Exhibit 2, Plaintiff also seeks the following:

- Past and ongoing lost tax revenue in the amount of approximately $734 million.

---

[1] Plaintiff's computation does not include any financial expenditures related to injunctive relief sought in Plaintiff's Complaint.

[2] Exhibit 2 may not reflect grant money or other third-party revenue sources that Plaintiff could potentially recover from Defendants.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Treble damages pursuant to Plaintiff's federal Racketeer Influenced and Corrupt Organizations ("RICO") Act claim.

- Reasonable attorneys' fees and costs as permitted by law.

- The maximum amount of punitive damages that is constitutionally permissible in this case as determined by the trier of fact.

- Recovery of costs imposed on it by Defendants' conduct, along with disgorgement of profits, under unjust enrichment theories.  The costs borne by Plaintiff are past damages described above.  Plaintiff, however, does not include in this Answer an estimate for disgorgement of profits, which is not "damages."  Moreover, estimating Defendants' profits to be disgorged would require financial information not yet produced, or fully produced, by Defendants, and upon expert analysis, and therefore cannot be provided at this time.

- All applicable statutory pre and post-judgment interest to the fullest extent permissible by state and federal law.

- In addition to, and distinct from, "damages," Plaintiff continues to investigate and determine the scope of equitable relief they are entitled to under applicable causes of action, including abatement.  That is not the subject of this interrogatory but it is anticipated to include at a minimum the following categories of programs and services:

  o Increased availability of Medication Assisted Treatment (MAT)

  o Expansion and improvement of treatment facilities to address Opioid Use Disorder (OUD)

  o Expansion and improvement of access to treatment for individuals with OUD

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- o Expansion and improvement of opioid-related treatment in jails

- o Expansion and improvement of opioid-related treatment for adolescents

- o Expansion and improvement of opioid-related treatment for pregnant mothers

- o Expansion and improvement of opioid-related support for employment

- o Expansion and improvement of access to housing for individuals with OUD

- o Increased availability for naloxone/Narcan

- o Increased availability for Needle Exchanges

- o Expansion and improvement of Hep C/HIV interventions

- o Expansion and improvement of opioid-related media campaigns

- o Expansion and improvement of opioid-related school-based prevention programs

- o Expansion and improvement of opioid-related law enforcement interventions

- o Expansion and improvement of opioid-related drug disposal programs

- o Expansion and improvement of opioid-related medical provider education

- o Expansion and improvement of surveillance of opioid use

- o Expansion and improvement of opioid-related data-informed systems

- o Expansion and improvement of opioid-related court-system resources

- Restrictions on the marketing and promotion of opioids.

To the extent Plaintiff is seeking future damages as set forth above, various components and subparts may either overlap, be a component part of, or be incidental to the equitable remedy sought as part of a comprehensive abatement plan should the Court enter such a plan, including the provision of funds necessary to implement the abatement plan.

Additionally, Plaintiff identifies the following persons with knowledge of such damages:

8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Brian Nelsen
- Darin Kearns
- Gerald Craig
- Shane Barker
- Jennifer Peveich
- Angela Burgess

Plaintiff also refers Defendants to persons identified in its response to Distributor Defendants' Interrogatory No. 12.

Discovery into these topics is ongoing and will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Plaintiff reserves the right to supplement and amend this response upon further investigation.


Dated:  November 30, 2018

*/s/  Linda Singer*
Linda Singer
Joseph F. Rice
Jodi Westbrook Flowers
Anne McGinness Kearse
David I. Ackerman
Jeffrey C. Nelson
Motley Rice LLC
401 9th Street NW, Suite 1001
Washington, DC 20004
Tel: (202) 232-5504

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>**CERTIFICATE OF SERVICE**</u>

I, Richard Cashon, certify that on this 30th day of November 2018, I caused the foregoing to be served via electronic mail on Defendant's Liaison Counsel pursuant to the Case Management Order. *See* Dkt. No. 232.

<u>*s/ Richard Cashon*</u>

# EXHIBIT 1

SUMMIT_000000207
SUMMIT_000001199
SUMMIT_000001329
SUMMIT_000001461
SUMMIT_000001605
SUMMIT_000001728
SUMMIT_000002310
SUMMIT_000002922
SUMMIT_000003930
SUMMIT_000003942
SUMMIT_000003954
SUMMIT_000003958
SUMMIT_000004014
SUMMIT_000004070
SUMMIT_000004126
SUMMIT_000004182
SUMMIT_000004234
SUMMIT_000004286
SUMMIT_000004353
SUMMIT_000004576
SUMMIT_000005545
SUMMIT_000005697
SUMMIT_000006502
SUMMIT_000006663
SUMMIT_000007551
SUMMIT_000008414
SUMMIT_000009742
SUMMIT_000010324
SUMMIT_000010936
SUMMIT_000011824
SUMMIT_000012888
SUMMIT_000012894
SUMMIT_000012901
SUMMIT_000012907
SUMMIT_000012912
SUMMIT_000012941
SUMMIT_000012943
SUMMIT_000012948
SUMMIT_000012954
SUMMIT_000012978
SUMMIT_000013002
SUMMIT_000013022
SUMMIT_000013026
SUMMIT_000013055

SUMMIT_000013061
SUMMIT_000013075
SUMMIT_000013081
SUMMIT_000013087
SUMMIT_000013095
SUMMIT_000013115
SUMMIT_000013123
SUMMIT_000013128
SUMMIT_000013135
SUMMIT_000013142
SUMMIT_000013440
SUMMIT_000013551
SUMMIT_000013575
SUMMIT_000013699
SUMMIT_000013877
SUMMIT_000014002
SUMMIT_000014151
SUMMIT_000014772
SUMMIT_000015385
SUMMIT_000015990
SUMMIT_000017896
SUMMIT_000018430
SUMMIT_000018440
SUMMIT_000018601
SUMMIT_000018676
SUMMIT_000018966
SUMMIT_000019112
SUMMIT_000019258
SUMMIT_000019388
SUMMIT_000019490
SUMMIT_000019580
SUMMIT_000019668
SUMMIT_000022439
SUMMIT_000022510
SUMMIT_000022583
SUMMIT_000022656
SUMMIT_000022730
SUMMIT_000028305
SUMMIT_000042884
SUMMIT_000047408
SUMMIT_000070610
SUMMIT_000087427
SUMMIT_000087479
SUMMIT_000111080

SUMMIT_000111088
SUMMIT_000111100
SUMMIT_000111332
SUMMIT_000111364
SUMMIT_000111417
SUMMIT_000111475
SUMMIT_000111606
SUMMIT_000111607
SUMMIT_000111608
SUMMIT_000111609
SUMMIT_000111610
SUMMIT_000111611
SUMMIT_000111612
SUMMIT_000111613
SUMMIT_000111614
SUMMIT_000111615
SUMMIT_000115686
SUMMIT_000182167
SUMMIT_000290130
SUMMIT_000982362
SUMMIT_000990286
SUMMIT_001026964
SUMMIT_001054571
SUMMIT_001084697
SUMMIT_001128330
SUMMIT_001146952
SUMMIT_001443862
SUMMIT_001520049
SUMMIT_001520072
SUMMIT_001520096
SUMMIT_001520120
SUMMIT_001520146
SUMMIT_001520172
SUMMIT_001520200
SUMMIT_001520232
SUMMIT_001520256
SUMMIT_001520288
SUMMIT_001547433
SUMMIT_001874477
SUMMIT_001874511
SUMMIT_001952975
SUMMIT_001952976

Bureau of Justice Statistics - Prisoner Statistics;
https://www.bjs.gov/index.cfm?ty=dcdetail&iid=269

US Department of Justice, National Drug Intelligence Center, "The Economic Impact of
Illicit Drug Use on American Society" (2011), Table 1.7;
https://www.justice.gov/archive/ndic/pubs44/44731/44731p.pdf

National Survey on Drug Use and Health (NSDUH); http://pdas.samhsa.gov/#/

FBI Uniform Crime Reporting Program, National Incident-Based Reporting System
(NIBRS), Summit Data; https://ucr.fbi.gov/nibrs-overview

National Survey on Drug Use and Health (NSDUH);
https://www.samhsa.gov/data/data-we-collect/nsduh-national-survey-drug-use-and-
health

U.S. Drug Enforcement Administration (Diversion Control Division), National Forensic
Laboratory Information System, Public Resource Library, Table 2;
https://www.nflis.deadiversion.usdoj.gov/Resources/NFLISPublicResourceLibrary.aspx

Bureau of Justice Statistics - Prisoner Statistics;
https://www.bjs.gov/index.cfm?ty=dcdetail&iid=269

**Summit County ($ Millions)**  CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Divisions | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol, Drug & Mental Health Services Board | $ 4.8 | $ 5.3 | $ 4.5 | $ 4.8 | $ 4.1 | $ 3.4 | $ 3.0 | $ 3.2 | $ 3.0 | $ 1.1 | $ 1.0 | $ 1.0 | $ 39.3 |
| Children Services Board | $ 10.4 | $ 11.7 | $ 9.7 | $ 9.3 | $ 8.4 | $ 6.6 | $ 5.7 | $ 5.9 | $ 5.6 | $ 4.6 | $ 4.1 | $ 4.0 | 86.1 |
| Prosecutor | $ 0.6 | $ 0.5 | $ 0.4 | $ 0.7 | $ 0.5 | $ 0.4 | $ 0.3 | $ 0.3 | $ 0.3 | $ 0.2 | $ 0.2 | $ 0.1 | 4.5 |
| Court of Common Pleas | $ 0.8 | $ 0.8 | $ 0.7 | $ 1.0 | $ 0.7 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.4 | $ 0.2 | $ 0.2 | $ 0.2 | 6.3 |
| Juvenile Court (including Detention & Probation) | $ 0.9 | $ 0.9 | $ 0.8 | $ 0.7 | $ 0.7 | $ 0.6 | $ 0.5 | $ 0.4 | $ 0.5 | $ 0.4 | $ 0.4 | $ 0.3 | 7.0 |
| Sheriff | $ 0.9 | $ 0.8 | $ 0.7 | $ 0.6 | $ 0.6 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.3 | $ 0.3 | 6.7 |
| Sheriff Jail | $ 1.1 | $ 1.1 | $ 1.1 | $ 1.0 | $ 0.9 | $ 0.8 | $ 0.8 | $ 0.9 | $ 0.9 | $ 0.7 | $ 0.6 | $ 0.6 | 10.4 |
| Alternative Corrections | $ 0.6 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.5 | $ 0.5 | $ 0.4 | $ 0.4 | $ 0.3 | $ 0.3 | 5.3 |
| Adult Probation | $ 0.4 | $ 0.4 | $ 0.3 | $ 0.5 | $ 0.4 | $ 0.3 | $ 0.3 | $ 0.2 | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.1 | 3.2 |
| Medical Examiner | $ 0.5 | $ 0.3 | $ 0.2 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | $ 0.1 | 1.9 |
| Public Health | $ 0.1 | $ 0.1 | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | $  - | 0.2 |
| Department-Related Costs (Past) | $ 21.1 | $ 22.4 | $ 18.9 | $ 19.3 | $ 17.0 | $ 13.7 | $ 12.3 | $ 12.3 | $ 11.8 | $ 8.3 | $ 7.2 | $ 6.8 | $ 171.0 |

| | 2027 | 2026 | 2025 | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Department-Related Costs (Ongoing) | $ 36.0 | $ 34.5 | $ 33.1 | $ 31.7 | $ 30.2 | $ 28.8 | $ 27.4 | $ 26.0 | $ 24.5 | $ 23.1 | $ 295.4 |

**Total Department-Related Costs (Past & Ongoing)**  $ 466.3

## Verification

I, Deborah S. Matz, declare:

I am the Director of Law and Risk Management for the County of Summit, Ohio. I am authorized to make this verification on behalf of Plaintiff the County of Summit, Ohio. The foregoing Summit County, Ohio Plaintiff's Supplemental Responses and Objections to Distributor Defendants' Interrogatory No. 18 Pursuant to Special Master Cohen's October 23, 2018 Order represents a municipal corporate response, based on information, in part, assembled by the County of Summit, Ohio employees and/or representatives. Because the matters stated in the document identified above constitute a corporate response, they are not all necessarily within my personal knowledge, or within the personal knowledge of any single individual. Subject to these limitations, the information contained in the foregoing response is, to the best of the County of Summit, Ohio's knowledge, true and correct. The County of Summit, Ohio reserves the right to make any changes should it appear that any omissions or errors have been made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Summit, Ohio on this 28th day of November, 2018

Signature

Deborah S. Matz
Print Name

Director of Law and Risk Management
For Summit County

# EXHIBIT 4



# License Look Up

6/10/2019 2:13 PM

## CVS INDIANA, LLC

| Status | Active |
|---|---|
| Sub-Status | |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 011648300 |
| License Issue Date | 11/30/2006 |
| License Expiration Date | 06/30/2021 |
| License Effective Date | 07/01/2019 |
| Street Address | 7590 EMPIRE DRIVE |
| City | INDIANAPOLIS |
| State | IN |
| Zipcode | 46219 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| THOMAS SEIBERT | | Active | Sat Mar 16 00:00:00 GMT 2019 | |

Current date & time: **6/10/2019 2:13 PM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 5



# License Look Up

6/10/2019 2:14 PM

## CVS PHARMACY DISTRIBUTION CENTER

| | |
|---|---|
| Status | Active |
| Sub-Status | |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 012395150 |
| License Issue Date | 03/12/2014 |
| License Expiration Date | 06/30/2021 |
| License Effective Date | 07/01/2019 |
| Street Address | 150 WHITE WAGON ROAD |
| City | CHEMUNG |
| State | NY |
| Zipcode | 14825 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| | | Active | Sat Oct 07 00:00:00 GMT 2017 | |

Current date & time: **6/10/2019 2:14 PM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 6

Page 1

1              UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4                     *   *   *

5

6    IN RE:

7    NATIONAL PRESCRIPTION      MDL 2804

8    OPIATE LITIGATION          Case No. 1:17-md-2804

9

10                    *   *   *

11          Deposition of ERIC A. GRIFFIN,

12   Witness herein, called by the Defendants for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Christine Gallagher,

15   a Notary Public and Registered Professional

16   Reporter in and for the State of Ohio, at the

17   Sheraton Columbus at Capitol Square, 75 East

18   State Street, Judicial Board Room, Columbus,

19   Ohio, on Wednesday, the 23rd day of January,

20   2019, at 8:48 a.m.

21                     *   *   *

22

23

24

25

Page 62

1    over 500, but I'm sure there's plenty of

2    out-of-state distributors that ship to the

3    State of Ohio.

4            Q.   Distributors who do business --

5            A.   Actually, can I correct that

6    answer?

7            Q.   Yes, you may.

8            A.   No, I would not be surprised if

9    it's over 500.

10           Q.   And why is that?

11           A.   Because there's plenty of places

12   that are shipping controlled substances and

13   dangerous drugs into the State of Ohio that we

14   license outside of the State of Ohio.

15           Q.   Wholesale pharmaceutical

16   distributors who do business in Ohio have to be

17   licensed to operate in Ohio, correct?

18           A.   Correct.

19           Q.   And the BOP is the agency

20   responsible for licensing wholesale drug

21   distributors in Ohio?

22           A.   Yes, ma'am.

23           Q.   Information about whether an

24   entity is licensed -- a wholesale entity is

25   licensed in the State of Ohio is publicly

Page 63

1   available?

2            A.    Yes, ma'am.

3            Q.    And can one access that through

4   the BOP website?

5            A.    Yes, ma'am.

6            Q.    The public information identifies

7   when a license was issued to a wholesaler,

8   correct?

9            A.    I believe so.

10           Q.    Does it --

11           A.    We recently changed licensing

12  systems.

13           Q.    Does it identify the expiration

14  date of a wholesale license?

15           A.    I believe so.

16           Q.    Does the public information about

17  a wholesaler indicate whether the wholesaler

18  has ever had any discipline?

19           A.    It does.

20           Q.    Has that type of information, the

21  licensee period and whether action has been

22  ever taken against a licensee, always been

23  publicly available?

24           A.    To my knowledge it's been -- since

25  2008 when I started, it was publicly available.

# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549 **FORM 10-K**

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED DECEMBER 30, 2000**

*COMMISSION FILE NUMBER 001-01011*

# CVS CORPORATION

(Exact name of Registrant as specified in its charter)

```
          DELAWARE                              05-0494040
          --------                              ----------
  (State or other jurisdiction of     (I.R.S. Employer Identification No.)
   incorporation or organization)


       ONE CVS DRIVE                               02895
  WOONSOCKET, RHODE ISLAND                         -----
  ------------------------                       (Zip Code)
(Address of principal executive offices)


                         (401) 765-1500
                         --------------
            (Registrant's telephone number, including area code)
```

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE EXCHANGE ACT:**

```
COMMON STOCK, PAR VALUE $0.01 PER SHARE             NEW YORK STOCK EXCHANGE
---------------------------------------             -----------------------
          Title of each class              Name of each exchange on which registered
```

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE EXCHANGE ACT: NONE**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes /X/ No / /

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. /X/

The aggregate market value of the registrant's common stock held by non-affiliates of the registrant was approximately $23,208,276,572 as of March 9, 2001, based on the closing price of the common stock on the New York Stock Exchange. For purposes of this calculation, only executive officers and directors are deemed to be the affiliates of the registrant. This amount excludes the value of 4,982,970 shares of Series One ESOP Convertible Preference Stock.

As of March 9, 2001, the registrant had 392,925,516 shares of common stock issued and outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Filings made by companies with the Securities and Exchange Commission sometimes "incorporate information by reference." This means that the company is referring you to information that was previously filed with the SEC, and this information is considered to be part of the filing

**CVS/PHARMACY STORES**

OPERATING STRATEGY ~ Our operating strategy is to provide a broad assortment of high-quality merchandise at competitive prices using a retail format that emphasizes service, innovation and convenience. One of the keys to our strategy is technology, which allows us to constantly improve service and explore ways to provide more personalized product offerings and services. We believe our continuing to be the first to market with new products and services, using innovative marketing, introducing more products which are unique to CVS and adjusting our mix of merchandise to match customer needs and preferences is very important in our ability to maintain customer satisfaction.

CUSTOMERS ~ During fiscal 2000, we served an average of 2.5 million customers per day. Since our sales are to numerous customers, including managed care organizations, the loss of any one customer would not have a material effect on the business. No single customer, including managed care organizations, accounts for more than ten percent of our total sales.

PRODUCTS ~ A typical CVS/pharmacy store sells prescription drugs and a wide assortment of high-quality, nationally advertised brand name and private label merchandise. General merchandise categories include over-the-counter drugs, greeting cards, film and photofinishing services, beauty products and cosmetics, seasonal merchandise and convenience foods.

We centrally purchase most of our merchandise, including prescription drugs, directly from numerous manufacturers and distributors. This purchasing strategy allows us to take advantage of the promotional and volume discount programs that certain manufacturers and distributors offer to retailers. During fiscal 2000, approximately 85% of the merchandise we purchased was received by our distribution centers for redistribution to our stores, while the balance was shipped directly to the stores. We believe that competitive sources are readily available for substantially all of the products we carry and the loss of any one supplier would not have a material effect on the business.

To complement the national brand name products we offer, we also carry a full range of high-quality private label products that are only available through CVS. We carried over 1,500 CVS brand products, which accounted for approximately 12% of our front store sales during fiscal 2000. Due to the success of our private label program, we will continue to assess opportunities to expand our range of private label product offerings.

OPERATIONS ~ As of December 30, 2000, we operated 4,087 CVS and CVS/pharmacy stores, approximately a fourth of which operated on an extended hour or 24-hour basis. Store operations are divided into two areas, pharmacy and front store:

PHARMACY ~ Retail pharmacy sales increased 18.2% to $12.6 billion, representing 63% of total sales in fiscal 2000, compared to 59% in fiscal 1999 and 58% in fiscal 1998. During fiscal 2000, we filled 297 million prescriptions, or approximately 11% of the U.S. retail market, which was more than any other retailer. We believe that our pharmacy operations will continue to represent a critical part of our business and strategy due to our ability to attract and retain managed care customers, favorable industry trends and our on-going program of purchasing patient prescription files from independent pharmacies.

The growth in managed care has substantially increased the use of prescription drugs. Managed care providers have made the cost of prescription drugs more affordable to a greater number of people and supported prescription drug therapy as an alternative to more expensive forms of treatment, such as surgery. Payments by third party managed care providers under prescription drug plans represented 89% of our total pharmacy sales in fiscal 2000, compared to 87% in fiscal 1999 and 84% in fiscal 1998.

3

# EXHIBIT 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

☒  **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended December 31, 2010**

**OR**

☐  **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from           to**

**Commission file number 001-01011**

# CVS CAREMARK CORPORATION

**(Exact name of Registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **050494040** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **One CVS Drive, Woonsocket, Rhode Island** | **02895** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**(401) 765-1500**

**(Registrant's telephone number, including area code)**

**Securities registered pursuant to Section 12(b) of the Exchange Act:**

| | |
|---|---|
| **Common Stock, par value $0.01 per share** | **New York Stock Exchange** |
| **Title of each class** | **Name of each exchange on which registered** |

**Securities registered pursuant to Section 12(g) of the Exchange Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☒        No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐        No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒        No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒        No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒                                                          Accelerated filer ☐

Non-accelerated filer ☐        (Do not check if a smaller reporting company)        Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐        No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was approximately $39,599,675,690 as of June 30, 2010, based on the closing price of the common stock on the New York Stock Exchange. For purposes of this calculation, only executive officers and directors are deemed to be the affiliates of the registrant.

As of February 11, 2011, the registrant had 1,368,174,000 shares of common stock issued and outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Filings made by companies with the Securities and Exchange Commission sometimes "incorporate information by reference." This means that the company is referring you to information that was previously filed or is to be filed with the SEC, and this information is considered to be part of the filing you are reading. The following materials are incorporated by reference into this Form 10-K:

Table of Contents

other government entities enact legislation regulating PBMs that survive legal challenges to their enforceability, such legislation could adversely impact our ability to conduct business on commercially reasonable terms in locations where the legislation is in effect.

In addition, certain quasi-regulatory organizations, including the National Association of Boards of Pharmacy and the National Association of Insurance Commissioners ("NAIC") have issued model regulations or may propose future regulations concerning PBMs and/or PBM activities. Similarly, credentialing organizations such as NCQA and the Utilization Review Accreditation Commission ("URAC") may establish voluntary standards regarding PBM or specialty pharmacy activities. For example, URAC has issued PBM accreditation standards for PBMs serving the commercially insured market, and Caremark is currently accredited as a PBM by URAC. While the actions of these quasi-regulatory or standard-setting organizations do not have the force of law, they may influence states to adopt their requirements or recommendations and influence client requirements for PBM or specialty pharmacy services. Moreover, any standards established by these organizations could also impact our health plan clients and/or the services we provide to them.

In addition to state statutes and regulations, we are also subject to state common laws to the extent applied to PBMs through judicial interpretation or otherwise. Potential common law claims could involve, for example, breach of fiduciary duty, constructive fraud, fraud or unjust enrichment.

**Pharmacy Licensure and Regulation** - We are subject to state and federal statutes and regulations governing the operation of retail and mail pharmacies, repackaging of drug products, wholesale distribution, dispensing of controlled substance and listed chemical products, and medical and controlled substance waste disposal. Federal statutes and regulations govern the labeling, packaging, advertising and adulteration of prescription drugs and the dispensing of controlled substances. Federal and state controlled substance laws require us to register our pharmacies and distribution centers with the DEA and state controlled substances agencies and to comply with security, recordkeeping, inventory control, personnel and labeling standards in order to possess and dispense controlled substances and listed chemical products.

We also are subject to regulation by the DEA and state pharmacy boards in connection with our online pharmacies because we dispense prescription drugs pursuant to refill orders received through our Internet websites, among other methods. Numerous state laws also exist affecting our receipt and processing of electronic prescription drug orders.

Certain violations of the federal controlled substances laws can subject the Company, its pharmacies and distribution centers, and individual pharmacy personnel to criminal and civil penalties and can also result in administrative action by the DEA, including suspension or revocation of a pharmacy's or distribution center's registration to distribute controlled substances and/or listed chemical products. State authorities and state boards of pharmacy similarly have the authority to impose both monetary penalties and disciplinary sanctions, including revocation of a pharmacy's or individual pharmacist's license to dispense controlled substances, and these penalties and sanctions are in addition to sanctions imposed under the federal controlled substances laws. Certain violations of these federal and state legal requirements can also trigger other consequences for the Company's business and could potentially impact our eligibility to participate in federal health care programs. See Item 3, "Legal Proceedings" for further information.

Other statutes and regulations may affect our mail service operations. For example, the FTC requires mail service sellers of goods generally to engage in truthful advertising, to stock a reasonable supply of the products to be sold, to fill mail service orders within thirty days and to provide clients with refunds when appropriate. In addition, the United States Postal Service has statutory authority to restrict the transmission of drugs and medicines through the mail, and state licensing authorities may restrict the types of personnel who may work in mail service operations.

Our pharmacists and technicians are subject to state regulation of the profession of pharmacy, and our employees who are engaged in a professional practice must satisfy applicable state licensing or registration requirements and

18

Table of Contents

- managed care reform and plan design legislation;

- insurance licensing and other insurance regulatory requirements applicable to offering Medicare Part D programs and services; and

- direct regulation of pharmacies or PBMs by regulatory and quasi-regulatory bodies.

***Risks related to litigation and other legal proceedings.***

Pharmacy services and retail pharmacy are highly regulated and litigious industries. Our Company is currently subject to various litigation matters and legal proceedings. Resolution of these matters could have a material adverse effect on our business and results of operations. As such, we refer you to Item 3. "Legal Proceedings" for additional information.

The foregoing is not a comprehensive listing and there can be no assurance that we have correctly identified and appropriately assessed all factors affecting the business. As such, we refer you to the "Management's Discussion and Analysis of Financial Condition and Results of Operations," which includes our "Cautionary Statement Concerning Forward-Looking Statements" at the end of such section, on pages 41 through 42 of our Annual Report to Stockholders for the year ended December 31, 2010, which section is incorporated by reference.

## Item 1B. Unresolved Staff Comments

There are no unresolved SEC Staff Comments.

## Item 2. Properties

We lease most of our stores under long-term leases that vary as to rental amounts, expiration dates, renewal options and other rental provisions. For additional information on the amount of our rental obligations for our leases, we refer you to the Note "Leases" on page 65 in our Annual Report to Stockholders for the year ended December 31, 2010.

As of December 31, 2010, we owned approximately 5.0% of our 7,182 retail stores. Net selling space for our retail drugstores increased to 69.7 million square feet as of December 31, 2010. More than one half of our store base was opened or significantly remodeled within the last five years.

We own nine distribution centers located in Alabama, California, Hawaii, Rhode Island, South Carolina, Tennessee and Texas and lease ten additional facilities located in Arizona, Florida, Indiana, Michigan, New Jersey, Pennsylvania, Rhode Island, Texas and Virginia. The 19 distribution centers total approximately 10.7 million square feet as of December 31, 2010. In addition, during 2009, we began construction on two new distribution centers, one in Chemung County, New York, and one in Kapolei, Hawaii, each of which is expected to open during 2011.

As of December 31, 2010, we owned one mail service pharmacy located in Texas and leased three additional mail service pharmacies located in Florida, Illinois and Pennsylvania. We leased call centers located in Missouri, Pennsylvania, Tennessee, Texas and Puerto Rico. As of December 31, 2010, we also had 18 specialty mail order pharmacies, one of which we owned, and 44 specialty pharmacy stores, which we leased. The specialty mail order pharmacies and specialty pharmacy stores are located in 25 states, the District of Columbia and Puerto Rico. In addition, we lease a central fill facility in Sacramento, California.

We own our corporate offices located in Woonsocket, Rhode Island, which totals approximately 750,000 square feet. We are currently in the process of expanding our corporate offices in the State of Rhode Island. In addition, we lease large corporate offices in Scottsdale, Arizona, Northbrook, Illinois and Irving, Texas.

29

# EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

(Mark One)

**/X/ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 1997

**/ / TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE
SECURITIES EXCHANGE ACT OF 1934**

For the transition period from to

*Commission file number 1-1011*

# CVS CORPORATION
(Exact name of registrant as specified in its charter)

```
          Delaware                            05-0494040
(State or other jurisdiction              (I.R.S. Employer
 of incorporation or organization)       Identification No.)

        One CVS Drive
   Woonsocket, Rhode Island                     02895
(Address of principal executive offices)     (Zip Code)
```

Registrant's telephone number, including area code: (401) 765-1500

**Securities registered pursuant to Section 12(b) of the Exchange Act:**

```
   Title of each class              Name of each exchange on which registered
----------------------             ---------------------------------------
Common Stock, par value
   $.01 per share                           New York Stock Exchange
```

**Securities registered pursuant to Section 12(g) of the Exchange Act: None**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

The aggregate market value of the registrant's voting stock* held by non-affiliates** of the registrant (without admitting that any person whose shares are not included in such calculation is an affiliate) on March 2, 1998 was approximately $12,669,785,088, based on the last sale price as reported by the New York Stock Exchange.

## SUPPLIERS

The Company centrally purchases most of its merchandise, including prescription drugs, directly from manufacturers, allowing it to take advantage of the promotional and volume discount programs that certain manufacturers offer to retailers. During 1997, approximately 85% of the merchandise purchased by the Company was received at one of the Company's distribution centers for redistribution to its stores. The balance of store merchandise is shipped directly to CVS stores from manufacturers and distributors at prices negotiated at the corporate level.

The Company believes that the loss of any one supplier or group of suppliers under common control would not have a material effect on its business.

## CUSTOMER SERVICE

CVS strives to provide the highest levels of service to its customers and partners. As a result, the Company devotes considerable time and attention to people, systems and high service standards. The Company places an emphasis on attracting and training friendly and helpful associates to work both in CVS stores and throughout the CVS organization. Each CVS store receives a formal customer service evaluation twice per year, based on a mystery shopper program, customer letters and calls, and market research. CVS' priority on customer service extends into the managed care portion of its business as well. In every market, a Managed Care Service Team is responsible for ensuring that managed care partners are receiving high levels of service. CVS pharmacists consistently rank at the top of the industry on measurements of trust, relationship-building and accessibility. This high level of service and expertise has played a key role in enabling the growth of CVS' pharmacy operations.

## REGULATION

The Company's pharmacies and pharmacists are required to be licensed by the appropriate state boards of pharmacy. The Company's pharmacies and its distribution centers are also registered with the Federal Drug Enforcement Agency. By virtue of these licensing and registration requirements, the Company is required to comply with various statutes, rules and regulations, a violation of which could result in a suspension or revocation of such licenses or registrations. Under the Omnibus Budget Reconciliation Act of 1990, the Company's pharmacists are required to offer counseling, without charge, to customers covered by Medicare about medication, dosage, delivery system, potential side effects, and other information deemed significant by such pharmacists. The Company's pharmacists in fact routinely offer such counseling to consumers.

## COMPETITION

The retail drugstore business is highly competitive. The Company believes that it competes principally on the basis of: (i) store location and convenience, (ii) customer service and satisfaction, (iii) product selection and variety and (iv) price. The Company experiences active competition not only from independent and other chain drugstores, but also from health maintenance organizations, hospitals, mail order organizations, supermarkets, discount drugstores and discount general merchandisers. The deep discount drug segment has experienced significant growth over the past several years as drug chains, food, discount and specialty retailers have entered the business. Major retail companies now operate deep discount drugstores in the most competitive retailing markets. "Combo" stores, which consist of grocery, drugstore and several other operations under the same roof, have also experienced significant growth over the past several years as consumers have become more attracted to one-stop shopping. Retail mass merchandisers with prescription departments have also grown in popularity. The Company is among the nation's largest chain drugstores, in terms of both store count and annual sales volume.

## CAUTIONARY STATEMENT CONCERNING FORWARD-LOOKING STATEMENTS

This report (as well as other public filings, press releases and discussions with Company management) contains and incorporates by reference certain forward-looking statements that are subject to risks and uncertainties. Forward-looking statements include the information concerning future results of operations, cost savings and synergies of the Company following the Revco merger and the Arbor acquisition; the information concerning the Company's ability to continue to achieve significant sales growth; the information concerning the

6

# EXHIBIT 10

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
### THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2005

Commission file number 001-01011

# CVS CORPORATION
### (Exact name of Registrant as specified in its charter)

---

| | |
|---|---|
| **Delaware** | **050494040** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One CVS Drive** | |
| **Woonsocket, Rhode Island** | **02895** |
| (Address of principal executive offices) | (Zip Code) |

**(401) 765-1500**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Exchange Act:

| | |
|---|---|
| **Common Stock, par value $0.01 per share** | **New York Stock Exchange** |
| Title of each class | Name of each exchange on which registered |

Securities registered pursuant to Section 12(g) of the Exchange Act: None

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was approximately $23,238,345,000 as of July 2, 2005, based on the closing price of the common stock on the New York Stock Exchange. For purposes of this calculation, only executive officers and directors are deemed to be the affiliates of the registrant.

As of March 10, 2006, the registrant had 817,412,000 shares of common stock issued and outstanding.

---

Table of Contents

**Intellectual Property and Licenses ~** We have registered or applied to register for a variety of trade names, service marks, trademarks and business licenses for use in our business. We regard our intellectual property as having significant value and as being an important factor in our marketing efforts. We are not aware of any facts that could negatively impact our continuing use of any of our intellectual property. Our pharmacies and pharmacists must be licensed by the appropriate state boards of pharmacy. Our pharmacies and distribution centers are also registered with the Federal Drug Enforcement Administration. Because of these licensing and registration requirements, we must comply with various statutes, rules and regulations, a violation of which could result in a suspension or revocation of these licenses or registrations.

**Competition ~** The retail drugstore business is highly competitive. We believe that we compete principally on the basis of: (i) store location and convenience, (ii) customer service and satisfaction, (iii) product selection and variety and (iv) price. In each of the markets we serve, we compete with independent and other retail drugstore chains, supermarkets, convenience stores, pharmacy benefit managers and other mail order prescription providers, discount merchandisers, membership clubs and Internet pharmacies.

## Item 1A. Risk Factors

Our business is subject to various industry, economic and regulatory risks and uncertainties. These risks include those described below and may include additional risks and uncertainties not presently known to us or that we currently deem to be immaterial.

**Business Risks ~** We operate in a highly competitive environment. We compete with other drugstore chains, supermarkets, discount retailers, membership clubs and Internet companies. In addition, the growth of mail order pharmacies and changes to pharmacy benefit plans requiring maintenance medications to be filled exclusively through mail order pharmacies continues to challenge our business.

Further, the continued efforts of health maintenance organizations, managed care organizations, pharmacy benefit management companies, government entities, and other third party payors to reduce prescription drug costs and pharmacy reimbursement rates may impact our profitability. In that regard, on January 1, 2006, the new Medicare Part D prescription drug program went into effect. It is anticipated that the program will increase utilization and decrease pharmacy gross margin rates as higher margin business (such as cash and state Medicaid customers) migrate to the new Medicare Part D coverage. The potential impact on pharmacy sales and gross margin rates is still undetermined due to the fact the program is in its early stages.

Further, on February 8, 2006, the President signed into law the Deficit Reduction Act of 2005 (the "Act"). The Act seeks to reduce federal spending by $3.6 billion over a five-year period by altering the Medicaid reimbursement formula for multi-source (i.e., generic) drugs. According to the Congressional Budget Office, retail pharmacies are expected to negotiate with individual states for higher dispensing fees to mitigate the adverse effect of these changes. These changes take effect January 1, 2007 and are expected to result in reduced Medicaid reimbursement rates for retail pharmacies. In addition, the President's proposed budget for fiscal year 2007 contains further reductions in the Medicaid reimbursement formula for multi-source drugs. The extent of these reductions cannot be determined at this time.

**Economic Risks ~** Our business is affected by the economy in general and in the markets we serve, including changes in consumer purchasing power and/or spending patterns. Our ability to attract, hire and retain suitable pharmacists and management personnel as well as establishing effective advertising, marketing and promotional programs is directly impacted by the economic environment. Further, interest rate fluctuations and changes in capital market conditions may affect our ability to obtain necessary financing on favorable terms.

**Regulatory Risks ~** We are subject to litigation risks as well as changes in laws and regulations, including changes in accounting standards and taxation requirements, such as tax rate changes, new tax laws and revised tax law interpretations.

The foregoing is not a comprehensive listing and there can be no assurance that we have correctly identified and appropriately assessed all factors affecting the business. As such, we refer you to the "Management's Discussion and Analysis of Financial Condition and Results of Operations," which includes our "Cautionary Statement Concerning

6

**Table of Contents**

Forward-Looking Statements" at the end of such section, on pages 18 through 23 of our Annual Report to Stockholders for the fiscal year ended December 31, 2005, which is incorporated by reference herein.

## Item 1B. Unresolved Staff Comments

No events have occurred which would require disclosure under this Item.

## Item 2. Properties

We lease most of our stores under long-term leases that vary as to rental amounts, expiration dates, renewal options and other rental provisions. For additional information on the amount of our rental obligations for our leases, we refer you to the Note "Leases" on page 35 in our Annual Report to Stockholders for the fiscal year ended December 31, 2005.

As of December 31, 2005, we owned approximately 3% of our 5,471 retail and specialty pharmacy drugstores. Net selling space for our retail and specialty pharmacy drugstores increased 3.6% to 45.0 million square feet as of December 31, 2005 compared to 43.5 million square feet as of January 1, 2005. More than half of our store base was opened or significantly remodeled within the last five years.

We own five distribution centers located in Alabama, Rhode Island, South Carolina, Tennessee and Texas and lease eight additional facilities located in Florida, Indiana, New Jersey, Michigan, Pennsylvania, Texas and Virginia. The thirteen distribution centers total approximately 7,672,000 square feet as of December 31, 2005. During 2004, we began operating our newest distribution center in Ennis, Texas, which utilizes state of the art storage and retrieval systems, and during 2005 we began construction on a new facility utilizing the same technology in Vero Beach, Florida, which is projected to open during 2006.

We own our corporate headquarters building located in Woonsocket, Rhode Island, which contains approximately 568,000 square feet. We lease approximately 116,000 square feet of additional office space in Rhode Island. We also lease approximately 135,000 square feet in three mail order service facilities located in Florida, Pennsylvania, and Ohio. In addition, we own one mail order facility located in Pennsylvania, which contains approximately 80,000 square feet.

In connection with certain business dispositions completed between 1991 and 1997, we continue to guarantee lease obligations for approximately 360 former stores. We are indemnified for these guarantee obligations by the respective purchasers. These guarantees generally remain in effect for the initial lease term and any extension thereof pursuant to a renewal option provided for in the lease prior to the time of the disposition. For additional information, we refer you to the Note "Commitments & Contingencies" on page 40 in our Annual Report to Stockholders for the fiscal year ended December 31, 2005.

Management believes that its owned and leased facilities are suitable and adequate to meet the Company's anticipated needs. At the end of the existing lease terms, management believes the leases can be renewed or replaced by alternate space.

7

# EXHIBIT 11

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

---

# FORM 10-K

---

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the fiscal year ended December 31, 2011

OR

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

For the transition period from            to

Commission file number 001-01011

---

# CVS CAREMARK CORPORATION
(Exact name of Registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **050494040** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One CVS Drive, Woonsocket, Rhode Island** | **02895** |
| (Address of principal executive offices) | (Zip Code) |

**(401) 765-1500**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Exchange Act:

---

| | |
|---|---|
| **Common Stock, par value $0.01 per share** | **New York Stock Exchange** |
| Title of each class | Name of each exchange on which registered |

Securities registered pursuant to Section 12(g) of the Exchange Act: **None**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.  Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer  ☒ | Accelerated filer  ☐ |
| Non-accelerated filer  ☐ | Smaller reporting company  ☐ |
| (Do not check if a smaller reporting company) | |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes ☐    No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was approximately $50,513,379,248 as of June 30, 2011, based on the closing price of the common stock on the New York Stock Exchange. For purposes of this calculation, only executive officers and directors are deemed to be the affiliates of the registrant.

As of February 10, 2012, the registrant had 1,302,378,570 shares of common stock issued and outstanding.

---

## DOCUMENTS INCORPORATED BY REFERENCE

Filings made by companies with the Securities and Exchange Commission sometimes "incorporate information by reference." This means that the company is referring you to information that was previously filed or is to be filed with the SEC, and this information is considered to be part of the filing you are reading. The following materials are incorporated by reference into this Form 10-K:

- Portions of our Annual Report to Stockholders for the fiscal year ended December 31, 2011 is incorporated by reference in our response to Items 7, 8 and 9 of Part II.
- Information contained in our Proxy Statement for the 2012 Annual Meeting of Stockholders is incorporated by reference in our response to Items 10 through 14 of Part III.

Table of Contents

enforceability, such legislation could adversely impact our ability to conduct business on commercially reasonable terms in locations where the legislation is in effect.

In addition, certain quasi-regulatory organizations, including the National Association of Boards of Pharmacy and the NAIC have issued model regulations or may propose future regulations concerning PBMs and/or PBM activities. Similarly, credentialing organizations such as the National Committee for Quality Assurance and the Utilization Review Accreditation Commission ("URAC") may establish voluntary standards regarding PBM or specialty pharmacy activities. For example, URAC has issued PBM accreditation standards for PBMs serving the commercially insured market, and Caremark is currently accredited as a PBM by URAC. While the actions of these quasi-regulatory or standard-setting organizations do not have the force of law, they may influence states to adopt their requirements or recommendations and influence client requirements for PBM or specialty pharmacy services. Moreover, any standards established by these organizations could also impact our health plan clients and/or the services we provide to them.

In addition to state statutes and regulations, we are also subject to state common laws to the extent applied to PBMs through judicial interpretation or otherwise. Potential common law claims could involve, for example, breach of fiduciary duty, constructive fraud, fraud or unjust enrichment.

**Pharmacy and Professional Licensure and Regulation** - We are subject to state and federal statutes and regulations governing the operation of retail and mail pharmacies, repackaging of drug products, wholesale distribution, dispensing of controlled substance and listed chemical products, and medical and controlled substance waste disposal. Federal and state statutes and regulations govern the labeling, packaging, advertising and adulteration of prescription drugs and the dispensing of controlled substances, and some state regulations require compliance with standards established by the United States Pharmacopeia with respect to the packaging, storing and shipping of pharmaceuticals. Federal and state controlled substance laws require us to register our pharmacies and distribution centers with the DEA and state controlled substances agencies and to comply with security, recordkeeping, inventory control, personnel and labeling standards in order to possess and dispense controlled substances and listed chemical products.

We also are subject to regulation by the DEA and state pharmacy boards in connection with our online pharmacies because we dispense prescription drugs pursuant to refill orders received through our Internet websites, among other methods. Numerous state laws also exist affecting our receipt and processing of electronic prescription drug orders.

Certain violations of the federal controlled substances laws can subject the Company, its pharmacies and distribution centers, and individual pharmacy personnel to criminal and civil penalties and can also result in administrative action by the DEA, including suspension or revocation of a pharmacy's or distribution center's registration to distribute controlled substances and/or listed chemical products. State authorities and state boards of pharmacy similarly have the authority to impose both monetary penalties and disciplinary sanctions, including revocation of a pharmacy's or individual pharmacist's license to dispense controlled substances, and these penalties and sanctions are in addition to sanctions imposed under the federal controlled substances laws. Certain violations of these federal and state legal requirements can also trigger other consequences for the Company's business and could potentially impact our eligibility to participate in federal health care programs.

Other statutes and regulations may affect our mail service operations. For example, the FTC requires mail service sellers of goods generally to engage in truthful advertising, to stock a reasonable supply of the products to be sold, to fill mail service orders within thirty days and to provide clients with refunds when appropriate. In addition, the United States Postal Service and the Department of Transportation each has regulatory authority to restrict the transmission of drugs and medicines through the mail or in commerce, and state licensing authorities may restrict the types of personnel who may work in mail service operations.

Our pharmacists, technicians and certain other health care professionals are subject to state regulation of their profession, and our employees who are engaged in a professional practice must satisfy applicable state licensing or registration requirements and comply with applicable professional standards. In addition, they must comply with any applicable federal or state requirements for participation in government-sponsored health care programs. Failure to comply with these requirements could subject us and our employees to disciplinary action, including fines, penalties or sanctions, could impact our ability to obtain or retain reimbursement for services provided to participants of government-sponsored health care programs and/or could cause our licenses and permits and our employees' licenses to be suspended or revoked.

16

**Item 1B. Unresolved Staff Comments**

There are no unresolved SEC Staff Comments.

**Item 2. Properties**

We lease most of our stores under long-term leases that vary as to rental amounts, expiration dates, renewal options and other rental provisions. For additional information on the amount of our rental obligations for our leases, we refer you to the Note "Leases" in our Annual Report to Stockholders for the year ended December 31, 2011, which section is incorporated by reference herein.

As of December 31, 2011, we owned approximately 6% of our 7,327 retail stores. Net selling space for our retail drugstores increased to 71.5 million square feet as of December 31, 2011. Nearly one half of our store base was opened or significantly remodeled within the last five years.

We own eleven distribution centers located in Alabama, California, Hawaii, New York, Rhode Island, South Carolina, Tennessee and Texas and lease nine additional facilities located in Arizona, Florida, Indiana, Michigan, New Jersey, Pennsylvania, Texas and Virginia. The 20 distribution centers total approximately 11.5 million square feet as of December 31, 2011. During 2011, we opened two new distribution centers, one in Chemung County, New York, and one in Kapolei, Hawaii.

As of December 31, 2011, we owned one mail service pharmacy located in Texas and leased three additional mail service pharmacies located in Florida, Illinois and Pennsylvania. We leased call centers located in Missouri, Pennsylvania, Tennessee and Texas. As of December 31, 2011, we also had 30 onsite pharmacy stores, which we leased, 31 specialty pharmacy stores, which we leased, and 12 specialty mail order pharmacies, one of which we owned.

We own our corporate offices located in Woonsocket, Rhode Island, which totals approximately 920,000 square feet. During 2011, we expanded our corporate offices in the State of Rhode Island. In addition, we lease large corporate offices in Scottsdale, Arizona, Northbrook, Illinois and Irving, Texas.

In connection with certain business dispositions completed between 1991 and 1997, we continue to guarantee lease obligations for approximately 75 former stores. We are indemnified for these guarantee obligations by the respective purchasers. These guarantees generally remain in effect for the initial lease term and any extension thereof pursuant to a renewal option provided for in the lease prior to the time of the disposition. For additional information, we refer you to Note 13 "Commitments and Contingencies" in our Annual Report to Stockholders for the year ended December 31, 2011, which section is incorporated by reference herein.

Management believes that its owned and leased facilities are suitable and adequate to meet the Company's anticipated needs. At the end of the existing lease terms, management believes the leases can be renewed or replaced by alternate space.

# EXHIBIT 12

Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE NATIONAL | : | MDL No. 2804 |
| PRESCRIPTION OPIATE | : | CASE NO. 17-MD-2804 |
| LITIGATION | : | (DAP) |
| | : | |

EXPERT REPORT OF CRAIG J. MCCANN, PH.D., CFA
March 25, 2019

Confidential - Subject to Protective Order

l. U.S. Dep't of Justice, DEA, Diversion Investigators Manual (1996) (CAH_MDL2804_02203353);

m. Other documents cited in the text and footnotes below.

## III.  Assignment

10.   I have been asked by Plaintiffs' Counsel to document how I processed, validated and augmented opioid transaction data produced by the Drug Enforcement Administration ("DEA") and from the Defendants.

11.   I have been asked to summarize shipments in the ARCOS Data, especially those shipments into Cuyahoga County and Summit County.

12.   I have also been asked to report the results of applying certain algorithms to the ARCOS Data.

## IV.  Summary of Opinions

13.   Based upon my comparison of the ARCOS Data produced by the DEA and the public ARCOS Retail Drug Summary Reports, I conclude that, after correcting a relatively small number of records, the ARCOS Data produced by the DEA is reliable.

14.   I conclude that the ARCOS Data is reliable because it closely matches the DEA's Retail Drug Summary Reports for January 2006 through December 2014. Retail Drug Summary Reports summarize the weight of drugs in reported transactions with consumers in each of the 50 states and the District of Columbia. Where there were discrepancies between the ARCOS Data produced by the DEA and the Retail Drug Summary Reports, I was able

- 4 -

Confidential - Subject to Protective Order

to identify and correct the error in either the ARCOS Data or the Retail Drug Summary Reports.

15.     The ARCOS Data produced by the DEA also closely matches transaction data produced in discovery by Cardinal Health, McKesson Corp, Walgreens, CVS, Anda, H.D. Smith, Walmart, HBC, Discount Drug Mart, and Prescription Supply from their business records. I expect the data produced in discovery by the Defendants to be accurate. As with the Retail Drug Summary Reports, I have been able to identify and correct relatively minor discrepancies between the ARCOS Data produced by the DEA for transactions in Cuyahoga County and Summit Counties in Ohio from January 2006 through December 2014 and the Defendants' transaction data.

16.     The data on opioid shipments from January 2006 through December 2014 produced in discovery by AmerisourceBergen does differ from what AmerisourceBergen reported to the DEA as reflected in the ARCOS Data.

17.     I conclude from my review of the ARCOS Data, the Retail Drug Summary Reports, and transaction data produced in discovery by the Defendants that the ARCOS Data is reliable. Based on this analysis, I further conclude that the transaction records produced in discovery by the Defendants other than AmerisourceBergen are a reliable source of transactions data before 2006 and after 2014 for the varied time periods covered by the Defendants' productions.

18.     In the next section, I describe the ARCOS Data produced by the DEA and report national summary statistics for the ARCOS Data, after correcting minimal errors explained fully in Appendix 2. In Section VI, I

Confidential - Subject to Protective Order

## IX.    Transaction Analysis

130.  I implemented various approaches to identify transactions meeting specified criteria using the non-public ARCOS Data from 2006 to 2014, supplemented with Defendant transaction data where the ARCOS Data is obviously missing transactions that are included in the transactions produced by Defendants in discovery and to the extent I have Defendant transaction data for the periods before 2006 and after 2014. I calculated the results separately for each of twelve controlled substance drug codes.[54]

### A. Maximum Monthly, Trailing Six-month Threshold

131.   Under the first approach, I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed the highest number of dosage units shipped by the Distributor to the Pharmacy in any one of the six preceding calendar months. For example, if the number of dosage units containing hydrocodone shipped from a Distributor to a Pharmacy in February, March, April, May, June, and July were 5,000; 10,000; 7,000; 8,000; 9,000; and 9,500 respectively, a requested transaction in August would be flagged if it would cause the number of dosage units containing hydrocodone the Distributor shipped to the Pharmacy to exceed 10,000. Any reported transactions containing hydrocodone on that date and all reported transactions containing hydrocodone from that Distributor to that Pharmacy thereafter are flagged.

132.   In this approach and the others implemented below I have been asked by Counsel to assume that the Distributor did not effectively investigate

---

[54] I do not analyze transactions in two treatment drugs: buprenorphine and methadone.

the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.

133.    Figure 11 illustrates total opioid transactions from Distributors to retail and chain pharmacies into Cuyahoga County from 1996 to 2018. The Trailing Six-Month Maximum Threshold methodology flags ███████ ████████████████████████████████████████████████████████ ███████████████████████████████████. Additional charts and tables reflecting the result of applying this methodology and the methodologies below to each Distributor are in Appendix 10.



134.    Figure 12 illustrates total transactions from Distributors to retail and chain pharmacies into Summit County from 1996 to 2018. The Trailing Six-Month Maximum Threshold methodology flags ███████ of transactions

Confidential - Subject to Protective Order

accounting for ███████ of dosage units, ██████ of MME and ██████ of drug weight shipped into Summit County.



135.    Table 24 and Table 25 summarize the transactions in transactions flagged based on the Trailing Six-Month Maximum Threshold Approach in Cuyahoga and Summit Counties.

Confidential - Subject to Protective Order



Confidential - Subject to Protective Order



## B. Twice Trailing Twelve-Month Average Pharmacy Dosage Units

136.  I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed twice the trailing twelve-month average dosage units to retail and chain pharmacies served by the Distributor. I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.