UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The County of Summit, Ohio*, et al. *v. Purdue Pharma L.P.*, et al.<br>Case No. 18-op-45090<br><br>*The County of Cuyahoga, Ohio*, et al. *v. Purdue Pharma L.P.*, et al.,<br>Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Hon. Dan Aaron Polster |

## DECLARATION OF ELISA P. MCENROE

Pursuant to 28 U.S.C. § 1746, I, Elisa P. McEnroe, hereby declare as follows:

1. I am a partner in the Philadelphia, PA office of Morgan, Lewis & Bockius LLP, counsel for Rite Aid of Maryland, Inc. d/b/a Mid-Atlantic Customer Support Center ("Rite Aid") in the above-captioned cases.

2. I submit this declaration on behalf of Rite Aid in support of the Pharmacy Defendants' Motion for Summary Judgment Based on Statutes of Limitations and for the purpose of transmitting to the Court true and correct copies of the documents attached thereto.

3. Attached as Exhibit 1 is a copy of excerpts from the expert report of Dr. Anupam B. Jena, submitted on behalf of Rite Aid on May 10, 2019 in the above-captioned cases.

4. Attached as Exhibit 2 is a copy of the Ohio Board of Pharmacy License for Rite Aid. This license was obtained from the publicly available Ohio license look-up website, https://elicense.ohio.gov/OH_VerifyLicense.

5. Attached as Exhibit 3 is a copy of excerpts from Rite Aid Corporation's Form 10-K for Fiscal Year ended March 3, 2012.

6. Rite Aid last distributed hydrocodone combination products ("HCPs") into Cuyahoga and Summit counties on September 26, 2014 and September 18, 2014, respectively. *See* Rite_Aid_OMDL_0014289; Rite_Aid_OMDL_0049968.

7. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 14th day of June, 2019.

*[signature]*
Elisa P. McEnroe
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
T: 215-963-5917
F: 215-963-5001
elisa.mcenroe@morganlewis.com

Kelly A. Moore
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Phone: (212) 309-6612
Fax: (212) 309-6001
E-mail: kelly.moore@morganlewis.com

*Counsel for Rite Aid of Maryland, Inc. d/b/a Mid-Atlantic Customer Support Center*

# EXHIBIT 1

*CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-OP-45090<br>*The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 17-OP-45004 | MDL No. 2804<br><br>Case No. 17-md-2804 |

**EXPERT REPORT OF DR. ANUPAM B. JENA, MD, PhD**

May 10, 2019

26. Rite Aid Mid-Atlantic never distributed schedule II drugs. While pure hydrocodone and HCPs are both currently schedule II substances, the DEA rescheduled HCPs from schedule III to schedule II on October 6, 2014.[16] At this time, when HCPs were moved to the higher risk schedule II, Rite Aid Mid-Atlantic discontinued distribution of HCPs.[17] As seen in this exhibit, buprenorphine, typically used to treat opioid dependence, is a schedule III substance, while codeine forms are schedule II, III or V depending on the quantity of the narcotic in the drug. The rest of the opioids are schedule II substances (dihydrocodeine, fentanyl, hydrocodone, hydromorphone, levorphanol, methadone, meperidine, morphine, opium, oxycodone, oxymorphone, tapendatol). With the exception of buprenorphine and methadone, which are used to treat opioid addiction, the other twelve opioids in **Exhibit 1** are used to treat pain, with slightly different uses depending on the substance.

27. Opioids differ in their potency. To assist physicians with prescribing opioids and to provide a standard way of measuring quantities across opioids, an "opioid conversion factor" has been developed, and has become a standard means of measuring quantities of opioids.[18] This factor is designed to convert the quantity of each drug into units that are equivalent to milligrams of morphine, or morphine milligram equivalents ("MME"). The MME conversion factor is shown in **Exhibit 1**. As can be seen in the exhibit, the conversion factor varies by strength for some opioids. Drugs with higher conversion factors are more potent. For example, the MME conversion factor is equal to 1 for hydrocodone and 1.5 for oxycodone.[19] This means that 10 mg of hydrocodone is equivalent to 10 mg of morphine, but 10 mg of oxycodone is equivalent to 15 mg of morphine. In other words, oxycodone is 50 percent more potent than hydrocodone.

28. An alternative measure that does not account for potency is "dosage units." For pills, one pill is one dosage unit. For example, a 10 mg hydrocodone pill is one dosage unit, as is a 10 mg oxycodone pill, regardless of the fact that oxycodone is more potent than hydrocodone.

---

[16] United States Department of Justice, Drug Enforcement Administration, Diversion Control Division, "Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products From Schedule III to Schedule II," 79 FR 49661, August 22, 2014, available at https://www.deadiversion.usdoj.gov/fed_regs/rules/2014/fr0822.htm, accessed April 4, 2019 (hereafter, "DEA, Rescheduling of Hydrocodone Combination Products (August 2014)").

[17] ████████████

[18] United States Department of Health and Human Services, Centers for Disease Control and Prevention, "Calculating Total Daily Dose of Opioids for Safer Dosage."

[19] *Id.*

41. On July 10 and 11 of 2012, two inspectors from the DEA conducted an unannounced audit of Rite Aid Mid-Atlantic.[56] According to Rite Aid Mid-Atlantic's notes of the audit, both of the DEA inspectors were "very impressed and pleased to see that Rite Aid demonstrate[d] its due diligence by having an *excellent* excessive order monitoring program."[57] According to testimony from DEA employees, registrants can rely on guidance from DEA field agents.[58] In the case of Rite Aid Mid-Atlantic, that means accepting the positive feedback from the unannounced DEA audits and not implementing any additional mechanisms to its suspicious order monitoring system. The DEA inspectors also "mentioned that the DEA is taking a harder look at all distributors to ensure that order monitoring processes are in place and effective."[59] Even with the additional scrutiny, the DEA inspectors were pleased with Rite Aid Mid-Atlantic's system and found no deficiencies.

### 2. Rite Aid Mid-Atlantic did not distribute schedule II opioids

42. Rite Aid Mid-Atlantic never distributed schedule II drugs. From 2006-2014, the only opioids Rite Aid Mid-Atlantic distributed were HCPs.[60] HCPs were schedule III drugs until they were moved to schedule II in October 2014.[61] Rite Aid Mid-Atlantic stopped distributing HCPs when the DEA rescheduled HCPs to schedule II after concluding that HCPs had a higher potential for abuse than previously believed.[62] I understand that Rite Aid Mid-Atlantic stopped distributing all narcotics in November 2014.[63]

---

[56] Rite_Aid_OMDL_0032618-19.
[57] *Id*.
[58] Prevoznik Deposition, p. 461 ("Q. DEA headquarters expects a registrant to listen to the information it receives from DEA field office personnel, true? […] A. Yeah. It depends what they are asking, sure. Q. Okay. And the registrants who are visited by DEA field office personnel can rely on the information that they receive from DEA field division personnel regarding SOMs systems, true? […] A. Yeah, they get guidance."); and Wright Deposition pp. 231-232 ("Q. And based on your experience, you think it would be fair for a registrant to rely on guidance that the registrant received from DEA agents out in the field? […] A. If you make the phone call, you expect to receive a -- an answer. And if you're making that phone call, I think you would rely on the information an then put it together with ever -- other factors that are known to you to make that decision. Q. Okay. And that's the registrant receiving information from DEA, relying on that, and then acting? A. Yes, sir.").
[59] Rite_Aid_OMDL_0032618-19.
[60] ███████████████████████████████████████████████████████████████ and ECF No. 693 at 3 ("Accordingly, the Special Master RULES as follows. Defendants shall produce discovery related to all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act.").
[61] DEA, Rescheduling of Hydrocodone Combination Products (August 2014).
[62] ███████████████
[63] Rite_Aid_OMDL_0032602.

identified in the McCann Report."[84] Mr. Rafalski states that the "purpose of each system [i.e., methodology] was to identify suspicious orders that should not be shipped unless the distributors' due diligence eliminated the suspicion of diversion."[85]

54. In this section, I describe the numerous flaws in Dr. McCann's proposed approaches for identifying suspicious orders, that is, why these calculations do not reliably identify orders at risk of diversion. I then describe two basic robustness tests, commonly employed by economists, demonstrating that Dr. McCann's calculations are not reliable. Finally, I explain why Dr. McCann's calculation of "excessive shipments" is baseless and nonsensical.[86]

### A. Each of Dr. McCann's five approaches for flagging transactions is unreliable as a method for identifying "suspicious" orders

55. Dr. McCann applies five "approaches" to flagging orders. Each of the five approaches is applied to shipments from a distributor to a specific pharmacy, sometimes for different varieties of an at-issue drug.[87] In the case of Rite Aid Mid-Atlantic, this means each of the approaches is applied to shipments of HCPs (the only at-issue drug Rite Aid Mid-Atlantic distributed)[88] from Rite Aid Mid-Atlantic to each of the 43 Rite Aid stores in Cuyahoga and Summit Counties.[89] The approaches are applied separately, not in combination.

56. Under his five methodologies, Dr. McCann's approaches flag as much as ▮▮▮▮ of shipments in Cuyahoga County and ▮▮▮▮ in Summit County, with the share flagged depending on the approach and how the share of shipments flagged are measured, as seen in **Exhibit 6** below. On its face, a methodology that flags nearly ▮▮▮▮ of shipments as being potentially suspicious, without any corroboration of diversion, cannot be taken seriously.

---

[84] Rafalski Report, pp. 40-41.
[85] *Id.*, p. 41.
[86] McCann Report, Section X.
[87] Dr. McCann excludes buprenorphine and methadone, which are treatment drugs (McCann Report, footnote 54).
[88] Dr. McCann incorrectly flags Rite Aid's orders of schedule III codeine, a substance that is beyond the scope of the litigation. Although codeine can be schedule II depending on the dosage, Rite Aid Mid-Atlantic did not distribute any schedule II codeine. ▮▮▮▮ and ECF No. 693, p. 3 ("Accordingly, the Special Master RULES as follows. Defendants shall produce discovery related to all opioid products that are or ever were classified as Schedule II under the Controlled Substances Act.").
[89] Dr. McCann also proposes an alternative approach in which chain pharmacy distributors, including Rite Aid Mid-Atlantic, should have identified suspicious orders based on all distributors shipping opioids to their customers (McCann Report, ¶ 152). The flaws in Dr. McCann's approaches apply equally to this alternative.

30

# EXHIBIT 2



# License Look Up

6/7/2019 10:08 AM

### RITE AID OF MARYLAND, INC. RITE AID LICENSING DEPT.

| | |
|---|---|
| Status | Active |
| Sub-Status | |
| Board | Board of Pharmacy |
| License Type | Wholesaler - Category 3 |
| License Number | 011170150 |
| License Issue Date | 11/01/1999 |
| License Expiration Date | 06/30/2021 |
| License Effective Date | 07/01/2019 |
| Street Address | 601 CHELSEA ROAD |
| City | ABERDEEN |
| State | MD |
| Zipcode | 21001-4306 |
| Country | United States |
| Board Action | No |

Supervised By:

| Supervisor Name | Supervisor License | Status | Start Date | End Date |
|---|---|---|---|---|
| Amanda Glover | | Active | Mon May 13 00:00:00 GMT 2019 | |

Current date & time: **6/7/2019 10:08 AM**

**Disclaimer:** The Joint Commission and NCQA consider on-line status information as fulfilling the primary source verification requirement for verification of licensure in compliance with their respective credentialing standards.

# EXHIBIT 3

10-K 1 a2208945z10-k.htm 10-K

Use these links to rapidly review the document
[TABLE OF CONTENTS](#)
[Item 9B. Other Information](#)

[Table of Contents](#)

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For The Fiscal Year Ended March 3, 2012**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For The Transition Period From            To**

**Commission File Number 1-5742**

# RITE AID CORPORATION
(Exact name of registrant as specified in its charter)

| Delaware | 23-1614034 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **30 Hunter Lane, Camp Hill, Pennsylvania** | **17011** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(717) 761-2633**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $1.00 par value | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒    No ☐

**Seasonality**

We experience moderate seasonal fluctuations in our results of operations concentrated in the first and fourth fiscal quarters as the result of the concentration of the cough, cold and flu season and the holidays. We tailor certain front end merchandise to capitalize on holidays and seasons. We increase our inventory levels during our third fiscal quarter in anticipation of the seasonal fluctuations described above. Our results of operations in the fourth and first fiscal quarters may fluctuate based upon the timing and severity of the cough, cold and flu season, both of which are unpredictable.

**Regulation**

Our business is subject to federal, state, and local government laws, regulations and administrative practices. We must comply with numerous provisions regulating health and safety, equal employment opportunity, minimum wage and licensing for the sale of drugs, alcoholic beverages, tobacco and other products. In addition we must comply with regulations pertaining to product content, labeling, dating and pricing.

Pursuant to the Omnibus Budget Reconciliation Act of 1990 ("OBRA") and comparable state regulations, our pharmacists are required to offer counseling, without additional charge, to our customers about medication, dosage, delivery systems, common side effects and other information deemed significant by the pharmacists and may have a duty to warn customers regarding any potential adverse effects of a prescription drug if the warning could reduce or negate such effect.

The appropriate state boards of pharmacy must license our pharmacies and pharmacists. Our pharmacies and distribution centers are also registered with the Federal Drug Enforcement Administration and are subject to Federal Drug Enforcement Agency regulations relative to our pharmacy operations, including regulations governing purchasing, storing and dispensing of controlled substances. Applicable licensing and registration requirements require our compliance with various state statutes, rules and/or regulations. If we were to violate any applicable statute, rule or regulation, our licenses and registrations could be suspended or revoked or we could be subject to fines or penalties. Any such violation could also damage our reputation and brand.

In recent years, an increasing number of legislative proposals have been enacted (including the Patient Protection and Affordable Care Act), introduced or proposed in Congress and in some state legislatures that affect or would affect major changes in the healthcare system, either nationally or at the state level. The legislative initiatives include changes in reimbursement levels, changes in qualified participants, changes in drug safety regulations and e-prescribing. We cannot predict the timing of enactment of any such proposals to the extent not yet approved or the long-term outcome or effect of legislation from these efforts on our business.

Our pharmacy business is subject to patient privacy and other obligations, including corporate, pharmacy and associate responsibility imposed by the Health Insurance Portability and Accountability Act. As a covered entity, we are required to implement privacy standards, train our associates on the permitted uses and disclosures of protected health information, provide a notice of privacy practice to our pharmacy customers and permit pharmacy customers to access and amend their records and receive an accounting of disclosures of protected health information. Failure to properly adhere to these requirements could result in the imposition of civil as well as criminal penalties.

We are also subject to laws governing our relationship with our associates, including minimum wage requirements, overtime, working conditions and unionizing efforts. Increases in the federal minimum wage rate, associate benefit costs or other costs related to associates could adversely affect our results of operations.

In addition, in connection with the ownership and operations of our stores, distribution centers and other sites, we are subject to laws and regulations relating to the protection of the environment and

10

We own our corporate headquarters, which is located in a 205,000 square foot building at 30 Hunter Lane, Camp Hill, Pennsylvania 17011. We lease 366,400 square feet of space in various buildings near Harrisburg, Pennsylvania for document warehousing use and additional administrative personnel. We own additional buildings near Harrisburg, Pennsylvania which total 105,800 square feet and house our model store and additional administrative personnel.

We operate the following distribution centers and satellite distribution locations, which we own or lease as indicated:

| Location | Owned or Leased | Approximate Square Footage |
|---|---|---|
| Poca, West Virginia | Owned | 255,000 |
| Dunbar, West Virginia(1) | Leased | 110,000 |
| Perryman, Maryland | Owned | 885,000 |
| Perryman, Maryland(1) | Leased | 262,000 |
| Tuscaloosa, Alabama | Owned | 230,000 |
| Cottondale, Alabama(1) | Leased | 224,000 |
| Pontiac, Michigan | Owned | 325,000 |
| Woodland, California | Owned | 513,000 |
| Woodland, California(1) | Leased | 200,000 |
| Wilsonville, Oregon | Leased | 547,000 |
| Lancaster, California | Owned | 914,000 |
| Charlotte, North Carolina | Owned | 585,500 |
| Charlotte, North Carolina(1) | Leased | 291,000 |
| Dayville, Connecticut | Owned | 460,000 |
| Liverpool, New York | Owned | 828,000 |
| Philadelphia, Pennsylvania | Owned | 245,000 |
| Philadelphia, Pennsylvania(1) | Leased | 415,000 |

(1)     Satellite distribution locations.

The original terms of the leases for our distribution centers and satellite distribution locations range from 5 to 22 years. In addition to minimum rental payments, certain distribution centers require tax reimbursement, maintenance and insurance. Most leases contain renewal options, some of which involve rent increases. Although from time to time, we may be near capacity at some of our distribution facilities, particularly at our older facilities, we believe that the capacity of our facilities is adequate.

We also own a 55,800 square foot ice cream manufacturing facility located in El Monte, California.

On a regular basis and as part of our normal business, we evaluate store performance and may reduce in size, close or relocate a store if the store is redundant, underperforming or otherwise deemed unsuitable. We also evaluate strategic dispositions and acquisitions of facilities and prescription files. When we reduce in size, close or relocate a store or close distribution center facilities, we often continue to have leasing obligations or own the property. We attempt to sublease this space. As of March 3, 2012, we had 8,633,833 square feet of excess space, 4,907,155 square feet of which was subleased.

22