**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

*County of Summit, Ohio, et al. v. Purdue
Pharma L.P., et al.,*
Case No. 18-op-45090 (N.D. Ohio)

*The County of Cuyahoga, Ohio, et al. v.
Purdue Pharma L.P., et al.,*
Case No. 17-op-45004 (N.D. Ohio)

**MDL No. 2804
Case No. 17-md-2804
Judge Dan Aaron Polster**

**MEMORANDUM IN SUPPORT OF
PHARMACY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' CIVIL CONSPIRACY CLAIM**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF UNDISPUTED FACTS ......................................................... 2

LEGAL STANDARD ........................................................................................... 6

ARGUMENT ......................................................................................................... 6

I.    There Is No Evidence That Pharmacy Defendants Were Part Of A Malicious
Combination............................................................................................... 7

        A.    To The Extent Any Evidence Of A Malicious Combination Exists,
Pharmacy Defendants Played No Role In It ........................................ 8

        B.    Pharmacy Defendants Did Not Enter A Conspiracy By Agreeing To
Distribute And Dispense Prescription Opioids .................................. 10

        C.    Pharmacy Defendants Did Not Enter A Conspiracy By Participating In
Legitimate Trade Associations .......................................................... 12

        D.    Plaintiffs Cannot Establish A Conspiracy By Presenting Evidence Of
Parallel Conduct.................................................................................. 14

II.    Plaintiffs Cannot Establish That Any Purported Conspiracy Resulted In An
Unlawful Act That Caused Them Damages ................................................ 17

CONCLUSION.................................................................................................... 18

## <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Aetna Cas. & Sur. Co. v. Leahey Const. Co.*,
219 F.3d 519 (6th Cir. 2000) ......................................................................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................16

*Bevan Grp. 9 v. A-Best Prod. Co.*,
No. 501703, 2004 WL 1191713 (Ohio C.P. May 17, 2004)....................6, 7

*Castaneda v. Immigration & Naturalization Serv.*,
557 F.2d 79 (6th Cir. 1977) .......................................................................16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).......................................................................................6

*Crosby v. Beam*,
615 N.E.2d 294 (Oh. Ct. App. 1992) ........................................................18

*Fuller & Assocs. v. Heil Windermere Moving & Storage Co.*,
2005-Ohio-2598 (Ohio Ct. App. 2005).......................................................7

*In re Asbestos Sch. Litig.*,
46 F.3d 1284 (3d Cir. 1994).................................................................13, 14

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) .....................................................................14

*In re Welding Fume Prod. Liab. Litig.*,
No. 03-cv-17000, 2007 WL 1087605 (N.D. Ohio Apr. 9, 2007) ...............8

*In re Welding Prods. Liab. Litig.*,
526 F. Supp.2d 775 (N.D. Ohio 2007)......................................................14

*Johnston v. MidFirst Bank*,
No. 5:14-CV-466, 2015 WL 5175147 (N.D. Ohio Sept. 3, 2015).............6

*Kimmel v. Lowe's, Inc.*,
2011-Ohio-28 (Ohio Ct. App. 2011).........................................................17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................................6, 17

*Moore v. Johnson & Johnson*,
    907 F. Supp. 2d 646 (E.D. Pa. 2012) ..............................................................10

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ...........................................................................................13

*Opdyke Inv. Co. v. City of Detroit*,
    883 F.2d 1265 (6th Cir. 1989) ........................................................................13

*Parker v. Eli Lily & Co.*,
    No. CV-274501, 1996 WL 1586780 (Ohio C.P. Jun. 21, 1996) ..........14

*Payton v. Abbott Labs*,
    512 F. Supp. 1031 (D. Mass. 1981) ...............................................................12

*State ex rel. Jennings v. Purdue Pharma L.P.*,
    No. N18C-01-223, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019 ......10

*United Food & Commercial Workers v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) .........................................................................10

*Williams v. Aetna Fin. Co.*,
    700 N.E.2d 859 (Oh. 1998) ..............................................................................17

*Woodward Constr., Inc. v. For 1031 Summit Woods, L.L.C.*,
    2015-Ohio-975 (Ohio Ct. App. 2015) .............................................7, 8, 11, 17

## STATUTES

21 U.S.C. § 823(b)(1), (e)(1) ...............................................................................4, 15

## OTHER AUTHORITIES

Baldwin's Oh. Prac. Tort L. § 35:48 .....................................................................7

16 Ohio Jur. 3d Conspiracy—Civil Aspects § 1 ...............................................10

## INTRODUCTION

To meet their burden on their civil conspiracy claim, Plaintiffs must prove that Pharmacy Defendants[1] were part of a "malicious combination," meaning that they shared a common understanding to work together to harm another through an intentional unlawful act.  At this stage of the case—with extensive discovery, including hundreds of depositions, now complete—allegations are no longer sufficient.  Plaintiffs must offer *actual evidence* from which a factfinder could conclude that Pharmacy Defendants were part of a conspiracy.  Plaintiffs cannot meet that burden by showing that Pharmacy Defendants distributed a lawful product, that Pharmacy Defendants participated in trade associations, or even, as Plaintiffs may assert, that Pharmacy Defendants committed separate regulatory violations.  Nor can Plaintiffs meet that burden by showing a RICO enterprise, because (it is worth underscoring) Plaintiffs did not allege a RICO claim against Pharmacy Defendants.

Plaintiffs' conspiracy theory rests on allegations that *Manufacturer Defendants* used "front groups" of medical professionals to spread false and misleading information about prescription opioids in order to stoke demand, ultimately leading to a crisis of addiction.  But whatever evidence may support that claim—and Manufacturer Defendants will no doubt argue there is none—one thing is crystal clear:  *Pharmacy Defendants* had nothing to do with that alleged conspiracy.  Pharmacy Defendants did not market opioids and were not part of any scheme to propagate false or misleading claims about opioid addiction.  Indeed, Plaintiffs' own experts have identified Pharmacy Defendants as among the *targets* of this alleged conspiracy.

---

[1] "Pharmacy Defendants" are CVS Rx Services, Inc. and CVS Indiana, L.L.C. ("CVS Distributors"), Rite Aid of Maryland, Inc., d/b/a Mid-Atlantic Customer Support Center ("Rite Aid"), Walgreen Co. and Walgreen Eastern Co. ("Walgreens"), HBC Service Company, an unincorporated operating division of Giant Eagle, Inc. ("Giant Eagle"), Discount Drug Mart ("DDM"), and Walmart Inc. ("Walmart").

The record evidence of Pharmacy Defendants' actual conduct provides no basis to find an actionable conspiracy.  Although Pharmacy Defendants distributed and sold opioids that had been prescribed by licensed medical professionals, they did not enter a conspiracy merely by distributing and selling an FDA-approved medication.  And while Pharmacy Defendants participated in trade associations, including the National Association of Chain Drug Stores, the evidence shows those associations *cooperated* with the DEA to promote regulatory compliance and *prevent* opioid abuse.  Plaintiffs may disagree with some of the policy positions staked out by those associations, but that kind of protected First Amendment activity cannot form the basis for a conspiracy claim.

Finally, it does Plaintiffs no good to argue that the requisite malicious combination is somehow proven because (they argue) Pharmacy Defendants fell short of various regulatory requirements in the conduct of their business.  Even assuming Plaintiffs can prove these alleged regulatory shortcomings (and they cannot), that would only show that individual defendants had individual compliance systems that contained deficiencies.  A conspiracy requires more than evidence that multiple defendants violated similar regulations at the same time; a conspiracy requires proof of a common understanding to work together to violate the law.  The separate regulatory violations alleged here provide no basis for such a finding.[2]

## STATEMENT OF UNDISPUTED FACTS

### A. Pharmacy Defendants' Distribution And Dispensing Of Prescription Opioids.

Pharmacy Defendants are operators of retail pharmacy chains.  Plaintiffs have raised no claim concerning Pharmacy Defendants' actions as *pharmacies*.  Doc. 1203 at 2.  Instead,

---

[2] Although Plaintiffs' claims against the Distributor Defendants raise separate factual issues, the legal arguments raised by Distributor Defendants in their conspiracy brief are relevant here, as well, and Pharmacy Defendants incorporate that brief by reference.  *See* Doc. 1692.

2

Plaintiffs' claims relate to Pharmacy Defendants' conduct as distributors of prescription opioids to their own pharmacies.  *Id.*  As self-distributors, Pharmacy Defendants distributed only to their own pharmacists and did not distribute to any third-party pharmacies or pain clinics— independents, internet pharmacies, "pill mills," or otherwise.  Ex. 1;[3] Ex. 3 at 1-2, 9; Ex. 10 at 37; Ex. 11 at 22:4-8, 51:17-19; Ex. 16 at 259:25-260:13; Ex. 17 at 100:15-20; Ex. 27 at 23-25; Ex. 28 at 7-9; Ex. 29 at 9; Ex. 30 at 17; *see also* Ex. 23 at 449:1-18, 481:13-482:1, 483:7-484:23, 1175:14-1176:14; Ex. 39 at 3.

After all of the extensive discovery taken in this case, there is no evidence that Pharmacy Defendants were party to any kind of agreement to mislead the public about the addictive properties of opioids.  To the contrary, Pharmacy Defendants never marketed opioids.  *See, e.g.*, Ex. 13 at 57:10-16 (explaining that Walmart "never did anything that would promote opioids to the customer, to the end customer user, the patient that would pick up the prescription"); *see also* Ex. 2 at 9, 13, 20-21; Ex. 3 at 5, 10, 14; Ex. 5 at 4-6; Ex. 8 at 9-10, 15-16, 22, 25; Ex. 9 at 15, 39-40, 48-49; Ex. 10 at 31-32; Ex. 14 at 48:11-18. And in fact Pharmacy Defendants have no capacity to drive demand, because they only ever distributed controlled substances to their own pharmacies to be dispensed pursuant to a prescription and do not market medications to prescribing doctors.  *See* Ex. 39 at 42 (noting that distributors, unlike manufacturers, do not market to doctors).  For this reason, when Plaintiffs' experts describe a conspiracy to market opioids, they describe an alleged conspiracy involving the Manufacturer Defendants.  *See, e.g.*, Ex. 32 at 5 (assessing "manufacturers' deceptive marketing strategy and tactics").

---

[3] Citations to "Ex." refer to the exhibits to the Declaration of Tara A. Fumerton in Support of Pharmacy Defendants' Motion for Summary Judgment on Plaintiffs' Civil Conspiracy Claim, filed contemporaneously with this memorandum.

In fact, according to Plaintiffs' experts, the evidence shows that Pharmacy Defendants were among the *recipients* of Manufacturer Defendants' allegedly false and misleading claims. *See, e.g.*, Ex. 33 at 7 n.9.  For example, Plaintiffs' expert Matthew Perri points to an "educational letter and pamphlet from Purdue to pharmacies" that contained allegedly misleading statements. Ex. 33 at 61 n.194.  Plaintiffs' expert Anna Lembke likewise quotes a Purdue document identifying "pharmacists" as among those creating a "barrier to vastly improved treatment for hundreds of thousands of people in pain."  Ex. 34 at 9; *see also* Ex. 24 at 270:12-19.

There is also no evidence that Pharmacy Defendants' policies and procedures for distributing opioids were the product of a common scheme to cause intentional harm.  These procedures were driven by regulations that apply to *all* controlled substances—not just opioids. *See* 21 U.S.C. § 823(b)(1), (e)(1).  And different Pharmacy Defendants adopted different order-monitoring procedures at different times, meaning that their conduct in this regard was not even remotely parallel.  For instance, in 2008 CVS hired an external vendor to develop a computerized system to help identify potentially suspicious orders, Ex. 30 at 19-20; Walmart enhanced its own internal systems throughout the relevant time period, including implementing automatic threshold alerts in 2011 and algorithmic order monitoring in 2017, Ex. 4 at 6, Ex. 19 at 256:21-257:4, 265:1-24, 435:2-436:6; Walgreens enhanced its own efforts in 2010 with a new computer algorithm that it developed internally, Ex. 40 at 10; Giant Eagle enhanced its integrated controls with the addition of an algorithm threshold system in 2013, Ex. 31 at 43-44, 48-49; and Rite Aid enhanced its existing systems in the early 2000s with the assistance of an outside consultant, Ex. 5 at 2, Ex. 18 at 25:24-27:14, 70:22-71:21,72:3-74:1.  There is no evidence that the Pharmacy Defendants' adoption of these various policies and procedures was the product of a

common understanding, scheme, or agreement to engage in an intentional violation of the law, as opposed to Pharmacy Defendants' independent, parallel efforts to *comply* with the law.

### B. Pharmacy Defendants' Participation In Industry Associations.

Plaintiffs' expert witnesses claim that Manufacturer Defendants used "front groups" of medical professionals to spread false information about opioids.  *See, e.g.*, Ex. 34 at 7; Ex. 35 at 37-38; Ex. 38 at 296-309.  But those experts nowhere suggest that Pharmacy Defendants played any kind of role in that alleged scheme.  *See, e.g.*, Ex. 24 at 267:16-23 (testimony by Plaintiffs' expert that she is not aware of "any marketing of opioids that was done by any of the retail chain pharmacies"); Ex. 21 at 414:5-11 (testimony by Plaintiffs' expert disclaiming any intention to offer opinions regarding Pharmacy Defendants).

Certain Pharmacy Defendants may have participated in events and other forums hosted by another organization, the Healthcare Distribution Alliance ("HDA"),[4] but the evidence shows that Pharmacy Defendants, unlike other Distributor Defendants, were not members of the HDA. Ex. 3 at 7-8; Ex. 6 at 7-8; Ex. 7 at 17; Ex. 9 at 20-21; Ex. 10 at 26-27; Ex. 15 at 390:5-11; Ex. 20 at 124:10-11; *see also* Ex. 49.[5]  There is nothing inherently nefarious about Pharmacy Defendants' participation in HDA events, as the DEA itself also attended HDA events and used them as a venue to provide information to distributors.  *See, e.g.*, Ex. 25 at 42:12-16; Ex. 43.

While Pharmacy Defendants were not members of HDA, Pharmacy Defendants or their parent corporations were members of a different association, the National Association of Chain

---

[4] The HDA was formerly known as the Healthcare Distribution Management Association or National Wholesale Druggists' Association.  This brief uses "HDA" to refer to all three incarnations of the organization.

[5] While another CVS entity became an "affiliate" member of HDA in 2008 (when it acquired a pharmacy benefit manager with such an "affiliate" membership), no CVS entity has ever held an HDA board seat or position or been part of any HDA committee, task force, or working group.  *See* Ex. 6 at 7-8; Ex. 22 at 439:4-17; Ex. 44.

Drug Stores ("NACDS").  Ex. 3 at 4, 7-8; Ex. 7 at 17; Ex. 9 at 20-21; Ex. 10 at 26-27; Ex. 15 at 390:18-391:2; Ex. 19 at 342:16-20; Ex. 41.  NACDS's mission is to "advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."  Ex. 50.  NACDS coordinated with the DEA to provide Pharmacy Defendants with information on regulatory best practices.  *See, e.g.*, Ex. 46; Ex. 47; Ex. 48.  In addition, NACDS engaged in lobbying and litigation activity, including promoting measures to curb opioid abuse, while also opposing other measures on grounds that they would not be effective.  *See, e.g.*, Ex. 45.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In response to a properly supported motion for summary judgment, the non-movant must offer "specific facts showing that there is a genuine issue [of material fact] for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Those specific facts "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party "must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *Johnston v. MidFirst Bank*, No. 5:14-CV-466, 2015 WL 5175147, at *3 (N.D. Ohio Sept. 3, 2015) (*quoting Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995)).

## ARGUMENT

Under Ohio law, a plaintiff claiming a civil conspiracy must establish "'a malicious combination of two or more persons to injure another, in person or property, in a way not competent for one alone, resulting in actual damage.'"  *Bevan Grp. 9 v. A-Best Prod. Co.*, No.

501703, 2004 WL 1191713, at *8 (Ohio C.P. May 17, 2004) (quoting *Minarik v. Nagy*, 8 Ohio App.2d 194 (Ohio Ct. App. 1963)).  Because Plaintiffs cannot meet this standard, Pharmacy Defendants are entitled to summary judgment on Plaintiffs' civil conspiracy claim.

**I.  There Is No Evidence That Pharmacy Defendants Were Part Of A Malicious Combination.**

The essence of a conspiracy is the requirement of a "malicious combination," which courts define as "a common understanding or design, even if tacit, to commit an unlawful act." *Woodward Constr., Inc. v. For 1031 Summit Woods, L.L.C.*, 2015-Ohio-975, ¶¶ 23-24 (Ohio Ct. App. 2015) (citation omitted).  The requirement of a malicious combination distinguishes a conspiracy both from unlawful-but-separate acts and from lawful concerted action; it requires concerted action purposefully directed toward an unlawful end, and it is not met where acts are (1) unlawful but separate or (2) concerted but lawful.

A malicious combination must be just that—*malicious*.  Malice is a state of mind involving intentional wrongdoing, which may be established by showing "a common design by two or more persons to cause harm to another." *Fuller & Assocs. v. Heil Windermere Moving & Storage Co.*, 2005-Ohio-2598, ¶¶ 27-28 (Ohio Ct. App. 2005).  In Ohio, as elsewhere, there is no such thing as a conspiracy to commit negligence.  "Ohio law deems civil conspiracy an intentional tort," with the result that "plaintiffs must demonstrate that [Defendants] purposely committed a wrongful act." *Bevan Group*, 2004 WL 1191713, at *8.  So concerted action is not inherently unlawful and must be shown to be purposefully directed to an unlawful end.

A malicious combination also must be a *combination*.  "The heart of a conspiracy is concerted action, a combination of two or more persons working together to accomplish a criminal or unlawful purpose."  Baldwin's Oh. Prac. Tort L. § 35:48 (2d ed.) (internal quotation marks omitted).  A plaintiff "need not prove an *express* agreement," but a plaintiff must show

some "type of agreement, common understanding or design." *Woodward Constr.*, 2015-Ohio-975, ¶¶ 22; *see also Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 538 (6th Cir. 2000).  Put differently, a plaintiff must show a "meeting of the minds," meaning the "'minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts and to commit the offense charged, although such agreement is not manifested by any formal words, or by a written instrument.'" *In re Welding Fume Prod. Liab. Litig.*, No. 03-cv-17000, 2007 WL 1087605, at *9 (N.D. Ohio Apr. 9, 2007) (citation omitted).  This requirement of a combination distinguishes a conspiracy from a series of separate unlawful acts.

There is simply no evidence that Pharmacy Defendants were party to any such common plan, understanding, or design.  Pharmacy Defendants did not enter into a conspiracy by engaging in legitimate business activities involving the distribution of a lawful medication.  And even assuming Pharmacy Defendants committed any regulatory violations (and they did not), there is no evidence that those violations were part of a common plan.

**A.   To The Extent Any Evidence Of A Malicious Combination Exists, Pharmacy Defendants Played No Role In It.**

Plaintiffs' witnesses devote significant attention to establishing the existence of a conspiracy on the part of Manufacturer Defendants to use "front groups" of medical professionals to spread misleading information about the addictive properties of prescription opioids.  Plaintiffs' witnesses claim that "the *opioid manufacturers* contributed to altering the standard of care for the treatment of pain" through their involvement in these groups, Ex. 38 at 296 (emphasis added); that "*pharmaceutical companies* provided financial support for medical education" to promote opioids, Ex. 35 at 24 (emphasis added); and that there were "concerted efforts by pain specialists funded significantly by Purdue and the other *opioid manufacturers* to persuade state medical boards and state legislatures to remove legal impediments to opioid-based

pain treatment," Ex. 37 at 24 (emphasis added).  No doubt Manufacturer Defendants will dispute that such testimony is sufficient to establish a conspiracy.  But, for purposes of this brief, the key point is that such claims do not even *allege* any conspiracy involving Pharmacy Defendants.

And, of course, discovery has revealed no evidence that Pharmacy Defendants were a part of any alleged conspiracy to market prescription opioids.  On the contrary, Pharmacy Defendants have never marketed prescription opioids.  *See* Ex. 2 at 9, 13, 20-21; Ex. 3 at 5, 10, 14; Ex. 5 at 4-6; Ex. 8 at 9-10, 15-16, 22, 25; Ex. 9 at 15, 39-40, 48-49; Ex. 10 at 31-32; Ex. 12 at 51:10-22; Ex. 13 at 57:10-16.  Indeed, Pharmacy Defendants have no real ability to engage in such marketing, as Pharmacy Defendants cannot dispense controlled substances without a prescription and (unlike Manufacturer Defendants) have no capacity to influence the prescribing decisions of physicians.  *See* Ex. 39 at 42 ("Opioid manufacturers . . . *unlike distributors* . . . make routine sales calls on prescribers' offices" (emphasis added)).

To the extent that Plaintiffs' witnesses mention Pharmacy Defendants at all in connection with this alleged conspiracy, they list Pharmacy Defendants among the *recipients* of misinformation.  Thus, for example, Matthew Perri states that "pharmacists that dispense prescriptions may also receive promotional messages," giving as an example an "educational letter and pamphlet from Purdue to pharmacies" that contained allegedly misleading statements. Ex. 33 at 61 & n.194; *see also id.* at 7 n.9 (stating that the "customers of a pharmaceutical company's marketing activities include . . . pharmacies, pharmacists, wholesale distributors"). Anna Lembke likewise quotes a Purdue document identifying "doctors, pharmacists, and regulatory bodies" as a "barrier to vastly improved treatment for hundreds of thousands of people in pain."  Ex. 34 at 9; *see also* Ex. 36 at 4 (opining that "Cardinal Provided Marketing to

Manufacturers to Get Messages to CVS").  This evidence shows that Pharmacy Defendants were among the targets of—not participants in—the alleged conspiracy.

**B.      Pharmacy Defendants Did Not Enter A Conspiracy By Agreeing To Distribute And Dispense Prescription Opioids.**

While there is no dispute that Pharmacy Defendants distributed and sold prescription opioids, Pharmacy Defendants did not enter a conspiracy by selling lawful products.  *See* 16 Ohio Jur. 3d Conspiracy—Civil Aspects § 1 ("Parties cannot conspire to do that which they are legally entitled to do.").  Rather, to be liable for a conspiracy, a defendant must agree to help bring about the alleged violation of the law.  Pharmacy Defendants' distribution and sale of a lawful product is not evidence of an agreement to engage in intentional wrongdoing.

Courts have repeatedly rejected the idea that pharmacies or others in the drug distribution chain "conspire" with drug manufacturers simply by distributing their products.  Most relevant here, in *State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223, 2019 WL 446382, at *14 (Del. Super. Ct. Feb. 4, 2019), the Delaware Superior Court rejected a claim that manufacturers, distributors, and pharmacies conspired to create the opioid crisis, holding that there were "no allegations of a concerted action, an agreement to commit an underlying wrong, awareness of an agreement, or action in accordance with that agreement."  Similarly, *Moore v. Johnson & Johnson*, 907 F. Supp. 2d 646, 672 (E.D. Pa. 2012), rejected the notion that Costco "conspired" with the manufacturer of Children's Tylenol when it agreed to distribute the drug.  And *United Food & Commercial Workers v. Walgreen Co.*, 719 F.3d 849, 854–55, 856-67 (7th Cir. 2013), found no basis for a RICO conspiracy (a claim not even alleged against the Pharmacy Defendants here) where the "allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy."  Were it otherwise, retailers would be in a "conspiracy" with the manufacturers

of every product that they carry and would be vicariously liable for all those manufacturers'
misdeeds.  Of course that is not the law.

In this regard, the Ohio Court of Appeals' decision in *Woodward Construction*, 2015-
Ohio-975, is instructive.  That case involved a real estate transaction in which a middleman
purchased property from one set of sellers and then allegedly concealed material facts when
selling it to another set of buyers.  *Id.* at ¶¶ 3-8.  Although the sellers' participation was essential
for the transaction to go forward, their participation in the transaction was not sufficient to make
out a civil conspiracy claim.  *Id.* ¶ 22.  The court explained that, "[w]hile a party need not prove
an express agreement to establish the malicious combination necessary for a civil conspiracy, it
must at least show 'a common understanding or design, even if tacit, to commit an unlawful
act.'"  *Id.* (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)).  An agreement
to participate in the business transaction was not enough.

Likewise in this case, while there is evidence in the record of ordinary business
transactions between Pharmacy Defendants and the Manufacturer Defendants, that evidence
reflects nothing more than the existence of legitimate business relationships.  Thus, for instance,
the record reflects that manufacturers offered rebates and other pricing incentives for Pharmacy
Defendants to stock their products, which shows nothing more than that the parties negotiated
over price.  Ex. 36 at 7; *see also* Ex. 13 at 156:6-24.  Similarly, while Plaintiffs' expert David
Egilman asserts that "Purdue and Walgreens co-promoted Hysingla," Ex. 36 at 3, the document
that he points to has nothing to do with co-promotion or any other kind of marketing, but is an
agreement for Purdue to provide "a list of potential Hysingla ER prescribers" so that Walgreens
"can determine the appropriate stores to stock," *id.* at 6.  Dr. Egilman likewise asserts that
"Walmart helped Actavis Market Opioids," *id.* at 5, but the only evidence that he cites is an

11

Actavis presentation given to Walmart concerning sales of the entire range of Actavis products—including medications for cancer, diabetes, respiratory illnesses, and women's health, *id.* at 8-41. And while Dr. Egilman claims that "Rite Aid Provided Marketing Services to Teva," the only evidence he cites is an unexecuted draft contract for Rite Aid to provide educational information to patients about the correct administration of a product after the prescription was filled. *Id.* at 42-44; *see also* Ex. 26 at 780:2-781:4. All such evidence shows is that Pharmacy Defendants treated prescription opioids like *any other prescription medication*. That kind of legitimate business activity is not proof of a conspiracy to harm another.

> **C.**   **Pharmacy Defendants Did Not Enter A Conspiracy By Participating In Legitimate Trade Associations.**

Pharmacy Defendants also did not enter a conspiracy by participating in legitimate trade associations.

While the evidence shows that representatives of certain Pharmacy Defendants occasionally attended conferences and other meetings hosted by the HDA, that alone is not proof of a conspiracy. *See, e.g.*, *Payton v. Abbott Labs*, 512 F. Supp. 1031, 1038 (D. Mass. 1981) ("There is nothing inherently wrong with membership in an industry-wide trade association [or] with participating in scientific conferences . . . ."). Despite attending some HDA events, the Pharmacy Defendants were not actually members of that organization. *See supra* p. 5 & n. 5. And regardless, Plaintiffs themselves acknowledge that HDA was involved in legitimate activity; indeed, Plaintiffs' experts approvingly cite guidelines for suspicious order monitoring that were developed by HDA. *See*, *e.g.*, Ex. 39 at 195 (faulting Walgreens for allegedly not complying with "[HDA] voluntary industry guidelines"); Ex. 40 at 3 (noting that DEA sent a letter "commending the [HDA] for their efforts to assist their members in fulfilling the obligations"). Given the significant legitimate work undertaken by HDA, mere participation in events hosted

by HDA cannot possibly be proof of a malicious combination.  There is no evidence to suggest that any Pharmacy Defendant's attendance at these events was part of any unlawful conspiracy.

While the Pharmacy Defendants were not members of HDA, Pharmacy Defendants or their parent corporations were members of a different trade association devoted to their interests—the NACDS.  But this, too, is inconsistent with the notion of an overarching conspiracy, because it only shows that the various defendants in this case were members of *separate* organizations devoted to their *separate* interests.  Moreover, the evidence confirms that, far from having a malicious purpose, NACDS is a legitimate industry association that helped to promote regulatory compliance.  Among other things, the NACDS facilitated meetings where DEA representatives provided information relevant to members' anti-diversion efforts.  *See* Ex. 45 at 3; *see also* Ex. 46; Ex. 47; Ex. 48.  There is no evidence of any kind that the NACDS was the nexus of a conspiracy to commit intentional wrongdoing.

Even if Plaintiffs disagree with some of the policy positions staked out by the NACDS or HDA, that kind of advocacy work is fully protected by the First Amendment and cannot form the basis for a conspiracy claim.  *See, e.g.*, *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989) (explaining that liability can be imposed on the basis of lobbying and litigation only if such activity was a "sham").  As the Third Circuit explained in an opinion by then-Judge Alito, "[j]oining organizations that participate in public debate, making contributions to them, and attending their meetings are activities that enjoy substantial First Amendment protection." *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1294 (3d Cir. 1994).  Citing the Supreme Court's opinion in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the court held that a plaintiff seeking to hold a defendant liable for conspiracy based on membership in a trade association must show that the defendant's "actions taken in relation to the [trade association]

13

were specifically intended to further [the alleged conspiracy's] wrongful conduct," as opposed to the association's protected First Amendment activity.  46 F.3d at 1290; *see also In re Welding Prods. Liab. Litig.*, 526 F. Supp.2d 775, 804-06 (N.D. Ohio 2007) (applying the rule announced in *Asbestos School Litigation* to grant summary judgment for defendants on a conspiracy claim).  The record in this case contains no evidence from which a jury could make such a finding.

> **D.  Plaintiffs Cannot Establish A Conspiracy By Presenting Evidence Of Parallel Conduct.**

In an attempt to transform this legitimate business activity into a conspiracy, Plaintiffs have alleged that Pharmacy Defendants fell short of various regulatory obligations in the course of distributing prescription medications—including the obligation to report suspicious orders to the DEA.  Defendants will be filing additional briefs explaining that those allegations are meritless.  But even assuming for purposes of the conspiracy claim that those allegations have merit (and they do not), they would at most establish discrete violations, not a civil conspiracy. The evidence does not establish any connection between any individual supposed wrongdoing and an agreement (tacit or otherwise) involving Pharmacy Defendants.

Evidence that members of an industry engaged in parallel conduct (or even that they committed similar regulatory violations) is insufficient as a matter of law to support a claim for civil conspiracy.  *See, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) ("parallel conduct" is not sufficient to prove a conspiracy); *In re Asbestos Sch. Litig.*, 46 F.3d at 1286 (same).  Thus, for instance, in *Parker v. Eli Lily & Co.*, No. CV-274501, 1996 WL 1586780, at *3 (Ohio C.P. Jun. 21, 1996), the court rejected a claim that drug manufacturers engaged in concerted action to conceal the harmful effects of the drug DES, explaining that parallel conduct by the defendants was insufficient absent "evidence of an agreement, either actual or tacit, among these Defendants with one another or with a manufacturer or distributor

not a party to this lawsuit to aid or substantially assist in the wrongful conduct complained of." A claim of conspiracy requires proof that defendants purposefully worked together to violate the law, not an allegation that defendants all violated the same law at the same time.  And this makes sense:  While parallel regulatory violations may conceivably be individually "malicious," that is not sufficient to show a malicious *combination*.

In this case, while Plaintiffs may attempt to establish various regulatory violations by Pharmacy Defendants, nothing suggests that those supposed violations were *concerted*. Plaintiffs' experts describe the suspicious order monitoring programs of various Pharmacy Defendants, but what is perfectly clear from those descriptions is that different defendants adopted different policies at different times.  *See*, *e.g.*, Ex. 40 at 9 (discussing CVS); *id.* at 10 (discussing Walgreens).[6]  Plaintiffs may argue (incorrectly) that these compliance efforts fell short in various ways, but there is no evidence that these alleged shortcomings were the result of any kind of purposeful scheme to engage in coordinated action to violate the law.

The notion that alleged regulatory violations resulted from an opioid-specific conspiracy is particularly implausible in light of the fact that these regulations apply equally to *all* controlled substances.  *See* 21 U.S.C. § 823(b)(1), (e)(1).  As required by law, Pharmacy Defendants developed suspicious order monitoring procedures to apply to all controlled substances in their supply chain.  *See, e.g.*, Ex. 27 at 14-19; Ex. 30 at 16-24; Ex. 42; *see also* Ex. 40 at 4-8. Pharmacy Defendants did not adopt less stringent procedures for opioids, and in fact the opposite is true:  Pharmacy Defendants in some cases went above and beyond by adopting *additional* protections just for opioid medications.  *See, e.g.*, Ex. 20 at 146:11-24, 190:13-191:21; *see also*

---

[6] And, indeed, that is exactly what the DEA expected distributors to do, as DEA witnesses have made clear there is no one-size-fits-all solution to anti-diversion procedures.  *See, e.g.,* Ex. 23 at 179:22-180:11; Ex. 25 at 466:17-22.

Ex. 19 at 275:9-276:7 (noting additional protections implemented for Schedule II controlled substances); Ex. 31 at 44-45 (same).  It would be nonsensical to conclude that Pharmacy Defendants conspired to illegally expand the market for opioids by adopting *more stringent* procedures for opioids than those they applied to other controlled substances in their supply chain.

Against this backdrop, it should hardly be surprising that even Plaintiffs' own experts concede that Pharmacy Defendants' alleged parallel conduct is the product of the fact that all Pharmacy Defendants are subject to the same competitive pressures in the same marketplace. *See* Ex. 39 at 46; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (noting that parallel conduct may be explained by "rational and competitive business strategy").  At the motion to dismiss stage, Plaintiffs argued that the alleged regulatory violations were *contrary* to economic self-interest, as "each Defendant acted directly against their commercial interests in not reporting the unlawful distribution practices of their competitors."  Doc. 1025 at 97. Discovery has demonstrated, however, that the facts do not support this theory.  There is no evidence that any Pharmacy Defendant had information about distribution to pharmacies other than its own retail stores, and, accordingly, no evidence that Pharmacy Defendants had any information that their competitors were committing violations.  On the contrary, while each Pharmacy Defendant had access to its *own* data, the DEA did not provide Pharmacy Defendants with access to data about the activities of *other* distributors until 2018 (and, even then, the information provided was de-identified).  Ex. 23 at 534:1-535:1; Ex. 25 at 25:6-11.[7]

---

[7] Moreover, Pharmacy Defendants had no legal obligation to report *other* distributors beyond their own supply chain, and the failure to do so is not proof of a conspiracy.  *See Castaneda v. Immigration & Naturalization Serv.,* 557 F.2d 79, 84 (6th Cir. 1977) ("Misprision is not conspiracy.").  Nor is there reason to think that Pharmacy Defendants would have achieved any competitive advantage by filing such a complaint, which might have resulted in the DEA

With discovery now complete, Plaintiffs' claims of a conspiracy must be supported by actual evidence.  "Conceivable" is not good enough.  The Ohio Court of Appeals' conclusion in *Woodward Construction* applies equally here:  Even if the evidence "might . . . [lead] one to speculate that [defendants] must have known what [the alleged wrongdoer] was up to," such "speculation and conjecture . . . [are] insufficient as a matter of law to establish a malicious combination."  2015-Ohio-975, ¶ 28; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (holding, in antitrust context, that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").  Plaintiffs have not identified a single employee of Pharmacy Defendants who reached an agreement—tacit or otherwise—with any employee of another Defendant to do anything nefarious.  They have not even proven truly parallel conduct.  There is simply no evidence that would allow a jury to find that these alleged regulatory violations were the product of a common scheme to bring about an intentional violation of the law.

## II.     Plaintiffs Cannot Establish That Any Purported Conspiracy Resulted In An Unlawful Act That Caused Them Damages.

Plaintiffs' inability to prove a malicious combination provides a sufficient reason to grant summary judgment, as there can be no conspiracy absent a malicious combination.  But Plaintiffs' civil conspiracy claim fails for two additional reasons as well.

First, in addition to proving a malicious combination, a plaintiff alleging a civil conspiracy must prove that the malicious combination resulted in an unlawful act.  *See, e.g.*, *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Oh. 1998) ("An underlying unlawful act is required before a civil conspiracy claim can succeed."); *see also Kimmel v. Lowe's, Inc.*, 2011-

---

imposing a fine but would not have yielded even a single additional sale (or any other benefit) to the reporting company.

Ohio-28, ¶ 20 (Ohio Ct. App. 2011).  Defendants will explain in their forthcoming motions for summary judgment on the merits of each individual claim that each tort alleged by Plaintiffs fails on its own terms.  Absent an underlying wrong, there can be no conspiracy.  And, of course, for all the reasons explained above, even if these claims *do* proceed past summary judgment, there is no evidence to show that the alleged violations were the product of intentional concerted action involving Pharmacy Defendants.

Second, in addition to proving a malicious combination and an unlawful act, Plaintiffs must show that the conspiracy caused them to suffer injury.  *See, e.g.*, *Crosby v. Beam*, 615 N.E.2d 294, 304 (Oh. Ct. App. 1992) ("[T]here must be actual damages attributable to the conspiracy in addition to those damages caused by the underlying tort in order for the plaintiff to recover for the conspiracy.").  Pharmacy Defendants will separately address the issue of causation.  For present purposes, it suffices to note that there is no evidence that Plaintiffs' injuries are the product of a conspiracy, as opposed to a complex mix of other factors—including regulatory inaction, as well as the individual decisions of literally thousands of non-parties to the litigation.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Pharmacy Defendants on Plaintiffs' civil conspiracy claim.

Dated:  June 21, 2019                        Respectfully submitted,

                                             /s/   Tara A. Fumerton
                                             Tina M. Tabacchi
                                             Tara A. Fumerton
                                             JONES DAY
                                             77 West Wacker
                                             Chicago, IL 60601
                                             Phone: (312) 269-4335
                                             Fax: (312) 782-8585
                                             E-mail: tfumerton@jonesday.com

                                             *Attorneys for Walmart Inc.*

                                             /s/   Eric R. Delinsky
                                             Eric R. Delinsky
                                             Alexandra W. Miller
                                             ZUCKERMAN SPAEDER LLP
                                             1800 M Street, NW
                                             Suite 1000
                                             Washington, DC  20036
                                             Phone: (202) 778-1800
                                             Fax: (202) 822-8106
                                             E-mail: edelinsky@zuckerman.com
                                             E-mail: smiller@zuckerman.com

                                             *Attorneys for CVS Rx Services, Inc. and CVS
                                             Indiana, L.L.C.*

                                             /s/   Robert M. Barnes
                                             Robert M. Barnes
                                             Scott D. Livingston
                                             Joshua A. Kobrin
                                             MARCUS & SHAPIRA, LLP
                                             35th Floor, One Oxford Centre
                                             301 Grant Street
                                             Pittsburgh, PA 15219
                                             Phone: (412) 471-3490
                                             Fax: (412) 391-8758
                                             E-mail: rbarnes@marcus-shapira.com
                                             E-mail: livingston@marcus-shapira.com
                                             E-mail: kobrin@marcus-shapira.com

                                             *Attorneys for HBC Service Company*

19

/s/   Kaspar Stoffelmayr
Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Phone: (312) 494-4400
Fax: (312) 494-4440
E-mail: kaspar.stoffelmayr@bartlit-beck.com

*Attorney for Walgreen Co. and Walgreen
Eastern Co.*

/s/   Kelly A. Moore
Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Phone: (212) 309-6612
Fax: (212) 309-6001
E-mail: kelly.moore@morganlewis.com

Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Phone: (215) 963-5917
Fax: (215) 963-5001
E-mail: elisa.mcenroe@morganlewis.com

*Attorneys for Rite Aid of Maryland, Inc., d/b/a
Mid-Atlantic Customer Support Center*

/s/ Timothy D. Johnson
Timothy D. Johnson
Gregory E. O'Brien
CAVITCH FAMILO & DURKIN, CO. LPA
Twentieth Floor
1300 East Ninth Street
Cleveland, OH 44114
Phone: (216) 621-7860
Fax: (216) 621-3415
Email: tjohnson@cavitch.com
Email: gobrien@cavitch.com

*Counsel for Discount Drug Mart, Inc.*

<u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)</u>

Pursuant to Local Rule 7.1(f), I hereby certify that this Court has ordered that Defendants' briefs on the issue of conspiracy are subject to a total length limitation of 60 pages. *See* Doc. 1709 at 3 (No. 1:17-MD-2804).  The foregoing Memorandum of Law is 18 pages of length and, when combined with Defendants' other memoranda addressing the conspiracy issue, within the 60-page limit set by the Court's Order.

/s/  Tara A. Fumerton

Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tfumerton@jonesday.com