# EXHIBIT 18

```
 1      IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                     - - -
 5
     IN RE:  NATIONAL          :   HON. DAN A.
 6   PRESCRIPTION OPIATE       :   POLSTER
     LITIGATION                :
 7                             :
     APPLIES TO ALL CASES      :   NO.
 8                             :   1:17-MD-2804
                               :
 9
             - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       - - -
12
              January 16, 2019
13
                       - - -
14
15          Videotaped deposition of
     KEVIN MITCHELL, taken pursuant to notice,
16   was held at the Doubletree Resort by
     Hilton, 2400 Willow Street Pike,
17   Lancaster, Pennsylvania, beginning at
     9:34 a.m., on the above date, before
18   Michelle L. Gray, a Registered
     Professional Reporter, Certified
19   Shorthand Reporter, Certified Realtime
     Reporter, and Notary Public.
20
                       - - -
21
22      GOLKOW LITIGATION SERVICES
         877.370.3377 ph| 917.591.5672
23             deps@golkow.com
24
```

1  employment at Frito Lay was what?
2      A.   I think it was June of
3  2000 -- 2000.
4      Q.   And why did you leave that
5  position?
6      A.   I was terminated.
7      Q.   For what reason?
8      A.   I was moving into a role
9  other than the one that I was in, and
10 word got out that I was moving before
11 that actually happened.  And so they
12 terminated me because word got out,
13 although it didn't get out by me.
14     Q.   I'm not sure I entirely
15 follow.  Word got out that you were
16 moving from one position to another, and
17 they fired you for that?
18     A.   Correct.  I was told not to
19 say anything.  I did not say anything.
20 Someone else -- it got out, and I got
21 accused of saying it, so they let me go.
22     Q.   And what was your next
23 position after leaving Frito Lay?
24     A.   I went to work at Rite Aid

1  in September of 2000 as pharmacy support
2  manager.
3       Q.   Was there a period of time
4  where you were out of work between the
5  Frito Lay job and Rite Aid?
6       A.   Yes, sir.
7       Q.   How many months?
8       A.   From June to September.  So
9  three months.
10      Q.   And what were your
11 responsibilities as pharmacy support
12 manager?
13      A.   To provide liaison between
14 the pharmacy distribution centers and
15 regulatory agencies, such as DEA, FDA,
16 cigarette, tobacco, auditors from
17 different states, and process
18 improvement.
19      Q.   Did you actually manage some
20 employees in that position?
21      A.   I did not.
22      Q.   How did you receive training
23 to -- for your new job?
24           MS. McENROE:  Objection to

```
 1            form.
 2                 MR. SIMMER:  Strike that.
 3       BY MR. SIMMER:
 4            Q.    Did you receive any training
 5       for your new job?
 6            A.    Yes, I did.
 7            Q.    What kind of training did
 8       you receive?
 9            A.    The former deputy director
10       of DEA, Ron Buzzeo, who owned his own
11       company, Buzzeo PDMA, actually came to
12       the Perryman, Maryland distribution
13       center and performed audits, training me
14       to do the same.
15            Q.    So were you working out of
16       the Perryman facility at that time?
17            A.    No, sir.
18            Q.    Where were you working out
19       of?
20            A.    Rite Aid headquarters.
21            Q.    And where were they?
22            A.    Camp Hill, Pennsylvania.
23            Q.    Did you receive any written
24       materials as part of this training?
```

1 chain regulatory compliance, you
2 understand that the DEA required that
3 Rite Aid prevent diversion?
4     MS. McENROE: Objection to
5 form.
6     THE WITNESS: Yes, sir.
7 BY MR. SIMMER:
8     Q. And based on your work and
9 experience, you are familiar with the
10 concept of a "suspicious order" in the
11 context of controlled substances?
12     MS. McENROE: Objection to
13 form.
14     THE WITNESS: Yes, sir.
15 BY MR. SIMMER:
16     Q. And what does it mean?
17     A. Suspicious would be
18 anything, just that, suspicious.
19     Q. Can you clarify what you
20 mean by a suspicious order?
21     A. Anything abnormal.
22     Q. Where did you gain your
23 understanding about what a suspicious
24 order was?

1  A. Through training with Ron
2  Buzzeo.
3  Q. Would that be only at the
4  conferences that you attended?
5  A. It really started when Ron
6  came to train me two months into my
7  employment.
8  Q. Back in 2000?
9  A. Yes, sir.
10  Q. How extensive was that
11  training with Mr. Buzzeo?
12  A. I like to think it was
13  pretty extensive. We spent three or
14  four days together going through his
15  checklist, not just auditing, but
16  explaining really what the spirit of the
17  regulations mean, and then how to ensure
18  that, you know, as a registrant that they
19  were doing the things needed to do to be
20  compliant with all the rules and
21  regulations set forth.
22  Q. So let me clarify this. You
23  received three or four days of training
24  in 2000 when you first began working for

1   Rite Aid, correct?
2         A.    That's correct, sir.
3         Q.    Did you have any additional
4   training with Mr. Buzzeo up until those
5   conferences you talked about, that you
6   attended later?
7         A.    Yes.
8         Q.    And what kind of training
9   did you receive from Mr. Buzzeo in that
10  interval in between?
11        A.    Just the exact same things.
12        Q.    He came back?
13        A.    Yes, sir.
14        Q.    And trained you
15  additionally?
16        A.    We worked together
17  additionally, yeah.  So I can give you an
18  example.  When I first got there, in --
19  well, 2000 -- in November 2000 Ron and I
20  performed the training.  He performed the
21  training with me.  The results were what
22  they were.
23              And I invited him to come
24  back in six months and do a re-audit and,

1   you know, give us a chance to treat
2   our -- address any deficiencies so that
3   six months from now when you come back,
4   you should see a different story.
5              So four months after the
6   fact I called Ron and invited him back
7   and told him we were ready.
8              Ron came back a week or two
9   after our phone call and conducted
10  another audit.  He conducted the audit
11  with me there, again asking questions,
12  trying to continue to learn and found no
13  deficiencies.
14       Q.   So what was he auditing when
15  he came back the second time?
16       A.   Could you rephrase?  I'm
17  sorry.
18       Q.   You said he conducted a
19  re-audit.  What was he actually auditing?
20       A.   The control drug cage and
21  all the processes, the SOPs, biennial
22  inventories, you name at --
23       Q.   At Perryman?
24       A.   -- accountability -- yes,

1  sir, at Perryman.
2      Q.   Okay.  So when he first
3  trained you in 2000, he actually
4  conducted an audit of Perryman at that
5  time?
6      A.   Yes, sir.
7      Q.   I take it that that wasn't a
8  positive audit?
9      A.   That would be correct, sir.
10     Q.   What were the deficiencies
11 that you recall he noted in -- in 2000?
12     A.   I -- I don't recall
13 individual.
14     Q.   Was there a written report
15 that he prepared?
16     A.   Yes, sir.
17     Q.   And is that something that
18 the company retained in its records as
19 far as you know?
20     A.   I would assume but I do not
21 know for sure.
22     Q.   When he came back, I guess
23 was it four months or six months later?
24     A.   Four months.