# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL | ) | MDL No. 2804 |
| PRESCRIPTION OPIATE | ) | |
| LITIGATION, | ) | Case No. |
| | ) | 1:17-MD-2804 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Hon. Dan A. |
| ALL CASES | ) | Polster |
| | ) | |

— — —

Tuesday, January 22, 2019

— — —

HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

— — —

Videotaped 30(b)(6) Deposition of
Walmart, through the testimony of Susanne
Hiland, held at 4206 South J.B. Hunt Drive,
Rogers, Arkansas, commencing at 8:22 a.m., on
the above date, before Debra A. Dibble,
Certified Court Reporter, Registered
Diplomate Reporter, Certified Realtime
Captioner, Certified Realtime Reporter and
Notary Public.

— — —

GOLKOW LITIGATION SERVICES
877.370.3377 ph | fax 917.591.5672
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review



Page 14

```
22        Q.   So it seems like you're fairly
23   familiar with the ground rules for a
24   deposition.  Would that be accurate?
```

Page 16

```
 1        Q.   And do you understand,
 2   therefore, that the testimony you will give
 3   today can be binding on the corporation?
 4        A.   Yes.
 5        Q.   Okay.  How long have you been
 6   working at Walmart?
 7        A.   29 years.
 8        Q.   And I don't want to spend too
 9   much time on your employment history, but can
10   you just -- let's start maybe in 2005, give
11   or take.  Going forward.  Okay?
12        A.   Yes.
13        Q.   What was your position in 2005?
14        A.   At the start of 2005, I was a
15   regional director for operations.  And then I
16   transitioned to a director of professional
17   services.
18        Q.   And when would that transition
19   occur?
20        A.   March of 2005.
21        Q.   Okay.
22             During that time period, did
23   you have oversight over Walmart pharmacies?
24        MS. TABACCHI:  Object to the
```

Page 15

```
 1        A.   Yes.
 2        Q.   Okay.
 3             And so just to make sure we're
 4   all on the same page, I just want to go over
 5   a couple of those rules, just so there's no
 6   issues moving forward.  I think probably the
 7   most important one is to make sure that you
 8   understand my question.  So if at any point
 9   you don't understand the question, please
10   just let me know and I'll try to rephrase it.
11   Okay?
12        A.   Okay.
13        Q.   If you don't ask me to rephrase
14   it, I'll assume that you understand the
15   question as I asked it.  Okay?
16        A.   Okay.
17        Q.   And you understand that your
18   answers today are on behalf of Walmart;
19   correct?
20        A.   Yes.
21        Q.   And that tomorrow you will be
22   providing your own fact testimony; is that
23   correct?
24        A.   Yes.
```

Page 17

```
 1   form.
 2             THE WITNESS:  In the regional
 3   role I had oversight, yes.
 4        Q.   (BY MR. BOWER) And what about
 5   in the director role?
 6        A.   In the director role, I had
 7   responsibilities for Board of Pharmacy
 8   issues.
 9        Q.   What was your next position at
10   Walmart?
11        A.   The next position was a
12   promotion to senior director.  It was the
13   same department, but we -- the name of the
14   department changed to regulatory affairs.
15        Q.   And when did that occur?
16        A.   2009.
17        Q.   And just generally what were
18   your duties and responsibilities as the
19   senior director in regulatory affairs?  Is
20   that an accurate description of your title at
21   that time?
22        A.   That was my title.
23        Q.   Okay.
24             And what were your -- just a
```

5  (Pages 14 to 17)

Highly Confidential - Subject to Further Confidentiality Review

Page 18

```
 1    general description of your duties and
 2    responsibilities in connection with that
 3    title.
 4         A.    I began to supervise the
 5    directors that had responsibility for Board
 6    of Pharmacy regulation.
 7         I also had responsibility for
 8    our licensing and registration function for
 9    our facilities.  And I had federal regulatory
10    responsibility as it related to our licensed
11    pharmacies.
12         MS. TABACCHI:  Zach, of course,
13    you're welcome to inquire about the
14    witness's personal background, but
15    this is all beyond the scope of the
16    notice.
17         MR. BOWER:  I'm just trying to
18    get, like I said, a very high level.
19         MS. TABACCHI:  I just want to
20    make sure we're on the same page.  I'm
21    not going to object to every question
22    during this portion.
23         MR. BOWER:  No, I understand.
24    I'm just going to move quickly through
```

Page 19

```
 1    this.
 2         Q.    (BY MR. BOWER)  And what was
 3    your next role at Walmart after senior
 4    director of regulatory affairs?
 5         A.    For a short period of time in
 6    July 2011, I was senior director of
 7    compliance and quality assurance.
 8         Q.    So that was in 2011; is that
 9    correct?
10         A.    Yes.
11         Q.    And then your next role after
12    that was?
13         A.    February 2012 of -- I'll likely
14    not get the title correct, but it was senior
15    director of clinical quality assurance.
16         Q.    Okay.
17         A.    And that was the general title.
18    I'd have to look back to get the title
19    exactly correct.
20         Q.    Approximately how many titles
21    would you say you've had at Walmart in your
22    29 years?
23         A.    One -- a different one every
24    three years approximately.
```

Page 20

```
 1         Q.    What's your current title?
 2         A.    My current title -- on paper my
 3    title is Senior Director II, business
 4    strategy.  That's an HR title.
 5         In function, my title is senior
 6    director of professional relations,
 7    professional practice standards and clinical
 8    services.
 9         Q.    Do you believe you are the
10    person at Walmart with the most knowledge of
11    Walmart's maintenance and effective controls
12    against diversion?
13         MS. TABACCHI:  Object to the
14    form.
15         THE WITNESS:  I believe that
16    I'm prepared to speak to that topic on
17    behalf of Walmart.
18         MR. BOWER:  I move to strike
19    that answer.
20         Q.    (BY MR. BOWER)  I just would
21    ask you to please carefully listen to my
22    questions and answer the questions that I
23    ask.  Okay?
24         A.    Yes.
```

Page 21

```
 1         Q.    The question is, do you believe
 2    that you are the person at Walmart with the
 3    most knowledge of Walmart's -- strike that.
 4         Do you believe you are the
 5    person at Walmart with the most knowledge on
 6    Walmart's maintenance of effective controls
 7    against diversion?
 8         MS. TABACCHI:  Object to the
 9    form, asked and answered.
10         THE WITNESS:  Yes.
11         Q.    (BY MR. BOWER)  How did you
12    prepare for today's deposition?
13         A.    I interviewed current and
14    former Walmart associates, I prepared with
15    counsel, and I reviewed documents.
16         Q.    Okay.  Let's take those one at
17    a time.  Get just a little more detail on
```

6 (Pages 18 to 21)

Highly Confidential - Subject to Further Confidentiality Review



Page 254

Page 256

```
21          Now let's go to bullet point 4
22    for a minute.  Now we're in the time frame
23    2011 to 2015; correct?
24        A.    Correct.
```

Page 255

Page 257

```
 1        Q.    And this is when Walmart first
 2    implemented order alerts in Reddwerks;
 3    correct?
 4        A.    Yes.
 5        Q.    Do you know when in 2011
 6    Walmart first implemented order alerts in
 7    Reddwerks?
 8        A.    I don't know the exact date.
 9        Q.    Is that something you prepared
10    to testify on today?
11          MS. TABACCHI:  Object to the
12    form.
13          THE WITNESS:  I don't have an
14    exact date.
15        Q.    (BY MR. BOWER)  Do you know
16    whether it was -- could it have been 2012?
17        A.    No.  It was 2011.
```

Highly Confidential - Subject to Further Confidentiality Review



Highly Confidential - Subject to Further Confidentiality Review



Page 262

17          Do you know whether during this
18    time period reflected in bullet point 4
19    there, whether Reddwerks was flagging orders
20    for non-controlleds of 50 bottles or more?
21          A.    Yes.

Page 264

Page 263

Page 265

1          Q.    (BY MR. BOWER)  When was
2    Walmart flagging orders for amounts
3    30 percent higher than a rolling four-week
4    average?
5          A.    That began in 2011.
6          Q.    And that again -- that began on
7    or about 12-20-2011; is that correct?
8          A.    That's correct.
9          Q.    And how long did that process
10    continue without any order alerts in place?
11          MS. TABACCHI:  Object to the
12    form.
13          THE WITNESS:  So I think I'm
14    confused about any order limits.
15          Q.    (BY MR. BOWER)  Okay.
16          A.    The alerts included order
17    limits.
18          Q.    Did the alerts include order
19    limits from their initial implementation?
20          MS. TABACCHI:  Object to the
21    form.
22          THE WITNESS:  The 50-bottle
23    alert was part of the initial
24    implementation.

Highly Confidential - Subject to Further Confidentiality Review



Page 274

Page 276

1    the policy and procedure at Walmart DC 6045?
2        A.    So the report would be
3    circulated for review.  A report would be
4    created and then circulated for review by the
5    DC associates.  And it was forwarded on to
6    our asset protection team as well, to -- to
7    just take a review of that location.

Page 275

9        In July 2012, Walmart also
10    begins to flag orders of more than 20 bottles
11    for Schedule II substances at DC 6045; is
12    that correct?
13        A.    Yes.
14            MS. TABACCHI:  Object to --
15            Go ahead.
16        Q.    (BY MR. BOWER) And can you just
17    describe for us what that process was?
18            I know in here it says "for
19    further review and follow-up as needed."
20            Do you see that?
21        A.    Yes.
22        Q.    So let's say we're at the end
23    of 2012.  An order for controlled substances
24    comes in for more than 20 bottles.  What was

Page 277

Golkow Litigation Services - 877.370.DEPS

Highly Confidential - Subject to Further Confidentiality Review



Page 342

16          During this time period, was
17    Walmart a member of the NACDS?
18          MS. TABACCHI:  Object to the
19    form.
20          THE WITNESS:  Yes.

Page 344

Page 343

Page 345

Highly Confidential - Subject to Further Confidentiality Review



Page 434

Page 436

1   improvement.
2        Additionally, there was an
3   algorithm applied that Buzzeo
4   determined to set those thresholds.
5   So those were the largest changes
6   around how the program worked.

Page 435

2        THE WITNESS:  We did implement
3   Buzzeo at the end of 2017.
4        Q.    (BY MR. BOWER)  And was the
5   implementation of Buzzeo improvement of
6   Walmart's SOM program?
7        MR. TABACCHI:  Object to the
8   form.
9        THE WITNESS:  It was a
10  continuous evolution and improvement
11  in the automation of orders in how
12  they were flagged.
13       Q.    (BY MR. BOWER)  Okay.  And how,
14  if at all, did the change to Buzzeo impact
15  how orders of controlled substances were
16  flagged?
17       MR. TABACCHI:  Object to the
18  form.
19       THE WITNESS:  It specifically
20  sat ahead of the distribution system.
21  So an order was alerted -- an order
22  that was alerted came to the practice
23  compliance team before going to the
24  logistics team.  So that was an

Page 437