# EXHIBIT 25

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF OHIO
2              EASTERN DIVISION
3
     _____
4
5    IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
     OPIATE LITIGATION                  Case No. 17-md-2804
6
     This document relates to:          Judge Dan
7                                       Aaron Polster
8    The County of Cuyahoga v. Purdue
     Pharma, L.P., et al.
9    Case No. 17-OP-45005
10   City of Cleveland, Ohio vs. Purdue
     Pharma, L.P., et al.
11   Case No. 18-OP-45132
12   The County of Summit, Ohio,
     et al. v. Purdue Pharma, L.P.,
13   et al.
     Case No. 18-OP-45090
14   _____
15
16
17
18      Videotaped Deposition of Joseph Rannazzisi
19               Washington, D.C.
20                April 26, 2019
21                  8:37 a.m.
22
23
24   Reported by:  Bonnie L. Russo
25   Job No. 3301876

Page 18

1 understand the scope of my question.
2     Does that make sense?
3  A.  Yes, sir.
4  Q.  Now is there anything that would
5 prevent you from testifying completely and
6 truthfully today?
7  A.  No, sir.
8     MR. EPPICH: Let me mark as Exhibit
9 1.
10     (Deposition Exhibit 1 was marked for
11 identification.)
12     MR. EPPICH: Exhibit 1 is the second
13 amended notice of videotaped deposition of
14 Joseph Rannazzisi.
15     MS. SINGER: Excuse me one second,
16 Counsel. Do you have copies for the plaintiffs
17 too?
18     BY MR. EPPICH:
19  Q.  Sir, have you seen Exhibit No. 1
20 before?
21  A.  No, sir.
22  Q.  You haven't seen it?
23     You didn't review it in preparation
24 for today's deposition?
25  A.  No.

Page 19

1  Q.  If I you could turn with me to the
2 letter that is Exhibit A, four or five pages
3 in. Now, this letter is prepared by the U.S.
4 Department of Justice.
5     Have you seen this letter before?
6  A.  Yes, I have.
7  Q.  And you understand Exhibit A to be
8 a -- a letter from the DEA authorizing your
9 testimony on certain subjects today?
10  A.  Yes.
11  Q.  You were the head of DEA's Office of
12 Diversion Control from 2005 to 2015; is that
13 right?
14  A.  Approximately July of 2005 to '15,
15 yes.
16  Q.  July of 2005 to what month in 2015?
17  A.  October. October 31st, 2015.
18  Q.  Halloween. One of my favorite days.
19  A.  Uh-huh.
20  Q.  Now, between 2005 and 2015, you were
21 the senior-most law enforcement official at the
22 DEA responsible for pharmaceutical diversion?
23  A.  Yes, sir.
24  Q.  Was -- was there an opioid crisis
25 the entire time you were the head of the Office

Page 20

1 of Diversion Control?
2     MR. BENNETT: Objection. Calls for
3 speculation.
4     You can answer.
5     MS. SINGER: Excuse me one second.
6     Can we ask the people on the phone
7 to mute, please.
8     MR. UTTER: Go ahead. You can
9 answer.
10     THE WITNESS: Yes. Yes. There was
11 an opioid crisis during that time period.
12     BY MR. EPPICH:
13  Q.  And was the opioid crisis getting
14 worse every year you were the head of the
15 Office of Diversion Control?
16     MR. BENNETT: Same objection.
17     THE WITNESS: Overdoses -- overdose
18 deaths increased, yes.
19     BY MR. EPPICH:
20  Q.  As head of the Office of Diversion
21 Control, you were responsible for oversight and
22 control of all regulatory compliance,
23 inspections, and civil and criminal
24 investigations of approximately 1.6 million DEA
25 registrants; isn't that correct?

Page 21

1  A.  Yes.
2  Q.  And you provided leadership to a
3 team of 300 personnel?
4  A.  Direct -- direct report,
5 approximately -- you know, in headquarters,
6 approximately 300, yes.
7  Q.  And you controlled and operating
8 budget of approximately $350 million, correct?
9  A.  Yes.
10  Q.  Now, Mr. Rannazzisi, every entity
11 that is involved with getting opioids to
12 patients has to be registered with the DEA,
13 correct?
14  A.  Could you repeat that question.
15  Q.  Every entity that is involved with
16 getting opioids to patients has to be
17 registered with the DEA.
18  A.  No. That's not correct.
19  Q.  Which entities do not have to be
20 registered?
21  A.  Nurses, pharmacists. They have
22 no -- they're not registered.
23  Q.  But manufacturers have to be
24 registered?
25  A.  Yes.

| Page 22 | Page 24 |
|---|---|
| 1  Q. Distributors have to be registered? | 1  data. |
| 2  A. Yes. | 2       BY MR. EPPICH: |
| 3  Q. Pharmacies have to be registered? | 3  Q. And using ARCOS, DEA monitors the |
| 4  A. Yes. | 4  flow of DEA-controlled substances from their |
| 5  Q. And doctors have to be registered? | 5  point of manufacture through commercial |
| 6  A. Yes. | 6  distribution channels to point of sale or |
| 7  Q. Now, none of those individuals or | 7  distribution to the dispensing retail level? |
| 8  entities can lawfully handle opioids without | 8       MS. SINGER: Objection. Foundation. |
| 9  DEA registration. | 9       MR. BENNETT: Objection. Vague. |
| 10 A. Yes. | 10      THE WITNESS: DEA can use that |
| 11 Q. Now, DEA can, when it determines it | 11 system to monitor transactions downstream. |
| 12 is legally appropriate, suspend or revoke a DEA | 12      BY MR. EPPICH: |
| 13 registration. | 13 Q. And that's downstream from the |
| 14 A. Yes. | 14 manufacturers all the way to the retail level, |
| 15 Q. For example, that's a way the DEA | 15 correct? |
| 16 has to cut off a diverting registrant? | 16 A. Yes. I believe so. |
| 17 A. Repeat that question again, please. | 17      SPECIAL MASTER COHEN: Just a |
| 18 Q. DEA's authority to suspend or revoke | 18 minute, please. |
| 19 a DEA registration is a way for DEA to cut off | 19      We're still hearing folks on the |
| 20 a diverting registrant; isn't that correct? | 20 phone. If you are on the phone, please mute |
| 21 A. That authority, we could stop a | 21 yourself. |
| 22 registrant from conducting transactions with | 22      BY MR. EPPICH: |
| 23 controlled substances, yes. | 23 Q. So, Mr. Rannazzisi, using ARCOS, DEA |
| 24 Q. Yes. | 24 can see the number of opioids sold by |
| 25    You could cut them off, correct? | 25 manufacturers to distributors? |

| Page 23 | Page 25 |
|---|---|
| 1  A. Yeah. Stopping transactions, yes. | 1  A. Yes. |
| 2  Cutting them off. | 2  Q. And using ARCOS, DEA can see the |
| 3  Q. In fact, it's -- it's DEA's | 3  number of opioids distributed by distributors |
| 4  responsibility to do its best to ensure that | 4  to pharmacies, hospitals and doctors? |
| 5  anyone who is registered to DEA or by DEA is | 5  A. Yes. |
| 6  acting appropriately. | 6  Q. Registrants did not have access to |
| 7       MS. SINGER: Objection. Vague. | 7  ARCOS data during your -- the time you led the |
| 8       MR. BENNETT: Join that objection. | 8  Office of Diversion Control, correct? |
| 9       THE WITNESS: It's DEA's | 9  A. They had access to their own data |
| 10 responsibility to ensure that the registrant | 10 that they submitted to ARCOS. But no, not |
| 11 population is complying with the code of | 11 other. |
| 12 federal regulations 21 C.F.R. and also 21 USC, | 12 Q. So registered -- |
| 13 United States code. | 13 A. From the ARCOS. |
| 14      BY MR. EPPICH: | 14 Q. Pardon me. |
| 15 Q. You're familiar with the ARCOS | 15    Registrants had no access to the |
| 16 database? | 16 ARCOS database, correct? |
| 17 A. Yes, I am. | 17 A. Except for their own entries, yes. |
| 18 Q. Manufacturers and distributors are | 18 Q. Their own entries that's they |
| 19 required to report data to ARCOS on every | 19 submitted? |
| 20 single controlled substance transaction? | 20 A. Yes, that they submitted. |
| 21 A. Yes. | 21 Q. But they couldn't access those |
| 22 Q. DEA can then make use of that data, | 22 entries through the ARCOS database, could they? |
| 23 can't it? | 23 A. I'm not sure about that. |
| 24      MR. BENNETT: Objection. Vague. | 24 Q. There was no portal that you were |
| 25      THE WITNESS: DEA does use that | 25 aware of that a registrant could log into to |

1 testimony.
2     MR. UTTER: Same objection.
3     Go ahead.
4     THE WITNESS: It was years later
5 before we heard that, that they were confused.
6 Years later.
7     BY MR. EPPICH:
8  Q.  When did DEA hear that the
9 distributors were confused?
10  A.  Had to be sometime around 2000 --
11 the end of 2010 or early 2011.
12  Q.  And in response to that knowledge,
13 did you provide guidance to distributors?
14  A.  If I remember correctly, there was
15 meetings with individual distributors and also
16 with HDMA.
17  Q.  But isn't it true that you
18 affirmatively stated that it was DEA's policy
19 not to approve any suspicious order monitoring
20 programs?
21  A.  That was the position of the agency.
22 And yes, that was stated in at least two of my
23 letters to industry.
24  Q.  And it was DEA's policy not to tell
25 registrants that an order is or is not

1 suspicious, correct?
2  A.  Well, that's a business decision
3 that only the -- the distributor could make.
4     They're the only ones who know their
5 customer. And they know what their customers
6 are doing. And they know the -- the population
7 around the customer's business. They know what
8 is in the area that could warrant an increase
9 or not.
10     So DEA couldn't make that decision.
11 It had to come as a business decision from the
12 distributor.
13  Q.  So it was DEA's policy not to tell
14 registrants that an order is suspicious?
15     MS. SINGER: Objection.
16     MR. BENNETT: Objection. Asked and
17 answered.
18     MS. SINGER: Objection. Scope.
19 Calls for this witness's opinion on DEA policy.
20     MR. UTTER: Go ahead.
21     THE WITNESS: It was a business
22 decision that would be made by the distributor
23 whether an order is suspicious. And DEA made
24 that very clear to the distributors.
25     BY MR. EPPICH:

1  Q.  During your time as the head of
2 Office of Diversion Control, it was DEA's
3 policy not to tell a registrant if they should
4 stop sales to a customer, correct?
5     MS. SINGER: Same objection.
6     THE WITNESS: There were due process
7 concerns. And after consultation with
8 counsel's office, we decided that that was not
9 appropriate because of the due process
10 concerns.
11     BY MR. EPPICH:
12  Q.  So if a distributor came to you in
13 2007 or '8 or '9 or '10 and said, "We -- we
14 can't tell if this order is legitimate or
15 suspicious," DEA would refuse to answer?
16     MR. BENNETT: Objection. Compound.
17     MR. UTTER: Object to the incomplete
18 hypothetical.
19     You can go ahead and answer if you
20 understand all the elements of the
21 hypothetical.
22     THE WITNESS: Yeah. I'm trying to.
23     Could you repeat that question,
24 please.
25     BY MR. EPPICH:

1  Q.  Sure.
2     If a distributor came to you while
3 you were the head of the Office of Diversion
4 Control and said, "We cannot tell if this order
5 is legitimate or suspicious, the DEA would
6 refuse to answer the distributor's question"?
7     MR. UTTER: Same objection.
8     Go ahead.
9     MS. SINGER: Objection.
10     THE WITNESS: Yeah.
11     MS. SINGER: Calls for speculation.
12     THE WITNESS: I mean I'd have to
13 have more information than that.
14     BY MR. EPPICH:
15  Q.  But as a general policy --
16  A.  I can't answer.
17  Q.  -- it would be DEA's -- it would be
18 DEA's response to refuse to answer?
19  A.  It's DEA's policy that they do not
20 advise when to ship or when to file a
21 suspicious orders. That's a business decision
22 that, under the regulations, is maintained by
23 the --
24  Q.  This was the --
25  A.  -- distributor.

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3

     _____
 4

 5   IN RE: NATIONAL PRESCRIPTION      MDL No. 2804
     OPIATE LITIGATION                 Case No. 17-md-2804
 6
     This document relates to:         Judge Dan
 7                                     Aaron Polster
 8   The County of Cuyahoga v. Purdue
     Pharma, L.P., et al.
 9   Case No. 17-OP-45005
10   City of Cleveland, Ohio vs. Purdue
     Pharma, L.P., et al.
11   Case No. 18-OP-45132
12   The County of Summit, Ohio,
     et al. v. Purdue Pharma, L.P.,
13   et al.
     Case No. 18-OP-45090
14   _____
15
16
17                    VOLUME II
18      Videotaped Deposition of Joseph Rannazzisi
19                Washington, D.C.
20                  May 15, 2019
21                   8:43 a.m.
22
23
24   Reported by: Bonnie L. Russo
25   Job No. 3301884
```

1 hey, don't blame us, the DEA didn't -- it's the
2 DEA responsibility to design and operate the
3 system.  Would that be true?
4             MR. EPPICH:  Objection.
5             MS. MAINIGI:  Form.
6             THE WITNESS:  No, that is just
7 incorrect.  It is very specific.  The
8 regulation is specific.
9             BY MR. LANIER:
10     Q.   Well, what if they say, oh, but the
11 DEA told us it is okay to do it this way?
12             MR. EPPICH:  Objection.  Form.
13             THE WITNESS:  No.  The DEA would not
14 tell them to do something outside of the
15 regulation.
16             BY MR. LANIER:
17     Q.   And did you specifically warn them
18 of this, that the DEA does not approve or
19 otherwise endorse any specific system for
20 reporting suspicious orders?
21             MS. MAINIGI:  Objection.
22             THE WITNESS:  Yes.
23             BY MR. LANIER:
24     Q.   All right.  So much of this is the
25 same as the 2006 letter.  I am just going to