# EXHIBIT 29

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | MDL No. 2804 |
| | ) | Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: *Track One Cases* | ) ) ) | Judge Dan A. Polster |

# EXPERT REPORT OF MATHEW C. GREIMEL

Confidential – Subject to Protective Order

A1366495.14

Confidential - Subject to Protective Order

IV. Factors Specific to Giant Eagle and HBC's Distribution Operations

    A. Types of Drugs Distributed by HBC

Throughout the relevant time period, HBC only distributed Schedule III-V Controlled Substances.[40] Further, it is my understanding that HBC only distributed one type of controlled substance—Schedule III hydrocodone combination products containing hydrocodone in combination with another painkiller or cough medicine—that is relevant to this Litigation, which is otherwise focused on the distribution of Schedule II opioids. Hydrocodone combination products, or HCPs, are relevant because the DEA reclassified the products from Schedule III to Schedule II in October 2014. And at that time, HBC—which was only registered as a Schedule III-V facility—stopped distributing HCPs.[41]

Any assessment of HBC's monitoring and controls must consider HBC's limited product line when assessing its compliance with § 1301.71.[42] Because HBC only distributed Schedule III-V controlled substances, one could expect that its monitoring controls would be less demanding than an operation distributing Schedule II controlled substances. Yet despite this diminished obligation, HBC appears to have imposed numerous controls to prevent diversion and ensure compliance with the security requirement.

    B. Type of Customers to Whom HBC Distributed

Though it is not part of the statute or its regulations, in recent years the DEA has promoted the idea that a registrant must "Know Your Customer." This catchphrase attempts to capture the DEA's concern—which arose when internet pharmacies began operating—that registrants know about the business of the entity to whom they are selling controlled substances.[43]

In this regard, HBC's controls were truly exemplary. All of HBC's (and later GERX's) customers were Giant Eagle pharmacies that were part of the same company that oversaw HBC's distribution operations. The warehouse was thus a captive operation that exclusively served Giant Eagle pharmacies. For this reason, HBC did not just know its own customers; it was its customer. Thus, it knew who was working at each pharmacy, who was managing each pharmacy, the level of corporate supervision that was imposed at each pharmacy, the location and market dynamics of each pharmacy, and the policy and controls that each pharmacy imposed from delivery to storage to dispensation.[44] HBC also never distributed to the two most significant sources of diversion: independents pharmacies and internet pharmacies. The DEA's concern with these pharmacies is well documented in other expert reports. Nevertheless, it is worth noting that numerous DEA

---

[40] Tsipakis Dep. 23:10-19, 73:17 – 74:8, Dec. 13, 2018; Durr Dep. 125:2-15, Jan. 1, 2019.

[41] In 2016, Giant Eagle began distributing Schedule II controlled substances after opening a successor distribution facility known as GERX. *See supra* note 2.

[42] *See, e.g.*, 21 C.F.R. 1301.71(b)(2) (listing "type and form of controlled substance handled" among the factors to consider when assessing compliance).

[43] *See, e.g.*, US-DEA-00000386; Wright Dep. 518:6 – 520:12.

[44] Tsipakis Dep. 106:18 – 107:23, Dec. 13, 2018; *see also, e.g.*, Mollica 213:19 – 215:12.