# EXHIBIT 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     - - -
 5
       IN RE:  NATIONAL        :  HON. DAN A.
 6     PRESCRIPTION OPIATE     :  POLSTER
       LITIGATION              :
 7                             :
       APPLIES TO ALL CASES    :  NO.
 8                             :  1:17-MD-2804
                               :
 9
                  - HIGHLY CONFIDENTIAL -
10
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       VOLUME I
12
                        - - -
13
                   April 17, 2019
14
                        - - -
15
16             Videotaped deposition of
       THOMAS PREVOZNIK, taken pursuant to
17     notice, was held at the law offices of
       Williams & Connolly, 725 12th Street,
18     Washington, D.C., beginning at 9:11 a.m.,
       on the above date, before Michelle L.
19     Gray, a Registered Professional Reporter,
       Certified Shorthand Reporter, Certified
20     Realtime Reporter, and Notary Public.
21                     - - -
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

 1  need to follow up on.
 2      Q.    Okay.  And how can you tell
 3  if an order is a typical order versus one
 4  that deviates substantially from a normal
 5  pattern?
 6      A.    Well, I apologize.  It's --
 7  I don't know if you can say what the
 8  difference is a typical order and that.
 9  What you have is you have a history of
10  what are -- what are the sales to that
11  distributor.  So you would start with
12  that.  But as you -- as you -- as the
13  customers -- you know, what questions are
14  you asking the distributors?  Are you
15  asking them for their customers?  And,
16  you know, who are they selling to?
17              And then you can look at
18  newspaper articles and see the overdose
19  deaths.  You can see this is affecting
20  these communities that these product,
21  your products, are going into, because
22  that distributor is putting them in
23  there.  So you would have to start asking
24  those questions.

```
1          Q.    But when a manufacturer
2    receives an order from a distributor, how
3    do you tell whether that particular order
4    deviates from a normal pattern, even
5    looking at the sales history to that
6    distributor?
7          A.    I'm not sure I'm following.
8          Q.    Well, I'm just asking you,
9    DEA has imposed this obligation on
10   manufacturers.  And I'm wondering whether
11   DEA has a position on how a manufacturer
12   should determine whether a particular
13   order that comes into it from a
14   distributor, deviates from a normal
15   pattern?
16         A.    Well, I mean, you can go
17   back to the internet days when it was --
18   the pattern was all of the sudden
19   products that were skyrocketing to the
20   millions and hundreds of thousands that
21   were never there.
22         Q.    So you're saying if a
23   product was not being purchased at all
24   previously and then skyrocketed --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.   I'm not saying not at all.
 2   But if it's -- if it's not been used
 3   much, and then all of the sudden it takes
 4   off.
 5          Q.   Okay.  And if it does take
 6   off, is that enough to conclude that the
 7   product is being diverted?
 8          A.   I don't think it's enough to
 9   conclude that it's diverted, just based
10   on that.  But it should be enough to make
11   it a suspicious order, to at least report
12   it.
13          Q.   Okay.  And how big an
14   increase do you have in mind when you say
15   skyrocket?
16          A.   I don't have a number in
17   mind.
18          Q.   It sort of depends on the
19   situation?
20          A.   It depends on the situation,
21   yeah.
22          Q.   All right.  How about with
23   respect to unusual frequency?  When a
24   manufacturer receives an order from a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributor, how does it determine
 2    whether the order is one of unusual
 3    frequency?
 4         A.    Well, again, are they
 5    ordering more and more?  I mean, again,
 6    it depends on the situation.  Again,
 7    these are not -- not one particular
 8    thing.  It could be two of them, it could
 9    be three of them.  It could be any
10    information that you have obtained that
11    has and shows or that indicates that your
12    product may be being diverted, then you
13    have the responsibility to guard that
14    from doing that.  So that would trigger a
15    suspicious order.
16         Q.    So fair to say whether an
17    order is of an unusual frequency requires
18    some -- some judgment?
19         A.    Yes.
20         Q.    It's fair to say that it's
21    in the eye of the beholder?
22         A.    I don't think it's in the
23    eye of the beholder because it's -- the
24    data is going to show you what is going
```

```
 1              Does every order that's
 2   unusually large necessarily lead to
 3   diversion?
 4        A.    I have no idea.
 5              MS. SINGER:  Objection.
 6   Scope.
 7              THE WITNESS:  I have no idea
 8        what you mean by unusually large.
 9   BY MR. O'CONNOR:
10        Q.    Okay.  As the term
11   "unusually large" is used in the
12   suspicious order monitoring regulation,
13   are orders that are unusually large
14   necessarily diverted?
15        A.    Well, for example, a bottle
16   of 100 Vicodin from a manufacturer to a
17   vet, is that unusually large?
18        Q.    Is it?
19        A.    I don't think it's unusually
20   large, but it would raise my eyebrows of
21   why would -- why would a vet be ordering
22   that bottle when they know that the
23   toxicity to cats and dogs would kill
24   them.  So I don't think you can just look
```

```
 1    at a number and say that's too big.
 2              MR. O'CONNOR:  Whoever is on
 3    the phone needs to go on mute.
 4              MR. FINKELSTEIN:  Whoever is
 5    on the phone please mute your
 6    phone.
 7    BY MR. O'CONNOR:
 8         Q.   Before we get back to my
 9    question, I just want to be clear.
10    Are -- are vets required to obtain a DEA
11    registration before they order controlled
12    substances?
13         A.   Yes.
14         Q.   And the DEA issues some
15    veterinarians registrations to allow them
16    to purchase controlled substances?
17         A.   Correct.
18         Q.   Okay.  I do -- I do want to
19    get back to my original question though,
20    which was, is an order that is unusually
21    large, does that order necessarily lead
22    to diversion?
23              MR. FINKELSTEIN:  Objection.
24    Vague.
```

```
 1                THE WITNESS:  It may or
 2      may -- it may or may not.
 3  BY MR. O'CONNOR:
 4      Q.    Would the same be true of an
 5  unusually frequent order?
 6                MR. FINKELSTEIN:  Same
 7      objection.  You can answer.
 8                THE WITNESS:  Correct.  It
 9      may or may not.
10  BY MR. O'CONNOR:
11      Q.    And the same would be true
12  of an order that deviates substantially
13  from the normal pattern?
14                MR. FINKELSTEIN:  Same
15      objection.  You can answer.
16                THE WITNESS:  Correct.  It
17      may or may not.
18  BY MR. O'CONNOR:
19      Q.    Okay.  And putting that
20  together, that means that not every
21  suspicious order leads to diversion,
22  correct?
23                MR. FINKELSTEIN:  Objection.
24      Scope.  You can answer.
```

```
 1                    THE WITNESS:  Could you
 2        please repeat that?
 3   BY MR. O'CONNOR:
 4        Q.    Not every suspicious order
 5   leads to diversion, correct?
 6        A.    Correct.
 7        Q.    I want to talk a little bit
 8   about how suspicious order reports are --
 9   are used within DEA.
10              Is it fair to say that most
11   suspicious order reports are submitted to
12   field offices?
13        A.    I would say based on the
14   fact that the big three are filing
15   electronically, I would say the majority
16   electronically.
17        Q.    When an order or when
18   suspicious order reports are filed
19   electronically, does that mean they are
20   filed with headquarters?
21        A.    Yes.  On the Legacy and the
22   vetted system.
23        Q.    Okay.  And do registrants
24   that are not reporting electronically to
```

```
 1       IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF OHIO
 3                 EASTERN DIVISION
 4                      - - -
 5
      IN RE:  NATIONAL       :   HON. DAN A.
 6    PRESCRIPTION OPIATE    :   POLSTER
      LITIGATION             :
 7                           :
      APPLIES TO ALL CASES   :   NO.
 8                           :   1:17-MD-2804
                             :
 9
                 - HIGHLY CONFIDENTIAL -
10
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                       VOLUME II
12
                         - - -
13
                    April 18, 2019
14
                         - - -
15
16            Continued videotaped
      deposition of THOMAS PREVOZNIK, taken
17    pursuant to notice, was held at the law
      offices of Williams & Connolly, 725 12th
18    Street, Washington, D.C., beginning at
      8:16 a.m., on the above date, before
19    Michelle L. Gray, a Registered
      Professional Reporter, Certified
20    Shorthand Reporter, Certified Realtime
      Reporter, and Notary Public.
21
                         - - -
22
            GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

Golkow Litigation Services     Page 410

```
 1    "Approximately how many websites
 2    currently offer to sell controlled
 3    substances illegally over the internet?"
 4              Do you see that?
 5         A.   Yes.
 6         Q.   Okay.  Now, if you look down
 7    towards the -- the middle of the
 8    response, there's a state -- there's a
 9    sentence that starts it should be noted.
10    Do you see that?
11         A.   Yes.
12         Q.   The statement reads:  "It
13    should be noted that there are legitimate
14    pharmacies that provide controlled
15    substances via the internet and operate
16    daily within the boundaries of the law."
17              Do you see that?
18         A.   Yes.
19         Q.   Do you agree with that?
20              MR. FINKELSTEIN:  Scope.
21    Calls for speculation.
22              THE WITNESS:  Yeah, this is
23         before the Ryan-Haight Act.  So,
24         yes.
```

```
 1   BY MR. STEPHENS:
 2        Q.   Okay.  So my -- my point
 3   was, some internet pharmacies in the eyes
 4   of DEA were rogue and diverted opioids --
 5   or diverted controlled substances, fair?
 6        A.   Fair.
 7        Q.   All right.  Other online
 8   internet pharmacies were not rogue
 9   pharmacies and operated within the
10   boundaries of the law in the eyes of DEA
11   as of May 16, 2007, based on what DEA
12   told the Senate, right?
13        A.   Correct.
14        Q.   Okay.  Now, did DEA blame
15   the internet pharmacies who were acting
16   within the boundaries of the law for the
17   actions of the rogue internet pharmacies
18   who DEA thought were diverting
19   prescription opioids?
20             MS. SINGER:  Objection.
21        Scope.
22             MR. FINKELSTEIN:  Vague.
23        Incomplete hypothetical.
24             THE WITNESS:  Not really
```

```
 1              sure what you mean by the use of
 2              the word "blame."
 3     BY MR. STEPHENS:
 4         Q.    Did DEA take any action,
 5     civil, regulatory, administrative,
 6     against legitimate internet pharmacies
 7     who DEA thought was acting within the
 8     boundaries of the law for the actions of
 9     the other internet pharmacies who DEA
10     thought were rogue and were diverting
11     controlled substances?
12              MR. FINKELSTEIN:   Vague.
13         Incomplete hypothetical.
14              THE WITNESS:   I'm not aware
15         of it.
16     BY MR. STEPHENS:
17         Q.    Okay.  So one aspect that
18     DEA included in its internet distributor
19     briefing related to the percentage of
20     controlled versus noncontrolled
21     substances that a particular pharmacy
22     ordered, right?
23              MR. FINKELSTEIN:   Vague.
24              THE WITNESS:   Correct.
```

Highly Confidential - Subject to Further Confidentiality Review

| | |
|---|---|
| 1 | answered. |
| 2 | THE WITNESS: Correct. |
| 3 | MR. STEPHENS: I'm just |
| 4 | trying to set the time frame for |
| 5 | the witness. |
| 6 | BY MR. STEPHENS: |
| 7 | Q. Do you understand what I'm |
| 8 | saying, Mr. Prevoznik? |
| 9 | A. Yes. |
| 10 | Q. Okay. All right. So it was |
| 11 | in the -- in -- approximate time frames |
| 12 | here, and clarify to whatever degree you |
| 13 | feel you need to, Mr. Prevoznik. But |
| 14 | roughly in 2009, 2010, and shortly after |
| 15 | that, the DEA started to have more issues |
| 16 | with rogue pain clinics, right? |
| 17 | A. Correct. |
| 18 | Q. Okay. Did DEA ever conduct |
| 19 | a distributor briefing with retail chain |
| 20 | pharmacies related to rogue pain clinics? |
| 21 | MR. FINKELSTEIN: Asked and |
| 22 | answered. |
| 23 | THE WITNESS: Correct. |
| 24 | BY MR. STEPHENS: |

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Okay.  So now like rogue --
 2  or I'm sorry, strike that.  Let me re-ask
 3  the question.
 4               Like internet pharmacies,
 5  DEA -- DEA would agree that not all pain
 6  clinics diverted controlled substances?
 7               MR. FINKELSTEIN:  Calls for
 8        speculation.  Asked and answered.
 9               THE WITNESS:  Correct.
10  BY MR. STEPHENS:
11        Q.    Okay.  There was some good
12  pain clinics who operated within the
13  boundaries of the law and there were some
14  rogue pain clinics that operated outside
15  the boundaries of the law.
16               Is that fair?
17               MS. SINGER:  Same objections
18        as to scope of the questioning
19        here.
20               THE WITNESS:  Yes.
21  BY MR. STEPHENS:
22        Q.    Okay.  Did DEA file any
23  lawsuits against the good pain clinics to
24  try and make them pay for the harm caused
```

```
 1   by the rogue pain clinics?
 2              MR. FINKELSTEIN:  Objection.
 3        Vague.
 4              THE WITNESS:  Not that I'm
 5        aware of.
 6   BY MR. STEPHENS:
 7        Q.   Okay.  And like the rogue
 8   internet pharmacies that preceded them,
 9   these rogue pain clinics that were
10   diverting controlled substances typically
11   distributed a lopsided ratio of
12   controlled substances to noncontrolled
13   substances?
14              MS. SINGER:  Objection.
15        Scope.
16              THE WITNESS:  To my -- yes.
17   BY MR. STEPHENS:
18        Q.   Okay.  The -- rogue pain
19   clinics were not full service pharmacies
20   like a retail chain pharmacy like Walmart
21   or CVS, Rite Aid or Walgreens, right?
22              MR. FINKELSTEIN:  Calls for
23        speculation.  Foundation.
24              THE WITNESS:  I'm not sure
```