# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION | MDL No. 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| | |
| This document relates to: | Judge Dan Aaron Polster |

The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090

_____

VOLUME I
Videotaped Deposition of Kyle J. Wright
Washington, D.C.
February 28, 2019
9:33 a.m.

Reported by: Bonnie L. Russo
Job No. 3244302

1  THE WITNESS: Earlier today we
2  talked about the distributor briefing. And
3  inside that debriefing is the context or a
4  repeat of the federal regulation. Those are
5  the criteria for suspicious orders.
6  A suspicious order does not mean
7  that -- there's nowhere in that definition of
8  the -- under CFR of a suspicious order of
9  saying it reached a bench -- arbitrary
10 benchmark. That's the difference between
11 excessive and suspicious.
12 BY MR. O'CONNOR:
13 Q. Okay. Is it fair to say that not
14 all orders reported as suspicious are likely to
15 be diverted?
16 MR. BENNETT: Objection.
17 THE WITNESS: I'm going to
18 regurgitate your question to you.
19 That you're saying that a suspicious
20 order does not necessarily mean that there's an
21 illicit act.
22 MR. O'CONNOR: Okay.
23 MR. SHKOLNIK: Object to the form of
24 the reforming of the question.
25 MR. O'CONNOR: Your -- your

1  objection was to his question?
2          MR. SHKOLNIK:  Yes.
3          MR. O'CONNOR:  All right.
4          BY MR. O'CONNOR:
5      Q.  With respect to the suspicious
6  orders that were reported to DEA, is it fair to
7  say that there were a large number of false
8  positives?
9          MR. BENNETT:  Objection to form.
10         THE WITNESS:  Because a suspicious,
11 there could be a false positive.  As to the
12 quantity, I cannot stipulate.
13         BY MR. O'CONNOR:
14     Q.  Isn't it true that there were a
15 large number of suspicious orders that were
16 reported to DEA that were not, in fact, likely
17 to be diverted?
18         MR. BENNETT:  Objection to the form.
19         THE WITNESS:  I know --
20         BY MR. O'CONNOR:
21     Q.  You can answer the question.
22     A.  I know that there was a quantity.
23 As to the extent of that quantity being large
24 or not large, I don't know.
25         MR. O'CONNOR:  All right.  I'm going

1    mark Exhibit No. 29.
2            (Deposition Exhibit 29 was marked
3    for identification.)
4            MR. O'CONNOR:  Counsel, could the
5    witness read his copy?
6            MR. BENNETT:  Give me one second.
7            MR. MIGLIORI:  You said 29, right?
8            MR. O'CONNOR:  Yeah.  Exhibit 29.
9    And for the record, it's US DEA 00007691.
10           MR. BENNETT:  Don't answer anything
11   yet.
12           BY MR. O'CONNOR:
13      Q.   This is an e-mail exchange between
14   you and Ruth Carter, correct?
15           MR. BENNETT:  Counsel, hang on one
16   second.  We're having it reviewed by DEA
17   counsel to see if there's any basis for any
18   objections or any concerns with this document.
19           Can we hold off on the question for
20   a moment, please.
21           MR. O'CONNOR:  Sure.
22           MR. BENNETT:  Thank you.
23           To the extent that this may refer to
24   a specific investigation, the witness is not
25   authorized to answer any questions about that

1  exchange?
2  A. I have recollection not of all the
3  context, but yes.
4  Q. Okay. And do you see halfway down
5  an e-mail from you dated January 31st, 2017, at
6  5:32 p.m.?
7  A. Where do we see 5:32 p.m.?
8  Yes.
9  Q. Okay. And would you mind just
10 reading that e-mail for the record.
11         MR. MIGLIORI: Objection.
12         THE WITNESS: "The WDO, on a monthly
13 basis, downloads all SORS reports from the
14 previous month, conducts the analysis of those
15 SORS to eliminate large number of false
16 positives, and then assigns out the
17 miscellaneous assignments, those that have
18 investigative potential. I previously passed
19 this link to the GSs within the division to
20 include newly assigned GS Kellum for their
21 information."
22         BY MR. O'CONNOR:
23 Q. Okay. Any reason to think that
24 e-mail -- it wasn't accurate at the time you
25 wrote it?

1     A.     No.
2     Q.     Okay.  Curiosity:  What is the WDO?
3     A.     Washington district office.
4     Q.     Okay.  Okay.  When you said in this
5  e-mail that there were a large number of false
6  positives, that referred to orders that were
7  reported to suspicious but were not likely to
8  be diverted, correct?
9          MR. BENNETT:  Objection.  Form of
10  the question.
11         THE WITNESS:  The word "diverted"
12  means an act that it -- my understanding of the
13  word "diverted" means an act that has already
14  been fulfilled.  It's -- it's -- it's been
15  taken out -- taken out of this closed system of
16  distribution.
17         MR. O'CONNOR:  Okay.
18         THE WITNESS:  It doesn't
19  necessarily -- source does not mean -- or
20  suspicious order does not imply that.  It
21  implies that there are suspicions that need to
22  be resolved.  Anomalies exist.
23         BY MR. O'CONNOR:
24     Q.     Okay.  But being reported as
25  suspicious does not imply necessarily that it

1  will be diverted, correct?
2      A.    It does not imply that, no.
3      Q.    Earlier today we talked a little bit
4  about -- or about ARCOS data.
5      At one point you were the unit chief
6  for targeting and analysis, correct?
7      A.    Correct.
8      Q.    And that unit is responsible for
9  ARCOS data; is that fair?
10      A.    It is responsible for the output
11  side of -- and making the information available
12  as needed for analytical studies,
13  investigations.  But it is not responsible for
14  the input side.
15      Q.    Okay.  What do you mean by "the
16  output side"?
17      A.    Output the product has been
18  finalized.
19      Q.    Okay.  Would that refer to reports
20  that are generated from ARCOS or something
21  else?
22      A.    The information has gone through the
23  input side, which does several checks to make
24  sure that the data could be used and received
25  properly; it's been reported properly.

1                Then once it goes through the form
2     that they report, it then has to go -- an NDC
3     number is what they report with no description.
4     When it comes to me, it's the NDC and then the
5     full description.
6                It is the registrant's DEA number.
7     That's it.  Mine is the cross-reference to the
8     CSA, which gives me -- tells me that it's a
9     pharmacy or -- or -- or whatever.
10                Once it comes to me, then the data
11    is available for our use.
12        Q.    And what was the purpose of your use
13    of the data?
14        A.    To support investigations and to
15    determine if I saw any outliers, anomalies that
16    I -- my group, my unit felt were egregious
17    enough to warrant further investigation.
18        Q.    And how would your group going about
19    -- go about determining whether they're
20    egregious enough to warrant further
21    investigation?
22                MR. BENNETT:  Object.  The witness
23    is instructed that you may not talk about
24    confidential law enforcement techniques that
25    you used.