# EXHIBIT 11

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION
                     -  -  -
 3   IN RE:  NATIONAL          :  HON. DAN A.
     PRESCRIPTION OPIATE       :  POLSTER
 4   LITIGATION                :  MDL NO. 2804
                               :
 5   This document relates to:  :  Case No. 17-MD-2804
                               :
 6   The County of Summit, Ohio  :
     Ohio et al. v. Purdue Pharma :
 7   L.P., et al., Case No.     :
     17-OP-45004                :
 8                             :
     The County of Cuyahoga v.  :
 9   Purdue Pharma Purdue Pharma  :
     L.P., et al., Case No.     :
10   18-OP-45090                :
11                   -  -  -
12        - HIGHLY CONFIDENTIAL -
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13
                    VOLUME I
14                   -  -  -
                  May 9, 2019
15
16            Videotaped deposition of
     CRAIG J. McCANN, Ph.D., CFA, taken
17   pursuant to notice, was held at the law
     offices of Morgan Lewis & Bockius, LLP,
18   1111 Pennsylvania Avenue, NW, Washington,
     D.C., beginning at 10:03 a.m., on the
19   above date, before Michelle L. Gray, a
     Registered Professional Reporter,
20   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
21
                     -  -  -
22
         GOLKOW LITIGATION SERVICES
23     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

```
1              Q.      What do you mean by a

2    flagged transaction?

3              A.      Well, for my purposes it's

4    just a -- an example we were looking at a

5    minute ago, a fairly simple, if-then

6    step.  I think of everything I -- I've

7    done here in terms of what you can do in

8    Excel.  And so imagine that you've got

9    numbers in two columns and you've got a

10   rule that says if Column A exceeds

11   Column B, put a one in that cell.  And I

12   would think of that one as a flag.  And

13   the absence of that one, signifying that

14   A does not exceed B, being an unflagged

15   transaction.

16              And then it's only a slight

17   further modification to say in that third

18   column, it's a one if A exceeds B or if

19   the column above -- the value above is

20   one.  And then you would just fill in

21   ones in every cell after the first time A

22   exceeds B.

23              And all I mean by flagging

24   is that it's got that checkmark or one
```

Highly Confidential - Subject to Further Confidentiality Review

1    for that transaction and everything that

2    follows it.

3         Q.    Are you of the opinion that

4    a flagged transaction means that that

5    transaction represents a suspicious

6    order?

7         A.    That's way beyond my report,

8    I think.

9         Q.    Are you --

10        A.    I'm sorry, I apologize.  I

11   don't have an opinion one way or the

12   other.  If -- if you inferred from my

13   answer that I think it means that it is

14   not a suspicious order, I didn't mean

15   that.  I just mean I don't have an

16   opinion one way or the other.

17        Q.    Understood.  But just to

18   make sure we are speaking the same

19   language.  It's fair to say that you are

20   not taking the opinion that a flagged

21   transaction is necessarily a suspicious

22   order?

23        A.    Correct.

24        Q.    And it's also fair to say

Highly Confidential - Subject to Further Confidentiality Review

1    that you are not saying that a flagged

2    transaction is necessarily illegal or

3    representative of illegal conduct?

4          A.    Correct.

5          Q.    It's also fair to say that a

6    flagged transaction in your opinion does

7    not necessarily mean there's been a

8    failure of due diligence?

9          A.    Correct.

10         Q.    I want to take a look real

11   quick specifically at this first

12   approach, the maximum monthly trailing

13   six-month threshold.

14               And I want to -- your --

15   your -- strike that.

16               Your example here is very

17   helpful for understanding it, so I

18   appreciate that.

19               But I want to get an

20   understanding for, in practical terms,

21   various of the defendants for different

22   reasons may have gaps in their data.  So

23   for example, they may have been serving a

24   pharmacy for a period of time, the

1    pharmacy switched to a different

2    distributor, and then went back to that

3    distributor.

4              Are you familiar with those

5    kinds of changes or variations in the

6    data, just speaking generally?

7         A.    Yes.

8         Q.    Okay.  How were gaps in the

9    data or entries without anything included

10   handled in figuring out the maximum

11   monthly trailing six-month threshold?

12        A.    I'm sorry, I don't think I'm

13   understanding that question.

14        Q.    Sure.  So I have a

15   hypothetical for you.  We can try and

16   walk through it to see if that helps to

17   clarify.

18        A.    Okay.

19        Q.    We have a pharmacy

20   purchasing from a distributor in January

21   through June, let's say of 2007.  I'm

22   just picking a year.  But does not

23   purchase from that distributor from July

24   through December of 2007.  Okay?  So

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    Why did you use the word

 3   "excessive" here?

 4        A.    Well, you have to read the

 5   title in the context of the four or five

 6   or eight pages that follow.  And you can

 7   see in what follows.  I report the

 8   shipments per capita, and then a couple

 9   of baselines that the judge or a jury may

10   find helpful.  And excessive is then

11   defined to just be the difference between

12   what you observe and those example

13   thresholds.  The modeling allows for

14   variations in those thresholds, the two

15   thresholds are just examples that I've

16   given you.  And then I've described the

17   difference between what was shipped per

18   capita and those baselines as excessive.

19             I -- I'm not -- I'm not

20   describing them as excessive in some

21   epidemiological sense, or -- or legal

22   sense.  I'm just describing it relative

23   to the benchmarks that I've -- or

24   baselines that I've described.
```

1    Q.    Okay.  I mean I want to make

2    sure I understand the use of the word

3    excessive here.  Do you literally mean

4    that it -- the data exceeds something, so

5    you're using the word excessive?  Is that

6    what you're referring to?

7    A.    Exactly.

8    Q.    So you're not saying that

9    you think it's too much in that means of

10   excessive.  You're trying to just say

11   it's above some threshold you've

12   identified?

13   A.    Correct.

14   Q.    Okay.  So you're not making

15   a qualitative judgment about the

16   excessiveness in this section, you are

17   making a quantitative judgment?

18   A.    I think that's correct.

19   Q.    You are not saying in your

20   report that excessive means suspicious

21   for the purposes of suspicious order

22   monitoring, correct?

23   A.    Correct.

24   Q.    You are not saying that

1    excessive means unlawful in any way,

2    correct?

3           A.    Correct.

4           Q.    Let's take a look at

5    Paragraph 160 which is later on in this

6    section, right at the end of it, on

7    Page 88.

8                 Do you see that?

9           A.    Yes.

10          Q.    And toward -- I would say a

11   little more than halfway down there's a

12   sentence that starts "the purpose."

13                Do you see that?

14          A.    Yes.

15          Q.    "The purpose of identifying

16   transactions -- to determine which

17   transactions warrant some further due

18   diligence -- is likely to only be met by

19   flagging more transactions than those

20   which are used to fill medically

21   unnecessary prescriptions.  Thus the

22   decline in opioid use in Ohio and the

23   implication that more than 70 percent of

24   opioids shipped into Ohio were excessive

1    supports my identification of

2    transactions."

3              Did I read that correctly?

4    A.    Yes.

5    Q.    Now, I want to make sure I

6    understand what you're saying here.

7              When you are talking about

8    the purpose of identifying transactions,

9    is that the same as flagging transactions

10   like we've discussed today?

11   A.    Yes.

12   Q.    And you are now saying that

13   means to determine which transactions

14   warrant some further due diligence.

15             Do you see that?

16   A.    Yes.

17   Q.    And is that coming from you

18   or is that coming from plaintiffs'

19   counsel, that the flagging means that

20   those transactions warrant some further

21   due diligence?

22   A.    I'm not sure.  Maybe a

23   mixture of both.  But I'm -- I'm just

24   trying to provide some context.  My

```
 1    would be appropriate or where we wrote a

 2    zero when an N/A would be appropriate.

 3              But looking at this example

 4    you've pointed me to, that would be the

 5    interpretation that I would take from it.

 6        Q.    Now, Dr. McCann, have you

 7    ever heard the term "diversion" used in

 8    connection with prescription opioids?

 9        A.    Yes.

10        Q.    What does diversion mean to

11    you?

12        A.    I only have the very vaguest

13    of kind of layman's understanding of that

14    term.  I don't -- I don't have an

15    understanding that would be helpful here,

16    I don't think.  I'm happy to tell you

17    what it is, but I'm not sure that it's

18    helpful.

19        Q.    Yeah, please.

20        A.    Sure.  So I would just say

21    it sounds like it's related to diverted

22    and that diversion means that some drugs,

23    some prescription drugs were diverted

24    from their intended use, or from their
```

```
 1    legitimate intended uses to illicit

 2    activities.

 3           Q.    Do you agree that diversion

 4    is a crime?

 5           A.    I have no -- no opinion --

 6                 MR. MOUGEY:  Objection.

 7           Outside the scope.

 8                 THE WITNESS:  -- one way or

 9           the other.

10    BY MR. EPPICH:

11           Q.    Are you planning to offer

12    any opinions about whether or not any of

13    the defendants diverted prescription

14    opioids in this litigation?

15           A.    No.

16           Q.    I'd like to turn back to

17    Page 56 of your report.  Page 56 is the

18    start of Section 9, transaction analysis,

19    you'll recall.

20                 I'd like to return to the --

21    the five methodologies that you implement

22    to identify what you call flagged orders.

23    Okay?

24           A.    Yes.
```

```
 1              Q.     You testified earlier that

 2     the plaintiffs' counsel provided these

 3     five methodologies for identifying

 4     flagged transactions to you, correct?

 5              A.     Yes.

 6              Q.     You didn't come up with the

 7     five methodologies yourself?

 8              A.     No.

 9              Q.     You have no opinion of -- on

10     whether any of the five methodologies is

11     appropriate for evaluating whether or

12     not -- or, excuse me.  Let me strike

13     that.

14                     You have no opinion on

15     whether any of the five methodologies are

16     appropriate for identifying what you call

17     flagged transactions, correct?

18              A.     Correct.

19              Q.     There may be other

20     appropriate methodologies for -- for --

21     let me strike that.

22                     You'd agree there may be

23     other appropriate methodologies for

24     flagging suspicious orders, correct?
```

1    that the defendants produced in this case

2    in discovery.  It's a little bit

3    different than what you said, but it's

4    close.

5         Q.    So to restate, you'd agree

6    that the ARCOS data that the DEA provided

7    to you was accurate?

8         A.    That's certainly how I

9    shorthanded in a sentence or two a couple

10   of times in the report.  But if you read

11   the entire report what I'm saying is that

12   the ARCOS data that I received after

13   making some corrections on allowing for

14   some periods where they don't match

15   perfectly, match the defendant

16   transaction data produced in discovery

17   quite closely.

18        Q.    You're aware that only the

19   DEA has access to ARCOS data?

20        A.    I don't know if that's true.

21   I don't know one way or another.

22        Q.    Are you aware that

23   distributors could not see the ARCOS data

24   of any other distributor?

1          A.    I don't know if that's true.

2    I don't know one way or the other.

3          Q.    Do you plan on offering any

4    opinions about whether or not a

5    distributor has access to ARCOS data?

6              MR. MOUGEY:  Objection.

7              THE WITNESS:  Not other than

8         to their own data, I don't have an

9         opinion one way or the other.

10   BY MR. EPPICH:

11         Q.    Do your methodologies comply

12   with the Controlled Substance Act and the

13   applicable DEA regulations?

14         A.    I'm not familiar with the

15   details of the Controlled Substance Act

16   or the applicable regulations.  But there

17   seems to be a disconnect between whatever

18   is in those documents and what I've

19   described here as my methodologies.

20         Q.    What is that disconnect?

21         A.    Well, by a disconnect, I

22   mean in layman's terms they are kind of

23   apples and oranges.  I've described in

24   the reports the methodologies that I

1   applied and the results of applying those

2   methodologies to the ARCOS data for

3   Cuyahoga and Summit, supplemented with

4   the defendants' transaction data

5   produced.

6           I'm not sure what -- I don't

7   understand the applicability of the

8   Controlled Substances Act or the

9   regulations they're under to the

10  calculations that I've done.  So I don't

11  know if it's consistent or not

12  consistent.  I don't see the connection

13  between them.

14      Q.   And do you intend to offer

15  any opinions in this case about whether

16  or not your methodologies comply with the

17  Controlled Substances Act or its

18  regulations?

19          MR. MOUGEY:  Objection.

20          THE WITNESS:  Not as I sit

21      here.  I don't see the connection,

22      as I just said.

23  BY MR. EPPICH:

24      Q.   If we can look at Page 56 of

1    your report, sir, at Paragraph 132.  This

2    has been the subject of some questioning

3    earlier today.

4           And I'm referring to the

5    assumption that is stated in

6    Paragraph 132, where you write, "In this

7    approach" -- and I think we've

8    established that Paragraph 132 is

9    applying to all five methodologies.

10          "In" -- "in this approach

11    and the others implemented below, I have

12    been asked by counsel to assume that the

13    distributor did not effectively

14    investigate the flagged transactions, and

15    so every subsequent transaction of that

16    drug code is also flagged because the

17    distributor had an unfulfilled obligation

18    to detect and investigate the first

19    flagged transaction."

20          Did I read that correctly?

21    A.    Yes.

22    Q.    What did you do to evaluate

23    the validity of this assumption?

24    A.    Nothing.  It was just an

1    well, as I explained earlier, that I have

2    interpolated between the 1997 and the

3    2018 levels for the reasons I did.  For

4    no other reasons.  And that includes for

5    no other consideration beyond the actual

6    levels of 2018.  However, they may or may

7    not be impacted by the quotas you're

8    describing.

9         Q.    You don't know as you sit

10   here today, correct?

11        A.    I don't know anything about

12   the quotas, as I said now two or three

13   times.  They did not impact any of my

14   calculations including in this section.

15        Q.    Your report classifies

16   shipments of prescription opioids as

17   excessive, correct?

18        A.    Relative to the benchmarks

19   in Section 10, that's correct.

20        Q.    Which of these shipments

21   should distributors have refused to ship

22   to their pharmacy customers?

23        A.    In Section 10?

24        Q.    Yes, sir.

```
 1          A.    Section 10 doesn't deal with

 2   individual shipments from distributors to

 3   pharmacies.  It's at a higher, more macro

 4   level, describing the shipments into

 5   Ohio, and into Cuyahoga and Summit, and

 6   how those exceed the two example

 7   baselines that I created.

 8          Q.    Yes.  And earlier you -- you

 9   explained what the -- what you meant by

10   excessive shipments.  And so I'm asking

11   you, of these excessive shipments, which

12   of them should distributors have not

13   shipped to pharmacies?

14          A.    I don't have an opinion one

15   way or another beyond what's expressed in

16   Section 10 on that topic.

17          Q.    Were any of what you

18   called -- call excessive shipments

19   diverted?

20          A.    I don't know.

21          Q.    You can't point to any of

22   your excessive shipments that were

23   diverted?

24                MR. MOUGEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

1        Outside the scope.

2            THE WITNESS:  And it's just

3        mischaracterizing what I did in

4        Section 10.  I'm not identifying

5        individual transactions in

6        Section 10.

7            I'm just saying at a macro

8        level, the amount of MME per

9        capita shipped into Cuyahoga and

10        Summit went up by a factor of

11        eight or ten, and then came back

12        down by nearly 50 percent, and

13        I've explained how that dramatic

14        increase exceeds some gradual

15        growth from the earlier levels to

16        the later levels.

17    BY MR. EPPICH:

18        Q.    Do you plan to offer any

19    opinions in this case as to whether or

20    not the excessive shipments that are

21    represented in your report in Section 10

22    were diverted?

23        A.    No.

24        Q.    Your 1997 baseline, you

1   recall testifying about that earlier

2   today?

3          A.    Yes.

4          Q.    Your 1997 baseline assumes

5   all prescriptions were necessary?

6          A.    Yes.

7          Q.    Your 1997 baseline does not

8   consider any additional factors beyond

9   the number of prescriptions that year,

10  correct?

11         A.    There's a whole lot of stuff

12  it doesn't consider.  Like car sales, I

13  don't know what it is that you're

14  referring to.  I don't have any idea what

15  you might be referring to.

16              It doesn't include anything

17  except the MME per capita shipped in

18  1997.

19              I apologize.  I don't mean

20  to get snippy.  I'm getting hungry.  I

21  need a Snickers bar.

22         Q.    Would you like to take a

23  break, sir?

24         A.    Whenever is a convenient

1    you're espousing in your report, fair?

2         A.    Correct.  I don't know about

3    espousing, but presenting.  I'm not

4    advocating for one or the other.

5         Q.    That's a fair clarification.

6               There was a reference

7    earlier today about DEA annual quotas.

8    Do you remember a couple of questions

9    about DEA quotas?

10        A.    Yes.

11        Q.    Are you familiar with how

12   DEA quotas for prescription opioid

13   medications are set?

14        A.    No.

15        Q.    Do you know the extent to

16   which annual quotas set by the DEA for

17   the use of prescription opioid

18   medications has varied over time?

19        A.    No.

20        Q.    Do you have any knowledge

21   about the ways in which guidelines to the

22   medical community for the appropriate use

23   of prescription opioid medications has

24   changed over time?

```
1            A.    No.

2            Q.    I just wanted to make sure I

3    understood this very clearly.  Are you in

4    any way relying on the opinions of, or

5    information from any consultants or

6    experts that the lawyers have retained in

7    this litigation for purposes of informing

8    your own opinions and your own report?

9            A.    No.

10           Q.    There were a couple of

11   questions earlier today about diversion.

12           A.    Yes.

13           Q.    Do you remember that?

14                 I just wanted to make sure I

15   understood, that you do not have any

16   opinions about the physical security that

17   any distributor uses or has used to

18   prevent diversion of controlled

19   substances including prescription opioid

20   medications, true?

21           A.    True.

22           Q.    And you have not identified

23   any specific instances of diversion based

24   on your review of any of the materials
```

```
 1    that you've looked at in this lawsuit,

 2    correct?

 3         A.    Correct.  I haven't made any

 4    attempt to do that.

 5         Q.    One of the things that I

 6    understand you did, pursuant to the

 7    lawyers' request, was to compare

 8    individual defendants' transactional data

 9    with the information that you saw in the

10    DEA's ARCOS database; is that right?

11         A.    Yes.

12         Q.    You tried to match it up?

13         A.    Yes.

14         Q.    And in Cardinal's case, you

15    concluded that the match had nearly

16    perfect overlap.  Do you remember writing

17    that in your report?

18         A.    With the two exceptions that

19    I identified in the report specifically

20    for Cardinal.  So maybe that wording

21    isn't particularly good, because where

22    they do not overlap is biggest for

23    Cardinal Health compared to any of the

24    other defendants.  You've got the 610,000
```

```
1    duplicates for Cardinal Health, and then

2    you've got three weeks where there are no

3    transactions at all in Cuyahoga and

4    Summit for Cardinal Health.

5              So separating those two

6    periods, the rest of the data lines up

7    really well for Cardinal.

8         Q.    You're referring to an

9    exception in the data from March 2008?

10   Is that what you're talking about?

11        A.    That's part of it.

12        Q.    Well, you write on Page 34

13   of your report -- is that where you're

14   looking right now?

15        A.    Yes.

16        Q.    You wrote, "Virtually all of

17   the transactions in Cardinal Health's

18   data and the transactions in the ARCOS

19   data match, with the exception of

20   March 2008."

21              Do you see that?

22        A.    Yes.

23        Q.    Did I read that correctly?

24        A.    Correct.  But you have to
```