# EXHIBIT 13

Case: 1:17-md-02804-DAP Doc #: 1876-15 Filed: 07/19/19 2 of 34. PageID #: 62294

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL        )    MDL No. 2804
     PRESCRIPTION OPIATE    )
 4   LITIGATION             )    Case No.
                            )    1:17-MD-2804
 5                          )
     THIS DOCUMENT RELATES TO  )  Hon. Dan A.
 6   ALL CASES              )    Polster
                            )
 7
 8
 9                    __ __ __
10            Monday, May 13, 2019
                      __ __ __
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                      __ __ __
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, held at Weitz & Luxenburg PC, 3011
17   West Grand Avenue, Suite 2150, Detroit,
     Michigan, commencing at 9:20 a.m., on the
18   above date, before Michael E. Miller, Fellow
     of the Academy of Professional Reporters,
19   Registered Diplomate Reporter, Certified
     Realtime Reporter and Notary Public.
20
21
22
                      __ __ __
23
            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | fax 917.591.5672
                deps@golkow.com
25
```

1    been, we can put aside for another day.

2    Okay?  Let's just say that there's an order

3    of unusual size, frequency, pattern, that, in

4    fact, was shipped and it -- you can even

5    say -- and let's say it should have been

6    reported as a suspicious order, but it

7    shipped.  All right?

8               Do you agree that even though

9    that order was shipped and even though you

10   say it shouldn't have been shipped, it

11   doesn't necessarily mean that the pills that

12   underlie that order are going to be diverted.

13   You don't know.

14               MR. FULLER:  Object to form.

15   BY MR. NICHOLAS:

16       Q.     Correct?

17       A.     So I'll answer that question by

18   saying that if it's identified as suspicious

19   order by unusual size or unusual frequency or

20   deviating form -- you know, substantial

21   deviation from a pattern, so to me that puts

22   it as a probable, greater than 51% that it's

23   going to be diverted because it's been

24   identified.

25               So I can't draw the conclusion

1    that I don't know that it's going to be

2    diverted.  I probably can't draw a definitive

3    statement that it is, but I'm going to say

4    that it's more probable because the system

5    identified it.

6         Q.    So you got it at 51% above,

7    it's going to be diverted; is that what

8    you're telling me?

9         A.    Well, that's the definition of

10   probable.  If it's an effective suspicious

11   order system, I believe the percents would

12   rise much higher than that, but I guess that

13   depends on the effectiveness of the

14   suspicious order system.

15        Q.    Where are you getting that

16   percent from?  Where are you getting that

17   from, just your own --

18        A.    What?

19        Q.    The 51, the probable, where are

20   you getting that it's probable?

21        A.    That's my belief of what

22   probable means.

23        Q.    Okay.  Other than your belief,

24   is it written down anywhere?  Is there any

25   research on that?  Is there any data on that?

Highly Confidential - Subject to Further Confidentiality Review

1    Is this just -- just your belief?

2          A.      Not that I can cite.

3          Q.      Okay.

4                  MR. FULLER:  Vegas odds.

5                  MR. NICHOLAS:   Okay.

6    BY MR. NICHOLAS:

7          Q.      Did you look at any individual

8    orders from any pharmacies in the Cuyahoga or

9    Summit Counties?

10         A.      I looked at some DEA 222 forms,

11   but I believe my recollection, it was out of

12   maybe the Boston area, so I would say no.

13         Q.      Okay.

14         A.      No original records.  I

15   reviewed no original records.

16         Q.      You reviewed data that was in

17   the aggregate, right, totals?  Correct?

18         A.      No.  I reviewed -- so just so

19   we're clear on, you know, what we're talking

20   about, so there's no confusion.

21         Q.      Uh-huh.

22         A.      So to me, in the DEA world, an

23   original record is the actual DEA order form,

24   the invoice or a CSOS electronic order form.

25   So that's what I would consider an original

1    record.  Also provided to me, there's the

2    ARCOS data, which is not an original record,

3    and there were some electronic databases that

4    appeared to me to be an electronic

5    spreadsheet or an electronic format of orders

6    that distributors or registrants had

7    submitted as part of the discovery.  But none

8    of those would be what I would consider an

9    original record.

10        Q.    Can you identify a particular

11   order from a particular pharmacy that you

12   believe should have been reported as

13   suspicious?

14        A.    Well, in my assignment to

15   create this and do the investigation to come

16   to this opinion, there wasn't a requirement

17   for me to actually find specific orders that

18   were suspicious.

19             First of all, it would require

20   the use of the suspicious order system of the

21   registrant, like what would be the criteria.

22   The -- and the thing I found in doing my

23   opinion is that probably the most critical

24   part of setting up a suspicious order system

25   is the due diligence or sometimes in the

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7
 8
 9                     __ __ __
10              Tuesday, May 14, 2019

                       __ __ __
11
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                       __ __ __
13
14
15
16         Videotaped Deposition of JAMES E.
      RAFALSKI, VOLUME 2, held at Weitz &
17    Luxenburg PC, 3011 West Grand Avenue, Suite
      2150, Detroit, Michigan, commencing at
18    8:25 a.m., on the above date, before
      Michael E. Miller, Fellow of the Academy of
19    Professional Reporters, Registered Diplomate
      Reporter, Certified Realtime Reporter and
20    Notary Public.
21
22
23                     __ __ __
24           GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25                deps@golkow.com
```

1      Q.      My question is simply:  Do you
2    agree with me that the formula in
3    Appendix E(3) that Walgreens used to report
4    suspicious orders from 2007 to 2012 is not
5    the same as the customer grouping formula
6    Walgreens was using in 2006?
7      A.      Well, this statement just goes
8    to say that they used the same multiplier, so
9    the three multiplier is the same as the E(3)
10   as it is in the area referenced in the prior
11   time period.
12     Q.      The two formulas are not the
13   same, correct, sir?
14     A.      The formulas are not, but the
15   multiplier is.
16     Q.      Okay.  That's all I'm trying to
17   get an understanding from you is whether the
18   customer grouping formula that Walgreens was
19   using when it received the 2006 letter from
20   the DEA is the same or different from the
21   formula it changed to use afterwards?
22     A.      There's no customer grouping in
23   the subsequent years --
24     Q.      Thank you.
25     A.      -- starting in 2007.

1     Q.     You didn't do -- well, strike

2   that.

3            You don't say in your report

4   that you or anyone else at the DEA ever told

5   Walgreens not to use the formula found in

6   Appendix E(3) of the Chemical Handler's

7   Manual, correct, sir?

8     A.     Appendix E(3) was never

9   discussed in my presence with Walgreens.

10    Q.     The DEA's 2006 letter to

11  Walgreens doesn't say not to use the E(3)

12  formula, correct?

13    A.     I still stand by my previous

14  statement.  The E(3) appendix was never

15  discussed by me or anyone in my presence the

16  whole time I was at Walgreens.

17    Q.     And it's not mentioned in this

18  letter either?

19    A.     It is not mentioned in that

20  letter.

21    Q.     All right.  I'd like you to

22  turn to page 40 of your report, please.  Is

23  that 40?

24    A.     I'm sorry.

25    Q.     I believe you testified

1  yesterday that you did not review any of the

2  flagged orders from Dr. McCann's analysis; is

3  that correct?

4      A.    I think my testimony in that

5  area was any specific orders.  That would be

6  correct of what my testimony was, yes.

7      Q.    You did not do any analysis to

8  see whether any specific suspicious order

9  caused the diversion of any specific pills

10 for nonmedical use, correct?

11     A.    In regards to Dr. McCann's --

12     Q.    Correct.

13     A.    That would be a correct

14 statement.  I didn't do a specific order of a

15 specific drug, if I understand your question

16 properly.

17     Q.    Well, you asked for a

18 clarification of whether I was speaking about

19 Dr. McCann's analysis.

20          You didn't do any analysis to

21 see whether any specific suspicious order

22 caused the diversion of any specific pills,

23 correct?

24          MR. FULLER:  Object to form.

25     A.    I think that's an accurate

1    statement.

2    BY MS. SWIFT:

3         Q.    You testified yesterday that

4    you endorsed Flagging Method A, which you can

5    see at the top of page 41 of your report.

6    Because it -- is that correct?

7         A.    I think that's an accurate

8    statement.  It was -- I endorsed it because

9    it was utilized by the Masters

10   Pharmaceutical.

11        Q.    Is that the only reason you

12   endorsed Flagging Method A?

13        A.    No, that wouldn't be the only

14   reason, no, ma'am.

15        Q.    Did any of the plaintiffs'

16   lawyers instruct or suggest to you that you

17   use Flagging Method A?

18        A.    No.

19        Q.    What other reasons did you

20   endorse Flagging Method A?

21        A.    One, it was part of one of the

22   investigations I conducted, so I was familiar

23   with it.  I believe it was discussed at an

24   administrative hearing with the DEA,

25   subsequently reviewed by the D.C. Court, and

1    there was a ruling on it from the D.C. Court

2    and also the one ruling that it was part of

3    this litigation, I think...

4            Q.     Discovery Ruling 12?

5            A.     Yes, Discovery Ruling 12.  So I

6    think it's had some scrutiny.  I think it

7    would be the proper one.  And that's...

8            Q.     What analysis, if any, did you

9    undertake to test each of the five flagging

10   methodologies and their ability to identify

11   suspicious orders?

12           A.     Could you say that one more

13   time, please?

14           Q.     Sure.

15                  What analysis, if any, did you

16   do to test the five flagging methodologies in

17   your report and their ability to identify

18   suspicious orders?

19           A.     I didn't personally do any

20   tests.  I'm aware that they could have been

21   done by Dr. McCann, but I didn't personally

22   do them.

23           Q.     Do you know whether Dr. McCann

24   conducted any analysis at all to test the

25   five flagging methodologies and their ability

1    to identify suspicious orders?

2              MR. FULLER:  Object to form.

3         A.      He had an extensive report.

4    I'm not sure on that.  I believe he did, but

5    I'm not sure.

6    BY MS. SWIFT:

7         Q.      Why do you believe Dr. McCann

8    did any analysis at all to test the five

9    flagging methodologies and their ability to

10   identify suspicious orders?

11             MR. FULLER:  Object to form.

12        A.      Well, I think that's what this

13   does.

14   BY MS. SWIFT:

15        Q.      You think that's what what

16   does?

17        A.      I think the methodology of A

18   identifies suspicious orders based on that

19   methodology, and then it provides them in

20   dosage units.  So I think ultimately, for

21   these dosage units to appear on this page,

22   there had to be flagged suspicious orders.

23        Q.      You're pointing to a page of

24   your report, not Dr. McCann's report,

25   correct, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          A.      Right.  But -- yes.  But for me

2     to see this --

3                  MR. FULLER:  Form.

4          A.      -- I would have to know that

5     this methodology had flagged suspicious

6     orders because that's the only way the dosage

7     units could appear on this chart.

8     BY MS. SWIFT:

9          Q.      Did you read Dr. McCann's

10    report?

11         A.      I did.

12         Q.      When did you read Dr. McCann's

13    report?

14         A.      Sometime after he had submitted

15    it and reviewed his charts resulting from his

16    analysis.

17         Q.      Did you read Dr. McCann's

18    report before you put together this section

19    of your report that appears at page 41?

20         A.      No.

21         Q.      Flagging Methodology A -- I'm

22    still at page 41 of your report.  I'm going

23    to focus on the rows of these tables that

24    we've got here that relate to my client,

25    which is Walgreens, okay?

1        A.      Sure.  Yes, ma'am.

2        Q.      Flagging Methodology A flagged

3     ▓  of all Walgreens orders by dosage unit of

4     oxycodone and hydrocodone, correct, sir?

5        A.      Yes, ma'am.

6        Q.      Is it your professional opinion

7     to a reasonable degree of certainty that ▓

8     of Walgreens orders should not have been

9     shipped?

10       A.      Based on the conduct of

11    Walgreens and the failure to do due diligence

12    on suspicious orders, yes, ma'am.

13       Q.      Is it your opinion to a

14    reasonable degree of certainty that only ▓

15    of orders from Walgreens stores should have

16    been shipped and available to fill

17    prescriptions for Walgreens patients?

18       A.      Well, that would be the

19    converse of this statement, but based on

20    their conduct -- I'll go back again, based on

21    their conduct and their failure to do

22    diligence after identification of suspicious

23    orders, the only conclusion I can draw is

24    that subsequent to that act, all of the

25    controlled substances were diverted.

1      Q.     So that's a yes, your opinion

2    is that only ▨ of orders from Walgreens

3    stores should have been shipped and available

4    to fill prescriptions for Walgreens patients?

5                  MR. FULLER:  Object to form.

6      A.     I really don't know because

7    Walgreens didn't conduct the proper due

8    diligence.  But based on the methodology and

9    how I applied it, that's the results of the

10   methodology.

11   BY MS. SWIFT:

12     Q.     You don't know whether it's

13   true that only ▨ of orders from Walgreens

14   stores should have been shipped and available

15   for prescriptions to be filled for Walgreens

16   patients?

17     A.     I guess you would draw that

18   conclusion based on ▨ based on the

19   conduct of Walgreens, yes, ma'am.

20     Q.     You would draw the

21   conclusion --

22     A.     I would draw the conclusion

23   based on --

24     Q.     Let me ask the question so the

25   record is clear.

1    You would draw the conclusion

2    that only ▢ of Walgreens orders should have

3    been shipped so that prescriptions could be

4    filled for Walgreens patients?

5         MR. FULLER:  Object to form,

6         asked and answered.  You've asked it

7         twice now or three times, probably.

8    A.    Same as my previous statement.

9    Based on Walgreens' conduct in regards to

10   applying this methodology, that would be a

11   correct statement, yes, ma'am.

12   BY MS. SWIFT:

13   Q.    You didn't do any analysis of

14   how many people would not have gotten their

15   medication if ▢ of Walgreens orders had not

16   shipped, correct, sir?

17   A.    I did not.

18   Q.    You didn't do any analysis of

19   how many legitimate prescriptions would have

20   gone unfilled if 95% of Walgreens orders had

21   not been shipped, correct, sir?

22   A.    I did not do that analysis, no,

23   ma'am.

24   Q.    In your report, you don't offer

25   an opinion on the legitimacy of any of the

1    A.    Yes.

2    Q.    You show aggregated numbers for

3    each defendant for oxycodone and hydrocodone,

4    correct?

5    A.    Yes, I do.

6    Q.    All right.  I'm going to focus

7    on Walgreens.  You provide one number for

8    flagged orders of oxycodone into Cuyahoga

9    County, right?

10          MR. FULLER:  Are you looking at

11       the first methodology?

12          MS. SWIFT:  Yeah, the

13       40 million and some odd.

14    A.    Yes, ma'am.

15 BY MS. SWIFT:

16    Q.    Then you do the same thing for

17 Summit County below, correct, sir?

18    A.    Yes, ma'am.

19    Q.    You provide one number for

20 Walgreens shipments of oxycodone into Summit,

21 right?

22    A.    Yes, ma'am.

23    Q.    You provide one number for

24 Walgreens shipments of hydrocodone into

25 Summit, correct?

1    A.    Yes, ma'am.

2    Q.    And then you do the same thing

3    for all five of the flagging methods,

4    correct?

5    A.    That's correct.

6    Q.    You don't break down the

7    numbers by any individual pharmacy in your

8    report, correct?

9    A.    I do not.

10    Q.    You did not perform any

11    analysis to show how many orders were flagged

12    at any individual Walgreens pharmacy,

13    correct?

14    A.    I do not show that in my

15    report, but I know that that has to exist

16    because it's obviously part of the analysis

17    done by Dr. McCann.

18    Q.    Have you seen it?

19    A.    I have not.

20    Q.    Do you know for a fact whether

21    McCann did any flagging analysis on a

22    pharmacy-by-pharmacy basis?

23    A.    So I'd like to answer that by

24    saying -- when you say I know by a fact, I

25    would know through the analysis of the ARCOS

1    data that it would have to indicate specific

2    orders which would identify those pharmacies.

3              Now, whether he looked at them

4    specifically to that pharmacy, but based on

5    your question, just the analysis of the ARCOS

6    data, that -- that actually would occur

7    because each order would be specific to a

8    pharmacy.

9              He didn't -- if I understand

10   your question, he didn't look at them in

11   terms of each specific pharmacy, but the

12   nature of the analysis, it is by the pharmacy

13   by the orders.

14        Q.   You did not perform an analysis

15   to see whether Walgreens performed diligence

16   on any of the actual orders that flagged on

17   any of your five methodologies in

18   Mr. McCann's analysis, correct?

19        A.   Well, my investigation and

20   opinion of Walgreens does state that in

21   regards to the due diligence topic.

22        Q.   Listen to my question.  That's

23   not what I'm asking about.

24        A.   Okay.

25        Q.   We'll get to the stuff you say

1    in your report about the due diligence that

2    Walgreens did.

3              You didn't perform an analysis

4    to see whether Walgreens performed diligence

5    on any of the specific orders that flagged on

6    any of these five methodologies, correct,

7    sir?

8         A.    I'm not aware of any due

9    diligence for those orders, that's correct.

10        Q.    That's not what I asked.

11        A.    I didn't -- I didn't

12   specifically go to McCann's report and look

13   at each order of Dr. McCann's and try to find

14   due diligence.  I just looked at the scope of

15   the due diligence by Walgreens.

16        Q.    You didn't go to Dr. McCann's

17   report and look at any order of -- that

18   flagged on any of the analyses.

19        A.    That's a correct statement.

20        Q.    For any of the five flagging

21   methods that you talk about, did you consider

22   the impact of stocking a new store's shelves?

23        A.    I did not take that specific

24   incident into consideration, but in my review

25   of due diligence records, I didn't find

1    anything that would indicate that that had

2    occurred.

3         Q.    Did you consider whether any of

4    the five flagging methods that you talk about

5    could flag an order for a store before the

6    store even opened for business, just based on

7    the stocking of the store's shelves?  Do you

8    know whether that happened?

9         A.    I'm not aware that that had

10   happened.

11        Q.    Did you read Dr. McCann's

12   testimony from this past Friday that using at

13   least some of these five flagging methods, an

14   order to stock a new store's shelves could be

15   flagged?

16        A.    I don't recall reading that in

17   his testimony, no, ma'am.

18        Q.    Did you read his testimony yet?

19   I know it was just the other day.

20        A.    I've read so many.  I don't

21   believe so.

22        Q.    I will represent to you, and

23   you can check the transcript, that Dr. McCann

24   testified that for low-volume stores, the

25   store might never have another order as big

1    Q.    You didn't --

2    A.    -- trigger.

3    Q.    You can't vouch for the

4    accuracy of any of the numbers that appear in

5    these tables at pages 41 to 45 of your

6    report, correct, sir?

7    A.    Mr. McCann would have to

8    testify to the accuracy.  He did the

9    analysis.

10   Q.    You just relied on what

11   Mr. McCann provided, correct, sir?

12   A.    Yes, I did.

13   Q.    You were -- strike that.

14         You don't have an opinion about

15   whether any particular order that you

16   identified or that Dr. McCann identified as

17   suspicious was diverted to an illicit

18   channel, correct, sir?

19   A.    Well, I think based on the

20   methodologies and the lack of due diligence,

21   I think my -- these say that those were

22   diverted.

23   Q.    My question was a little bit

24   different.

25   A.    Okay.

```
 1              Q.      You don't have an opinion about
 2     whether any particular order -- you didn't
 3     look at any particular order to see whether
 4     it was diverted to an illicit channel?
 5              A.      I did not --
 6              Q.      Okay.
 7              A.      -- analyze all the orders and
 8     try to find one or locate one that was
 9     diverted.
10              Q.      You didn't analyze any of the
11     orders, correct, sir?
12              A.      That's correct.
13              Q.      You have no opinion about
14     whether any particular order that was flagged
15     as suspicious led to someone's addiction,
16     overdose or death, correct, sir?
17              A.      As of today, I have no opinion
18     on that matter.
19              Q.      Do you plan on coming up with
20     that opinion at some point after today?
21              A.      I can't rule that out if I'm
22     asked to look at that or I'm provided some
23     information I could review that would -- that
24     would indicate that.  So I can't rule out
25     that that would occur.
```

1      Q.     If a prescription was

2    legitimate, the pharmacist was obligated to

3    fill it, correct, sir?

4                   MR. FULLER:  Form.

5      A.     I don't think the DEA speaks to

6    that, whether they're obligated to fill a

7    prescription.

8    BY MS. SWIFT:

9      Q.     Do you know one way or the

10   other whether --

11     A.     If the DEA speaks to that

12   topic?

13     Q.     No, sorry.

14                  Do you know whether pharmacists

15   are obligated by their professional

16   responsibilities to fill prescriptions that

17   they have determined are legitimate?  Maybe

18   you don't know one way or the other.

19     A.     Let me think.  I don't know

20   that, the answer to that question.

21     Q.     All right.  Turn, if you would,

22   please, to page 114 of your report.

23     A.     Can I qualify my last answer,

24   quickly?

25     Q.     Sure.

1      Q.      Is that the page 856 that you

2   cite in your report at page 114?

3      A.      Yes, ma'am.

4      Q.      Okay.  This Appendix 10 from

5   McCann's report is what you relied on to

6   determine total volume of oxycodone and

7   hydrocodone that Walgreens shipped into

8   Cuyahoga and Summit Counties; is that right?

9      A.      Yes, ma'am.

10      Q.      You only talk about oxycodone

11   and hydrocodone in your report, correct?

12      A.      Yes, ma'am.

13      Q.      Am I right that you don't have

14   any opinions about any other opioid pain

15   medications besides oxy and hydro?

16      A.      As of today I do not because I

17   was not requested to do any analysis on those

18   other drugs.

19      Q.      After -- turn back to page 1 of

20   Exhibit 21.  The page 1 of Exhibit 21 is a

21   table that shows overall numbers, Total

22   Shipments to Cuyahoga identified by

23   Methodology, Common Sense Method, Maximum

24   Monthly Trailing Six-Month Pharmacy Specific

25   Threshold, Walgreens to All Buyers, 1996 to

1    2018, correct?

2         A.    Yes.

3         Q.    And it's a table that shows

4    numbers broken out by drug and by

5    transaction, dosage units, MME, and base

6    weight, correct?

7         A.    Yes.

8         Q.    After the table on page 1 of

9    Appendix 10, there's a series of bar graphs

10   showing, in the aggregate, Walgreens

11   shipments of oxy and hydro to its pharmacies

12   in the aggregate, correct?

13        A.    Yes, ma'am.

14        Q.    None of these charts shows any

15   data for any individual Walgreens pharmacy,

16   correct?

17             MR. FULLER:  Object to form.

18        A.    That's an accurate statement,

19   but they're all built upon individual orders.

20   BY MS. SWIFT:

21        Q.    I understand.

22        A.    Okay.

23        Q.    I'm just saying, when you're

24   flipping through Dr. McCann's charts that

25   display the results of his flagging

1    methodologies, you can't tell anything about

2    any individual pharmacy, correct?

3         A.    I cannot by looking at these

4    charts.

5         Q.    Do you know how many Walgreens

6    stores there are in Cuyahoga County?

7         A.    I do not.

8         Q.    How about Summit County?

9         A.    I do not.

10        Q.    Do you know anything about the

11   geographic locations of any of Walgreens'

12   pharmacies in Summit or Cuyahoga County,

13   other than the fact that they're in those

14   counties?

15        A.    It doesn't appear in my

16   opinion, but during my review of data, I did

17   at one point take a look by just using the

18   Internet, Googling and looking at some of the

19   locations, but I didn't formulate a report on

20   that.

21             So I won't say that I never did

22   that, but I don't have any records or

23   documents that would record exactly the

24   distances and the locations.

25        Q.    You also didn't include in your

1   report anything about the specific customer

2   base for any individual Walgreens pharmacy,

3   correct, sir?

4        A.    I did not.

5        Q.    Do you know how many of the

6   Walgreens pharmacies in Cuyahoga and Summit

7   County are on corner lots?

8        A.    I do not.

9        Q.    Do you know how many of the

10   Walgreens pharmacy in Summit and Cuyahoga

11   Counties are freestanding locations with

12   their own dedicated parking and a

13   drive-through window?

14        A.    I do not.

15        Q.    Do you know how much oxycodone

16   or hydrocodone Walgreens distribution centers

17   shipped to any one of those Walgreens

18   pharmacies?

19        A.    I do not.  I had not done that

20   analysis up to today.

21        Q.    You can't tell any of that from

22   the charts that are in Appendix 10, correct,

23   sir?

24        A.    That's correct.

25        Q.    All right.  You can set that

1    one aside.

2              Turn, if you would, please,

3    sir, to page 117 of your report.  This is a

4    section within the Walgreens section about

5    the due diligence that you believe Walgreens

6    conducted, correct?

7         A.    Yes, ma'am.

8         Q.    Now, as I understand it, it's

9    your opinion that because you only saw a

10   limited number of e-mails about due diligence

11   that Walgreens performed 10, 12, 13 years

12   ago, that that means Walgreens performed no

13   other due diligence; is that correct?

14        A.    Not that was brought to my

15   attention in trying to formulate my opinion.

16        Q.    And in formulating your

17   opinion, you determined that Walgreens had

18   only conducted limited due diligence because

19   you only saw documentation of limited due

20   diligence, correct?

21        A.    That's the only basis I could

22   use to form my opinion.

23        Q.    You based your -- well, let me

24   ask you this.

25              Did you read any of the

Highly Confidential - Subject To Further Confidentality Review

1    diligence on an order.  That -- what you just

2    read says nothing about that, right?

3         A.    It does not say --

4         Q.    Okay.

5         A.    -- that it would flag all

6    subsequent orders, but it does say if you

7    don't do the due diligence, you could lose

8    your DEA registration.

9         Q.    Have you done any calculation

10   of what the impact is of the assumption that

11   everything flags after one failure to do due

12   diligence?

13        A.    I have not.  You mean in terms

14   of denial of controlled substances to the two

15   counties?  Is that --

16        Q.    Well, in terms of the number of

17   orders that are -- or the percentage of

18   orders that are flagged for each one of the

19   distributor defendants in this case.

20        A.    In regards to?

21        Q.    Well, say -- take a look at

22   page 41.

23        A.    Okay.

24        Q.    This is by dosage units, I

25   understand.

```
 1              A.      Yes.

 2              Q.      But if you look at the CVS line

 3     for Cuyahoga County on page 41, you've got

 4     [        ] of the total dosage units are flagged

 5     using the trailing six-month threshold?

 6              A.      I do.

 7              Q.      And you have [    ] of the total

 8     dosage units in Summit County that are

 9     flagging, right?

10              A.      I do.

11              Q.      And if you remove the

12     assumption that everything after one failed

13     due diligence effort flags, do you know what

14     those numbers go down to?

15              A.      I do not.

16              Q.      You have no clue?

17              A.      I have no clue.

18              Q.      If I told you that in Summit

19     County they go down to [    ] rather than [    ],

20     and they go down to [    ] rather than [   ] in

21     Cuyahoga, would that surprise you?

22              A.      I wouldn't have a comment on

23     those figures.

24              Q.      Now, you also have testified

25     already a little bit about whether or not you
```

1   reviewed any particular orders, and I think

2   your answer in substance is no, you didn't

3   review any particular orders that might or

4   might not have been suspicious.

5              Is that generally true?

6        A.    That's generally true, that's

7   my recollection is I answered that way

8   previously, too, yes, sir.

9        Q.    And with respect to any of the

10  orders that are flagged by these

11  methodologies under your and Mr. McCann's

12  analysis, you don't know what happened to any

13  of the drugs that were actually shipped and

14  delivered to CVS Pharmacies?

15       A.    I don't have any direct

16  knowledge of what happened to any of the

17  drugs that were distributed to each of the

18  pharmacies.  I didn't conduct any analysis as

19  of today that would give me that knowledge.

20       Q.    And you don't know whether -- I

21  understand that your opinion is that the due

22  diligence was insufficient by CVS, and we'll

23  get to that in a minute.

24              But you don't know whether any

25  of these orders would have cleared a due

1    diligence investigation that does meet your

2    exacting standards, do you?

3         A.    Could you say that one more

4    time, I'm sorry?

5         Q.    I'm just saying you don't know

6    whether any of the orders that are flagged

7    using your and Mr. McCann's methodologies for

8    CVS would have been cleared using what you

9    would say is an adequate due diligence

10   process.  You haven't done that analysis.

11        A.    So I think what you're asking,

12   is it a hypothetical question?

13        Q.    Yes.

14        A.    Okay.

15        Q.    Well, no, actually it's not.

16   You don't know.  I'm asking you.  You don't

17   know?

18        A.    Well, I guess you're asking me

19   to assume that if CVS had an adequate due

20   diligence system in place and they conducted

21   it?  Is that the question?  Maybe I don't

22   understand the question.

23        Q.    Let's -- if you took your

24   standards for a due diligence system --

25        A.    Okay.