# EXHIBIT 15

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3

      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____   )   Case No.
                               )   1:17-MD-2804
 6                             )
      THIS DOCUMENT RELATES    )   Hon. Dan A.
 7    TO ALL CASES             )   Polster
 8
                 WEDNESDAY, APRIL 24, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                 CONFIDENTIALITY REVIEW
11                         - - -
12            Videotaped deposition of Anna
13    Lembke, M.D., held at the offices of Lieff
14    Cabraser Heimann & Bernstein, LLP, 275
15    Battery Street, 29th floor, San Francisco,
16    California, commencing at 8:07 a.m., on the
17    above date, before Carrie A. Campbell,
18    Registered Diplomate Reporter and Certified
19    Realtime Reporter.
20
21
22                         - - -
23
                GOLKOW LITIGATION SERVICES
24        877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. ARBITBLIT:  Object to form.
 2                THE WITNESS:  I would agree
 3         that such a doctor is violating
 4         medical ethics, but I have also
 5         written and published on the problem
 6         of prescribing, and we have shown,
 7         using Medicare Part D data, that the
 8         increase in opioid prescribing in this
 9         country over the past three decades
10         was not primarily due to a small
11         subset of prolific prescribers or
12         so-called pill mill doctors, unethical
13         doctors, doctors who have lost their
14         moral compass.  Those types of doctors
15         have always existed and will always
16         exist.
17                In fact, the increase in opioid
18         prescribing in this country has been
19         primarily driven by all types of
20         doctors across all types of
21         specialties because of the major
22         paradigm shift in the use of opioids
23         for minor and chronic pain conditions
24         as a result of misrepresentation of
25         the evidence on the part of the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        defendants.
 2   QUESTIONS BY MR. TSAI:
 3        Q.    If a doctor in the counties was
 4   prescribing opioid medications purely for
 5   their personal profit, knowing that the
 6   individual they're providing opioids to did
 7   not have a legitimate pain condition, would
 8   you agree that doctor is committing a crime?
 9             MR. ARBITBLIT:  Object to form.
10             THE WITNESS:  I would agree
11        that that doctor is committing a
12        crime, but I think doctors like that
13        constitute a small subset of the
14        overall opioid prescriptions.
15   QUESTIONS BY MR. TSAI:
16        Q.    Okay.  Do you have a method of
17   assigning the degree to which doctors in
18   Cuyahoga and Summit Counties, in your words,
19   bear some responsibility for the
20   overprescribing of opioids for chronic pain
21   versus the contribution of any of the other
22   factors we've discussed today?
23             MR. ARBITBLIT:  Object to form.
24             THE WITNESS:  I believe that
25        the majority of opioid prescribers in
```

```
 1           Cuyahoga and Summit County and the
 2           rest of the country are
 3           well-intentioned doctors who were led
 4           to believe that opioids work for
 5           chronic pain and that the risks are
 6           low, including the risk of addiction
 7           and death.
 8    QUESTIONS BY MR. TSAI:
 9           Q.    Have you reviewed any materials
10    or have any other basis, or conducted any
11    kind of quantitative analysis, to reliably
12    rule out the likelihood that doctors in
13    Cuyahoga and Summit Counties, in your words,
14    bear some responsibility for the
15    overprescribing of opioids for chronic pain
16    to individuals in those counties?
17                 MR. ARBITBLIT:  Object to form.
18                 THE WITNESS:  I think that
19           prescribers bear responsibility in the
20           sense that they were misled by the
21           defendants, and they weren't more
22           questioning of what they were taught
23           in the '90s and early aughts.
24                 And so they bear some
25           responsibility in the sense of not
```

```
 1          having been more skeptical about the
 2          use of opioids, but in general, I
 3          believe that doctors were primarily
 4          duped by the defendants into
 5          prescribing opioids for chronic pain
 6          and minor pain conditions.
 7   QUESTIONS BY MR. TSAI:
 8          Q.    And can you point to me
 9   anywhere where you have quantified the degree
10   or extent of, as you say, the responsibility
11   of prescribers in Cuyahoga and Summit
12   Counties due to their lack of diligence or
13   negligence?
14               MR. ARBITBLIT:  Object to form.
15               THE WITNESS:  It's not a lack
16          of diligence or negligence.  It's a
17          matter of a paradigm shift in the way
18          that doctors were pressured into
19          treating pain with opioids, and I have
20          quantified that in an article that we
21          published in The Journal of the
22          American Medical Association, showing
23          that the increase in opioid
24          prescribing based on the Medicare
25          Part D database -- which is a database
```

1          that covers the entire United States,
2          showing that increased prescribing has
3          not been driven primarily by a small
4          subset of prolific prescribers, but by
5          a paradigm shift in prescribing
6          opioids across all different types of
7          prescribers such that we were all
8          prescribing more opioids as a result
9          of misrepresentation of the evidence
10         by the defendants.
11    QUESTIONS BY MR. TSAI:
12         Q.    And what was the quantification
13    of the degree of responsibility for
14    physicians in your analysis?
15              MR. ARBITBLIT:  Object to form.
16              THE WITNESS:  I feel like I've
17         answered that question.
18    QUESTIONS BY MR. TSAI:
19         Q.    Well, if there's an amount or a
20    number, would that be in the article?
21              MR. ARBITBLIT:  Object to form.
22    QUESTIONS BY MR. TSAI:
23         Q.    Or was it a qualitative
24    analysis?
25         A.    It was a quantitative analysis.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  The article uses the
 2      quantitative analysis of the Medicare Part D
 3      database to demonstrate that pill mill
 4      doctors, doctors who, as you suggested, are
 5      committing crimes are not the major factor.
 6      Those doctors exist.
 7                  Their behavior is
 8      reprehensible, but the vast majority of
 9      opioids prescribed in this country are
10      prescribed not by such ethically compromised
11      doctors, but by well-intentioned doctors who
12      have been prescribing according to the
13      misrepresentation of the evidence made
14      available to them by the actions of the
15      defendants.
16                  (Lembke Exhibit 11 marked for
17          identification.)
18      BY MR. TSAI:
19          Q.    So I'll introduce exhibit next
20      in order.  So this is a --
21          A.    I don't have it yet.  Just grab
22      it?
23          Q.    I'll describe it to you while
24      the court reporter is marking it.
25                  I'll represent to you that this
```

1    is a press release from the US Department of

2    Justice. It's dated August 22, 2018.

3              Were you aware of that press

4    conference that happened right in Cleveland,

5    Ohio?

6         A.   I might have read about it if

7    it was in the public domain. I don't

8    specifically recall.

9         Q.   Okay. So if you could turn to

10   page -- starting on page 3 of this exhibit,

11   press release, and I would just like to focus

12   you in on this issue. It is the third

13   paragraph from the bottom, and I'll just read

14   it.

15             "My third announcement arises

16   from Operation Darkness Falls, a joint

17   operation against dark net fentanyl

18   traffickers by the FBI, the IRS, our Postal

19   Inspectors and Homeland Security

20   investigators, again right here in northern

21   Ohio.

22             "Today I'm announcing that this

23   office has charged a husband and wife who, at

24   the time of their arrest, were the most

25   prolific dark fentanyl vendor in the United