# EXHIBIT 18

Highly Confidential - Subject to Further Confidentiality Review

1      IN THE UNITED STATES DISTRICT COURT
2       FOR THE NORTHERN DISTRICT OF OHIO
3              EASTERN DIVISION
4                  - - -
5

6   IN RE:  NATIONAL        :   HON. DAN A.
    PRESCRIPTION OPIATE     :   POLSTER
    LITIGATION              :
7                           :   MDL NO. 2804
    APPLIES TO ALL CASES    :
8                           :   CASE NO.
                            :   17-MD-2804
9                           :
10        - HIGHLY CONFIDENTIAL -
11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12              VOLUME I
13                 - - -
14            May 16, 2019
15                 - - -
16             Videotaped deposition of
     DR. SETH B. WHITELAW, taken pursuant to
17   notice, was held at the offices of Golkow
     Litigation Services, One Liberty Place,
18   1650 Market Street, Philadelphia,
     Pennsylvania beginning at 9:18 a.m., on
19   the above date, before Michelle L. Gray,
     a Registered Professional Reporter,
20   Certified Shorthand Reporter, Certified
     Realtime Reporter, and Notary Public.
21

                   - - -
22

          GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24

Highly Confidential - Subject to Further Confidentiality Review

1    the regulation, you'd agree that that

2    does not mean the order is for an

3    illegitimate purpose?

4                    MR. BOGLE:  Object to form.

5                    THE WITNESS:  I would say

6            that if an order is deemed

7            suspicious or you think it's

8            suspicious, it needs further

9            investigation to determine the

10           nature of that order, including

11           all of the above.

12   BY MR. EPPICH:

13           Q.    And that's because the order

14   may not be for an illegitimate purpose.

15   You'd agree with me there?

16                    MR. BOGLE:  Objection.

17           Asked and answered.

18                    THE WITNESS:  It's a fairly

19           broad hypothetical, but yes, that

20           is a -- one of -- obviously there

21           are two possibilities here.  It's

22           legitimate or illegitimate.  There

23           are two possibilities.  It could

24           be A or B.  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. EPPICH:

2        Q.    And simply because an order

3    meets the definition of suspicious under

4    the regulation, that does not mean the

5    order is going to be diverted, correct?

6            MR. BOGLE:  Object to form.

7            THE WITNESS:  Could you be

8        more specific?  I mean...

9    BY MR. EPPICH:

10       Q.    Well, my question is simply

11   an order that meets the definition of

12   suspicious under the regulation, that

13   fact alone doesn't mean that that order

14   will be diverted?

15           MR. BOGLE:  Same objection.

16           THE WITNESS:  Again, I think

17       it is a possibility, but also

18       there are multiple possibilities.

19       So, yes, I would agree with you,

20       you do need to do further

21       investigation to determine what is

22       in fact going on, which was, I

23       think, the point that I tried to

24       make throughout my report.

Highly Confidential - Subject to Further Confidentiality Review

1  BY MR. EPPICH:

2       Q.    And that's because the

3  investigation that you do could reveal

4  that is a legitimate explanation for why

5  a customer placed an order of unusual

6  size?

7       A.    There could be a legitimate

8  explanation.  There could be lots of

9  facts to take into account.  Again, it's

10  fact driven.  And as a result of being

11  fact driven, you need to do a thorough

12  due diligence and investigation program.

13  The problem is, is that I didn't see that

14  happening all that often.

15       Q.    Well, there may be

16  legitimate explanations for why a

17  customer places an order that deviates

18  substantially from normal pattern,

19  correct?

20            MR. BOGLE:  Object to form.

21            THE WITNESS:  There could be

22       lots of reasons for that to

23       happen, both legitimate and

24       illegitimate.  Again, we're back

Highly Confidential - Subject to Further Confidentiality Review

1    to the same point being made, is,

2    you need to do -- you need to

3    thoroughly know your customer.

4    You need to thoroughly need to

5    know the background of your

6    customer, and you need to do an

7    investigation for anything in

8    flags in your system.

9  BY MR. EPPICH:

10       Q.    And it's true that there may

11  be legitimate explanations for why a

12  customer places an order that deviates

13  its unusual frequent, correct?

14       A.    Again, we're talking in

15  hypothetical terms.  So hypothetically,

16  yes.

17       Q.    Now, sir, you're not

18  offering any opinions in this case that a

19  particular order to a distributor, a

20  defendant in this case, was suspicious?

21            MR. BOGLE:  Object to form.

22            THE WITNESS:  Could you be

23       more specific.  When you say I'm

24       not offering an opinion on

Highly Confidential - Subject to Further Confidentiality Review

1    report.

2              MR. BOGLE:  You can go to

3         your report.

4              THE WITNESS:  I'm going to

5         go with my --

6              MS. SWIFT:  I don't want to

7         know the definition that he has in

8         his report.

9    BY MS. SWIFT:

10         Q.    What I would like to know is

11   if you can give a definition without

12   looking at your report.  Yes or no?

13         A.    I'm going to look at my

14   report.

15         Q.    Okay.

16         A.    I want to look at my report.

17         Q.    That's fine.  We'll move on.

18         A.    Okay.

19         Q.    You haven't done any

20   analysis of any order that Walgreens

21   shipped to one of its pharmacies to

22   determine whether that order led to drugs

23   being diverted, correct, sir?

24         A.    Again, Counselor, I'm not

Highly Confidential - Subject to Further Confidentiality Review

1    here to talk about whether or not there

2    was diversion.  What I'm talking about is

3    you had a process into place.  You didn't

4    follow -- you didn't follow your process

5    into place.

6               You had poor documentation

7    of the work that you did when you say you

8    did due diligence.  There's poor work

9    that's there.  And at the end of the day,

10   it's hard to know what the heck you did.

11   So I'm talking about the quality of your

12   program.

13              I'm not talking about

14   whether -- whether -- I'm not talking

15   about whether it led to diversion or not.

16   I'm just talking about you've got --

17   you've got a sloppy program.

18         Q.    Did you do any analysis to

19   see how often a Walgreens store had an

20   order rejected by a Walgreens

21   distribution center and then went to an

22   outside distributor to fill that order?

23              MR. BOGLE:  Object to form.

24   BY MS. SWIFT:

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Just yes or no, if you could

2  please.

3          MR. BOGLE:  Answer how you

4      see fit.

5          THE WITNESS:  Again, I've

6      got to go back and look at exactly

7      what I looked at, but...

8  BY MS. SWIFT:

9    Q.    If you can't answer that

10  without looking at your report, we'll

11  move on.  Turn to Page 206, please.

12          Actually, let's go ahead and

13  go to 208.  We'll go back to that last

14  paragraph in the Walgreens section.

15    A.    Sure.

16    Q.    The one about the crucial

17  employees.

18    A.    Mm-hmm.

19    Q.    You wrote that it's your

20  understanding that Natasha Polster, Ed

21  Bratton and Rex Swords were the crucial

22  employees involved in shaping,

23  maintaining and operating Walgreens'

24  anti-diversion program, correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -  -  -
 5

    IN RE:  NATIONAL          :   HON. DAN A.
 6  PRESCRIPTION OPIATE       :   POLSTER
    LITIGATION                :
 7                            :   MDL NO. 2804
    APPLIES TO ALL CASES      :
 8                            :   CASE NO.
                              :   17-MD-2804
 9                            :
10           - HIGHLY CONFIDENTIAL -
11  SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                    VOLUME II
13                      -  -  -
14               May 17, 2019
15                      -  -  -
16            Continued videotaped
    deposition of DR. SETH B. WHITELAW, taken
17  pursuant to notice, was held at the
    offices of Golkow Litigation Services,
18  One Liberty Place, 1650 Market Street,
    Philadelphia, Pennsylvania, beginning at
19  8:31 a.m., on the above date, before
    Michelle L. Gray, a Registered
20  Professional Reporter, Certified
    Shorthand Reporter, Certified Realtime
21  Reporter, and Notary Public.
22                      -  -  -
23         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    sir, is the outcome of that process.

2               I understand you believe

3    Cardinal Health's process for setting and

4    adjusting thresholds had flaws, correct?

5          A.    Yes.

6          Q.    Have you identified any

7    threshold for any Cardinal Health

8    customer that you believe was

9    inappropriately set --

10         A.    Again --

11              MR. BOGLE:  Just wait --

12   BY MS. WICHT:

13         Q.    -- as a result of the

14   process flaws that you identified?

15         A.    Again, outside the setting

16   of the actual number on whether it's

17   right or wrong, is outside of the scope

18   of what I was asked to look at.

19         Q.    And you're not offering any

20   opinions as I understand it,

21   Dr. Whitelaw, that any particular

22   shipment of opioids by Cardinal Health

23   was, in fact, diverted, correct?

24         A.    Again, my limit, the limits

1    that I was asked to do, was look at

2    process, and whether the process was

3    followed.  I am not drawing any legal

4    conclusions.  I am simply noting the

5    process flaws and issues with the

6    current -- with the process that I

7    observed.

8         Q.   I don't think I'm asking you

9    about any legal conclusions.  I'm asking

10   you whether, as a factual matter, there's

11   any shipment of opioids by Cardinal

12   Health that you are opining was, in fact,

13   diverted to illegitimate use.

14        A.   Again, you know the scope of

15   the report.  It was outside of the scope.

16   I was not looking at that.  I was looking

17   at the process and whether the process

18   was being followed.

19        Q.   Okay.  Now, your report,

20   sir, lays out a variety of ways that you

21   believe Cardinal Health's anti-diversion

22   program was not effective, correct?

23        A.   Yes.

24        Q.   And I take it from the

Highly Confidential - Subject to Further Confidentiality Review

1   testimony that you gave yesterday, that

2   you would agree with the premise that

3   there is no one correct way to run an

4   anti-diversion program, correct?

5              MR. BOGLE:  Object to form.

6              THE WITNESS:  I would agree

7         with the premise that any

8         anti-diversion program needs to be

9         tailored to the individual

10        company, which is consistent with

11        my experience as a compliance

12        expert and certainly fits with the

13        guidance that I have seen from the

14        DEA and others.

15   BY MS. WICHT:

16        Q.    So anti-diversion systems or

17   practices, you would expect them to vary

18   from company to company, correct?

19        A.    I would expect them to be

20   tailored appropriately to the -- from

21   company to company.

22        Q.    And you would expect, even

23   the anti-diversion processes and systems

24   within one company to vary over time,