## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
| --- | --- |
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*,<br>Case No. 17-op-45004<br><br>and<br><br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P, et al.*,<br>Case No. 18-op-45090. | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Hon. Dan Aaron Polster |

## DECLARATION OF JOHN J. HAGGERTY
## IN SUPPORT OF NON-RICO SMALL DISTRIBUTORS' MOTION
## FOR SUMMARY JUDGMENT BASED ON THEIR *DE MINIMIS* STATUS

Pursuant to 28 U.S.C. § 1746, I, John J. Haggerty, declare as follows:

1.      I am a partner at the law firm of Fox Rothschild LLP and counsel for Defendant Prescription Supply Inc. in the above-captioned cases.

2.      I submit this declaration for the purpose of transmitting true and correct copies of exhibits to support the motion for summary judgment of Non-RICO Defendants Anda, Inc., H. D. Smith Holdings, LLC, H. D. Smith Holding Company, Henry Schein, Inc., Henry Schein Medical Systems, Inc., and Prescription Supply Inc. (collectively, the "Small Distributors") based on their *de minimis* status.

3.      Attached as **Exhibit 1** is a true and correct copy of exhibits (McCann-3, McCann-12, McCann-14, McCann-15, McCann-16, McCann-17) and excerpts from the transcript of the

deposition of Craig McCann, Ph.D., which was held on May 9–10, 2019 in the above-captioned cases.

4.      Attached as **Exhibit 2** is a true and correct copy of excerpts from the transcript of the deposition of James Rafalski, which was held on May 13–14, 2019 in the above-captioned cases.

5.      Attached as **Exhibit 3** is a true and correct copy of excerpts from the transcript of the deposition of David Egilman, M.D., which was held on April 25–26, 2019 in the above-captioned cases.

6.      Attached as **Exhibit 4** is a true and correct copy of excerpts from the transcript of the deposition of Seth Whitelaw, Ph.D., which was held on May 16–17, 2019 in the above-captioned cases.

7.      Attached as **Exhibit 5** is a true and correct copy of excerpts from Plaintiffs the County of Cuyahoga, Ohio and the State of Ohio *ex rel.* Prosecuting Attorney of Cuyahoga County, Michael O'Malley's First Amended Responses and Objections to Distributor Defendants' Third Set of Interrogatories, which were served in the above-captioned cases.

8.      Attached as **Exhibit 6** is a true and correct copy of excerpts from Cuyahoga County's Supplemental Response and Objections to Distributor Defendants' Interrogatories, which was served in the above-captioned cases.

9.      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 28th day of June 2019.

/s/ John J. Haggerty
John J. Haggerty (0073572)
FOX ROTHSCHILD LLP
2700 Kelly Road, Suite 300
Warrington, PA 18976
Tel: (215) 345-7500
Fax: (215) 345-7507
jhaggerty@foxrothschild.com

*Counsel for Defendant,*
*Prescription Supply Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, John J. Haggerty, certify that the foregoing document was served via the Court's ECF system to all counsel of record.

<u>*/s/ John J. Haggerty*</u>
John J. Haggerty (0073572)

# EXHIBIT 1

**(McCann Deposition Transcript)**

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION
                    -   -   -
 3    IN RE:  NATIONAL          :  HON. DAN A.
      PRESCRIPTION OPIATE       :  POLSTER
 4    LITIGATION                :  MDL NO. 2804
                                :
 5    This document relates to: :  Case No. 17-MD-2804
                                :
 6    The County of Summit, Ohio :
      Ohio et al. v. Purdue Pharma :
 7    L.P., et al., Case No.      :
      17-OP-45004                 :
 8                                :
      The County of Cuyahoga v.   :
 9    Purdue Pharma Purdue Pharma :
      L.P., et al., Case No.      :
10    18-OP-45090                 :
11                    -   -   -
12        - HIGHLY CONFIDENTIAL -
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13
                     VOLUME I
14                  -   -   -
                  May 9, 2019
15
16            Videotaped deposition of
      CRAIG J. McCANN, Ph.D., CFA, taken
17    pursuant to notice, was held at the law
      offices of Morgan Lewis & Bockius, LLP,
18    1111 Pennsylvania Avenue, NW, Washington,
      D.C., beginning at 10:03 a.m., on the
19    above date, before Michelle L. Gray, a
      Registered Professional Reporter,
20    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
21
                    -   -   -
22
          GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -
 2                      I N D E X
 3                        -  -  -
 4
     Testimony of:
 5
                   CRAIG J. McCANN, Ph.D., CFA
 6
 7         By Ms. McEnroe                   16
 8         By Mr. Eppich                   253
 9         By Mr. Boehm                    323
10
11
                          -  -  -
12
                   E X H I B I T S
13
                          -  -  -
14
15   NO.           DESCRIPTION            PAGE
16   McCann-1       Notice of Videotaped  17
                   Deposition
17
18   McCann-2       Banker Box            23
                   Initial Report
19                 1-11 Appendices
                   Supplemental Report
20                 A through F Appendices
                   Second Supplemental
21                 Report
                   Appendices 1 and 2
22                 & Attachment
23
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                     -  -  -
 4
 5    NO.            DESCRIPTION            PAGE
 6    McCann-3       Expert Report of       24
                     Craig J. McCann, Ph.D.
 7                   3/25/19
 8    McCann-4       Appendix 1            105
                     Resumé
 9
      McCann-5       Appendix 2            111
10                   Correction to the
                     ARCOS Data
11
      McCann-6       Expert Report of      231
12                   Professor David Cutler
                     3/25/19
13
      McCann-7       Morgan Keegan v       248
14                   Garrett Synopsis
15    McCann-8       Appendix 6, List of   315
                     Reporter Company
16                   Families
17    McCann-9       Appendix D,           321
                     Additional McKesson
18                   Figures and Tables
19    McCann-10      Excessive Purchases   370
                     Schedule II
20                   Exhibit P
                     CAH_MDL_PRIORPROD_DEA07_
21                   01384160-R-61
22
23
24
```

1    I'm going to hold onto it.

2              MR. MOUGEY:  That sounds

3         good.

4    BY MS. McENROE:

5         Q.    To make things a little bit

6    easier, what we've done is for Exhibit 3,

7    we've bound together your original report

8    from March 25th -- and I'll hand this to

9    you in a minute so you can look at it,

10   with one addition.

11             We swapped in what I think

12   you referred to as an errata page, at

13   Page 35?

14        A.    Yes.

15        Q.    And then we included behind

16   a blue slip sheet the first supplemental

17   report that was submitted on April 3,

18   2019, without any of the attachments or

19   exhibits.  And then behind the next blue

20   slip sheet, the April 15th supplemental

21   report.  Okay?

22             Do you see that?

23        A.    Thank you.  Yes.

24             (Document marked for

Highly Confidential - Subject to Further Confidentiality Review

```
 1              identification as Exhibit

 2              McCann-3.)

 3    BY MS. McENROE:

 4         Q.    We're going to mark that as

 5    Exhibit 3.

 6              And today, if we're

 7    referring -- today or tomorrow, if we're

 8    referring to paragraphs and whatnot, in

 9    any of the reports you've submitted, it's

10    probably easiest if we refer to this

11    version.  But if you do want any of the

12    appendices or exhibits for completeness,

13    we can definitely arrange that.  All

14    right?

15         A.    Thank you.  Thank you.

16         Q.    So take a quick second and

17    look at that with me, just to make sure

18    that we are speaking the same language

19    here.

20              So the first cover sheet is,

21    as I said, the March 25th report, the

22    original report that you submitted,

23    correct?

24         A.    Yes.
```

```
 1          Q.    Okay.  And you didn't -- you

 2   didn't apply any other criteria?

 3          A.    Not that I can think of.

 4          Q.    Okay.  In that Paragraph 130

 5   that I just read out, you say at the

 6   beginning that you implemented various

 7   approaches.  And is that talking about

 8   the approaches that are discussed later

 9   in that section, Approaches 1, 2, 3, 4

10   and 5?

11          A.    Yes.

12          Q.    You are not talking about

13   anything else than that?

14          A.    Correct.

15          Q.    And then you have five

16   approaches in this report; is that

17   correct?

18          A.    Yes.

19          Q.    And the first one is the

20   maximum monthly trailing six-month

21   threshold, correct?

22          A.    Correct.

23          Q.    And the second is the twice

24   trailing 12-month average pharmacy dosage
```

1   to do in this approach?

2       A.    I'm pausing just for a

3   second to make sure when you say, is that

4   all, prior to the instruction that I got

5   from counsel, I think the answer is yes.

6       Q.    Paragraph 132 says, "In this

7   approach and the others implemented

8   below" -- just pausing there for a

9   second.  The others implemented below are

10  the rest of the five approaches in this

11  Section 9; is that correct?

12      A.    Yes.

13      Q.    So it says, "In this

14  approach, and the others implemented

15  below, I have been asked by counsel to

16  assume that the distributor did not

17  effectively investigate the flagged

18  transactions, and so every subsequent

19  transaction of that drug code is also

20  flagged because the distributor had an

21  unfulfilled obligation to detect and

22  investigate the first flagged

23  transaction."

24          Is that assumption made in

1    Paragraph 132 also from direction of

2    counsel?

3         A.    Yeah, so I might shorten

4    that sentence up a great deal, because

5    there's some of that sentence that's not

6    necessary to describe our implementation.

7         Q.    Explain to me what you mean

8    by that.

9         A.    Well, as it's written, as I

10   wrote it --

11        Q.    Yeah.

12        A.    -- I said counsel asked me

13   to assume that the distributor did not

14   effectively investigate the flagged

15   transactions.  And so every subsequent

16   transaction of that drug code is also

17   flagged because the distributor had an

18   unfulfilled obligation to detect and

19   investigate the first flagged

20   transaction.

21             Operationally, you could

22   condense that to just say, I was asked to

23   flag every subsequent transaction after

24   the first transaction is flagged.  It

1    doesn't need the rest of the context to

2    describe the calculation that I did.

3                    It's there because I'm sort

4    of describing my understanding, but it's

5    not necessary to describe the

6    calculations.  Just if you hit a flag,

7    everything after that is flagged.  And

8    some other witness will deal with whether

9    there was effective due diligence and

10   whether in the absence of that there was

11   an ongoing duty that should trigger a

12   flag on all the subsequent transactions.

13        Q.   Is it your assertion after

14   the because -- so where it says -- you

15   know, it says the first part that you

16   were just reading, and then it says,

17   "Because the distributor had an

18   unfulfilled obligation to detect and

19   investigate the first flagged

20   transactions."

21                    Is that coming from you or

22   is that coming from plaintiffs' counsel,

23   the reasoning of the because?

24        A.   It's coming from the

1    plaintiffs' counsel.  I don't -- you

2    know, I was asked to assume everything

3    that's in that sentence, including that

4    last clause that you've read.

5         Q.    And just so I make sure that

6    I understand, that assumption -- that is,

7    flagging every subsequent transaction for

8    that specific drug after you have a

9    flagged transaction -- you apply across

10   all five of the methodologies or

11   approaches used in Section 9; is that

12   correct?

13        A.    Correct.

14        Q.    For every distributor, for

15   each of the drugs that you use or

16   manufacture as appropriate for the second

17   supplemental report?

18        A.    Correct.

19        Q.    So that I understand and

20   make sure we're totally clear.  You have

21   a methodology that you explain here in

22   Paragraph 131 regarding the maximum

23   monthly trailing six-month threshold; is

24   that correct?  We were just talking about

1    your March 25th report, in particular, to

2    Paragraphs 181, 182, and 183, which are

3    towards the end at Page 93 to 94.  Let me

4    know when you're there.

5         A.    I'm there.

6         Q.    And this section is labeled

7    "Conclusion," correct?

8         A.    Yes.

9         Q.    And Paragraph 181 says,

10   "Based upon my comparison of the ARCOS

11   data produced by the DEA, the public

12   ARCOS retail drug summary reports, and

13   the defendants' transactional data, I

14   conclude that -- after correcting a

15   relatively small number of records -- the

16   ARCOS data produced by the DEA is

17   complete and reliable."

18              Did I read that correctly?

19        A.    Yes.

20        Q.    That's an opinion you're

21   advancing in this litigation?

22        A.    Yes.

23        Q.    And then Paragraph 182, "I

24   further conclude that **Redacted**

```
 1   transactional" -- "transaction records

 2   produced in discovery are a reliable

 3   source of transactions data before 2006

 4   and after 2014.  More generally, with the

 5   exception of  Redacted           , the other

 6   defendants' transaction data is also a

 7   reliable source of transaction data for

 8   the periods covered by its production."

 9             Did I read that correctly?

10        A.    Yes.

11        Q.    And that's an opinion that

12   you're advancing in this litigation?

13        A.    Yes.

14        Q.    Paragraph 183, "The ARCOS

15   data can be used to identify transactions

16   in a state, county, zip code, or

17   individual pharmacy meeting certain

18   criteria as I have illustrated above."

19             Did I read that correctly?

20        A.    Yes.

21        Q.    And that's an opinion that

22   you're advancing in this litigation?

23        A.    Yes.

24        Q.    Are you advancing any other
```

```
 1    legitimate intended uses to illicit

 2    activities.

 3            Q.    Do you agree that diversion

 4    is a crime?

 5            A.    I have no -- no opinion --

 6                  MR. MOUGEY:  Objection.

 7            Outside the scope.

 8                  THE WITNESS:  -- one way or

 9            the other.

10    BY MR. EPPICH:

11            Q.    Are you planning to offer

12    any opinions about whether or not any of

13    the defendants diverted prescription

14    opioids in this litigation?

15            A.    No.

16            Q.    I'd like to turn back to

17    Page 56 of your report.  Page 56 is the

18    start of Section 9, transaction analysis,

19    you'll recall.

20                  I'd like to return to the --

21    the five methodologies that you implement

22    to identify what you call flagged orders.

23    Okay?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. EPPICH:

 2         Q.    Now, you say that your

 3   methodology flags orders, correct?

 4         A.    Yes.

 5         Q.    If the distributors had

 6   refused to ship each of your flagged

 7   orders, would any legitimate

 8   prescriptions have gone unfilled?

 9               MR. MOUGEY:  Objection.

10               THE WITNESS:  I don't know.

11   BY MR. EPPICH:

12         Q.    Are you planning to offer

13   any opinions in this case as to whether

14   or not distributors' refusal to ship

15   would result in any legitimate

16   prescriptions having gone unfilled?

17               MR. MOUGEY:  Objection.

18               THE WITNESS:  Not as I sit

19         here.

20   BY MR. EPPICH:

21         Q.    Now, if the distributors had

22   refused to ship each of your flagged

23   orders, would that have prevented the

24   opioid crisis?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. MOUGEY:  Objection.

 2                THE WITNESS:  I have no

 3          idea.  No opinion one way or the

 4          other.

 5   BY MR. EPPICH:

 6          Q.    And do you plan to offer any

 7   opinions about whether or not

 8   distributors play a role or played a role

 9   in causing or preventing the opioid

10   crisis?

11                MR. MOUGEY:  Objection.

12                THE WITNESS:  No.  As with a

13          lot of this stuff, that's going to

14          be the subject of other experts'

15          reports and testimony.

16   BY MR. EPPICH:

17          Q.    Now, you used ARCOS data for

18   your methodologies, correct?

19                MR. MOUGEY:  Objection.

20                THE WITNESS:  Along with

21          other data.  But, yes, I used

22          ARCOS data.

23   BY MR. EPPICH:

24          Q.    And you understand that
```

```
 1            A.    Section 10 doesn't deal with

 2    individual shipments from distributors to

 3    pharmacies.  It's at a higher, more macro

 4    level, describing the shipments into

 5    Ohio, and into Cuyahoga and Summit, and

 6    how those exceed the two example

 7    baselines that I created.

 8            Q.    Yes.  And earlier you -- you

 9    explained what the -- what you meant by

10    excessive shipments.  And so I'm asking

11    you, of these excessive shipments, which

12    of them should distributors have not

13    shipped to pharmacies?

14            A.    I don't have an opinion one

15    way or another beyond what's expressed in

16    Section 10 on that topic.

17            Q.    Were any of what you

18    called -- call excessive shipments

19    diverted?

20            A.    I don't know.

21            Q.    You can't point to any of

22    your excessive shipments that were

23    diverted?

24                  MR. MOUGEY:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Outside the scope.

 2                 THE WITNESS:  And it's just

 3            mischaracterizing what I did in

 4            Section 10.  I'm not identifying

 5            individual transactions in

 6            Section 10.

 7                 I'm just saying at a macro

 8            level, the amount of MME per

 9            capita shipped into Cuyahoga and

10            Summit Redacted    by a factor of

11            Redacted        , and then Redacted

12            Redacted by nearly Redacted      , and

13            I've explained how that Redacted

14            Redacted              some gradual

15            Redacted   from the earlier levels to

16            the later levels.

17   BY MR. EPPICH:

18            Q.   Do you plan to offer any

19   opinions in this case as to whether or

20   not the excessive shipments that are

21   represented in your report in Section 10

22   were diverted?

23            A.   No.

24            Q.   Your 1997 baseline, you
```

```
 1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
 2               EASTERN DIVISION
                    -  -  -
 3   IN RE:  NATIONAL          :  HON. DAN A.
     PRESCRIPTION OPIATE       :  POLSTER
 4   LITIGATION                :  MDL NO. 2804
                               :
 5   This document relates to: :  Case No. 17-MD-2804
                               :
 6   The County of Summit, Ohio :
     Ohio et al. v. Purdue Pharma :
 7   L.P., et al., Case No.     :
     17-OP-45004                :
 8                             :
     The County of Cuyahoga v. :
 9   Purdue Pharma Purdue Pharma :
     L.P., et al., Case No.     :
10   18-OP-45090                :
11                -  -  -
12          Friday, May 10, 2019
13               Volume II
14
                    -  -  -
15   HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
             CONFIDENTIALITY REVIEW
16                  -  -  -
17           Videotaped deposition of
     CRAIG J. MCCANN, Ph.D., CFA, taken pursuant
18   to notice, was held at the law offices of
     Morgan Lewis & Bockius, 1111 Pennsylvania
19   Avenue, NW Washington, DC 20004, beginning
     at 9:08 a.m., on the above date, before
20   Amanda Dee Maslynsky-Miller, a Certified
     Realtime Reporter.
21
                    -  -  -
22
          GOLKOW TECHNOLOGIES, INC.
23     877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                     -  -  -
 2                   I N D E X
 3                     -  -  -
 4
    Testimony of: CRAIG J. McCANN, Ph.D., CFA
 5
 6        By Ms. Swift                 400
          By Mr. Alexander             464
 7        By Ms. Fumerton              509
          By Mr. Matthews              525
 8        By Mr. McDonald              543
          By Mr. Livingston            557
 9        By Mr. Hahn                  587
          By Mr. Gallagher             605
10        By Ms. Persio                659
          By Mr. Allan                 677
11        By Ms. O'Gorman              706
          By Ms. Leibell               722
12        By Ms. Levy                  729
13
14                   -  -  -
15                E X H I B I T S
16                   -  -  -
17   NO.          DESCRIPTION              PAGE
18   McCann-11    Excerpted Appendix 10
                  Of C. McCann Report      427
19
     McCann-12    Excerpted Appendix 9
20                Of C. McCann Report      440
21   McCann-13    Excerpted Appendix 11
                  Of C. McCann Report      458
22
     McCann-14    Page 3779 of Appendix 9
23                Of C. McCann Report      512
     McCann-15    Page 3849 of Appendix 9
24                Of C. McCann Report      512
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -
 2                  E X H I B I T S
 3                        -  -  -
 4    NO.            DESCRIPTION                PAGE
 5
      McCann-16      Page 3783 of Appendix 9
 6                   Of C. McCann Report       513
 7    McCann-17      Page 3852 of Appendix 9
                     Of C. McCann Report       513
 8
      McCann-18      3/21/19 Expert Report of
 9                   C. McCann, with
                     Appendices                526
10
      McCann-19      Sub-Appendix I of
11                   Appendix 9                535
12    McCann-20      HSI Distributor Transaction
                     With Flag Chart           551
13
      McCann-21      Distributor Market Share by
14                   Year for Cuyahoga County  554
15    McCann-22      Distributor Market Share by
                     Year for Summit County    554
16
      McCann-23      Demonstrative             569
17
      McCann-24      Demonstrative             572
18
      McCann-25      Aggregate Production Quota
19                   History for Selected
                     Pharmaceutical Products   575
20
      McCann-26      Defense Expert Quota Chart  582
21
      McCann-27      Appendix 5 of
22                   C. McCann Report          605
23    McCann-28      Memorandum of Agreement   653
24
```

```
 1                       -  -  -

 2                 E X H I B I T S

 3                       -  -  -

 4    NO.            DESCRIPTION              PAGE

 5    McCann-29      Excerpted Excel

               Spreadsheet              681

 6

      McCann-30      Appendix F

 7                   Of C. McCann Report     719

 8    McCann-31      Appendix 1 of

               C. McCann Report         730

 9

      McCann-32      Allergan NDC Codes      737

10

      McCann-33      Actavis NDC Codes       739

11

      McCann-34      Computer Code           747

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  In charts like the charts in

 2    Figure 11, Figure 12, where you're

 3    looking at all transactions for the time

 4    period, you can't tell how many of those

 5    transactions shipped from a Walgreens

 6    distribution center to a Walgreens

 7    pharmacy, correct?

 8         A.    Not from the figures.

 9         Q.    All right.  I'm going to

10    hand you what I'm going to mark as

11    Exhibit-12.

12                  -   -   -

13              (Whereupon, Exhibit

14         McCann-12, Excerpted Appendix 9 of

15         C. McCann Report, was marked for

16         identification.)

17                  -   -   -

18    BY MS. SWIFT:

19         Q.    This one is going to be sort

20    of similar to Exhibit-11.

21                  Exhibit-12 is an excerpted

22    large binder of documents from your

23    Exhibit-9.  And what we did was the same

24    thing, we pulled out the pages that
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    related to my client, which is Walgreens.

 2              Do you recognize that chart

 3    on the first page of Exhibit-12 as a

 4    chart from your Exhibit-9?

 5         A.    Yes.

 6              I'm sorry, this Exhibit-9 is

 7    4,000 pages.  I don't recognize --

 8         Q.    You don't recognize this

 9    particular one?

10         A.    -- this particular chart.

11    But I recall charts that look exactly

12    like this.

13         Q.    You included -- you say in

14    your report that Exhibit-9 is a set of

15    charts and reports too voluminous to

16    include in the body of the report,

17    correct, sir?

18         A.    Yes.

19         Q.    And if you're -- just to see

20    the description of Exhibit-9 in your

21    report, it's Page 89, Paragraph 161.

22              This section of your report,

23    it's Section 11, charts and reports,

24    walks through the variety of reports and
```

1    charts that are included in Appendix 9,

2    correct, sir?

3         A.    Yes.

4         Q.    The first several categories

5    of charts that are included in Appendix 9

6    are summary charts of high-level data.  I

7    haven't included all of them in our

8    excerpt version of it.

9              But you can see from the

10   body of the report, the first example is,

11   State hydrocodone and Oxycodone MME per

12   capita, 1997 to 2017.

13             And there are a bunch of

14   other high-level charts like that,

15   correct, sir?

16        A.    Yes.

17        Q.    You can't tell anything

18   about any individual distributor from

19   charts like those high-level charts in

20   Appendix 9, correct, sir?

21        A.    Correct.

22        Q.    Then if you look at

23   Paragraph 174 of your March 25th report,

24   that references Part G of Appendix 9,

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  -  -  -
 2             VIDEO TECHNICIAN:  Back on
 3        the record at 11:07 a.m.
 4                  -  -  -
 5             EXAMINATION
 6                  -  -  -
 7   BY MS. FUMERTON:
 8        Q.    Good morning, Dr. McCann.
 9   My name is Tara Fumerton, and I represent
10   Walmart in this action.
11        A.    Good morning.
12        Q.    Good morning.  Right before
13   we went on the record I marked as
14   Exhibits-14 through 17 a series of
15   excerpts from your Appendix 9.  I'm going
16   to ask you some questions about those in
17   a minute, if you can set them aside.
18             Dr. McCann, do you recall
19   yesterday that you were asked questions
20   about whether your calculations took into
21   consideration the fact that a certain
22   number of opioids distributed into Summit
23   County and Cuyahoga County was returned?
24        A.    Yes.
```

```
 1            Q.    And the record will reflect

 2    what you said, but I believe that you

 3    testified that you would need to verify

 4    the extent to which returns were factored

 5    into your analysis, but that in any

 6    event, returns constituted a de minimus

 7    amount of the transactions you reviewed.

 8            A.    Yes.

 9            Q.    Is that a fair summary of

10    your testimony?

11            A.    Yes.

12            Q.    In a data set as large as

13    the one that you reviewed concerning the

14    shipments of opioids into Cuyahoga and

15    Summit County, do you consider de minimus

16    to be 1 percent?

17            A.    I'd have to think through

18    the context a little bit.

19                  But in some contexts, 1

20    percent would be de minimus and in other

21    contexts not.  And it depends on -- let

22    me leave it at that.

23            Q.    Okay.  If Redacted

24    constituted about Redacted     of the total
```

1    amount of opioids being distributed to

2    Cuyahoga or Summit counties, would you

3    consider that to be 1 percent -- I'm

4    sorry, let me --

5           A.    Yes.  That was the easiest

6    question I've had so far.

7           Q.    It would be.  Let me

8    rephrase.

9                 If  Redacted     constituted about

10   Redacted      of the total amount of opioids

11   being distributed into Cuyahoga and

12   Summit counties, would you consider that

13   to be de minimus?

14          A.    In the context of my

15   opinions, yes.

16          Q.    Okay.  I would like you to

17   now look at the four exhibits that I

18   marked.  And I'm going to go through them

19   quickly and ask you yes-or-no questions.

20   And if you could answer yes or no, I

21   would appreciate it, and I'm sure my

22   colleagues would appreciate it who are

23   waiting to get up here and ask questions,

24   too.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              for identification.)

 2                    -  -  -

 3              (Whereupon, Exhibit

 4         McCann-15, Page 3849 of Appendix 9

 5         of C. McCann Report, was marked

 6         for identification.)

 7                    -  -  -

 8              (Whereupon, Exhibit

 9         McCann-16, Page 3783 of Appendix 9

10         of C. McCann Report, was marked

11         for identification.)

12                    -  -  -

13              (Whereupon, Exhibit

14         McCann-17, Page 3852 of Appendix 9

15         of C. McCann Report, was marked

16         for identification.)

17                    -  -  -

18              THE WITNESS:  Yes.

19   BY MS. FUMERTON:

20         Q.   So Exhibit-14 is Page 3779

21   of 3877 of your Appendix 9, correct?

22         A.   Yes.

23         Q.   And on that page, you

24   provide an analysis, by MME, of the total
```

Highly Confidential - Subject to Further Confidentiality Review

1    opioids distributed into Cuyahoga County

2    by company, correct?

3          A.    Correct.

4          Q.    You conclude that Walmart's

5    market share of the total opioids

6    distributed into Cuyahoga County by MME

7    is 1.28 percent, correct?

8          A.    Correct.

9          Q.    Please turn to Exhibit-15.

10         A.    Yes.

11         Q.    This is Page 3849 of 3877 of

12   your Appendix 9.

13               And on this page you provide

14   an analysis, by MME, of the total opioids

15   distributed into Summit County by

16   company, correct?

17         A.    Yes.

18         Q.    You conclude that Walmart's

19   market share of the total opioids

20   distributed into Summit County by MME is

21   1.12 percent, correct?

22         A.    Correct.

23         Q.    Can you please turn to

24   Exhibit-16?

Highly Confidential - Subject to Further Confidentiality Review

1      A.    Yes.

2           Q.    And this is Page 3783 of

3    3877 of your Appendix 9.

4                 And on this page, you

5    provide an analysis by dosage units of

6    the total opioids distributed into

7    Cuyahoga County by company, correct?

8      A.    Yes.

9           Q.    You conclude that Walmart's

10   market share of the total opioids

11   distributed into Cuyahoga County by

12   dosage units is 2.17 percent, correct?

13     A.    Yes.

14          Q.    Turn to Exhibit-17, please.

15   This is Page 3852 of 3877 of your

16   Appendix 9.

17                And on this page, you

18   provide an analysis by dosage units of

19   the total opioids distributed into Summit

20   County by company, correct?

21     A.    Correct.

22          Q.    You conclude that Walmart's

23   market share by dosage units of the

24   opioids distributed into Summit County is

1                 -  -  -

2                 THE WITNESS:  Thank you.

3    BY MR. MATTHEWS:

4         Q.    Exhibit-19 is an excerpt

5    from your Appendix 9, Sub-Appendix I,

6    which I will represent to you contains

7    data relative to distribution by **Redacted**

8    into Summit -- Ohio, Summit and Cuyahoga

9    counties.

10                Do you recognize it to be

11   that?

12        A.    I don't recognize it yet to

13   be that, but I do recognize it as pages

14   from one of my appendices.

15        Q.    Okay.  I just want to make

16   sure I understand what you're saying.

17                So if you could turn to Page

18   3762 of what's been marked as Exhibit-19.

19        A.    Yes.

20        Q.    The page is captioned,

21   Opioid Total Dosage Units By Individual

22   DEA Number in Ohio, right?

23        A.    Yes.

24        Q.    And then on the second entry

1    on the left, there's a company named

2    Redacted       , right?

3          A.    Correct.

4          Q.    And you notice that you

5    distinguish between Redacted

6    Redacted and Redacted

7                Do you see that?

8          A.    Yes.

9          Q.    Why did you do that?

10          A.    For purposes of this report,

11   the report is by DEA number, and so it

12   includes both of those DEA numbers and

13   the reporter name from the ARCOS data we

14   received.

15          Q.    Okay.  So according to this,

16   if I understand it correctly, Redacted       ,

17   meaning -- the Redacted        total

18   percentage of opioids distributed into

19   Ohio during the relevant time period, as

20   a total of all opioids, was Redacted percent,

21   right?

22          A.    No, not necessarily.  During

23   the time period covered by this report,

24   which is the public -- the ARCOS data I

1    received, that would be a true statement.

2         Q.    Right.  So during the

3    relevant time period analyzed by you in

4    connection with this report, Redacted        ,

5    including Redacted     total -- Redacted

6    Redacted                  , and Redacted      ,

7    the total of their market share is Redacted

8    percent, right?

9         A.    No.  You're still not

10   describing the report accurately, I don't

11   think.

12             The relevant time period is

13   broader than, as I understand it, 2006 to

14   2014.  If by relevant time period that's

15   shorthand for you for 2006 to 2014, then

16   I agree with your statement.

17        Q.    Okay.  From now on, that's

18   what I mean.

19        A.    Okay.

20        Q.    You, your report.

21             You're telling us that Redacted

22   Redacted , meaning Redacted

23   and Redacted     collectively, distributed

24   Redacted percent of all opioids into Ohio

1    during the period covered by your report?

2         A.    I'm sorry, Mr. Matthews,

3    you're still not saying that right.

4              My report covers a longer

5    time period, including for Redacted        So

6    you can't say in my report Redacted

7    market share is Redacted, unless you're

8    referring only to this page and only to

9    this time period, which is not the time

10   period covered by my report.

11        Q.    And the time period is --

12   why don't you tell me again, what's the

13   time period?

14        A.    It covers from -- there's

15   data in my report from 1997 to 2018,

16   maybe 1996 or 1997 to 2018.

17        Q.    And that's the period that's

18   covered here?

19        A.    "Here" being what?

20        Q.    On Page 3762.

21        A.    No.  This is the ARCOS time

22   period of 2006 to 2014.

23        Q.    All right.  And for that

24   same period, Redacted                    ,

Highly Confidential - Subject to Further Confidentiality Review

1   distributed <sup>Redacted</sup> percent of the opioids

2   distributed in Ohio, right?

3          A.    At least according to the

4   ARCOS data, correct.

5          Q.    And what you're telling me

6   is, according to the ARCOS data during

7   this same time period, <sup>Redacted</sup>

8   distributed <sup>Redacted</sup> percent of the opioids

9   into Ohio?

10         A.    At least as identified as

11  the reporter name in ARCOS.

12         Q.    Turn to Page 3788.

13               You'll agree this is

14  captioned, Opioid Total Dosage Units By

15  Individual DEA Number into Cuyahoga

16  County, right, Ohio?

17         A.    Yes.

18         Q.    And so if you look down in

19  the left column, the second entry is,

20  <sup>Redacted</sup>       total, right?

21         A.    Correct.

22         Q.    And according to this, if

23  I'm reading it correctly, <sup>Redacted</sup>

24  alone distributed <sup>Redacted</sup> percent of all of

Highly Confidential - Subject to Further Confidentiality Review

1    the opioids distributed into Cuyahoga

2    County for the time reported on this

3    page, right?

4          A.    At least by buyer name in

5    the ARCOS data, correct.

6          Q.    And Redacted

7    Redacted distributed Redacted percent of all

8    opioids distributed into Ohio -- Cuyahoga

9    County, Ohio, during the time period

10   reflected on this page?

11         A.    At least as identified in

12   the ARCOS data I received, yes.

13         Q.    And collectively what you

14   refer to as Redacted    , total it's Redacted

15   percent, right?

16         A.    Correct.

17         Q.    If you could just turn to

18   Page 3856.

19               This is captioned, Opioid

20   Total Dosage Units By Individual DEA

21   Number in Summit County, Ohio, right?

22         A.    Yes.

23         Q.    And looking at this, the

24   first entry is Redacted -- or the Redacted

1    Redacted        , right?

2            A.    Yes.

3            Q.    And so as I understand this,

4    for the time period reflected in this

5    exhibit, Redacted      , standing alone,

6    distributed Redacted percent of all opioids

7    distributed into Summit County, Ohio,

8    right?

9            A.    At least as identified as

10   the seller name in the ARCOS data I

11   received.

12           Q.    And Redacted

13   Redacted distributed Redacted percent of all

14   opioids distributed into Summit County,

15   Ohio, in the time period reflected on

16   this exhibit, right?

17           A.    At least as identified by

18   the seller name in the ARCOS data I

19   received.

20           Q.    And, collectively, Redacted

21   Redacted             and Redacted

22   distributed Redacted percent of all the

23   opioids distributed into Summit County,

24   correct?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    At least as identified by

 2    the seller name in the ARCOS data I

 3    received.

 4               MR. MATTHEWS:  Thanks, Dr.

 5          McCann.  I have many more

 6          questions, but my colleagues won't

 7          let me ask them.  So I'm finished.

 8               THE WITNESS:  Thank you very

 9          much.

10               VIDEO TECHNICIAN:  Off the

11          record at 11:39 a.m.

12                    -   -   -

13               (Whereupon, a discussion off

14          the record occurred.)

15                    -   -   -

16               VIDEO TECHNICIAN:  We're

17          back on the record at 11:44 a.m.

18                    -   -   -

19                    EXAMINATION

20                    -   -   -

21    BY MR. McDONALD:

22          Q.    Dr. McCann, my name is John

23    McDonald, and I represent Henry Schein,

24    Inc. and Henry Schein Medical Systems,
```

```
 1                        And for Redacted       , it's a

 2    short list.  For other defendants, it

 3    would be a much larger one.

 4          Q.    And for Redacted    , it's

 5    completely blank for every one of the

 6    five flagging methods for every

 7    transaction, correct?

 8          A.    Right.  Because it appears

 9    all -- it's not applicable because it

10    appears that all of the buyers are

11    practitioners.

12          Q.    So you have no opinions in

13    this case about Redacted    in regard to

14    your transactional analysis using the

15    five flagging methods; is that right?

16          A.    Correct.

17          Q.    And that's because Redacted

18    has no sales to chain or retail

19    pharmacies in either Summit or Cuyahoga

20    County?

21          A.    And that is all that is

22    covered in Section 9, yes.

23          Q.    Now, you also did a market

24    share analysis or calculations about
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    market share, correct?

2         A.    Yes.

3         Q.    And what was the purpose of

4    that?

5         A.    To assist the court.

6         Q.    To assist the court, okay.

7               Well, then, let's look at it

8    quickly for my client.  Let me show you

9    what I've marked as Exhibits-21 and 22.

10        A.    Thank you.

11                   -  -  -

12              (Whereupon, Exhibit

13              McCann-21, Distributor Market

14              Share by Year for Cuyahoga County,

15              was marked for identification.)

16                   -  -  -

17              (Whereupon, Exhibit

18              McCann-22, Distributor Market

19              Share by Year for Summit County,

20              was marked for identification.)

21                   -  -  -

22   BY MR. McDONALD:

23        Q.    And 21 is the distributor

24   market share by year for Cuyahoga County;
```

Highly Confidential - Subject to Further Confidentiality Review

1    is that right?

2          A.    For the period 2006 to 2014,

3    correct.

4          Q.    Okay.  And you used ARCOS

5    data for this analysis, correct?

6          A.    Supplemented with individual

7    transaction data, yes.

8          Q.    All right.  And, now, do you

9    understand Redacted     is not a defendant

10   in Cuyahoga County?

11         A.    I don't know one way or the

12   other.

13         Q.    So you just did this for

14   everybody, whether they were a defendant

15   or not?

16         A.    Correct.

17         Q.    Okay.  And you see Redacted

18   Redacted       market share.

19               And that would include

20   Redacted       , right, since you're using

21   them --

22         A.    To the extent that Redacted

23   Redacted  was shipping drugs in Cuyahoga,

24   yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    And the market share is Redacted

2    percent for these years?

3          A.    Correct.

4          Q.    And you would agree with me

5    that's de minimus?

6          A.    Yes.

7          Q.    All right.  And if you'll

8    look at Exhibit-22, this is the same

9    analysis for Summit County, correct?

10         A.    Yes.

11         Q.    And Redacted                is --

12   market share is Redacted percent.

13               Do you see that?

14         A.    Yes.

15         Q.    And you would agree with me

16   that's de minimus?

17         A.    Yes.

18               MR. McDONALD:  That's all

19         the questions I have.  Thank you.

20               VIDEO TECHNICIAN:  Off the

21         record at 11:57 a.m.

22                    -  -  -

23               (Whereupon, a discussion off

24         the record occurred.)

Highly Confidential - Subject to Further Confidentiality Review

1   MME by Company in Cuyahoga County, Ohio;

2   is that correct?

3       A.   Yes.

4       Q.   All right.  And as part of

5   your work for the plaintiffs, you

6   prepared this chart that you contend

7   represents the opioid total MME by

8   company in Cuyahoga, correct?

9       A.   Correct.

10      Q.   All right.  And this covers

11   the time period from 2006 through 2014;

12   is that correct?

13      A.   Yes.

14      Q.   On this chart that's marked

15   as Exhibit-14, what percentage of the

16   market share of total opioid MMEs in

17   Cuyahoga County did you attribute to Redacted

18  Redacted ?

19      A.   Redacted percent.

20      Q.   And you believe that number

21   is accurate?

22      A.   I do.

23      Q.   If you could, sir, flip to

24   the document that was previously marked

Highly Confidential - Subject to Further Confidentiality Review

```
 1    as Exhibit-16.

 2           A.    Yes.

 3           Q.    This is another chart that

 4    you prepared for plaintiffs that is

 5    entitled, Opioid Total Dosage Units by

 6    Company in Cuyahoga County, Ohio; is that

 7    correct?

 8           A.    Yes.

 9           Q.    And, again, this Exhibit-16

10    refers to the time period between 2006

11    and 2014, correct?

12           A.    Yes.

13           Q.    On Exhibit-16, what

14    percentage of market share, based on

15    total opioid dosage, did you -- dosage

16    units did you attribute to  Redacted     ?

17           A.    Redacted  percent.

18           Q.    Mr. McCann, let's refer to

19    what's previously marked as Exhibit-15.

20                 And this is another chart

21    that you prepared for plaintiffs that is

22    entitled, Opioid Total MME by Company in

23    Summit County, Ohio; is that correct?

24           A.    Yes.
```

1        Q.    And, again, this covers the

2   time period from 2006 through 2014,

3   correct?

4        A.    Yes.

5        Q.    On this chart that's now

6   marked as Exhibit-15, what percentage of

7   total opioid MMEs in Summit County did

8   you attribute to Redacted        ?

9        A.    Redacted percent.

10       Q.    And do you believe that

11  number is accurate?

12       A.    Yes.

13       Q.    With regard to -- I think I

14  skipped over this, sir.

15             With regard to Exhibit-16,

16  you had said that the market share that

17  you attributed to Redacted        was Redacted

18  percent.

19             Do you believe that number

20  is accurate?

21       A.    Yes.

22       Q.    If you would, sir, please

23  refer to Exhibit-17.

24             And Exhibit-17 is another

Highly Confidential - Subject to Further Confidentiality Review

1    chart that you had prepared for the

2    plaintiffs in this litigation that's

3    entitled, Opioid Total Dosage Units by

4    Company in Summit County, Ohio; is that

5    correct?

6         A.    Yes.

7         Q.    And this is another document

8    that's from Appendix 9 to your report?

9         A.    Yes.

10        Q.    And Exhibit-17 covers that

11   same time period from 2006 through 2014,

12   correct?

13        A.    Yes.

14        Q.    On Exhibit-17, what

15   percentage of total opioid dosage in

16   Summit County did you attribute to Redacted

17   Redacted ?

18        A.    Redacted percent.

19        Q.    And do you believe that

20   number is accurate?

21        A.    Yes.

22        Q.    If you would, sir, I know

23   you have your report in front of you

24   there that's been previously marked as

Highly Confidential - Subject to Further Confidentiality Review

1    Exhibit-3.  I want to ask you some

2    questions regarding that.

3              I know you've been asked a

4    lot of questions over the last day

5    and-a-half about the five methodologies

6    that were utilized.  I'm not going to ask

7    you specifics about the methodologies,

8    but I want to ask you some questions

9    about specific numbers that you generated

10   through those five different

11   methodologies.

12             So if you could, please,

13   turn to Table Number 24 in Exhibit-3,

14   which is Page 59 of your report.

15        A.    Yes.

16        Q.    Now, this Table 24 relates

17   to the trailing six-month maximum

18   threshold flag transactions methodology,

19   correct?

20        A.    Correct.

21        Q.    All right.  And using that

22   methodology, how many flagged

23   transactions did you attribute to H.D.

24   Smith for the period between 1996 and

```
 1    2018?

 2         A.    269.

 3         Q.    And you believe that number

 4    is accurate?

 5         A.    Yes.

 6         Q.    If you could, sir, could you

 7    tell me what the percentage of the total

 8    flagged -- well, let me ask it this way:

 9    Total flagged transactions that you have

10    in Table 24 for that time period for all

11    of the identified companies you have as

12    1,271,618; is that correct?

13         A.    Yes.

14         Q.    If you could, please, sir,

15    could you tell me what percentage of that

16    1,271,618 flagged transactions you've

17    attributed to H.D. Smith?

18              And I've handed you a

19    calculator there, because I assume you

20    can't do that one in your head.

21         A.    Apparently, I can't do it on

22    a calculator either.  Just give me a

23    minute.

24              .02 percent.
```

1          Q.     Does that sound accurate,

2     sir?

3          A.     Yes.

4          Q.     If you would, please, turn

5     to Table 26 in Exhibit-3.  It's on Page

6     63 of your report.

7          A.     Yes.

8          Q.     And this table relates to

9     the twice trailing 12-month average

10    pharmacy dosage units threshold

11    methodology, correct?

12         A.     Yes.

13         Q.     Using that methodology in

14    Table 26, sir, how many flagged

15    transactions did you attribute to H.D.

16    Smith for the period between 1996 and

17    2018?

18         A.     355.

19         Q.     All right.  And you believe

20    that number is accurate?

21         A.     Yes.

22         Q.     If you could, sir, and

23    you've already anticipated my next

24    question, could you tell me what the

Highly Confidential - Subject to Further Confidentiality Review

1   percentage of the total flagged

2   transactions, using the methodology on

3   Table 26, that you've attributed to H.D.

4   Smith?

5          A.    Yes.  It's .046 percent.

6          Q.    And you believe that number

7   is accurate?

8          A.    Yes.

9          Q.    If you could, please, sir,

10  turn to Table 28 in Exhibit-3.  This is

11  on Page 67 of your report.

12         A.    Yes.

13         Q.    And Table 28 relates to the

14  three times trailing 12-month average

15  pharmacy dosage units methodology?

16         A.    Yes.

17         Q.    And in what's reflected in

18  Table 28, utilizing that methodology,

19  sir, how many flagged transactions did

20  you attribute to H.D. Smith for the

21  period between 1996 and 2018?

22         A.    311.

23         Q.    And do you believe that

24  number is accurate?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    At least for the subperiod

 2    that there is H.D. Smith data, yes.

 3         Q.    Okay.  You say "for the

 4    subperiod that there is H.D. Smith data."

 5               Why did you qualify that?

 6         A.    Well, and perhaps I should

 7    have on some of the earlier ones.

 8               We don't have H.D. Smith

 9    data going back to 1996.  So for whatever

10    time period we have H.D. Smith data in

11    this table, we identified 311

12    transactions.

13               And in total, across all of

14    the distributors, some of which we have

15    data going back into the late 1990s, or

16    even 1996 for Cardinal Health, there's

17    434,698 flagged transactions.

18               So I just should have,

19    perhaps, on your prior questions made

20    clear that we're talking about how many

21    flagged transactions we have for H.D.

22    Smith.  And it's not for all of that time

23    period; it's for the part of that time

24    period that we have H.D. Smith data.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.    And do you know, sitting

2   here today, what time period you have

3   data for, for H.D. Smith?

4        A.    We have it at least for the

5   ARCOS time period, 2006 to 2014.  I don't

6   recall, as I sit here.  Although we could

7   look at a chart or a table that would

8   tell us that, how much before or after we

9   have.

10        Q.    Okay.  Well, going back to

11   your Table 28 in your report, you said

12   for -- with your qualification for the

13   time period that you have H.D. Smith

14   data, you identified 311 flagged

15   transactions for H.D. Smith; is that

16   correct?

17        A.    Yes.

18        Q.    Of the total flagged

19   transactions utilizing the methodology

20   that's reflected in Table 28 on Page 67

21   of your report, what percentage of the

22   total flagged transactions are you

23   attributing to H.D. Smith?

24        A.    .07 percent.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    If you could, sir, please

2   turn to Table 30 in Exhibit-3.  It's on

3   Page 71 of your report.

4      A.    Yes.

5      Q.    And Table 30 reflects the

6   maximum 8,000 dosage units monthly

7   threshold methodology that we've talked

8   about already, correct?

9      A.    Yes.

10      Q.    All right.  Utilizing that

11   methodology, sir, how many flagged

12   transactions did you attribute to H.D.

13   Smith?

14      A.    308.

15      Q.    And you believe that number

16   is accurate?

17      A.    Yes.

18      Q.    And you've already

19   anticipated my next question.

20            Using that number, the 308,

21   sir, that -- you identified 713,969

22   flagged transactions in Table 30.  What

23   percentage of those total flagged

24   transactions do you attribute to H.D.

Highly Confidential - Subject to Further Confidentiality Review

```
1   Smith?

2        A.    .04 percent.

3        Q.    And you believe that number

4   is accurate?

5        A.    Yes.

6        Q.    If you would, sir, please

7   turn to Table 32 in Exhibit-3, which is

8   on Page 75 of your report.

9        A.    Yes.

10        Q.    And Table 32 reflects the

11   maximum daily dosage units threshold

12   methodology.

13             And utilizing that

14   methodology that's reflected in Table 32,

15   how many flagged transactions did you

16   attribute to H.D. Smith?

17        A.    352.

18        Q.    All right.  Now, you have a

19   total flagged transactions that you've

20   identified in Table 32, using that

21   methodology, as 1,225,867; is that

22   correct?

23        A.    Yes.

24        Q.    All right.  First, do you
```

1    believe that the 352 flagged transactions

2    that you attribute to H.D. Smith is

3    accurate?

4         A.    Yes.

5         Q.    What percentage of the total

6    flagged transactions, using the

7    methodology that's reflected in Table 32,

8    do you attribute to H.D. Smith?

9         A.    .03 percent.

10        Q.    Sir, I would just like to,

11   if we could -- if we could quickly go

12   through, in your report -- so those

13   tables that we've just discussed all

14   related to Cuyahoga County.

15             If I could just briefly go

16   through relating to Summit County.

17             Let's start with Table 25.

18        A.    Yes.

19        Q.    And Table 25 on Page 60 of

20   your report, that's Exhibit-3, that,

21   again, relates to the trailing six-month

22   maximum threshold methodology, correct?

23        A.    Yes.

24        Q.    What's the total number of

```
 1    flagged transactions, using that

 2    methodology, that you identified for H.D.

 3    Smith?

 4         A.    185.

 5         Q.    And what's the percentage of

 6    the total flagged transactions that you

 7    had identified in Table 25 that you

 8    attribute to H.D. Smith?

 9         A.    .02 percent.

10         Q.    If you would, sir, please

11    turn to Table 27, which is on Page 64 of

12    your report, Exhibit-3.

13              And Table 27 relates to the

14    twice trailing 12-month average pharmacy

15    dosage units threshold methodology.

16              How many flagged

17    transactions, using that methodology,

18    sir, did you attribute to H.D. Smith for

19    Summit County?

20         A.    128.

21         Q.    All right.  And, again, of

22    the total flagged transactions that are

23    reflected in Table Number 27, what is the

24    percentage of flagged transactions that
```

1    you attribute to H.D. Smith?

2         A.    .02 percent.

3         Q.    And you believe that the 128

4    number, flagged transactions, is

5    accurate?

6         A.    Yes.

7         Q.    If you would, sir, please

8    turn to Table 29 of your report, which is

9    on Page 67.

10        A.    Yes.

11        Q.    I'm sorry, 68 --

12        A.    Yes.

13        Q.    -- of Exhibit-3.

14              This relates to the three

15   times trailing 12-month average pharmacy

16   dosage units threshold for Summit County,

17   correct?

18        A.    Yes.

19        Q.    And using that methodology,

20   sir, how many flagged transactions did

21   you attribute to H.D. Smith?

22        A.    114.

23        Q.    Do you believe that number

24   is accurate, sir?

```
 1           A.     Yes.

 2           Q.     Of the total flagged

 3    transactions that you've identified in

 4    Table 29 of Exhibit-3, what is the

 5    percentage that you -- of those flagged

 6    transactions that you attribute to H.D.

 7    Smith?

 8           A.     .026 percent.

 9           Q.     If you would, please, sir,

10    turn to Table 31 --

11           A.     Yes.

12           Q.     -- which is on Page 72 of

13    your report.

14           A.     Yes.

15           Q.     This table relates to the

16    maximum 8,000 dosage units methodology?

17           A.     Yes.

18           Q.     And in Table 31, sir, how

19    many flagged transactions did you

20    attribute to H.D. Smith?

21           A.     None.

22           Q.     Even I can do the percentage

23    on that one without the calculator.

24                  And then lastly, sir, if you
```

 1    could, please, turn to Table 33.  It's on

 2    Page 76 of your report that's Exhibit-3.

 3         A.    Yes.

 4         Q.    This is the maximum daily

 5    dosage units threshold methodology,

 6    correct?

 7         A.    Yes.

 8         Q.    And the -- how many flagged

 9    transactions did you attribute to H.D.

10    Smith in Table 33, sir?

11         A.    74.

12         Q.    And what is the percentage,

13    based on the overall flagged transactions

14    that you identified, that you attribute

15    to H.D. Smith in Table 33?

16         A.    .009 percent.

17         Q.    And you believe that number

18    of 74 flagged transactions is accurate?

19         A.    Yes.

20         Q.    If I could, just to clarify,

21    on Table 31, do you believe that the zero

22    flagged transactions is an accurate

23    number?

24         A.    Yes.

```
 1          Q.    And to summarize, you

 2  believe that all the numbers that I've

 3  asked you about, as they relate to H.D.

 4  Smith, that are reflected in your report

 5  in Exhibit-3, all the specific numbers

 6  I've asked you about are accurate?

 7          A.    Yes.

 8               MR. HAHN:  That's all I

 9       have, sir.

10               THE WITNESS:  Thank you.

11               VIDEO TECHNICIAN:  Off the

12       record at 1:29 p.m.

13                    -  -  -

14               (Whereupon, a discussion off

15       the record occurred.)

16                    -  -  -

17               VIDEO TECHNICIAN:  We're

18       back on the record at 1:31 p.m.

19                    -  -  -

20                  EXAMINATION

21                    -  -  -

22  BY MR. GALLAGHER:

23          Q.    Mr. McCann, good afternoon.

24  My name is Rick Gallagher, I'm a lawyer
```

**MCCANN-3**

Confidential - Subject to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE NATIONAL
PRESCRIPTION OPIATE
LITIGATION

: MDL No. 2804
: CASE NO. 17-MD-2804
: (DAP)
:

EXPERT REPORT OF CRAIG J. MCCANN, PH.D., CFA
March 25, 2019



EXHIBIT
McCann-3
Date: 5-9-19
MLG, CSR, RPR, CRR

Confidential - Subject to Protective Order

Table 24 Trailing Six-Month Maximum Threshold Flagged Transactions, Cuyahoga County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

Confidential - Subject to Protective Order

Table 25 Trailing Six-Month Maximum Threshold Flagged Transactions, Summit County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

## B. Twice Trailing Twelve-Month Average Pharmacy Dosage Units

136.  I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed twice the trailing twelve-month average dosage units to retail and chain pharmacies served by the Distributor. I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.

- 60 -

Confidential - Subject to Protective Order

Table 26 Twice Trailing Twelve-Month Average Pharmacy Dosage Units Threshold Flagged Transactions, Cuyahoga County, 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

Confidential - Subject to Protective Order

Table 27 Twice Trailing Twelve-Month Average Pharmacy Dosage Units Threshold Flagged Transactions, Summit County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

REDACTED

## C. Three Times Trailing Twelve-Month Average Pharmacy Dosage Units

140.  I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed three times the trailing twelve-month average dosage units to retail and chain pharmacies served by the Distributor. I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.

- 64 -

Confidential - Subject to Protective Order

Table 28 Three Times Trailing Twelve-Month Average Pharmacy Dosage Units Threshold Flagged Transactions, Cuyahoga County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

Confidential - Subject to Protective Order

Table 29 Three Times Trailing Twelve-Month Average Pharmacy Dosage Units Threshold Flagged Transactions, Summit County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

## D. Maximum 8,000 Dosage Units Monthly

144. I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a calendar month to exceed 8,000 dosage units. I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.

145. Figure 17 illustrates total opioid shipments into Cuyahoga County from 1996 to 2018 from ARCOS Data for 2006 to 2014 and, to the extent I have Defendant transaction data for the periods before 2006 and after

Confidential - Subject to Protective Order

Table 30 Maximum 8,000 Dosage Units Monthly Threshold Flagged Transactions, Cuyahoga County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

Confidential - Subject to Protective Order

Table 31 Maximum 8,000 Dosage Units Monthly Threshold Flagged Transactions, Summit County, OH 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

## E. Maximum Daily Dosage Units

148. I identify transactions that cause the number of dosage units shipped by a Distributor to a Pharmacy in a day to exceed a number of dosage dosage units that varies by drug type and within some drug types by formulation.[55] I have been asked by Counsel to assume that the Distributor did not effectively investigate the flagged transactions and so every subsequent transaction of that drug code is also flagged because the Distributor had an unfulfilled obligation to detect and investigate the first flagged transaction.

---

[55] Maximum Daily Dosage Units used as specified in
CAH_MDLPRIORPRO_DEA07_01384160

Confidential - Subject to Protective Order

Table 32 Maximum Daily Dosage Units Threshold Flagged Transactions in Cuyahoga County, 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

Confidential - Subject to Protective Order

Table 33 Maximum Daily Dosage Units Threshold Flagged Transactions in Summit County, 1996-2018

| # of Flagged Transactions | Oxycodone | Hydrocodone | Morphine | Hydromorphone | Oxymorphone | Other | Total |
|---|---|---|---|---|---|---|---|

# REDACTED

## F. Additional Identification

152.  I have been asked by Counsel to assume that Chain Distributors may have had knowledge of - or information available to inform them of – opioid shipments from all Distributors to the Chain Distributor's affiliated pharmacies. I have re-run the five identification routines described above assuming that the Chain Distributors could have flagged transactions based on this expanded information set and report the results for the Chain Distributors in Table 34 through Table 43 below. Additional charts and tables reflecting the result of applying methodologies below to each Chain Distributor are in Appendix 11.

# MCCANN-12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**All Defendants 12 Opioid Drug Distribution into Cuyahoga County, OH**
**1996 - 2018**



Data source: ARCOS (2006-2014) and defendant transactional data
12 opioid drugs include: Codeine, Dihydrocodeine, Fentanyl, Hydrocodone, Hydromorphone, Levorphanol, Meperidine, Morphine, Opium, Oxycodone, Oxymorphone, Tapentadol

March 2019

EXHIBIT 012
Witness: McCann
Date: May 10, 2019
Amanda Miller CRR

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### State and County Opioid Total Dosage Units Market Share

| Company Name | OH | | Summit County | |
|---|---|---|---|---|
| | Market Share | Total Dosage Units | Market Share | Total Dosage Units |

# REDACTED

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### Distributor Market Share by Year in Summit County, OH

| Company Name | Market Share | Total Dosage Units | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| County Population | | | 544,660 | 544,275 | 543,116 | 542,135 | 541,648 | 541,293 | 540,716 | 541,601 | 542,095 |
| Total Percentage | | | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

# REDACTED

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### State and County Opioid Total Dosage Units Market Share

| Company Name | OH | | Cuyahoga County | |
|---|---|---|---|---|
| | Market Share | Total Dosage Units | Market Share | Total Dosage Units |

# REDACTED

**MCCANN-14**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opioid Total MME by Company in Cuyahoga County, OH**

| Company Name | Market Share | MME | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| County Population | | | 1,312,816 | 1,301,540 | 1,291,479 | 1,285,082 | 1,278,200 | 1,270,461 | 1,266,210 | 1,264,622 | 1,262,459 |
| Total MME | | | REDACTED | | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |

# REDACTED

EXHIBIT     014

Witness: McCann

Date: May 10, 2019

Amanda Miller CRR

**MCCANN-15**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Opioid Total MME by Company in Summit County, OH

| | County Population Total MME | 544,660 REDACTED | 544,275 REDACTED | 543,116 REDACTED | 542,135 REDACTED | 541,648 REDACTED | 541,293 REDACTED | 540,716 REDACTED | 541,601 REDACTED | 542,095 REDACTED |
|---|---|---|---|---|---|---|---|---|---|---|
| Company Name | Market Share  MME | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |

# REDACTED

**EXHIBIT** 015
Witness: McCann
Date: May 10, 2019
Amanda Miller CRR

**MCCANN-16**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Opioid Total Dosage Units by Company in Cuyahoga County, OH

| | | County Population | 1,312,816 | 1,301,540 | 1,291,479 | 1,285,082 | 1,278,200 | 1,270,461 | 1,266,210 | 1,264,622 | 1,262,459 |
| | | Total Dosage Units | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Company Name | Market Share | Total Dosage Units | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |

# REDACTED

3783 of 3877

EXHIBIT 016

Witness: McCann

Date: May 10, 2019

Amanda Miller CRR

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opioid Total Dosage Units by Company in Cuyahoga County, OH**

| Company Name | Market Share | Total Dosage Units | County Population Total Dosage Units | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1,312,816 REDACTED | 1,301,540 REDACTED | 1,291,479 REDACTED | 1,285,082 REDACTED | 1,278,200 REDACTED | 1,270,461 REDACTED | 1,266,210 REDACTED | 1,264,622 REDACTED | 1,262,459 REDACTED |
| | | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |

# REDACTED

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opioid Total Dosage Units by Company in Cuyahoga County, OH**

| | | | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **County Population** | | | 1,312,816 | 1,301,540 | 1,291,479 | 1,285,082 | 1,278,200 | 1,270,461 | 1,266,210 | 1,264,622 | 1,262,459 |
| **Total Dosage Units** | | | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED 0 | REDACTED | REDACTED |
| **Company Name** | **Market Share** | **Total Dosage Units** | | | | | | | | | |

# REDACTED

**MCCANN-17**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Opioid Total Dosage Units by Company in Summit County, OH

| | | | 544,660 | 544,275 | 543,116 | 542,135 | 541,648 | 541,293 | 540,716 | 541,601 | 542,095 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | County Population Total Dosage Units | | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED | REDACTED |
| Company Name | Market Share | Total Dosage Units | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |

# REDACTED

EXHIBIT 017

Witness: McCann

Date: May 10, 2019

Amanda Miller CRR

# EXHIBIT 2

**(Rafalski Deposition Transcript)**

```
  1              UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
  2                    EASTERN DIVISION
  3   IN RE: NATIONAL         )   MDL No. 2804
      PRESCRIPTION OPIATE     )
  4   LITIGATION              )   Case No.
                              )   1:17-MD-2804
  5                           )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
  6   ALL CASES               )   Polster
                              )
  7

  8

  9                    __ __ __
 10            Monday, May 13, 2019

                       __ __ __
 11

        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
 12            CONFIDENTIALITY REVIEW
                       __ __ __
 13

 14

 15

 16        Videotaped Deposition of JAMES E.
      RAFALSKI, held at Weitz & Luxenburg PC, 3011
 17   West Grand Avenue, Suite 2150, Detroit,
      Michigan, commencing at 9:20 a.m., on the
 18   above date, before Michael E. Miller, Fellow
      of the Academy of Professional Reporters,
 19   Registered Diplomate Reporter, Certified
      Realtime Reporter and Notary Public.
 20

 21

 22

                       __ __ __
 23

              GOLKOW LITIGATION SERVICES
 24      877.370.3377 ph | fax 917.591.5672
                 deps@golkow.com
 25
```

1          A.    I guess that's Mr. Prevoznik's

2    issue to comment on.

3               I'm not sure, under my

4    authorization from the DEA, if I even knew I

5    could comment on that.

6          Q.    In your report -- and you can

7    turn to the pages if you want.  Starting on

8    page 40, you make reference to five different

9    methodologies that address the issue of the

10   number of suspicious orders that were and

11   weren't reported in the Track 1

12   jurisdictions, correct?

13         A.    I think I report dosage amounts

14   based on the methodologies.

15         Q.    I'm sorry.  I'm sorry.  I

16   apologize.  Dosage amounts.

17               So we're talking about the

18   number of -- however you want to describe it,

19   the number of pills or the number of dosage

20   amounts of pills that are going into these

21   jurisdictions over a period of time; is that

22   right?

23         A.    Yes, based on that particular

24   methodology.

25         Q.    Okay.  Well, you say that

```
 1    particular methodology.  You used -- you

 2    referenced five methodologies, correct?

 3          A.     Yes, sir.

 4          Q.     Okay.  Did you figure out those

 5    methodologies yourself, or did Mr. McCann do

 6    that?

 7          A.     No, those are mine based on --

 8          Q.     These five methodologies are

 9    yours?

10          A.     Yes.  Well, they are

11    methodologies that are mirroring suspicious

12    order systems that are utilized by one or

13    more companies in my report.

14          Q.     Okay.  So did you -- you put

15    these -- did you put these charts together

16    yourself?

17          A.     No, I did not.

18          Q.     Who put the charts together?

19          A.     I -- I'm sorry.

20                 Well, this is based on

21    McCann's -- Mr. McCann takes -- took my

22    methodology, and these were the results of

23    his application of my methodology to the

24    ARCOS data.

25          Q.     I see.
```

Highly Confidential - Subject to Further Confidentiality Review

1          So you -- you came up with

2     these five methodologies?

3          A.     Yes, sir.

4          Q.     Okay.  And tell me -- tell me

5     why you chose these five methodologies.  I

6     think you started to do it, but just go ahead

7     and explain it to me.

8          A.     Well, because these are

9     methodologies that were used by one or more

10     companies in my report, during the time frame

11     of my report.  Each one of these were not

12     invented by me, but they were actually used.

13          Q.     Okay.  Can you -- let's start

14     with the first one.  Methodology A is maximum

15     monthly trailing six-month threshold.

16          Can you explain to me what you

17     were trying to express here?

18          A.     Well, this is the Masters case

19     methodology.

20          Q.     Okay.

21          A.     Or I shouldn't say methodology.

22     This is their suspicious order system.  So

23     it's a rolling six-month, and it looks for a

24     current month that exceeds the highest

25     previous amount in the six months.

 1    there's any actual written reference to

 2    records or the retention of records in that

 3    section?

 4         A.    Well, so in the maintenance of

 5    effective controls?

 6         Q.    Yeah.

 7         A.    It doesn't specifically say

 8    that, if that's what you're...

 9         Q.    Okay.  Okay.  Now -- so just --

10    we'll break for lunch, but just so I

11    understand, the methodologies that -- the

12    five methodologies described here were

13    selected -- were identified or selected by

14    you.  Is that -- based on what you saw the

15    various companies had done over the years; is

16    that correct?

17         A.    Yes, sir.

18         Q.    And you provided just those

19    methodologies, the concepts, to Mr. McCann

20    and he plugged in the numbers; is that

21    correct?

22         A.    Yes, but just as a

23    clarification, I personally didn't discuss

24    that with Mr. McCann.  I discussed it with

25    counsel and then counsel relayed that to

Highly Confidential - Subject to Further Confidentiality Review

1    BY MR. NICHOLAS:

2         Q.      -- at least for the purposes of

3    your numbers?

4              MR. FULLER:  Object to form.

5         A.      It's not an assumption.  It's

6    based on my review of records and depositions

7    and documents that I couldn't find a time

8    period where I believed there was sufficient

9    due diligence -- well, there was actually a

10   complete failure.

11              There was the failure to stop

12   suspicious orders, there was ineffective

13   suspicious order systems, but in regards to

14   what caused these large numbers, it was the

15   failure to have the maintenance of effective

16   controls to prevent diversion, which is the

17   act of the due diligence, the reviewing those

18   orders to approve them as was detailed in the

19   Masters opinion.

20   BY MR. NICHOLAS:

21        Q.    Okay.  Now, see if we can agree

22   on one thing here, which is this:  There

23   could be an order of unusual size or

24   frequency or pattern that is shipped.

25   Whether it should have been or shouldn't have

Highly Confidential - Subject to Further Confidentiality Review

1    been, we can put aside for another day.

2    Okay?  Let's just say that there's an order

3    of unusual size, frequency, pattern, that, in

4    fact, was shipped and it -- you can even

5    say -- and let's say it should have been

6    reported as a suspicious order, but it

7    shipped.  All right?

8              Do you agree that even though

9    that order was shipped and even though you

10   say it shouldn't have been shipped, it

11   doesn't necessarily mean that the pills that

12   underlie that order are going to be diverted.

13   You don't know.

14             MR. FULLER:  Object to form.

15   BY MR. NICHOLAS:

16        Q.     Correct?

17        A.     So I'll answer that question by

18   saying that if it's identified as suspicious

19   order by unusual size or unusual frequency or

20   deviating form -- you know, substantial

21   deviation from a pattern, so to me that puts

22   it as a probable, greater than 51% that it's

23   going to be diverted because it's been

24   identified.

25             So I can't draw the conclusion

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that I don't know that it's going to be

 2    diverted.  I probably can't draw a definitive

 3    statement that it is, but I'm going to say

 4    that it's more probable because the system

 5    identified it.

 6         Q.    So you got it at 51% above,

 7    it's going to be diverted; is that what

 8    you're telling me?

 9         A.    Well, that's the definition of

10    probable.  If it's an effective suspicious

11    order system, I believe the percents would

12    rise much higher than that, but I guess that

13    depends on the effectiveness of the

14    suspicious order system.

15         Q.    Where are you getting that

16    percent from?  Where are you getting that

17    from, just your own --

18         A.    What?

19         Q.    The 51, the probable, where are

20    you getting that it's probable?

21         A.    That's my belief of what

22    probable means.

23         Q.    Okay.  Other than your belief,

24    is it written down anywhere?  Is there any

25    research on that?  Is there any data on that?
```

Highly Confidential - Subject to Further Confidentiality Review

1    Is this just -- just your belief?

2        A.    Not that I can cite.

3        Q.    Okay.

4            MR. FULLER:  Vegas odds.

5            MR. NICHOLAS:  Okay.

6    BY MR. NICHOLAS:

7        Q.    Did you look at any individual

8    orders from any pharmacies in the Cuyahoga or

9    Summit Counties?

10       A.    I looked at some DEA 222 forms,

11   but I believe my recollection, it was out of

12   maybe the Boston area, so I would say no.

13       Q.    Okay.

14       A.    No original records.  I

15   reviewed no original records.

16       Q.    You reviewed data that was in

17   the aggregate, right, totals?  Correct?

18       A.    No.  I reviewed -- so just so

19   we're clear on, you know, what we're talking

20   about, so there's no confusion.

21       Q.    Uh-huh.

22       A.    So to me, in the DEA world, an

23   original record is the actual DEA order form,

24   the invoice or a CSOS electronic order form.

25   So that's what I would consider an original

Highly Confidential - Subject to Further Confidentiality Review

1    defendant a little bit.

2          A.     Oh, okay.

3          Q.     So if there's 13 defendants, is

4    it roughly spread evenly, divided by 13, you

5    get a rough approximation?

6          A.     Well, I think I spent a little

7    more time on the distributors until I did

8    the -- instead of the manufacturers.  I would

9    say I probably spent more time in totality

10   and individually in -- as far as just at the

11   distributors.

12               I would probably say pretty

13   equal except with Henry Schein, because

14   that's a smaller distributor and there was

15   less documents and less information to

16   review.

17         Q.     So for each of the larger

18   distributors, we're talking something in the

19   range of 50 or 60 hours each; is that fair?

20         A.     I guess that could be a

21   possible --

22               MR. FULLER:  Object to form.

23         A.     I guess it could be a possible

24   approximation.

25   BY MR. PYSER:

1        Q.     Okay.  But you're the -- you're

2    the guy, you're the expert on what's an

3    effective SOM system and what's not an

4    effective SOM system for the plaintiffs,

5    right?

6        A.     I am.

7        Q.     And there's not another

8    individual who's been designated as an expert

9    by the plaintiffs to help you in analyzing

10   whether or not a SOM system is compliant or

11   noncompliant?

12       A.     That is a correct statement,

13   yes, sir.

14       Q.     Okay.  And sitting here today,

15   you don't know the number of suspicious

16   orders that Henry Schein has distributed into

17   Summit County?

18       A.     If you're asking do I have a

19   specific number of orders, I do not.

20       Q.     Okay.  In fact, you don't know

21   if any suspicious orders have been

22   distributed by Henry Schein into Summit

23   County, do you?

24       A.     I don't state that in my

25   report, no, sir.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Okay.  And similarly, you don't

2  know what, if any, orders that Henry Schein

3  distributed into Summit County were diverted?

4          (Document review.)

5    A.    I do not have knowledge of any

6  drugs that were diverted.

7  BY MR. JONES:

8    Q.    As part of your work in this

9  case, you reviewed Henry Schein's standard

10  operating procedures?

11    A.    Yes, sir.

12    Q.    Or SOPs?

13    A.    Yes, sir.

14    Q.    You also reviewed Henry Schein

15  witness deposition testimony?

16    A.    I'm just checking.  I don't

17  have a recollection of that.

18          (Document review.)

19    A.    Yes, sir, I believe I did.

20  BY MR. JONES:

21    Q.    Do you recall whose?

22    A.    Abreu.

23    Q.    Is that a man or a woman, do

24  you know?

25    A.    I don't recall.  I remember the

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    IN RE: NATIONAL           )   MDL No. 2804
      PRESCRIPTION OPIATE       )
 4    LITIGATION                )   Case No.
                                )   1:17-MD-2804
 5                              )
      THIS DOCUMENT RELATES TO  )   Hon. Dan A.
 6    ALL CASES                 )   Polster
                                )
 7

 8

 9                      __ __ __
10              Tuesday, May 14, 2019
                        __ __ __
11

         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                        __ __ __
13

14

15

16         Videotaped Deposition of JAMES E.
      RAFALSKI, VOLUME 2, held at Weitz &
17    Luxenburg PC, 3011 West Grand Avenue, Suite
      2150, Detroit, Michigan, commencing at
18    8:25 a.m., on the above date, before
      Michael E. Miller, Fellow of the Academy of
19    Professional Reporters, Registered Diplomate
      Reporter, Certified Realtime Reporter and
20    Notary Public.
21

22

23                      __ __ __
24          GOLKOW LITIGATION SERVICES
         877.370.3377 ph | fax 917.591.5672
25               deps@golkow.com
```

1    yesterday that you did not review any of the

2    flagged orders from Dr. McCann's analysis; is

3    that correct?

4         A.    I think my testimony in that

5    area was any specific orders.  That would be

6    correct of what my testimony was, yes.

7         Q.    You did not do any analysis to

8    see whether any specific suspicious order

9    caused the diversion of any specific pills

10   for nonmedical use, correct?

11        A.    In regards to Dr. McCann's --

12        Q.    Correct.

13        A.    That would be a correct

14   statement.  I didn't do a specific order of a

15   specific drug, if I understand your question

16   properly.

17        Q.    Well, you asked for a

18   clarification of whether I was speaking about

19   Dr. McCann's analysis.

20              You didn't do any analysis to

21   see whether any specific suspicious order

22   caused the diversion of any specific pills,

23   correct?

24              MR. FULLER:  Object to form.

25        A.    I think that's an accurate

Highly Confidential - Subject to Further Confidentiality Review

1    statement.

2    BY MS. SWIFT:

3        Q.    You testified yesterday that

4    you endorsed Flagging Method A, which you can

5    see at the top of page 41 of your report.

6    Because it -- is that correct?

7        A.    I think that's an accurate

8    statement.  It was -- I endorsed it because

9    it was utilized by the Masters

10   Pharmaceutical.

11       Q.    Is that the only reason you

12   endorsed Flagging Method A?

13       A.    No, that wouldn't be the only

14   reason, no, ma'am.

15       Q.    Did any of the plaintiffs'

16   lawyers instruct or suggest to you that you

17   use Flagging Method A?

18       A.    No.

19       Q.    What other reasons did you

20   endorse Flagging Method A?

21       A.    One, it was part of one of the

22   investigations I conducted, so I was familiar

23   with it.  I believe it was discussed at an

24   administrative hearing with the DEA,

25   subsequently reviewed by the D.C. Court, and

1      Q.      You don't have an opinion about

2   whether any particular order -- you didn't

3   look at any particular order to see whether

4   it was diverted to an illicit channel?

5      A.      I did not --

6      Q.      Okay.

7      A.      -- analyze all the orders and

8   try to find one or locate one that was

9   diverted.

10      Q.      You didn't analyze any of the

11   orders, correct, sir?

12      A.      That's correct.

13      Q.      You have no opinion about

14   whether any particular order that was flagged

15   as suspicious led to someone's addiction,

16   overdose or death, correct, sir?

17      A.      As of today, I have no opinion

18   on that matter.

19      Q.      Do you plan on coming up with

20   that opinion at some point after today?

21      A.      I can't rule that out if I'm

22   asked to look at that or I'm provided some

23   information I could review that would -- that

24   would indicate that.  So I can't rule out

25   that that would occur.

1    wouldn't have mattered in your hypothetical.

2                    Would you agree with me on

3    that?

4                    It's a risk of -- maybe we can

5    grant you that, but if the risk never came

6    home to roost, then it doesn't matter, but

7    you don't know that.

8         A.    Well, that's it.  The concept

9    of why we're not agreeing on this is the

10   suspicious order system and the effectiveness

11   of it and the due diligence is all based on

12   the risk of diversion.  It doesn't mean that

13   diversion is going to occur.  Just based on

14   the serious risk, and that's what makes it a

15   maintenance of effective controls requirement

16   by the law.

17        Q.    All right.  Take a look at

18   page 108.  So this -- I want to direct your

19   attention to the top of page 108.  You say:

20   Mortelliti testified that while he was

21   reviewing the IRR, every HCP order that

22   appeared on the IRR was referred out for

23   additional investigation which he believed

24   was necessary.

25                    With me so far?

```
 1                 MR. O'CONNOR:  Objection, form.

 2                 MR. FULLER:  I'm sorry, go

 3        ahead.

 4        A.      Any relevant transactions.

 5                 MR. FULLER:  I don't have

 6        anything further.

 7                 THE VIDEOGRAPHER:  Going off

 8        the record, 5:04 p.m.

 9                 (Recess taken, 5:04 p.m. to

10        5:14 p.m.)

11                 THE VIDEOGRAPHER:  We're back

12        on the record at 5:14 p.m.

13                      EXAMINATION

14    BY MR. MATTHEWS:

15        Q.      Good afternoon, Mr. Rafalski.

16    I already introduced myself to you but just

17    for the record, I'm James Matthews.  I

18    represent Anda Inc.

19        A.      Good afternoon.

20        Q.      How are you.

21                 I want to take you back to the

22    beginning of the day.  There were some

23    questions asked of you by Ms. Swift who

24    represented Walgreens.

25                 Do you remember that very
```

1    beginning of the day, right in the morning?

2         A.    I recall I was interviewed or

3    deposed about Walgreens.  I don't

4    specifically -- the questions, I don't

5    recall.

6         Q.    Okay.  You issued 183 --

7    180-some-odd-page report, right?

8         A.    Yes, sir.

9         Q.    And in that, you set forth your

10   opinions, and you told Ms. Swift that all of

11   your opinions are in that report, right?

12        A.    Of the companies that I

13   evaluated, the opinion -- of -- yes.

14        Q.    Yes.

15             And the bases for those

16   opinions, except insofar as they're based on

17   your own personal experience and knowledge,

18   are in the footnotes to that report, right?

19             MR. FULLER:  I'm going to

20        object, and if I can have a running

21        objection that this is outside my

22        cross.

23             MR. MATTHEWS:  That's fine, you

24        can have your objection, thank you.

25             MR. FULLER:  Thank you.

1          A.      I think it's an accurate

2     statement.  It was based on the review of the

3     records that I cited.

4     BY MR. MATTHEWS:

5          Q.      Okay.  There's not a single

6     document created by Anda Inc. cited in any of

7     the footnotes in your report, right?

8          A.      That's correct.

9          Q.      And that means that there's --

10    and there's no depositions of any Anda Inc.

11    employees cited in any of the footnotes of

12    your report, right?

13         A.      There is not.

14         Q.      In fact, you haven't done

15    anything to look at Anda's suspicious order

16    monitoring program, right?

17         A.      I have not.

18         Q.      And since there's no

19    information that would be the basis for any

20    opinions as to Anda's suspicious order

21    monitoring system in your report, it's safe

22    to say that there are no opinions about

23    Anda Inc. in your report, right?

24         A.      There's no opinions of Anda in

25    the current report, right here, no, sir.

1    Q.    And so I'd like you, if you

2    could, to just open your report to page 7.

3    You know that Anda, Inc. is one of the

4    defendants in this action, right?

5    A.    I believe so, yes, sir.

6    Q.    Okay.  Looking at page 7 of

7    your report, in the second full paragraph,

8    you wrote:  I am of the opinion to a

9    reasonable degree of professional certainty

10   that there was a systematic, prolonged

11   failure over many years by the defendant

12   manufacturers and distributors to maintain

13   effective controls against diversion of

14   legitimate opioid prescriptions into the

15   illicit market.

16          Did I read that correctly?

17   A.    You did.

18   Q.    So Anda is a defendant, right?

19   A.    Yes, sir.

20   Q.    And that opinion as described

21   on page 7 does not apply to Anda, right?

22   A.    As I sit here today, no, I have

23   not reviewed any records related to Anda.

24   Q.    Okay.  I want to ask one more

25   question following up on your testimony.

# EXHIBIT 3

**(Egilman Deposition Transcript)**

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION,              )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7
 8                    __ __ __
 9              Friday, April 26, 2019
                      __ __ __
10
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
11              CONFIDENTIALITY REVIEW
                      __ __ __
12
13
14
15        Videotaped Deposition of DAVID S.
      EGILMAN, M.D., MPH, held at the Providence
16    Marriott Downtown, 1 Orms Street, Providence,
      Rhode Island, commencing at 9:08 a.m., on the
17    above date, before Debra A. Dibble, Certified
      Court Reporter, Registered Diplomate
18    Reporter, Certified Realtime Captioner,
      Certified Realtime Reporter and Notary
19    Public.
20
                      __ __ __
21
22
23            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1      corrected on the record by

2      Dr. Egilman.

3                    EXAMINATION

4   BY MS. FINGER:

5      Q.    Dr. Egilman, my name is Anna

6   Finger.  I'm at Locke Lord, and I represent

7   Henry Schein, Incorporated and Henry Schein

8   Medical Facility, Incorporated.  I'm going to

9   refer to them herein as Henry Schein or the

10  Henry Schein defendants.  Is that okay?

11     A.    Sure.

12     Q.    And so you had access to review

13  all documents produced by Henry Schein in

14  this litigation; correct?

15     A.    Right.  I think they came in

16  late, though.  So I didn't have that much

17  time on those documents.

18     Q.    Okay.  But you had access to

19  all of their documents; correct?

20     A.    Right.  At some point in time.

21     Q.    Okay.  And you do not list any

22  opinions in your report that specifically

23  mention Henry Schein; correct?

24     A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.      And Henry Schein is not

2   specifically identified as a member in what

3   you call "the venture"; correct?

4      A.      Correct.

5              MS. FINGER:  That's all I have.

6      I'll pass the witness.

7              THE WITNESS:  Great job.

8                  EXAMINATION

9   BY MS. SAULINO:

10     Q.      Dr. Egilman, it's Jennifer

11  Saulino for McKesson again.  I'm back.

12     A.      Welcome back.

13     Q.      Thank you.

14             So first, because you've kindly

15  made this offer to us several times, I'd like

16  to ask you, on the record, whether you are

17  willing to sit for additional hours of the

18  deposition so that all of the defendants can

19  have sufficient time to explore your numerous

20  opinions.

21     A.      No.  Unless ordered by the

22  judge.

23     Q.      Okay.  So you are only willing

24  to talk by telephone with us?

# EXHIBIT 4

**(Whitelaw Deposition Transcript)**

Highly Confidential - Subject to Further Confidentiality Review

```
 1          IN THE UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF OHIO
 3                    EASTERN DIVISION
 4                      -  -  -
 5

 6    IN RE:  NATIONAL        :   HON. DAN A.
      PRESCRIPTION OPIATE     :   POLSTER
      LITIGATION              :
 7                            :   MDL NO. 2804
      APPLIES TO ALL CASES    :
 8                            :   CASE NO.
                              :   17-MD-2804
 9                            :
10          - HIGHLY CONFIDENTIAL -
11    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                    VOLUME I
13                      -  -  -
14                  May 16, 2019
15                      -  -  -
16                  Videotaped deposition of
      DR. SETH B. WHITELAW, taken pursuant to
17    notice, was held at the offices of Golkow
      Litigation Services, One Liberty Place,
18    1650 Market Street, Philadelphia,
      Pennsylvania beginning at 9:18 a.m., on
19    the above date, before Michelle L. Gray,
      a Registered Professional Reporter,
20    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
21
                        -  -  -
22

          GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

1    new developments that are relevant

2    to the work that I've already

3    done, so...

4  BY MR. EPPICH:

5        Q.    But these reports express --

6  represent your complete set of opinions

7  in this case; is that true?

8        A.    At this moment in time, as

9  you'll notice in my original report, I

10  reserve the right to supplement the

11  report should new and additional

12  information come to light that's relevant

13  to the work that I've done.

14        Q.    Do you have any changes to

15  make to either of your reports sitting

16  here today?

17        A.    Not that I can think of.

18        Q.    You still hold all of the

19  opinions expressed in these reports?

20        A.    Yes, sir, I do.

21        Q.    In writing your report, did

22  you report -- did you write the first

23  draft of your report?

24        A.    Chris, I wrote every draft

# EXHIBIT 5

**(Plaintiffs The County of Cuyahoga, Ohio and the State of Ohio Ex Rel. Prosecuting Attorney of Cuyahoga County, Michael C. O'Malley's First Amended Responses to Distributor Defendants' Third Set of Interrogatories)**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

IN RE NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

Case No. 17-OP-45004 (N.D. Ohio)

THE COUNTY OF CUYAHOGA, OHIO, and
STATE OF OHIO EX REL., PROSECUTING
ATTORNEY OF CUYAHOGA COUNTY,
MICHAEL C. O'MALLEY,

                          Plaintiffs,

     vs.

PURDUE PHARMA L.P., PURDUE
PHARMA INC., THE PURDUE FREDERICK
COMPANY, INC., ENDO HEALTH
SOLUTIONS INC., ENDO
PHARMACEUTICALS, INC., JANSSEN
PHARMACEUTICALS, INC., JANSSEN
PHARMACEUTICA, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC., NORAMCO,
INC., ORTHO-MCNEIL-JANSSEN
PHARMACEUTICALS, INC. n/k/a JANSSEN
PHARMACEUTICALS, INC., JOHNSON &
JOHNSON, TEVA PHARMACEUTICAL
INDUSTRIES LTD., TEVA
PHARMACEUTICALS USA, INC.,
CEPHALON, INC., ALLERGAN PLC f/k/a
ACTAVIS PLC, ALLERGAN FINANCE LLC,
f/k/a ACTAVIS, INC., f/k/a WATSON
PHARMACEUTICALS, INC., WATSON
LABORATORIES, INC., ACTAVIS LLC,
ACTAVIS PHARMA, INC. f/k/a WATSON
PHARMA, INC., INSYS THERAPEUTICS,
INC., MALLINCKRODT PLC,
MALLINCKRODT LLC, CARDINAL
HEALTH, INC., McKESSON

MDL No. 2804

Case No. 17-md-2804

Judge Dan Aaron Polster

PLAINTIFFS THE COUNTY OF
CUYAHOGA, OHIO AND THE STATE
OF OHIO *EX REL.* PROSECUTING
ATTORNEY OF CUYAHOGA COUNTY,
MICHAEL C. O'MALLEY'S  FIRST
AMENDED RESPONSES AND
OBJECTIONS TO DISTRIBUTOR
DEFENDANTS' THIRD SET OF
INTERROGATORIES

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

CORPORATION, AMERISOURCEBERGEN
CORPORATION, HEALTH MART
SYSTEMS, INC., H. D. SMITH, LLC d/b/a
HD SMITH, f/k/a H.D. SMITH
WHOLESALE DRUG CO., H. D. SMITH
HOLDINGS, LLC, H. D. SMITH HOLDING
COMPANY, CVS HEALTH
CORPORATION, WALGREENS BOOTS
ALLIANCE, INC. a/k/a WALGREEN CO.,
and WAL-MART INC. f/k/a WAL-MART
STORES, INC.,

                    Defendants.

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case

Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232),

The County of Cuyahoga, Ohio and the State of Ohio *Ex Rel.* Prosecuting Attorney of Cuyahoga

County, Michael C. O'Malley, ("Plaintiff") hereby responds to Distributor Defendants[1] Third Set of

Interrogatories (the "Interrogatories" and, each individually, a "Interrogatory"), as follows:

## OBJECTIONS

The following objections apply to each Interrogatory. To the extent that certain specific

objections are cited in response to an individual Interrogatory, those specific objections are provided

because they are applicable to that specific Interrogatory and are not a waiver of the objections

applicable to information falling within the scope of such Interrogatory.

1.      Plaintiff objects to each Interrogatory to the extent they are overly broad, vague,

unduly burdensome, seeks information that is not relevant to any party's claim or defense, or seeks

to impose obligations or require actions beyond those required by the Rules of Civil Procedure, the

---

[1] The Distributor Defendants are AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and
McKesson Corporation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Interrogatory No. 15:**

State the maximum number of pills or other dosage units of Prescription Opioids that should properly have been distributed in Your geographic boundaries for legitimate medical purposes during the Timeframe. In Your response, explain how You calculated that number, including any per capita, per patient, drug family or other grouping, or any other basis on which you rely.

**Response to Interrogatory No. 15:**

Plaintiff objects to this Interrogatory to the extent the term "other dosage units" is vague and ambiguous and subject to varying interpretations.  This Interrogatory is contention discovery more appropriately answered once discovery is complete.  *See* Fed. R. Civ. P. 33(a)(2).  Plaintiff also objects in that this Interrogatory seeks information already in the possession of Defendants and third-parties.

Plaintiff objects that it would be unduly burdensome and disproportionate to the needs of the case for Plaintiff to identify the maximum number of pills or other dosage units of prescription opioids that should properly have been distributed in its geographic boundaries for legitimate medical purposes during the Timeframe. Plaintiff states that discovery and analysis of the ARCOS database is ongoing related to these issues.

As discovery is ongoing, this information will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

**Interrogatory No. 16:**

Identify every specific prescription that You believe, suspect, or contend was diverted or used— in whole or in part—for other than legitimate medical, scientific, research, or industrial purposes in Your geographical area. Include in your response: the date the prescription was written; the name(s)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the Controlled Substance(s) prescribed; the quantity of Controlled Substance(s) prescribed; the recipient of each prescription; the name of the prescriber; the name of the dispensing pharmacy, hospital, or clinic; the date the prescription was filled whether any Defendant was involved in the Distribution of that Controlled Substance (s); whether the Controlled Substance(s) were distributed as part of a Suspicious Order (and if so what made the order suspicious); and the reason(s) why you believe, suspect, or contend that all or part of the prescription was diverted.[2]

**<u>Response to Interrogatory No. 16:</u>**

Plaintiff objects to the term "identify every specific prescription" as overly broad and unduly burdensome with little or no relevance to the claims and defenses in this action.

The factual basis for Plaintiff's claims are specific:  the conduct of the Manufacturing Defendants in engaging in a massive false advertising campaign about opioids, coupled with the Distributor Defendants and National Retail Pharmacy Defendants' conduct in failing to monitor and restrict the improper distribution of opioids, are substantial causes of a public health emergency in Plaintiff's jurisdiction. This is not a collection of personal injury cases and Plaintiff does not seek any personal injury damages suffered by their residents; instead, the lawsuit seeks to abate a public nuisance affecting the communities as a whole and to compensate Plaintiff for the additional expenses caused by Defendants' conduct and from which each profited.

This case concerns whether the cumulative effect of Defendants' marketing and distribution practices created the opioid public health crisis that currently exists within Plaintiff's jurisdiction.  It

---

[2] Distributor Defendants acknowledge that the Court has required Plaintiff to provide some of this information by July 16, 2018. Distributor Defendants' request, however, is broader than the relevant provision of the CMO. And Defendants need the information they have requested more than one day in advance of the July 17, 2018 deadline for Defendants to add parties without leave of Court. *See* CMO 1 at 9. Defendants also require this information to conduct further discovery in Track One Cases.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

is not whether each opioid pill, prescription, overdose, or patient is a separate public nuisance or separate "epidemic;" it is not whether particular individuals in specific circumstances with individualized medical conditions abused or misused or were improperly prescribed opioids. Instead, Plaintiff's claims center on the aggregate effect of opioids on the public health, safety, and welfare within Plaintiff's jurisdiction.

Plaintiff will prove causation through aggregate proof demonstrating the link between Defendants' unlawful and tortious conduct and the exponential increase in prescribing and diversion of opioids and the resulting harms on a jurisdiction-wide basis. This will establish that the Defendants' actions were a substantial factor in the epidemic experienced by, and paid for by, Plaintiff. Whether a specific resident with a history of substance abuse received an opioid prescription, for example, is irrelevant because a definable percentage of residents who received opioids were bound to have a history of substance abuse. Discovery about individuals and individual health case and addiction issues is irrelevant to establishing that an opioid epidemic exists and is impermissible.  *See* Fed. R. Evid. 402.

Plaintiff states that it does not have information concerning the identity of every person who received an opioid prescription or became addicted to opioids in Cuyahoga County – whether or not they ever received treatment – or access to the confidential, private health care records of residents who were prescribed opioids or treated for opioid addiction. In addition, Plaintiff objects to this Interrogatory to the extent it seeks Confidential Information.

The information sought is overly broad and vague in that it requests all medical records and all medical information related to every single person who was ever prescribed an opioid that ever made its way into Plaintiff's jurisdiction.  Furthermore, this Interrogatory is so broad as to render resolution of this matter all but impossible to resolve within any reasonable amount of time while

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Defendants examine every record and then depose residents, doctors, treatment facilities, and the like about each individual case.  Even if the Interrogatory was proper and reasonably circumscribed, the information that Plaintiff may have that would be arguably related to the Interrogatory (though irrelevant to the case) relates to Plaintiff's employees who received opioid treatment through Plaintiff's sponsored health insurance or worker's compensation programs.

Plaintiff further responds that this Interrogatory is contention discovery more appropriately answered once discovery is complete.  *See* Fed. R. Civ. P. 33(a)(2).  In addition, discovery is ongoing and this information will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Subject to and without waiving all objections, Subject to and without waiving all objections, Plaintiff states that it believes, suspects, or contends that the following distributors and pharmacies dispensed or distributed prescriptions that were diverted or used – in whole or in part – for other than legitimate medical, scientific, research, or industrial purposes in its geographical area:

- AmerisourceBergen Drug Corp.;

- Anda, Inc.

- Cardinal Health, Inc.;

- CVS Health Corp.;

- Discount Drug Mart, Inc.;

- HBC Service Company;

- McKesson Corp.;

- Prescription Supply, Inc.;

- Rite Aid Corp.;

11

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Rite Aid of Maryland, Inc. (d/b/a/ Rite Aid Mid-Atlantic Customer Support Center);

- Walgreens Boots Alliance, Inc.; and

- Walmart Inc.

Subject to and without waiving all objections, Plaintiff further states that data from the ARCOS database indicates that prescriptions of oxycodone, hydrocodone, hydromorphone, and fentanyl have been diverted or used – in whole or in part – for other than legitimate medical, scientific, research, or industrial purposes in its geographical areas.

Plaintiff reserves the right to supplement and amend this response upon further investigation.

**Interrogatory No. 17:**

To the extent not already identified in response to Interrogatory Number 16, identify every pharmacy, clinic, or hospital inside or outside Your geographic boundaries whose conduct with respect to Prescription Opioids You believe, suspect, or contend caused harm within Your geographic boundaries. For each such pharmacy, clinic, or hospital that You know that support Your belief, suspicion, or contention, including (without limitation): the name of the pharmacy, clinic, or hospital; each prescription filled by the pharmacy, clinic, or hospital that You believe, suspect, or contend caused harm in Your geographic boundaries; the date that each such prescription was written; the name of the prescriber; the name of the recipient of the prescription; the name(s) of the Prescription Opioids prescribed; the quantity of Prescription Opioids prescribed; the date the prescription was filled; whether any Defendant was involved in the Distribution of that Controlled Substance(s); whether the Controlled Substance(s) were distributed as part of a Suspicious Order (and if so what made the order suspicious); and the reason(s) why You believe, suspect, or contend the prescription caused harm within Your geographic boundaries.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### Response to Interrogatory No. 17:

Plaintiff objects that this Interrogatory is unduly burdensome to the extent it requests Plaintiff to search for and identify any such pharmacy, clinic, or hospital.  Plaintiff further objects to this Interrogatory to the extent it calls for information in the Distributors' possession, custody, or control, or is just as available to Distributors from third-party sources as it may be available to Plaintiff, and thus places an undue burden on Plaintiff to gather.  Plaintiff also objects to the extent that the terms "believe" and "suspect" are overbroad, vague, and burdensome to Plaintiff beyond any need proportional to this case. Plaintiff further objects to the term "every specific prescription" as overly broad, irrelevant, and highly burdensome.  Plaintiff objects to the extent that this Interrogatory calls for expert opinions or conclusions and the expert discovery period in this litigation has not been commenced, let along concluded.  Finally, Plaintiff objects to this Interrogatory because it is a premature contention interrogatory, discovery and investigation are on-going and Plaintiff will amend its response at the close of discovery.

Subject to and without waiving all objections, Plaintiff states that as alleged in Plaintiff's Corrected Second Amended Complaint, based on information, belief, and facts reasonably known to Plaintiff, the distributors and pharmacies who are listed below and as Defendants in this matter, including retail pharmacy defendants, are the parties whose conduct "with respect to Prescription Opioids [we] believe, suspect, or contend caused harm within [our] geographical boundaries":

- AmerisourceBergen Drug Corp.;

- Anda, Inc.

- HBC Service Company;

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- Cardinal Health, Inc.;

- CVS Health Corp.;

- Discount Drug Mart, Inc.;

- McKesson Corp.;

- Prescription Supply, Inc.;

- Rite Aid Corp.;

- Rite Aid of Maryland, Inc. (d/b/a/ Rite Aid Mid-Atlantic Customer Support Center);

- Walgreens Boots Alliance, Inc.; and

- Walmart Inc.

Plaintiff directs Defendants to the chart at paragraph 705 of Plaintiff's Second Amended Complaint for a breakdown of prescription opioids delivered in Cuyahoga County between 2006 and 2014.

Subject to and without waiving all objections, Plaintiff states that while its investigation is ongoing, Plaintiff's understanding and belief is that the Manufacturers and Distributors of opioids who are listed as Defendants in this matter, are the primary, if not sole, parties whose conduct "with respect to Prescription Opioids [Plaintiff] believe[s], suspect[s], or contend[s] caused harm within [its] geographic boundaries."

Additionally, as said investigation is ongoing, Plaintiff expects this topic will be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Plaintiff reserves the right to supplement and amend this response upon further investigation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated:  August 13, 2018

Respectfully submitted,
Plevin & Gallucci

*/s Frank Gallucci*
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804
Napoli Shkolnik PLLC

*/s Hunter J. Shkolnik*
Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

Scott Elliot Smith L.P.A.

*/s Scott Elliot Smith*
Scott Elliot Smith (0003749)
5003 Horizons Dr., Suite 200
Columbus, Ohio 43220
Phone: (614) 846-1700
ses@sestriallaw.com
Thrasher Dinsmore & Dolan L.P.A.

*/s Leo M. Spellacy, Jr.*
Leo M. Spellacy, Jr. (0067304)
1111 Superior Avenue
Suite 412
Cleveland, Ohio 44114
Phone: (216) 255-5450

# EXHIBIT 6

**(Cuyahoga County's Supplemental Response and Objections
to Distributor Defendants' Interrogatories)**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>*County of Cuyahoga, et al. v. Purdue Pharma L.P., et al.,* Case No. 17-OP-45004 | MDL No. 2804<br><br>Case No. 17-md-2804<br><br>Judge Dan Aaron Polster |

**CUYAHOGA COUNTY'S**
**SUPPLEMENTAL RESPONSE AND OBJECTIONS TO**
**DISTRIBUTOR DEFENDANTS' INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Case Management Order in *In re National Prescription Opiate Litigation*, No. 1:17-cv-2804 (Dkt. No. 232), Cuyahoga County ("Plaintiff") hereby provide its supplemental response and objections to Distributor Defendants' Interrogatories, as follows:

**OBJECTIONS**

The following objections apply to each Interrogatory. To the extent that certain specific objections are cited in response to an individual Interrogatory, those specific objections are provided because they are applicable to that specific Interrogatory and are not a waiver of the other objections applicable to information falling within the scope of such Interrogatory.

1.      Plaintiff objects to each Interrogatory to the extent they are overly broad, vague, unduly burdensome, seek information that is not relevant to any party's claim or defense, or seek to impose obligations or require actions beyond those required by the Rules of Civil Procedure, the ESI Protocol entered in this matter or the Local Rules of the United States District Court of the Northern District of Ohio.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Response to Interrogatory No. 16:**

Plaintiff objects to this Interrogatory to the extent the term "other dosage units" is vague, ambiguous, and subject to varying interpretations. Plaintiff objects in that this Interrogatory seeks information already in the possession of Defendants and third-parties. Plaintiff states that it would be unduly burdensome and wholly disproportionate to the needs of the case for Plaintiff to identify the "maximum number" of individual opioid pills or other dosage units of prescription opioids that "should properly" have been distributed in its geographic boundaries for "legitimate medical purposes" during the Timeframe. *DiOrio v. TMI Hosp.*, 2017 U.S. Dist. LEXIS 59676, at *6 (N.D. Ohio Apr. 19, 2017) (affirming magistrate ruling finding "discovery request overbroad, vague, unduly burdensome, and disproportionate to the needs of the case").

Plaintiff will not opine on the maximum number of pills that should have been distributed "for legitimate medical purposes" and this is not anticipated to be the subject of expert testimony. *Buckner v. Montgomery Cnty. Jobs & Family Servs.* Div., 2012 U.S. Dist. LEXIS 43251, at *6 (S.D. Ohio Mar. 29, 2012) (granting objection, in part, because interrogatory called for speculation).

However, as discovery is ongoing, should this information be deemed relevant, it could be the subject of fully-supported and detailed expert witness opinion(s) that will be disclosed in accordance with CMO 1 and the Federal Rules of Civil Procedure.

Plaintiff incorporates by reference its "Responses to the Amended and Clarified Discovery Ruling 12 Supplemental Interrogatory Issued to Plaintiffs" dated January 25, 2019 (Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23); "Responses to Supplemental Interrogatory Issued in Discovery Ruling 12 to Plaintiffs" dated January 11, 2019 (Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23); "Supplemental Amended Responses and Objections to the Manufacturer Defendants' First Set of Interrogatories, Submitted Pursuant to Discover Ruling No. 13" dated December 31, 2018 (Manufacturer Interrogatory No. 6);

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"Supplemental Objections and Responses to Manufacturer Defendants' Interrogatory Nos. 27/28" dated December 21, 2018; "Fourth Amended Responses and Objections to Manufacturer Defendants' First Set of Interrogatories" dated December 14, 2018 (Manufacturer Interrogatory Nos. 6 & 10); "Supplemental Responses & Objections to Reformulated Suspicious Order Interrogatory Served by Manufacturer Defendants" dated November 27, 2018 (Manufacturer Interrogatory No. 27); "Amended Responses and Objections to the Manufacturer Defendants' First Set of Interrogatories and the National Retail Pharmacy Defendants' First Set of Interrogatories" dated November 2, 2018 (Manufacturer Interrogatory No. 10 and Pharmacy Interrogatory Nos. 2 & 3); "Amended Responses and Objections to the National Retail Pharmacy Defendants First Set of Interrogatories and Distributor Defendants' Fourth Set of Interrogatories" dated October 31, 2018 (Distributor Interrogatory No. 23 and Pharmacy Interrogatory No. 7); "Responses and Objections to Distributor Defendants' Fourth Set of Interrogatories" dated August 31, 2018 (Distributor Interrogatory Nos. 23 & 29); "First Amended Responses and Objections to Distributor Defendants' Third Set of Interrogatories" dated August 13, 2018 (Distributor Interrogatory Nos. 16 & 17); and "Initial Responses and Objections to Manufacturer Defendants' Second Set of Interrogatories" dated July 5, 2018 (Manufacturer Interrogatory No. 27).

**Interrogatory No. 17:**

To the extent not already identified in response to Interrogatory Number 16, identify every pharmacy, clinic, or hospital inside or outside Your geographic boundaries whose conduct with respect to Prescription Opioids You believe, suspect, or contend caused harm within Your geographic boundaries. For each such pharmacy, clinic, or hospital that You know that support Your belief, suspicion, or contention, including (without limitation): the name of the pharmacy, clinic, or hospital; each prescription filled by the pharmacy, clinic, or hospital that You believe, suspect, or contend caused harm in Your geographic boundaries; the date that each such

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Dated:  March 4, 2019

Respectfully submitted,
Plevin & Gallucci

*/s Frank Gallucci*
Frank Gallucci (0072680)
55 Public Square, Suite 2222
Cleveland, Ohio 44113
fgallucci@pglawyer.com
Phone: (216) 861-0804

Napoli Shkolnik PLLC

*/s Hunter J. Shkolnik*
Hunter J. Shkolnik (admitted *pro hac vice*)
Salvatore C. Badala (admitted *pro hac vice*)
Joseph L. Ciaccio (admitted *pro hac vice*)
360 Lexington Avenue
New York, New York 10017
hunter@napolilaw.com
sbadala@napolilaw.com
jciaccio@napolilaw.com
Phone: (212) 397-1000

Scott Elliot Smith L.P.A.

*/s Scott Elliot Smith*
Scott Elliot Smith (0003749)
5003 Horizons Dr., Suite 200
Columbus, Ohio 43220
Phone: (614) 846-1700
ses@sestriallaw.com
Thrasher Dinsmore & Dolan L.P.A.

*/s Leo M. Spellacy, Jr.*
Leo M. Spellacy, Jr. (0067304)
1111 Superior Avenue
Suite 412
Cleveland, Ohio 44114
Phone: (216) 255-5450