# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL NO. 2804 |
| This document relates to: | Case No. 17-md-2804 |
| *County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.* Case No. 1:18-op-45090 | Hon. Dan Aaron Polster |
| *The County of Cuyahoga v. Purdue Pharma L.P., et al.,* Case No. 17-op-45004 | |

# MOTION OF PLAINTIFFS CUYAHOGA AND SUMMIT COUNTIES FOR PARTIAL SUMMARY ADJUDICATION OF THEIR EQUITABLE CLAIMS FOR ABATEMENT OF AN ABSOLUTE PUBLIC NUISANCE

TABLE OF CONTENTS

INTRODUTION ..........................................................................................................................1

LEGAL STANDARD ...............................................................................................................2

ARGUMENT..............................................................................................................................2

I.      Plaintiffs are entitled to partial summary adjudication that the opioid epidemic constitutes an ongoing public nuisance in Cuyahoga and Summit Counties. ..................................................2

      A.      A public nuisance includes significant interferences with the public health...................3

      B.      The opioid epidemic is an ongoing public nuisance in Cuyahoga and Summit Counties. ............................................................................................................................4

            1.      The opioid epidemic is a significant interference with the public health in Summit County...........................................................................................................5

            2.      The opioid epidemic is a significant interference with the public health in Cuyahoga County. ....................................................................................................11

      C.      Defendants acknowledge that the opioid epidemic is a significant interference with the public health that has devastated communities. ................................................14

            1.      Distributor Defendants admit that the opioid epidemic is an ongoing public health crisis. ...............................................................................................14

            2.      Manufacturing Defendants also admit the opioid epidemic is an ongoing public health crisis. ...............................................................................................19

II.     Any Defendant whose conduct is found to be a substantial factor in producing the public nuisance will be jointly and severally liable for abating the nuisance. ...........................22

      A.      Ohio common law provides for joint and several liability for abatement of a public nuisance...........................................................................................................22

      B.      Ohio's Apportionment Statute is inapplicable to equitable claims to abate a public nuisance and thus does not limit joint and several liability................................23

CONCLUSION.........................................................................................................................26

## INTRODUCTION

Plaintiffs Cuyahoga and Summit Counties move for partial summary adjudication of their absolute public nuisance claims to simplify the issues remaining to be tried on that cause of action. At least the following three aspects of this claim do not depend on any genuinely disputed issue of material fact and are beyond legitimate dispute as a matter of law or fact:

1) The opioid epidemic constitutes a public nuisance in both Cuyahoga and Summit Counties because it significantly interferes with the public health in those communities;

2) Under Ohio common law, any Defendant found to have been a substantial factor in the creation or maintenance of the public nuisance shall be jointly and severally liable; and

3) Ohio's Apportionment Statute that Defendants raised as an affirmative defense, R.C. §§ 2307.22-2307.31, is inapplicable to Plaintiffs' claim to abate a public nuisance.

There can be little doubt that the opioid crisis—the epidemic of opioid availability and use--significantly interferes with the public health and constitutes a public nuisance in both Cuyahoga and Summit Counties. As Defendants admit, it is the deadliest drug epidemic in our nation's history that has devastated families and these communities. To be sure, Defendants dispute that their conduct was a contributing cause of the opioid crisis or that they bear legal responsibility for abating the nuisance. But they do not and cannot deny that the nuisance itself exists. This Court should therefore hold that the opioid crisis constitutes a public nuisance in both counties.

Second, under Ohio common law, any defendant whose conduct was a substantial contributing factor in causing a public nuisance may be held jointly and severally liable for abating the nuisance. While Ohio has, by statute, limited joint and several liability for compensatory damages in tort that represent economic losses, *see* R.C. § 2307.22, Plaintiffs' equitable action for abatement of a public nuisance is not a tort action for compensatory damages that represent economic losses and is, therefore, not subject to the Ohio Apportionment Statute. This Court should strike the Apportionment Statute affirmative defense and hold that any Defendant found to be a substantial factor in the creation or maintenance of the public nuisance will be jointly and severally liable for abating that nuisance.

1

## LEGAL STANDARD

"Summary judgment is proper where the moving party has 'show[n] that there is no genuine dispute as to any material fact and that [they are] entitled to judgment as a matter of law.'" *Humphrey v. Stored Value Cards*, 355 F. Supp. 3d 638, 641 (N.D. Ohio 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). It is "well-established that a court may grant partial summary judgment that establishes the existence of certain facts or liability, even though no actual judgment is entered on a claim." *Brauer v. Pannozzo*, 232 F. Supp. 2d 814, 818 (N.D. Ohio 2002). "Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute." *Pund v. City of Bedford*, 339 F. Supp. 3d 701, 709 (N.D. Ohio 2018). That requires the non-moving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. DOT*, 53 F.3d 146, 150 (6th Cir. 1995). "A dispute over a material fact cannot be 'genuine' unless a reasonable jury could return a verdict for the nonmoving party." *Cincinnati Ins. Co. v. Zen Design Grp., Ltd.*, 329 F.3d 546, 552 (6th Cir. 2003).

## ARGUMENT

I.     **Plaintiffs are entitled to partial summary adjudication that the opioid epidemic constitutes an ongoing public nuisance in Cuyahoga and Summit Counties.**

Plaintiffs allege that the Defendants are liable for an absolute public nuisance. To sustain their claim, Plaintiffs must establish that a public nuisance exists, and that Defendants' intentional or unlawful conduct renders them liable for the nuisance. *See City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002); *Taylor v. Cincinnati*, 55 N.E.2d 724, 730 (Ohio 1944) (absolute nuisance arises or results from "the unlawfully doing of anything … which results in injury to another"); *Angerman v. Burick*, 2003-Ohio-1469, ¶ 9 (Ct. App.) (absolute nuisance consists of, *inter alia*, "an act involving culpable and unlawful conduct causing unintentional harm'") (Batchelder, J.); *Nottke v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 859, 863 (N.D. Ohio 2017) ("intentional conduct, standing alone, supports an absolute-nuisance claim").

What constitutes a public nuisance is a question of fact. *Hamilton v. Dilley*, 165 N.E. 713, 714 (Ohio 1929) (finder of fact "determine[s] whether the circumstances of the particular case come

2

within the definition of a nuisance"); *Toledo v. Gorney*, C. A. No. L-87-408, 1988 Ohio App. LEXIS 4702, at *6 (Ct. App. Dec. 2, 1988) ("What constitutes a nuisance is a question for the trier of fact."). As shown below, there is no disputed material fact upon which a reasonable fact-finder could decide anything but that the opioid epidemic constitutes an ongoing public nuisance under Ohio law. Accordingly, the Court should grant partial summary judgment in Plaintiffs' favor on this issue.[1]

### A.     A public nuisance includes significant interferences with the public health.

A "public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts, § 821B(1) (1979) (hereafter "Restatement"); *Beretta*, 768 N.E.2d at 1142 (adopting Restatement's definition). While the definition "is couched in broad language," both the Ohio Supreme Court and the Restatement recognize that public nuisances include a "significant interference with the public health" from which the public is entitled to protection. *Beretta*, 768 N.E.2d at 1142; Restatement, § 821B(2)(a). Thus, in *Beretta* the court held that the city's allegation that handgun manufacturers "created and maintained a public nuisance by manufacturing, marketing, distributing, and selling firearms in ways that unreasonably interfere with the public health, welfare, and safety in Cincinnati and that the residents of Cincinnati have a common right to be free from such conduct" stated a public nuisance claim. *Id. See also City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017) (under Ohio law, public nuisance includes interferences with "a right to public health"); Restatement, § 821B, cmt b (explaining how "public nuisances included interference with the public health, as in the case of keeping diseased animals or the maintenance of a pond breeding malarial mosquitoes").

---

[1] For purposes of this motion, and to lessen the burden on the Court, Plaintiffs limit themselves to the definition of a public nuisance as a significant interference with the public health. By so limiting their motion, Plaintiffs do not abandon any of the other potential bases for public nuisance, including conduct that "involves a significant interference with . . . the public safety, the public peace, [or] the public comfort," "conduct that is proscribed by a statute, ordinance or administrative regulation," or "conduct [that] is of a continuing nature or has produced a permanent or long-lasting effect" that defendants knew or had reason to know "has a significant effect upon the public right." Restatement, § 821B(2); *Beretta*, 768 N.E.2d at 1142. Plaintiffs expressly reserve their rights to establish their public nuisance claims at trial under any of these alternative definitions.

The Restatement describes other interferences with the public health that constitute public nuisances, such as the threat of smallpox communication to even a single person, the unlawful practice of medicine, defective sewers, and unsafe buildings. *Id.*, cmt g. The point of such examples is not to define public nuisances by drawing vague lines between public health issues that may impede the public's right safely to move about and be in public from those that may not. It is to illustrate how the common law is not a fossil but remains responsive to contemporary societal needs by defining public nuisance in terms of harms that "affect the health of so many persons as to involve the interests of the public at large." Restatement, § 821B, cmt g. Indeed, this Court recently rejected Defendants' argument that "public health" and "public right" are "not synonymous," because it "conveniently overlook[s] large portions of the Restatement," demonstrating that "'public health' has traditionally been considered a 'public right.'" Doc.#1680, Opinion, at p.18-19.

**B.  The opioid epidemic is an ongoing public nuisance in Cuyahoga and Summit Counties.**

By any measure, the opioid epidemic is a significant interference with the public health and a public nuisance. It is the deadliest drug epidemic in our nation's history. The President of the United States has declared the opioid epidemic a national emergency, and the Sixth Circuit recently concurred with this Court's analysis that "the circumstances in this case, which affect the health and safety of the entire country, are certainly compelling." *In re Nat'l Prescription Opiate Litig.*, No. 18-3839/3860, 2019 U.S. App. LEXIS 18502, at *3-4 (6th Cir. June 20, 2019) (quoting Doc#233, Order Regarding ARCOS Data, p.13). Compelling, and also tragic. Prescription opioid overdose has increased exponentially in the United States, from 4,030 deaths in 2000 to 16,651 deaths in 2010. Crueger Declaration Ex. 104, Katherine Keyes report at p. 20.[2] The numbers remain unacceptably high today with 14,487 and 14,495 deaths in 2016 and 2017, respectively. *Id.* Over 230,000 people fatally overdosed using prescription opioids between 1999 and 2017. *Id.* As one CDC director remarked: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently." Ex. 2 at p. 2.

_____

[2] Unless noted otherwise, all "Ex." citations are to the exhibits attached to the Crueger Decl.

There can be no argument that the opioid epidemic significantly interferes with a public right. This Court has already concluded that Defendants' characterization of the harm as limited to the "private sphere" by "blam[ing] the addict" is unfounded "because it echoes one of the misrepresentations alleged to have been made by Defendants in causing the crisis." Doc.#1680, Opinion, at 18-20. An epidemic of opioid addiction and abuse affects the community. It affects the patients seeking help and members of the community who need to care for them. It affects children born addicted to opioids; it affects the services the community can deliver to its citizens because finite resources are used for opioids; and it affects the first responders and other workers who day-after-day confront the real-world consequences of the opioid epidemic. In fact, when they discuss these issues internally, Defendants admit that addiction is a disease not a private choice, that the opioid epidemic costs the public tens of billions of dollars each year, and that it devastates families and communities. *See infra,* Section I.C. That is why the opioid epidemic is a public nuisance. It is a public health crisis that "affect[s] the health of so many persons as to involve the interests of the public at large." Restatement, § 821B, cmt g.

1. <u>The opioid epidemic is a significant interference with the public health in Summit County.</u>

The opioid epidemic has devastated Summit County. Ex. 52, Deposition of Donna Skoda at 367:3-11. The loss of life is unprecedented.[3] In 2015, Summit County experienced 212 total overdose deaths, a number that dramatically increased to 336 deaths by 2016.[4] Summit's prescription opioids death rates consistently exceed the national average. Ex. 104, Keyes report at 23-24. By 2016, the pharmaceutical opioid overdose death rate in Summit County was 2.86 times higher than the national rate. *Id.,* at 24. Reports from Summit's medical examiner's office show a total of 1,065 drug overdose deaths from January 2009 through December 2016, with a 277% increase in drug overdose deaths over the study period. *Id.,* at 24. So rapid was the increase in overdose deaths that

---

[3] Ex 3, ADM Report at 2.
[4] Ex.4, at p. 1, Emergency Proclamation; Ex. 53, Deposition of Lisa Kohler at 51–53.

Summit's medical examiner had to resort to a mobile morgue to handle the bodies.[5] As Akron Fire Chief Clarence Tucker related, the epidemic is "like a tsunami" that is "a crisis" because of "the absolute total devastation" he and his department witnessed. Ex. 54, Deposition of Clarence Tucker at 141:10 – 141:23 & 262:3 to 263:3. "It's not some isolated case that we just hope will go away on its own." *Id.* at 262:3-263:3. The data support Chief Tucker's observation. The death rates in Summit today remain much higher overall than a decade ago. Ex. 104, Keyes report at 24.

Other measures drive home the significant interference with the public health in Summit County. One consequence of the epidemic is an increase in neonatal abstinence syndrome. Ex. 105, Scott Wexelblatt report at 14, 16. Rates of neonatal abstinence syndrome have increased greatly, from 2.9 per 1,000 births in 2004-2008 to 13.6 per 1,000 births in 2011-2015 – more than twice the national average over the same time period. Ex. 104, Keyes report at 25, *See also* Ex. 105, Wexelblatt report at 5 (growing incidence of neonatal abstinence syndrome in Cuyahoga and Summit Counties "is a significant public health issue," that requires "additional and enhanced services … focused on prevention, treatment, and early intervention.") In 2014, 10% of NICU admissions had a neonatal abstinence syndrome diagnosis and the number keeps increasing.[6] From 2013-2017, 426 infants were diagnosed with neonatal abstinence syndrome in Summit. Ex. 104, Keyes report at 25. Emergency room visits also skyrocketed with 2,431 overdoses in 2016.[7] In 2014, 32% of hospital admissions in Summit County had a primary diagnosis of opiate use disorder.[8] Acute withdrawals led to over 1,500 detoxifications at Summit County's Alcohol, Drug Addiction & Mental Health Services Board Crisis Center, a majority of which were opiate related.[9]

---

[5] Ex. 5 (Amani Abraham, *Mobile Morgue Trailer Brought Into Summit County To Deal With Surge of Overdoses*, WKYC3 (June 27, 2017).

[6] Ex. 6, at p. 4, August 20, 2014 Opiate Task Force Health Care Subcommittee Minutes. *See also* Ex. 7, May 4, 2015 Opiate Task Force Quarterly Stakeholders Meeting Minutes.

[7] Ex. 45, Summit County Public Health, Dashboard for Estimated Overdose Emergency Room Department Visits 2016-2019.

[8] Ex. 8, Unduplicated Admissions for Opiate Abuse and Dependence (2015).

[9] *Id.*

Summit County formed an Opiate Task Force in 2014 to respond to the rising number of opiate related treatment admissions and deaths.[10] At the time that the Task Force was created, Summit County's Alcohol, Drug Addiction and Mental Health Services Board ("ADAMHSB") reported that 45% of the opiate dependent persons admitted to treatment were addicted to prescription opioids. Ex. 9. In 2014, Summit County had one of the highest naloxone administration rates in the state, with an estimated 24.6 naloxone administrations per 10,000 persons.[11] Unintended drug overdoses rose, increasing numbers of inmates experienced drug withdrawals in jail; heroin and prescription drug-related arrests increased; diversion of prescription medications increased; and there was an increase in hepatitis diagnosis.[12]  As the Executive Director of Summit County's ADAMHSB stated, the county is "being impacted in every segment of our community; health care, public health, courts, law enforcement, pharmacy practice, addictions treatment, employment, faith and family." Ex. 9, at p.1.

The opioid epidemic has overloaded Summit County's systems. Akron Fire Chief Tucker explained how

> The opiate issue  . . . just seemed to raise to the level of just overwhelming our ability to respond.  [Other drugs] never overwhelmed our resources like this opiate issue has . . .  to the point where it has been really stressing our resources, our ability to respond, overwhelming our personnel.

Ex. 54, Tucker Dep., at 142:17 – 143:24. As Summit County's Addiction, Prevention and Training Coordinator testified, "many of our systems were becoming overloaded" and people were "fearful" of family members overdosing and calling to ask how to get them into treatment before they died. Ex. 55, Deposition of Kim Patton at 269 -71.

The epidemic has disproportionately impacted Summit treatment providers, first responders, hospitals, Children Services, the criminal justice system, the Medical Examiner, and the families of

---

[10] Ex. 9, at p. 1; Kohler Dep., at 222:2-22 (reporting 144 overdoses in 2014)]
[11] Ex. 10, Naloxone Administration in Ohio (2015).
[12] Ex. 9, at p. 1.

Summit County.[13] In 2014, Summit County Children Services saw an increase in the need for services because of the opioid epidemic.[14]  By 2016, Children Services was placing in care an unprecedented number of children who lost their caregivers to overdose or to the criminal justice system.[15] Julie Barnes, Executive Director of Children Services, testified that in her 28 year career "dealing with opiates has been one of the greatest challenges that we've had with our clientele."[16] Children Services saw a drastic increase in the number of referrals, a 17% increase in number of children who entered custody and an 18% increase in the cost of placing and caring for children affected by substance abuse. All of this has created an urgent need for more foster and adoptive homes.[17]  Children Services continues to see the impact of the opioid epidemic on the children and families they serve, with an ever-increasing number of children in custody.[18] As Ms. Barnes explained:

> I have many examples of [and] very specific situations where I know that children have been harmed.  I know their parents have overdosed frequently.  I know that my caseworkers have struggled with [ ] telling a child that their parent is deceased. Removing a child from a home because their parents have addiction issues and the trauma of removal alone is a significant trauma for children.

Ex. 56, Barnes Dep., at 372:5-373:6. Children continue to come into Children Services at higher rates.[19] To cope with this increasing demand, Children Services needs (but lacks) more resources and staffing, more foster homes, more clinical persons on staff to work with caseworkers, more trauma experts to deal with childhood trauma, and more support for kinship programs. Ex. 56, Barnes Dep., at 281:18-284:9; 162:10-164:9.

---

[13] Ex. 11, 2016 ADM SSAB Annual Budget Review.

[14] Ex. 56, Deposition of Julie Barnes at 88:22-89:16; 92:19-93:13.

[15] Ex. 55, Patton Dep., at 269:19 -271:1.

[16] Ex. 56, Barnes Dep., at 71:6-72:3.

[17] Ex. 12, at p. 1, Summit Cty. Children Serv., 2016 Annual Report.

[18] Ex. 13, at p. 1, Summit Cty. Children Serv., 2017 Annual Report.

[19] Ex. 57, Deposition of Greta Johnson (Summit County 30(b)(6)) at 258:10-11.

Law enforcement and the courts are affected by increased caseloads. A Summit County Deputy Chief Probation Officer testified how starting in 2012, "courts, treatment agencies started to identify more and more clients coming to their attention for having opiate use disorder that was exacerbated by overdose."[20] Summit County had to create an Opiate Unit for low and moderate risk offenders to combat the growing percentage of opiate addicted individuals.[21] Drug Courts have had to increase capacity to deal with crimes that were committed as a result of addiction and drug seeking behaviors.[22]

While Summit expanded its capacity for treatment, the need still outstrips available resources.[23]  Today, Summit County is faced with a population of people living with addiction.[24] On October 25, 2017, Summit County declared a countywide emergency due to the opioid epidemic that remains in effect today.[25]

Another measure of the opioid epidemic's burden is the trauma it causes to first responders and other county workers. As Summit County's Executive Director for Children Services explained at her deposition:

> There's been a tremendous impact on the entire workforce related to the opiate epidemic. I have personally talked to supervisors and staff who have experienced very significant trauma when they've lost a child who may have got into a parents' drugs and overdosed.  We've had some die.  We've had parents who've died.  We have parents who relapse.  It's very hard on a worker if you're working with a case and the family is doing well and you're close to feeling like you can be able to send this child back to live with their family, and then the parent relapses, and they're unable to make that reunification.  There's a sense of failure that goes with that when

---

[20] Ex. 58, Deposition of Jeffery Sturmi at 136:8-139:5

[21] Ex. 14, at p. 34, Summit Cty. Court of Common Pleas, 2016 Annual Report (noting that during 2016, there were 429 cases placed in this specialty unit).

[22] Ex. 57, G. Johnson 30(b)(6) Dep., at 246: 2 – 247:6.

[23] Ex. 59, Deposition of Gerald Craig at 271:13-272:7; *See also*, Ex. 15, pp. 1-2, Summit County Opiate Task Force "*Reducing Opiate Abuse in Summit County*"  Updated August 2017 (listing examples of Prevention, Education, Community Outreach, Treatment and Recovery Supports initiated to combat the crisis).

[24]Ex. 57, G. Johnson 30(b)(6) Dep., at 257:22-23.

[25] Ex. 3, ADM 2016 Annual Report at 2.

> someone fails or someone dies or someone is harmed. And relapse is very high.
> Overdoses are very high. So those have a very traumatic impact on the staff.

Ex. 56, Barnes Dep., at 162:10-164:9. Indeed, one of Summit County's pressing concerns is "compassion fatigue" amongst first responders and treaters, ensuring they do not become "overwhelmed by hopelessness" and "overwhelmed by the sheer volume and turn cold to it." Ex. 57, G. Johnson 30(b)(6) Dep., at 195: 2-18. Overall, the opioid epidemic has caused a "loss of a sense of community" and an "overwhelming sense of hopelessness." *Id.*, at 192-94.

The epidemic has also impacted Summit County's ability to deliver needed services to its community members. As Summit County's Assistant Chief of Staff testified, the county has deferred capital improvements and enhancement projects, "because our resources were laser-focused on the opioid epidemic. . . . Important community initiatives get pushed to the side because when people are dying immediately . . . it's all hands on deck." Ex. 57, G. Johnson 30(b)(6) Dep., at 197:15-199:1. The epidemic has also impacted Summit County's ability to deliver necessary police and fire services to its community, because "when your manpower is swamped like that, no one is out doing training, they're not doing inspections, they're not doing rig maintenance, they're not doing building maintenance, and all that is a[n] indirect result of increased call volume." Ex. 60, Deposition of Charles Twigg at 231:19-232:21. It effects public safety because "[a]nytime a police officer is responding to an overdose, they're not proactively policing. They're not being present in the community." Ex. 57, G. Johnson 30(b(6) Dep., at 208:19-23.

The Summit County Public Health department concluded that these grim statistics make it "clear" that the opioid epidemic "is a community-wide crisis" that "is striking all parts of the community; city and suburban, white and black, male and female, young and old."[26] These facts make it clear that the opioid epidemic is a significant interference with the public health in Summit County and, thus, a public nuisance. *See Beretta,* 768 N.E.2d at 1142 (a public nuisance is "'an

---

[26] Ex. 18 at p. 8, Cty. Pub. Health, *Population Health Vital Statistics Brief, Volume 3: Drug Overdoses, July1- July 31 2018.*

unreasonable interference with a right common to the general public'" and "includes those acts that significantly interfere with public health" (quoting and citing Restatement, § 821B(1) and (2)).

    2.    <u>The opioid epidemic is a significant interference with the public health in Cuyahoga County.</u>

Cuyahoga County has also been dramatically affected by the opioid epidemic. Drug overdose is now the leading cause of accidental death in the county. Ex. 16, at p. 1. Pharmaceutical opioid deaths were 1.51 times higher than the national average in 2000. Ex., 104, Keyes report at 23. By 2016, the pharmaceutical opioid death rate in Cuyahoga County was 3.26 times higher than the national average. *Id.*, at 23. In 2017, the emergency rooms treated an estimated 9,191 patients presenting with drug related injuries, a 21% increase compared to 2016. Ex. 17, at p. 1. Moreover, heroin mortality rose significantly in Cuyahoga, from 40 deaths associated in 2007 to 161 in 2012. Exhibit 51 at pg. 1. In 2015, one person died every day in Cuyahoga County from a drug overdose. Ex. 19, at p. 4. During January and February of 2016, one person died every day in Cuyahoga County from a heroin or fentanyl overdose. *Id.*. By March of 2016, two people died every day from a heroin or fentanyl overdose. *Id.*. In 2016, there were 666 total drug overdose deaths reported by the Cuyahoga County Medical Examiner's Office.[27] Ex. 20, at p. 2.. The data consistently show that 70-80% of individuals who use heroin started with prescription opioids. Ex. 104, Keyes report at 26; *see also* Ex. 62, Deposition of Hugh Shannon (30(b)(6) Cuyahoga County) at 26:16-28:2; 28:17-28:23; 36:7-37:21; Ex. 61, Deposition of Thomas Gilson (30(b)(6) Cuyahoga County) at 251:9-254:1; 314:22-315:15; Ex. 21 at p. 12.  Regardless of the question of Defendants' responsibility, these deaths are part of a public health crisis created by the opioid epidemic. As Margaret Keenan, Director of the Cuyahoga County Office of Budget and Management, testified:

> [W]e're in a crisis. We've been in a crisis. I have 60 agencies calling me daily saying they're in a crisis due specifically to the opiate epidemic, prescription opiates, Fentanyl, carfentanil, and heroin.

---

[27] The deaths reported by the medical examiner differ from the deaths reported by vital statistics in that they include all deaths that occurred in the county, not just the deaths of residents of the county. Ex. 104, Keyes Dec., report at 24.

Ex. 63, Deposition of Margaret Keenan (30(b)(6) Cuyahoga County), at 385:9-14.

Other statistics underscore how the opioid epidemic in Cuyahoga County is a community-wide crisis. The rate of children born addicted to opioids has increased greatly as a result of the opioid epidemic. Neonatal abstinence syndrome increased from 1.9 infants per 1,000 births in 2004-2008 to 6.1 infants per 1,000 births in 2011-2015. Ex. 104, Keyes report at 25. From 2013-2017, 629 infants were diagnosed with neonatal abstinence syndrome. *Id.* The number of children in placement has increased as well as the number of abuse, dependency, and neglect cases in juvenile court[28]  As of 2017, 32% of removals were due to drugs or alcohols and there were 2,000 children and teens in temporary or permanent custody, the highest since 2011.[29] There has also been a 62% increase in drug-exposed infants.[30] In 2016, 483 drug-exposed children were referred to Sobriety Treatment and Recovery Teams (START).[31] In 2017, that number grew to 523.[32] The START program has also seen an increase in opiate-related cases and referrals, including almost 100% of the Family Drug Court population.[33]

The opioid epidemic has resulted in increased population at the county jails and an escalation in medical care costs for opiate addicted inmates.[34] The Cuyahoga County Corrections Center provides housing and medically assisted treatment for 26,000 inmates annually.[35]  Seventy-five percent of these inmates have a substance use disorder.  In 2016, almost 30% of the Common Pleas Court defendants had an opioid addiction diagnosis.[36] Hugh Shannon, Director of Operations at Cuyahoga County Medical Examiner's Office, explained in his deposition regarding impacts on the Prosecutor, Public Defender, Court of Common Please, and Juvenile Court:

---

[28] Ex. 63, Keenan 30(b)(6) Dep., at 371:4-372:2.

[29] Ex. 22, at p.2.

[30] Ex. 23, at p. 1 & Ex. 24, at p. 13.

[31] Ex. 27, at p. 1.

[32] Ex. 28, at p. 5.

[33] Ex. 24, at p. 13.

[34] Ex. 63, Keenan 30(b)(6) Dep., at 48:15-50:5; 114:19-21.

[35] Ex. 29, at p. 1.

[36] *Id.*

So again, greater caseloads all the way around, more people going through the justice system. There are more arrests, there is obviously more people going into the jail, both juveniles and adults. This crisis has not spared anybody, based on age, demographics or where they live. So more prosecutions means more cases for prosecutors, more cases for defenders, busier dockets for the Court. We have special dockets, drug court and recovery court. Recovery court was created in response to this crisis. We had already had an operating drug court. I think there is talk about trying to add another to keep up with caseloads. And those deal specifically with trying to get people out of the jail and into treatment. They have criteria that they have to meet, and it is a rigorous program, but they see very good results. But those are also not inexpensive. So more people going through drug courts, getting into treatment, means more resources.

Ex. 62, Shannon 30(b)(6) Dep., at 33:12-34:16. The Sheriff's Office has felt the impact, with a growth in costs due to more inmates, deputy sheriff overtime and transportation expenses.[37] The Juvenile Court, Prosecutor's Office, and Public Defender's office have been overwhelmed with increased caseloads.[38] An estimated 85% of the participants in the Drug Court have an opioid use disorder.[39] The Drug Court has hired additional probation and case management staff to keep up with the overflow stemming from the opioid epidemic.[40] Cuyahoga has incurred other costs, including drug testing and treatment costs (e.g., residential and intensive outpatient), transportation costs (e.g., bus tickets), medical costs and costs associated with referrals from county jails.[41] An additional docket was created to deal specifically with opioid use disorder.[42]

The result of this increased spending to address opioids is that Cuyahoga, like Summit County, has less resources to devote to other non-opioid-related services. As Cuyahoga witnesses testified, the money spent to deal with the opioid epidemic has "got to come from somewhere," and "if we [Cuyahoga] weren't dealing with the opiate issue, we would have money that we could spend

---

[37] Ex. 63, Keenan 30(b)(6) Dep., at 114:4-18.

[38] *See, e.g.*, Ex. 63, Keenan 30(b)(6) Dep., at 33:17-35:2; 113:3-8; 135:17-136:10.

[39] Ex. 64, Deposition of Molly Leckler at 59:20-60:16; 249:7-256:22.

[40] *Id.* at 348:23-351:25; 391:4-393:18.

[41] *Id.*

[42] *Id.*

on something else." Ex. 65, Deposition of Trevor McAleer at 105:10-106:1; Ex. 63, Keenan 30(b)(6) Dep., at 389.

These distressing statistics make it clear that the opioid epidemic is a significant interference with the public health in Cuyahoga County and, thus, a public nuisance. *See Beretta,* 768 N.E.2d at 1142 (a public nuisance is an "'an unreasonable interference with a right common to the general public'" and "includes those acts that significantly interfere with public health") (quoting and citing Restatement § 821B(1) and (2).

**C.  Defendants acknowledge that the opioid epidemic is a significant interference with the public health that has devastated communities.**

Defendants cannot legitimately dispute that the opioid epidemic is a public nuisance. In fact, when Defendants looked at the statistics of opioid abuse and addiction, they consistently concluded that the epidemic is a significant and deadly public health crisis.

1.  <u>Distributor Defendants admit that the opioid epidemic is an ongoing public health crisis.</u>

*Defendant McKesson*: McKesson admits that the opioid epidemic is a significant interference with the public health. One McKesson employee testified that there is a national epidemic of prescription opioid "addiction, abuse, morbidity and mortality," that posed a "hazard" to public health and safety. Ex. 66, Deposition of Nate Hartle (7/31/2019) at 297, 365-66. A McKesson confidential presentation stated that the opioid epidemic is the "deadliest drug epidemic on record in our nation's history":



14

Ex. 46. *See also* Ex. 67, Hartle (8/1/2018) Dep., at 35-36. McKesson described how on the *average day* more than 650,000 opioid prescriptions are dispensed, 3,900 people initiate non-medical use of prescription opioids, and 78 people die from an opioid-related overdose. Ex. 46 at 4. McKesson has admitted that prescription opioids are *the* predominate gateway to heroin use, observing how persons addicted to prescription opioids are forty times more likely to become addicted to heroin, and that 45% of heroin users are also addicted to prescription opioids. Ex. 46 at 4, 16. *See also* Ex. 67, Hartle (8/1/2018) Dep., at 37-38; Ex. 66, Hartle (7/31/2018) Dep., at 321.

In a confidential 2013 presentation, McKesson called prescription opioid abuse, addiction and death a "National Epidemic." Ex. 47 at p.24. McKesson observed that "more than 45 people die per day from prescription opioids," deaths attributable to prescription opioids increased four-fold from "4,030 in 1999 to 16,651 in 2010," and nearly 5 million people abused prescription pain relievers in 2012, with "6,700 new initiates per day in 2012." Ex. 47 at 23, 24. According to McKesson, the epidemic's "economic impact to America" is "[greater than] $57 billion dollars per year." *Id.* at 24.

McKesson also identified – again, confidentially in 2013 – who to blame for the opioid epidemic: the manufacturers and their false and misleading statements about prescription opioids, *not* doctors, addicts, or "bad" people. Ex. 47 at 4. *See also* Ex. 68, Boggs Dep., at 132-33; Ex. 66, Hartle (7/31/2018) Dep., 292 (agreeing that manufacturers "played a role" in fueling the opioid crisis). McKesson's presentation did not equivocate on this point:



Ex. 47 at 4. In fact, McKesson's representative admitted that it "gives you pause" to be selling opioids in the midst of an opioid epidemic. Ex. 66, Hartle (7/31/2018) Dep., at 220.

*Defendant Cardinal Health*: Cardinal Health admits that the epidemic of prescription drug abuse is "an unparalleled epidemic and public health crisis." Ex. 30, at 1. Cardinal Health's court filings claim opioid addiction "occurs in the private sphere" and does not interfere with public rights. But the company's internal message to employees is different: "It's an epidemic that affects *all of us*, professionally and personally," and a "serious and complex public health crisis." Ex. 31, at 1 (emphasis added). Cardinal Health's website calls the opioid epidemic a "national public health crisis" and recognizes the "devastation opioid misuse has caused American families and communities." Ex. 37, at 1. Likewise, Cardinal Health's representative testified that it "recognizes that there is an issue in the country with prescription drug abuse." Ex. 69, Deposition of Jennifer Norris at 97-98; *see also* Ex. 70, Deposition of Mark Hartman at 147. In fact, Cardinal Health is obviously aware that the opioid epidemic has caused a public health crisis in Summit County: its foundation has provided at least one grant to help Summit County address the opioid epidemic. Exs. 31-33.

16

*Defendant AmerisourceBergen*: AmerisourceBergen's internal documents state that "the statistics overwhelmingly demonstrate that we have an opioid epidemic in the U.S., and tragically people are dying." Ex. 39 at 5. In fact, AmerisourceBergen recites the same abuse and death statistics as its co-defendants and notes how prescription opioids are now more widely used than tobacco. *Id.* at 4. The United States faces, in AmerisourceBergen's words, a "tremendous prescription drug abuse problem," with over "$55 billion in health and social costs related to prescription opioid abuse each year." *Id.* at 4-5.

*Defendant H.D Smith*: Internal presentations at H.D. Smith admit that the nation is in the "grip" of a prescription overdose epidemic, with prescription drug abuse being the "#1 cause of accidental death in the United States." Ex. 35 at 15. H.D. Smith also recognized that, as the sales of prescription painkiller tripled between 1999 and 2008, "their involvement in overdose deaths has spiked as well, from 4,000 cases in 1999 to 15,000 in 2008," which was "more than heroin and cocaine combined." *Id.* at 16. Another H.D Smith presentation recognized that the consequences of the "U.S. Rx Drug Abuse Epidemic" included "approximately one death every 30 minutes [being] attributed to prescription drugs," and that "the number of painkiller-addicted newborns has tripled in the past 10 years." Ex. 36 at 1. One H.D. Smith presentation describes how the opioid crisis is a public nuisance, pointing out that "every active addict has profound effects on several people, both directly and indirectly," that prescription drug abuse costs an "estimated $70 billion per year," and that it has "tremendous social, financial, and medical impacts," including "child neglect, abuse, abandonment." Ex. 38 at 4.

*Defendant Henry Schein*: Henry Schein calls the bleak statistics about opioid addiction "alarming," noting how between "21-29% of patients prescribed opioids for chronic pain misuse them," and that "[s]cientific evidence is lacking for the benefits [of using opioids] to treat chronic pain." Ex. 41. Henry Schein has also acknowledged that since at least 2006 the industry understood that the nation was in an opioid epidemic. Ex. 71, Deposition of Shawn Abreu, at 184-85; Ex. 72, Deposition of Jeff Peacock at 97.

*Defendant Walmart*: Walmart acknowledged at deposition that it is "aware of the issues, the health issues related to the opioid crisis." Ex. 73, Deposition of Susanne Hiland (30(b)(6) Walmart) at 348-50. Other employees testified that they were aware of the opioid epidemic. Exs. 74-81 (Deposition of Jeff Abernathy at 33-34; 219-20; Deposition of Miranda Johnson at 73; Deposition of Jolynn Coleman at 75-76; 82; Deposition of Ramona Sullins at 96; Deposition of George Chapman at 94-95, 198-99; Deposition of Roxanne Reed at 83-84; Deposition of Debbie Hodges at 16, 157; Deposition of Susanne Hiland (fact) at 295-96.)

*Defendant Walgreens*: Walgreens was aware there was an opioid epidemic by at least 2012. Ex. 108, Deposition of Steven Mills at 11-12; 171. Since at least 2013, Walgreens knew that the county was in the middle of an "opiate crisis." Ex. 109, Deposition of Edward Bratton (fact) at 57-59. A Walgreens vice president admitted that the opiate epidemic was a "significant" "national crisis" and that "year after year after year for a least a decade the deaths had been increasing." Ex. 110, Deposition of Rex Swords at 352-353. Walgreens's internal presentations deem the increasing deaths from prescription drugs as a "troubling trend." Ex. 111 at 00114613. Another Walgreens manager admitted that, from a "pharmacy perspective," the fact that deaths from prescription opiates surpassed deaths from car accidents evidenced a significant "health care effect," and constituted an "early sign of an epidemic developing in United States related to prescription drugs and death." Ex. 112, Deposition of Chris Dymon at 256-257. Walgreens also admits that "[d]rug overdose deaths have reached epidemic proportions," that "six in 10 overdose deaths involve[] opioids", and that "more than two-thirds of opioids related deaths" are linked to "opioid painkillers", while providers in 2016 "wrote more than 66 prescriptions for every 100 people in the United States," and "U.S. pharmacies dispense more than 650,000 opioid prescriptions on an average day." Ex. 113 at 334475.

Walgreens also understands that there is a link between increased prescription opioid availability and increased rates of addiction, overdose and death.  It recognizes the "[i]ncreases in death rates from overdose [as] related to increased availability of opioid prescriptions," noting that "[t]hose who receive higher doses of opioids are at greater risk for overdose," but also acknowledging that the opioid abuse epidemic "can be prevented and treated." Ex. 114 at 608999.

Walgreens also acknowledges a proven link between "Prescription Opioids and Heroin", noting that "[n]early 80% of Americans using Heroin reported misusing opioids first" and that "[i]ndividuals who misuse prescription opioid pain pills are forty times more likely to abuse heroin." Ex. 115 at 35676. Walgreens knew that pills being sold into "epicenter[s] of [the] notorious well-documented epidemic of prescription drug abuse… were migrating to other states," and that many "prescriptions [were] not for a legitimate medical purpose." Ex. 116, Deposition of Eric Stahmann at 207.

Finally, Walgreens admits that the opioid epidemic imposes tremendous costs on society, totaling "$55.7 billion nationally" including "$25 billion in healthcare costs" and "5.1 billion in criminal justice costs." Ex. 115 at 35676. As Walgreens also admits, the "[a]verage annual healthcare costs for those that abuse opioids are about 8 times higher than those that do not abuse." Ex. 114 at 608999.

> 2. <u>Manufacturing Defendants also admit the opioid epidemic is an ongoing public health crisis.</u>

*Defendant Mallinckrodt*: A Mallinckrodt presentation admits that the statistics on opioid abuse "are significant," as prescription opioid abuse is two to four times greater "than street drugs" resulting in over 16,500 deaths in 2010 alone. Ex. 40 at 34 (Bates No. 179124). Indeed, Mallinckrodt noted that the prevalence of "diagnosed opioid abuse increased 2-fold from 2005 to 2010," with "1.77 million abusers or drug dependent individuals in 2011." *Id.* And as a Mallinckrodt's medical affairs employee testified, "We have a massive problem that is taking place in this county that's killing people." Ex. 82, Deposition of Art Morelli at 131-32. Indeed, numerous Mallinckrodt employees working in areas as diverse as sales, compliance, and medical, agreed in deposition that the country is in the midst of an opioid epidemic. *See* Exs. 82-95 (Deposition of Karen Harper at 34-35; Morelli Dep., at 131-33; Deposition of Victor Borelli at 91-95; Deposition of William Ratliff at 22-24; Deposition of Erin Cox at 45-46; Deposition of Stacey Chick at 42-43; Deposition of Steven Becker at 95-97; Deposition of Cathy Jackson at 29-31; Deposition of Michael Wessler at 149-49; Deposition of Lisa Cardetti at 15-16; Deposition of Eileen Spaulding at 105; Deposition of George

Saffold at 54-55; Deposition of Tiffany Rowley-Kilper at 61-62; Deposition of Bonnie New at 274-75).

As this 2004 presentation makes obvious, Mallinckrodt's sales people recognized that the opioid epidemic was a massive public health crisis:



# America "Hooked" on Drugs

**Large and growing problems:**

- ☐ 6.3 million Americans need treatment for *illicit* substance abuse or addiction.
- ☐ Opioids account for 83% of admissions for injection drug abuse.
- ☐ 4.4 million adults abuse opioid painkillers.
- ☐ 83% of patients entering MMT also abuse Rx opioids.



Graphic retouched from *Time* magazine; May 5, 1997

Ex. 42 at 4.

Mallinckrodt's interest in the opioid epidemic – or "the Great Brain Robbery," as it called the problem in this presentation – is two-fold.  Mallinckrodt sold opioids. It also sold methadone used to treat the increasing number of persons addicted to prescription opioids. *Id.* at 1, 29. As Mallinckrodt explains, opioid abuse or addiction is "a disease" marked by "use despite harm" and "chronic, relapsing loss of control." Id at 10-14, 30. For persons addicted to opioids, the "drugs can take on survival value that overrides all other, more basic, needs." *Id.* at p. 7.  "Intellect is intact, but volition – the ability to consciously control drug use – is deranged." *Id.* p.20.

*Defendant Purdue*: "Purdue acknowledges that there is an opioid crisis," and is "aware that prescription opiates contribute to opiate addiction." Ex. 96, Deposition of Richard Fanelli (12/7/2018 fact) at p 485-87. A Purdue owner, Kathe Sackler, admitted that the prescription opioid

epidemic is tied to "too much product being out there beyond the needs of patients" and also "the lack of access to treatment." Ex. 97, Deposition of Kathe Sackler at 230-31. Purdue's corporate designee admitted that "the opiate addiction and abuse crisis is serious and a tragedy." Ex. 96, Fanelli (12/7/2018 fact) Dep., at 485-488. Purdue has recently taken out newspaper advertisements stating that it is "acutely aware of the public health risks opioid analgesics can create, even when taken as prescribed," and claims to be "deeply concerned about the toll the opioid crisis is having on individuals and communities across the nation…." Ex. 48.

*Defendant Teva*: Teva admits that the "prevalence of prescription opioid abuse and misuse has increased in the past decade and poses a serious public health issue," and that this poses a "significant challenge to public health." Ex 49 at 4. Teva calls the statistics on prescription opioid abuse, addiction and death "staggering." *Id.* But like others, Teva hoped to capitalize on this serious public health issue by stressing so-called "abuse deterrent" properties to market its new extended release opioid, called Vantrela™ ER. *Id.* at 3-4. Teva's strategic plan stated that "opioid treatment often leads to abuse and/or misuse," and that this "presents a significant opportunity for the Teva pain franchise…."[43] *Id.* at p. 13. To that end, Teva's marketing presentation for Vantrela™ ER recites key facts about opioid addiction and abuse, stating how "Opioids have a high rate of abuse and generate enormous costs," because (i) "Almost 12% of opioid patients become addicted," (ii) "Opioids are responsible for approximately 2/3 of drug overdose deaths," and (iii) "Abuse leads to billions of dollars in healthcare and indirect costs." Ex 50 at p. 13. Teva also presented statistics to show how "the misuse, abuse, and diversion of opioids is a major public health concern" and "poses a substantial economic burden," totaling $61.5 billion in "societal costs." Ex 50 at p. 5 & p. 8.

*Defendant Endo*: Endo admits that there is an opioid abuse epidemic and that it is "getting worse." Ex. 103, Deposition of Stephens Macrides at p. 56-57; *See also* Ex. 99, Deposition of Lisa

---

[43] Teva asserted that its abuse deterrent formulation potentially prevented "dose dumping," which is a patient inadvertently causing the rapid release of the full opioid dose of an extended-release opioid by drinking alcohol while taking the drug. Ex. 43 at p.3. Teva saw this as a marketing and sales opportunity since "data that suggest upwards of 25% of all chronic pain patients may have alcohol abuse issues." *Id.* at p.15. In other words, Teva saw no problem in marketing highly addictive opioids to people with known substance abuse problems.

Walker at p.276. Endo's current CEO admitted that there is an "opioid abuse epidemic" with "too much addiction" in the country that has impacted families and communities, and that it is a "terrible situation" about which he personally feels "terrible." Ex. 100, Deposition of Paul Campanelli at p. 66, 346, 121-126. Yet, in 2004, Endo implemented a public relations program to "neutralize" negative stories about opioid abuse even if the stories were about competitor's opioid products. Ex. 101, Deposition of George Stevenson at 328-330. Endo's CEO also acknowledged that the Endo was aware that its opioid products could cause overdose. Ex. 100, Campanelli Dep., at p. 117-18. That is unsurprising since Endo also knew that its opioid, Opana, was being sold as a street drug, had a street value and street name ("stop signs"), and was involved in case after case of misuse. Ex. 102, Deposition of Brian Lortie at p. 532-36; 544-550; 667-78.

* * *

No reasonable finder of fact could conclude that the opioid epidemic does not constitute a public nuisance in Summit and Cuyahoga Counties. The Court should grant partial summary judgment in Plaintiffs' favor on this question and narrow the issues for trial to focus on whether Defendants' conduct renders them liable for abatement of the nuisance to prevent the further loss of life and widespread and grievous harm to these two Counties and their residents.

**II.     Any Defendant whose conduct is found to be a substantial factor in producing the public nuisance will be jointly and severally liable for abating the nuisance.**

**A.     Ohio common law provides for joint and several liability for abatement of a public nuisance**

The long-standing rule is when two or more actors cause a public nuisance, whether through concerted action or independent acts, the actors are jointly and severally liable for abating that nuisance. "The authorities are, generally, that persons contributing to the creation of a nuisance, though acting independently, are jointly liable in equity in a suit to abate the nuisance . . . ." *City of Columbus v. Rohr*, 1907 WL 572, *2 (Oct. 10, 1907).[44] *See also State ex rel. Montgomery v. Portage Landfill*

---

[44] The court in *Rohr* further stated that independent tortfeasors were not jointly and severally liable in an action at law for damages, but the Ohio Supreme Court long ago recognized that *Rohr*'s

*& Dev. Co.,* 11th Dist. Portage No. 98-P-0033, 1999 WL 454623 (upholding joint and several liability in equitable action for abatement); *People v. ConAgra Grocery Prods. Co.,* 227 Cal. Rptr. 3d 499, 549 (Ca. App. 2017) ("Defendants may be held liable for a public nuisance that they assisted in creating if their wrongful promotions were a substantial factor in the creation of that public nuisance."). *C.f.,* *Schindler v. Std. Oil Co.,* 143 N.E.2d 133, 134 (Ohio 1957) (multiple parties whose actions combine to create a nuisance can be held jointly and severally liable for the damage caused); *Bowling v. Heil Co.,* 511 N.E.2d 373, 380–81 (Ohio 1987) ("'The general rule undoubtedly is, that where damage is caused by the joint or concurrent wrongful acts of two or more persons, they may be prosecuted therefor jointly or severally.'") (quoting *Transfer Co. v. Kelly,* 36 Ohio St. 86, 90 (1880).

Plaintiffs contend that Defendants' actions created or maintained the opioid epidemic, a systemic public health crisis and, thus, a public nuisance in Cuyahoga and Summit Counties. Accordingly, the Court should hold that any Defendant whose conduct is found to be a substantial factor in producing or maintaining the public nuisance will be jointly and severally liable for abating the nuisance. *See e.g.,* *ConAgra,* 227 Cal. Rptr. 3d at 549 (affirming judgment holding led paint manufacturers jointly and severally liable for abatement of the public nuisance), *review denied by,* 2018 Cal. LEXIS 1277 (Cal., Feb. 14, 2018), and *cert denied by* 139 S.Ct. 377 (U.S., Oct. 15, 2018).

The affirmative defense, which all Defendants have raised, based on Ohio's Apportionment Statute, R.C. § 2307.22, does not change the analysis. As discussed below, that is because the statute, by its terms, does not encompass equitable claims to abate a public nuisance.

### B.  Ohio's Apportionment Statute is inapplicable to equitable claims to abate a public nuisance and thus does not limit joint and several liability.

The aim of an abatement remedy is to reduce or eliminate the nuisance prospectively.

Damages compensate a plaintiff for prior harm. *See San Diego Unified Port Dist. v. Monsanto Co.,* No.

---

statement was never really an established rule of Ohio common-law. *See Schindler v. Std. Oil Co.,* 166 Ohio St. 391, 394, 143 N.E.2d 133, 136 (1957) ("There was formerly a theory of law that there could be no joint recovery in tort against persons, in the absence of a common duty, common design, or concerted action by them in reference to the injury they caused. However, that theory, if it ever did obtain in Ohio, has long since been abandoned.").

15cv578, 2018 U.S. Dist. LEXIS 149485, at *14 (S.D. Cal. Aug. 30, 2018) (recognizing "stark" distinction between abatement as equitable remedy for prospective relief while damages compensate for "'prior accrued harm'"). The distinction is important, because the Apportionment Statute only applies to "tort actions" and addresses only apportionment for payment of "compensatory damages that represent economic loss." *See* R.C. § 2307.22(a)(1)-(4). It does not address abatement of a public nuisance. The relevant provisions state:

> In a tort action . . . in which the trier of fact determines that more than fifty percent of the tortious conduct is attributable to one defendant, that defendant shall be jointly and severally liable in tort for all compensatory damages that represent economic loss.

R.C. § 2307.22(a)(1); and that:

> If division (A)(1) of this section is applicable, each defendant . . . to whom fifty percent or less of the tortious conduct is attributable shall be liable to the plaintiff only for that defendant's proportionate share of the compensatory damages that represent economic loss.

R.C. § 2307.22(a)(2). Importantly, the statute expressly states that its provisions "do not affect joint and several liability that is not based in tort." R.C. § 2307.24(A).

This equitable action for abatement of a public nuisance is not a tort action and the abatement remedy Plaintiffs seek is not a form of compensatory damages. *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368, 1371 (Ohio 1995) (holding abatement remedy is equitable as it was "'unknown to an action at common law'") (quoted case omitted).[45] For example, Plaintiffs' abatement plan focuses on prospective measures to abate the nuisance, such as prevention (e.g., education of the public and providers), treatment (e.g., for addiction, including for vulnerable populations, such as pregnant women), and harm reduction (e.g., narcan to reduce fatalities), as well as surveillance and enforcement. *See generally* Ex. 106, Caleb Alexander report at 13-58; Ex. 107, Jeffrey Liebman report at ¶ 3 (summarizing plan). It does not seek compensatory damages for past

---

[45] Although Plaintiffs have designated an expert who has quantified their past damages, the pleadings in this case are clear that Plaintiffs do not seek damages, past or otherwise, with respect to the *public nuisance* claims. The apportionment statute, therefore, is inapplicable to Plaintiffs' *public nuisance* claims for abatement, the only claims at issue on this motion.

economic loss. Yet the statute's plain language addresses only apportionment with respect to compensatory tort damages that represent economic loss. It addresses no other forms of relief. For this reason, the statute does not abrogate established Ohio rules on joint and several liability for an equitable abatement remedy. To conclude otherwise would disregard the plain language of the statute stating that its provisions "do not affect joint and several liability that is not based in tort." Ohio Rev. Code § 2307.24(A). *See also Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160, 164 (Ohio 2002) ("'[T]here is no repeal of the common law by mere implication,'" and "'in the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force.'") (quoted case omitted).

Jurisprudence from other jurisdictions with similar statutes clearly differentiates between compensatory damages and nuisance abatement, holding that state statutes limiting the availability of the former (like Ohio's Apportionment Statute) have no impact whatsoever on the availability of the latter remedy.  *See, e.g.*, *Cobbley v. City of Challis*, 59 P.3d 959, 963 (Idaho 2002) ("Had the court allowed the Cobbleys to amend their complaint, they could have specifically alleged a claim for abatement of a nuisance, which would not be an action to recover damages and subject to the constraints of the notice requirements under the [Idaho] Tort Claims Act.");  *Peterson v. Putnam County*, 2006 Tenn. App. LEXIS 677, at *32-33 (Tenn. Ct. App. Oct. 19, 2006) ("In Tennessee, a nuisance-type claim that seeks *damages* against a governmental entity must be brought under the terms of the [Governmental Tort Liability Act].  .  .  .  Our courts have held, however, that an *equitable action to abate* a nuisance created by a governmental entity is permitted outside of [the] terms of the GTLA.") (emphasis in original); *Bostco LLC v. Milwaukee Metro. Sewerage Dist.*, 835 N.W.2d 160, 178 (Wis. 2013) ("Accordingly, we conclude that the plain meaning of Wis. Stat. § 890.80(3) is to limit the dollar amount of recovery to be paid for damages. . .  but that the plain meaning of that provision has no bearing on the availability of equitable relief such as abatement.").

Thus, the Court should find as a matter of law that the Ohio Apportionment Statute's limitations on joint and several liability against "compensatory damages that represent economic loss" do not apply to Plaintiffs' claims for abatement of a public nuisance and that all Defendants

who are found to have been substantial factors in creating the nuisance will be jointly and severally liable for its abatement.[46]

## CONCLUSION

As this Court stated earlier, it "is accurate to describe the opioid epidemic as a man-made plague, twenty years in the making. The pain, death, and heartache it has wrought cannot be overstated. . . . [I]t is hard to find anyone in Ohio who does not have a family member, a friend, a parent of a friend, or a child of a friend who has not been affected." Doc #: 1203, at 38. The evidence bears out that observation. For the foregoing reasons, Plaintiffs Cuyahoga and Summit Counties hereby request that the Court grant their motion for partial summary adjudication with regard to their public nuisance claims and determine that this man-made plague:

1) Constitutes a public nuisance in both Cuyahoga and Summit Counties because it significantly interferes with the public health in those communities;

2) Under Ohio common law, any Defendant found to have been a substantial factor in the creation or maintenance of the public nuisance shall be jointly and severally liable; and

3) Defendants' affirmative defense based on Ohio's Apportionment Statute, R.C. §§

---

[46] Even if the Ohio Apportionment Statute were applicable to Plaintiffs' public nuisance claims, it would not preclude holding all responsible Defendants jointly and severally liable for the costs of abatement. The Ohio Apportionment Statute expressly *does not limit* joint and several liability among intentional tortfeasors. *See* R.C. § 2307.22(A)(3). The Statute thus *requires* joint and several liability for defendants found to have committed intentional torts. *See, e.g.*, *Trogdon v. Beltran*, 69 N.E.3d 1047, 1059 (Ohio Ct. App. 2016) ("'However, in a tort action where the tortfeasors have engaged in an intentional tort, joint and several liability applies regardless of the percentage of any tortfeasor's liability.'") (quoting *Gurry v. C.P.*, 972 N.E.2d 154, 156 (Ohio Ct. App. 2012)).

2307.22-2307.31, is inapplicable to Plaintiffs' claim for abatement of a public nuisance and should be stricken.

Dated: June 28, 2019                    Respectfully submitted,

/s/ *Paul J. Hanly, Jr.*
Paul J. Hanly, Jr.
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
phanly@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
 Pweinberger@spanglaw.com

*plaintiffs' Liaison Counsel*

Hunter J. Shkolnik
NAPOLI SHKOLNIK
360 Lexington Ave., 11th Floor
New York, NY  10017
(212) 397-1000
(646) 843-7603 (Fax)
hunter@napolilaw.com

*Counsel for Plaintiff Cuyahoga County, Ohio*

Linda Singer
MOTLEY RICE LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
(202) 386-9626 x5626
(202) 386-9622 (Fax)
lsinger@motleyrice.com

*Counsel for Plaintiff Summit County, Ohio*