# EXHIBIT 8

Highly Confidential - Subject to Further Confidentiality Review

```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                     -   -   -
 5    IN RE:  NATIONAL      :  MDL NO. 2804
      PRESCRIPTION OPIATE :
 6    LITIGATION           :
      ----------------------------------------------
 7                         :   CASE NO.
      THIS DOCUMENT        :   1:17-MD-2804
 8    RELATES TO ALL CASES:
                           :   Hon. Dan A.
 9                         :   Polster
10                     -   -   -
              Friday November 16, 2018
11                     -   -   -
12    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
              CONFIDENTIALITY REVIEW
13

                       -   -   -
14

                  Videotaped deposition of
15    JOHN HASSLER, taken pursuant to notice,
      was held at Golkow Litigation Services,
16    One Liberty Place, 1650 Market Street,
      Suite 5150, Philadelphia, Pennsylvania
17    19103, beginning at 10:43 a.m., on the
      above date, before Amanda Dee
18    Maslynsky-Miller, a Certified Realtime
      Reporter.
19

20                     -   -   -

21

22         GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23             deps@golkow.com

24
```

Highly Confidential - Subject to Further Confidentiality Review

1                    MS. HILLYER:  Objection to

2          form.  Assumes facts not in

3          evidence.

4     BY MR. CRAWFORD:

5          Q.    Who markets Fentora?

6          A.    They are not -- they're not

7     promoted any longer.

8          Q.    Fentora is no longer

9     promoted?

10         A.    No.

11         Q.    So -- but it's sold and

12    manufactured and distributed, Fentora,

13    correct?

14         A.    Yes.  It's manufactured by

15    Cephalon and sold and distributed by Teva

16    USA.

17         Q.    And did Teva USA, at any

18    time, manufacture Fentora?

19                I'm sorry, did they, at any

20    time, market or promote Fentora?

21         A.    After the acquisition of

22    Cephalon, Teva CNS had a pain care group.

23    Fentora was part of that pain care group,

24    and it did promote Fentora as part of

Highly Confidential - Subject to Further Confidentiality Review

1    their sales effort.

2         Q.    Is Teva CNS a separate Teva

3    company --

4         A.    No.

5         Q.    -- from Teva USA?

6         A.    Not that I'm aware of.  It's

7    a managerial structure.

8         Q.    A division within Teva USA?

9         A.    I'm not sure of how the

10   employees relate to the specific legal

11   entity structure.

12              The operation of the

13   business was to have all of the CNS

14   products, which included a pain

15   portfolio, under a CNS business unit.

16              But they may have had

17   employees that would have actually been

18   employed by different legal entities.

19   I'm not sure.

20        Q.    Okay.  I think that's one of

21   the other topics.  We'll get into that.

22              So when did -- whatever Teva

23   entity was marketing and promoting

24   Fentora, when did they stop doing that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    The end of 2015.

 2            Q.    And is there a reason why

 3    they stopped?

 4            A.    We had other products that

 5    we were preparing to launch and needed to

 6    apply our sales resources there.

 7            Q.    And what were those

 8    products?

 9            A.    Just after that, Ajovy --

10    I'm sorry, Austedo, which is a product

11    for Huntington's disease and tardive

12    dyskinesia, those products were coming to

13    market.

14                  I'm trying to remember,

15    around that same time period we also had

16    a product called Zecuity, but that may

17    have been pulled off the market by that

18    point.  I don't remember the specific

19    dates.

20            Q.    Does any -- does Teva USA --

21    and when I say "Teva USA," I mean Teva

22    Pharmaceuticals USA, Inc.; is that how

23    you understand it?

24            A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Does Teva USA or any

2    Teva/Cephalon/Actavis entity owned under

3    the Teva Limited umbrella, manufacture,

4    market, sell, or promote any other opioid

5    product besides -- branded opioid product

6    besides Actiq or Fentora?

7               MS. HILLYER:  Objection to

8          form.

9               But you can answer.

10              THE WITNESS:  I'm trying to

11         remember all of the --

12   BY MR. CRAWFORD:

13         Q.    Right.  Does any Teva entity

14   that you're testifying for, or anyone

15   that you know of under the Teva umbrella,

16   manufacture, market, sell, or distribute

17   any branded opioid product besides Actiq

18   or Fentora?

19         A.    Teva manufacturers a branded

20   product for Allergan.

21         Q.    Is that Kadian?

22         A.    Yes.

23         Q.    Are there any other opioid

24   products that they manufacture or sell?

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     So what did you do?

2          A.     I spoke with Paula Williams

3     and Matt Day, Dolly Judge, to try to

4     assess whether Teva had relationships

5     with these organizations.  I had reviewed

6     some of the grants that were made to

7     these organizations to understand the

8     structure, as well as reviewed policies

9     on the grant process at different points

10    in time.

11                  I had also reviewed policies

12    related to Watson, and I believe -- I

13    believe Actavis, but Watson certainly, on

14    interaction with customers.

15                  Let me just double check

16    that.  I think that was the policy that I

17    had looked at.  But I had reviewed a

18    number of documents to understand how

19    that process would work to provide grants

20    of support to these organizations.

21          Q.     And the people you mentioned

22    are the people you thought or were told

23    by counsel were people that might be most

24    knowledgeable about these topics?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MS. HILLYER:  Objection to

 2        form.

 3                THE WITNESS:  Discussion

 4        with counsel, as well as having

 5        been the general manager, I had

 6        worked with Matt and knew Matt had

 7        experience in this area.

 8                I was also familiar with

 9        Paula and knew that she had worked

10        in this space.  So it was -- I

11        followed up with her as well.

12   BY MR. CARTMELL:

13        Q.    And let's talk first about

14   payments to these societies that are

15   listed on your Exhibit-1 and foundations

16   and medical boards and all these

17   organizations.

18                Why is it that Cephalon, for

19   instance, during the time it was selling

20   Actiq and then Fentora from 2000 to 2009,

21   why is it that Cephalon was making

22   payments to these organizations?

23        A.    The organizations would

24   request grants to support educational
```

1    initiatives.  And where those objectives

2    for those educational initiatives aligned

3    with Cephalon's educational objectives,

4    they would issue grants in support of

5    those proposals.

6              Educational grants had to be

7    independent of company influence over the

8    content, and there were letters of

9    agreement signed for those grants that

10   were issued that would specify that.

11        Q.    Now, these -- for example,

12   let's talk about Cephalon first, these

13   payments to these organizations, the

14   request for those payments to be made to

15   these organizations, were those requests

16   made to the marketing department at

17   Cephalon?

18        A.    Early on they could come

19   through marketing, and then would be

20   transferred to medical.  Over time,

21   marketing was excluded from that and they

22   had to be made online for the request to

23   come directly in to medical.

24        Q.    When was that, that

Highly Confidential - Subject to Further Confidentiality Review

1    marketing was excluded, do you know?  Was

2    that after the 2008 corporate integrity

3    agreement?

4           A.    I don't know the specific

5    date of that.  If you have the

6    independent grant policy, I know it's

7    listed in there.  I just don't know the

8    date of that policy.

9           Q.    But payments to these

10   organizations were not made just for

11   educational purposes, correct?

12          A.    That's correct.  There were

13   also payments that were sponsorships.

14   And corporate memberships were also made

15   to some of these organizations.

16          Q.    Right.  For instance, these

17   organizations, like the American Academy

18   of Pain Medicine or the American Pain

19   Society, some of those types of

20   organizations allow pharmaceutical

21   companies like Cephalon or Teva to

22   actually become members of the society or

23   the organization, correct?

24          A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     And they may charge the

2     pharmaceutical company like Cephalon or

3     Teva a fee to be a member, correct?

4          A.     Yes.

5          Q.     And so I think when you

6     said -- what did you say, you called

7     those corporate membership payments?

8          A.     Corporate sponsorships or

9     corporate memberships.

10          Q.     So, in fact, I take it you

11     know that at Cephalon, and also at Teva,

12     those pharmaceutical companies, as well

13     as lots of other pharmaceutical companies

14     who sell opioids, have become, in the

15     past, members or corporate sponsors of

16     these companies, correct?

17          A.     Yes.

18          Q.     Or these organizations,

19     correct?

20          A.     Yes.

21          Q.     And that's thought to be --

22     within the companies, typically, that is

23     a sort of marketing-type of activity or

24     promotion-type activity, or it can be,

1   correct?

2                   MS. HILLYER:  Objection to

3           form.

4                   THE WITNESS:  Marketing can

5           issue sponsorships or can issue

6           membership payments, but they have

7           to be approved via our compliance

8           process.

9   BY MR. CARTMELL:

10          Q.    Right.  But do they come out

11  of the marketing budget?

12          A.    They can.

13          Q.    And also Cephalon and other

14  companies can pay, in these grants that

15  they pay these organizations and

16  societies for, publications or to help

17  with publications, for example, that

18  support the use of opioids, correct?

19                  MS. HILLYER:  Objection to

20          form.

21                  THE WITNESS:  The payments

22          that we make to these

23          organizations, or the grants that

24          are given, would be given for a

```
 1              specific educational objective.

 2                     But we wouldn't control any

 3         of the content of those materials

 4         that are associated with that

 5         grant.

 6                     MR. CARTMELL:  I'm going to

 7         object and move to strike that, I

 8         don't think that answered my

 9         question.

10    BY MR. CARTMELL:

11         Q.      My question is a little

12    different.  I'm not asking who controls

13    the content.

14                     Cephalon and Teva and other

15    opioid selling pharmaceutical companies

16    have provided, I take it you know from

17    your experience, grants to these types of

18    organizations, pain organizations, that

19    the money can be used for publication of

20    papers or pamphlets, those types of

21    things, that support the use of opioids,

22    correct?

23                     MS. HILLYER:  Objection to

24         form.  And asked and answered.
```

Highly Confidential - Subject to Further Confidentiality Review

1                   You can answer it again.

2                   THE WITNESS:  They may.  But

3           they may not as well.  They

4           typically are publications in

5           support of pain management, which

6           may include components of opioid

7           use.

8    BY MR. CARTMELL:

9           Q.    And lots of these

10   organizations, like The American Academy

11   of Pain Medicine and American Pain

12   Society, the American Pain Foundation,

13   organizations like that will have annual

14   meetings, things like that?

15          A.    Yes.

16                MS. HILLYER:  Objection.

17          Beyond the scope.

18   BY MR. CARTMELL:

19          Q.    And sometimes you know that

20   Cephalon and Teva, and other

21   pharmaceutical companies that sell

22   opioids, will make payments to those

23   organizations to help sponsor their

24   annual meetings that doctors come to,