# EXHIBIT 11

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804<br>Case No. 17-md-2804 |
| This document relates to: | Hon. Dan Aaron Polster |
| *The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.* Case No. 18-op-45090 | |
| *The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al* <br> Case No. 17-op-45004 | |

**EXPERT REPORT OF PROFESSOR EDWARD MICHNA, J.D., M.D.**
**MAY 10, 2019**

understanding before prescriptions of those medicines can be written; and (e) to evaluate the assumption that all marketing, including detailing, is false, including marketing materials attributable to the Teva Defendants.

### B. Qualifications

4. I am an Assistant Professor of Anesthesia at Harvard Medical School. I am also Staff Anesthesiologist at the Pain Management Center, Brigham and Women's Hospital and Clinical Staff, Anesthesia, at Dana-Faber Cancer Institute. I am currently the Director of Pain Trials Center, Department of Anesthesia, Brigham and Women's Hospital. From 2001-2010, I was the Director of Interventional Pain Management, Dana-Faber Cancer Institute.

5. Since 2009, I have been a part-time consultant of the Food and Drug Administration, Drug Advisory Committee on anesthesia and analgesia.

6. At Harvard Medical School, I teach pain management and anesthesia to fellows, residents, and medical students.

7. I obtained my M.D. from the UMDNJ–New Jersey Medical School in 1991. I also obtained a J.D. from Seton Hall Law School, New Jersey in 1985. I did a residency in anesthesia and a fellowship in pain, both at Brigham and Women's Hospital. Prior to becoming an assistant professor, I was a clinical fellow and a clinical instructor at Harvard Medical School.

8. I have published over 50 peer-reviewed academic articles over the course of my career to date. My articles have been published in the top journals in pain medicine: Radiology, Pain, Clinical Journal of Pain, Anesthesiology, and Pain Medicine, among others.

9. Over the years, my research has included overseeing FDA registration trials (phases 2 and 3) for pain medications and medications for symptom relief. Another major part of my clinical research has involved the development of opioid prescribing risk mitigation strategies, and assessing the clinical effects of those strategies.

10. I currently bill for my services at $800 per hour. My compensation for the work on this matter is not contingent upon the outcome of this litigation or on the content of the opinions that I offer in this case. Appendix A provides my Curriculum Vitae, which includes a list of my expert testimony within the past four years.

### C. Facts and Data Considered

11. The opinions and analysis presented in this report are based on currently available information, and I reserve the right to supplement or amend this report if I receive additional information that warrants such a supplement or amendment. A list of the materials I have considered in forming my opinion is attached as Appendix B.

## II. OVERVIEW OF TEVA DEFENDANTS' TIRF PRODUCTS AND RELATED PLAINTIFFS' ALLEGATIONS

12. Actiq is an oral transmucosal buccal fentanyl lozenge that was approved by the FDA in November 1998 for the "management of breakthrough pain in cancer patients 16 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain."[2] Actiq was initially developed by Anesta Corporation and marketed by Abbott Laboratories.[3] Cephalon purchased Anesta

---

[2] "Actiq Label, November 1998," 1998, available at https://www.accessdata.fda.gov/drugsatfda_docs/label/1998/20747lbl.pdf.

[3] "Actiq Label, November 1998," p. 30.

3

## B.  Off-label Prescribing Can Represent the Appropriate Standard of Care

34. The FDA has long acknowledged that "accepted medical practice often includes drug use that is not reflected in approved drug labeling."[24] This is because off-label use provides important opportunities for patients to receive care based on the most up-to-date medical and scientific data, which may not be reflected in the FDA-approved labeling. Moreover, off-label usage allows doctors to tailor their patients' treatment plans based on each patient's unique medical needs and preferences.[25] Indeed, off-label uses or treatment regimens may constitute "a medically recognized standard of care."[26]

35. The Centers for Medicare and Medicaid Services (CMS) describes off-label prescribing as "a fundamental component of patient care" that "allows and encourages innovation, [and] enables discovery of benefits not otherwise known."[27] Off-label prescribing is also fundamental to medical care for patient populations not typically included in clinical studies, such as pediatric or geriatric patients.[28]

36. Because off-label uses may constitute the appropriate standard of care, the FDA has expressly recognized the need for physicians and other healthcare professionals to receive

---

[24] FDA, "Use of Approved Drugs for Unlabeled Indications," *FDA Drug Bulletin* Vol. 12, No. 1 (April, 1982).

[25] E.g., Scott Gottlieb, M.D., *Remarks by Dr. Gottlieb at the FDA Online Opioid Summit*, June 27, 2018, https://www.fda.gov/NewsEvents/Speeches/ucm611945.htm ; 63 Fed. Reg. 31,143, 31,153 (June 8, 1998); FDA, "Use of Approved Drugs for Unlabeled Indications," *FDA Drug Bulletin* Vol. 12, No. 1 (April, 1982).

[26] FDA, "Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices," January 13, 2009, available at http://www.fda.gov/oc/op/goodreprint.html, accessed February 14, 2019; 63 Fed. Reg. 31,143, 31,153 (June 8, 1998); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 351 n.5 (2001); *Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 56 (D.D.C. 1998).

[27] CMS, *Pharmacy Self-Auditing*, December 2015, p. 4.

[28] CMS, *Pharmacy Self-Auditing*, December 2015, p. 4 ("Off-label prescribing allows and encourages innovation, enables discovery of benefits not otherwise known, and is a tenet of care for patient populations not routinely included in clinical studies (for example: pediatric and geriatric populations).").

11

scientific information and data regarding off-label uses.[29] This policy is rooted in the agency's understanding that patient care may be optimized and public health may benefit by increased sharing of high-quality scientific information and data with healthcare providers.

### C.  Opioids May Be Effective In Treating Non-Cancer Pain.

37.  Chronic pain is a serious and debilitating health condition that is estimated to affect at least 50 million people, with significant costs to the economy.[30] The FDA has approved certain opioids for the treatment of chronic non-cancer pain. In my experience, opioids can effectively treat chronic non-cancer pain in appropriate patients.

38.  As Schedule II controlled substances, opioid medicines must be prescribed for a legitimate medical purpose—for conditions known to be responsive to the therapy.[31] The decision to prescribe depends on the clinical needs of the patient, and whether the potential benefits outweigh any potential risks for that patient. Patients then need to be monitored for efficacy, side effects, and for any misuse or use for nonmedical purposes.

---

[29] *See, e.g.*, 63 Fed. Reg. 64,556, 64,579 (Nov. 20, 1998) (recognizing the "public health gains associated with the earlier dissemination of objective, balanced, and accurate information" about off-label uses); FDA, "Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices" ("FDA does recognize … the important public health and policy justification supporting dissemination of truthful and non-misleading medical journal articles and medical or scientific reference publications on unapproved uses of approved drugs… [T]he public health may be advanced by healthcare professionals' receipt of medical journal articles and medical or scientific reference publications on unapproved new uses of approved or cleared medical products that are truthful and not misleading.").

[30] Dahlhamer J, et al., "Prevalence of Chronic Pain and High-Impact Chronic Pain Among Adults — United States," 2016. Morbidity and Mortality Weekly Report (2018), 67:1001–1006, https://www.cdc.gov/mmwr/volumes/67/wr/mm6736a2.htm, accessed May 9, 2019.

[31] U.S. Drug Enforcement Administration, "Practitioner's Manual - Section V - Valid Prescription Requirements," available at https://www.deadiversion.usdoj.gov/pubs/manuals/pract/section5.htm, accessed April 24, 2019 ("To be valid, a prescription for a controlled substance must be issued for a legitimate medical purpose by a practitioner acting in the usual course of professional practice.").

12

66. The SECURE program also sought to minimize misuse, abuse and diversion of the medicine through ensuring the integrity of the supply chain, creating tools to "educate broadly," and promptly detecting diversion or abuse.[90] First, all parties handling or prescribing Fentora needed to be compliant with existing distribution controls and recordkeeping requirements for Schedule II medicines set by the DEA.[91] For example, Fentora prescriptions could not be refilled and a physician visit was required to receive a new supply of the medicine.[92]

67. To minimize the risks of unintended exposure, Fentora was distributed with the "most stringent of child-resistant packaging requirements," included reminder messages on the packaging, and required direct counseling of Fentora patients advising them of the risk posed to children.[93] Fentora packaging and informational materials included instructions on proper disposal of the medication.[94]

### 3. TIRF REMS Program

68. Since March 2012, Actiq and Fentora have been subject to the TIRF REMS Program, which delineates the procedures that prescribers, patients, and suppliers must follow to handle or access TIRF products. The goals of the TIRF REMS Access program are to "mitigate the risk of misuse, abuse, addiction, overdose, and serious complications due to

---

[90] TEVA_MDL_A_00265075-425, at 00265082.

[91] TEVA_MDL_A_00265075-425, at 00265104.

[92] TEVA_MDL_A_00265075-425, at 00265093.

[93] TEVA_MDL_A_00265075-425, at 00265084.

[94] TEVA_MDL_A_00265075-425, at 00265215.

28

medication errors."[95] To ensure appropriate use of TIRF medications, the program delineates four goals: (1) "prescribing and dispensing TIRF medicines only to appropriate patients, which includes use only in opioid-tolerant patients;"[96] (2) "preventing inappropriate conversion between TIRF medicines;"[97] (3) "preventing accidental exposure to children and others for whom it was not prescribed;"[98] and (4) "educating prescribers, pharmacists, and patients on the potential for misuse, abuse, addiction, and overdose of TIRF medicines."[99]

69. The development and implementation of the TIRF REMS program incorporated many of the principles and objectives of the Actiq RMP and Fentora RiskMAP.[100] Healthcare providers prescribing TIRF medicines in an outpatient setting are required to review the prescriber educational materials and enroll in the TIRF REMS access program by completing and signing a Prescriber Enrollment Form, thus committing to comply with the program requirements.[101] Furthermore, physicians must meet with each patient to whom they will prescribe a TIRF product and review the benefits and risks as well as how to safely store and dispose of their medication. Before a TIRF product can be

---

[95] "Actiq TIRF REMS Documentation," TEVA_MDL_A_00709777-10056 at 00709810; "Fentora TIRF REMS Documentation," TEVA_MDL_A_00710057-205 at 00710077.

[96] TEVA_MDL_A_00709777-10056 at 00709810; TEVA_MDL_A_00710057-205 at 00710077.

[97] TEVA_MDL_A_00709777-10056 at 00709810; TEVA_MDL_A_00710057-205 at 00710077.

[98] TEVA_MDL_A_00709777-10056 at 00709810; TEVA_MDL_A_00710057-205 at 00710077.

[99] TEVA_MDL_A_00709777-10056 at 00709810; TEVA_MDL_A_00710057-205 at 00710077.

[100] FDA, "Standardizing and Evaluating Risk Evaluation and Mitigation Strategies."

[101] TIRF REMS Access, "Prescriber Enrollment Form," available at https://www.tirfremsaccess.com/TirfUI/rems/pdf/prescriber-enrollment-form.pdf; TEVA_MDL_A_00709777-10056 at 00709810; TIRF REMS Access, Frequently Asked Questions.

29

dispensed, every patient and prescriber must sign a Patient-Prescriber Agreement Form attesting that they reviewed this information.[102]

70. Enrollment is also required for all participants in the TIRF distribution chain, including wholesalers and distributors.[103] These parties are required to train relevant staff on the procedures and requirements of the TIRF REMS program and to distribute TIRF medicines only to enrolled pharmacies.[104] The TIRF REMS program also mandates that wholesalers and distributors provide complete data on inventory of TIRF medicines and shipments to enrolled pharmacies.[105] The wholesaler or distributor must agree to comply with periodic audits to ensure program compliance.[106]

71. Pharmacies must be enrolled in the TIRF REMS program to be eligible to receive shipments of TIRF products.[107] Both inpatient and outpatient pharmacies are required to enroll and train their staff in the proper usage and handling of TIRF medicines. Pharmacies are prohibited from lending, selling or transferring TIRF medications to any

---

[102] TIRF REMS Access, Frequently Asked Questions.

[103] TIRF REMS Access, Frequently Asked Questions, p. 12 ("Does a distributor have to enroll in the TIRF REMS Access program? Yes, distributors will need to enroll in the TIRF REMS Access program in order to be able to purchase and distribute TIRF medicines.").

[104] TEVA_MDL_A_00709777-10056 at 00709820 ("The Wholesaler/Distributor will ensure that relevant staff are trained on the TIRF REMS Access program procedures and will follow the requirements of the TIRF REMS Access program").

[105] TEVA_MDL_A_00709777-10056 at 00709820 ("The Wholesaler/Distributor will provide complete, unblinded and unblocked data (i.e. EDI 867 transmission) to the TIRF REMS Access program including information on shipments to enrolled pharmacies").

[106] TEVA_MDL_A_00709777-10056 at 00709820 ("The Wholesaler/Distributor will cooperate with periodic audits or non-compliance investigations to ensure that TIRF medicines are distributed in accordance with the program requirements").

[107] TIRF REMS Access, Frequently Asked Questions, p. 6 ("There are 3 types of outpatient pharmacies. They are all required to be enrolled in the TIRF REMS Access program, complete the TIRF REMS Education Program, and verify patient and prescriber enrollment when processing prescriptions.").

30

other pharmacy, institution, distributor or supplier.[108] Furthermore, all registered pharmacies must obtain TIRF medicines only from wholesalers and distributors enrolled in the TIRF REMS Access program.[109]

72. The maker of the TIRF medicine, or "TIRF Sponsor," is responsible for monitoring and ensuring compliance with the TIRF REMS Access program throughout the entire supply chain, from distribution through to the patient.[110] The TIRF Sponsor maintains a database of all enrolled parties. Given that all TIRF REMS participants—including patients, prescribers, distributors/wholesalers, and pharmacies—must re-enroll every two years, the TIRF Sponsor tracks the status of each party as either active or inactive.[111] The TIRF Sponsor uses these data in conjunction with distribution and prescription data to ensure that only actively enrolled distributors supply actively enrolled pharmacies, only actively enrolled healthcare providers prescribe TIRF medicines in an outpatient setting, and only actively enrolled patients receive TIRF medicines for outpatient use from actively enrolled pharmacies.

73. Following approval of the TIRF REMS program, each TIRF Sponsor is required to submit REMS Assessments to the FDA at six and twelve months following approval, and each year thereafter.[112] These reports include outreach statistics, utilization statistics, program infrastructure metrics, and safety surveillance reports. REMS Assessments done at 12 and 24 months following the TIRF REMS Access program approval also include

---

[108] TEVA_MDL_A_00709777-10056 at 00709817.
[109] TEVA_MDL_A_00709777-10056 at 00709815–00709818; TIRF REMS Access, Frequently Asked Questions.
[110] TEVA_MDL_A_00709777-10056 at 00709819–00709820.
[111] TEVA_MDL_A_00709777-10056 at 00709820.
[112] TEVA_MDL_A_00709777-10056 at 00709821.

31

surveys of patients, healthcare providers, and pharmacies. For each reporting period, outreach statistics measure the number of educational letters sent to prescribers and pharmacists, as well as the number of returned mailings.[113] Utilization statistics provide per-period and cumulative counts of enrolled patients, prescribers, pharmacies and distributors, as well as prescriptions authorized and prescriptions denied.[114] Program infrastructure metrics provide indications of how well the system is functioning, including information such as the number of inadvertent enrollment deactivations.[115] Safety surveillance includes ongoing monitoring of the FDA's Adverse Event Reporting System and other external databases for TIRF-medicine-related death, overdose, misuse, abuse, addiction, inappropriate prescribing, medication errors, and accidental exposures/ingestion.[116]

74. TIRF Sponsors are required by law to process and report to the FDA any adverse events related to their products.[117] Periodic surveys assess knowledge, attitude and behavior of prescribers, pharmacists and patients enrolled in the program.[118] Since its inception, the TIRF REMS program has been updated several times in order to reflect the current best practices of prescription opioid control.[119]

---

[113] TEVA_MDL_A_00709777-10056 at 00709779.

[114] TEVA_MDL_A_00709777-10056 at 00709779–00709780.

[115] TEVA_MDL_A_00709777-10056 at 00709780.

[116] TEVA_MDL_A_00709777-10056 at 00709781.

[117] TEVA_MDL_A_00709777-10056 at 00709781.

[118] TEVA_MDL_A_00709777-10056 at 00709781.

[119] FDA, "FDA Approved Drug Products, Fentora," available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021947, accessed February 19, 2019.

### B. The TIRF REMS Program Ensures Prescribers Are Informed About the Risks, Indications, and Protocols for Safe Use of Actiq and Fentora

75. The TIRF REMS includes many measures intended to educate prescribers about the unique requirements for safe outpatient use of TIRF medications. These include prescriber enrollment, a knowledge assessment, a patient-prescriber agreement form, and direct outreach to licensed healthcare providers. These measures ensure that prescribers are aware of the risks, indications, and protocols for safe use of Actiq and Fentora. Notably, physicians prescribing Actiq or Fentora for inpatient use are not subject to the requirements of the TIRF REMS Access program.[120] In the inpatient setting, the best judgment of and consistent monitoring by the healthcare provider is sufficient to address the risks associated with TIRF medicines, but an authorized pharmacist must enroll the inpatient pharmacy itself in the TIRF REMS program, including reviewing the TIRF REMS ACCESS Education Program.[121]

76. Prescriber enrollment is required to ensure that prescribers understand the risks, indications, and safe use of TIRF medicines, and can demonstrate their understanding of how to mitigate the risks.[122] Each prescriber must review the Education Program, successfully complete the Knowledge Assessment, complete a Prescriber Enrollment form either online or via fax, and enter into a Patient-Prescriber Agreement.[123]

---

[120] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 2.

[121] TEVA_MDL_A_00709777-10056, at 00709816 ("Inpatient Pharmacies: The authorized pharmacist must complete the following requirements to successfully enroll their inpatient pharmacy: i. Review the TIRF REMS Access Education Program (TIRF REMS Access Education Program) and successfully complete the pharmacy Knowledge Assessment.").

[122] TEVA_MDL_A_00709777-10056 at 00709810–00709813; TEVA_MDL_A_00710057-205 at 00710077–00710080.

[123] TEVA_MDL_A_00709777-10056 at 00709810, 00709826–00709851; TEVA_MDL_A_00710057-205 at 00710077, 00710097–00710122.

33

77. The Education Program provides guidance on identifying appropriate patients, as well as dosing, conversion, contraindications, use, storage, and disposal of TIRF medicines.[124] The Education Program provides specific thresholds at which a patient is considered opioid tolerant.[125] Contraindications include use by opioid non-tolerant patients, management of acute or postoperative pain such as migraine or dental pain, and use by patients with a known intolerance or hypersensitivity to any component in the medication.[126] Notably, the Education Program's guidance on appropriate patient selection does not list treatment of non-cancer pain as a contraindication.

78. The Education Program informs prescribers on proper assessment of patient-specific risk factors. Prescribers are asked to consider the patient's past or current alcohol or drug abuse, history of psychiatric illness, and family history of drug and alcohol abuse.[127] The program advises that "[c]oncerns about abuse and addiction should not prevent the proper management of pain."[128] Even in patients without additional risk factors, prescribers are advised that "all patients treated with opioids require careful monitoring for signs of abuse and addiction."[129] To limit the possibility of abuse, the Education Program emphasizes "proper assessment of patients; safe prescribing practices; periodic re-evaluation of therapy; proper dispensing and storage; keeping detailed records of

---

[124] TIRF REMS Access, "Education Program for Prescribers and Pharmacists"; TEVA_MDL_A_00709777-10056 at 00709826–00709847; TEVA_MDL_A_00710057-205 at 00710097–00710118.

[125] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 3.

[126] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 3.

[127] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 4.

[128] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 4.

[129] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 4.

34

prescribing information … and informing patients/caregivers to protect against theft and misuse of TIRF medicines."[130]

79. The Knowledge Assessment tests the prescriber's understanding of information presented in the Education Program. Successful completion is required for prescribers, pharmacies, and distributors to enroll in the TIRF REMS Access program.[131]

80. By enrolling in the program, the prescriber attests to compliance with all program requirements. These include reviewing full prescribing information for each TIRF medicine and completing the knowledge assessment. The prescriber further attests to understanding of risks and benefits; understanding potential for abuse; understanding indications and contraindications; understanding dosing and conversion between TIRF medications; providing Medication Guide for particular TIRF medicine to patient and reviewing it with them; and agreeing to follow-up visits to assess appropriateness of dose and signs of misuse and abuse.[132] The enrolling prescriber must provide a state license number, DEA number, and National Provider Identifier (NPI). Enrollment is effective for two years, after which time the prescriber must re-enroll to continue prescribing TIRF medicines.[133]

---

[130] TIRF REMS Access, "Education Program for Prescribers and Pharmacists," p. 4.

[131] TIRF REMS Access, Knowledge Assessment; TEVA_MDL_A_00709777-10056 at 00709848–00709851; TEVA_MDL_A_00710057-205 at 00710119–00710122.

[132] TIRF REMS Access, "Prescriber Enrollment Form"; TEVA_MDL_A_00709777-10056 at 00709852–00709854; TEVA_MDL_A_00710057-205 at 00710123–00710126.

[133] TEVA_MDL_A_00709777-10056 at 00709813; TEVA_MDL_A_00710057-205 at 00710080.

81. The prescriber is also required to complete the Patient-Prescriber Agreement Form ("PPAF") along with the patient.[134] The prescriber is required to provide a copy to the patient, retain a copy, and submit a copy to the TIRF REMS Access program within 10 days.[135] By signing the form, the prescriber attests to understanding indications and contraindications of TIRF medicines including an understanding of the definition of an opioid-tolerant patient. The prescriber further attests to providing and reviewing the appropriate Medication Guide with the patient; providing and reviewing the appropriate Medication Guide with the patient if the patient is changed to a different TIRF medicine; understanding that changes to a different TIRF medicines require starting all patients at lowest dose. Lastly, the prescriber attests to having counseled the patient regarding risks, benefits, appropriate use, and safety concerns specific to TIRF medicines. Both the prescriber and the patient must sign the PPAF before the prescription may be given.

82. Prior to implementation of the Program, "Dear Healthcare Provider" letters were sent to appropriately licensed healthcare professionals who may prescribe TIRF medicines, educating them on the risks of TIRF medicines and explaining that they must enroll in the Program to prescribe TIRF medicines. Per the FDA-approved TIRF REMS, Teva was obligated to discuss Actiq and Fentora with "pain management specialists (comprised of anesthesiologists, physical medicine and rehabilitation physicians), primary care physicians, oncologists, oncology nurse practitioners who treat breakthrough pain in patients with cancer, and other appropriately licensed healthcare professionals who

---

[134] TIRF REMS Access, Patient-Prescriber Agreement Form; TEVA_MDL_A_00709777-10056 at 00709855–00709857; TEVA_MDL_A_00710057-205 at 00710127–00710129.

[135] TEVA_MDL_A_00709777-10056 at 00709852.

36

prescribe TIRF medicines."[136] As a result, the FDA expressly recognized that non-oncologists could and would continue to write prescriptions for Actiq, Fentora, and other TIRF medicines for their patients.

83. Given these requirements, prescribers should have been aware of the risks, indications, and protocols for safe use of Actiq and Fentora before writing any prescription, as even Plaintiffs' experts acknowledge.[137]

---

[136] TEVA_MDL_A_00709777-10056, at 00709814 ("TIRF Sponsors will: [...] Ensure that prior to the first availability of the TIRF REMS Access program/website, Dear Healthcare Provider Letters will be sent. The target audience for the letters will include pain management specialists (comprised of anesthesiologists, physical medicine and rehabilitation physicians), primary care physicians, oncologists, oncology nurse practitioners who treat breakthrough pain in patients with cancer, and other appropriately licensed healthcare professionals who prescribe TIRF medicines. The letter will include information on the risks associated with the use of TIRF medicines and will explain to healthcare providers that if they wish to treat patients using TIRF medicines, they must enroll in the TIRF REMS Access program."). An example of one of these letters is available at TEVA_MDL_A_00970847-50.

The Actiq RMP similarly identifies the target audience for education and detailing about Actiq as "oncologists and pain management specialists." TEVA_MDL_A_00564336-365, at 00564352.

[137] Deposition of David S. Egilman MD, MPH, *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court, Northern District of Ohio, Eastern Division, April 25, 2019 ("Egilman Deposition"), pp. 201-203 ("Q. Are you aware, sir, that before a prescription can be written under the TIRF REMS program, a prescriber must sign an agreement with the patient stating that he or she has counseled the patient about the risk, benefits, and appropriate use of TIRF medicines?

A. That's what they're supposed to do, that's right.

Q. And are you aware that under the TIRF REMS program, prescribers must be aware of the risks of any TIRF REM -- TIRF medicine before they write a prescription for one of those medicines?

A. That's generally true under any program, yes.

Q. And are you aware under the TIRF REMS program, a doctor must agree to assess his or her patient for signs of misuse or abuse?

A. Yes.");
See also, "Deposition of Matthew Perri III," p. 565 ("Q. So these are requirements that are specific to this class of medications, is that correct?

A. Well, these requirements -- yes, I agree, they are specific to Actiq and this class of drugs. They are not unique in terms of REMS. There are other programs that pharmacists and doctors have to enroll, but this is certainly unique to the other opioids.").

### C. The TIRF REMS Program Ensures That Patient Are Informed About the Risks, Indications, and Protocols for Safe Use of Actiq and Fentora

84. Patients must also understand the risks and benefits of the medicine and sign a PPAF with their healthcare provider to receive TIRF medicines for outpatient use.[138]

85. The patient is required to complete the PPAF along with the prescriber.[139] Each party completes their respective section and signs the document. The patient attests to receiving a copy of the appropriate Medication Guide and reviewing with prescriber. The Medication Guide is part of the product label that is approved by the FDA, and is specifically written to communicate with patients in lay terms. In particular, the Medication Guide includes specific risk disclosures with respect to opioids.[140] The patient must acknowledge that they understand the need for opioid-tolerance when taking TIRF medicines, and that they must stop taking TIRF medicines if they stop taking around-the-clock opioids. The patient attests to understanding how to take TIRF medicines, including dose and timing; understanding side effects; agreeing to contact their prescriber if the TIRF medicine does not relieve pain and to not change their dosage or take more often than directed. The patient agrees never to give away their TIRF medicines, to store the medicine safely, and to dispose of unused or unneeded TIRF medicines properly. The patient acknowledges that selling or giving away TIRF medicines is illegal. Both prescriber and patient must sign the PPAF before the

---

[138] TEVA_MDL_A_00709777-10056 at 00709812–00709813; TEVA_MDL_A_00710057-205 at 00710079–00710080.

[139] TIRF REMS Access, Frequently Asked Questions, p. 5 ("As a patient, how do I participate in the TIRF REMS Access program? You must sign a Patient-Prescriber Agreement with your prescriber and take your prescription for a TIRF medicine to an "enrolled" pharmacy. The pharmacy will enroll you in the TIRF REMS Access program. Your prescriber will go over important information you need to know before you take the TIRF medicine."); TIRF REMS Access, Patient-Prescriber Agreement Form.

[140] TEVA_MDL_A_00709793-802; TEVA_MDL_A_00710070-075.

prescription is given. The patient is given a copy of the PPAF for their records. As with the prescriber, a new PPAF must be completed every two years in order for a patient to continue receiving prescriptions for TIRF medicines.[141]

86. Patients are enrolled in the TIRF REMS Access program by the pharmacy at the time their first prescription is filled.[142]

87. Patients remain active until a trigger for inactivation occurs. Triggers include (a) passage of a six-month period in which the patient does not fill a prescription; and (b) the patient receiving prescriptions for TIRF medicines from multiple prescribers within an overlapping time frame.[143] Receiving prescriptions from multiple prescribers is suggestive of misuse, abuse, or addiction. A patient may have more than one current prescriber (e.g., a pain management specialist and a primary care physician) if prescriptions for TIRF medicines are not for the same or overlapping period of treatment.[144]

## VI. IT IS INCORRECT TO ASSUME THAT ALL PROMOTION OF OPIOID MEDICINES, INCLUDING MARKETING MATERIALS INVOLVING ACTIQ AND FENTORA, IS FALSE OR MISLEADING

88. Plaintiffs' experts assume that all marketing of prescription opioids is false.[145] This assumption is not true, and ignores the role marketing can play as one of many sources of

---

[141] TEVA_MDL_A_00709777-10056 at 00709813.

[142] TEVA_MDL_A_00709777-10056 at 00709819; TEVA_MDL_A_00710057-205 at 00710087.

[143] TEVA_MDL_A_00709777-10056 at 00709819.

[144] TEVA_MDL_A_00709777-10056 at 00709819.

[145] Expert Report of Professor Meredith Rosenthal, *In Re: National Prescription Opiate Litigation*, MDL No. 2804, March 25, 2019 ("Rosenthal Report"), p. 50 ("I have been instructed by counsel to assume in my but-for scenarios that the fact finder (judge or jury) finds that all or virtually all promotion by the manufacturer Defendants from 1995 to the present was unlawful."); Perri Report, p. 138 ("I was asked to assume that the Plaintiffs' expert reports rendered in this case assessed the common messages delivered by the Defendants'

39

information that keep physicians up-to-date on the latest available treatment options. The marketing of opioids was certainly not misleading or deceptive in all cases, despite what Plaintiffs' experts assume.

89. In my experience, detailing can be informative. While I have never relied upon the information from sales representatives to make a prescribing decision, detailing has provided useful information about available treatments such as studies, full labels approved by the FDA, and other information about approved indications and potential side effects. Some detailing is the result of FDA requirements for educating physicians about the risks of new medicines, as was the case with the Actiq RiskMAP's "educational outreach" program.[146]

90. I have reviewed marketing materials produced by the Teva Defendants,[147] and I found them to be balanced and reasonable. They often include the full, FDA-approved label and risk information.[148] In my professional opinion, these marketing materials are not false or misleading when considered in context, and, in my opinion, they would not cause a prescriber to write an opioid prescription that was medically inappropriate or unnecessary. The repetition of the dangers and warnings of the potency of the medication

---

marketing and hold the opinions that Defendants' messages were false, misleading, inaccurate, or designed to misstate the risks and benefits of Defendants' drugs.").

[146] TEVA_MDL_A_00564336-65, at 00564353.

[147] "Actiq Marketing Materials," TEVA_MDL_A_00695218-6810; "Fentora Marketing Materials," TEVA_MDL_A_00025238-33471

[148] See, e.g. TEVA_MDL_A_00695218-6810, at 00695884-00695900, 00696492-00696506; TEVA_MDL_A_00025238-33471, at 00025873-00025876.

and its abuse potential sends a very clear signal that it is crucial to prescribe to the right individual.[149]

91. Despite Plaintiffs' expert Dr. Schumacher's broad claims about "widespread promotion and marketing of opioids by Defendants," defined to include the Teva and Actavis Generic Defendants,[150] Dr. Schumacher admitted that "[i]n the preparation of my report, I did not review any marketing materials from Teva," and that he had no evidence of any false marketing by the Teva or Actavis Generic Defendants.[151] Plaintiffs' expert Dr. Lembke includes an appendix to her report listing "Misleading Promotional Messages" from several Defendants, but notably includes none from Teva or the Actavis Generic Defendants.[152] Likewise, Dr. Perri testified that he is not offering any Teva USA- or Cephalon-specific opinion in his testimony and was relying upon other experts to assess whether any messages were false or misleading.[153]

---

[149] See, e.g. TEVA_MDL_A_00695218-6810, at 00696155 ("Important: Do not use FENTORA unless you are regularly using another opioid pain medicine around-the-clock for your cancer pain and your body is used to these medicines[…] Get emergency help right away if: […] an adult who has not been prescribed FENTORA uses it […] These are medical emergencies that can cause death."); TEVA_MDL_A_00695218-6810 at 00695619, ("ACTIQ contains fentanyl, an opioid agonist and a Schedule II controlled substance…Schedule II opioid substances…have the highest potential for abuse and risk of fatal overdose due to respiratory depression…This product must not be used in opioid non-tolerant patients.").

[150] Expert Report of Mark A. Schumacher, M.D., Ph.D., *In Re: National Prescription Opiate Litigation*, MDL No. 2804, March 25, 2019 ("Schumacher Report"), p. 6.

[151] Deposition of Mark A. Schumacher, M.D., Ph.D., *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, April 23, 2019 ("Deposition of Mark A. Schumacher, M.D., Ph.D."), pp. 84, 102-105.

[152] Expert Report of Anna Lembke, M.D., *In Re: National Prescription Opiate Litigation*, MDL No. 2804, March 25, 2019 ("Lembke Report"), Appendix I.

[153] Deposition of Matthew Perri III, M.D., *In Re: National Prescription Opiate Litigation* MDL No. 2804, United States District Court for the Northern District of Ohio, Eastern Division, April 24, 2019 ("Deposition of Matthew Perri III"), pp. 420, 561.

41