# EXHIBIT 13

1          UNITED STATES DISTRICT COURT

       FOR THE NORTHERN DISTRICT OF OHIO

2                EASTERN DIVISION

3

   IN RE: NATIONAL          )

4  PRESCRIPTION             )  MDL No. 2804

   OPIATE LITIGATION        )

5  _____ )  Case No.

                            )  1:17-MD-2804

6                           )

   THIS DOCUMENT RELATES )  Hon. Dan A.

7  TO ALL CASES             )  Polster

8

              WEDNESDAY, APRIL 24, 2019

9

    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

10              CONFIDENTIALITY REVIEW

11                   - - -

12          Videotaped deposition of Anna

13  Lembke, M.D., held at the offices of Lieff

14  Cabraser Heimann & Bernstein, LLP, 275

15  Battery Street, 29th floor, San Francisco,

16  California, commencing at 8:07 a.m., on the

17  above date, before Carrie A. Campbell,

18  Registered Diplomate Reporter and Certified

19  Realtime Reporter.

20

21

22                   - - -

23

          GOLKOW LITIGATION SERVICES

24     877.370.3377 ph | 917.591.5672 fax

              deps@golkow.com

25

Highly Confidential - Subject to Further Confidentiality Review

1           that the Cochrane analysis had a huge

2           impact on physicians' perception of

3           risk --

4   QUESTIONS BY MS. VICARI:

5           Q.     I didn't ask about the Cochrane

6   analysis.  I have limited time.  I asked

7   about the McIlwain study.

8                MR. ARBITBLIT:  Limited time or

9           not, Counsel, you're supposed to let

10          her finish.

11               THE WITNESS:  I think I did

12          answer it.

13  QUESTIONS BY MS. VICARI:

14          Q.     You can't identify any

15  physicians, correct?

16               MR. ARBITBLIT:  Object to form.

17               THE WITNESS:  Again, I think

18          that I've answered this before in

19          other ways, with other defendants

20          asking similar questions, that

21          although I don't -- I can't identify

22          any specific physicians.  Broadly this

23          is misleading marketing messages.  We

24          were all exposed to them in the '90s

25          and ongoing to today.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   And it had a significant and

 2          instrumental effect on the way that we

 3          prescribe opioids.

 4   QUESTIONS BY MS. VICARI:

 5          Q.    Dr. Lembke, you would agree

 6   with me that as a general matter, a patient's

 7   exposure to an ineffective medical treatment

 8   should be minimized, correct?

 9                   MR. ARBITBLIT:  Object to form.

10          Incomplete hypothetical.

11                   THE WITNESS:  It says here --

12          can you restate because it says

13          "shouldn't be minimized."  But I think

14          you meant should be minimized.

15   QUESTIONS BY MS. VICARI:

16          Q.    That is a mistake in the

17   transcript.

18                   You would agree with me that a

19   patient's exposure to an ineffective medical

20   treatment should be minimized?

21                   MR. ARBITBLIT:  Object to form.

22                   THE WITNESS:  I do agree with

23          that.

24                   MS. VICARI:  Thank you.  I have

25          no further questions.  We can go off
```

1     the record.  I'll pass the witness.

2              VIDEOGRAPHER:  We're now going

3     off the record, and the time is

4     5:07 p.m.

5      (Off the record at 5:07 p.m.)

6              VIDEOGRAPHER:  We're now going

7     back on the record, and the time is

8     5:08 p.m.

9               CROSS-EXAMINATION

10    QUESTIONS BY MS. HOLLY:

11         Q.    My name is Pam Holly.  I'm an

12    attorney with Morgan Lewis, and we represent

13    Teva Pharmaceuticals, USA, Cephalon, Inc.,

14    Actavis Pharma, Watson Laboratories and

15    Actavis, LLC.

16              Are you familiar -- or are you

17    aware that Watson Laboratories is a party to

18    this action?

19         A.    I was not aware.

20         Q.    Is it fair to say that you

21    don't know what opioid medications they sell?

22         A.    I know what opioids Teva

23    Pharmaceuticals sells, so if that's all part

24    of the same entity, Actiq and Fentora.

25         Q.    So is it fair to say that you

1  don't know what opioids Watson Labs sells,

2  correct?

3          A.      Correct.

4          Q.      Are you aware that Actavis

5  Pharma is a part of this litigation?

6          A.      I believe that Actavis Pharma

7  was mentioned in combination with Allergan.

8          Q.      A different entity, not Actavis

9  Pharma.

10         A.      Okay.  Okay.

11         Q.      So it's fair to say that you're

12  not aware that Actavis Pharma is a party to

13  this litigation?

14         A.      It's fair to say that I'm not

15  aware of the various mergers, and it is very

16  confusing.  So I'm not entirely aware of who

17  owned what when.

18         Q.      Are you aware that Actavis,

19  LLC, is a party to this litigation?

20         A.      I wasn't aware, but I am aware

21  now.

22         Q.      Are you aware of what opioid

23  medications they sell?

24         A.      No.

25         Q.      Are you aware that generic

1    manufacturers do not -- excuse me, do not

2    market their products?

3         A.    I wasn't specifically aware of

4    that, no.

5         Q.    Are you aware that Teva

6    Pharmaceuticals USA is a party to this

7    litigation?

8         A.    Yes.

9         Q.    Do you know what products Teva

10   Pharmaceuticals --

11        A.    Actiq and Fentora.

12        Q.    Your report makes no reference

13   to Teva Pharmaceuticals USA, so it's fair to

14   say that you can't offer an opinion to a

15   reasonable degree of medical certainty about

16   the marketing of Teva USA; is that correct?

17        A.    I disagree.  If they're named

18   in the complaint, and I see all the

19   defendants as party to the litigation, and --

20        Q.    Any -- pardon me.

21        A.    Go ahead.  Go ahead.

22        Q.    I was going to ask you to point

23   me to a reference in your report to Teva

24   Pharmaceuticals USA.

25              We may have to go off the

 1   record, but I only have five minutes.

 2        A.    Sorry.  Yeah.  There's no

 3   specific reference in my report to Teva

 4   Pharmaceuticals, but if they're named in the

 5   complaint, I believe -- I agree with the

 6   complaint, and my report applies to all the

 7   defendants in particular as pertains to the

 8   misrepresentation of the benefits and risks

 9   of opioids more broadly as a class of drugs.

10        Q.    So Appendix I of your report

11   has five sections, correct?

12        A.    Yes.

13        Q.    And none of those five sections

14   relate to Teva Pharmaceuticals or Cephalon,

15   correct?

16        A.    That's correct.

17        Q.    So it's fair to say that in

18   your report, you're not offering an opinion

19   in this litigation about the marketing

20   conducted by those entities, correct?

21        A.    No.  I feel like I answered

22   that question already.

23        Q.    Well, I don't -- I disagree

24   with all due respect.

25             There's no section -- what is

```
 1     the title of Appendix I?

 2            A.      Appendix I?

 3            Q.      In the table of contents, you

 4     refer to it as misleading promotional

 5     messages, correct?

 6            A.      Yes.

 7                    MR. ARBITBLIT:  That's it.

 8            Thank you, Counsel.  It's been nice.

 9            Feel free to take whatever is left

10            over at the end, sandwiches, I mean.

11                    VIDEOGRAPHER:  Shall we

12            conclude?

13                    MR. ARBITBLIT:  Yes.

14                    VIDEOGRAPHER:  Okay.  This

15            concludes the video deposition of Anna

16            Lembke.  We are --

17                    MS. HOLLY:  I'm sorry, I did

18            not have five minutes.

19                    MS. DO AMARAL:  You did.

20                    MS. HOLLY:  I did not have five

21            minutes.

22                    VIDEOGRAPHER:  I have five.

23                    MS. HOLLY:  I am --

24                    MR. ARBITBLIT:  What does your

25            timer say, Pam?  Have you timed
```

1    yourself?

2         MS. HOLLY:  Yeah, my time is

3    three minutes.

4         MS. DO AMARAL:  No.  No, sorry.

5         MR. ARBITBLIT:  No.

6         MS. DO AMARAL:  Your

7    codefendants, the videographer, and by

8    my count --

9         MS. HOLLY:  All right.  I'm

10   going to state for the record that I

11   have specific time to ask questions

12   that I intended to ask on behalf of my

13   clients, and I object and don't agree

14   to close the deposition, and I reserve

15   all rights to raise with the Court to

16   request the appropriate relief,

17   including any deposition testimony

18   that went unanswered here today.

19        MR. ARBITBLIT:  Well, let's do

20   two more minutes, Pam, and ask your

21   questions.  Let's not fight about two

22   minutes.

23        MS. HOLLY:  Okay.  Well, then I

24   need -- I need -- I need full two

25   minutes.