# EXHIBIT 14

CONFIDENTIAL
Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

Expert Report of Matthew Perri III, BS Pharm, PhD, RPh

March 25, 2019

CONFIDENTIAL
Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

CONFIDENTIAL
Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

**INTRODUCTION**

1. I was retained on behalf of Plaintiffs to evaluate the record and ascertain the significance, if any, of Defendants' activities from a marketing perspective. Specifically, I was tasked with evaluation of Defendants' marketing of prescription opioids. This Report provides a detailed summary of my findings.

**QUALIFICATIONS**

2. My name is Matthew Perri III. I am a Professor at the University of Georgia. I received my Bachelor of Science in Pharmacy from Temple University in Philadelphia, Pennsylvania in 1981. In 1985, I obtained my Doctor of Philosophy, with a dual concentration in Pharmacy and Marketing, from the University of South Carolina. I have held academic and administrative positions at the University of Georgia, College of Pharmacy, since 1985.

3. My current title is Professor and Associate Head of the Department of Clinical and Administrative Pharmacy at the College of Pharmacy. I am a member of the University's Graduate Faculty and Adjunct Faculty of Gerontology in the College of Public Health. I also serve as the Director of the Pharm D / MBA dual degree program, and I am an invited member of the University of Georgia Teaching Academy where the University's best teachers are recognized for their contributions to education.

4. At the University of Georgia, I teach graduate and undergraduate courses in health care and pharmaceutical marketing, management, research methods, patient communications, patient care skills laboratories, and biomedical statistics. Some of these courses attract students from the School of Public Health, the Terry College of Business, and the College of Education.

5. I have published articles in peer-reviewed journals such as Medical Care, Journal of Health Care Marketing, Health Marketing Quarterly, Value in Health, and the Journal of Health Communication. I have served as a peer-review referee for more than two dozen academic journals such as the Journal of Advertising, Clinical Therapeutics, Health Marketing Quarterly, the Journal of Health Care Marketing and Management, and Medical Care. I have also published

Case: 1:17-md-02804-DAP  Doc #: 1891-18  Filed: 07/19/19  4 of 8.  PageID #: 67307

CONFIDENTIAL

Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

articles written for health care professionals in professional publications such as Pharmaceutical Executive, Southern Medical Journal, Drug Store News, and The Consultant Pharmacist.

6. I have made numerous presentations to audiences including academicians, researchers, industry professionals, policy makers, healthcare professionals, civic organizations, and consumer groups. Many of these were peer-reviewed or invited presentations. Recently, I was the invited keynote speaker at the Emory School of Medicine conference on Geriatrics where I spoke on strategies to help physicians understand pharmaceutical marketing.

7. I have authored two books, Pharmaceutical Marketing and Financial Analysis in Pharmacy Practice, as well as book chapters, and monographs on topics related to marketing, management, and clinical pharmacy care.

8. I have conducted extensive original research as principal, co-investigator, or consultant related to pharmaceutical marketing and related policy analyses, including work in the area of opioids funded by private and public sources, such as the National Institutes of Health the Substance Abuse and Mental Health Services Administration, private foundations, and State and Federal Government.

9. My current research includes two, multi-year grants from the National Institutes of Health (NIH) and the Substance Abuse and Mental Health Services Administration (SAMHSA). The NIH grant investigates the effects of Medicaid prescription drug benefit program policy changes on patient outcomes, including death, in the Medicaid population. The SAMHSA grant is a training project which aims to provide skills to pharmacists, social workers, psychologists, and other health professionals to proactively recognize patients who may be at higher risk for health problems due to substance abuse.[1]

---

[1] Opioid Prescribing in Medicaid: Healthcare Utilization and Deaths from Overdose. Grant No: 1R01DA039930-01A1 2016-2019; $675,000 National Institutes of Health (NIDA), Principle Investigator. UGA SBIRT Inter-professional Training Program, Grant No: 1H79T1026457-01, 2016-2019; $851,016 Department of Health and Human Services, Co-Investigator.

Case: 1:17-md-02804-DAP  Doc #: 1891-18  Filed: 07/19/19  5 of 8.  PageID #: 67308
CONFIDENTIAL

Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

10. I have been involved with various non-paid national and state service and consulting activities including, for example, my longstanding work with Georgia Medicaid,[2] service on the Boards of the Association for Marketing and Health Care Research and the Medical College of Georgia / Blue Cross Blue Shield Center for Healthcare Improvement, and service as a consultant to the Georgia Senate Committee on Cost Controls in State Funded Health Plans. I have been an invited participant to the National Consumers League workshop on direct-to-consumer prescription drug advertising, and to the Agency for Healthcare Research and Quality/U.S. Food and Drug Administration "Think Tank" on current issues and future research agenda for the marketing and advertising of prescription medications.

11. I have also been a paid marketing consultant to organizations, including hospitals and long-term care facilities, independent marketing research companies, pharmacy organizations, pharmaceutical companies, and chain and independent pharmacies. My consulting activities have also included work with the U.S. Department of Justice, State Attorneys General, and private attorneys in litigation related to the marketing of pharmaceutical products.

12. Prior to becoming a registered pharmacist, I worked as a pharmaceutical sales representative for a multinational pharmaceutical company.[3] I have been a registered pharmacist since 1981 and am currently licensed to practice pharmacy in Georgia and South Carolina. Since 2002, I have served as a part-time volunteer pharmacist at the Mercy Health Center, an independent, not-for-profit, comprehensive health center.

---

[2] I was a Board member (2001-2012) and Chair (2004-2010) of the Georgia Department of Community Health, Drug Utilization Review Board (DURB). I was reappointed to the DURB in October of 2018. The DURB, composed of pharmacists, prescribers, insurers, and patient advocates, is responsible for recommending the drugs listed on the State's preferred drug list for all State-funded health plans.

[3] In 1979 and 1980, I was a Pharmacy Student Sales Representative (PSSR) for the Dome Division of Miles Laboratories. In this position, I was trained and detailed a line of dermatological products to dermatologists, obstetricians, gynecologists, and general practitioners. Pharmacy distribution was also an important aspect of this position due to planned new product introductions and initial stocking needs. The PSSR program was a work-coop program, approved by Temple University School of Pharmacy and sponsored by Miles Pharmaceuticals.

Case: 1:17-md-02804-DAP  Doc #: 1891-18  Filed: 07/19/19  6 of 8.  PageID #: 67309

CONFIDENTIAL

Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

152. As detailed here, in Table II, and in Schedule 10, Defendants' marketing messages were aimed at shifting Customers' thinking regarding the use of opioids for the treatment of pain. This change in the prescribing paradigm included seeking to treat most all pain patients with opioids first. Because Defendants' strategy to shift medical thinking worked, it expanded the total market for opioids.

D.    Marketing Messages Over Time

153. As noted in this Report, some of the marketing messages employed by Defendants changed over time, for example, when the OxyContin PI changed in 2006[318], or when part of the marketing focus shifted to tamper-resistance and abuse-deterrence. More recently, Purdue reports that it has stopped marketing opioids entirely.[319] However, marketing principles teach us that the impact of the early marketing, that was so effective in shifting prescribers' paradigms about opioids, would be durable and resistant to change.[320] The aggressive marketing practices employed by Defendants beginning in the mid-1990s created the new opioid paradigm that

---

it provides the continuous around the clock. Pain control that they need. Since there's no way to determine which patients will develop Wind Up, It is imperative to treat every patient as if they will."; "Patient Brochure, Living with chronic pain – Your guide to better days and night," from the makers of Avinza ® 24 hour (morphine sulfate extended-release capsules), at END00014047: "Once-a-day medication means you do not have to worry about when to take your next dose." "AVINZA® is the only opioid approved to be dosed not more than once daily. It contains morphine, which has a long history of pain control. When a patient takes AVINZA®, morphine is released gradually over 24 hours. This is why AVINZA® helps people with chronic pain all day and all night. The AVINZA® capsule is designed to keep the amount of morphine in your body steady throughout the day. In clinical studies, AVINZA® gave patients Continuous, reliable pain control over 24 hours with just 1 capsule a day; More active days; More restful nights" END00014041-58; "acute pain doesn't last 4-6 hours- neither should its treatment" Core message email, MNK-T1_0000130448; See also, Table II and Schedule 10.

[318] Mr. Cramer noted in his deposition with respect to OxyContin, "once any reference to the risk of addiction being was removed [from FDA approved labeling], we never referred to it again." (Cramer, Phil 11-20-18 Deposition, p.245.) From a marketing perspective, beliefs, attitudes, and intentions, once created are durable in Customers' minds. Purdue's marketing would be expected to have lasting impact.

[319] Cramer, Phil_11.20.18, p.161.

[320] It is generally understood in marketing that customer beliefs, attitudes, intentions, and values are relatively durable. When considered in relation to products, i.e., beliefs or intentions regarding a product, it is difficult for marketing to create or change them. Hence, once new paradigms are formed, these new beliefs or intentions also become resistant to change. The marketing texts cited earlier in this Report provide extensive insight into this marketing principle.

Case: 1:17-md-02804-DAP  Doc #: 1891-18  Filed: 07/19/19  7 of 8.  PageID #: 67310

CONFIDENTIAL

Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

resulted in blockbuster sales. Marketing principles teach us that two decades of Defendants' marketing aimed at a paradigm shift, will take time and effort to correct.[321]

### E. Defendants' Marketing Violated Industry Standards

154. I was asked to assume that the Plaintiffs' expert reports rendered in this case assessed the common messages delivered by the Defendants' marketing and hold the opinions that Defendants' messages were false, misleading, inaccurate, or designed to misstate the risks and benefits of Defendants' drugs. This is consistent with the FDA documents (i.e., warning letters) cited in this Report regarding the false or misleading nature of Defendants' marketing. These opinions are also consistent with the proposition evaluated above that Defendants had a bias toward benefits over harms in their marketing.

155. Further, the use of influencers, KOLs, and professional (advocacy) organizations that Defendants funded and influenced to deliver these messages was more credible because Defendants' hid their influence from the medical community and the public, creating perceptions of unbiased and more scientific information. The marketing analysis in the Report confirms that KOLs and advocacy organizations furthered Defendants' desired promotional messaging in the marketplace. However, Defendants were not forthcoming about their support of these people and activities, or their influence over the conclusions drawn. Defendants' marketing activity supports the proposition that these behaviors were designed to mislead Customers about the impartiality of the messages. In my professional opinion, and considering the full scope of Defendants' marketing, Defendants violated marketing standards by creating and disseminating false or misleading marketing messages that downplayed or minimized the risks associated with opioids, while emphasizing the benefits of their drugs, and by disguising their support of activities aimed at increasing sales of their own products.

---

[321] Pharmaceutical Marketing, Ch. 2, Rollins, B.L. & Perri, M. (eds.) (2013), p.244.

Case: 1:17-md-02804-DAP Doc #: 1891-18 Filed: 07/19/19 8 of 8. PageID #: 67311

CONFIDENTIAL

Report of Matthew Perri III in Case no. 17-OP-45004 (N.D. Ohio) and Case No. 18-OP-45090 (N.D. Ohio)
Confidential and Subject to Protective Order

F. **The Defendants' Marketing Was Effective**

156. By minimizing concerns over opioid use with these key messages, Defendants' marketing effectively deconstructed the barriers associated with opioids for the treatment of pain. The marketing documents recognized concerns over opioid use, but as a barrier to be overcome through marketing and not as a public health concern.[322] After reviewing numerous marketing documents describing Defendants' marketing planning and execution, spanning more than two decades, it is my opinion that Defendants' approach to marketing opioids was purposeful, aggressive, and effective in increasing sales. The marketing outcomes, including Defendants' own internal metrics, support the fact that the Defendants were able to persuade prescribers and other stakeholders to increase the use of opioids for pain.

157. The impact of marketing efforts can be assessed by examining sales or by how well specific marketing goals were met. Defendants' marketing plans and metrics reveal many such goals and certainly confirm the association between marketing and sales. In the pharmaceutical market, sales are measured through dollar sales figures or by proxy variables such as the numbers of prescriptions written for a drug (TRx), the numbers of "new" prescriptions (NRx), or market share.

158. However, marketing success is relative, as not all products achieve the same levels of utilization. For some products, small increases in TRx or market share can be viewed as success.[323] For example, Endo set a goal for its Opana ER (oxymorphone ER) "To become the #2 branded oral solid CII analgesic..." in recognition that this brand would never overcome oxycodone in market share.[324] Endo's former Senior Director of Marketing, Demir Bingol, agreed that Opana ER was a "successful" franchise that met or exceeded its sales goals.[325] Given this characteristic of the

---

[322] See e.g., JAN-MS-004078579, "Prevent abuse issues from impacting performance of DURAGESIC". 2002 Duragesic Business Update.

[323] See e.g., 50_MNKT-T1_0000540013, Brands Financial Forecast Review, Exalgo and other product sales Q4 FY1- through Q3 FY13, where Exalgo net sales increase, yet at a decreasing rate.

[324] 2009 Opana Brand Overview, ENDO-CHI-LIT-00022642.

[325] Bingol, Demir_Endo Deposition, pp.39-40.