# EXHIBIT 19

Highly Confidential - Subject to Further Confidentiality Review

```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
                        -   -   -

 IN RE:  NATIONAL          :   HON. DAN A.
 PRESCRIPTION OPIATE       :   POLSTER
 LITIGATION                :
                           :
 APPLIES TO ALL CASES      :   NO.
                           :   1:17-MD-2804
                           :

            - HIGHLY CONFIDENTIAL -

    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

                        -   -   -

                    January 4, 2019

                        -   -   -

              Videotaped deposition of
    MATTHEW DAY, taken pursuant to notice,
    was held at the offices of Golkow
    Litigation Services, 1650 Market Street,
    Philadelphia, Pennsylvania, beginning at
    9:35 a.m., on the above date, before
    Michelle L. Gray, a Registered
    Professional Reporter, Certified
    Shorthand Reporter, Certified Realtime
    Reporter, and Notary Public.

                        -   -   -

          GOLKOW LITIGATION SERVICES
      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
```

1    those prior marketing activities?
2         A.    Yes.
3         Q.    How were you made aware of
4    those?
5         A.    Through -- these continued
6    to be points of emphasis during the
7    training program that we were developing.
8    Opioid tolerance was critical because it
9    could lead to life-threatening
10   respiratory depression in patients.
11        Q.    You get hired on in, what,
12   July of '07 as kind of the sales training
13   manager, correct?
14        A.    Mm-hmm.
15        Q.    Is that yes?
16        A.    Yes.
17        Q.    And who advised or trained
18   you when you were first hired as sales
19   training manager at Cephalon?
20             MR. ANDRISANI:  Objection to
21        form.
22             THE WITNESS:  I was trained
23        by a combination of people from
24        medical to my direct line manager

1           to meeting with marketing and even
2           regulatory personnel and legal.
3    BY MR. MADDEN:
4           Q.    All right.  With regard to
5    the items that we just looked at with
6    regard to Actiq -- Actiq, the guilty plea
7    and the prior off-label marketing
8    activities, who at Cephalon informed you
9    about that prior activity with regard to
10   Actiq?
11          A.    Our compliance department.
12          Q.    Who in the compliance
13   department?
14          A.    Karen Lowney.
15          Q.    Is she still with Teva?
16          A.    She is not.
17          Q.    Do you know where she is
18   now?
19          A.    I do not.
20          Q.    What did Karen tell you
21   about the Actiq situation and prior
22   off-label marketing activities?
23                MR. ANDRISANI:  Objection.
24                THE WITNESS:  Well, from my

1        recollection of the way the
2        organization communicated this is
3        that once they entered into the
4        CIA, there was actually an entire
5        training program and protocol that
6        was put in place through the
7        compliance department.  I believe
8        it was three or four modules that
9        highlighted the important features
10       that we are talking here, and also
11       other key areas within the CIA.
12             So it wasn't like a
13       one-on-one interaction.  It was a
14       companywide training initiative.
15  BY MR. MADDEN:
16       Q.    And did you read and take
17  the test that went with those manuals?
18       A.    Yes.
19       Q.    Have you read the Corporate
20  Integrity Agreement entered by Cephalon?
21       A.    I have not.
22       Q.    But you read the modules and
23  took the test, correct?
24       A.    Correct.

Highly Confidential - Subject to Further Confidentiality Review

1       Q.   So with regard to your work
2 as a sales training manager for Fentora,
3 you did not have the benefit of reading
4 the actual Corporate Integrity Agreement,
5 is that true?
6       A.   Yes, that's true.
7       Q.   When in the fall of
8 September of 2008 it was announced that
9 Cephalon had entered an agreement to pay
10 $425 million for off-label promotion of
11 drug that included Actiq, were there
12 people who lost their jobs as a result of
13 that?
14           MR. ANDRISANI: Objection.
15           THE WITNESS: I'm not aware
16     of specific displacements due to
17     that.
18 BY MR. MADDEN:
19       Q.   Were you aware of your
20 predecessor as sales training manager,
21 whether that person was disciplined or
22 fired as a result of the prior off-label
23 promotion of Actiq?
24           MR. ANDRISANI: Objection.