# EXHIBIT 30

```
                                                            Page 1
 1
            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
                     EASTERN DIVISION
 3
 4    _____
 5    IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION                Case No. 17-md-2804
 6
 7    This document relates to:        Judge Dan
                                       Aaron Polster
 8
      The County of Cuyahoga v. Purdue
 9    Pharma, L.P., et al.
      Case No. 17-OP-45005
10
      City of Cleveland, Ohio vs. Purdue
11    Pharma, L.P., et al.
      Case No. 18-OP-45132
12
      The County of Summit, Ohio,
13    et al. v. Purdue Pharma, L.P.,
      et al.
14    Case No. 18-OP-45090
      _____
15
16
17                   VOLUME I
18      Videotaped Deposition of Kyle J. Wright
19                Washington, D.C.
20                February 28, 2019
21                    9:33 a.m.
22
23
24    Reported by:  Bonnie L. Russo
25    Job No. 3244302
```

1   A.   The only other information that they
2   would have would be the public reports that we
3   publish 1 through 7.
4   Q.   I'm sorry. I missed the -- what --
5   what are the public reports?
6   A.   Public reports are very gran -- not
7   very granular. They're very, very broad.
8   Okay? Hydrocodone sales by state to hospitals,
9   to doctors, to pharmacies, by population.
10          They are not specific. And we
11  definitely worked very hard -- we -- we kept it
12  at three-digit ZIP code. Because if we went
13  down to a five-digit ZIP code, there may be one
14  pharmacy in that five digit ZIP code. Then
15  everybody would know it. Or there may be one
16  hospital or whatever.
17          So it was very broad, very general.
18  But it was also very good at seeing trends
19  comparing one state to another or a ZIP -- a
20  group of ZIP codes within another. And it also
21  had population. In other words, population
22  consumption. Okay?
23          So otherwise, the answer to your
24  real question that predicated this is no. Did
25  not share or give Distributor Y Distributor's L

Page 170

1  data.
2    Q.    Just to make sure the record is
3  clear, each distributor provided their own
4  ARCOS data to the DEA, correct?
5    A.    Correct.
6    Q.    And the DEA did not take
7  distributor -- one distributor's ARCOS data and
8  share it with another distributor, correct?
9    A.    Not to my knowledge.
10   Q.    And did the same apply for
11 pharmacies?
12   A.    It applied to all registrants.
13   Q.    And manufacturers as well?
14   A.    All registrants.
15   Q.    Now, the ARCOS system included
16 reporting tools, correct?
17         Were -- were there different reports
18 that could be run from the ARCOS data?
19   A.    You can extrapolate data any way you
20 want.
21   Q.    So you were -- and maybe not you
22 personally.
23         But the DEA was able to slice and
24 dice ARCOS data in a number of different ways
25 through various reports?

Page 171

```
 1            MR. BENNETT:  Objection to form.  I
 2   also will remind the witness that the witness
 3   is not authorized to disclose investigative
 4   techniques, the effect of -- effectiveness of
 5   which would be impaired by his answer.
 6            THE WITNESS:  Data is data.
 7   Extrapolate.  Extrapolate the data.
 8            BY MS. MAINIGI:
 9       Q.   Okay.  So the ARCOS data could be
10   utilized in different ways through different
11   reports, correct?
12       A.   At the a very beginning of this
13   deposition, you talked about this.  And you
14   even said and commented that, at the end of it,
15   was data specific.
16       Q.   Yes.
17       A.   That is what we did.
18       Q.   Okay.  So for different purposes you
19   extracted ARCOS data in different ways?
20       A.   Yes.
21       Q.   And I think what you told me at the
22   beginning of this deposition was that for
23   particular distributors, for example, you were
24   able to identified outliers and aberrations,
25   correct?
```

Page 219

1    Q.   What does the term "charge-back"
2    mean to you?
3            MR. BENNETT:  Objection.  This is
4    beyond the scope of what was requested of this
5    particular witness.  I will let him answer
6    based on his personal knowledge.
7            I understand this wasn't one of the
8    topic that anybody wanted to discuss with this
9    witness.  There's other witnesses that that's
10   been requested from.
11           THE WITNESS:  My understanding is
12   very limited.  I didn't deal with it.  It was a
13   field issue.
14           But it was giving credit through a
15   distributor.  The pharmacy would buy; the
16   distributor would confirm; and a re -- monetary
17   would go back to the pharmacy.
18           BY MR. O'CONNOR:
19   Q.   Do you have an understanding of
20   whether any information regarding the
21   distributor sale to the pharmacy was provided
22   back to a manufacturer in connection with the
23   charge-back?
24   A.   I would not know.
25           MR. O'CONNOR:  Okay.  Okay.  We've

Page 220

1    been going about an hour.
2            Can we take maybe just a five- or
3    ten-minute break?
4            MR. BENNETT:  Ten minutes.
5            THE VIDEOGRAPHER:  We are going off
6    the record.
7            This is the end of Media Unit No. 4.
8            The time is 4:43.
9            (A short recess was taken.)
10           THE VIDEOGRAPHER:  We are going back
11   on the record.
12           This is the start of Media Unit No.
13   5.
14           The time is 4:59.
15           You may proceed, Counsel.
16           BY MR. O'CONNOR:
17       Q.  Thank you, Mr. Wright.  We're almost
18   done, I promise, at least with my portion of
19   the -- the event.
20           Before we took a break, we talked a
21   little bit about charge-backs.
22           And I wanted to ask, in your
23   understanding, what role, if any, do
24   charge-backs play in Suspicious Order
25   Monitoring?

Page 221

1       A.    None.
2       Q.    Okay.
3       A.    None.
4       Q.    All right.  Just a couple other
5    questions.
6             Are you being compensated in any way
7    for your time here today?
8       A.    Absolutely not.
9       Q.    Okay.  Is anyone covering your
10   out-of-pocket expenses, anything like that?
11      A.    No.
12      Q.    Okay.  During your time at DEA,
13   Mr. Wright, was there ever a time when you were
14   subject to any sort of discipline?
15      A.    No.
16      Q.    And when you retired from DEA, was
17   that retirement of your own choosing?
18      A.    Absolutely.
19      Q.    Was there ever any request made by
20   anyone that -- that you leave the agency?
21      A.    None.
22            MR. O'CONNOR:  Okay.  Okay.  Thank
23   you very much.  That's actually all I have.
24            Can we just go off the record for a
25   few minutes.

Page 222

1  THE VIDEOGRAPHER: We are going off
2  the record.
3  The time is 5:01.
4  (Discussion off the record.)
5  THE VIDEOGRAPHER: We are going back
6  on the record.
7  The time is 5:03.
8  You may proceed, Counsel.
9
10  EXAMINATION BY COUNSEL FOR DEFENDANT
11  WALMART, INC.
12  BY MR. STEPHENS:
13  Q. Mr. Wright, good afternoon.
14  My name is Neal Stephens. I'm from
15  the Jones Day law firm. And I represent
16  Walmart in this matter.
17  A. Okay.
18  Q. Good after -- so I'm also going to
19  ask you a series of questions on behalf of
20  retail pharmacies today. Okay?
21  A. Okay.
22  Q. The other retail pharmacies in this
23  case are CVS, Rite Aid and Walgreens.
24  A. Okay.
25  Q. So if I mention retail pharmacies,