# EXHIBIT 31

```
 1          IN THE DISTRICT COURT OF CLEVELAND COUNTY

 2                     STATE OF OKLAHOMA

 3                     No. CJ-2017-816

 4 - - - - - - - - - - - - - - - - X

 5 STATE OF OKLAHOMA, ex rel.,

 6 MIKE HUNTER, ATTORNEY GENERAL

 7 OF OKLAHOMA,

 8                     Plaintiff,

 9      v.

10 (1)  PURDUE PHARMA, L.P., et al.,

11                     Defendants.

12 - - - - - - - - - - - - - - - - X

13 COMPLETE CAPTION ON PAGE 2

14 - - - - - - - - - - - - - - - - X

15  VOLUME I                          Pages 1-542

16

17          DEPOSITION OF RUSSELL PORTENOY, M.D.

18          Thursday, January 24, 2019, 10:49 a.m.

19                 Shaheen & Gordon, P.A.

20                   107 Storrs Street

21              Concord, New Hampshire 03301

22

23   -- Reporter: Kimberly A. Smith, CSR, CRR, CRC, RDR --

24             Realtime Systems Administrator

25                U.S. Legal Support
```

```
 1    1990, which may be very different because -- than

 2    the statement you would make today because the

 3    science has changed, correct?

 4        A.  Correct.

 5              MR. BECKWORTH:  Objection.

 6    BY MR. EHSAN:

 7        Q.  That doesn't make either statement false.

 8    It just makes them appropriate for the time that

 9    they were given, correct?

10        A.  Yes.

11              MR. BECKWORTH:  Objection.

12    BY MR. EHSAN:

13        Q.  So when you were talking to folks in the

14    context of discussions you had about chronic

15    long-term opioid use, you always gave them fair and

16    balanced information; is that correct?

17        A.  Yes.  I tried to.

18        Q.  And you've given those -- I just want to

19    separate two separate topic areas.  Because I think

20    there was some conflation here between CMEs, which

21    are continuing medical education events; is that

22    correct?

23        A.  Yes.

24        Q.  And promotional speaking engagement, okay?

25        A.  What are now called that.
```

Russell Portenoy, M.D.
January 24, 2019

331

1      Q.   What are now called that?

2      A.   What are now called those.

3      Q.   Names change.  But we'll stick with the CME

4   first.

5      A.   Yes.

6      Q.   In the context of a CME, who had control

7   over the content?

8      A.   The speaker.

9      Q.   So if it was you who was speaking, it would

10   have been you, correct?

11     A.   Yes.

12     Q.   Now, is it possible for a pharmaceutical

13   company to directly or indirectly provide financial

14   support for a CME?

15     A.   Yes.

16     Q.   In your experience, has a pharmaceutical

17   company ever dictated to you the content of a CME

18   where you disagreed about a particular point?

19     A.   No.

20     Q.   And there are strict rules and regulations

21   about disclosures when it comes to a CME, correct?

22     A.   Yes.  And as I mentioned before, those too

23   have been evolving over the years.  Now they're

24   quite strict.  They were less strict in the '80s and

25   '90s.

 1      Q.  I'm sorry.  Please finish.

 2      A.  I think that was the statement I wanted to

 3   make.  Thank you.

 4              MR. EHSAN:  And just to kind of drive

 5   this point . . .

 6              MS. SPENCER:  Are we done with the 1986

 7   article?

 8              MR. EHSAN:  For now, yes.

 9                  (Portenoy Exhibit 32 was marked

10                  for identification.)

11   BY MR. EHSAN:

12      Q.  Doctor, the reporter has handed you what's

13   been marked as 32, I believe?

14      A.  Yes.

15      Q.  Exhibit 32.  I'll give you as much time as

16   you like to look at it.  But just looking at the

17   cover, do you recognize what it is?

18      A.  Yes.

19      Q.  And what is your recollection of what it is.

20              MS. SPENCER:  I would give -- give me a

21   second to look at it and give him a moment to

22   familiarize himself with it.

23              MR. EHSAN:  Sure.

24              MS. SPENCER:  Thanks.

25              THE WITNESS:  Yes.

Russell Portenoy, M.D.
January 24, 2019                                                397

1    conferences, which amounted, I believe, to eight

2    large conferences over ten years, were focused on

3    this interface between chronic pain and chemical

4    dependency.  And typically more than half of that

5    two-and-a-half-day conference was focused on

6    addiction issues.

7        Q.  How about issues of diversion?

8        A.  At those conferences?

9        Q.  Yes.

10       A.  To my recollection, we invited speakers to

11   those conferences, individuals from law enforcement

12   that would help educate the audience, which the

13   audience comprised professionals, mostly physicians.

14            And the goal was to try to enhance

15   communication between law enforcement and physicians

16   so that physicians would understand what law

17   enforcement's expectations were with respect to

18   monitoring for diversion and what to do if it was to

19   occur, and reciprocally to try to educate people in

20   law enforcement about the medical community's issues

21   in trying to treat chronic pain.

22       Q.  So would it be fair to say that the opioid

23   manufacturer provided you or your institutions

24   funding to facilitate education that directly went

25   to the risk associated with opioid prescribing?

```
 1                MR. BECKWORTH:  Objection.

 2                MS. SPENCER:  You can answer.

 3                THE WITNESS:  Yes.  That's true.

 4   BY MR. EHSAN:

 5        Q.  So that would be focusing on the negative

 6   or the risk side of chronic opioid use, correct?

 7        A.  Yes.

 8        Q.  Now, doctor, we've gone through a whole lot

 9   of science nerdy stuff, so I will try to distill

10   some of that down because sometimes I get into that

11   conversation and now it's just the two of us talking

12   and no one else understands what we're saying.  But

13   maybe others do.

14                MR. BECKWORTH:  Objection.  Disrespectful

15   to the 12 people in the jury box.

16   BY MR. EHSAN:

17        Q.  Doctor, would it be fair to say that at all

18   times, you provided the best possible and most

19   accurate information in your speaking -- Strike

20   that.  Let me start more broadly.

21                You received money from opioid

22   manufacturers, correct?

23        A.  Yes.

24        Q.  It never influenced anything you said with

25   respect to saying something you didn't believe was
```

Russell Portenoy, M.D.
January 24, 2019                                          399

```
 1   accurate, correct?
 2       A.  Correct.
 3       Q.  You also received funding for publications,
 4   correct?
 5       A.  When you say "publications," you need to be
 6   more specific.
 7       Q.  Sure.  You received funding for studies,
 8   correct?
 9       A.  Yes.  Research studies.
10       Q.  Research studies.  And those fundings never
11   dictated to you anything about the conclusions or
12   your findings, correct?
13       A.  That's correct.
14       Q.  You gave a significant number of talks
15   related to opioid use; is that correct?
16       A.  Yes.
17       Q.  And in all of those talks, you tried to
18   present a fair and balanced presentation of the
19   science as we understood it at the time, correct?
20       A.  Yes.
21       Q.  Likewise, you never attended any speaking
22   engagement regardless of the context in which a
23   speaker provided information related to the use of
24   opioids that you did not find -- that you found to
25   be problematic or inappropriate or inaccurate,
```

 1  correct?

 2      A.  I don't recall any.

 3      Q.  You have, in fact, given talks about

 4  addiction, abuse, and diversion, correct?

 5      A.  I have given talks that have included

 6  information about those areas, yes.

 7      Q.  Well, you have put on talks or conferences

 8  that address abuse, addiction, and diversion,

 9  correct?

10      A.  Yes.

11      Q.  And some of those talks were funded by

12  opioid manufacturers, correct?

13      A.  Yes.

14      Q.  As best as you recall, the labeling for

15  opioid medications included a section on the risks

16  and the benefits of the medication, correct?

17      A.  Yes.

18      Q.  And those included, at least in the 2000s

19  time period that we specifically talked about, a

20  discussion about addiction, diversion, and abuse,

21  correct?

22      A.  Yes.

23      Q.  And at least in the couple of instances

24  that you recalled, in a boxed warning, correct?

25      A.  Yes.

1      Q.  And as you testified, you encourage your

2   residents when you teach them to read the labeling

3   information for the medication they're prescribing,

4   correct?

5      A.  No, I don't think I said that.  When I

6   educate, whether it's residents or fellows, which is

7   a more common trainee level that I educate at --

8   these are people who have finished their residency

9   and getting extra training in pain medicine or in

10  palliative care, when I educate trainees or educate

11  colleagues, the emphasis is always on needing to

12  know what -- what -- needing to know the information

13  necessary to make judgments about what's safe and

14  effective for patients based on the specific

15  characteristics of the patient.

16          It hasn't been my practice to recommend

17  to everyone to read the package label.  That has

18  never been an educational meme of mine, if you will.

19          However, including in my education

20  information about the pharmacology, how to optimize

21  the analgesic outcomes, what expectations should be

22  made for side effect monitoring and how to treat

23  side effects, and then to be aware of the risk of

24  abuse and addiction and in recent years how to

25  actually assess and manage that, that's always been

 1   BY MR. ERCOLE:

 2       Q.  Yes.  Take your time to get there.

 3       A.  Um-hum.

 4       Q.  The State asked you some questions earlier

 5   about paragraph 30.  Do you recall that?

 6       A.  Yes.

 7       Q.  And by "the State" -- and I mean --

 8               MS. SPENCER:  We know.

 9   BY MR. ERCOLE:

10       Q.  -- Mr. Beckworth, who's representing the

11   State here.

12       A.  Yes.

13       Q.  And Mr. Beckworth walked you through some

14   of the examples from (a) to (p) in that declaration,

15   correct?

16       A.  Yes.

17       Q.  So if you can turn to paragraph 30(c),

18   do you see that?

19       A.  Yes.

20       Q.  And it refers to, in paragraph 30(c),

21   a seminar titled "Breakthrough pain curriculum

22   development workshop"?

23       A.  Yes.

24       Q.  And in there, it says, "I believe this was

25   financed ultimately by Cephalon, Inc. related to its

1   drug Fentora"; do you see that?

2       A.  Yes.

3       Q.  Are you aware of anything false or

4   misleading in that seminar, "Breakthrough pain

5   curriculum development workshop"?

6       A.  I don't have a specific recollection of

7   that workshop.  As a general rule, I would say no,

8   there was nothing false or misleading in workshops

9   like that.

10      Q.  And why would you say that as a general

11  rule?

12      A.  I participated in a number of educational

13  programs devoted to breakthrough pain.  Breakthrough

14  pain was a specific interest of mine.  I developed

15  the first measurement tool for that type of pain and

16  was involved in designing the research protocols

17  that demonstrated how the short-acting drugs work

18  for breakthrough pain.  So it was a specific area of

19  interest.

20          So I participated in a number of those

21  kinds of programs.  And all the programs that I

22  participated in were CME programs that -- for which

23  I created my own messages, used my own slides.

24  There was never any effort on the part of a funding

25  company, the sponsor, to change my messages or ask

 1   me to use specific slides.

 2       Q.  And paragraph 30(c) indicates that you were

 3   compensated $3,000 by Advanced Strategies in

 4   Medicine.

 5           Do you see that?

 6       A.  Yes.

 7       Q.  Was there anything wrong with being

 8   compensated for putting together a seminar that was

 9   neither false nor misleading?

10       A.  No, I don't think so.

11       Q.  If you turn to paragraph 30(e) -- Strike

12   that.  The next sort of bullet down, paragraph 30(d),

13   do you see that?

14       A.  Yes.

15       Q.  It says, "On May 15, 2007, I worked on an

16   advisory board for Cephalon, Inc. concerning the

17   drug Fentora, for which I was compensated $3,500"?

18       A.  Yes.

19       Q.  Did I read that correctly?

20       A.  Yes.

21       Q.  And are you aware of anything false or

22   misleading that was discussed at that advisory board

23   meeting on May 15, 2007?

24       A.  I'm not aware of anything.

25       Q.  Was there anything inappropriate about

1  being compensated for your work in connection with

2  that advisory board meeting?

3      A.  No.

4      Q.  And is it fair to say that that advisory

5  board meeting was an internal meeting at Cephalon?

6  Strike that.  That's a bad --

7              MS. SPENCER:  I was going to say, he can

8  answer if he recalls.

9              MR. ERCOLE:  Fair enough.

10 BY MR. ERCOLE:

11     Q.  In connection with that advisory board

12 meeting, was there any marketing done external in

13 connection with that?

14             MS. SPENCER:  Objection.

15             You can answer if you recall.

16             THE WITNESS:  Yeah.  I don't recall this

17 specific meeting in 2007.  So I really can't answer

18 that.

19 BY MR. ERCOLE:

20     Q.  As a general matter, did advisory boards

21 engage in marketing?

22     A.  No.  As a general matter, the advisory

23 boards did not discuss marketing.

24     Q.  And sitting here today, with respect to the

25 May 15, 2007 advisory board meeting for Cephalon,

 1   you're not aware of any marketing that was done in

 2   connection with that particular meeting?

 3       A.  I'm not aware of any, no.

 4       Q.  And you're not aware of anything false or

 5   misleading said during that meeting, correct?

 6       A.  That's correct.

 7       Q.  Paragraph -- turn to the next paragraph,

 8   paragraph 30(e).  It says, "On November 6, 2007,

 9   I presented a continuing medical education program,

10   'Meet the patients: Individualizing therapy for

11   persistent and breakthrough pain.'"

12            Do you see that?

13       A.  Yes.

14       Q.  Are you aware of anything false or

15   misleading -- Strike that.

16            In connection with that CME program, did

17   you independently develop the content of that

18   program?

19       A.  I don't remember the specific program, but

20   I'll answer yes to that because I developed the

21   content for all of the educational programs that I

22   did.

23       Q.  And with respect to any CME programs you

24   did for -- Strike that.

25            With respect to any CME programs that

```
 1    were sponsored by Cephalon, is it fair to say that

 2    Cephalon never controlled the content of those

 3    programs?

 4         A.   That I was involved with?

 5         Q.   Yes.

 6         A.   Yes, it's fair to say that.

 7         Q.   And to the best of your recollection, the

 8    November 6, 2007 CME program was no exception?

 9         A.   That's -- To the best of my recollection,

10    that's true.

11         Q.   And it indicates in that paragraph that you

12    were compensated $2,000 by Advanced Strategies in

13    Medicine; do you see that?

14         A.   Yes.

15         Q.   Anything improper about you being

16    compensated for your work in creating that CME?

17         A.   I don't think so, no.

18         Q.   If you go down to paragraph 30(j) --

19         A.   Yes.

20         Q.   -- it says, "On April 1, 2009, I

21    participated in a Fentora medical scientific

22    advisory board meeting"?

23         A.   Yes.

24         Q.   Do you see that?

25         A.   Yes.
```

1      Q.  And is the medical scientific advisory

2  board meeting referenced there the same type of

3  advisory board meeting that you've talked about

4  already?

5      A.  I don't remember this specific meeting.

6  I remember, for example, participating in a meeting

7  in which we designed a new research protocol for

8  studying Fentora in -- as a repeated dose

9  administration.

10          So the answer is, it could have been on

11  a research protocol, or it could have been of the

12  type I mentioned before where we were talking about

13  the role of treating breakthrough pain as part of

14  pain medicine.

15      Q.  Anything inappropriate that you recall

16  taking place on April 1, 2009?

17      A.  No, not that I recall.

18      Q.  Anything inappropriate or wrong from your

19  perspective in connection with participating in an

20  advisory board meeting for Fentora?

21      A.  No.

22      Q.  If you turn to paragraph 30(m), it says,

23  "In May 2010, I moderated an online program called

24  'Medico-legal issues, clinical guidelines and opioid

25  dose conversions.'"

 1    BY MR. ERCOLE:

 2        Q.  Are you aware of Cephalon not disclosing

 3    any relevant risks when communicating with the

 4    public of its medicine?

 5        A.  I'm not aware of communications to the

 6    public from Cephalon.

 7        Q.  And it goes on to say, "the risks

 8    associated with opioid abuse and addiction were

 9    known at that time."

10            Do you see that?

11        A.  Yes.

12        Q.  That would have been in 2004?

13        A.  Yes.

14        Q.  So in 2004, in your declaration, you're

15    confirming that the risks associated with opioid

16    abuse and addiction were known, correct?

17        A.  Correct.

18        Q.  And they would have been known within the

19    medical community, correct?

20        A.  Yes.

21        Q.  If you turn to paragraph 34 of your

22    declaration, I believe it's page 23.

23        A.  Yes.

24        Q.  It says, "I believe that, over the years,

25    some defendant drug companies have used my work to

```
 1    promote opioids by referencing the positive

 2    statements that I made repeatedly without providing

 3    the background, analysis of the literature, and

 4    cautions that accompanied these positive statements."

 5             Do you see that?

 6        A.  Yes.

 7        Q.  Are you aware of any instances where

 8    Cephalon did that?

 9             MS. SPENCER:  All you can answer is what

10    you know.

11             THE WITNESS:  Yes.  So I'm not aware of

12    an example where Cephalon has done that, no.

13    BY MR. ERCOLE:

14        Q.  And you're not aware of an example of Teva

15    USA doing that?

16        A.  No.

17        Q.  If you turn to paragraph 35 of your

18    declaration.  Do you see that, sir?

19        A.  Yes.

20        Q.  And I think it may be the fourth sentence

21    down.  It says, "Although I personally was never

22    influenced to say things I did not believe," do you

23    see that?

24        A.  Yes.

25        Q.  What did you mean by that?
```

1      A.   Essentially what we were saying before.

2   That in the funding that I received for educational

3   programs or in the funding that I received for

4   research projects, I personally was never asked to

5   craft a specific message or not -- not convey a

6   message that I originally put into some educational

7   materials or to do a specific kind of research or

8   change my research methodology.  I haven't

9   personally experienced that.

10     Q.   And if you keep going where there's a

11  reference to "they used the positive statements that

12  I made about opioids to portray opioid treatment as

13  safe and effective without the accompanying

14  discussion of risk that I included in the papers,

15  chapters, and lectures I produced beginning in the

16  1980s."

17           Do you see that?

18     A.   Yes.

19     Q.   Are you aware of any instance where

20  Cephalon did that with respect to opioids?

21     A.   Yeah.  I don't have any specific

22  recollection of that -- of those materials from

23  Cephalon.

24     Q.   About Teva USA?

25     A.   No.

```
 1       Q.  If you turn to paragraph 36.

 2       A.  Yes.

 3       Q.  It says -- last sentence there --

 4   "I believe that the drug companies created material

 5   that narrowly focused on the potential for safe and

 6   effective treatment of chronic noncancer pain, some

 7   of which was attributed to my work, but failed to

 8   include an adequate and balanced discussion of the

 9   limitations in the relevant science and the risks as

10   they were then known."

11           Do you see that?

12       A.  Yes.

13       Q.  Any instances where Cephalon did that?

14           MR. BECKWORTH:  Objection.

15           MS. SPENCER:  You can answer to the

16   extent that you know.

17           MR. BECKWORTH:  Yeah.  That's my

18   objection.  Are you asking him if he remembers or if

19   there are, in fact, any?

20           MR. ERCOLE:  Well, I appreciate the

21   objection.  So I'll let the question stand.

22   BY MR. ERCOLE:

23       Q.  And you can answer the question if --

24       A.  Yeah.  I don't recall any.

25       Q.  So sitting here, you don't recall any
```

```
 1              MR. ERCOLE:  So just to get on the

 2   record as you're --

 3              MS. SPENCER:  Yes, go ahead.

 4              MR. ERCOLE:  -- Dr. Portenoy, as your

 5   counsel knows, Judge Hetherington indicated that the

 6   State would have four hours, the defendants would

 7   have six hours.  Now, I appreciate it was a

 8   recommendation, and I appreciate we've --

 9              MS. SPENCER:  That's not --

10              MR. ERCOLE:  -- made that --

11              MS. SPENCER:  I'll object.  That's not

12   what the order provided.

13              MR. ERCOLE:  Well, we --

14              MR. BECKWORTH:  Told you.

15              MR. ERCOLE:  -- we may disagree on that.

16   But fair enough.  The request is obviously that I'd

17   like maybe 15 more minutes or so and we'll -- I'll

18   wrap up then.

19              MS. SPENCER:  I will absolutely grant

20   you 15 more minutes.  My understanding of the order,

21   and what my agreement is, is that you will have

22   equal time.  So along those lines, I will also

23   permit Attorney Beckworth to ask 15 more minutes --

24   15 minutes' worth of questioning as well.  And

25   that's equal time.
```

```
 1                    MR. ERCOLE:  Sorry, sir.  Before I was

 2    interrupted by the back-and-forth here, I need to go

 3    back and check where I was.  I apologize for that

 4    interruption.

 5                    MR. BECKWORTH:  And while you're doing

 6    that, just to be fair, to respect Amy's wishes, if

 7    you don't go that long, that's fine.  If you stop

 8    now, I'll take the three or whatever we're over, to

 9    be fair to everyone --

10                    MR. ERCOLE:  Thank you.

11                    MR. BECKWORTH:  -- meaning equal time.

12    BY MR. ERCOLE:

13        Q.  So let me -- so my question is, are you

14    aware of any false or misleading statement said by

15    Teva USA that has caused any particular prescriber

16    to write an opioid prescription that was

17    inappropriate?

18                    MR. BECKWORTH:  Same --

19                    THE WITNESS:  No, not to my knowledge.

20    BY MR. ERCOLE:

21        Q.  And certainly not in Oklahoma; is that fair

22    to say?

23                    MR. BECKWORTH:  Same objection.

24                    THE WITNESS:  Correct.

25
```

```
 1    BY MR. ERCOLE:

 2        Q.  Are you -- Dr. Portenoy, are you aware that

 3    Cephalon manufactures a drug by the name of Actiq?

 4        A.  Yes.

 5        Q.  And are you aware that Cephalon

 6    manufactures a drug by the name of Fentora?

 7        A.  Yes.

 8        Q.  Have you ever prescribed Actiq or Fentora?

 9        A.  Yes.

10        Q.  Have you ever prescribed Actiq or Fentora

11    for breakthrough pain in patients who do not have

12    cancer?

13        A.  Yes.

14        Q.  Can you describe some of those

15    circumstances where you've done that.

16             MS. SPENCER:  Again, within the confines

17    of HIPAA, yes.

18    BY MR. ERCOLE:

19        Q.  And I apologize.  Yes.  I don't need you to

20    disclose names or specific information.  Just --

21        A.  Yes.

22        Q.  -- some examples where that has happened.

23        A.  Well, I recall one patient who has a

24    diagnosis of a condition called medullary sponge

25    kidney.  This patient makes kidney stones and has
```

```
 1   have.

 2              MR. BECKWORTH:  There's no way that this

 3   witness is going to have to come back in this case.

 4   That's not true.

 5              MR. ERCOLE:  Well, if I don't get to ask

 6   my questions, then I will probably --

 7              MR. BECKWORTH:  Sir, trials don't go on

 8   forever.

 9              MR. ERCOLE:  Can I finish?

10              MR. BECKWORTH:  No.  You do not get --

11              MS. SPENCER:  All right.

12              MR. BECKWORTH:  You're not the

13   plaintiff.  You don't get a rebuttal of a rebuttal.

14              MR. ERCOLE:  It's not your decision.

15              MR. BECKWORTH:  It's her decision.

16              MS. SPENCER:  So where are we?

17              THE VIDEO OPERATOR:  Eight hours,

18   38 minutes.

19              MR. ERCOLE:  I can do it under five

20   questions.

21              MS. SPENCER:  I'm going to say this.

22   If I give you each five more minutes --

23              MR. ERCOLE:  I don't need five more

24   minutes.

25              MR. BECKWORTH:  Five questions is fine.
```

```
 1              MS. SPENCER:  If I give you each five

 2    more minutes, that's what I'm going to do.  It's

 3    fair, we don't have to come back here, we don't have

 4    to argue about this.  We can all get out of here.

 5              MR. BECKWORTH:  Brian said he can do it

 6    in five questions, and I bet you I won't have any.

 7                        EXAMINATION

 8    BY MR. ERCOLE:

 9         Q.  Dr. Portenoy, you have prescribed opioids

10    off-label; is that fair to say?

11         A.  Yes.

12         Q.  You've prescribed Actiq off-label, correct?

13         A.  Yes.

14         Q.  You've prescribed Fentora off-label?

15         A.  I don't think I've used Fentora, no.

16         Q.  Is it fair to say that in some situations,

17    off-label prescribing may form the appropriate

18    standard of care?

19         A.  Yes.

20         Q.  With respect to the off-label marketing

21    referenced in Plaintiff's Exhibit 7 --

22         A.  Yes.

23         Q.  -- do you have any knowledge one way or the

24    other -- personal knowledge one way or the other

25    whether Cephalon ever engaged in off-label promotion
```

 1   in Oklahoma?

 2        A.  I have no personal recollection that I --

 3   of that information, no.

 4        Q.  And you're not aware of anything in this

 5   document that says Cephalon engaged in off-label

 6   promotion in Oklahoma, correct?

 7        A.  Correct.

 8             MR. ERCOLE:  Thank you.

 9             MR. PATE:  That was six questions.

10             MS. SPENCER:  But it was less than five

11   minutes, so we're good.

12             MR. BECKWORTH:  We're done.  I've got to

13   go to New Jersey.

14             THE VIDEO OPERATOR:  The time is 10:33.

15   We're off.

16        (Deposition concluded at 10:33 p.m.)

17

18

19

20

21

22

23

24

25