# EXHIBIT 32

```
   IN THE DISTRICT COURT OF CLEVELAND COUNTY
                 STATE OF OKLAHOMA

STATE OF OKLAHOMA, ex rel.,
MIKE HUNTER,
ATTORNEY GENERAL OF OKLAHOMA,

           Plaintiffs

vs.                          Case No. CJ-2017-816

(1) PURDUE PHARMA, L.P.;
(2) PURDUE PHARMA, INC.;
(3) THE PURDUE FREDERICK COMPANY;
(4) TEVA PHARMACEUTICALS USA, INC.;
(5) CEPHALON, INC.;
(6) JOHNSON & JOHNSON;
(7) JANSSEN PHARMACEUTICALS, INC.;
(8) ORTHO-McNEIL-JANSSEN
PHARMACEUTICALS, INC., n/k/a
JANSSEN PHARMACEUTICALS, INC.;
(9) JANSSEN PHARMACEUTICA, INC.,
n/k/a JANSSEN PHARMACEUTICALS, INC.;
(10) ALLERGAN, PLC, f/k/a ACTAVIS PLC,
f/k/a ACTAVIS, INC., f/k/a WATSON
PHARMACEUTICALS, INC.;
(11) WATSON LABORATORIES, INC.;
(12) ACTAVIS, LLC; and
(13) ACTAVIS PHARMA, INC.,
f/k/a WATSON PHARMA, INC.,

           Defendants.


 VIDEOTAPED DEPOSITION OF LYNN WEBSTER, M.D.

      TAKEN ON BEHALF OF THE PLAINTIFF

ON FEBRUARY 18, 2019, BEGINNING AT 9:11 A.M.

           IN SALT LAKE CITY, UTAH




REPORTED BY:  VICKIE LARSEN, CSR/RMR
```

1  so-called KOLs have given depositions,
2  testimony in this case; right?
3         MR. ROBINSON: Objection. To
4      the extent you know anything
5      personally outside of any
6      communications you've had with
7      counsel.
8         THE WITNESS: I do not.
9         MR. EHSAN: Objection to the
10     form.
11        MR. ERCOLE: Same objection.
12        THE WITNESS: I do not know.
13     Q.   BY MR. DUCK: Would it surprise
14 you to learn that other KOLs that have
15 testified in this case feel that they were
16 used by the pharmaceutical companies --
17        MR. EHSAN: Objection.
18     Q.   BY MR. DUCK: -- that are
19 defendants in this case?
20        MR. ERCOLE: Objection.
21        MR. ROBINSON: Objection.
22        THE WITNESS: I'd be surprised
23     if that's what they thought.
24     Q.   BY MR. DUCK: You would be?
25     A.   Uh-huh.

1     Q.    Because you don't feel that
2  way?
3     A.    No.
4     Q.    You don't feel like they used
5  your influence to increase prescriptions of
6  their drugs?
7     A.    No, I do not.
8     Q.    You don't feel that they asked
9  you to be a key opinion leader or presenter
10 for them to increase peer to peer influence
11 opportunities?
12    A.    No, I think that that might be
13 true.
14           MR. EHSAN:  Objection.  Form.
15           THE WITNESS:  I mean, I think
16      that I'm well respected in my field,
17      and so to ask me to be involved in
18      anything that they're doing would
19      probably be something useful to them.
20      But that doesn't mean that I -- I did
21      anything to help them.
22    Q.    BY MR. DUCK:  Well, that may
23 not have been your intent, and that's not my
24 question.
25           My question is, you would agree

1  that -- I think this is what you just said --
2  that these defendants asked you to do things
3  because they perceived a business positive?
4          MR. EHSAN:  Objection to form.
5          MR. ERCOLE:  Same objection.
6     Mischaracterizes testimony.
7          MR. EHSAN:  Object to form.
8          THE WITNESS:  I've never
9       perceived it that way.  I've always
10      perceived it that they respect what I
11      stand for and they appreciate my
12      views, and so they've asked me to
13      give -- probably be engaged because of
14      that.
15     Q.    BY MR. DUCK:  Now, if your
16  views were that opioids were terrible drugs
17  that should never be prescribed, these
18  defendants probably wouldn't have had you
19  speak for them, would they?
20         MR. HOFFMAN:  Object to form.
21         MR. ERCOLE:  Same objection.
22         THE WITNESS:  I always lectured
23      about how harmful they were.
24      That's -- that's what I lectured
25      about.  I rarely said anything other

```
 1  the State today ever show you any documents
 2  concerning Watson Laboratories, Inc.?
 3       A.    Not that I'm familiar.  No, I
 4  don't recall.
 5       Q.    Did counsel for the State ever
 6  reference Watson Laboratories, Inc.?
 7       A.    I don't believe so.
 8       Q.    How about Actavis, LLC, have
 9  you ever heard of that entity?
10       A.    Well, I know Actavis.  I don't
11  know what the other part of it is, and if
12  there's a difference.
13       Q.    Sure.  About -- ever received,
14  to the best of your recollection, any funding
15  from Actavis, LLC?
16       A.    Not that I recall.
17       Q.    Are you aware of any -- aware
18  of any promotional or marketing statements
19  about opioids that were ever made by Actavis,
20  LLC?
21       A.    No.
22       Q.    Aware of any false or
23  misleading statements attributable to
24  Actavis, LLC --
25       A.    No.
```

1      Q.     -- sitting here today?

2      A.     No.

3      Q.     You've -- counsel for the State

4  mentioned -- has used the word -- the name

5  "Teva."

6             Do you recall that?

7      A.     Yes.

8      Q.     And counsel for the State never

9  differentiated as to what Teva entity it was

10 referring to or not referring to, but have

11 you ever heard of the -- of the company Teva

12 Pharmaceuticals USA?

13            MR. DUCK:  Objection to form.

14            THE WITNESS:  You know, I think

15     of Teva as Teva, and I'm not sure I

16     know the difference with -- if there

17     are different Tevas.

18     Q.     BY MR. ERCOLE:  Fair enough.

19            Are you aware of any false or

20 misleading statements, sitting here today,

21 that Teva USA has made?

22            MR. DUCK:  Objection to form.

23            THE WITNESS:  No.

24     Q.     BY MR. ERCOLE:  Are you aware

25 of any marketing at all that Teva USA has

1   done regarding opioids in Oklahoma?

2            MR. DUCK:  Objection to form.

3            THE WITNESS:  No.

4       Q.   BY MR. ERCOLE:  There was some

5   discussion earlier about Cephalon.  Do you

6   recall that?

7       A.   Yes.

8       Q.   Cephalon is different than

9   Teva; correct?

10      A.   Well, I don't know what you

11  mean by that.  Cephalon is what developed

12  Fentora and Actiq, and it was acquired by

13  Teva, is what my understanding is.  So it was

14  a different company, but then it folded into

15  Teva, is what my understanding is.

16      Q.   Would you be surprised to learn

17  that Teva USA and Cephalon are two distinct

18  companies even today?

19           MR. ROBINSON:  Objection.

20      Form.

21           THE WITNESS:  I guess I would

22      be surprised.  I didn't know that.

23      Q.   BY MR. ERCOLE:  With respect to

24  Cephalon, at any stage in time are you aware

25  of any false or misleading statements that

1   Cephalon has ever made?

2            MR. DUCK:  Objection to form.

3            THE WITNESS:  Only what was

4       presented to me today that the

5       Cephalon admitted to doing something

6       wrong.

7       Q.    BY MR. ERCOLE:  You have no

8   independent knowledge of that; correct?

9            MR. DUCK:  Objection.  Form.

10           THE WITNESS:  That's correct, I

11      don't.

12      Q.    BY MR. ERCOLE:  And you have no

13  independent knowledge, is it fair to say, of

14  any -- of any false or misleading statements

15  that Cephalon has ever made in the state of

16  Oklahoma; is that fair to say?

17           MR. DUCK:  Objection to form.

18           THE WITNESS:  That's correct.

19      Q.    BY MR. ERCOLE:  And sitting

20  here today, there were no documents presented

21  to you showing any false or misleading

22  statements made my Cephalon in the state of

23  Oklahoma; correct?

24      A.    Again, it's one document

25  that -- that the executives -- or there was

1  some kind of fine, and I don't know if that
2  applied to Oklahoma or not.
3       Q.   Are you aware that that was --
4  are you aware that that was -- that addressed
5  the issue of off-label promotion?
6       A.   That's what he -- that's what I
7  learned today.
8       Q.   Sure.  And we'll get into sort
9  of off-label prescribing issues, but is it
10 fair to say that off-label prescribing can,
11 in some instances, form the appropriate
12 standard of care for patients?
13           MR. DUCK:  Objection to form.
14           THE WITNESS:  Off-label
15      prescribing is common.  30 to
16      40 percent, probably, of all -- of all
17      prescribing across the board, all
18      medicines, is off-label.  And it's --
19      it's not uncommon to off-label --
20      prescribe off-label and that's why --
21      well, it's just not uncommon.
22      Q.   BY MR. ERCOLE:  And what is
23 sort of off-label prescribing, just to give
24 some additional context there?
25      A.   It just means --

1                MR. DUCK:  Objection to form.
2                THE WITNESS:  It just -- what
3        it means is that it's -- it's being
4        used, it's being prescribed for a
5        disease or a state that is not within
6        the FDA package insert guideline.
7        Doesn't have an approved FDA
8        indication.
9        Q.    BY MR. ERCOLE:  And is it fair
10   to say that, depending on context, some
11   off-label statements themselves may be
12   entirely true?
13               MR. DUCK:  Objection.  Form.
14               THE WITNESS:  Off-label
15       statements?
16               MR. ROBINSON:  Objection.
17       Form.
18               MR. ERCOLE:  Sure.
19               THE WITNESS:  You -- you mean
20       making some statements about off-label
21       use could be true?
22               MR. ERCOLE:  Yes.
23               MR. DUCK:  Objection to form.
24               THE WITNESS:  Yes, of course.
25       Q.    BY MR. ERCOLE:  And you say "of

1 course," what do -- what do you mean by that?
2     A.    Well, I mean --
3          MR. ROBINSON: Objection.
4          You can answer the question if
5 you can answer that in a vacuum. Go
6 ahead.
7          THE WITNESS: Well, I think
8 that it's very common for physicians
9 to write something that has no FDA
10 indication because we believe it's the
11 appropriate thing. And we may make
12 some statement that we believe it's
13 appropriate for that patient, for that
14 indication, for the -- whatever we're
15 prescribing, even though it's not a
16 part of the FDA indication.
17     Q.    BY MR. ERCOLE: And just
18 because it's -- is it fair to say just
19 because it's a off-label statement doesn't
20 necessarily mean it's false or misleading in
21 any way?
22          MR. DUCK: Objection to form.
23          THE WITNESS: It means that the
24 FDA has not approved it. That's all
25 it means.

1       Q.      BY MR. ERCOLE:  Okay.  Are
2  you -- Dr. Webster, how many years of medical
3  training do you have?
4       A.      Well, I was formally trained
5  with five years of college and three years of
6  medical school, four years -- three years of
7  a residency, one fellowship, and then I
8  trained myself a lot after my postgraduate.
9       Q.      And as a trained medical
10 professional, is it fair to say that when
11 prescribing a medicine, you as the -- as the
12 doctor, as the trained medical professional,
13 are the one responsible for making the
14 prescribing decision for the patient?
15      A.      Yes, that's correct.
16      Q.      And is it fair to say that as a
17 trained medical professional, you have the
18 obligation to make prescribing decisions in
19 the best interest of your patients?
20      A.      That's correct.
21      Q.      And is it fair to say that as a
22 trained medical professional, you actually do
23 make prescribing decisions in the best
24 interest of your patient?
25      A.      We try.

1  they would have been developed independent of
2  pharmaceutical companies; correct?
3          MR. DUCK:  Objection to form.
4          THE WITNESS:  By CM- -- by the
5      definition of CME, they are
6      independent.  They're funded by
7      pharma, but they're not developed by
8      pharma.
9      Q.    BY MR. ERCOLE:  Sure.  With
10 respect to that funding, are you aware of any
11 CME where -- that you were involved in where
12 the funding somehow influenced the particular
13 opinion or discussion you were giving?
14         MR. DUCK:  Objection to form.
15         THE WITNESS:  I would not have
16     contact with the company, so I
17     wouldn't know that.
18     Q.    BY MR. ERCOLE:  And sort of the
19 -- strike that.
20         With respect to there was some
21 discussion, I believe, of speaker programs --
22     A.    Yes.
23     Q.    -- earlier.
24         What's a speaker program?
25     A.    Those are promotional programs.

1   Those are educational but promotional.  I

2   mean, those are where pharmaceutical

3   companies or device companies contract with

4   physicians to talk about their product in a

5   promotional way.

6          Q.     And did you serve as a speaker

7   for Cephalon at some point?

8          A.     I think Cephalon is the only

9   company that I did that with for a short

10  time, and I can't remember how long, but I

11  did speak on the speaker bureau.  The content

12  was not promoting their product, though.  I

13  only spoke about the risk and abuse, and

14  that's the reason I would do it.

15         Q.     And with respect to the -- the

16  speaker programs that you did for Cephalon,

17  the opinions you gave regarding risks and

18  abuse, those were your own opinions; correct?

19                MR. DUCK:  Objection to form.

20                THE WITNESS:  Yes, that's

21      correct.

22         Q.     BY MR. ERCOLE:  And you

23  wouldn't have done those speaker programs if

24  they weren't your opinions; is that fair to

25  say?

```
 1              MR. DUCK:  Objection to form.
 2              THE WITNESS:  That is
 3      absolutely correct.  Much of it was
 4      based on my research and science.  And
 5      so, I mean, most of the -- of what's
 6      been developed in this field is -- is
 7      really come from my research and
 8      helped physicians understand what the
 9      risks are and how to mitigate those
10      risks.
11      Q.      BY MR. ERCOLE:  And with
12 respect to speaker programs that you did, do
13 you feel like they were helpful to
14 physicians?
15              MR. DUCK:  Objection to form.
16              THE WITNESS:  I was hopeful
17      that they were helpful.
18      Q.      BY MR. ERCOLE:  How about with
19 respect to the CMEs?
20              MR. DUCK:  Objection to form.
21              THE WITNESS:  So, yes, I mean,
22      I think when you can put out good
23      science that is new, I'm hoping that
24      -- and -- because it was the topic
25      area, I was hoping that it was useful
```

```
 1            to the doctors.
 2       Q.   BY MR. ERCOLE:  Anything --
 3  anything false or misleading that you can
 4  recall ever saying in any speaker program
 5  that you were involved in?
 6            MR. ROBINSON:  Objection to
 7       form.
 8            MR. DUCK:  Objection to form.
 9            THE WITNESS:  No.
10       Q.   BY MR. ERCOLE:  Dr. Webster,
11  you've written books about opioids; is that
12  fair to say, or at least one book?
13            MR. ROBINSON:  Objection.
14            MR. DUCK:  Objection to form.
15            MR. ERCOLE:  All right.  Let me
16       ask it again.
17            MR. ROBINSON:  Lacks
18       foundation.
19       Q.   BY MR. ERCOLE:  Have you
20  written any -- any books about opioids?
21            MR. ROBINSON:  Objection.
22       Lacks foundation.  Form.
23            THE WITNESS:  I wrote a book
24       about how to prescribe opioids and
25       mitigate the risk for practitioners.
```

 1          it -- at the beginning, they did not
 2          believe there was much risk at all.
 3                  And I think that that -- that
 4          was just about not knowing and
 5          probably not understanding how to
 6          assess for risk at the time, because
 7          there are a lot of people who have
 8          chronic pain who have comorbid
 9          medical -- mental health problems that
10          clearly increase the risk.
11                  And so I would tell patients,
12          If you take the medicine as directed,
13          you should not have a problem with
14          addiction.
15                  And I think that's true, but I
16          think it -- it didn't -- I didn't
17          appreciate that there were people that
18          probably were at greater risk at the
19          beginning.  But that's why I developed
20          the opioid risk tool, because I knew
21          that there was something more there.
22          And we were beginning to see people
23          with problems.
24                  But who -- who and why, and how
25          do you -- how do you identify those

1        people, that's why I did the
2        literature search.  I don't think I
3        was unique.  I think that's the way we
4        collectively in the field as experts
5        understood where we were and where the
6        science was at the time.
7        Q.    BY MR. ERCOLE:  And -- and
8   those views were -- were views that you
9   independently developed based upon the
10  science and the field at that time?
11       A.    Yeah.  Wasn't from pharma.  I
12  mean, this is -- this is something that I
13  developed on my own because I wanted -- I
14  didn't want to cause any harm, and I wanted
15  to be a leader in the field to make sure that
16  others knew what I knew and what I'd learned,
17  what I'd published.
18       Q.    You were shown some documents
19  today pertaining to Cephalon and Teva.  Do
20  you recall that?
21       A.    Yes.
22             MR. LEONOUDAKIS:  Objection.
23  Form.
24       Q.    BY MR. ERCOLE:  If you turn to,
25  I believe it's Exhibit 9.  I think it's the

 1  document with "Actiq" on the front of it.
 2       A.    I see it.
 3       Q.    Before today, did you have any
 4  independent knowledge of this document?
 5       A.    No.
 6       Q.    Did you ever see this document
 7  before?
 8       A.    No.
 9       Q.    Do you have any understanding
10  of the -- given that you -- strike that.
11             Given that you have no
12  independent knowledge of this document, did
13  you have any understanding of the intent of
14  this document?
15             MR. LEONOUDAKIS:  Objection.
16       Form.
17             THE WITNESS:  Not what we
18       reviewed today.  There are more pages
19       here than we reviewed earlier, so I
20       don't -- I can't comment on anything I
21       haven't reviewed.
22       Q.    BY MR. ERCOLE:  Sure.  At least
23  with respect to the -- to the pages that you
24  reviewed; correct?
25             I'll ask the question this way: