# EXHIBIT 33

```
 1        IN THE DISTRICT COURT OF CLEVELAND COUNTY

 2                    STATE OF OKLAHOMA

 3   STATE OF OKLAHOMA, ex rel.
     MIKE HUNTER, ATTORNEY GENERAL
 4   OF OKLAHOMA,
              Plaintiff,
 5
          vs.                        Case No. CJ-2017-816
 6
     PURDUE PHARMA, L.P.; PURDUE
 7   PHARMA, INC.; THE PURDUE
     FREDERICK COMPANY; TEVA
 8   PHARMACEUTICALS USA, INC.;
     CEPHALON, INC.; JOHNSON &
 9   JOHNSON; JANSSEN PHARMACEUTICALS,
     INC.; ORTHO-McNEIL-JANSSEN
10   PHARMACEUTICALS, INC., n/k/a
     JANSSEN PHARMACEUTICALS, INC.;
11   JANSSEN PHARMACEUTICA, INC.;
     ALLERGAN, PLC, f/k/a ACTAVIS,
12   INC., f/k/a WATSON
     PHARMACEUTICALS, INC.; WATSON
13   LABORATORIES, INC.; ACTAVIS, LLC
     and ACTAVIS PHARMA, INC., f/k/a
14   WATSON PHARMA, INC.,
              Defendants.
15   _____

16      VIDEOTAPED DEPOSITION OF SCOTT FISHMAN, M.D.

17                  February 26, 2019

18                     9:43 a.m.

19

20          4860 Y Street, Suite 3020

21            Sacramento, California

22

23   REPORTED BY:

24   MARYANN H. VALENOTI

25   CSR #11266, RPR, CRR
```

1        Q.   And you worked with them for many years?

2        A.   Yes.

3        Q.   Do you believe that had they known this,

4    they would have wanted to engage with Janssen as a

5    key opinion leader?

6             MR. EHSAN:   Objection, calls for

7    speculation.

8             THE WITNESS:   I -- yeah, I don't know what

9    they would do or what they were thinking.

10   BY MS. BALDWIN:

11       Q.   If you turn to Page 8, it looks like they

12   sampled consistent of the -- the sample of 1,000

13   physicians were from five different regions;

14   correct?

15            MR. EHSAN:   Objection to form.

16            THE WITNESS:   Yes.

17   BY MS. BALDWIN:

18       Q.   And they broke down the Respondents by

19   specialty, and the majority were primary care

20   physicians; is that correct?

21       A.   Yes.

22            MR. EHSAN:   Same objection.

23            THE WITNESS:   Yes.

24   BY MS. BALDWIN:

25       Q.   And then there's -- on the following page,

1   there is a table that shows the number and

2   percentage of doctors by Duragesic decile in each

3   region.  Do you see that?

4           MR. EHSAN:  Objection to form.

5           THE WITNESS:  Yes.  Can you tell me what a

6   "Duragesic decile" means?

7           MR. ROBINSON:  You can't ask questions.

8           THE WITNESS:  Sorry.

9   BY MS. BALDWIN:

10      Q.   Well, again, did you know -- you didn't

11  know until I told you today that -- correct, that

12  Janssen ranked physicians based on how often they

13  prescribed their products; correct?

14      A.   Correct.

15          MR. EHSAN:  Objection to form.

16  BY MS. BALDWIN:

17      Q.   And it's typically on a scale of 1 to 10?

18      A.   Yes.

19          MR. EHSAN:  Objection to form.

20  BY MS. BALDWIN:

21      Q.   You didn't know that prior to today?

22          MR. EHSAN:  Objection to form.

23          THE WITNESS:  I think it was a scale of 1

24  to 7.  On Page 6 it says 1 to 7, but I did not know

25  that until today.

```
 1    BY MS. BALDWIN:

 2         Q.   Yeah, 1 to 7 is the influence of a key

 3    opinion leader on prescribing.

 4         A.   Oh, I see.  Got it.

 5              MR. EHSAN:  Objection to form.

 6    BY MS. BALDWIN:

 7         Q.   This is a pretty --

 8         A.   Yeah, involved.

 9         Q.   This PowerPoint is a pretty involved

10    analysis of the influence of key opinion leaders on

11    physicians prescribing.  Would you -- wouldn't you

12    say?

13              MR. EHSAN:  Objection to form.

14              MR. ROBINSON:  Objection to form.

15              THE WITNESS:  Yes.

16    BY MS. BALDWIN:

17         Q.   If you turn to Page 12, do you see that

18    they -- Janssen did a point allocation summary.

19    "Each Respondent was asked to assign points based

20    on the level of influence of these parameters on

21    his prescribing.  The most influential factor was

22    assigned 100 points, and no two factors were to be

23    assigned the same value by a Respondent.  A summary

24    of the response is as follows in the next two

25    slides:  First one with overall results, and the
```

```
 1    second one by specialty group of Respondent";

 2    correct?

 3              MR. EHSAN:  Objection to form.

 4              THE WITNESS:  Yes.

 5    BY MS. BALDWIN:

 6        Q.   Give you an example of Question 10:

 7    "Please consider the following specific factors

 8    that may influence your prescribing of opioids.  Of

 9    course many other factors will influence your

10    prescribing, but we are interested in the relative

11    influence of these particular factors"; correct?

12              MR. EHSAN:  Objection to form.

13              THE WITNESS:  Yes.

14    BY MS. BALDWIN:

15        Q.   And these factors include peer

16    interaction; correct?

17        A.   Yes.

18              MR. EHSAN:  Objection to form.

19    BY MS. BALDWIN:

20        Q.   Availability of coupons and/or vouchers?

21              MR. EHSAN:  Same objection.

22              THE WITNESS:  Yes.

23    BY MS. BALDWIN:

24        Q.   Patient request for specific drugs?

25              MR. EHSAN:  Same objection.
```

```
 1              THE WITNESS:  Yes.

 2     BY MS. BALDWIN:

 3         Q.   Sales representative messages?

 4              MR. EHSAN:  Same objection.

 5              THE WITNESS:  Yes.

 6     BY MS. BALDWIN:

 7         Q.   Influence of opinion leaders?

 8              MR. EHSAN:  Same objection.

 9              THE WITNESS:  Yes.

10     BY MS. BALDWIN:

11         Q.   Peer-reviewed journal articles or studies?

12              MR. EHSAN:  Same objection.

13              THE WITNESS:  Yes.

14     BY MS. BALDWIN:

15         Q.   Medical education?

16              MR. EHSAN:  Same objection.

17              THE WITNESS:  Yes.

18     BY MS. BALDWIN:

19         Q.   Formulary status?

20              MR. EHSAN:  Same objection.

21              THE WITNESS:  Yes.

22     BY MS. BALDWIN:

23         Q.   Regulatory liability concerns?

24         A.   Yes.

25              MR. EHSAN:  Same objection.
```

```
 1    used them before.

 2            We didn't use them excessively in my

 3    practice, and we rarely use them at very high

 4    doses.  So that's a long-winded yes.

 5            You know, I think when I present, that

 6    would be the basis that I would come from, and no

 7    one would shift me, and some people disagreed with

 8    my positions and other people agreed.

 9            In the long run, I believe that the work

10    that I did would be embraced by pharmaceutical

11    companies, because in the long run, pharmaceutical

12    companies wouldn't have successful products unless

13    they were used safely.

14    BY MR. ERCOLE:

15        Q.   In fact, pharmaceutical companies did

16    sponsor, indirectly at least, presentations that

17    you've given on these very topics; correct?

18            MS. BALDWIN:  Objection, leading.

19            THE WITNESS:  I would say they sponsored

20    the book Responsible Opioid Prescribing, which if

21    you really read it, is basically a book that says

22    be careful.

23    BY MR. ERCOLE:

24        Q.   It's a book to physicians saying be

25    careful, these are the risks associated with
```

1    opioids potentially; correct?

2         A.    This is a dangerous group of drugs that we

3    have to use carefully or we'll use the right to use

4    them, which is something I say in the book.

5         Q.    And the book you're referring to is

6    Responsible Opioid Prescribing; is that correct?

7         A.    Correct.

8         Q.    Just we heard a lot of -- we'll get into

9    some of the content of that book a little bit

10   later, but we had a lot of questions about

11   Responsible Opioid Prescribing.  Just to clarify,

12   the opinions expressed in that book are your

13   independent opinions and your independent opinions

14   only; correct?

15            MS. BALDWIN:  Objection, leading.

16            THE WITNESS:  They're my independent

17   opinions, but with that said, I wrote the book as a

18   commissioned production for the Federation of State

19   Medical Boards to articulate what I thought was an

20   important -- were important guiding principles from

21   the model policy, which gave medical boards

22   guidance on how to investigate physicians if they

23   were called out for their prescribing.  Does that

24   make sense?

25            So with that, that was really my

```
 1   framework, and I built it -- I built the

 2   Responsible Opioid Prescribing case out from there.

 3   BY MR. ERCOLE:

 4       Q.   Understand, and we'll get into some of

 5   these topics a little bit later, but at least with

 6   respect to the views expressed in Responsible

 7   Opioid Prescribing, the book that you authored, is

 8   it fair to say that those views were developed by

 9   you independent from any pharmaceutical company

10   influence?

11           MS. BALDWIN:  Objection, leading.

12           THE WITNESS:  Independent of any direct

13   influence.  Again, it's all an amalgamation of all

14   the experiences and thoughts and ideas that I've

15   had, but they were in my independent views.

16   BY MR. ERCOLE:

17       Q.   And the book reflects your independent

18   views; correct?

19       A.   Correct.

20           MS. BALDWIN:  Objection, leading.

21           THE WITNESS:  I would say the book is

22   consistent with my views throughout, throughout its

23   evolution of editions.

24   BY MR. ERCOLE:

25       Q.   There have been -- with respect to that
```

1    book and again we'll get into this a little bit, is

2    it fair to say there have been two editions?

3        A.    There have been three editions.  The first

4    two were called First and Second Edition.  The

5    third was called the Second Edition Expanded.

6        Q.    Dr. Fishman, you understand this case was

7    brought by the -- strike that.  Let me go back.

8            You mentioned before that you have no

9    direct knowledge, and I don't want to misquote you,

10   but this is what I wrote down.  You have no direct

11   knowledge of how any company in this case marketed

12   its drugs.  Do you recall saying that?

13           MS. BALDWIN:  Objection, leading.

14           THE WITNESS:  Yes.

15   BY MR. ERCOLE:

16       Q.    And is that accurate?

17       A.    Yes.

18       Q.    You understand that this case is -- strike

19   that.

20           With respect to your reference to drugs,

21   that would include opioid medicines; correct?

22           MS. BALDWIN:  Objection.

23           THE WITNESS:  Correct.

24   BY MR. ERCOLE:

25       Q.    You understand this case is brought by the

```
 1    BY MR. ERCOLE:

 2         Q.    Are you aware of any promotional or

 3    marketing statements made about opioids from Watson

 4    Laboratories?

 5         A.    No.

 6         Q.    Have you ever had any communications with

 7    a company known as Actavis, LLC, to the best of

 8    your understanding?

 9         A.    Not that I recall.

10         Q.    Do you ever -- were you ever aware of any

11    funding that you've received directly or indirectly

12    from a company known as Actavis, LLC?

13         A.    Not that I know of.

14         Q.    Are you aware of any promotional or

15    marketing statements about opioids made by Actavis,

16    LLC?

17         A.    Not that I am aware of.

18         Q.    Are you aware of what medicines, if any,

19    Actavis Pharma, Watson Laboratories or Actavis, LLC

20    manufactures?

21         A.    I am not.

22         Q.    Do you recall any documents that the State

23    showed you today about any of those entities?

24               MS. BALDWIN:  Object to form.

25               THE WITNESS:  I think there was one
```

```
 1     document that listed Watson, and, I mean, it could

 2     have even been in my book.  I think I saw the name

 3     "Watson" somewhere.

 4     BY MR. ERCOLE:

 5          Q.   Sitting here today, can you

 6     recall specifically about --

 7          A.   I don't know if that happened today, no.

 8               MS. BALDWIN:  Object to form.

 9     BY MR. ERCOLE:

10          Q.   Are you aware of any -- Dr. Fishman, are

11     you aware of any -- you've heard of the company

12     Teva, USA; is that fair to say?

13          A.   Yes.

14          Q.   Are you aware of any false or misleading

15     statements that Teva USA has ever made about

16     opioids?

17          A.   No.

18          Q.   You've heard of the company Cephalon; is

19     that fair?

20          A.   Yes.

21          Q.   Are you aware of any -- strike that.

22               Do you have any personal knowledge of any

23     false or misleading statements that Cephalon has

24     ever made about opioids?

25               MS. BALDWIN:  Object to form.  I should
```

1    say I have a history with Cephalon in that they

2    made misleading statements about me.

3    BY MR. ERCOLE:

4        Q.   Okay.  With respect to making misleading

5    statements about you, do you recall what that issue

6    was?

7        A.   The issue was that I agreed to do a public

8    service announcement, and I think it was Cephalon

9    at the time, and then it became Teva, and I signed

10   an agreement that said that I wasn't getting paid,

11   and it would only be for public service, public

12   education.  It was actually a commentary that I

13   made at a professional meeting about the risk of

14   addiction and abuse in children.  They wound up

15   putting it up on their marketing website,

16   unbeknownst to me, something that they later took

17   off and apologized for.

18       Q.   So is it fair to say when that issue was

19   brought to your attention, that they immediately

20   took off the video from the website?

21       A.   Yes.

22            MS. BALDWIN:  Object to form.

23            THE WITNESS:  Yes.

24   BY MR. ERCOLE:

25       Q.   You said Cephalon also apologized to you.

```
 1   risks of opioids.

 2   BY MR. ERCOLE:

 3       Q.   And then Cephalon went and put that,

 4   actually, on its website; is that correct?

 5           MS. BALDWIN:  Objection, leading.

 6           THE WITNESS:  That is correct, or Teva

 7   did.  I'm not sure.

 8   BY MR. ERCOLE:

 9       Q.   Fair enough.  Once you said, Hey, could

10   you take that down because there was an incorrect

11   attribution of some payment to you in there, they

12   immediately did that; is that fair to say?

13           MS. BALDWIN:  Objection, leading.

14           THE WITNESS:  They took it down because it

15   was never intended to be used in their marketing,

16   and there was also an inaccurate attribution of

17   payment to me.

18   BY MR. ERCOLE:

19       Q.   In connection with that particular video,

20   was there anything false or misleading other than

21   the attribution of payment to you that was

22   associated with that?

23           MS. BALDWIN:  Object to form.

24           THE WITNESS:  No.

25
```

```
 1     BY MR. ERCOLE:

 2         Q.    Other than that medication attribution of

 3     you receiving a payment, anything false or

 4     misleading that you can recall Cephalon making

 5     about opioids?

 6               MS. BALDWIN:  Object to form.

 7               THE WITNESS:  No.

 8     BY MR. ERCOLE:

 9         Q.    With respect to the misattribution of

10     payment that you just described, that was disclosed

11     as part of the video; is that correct?

12               MR. ROBINSON:  Object to form.

13               MS. BALDWIN:  Objection.

14               THE WITNESS:  I actually don't know.  It

15     was somehow transmitted to media sources that I was

16     paid, so Cephalon made a statement that I wasn't --

17     in fact, reproduced this document I had them sign

18     that stated that I would not be paid.  These were

19     my own ideas.  This would only be used for a public

20     service announcement, and it would not be used for

21     marketing purposes or for corporate purposes.

22     BY MR. ERCOLE:

23         Q.    So we looked at and I asked you to look at

24     Exhibit 1 in your CV.  There are a number of

25     different categories in this particular document,
```

 1   it's very extensive, very impressive.  If you look

 2   to, it looks like it's Bates marked as FISH 8; do

 3   you see that on the bottom right-hand corner?

 4   There is a section that says, "Teaching Lectures

 5   and Presentations"; do you see that?

 6        A.   Yes.

 7        Q.   And it looks like there are -- if you

 8   scroll through, it looks like there are 566 of

 9   them; do you see that?

10        A.   Yes, as of August 2017.

11        Q.   Sitting here today with respect to those

12   lectures and presentations, could you identify a

13   single one of those lectures or presentations that

14   did not reflect your own independent medical

15   opinion?

16        A.   No.

17        Q.   Because they all did reflect your own --

18             MS. BALDWIN:  Object to form.

19   BY MR. ERCOLE:

20        Q.   They all did reflect your own independent

21   medical opinion?

22             MS. BALDWIN:  Objection, leading.

23             THE WITNESS:  They did.

24   BY MR. ERCOLE:

25        Q.   And if you turn to the next category, it