# EXHIBIT 35

```
 1        IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF OHIO
 3                  EASTERN DIVISION
 4                      - - -
 5
    IN RE:  NATIONAL          :   HON. DAN A.
 6  PRESCRIPTION OPIATE       :   POLSTER
    LITIGATION                :
 7                            :
    APPLIES TO ALL CASES      :   NO.
 8                            :   1:17-MD-2804
                              :
 9
            - HIGHLY CONFIDENTIAL -
10
    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                    VOLUME I
12
                     - - -
13
                 April 17, 2019
14
                     - - -
15
16          Videotaped deposition of
    THOMAS PREVOZNIK, taken pursuant to
17  notice, was held at the law offices of
    Williams & Connolly, 725 12th Street,
18  Washington, D.C., beginning at 9:11 a.m.,
    on the above date, before Michelle L.
19  Gray, a Registered Professional Reporter,
    Certified Shorthand Reporter, Certified
20  Realtime Reporter, and Notary Public.
21                   - - -
22
          GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
               deps@golkow.com
24
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    But neither the statute nor
2    the regulation says explicitly that
3    manufacturers need to know their
4    customers' customers, do they?
5    A.    It does not say that
6    explicitly.  But it does say that you
7    need to guard against diversion.
8    Q.    Has the DEA ever provided
9    guidance to the industry in writing
10   informing registrants that they are to
11   know their customers' customers?
12   A.    Not that I'm aware of.
13   Q.    Has DEA provided any other
14   kind of guidance, besides written
15   guidance, informing manufacturers of any
16   duty to know their customers' customers?
17   A.    Well, again it comes down to
18   what information you have.  So if you
19   have that information, you have the duty
20   to protect and guard against the
21   diversion.
22          So if you have that
23   information, you're to guard against
24   diversion of controlled substances.

Highly Confidential - Subject to Further Confidentiality Review

```
 1           Q.    But to my question, has the
 2   DEA ever provided any kind of guidance to
 3   manufacturers informing them that they
 4   were to know their customers' customer?
 5           A.    No, not to my knowledge.
 6           Q.    Okay.  Let's talk for a
 7   minute about ARCOS.
 8                 Generally speaking, what
 9   sorts of information does ARCOS contain?
10           A.    ARCOS contains the
11   manufacturers and distributors that are
12   to report all transactions for
13   Schedule I, Schedule II, Schedule III
14   narcotics, and GHB, and manufacturers
15   also have reported -- additional
16   reporting requirements for some
17   psychotropics.
18           Q.    Okay.  Would ARCOS contain
19   all of the distributions of prescription
20   opioids by manufacturers to distributors?
21           A.    So the transactions for
22   manufacture -- yes, manufacturer to a
23   distributor?  Yes.
24           Q.    Would ARCOS contain all the
```

Highly Confidential - Subject to Further Confidentiality Review

1 distributions of prescription opioids
2 from distributors to pharmacies or other
3 retail outlets?
4   A. For those items, yes.
5   Q. Does ARCOS data provide any
6 details about those transactions, like
7 the amount, the recipients --
8   A. Yes, it tracks the quantity.
9 It has the DEA number of the registrant
10 that -- whether it's a sale. It could be
11 a sale, it could be a purchase. It could
12 be a disposition of, you know, getting
13 wasted. Any transaction that -- that
14 could fall within the system that --
15 that's trackable, that would be in there,
16 for those items.
17   Q. Okay. Through ARCOS, can
18 DEA see the type of medication that's
19 being purchased?
20   A. Well, it's in there by NDC
21 number.
22   Q. Okay. And the NDC number
23 would -- would allow the DEA to determine
24 which product we are talking about?

1    BY MR. O'CONNOR:
2         Q.   Yeah.
3         A.   It says, "Ms. Duft explained
4    the cash-back system which allows
5    Mallinckrodt to view who their customers
6    are selling to and to what products they
7    are selling.  Ms. Duft stated
8    Mallinckrodt has been reviewing this
9    system since last fall, though it's been
10   available to them for several years."  So
11   they've had -- they've had the data for a
12   few years.
13        Q.   At any point before that
14   time, had anyone at DEA ever told a
15   manufacturer that it should review
16   chargeback data?
17             MR. FINKELSTEIN:  Objection
18        to the scope.
19             Industrywide guidance was
20        the authorization, but you can
21        answer if you know.
22             THE WITNESS:  I don't know.
23   BY MR. O'CONNOR:
24        Q.   Just to be clear, at any

Highly Confidential - Subject to Further Confidentiality Review

1  point before that time, had the DEA ever
2  issued any industrywide guidance
3  indicating that manufacturers should
4  review chargeback data?
5          A.    Not to my knowledge.
6          Q.    Earlier you mentioned
7  something about prescription data.
8  Chargeback data doesn't involve
9  prescription data, does it?
10         A.    It depends what data -- for
11 SearchPoint and ChoicePoint data that the
12 pharmacies were selling to it.
13         Q.    But SearchPoint data was not
14 chargeback data, correct?
15               MR. FINKELSTEIN:  Scope.
16               THE WITNESS:  It was an
17         exchange of money for their data,
18         so...
19 BY MR. O'CONNOR:
20         Q.    Is DEA aware of whether
21 chargeback data provides information on
22 every sale of the Schedule I and II
23 opioids?
24               MS. SINGER:  Objection.

Golkow Litigation Services                           Page 347

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Scope.
 2                 MR. FINKELSTEIN:  Scope.
 3                 THE WITNESS:  Schedule I?
 4   BY MR. O'CONNOR:
 5         Q.    Schedule II and III.
 6         A.    I -- could you repeat the
 7   question?
 8         Q.    Yeah.  Sure.  I'm sorry, I
 9   did say Schedule I.  Strike that.  I'll
10   ask a new question.
11               Is the DEA aware whether
12   chargeback data provides information on
13   every sale of Schedule II and
14   Schedule III opioids?
15         A.    I don't know that.
16         Q.    Is DEA aware whether
17   chargeback data provides information
18   regarding every sale?
19                 MR. FINKELSTEIN:  Scope.  If
20          we don't get to something that's
21          within his authorization pretty
22          quick, I'm going to start
23          instructing him not to answer.
24                 But you can answer that
```

Golkow Litigation Services                          Page 348

Highly Confidential - Subject to Further Confidentiality Review

1  me that the way -- the way the program
2  functioned, is more important than what's
3  described on paper?
4              MR. FINKELSTEIN:  Vague.
5              THE WITNESS:  I don't know.
6         You'd have to assess both to see.
7         I mean, you would hope that it
8         would function better, yes.
9  BY MR. O'CONNOR:
10        Q.    Because what matters is
11 whether the program identifies suspicious
12 orders when they come in, correct?
13             MR. FINKELSTEIN:  Objection.
14        Vague.
15             THE WITNESS:  What matters
16        is, do you have an effective means
17        to safeguard against diversion.
18        That's what matters, because we're
19        trying to protect the public.
20 BY MR. O'CONNOR:
21        Q.    Does it say anywhere in the
22 relevant regulations that registrants are
23 required to have a written policy with
24 respect to suspicious order monitoring?

```
 1        A.    No.
 2        Q.    Okay.  You spent some time
 3   in the liaison policy -- or the policy
 4   liaison section, correct?
 5        A.    Correct.
 6        Q.    And could you describe for
 7   me the modes of communication that that
 8   office or other offices used to
 9   communicate guidance to the registrant
10   community?
11              MR. FINKELSTEIN:  Objection.
12        Vague.
13              THE WITNESS:  The -- it's
14        basically two sections, or units.
15        One is policy and the other one is
16        liaison.  I was in the liaison
17        section.  So that would be the
18        interact -- pretty much the
19        physical interaction with people,
20        whether it's registrants or
21        associations, that type, you know,
22        where we're physically meeting
23        with them or physically doing
24        conferences, doing presentations,
```