# EXHIBIT 39

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | |
|---|---|
| IN RE:  NATIONAL | :HON. DAN A. POLSTER |
| PRESCRIPTION OPIATE | : |
| LITIGATION | :MDL NO. 2804 |
| | : |
| APPLIES TO ALL CASES | :NO. |
| | :1:17-MD-2804 |

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

- - -

December 14, 2018

- - -

        Videotaped sworn deposition of
COLLEEN McGINN, taken pursuant to
notice, was held at GOLKOW LITIGATION
SERVICES, One Liberty Place, 1650 Market
Street, Philadelphia, Pennsylvania,
beginning at 9:39 a.m., on the above
date, before Margaret M. Reihl, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Page 224

1    making a decision.

2         Q.    And Teva wasn't doing that when

3    you took over, correct?

4         A.    Not that I know of.

5         Q.    Okay.  And so from perspective of

6    the gap analysis related to the computer

7    algorithm, there were big gaps between what Teva

8    was doing and what you felt should be done,

9    correct?

10             MR. ANDRISANI:  Objection, form.

11             THE WITNESS:  Again, all of the

12             things I have listed in the model

13             program did not necessarily have to be

14             taken care of by a computerized

15             algorithm but should be a part of the

16             program in its entirety.

17   BY MR. CARTMELL:

18        Q.    I understand, but you wouldn't

19   have put these things here if they were

20   currently being done by Teva, correct?

21        A.    Agreed.

22        Q.    Okay.  So my point is there were

23   big gaps between what you looked at in the

24   program, whether it's SORDS or not, related to

Highly Confidential - Subject to Further Confidentiality Review

Page 225

1    what you think -- you thought the program should

2    do, correct?

3                    MR. ANDRISANI:  Objection, form.

4                    THE WITNESS:  There were things

5           that I thought that could be improved

6           than what they were currently doing.

7    BY MR. CARTMELL:

8           Q.    It was multiple things, correct?

9           A.    Multiple things.

10          Q.    Okay.  If you go to the next

11   page -- let me ask you, because I forgot to,

12   about SORDS.

13                 Was SORDS the computer program

14   that Cephalon was using and brought over with

15   them?

16          A.    No.

17          Q.    Teva already had it?

18          A.    Yes.

19          Q.    What was the computer program

20   that Cephalon was using?

21          A.    There was not a computer program.

22          Q.    Was there any type of computer

23   algorithm at Cephalon at all?

24          A.    There was not a computer program

Highly Confidential - Subject to Further Confidentiality Review

Page 226

1   at Cephalon.  We had a third party distributor,

2   from what I can recall, that had a computerized

3   system.

4            Q.    Was Cephalon actually using a

5   third party to do their suspicious order

6   monitoring?

7            A.    We -- when I say "we," Cephalon

8   reviewed the orders manually, processed them,

9   sent them to the third party, and then those

10  orders would have been processed through their

11  electronic system, but we ultimately reviewed

12  and approved before it got to them.

13           Q.    I'm confused, because when they

14  would be reviewed by you and then sent to them,

15  was that -- were those orders sent to them to

16  try to do some algorithm to find out if they

17  were suspicious or not?

18           A.    I think it was a second review,

19  say that Cephalon reviewed orders manually,

20  looked to see if there was anything out of line.

21  If there was, and it was not done by me, it was

22  done by the distribution and logistics people,

23  if there was anything suspicious, they would

24  have reported it to me, and then those orders

Highly Confidential - Subject to Further Confidentiality Review

Page 227

1    would have been sent to the distribution center

2    and processed through their electronic system.

3            Q.    Who is the third party that would

4    process those?

5            A.    It was Cardinal Health.

6            Q.    So is it correct to say that

7    Cephalon was using Cardinal Health in some

8    respects to help with their suspicious order

9    monitoring?

10           A.    It would have been a second level

11   review.

12           Q.    Okay.  And was Cardinal Health an

13   actual customer of Cephalon's?

14           A.    Cardinal would have -- I'm

15   guessing that Cardinal would have been a

16   customer of Cephalon's.

17           Q.    Like the biggest customer?

18           A.    One of the big three, yes.

19           Q.    Okay.  The next page of your gap

20   assessment, the activity that you're looking at

21   is what's called "know your customer's

22   customer," correct?

23           A.    Yes.

24           Q.    And just to refer back, this is

Highly Confidential - Subject to Further Confidentiality Review

Page 228

1    one of the areas in the executive summary that

2    we looked at that was found to be noncompliant

3    at this time, correct?

4          A.     Was it know your customer or know

5    your customer's customer that was found to be

6    noncompliant?

7          Q.     I'm sorry.  It may have been know

8    your customer.  I think it was.

9          A.     Okay.

10         Q.     Okay.  This is different than

11   that?

12         A.     Yes.

13         Q.     Okay.  But at this time, you felt

14   like a model suspicious order monitoring program

15   should include activities of Teva trying to know

16   their customer's customers, right?

17         A.     It was trying to know what our

18   customers' customers did with our product

19   downstream.

20         Q.     And because it gets kind of

21   confusing when you say customer's customer, I

22   want to try to explain it for the jury and give

23   an example.  Sometimes that makes it easier.

24                But, for example, if let's say