# EXHIBIT 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

-----------------------------) MDL No. 2804

IN RE NATIONAL PRESCRIPTION  )

OPIATE LITIGATION            )

                             ) Case No. 17-md-2804

This document relates to:    )

All Cases                    )

-----------------------------) Hon Dan A. Polster


HIGHLY CONFIDENTIAL

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


      The 30(b)(6) videotaped deposition of ALLERGAN by and through MARY WOODS, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before JULIANA F. ZAJICEK, a Registered Professional Reporter and a Certified Shorthand Reporter, at Lieff Cabraser Heimann & Bernstein, 8th Floor, 250 Hudson Street, New York, New York, on January 9, 2019, at 9:10 a.m.

1  talking about brand name and opioid drugs, right?
2          And so you had said that every opioid --
3  every controlled substance has to go through a
4  suspicious order monitoring system?
5      A.   That's correct.
6      Q.   And does -- as you think about it, does
7  every opioid in your experience at Watson, Actavis
8  Inc. and Allergan Finance, LLC -- let me start over.
9          In your experience at Watson, Actavis and
10 Allergan Finance, LLC, did every controlled substance
11 go through the same suspicious order monitoring
12 system?
13     A.   So let me just make one clarification.
14 Allergan Finance, LLC is not a DEA registrant.  So
15 let's just stop with that one --
16     Q.   Uh-huh.
17     A.   -- for one second, okay.
18     Q.   Let me -- before we get -- Actavis, Inc.
19 was a DEA registrant, right?
20     A.   Actavis, Inc. was a DEA registrant.
21 Allergan Finance, LLC is not a DEA registrant.
22     Q.   Okay.
23     A.   Okay.
24          Watson Pharmaceuticals, Inc. had a

1  different suspicious monitor ordering system than
2  Actavis Inc. because they were separate companies.
3     Q.   So, at Watson Pharmaceuticals you
4  testified that there were Schedule II through V
5  controlled substances at the company.
6          Did all of the controlled substances go
7  through the same suspicious order monitoring system or
8  was there a different SOM for each drug or something
9  else?
10    A.   Every controlled substance goes through.
11 The CSA doesn't differentiate that you can be more
12 lenient on some controlleds than others.
13    Q.   All right.
14    A.   They all go through the same suspicious
15 order monitoring system.
16    Q.   All right.  And do you have an
17 understanding as to whether that was the case at
18 Actavis no comma Inc. as well?
19    A.   My understanding is that that was the same
20 for Actavis Inc. as well.
21    Q.   And how about for Actavis comma Inc.?
22    A.   Yes, same for them as well.
23    Q.   All right.  So for all three of these
24 entities with the understanding that the third is

1  Actavis, Inc., not Allergan Finance, LLC, each of them
2  had at any given time one suspicious order monitoring
3  system that every Controlled Substances Act-eligible
4  drug would have been processed through, is that right?
5      A.   That is correct.
6      Q.   All right.
7           So, with regard to your time at Watson
8  Pharmaceuticals, Inc., when you think of the volume of
9  drugs going through the suspicious order monitoring
10 system, about what percentage of the volume was made
11 up by prescription opioid drugs?
12     MS. LEVY:  Objection; far beyond the scope of
13 the corporate representative topics.
14          You can answer to the extent you know.
15 BY THE WITNESS:
16     A.   I can give you an idea of maybe
17 the percent that pended, if that will help.  In some
18 years, I mean, we did do metrics, I can give you an
19 idea, so an average amount that pended of the orders
20 was probably between 30 and 40 percent.
21 BY MR. EGLER:
22     Q.   When you say the "amount that pended,"
23 what does that mean?
24     A.   That would mean that it would block in our

1  system by one of the parameters that were set up and
2  it would have to be reviewed and investigated.
3      Q.   Do you have an understanding with regard
4  to Actavis Inc. what the volume of prescription
5  opioids drugs was with regard to their entire volume
6  being passed through the suspicious order monitoring
7  system?
8      MS. LEVY:  Object to the form.
9           You can answer.
10 BY THE WITNESS:
11     A.   I'm sorry.  Can you rephrase that?  Are
12 you -- are you looking for the same answer?
13 BY MR. EGLER:
14     Q.   Yes, for -- the same question for Actavis
15 Inc.
16     A.   Their system worked different, so I don't
17 necessarily have a percent of -- of orders that were
18 controlled substances.  Their system worked different
19 and their reports were different and it was an
20 inventory management/order management -- order
21 management SOMS report, so it was different, so I -- I
22 can't really give you a percent.
23     Q.   And how about for Actavis Inc., do you
24 have an understanding of --

1     A.    Yeah. It was bicoastal.

2     Q.    Okay.

3     A.    So customer relations, the customer
4 service people were located in Corona, California and
5 the master data license people were located in
6 New Jersey.

7     Q.    What was the role of the master data
8 license people?

9     A.    That would have been the description I
10 gave you with Vicky Lepore and Mary Moskello.

11     Q.    All right.

12     A.    Okay?

13     Q.    And then did that change at any time while
14 you were at Watson Pharmaceuticals, Inc. before the
15 Actavis merger?

16     A.    It did not change before the Actavis
17 merger, no. Well, before the -- I'm sorry. Before
18 the Actavis merger, I would say in -- back in about
19 2003 it did change. We changed computer systems and
20 when we changed computer systems and went to SAP, we
21 did segregate the roles more. And so at the time we
22 went into SAP, we did separate roles because of
23 segregation and duty and at that time we developed
24 smaller teams and that's when this team came into

1  play.
2      Q.    Okay.
3      A.    It was probably around 2003.
4      Q.    All right.
5      A.    The time that that occurred.
6      Q.    All right.
7      A.    So it had been in place for obviously
8  quite a long time by that point.
9      Q.    And then when the two entities merged,
10 Watson Pharmaceuticals, Inc. and Actavis Inc., can you
11 describe -- well, let's start out with your
12 understanding of how Actavis Inc. was set up prior to
13 the merger, their SOM and diversion systems?
14     A.    So in approximately -- so Actavis Inc.'s
15 SOM program, they had been running a parallel system
16 in about 2011 into 2012, which was a combination of
17 utilizing ValueCentric's Safe and Secure.  And Cegedim
18 Dendrite, I'm going to use both names because they
19 changed their name a little bit frequently, it was
20 Buzzeo and then they changed to Cege -- to Dendrite
21 and then to Cegedim, so I'm not sure what name people
22 will recognize them by.
23     Q.    I have the same issues, so we'll -- to the
24 extent we can clarify this, we will, but --

1     A.    Okay.

2     Q.    -- I understand what you are talking
3 about.

4     A.    I think at the time they were under
5 Cegedim, to be honest.

6     Q.    Okay.

7           Can you spell your understanding of
8 Cegedim for the court reporter?

9     A.    Let me --

10    Q.    Is it C-e-g-e-d-i-m?

11    A.    M, correct.  They are now IQVIA.

12    Q.    All right.

13    A.    So if you need to know their name today,
14 they are owned by IQVIA.  Many of the same people are
15 still there.

16    Q.    All right.

17    A.    And so at the time they were operating
18 under those two systems, ValueCentric for indirect
19 data, Safe and Secure, and the Cegedim system for the
20 standard SOMS program.

21    Q.    Okay.  You used that term "Safe and
22 Secure."

23    A.    Um-hum.

24    Q.    What's your understanding of that?