# EXHIBIT 42

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3

       IN RE NATIONAL PRESCRIPTION
 4     OPIATE LITIGATION
                                          MDL No. 2804
 5     THIS DOCUMENT APPLIES TO ALL    No. 17-MD-2804
       CASES                           Hon. Dan A. Polster
 6     _____/
 7
 8                HIGHLY CONFIDENTIAL -
          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                         --  --  --
10              FRIDAY, FEBRUARY 1, 2019
                         --  --  --
11
            Videotaped Deposition of STACEY BECKHARDT,
12    held at the Law Offices of Skikos Crawford Skikos &
      Joseph, One Sansome Street, Suite 2830,
13    San Francisco, California, beginning at 9:40 a.m.,
      before Sandra Bunch VanderPol, FAPR, RMR, CRR,
14    CALIFORNIA CSR #3032
15                       --  --  --
16
17
18
19
20
21    _____
22
23              GOLKOW LITIGATION SERVICES
24         877.370.3377 ph | 917.591.5672 fax
25                  Deps@golkow.com
```

1  specific condition.  And I worked with a number of
2  groups in that regard.
3          Q.    Okay.  So patient groups aren't
4  necessarily groups of patients who are taking these
5  drugs, but patient groups are actually organizations;
6  is that right?
7          A.    That's correct.
8          Q.    Give us the names of some of the
9  patient group organizations that you work with and
10 partnered with when you were dealing with the opioid
11 narcotics at Cephalon.
12         A.    Cancer Care; American Pain
13 Foundation; American Chronic Pain Association; reflex
14 Sympathetic Dystrophy Syndrome Association, were
15 probably the primary ones.
16         Q.    And these are organizations, I take
17 it, pain-type of organizations, that provide
18 materials, literature, maybe information on websites
19 to actual patients about opioid drugs?
20         MR. JAMES:  Calls for speculation.
21         THE WITNESS:  To some extent.
22 BY MR. CARTMELL:
23         Q.    Okay.  And those patient groups that
24 you just mentioned, the American Pain Foundation,
25 American Chronic Pain Association, those types of

1    pain -- or excuse me, patient groups, during the time

2    that you were working with PR at Cephalon, Cephalon

3    would provide those companies what are called grants

4    from time to time; correct?

5            A.    Those not-for-profits did receive

6    grants from Cephalon.

7            Q.    In other words, Cephalon would pay

8    amounts of money to those groups from time to time

9    related to providing information to patients about,

10   for example, breakthrough pain or opioid information

11   in general; correct?

12           MR. JAMES:  Vague and ambiguous.

13           THE WITNESS:  We would provide grants that

14   were unrestricted to them to create the materials

15   themselves.

16   BY MR. CARTMELL:

17           Q.    I understand.  But the American Pain

18   Foundation, the American Chronic Pain Association,

19   and the other patient-type groups that you dealt with

20   in PR, they might come to you and Cephalon and ask

21   for money; correct?

22           A.    For grants, yes.

23           Q.    Right.  And then you had to decide

24   what money or what grants you wanted Cephalon -- or

25   Cephalon had to decide what grants or what money they

```
 1   wanted to provide to those patient groups; correct?
 2        A.    In collaboration with a
 3   cross-functional committee.
 4        Q.    And that cross-functional committee
 5   included marketing; didn't it?
 6        A.    No.  It actually did not, to the best
 7   of my memory.
 8        Q.    Your belief is that the Marketing
 9   Department was not involved in what grants were
10   provided to patient groups?
11        A.    They were not on the committee.
12        Q.    Were they involved?
13        MR. JAMES:  Vague.
14        THE WITNESS:  They were involved to the
15   extent that they were informed about possible
16   opportunities to work with organizations.
17   BY MR. CARTMELL:
18        Q.    And the grants or the money that you
19   would provide to these pain foundations and patient
20   groups, as you described, lots of times that money
21   would go into written materials that they would
22   produce for patients; correct?
23        A.    That's correct.
24        Q.    And those written materials that they
25   would produce, for example, would include information
```

```
 1            Any other professional societies that you
 2   can remember working with related to the opioids
 3   Actiq and Fentora?
 4            A.    We had some outreach to the American
 5   Society of Clinical Oncology.
 6            Q.    Okay.  And then finally you, in your
 7   job in PR related to Actiq and Fentora, the narcotic
 8   opioids, would partner sometimes with what you would
 9   call key opinion leaders; correct?
10            A.    That's correct.
11            Q.    Tell the jury what you mean when you
12   refer to someone as a key opinion leader.
13            A.    Somebody who is recognized as a
14   prominent leader by their colleagues.
15            Q.    And when you were working with these
16   key opinion leaders, you were -- I take it they were
17   typically doctors or nurses?
18            A.    That's correct.
19            Q.    In other words, a key opinion leader
20   that is a doctor, that's somebody the company works
21   with and may hire as a consultant; correct?
22            A.    In some circumstances.
23            Q.    And when the company might hire a key
24   opinion leader as a consultant, they would pay that
25   consultant for their time; is that right?
```

```
 1           A.    That's correct.
 2           Q.    Sometimes they would pay that
 3   consultant pursuant to an agreement on -- based on
 4   the actual activity that the consultant is
 5   performing; correct?
 6           MR. JAMES:  Vague.  Calls for a legal
 7   conclusion.
 8           THE WITNESS:  I don't understand the
 9   question.
10   BY MR. CARTMELL:
11           Q.    Well, for example, sometimes the --
12   Cephalon, the company, and you in PR, might partner
13   with key opinion leaders to -- to write potentially
14   manuscripts, for example; correct?
15           A.    Independent of the company.
16           Q.    I understand.  But Cephalon may pay
17   the individual --
18           A.    Not an individual.  You would not pay
19   an individual to do a manuscript unless they were
20   working on a -- something scientific related to our
21   clinical trial program and they were investigators.
22           Q.    Okay.  That's a good point.  We will
23   distinguish that.
24           First, let me ask you this, though:  Were
25   there times that you would pay an organization a
```

 1   grant that would then be utilized by key opinion

 2   leaders to, for example, write materials related to a

 3   disease condition or opioids?

 4           A.    That's correct.

 5           Q.    Okay.  In other words, the company

 6   and you had control of the budget for a period of

 7   time for PR; correct?

 8           A.    That's correct.

 9           Q.    You might decide that you wanted to

10   give a grant or money to an organization knowing that

11   that money may go to a doctor, a key opinion leader,

12   who would then write materials related to, for

13   example, opioids or a disease state like breakthrough

14   pain; correct?

15           A.    No, that's not correct.

16           Q.    What was wrong with what I just said?

17           A.    The money went to organizations, not

18   individual physicians, for the work that I worked on.

19           Q.    Right.  And that's -- I thought I

20   made that clear.  I think my question was this, but

21   let me restate it.

22                 From time to time you would decide, as the

23   manager in the Public Relations Department, to pay

24   money to an organization that the company knew,

25   Cephalon knew and you knew, would then provide that

```
 1   their Actiq product, and it included sufferers, any
 2   opioid-tolerant patient suffering from breakthrough
 3   pain or chronic episodic pain regardless of whether
 4   or not they had cancer; correct?
 5          A.     That's correct.
 6          Q.     Do you think that was appropriate for
 7   them to be able to sell this potent opioid product
 8   under the guise of a Risk Management Program that
 9   they told the FDA they would do everything they could
10   to limit the use to cancer patients, but internally
11   set up a patient profile as part of their marketing
12   strategy that included all kinds of noncancer
13   patients?  Do you think that was appropriate?
14          MR. JAMES:  Objection.
15          THE WITNESS:  I was not in the marketing
16   plan.  I didn't set those profiles.
17   BY MR. CARTMELL:
18          Q.     If you were setting those profiles,
19   would you have done that?
20          A.     I would not have set it that way, no,
21   unless it was based on data sets.
22          Q.     And we have already seen in here that
23   they didn't have data sets then; did they?
24          A.     Not at that time, no.  There was
25   experience in the community using those -- using --
```

```
 1    treating breakthrough pain and noncancer states.
 2           Q.    But no randomized, controlled, double
 3    blind placebo-controlled studies; right?
 4           A.    That is correct.  Not at that time.
 5           Q.    Turn to page 47, please.  Starting in
 6    2003, if you go down to the issue, "Low awareness,
 7    lack of branding of Actiq Cephalon within the pain
 8    community," it talks at the end of the paragraph
 9    about:
10                 (Reading) Marketing will sponsor
11                 symposia at the American Academy of
12                 Pain Management and possibly (end of
13                 reading) --
14           What's PM&R; do you know?
15           A.    Pain medicine and rehabilitation.
16           Q.    -- (Reading) and possibly pain
17                 medicine and rehabilitation meetings
18                 on the topic of use of opioids in
19                 neuropathic pain and use of opioids in
20                 musculoskeletal pain (end of reading).
21           Do you see that?
22           A.    Yes.
23           Q.    So this is talking about strategies
24    to use to increase the use of Actiq into off-label
25    uses; correct?
```

```
 1              MR. JAMES:  Objection.
 2              THE WITNESS:  Yes.  It is -- it does
 3   indicate that marketing will sponsor the symposium,
 4   but it is my understanding that marketing did not
 5   create the symposia.  They had the financial -- they
 6   had financial support from the Marketing Department,
 7   but they did not do the content.
 8   BY MR. CARTMELL:
 9        Q.    I understand, but -- but what they
10   were doing, according to their marketing strategy,
11   was they were trying to pay grants or sponsor
12   programs that included off-label messages; correct?
13        A.    That's correct.
14        Q.    And that is inconsistent with the
15   obligations that they had entered into with the FDA;
16   correct?
17              MR. JAMES:  Objection.
18              THE WITNESS:  I'm not sure whether it's
19   inconsistent to support continuing medical education.
20   BY MR. CARTMELL:
21        Q.    Well, when you tell the FDA that
22   you're going to do all you can to spread the message
23   that the product should only be used for cancer, but
24   then you pay money, grants and things, to put on
25   medical education programs or symposia for off-label
```

```
 1   uses, isn't that inconsistent?
 2          MR. JAMES:  Objection.
 3          THE WITNESS:  It depends on what the content
 4   was of those programs.  And I don't recall the
 5   content.
 6   BY MR. CARTMELL:
 7      Q.   Okay.  And then I think if you turn
 8   to page 55, this is one of the tactics that was used
 9   by the company to further their strategy of
10   increasing usage of Actiq into off-label uses.  And
11   this is one that you were involved in; correct?
12      A.   Where are you?
13      Q.   Patient education materials and
14   programs.
15      A.   Yes.
16      Q.   It states:
17          (Reading) marketing and public
18          relations will work together (end of
19          reading) --
20        So you from time to time worked with
21   marketing; correct?
22      A.   That is correct.
23      Q.   -- (Reading) to create and/or
24          update appropriate patient education
25          materials, both branded and nonbranded
```

```
 1         A.    No.
 2         Q.    No?  So how -- did he get compensated
 3   in any way for doing that radio media tour?
 4         A.    Not to the best of my knowledge.
 5         Q.    So he did it free?
 6         A.    He's on the board of directors of a
 7   patient advocacy organization, so yes.
 8         Q.    Does he get paid as a member of the
 9   board?
10         A.    No, he does not.
11         MR. CRAWFORD:  Now I want to mark two more
12   exhibits.  That will be 29 and 30.  How much time do
13   I have?
14         MR. WOLFE:  Ten.
15                (Exhibit No. 29 was marked.)
16         MR. CRAWFORD:  So 1930 and 2040.
17         Q.    I have marked here another
18   Educational Grant Draft Request for the American Pain
19   Foundation.  The amount is $25,000.  "Type of program
20   PR:  Patient-focused book on treatment options to be
21   developed by a patient advocacy group."  It's signed
22   off in about -- in September of '06.
23               That's about the time that Fentora was
24   approved; right?
25         A.    That's correct.
```

```
 1          Q.    And you signed off on this on the
 2   next page; right?
 3          A.    I signed off on this as the
 4   submitter, yes.
 5          Q.    And then attached to it is a letter
 6   dated May 10th, 2006, from the American Pain
 7   Foundation, Wilbert Rowe, and he is asking for
 8   $25,000 to distribute American Pain Foundation's new
 9   book, "Treatment Options for Pain"; correct?
10          A.    To produce and distribute.
11          Q.    And so this grant is to fund the --
12   is it to fund the production of the book and
13   distribution or just the distribution?
14          A.    Production and distribution, which is
15   an important distinction.  We had not seen any of the
16   content when we gave this grant.
17                      (Exhibit No. 30 was marked.)
18   BY MR. CRAWFORD:
19          Q.    So but -- okay.  So let's take a
20   look.  It is Exhibit 30.  Is that the book that was
21   eventually produced out of this?
22          A.    Yes.
23          Q.    Okay.  And if you take a look at the
24   book, it does say at page -499 that Cephalon made
25   contributions to this; correct?
```

```
 1        A.    Financial contributions.  Not content
 2   contributions.
 3        Q.    Okay.  But if you look at page -501,
 4   it says:
 5              (Reading) American Pain Foundation
 6              Board, reviewer -- physician
 7              reviewers, Dr. Scott Fishman and
 8              Dr. Russell Portenoy (end of reading).
 9        Do you see that?
10        A.    That's correct.
11        Q.    And they were Cephalon-paid
12   consultants; correct?
13        A.    They were certain points in time that
14   they were compensated for certain work that they did.
15   They were both unpaid board members of the American
16   Pain Foundation.
17        Q.    But they were paid by Cephalon at
18   some point as consultants; right?
19        A.    For specific projects that they did.
20   Russ Portenoy, for example, was a clinical
21   investigator for the company.
22        Q.    How about Dr. Fishman, was he paid to
23   be a KOL by Cephalon?
24        A.    Dr. Fishman was a KOL, is a KOL.  He
25   is one of -- the two of these are two of the most
```

Highly Confidential - Subject to Further Confidentiality Review

 1   prominent pain specialists in the country.  I don't
 2   remember specifically Dr. Fishman being compensated
 3   by Cephalon.  I just don't recall.  I know that we
 4   did some projects with him, but I do not specifically
 5   recall him being compensated for those projects.
 6            Q.    So you're not sure if he was a paid
 7   KOL by Cephalon or a paid speaker?
 8            A.    That is correct.
 9            Q.    All right.  And if you could go to
10   -516, this page does talk about breakthrough pain;
11   correct?
12            A.    Where are you reading?
13            Q.    I'm sorry.  -516, in the bubble it
14   would be.  It's a little hard to read.  But it
15   says -- it's up on the screen --
16                  (Reading) Pain is considered
17                  breakthrough pain when it breaks
18                  through the pain medication being used
19                  to treat persistent pain.
20                  Breakthrough pain, BTP, can occur
21                  suddenly in bursts and may last for
22                  short periods of time.  BTP can also
23                  be experienced during pain-producing
24                  activities.  BTP can result when the
25                  dose of a long-acting opioid begins to

```
 1                wear away (end of reading).
 2          And that -- did I read that correctly?
 3          A.    Yes, you did.
 4          Q.    And it does say next to the bubble:
 5                (Reading) Fentanyl is also available
 6                in a losange.  In this formulation it
 7                has a quick on set and short duration
 8                of effect that makes it especially
 9                useful for the treatment of, quote,
10                breakthrough, unquote, pain (end of
11                reading)?
12          Right?  And at this time, when this
13    publication comes out, or at least when you've
14    attached it, Fentora and Actiq are the only two
15    breakthrough pain medications out there; right?
16          A.    That is correct.
17          Q.    And they are only approved, as you
18    acknowledge, for cancer pain; right?  Cancer
19    breakthrough pain?
20          A.    That is correct.
21          Q.    And no -- there's no reference here
22    that this drug that's being referenced is only
23    approved for cancer breakthrough pain; is there?
24                MR. JAMES:  Objection.
25                THE WITNESS:  The content of this brochure
```

```
 1    was not created by us.  It was created by a patient
 2    organization.
 3    BY MR. CRAWFORD:
 4         Q.    But with reviewers who at some point,
 5    at least one of them that you're aware of, was paid
 6    by Cephalon, right, Dr. Portenoy?
 7         A.    This brochure includes reference to a
 8    number of medications, to my memory.  I haven't had a
 9    chance -- I know we're short on time.  But if you
10    look through it, it refers to a lot of medications,
11    not just breakthrough pain medicines.  This was
12    intended as a broad look at the field of pain
13    medicine from a patient perspective.
14         Q.    One of the medications it's referring
15    to is breakthrough pain medication, which at the time
16    was only Fentora; right -- and Actiq?
17         A.    That is correct.
18         Q.    And Cephalon, at least in part,
19    funded the creation and distribution of this booklet;
20    right?
21         A.    We were one of the funders, yes.
22         MR. CRAWFORD:  Let me just check my outline
23    here.
24         All right.  That's all I have.  Thank you.
25         THE WITNESS:  Thank you.
```

```
 1              MR. GASTEL:  Do you want to take a quick
 2    five-minute break?
 3              THE VIDEOGRAPHER:  We are going off the
 4    record.  The time is 6:53 p.m.
 5              (Recess taken.)
 6              THE VIDEOGRAPHER:  We are back on the
 7    record.  The time is seven o'clock p.m.
 8                         EXAMINATION
 9    BY MR. GASTEL:
10         Q.    Good evening, Ms. Beckhardt, my name
11    is Ben Gastel and I represent plaintiffs in the
12    Tennessee lawsuits that have been cross-noticed into
13    this deposition.  And I represent some folks in
14    different cases than the two attorneys who have been
15    asking you questions previously today.
16              I began all of these examinations with an
17    objection.  We have a standing objection about these
18    depositions going forward.  I will just lodge it, and
19    we will continue.
20              But my first question is, is during your
21    work for Cephalon and Teva, did you ever on occasion
22    have chance to travel to the state of Tennessee?
23         A.    Not that I recall.  There -- not that
24    I recall.
25         Q.    And let me back up and do one
```