# EXHIBIT 44

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>*The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 17-op-45004 | MDL No. 2804<br><br>Case No. 17-md-2804<br>Hon. Dan Aaron Polster |

# EXPERT REPORT OF PRADEEP K. CHINTAGUNTA, PH.D.

May 10, 2019

Confidential

I.      **Qualifications**

1.    I am the Joseph T. and Bernice S. Lewis Distinguished Service Professor of Marketing at the Graduate School of Business at the University of Chicago.  Prior to joining the University of Chicago, I was an Associate Professor (with tenure) at the S.C. Johnson Graduate School of Management at Cornell University.  I also have held the position of Thomas Carroll Ford Foundation Visiting Professor of Marketing at the Harvard Business School between September and December 2002 and was a distinguished visiting scholar at Stanford University in 2012.

2.    At the University of Chicago, I teach courses on marketing strategy and marketing management to MBA and Executive MBA students.  I also teach courses on marketing models to Ph.D. students at the University of Chicago and have previously done so at Cornell University.

3.    I obtained my Ph.D. from the Kellogg Graduate School of Management at Northwestern University in 1990.  My Ph.D. dissertation was titled "Issues in Panel Data Analysis" in which I studied issues relating to consumer purchase behavior and differences in behavior across consumers.  I also hold a Post Graduate Diploma in Management from the Indian Institute of Management in Ahmedabad and a Bachelor of Technology degree from the Indian Institute of Technology, Banaras Hindu University, India.

4.    I have published over 100 peer-reviewed academic articles over the course of my career to date.  My articles have been published in the top journals in marketing including *Marketing Science*, *Management Science*, *Journal of Marketing Research*, *Journal of Marketing*, and *Quantitative Marketing & Economics*.  I also have published in journals focused on econometrics and statistics such as the *Journal of Econometrics* and the *Journal of the American Statistical Association*.  A copy of my curriculum vitae is included as **Appendix A** to this report.  A list of my prior testimony for the past four years is included as **Appendix B** to this report.

5.    Over the years, my research has investigated how prescription choice is impacted by factors such as marketing activities, patient satisfaction, academic research, and FDA regulations.  For example, one of my studies examined the differences in how physicians respond to detailing and how patient satisfaction and feedback could influence subsequent

prescribing behavior of physicians.  I have also investigated how physicians' relative preference across medicines is sensitive to news reports, academic articles, and FDA updates.

6. I currently bill for my services at $850 per hour.  Staff at Cornerstone Research, a consultancy, worked under my direction and helped me prepare my report.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation for my work on this matter nor my compensation from Cornerstone Research is contingent upon the outcome of this litigation or on the content of the opinions that I offer in this matter.

## II. Assignment

7. I have been retained by counsel for Teva Pharmaceuticals USA, Inc. ("Teva USA"), Cephalon, Inc. ("Cephalon"), Actavis Pharma, Inc. ("Actavis Pharma"), Actavis LLC ("Actavis LLC"), Watson Laboratories, Inc. ("Watson"), Anda, Inc. ("Anda"), and their affiliates[1] to review and respond to opinions related to pharmaceutical marketing in the Plaintiffs' expert reports.[2]  In particular, I have been asked to:  (i) evaluate the nature and extent of marketing of at-issue opioid products by the Teva and Actavis Generic Defendants and analyze the extent to which marketing and other factors influence physicians' prescribing decisions; (ii) assess the validity of Dr. Rosenthal's econometric analyses regarding the impact of the manufacturer Defendants' promotion on opioid sales;[3] and (iii) evaluate the extent to which academic publications are sponsored by the Teva Defendants and their influence relative to other academic publications.[4]

---

[1] Teva USA and Cephalon are referred to as the "Teva Defendants."  Actavis Pharma, Actavis LLC, Watson, Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida are referred to as the "Actavis Generic Defendants."  In addition, I understand that Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") has been named as a defendant in this case based upon the conduct of the Teva and Actavis Generic Defendants, but contests personal jurisdiction.  The opinions stated herein as to the Teva and Actavis Generic Defendants also apply to Teva Ltd.

[2] I understand that Anda is a "Distributor Defendant" and is not alleged to have engaged in any of the marketing conduct that is the subject of Dr. Rosenthal's expert report (or others).  To the extent Dr. Rosenthal were to offer any marketing-related opinions as to Anda, they would be unfounded for the general reasons discussed herein.

[3] In the rest of my report, I use "opioid sales" and "opioid shipments" interchangeably to refer to the volume of opioid sold by manufacturers.

[4] In this matter, at-issue opioid medicines consist of the following branded opioid medicines:  Actiq, Butrans, Dilaudid, Dilaudid HP, Duragesic, Exalgo, Fentora, Hysingla ER, Kadian, Methadose, MS Contin, Norco, Nucynta, Nucynta ER, Opana, Opana ER, OxyContin, Percocet, Percodan, Roxicodone, Subsys, Targiniq ER, and Xartemis XR, as well as the generic opioid medicines related to the following molecule names:  buprenorphine, fentanyl,

**C.  Plaintiffs Fail to Acknowledge that the Teva and Actavis Generic Defendants Did Not Promote the Safety and Efficacy of Their Generic Medicines to Physicians, and Any Marketing of the Availability of Generic Medicines Is Minimal At Best**

41. Plaintiffs' experts not only fail to acknowledge that the Teva Defendants' promotional activities for their branded opioid products were in line with the pharmaceutical industry, they also fail to account for the general differences in marketing between branded and generic medicines. While manufacturers employ various promotional tools to market their brand-name products, they typically do not promote their generic medicines.[63] Yet, several of the Plaintiffs' experts fail to address the different marketing strategies of branded and generic medicines. Moreover, Plaintiffs' experts have combined branded and generic opioids in their analyses and have not investigated the differential impact of the branded marketing versus the minimal (if any) generic marketing.

42. For example, Dr. Rosenthal purports to have quantified the impact of the manufacturer Defendants' marketing on opioid sales, yet she did not make any distinction between the marketing for, and sales of, branded and generic opioid medicines in her quantitative analyses.[64] Instead, she concludes that "the combined effect of the Defendant manufacturers' promotion of prescription opioids since 1995 was a substantial contributing factor to the increase in the use of prescription opioids" based on marketing measures aggregated across branded and generic medicines.[65]

43. Generic medicines are versions of already FDA approved brand-name medicines with the same "dosage, safety, effectiveness, strength, stability, and quality, as well as in the way [they are] taken and should be used."[66] A pharmaceutical company can launch a generic medicine once the patents of the corresponding brand-name medicine expire. Generics typically sell at greatly discounted prices.[67] Generic sales depend on state automatic substitution laws

---

[63] Federal Trade Commission Report, "Authorized Generic Drugs: Short-Term Effects and Long-Term Impact," August 2011, p. 17.
[64] Rosenthal Production.
[65] Rosenthal Report, ¶ 11.
[66] FDA, "Generic Drug Facts" ("FDA, 'Generic Drug Facts'"), available at https://www.fda.gov/Drugs/ResourcesForYou/Consumers/BuyingUsingMedicineSafely/GenericDrugs/ucm167991 htm, accessed on February 14, 2019.
[67] FDA, "Generic Drug Facts."

whereby pharmacies are allowed to, and in some cases are required to, dispense a generic medicine even when a physician writes a prescription for a branded medicine.[68] Ohio law gives pharmacies the discretion to make that determination.[69] Oftentimes, a patient's own health insurance provider or Pharmacy Benefit Manager ("PBM") will require that a generic be substituted for the branded prescription once the patient submits their prescriptions at the pharmacy.[70]

44.  Manufacturers rarely, if at all, promote generic medicines.  For example, the FDA website to consumers states that manufacturers for generic medicines "generally do not pay for advertising, marketing and promotion."[71]  This is also consistent with the statements in the Teva Ltd.'s 10-K from 2018: "[i]n markets such as the United States . . . generic medicines may be substituted by the pharmacist for their brand name equivalent . . . .  In these so-called 'pure generic' markets, physicians and patients have little control over the choice of generic manufacturer, and consequently generic medicines are not actively marketed or promoted to physicians"[72]  Indeed, Dr. Perri acknowledges that "[f]or generics, the chemical entity selected by the prescriber is usually available from multiple manufacturers who are competing for market share.  While prescribers still choose the medication to use, it is the pharmacy provider, sometimes working in concert with, and subject to the desires of wholesalers, TPPs [("Third Party Payors")] or PBMs, who typically selects the manufacturer that will supply the generic medication."[73]  This was also confirmed by Dr. Rosenthal, who testified that "[g]enerally, manufacturers will not detail physicians for generics.  They may have other sales force activities that they do that relate to price, but individual physicians are not generally making a decision about one generic versus the other.  That decision happens at the pharmacy."[74]

---

[68] Henry Grabowski et al., "Does Generic Entry Always Increase Consumer Welfare?," *Food and Drug Law Journal*, 67(3), 2012 ("Grabowski et al. (2012)"), pp. 373–391 at p. 377.
[69] LAWriter Ohio Laws and Rules, "4729.38 Selecting generically equivalent drugs or interchangeable biological products," available at http://codes.ohio.gov/orc/4729.38, accessed on May 8, 2019 ("Unless instructed otherwise by the person receiving the drug pursuant to the prescription, a pharmacist filling a prescription for a drug prescribed by its brand name may . . . select a generically equivalent drug, or, in the case of a drug that is a biological product, select an interchangeable biological product").
[70] Grabowski et al. (2012), p. 377.
[71] FDA, "Generic Drugs Undergo Rigorous FDA Scrutiny."
[72] Teva 2017 10-K, p. 5.
[73] Perri Report, p. 147.
[74] Deposition of Meredith B. Rosenthal, May 4, 2019 ("Rosenthal Deposition"), pp. 197:23–198:4.

45. The academic literature finds that manufacturers generally do not promote generic medicines.  For example, Lakdawalla and Philipson (2012) find that generic manufacturers spend little to no funding on direct-to-physician promotion, such as detailing and dispensing samples.[75]  Specifically, as explained earlier, generic sales are largely driven by state automatic substitution laws whereby generic medicines can, and in some instances must, be dispensed even when a physician writes a prescription for a branded medicine.[76]  Likewise, the promotion of generics does not guarantee that a manufacturer will recover the value of the promotion because a generic prescription could be filled with any product manufactured by a number of competing generic manufacturers.  Thus, any promotion conducted by one manufacturer for its own generic medicines could ultimately benefit the sales of a different generic medicine manufactured by its competitor.  This diminishes the value of pharmaceutical promotion for generic medicines.  Thus, generic medicines do not rely on marketing to drive medicine sales.[77]

46. To the extent generic medicines are marketed at all, companies merely promote their commercial availability.  Generally, there is no promotional spending for detailing or journal advertising for the safety, efficacy, or therapeutic value of the generic medicines.  This is supported by the testimony of Dr. Perri as well as those of several former personnel of the Teva and Actavis Generic Defendants.  For example, Dr. Perri testified that generic manufacturers "do not promote the safety[,] efficacy, or benefits of their generic medications" and instead "[focus] on consistency of supply, pricing and quality of the products."[78]  Similarly, Ms. Jinping McCormick, former Marketing Manager at Actavis, mentions that the Actavis Generic Defendants "were not detailing any benefit of the . . . [generic] medicine."[79]  Mr. Andrew Boyer, former President and Chief Executive Officer of Teva North America, also confirms that the Teva Defendants do not market generic medicines beyond their commercial availability.[80]

---

[75] Darius Lakdawalla and Tomas Philipson, "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets," *The Journal of Law and Economics*, 55(1), 2012, pp. 151–187 at pp. 169–170.
[76] Grabowski et al. (2012), p. 377.
[77] Grabowski et al. (2012), p. 377.
[78] Deposition of Matthew Perri, April 23 and 24, 2019 ("Perri Deposition"), pp. 547:15–548:8.
[79] Deposition of Jingping McCormick, January 9, 2019, pp. 20:10–13, 112:20–114:24, 258:3–15.
[80] Deposition of Andrew Boyer, January 15, 2019 ("Boyer Deposition"), pp. 22:21–24, 125:9–129:21. (When asked about "print advertising, internet advertising, recruitment of key opinion leaders, . . . [and] joint marketing and

47. In line with academic findings, the Teva and Actavis Generic Defendants incurred minimal marketing spending for their generic medicines, despite the fact that there are the more than 1,000 generic products in their portfolio.[81] In fact, according to Dr. Rosenthal's IQVIA data, the Teva and Actavis Generic Defendants did not incur any marketing spending for 8 of their 14 generic opioid medicines. Between January 1995 and May 2018, the proposed period of allegations, the marketing spending by the Teva and Actavis Generic Defendants on their generic opioid medicines accounted for 0.09 percent of the combined marketing spending by *all* of the Defendant and non-Defendant manufacturers on branded and generic opioids as identified by Dr. Rosenthal (See **Exhibit 7**).[82] The marketing spending by the Teva and Actavis Generic Defendants on each generic opioid medicine, using Dr. Rosenthal's IQVIA data, is shown in **Exhibit 8**.

48. The highly limited marketing activities for generic medicines are also evident from deposition testimony of Christine Baeder, the Chief Operations Officer of Teva USA's generic segment. She testified that Teva USA does not promote generic medications to physicians because "[t]he decision-maker in generic procurement is not the physician. It's the officer at a corporate retail chain."[83] When asked about Teva USA's promotion of generic opioid medication to patients, Ms. Baeder again confirmed that Teva USA does not promote generic medication to patients because "[t]he economics of the generic products don't support the generally very expensive interfaces to reach patients."[84] According to Ms. Baeder, with regards to generic medication, Teva "provide[s] availability information, [Teva] provide[s] a price, and [Teva] tr[ies] to negotiate a construct of a framework with a customer

---

promotion efforts of generic products . . . with other manufacturers," Boyer said that this did "[n]ot [happen] on the generic side of the business" beyond mentioning product availability or the company's supply chain.)

[81] Deposition of Christine Baeder, January 24, 2019 ("Baeder Deposition"), pp. 28:7–9, 40:9–13. ("Teva has around 1,200 [generic] products. I think we've had up to 1,500 generic products and right now we have somewhere between 1,100 and 1,200 [generic] products.").

[82] The marketing spending for generic opioids in **Exhibit 7** and **Exhibit 8** includes promotional spending by manufacturers Dr. Rosenthal classifies as "Teva" and "Actavis" in her Defendant classification. This includes promotional spending by "Actavis," "Barr Labs," "Royce Labs," "Teva," and "Watson Labs" as recorded in Dr. Rosenthal's IQVIA data.

[83] Baeder Deposition, p. 416:5–15.

[84] Baeder Deposition, pp. 416:16–417:1.

that makes [Teva] relatively easy to do business with. But that's really all [Teva] ha[s] from a promotional perspective."[85]

49. Similarly, several former personnel from the Actavis Generic Defendants also testified that the Actavis Generic Defendants did not promote the safety, efficacy, or therapeutic value of their generic medicines (to physicians or otherwise).[86] According to Michael Perfetto, former Vice President of Actavis Sales and Marketing, "if you look at generics, we're all the same product. So we use quality, product supply, and pricing primarily to sell our products."[87] Andy Boyer, former Senior Vice President of Actavis Sales and Marketing, further added that "[i]t is physically impossible for a generics company to hire enough sales representatives to go in and speak to physicians about all of [their] generics products."[88] Mr. Boyer also noted that, "We don't detail products . . . These are not brands, these are generics. We offer up a price and we offer up a consistent supply in our supply chain and hopefully quality products . . . There's no pushing, there's no detailing, there's nothing else there."[89]

50. Plaintiffs' experts have ignored that the Teva and Actavis Generic Defendants have not promoted the safety and efficacy of their generic products and that, as a result, sales of the Teva and Actavis Generic Defendants' generic opioids could not have been caused by the Teva and Actavis Generic Defendants' own marketing efforts.[90] Dr. Rosenthal, however, conducts her analysis by combining the shipments and marketing activities of all branded and generic opioids.[91] Thus, her analysis is unable to accurately evaluate the impact of the Teva and Actavis Generic Defendants' marketing activities, if any, on the sales of the Teva and

---

[85] Baeder Deposition, p. 134:1–12; See also, Hassler Deposition (November 2018), p. 108:8–13 ("it just wasn't a practice that they would talk about the therapeutic information in the [generic] product. They typically just ran with the brand name, the dosage strength, and the availability of the product.").

[86] See, for example, Deposition of Douglas Boothe, January 17, 2019, pp. 146:21–147:10 ("Q. Are you aware of what marketing tools were used by Actavis to drive sales of its generic drugs, including opioids, while you were at the company? . . . A. . . . generic drugs generally don't do a lot of marketing."); Deposition of Michael Perfetto, December 18, 2018 ("Perfetto Deposition"), p. 315:11–21 ("Q. Okay. And what marketing tools did Actavis use to drive sales of these generic products while you were there? . . . A. We -- we don't -- we don't market products. We sell generics. We don't use marketing. We actually don't use promotion."); Deposition of David Myers, December 13, 2018, p. 83:6–11 ("Watson [Actavis] did not believe in really advertising generic pharmaceuticals.").

[87] Perfetto Deposition, pp. 315:22–316:2.

[88] Boyer Deposition, p. 317:3–7.

[89] Boyer Deposition, p. 346:9–17.

[90] Note that there is no generic version of Fentora on the market as of December 31, 2017.

[91] Rosenthal Report, ¶¶ 11, 58–64.

65. In addition, as I discussed in Section VI.B, none of the Plaintiffs' experts have systematically disentangled the lawful component of the manufacturer Defendants' marketing messages from the alleged unlawful components. In particular, some of the Teva Defendants' marketing messages were educational and focused on the risks and indications of their opioid products. Dr. Rosenthal fails to acknowledge the distinction between lawful and unlawful marketing messages and, instead, assumes that every detailing activity employed by the manufacturer Defendants should not have occurred.

66. In sum, by constructing a hypothetical world in which the manufacturer Defendants engage in no promotion of any kind, Dr. Rosenthal is likely to have *underestimated* the number of MMEs but for the manufacturer Defendants' alleged misconduct. This would have artificially *inflated* the MMEs attributable to the alleged unlawful promotion and thereby render Dr. Rosenthal's conclusions invalid.

VII. **Dr. Rosenthal's Models Are Insufficient to Demonstrate that the Teva Defendants' Promotional Efforts for Actiq and Fentora Have Increased Sales of Prescription Opioids, or that the Manufacturer Defendants' Combined Promotional Efforts Increased Sales of Prescription Opioids**

67. Based on her regression analysis, Dr. Rosenthal concludes that "the combined effect of the Defendant manufacturers' promotion of prescription opioids since 1995 was a substantial contributing factor to the increase in the use of prescription opioids."[121] However, her aggregate models should not be used to draw any conclusions regarding the effect of promotional efforts by individual manufacturers on opioid sales. Moreover, Dr. Rosenthal's models have several econometric limitations that render her conclusions about the manufacturer Defendants' combined effect of promotion on opioid sales unreliable.

    A. **Dr. Rosenthal's Model Cannot Estimate the Impact of the Teva Defendants' Promotional Efforts for Actiq and Fentora on Opioid Sales**

68. Dr. Rosenthal attempts to measure the combined effect of the manufacturer Defendants' promotions on the combined sales of opioid medicines. Dr. Rosenthal's analysis is unfounded for reasons I describe in this report, and therefore her approach cannot estimate the causal

---

[121] Rosenthal Report, ¶ 11.

relationship between combined opioid marketing efforts and combined opioid sales. Moreover, in addition to the limitations with her aggregate model, Dr. Rosenthal's methodology does not allow her to appropriately estimate the impact of each individual manufacturer Defendant's marketing efforts on opioid sales.

69. First, many factors influence the effectiveness of a given pharmaceutical company's marketing activities, and estimating an aggregate impact of marketing across various medicines and manufacturers ignores differences in effectiveness of marketing and "forces" every medicine's marketing efforts to have the same effect on sales.  For example, Leeflang and Wieringa (2010) find that "the effects of promotional efforts are brand specific" and "pooling [marketing expenditures] across brands, even within the same category, is inappropriate."[122]  In addition, a study conducted by Kremer et al. (2008) finds that the effectiveness of promotional expenditures in pharmaceutical markets differs by disease categories.[123]  Given the fact that each of the manufacturer Defendants marketed distinct branded opioid products and tailored their marketing messages to the specific disease categories for which their medicines were indicated, Dr. Rosenthal's aggregate approach cannot capture the different impact across medicines and manufacturers.

70. Second, Dr. Rosenthal's aggregate model fails to consider the effect of competition between pharmaceutical products, where the marketing of one medicine can have a negative effect on the sales of a competing medicine.  Academic literature shows that marketing can shift the demand towards the promoted medicine from other competing medicines that are not promoted.[124]  Similarly, the price increase of one medicine can have a positive effect on the sales of a competing medicine.  Intuitively, as the price of a medicine increases, consumers substitute that medicine with competing medicines with lower prices.[125]  Dr. Rosenthal ignores these competitive dynamics, and therefore her model cannot estimate the incremental

---

[122] Peter S. H. Leeflang and Jaap E. Wieringa, "Modeling the Effects of Pharmaceutical Marketing," *Marketing Letters*, 21(2), 2010, pp. 121–133.

[123] Sara T.M. Kremer et al., "Generalizations on the Effectiveness of Pharmaceutical Promotional Expenditures," *International Journal of Research in Marketing*, 25(4), 2008, pp. 234–246 at p. 244.

[124] See, for example, Ian Larkin et al., "Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing," *Journal of the American Medical Association*, 317(17), 2017, pp. 1785–1795 at p. 1785.  Larkin et al. find that restricting detailing for certain medicines resulted in an increase in the market share of competing non-detailed medicines.

[125] See, for example, John A. Rizzo, "Advertising and Competition in the Ethical Pharmaceutical Industry:  The Case of Antihypertensive Drugs," *The Journal of Law and Economics*, 42(1), 1999, pp. 89–116 at p. 113.  The study finds that "[i]n the absence of heavy promotion . . . sales are quite responsive to price," indicating that as the price of one medicine increases consumers substitute to a lower-priced competing medicine.

potential effect of the Teva Defendants' marketing on opioid sales.  Because the size of such a competitive effect could vary across manufacturers, it is unreasonable to assume that the aggregate relationship Dr. Rosenthal estimates would hold for each individual manufacturer Defendant.

71.  Third, Dr. Rosenthal's model ignores that different opioid medicines were in different phases of their life-cycle during the proposed period of allegations.  Specifically, the at-issue opioid medicines were launched, sold, marketed, and patent-protected at different times during the proposed period of allegations.  However, marketing efforts typically evolve over time.  As I show for the marketing spending for Actiq and Fentora in Section V.B, marketing is typically higher earlier in the product life-cycle, and marketing will typically stop once a medicine has experienced generic entry by competitors.[126]  As such, the impact of marketing on sales can be attributable to one manufacturer more than another at any given point in time.  Individual manufacturer Defendants, including the Teva Defendants, would not be responsible for opioid prescribing in a period during which their own marketing is either declining or non-existent.[127]  Dr. Rosenthal's model does not account for the difference in the life-cycle across manufacturers and medicines, and hence it cannot be used to determine the Teva Defendants' contributions to total opioid sales.

72.  Fourth, as I discussed in Section V.C above, manufacturers generally do not promote generic medicines.  The Teva and Actavis Generic Defendants incurred minimal marketing spending for their generic opioid medicines and any such spending focused on the commercial availability of those medicines, not their safety or efficacy.  However, by including generics in her analysis Dr. Rosenthal assumes that the impact of the Teva Defendants' marketing for Actiq and Fentora equally affects the shipments of Actiq and Fentora as well as the shipments of the Teva and Actavis Generic Defendants' generic products that are therapeutic equivalents to the branded medicines manufactured by the other Defendants.  This is implausible.

---

[126] For the Teva Defendants' medicine products, see discussion in Section V.B.  More generally, academic literature shows that the life-cycle of medicine products is one of the factors that impact manufacturers' promotional efforts.  See, for example, Dhaval Dave and Henry Saffer, "Impact of Direct-to-Consumer Advertising on Pharmaceutical Prices and Demand," *Southern Economic Journal*, 79(1), 2012, pp. 97–126.

[127] Dr. Rosenthal uses her model to estimate excess MMEs attributable to marketing between January 1995 and May 2018.  However, the Teva Defendants' first at-issue branded opioid product, Actiq, was not marketed until February 1999, as shown in **Exhibit 1**.  Therefore, the Teva Defendants' marketing efforts for Actiq cannot have contributed to the excess MMEs Dr. Rosenthal estimates between 1995 and 1998 at a minimum.  See, Rosenthal Report, Table 2.

**B.     Dr. Rosenthal's Estimates of the Combined Impact of Marketing on Opioid Sales Are Incorrect Because Her Model Omits Important Variables and Ignores that Marketing Is Influenced by Sales**

73. In her direct approach, Dr. Rosenthal purports to model prescription opioid sales as a function of *only* three factors: detailing contacts, a price index for opioid medicines, and a timeline of key events.[128] In other words, Dr. Rosenthal implicitly claims that no other factors could have influenced the sales of prescription opioids. Yet Dr. Rosenthal provides no support for such a presupposition. This, in addition to the several other factors discussed in this report, renders her estimates of the impact of aggregate marketing on aggregate opioid shipments incorrect and inappropriate for determining the percent of sales attributable to the manufacturer Defendants' alleged misconduct.

74. One problem with Dr. Rosenthal's direct approach is that she omits important relevant explanatory variables from her model. This omitted variable problem will cause the estimated impact of the independent variables included in the regression—in this case, detailing contacts—to be incorrect, and therefore to incorrectly measure the impact of the manufacturer Defendants' marketing on opioid shipments.[129] If the omitted variables have a positive impact on opioid sales, then the *true* impact of marketing on opioid sales will be *lower* than the impact estimated by Dr. Rosenthal.[130] In Section IX, I discuss several variables that the academic literature finds to impact physician prescribing behavior but that Dr. Rosenthal does not consider.

75. The pharmaceutical marketing literature frequently addresses the potential bias caused by omitted variables. For example, Mizik and Jacobson (2004) control for physician-specific

---

[128] Rosenthal Report, ¶¶ 58–60.
[129] Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Fifth Edition (Mason, OH: Cengage Learning, 2013), pp. 88–92.
[130] To understand how omitted variable bias operates, consider a statistician using multiple regression to assess the impact of intelligence quotient ("IQ") on wages. Suppose the statistician regresses wages on IQ from a set of sample data – that is, she tests the relationship between IQ as the independent variable and wages as the dependent variable. The regression outputs a statistically significant relationship between the two variables, whereby every one-point increase in IQ is associated with a two percent increase in wages. However, this *observed* impact of IQ on wages is not necessarily the *true* impact of IQ on wages. If another variable also increases as IQ increases and has an impact on income – for example, education – then the tested model suffers from omitted variable bias. It is possible that education increases income at all IQ levels, and people with higher IQs tend to pursue more education, meaning the regression misattributes education's effect to IQ. Had the statistician tested a model that controlled for education, she would have found that a one-point increase in IQ has less impact on wages than the two percent she originally predicted. This mistake is in essence analogous to Dr. Rosenthal's decision to ignore non-marketing factors.