# EXHIBIT 47

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| This document relates to: | Case No. 17-md-2804 Hon. Dan Aaron Polster |
| *The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.* Case No. 18-op-45090 | |
| *The County of Cuyahoga, Ohio, et al. v. Purdue Pharma L.P., et al.* Case No. 17-op-45004 | |

# Expert Report of Jonathan Ketcham, PhD

# May 10, 2019

## I.      Qualifications

1.      I am the Earl G. and Gladys C. Davis Distinguished Research Professor in Business at the W.P. Carey School of Business at Arizona State University.  I am also a Faculty Affiliate in the Department of Economics at the W.P. Carey School of Business at Arizona State University. Prior to joining Arizona State University, I was a Robert Wood Johnson scholar in the Health Policy Research Program at the University of California, Berkeley.  I received my Ph.D. in Economics from the Wharton School of Business of the University of Pennsylvania in 2002, and hold a B.A. degree in Economics from Baylor University.

2.      At Arizona State University, I teach courses in Health Care Economics and Marketing Research to undergraduates and MBA students.  I have published peer-reviewed academic articles in top economics and health policy journals such as the *American Economic Review* and *Health Affairs*, and I have been invited to present my research at a number of conferences and seminars.  My research relies on econometrics and economic theory to evaluate the roles of information and incentives in health care.  For example, some of my prior work analyzed large data sets to determine how consumers choose insurance plans and how physicians choose drugs and other treatments for their patients.  For my work, I have received awards such as the university-wide award for the Best Application of Defining Edge Research and Creative Work from Arizona State University, as well the National Institute for Health Care Management ("NIHCM") Foundation Health Care Research Award.  My research has also been funded by a number of large federal grants.  A copy of my curriculum vitae, including my prior testimony, is attached to this report as **Exhibit 1**.

3.      For my work on this matter, I am being compensated at a rate of $775 per hour.  In the preparation of this report, I have been assisted by staff of Cornerstone Research, who worked under my direction.  My compensation for work on this matter is not contingent in any way upon the content of my opinions or the outcome of litigation in this or any other matter.

opioids prescribed for pain. Deterioration in functioning or quality of life appears to be closely associated with lack of motivation to improve; young adults are the most susceptible to this type of deterioration.[49]

In general, noncompliance should arouse the physician's concern about possible addiction or diversion and prompt careful control and monitoring of opioid therapy. Opioid therapy should be discontinued if the behavior persists.[50]

[E]vidence now suggests that prolonged, high-dose opioid therapy may be neither safe nor effective. It is therefore important that physicians make every effort to control indiscriminate prescribing, even when they are under pressure by patients to increase the dose of opioids.[51]

31.    A *New York Times Magazine* 2001 article also documented diversion and street use of OxyContin.[52]  It detailed personal stories of abuse in the early days of OxyContin availability in a small town in West Virginia, focusing on how quickly tolerance and dependence developed. While the article is informal and written for a general audience, it demonstrates the downsides and risks of opioids were known very early in the period of the allegations.

32.    As a result of this publicly available information broadcasted by important national institutions, medical professionals, third party payors, and policy makers within Ohio had access to the information necessary to be aware of the risks of opioids and potential problems with opioid prescribing during the period of the allegations.

33.    Moreover, by the Plaintiffs' own logic, such actors were and are informed regarding the risks of opioids.  The Plaintiffs consider the Defendants to be informed actors because "Defendants are in the business of manufacturing, marketing, and/or distributing prescription drugs."[53]  Similarly, prescribers, third party payors, and policy makers are in the business of prescribing, reimbursing, and/or legislating regarding prescription drugs.  Therefore, the risks of opioids should have been "specifically known" to such prescribers, third party payors, and policy

---

[49] Jane C. Ballantyne and Jianren Mao, "Opioid Therapy for Chronic Pain," *The New England Journal of Medicine*, 349, no. 20, 2003, pp. 1943–1953 at p. 1948.
[50] Jane C. Ballantyne and Jianren Mao, "Opioid Therapy for Chronic Pain," *The New England Journal of Medicine*, 349, no. 20, 2003, pp. 1943–1953 at p. 1950.
[51] Jane C. Ballantyne and Jianren Mao, "Opioid Therapy for Chronic Pain," *The New England Journal of Medicine*, 349, no. 20, 2003, pp. 1943–1953 at p. 1951.
[52] Paul Tough, "The Alchemy of OxyContin," *The New York Times Magazine*, July 29, 2001, available at https://www.nytimes.com/2001/07/29/magazine/the-alchemy-of-oxycontin.html.
[53] Complaint, ¶ 1018.

"placebo tests." Specifically, her logic, model, and interpretation can be used to show the following: 1) that random numbers cause opioid shipments to virtually the same extent as opioid detailing; 2) that opioid detailing has a causal effect on the price of gold; and 3) that virtually all of the opioid shipments for the period 2003–2018 were caused by detailing prior to March 2002 alone. These spurious relationships demonstrate the unreliability and lack of usefulness of Professor Rosenthal's direct approach to establish a causal relationship between Defendants' alleged promotion of opioids and opioid shipments.

180. An important flaw in Professor Rosenthal's model is her use of a negative depreciation rate. After discussing the problematic nature of such a depreciation rate, I show that the use of depreciation rates that are more consistent with the academic literature yields results that directly contradict Professor Rosenthal's conclusions.

181. Finally, I describe a variety of other methodological flaws with the direct approach.

### A. Overview of Professor Rosenthal's Direct Approach

182. In the econometric approach she terms the "direct approach," Professor Rosenthal attempts to quantify the effect of promotion on total shipments of opioids. The specific technique that she uses is a time series regression analysis and she asserts that such a technique captures "a dynamic causal relationship."[345]

183. The unit of observation in this regression is a month, aggregated across the entire U.S and across all opioid drugs.[346] That is, the dependent variable used in this regression analysis is the number of morphine milligram equivalents ("MMEs") of all drugs (across all manufacturers) sold in the entire U.S. in a given month.[347] In other words, Professor Rosenthal aggregates opioid drugs and geographies, and does not conduct the analysis at the manufacturer, drug, physician, or county level. The sample period ranges from January 1993–May 2018.[348]

184. Professor Rosenthal includes just two explanatory variables in her preferred specification: a measure of marketing based on the number of detailing contacts (i.e., the number of visits by

---

[345] Rosenthal Report, ¶ 58.
[346] Rosenthal Report, ¶ 58.
[347] Rosenthal Report, ¶ 59.
[348] Rosenthal Report, Table 1.

sales representatives to physicians' offices) and a price index.[349]  The monthly number of detailing contacts ("flow") is not the variable used in the regression, however.  Professor Rosenthal instead uses the "detailing stock," which is equal to the detailing flow in that month plus the detailing stock in the previous month discounted by δ, the depreciation rate.[350]

185.      Professor Rosenthal estimates three different models.[351]  Model A is a regression based on the detailing stock and the price index, as described above.  The regression jointly estimates the coefficients for the explanatory variables and the value of δ.[352]  According to Professor Rosenthal, she develops a second model (Model B) because of alleged changes in prescribing attitudes and guidelines during the period she uses to conduct the regression analysis.[353]  She identifies three sub-periods—one until March 2002, another through July 2010, and a third starting in August 2010—but does not use the same specification for each one, and provides no explanation for this inconsistency.[354]  She uses the same intercept and coefficient on the price index throughout the period of her regression.  The coefficient on the stock of marketing during the first sub-period is $\beta_1$; this coefficient during the second sub-period is $\beta_2$.  For the third sub-period, from August 2010 onwards, which covers the decline in opioids shipments, Professor Rosenthal changes her approach:  the coefficient on the stock of marketing changes every month instead of being the same during this sub-period.  To do so, she introduces a new parameter, $\beta_3$, which represents the amount by which the coefficient on the stock of marketing decreases every month.  For example, August 2010 is the first month of the third sub-period and the coefficient for this month is $\beta_2 + \beta_3 * 1$, or approximately 1103.[355]  Similarly, the coefficient for September 2010–the second month in the third sub-period–is $\beta_2 + \beta_3 * 2$ or approximately 1095.  The coefficient for May 2018, the 94[th] month in the third sub-period, is $\beta_2 + \beta_3 * 94$ or approximately 362.[356]  In essence, the coefficient on the stock of marketing linearly decreases over time during the third sub-period.   She also develops a third model, Model C, but concludes

---

[349] Rosenthal Report, ¶ 60.
[350] Rosenthal Report, ¶ 62.
[351] Rosenthal Report, Table 1.
[352] Rosenthal Report, Table 1.
[353] Rosenthal Report, ¶ 71.
[354] Rosenthal Report, ¶ 71.
[355] Author's own calculations, based on code that generates results in Rosenthal Report, Table 1.
[356] The result differs from 1111-8*94 because 1,111 and 8 are rounded.

that this model "barely improves upon the adjusted R-squared in Model B and the main results concerning promotion and price are little changed."[357]

186.    Professor Rosenthal concludes that "Model B is a fair, accurate and econometrically sound method by which to estimate the relationship of the Defendants' detailing of opioids on the sales of prescription opioids over the time period 1993 to 2018."[358]

187.    Based on this Model B, Professor Rosenthal claims to calculate the percentage of MMEs attributable to the alleged unlawful promotion.  To do so, she purports to calculate but-for MMEs (the number of MMEs that would have been shipped absent the alleged misconduct) by assuming that 1) "all promotion by the manufacturer Defendants from 1995 to the present was unlawful," and 2) in the but-for world, Defendants would not have promoted opioids at all starting in 1995.[359]  Using these assumptions and her estimates of Model B, she calculates the difference between the predicted actual MMEs (i.e., the prediction of actual MMEs using the coefficients of Model B) less the predicted but-for MMEs (adjusting the detailing flow for Defendants based on the methodology previously described) and divides this difference by the predicted actual MMEs, which represents her estimate of the percentage of MMEs attributable to the alleged unlawful promotion in any given month.[360]  She then averages these monthly percentages within each year and across the full period of her regression.[361]

### B.    Professor Rosenthal's Model B Cannot Provide Any Insight Into the Relationship between Opioid Shipments and Opioid Detailing, and Cannot Be Used to Establish that Detailing Causes Shipments

188.    Professor Rosenthal asserts that her econometric analysis serves the purpose of showing "a causal relationship between the Defendants' promotion and prescriptions of opioids."[362]  She asserts that "[t]he predictive power of Model B is shown to be quite good with an R-square [sic] of 0.9937, thus explaining over 99% of the variation in MME sales"[363] and, as mentioned above,

---

[357] Rosenthal Report, ¶ 73.
[358] Rosenthal Report, ¶ 74.
[359] Rosenthal Report, ¶ 75.
[360] Rosenthal Report, ¶ 75.
[361] Rosenthal Report, Table 2.
[362] Rosenthal Report, ¶ 64.
[363] Rosenthal Report, ¶ 72.

that Model B is a "sound method by which to estimate the relationship of the Defendants' detailing of opioids on the sales of prescription opioids over the time period 1993 to 2018."[364]

189.    However, Model B cannot show any such causal relationship.  Rather, the sources of the artificial and positive correlation between opioid shipments and the detailing stock are 1) the negative δ, and 2) the coefficient on marketing that is linearly decreasing over time during the third sub-period, when opioid shipments are decreasing.  As shown in Figure 4 of the Rosenthal report, a negative δ creates an upward trending curve for the detailing stock, which allows for a strong correlation with the upward trending part of the opioid shipments curve.  This is because, when δ is negative, the effect of past detailing on opioid shipments grows over time.  Moreover, Professor Rosenthal's inclusion of a coefficient on marketing that is linearly decreasing over time during the third sub-period artificially creates a positive correlation between the detailing stock and opioid shipments, even during a period when opioid shipments are experiencing a decline, but when the stock of detailing is still rising.

190.    I demonstrate the inability of Professor Rosenthal's model to establish a causal relationship between the stock of detailing and opioid shipments using three validation tests.  These test whether a model is properly specified and whether the potential insights from the model are reliable.[365]  A sound model should not show a relationship between a dependent variable and an explanatory variable with which it cannot possibly have a causal relationship.  For example, the returns on the S&P 500 cannot cause temperature fluctuations in Chicago.  According to Athey and Imbens, "[t]he implication of rejection here is that it is possible the original analysis was not credible at all."[366]

---

[364] Rosenthal Report, ¶ 74.

[365] For example, in an analysis featuring a placebo outcome, "the researcher replicates the primary analysis with the outcome replaced by a pseudo outcome that is known not to be affected by the treatment.  Thus, the true value of the estimand for this pseudo-outcome is zero, and the goal of the supplementary analysis is to assess whether the adjustment methods employed in the primary analysis, when applied to the pseudo-outcome, lead to estimates that are close to zero."  See Susan Athey and Guido W. Imbens, "The State of Applied Econometrics:  Causality and Policy Evaluation," *Journal of Economic Perspectives* 31, no. 2, 2017, pp. 3–32 at p. 17.  Bertrand et al. pursue precisely the opposite approach:  They consider placebo "causes"—placebo "laws" that are assigned to states at random—that could not possibly cause any economic outcomes in these states, since they are not real.  Then they study the "effect" of these laws on female wages using various methods of standard error computation to determine which methods are appropriate.  Marianne Bertrand et al., "How Much Should We Trust Differences-In-Differences Estimates?" *Quarterly Journal of Economics* 119, no. 1, 2004, pp. 249–275.

[366] Susan Athey and Guido W. Imbens, "The State of Applied Econometrics:  Causality and Policy Evaluation," *Journal of Economic Perspectives* 31, no. 2, 2017, pp. 3–32 at p. 17.

191.    Professor Rosenthal asserts that her Model B establishes that detailing causes opioid shipments.  If Professor Rosenthal's Model B were reliable for inferring causality, then it should not show that 1) a variable that is facially unrelated to opioid shipments causes opioid shipments; 2) the change in a variable that is facially unrelated to detailing was causally affected by detailing; and 3) opioid shipments for the period 1995–2018 are fully explained by the detailing that occurred before March 2002.  I implemented these three types of tests and found that Model B fails all of them.

192.    Specifically, with respect to the first test, I used a sequence of random numbers in place of the detailing data used by Professor Rosenthal.  In other words, for every month in the period covered by Model B, I randomly generated a number between 0 and 100 that I multiplied by 1,000.[367]  Then, I estimated Professor Rosenthal's Model B—all coefficients, the depreciation rate, and the structural break points—using precisely her methodology, but replacing the detailing data with these random numbers.  I collected the R-squared statistics, as well as the coefficients and their respective statistical significance.  I repeated this procedure 1,000 times.

193.    The results, presented in **Exhibits 9 and 10,** show why Professor Rosenthal's model cannot be used to establish a relationship between marketing and opioid shipments.  For the one thousand iterations of the procedure previously mentioned, the lowest R-squared is 0.9927 and the highest R-squared is 0.9942—almost identical to the R-squared statistic for Professor Rosenthal's Model B.  Also, the coefficients on all of the variables, including opioid prices and the randomly generated variable, always have the same signs as those in Model B.  In addition, the coefficients associated with the stock of random numbers are always statistically significant at the 95% confidence level and the coefficients associated with the price index are statistically significant at this confidence level 98% of the time.  That is, my randomly generated variable, when turned into a stock using Professor Rosenthal's methodology and following Professor Rosenthal's model and logic, "caused" opioid shipments.  It is important to note that for these one thousand iterations, I always find a negative depreciation rate and a negative $\beta_3$, which is the parameter used to adjust on a monthly basis the coefficient on the stock of marketing during the third sub-period—just as Professor Rosenthal does using the true detailing data.

---

[367] The multiplication by one thousand is used to have a magnitude comparable to the magnitude of the monthly flow in the data.  The random numbers uniformly distributed between 0 and 100, i.i.d.

194.    The conclusion from this exercise is clear.  By allowing the depreciation rate to take negative values and by using a coefficient on marketing that is linearly decreasing over time during the third sub-period, Professor Rosenthal's Model B creates an artificial positive correlation between opioid shipments and *any* type of positive data, whether a truly random data as I have used or a measure of actual detailing as she has used.  In other words, Professor Rosenthal's model essentially guarantees that she will find a positive association between the stock of detailing and an increase in opioid shipments even if there is no causal relationship, as in the case of my 1,000 sets of random numbers.

195.    As I will explain in the next section, a negative depreciation rate is illogical and inconsistent with the academic literature,[368] despite Professor Rosenthal's attempt to justify it.  In addition, Professor Rosenthal claims that using a coefficient on marketing that is linearly decreasing over time during the third sub-period should capture the "secular decrease in promotional effectiveness,"[369] which is in turn the result of "countervailing factors such as the introduction of mandatory prescription drug monitoring programs and new treatment guidelines,"[370] but she does not provide any academic support or evidence to show that such a linear trend is the proper way to model these countervailing effects.

196.    I conducted a second test to further illustrate the inability of Model B to establish a causal relationship between marketing and opioid shipments.  In this test I replaced the opioid shipments variable—the dependent variable—with the price of gold.[371]  I then estimated Professor Rosenthal's model using her explanatory variables, including her detailing stock variable.  **Exhibits 11 and 12** present the results.  I found an R-squared of 94.94% which is nearly as high as the R-squared for Professor Rosenthal's Model B.  The coefficients are statistically significant at the 99% confidence level and their signs match those presented in Table 1 of the Rosenthal report.  Thus, even though detailing for opioids is unrelated to the price

---

[368] Even Professor Rosenthal admits in her deposition that she is not aware of any academic literature supporting the use of a negative depreciation rate: ("Q. As you sit here right now, do you know of any literature, whether related to nonaddictive or addictive products, that has a negative depreciation rate? A.  I cannot point to any study, no.") Deposition of Meredith B. Rosenthal, May 4–5, 2019 ("Rosenthal Deposition"), 259:25–260:6.

[369] Rosenthal Report, ¶ 71.

[370] Rosenthal Report, ¶ 65.

[371] ICE Benchmark Administration Limited (IBA), Gold Fixing Price 3:00 P.M. (London time) in London Bullion Market, based in U.S. Dollars [GOLDPMGBD228NLBM], retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/GOLDPMGBD228NLBM, May 6, 2019.

of gold, using Professor Rosenthal's model and logic we would conclude that a causal relationship exists between the two.  If we reject that conclusion, we must reject Rosenthal's model and/or its usefulness for drawing causal inferences.

197.    I conducted a third test, where I used Professor Rosenthal's methodology to calculate detailing stock assuming that no detailing happened after February 2002 but otherwise make no changes to Model B.  As shown in **Exhibits 13 and 14**, using this adjusted explanatory variable, Model B provides an R-squared of 99.36% and all the coefficients are statistically significant at the 99% confidence level with the same signs as those shown in Table 1 of the Rosenthal Report. The implication is that, following Professor Rosenthal's logic, detailing prior to March 2002 caused opioid shipments for the period 1995–2018.

198.    These three analyses demonstrate that Professor Rosenthal's Model B is flawed and unreliable for establishing any causal relationship between opioid detailing visits and opioid shipments.

### C.    The Negative Depreciation Rate Estimated by Professor Rosenthal Is Evidence That Her Model Is Unreliable

199.    Professor Rosenthal estimates a negative $\delta$ for Model B.[372]  This means that shipments in the current period are impacted more by past detailing than by current detailing for a given estimated coefficient of the stock of detailing on shipments, $\beta, \beta_1, \beta_2,$ and $\beta_3$.  Setting aside for the moment the numerous limitations of the model noted elsewhere, there are two possible interpretations of Professor Rosenthal's Model B: (a) one in which the stock of detailing represents physicians' recollection of current and past detailing visits; and (b) one in which the model is the simplification of a more complicated model, possibly involving addiction as stated by Professor Rosenthal.  I discuss the implications of these two interpretations one at a time; each set of implications is deeply problematic for Professor Rosenthal's conclusions.

200.    If Professor Rosenthal's model is to be taken literally, then a negative depreciation rate is contradicted by academic literature and common sense.  Numerous academic articles in the field of marketing (including the marketing of pharmaceuticals) consider or estimate a depreciation

---

[372] Rosenthal Report, Table 1.

rate that is between zero and one.[373]  Professor Rosenthal provides no academic support for her use of a negative deprecation rate.  Common sense also requires a positive deprecation rate.  The intuition behind a positive deprecation rate is that a physician may remember a detailing visit that occurred several months ago, but will remember it less well than a detailing visit that occurred more recently.[374]  On the other hand, the implication of a negative deprecation rate— that a physician will remember a detailing visit in the more distant past better than one in the more recent past—is illogical.

201.  Professor Rosenthal anticipates these criticisms and acknowledges that a negative deprecation rate is "at odds with the usual marketing literature."[375] However, rather than evaluating the implications for her model, she attempts to rationalize this result by stating "it is perfectly consistent with an addictive product like opioids."[376]  In her expert report, she does not elaborate on this assertion and does not explain the logic behind it.[377]  She simply refers to a statement in another expert report submitted by Plaintiff without explaining how this statement justifies a negative deprecation rate:  "[B]ecause prescription opioids may result in dependence, and/or addiction, the overall 'demand' for opioids is distorted by pharmaceutical marketing aimed at increasing the use of these drugs…some patients who use opioids require and/or seek more opioids over time."[378]

202.  This explanation suggests the second interpretation of her model:  the simplification of a model involving addiction.  However, this interpretation is problematic for two distinct reasons.

---

[373] Rizzo (1999), p. 96; Marc Nerlove and Kenneth J. Arrow, "Optimal Advertising Policy under Dynamic Conditions," *Economica* 29, no. 114, 1962 ("Nerlove and Arrow (1962)"), pp. 129–142 at pp. 130–131; Jean-Pierre Davina C. Ling et al., "Deregulation Direct-to-Consumer Marketing of Prescription Drugs:  Effects on Prescription and Over-the-Counter Product Sales," *Journal of Law and Economics* 45, 2002, pp. 691–723 at pp. 710–711; Julie M. Donohue and Ernst R. Berndt, "Effects of Direct-to-Consumer Advertising on Medication Choice:  The Case of Antidepressants," *Journal of Public Policy & Marketing* 23, no. 2, 2004, pp. 115–127 at p. 119; Sridhar Narayanan et al., "Temporal Differences in the Role of Marketing Communication in New Product Categories," *Journal of Marketing Research* 42, no. 3, 2005, pp. 278–290 at pp. 279, 284.

[374] Nerlove and Arrow (1962), p. 130.

[375] Rosenthal Report, ¶ 72.

[376] Rosenthal Report, ¶ 72.

[377] In her deposition, Professor Rosenthal explains:  "As you know, my model is estimating the relationship between promotion and sales for an addictive good, and so what we're saying is let's say promotion caused them – the physician to write a hundred MMEs in a prescription today, as the patient gets more tolerant, not only do they continue writing that prescription because the patient comes back, but also the dose goes up.  So that is really what the negative deprecation rate is about here." Rosenthal Deposition, 249:16–250:1.  It does not address the issues that I detail in this section.

[378] Rosenthal Report, fn 103.

203.    First, Professor Rosenthal does not show that such a model, with plausible parameters, is equivalent to the model she estimates.  In fact, she does not propose or estimate such a model at all.  If this is the sort of model Professor Rosenthal had in mind, then she should have proposed and estimated such a model, following best practices in the peer-reviewed economics literature on addiction.  In this literature on addiction, the depreciation rate reflects the influence of past consumption (rather than promotion) on present consumption. A negative depreciation rate is inconsistent with this literature as well.[379]

204.    Second, if Professor Rosenthal in fact estimated the simplification of a model involving addiction, then it is not the case that "[t]he effectiveness of detailing is reflected in the parameters $\beta$, $\beta_1$, $\beta_2$, and $\beta_3$."[380]  Instead, these coefficients represent merely (possibly quite complicated) functions of a variety of factors that are associated with opioid shipments.  Thus, if this is the correct interpretation of Professor Rosenthal's analysis, she *has failed to demonstrate that marketing has any statistically or economically significant effect on shipments at all*, because she has not estimated such a parameter, and the parameters that she has estimated cannot isolate the effects of marketing.

205.    In summary, a negative $\delta$ as estimated by Professor Rosenthal implies either (a) that her estimates are inconsistent with the marketing literature and common sense, or (b) that she has failed to demonstrate any effect of marketing on shipments.  In either case, her estimated negative value for this parameter indicates that her model cannot provide reliable evidence regarding the influence of detailing on opioid utilization.

### D.    Professor Rosenthal's Results Do Not Hold When an Appropriate Depreciation Rate Is Used

206.    To further test Professor Rosenthal's Model B, I set the depreciation rate at values that are consistent with the academic literature.  Other than this adjustment, I fully followed Professor

---

[379] For example, Chaloupka (1999) examines cigarette addiction and defines an addictive stock in order to estimate cigarette demand functions.  Frank Chaloupka, "Rational Addictive Behavior and Cigarette Smoking," *Journal of Political Economy* 99, no. 4, 1991, pp. 722–742 at p. 726.  This stock is a function of past consumption (at p. 732) and uses positive depreciation rates (at Table 1).  Similarly, Gruber and Köszegi (2001) analyze the effect of past consumption on current consumption by creating a stock of past consumption, again using positive depreciation rates.  Jonathan Gruber and Botond Köszegi, "Is Addiction 'Rational'? Theory and Evidence," *The Quarterly Journal of Economics* 116, no. 4, 2001, pp. 1261–1303 at pp. 1280–1281 and Table V.
[380] Rosenthal Report, ¶ 69.

Rosenthal's methodology to determine the regression coefficients.  The results are presented in **Exhibit 15**.

207.    The results show that when I use values for the depreciation rate that are consistent with the academic literature, Professor Rosenthal's Model B consistently yields results that contradict those in Table 1 of Professor Rosenthal's expert report.  For example, for every depreciation rate in **Exhibit 15** the price index has a positive coefficient, meaning that increases in prices increase sales.  This runs counter to basic economic theory and empirical evidence on the effects of opioid prices on opioid consumption, both of which indicate a negative effect of price.[381] Moreover, the signs on the coefficients for the detailing stock during the first sub-period (ending in December 1999) are negative, which under Professor Rosenthal's logic, means that marketing has a negative effect on opioid shipments.

### E.    Professor Rosenthal's Models Do Not Attempt to Estimate the Impact of Defendants' Allegedly Unlawful Marketing Activities Separately from Defendants' Lawful Marketing

208.    The question that needs to be addressed to assist the trier of fact is whether Marketing Defendants' allegedly unlawful marketing activities, as well as the Teva and Actavis Generic Defendants' allegedly unlawful marketing activities, had an impact on shipments of opioids. Professor Rosenthal's direct approach cannot address such a question.

209.    As explained in Section IV, Plaintiff alleges that Defendants use different channels to allegedly unlawfully promote opioids.  I note that the Complaint lists eight different channels of allegedly unlawful promotions,[382] but Professor Rosenthal only analyzed detailing without providing evidence that detailing is a good proxy for all the other forms of marketing.

210.    Additionally, Professor Rosenthal's model does not attempt to estimate the impact of Defendants' allegedly unlawful marketing activities separately from Defendants' lawful marketing activities.  This is evident in several ways.

211.    First, Professor Rosenthal does not appear to have information on the extent of Defendants' detailing visits that included allegedly unlawful claims versus those that did not.

---

[381] Powell et al. (2017) found a price elasticity of demand for opioids of -0.6 for the 59–64 age group using Medicare Part D.  See David Powell et al., "How Increasing Medical Access to Opioids Contributes to the Opioid Epidemic:  Evidence from Medicare Part D," Working Paper, April 2017, p. 15.
[382] Complaint, ¶ 346.

Professor Rosenthal simply attempts to estimate the impact of Defendants' overall (both allegedly unlawful, and lawful) detailing on aggregate opioid shipments, and in calculating the alleged harm caused by Defendants she assumes that all of Defendants' detailing from 1995 onward was unlawful.[383]  She did not review any information regarding the actual marketing engaged in by any Defendant.[384]  Thus, she cannot estimate the specific impact of the allegedly false and misleading statements on opioid shipments.

212.    Second, Professor Rosenthal asserts that if "a specific Defendant was exempted from liability…, then the measure of harm can be updated to include that Defendants' [sic] promotion in the but-for – and lawful promotion."[385]  In other words, she asserts that the coefficients of Model B can be used to predict the effect of lawful and unlawful marketing on opioid shipments for any Defendants.

213.    The coefficients in Model B associated with detailing stock represent, according to Professor Rosenthal, an estimate of the effect of one unit of detailing stock on opioids shipments.[386]  Therefore, she implicitly assumes that this effect is the same for every manufacturer and is not affected by the nature of the information (lawful or unlawful) that is disseminated.  She does not provide any support for these assumptions.  In reality, these coefficients reflect the effects of at least three elements:  a) the nature of the information used by the sales representatives; b) the quality of the product; and c) the ability of the sales representatives of a specific manufacturer to connect with physicians and to convert the use of this information and product quality into sales.  These factors likely imply different manufacturers and different types of marketing should be associated with different coefficients. Indeed, academic literature in other contexts has found that false advertising may reduce sales.[387]

---

[383] Rosenthal Report, ¶ 75.
[384] Rosenthal Deposition, 43:19–22.  ("I have not, nor do I believe it's necessary to make that causal step, looked at individual details throughout the period for my analysis").
[385] Rosenthal Report, Attachment D.
[386] Rosenthal Report, ¶ 69.
[387] Cawley et al., "The Effect of Deceptive Advertising on Consumption of the Advertised Good and its Substitutes: The Case of Over-the-Counter Weight Loss Products," NBER Working Paper No. 18863, Issued in March 2013; Darke and Ritchie, "The Defensive Consumer: Advertising Deception, Defensive Processing, and Distrust," *Journal of Marketing Research*, Vol. 44, No. 1 (Feb., 2007), pp. 114-127.

214.    Third, Professor Rosenthal's Model B assumes a linear effect of detailing stock on MMEs shipped.[388]  That is, in any given month, the model assumes that a unit increase in the stock of detailing will always have the same effect on MMEs shipped, regardless of the level of the stock of detailing.  In particular, Professor Rosenthal ignores that the academic literature documents decreasing marginal returns for detailing.[389]  In other words, academic literature has documented that the marginal effect of the next visit depends on how many detailing visits have already occurred, but Professor Rosenthal's model ignores this fact.  This consideration further undermines Professor Rosenthal's Model B ability to predict the effect of Defendants' allegedly unlawful conduct.

215.    Therefore, absent any additional evidence, using the same coefficients for the Teva and Actavis Generic Defendants and other manufacturers, or for the Teva and Actavis Defendants' lawful and allegedly unlawful conduct, is unreasonable and leads to flawed and unreliable estimates.

### F.    Professor Rosenthal's Models Are Unreliable Because of Simultaneity Bias, Reverse Causality, Omitted Variable Bias, and Measurement Error for Price

216.    Professor Rosenthal's Model B suffers from multiple additional flaws that undermine the reliability of this model.

### 1.    Simultaneity Bias

217.    Econometric principles establish that Professor Rosenthal's method of including price in her model introduces simultaneity bias,[390] which means that even the other coefficients of interest are unreliable and, as a result, the model cannot be used for causal inferences even notwithstanding the other flaws already discussed.  In this case, her method of including price would bias the estimated relationship between opioid shipments and detailing stock.

---

[388] Rosenthal Report, ¶ 63.
[389] Datta and Dave (2017), p. 457 ("In addition, we also include quadratic terms for all promotional measures to capture diminishing returns.").
[390] William H. Greene, *Econometric Analysis*, Fifth Edition (Upper Saddle River, NJ:  Prentice Hall, 2002), p. 379.

### 2.      Reverse Causality

218.    There is evidence that opioid shipments affect opioid promotions. As discussed in the Chintagunta report, the Teva Defendants' marketing plans indicate that the Teva Defendants' sales representatives targeted physicians who prescribed higher volumes of Actiq and Fentora.[391] In this case, a positive correlation between shipments and detailing could be the result of shipments causing detailing rather than the result of detailing causing shipments.

### 3.      Omitted Variables Bias

219.    An omitted variable occurs when a missing variable influences the dependent variable and is correlated with some explanatory variables.  When this happens, the coefficients associated with the explanatory variables reflect the influence of the missing variables, and are therefore biased.[392]  As explained earlier in this report, there are several factors that affect opioid shipments that Professor Rosenthal has failed to include in her model.

220.    For example, Datta and Dave (2017) emphasize that failing to consider physician characteristics and patient characteristics when analyzing the effect of detailing on physician prescriptions may lead to unreliable results.

> A key empirical concern in this literature relates to potential targeting bias, which physicians who already have a history of prescribing a particular drug or who have a higher unobserved likelihood of prescribing the drug (for instance due to their patient population or practice type) are more likely to be targeted by detailers. Addressing such endogeneity is a vital issue in identifying plausibly causal effects of advertising, which would otherwise lead to overestimates of the advertising response.[393]

221.    Another example, as discussed above in Section VII, is that Professor Rosenthal fails to control for product life cycle as is common in the literature seeking to identify the causal effect of promotion on pharmaceutical sales. In general, prescription drug sales are known to expand

---

[391] Chintagunta Report, ¶ VII.B.
[392] James H. Stock and Mark W. Watson, *Introduction to Econometrics*, Third Edition (Boston, MA:  Addison-Wesley, 2011), p. 180.
[393] Datta and Dave (2017), p. 452.

rapidly after their introduction to the market, and detailing is increasing *also* because of the introduction of new drugs.  As Dave and Saffer (2012) explain, "changes in sales, price and promotion are partly governed by the drug's life cycle."[394]  In this case, omitting any controls for products' life cycle will cause the regression to misattribute the rise in sales to the marketing, rather than the effects of the introduction of new drugs and products' life cycles.

### 4.    Measurement Error

222.    Professor Rosenthal also did not adjust her model for the measurement error related to her price index.  She collects her price information from IQVIA to construct her price index.[395]  However, as explained by Aitken et al. (2016), "IMS Health's National Sales Perspectives (NSP)…is based on invoiced sales by wholesalers (and direct sales by manufacturers) to their customers, such as major national pharmacy chains, hospitals, clinics, group purchasing organizations, and other supply chain intermediaries. Although the invoiced data incorporate discounts for prompt payment, they typically do not capture off-invoice discounts and rebates frequently given by manufacturers to insurers, providers, and pharmacy benefit managers."[396]  Therefore, the use of NSP data by Professor Rosenthal[397] means that her price index is measured with error.  Furthermore, even ignoring this issue, Professor Rosenthal does not explain why the prices in NSP are the relevant ones to analyze the effect of prices on opioid shipments, which are the result of a process involving many actors, including patients and insurers.

223.    In sum, Professor Rosenthal's models suffer from multiple biases for which she does not account even though the econometric literature provides tools to circumvent these issues.  For example, instrumental variables can be used to address the omitted variable bias.[398]

224.    Consequently, Professor Rosenthal's model cannot reliably estimate the causal effect of Defendants' allegedly false marketing statements on opioid shipments.

---

[394] Dave and Saffer (2012), p. 107.
[395] Rosenthal Report, ¶ 51.
[396] Murray Aitken et al., "Has the Era of Slow Growth for Prescription Drug Spending Ended?" *Health Affairs* 35(9), 2016, pp. 1595–1603.
[397] Professor Rosenthal uses the following NSP files to generate her price index:  Highly Confidential NSP_reissue_NDC_1992-2012.xlsx; Copy of NSP 1995 - 2008 reissue 1997.xlsx; Highly Confidential NSP_NDC_Jan 2013-May 2018.xlsx.
[398] Jeffrey M. Wooldridge, *Introductory Econometrics:  A Modern Approach*, Fifth Edition (Mason, OH:  South-Western, 2013), pp. 512, 532.

G.    **Professor Rosenthal's Conclusions Regarding the Consequences of Defendants' Alleged Actions Rely on Implausible Assumptions about the Extent of the Allegedly False Marketing and the But-For World**

225.    In calculating the purported consequences of Defendants' allegedly false marketing activities in Table 2 and 3, Professor Rosenthal assumes that all of Defendants' detailing activities are false, and moreover, that none of these detailing expenditures would occur in the but-for world.  Both of these assumptions are implausible.

226.    First, there is no evidence about the extent to which Defendants' marketing activities were false.  As discussed in the Chintagunta report, Teva had non-false marketing activities.[399] Thus, even apart from the various flaws in Professor Rosenthal's models, her estimates in Table 2 and 3 would overestimate the impact of the allegedly false marketing on opioid shipments.

227.    Second, Professor Rosenthal does not explain why detailing visits would decrease absent the allegedly false statements.  That is, it is possible that absent the allegedly false marketing statements the detailing visits would remain the same or could even increase, with merely a change in messaging.  Even if they were to decrease, it is unclear by how much, and Professor Rosenthal has no basis to assume that they would go down to zero.

228.    Third, as explained in Section XI., Professor Rosenthal does not establish that the Model B coefficients can be used to estimate the but-for world because these coefficients may vary by 1) manufacturer, 2) type of marketing (lawful or unlawful), and 3) levels of detailing (diminishing marginal return).  These considerations are critical for the but-for world since the goal is to predict the number of MMEs that would have been shipped had a specific Defendant only used lawful marketing.

229.    Therefore, Professor Rosenthal's calculations to estimate but-for MMEs for Defendants are baseless.

---

[399] Chintagunta Report, ¶ VI.B.

## XII. Professor Rosenthal's Indirect Approach Suffers from Multiple Flaws and Is Unreliable

230.     In addition to the direct approach, Professor Rosenthal proposes a second econometric approach, which she calls the "indirect approach."  She motivates this approach by claiming that the direct approach could not "include…all of the tactics allegedly employed by the Defendants, including manipulation of various professional societies and accrediting bodies."[400]

231.     After briefly describing this indirect approach, I explain why this methodology is unreliable and speculative.  Subsequently, as I did with the direct approach, I demonstrate that when depreciation rates that are consistent with the academic literature are used to estimate the detailing stock, Professor Rosenthal's assertion that her measure of excess MMEs using the indirect approach is related to the alleged misconduct is unsupported.  Thus, her methodology is unreliable.

### A. Overview of Professor Rosenthal's Indirect Approach

232.     Professor Rosenthal's indirect methodology starts with a regression analysis conducted at the county level in 1997.  Her goal is to analyze the influence of demographic, economic, and healthcare characteristics of an area on opioid shipments prior to the misconduct.  Professor Rosenthal asserts that using 1997 as the benchmark makes her analysis likely to be conservative.[401]  As explained in the next section, she provides no evidence to support this assertion.

233.     To perform this regression analysis, she collects opioid shipments for the county sample used in the mortality analysis (404 counties)[402] and calculates opioid shipments per capita, per day.  Then, for each county in 1997, she chooses a set of explanatory variables that include demographic information (e.g., percent of the population in different age groups), economic information (e.g., unemployment rate, employment-to-population ratio), and information about two healthcare factors—the percentage of the population without insurance coverage and the number of cancer deaths.[403]  Then, she regresses opioid shipments on these explanatory variables

---

[400] Rosenthal Report, ¶ 78.
[401] Rosenthal Report, ¶ 79.
[402] Rosenthal Report, Table 4.
[403] Rosenthal Report, ¶ 84.

at the county level to obtain the estimates she presents in Table 4.  Next, to estimate the portion of MMEs for the years 1998–2016 that was due to demographic, economic, and healthcare characteristics of these 404 counties, Professor Rosenthal assumes 1) that her chosen variables capture all of the relevant demographic, economic, and healthcare factors and 2) that the coefficients from this first regression can be applied to future years—that is, that there should be a stable relationship between these factors and opioid shipments over time.  Specifically, she collects the same explanatory variables for each of these years and applies the 1997 coefficients to predict MME shipments for each year in a manner that she claims accounts for changes in these explanatory variables.[404]

234.    Then, Professor Rosenthal adds to these predicted MME shipments "an annual increase based on an estimated linear trend using historical data [about opioid shipments] that pre-date the alleged misconduct."[405] In particular, she estimates this trend using the period 1980–1995.[406] She asserts that this linear trend captures "the market expanding effect of non-Defendant promotion"[407] and the "changes in clinical practices and other unmeasured influences."[408]

235.    Professor Rosenthal includes one final adjustment to estimate MME shipments that would have occurred but for the alleged marketing misconduct:  She adjusts for the effect of increasing prices on opioids shipments.[409]  She starts with the price index coefficient from the direct approach that was determined based on monthly, national data.  Then, she makes an adjustment for the difference in magnitude between opioid shipments in the data that she uses for the indirect approach and opioid shipments in the data she uses for the direct approach. Finally, she multiplies this adjusted coefficient by the increase in the price index for each year to yield the effect of prices on predicted MMEs.  She then estimates the level of opioid shipments that would have occurred absent the Defendants' alleged misconduct—the "but-for MMEs"—by summing the predictions from the regression on demographic, economic, and health characteristics; the adjustment for the linear trend; and the adjustment for rising prices.

---

[404] Rosenthal Report, ¶ 87.
[405] Rosenthal Report, ¶ 87.
[406] Rosenthal Report, ¶ 87.
[407] Rosenthal Report, ¶ 81.
[408] Rosenthal Report, ¶ 87.
[409] Rosenthal Report, ¶ 88.

236.    After estimating the but-for MMEs for each year, Professor Rosenthal allocates the full difference between the actual MMEs and but-for MMEs ("excess MMEs") to "the full set of tactics used by the Defendants to increase opioids use."[410] She denotes this as a "residual analysis" and appeals to prior literature that uses this approach "to evaluate economic impact."[411]

### B.    Professor Rosenthal's Indirect Approach is Conceptually Flawed

237.    As explained in the previous section, Professor Rosenthal's indirect approach uses a "residual analysis" to estimate the impact of the allegedly false marketing activities on opioid MMEs.  She interprets the difference between predicted and actual MMEs as due to the allegedly unlawful marketing activities.  Predicted MMEs are estimated based on a regression of opioid MMEs on a set of economic, demographic, and health care characteristics of counties in 1997, as well as a linear time trend and a price index.[412]

238.    Professor Rosenthal finds that her model, after adjusting for the linear time trend and the price index, leads to predicted MMEs that are lower than actual MMEs, and she interprets this residual as being caused by Defendants' allegedly unlawful marketing activities.  However, Professor Rosenthal's choice to interpret this under-prediction as caused by marketing is unsupported by the literature in health economics. This academic literature, including three articles she cites, typically interprets the residuals as due to technological change.[413]  In addition,

---

[410] Rosenthal Report, ¶ 82.

[411] Rosenthal Report, ¶ 82.

[412] Rosenthal report, ¶¶ 78–82.

[413] Sheila Smith et al., "Income, Insurance, and Technology: Why Does Health Spending Outpace Economic Growth?" *Health Affairs* 28, no.5, 2009, pp. 1276-1284 at Exhibit 1; Paul B. Ginsburg, "High and Rising Health Care Costs: Demystifying U.S. Health Care Spending," Robert Wood Johnson Foundation Research Synthesis Report 18, 2008 at Table 1; Joseph P. Newhouse, "Medical Care Costs: How Much Welfare Loss?" *The Journal of Economic Perspectives* 6, no. 3, 1992, pp. 3–21 at p. 5.  CBO, "Technological Change and the Growth of Health Care Spending", January 2018, available at http://www.cbo.gov/sites/default/files/cbofiles/ftpdocs/89xx/doc8947/01-31-techhealth.pdf, p. 7. ("Another way to approximate the effect of technological change is to do so indirectly, using the "residual" method. Certain demographic and economic factors, such as the aging of the population and rising personal income, are determinants of health care spending; using estimates of the relationships between those factors and spending levels, analysts can estimate how changes in those factors contributed to changes in spending, assuming no changes in medical technology. After accounting for the contributions of as many measurable factors as possible, analysts attribute the unexplained portion of spending growth, or the residual, to technological change and the changes in clinical practice associated with it. This approach yields findings that can be sensitive to assumptions concerning the effects of the various factors. In addition, studies using this approach generally do not account for dynamic interactions between growth of personal income, health insurance coverage, and technology development. Nonetheless, this approach can

other factors are omitted from Professor Rosenthal's model that also contribute to its systematic under-prediction of opioid shipments.  These factors include, for example, the expansion of insurance coverage for pharmaceuticals generally and opioids specifically,[414] and the interaction between technology and health insurance.[415]  Using the "residual approach" to interpret the under-prediction as caused by a single omitted factor requires that all other factors be fully accounted for.  However, key factors that are omitted likely contributed to growth in opioid use during this time period, and Professor Rosenthal fails to demonstrate that her linear trend accounts for them properly.

239.    Thus, as I will further explain below, what Professor Rosenthal interprets as the effect of marketing in fact does not isolate the effect of marketing, but includes the effect of many other factors.

### C.    The Different Components of Professor Rosenthal's Indirect Approach Are Not Correctly Estimated

240.    As explained in section XII.A, the three components of Professor Rosenthal's indirect approach—1) the 1997 cross-sectional regression,2) the time trend, and 3) the price index that are used to estimate but-for MMEs—are individually unreliable, and so is her conclusion that her excess MMEs are caused solely by Defendants' alleged unlawful tactics.

### 1.    The 1997 Cross-Sectional Regression

241.    The first component is the cross-sectional regression analysis performed for 404 counties using socioeconomic and healthcare factors that were collected for 1997 as explanatory variables.  Professor Rosenthal uses the estimated coefficients to predict shipments in subsequent years, which assumes that 1) the coefficients of her regression are correct, and 2) these

---

yield a reasonable approximation of how technological change relates to long-term growth in total health care spending.")

[414]  Zhou et al., "Payments For Opioids Shifted Substantially To Public and Private Insurers While Consumer Spending Declined, 1999-2012." *Health affairs (Project Hope)*, 35, no. 5, 2016, pp. 824–831.

[415] Sheila Smith et al., "Income, Insurance, and Technology: Why Does Health Spending Outpace Economic Growth?" *Health Affairs,* 28, no. 5, 2009, pp. 1276-1284 at Table 1; Burton A Weisbrod, "The Health Care Quadrilemma: An Essay on Technological Change, Insurance, Quality of Care, and Cost Containment." *Journal of Economic Literature*, 29, no. 2, 1991, pp. 523–532.

coefficients do not change over time.  However, she does not provide any evidence that these two conditions are met.

242.    The first condition is that the coefficients are estimated correctly.  This is unlikely to be true; the regression analysis suffers from some of the same flaws as those detailed for the direct approach, and this would bias the coefficients.  In particular, Professor Rosenthal's cross-sectional analysis suffers from endogeneity and omitted variable biases. The omitted variable issue is particularly important for the residual analysis because these missing variables will be included in the residual.  Professor Rosenthal argues that the effect of these missing variables is included in her secular trend, but I will explain that it is not the case.

243.    For example, Datta and Dave (2017) indicate that it is important to control for "disease prevalence…and provider availability."[416]  Professor Rosenthal's controls for the prevalence of diseases that could require the use of opioids are insufficient; while it is necessary to control for the prevalence and severity of *all* the illnesses that might be associated with opioid use, Professor Rosenthal only controls for cancer deaths.[417]  In Section X of her own expert report, Professor Rosenthal indicates that opioids could be used for other conditions such as the "short-term treatment of severe acute pain (e.g., trauma or post-surgical pain); end-of-life pain/hospice care" and others, thereby admitting that cancer deaths alone are an insufficient control.[418]

244.    Also, as explained in Section XI.F. 3., omitted variables can bias coefficients, which would undermine the reliability of Professor Rosenthal's cross-sectional regression.

245.    The second condition is that the coefficients she estimates for the 1997 cross-section are applicable to the period from 1998–2016.  In other words, she assumes that the relationship between her socioeconomic and healthcare variables and opioid shipments is constant over time. She provides no empirical evidence or academic support for such an assumption.

246.    The age-aggregation bias is a good illustration of this issue.  If these counties age over time then the average age within the age buckets chosen by Professor Rosenthal may increase over time.  If age is related to opioid shipments even conditional on age bucket, then the coefficients associated with Professor Rosenthal's age buckets are going to change over time.

---

[416] Datta and Dave (2017), p. 457.
[417] Rosenthal Report, Table 4.
[418] Rosenthal Report, ¶ 92.

247.    Professor Rosenthal also conducted her cross-sectional regression on data that she admits is inappropriate.  As she explains, this regression analysis should have been conducted during a period prior to the alleged misconduct,[419] but she performs this analysis using information collected in 1997, a year that was allegedly tainted according to her.[420]  She tries to downplay this problem by claiming that Defendants' alleged misconduct in 1997, which allegedly elevated shipments, will lead to conservative estimates of harm.  However, such a statement implicitly admits that not including any variables about the alleged misconduct in her regression analysis could bias her results.  She offers no evidence that omitting these variables will, as claimed, bias upwards the estimates of but-for shipments.  The overall effect depends on the existence and sign of the correlation between the omitted variables and the variables already included as explanatory variables.

248.    Moreover, Professor Rosenthal's claim that her estimate of but-for MMEs is conservative is undermined by her own work.  She fails to mention in the body of her report that she performs a downward adjustment to her estimates of but-for MMEs.  Specifically, she uses the linear trend that she develops based on shipment data for the period 1980–1995 (discussed in more detail in the next subsection), and she calculates the difference between the actual increase in opioid shipment for the period 1995–1997 and the prediction of this trend line.  Then, she removes this difference, which she calls "excess shipment," from her estimates of but-for MMEs in 1997 and for every year going forward.[421]  In attachment D, Professor Rosenthal indicates that "IQVIA data is used to estimate the conversion to an earlier benchmark year, by incorporating an adjustment to these results to reflect changes in shipments between 1995 and 1997."[422]  However, she does not explain the logic behind this adjustment and, in particular, that it is a downward adjustment.

249.    These flaws show that the cross-sectional regression used by Professor Rosenthal is unreliable.

---

[419] Rosenthal Report, ¶ 79.
[420] Rosenthal Report, Attachment D.
[421] Rosenthal Report Attachment D.
[422] Rosenthal Report, Attachment D.

### 2.  The Secular Trend

250.    The second component of the indirect approach's estimate of but-for MMEs is also unreliable.  Professor Rosenthal adds to her estimates of but-for MMEs a secular trend to capture "the market expanding effect of non-Defendant promotion"[423] and the "changes in clinical practice and other unmeasured influences."[424]  To do so, she estimates a linear trend relying on shipment data from the International Narcotics Control Board for the period 1980–1995.  The assertion that such a calculation yields an appropriate adjustment is unsupported.

251.    Professor Rosenthal's linear trend line assumes that the overall effect on opioid shipments of non-Defendants' marketing and other variables that she omitted—such as the competition from other drugs, the effects of product life cycle, the introduction of new products, the establishment of new clinical knowledge, among other items—yields a constant increase for every year in the period 1998–2016.  Professor Rosenthal does not provide any academic support for this assumption, and it is unreasonable.  In fact, the variables that are supposed to drive this linear trend are dynamic in nature; their annual changes are not constant over time.  Therefore, it is unreasonable to assume that the change in their effects on opioid shipments from one year to the next is constant over time.

### 3.  The Price Index

252.    The last component of Professor Rosenthal's indirect approach to estimate but-for MMEs is the adjustment for rising prices.  As discussed above, she uses the coefficient on the price index that was estimated by the direct approach.  Also as explained above, during the discussion of the direct approach, the influence of prices on shipments is complex because these variables are simultaneously determined by market outcomes. Because the methodology of the direct approach was incorrect, using the coefficient from the direct approach for the indirect approach also results in an unreliable methodology.

253.    In summary, Professor Rosenthal's conclusion that the differences between actual MMEs and her estimates of but-for MMEs represent the number of MMEs caused by the alleged

---

[423] Rosenthal Report, ¶ 81.
[424] Rosenthal Report, ¶ 87.

misconduct is baseless.  The previous considerations clearly show that her methodology is flawed and, therefore, these "excess MMEs" represent the influence of multiple variables on MMEs—not only the influence of the alleged misconduct.

### D.    There Is No Evidence that Professor Rosenthal's Excess MMEs Are Related to The Alleged Misconduct

254.    Professor Rosenthal asserts that 1) "[t]he manufacturer Defendants used a panoply of both branded and unbranded marketing tactics," 2) "pharmaceutical marketing programs typically combine various forms of marketing such that, were there to be an increase or decrease in promotional detailing, it is reasonable to expect that some other forms followed [sic] that course," and 3) "detailing is a good proxy for total promotional effort."[425]

255.    She provides no evidence for these assertions.  Assuming Professor Rosenthal's assertions are correct and her estimates of excess MMEs were related to the alleged misconduct, then a strong, positive correlation should exist between these excess MMEs for the 404 counties and detailing stocks.

256.    To evaluate the validity of her assertion and estimates, I test this implication. Specifically, I calculate the correlation between the yearly excess MMEs estimated by Professor Rosenthal's indirect method and the average monthly detailing stock for each year.  Even though the measure of detailing stock is national, one would expect that the detailing stock for these 404 counties is strongly positively correlated with the nationwide detailing stock.  To calculate the detailing stock, I use Professor Rosenthal's calculations making only one adjustment:  instead of her negative depreciation rate, I consider the same set of literature-supported depreciation rates as I considered in my discussion of the direct approach above.

257.    **Exhibit 16** shows that the Pearson correlations are small for this set of depreciation rates. The correlation coefficients are from 0.28% to 12.01%, failing to support Professor Rosenthal's conclusion that her estimated excess MMEs are the result of marketing.

---

[425] Rosenthal Report, ¶ 56.

**XIII.    Professor Rosenthal's Analysis to Test the "Under-Treated Pain" Theory Is Unreliable**

258.    Professor Rosenthal purports to examine whether the rise in opioid prescribing could be explained by the fact that the pain was previously "under-treated."  To do so, she conducts a "thought experiment" in order to calculate an "'upper bound' of how much of the growth in MMEs could be attributable to more intensive pain management for patient groups that, according to plaintiffs' experts could have benefitted from treatment with opioids."[426]

259.    The first step of her "thought experiment" is to select, based on the inputs of other Plaintiffs' experts, pain conditions for which the use of opioids is properly indicated.

"As a general matter and for purposes of this empirical test, I assume: (i) that, at most, opioids are properly indicated for the short-term treatment of severe acute pain (e.g. trauma or post-surgical pain); end-of-life pain/hospice care; and cancer pain from active malignant disease; (ii) that chronic opioid therapy is not recommended for most common chronic pain conditions (defined as moderate to severe pain lasting beyond 60 to 90 days), including low back pain, centralized pain such as fibromyalgia, and headache pain; and (iii) that in less common chronic pain conditions (such as pain from advanced multiple sclerosis, sickle cell disease, pain following spinal cord injury and paraplegia, or post-herpetic neuralgia), which comprise a small percentage of chronic pain patients, opioids may be considered a third-line therapy (taken if other therapies are ineffective or contraindicated) for moderate and severe pain."[427]

260.    She also adds that "[g]iven the narrow categories of indicated chronic pain use, its role as third-line therapy, and the significant risks associated with its use, optimal chronic opioid therapy is difficult to characterize"[428]  For these reasons, she did not attempt to "capture optimal treatment for patients with chronic pain in [her] simulation."[429]  In other words, Professor Rosenthal did not include any use of opioids related to chronic pain in her analysis.

---

[426] Rosenthal Report, ¶ 92.
[427] Rosenthal Report, ¶ 92.
[428] Rosenthal Report, ¶ 93.
[429] Rosenthal Report, ¶ 93.

261.    Then, for each of these conditions Professor Rosenthal estimates 1) the number of patients treated, 2) a baseline assumption regarding the daily dose in MMEs, and 3) an estimated duration of treatment in days.[430]  Finally, she multiplies these three estimates for each type of pain condition and sum these products in order to obtain the "theoretical maximum" use of opioids.[431]  She also performs a sensitivity test by increasing her results by 50%.[432]

262.    However, Dr. Michna and Dr. Rosenblatt both state that opioids can be appropriate and effective for treating chronic non-cancer pain under certain circumstances.[433]  In particular, whereas Professor Rosenthal specifically excludes chronic pain due to fibromyalgia from her analysis,[434] Dr. Michna states that opioids can be effective in treating fibromyalgia, in addition to other causes of chronic pain such as sickle cell disease and nociceptive or neuropathic pain.[435,436]

263.    Professor Rosenthal also does not consider other factors that may cause opioid MMEs to increase.  Based on these reasons, Professor Rosenthal's analysis of under-treated pain is unreliable.

## XIV.    Conclusion

264.    In conclusion my review of documents related to this matter leads me to conclude that the risks of opioids in general, and of the Teva and Actavis Generic Defendants' opioids in particular, were generally known, or should have been known, to informed actors, including the Plaintiffs, in the U.S. during the period of the allegations.  Given this information and the tools available to them, these actors could have taken measures to limit opioid use in Ohio.  This is not considered by Plaintiffs and Plaintiffs' experts, who also do not evaluate TPPs' financial incentives to encourage opioid use.

---

[430] Rosenthal Report, ¶ 94.
[431] Rosenthal Report, ¶ 94.
[432] Rosenthal Report, ¶ 101.
[433] Expert Report of Professor Edward Michna, J.D., M.D, May 10, 2019, ("Michna Report"), ¶ 37-41; Expert Report of Melanie H. Rosenblatt, M.D., May 10, 2019, ("Rosenblatt Report"), ¶ 37, 39-43.
[434] Rosenthal Report, ¶ 92.
[435] Michna Report, ¶ 40.
[436] I note that the Centers for Disease Control and Prevention also recommends the use of opioids for chronic pain when appropriate.  *See* Dowell et al. "CDC Guideline for Prescribing Opioids for Chronic Pain - United States, 2016," Morbidity and Mortality Weekly Report, 65(No. RR-1), 2016.

265.    Professor Gruber has failed to establish a causal relationship between opioid shipments and opioid abuse and mortality.  His conclusions fail to account for a host of other factors, often acknowledged by Professor Gruber himself that can influence opioid abuse.  He also makes unsubstantiated claims regarding the link between prescription opioid shipments and the use of illicit opioids, and fails to consider important differences between medical and nonmedical use of prescription opioids, and how these difference are related to future illicit opioid use.

266.    Likewise, Professor Rosenthal's direct and indirect approaches suffer from multiple flaws, are unreliable, and cannot reliably establish a causal relationship between Defendants' alleged promotion of opioids and opioid shipments.  They certainly cannot reliably establish a causal relationship between the Teva and Actavis Defendants' alleged promotion of opioids and opioid shipments.

_____

Jonathan Ketcham, PhD, 5/10/2019