# EXHIBIT 51

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2              NORTHEASTERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4   IN RE NATIONAL PRESCRIPTION
 5   OPIATE LITIGATION                      MDL No. 2804
 6
 7   This document relates to:         Case
                                       No. 17-md-2804
 8   The County of Cuyahoga v.
     Purdue Pharma, L.P., et al.,      Judge Dan Aaron
 9   Case No. 18-OP-45090              Polster
10   City of Cleveland, Ohio vs.
     Purdue Pharma, L.P., et al.
11   Case No. 18-OP-45132
12   The County of Summit, Ohio, et al.,
     v. Purdue Pharma L.P., et al.,
13   Case No. 1:18-OP-45004 (N.D. Ohio)
14
15           The videotaped deposition of DEMETRA
16   ASHLEY, called for examination pursuant to the
17   Rules of Civil Procedure for the United States
18   District Courts pertaining to the taking of
19   depositions, taken at 10 South Wacker Drive,
20   Suite 4000, Chicago, Illinois, on the 15th day of
21   March, 2019, at the hour of 9:16 a.m.
22
23
24   Reported by:  Gina M. Luordo, CSR, RPR, CRR
25   License No.:  084-004143
```

Page 158

1  knowing their own customers?
2      A.   Yes.
3      Q.   Does each participant in the closed system
4  of distribution have corresponding responsibility
5  for their direct sales of controlled substances?
6      A.   Yes.
7      Q.   Have you ever heard of the phrase know
8  your customer's customer?
9      A.   Yes.
10     Q.   What does that mean?
11     A.   It means if you have a customer that
12 you're supplying to that you want to make sure that
13 they are making sales to legitimate customers, that
14 they are a legitimate business and they have
15 customers supporting the business that they want
16 from you.
17     Q.   It means -- I'm just looking at your
18 testimony.  I want to make sure I understand it.
19 It means if you have a customer that you're
20 supplying to, you want to make sure that they're
21 making sales to legitimate customers, but does that
22 require you to know all of the details about -- for
23 instance, if you are supplying prescription drugs
24 to a distributor, does that require you to know all
25 of the details of the distributor's customer base?

Page 159

1  MR. SHKOLNIK: Objection. You're asking for
2  DEA's position and the law here. Objection to
3  form, first of all. Objection to asking for a
4  position of the DEA.
5  MS. ZOLNER: I would again respectfully ask
6  that you refrain from speaking objections. I'll
7  say it every time so the record is clear. Form
8  objections and objection to --
9  MR. SHKOLNIK: I'm allowed at least 10 words.
10  That's the rule. I've done enough of these.
11  MS. ZOLNER: If you're comfortable taking that
12  position. I would again just request no speaking
13  objections respectfully.
14  MS. BACCHUS: Can I ask that you slow down a
15  little bit.
16  MS. ZOLNER: Sure. You know, it's funny. I'm
17  making a big effort to slow down, so I'll make even
18  more of an effort to slow it down.
19  BY MS. ZOLNER:
20  Q. Okay. Going back to know your customer's
21  customer, to your knowledge, is there any language
22  in the Controlled Substances Act that states that a
23  manufacturer is required to know its customer's
24  customer?
25  A. In the Controlled Substances Act, no.

Page 160

1  Q. Is that phrase anywhere in the CSA to your
2  knowledge?
3  A. To my knowledge, no.
4  Q. To your knowledge, is there any language
5  in the Code of Federal Regulations that states that
6  a manufacturer is required to know its customer's
7  customer?
8  MR. SHKOLNIK: Objection. Form.
9  THE WITNESS: I have to say I'm not sure to
10  that one.
11  BY MS. ZOLNER:
12  Q. You just don't know one way or another?
13  A. Correct.
14  MR. SHKOLNIK: Objection to form.
15  BY MS. ZOLNER:
16  Q. As you sit here today, are you aware of
17  any statute that requires a manufacturer to know
18  its customer's customer?
19  A. No, I am not aware of a statute that says
20  that.
21  Q. What about a regulation?
22  A. No, I'm not aware of a regulation that
23  says that.
24  Q. What about a formal notice that's been
25  promulgated by DEA?

Page 161

1       MR. SHKOLNIK: Objection to form.
2       THE WITNESS: I'd have to say I don't know.
3   BY MS. ZOLNER:
4       Q. Are you aware of any correspondence from
5   DEA to manufacturers explaining that manufacturers
6   are responsible for knowing their customer's
7   customer?
8       A. I can't recall any.
9       Q. So to your knowledge, where is this phrase
10  know your customer's customer coming from?
11      A. My recollection is it comes from Federal
12  Register notices after final orders. I remember
13  reading them in final orders.
14      Q. You recall the language know your
15  customer's customer being formally written in final
16  orders? Is that your testimony?
17      A. I remember those terms being used.
18      MR. SHKOLNIK: Objection to form.
19      THE WITNESS: Exactly how they were used, I
20  don't remember, but I do remember those terms being
21  used.
22  BY MS. ZOLNER:
23      Q. In your opinion, how is a manufacturer
24  expected to know its customer's customer?
25      MS. BACCHUS: Objection. You can answer if you

Page 162

1  have an opinion.
2       THE WITNESS:  My opinion is in exercising due
3  diligence -- you're speaking from a manufacturer
4  knowing its customer's customer?  That was the
5  question?
6  BY MS. ZOLNER:
7       Q.   Correct.
8       A.   If they're supplying to a customer, which
9  is the distributor, in my opinion, in exercising
10 due diligence, you want to know that the
11 distributor is distributing to customers that are
12 real and that can support the amount of controlled
13 substances that the distributor has ordered.
14      Q.   Based on your experience, did DEA provide
15 guidance as to how a manufacturer was supposed to
16 engage in due diligence on a distributor's
17 customers?
18      MR. SHKOLNIK:  I'm sorry.  Objection to form.
19      THE WITNESS:  Yes.  There were policy and final
20 order documents that laid those things out.
21 BY MS. ZOLNER:
22      Q.   Which policy and final --
23      A.   I don't recall.
24      THE COURT REPORTER:  I'm sorry.  One more time,
25 please.


Page 171

1  they get chargeback data, do you know if they can
2  only get chargeback data for products with their
3  own NDC codes?
4       A.  I don't know that.
5       Q.  Do you know -- do you know if chargeback
6  data only contains information on a number of units
7  for which a distributor is seeking a chargeback?
8       A.  No, I don't know that.
9       MR. SHKOLNIK:  Objection.  Form.
10 BY MS. ZOLNER:
11      Q.  No, I don't know that?
12      A.  No, I don't know that.
13      Q.  I'm sorry.  I'm not trying to repeat what
14 you said.  I'm just making sure I'm hearing you
15 accurately.
16          Are you aware of any instance, based on
17 your 35 years with DEA, where DEA informed
18 registrants that they should monitor chargeback
19 data?
20      MR. SHKOLNIK:  Objection to the extent you're
21 asking outside of her personal knowledge.
22      THE WITNESS:  Can I ask you a question?  Can we
23 break?  I need to ask you a question.
24      MS. BACCHUS:  About privilege?
25      THE WITNESS:  Yeah.

Page 172

1  MS. BACCHUS: Do you mind if we go off the
2  record?
3  MS. ZOLNER: No. Absolutely.
4  THE VIDEOGRAPHER: We are off the record at
5  2:57 p.m.
6              (Whereupon, a short break was
7              taken.)
8  THE VIDEOGRAPHER: We're back on the record at
9  3:00 p.m.
10  MS. BACCHUS: To the extent that you have
11  knowledge outside of privileged information that
12  was involved in your communications with any of the
13  third parties, you may answer, but you may not
14  disclose any privileged communications.
15  THE WITNESS: Okay.
16  BY MS. ZOLNER:
17  Q.  I think I can withdraw the question and
18  maybe try to give you a question that's easier to
19  answer.
20       Are you aware, as you sit here today, of
21  an instance in which DEA informed all registrants
22  that they should monitor chargeback data?
23  MR. SHKOLNIK: Objection to form.
24  THE WITNESS: I am not.
25

Page 173

1  BY MS. ZOLNER:
2     Q.  Are you aware of any instance in which DEA
3  informed manufacturers that there was a legal
4  obligation to monitor chargeback data?
5     A.  I wouldn't want to say DEA.  I'm aware
6  that I have not.
7     Q.  Understanding your caveat there, are you
8  aware of anyone else at DEA ever communicating to
9  manufacturers that there was a legal obligation to
10 monitor chargeback data?
11    MR. SHKOLNIK:  Objection.
12    THE WITNESS:  I am not.
13 BY MS. ZOLNER:
14    Q.  Thank you.
15        I'm going to show you a new document now.
16              (Whereupon, ASHLEY Deposition
17              Exhibit No. 20 was marked for
18              identification.)
19 BY MS. ZOLNER:
20    Q.  Ms. Ashley, I'm going to ask you about the
21 page that has a Bates number in the lower
22 right-hand corner of 5926 as well as the document
23 that starts on this page with the Bates number
24 5928.
25    A.  Okay.

Page 174

1  Q. Have you seen this document before?
2  A. I don't recall.
3  Q. What are OD policy letters?
4  A. So if it's from the Office of Diversion
5  Control, typically if they have a response to a
6  registrant that they feel affects the national
7  diversion control program, they'll send a copy of
8  the letter out to all of diversion.
9  Q. Okay. And when you say that they'll send
10 a copy of the letter out to all of diversion, do
11 you mean that a copy of the letter goes to all of
12 the internal diversion employees within DEA?
13 A. Just the diversion control staff.
14 Q. Understood. And to your knowledge, what
15 is the purpose of submitting that policy letter to
16 the diversion control staff?
17 A. It's to help all divisions to be
18 consistent when we engage with registrants.
19 Q. Does OD stand for Office of Diversion?
20 A. Yes.
21 Q. And it says here that this letter was sent
22 to all diversion program managers, group
23 supervisors and senior diversion investigators.
24 Are those the diversion control staff?
25 A. Yes.