# Exhibit 2

CONFIDENTIAL

**Expert Report of Professor Meredith Rosenthal**

**March 25, 2019**

estimates not only because of the relative importance of detailing, but also because detailing is often used in concert with other forms of promotion including samples and yields conservative results.

57.     Figure 5 is a timeline of key events. According to Plaintiffs' experts and the published literature, the perceptions of physicians and the public evolved as a direct result of the alleged misconduct.[90] These changes – which were the result of the Defendants' actions -- would have affected the receptiveness of prescribers and patients to promotional messages about the safety and effectiveness of opioids. Figure 5 shows key events identified by Plaintiffs that helped promote expanded opioid prescribing (in green), and subsequent public health and regulatory events (in red) that signaled the growing realization about the dangers of opioid use.[91]

---

[90] "Defendants worked to create aggressive marketing strategies for opioids which served to distort needs, wants, and demand for opioids." Perri Report, ¶ 119.

[91] The arc of the opioid epidemic has been chronicled elsewhere. For example, L. Machikanti, *et al.*, "Opioid Epidemic in the United States," *Pain Physician*, Vol. 15, 2012, es9-38. M. Jones, *et al.*, "A Brief History of the Opioid Epidemic and Strategies for Pain Medicine," *Pain Therapy*, Vol. 7, 2018, pp. 13-21. A. Alam and D. Juurlink, "The prescription opioid epidemic: An overview of anesthesiologists," *Canadian Journal of Anesthesiology*, Vol. 63, 2016, pp. 61-68. FDA, "Timeline of Selected FDA Activities and Significant Events Addressing Opioid Misuse and Abuse" (https://www.fda.gov/drugs/drugsafety/informationbydrugclass/ucm338566.htm). Expert Report of Theodore Parran, in this matter, March 25, 2019 (hereafter "Parran Report"), Sections IV.E-F and I-J. Expert Report of Mark Schumacher, in this matter, March 25, 2019 (hereafter "Schumacher Report"), Section III.B.3.

**FIGURE 5**
**TIMELINE OF KEY EVENTS**



Source: IQVIA NPA, ARCOS, CDC.

### B. Analytic Approach

58. To quantify the effect of promotion on total sales of opioids I use a standard econometric technique: multiple regression. Multiple regression techniques allow the analyst to separately quantify the influence of multiple economic variables on an outcome. Time-series regression, which is the particular technique I use in this case, examines patterns over time for a single unit of analysis (here, the United States retail pharmaceutical market) to capture a dynamic causal relationship. Because pharmaceutical sales in a particular period are related not

only to pharmaceutical promotion in that period, but also to promotion that occurred in prior periods, a dynamic model is well-suited to the question at hand.

59. My primary dependent variable (the outcome to be explained) is the number of MMEs for all drugs at issue in this matter. This is the measure of impact that is conceptually connected to the harms that are quantified in the report by Prof. David Cutler. In Attachment D I show that a similar cause and effect relationship can be demonstrated for the number of extended units.

60. The key explanatory variable in the model is the number of detailing contacts for opioids. Consistent with the theory of demand I also include a class-wide price index[92] for opioid drugs. Finally, in an expanded model, I include variables that capture some of the key events in the timeline described above.

61. The basic regression model can be expressed in the following form:

---

[92] Given the long time period with entry and exit of opioid products, I construct a Fisher Ideal Price Index. More information on the price index is provided in Attachment D.

$$Q_t = \alpha + S'_t \beta + X'_t \gamma + e_t \tag{1}$$

Where:

$Q_t$     is the number of opioid MMEs sold at retail in month t

$S_t$     is a vector measuring the stock of detailing contacts for all opioids at month t

$X_t$     is a vector of factors other than detailing that change over time, including prices and variables that capture events such as the issuance of new clinical guidelines for the treatment of pain

$e_t$     is an error term

α, β and γ and are coefficients to be estimated

62. Detailing contacts were entered into the model as a stock, including the number of current contacts and the depreciated value of past contacts, in line with the published literature and in accordance with the theory that effects of promotion on prescribing are dynamic.[93] The stock of contacts in month t, $S_t$, was computed as follows:

$$S_t = Contacts_t + (1 - \delta) S_{t-1} \tag{2}$$

Where:

$Contacts_t$ is the number of detailing contacts in month t, and

$S_{t-1}$ is the depreciated value of past contacts.

The parameter δ is the depreciation rate, which I estimate in the model along with the other parameters.

---

[93] See discussion in ¶ 33 above.

63. In specifying the model, I include the right-hand side variables in levels without transformation. As discussed in more detail below, I allow the impact of the stock of promotion to change over time based on specification tests. A full description of the model and related statistical output appears in Attachment D.

64. The econometric analyses serve two purposes. First, they indicate that in economic terms there is a causal relationship between the Defendants' promotion and prescriptions of opioids so that if the allegations of misconduct are proven true, impact can be found. Second, I use the models to simulate what the level of prescribing would have been if the Defendants had not engaged in the alleged misconduct, as measured by their detailing contacts. That is, I alter the underlying values of the promotional stock to replicate a "but-for" world and predict but-for quantities.

## C. Results

65. Starting from the basic model described in Equation 1 above, I sequentially build models to account for the different ways the opioid prescribing unfolded into an epidemic over time. Consistent with facts summarized in this matter and the observations I made based on the figures above, I hypothesized that the impact of detailing would change over time as beliefs and norms about opioid treatment change. To account for these changes, I empirically identify changes, or "breaks" in econometric terms, in the relationship between detailing and sales over time. Ultimately, the data reveal there were three eras in the life of opioid detailing: (1) the period before wide acceptance of expanded use of opioids for pain,[94] (2) rapid growth after

---

[94] See also Parran Report, ¶¶ 125-28.

alleged efforts to co-opt pain guidelines and other norm-setting activities, and (3) the period of cumulative impact of countervailing factors such as the introduction of mandatory prescription drug monitoring programs and new treatment guidelines. (For a more complete picture see the events marked in red in Figure 5).

66. While the Defendants actively sought to manipulate the scientific and popular understanding of the risks of opioids prior to 1999, according to the plaintiffs' marketing expert Perri,[95] the release of the American Pain Society and American Association of Pain Medicine (APS, AAPM) consensus statement on pain (Spring 1997)[96] followed by the Federation of State Medical Board (FSMB) model guidelines (May 1998)[97] and the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) pain management standards (2001)[98] were also important marketing tools.[99] Through such advocacy as well as traditional marketing vehicles, Dr. Perri finds that Defendants sought to change the narrative about opioid therapy, opening the floodgates to prescribing.[100]

---

[95] Perri Report, ¶¶ 72-74.

[96] American Academy of Pain Medicine and the American Pain Society, "The use of opioids for the treatment of chronic pain – A consensus statement from the American Academy of Pain Medicine and the American Pain Society," *Journal of Pain,* 6(1), 1997, pp. 77-79.

[97] Federation of State Medical Boards, "Model policy for the use of controlled substances for the treatment of pain," *Journal of Pain and Palliative Care Pharmacotherapy*, 19(2), 2005, pp. 73-78.

[98] D. Phillips, "JCAHO pain management standards are unveiled," *JAMA*, 284(4), 2000, pp. 428-29.

[99] "Reshaping the minds of prescribers through CPG [Clinical Practice Guideline] development and associated distribution of these guidelines through educational (marketing) activities was an important aspect of Defendants marketing because of the impact it could have on sales."[99] Perri Report, ¶ 80.

[100] Specifically, Dr. Perri concludes: "Defendants' messages (discussed in detail below) focused on translating drug features into drug benefits, and downplayed information that would serve to discourage prescribing, including potential harms." Perri Report, ¶ 121). "In addition to downplaying addiction, Defendants' marketing also attacked mainstream thinking about dependence, claiming that patients can easily be tapered off opioids, and that dependence is not a significant concern." Perri Report, ¶ 137.