# Exhibit 2

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
 3    IN RE: NATIONAL          )   MDL No. 2804
      PRESCRIPTION OPIATE      )
 4    LITIGATION               )   Case No.
                               )   1:17-MD-2804
 5                             )
      THIS DOCUMENT RELATES TO )   Hon. Dan A.
 6    ALL CASES                )   Polster
                               )
 7

 8

 9                   __ __ __
10          Saturday, May 4, 2019
                     __ __ __
11

12       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
               CONFIDENTIALITY REVIEW
                     __ __ __
13

14

15

16        Videotaped Deposition of MEREDITH B.
      ROSENTHAL, Ph.D., held at Robins Kaplan LLP,
17    800 Boylston Street, Suite 2500, Boston,
      Massachusetts, commencing at 8:04 a.m., on
18    the above date, before Michael E. Miller,
      Fellow of the Academy of Professional
19    Reporters, Registered Diplomate Reporter,
      Certified Realtime Reporter and Notary
20    Public.
21

22

23                   __ __ __
24        GOLKOW LITIGATION SERVICES
        877.370.3377 ph | fax 917.591.5672
25            deps@golkow.com
```

Page 42

1 again, as a health economist, a question of
2 ascertaining what was in a particular detail,
3 but what was available in -- through key
4 opinion leaders, what was available through
5 professional guidelines, all of that setting
6 the context. So it's not so much about
7 looking for one co-mission as a much broader
8 picture of what the information was that was
9 conveyed.
10 Q. Okay. You've testified as a
11 causation or damages expert before, correct?
12 MR. SOBOL: Objection.
13 A. I have.
14 BY MR. ROTH:
15 Q. And in general, you understand
16 that to opine on causation or damages, you
17 have to tie the theory of liability to
18 damages?
19 MR. SOBOL: Objection.
20 A. Yes, and I have done that in my
21 report.
22 BY MR. ROTH:
23 Q. Okay. The complaint defines a
24 theory of liability here as false and
25 incomplete information, correct?

Page 43

1 A. Yes, correct.
2 Q. What have you done to confirm
3 that the detailing visits you analyzed
4 actually contained false and incomplete
5 information as the complaint or you define
6 it?
7 MR. SOBOL: Objection, just
8 asked and answered.
9 A. As we talked about earlier,
10 I've been asked to assume that counsel will
11 prove that all or virtually all marketing
12 during the period from 1995 to the end of my
13 data was unlawful.
14 So I have tested the
15 reasonableness of that assumption in the
16 review of the documents that we've talked
17 about, in the review of other expert
18 opinions.
19 I have not, nor do I believe
20 it's necessary to make that causal step,
21 looked at individual details throughout the
22 period for my analysis.
23 BY MR. ROTH:
24 Q. You would agree that detailing
25 in and of itself is not unlawful?

Page 44

1 MR. SOBOL: Objection.
2 A. Well, again, if that detailing
3 is conveying false and misleading
4 information, I understand -- I'm not a
5 lawyer, but I understand that it would be
6 unlawful. And so, you know, I do not -- I am
7 not making an assumption that detailing in
8 general is unlawful but that this detailing
9 can be proved to be unlawful.
10 BY MR. ROTH:
11 Q. A pharmaceutical rep going to a
12 doctor to drop off a pizza could be
13 considered a detailing visit, correct?
14 MR. SOBOL: Objection.
15 A. A detailing visit generally
16 involves the conveyance of some information,
17 maybe a pizza in addition, but the details
18 that I'm looking at, there is a specific
19 product mentioned.
20 BY MR. ROTH:
21 Q. But detailing visits can take
22 many forms, correct?
23 MR. SOBOL: Objection.
24 A. Well, I'm not sure exactly what
25 you mean by it. There's information conveyed

Page 45

1 about a product or a set of products, and
2 detailing visits are face-to-face visits
3 between the salesperson and someone in the
4 physician's office.
5 BY MR. ROTH:
6 Q. But you know that detailing
7 could just be the sales rep dropping off a
8 placard with the product's label on it?
9 MR. SOBOL: Objection.
10 A. I think you misunderstand,
11 again, the interconnectedness of all of this.
12 And so if a detail were something like you
13 just described -- I don't know about a
14 placard, how about a coffee mug -- those
15 details are intended to reinforce messages
16 that have been conveyed in previous details
17 that have been conveyed by key opinion
18 leaders.
19 I don't think it's appropriate
20 to pull these individual pieces out as if
21 they were not part of an integrated marketing
22 scheme, which is really precisely what
23 Dr. Perri talks about in his report.
24 BY MR. ROTH:
25 Q. But you're not offering the

Page 78

BY MR. ROTH:

Q.   And --

A.   I did look for those data.

Q.   You did look for it.  And that's true of every single manufacturer defendant, there is no physician-level detailing data available?

MR. SOBOL:  Objection.

A.   There were no physician-level detailing data for any manufacturer that covered the period of interest.  So in order for me to do my analysis, I would need those data for all the defendants for the entire time period.

So where -- to the extent that we found any data, they were bits and pieces of contact registries, essentially sales databases, which are not the same level as what these folks have -- they have actual linked data, linkable.

BY MR. ROTH:

Q.   But you didn't take the specific data you had for individual defendants for whatever time period you had to test the results of your regression

Page 79

against a model you could do on just that data?

MR. SOBOL:  Objection, form and asked and answered.

A.   There would be no such test. These -- the goal of my analysis and the goal of Datta and Dave's analysis are completely different.  So there -- there would be no point in comparing those results.

They are trying to ascertain the extent to which detailing across physicians drives marketing impact, so they're really interested in questions like, you know, what -- how -- how much does it make sense for a company to detail high prescribers versus low prescribers to a greater degree.

I'm interested in the aggregate impact, and so that is what my model does best.  Their model would not be appropriate for ascertaining the aggregate impact.

BY MR. ROTH:

Q.   I understand you're interested in the aggregate impact, but if one were interested in the individual impact of any

Page 80

single manufacturer's detailing, you could run an analysis similar to Datta and Dave using whatever data were available for that manufacturer?

MR. SOBOL:  Objection.

A.   There are two levels of aggregation here.  One is from the doctors up to the total product level, and the other is from the product to the defendant to the whole class, if I can use that term to describe all the opioids that we're interested in here.

So Datta and Dave are at the most granular level, the individual doctor prescribing for an individual drug.

I am interested in understanding how marketing as a whole drove sales in this market and I want to capture all of the spillover effects.  They're trying to tease out other kinds of effects.

This analysis could not be used to get an answer to the question what would have happened if these manufacturers had not marketed their products.

///

Page 81

BY MR. ROTH:

Q.   And the reason you're interested in the aggregate question is that was the charge you were given by plaintiffs' counsel was to look at the aggregate impact as opposed to an individual defendant-specific impact?

A.   Well, again, there are multiple levels of aggregation here, so if I -- my model, as you know, can be used to parse out individual defendants as I have done in Table 3 of my report, so it can look at an individual defendant, and I've shown you results excluding individual defendants.  So it is already doing that.

It's the cross-sectional nature of what they're modeling here with the physician-fixed effects.  They're really trying to tease apart how manufacturers go about targeting doctors for marketing and what effect that has.

I'm not interested in that effect, and so it wouldn't be appropriate even if I were only looking for one defendant.

Page 78

BY MR. ROTH:
1. Q. And --
2. A. I did look for those data.
3. Q. You did look for it. And
   that's true of every single manufacturer
   defendant, there is no physician-level
   detailing data available?
4. MR. SOBOL: Objection.
5. A. There were no physician-level
   detailing data for any manufacturer that
   covered the period of interest. So in order
   for me to do my analysis, I would need those
   data for all the defendants for the entire
   time period.
6. So where -- to the extent that
   we found any data, they were bits and pieces
   of contact registries, essentially sales
   databases, which are not the same level as
   what these folks have -- they have actual
   linked data, linkable.
   BY MR. ROTH:
7. Q. But you didn't take the
   specific data you had for individual
   defendants for whatever time period you had
   to test the results of your regression

Page 79

against a model you could do on just that
data?
MR. SOBOL: Objection, form and
asked and answered.
A. There would be no such test.
These -- the goal of my analysis and the goal
of Datta and Dave's analysis are completely
different. So there -- there would be no
point in comparing those results.
They are trying to ascertain
the extent to which detailing across
physicians drives marketing impact, so
they're really interested in questions like,
you know, what -- how -- how much does it
make sense for a company to detail high
prescribers versus low prescribers to a
greater degree.
I'm interested in the aggregate
impact, and so that is what my model does
best. Their model would not be appropriate
for ascertaining the aggregate impact.
BY MR. ROTH:
Q. I understand you're interested
in the aggregate impact, but if one were
interested in the individual impact of any

Page 80

single manufacturer's detailing, you could
run an analysis similar to Datta and Dave
using whatever data were available for that
manufacturer?
MR. SOBOL: Objection.
A. There are two levels of
aggregation here. One is from the doctors up
to the total product level, and the other is
from the product to the defendant to the
whole class, if I can use that term to
describe all the opioids that we're
interested in here.
So Datta and Dave are at the
most granular level, the individual doctor
prescribing for an individual drug.
I am interested in
understanding how marketing as a whole drove
sales in this market and I want to capture
all of the spillover effects. They're trying
to tease out other kinds of effects.
This analysis could not be used
to get an answer to the question what would
have happened if these manufacturers had not
marketed their products.
///

Page 81

BY MR. ROTH:
Q. And the reason you're
interested in the aggregate question is that
was the charge you were given by plaintiffs'
counsel was to look at the aggregate impact
as opposed to an individual
defendant-specific impact?
A. Well, again, there are multiple
levels of aggregation here, so if I -- my
model, as you know, can be used to parse out
individual defendants as I have done in
Table 3 of my report, so it can look at an
individual defendant, and I've shown you
results excluding individual defendants. So
it is already doing that.
It's the cross-sectional nature
of what they're modeling here with the
physician-fixed effects. They're really
trying to tease apart how manufacturers go
about targeting doctors for marketing and
what effect that has.
I'm not interested in that
effect, and so it wouldn't be appropriate
even if I were only looking for one
defendant.

Page 118

1  level; is that right?
2        MR. SOBOL:  Objection.
3     A.    Professor Cutler's
4  calculations, once he has looked at the
5  effect of shipments on harms, he then applies
6  my percentage to that, yes.
7  BY MR. ROTH:
8     Q.    Did you have any conversations
9  with Professor Cutler about the fact that he
10  was taking your national model and then
11  applying it to his county model and what that
12  might mean for his results?
13        MR. SOBOL:  That's a yes or a
14  no.
15     A.    Yes.
16  BY MR. ROTH:
17     Q.    Did you have any of those
18  conversations outside of the presence of
19  counsel?
20     A.    No.
21     Q.    Do you have any view about the
22  propriety of taking a national model as
23  you've done and then inputting that into a
24  county-specific model as Professor Cutler has
25  done?

Page 119

1     A.    Yes.  I believe the national
2  model is appropriate.  Again, because
3  marketing strategy is a national phenomenon,
4  the national data are a reliable way to
5  ascertain the relationship between marketing
6  and sales.
7        I have used the same
8  methodology, for example, in the Neurontin
9  matter concerning Kaiser.  We used a national
10  model to estimate the relationship between
11  marketing and sales and applied that to a
12  single healthcare system.
13     Q.    So if marketing is, in your
14  view, nationally done and substantially
15  similar, why is there a difference in
16  shipments on a county level the way Professor
17  Cutler's modeled it?
18        MR. SOBOL:  Objection, scope.
19     A.    This of course is the subject
20  of Professor Cutler's report, and I -- I'm
21  not sure as I sit here I could tell you
22  exactly the factors, but it is obviously
23  counties are situated differently in ways
24  that he captures in his cross-sectional model
25  of harms that could absolutely affect the

Page 120

1  shipments in that county, conditional on
2  marketing.
3  BY MR. ROTH:
4     Q.    Put another way, though, you
5  would not expect differences in shipments
6  across counties to be caused by marketing
7  where you presume all marketing is national
8  in scope?
9        MR. SOBOL:  Objection.
10     A.    I don't believe that that's the
11  right way of looking at it.  So if there's a
12  specific relationship between marketing and
13  sales and -- it could well be that counties
14  start at different levels of use, and so the
15  incremental effect of those relationships, as
16  you see in Professor Cutler's analysis,
17  materializes differently in those counties.
18        That doesn't mean the effect of
19  marketing was different.  It's just the
20  baseline was different.
21  BY MR. ROTH:
22     Q.    But I think you said that's an
23  issue you would defer to Professor Cutler.
24  You don't have an opinion on how your
25  national model plugs into his county model

Page 121

1  and why the differences may occur in
2  shipments?
3        MR. SOBOL:  Objection.
4     A.    It's my opinion that it's
5  appropriate to take my national estimates.
6  National-level analysis is the most robust
7  analysis.  It's the place where the data are
8  really reliable.  I think it's appropriate
9  for Professor Cutler to use those estimates
10  in the way that he has.
11  BY MR. ROTH:
12     Q.    But you have no opinion that
13  explains why we may be seeing variation
14  between county-level shipments in his model
15  despite him using your national model on
16  marketing?
17        MR. SOBOL:  Objection, asked
18  and answered.
19     A.    I do not have an opinion
20  specifically on that, no.
21  BY MR. ROTH:
22     Q.    You do not attempt to link any
23  specific prescription to any specific
24  defendant's marketing; is that fair?
25     A.    Are you asking me whether I'm

Page 122

1 looking prescription by prescription, these
2 ones were caused and those ones were not?
3 The analysis -- the but-for analysis is a
4 world that did not occur, of course. Would
5 you agree?
6     The but-for world where the
7 marketing didn't happen, didn't happen. So
8 my analysis can tell me about the correct
9 aggregate amount. It does not identify one
10 prescription at a time.
11    Q.   Okay. Yeah. Just so the
12 record is clear, we've been through this, but
13 you did an aggregate model. You didn't build
14 it from the ground up on a
15 prescription-by-prescription,
16 detail-by-detail basis?
17        MR. SOBOL: Objection.
18    A.   Right. If I may, the -- I did
19 an aggregate model. The aggregate sales of
20 course are the sum of individual
21 prescriptions, but I am looking at the
22 national level at total marketing on total
23 sales.
24        It's not that it's unknowable
25 what those prescriptions were underneath the

Page 123

1 sales data. That's not the -- that's not the
2 challenge. The challenge is a conceptual
3 one.
4     The but-for scenario didn't
5 happen, so I cannot say precisely which
6 prescriptions would not have been written,
7 only that there is some group of them.
8 BY MR. ROTH:
9    Q.   I know you said earlier you
10 looked for manufacturer-specific detailing
11 notes and marketing information. Did you
12 find or learn of any manufacturer-produced
13 data on detailing to specific doctors within
14 Summit or Cuyahoga County?
15    A.   I don't recall.
16    Q.   And it's fair to say if that
17 does exist, it's not something you reviewed
18 or relied on for Attachment B?
19        MR. SOBOL: Objection.
20    A.   I did not use individual
21 physician-level data, no.
22 BY MR. ROTH:
23    Q.   And individual physician-level
24 data, as you may have used in other cases,
25 would be drug specific and doctor specific,

Page 124

1 correct?
2        MR. SOBOL: Objection.
3    A.   Well, it depends on really what
4 you're talking about. When I have had
5 individual physician-level data in the past,
6 they are sales data. So again, I think the
7 challenge is not disaggregating the sales
8 data.
9        There are products that exist;
10 sometimes they require subpoenas to get them,
11 but there are products that exist that allow
12 us to look at prescribing at a physician
13 level, but not at detailing at a physician
14 level. So those data I have not used because
15 I have not seen them.
16    Q.   Well, but, for example, an
17 individual manufacturer may keep detailed
18 call notes of the doctor visits that their
19 sales representatives engage in, correct?
20    A.   Well, I have seen call notes in
21 the past, and I have always found them to be
22 unusable.
23    Q.   And why is that, out of
24 curiosity?
25    A.   They often do not include

Page 125

1 provider identifiers, so they can't be linked
2 to other data. They are incomplete, and
3 they -- they are often produced -- so
4 incomplete in the sense of the call notes
5 have a lot of blank fields, and they're often
6 produced for short time periods.
7    Q.   But you didn't look at any
8 individual manufacturer call notes in this
9 case in conjunction with your expert report
10 or opinions?
11    A.   I looked to see if there was a
12 source of complete data for -- in order to do
13 such an analysis, and my staff worked with
14 counsel to identify documents or databases
15 and did not find any.
16    Q.   Pivoting back to Professor
17 Cutler for one more second. Have you worked
18 as an expert in other cases where you've only
19 modeled causation and then another expert has
20 taken that forward and put into it a damages
21 model as Professor Cutler has done here?
22    A.   Yes.
23    Q.   And what case was that or
24 cases, if there's more than one?
25    A.   Yes. In Neurontin, I did the

Page 146

1  for unlawfulness to determine what the impact
2  is?
3         MR. SOBOL:  Objection.
4     A.    I would not conclude that
5  without giving some thought.  I'm sure it
6  couldn't be done for every qualitative
7  example that you could come up with, but I
8  think that there are ways of doing it
9  qualitatively, as I, again, did in the
10 Neurontin matter, looking at promotion to
11 psychiatrists as opposed to other physicians.
12 BY MR. ROTH:
13    Q.    But since you have an aggregate
14 national model with aggregate detailing, is
15 there a way to go, for example, and figure
16 out where the details only to dentists were
17 if the court concludes that that was the
18 unlawful activity as opposed to detailing
19 writ large?
20    A.    I'm not a hundred percent sure
21 about dentists, but as I used in the
22 Neurontin matter, there are detailing data
23 available that would allow you to look
24 nationally by specialty.
25    Q.    But the detailing data you used

Page 147

1  in the Neurontin matter for that exercise is
2  not the same detailing data you used in this
3  matter for your direct model, correct?
4     A.    It's not exactly the same
5  because it was disaggregated by specialty,
6  but I believe those -- that is possible to
7  disaggregate by specialty.  I've not done
8  that here.
9     Q.    And you haven't even tested
10 whether it can be done yet, right?
11        MR. SOBOL:  Objection.
12    A.    I have not.
13 BY MR. ROTH:
14    Q.    I'll give you a quantitative
15 measure.  What if the court concludes that
16 any detail over five minutes in length were
17 presumed unlawful, but anything shorter than
18 that isn't?  How can you quantify the impact
19 of the over-five-minute visits in your model?
20    A.    As I sit here, I don't know
21 because I haven't thought about it.  Clearly
22 I would need some data on the length of
23 details.
24    Q.    We'll come back to this, I
25 promise, but back to paragraph 11 for a

Page 148

1  minute.
2         So on page 9, the bullet says:
3  Based upon my analyses and assumptions from
4  counsel about the extent of promotion that
5  can be proven to be unlawful, I can
6  reasonably identify approximately ████
7  of MMEs during the period of my analysis as
8  caused by unlawful promotion.
9         Did I read that correctly?
10    A.    You did.
11    Q.    And the ██ is the direct
12 number, and the ██ is the indirect number
13 from your models?
14    A.    That's correct.
15    Q.    Okay.  And then if you look at
16 paragraph 75 -- and we talked about this
17 earlier already.  But paragraph 75, which is
18 on page 50 under Calculation of But-For MMEs.
19        Do you see that?
20    A.    Yes.
21    Q.    You say:  I have been
22 instructed by counsel to assume in my but-for
23 scenarios that the fact finder, judge or
24 jury, finds that all or virtually all
25 promotion by the manufacturer defendants from

Page 149

1  1995 to present was unlawful.
2         Do you see that?
3     A.    Yes.
4     Q.    And then after the parentheses,
5  it says:  Thus, to calculate impact for the
6  purpose of damages beginning in 2006, I
7  modeled a world in which this promotion did
8  not occur, i.e., but-for promotion equals
9  actual promotion for opioids, less all
10 promotion for opioids by the defendants and
11 their surrogates.
12        Do you see that?
13    A.    I do.
14    Q.    And then in Table 2 on the next
15 page, there's actually a note that says:  The
16 percent of MMEs attributable to challenged
17 promotion is calculated as the difference
18 between predicted actual and predicted
19 but-for MMEs, assuming all defendants'
20 promotion is set to zero starting in 1995
21 divided by predicted actual MMEs.
22        Do you see that?
23    A.    Yes.
24    Q.    So your model assumption is
25 actually, not virtually, all promotion by

Page 150

1 defendants is unlawful; it's that all
2 promotion by defendants is unlawful?
3    A.   Yes. I guess the -- sort of
4 the legal formulation of that, I'm repeating
5 there when I say all and virtually all. I'm
6 not sure what virtually all would be
7 quantified as, 99%, but I do all, yes.
8    Q.   Okay. And does that not equate
9 to assuming that all MMEs prescribed due to
10 defendants' promotion were medically
11 unnecessary?
12    A.   No, that does not equate to
13 that.
14    Q.   So in your model, you could
15 have unlawful promotion that leads to
16 medically necessary scripts still?
17    A.   I was asked to quantify the
18 impact of the alleged unlawful promotion, not
19 to examine that question about whether that
20 prescription itself was medically
21 unnecessary, so -- so it's something I
22 haven't looked at and I don't believe it's
23 related to my charge.
24       The fact that the promotion was
25 unlawful to me does not equate to the fact

Page 151

1 that a prescription was medically
2 unnecessary.
3    Q.   So if promotion, whether lawful
4 or unlawful, results in a medically necessary
5 prescription, how does that prescription
6 cause damage?
7       MR. SOBOL: Objection, scope.
8    A.   I'm not a lawyer, as you know.
9 And sort of what the theory of liability is
10 and what -- what plaintiffs can recover for
11 and what they can't is -- I do not know.
12       I have only been asked to
13 examine the extent to which this unlawful
14 conduct caused sales.
15 BY MR. ROTH:
16    Q.   Okay. You're not a lawyer, but
17 you're a good economist. You've testified a
18 lot about causation and damages, okay, and
19 you're familiar with what a but-for world is,
20 right?
21    A.   Yes.
22    Q.   You have one here?
23    A.   I do.
24    Q.   So how does your but-for world
25 treat medically necessary prescriptions?

Page 152

1    A.   Again, this is --
2       MR. SOBOL: Objection.
3       But go ahead.
4       THE WITNESS: Sorry.
5    A.   The model treats the right-hand
6 side variable as the thing that will be
7 proven to be unlawful, and any sales gained
8 from that unlawful conduct as subject to
9 recovery. This I know as a, thank you, good
10 economist and someone who's done that, that
11 downstream of my analysis there's a damage
12 number that plaintiffs I believe will try to
13 recover.
14       So as an economist, to me, the
15 theory is that any gains, whether or not they
16 resulted in medically necessary
17 prescriptions, are subject to recovery. As
18 an economist, that seems like a reasonable
19 theory if we wanted to deter fraudulent and
20 misleading information. This is the same
21 analysis that I did in the Neurontin case.
22 BY MR. ROTH:
23    Q.   Stated differently, your model
24 will calculate causation by defendants'
25 marketing even for medically necessary

Page 153

1 prescriptions?
2    A.   It does not distinguish. And
3 to be clear, whether or not there were
4 medically necessary prescriptions caused by
5 the misconduct, I can't say for sure.
6    Q.   And as an economist, is that
7 not something you think you should take into
8 account in your but-for world where you're
9 opining that but for the defendants' conduct,
10 fewer of these MMEs would be out in the
11 world?
12    A.   Absolutely not. Again, as an
13 economist, to me, if the allegations are
14 true, I can see a strong economic rationale
15 for ensuring that liability is attached to
16 all these ill-gotten gains from the alleged
17 misconduct.
18    Q.   But there is a parallel world
19 where a manufacturer may promote lawfully and
20 that lawful promotion would result in
21 medically necessary prescriptions, correct?
22       MR. SOBOL: Objection.
23    A.   I -- you have a lot of parallel
24 worlds I've noticed, but yes, I think we
25 agreed at the beginning of the day that there

Page 150

1 defendants is unlawful; it's that all
2 promotion by defendants is unlawful?
3     A.    Yes.  I guess the -- sort of
4 the legal formulation of that, I'm repeating
5 there when I say all and virtually all.  I'm
6 not sure what virtually all would be
7 quantified as, 99%, but I do all, yes.
8     Q.    Okay.  And does that not equate
9 to assuming that all MMEs prescribed due to
10 defendants' promotion were medically
11 unnecessary?
12     A.    No, that does not equate to
13 that.
14     Q.    So in your model, you could
15 have unlawful promotion that leads to
16 medically necessary scripts still?
17     A.    I was asked to quantify the
18 impact of the alleged unlawful promotion, not
19 to examine that question about whether that
20 prescription itself was medically
21 unnecessary, so -- so it's something I
22 haven't looked at and I don't believe it's
23 related to my charge.
24         The fact that the promotion was
25 unlawful to me does not equate to the fact

Page 151

1 that a prescription was medically
2 unnecessary.
3     Q.    So if promotion, whether lawful
4 or unlawful, results in a medically necessary
5 prescription, how does that prescription
6 cause damage?
7         MR. SOBOL:  Objection, scope.
8     A.    I'm not a lawyer, as you know.
9 And sort of what the theory of liability is
10 and what -- what plaintiffs can recover for
11 and what they can't is -- I do not know.
12         I have only been asked to
13 examine the extent to which this unlawful
14 conduct caused sales.
15 BY MR. ROTH:
16     Q.    Okay.  You're not a lawyer, but
17 you're a good economist.  You've testified a
18 lot about causation and damages, okay, and
19 you're familiar with what a but-for world is,
20 right?
21     A.    Yes.
22     Q.    You have one here?
23     A.    I do.
24     Q.    So how does your but-for world
25 treat medically necessary prescriptions?

Page 152

1     A.    Again, this is --
2         MR. SOBOL:  Objection.
3         But go ahead.
4         THE WITNESS:  Sorry.
5     A.    The model treats the right-hand
6 side variable as the thing that will be
7 proven to be unlawful, and any sales gained
8 from that unlawful conduct as subject to
9 recovery.  This I know as a, thank you, good
10 economist and someone who's done that, that
11 downstream of my analysis there's a damage
12 number that plaintiffs I believe will try to
13 recover.
14         So as an economist, to me, the
15 theory is that any gains, whether or not they
16 resulted in medically necessary
17 prescriptions, are subject to recovery.  As
18 an economist, that seems like a reasonable
19 theory if we wanted to deter fraudulent and
20 misleading information.  This is the same
21 analysis that I did in the Neurontin case.
22 BY MR. ROTH:
23     Q.    Stated differently, your model
24 will calculate causation by defendants'
25 marketing even for medically necessary

Page 153

1 prescriptions?
2     A.    It does not distinguish.  And
3 to be clear, whether or not there were
4 medically necessary prescriptions caused by
5 the misconduct, I can't say for sure.
6     Q.    And as an economist, is that
7 not something you think you should take into
8 account in your but-for world where you're
9 opining that but for the defendants' conduct,
10 fewer of these MMEs would be out in the
11 world?
12     A.    Absolutely not.  Again, as an
13 economist, to me, if the allegations are
14 true, I can see a strong economic rationale
15 for ensuring that liability is attached to
16 all these ill-gotten gains from the alleged
17 misconduct.
18     Q.    But there is a parallel world
19 where a manufacturer may promote lawfully and
20 that lawful promotion would result in
21 medically necessary prescriptions, correct?
22         MR. SOBOL:  Objection.
23     A.    I -- you have a lot of parallel
24 worlds I've noticed, but yes, I think we
25 agreed at the beginning of the day that there

Highly Confidential – Subject to Further Confidentiality Review

Page 158

1  All right.
2      So looking at Attachment D,
3  page D6. This may be from one of the same
4  attachments. I don't know. Do you see
5  there's a section that says Comcast
6  Considerations?
7      A.  Yes, I do.
8      Q.  What is the reference to
9  Comcast there?
10     A.  Well, again, I'm not lawyer,
11 but I understand that there was a case
12 involving Comcast, and that the -- what it
13 concerns, again, from a layperson's
14 understanding, is about the ability of the
15 damages as presented to the court to conform
16 to different conclusions about the but-for
17 scenario.
18     Q.  Essentially the issue we've
19 been talking about for the last --
20     A.  The issue we've been talking
21 about.
22     Q.  And why were you concerned
23 about the application of Comcast to this
24 case?
25     MR. SOBOL: Objection, assumes

Page 159

1  a fact not in evidence.
2  BY MR. ROTH:
3      Q.  Assuming you were.
4      A.  As you recall, the last part of
5  my assignment was to report on how my
6  conclusion would be different if there were
7  different considerations with regard to who's
8  in, who's out by defendant, for example. So
9  yes.
10     Q.  Okay. I'm trying to streamline
11 here because we've covered more ground --
12     A.  We're going to cover 14 hours
13 no matter what --
14     Q.  That's true.
15     A.  -- so streamlining may be good
16 for you, but it's not good for me.
17     MR. ROTH: I'm having fun. I
18 think you are too.
19     THE WITNESS: Of course.
20     MR. LONERGAN: What about us?
21 BY MR. ROTH:
22     Q.  Do you agree that your model
23 does not measure the impact -- we went over
24 this. I'm not going to ask that again.
25 Strike that.

Page 160

1      Could you have modeled an
2  individual manufacturer separately?
3      MR. SOBOL: Objection, asked
4      and answered.
5      A.  It was not something I
6  attempted to do. I think mechanically it is
7  possible. But as I noted, one of the reasons
8  for using an aggregate time series is that we
9  smooth over a lot of noise in the data, so I
10 don't know whether an individual
11 manufacturer-level model would be feasible.
12 BY MR. ROTH:
13     Q.  Okay. In a but-for world,
14 where all of the unlawful detailing, which is
15 your assumed all defendants' detailing, were
16 replaced with lawful detailing, would there
17 be any change in overall prescribing?
18     A.  Sorry. I just -- so the model
19 doesn't itself have a presumption about
20 lawful and unlawful. The but-for scenario is
21 where that presumption is incorporated, so
22 the model is the model.
23     Q.  I asked a bad question and you
24 properly called me on it. Let me ask a
25 better question.

Page 161

1      If we assume that all unlawful
2  detailing is lawful, then the actual
3  prescribing and the but-for prescribing in
4  your models would be equal to each other?
5      A.  Yes, that's correct. Those two
6  predicted values would be identical.
7      Q.  So the percent of MMEs
8  attributed to unlawful detailing in that
9  scenario would be zero percent.
10     A.  Yes. If marketing were the
11 same in both scenarios, then there would be
12 no difference.
13     Q.  Assume for a minute that a
14 manufacturer's detailing is found to be
15 unlawful but it did not engage in any of the
16 other marketing misconduct alleged by
17 plaintiffs with respect to the key opinion
18 leaders, journal advertising and the other
19 factors.
20     How would your model account
21 for harm for that specific manufacturer?
22     MR. SOBOL: Objection.
23     A.  In my opinion, that would be a
24 legal question because, again, all the
25 manufacturers are operating in the same

Page 162

1  ecosystem.  According to the complaint and
2  everything I know as a health economist, the
3  effects of one manufacturer's unbranded
4  marketing -- I use that to refer to the
5  guidelines and those kinds of activities --
6  will spill over on to another manufacturer,
7  and I don't know whether it would be
8  appropriate to pull that out or not.
9  BY MR. ROTH:
10  Q.  That's a long answer.  I want
11  to -- I think I asked a more specific
12  question.
13  A.  Sure.
14  Q.  So if detailing is unlawful --
15  A.  Yes.
16  Q.  -- and let's say also the other
17  stuff, okay, key opinion leaders influencing
18  standards of care is also unlawful, and a
19  manufacturer just detailed, they're going to
20  have the same percentage of liability in your
21  direct model whether or not they engaged in
22  the other unlawful conduct, correct?
23  MR. SOBOL:  Objection.
24  A.  Yes, that's true.  Although
25  it's true in terms of what I calculate in

Page 163

1  Table 3.  Just to be clear, I don't have an
2  opinion on liability.  That's a legal matter.
3  But what I do in Table 3 is I say, okay,
4  well, what would happen if we said the
5  detailing by Purdue were lawful, what would
6  happen there?
7  So whether or not that quantum
8  is exactly what liability is, I don't -- I
9  don't really know how the court is going to
10  see that, and so that's why I don't really
11  know if you would need to say, well, some of
12  why your detailing was so productive was
13  caused by somebody else's activity.  I don't
14  know whether it would make sense to back that
15  out.
16  BY MR. ROTH:
17  Q.  So let's take the opposite.
18  A.  Yeah.
19  Q.  Someone's detailing is entirely
20  lawful.  There's no issue there.  But they've
21  influenced the standards of care through key
22  opinion leaders, they've paid off doctors,
23  they've done all of the parade of horribles
24  that the plaintiffs allege, and the court
25  finds that that in fact is unlawful.  In your

Page 164

1  model, that manufacturer has no liability,
2  correct?
3  MR. SOBOL:  Objection.
4  A.  Well, again, my model is
5  looking at the aggregate causation between
6  marketing and sales; it is not designed to
7  assign liability to individual manufacturers
8  nor, again, am I certain how counsel or the
9  courts would do so.
10  The purpose of Table 3 is to
11  show that I can back out individual levels of
12  detailing, not to assign liability.  So I --
13  I don't know exactly how that would proceed,
14  even -- even without having these variable
15  assumptions across defendants.  I have not
16  looked defendant by defendant at something
17  like liability.
18  BY MR. ROTH:
19  Q.  Okay.  So let's look aggregate.
20  If for all the manufacturers
21  the conclusion is that the detailing is
22  entirely lawful, but the manufacturers
23  engaged in other conduct that the court finds
24  is unlawful, what would the result of your
25  model be in that world?

Page 165

1  MR. SOBOL:  Objection.
2  A.  I would have to give it some
3  thought, but again, my preferred model
4  ultimately captures the effect of all that
5  other stuff that we're calling as really is
6  the what happens -- in part, a chunk of it is
7  what happens to the promotional effectiveness
8  after the first turning point and before the
9  second turning point.  And so in theory, one
10  could look at that, but it would really
11  depend on the specific set of facts.
12  BY MR. ROTH:
13  Q.  It would require a new model
14  probably?
15  MR. SOBOL:  Objection.
16  A.  I don't know that it would
17  require a new model.  It would require a new
18  but-for analysis.
19  BY MR. ROTH:
20  Q.  Back to your body of your
21  report, paragraph 64.  You say:  The
22  econometric analyses serve two purposes.
23  First, they indicate that in economic terms
24  there is a causal relationship between the
25  defendants' promotion and prescriptions of

Page 190

1 of promotion are correlated?
2    A.    Well, as I mentioned, when I
3 looked at the IQVIA data for journal
4 advertisements, direct-to-consumer
5 advertising, sampling, there was very little
6 data there.  I have no reason to believe that
7 they're just not measuring it.  It may be
8 that there are some kinds of advertising that
9 we see in the marketing budgets that IQVIA
10 doesn't capture.  But to the extent that the
11 IQVIA data are complete, it was not really
12 possible to do a correlation analysis because
13 there was so little data for these other
14 tools.
15    Q.    So when you say it's a
16 reasonable expectation that other forms of
17 marketing follow detailing, that's really
18 just an assumption based on your experience
19 with other drugs in other cases?
20    A.    It's based on my experience
21 with very similar kinds of analyses with
22 other drugs.  And again, I cite to
23 Dr. Perri's report at the beginning of this
24 where he talks about the coordination of
25 marketing mechanisms, so it's very consistent

Page 191

1 with his opinions as well.
2    Q.    Yeah.  But to be clear, that's
3 an assumption you're making that's not
4 supported by any specific work you've done to
5 confirm it's true that detailing and other
6 forms of promotion are correlated for
7 opioids?
8        MR. SOBOL:  Objection, asked
9    and answered.
10    A.    Again, the analysis -- the
11 correlation analysis was not possible here,
12 so I'm relying on my past experience and
13 Dr. Perri's expertise.
14 BY MR. ROTH:
15    Q.    Okay.  Then you say:  Third,
16 alternative measures of promotion that I
17 could obtain from available sources have
18 substantial missing data, e.g., estimates of
19 payments to pain advocacy groups can only be
20 obtained from the records of some, but not
21 all manufacturers.
22        Do you see that?
23    A.    Yes.
24    Q.    And that's what we've been
25 talking about.

Page 192

1    A.    Yes.
2    Q.    Are you certain that every
3 manufacturer in this case has made payments
4 to pain advocacy groups for opioids?
5    A.    Well, given -- that's -- it's
6 hard to be certain about something for which
7 I have incomplete data, so I -- there are a
8 number of documents that I cite to that show
9 these kinds of payments, and I believe other
10 experts have tracked these payments as well.
11        But am I certain that every
12 defendant has evidence of that type?  No, I'm
13 not certain.
14    Q.    And then you wrap up this
15 paragraph saying:  Note that in this case
16 there appears to be substantial evidence that
17 through means other than promotional
18 spending, the defendant manufacturers
19 fundamentally changed opioid prescribing
20 standards.  The direct approach does not
21 calculate the efforts -- the effects,
22 sorry -- of the nonpromotional marketing and
23 is thus conservative.
24        Do you see that?
25    A.    Yes.

Page 193

1    Q.    But that's not universally true
2 for all manufacturers, is it?
3        MR. SOBOL:  Objection.
4    A.    Again, my opinions here really
5 are to look at the market as a whole, and
6 even if there were a defendant that did not
7 incur this kind of spending, the effects of
8 changing things like guidelines would --
9 would flow through to everyone's drugs,
10 right.
11        So these are sort of broad
12 changes in the environment of prescribing,
13 and so again, I don't have an opinion on the
14 liability question of whether there's a
15 defendant who has not undertaken the
16 unbranded advertising, whether they therefore
17 should not be liable for its effects.  I
18 don't know the answer to that.
19 BY MR. ROTH:
20    Q.    What if a manufacturer engages
21 only in limited detailing and not other types
22 of promotional activities?  It would not be
23 conservative for that manufacturer to only
24 look at detailing, correct?
25    A.    The purpose of my analysis is

Page 194

not to assign liability to individual
defendants. It's to look at the aggregate
effect. So I don't know what would be
appropriate. That to me seems like a legal
question.

Q. Would it be conservative from
an economic perspective if a manufacturer
purchases an opioid product in, say, 2008 and
engages in detailing but no other marketing?

A. I do not calculate any
estimates at the individual defendant level,
so I cannot characterize them as conservative
or otherwise. I'm only looking at aggregate
effects.

Q. Okay. I'm just trying to get
at what you mean when you say the direct
approach is conservative. It strikes me that
for a defendant who didn't participate in the
market ecosystem until late in the game and
only detailed, it's actually the opposite of
conservative the way your model calculates
damages.

MR. SOBOL: Objection.

A. I believe that is inaccurate.
My model does not calculate damages for any

Page 195

individual defendant, period.
BY MR. ROTH:

Q. Causation, sorry, I should have
said.

A. So again, because I am not
looking at impact for an individual
defendant, we cannot characterize my analysis
as conservative or otherwise for an
individual defendant. It is for the market
as a whole.

Q. Okay. So when you say in
paragraph 56 that the approach is
conservative, you mean on an aggregate basis
it is conservative because it looks at
detailing and not other things?

A. That's correct.

Q. Okay. Sort of implicit in that
statement and other things you've said today
is an assumption that all manufacturers
market opioids the same way.

MR. SOBOL: Objection.
BY MR. ROTH:

Q. Do you agree with that?

A. I don't believe so. Again, I
include in my model detailing. To the extent

Page 196

that there's variation in the way
manufacturers detail, the specific details
may generate more prescriptions or fewer, and
my model captures the average effect. That's
what the coefficients basically tell us is
the average effects.

So there may be variation in
there, but for the purposes of calculating
aggregate impact, the average is appropriate.

Q. So for manufacturers who have
detailing that's below average, they're being
brought up to the average by the way you've
aggregated the model in terms of causation?

A. Well, by definition, an average
will be not the same as all the individual
components unless there's no variation, and
so there will be some who are brought up and
some who are brought down.

It's my belief, as we talked
about before, that this aggregate model is
the most reliable model; because there's
substantial spillover effects, because there
can be noise in the data when we try to
disaggregate it too much. I think for that
reason, the aggregate model is preferable.

Page 197

Q. You know, though, that not
every manufacturer markets products the same
way?

A. I guess -- I'm not exactly sure
how to answer that question. As we've talked
about before, I am not a pharmaceutical
marketing expert. I leave that to Dr. Perri.
I think it's reasonable to assume that there
is some variation in tactics and the like
across manufacturers and perhaps across
products.

Q. Well, let's look at one thing
you do talk about. So there's a difference
in the way promotion is engaged in by brand
companies and marketing may be engaged in by
generic companies, correct?

A. Yes, brand companies are
primarily the ones that engage in marketing.

Q. A generic company might still
detail but may just talk about price and
formulary status?

MR. SOBOL: Objection.

A. Generally, manufacturers will
not detail physicians for generics. They may
have other sales force activities that they

Page 194

1  not to assign liability to individual
2  defendants.  It's to look at the aggregate
3  effect.  So I don't know what would be
4  appropriate.  That to me seems like a legal
5  question.
6       Q.    Would it be conservative from
7  an economic perspective if a manufacturer
8  purchases an opioid product in, say, 2008 and
9  engages in detailing but no other marketing?
10      A.    I do not calculate any
11  estimates at the individual defendant level,
12  so I cannot characterize them as conservative
13  or otherwise.  I'm only looking at aggregate
14  effects.
15      Q.    Okay.  I'm just trying to get
16  at what you mean when you say the direct
17  approach is conservative.  It strikes me that
18  for a defendant who didn't participate in the
19  market ecosystem until late in the game and
20  only detailed, it's actually the opposite of
21  conservative the way your model calculates
22  damages.
23           MR. SOBOL:  Objection.
24      A.    I believe that is inaccurate.
25  My model does not calculate damages for any

Page 195

1  individual defendant, period.
2  BY MR. ROTH:
3       Q.    Causation, sorry, I should have
4  said.
5       A.    So again, because I am not
6  looking at impact for an individual
7  defendant, we cannot characterize my analysis
8  as conservative or otherwise for an
9  individual defendant.  It is for the market
10  as a whole.
11      Q.    Okay.  So when you say in
12  paragraph 56 that the approach is
13  conservative, you mean on an aggregate basis
14  it is conservative because it looks at
15  detailing and not other things?
16      A.    That's correct.
17      Q.    Okay.  Sort of implicit in that
18  statement and other things you've said today
19  is an assumption that all manufacturers
20  market opioids the same way.
21           MR. SOBOL:  Objection.
22  BY MR. ROTH:
23      Q.    Do you agree with that?
24      A.    I don't believe so.  Again, I
25  include in my model detailing.  To the extent

Page 196

1  that there's variation in the way
2  manufacturers detail, the specific details
3  may generate more prescriptions or fewer, and
4  my model captures the average effect.  That's
5  what the coefficients basically tell us is
6  the average effects.
7           So there may be variation in
8  there, but for the purposes of calculating
9  aggregate impact, the average is appropriate.
10      Q.    So for manufacturers who have
11  detailing that's below average, they're being
12  brought up to the average by the way you've
13  aggregated the model in terms of causation?
14      A.    Well, by definition, an average
15  will be not the same as all the individual
16  components unless there's no variation, and
17  so there will be some who are brought up and
18  some who are brought down.
19           It's my belief, as we talked
20  about before, that this aggregate model is
21  the most reliable model; because there's
22  substantial spillover effects, because there
23  can be noise in the data when we try to
24  disaggregate it too much.  I think for that
25  reason, the aggregate model is preferable.

Page 197

1       Q.    You know, though, that not
2  every manufacturer markets products the same
3  way?
4       A.    I guess -- I'm not exactly sure
5  how to answer that question.  As we've talked
6  about before, I am not a pharmaceutical
7  marketing expert.  I leave that to Dr. Perri.
8  I think it's reasonable to assume that there
9  is some variation in tactics and the like
10  across manufacturers and perhaps across
11  products.
12      Q.    Well, let's look at one thing
13  you do talk about.  So there's a difference
14  in the way promotion is engaged in by brand
15  companies and marketing may be engaged in by
16  generic companies, correct?
17      A.    Yes, brand companies are
18  primarily the ones that engage in marketing.
19      Q.    A generic company might still
20  detail but may just talk about price and
21  formulary status?
22           MR. SOBOL:  Objection.
23      A.    Generally, manufacturers will
24  not detail physicians for generics.  They may
25  have other sales force activities that they

Highly Confidential - Subject to Further Confidentiality Review

Page 198

1  do that relate to price, but individual
2  physicians are not generally making a
3  decision about one generic versus the other.
4  That decision happens at the pharmacy.
5  BY MR. ROTH:
6      Q.    But Attachment C contains a
7  slew of generics on that list?
8      A.    That's correct.  Some of them
9  have contacts related to them.  Some of them
10  don't.  Some of those contacts relate to
11  marketing agreements that are really for
12  brand drugs.
13     Q.    So how do you square your
14  testimony a minute ago that generics
15  generally don't detail with the fact that you
16  have a lot of promotional contacts in your
17  model for generic drugs?
18         MR. SOBOL:  Objection.
19     A.    I believe I just squared it.  I
20  think a lot of those contacts relate to
21  marketing agreements.
22  BY MR. ROTH:
23     Q.    And so if there's marketing
24  under a marketing agreement, that gets
25  attributed to the generic drug, even though

Page 199

1  it may be different in kind than a branded
2  drug promotional visit?
3         MR. SOBOL:  Objection.
4      A.    No.  The marketing of a
5  particular drug is identified, and if the
6  drug is sold by a defendant manufacturer,
7  even if it's detailed by a different
8  manufacturer, that gets counted in my model.
9  And then in Table 3, I take out those
10  marketing agreement related drugs.
11         So -- so it's -- the marketing
12  is associated with -- I mean, I look at
13  aggregate marketing, so it's all in the
14  aggregate marketing.  But I do have a
15  mechanism for pulling out marketing that's
16  for someone else's drug.
17  BY MR. ROTH:
18     Q.    So if that's the mechanism
19  you're using, how are any of these detailing
20  contacts being attributed to generic drugs in
21  your model?
22         MR. SOBOL:  Objection.
23     A.    I think you misunderstand the
24  nature of the model.  The model uses
25  aggregate MMEs and aggregate detailing, so

Page 200

1  there's not an attribution underneath that.
2         And furthermore, as we know,
3  that detailing for the brand drug will spill
4  over to the generic drugs too, and so it's
5  entirely appropriate that the model allows
6  that to happen.
7      Q.    So maybe we're talking past
8  each other.
9         I understand the model works
10  that way.
11     A.    Yeah.
12     Q.    What I'm talking about, which
13  we'll get to later, is your Table 3 allocates
14  drugs to specific manufacturers, including
15  generic manufacturers, and I'm just trying to
16  understand how that works in a world where we
17  agree that generic drugs generally aren't
18  detailed.
19     A.    So Table 3, it sits on top of a
20  somewhat more complicated analysis, but what
21  it in effect does is it takes the detailing
22  associated with each of those defendants and
23  treats it separately, depending on where we
24  are in the table.
25         So, you know, at the top for

Page 201

1  Actavis, to the extent that Actavis has
2  detailing in my data, the row that says,
3  well, what would the damages look like or
4  what would impact look like if Actavis'
5  detailing was deemed to be lawful?  Basically
6  we've taken out their detailing, out of --
7  we've left it in basically in a but-for
8  world.  It happens because it's lawful.
9         So that's how -- that's how the
10  allocation works, is in Table 3, it's by
11  manufacturer.
12     Q.    Okay.  We'll get there.
13     A.    Okay.
14     Q.    But that's helpful.
15         If you look back at
16  paragraph 55, I mean, you acknowledge that
17  detailing is undertaken by the brand name
18  drugs in the class, typically peaks during
19  initial launch, and ceases shortly before or
20  after the AB-rated bioequivalent generic
21  drugs enter.
22     A.    That's correct.
23     Q.    And how does your model account
24  for detailing at different points of a
25  product's life cycle, close-to-launch

Page 202

1 detailing versus the period right before
2 generic entry?
3 A. My model is an aggregate model,
4 so I'm looking across drugs in the entire
5 market, and those drugs are at different
6 stages in their life cycle. And so the
7 important input to my model is the level of
8 detailing, not where it is in the course of a
9 product's life cycle.
10 But we know that the bolus of
11 detailing happens for these new products, and
12 so that is incorporated into the data.
13 Q. So it's incorporated in the
14 sense that you'll see more contact at the
15 beginning of the life cycle than at the end
16 of the life cycle?
17 A. That's correct.
18 Q. But the detailing that happens
19 at the beginning of the life cycle could be
20 qualitatively different than the detailing
21 that happens at the end of the branded life
22 cycle.
23 Would you agree with that?
24 MR. SOBOL: Objection.
25 A. I don't know that to be true.

Page 203

1 BY MR. ROTH:
2 Q. As an economist, I mean, when a
3 product is launched, you would expect more
4 detailing about clinical studies and things
5 designed to promote a new product that
6 physicians might be unaware of, right?
7 A. It may be that there is more of
8 that sort of baseline information at the
9 beginning.
10 Q. Right. And at the end of a
11 product's life cycle, when the generics are
12 about to come on the market, you might expect
13 the detailing to focus more on things like
14 price and availability and formulary status
15 and things of that nature, right?
16 A. I have seen no detailing
17 information that pertains to price. I can't
18 say that it never happens, but I've certainly
19 never seen that.
20 What that sort of -- what
21 you've just described here is on the one hand
22 saying, hey, there's this new drug early on,
23 and don't forgot your old friend at the end,
24 something to that effect. Those -- those
25 differences are not relevant to the question

Page 204

1 of does the detail generate more MMEs.
2 So for my purposes, I really
3 only want to understand does the detail
4 generate more MMEs. And again, because I'm
5 looking at the aggregate, the fact that some
6 drugs are ending and others are beginning,
7 that -- that sort of -- that mix, it may
8 change a little bit over time, but I'll be
9 looking across a set of drugs at different
10 stages.
11 Q. Okay. But what I described
12 might be relevant to the question of whether
13 the detailing was lawful, correct?
14 A. I don't know what you mean by
15 that.
16 Q. Right. So we've established
17 this, I think, but just to try it one more
18 time: Because your model is just focusing on
19 whether detailing impacts the aggregate
20 number of MMEs, you don't evaluate any
21 qualitative difference in the kind of
22 detailing that is occurring?
23 MR. SOBOL: Objection, asked
24 and answered.
25 ///

Page 205

1 BY MR. ROTH:
2 Q. Is that a fair statement?
3 MR. SOBOL: Asked and answered.
4 A. I -- you had a "because" at the
5 beginning of that sentence, which doesn't
6 make sense to me. I am not looking at the
7 content of the detailing as we talked about
8 this morning. I am assuming the plaintiffs
9 will prove their case.
10 I understand that you think
11 differently and you're trying to probe
12 whether I've tried to disaggregate the
13 detailing.
14 I have not tried to
15 disaggregate the detailing by drug or over
16 time. It is possible to do that, but I have
17 not done that.
18 BY MR. ROTH:
19 Q. So in your direct model, just
20 like all MMEs are created equal, all
21 detailing contacts are created equal?
22 MR. SOBOL: Objection.
23 A. Again, I would acknowledge that
24 there's variation in detailing and that my
25 model captures the average effect.

Highly Confidential - Subject to Further Confidentiality Review

Page 206

BY MR. ROTH:

Q.    And it captures the average effect by treating each contact the same?

MR. SOBOL:  Objection.

A.    Well, I guess sort of an average effect means that sort of tautologically, I'm summing up all of the effects.

BY MR. ROTH:

Q.    Does your model account for rivalrous marketing?

A.    I'm so happy that we've gotten back to this.

MR. SOBOL:  That makes one of us.

A.    The aggregate model that I put forth is intended to essentially obscure the rivalrous marketing, so to the extent that marketing only moves people from hydrocodone to oxycodone or the other direction, whatever it is, that will show up as a noneffect in my model.

So I'm only looking at market expansion because the question I care about is market expansion.

Page 207

BY MR. ROTH:

Q.    I'm not sure I followed your answer.  So how does it show up as a noneffect if you're including that contact in your regression analysis, whether it was new drug promotion or rivalrous marketing?

A.    I think the way you're looking at rivalrous marketing is a bit different than the way I would look at it.  And this goes back to a conversation we had before where I think there was a little bit of a disconnect.

So it may well be that you go to the detail and what you want to talk about is why you're better than the other guy.  But still, what happens is you actually increase the use of any product in this class.

So what I'm concerned about is not the intent of the marketing but the effect of the marketing.  You seem focused on the intent.

Q.    I do.  But now I think you've helped me, and your answer is actually the opposite of what I understood it to be before.

Page 208

When you say that rivalrous marketing is a noneffect, what you mean is you don't assess whether the marketing was rivalrous or not, because in either case, your view is it will potentially lead to increased MMEs, so it gets counted?

MR. SOBOL:  Objection, form, asked and answered.

A.    I am interested only in a particular kind of impact, and that impact is an increase in the number of MMEs.  If there is marketing that changes the drug people take without affecting their MMEs, then I ignore that.

Let's just say there's unlawful conduct and you earn money off of it, but it's really only because you've switched brands.  That, I'm not counting, so that's a kind of rivalrous marketing effect that's not being counted in my impact assessment.

I'm only concerned about market expansion by definition.  Economists can be interested in both of those things, but for my purpose, I'm only interested in market expansion.

Page 209

BY MR. ROTH:

Q.    I'm just trying to understand functionally how that happens.

So the reason you're saying that is because you're only looking at the delta, the change in MMEs, and so if there's no change, then the rivalrous marketing doesn't get counted?  I'm just struggling with the mechanics.

A.    Sure.  Let me try to explain.

If we had two drugs in the market and we looked at their marketing separately, we could ascertain whether your marketing increases your sales, right, and -- and then what we wouldn't know is, is that increase coming from new patients, or is it coming from the decrease in someone else's sales.  So we could use a system kind of analysis to show what's happening.

So people have done this in prescription drugs.  I know you've spent some time with the literature, and they're curious about when you increase your sales, does it come at someone else's expense or are you just growing the market.  And in different

Page 210

1  drug classes, those two things seem to
2  operate differently.
3          But if you were to add those
4  two drugs together and say, okay, for any
5  herpes treatment, what's the total effect of
6  marketing?  Then what you would get is only
7  the market expansion effect.  You would wash
8  out any of the market stealing because your
9  gain is my loss.  And so those two things
10 would net out and you'd only get the net
11 result.  So that's what I'm doing here.
12     Q.    So the mechanics are because
13 it's an aggregate model that's aggregating
14 all contacts and aggregating all scripts, it
15 comes out in the wash if it's rivalrous?
16     A.    Exactly.  Rivalrous, again, my
17 definition of rivalrous is my sales come from
18 you and that those two things fully offset.
19     Q.    Okay.  But the detail itself is
20 still counted in the model, because you're
21 not actually looking substantively at the
22 detail to determine what happened?
23          MR. SOBOL:  Objection.
24     A.    That is correct.  The detail is
25 still in the model, and where the rivalrous

Page 211

1  piece shows up is that it dampens the
2  effectiveness of marketing that we measure.
3  BY MR. ROTH:
4      Q.    Okay.  We're finally on the
5  same page then.
6          How does your model account for
7  unbranded marketing?
8      A.    Well, in two ways.  In Model C,
9  I explicitly put in some of those events.  We
10 can look at exactly which ones they are.
11     Q.    I was saving this for later,
12 but we can --
13     A.    I know, it sounds like an
14 after-lunch conversation, but the consensus
15 statement from the American Academy of Pain
16 Management and the American Pain Society, the
17 Federation of State Medical Boards
18 Guidelines, the JCAHO pain standards
19 released.
20          So these, I understand that
21 plaintiffs intend to prove they were
22 manipulated by the defendants.  So I put
23 those explicitly in Model C.
24          And then as I describe Model B
25 and my rationale and the way I interpret the

Page 212

1  turning points is that they -- that is
2  incorporating these many different events and
3  tactics.
4      Q.    So the unbranded marketing is
5  captured by the way you do the breaks and the
6  way you test for these five events in
7  Model C, correct?
8      A.    That's correct.
9      Q.    But the unbranded marketing is
10 not captured in the detailing contacts you
11 use for your stock of promotion?
12     A.    That's correct.
13     Q.    How does your model account for
14 the peer-to-peer marketing that I think you
15 or Dr. Perri describes as a contagion
16 phenomenon in paragraph 25?
17     A.    Yeah.  So that phenomenon will
18 get picked up in marketing effectiveness,
19 because again, we're looking at aggregate
20 prescribing and not just the prescribing of
21 the targeted physicians.
22          So, you know, as -- we can go
23 back to our favorite paper by Datta and Dave,
24 they're looking at individual physicians.
25          It could well be, of course,

Page 213

1  detailing physician A causes physician B's
2  prescribing to increase; they're not really
3  looking at that because they're only looking
4  within physician.  But we, for the same
5  reasons that I can capture market expansion
6  appropriately, aggregating up across doctors
7  here allows me to capture that contagion
8  effect.
9      Q.    We do agree, though, that at an
10 individual prescriber, individual detail
11 visit level, there could be variation in the
12 impact that visit has?
13     A.    There may be variation in the
14 impact of detailing on an individual
15 prescriber and her network and my model will
16 average that, will generate a result that
17 captures the average.
18     Q.    And we talked a little bit
19 earlier about some of the variability in the
20 way detailing occurs.  I think I used the
21 pizza example.
22          Do you remember that?
23     A.    I remember pizza.
24     Q.    Okay.  I want to come back to
25 that for a minute maybe because it's

Page 202

1  detailing versus the period right before
2  generic entry?
3      A.   My model is an aggregate model,
4  so I'm looking across drugs in the entire
5  market, and those drugs are at different
6  stages in their life cycle.  And so the
7  important input to my model is the level of
8  detailing, not where it is in the course of a
9  product's life cycle.
10      But we know that the bolus of
11  detailing happens for these new products, and
12  so that is incorporated into the data.
13      Q.   So it's incorporated in the
14  sense that you'll see more contact at the
15  beginning of the life cycle than at the end
16  of the life cycle?
17      A.   That's correct.
18      Q.   But the detailing that happens
19  at the beginning of the life cycle could be
20  qualitatively different than the detailing
21  that happens at the end of the branded life
22  cycle.
23      Would you agree with that?
24      MR. SOBOL:  Objection.
25      A.   I don't know that to be true.

Page 203

1  BY MR. ROTH:
2      Q.   As an economist, I mean, when a
3  product is launched, you would expect more
4  detailing about clinical studies and things
5  designed to promote a new product that
6  physicians might be unaware of, right?
7      A.   It may be that there is more of
8  that sort of baseline information at the
9  beginning.
10      Q.   Right.  And at the end of a
11  product's life cycle, when the generics are
12  about to come on the market, you might expect
13  the detailing to focus more on things like
14  price and availability and formulary status
15  and things of that nature, right?
16      A.   I have seen no detailing
17  information that pertains to price.  I can't
18  say that it never happens, but I've certainly
19  never seen that.
20      What that sort of -- what
21  you've just described here is on the one hand
22  saying, hey, there's this new drug early on,
23  and don't forgot your old friend at the end,
24  something to that effect.  Those -- those
25  differences are not relevant to the question

Page 204

1  of does the detail generate more MMEs.
2      So for my purposes, I really
3  only want to understand does the detail
4  generate more MMEs.  And again, because I'm
5  looking at the aggregate, the fact that some
6  drugs are ending and others are beginning,
7  that -- that sort of -- that mix, it may
8  change a little bit over time, but I'll be
9  looking across a set of drugs at different
10  stages.
11      Q.   Okay.  But what I described
12  might be relevant to the question of whether
13  the detailing was lawful, correct?
14      A.   I don't know what you mean by
15  that.
16      Q.   Right.  So we've established
17  this, I think, but just to try it one more
18  time:  Because your model is just focusing on
19  whether detailing impacts the aggregate
20  number of MMEs, you don't evaluate any
21  qualitative difference in the kind of
22  detailing that is occurring?
23      MR. SOBOL:  Objection, asked
24  and answered.
25      ///

Page 205

1  BY MR. ROTH:
2      Q.   Is that a fair statement?
3      MR. SOBOL:  Asked and answered.
4      A.   I -- you had a "because" at the
5  beginning of that sentence, which doesn't
6  make sense to me.  I am not looking at the
7  content of the detailing as we talked about
8  this morning.  I am assuming the plaintiffs
9  will prove their case.
10      I understand that you think
11  differently and you're trying to probe
12  whether I've tried to disaggregate the
13  detailing.
14      I have not tried to
15  disaggregate the detailing by drug or over
16  time.  It is possible to do that, but I have
17  not done that.
18  BY MR. ROTH:
19      Q.   So in your direct model, just
20  like all MMEs are created equal, all
21  detailing contacts are created equal?
22      MR. SOBOL:  Objection.
23      A.   Again, I would acknowledge that
24  there's variation in detailing and that my
25  model captures the average effect.

Page 202

1 detailing versus the period right before
2 generic entry?
3      A.   My model is an aggregate model,
4 so I'm looking across drugs in the entire
5 market, and those drugs are at different
6 stages in their life cycle.  And so the
7 important input to my model is the level of
8 detailing, not where it is in the course of a
9 product's life cycle.
10      But we know that the bolus of
11 detailing happens for these new products, and
12 so that is incorporated into the data.
13      Q.   So it's incorporated in the
14 sense that you'll see more contact at the
15 beginning of the life cycle than at the end
16 of the life cycle?
17      A.   That's correct.
18      Q.   But the detailing that happens
19 at the beginning of the life cycle could be
20 qualitatively different than the detailing
21 that happens at the end of the branded life
22 cycle.
23      Would you agree with that?
24      MR. SOBOL:  Objection.
25      A.   I don't know that to be true.

Page 203

1 BY MR. ROTH:
2      Q.   As an economist, I mean, when a
3 product is launched, you would expect more
4 detailing about clinical studies and things
5 designed to promote a new product that
6 physicians might be unaware of, right?
7      A.   It may be that there is more of
8 that sort of baseline information at the
9 beginning.
10      Q.   Right.  And at the end of a
11 product's life cycle, when the generics are
12 about to come on the market, you might expect
13 the detailing to focus more on things like
14 price and availability and formulary status
15 and things of that nature, right?
16      A.   I have seen no detailing
17 information that pertains to price.  I can't
18 say that it never happens, but I've certainly
19 never seen that.
20      What that sort of -- what
21 you've just described here is on the one hand
22 saying, hey, there's this new drug early on,
23 and don't forgot your old friend at the end,
24 something to that effect.  Those -- those
25 differences are not relevant to the question

Page 204

1 of does the detail generate more MMEs.
2      So for my purposes, I really
3 only want to understand does the detail
4 generate more MMEs.  And again, because I'm
5 looking at the aggregate, the fact that some
6 drugs are ending and others are beginning,
7 that -- that sort of -- that mix, it may
8 change a little bit over time, but I'll be
9 looking across a set of drugs at different
10 stages.
11      Q.   Okay.  But what I described
12 might be relevant to the question of whether
13 the detailing was lawful, right?
14      A.   I don't know what you mean by
15 that.
16      Q.   Right.  So we've established
17 this, I think, but just to try it one more
18 time:  Because your model is just focusing on
19 whether detailing impacts the aggregate
20 number of MMEs, you don't evaluate any
21 qualitative difference in the kind of
22 detailing that is occurring?
23      MR. SOBOL:  Objection, asked
24 and answered.
25      ///

Page 205

1 BY MR. ROTH:
2      Q.   Is that a fair statement?
3      MR. SOBOL:  Asked and answered.
4      A.   I -- you had a "because" at the
5 beginning of that sentence, which doesn't
6 make sense to me.  I am not looking at the
7 content of the detailing as we talked about
8 this morning.  I am assuming the plaintiffs
9 will prove their case.
10      I understand that you think
11 differently and you're trying to probe
12 whether I've tried to disaggregate the
13 detailing.
14      I have not tried to
15 disaggregate the detailing by drug or over
16 time.  It is possible to do that, but I have
17 not done that.
18 BY MR. ROTH:
19      Q.   So in your direct model, just
20 like all MMEs are created equal, all
21 detailing contacts are created equal?
22      MR. SOBOL:  Objection.
23      A.   Again, I would acknowledge that
24 there's variation in detailing and that my
25 model captures the average effect.

Page 330

page 452 again, we're now going to get to talk about endogeneity.

A. Excellent.

Q. You knew it was coming.

A. I did.

Q. So at the top of the page, they say: A key empirical concern in this literature relates to potential targeting bias, which physicians who already have a history of prescribing a particular drug or who have a higher unobserved likelihood of prescribing the drug (for instance, due to their patient population or practice type) more likely to be targeted by detailers.

Do you see that?

A. I do.

Q. And is that an empirical concern that you as an econometrician or economist would have?

A. If I were doing a physician-level study, yes.

Q. And one could describe this issue as something called endogeneity?

A. Yes.

Q. And can you define endogeneity

Page 331

for us?

A. Well, in effect, what they're talking about here, I described earlier this morning the endogeneity they're concerned about is of the type that physicians who are more likely to be detailed are already more likely to be open to prescribing or are, in fact, high prescribers already.

Q. And it's called endogeneity because that's an endogenous problem?

A. Yes. The level of detailing is endogenously determined with the level of prescribing.

Q. So continuing on their paper, they say "Addressing such endogeneity is a vital issue in identifying plausibly causal effects of advertising, which would otherwise lead to overestimates of the advertising response.

Do you see that?

A. I do see that.

Q. And --

A. And as I said before, it's because they're talking about physician-level data.

Page 332

Q. Which you didn't look at?

MR. SOBOL: Objection, asked and answered.

A. It was not relevant to my report because I have been asked to conduct an aggregate analysis.

BY MR. ROTH:

Q. And then they say: Studies that address this endogeneity in most cases have done so through an instrumental variables-based methodology, although as Bronnenberg caution, many of the instruments employed have limited variation and may not fully satisfy the validity requirements. This caveat notwithstanding, these studies generally find a smaller marginal effect of detailing relative to those that do not account for endogeneity.

Do you see that?

A. I do.

Q. Now, what about having an aggregate macro analysis means that endogeneity is no issue for you?

MR. SOBOL: Objection.

A. Well, endogeneity is something

Page 333

different in every context, so what they're describing specifically here, I mean, I think they say that they're talking about targeting bias, so that's the physician-level concern.

It simply doesn't exist in my data because I'm not looking at physician-level data. I cannot mistake the fact that Doctor A has high prescriptions compared to Doctor B, not because she's been detailed before, but she's been detailed before because she has high prescriptions. Because I'm only looking at the aggregate. So the only kind of endogeneity there, it can't be related to targeting. It has to be related to something else.

In other instances people have looked at endogeneity when it comes to a specific product. They said, well, you know, we knew that this product was going to be a blockbuster so we put our detailing on product A versus product B, and so that's the nature of the endogeneity. But again, I don't have that here because I'm aggregating across products.

///

Highly Confidential - Subject to Further Confidentiality Review

Page 342

1 promotion with a depreciation rate similar to
2 here?
3     A.    At least I'm consistent, yes.
4     Q.    No doubt.
5           And then you also used a Fisher
6 Ideal Price Index in that case too?
7     A.    I did.
8     Q.    But you weren't consistent
9 next, because then you say:  In addition, the
10 estimation deals with two important issues,
11 serial correlation in the error terms and the
12 endogeneity of price and promotion.  Serial
13 correlation in the error terms require the
14 use of time series methods to produce
15 reliable estimates.  The endogeneity of price
16 and promotion was handled using the standard
17 instrumental variables approach.
18           Did I read that correctly?
19     A.    Yes, you did.
20     Q.    And if endogeneity is an issue
21 for you -- I understand you don't think it
22 is -- but if it is an issue for you, your
23 regression may lead to overestimating the
24 response to promotion?
25           MR. SOBOL:  Well, then,

Page 343

1     objection.
2     A.    I do not believe endogeneity is
3 an issue in my model for the reasons that
4 I've described.  But in particular, what
5 we're looking at is an aggregate phenomenon,
6 and so the theory of endogeneity that we
7 would have to have requires this reverse
8 causation on a month-by-month basis for the
9 market as a whole, and I do not believe
10 that's a plausible notion.
11 BY MR. ROTH:
12     Q.    Okay.  Don't fight the
13 hypothetical, though.
14           Assume endogeneity is an issue
15 with your model.  What impact would it have?
16           MR. SOBOL:  Objection, asked
17     and answered.
18     A.    I cannot imagine a form of
19 endogeneity that would make sense in this
20 case.  I cannot understand how it could be
21 that one month's sales could have caused the
22 next month's detailing to change in the way
23 that endogeneity requires.  It's simply not a
24 plausible set of ideas in this context.
25           ///

Page 344

1 BY MR. ROTH:
2     Q.    And why is that again?
3     A.    Because we're looking at the
4 market as a whole, and not individual
5 manufacturers or individual drugs, where
6 those decisions are made.
7     Q.    I guess I'm confused, because
8 earlier you talked about us as this
9 manufacturing ecosystem that all kind of acts
10 together, but now for purposes of
11 endogeneity, you're saying there are no
12 issues because we're not looking at it on an
13 individualized basis, and I can't square
14 those two things.  Maybe you can help.
15     A.    Sure.
16           MR. SOBOL:  I'll object to the
17     form, but go for it.
18     A.    Sure.  I think where you're
19 confused is the ecosystem is causing
20 prescribing in a way that may be concerted,
21 but I -- I don't believe anywhere I have said
22 that the defendants are aligning, explicitly,
23 their marketing efforts.
24 BY MR. ROTH:
25     Q.    Okay.  Do you remember if you

Page 345

1 used an instrumental variables approach to
2 address endogeneity in Neurontin?
3     A.    All not quite 12 years ago, 17,
4 however many, but I believe the answer is
5 yes, in the circumstance of -- thank you, can
6 you remind me -- the circumstance is very
7 similar to the Zyprexa matter.
8     Q.    Yes, so we can do this one
9 quickly.
10     A.    Yes.
11     Q.    But Exhibit 13 is your
12 Neurontin declaration, excerpted.
13           (Whereupon, Deposition Exhibit
14     Rosenthal-13, Rosenthal Declaration
15     re: Neurontin, was marked for
16     identification.)
17     A.    It's in Calibri too.
18 BY MR. ROTH:
19     Q.    It must be the Greylock
20 computers.  Did Greylock McKinnon assist you
21 there?
22     A.    Yes.
23     Q.    August 2008.
24           So looking at your Neurontin
25 declaration, you were addressing alleged

Page 498

1 the analysis of competition at the individual
2 product level within each class we specify
3 and estimate three alternative models: 1, an
4 AIDS-type specification; 2, a logit model
5 with log of quantity share divided by, one
6 minus quantity share, on the left-hand side,
7 and prices and promotional spending on the
8 right-hand side; and 3, a Cobb-Douglas model
9 in log levels.
10      Do you see that?
11      A.   Yes, I do.
12      Q.   And then on page 15, under
13 Econometric Results, it says:  We begin by
14 presenting results in Table 3 for the top of
15 the tree structure in Figure 2, the class
16 level quantity equations.
17      Do you see that?
18      A.   I do.
19      Q.   And then if you look at
20 Table 3, which is on page 25, the top two
21 lines say:  Class DTC and Class Detail, and
22 they have an asterisk that says Endogenous,
23 IV Estimated.
24      Do you see that?
25      A.   Yes, I do.  Actually, I can

Page 499

1 keep reading, but I think essentially the
2 class level estimates are the sum of the
3 individual product level estimates.  So
4 again, the instrumentation was at a product
5 level.
6      Q.   And then applied to the class
7 level through aggregation?
8      A.   That's right.
9      Q.   Okay.  And if you had
10 disaggregated individual drugs or
11 manufacturers in this case, you could have
12 applied an instrumental variables method to
13 each and aggregated them similarly here?
14      MR. SOBOL:  This case, the
15      opioids case, not this?
16      MR. ROTH:  Correct, so let me
17      reask it.
18      MR. SOBOL:  Yeah.
19 BY MR. ROTH:
20      Q.   If you had used disaggregated
21 individual drugs or manufacturers in the
22 opioids case we're talking about now, you
23 could have applied an instrumental variables
24 model to each individual drug and then
25 aggregated them as you did in this article?

Page 500

1      A.   Unlike the research question in
2 this paper, my assignment asks me to compute
3 the impact of the alleged misconduct at the
4 level of the class, the industry, opioid
5 industry as a whole.  And so it was not
6 appropriate for me to look at individual drug
7 level analyses.
8      I maintain that at that class
9 level, industry level, these endogeneity
10 questions do not pertain.
11      Q.   Did you test that hypothesis by
12 looking at an individual defendant or two to
13 see how the issues there compare to how your
14 model handles endogeneity?
15      A.   Since my assignment was an
16 aggregate assignment, I have conducted my
17 analysis at the aggregate level.  I have not
18 conducted my analysis at the level of an
19 individual defendant.
20      Q.   And, in fact, to confirm,
21 you've not reviewed any individual
22 defendant's marketing materials for any drug
23 at issue in this case?
24      MR. SOBOL:  Objection, asked
25      and answered.

Page 501

1      A.   I'm not sure what you mean by
2 that exactly.  I reviewed the documents that
3 you see I relied on in my report.  I would
4 consider those to be marketing materials.
5 BY MR. ROTH:
6      Q.   You've not reviewed any
7 manufacturer's marketing plan for any drug at
8 issue in this case?
9      MR. SOBOL:  Objection.
10      A.   Again, I'm not sure that that's
11 entirely correct.  I do cite to what I would
12 consider to be marketing plans.
13 BY MR. ROTH:
14      Q.   Okay.  Aside from the documents
15 reflected in Attachment B or cited in your
16 report, you've not reviewed any marketing
17 materials for any drugs at issue in this
18 case?
19      A.   Aside from materials cited in
20 my report, I've certainly not relied on any
21 of those marketing materials.
22      Q.   And aside from the depositions
23 reflected in Attachment B, you've not
24 reviewed any depositions from any
25 manufacturer's sales representatives?