# Exhibit 10

Highly Confidential - Subject to Further Confidentiality Review

```
 1                UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3    IN RE: NATIONAL              )    MDL No. 2804
      PRESCRIPTION OPIATE          )
 4    LITIGATION                   )    Case No.
                                   )    1:17-MD-2804
 5                                 )
      THIS DOCUMENT RELATES TO     )    Hon. Dan A.
 6    ALL CASES                    )    Polster
                                   )
 7
 8
 9                         —  —  —
10                  Tuesday, May 14, 2019
                           —  —  —
11
         HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                           —  —  —
13
14
15
16         Videotaped Deposition of JAMES E.
      RAFALSKI, VOLUME 2, held at Weitz &
17    Luxenburg PC, 3011 West Grand Avenue, Suite
      2150, Detroit, Michigan, commencing at
18    8:25 a.m., on the above date, before
      Michael E. Miller, Fellow of the Academy of
19    Professional Reporters, Registered Diplomate
      Reporter, Certified Realtime Reporter and
20    Notary Public.
21
22
23                         —  —  —
24             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | fax 917.591.5672
25                   deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

Page 632

1  that. It's just that I wasn't tasked to
2  provide that methodology in regards to
3  manufacturers at this time.
4      Q.   I understand. But your report
5  doesn't identify any suspicious orders that
6  were submitted by distributors to
7  manufacturers.
8      A.   My report would only identify
9  those orders that the manufacturers have
10 identified. I don't make any independent
11 calculations or apply any algorithms to
12 identify it outside of what's in my report
13 stated as I've discovered as part of this
14 discovery.
15     Q.   Okay. So other than the
16 reports that the manufacturers themselves
17 reported to DEA, you have not identified any
18 suspicious orders submitted by distributors
19 to manufacturers, correct?
20     A.   Can I ask a clarification? Are
21 you talking about an individual order or are
22 you talking about conduct?
23     Q.   I'm talking about individual
24 orders.
25     A.   I have not done that as we sit

Page 633

1  here today, no, sir.
2      Q.   Okay. So your report does not
3  identify any shipments by manufacturers to
4  distributors that you claim should have been
5  reported as suspicious?
6      A.   My opinion goes to whether or
7  not there were effective -- or suspicious
8  orders, effective suspicious order systems in
9  place and/or the maintenance of effective
10 controls, the due diligence. I do not do any
11 calculations that would identify any specific
12 orders.
13     Q.   Okay. So just to be clear, in
14 response to my question, your report does not
15 identify any shipments by manufacturers to
16 distributors that you claim should have been
17 reported as suspicious, correct?
18     A.   I think there's some instances
19 in my report, there was -- there may be a
20 description of a relationship or some
21 transactions between a -- let me think a
22 second.
23     Q.   Uh-huh.
24     A.   Because I have all of the
25 different companies.

Page 634

1      (Document review.)
2      A.   I don't believe so, no, sir.
3  BY MR. O'CONNOR:
4      Q.   Okay. And at trial, do you
5  intend to offer any opinion regarding whether
6  any particular order submitted to a
7  manufacturer was suspicious?
8      A.   If I'm requested to do that
9  analysis by counsel, I guess that would be a
10 possibility. I haven't done the analysis as
11 today, so I couldn't offer that opinion.
12     Q.   So as you sit here today, you
13 do not have an opinion on whether any
14 particular order that was shipped by a
15 manufacturer was suspicious?
16     A.   I think I have an opinion.
17     Q.   But you haven't identified any
18 order, correct?
19     A.   I have not identified a
20 specific order, but I have an opinion on the
21 conduct.
22     Q.   And are you offering any
23 opinion in this litigation that any
24 particular order that was shipped into Summit
25 or Cuyahoga Counties was suspicious?

Page 635

1      A.   Yes.
2      Q.   Okay. And are you offering any
3  opinion in this litigation that any
4  particular order shipped by a manufacturer
5  into Summit or Cuyahoga County was
6  suspicious?
7      A.   I'm sorry, shipped by a
8  manufacturer --
9      Q.   Correct.
10     A.   -- to a distributor?
11     Q.   That's right. To -- to someone
12 in Cuyahoga or Summit County.
13     A.   No, sir.
14     Q.   Okay. With respect to a
15 manufacturer, what is a suspicious order?
16     A.   Well, if a manufacturer has
17 conducted a sufficient due diligence or
18 onboarding process and they've evaluated the
19 scope of their customers' business and the
20 needs, they would establish a pattern, and
21 that pattern would give them an idea of
22 initially the volume of drugs they need to
23 purchase.
24          Now, if it's brand-new
25 customer -- yours is kind of a hypothetical.

Highly Confidential - Subject to Further Confidentiality Review

Page 636

1  If it's a brand-new customer, there's not a
2  pattern or a frequency, but they would start
3  out with what they assess as a legitimate
4  volume, and they would monitor that volume,
5  and if a customer exceeded that, that should
6  trigger as an unusual size.
7          But to give you just a general
8  definition, it's kind of a broad topic
9  because it depends on the scope of business
10 of the manufacturer, of the customer, the
11 type of products, the needs, so the -- prior
12 to ever shipping an order, the importance is
13 to understand what the legitimate needs is of
14 a customer.
15     Q.   Yesterday you testified that it
16 was important to understand what a usual
17 order was so that you could determine what a
18 suspicious order was.
19          Do you generally recall that
20 testimony?
21     A.   I think that's a general
22 description. I think we were discussing the
23 size, so I think before you would know an
24 unusual size, you would need to know the
25 usual size.

Page 637

1          And I think that's kind of the
2  simpler way of what I just said, is that if
3  you don't really have a comprehension of what
4  is the legitimate needs of your customer,
5  then you couldn't know an unusual order --
6  unusual size of an order, I'm sorry.
7      Q.   What information would you need
8  to determine what a usual order looked like
9  for a manufacturer?
10         MR. FULLER: Form.
11         THE WITNESS: I'm sorry, you
12     said something?
13         MR. FULLER: Object to form.
14         THE WITNESS: Oh. Sorry.
15     A.   I think that's dependent on the
16 skill of your compliance employees. I think
17 you go in and evaluate the distributor. I
18 don't think the distributor would purchase a
19 manufacturer's product with an idea on how
20 they were going to sell it and market it, and
21 I think you would evaluate what their scope
22 of business is and the type of customers they
23 were; how many pharmacies they could
24 distribute to.
25         I think you'd have to get some

Page 638

1  baseline information to get a gauge on how
2  much product you'd want to send to them. I
3  don't think you would just send them an
4  amount of product and hope they distribute
5  it. I think there should be some kind of a
6  relationship and identification of a
7  legitimate total.
8  BY MR. O'CONNOR:
9      Q.   Besides understanding what type
10 of pharmacy -- or what type of customer or
11 the number of customers a distributor had,
12 what other information would you say a
13 manufacturer needs to know in order to
14 establish a baseline?
15     A.   A baseline in regards to size?
16     Q.   Correct.
17     A.   Well, I think there would be
18 some other factors that they should minimally
19 look at. That would be the ability for the
20 company to actually handle the volume of
21 product on a security aspect, they had
22 sufficient cage or vault depending on the
23 schedule of controlled substance they were
24 purchasing.
25         I think they may want to do

Page 639

1  some analysis of the identifications of the
2  pharmacies, if possible, because it's a
3  potential that in the case of Mallinckrodt,
4  they might already have information about the
5  distribution amounts or the purchase amounts
6  for those pharmacies and some trends.
7          Might do some comparison to
8  like customers. Might look into the
9  geographic location of where the product is
10 intended to be distributed. At least for the
11 Mallinckrodt products, to confirm or deny
12 there might be an issue of a distribution by
13 volume to those specific areas.
14         I think the essential thing is
15 what I said initially. I think you need to
16 get an idea of how many customers that that
17 distributor intends to distribute.
18         And I think if we're talking
19 about the onboarding or the initial amounts
20 that they'll be distributing, I think that a
21 registrant should follow those pretty closely
22 because my experience would indicate that
23 sometimes other registrants aren't that
24 truthful, and not just because they want to
25 divert, although that's one of the

Page 820

1 recollection is they did not implement their
2 system.
3    Q.   What do you mean they didn't
4 implement their system?
5    A.   Buzzeo was not retained as a
6 consultant and the Buzzeo system was not
7 implemented at the company.
8    Q.   And at that time, he was
9 reviewing the Suspicious Orders I system for
10 Teva, correct?
11    A.   I think that's an accurate
12 statement, yes.
13    Q.   And at no point does the report
14 conclude that Teva's suspicious order
15 monitoring system was not compliant with DEA
16 regulations; isn't that a correct statement?
17    A.   Say that again.
18    Q.   At no point in Mr. Buzzeo's
19 report does he conclude that the Teva
20 suspicious order monitoring system was not
21 compliant with DEA regulations; wouldn't you
22 agree?
23    A.   I think -- I think he was
24 critical of the functionality of it, but in
25 reading other reports by Mr. Buzzeo, I don't

Page 821

1 think he draws -- makes that conclusion. At
2 least he doesn't put it in his reports,
3 because he's not a DEA representative.
4    Q.   The DEA regulations don't state
5 what type of suspicious order monitoring
6 model a registrant has to use; isn't that
7 correct?
8    A.   No, it's up to the registrant
9 to design their system that meets their
10 business needs and accomplishes the
11 identification of suspicious orders.
12    Q.   And it doesn't state anything
13 about what standard deviations or what number
14 of standard deviations a registrant should
15 use in its algorithm for monitoring
16 suspicious orders?
17    A.   It does not give guidance in
18 that area.
19    Q.   At the time the Buzzeo
20 report -- I'm sorry, strike that.
21        The Buzzeo report concluded
22 that SORDS II, which is an improvement on the
23 SORDS I suspicious order monitoring program,
24 that Teva had in place was an improvement
25 over SORDS I; isn't that correct?

Page 822

1    A.   I believe he did make that
2 comment, yes. He didn't say that it was
3 sufficient to be compliant, but he did say it
4 was an improvement.
5    Q.   But again, he didn't say that
6 it wasn't compliant with DEA regulations?
7    A.   No, I didn't say that.
8    Q.   My question to you is: He
9 didn't say that it wasn't compliant with DEA
10 regulations?
11    A.   He never made that exact
12 statement.
13    Q.   Teva also had an internal audit
14 of its own suspicious order monitoring
15 program?
16    A.   I believe so, yes.
17    Q.   And that program was rated
18 overall as effective, correct?
19    A.   Yes, but it's an internal
20 audit.
21    Q.   The DEA regulations don't
22 require that companies actively audit their
23 own programs, correct?
24    A.   No, that's true. But I only
25 make that statement because sometimes the

Page 823

1 person that does the audit, without knowing
2 the full information on the audit, is the
3 person in charge of the system, so they don't
4 typically give a bad audit to themselves.
5        So, I mean, I'm not totally
6 discounting it, but I'm always concerned
7 about internal audits.
8    Q.   Mr. Rafalski, in your report
9 you don't identify any suspicious order that
10 Teva shipped to Summit County or Cuyahoga;
11 isn't that correct?
12    A.   I do not identify any single
13 suspicious order -- any order specifically
14 that was suspicious.
15    Q.   And that goes for Cephalon and
16 the Actavis entities as well, correct?
17    A.   As I sit here today, that's an
18 accurate statement.
19    Q.   And you don't identify any
20 order that Teva failed to flag as suspicious?
21    A.   Is that question a specific
22 order?
23    Q.   Any order that Teva failed to
24 flag as suspicious, you don't have an example
25 of any specific order?

Page 824

1    A.   No, I think my examples in here
2 are more -- go more to the conduct of the due
3 diligence and it doesn't specifically say
4 that there was a specific order, but I think
5 the totality of the incident that I describe
6 on page 183 I think would include that, but
7 to answer your question, there's no specific
8 order where I state that.
9    Q.   And I want to ask you quickly
10 about that order.
11         You're speaking of the Publix
12 Supermarket pharmacies incident or scenario
13 that we discussed -- that's in your report on
14 page 183?
15    A.   Yes, I am.
16    Q.   The orders involving the Publix
17 Supermarket pharmacies were not orders placed
18 from Publix to Teva, were they?
19    A.   No, they were placed to a
20 distributor, an in-between so --
21    Q.   Right.  They were orders placed
22 from Publix to Anda, correct?
23    A.   Yes.  But so the first concern
24 that I would have with this is that Teva
25 would need a means of effective controls to

Page 825

1 go to Anda and see why this situation
2 occurred.
3    Q.   And it did do that, correct?
4    A.   I don't recall that occurring.
5    Q.   Well, so you read the
6 deposition of Joe Tomkiewicz, didn't you?
7    A.   Yes.
8    Q.   And sitting here today, you
9 don't know whether any of Teva's product was
10 ultimately shipped to one of those Publix
11 Supermarkets that Joe Tomkiewicz identified
12 as entities he wanted to look into, correct?
13    A.   Based on my review, he was
14 looking at the chargebacks, and I believe
15 they were Teva products.
16    Q.   But you would agree with me
17 that Joe Tomkiewicz testified he didn't see
18 any specific orders of Teva's products,
19 correct?
20    A.   Yes, but if they weren't Teva's
21 products, I'm not sure that he would have
22 taken all this action unless he was
23 indicating it was someone else's product that
24 he was going to go investigate.
25    Q.   Well, he could have been

Page 826

1 looking at those because Anda is his
2 customer, correct?
3    A.   Yes.
4    Q.   Right.  And he was looking at
5 Publix's forecasting data, correct?
6    A.   Yes.
7         MR. FULLER:  Counsel, I believe
8    the 14 hours is up.
9         MS. BARBER:  All right.  At
10   this time I am going to reserve my
11   time.  I haven't had -- along with my
12   colleagues, haven't had adequate time
13   to ask questions of Mr. Rafalski,
14   which is a violation of our clients'
15   due process, and we reserve any
16   additional time in the future to
17   examine Mr. Rafalski or reexamine
18   Mr. Rafalski.
19        MS. SWIFT:  Before we break,
20   I'd like to put one additional thing
21   on the record.
22        Mr. Rafalski, you said your
23   method for assessing the defendants'
24   suspicious order monitoring system is
25   based on your experience, training and

Page 827

1 legal guidance from lawyers at the
2 DEA.
3      Just yes or no, does your Touhy
4 authorization --
5      MR. FULLER:  Don't answer this
6 question.
7      MS. SWIFT:  -- prevent you from
8 disclosing the legal guidance from DEA
9 lawyers that supports your opinion?
10     MR. FULLER:  Don't answer the
11 question.  She's over her time.
12     Off the record.
13     THE VIDEOGRAPHER:  Going off
14 the record, 4:52 p.m.
15     (Recess taken, 4:52 p.m. to
16 4:52 p.m.)
17     (The following proceedings were
18 conducted off the videotaped record.)
19     MR. MATTHEWS:  Good afternoon.
20 This is James Matthews.  I represent
21 Anda Inc.  I've sat here for two days
22 at this deposition and have not asked
23 any questions because the name Anda
24 doesn't appear in your report.
25     However, in the last series of