# Exhibit 14

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3    *************************
     IN RE:  NATIONAL
 4   PRESCRIPTION OPIATE        MDL No. 2804
     LITIGATION
 5                              Case No.
     This document relates to:  17-MD-2804
 6
     The County of Summit,
 7   Ohio, et al v. Purdue      Hon. Dan A. Polster
     Pharma L.P., et al
 8   Case No. 1:18-OP-45090
 9
     The County of Cuyahoga v.
10   Purdue Pharma L.P., et al
     Case No. 17-OP-45004
11
     *************************
12         HIGHLY CONFIDENTIAL - SUBJECT TO
13           FURTHER CONFIDENTIALITY REVIEW
14      VIDEOTAPED DEPOSITION OF DAVID CUTLER, Ph.D.
15
16            Friday, April 26th, 2019
17                   9:00 a.m.
18
19      Held At:
20         Robins Kaplan LLP
           800 Boylston Street
21         Boston, Massachusetts
22
23   REPORTED BY:
24   Maureen O'Connor Pollard, RMR, CLR, CSR
```

Page 54

1  Q. Any other companies that you can think
2 of that you've attributed harms to in this case?
3     MR. SOBOL: Objection.
4 BY MR. KNAPP:
5  Q. In your report. Strike that.
6     Any other companies you can think of
7 that you've attributed harms to in your report?
8     MR. SOBOL: Objection.
9  A. I do not attribute harms in the report
10 to any single company.
11 BY MR. KNAPP:
12  Q. Well, by implication, if defendants
13 are specific companies, are you attributing harm
14 to particular companies, or no?
15     MR. SOBOL: Objection.
16  A. There are two types of defendants
17 here. Let me answer your question that way.
18 There are two types of defendants. There are
19 the manufacturers, and there are the
20 distributors, at least from an economic
21 perspective, that's how I think about them. So
22 I was giving you, obviously, some of the
23 manufacturers.
24     In terms of the distributors, there

Page 55

1 are a number of distributors as well. There are
2 also -- distributors are both those involved in
3 shipments as well as those involved in sales,
4 for example, Walgreens and CVS, but there are
5 also the shipment companies, for example,
6 Cardinal Health and McKesson and other
7 companies.
8     But again, I don't want to implicate
9 any without being absolutely correct, so I
10 will -- I will not say any more company names.
11 BY MR. KNAPP:
12  Q. Let's turn to Paragraph 31 of your
13 report. Are you at Paragraph 31?
14  A. Yes, I am.
15  Q. So you made no attempt to uniquely
16 apportion harms resulting from actions by any
17 individual type of defendant, right?
18  A. That's correct. I did not attempt to
19 apportion harms to any individual type of
20 defendant.
21  Q. And you also made no attempt to
22 uniquely apportion harm to any individual
23 defendant, correct?
24  A. That is correct, I did not make any

Page 56

1 attempt to apportion harm to any individual
2 defendant.
3  Q. And your model does not calculate the
4 percentage of tortious conduct that proximally
5 caused any harm that is attributable to the
6 plaintiff, doesn't it?
7  A. The model does not attempt to
8 apportion any harm to any specific party.
9  Q. Including the plaintiff?
10     MR. SOBOL: Objection.
11  A. That's correct, including the
12 plaintiff.
13 BY MR. KNAPP:
14  Q. And including each defendant, right?
15     MR. SOBOL: Objection.
16     You can answer.
17  A. That is correct. The model does not
18 determine the portion of harm for any individual
19 defendant.
20 BY MR. KNAPP:
21  Q. And the model does not calculate the
22 percentage of harm that was proximately caused
23 by any non-defendants either, right?
24     MR. SOBOL: Objection.

Page 57

1  A. That is correct. There is no
2 apportionment of harm to any non-defendant.
3 BY MR. KNAPP:
4  Q. And you made no attempt to calculate
5 whether any particular defendant was more than
6 50 percent at fault, did you?
7     MR. SOBOL: Objection.
8  A. I did not make any attempt to
9 determine whether any individual defendant was
10 more than 50 percent at fault.
11 BY MR. KNAPP:
12  Q. You made no attempt to calculate the
13 percentage of fault of any individual defendant?
14  A. I made no attempt to calculate the
15 proportion of fault due to any individual
16 defendant.
17  Q. Now, the plaintiffs have recently
18 represented that they may proceed to trial with
19 only a subset of the defendants that are
20 currently in this case. If that happens, would
21 you need to redo your model?
22     MR. SOBOL: Objection.
23  A. The model that I estimate translates
24 the shipments of opioids into harms. It then

Page 58

1 takes as an input the share of opioid shipments
2 which are due to misconduct on the part of the
3 defendants. If the court or for any other
4 reason -- if the court wishes to know the impact
5 of any particular single defendant or subset of
6 defendants, the model could be used to do that
7 because it would take as input those harms which
8 are related to that specific defendant or set of
9 defendants.
10 BY MR. KNAPP:
11    Q. And what you're referring to when you
12 say the share of opioid shipments which are due
13 to misconduct on the part of defendants, are you
14 referring to Professor Rosenthal's conclusions?
15    A. In the body of the report, the share
16 of shipments that result from misconduct on the
17 part of the defendants comes from Professor
18 Rosenthal's conclusions.
19    Q. And so you would have to redo your
20 report to reduce the amount of shipments that
21 you're calculating the percentages off of, is
22 that right?
23      MR. SOBOL: Objection.
24 BY MR. KNAPP:

Page 59

1    Q. Strike that.
2      If any defendant is not in the first
3 trial, you would have to redo your model to
4 remove the percentages of shipments associated
5 with that defendant, correct?
6      MR. SOBOL: Objection.
7    A. I would like to make a distinction.
8 The model is the model that translates shipments
9 into harms. That model would not need to be
10 reestimated. The inputs to the model, which
11 is -- which is the percentage of shipments which
12 are due to misconduct, that input would change,
13 and so, therefore, the harms would change, but
14 the model that's used would not change.
15 BY MR. KNAPP:
16    Q. Professor Cutler, you made no attempt
17 to link any alleged harm to any particular
18 prescription, is that right?
19      MR. SOBOL: Objection.
20    A. I did not relate the harm to any
21 particular prescription.
22 BY MR. KNAPP:
23    Q. And you didn't relate the harm to any
24 particular shipment either, did you?

Page 60

1      MR. SOBOL: Objection.
2      You can answer.
3    A. The harm is related to the aggregate
4 of shipments to particular areas, so it's not on
5 a shipment-by-shipment basis, but it is related
6 to the shipments going to different areas.
7 BY MR. KNAPP:
8    Q. But you did not attempt to apportion
9 harm and link it to a particular shipment, is
10 that correct?
11    A. Can you just explain what you mean by
12 "a particular shipment"?
13    Q. X company sent Y MMEs to Z company.
14      MR. SOBOL: Object to the form.
15      You can answer.
16    A. No, it did not relate any particular
17 shipment to harms.
18 BY MR. KNAPP:
19    Q. And you made no attempt to link any
20 particular type of opioid to the harms you
21 analyzed in your report, right?
22    A. That's correct. We took all the
23 opioids together here.
24    Q. So you treat for purposes of your

Page 61

1 report all opioid medicines as if they're the
2 same, right?
3      MR. SOBOL: Objection.
4    A. They're not the same in terms --
5 they're treated as similar given the MMEs, given
6 the milligrams of morphine equivalent. That
7 differs across medications. So, for example,
8 one prescription of one medication, say 30
9 pills, and 30 pills prescription of a different
10 medication, they have different milligrams of
11 morphine equivalents and, therefore, they would
12 contribute differently to the shipments which
13 are then related to the harms.
14 BY MR. KNAPP:
15    Q. Other than making the conversion for
16 milligrams -- morphine milligram equivalence,
17 you treated all opioid medicines as if they were
18 the same, correct?
19      MR. SOBOL: Objection.
20    A. Other than for the MME conversion,
21 they were added together -- there's another
22 issue, which is two of the categories of opioid
23 medications are used as both treatments for pain
24 and as treatments for addiction, and so we had

Page 66

1 opinion regarding any harms that were
2 specifically caused by Allergan Finance, right?
3   A.  In this model we -- I do not have any
4 particular -- I do not have any harms that are
5 attributed to any particular defendant.
6   Q.  And so going back to the point that we
7 were just talking about, if a particular
8 defendant manufactured or distributed a type of
9 opioid that had less risk for abuse than other
10 types of opioids, your model doesn't make any
11 adjustments in terms of allocating percentages
12 of harm to that defendant based upon the types
13 of opioids that they sold?
14      MR. SOBOL:  Objection.
15   A.  In this model there is no allocation
16 to any single defendant, and so, therefore --
17 let me just say there is no -- there is no
18 allocation to any single defendant.
19 BY MR. KNAPP:
20   Q.  Well, isn't it possible, Professor
21 Cutler, that you could rule out certain
22 defendants as having contributed to some of the
23 harms that you looked at?
24      MR. SOBOL:  Objection.

Page 67

1   A.  The model that I have here is not
2 designed to do that.  One would need to develop
3 a different model to do that for each specific
4 defendant.  I haven't developed that model.
5 BY MR. KNAPP:
6   Q.  Well, let's just say that a
7 manufacturer didn't start manufacturing
8 prescription opioids until 2010, okay?  That's
9 the hypothetical here.  Your model would
10 attribute harms from 2006 to 2009 to that
11 defendant, correct?
12      MR. SOBOL:  Objection.
13 BY MR. KNAPP:
14   Q.  As part of the group of defendants,
15 they are attributed harm according to your
16 model, is that right?
17      MR. SOBOL:  Objection.
18   A.  What the model gives is the harm that
19 results from all the defendants together.  If
20 the court wished to know about the impact of any
21 individual defendant, the way to do that would
22 be through the inputs that Professor Rosenthal
23 provides where she provides the share of
24 shipments in each year that are a result of

Page 68

1 misconduct.  In the case of the model here, she
2 provides the share of the shipments in each year
3 that are a result of misconduct on the part of
4 defendants as a whole.  If one had data on the
5 share of shipments that result from a specific
6 defendant in a particular year, one could feed
7 that into the model here and calculate -- the
8 model that I developed and calculate the harms
9 from that.
10 BY MR. KNAPP:
11   Q.  But you haven't done that here, right?
12   A.  I have not done anything with respect
13 to any specific defendant.
14   Q.  And so to the extent that a defendant
15 wasn't marketing, manufacturing, or distributing
16 from 2006 to 2009, you still attribute harm to
17 that defendant, correct?
18      MR. SOBOL:  Objection.
19   A.  That's not correct.
20 BY MR. KNAPP:
21   Q.  Why is that not correct?
22   A.  It's not correct because it is
23 attributing the harm to the defendants as a
24 whole.  It is not attributing it to any specific

Page 69

1 defendant.  And there is nothing in this report
2 that says in order to attribute it to a specific
3 defendant, follow the following procedure.
4   Q.  All right.  In Paragraph 31 you also
5 refer to indivisible harms.  What are
6 indivisible harms?
7   A.  Can you just refer me to the very
8 specific wording?
9   Q.  It's in Paragraph 31, it's in the
10 third line.
11   A.  Thank you very much.
12      An indivisible harm is a harm where --
13 at least as I was using the term, it's a harm
14 where multiple parties may be responsible for
15 the same harm.
16      So, for example, in a situation where
17 a manufacturer inappropriately promotes a
18 medication and where a distributor
19 inappropriately does not flag a suspicious
20 shipment, then that is an indivisible harm, at
21 least as I'm using the word, because there are
22 multiple parties, that each were at fault.
23   Q.  And how did you determine that the
24 harms that you analyzed in your report were

Highly Confidential - Subject to Further Confidentiality Review

Page 70

1 indivisible?
2   MR. SOBOL: Objection.
3   You may answer.
4   A. I did not make a -- I did not make a
5 determination in this report as to which
6 specific harms resulted from, for example,
7 manufacturers and which specific harms resulted
8 from distributors, so I did not do a division of
9 the harms that way.
10 BY MR. KNAPP:
11   Q. My question was, how did you determine
12 that these particular harms were indivisible?
13   MR. SOBOL: Objection.
14   A. This is a statement not that I
15 determined that, but rather it was a reason why
16 I was bolstering the argument in the first
17 sentence, which is in part why I did not try to
18 uniquely apportion harm. And I was giving an
19 example of why one might not want to try to
20 uniquely apportion harm as a specific example of
21 which might be harms that are indivisible.
22 BY MR. KNAPP:
23   Q. So do you -- strike that.
24   Do you have an opinion whether these

Page 71

1 harms are indivisible, or are they divisible?
2   A. I do not have an opinion about that.
3   Q. All right. If we go to the next
4 clause of that sentence, it says "It is unlikely
5 that a unique attribution of harm to each
6 contributing" possible -- "each contributing" --
7 excuse me -- "party is possible."
8   Do you see that?
9   A. Yes, I do see that.
10   Q. Why is it unlikely?
11   A. I'm going to tell you what I meant,
12 which was economics language, and that may not
13 be -- I'm not sure I'm going to get the legal
14 words correctly, so just to give you that.
15   As an economic matter, if there is a
16 harm which both parties are responsible for the
17 full extent of the harm, for example, one party,
18 the manufacturer, is engaged in misconduct in
19 promoting the medication inappropriately and
20 another party, the distributor, engaged in
21 misconduct by not noting the suspicious
22 shipments, then in essence both are responsible
23 for the harm, and as an economic matter one
24 could not assign a percentage of the blame to

Page 72

1 each party because the harm would not have
2 occurred unless -- it had to be the case that
3 both parties failed their responsibilities in
4 order for the harm to occur.
5   Q. And so here did you conclude that it's
6 impossible to uniquely attribute harm to each
7 contributing party?
8   MR. SOBOL: Objection.
9   A. No, I did not conclude that it was
10 impossible to do so. I merely noted why I was
11 not doing so here.
12 BY MR. KNAPP:
13   Q. So -- strike that.
14   Do you agree that there are parties
15 that are not defendants here that contributed to
16 the harms that you analyzed in your report?
17   MR. SOBOL: Objection.
18   A. That sentence is too vague for me to
19 give a yes or no answer to.
20 BY MR. KNAPP:
21   Q. Do you believe that there are
22 individuals or entities that contributed to the
23 harms that you analyzed that are not defendants
24 in this lawsuit?

Page 73

1   MR. SOBOL: Objection.
2   A. I don't make a determination here as
3 to who gets what portion of the blame, so that's
4 not -- that's not an area that I have an opinion
5 upon.
6 BY MR. KNAPP:
7   Q. Your model cannot rule out that there
8 are individuals or entities that contributed to
9 the harms that you analyzed that are not
10 defendants in this case?
11   MR. SOBOL: Objection.
12   A. I haven't made any -- the model does
13 not rely upon any specific delineation as to who
14 it was that caused the harm.
15 BY MR. KNAPP:
16   Q. Now, Professor Cutler, that wasn't my
17 question.
18   My question was, your model does not
19 rule out that there are individuals or entities
20 that contributed to the harms that you analyzed
21 who are not parties to this lawsuit?
22   MR. SOBOL: Objection. Asked and
23 answered twice.
24   A. Again, I haven't made any

Page 74

1 determination as to who are the parties at fault
2 here.
3 BY MR. KNAPP:
4   Q.  All right.  Let's turn to Paragraph 3
5 of Appendix J, which is towards the back.  All
6 right.  I'm looking on the second page of
7 paragraph -- sorry, Paragraph 3 which goes on to
8 the second page, Page 2.
9       Do you see the first full sentence?
10 It says "As an economic matter, manufacturers
11 are appropriately held liable for at least the
12 10 percent of the harm that distributors could
13 not have avoided."
14      That refers back to the prior
15 sentence, right?
16   A.  That is correct, yes.
17   Q.  What does it mean to be held liable as
18 an economic matter?
19      MR. SOBOL:  Objection.
20   A.  As an economic matter, held liable
21 would be that the blame would be attributable to
22 them economically.
23 BY MR. KNAPP:
24   Q.  And you say that if the share of the

Page 75

1 harm attributed to manufacturers is greater than
2 the share of harms that could have been avoided
3 by distributors, that the manufacturers are
4 liable for at least the difference, right?
5   A.  Yes, that is correct.
6   Q.  And do you have an opinion on whether
7 the manufacturers are liable for just that
8 difference, or if they're liable for something
9 more than that as an economic matter?
10   A.  As an economic matter, no, as we were
11 talking about, the harm which is caused by
12 failure on the part of both parties, as an
13 economic matter there's no easy way to attribute
14 it between the different defendants.
15   Q.  And again, when you say there's no
16 easy way, what you mean is you haven't done it?
17      MR. SOBOL:  Objection.
18   A.  What I mean is that one would have to
19 make some type of assumptions to do it.  I have
20 not made any assumptions that would do that.
21 BY MR. KNAPP:
22   Q.  All right.  So if you look at Table
23 J.1, do you see Table J.1 says the
24 percentages -- sorry, "percent of shipments

Page 76

1 attributable to distributors' misconduct."
2      Do you see that?
3   A.  Yes, I do see that.
4   Q.  Do you know whether the percentage of
5 shipments that you attribute to distributor
6 misconduct in each year is higher, lower, or the
7 same as the percentage of shipments that you
8 attribute to marketing misconduct?
9      MR. SOBOL:  Objection to the form, but
10 he can answer.
11   A.  I have not -- I have not attributed
12 anything specifically to marketers, marketers'
13 misconduct.
14 BY MR. KNAPP:
15   Q.  When I say for -- purposes of this
16 question, when I say marketing misconduct, I
17 mean the part of your analysis that relies on
18 the percentages from Professor Rosenthal's
19 report.  Do you understand that?
20   A.  Okay.  That -- so just to be clear,
21 that's not what I -- the word marketing is what
22 threw me off there since Professor Rosenthal
23 gave me an estimate which is not specific just
24 to marketers.

Page 77

1   Q.  What is your understanding of what the
2 percentages are that you got from Professor
3 Rosenthal?
4   A.  Professor Rosenthal gave me an
5 estimate of the share of shipments which are due
6 to misconduct on the part of the defendants as a
7 whole.
8   Q.  And so you don't understand Professor
9 Rosenthal's percentages to be attributed to any
10 particular defendant group, is that your
11 understanding?
12   A.  That is my understanding of Professor
13 Rosenthal's percentages.
14   Q.  And what is your understanding of the
15 alleged misconduct that Professor Rosenthal was
16 looking at?
17      MR. SOBOL:  Objection.  Asked and
18 answered.
19   A.  Professor Rosenthal was looking at the
20 misconduct on the part of the manufacturers in
21 terms of promoting the drugs in an inappropriate
22 way, and of the distributors in terms of failing
23 to identify, report, and stop suspicious
24 shipments.

Page 529

1 large part of the variation in mortality changes
2 across areas.  So in that sense we're
3 controlling for differences in Cuyahoga and
4 Summit relative to the rest of the nation.
5         But the specific shipments variable,
6 there's -- we have no way to see whether that
7 number would be different in one or two
8 particular counties relative to the rest of the
9 counties.  There's no econometric way one could
10 estimate whether that coefficient is different
11 for just those two counties.  You'd need a
12 different type of model entirely in order to
13 estimate a coefficient for a single county.  You
14 can't do it with just one observation for a
15 county, or even a group of two counties.  You
16 couldn't do it.
17     Q.  All right.  Let's look at Table 3.10
18 on 64.  And I just want to make sure my
19 understanding of these columns is correct, so
20 hopefully these will be relatively simple
21 questions.
22         Column A reports actual mortality for
23 all the counties in your sample, right?
24     A.  That is correct, column A is the

Page 530

1 actual mortality rate.
2     Q.  And column B reports the actual
3 shipments for all counties -- excuse me, strike
4 that.
5         Column B reports actual shipments for
6 all counties in your sample, right, the
7 cumulative average?
8     A.  That is correct, column B is the
9 cumulative average shipment for the counties in
10 the sample.
11     Q.  And then we talked about this, but
12 column D is the shipment coefficient for all of
13 the counties in your sample, right?
14     A.  That's correct.  That is the -- that's
15 not quite phrased the exact way I would phrase
16 it.  That is the shipment coefficient from the
17 regression model that uses cross-county data, so
18 it is the shipment coefficient from the model.
19     Q.  But it's not as if there's a different
20 shipment coefficient for different counties
21 included in your sample?
22     A.  No.
23         MR. KO:  Object to the form.
24     A.  No.  As I said, it would not be

Page 531

1 possible given just one observation per county
2 to have a different -- it's econometrically
3 impossible to have a different coefficient for
4 each county.
5 BY MR. KNAPP:
6     Q.  Did you test whether the impacts that
7 you estimated based upon all the counties in
8 your sample lead to unexpected results in any
9 particular county?
10         MR. KO:  Object to the form.
11     A.  A general thing that one does in
12 looking at regression analysis is often to look
13 at the specific observations and then to see how
14 well the regression fits the observations.
15         To the extent that there are outliers
16 in that, that is, a particular county is way off
17 the regression line, one then often either
18 adjusts the model or sometimes decides to
19 eliminate an observation entirely because it may
20 not be relevant.
21         In this case, as we spoke about
22 earlier, there were four counties that they're
23 not so far off the line but the shipments were
24 so high that it seemed clear that they -- and

Page 532

1 they were from areas where cross-county
2 transshipment was reported by press and others
3 to be big, that they seemed so high that I felt
4 more comfortable using the vast bulk of the
5 other data, the 400 out of 404 other data that
6 did not have any concerns about those issues in
7 those four counties.
8 BY MR. KNAPP:
9     Q.  So let me just pick up on something
10 that you said.  You said you looked at press
11 articles about high rates of transshipments.
12 What press articles did you look at that
13 referenced high rates of transshipments into or
14 out of Franklin County, Ohio?
15     A.  I don't think there were any that
16 specifically mentioned Franklin County, Ohio.
17 There are articles and books that have spoken
18 about transshipments from, for example, Florida,
19 from West Virginia, from Kentucky, from Ohio.
20         And so because the counties with the
21 very high shipments tended to be in states in
22 general where transshipments were reported to be
23 an issue, I thought it -- I thought it more -- a
24 more convincing analysis to eliminate those four

Page 533

1 observations as being very different on
2 the shipment variable.
3    Q.  Did you consider whether it's possible
4 that your regression model would attribute
5 greater than 100 percent impact on mortality
6 when applied to any single county?
7        MR. KO:  Object to the form.
8        Which regression model?
9    A.  It's -- so, in general, one does look
10 for things like that.  But the issue is there
11 are always, of course, points that are off the
12 line, so there are always outlier observations.
13       There may be observations for which
14 there was a particularly high level of shipments
15 relative to population not in those four, or for
16 which other factors imply an increase in
17 mortality where the prediction as a whole could
18 very well lead to an estimate of over
19 100 percent or any other type of issue.
20       That's why as an econometrician you
21 wouldn't use the analysis of this to predict for
22 a single county, but rather one wants to use
23 this to develop an estimate for the set of
24 counties as a whole because that's what this --

Page 534

1 this is what is describing the vast -- the
2 average county in the data set, and that's what
3 that regression coefficient is giving, and,
4 therefore, it's appropriate to evaluate it at
5 the average in the data set.
6 BY MR. KNAPP:
7    Q.  You would agree that shipments of
8 prescription opioids can't have more than
9 100 percent impact on mortality, right?
10   A.  Of course, the question is 100 percent
11 relative to what?  It is possible that there
12 could be fewer deaths than would be predicted by
13 a model.  For example, if a county were
14 particularly good at treat -- if a county got to
15 be particularly good at treating people who had
16 opioid overdoses, then the actual mortality rate
17 would be lower than would be predicted on the
18 basis of shipments because the county was
19 successfully able to prevent death that results
20 from opioid use.
21   Q.  So it's your testimony that if there's
22 a greater than 100 percent impact on mortality
23 for any given county that that can be explained
24 by shipments into that county?

Page 535

1    A.  I'm not saying that that's -- I'm not
2 saying that that is the explanation.  I'm making
3 two points.  The first point is that it is, of
4 course, theoretically possible that a county
5 could be estimated to have more deaths than it
6 actually does because the county does a good job
7 at preventing deaths, so preventing actual
8 deaths relative to -- relative to what would be
9 predicted.  So that county is not -- in that
10 eventually, in that hypothetical, that county
11 would have predicted deaths greater than actual
12 deaths, and that would be a perfectly correct
13 statement -- conclusion to draw.
14       And, second, I'm making -- so that's
15 the first point to make.  And then the second
16 point to make is that using a regression
17 coefficient to then predict and look at a single
18 county is generally not what an applied
19 economist does, because a single county may have
20 an outlier for a particular reason in a
21 particular year.  And the regression says yes,
22 given all the outliers, here is the nature of
23 the data, here is what I -- here's what's true
24 about the data as a whole, but that doesn't --

Page 536

1 but it doesn't erase what may be an outlier for
2 any number of reasons in a county.
3       And so it's just not -- this is not
4 the methodology you'd use if you wanted to
5 understand that single county.  You would sort
6 of almost do an exact time series of that
7 specific county, and you'd use a very different
8 methodology.
9       So just as a -- so the second point is
10 as a general matter, I wouldn't apply this to a
11 single county and say, oh, okay, that's the
12 obvious way to do it.  Instead I would do what
13 we did here and what most econometricians would
14 do, which is to apply it to the sample as a
15 whole.
16   Q.  Okay.  Let's look at Paragraph 109.
17 So now Paragraph 109, we're looking at your
18 application of the direct model to the period --
19 to elicit mortality in the period 2011 to 2016,
20 right?
21   A.  Yes, that is correct.
22   Q.  Why did you conclude that it was
23 reasonable to assume that the relationship
24 between opioid shipments and deaths prior to

Highly Confidential - Subject to Further Confidentiality Review

Page 601

1 qualified to opine on whether the defendants --
2 whether any of the defendants here violated the
3 CSA, right?
4   A.  I am not making a determination as to
5 whether the defendants violated the CSA.
6   Q.  And we talked about unique attribution
7 of harms in connection with the report as a
8 whole, but I want to ask you specifically to the
9 model in Appendix J.
10     You do not attempt to uniquely
11 attribute harm between any different type of
12 defendant in Appendix J, correct?
13     MR. KO:  Object to the form.
14   A.  Can you just explain by you mean --
15 what you mean by "you do not attempt to
16 distribute to any particular type of defendant,"
17 what you mean by "type of defendant" in that
18 sentence?
19 BY MR. KNAPP:
20   Q.  You said distribute, and I may have
21 said distribute.  I meant uniquely attribute,
22 with an A, not a D.
23     But when I say type of defendant, I
24 mean manufacturer, distributor, pharmacy, so let

Page 602

1 me ask you that.
2     In this model you do not attempt to
3 uniquely attribute harm between the different
4 types of defendants in this lawsuit, right?
5     MR. KO:  Object to the form.
6   A.  In the model that I develop as a
7 whole, there is nothing that says how the harm
8 gets attributed to any particular defendant.
9     The model can then take as an input
10 the percentage of shipments associated with
11 misconduct of all the parties as a whole, some
12 of the parties, some particular group of
13 parties, and then use that to come up with an
14 output.  But I myself do not come up with that
15 attribution.
16 BY MR. KNAPP:
17   Q.  And in this model, Appendix J, you're
18 not attempting to and you do not uniquely
19 attribute harm, any of the harms that you
20 analyzed, to any particular defendant, correct?
21     MR. KO:  Object to the form.  Asked
22 and answered.
23   A.  That's correct.  Appendix J is not
24 looking at any single defendant.  It's merely

Page 603

1 showing how to take an estimate of
2 distributors' -- in this case an estimate that
3 was provided to me of distributors' misconduct
4 and calculate the harms that result from that.
5 And nothing in Appendix J is specific to any
6 single defendant.
7     MR. KNAPP:  Why don't we take just a
8 five-minute break, and I'll be turning over the
9 mic here.
10     THE VIDEOGRAPHER:  The time is
11 2:19 p.m., and we're off the record.
12     (Whereupon, a recess was taken.)
13     THE VIDEOGRAPHER:  The time is
14 2:36 p.m., and we're on the record.
15         EXAMINATION
16 BY MR. HALLER:
17   Q.  Good afternoon, Professor Cutler.  I'm
18 David Haller.  We've just had a chance to meet
19 very briefly just before we went on the record.
20 You will not be as impressed by my econometric
21 knowledge as you were by Mr. Knapp's, so I hope
22 you'll be a little patient with me.
23   A.  I will do my best.
24   Q.  Now, near the end of your analysis,

Page 604

1 one of the things you arrive at is a percent
2 impact, right, a percent of harms attributable
3 to defendants' misconduct, and your endpoint
4 there is a percent impact, correct?
5   A.  That is correct.  I estimate an
6 endpoint which is the percentage of harms which
7 are attributable to defendants' misconduct.
8   Q.  And then your final step is to apply
9 that percentage to certain assumed dollars spent
10 by the counties in various areas, correct?
11   A.  I do not apply it specifically to the
12 dollars spent by the counties.  The application
13 to the dollars spent by the counties is in
14 Professor McGuire's report.
15   Q.  What do you -- what do you apply the
16 percent impact to?
17   A.  What I estimate in my report is the
18 percentage of the activities of these agencies
19 that resulted from misconduct on the part of
20 defendants.
21   Q.  So if I, for example, refer you to
22 Table 3.13 on Page 70 of your report, you can
23 see there on the right-hand column the percent
24 impact percentages that you calculated and