**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br>*The County of Summit, Ohio, et al. v. Purdue Pharma L.P., et al.*<br>Case No. 18-op-45090<br><br>and<br><br>*The County of Cuyahoga v. Purdue Pharma L.P., et al.*<br>Case No. 1:18-op-45004 | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | MDL No. 2804<br><br>Hon. Judge Dan A. Polster |

**COMBINED BRIEF OF**

**DISTRIBUTORS AND MANUFACTURERS**

**IN SUPPORT OF PARTIAL SUMMARY JUDGMENT ON**

**STATUTE OF LIMITATIONS GROUNDS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................... 2

ARGUMENT ...................................................................................................................... 4

I.  PLAINTIFFS' CLAIMS ACCRUED WHEN THE ALLEGED MISCONDUCT
    OCCURRED AND PLAINTIFFS WERE INJURED. ....................................................... 5

    A.  The Applicable Statutes of Limitations. ...................................................... 5

    B.  The Applicable Rules Regarding Accrual. .................................................... 8

II.  ALL CLAIMS BASED ON PRE-OCTOBER 27, 2012 CONDUCT ARE TIME-
     BARRED. ................................................................................................................ 12

    A.  Plaintiffs Knew the Volume of Prescription Opioids Shipped Into Their
        Communities. ............................................................................................. 13

    B.  Plaintiffs Knew There Was a Problem of Opioid Use and Abuse in Their
        Communities. ............................................................................................. 15

    C.  Plaintiffs Knew the Costs They Had Incurred Because of Opioid Use and
        Abuse. ......................................................................................................... 22

    D.  Plaintiffs Knew About Manufacturers' Marketing of Opioids. .................. 23

III.  PLAINTIFFS KNEW OR SHOULD HAVE KNOWN BEFORE OCTOBER 27,
      2012, ABOUT *DISTRIBUTORS'* ROLE IN THE SUPPLY CHAIN AND THEIR
      ALLEGED MISCONDUCT ......................................................................................... 25

    A.  What Plaintiffs Knew or Should Have Known About Distributors' Role. ............ 26

    B.  What Plaintiffs Knew or Should Have Known About the Volume of Pills
        Shipped to the Counties. ............................................................................ 27

    C.  What Plaintiffs Knew or Should Have Known About DEA and Ohio
        Enforcement Actions Against Distributors. ................................................ 28

    D.  What Plaintiffs Knew or Should Have Known About West Virginia's
        Lawsuits Against Distributors. .................................................................... 30

IV.  PLAINTIFFS KNEW OR SHOULD HAVE KNOWN BEFORE OCTOBER 27,
     2012, ABOUT *MANUFACTURERS'* ROLE IN THE SUPPLY CHAIN AND
     THEIR ALLEGED MISCONDUCT. ............................................................................. 32

    A.  Plaintiffs Had Knowledge of Any Alleged Failure To Report and Halt
        Suspicious Orders by Manufacturers Long Before October 2012. ............ 33

    B.  Plaintiffs Had Constructive Knowledge of Any Alleged False Marketing
        by Manufacturers Long Before October 2012. .......................................... 34

V.  PLAINTIFFS' PRINCIPAL ARGUMENTS WHY THE STATUTE OF
    LIMITATIONS HAS NOT RUN ARE WITHOUT MERIT. ............................................. 39

    A.  "We Did Not Know There Was an Opioid Crisis Until 2016." .................... 40

i

B.  "We Did Not Have the ARCOS Data." ................................................................40

C.  "The Continuing Tort Doctrine Applies." ..........................................................41

D.  "The Statute of Limitations Does Not Run as to a Public Nuisance."..................42

E.  "Defendants Fraudulently Concealed Their Misconduct.".................................43

    1.  Distributors and Manufacturers .................................................................44

    2.  Manufacturers ..........................................................................................45

CONCLUSION.................................................................................................................47

INDEX TO APPENDICES FOR COMBINED BRIEF .................................................52

CERTIFICATE OF SERVICE .......................................................................................62

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ass'n of Commonwealth Claimants v. Moylan*, 71 F.3d 1398 (8th Cir. 1995) .............................10

*Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231 (6th Cir. 1985) ..............................11

*Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004).................................................11, 39

*Bowerman v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., Local No. 12*, 646 F.3d 360 (6th Cir. 2011) .......................................................................4

*Central Regional Employees Benefit Fund, et al. v. Cephalon Inc.*, No. 09-cv-03418 (D.N.J. removed July 10, 2009).................................................................................38

*City of Cuyahoga Falls v. Johnson Controls, Inc.*, No. 5:18-CV-1130, 2019 WL 1116006 (N.D. Ohio Mar. 11, 2019) ......................................................................................44

*Dayco Corp. v. Firestone Tire & Rubber Co.*, 386 F. Supp. 546 (N.D. Ohio 1974)....................45

*Dayco Corp. v. Firestone Tire & Rubber Co.*, 523 F.2d 389 (6th Cir. 1975) ..............................43

*Duffey v. Pope*, No. 2:11-cv-16, 2012 WL 4442753 (S.D. Ohio Sept. 25, 2012) ..........................6

*Electric Power Bd. v. Monsanto Co.*, 879 F.2d 1368 (6th Cir. 1989) ............................................9

*Estate of Abdullah ex rel. Carswell v. Arena*, 601 F. App'x 389 (6th Cir. 2015) ........................45

*Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375 (1982)..........................................45

*Guy v. Lexington-Fayette Urban County Gov't*, 488 Fed. App'x 9 (6th Cir. 2012)................9, 26

*Hardin v. Reliance Trust Co.*, No. 1:04 CV 02079, 2006 WL 2850455 (N.D. Ohio Sept. 29, 2006), *aff'd Cline v. Reliance Trust Co.*, 245 F. App'x 503 (6th Cir. 2007) ......................................................................................................11, 29, 30, 31

*Harner v. Prudential-Bache Sec.*, 35 F.3d 565 (6th Cir. 1994).....................................................9

*Hofstetter v. Fletcher*, 905 F.2d 897 (6th Cir. 1988) ...................................................................10

*Hughes v. Vanderbilt Univ.*, 215 F.3d 543 (6th Cir. 2000) ......................................................4, 39

*In re Actiq Sales and Marketing Practices Litigation*, No. 07-4492 (E.D. Pa. filed October 2007; several nationwide putative class actions) ......................................................39

*Isaak v. Trumbull*, 169 F.3d 390 (6th Cir. 1999) .........................................................................10

*Jacobs v. Lambda Research, Inc.*, 2014 WL 1264911 (S.D. Ohio June 16, 2014) ......................12

*Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir. 1987) ............................................................9

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ...........................................................................10

*Leschorn v. Fitzgerald*, 142 F.3d 434 (6th Cir. 1998) ...................................................................12

*Loyd v. Huntington Nat'l Bank*, 2009 WL 1767585 (N.D. Ohio Jun. 18, 2009).........11, 29, 30, 31

*Meros v. Dimon*, 2019 WL 1384390 (S.D. Ohio Mar. 27, 2019) ...................................................10

*Metz v. Unizan Bank*, No. 5.05 CV 1510, 2006 WL 8427066 (N.D. Ohio Feb. 28, 2006) ..........................................................................................................................................43

*NanoLogix, Inc. v. Novak*, 2015 WL 1400656 (N.D. Ohio Mar. 26, 2015) ....................................6

*Nat'l Credit Union Admin. Bd. v. Ciuni & Panichi, Inc.*, No. 5:16-cv-455, 2019 WL 188472 (N.D. Ohio Jan. 11, 2019).......................................................................................8, 41

*Nieman v. NLO, Inc.*, 108 F.3d 1546 (6th Cir. 1997) ...............................................................4, 41

*Rotella v. Wood*, 528 U.S. 549 (2000) ...........................................................................5, 9, 25, 32

*Sampson v. Sisters of Mercy of Willard, Ohio*, No. 3:12 cv 824, 2016 WL 660917 (N.D. Ohio Feb. 18, 2016) ........................................................................................................4

*Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433 (6th Cir. 2005) ...................................................9, 10

*Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406 (2d Cir. 2008) .....................................31

*Suckow Borax Mines Consol. v. Borax Consolidated*, 185 F.2d 196 (9th Cir. 1950) ..........................................................................................................................................45

*Thompson v. Citizens Nat'l Bank*, No. 1:4-CV-1197, 2016 WL 5076053 (N.D. Ohio Sept. 20, 2016) ....................................................................................................................8

*Travelers v. Cephalon, Inc.,* Civil Action No. 12–4191 (E.D. Pa. filed July 24, 2012) ..........................................................................................................................................39

*World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695 (2d Cir. 2009)....................10

*Wuliger v. Anstaett*, 363 F. Supp. 2d 917 (N.D. Ohio 2005)...........................................................6

*Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553 (6th Cir. 2005) .....................................11

## STATE CASES

*Bd. of Educ. of the Loveland City Sch. Dist. v. Bd. of Trs.* 111 N.E.3d 883 (Ohio Ct. App. 2018)......................................................................................................................27

*Brown v. County Comm'rs*, 622 N.E. 2d 1153 (Ohio 1993)........................................................4, 42

*Cain v. Mid-Ohio Secs., Inc.*, 2007-Ohio-3711 ...............................................................................11

*Chernett Wasserman, Yarger, L.L.C. v. ComScape Holding, Inc.*, No. 100907,
    2014 WL 4748513 (Ohio Ct. App. Sept. 25, 2014).................................................................41

*Collins v. Sotka*, 692 N.E. 2d 581 (Ohio 1998) .................................................................................8

*Columbus Bd. of Educ. v. Armstrong World*, 627 N.E. 2d 1033 (Ohio Ct. App.
    1993) .......................................................................................................................................9, 41

*Corbett v. Ford Motor Co.*, No. 69216, 1996 WL 75721 (Ohio Ct. App. Feb. 22,
    1996) .......................................................................................................................................4, 12

*Creech v. Brock & Assoc. Constr.*, 918 N.E.2d 541 (Ohio Ct. App. 2009)..................................41

*Cundall v. U.S. Bank*, 909 N.E.2d 1244 (Ohio 2009).........................................................10, 11, 32

*Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268 (Ohio 2006) ...................................................10

*Doe v. First United Methodist Church*, 629 N.E.2d 402 (Ohio 2004) .........................................5, 6

*Drozeck v. Lawyers Title Ins. Corp.*, 749 N.E.2d 775 (Ohio Ct. App. 2001).................................8

*Fay v. Swicker*, 96 N.E.2d 196 (Ohio 1950).....................................................................................40

*Flowers v. Walker*, 589 N.E. 2d 1284 (Ohio 1992) ...........................................................9, 25, 32

*Gibson v. Park Poultry, Inc.*, No. 2006 CA 00296, 2007 WL 2358589 (Ohio Ct.
    App. Aug. 13, 2007) ...............................................................................................................42

*Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612 (Ohio Ct. App.
    1999) .........................................................................................................................................43

*Hallowell v. Cty. of Athens,* No. 03-CA-29, 2004 WL 1802042, Ohio Ct. App.
    Aug. 10, 2004). .......................................................................................................................40

*Inv'rs REIT One v. Jacobs*, 546 N.E.2d 206 (Ohio 1989) ................................................................8

*Kunz v. Buckeye Ins. Co.,* 437 N.E. 2d 1194 (Ohio 1982) (*per curiam*) .........................................6

*Law v. Lake Metroparks*, 2006 WL 3833863 (Ohio Ct. App. 2006) *aff'd*, 878 N.E.
    2d 1046 (Ohio 2007)...............................................................................................................43

*LGR Realty, Inc. v. Frank & London Ins. Agency*, 98 N.E.3d 241 (Ohio 2018) ............................8

*Lynch v. Dial Fin. Co.*, 656 N.E. 2d 714 (Ohio Ct. App. 1995).......................................................9

*NASA Tool Mfg. Corp. v. Cincinnati Milacron, Inc.*, No. CA86-07-044, 1987 WL 16301 (Ohio Ct. App. Aug. 31, 1987) ..................................................................11

*O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727 (Ohio 1983) ........................................8

*Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718 (Ohio Ct. App. 1995) ....................10

*Sec. Tr. Co. v. Ford*, 79 N.E. 474 (Ohio 1906) ..............................................................11

*Sexton v. Mason*, 883 N.E.2d 1013 (Ohio 2008) ..........................................................42

*State ex rel. County of Cuyahoga v. Jones Lang Lasalle Great Lakes Co.*, No. 104157, 2017 WL 4177024 (Ohio Ct. App. Sep. 21, 2017) ...............................9, 29

*State ex rel. N. Olmsted Fire Fighters Assn. v. N. Olmsted*, 597 N.E.2d 136 (Ohio 1992) .......................................................................................................41

*State ex rel. Nickoli v. Erie MetroParks*, 923 N.E.2d 588  (Ohio 2010) .......................41

*Stewart v. Allen*, No. 06CA0039, 2008 WL 918528 (Ohio Ct. App. Apr. 7, 2008) .................9, 11

*The Little Miami RR Co. v. Comm'rs of Greene Cty.*, 31 Ohio St. 338 (1877) ...........................43

*Tri-State Computer Exchange, Inc. v. Burt*, 2003 WL 21414688 (Ohio Ct. App. June 20, 2003) ...............................................................................................9

*Velotta v. Leo Petronzio Landscaping, Inc.*, 433 N.E.2d 147 (Ohio 1982) .....................9

*Wood v. American Aggregates Corp.*, 585 N.E. 2d 970 (Ohio 1993) ...........................42

*Zemcik v. LaPine Truck Sales & Equip. Co.,* 706 N.E.2d 860 (Ohio Ct. App. 1998) ...............................................................................................11

*Zimmie v. Calfee, Halter & Griswold*, 538 N.E. 2d 398 (Ohio 1989) ...........................9

## OTHER AUTHORITIES

21 C.F.R. § 1301.46, 1316.67 ......................................................................................28

21 C.F.R. § 1301.74 .....................................................................................................26

28 C.F.R. § 0.103(a)(1)–(2) .........................................................................................44

21 U.S.C. § 830(a), (c)(1) ............................................................................................44

Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 282 (2008) .......................................................................................................43

Ohio Corrupt Practices Act ............................................................................................6

Ohio Products Liability Act, Ohio Rev. Code §§ 2305.10(A) & (B)(1) ........................................5

Ohio Rev. Code § 2305.07.........................................................................................................5

Ohio Rev. Code § 2305.09..............................................................................................5, 10, 43

Ohio Rev. Code § 2923.34.........................................................................................................5

Restatement (Second) of Torts, § 871B......................................................................................43

RICO ................................................................................................................................ *passim*

Rule 30(b)(6)...............................................................................................................................2

Distributors[1] and Manufacturers[2] move for **_partial_** summary judgment based on the respective statutes of limitations for each of Plaintiffs' claims.[3]  This Motion does not seek to eliminate Plaintiffs' claims entirely.

Plaintiffs claim damages stretching back to 2006, yet waited until October 27, 2017 (Cuyahoga) and December 20, 2017 (Summit) to file their claims (and even longer as to certain Defendants).  Depending on the claim, the applicable statutes of limitation range from one to five years, meaning that even using the most generous time period—five years for the Ohio RICO counts—claims that accrued before October 2012 are unquestionably barred.[4]  This motion does not seek to bar claims pertaining to wrongful acts that occurred within the applicable limitations periods.

---

[1] Distributors include Cardinal Health, Inc., McKesson Corp., AmerisourceBergen Drug Corp., Anda, Inc., H. D. Smith, H.D. Smith, LLC f/k/a H.D. Smith Wholesale Drug Company, H.D. Smith Holdings, LLC, and H.D. Smith Holding Company, Prescription Supply Inc., Henry Schein, Inc., Henry Schein Medical Systems, Inc.

[2] Manufacturers include Purdue Pharma, L.P., Purdue Pharma, Inc., The Purdue Frederick Company, Inc., Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc. (incorrectly named as "Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc."), Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc., Noramco, Inc., Ortho-Mcneil-Janssen Pharmaceuticals, Inc., n/k/a Janssen Pharmaceuticals,  Inc., Johnson & Johnson, Teva Pharmaceutical Industries Ltd., Teva Pharmaceuticals USA, Inc, Cephalon, Inc., Allergan PLC f/k/a Actavis PLC, Allergan Finance, LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., Actavis LLC, Actavis Pharma, Inc. f/k/a Watson Pharma, Inc, Mallinckrodt, PLC, Mallinckrodt LLC, SpecGx LLC, Allergan Sales, LLC, Allergan USA, Inc., Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida.  Teva Pharmaceutical Industries, Ltd., Allergan plc, and Mallinckrodt plc are respectively an Israeli corporation, Irish holding company, and Irish company that are not subject to and contest personal jurisdiction for the reasons explained in their pending motions to dismiss for lack of personal jurisdiction; they are specially appearing to join this motion as a result of the Court's summary judgment deadline, and, thus, they do not waive and expressly preserve their pending personal jurisdiction challenges.  Noramco, Inc. is alleged to be a former subsidiary of Johnson & Johnson and joins in this motion to the extent applicable, yet notes that it does not (and did not at all material times relevant hereto) manufacture, package, brand, market, distribute, or sell the finished drug products at issue in this litigation, and it reserves all rights and defenses specific to it.

[3] Pharmacies are adopting Sections I and II of this Common Brief, but are filing separately because certain pharmacy defendants are moving for summary judgment in full.

[4] For simplicity, this Memorandum frames the arguments with respect to the earliest limitations date at issue—_i.e._, October 27, 2012, for Cuyahoga's Ohio RICO claims.  But each claim has its own limitation period, and different Plaintiffs sued different Defendants on different dates.

The ruling Defendants seek is compelled by application of controlling law to the undisputed facts. Granting this motion, however, would also have practical benefits. It would focus the jury on a shorter span of years, facilitate the jury's ability to consider the separate evidence as to each Defendant's conduct, limit the potential damages to the statutory period, and, in all these ways, streamline the trial.

## INTRODUCTION

After eight months of discovery, the production of more than 150 million pages of documents, and more than 400 depositions in these two cases, the undisputed record establishes beyond question that Plaintiffs knew long before October 2012 that their communities were experiencing an opioid abuse epidemic that was imposing a financial burden on them, i.e., causing their injury.  Plaintiffs undisputedly knew about the crisis before October 2012 because their first responders, public hospitals, police, prosecutors, courts, and social service agencies all witnessed it first-hand in the years before 2012.  As one Cuyahoga prosecutor testified, prescription opioids "exploded" into Ohio "like a jailbreak" and had "absolutely" become a "problem" by the "*early '90s*."[5]  The Chief Toxicologist of Summit County recalled that, "in the *early 2000s*," "all I saw … at the coroner's office were prescription meds."  A. 20.  The Cuyahoga Health Commissioner testified to his "awareness *in 2010*," if not before, "that prescription drug abuse and overdose was a public health problem."  A. 1.  Numerous other county officials—including the Summit Rule 30(b)(6) representative, the Chair of the Cuyahoga County Opiate Task Force, the CEO of the Cuyahoga Alcohol, Drug Abuse, and Mental Health Services ("ADAMHS") Board, and the Executive Director of the Summit ADAMHS Board— testified that they knew *before October 27, 2012* that their counties were experiencing what they

---

[5] Gutierrez Dep. 51 (Appendix, Tab 11).  In this Memorandum, (1) all emphases in quotes have been added unless otherwise indicated, (2) internal quotations have been omitted, (3) Plaintiffs are referred to individually as "Cuyahoga" and "Summit," and (4) references to the Appendix tab numbers are denoted by "A._."

called an opioid "epidemic."[6]  The Court itself recognized that Plaintiffs have known about the "effects of the opioid crisis" since at least 2007.[7]  And the multiple reports of state-wide task forces and summits put Plaintiffs on notice prior to October 2012 of the alleged causes of the crisis (including "aggressive marketing" by Manufacturers and the "sheer volume" of pills being shipped into the counties by Distributors).  A. 35–36. 125–26.

Plaintiffs also knew before October 27, 2012—indeed, could not help but know—that the opioid abuse crisis was imposing the financial burden they now allege as the basis for their injuries.  They allegedly spent "staggering" additional sums before that date to address the crisis.[8]  According to Plaintiffs' own experts, those expenditures began as early as 2006, and they opine that Defendants' alleged "wrongful acts" began even earlier.

What starts the limitations period running (except for the fraud claim against Manufacturers) is Plaintiffs' knowledge of the "epidemic" and its impact on their communities, financial and otherwise, before October 27, 2012.  As to the common-law fraud claim, the undisputed evidence shows that Plaintiffs had knowledge of any allegedly false marketing by Manufacturers and its alleged role in the "epidemic" years before October 27, 2012.  It is true for all claims that the law does not require that Plaintiffs have known either the full extent of their alleged injury or the identity of any present defendant who allegedly committed the wrongful acts—although the evidence shows that Plaintiffs did know about Defendants' alleged role in the purported harm that forms the basis for their claims.  Plaintiffs knew about the volume of prescription opioids being distributed to pharmacies in the two counties, and Plaintiffs knew of

---

[6] *See infra* II.B–II.C.

[7] ECF No. 1203, at 4.

[8] *See* Summit Original Compl. ("Summit Compl."), ¶ 19 ("staggering" financial burden).  Defendants dispute Plaintiffs' claim that they incurred "staggering" costs.  It is sufficient to say here that, whatever costs Plaintiffs incurred before October 27, 2012, they knew about them at the time they incurred them.

Manufacturers' alleged false marketing and its purported role in the harm—all before October 27, 2012.[9]

Because the longest limitations period for any of Plaintiffs' claims is five years, Plaintiffs may seek recovery only for claims that accrued **on or after October 27, 2012**.  The Court therefore should grant summary judgment against Cuyahoga and Summit, respectively, for claims that accrued **before** that date (as more particularly set out claim-by-claim, and for defendants sued at different times, in Tables 1-4 below).[10]  Again, as noted, this motion does not seek dismissal of claims arising from alleged wrongful acts that occurred later.

This is the right result under controlling law, and there is nothing unfair about it.  Statutes of limitations are "vital to the welfare of society" and "favored in the law."  *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 550 (6th Cir. 2000).  Here, in particular, where there are more than 20 defendants and the challenged conduct changed over time, granting summary judgment as to the time-barred claims is not only required, but will "simplify matters at trial."  *Sampson v. Sisters of Mercy of Willard, Ohio*, 2016 WL 660917, at *2 (N.D. Ohio Feb. 18, 2016).

## ARGUMENT

*Part I* discusses the applicable statutes of limitation and the law governing accrual.  *Part II* discusses the undisputed evidence showing that before October 27, 2012, Plaintiffs knew about: (1) the large volume of opioids being prescribed, dispensed, and distributed within their jurisdictions; (2) the "epidemic" of opioid abuse experienced by their communities; (3) the alleged increased costs incurred by county government to address the crisis; and (4) the alleged

---

[9] *See infra* Parts III and IV.

[10] *See Corbett v. Ford Motor Co.*, 1996 WL 75721, at *6 (Ohio Ct. App. Feb. 22, 1996) (each "new occurrence" is "subject to its own claim" for "statute of limitations purposes" under Ohio law); *see also Bowerman v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., Local No. 12*, 646 F.3d 360, 367 (6th Cir. 2011) ("discrete acts" with "discrete consequences" are each "potentially actionable").  Even if Defendants' alleged misconduct were deemed part of a continuing tort, Plaintiffs could still recover damages only for conduct "incurred within the [applicable limitations period]."  *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1559 (6th Cir. 1997); *Brown v. County Comm'rs*, 622 N.E. 2d 1153, 1162 (Ohio 1993).

role of marketing in opioid prescribing and abuse.  ***Part III*** (on behalf of Distributors) and ***Parts II.D and IV*** (on behalf of Manufacturers) address the undisputed evidence showing that, even if Plaintiffs' knowledge of Defendants' alleged wrongdoing or role in causing the alleged injuries were relevant to the statute of limitations, Plaintiffs had the requisite knowledge before October 27, 2012.  ***Part V*** answers Plaintiffs' principal arguments why the statutes of limitation do not bar their claims.

## I.     PLAINTIFFS' CLAIMS ACCRUED WHEN THE ALLEGED MISCONDUCT OCCURRED AND PLAINTIFFS WERE INJURED.

### A.     The Applicable Statutes of Limitations.

**Ohio RICO claim**.  A five-year statute of limitations applies to Ohio RICO claims.  Ohio Rev. Code § 2923.34(J).

**Ohio Common Law and Federal RICO claims**.  At most, a four-year statute of limitations applies to Plaintiffs' general tort claims, including their common law negligence, public nuisance, fraud, and civil conspiracy claims, Ohio Rev. Code § 2305.09,[11] and to their federal RICO claims, *Rotella v. Wood*, 528 U.S. 549, 552 (2000).

The same statute of limitations also applies to the unjust enrichment claim.  While in certain circumstances such claims are subject to a six-year limitations period, Ohio Rev. Code § 2305.07, that is only where such claims sound in quasi-contract.  "[I]n determining which limitation period will apply, courts must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded."  *Doe v. First United Methodist Church*, 629 N.E.2d 402, 407 (Ohio 2004).  This Court already has determined that Plaintiffs' unjust enrichment claim "is not based on a financial transaction" with any defendant and that Plaintiffs do not assert claims as purchasers of opioids, "indirect or otherwise."  Opinion and Order (Doc.

---

[11] As Defendants have argued elsewhere (and maintain), Plaintiffs' common law claims have been abrogated by the Ohio Products Liability Act, Ohio Rev. Code §§ 2305.10(A) & (B)(1), which has a two-year statute of limitations and a ten-year statute of repose.

No. 1203) at 37 (quoting R&R at 92). Their claims instead concern "the cost of the harms caused by Defendants' improper distribution practices." *Id.* (quoting Summit Compl. ¶ 1114). The unjust enrichment claim is thus subject to the same statute of limitations for torts.[12]

**Ohio Injury Through Criminal Acts claim**. A one-year statute of limitations applies. *Duffey v. Pope*, 2012 WL 4442753, at *11–13 (S.D. Ohio Sept. 25, 2012).

These statutes of limitation bar Plaintiffs' claims insofar as they accrued before the dates set forth in the Tables below. Each successive Table provides the operative statute of limitations dates for those entities newly added as defendants in that amended complaint:

| Table 1 (Original Complaints)[13] | | |
|---|---|---|
| **Claim** | **Summit** | **Cuyahoga** |
| Injury Through Criminal Acts | December 20, 2016 | October 27, 2016 |
| Negligence, Nuisance, Unjust Enrichment, Federal RICO, Fraud, Civil Conspiracy | December 20, 2013 | October 27, 2013 |
| Ohio Corrupt Practices Act ("Ohio Rico") | December 20, 2012 | October 27, 2012 |

---

[12] *See, e.g.*, *NanoLogix, Inc. v. Novak*, 2015 WL 1400656, at *5 (N.D. Ohio Mar. 26, 2015) ("Notwithstanding plaintiff's labels," unjust enrichment claim was "nothing more and nothing less than [an] untimely malpractice cause[] of action."); *Kunz v. Buckeye Ins. Co.*, 437 N.E. 2d 1194 (Ohio 1982) (*per curiam*) (four-year statute of limitations governed unjust enrichment claim "grounded in tort"); *cf. Wuliger v. Anstaett*, 363 F. Supp. 2d 917, 933 (N.D. Ohio 2005) (applying two-year statute of limitations to "unjust enrichment" claim that arose from sales of securities).

[13] The Original Complaints filed on October 27, 2017 (Cuyahoga) and December 20, 2017 (Summit) named as defendants: Purdue Pharma, L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Janssen Pharmaceuticals, Inc.; Johnson & Johnson; Ortho- McNeil-Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc.; Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Allergan PLC f/k/a Actavis PLC; Allergan Finance LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc. (Cuyahoga); Actavis LLC (Cuyahoga); Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Insys Therapeutics, Inc.; Cardinal Health, Inc.; McKesson Corporation; AmerisourceBergen Drug Corporation.

| Table 2 (First Amended Complaints)[14] | | |
|---|---|---|
| **Claim** | **Summit** | **Cuyahoga** |
| Injury Through Criminal Acts | April 25, 2017 | April 25, 2017 |
| Negligence, Nuisance, Unjust Enrichment, Federal RICO[15], Fraud, Civil Conspiracy | April 25, 2014 | April 25, 2014 |
| Ohio RICO | April 25, 2013 | April 25, 2013 |

| Table 3 (Second Amended Complaints)[16] | | |
|---|---|---|
| **Claim** | **Summit** | **Cuyahoga** |
| Injury Through Criminal Acts | May 18, 2017 | May 18, 2017 |
| Negligence, Nuisance, Unjust Enrichment, Federal RICO, Fraud, Civil Conspiracy | May 18, 2014 | May 18, 2014 |

---

[14] The First Amended Complaints filed on April 25, 2018, named as additional defendants: Noramco, Inc.; Teva Pharmaceutical Industries Ltd.; Allergan Finance LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc. (Summit); Actavis LLC (Summit); Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. (Summit); Mallinckrodt, PLC; Mallinckrodt, LLC; CVS Health Corporation; Rite Aid Corporation; Walgreens Boots Alliance, Inc.; Walgreens Co.; Walmart Inc., f/k/a Wal-Mart Stores, Inc.; H. D. Smith, LLC f/k/a H. D. Smith Wholesale Drug Company, H. D. Smith Holdings, LLC, and H. D. Smith Holding Company (Cuyahoga only).

[15] Plaintiffs do not assert federal or Ohio RICO claims against any of the Pharmacy defendants or any Distributor other than AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation.

[16] The Second Amended Complaints ("SACs") filed on May 18, 2018, named as additional defendants:  Anda, Inc.; Discount Drug Mart, Inc.; HBC Service Company; Henry Schein, Inc.; Henry Schein Medical Systems, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceutical Companies, Inc.; Prescription Supply, Inc.; and SpecGx LLC.  The SACs do not assert Ohio RICO claims against the newly added defendants.

| Table 4 (Third Amended Complaints)[17] | | |
|---|---|---|
| **Claim** | **Summit** | **Cuyahoga** |
| Injury Through Criminal Acts | March 21, 2018 | May 10, 2018 |
| Negligence, Nuisance, Unjust Enrichment, Federal RICO, Fraud, Civil Conspiracy | March 21, 2015 | May 10, 2015 |

**B.      The Applicable Rules Regarding Accrual.**

**Negligence, nuisance, unjust enrichment & civil conspiracy claims**.  In Ohio, a claim typically accrues (and the statute of limitations thus begins to run) "when the injurious act is committed."  *LGR Realty, Inc. v. Frank & London Ins. Agency*, 98 N.E.3d 241, 247 (Ohio 2018).[18]  Typically, a plaintiff will know of his injury when the wrongful act occurs, because they go hand-in-hand.  Under the general rule, however, whether the plaintiff knows of the wrongful conduct or the alleged injury is irrelevant.  *Inv'rs REIT One v. Jacobs*, 546 N.E.2d 206, 210 (Ohio 1989) ("The legislature's express inclusion of a discovery rule for certain torts arising under R.C. 2305.09 … implies the exclusion of other torts arising under the statute, including negligence.").[19]

Ohio law recognizes exceptions when either (i) "an injury does not manifest itself immediately," *LGR Realty*, 98 N.E.3d at 245 (quoting *O'Stricker v. Jim Walter Corp.*, 447

---

[17] The Third Amended Complaints ("TACs"), filed respectively on March 21, 2019 (Summit) and May 21, 2019 (Cuyahoga) named as additional defendants:  Allergan Sales, LLC, Allergan USA, Inc., Warner Chilcott Company, LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. f/k/a Watson Laboratories, Inc.-Salt Lake City, and Actavis Laboratories FL, Inc., f/k/a Watson Laboratories, Inc.-Florida.  The TACs do not assert Ohio RICO claims against the newly added defendants.

[18] *See also Collins v. Sotka*, 692 N.E. 2d 581, 582 (Ohio 1998); *Nat'l Credit Union Admin. Bd. v. Ciuni & Panichi, Inc.*, 2019 WL 188472, at *8 (N.D. Ohio Jan. 11, 2019) ("The Ohio Supreme Court has long recognized that a '[s]tatute of limitations commences to run as soon as the injurious act complained of is perpetrated, although the actual injury is subsequent.'").

[19] *See Thompson v. Citizens Nat'l Bank*, 2016 WL 5076053, at *7 (N.D. Ohio Sept. 20, 2016) ("The discovery rule does not apply … to negligence … claims."); *Drozeck v. Lawyers Title Ins. Corp.*, 749 N.E.2d 775, 782 (Ohio Ct. App. 2001) ("The discovery rule does not apply to unjust enrichment claims.").

N.E.2d 727 at syllabus ¶ 2 (Ohio 1983)), or (ii) "the wrongful conduct complained of is not

presently harmful." *Id*. (quoting *Velotta v. Leo Petronzio Landscaping, Inc.*, 433 N.E.2d 147

(Ohio 1982)).  In those "narrow circumstances," the "cause of action does not accrue until actual

damage occurs." *Id*. at 246–47.  The test is objective:  a claim accrues not when the actual

plaintiff learned of its injury, but when a reasonable plaintiff should have known about it.

*Columbus Bd. of Educ. v. Armstrong World*, 627 N.E. 2d 1033, 1037 (Ohio Ct. App. 1993) ("The

question then becomes when did appellant know or when should appellant have known that its

property was damaged.").[20]  A plaintiff need ***not*** know (1) the full extent of its injury,[21] or

(2) who caused the injury or what legal claims might be brought.[22]

      **Federal & Ohio RICO claims**.  The claims accrue when the plaintiff discovers, or

should have discovered, its injury.  *Rotella*, 528 U.S. at 555 ("[D]iscovery of the injury, not

---

[20] A*ccord Lynch v. Dial Fin. Co*., 656 N.E. 2d 714, 718 (Ohio Ct. App. 1995).  A similarly objective test applies to Plaintiffs' other claims.  *Stewart v. Allen*, 2008 WL 918528, at *3 (Ohio Ct. App. Apr. 7, 2008) (limitations period for nuisance claim begins to run "when it is first discovered, or through the exercise of reasonable diligence it should have been discovered, that there is damage to the property"); *State ex rel. County of Cuyahoga v. Jones Lang Lasalle Great Lakes Co.*, 2017 WL 4177024, at *18, *24 (Ohio Ct. App. Sep. 21, 2017) (applying objective discovery rule; "claim for civil liability for criminal acts is barred by the statute of limitations" based on "the discovery date"); *id.* at *18, *24 (same for civil conspiracy claim); *Tri-State Comput. Exch., Inc. v. Burt*, 2003 WL 21414688, at *3 (Ohio Ct. App. June 20, 2003) (statute of limitations for Ohio RICO claim "begins to run when the plaintiff knew or should have known of the injury underlying his or her cause(s) of action"); *Sims v. Ohio Cas. Ins. Co*., 151 F. App'x 433, 435 (6th Cir. 2005) ("The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a [federal] RICO violation.").

[21] *Zimmie v. Calfee, Halter & Griswold*, 538 N.E. 2d 398, 400, 402 (Ohio 1989) (holding that statute of limitations began to run when the trial court invalidated an antenuptial agreement, "although Zimmie's damages were not completely ascertainable" then, and citing a prior decision in which the court held, "we do not believe that an injured person must be aware of the full extent of the injury before there is a cognizable event"); *see also Electric Power Bd. v. Monsanto Co.*, 879 F.2d 1368, 1377 (6th Cir. 1989) (limitations period begins to run "even if all injuries stemming from the traumatic event have not manifested themselves by the end of the running of the statute of limitations"); *Harner v. Prudential-Bache Sec*., 35 F.3d 565, at *4 (6th Cir. 1994) (table) ("[T]he running of the statute of limitations begins when a plaintiff … has been presented with evidence suggesting the *possibility* of fraud." (emphasis in original)).

[22] *Flowers v. Walker*, 589 N.E.2d 1284, 1287 (Ohio 1992) ("In an auto accident resulting from a blowout, … additional time is not given to (1) discover whether the tire was defective or (2) learn the identity of the manufacturers and sellers of the tire."); *see also Guy v. Lexington-Fayette Urban Cty. Gov't*, 488 Fed. App'x 9, 15 (6th Cir. 2012) (holding time-barred a claim for failure to report sexual abuse because "Berry's abuse is the injury that gives rise to plaintiffs' claims. … Plaintiffs knew they were injured, but they simply did not know that [defendant] might be liable for their injury."); *Harner*, 35 F.3d at 565 ("Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.'" (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 802 (1st Cir. 1987))).

discovery of the other elements of a claim, is what starts the clock.").  The plaintiff need not be aware of the full extent of the alleged injury; rather the statute of limitations begins "when a plaintiff is put on inquiry notice" by "storm warnings." *Isaak v. Trumbull*, 169 F.3d 390, 399 (6th Cir. 1999); *see World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009); *accord Sims v. Ohio Cas. Ins. Co.*, 151 F. App'x 433, 436 (6th Cir. 2005) ("A plaintiff need only be aware of 'storm warnings' but does not need to 'hear[ ] thunder and see [ ] lightning'"); *Ass'n of Commonwealth Claimants v. Moylan*, 71 F.3d 1398, 1403–04 (8th Cir. 1995) (RICO limitations period "begins to run even though the injured party, knowing he has suffered an injury, may not yet know the full extent of his injuries"); *Hofstetter v. Fletcher*, 905 F.2d 897, 904 (6th Cir. 1988) (RICO action accrues when a plaintiff knew or should have known of defendant's fraudulent scheme).  The same is true for the Ohio RICO claims.  *See, e.g.*, *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 278 (Ohio 2006); *Meros v. Dimon*, 2019 WL 1384390, at *5 (S.D. Ohio Mar. 27, 2019) ("A cause of action under [Ohio RICO] accrues when the plaintiff knew or should have known of the injury underlying the claim.").[23]

**Fraud claim**.[24]  A fraud claim accrues when "the fraud is discovered."  Ohio Rev. Code § 2305.09(E); *see Palm Beach Co. v. Dun & Bradstreet, Inc.*, 665 N.E.2d 718, 721 (Ohio Ct. App. 1995) (emphasizing "the objective aspect of the discovery rule" for Ohio fraud claims; "[t]he question is not necessarily when [plaintiff] understood [that a fraud occurred], but when it should have understood").  Discovery means either (1) actual discovery or (2) when "in the exercise of reasonable diligence, the fraud should have been discovered."  *Cundall v. U.S. Bank*, 909 N.E.2d 1244, 1250 (Ohio 2009).  "No more than a reasonable opportunity to discover the

---

[23] "[T]he commission of a separable, new predicate act within a 4-year limitations period permits a plaintiff to recover for the additional damages caused by that act," but "the plaintiff cannot use an independent, new predicate act as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period."  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997).

[24] The Complaints assert fraud claims against only the Manufacturers.

fraud is required to start the period of limitation." *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1237 (6th Cir. 1985). Indeed, the standard to trigger the limitation period "requires only facts sufficient to alert a reasonable person of the ***possibility of fraud***." *Cundall*, 909 N.E.2d at 1250 (emphasis added; internal quotations and citations omitted); *see also Au Rustproofing Ctr., Inc.*, 755 F.2d at 1237 ("[C]onstructive knowledge of facts … is enough to start the statute of limitations running under the discovery rule").

The Sixth Circuit repeatedly has held that news stories and lawsuits about conduct provide constructive knowledge to trigger the limitation period, even if the plaintiff "claims that that 'she did not hear or read' any of the media reports." *Ball v. Union Carbide Corp.*, 385 F.3d 713, 722 (6th Cir. 2004) (citing cases). Ohio law is consistent with this principle. *See, e.g., Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 563-64 (6th Cir. 2005) (applying principle to bar fraud claims under Ohio law); *Hardin v. Reliance Tr. Co.*, No. 1:04 CV 02079, 2006 WL 2850455, at *7 (N.D. Ohio Sept. 29, 2006), *aff'd sub nom. Cline v. Reliance Tr. Co.*, 245 F. App'x 503 (6th Cir. 2007) (applying Ohio law and holding that plaintiff had constructive knowledge of alleged fraud based on previously filed lawsuits, SEC press releases, and other news articles); *Sec. Tr. Co. v. Ford*, 79 N.E. 474, 477 (Ohio 1906) (it is "well established that a public record is constructive notice of what the record may properly contain . . .").[25] Importantly, "[o]nce sufficient indicia of fraud are shown, a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false security to toll the statute." *Zemcik v. LaPine Truck Sales & Equip. Co.,* 706 N.E.2d 860, 866 (Ohio Ct. App. 1998).

---

[25] *See also Loyd v. Huntington Nat. Bank*, No. 1:08CV2301, 2009 WL 1767585, at *10 (N.D. Ohio June 18, 2009) (applying Ohio law and holding that plaintiff had constructive knowledge of alleged fraud based on previously filed lawsuit and past criminal history); *Cain v. Mid-Ohio Secs., Inc.*, 2007-Ohio-3711, ¶ 16 (constructive notice of fraud based on, among other things, SEC litigation releases and court opinions); *Stewart v. Allen*, 2008-Ohio-1645, ¶ 18 (constructive notice of fraud based upon publicly-filed documents that plaintiffs should have been aware of); *NASA Tool Mfg. Corp. v. Cincinnati Milacron, Inc.*, No. CA86-07-044, 1987 WL 16301, at *3 (Ohio Ct. App. Aug. 31, 1987) (constructive notice of fraud based on, among other things, article in the *Wall Street Journal*).

## II.    ALL CLAIMS BASED ON PRE-OCTOBER 27, 2012 CONDUCT ARE TIME-BARRED.

Under Ohio law, Plaintiffs' claims for negligence, nuisance, unjust enrichment, injury through criminal acts, and civil conspiracy accrued at the time of Defendants' alleged misconduct, because the undisputed evidence shows that Plaintiffs either knew or should have known at the time that (1) there was an opioid use and abuse problem in their communities and (2) they were spending money to combat it.  The same undisputed evidence leaves no doubt that Plaintiffs also had inquiry (if not actual) notice of their alleged injuries under the discovery rule applicable to Plaintiffs' federal and Ohio RICO claims.  The evidence also shows that Plaintiffs had at least inquiry notice of the very marketing that forms the basis for their common-law fraud claim against the Manufacturers.  Accordingly, Plaintiffs cannot bring any claims accruing *before* the dates set forth in Tables 1-4 *supra*.  The only timely claims are those, if any, accruing *after* those dates.  *Corbett*, 1996 WL 75721 at *6.

As governmental bodies, Plaintiffs have a comprehensive view of what is happening in their own jurisdictions, and of how events beyond their borders affect their communities. Plaintiffs employ thousands of workers—police officers, firemen, social workers, teachers, doctors, prosecutors, and many others—who are their eyes and ears in the community.  Their knowledge is Plaintiffs' knowledge.  *See Leschorn v. Fitzgerald*, 142 F.3d 434, at *2 (6th Cir. 1998) (Table) (what is "readily apparent to any reasonable government official … may be fairly imputed to the knowledge of [other] officials"); *Jacobs v. Lambda Research, Inc.*, 2014 WL 1264911, at *10 (S.D. Ohio June 16, 2014) ("Information communicated to technical representatives … can be imputed to the Government").  Additionally, Plaintiffs have access to data collected by the state and federal governments that individuals do not have, and they partner with state and federal agencies to study and address problems in their communities.[26]

---

[26] For example, a 2003 federal General Accounting Office Report (the "GAO Report") noted that the DOJ provided a grant to establish prescription drug monitoring programs in Ohio among other states.  A. 26.

Accordingly, a "reasonable person"—in this case, a reasonable Cuyahoga or Summit official—should have known the salient facts about the opioid abuse epidemic before October 27, 2012. As demonstrated in detail below, the undisputed evidence, including the deposition testimony of those very officials, establishes that they did know: (A) the volume of the prescription opioids shipped into their communities), (B) that there was a problem of opioid use and abuse in their communities, (C) the costs they had incurred because of opioid use and abuse, and (D) manufacturers' marketing of opioids.

### A. Plaintiffs Knew the Volume of Prescription Opioids Shipped Into Their Communities.

Plaintiffs assert that the "volume of opioids distributed in Ohio communities," including in Summit and Cuyahoga, was "so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses."  Cuyahoga Original Compl. ("Cuyahoga Compl.") ¶ 653; *accord* Summit Compl. ¶ 690; *see id.* ¶ 1003 ("Defendants … flooded Plaintiffs' communities with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market ….").  But the volume of opioids prescribed, dispensed, and distributed has never been a secret.  Specific information about the volume of prescription opioids distributed to Cuyahoga and Summit has been publicly available since *2003*, and Plaintiffs have been on notice of this alleged "red flag" since then.  The DEA began posting quarterly reports of the volume of prescription opioids on a drug-by-drug basis distributed to each zip code (by first three digits) in the United States.  A. 25.  Based on this publicly-available data, Cuyahoga officials could easily see how much of each medication had been shipped quarterly to the zip code beginning "441," and Summit officials could do the same for the zip code beginning "443."  And from at least *2011*, the Ohio Board of Pharmacy provided Plaintiffs with quarterly statistics on the volume of prescription opioids dispensed in their counties—in the aggregate, per capita, and per patient.

13

Making use of the public data, *The Plain Dealer* in **2011** published the number of opioid doses per capita dispensed in Cuyahoga and Summit.  A. 71.  Plaintiffs indisputably knew about this public data because they authored documents that relied on it.  *E.g.*, A. 121, 126, 144, 148–49, 153.  In March **2012**, the chair of the Cuyahoga County Opiate Task Force circulated to task force members an Ohio Department of Health report that identified "Pain medications (opioids) and multiple drug use [as] the largest contributors to the epidemic" and highlighted DEA's posted data showing that "[f]rom 1997 to 2007, there was a 506 percent increase in the amount of prescription opioid grams per 100,000 population distributed to retail pharmacies in Ohio." A. 120–21.

Shortly thereafter (but still before October 2012), the Summit ADM Board emailed to government and community leaders a slide from the statewide Opiate Summit containing charts and graphs that expressly relied on DEA's ARCOS data and showed the rise in opioid distribution from 1997 to 2007, A. 125–26:



14

**OPIOID DISTRIBUTION IN OHIO, 2010**

| Opioids | 2010 doses in Ohio |
|---|---|
| Hydrocodone (e.g., Vicodan) | 303,268,137 |
| Oxycodone (e.g., OxyContin, Percocet) | 282,936,529 |
| Methadone | 30,908,359 |
| Morphine (e.g., Opana) | 25,902,895 |
| Codeine | 24,838,334 |
| Hydromorphone (e.g., Dilaudid) | 9,739,798 |
| Buprenorphine | 9,285,455 |
| Fentanyl base | 4,457,848 |
| Meperidine (Demerol) | 742,850 |
| **Total** | **692,080,205** |

In 2010, 692 million opioid doses were distributed to retail pharmacies in Ohio.

That's enough to provide 60 opioid doses to every single Ohioan.

- Or the equivalent of:
  - 1.8 million doses per day
  - 79,000 doses per hour
  - 1,316 doses per min.
  - 22 doses per second

Source: DEA, ARCOS Reports, Retail Drug Summary Reports by State, Cumulative Distribution Reports (Report 4) Ohio, 2010 4. US Census Bureau, Ohio population estimates 2010

SUMMIT_001284703

Plaintiffs' own documents thus establish—conclusively—that the volume of opioids not only was well known, but also was an active subject of discussion and inquiry before October 27, 2012.

**B.      Plaintiffs Knew There Was a Problem of Opioid Use and Abuse in Their Communities.**

Plaintiffs also knew before October 27, 2012 that there was an opioid "epidemic" in Summit and Cuyahoga.  The (i) deposition testimony of officials in a position to know proves that, as does (ii) the contemporaneous conduct of state and local officials, and (iii) pervasive references to an "epidemic" by those officials.

**Deposition testimony demonstrates that Plaintiffs knew**.  Beginning in the 1990s, officials in Cuyahoga and Summit (and also Cleveland and Akron) knew first-hand that there was an opioid use and abuse problem:

- Chief of Police, City of Akron—
  - Q:  "And when did that ***prescription opioid epidemic*** begin, in your opinion?"  A:  "I believe that it … started in … in the ***late '90s*** when we started to see a significant number of … reports and other interactions that suggested that."
  - There was "a growing familiarity" within the Akron Police Department about the prescription problem starting "in the ***late 1990s***."  A. 3.

15

- Assistant Prosecutor, Cuyahoga County—

  - Q:  "Were prescription opioids a problem in the ***early '90s***?"  A:  "Absolutely."

  - Q:  "And what kind of problem were they posing in the ***1990s*** in Cuyahoga County?"  A:  "When OxyContin came out, it was—it was like a jailbreak.  It just exploded."

    - Q:  "Would you say that OxyContin then was the drug of choice in the late 1990s in Cuyahoga County?"  A:  "Absolutely."

    - The County Prosecutor's Office had "routine communication" with DEA "diversion directors" "from middle ***'90s*** to the middle ***2000s***" and worked with diversion investigators from the Ohio Board of Pharmacy starting in "***the '90s***."  A. 11.

- Director of Public Health, City of Cleveland—

  - Speaking of her time on the Cleveland City Council (***1997–2005***), "I remember hearing stories of people's houses getting broken into and people going into the bathrooms and looking for drugs in medicine cabinets.  I remember hearing about this countless times.  These were painkillers.  These were pills people were looking for in people's homes.  I went to a lot of meetings and heard a lot of stories of this nature."  A. 10.

- Director, Office of Opioid Safety, MetroHealth—

  - As an emergency physician, observed a problem of opioid overdoses in the ***mid-1990s***. This concern about opioid overdoses "began in ***the beginning of the 2000s*** and the ***mid-1990s.*** It has continued to grow over time."  A. 19.

- Chief Toxicologist, Summit County—

  - "Now, prior to that, when I first started [in] the coroner's office, as I mentioned before, I would see trends.  You know, initially in the ***early 2000s***, hydrocodone, oxycodone, and that lasted for years.  I mean, you see peaks and valleys and spikes.  But typically what all I saw the first 10 years at the coroner's office were prescription meds."  A. 20.

- Ohio High Intensity Drug Trafficking Area Director—

  - Q. "Around what time period would you say those pill mill problems were occurring? … A. Probably sometime ***in the 2000s***, certainly were here when I got here in 2009, until the state shut the pill mills down. ….  A. 23.

- Summit 30(b)(6) Representative—

  - In ***2005***, Summit County was "starting to become very aware that pills were beginning to ***flood*** our community."

  - Acknowledging county's ***2005*** grant application that said, "[I]t is known that legitimate commercial disbursal of prescription pharmaceuticals distributed to

16

pharmacies, hospitals, and practitioners has increased sharply over the past four years, thereby making more of the drugs available to criminal diversion and abuse."

- o "[W]e really saw an uptick in the presence of diverted pills in the *late 2000s*." A. 12.

- Detective, Cleveland Police Department—

- o Q. "Okay. When did you first become aware of trafficking of OxyContin pills? …. Certainly as of *December of 2005*, correct? A. Yes." A. 18.

- Former Injury Prevention Grant coordinator, Cuyahoga County Board of Health—

- o She and others "began working in putting forth some efforts in *2006*" to address the opioid abuse epidemic in Cuyahoga County, mostly through drug take-back events. A. 16.

- Former CEO, Cuyahoga County ADAMHS Board—

- o He was aware that, "as of *February 2007*, people in Ohio and Cuyahoga County were referring to trends of opioid abuse and overdose in the county as an epidemic." A. 9.

- Lieutenant, Cleveland Police Department—

- o Q:  "When do you think you first became aware of there being a significant prescription opioid problem?"  A:  "During my time in the narcotics unit is when I really became aware of more of the prescription opioid problem.  So *2006, 2007, 2008* maybe."  A. 7.

- Sergeant, Cleveland Police Department—

- o Q:  "In your mind, when did the opioid epidemic begin?"  A:  "I'm going to say in the—sometime in the 2000—we started—we started to see a real problem in about *2008, 2009*.  And it got progressively worse." "[W]e started to see a real problem in about *2008, 2009*.  And it got progressively on."  A. 2.

- Administrative Captain, Corrections Division, Summit County Sheriff's Department—

- o In *2008 to 2009*, "[w]e were starting to see pills that were being stolen, started to see more of that …. They would get them from family members.  They would steal them in the course of a—of a burglary, from pharmacies, things were being taken.  A variety of places where people would try to dig up the pills."  A. 4.

- Sanitarian Supervisor, Cuyahoga County Board of Health; former chair, Cuyahoga County Opiate Task Force—

- o Q:  "Can you generally say when you first recall having heard that the worrisome trends that we've talked about earlier today related to abuse of opioids and overdoses might have been driven by the increased prescribing by licensed physicians of prescription opioid medications?"  A:  "*2009* report from the Ohio Department of Health."  A. 6.

- Health Commissioner, Cuyahoga County Board of Health—

17

Q:  "Was there awareness in *2010* that prescription drug abuse and overdose was a public health problem in Cuyahoga County?"  A:  "Yes."  A. 1.

- CEO, Ohio Association of County Behavioral Health Authorities—

  o She agreed that in *2011* "Ohio now recognizes that lives are being lost and budgets are being decimated by heroin and other opiate abuse, related criminality and societal costs" and that "the epidemic of heroin and opiate addiction … was not just limited to one or two counties, it was something affecting the entire state."  A. 24.

- Assistant Health Commissioner, Summit County—

  o Q:  "Was there an opiate epidemic in Summit County in *June of 2012*?"  A:  "That is certainly the term that was being used at that time, and since then."  A. 5.

In short, it was common knowledge long before October 27, 2012, that there was a crisis of opioid misuse and abuse. Asked when it became common knowledge to "cities, towns, counties, states," Plaintiffs' own expert answered, "2004–2005."  A. 21.

**Contemporaneous conduct and statements demonstrate that Plaintiffs knew**.  The contemporaneous conduct of state, county, and city officials echoes this testimony.  As early as *2005*, the Sheriff of Summit County submitted a Justice Assistance Grant Application identifying the "Level of Threat" from "OxyContin, Vicodin, Percocet, Morphine, Methadone, and Fentanyl" prescription opioids as "Very High."  A. 142.  In *2007*, the Ohio Department of Health reported that "unintentional drug poisoning became the leading cause of injury death" in that year, "'driven largely by opioid related overdoses,'" A. 36, and in a *2009* email exchange the Cuyahoga Health Commissioner discussed sharing these statistics with Board of Health members.  A. 96.  Also in *2009*, the Department of Health convened a symposium entitled, "Epidemic of Prescription Drug Overdoses:  A Call to Action," attended by several county representatives,[27] at which the following slide (and more like it) were presented—a slide that again expressly relied on DEA ARCOS data:

---

[27] The future chair of the Cuyahoga Opiate Task Force was listed as an attendee of the Symposium.  A. 100.  The Summit Sheriff was invited to the symposium and received an informational brochure.  A. 97–98.  And an Akron Health Department Project Director urged others to attend so there would be "representation from Summit County."  A. 99.



A. 144.

Summit's Drug Unit reported that "[i]n *2010*, across the State of Ohio, unintentional drug poisoning became the leading cause of injury and death by surpassing motor vehicle crashes and suicide."  A. 49.  That same year, a detective in the Cleveland police department reported to his Commander that "I have seen an explosion in pill related cases in the Narcotics Unit and assist Narcotics Units squads on a regular basis accessing specific medical information and records which are critical to Pharmaceutical related investigations."  A. 147.

In *2011*, the Ohio Substance Abuse Monitoring Network ("OSAMN") reported, based on information gathered from local officials and other local sources in Summit and surrounding counties, that "[p]rescription opioids are highly available in the region.  Participants consistently reported street availability of these drugs as "*very high* … [i.e.,] '10' on a scale of '0' (not available, impossible to get) to '10' (high availability, extremely easy to get."  A. 169 (emphasis in original).[28]  Other prescription opioids were "highly available" as well.  A. 169.  The Cuyahoga Medical Examiner informed officials in various county offices—including the County Council's office, the County Executive's Office, the ADAMHS Board, and the Board of Health—that there had been a "significant increase over the past 3 and 5 years" in heroin deaths.

---

[28] OSAMN reports dating back to January 2000 (and available publicly through the OSAMN website) show the diversion of prescription opioids in Cuyahoga and Summit Counties.

A. 116.  His report showed a tripling of heroin deaths between 2007 and 2011 and mapped the overdose deaths by each County Council member's voting district.  A. 127–35.

In May *2012*, the DEA announced the creation of a Cleveland-based investigative unit, the "DEA Tactical Diversion Squad," to investigate and prosecute cases of prescription drug abuse.  Plaintiffs knew about this squad because in addition to DEA and FBI agents, it included police officers from **Cuyahoga** and **Summit**.  A. 89.

**Pervasive reference to an "epidemic" demonstrates that Plaintiffs knew.**  Not surprisingly, therefore, officials at every level of government were talking about an "epidemic" of opioid abuse before October 27, 2012.  In *2010*, Cuyahoga formed the Cuyahoga County Opiate Task Force, officially named the "Prescription for Prevention: Stop the *Epidemic*."  A. 6, 110, 145.  That year, the Chair of the Task Force circulated to Cleveland and Cuyahoga County officials an Ohio Department of Health report examining at length the "*epidemic*" of prescription drug abuse in Ohio.  A. 113, *see* A. 36.  Also in *2010*, then-Governor Strickland created the Ohio Prescription Drug Abuse Task Force because "Ohio's prescription drug abuse problem is an *epidemic*," A. 33, and the Ohio Department of Health wrote to the CEO of Cuyahoga County's ADAMHS Board about steps "to combat the *epidemic* of prescription drug overdose and abuse in our state."  A. 102.  In *2011*: (1) the Ohio Legislature passed a bill to regulate pain management clinics in "response to the *epidemic* of prescription drug abuse identified in Ohio," A. 38; (2) Ohio joined West Virginia and Kentucky to form the Interstate Opiate Task Force "to fight prescription-drug abuse" in the region, A. 72 & 117; and (3) Governor Kasich established the Governor's Cabinet Opiate Action Team.  A. 51.  Orman Hall, the leader of that Action Team and Director of the Ohio Department of Alcohol and Drug Addiction Services, explained in public comments made in *2011* that "[o]piate use in Ohio has mushroomed into *a crisis of serious proportions* with deadly consequences."  A. 73.  In May *2012* the Ohio Association of

Behavioral Health Authorities hosted a state-wide Opiate Summit, "drawing more than 1,000 addiction, criminal justice, policy and medical professionals" from across the state.  A. 51.  The Opiate Summit's host was the CEO of the Cuyahoga County ADAMHS Board, who told attendees about "[t]he opiate *epidemic*" in Cuyahoga County.  A. 141.

>**Media demonstrates that Plaintiffs reasonably would have known.**

Cuyahoga and Summit officials held positions that gave them special insight into the opioid abuse crisis and imposed a special responsibility to be alert to it.  But, because of press coverage, even a reasonable person would have known about the opioid abuse crisis before October 27, 2012.  As early as *2001*, *Newsweek* and *The New York Times Magazine* featured cover stories on the abuse of OxyContin and other prescription opioids.  A. 53–54.  In Ohio, the *Akron Beacon Journal* in *2011* editorialized under the headline, "Prescriptions for an Epidemic; Ohio Has a Mounting Drug Problem," citing statistics about the increase in drug overdoses and the "epidemic" of prescription opioids being prescribed and dispensed.  A. 70.  *The Plain Dealer* published a front-page story that drew attention to the work of then-Governor Strickland's Prescription Abuse Task Force and  reported that "[n]early every community in Cuyahoga County has been touched by a death from an accidental overdose of opiates—prescription painkillers or … heroin."  A. 71.  The article also spoke of these products "*flood*[***ing***] ***the market***," and noted that "Cuyahoga County alone sees more opiate overdose deaths in one year—about 100—than were seen statewide a decade ago."  A. 71.  Less than a year later (but again, still before October 2012), referring to the alarming "10-fold increase in the number of opioids dispensed during the past 15 years," the *Akron Beacon Journal* in *2012* called the problem a "drug epidemic."  A. 87.

*   *   *

Thus, before October 2012, Plaintiffs knew—and, at a minimum, had constructive knowledge—that there was an opioid use and abuse problem in their communities.  Talk about it

21

was everywhere.  Cuyahoga and Summit officials themselves knew about and cited data regarding the issue, and participated in boards, task forces, and investigative units created to address the crisis—as demonstrated in Plaintiffs' own testimony and documents.

### C. Plaintiffs Knew the Costs They Had Incurred Because of Opioid Use and Abuse.

Plaintiffs also knew of their alleged injuries before October 27, 2012.  To say that they did not would defy common sense.  They claim 13 categories of financial loss, including lost tax revenue, diminished property values, costs for increased burdens on the child welfare, judicial, and public safety systems,[29] as well as "excessive costs related to diagnosis, treatment and cure of addiction, … massive costs of these illnesses and conditions [, and] by having to provide necessary resources for care, treatment facilities and law enforcement services."[30]  If Plaintiffs incurred these costs, they knew they were doing so.  If, as they contend, they spent more for opioid-related county services, then Plaintiffs knew they were "writing the check," and they knew why they were writing it.

The record evidence demonstrates that Plaintiffs incurred additional costs for opioid-related services and knew that they were well before October 27, 2012:

- As Cuyahoga's 30(b)(6) representative admitted, "[t]he county recognized that the opiate epidemic had an impact on [its] systems and budgets beginning in *2006*."  A. 14.

- In *2009*, the Summit ADM Board was seeing "consistent growth for requests for Opiate treatment."  A. 101.

- In *2010*, the Ohio Prescription Drug Abuse Task Force reported that opioid misuse "contributes to increased demand on many community services such as hospitals, medical professionals, courts, children's services, treatment centers and law enforcement."  The report identified Cuyahoga as one of the five counties hardest hit and recommended that the Ohio Department of Health's "Prescription for Prevention: Stop the Epidemic" campaign direct special funds to the County.  A. 35.

---

[29] Summit Compl. ¶¶ 17, 19, 948.

[30] Cuyahoga Compl. ¶ 816; *id. ¶* 61.

- In *2011*, the CEO of the Cuyahoga ADAMHS Board requested $25 million in additional funding from the County Council due in significant part to increased demand for opiate-related services.  A. 150.

Newspapers also reported on these costs.  The *Akron Beacon Journal* reported in *2008* that "[i]t used to be that 75 percent of clients at Oriana House's A.D.M. Crisis Center checked in for alcohol abuse, but now 50 percent are being treated for opiates, which include morphine, heroin and codeine."  A. 62.  And *The Plain Dealer* reported in *2011* that a local drug and alcohol treatment center, citing "an epidemic in alcohol and prescription drug abuse," "plead[ed] for money" at a Cuyahoga County Council budget meeting.  A. 74.

In short, the undisputed record demonstrates that Plaintiffs knew about their alleged injuries before October 27, 2012, because they knew about their opioid-related expenditures.  It does not matter whether they knew the full extent of their injuries or Defendants' alleged role in causing them.  *See supra* nn.22-24 and accompanying text.

### D.     Plaintiffs Knew About Manufacturers' Marketing of Opioids.

Plaintiffs did not just know before October 2012 just that there was an opioid abuse crisis in Ohio and that they were incurring opioid-related expenditures.  They also "inarguably knew" about Manufacturers' "marketing practices" (ECF No.  1203, at 4), as well as allegations that the marketing of opioids supposedly contributed to this "epidemic" in Ohio.

In 2010, Ohio's governor convened the Ohio Prescription Drug Abuse Task Force ("Ohio Task Force") to address Ohio's "prescription drug abuse epidemic."  A. 33.   The Ohio Task Force published a final report ("Final Report") on October 1, 2010.  A. 35.  Under the question "**HOW DID THIS BECOME AN EPIDEMIC?**," the Final Report stated:

> Changing medical and advertising practices have contributed to widespread use of prescription drugs across all levels of the population, thereby increasing the scope of abuse.  Societal and medical trends that led to this problem include:  changes in prescribing practices for pain medication, ***changes in the marketing of medications***, overmedication, increased use of prescription opioids, self-medication, improper disposal of excess medications, and widespread diversion.

*Id.* at 21 (emphasis added).  It then included the following chart:

23



Under the heading "<u>Aggressive Marketing of Opioids by Pharmaceutical Companies</u>," the Final Report stated:  "At the same time as these clinical and regulatory changes in the treatment of pain were made, the introduction of new, extended-release prescription opioids … and ***overly aggressive marketing strategies by pharmaceutical companies to prescribers*** contributed to the growing use of prescription opioids throughout Ohio."  *Id.*  The Task Force also identified "Direct-to-Consumer Marketing" as another factor.  *Id.*  Plaintiffs knew about and discussed the Final Report when it was published in October 2010.  A. 104–09, 111–12, 146.

In addition, the Ohio Department of Health published another document in October 2010 entitled "The Burden of Poisoning in Ohio:  1999–2008."  A. 36.  This report (the "DOH Report") also identified the alleged causes of the opioid abuse "epidemic" in Ohio, including "aggressive marketing."  A. 36.  The DOH Report asserted that "many patients may be using medications unnecessarily and/or are overmedicated," *id.* at 32, and it stressed that the "overly aggressive marketing of new extended release opioids created an environment ripe for increased opioid prescribing."  *Id.*  The DOH Report stated that one way to address the crisis was to

24

"promote collaborative efforts … to enforce drug fraud statutes" and to "promote the coordination of investigations of fraud" committed in Ohio.  *Id.* at 37–38.  Officials in Cuyahoga and Summit County read this document, too, when it was published.  A. 113–14.  Given these undisputed facts, Plaintiffs had actual (and certainly constructive) knowledge of any alleged false marketing by Manufacturers.

*       *       *

Because Plaintiffs had contemporaneous knowledge (actual or at least constructive) of the opioid abuse crisis and the financial burden it created, Plaintiffs' claims (other than the common law fraud claim) accrued at the time of the wrongful acts that allegedly caused those injuries (or, at the latest, when the injuries occurred).  And as for Plaintiffs' common law fraud claim against Manufacturers, Plaintiffs had knowledge (actual or at least constructive) of any alleged improper marketing.  As a result, the statutes of limitations applicable to each of Plaintiffs' causes of action—at the very least—bar claims that accrued before the dates in Tables 1-4, *supra*.

## III.    PLAINTIFFS KNEW OR SHOULD HAVE KNOWN BEFORE OCTOBER 27, 2012, ABOUT *DISTRIBUTORS'* ROLE IN THE SUPPLY CHAIN AND THEIR ALLEGED MISCONDUCT.

Distributors' allegedly "wrongful acts" consist of failing to develop adequate suspicious-order monitoring systems, such that they failed to flag and halt shipment of suspicious pharmacy orders.  Plaintiffs contend that these wrongful acts resulted in supplying more opioids than were medically necessary.[31]  It is irrelevant under established law, however, whether Plaintiffs knew Distributors' alleged role in causing their harm.  The running of the statute does not await a plaintiff's discovery of who is legally responsible for his injury.[32]  The statutes of limitations

---

[31] *See* Summit Compl. ¶¶ 986, 1012, 1046; Cuyahoga Compl. ¶¶ 1027, 1053–54, 1089.

[32] *See, e.g., Flowers v. Walker*, 589 N.E. 2d 1284, 1287 (Ohio 1992) ("In an auto accident resulting from a blowout, … additional time is not given to (1) discover whether the tire was defective or (2) learn the identity of the manufacturers and sellers of the tire."); *Rotella*, 528 U.S. at 555 ("[D]iscovery of the injury, not discovery of the

began to run (at the latest) when Plaintiffs knew they were experiencing increased costs as a result of opioid abuse—whether or not they knew or should have known that McKesson, ABDC, Cardinal Health, or one of scores of other licensed distributors had allegedly contributed to the crisis.

Yet, the undisputed factual record demonstrates that Plaintiffs did know (or should have known) before October 27, 2012, that Distributors had supplied the "sheer volume" of prescription opioids that Plaintiffs claim was itself a "red flag" of diversion and that Distributors had been accused of failing to report and halt shipment of suspicious pharmacy orders.

A.     **What Plaintiffs Knew or Should Have Known About Distributors' Role.**

It is common knowledge that prescription medications (and controlled substances, in particular) are strictly regulated.  Plaintiffs therefore knew or should have known that wholesale distributors such as ABDC, Cardinal Health, and McKesson were licensed by DEA and the Ohio Board of Pharmacy to deliver controlled substances, including opioids, to pharmacies and other retailers in Ohio.  As shown above, Plaintiffs knew their communities were "flooded" with prescription opioids.  Once Plaintiffs knew that, one of the first steps in any reasonable inquiry would have been to ask who supplies local pharmacies and what regulations govern the supply of the medications.  That inquiry, as the Cuyahoga and Summit Complaints reflect, leads directly to the discovery that wholesale distributors are part of the "closed system of distribution" for controlled substances, which requires them to ensure the physical security of the drugs, to report to DEA each receipt and shipment of the medications as they are moved from manufacturer to warehouse to retail pharmacy, and to report "suspicious" orders to DEA.  *See* 21 C.F.R. §

---

other elements of a [RICO] claim, is what starts the clock."); *see also Guy v. Lexington-Fayette Urban County Gov't*, 488 Fed. App'x 9, 15 (6th Cir. 2012) (claim for failure to report sexual abuse was time-barred because "abuse is the injury that gives rise to plaintiffs' claims… .  Plaintiffs knew they were injured, but they simply did not know that [defendant] might be liable for their injury.").

1301.74.[33]  Plaintiffs also knew or should have known that McKesson, Cardinal Health, and

ABDC were large wholesale distributors, with distribution centers located in the State.

**B.      What Plaintiffs Knew or Should Have Known About the Volume of Pills Shipped to the Counties.**

Plaintiffs allege that the "***sheer volume***" of opioids shipped to each County was sufficient

to establish that Distributors, individually and collectively, were negligent:

- "[P]ublically available information confirms that Distributor[s] … funneled ***far more opioids*** into Summit County than could have been expected to serve legitimate medical use, and ignored other red flags of suspicious orders."[34]

- "The ***sheer volume*** of the increase in opioid pain medications … being distributed to retailers should have put the Defendants on notice to investigate and report such orders."[35]

- "The ***sheer volume*** of prescription opioids flooding out the doors of the Defendants and into … Cuyahoga County shocks the conscience and required each Defendant to take appropriate action, such as investigating and reporting the orders as suspicious."[36]

According to Plaintiffs, there was no innocent explanation for that volume:  it was

"facially suspicious" and a "red flag."  But, as explained in Part II.A, Plaintiffs had access to and

relied on the publicly available data showing the exact number of pills shipped into their

jurisdictions.  Therefore, by Plaintiffs' own logic, they had inquiry notice of Distributors' alleged

wrongdoing—shipping "too many" opioid pills to Cuyahoga and Summit—before October 27,

2012.  *See, e.g.*, *Bd. of Educ. of the Loveland City Sch. Dist. v. Bd. of Trs.* 111 N.E.3d 883, 844–

45 (Ohio Ct. App. 2018) ("[N]o more than a reasonable opportunity to discover the injurious

conduct is required to start the running of the statute of limitations.").

---

[33] Summit Compl. ¶ 510; Cuyahoga Compl. ¶¶ 648–49; *see* Cuyahoga County Supp. Resp. to Distributors Defendants' Interrogatory No. 3 at pg. 6–7 (Dec. 28, 2018); Summit County Supp. Resp. to Distributors Defendants' Interrogatory No. 3 pg. at 6–7 (Dec. 21, 2018).

[34] Summit Compl. ¶ 229

[35] Cuyahoga Compl. ¶ 726

[36] Cuyahoga Compl. ¶ 848

### C.    What Plaintiffs Knew or Should Have Known About DEA and Ohio Enforcement Actions Against Distributors.

Plaintiffs allege that "DEA issu[ed] final decisions against distributors in 178 registrant actions between 2008 and 2012."[37]  Final decisions like these, issued by the DEA Administrator, are published in the Federal Register.[38]  DEA gave public testimony about them before Congress.[39]  Among the DEA enforcement actions were actions commenced against Cardinal Health in November *2007*, December *2007*, January *2008*, September *2008*, and February *2012*.[40]  McKesson in May *2008* agreed to pay over $13 million in civil penalties to resolve allegations that it failed to report suspicious sales of opioids.  News of that settlement was written up by wire services and published in newspapers across the country, A. 65 & 66, as were a 2012 DEA enforcement action against Cardinal Health for alleged deficiencies in the suspicious order monitoring program at its Lakeland, Florida facility, A. 1, 85, & 90, and other DEA enforcement actions related to the distribution of controlled substances, A. 78, 80–84, 86, 92–93, & 95.

The Ohio press put a spotlight on federal and state enforcement actions against Distributors.  For example, the *Columbus Dispatch* reported in October *2008* that federal and state authorities had "ensnared Ohio's biggest company by revenue, Dublin-based Cardinal Health," and "shut down three of Cardinal Health's 24 U.S. warehouses for … not notifying authorities" of suspicious orders.  A. 64.  The *Dispatch* reported that "dangerous drugs" such as hydrocodone were "flooding the market," and that the federal government had "begun to scrutinize the entire supply chain," looking not only into Cardinal Health but also "the nation's other big drug wholesalers, which move drugs from the manufacturer to the pharmacy."  A. 64.

---

[37] Summit Compl. ¶ 739; *see* Cuyahoga Compl. ¶ 566.

[38] *See* 21 C.F.R. §§ 1301.46, 1316.67; A. 11.

[39] A. 48.

[40]  Summit Compl. ¶ 739.

28

The article noted that "[t]he 'Big Three'" pharmaceutical wholesalers—"Cardinal Health[,] …

AmerisourceBergen Co. and McKesson"—"sell 95 percent of the products purchased by

pharmacies from wholesalers," and that the three distributors "have been pinched [by DEA] for

lack of oversight when customers, especially small pharmacies, suddenly began ordering

controlled substances at much higher rates."  A. 64.  The article also tied the increased flow of

opioids into Ohio to increases in addiction-treatment costs and a "spike in prescription-drug-

abuse-related" arrests.  A. 64.  Cuyahoga was aware of this reporting because the CEO of its

ADAMHS Board forwarded to his colleagues the report that announced the DEA's allegations

that "Cardinal knew or should have known that they were inappropriately filling prescriptions

issued by DEA-licensed physicians for non-medical reasons."  A. 118–19.

 This pre-October 2012 reporting told Plaintiffs everything they needed to know to file

their complaints.  It (i) identified Cardinal Health, ABDC and McKesson as the primary

distributors of opioids, (ii) characterized their distribution as "flood[ing]" Ohio communities

with prescription opioids, and (iii) described the regulatory actions that accused distributors of

"fail[ing] to conduct due diligence … and fail[ing] to report suspicious orders to DEA."  *See

State ex rel. County of Cuyahoga v. Jones Lang Lasalle Great Lakes Co.*, 2017 WL 4177024, at

*18–19 (Ohio Ct. App. Sept. 21, 2017) (local newspaper articles and linked copy of search

warrant established on summary judgment "when the County, through reasonable diligence,

should have discovered the possible causes of action"); *Loyd v. Huntington Nat'l Bank*, 2009 WL

1767585, at *10 & n. 24 (N.D. Ohio Jun. 18, 2009) (fraud claim barred where prior lawsuit of

which plaintiff's counsel had knowledge was part of public information that triggered the statute

of limitations); *Hardin v. Reliance Trust Co*., 2006 WL 2850455, at *7–8 (N.D. Ohio Sept. 29,

2006), *aff'd sub nom. Cline v. Reliance Trust Co*., 245 F. App'x 503 (6th Cir. 2007) (lawsuits

and other public records can be sufficient to put investors on inquiry notice); *see also supra* n.24.

**D.     What Plaintiffs Knew or Should Have Known About West Virginia's Lawsuits Against Distributors.**

In August 2011, Ohio joined West Virginia and Kentucky to form the Interstate Opiate Task Force "to fight prescription-drug abuse" in the region.  A. 72 & 118.  Less than a year later, in June 2012, the West Virginia Attorney General sued fourteen distributors, including ABDC and Cardinal Health, alleging that they had flooded that state with prescription opioids and failed to report suspicious orders—precisely the same allegations Plaintiffs make here.  A. 94.  The Attorney General's complaint prominently cited the allegations made in a pending case involving DEA enforcement action against Cardinal Health (the same case about which the *Columbus Dispatch* reported in March 2012), and quoted the judge as saying that companies "have an obligation to police themselves … and to be proactive in assessing whether diversion … is taking place."  A. 85.  At the time, the West Virginia lawsuit received substantial attention in the national press.  A. 94–95.  The fact that West Virginia, with whom Ohio authorities were working closely to combat opioid abuse, sued 14 distributors in 2012 indicates that Plaintiffs too "should have discovered the purported basis for their claims upon a reasonably diligent inquiry." *Hardin*, 2006 WL 2850455, at *7–8; *see also Loyd*, 2009 WL 1767585 at *10 & n.24 (existence of earlier-filed lawsuit that "brought claims nearly identical to those raised in this action" shows "that information sufficient to support the Plaintiffs' claims must have been available prior to [the limitations period]").  The 14 lawsuits "were matters of public record available to the [Plaintiffs]," and because "the inquiry notice standard is an objective standard," Plaintiffs could (and should) have discovered the other lawsuits and what claims could be brought against Distributors.  *Hardin*, 2006 WL 2850455 at *9.  But apart from whether Plaintiffs should have discovered the 14 lawsuits, the fact that the West Virginia Attorney General had sued Distributors in 2012 indicated that Cuyahoga and Summit "should have discovered the purported

basis for their claims upon a reasonably diligent inquiry" long before they filed these two lawsuits.  *Id*.

*   *   *

In sum, before October 27, 2012, Plaintiffs had at least inquiry notice of the key facts necessary to assert their claims:  that Distributors (i) were responsible for shipping the "flood" of opioids into Ohio, and (ii) had been accused by the federal and state regulators of failing to conduct sufficient due diligence and report "suspicious" opioid orders.  Information about the volume of pills distributed to Cuyahoga and Summit, about Distributors' role in supplying the pills, about Distributors' alleged regulatory violations, and about lawsuits making the very same claims asserted by Plaintiffs all has long been in the public domain and was readily knowable by a reasonably diligent local government incurring expenses as a result of an opioid crisis.[41]

MDL plaintiffs' counsel has effectively admitted as much, taking the position that "everything since January 1, 1995 is relevant to Plaintiffs' theories of liability" because, among other reasons:

- "As early as August 21, 2001, Congress was investigating a disturbing trend in prescription opiate diversion";

- "On June 14, 2004, Congress held a hearing before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs, United States Senate, One Hundred Eighth Congress, second session, entitled BUYER BEWARE : the danger of purchasing pharmaceuticals over the Internet," which highlighted "the complexities and the vulnerability of the distribution chain and the potential for exploitation or abuse";

- "On October 2, 2006, the DEA fined McKesson $34 million for shipping suspicious orders to rogue pharmacies"; and

- "On September 30, 2008, the DEA and Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement related to the

---

[41] *See, e.g.*, *Loyd*, 2009 WL 1767585 at *10 & n.24 (fraud claim barred, where prior lawsuit, of which plaintiff's counsel had knowledge, was part of public information that triggered the statute of limitations); *Hardin*, 2006 WL 2850455 at *7–8 (lawsuits and other public records can be sufficient to put investors on inquiry notice); *cf. Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (prior lawsuit did not trigger inquiry notice because it "received no publicity whatever").

31

allegations that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities."  A. 170.

If, as Plaintiffs contend, these publicly available facts are "relevant" to their claims against Distributors, then Plaintiffs plainly knew of them—or at least should have known them—by no later than 2008.

## IV. PLAINTIFFS KNEW OR SHOULD HAVE KNOWN BEFORE OCTOBER 27, 2012, ABOUT *MANUFACTURERS*' ROLE IN THE SUPPLY CHAIN AND THEIR ALLEGED MISCONDUCT.

Manufacturers' allegedly "wrongful acts" consist of:  (1) failing to report and halt suspicious opioid orders (made by their customers' customers); and (2) falsely marketing their opioid medications in ways that minimized their risks and overstated their benefits.[42]  Plaintiffs contend that these wrongful acts resulted in more opioid prescriptions and shipments than were medically necessary, which contributed to the opioid abuse crisis in Plaintiffs' counties.[43]

As explained in Part II, the undisputed record demonstrates that Plaintiffs knew—or should have known—before October 27, 2012 of the large volumes of prescription opioids being prescribed, dispensed, and distributed within their jurisdictions; the opioid abuse crisis in Plaintiffs' communities; the alleged role of marketing in opioid prescribing and abuse; and the alleged increased costs incurred by county governments to address the crisis.  These facts, on their own, bar Plaintiffs' claims, because they show that Plaintiffs knew about their alleged injuries, and, with respect to the common law fraud claim, were on inquiry notice about any alleged role that opioid marketing played in causing their injuries, well before October 2012.[44]

---

[42] *See, e.g.*, Summit Third Amended Compl. ¶¶ 9–21; Cuyahoga Third Amended Compl. ¶¶ 9–20.

[43] *See, e.g.*, Summit Third Amended Compl. ¶¶ 9–21; Cuyahoga Third Amended Compl. ¶¶ 9–20.

[44] *See, e.g.*, *Flowers*, 589 N.E. 2d at 1287 (granting summary judgment and recognizing in tort cases that "additional time is not given to (1) discover whether the tire was defective or (2) learn the identity of the manufacturers and sellers of the tire."); *Rotella*, 528 U.S. at 552 (for federal RICO claims, "[d]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."); *Cundall*, 909 N.E.2d at 1250 (statute of limitations for fraud claim under Ohio "requires only facts sufficient to alert a reasonable person of the possibility of fraud").

The undisputed factual record demonstrates much more, too.  Plaintiffs also knew—or should have known—before October 27, 2012 of the **specific alleged conduct** by Manufacturers forming the very basis for their claims:  allegations that Manufacturers supposedly failed to report and halt suspicious orders and falsely marketed their opioid medications across the country, including in Ohio.  Despite this knowledge (actual and constructive), Plaintiffs deferred bringing any claims against Manufacturers until October 27, 2017 (Cuyahoga) and December 20, 2017 (Summit).  Because the longest limitations period for Plaintiffs' claims is five years, Plaintiffs may only seek recovery for any claims that accrued—at the earliest—**on or after October 27, 2012**.

### A. Plaintiffs Had Knowledge of Any Alleged Failure To Report and Halt Suspicious Orders by Manufacturers Long Before October 2012.

Plaintiffs knew their communities were "flooded" with prescription opioids and that there was an opioid abuse crisis long before 2012.  *See* Part II.  Plaintiffs also had constructive notice of DEA and Ohio enforcement actions against distributors as early as 2007.  *See* Part III.B.  Once Plaintiffs knew that, one of the first steps in any reasonable inquiry would have been to ask who manufactured the prescription opioids that were allegedly being oversupplied to County residents.  That inquiry, as the Complaints reflect, would have immediately revealed who manufactured particular medicines—which is no secret and is available from government websites, A. 52, manufacturer websites, A. 164–67, and Plaintiffs' **own claims data** showing opioid prescriptions for which Plaintiffs reimbursed (and continue to reimburse) their employees. A. 13.  That inquiry also would have revealed that Manufacturers are among the few entities in the highly regulated system for producing controlled substances—overseen by the DEA—with a license to manufacture opioids.[45]

---

[45] Summit Third Amended Compl. ¶¶ 41–100; Cuyahoga Third Amended Compl. ¶¶ 36–94.

According to Plaintiffs, there was no innocent explanation for the volume of Manufacturers' opioids that were being shipped to the counties: they were facially "suspicious" and a "red flag."[46] As described in Part III.A, Plaintiffs had access to and relied on publicly available data showing the exact type and number of pills shipped into their jurisdictions. At a minimum, therefore, Plaintiffs had inquiry notice that Manufacturers were responsible for manufacturing and allegedly failing to report the "sheer volume" of opioid pills that were being shipped to Cuyahoga and Summit counties—long before October 27, 2012. As a result, Plaintiffs' claims based upon the alleged failure to report and halt suspicious orders of opioid medicines prior to at least October 27, 2012 are time-barred.

### B. Plaintiffs Had Constructive Knowledge of Any Alleged False Marketing by Manufacturers Long Before October 2012.

This Court previously held that, based upon their allegations alone, Plaintiffs "inarguably knew about Defendants' marketing practices" since 2007.[47] The undisputed evidence confirms that Plaintiffs had notice of any alleged false marketing by the Manufacturers—and of any purported role such marketing had with respect to their injuries—well before October 2012 because: (a) the branded and unbranded marketing took place publicly; (b) the public studies on which Plaintiffs base their claims were available before October 2012; (c) Plaintiffs were or should have been aware of government and private actions against Manufacturers based upon the marketing of opioids dating back to 2001; (d) the Ohio Attorney General put Plaintiffs on notice of the alleged importance of opioid-related marketing as of 2007; and (e) Plaintiffs were aware by 2010 that the State of Ohio blamed the opioid "epidemic," in part, upon improper marketing by manufacturers. Given these undisputed facts, all of Plaintiffs' false marketing claims are time-barred to the extent they rely upon conduct before October 2012.

---

[46] Summit Compl. ¶¶ 555–57; Cuyahoga Compl. ¶¶ 538–40

[47] ECF No. 1203, at 4.

### *Plaintiffs Concede That The Alleged Improper Marketing Took Place Publicly.*

Plaintiffs allege that Manufacturer Defendants made false statements through detailing visits to prescribers and through branded promotional materials.[48]  Plaintiffs concede that neither form of marketing was concealed from the public.  Data regarding detailing visits by sales representatives was "publicly available."[49]  And Plaintiffs acknowledge that Manufacturers' branded promotional materials were "posted online" and "were available to … physicians nationwide."  For example, Plaintiffs' complaints allege the following:[50]

- Alleged misrepresentations on "Endo's website" were available online until *April 2012*.[51]

- The website *Let's Talk Pain* "carried Janssen's trademark" and was available online as of at least *August 2009*.[52]

- Purdue used a "*1996* press release" to communicate alleged misrepresentations.[53]

- Cephalon received a public letter from the FDA in *2009* regarding a public Internet advertisement that Plaintiffs describe as "misleading."[54]

Plaintiffs also allege that Manufacturers Defendants are responsible for the statements of various third-party physicians and trade groups.  But, as explained in more detail in Part V, that sponsorship was not concealed either—it was available publicly, including on websites (A. 160), through annual reports (A.159, at 18–21), in news articles (A. 61, 75–76, 79–80), and in the very documents that Plaintiffs challenge as supposedly false and misleading.  *See, e.g.,* A. 156 at 130.e ("List of Panel Members and Conflict of Interest Statements"); A. 168 at 1 ("Supporters").

---

[48] Summit Third Amended Compl. ¶¶ 437–38, 447–56; Cuyahoga Third Amended Compl. ¶¶ 425–26, 435–44.

[49] Summit Third Amended Compl. ¶ 674 (making allegations about detailing visits based upon "publicly available data"); Summit Second Amended Compl. ¶ 673 (same); Summit Amended Compl. ¶ 654 (same); Summit Compl. ¶ 197 (same).

[50] Summit Third Amended Compl. ¶ 375; Cuyahoga Third Amended Compl. ¶ 363.

[51] Summit Third Amended Compl. ¶ 199; Cuyahoga Third Amended Compl. ¶ 187.

[52] Summit Third Amended Compl. ¶ 207; Cuyahoga Third Amended Compl. ¶ 195.

[53] Summit Third Amended Compl. ¶ 185; Cuyahoga Third Amended Compl. ¶ 173.

[54] Summit Third Amended Compl. ¶ 790; Cuyahoga Third Amended Compl. ¶ 836.

At the latest, Plaintiffs should have known of any alleged financial ties by May 2012, when the Senate Finance Committee (the "Finance Committee") launched a well-publicized investigation into the connections between certain Manufacturers in this case and medical groups and physicians.  A. 40, 88.  The Finance Committee sent public letters to many of the manufacturers and third parties at issue here.  A. 41 (Endo); A. 42 (Johnson and Johnson); A. 43 (Purdue); A. 44 (American Academy of Pain Medicine); A. 45 (American Pain Foundation); A. 46 (Federation of State Medical Boards); A. 47 (American Pain Society).  These letters noted that recent "reporting … revealed extensive ties between companies that manufacture and market opioids and non-profit organizations."  A. 41–47.

Further, any alleged misstatements by such third parties were made public well before October 2012, such as through CMEs, speaker programs, and guidelines.[55]  At a minimum, Plaintiffs should have discovered any alleged fraud merely by comparing those public statements to the FDA-approved labels for the opioid medicines at issue, which have always disclosed their risks and indications.[56]  For this reason alone, Plaintiffs' false marketing claims are time-barred.

*The Studies On Which Plaintiffs Base Their Claims Were Available Before October 2012*.  Well before 2012, Plaintiffs knew or should have known of the very basis for their false marketing theory—the alleged lack of evidence showing that opioids are effective for the treatment of long-term chronic pain.  Plaintiffs' allegations identify several publicly available studies and FDA letters before 2010 addressing this very issue.[57]  Plaintiffs' experts also rely

---

[55] Summit Third Amended Compl. ¶¶ 217, 232, 242, 288, 360, 366, 465; Cuyahoga Third Amended Compl. ¶¶ 205, 220, 230, 276, 348, 354, 453.

[56] Summit Third Amended Compl. ¶ 344 (alleging that statements attributable to Manufacturers are "contrary to the Marketing Defendants' product labels).

[57] *See* Summit Third Amended Compl. p. 27 n. 55 (noting that "[t]he FDA, for years, has made clear through warning letters to manufacturers the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life," and citing letters from the FDA to opioid manufacturers dated ***Mar. 24, 2008*** and ***Feb. 18, 2010***); *id* ¶ 277 (alleging that "substantial evidence exists demonstrating that opioid drugs are ineffective for the treatment of chronic pain" and citing to a "***2006*** study-of-studies" in support for that proposition")

upon publicly available studies and articles dating back to at least 2003 that purportedly support their view that opioids rarely if ever should be used for long-term chronic pain, including the following:

- The *2003* GAO Report, which stated that "the claim … that opioid analgesics cause addiction in less than one percent of patients is … unsubstantiated." A. 162 at 77 (citing A. 26).

- A *2008* Fishbain study, which found that "14 of 59 clinic patients (24%) taking opioids for long-term met criteria for 'narcotics addiction.'" *Id.* at 65 (citing A. 154).

- A *2008* Saper study for the proposition that a "headache is another common painful complaint that is unresponsive to long-term opioid therapy." A. 163 at 47 (citing A. 155).

- The *2009 Clinical Guidelines For The Use Of Chronic Opioid Therapy In Chronic Noncancer Pain*, which provided that "[r]eliable evidence on methods to accurately assess the potential benefits of COT [chronic opioid therapy] are limited."  A. 156 at 6; *see* A. 162 at 21.

- A *2010* Cochraine review article for the proposition that there was only "weak" evidence to support the use of opioids for chronic noncancer pain."  A. 162 at 22 (citing A. 158).

- A *2011* Boscarino study for the proposition that the "[r]isks of dependence and addiction are greater when opioid analgesics are used long term … ."  A. 163 at 52 (citing A. 159).

In fact, Plaintiffs' experts contend that since "the mid-1990s, there was nothing more than weak evidence of benefit from chronic opioid therapy."  A. 163 at 53.  Those experts further rely upon articles published in the 2000s to argue that pharmaceutical marketing "influences physicians' prescribing … ."  A. 162 at 18–19 (citing A. 172 at 221–22).  Plaintiffs certainly had access to this same information.  Clearly, Plaintiffs were on notice of the factual bases for their false marketing claims against the Manufacturers well before October 2012.

---

¶ 279 (citing a *2009* study concluding that "opioids may work acceptably well for a while, but over the long term, function generally declines, as does general health, mental health, and social functioning. Over time, even high doses of potent opioids often fail to control pain, and these patients are unable to function normally."); *id* (alleging that "research such as a *2008* study in the journal *Spine* has shown that pain sufferers prescribed opioids long-term suffered addiction that made them more likely to be disabled and unable to work.")

*Plaintiffs Knew Or Should Have Known Of Pre-2012 Government And Private Actions Against Manufacturers Regarding The Alleged Improper Promotion Of Opioid Medicines.*

Plaintiffs also had at least constructive knowledge that Manufacturers (as well as other prescription drug manufacturers that Plaintiffs chose not to sue) had been previously accused of marketing their opioid medications in ways that minimized their risks and overstated their benefits—the precise "wrongful act" Plaintiffs allege in these actions.[58] Government agencies, national media, and local Ohio media reported this information long before October 2012. By way of example:

- *July 2001* news articles reported about a West Virginia lawsuit against Purdue for, among other things, allegedly creating a public nuisance with its marketing of OxyContin. A. 54.

- A *December 2003* GAO Report was critical of Purdue's marketing of OxyContin, including in Ohio. A. 26.

- *May 2007* articles by the *New York Times*, *Columbus Dispatch*, *Toledo Blade*, and local Ohio media reported about Purdue's settlements with the DOJ and numerous states (including Ohio), arising from Purdue's marketing of OxyContin. A. 58–60.

- In *September 2008,* the *Columbus Dispatch*, the *Wall Street Journal*, the DOJ , and other press reported that Cephalon had reached a settlement with the DOJ and numerous states (including Ohio) in connection with its marketing of three medications, including an opioid medication at issue in this litigation—Actiq. A. 31, 61, 63. The Complaints, in fact, reference this very settlement (and DOJ press release), thereby showing that Plaintiffs had notice of any alleged wrongdoing nearly a decade before filing this lawsuit.[59]

- An *October 2009 Law 360* reported on a putative nationwide class action brought by governmental entities (including a county) against Cephalon challenging its marketing of the opioid medication Actiq. A. 68.[60] Additional putative nationwide class actions and lawsuits were filed against Cephalon and affiliate companies

---

[58] *See, e.g.*, Summit Third Amended Compl. ¶¶ 9–21; Cuyahoga Third Amended Compl. ¶¶ 9–20.

[59] *See, e.g.,* Summit Third Amended Compl. ¶ 787; Cuyahoga Third Amended Compl. ¶ 833.

[60] *See Central Regional Employees Benefit Fund, et al. v. Cephalon Inc*., No. 09-cv-03418 (D.N.J. removed July 10, 2009).

pertaining to their alleged marketing of opioid medicines well prior to October 2012.  A. 171.[61]

These widely-publicized settlements and lawsuits were premised on the same alleged marketing-based claims Plaintiffs raise here, and they certainly gave Plaintiffs ample notice of any such claims.  Based on these facts alone, Plaintiffs knew or should have known by October 27, 2012 of the "wrongful conduct" they allege against the Manufacturers.[62]  *See, e.g., Ball*, 385 F.3d at 722 (plaintiff had constructive knowledge based upon fact that "local and national news repeatedly covered the issue"); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (newspapers and public reports triggered constructive knowledge to start statute of limitation period).

***The Ohio Attorney General Put Plaintiffs On Notice Of The Potential Dangers Of Opioid-Related Marketing In Ohio As Of 2007.***   In 2007, Ohio's chief legal officer—Ohio Attorney General Marc Dann—led an investigation that resulted in Purdue's settlement with Ohio.  A. 56.  At the time of the settlement, Attorney General Dann declared publicly:

> It's important that drug companies marketing painkiller drugs like OxyContin take into consideration the safety risks involved with the drug.  Failing to adequately account for possible abuse of the drug with off-label marketing, not only is it unsafe for Ohio consumers but it also creates an unfair business market.

*Id*.  Given increased costs that the Counties claim to have been experiencing by this point, the statements made by the Ohio Attorney General certainly should have put the Counties on notice to make further inquiry regarding opioid marketing by Manufacturers in Ohio.

## V.   PLAINTIFFS' PRINCIPAL ARGUMENTS WHY THE STATUTE OF LIMITATIONS HAS NOT RUN ARE WITHOUT MERIT.

None of the arguments Plaintiffs have offered in the past to avoid the statutes of limitation withstands scrutiny.

---

[61] *See In re Actiq Sales and Marketing Practices Litigation,* No. 07-4492 (E.D. Pa. filed October 2007; several nationwide putative class actions); *Travelers v. Cephalon, Inc.,* Civil Action No. 12–4191 (E.D. Pa. filed July 24, 2012).

[62] *See, e.g.*, Summit Third Amended Compl. ¶¶ 9–21; Cuyahoga Third Amended Compl. ¶¶ 9–20.

A.     **"We Did Not Know There Was an Opioid Crisis Until 2016."**

Some of Plaintiffs' witnesses testified that they did not know there was an opioid crisis until 2016.  That testimony is puzzling, to say the least, in light of the undisputed evidence showing Plaintiffs' knowledge that there was a crisis of addiction, overdose, and deaths attributable to prescription opioids by no later than 2010.  The Summit 30(b)(6) Representative, Summit Chief Toxicologist, Executive Director of Summit's ADAMHS Board, CEO of Cuyahoga County's ADAMHS Board, Chair of Cuyahoga's Opiate Task Force, and Cuyahoga's Health Commissioner, among others, all knew there was an opioid problem before October 27, 2012.[63]  Their knowledge is Plaintiffs' knowledge, and what they knew, others in county and city government could and should have known.[64]

B.     **"We Did Not Have the ARCOS Data."**

Time and again Plaintiffs have said that they could not have sued earlier because they did not have detailed data from the ARCOS database.  But Plaintiffs *did* sue *before* they had the confidential transaction-level ARCOS data.  Beyond this obvious contradiction, Plaintiffs have long had access to very similar information about the *volume* of opioids distributed in their jurisdictions.  For example, since 2003 DEA has posted quarterly reports that list the aggregate amount of each opioid medication delivered to each zip code by three-digit prefix.  Thus, for 14 years before they filed suit, Plaintiffs had access to the ARCOS data, as well as to the numerous public documents and presentations making use of that data.  A. 121, 126, 144, 148–49, 153. They had all the data they needed well before October 27, 2012.

---

[63] *See* __–__, *supra.*

[64] *See, e.g., Fay v. Swicker,* 96 N.E.2d 196, 199 (Ohio 1950); *Hallowell v. Cty. of Athens,* No. 03-CA-29, 2004 WL 1802042, at *3–4 (Ohio Ct. App. Aug. 10, 2004).

### C.     "The Continuing Tort Doctrine Applies."

Plaintiffs argue that Defendants' alleged tortious conduct was and/or is continuing in nature and the statute of limitations is tolled as a result.[65]  The statute is not tolled for three reasons.  First, as a general rule, the continuing tort doctrine applies only to tort claims involving damage to, or interference with, real property.  *See, e.g.*, *Chernett Wasserman, Yarger, L.L.C. v. ComScape Holding, Inc.*, 2014 WL 4748513, *10 (Ohio Ct. App. Sept. 25, 2014) ("In Ohio, the continuing tort doctrine is usually employed in cases involving injury caused by a trespass to real property"); *Creech v. Brock & Assoc. Constr.*, 918 N.E. 2d 541 (Ohio Ct. App. 2009) ("A continuing tort occurs when the defendant's tortious activity is ongoing, perpetually creating fresh violations of the plaintiffs' property rights.").[66]  The doctrine therefore does not apply to Plaintiffs' claims, which do not involve damage to property, but are instead product-based and involve financial harm.

Second, Plaintiffs' alleged injuries arose not from a "continuing violation" but from alleged "repetitive discrete violations."  *Nat'l Credit Union Admin. Bd. v. Ciuni & Panichi, Inc.*, 2019 WL 188472, at *10 (N.D. Ohio Jan. 11, 2019) (holding that series of negligent annual audits were "repetitive and discrete, not continuing," despite allegation "defendants' negligence was continuous from 2006 through late 2012"); *see State ex rel. N. Olmsted Fire Fighters Assn. v. N. Olmsted*, 597 N.E.2d 136, 141 (Ohio 1992) (holding that each year during which an employee's vacation time was improperly calculated gave rise to a separate cause of action); *see also State ex rel. Nickoli v. Erie MetroParks*, 923 N.E.2d 588, 594 (Ohio 2010) ("The present effects of past [violations] do not trigger a continuing violations exception.").  For instance, each

---

[65] Summit Compl. ¶ 768.

[66] The decision in *Columbus Board of Education v. Armstrong World Industries, Inc.*, 627 N.E. 2d 1033 (Ohio Ct. App. 1993), underscores the importance of ***ongoing*** tortious activity and injury.  That case involved asbestos-containing materials that had been installed in the Columbus public schools in the 1950s and 1960s.  The court held that the continuous tort doctrine did not apply, because "[t]he doctrine connotes a continuing injury, whereas here, the injury—property damage—is not continuing."  *Id*. at 1041.

time that a Distributor allegedly shipped an improper order to a County pharmacy, that alleged conduct was a discrete wrong.

Third, even when the continuing tort doctrine applies, a plaintiff may "only claim damages incurred within the [applicable limitations period]." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1559 (6th Cir. 1997); *see Sexton v. Mason*, 883 N.E.2d 1013, 1021 (Ohio 2008) ("So long as [defendants] engaged in continuing conduct …, the expiration of the statute of limitations was tolled, with [plaintiffs'] potential recovery on any claims limited to damages only within the four-year period that would have preceded the filing of a suit"); *Brown v. County Comm'rs*, 622 N.E. 2d 1153, 1162 (Ohio 1993) (nuisance action can be brought only "for those injuries incurred within the applicable period, regardless of when the nuisance began"); *Wood v. American Aggregates Corp.*, 585 N.E. 2d 970, 973 (Ohio Ct. App. 1990) (barring plaintiffs from proving damages for period earlier than the applicable limitations period).

That is to say, even if the continuing tort doctrine applied here, Plaintiffs may recover only those damages incurred within the one to five years (depending on the claim) before they filed suit, and this motion does not try to bar those claims (though Defendants reserve the right to make such arguments at trial, if necessary).  Accordingly, Defendants still would be entitled to summary judgment against Plaintiffs on alleged damages first incurred before the relevant limitations periods.

**D.     "The Statute of Limitations Does Not Run as to a Public Nuisance."**

Plaintiffs also have argued that their nuisance claims are not time barred because the statute of limitations does not run as to a nuisance.  That is not the law in Ohio.  Under Ohio law, nuisances are classified as either permanent or continuing.  "A permanent nuisance is governed by [the] four year statute of limitations ... and occurs when the defendant's tortious act has been fully accomplished but injury to the plaintiff's estate from that act persists in the absence of further conduct by the defendant."  *Gibson v. Park Poultry, Inc.*, 2007 WL 2358589 (Ohio Ct.

42

App. Aug. 13, 2007).  By contrast, "[a] continuing nuisance arises when the wrongdoer's tortious conduct is ongoing, perpetually generating new violations."  *Haas v. Sunset Ramblers Motorcycle Club, Inc.*, 726 N.E.2d 612, 613 (Ohio Ct. App. 1999).  Even where a nuisance is deemed continuous, however, the "four-year period prescribed in R.C. 2305.09 … limit[s] the recovery to damages resulting within the four years preceding the filing of the complaint."  *Haas*, 726 N.E.2d at 614; *see also* Kyle Graham, *The Continuing Violations Doctrine*, 43 GONZ. L. REV. 271, 282 (2008).[67]

Plaintiffs allege that the statute of limitations has not run because the nuisance has not been abated.  Summit Compl. ¶ 743.  But *Brown* makes clear that the continuing tort doctrine applies to nuisance claims in the same way as it does to other tort claims. 622 N.E. 2d at 1162–63.

### E.     "Defendants Fraudulently Concealed Their Misconduct."

To toll the statute of limitations, Plaintiffs must prove separately for each Defendant: "(1) wrongful concealment of the[] actions by [each] defendant[]; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts."  *Dayco Corp. v. Firestone Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975); *Metz v. Unizan Bank*, 2006 WL 8427066, at *8 (N.D. Ohio Feb. 28, 2006) (plaintiff must prove fraudulent concealment against each defendant

---

[67] The 150-year old decision in *The Little Miami RR Co. v. Comm'rs of Greene Cty.*, 31 Ohio St. 338, 349 (1877), is not to the contrary.  Whatever the continuing validity of that decision in light of the legislature's adoption of Ohio Rev. Code § 2305.09—a question the Court need not decide—that case is not controlling because it did not involve a public nuisance claim.  *Little Miami R.R. Co.* and the handful of cases that have cited it involved a private party's claim of adverse possession to public land.  Those cases hold that, no matter how long the adverse possession, a governmental entity can always sue to assert its rights of ownership in public land.  *Id.* (holding that railroad encroachment onto county road could not mature into adverse possession); *Law v. Lake Metroparks*, 2006 WL 3833863, at *3 (Ohio Ct. App. 2006) *aff'd*, 878 N.E. 2d 1046 (Ohio 2007) (claim of adverse possession to former railroad property that had been sold to county park districts).

A claim of adverse possession is not a public nuisance, as defined by the Restatement (Second) of Torts, § 871B and Ohio case law of the last century.

who allegedly participated in the concealment"); *City of Cuyahoga Falls v. Johnson Controls, Inc.*, 2019 WL 1116006 (N.D. Ohio Mar. 11, 2019) (same).  The discovery record shows that Plaintiffs cannot meet their evidentiary burden.

### 1.    Distributors and Manufacturers

**ARCOS data**.  Plaintiffs' contention that Defendants failed to disclose the "ARCOS data"[68] is baseless for three reasons.  First, Defendants did not control or conceal the ARCOS data.  Defendants do not have "the ARCOS data."  And transaction-level data is confidential under federal regulations.[69]  Each Defendant has only its own data, which it submits to DEA.  DEA then posts the aggregated data online.  The aggregated data posted by DEA showed the total volume of prescription opioids, by medication, shipped to Cuyahoga and Summit from *2003* onward.  *See supra* __.  Defendants also reported the same data to the Ohio Board of Pharmacy, which sent reports based on the data to Ohio counties.  A. 149.

Second, Plaintiffs cannot show that they were unable to discover necessary facts during the limitations period.  Their lack of access to the transaction-level ARCOS data certainly did not stand in the way of filing these lawsuits—Plaintiffs sued Defendants in 2017 without it.  Plaintiffs allege that the "sheer volume" of opioids shipped into the counties was a "red flag," and the undisputed evidence shows that Plaintiffs were aware of that sheer volume by no later than October 2012.  *See supra* II.A & III.B.

Third, Plaintiffs cannot demonstrate that they engaged in any due diligence to investigate their claims, much less that their due diligence was fruitless because of Defendants' alleged concealment.  The reams of publicly-available facts noted above demonstrate that Plaintiffs can prove no such thing.

---

[68] Summit Compl. ¶ 750.

[69] 21 U.S.C. § 830(a), (c)(1); 28 C.F.R. § 0.103(a)(1)–(2).

**Assertions of regulatory compliance**.  Plaintiffs contend that Defendants "affirmatively [sought] to convince the public that their legal duties to report suspicious sales had been satisfied" and that they "publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion … curb the opioid epidemic."[70]  But any such statements amount to a "denial of an accusation of wrongdoing," which, as a matter of law, is "not a 'fraudulent concealment.'"  *Dayco Corp. v. Firestone Tire & Rubber Co.*, 386 F. Supp. 546, 549 (N.D. Ohio 1974) (quoting *Suckow Borax Mines Consol. v. Borax Consolidated*, 185 F.2d 196, 209 (9th Cir. 1950)); *Estate of Abdullah ex rel. Carswell v. Arena*, 601 F. App'x 389, 395 (6th Cir. 2015) ("vague denial of wrongdoing" does not constitute fraudulent concealment).  Moreover, any such denials plainly were not material to Plaintiffs (or the hundreds of other MDL plaintiffs).  The denials of wrongdoing, of course, did not prevent Plaintiffs from suing in 2017.  Given the numerous federal and state enforcement actions that Plaintiffs allege and of which they had notice, Plaintiffs cannot now rely on Defendants' "denial[s] of … accusation[s] of wrongdoing" to excuse their delay.  *See Dayco Corp.*, 386 F. Supp. At 549.

## 2.    Manufacturers

**Advocacy Groups**.  Plaintiffs allege that the Manufacturers deliberately worked through groups "purporting to be patient advocacy and professional organizations" to "secretly control messaging" and to "conceal[] their role in shaping, editing, and approving the content of …  false and misleading materials addressing pain management and opioids."[71]  There is no evidence to support these baseless accusations.  Manufacturers' financial support of independent third parties in the field of pain management does not create an agency relationship as a matter of law[72]—and the undisputed evidence shows that such funding was neither secret nor concealed.

---

[70] Summit Compl. ¶ 747; *id*. ¶ 587.

[71] Summit Third Amended Compl. ¶ 772.

[72] *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 395 (1982) (mere fact that defendant may "fund the activities of [an organization] does not render the [organization] [a defendant's] servant or agent").

For example, 2003 GAO Report disclosed that "Purdue used **multiple approaches** to market and promote OxyContin," including "expanding its physician speaker bureau and conducting speaker training conferences," "sponsoring pain-related educational programs," and "sponsoring pain-related Web sites."  A. 26 (emphasis added).  Similarly, the 2008 Cephalon Settlement asserted that Cephalon marketed through a "*variety of techniques* … [including] retain[ing] medical professionals to speak to doctors about off-label uses … [and] fund[ing] continuing medical education programs."  A. 31.

Even more fundamentally, Manufacturers' financial support for independent third parties in the field of pain management was well publicized prior to October 2012.  Such funding not only was disclosed through the very opioid-related publications and programs at issue, *see, e.g.,* A. 168, at 1, annual public reports by the third-party organizations, *see, e.g.,* A. 157, at 18–21, and websites run by those organizations, A. 160, but also was made public through news reports and investigative articles.  A. 61, 75–76, 79–80.  Based upon those reports, the Senate Finance Committee launched a highly public investigation in May 2012 into the financial ties between drug manufactures and third-party pain management groups and doctors, including those identified by Plaintiffs in their pleadings.  A. 91.  The Finance Committee sent public letters requesting information to these third-party groups, noting that "[r]ecent investigative reporting … revealed extensive ties between companies that manufacture and market opioids and non-profit organizations … ."  A. 41–47.  These letters were posted on the Finance Committee's website, along with a press release, on May 8, 2012.  A. 40.  Clearly, there was no concealment of any financial ties between Manufacturers and any third-party pain management speakers or groups.  At a minimum, with the exercise of due diligence, Plaintiffs could have discovered such funding well prior to October 2012.

*   *   *

46

The bottom line is that the opioid epidemic, and the allegations about Defendants' roles in it, have been a matter of public record for well over a decade.  Even if Plaintiffs' claims against Defendants had merit (which, as Defendants will argue elsewhere, they do not), it is too late for Plaintiffs to press claims that accrued before the dates set forth in Tables 1-4, *supra*.  The limitations periods have run.  The only claims that even potentially remain timely are those that accrued *after* those dates.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' partial motion for summary judgment and hold that Plaintiffs may not recover for claims accruing outside of the applicable limitations periods.

Dated:  June 17, 2019                                  Respectfully submitted,

  /s/ Geoffrey Hobart                                   /s/ F. Lane Heard III
Geoffrey E. Hobart                                Enu Mainigi
Mark H. Lynch                                     F. Lane Heard III
Christian J. Pistilli                             George A. Borden
**COVINGTON & BURLING LLP**                       Ashley W. Hardin
One CityCenter                                    **WILLIAMS & CONNOLLY LLP**
850 Tenth Street NW                               725 Twelfth Street NW
Washington, DC 20001                              Washington, DC  20005
Tel: (202) 662-5281                               Tel:  (202) 434-5000
ghobart@cov.com                                   Fax:  (202) 434-5029
mlynch@cov.com                                    emainigi@wc.com
cpistilli@cov.com                                 lheard @wc.com
                                                  gborden@wc.com
                                                  ahardin@wc.com
*Counsel for Defendant McKesson*
*Corporation*                                     *Counsel for Defendant Cardinal Health*

/s/ John P. McDonald
John P. McDonald (TX Bar # 13549090)
C. Scott Jones (TX Bar # 24012922)
Lauren M. Fincher (TX Bar # 24069718)
Brandan J. Montminy (TX Bar # 24088080)
**LOCKE LORD LLP**
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
Tel: (214) 740-8445
Fax: (214) 756-8110
jpmcdonald@lockelord.com
sjones@lockelord.com
lfincher@lockelord.com
brandan.montminy@lockelord.com

*Counsel for Defendants Henry Schein, Inc.
and Henry Schein Medical Systems, Inc.*

/s/ William E. Padgett
William E. Padgett (IN No. 18819-49)
Kathleen L. Matsoukas (IN No. 31833-49)
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204
Tel: (317) 236-1313
Fax: (317) 231-7433
william.padgett@btlaw.com
kathleen.matsoukas@btlaw.com

*Counsel for Defendants H. D. Smith, LLC,
f/k/a H. D. Smith Wholesale Drug Co., H. D.
Smith Holdings, LLC and H. D. Smith
Holding Company*

/s/ *Charles C. Lifland* (consent)
Charles C. Lifland
Sabrina H. Strong
**O'MELVENY & MYERS LLP**
400 S. Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
clifland@omm.com
sstrong@omm.com

*Counsel for Defendants Janssen
Pharmaceuticals, Inc., Johnson & Johnson,
Janssen Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc., and Ortho-McNeil-
Janssen Pharmaceuticals, Inc. n/k/a Janssen
Pharmaceuticals, Inc.*

/s/ Mark S. Cheffo
Sheila L. Birnbaum
Mark S. Cheffo
Hayden A. Coleman
**DECHERT**
Three Bryant Park
1095 Avenue of the Americas
New York, NY
Telephone: (212) 698-3500
Fax: (212) 698-3599
sheila.birnbaum@dechert.com
mark.cheffo@dechert.com
hayden.colemen@dechert.com

*Counsel for Defendants Purdue Pharma L.P.,
Purdue Pharma Inc., and the Purdue
Frederick Company, Inc.*

*/s/ James W. Matthews*

James W. Matthews
Katy E. Koski
Kristina Matic
**FOLEY & LARDNER LLP**
111 Huntington Avenue
Boston, MA 02199
Tel:  (617) 342-4000
Fax:  (617) 342-4001
jmatthews@foley.com
kkoski@foley.com
kmatic@foley.com

*Counsel for Defendant Anda, Inc.*

/s/ Daniel G. Jarcho

Daniel G. Jarcho
D.C. Bar No. 391837
**ALSTON & BIRD LLP**
950 F Street NW
Washington, DC 20004
Tel: (202) 239-3254
Fax: (202) 239-3333
daniel.jarcho@alston.com

Cari K. Dawson
Georgia Bar No. 213490
Jenny A. Hergenrother
Georgia Bar No. 447183
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW
Atlanta, GA 30309
Tel: (404) 881-7000
Fax: (404) 881-7777
cari.dawson@alston.com
jenny.hergenrother@alston.com

*Counsel for Noramco, Inc.*

*/s/ John J. Haggerty*

John J. Haggerty (0073572)
James C. Clark
Stephan A. Cornell
**FOX ROTHSCHILD LLP**
2700 Kelly Road, Suite 300
Warrington, PA 18976
Tel: (215) 345-7500
Fax: (215) 345-7507
jhaggerty@foxrothschild.com
jclark@foxrothschild.com
scornell@foxrothschild.com

*Counsel for Defendant Prescription Supply Inc.*

*/s/ Sean O. Morris (consent)*

Sean O. Morris
**ARNOLD & PORTER KAYE SCHOLER LLP**
777 S. Figueroa St., Suite 4400
Los Angeles, CA 90017
Tel: (213) 243-4000
sean.morris@arnoldporter.com

Jonathan L. Stern
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 942-5000
jonathan.stern@arnoldporter.com

*Counsel for Endo Health Solutions Inc., Endo Pharmaceuticals, Inc., Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. (incorrectly named as "Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical Holdings, Inc.")*

| | |
|---|---|
| */s/ Brien T. O'Connor (consent)* | */s/ Donna M. Welch* (consent) |
| Brien T. O'Connor | Donna M. Welch, P.C. |
| Andrew J. O'Connor | **KIRKLAND & ELLIS LLP** |
| **ROPES & GRAY LLP** | 300 North LaSalle, Chicago, IL 60654 |
| Prudential Tower | Tel: (312) 862-2000 |
| 800 Boylston St. | donna.welch@kirkland.com |
| Boston, MA 02199-3600 | |
| (617) 235-4650 | *Counsel for Defendant Allergan Finance,* |
| Brien.O'Connor@ropesgray.com | *LLC f/k/a/ Actavis, Inc. f/k/a Watson* |
| Andrew.O'Connor@ropesgray.com | *Pharmaceuticals, Inc., Allergan PLC f/k/a* |
| | *Actavis PLC, Allergan Sales, LLC, and* |
| *Counsel for Defendants Mallinckrodt LLC* | *Allergan USA, Inc., and appearing specially* |
| *and SpecGx LLC, and appearing specially for* | *for Allergan PLC f/k/a Actavis PLC* |
| *Mallinckrodt plc* | |

/s/ Steven A. Reed

Steven A. Reed
Eric W. Sitarchuk
Rebecca J. Hillyer
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market St.
Philadelphia, PA 19103-2921
Tel: (215) 963-5603
steven.reed@morganlewis.com
eric.sitarchuk@morganlewis.com
rebecca.hillyer@morganlewis.com

Nancy L. Patterson
**MORGAN, LEWIS & BOCKIUS LLP**
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel:  (713) 890-5195
nancy.patterson@morganlewis.com

Brian M. Ercole
**MORGAN, LEWIS & BOCKIUS LLP**
200 S. Biscayne Blvd., Suite 5300
Miami, FL 33131-2339
Tel: (305) 415-3000
brian.ercole@morganlewis.com

*Counsel for Cephalon, Inc., Teva
Pharmaceuticals USA, Inc., Teva
Pharmaceutical Industries, Ltd., Watson
Laboratories, Inc., Actavis LLC, Actavis
Pharma, Inc. f/k/a Watson Pharma, Inc.,
Warner Chilcott Company, LLC, Actavis
South Atlantic LLC, Actavis Elizabeth LLC,
Actavis Mid Atlantic LLC, Actavis Totowa
LLC, Actavis Kadian LLC, Actavis
Laboratories UT, Inc. f/k/a Watson
Laboratories, Inc.-Salt Lake City, and Actavis
Laboratories FL, Inc., f/k/a Watson
Laboratories, Inc.-Florida, and specially
appearing Teva Pharmaceutical Industries
Ltd.*

/s/ Robert A. Nicholas

Robert A. Nicholas
Shannon E. McClure
**REED SMITH LLP**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Tel: (215) 851-8100
Fax: (215) 851-1420
rnicholas@reedsmith.com
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Drug
Corporation*

## INDEX TO APPENDICES FOR COMBINED BRIEF

### I.   Depositions

| No. | Document Description |
|---|---|
| 1 | Allan, Terrence Dep. (p. 183) |
| 2 | Baeppler, Matthew Dep. (p. 54) |
| 3 | Ball, Kenneth Dep. (pp. 127, 185–86) |
| 4 | Barker, Shane Dep. (pp. 76–77) |
| 5 | Block, Tonya Dep. (p. 241) |
| 6 | Caraffi, Vincent Dep. (pp. 54, 158, 166–67) |
| 7 | Connelly, Michael Dep. (p. 209) |
| 8 | Craig, Gerald Dep. (p. 149–50) |
| 9 | Denihan, William Dep. (p. 181) |
| 10 | Gordon, Merle Dep. (pp. 61–62) |
| 11 | Gutierrez, James Dep. (pp. 21–22, 51, 58–59) |
| 12 | Johnson, Greta (Rule 30(b)(6)) Dep. (pp. 43, 46–47, 51–52) |
| 13 | Johnson, Greta (Rule 30(b)(6)) Dep. Excerpt of Ex. 12 |
| 14 | Keenan, Margaret (Rule 30(b)(6) Dep. (p. 68–69) |
| 15 | Leonard, Patrick Dep. (pp. 155–57) |
| 16 | Leppla, Allisyn Dep. (pp. 76–77) |
| 17 | McCann, Craig Dep. (pp. 96–97, 350–52) |
| 18 | Moran, Scott Dep. (pp. 181-82) |
| 19 | Papp, Joan Dep. (p. 93) |
| 20 | Perch, Steve Dep. (p. 186) |
| 21 | Prince, John Dep. (pp. 191–96) |
| 22 | Rafalski, James Dep. (pp. 202–04) |
| 23 | Siegle. Derek Dep. (p. 68) |
| 24 | Walter, Cheri Dep. (pp. 106–07, 120–21) |

### II.   Government Reports & Documents

| No. | Document Description |
|---|---|
| 25 | Drug Enf't Admin., U.S. Dep't of Justice, ARCOS: Retail Drug Summary https://web.archive.org/web/20030124105513/http://www.deadiversion.usdoj.gov:80/arcos/retail_drug_summary/index.html (last visited Feb. 20, 2019) (Wayback Machine capture of webpage as it existed on Jan. 24, 2003 with links to ARCOS reports for 1997–2001). |
| 26 | United States General Accounting Office, *Prescription Drugs:  OxyContin Abuse and Diversion Efforts to Address the Problem*, GAO-04-110 (Dec. 2003). |

| No. | Document Description |
|-----|---------------------|
| 27 | Douglas F. Gansler, Maryland Office of the Attorney General, *Attorney General Gansler Announces Settlement with Purdue Pharma Pharmaceutical Company*, (May 8, 2007). |
| 28 | United States Attorney's Office, Western District of Virginia, United States Dep't of Justice, *The Purdue Frederick Co., Inc. and Top Executives Plead Guilty to Misbranding OxyContin; Will Pay over $600 Million* (May 10, 2007). |
| 29 | Drug Enf't Admin., U.S. Dept. of Justice, *McKesson Corporation Agrees to Pay More $13 Million to Settle Claims that it Failed to Report Suspicious Sales of Prescription Medications* (May 2, 2008). |
| 30 | Ohio Medicaid Fraud Control Unit, *FY 2008 Annual Report* |
| 31 | United States Dep't of Justice, *Biopharmaceutical Co., Cephalon, to Pay $425 Million & Enter Plea to Resolve Allegations of Off-Label Marketing* (Sep. 29, 2008). |
| 32 | Office of Public Affairs, United States Dep't of Justice, *Alpharma to Pay $42.5 Million to Resolve False Claims Act Allegations in Connection with Promotion of Drug Kadian* (Mar. 16, 2010). |
| 33 | Exec. Order 2010 – 4S, *Establishing the Ohio Prescription Drug Abuse Task Force*, Apr. 2, 2010. |
| 34 | Oregon Dep't of Justice, *Pharmaceutical Company Pays $42.5 Million to Resolve Allegations of Fraud* (Apr. 7, 2010). |
| 35 | Ohio Prescription Drug Abuse Task Force, *Final Report Task Force Recommendations* (Oct 1, 2010) available at http://www.healthy.ohio.gov/vipp/data/~/media/10E7E7D5543C41DF9D7824DD479E F37B.ashx. |
| 36 | Ohio Dep't of Health, *The Burden of Poisoning in Ohio: 1999–2008* (Oct. 2010). |
| 37 | Securities and Exchange Commission, *Alpharma Settlement Agreement.* |
| 38 | William T. Winsley & Danna E. Droz, House Bill 93 Report (Nov. 21, 2011). |
| 39 | Ohio Association of County Behavioral Health Authorities, *Ohio's Opiate Epidemic* (Mar. 2011). |
| 40 | Senate Finance Committee, Press Release, Baucus, Grassley Seek Answers about Opioid Manufacturers' Ties to Medical Groups (May 8, 2012) accessible at |
| 41 | Letter from Senate Finance Committee to Endo, dated May 8, 2012, accessible at |
| 42 | Letter from Senate Finance Committee to Johnson and Johnson, dated May 8, 2012, accessible at https://www.finance.senate.gov/imo/media/doc/05092012%20Baucus%20Grassley%20 Opioid%20Investigation%20Letter%20to%20Johnson%20and%20Johnson.pdf |
| 43 | Letter from Senate Finance Committee to Purdue, dated May 8, 2012, accessible at |
| 44 | Letter from Senate Finance Committee to American Academy of Pain Medicine, dated May 8, 2012, accessible at |
| 45 | Letter from Senate Finance Committee to American Pain Foundation, dated May 8, 2012, accessible at |
| 46 | Letter from Senate Finance Committee to Federation of State Medical Boards, dated May 8, 2012, accessible at |

| No. | Document Description |
|-----|----------------------|
| 47 | Senate Finance Committee to American Pain Society, dated May 8, 2012, accessible at |
| 48 | Joseph Rannazzisi, *Statement of Joseph T Rannazzisi, Deputy Assistant Administrator, Drug Enforcement Administration, before the Caucus on International Narcotics Control, United States Senate, at a hearing entitled "Responding to the Prescription Drug Abuse Epidemic* (July 18, 2012). |
| 49 | Summit County Sheriff's Office, *Annual Report 2013*. |
| 50 | U.S. Dep't of Justice, Office of the Inspector General, The Drug Enforcement Administration's Adjudication of Registrant Actions, 4–6 (2014) https://oig.justice.gov/reports/2014/e1403.pdf. |
| 51 | Opiate Action Team Timeline, https://web.archive.org/web/20181204043806/https://fightingopiateabuse.ohio.gov/time line/index.htm (last visited May 15, 2019) (Wayback Machine capture of webpage as it existed on Dec. 1, 2016). |
| 52 | FDA, FDA Approved Drug Products, accessible at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm |

## III. Media

| No. | Document Description |
|-----|----------------------|
| 53 | Claudia Kalb, *Playing with Pain Killers*, Newsweek, Apr. 9, 2001. |
| 54 | Paul Tough, *The Alchemy of OxyContin*, N.Y. Times Mag., July 29, 2001. |
| 55 | Roger Mezger, Ohio gets $950,000 in OxyContin settlement, *Cleveland.com* (May 8, 2007), http://blog.cleveland.com/business/2007/05/ohio_gets_949_500_in_oxycontin.html. |
| 56 | Shannon Henson, *Purdue Pharma Settles with States Over OxyContin*, Law360, May 8, 2007. |
| 57 | *OxyContin maker must pay $19.5M*, Cincinnati Enquirer, May 9, 2007. |
| 58 | Barry Meier, *In Guilty Plea, Oxycontin Maker to Pay $600 Million*, The New York Times, May 10, 2007. |
| 59 | *OxyContin maker, executives fined $634.5M for misleading public*, The Blade, Jul. 20, 2007. |
| 60 | *Drugmaker, execs fined millions for false claims*, The Columbus Dispatch, Jul. 21, 2007. |
| 61 | Peter Loftus & Thomas Gryta, *Cephalon Completes Settlement*, The Wall Street Journal, Sep. 30, 2008. |
| 62 | Rick Armon, *Youths' Heroin Use Rises*, Akron Beacon Journal, Aug. 14, 2008. |
| 63 | James Nash, *Drug company to pay AG's office, other states*, The Columbus Dispatch, Oct. 1, 2008. |
| 64 | Mike Pramik, *Online Overdose; Lack of Oversight Allows Free Flow of Dangerous Prescription Drugs via the Internet*, The Columbus Dispatch, Oct. 12, 2008. |
| 65 | Times Wire Service, *McKesson to settle U.S. Claims*, Los Angeles Times, May 3, 2008. |

| No. | Document Description |
|-----|---------------------|
| 66 | Josh Mitchell, *Pharmaceutical Distributor to Pay $13 Million in Fines*, THE BALTIMORE SUN, May 3, 2008. |
| 67 | Mike Pramik, *New law regulates Internet drug sales*, THE COLUMBUS DISPATCH, Oct. 17, 2008. |
| 68 | Jocelyn Allison, Class Action Over Cephalon Off-Label Claims Tossed, *Law360.com* (Oct. 9, 2009) https://www.law360.com/articles/127434/class-action-over-cephalon-off-label-claims-tossed. |
| 69 | Mike Rutledge, *Drug tracking system set; NEWPORT – Pharmacists and doctors are finding themselves on the front lines of an increasingly deadly drug war. But by the end of this year, Ohio, Kentucky and Indiana hope to have a powerful new weapon*, THE CINCINNATI ENQUIRER, May 3, 2010 |
| 70 | Editorial Board, *Prescriptions for an Epidemic; Ohio Has a Mounting Drug Problem*, AKRON BEACON JOURNAL, Feb. 11, 2011. |
| 71 | Rachel Dissell, *Painkillers, Heroin Fueling a Pattern of Devastation, Death*, THE PLAIN DEALER, Feb. 20, 2011. |
| 72 | Joe Vardon, *Ohio, Kentucky to share prescription-drug data*, THE COLUMBUS DISPATCH, Aug. 11, 2011. |
| 73 | *Pills are killing pain and killing people; Prescription drug abuse is taking a huge toll on our communities, according to Orman Hall, the man appointed by Gov. Kasich to lead the fight against it*, DAYTON DAILY NEWS, Aug. 14, 2011. |
| 74 | Sarah Jane Tribble, *Officials from Rosary Hall Addiction Program Plead with Cuyahoga County Officials for Funding*, THE PLAIN DEALER, Nov. 11, 2011. |
| 75 | Tracy Weber & Charles Ornstein, *Two Leaders in Pain Treatment Have Long Ties to Drug Industry*, PRO PUBLICA, Nov. 11, 2011 available at https://www.propublica.org/article/two-leaders-in-pain-treatment-have-long-ties-to-drug-industry. |
| 76 | Tracy Weber & Chris Ornstein, *Patient Advocacy Group Funded By Success Of Painkiller Drugs, Probe Finds*, THE WASHINGTON POST, December 23, 2011. |
| 77 ****** | *Starting Point* (CNN television Broadcast Feb. 7, 2012), *available at* https://archive.org/details/CNNW_20120207_120000_Starting_Point/start/5520/end/5580 (describing DEA raid of CVS pharmacies). |
| 78 | Devlin Barrett and Timothy W. Martin, *Pharmacies Swept Into Drug Wars*, THE WALL STREET JOURNAL, Feb. 15, 2012. |
| 79 | John Fauber, *Painkiller boom fueled by networking*, JOURNAL SENTINEL, Feb. 18, 2012 |
| 80 | John Fauber, *Follow the Money: Pain, Policy, and Profit*, MEDPAGE TODAY, Feb. 19, 2012. |
| 81* | *Studio B With Shepard Smith* (Fox News television broadcast Feb. 21, 2012), *available at* https://archive.org/details/FOXNEWS_20120221_200000_Studio_B_With_Shepard_ |

| No. | Document Description |
|---|---|
| | Smith/start/1980/end/2040 (describing DEA's enforcement action against Cardinal Health). |
| 82* | *Squawk Box* (CNBC television broadcast Feb. 21, 2012), *available at* https://archive.org/details/CNBC_20120221_110000_Squawk_Box/start/3300/end/3360 (describing DEA's enforcement actions against Cardinal Health and CVS). |
| 83* | *ABC World News With Diane Sawyer* (ABC television broadcast Apr. 6, 2012) *available at* https://archive.org/details/WMAR_20120406_223000_ABC_World_News_With_Diane_Sawyer/start/600/end/660 (describing DEA enforcement actions against CVS and Walgreens). |
| 84 | Donna Leinwand Leger, *DEA aims big to step painkiller black market*, USA TODAY, Feb. 28, 2012. |
| 85 | Steve Wartenberg, *Cardinal loses round in drug fight*, THE COLUMBUS DISPATCH, Mar. 1, 2012. |
| 86* | *CNN Newsroom* (CNN television broadcast Apr. 7, 2012), *available at* https://archive.org/details/CNN_20120407_150000_CNN_Newsroom/start/1800/end/1860 (describing DEA's enforcement actions against Cardinal Health, Walgreens, and CVS). |
| 87 | Cheryl Powell, *Doctor Says Pain Care Key to Curbing Drug Abuse*, AKRON BEACON JOURNAL, April 7, 2012. |
| 88 | Barry Meier, *Senate Inquiry Into Narcotic Drug Makers' Ties*, N.Y. TIMES, May 9, 2012. |
| 89 | James F. McCarty, *U.S. DEA Creates Specialized Prescription Drug Investigative Unit Based in Cleveland*, THE PLAIN DEALER, May 14, 2012. |
| 90 | Steve Wartenberg, *2-Year License Suspension: Cardinal, DEA Settle Florida Shipping Case*, THE COLUMBUS DISPATCH, May 16, 2012. |
| 91 | John Fauber & Ellen Gabler, *Narcotic Painkiller Use Booming Among Elderly*, MEDPAGE TODAY, May 30, 2012. |
| 92* | *Early Start* (CNN television broadcast June 12, 2013) *available at* https://archive.org/details/CNNW_20130612_090000_EarlyStart/start/1500/end/1560 (describing DEA settlement with Walgreens). |
| 93* | *ABC World News Now* (ABC television broadcast June 12, 2013) *available at* https://archive.org/details/KGO_20130612_084000_ABC_World_News_Now/start/5220/end/5280 (describing DEA settlement with Walgreens). |
| 94 | Jon Kamp, *West Virginia Sues Drug Distributors in Pill-Abuse Fight*, WALL STREET JOURNAL, June 27, 2012. |
| 95 | Barry Meier, *A New Painkiller Crackdown Targets Drug Distributors*, N.Y. TIMES, Oct. 18, 2012. |
| | |

IV.    **Emails**

| No. | Document Description |
|---|---|
| 96 | Email from Terry Allan to John Mcleod & Mike Pokorny (Aug 15, 2009), CUYAH_014330031. |
| 97 | Email from Drew Alexander to Dale Soltis (May 13, 2009), SUMMIT_001772047. |
| 98 | Attachment to Email from Drew Alexander to Dale Soltis (May 13, 2009), SUMMIT_001772049. |
| 99 | Email Forward from Ronald Zumpano (Jun. 9, 2009), AKRON_000354805. |
| 100 | Email from Judi Moseley to Vincent Caraffi et al. (Sept. 3, 2009), AG-MHA_134422. |
| 101 | Email from Ted Ziegler to aldridge@ada.state.us et al. (Dec. 7, 2009), SUMMIT_000947613. |
| 102 | Email from Jennifer Miltner to William Denihan (May 20, 2010), CUYAH_012366210. |
| 103 | Email from Dave Lieberth to Patricia Ambrose et al. (May 21, 2010), AKRON_000896645. |
| 104 | Attachment to Email from Dave Lieberth to Patricia Ambrose et al. (May 31, 2010), AKRON_000896647. |
| 105 | Email from Dave Lieberth to Patricia Ambrose et al. (Apr. 3, 2010), AKRON_000896517. |
| 106 | Email from Drew Alexander to Keith Thornton and Hylton Baker (Apr. 28, 2010), SUMMIT_001009339. |
| 107 | Attachment to Email from Drew Alexander to Keith Thornton and Hylton Baker (Apr. 28, 2010), SUMMIT_001009400. |
| 108 | Email from Dave Lieberth to Patricia Ambrose et al. (Aug. 19, 2010), AKRON_000896854. |
| 109 | Attachment to Email from Dave Lieberth to Patricia Ambrose et al. (August 19, 2010), attaching AKRON_000896855. |
| 110 | Email from Jennifer House to Gene Nixon (Sep. 21, 2010), SUMMIT_001610590. |
| 111 | Email from Dave Lieberth to Patricia Ambrose et al. (Oct. 2, 2010), AKRON_000894166. |
| 112 | Attachment to Email from Dave Lieberth to Patricia Ambrose et al. (October 10, 2010), AKRON_000894169. |
| 113 | Email from Vincent Caraffi to Allisyn Leppla et al. (Dec. 9, 2010) CLEVE_000211919. |
| 114 | Email from Christina M. Delos Reyes to William Denihan et al. (Dec. 14, 2010) CUYAH_015866402. |
| 115 | Email Forward from Donna Skoda, (Mar. 17, 2011), SUMMIT_000179598. |
| 116 | Email from Hugh Shannon to Joseph Nanni (Jul. 9, 2012), CUYAH_009714803. |
| 117 | Email from William Denihan to Scott Osiecki, (Aug. 10, 2011), CUYAH_012664268. |

| No. | Document Description |
|-----|---------------------|
| 118 | Email from William Denihan to Scott Osiecki (Feb. 3, 2012), CUYAH_012652563. |
| 119 | Attachment to Email from William Denihan to Scott Osiecki (Feb. 3, 2012), CUYAH_012652566. |
| 120 | Email from Vince Caraffi to Jeff Capretto et al. (Mar. 9, 2012), CUYAH 010685323. |
| 121 | Attachment to Email from Vince Caraffi to Jeff Capretto et al. (Mar. 9, 2012), CUYAH_010685324. |
| 122 | Email from Todd Hollett to William Denihan and Scott Osiecki (May 18, 2012), CUYAH_012642097. |
| 123 | Attachment to Email from Todd Hollett to William Denihan and Scott Osiecki (May 18, 2012), CUYAH_012642098. |
| 124 | Attachment to Email from Todd Hollett to William Denihan and Scott Osiecki (May 18, 2012), CUYAH_012642097. |
| 125 | Email from Aimee Wade to Adrianne Loop et al. (May 18, 2012), SUMMIT_001284655. |
| 126 | Attachment to Email from Aimee Wade to Adrianne Loop et al. (May 18, 2012), SUMMIT_001284658. |
| 127 | Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635406. |
| 128 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635407. |
| 129 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635408. |
| 130 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635409. |
| 131 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635410. |
| 132 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635411. |
| 133 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635412. |
| 134 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635413. |
| 135 | Attachment to Email from Hugh Shannon to Joseph Gautner and Matt Carroll (Jul. 9, 2012), CUYAH_001635414. |
| 136 | Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842562. |
| 137 | Attachment to Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842563. |
| 138 | Attachment to Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842564. |

| No. | Document Description |
|-----|---------------------|
| 139 | Attachment to Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842565. |
| 140 | Attachment to Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842566. |
| 141 | Attachment to Email from Hugh Shannon to William Denihan et al. (Aug. 28, 2012), CUYAH_009842567. |

## V.    Other Produced Documents

| No | Document Description |
|-----|---------------------|
| 142 | Captain Hylton E. Baker, Summit County Sheriff's Office, Summit County Drug Unit, *Drug Threat Assessment: Summit County, Ohio (Multi-Jurisdictional Law Enforcement Task Force Addendum to 2005 Justice Assistance Grant Application Continued)*, SUMMIT_000023567. |
| 143 | Ohio Department of Transportation, *Draft Agenda, Epidemic of Prescription Drug Overdoses: A Call to Action*, ODH_MDL 1st Production_000004. |
| 144 | Ohio Dep't of Health, *Alarming Rise in Unintentional Drug Overdose Deaths in Ohio* (2009), ODH_MDL 1st Production_001031. |
| 145 | Cuyahoga County Coalition, *Prescription for Prevention:  Feb 16, 2010, Meeting Notes*, CUYAH_015867609. |
| 146 | Medical Directors, Cuyahoga County ADAMHS Board, *Meeting Minutes* (Nov. 23, 2010), CUYAH_015851759. |
| 147 | 2010 Narcotics Unit Compliance Enforcement Stats, CLEVE_001485361. |
| 148 | Ohio Dep't of Health, *2010 Ohio Drug Overdose Data: General Findings* (2010), CUYAH_010685324. |
| 149 | Ohio State Board of Pharm., *Ohio's Opiate Epidemic* (Jul. 2011), CLEVE_002278003. |
| 150 | William M. Denihan, *Suggested Talking Points, Cuyahoga Council CY12-13 Budget Hearing* (Nov. 7, 2011). |
| 151 | Ohio Association of County Behavioral Health Authorities, *Ohio's 2012 Opiate Summit: Miles Traveled – Miles Ahead,* SUMMIT_001208640. |
| 152 | William Denihan, *Morning Introduction –9:00 A.M.* (May 8, 2012), OACBHA-00034654. |
| 153 | *Summit Cty. Quarterly OARRS Rep't – Quarter 2, 2012*, SUMMIT_000824170. |

## VI.    Other Documents

| No. | Document Description |
|-----|---------------------|
| 154 | David A. Fishbain, et al., *What percentage of chronic nonmalignant pain patients exposed to chronic opioid analgesic therapy develop abuse/addiction and/or* |

| No. | Document Description |
|-----|----------------------|
|     | *aberrant drug-related behaviors? A structured evidence-based review.* 9 PAIN MED. 444 (2008). |
| 155 | Joel R. Saper, and Alvin E. Lake, III, *Continuous opioid therapy (COT) is rarely advisable for refractory chronic daily headache: limited efficacy, risks, and proposed guidelines*, HEADACHE, 48: 838-49 (2008). |
| 156 | Roger Chou, et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 THE JOURNAL OF PAIN, 113 (2009). |
| 157 | American Pain Foundation, *2010 Annual Report* (2010), available at https://www.documentcloud.org/documents/277604-apf-2010-annual-report#document/p18/a41520.. |
| 158 | Noble M. Treadwell, Jr., et al., *Long-term opioid management for chronic noncancer pain (Review)*, COCHRAINE DATABASE OF SYSTEMIC REVIEWS, issue 1, Art. No.: CD006605 (2010). |
| 159 | Joseph A. Boscarino, *Prevalence of Prescription Opioid-Use Disorder Among Chronic Pain Patients: Comparison of the DSM-5 vs. DSM-4 Diagnostic Criteria*, 30 JOURNAL OF ADDICTIVE DISEASES 185 (2011). |
| 160 | The American Academy of Pain Medicine, Corporate Relations Council Profiles, https://web.archive.org/web/20120209175115/http://www.painmed.org/membercenter/corporate-relations-council-profiles/ (last visited Jun. 9, 2019) (Wayback Machine capture of webpage as it existed on Feb. 9, 2012). |
| 161 | American Pain Society, *APS Corporate Council Application*, available at http://americanpainsociety.org/uploads/get-involved/APS13_Corporate_Member_Reg_Form_only.pdf. |
| 162 | Anna Lembke, *Expert Report* (Mar. 25, 2019). |
| 163 | Mark A. Schumacher, *Expert Report* (Mar. 25, 2019). |
| 164 | Endo, Our Products, accessible at http://www.endo.com/endopharma/our-products. |
| 165 | Purdue, Purdue Products, accessible at https://www.purduepharma.com/healthcare-professionals/products/#prescription-opioids. |
| 166 | Janssen, Products, accessible at https://www.janssen.com/products. |
| 167 | Teva USA, Product Catalog, accessible at http://tevausa.com/teva-product-catalog. |
| 168 | Excerpt of Scott M. Fishman, MD, Responsible Opioid Prescribing:  A Physicians Guide. |
| 169 | Ohio Substance Abuse Monitoring Network, *Drug Abuse Trends in the Akron-Canton Region*, accessible at http://mha.ohio.gov/Portals/0/assets/Learning/Drug%20Trend%20Reports/2011JandrugTrendsAkronCanton.pdf. |
| 170 | Email from Paul T. Farrell to Dale Rice (Jun. 15, 2018). |
| 171 | Linda Chiem, *Travelers Sues Cephalon Over $17M In Actiq Claims*, Law360.com (July 24, 2012), accessible at |
| 172 | Van Zee A. The promotion and marketing of oxycontin: Commercial triumph, public health tragedy. |

| No. | Document Description |
|-----|---------------------|
|     | Am J Public Health. 2009. doi:10.2105/AJPH.2007.131714, at pp. 221-22. |

## CERTIFICATE OF SERVICE

I, F. Lane Heard III, hereby certify that the foregoing document was served via the

Court's ECF system to all counsel of record.

　　　　　　　　　　　　　　　　　　　　_/s/ *F. Lane Heard III*_____
　　　　　　　　　　　　　　　　　　　　F. Lane Heard III