Exhibit 11

Page 1

1             IN THE UNITED STATES DISTRICT COURT
2                  NORTHERN DISTRICT OF OHIO
3                       EASTERN DIVISION
4
                  ~~~~~~~~~~~~~~~~~~~~
5
6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION
7                                      Case No. 17-md-2804
8                                      Judge Dan Aaron
      This document relates to:        Polster
9
10    The County of Cuyahoga v. Purdue
      Pharma L.P., et al.
11
      Case No. 18-OP-45004
12
13                ~~~~~~~~~~~~~~~~~~~~
14
                  Videotaped deposition of
15                JAMES A. GUTIERREZ, ESQ.
16
                     January 31, 2019
17                      9:48 a.m.
18
19                      Taken at:
20                   Kelley & Ferraro
21              950 Main Avenue, Suite 1300
22                    Cleveland, Ohio
23
24
25          Renee L. Pellegrino, RPR, CLR

```
 1   APPEARANCES:
 2   On behalf of Cuyahoga County:
        Thasher, Dinsmore & Dolan
 3      LEO. M. SPELLACY, JR., ESQ.
        1111 Superior Avenue
 4      Suite 412
        Cleveland, Ohio  44114
 5      (216) 255-5434
        lspellacy@tddlaw.com
 6         - and -
        (Via Telephone)
 7      Napoli Shkolnik PLLC
        SALVATORE BADALA, ESQ.
 8      JOSEPH L. CIACCIO, ESQ.
        360 Lexington Avenue
 9      New York, New York  10017
        (844) 230-7676
10      sbadala@napolilaw.com
        jciaccio@napolilaw.com
11
     On behalf of Walmart, Inc.:
12      (Via Telephone)
        Jones Day
13      LISA GATES, ESQ.
        901 Lakeside Avenue East
14      Cleveland, Ohio  44114
        (216) 586-3939
15      lgates@jonesday.com
16   On behalf of CVS Indiana, LLC and CVS Rx Services,
     LLC:
17      Zuckerman Spaeder LLP
        R. MILES CLARK, ESQ.
18      1800 M Street NW
        Suite 1000
19      Washington, D.C.  20036-5807
        (202) 778-1800
20      mclark@zuckerman.com
21
                     ~ ~ ~ ~ ~
22
23
24
25
```

```
 1   APPEARANCES, CONT'D:
 2   On behalf of AmerisourceBergen Drug Corporation:
        Jackson Kelly PLLC
 3      SANDRA K. ZERRUSEN, ESQ.
        50 South Main Street
 4      Suite 201
        Akron, Ohio  44308
 5      (330) 252-9060
        skzerussen@jacksonkelly.com
 6
     On behalf of Endo Pharmaceuticals, Inc., Endo
 7   Health Solutions, Inc., Par Pharmaceuticals,
     Inc. and Par Pharmaceutical Companies, Inc.:
 8      Baker & Hostetler
        DOUGLAS L. SHIVELY, ESQ.
 9      127 Public Square, Suite 2000
        Cleveland, Ohio  44114-1214
10      (216) 621-0200
        dshively@bakerlaw.com
11
     On behalf of Johnson & Johnson and Janssen
12   Pharmaceuticals, Inc.:
        Tucker Ellis LLP
13      JEFFREY M. WHITESELL, ESQ.
        950 Main Avenue, Suite 1100
14      Cleveland, Ohio  44113-7213
        (216) 592-5000
15      jeffrey.whitesell@tuckerellis.com
16
                     ~ ~ ~ ~ ~
17
18
19
20
21
22
23
24
25
```

```
 1   APPEARANCES, CONT'D:
 2   On behalf of McKesson Corporation:
        Covington & Burling
 3      RAE WOODS, ESQ.
        One CityCenter
 4      850 Tenth Street, NW
        Washington, D.C.  20001-4956
 5      (202) 662-6000
        rwoods@cov.com
 6         - and -
        Covington & Burling LLP
 7      ASEEM PADUKONE, ESQ.
        One Front Street
 8      San Francisco, California  94111-5356
        (415) 591-6000
 9      apadukone@cov.com
10
     ALSO PRESENT:   Joe VanDetta, Videographer
11
                        ~ ~ ~ ~ ~
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        TRANSCRIPT INDEX
2
3  APPEARANCES ......................................2
4  INDEX OF EXHIBITS ................................6
5  INDEX OF OBJECTIONS ..............................9
6
7  EXAMINATION OF JAMES A. GUTIERREZ, ESQ.:
8  BY MS. WOODS ....................................15
9
10 AFTERNOON SESSION ..............................135
11
12 REPORTER'S CERTIFICATE .........................321
13
14 EXHIBIT CUSTODY - RETAINED BY COURT REPORTER
15
16
17
18
19
20
21
22
23
24
25

Page 21

1 a similar one on the east side. And these
2 are -- what they are are different detectives
3 from different jurisdictions all basically work
4 with one unit. Like the Westshore Enforcement
5 Bureau are detectives from different cities.
6 There's one on the east side. And then all
7 local jurisdictions in Cuyahoga County, all the
8 police departments, if they have an issue in a
9 particular incident there, they'll call us.
10      Q.    Do you work with the Drug
11 Enforcement Administration?
12      A.    Yes.
13      Q.    Would you say that you communicate
14 on a regular basis with the DEA?
15      A.    I used to, but not recently.
16      Q.    During what period of time were you
17 communicating regularly with the DEA?
18      A.    Well, I -- to answer your question
19 candidly, it depends who is sitting in that
20 chair with the DEA locally, and that
21 relationship. So over the years we would have
22 better relationships with some of the diversion
23 directors than other ones, and so -- and the DEA
24 has their own policies, whether they want to
25 come to us with certain cases. Sometimes they

Page 22

1  did.  Sometimes they didn't.  So over the years
2  it's been kind of hit and miss.
3       Q.    Okay.  Are there particular years
4  where you recall having more routine
5  communication relative to the other years?
6       A.    I would say from middle '90s to the
7  middle 2000s, maybe 2005.
8       Q.    And are there years when you recall
9  having less communication with the DEA relative
10 to the other years?
11      A.    Again, I would say it was hit and
12 miss.  It would depend on the case and things of
13 that nature.
14      Q.    I believe you stated that currently
15 you don't have regular communication?
16      A.    Well, I do.  I mean, I do.  I don't
17 know what you mean by "regular."  Do we -- do I
18 talk to them over a period of a year?  Yes.  We
19 have certain individuals that are in a task
20 force that are local CPD officers that work with
21 the DEA.  They have a task force.  So if you
22 want to -- if you want to say that, yeah, then I
23 have a regular communication with them.
24      Q.    But over the years you had the most
25 communication with your DEA counterparts between

Page 51

1  prosecution?
2              MR. SPELLACY:  Objection.
3       A.    I don't know the answer to that
4  question.  I don't know anybody who would.
5       Q.    And when was the first time your
6  office considered filing charges in a
7  prescription opioid case?
8              MR. SPELLACY:  Objection.
9       A.    Again, all I can tell you is what I
10 have -- what my experience was since basically
11 1989, when I started doing practitioners.
12      Q.    When was the first time you filed a
13 prosecution related to prescription opioids?
14      A.    Early '90s.
15      Q.    Were prescription opioids a problem
16 in the early '90s?
17             MR. SPELLACY:  Objection.
18      A.    Absolutely.
19      Q.    And what kind of problem were they
20 posing in the 1990s in Cuyahoga County?
21      A.    When OxyContin came out, it was --
22 it was like a jailbreak.  It just exploded.
23      Q.    And when did that occur?
24      A.    The late '90s, when OxyContin first
25 went on the market.  It was unbelievable what

Page 58

```
 1              MR. SPELLACY:  Objection.
 2       Q.     How does the number of prescription
 3   opioid crimes prosecuted by your office in the
 4   late 1990s compare to the early 1990s?
 5              MR. SPELLACY:  Objection.
 6       A.     I couldn't quantify that for you.
 7       Q.     Am I correct that you noticed a
 8   surge in prescription drug crime in the late
 9   1990s?
10              MR. SPELLACY:  Objection.
11       A.     I noticed a surge in the -- in
12   the -- what's the word I'm looking for -- in the
13   wanting of a certain drug, which was OxyContin.
14       Q.     And what sources of data informed
15   you of that?
16       A.     Again, just my experience of talking
17   to the officers on the streets.
18       Q.     Which specific officers did you
19   speak to?
20       A.     Back in the '90s?
21       Q.     Yes.
22              MR. SPELLACY:  Objection.
23       A.     There were individuals that are
24   retired now.  I could give you some names of
25   people that worked back in the '90s.  Bob Cole,
```

Page 59

1  who was a diversion supervisor of the pharmacy
2  board, Jim Rye, Lynn Mudra.  Those are the names
3  that come to my mind.
4          Q.    And who did Jim Rye work with?
5          A.    All pharmacy board investigators.
6          Q.    Apart from those three individuals,
7  were there any other sources that you recall
8  speaking with?
9          A.    Yeah, but I don't know their names.
10 Local law enforcement people.
11         Q.    How many such people --
12               MR. SPELLACY:  Objection.
13         Q.    -- approximately?
14         A.    I'd say a handful.
15         Q.    And what steps did your office take
16 to deploy resources toward prescription drug
17 work in the late 1990s?
18               MR. SPELLACY:  Objection.
19         A.    The only thing I can tell you is if
20 we were doing a practitioner and we needed to
21 hire an expert, then we got money to hire an
22 expert.
23         Q.    Are you aware of any other resources
24 that were deployed in reaction to the surge in
25 prescription drug crime?