Exhibit 35

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE



FINAL REPORT
TASK FORCE RECOMMENDATIONS
OCTOBER 1, 2010

PRESENTED TO

GOVERNOR TED STRICKLAND
& THE OHIO GENERAL ASSEMBLY



# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

George T. Maier, *Chair*
*Department of Public Safety*

Dr. Alvin Jackson, *Vice Chair*
*Department of Health*

October 1, 2010

The Honorable Ted Strickland
Governor of Ohio
Statehouse
Columbus, OH  43215

Dear Governor Strickland:

The Ohio Prescription Drug Abuse Task Force has completed its work and has developed 20 policy recommendations that we believe will curb Ohio's prescription drug abuse epidemic.

The Task Force's recommendations preserve a necessary balance between prevention, treatment, law enforcement, legislative needs, education needs and policy changes.  These recommendations are the first steps in addressing this issue from each of these critical perspectives. We believe that these recommendations address the areas of concern identified in Executive Order 2010-4S.

In just six months, the Task Force has convened 10 full meetings and 15 Work Group meetings, with members from a diverse group of professional backgrounds and perspectives, to develop a report and recommendations to address Ohio's complex prescription drug abuse epidemic.  These recommendations reflect hours of discussion and debate and represent the consensus of the members of the Task Force. The group had an open and inclusive process, giving many individuals and professional organizations the opportunity to comment and have their concerns heard.

The members of the Task Force are passionate about this issue. Many of its dedicated professionals have committed to continuing to work on combating this epidemic in the future.  Ohio is fortunate to have this committed group of leaders as we continue to work at reducing prescription drug abuse and misuse in our state. Thank you for your continued commitment to solving this epidemic.  We look forward to working with you in the future to implement these recommendations and will continue to fight to protect and improve the well-being of Ohio's residents.

Sincerely,

George T. Maier
Assistant Director, Ohio Department of Public Safety
Ohio Prescription Drug Abuse Task Force Chair

Alvin D. Jackson M.D.
Director, Ohio Department of Health
Ohio Prescription Drug Abuse Task Force  Vice Chair

*Governor*
*Ted Strickland*

# Ohio Prescription Drug Abuse Task Force

*Final Report • Task Force Recommendations*

## TABLE OF CONTENTS

Executive Summary ...................................................................................................... 5

Summary of Recommendations ................................................................................ 9

Task Force Members ..................................................................................................... 13

Ohio's Epidemic .............................................................................................................. 17

    Role of Prescription Pain Medications ............................................................... 19

    How Did This Become an Epidemic? .................................................................. 21

    Impact of the Epidemic on Law Enforcement ................................................ 24

    Impact of the Epidemic on Treatment .............................................................. 27

    Impact of the Epidemic on Public Health ........................................................ 28

    Impact of the Epidemic on Healthcare Professionals ................................... 30

Law Enforcement Recommendations ..................................................................... 33

Treatment Recommendations ................................................................................... 41

Regulatory Recommendations .................................................................................. 49

Public Health Recommendations ............................................................................. 61

Task Force Progress ....................................................................................................... 69

Appendix:

    Additional Participants ........................................................................................... 73

    Letters of Support from Professional Organizations ...................................... 75

    Executive Order .......................................................................................................... 83

    Sources .......................................................................................................................... 88

# EXECUTIVE SUMMARY

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## EXECUTIVE SUMMARY

On April 2, 2010, Governor Ted Strickland signed Executive Order 2010-4S, establishing the Ohio Prescription Drug Abuse Task Force (the "Task Force").  The Task Force was created to develop a coordinated and comprehensive approach to Ohio's prescription drug abuse epidemic.  The group was comprised of 33 members with a wide range of professional backgrounds and perspectives, including: state and local public health officials, health provider board and association representatives, state and local law enforcement, local government officials, state agency representatives and legislators.

The Task Force was charged with meeting regularly to develop and recommend potential remedies to the growing misuse and abuse of prescription drugs in Ohio.  Due to the urgency of this problem, the Task Force was required to submit an initial progress report to the Governor and the leaders of the Ohio General Assembly by May 17, 2010.  The progress report included initial recommendations encouraging support for community education efforts (i.e.  drug take back programs and social marketing campaigns) and charged the Task Force Work Groups to explore and identify potential solutions for the Task Force Final Report.

Since the submission of the initial progress report, the Task Force and its Work Groups met frequently and have developed 20 recommendations.  In order to ensure the state's approach is both multifaceted and comprehensive, the recommendations address issues related to treatment, law enforcement, public health and regulation.

In accordance with Executive Order 2010-4S, and in support of the Governor's mission to reduce prescription drug abuse in Ohio, the Task Force hereby issues this final report.

# SUMMARY OF RECOMMENDATIONS

## SUMMARY OF RECOMMENDATIONS

| Law Enforcement | Regulatory | Treatment | Public Health |
|---|---|---|---|
| Implement standards for pain management clinics | Examine the regulation of prescriber dispensing of controlled substances | Enhance resources available within the alcohol and other drug addiction system of care for direct client services | Establish new and support existing local coalitions/task forces to address the prevention of prescription drug misuse, abuse and overdose |
| Legislative reform to increase the effectiveness of law enforcement in investigating and prosecuting prescription drug abuse cases | Redesign of the Medicaid lock-in program | Adopt a statewide standardized screening and referral tool | Implement social marketing campaigns to create awareness about prescription drug abuse |
| Promote cooperation, communication, education and training among law enforcement agencies | Enable state agencies and private enterprises to create medication lock-in programs | Increase education of prevention, intervention, treatment, and recovery support services for prescription drug abuse | Provide population specific education to increase awareness, knowledge and resources related to the risks of prescription drug abuse |
| Conduct comprehensive review of funding initiatives for law enforcement issues related to prescription drug abuse | Reduce regulatory barriers to increase utilization of evidence-based addiction treatment practices | Increase utilization of evidence-based practices to meet the growing need of opioid addicted individuals seeking help | Facilitate the proper disposal of prescription medications |
| | Implement changes to the state prescription monitoring program | Identify best practices for managing acute and chronic non-malignant pain, and disseminate and promote these proven approaches | Improve and coordinate data collection related to prescription drug misuse, abuse and overdose |
| | Encourage increased initial and continuing education on pain management and drug abuse | | |

# TASK FORCE MEMBERS

# Ohio Prescription Drug Abuse Task Force

*Final Report • Task Force Recommendations*

## TASK FORCE MEMBERS

**Task Force Chair**
George Maier, *Assistant Director*
Ohio Department of Public Safety

**Task Force Vice Chair**
Alvin D. Jackson, M.D., *Director*
Ohio Department of Health

Angela Cornelius Dawson, *Director*
Ohio Dept. of Alcohol and Drug Addiction
Services

Aaron Adams, D.O.
Representing: Association of Ohio Health
Commissioners

David T. Applegate II, M.D., *President*
Ohio State Coroners Association

S. David Baker, PharmD, DABAT
Representing: Ohio Poison Control
Collaborative

Robert J. Balchick, M.D., M.B.A.
Representing: Ohio Bureau of Workers'
Compensation

Ernest Boyd, R.Ph., CAE, *Executive Director*
Ohio Pharmacists Association

Representative Dave Burke
Ohio House of Representatives

Cleanne Cass, D.O.
Representing: Ohio Osteopathic Association

Tim A. Colburn
Representing: Ohio Hospital Association

Jeff Davis
Representing: Ohio Association of Health
Plans

Steven M. Dettelbach, *U.S. Attorney*
Northern District of Ohio
U.S. Department of Justice

Cynthia Callender Dungey
Representing: Ohio Department of Job and
Family Services

Kort M. Gronbach, M.D.
Representing: Ohio State Medical Association

Lois Hall, *Executive Director*
Ohio Public Health Association

Keeley Harding
Representing: Ohio Association of Advanced
Practice Nurses

T. Shawn Hervey, Esq.
Representing: Ohio Prosecuting Attorneys
Association

Chief Charles Horner
Representing: Ohio Association of Chiefs of
Police

Betsy Houchen, RN,MS, JD, *Executive Director*
Ohio Board of Nursing

Ed Hughes
Representing: The Ohio Council of Behavioral
Health & Family Services Providers

Matthew Kanai, Esq.
Representing: Ohio Attorney General's Office

Keith R. Kerns, Esq.
Representing: Ohio Dental Association

Representative Clayton Luckie
Ohio House of Representatives

Sergeant Richard Meadows
Representing: Ohio State Highway Patrol

Michael A. Moné, BPharm, JD, FAPhA
Representing: Cardinal Health

Lili C. Reitz, *Executive Director*
Ohio State Dental Board

Sheriff Kim Rogers
Representing: Buckeye State Sheriffs'
Association

Senator Shirley Smith
Ohio Senate

Carter Stewart, *U.S. Attorney*
Southern District of Ohio
U.S. Department of Justice

Senator Jimmy Stewart
Ohio Senate

J. Craig Strafford, M.D., M.P.H.
Representing: Ohio Medical Board

William T. Winsley, *Executive Director*
Ohio Pharmacy Board

# OHIO'S EPIDEMIC

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## OHIO'S EPIDEMIC

From 2000 to 2006, the number of deaths due to unintentional drug overdose in the U.S. more than doubled from 11,712, or an average of 32 deaths per day in 2000, to 26,400, or an average of 72 deaths per day in 2006.[1]

Ohio's death rate has grown faster than the national rate.  In 1999, Ohio's unintentional drug overdose death rate was 2.9 per 100,000 compared to the national rate of 4.0 per 100,000 (Figure 1).  In 2006, Ohio's unintentional drug poisoning death rate had risen to 11.1 per 100,000, compared to the national rate of 8.8 per 100,000.  By 2008, Ohio's death rate rose to almost 13 per 100,000.[2]

Figure 1.  Ohio[3]  and U.S.[4] Unintentional Drug Overdose Death Rates per 100,000 Population, 1999-2006 (2008 for Ohio).



In Ohio, between 2006 and 2008, the highest average annual death rates due to unintentional drug overdose occurred primarily in the state's southern region (Figure 2). Of the counties with the top ten death rates between 2006 and 2008, seven are located in this area.

Figure 2.  Unintentional Drug/Medication Poisoning Death Rates per 100,000 by County, 2004-08.[5,6]



Death rates per 100,000

- <2.99
- 3.00-4.99
- 5.00-6.99
- 7.00-9.99
- 10.00-14.99
- ≥15.00
- 10 or fewer deaths

Ohio's rate – 10.4 per 100,000

A wide range of individuals have been found to abuse prescription medications.  Although every age group has experienced fatalities due to unintentional drug overdose, the highest rate of death in 2006 through 2008 was for 45-54 year-olds.  Although males have a 1.5 times higher rate of death from opioid poisoning, females are the fastest growing at-risk group.[7]

The epidemic is also having an impact on younger Ohioans.  Four out of the top five drugs abused by 12th graders are prescription or non-prescription medications.  In 2007, 26.5 percent of high school students reported using a prescription drug without a prescription one or more times in their life.[8]  The National Center on

*"In one case in particular, a father is addicted and has stolen his son's toys and electronics to sell for money to buy more drugs.  The boy is wary and resentful when his father is in the home."*

**– Children's Services Caseworker**

Source: Research conducted by Joe Gay, Executive Director, Health Recovery Services Inc.

> "Oh, the pills, that's huge [among high school students]! They don't even know what they're taking… and don't seem to be concerned about it."
>
> **– School counselor, Dayton**
>
> Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

Addiction and Substance Abuse surveyed teenagers in 2008 and reported that teens were able to purchase prescription drugs more easily than beer.[9]

In 2007, unintentional drug overdose surpassed motor vehicle crashes and suicide as the leading cause of injury death in Ohio for the first time on record (Figure 3).   This trend continued in 2008.

Figure 3. Number of Deaths from Motor Vehicle Traffic[10], Suicide and Unintentional Drug Poisonings[11]  by Year, Ohio 1999-2008



### ROLE OF PRESCRIPTION PAIN MEDICATIONS

Opioids are chemicals that originate from the poppy flower and its product opium.  They are analgesics (pain relievers) that work by binding to specific receptors in the brain, the same receptors as natural endorphins, to decrease the perception of pain and increase pain tolerance.  They belong to the central nervous system depressant classification of drugs, which produce sedation and respiratory depression.  This drug class includes prescription pain relievers (e.g., oxycodone, hydrocodone, methadone, fentanyl, codeine, morphine, tramadol, etc.) and heroin.

Physical dependence on opioids develops with long-term use, which can lead to severe withdrawal symptoms upon abrupt discontinuation of use.  Due to increasing tolerance levels and the feeling of euphoria these drugs can produce, opioids can lead to abuse and overdose as individuals must take increasing doses of medication in order to attain the same results (e.g., euphoria, pain relief, normalcy, etc.).

When compared to previous drug overdose epidemics, the current prescription drug epidemic is responsible for considerably more deaths.  Mortality rates are currently four to five times higher than the rates during the "black tar" heroin epidemic in the mid-1970s and more than three times what they were during the peak years of crack cocaine epidemic in the early 1990s (Figure 4).

Figure 4.  Epidemics of unintentional drug overdoses in Ohio, 1979-2008.[12,13,14]



Prescription opioids are largely responsible for this alarming increase in drug overdose death rates and continue to have a significant impact on this epidemic.  In Ohio in 2008, prescription opioids were involved in more unintentional overdoses (37 percent) than heroin and cocaine combined (33 percent).[15]   The opioids most associated with overdose are methadone, oxycodone (e.g., OxyContin®), hydrocodone (e.g., Vicodin®) and fentanyl.  Other opioids such as morphine, meperidine (Demerol®) and hydromorphone (Dilaudid®) also play a role.[16]

Prescription opioids frequently result in accidental overdose in combination with other drugs.  In 2008, the majority of unintentional overdose deaths in Ohio that involved a prescription opioid, also had at least one of the following listed on the death certificate: heroin, cocaine, a hallucinogen, a barbiturate, benzodiazepine, alcohol, or other/unspecified. [17] Fourteen percent of the deaths due to a prescription opioid involved cocaine and eight percent involved heroin.[18]

Individuals who misuse or who are addicted to prescription opioids sometimes transition to heroin because it is a less expensive, readily available alternative that provides a similar high.[19]  A 2002 study by the Ohio Substance Abuse Monitoring Network found that  "young,

*"I think if all my friends had never tried OxyContins, it would have never led to the heroin, never.  Everybody [that I know who uses heroin] started out with OxyContins."*

**– Female, 18, Dayton**

Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

*"I was sick one time and couldn't find any pills [OxyContin]… I was really, really sick. And I couldn't work, and I couldn't do much, and a friend a mine that was already usin' heroin turned me onto the heroin.  He said that it would take the dope sick away.  And from there on, you know, it's cheaper, it's quicker…."*

**– Female, 29, Dayton**

Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

new heroin abusers seeking treatment reported OxyContin abuse prior to becoming addicted to heroin."[20]  The study also found that "several individuals reported resorting to heroin when their OxyContin habits became too expensive or when the drug became difficult to obtain."[21]

### HOW DID THIS BECOME AN EPIDEMIC?

Changing medical and advertising practices have contributed to widespread use of prescription drugs across all levels of the population, thereby increasing the scope of abuse.  Societal and medical trends that led to this problem include: changes in prescribing practices for pain medication, changes in the marketing of medications, overmedication, increased use of prescription opioids, self-medication, improper disposal of excess medications, and widespread diversion (Figure 5).

Figure 5.  Contributing Factors to Rising Fatal Drug Death Rates.



### Changes in Clinical Pain Management

Growing recognition by professionals of the under-treatment of pain in the late 1990's prompted needed changes in clinical pain management guidelines at the national level, as well as changes in Ohio's law regarding the treatment of intractable pain.  As defined in Ohio law, "intractable pain" means a "state of pain that is determined, after reasonable medical efforts have been made to relieve the pain or cure its cause, to have a cause for which no treatment or cure is possible or for which none has been found."[22]

> *"I  was, like, 15 when I broke my ankle, and they gave me a prescription of Percs . . .  and I just haven't really ever quit since."*
>
> **– Male, active user**
>
> Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

To address the perception that prescribing adequate amounts of controlled substances would result in unnecessary scrutiny by regulatory authorities, Ohio's Intractable Pain Act provided that physicians treating intractable pain are not subject to disciplinary action when practicing in accordance with accepted and prevailing standards of care and rules adopted by the Medical Board delineating those standards.[23]  Such fundamental changes in the recognition and treatment of pain contributed to increased prescribing and concomitant availability of, and exposure to, potent opioid analgesics (pain medications).

### Aggressive Marketing of Opioids by Pharmaceutical Companies

At the same time as these clinical and regulatory changes in the treatment of pain were made, the introduction of new, extended-release prescription opioids (e.g., OxyContin®) and overly aggressive marketing strategies by pharmaceutical companies to prescribers contributed to the growing use of prescription opioids throughout Ohio.[24]  In 2003, the Drug Enforcement Agency (DEA) cited Purdue Pharma's focus on promoting OxyContin for treating a wide range of conditions as one of the reasons the agency considered Purdue's marketing of OxyContin to be aggressive.[25]  The DEA expressed concern that Purdue marketed OxyContin for a wide variety of conditions to physicians who may not have been adequately trained in pain management.  Purdue was also cited twice by the Food and Drug Administration (FDA) for OxyContin advertisements in medical journals that violated the Federal Food, Drug, and Cosmetic Act.[26]

### Growing Use of Prescription Opioids

From 1999 to 2007, Ohio's rate of opioid distribution in grams per 100,000 population through retail pharmacies increased 325 percent while the unintentional drug overdose death rate increased 305 percent (Figure 6).  These increases represent a nearly one-to-one correlation, demonstrating that increased exposure to opioids has contributed to Ohio's overdose epidemic.  With the exception of modest decreases in codeine and meperidine distribution, nearly all types of prescription opioids experienced dramatic increases during this period.[27] Hydrocodone combined with acetaminophen (Vicodin®) was the most prescribed drug in the U.S. in 2008, according to IMS, an independent healthcare information company.[28]

Figure 6.  Unintentional Fatal Drug Poisoning Rates[29]  and Distribution Rates of Prescription Opioids[30,31],  in Grams per 100,000 Population[32]  by Year, Ohio, 1997-2007.[33]



### Direct-to-Consumer Marketing of Pharmaceuticals

Beginning in the early 1990's, there was a significant philosophical shift in the way prescription drugs were marketed.  Twenty years ago, direct appeals to consumers by prescription drug manufacturers via print and broadcast media was a new phenomenon in the health sector.  This approach, known as direct-to-consumer (DTC) marketing, has taken an increasingly important position in terms of public awareness of prescription drug products.  Surveys have shown that over 90 percent of the public reports seeing prescription drug advertisements.[34]

In 1989, the drug industry collectively spent only $12 million on DTC marketing, compared to $2.38 billion in 2001, an increase of almost 200-fold in only 12 years (Figure 7).  A total of 105 prescription drugs were advertised directly to consumers in 2001.[35]

Figure 7.  Total Amount Spent in Direct-to-Consumer Advertising of Prescription Drugs, US, 1989-2001.[36]



> *"The availability is so good because the people want to get rid of 'em that bad that's why they, we don't have to really search; it finds us.  People text you, saying, 'Hey, you know, I got this. You want it, you want it?' People are pushing, tryin' to push 'em away.  I mean, that's how available they are."*
>
> **– Female user**
>
> Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

As a result of this change in marketing, the Institute for Safe Medication Practices reports 78 percent of primary care physicians have been asked for drugs that their patients saw advertised on television and 67 percent concede that they sometimes grant patients' requests for medications that are not clinically indicated.   Therefore, many patients may be using medications unnecessarily and/or are overmedicated.

**Diversion**
These and other social trends toward increased prescription drug use have resulted in the exposure of a much greater proportion of the public to highly addictive, "legal" substances than would be exposed to or likely to experiment with illegal drugs.   Through this exposure, which occurs many times for legitimate pain issues, individuals have become addicted thus driving the demand for the drugs.  Drug diversion, the unlawful channeling of regulated drugs from medical sources to the illicit marketplace, is supplying large quantities of controlled substances to fuel addiction.[38]

Studies indicate the most common method of diversion is through a family member or a friend.  Data from the 2009 National Survey on Drug Use & Health (NSDUH) reveal that 55.3 percent of  individuals aged 12 or older who engaged in non-medical use of prescription pain relievers  obtained the drug they most recently used from "a friend or relative for free."[39] Other methods of prescription drug diversion include:

- Utilizing multiple physicians and pharmacies to acquire controlled substances for nonmedical use (also known as "doctor shopping");

- Theft from pharmacies, health care facilities, and private homes;

- Intentional overprescribing by unscrupulous physicians; and

- Internet pharmacies.


**IMPACT OF THE EPIDEMIC ON LAW ENFORCEMENT**
In the past decade, the threat to public safety posed by prescription drug abuse has increased throughout the Nation.  Data from the 2009 National Prescription Drug Threat Assessment show that law enforcement agencies reported the abuse of prescription drugs as the fastest growing trend in drug abuse.  In 2004, data showed that 3.1 percent of law enforcement agencies reported pharmaceuticals as a threat.  In 2008, this percentage had increased to 8.1 percent.[40]  The availability of prescription drugs has also increased; 48.7 percent of law enforcement agencies report high availability in 2008 versus 40.8 percent in 2004.[41] In fact, a greater percentage of law enforcement agencies reported a higher availability of prescription drugs nationwide than that of heroin or powder cocaine.

Law enforcement agencies are increasingly associating prescription drug abuse with violent and property crimes (Figures 8 and 9).  In 2008, 3.5 percent of law enforcement agencies reported an association between prescription drugs and violent crime, compared to 2.2 percent in 2004.  For property crime, the percentage went from 2.5 percent in 2004 to 6.0 percent in 2008, while the association between crack cocaine, marijuana, and powder cocaine decreased.

Figure 8.  Percentage of Law Enforcement Agencies Reporting an Association Between Drug Type and Violent Crime, Nationwide, 2004-2008.[42]



Figure 9.  Percentage of Law Enforcement Agencies Reporting an Association Between Drug Type and Property Crime, Nationwide, 2004-2008.[43]



The distribution and use of prescription drugs is regulated by the Federal Controlled Substances Act, which classifies controlled substances by schedules according to the risk of abuse, the use in accepted medical treatment, and the potential for dependence. Despite the strict regulations of these substances, local law enforcement agencies are faced with increasing diversion from legitimate sources for illicit purposes, including: doctor shopping, forged prescriptions, falsified pharmacy records, and employees who steal from their place of employment.  This on-going diversion of prescription narcotics creates a lucrative marketplace.  For example, a bottle of 100 OxyContin® 80 mg tablets, which normally costs $700-800 at the pharmacy, has a street value of $7,000-8,000.[44]

A growing problem for law enforcement throughout the state, particularly in southern Ohio, is diversion through clinics that prescribe and/or dispense powerful narcotics inappropriately or for non-medical reasons.  These clinics are often referred to as "pill mills."  Pill mills are sometimes disguised as independent pain-management centers.  They often exhibit certain characteristics, such as:

- Not accepting insurance and operating as a cash-only business;

- Not requiring a physical exam, medical records, or x-rays;

- Treating pain with prescription medication only;

- Avoiding scrutiny by pharmacists by dispensing medication within the clinic;

- Irregular hours of operation;

- Presence of security guards; and

- Long lines of people waiting outside of the building.[45]

> "I could get Roxicet for $4 a piece; Percocet 5s, $4 a piece; Perc 10s $6 a piece; Perc [immediate release oxycodone] 15s are, like, $10 a piece; and then Perc [immediate release oxycodone] 30s, those go for $20.  And the Oxys, those go for a dollar a milligram, and Vicodin 5, [$]2; Vicodin 10, [$]4; and then, um, Valium 5s are a dollar; and then the Valium 10s go to [$]2; and the V cuts go to [$]5."
>
> **– Active user, Columbus**
>
> Source: Research conducted by Robert Carlson, Wright State University for the Ohio Substance Abuse Monitoring Network (OSAM).

These facilities usually open and shut down quickly in order to evade law enforcement.  Authorities believe that as many as eight pill mills could be operating in Scioto County alone, which has a population of 76,000 residents.[46]

One of the most notorious owners of a pill mill was Dr. John Lilly.  Dr. Lilly was an orthopedic surgeon in Portsmouth, Ohio.  He was arrested in March of 2000 for operating one of the largest narcotics operations in the Midwest.  About the time that Dr. Lilly started his pain clinic, local police noticed that drug-related crimes in Portsmouth started to trend upward.  Burglaries increased 20 percent compared to the previous year and, for a period of about three months, police records showed homes and pharmacies were being broken into and robbed of prescription drugs almost daily.[47]

After his arrest, police found an x-ray machine that did not work and beer cans on the waiting room floor.  According to the Portsmouth Chief of Police, Dr. Lilly would perform little or no physical examination after collecting $200 cash.  He would merely elicit a complaint from a patient, note the complaint as "intractable pain", and give the patient

a prescription.  He charged $10 for each narcotic pill and an additional $10 for each OxyContin.[48]  Over a six-month period, Dr. Lilly wrote more than 4,000 prescriptions, most of which were for pain medications.  An investigation revealed that people came from as far as Texas to obtain prescriptions.[49]  Police also found almost half a million dollars in cash in his basement and almost an additional $100,000 in a separate apartment he kept next to his practice.

The investigation into Dr. Lilly's practice took almost four months and required the assistance of four full-time officers and three Ohio Bureau of Criminal Identification and Investigation (BCI) agents.[50]  Investigations like these require a great deal of time and resources and can present challenges to small law enforcement agencies with limited funding.

**IMPACT OF THE EPIDEMIC ON TREATMENT**

Prescription drugs are the second most abused category of drugs in the United States, following marijuana.[51]  In 2008, an estimated 23.1 million people needed treatment for a substance use disorder in the U.S.[52]  Between 1998 and 2008, treatment admissions for prescription painkillers increased 460 percent nationwide.  In the past decade, admissions for non-heroin opioid substance abuse treatment have increased more than 300 percent in Ohio (Figure 10).

Figure 10.  Number of substance abuse treatment admissions for non-heroin opioids by year, Ohio, 1993-2008 [53]



There are approximately one million individuals in Ohio who need substance abuse prevention or treatment services.  Only one in ten of the people in the state who need these services receive them through the publicly funded system.[54]  In State Fiscal Year (SFY) 2009, 14,585 clients had a diagnosis of opiate abuse or dependence, equaling 14 percent of the total 103,469 clients within the publicly funded alcohol or other drug (AoD) system of care.[55]

The state of Ohio spent $5.4 billion, or roughly $468 per Ohio resident on untreated addiction related costs in 2005.[56]  Untreated addiction increased state spending in areas

> *In 2003, Fairfield County spent $350,000 incarcerating opiate addicts.  By 2008, the cost of incarcerating opiate addicts had increased to $2.5 million.*
>
> Source: The Fairfield County Opiate Task Force, Presentation to the Ohio Prescription Drug Abuse Task Force, August 18, 2010.

such as child welfare, adult corrections, and juvenile justice.  Across the nation, these related costs have significantly increased causing the burden of substance abuse to surpass the amount states spend on education.[57]

## IMPACT OF THE EPIDEMIC ON PUBLIC HEALTH

Prescription opioid misuse, abuse and overdose have an enormous impact on the health of Ohio residents.  On average, from 2006 to 2008, approximately four people died each day in Ohio due to drug-related overdose.[58]  In response to the devastating effects of this problem in Scioto County, including a rise in overdose deaths, an increase in those seeking treatment for opioid addiction, and a rise in crime, the city and county health commissioners declared a public health emergency in January 2010.[59]

The health and safety of individuals and communities are at risk, as the consequences of this problem go far beyond the individual who is misusing or addicted to these drugs and reach well into the community.  Some of the repercussions for individuals include job loss, loss of custody of children, physical and mental health problems, homelessness, and incarceration.  This results in instability in communities often already in economic crisis and contributes to increased demand on many community services such as hospitals, medical professionals, courts, children's services, treatment centers and law enforcement. For example, according to data gathered by the Ohio Department of Health (ODH) from Ohio hospitals, more than nine out of ten (95.7 percent) poisoning hospitalizations in Ohio are due to drugs.  Further, hospital emergency department visits for "drug overdose" or "symptoms of drug overdose" as the chief complaint on admission rose from 40 to 70 per day in August 2007, to 50 to 80 per day in July 2008.  There were never less than 40 visits per day during this time period.

In addition to the personal costs experienced, the annual costs of unintentional drug overdose are also shocking; $3.5 billion in fatal costs (including medical, work loss, and quality of life loss) and $31.9 billion in non-fatal, hospital admitted costs (Figure 11).

Figure 11.  Estimated Average Annual Costs of Unintentional Drug Overdose in Ohio[60]

| Type of Costs | Fatal Costs | Non-fatal, hospital admitted costs |
|---|---|---|
| Medical | $4.9 million | $19.1 million |
| Work Loss | $1.2 billion | $5.2 million |
| Quality of Life | $2.2 billion | $7.6 million |
| Total | $3.5 billion | $31.9 million |

As one method of combating the problem of prescription opioid abuse, local public health departments, prevention educators, alcohol and drug treatment agencies, health care providers, law enforcement agencies and many other partners in communities across Ohio have come together to form coalitions to raise public awareness, promote community action and implement educational programs about the dangers and devastating effects of prescription opioid abuse.  The following are two examples of such efforts.

*13.9 million doses of hydrocodone and oxycodone were legally dispensed to the residents of Fairfield, Athens, Hocking and Perry counties in 2009.  This is equal to 52 pills for every man, woman and child in these counties.*

Source: The Fairfield County Opiate Task Force, Presentation to the Ohio Prescription Drug Abuse Task Force, August 18, 2010.

In Scioto County, the Scioto County Rx Drug Action Team was formed in January 2010, in response "to the epidemic of prescription drug abuse, misuse, overdose, consequent death and disease incidence and social disruption."[61]  The Action Team spawned several specialized groups, including a large citizen's support group called SOLACE.

SOLACE stands for "Surviving Our Losses and Continuing Everyday" and is a support group for family members who have lost a loved one to a drug related death.  The group, which meets in Portsmouth, takes an active role in raising awareness and is working to prevent future drug-related deaths.  SOLACE is open to anybody who is passionate about stopping drug abuse in their community, anybody in a recovery program, or any person who has a loved one who is addicted and needs someone who understands.

In July 2010, the group held a "Rockin' for Recovery Project" event on the town square in Portsmouth and unveiled the "Be the Wall Against Drugs" community awareness campaign featuring a memorial wall with photographs of people lost to drugs.  The wall remains on prominent display, in a department storefront window, in downtown Portsmouth.  This project puts a face to the problem and reminds passersby that everyone must "be the wall" for the community so that no more Ohioans are sacrificed to this epidemic.

SOLACE members also volunteer to do drug prevention education with youth, participate in public awareness and education events, and provide support to families who are experiencing crisis related to a family member's drug use, addiction, or death.  The group also maintains a Facebook page that serves as a source to link interested parties with services.[62]

Another community outreach effort is taking place in Jackson County, which also has one of the highest rates of unintentional drug overdose deaths.[63]  A group of concerned citizens came together and formed the Launch Youth Leadership Team (LYLT) to engage young people in making a difference in their community.  The LYLT identified prescription drug misuse and abuse by teens as a problem in their community, they educated themselves about this issue, and they took action.

The LYLT teens are working with their schools to present educational programs with a peer-to-peer approach to raise awareness with other students.  They agreed on a "Protect Your Pills" theme and developed a brochure about proper storage and disposal of prescription drugs.  The Launch Team and adult community volunteers delivered

12,000 flyers to pharmacies throughout Jackson County in February 2010.  The flyers were handed out with every prescription purchased through mid-March 2010 and highlighted the importance of properly monitoring, securing and disposing of over-the-counter and prescription drugs.  This is an on-going biannual effort and is an example of a coordinated community response with youth and adults working together in partnership with local businesses.

**IMPACT OF THE EPIDEMIC ON HEALTHCARE PROFESSIONALS**

Medical providers are also impacted by this epidemic.  Patients who suffer from intractable pain may need medical care that includes prescription opioids.  Prescription opioids, when taken exactly as prescribed, can assist individuals living in pain by improving their quality of life.   However, when abused or taken improperly, these drugs can produce serious adverse health effects, including addiction and overdose.[64]

Most doctors will treat a significant number of patients with pain problems or substance abuse issues throughout their careers.[65]  However, these issues are only a small part of most physicians' medical training.  In fact, many doctors may only receive a few hours of education on the use and potential consequences of opioids during their time in medical school.[66]

As a result, medical providers may be unprepared to deal with the complexity of issues arising from the treatment of chronic pain and/or prescription drug abuse.  Some providers overprescribe combinations of medications to treat pain while others choose not to work with patients who have ongoing pain issues because of fear of prescription drug abuse, liability, or personal or professional biases.[67]  Doctors can face criticism if they have high numbers of pain-related cases or prescribe significant amounts of pain medications.[68]  Additionally, doctors are often confronted with the difficult position of judging if certain patients are deceiving them to obtain prescriptions to feed their addictions or sell to others, or if they are legitimately in need of these medications to treat their pain.

Pharmacists have also been negatively impacted by Ohio's prescription drug abuse problem.  Over the past few years there has been a growing trend of pharmacy crimes including robbery and burglary.  A 2005 study by The Center on Addiction and Substance Abuse at Columbia University revealed that 28.9 percent of pharmacists responding had experienced robbery or theft within the previous five years.[69]

Pharmacy robbery has grave implications; the robber may be armed, may have accomplices, and may even jump over the counter to take what he or she wants.  Pharmacy robberies frequently target brand name controlled substances, as Vicodin®, Percocet®, OxyContin®, and Xanax®.  The survey also indicated that 20.9 percent of pharmacies no longer stocked certain medications, such as OxyContin® and Percocet,® in order to protect themselves from pharmacy robbery.[70]

# Law Enforcement Recommendations

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## LAW ENFORCEMENT RECOMMENDATIONS

The Task Force Law Enforcement Work Group was charged with developing recommendations to assist law enforcement in combating the prescription drug abuse epidemic.  The Work Group was chaired by Matthew Kanai of the Ohio Attorney General's Office, and Lili C.  Reitz, Executive Director of the Ohio State Dental Board served as the vice chair.  The Group consisted of members representing federal, state and local law enforcement agencies, professional healthcare organizations, state licensing boards, prosecutors, county Drug Task Forces, and state agencies.

The Law Enforcement Work Group was charged with the following areas of responsibility:

- Explore mechanisms to increase multi-jurisdictional collaboration within the criminal justice and law enforcement community to investigate and enforce prescription drug abuse cases.
- Explore funding opportunities for criminal justice and law enforcement.
- Identify opportunities and strategies for greater local, state and federal collaboration on issues regarding prescription drug abuse cases.
- Identify other strategies to strengthen the role of law enforcement in dealing with the issue.

The Work Group met on July 14, August 11, and September 20, 2010.  The Group came to consensus on four recommendations, which were presented to the Task Force for further consideration.  Final recommendations presented herein were determined after discussion with the Task Force and through a consensus-based decision-making process.

### IMPLEMENT STANDARDS FOR PAIN MANAGEMENT CLINICS

The majority of pain clinics and physician offices in Ohio contribute to the health and safety of Ohioans by legitimately caring for persons with acute and chronic pain issues. However, so-called "pill mills" cloak themselves under the guise of pain clinics and furnish controlled substances in an irresponsible manner.  Current Ohio law makes it difficult to address situations in which members of a trusted profession abuse their position by shielding illegal activity within their practice area.

Ohio House Bill 547 (H.B. 547), as recently introduced in the General Assembly, enhances the enforcement capabilities of the law enforcement and regulatory agencies by identifying and focusing on rogue pain clinics that operate outside accepted and prevailing standards of care.  This legislation utilizes an existing licensing mechanism at the Ohio Board of Pharmacy (BoP) to address outlier pain clinics that should be distinguished from legitimate pain practices.  The licensure process will enhance the tools that regulatory bodies have in pursuing illegitimate clinics by requiring physician ownership, background checks and prohibiting ownership interests that

have a felony record.  In addition, one of the benefits of authorizing the BoP to license pain management facilities is that the agency would have jurisdiction to deny licensing to rogue clinics and take disciplinary action against those clinics that practice outside the law and accepted operational standards.  As a result, the burden on law enforcement to monitor these clinics will be reduced.

H.B. 547 also provides the State Medical Board with greater authority to develop standards of care for physicians who own or practice in a pain management clinic.  The legislation directs the Medical Board to promulgate rules to: "ensure that any person employed by the facility complies with the requirements for the operation of a pain management clinic;" to establish "standards for the operation of a pain management clinic by a physician;" and to "establish standards and procedures to be followed by physicians regarding the review of patient information available through the drug database."  Establishing and updating standards of care and procedures for prescribers and clinics through the rule making process would clearly differentiate legitimate clinics from criminal operations thereby allowing regulators and law enforcement to focus activities on unlawful facilities.

By giving regulatory boards the proper tools and the authority to use them in enforcing the laws, H.B. 547 reduces the burden on criminal authorities to proceed with the difficult task of criminal proceedings.  Currently, criminal actions initiated in the courts require professional licensing boards to wait for a decision in the criminal matter before taking further action based on a conviction.  The legislation sets out to strengthen the ability of the State Medical and Pharmacy Boards to summarily suspend (to suspend without a prior hearing) the license of a facility or a practitioner if there is clear and convincing evidence of immediate and serious harm to the public.

The General Assembly should consider whether the definition of a "pain management clinic" in H.B. 547 is sufficient and will be effective for these

## John*

John lives in one of the communities in Ohio hardest hit by opioid use.  John made good grades and was active in sports and school activities. His first exposure to opioids was a prescription at age 19 after breaking his ankle. He continued to take opioids on his own after the prescription was discontinued, first obtaining pills from a family member's prescription and then buying them "on the street."

He stopped using for a year and went away to college. Upon returning to the community, he resumed his use and it was soon out of control. John said that when he left opioids were hard to find but when he got back they were everywhere.

John once wrote down the names of everyone he knew who sold pills. There were 60 people on the list, all from his small community.

John supported his habit by stealing, which was very much contrary to his values. He became depressed, suicidal, and attempted suicide several times. Withdrawal he describes as "Terrible. I've always compared it to being held under water. All you want is a breath of air. All it takes is $30 to feel OK."

After attempting suicide, being in a psychiatric hospital, and facing jail, he entered treatment. After struggling to remain abstinent while on a waiting list, he has stabilized on Suboxone and counseling and is making good progress.

John said, "I graduated in a class of 67 people; within 10 years 15 were dead from drugs."

*Name has been changed; individual did not wish to be named. Source: Research conducted by Joe Gay, Executive Director, Health Recovery Services Inc.

purposes.  Under the proposed law, a facility is a pain management clinic if its "primary" practice is the treatment of pain.  This means treatment specific to pain, as opposed to the underlying condition that causes pain.  Accordingly, a doctor could treat both and avoid being classified as a pain management clinic.  This could create an exploitable loophole that should be addressed in the legislative process.

The General Assembly should also consider requiring other professional licensing boards to develop rules specifying when pharmacists and other authorized prescribers are required to review patient data in the Ohio Automated Rx Reporting System (OARRS), which is the state's prescription monitoring program.  H.B. 547 requires only the Medical Board to adopt rules specifying when a physician is required to review information in OARRS.  By standardizing requirements in this area, the state is encouraging greater transparency and accountability to the public and practitioners.

Overall, the legislation seeks to enhance opportunities for greater collaboration between the State Medical and Pharmacy Boards. While these agencies are critical to successfully addressing the abuses identified by the Task Force, the various provisions in H.B. 547 should help foster greater collaboration and effectiveness of the entire law enforcement community.

Therefore, the Task Force supports passage of H.B. 547 or a successor bill that addresses the same issues - in particular, the provisions allowing for summary suspension, additional regulatory authority for the Medical Board and BoP, licensure of pain management clinics, and enhancing the use of OARRS - while strengthening the definition of a pain management clinic to avoid any potential loopholes.   The General Assembly should partner with professional licensing boards, healthcare provider organizations, and state and local law enforcement agencies to implement this recommendation.

**LEGISLATIVE REFORM TO INCREASE THE EFFECTIVENESS OF LAW ENFORCEMENT IN INVESTIGATING AND PROSECUTING PRESCRIPTION DRUG ABUSE CASES**
The Task Force recommends that the General Assembly propose and support additional legislative efforts to increase the capacity of law enforcement to be more aggressive and more effective in its ability to investigate and prosecute prescription drug abuse cases.

These provisions may include, but are not limited to:

- Limiting the unit dosage of Schedules II-IV drugs an individual can possess for a given time period.  The unit dosage amount and time period should be tailored so that only the most extreme legitimate cases would be included, leaving the majority of legitimate patients unaffected.  The State BoP, in consultation with the State Medical Board, should be given the authority to adopt rules regulating what would be considered a maximum quantity of prescribed opiates and other controlled substances to be possessed by an individual at one time. Possession of greater than the unit dosage amount by a specified amount creates a rebuttable presumption (one that is taken to be true unless someone comes forward to contest it and prove otherwise) of criminal possession.  The rebuttable presumption of criminal possession would also apply to pills or prescriptions that come across state lines into Ohio.

- Lowering the bulk amount of drugs for Schedule III and IV and increasing the criminal penalty for possession of bulk amounts to better enable law enforcement to pursue felony possession charges.

- Requiring those in possession of drugs that are not in their original containers to prove within a specified period of time that the drugs were acquired through a lawful prescription.  This requirement would not create an additional criminal offense for failure to comply, nor would it prevent an officer who otherwise has probable cause that a crime has been committed to arrest or confiscate such drugs.

- Enhancing and strengthening current reporting requirements of licensed healthcare professionals (i.e.  physicians, dentists, nurses, pharmacists, veterinarians) who reasonably suspect other healthcare providers are committing prescription drug violations, including the requirement of inter-disciplinary reporting.

- Implementing an efficient reporting process for physicians and other healthcare professionals wanting to report doctor shopping or abuse to law enforcement. An efficient reporting process would emphasize the vital role that healthcare professionals can play in cooperation with local law enforcement.

- Requiring all licensees permitted to prescribe prescription narcotics to use a standardized, tamper resistant prescription pad or standardized electronic prescribing.

- Increasing fines for prescription drug abuse convictions.[71]

- Developing rules and utilizing systems for sharing interstate records regarding pharmaceutical investigative information (i.e.  history, criminal activity, etc.) with other states.

Stronger legislation creates clear standards that place greater control on enterprises that predominantly involve drugs that are prone to abuse.  These recommendations require leadership by the General Assembly in collaboration with law enforcement agencies across the state, healthcare provider organizations and professional licensing boards.


**PROMOTE COOPERATION, COMMUNICATION, EDUCATION, AND TRAINING AMONG LAW ENFORCEMENT AGENCIES**

Laws and rules pertaining to the enforcement of criminal activity relating to prescription drugs are underutilized.  Traditionally, there has been hesitancy about encroachment and disagreement about methods of investigation and prosecution.  The lack of knowledge by law enforcement of existing laws and rules (i.e. such as in the area of drug trafficking and illegal processing of drug documents) may also result in ineffective application of those laws to licensed individuals committing crimes related thereto.  There is also a lack of strong cooperative working relationships among various levels of law enforcement and knowledge about existing resources and tools for enforcement.

The Task Force recommends that law enforcement work to promote cooperation and communication among federal, state and local law enforcement agencies.  By developing working relationships and fostering collaboration at all levels of law enforcement, agencies can maximize existing resources to address criminal activities relating to prescription drug

abuse.  In addition, developing improved communication will allow law enforcement officials to clarify jurisdictional issues to prevent overlapping investigations.

In order to promote greater cooperation and education, the Task Force recommends that law enforcement agencies hold a summit to identify resources, tools, and training available to combat criminal activity involving prescription narcotics.  The summit should address the traditional hesitancy about encroachment, best-practices regarding methods of investigation and prosecution, existing laws, and resources available to foster improved linkages among all levels of law enforcement.

The necessary partners for this recommendation include local, state and federal law enforcement agencies involved in the investigation and prosecution of prescription drug cases.  The Task Force recommends including agencies that are not directly linked to drug diversion enforcement (such as the IRS as it focuses on financial and organizational investigations), as well as regulatory agencies interested in productive law enforcement investigations.  Cooperation with the Ohio Peace Officer Training Academy (OPOTA) and other similar education sponsors is also needed.  The Governor and/or Attorney General of Ohio should take a leadership role in implementing this recommendation.  The U.S. Attorney's Office indicated it may have training funds available to assist in carrying out this recommendation.

### CONDUCT COMPREHENSIVE REVIEW OF FUNDING INITIATIVES FOR LAW ENFORCEMENT ISSUES RELATED TO PRESCRIPTION DRUG ABUSE

The Task Force recommends that the Governor designate the appropriate state agency to catalogue available resources to assist law enforcement in combating prescription drug abuse and develop a coherent statewide plan on distribution.  Additional resources are required to address the funding needs of law enforcement such as direct sponsorship of prescription drug-related investigations and prosecutions, enhancement of the existing OARRS database, and community education and outreach.  A comprehensive review should not preempt a local agency from seeking funds, but should help provide statewide coordination.

A review of existing funding should include but are not limited to the following:

- Resources available for investigations, such as task force seed money from the Organized Crime Investigations Commission, the Ohio Department of Public Safety's Office of Criminal Justice Services, and other state and federal sources.

- Forfeiture funding.

- Grants from the National Association of Drug Diversion Investigators.

Given the complexity of identifying all available sources, it is recommended that the Governor designate an appropriate agency to begin compiling the necessary information immediately.  Critical partners include the Ohio General Assembly, the Ohio Department of Public Safety (DPS), the Ohio Attorney General's office, and federal grant-administering agencies.

# Treatment Recommendations

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## TREATMENT RECOMMENDATIONS

The Treatment Work Group was charged with developing recommendations to improve the treatment outcomes of those who currently abuse prescription narcotics. The Work Group was chaired by Ed Hughes, who represents the Ohio Council of Behavioral Health & Family Services Providers, and co-chaired by Dr. Cleanne Cass of the Ohio Osteopathic Association. The group's membership included more than 40 individuals from a variety of professional backgrounds including treatment and prevention service professionals, physicians, pharmacists, regulatory entities, professional healthcare organizations and educators.   ODADAS was the lead agency for the group and a facilitator from the Ohio Department of Administrative Services (DAS) was used during each of the meetings.

The Treatment Work Group was charged with the following tasks:

- Identify state medical/healthcare associations to request they make a commitment to address the prescription drug abuse problem in upcoming meetings, conferences, courses and newsletters.
- Identify mechanisms to ensure that individuals with chronic pain are given appropriate treatment and healthcare providers are not dissuaded from including pain management in their practice.
- Examine screening/referral and treatment options available in Ohio to individuals addicted to prescription drugs.
- Identify and promote to medical professional associations educational programs for physicians and other prescribers that address the issue.
- Work with medical associations to identify and implement model prescribing guidelines for all prescribers.
- Initiate and support efforts to increase the capacity for treatment for opioid addiction including medication assisted treatment.

The Work Group met for more than 12 hours in a series of three meetings in the months of July and August 2010.  The group worked on converting general ideas and concerns into five specific recommendations. Final recommendations presented herein were determined after discussion with the Task Force and through a consensus-based decision-making process.

### ENHANCE RESOURCES AVAILABLE WITHIN THE ALCOHOL AND OTHER DRUG ADDICTION SYSTEM OF CARE FOR DIRECT CLIENT SERVICES

In Ohio, it is estimated that there are 916,000 people who need treatment.  Only 1 in 10 of those individuals received treatment and recovery services through the publicly funded system.[72]  In SFY 2009, the Ohio Department of Alcohol and Drug Addiction Services (ODADAS) provided treatment and recovery services to more than 100,000 individuals.[73] However, only about 30 percent of the people in the AoD system of care in Ohio have

Medicaid to cover some of their costs.[74]

Treatment is essential to decreasing the criminal and delinquent behavior tied to drug use that disrupts family, neighborhood, and community life in fundamental and long-lasting ways.[75]  A 2010 report, released by the Substance Abuse and Mental Health Services Administration (SAMHSA), states that 73 percent of those in treatment report a greater ability to function at home, work, or school.[76]  In addition, 68 percent of women who stayed in comprehensive treatment longer than three months were able to remain alcohol and drug free, compared with 48 percent who left treatment within the first three months and did not remain alcohol and drug free.[77]

The Task Force recommends that additional funding opportunities for the AoD system at the Federal level be explored.  An investment in treatment is an investment in savings. For most clients in Ohio, the average annualized cost per client for treatment is approximately $1,600, as compared to the cost of incarceration per person, which is $25,000 annually.[78]  Funding sources should also be explored to encourage the increased use of programs for addicted individuals such as drug courts, rehabilitation centers, and therapeutic communities to provide addiction treatment options rather than incarceration.

ODADAS should partner with the Ohio Council of Behavioral Health and Family Services Providers, Ohio Association of County Behavioral Health Authorities, The Ohio Alliance of Recovery Providers, healthcare provider organizations, and professional licensing boards to implement this recommendation.  Success would be measured by the increase in people receiving treatment services for opioid addiction and the number of initiatives pursued to diversify resources to the AoD field.

## ADOPT A STATEWIDE STANDARDIZED SCREENING AND REFERRAL TOOL

Primary care centers, hospital emergency rooms, trauma centers, and other community settings have limited opportunities for early intervention

### Kim

Kim, now age 27, had a friend with an opioid prescription and asked to try one. Liking it, she used her friend's prescription then started buying pills "on the street." Shifting to more potent preparations and larger numbers of pills, the resulting dosages rapidly increased and she could barely sustain the habit.  She commented: "I heard there was this little bag of stuff for $40 that would do more than the pills did." That was heroin.  She started taking it orally but her tolerance increased rapidly.

She had a friend who was already using a needle. "I forced him to shoot me up.  He begged me not to do it." As with pills, her tolerance rapidly increased until her habit was at $400 to $600 per day.  She said that she sustained it by selling drugs.

Children's Services took custody of her older daughter.  Another daughter was born addicted to heroin.  The daughter spent four months in the hospital treated with methadone to prevent withdrawal. Children's Services transferred custody of the children to Kim's parents. "I really didn't care. I wasn't bonded to her," Kim said with regret.

After the birth of her second daughter, Kim began treatment.  She has had her struggles with relapse. She has now entered a program that offers strong counseling support with Suboxone and is doing well.  She said the Suboxone "has helped 110 percent with staying clean."

She is now working towards regaining custody of her children but admits it is a slow process, in terms of connecting with the children, regaining the trust of her parents, and proving herself reliable to Children's Services.

**Source: Research conducted by Joe Gay, Executive Director, Health Recovery Services Inc.**

with at-risk substance users before more severe consequences occur.  In fact, of the 23 million Americans who are addicted to drugs and alcohol, 95 percent of those who needed treatment did not receive any and were unaware that there were programs in place to help them recognize substance abuse problems.[79]

Ohio lacks an integrated and coordinated system of screening and treatment components. A system of services should link a community's specialized treatment programs with a network of early intervention and referral activities conducted in medical and social service settings, including an effective referral mechanism between the AoD field, physicians, and hospitals.

The Task Force recommends examining the statewide implementation of the Screening, Brief Intervention, and Referral to Treatment (SBIRT) program.  Interventions such as SBIRT decrease the frequency and severity of drug and alcohol use, reduce the risk of trauma, and increase the percentage of patients who enter specialized substance abuse treatment.[80]  The SBIRT model involves the implementation of a system within the community and medical settings which screens for and identifies individuals with substance use related problems, including physician offices, hospitals, education institutions, and mental health centers.  The system would then allow for brief intervention or treatment within the community setting and refers those identified as needing more extensive services than can be provided in the community setting, to a specialist for assessment, diagnosis, and appropriate treatment.[81]

SBIRT is easy to implement and requires minimal financial support.  It is a federally funded program that has already been implemented in 17 states and as of February 2009, 658,000 patients have been screened with the SBIRT model.[82]  If the state were to implement the program, for every one dollar spent on SBIRT, almost a 4 dollar savings would result in health care costs, which could amount to almost a $2 billion in hospital savings each year.[83]  Federal funding opportunities for the SBIRT program should be explored and an SBIRT pilot program could be introduced to study the efficacy of statewide program.

ODADAS and the Ohio Department of Job and Family Services (ODJFS) should partner with the Ohio Council of Behavioral Health and Family Services Providers, Ohio Association of County Behavioral Health Authorities, the Ohio Alliance of Recovery Providers, healthcare provider organizations, and professional licensing boards to implement this recommendation.  Success of this recommendation would be measured by an increase in number of persons accessing the system who are addicted to prescription opioids.

## INCREASE EDUCATION OF PREVENTION, INTERVENTION, TREATMENT, AND RECOVERY SUPPORT SERVICES AMONG HEALTHCARE PROFESSIONALS

The costs and consequences of opioid addiction are staggering.  If substance abuse and addiction were its own state budget category, it would rank second just behind spending on elementary and secondary education.[84]  However, for every dollar spent on substance abuse, 95.6 cents went to the societal consequences of addiction and only 1.9 cents on prevention and treatment, 0.4 cents on research, 1.4 cents on taxation or regulation and 0.7 cents on interdiction.[85]

Most physicians will treat a significant number of patients with substance abuse issues throughout their careers.  Substance use disorders affect 45 percent of patients who present for medical care but are routinely unrecognized by healthcare providers.[86]  These issues represent only a small part of most physicians' medical training.  In fact, many doctors may only receive a few hours of education on substance abuse during their time in medical school.[87]  A recent study published by The National Center of Addiction and Substance Abuse at Columbia University found that only 40 percent of surveyed physicians received any training in medical school in identifying prescription drug abuse and addiction.[88]

Physicians and other healthcare providers can play a key role in facilitating the screening, diagnosis and treatment of patients with substance use disorders.  However, lack of knowledge about the disease of addiction, clinical screening techniques and referral resources increases clinician reluctance to evaluate patients for substance use disorders. People suffering from addiction are still heavily stigmatized. Physicians are not immune from negative attitudes about substance abuse.[89]  There is benefit in the education of physicians about the disease of addiction as a disease of the brain and comparable to other chronic medical conditions such as diabetes, asthma, or high blood pressure which also need ongoing monitoring and treatment.

Further, increasing initial and continuing education of prescription drug abuse issues across a variety of professional healthcare disciplines will lead to increased use of structured screening tools and referrals into the AoD treatment services system. This action will ultimately reduce the number of deaths associated with prescription drug abuse and the costs of these disorders to individuals, families, and society.

Ohio is facing an epidemic of opioid abuse and its tragic consequences of fatal overdose. Greater recognition of the importance of pain management and the under-treatment of pain has led to a dramatic increase in numbers of prescriptions for opioid analgesics. Simultaneously, abuse of these drugs has risen.[90]  This correlation has left many physicians struggling with the best ways to ensure that patients get needed pain relief while preventing abuse of opioids.[91]  A solution to these issues will not be resolved by healthcare providers without concomitant understanding of the inextricable link between chronic pain and opioid use/misuse and abuse.

The Task Force recommends that additional education courses in chronic pain management and substance abuse be developed for healthcare professionals.  Specifically, the Task Force recommends:

- Developing a holistic pain course for prescribers developed through the State Medical Board's Pain Panel.  Respective professional boards and associations should help promote completion of this course as appropriate.

- Establishing professional medical school education requirements in the field of substance abuse and treatment for medical professionals.

- Identifying and/or creating as needed an online, multi-disciplinary toolkit for a variety of professions that would enable easy and immediate access to continuing education and up-to-date information regarding key aspects of prescription drug use, misuse, abuse and addiction.  In addition, this toolkit should include structured screening and

assessment tools to increase prescription drug abuse screening among health care professionals.  Respective professional boards and associations should help promote widespread use of these toolkits.

ODH, ODADAS, the Ohio Department of Education (ODE), professional licensure boards, and Ohio Board of Regents (BoR), partnering with the Association of American Medical Colleges, state medical schools, and healthcare provider organizations should work together to implement this recommendation.  Success will be measured by the increased number of courses, professional credit hours, and substance abuse education offered by medical schools, professional healthcare organizations and licensing boards.

### INCREASE UTILIZATION OF EVIDENCE-BASED TREATMENT TO MEET THE GROWING NEED OF OPIOID ADDICTED INDIVIDUALS SEEKING HELP

The Drug Addiction Treatment Act of 2000 (DATA 2000), Title XXXV, Section 3502 of the Children's Health Act of 2000, permits physicians who meet certain qualifications to treat opioid addiction with medications that have been specifically approved by the Food and Drug Administration.  Following the passage of DATA 2000, Buprenorphine-based schedule III narcotic medications Subutex® and Suboxone® received FDA approval for the treatment of opioid addiction.  Studies have shown that Buprenorphine is more effective than placebo and is equally as effective as moderate doses of methadone in opioid maintenance therapy.  According to SAMHSA, Buprenorphine enables opioid-addicted individuals to discontinue the misuse of opioids without experiencing withdrawal symptoms.[92]

To increase the utilization of evidence-based treatments, the Task Force recommends improved cross-referrals to DATA 2000 physicians, who prescribe opioid addiction medication.  In achieving this goal, developing an incentive system may improve cross-referrals between the treatment and physical health care systems.  To support this recommendation, ODADAS should explore the utilization of physicians that have obtained a waiver under DATA 2000 to administer Buprenorphine-based medicines in Ohio.  This would allow the Department to gain information on how many of the DATA 2000 waived physicians eligible to prescribe Buprenorphine-based medications are prescribing the medication to patients.

The Task Force also recommends regulatory changes to enhance the availability of evidence-based medication assisted treatment resources.   ODADAS should consider clarification of the existing Ohio Administrative Code language to allow treatment professionals to bill for Buprenorphine-based medication under its medical somatic service.

ODADAS along with SAMHSA, healthcare provider organizations, Ohio State Medical Board, Ohio Council of Behavioral Health and Family Services Providers, Ohio Alliance of Recovery Providers and Ohio County Behavioral Health Authorities, should take the lead in implementing these recommendations.  Evidence of success would be demonstrated by an increase in utilization of evidence-based medication assisted therapies and an increase in activities to improve referrals to DATA 2000 physicians for treatment.

**IDENTIFY BEST PRACTICES FOR MANAGING ACUTE AND CHRONIC NON-MALIGNANT PAIN, AND DISSEMINATE AND PROMOTE THESE PROVEN APPROACHES TO PRESCRIBERS AND PHARMACISTS IN THE COMMUNITY**

Education is the key to the effective management of pain.  As far back as 2004, there were approximately 931,000 adults and 231,000 children in Ohio suffering from chronic pain, representing both cancer-related and non-malignant severe chronic pain.[93]  The cost of loss of productivity due to pain is estimated at $61.2 billion annually and when medical costs are added in, the annual cost of pain is upwards of $120 billion.[94]

The medications often used to treat pain can be abused, misused and illegally sold.  Most physicians are under-trained in pain management and many are unaware that different types of pain are responsive to a different type of pain medication, with opioids not always being the best choice.  In addition, many patients who present with pain often have genetic or psychosocial predisposition to addiction.  If more physicians can identify these issues, and are knowledgeable about alternative medications, they will be less likely to prescribe opioids and other addicting drugs for at-risk patients.

The Task Force acknowledges that many challenges exist in implementing this recommendation.  In addition to identifying best practices and ensuring they are consistently used in the community, physician time and access to continuing medical education hours can be difficult to obtain and state professional organizations may be hesitant to mandate education for pain when state mandates on education have not previously been required.  Medical schools may also be hesitant to allot additional hours of training for pain management when curriculums are already crowded with other required subjects.  To combat these challenges, the Task Force recommends that the state first identify best practices and have them approved by the State Medical Board of Ohio.  Following approval, professional healthcare schools and provider organizations should be encouraged to disseminate and promote these approaches to students and professionals.

The lead agencies for implementing this recommendation should be the State Medical Board of Ohio, other professional licensing boards, healthcare provider organizations, and the Association of American Medical Colleges, partnering with and state medical schools, and the Ohio Pain Initiative.  Success will be measured by an increased knowledge base of a variety of medical professionals on best practices for the treatment of acute and chronic non-malignant pain.  Likewise, the presence of more continuing medical education credits and events offered on pain management throughout the year for healthcare professionals could indicate the effectiveness of this recommendation.

# REGULATORY RECOMMENDATIONS

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## REGULATORY RECOMMENDATIONS

The Task Force Regulatory Work Group was given the opportunity to develop recommendations for regulatory/legislative changes that could work to potentially curb Ohio's prescription drug abuse epidemic.  The Work Group was chaired by Ernest E. Boyd, R.Ph.  CAE, Executive Director of the Ohio Pharmacists Association and J. Craig Strafford, MD, MPH served as the vice chair representing the State Medical Board of Ohio. Membership was diverse and included representation from public health, medicine, pain management, pharmacy, nursing, behavioral health/substance abuse treatment, law and law enforcement.  ODH was the lead agency for the group and a facilitator from DAS assisted during each of the meetings.

The Regulatory Work Group was charged with the following areas of responsibility:

- Examine the feasibility of implementing standards for pain management clinics in Ohio.

- Identify options for other methods of addressing improper prescribing of pain medication (i.e.  revision of standards of practice for prescribers).

- Identify options for increasing the number of prescribers registered with the OARRS, Ohio's prescription monitoring database maintained by the BoP.

- Support work of the BoP in collaborating with other states to link prescription drug misuse/abuse and unintentional overdose prevention.

- Identify other regulatory strategies to deal with the issue.

The Work Group met five times for a total of 14 hours, over the months of July, August and September 2010.  Members were asked to initially consider the Poison Action Group policy/legislative recommendations and the first Task Force report recommendations in small work groups.  From these recommendations, members narrowed down to a core list of regulatory topics for further consideration and discussion.   Presentations were made at the members' request on H.B. 547 (pain clinic licensure), OARRS and physician dispensing of controlled substances.   Members were asked to submit specific recommendations to the Task Force for further consideration.  Final recommendations presented herein were determined after discussion with the Task Force and through a consensus-based decision-making process.

### EXAMINE THE REGULATION OF PRESCRIBER DISPENSING OF CONTROLLED SUBSTANCES

Reports have shown that some pain clinics essentially operate as "pill mills" or quasi-pharmacies by dispensing drugs that have the highest potential for abuse and diversion for street use with only cursory or limited medical evaluations.  This is often done as a direct result of pharmacists refusing to fill prescriptions from suspicious and known intentional over-prescribers.  It is also recognized that direct dispensing by prescribers

of controlled substances is not submitted to the State of Ohio's prescription monitoring system, OARRS.  In 2009, Ohio prescribers dispensed prescription opioids at a much higher rate than neighboring states (Figure 12 and 13).

Figure 12.  Oxycodone Purchases by Practitioners in Select States (January – December, 2009)[95]

|  | Ohio | Pennsylvania | West Virginia | Kentucky | Indiana | Michigan |
|---|---|---|---|---|---|---|
| Dosage Units | 969,302 | 244,771 | 1,000 | 127,526 | 32,895 | 16,650 |
| % State/Total) | 69.6% | 17.5% | .0007% | 9.1% | 2.3% | 1.2% |

Figure 13.  OxyContin Purchases by Practitioners in Select States (January – December, 2009)[96]

|  | Ohio | Pennsylvania | West Virginia | Kentucky | Indiana | Michigan |
|---|---|---|---|---|---|---|
| Dosage Units | 97,496 | 7,586 | 0 | 0 | 1,700 | 180 |
| % State/Total) | 91.1% | 7.0% | 0 | 0 | 1.7% | 0.2% |

The Task Force recommends stakeholders examine regulation of in-office dispensing of controlled substances.  Regulations should allow for the appropriate administration of medications in the prescriber's practice and permit a reasonable amount of medication for patients in emergency situations.  Florida has enacted legislation that would prohibit registered pain clinics from dispensing more than a 72-hour supply of a controlled substance for any patient who pays for the medication with cash, check or credit card.[97] The development of standards for in-office dispensing will eliminate the profit-motivation of dispensing controlled substances, allow for increased professional scrutiny by pharmacists and increase the likelihood that an OARRS check will be performed.

The Ohio General Assembly should partner with pain management specialists, healthcare provider organizations, and professional licensing boards to implement this recommendation.  These parties should be cognizant that regulation must be developed in such a way as to not impede legitimate operations of medical facilities and ensure the delivery of legitimate and necessary care.  If implemented, data on the purchase of controlled substances by prescribers is available from the DEA[98] and can be utilized by regulatory authorities to determine the success of dispensing standards.


**REDESIGN OF THE MEDICAID LOCK-IN PROGRAM**
The Task Force recommends that ODJFS should continue its efforts to redesign the Medicaid lock-in program currently established in administrative rule.  The program would "lock-in" certain individuals to a specific physician or physician group and/or pharmacy for the purpose of receiving controlled substance prescription medications.

The program should allow patients the option to choose their own physician and pharmacy.  The purpose of the lock-in program is to maintain quality medical care, improve the safety of individuals and reduce health care costs by monitoring the use of controlled substance prescription medication dispensing patterns and taking action when potential misrepresentation, fraud, forgery, deception or abuse is identified. Implementation of an effective lock-in program will reduce the ability to doctor shop within the Ohio Medicaid system and may produce immediate cost savings to the state.

ODJFS should partner with Medicaid managed care plans, pharmacies, healthcare provider organizations, the state's pharmacy benefit manager, the Executive Medicaid Management Agency (EMMA), emergency room physicians, hospitals and other advocates to identify common language to ensure a uniform set of rules for all consumers.  Implementation of this program requires the establishment of uniform criteria, rule development, system changes, and clinical resources (nurses, pharmacists, physicians).  A lock-in program lends itself to easily identifiable and measurable criteria.  A reduction in utilization and costs can be measured almost immediately upon enrollment.

Currently, ODJFS is implementing a new claims payment system, the Medicaid Information Technology System (MITS).  Programming changes and implications will need to be assessed in the MITS environment.

## ENABLE STATE AGENCIES AND PRIVATE ENTERPRISES TO CREATE MEDICATION LOCK-IN PROGRAMS

There is often a need for multiple medical specialists or multiple pharmacy providers for any individual or individual medical problem.  However, the risk of diversion, addiction, and overdose increases when the intent to establish relationships with multiple providers is solely to increase the type and quantity of scheduled narcotics.

### Mary*

Both of Mary's parents were addicted. She was first given a drug, OxyContin, by her alcoholic father who was sexually abusing her. Understandably, she spent as much time as possible away from her home and fell in with the "bad crowd" and began using drugs, including opioids, with them. Her opioid use escalated. She had a daughter but Children's Services took custody of that child. Pregnant with a second child and with Children's Services prepared to take custody of that child at birth, she made a decision to stop using.

Referred to counseling, she stopped "cold turkey" and remained abstinent for months until she entered the Suboxone program. The worst part of her use, she says was its impact on her children. "I didn't know where I was 2 or 3 days at a time or who was taking care of my kids." She worries about her daughter seeing her in withdrawal and having seizures, and the constant stream of people in and out of their home and unsavory activity that took place.

"We were moving around, hopping from place to place." She added, "It took so much money. I would go around bumming money for diapers because my daughter was in a dirty diaper when I just spent $200 for drugs." She said of her relationship with her children while using drugs, "I knew I loved them and I knew I cared about them but I didn't care."

Mary had friend, who was also an addict, who died of an overdose. The friend had prescriptions from 7 pain clinics with different diagnoses from each clinic. An autopsy, after she died of an overdose, showed no underlying physical diseases or conditions at all.

*Name has been changed; individual did not wish to be named. Source: Research conducted by Joe Gay, Executive Director, Health Recovery Services Inc.

The Task Force recommends that enabling legislation should be enacted that would permit state agencies, such as the Bureau of Workers' Compensation (BWC), and private enterprises that manage and reimburse for scheduled narcotics in the State of Ohio, to create a Medication Lock-In program.  Under this program, the agency or private enterprise would be able to identify member individuals who have demonstrated the utilization of multiple providers above a threshold for the purpose of obtaining multiple scheduled narcotic prescriptions or medications beyond that which is therapeutically necessary, and require them to select one prescriber, one distributor/retailer, or both for their scheduled narcotic needs, for a specified period of time.  Single prescribers and distributors are able to understand the comprehensive history of scheduled narcotic use in an individual and manage treatment to decrease the legal sources of controlled substances for that individual.

The Ohio General Assembly should partner with state agencies and representatives from the private sector that manage and reimburse for scheduled narcotics, healthcare provider organizations and professional licensing boards to implement this recommendation.  It should be noted that the restriction of free choice of providers should not be undertaken lightly and criteria should be developed to prevent challenges from legitimate users of multiple providers.

### REDUCE BARRIERS TO INCREASE UTILIZATION OF EVIDENCE-BASED ADDICTION TREATMENT PRACTICES

The use of Buprenorphine is a National Institute on Drug Abuse (NIDA) evidence-based practice to diminish the symptoms of opioid withdrawal.  A large NIDA-sponsored, multisite clinical trial published in 2003 showed that "Buprenorphine and Naloxone in combination and Buprenorphine alone are safe and reduce the use of opiates and the craving for opiates among opiate-addicted persons who receive these medications in an office-based setting."[99]

The Task Force recommends a reduction of regulatory barriers to evidence-based opioid treatment.  Specifically, the use of and billing for Buprenorphine-based medications,[100] which have been shown to increase successful opioid treatment efficacy.  ODADAS has historically interpreted the Ohio Administrative Code (OAC) in a way that prevents treatment organizations from being able to bill Buprenorphine as a medical somatic service.[101]  A revised interpretation could allow treatment providers who choose to use Buprenorphine as part of their opioid treatment regiment to bill for the management of the medication to Medicaid.

ODADAS should partner with ODJFS, Centers for Medicare & Medicaid Services, Ohio Council of Behavioral Health and Family Services Providers, Ohio Alliance of Recovery Providers and Ohio County Behavioral Health Authorities to draft guidance or new rules regarding the agency's medical somatic service.  Recommendations on guidance or a new rule package could be made within a three month period.  A survey of the number of treatment providers that utilize Buprenorphine as an adjunct to opioid treatment could be used to evaluate this recommendation.  The cost of providers being able to bill

for Buprenorphine has not been calculated.  The stakeholder group should explore the funding sources available to cover the cost of this treatment.

### IMPLEMENT CHANGES TO THE STATE PRESCRIPTION MONITORING PROGRAM

Prescription Monitoring Programs (PMPs) monitor the prescription and sale of drugs identified as controlled substances by the DEA.  PMPs limit traditional diversion methods by enabling prescribers and pharmacists to monitor patients' prescription drug histories for these controlled substances and intervene when diversion and/or abuse are suspected. A 2002 U.S.  Government Accountability Office report[102]  determined that state PMPs improved the timeliness of law enforcement and regulatory investigations by at least 80 percent and that the programs had deterred doctor shopping in the three states involved in the study.

In Ohio, doctor shopping and prescription drug diversion are contributing factors in the growing prescription drug abuse and overdose epidemic.  In 2008, at least 16 percent of unintentional drug overdose decedents had a history of doctor shopping[103]  in the two years prior to their death.[104]  Increased use of the PMP by both prescribers and pharmacists is needed to reduce doctor shopping, diversion, insurance fraud and drug abuse, misuse and overdose.

The Task Force recommends that the following changes be adopted to Ohio's PMP, OARRS:

#### Registration and Proper Use
- Authorize the BoP and respective prescriber licensing boards to create rules specifying when pharmacists and prescribers should register and use OARRS prior to prescribing controlled substances.  Allowing each professional healthcare regulatory board to establish their own specific rules should mitigate stated opposition to blanket registration/use rules.  These recommendations would allow the boards to establish their own rules and specify the circumstances under which a prescriber should check the patient's OARRS history prior to prescribing controlled substances. Current law states that prescribers and pharmacists are not required to obtain information about a patient from OARRS.[105]

#### Reporting and Data Requirements
- Wholesale distributors who deliver drugs to terminal distributors should be required to report to OARRS.  Current statute requires only wholesale distributors who deliver drugs to prescribers to submit information to the database.

- Work with Veteran's Administration (VA) to encourage VA facilities in Ohio to report prescription information to OARRS.  VA facilities, per federal policy, are not required to submit prescription data to a state prescription monitoring program.

- Change the ORC so that information collected in OARRS shall be maintained for at least two years.  Only information that would identify a person will be destroyed after two years, unless there is a specific written request for retention of individual

information by law enforcement or a licensing board.  Allowing the Board of Pharmacy to retain de-identified data beyond two years will assist the Board in outlining use and abuse trends in Ohio.

**Access to Information and Information Sharing**
- Permit "prescriber's agents registered with the Board" as well as a prescriber to receive information from OARRS.  Allowing prescriber's agents to access OARRS should also reduce one of the stated barriers (i.e. time constraints) by both prescribers and pharmacists to use.  Criminal penalties for improperly disseminating, seeking to obtain, or obtaining information from OARRS should also be established.

- Explore the feasibility of sharing PMP data with ODJFS/Medicaid and other relevant state agencies (e.g., BWC) to facilitate the monitoring of client prescription drug histories.  Agency representatives and appropriate stakeholders should meet with the BoP to determine if data sharing is practical and warranted, under what conditions it would occur, and identify resources (financial and administrative) to develop such a system.  As needed, parties should recommend changes to ORC to allow for specified data sharing.  OARRS access will also enhance the Medicaid lock-in program because it will enable the State of Ohio to better identify those consumers who should be enrolled in the program and generally strengthen efforts to monitor the health, welfare, and safety of Medicaid consumers during cash transactions.

- Change ORC as needed to allow enhanced interstate data sharing in order to reduce border jumping to obtain controlled substances.

**Funding Sources**
- Explore additional sources of funding to increase the capacity of OARRS in response to increased demand for services.  The current system is funded by two federal grants: 1) Bureau of Justice Assistance (administered by the U.S. Department of Justice) and 2) NASPER (administered by the U.S. Department of Health and Human Services.

**Red Flag System**
- Explore the feasibility and effectiveness of issuing "red flag" reports for law enforcement and prescribers/pharmacists to identify individuals and prescribers who fall outside of normal prescription use patterns.  (Note:  The Regulatory Work Group members were generally supportive of this measure but emphasized caution in this approach as an OARRS report is not the patient's medical record, but a listing of dispensed prescriptions, and quantity of medication may not be indicative of abuse.)

The Ohio General Assembly should partner with the BoP to draft legislative language to implement the recommended changes to the state PMP.  Once authorizing language is enacted, professional licensing boards and healthcare provider organizations should collaborate on the adoption of rules specifying when pharmacists and prescribers should register and use OARRS.  Registration and use of OARRS by prescribers and pharmacists as tracked by the BoP and the distribution of controlled substances to doctor shoppers, as measured through OARRS data, should be used to evaluate the proposed changes.

**ENCOURAGE INCREASED INITIAL AND CONTINUING EDUCATION ON PAIN MANAGEMENT AND DRUG ABUSE**

Pain is one of the leading reasons people seek medical advice.[106]  Chronic pain prevalence in the adult population has been conservatively estimated at 57 percent.[107]  Despite the rapid increase in opioid prescribing, drug abuse and overdose rates, there has been no corresponding increase in the education of prescribers.  From 1999 to 2007, Ohio's rate of opioid distribution in grams per 100,000 population increased 325 percent while the unintentional drug overdose death rate increased 305 percent.[108]  This data supports the need for increased education of health care providers about opioids and related issues of pain management and prescription drug abuse.

The Ohio Compassionate Care Task Force final report (2004) concluded that there was an inadequate education and professional training in areas of pain management and addiction medicine.[109]  The report identified several barriers to quality care of chronic pain and terminal illness including:

- Healthcare professionals received insufficient education.

- Many practicing providers have not updated their knowledge.

- Lack of specialists available.

The Federation of State Medical Boards updated and revised its pain guidelines now called *Model Policy for Use of Controlled Substances for the Treatment of Pain*.[110]  They identified four circumstances that lead to poor pain treatment:

1. Lack of knowledge of medical standards, current research, and clinical guidelines for appropriate pain treatment.

2. The perception that prescribing adequate amounts of controlled substances will result in unnecessary scrutiny by regulatory authorities.

3. Misunderstanding of addiction and dependence.

4. Lack of understanding of regulatory policies and processes.

The Task Force recommends increased education among health care professionals on issues of drug abuse, addiction and pain management should be strongly encouraged for both initial and continuing education.  Medical, pharmacy, nursing and other professional healthcare schools should incorporate these subject areas within their curricula and a minimum number of hours should be identified.  The Ohio State Medical Board, in cooperation with other appropriate professional licensing boards and healthcare provider associations should collaborate to identify, and/or develop as needed, continuing education programs to address the lack of education.  A minimum number of hours for continuing education on these topics should also be identified and recommended depending on the area of practice.  Incentives should be developed to encourage healthcare professionals to obtain adequate continuing education.

Initial and continuing education courses should include but are not limited to the following topics:

- Background of the problem of prescription drug abuse/overdose epidemic.

- Prescription drug diversion.
- State prescription monitoring program including description, importance and any registration and use requirements/recommendations.
- Responsible and appropriate opioid prescribing with particular attention to education about initial doses for acute pain, long-acting or extended release opioids with higher risk for overdose, and use of opioids in conjunction with other prescribed central nervous system depressants.
- Chronic pain management including types of pain, psychology of pain, tolerance/dependence/addiction, patient education and safety (e.g., medication contracts, drug screens), discussion of risks with patients, and alternative (non-opioid) treatment strategies.
- Substance abuse including disease of addiction, assessment/identification, discussing abuse with patients, identifying and managing drug seeking behavior and referrals to substance abuse treatment providers.
- Importance of patient education and providing simple instructions regarding:
  - Taking medication exactly as prescribed and the dangers of overuse/misuse, sharing medications, mixing medications and the warning signs of overdose.
  - Potential for physical dependence, abuse and/or addiction with prolonged use of prescription pain opioids.
  - Safe medication storage and proper disposal of unused medication.

The Task Force recommends the following activities for <u>initial education</u> in professional healthcare schools:

1. Convene a curriculum committee within the school to discuss and collaborate on the development of curriculum to address pain management and drug abuse issues as listed above.
2. Collaborate with other professional schools across Ohio and other states on the development of the curriculum.
3. Research course syllabi developed at other professional schools to serve as a model.
4. Establish standards for content and recommended number of hours for specific topics.
5. Develop curriculum and identify appropriate professors from other disciplines as needed to teach or "guest lecture" on specific topic areas such as identifying and intervening with drug abusers and strategies for addressing drug seeking behavior.
6. Incorporate course into overall curriculum and set completion requirements as appropriate.

The Task Force recommends the following activities for <u>continuing education</u> of healthcare professionals:

1. Convene a continuing education committee to address this topic comprised of appropriate licensing board and member association representatives.

2. Establish recommended standards for content and recommended number of hours for continuing medication education.

3. Identify existing curricula meeting those standards and adapt as necessary for use in Ohio.

4. Disseminate recommendations and promote availability of courses through professional boards and associations to all relevant professionals with controlled substance prescribing authority.

5. Licensing boards and associations should develop a means of tracking course completion and measuring trends.

Professional licensing boards should partner with healthcare provider organizations, Ohio colleges of medicine and pharmacy, and representative healthcare agencies on the Task Force to encourage education on pain management and drug abuse among students and professionals.

There will be costs associated with making these adaptations, promoting the curricula and/or coordinating courses through professional organizations and colleges of medicine. However, increased education of healthcare providers may ultimately result in cost savings to law enforcement, health insurers and hospital systems.  Developmental costs may be minimized since curricula exist locally in Ohio and in other states that can serve as a model or may be adapted.

A recent study, conducted by the Geisinger Health System,[111]  concluded that the group most vulnerable to addiction has four main risk factors in common: age (being younger than 65); a history of depression; prior drug abuse; and use of psychiatric medications. Painkiller addiction rates among patients with these factors are as high as 26 percent. This study shows that by learning more about the patient, and assessing for these risk factors, which can be identified through further research, prescribers can better treat their patients' pain without the potential for future drug addiction.  Initial and continuing education on these subjects is critical to the efficacy of assessing risk factors.

***Note:***
Some members of the Regulatory Work Group felt strongly that these continuing education recommendations should be elevated to requirements by the respective professional licensing boards; however, consensus could not be achieved on required continuing medical education.

# PUBLIC HEALTH RECOMMENDATIONS

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## PUBLIC HEALTH  RECOMMENDATIONS

The Task Force Public Health Work Group was presented with the task of identifying public health strategies to address prescription opioid abuse.  The Work Group was chaired by Dr. Aaron Adams, Scioto County Health Commissioner and David Baker, PharmD, DABAT, the Managing Director of the Central Ohio Poison Center served as the vice-chair.  The Work Group was comprised of 26 members representing a wide range of disciplines from across the state including public health departments, alcohol and drug treatment programs, alcohol and drug prevention programs, veterans services, two colleges of pharmacy, mental health boards, health care professional associations, advocacy organizations, community coalitions and state agencies and licensing boards.  The work group was staffed by the ODH and a facilitator from the ODJFS ) assisted with each of the meetings.

The Public Health Work Group was charged with the following areas of responsibility:

- Examine the feasibility of the establishment of local and regional task forces.
- Develop strategies to fund social marketing campaigns.
- Explore opportunities to increase the proper disposal of prescription drugs.
- Identify data owners needed for collaboration to improve data collection around prescription drug misuse/abuse and unintentional overdose prevention.
- Identify other public health strategies to deal with the issue.

The Work Group held four meetings in the Columbus area between July and September 2010.  The group's Recommendations were identified through large group discussion and small group work and final decisions were achieved through consensus.  Five recommendations were submitted to the Task Force for further consideration.  Final recommendations presented herein were determined after discussion with the Task Force and through a consensus-based decision-making process.

### ESTABLISH NEW AND SUPPORT EXISTING LOCAL COALITIONS/TASK FORCES TO ADDRESS THE PREVENTION OF PRESCRIPTION OPIOID MISUSE, ABUSE AND OVERDOSE

Local coalitions are a key element in combating prescription opioid abuse, as they can provide the opportunity for collaboration among entities that are concerned with this problem, but may not typically interact with one another.  Coalitions are also important because members are able to combine their resources and voices and become more powerful than if each one was to act alone.  This can broaden the conversation and focus to more comprehensively address the problem.  Coalitions can serve as a mechanism for local capacity building and an ongoing base for change.  Coalitions with diverse

membership expand the number of people who are educated about the issue and can serve as advocates.

The Task Force recommends the establishment of new and the support of existing local coalitions to address prevention of prescription opioid misuse, abuse and overdose.  Many effective models of coalition development are available for use by local organizations including the Community Anti-Drug Coalition of America, the Public Health Model promoted by the Centers for Disease Control and Prevention, and the Incident Command Model used by health departments in responding to public health emergencies. However, activities implemented by coalitions should be community specific and based on local data and demographics. Coalitions addressing alcohol and drug addiction already exist in many counties in Ohio and should be encouraged to expand their focus to include prescription opioid abuse, while new coalitions must be developed in areas without existing coalitions.  Coalition activities should be designed to reach many different populations in a variety of settings to provide education and opportunities for taking action.

The Ohio Drug-Free Action Alliance (DFAA), which houses the Center for Coalition Excellence, should implement this recommendation.  The DFAA should also provide coordination and technical assistance.  In addition, the Task Force recommends that a coalition development toolkit be created and disseminated.  An internet site should also be established to house all coalition related activities in the state.  The DFAA should work with the ODH and the ODADAS to coordinate their efforts with those already underway.

There are a variety of potential funding sources to assist with coalition development that should be explored.  These sources include coalition mini-grants from the DFAA, federal grants, support from pharmaceutical companies, asset forfeiture funds from prosecuted drug cases, Attorney General Settlement funds, and the Drug-Free Communities grant from the Office on National Drug Control Policy.

## Carol

"My first child was not interested in drugs but I found out later that she was in a minority.  My son didn't escape so innocently. He suffered a significant football injury during a playoff game that changed his life plans. I do believe this was his entry into serous pain killer use.

My family was not ready for what would follow but as soon as I found out seven years ago I knew we were in big trouble.  Being a healthcare professional, for over 25 years by that time, I knew if opiate pain killers were involved, addiction would be a severe problem.  Fortunately he is still here and has battled back to be better with treatment, time, and maturity.

Of course being an angry mother I investigated the problem thoroughly and what I found was shocking.  The number of young people involved in this was not believable at first. I can honestly say that every family in the area has been affected by this problem in some way. The problem reaches across economic classes.

The abuse of opiates eventually led to an increased number of deaths—several young people included. Crime escalated after oxy hit the streets, the welfare of children suffered and many kids were transferred to the care of their grandparents and others through children services.

My co-worker said that "drugs have crippled our area." The counties hardest hit by this epidemic have decreased in appearance, poverty has increased and kids are suffering from this very serious problem.  Our community has received a lot of negative attention, people have chosen to move out of the area, the school enrollment is down and the financial impact on the school district is huge. I think there is even a question if the school system will remain intact."

Source: Research conducted by Joe Gay, Executive Director, Health Recovery Services Inc.

**FUND AND IMPLEMENT SOCIAL MARKETING (PUBLIC AWARENESS AND OUTREACH) CAMPAIGNS TO CREATE AWARENESS ABOUT PRESCRIPTION OPIOID MISUSE, ABUSE AND OVERDOSE TO CHANGE PUBLIC PERCEPTION AND INFLUENCE BEHAVIOR**

According to the Institute for Safe Medication Practices, half of the prescriptions taken each year in the United States are used improperly.  In addition, a 2005 study by SAMHSA found that 53 percent of individuals ages 18-25 obtained free prescription pain relievers from relatives or friends for nonmedical use in the past year.  The study also showed that 10.6 percent bought the pain reliever from a relative or friend.[112]  These, and other studies, document the high rates of fatal unintentional drug overdose and point to a critical need for more public awareness about the proper use of prescription pain relievers.

The Task Force recommends ODH in conjunction with ODADAS, and other state and local partners, lead an effort to raise public awareness about Ohio's prescription drug abuse epidemic.  ODH should explore and identify potential funding sources to expand current social marketing efforts and initiate new efforts focused on at-risk populations.

Social marketing campaigns can assist with dispelling misconceptions and emphasizing the potential dangers if pain relievers are not taken properly.  The goal of a social marketing campaign should be a reduction in the devastating toll that this problem takes on individuals, families and communities including a reduction in hospitalizations, family instability, incarceration, economic instability and the need for treatment.

The campaign should leverage all available outlets, including, but, not limited to, traditional media (radio, TV, newspapers, bill boards, bus signs, etc.), social media (Facebook, Twitter, etc.), community events, trade publications, and electronic newsletters of professional associations.  The Task Force recommends that specific and distinct messages should be used to effectively reach various populations such as middle-aged adults (males and females), youth, those already addicted, children and parents.  Messages should be specific to preventing first use, addiction and death and include information about the potential for a person misusing or addicted to prescription opioids to transition to heroin due to similar properties between the two.

For future campaigns, ODH can use the resources developed for the current Prescription for Prevention Campaign.  However, funding will be needed for social marketing campaigns to be effective.  Potential funding sources include corporate grants, federal grants, and foundation grants.  In addition, public-private partnerships with local media outlets for Public Service Announcements should be explored.

**PROVIDE EDUCATION TO INCREASE AWARENESS, KNOWLEDGE AND RESOURCES RELATED TO THE RISKS OF PRESCRIPTION PAIN RELIEVER MISUSE, ABUSE AND OVERDOSE**

There is a public perception that prescription opioids are safe because they are prescribed by a healthcare provider.  However, misuse of these drugs, including sharing with others, taking more than prescribed, and/or combining them with other drugs and/or alcohol can be lethal.  In 2007, 70 percent of all unintentional drug poisoning deaths in Ohio involved a prescription opioid or "other/unspecified" (i.e. multiple drugs).  In 2008, there were 1,473

fatal unintentional drug overdoses, a 350 percent increase from 327 such deaths in 1999.[113] To effectively combat this growing epidemic, comprehensive education is needed in every sector of society.

The Task Force recommends that comprehensive, population specific and age appropriate education take place throughout the state, including education to intervene with those already addicted to prescription opioids.  In some cases, information about this problem can be included in existing efforts such as alcohol and drug prevention programs already in schools.  However, for this recommendation to be successful, a comprehensive, coordinated and consistent state primary prevention strategy must be identified and a "train the trainer" approach should be used.

These educational efforts, including the use of model programs and tool kits, should take place at all levels and in multiple settings (i.e. with students, parents, those in the work force, health care providers, in health care settings, with law enforcement, with faith institutions and with policy makers.) The focus should be on the prevention of abuse, addiction and death.  In addition, information should be included about the potential for transitioning to heroin abuse and addiction if a person is misusing or addicted to prescription opioids.

This effort should be led by a committee of state agencies/boards, to specifically include, ODE, ODH, BWC, ODADAS, the Board of Regents, the Ohio Attorney General's Office-Electronic Ohio Peace Officers Training Academy (E-OPOTA), the Ohio Department of Public Safety (Office of Criminal Justice Services), ODJFS, the Department of Veterans Affairs, and professional licensing boards.

These state agencies should be assisted in the effort by other state partners such as healthcare provider organizations, citizen action groups, business associations and colleges and universities across the state.  Local organizations and agencies are also a critical part of this educational effort and should be engaged as partners.  Potential sources of funding to support these efforts include grants from pharmaceutical companies and using a portion of the money from drug forfeitures.

**FACILITATE THE PROPER DISPOSAL OF PRESCRIPTION MEDICATIONS**
Leftover or unused medications in homes or other settings can be an easy access source for those seeking to obtain prescription pain opioids.  Programs are needed to decrease the availability and accessibility of unused prescription drugs in the home and increase the number of prescription medications that are stored properly and disposed of correctly. Currently, based on the experience of members of the Task Force's Public Health Work Group, who represent communities around the state, there is a lack of coordination among groups and individuals holding drug disposal events.  In addition, there is a lack of knowledge and/or resources to coordinate and implement drug take-back events.

The Task Force recommends that Drug Disposal Day Guidelines (DDDG) be developed by ODH.  Once complete the DDDG should be distributed by Task Force member organizations through their networks.  In addition, he DDDG should be posted on the web sites of these agencies/organizations.

Drug disposal events should be implemented by the local coalitions working in conjunction with local law enforcement agencies.  In addition, direction and guidelines should be provided to communities and/or groups interested in holding a drop-off event.  Educational materials specific to proper disposal should be disseminated similar to www.smarxtdisposal.net.  In addition, data should be collected related to the drop-off event to help plan future events and to document and share the value of the event.

Costs for these events include printing for event flyers, newspaper, TV and radio ads, permits, disposal containers, and signage at the event.  Potential sources of funding include community business partners, hospitals, colleges, universities, student organizations, local civic or business associations, and local ADAMH boards.

### IMPROVE AND COORDINATE DATA COLLECTION RELATED TO PRESCRIPTION PAIN RELIEVER MISUSE, ABUSE AND OVERDOSE

Improved and coordinated data collection is needed in order to provide an increased understanding of the extent of the problem and to identify patterns of misuse and abuse of the drugs involved.  Improved data will document the need for prevention and treatment services and will assist decision makers as they develop appropriate interventions.  In addition, this data will help to measure the impact and outcomes of the initiatives of the Task Force and the state of Ohio.

The Task Force recommends that the ODH, working with the Ohio Injury Prevention Partnership (OIPP), identify and convene data owners collecting data relevant to this problem.  ODH should develop a data committee to create a comprehensive plan to address data collection and data linkage.  The development of this plan should include consideration of: actions needed to make prescription drug overdose a reportable condition; standardized data elements for collection; a review of trend data; a method for regularly updating trend data; a review of current surveys and data collection methods; identification of gaps in knowledge and information gathered from these surveys and data collection methods; questions for the surveys to address the identified gaps; and, recommendations to improve data collection methods.

Further, it is recommended that this committee support the work of the BoP in collaborating with other states to:

- Link prescription monitoring systems.

- Review the results from the Poison Death Review Committees (PDR) established in Scioto and Montgomery Counties as part of ODH funded pilot projects.

- Make recommendations regarding the replication of the PDRs in other parts of the state (if the results are found to be positive).

- Work with the Ohio Coroners Association to increase the capacity of coroners to improve data collection (particularly toxicology reports related to prescription drug misuse, abuse and overdose).

- Explore the feasibility of statutory and rule changes to require data submission.

Potential sources of funding include implementing an "add-on" to criminal fines, applying for federal grants and, assessing penalties and fines on pain management clinics for non-compliance and failure to meet appropriate standards of care.

# Task Force Progress

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## TASK FORCE PROGRESS

The Task Force's initial report, in addition to charging the Task Force Work Groups to develop recommendations, included recommendations encouraging support for community education and awareness efforts.  Several of these efforts have already begun to take place.

Two unprecedented prescription drug take back programs will take place this year.  On September 25, the DEA spearheaded its first ever nationwide Prescription Drug Take Back Day, in cooperation with government, community, public health, and law enforcement partners around the country, including many in Ohio.  To encourage Ohioans to properly dispose of unused prescription medication, Governor Ted Strickland designated September 25 as "Ohio Prescription Drug Take-Back Day".  Additionally, the 2010 American Medicine Chest Challenge, hosted by The Partnership for a Drug-Free New Jersey, is also aimed at collecting unused prescription medications.  This is the first year the American Medicine Chest Challenge is being launched on a national scale and communities, in Ohio and across the nation, will sponsor drug take back programs on November 13, 2010.

In an effort to assist law enforcement agencies, on June 14, 2010, the Ohio Office of Criminal Justice Services (OCJS), a division of the Ohio Department of Public Safety, announced the Ohio Prescription Drug Grant.  The grant provided funding to defray expenses that a prescription drug investigation incurs in performing its functions related to the enforcement of the states prescription drug laws and other state laws related to illegal prescription drug activity.  The funds, totaling $250,000 with a maximum of $15,000 per application, can be used for overtime costs of case investigators, equipment necessary to complete the investigation and costs for prosecuting the case.

In an effort to prevent unintentional prescription drug overdoses, ODH is funding an outreach campaign titled Prescription for Prevention: Stop the Epidemic.  The campaign focuses on enhancing awareness and creating behavior changes in counties with some of the highest rates of unintentional prescription drug overdose.  The counties with coalitions receiving direct support from ODH are: Adams, Cuyahoga, Jackson, Ross and Vinton.  The campaign materials are available for download at www.P4POhio.org.

In addition to these efforts, the Task Force Chair and Vice-Chair sent a letter to health care professional organizations asking for support in raising awareness about this issue in upcoming meetings, conferences, courses, grand rounds and newsletters.  Many of the professional organizations have responded positively to this letter and pledged to assist the Task Force is raising awareness about Ohio's prescription drug abuse epidemic.  The response letters can be found in the appendix of this report.

# APPENDIX

# OHIO PRESCRIPTION DRUG ABUSE TASK FORCE

*Final Report • Task Force Recommendations*

## APPENDIX

### ADDITIONAL PARTICIPANTS

### Final Report Writing Team
Kristen Castle, Ohio Department of Public Safety
Jen House, Ohio Department of Health
Cameron McNamee, Ohio Department of Health
Judi Moseley, Ohio Department of Health
Krista Weida, Ohio Department of Public Safety

### Regulatory Work Group
Chair – Ernest Boyd, Ohio Pharmacists Association
Vice Chair – J.  Craig Strafford, State Medical Board of Ohio

### Agency Staff
Christy Beeghly, Ohio Department of Health
William Demidovich, Ohio Department of Administrative Services
Cameron McNamee, Ohio Department of Health

### Members
Loren Anthes, Ohio Department of Job and Family Services
David Applegate, Ohio State Coroner's Association/Union County Coroner
Robert Balchick, Ohio Bureau of Worker's Compensation
Pat Bridgman, The Ohio Council of Behavioral Health & Family Services Providers
Gerald L. (Jerry) Cable, The Ohio State University College of Pharmacy
Cleanne Cass, Ohio Osteopathic Association
James R.Columbro, Columbro Consultation Services, Inc.
Jeff Connors, Drug Enforcement Agency
Joshua Cox, Dayton Physicians Oncology/Hematology
Jeff Davis, Buckeye Community Health Plan
Todd Dieffenderfer, Ohio Attorney General's Office
Thomas Dilling, Ohio Board of Nursing
Dale English, Ohio Pharmacists Association
Juni Frey, Paint Valley ADAMH Board
Joe Gay, Health Recovery Services Inc.
Elizabeth Goodwin, Hospice of the Western Reserve
Keeley Harding, Ohio Association of Advanced Practice Nurses
Tracy Hopkins, Alcoholism Council of Greater Cincinnati, NCADD
Charles Horner, Portsmouth Police Department
Robin Hurst, Ohio Attorney General's Office
Mark Keeley, Ohio State Board of Pharmacy
Keith R. Kerns, Ohio Dental Association
John Lisy, Ohio Association of Alcohol and Drug Abuse Counselors

Michelle Litton-Betts, Phoenix Rising Behavioral Healthcare and Recovery, Inc.
Michael A Moné, Cardinal Health
Sean McGlone, Ohio Hospital Association
Amy Mestemaker, The Ohio Pain Initiative
Michael Miller, State Medical Board of Ohio
Martina Moore, Moore Counseling & Mediation Services, Inc.
Virginia O'Keeffe, Amethyst, Inc.
Phillip Prior, Chillicothe VA
Chris Richardson, Oriana House Inc.
Lisa Roberts, Portsmouth City Health Department
Jim Ryan, Alcohol & Drug Abuse Prevention Association of Ohio (ADAPAO)
William J. Schmidt, State Medical Board of Ohio
Karen J. Scherra, Clermont County Mental Health and Recovery Board
Jeff Smith, Ohio State Medical Association
John Stanovich, University of Findlay College of Pharmacy
Glenn Swimmer, PainCare of Northwest Ohio
Kelly Vyzral, Ohio Pharmacists Association
Frank Wickham, Public
Jon Wills, Ohio Osteopathic Association

### Public Health Work Group
Chair – Aaron Adams, Scioto County Health Department
Vice Chair – S.  David Baker, Ohio Poison Control Collaborative

### Agency Staff
Anita Jennings, Ohio Department of Job and Family Services
Amy Kuhn, Intern, Ohio Department of Health
Judi Moseley, Ohio Department of Health

### Members
Nicole Cartwright Kweik, College of Pharmacy, The Ohio State University
Antonio Ciaccia, Ohio Pharmacists Association
Donna Conley, Ohio Citizen Advocates for Chemical Dependency Prevention and Treatment
Lisa Coss, Ohio Department of Job and Family Services
Sallie Debolt, State Medical Board of Ohio
Cathy Denney, Veterans Administration-Chillicothe
Lloyd Early, Ohio Attorney General's Office
Robyn Fosnaugh, Greene County Combined Health District
Stacey Frohnapfel-Hasson, Ohio Association of County Behavioral Health Authorities
John Gabis, Ross County Coroner

Marc Grodner, Hamilton County Mental Health and Recovery Services Board
Mary Haag, Coalition for a Drug-Free Greater Cincinnati
Kenneth Hale, College of Pharmacy, The Ohio State University
Lois Hall, Ohio Public Health Association
Keeley Harding, Ohio Association of Advanced Practice Nurses
Andrea Hoff, Alcohol and Drug Abuse Prevention Association of Ohio
Rachel Jones, Ohio Department of Job and Family Services
Vickie Killian, Killian Counseling and Consulting
Jason Koma, Ohio State Medical Association
Sue Marks, Ohio Department of Job and Family Services
Denise Martin, Gallia-Jackson-Meigs Board of Alcohol, Drug Addiction and Mental Health Services
Traci Mason, The Recovery Center
Tim Ulbrich, Northeastern Ohio Universities Colleges of Medicine and Pharmacy
Wendy Williams, Community Mental Health and Recovery Board of Licking and Knox Counties

### Law Enforcement Work Group

Chair – Matt Kanai, Ohio Attorney General's Office
Vice Chair – Lili C.  Reitz, Ohio State Dental Board

### Agency Staff

Linda Bowsher, Ohio Attorney General's Office

### Members

Fred Alverson, U.S.  Attorney's Office
Malika Bartlett, Ohio Department of Insurance
Tim Benedict, Ohio State Board of Pharmacy
Joseph Branch, Ohio Department of Alcohol and Drug Addiction Services
John Burke, Warren County Drug Task Force
Cynthia Callender Dungey, Ohio Department of Job and Family Services
Lisa Ferguson-Ramos, Ohio Board of Nursing
Keeley Harding Ohio Association of Advanced Practice Nurses
T .  Shawn Hervey, Harrison County Prosecutor
Adam Hewit, Ohio Dental Association
Charles Horner, Portsmouth Police Department
Dennis Luken, Warren County Drug Task Force
Richard Meadows, Ohio State Highway Patrol
Gregg Mehling, Lorain County Drug Task Force
Larry Mincks, Sr., Washington County Sheriff
Fred Moore, Ohio Bueau of Criminal Investigation
Kim Rogers, Adams County Sheriff
Joe Sabino, Ohio Pharmacists Association
William Schmdt, State Medical Board of Ohio
John Stanovich, Ohio Pharmacists Association
Evan Waidley, Ohio HIDTA, Cleveland OH
Robert White, FBI-Cyber Crime

### Treatment Work Group

Chair – Ed Hughes, The Ohio Council of Behavioral Health & Family Services Providers
Vice Chair – Cleanne Cass, Ohio Osteopathic Association

### Agency Staff

Amanda Conn Starner, Ohio Department of Alcohol and Drug Addiction Services
Tom Terez, Ohio Department of Administrative Services

### Members

David Baker, Ohio Poison Control Collaborative
Stu Beatty, The Ohio State University College of Pharmacy
Marilyn Booze, Fairfield Medical Center
Joseph Branch, Ohio Department of Alcohol and Drug Addiction Services
Carie Brown, Scioto Paint Valley Mental Health Center
Lisa Callander, City of Columbus
Joshua Cox, Dayton Physicians Oncology/Hematology
Brad DeCamp, Ohio Department of Alcohol and Drug Addiction Services
Landa Dorris, Scioto Paint Valley Mental Health Center
Danna Droz, Ohio State Board of Pharmacy
Dale English, Ohio Pharmacists Association
John Feucht, Mercy Medical Center
Phyllis Grauer, The Ohio State University Medical Center
Tracy Greuel, Ohio Attorney General's Office
Kurt Gronbach, Ohio State Medical Association
Lois Hall, Ohio Public Health Association
Liz Henrich, Ohio Association of County Behavioral Health Authorities
Tracy Hopkins, Alcoholism Council of Greater Cincinnati
Chet Kaczor, Ohio Pharmacists Association
Shana Kaplanov, Ohio Department of Alcohol and Drug Addiction Services
Larry Moliterno, Meridian Services
Pamela Moore, Summa Health System
Patricia Murphy, Cleveland Clinic
Bill Quinlan, St. Luke's Hospital
Lesli Parker, Adena Health System
Dawn Prall, Immediate Health Services, Inc.
Cheri Rawe, Miami Valley Hospital
Peter Rogers, Ohio Physicians Health Program
Trish Saunders, The Recovery Center
Geneva Sanford, Ohio Health
Joyce Starr, Ohio Department of Alcohol and Drug Addiction Services
Sanford Starr, Ohio Department of Alcohol and Drug Addiction Services
Jon Wills, Ohio Osteopathic Association

**LETTERS OF SUPPORT FROM PROFESSIONAL ORGANIZATIONS**



Ohio
State Medical
Association
The power of many. The voice of one.

August 25, 2010

George T. Maier, Chair
Alvin D. Jackson, MD, Vice Chair
Ohio Prescription Drug Abuse Task Force
1970 West Broad Street
Columbus, OH 43223

Dear Chair Maier and Dr. Jackson:

On behalf of the 20,000 physician, resident and medical student members of the Ohio State Medical Association (OSMA), I want to commend the efforts of Ohio Prescription Drug Abuse Task Force (OPDATF) in addressing the epidemic of prescription drug abuse and diversion in Ohio. With membership on the OPDATF, the OSMA is committed to working with all relevant stakeholders to find a multi-faceted solution to this important public health issue.

To aid in these efforts, we have created the OSMA Prescription Drug Abuse Advisory Committee. This Committee is comprised of 25 physicians from pain medicine, physical medicine and rehabilitation, anesthesiology, psychiatry, emergency medicine and primary care. This group is charged with studying the issue, formulating OSMA policy, aiding the OSMA's efforts on the OPDATF and educating the medical community on the prescription drug abuse and diversion epidemic.

The OSMA's efforts have also included a video on Ohio Automated Rx Reporting System (OARRS). The video has been distributed to Ohio physicians through many different vehicles and is accessible through the OSMA's website and YouTube. In addition, we have distributed information on both OARRS and the rising epidemic of prescription drug abuse and diversion to physicians through OSMA publications.

We are also currently in the process of developing a Continuing Medical Education (CME) course on this issue. The course will focus on increasing awareness of the prescription drug use, misuse and abuse and proper pain assessment and lawful prescribing of controlled substances. The OSMA plans to promote this course, and an associated speaker's bureau on this topic, to county medical and state specialty societies, hospital medical staffs and others in the medical community.

In short, the OSMA has been and will remain committed to educating the state's physicians about the rising epidemic of prescription drug abuse and diversion in Ohio.

Sincerely,

*Richard R. Ellison, M.D.*

Richard Ellison, MD
President
Ohio State Medical Association

3401 Mill Run Drive · Hilliard, OH 43026 · P (800) 766-6762 · P (614) 527-6762 · F (614) 527-6763

www.osma.org

# president's message

## Prescription Drug Abuse is Epidemic: Pharmacists Can Help



*Matthew A. Fettman, R.Ph.*

Prescription drug abuse is being described as *epidemic* in Ohio. Governor Strickland signed an executive order in April that has established the Ohio Prescription Drug Abuse Task Force (OPDATF) to study the issues and return a comprehensive plan of action. OPA Executive Director Ernie Boyd has been appointed to the Task Force. Work groups for the Task Force have been formed and meetings have begun. The Work Groups include: Treatment Work Group, Public Health Work Group, Regulatory Work Group, and Law Enforcement Work Group. Several OPA members and staff have been appointed to the work groups.

How did the problem get to the point where it can be described as *epidemic*? Controlled substances are not supposed to be easily obtained. That being said, how does someone obtain access to quantities large enough to maintain their habit? Doctor shopping, frequent emergency room visits, and buying from drug traffickers are probably the most common means of acquiring the medications.

The Ohio Automated Rx Reporting System (OARRS), Ohio's prescription monitoring program, is a tool available for pharmacists, prescribers, and law enforcement officials to identify individuals who are attempting to obtain controlled substances. Governor Strickland's press release announcing the OPDATF stated "…all pharmacists report into this system, but only one in five use the system when filling prescriptions." This is a statistic we can improve. Next time you speak with a colleague to transfer a prescription, ask if he/she uses the OARRS program. Be sure to explain how helpful it is when a questionable controlled substance prescription crosses the counter.

The Board of Pharmacy stresses the word "tool" when describing OARRS because the information

gathered from an OARRS report should aid in making a judgment in deciding whether or not to fill a prescription. The data produced in an OARRS report must be carefully considered.

OPA published a home study jurisprudence program in the June 2009 issue of the *Ohio Pharmacist* journal, "OARRS:  Ohio's Prescription Monitoring Program." The lesson was a good review of the inception, implementation, and current outcomes of OARRS, as well as future plans. If you haven't already read it, do so now. You can even get Ohio jurisprudence credit for it. OPA members can access a PDF of the lesson at www.ohiopharmacists.org (*Education/Law and Home Study CE*). The lesson expires May 28, 2011. For more information on OARRS, visit www.ohiopmp.gov.

In addition, OARRS is also a tool used in identifying prescribers and pharmacists who are not practicing responsibly. The drugs are reaching the street somehow. Governor Strickland emphatically stated, "…And so to all the pill mills out there making a profit by selling a poison, let me be clear. We're coming for you. What you do is illegal and immoral, and we will fight you with everything we have."

"Pain management is a legitimate medical concern and in no way will we interfere with necessary medical responses to chronic pain. But there is no place for physicians or pharmacists who are not meeting any acceptable standard of care and are apparently dispensing prescriptions, not as a means to help a patient, but as a means to enrich themselves."

We can help end the epidemic. And when you recommend utilization of OARRS to a colleague, suggest they join OPA also!

> *"Prescription drug abuse is being described as epidemic in Ohio."*

# Ohio Osteopathic Association

53 West Third Avenue • Post Office Box 8130 • Columbus, Ohio 43201-0130
Telephone 614/299/2107 • In Ohio 800/234/4848 • Fax 614/294/0457 • www.ooanet.org

September 7, 2010

George T. Maier, Chair
Alvin D. Jackson, M.D., Vice Chair
Ohio Prescription Drug Abuse Task Force
1970 West Broad Street
Columbus, Oh 43223

Dear Mr. Maier and Dr. Jackson:

Thank you for your recent letter requesting the Ohio Osteopathic Association's (OOA) commitment to the Ohio Prescription Drug Abuse Task Force. The OOA has a long-standing history of promoting pain management best practices, while, at the same time, addressing the problem of drug diversion and substance abuse. I am enclosing some of our **existing policy statements** that are reviewed, reaffirmed on a five-year basis, posted and circulated for the education of our members.

The Ohio Osteopathic Association is also committed to providing **pain management and drug abuse education programs** for our membership and our affiliate, the Ohio State Society of the American College of Osteopathic Family Physicians. We have historically included pain management topics on our educational programs. This year the Ohio Symposium on Osteopathic Education and Research featured two speakers who addressed:

- "Botulum Toxin Therapy in Chronic Pain Management," Martin Taylor, DO, PhD; and
- "Management of Chronic Pain: Balancing Patient Safety," William R. Morrone, DO

In fact, Dr Morrone's address was so well received, that we are asking him to return for another presentation next year.

The **OOA website**, since its inception, has contained pain management and drug abuse resources for our members and their patients. These include the following listings, which appear under "Resources" with links to pertinent web sites on either the physician or patient resource page:

- The National Institute on Drug Abuse, which maintains on-line resources to help physicians and their patients stay current with the latest science-based facts on drug abuse and addiction. NIDA, an institute of the National Institutes of Health, is the world's leading source of science-based knowledge on preventing and treating drug addiction, a chronic, relapsing disease affecting the brain and behavior. Click here for more information http://www.nida.nih.gov/medstaff.html

Schield M. Wikas, DO
President
Albert M. Salomon, DO
President-Elect
John F. Raney, DO
First Vice President

Robert L. Hunter, DO
Second Vice President
Brian A. Kessler, DO
Treasurer
Christopher J. Loyke, DO
Immediate Past President

Barbara A. Bennett, DO
Past President
Sean D. Stiltner, DO
At-Large Member
Kathleen A. Rice, RPh, MBA
OOHA Representative

John A. Brose, DO
Dean, OU-COM
Jon F. Wills
Executive Director

- The Purdue Web Site -- www.PartnersAgainstPain.com -- contains useful information for physicians in the following categories: (1) Pain Education Center, (2) Pain Assessment, (3) Pain and Integrative Medicine, (4) Pain Documentation, (5) Pain Policy and Advocacy, (6) Pain Resources and Links, and (7) Provider or Practice Pain Tools.

We have kept our members informed of Task Force activities through our **bi-weekly e-newsletter and quarterly magazine**, *The Buckeye Osteopathic Physician*, since Governor Strickland released his Executive Order, and we have posted the following item on the State Government page of our website:

- Governor Strickland formed the Ohio Prescription Drug Abuse Task Force, April 2,2010, to combat prescription drug abuse across Ohio.  The Task force has been meeting monthly and delivered its preliminary report to the Governor in May. **Cleanne Cass, DO**, of Dayton, represents the OOA on the PDATF and also serves as co-chair of the Treatment Work Group.  **Aaron Adams, DO**, an OOA member and Scioto County Health Commissioner, heads the Public Health Work Group.   For ongoing reports and updates visit:
http://www.odh.ohio.gov/features/odhfeatures/drugod/drugoverdose.aspx

Additionally, when the OARRS system was originally implemented, the Ohio Osteopathic Association was one of the first provider associations to actively promote its use to our members.  We have continued to encourage our physicians to use the OARRS system, and are again dedicated to promoting its use through our publications and web site.  The following information is also posted on our website:

- OARRS is a free on-line tool for physicians and other prescribers to check to see if new or existing patients are potentially abusing dangerous drugs or obtaining prescriptions from multiple providers that could cause adverse drug interactions. Outpatient pharmacies that dispense controlled substances to Ohio residents are required to report information into the database at regular intervals.  Any prescriber can access OARRS to obtain detail prescription drug histories that includes the:

  o  Patients name, address and phone number
  o  Patient's date of birth and gender
  o  Quantity of drug
  o  Days supply of drug
  o  Date of dispensing
  o  Date prescription written or authorized
  o  Number of refills authorized
  o  Prescriber's DEA registration number
  o  Pharmacy's name and contact information

The OOA supports voluntary use of OARRS and urges its members to register and query the system when precaution is appropriate.  To establish an account with OARRS:

- o Go to http://www.ohiopmp.gov and complete the online registration.
- o Print the application and have your signature notarized
- o Mail the application and a copy of your driver's license, medical license and DEA registration to the Ohio State Board of Pharmacy
- o The registration process takes about two weeks.

We have also posted a story concerning the September 25th Drug Take Back Day on our home page with a link to the DEA Web Site.  We are also going to publicize the event through the **Family Health Radio Program**, which is a daily radio program produced by the Ohio University with support from the osteopathic profession.  The program is distributed daily to radio stations across the country and reaches an estimated audience of 11 million listeners.

Finally, we are dedicated to assisting Ohio's physicians in stemming the tide of prescription abuse through the installation and use of **electronic medical records and e-prescribing**. The OOA is a founding member of the Ohio Health Information Partnership (OHIP), which received $43 million in federal grants to establish a Health Information Exchange (HIE) and assist 6,000 primary care providers in using Electronic Medical Records "meaningfully." Our commitment to e-prescribing began more than nine years ago when the Ohio University College of Osteopathic Medicine, in collaboration with the Ohio Osteopathic Association, the Ohio Pharmacists Association, and the University of Findlay College of Pharmacy, received three grants from the Ohio Medical Quality Foundation, from 2001 through 2008, to evaluate the impact of e  prescribing on patient safety, patient satisfaction, physician satisfaction and pharmacist satisfaction.  As a Health Information Exchange is established by OHIP, we believe the OARRS System is likely to become an integral part of the HIE.

Thank you again for coordinating this important project. We are pleased to be a partner with the Task Force in helping to stem the epidemic of drug diversion and abuse in our communities while ensuring that chronic pain patients receive access to appropriate care and treatment.

Sincerely,

Shield M. Wikas, DO

Shield M. Wikas, DO, FAOCD
President

Enclosures

**Pain Management (2009)**

RESOLVED, that the Ohio Osteopathic Association supports efforts to improve medical education involving the treatment of patients with chronic pain and continues to seek the elimination of regulatory barriers that interfere with effective pain management. *(Original 2004)*

**End of Life Care (2008)**

RESOLVED, that the Ohio Osteopathic Association (OOA) encourages member physicians to discuss advance directives with all their patients, and end of life options when appropriate; and be it further

RESOLVED, that the OOA continue to offer continuing medical educational programs on end of life care to update member physicians on the latest clinical and legal issues pertaining to pain management and end of life care; and be it further

RESOLVED, that the OOA supports the right of physicians to carry out the wishes of terminally-ill patients as declared in statutorily-recognized advance directives; and be it further

RESOLVED, that the OOA continues to seek regulatory and legislative protection as necessary to ensure the right of physicians to utilize all medically accepted palliative care and pain management methodologies during end of life care without fear of legal prosecution or disciplinary action; and be it further

RESOLVED, that the Ohio Osteopathic Association continue to monitor and participate in legislative and regulatory initiatives involving end of life care. *(Original 1988)*

**Prescriptions, Photo IDs for Scheduled Drugs (2006)**
RESOLVED, that the Ohio Osteopathic Association encourages pharmacists through the Ohio Pharmacists Association, to request photo IDs from individuals who present a prescription or pick up the prescribed medication when the pharmacist has concerns about the identity of that individual. (Original 2006)

**Prescriptions, Photo ID For Schedule II, III, And IV Drugs (2008)**
WHEREAS, a picture ID of the purchasing consumer could potentially be a deterrent to drug diversion; and

WHEREAS, this picture ID could possibly provide a tracking mechanism for law enforcement and physician defense; now, therefore, be it

RESOLVED, that the Ohio Osteopathic Association (OOA) request that the State of Ohio Board of Pharmacy require photo ID or appropriate identification of anyone obtaining a schedule II, III or IV medication with a record maintained of the transaction; and be it further,

RESOLVED, that the OOA send a letter to AACOM to encourage colleges of osteopathic medicine to teach students about common diversionary tactics related to schedule II, III, and IV medications.

**Prescriptions, Triplicate (2004)**
RESOLVED that the Ohio Osteopathic Association opposes any mandatory state

multiple prescription program, which would impair the physician's ability to prescribe effective medications for patients who need them and which threaten doctor-patient confidentiality, and be it further

RESOLVED that the Ohio Osteopathic Association continue to cooperate with the pharmaceutical industry, law enforcement officials, and government agencies to stop prescription drug abuse as a threat to the health and well-being of the American public. *(Original 1989)*

**Prescription Safety and Drug Diversion Tactics (2006)**

RESOLVED that the Ohio Osteopathic Association (OOA) encourage colleges of osteopathic medicine to educate students about common diversionary tactics; and be it further,

RESOLVED, that the OOA periodically publish information and/or provide continuing medical education on best practices to eliminate medication errors and prevent drug diversion in physician practices. *(Original 2006)*

**Substance Abuse, Position Statement (2009)**

RESOLVED, that the Ohio Osteopathic Association reaffirms its position that members should prescribe controlled substances in compliance with state and federal laws and regulations; and be it further,

RESOLVED, that the Ohio Osteopathic Association support the crusade to reduce substance abuse by advocating intelligent enforcement of existing state and federal laws which govern handling of all dangerous substances; and be it further,

RESOLVED, that the Ohio Osteopathic Association pledge its full support of existing and future programs which promote proper use of prescription drugs and other substances among young and old alike in an effort to reduce or eliminate substance abuse. *(Original 1972)*

**Substance Abuse Insurance Coverage (2009)**

RESOLVED, that the Ohio Osteopathic Association supports mandated offering of coverage for in-hospital and ambulatory treatment of substance abuse as part of all health benefits plans or policies offered in Ohio. *(Original 1977)*

**Electronic Prescribing of Controlled Substances**

WHEREAS, electronic prescribing (e-prescribing) of controlled substances has previously been prohibited by the US Drug Enforcement Administration (DEA); and WHEREAS, the DEA published its interim final rule on electronic prescribing of controlled substances on March 31, 2010; and

WHEREAS, the rule will revise DEA regulations to provide an option for practitioners to write prescriptions electronically for controlled substances by registering as e-prescribers,

but does not replace existing requirements for written and oral prescriptions for controlled substances; and

WHEREAS, the adoption of e-prescribing by physicians has been impeded because uncertainties about the procedures necessary to digitally sign and authenticate the person submitting the e-prescription via electronic medical record systems; and

WHEREAS, the Centers for Medicare & Medicaid Services (CMS) is requiring providers to electronically prescribe greater than 70 percent of prescriptions in order to qualify for reimbursement for the meaningful use of electronic medical records (EMR); and

WHEREAS, studies have shown that most providers will not be able to achieve the minimum 70 percent requirement set by CMS without changes to the interim DEA rules; now therefore, be it

RESOLVED, that the Ohio Osteopathic Association petition the American Osteopathic Association to encourage the US Drug Enforcement Administration to modify rules to reduce any potential administrative barriers to electronic prescribing of controlled substances.

**EXECUTIVE ORDER 2010-4S**



**TED STRICKLAND**
GOVERNOR
STATE OF OHIO

## Executive Order 2010 – 4S

### Establishing the Ohio Prescription Drug Abuse Task Force

1. **Prescription drug abuse is a national public health problem.** The Association of State and Territorial Health Officials recognizes prescription drug overdoses as a national public health concern. A 2006 Centers for Disease Control report demonstrated that between 1995 and 2005, the annual number of unintentional drug overdose deaths in the United States more than doubled due to increasing deaths from prescription drugs. The Substance Abuse and Mental Health Services Administration reported that the number of admissions for substance abuse treatment for prescription drugs increased by 141% from 1998 to 2006. These increases in prescription drug overdoses and abuse have created a considerable strain on public health across the country, hitting particularly hard in rural areas in Southern and Midwestern states.

2. **Ohio's prescription drug abuse problem is an epidemic.** In 2007, unintentional drug poisoning became the leading cause of injury death in Ohio, surpassing motor vehicle crashes and suicide for the first time on record. From 1999 to 2007, Ohio's death rate due to unintentional drug poisonings increased more than 300 percent. The increase in deaths has been driven largely by prescription drug overdoses caused by opioids (pain medications). Prescription opioids are associated with more overdoses than any other prescription or illegal drug, including cocaine and heroin.

3. **Significant efforts to address the problem of prescription drug abuse are currently underway.** Various federal, state and local agencies and officials are currently working to combat the problem of prescription drug abuse.

(Page 1 of 5)

a. The Ohio Department of Health and the Ohio Department of Alcohol and Drug Addiction Services have combined the efforts of their respective pre-existing groups, the Poison Action Group/New and Emerging Drug Trends Workgroup, into a single entity working to develop state-level recommendations and strategies to address unintentional prescription drug abuse and fatalities. This group includes state and local government, law enforcement, coroner, prosecutor, public health, health care, medical professional, education, and non-profit advocacy representatives.

b. The Ohio Office of Criminal Justice Services housed within the Department of Public Safety acts as a liaison with law enforcement and drug task forces throughout the state, and has been serving as a resource in helping to address the legal and law enforcement issues related to prescription drug abuse in Ohio.

c. The Department of Job and Family Services works to ensure that Medicaid fraud is not present within its Medicaid program and has taken various steps in that regard concerning prescription drug abuse including lowering the amount of Oxycontin that can be dispensed at one time, requiring that all Medicaid prescriptions be made on tamper resistant prescription pads, and promoting the use of CyberAccess, a web-based tool that provides prescribers and/or their authorized staff with the ability to review two years of patients' prescribed drug history paid by Medicaid.

d. The Ohio Attorney General's Office helps coordinate law enforcement activities, including those dealing with prescription drug abuse. Currently, the Ohio Attorney General's Office efforts are focused on organized stakeholder outreach and educating law enforcement about the widespread problem of prescription drug abuse.

e. The Ohio Medical and Pharmacy Boards are each involved in efforts to revoke the licenses of doctors and pharmacists who improperly provide access to prescription drugs.

f. U.S. Senator Sherrod Brown recently convened a meeting in Chillicothe of federal agency representatives, including representatives from the Drug Enforcement Administration and the Centers for Medicare and Medicaid Services, able to provide resources and strategic assistance with the fight against prescription drug abuse in Ohio.

(Page 2 of 5)

g. There are a range of local task forces and working groups addressing the prescription drug abuse problem, including groups in Adams, Lawrence, Lorain, Scioto, and Warren counties and in Northeast Ohio.

h. There are also legislative efforts being undertaken by the Ohio General Assembly.

4. **Ohio needs a more coordinated, multi-disciplinary, multi-jurisdictional approach to the problem of prescription drug abuse.**  Too many Ohioans have lost their lives or have been impacted by the devastating effects of addiction because of abuse and diversion of prescription drugs.  The efforts to combat prescription drug abuse that are already underway would benefit from greater coordination.  Accordingly, I order the establishment of an Ohio Prescription Drug Abuse Task Force (OPDATF).  The Task Force is charged with undertaking the following efforts to undermine prescription drug abuse in Ohio:

a. Research and problem clarification designed to inform law enforcement, public health and legislative strategies.

b. Identification of law enforcement strategies for potential implementation by federal, state and local law enforcement officials.

c. Identification of public health strategies for potential implementation by public and private health care community officials and representatives.

d. Identification of legislative strategies for consideration by the Ohio General Assembly.

e. Identification of other strategies which might help alleviate the harm and danger of prescription drug abuse in Ohio.

5. **OPDATF Membership.**  The Chair of the Task Force will be the Assistant Director of the Ohio Department of Public Safety and the Vice-Chair will be the Director of the Ohio Department of Health, who shall serve as Task Force chair in the absence of the Assistant Director of Public Safety.  I will appoint the following additional individuals to the Task Force:

a. The Directors (or their designees) of the Departments of Alcohol and Drug Addiction Services  and Job and Family Services;

(Page 3 of 5)

b. One person designated by each of the following: the Ohio Medical Board and the Ohio Pharmacy Board;

c. One person designated by the Ohio Attorney General;

d. One of each of the following local government officials: county sheriff, county prosecutor, county coroner, county or city public health director, and police chief;

e. One person designated by each of the following: the U.S. Department of Justice, the U.S. Department of Health and Human Services, and U.S. Senators Brown and Voinovich;

f. One representative from each of the following organizations as recommended by the organization's chief executive officer:

   i.    Ohio State Medical Association
   ii.   Ohio Osteopathic Association
   iii.  Ohio Pharmacists Association
   iv.   Ohio Hospital Association
   v.    Ohio Poison Control Collaborative;

g. One legislator recommended to me by each of the following:

   i.    The Speaker of the Ohio House of Representatives
   ii.   The President of the Ohio Senate
   iii.  The Minority Leader of the Ohio House of Representatives
   iv.   The Minority Leader of the Ohio Senate; and

h. Such other persons as I may deem appropriate in consultation with the Task Force chair and vice-chair.

6. **OPDATF Operations.** The Task Force shall meet collectively or in work-groups as it deems appropriate and may include individuals who are not members of the Task Force, including individuals from the groups listed in paragraph 3 of this Order, in any work groups it may form. Members of the Task Force will not receive compensation for their service to the Task Force and the Departments of Public Safety and Health will provide staff support to the work of the Task Force.

(Page 4 of 5)

7. **OPDATF Reporting.**  Within six weeks of the issuance of this Order, and on October 1 of this year, the chair shall provide a report to the Governor and to the leaders of the Ohio General Assembly regarding the work of the Task Force.  In its first report, the Task Force shall review the recommendations issued by the Poison Action Group/New and Emerging Drug Trends Work Group and recommend which, if any, of their recommendations should be adopted immediately.  Each report shall address the law enforcement, regulatory, public health and treatment recommendations of the Task Force.  The Task Force should not wait for a scheduled reporting time to work for the implementation of recommendations developed by the Task Force.

8. I signed this Executive Order on April 2, 2010, in Columbus, Ohio, and it will not expire unless it is rescinded.



Ted Strickland, Governor

ATTEST:

_____
Jennifer Brunner, Secretary of State

(Page 5 of 5)

## ENDNOTES

[1]  WONDER (NCHS Compressed Mortality File, 1979-1998 & 1999-2005). 2.  2006-2008 Ohio Department of Health Office of Vital Statistics.

[2]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[3]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[4]  WONDER (NCHS Compressed Mortality File, 1979-1998 & 1999-2005).

[5]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[6]  Does not include out-of-state deaths of Ohio residents

[7]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[8]  Ohio Department of Health. (2007). Tobacco-alcohol-drugs. 2007 Ohio Youth Risk Behavior Survey. http://www.odh.ohio.gov/odhPrograms/chss/ad_hlth/YouthRsk/youthrsk1.aspx

[9]  National Survey of American Attitudes on Substance Abuse XIII: Teens and Parents. 2008. http://www.casacolumbia.org/templates/PressReleases.aspx?articleid=533&zoneid=66

[10]  Ohio Department of Public Safety

[11]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[12]  WONDER (NCHS Compressed Mortality File, 1979-1998 & 1999-2005).

[13]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[14]  Change from ICD-9 to ICD-10 coding in 1999 (caution in comparing before and after 1998 and 1999).

[15]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[16]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program..

[17]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[18]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[19]  Surveillance of Drug Abuse Trends in the State of Ohio. Ohio Substance Abuse Monitoring Network, June 2008

[20]  OSAM-O-GRAM, DATE: January 24, 2002: http://www.odadas.ohio.gov/WebManager/UltimateEditorInclude/UserFiles/WebDocuments/Planning/Jan02ConnxtsOxy.pdf

[21]  OSAM-O-GRAM, DATE: January 24, 2002: http://www.odadas.ohio.gov/WebManager/UltimateEditorInclude/UserFiles/WebDocuments/Planning/Jan02ConnxtsOxy.pdf

[22]  Ohio Revised Code 4731.052, Administrative rules for management of intractable pain with dangerous drugs.

[23]  Ohio Revised Code 4731.21 Drug Treatment of Intractable Pain

[24]  FDA Warning Letters and Notice of Violation Letters to Pharmaceutical Companies; FDA issues warning letter to Purdue Pharma for the marketing of OxyContin, 2003.  OxyContin Class Action Lawsuit to Proceed.  CMAJ, SEPT.  30, 2003; 169 (7).  699-b.  Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem, United States General Accounting Office, Report to Congressional Requestors, December 2003.

[25]  Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem, United States General Accounting Office, Report to Congressional Requestors, December 2003.

[26]  FDA Warning Letters and Notice of Violation Letters to Pharmaceutical Companies; FDA issues warning letter to Purdue Pharma for the marketing of OxyContin, 2003.

[27]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[28]  IMS 2008, http://seekingalpha.com/article/128003-u-s-prescription-drug-sales-grow-slowly-hydrocodone-most-prescribed

[29]  Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[30]  DEA, ARCOS Reports, Retail Drug Summary Reports by State, Cumulative Distribution Reports (Report 4) Ohio, 1997-2007

[31]  Calculation of oral morphine equivalents used the following assumptions:  (1)  All drugs other than fentanyl are taken orally; fentanyl is applied transdermally.  2)  These doses are approximately equianalgesic:  morphine:  30 mg; codeine 200 mg; oxycodone and hydrocodone:  30 mg; hydromorphone; 7.5 mg; methadone:  4 mg; fentanyl:  0.4 mg; meperideine:  300 mg.

[32]  US Census Bureau, Ohio population estimates 1997-2007

[33]  DEA, ARCOS Reports, Retail Drug Summary Reports by State, Cumulative Distribution Reports (Report 4) Ohio, 1997-2007 (2007 Data is Preliminary)

[34]  Source:  Frank, Richard, et al.  Trends in Direct-to-Consumer Advertising of Prescription Drugs, Kaiser Family Foundation, February 2002.

[35]  Palumbo, F.B., Mullins C.D., The Development of Direct-to-Consumer Prescription Drug Advertising Regulation.  Food and Drug Law Journal: Analyzing the Laws, Regulations, and Policies Affecting FDA-Regulated Products, Vol.  54 (3) 2002.

[36]  Palumbo, F.B., Mullins C.D., The Development of Direct-to-Consumer Prescription Drug Advertising

Regulation.  Food and Drug Law Journal: Analyzing the Laws, Regulations, and Policies Affecting FDA-Regulated Products, Vol. 54 (3) 2002.

[37] A White Paper on Medication Safety in the US and the Role of Community Pharmacists.  Institute for Safe Medication Practices. 2007. http://www.ismp.org/pressroom/viewpoints/CommunityPharmacy.pdf

[38] Drug Abuse Trends in Rural Ohio: A Targeted Response Initiative.  Ohio Substance Abuse Monitoring Network, June 2008.

[39] Results from the 2009 National Survey on Drug Use and Health: Volume I.  Summary of National Findings. http://www.oas.samhsa.gov/NSDUH/2k9NSDUH/2k9Results.htm

[40] National Drug Intelligence Center, National Prescription Drug Threat Assessment, 2009

[41] National Drug Intelligence Center, National Prescription Drug Threat Assessment, 2009

[42] National Drug Intelligence Center, National Prescription Drug Threat Assessment, 2009

[43] National Drug Intelligence Center, National Prescription Drug Threat Assessment, 2009

[44] Drug Story Factsheet: Abuse of Prescription Painkillers.

[45] What's a Pill Mill? http://www.cbsnews.com/8301-501263_162-2872835-501263.html

[46] Illegal prescription-drug trade now epidemic, Columbus Dispatch, February 7, 2010.

[47] 2001 U.S. News & World Report, February 3, 2001.

[48] 2001 U.S. News & World Report, February 3, 2001.

[49] 2001 U.S. News & World Report, February 3, 2001.

[50] 2001 U.S. News & World Report, February 3, 2001.

[51] Office of National Drug Control Policy, 2010.

[52] Results from the 2007 National Survey on Drug Use and Health: Volume I. Summary of National Findings. http://www.oas.samhsa.gov/NSDUH/2k7NSDUH/2k7Results.htm

[53] Office of Applied Studies, Substance Abuse and Mental Health Services Administration, Treatment Episode Data Set (TEDS), Ohio.  Data received through 4.27.10.

[54] Ohio Department of Alcohol and Drug Addiction Services Behavioral Health Module.

[55] Ohio Department of Alcohol and Drug Addiction Services Behavioral Health Module.

[56] Columbia University-Shoveling Up II: The impact of Substance Abuse on Federal, State and Local Budgets, 2009.

[57] Columbia University-Shoveling Up II: The impact of Substance Abuse on Federal, State and Local Budgets, 2009.

[58] Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[59] Scioto County Health Department, ICS Document.

[60] Children's Safety Network Economics & Data Analysis Resource Center, at Pacific Institute for Research and Evaluation, 2005; 2 Year 2004 Dollars, Based on 2004-2007 average Ohio incidence 3 Year 2005 Dollars, Based on Year 2003 Ohio incidence.

[61] Scioto County Health Department, ICS Document.

[62] http://www.facebook.com/solace.survivingourlosses?ref=ts#!/solace.survivingourlosses?v=wall&ref=ts

[63] Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.

[64] National Institute on Drug Abuse InfoFacts: Prescription and Over-the-Counter Medications Fact Sheet.

[65] Oregon State University College of Pharmacy; Pain management failing as fears of prescription drug abuse rise, January 2010.

[66] Oregon State University College of Pharmacy; Pain management failing as fears of prescription drug abuse rise, January 2010.

[67] Chronic Pain Management, Kathryn Hahn. The Rx Consultant. December 2009.

[68] Oregon State University College of Pharmacy; Pain management failing as fears of prescription drug abuse rise, January 2010.

[69] Bollinger LC, Bush C, Califano JA, et a1. Under the counter. The diversion and abuse of controlled prescription drugs in the U.S. The National Center on Addiction and Substance Abuse at Columbia University (CASA). July 2005.

[70] Bollinger LC, Bush C, Califano JA, et a1. Under the counter. The diversion and abuse of controlled prescription drugs in the U.S. The National Center on Addiction and Substance Abuse at Columbia University (CASA). July 2005.

[71] Additional fine monies and/or forfeiture funds could be utilized to fund a statewide elite pharmaceutical investigative unit.

[72] National Survey on Drug Use and Health, 2008.

[73] National Survey on Drug Use and Health 2008.

[74] ODADAS Annual Report, SFY 2006.

[75] Office of National Drug Control Policy, 2010.

[76] Substance Abuse and Mental Health Services Administration Treatment Episode Data Set (TEDS) 2007 Discharges from Substance Abuse Treatment Services, 2010.

[77] Substance Abuse and Mental Health Services Administration Benefits of Residential Substance Abuse Treatment for Pregnant and Parenting Women, 2001.

[78] Ohio Department of Alcohol and Drug Addiction Services Behavioral Health Module & Ohio Department of Rehabilitation and Correction.

[79] National Survey on Drug Use and Health, 2007.

[80] Substance Abuse and Mental Health Services Administration, 2010.

[81] Screening, Brief Intervention, and Referral to Treatment: SAMHSA, CST 2010.

[82] The Institute for Health Policy Research into Action, February 2010.

[83] The Institute for Health Policy Research into Action, February 2010.

[84] Columbia University, Shoveling Up II:  The Impact of Substance Abuse on Federal, State, and Local Budgets, 2009.

[85] Columbia University, Shoveling Up II:  The Impact of Substance Abuse on Federal, State, and Local Budgets, 2009.

[86] Compton, WM, Thomas, YF, Stinson, FS, Grant, BF. (2007). Prevalence, correlates, disability, and comorbidity of DSM-IV drug abuse and dependence in the United States. Arch Gen Psychiatry, 64:566-576

[87] Oregon State University College of Pharmacy; Pain management failing as fears of prescription drug abuse rise, January 2010.

[88] Manchikanti L., Prescription drug abuse:  what is being done to address this new drug epidemic? Testimony before the Subcommittee on Criminal Justice, Drug Policy and Human Resources.  Pain Physician.  2006 Oct;9(4);287-321.

[89] Oregon State University College of Pharmacy; Pain management failing as fears of prescription drug abuse rise, January 2010.

[90] Kuehn, B.M. Opioid Prescriptions Soar: Increase in Legitimate Use as Well as Abuse. JAMA. 2007;297:249-251.

[91] Kuehn, B.M., Scientists Probe Ways to Curb Opioid Abuse Without Hindering Pain Treatment. JAMA . 2007: 297(18): 1965-1967.

[92] SAMHSA, About Buprenorphine Therapy.  http://www.buprenorphine.samhsa.gov/about.html

[93] Ohio Compassionate Care Task force Report, 2004.

[94] Ohio Compassionate Care Task force Report, 2004.

[95] Drug Enforcement Administration, Automation of Reports and Consolidated Orders System (ARCOS)

[96] Drug Enforcement Administration, Automation of Reports and Consolidated Orders System (ARCOS)

[97] SB 2272

[98] Automation of Reports and Consolidated Orders System

[99] Fudala, et al.  New England Journal of Medicine, 2003.

[100] Suboxone ® or Subutex ®

[101] Under OAC 3793:2-1-08(S)(3), the medical somatic service rule prohibits opioid agonists.  Buprenorphine is a combination of partial agonist and antagonist.

[102] GAO Report.  GAO-02-634.  Prescription drugs.  State monitoring programs provide useful tool to reduce diversion.  May 2002.  http://www.gao.gov/new.items/d02634.pdf

[103] Doctor Shopping was defined in study as visiting an average of 5 unique prescribers per year from 1/01/06 to 12/31/08.

[104] ODH Office of Vital Statistics and Ohio Board of Pharmacy, OARRS, Analysis by Injury Prevention Program.

[105] National Alliance of Model State Drug Laws.  June 2010: http://www.namsdl.org/documents/ StatesThatExplicitlyImposeNoBurdenonPractitionersToAccessPMPInformationRev.pdf

[106] Handbook of Chronic Pain Management. Tollison, C.David (ed.) Baltimore, Md. Williams & Wilkins, 1989.

[107] Americans Talk about Pain, A Survey Among Adults Nationwide Conducted for Research America!, Peter D. Hart Research Associates, 2003  http://www.researchamerica.org/uploads/poll2003pain.pdf

[108] DEA ARCOS Reports and ODH Office of Vital Statistics, Analysis by Injury Prevention Program.

[109] www.ohiopaininitiative.org/media/pdfs/occtf.pdf

[110] www.fsmb.org/pdf/2004_grpol_controlled_substances.pdf

[111] Boscarino, J. A., Rukstalis, M., Hoffman, S. N., Han, J. J., Erlich, P. M., Gerhard, G. S. and Stewart, W. F. , RESEARCH REPORT: Risk factors for drug dependence among out-patients on opioid therapy in a large US health-care system.  Addiction, no.  doi: 10.1111/j.1360-0443.2010.03052.x.  16 August 2010.

[112] http://www.oas.samhsa.gov/2k6/getPain/getPain.htm.  How Young Adults Obtain Prescription Pain Relievers for Nonmedical Use, 2006.

[113] Ohio Department of Health, Office of Vital Statistics, Analysis by Injury Prevention Program.