Exhibit 95

Case: 1:17-md-02804-DAP Doc #: 1896-98 Filed: 07/19/19 2 of 5. PageID #: 76484

The New York Times | https://nyti.ms/PCJgwN

**BUSINESS DAY**

# A New Painkiller Crackdown Targets Drug Distributors

By BARRY MEIER    OCT. 17, 2012

A local druggist in Newport Beach, Calif., never expected that the federal government's recent crackdown on distributors of prescription painkillers would ensnare him.

But in June, Cardinal Health, a major distributor, abruptly cut off his supplies of narcotics like OxyContin and Percocet. A few months earlier, the Drug Enforcement Administration had accused Cardinal of ignoring signs that some pharmacies in Florida that it supplied with such drugs might be feeding street demand for them.

Cardinal told the druggist, Michael Pavlovich, that the volume of pain drugs and other controlled medications he was dispensing was too high, a situation he said was explainable. His pharmacy specializes in pain patients, he said. Still, it took weeks for Cardinal to start supplying him again, and even then, it limited its shipments to about 15 percent of his previous orders. As a result, Mr. Pavlovich said, many of his patients had to go elsewhere to get prescriptions filled.

"We have to convince them that our dispensing is legitimate," he said of his dealings with Cardinal.

Cardinal's crackdown on Mr. Pavlovich was a sign of a new approach by the D.E.A. to stem the growing misuse and abuse of painkillers. In the last decade, the agency has tried a variety of tactics with limited success, from arresting hundreds of doctors to closing scores of pharmacies. Now, it and other agencies are moving up the pharmaceutical food chain, putting pressure on distributors like Cardinal, which act as middlemen between drug makers and the pharmacies and doctors that dispense painkillers.

In response, the distributors are scrambling to limit their liability by more closely monitoring their distribution pipelines and cutting off some customers.

Since January, for example, Cardinal has cut ties with a dozen pharmacies in states including Arizona, California, Nevada and Oklahoma, interviews and court records show. In doing so, the wholesaler, which is based in Columbus, Ohio, cited audits suggesting that people seeking to buy prescription drugs illegally might have targeted the store in question.

Case: 1:17-md-02804-DAP Doc #: 1896-98 Filed: 07/19/19 3 of 5. PageID #: 76485

Several of the affected drugstores sued Cardinal unsuccessfully to resume supplies, but documents filed in those actions show that until recently, the wholesaler shipped large volumes of pain pills to the stores for months, if not years.

George S. Barrett, Cardinal's chairman and chief executive, said the company had tightened the criteria it used in determining whether to sell narcotics to a pharmacy. In May, Cardinal settled the action brought by the D.E.A. in connection with its Florida sales by agreeing to suspend shipments of controlled drugs, like narcotics, from a facility in that state for two years. It could also face a significant fine.

"We had a strong antidiversion system in place, but no system is perfect," Mr. Barrett said. Among other steps, the company said it had created a special committee to regularly evaluate pharmacies that order high volumes of narcotic drugs.

Another major distributor, AmerisourceBergen, recently disclosed that it faces a federal criminal inquiry into its oversight of painkiller sales. And in June, West Virginia officials filed a lawsuit against 14 drug distributors, including Cardinal and AmerisourceBergen, charging that they had fed illicit painkiller use in that state. The companies have denied wrongdoing.

D.E.A. officials have heralded the Cardinal action as the forerunner of a more aggressive approach to the painkiller problem. But critics say that for years, the agency did little to scrutinize distributors who were making tens of millions of dollars from the prescriptions generated by pain clinics in Florida, Ohio and other states. These facilities, often described as "pill mills," employed doctors who wrote narcotics prescriptions after cursory examinations of patients.

"In the case of West Virginia, they have done nothing," said a lawyer in Charleston, James M. Cagle, who is working on the state's action against distributors.

The drug distribution system is a sprawling one that involves about 800 companies, which range in size from a few giants like Cardinal to hundreds of small firms. For wholesalers, the markup on medications can be small, sometimes a few pennies a pill. But with billions of pills sold annually, the profits can be big. Narcotic painkillers are now the most widely prescribed drugs in the United States, with sales last year of $8.5 billion.

This is not the first time the industry has faced scrutiny. In 2008, Cardinal paid $34 million to settle charges that it failed to alert the D.E.A. to suspicious orders for millions of pain pills that it was shipping to Internet pharmacies — operations that for years supplied the illicit market. The same year, another big distributor, McKesson, paid $13 million to settle similar charges. As part of the agreements, both companies denied wrongdoing.

Executives like Mr. Barrett of Cardinal say that it is often difficult for a distributor to tell whether a pharmacy or a doctor is serving legitimate pain patients or supplying illicit drug demand. And distributors have long complained that the D.E.A. has never issued specific guidelines for when they should stop shipping to a customer.

But agency officials say that wholesalers know about the red flags. For example, the agency charged that Cardinal was selling 50 times the amount of pain pills containing the narcotic oxycodone, the active ingredient in OxyContin and other drugs, to its four top pharmacy customers in Florida than it was supplying to the average drugstore in that state.

Cardinal failed to scrutinize such sales, the agency said, even violating the safeguards it promised to put in place when it agreed to settle the government charges in connection with its supplying of Internet pharmacies. "Everyone is making a large amount of money on these drugs," said Joseph T. Rannazzisi, a deputy assistant administrator of the D.E.A. division that oversees legal drugs, like painkillers.

The D.E.A. is able to track where painkillers are going because distributors regularly file reports detailing their shipments to customers. But just how aggressively the agency uses that data is anyone's guess.

An agency employee, Michelle Cooper, testified last year that she had attended a training session at which instructors described how investigators like her could use the database to identify suspicious distributors. In doing so, they pointed to data showing that a distributor had suddenly started shipping large and growing volumes of pain pills to Florida drugstores.

It was only later that Ms. Cooper discovered that the case involved a real distributor, not a hypothetical one, and that the company was still making those shipments despite the agency's apparent awareness of them.

"I didn't believe the numbers they were showing us were real," she said. "I thought it was for training purposes."

Ms. Cooper subsequently investigated the company, Keysource Medical, which agreed last year to give up its license to distribute narcotic drugs.

Faced with Congressional pressure, agency officials like Mr. Rannazzisi have said that they are increasing the ranks of investigators like Ms. Cooper, and that they provide distribution data to state officials when local authorities request it as part of an investigation.

But state officials say it would be more helpful to get that data routinely so they can act more quickly against rogue clinics and pharmacies. For years, Ohio law enforcement authorities did not know which distributors were supplying the many pill mills operating in the state, one official said. If the D.E.A. had supplied that information, "we would have known about the number of shipments going into Ohio and where they were going," said Aaron Haslam, an assistant state attorney general.

Also, while the D.E.A. brings actions against distributors like Cardinal for failing to notify the agency of a "suspicious order" from a pharmacy or other customer, it does not share those reports with officials in the state where the pharmacy is based.

In response to a request from The New York Times, the agency even declined to disclose the number of such reports it received annually. A spokeswoman, Barbara Carreno, said in a statement that the agency considered such statistics "law enforcement sensitive" information, but she did not elaborate.

The Times has filed a Freedom of Information Act request seeking that data.

A version of this article appears in print on October 18, 2012, on Page B1 of the New York edition with the headline: A New Painkiller Crackdown.

© 2019 The New York Times Company