# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
OPIATE LITIGATION                  Case No. 17-md-2804

This document relates to:          Judge Dan
                                   Aaron Polster

The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090
_____

VOLUME I
Videotaped Deposition of Kyle J. Wright
Washington, D.C.
February 28, 2019
9:33 a.m.

Reported by:  Bonnie L. Russo
Job No. 3244302

Page 142

1              MR. MIGLIORI:  Objection to form.
2              THE WITNESS:  I do not object to
3     this.
4              BY MS. MAINIGI:
5         Q.   So based on your recollection and
6     your review sitting here today, you agree --
7     you have no reason to disagree with the
8     testimony you provided in 2011?
9         A.   Yes, ma'am.
10             MR. SHKOLNIK:  Objection.  Improper
11    use of the document.
12             BY MS. MAINIGI:
13        Q.   Let me ask you -- let me the switch
14    for one moment while we seem to be looking for
15    other things.
16             When there is a suspicious order --
17    or let's say a registrant identifies a possible
18    suspicious order.
19             It's quite possible that, upon
20    further investigation, the registrant could
21    resolve the question of whether the order is
22    suspicious and make the decision to go ahead
23    and ship, correct?
24             MR. BENNETT:  Objection.  Form.
25             THE WITNESS:  Correct.

Page 143

1        BY MS. MAINIGI:
2        Q.   Okay.  And the exercise that the
3    registrant goes through to do some due
4    diligence to really bear out whether the order
5    is, in fact, truly a suspicious order or not,
6    that due diligence exercise, is there a
7    regulatory requirement to document that due
8    diligence?
9        A.   I apologize for being such a worm.
10   Can you repeat, please.
11            (The record was read as requested.)
12            THE WITNESS:  No.
13            MS. MAINIGI:  Can you get out
14   Exhibit 17.
15            BY MS. MAINIGI:
16       Q.   While -- while we're just getting
17   that exhibit together, one question for you,
18   Mr. Wright, in a different area.
19            Did you -- for a while you had a
20   practice of notifying registrants when a
21   distributor terminated a customer based on
22   concerns about diversion, correct?
23       A.   Yes.
24       Q.   And so you would group -- you would
25   send out an e-mail or something and BCC

Page 144

1  individuals from various companies, your
2  contacts at various companies, in an effort to
3  keep folks apprised about customers that were
4  terminated, correct?
5      A.   Yes.
6      Q.   And you would send those e-mails to
7  both distributors and manufacturers, correct?
8      A.   Yes.
9      Q.   And you understood that the
10 recipients of these e-mails found them helpful
11 in carrying out their due diligence
12 obligations, correct?
13           MR. BENNETT:  Objection.  Form.
14           THE WITNESS:  Yes.
15           BY MS. MAINIGI:
16     Q.   And at the end of your e-mails, you
17 would say to distributors or manufacturers
18 something to the effect of, "If your company
19 deems it appropriate to terminate or restrict a
20 customer, as a courtesy to the distributor
21 community, please notify this office," correct?
22     A.   Correct.
23     Q.   And do you recall that, in fact,
24 distributors did do that, correct?
25     A.   Correct.

1   exchange?
2       A.   I have recollection not of all the
3   context, but yes.
4       Q.   Okay.  And do you see halfway down
5   an e-mail from you dated January 31st, 2017, at
6   5:32 p.m.?
7       A.   Where do we see 5:32 p.m.?
8            Yes.
9       Q.   Okay.  And would you mind just
10  reading that e-mail for the record.
11           MR. MIGLIORI:  Objection.
12           THE WITNESS:  "The WDO, on a monthly
13  basis, downloads all SORS reports from the
14  previous month, conducts the analysis of those
15  SORS to eliminate large number of false
16  positives, and then assigns out the
17  miscellaneous assignments, those that have
18  investigative potential.  I previously passed
19  this link to the GSs within the division to
20  include newly assigned GS Kellum for their
21  information."
22           BY MR. O'CONNOR:
23      Q.   Okay.  Any reason to think that
24  e-mail -- it wasn't accurate at the time you
25  wrote it?

Page 212

1       A.   No.
2       Q.   Okay.  Curiosity:  What is the WDO?
3       A.   Washington district office.
4       Q.   Okay.  Okay.  When you said in this
5   e-mail that there were a large number of false
6   positives, that referred to orders that were
7   reported to suspicious but were not likely to
8   be diverted, correct?
9            MR. BENNETT:  Objection.  Form of
10   the question.
11            THE WITNESS:  The word "diverted"
12   means an act that it -- my understanding of the
13   word "diverted" means an act that has already
14   been fulfilled.  It's -- it's -- it's been
15   taken out -- taken out of this closed system of
16   distribution.
17            MR. O'CONNOR:  Okay.
18            THE WITNESS:  It doesn't
19   necessarily -- source does not mean -- or
20   suspicious order does not imply that.  It
21   implies that there are suspicions that need to
22   be resolved.  Anomalies exist.
23            BY MR. O'CONNOR:
24       Q.   Okay.  But being reported as
25   suspicious does not imply necessarily that it

Page 213

1  will be diverted, correct?
2       A.   It does not imply that, no.
3       Q.   Earlier today we talked a little bit
4  about -- or about ARCOS data.
5            At one point you were the unit chief
6  for targeting and analysis, correct?
7       A.   Correct.
8       Q.   And that unit is responsible for
9  ARCOS data; is that fair?
10      A.   It is responsible for the output
11 side of -- and making the information available
12 as needed for analytical studies,
13 investigations.  But it is not responsible for
14 the input side.
15      Q.   Okay.  What do you mean by "the
16 output side"?
17      A.   Output the product has been
18 finalized.
19      Q.   Okay.  Would that refer to reports
20 that are generated from ARCOS or something
21 else?
22      A.   The information has gone through the
23 input side, which does several checks to make
24 sure that the data could be used and received
25 properly; it's been reported properly.

1              Then once it goes through the form
2     that they report, it then has to go -- an NDC
3     number is what they report with no description.
4     When it comes to me, it's the NDC and then the
5     full description.
6              It is the registrant's DEA number.
7     That's it.  Mine is the cross-reference to the
8     CSA, which gives me -- tells me that it's a
9     pharmacy or -- or -- or whatever.
10             Once it comes to me, then the data
11    is available for our use.
12        Q.   And what was the purpose of your use
13    of the data?
14        A.   To support investigations and to
15    determine if I saw any outliers, anomalies that
16    I -- my group, my unit felt were egregious
17    enough to warrant further investigation.
18        Q.   And how would your group going about
19    -- go about determining whether they're
20    egregious enough to warrant further
21    investigation?
22             MR. BENNETT:  Object.  The witness
23    is instructed that you may not talk about
24    confidential law enforcement techniques that
25    you used.