# EXHIBIT 4

```
1          IN THE UNITED STATES DISTRICT COURT
2           FOR THE NORTHERN DISTRICT OF OHIO
3                    EASTERN DIVISION
4                        -   -   -
5
     IN RE:  NATIONAL      :   HON. DAN A.
6    PRESCRIPTION OPIATE   :   POLSTER
     LITIGATION            :
7                          :
     APPLIES TO ALL CASES  :   NO.
8                          :   1:17-MD-2804
                           :
9

            - HIGHLY CONFIDENTIAL -
10
     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11
                     VOLUME I
12
                        -   -   -
13
                   April 17, 2019
14
                        -   -   -
15
16           Videotaped deposition of
     THOMAS PREVOZNIK, taken pursuant to
17   notice, was held at the law offices of
     Williams & Connolly, 725 12th Street,
18   Washington, D.C., beginning at 9:11 a.m.,
     on the above date, before Michelle L.
19   Gray, a Registered Professional Reporter,
     Certified Shorthand Reporter, Certified
20   Realtime Reporter, and Notary Public.
21                       -   -   -
22
           GOLKOW LITIGATION SERVICES
23    877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
24
```

1    need to follow up on.

2          Q.    Okay.  And how can you tell

3    if an order is a typical order versus one

4    that deviates substantially from a normal

5    pattern?

6          A.    Well, I apologize.  It's --

7    I don't know if you can say what the

8    difference is a typical order and that.

9    What you have is you have a history of

10   what are -- what are the sales to that

11   distributor.  So you would start with

12   that.  But as you -- as you -- as the

13   customers -- you know, what questions are

14   you asking the distributors?  Are you

15   asking them for their customers?  And,

16   you know, who are they selling to?

17                And then you can look at

18   newspaper articles and see the overdose

19   deaths.  You can see this is affecting

20   these communities that these product,

21   your products, are going into, because

22   that distributor is putting them in

23   there.  So you would have to start asking

24   those questions.

1  Q.   But when a manufacturer

2  receives an order from a distributor, how

3  do you tell whether that particular order

4  deviates from a normal pattern, even

5  looking at the sales history to that

6  distributor?

7  A.   I'm not sure I'm following.

8  Q.   Well, I'm just asking you,

9  DEA has imposed this obligation on

10 manufacturers.  And I'm wondering whether

11 DEA has a position on how a manufacturer

12 should determine whether a particular

13 order that comes into it from a

14 distributor, deviates from a normal

15 pattern?

16 A.   Well, I mean, you can go

17 back to the internet days when it was --

18 the pattern was all of the sudden

19 products that were skyrocketing to the

20 millions and hundreds of thousands that

21 were never there.

22 Q.   So you're saying if a

23 product was not being purchased at all

24 previously and then skyrocketed --

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I'm not saying not at all.

2  But if it's -- if it's not been used

3  much, and then all of the sudden it takes

4  off.

5    Q.    Okay.  And if it does take

6  off, is that enough to conclude that the

7  product is being diverted?

8    A.    I don't think it's enough to

9  conclude that it's diverted, just based

10 on that.  But it should be enough to make

11 it a suspicious order, to at least report

12 it.

13   Q.    Okay.  And how big an

14 increase do you have in mind when you say

15 skyrocket?

16   A.    I don't have a number in

17 mind.

18   Q.    It sort of depends on the

19 situation?

20   A.    It depends on the situation,

21 yeah.

22   Q.    All right.  How about with

23 respect to unusual frequency?  When a

24 manufacturer receives an order from a

Highly Confidential - Subject to Further Confidentiality Review

1    distributor, how does it determine

2    whether the order is one of unusual

3    frequency?

4            A.    Well, again, are they

5    ordering more and more?  I mean, again,

6    it depends on the situation.  Again,

7    these are not -- not one particular

8    thing.  It could be two of them, it could

9    be three of them.  It could be any

10   information that you have obtained that

11   has and shows or that indicates that your

12   product may be being diverted, then you

13   have the responsibility to guard that

14   from doing that.  So that would trigger a

15   suspicious order.

16           Q.    So fair to say whether an

17   order is of an unusual frequency requires

18   some -- some judgment?

19           A.    Yes.

20           Q.    It's fair to say that it's

21   in the eye of the beholder?

22           A.    I don't think it's in the

23   eye of the beholder because it's -- the

24   data is going to show you what is going

Highly Confidential - Subject to Further Confidentiality Review

1          Does every order that's
2  unusually large necessarily lead to
3  diversion?
4          A.    I have no idea.
5               MS. SINGER:  Objection.
6       Scope.
7               THE WITNESS:  I have no idea
8       what you mean by unusually large.
9  BY MR. O'CONNOR:
10          Q.    Okay.  As the term
11  "unusually large" is used in the
12  suspicious order monitoring regulation,
13  are orders that are unusually large
14  necessarily diverted?
15          A.    Well, for example, a bottle
16  of 100 Vicodin from a manufacturer to a
17  vet, is that unusually large?
18          Q.    Is it?
19          A.    I don't think it's unusually
20  large, but it would raise my eyebrows of
21  why would -- why would a vet be ordering
22  that bottle when they know that the
23  toxicity to cats and dogs would kill
24  them.  So I don't think you can just look

Highly Confidential - Subject to Further Confidentiality Review

1    at a number and say that's too big.

2              MR. O'CONNOR:  Whoever is on

3         the phone needs to go on mute.

4              MR. FINKELSTEIN:  Whoever is

5         on the phone please mute your

6         phone.

7    BY MR. O'CONNOR:

8         Q.    Before we get back to my

9    question, I just want to be clear.

10   Are -- are vets required to obtain a DEA

11   registration before they order controlled

12   substances?

13        A.    Yes.

14        Q.    And the DEA issues some

15   veterinarians registrations to allow them

16   to purchase controlled substances?

17        A.    Correct.

18        Q.    Okay.  I do -- I do want to

19   get back to my original question though,

20   which was, is an order that is unusually

21   large, does that order necessarily lead

22   to diversion?

23             MR. FINKELSTEIN:  Objection.

24        Vague.

Highly Confidential - Subject to Further Confidentiality Review

1    THE WITNESS:  It may or

2    may -- it may or may not.

3  BY MR. O'CONNOR:

4    Q.   Would the same be true of an

5  unusually frequent order?

6    MR. FINKELSTEIN:  Same

7    objection.  You can answer.

8    THE WITNESS:  Correct.  It

9    may or may not.

10  BY MR. O'CONNOR:

11    Q.   And the same would be true

12  of an order that deviates substantially

13  from the normal pattern?

14    MR. FINKELSTEIN:  Same

15    objection.  You can answer.

16    THE WITNESS:  Correct.  It

17    may or may not.

18  BY MR. O'CONNOR:

19    Q.   Okay.  And putting that

20  together, that means that not every

21  suspicious order leads to diversion,

22  correct?

23    MR. FINKELSTEIN:  Objection.

24    Scope.  You can answer.

1          THE WITNESS:  Could you

2      please repeat that?

3  BY MR. O'CONNOR:

4      Q.    Not every suspicious order

5  leads to diversion, correct?

6      A.    Correct.

7      Q.    I want to talk a little bit

8  about how suspicious order reports are --

9  are used within DEA.

10          Is it fair to say that most

11  suspicious order reports are submitted to

12  field offices?

13      A.    I would say based on the

14  fact that the big three are filing

15  electronically, I would say the majority

16  electronically.

17      Q.    When an order or when

18  suspicious order reports are filed

19  electronically, does that mean they are

20  filed with headquarters?

21      A.    Yes.  On the Legacy and the

22  vetted system.

23      Q.    Okay.  And do registrants

24  that are not reporting electronically to

Highly Confidential - Subject to Further Confidentiality Review

```
 1            UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL         )
 4    PRESCRIPTION            )   MDL No. 2804
      OPIATE LITIGATION       )
 5    _____  )   Case No.
                              )   1:17-MD-2804
 6                            )
      THIS DOCUMENT RELATES   )   Hon. Dan A.
 7    TO ALL CASES            )   Polster
 8
                  FRIDAY, MAY 17, 2019
 9
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                       - - -
12            Videotaped deposition of Thomas
13    Prevoznik, Volume III, held at the offices of
14    WILLIAMS & CONNOLLY LLP, 725 Twelfth Street,
15    NW, Washington, DC, commencing at 8:10 a.m.,
16    on the above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                       - - -
22
              GOLKOW LITIGATION SERVICES
23       877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    a combination.

2              And so in the example I

3    would -- I would say is -- I think I've used

4    it before was the veterinarian that is

5    ordering Vicodin with the acetaminophen that

6    is toxic to cats and dogs.  So that in

7    itself, an order of that, would be why are

8    they doing that.

9         Q.   But standing alone, without

10   follow-up due diligence, it is not

11   necessarily always possible to determine

12   whether an order that is an unusual size,

13   unusual pattern or frequency is, by itself,

14   for that reason, indicative of diversion,

15   correct?

16              MR. FINKELSTEIN:  Asked and

17        answered.  Incomplete hypothetical.

18              THE WITNESS:  Correct.

19   QUESTIONS BY MS. MAINIGI:

20        Q.   And so some sort of follow-up

21   due diligence needs to be done by the

22   distributor or registrant, correct?

23              MR. FINKELSTEIN:  Incomplete

24        hypothetical.  Asked and answered.

25              THE WITNESS:  Right.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.    And with respect to -- we've

 3    talked a bit about due diligence in the last

 4    couple of days of your deposition.

 5              Do you recall that?

 6         A.    Yes.

 7         Q.    Okay.  And with respect to --

 8    you've been asked questions by both

 9    Mr. Farrell and Ms. Singer about

10    documentation related to due diligence.

11              Do you recall that?

12         A.    Yes.

13         Q.    And I believe that you

14    indicated that there was not any sort of

15    requirement by the DEA of the maintenance of

16    due diligence files, correct?

17              MR. FINKELSTEIN:

18         Mischaracterizes prior testimony.

19              THE WITNESS:  Yes.

20    QUESTIONS BY MS. MAINIGI:

21         Q.    Now certainly the DEA's view

22    appears to be that due diligence is a good

23    practice or a best practice, fair?

24              MR. FINKELSTEIN:  Foundation.

25         Mischaracterizes prior testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes, it would be

 2        good practice.

 3   QUESTIONS BY MS. MAINIGI:

 4        Q.      And but the DEA has not issued

 5   any sort of guidelines indicating how due

 6   diligence should be conducted, true?

 7        A.      I mean, I would say that the

 8   letters in 2006 and 2007 have certain

 9   questions to be asked, so that's a guide of

10   what should be asked or what should be looked

11   for.

12        Q.      Those are Mr. Rannazzisi's

13   letters?

14        A.      Yes.

15        Q.      And Mr. Rannazzisi's letters

16   touched on a few different areas, correct?

17        A.      Correct.

18        Q.      Let me try to focus on

19   guidelines that might be specific to the idea

20   of due diligence.

21                    Are there -- are you aware of

22   DEA ever issuing any guidelines specific to

23   due diligence that describe how due diligence

24   should be conducted?

25                    MR. FINKELSTEIN:  Asked and
```

1      Q.      But there's no requirement that

2      a due diligence file even be maintained,

3      correct?

4      A.      Correct.

5      Q.      So the two-year rule does not

6      apply to any due diligence files, per se,

7      correct?

8      A.      Correct.  I was just pointing

9      out that within the regs, there is records

10     for a two-year period.

11     Q.      Due diligence is certainly an

12     important part of this process, right?

13                 MR. FINKELSTEIN:  Vague.

14                 THE WITNESS:  Yes.

15     QUESTIONS BY MS. MAINIGI:

16     Q.      Why do you think the DEA has

17     never issued any specific guidance on due

18     diligence?

19                 MR. FINKELSTEIN:  Vague.

20                 Instruct you not to answer to

21         the extent that the answer calls for

22         predecisional deliberative

23         communications within the Department

24         of Justice.

25                 THE WITNESS:  I don't know.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.     Now, is there any sort of

 3    requirement -- I'm going to come back to

 4    suspicious orders.

 5              Is there any kind of

 6    requirement to hold on to suspicious orders

 7    themselves that are reported?

 8                   MR. FINKELSTEIN:  Vague.

 9                   THE WITNESS:  I'm not sure I'm

10         following on that.

11    QUESTIONS BY MS. MAINIGI:

12         Q.     Well, so, for example, if -- I

13    think when you were talking to one of the

14    other questioners, there was some reference

15    to perhaps at some point in time suspicious

16    orders being faxed in to the DEA.

17              Do you remember that

18    discussion?

19         A.     Yes.

20         Q.     Is there any sort of

21    requirement, either by the DEA or by the

22    registrant, to hold on to an actual

23    suspicious order being reported to the DEA?

24                   MR. FINKELSTEIN:  Scope.

25         Vague.  Calls for speculation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  No.

 2    QUESTIONS BY MS. MAINIGI:

 3         Q.     Has the DEA issued any sort of

 4    guidance indicating how long a suspicious

 5    order that's been reported must be

 6    maintained?

 7         A.     No.

 8         Q.     Now, I think with one of the

 9    prior questioners there was reference to --

10    well, let me back up.

11                You prepared back to 1996 for

12    this deposition, approximately, correct?

13         A.     Well, I mean, I had -- I --

14    from the letters that you saw, I had some

15    letters from 1980s that I saw.

16         Q.     So you prepared for various

17    earlier periods of time?

18         A.     I looked for what I could find.

19         Q.     Okay.  And did you speak to any

20    folks in the field offices to help yourself

21    prepare for this deposition?

22                MR. FINKELSTEIN:  Asked and

23         answered.

24                THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MAINIGI:

 2         Q.     And who were the folks you

 3    spoke to from the field office?

 4              MR. FINKELSTEIN:  Asked and

 5         answered.

 6              THE WITNESS:  Scott Collier,

 7         Ruth Carter, Susan Langston, Lisa

 8         Sullivan, David White, Scott Garriott.

 9         I'm trying to think.

10    QUESTIONS BY MS. MAINIGI:

11         Q.     And those were all folks that

12    were in the field offices in years prior?

13         A.     Yeah, they were in the field.

14    They've been -- they're in the field now.

15         Q.     Okay.  So you're aware through

16    your own experience in the field as well as

17    the conversations you had that the

18    requirement of the regulation and the statute

19    is that suspicious orders generally are

20    reported to the local or regional DEA

21    offices, correct?

22         A.     Correct.

23         Q.     And then it's up to the local

24    or regional DEA offices to ultimately make a

25    decision about whether to investigate a
```