# EXHIBIT 5

Highly Confidential - Subject to Further Confidentiality Review

```
 1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
 2                  EASTERN DIVISION
                       -  -  -
 3    IN RE:  NATIONAL           :  HON. DAN A.
      PRESCRIPTION OPIATE        :  POLSTER
 4    LITIGATION                 :  MDL NO. 2804
                                 :
 5    This document relates to:  :  Case No. 17-MD-2804
                                 :
 6    The County of Summit, Ohio :
      Ohio et al. v. Purdue Pharma :
 7    L.P., et al., Case No.     :
      17-OP-45004                :
 8                               :
      The County of Cuyahoga v.  :
 9    Purdue Pharma Purdue Pharma :
      L.P., et al., Case No.     :
10    18-OP-45090                :
11                    -  -  -
12         - HIGHLY CONFIDENTIAL -
      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13
                      VOLUME I
14                     -  -  -
                    May 9, 2019
15
16           Videotaped deposition of
      CRAIG J. McCANN, Ph.D., CFA, taken
17    pursuant to notice, was held at the law
      offices of Morgan Lewis & Bockius, LLP,
18    1111 Pennsylvania Avenue, NW, Washington,
      D.C., beginning at 10:03 a.m., on the
19    above date, before Michelle L. Gray, a
      Registered Professional Reporter,
20    Certified Shorthand Reporter, Certified
      Realtime Reporter, and Notary Public.
21
                       -  -  -
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
```

```
 1          Q.    So you have a Bachelor's
 2   degree, a Master's degree, and a Ph.D.;
 3   is that correct?
 4          A.    Correct.
 5          Q.    And your Ph.D. is in
 6   economics, correct?
 7          A.    Correct.
 8          Q.    Okay.  You are not a medical
 9   doctor, correct?
10          A.    Correct.
11          Q.    You did not attend medical
12   school?
13          A.    Correct.
14          Q.    You are not a physician's
15   assistant?
16          A.    Correct.
17          Q.    You are not licensed to
18   write prescriptions?
19          A.    Correct.
20          Q.    You are not a pharmacist?
21          A.    Correct.
22          Q.    Fair to say you're not an
23   expert in healthcare or the healthcare
24   industry?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.
 2        Q.    Fair to say that you do not
 3   have professional experience with
 4   suspicious order monitoring?
 5        A.    Yes.
 6        Q.    You have not been involved
 7   in designing a suspicious order
 8   monitoring program, correct?
 9        A.    Correct.
10        Q.    You have not reviewed
11   guidance from the DEA regarding
12   suspicious order monitoring, correct?
13        A.    Correct.
14        Q.    You are not experienced with
15   supply chain; is that correct?
16              So what I mean by that is
17   the moving of products along a supply
18   chain, like in this case,
19   pharmaceuticals, are you an expert in
20   that?
21        A.    Yeah, I was going to say,
22   I'm -- I'm familiar with the concept.
23   And a little bit familiar with operations
24   research.  But I would not call myself an
```

```
 1    expert in supply chain management.
 2          Q.    Would you consider yourself
 3    an expert in suspicious order monitoring?
 4          A.    No.
 5          Q.    Would you consider yourself
 6    an expert in issues from -- relating to
 7    the Drug Enforcement Agency?
 8                MR. MOUGEY:  Objection.
 9                THE WITNESS:  That's a
10          little too broad a question.
11          There may be some aspects that I
12          would be an expert in, for
13          instance, the -- the aspects that
14          I actually address in my expert
15          report, which is the assessment of
16          the data.
17                But if you mean something
18          more specific to the DEA as
19          opposed to the data that the DEA
20          produced to me, then I would
21          say -- I would agree with you,
22          what -- whatever the implication
23          was of your question.
24    BY MS. McENROE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Sure.  And so I can say it
 2   another way.  You've never worked at the
 3   DEA, correct?
 4          A.    Correct.
 5          Q.    You've never worked at the
 6   FDA?
 7          A.    Correct.
 8          Q.    You've never worked at the
 9   CDC?
10          A.    Correct.
11          Q.    Do you have any
12   healthcare-related experience, aside from
13   being potentially a consumer of
14   healthcare, that's not reflected in your
15   Appendix 1 to your expert report?
16          A.    No.
17          Q.    Is it fair to say that the
18   vast majority of your professional
19   experience relates to securities-related
20   issues?
21                Or I can say that a
22   different way if you'd prefer.
23                And I think I've seen you
24   having written this a number of times.
```

```
 1   computer, a sort of old school computer,
 2   that -- that you are taking in the data,
 3   processing it and putting out output in
 4   your opinions?
 5           A.   Yes.  Exactly.
 6           Q.   Okay.  And you're not saying
 7   that the sort of black box that data is
 8   going into is the right or the only
 9   algorithm to be used on that data.  You
10   are just the one who is actually doing
11   the calculations; is that correct?
12           A.   Well, close.  It's not a
13   black box at all.  A black box is
14   something where something -- data goes in
15   and results come out and you can't tell
16   what's happening.  In fact, this is not a
17   black box.  It's the opposite of that.
18                I'm describing for you in
19   detail, I think, exactly what's being
20   done to the data.  I don't take a
21   position on whether -- which or if any of
22   these algorithms and the associated
23   assumptions are appropriate, I think was
24   the word you used earlier?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.    Yep.
 2         A.    I'm just saying that you
 3   take the -- the data that we've prepped,
 4   and apply these formulas to it, you get
 5   particular results.
 6         Q.    And is that also true not
 7   only about whether those algorithms, the
 8   assumptions, are appropriate, but also
 9   true that you are not making any opinion
10   as to whether they are legally required?
11         A.    Right.  I think all of these
12   issues are being handled by other
13   experts.  I -- as you said a minute ago.
14   And I didn't take it as a pejorative.
15   I'm just serving as a calculator.
16         Q.    And in this Paragraph 21 you
17   use the -- the phrase "algorithms" to
18   discuss what's being applied in
19   Section 9.  But you also use the word
20   "approaches" later I believe.
21               Are you saying the same
22   thing?
23               So are -- in -- calling it
24   algorithms here in Paragraph 21, are you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   describing what you later in your report
 2   call an approach, Approach 1, Approach 2,
 3   Approach 3?
 4        A.    Yes.
 5        Q.    Let's take a look at
 6   Section 9.  So in particular I'll point
 7   you to Paragraph 130, which is -- starts
 8   on Page 56.
 9              Are you there?
10        A.    Yes.
11        Q.    Great.  And the section
12   heading is "Transaction Analysis."
13              Do you see that?
14        A.    Yes.
15        Q.    And this is what we were
16   just referring to when we were talking
17   about the algorithms?
18        A.    Yes.
19        Q.    And Paragraph 130 starts, "I
20   implemented various approaches to
21   identify transactions meeting specified
22   criteria using the non-public ARCOS data
23   from 2006 to 2014, supplemented with
24   defendant transaction data where the
```

```
 1   legitimate intended uses to illicit

 2   activities.

 3          Q.    Do you agree that diversion

 4   is a crime?

 5          A.    I have no -- no opinion --

 6              MR. MOUGEY:  Objection.

 7          Outside the scope.

 8              THE WITNESS:  -- one way or

 9          the other.

10   BY MR. EPPICH:

11          Q.    Are you planning to offer

12   any opinions about whether or not any of

13   the defendants diverted prescription

14   opioids in this litigation?

15          A.    No.

16          Q.    I'd like to turn back to

17   Page 56 of your report.  Page 56 is the

18   start of Section 9, transaction analysis,

19   you'll recall.

20              I'd like to return to the --

21   the five methodologies that you implement

22   to identify what you call flagged orders.

23   Okay?

24          A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.   You testified earlier that
 2   the plaintiffs' counsel provided these
 3   five methodologies for identifying
 4   flagged transactions to you, correct?
 5          A.   Yes.
 6          Q.   You didn't come up with the
 7   five methodologies yourself?
 8          A.   No.
 9          Q.   You have no opinion of -- on
10   whether any of the five methodologies is
11   appropriate for evaluating whether or
12   not -- or, excuse me.  Let me strike
13   that.
14               You have no opinion on
15   whether any of the five methodologies are
16   appropriate for identifying what you call
17   flagged transactions, correct?
18          A.   Correct.
19          Q.   There may be other
20   appropriate methodologies for -- for --
21   let me strike that.
22               You'd agree there may be
23   other appropriate methodologies for
24   flagging suspicious orders, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.
 2        Q.    But you have no opinion
 3   about the other methods of flagging
 4   suspicious orders, correct?
 5        A.    Or even that they exist.  I
 6   just allow, in your previous question,
 7   that they may exist.  I don't have an
 8   opinion one way or another on -- on any
 9   of the subject matter material.
10        Q.    You used algorithms to
11   identify the first flagged transactions
12   in these methodologies?
13        A.    Yes.
14        Q.    And then you flagged every
15   transaction after that, correct?
16        A.    Correct.
17        Q.    That was according to
18   plaintiff -- plaintiffs' counsel's
19   instruction, correct?
20        A.    Correct.
21        Q.    And you did that for all
22   five methodologies?
23        A.    Correct.
24        Q.    You did not use your
```

Highly Confidential - Subject to Further Confidentiality Review

1     algorithm in the five methodologies to
2     identify any of the subsequent
3     transactions that you flagged after the
4     first transaction?
5          A.   If I understand that
6     question, is the same as the question
7     asked earlier today.  The methodologies
8     flagged that first transaction and
9     everything after that gets flagged.  So,
10    in some complete description, the
11    methodology does flag those later
12    transactions, because it flags the first
13    one and every one that follows.
14              But the methodology is not
15    reapplied to each transaction anew.  I --
16    I guess is the way I would say it.
17         Q.   Another way to say that
18    would be there's no computational
19    analysis on any of the subsequent
20    transactions after that first flagged
21    transaction, correct?
22         A.   Correct.
23         Q.   Who developed your
24    algorithms for each of these five

Highly Confidential - Subject to Further Confidentiality Review

```
 1   methodologies?
 2        A.    I'm sorry, what do you mean
 3   by developed?
 4        Q.    Well, you wrote algorithms
 5   for each of these five methodologies,
 6   correct?
 7        A.    Correct.
 8        Q.    Who wrote those algorithms?
 9        A.    Well, it was a joint effort
10   of -- so at a very high level you can
11   think of the instruction about which
12   algorithms to use and the assumption that
13   once a transaction is flagged, everything
14   on that day and thereafter is flagged.
15   You could think of that as part of
16   developing or writing the algorithm.
17             So plaintiffs' counsel, some
18   discussion of that between me and -- and
19   my staff and plaintiffs' counsel, and
20   then the actual programming of those
21   rules, members of my staff.
22        Q.    It's true that none of your
23   methodologies was ever used by a
24   distributor to identify suspicious
```

Highly Confidential - Subject to Further Confidentiality Review

 1        A.    Well, as I said earlier, you
 2   end up with fewer transactions being
 3   flagged for sort of obvious reasons.
 4        Q.    So you'd agree that your
 5   reliance on plaintiffs' counsel
 6   assumption to flag every subsequent
 7   transaction increased the number of
 8   flagged transactions?
 9              MR. MOUGEY:  Objection.
10         Asked and answered.
11              Are we -- are we going to --
12         are we going to go through the
13         same questions we did this
14         morning?  I mean, that's -- that's
15         the third time he's answered that
16         question.
17              MR. EPPICH:  I'm doing my
18         best but I --
19              MR. MOUGEY:  I hear you, but
20         when we -- I'm --
21              MR. EPPICH:  Keep your
22         objection as to form.
23              MR. MOUGEY:  I mean, the
24         fact that we are allowing

Highly Confidential - Subject to Further Confidentiality Review

```
 1         different counsel to ask questions
 2         doesn't mean we're going to sit
 3         and ask the same questions.  I
 4         mean, some of these questions are
 5         almost verbatim of what we went
 6         through this morning fishing for a
 7         different answer.
 8              MR. EPPICH:  I disagree with
 9         that, sir.
10              MR. MOUGEY:  I mean, I can
11         almost cut and paste these and put
12         them on top.
13              And I think if y'all haven't
14         coordinated who is going to take
15         what topics, I think we need to
16         make sure we do that for tomorrow.
17         Because these questions are almost
18         verbatim to what we went through
19         this morning.  I could answer
20         them.
21    BY MR. EPPICH:
22         Q.   Sir, you may answer the
23    question.
24         A.   If you assume 100 percent
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   due diligence, you don't flag very many
 2   orders.  If you assume zero due
 3   diligence, you flag more orders.  And
 4   this model is flexible enough to
 5   incorporate different sets of facts
 6   developed about the extent of due
 7   diligence between zero and 100 percent.
 8         Q.    If we could turn to
 9   Paragraph 131 of your report which is on
10   Page 56.  This is the first paragraph
11   under the maximum monthly trailing
12   six-month threshold.
13         A.    Yes.
14         Q.    In Paragraph 131 of your
15   report, you provide an example.  You say,
16   "If the number of dosage units containing
17   hydrocodone shipped from a distributor to
18   a pharmacy in February, March, April,
19   May, June, and July were 5,000, 10,000,
20   7,000, 8,000, 9,000, and 9,500
21   respectively, a requested transaction in
22   August would be flagged if it would cause
23   the number of dosage units containing
24   hydrocodone the distributor shipped to
```

```
 1    the pharmacy to exceed 10,000."

 2              Did I read that correctly?

 3         A.   Yes.

 4         Q.   So if the pharmacy ordered

 5    10,500 in August of 1997, that order

 6    would be flagged under your six-month

 7    threshold analysis, correct?

 8              MR. MOUGEY:  Objection.

 9         Asked and answered.

10              THE WITNESS:  I'm sorry.

11         Which order?

12    BY MR. EPPICH:

13         Q.   If the pharmacy were to

14    order 10,500 in August of, say, 1997,

15    that order would be flagged under your

16    six-month threshold analysis, correct?

17         A.   I think there's some

18    confusion in that question.  Maybe my

19    sentence there is not clear.  I could

20    explain if you'd like.

21         Q.   Well, I'm just trying to

22    figure out if the pharmacy ordered 10,500

23    in August, wouldn't that order be

24    flagged?
```