# EXHIBIT 4

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | MDL NO. 2804 |
| | : | |
| This document relates to: | : | Case No. 17-MD-2804 |
| | : | |
| The County of Summit, Ohio | : | |
| Ohio et al. v. Purdue Pharma | : | |
| L.P., et al., Case No. | : | |
| 17-OP-45004 | : | |
| | : | |
| The County of Cuyahoga v. | : | |
| Purdue Pharma Purdue Pharma | : | |
| L.P., et al., Case No. | : | |
| 18-OP-45090 | : | |

- - -

- HIGHLY CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME I
- - -
May 9, 2019


          Videotaped deposition of
CRAIG J. McCANN, Ph.D., CFA, taken
pursuant to notice, was held at the law
offices of Morgan Lewis & Bockius, LLP,
1111 Pennsylvania Avenue, NW, Washington,
D.C., beginning at 10:03 a.m., on the
above date, before Michelle L. Gray, a
Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.


              - - -


        GOLKOW LITIGATION SERVICES
     877.370.3377 ph | 917.591.5672 fax
            deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 106

1    Exhibit 4, which I believe is Appendix 1
2    to your March 25th report.
3        A.   Thank you.
4        Q.   Great.  Thank you.
5            And I'll represent to you
6    that this is what you had included as
7    Appendix 1.  Does this look familiar?
8        A.   Yes.
9        Q.   Is there anything you'd like
10   to correct in Exhibit 4, or is it all
11   right if we consider this to be your
12   qualifications and experiences?
13       A.   There -- there, of course,
14   would be a couple of additional entries.
15   The two -- if we were preparing this
16   report -- this resumé today rather than
17   on March 25th, it would be the two
18   supplemental reports, and then I gave a
19   deposition last week or the week before
20   in the case that's third down on -- on
21   Page 97, the SEC V RPM.
22           Other than that, I -- I'm
23   not aware of any changes that I would
24   make to it.

Page 107

1        Q.   So you have a Bachelor's
2    degree, a Master's degree, and a Ph.D.;
3    is that correct?
4        A.   Correct.
5        Q.   And your Ph.D. is in
6    economics, correct?
7        A.   Correct.
8        Q.   Okay.  You are not a medical
9    doctor, correct?
10       A.   Correct.
11       Q.   You did not attend medical
12   school?
13       A.   Correct.
14       Q.   You are not a physician's
15   assistant?
16       A.   Correct.
17       Q.   You are not licensed to
18   write prescriptions?
19       A.   Correct.
20       Q.   You are not a pharmacist?
21       A.   Correct.
22       Q.   Fair to say you're not an
23   expert in healthcare or the healthcare
24   industry?

Page 108

1        A.   Yes.
2        Q.   Fair to say that you do not
3    have professional experience with
4    suspicious order monitoring?
5        A.   Yes.
6        Q.   You have not been involved
7    in designing a suspicious order
8    monitoring program, correct?
9        A.   Correct.
10       Q.   You have not reviewed
11   guidance from the DEA regarding
12   suspicious order monitoring, correct?
13       A.   Correct.
14       Q.   You are not experienced with
15   supply chain; is that correct?
16           So what I mean by that is
17   the moving of products along a supply
18   chain, like in this case,
19   pharmaceuticals, are you an expert in
20   that?
21       A.   Yeah, I was going to say,
22   I'm -- I'm familiar with the concept.
23   And a little bit familiar with operations
24   research.  But I would not call myself an

Page 109

1    expert in supply chain management.
2        Q.   Would you consider yourself
3    an expert in suspicious order monitoring?
4        A.   No.
5        Q.   Would you consider yourself
6    an expert in issues from -- relating to
7    the Drug Enforcement Agency?
8            MR. MOUGEY:  Objection.
9            THE WITNESS:  That's a
10           little too broad a question.
11           There may be some aspects that I
12           would be an expert in, for
13           instance, the -- the aspects that
14           I actually address in my expert
15           report, which is the assessment of
16           the data.
17               But if you mean something
18           more specific to the DEA as
19           opposed to the data that the DEA
20           produced to me, then I would
21           say -- I would agree with you,
22           what -- whatever the implication
23           was of your question.
24   BY MS. McENROE:

28 (Pages 106 to 109)

Highly Confidential - Subject to Further Confidentiality Review

Page 110

1    Q.   Sure.  And so I can say it
2  another way.  You've never worked at the
3  DEA, correct?
4    A.   Correct.
5    Q.   You've never worked at the
6  FDA?
7    A.   Correct.
8    Q.   You've never worked at the
9  CDC?
10   A.   Correct.
11   Q.   Do you have any
12 healthcare-related experience, aside from
13 being potentially a consumer of
14 healthcare, that's not reflected in your
15 Appendix 1 to your expert report?
16   A.   No.
17   Q.   Is it fair to say that the
18 vast majority of your professional
19 experience relates to securities-related
20 issues?
21       Or I can say that a
22 different way if you'd prefer.
23       And I think I've seen you
24 having written this a number of times.

Page 111

1  That the majority of your consulting work
2  since you left the SEC has primarily
3  involved the analysis of investments.
4        Is that a true statement?
5    A.   Yes.
6    Q.   This case does not involve
7  the analysis of investments, correct?
8    A.   Correct.
9    Q.   Do you know what the word
10 "anhydrous" means?
11   A.   Someone told me and I forget
12 right now.  It's not something that --
13 that I recall.
14   Q.   In your report, you have
15 certain statements with regards to
16 certain drug weights or the makeup of
17 certain pharmaceuticals.  Do you have
18 personal knowledge on which you can be
19 making those statements?
20   A.   I'm sorry, could you give me
21 an example?
22   Q.   Sure.  So let's take a
23 look -- let's do Appendix 2.
24       (Document marked for

Page 112

1        identification as Exhibit
2        McCann-5.)
3  BY MS. McENROE:
4    Q.   I'm going to hand you what
5  I'm marking as Exhibit 5, which is
6  Appendix 2 to your March 25th report.
7    A.   Thank you.
8    Q.   Sure.  And let's take a look
9  together at Paragraph 191.  So this is
10 just an example.
11       And I'm going to be
12 starting, a couple lines down, there's a
13 sentence towards the end of the line that
14 starts "I reviewed the ingredient base
15 weights."
16       Do you see that?
17   A.   Yes.
18   Q.   Okay.  And it says, "I
19 reviewed the ingredient base weights in
20 the NDC dictionary for all NDCs with
21 dosage units in the ARCOS data and
22 flagged ingredient base weights as
23 potentially incorrect, if the weight of
24 the drug per dosage form, e.g., capsule,

Page 113

1  tablet, patch, was significantly
2  different than the other drug products
3  with the same base drug and dosage
4  strength."
5        Do you see that?
6    A.   I do.
7    Q.   What methodology did you use
8  to make those determinations?
9    A.   Well, I compared NDCs with
10 the same active ingredient, the same drug
11 code, and noted that for some NDCs, the
12 ingredient base weights were orders of
13 magnitude different than other NDCs for
14 the same drug code.
15       So to give you a simple
16 example, if I may.  There might be an NDC
17 for a package of 10 pills and an NDC code
18 for a package of 30 identical pills.  And
19 the -- the base weights for those two
20 packages should be in that same
21 proportion, three to one.  And there are
22 just a handful of examples, maybe a dozen
23 or two dozen examples, where -- where
24 there appears to be an error.

29 (Pages 110 to 113)

Highly Confidential - Subject to Further Confidentiality Review

Page 126

1    your March 25th report or either of your
2    supplements to the ARCOS data in this
3    litigation?
4         A.   Not as I sit here.
5         Q.   And when you say that, you
6    say because you might do some later, but
7    you haven't been asked to yet?
8         A.   Right.  It's not something I
9    intend to do or that I am contemplating
10   as I sit here.  But there might be
11   additional facts developed or there might
12   be some instruction from the court or for
13   some other reason, another alternative
14   may come to mind that I would develop and
15   implement.  But I -- I don't have
16   anything in mind, as I sit here.
17        Q.   So even though you say that
18   in Section 9 you are describing a
19   nonexhaustive set of algorithms, you're
20   not meaning to say that you have not
21   listed all the algorithms that are
22   forming your opinions in this report in
23   this report?
24        A.   Correct.

Page 127

1         Q.   And you say that the
2    algorithms can be systematically applied.
3    Do you see where it says that?
4         A.   Yes.
5         Q.   And in saying can be
6    systematically applied, are you saying
7    that they are appropriate or should be
8    applied or -- are you taking that
9    opinion?
10        A.   No, I think that would get
11   into some subject matter expertise that
12   I'm not claiming to have.  I was asked to
13   implement these algorithms, which at some
14   broad level, has some assumptions.  And
15   then make an additional assumption or
16   two, apply it to the data and report out
17   the results.  And that's what I've done.
18        Q.   So speaking in a broad
19   level, which I think makes sense to start
20   and then we'll get a little bit more
21   specific.
22             And I don't mean this to be
23   pejorative in any way.  But is it fair to
24   say that you are serving in a role like a

Page 128

1    computer, a sort of old school computer,
2    that -- that you are taking in the data,
3    processing it and putting out output in
4    your opinions?
5         A.   Yes.  Exactly.
6         Q.   Okay.  And you're not saying
7    that the sort of black box that data is
8    going into is the right or the only
9    algorithm to be used on that data.  You
10   are just the one who is actually doing
11   the calculations; is that correct?
12        A.   Well, close.  It's not a
13   black box at all.  A black box is
14   something where something -- data goes in
15   and results come out and you can't tell
16   what's happening.  In fact, this is not a
17   black box.  It's the opposite of that.
18             I'm describing for you in
19   detail, I think, exactly what's being
20   done to the data.  I don't take a
21   position on whether -- which or if any of
22   these algorithms and the associated
23   assumptions are appropriate, I think was
24   the word you used earlier?

Page 129

1         Q.   Yep.
2         A.   I'm just saying that you
3    take the -- the data that we've prepped,
4    and apply these formulas to it, you get
5    particular results.
6         Q.   And is that also true not
7    only about whether those algorithms, the
8    assumptions, are appropriate, but also
9    true that you are not making any opinion
10   as to whether they are legally required?
11        A.   Right.  I think all of these
12   issues are being handled by other
13   experts.  I -- as you said a minute ago.
14   And I didn't take it as a pejorative.
15   I'm just serving as a calculator.
16        Q.   And in this Paragraph 21 you
17   use the -- the phrase "algorithms" to
18   discuss what's being applied in
19   Section 9.  But you also use the word
20   "approaches" later I believe.
21             Are you saying the same
22   thing?
23             So are -- in -- calling it
24   algorithms here in Paragraph 21, are you

Highly Confidential - Subject to Further Confidentiality Review

Page 130

1  describing what you later in your report
2  call an approach, Approach 1, Approach 2,
3  Approach 3?
4      A.   Yes.
5      Q.   Let's take a look at
6  Section 9.  So in particular I'll point
7  you to Paragraph 130, which is -- starts
8  on Page 56.
9          Are you there?
10     A.   Yes.
11     Q.   Great.  And the section
12 heading is "Transaction Analysis."
13         Do you see that?
14     A.   Yes.
15     Q.   And this is what we were
16 just referring to when we were talking
17 about the algorithms?
18     A.   Yes.
19     Q.   And Paragraph 130 starts, "I
20 implemented various approaches to
21 identify transactions meeting specified
22 criteria using the non-public ARCOS data
23 from 2006 to 2014, supplemented with
24 defendant transaction data where the

Page 131

1  ARCOS data is obviously missing
2  transactions that are included in the
3  transactions produced by defendants in
4  discovery, and to the extent I have
5  defendant transaction data for the
6  periods before 2006 and after 2014, I
7  calculated the results separately for
8  each of the 12 controlled substance drug
9  codes."
10         Do you see that?
11     A.   Yes.
12     Q.   And then you have a footnote
13 there that "you do not analyze
14 transactions in two treatment drugs,
15 buprenorphine and methadone."
16         Do you see that?
17     A.   Yes.
18     Q.   How did you pick that list
19 of 12 controlled drug codes?
20     A.   Well, by taking the 14 drug
21 codes we received from the DEA and
22 excluding the two, what I understand to
23 be treatment drugs identified in
24 Footnote 54.

Page 132

1      Q.   Okay.  And you didn't -- you
2  didn't apply any other criteria?
3      A.   Not that I can think of.
4      Q.   Okay.  In that Paragraph 130
5  that I just read out, you say at the
6  beginning that you implemented various
7  approaches.  And is that talking about
8  the approaches that are discussed later
9  in that section, Approaches 1, 2, 3, 4
10 and 5?
11     A.   Yes.
12     Q.   You are not talking about
13 anything else than that?
14     A.   Correct.
15     Q.   And then you have five
16 approaches in this report; is that
17 correct?
18     A.   Yes.
19     Q.   And the first one is the
20 maximum monthly trailing six-month
21 threshold, correct?
22     A.   Correct.
23     Q.   And the second is the twice
24 trailing 12-month average pharmacy dosage

Page 133

1  units, correct?
2      A.   Yes.
3      Q.   And we can do it slower,
4  sorry, you're flipping through.
5          MR. MOUGEY:  Which page are
6      you referencing?
7          MS. McENROE:  I'm just going
8      through a list of them, but --
9          MR. MOUGEY:  Right.
10         MS. McENROE:  -- that's
11     fine.
12 BY MS. McENROE:
13     Q.   The third one starts on
14 Page 64.  So the third one is the three
15 times trailing 12-month average pharmacy
16 dosage units; is that correct?
17     A.   Yes.
18     Q.   The fourth one starts on
19 Page 68, is the maximum 8,000 dosage
20 units monthly; is that correct?
21     A.   Yes.
22     Q.   And the fifth one, starts on
23 Page 72, is maximum daily dosage units.
24         Do you see that?

34 (Pages 130 to 133)

Highly Confidential - Subject to Further Confidentiality Review

Page 134

1    A.   I do.
2    Q.   So if I refer to your five
3  approaches, will you understand that I'm
4  referring to those five approaches as
5  I've just read them out?
6    A.   Yes.
7    Q.   Did you apply any other
8  approaches aside from those five in
9  reaching your conclusions?
10    A.   Not with respect to the
11  conclusions I reached in Section 9 at
12  least.
13    Q.   Okay.  From where did you
14  get the five approaches that you apply in
15  Section 9?
16    A.   From discussions with
17  counsel.
18    Q.   Who?  Is it the same list of
19  people that we discussed earlier today?
20    A.   Yes.  There may be some
21  additional lawyers whose names didn't
22  come to mind when I was giving you the
23  names of people I interacted with
24  earlier.

Page 135

1    Q.   Anyone come to mind?
2    A.   It would be -- it would be
3  something like that list and perhaps
4  more.
5    Q.   Anyone in particular that
6  you think you left out earlier that comes
7  to mind?
8    A.   No.
9    Q.   Did you get any input on
10  these five approaches from any of your
11  discussions with current or former DEA
12  agents?
13    A.   No.
14    Q.   Did you take any other step
15  to verify with the DEA that any or all of
16  these approaches are appropriate in this
17  setting?
18    A.   I'm sorry.  I don't know
19  what you mean by any other, but I didn't
20  do anything other than serve as the
21  computer, you referred to me as earlier.
22  I took these approaches and implemented
23  them, applied them to the data.  That's
24  what I did.

Page 136

1    Q.   Okay.  So just so that I can
2  make sure that I have it all straight.
3  So you got the five approaches from
4  plaintiffs' counsel, and you applied them
5  to the data, and that's it, with respect
6  to Section 9?
7    A.   Correct.
8    Q.   So it's fair to say that any
9  one of these approaches could be or could
10  not be appropriate for use in this
11  particular setting; you're just not
12  taking an opinion on that one way or the
13  other?
14    A.   Right.  I think other
15  witnesses are going to deal with that
16  issue.
17    Q.   And just to make sure I'm
18  totally clear, you're not opining
19  anywhere that any of these approaches is
20  or is not required by law in any way?
21    A.   Correct.
22    Q.   I think you mentioned
23  earlier that there are certain
24  assumptions that are built into your

Page 137

1  approaches.  Do you remember mentioning
2  that?
3    A.   Yes.
4    Q.   Let's take a look at Page
5  100 -- sorry, Paragraph 131 of your
6  report.
7        This is under the Heading A,
8  "Maximum Monthly Trailing Six-Month
9  Thresholds."
10        Do you see that?
11    A.   Yes.
12    Q.   Okay.  And in this
13  paragraph, it starts, "Under the first
14  approach, I identify transactions that
15  cause the number of dosage units shipped
16  by a distributor to a pharmacy in a
17  calendar month to exceed the highest
18  number of dosage units shipped by the
19  distributor to the pharmacy in any one of
20  the six preceding calendar months."
21        Did I read that correctly?
22    A.   Yes.
23    Q.   And then you go on and you
24  have an example, right?  It says, "For

35 (Pages 134 to 137)

Highly Confidential - Subject to Further Confidentiality Review

Page 142

1    plaintiffs' counsel.  I don't -- you
2    know, I was asked to assume everything
3    that's in that sentence, including that
4    last clause that you've read.
5        Q.    And just so I make sure that
6    I understand, that assumption -- that is,
7    flagging every subsequent transaction for
8    that specific drug after you have a
9    flagged transaction -- you apply across
10   all five of the methodologies or
11   approaches used in Section 9; is that
12   correct?
13       A.    Correct.
14       Q.    For every distributor, for
15   each of the drugs that you use or
16   manufacture as appropriate for the second
17   supplemental report?
18       A.    Correct.
19       Q.    So that I understand and
20   make sure we're totally clear.  You have
21   a methodology that you explain here in
22   Paragraph 131 regarding the maximum
23   monthly trailing six-month threshold; is
24   that correct?  We were just talking about

Page 143

1    that.
2        A.    Yes.
3        Q.    Okay.  And then once you
4    have a triggering entry, the rest of them
5    are flagged.  Do you apply that maximum
6    monthly trailing six-month threshold to
7    those remaining subsequent transactions
8    in any way?
9        A.    Yes.
10       Q.    And how is that?  Because if
11   they seem that you have a triggering and
12   the rest of them are all just flagged,
13   are you doing the analysis of the rest of
14   them, of which ones should be flagged and
15   which ones should not?
16       A.    No.  The end of your prior
17   question was "in any way."  And what I
18   meant by saying yes to that is that those
19   subsequent transactions are only flagged
20   because of the application of that rule,
21   having flagged one transaction.  Anything
22   after that is flagged.  So they are
23   affected, the identification of those
24   transactions are affected by the

Page 144

1    application of the rule.
2        Q.    I see.  Okay.  So I see.  So
3    I just want to make sure that the
4    transactions that come later could be
5    more than the trailing six months before
6    it or they could be lower than the
7    trailing six months before it, but
8    they're flagged because they are coming
9    after one triggering entry?
10       A.    Correct.
11       Q.    And did you do the analysis,
12   if you didn't use that assumption about
13   the subsequent flagging after you have
14   one triggering entry about how many of
15   the entries would be flagged or not
16   flagged if you didn't use that
17   assumption?
18           MR. MOUGEY:  Objection.
19           THE WITNESS:  I'm sorry,
20       could you repeat that again?
21   BY MS. McENROE:
22       Q.    Sure.
23       A.    The static is --
24   BY MS. McENROE:

Page 145

1        Q.    It's a little distracting.
2           MS. McENROE:  Anybody on the
3       line, if you can make sure to mute
4       yourself, that would be greatly
5       helpful.
6           Thank you.
7    BY MS. McENROE:
8        Q.    So my question is this, did
9    you run an analysis applying any of your
10   approaches to the transactions that are
11   flagged because of the assumption based
12   on them being subsequent transactions to
13   one that had been flagged, to see what
14   proportion of those would be flagged or
15   not flagged in their own right regardless
16   of the assumption about the first
17   triggering transaction?
18           MR. MOUGEY:  Objection.
19           THE WITNESS:  Not for
20       purposes of this report.  And --
21       and in some prior analysis of the
22       data, getting to understand the
23       data, we did some variations like
24       what you described.  I don't know

37  (Pages 142 to 145)

Highly Confidential - Subject to Further Confidentiality Review

Page 146

1    if it's exactly what you
2    described.  But we -- we did other
3    analysis.
4  BY MS. McENROE:
5    Q.    Without that assumption
6  about the first triggering transaction
7  flagging the remainders?
8    A.    Correct.
9    Q.    Across the different -- the
10  five different approaches?
11    A.    I don't recall whether that
12  is correct or not.
13    Q.    So you don't know one way or
14  the other, but you may have?
15    A.    Correct.
16    Q.    And do you have a sense of
17  the difference that this one assumption
18  makes about flagging the subsequent
19  transactions in terms of the number of
20  transactions or the proportion of
21  transactions that are flagged?
22      MR. MOUGEY:  Objection.
23      THE WITNESS:  I have some
24  general intuition.  I don't

Page 147

1    have -- I don't -- I don't have a
2    quantified answer for you.  But I
3    have a general intuition.
4  BY MS. McENROE:
5    Q.    What's your general
6  intuition?
7    A.    Well, because for most of
8  these defendants, you see a substantial
9  increase over time, especially leading up
10  to 2010 or 2011.  If you reset that
11  trailing six-month maximum to be the
12  maximum of the most recent six months,
13  then you end up with fewer transactions
14  being flagged.
15    Q.    Okay.  So it would be a
16  downward trend if you took away the
17  assumption about the subsequent
18  transactions being flagged?
19    A.    Correct.
20    Q.    We've been using the
21  terminology of a transaction being
22  flagged.  And that's language you used in
23  your report as well, correct?
24    A.    Correct.

Page 148

1    Q.    What do you mean by a
2  flagged transaction?
3    A.    Well, for my purposes it's
4  just a -- an example we were looking at a
5  minute ago, a fairly simple, if-then
6  step.  I think of everything I -- I've
7  done here in terms of what you can do in
8  Excel.  And so imagine that you've got
9  numbers in two columns and you've got a
10  rule that says if Column A exceeds
11  Column B, put a one in that cell.  And I
12  would think of that one as a flag.  And
13  the absence of that one, signifying that
14  A does not exceed B, being an unflagged
15  transaction.
16      And then it's only a slight
17  further modification to say in that third
18  column, it's a one if A exceeds B or if
19  the column above -- the value above is
20  one.  And then you would just fill in
21  ones in every cell after the first time A
22  exceeds B.
23      And all I mean by flagging
24  is that it's got that checkmark or one

Page 149

1  for that transaction and everything that
2  follows it.
3    Q.    Are you of the opinion that
4  a flagged transaction means that that
5  transaction represents a suspicious
6  order?
7    A.    That's way beyond my report,
8  I think.
9    Q.    Are you --
10    A.    I'm sorry, I apologize.  I
11  don't have an opinion one way or the
12  other.  If -- if you inferred from my
13  answer that I think it means that it is
14  not a suspicious order, I didn't mean
15  that.  I just mean I don't have an
16  opinion one way or the other.
17    Q.    Understood.  But just to
18  make sure we are speaking the same
19  language.  It's fair to say that you are
20  not taking the opinion that a flagged
21  transaction is necessarily a suspicious
22  order?
23    A.    Correct.
24    Q.    And it's also fair to say

Highly Confidential - Subject to Further Confidentiality Review

Page 150

1 that you are not saying that a flagged
2 transaction is necessarily illegal or
3 representative of illegal conduct?
4     A.   Correct.
5     Q.   It's also fair to say that a
6 flagged transaction in your opinion does
7 not necessarily mean there's been a
8 failure of due diligence?
9     A.   Correct.
10     Q.   I want to take a look real
11 quick specifically at this first
12 approach, the maximum monthly trailing
13 six-month threshold.
14         And I want to -- your --
15 your -- strike that.
16         Your example here is very
17 helpful for understanding it, so I
18 appreciate that.
19         But I want to get an
20 understanding for, in practical terms,
21 various of the defendants for different
22 reasons may have gaps in their data.  So
23 for example, they may have been serving a
24 pharmacy for a period of time, the

Page 151

1 pharmacy switched to a different
2 distributor, and then went back to that
3 distributor.
4         Are you familiar with those
5 kinds of changes or variations in the
6 data, just speaking generally?
7     A.   Yes.
8     Q.   Okay.  How were gaps in the
9 data or entries without anything included
10 handled in figuring out the maximum
11 monthly trailing six-month threshold?
12     A.   I'm sorry, I don't think I'm
13 understanding that question.
14     Q.   Sure.  So I have a
15 hypothetical for you.  We can try and
16 walk through it to see if that helps to
17 clarify.
18     A.   Okay.
19     Q.   We have a pharmacy
20 purchasing from a distributor in January
21 through June, let's say of 2007.  I'm
22 just picking a year.  But does not
23 purchase from that distributor from July
24 through December of 2007.  Okay?  So

Page 152

1 there's been a gap there.
2         If the pharmacy purchases
3 from the distributor again in
4 January 2008, how do you set that
5 threshold when you pick up again with the
6 distribution to that pharmacy?
7     A.   Well, that's a good
8 question.  That's a hypothetical I hadn't
9 thought of.  I'd have to look at the data
10 and see the -- and see how -- how
11 significant that is.
12         A slight variant on your
13 hypothetical would be if -- if the
14 pharmacy had bought from the distributor,
15 let's say in four of the previous six
16 months, then it would be just as I
17 described it there in the example.  If
18 you imagine in -- in March and May the
19 quantity is zero, so that the quantities
20 are 5,000, 7,000, 9,000, and 9,500, then
21 it still would be the case that if a
22 transaction in August put you past, in
23 this hypothetical, 9,500, not 10,000, you
24 would flag the transaction.

Page 153

1         So blanks in the six-month
2 window don't affect the calculation.  The
3 conditional statement is still, if the
4 cumulative transactions that month exceed
5 the highest of the preceding six calendar
6 months, you flag the transaction.
7         We don't ever flag a
8 transaction in the first -- at least
9 under this methodology, in the first six
10 months of the purchases from a
11 distributor.  But if a pharmacy is buying
12 from a distributor and then there's a gap
13 of greater than six months, six months or
14 greater, I'd have to think through and
15 maybe just check and see how that is
16 handled.  It -- whether we handle it as
17 restarting the clock, but I just don't
18 recall as I sit here.
19     Q.   Do you know if you guys
20 input, you and your staff I should say,
21 input any threshold or baseline, if there
22 was no data included, so you would pick a
23 number and put it in there?
24     A.   No, not for that purpose.

39 (Pages 150 to 153)

Highly Confidential - Subject to Further Confidentiality Review

Page 266

1    Q.   So in your mind what's the
2   difference between an N/A and a zero?
3    A.   Well, this is actually a
4   really good illustration of that.  Maybe
5   at least my thinking about how those
6   terms might be used.
7         So if we look at that source
8   document that's cited in the footnote on
9   Page 72, it gives daily limits for
10  different drugs.  And it does not, my
11  recollection, give a daily limit for
12  oxymorphone.  It does give a limit for
13  the other drugs.  And so if a distributor
14  doesn't ship a drug, then there might be
15  an N/A -- a drug for which there is a
16  daily limit in that source document.
17  There might be an N/A if they do ship
18  that drug, but never does that drug
19  exceed the daily limit, then there would
20  be a zero.  That's the way I would
21  interpret those two.
22        I might -- I might go back
23  and check to see if there's some
24  situation where we wrote N/A when a zero

Page 267

1   would be appropriate or where we wrote a
2   zero when an N/A would be appropriate.
3         But looking at this example
4   you've pointed me to, that would be the
5   interpretation that I would take from it.
6    Q.   Now, Dr. McCann, have you
7   ever heard the term "diversion" used in
8   connection with prescription opioids?
9    A.   Yes.
10   Q.   What does diversion mean to
11  you?
12   A.   I only have the very vaguest
13  of kind of layman's understanding of that
14  term.  I don't -- I don't have an
15  understanding that would be helpful here,
16  I don't think.  I'm happy to tell you
17  what it is, but I'm not sure that it's
18  helpful.
19   Q.   Yeah, please.
20   A.   Sure.  So I would just say
21  it sounds like it's related to diverted
22  and that diversion means that some drugs,
23  some prescription drugs were diverted
24  from their intended use, or from their

Page 268

1   legitimate intended uses to illicit
2   activities.
3    Q.   Do you agree that diversion
4   is a crime?
5    A.   I have no -- no opinion --
6        MR. MOUGEY:  Objection.
7   Outside the scope.
8        THE WITNESS:  -- one way or
9   the other.
10  BY MR. EPPICH:
11   Q.   Are you planning to offer
12  any opinions about whether or not any of
13  the defendants diverted prescription
14  opioids in this litigation?
15   A.   No.
16   Q.   I'd like to turn back to
17  Page 56 of your report.  Page 56 is the
18  start of Section 9, transaction analysis,
19  you'll recall.
20        I'd like to return to the --
21  the five methodologies that you implement
22  to identify what you call flagged orders.
23  Okay?
24   A.   Yes.

Page 269

1    Q.   You testified earlier that
2   the plaintiffs' counsel provided these
3   five methodologies for identifying
4   flagged transactions to you, correct?
5    A.   Yes.
6    Q.   You didn't come up with the
7   five methodologies yourself?
8    A.   No.
9    Q.   You have no opinion of -- on
10  whether any of the five methodologies is
11  appropriate for evaluating whether or
12  not -- or, excuse me.  Let me strike
13  that.
14        You have no opinion on
15  whether any of the five methodologies are
16  appropriate for identifying what you call
17  flagged transactions, correct?
18   A.   Correct.
19   Q.   There may be other
20  appropriate methodologies for -- for --
21  let me strike that.
22        You'd agree there may be
23  other appropriate methodologies for
24  flagging suspicious orders, correct?

68 (Pages 266 to 269)

Highly Confidential - Subject to Further Confidentiality Review

Page 270

1    A.   Yes.
2    Q.   But you have no opinion
3  about the other methods of flagging
4  suspicious orders, correct?
5    A.   Or even that they exist.  I
6  just allow, in your previous question,
7  that they may exist.  I don't have an
8  opinion one way or another on -- on any
9  of the subject matter material.
10   Q.   You used algorithms to
11 identify the first flagged transactions
12 in these methodologies?
13   A.   Yes.
14   Q.   And then you flagged every
15 transaction after that, correct?
16   A.   Correct.
17   Q.   That was according to
18 plaintiff -- plaintiffs' counsel's
19 instruction, correct?
20   A.   Correct.
21   Q.   And you did that for all
22 five methodologies?
23   A.   Correct.
24   Q.   You did not use your

Page 271

1  algorithm in the five methodologies to
2  identify any of the subsequent
3  transactions that you flagged after the
4  first transaction?
5    A.   If I understand that
6  question, is the same as the question
7  asked earlier today.  The methodologies
8  flagged that first transaction and
9  everything after that gets flagged.  So,
10 in some complete description, the
11 methodology does flag those later
12 transactions, because it flags the first
13 one and every one that follows.
14      But the methodology is not
15 reapplied to each transaction anew.  I --
16 I guess is the way I would say it.
17   Q.   Another way to say that
18 would be there's no computational
19 analysis on any of the subsequent
20 transactions after that first flagged
21 transaction, correct?
22   A.   Correct.
23   Q.   Who developed your
24 algorithms for each of these five

Page 272

1  methodologies?
2    A.   I'm sorry, what do you mean
3  by developed?
4    Q.   Well, you wrote algorithms
5  for each of these five methodologies,
6  correct?
7    A.   Correct.
8    Q.   Who wrote those algorithms?
9    A.   Well, it was a joint effort
10 of -- so at a very high level you can
11 think of the instruction about which
12 algorithms to use and the assumption that
13 once a transaction is flagged, everything
14 on that day and thereafter is flagged.
15 You could think of that as part of
16 developing or writing the algorithm.
17      So plaintiffs' counsel, some
18 discussion of that between me and -- and
19 my staff and plaintiffs' counsel, and
20 then the actual programming of those
21 rules, members of my staff.
22   Q.   It's true that none of your
23 methodologies was ever used by a
24 distributor to identify suspicious

Page 273

1  orders, correct?
2    A.   I don't know one way or the
3  other.
4    Q.   And are you offering any
5  opinions or do you plan to offer any
6  opinions about whether or not your five
7  methodologies were ever used by a
8  distributor to -- to identify suspicious
9  orders?
10   A.   No.
11   Q.   Do you have any experience
12 with any of the distributors' suspicious
13 order monitoring programs?
14   A.   No.
15   Q.   You didn't review any
16 distributor testimony in this case, did
17 you?
18   A.   No.
19   Q.   You didn't review the
20 suspicious order monitoring programs for
21 any distributor in this case?
22   A.   No.
23   Q.   You didn't review McKesson's
24 Section 55 of its operations manual?

69 (Pages 270 to 273)

Highly Confidential - Subject to Further Confidentiality Review

Page 282

1   that the defendants produced in this case
2   in discovery.  It's a little bit
3   different than what you said, but it's
4   close.
5       Q.   So to restate, you'd agree
6   that the ARCOS data that the DEA provided
7   to you was accurate?
8       A.   That's certainly how I
9   shorthanded in a sentence or two a couple
10  of times in the report.  But if you read
11  the entire report what I'm saying is that
12  the ARCOS data that I received after
13  making some corrections on allowing for
14  some periods where they don't match
15  perfectly, match the defendant
16  transaction data produced in discovery
17  quite closely.
18      Q.   You're aware that only the
19  DEA has access to ARCOS data?
20      A.   I don't know if that's true.
21  I don't know one way or another.
22      Q.   Are you aware that
23  distributors could not see the ARCOS data
24  of any other distributor?

Page 283

1       A.   I don't know if that's true.
2   I don't know one way or the other.
3       Q.   Do you plan on offering any
4   opinions about whether or not a
5   distributor has access to ARCOS data?
6       MR. MOUGEY:  Objection.
7       THE WITNESS:  Not other than
8       to their own data, I don't have an
9       opinion one way or the other.
10  BY MR. EPPICH:
11      Q.   Do your methodologies comply
12  with the Controlled Substance Act and the
13  applicable DEA regulations?
14      A.   I'm not familiar with the
15  details of the Controlled Substance Act
16  or the applicable regulations.  But there
17  seems to be a disconnect between whatever
18  is in those documents and what I've
19  described here as my methodologies.
20      Q.   What is that disconnect?
21      A.   Well, by a disconnect, I
22  mean in layman's terms they are kind of
23  apples and oranges.  I've described in
24  the reports the methodologies that I

Page 284

1   applied and the results of applying those
2   methodologies to the ARCOS data for
3   Cuyahoga and Summit, supplemented with
4   the defendants' transaction data
5   produced.
6       I'm not sure what -- I don't
7   understand the applicability of the
8   Controlled Substances Act or the
9   regulations they're under to the
10  calculations that I've done.  So I don't
11  know if it's consistent or not
12  consistent.  I don't see the connection
13  between them.
14      Q.   And do you intend to offer
15  any opinions in this case about whether
16  or not your methodologies comply with the
17  Controlled Substances Act or its
18  regulations?
19      MR. MOUGEY:  Objection.
20      THE WITNESS:  Not as I sit
21      here.  I don't see the connection,
22      as I just said.
23  BY MR. EPPICH:
24      Q.   If we can look at Page 56 of

Page 285

1   your report, sir, at Paragraph 132.  This
2   has been the subject of some questioning
3   earlier today.
4       And I'm referring to the
5   assumption that is stated in
6   Paragraph 132, where you write, "In this
7   approach" -- and I think we've
8   established that Paragraph 132 is
9   applying to all five methodologies.
10      "In" -- "in this approach
11  and the others implemented below, I have
12  been asked by counsel to assume that the
13  distributor did not effectively
14  investigate the flagged transactions, and
15  so every subsequent transaction of that
16  drug code is also flagged because the
17  distributor had an unfulfilled obligation
18  to detect and investigate the first
19  flagged transaction."
20      Did I read that correctly?
21      A.   Yes.
22      Q.   What did you do to evaluate
23  the validity of this assumption?
24      A.   Nothing.  It was just an

72 (Pages 282 to 285)

Highly Confidential - Subject to Further Confidentiality Review

Page 290

1     would be the same general
2     methodology, but the results would
3     be different because it would --
4     it would be based on a different
5     set of assumptions.
6   BY MR. EPPICH:
7        Q.   So under this different set
8   of assumptions where a distributor
9   detects and investigates the first
10  flagged order, you'd agree that the
11  results would be different and the
12  methodology that we see in this report
13  would be incorrectly flagging every
14  subsequent transaction?
15       MR. MOUGEY:  Objection.
16       THE WITNESS:  No.  I would
17  not say it that way.  I apologize
18       for being wordy.
19       But the way I would say it
20  is that -- that if the -- take a
21       situation where there's a
22       particular order that is the first
23       flagged order in this application
24       for a particular distributor and

Page 291

1     pharmacy.  And the evidence was
2     developed that that order was
3     investigated, cleared and shipped,
4     then the methodology would just be
5     applied allowing for that
6     transaction.  And -- so it's the
7     same methodology.
8        I'm not -- I'm not seeing --
9   maybe I'm -- I apologize.  I may
10  not be seeing the distinction
11  between this question and the
12  answer I gave to the prior
13  question.
14  BY MR. EPPICH:
15       Q.   And I apologize if I'm
16  confusing you.  And let me try and
17  simplify the question.
18       If a distributor were to
19  detect and investigate the first flagged
20  order and your methodology applied that
21  assumption, you'd agree with me that the
22  results of the flagged subsequent
23  transactions would be different than what
24  we see in the charts and graphs of your

Page 292

1   report?
2        A.   I apologize, yes.  If the
3   facts were to be developed to the jury's
4   satisfaction, to the court's
5   satisfaction, different from the assumed
6   facts in this illustration, then the
7   algorithms would have to be run under
8   that new set of assumed facts and it
9   would generate different results.
10       Q.   Now, I believe you testified
11  earlier today that you ran some of the
12  data without the plaintiffs' assumption.
13  Did I understand that testimony
14  correctly?
15       A.   Yes.
16       Q.   That was in preparing for
17  this report?
18       A.   No.  That was earlier than
19  that.
20       Q.   But that -- that analysis is
21  not found in your report, correct?
22       A.   Correct.
23       Q.   Now, when -- when you did
24  that, what were the results that you saw?

Page 293

1        A.   Well, as I said earlier, you
2   end up with fewer transactions being
3   flagged for sort of obvious reasons.
4        Q.   So you'd agree that your
5   reliance on plaintiffs' counsel
6   assumption to flag every subsequent
7   transaction increased the number of
8   flagged transactions?
9        MR. MOUGEY:  Objection.
10  Asked and answered.
11       Are we -- are we going to --
12  are we going to go through the
13  same questions we did this
14  morning?  I mean, that's -- that's
15  the third time he's answered that
16  question.
17       MR. EPPICH:  I'm doing my
18  best but I --
19       MR. MOUGEY:  I hear you, but
20  when we -- I'm --
21       MR. EPPICH:  Keep your
22  objection as to form.
23       MR. MOUGEY:  I mean, the
24  fact that we are allowing

74 (Pages 290 to 293)

Highly Confidential - Subject to Further Confidentiality Review

Page 294

1    different counsel to ask questions
2    doesn't mean we're going to sit
3    and ask the same questions. I
4    mean, some of these questions are
5    almost verbatim of what we went
6    through this morning fishing for a
7    different answer.
8        MR. EPPICH: I disagree with
9    that, sir.
10       MR. MOUGEY: I mean, I can
11   almost cut and paste these and put
12   them on top.
13       And I think if y'all haven't
14   coordinated who is going to take
15   what topics, I think we need to
16   make sure we do that for tomorrow.
17   Because these questions are almost
18   verbatim to what we went through
19   this morning. I could answer
20   them.
21   BY MR. EPPICH:
22       Q.   Sir, you may answer the
23   question.
24       A.   If you assume 100 percent

Page 295

1    due diligence, you don't flag very many
2    orders. If you assume zero due
3    diligence, you flag more orders. And
4    this model is flexible enough to
5    incorporate different sets of facts
6    developed about the extent of due
7    diligence between zero and 100 percent.
8        Q.   If we could turn to
9    Paragraph 131 of your report which is on
10   Page 56. This is the first paragraph
11   under the maximum monthly trailing
12   six-month threshold.
13       A.   Yes.
14       Q.   In Paragraph 131 of your
15   report, you provide an example. You say,
16   "If the number of dosage units containing
17   hydrocodone shipped from a distributor to
18   a pharmacy in February, March, April,
19   May, June, and July were 5,000, 10,000,
20   7,000, 8,000, 9,000, and 9,500
21   respectively, a requested transaction in
22   August would be flagged if it would cause
23   the number of dosage units containing
24   hydrocodone the distributor shipped to

Page 296

1    the pharmacy to exceed 10,000."
2        Did I read that correctly?
3        A.   Yes.
4        Q.   So if the pharmacy ordered
5    10,500 in August of 1997, that order
6    would be flagged under your six-month
7    threshold analysis, correct?
8        MR. MOUGEY: Objection.
9    Asked and answered.
10       THE WITNESS: I'm sorry.
11   Which order?
12   BY MR. EPPICH:
13       Q.   If the pharmacy were to
14   order 10,500 in August of, say, 1997,
15   that order would be flagged under your
16   six-month threshold analysis, correct?
17       A.   I think there's some
18   confusion in that question. Maybe my
19   sentence there is not clear. I could
20   explain if you'd like.
21       Q.   Well, I'm just trying to
22   figure out if the pharmacy ordered 10,500
23   in August, wouldn't that order be
24   flagged?

Page 297

1        A.   No. I'm sorry. You're not
2    saying it correctly. Can I explain?
3        Q.   Yes, please.
4        A.   So it's not an order of
5    10,500. It's probably a weekly order of
6    2,000, 3,000, 2,000, 4,000, 1,500. And
7    it's the last order that puts you above
8    10,000. And it's that order, it's the
9    order that puts you above 10,000. So you
10   keep saying the order of 10,500. It's
11   not an order of 10,500 typically.
12       And it's that order or the
13   orders that day in that drug code and the
14   subsequent orders in that drug code that
15   get flagged.
16       Q.   I appreciate that
17   clarification.
18       So if the pharmacy, if their
19   total orders for the month of August 1997
20   were 10,500 by the end of the month, the
21   last order that they had would be flagged
22   under your six-month threshold analysis,
23   correct?
24       A.   In my example. But it may

75 (Pages 294 to 297)

Highly Confidential - Subject to Further Confidentiality Review

Page 298

1    not be the last order that triggers the
2    flag, right.  It could be the
3    second-to-last order.  But whatever the
4    orders are on that day in that drug code
5    and the rest of the orders that month,
6    and the orders that follow, are what get
7    flagged.
8        Q.    That's right.  And so every
9    order of the drug thereafter would be
10   flagged for this particular pharmacy,
11   correct?
12       A.    Correct.
13       Q.    So orders starting in
14   September '97 or maybe even later in
15   August 1997 until all the way to the end,
16   let's say, 2018, those would all be
17   flagged under your six-month threshold
18   analysis, correct?
19       A.    Correct.
20       Q.    Even if no subsequent
21   monthly orders totaled 10,000, correct?
22       A.    Correct.
23       Q.    Now, let's say the
24   pharmacy -- let's say their orders for

Page 299

1    the month of August 1997 exceeded 10,000
2    because there was an emergency, let's say
3    a natural disaster.  That last order in
4    August would be flagged and every
5    subsequent order would be flagged under
6    your six-month threshold, correct?
7        MR. MOUGEY:  Objection.
8        THE WITNESS:  I'm sorry.
9    I'm not sure that I understood
10   that question.  Could you ask it
11   again, please.
12   BY MR. EPPICH:
13       Q.    Of course.  If a pharmacy --
14   if an order in August of 1997 -- let me
15   strike that.
16       If a pharmacy ordered a
17   total number of orders that exceeded
18   10,000 in August of 1997 because there
19   was an emergency, let's say a natural
20   disaster, that order that exceeded 10,000
21   would be flagged under your six-month
22   threshold analysis, correct?
23       A.    If the order itself doesn't
24   exceed 10,000, but the order causes the

Page 300

1    cumulative orders so far that month to
2    exceed $10,000 -- 10,000 dosage units,
3    that's correct.  Then that order -- it
4    might be just 200 dosage units, you know,
5    taking you from 9,900 to 10,100.  So that
6    200-dosage-unit order and all subsequent
7    orders get flagged.
8        Q.    Even though that store
9    ordered in excess of the limit of its
10   previous six-month ordering because of an
11   emergency?
12       A.    Correct, the application of
13   the algorithm to the data doesn't take
14   into account that or other hypotheticals
15   that you could develop that would go
16   either -- either way.
17       Q.    Assuming that the store
18   ordered that same drug every month
19   between, say, September 1997 and the end
20   of 2018, your six-month threshold
21   analysis would flag all of those orders
22   as suspicious just because of that one
23   month in 1997, correct?
24       A.    I don't think I used the

Page 301

1    word "suspicious" anywhere in this
2    report.  I just said that the order is
3    flagged.
4        And that's correct, the
5    algorithm is flagging the transactions
6    after that example transaction in your
7    hypothetical until the end of the data.
8    It's as equally likely to go the other
9    way as the way you are suggesting.  But
10   the algorithm is agnostic about that.
11   It's just applying the rule to the data.
12       Q.    I don't understand what
13   you -- what you're saying.  It's equally
14   as likely to go the other way?  Are you
15   saying that once an order is flagged, all
16   subsequent orders are not flagged?
17       A.    No, no.  Not at all.  In
18   your example, the natural disaster occurs
19   in the seventh month.  If it occurs in
20   the fifth month, then you've got a spike
21   in the -- temporary spike in the
22   shipments in the fifth month, and that
23   raises the threshold that would be
24   applied to judge all of the subsequent

76 (Pages 298 to 301)

Highly Confidential - Subject to Further Confidentiality Review

Page 362

1    you personally have access to. I'm just
2    asking you about the actual application,
3    like the actual nuts and bolts. You
4    talked about you being a computer. So
5    I'm talking about the technical
6    application, based on whatever you have
7    or you don't have.
8            You are going to have a
9    discrepancy when you have eight or nine
10   more years of data for one distributor
11   versus another distributor where you
12   don't have those same years of data, for
13   whatever reason or you haven't looked at
14   it or you don't have it, whatever the
15   reason is, you haven't looked at it,
16   there is a difference, right?
17           MR. MOUGEY: Objection.
18           THE WITNESS: That's a
19       difference in the data. In your
20       example, there's eight or
21       nine years of data for the
22       defendant that there isn't for the
23       other. And so you apply the same
24       algorithm to those two datasets,

Page 363

1        you get different results because
2        it's different data. Not because
3        there's a discordance or an
4        inconsistency. I don't
5        understand.
6    BY MR. BOEHM:
7        Q.   Well, you get different data
8    because you're looking at some of the
9    data, and either because you don't have
10   it or you chose not to, whatever the
11   reason, you're not looking at data for
12   another distributor, right? So there's
13   naturally going to be a difference when
14   you are using a carry-it-forward flagging
15   approach, correct?
16           MR. MOUGEY: Objection.
17           THE WITNESS: You just snuck
18       back -- I didn't mean that as a
19       pejorative. But you've just
20       brought in -- back into your
21       question that there's data or
22       there may be data that I don't
23       have or that I'm not looking at.
24           What I'm saying is if you

Page 364

1    apply this methodology to data
2    from 1997 forward and compare that
3    to exactly the same defendant but
4    only apply it from 2004 forward,
5    you get different results, of
6    course, because you're applying it
7    to different data.
8    BY MR. BOEHM:
9        Q.   Right. And there's more
10   opportunity for you to flag more orders
11   earlier on --
12           (Telephonic interruption.)
13   BY MR. BOEHM:
14       Q.   -- because of the assumption
15   that you've made -- actually, it's an
16   instruction that you received from
17   plaintiffs' lawyers, to assume that every
18   subsequent order ought to be flagged as
19   well, right?
20       A.   No. I wouldn't say that
21   it's more opportunity to flag orders.
22           There's just more orders.
23   There's more data in your hypothetical.
24   You've got five or six more years of

Page 365

1    data. And since the orders get flagged
2    in some sense earlier rather than later,
3    you -- you are picking up years of data
4    that are being flagged, especially --
5    partly because the trend is up.
6            If the trend was down in
7    opioid consumption, what we are talking
8    about wouldn't occur at all. It's the
9    fact that there's a significant upward
10   trend in Cardinal Health's data and other
11   firm's data that is creating that result.
12       Q.   If you were to mis-identify
13   or mistakenly flag an order or a
14   transaction earlier in time, the
15   implications of that mistake would be
16   even greater under your methodology
17   because every subsequent order also gets
18   flagged, fair?
19           MR. MOUGEY: Objection.
20           THE WITNESS: I don't
21       understand that question. If you
22       can --
23   BY MR. BOEHM:
24       Q.   Sure. Let me say it again.

92 (Pages 362 to 365)

Highly Confidential - Subject to Further Confidentiality Review

Page 366

1    If you don't understand, I'm happy to say
2    it again.
3            If you mis-identify or
4    mistakenly flag a transaction earlier in
5    time, that has greater implications for
6    more error because of the subsequent
7    flagging that automatically takes place
8    under your methodologies, correct?
9            MR. MOUGEY:  Objection.
10           THE WITNESS:  Greater than
11   what?  The sentence is --
12   BY MR. BOEHM:
13       Q.   Greater than later.  Greater
14   than later in time.
15           The earlier you make a
16   mistake, the bigger the implications in
17   terms of that error spreading throughout
18   your analysis, right?
19       A.   Maybe, maybe not.  I'd have
20   to think about it.
21       Q.   Well, when you identify an
22   order as flagged under your methodology,
23   would it be fair to say it's like you're
24   knocking over a domino, and every domino

Page 367

1    that follows along that chain gets
2    flagged, right?
3        A.   Correct.
4        Q.   So if you knock it over at
5    the very beginning, you are going to
6    knock over more dominoes than if you walk
7    up to the middle of the domino row and
8    knock it over from there, right?
9        A.   Well, I like the analogy.  I
10   just have to think through it a little
11   bit to see if it -- if it applies
12   precisely.  But in general, I think what
13   you're saying is correct.
14       Q.   So if you make a mistake
15   early on and knock over that domino, you
16   are going to mistakenly knock over more
17   dominoes that you didn't mean to knock
18   over, right?
19       A.   I'm not sure that you are
20   correct in -- in all instances.  I'd have
21   to think through it a little bit more.
22           But in general I agree that
23   the earlier the data you have, whenever
24   you first trigger, flag an order, you are

Page 368

1    going to be flagging more orders than if
2    you had data that started later.  And if
3    it turned out that there was some
4    disagreement about, for instance, whether
5    that order should have been flagged or
6    maybe was cleared as a result of some due
7    diligence, the fact that you are assuming
8    no due diligence with data that goes back
9    earlier would have a bigger impact maybe,
10   maybe, maybe not, but maybe, than if the
11   data started a few years later.
12       Q.   Starting on Page 72 of your
13   report you apply an approach that you
14   referred to as the "maximum daily dosage
15   units approach."  Do you remember that?
16       A.   Yes.
17       Q.   Did you come up with that
18   name, or was that something that the
19   lawyers or your staff came up with?
20       A.   I came up with it.
21       Q.   Okay.  How did you arrive at
22   that name?
23       A.   Well, I thought it was an
24   accurate description of the source

Page 369

1    document, and separate and apart from
2    whether it's the -- accurate description
3    of the source document, it's an accurate
4    description of the approach, of the
5    algorithm.
6            What I was trying, with the
7    names that I put on each of these five,
8    is to accurately describe in shorthand,
9    anyway, what the approach was, to have
10   the title be descriptive of what we're
11   actually implementing.  And what we're
12   implementing here is a maximum daily
13   threshold in dosage units.  And that's
14   why I call it maximum daily dosage units.
15       Q.   Okay.  Well, you kind of
16   talked about two things.  You first
17   talked about the source document, and
18   then you talked about your approach.
19   Let's see if we can break those up into
20   two separate conversations.  Does that
21   work?
22       A.   Sure.
23       Q.   Okay.  I think earlier today
24   you referred to the -- the -- what you

93 (Pages 366 to 369)

Highly Confidential - Subject to Further Confidentiality Review

Page 370

1    just now called a source document for
2    this approach as a two-page document.  Do
3    you remember that?
4        A.   Yes.
5        Q.    And I think what you meant
6    by that is that the lawyers who hired you
7    for this case only gave you two pages to
8    look at for purposes of this methodology;
9    is that right?
10       A.   No.  I meant it as I said
11   it.  I don't know whether I received more
12   than two pages or exactly two pages.
13       Q.    Why did you call it a
14   two-page document?
15       A.   Because that's how I
16   visualize it.  That's how I recall seeing
17   it.
18       Q.    You don't recall seeing
19   anything more than two pages?
20       A.   Not in connection with that
21   document, no.
22       (Document marked for
23       identification as Exhibit
24       McCann-10.)

Page 371

1    BY MR. BOEHM:
2        Q.    I've marked a document that
3    I'm handing you as Exhibit 10 for
4    purposes of your deposition.  It's, I
5    think, Exhibit P to your report if I
6    understand the markings on this page
7    correctly.
8        Do you see that?
9        A.   Yes.
10       Q.    Is Exhibit P the two-page
11   document that you referred to earlier
12   today in connection with the so-called
13   maximum daily dosage units approach?
14       A.   Yes.
15       Q.    You said you called it the
16   maximum daily dosage units approach based
17   on something that you saw in the
18   document, these two pages, right?
19       MR. MOUGEY:  Objection.
20       THE WITNESS:  Well, no, I
21       think what I said was that, as I
22       was answering your question, I
23       first said it was something I saw
24       on the document, or rather it is a

Page 372

1    description of the algorithm that
2    I implemented.  And what I
3    implemented was a maximum daily
4    dosage unit threshold.
5    BY MR. BOEHM:
6        Q.    Okay.  My colleagues have
7    corrected me.  So let me just for the
8    record say that Exhibit P is on -- as
9    printed on the document is on the
10   original.  Y'all didn't have that?
11       A.   Yeah, I was going to say I
12   don't recall attaching it as Exhibit P.
13   I referenced it in a footnote, but I
14   don't recall attaching it.
15       Q.    Yeah, that's what --
16   correct.  You got it right.  I apologize
17   for that.  It's a reference in
18   Footnote 55 of your report by Bates
19   number.
20       A.   Yes.
21       Q.    Are these the two pages,
22   that are now marked as Exhibit 10, are
23   these the two pages that you had in mind?
24       A.   Yes.

Page 373

1        Q.    Is there anything from the
2    document itself that informed your
3    decision to refer to this approach as the
4    maximum daily dosage units approach?
5        I guess another way, what
6    I'm really asking you is, do you know how
7    this document was actually understood and
8    used during the time that it was in
9    effect at Cardinal Health?
10       A.   No.
11       Q.    Do you have any knowledge
12   about whether or not the way you have
13   applied what you call the maximum daily
14   dosage unit approach, how that compares
15   to what Cardinal was or has done in terms
16   of flagging potentially suspicious
17   orders?
18       A.   No.
19       Q.    And you don't know how this
20   document which is now marked as
21   Exhibit 10 relates to Cardinal Health's
22   actual efforts to flag transactions,
23   right?
24       A.   Correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 374

1    Q.   Do you know when this
2  document was created?
3    A.   No.
4    Q.   Do you know the period of
5  time when the guidance in this document
6  was in effect at Cardinal?
7    A.   No.
8    Q.   Do you know what the term
9  "dosage limit" was understood to mean at
10  Cardinal in the context of this document?
11    A.   No.
12    Q.   Do you know how the term
13  "dosage limit" as used in this document
14  was implemented in terms of actual
15  calculations?
16    A.   No.
17    Q.   So was it the plaintiffs'
18  lawyers who told you how to kind of
19  define the parameters of the maximum
20  daily dosage units approach?
21    A.   Well, not precisely, but yes
22  in general terms, what I was asked to do
23  was implement an approach based on the
24  number of dosage units in the column

Page 375

1  under retail on this exhibit for the
2  drugs that are listed here.
3    Q.   And when you say you were
4  asked to do that, you mean you were asked
5  by the lawyers who hired you?
6    A.   Correct.
7    Q.   In response to some
8  questioning earlier today you made a
9  reference to what I think you called the
10  flexibility of the model.  Do you
11  remember that?
12    A.   Yes.
13    Q.   And I think what you meant
14  is that it would be possible for you to
15  make different assumptions than you
16  actually do in the way you've implemented
17  these five approaches.  Is that fair?
18    A.   Yes.
19    Q.   Okay.  And you're not
20  vouching in any way for the accuracy of
21  your assumptions; you're just
22  implementing them like a calculator
23  would, right?
24    A.   I don't judge assumptions

Page 376

1  based on whether they are accurate or
2  not.  The question is whether they're
3  useful or not.  But I'm not -- I'm not
4  opining on the assumptions.  I'm just
5  implementing the assumptions.
6    Q.   You are not vouching in any
7  way for the accuracy of the assumptions
8  that you're making for the purposes of
9  your five approaches, right?
10    A.   Correct.
11    Q.   And your calculations in
12  this lawsuit as set forth in your report,
13  do not actually involve any application
14  of alternative sets of assumptions,
15  correct?
16    A.   Except across the
17  applications -- across the approaches,
18  no.  Maybe I misunderstood.  It might be
19  getting a little late.
20    Q.   Well, it's possible that I
21  flubbed the question too.
22       You said that it would be
23  possible for you to make different
24  assumptions, right?

Page 377

1    A.   Yes.
2    Q.   And that's what you meant by
3  flexibility.  But your computations and
4  calculations and analyses in this case as
5  set forth in your opinions and report
6  don't actually involve any alternative
7  assumptions, right?
8    A.   Except across the -- across
9  the approaches.
10    Q.   Just -- just tell me what
11  you mean by across the approaches.
12    A.   Well, I've got five
13  approaches here we've been talking about.
14  And each of them applies a different set
15  of rules to flagging orders.
16    Q.   Oh, yeah.  There are
17  differences between the five approaches.
18    A.   That's what I meant.
19    Q.   I get that there are
20  differences between the five approaches.
21  But my question to you is, even though
22  you could make assumptions other than the
23  ones that you actually are making for
24  purposes of these five approaches, none

95 (Pages 374 to 377)

Highly Confidential - Subject to Further Confidentiality Review

Page 485

```
 1   there were dramatic differences between
 2   Section 9 and Section 10, orders of
 3   magnitude difference, it would cause me
 4   to rethink the material in both sections.
 5        Q.    Sure.  And just so we're on
 6   the same page, this issue of doing kind
 7   of a reality testing or a testing of a
 8   model to see if it actually does what
 9   it's supposed to do is a known
10   mathematical concept, correct?
11        A.    Where there's uncertainty.
12   There's no uncertainty in the application
13   of these algorithms.
14             It relates back to your
15   issue of probability, p values or
16   confidence intervals.  There's no p value
17   or confidence intervals surrounding these
18   algorithms, because it's just arithmetic
19   and the error rate is zero.
20             You can argue about whether
21   the arithmetic is applicable or not.  But
22   there's no confidence interval to be
23   drawn around it.
24        Q.    So on the question of
```

Page 486

```
 1   applicable or not, have you done any kind
 2   of testing to see if any of these models
 3   for looking at the amount of flagged
 4   orders or the number of flagged orders is
 5   applicable to anything like a real-world
 6   situation?
 7        A.    Not beyond the high-level
 8   reality check in Section 10.
 9        Q.    So if the model turns up
10   that about 80 percent of all the
11   pharmacies in Cuyahoga and Summit County
12   have at least one flagged order,
13   according to each of your models, would
14   you agree that doesn't sound very
15   realistic?
16        A.    No, not at all, given just
17   the context -- I'm just applying
18   calculations.  But I understand the
19   opioid crisis to be a very serious matter
20   and that -- and it's not isolated to one
21   or two pharmacies.
22             So if the calculations
23   generated a lot of pharmacies, even 80
24   percent of the pharmacies, as involved in
```

Page 487

```
 1   at least one transaction that ought to
 2   have been investigated, that wouldn't
 3   surprise me.
 4        Q.    Do you know if that's --
 5   well, have you done any testing on that
 6   issue, the number of pharmacies or the
 7   percentage of pharmacies with at least
 8   one flagged order, whether that is at all
 9   realistic or applicable to the real-world
10   situation?
11        A.    That was outside the scope
12   of my reports.
13        Q.    In general, from what you
14   were trying to do with these models for
15   determining flagged orders, would you
16   expect that the initial order that
17   triggers a flag would tend to be on the
18   larger side compared to the average
19   order?
20        A.    At least relative to the
21   preceding -- the average of the preceding
22   orders, I think that would make sense.
23        Q.    And have you looked at that
24   overall here to see whether the orders
```

Page 488

```
 1   that triggered the flag, by any of your
 2   models, tended to be larger than average,
 3   smaller than average or average?
 4        A.    Yes.  That analysis is
 5   implied in the fourth and fifth approach;
 6   to a lesser extent is also involved in
 7   the first approach.  I'm not sure about
 8   the second or third.
 9             So it's definitely involved
10   in the fourth and fifth.  It's involved
11   to some extent in the first.  I haven't
12   thought through whether -- I've just --
13   I'm thinking about it now as we're
14   talking about it, but I'm not seeing
15   immediately how it's also involved in the
16   second or third.  I don't know that it is
17   or isn't.
18        Q.    Do you know if, out of the
19   class of drugs that we've been talking
20   about, there's some that are considered a
21   higher risk of abuse or diversion than
22   others?
23        A.    Just generally I understand
24   that as part of the context I have for
```

27 (Pages 485 to 488)