# EXHIBIT 8

Highly Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

-   -   -

| | | |
|---|---|---|
| IN RE:  NATIONAL | : | HON. DAN A. |
| PRESCRIPTION OPIATE | : | POLSTER |
| LITIGATION | : | |
| | : | |
| APPLIES TO ALL CASES | : | NO. |
| | : | 1:17-MD-2804 |
| | : | |

- HIGHLY CONFIDENTIAL -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

VOLUME I

-   -   -

April 17, 2019

-   -   -


         Videotaped deposition of
THOMAS PREVOZNIK, taken pursuant to
notice, was held at the law offices of
Williams & Connolly, 725 12th Street,
Washington, D.C., beginning at 9:11 a.m.,
on the above date, before Michelle L.
Gray, a Registered Professional Reporter,
Certified Shorthand Reporter, Certified
Realtime Reporter, and Notary Public.

-   -   -


GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Highly Confidential - Subject to Further Confidentiality Review

Page 178

1  provided guidance as to what your
2  expectations were as to the suspicious
3  order monitoring systems going forward,
4  correct?
5      A.  That's where we -- yes.
6      Q.  What about the distributors
7  that didn't have MOAs?  How did they get
8  guidance from the DEA as to how to design
9  their -- or implement their suspicious
10  order monitoring systems in 2008 forward?
11     A.  So it would be through the
12  distributor, if we did an initiative with
13  them.  It could be through the
14  pharmaceutical conferences.  Again, I'm
15  not sure when we -- when we did them.
16  But it would be through that.  It would
17  be through their scheduled investigations
18  when we're out there.
19     Q.  So essentially there was no
20  industrywide guidance that was provided
21  in 2008 or forward as to how to design or
22  implement suspicious order monitoring
23  systems, true?
24         MR. FINKELSTEIN:  Object to

Page 179

1      the characterization.
2          THE WITNESS:  Nationwide,
3      correct.
4  BY MS. MAINIGI:
5      Q.  Instead, one-off guidance
6  was perhaps provided in the context of
7  individual distributor meetings, correct?
8      A.  Yes.  Along with the MOAs
9  and the settlements that were done.
10     Q.  And is there documentation
11  of what was said at the individual
12  distributor meetings?
13     A.  It would be the PowerPoints
14  and the report -- after report.
15     Q.  And this is an internal DEA
16  report?
17     A.  Yes.
18     Q.  And have you reviewed those
19  internal DEA reports for the purpose of
20  preparing for your testimony today?
21     A.  Some of them.
22     Q.  Now, does the DEA agree that
23  there's more than one way to design and
24  operate a system that can identify and

Page 180

1  report suspicious orders?
2      A.  Yes.
3      Q.  And there's no single
4  feature that makes a suspicious order
5  monitoring system compliant, correct?
6      A.  Correct.
7      Q.  And the DEA leaves it up to
8  the registrant to design a system that
9  works with its own business model and
10  customer base, correct?
11     A.  Correct.
12     Q.  Does it matter to the DEA
13  whether a registrant reviews orders
14  manually or uses an automated system?
15     A.  No, it doesn't matter.
16     Q.  Other than requiring that
17  the report, suspicious order report
18  clearly indicate that the order is
19  suspicious, does DEA require suspicious
20  order reports to follow a particular
21  format?
22     A.  That's correct.
23     Q.  Let me ask the question
24  again.  The DEA does not require

Page 181

1  suspicious order reports to follow a
2  particular format, correct?
3      A.  Well, I mean, they have to
4  follow what the regs say about unusual
5  size, unusual patterns, or frequency.  I
6  mean, that's in there.  We also ask that
7  the red flags and, you know, looking at
8  newspapers articles to see, you know,
9  what the overdoses are.  You know, are
10  they looking at more than just the data,
11  because the data is only as good as --
12  you know, you can set the threshold too
13  high, you can set it too -- it's never
14  going to pick up something, or you're not
15  going to see patterns, because it's a new
16  customer that gets onboarded, and they're
17  already high, and you don't question it
18  or you don't look at it, you don't see
19  the population size, you don't see what's
20  their percentage of control versus not
21  control.  I mean, there's a lot of
22  different factors that go in it.  So
23  however they design it, they need to get
24  the big picture so that they truly know

46 (Pages 178 to 181)

Highly Confidential - Subject to Further Confidentiality Review

Page 182

1    what is their customer doing.
2        Q.   Is there --
3            MR. FINKELSTEIN:  Hang on.
4    Five minutes ago, I asked for a
5    break.  We've been on the record
6    for more than an hour and a half.
7    Can you tell us when you are going
8    to be done?
9            MS. MAINIGI:  Just a couple
10   more minutes.
11   BY MS. MAINIGI:
12       Q.   Is the review -- is it fair
13   to say then that the identification of
14   suspicious orders can be a subjective
15   process?
16           MR. FINKELSTEIN:  Objection.
17   Vague.
18           THE WITNESS:  What do you
19   mean by "subjective"?
20   BY MS. MAINIGI:
21       Q.   Well, do you understand the
22   meaning of the word "subjective"?
23       A.   I'm asking you in terms of
24   this, what do you mean by subjective?

Page 183

1        Q.   Well, what I mean is that
2    you and I looking at the same data,
3    sometimes, not always, may come to
4    different conclusions, as to whether an
5    order is suspicious.  Is that possible?
6        A.   That is --
7            MR. FINKELSTEIN:  Hang on.
8    Objection.  Calls for speculation.
9    BY MS. MAINIGI:
10       Q.   I didn't hear -- you said
11   that is --
12       A.   That is possible.
13       Q.   And so, therefore, the
14   identification of suspicious orders is a
15   somewhat subjective process?
16           MR. FINKELSTEIN:  Objection.
17   Vague.
18           THE WITNESS:  I mean, when
19   it comes down to a suspicious
20   orders, what is triggering may --
21   it's the whole point of the
22   suspicious order is to identify --
23   hold on one second.  Okay.
24       A suspicious order is an

Page 184

1    order in which the recipient of
2    the order detects through their
3    suspicious order monitoring
4    system, a reason or reasons that
5    may indicate that that order may
6    be -- that order may be diverted
7    outside the legitimate scientific,
8    medical, and industry channels.
9    That's what it is.
10       So the subjectivity would be
11   not just us looking at it.  I
12   mean, we would look at it.  They
13   would look at it.  And that's why
14   many have gotten in trouble,
15   because they didn't look at it and
16   changed stuff.  So, you know, when
17   we get -- if we go to court or
18   whatever, it's going to be up to
19   the jury and the judge to decide.
20   BY MS. MAINIGI:
21       Q.   Because it's subjective,
22   right?
23           MR. FINKELSTEIN:  Objection.
24   Vague.

Page 185

1            THE WITNESS:  Yeah, it can
2    be subjective.
3            MS. MAINIGI:  Let's take a
4    break.
5            THE VIDEOGRAPHER:  All
6    parties agree to go off the
7    record?
8            MR. FINKELSTEIN:  Yes.
9    Thank you.
10           THE VIDEOGRAPHER:  Thank
11   you.  12:24, we are off the video
12   record.
13               - - -
14       (Lunch break.)
15               - - -
16   A F T E R N O O N   S E S S I O N
17               - - -
18           THE VIDEOGRAPHER:  1:32, we
19   are on the video record.
20   BY MS. MAINIGI:
21       Q.   Good afternoon.  Let me hand
22   you Exhibit 6 to take a look at.
23       (Document marked for
24   identification as Exhibit

47  (Pages 182 to 185)

Highly Confidential - Subject to Further Confidentiality Review

Page 190

1    to the characterization.
2         You can answer.
3         THE WITNESS:  One more time.
4    BY MS. MAINIGI:
5         Q.   Did --
6         A.   I apologize.  I just want to
7    make sure I got it.
8         Q.   No, no, no, no.  Let me try
9    it another way.
10        Did -- did the -- so we have
11   the -- the Rannazzisi December 27, 2007,
12   letter, correct?
13        And I think that in the file
14   there are lots of letters and issues in
15   the aftermath of that December 27, 2007,
16   letter.  And this letter is just one of
17   them, in March of 2008.
18        Did DEA understand that in
19   the aftermath of Mr. Rannazzisi's
20   December 27, 2007, letter, that
21   distributors took actions that resulted
22   in a number of complaints by pharmacies
23   that distributors were acting
24   precipitously?

Page 191

1         MR. FINKELSTEIN:  Objection.
2    Vague.
3         THE WITNESS:  We -- we heard
4    complaints.
5    BY MS. MAINIGI:
6         Q.   Complaints from whom?
7         A.   From -- it could be
8    pharmacies.  It could be -- it could be
9    patients saying I can't get my meds.
10        Q.   And so there were complaints
11   from pharmacies, kind of the variety we
12   see in Exhibit 6, basically saying
13   distributors are taking actions that are
14   unfair to the pharmacies as a result of
15   Mr. Rannazzisi's letter, true?
16        MR. FINKELSTEIN:  Objection.
17   Mischaracterizes.
18        THE WITNESS:  I'm not sure
19   that it's just the letter, because
20   this was also the time that we
21   started getting into settlement
22   agreements with the industry as
23   well.  So it wasn't just the
24   letter.  It was...

Page 192

1    BY MS. MAINIGI:
2         Q.   But there was -- I'm sorry.
3         A.   No.  Go ahead.
4         Q.   But there was -- and so
5    there were complaints from pharmacies to
6    the DEA, correct?
7         A.   Correct.
8         Q.   And there were complaints
9    from patients to the DEA also, correct?
10        A.   Yeah.
11        Q.   And this is -- these are
12   complaints from patients who are worried
13   that they are not able to get their meds
14   because distributors are restricting
15   their distribution of meds in part as a
16   result of the various actions with DEA,
17   correct?
18        MS. SINGER:  Objection.
19   Lacks foundation.
20        THE WITNESS:  I'm not -- I'm
21   not sure that that's completely
22   correct.  The -- the actions that
23   we were taking were against
24   internet pharmacies, so

Page 193

1    pharmacists that the public would
2    walk into.  That was not -- we
3    were targeting -- we were dealing
4    with this certain group of
5    registrants that are out of line,
6    that are not maintaining effective
7    controls.  And that's what we
8    targeted.  So we were -- we were
9    targeting the internet pharmacies
10   at this time.
11        So if --
12   BY MS. MAINIGI:
13        Q.   At the time of Exhibit 6?
14        A.   Well, no, I mean, this is --
15   this was the culmination of litigations
16   and investigations and, you know.  Again
17   like I said, we were getting into
18   settlements with some of the distributors
19   on, you know, you didn't do what you --
20   you said you were going to change, you
21   didn't change.  Now we're at the table
22   trying to settle this, and -- and, you
23   know, hopefully protect the public
24   health.  That -- that was the goal.

49 (Pages 190 to 193)

Highly Confidential - Subject to Further Confidentiality Review

Page 194

1      I mean part of -- the other
2  part of our mission besides preventing
3  and detecting and investigating the
4  diversion is we also had the
5  responsibility to ensure that there's
6  enough for -- of an adequate supply. So,
7  a twofold mission. So...
8      Q.   So was the perception of
9  some in the market that the distributors
10  had overreacted to what DEA was saying?
11      MR. FINKELSTEIN: Objection.
12  Scope, calls for speculation.
13      THE WITNESS: I -- I don't
14  know what the wholesalers were
15  thinking. I -- if -- I mean, I
16  know from my own experience with
17  the -- with the pharmacy diversion
18  awareness conferences where we had
19  pharmacists coming up and saying
20  hey, they are putting thresholds
21  on, they are cutting us off, this
22  is affecting patient care. And
23  they said well, DEA sets the
24  threshold. And we said, no,

Page 195

1  that's not true, we did not set
2  the thresholds. The industry sets
3  the thresholds.
4      That was an eye-opener for
5  them, because they were being
6  told -- somebody was telling them
7  the DEA set thresholds. We don't
8  set thresholds on that -- on that
9  part, with -- in regards to that.
10      So, pushing back, you know,
11  and then you get -- then we -- we
12  take action against pharmacists,
13  you have a similar situation with
14  a pharmacist saying oh, the DEA
15  said we're not allowed to fill
16  these prescriptions. DEA does
17  not -- does not regulate the
18  practice of medicine. And,
19  those -- you know, that's the
20  pharmacist's decision whether to
21  fill the prescription or not.
22  BY MS. MAINIGI:
23      Q.   But it appeared to you that
24  there was an uptick in complaints from

Page 196

1  pharmacists, pharmacies and patients in
2  the aftermath of the December 2007
3  Rannazzisi letter, correct?
4      A.   I think --
5      MR. FINKELSTEIN: Objection.
6  Mischaracterizes.
7      THE WITNESS: I think it's
8  both. It's both the letter and
9  the actions that we had taken
10  against them. So I can't say in
11  particular the letter triggered
12  all this, because I think the
13  actions also triggered stuff too.
14  BY MS. MAINIGI:
15      Q.   And so the collective
16  actions of DEA, including the Rannazzisi
17  letter, including the settlements and so
18  forth in 2007, you noticed an increase in
19  complaints from pharmacists from seasoned
20  patients in 2008, for example?
21      A.   Yes.
22      Q.   It was not DEA's intention
23  to interfere with patients' ability to
24  fill legitimate prescriptions for

Page 197

1  controlled substances, correct?
2      A.   Correct.
3      Q.   So did DEA provide any
4  additional guidance to distributors to
5  prevent -- to prevent the type of
6  incidents that were complained of from
7  happening?
8      MR. FINKELSTEIN: Objection.
9  Vague.
10      THE WITNESS: I'm not sure
11  what you're asking.
12  BY MS. MAINIGI:
13      Q.   Well, so, let's go ahead and
14  take a look at this letter again.
15      The writer of this letter,
16  Mr. Roberts from NCPA, asked the DEA to
17  hold the meeting with wholesalers,
18  consumer groups and community pharmacies
19  so that all parties could clearly
20  understand DEA's expectations and attempt
21  to comply with them, right?
22      A.   Just to make sure, on 5917?
23      Q.   Yes.
24      A.   And specifically the second

50 (Pages 194 to 197)

Highly Confidential - Subject to Further Confidentiality Review

Page 262

1  customer --
2      Q.   Well, the right --
3          MR. FINKELSTEIN:  You can
4  finish your answer.  Please do.
5          THE WITNESS:  You lost me on
6  where you said that the customer
7  gives you the --
8  BY MR. EPPICH:
9      Q.   I'll ask it again.
10     A.   Sure.
11     Q.   Isn't it true that the
12  regulations only apply to the suspicious
13  orders that a distributor receives from
14  its own customers?
15     A.   You still lost me.  How is
16  the -- how is the distributor getting --
17  getting the suspicious order from their
18  customer?
19     Q.   I'll strike the question.
20         You're generally familiar
21  with distributors' suspicious order
22  monitoring programs?
23     A.   Correct.
24     Q.   And DEA is aware that the

Page 263

1  distributors programs, they set a monthly
2  threshold for a customer's controlled
3  substances purchases?
4          MR. FINKELSTEIN:  Objection.
5  Calls for speculation.
6          THE WITNESS:  To my
7  knowledge, yes.
8  BY MR. EPPICH:
9      Q.   And DEA never instructed
10  distributors to set a monthly threshold
11  at a specific level, did they?
12     A.   No.
13     Q.   DEA never instructed
14  distributors to set monthly thresholds
15  for controlled substances at 8,000 dosage
16  units, did they?
17     A.   No.
18         MR. EPPICH:  That's all the
19  questions I have for you this
20  afternoon.  Let me pass the
21  witness.
22         THE VIDEOGRAPHER:  Going off
23  the record, 3:05 p.m.  We are off
24  the video record.

Page 264

1          (Brief pause.)
2          THE VIDEOGRAPHER:  3:08.  We
3  are on the video record.
4          - - -
5          EXAMINATION
6          - - -
7  BY MR. O'CONNOR:
8      Q.   Mr. Prevoznik, good
9  afternoon.  I'm Andrew O'Connor.  I
10  represent one of the manufacturers in the
11  case.  I appreciate your time today?
12     A.   Thank you.
13     Q.   I want to pick up where
14  Mr. Eppich left off.  Is it fair to say
15  that the Controlled Substances Act does
16  not require manufacturers to report
17  suspicious orders submitted to other
18  manufacturers?
19     A.   Manufacturers reporting
20  other --
21     Q.   Orders submitted to other
22  manufacturers, correct.
23     A.   Well, if there would be one,
24  then they would -- because a manufacturer

Page 265

1  can sub to another manufacturer.
2      Q.   I see.
3      A.   So there could be one.
4      Q.   Does a manufacturer under
5  the CSA have an obligation to report an
6  order that's placed with another
7  manufacturer?
8          MR. FINKELSTEIN:  Objection.
9  Vague, incomplete hypothetical.
10         THE WITNESS:  Could you --
11  BY MR. O'CONNOR:
12     Q.   Sure.  So if you had a
13  situation where Manufacturer A received a
14  suspicious order from Distributor A, is
15  it fair to say that Manufacturer B does
16  not have an obligation to report that
17  order?
18         MR. FINKELSTEIN:  Same
19  objection.
20         THE WITNESS:  I'm trying to
21  follow your logic on this one.
22  Can you give me -- try one more
23  time.
24

67 (Pages 262 to 265)

Highly Confidential - Subject to Further Confidentiality Review

Page 1176

1  distributor of controlled substances,
2  correct?
3       MR. FINKELSTEIN: Scope.
4       THE WITNESS:  Correct.
5  QUESTIONS BY MS. FUMERTON:
6       Q.   And that's true for Rite Aid as
7  well, correct?
8       MR. FINKELSTEIN:  Scope.
9       THE WITNESS:  Yes.
10  QUESTIONS BY MS. FUMERTON:
11       Q.   And Walgreens, CVS and HBC
12  Giant Eagle, correct?
13       MR. FINKELSTEIN:  Scope.
14       THE WITNESS:  Yes.
15  QUESTIONS BY MS. FUMERTON:
16       Q.   And would you agree that
17  nonmembers -- well, let me strike that.
18       You would agree that there may
19  be reasons why nonmembers of HDMA do not need
20  to follow HDMA guidelines, correct?
21       MR. FINKELSTEIN:  Scope.
22  Vague.
23       THE WITNESS:  I don't even know
24  that the HDMA members have to follow
25  the guidelines either.  I mean, the

Page 1177

1       registrants have to make their
2       decisions based on the registration.
3       HDMA is not a registrant.
4  QUESTIONS BY MS. FUMERTON:
5       Q.   You would agree that nonmembers
6  of HDMA might have different business models
7  than HDMA members, correct?
8       A.   Yes.  Yes.
9       MR. FINKELSTEIN:  Wait a
10  minute.
11       THE WITNESS:  Oh, sorry.
12       MR. FINKELSTEIN:  Scope.  Calls
13  for speculation.
14  QUESTIONS BY MS. FUMERTON:
15       Q.   And the DEA expects that each
16  registrant will review its own business model
17  and design a SOM system that fits its
18  designed method of distribution, correct?
19       A.   Yes.
20       Q.   Mr. Prevoznik, you're familiar
21  with immediate suspension orders, correct?
22       A.   Yes.
23       Q.   Are immediate suspension orders
24  also sometimes referred to as ISOs?
25       A.   Yes.

Page 1178

1       Q.   And an immediate suspension
2  order gives DEA the power, without notice, to
3  immediately freeze the prescribing ability of
4  a doctor who DEA believes is diverting
5  prescription opioids, correct?
6       A.   Well, it could be used for
7  that.  It could be used for other things,
8  too.
9       Q.   But that's one of the things
10  that it could be used for, correct?
11       A.   Correct.
12       Q.   And an immediate suspension
13  order is an important tool to DEA because it
14  immediately stops the hemorrhaging caused by
15  a doctor who is diverting prescription
16  opioids, correct?
17       A.   Again, yes, but it could be
18  more than that.
19       Q.   So an immediate suspension
20  order gives DEA the ability to immediately
21  stop the diversion and then backtrack and
22  build a criminal case against the diverting
23  doctor, correct?
24       A.   Well, sometimes they run
25  parallel.

Page 1179

1       Q.   Sometimes --
2       A.   So it's already -- both are
3  already ongoing.
4       Q.   Sometimes it can run parallel.
5  But are you also aware that during the 2006
6  to 2015 time frame when Mr. Rannazzisi ran
7  DEA's Office of Diversion Control, DEA
8  sometimes delayed filing an immediate
9  suspension order to allow investigators to
10  gather evidence for a criminal case?
11       MR. FINKELSTEIN:  Scope.
12       THE WITNESS:  I don't have
13  specifics, but I know that that did
14  happen.
15       MS. FUMERTON:  And just to
16  briefly address the scope objection,
17  Mr. Farrell started out with one of
18  his very first questions on day two to
19  Mr. Prevoznik:  "The million dollar
20  question right out of the gate is why
21  didn't the DEA do more?"  And then he
22  went on to ask a series of questions
23  relating to the DEA's actions and to
24  Mr. Patterson's -- and played
25  Mr. Patterson's testimony.

Highly Confidential - Subject to Further Confidentiality Review

Page 1184

1  the process of where a criminal case is being
2  investigated, there's been a delay in the ISO
3  process as they're gathering evidence.  One
4  of the concerns I have, and it goes back to
5  again what Mr. Griffith said, is that cuts
6  against the very argument that we have an
7  imminent problem that we are trying to deal
8  with."
9       Do you see that?
10      A.   Yes.
11      Q.   And so Mr. Patterson was
12  testifying here that the DEA, in fact, was
13  delaying in issuing ISOs to allow criminal
14  investigations to occur, correct?
15      MR. FINKELSTEIN:  Objection.
16  Mischaracterizes the document.
17      You can answer.
18      THE WITNESS:  Yes.
19      MS. SINGER:  Can I just
20  interject and ask that you get copies
21  at the next break in case there's any
22  redirect that needs to be done here?
23  It's a little unfair to question the
24  witness when there isn't a copy of the
25  exhibit.

Page 1185

1       MS. FUMERTON:  Well, you can
2  use one of the government's exhibits
3  or we can get a copy if you need that
4  as well.  But it was used previously,
5  so you should have a copy from the
6  prior time's exhibit.
7       MS. MAINIGI:  It's your
8  document, Linda.
9  QUESTIONS BY MS. FUMERTON:
10      Q.   And then if you go down on that
11  same page, about to the bottom third, you'll
12  see another question from Mrs. Brooks, and
13  she asks:  "And are you saying that the US
14  Attorneys were asking -- as a former
15  US Attorney, are you saying that US Attorneys
16  were asking or telling DEA not to issue
17  ISOs?"
18      And Mr. Patterson replies:  "In
19  trying to gather evidence in their criminal
20  case."
21      Mrs. Brooks responds:  "I
22  understand, but that can take months, if not
23  years, sometimes in criminal cases.  Do you
24  believe that's what happened prior to you
25  coming in October of 2017, that delays

Page 1186

1  happened?"
2       And Mr. Patterson replies:  "I
3  think that's been an ongoing theme of what
4  some of these delays are caused by."
5       Do you see that?
6       A.   Yes.
7       Q.   Do you have any reason to
8  disagree with Mr. Patterson's testimony?
9       MR. FINKELSTEIN:  Scope.
10      THE WITNESS:  No.
11  QUESTIONS BY MS. FUMERTON:
12      Q.   And so that meant that for
13  months, if not years, while these
14  investigations were occurring, the DEA
15  permitted doctors it believed were diverting
16  opioids to continue to divert opioids,
17  correct?
18      MR. FINKELSTEIN:  Foundation.
19  Argumentative.
20      THE WITNESS:  I'm sorry, can
21  you repeat it?
22  QUESTIONS BY MS. FUMERTON:
23      Q.   Sure.
24      And so that means that for
25  months, if not years, the DEA permitted

Page 1187

1  doctors it believed were diverting opioids to
2  continue to divert opioids, correct?
3       MR. FINKELSTEIN:  Same
4  objections.
5       THE WITNESS:  It's possible,
6  yeah.
7       MS. FUMERTON:  I am going to
8  pass the witness at this time.
9       Thank you very much for your
10  time.
11      Can we go off the record while
12  we switch?
13      VIDEOGRAPHER:  We're going off
14  the record.  The time is 4:07.
15   (Off the record at 4:07 p.m.)
16      VIDEOGRAPHER:  We're going back
17  on record.  Beginning of Media File
18  Number 9.  Time is 4:08.
19      EXAMINATION
20  QUESTIONS BY MR. O'CONNOR:
21      Q.   Mr. Prevoznik, I'm Andrew
22  O'Connor.  I represent one of the
23  manufacturers in the case.  We met last time
24  we were here.
25      A.   Good to see you again.

Highly Confidential - Subject to Further Confidentiality Review

Page 1188

1    Q.    Good to see you.
2         I'll try to be brief here.
3         Is it fair for me to say that
4    DEA does not advise registrants on whether
5    they have an adequate and effective
6    suspicious order monitoring program?
7    A.    We don't advise?
8    Q.    Correct.
9    A.    No, I don't think that's fair
10   to say that. I think when we -- when we sit
11   down and talk to them and they present what
12   they're having, we're in listening mode. We
13   offer suggestions, so that would be advising.
14   Q.    Okay. Does DEA approve any
15   particular suspicious order monitoring
16   program?
17   A.    No.
18   Q.    And why is that?
19   A.    Because it's ultimately -- it's
20   incumbent upon the registrant to design and
21   operate the system, so it's a business
22   decision made by the registrant.
23   Q.    And I believe you testified
24   earlier to the fact that one of the reasons
25   is because the registrant is the one that has

Page 1189

1    relevant information.
2         Is that a fair characterization
3    of what you said earlier?
4    A.    They're in a better position.
5    They deal with the customer on a more daily
6    basis.
7    Q.    And would you say they're in a
8    better position than DEA?
9    A.    To assess their customer? Yes.
10   Q.    And to assess the adequacy and
11   effectiveness of their suspicious order
12   monitoring program?
13   A.    I'm sorry, you're losing me on
14   that one.
15   Q.    Would you say that a registrant
16   is in a better position than DEA to assess
17   the adequacy and effectiveness of its
18   suspicious order monitoring program?
19   MR. FINKELSTEIN: Objection.
20   Vague.
21   THE WITNESS: No, I wouldn't
22   agree with that.
23   QUESTIONS BY MR. O'CONNOR:
24   Q.    Okay. So DEA is in a better
25   position than the registrant to assess the

Page 1190

1    program?
2    MR. FINKELSTEIN: Vague.
3    Mischaracterizes prior testimony.
4    THE WITNESS: I think -- I
5    think, again, it's the design and it's
6    the operating. So what is the
7    operating -- what is the registrant
8    doing to make the -- when they
9    implement it, what are they -- what
10   are -- are they following the
11   guidelines that they said that they
12   were going to design, or are they
13   starting the shift to change when a
14   customer comes in and asks for -- is
15   on-boarding. Are they looking at all
16   the parameters that the customer --
17   whether it's the questionnaire. Are
18   they validating all those types of
19   things.
20        It has to do with are they
21   increasing thresholds when they're
22   asked for a threshold increase. Are
23   they just arbitrarily increasing it to
24   some higher number or is there a
25   scientific basis that makes that

Page 1191

1    determination.
2         So that's what we look at when
3    we go back and look at the system.
4    QUESTIONS BY MR. O'CONNOR:
5    Q.    I just want to get back to my
6    question, because I had understood your
7    testimony earlier today to be that DEA would
8    not weigh in on the adequacy of a suspicious
9    order monitoring program because it was the
10   registrant and not DEA who had the right
11   information to make that assessment.
12   MR. FINKELSTEIN: Asked and
13   answered. Mischaracterizes prior
14   testimony.
15   QUESTIONS BY MR. O'CONNOR:
16   Q.    Do you agree with my
17   characterization of what you said earlier
18   today?
19   A.    No, I don't agree with your
20   characterization.
21   Q.    Okay. So do you think the DEA
22   then is in a better position to make
23   assessments about the suspicious order
24   monitoring programs than the registrants are?
25   MR. FINKELSTEIN: Vague. Asked

103 (Pages 1188 to 1191)

Highly Confidential - Subject to Further Confidentiality Review

Page 1236

1    it.
2        Q.   Okay.  But they could choose to
3    ship it if they wanted to.  That's a business
4    judgment, right?
5        MR. FINKELSTEIN:
6    Mischaracterizes prior testimony.
7        THE WITNESS:  They could ship
8    it if they -- yeah, it's a business
9    decision.
10   QUESTIONS BY MS. MAINIGI:
11       Q.   So let's say they choose to not
12   ship it and hold the order.  Are they then
13   required to not ship any orders to that same
14   customer?
15       MR. FINKELSTEIN:  Incomplete
16   hypothetical.  Asked and answered.
17       THE WITNESS:  Have they
18   alleviated the suspicion?  Did they do
19   anything to alleviate the suspicion?
20       If they haven't alleviated the
21   suspicion, then it's still a
22   suspicious order.
23   QUESTIONS BY MS. MAINIGI:
24       Q.   Okay.  I'm not talking about
25   that order; I'm talking about any additional

Page 1237

1    orders that may not appear suspicious.
2        So let's say they take a while
3    to investigate that particular suspicious
4    order.  They don't send it out.  But in the
5    meantime they have in the queue other orders
6    from that pharmacy that do not look
7    suspicious to them.
8        MR. FINKELSTEIN:  Incomplete --
9    QUESTIONS BY MS. MAINIGI:
10       Q.   Are they okay to ship those
11   orders?
12       MR. FINKELSTEIN:  Incomplete
13   hypothetical.
14       THE WITNESS:  Well, I think if
15   they have one in the queue that's
16   already saying it's suspicious, then I
17   would -- I would think that they would
18   be at least questioning it like, well,
19   what are they doing?
20   QUESTIONS BY MS. MAINIGI:
21       Q.   Are they required to hold the
22   other orders that they don't deem to be
23   suspicious, or is it okay to exercise their
24   business judgment to send those orders on?
25       MR. FINKELSTEIN:  Asked and

Page 1238

1    answered.  Incomplete hypothetical.
2        And I'd appreciate the break.
3        THE WITNESS:  Could you please
4    repeat it?
5    QUESTIONS BY MS. MAINIGI:
6        Q.   Are they required to hold the
7    other orders that they don't view to be
8    suspicious, or is it okay for the distributor
9    in that instance to exercise their business
10   judgment and send those nonsuspicious orders
11   out?
12       MR. FINKELSTEIN:  Asked and
13   answered.  Incomplete hypothetical.
14       THE WITNESS:  Yes.
15   QUESTIONS BY MS. MAINIGI:
16       Q.   Yes what?
17       A.   They can.
18       Q.   Okay.  They can ship those
19   other orders out?
20       A.   Yes.
21       MS. MAINIGI:  Okay.  Let's go
22   ahead and take your break.
23       VIDEOGRAPHER:  We're going off
24   record.  The time is 4:53.
25       (Off the record at 4:53 p.m.)

Page 1239

1        VIDEOGRAPHER:  We're going back
2    on record, beginning of Media File
3    Number 12.  The time is 5:03.
4    QUESTIONS BY MS. MAINIGI:
5        Q.   So, Mr. Prevoznik, just
6    following up on our last line of questioning,
7    is it fair to say that DEA has no internal
8    policy defining the circumstances under which
9    a distributor is required to terminate the
10   distribution of controlled substances to a
11   pharmacy?
12       MR. FINKELSTEIN:  Objection.
13   Mischaracterizes his prior testimony.
14       THE WITNESS:  Could you please
15   repeat that?
16   QUESTIONS BY MS. MAINIGI:
17       Q.   Sure.
18       Is it fair to say that DEA has
19   no internal policy defining the circumstances
20   under which a distributor is required to
21   terminate the distribution of controlled
22   substances to a pharmacy?
23       A.   Yes.
24       Q.   Now, do you recall being asked
25   last time a number of questions about the

115 (Pages 1236 to 1239)