# **EXHIBIT 9**

```
                                                        Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3
       _____
 4
       IN RE:  NATIONAL PRESCRIPTION      MDL No. 2804
 5     OPIATE LITIGATION                  Case No. 17-md-2804
 6
       This document relates to:          Judge Dan
 7                                        Aaron Polster
 8     The County of Cuyahoga v. Purdue
       Pharma, L.P., et al.
 9     Case No. 17-OP-45005
10     City of Cleveland, Ohio vs. Purdue
       Pharma, L.P., et al.
11     Case No. 18-OP-45132
12     The County of Summit, Ohio,
       et al. v. Purdue Pharma, L.P.,
13     et al.
       Case No. 18-OP-45090
14     _____
15
16
17
18         Videotaped Deposition of Joseph Rannazzisi
19                    Washington, D.C.
20                    April 26, 2019
21                      8:37 a.m.
22
23
24     Reported by:  Bonnie L. Russo
25     Job No. 3301876
```

Page 258

1  BY MS. MAINIGI:
2  Q. From the counsel's office?
3  A. Counsel's office and my staff.
4  Q. So what is a suspicious order?
5  A. Well, according to 1301.74(b), it's
6  an order of unusual size, frequency or
7  substantially deviating from the normal
8  ordering pattern.
9  Q. And so you said one of the things
10 that were told or -- to the distributors, in
11 addition to providing them the regulations at
12 these meetings, you said they were told what a
13 suspicious order is, right?
14 A. They were.
15    MS. SINGER: Objection. Misstates
16 the witness's prior testimony.
17    MR. BENNETT: Same objection.
18    MR. UTTER: Same objection.
19    Go ahead.
20    THE WITNESS: They were provided
21 with the regulation. They discussed the
22 regulation. They answered questions related to
23 the regulation, and then they showed specific
24 examples of what a suspicious order would look
25 like based on the transactions conducted by

Page 259

1  each individual distributor.
2     BY MS. MAINIGI:
3  Q. So to your understanding -- have you
4  ever described, and I don't need to know any
5  names, but just generically, have you ever
6  described to a registrant what a suspicious
7  order is?
8  A. I have -- I'm sure that I have
9  spoken to registrants in registrant meetings,
10 you know, in conferences where I have explained
11 what a suspicious order is.
12 Q. How do you explain it?
13 A. It's an order of unusual size,
14 frequency or substantially deviating from the
15 normal ordering pattern.
16 Q. Those are essentially the exact
17 words from the regulation, correct?
18 A. Yes.
19 Q. And have you ever provided to a
20 registrant any elaboration on that definition?
21 A. Definition seems pretty
22 straightforward.
23 Q. Have registrants asked you for an
24 elaboration on that definition?
25 A. Yes, and we have explained -- or not

Page 260

1  we, the staff has explained to them exactly
2  what is expected of them. If I am not
3  mistaken, it was also in Southwood.
4  Q. Okay. So that is what I am trying
5  to get to.
6     When the staff then or you explained
7  exactly what is expected, tell me what you said
8  back then.
9  A. Well, I wouldn't know.
10    MR. BENNETT: Objection.
11 Foundation.
12    You can answer.
13    BY MS. MAINIGI:
14 Q. You wouldn't know?
15 A. I know this is a suspicious order.
16 I -- what the staff would do is when they'd
17 come in and say, well, we are confused about
18 something or I don't understand this, they
19 would sit down with them and they would say,
20 okay, explain why and explain what you're
21 confused about or whatever it is, and then they
22 would explain what the requirements are under
23 the regulations. So, you know, again, it's
24 pretty straightforward regulation, unusual
25 size, unusual frequency.

Page 261

1  Q. So what is an order of unusual size?
2  A. An order of unusual size is a
3  pattern, we will say, a pharmacy that has been
4  ordering 5,000 tablets of Hydrocodone every
5  month for the last three years and they all of
6  a sudden bump it up to 20,000, then 50,000,
7  then a hundred thousand and so on. That's
8  unusual size.
9  Q. So it's unusual compared to their
10 past practice?
11 A. Yes. One of the factors.
12 Q. What other factors?
13    MR. BENNETT: Objection. Scope.
14    THE WITNESS: They would be looking
15 at other pharmacies that they service in that
16 area, a pharmacy might have an unusually high
17 purchase of a specific controlled substance in
18 an area where everybody else was fairly
19 consistent. That is unusual size as well.
20 Q. Just a large size compared to other
21 pharmacies in the area?
22 A. Yes.
23 Q. But that large size could perhaps be
24 explained by nonsuspicious reasons, correct?
25 A. That's due diligence.

Page 262

1  Q.  Anything else that defined unusual
2  size in your mind?
3       MR. BENNETT:  Objection.  Scope.
4  Objection.  Incomplete hypothetical.
5       THE WITNESS:  I'm sure there are
6  other things but right now at this current
7  moment, I don't have them right off the top of
8  my head.
9       MS. SINGER:  Is this a good time to
10 take a break or sometime soon?
11      BY MS. MAINIGI:
12 Q.  Can you keep going for a few more
13 minutes, Mr. Rannazzisi?
14 A.  Yes, about five more minutes.
15 Q.  Okay.  Let's go a couple more
16 minutes.
17      What is an order deviating
18 substantially from a normal pattern?
19 A.  A pharmacy --
20      MR. BENNETT:  Objection.  Scope.
21      You can answer.
22      THE WITNESS:  A pharmacy that is
23 ordering Hydrocodone on a regular basis and all
24 of a sudden, he starts ordering large
25 quantities of hydromorphone for no apparent

Page 263

1  reason, and there is no documentation why, and
2  that might exceed the amount of Hydrocodone.
3  That's -- he never ordered it before and now he
4  is ordering quantities that are inconsistent
5  with what he has previously done.
6       BY MS. MAINIGI:
7  Q.  That's kind of the same as unusual
8  size, right?
9  A.  No.
10 Q.  It's different?
11      MR. BENNETT:  Objection.
12      BY MS. MAINIGI:
13 Q.  How are those two different?
14 A.  Well, it's a pattern.  You've
15 established a pattern of purchasing, and now
16 all of a sudden, you are inserting a new drug
17 in that pattern of purchasing.  It doesn't have
18 to be Hydrocodone or hydromorphone.  It could
19 be alprazolam, it could be clonazepam, it could
20 be diazepam, it could be any pattern that --
21 anything that is different from your normal
22 ordering pattern, so if all of a sudden, he
23 starts -- or the person starts ordering 500
24 count bottles of alprazolam 2 milligrams, well,
25 that is not within the normal ordering pattern,

Page 264

1  or he's ordering carisoprodol, he never ordered
2  carisoprodol before, now all of a sudden he is
3  ordering carisoprodol.  That is an ordering
4  pattern deviation.
5  Q.  And the phraseology is deviating
6  substantially so what -- tell me what
7  substantially means.
8       MR. BENNETT:  Objection.  Scope.
9  Objection.  Incomplete hypothetical.
10      THE WITNESS:  Substantially means
11 just that.  It was -- it is something that
12 triggers an inquiry because it's not something
13 that has happened in the past.  It is not
14 something that was done in the past.
15      BY MS. MAINIGI:
16 Q.  Okay.  And unusual frequency, what
17 does that mean?
18      MR. BENNETT:  Objection.  Scope.
19      THE WITNESS:  A person orders
20 Hydrocodone once a week and all of a sudden, he
21 is ordering it once a day.
22      BY MS. MAINIGI:
23 Q.  And doesn't that overlap with order
24 deviating substantially from a normal pattern?
25 A.  No.  It's a frequency.  It's not a

Page 265

1  pattern.  A pattern is drugs and types of drugs
2  they are ordering, a frequency is just that,
3  the frequency of purchases.  Quantity is the
4  quantity of purchases.
5  Q.  Okay.
6       MS. MAINIGI:  Should we go ahead and
7  take a break.
8       THE VIDEOGRAPHER:  We are going off
9  the record.  This is the end of Media Unit No.
10 5.  The time is 2:59.
11      (A short recess was taken.)
12      THE VIDEOGRAPHER:  We are going back
13 on the record.  This is the start of Media Unit
14 No. 6.  The time is 3:13.
15      You may proceed, Counsel.
16      MS. MAINIGI:  Counsel for the
17 government, I just wanted to address some of
18 the scope objections that you made, which I do
19 think are improper.
20      In your authorization letter of
21 December 10, 2018, you authorize, among other
22 areas for Mr. Rannazzisi, your personal
23 recollection of your communications with DEA
24 registrants about what makes an order
25 suspicious under 21 C.F.R. Section 1301.74,

Page 270

1  description. Can you help me figure out
2  whether I should report this as a suspicious
3  order?
4      MS. SINGER: Objection.
5  Hypothetical. Calls for speculation.
6      MR. UTTER: Same objections.
7      Go ahead.
8      THE WITNESS: I don't know, that's
9  never been presented to me before, so I would
10 be -- I would be guessing what the answer was.
11     BY MS. MAINIGI:
12   Q.   You are not aware of whether, as the
13 head of the anti-diversion control, that
14 registrants would call seeking elaboration on
15 whether what they had in front of them was a
16 suspicious order or not to be reported?
17     MS. SINGER: Objection.
18 Argumentative.
19     MR. BENNETT: Objection. Asked and
20 answered.
21     THE WITNESS: In my role as the head
22 of the Office of Diversion Control, I have a
23 lot of different things going on at once, and
24 I'm sure that if there was a question that they
25 couldn't answer, they would pop their head into

Page 271

1  my office and say this is what came about, what
2  do you think. But no, I don't recall that ever
3  happening before. So they seemed to be able to
4  handle it.
5      BY MS. MAINIGI:
6    Q.   You don't know what they might have
7  told a registrant about what defines a
8  suspicious order, correct?
9      MR. BENNETT: Objection.
10 Foundation.
11     MS. SINGER: Objection. Foundation.
12     THE WITNESS: The liaison and policy
13 section, as well as the other sections are
14 trained to provide answers that were in
15 compliance with the regulations in the
16 Controlled Substances Act.
17     BY MS. MAINIGI:
18   Q.   So, for example, you gave -- I asked
19 you before we broke whether pattern and
20 frequency, whether those two terms could
21 overlap, that they could encompass the same
22 type of order, correct?
23   A.   Yes.
24   Q.   And you told me, no, that they are
25 not intended to overlap and you explained to me

Page 272

1  why the term pattern and the term frequency
2  were different.
3      Do you recall that?
4    A.   Yes.
5      MS. SINGER: Objection. Misstates
6  the witness's prior testimony.
7      THE WITNESS: Again, I explained to
8  you what an unusual size pattern substantially
9  deviating from the norm or -- and frequency,
10 unusual frequency.
11     BY MS. MAINIGI:
12   Q.   Do you recall, though, I asked you a
13 question about, could pattern and frequency be
14 the same?
15   A.   I don't recall that exact question.
16   Q.   Okay. Well, do you recall me
17 walking through what normal pattern meant to
18 you and what unusual frequency meant to you?
19   A.   I recall me giving you a definition,
20 my definition of what normal pattern and
21 unusual frequency is.
22   Q.   And then do you recall me following
23 -- do you recall me following up and saying,
24 well, couldn't your definition of frequency or
25 unusual frequency be the same as unusual

Page 273

1  pattern?
2    A.   Again, my answer would be depending
3  on the facts and the suspicious order that had
4  come in, the transaction that had come in, the
5  request for the transaction that had come in.
6  I would have to look at each individual one and
7  see if there is an overlap or not. But I would
8  have to look at the transaction and the
9  request.
10   Q.   So sometimes, there could be an
11 overlap between unusual frequency and unusual
12 pattern and sometimes, there wouldn't be; is
13 that right?
14     MS. SINGER: Objection. Misstates
15 the witness's prior testimony.
16     MR. BENNETT: Objection. Incomplete
17 hypothetical. Calls for speculation.
18     MR. UTTER: Same objections.
19     Go ahead.
20     THE WITNESS: Each individual
21 suspicious order, if -- if it rises to a
22 suspicious order, it could meet criteria. But
23 it -- again, it depends on the facts of that
24 order and that transaction, the -- the -- the
25 pharmacy that's making that purchase.

Page 274

1   But in the end, it's up to the
2 distributor to decide whether they're going to
3 fill the order or not. It's a business
4 decision.
5   BY MS. MAINIGI:
6   Q. It's a business decision as to
7 whether something is a suspicious order as
8 well, correct?
9   A. Yes.
10   Q. And it may be that one business
11 faced with a particular order makes a different
12 decision on the exact same order than another
13 business, correct?
14   MS. SINGER: Objection.
15 Hypothetical. And calls for the witness to
16 speculate.
17   MR. BENNETT: And objection. Scope.
18   THE WITNESS: It depends on the type
19 of due diligence they're doing on their
20 customers; whether they know their customers
21 and what their customers' normal ordering
22 patterns are; where is their customer situated;
23 is the customer close to a hospital; is the
24 customer close to -- is in a rural area.
25   There's so many dynamics that the

Page 275

1 drug enforcement administration doesn't have.
2 Only the business, the distributor, the
3 registrant has that information.
4   So if you're calling the Drug
5 Enforcement Administration to -- to -- to get
6 an okay to release an order, that's not going
7 happen. Because the Drug Enforcement
8 Administration does not know your customer.
9 You know the customer.
10   BY MS. MAINIGI:
11   Q. Only the business, at that point in
12 time, looking at the information before it as
13 well as its due diligence, can make the
14 business decision about whether something is a
15 suspicious order, correct?
16   MS. SINGER: Objection. Misstates
17 the witness's prior testimony.
18   MR. BENNETT: And objection. Scope.
19   THE WITNESS: Based on the facts of
20 the particular order and the customer, they are
21 required to make a decision on whether to file
22 the suspicious order and not ship or ship.
23   If they ship the order and it's not
24 been deemed to be -- their -- their suspicions
25 have not been resolved, then they're not

Page 276

1 maintaining effective controls against
2 diversion.
3   BY MS. MAINIGI:
4   Q. How does the DEA then go back after
5 the fact and determine that something was
6 suspicious?
7   MS. SINGER: Objection. Lacks
8 foundation.
9   MR. BENNETT: Objection. Scope.
10 Also objection.
11   You are not authorized to disclose
12 information regarding any specific DEA
13 investigations or activities or any information
14 that would reveal the internal deliberative
15 process of the DEA.
16   To the extent that you can answer
17 the question without disclosing those, you may
18 answer the question.
19   THE WITNESS: I can't. I can't
20 answer it that way.
21   BY MS. MAINIGI:
22   Q. You can't tell me how the DEA would
23 then go back and figure out whether something
24 is suspicious or not?
25   A. It's part of the --

Page 277

1   MR. BENNETT: I'll say --
2   THE WITNESS: -- investigative
3 process.
4   MR. BENNETT: And I will say same
5 instruction regarding the scope of your
6 authorization.
7   BY MS. MAINIGI:
8   Q. So let me come back to -- to this --
9 so you gave me your elaboration and further
10 definition of some of the terminology in 21
11 C.F.R. 1301.74, right?
12   A. Yes.
13   Q. But your elaboration, your further
14 definition of unusual size, pattern, frequency,
15 that's not in the regulation itself, right?
16   MR. BENNETT: Objection.
17   THE WITNESS: No.
18 Oh.
19   MR. BENNETT: Form.
20 Go ahead.
21   THE WITNESS: No, it's not in the
22 regulation.
23   BY MS. MAINIGI:
24   Q. And the elaboration that you
25 provided me on those terms -- unusual size,

Page 278

1 pattern, and frequency -- that elaboration is
2 not in any sort of written guidance, is it, to
3 your knowledge?
4     A.  With the exception of the three
5 letters that discussed suspicious order
6 monitoring and the fact that we sat down with
7 each individual distributor and talked about
8 it.
9         It was discussed in the Southwood
10 decision.  Other than that, no.
11    Q.  Okay.  Let's go through those.
12    A.  Okay.
13    Q.  Is it fair to say that the way you
14 defined or further defined unusual size for me
15 might be different than the way your deputy at
16 the time might have defined unusual size to a
17 registrant?
18        MS. SINGER:  Objection.  Calls for
19 speculation.
20        MR. BENNETT:  Same objection.
21        MR. UTTER:  Objection.
22        Go ahead.
23        THE WITNESS:  I don't know exactly
24 what my deputy or any of the other people would
25 use as an example.  I used -- I gave you

Page 279

1 examples of what my -- my position of what an
2 unusual size is or an unusual frequency.
3        Deposition is based on, you know,
4 my -- my own personal knowledge of how this
5 works plus other -- plus previous cases that
6 have been made public.
7        BY MS. MAINIGI:
8    Q.  Sitting here today, you can't tell
9 me that your definition of unusual size is the
10 same as Michael Mapes's definition of unusual
11 size, right?
12       MS. SINGER:  Objection.  Calls for
13 speculation.  Argumentative.
14       THE WITNESS:  I don't know --
15       MR. BENNETT:  Objection.  Form.
16 Objection.  Scope.
17       THE WITNESS:  I don't know what Mr.
18 Mapes's definition of unusual size is.  But I'm
19 pretty sure it's pretty consistent with what my
20 definition is.
21       BY MS. MAINIGI:
22   Q.  Have you guys compared notes on
23 that?
24   A.  No.  But based on the previous cases
25 we've done, it's pretty -- pretty easy to see a

Page 280

1 pattern of unusual size.
2    Q.  I thought pattern and size were two
3 different barometers.
4    A.  It -- they are.  But what I'm
5 talking about, unusual size when you have a --
6 a pharmacy that's been ordering a certain
7 amount for a long period of time, and then all
8 of a sudden they bump up their purchases for no
9 reason.
10       They haven't changed their area.
11 They haven't moved near a hospital.  And then
12 they continue to increase without anybody
13 filing a suspicious order, without anybody
14 going out and doing due diligence.
15       Okay.  That -- that's -- that's an
16 unusual size that should be followed up.
17   Q.  And do you think your definition of
18 unusual size would be the same as Mr. Wright's
19 definition of unusual size?
20   A.  I don't --
21       MS. SINGER:  Objection.  Calls for
22 speculation.
23       MR. BENNETT:  Objection.  Form.
24 Objection.  Scope.
25       Go ahead.

Page 281

1       THE WITNESS:  I don't know what Mr.
2 Wright's definition is on unusual size.  But
3 it's pretty straightforward.  Unusual size is
4 just that, an unusual size.
5       BY MS. MAINIGI:
6   Q.  Why did your division never write
7 down the further elaboration of the terms
8 "unusual size," "pattern" or "frequency" --
9       MS. SINGER:  Objection.  Found --
10       BY MS. MAINIGI:
11   Q.  -- for distributors?
12       MS. SINGER:  Sorry.
13       Objection.  Foundation.  And
14 objection.  Scope.
15       MR. BENNETT:  And I would object
16 that it misstates prior testimony.
17       And also I would inform the witness
18 that you are not authorized to disclose the
19 internal deliberative process of DEA or
20 information that would disclose nonpublic
21 recommendations you made or you're aware of
22 concerning any proposed agency action.
23       To the extent that you can answer
24 the question without disclosing that, you may
25 answer.

71 (Pages 278 - 281)

Page 282
1  THE WITNESS: In those limitations,
2  I can't answer that question.
3  BY MS. MAINIGI:
4  Q. Well, let me ask it this way: Has
5  DEA provided in written form your explanation
6  and elaboration of what a suspicious order is
7  to registrants?
8  A. Not as far as I'm aware. But again,
9  I gave you an explanation my opinion of what a
10  suspicious order of unusual size, frequency or
11  deviating substantially from the normal
12  ordering pattern. That was an -- examples and
13  a nonexhaustive list of what, in my opinion,
14  those are.
15  But in the end, only the distributor
16  could make a decision about what a suspicious
17  order of unusual size is.
18  Q. And, in fact, under your leadership,
19  you felt so strongly, Mr. Rannazzisi, that only
20  a distributor could decide what an unusual size
21  was or what a suspicious order was that you
22  essentially told your department not to provide
23  explanations and elaborations to registrants,
24  correct?
25  MS. SINGER: Objection.

Page 283
1  Argumentative. Lack of foundation. Compound
2  question.
3  MR. BENNETT: I join those
4  objections.
5  And I also indicate that the witness
6  is not authorized to disclose any nonpublic
7  recommendations you made or you're aware of
8  regarding any proposed agency action or reveal
9  the internal deliberative process within the
10  Department of Justice or the DEA.
11  MR. UTTER: Go ahead.
12  THE WITNESS: I've --
13  MR. BENNETT: Otherwise you can
14  answer.
15  THE WITNESS: Yeah. I've never
16  advised any of my people, while I was the head
17  of the Office of Diversion Control, not to
18  elaborate. And that wouldn't come from me
19  anyway. It could come from counsel's office.
20  BY MS. MAINIGI:
21  Q. And sitting here today, you don't
22  know, Mr. Rannazzisi, when Mr. Mapes or
23  Mr. Wright were asked to elaborate on what they
24  thought a suspicious order was, what they told
25  order registrants at distributor initiative

Page 284
1  meetings, correct?
2  MS. SINGER: Objection. Asked and
3  answered. Lack of foundation. Calls for
4  speculation.
5  THE WITNESS: I don't know exactly
6  what they said. But I know they followed the
7  regulation, which is unusual size, frequency,
8  substantially deviating from the normal
9  ordering pattern.
10  BY MS. MAINIGI:
11  Q. You mentioned the Southwood decision
12  as being perhaps instructive to the registrant
13  community about what a suspicious order was,
14  correct?
15  A. Yes.
16  Q. How was it instructive?
17  A. It explained what the
18  responsibilities were for suspicious order
19  monitoring. It explained what the requirements
20  were to maintain effective controls against
21  diversion. It explained that, you know, using
22  an example of a company that actually was
23  involved in this type of activity, what they
24  did and what the results of what they did were.
25  Q. Now, Southwood was an Internet

Page 285
1  pharmacy?
2  A. Southwood was a manufacturer -- a
3  repackager, I guess they would be, who supplied
4  Internet, among other types of registrants.
5  Q. So they were a supplier to an
6  Internet pharmacy?
7  A. They were a supplier to several
8  different registrant classes.
9  Q. And so what are some of the specific
10  elaborations of what goes into a suspicious
11  order monitoring system that come from
12  Southwood?
13  A. I don't have the decision. And I
14  read that decision a long time ago. But -- but
15  that's why the decision was included in the
16  December of 2007 letter to the registrant.
17  Q. And if I go to the Southwood
18  decision, I -- I would learn more about what
19  the DEA wants to see in the suspicious order
20  monitoring system?
21  A. I think --
22  MS. SINGER: Objection. Calls for
23  speculation.
24  THE WITNESS: I don't --
25  MR. BENNETT: Objection. Form.

Page 314

1  BY MS. MAINIGI:
2  Q. Are they guidance in the way that I
3  originally posed the question to you, meaning
4  you are familiar with the concept of federal
5  agencies issuing guidance?
6      MS. SINGER: Objection. Compound
7  question.
8      MR. BENNETT: Objection. Vague.
9      MS. SINGER: Calls for a legal
10 conclusion.
11     THE WITNESS: Are you talking about
12 notice and comment?
13     BY MS. MAINIGI:
14 Q. Does guidance go through notice and
15 comment?
16 A. Rulemaking regulations go through
17 notice and comment.
18 Q. Guidance doesn't go through notice
19 and comment, right?
20 A. No.
21 Q. And, in fact, was it around this
22 time that President Bush issued an executive
23 order that essentially stated that guidance is
24 not the same as law?
25     MS. SINGER: Objection. Foundation.

Page 315

1  Calls for a legal conclusion. Scope.
2      MR. BENNETT: I join those
3  objections.
4      MR. UTTER: Same objections.
5      Go ahead.
6      THE WITNESS: I don't know about
7  that particular -- I don't know about what
8  President Bush put out, but I can tell you that
9  there is nothing in these documents that
10 changes what the regulation and the statute
11 said, so if there is nothing in the document
12 that changes what the regulation and the
13 statute is, then, you know, it's just a letter
14 informing the registrant community of what
15 their obligations are.
16     BY MS. MAINIGI:
17 Q. With respect to coming back to
18 suspicious order monitoring systems, it was the
19 obligation of the registrant to essentially
20 come up with their own suspicious order
21 monitoring system, correct?
22 A. Yes, to design and operate the
23 system.
24 Q. And there was not any sort of
25 guidance or checklist that were provided by DEA

Page 316

1  to registrants as to what was required to be in
2  a suspicious order monitoring system, correct?
3      MS. SINGER: Objection. Vague.
4      THE WITNESS: The regulation stands
5  on its own. I believe the regulation says, the
6  registrant shall design and operate a system
7  that identifies and reports suspicious orders.
8      Again, it's a business decision
9  based on what the registrant's needs are and
10 the Drug Enforcement Administration does not
11 tell a registrant what that specific system
12 should look like.
13     MR. BENNETT: Counsel, we -- it is
14 after 4:00 and I know we are planning on ending
15 right around 5. Would this be an appropriate
16 time to take our last break for the day?
17     MS. MAINIGI: Sure. We can take a
18 break.
19     THE VIDEOGRAPHER: We are going off
20 the record. This is the end of Media Unit No.
21 6. The time is 4:05.
22     (A short recess was taken.)
23     THE VIDEOGRAPHER: We are going back
24 on the record. This is the start of Media Unit
25 No. 7. The time is 4:18.

Page 317

1      You may proceed, Counsel.
2      BY MS. MAINIGI:
3  Q. Mr. Rannazzisi, I am just looking
4  for a yes or no on the following question:
5  Does DEA have internal guidance as to what is a
6  suspicious order?
7      MR. BENNETT: Objection. Scope.
8      You can answer the question yes or
9  no only.
10     THE WITNESS: No.
11     BY MS. MAINIGI:
12 Q. And for clarity, let me focus you on
13 time periods with that same question.
14     Let's say from the 2005 through the
15 time you left DEA in 2016, that is the time
16 period, in that time period of 2005 to 2016,
17 yes or no, did DEA have internal guidance as to
18 what constitutes a suspicious order?
19     MR. BENNETT: Objection. Scope.
20     You can answer that question yes or
21 no only.
22     THE WITNESS: No.
23     BY MS. MAINIGI:
24 Q. In the time period 2005 to 2016, yes
25 or no, did DEA have internal guidance as to

Page 318

1  what constituted a suspicious order monitoring
2  system that complied with regulations?
3      MR. BENNETT: Objection. Scope.
4      You can answer that question yes or
5  no only.
6      THE WITNESS: I don't know about
7  2016, but for 2005 to 2015, no.
8      BY MS. MAINIGI:
9   Q.  DEA expected registrants to update
10 their suspicious order monitoring systems to
11 adopt to changing environments, correct?
12     MR. BENNETT: Objection. Scope.
13 Objection. Vague.
14     MR. UTTER: Go ahead.
15     THE WITNESS: DEA expected the
16 registrant, the distributor registrants and the
17 manufacturing registrants to design and operate
18 a system that will identify and report
19 suspicious orders.
20     BY MS. MAINIGI:
21  Q.  And did DEA expect that a registrant
22 would update their suspicious order monitoring
23 system to adopt to a changing environment?
24     MS. SINGER: Objection. Vague.
25     MR. BENNETT: Objection. Vague.

Page 319

1  Objection. Scope.
2      MR. UTTER: Objection. Asked and
3  answered.
4      You can answer again.
5      THE WITNESS: Again, the answer is
6  that we expect them to design and operate a
7  system that identifies suspicious orders.
8      BY MS. MAINIGI:
9   Q.  Would a system that identifies
10 suspicious orders in 2002, in your mind, be an
11 acceptable system in 2010?
12     MS. SINGER: Objection. Calls for
13 speculation.
14     MR. BENNETT: Objection. Calls for
15 speculation. Incomplete hypothetical and
16 scope.
17     MR. UTTER: Go ahead.
18     THE WITNESS: I don't know because I
19 didn't -- I have never reviewed a 2002
20 suspicious order monitoring system in 2002 or
21 2015. I mean, I don't know. I expect that
22 they will design and operate a system that
23 reports, identifies and reports suspicious
24 orders.
25     BY MS. MAINIGI:

Page 320

1   Q.  So you, yourself, have never even
2  inspected a suspicious order monitoring system,
3  fair?
4      MR. BENNETT: Objection. Misstates
5  testimony. Objection. Scope.
6      THE WITNESS: I have never gone on
7  site and reviewed a suspicious order monitoring
8  system, no.
9      BY MS. MAINIGI:
10  Q.  Have you ever viewed one on paper?
11     MR. SMITH: Objection. Scope.
12     THE WITNESS: I may have looked
13 years ago at the framework of a suspicious
14 order monitoring system on paper.
15     BY MS. MAINIGI:
16  Q.  Do you have an understanding of what
17 would separate an acceptable compliance
18 suspicious order monitoring system from one
19 that was not compliant with regulations?
20     MS. SINGER: Objection. Vague.
21 Foundation. Scope.
22     MR. BENNETT: Join the scope
23 objection.
24     MR. UTTER: Go ahead.
25     THE WITNESS: Again, the suspicious

Page 321

1  order monitoring system has to -- is designed
2  by the distributor -- the registrant, and
3  because it's designed by the registrant, you
4  know, it's their system to design. So I -- you
5  know, again, I'm not sure -- it's their system
6  to design under the regs.
7      BY MS. MAINIGI:
8   Q.  So how does a registrant know that
9  their system is enough that its compliant with
10 the regulations?
11     MS. SINGER: Objection. Calls for
12 speculation.
13     MR. BENNETT: Objection. Scope.
14     THE WITNESS: Because the regs tell
15 them that they must design and operate a system
16 that identifies suspicious orders and they have
17 to report. How they create that system is a
18 business decision and as long as it identifies
19 and reports suspicious orders, then -- and they
20 are comfortable with that system, then they
21 have a system.
22     BY MS. MAINIGI:
23  Q.  So there is more than one way to
24 design a compliant suspicious order monitoring
25 system?

Page 322

1  MR. BENNETT: Objection. Scope.
2  MR. UTTER: Asked and answered for
3 the third time.
4  Go ahead.
5  THE WITNESS: I don't -- I don't
6 know what the different ways of creating a
7 system is. Again, I can only go by what the
8 regulation says and it is up to the registrant
9 to design and operate a system.
10  BY MS. MAINIGI:
11  Q. Was there any single feature that
12 made a system compliant?
13  A. Yes, that they identify suspicious
14 orders or unusual size, frequency or deviating
15 substantially from a normal ordering pattern.
16  Q. Could two companies have different
17 suspicious order monitoring systems and they
18 were both compliant?
19  MS. SINGER: Objection. Calls for
20 the witness to speculate.
21  MR. BENNETT: Objection. Scope.
22  THE WITNESS: Again, I don't -- I
23 don't know. It's up to them to decide what
24 their systems are and without seeing or knowing
25 about -- knowing about each individual system,

Page 323

1 I don't know. I mean, one system could be --
2 could be identifying suspicious orders and
3 another might not identify suspicious orders
4 appropriately.
5  BY MS. MAINIGI:
6  Q. Well, what would you be looking for
7 between those two systems, Mr. Rannazzisi?
8  A. What the reg says. They have to
9 identify suspicious orders.
10  Q. So if both systems are identifying
11 suspicious orders, companies are reporting
12 suspicious orders, is it possible that two
13 companies that have employed two different
14 systems for suspicious order monitoring could
15 both be compliant?
16  MS. SINGER: Objection. Calls for
17 speculation. The question has been asked and
18 answered.
19  MR. BENNETT: Objection. Scope.
20  May I have a continuing objection to
21 -- based on scope to all your questions about
22 suspicious order monitoring systems so I don't
23 have to keep objecting?
24  MS. MAINIGI: No.
25  MR. BENNETT: Objection.

Page 324

1  MR. UTTER: Object to speculation.
2  Go ahead.
3  THE WITNESS: Again, without seeing
4 the systems, is it possible, I'm sure anything
5 is possible, but in the end, it falls back to
6 whether the system can identify -- is designed
7 to identify and report suspicious orders.
8  BY MS. MAINIGI:
9  Q. Well, without naming any company
10 names, Mr. Rannazzisi, as head of diversion
11 control for so many years, were you somehow
12 under the impression that every company had an
13 identical suspicious order monitoring system?
14  MS. SINGER: Objection. Foundation.
15 Vague. Scope.
16  MR. BENNETT: I'll join the scope
17 objection and also objection. Argumentative.
18  MR. UTTER: Go ahead.
19  THE WITNESS: I never really thought
20 about it. I just knew that they were supposed
21 to design and operate a system that identifies
22 suspicious orders. I knew what a suspicious
23 order was by definition, and I expected that
24 they would be the ones to create that system.
25  BY MS. MAINIGI:

Page 325

1  Q. So it's likely then, while you were
2 head of diversion control, that there were
3 companies operating in compliance that had
4 different suspicious order monitoring systems,
5 right?
6  MS. SINGER: Objection. Calls for
7 speculation beyond this witness's experience.
8  MR. BENNETT: Objection. Scope.
9  MR. UTTER: Objection to whether
10 they were in compliance.
11  But go ahead, you can answer.
12  THE WITNESS: Could you repeat that
13 one question, please.
14  BY MS. MAINIGI:
15  Q. Sure. So it's likely then, while
16 you were head of diversion control, that there
17 were companies operating in compliance that had
18 different suspicious order monitoring systems,
19 correct?
20  MS. SINGER: Same objections.
21  MR. UTTER: Same objection.
22  Go ahead.
23  THE WITNESS: In compliance with
24 what? In compliance with the suspicious order
25 monitoring reg?

82 (Pages 322 - 325)

Page 334

1  were no guidelines, right?
2      MS. SINGER: Objection.
3      THE WITNESS: I'm not sure.
4      BY MS. MAINIGI:
5   Q. There were not any guidelines on
6  what made up a successful compliant suspicious
7  order monitoring system, correct?
8      MR. BENNETT: Objection. Vague.
9      THE WITNESS: There didn't need to
10 be guidelines because that was the whole idea
11 behind the regulation, to operate, design and
12 operate a system to identify and report
13 suspicious orders.
14     BY MS. MAINIGI:
15  Q. Now, that regulation came into place
16 in 1971, right?
17  A. 40-plus years, yes.
18  Q. Were there opioids in 1971?
19     MR. BENNETT: Objection. Scope.
20 Lack of foundation.
21     You can answer.
22     MR. UTTER: Go ahead.
23     THE WITNESS: If you're defining
24 opioids as the semisynthetic or synthetic
25 versions, yes, there were opioids.

Page 335

1      BY MS. MAINIGI:
2   Q. There were opioids in 1971?
3   A. Yes.
4   Q. What were they?
5      MR. BENNETT: Objection. Scope.
6      THE WITNESS: Codeine, morphine,
7  hydromorphone, Hydrocodone, but not in the
8  tablet form, opium, Methadone, quite a few.
9      BY MS. MAINIGI:
10  Q. So no need for additional guidelines
11 because the regulation and the wording of the
12 regulation stood the test of time, right?
13     MS. SINGER: Objection. Asked and
14 answered. Argumentative.
15     MR. BENNETT: Objection.
16 Argumentative. Objection. Scope.
17     MR. UTTER: Go ahead.
18     THE WITNESS: Again, the regulation
19 is the regulation. That's what we followed,
20 yes.
21     BY MS. MAINIGI:
22  Q. Was there a point in time either
23 before -- right before your departure or right
24 after your departure, that you understood that
25 there was a movement within DEA to amend the

Page 336

1  regulations to provide greater specificity?
2      MS. SINGER: Objection. Lack of
3  foundation.
4      BY MS. MAINIGI:
5   Q. Yes or no.
6      MR. BENNETT: Objection. Scope.
7      You are not authorized to disclose
8  any information that would reveal the internal
9  deliberative process within DEA, information
10 that would reveal nonpublic recommendations you
11 made or you're aware of concerning any proposed
12 agency action.
13     To the extent that you are aware of
14 any public recommendations concerning any
15 proposed agency action, you may answer. To the
16 extent if there is any nonpublic, you may not
17 answer.
18     MR. UTTER: Go ahead.
19     THE WITNESS: I -- no.
20     BY MS. MAINIGI:
21  Q. No, what?
22  A. You asked me if I knew of any
23 movement within DEA to change the suspicious
24 order monitoring regulation and the answer is
25 no.

Page 337

1   Q. Okay. Now, in one of your prior
2  answers, you referenced other components
3  including counsel's office.
4      Without detailing for me or telling
5  me at all about any conversations that involved
6  counsel's office, did you mean by that that if
7  someone asked, is my suspicious order
8  monitoring system compliant, that you would
9  refer them to counsel's office for an answer?
10     MS. SINGER: Objection. Calls for
11 speculation.
12     MR. BENNETT: Objection. Misstates
13 testimony.
14     MR. UTTER: Go ahead.
15     THE WITNESS: Counsel's office was
16 always consulted on matters of suspicious
17 orders and other matters like that. But again,
18 when I am talking about other components, you
19 have an investigative team and pharmaceutical
20 investigations. You have an investigative
21 regulatory team and regulatory investigations.
22 You have liaison and policy, counsel's office,
23 and the executives that worked in the front
24 office, so all of them generally had some type
25 of input.

85 (Pages 334 - 337)

Page 338

1  BY MS. MAINIGI:
2    Q.  I don't think that answered my
3  question.
4        Yes or no, did -- to your knowledge,
5  did counsel's office or any other components of
6  DEA approve suspicious order monitoring
7  systems?
8    A.  Nobody approves suspicious order
9  monitoring systems.  I think the letters were
10  perfectly -- were very clear in the letters
11  that DEA does not approve a suspicious order
12  monitoring system.
13    Q.  Could one call the counsel's office
14  and get some sort of indication that particular
15  components of a suspicious order monitoring
16  system were compliant with regulations or not
17  compliant with regulations?
18        MS. SINGER:  Objection.
19        MR. BENNETT:  Objection.  Vague.
20        To the extent that the question
21  calls for circumstances where DEA executives
22  and officials would seek advice of counsel,
23  you're instructed you're not authorized to
24  answer.
25        To the extent the question calls for

Page 339

1  third parties outside of DEA to call counsel's
2  office, you may answer.
3        MS. SINGER:  Again, speculate --
4  calls for speculation.
5        MR. UTTER:  Go ahead.
6        THE WITNESS:  So the question is
7  whether outside individuals could call
8  counsel's office?
9  BY MS. MAINIGI:
10    Q.  Or any other component or department
11  of DEA and get advice as to particular
12  components of their suspicious order monitoring
13  system.
14        MR. BENNETT:  Objection.  Scope.
15        Not authorized to disclose any
16  attorney-client privileged communications.
17        To the extent that you can answer
18  without disclosing attorney-client privileged
19  communications, you may answer that question.
20        THE WITNESS:  Again, there's --
21  there's at least two components besides --
22  besides counsel's office that could answer
23  questions related to suspicious order
24  monitoring:  liaison policy and regulatory
25  investigations.

Page 340

1  BY MS. MAINIGI:
2    Q.  To your knowledge, did any of those
3  departments keep track of the questions that
4  they were asked?
5        MS. SINGER:  Objection.  Scope.
6        THE WITNESS:  I'm not sure.
7  BY MS. MAINIGI:
8    Q.  To your knowledge, did any of those
9  departments have internal guidance on what they
10  could or could not say as to suspicious order
11  monitoring systems?
12    A.  The guidance is the regulations.  We
13  don't vary far from the regulations.
14    Q.  After the December 27, 2007 letter,
15  which went to all registrants, did you send any
16  more letters to registrants related to
17  suspicious orders or suspicious order
18  monitoring systems?
19        MR. BENNETT:  Objection.  Vague.
20  Compound.
21        MR. UTTER:  Go ahead.
22        THE WITNESS:  I don't believe any
23  letters went out after that.
24  BY MS. MAINIGI:
25    Q.  Was there any communication with the

Page 341

1  industry, whether it's distributors,
2  manufacturers or pharmacies, in 2008, for
3  example, as to what the DEA was looking for
4  when it came to suspicious order monitoring and
5  reporting?
6        MS. SINGER:  Objection.  Vague.
7        MR. UTTER:  You can answer again.
8        THE WITNESS:  There were conferences
9  where we explained suspicious order monitoring.
10  There were conferences where we explained what
11  effective controls against diversion was.  And
12  those conferences were attended by
13  manufacturers and distributors.
14        I think there were -- they -- they
15  happened every couple of years, every two years
16  or so.
17  BY MS. MAINIGI:
18    Q.  Do you recall when those conferences
19  took place, meaning specific years?
20    A.  No.  But I'm sure that, if they
21  haven't taken it down, it's on the DEA web
22  site.
23    Q.  And you said there would be
24  explanations of what constituted a suspicious
25  order at these conferences?

Page 537

1  of what actually got said in those meetings.
2      Fair?
3  A.  No.  There were other people in
4  those meetings.  But I think consistently they
5  were the ones who were in each -- each meeting.
6  Q.  Okay.  And I think you told me that
7  you did not typically, in any interactions you
8  had with distributors or registrants, define
9  yourself what "unusual size" meant, correct?
10 A.  No.  I -- I personally didn't have
11 any contact with them discussing that.  That
12 was done through the liaison and policy section
13 or the E-commerce section, the sections that
14 handled requests or questions from the
15 industry.
16 Q.  And I think you told me last time
17 that there was not necessarily some sort of
18 internal set of talking points that allowed
19 folks within DEA to further define the term
20 "unusual size," correct?
21 A.  Those questions went to E-commerce
22 or liaison and policy.  And they were the
23 people who were running the meetings.  So I --
24 I -- I think they just ran off exactly what
25 they were telling the distributors during the

Page 538

1  meetings.
2  Q.  But there was no guidebook or
3  playbook that they could refer to that allowed
4  them to specifically define "unusual size" a
5  certain way, right?
6  A.  I don't believe there was any
7  guidebook.  Yes.  No.
8  Q.  Did you ever think about putting one
9  together?
10 A.  No.  We thought it was pretty
11 straightforward.  An unusual size is just that.
12 An unusual frequency or -- is just that.
13 Q.  So when we met last time, you gave
14 me an example of unusual size.
15 A.  Uh-huh.
16 Q.  You gave me probably several
17 examples of unusual size.
18     Do you remember that?
19 A.  Yes.
20 Q.  And one of those examples, as I
21 recall it, was a pharmacy that had been
22 ordering 5,000 pills of Hydrocodone every
23 month --
24 A.  Uh-huh.
25 Q.  -- let's say for the last three

Page 539

1  years --
2  A.  Uh-huh.
3  Q.  -- and then all of a sudden it
4  bumped up into the 20,000 range or the --
5  A.  Uh-huh.
6  Q.  -- 50,000 range.  And then it bumped
7  up to the 100,000 range.
8      Do you recall that --
9  A.  Yes.
10 Q.  -- testimony?
11     And you defined the jump all of a
12 sudden from 5,000 to 20,000 as perhaps an order
13 of unusual size, correct?
14 A.  Yes.
15 Q.  And that was a pretty
16 straightforward example, in your mind, right?
17 A.  Yes.
18 Q.  But you also acknowledged that there
19 could be circumstances that were a bit less
20 straightforward, correct?
21 A.  I don't recall that.  I said that in
22 some cases you -- it could be a crossover
23 between two of the three.  So an unusual size
24 and an unusual frequency could cross over
25 together, so...

Page 540

1  Q.  Well, you agree with me that, in
2  some instances, it's harder to define what
3  unusual size is, correct, and to determine
4  whether unusual size has been met?
5  A.  No.  I don't -- if you know your
6  customer, you should know what an unusual size
7  is.
8  Q.  So it can vary from vary to customer
9  what an unusual size is.
10     Fair?
11 A.  Within reason.
12 Q.  So let's -- let's take your 5,000
13 example.
14 A.  Uh-huh.
15 Q.  5,000 Hydrocodone a month.
16     Would an order the following month
17 of 10,000 be suspicious?
18     MR. BENNETT:  Objection.  Incomplete
19 hypothetical.
20     THE WITNESS:  I would say it should
21 trigger a -- questions.  If you've gone from
22 5,000 to 10,000, you've doubled your purchases.
23 I think that should trigger some questions,
24 yes.
25     BY MS. MAINIGI:

45 (Pages 537 - 540)

Veritext Legal Solutions
www.veritext.com                                          888-391-3376

Page 553

BY MS. MAINIGI:
Q. And then DEA would follow up and investigate that suspicious order, right?
A. DEA would investigate suspicious orders as they come in, yes.
Q. And if DEA found there to be validity to a suspicious order that was reported, DEA would take some sort of action, correct?
MR. BENNETT: Objection. Incomplete hypothetical. Objection. Scope.
THE WITNESS: Again, it's very fact-specific. You have to -- it's -- you know, a suspicious order doesn't necessarily give us the -- doesn't necessarily give us what we need to open an investigation, take a registration. That -- that requires investigation.
What a suspicious order does is provide us with a -- a starting point -- it's a pointer system -- so we could start our investigation if that is indeed appropriate.
So yes. Somewhere down the line there would be some kind of potential order to show cause if -- if we find that their

Page 554

orders -- their suspicious orders were leading to or were involved in diversion, yes.
But I mean, again, it's a very fact-specific -- I need the details. I need to know exactly what that pharmacy was doing in their ordering patterns.
BY MS. MAINIGI:
Q. And is it fair to say that reasonable minds could vary on whether something's a suspicious order?
MR. BENNETT: Objection. Form.
THE WITNESS: Again, I think that, because it's a suspicious order, and it's a decision that's made by the company, it involves further investigation by the company before they send out a suspicious order or send it.
But in either case, they should have documentation showing what they have. So if -- if it was suspicious, and they sent it anyway, they should explain why. Did they resolve the suspicion. If not, then they should send us the suspicious order.
It's pretty straightforward.
BY MS. MAINIGI:

Page 555

Q. Now, the documentation, they certainly could have documentation at the time they were investigating a potential suspicious order, correct?
A. It would be in the customer files or due diligence files.
Q. Is there any requirement in the DEA regulations or guidance to maintain due diligence documentation for a certain period of time?
A. There's no requirements. But it's in the company's best interest to do it. Because, if -- if you continue to send drugs downstream and there's no explanation why you do that and those orders are suspicious in nature, they're -- they're unusual -- unusual size, frequency or substantially deviating, at that point in time you've got to explain why you're doing it.
So if you don't have due diligence files, it becomes pretty -- the -- the investigators are in the dark.
Q. So you -- you gave some good advice with your 2006, 2007 letters, right?
A. I believe we did, yes.

Page 556

Q. Did you put into your letters that distributors ought to hold onto their due diligence files for a certain period of time?
A. I believe that due diligence files had come up in the -- in the meetings and we mentioned due diligence in all of those letters.
And obviously, when you mention due diligence, you should have some kind of documentation of your due diligence. But that was mentioned in the meetings.
Q. Okay. So let's -- let's just talk about with respect to the letters.
I -- you mentioned due diligence in the letters, right?
A. Yes.
Q. But you didn't say in the letters "Keep your due diligence for a certain period of time" or anything like that, did you?
A. It would -- it would be prudent and common sense to, knowing that, if their -- their methodology was questioned on why they were shipping drugs downstream without filing suspicious orders, that you would have some documentation showing why, showing that you

49 (Pages 553 - 556)

Page 549

1 BY MS. MAINIGI:
2   Q.  Okay.  So let me -- let's come back
3 to the numbers we were talking about.
4       So you -- you thought that an
5 increase from 5,000 Hydrocodone a month to
6 10,000 Hydrocodone a month may be cause for at
7 least further due diligence, right?
8   A.  I believe yes.  Absolutely.
9   Q.  And it could wind up being a
10 suspicious order that's reported, or there may
11 be reasons why it didn't need to be reported as
12 a suspicious order, correct?
13   A.  If they --
14       MR. BENNETT:  Objection.
15 Mischaracterizes testimony.
16       THE WITNESS:  If they resolve the
17 suspicious -- the suspicions within the order,
18 then they wouldn't have to notify DEA.  But if
19 they didn't resolve the suspicious nature of
20 the order, then they would.
21 BY MS. MAINIGI:
22   Q.  So a jump from 5,000 to 10,000 after
23 some due diligence could, in fact, result in
24 there not being a suspicious order that needed
25 to be reported, correct?

Page 550

1       MR. UTTER:  Object.  He answered the
2 question three times.
3       Go ahead.  You can answer again.
4       THE WITNESS:  No.  Again, it's
5 hypothetical.  I don't know.  I don't know what
6 -- I don't know what the presentation was.  I
7 don't know all the background or the particular
8 pharmacy.  I don't know what they've done in
9 the past.  I don't know where they're situated.
10 I don't know what drugs there are.
11       I mean there's so many different
12 variables.  So no, I can't -- I can't answer
13 that.  A -- an increase from 5 to 10 should
14 trigger due diligence.  Maintaining effective
15 controls against diversion.
16       Looking at your customer, trying to
17 figure out what they are doing.  Why did they
18 have this increase?  What's -- why is it
19 necessary?  What are they doing with the drugs
20 that they are sending to this -- this pharmacy
21 or hospital, whatever.
22       So no.  I can't -- based on that
23 hypothetical, I can't answer that question.
24 BY MS. MAINIGI:
25   Q.  What about -- but you were pretty

Page 551

1 confident that a jump from 5,000 to 20,000 all
2 of a sudden would be cause for reporting a
3 suspicious order, correct?
4   A.  Again, just giving me numbers
5 without giving me the -- what is actually going
6 on, what -- where the pharmacy is situated,
7 what the pharmacy is doing, who the pharmacist
8 is -- there's just so many different variables
9 that is -- should it trigger a due diligence
10 analysis?  Absolutely.  Should it trigger a --
11 a -- a suspicious order?  Maybe.  Probably.
12 Because going from 5- to 20,000, that's --
13 that's quite a bit.
14       But until you do the whole analysis,
15 until you look at the pharmacy, until you look
16 at what their patterns were, I can't make that
17 statement.
18   Q.  What about a jump from 5,000 one
19 month Hydrocodone to 8,000 the next month of
20 Hydrocodone?
21   A.  The -- the answer's --
22       MR. BENNETT:  Objection.  Incomplete
23 hypothetical.
24       THE WITNESS:  The answer is the
25 same.  I have to see the -- the whole idea

Page 552

1 behind this is the distributor does their due
2 diligence.  To do their due diligence, they
3 have to look at all the variables surrounding
4 the particular order.
5       Without that, without knowing where
6 the pharmacy is, what the location is, I -- I
7 couldn't answer the question.
8 BY MS. MAINIGI:
9   Q.  So just looking at the numbers,
10 let's say 10,000 -- excuse me.
11       Just looking at the numbers of 5,000
12 jumping to 8,000 would not be enough the
13 trigger, in your mind, automatically a
14 reporting of a suspicious order based on
15 unusual size.
16       Fair?
17       MR. BENNETT:  Object -- objection.
18 Vague.
19       THE WITNESS:  I think that that
20 would trigger the company to do a due diligence
21 analysis.  That's what it would trigger.  And
22 if they can't justify, if they can't explain or
23 resolve why that increase occurred, then, you
24 know, they're required to report it as
25 suspicious and not ship.

48 (Pages 549 - 552)