# EXHIBIT 10

Page 1

```
 1
                IN THE UNITED STATES DISTRICT COURT
 2               FOR THE NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION
 3
 4    _____
 5    IN RE:  NATIONAL PRESCRIPTION          MDL No. 2804
      OPIATE LITIGATION                      Case No. 17-md-2804
 6
 7    This document relates to:              Judge Dan
                                             Aaron Polster
 8
      The County of Cuyahoga v. Purdue
 9    Pharma, L.P., et al.
      Case No. 17-OP-45005
10
      City of Cleveland, Ohio vs. Purdue
11    Pharma, L.P., et al.
      Case No. 18-OP-45132
12
      The County of Summit, Ohio,
13    et al. v. Purdue Pharma, L.P.,
      et al.
14    Case No. 18-OP-45090
      _____
15
16
17                         VOLUME I
18         Videotaped Deposition of Kyle J. Wright
19                     Washington, D.C.
20                     February 28, 2019
21                        9:33 a.m.
22
23
24    Reported by:  Bonnie L. Russo
25    Job No. 3244302
```

Page 106

1 some of the -- with the criteria of the
2 definition of the law -- or the regulation by
3 volume, by size and quantity and things like
4 this. And that was it.
5     BY MS. MAINIGI:
6  Q.  The DEA didn't provide guidance on
7 how to apply the criteria in the regulation; is
8 that right?
9     MR. BENNETT: Object. Objection.
10 Form.
11     THE WITNESS: It couldn't provide
12 that. Because it is fluid, and there are too
13 many variables, too many anomalies, too many
14 situations. And what is the drug tomorrow?
15 What is the problem tomorrow?
16     Right now we started this Internet
17 with Hydrocodone. You tell me what the problem
18 is today.
19     BY MS. MAINIGI:
20  Q.  It shifted, right?
21  A.  Well, it's certainly not
22 Hydrocodone.
23  Q.  Now, under the new Suspicious Order
24 Guidance, once a registrant deemed an order to
25 be suspicious, DEA did not want that order

Page 107

1 shipped; is that right?
2     MR. BENNETT: Object to form.
3     MR. SHKOLNIK: Objection to form.
4     MR. BENNETT: Scope.
5     THE WITNESS: DEA would ask the
6 question: "If you deem it suspicious, why are
7 you shipping it continuing to ship? If you
8 deem it suspicious, what does 'suspicious'
9 mean?"
10     And in the context of all the other
11 regulations, the fact that you even have to be
12 registered and that you're dealing with
13 narcotic substances that can be highly
14 addictive and abused, what does "suspicious"
15 mean?
16     MR. BENNETT: Counsel, we've been
17 going for a little over an hour since our last
18 break.
19     Do you plan to break at noon for
20 lunch, or what's your plan on breaks?
21     MS. MAINIGI: Let's go for a little
22 while longer, and then maybe we'll take our
23 lunch break.
24     MR. BENNETT: Okay. I don't want to
25 go --

Page 108

1     MS. MAINIGI: But let's keep going.
2     MR. BENNETT: Much more -- we've
3 gone an hour. So I don't want to go much
4 more --
5     MS. MAINIGI: I think --
6     MR. BENNETT: -- than an hour.
7     MS. MAINIGI: -- we'll hit up on
8 lunch soon if you can stick with me for another
9 ten minutes.
10     THE WITNESS: Ten minutes.
11     MS. MAINIGI: Okay. Deal.
12     THE WITNESS: And then I will start
13 squirming.
14     MS. MAINIGI: Okay. Deal.
15     BY MS. MAINIGI:
16  Q.  Mr. Wright, the Suspicious Order
17 System represented a significant change in DEA
18 policy guidance and interpretation regarding
19 Suspicious Order Monitoring, correct?
20     MR. BENNETT: Objection. Form.
21     THE WITNESS: I agree with the
22 significant change. But interpretation, no.
23     BY MS. MAINIGI:
24  Q.  And you agree it was a change as to
25 whether a registrant could ship an order it

Page 109

1 reported to DEA, correct?
2     MR. SHKOLNIK: Objection to form.
3     MR. BENNETT: Objection. Form.
4     THE WITNESS: It lied in their
5 responsibility to make the appropriate
6 decision.
7     BY MS. MAINIGI:
8  Q.  I don't believe I got an answer to
9 my question.
10     Do you agree that it was a change as
11 to whether a registrant could ship an order it
12 reported to DEA?
13     MR. BENNETT: Objection again to the
14 form.
15     MR. MIGLIORI: Objection. Asked and
16 answered.
17     THE WITNESS: Could you rephrase
18 that question? Because -- I'm -- I'm sorry.
19 I -- it's vague to me. And I answered it the
20 best that I could.
21     BY MS. MAINIGI:
22  Q.  Okay. Do you agree that there was a
23 change in DEA policy guidance or interpretation
24 as to whether a registrant could ship an order
25 it reported to DEA?

Page 341

1  when I came on board.
2      MR. MIGLIORI: All right. Why don't
3  we take a break.
4      THE VIDEOGRAPHER: We are going off
5  the record.
6      This is the end of Media Unit No. 1.
7      The time is 10:23.
8      (A short recess was taken.)
9      THE VIDEOGRAPHER: We are going back
10 on the record.
11     This is the start of Media Unit No.
12 2.
13     The time is 10:42.
14     You may proceed, Counsel.
15     MR. MIGLIORI: Thank you.
16     (Deposition Exhibit 31 was marked
17 for identification.)
18     MR. MIGLIORI: I want to show you
19 what I've marked as Exhibit 31.
20     BY MR. MIGLIORI:
21  Q.  Mr. Wright, I'm showing you what's
22 been marked as Exhibit 31. This is a two-page
23 letter, if you look on the second page, it's
24 again signed by Joseph T. Rannazzisi.
25     In December of 2007, was he still

Page 342

1  your -- your boss?
2      MS. McCLURE: Object to form.
3      THE WITNESS: He was still the
4  deputy assistant administrator of diversion
5  control.
6      BY MR. MIGLIORI:
7   Q. This is another letter.
8      Have you ever -- did you have a
9  chance to review it?
10     MS. MAINIGI: Objection.
11     THE WITNESS: Yes, sir.
12     BY MR. MIGLIORI:
13  Q. Are you familiar with this letter?
14     MS. MAINIGI: Objection.
15     THE WITNESS: Only in the context
16 that it was sent out.
17     BY MR. MIGLIORI:
18  Q. Do you know to whom this was sent?
19     MS. MAINIGI: Objection.
20     THE WITNESS: This exhibit
21 specifically to Cardinal Health. But this went
22 out to -- industrywide.
23     BY MR. MIGLIORI:
24  Q. And did it go out to all
25 registrants, to your knowledge?

Page 343

1      MS. MAINIGI: Objection.
2      THE WITNESS: I do not know.
3      BY MR. MIGLIORI:
4   Q. Okay. You'll notice that the same
5  language is in this December 27th, 2007 letter.
6      It says: "The purpose of this
7  letter is to reiterate the responsibilities of
8  the controlled substance manufacturers and
9  distributors to inform DEA of suspicious orders
10 in accordance with 21 CFR 1301.74(b)."
11     Based on your recollection of this
12 letter, did you understand that to be the
13 purpose of sending this out to registrants like
14 Cardinal Health?
15     MS. MAINIGI: Objection. He's
16 testified he didn't have a recollection of
17 the -- of the letter. And there's been no
18 foundation.
19     MR. MIGLIORI: All right. You can
20 just -- you don't have to give that much
21 information. I got it with --
22     MS. MAINIGI: I am actually just
23 allowing you --
24     MR. MIGLIORI: Three or four words.
25     MS. MAINIGI: -- to correct your

Page 344

1  question, Counsel.
2      MR. MIGLIORI: I appreciate that.
3      THE WITNESS: Yes, sir.
4      BY MR. MIGLIORI:
5   Q. Here in the second paragraph, it
6  says: "In addition to and not in lieu of the
7  general requirement under 21 USC 823 that
8  manufacturers and distributors maintain
9  effective controls against diversion, DEA
10 regulations require all manufacturers and
11 distributors to report suspicious orders of
12 controlled substances. The title 21 CFR
13 1301.74(b) specifically requires that the
14 registrant design and operate a system to
15 disclose to the registrant suspicious orders of
16 controlled substances."
17     That's the same language we've seen
18 throughout your presentation.
19     It's about the general obligations
20 under Controlled Substances Act, correct?
21     MS. MAINIGI: Objection.
22     THE WITNESS: Correct, sir.
23     BY MR. MIGLIORI:
24  Q. "The regulation clearly indicates
25 that it is the sole responsibility of the

| | |
|---|---|
| Page 345<br>1  registrant to design and operate such a<br>2  system."<br>3      Was that message consistent with the<br>4  message that you delivered to the distributors<br>5  in your briefings with them in 2005, 2006<br>6  and -- and on?<br>7      MS. MAINIGI: Objection.<br>8      THE WITNESS: Yes, sir. It was.<br>9      BY MR. MIGLIORI:<br>10  Q. And it says: "Accordingly, DEA does<br>11  not approve or otherwise endorse any specific<br>12  system for reporting suspicious orders."<br>13      Is that consistent with the<br>14  messaging that you had in your distributor<br>15  initiative briefings?<br>16      MS. MAINIGI: Objection.<br>17      THE WITNESS: Yes, sir. It was.<br>18      BY MR. MIGLIORI:<br>19  Q. In your experience, do you recall<br>20  actually talking to registrants and telling<br>21  them that the DEA does not approve or otherwise<br>22  endorse a specific system for reporting<br>23  suspicious orders?<br>24      MS. MAINIGI: Objection.<br>25      THE WITNESS: Repeatedly. | Page 347<br>1  Q. If the industry or registrant<br>2  standard was to ship a suspicious order without<br>3  performing due diligence, would that standard<br>4  have been compliant with federal law, in your<br>5  experience and your understanding?<br>6      MS. MAINIGI: Objection.<br>7      THE WITNESS: No, sir.<br>8      BY MR. MIGLIORI:<br>9  Q. Would it have been compliant to<br>10  report suspicious orders after sale on a<br>11  monthly basis?<br>12      MS. MAINIGI: Objection.<br>13      THE WITNESS: No, sir.<br>14      BY MR. MIGLIORI:<br>15  Q. Mr. Rannazzisi says: "The<br>16  registration also requires that the registrant<br>17  inform the local DEA division office of<br>18  suspicious orders when discovered by the<br>19  registrant."<br>20      Is that a message that you delivered<br>21  in your distributor initiative briefings?<br>22      MS. MAINIGI: Objection.<br>23      THE WITNESS: Yes, sir.<br>24      BY MR. MIGLIORI:<br>25  Q. Was that true in 1995, in your |
| Page 346<br>1      BY MR. MIGLIORI:<br>2  Q. And in doing that, was that<br>3  something that was true in 1995 when you first<br>4  began with the DEA in the Dallas field office?<br>5      MS. MAINIGI: Objection.<br>6      THE WITNESS: Yes, sir.<br>7      BY MR. MIGLIORI:<br>8  Q. "Past communications with DEA,<br>9  whether implicit or explicit, that could be<br>10  construed as approval of a particular system<br>11  for reporting suspicious orders should no<br>12  longer be taken to mean that the DEA approves a<br>13  specific system."<br>14      Do you remember delivering that<br>15  message in your own experience during the<br>16  distributor initiative meetings?<br>17      MS. MAINIGI: Objection.<br>18      THE WITNESS: Yes, sir.<br>19      BY MR. MIGLIORI:<br>20  Q. Would that have applied to the<br>21  Excessive Purchase Reports, Exhibit 26, that<br>22  counsel for Cardinal showed you last week?<br>23      MS. MAINIGI: Objection.<br>24      THE WITNESS: Yes, sir.<br>25      BY MR. MIGLIORI: | Page 348<br>1  experience, when you got to the DEA?<br>2      MS. MAINIGI: Objection.<br>3      THE WITNESS: Yes, sir.<br>4      BY MR. MIGLIORI:<br>5  Q. That is reporting suspicious orders<br>6  when discovered by the registrant, is actually<br>7  part of the language of the Controlled<br>8  Substances Act, correct, in your -- to your<br>9  understanding?<br>10      MS. MAINIGI: Objection.<br>11      THE WITNESS: Yes, sir.<br>12      BY MR. MIGLIORI:<br>13  Q. So that goes back to the enactment,<br>14  in your understanding, of the Controlled<br>15  Substances Act and did not start in 2005 when<br>16  you did these briefings, correct?<br>17      MS. MAINIGI: Objection.<br>18      THE WITNESS: Yes, sir.<br>19      BY MR. MIGLIORI:<br>20  Q. Filling a month --<br>21      MS. MAINIGI: Can I ask a question<br>22  of the government: Is this all of fair game<br>23  for questioning so we and ask similar<br>24  questions?<br>25      MR. BENNETT: When it's about his |