# **EXHIBIT 11**

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2              NORTHEASTERN DISTRICT OF OHIO
 3                     EASTERN DIVISION
 4   IN RE NATIONAL PRESCRIPTION
 5   OPIATE LITIGATION                  MDL No. 2804
 6
 7   This document relates to:          Case
                                        No. 17-md-2804
 8   The County of Cuyahoga v.
     Purdue Pharma, L.P., et al.,       Judge Dan Aaron
 9   Case No. 18-OP-45090               Polster
10   City of Cleveland, Ohio vs.
     Purdue Pharma, L.P., et al.
11   Case No. 18-OP-45132
12   The County of Summit, Ohio, et al.,
     v. Purdue Pharma L.P., et al.,
13   Case No. 1:18-OP-45004 (N.D. Ohio)
14
15          The videotaped deposition of DEMETRA
16   ASHLEY, called for examination pursuant to the
17   Rules of Civil Procedure for the United States
18   District Courts pertaining to the taking of
19   depositions, taken at 10 South Wacker Drive,
20   Suite 4000, Chicago, Illinois, on the 15th day of
21   March, 2019, at the hour of 9:16 a.m.
22
23
24   Reported by:  Gina M. Luordo, CSR, RPR, CRR
25   License No.:  084-004143
```

Page 22

1 engagement.
2    MR. SHKOLNIK: Once again, my objection is to
3 time frame. Can you just --
4    MR. NICHOLAS: I'm talking about the time
5 period when Ms. Ashley was at -- was in her senior
6 position from roughly 2015 to 2018.
7    MR. SHKOLNIK: I understand. There should be
8 clarity. Objection to form just so it's clear.
9    MR. NICHOLAS: Okay. That's fine.
10 BY MR. NICHOLAS:
11    Q. You said that you and Mr. Milione came in
12 at the same time. Who did each of you replace?
13    A. Joseph Rannazzisi.
14    Q. You both came in to replace Mr. Rannazzisi
15 in combination?
16    A. Yes.
17    Q. And during your time in this role in this
18 senior role when you and Mr. Milione were there,
19 was there a shift in how the DEA worked with its
20 registrants?
21    MR. SHKOLNIK: Objection.
22 BY MR. NICHOLAS:
23    Q. You can go ahead.
24    A. I believe so, yes.
25    MR. SHKOLNIK: Just note my objection. Is the

Page 23

1 witness speaking on behalf of DEA, or is this a
2 personal opinion? I'm directing that to DEA
3 counsel.
4    MR. NICHOLAS: Let me just -- we're not going
5 to have speaking objections.
6    MR. SHKOLNIK: I'm allowed to make that
7 objection. I'm asking counsel very clearly is the
8 witness testifying as a policy voice for this
9 agency, or is the witness giving an opinion of her
10 own? We were given certain limitations in this
11 deposition as to what we would be allowed to do and
12 what the witness would be allowed to do.
13    MS. BACCHUS: On behalf of the government, the
14 witness is here to testify in her factual capacity.
15 She is not the representative of DEA. She can
16 testify to what her personal knowledge is and what
17 she performed -- duties she performed on behalf of
18 DEA, but she is not here to speak as a 30(b)(6)
19 witness on DEA policy, and that can go forward.
20    That will be our standing objections. If
21 there are any questions asked regarding DEA itself,
22 she can testify to what she did as a fact witness.
23    MR. SHKOLNIK: Thank you.
24 BY MR. NICHOLAS:
25    Q. You just said that you believed you saw a

Page 24

1 shift in how the DEA worked with registrants. Can
2 you describe what that shift was?
3    A. When we began as -- relatively soon after
4 we reported, we were getting meeting requests from
5 industry, and in those requests, industry
6 individuals would say to us we have not been able
7 to have these meetings and have these discussions.
8 So that's my knowledge.
9    Q. Thank you.
10    Do you know what -- during what period of
11 time Mr. Rannazzisi held the senior position that
12 you and Mr. Milione replaced him for?
13    A. I don't know for certain.
14    Q. Okay. If I said it was from 2007 to 2015,
15 does that sound right?
16    A. For sure he was there at that time.
17    Q. Okay. And during that time, he was a
18 deputy assistant administrator of the Office of
19 Diversion Control --
20    A. That's correct.
21    Q. -- in the DEA? Thank you.
22    Okay. During your time at the DEA, did
23 you become familiar with the regulation relating to
24 identification and reporting of suspicious orders?
25    A. Yes.

Page 25

1    Q. And would that be -- was that -- is that
2 21 CFR Section 1301.74?
3    A. It's in 1301. I can't speak to which
4 section, but it's in 1301.
5    Q. I'm going to give you the thing so you can
6 look at it.
7    MR. NICHOLAS: Can we mark as Ashley 3, please,
8 the next exhibit.
9        (Whereupon, ASHLEY Deposition
10        Exhibit No. 3 was marked for
11        identification.)
12 BY MR. NICHOLAS:
13    Q. So Ms. Ashley, I've handed you a copy of
14 21 CFR Section 1301.74. Do you recognize it --
15    A. Yes.
16    Q. -- as the regulation?
17    A. Yes.
18    Q. And I'm going to direct you probably most
19 specifically to Section B. Is this section -- does
20 this section pertain to requirements directed to
21 distributors?
22    A. Yes.
23    Q. And distributors are registrants; is that
24 correct?
25    A. Correct.

Page 26

1  Q. If you look at Section B of this
2  regulation, does the regulation tell registrants,
3  specifically distributors, how to identify
4  suspicious orders?
5  A. I guess my answer would be somewhat, yes.
6  Q. Okay. Is there an element of subjectivity
7  to it?
8  A. Yes.
9  Q. Does the regulation explain how to
10  identify an order of, quote, unusual size?
11  A. How to do it? Yes.
12  Q. Does -- how does it do that?
13  A. When it says to identify orders deviating
14  from -- substantially from a normal pattern, that
15  would make it unusual. That's my opinion.
16  Q. Does the regulation tell -- provide
17  guidance as to what constitutes an order of unusual
18  size?
19  A. No.
20  Q. Does the regulation provide guidance as to
21  what constitutes an order of unusual frequency?
22  A. No.
23  Q. Does the regulation provide guidance as to
24  what constitutes an order that deviates
25  substantially from normal ordering pattern?

Page 27

1  A. I would have to say in general, yeah, it
2  does.
3  Q. How does it do that?
4  A. By saying it's deviating from the normal
5  pattern.
6  Q. Okay. And does it explain what that
7  means?
8  A. You would need to know what was normal, so
9  I think so.
10  Q. And would normal vary from case to case?
11  A. Yes.
12  Q. And situation to situation?
13  A. Yes.
14  Q. Does the regulation say what type of
15  reports are supposed to be submitted?
16  A. The type?
17  Q. Well, what they're supposed to look like,
18  what's supposed to be in them.
19  A. The regulation does not say that.
20  Q. Does the regulation say anything about
21  whether a registrant can ship an order that it has
22  reported as suspicious?
23  A. It doesn't say if they should ship it. Is
24  that what your question was? Should they tell them
25  whether or not to ship it? Is that what you're

Page 28

1  asking me?
2  Q. Yeah.
3  A. It does not.
4  Q. Okay. Now, during the time that you were
5  at the DEA, was this regulation ever changed?
6  A. No.
7  Q. To your knowledge, has the regulation ever
8  changed since it was promulgated in 1971?
9  MS. BACCHUS: Objection.
10  BY MR. NICHOLAS:
11  Q. If you know.
12  A. I don't think so.
13  Q. I would like to ask you a few questions
14  about pre-2005 if we can go all the way back then.
15  When you were a diversion investigator prior to
16  2005, do you recall that -- do you recall
17  registrants reporting suspicious orders to the DEA
18  field offices where you worked?
19  A. Yes.
20  Q. And at that time prior to 2005, do you
21  recall that those were called excessive purchase
22  reports?
23  MR. SHKOLNIK: Objection to form.
24  BY MR. NICHOLAS:
25  Q. Go ahead.

Page 29

1  A. Yes.
2  Q. Do you recall how often those reports were
3  submitted?
4  A. No.
5  Q. Were they submitted on a monthly basis?
6  MR. SHKOLNIK: Objection.
7  THE WITNESS: I don't know. No. I mean, I
8  don't know for sure.
9  BY MR. NICHOLAS:
10  Q. Okay. Do you remember what information
11  those reports contained?
12  A. Somewhat, yes.
13  Q. Can you tell me at all if you remember
14  what was in those reports?
15  A. For the most part, they were line items of
16  transactions made by the distributors' sales and
17  the line items, computer-generated line items.
18  Q. Now, did you have an understanding then as
19  to whether the orders listed on those reports had
20  been shipped?
21  A. For the most part, I recall that they had,
22  yeah.
23  Q. And back then, was that the standard
24  practice in the industry?
25  MR. SHKOLNIK: Objection to form.

8 (Pages 26 - 29)

Page 86

1  BY MR. NICHOLAS:
2     Q.  Do you believe there was a need for
3  further written guidance?
4     MR. SHKOLNIK:  Objection.
5     MS. BACCHUS:  Objection.  Calls for opinion.
6     THE WITNESS:  Personally I thought the existent
7  regulation was clear.
8  BY MR. NICHOLAS:
9     Q.  You wrote and submitted to Congress
10 that -- about the importance of working with
11 registrants, and I don't want to read the whole
12 thing again.  I'm just going to the last part to
13 say to provide them all the information and
14 especially the certainty that they need to be in
15 full compliance, comma, as they want to be and as
16 we expect them to be.
17    In your experience, in your personal
18 experience, did the registrants, i.e., the
19 distributors, want to be in full compliance?
20    A.  For the most part, yes.
21    Q.  Okay.  Let's go back and talk for a few
22 minutes about the suspicious order regulation as it
23 still currently exists, CFR 1301.74, Subsection B.
24 This is Ashley 3.
25    Now, as we discussed, you're familiar with

Page 87

1  this regulation, correct?
2     A.  Yes.
3     Q.  And it first came out in 1971; is that
4  right?
5     A.  I believe so, yes.
6     Q.  And this is the regulation that addresses
7  the responsibilities of the distributors to
8  identify and report suspicious orders; is that
9  right?
10    A.  Yes.
11    Q.  And it says that registrants, quote, shall
12 design and operate a system to disclose the
13 registrant's suspicious orders of controlled
14 substances, correct?
15    A.  Yes.
16    Q.  Do you -- are you able to -- from your
17 experience both in the field and in headquarters,
18 are you able to define for the distributors or tell
19 them or have you been able to tell them what
20 constitutes a legally compliant system?
21    MS. BACCHUS:  Objection to form.
22    MR. SHKOLNIK:  Objection to form.  Outside the
23 scope.
24 BY MR. NICHOLAS:
25    Q.  Go ahead.

Page 88

1     A.  No.  That was never my role.
2     Q.  To your knowledge, is there a particular
3  formula or algorithm that is required for a legally
4  compliant system?
5     A.  To my knowledge --
6     MS. BACCHUS:  Same objection.
7     MR. SHKOLNIK:  Objection.
8  BY MR. NICHOLAS:
9     Q.  Go ahead.
10    A.  To my knowledge, there is not.
11    Q.  To your knowledge, does a legally
12 compliant system need to be automated?
13    A.  No, it does not.
14    Q.  Does it need to be manual, i.e., the
15 opposite of automated?
16    MS. BACCHUS:  Objection.  Vague.
17    THE WITNESS:  It's not specific.  There's no
18 direction on how to do it.
19 BY MR. NICHOLAS:
20    Q.  Are there particular methods of
21 investigation that are required in order for a
22 system to be legally compliant?
23    A.  Yes.
24    Q.  What are they?
25    A.  The method would be to -- as it's outlined

Page 89

1  in the regulation, to take a look at the order,
2  make a determination if it's deviating from what's
3  usual.  I mean, how you do it, it can be manual or
4  automatic, but it's just that it needs to be done.
5     Q.  And the criteria that determines whether
6  it deviates from pattern or too large or anything
7  else is criteria that is to be set by the
8  distributors?
9     A.  Correct.
10    Q.  And so it's within their discretion; is
11 that correct?
12    A.  That's correct.
13    Q.  And is it correct that the distributors
14 must define their own parameters for a suspicious
15 order?
16    A.  There's some regulation requirement that
17 it be effective.  So other than that, it's their
18 discretion, but it just must be effective.
19    Q.  And whether a system is effective is in
20 itself a subjective determination; isn't that
21 correct?
22    A.  Yes, I would agree with that.
23    Q.  Okay.  Are you aware that the United
24 States Government Accountability Office, the GAO,
25 issued a report in June of 2015 that stated that

23 (Pages 86 - 89)

Page 246

1  THE WITNESS: I would agree that I was prodding
2  her.
3  BY MR. SCHUTTE:
4    Q.  I'm going to change subjects slightly here
5  and talk about a different aspect of the
6  implementing regulation. As I've understood your
7  testimony today, distributors, in your view, have
8  to look at a variety of factors in making a
9  decision whether or not to ship, and I believe you
10 said that it can vary from situation to situation
11 what it means -- let me pull out my document here
12 what it would mean for an order to be unusual size.
13 I believe I've understood your testimony to be that
14 that varies from situation to situation?
15   A.  Yes.
16   Q.  Similarly, whether an order deviates
17 substantially from a normal pattern would vary from
18 situation to situation?
19   A.  Yes.
20   Q.  And orders of unusual frequency would vary
21 from situation to situation?
22   A.  Yes.
23   Q.  And all of these would be based on factors
24 that were specific to that distributor and the
25 facts the distributor was looking at?

Page 247

1    A.  Yes.
2    Q.  Would one of the factors that the
3  distributor should take into account is the
4  customer that's placing the order?
5    A.  Yes.
6    Q.  And how, in your view, as a 35-year
7  employee of DEA would a distributor take into
8  account its customer in determining whether an
9  order was suspicious?
10   A.  They -- in my experience, what the
11 distributor does is they get very specific
12 information from their customer like their tax ID
13 number, their location, the orders that they may
14 want from the distributor, what they want to be
15 supplied. The location is a big factor. It tells
16 the population. So they ask very specific
17 questions who their customer base is.
18   Q.  When you say who their customer base is,
19 do you mean the -- go ahead. What do you mean by
20 their customer base?
21   A.  The -- say the retail pharmacy's customer
22 base.
23   Q.  Now, you understand -- I think I've told
24 you I represent Rite Aid.
25   A.  Uh-huh.

Page 248

1    Q.  That's a yes?
2    A.  Yes.
3    Q.  Thank you.
4        And you understand or is it your
5  understanding that Rite Aid distributes only to
6  Rite Aid pharmacies?
7    A.  That's what I recall.
8    Q.  Do you understand that Rite Aid does not
9  distribute to internet pharmacies or pharmacies
10 that aren't affiliated with Rite Aid?
11   MR. SHKOLNIK: Objection.
12   MS. BACCHUS: Objection. If you know.
13   THE WITNESS: I don't know that for certain.
14 BY MR. SCHUTTE:
15   Q.  If it were the case that while during the
16 time period that Rite Aid was distributing
17 controlled substances that Rite Aid only
18 distributed to its own pharmacies, is that a factor
19 that would be appropriate for Rite Aid to take into
20 account when determining whether an order was
21 suspicious or not?
22   MR. SHKOLNIK: Objection to form.
23   THE WITNESS: It's one of the factors, sure.
24 Yes.
25

Page 249

1 BY MR. SCHUTTE:
2    Q.  And that would also be true -- if the same
3  base of the hypothetical was true for CVS and
4  Walmart and Walgreens, would you also agree that
5  the fact that these entities only shipped to their
6  own pharmacies is a factor that should be taken
7  into consideration when determining whether an
8  order is suspicious?
9    A.  Yes, I believe that's a factor.
10   Q.  And it's also a factor that can be taken
11 into consideration in making a determination
12 whether to ship an order?
13   A.  Yes.
14   Q.  You testified at some length this morning
15 that when you came to D.C. in, I think it was,
16 September of 2015. Do I have that right?
17   A.  Yes.
18   Q.  With Mr. Milione, that there was a change
19 in philosophy about interactions between DEA and
20 distributors. Do I have that right?
21   A.  Yes.
22   Q.  What was the reason for that change?
23   A.  One of the reasons was pretty soon after
24 we arrived, we were getting, you know, phone calls
25 e-mails from the registrant community hoping to