# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

| | |
|---|---|
| IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804<br>Case No. 17-md-2804 |
| This document relates to: | Judge Dan Aaron Polster |

The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090

_____

Videotaped Deposition of Matthew Strait

Washington, D.C.

May 31, 2019

9:05 a.m.

Reported by:  Bonnie L. Russo

Job No. 3404564

Page 37

1  necessarily agree with that assertion.
2  **Q. Okay. GAO was provided -- or GAO**
3  **provided DEA with a draft of this particular**
4  **report prior to its publication, correct?**
5  A. Correct.
6  **Q. And Mr. Joseph Rannazzisi responded**
7  **in a letter on behalf of DEA, correct?**
8  A. That is --
9  **Q. And who --**
10 A. -- correct.
11 **Q. -- who is Joseph Rannazzisi?**
12 A. So Joseph Rannazzisi, at the time
13 this report came out, was the deputy assistant
14 administrator for the diversion control -- or
15 the Office of Diversion Control. So he would
16 have been the person who ran the diversion --
17 the diversion control program.
18 **Q. And -- and DEA's position was that**
19 **additional guidance was not necessary?**
20 A. That is correct. DEA explained the
21 multitude in -- of ways in which its already
22 communicated in this case with distributors.
23 **Q. And DEA's position was that the --**
24 **the text of the suspicious order regulation**
25 **itself was sufficiently straightforward,**

Page 38

1  **correct?**
2  A. It had been in place for 40 -- at
3  the time of this publication, probably 45
4  years; and that it was well understood by our
5  DEA registrant community; and that we did not
6  see a -- a need to expand upon it.
7  **Q. And -- and be -- in part because the**
8  **DEA's position was that it was sufficiently**
9  **straightforward.**
10 A. I -- I think that's correct, yes.
11 **Q. And the -- but the GAO found in its**
12 **survey that many registrants did not feel that**
13 **it was well understood and, in fact, wanted**
14 **more guidance, correct?**
15 A. Survey respondents did show that
16 they would like more guidance.
17 **Q. More than half of the distributors**
18 **who -- who commented on that said -- said that,**
19 **right?**
20 A. Yeah. And I -- I want to make a
21 point of clarification on that.
22       If -- if we -- if we go to Table 21,
23 which is something that I think is -- is
24 necessary to point out -- remember we have 750
25 controlled substance distributors at present.

Page 39

1  The survey asked a number of questions. And
2  then it's asked some open-ended questions. And
3  you're obviously referring to the open-ended
4  questions.
5        But like we said at the outset, they
6  sent 200 surveys out to distributors. They
7  received 77 responses on a question to
8  distributors about guidance that -- that DEA
9  provided.
10       And to your point, there was a
11 portion of those 77 who asked for more
12 guidance.
13 **Q. Fair enough.**
14     **The DEA also told the GAO that,**
15 **short of providing arbitrary thresholds to**
16 **distributors, it cannot provide more specific**
17 **suspicious orders guidance because the**
18 **variables that indicate a suspicious order**
19 **differ among distributors and their customers,**
20 **correct?**
21 A. Can -- can you point that out on
22 the --
23 **Q. Sure. Page -- give me one second.**
24 **It's -- it's in the -- the letter that Joseph**
25 **Rannazzisi sent. On Page 81 of the report,**

Page 40

1  **Page 5 of the letter.**
2  A. Okay.
3  **Q. Second -- or first full paragraph,**
4  **last sentence.**
5      **Would you read that for the record?**
6  A. Sure.
7      "Short of providing arbitrary
8  thresholds to distributors, DEA cannot provide
9  more specific suspicious orders guidance as the
10 variables that indicate an order is suspicious
11 are very fact-intensive and differ from
12 distributor to distributor and from customer to
13 customer."
14 **Q. Can you explain what that means?**
15 A. Yes, I -- I can. So DEA -- we have
16 long understood that distributors would like
17 nothing more than for DEA to tell them how much
18 an average pharmacy should be able to purchase.
19 And then they could use DEA's assessment as
20 a -- to set a threshold. And that would give
21 them the opportunity to, you know, basically
22 say that that's a DEA-established threshold.
23       What we've said is, with 71,000
24 DEA-registered pharmacies and 18,000 hospitals
25 and 1,700 narcotic treatment programs, all of

10 (Pages 37 to 40)

Page 41

1  the types of customers that distributors sell
2  to, we can't do that.
3       Because, quite frankly, the
4  circumstances on what is appropriate for one
5  pharmacy may be completely different than the
6  requirements of another pharmacy.  It's based
7  on the population.  It's based on the types of
8  patients that are bringing prescriptions in to
9  pharmacies or -- or being dispensed or
10 administered at hospitals.  It's the based on a
11 number of different factors.
12      And pharmacies that are around the
13 corner from one another may have vastly
14 different profiles that are acceptable.
15      So DEA feels very strongly that that
16 is something that only a distributor can know.
17 Because a distributor is going to have much
18 more of a working knowledge of who their
19 customers are, more so than DEA.
20      And I would argue that, if you end
21 up setting an arbitrary limit on how much can
22 be distributed by -- if DEA were to do this,
23 you could inadvertently create a shortage of a
24 situation if that amount is not sufficient.  Or
25 on the flip side, if the -- if that number is

Page 43

1  specific written guidance as to what unusual
2  size, frequency or pattern means, correct?
3       MS. WAITES:  Objection.  Scope.
4       THE WITNESS:  That is correct.
5  Although I want the qualify that by saying
6  nothing as it pertains to what I think they
7  distributors wanted, which was something in
8  writing.
9       DEA was certainly increasing its
10 liaison opportunities with the distributor
11 community in terms of distributor conferences
12 that we held in '13, '15 and '16; kind of
13 one-on-one engagements through what's known as
14 our distributor initiative, which we initiated
15 back in 2011 and continues to this day.
16      And so I think, with a very limited
17 registrant population -- they represent, what,
18 0.06 percent of our DEA registrant population,
19 if not slightly less -- that the one-on-one
20 interaction we believe in -- in a -- in a
21 person-to-person, face-to-face environment
22 is -- is better.
23      Q.   But no written -- but you mentioned
24 no additional written guidance, correct?
25      A.   At the time of this letter, no.

Page 42

1  too high, you could actually create overages;
2  and therefore, DEA is of the opinion that
3  increases in availability could have the
4  unintended consequence of increasing diversion
5  and abuse.
6       Q.   And so DEA was not willing to
7  provide additional guidance -- more specific
8  suspicious order guidance than what is in the
9  regulation itself?
10      A.   At the time that this letter went
11 out, that is accurate.
12      Q.   And the regulation itself defines a
13 suspicious order as an order of unusual size,
14 deviating substantially from the normal
15 pattern, or an order of unusual frequency,
16 correct?
17      A.   That's sounds correct.
18      Q.   And -- and the regulation does not
19 say what an unusual size means, correct?
20      MS. WAITES:  Objection.  Scope.
21      THE WITNESS:  It does not go on to
22 define any of those terms.
23      BY MR. MASTERS:
24      Q.   And at the time that this letter was
25 written, the DEA had not provided additional

Page 44

1       Q.   Okay.  In its report GAO responded
2  to the DEA's letter, right?
3       A.   Can you repeat the question.
4       Q.   In -- in its report, the GAO
5  addressed what the DEA said in its letter,
6  correct?
7       A.   Yes.
8       Q.   And notwithstanding the DEA's
9  comments on the draft report, the GAO still
10 found that the DEA could provide additional
11 guidance to distributors, right?
12      A.   Can you point to what -- what you're
13 referring to?
14      Q.   Turning to Page 44, it says:
15 "Agency comments and our evaluation."
16      A.   Yeah.
17      Q.   Do you see that?
18      A.   Yes, I do.
19      Q.   And so this is the section in which
20 the GAO is responding to the Department of
21 Justice's response, correct?
22      A.   Yes.
23      Q.   And on page 45, it acknowledges
24 the -- the DEA's concerns about our second
25 recommendation to solicit input from