# EXHIBIT 14

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

**PLAINTIFFS' RESPONSES TO THE AMENDED AND CLARIFIED DISCOVERY RULING 12 SUPPLEMENTAL INTERROGATORY ISSUED TO PLAINTIFFS**

**Discovery Ruling 7 Reformulation of Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23:**

*Identify each Suspicious Order for Prescription Opioids that you contend was shipped to Your geographic area by any National Retail Pharmacy Defendant or Distributor Defendant during the Relevant Time Period. For each order, identify the date the order was shipped, the manufacturer', name, and amount of the medication that was shipped, the name of the defendant that shipped the order, and the name and location of the person or entity that placed the order. Furthermore, explain the criteria you used to identify these Suspicious Orders.*

**Discovery Ruling 12 Supplemental Interrogatory:**

*For each National Retail Pharmacy Defendant and Distributor Defendant, identify 10 Suspicious Orders for Prescription Opioids that you contend were shipped to Your geographic area during the Relevant Time Period. For each order, identify the date the order was shipped, the manufacturer', name, and amount of the medication that was shipped, the name of the defendant that shipped the order, and the name and location of the person or entity that placed the order. Furthermore, explain in detail all criteria you used to identify these Suspicious Orders, including whether and why you contend (i) any due diligence actually conducted was insufficient, and (ii) the order was so suspicious that there was no amount of due diligence that could have removed every basis to suspect the customer was engaged in diversion.*

**January 18, 2019 Amendment to and Clarification of Supplemental Discovery Ruling 12 Interrogatory:**

*Plaintiffs must identify 10 suspicious orders from EACH jurisdiction in the Track One cases for each distributor & pharmacy defendant. This means at least 20 orders per defendant, since Cleveland is within Cuyahoga County and Akron is within Summit County; show how they used their Monthly Total Rule and Methods to identify the SOs listed in their response; and must also identify any other criteria they have used to identify these and other SOs; and should include a variety of recipient pharmacies and a variety of dates.*

**Preliminary Objections and Legal Limitations**



The Bellwether Plaintiffs here renew and incorporate by reference their objections and assertions of legal limitation set out in each Plaintiff's Amended Responses and Objections to the National Retail Pharmacy Defendants' First Set of Interrogatories and Distributor Defendants' Fourth Set of Interrogatories to Plaintiffs, Reformulated Pharmacy Interrogatory No. 7 and Distributor Interrogatory No. 23, served on October 31, 2018, specifically including the introductory paragraph to those objections and assertions of legal limitation and paragraphs 1 – 11 (with related charts), as well as all objections and assertions of legal limitation set out in Plaintiff's Responses to Supplemental Discovery Ruling 12 Interrogatory, served on January 11, 2019, which the Bellwether Plaintiffs also assert here.

The National Retail Pharmacy Defendants and/or Distributor Defendants (collectively "Distributor Defendants") have refused to answer this very same discovery request, yet demand the Bellwether Plaintiffs do so without an adequate record and/or without the benefit of expert witness testimony. Nonetheless, the Bellwether Plaintiffs attempt to comply with the Court order in good faith.

The reformulated discovery request is a contention interrogatory. "Contention" interrogatories seek to clarify the basis for or scope of an adversary's legal claims. *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, n.2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198 (1999). The answer to this contention interrogatory "does not limit [our] experts from using different criteria to identify suspicious orders, and therefore from concluding that there exist suspicious orders in addition to those identified [herein]." Discovery Ruling No. 7, p. 6.

The Bellwether Plaintiffs reserve the right to supplement this answer if, or when, the Distributors fully and transparently respond to discovery. For the purposes of responding to this supplemental interrogatory, Plaintiffs have not attempted to identify every suspicious order, nor have Plaintiffs applied every reasonable method for identifying suspicious orders.

The Bellwether Plaintiffs reserve the right to supplement this answer if, or when the Distributors disclose the system(s) the Distributors designed and operated sufficient to detect suspicious orders using Distributors' own metrics.

The Bellwether Plaintiffs reserve the right to supplement this answer through expert witnesses pursuant to the Scheduling Order entered by the Court.

The Bellwether Plaintiffs contend that the Distributor Defendants shipped 168,035,774 hydrocodone pills and 215,257,732 oxycodone pills into Cuyahoga County between 2006 and 2014. The Bellwether Plaintiffs contend the Distributor Defendants shipped 112,172,575 hydrocodone pills and 118,323,484 oxycodone pills into Summit County between 2006 and 2014. The bellwethers contend the sheer volume of opioid pills shipped is indicative the distributors failed to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C.A. § 823(b)(1) [1970].

The Bellwether Plaintiffs contend each Distributor owes a duty under federal law to maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C.A. § 823(b)(1) [1970]. This duty has been defined to include the following obligations:

The "security requirement" at the heart of this case mandates that distributors "design and operate a system" to identify "suspicious orders of controlled substances" and report those orders to DEA (the Reporting Requirement). 21 C.F.R. § 1301.74(b). The Reporting Requirement is a relatively modest one: It requires only that a distributor provide basic information about certain orders to DEA, so that DEA "investigators in the field" can aggregate reports from every point along the legally regulated supply chain and use the information to ferret out "potential illegal activity." Southwood Pharm., Inc., 72 Fed. Reg. 36,487, 36,501 (Drug Enf't Admin. July 3, 2007). Once a distributor has reported a suspicious order, it must make one of two choices: decline to ship the order, or conduct some "due diligence" and—if it is able to determine that the order is not likely to be diverted into illegal channels—ship the order (the [No-]Shipping Requirement).

*Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 212–13 (D.C. Cir. 2017) (emphasis added) (bracket inserted). The bellwethers served discovery upon the Distributors, asking the Distributors to identify the "system" each distributor "designed and operated" but were limited by the Court to a period of time beginning in 2006 and extending to the present. Discovery revealed each Distributor used a different "system" at different times. The Bellwether Plaintiffs have attempted to replicate Defendants' "systems" in order to determine which orders should have been identified as suspicious thereby triggering the Reporting Requirement and the [No-] Shipping Requirement.

Despite repeated motions to compel, limitations including, without limitation, the following remain and impede Bellwether Plaintiffs' ability to fully respond to this request at this time:

A. <u>Post-Shipment Review Based on the DEA's Chemical Handler's Manual (2004) and/or the DEA's Report to U.S. Attorney General by the Suspicious Order Task Force.</u>

Cardinal Health, and various other Distributor Defendants, adopted some form of a national average multiplier from the DEA's Chemical Handler's Manual (2004) and/or the DEA's Report to U.S. Attorney General by the Suspicious Order Task Force (1998). Both provisions are nearly identical and arise out of the compliance requirements set forth in The Comprehensive Methamphetamine Control Act of 1996, 21 U.S. Code § 830 ("Each regulated person shall report to the Attorney General, in such form and manner as the Attorney General shall prescribe by regulation any regulated transaction involving an extraordinary quantity of a listed chemical, an uncommon method of payment or delivery, or any other circumstance that the regulated person believes may indicate that the listed chemical will be used in violation of this subchapter."). To comply with federal law, each distributor tracks the sale of controlled substances and OTC medications *which contain certain chemicals* including those used to make methamphetamine. The total weight of such chemicals are added and then measured against a multiplier of a national average. Sales in excess of this "threshold" are then reported to the DEA after shipment.

Cardinal Health and various other Distributor Defendants used this methodology to monitor sales of prescription opiates, including hydrocodone and oxycodone, between 2000 and 2008. Cardinal Health, for example, generated an "Ingredient Limit Report" based on a computer program which monitors customer-controlled substance purchases for a month and compares these purchases to predetermined averages or limits. However, the methodology for calculating the predetermined averages or limits has not been disclosed. Nor has any justification been proffered for Cardinal's use of a 4x multiplier (higher than the multiplier used to detect "extraordinary

quantities" of methamphetamine chemicals). The Bellwether Plaintiffs contend that using a formula for detection of extraordinary quantities of chemicals used to make methamphetamine may not be appropriate to detect unusual orders of prescription opiate pills. Nonetheless, it is impossible to apply even this formula to the transactional data until Cardinal Health and others disclose the full set of underlying variables within each formula utilized by Defendants to detect suspicious orders of prescription opioids.

The Bellwether Plaintiffs have attempted to replicate a national average multiplier using a factor of 3x (extraordinary) and 2x (more than unusual) premised upon a national average we calculated from the available ARCOS data. The bellwethers intend to supplement this response if, or when, the distributors disclose the actual variables historically applied over time.

2. Test for Review of Individual Orders Pre-Shipment

Cardinal Health and other Distributor Defendants also adopted some form of a metric which purported to monitor individual orders in real time which may be suspicious. For example, Cardinal Health adopted Policy No. DEA04.00 entitled Required Reports to DEA (effective from 2000 to 2006) which established written criteria of what constitutes a suspicious order. The policy mandates: (i) the criteria must be reasonable and based upon customer purchasing patterns; (ii) each facility must adhere to the established criteria in monitoring orders; and (iii) monitoring system may be either computerized or manual. However, like all other Distributor Defendants, the written criteria, the metrics to identify purchasing patterns, and the full results of applications have all not yet been fully disclosed. Thus, it is presently impossible to apply each Distributor Defendants' actual criteria to its transactional data.

By way of another example, McKesson Corporation adopted a policy (2000 through the end of 2006) which utilized a computer algorithm referenced as the "Drohan report" to detect individual suspicious orders. However, McKesson has failed to produce any evidence that such a system was in operation nor has it produced any work product generated from its system arising out of CT1.

In the meantime, the Bellwether Plaintiffs have attempted to replicate "a" rule set forth in the *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017). In Masters Pharmaceutical, the United States Court of Appeals for the District of Columbia Circuit issued the following instructive analysis:

> More fundamentally, the key question in this case is not whether held orders qualified as "suspicious" under Masters' policies; the question is whether they qualified as "suspicious" under 21 C.F.R. § 1301.74(b). Thus, while Masters frames its challenge on this point in substantial-evidence terms, the relevant inquiry is more legal than factual: It asks how far the language of the regulation reaches. Undertaking that legal exercise, the Administrator reasonably determined that all held orders were "suspicious" within the meaning of the regulation. Section 1301.74(b) provides that "[s]uspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." Apparently tracking that regulatory language, the Computer Program held an order if: **(a) that order—combined with other orders placed in the same 30-day period—requested more doses of a controlled medication than the pharmacy had requested in any of the previous six calendar months**; (b) the pharmacy ordered a controlled

medication more frequently in a 30-day period than it had in any of the previous six calendar months; or (c) the pharmacy's ordering pattern for a controlled medication deviated in some other notable way from its ordering pattern over the previous six months. As a matter of common sense and ordinary language, orders that deviate from a six-month trend are an "unusual" and not "normal" occurrence. It was therefore entirely reasonable for the Administrator to hold that orders held by the Computer Program met the regulatory definition of "suspicious orders" unless Masters' staff dispelled the suspicion.

*Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206, 216–17 (D.C. Cir. 2017) (internal citations omitted) (emphasis added).

The application of the Masters "common sense rule" is incomplete without the due diligence files. For instance, there is no dispute that each transaction reported in ARCOS was actually shipped regardless of whether it was initially flagged as suspicious. Therefore, flagged orders should have been "cleared" through due diligence in order to have been properly shipped. However, discovery has revealed no such due diligence. The failure to conduct due diligence renders each successive order suspicious. Therefore, the bellwether plaintiffs have applied the Masters "common sense rule" as if no due diligence was conducted.

C. Caps on Daily Orders

CARDINAL HEALTH (and perhaps others) implemented a cap on individual orders by posting a sign in the warehouse of a Dosage Limit Chart which blocks daily orders in excess of a dosage limit. The bellwether plaintiffs intend to disclose expert witness testimony which identifies each daily order which exceeded the vault cap.

D. Thresholds or Ceilings

McKesson and Distributor Defendants implemented thresholds or ceilings at various times which purportedly blocked all orders in excess of a predetermined volume until cleared by due diligence. These thresholds appear to have been exponentially increased over time without any justification in the record. The Bellwether Plaintiffs intend to apply the McKesson threshold across the entire industry as evidence of what a reasonably designed system should have identified as suspicious.

The bellwether Plaintiffs have identified the suspicious orders identified in Exhibits A (Cuyahoga County) and B (Summit County) hereto as suspicious based on the unusual size of the order(s), the unusual frequency of the order(s), the variance of the order(s) from the usual pattern, and/or the shipment of the order(s) where the recipient pharmacy or the prescribing physician's license had been revoked, as further explained in in Exhibits A and B. With regard to each identified order, either the order was so suspicious that no due diligence could have removed every basis to suspect the customer was engaged in diversion and/or Plaintiffs have been unable to identify sufficient due diligence conducted by the Defendant with respect to that order, as further explained in in Exhibits A and B.

Subject to, and without waiving, those objections and assertions of legal limitation, the bellwether Plaintiffs state as follows:

**ANSWER:** In a good faith effort to meet their obligations and to comply with Discovery Ruling 12 as Amended, which directs that this supplemental interrogatory be responded to at this time, Plaintiffs respond with the suspicious orders, and information regarding the same, as set out in the documents attached hereto.

The criteria utilized to identify these suspicious orders, as identified in the attached charts and documents, are as follows, calculated from the available ARCOS data:

1. **"Two Times Rule"** - ("Exceeding Threshold of Two Times the National Average): Any order(s) in a month such that the cumulative shipments in dosage units that month exceeds two times the national average shipments by the Defendant to all pharmacies to which it shipped the same month is considered suspicious.

2. **"Three Times Rule"** - ("Exceeding Threshold of Three Times the National Average): Any order(s) in a month such that the cumulative shipments in dosage units that month exceeds three times the national average shipments by the Defendant to all pharmacies to which it shipped the same month is considered suspicious.

3. **"Common Sense Method Two"** - ("Exceeding Threshold of Initial 6 Months and Assuming No Due Diligence"): Any order(s) in a month such that the cumulative shipments that month exceeds the largest monthly shipments in any of the initial six months of the applicable dataset is considered suspicious. Method 2 assumes such orders were cleared and shipped with no due diligence. The threshold does not increase beyond the largest monthly shipment during the initial six months because each and every order shipped thereafter in excess of the largest monthly shipments is considered unlawful.

4. **"Common Sense Method Three"** - ("Previous 6 Months Threshold is Triggered and Assuming No Due Diligence"): Once an order(s) in any month causes the cumulative shipments that month to exceed the largest monthly shipments in any of the previous six months all subsequent orders are considered suspicious. Method 3 assumes no due diligence on the first suspicious order(s) and as a result, each and every order shipped thereafter to that individual buyer is unlawful.

5. **"McKesson 8000 Rule"** - McKesson Corp. "designed and operated" a suspicious order monitoring system (SOMS) titled Lifestyle Drug Monitoring Program beginning which it represented to the United States Department of Justice was operational as of May 1, 2007, and held all orders of oxycodone in excess of 8,000 doses in a given month until due diligence was performed. Depo. Hartle (McKesson corporate designee) at p. 179-212, Exhibit 17 and 19. This methodology was applied to both oxycodone and hydrocodone.

Dated: January 25, 2019

                                                Respectfully submitted:

                                                /s/ *Peter J. Mougey*
                                                Peter J. Mougey

LEVIN, PAPANTONIO, THOMAS, MITCHELL,
RAFFERTY & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Tel.: 850-435-7068
Fax: 850-436-6068
pmougey@levinlaw.com
For the PEC

Paul T. Farrell, Jr. (OH 0070257)
**GREEN KETCHUM FARRELL BAILEY & TWEEL, LLP**
419-11th Street (25701)
PO Box 2389 Huntington, WV 25724-2389
Phone: 800-479-0053 or 304-525-9115
Fax: 304-529-3284
paul@greeneketchum.com
Co-Lead Plaintiffs' Counsel

---

[i] Due to the limitations of the ARCOS database, Plaintiffs must substitute "labeler" for "manufacturer" in their response. Labeler information was derived using the National Drug Code Number assigned to the product under the National Drug Code System of the Food and Drug Administration code for each drug and cross referencing against the Food and Drug Administration, National Drug Code Directory and list of NDC/NHRIC Labeler Codes.
A list of NDC/NHRIC Labeler Codes is available at:
https://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/ucm191017.htm.
Food and Drug Administration, National Drug Code Directory available at:
https://www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt
https://www.deadiversion.usdoj.gov/arcos/ndc/readme.txt
Additionally, the ARCOS Registrant Handbook provides the following definitions relating to labeler: A packer/repacker is a registrant that packs a product into a container (i.e., packer) or repacks a product into different size containers, such as changing a package of 50 capsules to 5 packages of 10 capsules each. A labeler/relabeler is a registrant that affixes the original label to a product (i.e., labeler) or changes in any way the labeling on a product without affecting the product or its container (i.e, relabeler). The "relabel" term implies that the package size remains unchanged with changes being made only in brand name, NDC number, distributor, etc.
Registrant Handbook at 6-2, available at:
https://www.deadiversion.usdoj.gov/arcos/handbook/full.pdf#search=arcos%20handbook.