# Exhibit 9

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                    EASTERN DIVISION
 3   IN RE: NATIONAL              )  MDL No. 2804
     PRESCRIPTION OPIATE          )
 4   LITIGATION                   )  Case No.
                                  )  1:17-MD-2804
 5                                )
     THIS DOCUMENT RELATES TO     )  Hon. Dan A.
 6   ALL CASES                    )  Polster
                                  )
 7
 8
 9                         — — —
10              Tuesday, May 14, 2019
                           — — —
11
        HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12               CONFIDENTIALITY REVIEW
                           — — —
13
14
15
16        Videotaped Deposition of JAMES E.
     RAFALSKI, VOLUME 2, held at Weitz &
17   Luxenburg PC, 3011 West Grand Avenue, Suite
     2150, Detroit, Michigan, commencing at
18   8:25 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21
22
23                         — — —
24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25                 deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

1    here today, no, sir.
2         Q.    Okay.  So your report does not
3    identify any shipments by manufacturers to
4    distributors that you claim should have been
5    reported as suspicious?
6         A.    My opinion goes to whether or
7    not there were effective -- or suspicious
8    orders, effective suspicious order systems in
9    place and/or the maintenance of effective
10   controls, the due diligence.  I do not do any
11   calculations that would identify any specific
12   orders.
13        Q.    Okay.  So just to be clear, in
14   response to my question, your report does not
15   identify any shipments by manufacturers to
16   distributors that you claim should have been
17   reported as suspicious, correct?
18        A.    I think there's some instances
19   in my report, there was -- there may be a
20   description of a relationship or some
21   transactions between a -- let me think a
22   second.
23        Q.    Uh-huh.
24        A.    Because I have all of the
25   different companies.

```
 1                    (Document review.)
 2        A.    I don't believe so, no, sir.
 3   BY MR. O'CONNOR:
 4        Q.    Okay.  And at trial, do you
 5   intend to offer any opinion regarding whether
 6   any particular order submitted to a
 7   manufacturer was suspicious?
 8        A.    If I'm requested to do that
 9   analysis by counsel, I guess that would be a
10   possibility.  I haven't done the analysis as
11   today, so I couldn't offer that opinion.
12        Q.    So as you sit here today, you
13   do not have an opinion on whether any
14   particular order that was shipped by a
15   manufacturer was suspicious?
16        A.    I think I have an opinion.
17        Q.    But you haven't identified any
18   order, correct?
19        A.    I have not identified a
20   specific order, but I have an opinion on the
21   conduct.
22        Q.    And are you offering any
23   opinion in this litigation that any
24   particular order that was shipped into Summit
25   or Cuyahoga Counties was suspicious?
```

1      A.     Yes.

2      Q.     Okay.  And are you offering any
3   opinion in this litigation that any
4   particular order shipped by a manufacturer
5   into Summit or Cuyahoga County was
6   suspicious?

7      A.     I'm sorry, shipped by a
8   manufacturer --

9      Q.     Correct.

10     A.     -- to a distributor?

11     Q.     That's right.  To -- to someone
12   in Cuyahoga or Summit County.

13     A.     No, sir.

14     Q.     Okay.  With respect to a
15   manufacturer, what is a suspicious order?

16     A.     Well, if a manufacturer has
17   conducted a sufficient due diligence or
18   onboarding process and they've evaluated the
19   scope of their customers' business and the
20   needs, they would establish a pattern, and
21   that pattern would give them an idea of
22   initially the volume of drugs they need to
23   purchase.

24            Now, if it's brand-new
25   customer -- yours is kind of a hypothetical.

1    If it's a brand-new customer, there's not a
2    pattern or a frequency, but they would start
3    out with what they assess as a legitimate
4    volume, and they would monitor that volume,
5    and if a customer exceeded that, that should
6    trigger as an unusual size.
7              But to give you just a general
8    definition, it's kind of a broad topic
9    because it depends on the scope of business
10   of the manufacturer, of the customer, the
11   type of products, the needs, so the -- prior
12   to ever shipping an order, the importance is
13   to understand what the legitimate needs is of
14   a customer.
15        Q.   Yesterday you testified that it
16   was important to understand what a usual
17   order was so that you could determine what a
18   suspicious order was.
19              Do you generally recall that
20   testimony?
21        A.   I think that's a general
22   description.  I think we were discussing the
23   size, so I think before you would know an
24   unusual size, you would need to know the
25   usual size.

1                    And I think that's kind of the
2     simpler way of what I just said, is that if
3     you don't really have a comprehension of what
4     is the legitimate needs of your customer,
5     then you couldn't know an unusual order --
6     unusual size of an order, I'm sorry.
7          Q.    What information would you need
8     to determine what a usual order looked like
9     for a manufacturer?
10               MR. FULLER:  Form.
11               THE WITNESS:  I'm sorry, you
12        said something?
13               MR. FULLER:  Object to form.
14               THE WITNESS:  Oh.  Sorry.
15          A.    I think that's dependent on the
16    skill of your compliance employees.  I think
17    you go in and evaluate the distributor.  I
18    don't think the distributor would purchase a
19    manufacturer's product with an idea on how
20    they were going to sell it and market it, and
21    I think you would evaluate what their scope
22    of business is and the type of customers they
23    were; how many pharmacies they could
24    distribute to.
25                    I think you'd have to get some

1     A.    I can think of one.

2  BY MR. O'CONNOR:

3     Q.    What was that?

4     A.    I'm not sure I can discuss that

5  with the Touhy letter.

6        MR. FULLER:  Not if it was

7        based on an investigation that you did

8        while an agent.

9        MR. O'CONNOR:  Sorry, are you

10       not answering that question?

11       THE WITNESS:  That's what I

12       stated, sir.

13       MR. O'CONNOR:  Okay.

14       THE WITNESS:  Because it's not

15       publicly readily available that

16       someone would know that.

17  BY MR. O'CONNOR:

18     Q.    While we're talking about

19  Touhy, you have said and your counsel has

20  stated on a number of occasions yesterday and

21  today that you're not permitted to speak

22  about any particular investigation you were

23  involved in while at the DEA; is that fair?

24     A.    That's not publicly or readily

25  available.

```
 1        Q.    Okay.  And with respect to
 2   Mallinckrodt in particular, given those
 3   restrictions, is it fair to say that all of
 4   the opinions you express in your report are
 5   based on materials that you reviewed in
 6   connection with this litigation?
 7        A.    Yes, sir.
 8        Q.    And your opinions are not based
 9   on any other information outside of what
10   you've relayed and referred to in your
11   report?
12        A.    Well, it's difficult to --
13   since I worked the case for a period of
14   years, obviously, that there may be things I
15   know that aren't part of the discovery, but
16   the opinion I wrote is only based on the
17   information contained in my report.
18        Q.    Okay.  And do you intend at
19   trial to offer any information or opinions
20   that are based on something other than what
21   you've cited here in this report?
22              MR. FULLER:  Object to form,
23        based on the same basis earlier.
24        A.    If the Touhy letter is in place
25   and it's restricted by the government, then I
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   would not offer anything outside of what's
 2   contained in my report or currently contained
 3   in the discovery material.
 4   BY MR. O'CONNOR:
 5        Q.   In your report, do you express
 6   any opinion as to the adequacy of
 7   Mallinckrodt's present day suspicious order
 8   monitoring program?
 9        A.   I do not believe I do.
10        Q.   Okay.  And just so we're clear
11   about the period of time your opinions do
12   relate to, do you have any opinion with
13   respect to Mallinckrodt's suspicious order
14   monitoring program in 2018?
15        A.   I do not.
16        Q.   2017?
17        A.   I don't think my report
18   references any time period after 2011.
19        Q.   Okay.  So fair to say in this
20   litigation, you're not providing any opinion
21   with respect to Mallinckrodt's suspicious
22   order monitoring program after 2011?
23             MR. FULLER:  Form.
24        A.   At the current time based --
25   I'm sorry.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  MR. FULLER:  Form.  I just
 2        objected to the form.
 3                  Go ahead.
 4        A.    Based on the report as it
 5   stands right here without being amended, it
 6   doesn't address any time periods that I can
 7   find past 2011, so that would be an accurate
 8   statement as of today.
 9   BY MR. O'CONNOR:
10        Q.    Do you plan to amend your
11   report to add opinions related to
12   Mallinckrodt's program after 2011?
13        A.    If requested by counsel, I
14   will.
15        Q.    Okay.  As you sit here today,
16   do you have any opinions with respect to
17   Mallinckrodt's suspicious order monitoring
18   program after 2011?
19        A.    No, I do not.
20        Q.    Okay.  And as you sit here
21   today, do you have any opinions with respect
22   to Mallinckrodt's DEA regulatory compliance
23   outside of suspicious order monitoring after
24   2011?
25        A.    It doesn't appear in my report,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    so I wouldn't comment on it.
 2          Q.    Okay.  So you have no opinion
 3    on that subject?
 4          A.    No, I think the Touhy would --
 5    if I had an opinion or had knowledge and it's
 6    not cited here or it's not a public
 7    knowledge, I wouldn't make comment on it.
 8          Q.    Mr. Rafalski, would you agree
 9    that it's possible to have a suspicious order
10    monitoring program in place without a formal
11    written policy?
12          A.    In a hypothetical sense?
13          Q.    Uh-huh.
14          A.    Depending on the scope of
15    business, the size of the business and the
16    intended customers, I believe it could be
17    done manual -- manually, but that's
18    hypothetically based on those factors and
19    probably others.
20          Q.    Okay.  So just because a
21    company doesn't have a formal written policy
22    does not mean it didn't have a suspicious
23    order monitoring program, fair?
24          A.    Hypothetically, that could
25    occur, yes, sir.
```

1          Q.     Okay.  And is it fair to say in
2     your -- in your opinion, Mallinckrodt's
3     suspicious order monitoring program during
4     the time period that you examined it involved
5     an algorithm?
6          A.     Yes, sir.
7          Q.     Okay.  And your opinion is that
8     that algorithm-based program was not
9     adequate?
10         A.     Yes, sir.  And the reason why
11    is it used a multiplier, so anytime there's a
12    multiplier applied, if it's an effectively
13    designed system, you've established a
14    threshold for a customer that's their
15    legitimate use, to give that customer two or
16    three times more than that established
17    threshold I don't think is an effective
18    suspicious order system.
19         Q.     Is it your understanding that
20    Mallinckrodt's suspicious order monitoring
21    program consisted solely of an algorithm?
22         A.     That's my understanding in
23    reviewing records.  It did not look at size
24    or pattern.
25         Q.     Okay.  So if Mallinckrodt's