# Exhibit 10

Highly Confidential - Subject to Further Confidentiality Review

```
 1           UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION
 3

     IN RE: NATIONAL        )
 4   PRESCRIPTION           )  MDL No. 2804
     OPIATE LITIGATION      )
 5   _____   )  Case No.
                            )  1:17-MD-2804
 6                          )
     THIS DOCUMENT RELATES  )  Hon. Dan A.
 7   TO ALL CASES           )  Polster
 8
              TUESDAY, JANUARY 15, 2019
 9
      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10            CONFIDENTIALITY REVIEW
11                  - - -
12          Videotaped deposition of Karen
13   Harper, held at the offices of STINSON
14   LEONARD STREET LLP, 7700 Forsyth Boulevard,
15   Suite 1000, St. Louis, Missouri, commencing
16   at 9:09 a.m., on the above date, before
17   Carrie A. Campbell, Registered Diplomate
18   Reporter and Certified Realtime Reporter.
19
20
21
22                  - - -
          GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
              deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    document ends in Bates 421850.              16:39:03

 2              And this is an e-mail chain       16:39:21

 3    from the July 21, 2000 time period regarding  16:39:23

 4    Mallinckrodt suspicious order monitoring and  16:39:29

 5    the Harvard Drug license suspension.        16:39:30

 6              Do you see that?                  16:39:32

 7         A.   I'm reading the e-mail,           16:39:33

 8    please --                                   16:39:41

 9         Q.   Sure.                             16:39:41

10         A.   -- so that I can understand the  16:39:41

11    whole context.                              16:39:41

12         Q.   Absolutely.                       16:39:41

13              And my questions will relate to  16:40:02

14    just the first page of this e-mail.         16:40:04

15         A.   All right.  I'm ready.  Thank     16:40:06

16    you.                                        16:40:07

17         Q.   Okay.  On July 21, 2010,          16:40:07

18    Mr. Ratliff asks you whether or not, quote,  16:40:14

19    "As an aside, are we capable of knowing our  16:40:19

20    customers' customers with any specificity?"  16:40:22

21    end quote.                                  16:40:27

22              Did I read that correctly?        16:40:28

23         A.   Yes.                              16:40:28

24         Q.   And you respond that same day     16:40:29

25    that -- well, why don't you read the first  16:40:30
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    sentence of that e-mail response.              16:40:35

 2         A.    "Using chargeback data, it is        16:40:39

 3    indeed possible to know our customer's          16:40:41

 4    customer with great specificity."              16:40:46

 5         Q.    Okay.  And do you have any           16:40:49

 6    reason to doubt that you in fact sent that      16:40:50

 7    e-mail to Mr. Ratliff on July 21, 2010?         16:40:51

 8         A.    No.                                  16:40:54

 9         Q.    And so it's accurate to state        16:40:55

10    that as of July 2010, you understood that you   16:40:58

11    could utilize chargeback data to understand     16:41:03

12    with great specificity knowledge of your        16:41:07

13    customer's customer; is that accurate?          16:41:11

14         A.    Knowledge of who our customer        16:41:14

15    was shipping to, yes.                           16:41:20

16         Q.    Okay.  So just so the record is      16:41:21

17    clear, yes or no:  Is it accurate to state      16:41:25

18    that as of July 2010, you understood that you   16:41:26

19    could utilize chargeback data to understand     16:41:32

20    with great specificity where -- where your      16:41:34

21    pills were going after you shipped to the       16:41:38

22    distributor?                                    16:41:42

23              MR. O'CONNOR:  Object to form.        16:41:42

24              THE WITNESS:  Yes.                    16:41:43

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KO:                         16:41:43

 2         Q.    You can set that aside.           16:41:46

 3               (Mallinckrodt-Harper Exhibit 24   16:41:48

 4         marked for identification.)             16:41:49

 5    QUESTIONS BY MR. KO:                         16:41:49

 6         Q.    This is a copy of what will be    16:41:59

 7    marked as Harper Exhibit 24.                 16:42:00

 8               And this ends, for the record,    16:42:09

 9    ends in Bates 280607.                        16:42:09

10               And this appears to be a          16:42:31

11    November 1, 2010 letter that you send to Paul 16:42:32

12    Kleissle, correct?                           16:42:38

13         A.    Yes.                              16:42:39

14         Q.    And you'll see later on there's   16:42:40

15    the signature block of you on the second     16:42:43

16    page.                                        16:42:46

17         A.    Yes.                              16:42:47

18         Q.    And is it accurate to say that    16:42:47

19    you're sending him this correspondence on    16:42:49

20    November 1, 2010, to describe to him what you 16:42:52

21    can utilize based on the chargeback          16:42:56

22    information that you are -- that you have     16:42:59

23    been reviewing in that 2010 time period?     16:43:00

24         A.    Yes.                              16:43:03

25         Q.    Okay.  That's all I have on       16:43:04
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    that document.                              16:43:14

 2                 Now, in connection with running   16:43:15

 3    chargeback reports, is it also accurate to   16:43:28

 4    say that indirect match reports were reports  16:43:33

 5    that you asked to be run to understand the   16:43:40

 6    downstream details of a transaction?        16:43:44

 7                 MR. O'CONNOR:  Object to form.    16:43:46

 8                 THE WITNESS:  I don't             16:43:47

 9         understand the term "indirect match     16:43:49

10         report."                                 16:43:50

11    QUESTIONS BY MR. KO:                          16:43:52

12         Q.    Okay.  How about -- let's --       16:43:52

13    I'm sorry, let's go back to that document    16:43:55

14    then that we just set aside.                 16:43:58

15         A.    All right.                         16:43:59

16         Q.    And in the first sentence of       16:44:00

17    this correspondence to Mr. Kleissle, you     16:44:09

18    ask -- or you indicate, "In an ongoing effort 16:44:12

19    to enhance our existing suspicious order     16:44:15

20    monitoring program and in accordance with 21  16:44:18

21    CFR 1301.74, Mallinckrodt has begun the      16:44:22

22    process of reviewing sales to indirect end   16:44:26

23    user customers, open parens, retail          16:44:30

24    pharmacies, close parens, but geographic     16:44:34

25    region.  This analysis is accomplished by a  16:44:36
```

```
 1    review of chargeback data."                    16:44:39

 2              Did I read that correctly?           16:44:41

 3         A.    Yes.                                 16:44:41

 4         Q.    Okay.  And understanding that        16:44:41

 5    you don't recall the use of the word           16:44:45

 6    "indirect match report," you at least in this  16:44:47

 7    correspondence refer to retail pharmacies as   16:44:53

 8    indirect end user customers, correct?          16:44:55

 9         A.    Yes.                                 16:44:58

10         Q.    Okay.  Do you recall a time in       16:45:00

11    which -- and you state to Mr. Kleissle that     16:45:03

12    you can do this and accomplish this by          16:45:07

13    reviewing chargeback data, correct?            16:45:11

14         A.    Yes.                                 16:45:12

15         Q.    Okay.  And so do you recall a        16:45:12

16    time in which you had asked for reports to be  16:45:15

17    run on indirect end user customers?            16:45:20

18         A.    Yes.                                 16:45:24

19         Q.    Okay.  And these -- you can set      16:45:25

20    that aside.                                     16:45:28

21              And in these reports -- you ran      16:45:28

22    certain reports or had asked certain reports   16:45:37

23    to be run in connection with certain           16:45:39

24    customers that you were shipping drugs to,     16:45:44

25    including Harvard, for example, correct?       16:45:49
```

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | QUESTIONS BY MR. KO: | 17:58:58 |
| 2 | Q. I'm just simply asking whether | 17:58:59 |
| 3 | or not you determined that there were | 17:59:00 |
| 4 | instances, prior to 2000 -- November 2, 2010, | 17:59:01 |
| 5 | in which you discovered that you were | 17:59:07 |
| 6 | shipping suspicious orders based on a | 17:59:09 |
| 7 | peculiar order algorithm that was in place at | 17:59:14 |
| 8 | that time. | 17:59:17 |
| 9 | MR. O'CONNOR: Same objection. | 17:59:18 |
| 10 | THE WITNESS: The algorithm | 17:59:18 |
| 11 | points to orders that need to be | 17:59:20 |
| 12 | investigated further and does not | 17:59:23 |
| 13 | necessarily conclude in and of itself | 17:59:26 |
| 14 | that the order is suspicious. | 17:59:28 |
| 15 | QUESTIONS BY MR. KO: | 17:59:30 |
| 16 | Q. Right. | 17:59:31 |
| 17 | And I -- I see where the | 17:59:31 |
| 18 | confusion is, because I'm putting a label on | 17:59:32 |
| 19 | a particular order, so let me try it this | 17:59:34 |
| 20 | way. | 17:59:36 |
| 21 | A. All right. | 17:59:36 |
| 22 | Q. In the e-mail that you had | 17:59:37 |
| 23 | drafted to Eileen Spaulding that we went over | 17:59:42 |
| 24 | earlier today in which you said that no | 17:59:45 |
| 25 | orders -- no peculiar orders had risen to the | 17:59:50 |

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | level of suspicious, you also -- do you | 17:59:53 |
| 2 | recall also referencing Harvard and Sunrise? | 17:59:56 |
| 3 | MR. O'CONNOR:  Object to form. | 17:59:58 |
| 4 | THE WITNESS:  Yes.  Yes. | 17:59:59 |
| 5 | QUESTIONS BY MR. KO: | 17:59:59 |
| 6 | Q.    And you specifically reference | 18:00:00 |
| 7 | Harvard and Sunrise because you are saying | 18:00:02 |
| 8 | that those were instances in which the | 18:00:05 |
| 9 | peculiar order algorithm did not flag orders | 18:00:09 |
| 10 | to them that were potentially suspicious. | 18:00:13 |
| 11 | Is that accurate to say? | 18:00:18 |
| 12 | A.    Correct. | 18:00:19 |
| 13 | Q.    Okay.  And so applied to this | 18:00:20 |
| 14 | memorandum, I am asking you to confirm that | 18:00:26 |
| 15 | prior to November 2, 2010, there were in fact | 18:00:29 |
| 16 | instances in which you shipped potentially | 18:00:36 |
| 17 | suspicious orders because you were utilizing | 18:00:38 |
| 18 | a peculiar order algorithm that relied on the | 18:00:41 |
| 19 | numeric formula. | 18:00:45 |
| 20 | MR. O'CONNOR:  Object to form. | 18:00:47 |
| 21 | THE WITNESS:  We shipped orders | 18:00:48 |
| 22 | that would have been further | 18:00:53 |
| 23 | investigated if the algorithm was | 18:00:56 |
| 24 | different, but I can't conclude that | 18:00:58 |
| 25 | we shipped suspicious orders because | 18:01:00 |

Highly Confidential - Subject to Further Confidentiality Review

| | | |
|---|---|---|
| 1 | it's my belief that we have never | 18:01:01 |
| 2 | shipped a suspicious order. | 18:01:05 |
| 3 | QUESTIONS BY MR. KO: | 18:01:05 |
| 4 | Q.    For what time period? | 18:01:06 |
| 5 | A.    Ever. | 18:01:07 |
| 6 | Q.    Okay.  So your testimony here | 18:01:11 |
| 7 | today is that you believe Mallinckrodt has | 18:01:13 |
| 8 | never shipped a suspicious order? | 18:01:15 |
| 9 | A.    Yes. | 18:01:16 |
| 10 | Q.    Okay.  And that's | 18:01:18 |
| 11 | notwithstanding the settlement that | 18:01:19 |
| 12 | Mallinckrodt had entered into with the DOJ | 18:01:22 |
| 13 | regarding its suspicious order monitoring | 18:01:24 |
| 14 | activities? | 18:01:25 |
| 15 | A.    Correct. | 18:01:26 |
| 16 | Q.    Okay.  And that's | 18:01:31 |
| 17 | notwithstanding the fact that the DOJ has | 18:01:31 |
| 18 | alleged, and Mallinckrodt has in fact | 18:01:38 |
| 19 | admitted in the DOJ agreement, that at | 18:01:40 |
| 20 | certain points in time in 2008 through 2012 | 18:01:43 |
| 21 | Mallinckrodt did not have an adequate | 18:01:46 |
| 22 | suspicious order monitoring system? | 18:01:49 |
| 23 | MR. O'CONNOR:  Object to form. | 18:01:49 |
| 24 | THE WITNESS:  I -- I don't -- I | 18:01:50 |
| 25 | don't recall the MOA language. | 18:01:56 |

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KO:                        18:01:57

 2         Q.    I guess what I'm trying to ask   18:01:57

 3    you is, I understand that -- well, let's take 18:01:59

 4    a step back.                                 18:02:03

 5              I believe you testified earlier   18:02:04

 6    today that at least prior to 2008 there were 18:02:05

 7    at least ten instances, somewhere between one 18:02:09

 8    and ten instances, in which suspicious orders 18:02:14

 9    were reported to the DEA.                    18:02:17

10              Was that correct?                  18:02:18

11              MR. O'CONNOR:  Object to form.     18:02:19

12              THE WITNESS:  Yes.                 18:02:19

13    QUESTIONS BY MR. KO:                         18:02:21

14         Q.    So at least there were           18:02:22

15    somewhere north of one but south of ten      18:02:23

16    suspicious orders reported to the DEA?       18:02:25

17         A.    Yes.                              18:02:26

18         Q.    So that's more than the "none"    18:02:27

19    you just indicated to me; is that not        18:02:30

20    accurate?                                    18:02:32

21         A.    You asked if we had shipped a     18:02:32

22    suspicious order.                            18:02:34

23         Q.    I see.                            18:02:35

24         A.    But the orders that we had        18:02:36

25    reported between one and ten to DEA were not 18:02:38
```

```
 1    subsequently shipped.                              18:02:41

 2         Q.    Got it.  Understood.                    18:02:41

 3               So from -- is it your testimony         18:02:43

 4    today that from 2008 to present, Mallinckrodt     18:02:48

 5    has not shipped a single suspicious order?        18:02:50

 6         A.    Yes.  When we talk about               18:02:54

 7    suspicious orders, direct orders to our           18:02:56

 8    customers.                                         18:03:00

 9         Q.    Okay.  Let's take -- you can            18:03:00

10    set that aside.                                    18:03:15

11               I hand you a copy of what will         18:03:19

12    be marked as Harper Exhibit 33.                    18:03:20

13               MR. KO:  And for the record,           18:03:23

14         this is Bates -- ends in Bates 485740.       18:03:24

15               (Mallinckrodt-Harper Exhibit 33        18:03:28

16         marked for identification.)                   18:03:29

17    QUESTIONS BY MR. KO:                                18:03:29

18         Q.    Do you recognize that e-mail,          18:03:41

19    Ms. Harper?                                        18:03:44

20         A.    No, I don't, so I'm going to           18:03:45

21    read it, please --                                 18:03:52

22         Q.    Sure.                                    18:03:52

23         A.    -- because -- yeah.  Okay.             18:03:53

24         Q.    In terms of the September 9,           18:04:40

25    2010 e-mail that you drafted to James Parker,     18:04:47
```