# Exhibit 11

Highly Confidential - Subject to Further Confidentiality Review

```
 1         IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF OHIO
 3                   EASTERN DIVISION
 4                      -  -  -
 5

    IN RE:  NATIONAL              :   HON. DAN A.
 6  PRESCRIPTION OPIATE           :   POLSTER
    LITIGATION                    :
 7                                :   MDL NO. 2804
    APPLIES TO ALL CASES          :
 8                                :   CASE NO.
                                  :   17-MD-2804
 9                                :
10           - HIGHLY CONFIDENTIAL -
11   SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
12                     VOLUME II
13                      -  -  -
14                   May 17, 2019
15                      -  -  -
16                Continued videotaped
    deposition of DR. SETH B. WHITELAW, taken
17  pursuant to notice, was held at the
    offices of Golkow Litigation Services,
18  One Liberty Place, 1650 Market Street,
    Philadelphia, Pennsylvania, beginning at
19  8:31 a.m., on the above date, before
    Michelle L. Gray, a Registered
20  Professional Reporter, Certified
    Shorthand Reporter, Certified Realtime
21  Reporter, and Notary Public.
22                      -  -  -
23           GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    me to work with.
 2         Q.   So sitting here today the
 3    answer to that question is no?
 4              MR. BOGLE:  You can answer
 5         that, and then we're taking a
 6         break.
 7              MR. DAVISON:  Yeah.
 8              THE WITNESS:  As I said,
 9         unless there's new available
10         information I need to consider, I
11         am not -- at this current point I
12         have no intention of amending the
13         report.
14              MR. BOGLE:  All right.
15              MR. DAVISON:  We can go off
16         the record.
17              THE VIDEOGRAPHER:  Going off
18         the record at 4:19 p.m.
19              (Short break.)
20              THE VIDEOGRAPHER:  Back on
21         the record at 4:34 p.m.
22    BY MR. DAVISON:
23         Q.   All right.  Dr. Whitelaw, we
24    were earlier talking about kind of the --
```

1  the time period for your review of
2  Mallinckrodt's anti-diversion compliance
3  program.  Can you recall any documents
4  that you reviewed relating to
5  Mallinckrodt's anti-diversion compliance
6  program from prior to 2006?
7           A.    You are asking me to recall
8  specific documents.  I can't recall
9  specific documents.  But you've obviously
10 charted it out.
11                One thing I wasn't clear,
12 when we broke, was, I did ask for
13 documents and did look at documents all
14 the way through 2018.  And if you look at
15 the -- as you correctly noted, and we
16 were correctly having that discussion
17 right when the break took place, from
18 2012 onward, I haven't seen enough
19 documentation to be able to form an
20 opinion on the adequacy of an
21 anti-diversion program from Mallinckrodt
22 post 2012.
23                I would need to see
24 additional information.  One of the

1  things that would be, obviously for me
2  would be particularly critical, and
3  something I know I asked for, there
4  weren't any documents to be had, would
5  have been audits.
6          Q.    So, sir, I want to unpack
7  that a little bit.
8          A.    Sure.
9          Q.    Are you stating today that
10 you cannot offer an opinion as to the
11 adequacy of Mallinckrodt's anti-diversion
12 program post 2012?
13         A.    That is what I'm saying.  I
14 do not have enough information to offer
15 an opinion for or against.
16         Q.    All right.  So at trial,
17 you're not planning to offer an opinion
18 one way or the other regarding
19 Mallinckrodt's anti-diversion program
20 post 2012, correct?
21         A.    Unless additional
22 information that is relevant to this
23 report became available and to be
24 considered, I have no present intention

Highly Confidential - Subject to Further Confidentiality Review

1     of doing that.
2         Q.   Okay.  And if additional
3    information, you'd of course be required
4    to write a new report and we'd do this
5    all over again, correct?
6         MR. BOGLE:  Object to form.
7         THE WITNESS:  We'd certainly
8       be doing a supplement and having a
9       further conversation on a
10      supplement I'm sure.
11   BY MR. DAVISON:
12        Q.   But you don't intend to
13   offer a supplement sitting here today?
14        MR. BOGLE:  Object to form.
15        THE WITNESS:  As I said, and
16      I've stated on the record right
17      now, no, I have no intention of
18      offering a supplement as we
19      described post 2012 on
20      Mallinckrodt's program without any
21      additional information.
22   BY MR. DAVISON:
23        Q.   Thank you, sir.
24        So I want to -- I want to go

Highly Confidential - Subject to Further Confidentiality Review

1  back to the beginning of the time period
2  for your -- your review.
3              Are you offering an opinion
4  as to the adequacy of Mallinckrodt's
5  controlled substance compliance program
6  from 1996 to 2006?
7        A.    Again, I think we need to
8  look at the documents, where they fall
9  out.  I'm looking at your program from
10 just before 2007, probably up through
11 2012 to be precise is where I had
12 documents.  Although I asked for
13 documents going all the way back in time.
14       Q.    So your report is offering
15 an opinion as to Mallinckrodt's
16 suspicious -- excuse me.  Strike that.
17             Your report offers an
18 opinion as to the effectiveness of
19 Mallinckrodt's anti-diversion program
20 from 2007 to 2012, correct?
21             MR. BOGLE:  Object to form.
22             THE WITNESS:  I think to be
23       precise, it would probably be more
24       like 2008 to 2012.  That's the

Highly Confidential - Subject to Further Confidentiality Review

```
 1            revisit this issue, I do not have
 2            a present intention of amending my
 3            report as it stands today.
 4   BY MR. DAVISON:
 5       Q.   Thank you, sir.
 6            Sir, on Page 215 of your
 7   report you reference an individual named
 8   Victor Borelli.  I'm looking at the third
 9   paragraph.  It starts:  "Mr. Borelli
10   worked for Mallinckrodt from 2005 to
11   2012"?
12       A.   Yes, as a matter of fact I
13   see the reference.  I do.
14       Q.   All right.  And, sir, do you
15   also recall that in your report you
16   reference an individual from Mallinckrodt
17   named Hugh O'Neill?
18       A.   Yes, sir.  I actually do
19   remember referencing an individual,
20   Mr. Hugh O'Neill.
21       Q.   You are aware that
22   Mr. O'Neill joined Mallinckrodt in 2013?
23       A.   Yes, I'm aware that
24   Mr. O'Neill joined Mallinckrodt in 2013.
```

1      Q.    So you have no reason to
2   believe that Mr. O'Neill and Mr. Borelli
3   ever overlapped at Mallinckrodt, correct?
4      A.    That is correct.  I have --
5   have no reason to believe that they ever
6   overlapped at Mallinckrodt.
7      Q.    Sir, if you can turn to
8   Page 234 of your report.
9      A.    Yes, I see it.
10     Q.    You write -- I'm at the
11  third paragraph down.
12     A.    Third paragraph down.
13     Q.    It says "When Mallinckrodt."
14           Do you see that?
15     A.    Yes.
16     Q.    That's where it starts.
17  "When Mallinckrodt subsequently notified
18  distributors that it would not pay
19  chargeback on sales to multi-distributor
20  customers, Mallinckrodt failed to report
21  any of the orders that gave rise to
22  multi-distributor sales to the DEA as
23  suspicious."
24           All right, sir.  Earlier

Highly Confidential - Subject to Further Confidentiality Review

1  today, we talked a little bit briefly
2  about Mallinckrodt's chargeback
3  restriction program.  Are you familiar
4  with Mallinckrodt's chargeback
5  restriction program?
6          A.    In broad general terms, yes.
7  But would you care to refresh my
8  recollection of the conversation.  Be
9  happy to.  It's -- it's been 14 hours,
10 guys.
11         Q.    Fair enough.
12               Mallinckrodt at times would
13 restrict chargeback payments --
14         A.    Yes.
15         Q.    -- with respect to certain
16 downstream pharmacies, do you recall
17 that?
18         A.    Yes.  Now I understand what
19 you are referring to.  Thank you for
20 clarifying.
21         Q.    Not a problem.
22               Did you analyze
23 Mallinckrodt's chargeback restriction
24 program as part of your anti-diversion

Highly Confidential - Subject to Further Confidentiality Review

1    compliance review?
2             MR. BOGLE:  Object to form.
3             THE WITNESS:  I looked at --
4        I looked at how Mallinckrodt was
5        using chargeback data and
6        incorporating it into the SOMs
7        program as part of my review.
8    BY MR. DAVISON:
9        Q.   And did you find flaws with
10   Mallinckrodt's chargeback restriction
11   program?
12            MR. BOGLE:  Object to form.
13            THE WITNESS:  I did not find
14       flaws with the restriction
15       program, per se.  What I found a
16       flaw with was the presence of the
17       fact that Mallinckrodt had access
18       to this data for a long period of
19       time.  And it wasn't until 2010
20       roughly that you started to use it
21       in the SOMs program.  That was the
22       issue that I was raising with
23       chargebacks in particular.
24   BY MR. DAVISON:

Highly Confidential - Subject to Further Confidentiality Review

1      Q.    So -- so the flaw wasn't
2  with what Mallinckrodt did with it, but
3  when they started doing it.  Is that
4  fair?
5              MR. BOGLE:  Object to form.
6              THE WITNESS:  Well, some of
7         it is a flaw of what Mallinckrodt
8         did or didn't do with it, but the
9         other part of the flaw is the fact
10        that there was data that
11        indicated, as my report indicates,
12        and I think we can go to the page
13        for example, on Page 235,
14        Mallinckrodt had visibility to
15        similar data that indicated that
16        you were working and dealing with
17        some pretty unsavory, shall we
18        say, distributors, and nothing was
19        done about it, even though you had
20        the presence of the data inhouse
21        until the DEA took action.  So
22        that's another issue that I have
23        with how you used the data.
24  BY MR. DAVISON: