# EXHIBIT I.15

```
 1                UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF OHIO
 3                      EASTERN DIVISION
 4                           - - -
 5   IN RE:  NATIONAL          )
     PRESCRIPTION OPIATE       )  MDL No. 2804
 6   LITIGATION                )
     _____ )  Case No. 1:17-MD-2804
 7                             )
     THIS DOCUMENT RELATES     )
 8   TO ALL CASES              )  Hon. Dan A. Polster
 9                           - - -
10
11             Thursday, December 6, 2018
12       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
13
14                           - - -
15         Videotaped deposition of Gilberto Quintero,
16   held at the offices of BakerHostetler, 200 Civic
17   Center Drive, Suite 1200, Columbus, Ohio, commencing
18   at 7:04 a.m., on the above date, before Sara S. Clark,
19   Registered Merit Reporter and Notary Public.
20
21                           - - -
22
23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reporting suspicious orders?
 2             MS. WICHT:  Objection to form.
 3         Foundation.
 4         A.   This is not true.  I don't know
 5    why -- who is this -- Bill de Gutierrez-Mahoney
 6    wrote that, because that's not the fact.
 7         Q.   You started reporting suspicious
 8    orders in 2012 when the DEA amended their
 9    expectations of Cardinal?
10         A.   We reported --
11             MS. WICHT:  Object to form.
12         Foundation.  Mischaracterizes prior
13         testimony.
14         A.   We reported -- if you look at the
15    record and the number of suspicious orders to
16    DEA, we reported thousands of orders in 2012 and
17    thousands of orders in 2013, '14, '15 as
18    suspicious orders.
19         Q.   So the years you just chose to
20    list are '12, '13, '14, and '15, correct?
21         A.   Yes.  Because you're giving me a
22    document that is dated 2013.
23         Q.   Did you report thousands of
24    suspicious orders in 2011?
```

```
 1         A.    We reported suspicious orders, as
 2   defined by our program and as agreed by DEA, in
 3   2009, '10, and '11.
 4         Q.    So the answer is no?
 5               MS. WICHT:  Objection to the form.
 6         Mischaracterizes.
 7         A.    The answer is no to what?
 8         Q.    That Cardinal reported thousands
 9   of suspicious orders in 2011.
10         A.    We -- the answer is we reported
11   suspicious orders, as defined by our program, as
12   defined with agreement with DEA in 2009, '10,
13   and '11.
14         Q.    Mr. Quintero, are you aware of an
15   opioid epidemic in this nation?
16         A.    I'm aware that there's an opioid
17   epidemic in this nation.
18         Q.    And to your knowledge, what does
19   that mean?
20         A.    That means that there are
21   individuals in society that are using opiates
22   for other than legitimate medical use.
23         Q.    A few, or thousands?
24         A.    I believe thousands.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Hundreds of thousands?
 2          A.    I could not say that.  If I had
 3    documents in front of me that -- from healthcare
 4    professionals that have done the studies, but I
 5    do not recollect what the number is.
 6          Q.    And to your knowledge, what role
 7    did Cardinal play in causing that opioid
 8    epidemic in the United States?
 9          A.    We did not --
10                MS. WICHT:  Object to the form of
11          the question and on the basis that I
12          believe Special Master Cohen has ruled
13          that's an inappropriate area for
14          questioning in depositions in this case.
15                But I'll allow you to answer,
16          Mr. Quintero.
17          A.    I do not believe Cardinal Health
18    played a role in the opioid epidemic.  We had a
19    program in place that was designed to prevent --
20    to -- we had the proper controls against
21    diversion of drug products other than for
22    legitimate medical uses, as demonstrated by the
23    actions that we have taken, as demonstrated by
24    the hundreds of pharmacies that we have
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   terminated, not because we know they are
 2   diverting.  It's because we may have the
 3   suspicion that they may engage in practices that
 4   they are not consistent with the expectations
 5   that we have.
 6                        - - -
 7         (Cardinal-Quintero Exhibit 5 marked.)
 8                        - - -
 9   BY MR. KROEGER:
10         Q.    I'm going to hand you what is
11   marked as Exhibit 5,
12   CAH_MDL_PRIORPROD_DEA12_000001.  We have it
13   listed as P1.4085.  And I'd ask you to turn to
14   Page 4 of that, Mr. Quintero.  You're welcome to
15   take a look at the document and familiarize
16   yourself with it, but I'm going to ask you about
17   Page 4 to start.
18         A.    Is this our document or the
19   government document?
20         Q.    It's the government's document.
21               So if you turn to Page 4.  If I
22   could get you to -- well, I'll read it for you.
23   The first full paragraph.
24               "The illicit pain clinics, the
```

```
 1   chain pharmacy customers?
 2            MS. WICHT:  Object to the form.
 3        A.  I don't recall that.  I don't
 4   recall the document production for that
 5   particular time, so I cannot say that.
 6        Q.  Okay.  Lastly, do you agree or
 7   disagree that there's evidence -- there was
 8   evidence that respondent's due diligence
 9   practices were inconsistent with both the 2008
10   MOA and Cardinal Health's own policies, the
11   purpose of which was to reduce diversion?
12            MS. WICHT:  Object to the form.
13        A.  I completely disagree with that as
14   shown by the fact that we have terminated over
15   300 pharmacies at that point in time, and most
16   of those pharmacies continue to have a DEA
17   license today and they're still in business.
18        Q.  Cardinal still has a DEA license
19   and is still in business, correct?
20        A.  We regained our DEA license for
21   Lakeland.
22        Q.  So that doesn't necessarily prove
23   or disprove due diligence at any given time,
24   does it?
```