# EXHIBIT I.19

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3
       IN RE NATIONAL PRESCRIPTION
 4     OPIATE LITIGATION              Hon. Dan A. Polster
                                      MDL No. 2804
 5     THIS DOCUMENT APPLIES TO ALL    No. 17-MD-2804
       CASES
 6     _____/
 7
 8                   HIGHLY CONFIDENTIAL -
          SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
 9
                         --  --  --
10
                  THURSDAY, JANUARY 10, 2019
11
                         --  --  --
12
           Videotaped Deposition of DONALD WALKER, held
13   at the Law Offices of COVINGTON & BURLING, One Front
     Street, 35th Floor, San Francisco, California,
14   beginning at 8:57 a.m., before Sandra Bunch
     VanderPol, FAPR, RMR, CRR, CALIFORNIA CSR #3032
15
                         --  --  --
16
17
18
19
20
21
     _____
22
                 GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                     Deps@golkow.com
24
25
```

Golkow Litigation Services                                Page 1

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Regulatory Affairs Group was in there, and I had a
 2   group that was responsible for construction and
 3   building of our distribution centers.
 4            Q.    You mentioned Regulatory Affairs.
 5   What kind of regulatory affairs matters were you
 6   responsible for as Senior Vice President of
 7   operations -- distribution operations, I should say?
 8            A.    McKesson, and the wholesalers as an
 9   industry, are highly regulated.  We have
10   responsibilities for a number of regulatory
11   requirements.  The FAA, the Department of
12   Transportation, DOT, OSHA.  We had hazardous material
13   requirements.  Certainly we had responsibility for
14   compliance with DEA regulations.  And various state
15   and local regulations as well.
16            Q.    What was involved in the handling of
17   controlled substances in particular?
18            A.    Our -- our distribution network in
19   handling controlled substances was complex.  The
20   requirements under the federal code ensure -- wanted
21   to ensure that we had systems in place to prevent
22   diversion, primarily around security, as the code
23   spelled out.
24            And so the inside of our buildings, the
25   controlled substances divided into two major areas.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   One, in what we called the narcotics Class 2
 2   controlled substances were stored in a vault, much
 3   like a bank vault, and the balance of the controlled
 4   substances were stored in a locked and secured cage.
 5   There was requirements for alarm.  The physical --
 6   the physical construction of both the vault and the
 7   cage were specified under regulation.
 8              And, in addition, we had reporting
 9   requirements to the DEA, the ARCOS reporting, which
10   was the month-end reporting of all of our sales.  We
11   needed to reconcile all of our receipts and all of
12   our sales and our inventory, along with the physical
13   inventory, to ensure that we could account for each
14   and every one of the controlled substances that was
15   in our possession that was reportable.
16              We had reporting requirements on suspicious
17   orders.  Our suspicious order reporting we called at
18   the time -- prior to 2008 we gave it a moniker that
19   said -- basically a report number called DU45, and we
20   provided that suspicious order reporting to the local
21   DEA field offices, as required.
22         Q.    And you described the DU45 report.
23   What was the DU45 report exactly?
24         A.    The DU45 was a report that reviewed
25   sales of customers' purchases of controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1  suspicious orders.
2          You have described the Lifestyle Drug
3  Monitoring Program.  Earlier today Mr. Kennedy asked
4  you a lot of questions about the next program that
5  McKesson developed.  That was called what?
6          A.    The Controlled Substance Monitoring
7  Program, or CSMP.
8          Q.    What was the difference between the
9  new CSMP program that was put into place and the
10 LDMP, or Lifestyle Drug Monitoring Program?
11         A.    There were a number of things that --
12 that were done at that time.  First, the difference
13 specifically in the programs is we continued to use
14 the concept of thresholds to monitor specific orders.
15 The significant difference was that we created a
16 systemic solution to total the dose units purchased
17 by a given pharmacy on a given controlled
18 substances -- substance.  And if the order that was
19 generated at any given time caused the pharmacy to go
20 above the threshold, that entire order was blocked.
21 The blocking of orders was a piece.
22         We had -- we continued to have the
23 three-part review.  The difference being is that the
24 blocked order triggered a review process, but we
25 still maintained a three-tiered escalation process