**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL No. 2804** |
| | **Case No. 17-md-2804** |
| | **Judge Dan Aaron Polster** |

**This document relates to:**

*The County of Cuyahoga v. Purdue Pharma L.P., et al.,* Case No. 17-OP-45004

*The County of Summit, Ohio, et al. v. Purdue Pharma L.P. et al.*, Case No. 18-OP-45090

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS ALLERGAN PLC, ALLERGAN FINANCE, LLC, ALLERGAN SALES, LLC, AND ALLERGAN USA, INC.'S INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

**Page**

STATEMENT OF UNDISPUTED FACTS ..................................................................... 2

ARGUMENT ............................................................................................................. 5

I.      Allergan Is Not Liable for the Actavis Generic Entities as a Matter of Law..................... 6

      A.      Plaintiffs Have Not Alleged and Cannot Prove that the Corporate Veil Should Be Pierced. ................................................................................... 6

      B.      Even if Plaintiffs Could Pierce the Veil, Any Liability Based on Generics Transferred to Teva Through Its Unambiguous Assumption of Liability. ........... 11

II.     Allergan Is Not Liable for Kadian-Related Conduct of Alpharma................................. 12

III.    Allergan Is Entitled to Summary Judgment on All of Plaintiffs' Claims Related to Its Products............................................................................................................. 13

      A.      Plaintiffs Cannot Prove that Allergan Proximately Caused Plaintiffs Injuries or Any Public Nuisance. ..................................................................... 14

      B.      Plaintiffs Cannot Prove that Allergan Was Part of Any Conspiracy or the Alleged Opioid Supply Chain Enterprise. ............................................................. 16

      C.      All Claims Against Allergan Are Time-Barred. ................................................... 17

CONCLUSION........................................................................................................... 18

i

# **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*,
   617 N.E.2d 1075 (Ohio 1993) ........................................................................ 7, 10

*Boyle v. United States*,
   556 U.S. 938 (2009) ............................................................................................. 16

*C. Norris Mfg., LLC v. BRT Heavy Equip., LLC*,
   2017 WL 1179129 (N.D. Ohio Mar. 30, 2017) .................................................... 7

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
   863 F.3d 474 (6th Cir. 2017) .............................................................................. 14

*Dobbelaere v. Cosco, Inc.*,
   697 N.E.2d 1016 (Ohio Ct. App. 1997) ........................................................ 11, 12

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003) ............................................................................................... 6

*Dombroski v. WellPoint, Inc.*,
   895 N.E.2d 538 (Ohio 2008) ........................................................................ 6, 7, 9

*Duke Energy Fla., LLC v. FirstEnergy Corp.*,
   731 F. App'x 385 (6th Cir. 2018) ............................................................ 2, 6, 9, 10

*Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*,
   545 F.3d 357 (6th Cir. 2008) ................................................................................ 8

*Fla. Power Corp. v. Firstenergy Corp.*,
   2016 WL 7178660 (N.D. Ohio Dec. 9, 2016) .......................................... 1, 2, 10

*FV 1 Inc. v. Goodspeed*,
   974 N.E.2d 664 (Ohio Ct. App. 2012) ......................................................... 16, 17

*Goodman v. Challenger Int'l, Ltd.*,
   1995 WL 402510 (E.D. Pa. July 5, 1995),
   *aff'd*, 106 F.3d 385 (3d Cir. 1996) ..................................................................... 11

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
   No. 13-MD-2445, 2017 WL 4810801 (E.D. Pa. Oct. 25, 2017) ........................ 12

*Kessinger v. Grefco, Inc.*,
   875 F.2d 153 (7th Cir. 1989) .............................................................................. 11

*Meinert Plumbing v. Warner Indus., Inc.*,
  90 N.E.3d 966 (Ohio Ct. App. 2017) ................................................................. 7, 8

*Minno v. Pro-Fab, Inc.*,
  905 N.E.2d 613 (Ohio 2009) ............................................................................. 6, 7

*Pang v. Minch*,
  559 N.E.2d 1313 (Ohio 1990) ............................................................................. 14

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*,
  861 N.E.2d 121 (Ohio 2006) ............................................................................ 2, 12

*Welco Indus., Inc. v. Applied Companies,*,
  617 N.E.2d 1129 (Ohio 1993) ............................................................................. 11

*Woodward Constr., Inc. v. For 1031 Summit Woods, LLC*,
  30 N.E.3d 237 (Ohio Ct. App. 2015) ................................................................. 16

Plaintiffs' allegations against Allergan refer to two branded opioid medicines, Kadian and Norco.  Together, these two products have constituted a *de minimis* fraction of prescriptions in the opioid market over time, both nationally and in the Track One Counties.  Since 2009, when Allergan acquired Kadian, there have been a total of 11,435 prescriptions dispensed in Summit and Cuyahoga Counties (approximately 0.2% of the opioid market).  In the 20-year time period that Norco has been FDA-approved, there have been a total of 21,673 prescriptions dispensed in these counties (approximately 0.06% of the opioid market).  And there is not one shred of evidence in the record suggesting that a single one of those prescriptions was unlawful, unnecessary or diverted by criminals.  Indeed, Allergan is not named in the Opioid Marketing Enterprise that Plaintiffs allege conspired to make the market for prescription opioids.

Given Allergan's miniscule presence in the prescription-opioid market and the dearth of evidence of misconduct, it is perhaps not surprising that Plaintiffs attempt to create Allergan liability by focusing on the alleged conduct of others, specifically:  (1) the "Actavis Generic Entities," former indirect subsidiaries of Allergan plc that were sold as ongoing entities to Teva in 2016, which are themselves named defendants in the Track One Cases, and (2) Alpharma, Kadian's owner before 2009.  These efforts to conflate Allergan with other distinct, independent corporate entities fail as a matter of law and undisputed fact.

As set forth more fully below, under Ohio and Sixth Circuit precedent, Allergan cannot be held liable for the alleged actions of the Actavis Generic Entities.  First, Plaintiffs have not alleged facts on which they would be entitled to pierce the corporate veil to hold Allergan liable for the conduct of these entities—nor could they.  There is ***no evidence*** to suggest that Allergan caused Plaintiffs' injuries by using any erstwhile control over these former subsidiaries to commit specific egregious acts through the corporate form.  *See, e.g.*, *Fla. Power Corp. v. Firstenergy Corp.*, 2016

WL 7178660, at *10 (N.D. Ohio Dec. 9, 2016) (Polster, J.), *aff'd sub nom. Duke Energy Fla., LLC v. FirstEnergy Corp.*, 731 F. App'x 385 (6th Cir. 2018).  Second, even if Plaintiffs could pierce the corporate veil (they cannot), Teva expressly and unambiguously **assumed** all liability for the generics business it purchased from Allergan in 2016,[1] which precludes Allergan's liability to Plaintiffs for any generics-related conduct under settled Ohio law.

Nor can Allergan be held legally liable for any Kadian-related conduct of Alpharma before 2009, because the Kadian asset purchase agreement unequivocally affirmed the general rule, followed in Ohio, that an asset purchaser "is not liable for … tortious conduct[] of the seller corporation."  *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 130 (Ohio 2006).  Given the undisputed terms of the transaction, Alpharma and its successors unambiguously retained all liability with respect to Alpharma's Kadian-related conduct before the sale (yet, for reasons unknown to Allergan, Plaintiffs did not name them as defendants).[2]

When Allergan's conduct is properly viewed on its own, it is clear that Plaintiffs cannot sustain their sweeping claims against Allergan.  At a minimum, though, it is critical for the Court to clarify at this stage that Allergan is not liable for the conduct of the Actavis Generic Entities and Alpharma.  Such a ruling will streamline this litigation without extinguishing any potential liability—and will assist the parties in resolving their disputes.

## STATEMENT OF UNDISPUTED FACTS

### A.    Allergan Branded Opioid Products.

Defendant Allergan plc[3] is an Irish holding company that indirectly owns three other named

---

[1] *See, e.g.*, Ex. 1, January 31, 2018 Allergan-Teva Agreement (ALLERGAN_MDL_01396687) § 4.

[2] Allergan tried to implead Alpharma and its successors, but the Court declined to exercise supplemental jurisdiction, noting that these issues would further complicate this litigation.  ECF No. 1201 at 3-4.

[3] Allergan plc has disputed and continues to dispute that it is subject to personal jurisdiction in this Court (or any U.S. court), as articulated in its pending motion to dismiss.  *See* ECF No. 1258.

defendants, Allergan Finance, LLC f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc., Allergan Sales, LLC, and Allergan USA, Inc. (for convenience these entities and their current corporate affiliates are collectively referred to herein as, "Allergan").[4]  Like Allergan plc, Allergan Finance, LLC is a holding company that does not manufacture, market, distribute, or sell any pharmaceutical products.[5]  Allergan Sales, LLC and Allergan USA, Inc. have been involved in the manufacturing, marketing, distribution, or sales of Kadian and Norco.[6]

Kadian and Norco have constituted a *de minimis* fraction of the total prescriptions in the opioid market over time.  In both Cuyahoga and Summit Counties, the market share for Kadian was approximately 0.20% from 2009-2017 (11,435 total prescriptions dispensed to patients in Summit and Cuyahoga Counties over the course of 9 years), and the market share for Norco was 0.06% from 1997-2017 (21,673 total prescriptions dispensed to patients in Summit and Cuyahoga Counties over the course of 20 years).[7]  The FDA originally approved Norco in 1997.  Allergan has not promoted Norco since at least 2003.[8]  Following acquisition at the end of 2008, Allergan detailed Kadian from Spring 2009 through 2012, using a small, third-party sales force.[9]  Plaintiffs cite to a February 2010 FDA Warning Letter in support of a marketing-misconduct theory against Allergan, but there is no dispute Allergan quickly instituted an FDA-approved corrective action plan, and that each and every healthcare provider who received the marketing materials at issue also received the corrective measure.[10]

---

[4] *See, e.g.*, Summit TAC (ECF No. 1466) ¶¶ 49-53.
[5] Ex. 2, Kaufhold (30)(b)(6) Dep. Ex. 3 at 9.
[6] *See id.*
[7] Ex. 3, Allergan's Fourth Amended Responses and Objections to Pls.' Corrected Second Set of Interrogatories, at 44-45; Ex. 4, Kyle Rep. at Fig. 6-7 (market-percent figures are measured in terms of morphine milligram equivalents ("MMEs")).
[8] Ex. 3, Allergan's Fourth Amended Responses and Objections to Pls.' Corrected Second Set of Interrogatories, at 5.
[9] *See id.* at 35-38; Ex. 4, Kyle Rep. ¶ 50.
[10] *See* Ex. 4, Kyle Rep. ¶ 66; Ex. 5, Peck Rep. § VII.

Discovery is now complete, and there is no evidence in the record that Allergan engaged in the conduct that Plaintiffs allege improperly made a market for prescription opioids as they allege against other Defendants.  Specifically, Plaintiffs have no evidence that Allergan influenced treatment guidelines or promoted its opioids through key opinion leaders,[11] speakers' bureaus,[12] continuing medical education (CME) programs,[13] or pain advocacy organizations.[14]  Plaintiffs have likewise developed no evidence that a single order of Kadian or Norco determined to be suspicious was shipped by Allergan, let alone shipped to Summit County or Cuyahoga County.

### B.    Actavis Generic Opioid Products.

Prior to 2016, Allergan plc indirectly owned corporate entities that had involvement with generic opioids (the "Actavis Generic Entities").[15]  Allergan plc sold the entire generics business to Teva Pharmaceuticals Industries Ltd. ("Teva") pursuant to a stock purchase agreement, the Master Purchase Agreement, dated July 26, 2015, as amended (the "MPA").[16]  Pursuant to the MPA, Teva purchased all of the equity interests of the Allergan plc subsidiaries and assets involved with generic products, including generic opioid products.[17]  The Actavis Generic Entities that Teva owns are among the named defendants in the Track One Cases.[18]  On January 31, 2018, Allergan

---

[11] *See, e.g.*, Ex. 6, Altier Dep. at 369:10-13; *see also* Ex. 7, Perri Dep. at 600:1-25; 602:17-603:16; 605:7-18; 605:23-606:12.

[12] *See. e.g.*, Ex. 21, ALLERGAN_MDL_01104711 at -4716; Ex. 9, ALLERGAN_MDL_00400518 at -0518-20; Ex. 10 Boothe Dep. at 199:9-12.

[13] *See* Ex. 21, ALLERGAN_MDL_01104711 at -4717; *see also* Ex. 6, Altier Dep. at 368:23-369:18.

[14] *See* Ex. 7, Perri Dep. at 606:13-20.

[15] *See* Ex. 2, Kaufhold Dep. Ex. 3 at 3-7, 26 (MPA, Schedule 1.1(f)), 66-78 (MPA, Schedule 4.6(c)); Ex. 11, TEVA_MDL_JD000066.

[16] Ex. 12, MPA (ALLERGAN_MDL_01470362).

[17]*See id.* § 2.1; *Allergan plc July 28, 2015 8-K,*
https://www.sec.gov/Archives/edgar/data/1578845/000119312515265082/d70177d8k.htm.

[18]Defendants Warner Chilcott Company, LLC, Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), Watson Laboratories, Inc., Actavis LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City), and Actavis Laboratories FL, Inc.  *See* Summit TAC (ECF No. 1466) ¶¶ 54-64; Cuyahoga TAC (ECF No. 1631) ¶¶ 48-58.

and Teva entered a settlement agreement in which Teva again affirmed its assumption of generics liability in the MPA.[19]

### C.    Kadian Acquisition from King/Alpharma.

Until December 29, 2008, Alpharma Inc. owned, marketed, and sold Kadian.  On November 23, 2008, Alpharma entered a definitive merger agreement to be acquired by King Pharmaceuticals, Inc.  Before approving this merger, the FTC required the combined entity to divest Kadian due to competition concerns.  Allergan's predecessor purchased Kadian from King in an Asset Purchase Agreement dated December 17, 2008 (the "Kadian APA"), effective immediately following consummation of the merger agreement between King and Alpharma.[20]  In the Kadian APA, Alpharma and King expressly retained all liability for Alpharma's pre-sale conduct with respect to Kadian.[21]  King and Alpharma are now owned by Pfizer.[22]

### ARGUMENT

As Plaintiffs have seen their case against Allergan flounder in discovery, their focus has increasingly been on attempting to foist liability for the conduct of non-parties and other named defendants onto Allergan with no basis in fact or law.  Granting Allergan summary judgment on these issues is compelled under settled Ohio law.  Importantly, such a ruling ***would not extinguish any potential liability to the extent it exists***, but rather would require Plaintiffs to attribute responsibility to the correct corporate entities and pave the way for the parties to resolve their claims and streamline the trial (if necessary).  Absent such a legal ruling, Allergan will be compelled to present the veil-piercing and successor-liability defenses to the jury, further complicating an already too-complicated trial.

---

[19] Ex. 1, January 31, 2018 Allergan-Teva Agreement (ALLERGAN_MDL_01396687) § 4.
[20] Ex. 13, Kadian APA (ALLERGAN_MDL_00378157) §§ 5.01, 9.01, 10.02.
[21] *Id.* §§ 1.01(kk)(vi), 3.01.
[22] *See* ECF No. 1014.

## I.      Allergan Is Not Liable for the Actavis Generic Entities as a Matter of Law.

To hold Allergan plc[23] liable for the acts of its former generics subsidiaries, Plaintiffs must prove **both** (1) that the corporate veil should be pierced between Allergan plc and each of the Actavis Generic Entities to disregard the corporate form for the period before August 2, 2016; and (2) that Teva's unambiguous assumption of liability for conduct related to generic opioids should be disregarded.  With the record now closed, they cannot prove either.

### A.      Plaintiffs Have Not Alleged and Cannot Prove that the Corporate Veil Should Be Pierced.

Under Ohio law,[24] disregarding the corporate form to hold shareholders liable remains "a 'rare exception'" to the presumptive rule of nonliability.  *Dombroski v. WellPoint, Inc.*, 895 N.E.2d 538, 542 (Ohio 2008) (quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)).  The "test focuses on the extent of the shareholder's control of the corporation and whether the shareholder misused the control so as to commit specific egregious acts that injured the plaintiff."  *Id.* at 543. The plaintiff must prove three separate elements for the corporate form to be disregarded:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

---

[23] Ohio law has a bright-line rule that "a plaintiff cannot pierce the corporate veil of one corporation to reach its sister corporation" because "the two corporations have common individual shareholders but neither corporation has any ownership interest in the other corporation." *Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 616 (Ohio 2009).  While it is unclear how Plaintiffs intend to prove that the veil should be pierced through multiple and varying corporate-structure layers for each one of the numerous former affiliates now owned by Teva, Allergan plc is the only Allergan entity that had an indirect ownership interest in all of the Actavis Generic Entities transferred to Teva.  *See, e.g.*, Ex. 8, ALLERGAN_MDL_02147111.  Allergan Finance, LLC had an ownership interest in most but not all of these companies.  *See id.*  Allergan Sales, LLC and Allergan USA, Inc. had no ownership interest in these companies.  *See id.*  Thus, Allergan refers to efforts to hold Allergan plc liable, though any effort to hold Allergan Finance, LLC liable for the conduct of those companies that are its former subsidiaries (distinct from sister companies) would be subject to substantially the same analysis.

[24] Ohio law applies to any veil-piercing or successor-liability theory of secondary liability because Plaintiffs' alleged injury occurred in Ohio.  *See Duke Energy Fla., LLC v. FirstEnergy Corp.*, 731 F. App'x 385, 390–91 (6th Cir. 2018).

*Minno v. Pro-Fab, Inc.*, 905 N.E.2d 613, 616 & n.1 (Ohio 2009) (brackets and internal quotation marks omitted).   Although Allergan plc's corporate structure was complex, its relationships with its subsidiaries were typical of a sophisticated holding company.   Yale Law Professor Jonathan Macey, an expert in corporate governance and corporate control with more than 30 years of experience studying the relationship between parents and subsidiaries in sophisticated corporate structures, closely analyzed Allergan's corporate interactions with the Actavis Generic Entities and concluded that they "were not excessive or aberrant" in any way.[25] He also testified that he has "never been more certain about [his] opinion in any of the 80 cases in which" he has examined corporate interactions.[26]

**Prong 1:  The Actavis Generic Entities were not the alter ego of Allergan**.   For the first prong, Ohio courts conduct an "an alter-ego analysis" that "considers a non-exclusive list of factors" to determine whether "a corporation and its shareholders . . . are merely alter egos of" one another.  *C. Norris Mfg., LLC v. BRT Heavy Equip., LLC*, 2017 WL 1179129, at *11 (N.D. Ohio Mar. 30, 2017) (internal quotation marks omitted).   "[T]o succeed" on the alter-ego prong "a plaintiff must show that the individual and the corporation are fundamentally indistinguishable." *Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1086 (Ohio 1993), *holding modified on other grounds by Dombroski*, 895 N.E.2d 538.  Relevant factors Ohio courts consider in this inquiry include whether the corporation: is grossly undercapitalized; fails to observe corporate formalities; has its funds or property diverted; does not keep corporate records; is merely a façade, *see C. Norris Mfg., LLC*, 2017 WL 1179129, at *11; and is separated from the piercing-target by many corporate layers, as multiple "intermediate corporate entities" reinforce that the parent and indirect subsidiary are separate entities.  *See, e.g.*, *Meinert Plumbing*

---

[25] Ex. 14, Macey Rep. ¶¶ 2-4, 27.
[26] Ex. 15, Macey Dep. at 256:20-257:6.

7

*v. Warner Indus., Inc.*, 90 N.E.3d 966, 977 (Ohio Ct. App. 2017) (citing *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 363 (6th Cir. 2008)).  The record here is devoid of any such evidence supporting veil piercing.

Rather, certain of the Actavis Generic Entities were more than seven corporate layers below Allergan plc in the corporate structure, with numerous intermediaries in between that each are separately registered corporate entities that themselves observe corporate formalities and operate as their own companies.[27]  The Actavis Generic Entities "were substantial companies with their own corporate governance infrastructures" and "operated in a manner that was separate and distinct from the operations of their parent companies."[28]  The Actavis Generic Entities were also treated as separate entities for tax purposes and were subject to audits by tax authorities and auditors separate and apart from their parents and affiliates; entered into contracts in their own right; and were sued in their individual corporate capacity.[29]  Perhaps most telling is that the Actavis Generic Entities, along with all of their assets and almost 15,000 employees, were transferred to Teva in August 2016 for consideration in the amount of $40.5 billion and continue to exist today as going concerns (themselves named as defendants).[30]  There is no evidence that supports a finding that the Actavis Generic Entities were functionally indistinguishable from Allergan plc (*i.e.*, sufficient to render Allergan's careful and complex corporate structure a nullity).

***Prong 2:  Allergan did not exercise control over the Actavis Generic Entities in such a manner as to commit fraud, an illegal act, or a similarly unlawful act.***  The second prong of the veil-piercing test—whether the parent company "exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act" that harmed the plaintiff—

---

[27] *See, e.g.*, Ex. 16, ALLERGAN_MDL_01373716.
[28] Ex. 14, Macey Rep. ¶ 69.
[29] *Id.* ¶ 74.
[30] *See id.* ¶¶ 71, 112; Ex. 11, TEVA_MDL_JD000066.

is critical to preserving Ohio's underlying "goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Dombroski*, 895 N.E.2d at 545.  The Ohio Supreme Court has emphasized that courts should "[l]imit[] piercing to cases in which the shareholders used their complete control over the corporate form to commit specific egregious acts." *Id.* at 544.

It is not enough even if a plaintiff asserts the subsidiary committed "straightforward tort[s]" and shows that the parent is the alter ego of the subsidiary (which Plaintiffs here neither plead nor prove). *See id.* at 544-45.  Rather, to satisfy the second prong, a plaintiff must prove that the parent *itself* committed a fraudulent, illegal, or similarly egregious act through its control of the subsidiary. *See id.* at 542 ("Shareholders may thus be held liable *for their own bad acts* notwithstanding the protections afforded by the corporate form . . . ." (internal quotation marks omitted) (emphasis added)).  "Classic examples" of such egregious conduct by the parent company "include the use of the corporate form to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust." *Duke Energy Fla., LLC v. FirstEnergy Corp.*, 731 F. App'x 385, 395 (6th Cir. 2018) (internal quotation marks omitted); *see also id.* (applying Florida law but noting "the second prong of Ohio's veil-piercing test . . . is very similar to Florida's").

*Duke Energy* is instructive.  The plaintiff, successor to two subsidiaries that committed CERCLA violations decades earlier, attempted to pierce the corporate veil to hold the defendant, successor to the parent company, indirectly liable for those violations.  Although the plaintiff proved that the defendant's predecessor dominated and controlled its subsidiaries during the relevant period (the first prong), *id.* at 394, this Court granted the defendant's summary judgment motion because the plaintiff had "not met the second element required to pierce the corporate veil," as it failed to "produced any contemporaneous evidence . . . showing that [the parent] used [the

relevant subsidiaries] for improper or fraudulent purposes." *Fla. Power Corp. v. FirstEnergy Corp.*, 2016 WL 7178660, at *10 (N.D. Ohio Dec. 9, 2016) (Polster, J.).  The Sixth Circuit affirmed, finding "[t]he facts presented d[id] not show that [the parent] was purposefully avoiding environmental liability or cutting costs at the expense of the environment" through its control of the subsidiaries.  731 F. App'x at 396.  "The record d[id] not contain evidence tending to show that [the parent's] officials were even aware of the environmental costs of their business model."  *Id.*

That reasoning is even more compelling here.  Allergan plc is merely a holding company that did not manage the daily affairs of the former subsidiaries.[31]  There is no evidence that Allergan plc created its corporate structure or the Actavis Generic Entities to avoid legal obligations or potential liabilities with respect to generic opioids.  Rather, Allergan's complex corporate structure, including with respect to the Actavis Generic Entities, resulted from numerous business combinations leading up to the sale of the generic business to Teva.[32]  There is no evidence that the Actavis Generic Entities were sham liability shields with no way to carry out obligations or satisfy liabilities.  Quite the opposite—that Teva paid $40.5 billion for the Actavis Generic Entities, together with all of their assets, demonstrates the substantial value that these entities possessed on their own.[33]

*Prong 3:  Plaintiffs cannot prove their injuries or any losses are due to Allergan plc's control.*  If a plaintiff can prove prong two (Plaintiffs here cannot), the third prong requires proof that the shareholder's improper control of the corporation itself proximately caused the plaintiff's injury.  *See Belvedere*, 617 N.E.2d at 1086.  Plaintiffs here cannot prove that any conduct of the Actavis Generic Entities caused Plaintiffs' far-reaching injuries (as explained in detail in

---

[31] Ex. 14, Macey Rep. ¶ 30; Ex. 2, Kaufhold (30)(b)(6) Dep. Ex. 3 at 9.
[32] Ex. 2, Kaufhold Dep. Ex. 3 at 3, 17.
[33] Ex. 14, Macey Rep. ¶¶ 100-05.

Manufacturer Defendants' causation brief). Plaintiffs certainly have no evidence that any conduct of Allergan plc in the period before August 2016 is the cause of Plaintiffs' expenditures on the opioid abuse crisis in the Track One Counties.

> **B.    Even if Plaintiffs Could Pierce the Veil, Any Liability Based on Generics Transferred to Teva Through Its Unambiguous Assumption of Liability.**

Allergan is not liable to Plaintiffs for generics-related conduct as a matter of law for a second, independent reason: Teva unequivocally assumed any such liability. If Plaintiffs could pierce the veil (they cannot), the corporate separateness of the Actavis Generic Entities would be disregarded and the stock purchase agreement would effectively be treated as an asset purchase agreement (albeit of a $40.5 billion generics business). However, the first exception to successor non-liability in an asset purchase is where "the buyer expressly or impliedly agrees to assume such liability." *Welco Indus., Inc. v. Applied Companies,*, 617 N.E.2d 1129, 1132 (Ohio 1993). "[S]uch assumptions of liability are ordinarily legally effective against third-parties" who attempt to assert claims against the seller. *E.g.*, *Goodman v. Challenger Int'l, Ltd.*, 1995 WL 402510, at *4 (E.D. Pa. July 5, 1995), *aff'd*, 106 F.3d 385 (3d Cir. 1996) (granting summary judgment and rejecting plaintiff's argument that "as a third party to the" agreement, it could not "be held to [third-party defendant's] transfer of liability"); *Dobbelaere v. Cosco, Inc.*, 697 N.E.2d 1016, 1022 (Ohio Ct. App. 1997); *see also Kessinger v. Grefco, Inc.*, 875 F.2d 153, 155 n.4 (7th Cir. 1989).

*Dobbelaere* is directly on point. The plaintiff there was injured by a brush cutter that was manufactured at a time when the Cosco defendants owned the product line. 697 N.E.2d at 1021-22. Cosco subsequently sold the product line to another company (Aircap) in an asset purchase agreement that expressly provided Aircap would assume all liabilities for personal injuries caused by the product line (with one inapplicable exception). *Id.* at 1022. Applying Ohio law, the court affirmed summary judgment to Cosco because "the Cosco defendants successfully transferred all

liability, for the purposes of this case, to Aircap" in the unambiguous assumption of liability provision of the asset purchase agreement. *Id.* So "[e]ven if Cosco manufactured the brush cutter that injured" plaintiff, such "liability passed to Aircap." *Id.*

Likewise here, Teva expressly assumed the liabilities related to the generics business in the MPA.[34] And in connection with a broader true up related to that overall $40.5 billion transaction, Allergan and Teva removed any conceivable doubt about which counterparty was responsible for liability related to generic opioids.[35] Just as in *Dobbelaere*, Teva's unequivocal *assumption* of liability in the MPA entitles Allergan to judgment as a matter of law because through it Allergan "successfully transferred" any generics liability it might have to Teva.[36] *See* 697 N.E.2d at 1022.

## II.    Allergan Is Not Liable for Kadian-Related Conduct of Alpharma.

Allergan also cannot be held liable for Alpharma's conduct with respect to Kadian because Alpharma and King expressly *retained* such liability in the December 2008 asset purchase sale. "Ohio has adopted the general rule of successor liability, which provides that the purchaser of a corporation's assets is not liable for the debts and obligations, including liability for tortious conduct, of the seller corporation." *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 130 (Ohio 2006).

---

[34] *See* Ex. 12, MPA (ALLERGAN_MDL_01470362) § 2.3.

[35] The relevant provision provides:

Teva agrees, on behalf of itself and each of its successors-in-interest and assigns, that it *shall assume, and shall be or become responsible for* . . . any Liabilities or Losses arising from the Third Party Claims [in the identified cases] or arising from any other Third Party Claim, in each case to the extent such Liabilities or Losses are based upon generic opioid drugs . . . [and] any Liabilities, Losses or Claims that are, directly or indirectly, jointly or severally, asserted against or imposed on Allergan [or] its respective Affiliates . . . to the extent such Liabilities, Losses or Claims are based on parent or control liability or a substantially similar theory in connection with any Proceeding involving (1) a member of the Transferred Group and (2) a Product or the Business.

Ex. 1, January 31, 2018 Allergan-Teva Agreement (ALLERGAN_MDL_01396687) § 4 (emphasis added).

[36] That Teva unambiguously agreed to *assume* all liability—not merely to indemnify and defend Allergan—reinforces that the assumption is a defense against Plaintiffs' claims. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4810801, at *7 (E.D. Pa. Oct. 25, 2017) ("Assumption of liability by consent means that the acquiring entity agrees to be liable to third parties, whereas an agreement to defend and hold harmless or indemnify is an agreement that governs the relationship between the two contracting parties" only. (citing cases) (internal quotation marks, brackets, and ellipsis omitted)).

The undisputed facts show that Allergan and King did the exact opposite of transferring liability to Allergan. The Kadian APA expressly affirms the general rule: King and Alpharma "shall retain and remain solely responsible for, and shall satisfy, perform, pay and discharge when due" "any and all Liabilities of [King and Alpharma] . . . with respect to any claim or action asserted after the Closing to the extent the conduct giving rise to such claim or action occurred prior to the Closing."[37] In light of the general rule of successor liability, which has been a well-established principle in corporate law for over a century,[38] Alpharma's express and unequivocal *retention* of liability for its pre-sale conduct should be the end of the matter.

Plaintiffs chose not to pursue claims against Alpharma, King or Pfizer for Alpharma's pre-2009 conduct with respect to Kadian, and the Court has declined to exercise supplemental jurisdiction over Allergan's third-party claims against King and Pfizer for indemnification and contribution for any liability based on Alpharma's conduct.[39] Accordingly, Allergan cannot be liable for any marketing conduct with respect to Kadian before December 29, 2008, and to the extent Plaintiffs attempt to pursue claims against Allergan based on Alpharma's conduct in that time period, such claims fail as a matter of law.

## III. Allergan Is Entitled to Summary Judgment on All of Plaintiffs' Claims Related to Its Products.

When divorced from the attempted amalgamation of allegations against entities for which Allergan has no legal liability, Allergan's market share and conduct are both *de minimis*. Yet Plaintiffs still assert a broad array of statutory and common law claims against Allergan. The Court should grant summary judgment to Allergan because Plaintiffs do not have evidence that creates any material issue of fact for those sweeping claims.

---

[37] Ex. 13, Kadian APA (ALLERGAN_MDL_00378157) §§ 1.01(kk)(vi), 3.01
[38] Ex. 14, Macey Rep. ¶ 124.
[39] ECF No. 1201.

### A.   Plaintiffs Cannot Prove that Allergan Proximately Caused Plaintiffs Injuries or Any Public Nuisance.

As explained in more detail in Manufacturer Defendants' causation brief, for all claims asserted against Allergan individually, Plaintiffs must prove that unlawful conduct **by Allergan** proximately caused their alleged injuries (for damages) or the alleged public nuisance (for abatement costs).  *See, e.g.*, *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 477 (6th Cir. 2017); *Pang v. Minch*, 559 N.E.2d 1313, 1324 (Ohio 1990).  Allergan provides a particularly stark example of Plaintiffs' failure to analyze individual-defendant conduct when attempting to prove the causal chain through aggregate expert proof.

***Marketing Conduct.***  While Allergan disputes that any of its opioid marketing was false or misleading, the only Allergan opioid marketing even claimed to be objectionable occurred in the approximately 10 months Kadian was detailed, using materials inherited from Alpharma, before Allergan received the February 2010 FDA Warning Letter.[40]

Ironically, the Warning Letter and the FDA-approved corrective action plan is clear evidence that, by design, Allergan affirmatively corrected any prior statements that were allegedly misleading.[41]  Not only does Plaintiffs' expert, Meredith Rosenthal, fail to isolate and analyze the effect (if any) of this promotional conduct or the corrective action plan, her analysis does not even attempt to account for the actual content of Allergan detailing.  If it did, Rosenthal would have learned that those promotion materials consisted of ***rivalrous marketing***.[42]  As Rosenthal conceded, her "aggregate model . . . is intended to essentially obscure the rivalrous marketing, so . . . that [it] will show up as a noneffect in her model . . . because the question [she] care[s] about

---

[40] *See* Ex. 4, Kyle Rep. ¶ 50.
[41] *See* Ex. 5, Peck Rep. § VII.
[42] Ex. 4, Kyle Rep. ¶ 83 (rivalrous marketing aims to "substitute for existing products rather than to expand the market.").

is market expansion."[43]  Rosenthal also assumed all detailing contacts have the exact same effect as detailing contacts that falsely represent the safety of opioids—which cannot be squared with Allergan's detailing as part of the FDA-approved corrective action plan.[44]  Even Rosenthal agreed that her testimony cannot address the impact of Allergan's marketing:  "My assignment was to calculate aggregate impact, so I have not considered how to calculate impact for a single defendant."[45]

Thus, Plaintiffs are left with nothing but *ipse dixit* to prove that Allergan's allegedly false marketing was in any way causally related to the sweeping harms associated with the opioid abuse crisis in the Track One Counties.  Not only is that insufficient in itself, it is belied by the limited scope of marketing at issue, the time and content of the marketing, and the incredibly small market share of Allergan's opioids.

***Diversion-Control Failures.***  Plaintiffs have not identified evidence of a single unlawful order of Kadian or Norco that Allergan shipped to Summit County or Cuyahoga County.  Plaintiffs offer two experts (McCann and Keller) who identify orders that ***could be*** suspicious, but each admitted they offer no opinion that these ***are*** suspicious orders.[46]  More importantly, it is undisputed that not a single one of the orders flagged by McCann or Keller were actually shipped by Allergan: they ***were shipped by distributors to pharmacies.***[47]  Even still, the only orders from distributors to pharmacies for Allergan products flagged by Keller amounted to ***four total shipments*** of Norco over a 20-year time period.[48]  Plaintiffs have no evidence (expert of otherwise) that Allergan should (or even could) have identified, reported, or stopped these orders; rather,

---

[43] Ex. 17, Rosenthal Dep. Tr. at 206:10-25.
[44] *See id.* at 217:20-218:14.
[45] *Id.* at 526:9-12.
[46] Ex. 18, McCann Dep. Tr. 149:17-150:4, Ex. 19, Keller Dep. Tr. 51:6-52:15
[47] Ex. 18, McCann Dep. Tr. 136:1-7; Ex. 19, Keller Dep. Tr. 88:13-22, 90:10-17, 96:9-17.
[48] *See* Ex. 20, Kyle Supp. Rep. ¶ 12.

Plaintiffs' DEA expert (Rafalski) offers testimony about whether **distributors** should have done so for their orders.  This is a far cry from evidence that Allergan contributed to diversion.

> ### B.     Plaintiffs Cannot Prove that Allergan Was Part of Any Conspiracy or the Alleged Opioid Supply Chain Enterprise.

As detailed further in Manufacturer Defendants' joint briefs, civil conspiracy requires proof of "malicious combination" in which multiple parties agree to intentionally work together to commit unlawful acts against another.  *FV 1 Inc. v. Goodspeed*, 974 N.E.2d 664, 677 (Ohio Ct. App. 2012).  Thus, to prove a civil conspiracy claim, a plaintiff "must at least show a common understanding or design, even if tacit, to commit an unlawful act."  *Woodward Constr., Inc. v. For 1031 Summit Woods, LLC*, 30 N.E.3d 237, 243 (Ohio Ct. App. 2015) (internal quotation marks omitted).  The proof required to show that a defendant was part of a RICO association-in-fact enterprise or conspired to violate RICO is even more demanding.  *See Boyle v. United States*, 556 U.S. 938, 949–50 (2009).

Plaintiffs notably do not even allege that Allergan violated RICO (Count 1) or the OCPA (Count 3) through participation in the alleged "Opioid Marketing Enterprise."[49]  While the complaints allege that "Actavis" is a part of the "Opioid Supply Chain Enterprise," when Allergan is separated from its former affiliates (as it must be), it is not even clear that Plaintiffs contend that *Allergan* violated RICO (Count 2) or the OCPA (Count 4) through participation in the alleged Opioid Supply Chain Enterprise.

---

[49] The "RICO Marketing Defendants" alleged to be part of the "Opioid Marketing Enterprise" are Purdue, Cephalon, Janssen, Endo, and Mallinckrodt.  *See, e.g.*, Summit TAC (ECF No. 1466) ¶¶ 815-16 & n.210.  Cuyahoga makes the same substantive allegations in its complaint, *see, e.g.*, Cuyahoga TAC (ECF No. 1631) ¶¶ 858-59 & n.294, although the caption of the RICO marketing count (but not the OCPA marketing count) appears to have a typographical error, referring to Purdue, Cephalon, Endo, Mallinckrodt, and Actavis, along with McKesson, Cardinal, and AmerisourceBergen as the "RICO Marketing Defendants," in contradiction to the other allegations in the complaint.  Cuyahoga should confirm this error, but to the extent it does not, Allergan is entitled to judgment as a matter of law.

Indeed, and in any event, there is no evidence that Allergan worked with anyone else in the industry to unlawfully increase quotas, participated in lobbying to undermine the CSA's effectiveness, or intentionally failed to report suspicious opioid orders of competitors or others in the supply chain.  Consistent with Allergan's exclusion from the alleged Opioid Marketing Enterprise, there is also no evidence that Allergan influenced treatment guidelines or promoted its opioid products by retaining KOLs, running speakers' bureaus, sponsoring CME programs, or working with so-called "front groups."  The record is devoid of any evidence that Allergan agreed with competitors or others in the industry to increase all opioid sales—in fact, the undisputed evidence that Allergan's limited opioid marketing was rivalrous in nature and of Allergan's *de minimis* market share refute any supposition to the contrary.  *See FV 1 Inc.*, 974 N.E.2d at 677 (conspiracy claim failed where "largely based upon suppositions, not actual evidence").  With no evidence that Allergan entered any illicit agreement of any form, the Court must grant Allergan summary judgment on Plaintiffs' conspiracy claim and any RICO or OCPA claims that Plaintiffs assert against Allergan.

### C.    All Claims Against Allergan Are Time-Barred.

As Manufacturer and Distributor Defendants' joint brief explains in further detail, all of Plaintiffs' claims are time-barred to the extent they accrued before October 27, 2012 (or much later date for the vast majority of Plaintiffs' claims).  In ruling on motions to dismiss, the Court also recognized that "[i]f Plaintiffs relied solely on Defendants' concealment of their marketing practices, Plaintiffs' assertion that the statutes of limitation were tolled due to fraudulent concealment would fail" but noted that discovery would be required to determine whether Plaintiffs had knowledge of the scope of a Defendant's misconduct without access to ARCOS

data.[50]   Similarly, the Court held that Plaintiffs had plausibly alleged that Defendants had continued making misrepresentations that resulted in further injury such that the continuous violation doctrine could not be ruled out at the pleading stage.  As detailed above, discovery has confirmed Allergan has not committed any diversion-control violations and has not detailed opioids at all in over six years.  And ARCOS data, if anything, has revealed how *limited* the scope of Allergan's alleged misconduct is.  Accordingly, all claims against Allergan are time-barred.

## CONCLUSION

For the foregoing reasons, the Court should grant Allergan's individual motion for summary judgment or, in the alternative, grant partial summary judgement to Allergan on the issues of whether Allergan is liable for the conduct of the Actavis Generic Entities and Alpharma.


 Dated:  June 28, 2019                          Respectfully submitted,

                                                By:  */s/ Donna M. Welch*
                                                Donna M. Welch, P.C.
                                                KIRKLAND & ELLIS LLP
                                                300 North LaSalle
                                                Chicago, IL  60654
                                                Tel:     (312) 862-2000
                                                donna.welch@kirkland.com

                                                *Attorney for Defendants Allergan plc*
                                                *(appearing specially), Allergan Finance, LLC*
                                                *(f/k/a/ Actavis, Inc. f/k/a Watson*
                                                *Pharmaceuticals, Inc.), Allergan Sales, LLC,*
                                                *and Allergan USA, Inc.*

---

[50] ECF No. 1203 at 5.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of July 2019, the foregoing was served upon all counsel of record via email.

By: <u>/s/ Donna M. Welch</u>

Donna M. Welch, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel:     (312) 862-2000
<u>donna.welch@kirkland.com</u>