# Exhibit 7

Highly Confidential - Subject to Further Confidentiality Review

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3

     IN RE NATIONAL PRESCRIPTION   | MDL No. 2804
 4                                 |
     OPIATE LITIGATION             | Case No. 17-MD-2804
 5                                 |
     APPLIES TO ALL CASES          | Hon. Dan A. Polster
 6

 7                         - - -

 8               Wednesday, April 24, 2019

 9                         - - -

10

              CONFIDENTIAL - SUBJECT TO FURTHER
11
                   CONFIDENTIALITY REVIEW
12
                           - - -
13
                        Volume 2
14

15

            VIDEOTAPED DEPOSITION of MATTHEW PERRI, III,
16   BS Pharm, Ph.D., RPh, held at Jones Day,
     1420 Peachtree Street, N.E., Suite 800, Atlanta,
17   Georgia, commencing at 8:35 a.m., on the above date,
     before Susan D. Wasilewski, Registered Professional
18   Reporter, Certified Realtime Reporter and Certified
     Realtime Captioner.

19

20

21                         - - -
22             GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
24                   deps@golkow.com
25
```

Page 593

1 document that language comes from?
2    A.  I would have to see the document to make
3 sure, but -- I mean, I don't remember the specific
4 document.
5    Q.  Okay.  I'll show it to you.  Let's mark this
6 Exhibit 30.
7    A.  Oh, yeah.
8        (Perri Exhibit 30 was marked for
9 identification.)
10 BY MS. ZOLNER:
11    Q.  This document is titled:  Objection Handling
12 Workshop, Training Class July 7th and 8th, 2010.
13        Correct.
14    A.  Yes.
15    Q.  In going back to your report, you explain in
16 Paragraph 135, Note 264 -- it's a footnote to
17 Paragraph 135, that:  "Sales personnel were trained
18 on how to handle objections to multiple issues,
19 including concerns over addiction.  See, e.g.,
20 Kadian objection handler ACTAVIS0003698."
21        And I think my question is a simple one.  Is
22 the Objection Handling Workshop document that we
23 just marked Exhibit 30 the type of training
24 presentation that you're talking about in Paragraph
25 135?

Page 594

1        MR. CHALOS:  Object to the form.
2    A.  Yes.
3    Q.  Earlier in your report, on Paragraph --
4 under Paragraph 89 you have a Note 169 where you
5 explain that:  "Handling objections and reducing
6 concerns prescribers may have about a medication is
7 a staple of sales training and development."
8        Let me know when you are there.  I'm sorry.
9 I thought you were already on Paragraph 89.  I'm
10 looking specifically at Note 169.
11    A.  Yes, I'm there.
12    Q.  Looking again at Exhibit 30, I'm just asking
13 you to compare and contrast your report with what
14 I've marked as Exhibit 30, the Objection Handling
15 Workshop.  If you turn to Page 8 of this document,
16 Exhibit 30, you see the statement you cited about
17 proper assessment of the patient, right?  And it's
18 the page that begins with -- says at the top:
19 "Objection 4.  I'm concerned about the abuse
20 potential of Kadian."
21    A.  Right.
22    Q.  Again, if you could just read that first
23 bullet.
24    A.  "Proper assessment of the patient, proper
25 prescribing practices, periodic reevaluation of

Page 595

1 therapy, and proper dispensing and storage are
2 appropriate measures that help to limit abuse of
3 opioid drugs."
4    Q.  Okay.  And I told you you were going to need
5 Exhibit 29 again.  That was the one I said to keep
6 close at hand.  If you look at page 15 of that
7 document, this is Section 9.2, it's titled "Abuse."
8    A.  Okay.
9    Q.  Could you please read the second full
10 paragraph under 9.2?
11    A.  "Drug abuse is the intentional and
12 nontherapeutic use -- "
13    Q.  Actually, I'm sorry, I don't want you to
14 read something that you don't need to read.  That is
15 not the right section.
16        Next page.  Sorry about that.  This is the
17 second full paragraph at the top of the next page,
18 right before you get to Section 9.3, Dependence.
19    A.  "Proper assessment of the patient, proper
20 prescribing practices, periodic reevaluation of
21 therapy, and proper dispensing and storage are
22 appropriate measures that help to reduce abuse of
23 opioids."
24    Q.  Do you agree that the statement that you
25 cited from the Objection Handling Workshop,

Page 596

1 Exhibit 30, comes directly from the Kadian
2 prescribing information that we marked as
3 Exhibit 29?
4    A.  Yes.
5        MR. CHALOS:  Object to the form.  I'm sorry.
6 I lost you.  Where did you say he -- I'm back
7 on -- I may be a few questions behind.  Where did
8 he cite that in his report?
9        MS. ZOLNER:  Where did he cite what?
10        MR. CHALOS:  That sentence you just had him
11 read.
12        MS. ZOLNER:  The sentence that I just read
13 was cited in his report in Paragraph 1 -- oh,
14 101.
15        MR. CHALOS:  Page 101?
16        MR. CIULLO:  Yes.
17        MR. CHALOS:  Okay.  Sorry.  I'm just
18 having -- you're moving quickly through your
19 outline.  I'm having trouble keeping up.  Page
20 101.
21 BY MS. ZOLNER:
22    Q.  Dr. Perri, again, not to be repetitive, but
23 can you identify a single specific physician or
24 prescriber in Cuyahoga or Summit County to whom
25 Actavis communicated any of the statements in any

Highly Confidential - Subject to Further Confidentiality Review

Page 597

1  version of the Kadian learning system?
2  A.  I did not -- I did not undertake that
3  specific analysis, but I know from the testimony and
4  the documents in this case that the marketing plans
5  and the marketing documents that I saw were
6  distributed nationally and used even locally in
7  Ohio.
8  Q.  Do you know that these documents that we've
9  been looking at today were distributed in Cuyahoga
10  and Summit Counties?
11  A.  Specifically this document, I don't have
12  any -- anything that points to its actual use there
13  other than, as I said, the testimony that the
14  marketing plans and the marketing materials were
15  developed nationally and implemented in Ohio.
16  Q.  I think you're referring to what you've
17  referred to all day as some of the aggregate data
18  that you were referring to, right?
19  MR. CHALOS:  Object to the form.
20  A.  There is actually a citation in my report I
21  think from -- quoting testimony from defendants that
22  specifically relates to this issue.  So I can look
23  for that and point you to that if you need me to.
24  Q.  I think my question is much more simple.  I
25  just want to know if you can identify any physician

Page 598

1  or prescriber in Cuyahoga or Summit who Actavis or
2  Allergan communicated with with respect to anything
3  related to Kadian marketing?
4  A.  I guess I'm confused because it sounds like
5  to me that your question is asking me that if I say
6  no, I can't, then the conclusion that you would draw
7  from that is that none of the materials that we're
8  looking at today were used in Ohio and specifically
9  to these counties, and that's not accurate.
10  Q.  My question is a yes-or-no question.  Can
11  you identify a single physician or prescriber in
12  either Cuyahoga or Summit County to whom Actavis or
13  Allergan communicated any of the marketing
14  information we've looked at today?
15  MR. CHALOS:  Object to the form.
16  Q.  And if you don't have any names, then --
17  MR. CHALOS:  Well, object to the form.
18  A.  I actually have a long list of physicians
19  names in Cuyahoga and the other county that you
20  mentioned, they are from call notes from another one
21  of the defendants, so I don't know that they would
22  reflect any activities by your company, but they
23  would reflect the names of physicians who were the
24  recipients of the marketing that occurred in Ohio.
25  Q.  But you can't link it back to Allergan or

Page 599

1  Actavis, correct?
2  A.  Well, this kind of goes along with what I
3  was saying yesterday, that -- when I was asked
4  another question along these same lines, that, you
5  know, the fact that I can't link a specific
6  advertisement to a specific doctor doesn't mean that
7  the advertisements weren't present in the
8  marketplace, it doesn't mean the doctors didn't see
9  them, it just means that I haven't the tools at my
10  disposal to make that connection.
11  Q.  And you haven't made that connection,
12  correct?
13  A.  I make the connection by virtue of the fact
14  that I know these materials were used in Ohio and I
15  know that doctors in Ohio saw them.
16  Q.  My question is a different one.
17  Can you identify any of the doctors who saw
18  them?
19  MR. CHALOS:  Object to the form.
20  A.  Yeah, I mean, I can give you the -- I can
21  give you doctors' names but it would be a
22  presumption that they did or didn't see it in any
23  individual case.
24  Q.  Okay.  You talk about KOLs in your report.
25  A.  Yes.

Page 600

1  Q.  And KOLs are key opinion leaders, right?
2  The acronym KOL stands for key opinion leader?
3  A.  That's right.
4  Q.  In your report you talk about how KOLs are
5  influencers, right?
6  A.  Yes.  I -- that's not my terminology
7  necessarily.  That's either industry or in some of
8  the defendants' terminology.
9  Q.  Understood.  So in Paragraph 67 of your
10  report, you include a quote:  "Peer-to-peer
11  marketing uses key opinion leaders, or influencers,
12  and word of mouth to create an expanding awareness
13  and more rapid adoption of new pharmaceuticals by
14  prescribers and other stakeholders."
15  Did I read that right?
16  A.  Yes.
17  Q.  Would you agree that in the context of this
18  case, a KOL is an influential doctor in the field of
19  pain management?
20  MR. CHALOS:  Object to the form.
21  A.  KOL could be a pain management, it could be
22  addiction, it could be just -- in this case, it
23  could have been a general practitioner.  It could
24  have been a nurse, it could have been a lot of
25  different people.

Page 601

1    Q.   Does simply being a doctor make someone a
2  KOL?
3    A.   No.  The --
4      MR. CHALOS:  Hold on.  Object to the form;
5  incomplete hypothetical.
6    A.   So the requirements for KOL are completely
7  subjective and they are really up to the company
8  hiring the KOL or employing that strategy.  The KOL
9  would be -- and I saw a lot of documents in the
10  record that were evaluations of people who were
11  being considered as key opinion leaders, of
12  databases of people who were either past, present or
13  being considered for the future key opinion leaders,
14  and those people would be evaluated.  Some of them
15  were eliminated because they weren't meeting up to
16  certain criteria.
17      So the whole idea of key opinion leadership
18  is one that is subjective to the company and if the
19  company thinks that it's a person that's an
20  influential prescriber or other type of
21  practitioner, then that's up to them to decide.  The
22  point about what they are is that they are people
23  who influence the opinions of others, and in my
24  report I refer to it -- and it was not my word, it
25  was the word of one of the defendant's witnesses --

Page 602

1  that said key opinion leaders are used to infect
2  other doctors with the ideas that they have.
3    Q.   Do you have any opinion as you sit here
4  today as to whether Actavis worked with key opinion
5  leaders?
6    A.   I think the answer to that is that I do
7  have -- I have seen evidence that Actavis did --
8  well, Actavis I don't know specifically.  Allergan
9  or Actavis, because in my analysis I made a note to
10  try and determine if each company did indeed work
11  with key opinion leaders or have key opinion leaders
12  in their sort of cadre of people that they went to,
13  and I know that I have a schedule in my report that
14  we can look at that's broken down by manufacturer.
15  So we can go to that if you need me to look for a
16  document that shows that.
17    Q.   Sure.  I mean, do you know if Allergan or
18  Actavis worked with key opinion leaders?  Is that
19  part of your opinion in this case?
20    A.   I will let you know.
21      So it appears that for Allergan I have four
22  entries:  Dr. Chester Chorazy, David Sua, a person
23  called Nutel and Stewart Lewis.
24    Q.   Are you looking at -- Dr. Perri, are you
25  looking at Schedule 18 in your report?

Page 603

1    A.   Yes, "Amounts Paid to Key Opinion Leaders."
2    Q.   Okay.
3    A.   Let me finish my review here.
4    Q.   Sure.  You just let me know when you are
5  done with your review.
6    A.   Yes, ma'am.  I'm sorry.  It's taking just a
7  moment but these materials were originally in a
8  spreadsheet that was a lot easier to click on tabs
9  than it is to look through them.
10    Q.   It's easier to search too, I'm sure.
11    A.   Yep.  Okay.  So other than those four I
12  mentioned, I don't see anything else that I can
13  point to at this time.
14    Q.   Okay.  And you've just identified four
15  names, right?
16    A.   Yes.
17    Q.   So let's take a step back.  I know earlier
18  today you mentioned that you read -- I think you
19  said portions of Doug Boothe's testimony in this
20  case.  Is that accurate?
21    A.   Yes.
22      MS. ZOLNER:  Do we have his testimony
23  available?
24      MR. CIULLO:  Uh-huh.
25      MS. ZOLNER:  Can we mark that?  Is that

Page 604

1  Exhibit 31?  It's Page 363.
2      (Perri Exhibit 31 was marked for
3  identification.)
4  BY MS. ZOLNER:
5    Q.   Dr. Perri, we are going to flip specifically
6  to Page 363.  Are you aware that Doug Boothe was the
7  CEO of Allergan?
8    A.   As I recall, his title was -- I can't recall
9  his exact title.
10    Q.   Okay.  Well, I'll represent to you that he
11  was the CEO.  And if you could look at Page 363,
12  starting at line 23, I'll read to you the question
13  and I'll eliminate the objections and then read the
14  answer.  Line 23 of page 363 of Doug Boothe's
15  deposition.
16      Question:  Were you aware of any KOL
17  development at either Alpharma or Actavis when
18  you were there?
19      Answer:  As I previously said, we at Actavis
20  did no KOL activity for Kadian or any of our
21  generic approved products.
22      Question:  Were you aware of any KOL
23  development for any opioid products at Alpharma
24  or Actavis?
25      Let's just focus on the first part.  Do you

Page 605

1  see where he said:  Actavis did no KOL activity for
2  Kadian or any of our generic approved products?
3      A.  Yes.
4      Q.  Do you have any basis to dispute that
5  testimony?
6      A.  No.
7      Q.  Now, you referred to Schedule 18 of your
8  report.
9      A.  Uh-huh.
10     Q.  Which is the section about amounts paid to
11 KOLs and you first mentioned Chester Chorazy, right?
12     A.  Yes.
13     Q.  Who is Chester Chorazy?
14     A.  I don't know.
15     Q.  How long has he been a KOL?
16     A.  I don't know.
17     Q.  Who is he employed by?
18     A.  I don't know.
19     Q.  On what basis do you claim he was a KOL for
20 Allergan?
21     A.  On the basis that he is on this list, but we
22 can pull that document and answer those questions.
23     Q.  Do you know anything about Mr. Chorazy's
24 background as a KOL?
25     A.  No, I don't.

Page 606

1      Q.  Do you know anything about his area of
2  expertise?
3      A.  As I said, his presence on this list tells
4  me there were amounts paid to him.  That's what I
5  know.
6      Q.  Okay.  What about David Sua, Nutal, or
7  Stewart Lewis, would the answer be the same for all
8  of those individuals?
9      A.  Same answer for all of those, yes.
10     Q.  In other words, you don't know who they are
11 and you don't know how long they worked as a KOL?
12     A.  I don't recognize those specific names, yes.
13     Q.  Do you have any opinion as to whether
14 Actavis worked with pain advocacy organizations to
15 promote opioids?
16     A.  I don't think they did.
17     Q.  Do you have any opinion as to whether
18 Allergan worked with pain advocacy organizations to
19 promote opioids?
20     A.  Same answer.
21     Q.  I know this morning a drug called MoxDuo
22 came up, and I don't want to put words in your mouth
23 but according to my notes, I think you mentioned
24 MoxDuo as an example of a drug that never made it to
25 market, correct?

Page 607

1      A.  Yes.  It was not approved, right.
2      Q.  Okay.  So it was not approved by the FDA; is
3  that accurate?
4      A.  Not approved by the FDA and not marketed by
5  the company, either one.
6      Q.  Okay.  So that means no patient was ever
7  prescribed MoxDuo?
8          MR. CHALOS:  Object to the form.
9      A.  I guess that's true, yes, unless somebody
10 did something untoward.
11     Q.  And your voice dropped.  I think you said
12 that MoxDuo was never marketed; is that accurate?
13         MR. CHALOS:  Object to the form.
14     A.  That is my understanding, that MoxDuo didn't
15 ever launch.
16     Q.  Do you have any opinion as to whether
17 Actavis was involved in continuing medical education
18 courses?
19     A.  I don't recall.
20     Q.  What about Allergan, do you have any opinion
21 as to whether Allergan was involved in any
22 continuing medical education courses?
23     A.  Again, I don't recall specifically Allergan.
24     Q.  Is there anything that you could use to
25 refresh your recollection on those?

Page 608

1      A.  Well, if I looked -- if I pulled the Kadian
2  marketing plans or other marketing plans, perhaps,
3  that would -- if they were going to do it, it would
4  be, generally speaking, in the marketing plans, so
5  we could look at that.
6      Q.  Yes.  Okay.  So that's going to be Exhibit
7  Number 32.
8          (Perri Exhibit 32 was marked for
9  identification.)
10 BY MS ZOLNER:
11     Q.  I'm going to show you another document,
12 Dr. Perri.  This is ALLERGAN_MDL_01104711, for the
13 record.  The document is titled "Healthcare
14 Compliance Business Rules."
15     A.  Okay.
16     Q.  Have you seen this document before?
17     A.  It does not look familiar to me, but I've
18 looked at a lot of documents.
19     Q.  You have looked at a lot of documents.
20     A.  I'm just beginning.  Let me scan through it
21 and --
22     Q.  Sure.
23         MR. CHALOS:  Is this number 32?
24         MS. ZOLNER:  It is.
25     A.  There are certainly things in here that look

Highly Confidential - Subject to Further Confidentiality Review

Page 609

1 familiar to me, but again, I can't say I've seen
2 this specific document.
3    Q.  The title of this document is "Sales
4 Representative's Interactions with Healthcare
5 Professionals & Patients," correct?
6    A.  Yes.
7    Q.  And the effective date of this document is
8 January 5th, 2010?
9        MR. CHALOS:  Hold on.  Object to the form.
10 He just said he's never seen this document.  If
11 you are just asking him to read it and say that's
12 what it says, that's one thing, but I don't think
13 you can ask him to affirm that that's true.
14    Q.  Does the document represent that it was
15 effective as of January 5th, 2010?
16    A.  Yes.
17    Q.  If you could look at Page 7, under
18 Educational Grants -- this is Section 12.0.
19    A.  Yes.
20    Q.  Do you see under Section 12.2 in bold it
21 says: "At this time Actavis will not be offering
22 any educational grants?"
23    A.  It does say that in this document, yes.
24    Q.  Do you have any basis to dispute that
25 Actavis was not offering educational grants at this

Page 610

1 time?
2        MR. CHALOS:  Object to the form.
3    A.  So, I -- yeah.  I -- I mean, I'm not
4 disputing that they are not involved.  I don't have
5 a specific recollection of them being involved in
6 these programs, but I'm just uncomfortable drawing
7 conclusions from, you know, this cursory look at
8 this document that I haven't really had a chance to
9 review or a document that I am not exactly sure
10 where it fits into the big picture of things that
11 I've examined in this case.  I know that this --
12 what this appears to be is a document where
13 Allergan/Actavis was sort of setting out the rules
14 of the road for a sales force that they were going
15 to employ.
16    Q.  Right.
17    A.  So it -- it looks like it's consistent with
18 what I would expect to see and it definitely says at
19 this time Actavis will not be offering any
20 educational grants.  What I would point out is that
21 offering of educational grants is typically
22 something you find in the marketing plans for
23 branded products.  So the fact that they are saying
24 they're not going to do it at this time doesn't tell
25 me that they never did it.  It just says they

Page 611

1 weren't planning on doing it right now.
2    Q.  Right.  But a couple of questions ago I
3 think that you testified that you don't have any
4 recollection of whether Allergan or Actavis was
5 involved in any continuing medical education,
6 correct?
7        MR. CHALOS:  Object to the form.
8    A.  I think what I said was I didn't have a
9 specific -- a specific program that I could point to
10 that -- yes, so the answer is yes.
11    Q.  What about general?
12        MR. CHALOS:  Object to the form.
13    Q.  Do you have any general knowledge of any
14 continued medical education that Allergan or Actavis
15 was involved with?
16        MR. CHALOS:  Object to the form.
17    A.  As I sit here right now, I can't -- I can't
18 have a -- I don't have an answer for that because I
19 just don't remember.
20    Q.  Okay.  Do you have any opinion as to whether
21 Actavis ever hosted speakers bureaus?
22    A.  Again, I need to look at the Actavis
23 marketing or the marketing plans because --
24    Q.  Have you not looked at those plans?
25    A.  No, I have.  I've just -- I've looked at

Page 612

1 hundreds and hundreds of marketing plans and I can't
2 tell you off the top of my head what's in every
3 single one of them.  So if you are going to ask me a
4 specific question about that, I need to look at the
5 marketing plans to see if they laid out plans and
6 then I would know which documents or what to look at
7 to know if those were actually enacted.
8    Q.  Do you have any opinion as to whether
9 Allergan ever hosted speakers bureaus?
10    A.  Same answer.
11    Q.  Okay.  You just -- you don't know as you sit
12 here right now?
13    A.  I would need to look the marketing plans to
14 refresh my memory about what they did or didn't do
15 specifically in each category for all of the
16 categories of marketing that I put in my report.
17    Q.  You understand that Allergan is one of seven
18 manufacturing defendants that has been sued in this
19 MDL, correct?
20        MR. CHALOS:  Object to the form.
21    A.  The list is longer than seven but I
22 understand that that's what we're talking about here
23 today.
24    Q.  In preparation for your deposition today did
25 you do anything to try to determine which