# Exhibit 14

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION LITIGATION<br><br>*County of Summit, Ohio, et al.*<br><br>v.<br><br>*Purdue Pharma L.P., et al.*<br><br><br>*The County of Cuyahoga*<br><br>v.<br><br>*Purdue Pharma L.P., et al.* | CASE NO. 1:17-MD-2804<br><br>JUDGE DAN AARON POLSTER<br><br>TRACK ONE CASES<br><br><u>EXPERT REPORT OF JONATHAN R. MACEY</u> |

1

EXPERT REPORT OF PROFESSOR JONATHAN R. MACEY

EXPERT REPORT OF PROFESSOR JONATHAN R. MACEY

I.    Introduction

1.  At the request of counsel for Allergan plc f/k/a Actavis PLC; Allergan Finance, LLC, f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.; Allergan Sales, LLC and Allergan USA, Inc., in the captioned litigation or related cases, I respectfully submit this Expert Report reflecting my opinions regarding corporate governance and corporate control related to the issues before the court.

2.  I am an expert in corporate governance and corporate control, particularly with respect to the ordinary and customary interactions between and among investors, parent companies and their affiliates and subsidiaries.  I also am an expert in the economic (efficiency) implications of corporate control and limited liability.

3.  Information on my background and qualifications is provided in Exhibit 1 of this Report. Briefly, I am the Sam Harris Professor of Corporate Law, Corporate Finance, and Securities Law at Yale Law School, and Professor in the Yale School of Management.  I am also a member of the Provost's Standing Advisory & Appointments Committee for the Yale School of Management, and Chair of the Yale University Advisory Committee on Investor Responsibility (ACIR).

4.  I have more than 30 years of experience in the area of corporate governance and in the relationships between parents and subsidiaries and among multiple subsidiaries of a single parent corporation.  My expertise includes knowledge of the ordinary and customary business practices between and among parents and subsidiaries and expertise in the policies underlying the legal concept of piercing the corporate veil.

3

5.  I am being compensated at a rate of $1250.00 per hour for my time and reimbursed for my out-of-pocket expenses in connection with my review of the record, preparation of this Report, and provision of testimony.  My compensation is not dependent on the content of my Report or testimony or the outcome of litigation.  My prior testimony over the past four years is provided in Exhibit 2.  The documents I have reviewed in connection with this Report are listed in Exhibit 3.

6.  I reserve the right to modify or supplement the opinions expressed in this Report for reasons including review of new evidence, in response to opinions or argument by Plaintiffs or any expert that Plaintiff may retain, and in response to any ruling by the Court.

7.  In the process of preparing this Report, I have examined the relationships among the following named defendants, and between these defendants and their affiliates and subsidiaries from a corporate governance perspective, to determine if the interactions between and among these entities was normal or aberrational:[1]

a)  Allergan plc (f/k/a Actavis plc).  Defendant Allergan plc (f/k/a Actavis plc) is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland.

b)  Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.).  Defendant Allergan Finance, LLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.) is a limited liability company (LLC) formed in Nevada and headquartered in Madison, New Jersey.

---

[1] Consistent with ordinary and customary usage in the field of corporate governance, the word "affiliate" is used to refer to a person or company that controls, is controlled by, or is under common control with, another company. Further, the word "control" means to control directly or indirectly or to exert a controlling influence over a person or company including the possession, directly or indirectly, of the power to direct or to cause the direction of the management and policies of such person or company, whether through the ownership of voting securities, by contract or otherwise.  As such, consistent with ordinary and customary usage, the term control is defined broadly to define typical investment relationships such as the relationship between parent companies and majority shareholders and their subsidiaries and affiliates even though such relationships do not create agency relationships or otherwise give rise to liability of the controlling person or company for tort or contractual liabilities of the controlled person or entity under theories of enterprise liability including doctrines related to piercing the corporate veil.

4

c) <u>Allergan Sales, LLC</u>.  Defendant Allergan Sales, LLC was formed in Delaware and is headquartered in Irvine, California.

d) <u>Allergan USA, Inc</u>.  Defendant Allergan USA, Inc. is incorporated in Delaware and headquartered in Irvine, California.

8.  In this Report, I use the term "Allergan Entities" to describe the entities described in the previous paragraph Allergan plc (f/k/a Actavis plc), Allergan Finance, LLC, (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.), Allergan Sales, LLC, and Allergan USA, Inc., along with any other affiliate of these named defendants that the Plaintiffs allege to have acted improperly from a corporate governance perspective or to have improperly controlled entities sold to Buyer[2] in 2016 pursuant to the Master Purchase Agreement dated as of July 26, 2015 between Allergan plc and Teva Pharmaceutical Industries Ltd. (defined as "Buyer Parent" in the MPA). My opinions in this matter relate to the relationships among and between the Allergan Entities and various affiliated corporate entities that were acquired by Buyer as part of Allergan plc's general divestiture of its generic drug business in 2016.  In this Report I use the term "Divested Entities" to describe the entities that were transferred to Buyer in 2016 and named as defendants in the Third Amended Complaint.

9.  The following are the Divested Entities that are named as defendants in the Third Amended Complaint and sold to Buyer via the Master Purchase Agreement:

---

[2]  I adopt the definition of "Buyer" in Section 1.1 of the Master Purchase Agreement, which is "Buyer Parent or any Affiliate or Subsidiary of Buyer Parent that Buyer Parent designates to purchase any of the Acquired Assets and/or are a party to any Ancillary Agreement."  As the definition suggests, under the terms of the Master Purchase Agreement, Teva Pharmaceuticals Industries Ltd. had the right to designate one or more of its affiliates or subsidiaries to acquire any of the Acquired Assets, including the right to designate one or more subsidiary to acquire the stock of the Divested Entities. I understand each of the Divested Entities that is named as a defendant in the Third Amended Complaint continues to be a separate corporate subsidiary within the Teva corporate structure. Actavis LLC, for example, remains a subsidiary of Watson Laboratories, Inc., which is now a subsidiary of Actavis Holdco US, Inc. Actavis Holdco, Inc. is a subsidiary of Teva Pharmaceuticals USA Inc., which is itself an indirect wholly-owned subsidiary of Teva Pharmaceuticals Industries Lt., the Israeli-based corporate parent. *See* Teva_MDL_JD_000059.

- **Defendant Warner Chilcott Company, LLC** is a limited liability company formed in Puerto Rico.  Plaintiffs allege that since 2015, Warner Chilcott Company, LLC has been the manufacturer of Norco.  Warner Chilcott Company, LLC was a subsidiary of Warner Chilcott plc until Warner Chilcott plc became a wholly owned subsidiary of Allergan plc in 2013.  From its formation on February 25, 2004 until April 13, 2009, Warner Chilcott Company LLC was organized as a corporation known and operated under the name "Warner Chilcott Company, Inc."  On April 13, 2009 Warner Chilcott Company, Inc. converted from the corporate form into a limited liability company that operated under the name "Warner Chilcott Company, LLC".[3]

- **Defendant Actavis Pharma, Inc.** (f/k/a Watson Pharma, Inc.), is a Delaware corporation.  Plaintiffs allege that Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) was previously responsible for sales of Kadian and Norco.

- **Defendant Watson Laboratories, Inc.** is a Nevada corporation with its principal place of business in Corona, California.  According to the Plaintiffs' Third Amended Complaint, between 2000 and 2015, Watson Laboratories, Inc. held the Abbreviated New Drug Applications (ANDA) for Norco and was the manufacturer of that medication.  Watson Laboratories, Inc. was also the ANDA holder of various generic opioids.[4]

- **Defendant Actavis LLC** is a Delaware limited liability company and an indirect subsidiary of Watson Laboratories, Inc.  The following direct subsidiaries of defendant Actavis LLC also are named as defendants in the Third Amended Complaint and were also sold to Buyer pursuant to the Master Purchase Agreement in 2016:

  - **Defendant Actavis South Atlantic LLC,** is a Delaware limited liability company with its principal place of business in Sunrise, Florida.  According to the Third Amended Complaint, Actavis South Atlantic LLC was listed as the ANDA holder for oxymorphone and fentanyl transdermal.

  - **Defendant Actavis Elizabeth LLC** is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. According to Plaintiffs' Third Amended Complaint, from December 19, 2005, until it purchased the medication in December 2008, Actavis Elizabeth LLC served as the contract manufacturer of Kadian for Alpharma.  Plaintiffs also alleged

---

[3] Certification of Kenneth D. McClintock, Secretary of State of the Commonwealth of Puerto Rico, certifying that "on April 13, 2009 at 4:13 pm, was filed a Certificate of Conversion of "Warner Chilcott Company, Inc.", file 142,169, to a Limited Liability Company, organized under the laws of Puerto Rico, under the name of "Warner Chilcott Company, LLC", file number 1,544 – LLC.  The effective date of the conversion was April 13, 2009."  See also Certificado de Conversión a Una Companía de Responsibilidad Limitada, (Certificate of Conversion of a Limited Liability Company," Registration No. 142169) (ALLERGAN_MDL_04449405).

[4] ANDA is the acronym for Abbreviated New Drug Application.  Abbreviated New Drug Application," https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda (accessed May 6, 2019).

in the Third Amended Complaint that Actavis Elizabeth LLC held the ANDA for Kadian from 2008 to 2013, and that Actavis Elizabeth LLC was also the holder of ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide/hydrocodone bitartrate; morphine sulfate capsule; morphine sulfate tablet; oxycodone/hydrochloride tablet; oxycodone/ibuprofen; and oxymorphone tablet.

o   Defendant Actavis Kadian LLC is a Delaware limited liability company. Plaintiffs allege in the Third Amended Complaint that Actavis Kadian LLC has been identified on Kadian's label as a manufacturer or distributor of Kadian.

o   Defendant Actavis Mid Atlantic LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Plaintiffs allege in the Third Amended Complaint that Actavis Mid Atlantic LLC has held the ANDA for homatropine methylbromide/hydrocodone bitartrate.

o   Defendant Actavis Totowa LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Plaintiffs allege in the Third Amended Complaint that Actavis Totowa LLC has held the ANDAs for the following Schedule II opioid products: oxycodone/acetaminophen; homatropine methylbromide; oxycodone/hydrochloride.

o   Defendant Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City), is a Delaware limited liability company with its principal place of business in Salt Lake City, Utah. Plaintiffs allege in the Third Amended Complaint that Actavis Laboratories UT, Inc. was the Kadian ANDA holder from 2013 to 2016 and was listed as the NDA holder for morphine sulfate capsule.

and

- Defendant Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) is a Florida limited liability company with its principal place of business in Davie, Florida. Plaintiffs allege in the Third Amended Complaint that Actavis Laboratories FL, Inc. was a Norco ANDA holder in 2015 and was the ANDA holder of the following Schedule II opioid products: hydrocodone/acetaminophen; hydrocodone/ibuprofen; oxycodone/aspirin; and hydromorphone tablet. Actavis Laboratories FL, Inc. was a direct subsidiary of Andrx Corporation, which is not named as a defendant. Andrx also was transferred to Buyer as part of the 2016 sale.

10.     In this Report I analyze the following: (1) the corporate governance and corporate control relationships among the entities listed above prior to the 2016 transaction with

7

Buyer; (2) the corporate governance and corporate control implications of the 2016 transaction

with Buyer; (3) the corporate governance and corporate control implications of the operating

environment of the Allergan Entities in the period following the transaction with Buyer.

11.     I note at the outset that the  allegations in the Complaint in this case are unusual

from a corporate governance perspective to the extent Plaintiffs intend to argue that veil

piercing would be appropriate.  Specifically, it is noteworthy that the Plaintiffs' 334-page Third

Amended Complaint does not contain a single factual allegation that provides any basis or any

rationale from a general policy or economic perspective for the claim that the corporate veil of

any of the Divested Entities should be pierced at any time, before, during or after their 2016

transfer to Buyer.  From a corporate governance perspective, so-called veil piercing claims,

which are assertions that the separate legal status of a corporation or LLC should be

disregarded, typically are supported by specific allegations or examples of the improper use of

control or voting power, undercapitalization of the subsidiary or affiliate, failure to observe

corporate formalities, failure to maintain proper books and records, failure to pay incorporation

or franchise taxes, and/or failure to maintain the separate corporate identities of the companies,

or any other.[5]  Such allegations or examples would provide support for the assertion that a

subsidiary or other corporate affiliate is a mere instrumentality of the parent corporation.  From

a policy perspective, it generally is believed that piercing the corporate veil requires a

demonstration that the entity whose corporate separateness is being attacked was organized or

used by its parent to mislead creditors or to perpetrate a fraud on such creditors.  Here, there are

no allegations of improper formation or utilization of the corporate form in this case.

---

[5] Jonathan Macey and Joshua Mitts, *Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil*, 100 CORNELL L. REV. 99 (2014), available at: https://scholarship.law.cornell.edu/clr/vol100/iss1/2 (accessed May 10, 2019)

II.     Summary of Opinions

12.     By way of summary, the opinions expressed in this Report all are based on a single, consistent premise, which is the fundamental concept that "the entire point of the incorporation process is to permit the creation of a legal entity that is not an association of individuals, but rather a discrete legal entity whose rights and obligations are distinct from those of it its creators, investors, managers, and other constituents."[6]  The point of incorporating a business or forming a limited liability company[7] is to create an entity that can sue and be sued, enter into legally binding contracts, and hold assets and incur liabilities in its own name separate and distinct from their investor/shareholders.  As I have observed in previous academic writing:

> The doctrine of piercing the corporate veil presupposes that a corporation is a "juridical entity with the characteristic of legal 'personhood.'" The legal recognition that corporations are distinct legal entities that are not associations of shareholders is reflected in the fact that courts recognize that it is legitimate to create a corporation or other form of limited liability business organization such as a limited liability company "for the very purpose of escaping personal liability" for the debts incurred by the enterprise. And it is precisely because corporations have legal status as juridical entities with the characteristic of legal personhood that courts' equitable authority to pierce the corporate veil is to be exercised "reluctantly" and "cautiously."[8]

---

[6] Jonathan Macey and Leo E. Strine, Jr., *Citizens United as Bad Corporate Law*, 2019 WISCONSIN L. REV. (forthcoming 2019), available as *U of Penn, Inst for Law & Econ Research Paper No. 18-28; Harvard Law School, John M. Olin Institute for Law, Economics, and Business Discussion Paper No. 972, and Yale Law & Economics Research Paper No. 598*.

[7] A limited liability company (LLC) is a corporate structure specifically allowed under U.S. law in which the investor/owners (who are known as members) are not liable for the LLC's debts or liabilities either personally (where the investors are individuals) or in their own corporate capacity (where the investors are themselves LLCs or corporations). LLCs are considered "hybrid" because they combine the limited liability feature of the corporate form and the flow-through tax treatment of the partnership form.  *See id*.  While the limited liability feature is similar to that of a corporation, the availability of flow-through taxation to the members of an LLC is a feature of partnerships.

[8] Macey and Stine, *Citizens United as Bad Corporate Law, supra*.

13.     As reflected in the opinions below, the conceptual fact that a corporation is a legal entity separate and apart from its shareholders has implications for the issues in this case, which involve the liability implications resulting from stock sales and asset purchases.

14.     With regard to stock sales, which is what occurred when Allergan plc sold shares in the Divested Entities to Buyer in 2016, the key point is that shares of stock are financial assets that are separate from the corporation.  When a stockholder (and this analysis applies when the stockholder is itself a corporation) sells the stock that it owns in a corporation, the selling shareholder does not lose its status as a shareholder and become liable for the debts of the underlying corporation whose shares were sold merely because the shareholder received cash or stock or other consideration in exchange for its shares.  The sale of shares, including the sale of 100% of the shares of the corporate entity does not reduce the value of the assets of the corporation whose shares are being sold by the shareholder.  The sale by a shareholder of its stock in a corporation has no effect whatsoever on the duties and obligations, or on the capacity to meet those duties and obligations of the corporation whose shares are sold.  The principle that shareholders are not liable for corporate debts is a logical implication of two facts, from a corporate governance perspective:  (1) the corporation is a juridical entity whose assets and liabilities are entirely separate from the assets and liabilities of its shareholders; and (2) shares of stock in a corporation are financial assets that are not assets or liabilities of the corporation, and may be freely transferred by their owners without incurring or creating liability for the debts or obligations of the underlying corporation that originally issued the shares.

15.     The same corporate governance reasoning applies with equal force to transactions in which a corporation sells some or all of its assets for cash to another corporation.  The selling entity and the buying entities are distinct juridical entities.  From the point of view of the selling

10

entity, an arms'-length asset sale involves the fair exchange of one set of assets (i.e., those assets being sold) for another set of assets (i.e., the cash, stock or other assets received from the buyer in exchange for the assets being sold).  Unless expressly agreed otherwise, the buyer of the assets does not shoulder responsibility for the debts of the entity that is selling the assets because under the principle that the corporation selling the assets is a distinct juridical entity, responsibility for debts of the corporation selling the assets remains at all times with the seller, which is a distinct juridical entity.  Creditors are not harmed or disadvantaged by such asset sales (as long as they are arms-length transactions at market value) for the reasons stated above: An asset sale involves the exchange of the particular assets being sold for the cash, stock or other consideration being received for those assets.

16.      The selling corporation remains perfectly intact after an asset sale.  Before the asset sale, the assets being sold were held by the corporate entity that owned them.  After the asset sale that separate corporate entity is unchanged from the perspective of its liabilities.  The only change is that the seller of the assets has traded one set of assets (those being sold) for another set of assets (the cash or stock or other consideration that comprised the consideration used to buy the assets).  Unless otherwise agreed, the buyer of the assets is no more responsible for the liabilities of the selling entity than it was prior to moment when it purchased those assets.  Thus, in asset sales, unless the parties expressly agree otherwise, liability for the tort and contract obligations of the selling entity remain with the seller, and the entity buying those assets does not assume the liabilities of the selling corporation.

17.      The below summarizes my opinions

<u>Opinion #1</u>:  There are strong and longstanding economic and efficiency justifications for the principle of limited liability.  Limited liability is the principle that allows shareholders to limit the liability associated with their investments in companies to the amount of the capital they invest into such companies.  These justifications center around the economic insights

11

that limited liability provides shareholders – including shareholders that are themselves corporations – with incentives to make investments in business ventures and that such investments are critical to economic growth.

Opinion #2:  The interactions and the degree of "control" among the shareholders, directors and corporations involved in this case were within the normal range for closely-held companies.  They were not excessive or aberrant.  All such control was a necessary and inevitable consequence of the fact that the Allergan Entities directly or indirectly owned 100% of the stock of the Divested Entities.  Such stock ownership brings with it voting control, which simply means that the shareholder is able to elect all of the members of the board of directors of the company whose shares are owned.  The actual control of the company is not vested in the 100% shareholder.  Actual control from a corporate governance perspective is vested in the board of directors or other appropriate governing body of each of the Divested Entities.  As a matter of public policy, shareholder liability under veil piercing theories should occur if and only if the owner of the control block of shares acts in an aberrant or deviant manner.  The involvement of the Allergan Entities in the operations of the various Divested Entities prior to the 2016 sale of the Divested Entities to Buyer was well within the normal range of involvement by parent companies in the activities of their subsidiaries and affiliates.

Opinion #3:  The Allergan Entities and the Divested Entities were all substantial companies with their own corporate governance infrastructures.  They operated in a manner that was separate and distinct from the operations of their parent companies and affiliates and had a significant amount of independence.  There is no indication that these companies were undercapitalized.  In particular, with regard to any claim that the Divested Entities were alter egos, mere shells,  insolvent or undercapitalized, I note that if the Divested Entities were alter egos,  mere shells, insolvent or undercapitalized, then it would have been irrational for Teva to have purchased them in 2016 for the substantial price that it paid in an arms-length market transaction.

Opinion #4:  The 2016 transactions with Buyer involved the sale of 100% of the stock that the Allergan Entities owned in the Divested Entities.  These transactions do not indicate that the Allergan Entities improperly controlled the Divested Entities.  Moreover, because the 2016 transaction was done at arm's length between a sophisticated seller and a sophisticated buyer, the transactions also provide a further indication that there was complete corporate separateness between the Allergan Entities and the Divested Entities whose shares were sold to Buyer in 2016.

Opinion #5:  The structure of the 2016 transactions with Buyer show that the 2016 sales transactions did not result in any harm or unfairness to tort claimants such as the plaintiffs.

Opinion #6:  After the sale to Buyer by the Allergan Entities of all of their stock in the Divested Entities in 2016, the Allergan Entities completely severed their corporate governance ties with the Divested Entities.  After the sale, the Allergan Entities lacked even the *capacity* to control the Divested Entities.  After these transactions, Allergan was a

12

minority shareholder in Teva Pharmaceutical Industries Ltd.,[9] because it received Teva
Pharmaceutical Industries Ltd. shares as part of the consideration for the businesses sold.
Allergan plc agreed to hold its Teva Pharmaceutical Industries Ltd. shares for a twelve
month period, [10] and has now sold all of these shares.[11]  It would be entirely unprecedented
and anomalous for the Allergan Entities to be considered responsible for the debts of these
entities after the 2016 sales because the Allergan Entities no longer even had the *capacity* to
control the Divested Entities because they no longer owned a majority or a control block in
these entities.

Opinion #7:  On December 30, 2008, a former Allergan subsidiary purchased certain assets
related to the branded oral long-acting opioid analgesic drug Kadian®.[12]  The assets
acquired from King Pharmaceuticals, Inc. consisted of all of the intellectual property and
regulatory approvals, inventory, books and records, marketing materials and assumed
contracts that were related to Kadian®.[13]  In exchange for these assets a former Allergan
subsidiary agreed to pay up to $127.5 million in cash based on the achievement of certain
periodic milestones related to profitability.[14]  As a matter of basic corporate governance, for
very sound reasons of finance and economics, it is well-established that the sale of assets
from one corporation to another does not result in tort liability for the company that
purchases the assets for the contract or tort liabilities of the corporation that sells the assets
absent an explicit agreement to the contrary by the parties.  As long as the assets are sold for
fair value (in this case $127.5 million), the company that incurred the tort liability retains the
liability associated with those torts.  Here, the Asset Purchase Agreement expressly
documents this point.[15]  The tort creditors are protected because there is no dilution in the
value of the corporate entity that sells the assets. Rather the selling entity simply is
exchanging one pool of assets (in this case intellectual property and regulatory approvals,
inventory, books and records, marketing materials and assumed contracts) for another set of
assets (cash) which are of even more use to tort plaintiffs than the assets sold.  Under these
facts, it would be bad public policy to hold the purchaser of the assets liable for any tort or
contract liabilities of the seller.

---

[9] Allergan Press Release, "Allergan plc Completes Divestiture of Global Generics Business to Teva
Pharmaceuticals," August 2, 2016. ("Allergan received 100.3 million shares of Teva stock valued at $5.4 billion
based on the opening price of $53.39 for Teva Pharmaceutical Industries Ltd. shares on August 2, 2016.  These
shares are subject to a twelve month holding period post-close of the transaction.")
https://www.allergan.com/news/news/thomson-reuters/allergan-plc-completes-divestiture-of-global-gener (accessed
May 9, 2019).
[10] *Id*.
[11] See Allergan plc / Warner Chilcott Limited 2018 10K (combined Annual Report filed separately by Allergan plc
and its indirect wholly-owned subsidiary, Warner Chilcott Limited),  at F-40, https://allergan-web-cdn-
prod.azureedge.net/actavis/actavis/media/allerganinvestors/financial-information/proxy-materials/2018_10-k.pdf,
accessed May 9, 2019.
[12] United States Securities and Exchange Commission Form 8-K for King Pharmaceuticals, Inc. (date of report (date
of earliest event reported): January 5, 2009 (December 29, 2008)).
[13] *Id*.
[14] *Id*.
[15] Asset Purchase Agreement Between King Pharmaceuticals, Inc. and Actavis Elizabeth, L.L.C., December 17,
2008 (Allergan_MDL_00378157) ("APA") §§  3.01-3.02.

III.   Support for Opinion #1

18.      The concept of limited liability has been characterized as "the greatest single discovery of modem times… . Even steam and electricity are far less important than the limited liability corporation, and they would be reduced to comparative unimportance without it."[16] The corporate form permits investors in corporations to manage their risk through the operation of what is known as "limited liability."  Limited liability is the concept that the ceiling on shareholders' risk of loss associated with their investments is limited to the amount of those investments.

19.      From an economic perspective, limited liability provides incentives for investors to invest in wealth producing businesses that generate growth and employment because they can invest without the risk that all of their assets will be exposed to loss for tort or contractual liabilities incurred by the corporations in which in their investments have been made.

20.      The economic justification for limited liability can be more completely described as justifying the use of corporate form as a liability shield in order: (a) to encourage investment; (b) to promote the economic efficient operation of separately incorporated businesses; and (c) to allow investors to form, invest in and manage multiple businesses.  These economic justifications for the corporate liability shield apply with equal force to all investors, regardless of whether the investor is an individual who owns a very small percentage of the stock in a corporation or whether the investor is itself a corporation and owns 100% of the shares many companies.

---

[16] Nicholas Murray Butler, "Why Should We Change Our Form of Government?"  82 (1912). https://archive.org/details/whyshouldwechan00butlgoog/page/n102 (accessed May 9, 2019).  Nicholas Butler was president of Columbia University, president of the Carnegie Endowment for International Peace, and a recipient of the Nobel Peace Prize in 1931.  *See* The Nobel Prize Organization, Nicholas Murray Butler, https://www.nobelprize.org/prizes/peace/1931/butler/facts/ (accessed May 9, 2019).

14

21.      In order to achieve the economic benefits of the corporate form, the liability of investors, including parent corporations and affiliated corporations must be limited to the amount of their capital investments.

22.      The ability of investors and companies to isolate liability within separately incorporated businesses (even under a single umbrella) enables them to pursue investment opportunities that have a positive present value benefits for employees, local communities, investors and others by encouraging investment.  In sum, the rationale for limited liability is to encourage investment.  This important economic objective can only be achieved if investors have a reasonable degree of certainty that when they make an investment they do not risk becoming personally and unlimitedly liable for the debts of the businesses in which they have invested.

23.      From an economic perspective, limited liability allows business enterprises to aggregate the large amounts of capital that are often necessary to fund their operations from investors who would be unwilling to risk the entire corpus of their personal wealth in a risky business enterprise.  Economists have observed that the expected cost of even a remote risk of a catastrophic loss will outweigh the prospective gains in many, if not most potential investments.[17]  Thus, absent limited liability, a substantial portion of the investment in business that we observe would not occur.

24.      Limited liability also facilitates the capital formation process by enabling investors to assemble diversified portfolios of stock and other assets.  Such diversification

------

[17] Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 44 (1991).

reduces the risk of holding financial assets such as stock, and further facilitates capital formation and the funding of new and existing businesses.

25.     In addition, through holding companies and parent-subsidiary relationships, limited liability promotes the economic efficient operation of separately incorporated businesses.  Parent companies can own controlling interests in multiple subsidiaries that are involved in business activities that have different risk and return profiles.  Each can be managed according to its own particular requirements and needs, with cost savings generated by sharing access to capital markets and technical expertise between and among the various entities in the group.

26.     Finally, limited liability enables investors to form, invest in and manage multiple businesses simultaneously.  This permits entrepreneurs and managers to leverage their expertise and human capital resources across multiple enterprises.

    IV.    Support for Opinion #2

27.     This opinion concerns the corporate governance and corporate control relationships between and among the Allergan Entities and the Divested Entities prior to the 2016 transactions with Buyer.  In my opinion the degree of control and influence exerted by certain of the Allergan Entities prior to the sale shares in the Divested Entities to Buyer in 2016 was not unusual or aberrational as a matter of ordinary and customary corporate practice.  The relationships among the various defendants were typical of the relationships between investors, parent companies and subsidiaries in the corporate world.  They were not excessive or aberrant. All such control was a necessary and inevitable consequence of the fact that the relevant Allergan Entities owned 100% of the stock of the Divested Entities.  Such stock ownership brings with it voting control, which simply means that the shareholder is able to elect all of the

16

members of the board of directors of the company whose shares are owned.  The actual control

of the company is not vested in the 100% shareholder.  It is vested in the board of directors or

other governing body of the portfolio company.  Shareholder liability should result only if the

owner of the control block of shares acts in an aberrant or deviant manner.  There are no

allegations, and I have seen no evidence, that the Allergan Entities exercised control of any of

the Divested Entities in an aberrant or deviant manner.

28.       The Allergan Entities respected corporate formalities throughout the time they

owned shares in the Divested Entities.

29.       Allergan Sales, LLC and Allergan USA, Inc. entered the Allergan corporate

family when Actavis plc (n/k/a Allergan plc) acquired Allergan, Inc. in March 2015.[18]  Four

months later, the sale to Buyer was announced.[19]  Allergan USA, Inc. and Allergan Sales, LLC

never integrated with the Divested Entities prior to the completion of the sale in August 2016.[20]

There is no evidence or allegation that they had any control over the Divested Entities.

30.       In sum, then, while the Allergan Entities owned shares of companies that

manufactured and sold generic opioids (i.e., the Divested Entities), I have not seen allegations

or evidence suggesting that they controlled the daily affairs of those companies, or that they

financed or controlled the Divested Entities' marketing or sales operations in Ohio.  Moreover,

the books, tax returns, and financial statements of the Allergan Entities were kept separate from

---

[18] https://www.allergan.com/news/news/thomson-reuters/actavis-completes-allergan-acquisition; Allergan, Inc. 2014
10K https://www.sec.gov/Archives/edgar/data/850693/000085069315000002/agn10-k2014.htm (pre-acquisition 10-
K listing Allergan Sales, LLC and Allergan USA, Inc. as subsidiaries).
[19] https://www.tevapharm.com/news/teva_to_acquire_allergan_generics_for_40_5_billion_creating_a_transformativ
e_generics_and_specialty_company_well_positioned_to_win_in_global_healthcare_07_15.aspx.
[20] https://www.allergan.com/news/news/thomson-reuters/allergan-plc-completes-divestiture-of-global-gener;
September 2015 Org Chart, ALLERGAN_MDL_02147315 (demonstrating the lack of integration); March 2016 Org
Chart, ALLERGAN_MDL_02147111 (same).

those of the Divested Entities, and the Allergan Entities operated independently of the Divested Entities.[21]

Allergan plc and Allergan Finance, LLC Status as Holding Companies

31.     Allergan plc (f/k/a Actavis plc), and Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) are holding companies.  They do not manufacture, distribute, produce or sell prescription drugs or any other products.  They exist solely for the purpose of holding shares of other companies rather than producing goods or services.[22]

32.     A holding company is simply a company with assets that consist primarily or exclusively of stock in other companies.  There are efficiency and tax reasons for using a holding company structure.  For example, holding companies can obtain dividends from subsidiaries tax-free under certain circumstances, and holding companies also can facilitate capital formation and borrowing and general operational efficiencies.  .

33.     Holding companies normally and necessarily are involved in the activities of their subsidiaries because they are the stewards of their investments in these businesses.  A parent's involvement in the activities of its subsidiaries does not undermine the commercial principle – universally understood in the business world – that affiliates are distinct and separate entities from each other.  Rather, such involvement is both appropriate and necessary.  It is common for parent companies to directly or indirectly provide shared services such as insurance procurement, cash management, accounting, legal, technical, environmental, and to charge for such services.  This is done for efficiency reasons, and helps profitability and economic

---

[21] See, e.g. First Declaration of Sheldon v. Hirt, Senior Vice President, Legal Affairs and Assistant Secretary of Actavis plc, in Support of Actavis Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, December 19, 2014.
[22] *Id*.

efficiencies, and economies of scale.  It is well known in the world of mergers and acquisitions, for example, that every acquisition, by definition brings the company that is the target of the acquisition "under the control" of the acquirer.  Such control, manifested by the acquirer's share ownership, does not by itself imply or suggest that the acquirer automatically becomes responsible for the debts of the target.  Every controlling shareholder (whether shares are held individually or by a corporation) has the power to control the company that they own.  This is what it means to be a controlling shareholder.

34.     It is common business practice for parent companies to control the capital expenditures of their subsidiaries.  In particular, it is common for parent companies and controlling shareholders to approve leases, major capital expenditures, large investments, major policy decisions and sales of securities.

35.     In this context, I note that capital expenditures represent investments in a business that are expected to generate revenue over a longer period of time (i.e., a period of time in excess of a single tax year).  Capital expenditures are expenditures on assets such as new buildings or equipment or patents, as well as upgrades to existing facilities.  In contrast, operating expenses are those incurred in the ordinary day-to-day operation of a business.  Expenditures on maintenance, repairs, utilities and workers' wages are examples of operational expenses.  The tax and financial reporting treatment of capital and operational expenditures is different.  The approval by a parent company of the capital expenditures of a subsidiary is consistent with ordinary and customary practice in the corporate world.

36.     Holding companies and other corporate parent companies typically exert a degree of control over their subsidiaries, and such control is both desirable and necessary.  When a corporation has a controlling interest in another corporation, that (parent) corporation will have

19

investors of its own.  As a matter of basic business practice, a parent company must work to maximize the value of the subsidiary in order to generate a competitive return for its own shareholders.  Similarly, parent companies generally are required to produce consolidated financial statements and tax returns that reflect the results of their subsidiaries.  In order to do this, parents must be able to control the financial reporting of their subsidiaries in order to be sure that the results are reported accurately and in the proper format.

37.     I am aware that certain employees involved in the operations of the Allergan Entities simultaneously performed roles as officers of other corporations within the corporate group.  As a matter of ordinary and customary corporate governance, serving simultaneously in two or more roles within a corporate group is quite common and is known as "double hatting." There is nothing nefarious about double-hatting, and does not provide a justification for imposing liability on the holding company from a corporate governance perspective.  There are obvious efficiencies in the form of cost-savings associated with the practice.  Double hatting also is done to provide an executive with opportunities to learn and gain experience in a variety of roles.

38.     I note that it is ordinary and customary – and indeed unavoidable – for controlling investors to be involved in the high-level management of their businesses and to be involved in and have veto powers over certain long-term decisions for those businesses, such as decisions about capital expenditures or about the strategic direction of the company.  If such decisions resulted in liability, then the investor managers in every one of the hundreds of thousands of corporations, partnerships and LLCs with owner/managers would face liability.

39.     From an economic perspective it is efficient for investors and their affiliated companies to monitor and provide managerial input and corporate governance services to their subsidiaries to other companies in which they have invested.

40.     As a matter of ordinary and customary business practice, investors and their affiliates normally and necessarily are involved in certain of the activities of their affiliates because they are the stewards of their investments in these businesses.  A person's routine involvement in the activities of its subsidiaries does not undermine the commercial principle — universally understood in the business world — that treats affiliates as distinct and separate entities.

41.     As was the case here, it is common for affiliates to be separately organized.  Such affiliates often are incorporated in different states.  Each may be subject to different laws, regulations and regulators, and one entity is not responsible for the liabilities of each other absent some exceptional corporate governance failure.  Businesses rely on these principles of corporate separateness when making investments through acquiring other companies and in planning and operating their businesses.

42.     It is common for a parent company and its affiliates to provide services to a number of its subsidiaries.  These services, which are provided either by the parent or a subsidiary of the parent, are known as shared services when they are offered simultaneously to a number of subsidiaries.  Because of their experience in providing certain services, it is efficient for parent companies (or certain specialized subsidiaries of the parent) to provide services for operating subsidiaries.  It is common for services like accounting, legal, human resources, payroll, information technology (IT), compliance, purchasing, security, and engineering.  The

21

provision of services by a parent is efficient because it reduces the costs of having decentralized business activities, and permits subsidiaries to avail themselves of the experience and expertise of the parent company.

43.     From an economic perspective, where there is a benefit to having a parent company provide a service to the subsidiary, then the parent should be encouraged to provide such a service.  For example, where a parent company has particular expertise in technical accounting or regulatory matters, that parent company should be encouraged to provide accounting or regulatory services to its subsidiaries because leveraging this expertise across firms within a corporate group is efficient. [23] Thus, from an economic perspective, it is inefficient to impose liability on a parent for permitting a subsidiary to avail itself of the parent's expertise in various specific issues because the imposition of liability in this context would provide a strong disincentive to parent companies to allow their subsidiaries to avail themselves of a parent's expertise.

44.     A corporate group is a collection of corporations that function as a single economic entity through a common source of control.  Parent companies are those companies in the group that own a controlling interest in the shares of other companies that are downstream in the group.  Those companies that operate under common control by one or more parent companies are known as affiliate companies.  Companies under common control of the same parent or parent companies are known as affiliates.  It is ordinary and customary business

---

[23] See for example pages 95-96 of the October 26, 2018 deposition of Stephen Kaufhold, who was Treasurer of Allergan Sales, LLC and also served as "treasurer of several legal entities in the Allergan group of companies."  As explained here, performing such multiple roles in affiliated corporations is ordinary and customary in the corporate world, and facilitates the efficient operation of complex businesses.

practice for companies that are members of the same corporate group to operate as a single entity for financial or tax reporting.

45.     It is common for companies within the same corporate group to use the same stationary, to share domain names/emails, marketing programs and to refer to themselves as a single entity, notwithstanding the fact that the corporate group is comprised of a number of distinct legal entities, often incorporated in different jurisdictions.  Likewise, parent companies and subsidiary companies that produce the same products may be considered a single entity for antitrust purposes, even when their identities remain distinct for organizational or other legal purposes.  For example, it is common practice for the multiple subsidiaries of multi-national corporations to conduct business and engage in activities such as research and development (R&D) jointly as integrated global teams.[24]  One strategy utilized by multi-national corporations is "to put together an Integrated Network of R&D units—essentially a "virtual organisation" that physically exists in multiple countries but that thinks and acts as an integrated whole. This approach allows for a coherent and structured R&D strategy to emerge, but it gives very limited degrees of freedom to the individual R&D units because they are acting as satellites of the headquarters operation."[25]

46.     Parent companies, particularly large companies often engage in corporate branding across subsidiaries and other related companies as a marketing strategy.  In business, the synergies available from having parents and subsidiaries engage in joint marketing arrangements are cited, along with sharing administrative services and financial systems, as a

---

[24] Julian Birkinshaw, "Managing Internal R&D Networks in Global Firms: What Sort of Knowledge is Involved?" 35 Long Range Planning, 245–267 (2002).
[25] *Id*.

23

principal advantages of forming subsidiaries in the first place.[26]  For example, it is not uncommon for parent companies and subsidiaries and affiliates to share logos, specific letterhead or stationary, common websites, domains/emails, and packaging.

47.  In this litigation Plaintiffs suggest that the corporate veil of the Divested Entities should be pierced because "Actavis plc's SEC filings explained that "references throughout to 'we,' 'our,' 'us,' the 'Company' or 'Actavis' refer interchangeably to Watson Pharmaceuticals, Inc., Actavis, Inc., and Actavis plc depending on the date."[27]  These descriptions in financial reports were entirely consistent with ordinary and customary business practice among corporate groups and does not provide a justification for imposing liability on the holding company from a corporate governance perspective.

48.  For example, in the GE Annual Report for 2016, the company refers to itself as a global company and refers to its joint activities with its subsidiaries as activities by "the company."  GE reports in its 10-K that "we also produce and market engines through CFM International, a company jointly owned by GE and Snecma… ."[28]  Similarly, in its annual report for 2016, the large insurance company AIG uses the terms "AIG," the "Company," we," "us" and "our" to refer to American International Group, Inc., a Delaware corporation, and to its subsidiaries.[29]  Likewise, Apple Inc. notes in its annual report that "the 'Company' and 'Apple' as used herein refers collectively to Apple Inc. and its wholly-owned subsidiaries, unless

---

[26] Chirantan Basu, "What Are the Advantages & Disadvantages of Establishing the Company's Own Subsidiary Overseas?"  Small Business Chronicle, http://smallbusiness.chron.com/advantages-disadvantages-establishing-companys-own-subsidiary-overseas-34167 html.
[27]  In re National Prescription Opioid Litigation, Third Amended Complaint, March 21, 2019, page 16, paragraph 50.
[28]  GE 2016 10-K at 46, available at http://www.ge.com/ar2016/assets/pdf/GE_AR16.pdf.
[29]  AIG 2016 Annual Report at page 3, available at http://www.aig.com/content/dam/aig/america-canada/us/documents/investor-relations/december-31-2016-10k.pdf.

otherwise stated."[30]  And Google reports that "throughout this Annual Report on Form 10-K, we refer to Alphabet and its consolidated subsidiaries, including Google and its consolidated subsidiaries, as 'we,' 'us,' and 'our;' Alphabet Inc. and its subsidiaries as 'Alphabet;' and Google Inc. and its subsidiaries as 'Google.'"[31]  Similarly, Newmont Mining Corporation, the largest copper mining company in the U.S., refers to itself together with its affiliates and subsidiaries as "Newmont," "the Company," "our" and "we."[32]

49.     As was the case here, it is nonetheless common for affiliates to be separately organized.  Businesses rely on principles of corporate separateness when making investments and in planning and operating their businesses.

50.     As a majority and hence controlling shareholder, a holding company's responsibilities of stewardship extend to all of its subsidiaries.  It is extremely common for operating entities such as the Divested Entities to be owned by a holding company like Allergan plc.  To reiterate: holding companies ordinarily and customarily "control" the high-level management of their subsidiaries because they, by definition, own a control block of the shares issued by such subsidiaries.  Accordingly, the general and conclusory averment that a holding company "controls" its subsidiaries is nothing more than a general description of the holding company form of business organization and does not provide a justification for imposing liability on the holding company.

---

[30] Apple 2014 Annual Report, available at http://files.shareholder.com/downloads/AAPL/5260568319x0xS1193125-14-383437/320193/filing.pdf.
[31] Alphabet/ Google 2015 Annual Report, available at https://abc.xyz/investor/pdf/20151231_alphabet_10K.pdf.
[32] Newmont 2016 Annual Report, at page 104, available at http://s1.q4cdn.com/259923520/files/doc_financials/annual/2016/Newmont-2016-Annual-Report-Bookmarked-PDF-for-website.pdf.

51.     Based upon my review of the Third Amended Complaint and the evidence in this case, there is nothing improper or contrary to public policy about Allergan plc's alleged involvement (or about any of the other Allergan Entities' alleged involvement) in the business affairs or operations of the Divested Entities.  In fact, it is ordinary and customary – and indeed unavoidable – for controlling investors, like Allergan plc to be involved in the oversight and management of their affiliates and subsidiaries, and to make certain decisions on behalf of those affiliates and subsidiaries.

Corporations vs. LLCs

52.     I note that some of the Divested Entities were organized as corporations, while others were organized as limited liability companies.  The corporate governance of these two types of limited liability business forms is very different, and these differences are significant from a veil-piercing perspective.

53.     A fundamental principle of corporate governance in both corporations and LLCs is that corporate powers are not exercised by and corporate decisions are not made by either equity investors or debtholders. The principle that equity investors, whether their investments take the form of shareholdings in corporations or membership units in LLCs, do not exercise corporate governance control is based on the fact that such control is exercised by appropriately delegated agents.

54.     In the case of corporations, the delegated agent responsible for controlling the corporation is the board of directors.  Corporate authority is exercised not by shareholders, even by shareholders who own 100% of a corporation's shares, but by the board of directors.  Such

shareholders do not have the authority to cause a corporation to take any action.  Rather, by longstanding custom and practice, corporate power is vested in the board of directors.[33]

55.      While LLCs provide limited liability to their investors just as corporations do, the LLC is a relatively new legal structure for businesses, at least in the U.S.  From a corporate governance perspective, LLCs are managed in ways similar to the way that corporations are managed, but there are important distinctions.  While corporations are managed by their boards of directors, LLCs may be managed either by elected managers (known as manager-managed LLCs) or by elected members (so-called member-managed LLCs).

56.      Investors creating an LLC can make an election at the time that the LLC is formed whether to organize the LLC as a member-managed LLC or as a manager-managed LLC.  In either case, the managers perform the same role in the corporate governance of the LLC that is played by boards of directors in corporations.  In member-managed LLCs, the member-managers act both as investor/owners and as mangers.  LLC members are investors, not employees. But where an LLC member acts as a member-manager and performs management duties, that individual typically will receive compensation as an employee. Such employment income is separate from the member's status as an owner/investor.

57.      As owners/investors, members of member-managed LLCs enjoy the same limited liability as shareholders in corporations,[34]  because limited liability companies (LLCs),

---

[33] This longstanding custom and practice is reflected in state corporate law statutes.  For example, Model Business Corporation Act (MBCA) Section 8.01(b) provides that "All corporate powers shall be exercised by or under the authority of, and the business and affairs of the corporation managed under the direction of, its board of directors." Similarly, Delaware General Corporation Law Section 141(a) provides that "The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors."  Courts have rejected efforts to restrict the authority of the board of directors.  *See*, e.g., CA, Inc. v. AFSCME Employee Pension Plan, 953 A.2d 227 (Del. 2008).

[34] Of course, just as shareholders can and do typically serve on a corporation's boards of directors, so too can members of LLCs also serve as managers of those entities.  From a corporate governance perspective, there is a crucial distinction between actions taken by a person in her capacity as a shareholder or investor, and actions taken

27

including single-member LLCs, are, from a corporate governance perspective, conceptualized as separate juridical entities from their owners.  For this reason, LLCs are solely liable for their own contractual and tort obligations.  Their members, including members who own 100% of the membership interests in the LLC, are not ordinarily legally responsible for the debts of the entity absent extraordinary circumstances.  I note that no such extraordinary circumstances are alleged against the Allergan Entities or the Divested Entities in the Third Amended Complaint and I have seen no evidence of such extraordinary circumstances in my review of the evidence in this case.

58.      I further note that while investors in both corporations and LLCs enjoy limited liability and are not liable for the debts of these entities, there are important differences between these two types of business organization.  In particular, corporations are required to operate with a certain level of formality.  This traditional requirement that corporations must observe corporate formalities does not apply to the operation of LLCs, which can operate more informally.  Because of the differences between corporations and LLCs described here, as a theoretical and a practical matter, the analysis that is used when attempting to pierce the corporate veil of a corporation cannot be used when attempting to pierce the corporate veil of an LLC.

59.      Generally speaking, while the corporate veil may be pierced against an LLC that is used as a subterfuge to defeat public convenience, justify wrong or perpetrate fraud, other historic grounds for piercing the corporate veil against a corporation may not suffice as justifications for piercing the corporate veil of an LLC.  For example, it sometimes is said that

_____

by the same person in her capacity as a director or manager.  Power exercised or decisions made as a shareholder (such as electing directors and voting for fundamental corporate changes such as the sale of the business) do not give rise to liability.

liability can exist against a shareholder under a piercing the corporate veil theory where it is shown to be the alter ego, mere instrumentality, or agent of a corporate defendant.  However, these factors may not serve as the basis for liability in the LLC context because LLCs are not required under state law to observe formalities in their governance and operations, and are permitted to be managed by only one member.[35]

60.      In this context, I note that several of the entities that Plaintiffs have named as defendants in this litigation, including Allergan Sales, LLC, Actavis Totowa LLC, Actavis LLC, Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Mid Atlantic LLC and Actavis Totowa LLC are Delaware LLCs.  Commentators on Delaware corporate law have observed that Delaware "alternative entities" such as limited partnerships and limited liability companies are not the same thing as corporations….  "In the context of veil piercing, these distinctions suggest that a Delaware LLC should not be subject to true veil piercing at all… and assuming the LLC's veil may be pierced, any piercing should be subject to different standards than those applicable to piercing the corporate veil."[36]

61.      Defendant Allergan Finance, LLC is a Nevada LLC, which follows a similarly restrictive approach to veil piercing.  In Nevada, it is harder to pierce the corporate veil of LLCs than of corporations.  Indeed, some scholars state that the alter-ego theory of veil piercing cannot be applied against LLCs in Nevada, only against corporations.[37]  Further courts in

---

[35] Peschel Family Trust v. Colonna, 75 P.3d 793, 796-97, 799 (Mont. 2003).
[36] The MGM Law Firm News, *The Delaware LLC is Not a Corporation and Should Be Subject to a Different Veil Piercing Analysis*, January 25, 2017, https://www.mgmlaw.com/the-delaware-llc-is-not-a-corporation-and-should-be-subject-to-a-different-veil-piercing-analysis (accessed May 2, 2019).
[37] Phillips Ballenger, *Why Nevada LLCs Just Might Be the Best!*, Nevada Estate Planning and Asset Protection Blog, March 13, 2013, https://phillipsballenger.com/lawyer/2013/03/13/Asset-Protection/Why-Nevada-LLCs-might-just-be-the-best!_bl7106.htm (accessed May 2, 2019).

Nevada have expressed an unwillingness to pierce the corporate veil "absent a  significant amount of fraud."[38]

62.	The point here is not to provide a legal analysis of veil piercing in LLCs.  Rather the point is merely that, from a corporate governance perspective, LLCs and corporations are very different, and the Plaintiffs' failure to distinguish between corporate defendants and LLC defendants in its Third Amended Complaint, coupled with their failure to articulate any factual basis for their piercing claims, render the Complaint devoid of economic or public policy justifications for piercing the corporate veil of any of the Allergan Entities or of any of the Divested Entities.

63.	With respect to both LLCs and corporations, consistent with the point made here that shareholders and investors in LLCs do not manage the corporations in which they invest, while corporations are managed by their boards of directors and LLCs are managed by their elected or delegated managers, shareholders and other equity investors do have indirect power over the governance of the companies in which they invest by virtue of their ability to elect directors and other delegated managers.  This ability to elect directors or LLC managers sometimes is described as the "power to control" the corporation or LLC.  It is well understood that this power to control is indirect and is not considered an adequate basis for assigning liability.

Different Kinds of Control

64.	There is a fundamental distinction between the "power" to control a company, such as by voting to elect directors or LLC managers, and the actual exercise of such power.

---

[38] Nevada Corporate Planners, Inc., (NCP), "Why Nevada?  The Current State of 'Piercing the Corporate Veil' in Nevada, https://www.nvinc.com/piercecorpnext htm (accessed May 2, 2019).

Every parent company – and indeed every majority or controlling shareholder – has the "power to control" the company in which they own the control block of shares.  In this way, it always will be true that a parent company or majority or controlling investor "could have prevented" a loss by creditors of subsidiary corporations by identifying the problem that caused the loss and correcting it.

65.     In practical terms, a shareholder that owns or controls a majority of the voting shares of a company has the power to elect that company's board of directors.  The board of directors has the power to hire and fire managers, determine the strategic direction of the company, and oversee the day-to-day operation of the company.  As a practical matter, however, the board of directors is answerable to the shareholders.  And because the board can be replaced by the controlling shareholder, boards of directors are instruments of the shareholders' will, subject of course to the constraints that directors must act in accordance with all applicable laws and regulations.

66.     With regard to the Plaintiffs' assertion that the Allergan Entities "controlled" the Divested Entities, I note that these assertions are based on the mere fact that certain of the Allergan Entities owned 100% of the shares in the Divested Entities.  However, majority (and certainly 100%) share ownership in corporations *always* brings with it the kind of "control" identified by the plaintiffs.  This type of control does not result in shareholder liability.  After all, if the control that results from ownership of a majority of shares in a corporation were sufficient to cause the shareholder to face liability for the tort or contract liabilities of the company, then all parent companies would always and automatically be liable for the debts of their subsidiaries.

67.     If majority ownership, or ownership of a so-called control block of stock in a company were tantamount to the kind of control required for veil piercing, then veil piercing would be automatic, and the concept of limited liability would disappear.

68.     As an economic matter, any person or entity that owns or controls shares representing more than 50 percent of the voting rights in another company is said to "control" that company.  However, within the ordinary lexicon of corporate America, there are many types and degrees of control.  Generally speaking, as a matter of ordinary and customary corporate practice, those who own a controlling interest (more than 50 percent of the voting shares) in a corporation exert significant actual control over the operations of that corporation.  As an economic matter, the exercise of such control is necessary in order for the controlling shareholder to protect its investment.  In other words, it is ordinary and customary for investors, including holding companies and other parent companies to interact and to exert investment control over the companies in which they have invested.  Similarly, it is ordinary and customary in business for investors who own a controlling block of stock in a corporation to be heavily involved in the governance, strategy, investments, and operations of the businesses in which they have invested.

V.     Support For Opinion #3

69.     The Allergan Entities and the Divested Entities were substantial companies with their own corporate governance infrastructures.  They operated in a manner that was separate and distinct from the operations of their parent companies, and had a significant amount of independence.  With regard to the Divested Entities, their independence from the Allergan Entities was well within the normal range for wholly-owned subsidiaries.

32

70.      I am unaware of any allegations or evidence suggesting that the Divested Entities failed to observe any required corporate formalities or violated any provision of U.S. or foreign law pertaining to their formation or operation.

71.      As further proof that the Divested Entities were not mere corporate shells for which piercing the corporate veil might be contemplated, I note that just prior to the divestiture, the Allergan Entities and all of its affiliates together had a total head count of approximately 31,200 employees.  It is significant that of these 31,200 employees, approximately 14,900 — almost one-half — moved with the Divested Entities to Buyer when Buyeracquired 100 percent of the shares in these businesses.[39]

72.      Prior to the divestiture, subsidiaries and affiliates of Allergan entities owned and operated 24 manufacturing facilities at which finished products were produced.  Fully two-thirds of these facilities were transferred to Buyer as part of the divestiture.[40]  The Allergan Entities transferred the following bricks and mortar manufacturing plants at which finished products were produced to Buyer:

| Location State | Country |
| --- | --- |
| Dupnitsa | Bulgaria |
| Davie | Florida |
| Athens | Greece |
| Hafnarfjordur | Iceland |
| Ambernath | India |
| Goa | India |
| Dublin | Ireland |
| Nerviano | Italy |
| Birzebbugia | Malta |
| Zetjun | Malta |
| Elizabeth | New Jersey |

[39] Allergan plc, Warner Chilcott Limited, Combined Annual Report for the fiscal year ended December 31, 2015 at 22.

[40] Id. at 15.

| | |
|---|---|
| Coleraine | Northern Ireland |
| Fajardo | Puerto Rico |
| Manati | Puerto Rico |
| Barnstable | UK |
| Salt Lake City | Utah[41] |

73.     Further support for my opinion that the Divested Entities were substantial companies with their own corporate governance infrastructures is reflected in the significant value that was received for these entities in arms-length transactions with a bona fide third party purchaser.  In exchange for these shares, Allergan received $40.50 billion, $33.75 billion of which was paid in cash and the balance of which was paid by transfer of $6.75 billion in Teva Pharmaceutical Industries Ltd.  stock (based on the market price for Teva Pharmaceutical Industries Ltd. shares (or American Depository Shares with respect thereto)) at the time the transaction was announced.[42]

74.     Further support for my opinion that the Divested Entities were substantial entities and not corporate shells is reflected in the fact that the Divested Entities manifested their corporate separateness and independence in myriad ways.  For example, as the following chart shows, these entities were: (a) treated as separate entities for tax purposes and were subject to audits by tax authorities and auditors separate and apart from their parents and affiliates; (b) entered into contracts in their own right; and (c) were sued in their individual corporate

---

[41] *Id*.

[42] *Id*. at F-15 (Index to Consolidated Financial Statements).  In exchange for the $40.5 billion purchase price, Buyer received shares in direct or indirect subsidiaires of Allergan plc that operated the global generics business, including the United States ("U.S.") and international generic commercial units, their third party supplier Medis, their global generic manufacturing operations, their global generic R&D unit, their international over-the-counter (OTC) commercial unit (excluding OTC eye care products) and "some established international brands." *Id*.

capacities in litigation by third party plaintiffs and hence recognized as legitimate, separate

juridical entities:[43]

| Divested Entity Name: | Manifestation of Corporate Independence Include: |
|---|---|
| Warner Chilcott Company, LLC | • Independently and separately audited by Pricewaterhouse Coopers LLP's office in Hato Ray Puerto Rico.<br>• Secretary of the Department of Economic Development and Commerce of the Commonwealth of Puerto Rico grant of tax exemption from specified truces to Warner Chilcott Company, LLC as an "eligible industry" because it proved to the satisfaction of the Secretary of the Department of Economic Development and Commerce that it has established, or will establish an eligible industry as defined in the Act and that the same will be in the best interest of Puerto Rico; Actonel Promotion and<br>• Distribution Agreement, dated as of January 15, 2015 by and between Warner Chilcott Company, LLC and Sanofi Winthrop Industrie;<br>• Transition Agreement, dated as of October 31, 2014, between Warner Chilcott Company, LLC and Sanofi-Aventis U.S. LLC;<br>• Actonel Promotion and Distribution Agreement, dated as of January 30, 2014, by and between Warner Chilcott Company, LLC and Sanofi Winthrop Industrie. |
| Actavis Pharma, Inc. (f/k/a/ Watson Pharma, Inc.) | • Actavis Pharma, Inc. filed its Indiana Corporate Income tax return on a separate state filing basis. |
| Watson Laboratories, Inc. and its indirect subsidiary: | • Supply Agreement, dated June 10, 2010 between The RiteDose Corporation and Watson Laboratories, Inc. (as amended on June 1, 2012 and August, 2012);<br>• Settlement Agreement, dated March 23, 2013, between Watson Laboratories, Inc., EGIS Pharmaceuticals PLC, AstraZeneca AB and Shionogi Sieyaku Kabushiki Kaisha in connection with approvals requested from the FDA for a rosuvastatin zinc product (NDA No. 202-172) and a rosuvastatin calcium product (ANDA No. 79-167); |

---

[43] Except as otherwise noted, this information was compiled from various documents produced at the Deposition of Stephan Kaufhold, October 26, 2018, Exhibit 3.

|  | • IRS Audit:  12/31/2010 to 6/30/2015 (withholding tax); <br>• Litigation regarding Vardenafil Hydrochloride (Staxyn®):  Bayer Pharma AG, et al. v. Watson Laboratories, Inc., et al. (D. Del. 1 :12cv-005l7-GMS-Sleet) <br>• Master Supply Agreement between Watson Laboratories, Inc. and Catalent Pharma Solutions, LLC |
|---|---|
| Actavis LLC and its direct subsidiaries: | • U.S. federal income tax audit for the tax years ended 12/31/2009, 12/31/2010, 12/31/2011 and 10/31/2012 for Actavis LLC (f/k/a Actavis Inc.). <br>• Litigation:  Actavis LLC's direct subsidiary Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) was involved in litigation regarding Metbylpbenidate HCl Extended-Release Oral NIA Suspension, CII (Quillivant XR®): Tris Pharma Inc. v. Actavis Laboratories FL Inc. (D. Del. 1 :15-cv-00393-Sleet) |

75.     Further support for my opinion that the Divested Entities sold to Buyer were substantial entities that is particularly relevant for this litigation is found in the fact that these entities themselves managed and held the intellectual property rights to several of the prescription drug medications that I understand are at issue in this litigation.

76.     In particular, the Divested Entities themselves held the ANDAs and the New Drug Application ("NDA")  for the certain medications at issue in this litigation.

77.     The NDA is the vehicle through which drug sponsors formally propose to the FDA that it approve a new medicine for sale and marketing in the U.S.  The data gathered during the animal studies and human clinical trials of an Investigational New Drug (IND)

become the focal part of the NDA.[44]  NDAs are approved for the entity that applies for the

NDA, which in this case, of course, were the Divested Entities that filed the applications.

78.     ANDAs contain the data that is transmitted to the U.S. Food and Drug

Administration for review and potential approval of a generic drug product. Once approved, it is

*the applicants,* which in this case were the Divested Entities that were granted permission to

manufacture and market the generic drug product.[45]

79.     The following chart depicts the ANDAs and NDAs held by the Divested Entities

that are named as defendants in this case:[46]

| Divested Entity Name: | Abbreviated New Drug Application and/or New Drug Application holder for: |
| --- | --- |
| Watson Laboratories, Inc. | Fentanyl citrate injection (ANDA# 074917) Fentanyl citrate table (ANDA# 079075) Fentanyl transdermal (ANDA# 076709) Hydrocodone / acetaminophen (ANDA #s 081083; 081080; 081079; 040094; 040122; 040123; 040099; 040148; 089883; 040248); Meperidine Hydrochloride Injection (ANDA #s 073443; 073444; 073445) Meperidine Hydrochloride Tablet (ANDA # 040186); Morphine sulfate injection (ANDA #s 073373; 073374; 073375; 073376); Morphine sulfate capsule (ANDA # 200812); |

[44] U.S. Food and Drug Administration, "New Drug Application (NDA)," https://www.fda.gov/drugs/types-applications/new-drug-application-nda
[45] U.S. Food and Drug Administration, "Abbreviated New Drug Application (ANDA)," https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda (accessed May 6, 2019). Generic drug applications are denoted as "abbreviated" applications because they generally are not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness. Instead, generic applicants must scientifically demonstrate that their product performs in the same manner as the innovator drug. A primary way that abbreviated new drug applicants demonstrate that a generic product performs in the same way as the innovator drug is to measure the time it takes the generic drug to reach the bloodstream in healthy volunteers. This demonstration of "bioequivalence" gives the rate of absorption, or bioavailability, of the generic drug, which can then be compared to that of the innovator drug.  To be approved by FDA, the generic version must deliver the same amount of active ingredients into a patient's bloodstream in the same amount of time as the innovator drug. The "Drug Price Competition and Patent Term Restoration Act of 1984," (Public Law 98-417) also known as the Hatch-Waxman Amendments, established bioequivalence as the basis for approving generic copies of drug products. See U.S. Food and Drug Administration, "Abbreviated New Drug Application," https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda (accessed May 6, 2019).
[46] This information was collected in response to Plaintiffs' 30(b) (6) Notice and is reflected in a document that was produced as Exhibit 3 to in the Deposition of Stephan Kaufhold, October 26, 2018.

| | |
|---|---|
| | Oxycodone / acetaminophen (ANDA #s 040234; 040171; 040371; 040535);<br>Oxycodone / aspirin (ANDA #s 040255; 090084);<br>Oxycodone / ibuprofen (ANDA# 078394);<br>Morphine sulfate tablet (ANDA# 075656). |
| Actavis South Atlantic LLC | Oxymorphone tablet (ANDA# 079046)<br>Fentanyl transdermal (ANDA# 077602) |
| Actavis Elizabeth LLC | Kadian® NDA (020616)<br>Oxycodone / acetaminophen (ANDA #s 040203; 040199; 040800; 201447);<br>Homatropine methylbromide / hydrocodone bitartrate (ANDA# 040295);<br>Morphine sulfate capsule (ANDA #s 020616; 079040)<br>Morphine sulfate tablet (ANDA# 203849)<br>Oxycodone / hydrochloride tablet (ANDA# 076636)<br>Oxycodone / ibuprofen (ANDA# 078769)<br>Oxymorphone tablet (ANDA# 079046) |
| Actavis Mid Atlantic LLC | Homatropine methylbromide/ hydrocodone bitartrate (ANDA# 088017) |
| Actavis Totowa LLC | Oxycodone / acetaminophen (ANDA #s 040203; 040199; 040800);<br>Homatropine methylbromide / hydrocodone bitartrate (ANDA# 040295);<br>Oxycodone / hydrochloride tablet (ANDA# 076636) |
| Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City) | Kadian® NDA (020616) |
| Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) | Hydrocodone / acetaminophen (ANDA #s 040493; 040494; 040495; 0401481; 206470);<br>Hydrocodone / ibuprofen (ANDA #s 077454; 076604);<br>Oxycodone / aspirin (ANDA# 090084);<br>Hydromorphone tablet (ANDA# 202144). |

80.     Based on a review of the current version of the FDA Orange Book, which identifies approved drugs products, there are numerous drugs registered to the Divested Entities to this day.[47]

81.     Allergan Finance, LLC, Allergan USA, Inc., and Allergan Sales, LLC and Allergan plc are not DEA registrants authorized to manufacture or distribute Schedule II controlled substances.[48]  I understand the Divested Entities maintained DEA registrations to distribute and manufacture controlled substances, and after the 2016 sale transaction, the Allergan Entities outsourced manufacturing and distribution of Kadian and Norco because they no longer had any DEA registrations to manufacture or distribute Schedule II controlled substances.[49]

82.     The book value of the assets sold to Buyer as of December 31, 2015 was $14.07 billion, as against liabilities transferred of $2.07 billion.[50]

83.     The following chart lists the names and addresses of the directors and officers of Divested Entities in 2012.  Those names marked with an asterisk ("*") depict individuals who served as officers and/or directors of these Divested Entities whose positions did not overlap. This lack of overlap is unusual and is a powerful indication that these entities were separate entities with their own governance structures.

| Actavis Pharma, Inc. & Subsidiaries (f/k/a/ Watson Pharma, Inc.) Board as of July 24, 2012 ALLERGAN  MDL  03367292 | |
|---|---|
| Paul M. Bisaro | Director, President and CEO |
| G. Frederick Wilkinson | President, Global Brands and Biosimilars |
| Robert A. Stewart | President, Global Operations |
| R. Todd Joyce | CFO, Global and Principal Accounting Officer |

---

[47] https://www.fda.gov/media/71474/download
[48] S. Kaufhold Ex. 3
[49] *Id.*
[50] *Id.* at F-15, Note 8, Assets Held for Sale.

| David A. Buchen | Chief Legal Officer -- Global and Secretary |
|---|---|
| Ranjana B. Pathak | Senior Vice President, Quality |
| *Andrew Boyer | Senior Vice President, Sales & Marketing, U.S. Generics Division |
| *Charles M. Mayr | Chief Communications Officer - -Global |
| *Lynne Amato | Vice President, Brand Sales and Operations |
| *Thomas R. Griffin | Vice President, US Brand Sales and Operations |
| *Tim Callahan | Vice President, International Brands & Biologics Marketing |
| *Diane Miranda | Vice President, Global Demand Planning and Logistics |
| Kathleen Reape | Vice President, Medical Affairs and Women's Health Clinical Research |
| *Allan Slavsky | Vice President, National Accounts |
| Michael W. Carr | Vice President, Human Resources |
| *Sigurd C. Kirk | Senior Vice President, Corporate Business Development and Integration |
| James O' Brien | Vice President, Controller |
| James A. Williamson | Vice President, Finance |
| Brett W. Hagadorn | Assistant Secretary |
| **Watson Laboratories, Inc. Board as of July 24, 2012 (ALLERGAN  MDL  03367294.)** | |
| Paul M. Bisaro | Director, President and CEO |
| G. Frederick Wilkinson | President, Global Brands and Biosimilars |
| Robert A. Stewart | President, Global Operations |
| R. Todd Joyce | CFO, Global and Principal Accounting Officer |
| David A. Buchen | Chief Legal Officer -- Global and Secretary |
| *Patrick G. Brunner | Senior Vice President, Manufacturing Operations |
| *Charles D. Ebert | Senior Vice President, Research and Development |
| Ranjana B. Pathak | Senior Vice President, Quality |
| *Nick Kerkhof | Vice President Pharmaceutical Technology |
| *Gary Kozloski | Vice President, Medical and Professional Affairs |
| *Gary Holloway | Vice President, Asia/Pacific – Global Generics |
| *Jeffery Regan | Vice President, Third Party Manufacturing |
| *Beth Brennan | Vice President, Brand Sales and Operations |
| Kathleen Reape | Vice President, Medical Affairs and Women's Health Clinical Research |
| Michael W. Carr | Vice President, Human Resources |
| James O' Brien | Vice President, Controller |
| James A. Williamson | Vice President, Finance |
| *Miguel A. Gomez | Vice President, Americas Manufacturing |
| Brett W. Hagadorn | Assistant Secretary |
| *Roberta Loomar | Assistant Secretary |

84.      In conclusion, I have seen no support for the contention that any of the Divested

Entities was  improperly organized or operated or governed in the period prior to their sale to

Buyer.  Similarly, I have seen no indication that the corporate or LLC forms of business

organization were abused in any way.

VI.      Support for Opinion #4

85.      The 2016 transaction involved the sale of 100% of the stock that the Allergan

Entities owned in the Divested Entities.[51]  The terms of the Master Purchase Agreement, dated

July 26, 2015 ("Master Purchase Agreement"), which is the contract that governed these

transactions, make it clear that the Allergan Entities were not involved directly or indirectly in

any improper way in the ownership, control, management or governance of any of the Divested

Entities, all of which were divested pursuant to that Agreement.[52]

86.      Prior to the 2016 transactions, Allergan plc or one of its subsidiaries was the

owner of one hundred percent (100%) of the outstanding equity (stock) of each Divested entity

that was sold.  At the closing of the July 2016 transaction, Allergan plc received $33.75 billion

in cash and $6.75 billion in Teva Pharmaceutical Industries Ltd. stock in exchange for 100% of

Allergan's equity interests in these entities.  Analysis of this transaction shows that Allergan plc

was not in any way involved directly or indirectly in any improper way in the ownership,

control, management or governance of any of the Divested Entities.

87.      The Master Purchase Agreement demonstrates that the 2016 transactions involved

the sale of all of the shares owned directly or indirectly by the Allergan entities in the Divested

---

[51] To the extent that assets were transferred in the 2016 transactions, these assets were transferred by the Divested
Entities who owned such assets.
[52] ALLERGAN_MDL_SUPP 00000174.

Entities and represented a complete transfer of every manifestation of control by the Allergan

Entities over the Divested Entities.

88.     Regarding the point that Allergan sold all of its shares in the Divested Entities,

Section 2.1, which is titled Agreement to Purchase and Sell, of the Master Purchase Agreement

provided that the Allergan Entities (referred to in the Master Purchase Agreement as the

"Sellers") shall sell all of their stock in the Divested Entities to Buyer:

> At the Closing, in accordance with and pursuant to the terms and
> conditions of this Agreement, for the consideration stated in
> Section 3.2(a)(ii) and Section 2.7, Sellers shall, and shall cause
> their respective Affiliates to, grant, sell, transfer, convey, assign
> and deliver to Buyers, and Buyers shall purchase and accept from
> Sellers or any of their respective Affiliates, all right, title, and
> interest of Sellers and their respective Affiliates, as of the Closing,
> in and to the following (collectively, the "Acquired Assets"):
> (a) the Transferred Shares, free and clear of all Liens.

89.     Master Purchase Agreement Section 3.2(i), which is titled Transactions at

Closing, provides that at the closing, the Allergan Entities were required to deliver to Buyer

Parent (as defined in the Master Purchase Agreement) the share certificates of the Divested

Entities.  Specifically the contract compelled the Allergan Entities to:

> deliver to Buyer Parent share certificates representing the
> Transferred Shares (all of the outstanding capital stock of the
> Divested Entities) free and clear of all Liens which certificates
> shall be duly endorsed in blank or accompanied by duly executed
> stock powers, or, in those jurisdictions where applicable, notarized
> deeds of transfer reasonably acceptable to Buyer Parent.

90.     Turning to the point that each of the Divested Entities was a separate legal entity,

Section 4.1 of the Master Purchase Agreement provided that every one of the selling Allergan

Entities and every one of the Divested Entities was a validly organized, distinct legal entity.

Specifically, the Master Purchase Agreement represented and attested that the Divested Entities,

and every entity selling these entities:

42

is a legal entity duly organized, validly existing and, where relevant, in good standing under the Laws of its respective jurisdiction of organization and has all requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing as a foreign corporation or other entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified or, where relevant, in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Seller Material Adverse Effect.

91.     Moreover, the Master Purchase Agreement makes it clear that the Allergan

Entities were merely shareholders in the Divested Entities.  Specifically, Section 4.6 (called

Transferred Entities) provides that an Allergan Entity, which is defined as Allergan plc or one

of its subsidiaries:

(a) Beneficially owns one hundred percent (100%) of the outstanding Equity Participations of each Transferred (Divested) Entity. All of the Transferred Shares are validly issued, fully paid and non-assessable and free and clear of any and all Liens. Upon transfer of the Transferred Shares to Buyer Parent at the Closing, Buyer Parent (Teva) shall own all outstanding Equity Participations of each Transferred Entity.

92.     Moreover, Section 4.6 of the Master Purchase Agreement further provides that

"[e]ach Seller (Allergan) has the full right to sell, convey, transfer, assign and deliver the

Transferred Shares owned by it to the applicable Buyer and, upon the Closing, such Buyer will

have good and valid title to all such Transferred Shares."

93.     Further evidence of the fact that the Allergan Entities completely severed their

relationship with the Divested Entities is found in the fact that all of the employees of the

Divested Entities who had stock options in Allergan plc got stock options in  Teva

Pharmaceutical Industries Ltd. at a prescribed exchange ratio and were no longer shareholders

of Allergan plc.  The treatment of stock awards for the employees of the Divested Entities was treated in Section 7.9 of the Master Purchase Agreement.  Section 7.9 of the Master Purchase Agreement provided:

> Master Purchase Agreement Section 7.9 Treatment of Business Employee Equity Awards.
>
> As of the Closing, without any action on the part of the holders thereof, each Seller Parent Option granted prior to the date of this Agreement … that is outstanding and unvested and held by a Business Employee immediately prior to the Closing shall be assumed by Buyer Parent and shall be converted into an option (a "Buyer Parent Option") to acquire (A) that number of shares of Buyer Parent Stock (rounded down to the nearest whole share) equal to the product obtained by multiplying (1) the number of shares of Seller Parent Stock subject to such Seller Parent Option immediately prior to the Closing by (2) the Exchange Ratio, (B) at an exercise price per shares of Buyer Parent Stock (rounded up to the nearest whole cent) equal to the quotient obtained by dividing (1) the exercise price per share of Seller Parent Stock of such Seller Parent Option by (2) the Exchange Ratio.

94.  Particularly relevant to an economic analysis of piercing the corporate veil issues, I note that after the sale of the Divested Entities, none of these companies could hold themselves out as continuing to be owned by an Allergan Entity.  As provided in Section 9.9 of the Master Purchase Agreement:

> *Use of Name.*
>
> *None of the Transferred Group shall hold itself out as continuing to be owned by Allergan*

95.  Thus, in my opinion the Allergan Entities were not improperly or unusually involved directly or indirectly in the ownership, control, management or governance of any of the Divested Entities.  They were merely shareholders in those entities, and even that relationship ended with the sale of the Divested Entities in 2016, as reflected in the Master Purchase Agreement.

96.     In the Settlement Agreement and Mutual Releases, dated January 31, 2018 (the "Settlement Agreement"),[53] the parties subsequently affirmed the general rule that applied to the sale of the stock owned in the Divested Entities pursuant to the MPA—namely, that the Divested Entities retained all of their liabilities, including those associated with any opioid products they owned and continue to own.  Specifically, the Settlement Agreement provided in relevant part (among other liability affirmations) that "Teva agrees, on behalf of itself and each of its successors-in-interest and assigns, that it shall assume, and shall be or become responsible for . . . any Liabilities or Losses arising from the Third Party Claims . . . based upon generic opioid drugs that are Products," and "any Liabilities, Losses or Claims that are, directly or indirectly, jointly or severally, asserted against or imposed on Allergan [or] its respective Affiliates . . . to the extent such Liabilities, Losses or Claims are based on parent or control liability or a substantially similar theory in connection with any Proceeding involving (1) a member of the Transferred Group and (2) a Product or the Business."[54]

VII.     Support for Opinion #5

97.     The structure of the 2016 transactions shows that from an economic and corporate governance perspective, the 2016 sales transactions did not result in any harm or unfairness to tort claimants such as the plaintiffs.

98.     In the 2016 transaction, the sale of the Allergan Entities' shares in the Divested Entities resulted in the transfer of virtually all of the assets of these entities, as well as their

---

[53] ALLERGAN_MDL_01396687.

[54] *Id.* § 4.  "Transferred Group," has the meaning ascribed to it in the MPA, which "means, individually and collectively, each of the Transferred Entities and each of their direct and indirect Subsidiaries," MPA § 1.1, and encompasses all of the Divested Entities.

intellectual property and human capital, including their R&D capabilities, product pipelines and portfolios, geographical footprints, operational networks and cultures.[55]

99.     As previously observed, Buyer paid $40.50 billion for the Divested Entities.  This figure represents the best assessment of a sophisticated buyer in an arms-length, non-coerced transaction of the *net value* of the assets of the Divested Entities.  This estimate unambiguously signals and implies that Buyer determined that the fair, going concern value of the assets of the Divested Entities was fully $40.5 billion greater than the combined tort and contract liabilities of these Entities.

100.     Thus, the fact that Buyer was willing to pay $40.5 for the Divested Entities conveys significant information that is relevant to a piercing analysis.  First, it indicates that the Divested Entities were not undercapitalized.  The price paid by Teva represents the best estimate of the fair market value of the capital of the Divested Entities at the time of the transfers to Buyer in 2016.

101.     As an economic matter, undercapitalization occurs when a company does not have sufficient resources to conduct its normal business operations.  Undercapitalization is the result of the failure of a business to generate sufficient cash flow to pay creditors as the debts to such creditors come due, during a period when the business is unable to access the capital markets (debt markets, equity markets or other sources of funds).  The inability of a company to pay extraordinary or unanticipated expenses is generally not attributable to undercapitalization.

---

[55] Teva Pharmaceuticals Press Release, "Teva Completes Acquisition of Actavis Generics," August 2, 2016.  As is typical in Merger and Acquisition transactions, particular assets, defined in the Master Purchase Agreement as "Excluded Assets,"  such as rights to refunds of taxes related to the Transferred Assets for any Pre-Closing Tax Period and cash, cash equivalents, bank deposits and marketable securities on hand and in transit of the Seller Parent and its Affiliates (excluding the Transferred Group) at the time of the closing.  *See* Master Purchase Agreement by and Between Allergan PLC and Teva Pharmaceutical Industries Ltd., July 26, 2015, Section 2.2.

102.     From a financial perspective, capitalization (and, hence, undercapitalization)
describes the *relationship* between a corporation's assets and its liabilities.  Substantial sums
may be removed from a corporation as long as what remains is sufficient to allow the
corporation to pay its debts.  Piercing the corporate veil claims frequently are accompanied by
accusations that the subsidiary companies have been "looted" or stripped of their assets.
However, in this case there are no allegations that any of the Allergan Entities engaged in any
looting or asset stripping and I have seen no evidence that any such conduct occurred here.  The
fact that the Divested Entities were able to pay their debts and meet their obligations for a
lengthy period of time before and after their sale to Buyer indicates that the Divested Entities
were not undercapitalized and that the control that the Allergan Entities had over the Divested
Entities by virtue of its share ownership in those entities was not abused.

103.     Moreover, with respect to capitalization, which is often a factor in piercing the
corporate veil cases, I stress that the significant price paid by Buyer for the Divested Entities
constitutes a market-based, arms-length evaluation by a highly sophisticated investor (Teva) of
the capital of the Divested Entities.  Simply put, if the Divested Entities were insolvent or
undercapitalized, then it would have been irrational for Buyer to have purchased them.

104.     Assuming that Buyer was behaving rationally, it would not have paid anything
(much less some portion of $40.5 billion) for Divested Entities if it believed that these
companies were undercapitalized.

105.     Second, the $40.5 billion price paid by Buyer shows that the 2016 divestiture
transactions were not unfair or disadvantageous from an economic perspective to the plaintiffs
in this case.  This opinion is a matter of basic corporate finance.  The Divested Entities were
sold in tact to Buyer.  In the process of determining the value of and negotiating the price to pay

47

for the Divested Entities, Buyer necessarily had to calculate the value of all of the assets that were being conveyed along with the Divested Entities, and then to calculate and then subtract the value of all of the liabilities of the Divested Entities that simultaneously were being conveyed.  Thus, Buyer determined, that, even in light of any and all anticipated tort liabilities to plaintiffs, the value of the entities conveyed to Buyer was $40.5 billion dollars greater than the value of its liabilities.

106.     Similarly, one can only conclude that the plaintiffs were not harmed or treated unfairly as a result of the 2016 divestiture for the simple reason that this transaction did not in any way diminish the capitalization, the earnings power, the financial condition, or the ability of the Divested Entities to fund their liabilities to contract or tort creditors.  This is because the divestiture transactions were effectuated by the sale of the stock owned in the Divested Entities. The balance sheet and the nature and quality of the assets of the Divested Entities was unaltered when the stock was transferred from the Allergan Entities to Buyer.

107.     A simple example illustrates the point that tort and contract creditors of the Divested Entities were not harmed by the divestiture.  Imagine that one of the entities being transferred had a simple balance sheet with $1 billion in assets and $450 million in liabilities. The capitalization of the entity is determined by subtracting the $450 million in liabilities from the $1 billion in assets, resulting in $550 million in capital.  When the entity is transferred in an arms-length, non-coerced sale, a rational, willing buyer will pay, and a rational willing seller will accept $550 million for the company.  The $550 million paid for the company is, of course, transferred at the shareholder level.  Any and all assets and capital available to the divested entity to satisfy the claims of tort and contract creditors prior to the sale remain available to satisfy those claims after the sale.

48

108.     In fact, basic economics indicates that creditors, including the plaintiffs were actually made better off as a result of the sale of the Divested Entities by the Allergan Entities. This is because of the concept of "gains from trade."  In an open and fair contracting environment untainted by fraud, transactions such as the sale of the Divested Entities will only occur in situations in which the buyer imputes and assigns a monetary value to the entities it is buying that is greater than the value attributed to those assets by the seller (in this case the Allergan Entities).  The fact that the buyer values the assets more than the seller generates what economists refer to as the gains from trade that make the purchase and sales process efficient in the sense that it is a "Pareto improvement" over the prior state of affairs.  A Pareto improvement is a contract, transfer or other change in the current allocation of resources that makes at least one individual better off without making any other individual worse off. A contract is considered "Pareto Superior" when both parties to the contract are made better off.  An economy has reached a state of "Pareto optimality" when contracting among fully informed parties will not make anyone better off.[56]

109.     Applying straightforward principles of economics to the sale by the Allergan Entities of the Divested Entities yields the conclusion that the divestiture transactions were Pareto improvements and were fair to Plaintiffs.  This is because the entities that produced and marketed the products that allegedly harmed the plaintiffs were transferred to shareholders (Buyer) who valued them more highly than the prior shareholders.

110.     The higher value that Buyer assigned to the Divested Entities was largely due to the fact that Buyer believed that it could achieve synergies by operating the Divested Entities

---

[56] John Black, Nigar Hashimzade, and Gareth Myles, A Dictionary of Economics (3d edition), (Oxford University Press: 2009, Print ISBN-13: 9780199237043 Online Version: 2009, eISBN: 9780191726637).

side-by-side with its own, legacy businesses which would improve the value of these entities.[57]
As Teva observed at the time of the transaction:

> We are confident that we can realize the projected synergies and
> accretion inherent in this acquisition for our stockholders and
> quickly integrate Actavis Generics into Teva. Furthermore, as a
> result of our strengthened financial profile following this
> transaction, we will be even better positioned to reap the benefits
> of Teva's R&D capabilities to support top-line growth and expand
> our portfolio across the business. The strong, combined company
> cash flow will allow for rapid deleveraging and give us the ability
> to continue capital allocation, with a focus on bolstering our
> specialty pipeline and product portfolio as well as strengthening
> shareholder returns.[58]

111. The significant sales price for the Divested Entities reflects the value of the

Divested Entities net of any anticipated tort liability to plaintiffs in the national prescription

opioid litigation and similar cases. As a matter of basic corporate finance, it makes no sense to

suggest that it was "unfair" to Plaintiffs for the Allergan Entities to have sold their equity

interests in the Divested Entities without sharing the proceeds of these sales with Plaintiffs.

This is because the Plaintiffs had no legitimate financial claim on the shares of stock, which

were not corporate assets, and because the sale of these shares did not in any way diminish or

affect the value of the assets held by the Divested Entities, these assets remained available to

satisfy any potential legal claims on such assets.

112. Further, the sales of the Divested Entities did not have any effect whatsoever on

the amount of cash or other assets available to the Divested Entities to satisfy the tort claims of

Plaintiffs because the sales of the Divested Entities involved only the sale of the stock of those

---

57 Erez Vigodman, President and CEO, Teva Pharmaceuticals, Inc., *quoted in* Teva Pharmaceutical Industries Ltd.
Press Release, Teva Completes Acquisition of Actavis Generics, August 2, 2016,
https://www.businesswire.com/news/home/20160802006666/en/ (accessed May 1, 2019).
58 *Id*.

50

assets by the Allergan Entities.  The Divested Entities retained all of their assets.[59]  All of those assets were transferred right along with the Divested Entities.  As such, there was no harm whatsoever to Plaintiffs from the transfer of the Divested Entities to Buyer.

113.     Further, as is frequently the case in corporate takeovers, Buyer, as the acquirer of the Divested Entities entered into financing arrangements to fund the transaction and took on significant leverage in order to do so.  This additional debt is relevant to my analysis of the transactions in 2016 for two reasons.

---

[59] The assets of the Allergan entities that were transferred to Buyer's control in 2016 included:
 (i) all Products;
(ii) all Inventory;
(iii) the Transferred Receivables;
(iv) the Transferred Owned Real Property and the Transferred Leased Real Property;
(v) all of the rights to the fixed and other tangible personal property and equipment, including materials, prototypes, tools, supplies, vehicles, furniture, fixtures, improvements to the property and other tangible assets;
(vi) all IT Assets Related to the Business;
(vii) the patents and patent applications owned by Sellers or their Controlled Affiliates which are Related to the Business;
(viii)  the Transferred Entities' Business Contracts, and all rights, benefits and interests thereunder;
(ix) Permits, Regulatory Registrations, and the original documents under the possession of Sellers and their Controlled Affiliates evidencing the Regulatory Registrations issued to and held by Sellers and their Controlled Affiliates by the Regulatory Authorities and all related Regulatory Documentation;
(x) copies of the design history files with respect to the Products;
(xi) the Manufacturing Instructions and Technical Information;
(xii) all Books and Records;
(xiii) each human clinical trial study report, if any, conducted or sponsored by Seller or any Affiliate of Seller or submitted by Seller or any Affiliate of Seller to the FDA or similar Regulatory Authority with respect to the Products;
(xiv) product Labeling, product advertising, marketing and promotional materials, sales training materials and all other materials Related to the Business;
(xv) all Claims (including under any express or implied warranties, guarantees or indemnities), causes of action, choses in action, rights of recovery and rights of set-off of any kind to the extent arising from the Business or related to any Acquired Asset or Assumed Liability;
(xvi) any Insurance Proceeds;
(xvii) Cash, to the extent included in the calculation of Closing Net Cash;
(xviii) all assets related to the Transferred Entity Benefit Plans;
(xix) all goodwill of the Business as a going concern;
(xx) the Current Assets at Closing … ;
and
(xxi) any other asset, property or right of Sellers and their respective Controlled Affiliates Related to the Business, whether tangible or intangible, real, personal or mixed… .  Teva Master Purchase Agreement, *supra*, at Section 2.1 Agreement to Purchase and Sell.

114.     First, the willingness of Buyer to assume such debt is a strong indication of Buyer's confidence and optimism about the business prospects of the Divested Entities.

115.     Second, the banks and other companies financing the acquisition of the Divested Entities would have performed due diligence on the Divested Entities before extending credit. This further reinforces my opinions that the transaction was not a sham or a fraud and that the Divested Entities were reasonably and legitimately viewed as valued assets with the capability to generate the income required to meet all of their tort and contractual obligations.

VIII.    Support for Opinion #6

116.     This opinion relates to the corporate governance and corporate control of the Divested Entities in the period following the sale.  After the sales by the Allergan Entities of all of their stock in the Divested Entities, the Allergan Entities completely severed their corporate governance ties with the Divested Entities.  After the sale, the Allergan Entities lacked even the *capacity* to control the Divested Entities.

117.     Because all of the stock of the Divested Entities was acquired by Buyer, each of these Entities became a wholly owned subsidiary of Buyer or one of their affiliates.[60]  And, just as the Divested Entities were separate corporations before they were sold, so too are they separate corporations after the sale.  As separate corporations, their assets and liabilities partitioned off from the assets and liabilities of the Allergan Entities before the sale, during the sale, and after the sale to Buyer.

118.     Thus, it is my opinion that prior to the sale to Buyer, the Allergan Entities had the capacity to control the Divested Entities, but they did not abuse that control in any way that would justify piercing the corporate veil from a public policy perspective because the Allergan

---

[60]  See Footnote 2.

Entities did not abuse that power or utilize it in a way that was inconsistent with ordinary and customary behavior by parent companies.

119.     After the sale to Buyer, the Allergan Entities had no ties with Divested entities whatsoever.  In fact, all of the corporate directors and officers of the Divested Entities resigned and were replaced by new nominees.  As provided in Section 9.10 of the Master Purchase Agreement Section, the Allergan Entities used ordinary voting rights as a 100% shareholder in the Divested Entities to "cause each entity in the (Divested Entities) to hold such corporate or other meetings as are necessary pursuant to applicable Laws to discharge the members of each board of directors or equivalent governing body of such entity with effect as of the Closing."

120.     With regard to the notion that the corporate veil of the Divested Entities might be pierced and liability imposed on any of the Allergan Entities for liabilities that arose after October, 2016, I am not aware of a case in history where liability has been imposed on a piercing the corporate veil theory or an agency theory or any related theory against an entity that owns zero shares and has no representatives on the board of directors of the company whose veil is subject to piercing.  In fact, there is no basis in corporate governance theory for concluding that the Allergan Entities had any corporate governance relationship whatsoever with the Divested Entities after their sale of those entities to Buyer in 2016.

121.     Similarly, with regard to the notion that the corporate veil of the Divested Entities might be pierced and liability imposed on any of the Allergan Entities for liabilities that arose after the sale to Buyer, I am not aware of any case in history where liability has been imposed on a piercing the corporate veil theory or an agency theory or any related theory against an entity that is a mere passive, minority shareholder in a publicly held corporation.  I note that after the October 2016 transactions, no Allergan Entity had any directors, officers or other

employees on the board of Teva Pharmaceutical Industries Ltd. or on the board of any of the Divested Entities.  There is no basis in economics, public policy or basic logic to conclude that the corporate veil of a Buyer-owned entity should be pierced to impose liability on an Allergan Entity merely because that entity owned (but no longer owns) a minority interest in Teva Pharmaceutical Industries Ltd., which, in turn, indirectly owned 100% of the shares of the Divested Entities.[61]

IX.    Support for Opinion #7

122.    This opinion relates to what I understand is a claim by Plaintiffs that somehow the Allergan Entities should be responsible for the tort liabilities from pre-2009 activities of unrelated corporations. This claim apparently is based on the notion that liability emanates from the December 30, 2008 purchase of Kadian® from King Pharmaceuticals, Inc.[62]

123.    However no liability resulted from this transaction because it was a simple sale of assets from one corporate entity to another and the contract related thereto expressly stated that the acquiring entity was not assuming liabilities with pre-sale marketing, promotion, or sale of Kadian.[63]  Specifically, the contract provided, "Buyer agrees to assume, satisfy, perform, pay

---

[61] *See* TEVA MDL JD 000059.
[62] United States Securities and Exchange Commission Form 8-K for King Pharmaceuticals, Inc. (date of Report (date of earliest event reported): January 5, 2009 (December 29, 2008)).
[63] See Asset Purchase Agreement Between King Pharmaceuticals, Inc. and Actavis Elizabeth, L.L.C., December 17, 2008 (Allergan_MDL_00378157) ("APA") §§  3.01-3.02.  The sale of assets by King Pharmaceuticals, Inc. to Actavis Elizabeth LLC came about in connection with an entirely separate transaction.  This separate transaction was the acquisition for $1.6 billion by King Pharmaceuticals, Inc. of rival drug-maker Alpharma Inc.  To settle charges that King's acquisition of Alpharma would be anticompetitive and would violate federal law, in a settlement with the U.S. Federal Trade Commission, King agreed to divest the rights to Alpharma's branded oral long-acting opioid (LAO) analgesic drug Kadian to Actavis Elizabeth LLC in order to "restore the competition between Kadian and King's LAO Avinza that would be lost as a result of the acquisition."  See Federal Trade Commission, "FTC Intervenes in King Pharmaceuticals Acquisition of Rival Alpharma Inc."  December 29, 2008 Press Release. https://www.ftc.gov/news-events/press-releases/2008/12/ftc-intervenes-king-pharmaceuticals-acquisition-rival-alpharma (accessed May 7, 2019).

and discharge only the Assumed Liabilities,"[64] and "Seller shall retain and remain solely

responsible for, and shall satisfy, perform, pay and discharge when due, any and all Excluded

Liabilities,"[65] which include "any and all Liabilities of Seller accruing or arising prior to the

Closing, including Liabilities with respect to any claim or action asserted after the Closing to

the extent the conduct giving rise to such claim or action occurred prior to the Closing."[66]

124.    When purchasers buy assets, unless the parties agree otherwise, the liabilities

remain with the selling entity.  This principle is so well-established in the corporate world that

the U.S. Supreme Court declared over 130 years ago that "[t]his doctrine is so familiar that it is

surprising that any other can be supposed to exist."[67]  The doctrine even applies in transactions

in which the buyer purchases 100% of the assets of the seller. [68]

125.    The assets acquired from King Pharmaceuticals, Inc., consisted of all of the

intellectual property and regulatory approvals, inventory, books and records, marketing

materials and assumed contracts that were related to Kadian®.[69]  As noted above, in exchange

for these assets King Pharmaceuticals, Inc. received up to $127.5 million in cash based on the

achievement of certain Kadian® quarterly gross profit related milestones for the period

beginning January 1, 2009 and ending June 30, 2010 as follows:[70]

| Quarter | Maximum Purchase Price Payment |
|---|---|
| First Quarter 2009 | $30 million |

[64] Asset Purchase Agreement Between King Pharmaceuticals, Inc. and Actavis Elizabeth, L.L.C., December 17, 2008 (Allergan_MDL_00378157) ("APA") §§  3.01-3.02..
[65] APA § 3.02.
[66] APA § 1.01(kk).
[67] Fogg v. Blair, 133 U.S. 534, 538 (1890); see 15 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 7122 (perm. ed., rev. vol. 2008) ("The general rule, which is well settled, is that where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor.").
[68] Id.
[69] United States Securities and Exchange Commission Form 8-K for King Pharmaceuticals, Inc., *supra.*
[70] Id.

| Second Quarter 2009 | $25 million |
|---|---|
| Third Quarter 2009 | $25 million |
| Fourth Quarter 2009 | $20 million |
| First Quarter 2010 | $20 million |
| Second Quarter 2010 | $7.5 million |

126.    For very sound reasons of economics and finance, it is well understood that the sale of assets from one corporation to another does not result in tort liability for the company that purchases the assets for the contract or tort liabilities of the company that sells the assets, absent an explicit agreement of the transacting parties to the contrary.

127.    Moreover, from a public policy perspective, good-faith, arms-length asset sales at fair value between sophisticated parties should be encouraged as long as the assets are sold for fair value.  Here I am not aware of any allegations that the $127.5 million contingent sales price was coerced, or was not consummated at arms-length.  Furthermore, the of Kadian asset purchase agreement was silent as to the transfer of any pre-sale liability connected to Kadian, reinforcing the general rule discussed above that the liabilities remain with the selling entity in an asset sale unless the parties agree otherwise.  This stands in stark contrast to the Allergan Entities' sale of the generics business to Buyer, where the parties subsequently affirmed the general rule that applied to that sale of the stock owned in the Divested Entities—that the Divested Entities (and, as a financial matter, Teva, as the new 100% owner) retained all of their liabilities, including those associated with any opioid products they owned and continue to own.

X.    Conclusion

128.    Economic activity, particularly investment, would diminish considerably without limited liability.  Limited liability, including limited liability for investments made in the context of corporate groups and parent-subsidiary relationships encourages investment, promotes the economic efficient operation of separately incorporated businesses and allows

investors to form, invest in and manage multiple businesses. In order to achieve the economic benefits of the corporate form, the liability of investors, including parent corporations must be limited to the amount of their capital investments. These economic considerations indicate that the goal of economic efficiency is furthered by rarely piercing the corporate veil. The economic justification for piecing the corporate veil is to protect creditors.

129. As discussed in this Report, the control exerted by the Allergan Entities was not aberrational as a matter of ordinary and customary corporate practice. The relationships among the Divested Entities and the Allergan Entities were typical of the relationships between investors, parent companies and subsidiaries in the corporate world. By definition, parent companies always control their subsidiaries simply by virtue of the fact that they own or control shares representing more than 50 percent of the voting rights in another company. Without such ownership or control they would not be parent companies in the first place. As a matter of ordinary and customary corporate practice, those who own a controlling interest (more than 50 percent of the voting shares) in a corporation inevitably exert significant actual control over the operations of that corporation. As an economic matter, the exercise of such control is necessary in order for the controlling shareholder to protect its investment. In other words, it is ordinary and customary for investors, including holding companies and other parent companies to interact and to exert investment control over the companies in which they have invested. Similarly, it is ordinary and customary in business for investors who own a controlling block of stock in a corporation to be heavily involved in the governance, strategy, investments, and operations of the businesses in which they have invested.

130. The Divested Entities were substantial companies with their own corporate governance infrastructures. They operated in a manner that was separate and distinct from the

operations of the Allergan Entities, and enjoyed significant independence that was well within the normal range for wholly-owned subsidiaries.

131.     I have examined the governance and operations of the Divested Entities and there is nothing in the record or in external documents I have discovered through my own research that provides any support for the proposition that these entities did not act appropriately and consistently with their status as separate juridical entities that maintained their own assets and liabilities before and during the sale to Buyer, and whose corporate forms should be respected.

132.     As noted above in paragraph 11, claims by Plaintiffs that the corporate form of any of the defendants should be ignored are not supported by any factual allegations that provide for this contention.  In particular the Third Amended Complaint does not contain any specific allegations or examples of the improper use of control or voting power, undercapitalization of the subsidiary or affiliate, failure to observe corporate formalities, failure to maintain proper books and records, failure to pay incorporation or franchise taxes, and/or failure to maintain the separate corporate identities of the companies.  In my experience, piercing claims are supported by specific factual allegations that support general claims that a subsidiary or other corporate affiliate is a mere instrumentality of the parent corporation.

133.     From a policy perspective, I believe that piercing the corporate veil requires a demonstration that the entity whose corporate separateness is being attacked was organized or used by its parent to mislead creditors or to perpetrate a fraud on such creditors.  From a corporate governance perspective, it is telling that there are no allegations of improper formation or utilization of the corporate form, and no evidence of improper formation or utilization of the corporate form, in this case.

Dated and Signed:  May 10, 2019

Jonathan R. Macey

# EXHIBIT 1

JONATHAN R. MACEY
CURRICULUM VITAE

Name:          Jonathan R. Macey

Address:       Yale Law School
               127 Wall Street               P.O. Box 208215
               New Haven, CT 06511           New Haven, CT 06520-8215
               (courier)                     (post)

Telephone:     (203) 432-7913                Fax:  (203) 432-4871

e-mail:        jonathan.macey@yale.edu

Education:     J.D. Yale Law School; Article and Book Review Editor, Yale Law Journal, 1982;
               A.B., cum laude (economics), Harvard College, 1977.

Current Positions:

- Sam Harris Professor of Corporate Law, Finance, and Securities Regulation, Yale University
- Professor, Yale School of Management
- Chair, Yale University Advisory Committee on Investor Responsibility (ACIR)
- Chair, Yale Faculty Committee on Athletics
- Executive Committee, Yale Law School Center for the Study of Corporate Law
- Economics Advisory Board, Financial Industry Regulatory Authority, (FINRA)
- Member, European Corporate Governance Institute (ECGI)

Subjects:      Business Organizations (Corporations and Other Business Associations);
               Corporate Finance; Corporate Governance; Banking and Financial Institutions
               Regulation; the Economics of Regulation.

Other:         Ph.D. (Law) honoris causa Stockholm School of Economics, 1996;

               D.P. Jacobs prize for the most significant paper in volume 6 of the Journal of
               Financial Intermediation for "The Law & Economics of Best Execution" (co-
               authored with Maureen O'Hara) (1997);

1

Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service awarded by the University of Chicago Law School Chapter of the Federalist Society, 1995;

Bipartisan Policy Center (BPC) Financial Regulatory Reform Initiative's Working Group on Capital Markets

Fellow, Columbia Law School and Columbia Business School, Program in the Law & Economics of Capital Markets

Founding Member, CCH/Aspen Wolters Kluwer Law & Business, Banking and Securities Editorial Board

Books:

"Cases and Materials on Corporations Including Partnerships and Limited Liability Companies," (Thomson*West, Thirteenth Edition 2017) (with Robert Hamilton and Douglas Moll).

"The Law of Banking and Financial Institutions," (Aspen Law &Business, sixth edition, 2017) (with Richard Cornell and Geoffrey P. Miller)

"Macey on Corporation Laws" (2 volume treatise), originally published in 1998, updated annually, Wolters Kluwer Law & Business, 2017 (updated annually)

"The Death of Corporate Reputation: How Integrity Has Been Destroyed on Wall Street," The Financial Times Press, (2013)

"Corporate Governance: Promises Kept, Promises Broken" (Princeton University Press 2008)

"Classics in Corporate Law and Economics," Jonathan Macey, editor, (Edward Elgar Publishing, 2008)

"Iconic Cases in Corporate Law," Jonathan Macey, editor, (Thomson*West, 2008)

"Costly Policies:  State Regulation and Antitrust Exemption in Insurance Markets" (with Geoffrey P. Miller, The AEI Press 1993);

"Svensk Aktiebolags Rätt I Omvandling: En Rättsekonomisk Analys" (Swedish Corporate Law in Transition:  A Law and Economics Analysis (published in Swedish and English by SNS Förlag 1993);

"Third Party Legal Opinions:  Evaluations and Analysis" (Prentice Hall Law and Business, 1992);

"Insider Trading:  Economics, Politics, and Policy" (The AEI Press, 1991);

"An Introduction to Modern Financial Theory" (The American College of Trust and Estate Council Foundation (1991).

Articles, Chapters in Books, Book Reviews:

“Error and Regulatory Risk in Financial Institution Regulation,”  25 Supreme Court Economic Review 155 (2018)

“*Martoma* and *Newman*: Valid Corporate Purpose and the Personal Benefit Test,” 71 Southern Methodist University L. Rev. 869 (2018).

“Vertical and Horizontal Problems in Financial Regulation and Corporate Governance,” *in* The Oxford Handbook of Corporate Law and Governance,” Jeffrey Gordon and Wolf-Georg Ringe,editors, (Oxford University Press 2018)

“Recovering the Promise of the Orderly and Fair Stock Exchange” 42 The Journal of Corporation Law 778 (2017) (with David Swensen)

“Beyond the Personal Benefit Test: The Economics of Tipping by Insiders,” 2 University of Pennsylvania Journal of Law & Public Affairs 24 (2017)

“Their Bark is Bigger than Their Bite: An Essay on W*ho Bleeds When the Wolves Bite*,”  The Yale Law Journal Forum, April 26, 2017 http://heinonline.org/HOL/Page?handle=hein.journals/yljfor126&div=44&g_sent =1&casa_token=&collection=journals

“A Public Choice Approach to the Unequal Treatment of Securities Market Participants and Home Borrowers,” 3 Russell Sage Foundation Journal of the Social Sciences 94-101 (2017)

“The Genius of the Personal Benefit Test,” 69 Stanford Law Review Online 17 (2016)

“Bank Corporate Governance: A Proposal for the Post-Crisis World,” 22 Economic Policy Review 85-105 (2016) (Publication of the Federal Reserve Bank of New York) (with Maureen O’Hara);

“Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil,” 100 Cornell L. Rev. 99 (2014)

“Are Any Creditors ‘Particularly Deserving”?: On the Enduring Attraction of the Ring-Fence Approach to Cross-Border Insolvencies of Financial Institutions, 31 Yale J. on Reg. 695 (2014)

"Theories of Regulatory Risk: The Surprise Theory, The Arbitrage Theory and the Regulatory Mistake Theory, *in* Risk Management in Financial Institutions, Shahin Shojai and George Feiger, editors, (Euromoney Books, 2013)

"Sublime Myths: An Essay in Honor of the Shareholder Value Myth and the Tooth Fairy," 91 Texas Law Review 911 (2013) (book review)

"The Regulator Effect in Financial Regulation," 98 Cornell Law Review, 591 (2013)

"Enforcing Self-Regulatory Organizations' Penalties and the Nature of  Self-Regulation," 40 Hofstra Law Review 963 (2012) (with Caroline Novogrod), *reprinted in* 55 Corporate Practice Commentator 279-313 (2013)

"It's All Shadow Banking, Actually" 31 Rev. Banking & Fin. L. 593 (2011-2012)

"Reducing Systemic Risk: The Role Money Market Mutual Funds as Substitutes for Federally Insured Bank Deposits" 17 Stanford Journal of Law, Business & Finance 131 (2011)

"Failure is an Option: An Ersatz-Antitrust Approach to Financial Regulation" 120 Yale Law Journal 1368 (2011) (with James Holdcroft)

"How Big Banks Fail and What to Do about It," 49 Journal of Economic Literature 750 (2011) (review essay)

"The Value of Reputation in Corporate Finance and Investment Banking (and the Related Roles of Regulation and Market Efficiency) 22 Journal of Applied Corporate Finance 18- 29 (2010).

"Process as Currency With the Courts: Judicial Scrutiny of Directors' Decisions," 4 International Journal of  Corporate Governance 337 (2009 (published June, 2010) (with Geoffrey Miller)

"The Demise of the Reputational Model in Capital Markets: The Problem of the 'Last Period Parasites'" 60 Syracuse Law Review 427 (2010)

"The Distorting Incentives Facing the U.S. Securities and Exchange Commission," 33 Harvard Journal of Law and Public Policy 641 (2010)

"Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages," 34 The Journal of Corporation Law 790 (2009) (with Geoffrey Miller, Maureen O'Hara, and Gabriel Rosenberg).

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 26 Yale Journal on Regulation 89 (2009) with Maureen O'Hara

"Judicial Review of Class Action Settlements" Harvard Journal of Legal Analysis Winter 2009: Volume 1, Number 1 peer-edited Harvard Law Review publication, pp. 1-40 (available at https://ojs.hup.harvard.edu/index.php/jla/article/view/6/21 2009) (2009) with Geoffrey Miller

"Down and Out in the Stock Market: The Law and Economics of the Delisting Process," 51 Journal of Law and Economics 683 – 713 (2008) with Maureen O'Hara

"A Close Read of an Excellent Commentary on *Dodge v. Ford*," 3 Virginia Law & Business Review, 177 (2008)

"Introduction to Iconic Cases in Corporate Law," *in* "Iconic Cases in Corporate Law," pp. i – x (Thomson*West, 2008)

"Judicial Review of Corporate Decisions: Kamin v. American Express Company," *in* "Iconic Cases in Corporate Law," pp. 120-138 (Thomson*West, 2008)

"Out With the Bathwater: Erosion of Shareholders' Takeover Review," *in* "Iconic Cases in Corporate Law,"  pp. 209-239  (Thomson*West, 2008)

"Getting the Word Out About Fraud" A Theoretical Analysis of Whistleblowing and Insider Trading" 105 Michigan Law Review 1899 (2007), *reprinted in* "Retaliation and Whistleblowers,"  Wolters Kluwer, 2009, p 439.

Too Many Notes and Not Enough Votes: Lucian Bebchuk and Emperor Joseph II Kvetch about Contested Director Elections and Mozart's *Seraglio*," 93 Virginia Law Review 759 (2007)

"Executive Branch Usurpation of Power: Corporations and Capital Markets," 115 Yale Law Journal 2416 (vol. 9, 2006)

"The Nature of Conflicts of Interest Within the Firm," 31 The Journal of Corporation Law 613 (2006)

"The Politicization of American Corporate Governance," 1 Virginia Law & Business Review 10 (2006) (revised  in volume 2, #2, Virginia Law & Business Review).

"Government as Investor: Tax Policy and the State," 23 Social Philosophy & Policy, (2006);

"Commercial Banking and Democracy: The Illusive Quest for Deregulation," 23 Yale Journal on Regulation 1 (2006);

"Occupation Code 541110: Lawyers, Self-Regulation, and the Idea of a Profession," 74 Fordham Law Review 1079 (2005);

"From Markets to Venues: Securities Regulation in an Evolving World," 58 Stanford Law Review 563 (2005) ) (with Maureen O'Hara);

"Comment – The Limits of Legal Analysis: Using Externalities to Explain Legal Opinions in Structured Finance," 84 Texas L. Rev. 75 (2005);

"Delaware: Home of the World's Most Expensive Raincoat," 33 Hofstra L. Rev. 1131 (2005);

"Stock Transfer Restrictions and Issuer Choice in Trading Venues," 55 Case Western Reserve L. Rev. 587 (2005) (with Maureen O'Hara);

"Institutional and Evolutionary Failure and Economic Development in the Middle East," 30 The Yale Journal of International Law 397 (2005) (with Ian Ayres);

"Positive Political Theory and Federal Usurpation of the Regulation of Corporate Governance: The Coming Preemption of the Martin Act," 80 Notre Dame Law Review 951 (2005);

"Best Execution Regulation: From Orders to Markets," 13 Journal of Financial Transformation 1 (2005);

"Legal Scholarship: A Corporate Scholar's Perspective," 41 San Diego Law Review, 1759 (2004);

"Wall Street in Turmoil: Federal State Relations Post Eliot Spitzer," 70 Brooklyn Law Review 117 (2004);

"Was Arthur Andersen Different? An Empirical Examination of Major Accounting Firm Audits of Large Clients," Journal of Empirical Legal Studies, July 2004, vol. 1, issue. 2, pp. 263-300(38) (with Ted Eisenberg);

"Monitoring, Corporate Performance: The Role of Objectivity, Proximity and Adaptability in Corporate Governance," Cornell Law Review, 2004, vol. 89, issue 2, p. 356-393 (with Arnoud Boot) (reprinted (in English and Portuguese) in Direito Empresarial: Aspectos atuais de Direito Empresarial brasileiro e comparado, pp. 416-441 (English); 442-470 (Portuguese) (2005);

"Efficient Capital Markets, Corporate Disclosure and Enron," <u>Cornell Law Review</u>,  2004, vol. 89, issue 2, p. 394-422;

"Regulatory Globalization as a Response to Regulatory Competition," 52 <u>Emory L. J</u>. 1353 (2003);

"A Pox on Both Your Houses: Enron, Sarbanes-Oxley and the Debate Concerning the Relative Efficiency of Mandatory Versus Enabling Rules, 81 <u>Washington University Law Quarterly</u>, 329 (2003);

"Observations on the Role of Commodification, Independence, Governance, and the Demise of the Accounting Profession," 48 <u>Villanova Law Review</u> 1167 (2003) (with Hillary Sale);

"The Corporate Governance of Banks," 9 <u>Economic Policy Review</u> 91 (2003) (Publication of the Federal Reserve Bank of New York) (with Maureen O'Hara);

"Solving the Corporate Governance Problems of Banks: A Proposal" 120 <u>The Banking Law Journal</u> 309 (2003) (with Maureen O'Hara);

"The Economics of Stock Exchange Listing Fees and Listing Requirements" 11 <u>Journal of Financial Intermediation</u> 297 (2002) (with Maureen O'Hara);

"Displacing Delaware: Can the Feds Do a Better Job Than the States in Regulating Takeovers?" 57 <u>The Business Lawyer</u> 1025 (2002);

"Smith  v. Van Gorkom: Insights About C.E.O.s, Corporate Law Rules, and the Jurisdictional Competition for Corporate Charters" 96 <u>Northwestern Law Review</u> 607 (2002);

"Cynicism and Trust in Politics and Constitutional Theory" 87 <u>Cornell Law Review</u> 280 (2002);

"Creditors Versus Capital Formation: The Case Against the European Legal Capital Rules" 86 <u>Cornell Law Review</u> 1165 (2001), rewritten in Italian as "Raccolta di Capitale di Rischio e Tutela dei Creditori: Una Critica Radicale alle Regole Europee sul Capitale Sociale" (Capital Formation and Creditor Protection: A Radical Critique of the European Legal Capital Rules), 57 <u>Rivista delle Società</u> 78 (2002) (with Luca Enriques);

"Regulatory Competition in the US Federal System: Banking and Financial Services" in <u>Regulatory Competition and Economic Regulation: Comparative Perspectives</u>, edited by Daniel C. Esty and Damien Geradin (Oxford University Press 2001) at pages 95-110;

"The 'Demand' for International Regulatory Cooperation: A Public Choice Perspective" in <u>Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives</u>" edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press  2000) at pages 147-166;

"US and EU Structures of Governance as Barriers to Transatlantic Regulatory Cooperation" in  <u>Transatlantic Regulatory Co-operation: Legal Problems and Political Perspectives</u>,  edited by George A. Bermann, Matthias Herdegen, & Peter L. Lindseth (Oxford University Press  2000) at pages 357-372;

"The Business of Banking: Before and After Gramm-Leach-Bliley" 25 The Journal of Corporation Law 691 (2000);

"Securities Trading: A Contractual Perspective" 50 <u>Case Western L. Rev.</u> 269 (1999);

"Information and Transaction Costs as the Determinants of Tolerable Growth Levels" 155 <u>Journal of Institutional and Theoretical Economics</u> 617 (1999) (with Enrico Colombatto);

"Fiduciary Duties as Residual Claims: Obligations to Non-shareholder Constituencies from a Theory of the Firm Perspective," 84 Cornell L. Rev. 1266 (1999);

"Globalization, Exchange Governance, and the Future of Exchanges" Brookings Wharton Papers on Financial Services 1999, the Brookings Institution (with Maureen O'Hara);

"Regulating Exchanges and Alternative Trading Systems: A Law and Economics Perspective" 28 <u>Journal of Legal Studies</u> 17 (1999 with Maureen O'Hara);

"Lawyers in Agencies: Economics, Social Psychology, and Process," 61 <u>Law & Contemporary Problems</u> 109 (1998 (published in January, 1999));

"The Legality and Utility of the Shareholder Rights Bylaw," 26 <u>Hofstra Law Review</u> 835 (1998);

"Wall Street Versus Main Street: How Ignorance, Hyperbole, and Fear Lead to Regulation," 65 <u>The University of Chicago Law Review</u> 1487 (1998);

"Professor Simon on the Kaye Scholer Affair: Shock at the Gambling at Rick's Place in Casablanca" 23 <u>Law and Social Inquiry</u> 323 (1998);

"Winstar, Bureaucracy and Public Choice," 6 <u>Supreme Court Economic Review</u> 173 (1998);

"On the Failure of Libertarianism to Capture the Popular Imagination," 15 Journal of Social Philosophy 372 (1998);

"Regulation and Disaster: Some Observations in the Context of Systemic Risk," 1998 Brookings-Wharton Papers on Financial Services 405;

"Public Choice and the Legal Academy" (reviewing Mashaw, Greed, Chaos and Governance), 86 Georgetown Law Journal 1075 (1998);

"Italian Corporate Governance: One American's Perspective" 1998 Columbia Business Law Review 121 (1998);

"Measuring the Effectiveness of Different Corporate Governance Systems: Toward a More Scientific Approach" 10 Journal of Applied Corporate Finance 16 (1998);

"The Legality of the Shareholder Rights By-Law in Delaware: Preserving the Market for Corporate Control" 10 Journal of Applied Corporate Finance 63 (1998);

"The Law and Economics of Best Execution," 6 Journal of Financial Intermediation 188 (1977, published in 1998, with Maureen O'Hara);

"An Economic Analysis of Conflict of Interest Regulation," 82 Iowa Law Review 965 (1997, published in 1998, with Geoffrey P. Miller);

"Law and the Social Sciences" 21 Harvard Journal of Law & Public Pol'y 171 (1997);

"Flexibility in Determining the Role of the Board of Directors in the Age of Information" 19 Cardozo Law Review 291 (1997 with Enrico Colombatto);

"Public and Private Ordering and the Production of Legitimate and Illegitimate Legal Rules"
82 Cornell Law Review 1123 (1997);

"Lessons from Transition in Eastern Europe: A Property-Right Interpretation," 1 International Bulletin of the Institute of Macroeconomic Analysis and Development 10 (1997 with Enrico Colombatto);

"Manipulation on Trial: Economic Analysis and the Hunt Silver Case" 35 Journal of Economic Literature 162 (1997) (book review);

"A Public Choice Model of International Economic Cooperation and the Decline of the Nation State," 18 Cardozo Law Review 925 (1996 with Enrico Colombatto);

9

"Externalities and the Matching Principle: The Case for Reallocating Environmental Regulatory Authority," 23 Yale Law & Policy Review/ Yale Journal on Regulation Symposium: Constructing a New Federalism 25 (1996);

"Exchange-Rate Management in Eastern Europe: A Public-Choice Perspective," 16 International Review of Law and Economics 195 (1996 with Enrico Colombatto);

"Derivative Instruments: Lessons For the Regulatory State," 21 The Journal of Corporation Law 69 ((1995) published in 1996);

"Public Choice, Public Opinion, and the Fuller Court," 49 Vanderbilt Law Review 373 (1996) (book review);

"Originalism As An `Ism'," 19 Harvard Journal of Law & Public Policy, 301 (1996);

"Exchange-Rate Management in Eastern Europe:  A Public Choice Perspective," 6 Journal des Economistes et des Etudes Humanines 259-275 (1995 with Enrico Colombatto);

"Reflections on Professional Responsibility in a Regulatory State," 63 George Washington Law Review 1105 (1995 with Geoffrey P. Miller);

"Corporate Governance and Commercial Banking:  A Comparative Examination of Germany, Japan, and the United States" 48 Stanford Law Review 73 (1995) (with Geoffrey P. Miller) reprinted in 9 Journal of Applied Corporate Finance 57 (1997);

"Public Choice Theory and the Transition Market Economy in Eastern Europe: Currency Convertibility and Exchange Rates" 28 Cornell Journal of International Law 387 (1995) (with Enrico Colombatto);

"The Regulation of Corporate Acquisitions:  A Law and Economics Analysis of European Proposals for Reform" 1995 Columbia Business Law Review 495 (1995) (with Clas Bergström, Peter Högfeldt and Per Samuelsson);

"A Market Approach to Tort Reform via Rule 78" 80 Cornell Law Review 909 (1995) (with Geoffrey P. Miller);

"Language and Self-Interest:  Preliminary Notes Towards a Public Choice Approach to Legal Language" in Northwestern University/Washington University Law and Linguistics Conference, 73 Washington University Law Quarterly 1001 (1995);

"The Limited Liability Company:  Lessons for Corporate Law" in F. Hodge O'Neal Corporate and Securities Law Symposium:  Limited Liability Companies, 73 <u>Washington University Law Quarterly</u> 433 (1995);

"Path Dependence, Public Choice, and Transition in Russia:  A Bargaining Approach" 4 <u>Cornell Journal of Law and Public Policy</u> 379 (1995) (with Enrico Colombatto);

"A Rejoinder" 16 <u>Cardozo Law Review</u> 1781 (1995);

"Deposit Insurance, the Implicit Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities" 12 <u>Yale Journal on Regulation</u> 1 (1995) (with Geoffrey P. Miller);

"Towards a Regulatory Analysis of Deposit Insurance" in Prudential Regulation of Banks and Securities Firms" (Guido Ferrarini, editor, 1995) (with Geoffrey P. Miller);

"Packaged Preferences and the Institutional Transformation of Interests" 61 <u>University of Chicago Law Review</u> 1443 (1994);

"Health Care Reform:  Perspectives from the Economic Theory of Regulation and the Economic Theory of Statutory Interpretation: 79 <u>Cornell Law Review</u> 1434 (1994);

"Judicial Preferences, Public Choice, and the Rules of Procedure" 23 <u>Journal of Legal Studies</u> 627 (1994);

"Property Rights, Innovation and Constitutional Structure" 11 <u>Social Philosophy and Policy</u> 181 (1994);

"A Public Choice View of Transition in Eastern Europe" 2-3 <u>Economia delle Scelte pubbliche</u> 113 (1994) (with Enrico Colombatto);

"Chief Justice Rehnquist, Interest Group Theory, and the Founders' Design" 25 <u>Rutgers Law Review</u> 577 (1994);

"Comment:  Confrontation or Cooperation for Mutual Gain?" 57 <u>Law and Contemporary Problems</u> 45 (comment on Moe & Wilson, Presidents and the Politics of Structure 1994);

"Administrative Agency Obsolescence and Interest Group Formation:  A Case Study of the SEC at Sixty" 15 <u>Cardozo Law Review</u> 909 (1994);

"The Pervasive Influence of Economic Analysis on Legal Decisionmaking" 17 <u>Harvard Journal of Law and Public Policy</u> 107 (1994);

"Civic Education and Interest Group Formation in the American Law School" 45 Stanford Law Review 1937 (1993);

"Corporate Law and Corporate Governance:  A Contractual Perspective" 18 The Journal of Corporation Law 185 (1993);

"Thayer, Nagel and the Founders' Design:  A Comment" 88 Northwestern Law Review 226 1993);

"The McCarran-Ferguson Act of 1945:  Reconceiving the Federal Role in Insurance Regulation" 68 New York University Law Review 13 (with Geoffrey P. Miller 1993);

"The Transformation of the American Law Institute" 61 George Washington Law Review 1412 (1993);

"Corporate Stakeholders:  A Contractual Perspective" 43 University of Toronto Law Journal 401 (with Geoffrey P. Miller 1993);

"Double Liability of Bank Shareholders:  A Look at the New Data" 28 Wake Forest Law Review 933 (1993);

"The Inevitability of Universal Banking" 19 Brooklyn Journal of International Law 203 (1993);

"Congress, the Court, and the Bill of Rights" 23 Cumberland Law Review 93 (Comment at Sixth Annual Federalist Society Symposium 1993);

"Kaye, Scholer, Firrea, and the Desirability of Early Closure:  A View of the Kaye, Scholer Case From the Perspective of Bank Regulatory Policy" 66 Southern California Law Review 1115 (with Geoffrey P. Miller 1993);

"Representative Democracy" 16 Harvard Journal of Law & Public Policy 49 (1993);

"The Community Reinvestment Act:  An Economic Analysis" 79 Virginia Law Review 291 (with Geoffrey P. Miller 1993);

"Auctioning Class Action and Derivative Litigation:  A Rejoinder" 87 Northwestern Law Review 458 (with Geoffrey P. Miller 1993);

"Bank Failure:  The Politicization of a Social Problem" 45 Stanford Law Review 289 (with Geoffrey P. Miller 1992);

"Implementing the FDIC Improvement Act of 1991" in Rebuilding Public Confidence Through Financial Reform, Conference Proceedings Volume, Ohio State University Business School, June 25, 1992;

"Nondeposit Deposits and the Future of Bank Regulation" 91 Michigan Law Review 237 (with Geoffrey P. Miller 1992);

"Judicial Discretion and the Internal Organization of Congress" 12 International Review of Law and Economics  280 (1992);

"Mandatory Pro Bono:  Comfort for the Poor or Welfare for the Rich?"  77 Cornell Law Review 1115 (1992);

"The End of History and the New World Order:  The Triumph of Capitalism and the Competition Between Liberalism and Democracy" 25 Cornell International Law Journal 277 (with Geoffrey P. Miller 1992);

"Separated Powers and Positive Political Theory:  The Tug of War Over Administrative Agencies" 80 Georgetown Law Journal 671 (1992);

"Organizational Design and the Political Control of Administrative Agencies" 8 Journal of Law, Economics & Organization 93 (1992);

"The Canons of Statutory Construction and Judicial Preferences" 45 Vanderbilt Law Review 647 (with Geoffrey P. Miller 1992);

"Some Causes and Consequences of the Bifurcated Treatment of Economic Rights and `Other' Rights Under the U.S. Constitution" 9 Social Philosophy and Policy 141 (1992);

"Double Liability of Bank Shareholders:  History and Implications" 27 Wake Forest Law Review 31 (with Geoffrey P. Miller 1992 Symposium);

"Origin of the Blue Sky Laws" 70 Texas Law Review 347 (with Geoffrey P. Miller 1991);

"Toward Enhanced Consumer Choice in Banking:  Uninsured Deposit Facilities as Financial Intermediaries for the 1990's" 1991 New York University Annual Survey of American Law 865 (with Geoffrey P. Miller 1991);

"The Fraud-on-the-Market Theory Revisited" 77 Virginia Law Review 1001 (with Geoffrey P. Miller 1991);

"Lessons From Financial Economics:  Materiality, Reliance, and Extending the Reach of Basic v. Levinson" 77 Virginia Law Review 1017 (with Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter 1991);

13

"The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform" 58 University of Chicago Law Review 1 (with Geoffrey P. Miller 1991);

"The Glass-Steagall Act and the Riskiness of Financial Intermediaries" 14 Research in Law and Economics 19 (with M. Wayne Marr and S. David Young 1991);

"Agency Theory and the Criminal Liability of Corporations" 71 Boston University Law Review 315 (1991 Symposium);

"State and Federal Regulation of Corporate Takeovers:  A View From the Demand Side" 69 Washington University Law Quarterly 383 (1991);

"America's Banking System:  The Origins and Future of the Current Crisis" 69 Washington University Law Quarterly 769 (1991 Symposium);

"An Economic Analysis of the Various Rationales for Making Shareholders the Exclusive Beneficiaries of Corporate Fiduciary Duties" 21 Stetson Law Review 23 (1991 Symposium);

"Politics, Bureaucracies, and Financial Markets:  Bank Entry into Commercial Paper Underwriting in the United States and Japan" 139 University of Pennsylvania Law Review 369 (with David G. Litt, Geoffrey P. Miller and Edward L. Rubin 1990);

"The Role of the Democratic and Republican Parties as Organizers of Shadow Interest Groups" 89 Michigan Law Review 1 (1990);

"Federal Deference to Local Regulators and the Economic Theory of Regulation" 75 Virginia Law Review 265 (1991);

"Good Finance, Bad Economics:  An Analysis of the Fraud on the Market Theory" 42 Stanford Law Review 1059 (with Geoffrey P. Miller 1990);

"The Stock Exchange as a Firm:  The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges" 76 Cornell Law Review 1007 (with Hideki Kanda 1990);

"Auction Theory, MBO's and Property Rights in Corporate Assets" 25 Wake Forest Law Review 85 (1990 Symposium);

"Firm-Specific Human Capital Investments and Hegelian Ethics:  A Comment on Cornell and Posner" 11 Cardozo Law Review 505 (1990);

"Courts and Corporations:  A Comment on Coffee" 89 <u>Columbia Law Review</u> 1692 (1990);

"Macey Responds to Lubet" 75 <u>Cornell Law Review</u> 959 (1990);

"The Fraud on the Market Theory:  Some Preliminary Issues" 74 <u>Cornell Law Review</u> 923 (1989);

"Restrictions on Short Sales:  An Analysis of the Uptick Rule and its Role in View of the October 1987 Stock Market Crash" 74 <u>Cornell Law Review</u> 799 (with Mark Mitchell and Jeffry Netter 1989);

"Externalities, Firm-Specific Capital Investments, and the Legal Treatment of Fundamental Corporate Changes" 1989 <u>Duke Law Journal</u> 173 (1989);

"The Political Science of Regulating Bank Risk" 49 <u>Ohio State Law Journal</u> 1277 (1989);

"The Myth of `Re-Regulation':  The Interest Group Dynamics of Regulatory Change in the Financial Services Industry" 45 <u>Washington & Lee Law Review</u> 1275 (1989);

"Public Choice:  The Theory of the Firm and the Theory of Market Exchange" 74 <u>Cornell Law Review</u> 43 (1989);

"How Separation of Powers Protects Individual Liberties" 41 <u>Rutgers Law Review</u> 813 (1989);

"The Chicken Wars as a Prisoners' Dilemma:  What is in a Game?" 64 <u>Notre Dame Law Review</u> 447 (1989) (review of John A.C. Conybeare, <u>Trade Wars: The Theory and Practice of International Commercial Rivalry</u>);

"The Dangers of Pop Thinking About Japan" 22 <u>Cornell Journal of International Law</u> 623 (1989) (review of Daniel Burstein, <u>Yen! Japan's New Financial Empire and its Threat to America</u>);

"The Internal and External Costs and Benefits of <u>Stare Decisis</u>" 65 <u>Chicago-Kent Law Review</u> 93 (Special Symposium Issue on Post-Chicago Law and Economics, 1989);

"Trans Union Reconsidered" 98 <u>Yale Law Journal</u> 127 (with Geoffrey P. Miller 1988);

"The Missing Element in the Republican Revival" 97 <u>Yale Law Journal</u> 1673 (1988);

"Bank Failures, Risk Monitoring and the Market for Bank Control" 88 Columbia Law Review 1153 (with Geoffrey P. Miller 1988);

"The Myth of Competition in the Dual Banking System" 73 Cornell Law Review 677 (with Henry N. Butler 1988);

"State Anti-Takeover Statutes:  Good Politics, Bad Economics" 1988 Wisconsin Law Review 467 (1988);

"Ethics, Economics and Insider Trading: Ayn Rand Meets the Theory of the Firm" 11 Harvard Journal of Law and Public Policy 785 (1988);

"Alan Bloom and the American Law School" 73 Cornell Law Review 1038 (1988) (review of Alan Bloom, The Closing of the American Mind);

"The Private Creation of Private Trusts" 37 Emory Law Journal 295 (1988);

"From Judicial Solutions to Political Solutions:  The New, New Direction of the Rules Against Insider Trading" 39 Alabama Law Review 355 (1988 Symposium); reprinted 30 Corporate Practice Commentator 459 (1989);

"Transaction Costs and the Normative Elements of the Public Choice Model:  An application to Constitutional Theory" 74 Virginia Law Review 471 (1988 Symposium);

"Market Discipline by Depositors:  A Summary of the Theoretical and Empirical Arguments" 5 Yale Journal on Regulation 215 (with Elizabeth H. Garrett 1988);

"Regulation on Demand:  Special Interest Groups and Insider Trading Law" 30 Journal of Law and Economics 311 (with David D. Haddock 1987);

"Competing Economic Views of the Constitution" 56 George Washington Law Review 50 (1987 Symposium);

"Regulation 13D and the Regulatory Process" 65 Washington University Law Quarterly 131 (with Jeffry M. Netter 1987 Symposium);

"Takeover Defensive Tactics and Legal Scholarship:  Market Forces vs. the Policymaker's Dilemma" 96 Yale Law Journal 342 (1987);

"A Coasian Model of Insider Trading" 88 Northwestern Law Review 1449 (with David D. Haddock 1987);

"Toward An Interest Group Theory of Delaware Corporate Law" 65 Texas Law Review 469 (with Geoffrey P. Miller 1987);

"Property Rights in Assets and Resistance to Tender Offers" 73 <u>Virginia Law Review</u> 701 (with David D. Haddock and Fred S. McChesney 1987);

"Promoting Public-Regarding Legislation Through Statutory Interpretation:  An Interest Group Model" 86 <u>Columbia Law Review</u> 223 (1986);

"ESOP's and Market Distortions" 23 <u>Harvard Journal on Legislation</u> 103 (with Richard L. Doernberg 1986);

"From Fairness to Contract:  The New Direction of the Rules Against Insider Trading" 14 <u>Hofstra Law Review</u> 6 (1985 <u>Symposium</u>); reprinted in 18 <u>Securities Law Review</u> (1986);

"A Theoretical Analysis of Corporate Greenmail" 95 <u>Yale Law Journal</u> 13 (with Fred S. McChesney 1985);

"Controlling Insider Trading in Europe and America:  The Economics of the Politics" (with David D. Haddock) (1986); in Law and Economics and the Economics of Regulation 149 (International Studies in Economics and Econometrics, Volume 13, Kluwer Academic Publishers);

"Shirking at the SEC:  The Failure of the National Market System" <u>University of Illinois Law Review</u>, 315 (with David Haddock 1985);

"Special Interest Groups Legislation and the Judicial Function:  The Dilemma of Glass-Steagall" 33 <u>Emory Law Journal</u> 1 (1984); Reprinted in 17 <u>Securities Law Review</u> 401 (1985);

"Toward a New Pedagogy" (Review of Loss, <u>Fundamentals of Securities Regulation</u>) 93 <u>Yale Law Journal</u> 1173 (1984);


<u>Miscellaneous Publications</u>:

"Wall Street Profits by Putting Investors in the Slow Lane," The New York Times, https://www.nytimes.com/2017/07/18/opinion/wall-street-brokers-rebates kickbacks.html?mcubz=2 July 18, 2017 (with David Swensen)

"As IPOs Decline, The Market is Becoming More Elitist," The Los Angeles Times, http://www.latimes.com/opinion/op-ed/la-oe-macey-ipo-democracy-20170110-story.html  January 10, 2017

"Corporations: The Short-Termism Debate," Panel Transcript from 2014 National Lawyers Convention: Millennials, Equity and the Rule of Law, 85 Mississippi Law Journal 697, 711-714 *inter alia* (2016)

17

"In Defense of Athletics," The Yale Daily News, http://yaledailynews.com/blog/2016/11/18/macey-in-defense-of-athletics/, November 18, 2016

"Obama's Pitch to Ban Non-Compete Agreements Would Make the Rich Richer," Fortune Magazine, http://fortune.com/2016/11/03/obama-non-compete-agreements/, November 3, 2016

"Insider Trading and the Supreme Court," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/insider-trading-and-supreme-court, September 29, 2016

"The Rise of Crony Capitalism," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/rise-crony-capitalism, February 11, 2016

"Beware of Banking Animus," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/beware-banking-animus, January 5, 2016 (reprinted in Hebrew in the Tel Aviv newspaper Haaretz)

"One Way to Unrig Stock Trading," The New York Times, December 24, 2015 (with David Swensen)

"Fannie and Freddie Are Making Lots of Money – But Not for Their Shareholders," The National Review, September 3, 2015 (with Logan Beirne)

"The Cure for Stock-Market Fragmentation: More Exchanges," The Wall Street Journal, June 1, 2015 (with David Swensen)

"Commissioner Gallagher's and Professor Grundfest's Wrongful Attack on the Shareholder Rights Project," Harvard Law School Forum on Corporate Governance and Regulation, May 18, 2015

"Injustice at the SEC," Defining Ideas, A Hoover Institution Journal, http://www.hoover.org/research/injustice-sec, May 14, 2015

"Professor Grundfest's Latest Reply Flip-Flops Allegations and Further Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, January 6, 2015

"Professor Grundfest's Reply Demonstrates that He and Commissioner Gallagher Wrongfully Accused the SRP," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 21, 2014

"SEC Commissioner, Law Professor Wrongfully Accuse SRP of Securities Fraud," The Harvard law School Forum on Corporate Governance and Financial Regulation, December 15, 2014

"An Insider-Trading Watershed," The Wall Street Journal, December 12, 2014

"Argentina's Disturbing New Low," National Review OnLine, October 31, 2014

"Did Fannie and Freddie Recover After the Collapse? Read the Report," The National Law Journal, (with Logan Beirne), September 8, 2014

"Congress Is Stealing Fannie and Freddie, Real Clear Markets," (with Logan Beirne), May 14, 2014

"It's Perfectly Fine For Herbalife Short-Sellers To Lobby The Government," Forbes.com, April 24, 2014

"How Argentina's Default Could Be New York's Loss: The Commercial Capital Depends On U.S. Courts to Hold Governments to Their Promises," The Wall Street Journal, April 20, 2014

"3 Justifications for Piercing the Corporate Veil," LexisNexis Law 360, April 1, 2014

"On Divestment," The Yale Daily News, November 15, 2013

"Using Disclosure to Silence Corporate America: The Soros-funded CPA-Zicklin Index' is Merely A Weapon Against Business," The Wall Street Journal, October 22, 2013

Jonathan Macey, Opinion analysis: "That which does not kill the SEC may make the agency stronger," SCOTUSblog (Feb. 28, 2013, 12:04 PM), http://www.scotusblog.com/2013/02/opinion-analysis-that-which-does-not-kill-the-sec-may-make-the-agency-stronger/

Jonathan Macey, Argument recap: "We're from the government and we're here to win," SCOTUSblog (Jan. 15, 2013, 10:50 AM), http://www.scotusblog.com/2013/01/argument-recap-were-from-the-government-and-were-here-to-win/

Jonathan Macey, Argument Preview: "Too bad both sides can't lose this one," SCOTUSblog (Jan. 7, 2013), http://www.scotusblog.com/2013/01/argument-preview-too-bad-both-sides-cant-lose-this-one/

"Is Mitt Romney at Risk from the Department of Justice?" Politico, August 16, 2012

"Libor: Three Scandals in One" Foreign Affairs, (foreignaffairs.com), July 20, 2012

"The Feds' New Mortgage Disclosures Are a Bust" The Wall Street Journal, July 18, 2012

"J.P. Morgan Lost $2 billion. They'll Learn From Experience. Regulators Rarely Do," The Wall Street Journal, May 14, 2012

"The Right Lessons of JPMorgan Fiasco," Politico, May 14, 2012

"An End to the Regulatory State," Politico, March 22, 2012

"How Private Equity Works," The Wall Street Journal, January 13, 2012

"Congress's Phony Insider-Trading Reform," The Wall Street Journal, December 13, 2011

"Tackling the Power of the 1%," Politico.com, November 29, 2011

"Buffett BofA Buy No Seal of Approval," Politico.com, August 28, 2011

"Will Court Short-Circuit Dodd-Frank"," Politico.com, (with Elaine Buckberg and James Overdahl) August 16, 2011

"Reform Still Lets Banks Play Roulette," Politico.com, May 5, 2011

"Deconstructing the Galleon Insider Trading Trial," The Wall Street Journal, April 19, 2011

"Uncle Sam and the Hostile Takeover" The Wall Street Journal, March 21, 2011

"The Governor's Power Grab: New York Law Journal March 7, 2011

"Did Egypt's Rising Economy Lead to Hosni Mubarak's Fall?" Politico.com, February 18, 2011.

"The SEC's Facebook Fiasco" The Wall Street Journal, January 20, 2011

"Who wants to watch 'Bank Bailout 2'? Politico.com, October 28, 2010

"Slouching Toward Financial Reform" Politico.com, June 17, 2010

"Break Up the Wall Street Banks. Now" RealClearPolitics.com, April 20, 2010

"Dodd Bill Too Opaque" Politico.com, April 19, 2010

20

"Financial Reform: It's the Politics" <u>Politico</u>, February 3, 2010

"Obama's Financial Reform Falls Short," <u>Politico</u>, January 22, 2010

"Obama and 'Fat Cat Bankers'" <u>The Wall Street Journal</u>, January 12, 2010

"Washington's Plans May Result In Even Higher Executive Pay," <u>The Wall Street Journal</u>, October 25, 2009

"Advice and Consent: The Biggest Danger Is That The Governance Model Transforms Too Radically and Directors Become a Threat To, Rather Than a Resource For, Management," (with Steven Seiden) Directors and Boards Magazine, 2009.

"Say on Pay and Other Bad Ideas: A Ban on Golden Parachutes Will Entrench Management," <u>The Wall Street Journal</u>, April 14, 2009

"Holding CEOs Accountable: Corporate Boards Are Often Last to See What's Wrong," <u>The Wall Street Journal</u>, December 9, 2008

"The Government Is Contributing to the Panic," <u>The Wall Street Journal</u>, October 11, 2008

"Wall Street-Main Street Power Game," <u>The Washington Independent</u>, October 17, 2008 (with James Holdcroft)

"Regulation and Scholarship: Constant Companions or Occasional Bedfellows?" 25 <u>Yale Journal on Regulation</u> 305-313 (2008) (speech delivered on the occasion of the 25th Anniversary of the Yale Journal on Regulation).

Yale Invests Responsibly," <u>Yale Daily News</u>, Friday, November 21, 2008

"Bear Stearns Too Big to Fail?" <u>The Washington Independent</u>, May 21, 2008 (http://washingtonindependent.com/view/bear-stearns-too-big)

"Brave New Fed" <u>The Wall Street Journal</u>, Monday, March 31, 2008, at A19.

"Regulatory McCarthyism" <u>The Wall Street Journal</u>, Tuesday, October 24, 2006 at A17

"From Orders to Markets: Who Should Decide What is 'Best Execution'" <u>Regulation</u>, Vol. 28, No. 2, Summer 2005.

"A Misguided Proposal to Regulate Risk-Taking" (letter) <u>The Wall Street Journal</u>, Tuesday, April 5, 2005.

"A Risky Proposition" (book review) <u>The Wall Street Journal</u>, Tuesday, March 15, 2005;

"How Does the SEC Arrive at its Fines Against Corporate Wrongdoers" June 21, 2004, <u>Forbes;</u>

"Securities and Exchange Nanny" <u>The Wall Street Journal</u>, Tuesday, December 29, 2003, A10;

"Public Choice and the Law." In *The New Palgrave Dictionary of Economics and the Law, Vol. 3*. P. Newman, ed. New York: Stockton. (1998).

"A Poison Pill That Shareholders Can Swallow" The Wall Street Journal, Monday, May 4, 1998;

"A Critical Test of Corporate Governance" <u>The Los Angeles Times</u>, Sunday, February 22, 1998, M2;

"Shareholder Rights Will Be Next Battleground" <u>The National Law Journal</u>, Monday, February 16, 1998;

"Will Euro's Heat Make U.S. Firms Wilt?" <u>The National Law Journal</u>, Monday, September 1, 1997

"Banking; A Reform Plan that Leaves Consumers Out" <u>The Los Angeles Times</u>, Sunday, May18, 1997;

"Fed Does End Run on Glass-Steagall" <u>The National Law Journal</u>, Monday, April 28, 1997;

"Blame Managers, Not Derivatives" <u>The National Law Journal</u>, Monday, August 26, 1996;

"Wealth Creation as a `Sin'," XVII <u>The Journal of Corporate Governance</u> 12 (1996), reprinted in <u>Independent Policy Report</u>, Independent Institute (1996);

"Appeals Court Decision Validates Shady Deals" <u>The National Law Journal</u>, Monday, September 25, 1995;

"The Court Gets It Half Right on Firrea" <u>The Wall Street Journal</u> Wednesday, September 13, 1995;

"The Lowdown on Lending Discrimination"  <u>The Wall Street Journal</u>, Wednesday, August 9, 1995;

"The '80s Villain, Vindicated" <u>The Wall Street Journal</u>, July 18, 1995;

"A Poison Pill to Destroy Banking Reform" <u>The Wall Street Journal</u>, Wednesday, June 7, 1995;

"Banking by Quota" <u>The Wall Street Journal</u>, Wednesday, September 7, 1994;

"Mutual Banks Take Your Money and Run" <u>The Wall Street Journal</u>, Wednesday, December 29, 1993;

"Porkbarrel Banking" <u>The Wall Street Journal</u>, Monday, July 19, 1993;

"Not All Pro Bono Work Helps the Poor" <u>The Wall Street Journal</u>, Wednesday, December 30, 1992;

"Naderite Mossbacks Lose Control Over Corporate Law" <u>The Wall Street Journal</u>, Wednesday, June 24, 1992;

"Needless Nationalization at the FDIC" <u>The Wall Street Journal</u>, Friday, February 14, 1992;

"The SEC Dinosaur Expands its Turf: <u>The Wall Street Journal</u>, Wednesday, January 29, 1992;

"Don't Blame Salomon, Blame the Regulators" <u>The Wall Street Journal</u>, Monday, August 19, 1991;

"In Wake of Bailout, Why are we Rewarding Banks?" <u>The Los Angeles Times</u>, Sunday, July 14, 1991;

"While Politicians Fiddle Banking Crises Explode" <u>The Los Angeles Times</u>, Sunday, September 23, 1990;

"S&L Bailout Plan Victim of Hysteria" <u>The Wall Street Journal</u>, Monday, June 25, 1990;

"A Good Idea Gone Sour:  Can Bank Insurance Fail?" <u>The Los Angeles Times</u>, Sunday, June 24, 1990;

"It's Time for Bush to Pay the Piper on the S&L Bailout" <u>The Los Angeles Times</u>, Sunday, April 22, 1990;

"The Politics of Denying an S&L Crisis" <u>The Los Angeles Times</u>, Sunday, December 10, 1990;

23

"Savings and Loan Regulations Create `Win-Win' Situation for Risk Takers" <u>The Los Angeles Times</u>, Sunday, February 5, 1989;

"The SEC's Insider Trading Proposal:  Good Politics, Bad Policy" <u>Cato Institute Policy Analysis No. 101</u>, March 31, 1988;

"Market for Corporate Control" <u>The Wall Street Journal</u>, Friday, March 4, 1988;

"Senators Would Shoot SEC Messengers" <u>The Wall Street Journal</u>, Thursday, September 10, 1987;

"SEC Vigilant Against Insider Trading - But is it Within Law?  Too Strict a Crackdown Will Harm Markets" <u>The Wall Street Journal</u>, Wednesday, May 28, 1986;

"Financial Planners - A New Professional Cartel?" <u>The Wall Street Journal</u>, Tuesday, October 31, 1985;

"Conservative Judgment Time" <u>The Wall Street Journal</u>, Friday, August 23, 1985;

"Introduction" to Volume V (1989) of the <u>Banking Law Anthology</u>;

Remarks at Symposium on the First Amendment and Federal Securities Regulation, 20 <u>Connecticut Law Review</u> (assorted pages) 1988;

Remarks at Colloquium on the ALI Corporate Governance Project, 71 <u>Cornell Law Review</u>. (assorted pages) (1986);

"A Conduct Oriented Approach to the Glass-Steagall Act" 91 <u>Yale Law Journal</u> 102 (1981) (published as a student).

<u>Recent Testimony</u>

"Measuring the Systemic Importance of U.S. Bank Holding Companies," Senate Banking Committee Hearing, July 23, 2015

<u>Current Activities</u>:

Member, American Law Institute;

Editorial Board, <u>Journal of Accounting, Finance and Law</u>

Academic Advisory Board Committee, the <u>Banking Law Anthology</u>;

Academic Advisory Board, <u>The Social Philosophy and Policy Center</u>;

Board of Editors, <u>Journal of Banking and Finance;</u>

Board of Editors, <u>Journal of Banking Law;</u>

Board of Editors, <u>Journal of Financial Crime</u>;

Board of Editors, <u>Corporate Practice Commentator;</u>

Guest Contributor, <u>Harvard Corporate Governance Blog</u>

<u>Employment History</u>:

Sam Harris Professor of Corporate Law, Securities Law and Corporate Finance, Yale University, 2004 – present;

Visiting Professor, Bocconi University, Milan, Italy, fall 2012;

Visiting Professor of Law, Yale University, 2003-2004;

 J. DuPratt White Professor of Law, Cornell Law School, 1991-2004;

Visiting Professor of Law, Harvard Law School, 1998-1999

Visiting Professor, Faculty of Law, Stockholm School of Economics, fall, 1993;

Research Fellow, International Centre for Economic Research, Turin Italy, winter, 1993, spring, 1994;

Professor of Law (with tenure), University of Chicago, 1990-1991;

Professor of Law, (with tenure), Cornell University, 1987-1990;

Visiting Professor of Law, The University of Chicago, fall quarter, 1989-1990;

Visiting Professor, University of Tokyo Faculty of Law, summer, 1989;

Visiting Associate Professor of Law, University of Virginia, 1986-1987;

Assistant to Associate Professor of Law, Emory University, 1983-1986;

Law Clerk to the Honorable Henry J. Friendly, United States Court of Appeals, Second Circuit, 1982-1983 term of court;

Consultant, Municipal Finance Department, Lloyd Bush & Associates, New York, NY (consultant representing municipalities and investment banks before credit rating agencies (1978-1979));

25

Municipal Bond Trader, Bankers Trust Company, New York, NY (1977-1978);

Member, Board of Directors, Telxon Corporation, 1998- 1999 (appointed as dissident director in settlement of proxy contest dispute); Member, Board of Directors, WCI Communities, Inc., 2007 – 2009; Alternative Director nominee for Illumina, Inc., 2012, Hess Corporation; 2015; Director nominee Rexene Corporation, 1999, Circon Corporation, 1998, Arvin Meritor, Inc. 2004, Wynn Resorts, Ltd. 2012, Family Dollar Stores, 2014 (among others).

Current consulting rate: $1250.00 per hour.

# EXHIBIT 2

Jonathan Macey -- Prior Expert Testimony as of May 10, 2019

| Year | Case Name | Court | Testimony Given |
|------|-----------|-------|-----------------|
| 2014 | Edgar Bachrach v. Bachrach Clothing Holding Corp. | Circuit Court Of Cook County, Illinois County Department, Law Division | Expert Report served as direct testimony; Cross Examination and Re-direct examination before Court Reporter. |
| 2014 | Heidi Stanley v. Sterling Financial Corp. | Superior Court, State of Washington, County of Spokane | Deposition Testimony/ Trial Testimony (jury trial) |
| 2014 | Florida Power Corporation v. First Energy | United States District Court for the Northern District of Ohio, Eastern Division | Deposition Testimony |
| 2015 | New York v. Maurice Greenberg | Supreme Court of the State of New York, County of New York | Deposition Testimony |
| 2015 | State of Connecticut v. The McGraw Hill Companies, and Standard & Poor's | Superior Court, Judicial District of Hartford, Hartford, CT | Deposition Testimony |
| 2015 | George L. Miller, Chapter 7 Trustee, v. Kirkland & Ellis | United States Bankruptcy Court, District of Delaware | Deposition Testimony |
| 2015 | In the Matter of Office of the Comptroller of the Currency v. James E. Plack | U.S. Department of the Treasury, Office of the Comptroller of the Currency | Deposition Testimony |
| 2015 | Paolo Moreno v. SFX Entertainment, Inc. | United States District Court for the Central District of California, Western Division | Deposition Testimony |
| 2015 | Future Select v. Tremont Group Holdings | Superior Court for the State of Washington for King County | Deposition Testimony |
| 2015 | Panattoni Development Company, Inc. v. Scout Funds 1-A, LP and 1-C, LP | Supreme Court of the State of New York, County of New York | Deposition Testimony |

2

| 2016 | CaremarkPCS Health, L.L.C. v. Walgreen Co. | American Arbitration Association, Phoenix, AZ | AAA Arbitration Hearing Testimony |
| 2017 | Robinson Mechanical Contractors, Inc. v. PTC Group Holdings Corp. | United States District Court for the Eastern District of Missouri, Southeastern Division | Deposition Testimony |
| 2018 | United States of America v. AT&T Inc., DirecTV Group Holdings, LLC, and Time Warner, Inc. | United States District Court for the District of Columbia | Deposition Testimony |
| 2018 | Blueblade Capital Opportunities LLC, and Blueblade Capital Opportunities II LLC | Court of Chancery of the State of Delaware | Deposition Testimony |

3

# EXHIBIT 3

## I. Case Materials

### A. Complaints

*County of Cuyahoga, Ohio, et al v. Purdue Pharma L.P.*, *et al*, Case No. 17-md-2804, Second Amended Corrected Complaint (May 30, 2018).

*County of Summit, Ohio, et al v. Purdue Pharma L.P.*, *et al*, Case No. 17-md-2804, Third Amended Complaint (March 21, 2019).

### B. Memorandum Opinion and Orders

*City of Chicago, v. Purdue Pharma L.P., et al,* Case No. 1:14-cv-04361, Memorandum Opinion and Order (May 8, 2015).

*City of Chicago, v. Purdue Pharma L.P., et al,* Case No. 1:14-cv-04361, Memorandum Opinion and Order (September 29, 2016).

### C. Declarations in Support

*City of Chicago, v. Purdue Pharma L.P., et al,* Case No. 1:14-cv-04361, First Declaration of Sheldon V. Hirt in Support of Actavis Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (November 20, 2015).

*City of Chicago, v. Purdue Pharma L.P., et al,* Case No. 1:14-cv-04361,Second Declaration of Sheldon V. Hirt in Support of Actavis Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (November 20, 2015).

### D. Depositions and Exhibits

Stephan Kaufhold, October 26, 2018

## II. Other Materials Considered

1. Actavis, Inc. Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (May 19, 2013).

2. Allergan, Inc. Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2014.

3. Allergan plc. Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2016.

4. Allergan plc. Press Release, "Actavis Completes Allergan Acquisition" (March 17, 2015).

5. Allergan plc. Press Release, "Allergan plc Completes Divestiture of Global Generics Business to Teva Pharmaceuticals" (August 2, 2016).

6. Allergan plc, Warner Chilcott Limited. Form 10-K, Actavis, Inc. Form 8-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2018 (May 19, 2013).

7. Apple Inc. Form 10-K, Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended September 27, 2014 (October 27, 2014).

8. Ballenger, T. Nevada Estate Planning and Asset Protection Blog (March 13, 2013).

9. Birkinshaw, J. Managing Internal R & D Networks in Global Firms, What Sort of Knowledge is Involved? (2002).

10. Black, J., et al. Oxford Dictionary of Economics (2009).

11. Business Wire. Teva Completes Acquisition of Actavis Generics (August 2, 2016).

12. Butler, N. Why Should We Change Our Form of Government? (1912).

13. Complete Business Formation. The Current State of "Piercing the Corporate Veil" in Nevada (2017).

14. Easterbrook, F. and Fischel, D. The Economic Structure of Corporate Law (1991).

15. Federal Drug Administration (FDA). New Drug Application (NDA) (accessed May 6, 2019).

16. Federal Drug Administration (FDA). Abbreviated New Drug Application (ANDA) (accessed May 6, 2019).

17. Federal Trade Commission. FTC Intervenes in King Pharmaceuticals Acquisition of Rival Alpharma Inc. (December 29, 2008).

18. Fletcher, W. Fletcher Cyclopedia of the Law of Private Corporations (1917).

19. General Electric Company. Form 10-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (February 24, 2017).

20. Google Inc. Form 10-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (February 11, 2016).

21. King Pharmaceuticals, Inc. Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for Date of Report (Date of earliest event reported): January 5, 2009 (December 29, 2008).

22. Macey, J. and Mitts, J. Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil (November 2014).

23. Macey, J. and Strine, L. Citizens United as Bad Corporate Law (2018).

3

24. MG+M Law Firm. The Delaware LLC is Not a Corporation and Should Be Subject to a Different Veil Piercing Analysis (January 25, 2017).

25. Newmont Mining Corporation. 2016 Annual Report and Form 10-K (2016).

26. Nicholson, B., et al. Treatment of chronic moderate-to-severe non-malignant pain with polymer-coated extended-release morphine sulfate capsules (March 2006).

27. Nobel Prize Organization. Nicholas Murray Butler - Facts, https://www.nobelprize.org/prizes/peace/1931/butler/facts/ (accessed May 9, 2019).

28. Quain, S. What Are the Advantages & Disadvantages of Establishing the Company's Own Subsidiary Overseas? (January 28, 2019).

29. Supreme Court of Delaware. Case No. 329, 2008. Fed. Sec. L. Rep. 94,784 (July 17, 2008).

30. Supreme Court of Montana. Case No. 02-730. 75 P.3d 793, 2003 MT 216 (2003).

31. Supreme Court of the United States. Fogg v. Blair, 133 U.S. 534, 10 S.Ct. 338, 33 L.Ed. 721 (1890).

32. Teva Pharmaceutical Industries Ltd. Teva to Acquire Allergan Generics for $40.5 Billion Creating a Transformative Generics and Specialty Company Well Positioned to Win in Global Healthcare (July 25, 2015).

33. Urgenson, L., et al. FCPA Anti-Bribery Liability for a Subsidiary's Conduct (January 2013).

34. United States Department of Health and Human Services. Approved Drug Products with Therapeutic Equivalence Evaluations, 39th Edition (2019).

## III. **Production Documents**

| | |
|---|---|
| ALLERGAN_MDL_00000001 | ALLERGAN_MDL_02079795 |
| ALLERGAN_MDL_00000006 | ALLERGAN_MDL_02147111 |
| ALLERGAN_MDL_00378157 | ALLERGAN_MDL_02147315 |
| ALLERGAN_MDL_01098786 | ALLERGAN_MDL_02177059 |
| ALLERGAN_MDL_01373731 | ALLERGAN_MDL_02758853 |
| ALLERGAN_MDL_01384578 | ALLERGAN_MDL_02761472 |
| ALLERGAN_MDL_01396687 | ALLERGAN_MDL_02931208 |
| ALLERGAN_MDL_01471538 | ALLERGAN_MDL_03295845 |
| ALLERGAN_MDL_01481207 | ALLERGAN_MDL_03295860 |

ALLERGAN_MDL_03295865

ALLERGAN_MDL_03295869

ALLERGAN_MDL_03367007

ALLERGAN_MDL_03367292

ALLERGAN_MDL_03367293

ALLERGAN_MDL_03367294

ALLERGAN_MDL_03367295

ALLERGAN_MDL_03367301

ALLERGAN_MDL_03367302

ALLERGAN_MDL_03367304

ALLERGAN_MDL_03367307

ALLERGAN_MDL_03367308

ALLERGAN_MDL_03367310

ALLERGAN_MDL_03367312

ALLERGAN_MDL_03367314

ALLERGAN_MDL_03367316

ALLERGAN_MDL_03367318

ALLERGAN_MDL_03367320

ALLERGAN_MDL_03367322

ALLERGAN_MDL_03367324

ALLERGAN_MDL_03367326

ALLERGAN_MDL_03367327

ALLERGAN_MDL_03367328

ALLERGAN_MDL_03367329

ALLERGAN_MDL_03367347

ALLERGAN_MDL_04449170

ALLERGAN_MDL_04449174

ALLERGAN_MDL_04449203

ALLERGAN_MDL_04449215

ALLERGAN_MDL_04449248

ALLERGAN_MDL_04449288

ALLERGAN_MDL_04449300

ALLERGAN_MDL_04449338

ALLERGAN_MDL_04449350

ALLERGAN_MDL_04449373

ALLERGAN_MDL_04449376

ALLERGAN_MDL_04449395

ALLERGAN_MDL_04449427

ALLERGAN_MDL_04449430

ALLERGAN_MDL_04449434

ALLERGAN_MDL_04449453

ALLERGAN_MDL_04449455

ALLERGAN_MDL_04449480

ALLERGAN_MDL_04449481

ALLERGAN_MDL_04449487

ALLERGAN_MDL_04449490

ALLERGAN_MDL_04449494

ALLERGAN_MDL_04449509

ALLERGAN_MDL_04449524

ALLERGAN_MDL_04449530

ALLERGAN_MDL_04449537

ALLERGAN_MDL_04449596

ALLERGAN_MDL_04449635

ALLERGAN_MDL_04449646

ALLERGAN_MDL_04449679

ALLERGAN_MDL_04449682

ALLERGAN_MDL_04449759

ALLERGAN_MDL_04449773

ALLERGAN_MDL_04449777

ALLERGAN_MDL_04449779

ALLERGAN_MDL_04449782

ALLERGAN_MDL_04449783

ALLERGAN_MDL_04449784

ALLERGAN_MDL_04449785

ALLERGAN_MDL_04449787

ALLERGAN_MDL_04449789

ALLERGAN_MDL_04449790

ALLERGAN_MDL_04449791

ALLERGAN_MDL_SUPP_00000174

TEVA_MDL_A_04209981

ALLERGAN_MDL_04449794

ALLERGAN_MDL_04449795

ALLERGAN_MDL_04449796

ALLERGAN_MDL_04449797

ALLERGAN_MDL_04449798

ALLERGAN_MDL_04449799

ALLERGAN_MDL_04449800

ALLERGAN_MDL_04449806

ALLERGAN_MDL_04449807

ALLERGAN_MDL_04449808

ALLERGAN_MDL_04449810

ALLERGAN_MDL_04449811

ALLERGAN_MDL_04449812

ALLERGAN_MDL_04449813

ALLERGAN_MDL_04449815

ALLERGAN_MDL_04449876

ALLERGAN_MDL_04449927

ALLERGAN_MDL_04449968

ALLERGAN_MDL_04450008

TEVA_MDL_JD_000059