# Exhibit 17

Highly Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION
 3   IN RE: NATIONAL              )   MDL No. 2804
     PRESCRIPTION OPIATE          )
 4   LITIGATION                   )   Case No.
                                  )   1:17-MD-2804
 5                                )
     THIS DOCUMENT RELATES TO     )   Hon. Dan A.
 6   ALL CASES                    )   Polster
                                  )
 7
 8
 9                      — — —
10              Sunday, May 5, 2019
                        — — —
11
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
12              CONFIDENTIALITY REVIEW
                        — — —
13
14
15
16       Videotaped Deposition of MEREDITH B.
     ROSENTHAL, Ph.D., VOLUME 2, held at Robins
17   Kaplan LLP, 800 Boylston Street, Suite 2500,
     Boston, Massachusetts, commencing at
18   8:04 a.m., on the above date, before
     Michael E. Miller, Fellow of the Academy of
19   Professional Reporters, Registered Diplomate
     Reporter, Certified Realtime Reporter and
20   Notary Public.
21
22
23                      — — —
24            GOLKOW LITIGATION SERVICES
          877.370.3377 ph | fax 917.591.5672
25                 deps@golkow.com
```

Golkow Litigation Services                    Page 1 (477)

Page 202

1 detailing versus the period right before
2 generic entry?
3    A.   My model is an aggregate model,
4 so I'm looking across drugs in the entire
5 market, and those drugs are at different
6 stages in their life cycle.  And so the
7 important input to my model is the level of
8 detailing, not where it is in the course of a
9 product's life cycle.
10       But we know that the bolus of
11 detailing happens for these new products, and
12 so that is incorporated into the data.
13    Q.   So it's incorporated in the
14 sense that you'll see more contact at the
15 beginning of the life cycle than at the end
16 of the life cycle?
17    A.   That's correct.
18    Q.   But the detailing that happens
19 at the beginning of the life cycle could be
20 qualitatively different than the detailing
21 that happens at the end of the branded life
22 cycle.
23       Would you agree with that?
24       MR. SOBOL:  Objection.
25    A.   I don't know that to be true.

Page 203

1 BY MR. ROTH:
2    Q.   As an economist, I mean, when a
3 product is launched, you would expect more
4 detailing about clinical studies and things
5 designed to promote a new product that
6 physicians might be unaware of, right?
7    A.   It may be that there is more of
8 that sort of baseline information at the
9 beginning.
10    Q.   Right.  And at the end of a
11 product's life cycle, when the generics are
12 about to come on the market, you might expect
13 the detailing to focus more on things like
14 price and availability and formulary status
15 and things of that nature, right?
16    A.   I have seen no detailing
17 information that pertains to price.  I can't
18 say that it never happens, but I've certainly
19 never seen that.
20       What that sort of -- what
21 you've just described here is on the one hand
22 saying, hey, there's this new drug early on,
23 and don't forgot your old friend at the end,
24 something to that effect.  Those -- those
25 differences are not relevant to the question

Page 204

1 of does the detail generate more MMEs.
2       So for my purposes, I really
3 only want to understand does the detail
4 generate more MMEs.  And again, because I'm
5 looking at the aggregate, the fact that some
6 drugs are ending and others are beginning,
7 that -- that sort of -- that mix, it may
8 change a little bit over time, but I'll be
9 looking across a set of drugs at different
10 stages.
11    Q.   Okay.  But what I described
12 might be relevant to the question of whether
13 the detailing was lawful, correct?
14    A.   I don't know what you mean by
15 that.
16    Q.   Right.  So we've established
17 this, I think, but just to try it one more
18 time:  Because your model is just focusing on
19 whether detailing impacts the aggregate
20 number of MMEs, you don't evaluate any
21 qualitative difference in the kind of
22 detailing that is occurring?
23       MR. SOBOL:  Objection, asked
24    and answered.
25       ///

Page 205

1 BY MR. ROTH:
2    Q.   Is that a fair statement?
3       MR. SOBOL:  Asked and answered.
4    A.   I -- you had a "because" at the
5 beginning of that sentence, which doesn't
6 make sense to me.  I am not looking at the
7 content of the detailing as we talked about
8 this morning.  I am assuming the plaintiffs
9 will prove their case.
10       I understand that you think
11 differently and you're trying to probe
12 whether I've tried to disaggregate the
13 detailing.
14       I have not tried to
15 disaggregate the detailing by drug or over
16 time.  It is possible to do that, but I have
17 not done that.
18 BY MR. ROTH:
19    Q.   So in your direct model, just
20 like all MMEs are created equal, all
21 detailing contacts are created equal?
22       MR. SOBOL:  Objection.
23    A.   Again, I would acknowledge that
24 there's variation in detailing and that my
25 model captures the average effect.

Page 206

BY MR. ROTH:
Q. And it captures the average effect by treating each contact the same?
MR. SOBOL: Objection.
A. Well, I guess sort of an average effect means that sort of tautologically, I'm summing up all of the effects.
BY MR. ROTH:
Q. Does your model account for rivalrous marketing?
A. I'm so happy that we've gotten back to this.
MR. SOBOL: That makes one of us.
A. The aggregate model that I put forth is intended to essentially obscure the rivalrous marketing, so to the extent that marketing only moves people from hydrocodone to oxycodone or the other direction, whatever it is, that will show up as a noneffect in my model.
So I'm only looking at market expansion because the question I care about is market expansion.

Page 207

BY MR. ROTH:
Q. I'm not sure I followed your answer. So how does it show up as a noneffect if you're including that contact in your regression analysis, whether it was new drug promotion or rivalrous marketing?
A. I think the way you're looking at rivalrous marketing is a bit different than the way I would look at it. And this goes back to a conversation we had before where I think there was a little bit of a disconnect.
So it may well be that you go to the detail and what you want to talk about is why you're better than the other guy. But still, what happens is you actually increase the use of any product in this class.
So what I'm concerned about is not the intent of the marketing but the effect of the marketing. You seem focused on the intent.
Q. I do. But now I think you've helped me, and your answer is actually the opposite of what I understood it to be before.

Page 208

When you say that rivalrous marketing is a noneffect, what you mean is you don't assess whether the marketing was rivalrous or not, because in either case, your view is it will potentially lead to increased MMEs, so it gets counted?
MR. SOBOL: Objection, form, asked and answered.
A. I am interested only in a particular kind of impact, and that impact is an increase in the number of MMEs. If there is marketing that changes the drug people take without affecting their MMEs, then I ignore that.
Let's just say there's unlawful conduct and you earn money off of it, but it's really only because you've switched brands. That, I'm not counting, so that's a kind of rivalrous marketing effect that's not being counted in my impact assessment.
I'm only concerned about market expansion by definition. Economists can be interested in both of those things, but for my purpose, I'm only interested in market expansion.

Page 209

BY MR. ROTH:
Q. I'm just trying to understand functionally how that happens.
So the reason you're saying that is because you're only looking at the delta, the change in MMEs, and so if there's no change, then the rivalrous marketing doesn't get counted? I'm just struggling with the mechanics.
A. Sure. Let me try to explain.
If we had two drugs in the market and we looked at their marketing separately, we could ascertain whether your marketing increases your sales, right, and -- and then what we wouldn't know is, is that increase coming from new patients, or is it coming from the decrease in someone else's sales. So we could use a system kind of analysis to show what's happening.
So people have done this in prescription drugs. I know you've spent some time with the literature, and they're curious about when you increase your sales, does it come at someone else's expense or are you just growing the market. And in different

Highly Confidential - Subject to Further Confidentiality Review

Page 210

 1  drug classes, those two things seem to
 2  operate differently.
 3         But if you were to add those
 4  two drugs together and say, okay, for any
 5  herpes treatment, what's the total effect of
 6  marketing?  Then what you would get is only
 7  the market expansion effect.  You would wash
 8  out any of the market stealing because your
 9  gain is my loss.  And so those two things
10  would net out and you'd only get the net
11  result.  So that's what I'm doing here.
12     Q.    So the mechanics are because
13  it's an aggregate model that's aggregating
14  all contacts and aggregating all scripts, it
15  comes out in the wash if it's rivalrous?
16     A.    Exactly.  Rivalrous, again, my
17  definition of rivalrous is my sales come from
18  you and that those two things fully offset.
19     Q.    Okay.  But the detail itself is
20  still counted in the model, because you're
21  not actually looking substantively at the
22  detail to determine what happened?
23         MR. SOBOL:  Objection.
24     A.    That is correct.  The detail is
25  still in the model, and where the rivalrous

Page 211

 1  piece shows up is that it dampens the
 2  effectiveness of marketing that we measure.
 3  BY MR. ROTH:
 4     Q.    Okay.  We're finally on the
 5  same page then.
 6         How does your model account for
 7  unbranded marketing?
 8     A.    Well, in two ways.  In Model C,
 9  I explicitly put in some of those events.  We
10  can look at exactly which ones they are.
11     Q.    I was saving this for later,
12  but we can --
13     A.    I know, it sounds like an
14  after-lunch conversation, but the consensus
15  statement from the American Academy of Pain
16  Management and the American Pain Society, the
17  Federation of State Medical Boards
18  Guidelines, the JCAHO pain standards
19  released.
20         So these, I understand that
21  plaintiffs intend to prove they were
22  manipulated by the defendants.  So I put
23  those explicitly in Model C.
24         And then as I describe Model B
25  and my rationale and the way I interpret the

Page 212

 1  turning points is that they -- that is
 2  incorporating these many different events and
 3  tactics.
 4     Q.    So the unbranded marketing is
 5  captured by the way you do the breaks and the
 6  way you test for these five events in
 7  Model C, correct?
 8     A.    That's correct.
 9     Q.    But the unbranded marketing is
10  not captured in the detailing contacts you
11  use for your stock of promotion?
12     A.    That's correct.
13     Q.    How does your model account for
14  the peer-to-peer marketing that I think you
15  or Dr. Perri describes as a contagion
16  phenomenon in paragraph 25?
17     A.    Yeah.  So that phenomenon will
18  get picked up in marketing effectiveness,
19  because again, we're looking at aggregate
20  prescribing and not just the prescribing of
21  the targeted physicians.
22         So, you know, as -- we can go
23  back to our favorite paper by Datta and Dave,
24  they're looking at individual physicians.
25         It could well be, of course,

Page 213

 1  detailing physician A causes physician B's
 2  prescribing to increase; they're not really
 3  looking at that because they're only looking
 4  within physician.  But we, for the same
 5  reasons that I can capture market expansion
 6  appropriately, aggregating up across doctors
 7  here allows me to capture that contagion
 8  effect.
 9     Q.    We do agree, though, that at an
10  individual prescriber, individual detail
11  visit level, there could be variation in the
12  impact that visit has?
13     A.    There may be variation in the
14  impact of detailing on an individual
15  prescriber and her network and my model will
16  average that, will generate a result that
17  captures the average.
18     Q.    And we talked a little bit
19  earlier about some of the variability in the
20  way detailing occurs.  I think I used the
21  pizza example.
22         Do you remember that?
23     A.    I remember pizza.
24     Q.    Okay.  I want to come back to
25  that for a minute maybe because it's

Highly Confidential - Subject to Further Confidentiality Review

Page 214

1  lunchtime.
2       Not every detail visit occurs
3  the same way in terms of time spent and what
4  is disseminated from the pharmaceutical sales
5  representative to the doctor, correct?
6       MR. SOBOL:  Objection, asked
7    and answered.
8    A.   I would not disagree that
9  details can be different day of the week,
10 whether there's food involved, how much time.
11 BY MR. ROTH:
12   Q.   And frankly, who is detailed,
13 because it could be a prescribing doctor or
14 it could be a nurse practitioner, it could be
15 some other healthcare professional in the
16 doctor's office, right?
17   A.   Yes, that's correct.
18   Q.   And does the IQVIA data you've
19 looked at distinguish between the target of
20 the detail?
21   A.   It distinguishes between
22 office-based and hospital-based physicians,
23 but it does not distinguish by licensure as
24 you've just described.
25       And again, what I'm interested

Page 215

1  in is the aggregate impact, and therefore,
2  the average across that variation is
3  appropriately subsumed in my analysis.
4    Q.   Right.  And because you used
5  the average, whether the sales rep makes
6  contact with the prescribing doctor and
7  spends 15 minutes discussing the virtues of
8  opioids or whether the sales rep quickly
9  speaks to a nurse practitioner to leave the
10 coffee mug will get treated the same as an
11 average in your model?
12   A.   Yes.  And that is appropriate
13 if you're interested in the aggregate effect.
14 If I were interested in comparing the
15 difference between a detail with pizza versus
16 a detail without pizza, then I would want to
17 look at them.  But I'm only interested in the
18 aggregate effect.
19   Q.   Are you aware that detailing
20 could be limited to simply providing
21 literature that contains information
22 contained in the package insert or approved
23 by the FDA in promotional materials?
24       MR. SOBOL:  Objection.
25   A.   I'm not exactly sure what you

Page 216

1  mean by simply.  I think we're getting into a
2  question about what and how will be proven to
3  be unlawful.  And if the question is was
4  certain information omitted, then the fact
5  that the information that was provided was in
6  some way not challenged, to me, seems like it
7  could still be a problem.
8       But the larger issue is that I
9  think it's not appropriate to try to pull
10 these detail visits off one at a time.  If
11 there was some messaging around the utility
12 of treating patients with opioids at an
13 earlier visit and these later visits are just
14 reminder visits, again, I'm not -- I'm not
15 trying to prove liability here, but to me as
16 an economist, it seems like they could well
17 be connected.
18 BY MR. ROTH:
19   Q.   And they all count the same way
20 as the average?
21   A.   All -- all details in my data
22 are included in the right-hand side, and they
23 produce an average effect, and then I back
24 out those particular ones deemed unlawful.
25   Q.   And similarly, if the detail is

Page 217

1  corrective messaging designed to dampen the
2  effects of some prior materials that FDA has
3  issued a warning letter on, those detail
4  visits get picked up by your data as well?
5       MR. SOBOL:  Objection.
6    A.   I think you need to understand
7  what the regression is doing.  It is not just
8  saying sales are strictly promotional to
9  detailing.  It's trying to look at that
10 effect, and, in fact, in the last period of
11 my three-period model, the effective
12 promotion is declining.
13      To the extent that there's
14 corrective messaging, that may be one of the
15 factors that is decreasing the effectiveness
16 of promotion, and so there are not MMEs
17 assigned to have been produced by that
18 detail.
19 BY MR. ROTH:
20   Q.   Let me just ask a simpler
21 question:  Yes or no, are details that are
22 simply designed to provide corrective
23 messaging included in your stock of
24 promotion?
25      MR. SOBOL:  Objection, asked

Page 218

1    and answered.
2        A.   I really have no idea about
3    whether such details exist.  My model
4    includes all detailing over the period from
5    1995 to 2018 based on the instruction that I
6    was given to consider that unlawful.
7    BY MR. ROTH:
8        Q.   Okay.  Without distinguishing
9    between the quality or extent of those
10   detailing visits?
11           MR. SOBOL:  Objection, asked
12       and answered.
13       A.   I do not distinguish among
14   those details, no.
15   BY MR. ROTH:
16       Q.   And I think we talked about
17   this, but I'm not sure.
18           You don't differentiate between
19   which physician practice groups were targeted
20   by the details in your model?
21           MR. SOBOL:  Objection, asked
22       and answered.
23       A.   As I noted, my detailing
24   measure is national.  It's aggregate.  It
25   does not distinguish at a level below that.

Page 219

1    BY MR. ROTH:
2        Q.   Do you have any view as to
3    whether allegedly deceptive marketing is more
4    impactful than truthful marketing?
5        A.   I think I do discuss this in my
6    report, and there's an economic theory
7    related to the profitability of fraud and
8    some evidence from other sectors that suggest
9    that for something unlawful to be undertaken
10   when lawful activities are possible, that it
11   must be more profitable because there's some
12   cost associated with matters such as this
13   one.  And so that would suggest that that
14   kind of marketing must be more profitable
15   than marketing to other physicians.
16           I think this is -- it depends
17   on what assumptions we're making about the
18   intention and knowledge of the various
19   actors.  So I think it could go either way.
20       Q.   But within your model, within
21   the time periods of your model, you treat
22   each of the details equally because in your
23   view, you assume them all to be equally
24   unlawful at this point in time?
25           MR. SOBOL:  Objection.

Page 220

1        A.   I am, as we've noted earlier,
2    operating on the assumption that the
3    defendants' conduct during the relevant
4    period was unlawful, and my model uses a
5    single measure of detailing and therefore
6    averages across allegedly lawful and unlawful
7    details.
8    BY MR. ROTH:
9        Q.   Let's look back at Datta and
10   Dave because you asked to.
11       A.   Okay.
12       Q.   It's Exhibit 5, for the record,
13   and I -- can you turn with me to page 454.
14       A.   Okay.
15       Q.   So at the top of the page it
16   says:  Thus, detailing plays a role in
17   educating providers about newer drugs and
18   their attributes and may have information
19   value early in a product's life cycle,
20   whereas later in the life cycle, its role can
21   be predominantly persuasive and chiefly
22   relegated to delivering samples and
23   reminders.
24           Do you see that?
25       A.   I do.

Page 221

1        Q.   And then at the end of the
2    paragraph, they say:  Because detailing can
3    affect both selective (brand centric) and
4    primary (market) demand under these views --
5    citation to Dave and Kelly, 2014 -- the
6    question cannot be resolved based on theory
7    alone, and empirical evidence needs to bear
8    upon the question.
9            Do you see that?
10       A.   Yes.  Just to be clear, what
11   they're talking about there is the welfare
12   effects of marketing, and that is a separate
13   question than the one that we're discussing
14   here.
15       Q.   It's the same issue that we've
16   been going around on, right?  You're not
17   looking at the welfare, you're not looking at
18   the quality; you're just looking to see if
19   there's a correlation between detailing
20   visits as a stock of promotion against
21   MMEs --
22           MR. SOBOL:  Objection, asked
23       and answered.
24   BY MR. ROTH:
25       Q.   -- on an aggregate basis.

Page 222

 1    MR. SOBOL:  And there's a lot
 2  in there, so be careful.
 3    A.   I just want to say that the
 4  sentence that you just said had a number of
 5  pieces that I think are entirely unrelated to
 6  one another.
 7         So a welfare analysis is -- is
 8  an economic analysis that is based on the
 9  theory of demand and is -- is specific to
10  this idea that consumers make rational
11  decisions, so what he's talking about in this
12  sentence really has nothing to do with this
13  question about the quality of detailing or
14  not.
15         That sentence is not connected
16  to the "thus detailing plays a role in
17  educating providers."  They have a marketing
18  theory that you related before about what
19  happens early versus late in the life cycle,
20  but this last sentence is really just about
21  are consumers better off because of
22  promotion, or not.
23         And the way economists do a
24  welfare analysis like this one is to assume
25  that consumers are perfectly informed and

Page 223

 1  perfectly rational and that if marketing is
 2  only about stealing market share and it
 3  doesn't increase the size of the market, that
 4  consumers are worse off.  But if it does
 5  increase the size of the market, that
 6  consumers are better off.
 7         As a health economist and a
 8  person who sits in the School of Public
 9  Health, I would like to say that if this
10  marketing was only about market expansion, as
11  it seems to have been quite a bit about
12  market expansion, I don't think consumers are
13  better off as a result.  They're just
14  operating from a totally different framework.
15  BY MR. ROTH:
16    Q.   Okay.  Let's go back to the
17  first sentence, which I think was more
18  relevant.
19         They theorized that based on
20  their results, there is a difference between
21  marketing early in the life cycle and
22  marketing later in the life cycle?
23    A.   They are positing a theory
24  about the intent of marketing and the focus
25  of marketing, but they do not say anything

Page 224

 1  about whether that generates more sales at
 2  the beginning or more sales at the end.
 3         There again, they're really
 4  focused on this are you getting a new unit
 5  from a patient who hasn't been treated versus
 6  a new unit from a rival.
 7    Q.   Got it.
 8         MR. ROTH:  I think now is a
 9    decent time to take lunch.
10         THE WITNESS:  Okay.
11         THE VIDEOGRAPHER:  The time is
12    12:09 p.m.  We're now off the record.
13         (Recess taken, 12:09 p.m. to
14    12:51 p.m.)
15         THE VIDEOGRAPHER:  The time is
16    12:51 p.m.  We're back on the record.
17  BY MR. ROTH:
18    Q.   Professor Rosenthal, before
19  lunch we were talking about how your stock of
20  promotion just includes detailing visits
21  multiplied by a coefficient as a single
22  variable; is that correct?
23    A.   Just to be perfectly clear,
24  it's a cumulative sum of detailing in one
25  period -- all the preceding periods with the

Page 225

 1  depreciation rate applied.
 2    Q.   Are you aware that there are
 3  other economic studies of the effect of
 4  marketing that model detailing using multiple
 5  variables?
 6    A.   I know that detailing has been
 7  modeled as both a stock and a flow, and both
 8  at the same time.  I don't know if that's to
 9  what you're referring.
10    Q.   It may be.
11         (Whereupon, Deposition Exhibit
12    Rosenthal-7, 2002 Azoulay Publication,
13    was marked for identification.)
14  BY MR. ROTH:
15    Q.   So let me mark as Exhibit 7 the
16  Azoulay study, Do Pharmaceutical Sales
17  Respond to Scientific Evidence.
18         Do you have that in front of
19  you?
20    A.   I do.
21    Q.   And the Azoulay study is a
22  document that I think you quote from and --
23  in your report and rely on in your
24  attachment.
25    A.   That's correct.

Highly Confidential - Subject to Further Confidentiality Review

Page 522

1    A.   Yes.
2    Q.   There's a patch, right?
3    A.   Yes.
4    Q.   There's that sublingual spray?
5    A.   Yes.
6    Q.   And then there's pills and
7  injectables, for example?
8    A.   Yes.
9         MR. SOBOL:  Film.
10 BY MR. ROTH:
11   Q.   Film?
12   A.   Yes, I'm aware that there are
13 different formulations.
14   Q.   And there's also
15 immediate-release opioids and
16 extended-release opioids, correct?
17   A.   Yes, that's correct.
18   Q.   And for the purpose of your
19 models, apart from the injectables, all of
20 those various forms of opioids are included?
21   A.   Yes, that's correct.
22   Q.   Did the manufacturers'
23 marketing budgets that you reviewed show
24 increased marketing spending over time?
25   A.   As I sit here, I don't recall.

Page 523

1    Q.   Would you agree that if the
2  depreciation rate augments the stock of
3  detailing over time, it would be irrational
4  to keep spending money on promotion?
5         MR. SOBOL:  Objection.
6    A.   No, I don't think that that
7  would be a conclusion that I would agree
8  with.
9  BY MR. ROTH:
10   Q.   And why not?
11   A.   The more effective your
12 marketing is, the more you want to spend on
13 it.
14        MR. SOBOL:  An answer I
15     understood.
16 BY MR. ROTH:
17   Q.   We spoke briefly about your
18 errata yesterday.  Can you just tell me how
19 did that errata come about?
20   A.   That came about from review
21 partly, my very careful review as I was
22 preparing for this deposition, and the staff
23 doing the same.
24   Q.   Got it.
25        And then why did it come in the

Page 524

1  form of a memo from Mr. McCluer to you and
2  Mr. Sobol?
3    A.   I'm not sure I can answer that
4  question.
5    Q.   But it sounds like the errors
6  were identified some by you and some by the
7  staff?
8    A.   Yes, that's correct.
9    Q.   Do you know who caught the
10 Table 3 error?
11   A.   That was me.
12   Q.   I feel bad for the staff on
13 that one.  And what about the --
14   A.   I'm not the yelling type.
15   Q.   And what about the statistical
16 significance error, was that you or the
17 staff?
18   A.   That was the staff.
19   Q.   Let's turn to your indirect
20 model.
21   A.   Okay.
22   Q.   So you talk about your indirect
23 model beginning at paragraph 78 of your
24 report.
25        And I guess just taking a step

Page 525

1  back before we get into specifics:  Do you
2  have a preference for your direct over your
3  indirect model in this case?
4    A.   I believe they have strengths.
5  Each of them has strengths, so in my
6  opinions, I have not favored one over the
7  other.
8    Q.   In general when you perform
9  regression analysis, do you have any
10 preference for a direct approach versus an
11 indirect approach?
12   A.   No preference.  I think these
13 kinds of models are really context specific.
14   Q.   And if you look at page 53,
15 paragraph 78, you start by saying:  As noted
16 earlier, the direct method of estimation is
17 limited in part by the extent to which we can
18 measure and include in the models all of the
19 tactics allegedly employed by defendants,
20 including manipulation of various
21 professional societies and accrediting
22 bodies.
23        Did I read that correctly?
24   A.   Yes, you did.
25   Q.   And that's based on the

Page 526

1 allegations that you reviewed?
2    A.   That's correct.
3    Q.   Would you agree that if a
4 defendant did not engage in promotion other
5 than the detailing measured by the IPS data,
6 the direct model would be a more appropriate
7 measure of that particular defendant's impact
8 on the aggregate MMEs?
9    A.   My assignment was to calculate
10 aggregate impact, so I have not considered
11 how to calculate impact for a single
12 defendant.
13        As we talked about yesterday, I
14 think there are some complicated questions
15 about how to deal with the spillover effect,
16 so I have not undertaken to do that.
17    Q.   As we've discussed fairly
18 exhaustively, your direct Model B explains
19 over 99% of the variation in MME sales based
20 on the detailing data in IQVIA.
21    A.   Yes, it does.
22    Q.   Does that not suggest that the
23 effect of all of these other types of
24 promotion is negligible at best?
25    A.   It may well be the case that

Page 527

1 the amount of variation that is picked up by
2 a broader measure of promotion would not be
3 so much more. The indirect model is
4 conceptually quite different, however.
5    Q.   So if you compare Table 5,
6 which is on page 61 -- let's take a step
7 back, lay some foundation.
8    A.   Sure.
9    Q.   So Table 5 on page 61 is the
10 output of your indirect model, correct?
11    A.   It is.
12    Q.   Okay. We talked yesterday
13 about Table 2, which is the output of your
14 direct model and appears on page --
15    A.   Should I bend the corner so we
16 can go back and forth?
17    Q.   Yes, good idea.
18        So I want to compare the direct
19 output in Table 5 on page 61 -- sorry, strike
20 that.
21        I want to compare the indirect
22 model output in Table 5 on page 61 with the
23 direct model output in Table 2 on page 51.
24    A.   Okay.
25        MR. SOBOL: Do we have a graph

Page 528

1 of this somewhere?
2        THE WITNESS: Not in my report.
3        MR. ROTH: Just for you. I
4 don't think we've seen that. I would
5 love to see it.
6 BY MR. ROTH:
7    Q.   So looking at the two tables
8 next to each other, I guess just first taking
9 the bottom line, in Table 2, the direct Model
10 B estimates that ▇▇▇ of MMEs are
11 attributable to defendants' detailing.
12        Do you see that?
13    A.   Yes.
14    Q.   And in Table 5, the indirect
15 method suggests that ▇▇ of MME shipments are
16 attributable to defendants' detailing; is
17 that right?
18    A.   That's correct.
19    Q.   So that's a ▇▇ delta -- well,
20 that's a bad question because that's not how
21 math works.
22        MR. SOBOL: Right.
23 BY MR. ROTH:
24    Q.   It's ▇▇ higher -- well, the
25 numbers are what they are, but it's ▇▇

Page 529

1 and ▇▇ -- it's actually ▇▇ higher, I think,
2 if I'm doing the math right.
3    A.   It is ▇ percentage points or
4 about ▇▇ higher than the direct estimate.
5    Q.   You said it better than I
6 could.
7        How is that possible given that
8 you had a 99% R-squared in the direct model
9 that your indirect model could estimate twice
10 as much impact by defendants' promotion?
11    A.   As I mentioned, they are
12 conceptually very different kinds of
13 analyses, so whether or not detailing
14 explains the vast majority of the variation
15 in sales, it does not account for -- it
16 accounts for a smaller percentage of total
17 sales, so the magnitude of effect is not the
18 same thing as the amount of variation
19 explained, right?
20        And the indirect model takes
21 the position that there are these long run
22 factors that may -- that we can see are
23 relevant to demand in -- across areas, and if
24 we extend those forward, looking at the
25 growth in MMEs only as a result of those

Page 530

1 factors, that's another version of what the
2 world would have been like.
3         It assumes, again, that the
4 drivers of the massive growth we saw were
5 only related to defendant promotion, and so
6 it allows defendant promotion to affect sales
7 in a broader way than the direct model does.
8     Q.   In the direct model, I believe
9 you went through 2018; is that right?
10    A.   Yes.  There were differences in
11 data availability, so yes.
12    Q.   Right.  So that was what I was
13 going to ask you.
14        Direct goes through 2018,
15 indirect only goes through 2016?
16    A.   Yes.  And as I'm sure we'll get
17 to also, because the ARCOS data start in
18 1997, I do, I backcast for '95 and '96, but
19 really I'm starting in 1997.
20    Q.   Got it.  So direct, you go '95
21 to 2018; indirect, you go from '97 to 2016.
22    A.   That's correct.
23    Q.   Okay.  And that's just because
24 of just data limitations?
25    A.   That's correct.

Page 531

1     Q.   If you had the other years, you
2 would use them in the indirect model?
3     A.   That's correct.
4     Q.   If you look at paragraph 82 of
5 your report, you describe your indirect model
6 as a form of residual analysis.
7         Do you see that?
8     A.   Yes.
9     Q.   And can you explain what a
10 residual analysis is?
11    A.   Well, a residual is the
12 leftover part, and so a residual analysis is
13 an analysis that draws inferences not from
14 something included, but something excluded.
15    Q.   Sort of like in accounting,
16 when you depreciate something, what's left
17 after you've depreciated it is the residual?
18    A.   Is it?  Yeah, perhaps.
19    Q.   Except if the depreciation
20 somehow appreciates, but we won't go there
21 again.
22        What is the baseline of your
23 indirect model?
24    A.   The baseline for the indirect
25 model as I just mentioned is the 1997 level

Page 532

1 of MMEs.
2     Q.   And you chose that because that
3 was the earliest year available in ARCOS?
4     A.   Yes, that's correct.
5     Q.   How did you construct the
6 explanatory variables you used in the
7 indirect model?
8     A.   The explanatory variables come
9 from a variety of sources that I think we
10 reviewed at a very high level yesterday.
11 They're county level -- we haven't exactly
12 talked about.  So this is a county level
13 cross-sectional analysis and we bring in data
14 from a variety of government economic sources
15 and other sources to capture county-level
16 information.
17    Q.   And we spoke about this a
18 little yesterday with respect to Professor
19 Cutler.
20    A.   Yes.
21    Q.   But the same question for you:
22 Why did you decide to use national data and
23 do a national model for direct regression,
24 but then do your indirect regression analysis
25 based on county-level data?

Page 533

1         MR. SOBOL:  Objection, asked
2     and answered.
3     A.   Sure.  The time series analysis
4 that I did is appropriately done at the
5 national level.  We're trying to calculate
6 national aggregate impact and the factors
7 that drive sales over time make sense to do
8 in -- at a national level there.  We don't
9 have promotional data at a county level, so
10 it would not be possible to do a direct model
11 at this level.
12        On the other hand, and this is
13 why the indirect model complements the direct
14 model, we can look cross-sectionally at
15 variation in these socioeconomic and
16 demographic variables because there's a fair
17 amount of cross-sectional variation, and get
18 reasonably precise estimates of the effect of
19 those factors on MMEs.
20        And so the cross-sectional
21 model works at the county level, and then
22 rather than having to estimate the effects of
23 those variables over time, we can trend them
24 forward based on the cross-sectional
25 analysis.