# Exhibit 19

Highly Confidential - Subject to Further Confidentiality Review

0   01


2     `     IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF OHIO

4                EASTERN DIVISION

5     -----------------------------X

      IN RE: NATIONAL PRESCRIPTION  MDL No. 2804

6     OPIATE LITIGATION,

                              Case No. 17-MD-2804

7     This document relates to:

8     All Cases                    Hon. Dan A. Polster

9     -----------------------------X

10              * HIGHLY CONFIDENTIAL *

11    * SUBJECT TO FURTHER CONFIDENTIALITY REVIEW  *

12              VIDEOTAPED DEPOSITION

13                    OF

14              LACEY R. KELLER

15            New York, New York

16           Thursday, June 13, 2019

17

18

19

20

21

22

23


      Reported by:

24    ANNETTE ARLEQUIN, CCR, RPR, CRR, RSA

25

Page 50

2  So as I understand your opinions,
3 they are opinions from a data science point
4 of view that say if you ran these metrics,
5 here's what the results would look like.
6  Is that a fair assessment at a
7 very, very high level?
8  MS. CONROY: Objection.
9  You can answer.
10  A.  I would say that's a fair
11 assessment.  I was asked to apply the
12 compliance metrics to the labeler's data,
13 including chargebacks and IMS, IQ, yeah.
14  Q.  And you don't intend to offer any
15 opinions about which one of those metrics
16 is the right one, do you?
17  A.  That is correct.  I don't endorse
18 any of the metrics or not endorse.
19 Agnostic would be the correct term, yeah.
20  Q.  Okay.  And you're not going to
21 offer any opinions that a particular
22 registrant should have or is required to
23 employ which ones of the metrics?  That is
24 not what you were retained to do, correct?
25  A.  That is correct.

Page 51

2  Q.  And that is beyond your expertise
3 to do.
4  Do you agree with that?
5  A.  That is correct.
6  Q.  And I think, if I'm reading your
7 report correctly, you don't take any
8 opinion as to what the DEA or the
9 Controlled Substances Act means when it
10 talks about suspicious orders.
11  You are not taking a position as
12 to what specifically the DEA means, right?
13  A.  Yes, I believe that's right.
14  Q.  And I think it can make our day
15 easier if I understand the scope of this.
16  What you have done is you've used
17 a number of different metrics to show that
18 if a particular defendant had looked at the
19 data this way, this is what that defendant
20 would have seen.
21  Is that fair?
22  A.  Yes.
23  Q.  And when you use the term
24 "suspicious," which you do quite a number
25 of times in your report, what you mean by

Page 52

2 that is the result of your own metrics,
3 right?
4  A.  Yes, you can characterize it that
5 way.
6  Q.  You don't mean to use
7 "suspicious" as a technical term meaning
8 suspicious under the Controlled Substances
9 Act, right?
10  MR. LEDLIE:  Object to the form.
11  You can answer.
12  A.  Yes, when I say "suspicious," I
13 mean that they have either triggered one of
14 the metrics, which are -- I'll leave it at
15 that.
16  Q.  Okay.  And you haven't, you
17 haven't gone -- have you ever met with
18 anyone from DEA about this case and your
19 report?
20  A.  I have not met with anyone about
21 this case or my report from the DEA.
22  Q.  Okay.  Why do you hesitate?
23  A.  I have spoken to DEA officials
24 about the ARCOS data and how to process it,
25 but clarifying questions of what does an S

Page 53

2 mean and what does this correction number
3 mean like...
4  Q.  Okay.  When you have spoken to
5 the DEA, it has been entirely in the
6 context of the data itself, correct?
7  A.  Absolutely.
8  Q.  You've never asked anyone from
9 DEA, "Do these various metrics make sense
10 to you"?  You've never asked that question?
11  A.  Never.
12  Q.  And you've never asked anybody
13 from DEA, "Are these metrics in line with
14 what DEA expects or requires"?  That's
15 nothing you've ever asked the DEA, correct?
16  A.  That is correct.
17  Q.  And that wasn't -- the point of
18 your report is not to say what the DEA
19 requires, but rather to say what the data
20 had available for people to look at.
21  Is that a proper simplification?
22  MS. CONROY:  Objection.
23  You can answer.
24  A.  I would say, yes, it was what
25 data was available to apply the -- what

Page 86

2 them separately, correct?
3    A.  That is correct.
4    Q.  And the reason you didn't is
5 because you were asked to assume these
6 groupings and to present the data this way;
7 is that right?
8      MS. CONROY:  Objection.
9    A.  Yes or from our own
10 understanding.  Yes.
11    Q.  Well, that's what I want to know.
12 Which one was it?
13      With Allergan specifically,
14 because that's my client, were you asked to
15 group it with Teva or did you independently
16 decide to do it that way?
17    A.  I would say it would be most
18 correct to say that we had grouped them
19 from doing this for a long time and that it
20 was agreed upon that that was okay.
21    Q.  Okay.
22    A.  So the data doesn't come that
23 way.  I have to process it and do the
24 groupings.  We presented the groupings.  We
25 continued with those groupings as agreed

Page 87

2 upon.
3      Does that help?
4    Q.  And so when you talk in table 7,
5 for example, about Allergan and you do
6 break it out for table 7, what is the
7 difference there in Allergan and Teva?
8 What Allergan products?
9    A.  I'm sorry, table 7?
10    Q.  I'm sorry, my fault.  Let me
11 reask the question.
12      Table 6.  I keep saying 7, but
13 it's table 6.
14      In table 6 on page 28, what I
15 really would like to understand is what you
16 understand the difference between Allergan
17 and Teva in that table?
18    A.  So for that table, I think there
19 were -- the purpose of this table is to
20 show compliance metrics over time, and so
21 there were differences over time.
22      And so to the extent that we
23 could help show that granularity, that was
24 the purpose of breaking them apart.
25    Q.  But you didn't ask -- you

Page 88

2 didn't -- you were not asked to and you
3 didn't look specifically at Allergan?
4      MS. CONROY:  Objection.
5    A.  As far as we were presenting
6 results, let's say, ala, table 1 and 2,
7 correct.
8    Q.  Now beginning on page 16 in
9 Section J, you describe your compliance
10 metric application.
11      Are you with me?
12    A.  Yes.
13    Q.  And you state in paragraph 51, "I
14 was instructed by counsel to apply metrics
15 derived and used by any manufacturer or
16 distributor and also to apply metrics
17 applied in enforcement actions, McKesson
18 and Masters, to all data sets to detect
19 prescribing and purchasing patterns of
20 unusual size, frequency and pattern."
21      Do you see that?
22    A.  I do.
23    Q.  When you say "I was instructed by
24 counsel," who does that refer to?  What
25 counsel?

Page 89

2    A.  That would refer to Linda Singer.
3    Q.  And so when we talk about
4 counsel, it's Linda Singer who asked you to
5 do these various metrics that we are going
6 to talk about in a minute?
7    A.  Linda Singer provided us with the
8 assignment, yes.
9    Q.  In No. 1 -- well, this term that
10 is used in the end of paragraph 51,
11 "patterns of unusual size, frequency and
12 pattern" and there is a cite there, what is
13 that cite?  Do you know?
14    A.  I understand that to be the Code
15 of Federal Regulations when it comes to
16 diversion, but I'd have to have the actual
17 language in front of me to know.
18    Q.  I don't mean to give you a memory
19 quiz on the cites.  That is not the purpose
20 of the question.
21      There are no specific
22 requirements for how a registrant is
23 supposed to calculate patterns of unusual
24 size, frequency, and purchasing patterns of
25 a -- sorry, let me ask the question again.

Page 90

2 You are not aware of any specific
3 rules or regulations for a registrant on
4 how to calculate patterns of unusual size
5 or frequency, correct?
6 A. So I think, as I stated earlier,
7 that's not my area of expertise.
8 Q. And you're not aware of any?
9 A. I wouldn't be able to say, but...
10 Q. Okay. The first metric that you
11 employ is double the national average. And
12 I'm looking now on page 17.
13 A. Correct.
14 Q. Are you with me?
15 And that metric, again, was one
16 that Linda Singer asked you to do, correct?
17 A. Correct.
18 Q. And you didn't find it in any DEA
19 regulations?
20 A. Correct.
21 Q. You are not aware of any place in
22 the real world where this metric is used,
23 correct?
24 MS. CONROY: Objection.
25 A. I wouldn't know for sure.

Page 91

2 Q. Do you have a guess?
3 MS. CONROY: Objection.
4 A. No.
5 Q. Okay. And you are -- I think you
6 already answered this earlier, but you are
7 not offering any opinion that this metric
8 is somehow a requirement on registrants,
9 right? That is not your opinion?
10 A. Correct. That's not my area of
11 expertise.
12 Q. And you are not offering an
13 opinion that failure to employ this metric
14 is somehow unlawful or misconduct?
15 That is beyond your expertise,
16 correct?
17 A. Correct.
18 Q. Going to the second metric that
19 you applied, triple national average,
20 again, that metric you were asked to run by
21 Linda Singer, correct?
22 A. Correct.
23 Q. That did not come from any DEA
24 guidance or any DEA regulations, correct?
25 A. Correct.

Page 92

2 Q. You do not know of any place in
3 the real world that applies that average,
4 correct?
5 MS. CONROY: Objection.
6 A. I wouldn't know.
7 Q. And it is not your opinion that
8 any registrant should have or had any
9 requirement to employ that metric in the
10 real world? That is not the opinion you're
11 offering in this case, correct?
12 A. Correct, that's not my area of
13 expertise.
14 Q. Looking at No. 3, the McKesson
15 8,000 rule, again -- I apologize if this is
16 getting tedious. The McKesson 8,000 rule
17 is a metric that you are asked to apply by
18 Linda Singer, correct?
19 A. Correct.
20 Q. And you were asked to look at
21 what would the data show if you used this
22 set of assumptions, right?
23 MS. CONROY: Objection.
24 A. Yes.
25 Q. Like No. 1 and 2, the McKesson

Page 93

2 8,000 rule is not a metric that you have
3 ever seen in any DEA guidance or
4 regulation, correct?
5 A. I think that's correct.
6 Q. Are you aware of any limitation
7 anywhere in the DEA regulations or in the
8 Controlled Substances Act or any guidance
9 interpreting them that puts a specific
10 limitation on dosage units?
11 MS. CONROY: Objection.
12 A. I would say that's outside of my
13 expertise.
14 Q. And it is not your opinion in
15 this case that any particular defendant was
16 required or obligated to employ this metric
17 in running its business, correct?
18 A. That's correct. That's outside
19 of my expertise.
20 Q. Even with respect to McKesson, it
21 is outside your area of expertise to say
22 that anybody, McKesson or anybody else, had
23 a duty to run a metric in the way that you
24 have, right?
25 A. Yes, I believe that is correct.

Page 94

1
2      Q.   Going down to No. 4, Maximum
3   Monthly Trailing Six-Month Threshold, which
4   in parentheses says, quote, "common sense."
5      I think you told me this before
6   the break, common sense is not a term that
7   you came up with, right?
8      A.   Correct.  I've heard this rule
9   referred to colloquially as the common
10  sense rule.
11     Q.   Who have you heard that
12  colloquially?  Who has referred to this
13  rule as the common sense rule?
14     A.   I honestly couldn't remember.
15  It's been -- I've heard it so many times
16  that I --
17     Q.   Had you heard it from lawyers in
18  the case?
19     A.   Sure.
20     Q.   Have you ever heard it from DEA?
21     A.   No.  Like I said, I only spoke to
22  the DEA about the ARCOS data.
23     Q.   Okay.  And it is not your opinion
24  in this case that this metric is the most
25  sensible metric?  Even though the term

Page 95

1
2   might suggest that, that's actually not
3   your opinion in this case.  Am I right
4   about that?
5      A.   That's correct.
6      Q.   Okay.  Have you read the Masters
7   Pharmaceutical opinion from the D.C.
8   circuit in 2017?
9      A.   I think I skimmed it a while ago.
10     Q.   You don't intend to offer any
11  opinions about what the law is as a result
12  of that opinion, correct?
13     A.   That's correct.
14     Q.   And you don't intend to offer any
15  opinions as to what the law might require
16  as a result of that opinion, do you?
17     A.   That's correct.
18     Q.   Okay.  Sorry, back to the common
19  sense threshold.  That is not a threshold
20  that came from -- where did that threshold
21  come from?
22     A.   Do you mean where was the metric
23  derived or?
24     Q.   Yes.  Where was metric derived?
25     A.   So I have it -- whatever citation

Page 96

1
2   I have there, that's where it would have
3   been derived from.
4      Q.   And beyond that, you don't know
5   anything other than you were asked to run
6   it, correct?
7      A.   Yeah, I was asked to review the
8   metric and implement it on the data.
9      Q.   With respect to the Qualitest
10  Endo 25/50 percent national average, that
11  metric also came -- that metric was
12  presented to you by the attorneys as
13  something that you should run based on
14  documents that you were provided, correct?
15     A.   It was either a metric that we
16  found or the attorneys provided.  I
17  honestly can't remember.
18     Q.   And for this metric, which was
19  it?  Did you stumble across a document and
20  say, hey, we should run this?  Or did the
21  attorneys provide you documents and say
22  based on these documents, we'd like for you
23  to run it as if this were the law of the
24  land?
25         MS. CONROY:  Objection.

Page 97

1
2      A.   I'd really have to review my
3   notes to know for sure.  I don't remember.
4      Q.   Okay.  And you don't recall
5   seeing this metric in any directive from
6   DEA or any guidance from DEA?  That's not
7   your opinion in this case?
8      A.   That's correct.  I don't recall
9   seeing it in any guidance, nor is it my
10  opinion to offer.
11     Q.   And I think, to short-circuit
12  this, if we look at page 19, 20, 21, and 22
13  of your report, those list other metrics
14  that you were asked to run, correct?
15     A.   Yes.  I would say I was asked to
16  review the documents, interpret the metrics
17  and run them on the data.
18     Q.   You will not offer any opinion in
19  this case as to whether these metrics are
20  appropriate for a registrant to do in real
21  life, whether a registrant should have done
22  them or had any requirement to do them in
23  real life?  That is outside of the scope of
24  the opinions you intend to offer in this
25  case, correct?